SPECIAL

# United States District Court
## Eastern District of Pennsylvania (Philadelphia)
## CIVIL DOCKET FOR CASE #: 2:20–cv–01463–GEKP

PRYOR et al v. MONSANTO COMPANY et al
Assigned to: HONORABLE GENE E.K. PRATTER
Cause: 28:1332 Diversity–Product Liability

Date Filed: 03/17/2020
Jury Demand: Plaintiff
Nature of Suit: 367 P.I.: Health
Care/Pharmaceutical Personal Injury
Product Liability
Jurisdiction: Diversity

**Plaintiff**

**JOHN PRYOR**

represented by **SASHA B. COFFINER**
RIEDERS TRAVIS HUMPHREY
WATERS & DOHEMANN
161 WEST THIRD ST
WILLIAMSPORT, PA 17701
570–323–8711
Email: scoffiner@gmail.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**DEBORAH PRYOR**

represented by **SASHA B. COFFINER**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**MONSANTO COMPANY**

**Defendant**

**JOHN DOES 1–50**

| Date Filed | # | Docket Text |
|---|---|---|
| 03/17/2020 | 1 | COMPLAINT against JOHN DOES 1–50, MONSANTO COMPANY ( Filing fee $ 400 receipt number PPE213074.), filed by JOHN PRYOR, DEBORAH PRYOR.(bw, ) (Entered: 03/18/2020) |
| 03/17/2020 | | DEMAND for Trial by Jury by DEBORAH PRYOR, JOHN PRYOR. (bw, ) (Entered: 03/18/2020) |
| 03/17/2020 | | 1 Summons Issued as to MONSANTO COMPANY. Forwarded To: COUNSEL on 3/18/2020 (bw, ) (Entered: 03/18/2020) |
| 04/28/2020 | 2 | WAIVER OF SERVICE Returned Executed by JOHN PRYOR, DEBORAH PRYOR. MONSANTO COMPANY waiver sent on 4/2/2020, answer due 6/1/2020. (RIEDERS, CLIFFORD) (Entered: 04/28/2020) |

## UNITED STATE DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JOHN PRYOR and DEBORAH PRYOR, | : | |
| | : | |
| | : | CIVIL ACTION NO. |
| Plaintiffs | : | |
| | : | JUDGE |
| vs | : | 20      1463 |
| | : | |
| | : | COMPLAINT AND |
| MONSANTO COMPANY and JOHN | : | DEMAND FOR JURY TRIAL |
| DOES 1-50, | : | |
| | : | |
| Defendants | : | |

## COMPLAINT

Plaintiffs, John Pryor and Deborah Pryor ("Plaintiffs"), by and through their undersigned attorneys, hereby bring this Complaint for damages against Defendants Monsanto Company and John Does 1-50 and allege the following

### NATURE OF THE CASE

1    This is an action for damages suffered by Plaintiff John Pryor which were factually caused by Defendants' negligent and wrongful conduct in connection with the design, development, manufacture, testing, packaging, promoting, marketing, advertising, distribution, labeling, and/or sale of the herbicide Roundup®, containing the active ingredient glyphosate

2    Plaintiffs maintain that Roundup® and/or its active ingredient glyphosate is defective, dangerous to human health, unfit and unsuitable to be marketed and sold in commerce and lacked proper warnings and directions as to the dangers associated

I

with its use   Plaintiffs maintain that the dangers of Roundup were not known or acceptable to the average and ordinary consumer, including plaintiff, under the "consumer expectations test "  The likelihood and seriousness of severe injury or death caused by the product outweighs the burden or costs of taking precautions, under the "risk-utility standard " *See Tincher v  Omega-Flex*, 104 A  3d 328,  385-91 (Pa  2014).

3.      Plaintiff's injuries, like those striking thousands of similarly situated victims across the country, were avoidable

## JURISDICTION AND VENUE

4      The Court has jurisdiction over Defendant and this action pursuant to 28 U.S C § 1332 because there is complete diversity of citizenship between Plaintiffs and Defendants  Defendants are all either incorporated and/or have their principal place of business outside of the state in which the Plaintiffs reside

5.      The amount in controversy between Plaintiffs and Defendants exceeds $75,000, exclusive of interest and cost

6      The Court has also supplemental jurisdiction pursuant to 28 U S C § 1367.

7      Venue is proper within this district pursuant to 28  U S C  § 1391 Defendants conduct in business in the Eastern District of Pennsylvania, selling, advertising and promoting Roundup products at issue in this lawsuit in this judicial district

8      Defendants transacted and conducted business both within the State of Pennsylvania and within the Eastern District of Pennsylvania that relates to the allegations in this Complaint, specifically within the Eastern District of Pennsylvania

9     Defendants advertise and sell goods, specifically Roundup, within the Eastern District of Pennsylvania

10     Upon best information and belief, Defendants derived substantial revenue from its Roundup goods and products sold in the State of Pennsylvania, specifically within the Eastern District of Pennsylvania

11.     Defendants expected or should have expected their acts to have consequences within the State of Pennsylvania, as Defendant derived substantial revenue from interstate commerce

## PARTIES

12.     Plaintiffs John Pryor and Deborah Pryor are natural persons and at all relevant times residents and citizens of the Commonwealth of Pennsylvania, Lycoming County  Plaintiffs bring this action for injuries sustained by exposure to Roundup® ("Roundup") containing the active ingredient glyphosate and surfactant POEA, to which Mr  Pryor was exposed in a pesticide application, mixing and spraying Roundup for the purpose of maintaining his property which he owned and resided on

13     Mr. Pryor's exposure to Roundup was the factual cause of his development of Non-Hodgkin's follicular lymphoma (NHL)

14     Mr  Pryor was diagnosed with NHL on September 16, 2019, based on the results of a pathology report of UPMC Presbyterian Shadyside (his treating medical institution) and later communicated to Plaintiff

15     Defendant Monsanto Company ("Monsanto") is incorporated in the State of Delaware with a principal place of business in St. Louis, Missouri.

16     Monsanto is a major producer of pesticides and genetically modified crops   Defendant Monsanto engaged in the business of designing, developing, manufacturing, testing, packaging, marketing, distributing labeling, and/or selling Roundup pesticide products

17     "Roundup" refers to all formulations of Defendants' Roundup products, including, but not limited to, Roundup Concentrate Poison Ivy and Tough Brush Killer 1, Roundup Custom Herbicide, Roundup D-Pak herbicide, Roundup Dry Concentrate, Roundup Export Herbicide, Roundup Fence & Hard Edger 1, Roundup Garden Foam Weed & Grass Killer, Roundup Grass and Weed Killer, Roundup Herbicide, Roundup Original 2k herbicide, Roundup Original II Herbicide, Roundup Pro Concentrate, Roundup Pro Herbicide, Roundup Promax, Roundup Quik Stik Grass and Weed Killer, Roundup Quikpro Herbicide, Roundup Rainfast Concentrate Weed & Grass Killer, Roundup Rainfast Super Concentrate Grass & Weed Killer, Roundup Ready-to- Use Weed & Grass Killer  Roundup Ready-to-Use Weed & Grass Killer 2, Roundup Ultra Dry, Roundup Ultra Herbicide, Roundup Ultramax, Roundup VM Herbicide, Roundup Weed & Grass Killer Concentrate, Roundup Weed & Grass Killer Concentrate Plus, Roundup Weed & Grass killer Ready-to-Use Plus, Roundup Weed & Grass Killer Super Concentrate, Roundup Weed & Grass Killer1 Ready-to-Use, Roundup WSD Water Soluble Dry Herbicide Deploy Dry Herbicide, or any other formulation containing the active ingredient glyphosate

18.     Upon best information and belief, Defendant, John Does 1-50 are subsidiaries, partners, or other entities that were involved in the design, development, manufacture, testing, packaging, promoting. marketing, advertising, distribution, labeling, and/or sale of the herbicide Roundup, containing the active ingredient glyphosate  The identities of John Does 1-50 are unknown to Plaintiffs at this time. Plaintiffs will move the Court to specifically name John Does 1- 50 as their identities become known to Plaintiffs through discovery

19      Defendants Monsanto Company and John Does 1-50 are collectively referred to as "Monsanto Defendants" or as "Defendants "

20      Upon information and belief, Defendants did act together to design, sell, advertise, manufacture and/or distribute Roundup, with full knowledge of its dangerous and defective nature

## FACTUAL ALLEGATIONS

21      At all relevant times, Defendants were in the business of, and did, design, research, manufacture, test, advertise, promote, market, sell, distribute, and/or have acquired Roundup and are responsible for Defendants who have designed, researched, manufactured. tested, advertised, promoted, marketed, sold, and distributed the commercial herbicide Roundup

22.     Monsanto is a multinational agricultural biotechnology corporation based in St Louis, Missouri  It is the world's leading producer of glyphosate, the active ingredient in Roundup

23     Defendant discovered the herbicidal properties in glyphosate during the 1970's and subsequently began to design, research, manufacture, sell, and distribute glyphosate based "Roundup" as a broad-spectrum herbicide.

24     Glyphosate is the active ingredient in Roundup

25     Glyphosate is a broad-spectrum herbicide used to kill weeds and grasses known to compete with commercial crops grown around the globe

26     Glyphosate is a "non-selective" herbicide, meaning it kills indiscriminately based only on whether a given organism produces a specific enzyme, 5-enolpyruvylshikimic acid 3- phosphate synthase, known as EPSP synthase

27     Glyphosate inhibits the enzyme 5-enolpyruvylshikimic acid 3-phosphate synthase that interferes with the shikimic pathway in plants, resulting in the accumulation of shikimic acid in plants and tissue and ultimately plant death

28     When sprayed as a liquid, plants absorb glyphosate directly through their leaves, stems, and roots, and detectable quantities accumulate in the plant tissues

29     Each year, approximately 250 million pounds of glyphosate are sprayed on crops, commercial nurseries, suburban lawns, parks, and golf courses  This increase in use has been driven largely by proliferation of genetically engineered crops, crops specifically tailored to resist the activity of glyphosate

30     Defendant is intimately involved in the development, design, manufacture, marketing, sale, and/or distribution of genetically modified ("GMO") crops, many of which are marketed as being resistant to Roundup i e , "Roundup Ready® " As of 2009, Defendants the world's leading producer of seeds designed to be

Roundup Ready® In 2010, an estimated 70% of corn and cotton, and 90% of soybean fields in the United States contained Roundup Ready® seeds

31    The original Roundup, containing the active ingredient glyphosate, was introduced in 1974 Today, glyphosate products are among the world's most widely used herbicides Monsanto's glyphosate products are registered in more than 130 countries and are approved for weed control in more than 100 crops No other herbicide active ingredient compares in terms of number of approved uses [1]

32    For nearly 40 years, farmers across the globe have used Roundup, unaware of its carcinogenic properties

## REGISTRATION OF HERBICIDES UNDER FEDERAL LAW

33    The manufacture, formulation and distribution of herbicides, such as Roundup, are regulated under the Federal Insecticide, Fungicide and Rodenticide Act ("FIFRA"), 7 U S C § 136 *et seq* FIFRA requires that all pesticides be registered with the Environmental Protection Agency ("EPA) prior to their distribution, sale, or use, except as described by FIFRA 7 U S C 136a(a)

34    The EPA requires as a part of the registration process, among other requirements, a variety of tests to evaluate the potential for exposure to pesticides, toxicity to people and other potential non-target organisms, and other adverse effects on the environment Registration by the EPA, however, is not an assurance or finding of safety The determination the EPA makes in registering or re-registering a product is not that the product is "safe," but rather that use of the product in accordance with its

Backgrounder History of Monsanto's Glyphosate Herbicides, June 2005

label directions "will not generally cause unreasonable adverse effects on the environment " 7 U S C § 136(a)(c)(5)(D)

35      FIFRA defines "unreasonable adverse effects on the environment' to mean "any unreasonable risk to man or the environment, taking into account the economic, social, and environmental costs and benefits of the use of any pesticide " 7 U S C § 136 (bb)  FIFRA thus requires the EPA to make a risk/benefit analysis in determining whether a registration should be granted or allowed to continue to be sold in commerce

36.      The EPA and the State of Pennsylvania registered Roundup for distribution, sale, and manufacture in the United States and the State of Pennsylvania

37      FIFRA generally requires that the registrant, Monsanto, conduct health and safety testing or pesticide products  The government is not required, nor is it able, to perform the product tests that are required of the manufacturer

38      Monsanto misrepresented the safety of its Roundup product to the EPA, when it knew and/or had reason to know of the product's dangerous properties, including Roundup's propensity to cause NHL

39      The evaluation of each pesticide product distributed, sold, or manufactured is completed at the time the product is initially registered  The date necessary for registration of a pesticide has changed over time  The EPA is in the process of re-evaluating all pesticide products through a Congressionally-mandated process called 're-registration "7 U S C § 136a-1  In order to reevaluate these pesticides, the EPA demands the completion of additional tests and the submission of data for the EPA's review and evaluation

40     In the case of glyphosate and Roundup, the EPA had planned on releasing its preliminary risk assessment- in relation to the registration process – no later than July 2015. The EPA completed its review of glyphosate in early 2015, but delayed releasing the assessment pending further review in light of the World Health Organization's findings

**MONSANTO'S FALSE REPRESENTATIONS REGARDING
THE SAFETY OF ROUNDUP ®**

41     In 1996, the New York Attorney General ("NYAG") filed a lawsuit against Monsanto based on its false and misleading advertising of Roundup products Specifically, the lawsuit challenged Monsanto's general representations that its spray-on glyphosate-based herbicides, including Roundup, were "**safer than table salt**" and "**practically non-toxic**" to mammals, birds, and fish  Among the statements made by defendants which NY AG found deceptive and misleading about the human and environmental safety of Roundup are the following

41 1     Remember that environmentally friendly Roundup herbicide is biodegradable  It won't build up in the soil so you can use Roundup with confidence along customers' driveways, sidewalks, and fences

41 2     Remember that Roundup is biodegradable and won't build up in the soil  That will give you the environmental confidence you need to use Roundup everywhere you've got a weed, brush, edging, or trimming problem

41 3     Roundup biodegrades into naturally occurring elements

41 4     Remember that versatile Roundup herbicide stays where you put it  That means there's no washing or leaching to harm customers' shrubs or other desirable vegetation.

41 5     This non-residual herbicide will not wash or leach in the soil  It stays where you apply it

41 6     You can apply Accord with "confidence because it will stay where you put it"  It bonds tightly to soil particles, preventing leaching  Then, soon after application, soil microorganisms biodegrade Accord into natural products

41 7     Glyphosate is less toxic to rats than table salt following acute oral ingestion

41 8     Glyphosate's safety margin is much greater than required  It has over a 1,000-fold safety margin in food and over a 700-fold safety margin for workers who manufacture it or use it

41 9     You can feel good about using herbicides by Monsanto  They carry a toxicity category rating of 'practically non-toxic' as it pertains to mammals, birds, and fish.

41 10     "Roundup can be used where kids and pets will play and breaks down into natural material " This ad depicts a person with his head in the ground and a pet dog standing in the area which has been treated with Roundup [2]

Attorney General of the State of New York  In the Matter of Monsanto Company, Assurance of Discontinuance Pursuant to Executive Law § 63(15) (Nov  1996)

42    On November 19, 1996, Monsanto entered into an Assurance of Discontinuance with NYAG, in which Monsanto agreed, among other things, "to cease and desist from publishing or broadcasting any advertisements [in New York] that represent, directly, or by implication that

    a   its glyphosate-containing pesticide products or any component thereof are safe, non-toxic, harmless or free from risk

                  \*\*\*

    b   its glyphosate-containing pesticide products or any component thereof manufactured, formulated, distributed, or sold by Monsanto are biodegradable

                  \*\*\*

    c   its glyphosate-containing pesticide products or any component thereof stay where they are applied under all circumstances and will not move through the environment by any means

                  \*\*\*

    d   its glyphosate-containing pesticide products or any component thereof are "good" for the environment or are "known for their environmental characteristics"

                  \*\*\*

    e   glyphosate-containing pesticide products or any component thereof are safer or less toxic than common consumer products other than herbicides,

                  \*\*\*

    f   its glyphosate- containing products or any component thereof might be classified as "practically non-toxic "

43    Monsanto did not alter its advertising in the same manner in any state other than New York, and on information and belief still has not done so today

44      In 2009, France's highest court ruled that Monsanto had not told the truth about Safety of Roundup. The French court affirmed an earlier judgment that Monsanto had falsely advertised its herbicide Roundup as "biodegradable" and that it "left the soil clean."[3]

## EVIDENCE OF CARCINOGENICITY IN ROUNDUP

45      As early as the 1980's Defendant Monsanto was aware of glyphosate's carcinogenic properties

46      On March 4, 1985, a group of the Environmental Protection Agency's ("EPA") Toxicology Branch published a memorandum classifying glyphosate as a Category C oncogene[4] Category C oncogenes are possible human carcinogens with limited evidence of carcinogenicity.

47      In 1986, the EPA issued a Registration Standard for glyphosate (NTIS PB87-103214) The Registration standard required additional phytotoxicity, environmental fate, toxicology, product chemistry, and residue chemistry studies All of the data required was submitted and reviewed and/or waived[5]

48.     At that time, Monsanto misrepresented the safety of its product, and its propensity to cause NHL to the EPA.

49      In October 1991 the EPA published a Memorandum entitled "Second Peer Review of Glyphosate." The memorandum changed glyphosate's classification

[3] Monsanto Guilty in 'False Ad' Row, BBC, Oct 15, 2009 available at
http://news.bbc.co.uk/2/hi/europe/8308953.stm
[4] Consensus Review of Glyphosate, Casewell No 661A March 4, 1985 United States Environmental Protection Agency
[5] http://www.epa.gov/oppsrrd1/reregistration/REDs/factsheets/0178fac.pdf

to Group E (evidence of non-carcinogenicity for humans)  Two peer review committee members did not concur with the conclusions of the committee and one member refused to sign [6]

50      In addition to the toxicity of the active molecule, many studies support the hypothesis that glyphosate formulations found in Defendants' Roundup products are more dangerous and toxic than glyphosate alone [7] As early as 1991, evidence existed demonstrating that glyphosate formulations were significantly more toxic than glyphosate alone.[8]

51.     In 2002, Julie Marc published a study entitled "Pesticide Roundup Provokes Cell Division Dysfunction at the Level of CDK1/Cyclin B Activation "

52.     The study found that the Defendant's Roundup caused delays in the cell cycles of sea urchins, while the same concentrations of glyphosate alone proved ineffective and did not alter cell cycles

53      In 2004, Julie Marc published a study entitled "Glyphosate-based pesticides affect cell cycle regulation " The study demonstrated a molecular link between glyphosate-based products and cell cycle dysregulation

54      The study noted that "cell-cycle dysregulation is a hallmark of tumor cells and human cancer  Failure in the cell-cycle checkpoints leads to genomic instability and subsequent development of cancers from the initial affected cell." Further, "[s]ince cell cycle disorders such as a cancer result from dysfunction of unique cell, it was of interest to evaluate the threshold dose of glyphosate affecting cells "[9]

[6] Second Peer Review of Glyphosate, CAS No  1071-83-6  October 30  1991  United States Environmental Protection Agency
[7] Martinez et al  2007, Benachour 2009, Gasnier et al  2010, Peixoto 2005, Marc 2004
[8] Martinez et al 1991
[9] (Molinari, 2000, Stewart et al , 2003)

55.   In 2005, Francisco Peixoto published a study showing that Roundup's effects on rat liver mitochondria are much more toxic and harmful than the same concentrations of glyphosate alone

56   The Peixoto study suggested that the harmful effects of Roundup on mitochondrial bioenergetics could not be exclusively attributed to glyphosate and could be the result of other chemicals, namely the surfactant POEA (Polyoxyethylene-alkylamine), or alternatively due to the possible synergy between glyphosate and Roundup formulation products

57   In 2009, Nora Benachour and Gilles-Eric Seralini published a study examining the effects of Roundup and glyphosate on human umbilical, embryonic, and placental cells.

58.   The study used dilution levels of Roundup and glyphosate far below agricultural recommendations, corresponding with low levels of residues in food  The study concluded that supposed "inert" ingredients, and possibly POEA, change human cell permeability and amplify toxicity of glyphosate alone  The study further suggested that determinations of glyphosate toxicity should take into account the presence of adjuvants, or those chemicals used in the formulation of the complete pesticide  The study confirmed that the adjuvants in Roundup are not inert and that Roundup is always more toxic than its active ingredient glyphosate

59   The results of these studies were confirmed in recently published peer-reviewed studies and were at all times available and/or known to Defendants

60.   Defendants knew or should have known that Roundup is more toxic than glyphosate alone and that safety studies on Roundup, Roundup's adjutants and "inert"

ingredients, and/or the surfactant POEA were necessary to protect Plaintiff and other consumers from Roundup

61     Defendant knew or should have known that tests limited to Roundup's active ingredient glyphosate were insufficient to prove the safety of Roundup

62     Defendant failed to appropriately and adequately test Roundup, Roundup's adjuvants and "inert" ingredients, and/or the surfactant POEA to protect Plaintiff from Roundup

63.     Rather than performing appropriate tests, Defendants relied upon flawed industry- supported studies designed to protect Defendants' economic interests rather than Plaintiff and the consuming public

64     Despite their knowledge that Roundup was considerably more dangerous than glyphosate alone, Defendant continued to promote Roundup as safe

## IARC CLASSIFICATION OF GLYPHOSATE

65     The International Agency for Research on Cancer ("IARC") is the specialized intergovernmental cancer agency the World Health Organization ("WHO") of the United Nations tasked with conducting and coordinating research into the causes of cancer

66     An IARC Advisory Group to Recommend Priorities for IARC Monographs during 2015-2019 met in April 2014  Though nominations for the review were solicited, a substance must meet two criteria to be eligible for review by the IARC Monographs there must already by some evidence of carcinogenicity of the substance, and there must be evidence that humans are exposed to the substance

67.     IARC set glyphosate for review in 2015-2016  IARC uses five criteria for determining priority in reviewing chemicals  (1) The substance must have potential for direct impact on public health, (2) scientific literature to support suspicion of carcinogenicity, (3) evidence of significant human exposure, (4) high public interest and/or potential to bring clarity to a controversial area and/or reduce public anxiety or concern; (5) policies with respect to related agents similar to one given high priority by the above considerations  Data reviewed is sourced preferably from publicly accessible, peer- reviewed data

68     On March 24  2015, after its cumulative review of human, animal, and DNA studies for more than one (1) year, many of which have been in Defendant's possession since as early as 1985, the IARC's working group published its conclusion that the glyphosate contained in Defendants' Roundup herbicide, is a Class 2A "probable carcinogen" as demonstrated by the mechanistic evidence of carcinogenicity in humans and sufficient evidence of carcinogenicity in animals.

69.     The IARC's full Monograph was published on July 29, 2015 and established glyphosate as a class 2A probable carcinogen to humans. According to the authors, glyphosate demonstrated sufficient mechanistic evidence (genotoxicity and oxidative stress) to warrant a 2A classification based on evidence of carcinogenicity in humans and animals

70     The IARC Working Group found an increased risk between exposure to glyphosate and non-Hodgkin's lymphoma ("NHL") and several subtypes of NHL, and the increased risk continued after adjustment for other pesticides

71     The IARC also found that glyphosate caused DNA and chromosomal damage in human cells.

## EARLIER EVIDENCE OF GLYPHOSATE'S DANGER

72     Despite the new classification by the IARC, Defendants have had ample evidence of glyphosate and Roundup's genotoxic properties for decades

73     Genotoxicity refers to chemical agents that are capable of damaging the DNA within a cell through genetic mutations, which is a process that is believed to lead to cancer

74     In 1997, Chris Clements published "Genotoxicity of select herbicides in *Rana catesbeiana* tadpoles using the alkaline single-cell gel DNA electrophoresis (comet) assay."

75     The study found that tadpoles exposed to Roundup showed significant DNA damage when compared with unexposed control animals

76     Both human and animal studies have shown that glyphosate and glyphosate-based formulations such as Roundup can induce oxidative stress

77     Oxidative stress and associated chronic inflammation are believed to be involved in carcinogenesis

78     The IARC Monograph notes that "[s]trong evidence exists that glyphosate, AMPA and glyphosate-based formulations can induce oxidative stress "

79.     In 2006 Cesar Paz-y-Miño published a study examining DNA damages in human subjects exposed to glyphosate

80     The study produced evidence of chromosomal damage in blood cells showing significantly greater damage after exposure to glyphosate than before in the

same individuals, suggesting that the glyphosate formulation used during aerial spraying had a genotoxic effect on exposed individuals

81    The IARC Monograph reflects the volume of evidence of glyphosate pesticides' genotoxicity noting "[t]he evidence of genotoxicity caused by glyphosate-based formulations in strong "

82    Despite knowledge to the contrary, Defendant maintain that there is no evidence that Roundup is genotoxic, that regulatory authorities and independent experts are in agreement that Roundup is not genotoxic, and that there is no evidence that Roundup is genotoxic

83    In addition to glyphosate and Roundup's genotoxic properties, Defendants have long been aware of glyphosate's carcinogenic properties

84    Glyphosate and Roundup in particular have long been associated with carcinogenicity and the development of numerous forms of cancer, including, but not limited to, non-Hodgkin's lymphoma, Hodgkin's lymphoma, multiple myeloma, and soft tissue sarcoma

85    Defendants have known of this association since the early to mid-1980s and numerous human and animal studies have evidenced the carcinogenicity of glyphosate and/or Roundup

86    In 1985, the EPA studied the effects of glyphosate in mice, finding a dose related response in male mice linked to renal tubal adenomas, a rare tumor  The study concluded that glyphosate was oncogenic

87    In 2003, Lennart Hardell and Mikael Eriksson published the results of two case-controlled studies on pesticides as a risk factor for NHL and hairy cell leukemia

88      The study concluded that glyphosate had the most significant relationship to NHL among all herbicides studied with an increased odds ratio of 3 11

89      In 2003, AJ De Roos published a study examining the pooled data of mid-western farmers, examining pesticides and herbicides as risk factors for NHL

90      The study, which controlled for potential confounders, found a relationship between increased NHL incidence and glyphosate.

91      In 2008, Mikael Eriksson published a study a population-based case-control study of exposure to various pesticides as a risk factor for NHL

92      This strengthened previous associations between glyphosate and NHL

93      In spite of this knowledge, Defendants continue to issue broad and sweeping statements suggesting that Roundup was, and is, safer than ordinary household items such as table salt, despite a lack of scientific support for the accuracy and validity of these statements and, in fact, voluminous evidence to the contrary

94      Upon information and belief, these statements and representations have been made with the intent of inducing Plaintiff, the agricultural community, and the public at large to purchase, and increase the use of, Defendants' Roundup for Defendants' pecuniary gain, and in fact did induce Plaintiff to use Roundup

95      Defendant made these statements with complete disregard and reckless indifference to the safety of Plaintiff and the general public

96      Notwithstanding Defendants' representations, scientific evidence has established a clear association between glyphosate and genotoxicity, inflammation, and an increased risk of many cancers, including but not limited to, NHL, Multiple Myeloma, and soft tissue sarcoma

97     Defendant knew or should have known that glyphosate is associated with an increased risk of developing cancer, including, but not limited to, NHL, Multiple Myeloma, and soft tissue sarcomas

98     Defendant failed to appropriately and adequately inform and warn Plaintiff of the serious and dangerous risks associated with the use of and exposure to glyphosate and/or Roundup, including, but not limited to, the risk of developing NHL, as well as other severe and personal injuries, which are permanent and/or long-lasting in nature, cause significant physical pain and mental anguish, diminished enjoyment of life, and the need for medical treatment, monitoring and/or medications.

99.     Despite the IARC's classification of glyphosate as a class 2A probable carcinogen, Defendants continue to maintain that glyphosate and/or Roundup is safe, non-carcinogenic, non-genotoxic, and falsely warrant to users and the general public that independent experts and regulatory agencies agree that there is no evidence of carcinogenicity in glyphosate and Roundup

100     Defendants have claimed and continue to claim that Roundup is safe, non- carcinogenic, and non-genotoxic

101     Monsanto claims on its website that "[r]egulatory authorities and independent experts around the world have reviewed numerous long-term/carcinogenicity and genotoxicity studies and agree that there is no evidence that glyphosate, the active ingredient in Roundup brand herbicides and other glyphosate-based herbicides, causes cancer, even at very high doses, and that it is not genotoxic "[10] This statement is untrue, or at best, misleading

---

[10] Backgrounder- Glyphosate No Evidence of Carcinogenicity  Updated November 2014 (downloaded March 29  2018 from https //monsanto com/app/uploads/2017/06/no-evidence-of-carcinogenicity pdf)

102     Ironically, the primary source for this statement is a 1986 report by the WHO, the same organization that now considers glyphosate to be a probable carcinogen

103     Glyphosate, and Defendant's Roundup products in particular, have long been associated with serious side effects and many regulatory agencies around the globe have banned or are currently banning the use of glyphosate herbicide products

104     Defendants' statements proclaiming the safety of Roundup and disregarding its dangers misled Plaintiff

105.    Despite Defendants' knowledge that Roundup was associated with an elevated risk of developing cancer, Defendant's promotional campaigns focused on Roundup's purported "safety profile "

106     Defendants' failure to adequately warn Plaintiff as well as the EPA about the dangers of the product resulted in (1) Plaintiff using and being exposed to glyphosate instead of using another acceptable and safe method of controlling unwanted weeds and pests, and (2) scientists and physicians relying on the Defendants' representations to the EPA and consumers, and therefore failing to warn and instruct consumers about the risk of cancer, including NHL, and other injuries associated with Roundup exposure

107     Defendants failed to seek modification of the labeling of Roundup to include relevant information regarding the risks and dangers associated with Roundup exposure

108    Defendants' failure to appropriately warn and inform the EPA has resulted in inadequate warnings in safety information presented directly to users and consumers

109    Defendants' failure to appropriately warn and inform the EPA has resulted in the absence of warnings or caution statements that are adequate to protect health and the environment

110    Defendants' failure to appropriately warn and inform the EPA has resulted in the directions for use that are not adequate to protect health and the environment

111    Plaintiff seeks compensatory damages arising out of Plaintiff John Pryor's use of, and exposure to, Roundup, which factually caused him to suffer from cancer, specifically Non-Hodgkin's lymphoma and plaintiff suffered severe and permanent injuries, including physical pain and mental anguish, and diminished enjoyment of life The foregoing acts and omissions of Defendant were the factual cause of Plaintiff's Non-Hodgkin's lymphoma

112    By reason of the foregoing acts and omissions, Plaintiff suffered, emotional and mental anguish, medical expenses, and other economic and non-economic damages, as a result of the actions and inactions of the Defendant

## PLAINTIFF'S EXPOSURE TO ROUNDUP

113    Plaintiff John Pryor first used Roundup beginning in 2011/2012 for the purpose of maintaining the property which he owned and resided in Montoursville, Pennsylvania  He used it to spray on weeds on his property

114    For approximately 7-8 years, until 2019, Plaintiff sprayed pesticides, including Roundup, every other week beginning through spring and summer months Plaintiff followed all safety and precautionary warnings he was provided during the course of his use of Roundup

115    Plaintiff was subsequently diagnosed with Non-Hodgkin's lymphoma, on or about September 16, 2019

116    Plaintiff's exposure to Roundup was the factual cause of Plaintiff's his development of Non-Hodgkin's follicular lymphoma (NHL)

117    As a result of his injury, Plaintiff suffered severe physical, economic and non-economic injuries

## 1
## (STRICT LIABILITY – DESIGN DEFECT)

118    Plaintiffs repeat each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein

119    At all times herein mentioned, the Defendants designed, researched, manufactured, tested, advertised, promoted, sold, distributed and/or have acquired the Defendants who have designed, researched, tested, advertised, promoted, marketed, sold, and distributed Roundup as hereinabove described that was used by the plaintiff

120    Defendants' Roundup was expected to and did reach the usual consumers, handlers, and persons coming into contact with said product without

substantial change in the condition in which it was produced, manufactured, sold, distributed, and marketed by the Defendants

121    Roundup had a defect in its design that made it unreasonably safe to the ultimate user or consumer.   The Roundup designed, researched, manufactured, tested, advertised, promoted, marketed, sold  and distributed by Defendants was defectively designed such that it was unreasonably safe when it left the hands of the manufacturer and/or suppliers

122    The product was defective at the time it left Defendants' control and reached Plaintiff and her physicians without a substantial change in condition.

123    Either Defendants should have not marketed the product at all and/or they should have removed the Product from the market but failed to do so in a timely and responsible manner.

124    The Roundup designed, researched, manufactured  tested, advertised, promoted, marketed, sold, and distributed by Defendants was defective in design and/or formulation, in that, when it left the hands of the Defendants' manufacturers and/or suppliers. it was unreasonably dangerous  and such dangerous and defective condition of the product was unknowable and unacceptable to the ordinary consumer, including Plaintiff, under the consumer expectations standard  Defendants could have marketed an alternatively designed pesticide without the carcinogenic glyphosate chemical.

125    At all times herein mentioned, Roundup was defective such that it was unreasonably dangerous, and Defendants knew or had reason to know that said

product was unreasonably dangerous, especially when used in the form and manner as provided by the Defendants

126   In particular, Defendant's Roundup was defective and unreasonably dangerous in the following ways

126 1  When placed in the stream of commerce, Defendants' Roundup products were defective in design and formulation and, consequently, dangerous to an extent beyond that which an ordinary consumer would anticipate,

126 2  When placed in the stream of commerce, Defendant's Roundup products were unreasonably dangerous in that they were hazardous and posed a grave risk of cancer and other serious illnesses when used in a reasonably anticipated manner,

126 3  When placed in the stream of commerce, Defendants' Roundup products contained unreasonably dangerous design defects and were not reasonably safe when used in reasonably anticipated manner,

126 4  Defendants did not sufficiently test, investigate, or study its Roundup products,

126 5  Exposure to Roundup presents a risk of harmful side effects that outweigh any potential utility stemming from the use of the herbicide,

126 6  Defendant knew at the time of marketing its Roundup products that exposure to Roundup and could result in cancer and other severe illnesses and injuries, specifically Non-Hodgkin's Lymphoma (NHL), and

126 7  Defendants did not conduct adequate post-marketing surveillance of its Roundup products

127    Defendants knew that at all times herein mentioned its Roundup was in a defective condition, and was and is unreasonably dangerous when used in an reasonably anticipated manner

128    Plaintiff John Pryor was exposed to Defendants' Roundup as described above, without knowledge of Roundup's unreasonably dangerous characteristics

129    At the time of Plaintiff's use of and exposure to Roundup, he used Roundup for the purposes and in a manner normally intended, as a broad-spectrum herbicide

130.   Defendants with voluntarily designed its Roundup in a defective, unreasonably dangerous manner for use by the public, and in particular the Plaintiff

131    Defendants' Roundup products were unreasonably dangerous for their normal, intended use

132    Defendants marketed and promoted their Roundup product and downplayed the suspected, probable, and established health risks inherent with its normal, intended use

133    The Roundup designed researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed by Defendants reached their intended users in the same defective and unreasonably dangerous condition in which the Defendants' Roundup was manufactured

134    Defendants are therefore strictly liable for the injuries sustained by the Plaintiff

135    The nature of the defects mentioned herein and the products' dangers were unknowable and unacceptable to the ordinary consumer, including plaintiff, under the consumer expectations standard   Reasonable alternatives existed

136    By reason of the foregoing, Defendants are strictly liable to plaintiff for the manufacturing, marketing, promoting, distribution, and selling of a defective product, Roundup

137    Defendants' defective design of Roundup amounts to willful misconduct by the Defendants because they were aware at the time they sold Roundup to Plaintiff that the product causes NHL.

138    Defects in Defendants' Roundup were the factual cause of Plaintiff's injuries

139    As a result of the foregoing acts and omissions, Plaintiff developed NHL and further suffered severe extreme physical pain and mental anguish, including diminished enjoyment of life and financial expenses for hospitalization and medical care

WHEREFORE, Plaintiff respectfully requests that this Court enter a judgment in excess of $75,000, exclusive of interests and costs, for compensatory and punitive damages, together with interest, costs herein incurred  attorneys fees and all relief as this Court deems just and proper.

2
(STRICT LIABILITY - FAILURE TO WARN)

140    Plaintiff repeats each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein

141    Defendants have engaged in the business of selling, testing, distributing, supplying, manufacturing, marketing, and/or promoting Roundup, and through that conduct have knowingly and intentionally placed Roundup into the stream of commerce with full knowledge that it reaches users such as Plaintiff who are exposed to it through ordinary and reasonably foreseeable uses

142.    Defendants did in fact sell, distribute, supply. manufacture, and/or promote Roundup to plaintiff  Additionally, Defendant expected the Roundup that they were selling, distributing, supplying, manufacturing, and/or promoting to reach -- and Roundup did in fact reach end consumers and users, including Plaintiff, without any substantial change in the condition of the product from when it was initially distributed by Defendant.

143    The Roundup products used by Plaintiff were  unreasonably dangerous and lacked appropriate and necessary warnings

144    The absence of adequate warnings was insufficient to notify users of non-obvious dangers inherent in the products

145    The products  their instructions  directions and warnings, were defective and unreasonably dangerous to the user and consumer because they failed to notify users of non-obvious dangers inherent in the product, and as such, Defendants are strictly responsible for Plaintiff John Pryor's injuries and damages

146    The absence of adequate warnings rendered the Roundup Products unreasonably dangerous

147    At the time of manufacture, Defendants failed to provide and could have provided the warnings or instructions regarding the full and complete risks of Roundup

and glyphosate-containing products because they knew that the products were unreasonably dangerous with respect to the use of and/or exposure to such Roundup chemical products   A reasonable consumer, including Plaintiff, would have heeded such product warnings on Roundup.

148   At all times herein mentioned, the aforesaid product was defectively manufactured such that it was unreasonably dangerous to the user, and was so at the time it was distributed by Defendants and at the time Plaintiff was exposed to the product  The defective condition of Roundup was due in part to the fact that it was not accompanied by proper warnings regarding its carcinogenic qualities and possible side effects, including, but not limited to, developing NHL as a result of exposure and use

149   Defendants' failure to include a warning or caution statement which was necessary and, if complied with, was adequate to protect the health of those exposed violated 7 U S §136j(a)(1)(E) as well as the laws of the State of Pennsylvania

150   At all times herein mentioned, Defendants defectively designed, manufactured, compounded. tested, inspected, packaged, labeled, distributed, marketed, examined, maintained, supplied, provided improper warnings, and failed to take such steps to assure that the product did not cause users to suffer from unreasonable and dangerous side effects due to the unreasonably dangerous nature of the products, namely its carcinogenic properties and its propensity to cause the development of NHL

151   Defendant labeled, distributed, and promoted the aforesaid product such that it was unreasonably dangerous for the use and purpose for which it was intended

152    These defects caused serious injury to Plaintiff, who used Roundup in for its intended use

153    Defendants knew, had reason to know and/or should have known of these defects

154    Defendants were aware of the consequences of the aforesaid conduct Despite the fact that Defendants knew or should have known that Roundup causes serious injuries, Defendants failed to warn of the dangerous carcinogenic properties and side effect of developing NHL from Roundup exposure, even though these properties and side effects were known or reasonably scientifically knowable at the time of distribution Defendant willfully and deliberately failed to avoid the consequences associated with their failure to warn, and in doing so, Defendant acted with a conscious disregard for the safety of Plaintiff

155    Plaintiff reasonably relied upon the skill, superior knowledge, and judgment of Defendants

156    Had Defendants properly disclosed the risks associated with Roundup, Plaintiff would have avoided the risk of NHL by not using Roundup

157    The information that Defendants did provide or communicate failed to contain adequate warnings and precautions that would have enabled Plaintiff, and similarly situated individuals, to utilize the product safely and with adequate protection Instead, Defendants disseminated information that was inaccurate, false, and misleading and which failed to communicate accurately or adequately the comparative severity, duration and extent of the risk of injuries associated with use of and/or exposure to Roundup and glyphosate, continued to promote the efficacy of Roundup,

even after it knewd, had reason to know and/or should have known the unreasonable risks from use or exposure, and concealed, downplayed, or otherwise suppressed, through aggressive marketing and promotion, any information or research about the risks and dangers of exposure to Roundup and glyphosate.

158     To this day, Defendants have failed to adequately warn of the true risks of Plaintiff's injuries associated with the use of and exposure to Roundup

159     As a direct factual result of Defendants' actions as alleged herein, and in such other ways to be later shown, the subject product caused Plaintiff to sustain injuries as herein alleged

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in excess of $75,000, exclusive of interests and costs, for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all relief as this Court deems just and proper

<u>3</u>
<u>NEGLIGENCE</u>

160     Plaintiffs repeat each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein

161     Defendants had a duty to exercise reasonable care in the designing, researching, testing, manufacturing, marketing, supplying, promoting, packaging, sale, and/or distribution of Roundup into the stream of commerce, including a duty to assure that the product would not cause users to suffer unreasonable, dangerous side effects

162    Defendants failed to exercise ordinary care in the designing, researching, testing, manufacturing, marketing, supplying, promoting, packaging, sale, testing, quality assurance, quality control, and/or distribution of Roundup into interstate commerce in that Defendants knew, had reason to know and/or should have known that using Roundup created a high risk of unreasonable, dangerous side effects, including, but not limited to, the development of NHL, as well as other severe and personal injuries which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life, as well as need for lifelong medical treatment, monitoring, and/or medications.

163    The negligence by the Defendants, and their agents, servants, and/or employees, included but was not limited to the following acts and/or omissions

163 1    Manufacturing, producing, promoting, formulating, creating and/or designing Roundup without adequately testing it,

163 2    Failing to test Roundup and/or failing to adequately, sufficiently, and properly test Roundup,

163 3    Not conducting sufficient testing programs to determine whether or not Roundup was safe for use, in that Defendants herein knew, had reason to know, and/or should have known that Roundup was unsafe and unfit for use by reasons of the dangers to its users,

163 4    Not conducting sufficient testing programs and studies to determine Roundup's carcinogenic properties even after Defendants had knowledge that Roundup is, was, or could be carcinogenic,

163 5    Failing to conduct sufficient testing programs to determine the safety of "inert" ingredients and/or adjuvants contained within Roundup, and the propensity of these ingredients to render Roundup toxic, increase the toxicity of Roundup, whether these ingredients are carcinogenic, magnify the carcinogenic properties of Roundup, and whether or not "inert" ingredients and/or adjuvants were safe for use;

163 6    Negligently failing to adequately and correctly warn the Plaintiff, the public, the medical and agricultural professions, and the EPA of the dangers of Roundup,

163 7    Negligently failing to petition the EPA to strength the warnings associated with Roundup,

163 8    Failing to provide adequate cautions and warnings to protect the health of users, handlers, applicators, and persons who would reasonably and foreseeably come into contact with Roundup,

163 9    Negligently marketing, advertising, and recommending the use of Roundup knowing it did not have sufficient knowledge as to its dangerous propensities;

163 10   Negligently representing that Roundup was safe for use for its intended purpose, and/or that Roundup was safer than ordinary and common items such as table salt, when in fact, it was unsafe,

163 11   Negligently representing that Roundup had equivalent safety and efficacy as other forms of herbicides,

163 12  Negligently designing Roundup in a manner which was dangerous to its users,

163 13  Negligently manufacturing Roundup in a manner which was dangerous to its users,

163 14  Negligently producing Roundup in a manner which was dangerous to its users,

163 15  Negligently formulating Roundup in a manner which was dangerous to its users,

163 16  Concealing information from the pPaintiff while knowing that Roundup was unsafe, dangerous, and/or non-conforming with EPA regulations;

163 17  Improperly concealing and/or misrepresenting information from the plaintiff, scientific and medical professionals, and/or the EPA, concerning the severity risks and dangers of Roundup compared to other forms of herbicides,

163 18  Negligently selling Roundup with a false and misleading label and,

163 19  Negligently underestimating, underreporting and downplaying the serious dangers of Roundup, and

163 20  Negligently and deceptively comparing the safety risks and/or dangers of Roundup with common everyday foods such as table salt, and with other forms of herbicides

163 21  Failing to use ordinary care in designing and manufacturing Roundup so as to avoid the aforementioned risks to individuals when Roundup was used as an herbicide,

163 22  Failing to accompany their product with proper and/or accurate warnings regarding all possible adverse side effects associated with the use of Roundup,

163 23  Failing to accompany their product with proper warnings regarding all possible adverse side effects concerning the failure and/or malfunction of Roundup,

163 24  Failing to accompany their product with accurate warnings regarding the risks of all possible adverse side effects concerning Roundup,

163 25  Failing to warn plaintiff of the severity and duration of such adverse effects, as the warnings given did not accurately reflect the symptoms, or severity of the side effects including, but not limited to, the development of NHL,

163 26  Failing to conduct adequate testing, clinical testing, and post-marketing surveillance to determine the safety of Roundup,

163 27  Failing to conduct adequate testing, clinical testing, and post-marketing surveillance to determine the safety of Roundup's "inert" ingredients and/or adjuvants,

163 28  Negligently misrepresenting the evidence of Roundup's genotoxicity and carcinogenicity, and

163 29  Were otherwise careless and/or negligent

164    Despite the fact that Defendants knew, had reason to know and or should have known that Roundup caused, or could cause, unreasonably dangerous side effects, Defendants continued and continue to market, manufacture, distribute, and/or sell Roundup to businesses, governmental entities, and consumers, including Plaintiff

165    Defendants knew, had reason to know and/or should have known that consumers such as plaintiff would foreseeably suffer injury as a result of Defendant's failure to exercise ordinary care, as set forth above

166    Defendant's violations of law and/or negligence were the cause of Plaintiff's injuries, harm and economic loss, which plaintiff suffered and/ or will continue to suffer

167    Defendant's actions and omissions factually caused Plaintiff John Pryor suffer from serious and dangerous side effects including, but not limited to, Non-Hodgkin's lymphoma, as well as other severe and personal injuries which are permanent and lasting in nature, physical pain and mental anguish, diminished enjoyment of life, and financial expenses for hospitalization and medical care Further, Plaintiff suffered severe personal injuries, physical pain and mental anguish, and diminished enjoyment of life

WHEREFORE, Plaintiff respectfully request that this Court enter judgment in excess of $75,000, exclusive of interests and costs, for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all relief as this Court deems just and proper

### 4
### FRAUD AND NEGLIGENT MISREPRESENTATION

168.   Plaintiff incorporates by reference each and every paragraph of this Complaint as if fully set forth herein

169.   Throughout the relevant time periods, it was known or knowable to Defendants that their Roundup products caused Non-Hodgkin's lymphoma and that this occurrence was not rare

170.   Defendants knew or had reason to know that the safety of its Roundup products had not been tested or proven

171.   Defendants knew, or had reason to know that there was no evidence that its Roundup products were safe

172.   In the alternative, Defendants knowingly failed to warn that its Roundup products were safe and cased and/or increased the risk of Non-Hodgkin's lymphoma.

173.   Specifically, Defendants failed to adequately test their products, ignored relevant safety studies and disregarded the conclusions of the International Agency for Research on Cancer ("IARC") that Roundup's active ingredient glyphosate was dangerous and carcinogenic

174.   Despite this knowledge. Defendants continued to represent through its advertising, marketing and product labeling that its Roundup products were safe, and continued to advertise and promote these products to consumers for the purchase of killing weeds

175.   Despite what Defendants knew and/or had reason to know about the lack of safety of their Roundup products through the relevant time periods, Defendants

failed to disclose these risks and concealed this material information from Plaintiff John Pryor, and from the public at large

176    In the alternative, despite this knowledge, Defendants continued to market and sell their Roundup products as safe, but with evidence to the contrary that the products were unsafe and caused Non-Hodgkin's lymphoma

177    Defendants had the duty and obligation to disclose to Plaintiff and the public at large in its advertising and labeling the true material facts concerning the aforesaid Roundup Products, that is, that said Products were dangerous and defective, and lacking safety in normal and intended use, and how likely it was to cause serious consequences to users including permanent and debilitating injuries  Defendants concealed these material facts prior to the time that plaintiff purchased and used Roundup products

178    Plaintiff relied on these material misrepresentations and/or omissions on the labeling of the products themselves to his detriment as the products themselves did not indicate that Roundup increased the risk of Non-Hodgkin's lymphoma

179    Defendants were under a duty to Plaintiff to disclose and warn of these materials facts concerning the defective nature of Roundup products because

179 1 Defendants were in a superior position to know the true dangers of the Product,

179 2 Defendants knowingly made false claims about the safety and quality of the Defendant's Roundup products on the label of the products to Plaintiff and the general public and in its advertising, and

179 3 Defendants fraudulently and affirmatively concealed the defective nature of its Products from Plaintiff

180    The facts concealed and/or not disclosed by Defendants to Plaintiff were material facts in plaintiff deciding whether or not to purchase the Roundup products

181    In the alternative, Defendants willfully, intentionally, and maliciously concealed the material facts as set forth above from plaintiff with the intent to defraud as herein alleged

182    In the alternative, Defendants intentionally concealed and/or failed to disclose these material facts illustrating the true defective nature of the Products so that Plaintiff would purchase the Roundup products  Such fraudulent concealment was material as plaintiff justifiably acted or relied upon, to his detriment, the concealed and/or non-disclosed facts, as evidenced by the purchase of these products

183.    Plaintiff could not have been aware of these material defects, despite reasonable diligence

184    At all times herein mentioned, Plaintiff was unaware of the material facts set forth above, and had he been aware of said facts, he would not have acted as he did, that is, would not have reasonably relied upon said representations of safety and purchased or used the Roundup products

185    Defendants knew and had reason to know of these defects, and knowingly and fraudulently disregarded these defects to plaintiff's detriment

186    Defendant's actions were the factual cause of plaintiff's Non-Hodgkin's lymphoma

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in excess of $75,000, exclusive of interest and costs, for compensatory and punitive damages  together with interest, costs herein incurred, attorneys' fees and all relief as this Court deems just and proper

**5**
## VIOLATION OF PENNSYLVANIA UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION LAW

187.   Plaintiffs incorporate by reference each and every paragraph of this Complaint as if fully set forth herein

188    Plaintiff purchased and used Defendant's Roundup products and therefore suffered ascertainable losses as a result of Defendants actions in violation of the Pennsylvania Unfair Trade Practices and Consumer Protection Law ("UTPCPL")

189    Unfair methods of competition or deceptive acts or practices that were proscribed by law, as set forth in Count IV, include the following.

189 1    Representing    that    Roundup    products    have    safe characteristics, uses, and/or benefits that they do not have,

189 2    Advertising the Roundup products with the intent not to sell them as advertised, and

189 3    Engaging in fraudulent or deceptive conduct that creates a likelihood of confusion or misunderstanding with respect to its Roundup products

190    Defendants violated consumer protection laws, specifically the Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 P S § 201-1

et seq , through their use of false and misleading misrepresentations or omissions of material facts relating its Roundup products

191    Defendants uniformly communicated the purported benefits of Roundup while failing to disclose the serious and dangerous risks associated with the product, its safety, its efficacy, and its usefulness   Defendants made these representations to consumers, including Plaintiff, on the face of the product and in its marketing and advertising

192.   Defendants' conduct in connection with the Product was also impermissible and illegal in that it created a likelihood of confusion and misunderstanding because Defendants misleadingly, falsely and/or deceptively misrepresented and omitted numerous material facts from its promotional materials and product labeling regarding, among other things, the utility benefits, safety, and advantages of its Roundup products, including. but not limited to ignoring relevant safety studies and conclusions of the IARC.

193    Had Defendants not engaged in the deceptive conduct described herein, Plaintiff would not have purchased and/or paid for Defendant's Roundup products, would not have used said products and would not have incurred related medical costs and injuries

194    As a result of these violations, Plaintiff developed non-Hodgkin's lymphoma   Defendants have a statutory duty pursuant to Pennsylvania's Unfair Trade Practices and Consumer Protection Law, 73 P S  §§201-1 - 201-9 , to refrain from unfair and deceptive acts or trade practices in the design, labeling, development, manufacture, promotion and sale of Defendant's Roundup products

195     Plaintiffs are entitled to treble damages and such additional relief as deems necessary or proper, pursuant to 73 P S  § 201-9 2.

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in excess of $75,000, exclusive of interest and costs, for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all relief as this Court deems just and proper

### 6.

### Loss of Consortium

196.    The preceding paragraphs are incorporated by reference as though set forth fully herein.

197     As a direct and factual result of Defendants' conduct, Plaintiff Deborah Pryor has been deprived of the assistance, companionship, society and services of her husband

WHEREFORE, Plaintiff Deborah Pryor demands judgment be entered against all Defendants for an amount in excess of the limits of arbitration, exclusive of interest and costs

### PRAYER FOR RELIEF

WHEREFORE  Plaintiffs demands judgment against the Defendants on each of the above- referenced claims and causes of actions. and seeks relief as follows

1   Awarding of actual damages  treble damages  costs and reasonable attorney's fees pursuant to 73 P S  § 201-9 2

2   Awarding compensatory damages in excess of the jurisdictional amount, including, but not limited to pain, suffering, emotional distress, loss of enjoyment of life, and any other non-economic damages in an amount to be determined at trial of this action,

3   Awarding compensatory damages to Plaintiffs for past and future damages, including, but not limited to, Plaintiff John Pryor's pain and suffering and for severe and permanent personal injuries sustained by the Plaintiff including health care costs and economic loss,

4   Awarding economic damages to Plaintiffs in the form of medical expenses, out of pocket expenses, lost earnings and other economic damages in an amount to be determined at trial of this action,

5   Punitive and/or exemplary damages for the wanton, willful, fraudulent, and reckless acts of the Defendants who demonstrated a complete disregard and reckless indifference for the safety and welfare of the general public and to the Plaintiff in an amount sufficient to punish Defendants and deter future similar conduct, to the extent allowed by applicable law,

6   Loss of consortium damages;

7   Pre-judgment interest,

8   Post-judgment interest;

9   Awarding Plaintiffs reasonable attorneys' fees as may be appropriate pursuant to statute or other applicable law,

10. Awarding Plaintiffs the costs of these proceedings, and

11  Such other and further relief as this Court deems just and proper

RIEDERS, TRAVIS, HUMPHREY, WATERS & DOHRMANN

Clifford A  Rieders, Esquire PA 20962
Sasha B  Coffiner, Esquire PA 320294
161 West Third Street
Williamsport, PA 17701
P  570 323 8711
F  570 323 4192
Attorneys for Plaintiffs

47