# U.S. District Court
# Eastern District of Missouri (St. Louis)
## CIVIL DOCKET FOR CASE #: 4:20–cv–00466–SNLJ

| | |
|---|---|
| Hutchison v. Monsanto Company | Date Filed: 04/01/2020 |
| Assigned to: District Judge Stephen N. Limbaugh, Jr | Jury Demand: Plaintiff |
| Demand: $75,000 | Nature of Suit: 245 Tort Product Liability |
| Cause: 28:1332 Diversity–Product Liability | Jurisdiction: Diversity |

**Plaintiff**

| | | |
|---|---|---|
| **Leslie Hutchison** | represented by | **Carl J. Lumley** |
| | | CURTIS HEINZ PC |
| | | 130 S. Bemiston Ave. |
| | | Suite 200 |
| | | St. Louis, MO 63105–1951 |
| | | 314–725–8788 |
| | | Fax: 314–725–8789 |
| | | Email: clumley@lawfirmemail.com |
| | | *LEAD ATTORNEY* |
| | | *ATTORNEY TO BE NOTICED* |

V.

**Defendant**

**Monsanto Company**

| Date Filed | # | Docket Text |
|---|---|---|
| 04/01/2020 | 1 | COMPLAINT against defendant Monsanto Company with receipt number AMOEDC–7845072, in the amount of $400 Jury Demand,, filed by Leslie Hutchison.(Lumley, Carl) (Additional attachment(s) added on 4/1/2020: # 1 Civil Cover Sheet, # 2 Original Filing Form, # 3 Waiver of Service) (BAK). (Entered: 04/01/2020) |
| 04/01/2020 | | Case Opening Notification: Waivers issued 1. All parties must file the Notice Regarding Magistrate Judge Jurisdiction Form consenting to or opting out of the Magistrate Judge jurisdiction. Click here for the instructions. and all non–governmental organizational parties (corporations, limited liability companies, limited liability partnerships) must file Disclosure of Organizational Interests Certificate  (moed–0001.pdf). Judge Assigned: U.S. Magistrate Judge Patricia L. Cohen. (BAK) (Entered: 04/01/2020) |
| 04/01/2020 | 2 | Pursuant to Local Rule 2.08, the assigned/referred magistrate judge is designated and authorized by the court to exercise full authority in this assigned/referred action or matter under 28 U.S.C. Sec. 636 and 18 U.S.C Sec. 3401, including any case budgeting matters. (CSAW) (Entered: 04/01/2020) |
| 04/02/2020 | 3 | Electronic Notice re: Disclosure of Organizational Interests Certificate Pursuant to Local Rule 2.09, every non–governmental organizational party must file a Disclosure of Organizational Interests Certificate within ten (10) days of the party's first pleading or entry of appearance. Please complete and file the certificate as soon as possible (moed–0001.pdf). Disclosure of Organizational Interests Certificate due by 4/13/2020. (KKS) (Entered: 04/02/2020) |
| 04/16/2020 | 4 | CJRA ORDER (GJL). Magistrate Judge Patricia L. Cohen termed. Case reassigned to District Judge Stephen N. Limbaugh, Jr for all further proceedings (CLO) (Entered: 04/16/2020) |
| 05/05/2020 | 5 | WAIVER of Service issued defendantMonsanto Company. sent to Monsanto Company on 04/01/2020 filed by Leslie Hutchison. Waiver of Service due by 5/31/2020. (Lumley, Carl) (Entered: 05/05/2020) |

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**

------------------------------------------------------------------X

LESLIE HUTCHISON,                                                           :

                 Plaintiff,              :

    -against-                                                      :

MONSANTO COMPANY,                                                     :

              Defendant.            :

------------------------------------------------------------------X

Case No.:

**JURY TRIAL DEMANDED**

## COMPLAINT

Plaintiff, Dr. Leslie Hutchison ("Hutchison"), by and through his undersigned attorneys,

hereby brings this Complaint for damages against Defendant Monsanto Company and alleges the

following:

### NATURE OF THE CASE

1.     This is an action for damages suffered by Hutchison as a direct and proximate

result of Defendant's negligent and wrongful conduct in connection with the design,

development, manufacture, testing, packaging, promoting, marketing, advertising, distribution,

labeling, and/or sale of the herbicide Roundup®, containing the active ingredient glyphosate.

2.     Hutchison maintains that Roundup® and/or glyphosate is defective, dangerous to

human health, unfit and unsuitable to be marketed and sold in commerce, and lacked proper

warnings and directions as to the dangers associated with its use.

3.     Hutchison was repeatedly exposed to Roundup® while using it as an herbicide on

his properties in Texas between 2000 and 2005

4.      Hutchison was diagnosed with non-Hodgkin's Lymphoma in May 2011. Since his diagnosis, Hutchison has suffered a litany of serious medical issues related to his cancer and treatment, including but not limited to life-threatening infections, painful shingles causing permanent nerve damage, reflux disease, and the development tumors in his vocal chords that have required repeated surgeries to remove.

5.      Hutchison's injuries, like those impacting thousands of similarly situated victims across the country, were avoidable.

## JURISDICTION AND VENUE

6.      This Court has jurisdiction over Defendant and this action pursuant to 28 U.S.C. § 1332(a)(2) because there is complete diversity of citizenship between Hutchison and Defendant. Hutchison is a citizen of the United Kingdom who resides in Barbados. Defendant is incorporated in Delaware and has its principal place of business in Missouri.

7.      The amount in controversy between Hutchison and Defendant exceeds $75,000, exclusive of interest and cost.

8.      The Court also has supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

9.      Venue is proper within this district pursuant to 28 U.S.C. § 1391 in that Defendant resides in this district, conducts business here, and is subject to personal jurisdiction in this district. Furthermore, Defendant sells, markets, and distributes Roundup® within this district. Also, a substantial part of the acts and omissions giving rise to these claims occurred within this district.

## PARTIES

10.     Hutchison, **Leslie Hutchison**, is a natural person and is a citizen of the United Kingdom who resides in Barbados.  Hutchison brings this action for personal injuries sustained by exposure to Roundup® ("Roundup") containing the active ingredient glyphosate and the surfactant polyethoxylated tallow amine ("POEA").  As a direct and proximate response of being exposed to Roundup, Hutchison developed non-Hodgkin's Lymphoma.

11.     "Roundup" refers to all formulations of Defendant's Roundup products, including, but not limited to, Roundup Concentrate Poison Ivy and Tough Brush Killer 1, Roundup Custom Herbicide, Roundup D-Pak herbicide, Roundup Dry Concentrate, Roundup Export Herbicide, Roundup Fence & Hard Edger 1, Roundup Garden Foam Weed & Grass Killer, Roundup Grass and Weed Killer, Roundup Quikpro Herbicide, Roundup Promax, Roundup Rainfast Concentrate Weed & Grass Killer, Roundup Rainfast Super Concentrate Weed & Grass Killer, Roundup Ready-to-Use Extended Control Weed & Grass Killer 1 Plus Weed Preventer, Roundup Ready-to-Use Weed & Grass Killer, Roundup Ready-to-Use Weed and Grass Killer 2, Roundup Ultra Dry, Roundup Ultra Herbicide, Roundup Ultramax, Roundup VM Herbicide, Roundup Weed & Grass Killer Concentrate, Roundup Weed & Grass Killer Concentrate Plus, Roundup Weed & Grass Killer Ready-to-Use Plus, Roundup Weed & Grass Killer Super Concentrate, Roundup Weed & Grass Killer 1 Ready-to-Use, Roundup WSD Water Soluble Dry Herbicide Deploy Dry Herbicide, or any other formulation of containing the active ingredient glyphosate.

12.     Defendant Monsanto Company ("Defendant" and with its predecessors "Monsanto") is a Delaware corporation, Missouri Secretary of State Charter No. F00488018, with a principle place of business in St. Louis, Missouri.

13.     Defendant advertises and sells goods, specifically Roundup, in the States of Missouri and Texas.

14.     Defendant transacted and conducted business within the States of Missouri and Texas that relate to the allegations in this Complaint.

15.     Defendant derived substantial revenue from goods and products used in the States of Missouri and Texas.

16.     Defendant expected or should have expected its acts to have consequences within the States of Missouri and Texas, and derived substantial revenue from interstate commerce.

17.     Defendant engaged in the business of designing, developing, manufacturing, testing, packaging, marketing, distributing, labeling, and selling Roundup.

18.     Defendant is authorized to do business in Missouri and Texas and to derive substantial income from doing business in these states.

19.     Upon information and belief, Defendant purposefully availed itself of the privilege of conducting activities with the State of Missouri, thus invoking the benefits and protections of its laws.

20.     Upon information and belief, Defendant designed, sold, advertised, manufactured and distributed Roundup, and continues to do so, with full knowledge of its dangerous and defective nature.

## FACTS COMMON TO ALL COUNTS

21.     At all relevant times, Defendant was in the business of, and designed, advertised, manufactured, tested, promoted, marketed, sold, distributed, and has acquired and is responsible for the commercial herbicide Roundup.

22.     Monsanto is a multinational agricultural biotechnology corporation based in St. Louis, Missouri.  It is the world's leading producer of glyphosate.

23.     Defendant discovered the herbicidal properties of glyphosate during the 1970's and subsequently began to design, research, manufacture, sell and distribute glyphosate based "Roundup" as a broad spectrum herbicide.

24.     Glyphosate is the active ingredient in Roundup.

25.     Glyphosate is a broad-spectrum herbicide used to kill weeds and grasses known to compete with commercial crops grown around the globe.

26.     Glyphosate is a "non-selective" herbicide, meaning it kills indiscriminately based only on whether a given organism produces a specific enzyme, 5-enolpyruvylshikimic acid-3-phosphate synthase, known as EPSP synthase.

27.     Glyphosate inhibits the enzyme 5-enolpyruvylshikimic acid-3-phosphate synthase that interferes with the shikimic pathway in plants, resulting in the accumulation of shikimic acid in plant tissue and ultimately plant death.

28.     Sprayed as a liquid, plants absorb glyphosate directly through their leaves, stems, and roots, and detectable quantities accumulate in the plant tissues.

29.     Each year from 2014 onward, approximately 250 million pounds of glyphosate are sprayed on crops, commercial nurseries, suburban lawns, parks, and golf courses, up from 0.8 million pounds in 1974.  This increase in use has been driven largely by the proliferation of genetically engineered crops, crops specifically tailored to resist the activity of glyphosate.

30.     Defendant is intimately involved in the development, design, manufacture, marketing, sale, and distribution of genetically modified ("GMO") crops, many of which are marketed as being resistant to Roundup *i.e.*, "Roundup Ready®." As of 2009, Defendant was the

world's leading producer of seeds designed to be Roundup Ready®. In 2010, an estimated 70% of corn and cotton, and 90% of soybean fields in the United States contained Roundup Ready® seeds.

31.     The original Roundup, containing the active ingredient glyphosate, was introduced in 1974. Today, glyphosate products are among the world's most widely used herbicides.

32.     For nearly 40 years, consumers, farmers, and the public have used Roundup, unaware of its carcinogenic properties.

### REGISTRATION OF HERBICIDES UNDER FEDERAL LAW

33.     The manufacture, formulation and distribution of herbicides, such as Roundup, are regulated under the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA"), 7 U.S.C. § 136 et seq. FIFRA requires that all pesticides be registered with the Environmental Protection Agency ("EPA") prior to their distribution, sale, or use, except as described by FIFRA, 7 U.S.C. § 136a(a).

34.     The EPA requires, as part of the registration process, a variety of tests to evaluate the potential for exposure to pesticides, toxicity to people and other potential non-target organisms, and other adverse effects on the environment. Registration by the EPA, however, is not an assurance or finding of safety. The determination the EPA makes in registering or re-registering a product is not that the product is "safe," but rather that use of the product in accordance with its label directions "will not generally cause unreasonable adverse effects on the environment." 7 U.S.C. § 136a(c)(5)(D).

35.     FIFRA defines "unreasonable adverse effects on the environment" to mean "any unreasonable risk to man or the environment, taking into account the economic, social, and

environmental costs and benefits of the use of any pesticide." 7 U.S.C. § 136(bb).  FIFRA thus requires the EPA to make a risk/benefit analysis in determining whether a registration should be granted or allowed to continue to be sold in commerce.

36.     The EPA and the States of Missouri and Texas registered Roundup for distribution, sale, and manufacture in the United States and the States of Missouri and Texas.

37.     FIFRA generally requires that the registrant, Monsanto, conduct health and safety testing of pesticide products.  The government is not required, nor is it able, to perform the product tests that are required of the manufacturer.

38.     The evaluation of each pesticide product distributed, sold, or manufactured is completed at the time the product is initially registered.  The data necessary for registration of a pesticide has changed over time.  The EPA is now in the process of re-evaluating all pesticide products through a Congressionally-mandated process called "re-registration."  7 U.S.C. § 136a-1.  In order to reevaluate these pesticides, the EPA demands the completion of additional tests and the submission of data for the EPA's review and evaluation.

39.     In the case of glyphosate and Roundup, the EPA had planned on releasing its preliminary risk assessment – in relation to the registration process – no later than July 2015. The EPA completed its review of glyphosate in early 2015, but delayed releasing the assessment pending further review in light of the World Health Organization's March 24, 2015 finding that glyphosate is a "probable carcinogen" as demonstrated by the mechanistic evidence of carcinogenicity in humans and sufficient evidence of carcinogenicity in animals.

## MONSANTO'S FALSE REPRESENTATIONS REGARDING THE SAFETY OF ROUNDUP

40.     In 1996, the New York Attorney General (the "NYAG") filed a lawsuit against Monsanto based on its false and misleading advertising of Roundup products.  Specifically, the

lawsuit challenged Monsanto's general representations that its spray-on glyphosate-based herbicides, including Roundup, were "safer than table salt" and "practically non-toxic" to mammals, birds, and fish. Among the representations the NYAG found deceptive and misleading about the human and environmental safety of Roundup are the following:

(a)    Remember that environmentally friendly Roundup herbicide is biodegradable. It won't build up in the soil so you can use Roundup with confidence along customers' driveways, sidewalks and fences . . .

(b)    And remember that Roundup is biodegradable and won't build up in the soil. That will give you the environmental confidence you need to use Roundup everywhere you've got a weed, brush, edging or trimming problem.

(c)    Roundup biodegrades into naturally occurring elements.

(d)    Remember that versatile Roundup herbicide stays where you put it. That means there's no washing or leaching to harm customers' shrubs or other desirable vegetation.

(e)    This non-residual herbicide will not wash or leach in the soil. It . . . stays where you apply it.

(f)    You can apply Accord [a glyphosate-based herbicide also produced by Monsanto] with "confidence because it will stay where you put it" it bonds tightly to soil particles, preventing leaching. Then, soon after application, soil microorganisms biodegrade Accord into natural products.

(g)    Glyphosate is less toxic to rats than table salt following acute oral ingestion.

(h)     Glyphosate's safety margin is much greater than required.  It has over a
1,000-fold safety margin in food and over a 700-fold safety margin for
workers who manufacture it or use it.

(i)     You can feel good about using herbicides by Monsanto.  They carry a
toxicity category rating of 'practically non-toxic' as it pertains to
mammals, birds and fish.

(j)     "Roundup can be used where kids and pets will play and breaks down into
natural material." This ad depicts a person with his head in the ground and
a pet dog standing in an area which has been treated with Roundup.

41.     On November 19, 1996, Monsanto entered into an Assurance of Discontinuance
with the NYAG, in which Monsanto agreed, among other things, "to cease and desist from
publishing or broadcasting any advertisements [in New York] that represent, directly or by
implication" that:

(a)     Its glyphosate-containing pesticide products or any component thereof are
safe, non-toxic, harmless or free from risk;

(b)     Its glyphosate-containing pesticide products or any component thereof
manufactured, formulated, distributed or sold by Monsanto are
biodegradable;

(c)     Its glyphosate-containing pesticide products or any component thereof
stay where they are applied under all circumstances and will not move
through the environment by any means;

(d)    Its glyphosate-containing pesticide products or any component thereof are
"good" for the environment or are "known for their environmental
characteristics";

(e)    Glyphosate-containing pesticide products or any component thereof are
safer or less toxic than common consumer products other than herbicides;
and

(f)    Its glyphosate-containing products or any component thereof might be
classified as "practically non-toxic."

42.    Monsanto did not alter its advertising in the same manner in any state other than
New York, and on information and belief still has not done so today.

43.    In 2009, France's highest court ruled that Monsanto had not told the truth about
the safety of Roundup. The French court affirmed an earlier judgment that Monsanto had falsely
advertised its herbicide Roundup as "biodegradable" and that it "left the soil clean."

## EVIDENCE OF CARCINOGENICITY IN ROUNDUP

44.    As early as the 1980's, Monsanto was aware of glyphosate's carcinogenic
properties.

45.    On March 4, 1985, a group of the Environmental Protection Agency's (the
"EPA") Toxicology Branch published a memorandum classifying glyphosate as a Category C
oncogene. Category C oncogenes are possible human carcinogens with limited evidence of
carcinogenicity.

46.    In 1986, the EPA issued a Registration Standard for glyphosate (NTIS PB87-
103214). The Registration standard required additional phytotoxicity, environmental fate,

toxicology, product chemistry, and residue chemistry studies. All of the data required was submitted and reviewed and/or waived.

47.    In October 1991, the EPA published a memorandum entitled "Second Peer Review of Glyphosate." The memorandum changed glyphosate's classification to Group E (evidence of non-carcinogenicity for humans). Two peer review committee members did not concur with the conclusions of the committee and one member refused to sign.

48.    In addition to the toxicity of the active molecule, many studies support the hypothesis that glyphosate formulations found in Defendant's Roundup products are more dangerous and toxic than glyphosate alone. As early as 1991, studies produced evidence which demonstrated that glyphosate formulations were significantly more toxic than glyphosate alone.

49.    In 2002, Julie Marc published a study entitled "Pesticide Roundup Provokes Cell Division Dysfunction at the Level of CDK1/Cyclin B Activation."

50.    The study found that Defendant's Roundup caused delays in the cell cycles of sea urchins, while the same concentrations of glyphosate alone proved ineffective and did not alter cell cycles.

51.    In 2004, Julie Marc published a study entitled "Glyphosate-based pesticides affect cell cycle regulation." The study demonstrated a molecular link between glyphosate-based products and cell cycle dysregulation.

52.    The study noted that "cell-cycle dysregulation is a hallmark of tumor cells and human cancer. Failure in the cell-cycle checkpoints leads to genomic instability and subsequent development of cancers from the initial affected cell." Further, "[s]ince cell cycle disorders such as cancer result from dysfunction of unique cell, it was of interest to evaluate the threshold dose of glyphosate affecting cells."

53.    In 2005, Francisco Peixoto published a study showing that Roundup's effects on rat liver mitochondria are much more toxic and harmful than the same concentrations of glyphosate alone.

54.    The Peixoto study suggested that the harmful effects of Roundup on mitochondrial bioenergetics could not be exclusively attributed to glyphosate and could be the result of other chemicals, namely the surfactant POEA, or the possible synergy between glyphosate and Roundup formulation products.

55.    In 2009, Nora Benachour and Gilles-Eric Seralini published a study examining the effects of Roundup and glyphosate on human umbilical, embryonic, and placental cells.

56.    The study used dilution levels of Roundup and glyphosate far below agricultural recommendations, corresponding with low levels of residues in food. The study concluded that supposed "inert" ingredients, and possibly POEA, change human cell permeability and amplify toxicity of glyphosate alone. The study further suggested that determinations of glyphosate toxicity should take into account the presence of adjuvants, or those chemicals used in the formulation of the complete pesticide. The study confirmed that the adjuvants in Roundup are not inert and that Roundup is always more toxic than its active ingredient glyphosate.

57.    The results of these studies were confirmed in recently published peer-reviewed studies and were at all times available and/or known to Defendant.

58.    Defendant knew or should have known that Roundup is more toxic than glyphosate alone and that safety studies on Roundup, Roundup's adjuvants and "inert" ingredients, and the surfactant POEA were necessary to protect Hutchison from Roundup.

59.    Defendant knew or should have known that tests limited to Roundup's active ingredient glyphosate were insufficient to prove the safety of Roundup.

11

60.    Defendant failed to appropriately and adequately test Roundup, Roundup's adjuvants and "inert" ingredients, and the surfactant POEA to protect Hutchison from Roundup.

61.    Rather than performing appropriate tests, Defendant relied upon flawed industry-supported studies designed to protect Defendant's economic interests rather than Hutchison and the consuming public.

62.    Despite its knowledge that Roundup was considerably more dangerous than glyphosate alone, Defendant continued to promote Roundup as safe.

### IARC CLASSIFICATION OF GLYPHOSATE

63.    The International Agency for Research on Cancer ("IARC") is the specialized intergovernmental cancer agency the World Health Organization ("WHO") of the United Nations tasked with conducting and coordinating research into the causes of cancer.

64.    An IARC Advisory Group to Recommend Priorities for IARC Monographs during 2015–2019 met in April 2014.  Though nominations for the review were solicited, a substance must meet two criteria to be eligible for review by the IARC Monographs: there must already be some evidence of carcinogenicity of the substance, and there must be evidence that humans are exposed to the substance.

65.    The IARC set glyphosate for review in 2015-2016.  The IARC used five criteria for determining priority in reviewing chemicals.  The criteria were: the substance must have a potential for direct impact on public health; scientific literature to support suspicion of carcinogenicity; evidence of significant human exposure; high public interest and/or potential to bring clarity to a controversial area and/or reduce public anxiety or concern; related agents similar to one given high priority by the above considerations.  Data reviewed was preferred to be sourced from publicly accessible, peer-reviewed data.

66.     On March 24, 2015, after the IARC working group's cumulative review of human, animal, and DNA studies for more than one (1) year, many of which have been in Defendant's possession since as early as 1985, the working group published its conclusion that the glyphosate contained in Defendant's Roundup herbicide is a Class 2A "probable carcinogen." This classification is demonstrated by the mechanistic evidence of carcinogenicity in humans and sufficient evidence of carcinogenicity in animals.

67.     The IARC's full Monograph was published on July 29, 2015, and established glyphosate as a class 2A probable carcinogen to humans.

68.     The IARC Working Group found an increased risk between exposure to glyphosate and non-Hodgkin's Lymphoma and several subtypes of non-Hodgkin's Lymphoma, and the increased risk continued after adjustment for other pesticides.

69.     The IARC also found that glyphosate caused DNA and chromosomal damage in human cells.

**EARLIER EVIDENCE OF GLYPHOSATE'S DANGER**

70.     Despite the new classification by the IARC, Defendant has had ample evidence of glyphosate's and Roundup's genotoxic properties for decades.

71.     Genotoxicity refers to chemical agents that are capable of damaging the DNA within a cell through genetic mutations, which is a process that is believed to lead to cancer.

72.     In 1997, Chris Clements published "Genotoxicity of select herbicides in Rana catesbeiana tadpoles using the alkaline single-cell gel DNA electrophoresis (comet) assay."

73.     The study found that tadpoles exposed to Roundup showed significant DNA damage when compared with unexposed control animals.

74.     Both human and animal studies have shown that glyphosate and glyphosate-based formulations such as Roundup can induce oxidative stress.

75.     Oxidative stress and associated chronic inflammation are believed to be involved in carcinogenesis.

76.     The IARC Monograph noted that "[s]trong evidence exists that glyphosate, AMPA and glyphosate-based formulations can induce oxidative stress."

77.     In 2007, César Paz-y-Miño published a study examining DNA damage in human subjects exposed to glyphosate.

78.     The study produced evidence of chromosomal damage in blood cells showing significantly greater damage after exposure to glyphosate than before in the same individuals, suggesting that the glyphosate formulation used during aerial spraying had a genotoxic effect on exposed individuals.

79.     The IARC Monograph reflected the volume of evidence of glyphosate pesticides' genotoxicity which noted "[t]he evidence for genotoxicity caused by glyphosate-based formulations is strong."

80.     Despite knowledge to the contrary, Defendant maintains that there is no evidence that Roundup is genotoxic, that regulatory authorities and independent experts are in agreement that Roundup is not genotoxic, and that there is no evidence that Roundup is genotoxic.

81.     In addition to glyphosate and Roundup's genotoxic properties, Defendant has long been aware of glyphosate's carcinogenic properties.

82.     Glyphosate, and Roundup in particular, have long been associated with carcinogenicity and the development of numerous forms of cancer, including, but not limited to, non-Hodgkin's lymphoma, Hodgkin's lymphoma, multiple myeloma, and soft tissue sarcoma.

83.    Defendant has known of this association since the early to mid-1980s and
numerous human and animal studies provided evidence as to the carcinogenicity of glyphosate
and/or Roundup.

84.    In 1985, the EPA studied the effects of glyphosate in mice, and found a dose-
related response in male mice linked to renal tubal adenomas, a rare tumor.  The study concluded
that the glyphosate was oncogenic.

85.    In 2002, Lennart Hardell and Mikael Eriksson published the results of two case-
controlled studies on pesticides as a risk factor for non-Hodgkin's Lymphoma and hairy cell
leukemia.

86.    The study concluded that glyphosate had the most significant relationship to non-
Hodgkin's Lymphoma among all herbicides studies, with an increased odds ratio of 3:11.

87.    In 2003, AJ De Roos published a study examining the pooled data of Mid-
Western farmers, examining pesticides and herbicides at risk factors for non-Hodgkin's
Lymphoma.

88.    The study, which controlled for potential confounders, found a relationship
between increased non-Hodgkin's Lymphoma incidence and glyphosate.

89.    In 2008, Mikael Eriksson published a population-based case-control study of
exposure to various pesticides as a risk factor for non-Hodgkin's Lymphoma.

90.    The study strengthened previous associations between glyphosate and non-
Hodgkin's Lymphoma.

91.    In spite of this knowledge, Defendant continued to issue broad and sweeping
statements suggesting that Roundup was, and is, safer than ordinary household items such as

table salt, despite a lack of scientific support for the accuracy and validity of these statements and, in fact, voluminous evidence to the contrary.

92.     Upon information and belief, these statements and representations have been made with the intent of inducing Hutchison, the agricultural community, and the public at large to purchase and increase the use of Defendant's Roundup for Defendant's pecuniary gain, and in fact, did induce Hutchison to use Roundup.

93.     Defendant made these statements with complete disregard and reckless indifference to the safety of Hutchison and the general public.

94.     Notwithstanding Defendant's representations, scientific evidence has established a clear association between glyphosate and genotoxicity, inflammation, and an increased risk of many cancers, including, but not limited to, non-Hodgkin's Lymphoma, Multiple Myeloma, and soft tissue sarcomas.

95.     Defendant knew or should have known that glyphosate is associated with an increased risk of developing cancer, including, but not limited to, non-Hodgkin's Lymphoma, Multiple Myeloma, and soft tissue sarcomas.

96.     Defendant failed to appropriately and adequately inform and warn Hutchison of the serious and dangerous risks associated with the use of and exposure to glyphosate and/or Roundup, including, but not limited to, the risk of developing non-Hodgkin's Lymphoma, as well as other severe and personal injuries, which are permanent and/or long-lasting in nature, cause significant physical pain and mental anguish, diminished enjoyment of life, and the need for medical treatment, monitoring and/or medications.

97.     Despite the IARC's classification of glyphosate as a class 2A probable carcinogen, Defendant continues to maintain that glyphosate and/or Roundup is safe,

16

noncarcinogenic, non-genotoxic, and falsely warrant to users and the general public that

independent experts and regulatory agencies agree that there is no evidence of carcinogenicity or

genotoxicity in glyphosate and Roundup.

98.    Defendant has claimed and continues to claim that Roundup is safe,

noncarcinogenic, and non-genotoxic.

**SCIENTIFIC FRAUD UNDERLYING
THE SAFETY DETERMINATIONS OF GLYPHOSATE**

99.    After the EPA's 1985 classification of glyphosate as possibly carcinogenic to

humans (Group C), Monsanto exerted pressure upon the EPA to change its classification.

100.    This culminated in the EPA's reclassification of glyphosate to Group E, which was

based upon evidence of non-carcinogenicity in humans.

101.    In so classifying, the EPA stated that "[i]t should be emphasized, however, that

designation of an agent in Group E is based on the available evidence at the time of evaluation

and should not be interpreted as a definitive conclusion that the agent will not be a carcinogen

under any circumstances."

102.    On two occasions, the EPA found that laboratories hired by Monsanto to test the

toxicity of its Roundup products for registration purposes committed scientific fraud.

103.    In the first instance, Monsanto hired Industrial Bio-Test Laboratories ("IBT") to

perform and evaluate pesticide toxicology studies relating to Roundup.  IBT performed

approximately 30 tests on glyphosate and glyphosate-containing products, including 11 of the 19

chronic toxicology studies needed to register Roundup with the EPA.

104.    In 1976, the Food and Drug Administration ("FDA") performed an inspection of

IBT and discovered discrepancies between the raw data and the final report relating to

toxicological impacts of glyphosate.  The EPA subsequently audited IBT and determined that the

17

toxicology studies conducted for Roundup were invalid. An EPA reviewer stated, after finding "routine falsification of data" at IBT, that it was "hard to believe the scientific integrity of the studies when they said they took specimens of the uterus from male rabbits."

105.   Three top executives of IBT were convicted of fraud in 1983.

106.   In the second incident, Monsanto hired Craven Laboratories ("Craven") in 1990 to perform pesticide and herbicide studies, including several studies on Roundup.

107.   In March of 1991, the EPA announced that it was investigating Craven for "allegedly falsifying test data used by chemical firms to win EPA approval of pesticides."

108.   The investigation lead to the indictments of the laboratory owner and a handful of employees.

### MONSANTO'S CONTINUING DISREGARD FOR THE SAFETY OF HUTCHISON AND THE PUBLIC

109.   Monsanto claims on its website that "[r]egulatory authorities and independent experts around the world have reviewed numerous long-term/carcinogenicity and genotoxicity studies and agree that there is no evidence that glyphosate, the active ingredient in Roundup brand herbicides and other glyphosate-based herbicides, causes cancer, even at very high doses, and that it is not genotoxic."

110.   Ironically, the primary source for this statement is a 1986 report by the WHO, the same organization that now considers glyphosate to be a probable carcinogen.

111.   Glyphosate, and Defendant's Roundup products in particular, have long been associated with serious side effects and many regulatory agencies around the globe have banned or are currently banning the use of glyphosate herbicide products.

112.   Defendant's statements proclaiming the safety of Roundup and disregarding its dangers misled Hutchison.

113.    Despite Defendant's knowledge that Roundup was associated with an elevated risk of developing cancer, Defendant's promotional campaigns focused on Roundup's purported "safety profile."

114.    Defendant's failure to adequately warn Hutchison resulted in (1) Hutchison using and being exposed to glyphosate instead of using another acceptable and safe method of controlling unwanted weeds and pests; and (2) scientists and physicians failing to warn and instruct consumers about the risk of cancer, including non-Hodgkin's Lymphoma, and other injuries associated with Roundup.

115.    Defendant failed to seek modification to the labeling of Roundup to include relevant information regarding the risks and dangers associated with Roundup exposure.

116.    The failure of Defendant to appropriately warn and inform the EPA has resulted in inadequate warnings in safety information presented directly to users and consumers.

117.    The failure of Defendant to appropriately warn and inform the EPA has resulted in the absence of warning or caution statements that are adequate to protect health and the environment.

118.    The failure of Defendant to appropriately warn and inform the EPA has resulted in the directions for use that are not adequate to protect health and the environment.

119.    By reason of the foregoing acts and omissions, Hutchison seeks compensatory damages as a result of Hutchison's use of, and exposure to, Roundup which caused or was a substantial contributing factor in causing Hutchison to suffer from cancer, specifically non-Hodgkin's Lymphoma, and Hutchison suffered severe and personal injuries which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life.

120.    By reason of the foregoing, Hutchison is severely and permanently injured.

121.   By reason of the foregoing acts and omissions, Hutchison has endured and, in some categories continues to suffer, emotional and mental anguish, medical expenses, and other economic and non-economic damages, as a result of the actions and inactions of Defendant.

**EQUITABLE TOLLING OF**
**APPLICABLE STATUTE OF LIMITATIONS**

122.   Hutchison incorporates by reference all prior paragraphs of this Complaint as if fully set forth herein.

123.   The running of any statute of limitations has been tolled by reason of Defendant's fraudulent concealment. Defendant, through its affirmative misrepresentations and omissions, actively concealed from Hutchison the true risks associated with Roundup and glyphosate.

124.   At all relevant times, Defendant has maintained that Roundup is safe, non-toxic, and non-carcinogenic.

125.   Indeed, even as of July 2016, Defendant continued to represent to the public that "Regulatory authorities and independent experts around the world have reviewed numerous long-term/carcinogenicity and genotoxicity studies and agree that there is no evidence that glyphosate, the active ingredient in Roundup® brand herbicides and other glyphosate-based herbicides, causes cancer, even at very high doses, and that it is not genotoxic" (emphasis added).

126.   As a result of Defendant's actions, Hutchison was unaware, and could not reasonably have known or have learned through reasonable diligence that Roundup and/or glyphosate contact, exposed Hutchison to the risks alleged herein and that those risks were the direct and proximate result of Defendant's acts and omissions.

127.   Furthermore, Defendant is estopped from relying on any statute of limitations because of its fraudulent concealment of the true character, quality and nature of Roundup.

Defendant was under a duty to disclose the true character, quality, and nature of Roundup because this was non-public information over which Defendant had and continues to have exclusive control, and because Defendant knew that this information was not available to Hutchison or to distributors of Roundup. In addition, Defendant is estopped from relying on any statute of limitations because of its intentional concealment of these facts.

128.    Hutchison had no knowledge that Defendant was engaged in the wrongdoing alleged herein. Because of the fraudulent acts of concealment of wrongdoing by Defendant, Hutchison could not have reasonably discovered the wrongdoing at any time prior. Also, the economics of this fraud should be considered. Defendant had the ability to and did spend enormous amounts of money in furtherance of its purpose of marketing, promoting and/or distributing a profitable herbicide, notwithstanding the known or reasonably known risks. Hutchison and medical professionals could not have afforded and could not have possibly conducted studies to determine the nature, extent, and identity of related health risks, and were forced to rely on only Defendant's representations. Accordingly, Defendant is precluded by the discovery rule and/or the doctrine of fraudulent concealment from relying upon any statute of limitations.

## HUTCHISON'S EXPOSURE TO ROUNDUP AND RESULTING MEDICAL INJURIES

129.    Hutchison purchased Roundup for use as an herbicide on his properties in Texas during the period between 2000 and 2005. Hutchison used and was exposed to Roundup approximately four times each year during that period. Typically, when Hutchison used Roundup, he would spray approximately five one-gallon drums of Roundup on weeds on his properties.

130. Beginning in 2010, Hutchison began to feel ill. Among other symptoms, Hutchison began to suffer from severe, progressive respiratory ailments.

131: After seeking medical care for his ailments and being subjected to scans and testing, Hutchison was diagnosed with non-Hodgkin's lymphoma in May 2011.

132. Since his diagnosis with non-Hodgkin's lymphoma, Hutchison has suffered from, and continues to suffer from, a litany of serious medical issues caused by his cancer and required treatment, including but not limited to:

a) A life-threatening staph infection;

b) An extremely painful case of shingles, resulting in permanent nerve damage;

c) A digestive disorder known as Gastroesophageal reflux disease;

d) The repeated development of non-malignant tumors in Hutchison's vocal chords, the treatment of which has required Hutchison to undergo 25 invasive operations, and will require Hutchison to undergo additional surgeries in the future; and

e) Additional severe side-effects from the chemotherapy and drug treatments required to fight Hutchison's cancer;

133. In addition to Hutchison's severe physical, mental, and emotional suffering as a result of his cancer, Hutchison's illness forced him to retire in 2013. Hutchison has been medically unable to work since that time, such that he has lost earnings opportunities and income during that period.

## FIRST CAUSE OF ACTION
### (NEGLIGENCE)

134. Hutchison repeats, reiterates, and re-alleges every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

135.    Defendant had a duty to exercise reasonable care in the designing, researching,
testing, manufacturing, marketing, supplying, promoting, packaging, sale, and distributing of
Roundup into the stream of commerce, including a duty to assure that the product would not
cause users to suffer unreasonable, dangerous side effects.

136.    Defendant failed to exercise ordinary care in the designing, researching, testing,
manufacturing, marketing, supplying, promoting, packaging, sale, testing, quality assurance,
quality control, and/or distribution of Roundup into interstate commerce in that Defendant knew
or should have known that using Roundup created a high risk of unreasonable, dangerous side
effects, including, but not limited to, the development of non-Hodgkin's Lymphoma, as well as
other severe and personal injuries which are permanent and lasting in nature, physical pain, and
mental anguish.  These injuries include a diminished enjoyment of life, as well as the need for
lifelong medical treatment, monitoring, and/or medications.

137.    The negligence by Defendant, its agents, servants, and employees, includes but is
not limited to the following acts or omissions:

(a)    Manufacturing, producing, promoting, formulating, creating, and
designing Roundup without thoroughly testing it;

(b)    Failing to test Roundup and failing to adequately, sufficiently, and
properly test Roundup;

(c)    Not conducting sufficient testing programs to determine whether or
not Roundup was safe for use, in that Defendant herein knew or
should have known that Roundup was unsafe and unfit for use by
reason of the dangers to its users;

(d)    Not conducting sufficient testing programs and studies to
determine Roundup's carcinogenic properties even after Defendant
had knowledge that Roundup is, was, or could be carcinogenic;

(e)    Failing to conduct sufficient testing programs to determine the
safety of "inert" ingredients or adjuvants contained within
Roundup, and the propensity of these ingredients to render
Roundup toxic, increase the toxicity of Roundup, whether these

ingredients are carcinogenic, magnify the carcinogenic properties of Roundup, and whether or not "inert" ingredients and/or adjuvants were safe for use;

(f) Negligently failing to adequately and correctly warn Hutchison, the public, the medical and agricultural professions, and the EPA of the dangers of Roundup;

(g) Negligently failing to petition the EPA to strengthen the warnings associated with Roundup;

(h) Failing to provide adequate cautions and warnings to protect the health of users, handlers, applicators, and persons who would reasonably and foreseeably come into contact with Roundup;

(i) Negligently marketing, advertising, and recommending the use of Roundup without sufficient knowledge as to its dangerous propensities;

(j) Negligently representing that Roundup was safe for use for its intended purpose, and that Roundup was safer than ordinary and common items such as table salt, when, in fact, it was unsafe;

(k) Negligently representing that Roundup was the equivalent in safety and efficacy as other forms of herbicides;

(l) Negligently designing Roundup in a manner which was dangerous to its users;

(m) Negligently manufacturing Roundup in a manner which was dangerous to its users;

(n) Negligently producing Roundup in a manner which was dangerous to its users;

(o) Negligently formulating Roundup in a manner which was dangerous to its users;

(p) Concealing information from Hutchison while knowing that Roundup was unsafe, dangerous, and/or non-conforming with EPA regulations; and

(q) Improperly concealing and/or misrepresenting information from Hutchison, scientific and medical professionals, and/or the EPA, concerning the severity of risks and dangers of Roundup compared to other forms of herbicides.

(r) Negligently selling Roundup with a false and misleading label.

138.    Defendant under-reported, underestimated, and downplayed the serious dangers of Roundup.

139.    Defendant negligently and deceptively compared the safety risks and dangers of Roundup with common, everyday foods such as table salt, and other forms of herbicides.

140.    Defendant was negligent and violated Missouri and Texas law in the designing, researching, supplying, manufacturing, promoting, packaging, distributing, testing, advertising, warning, marketing, and selling of Roundup in that it:

(a)    Failed to use ordinary care in designing and manufacturing Roundup to avoid the aforementioned risks to individuals when Roundup was used as an herbicide;

(b)    Failed to attach proper and accurate warnings to its product regarding all possible adverse side effects associated with the use of Roundup;

(c)    Failed to attach proper and accurate warnings to its product regarding all possible adverse side effects associated with the failure or malfunction of Roundup;

(d)    Failed to accompany its product with accurate warnings regarding the risks of all possible adverse side effects concerning Roundup;

(e)    Failed to warn Hutchison of the severity and duration of such adverse effects, as the warnings given did not accurately reflect the symptoms, or severity of the side effects including, but not limited to, the development of non-Hodgkin's Lymphoma;

(f)    Failed to conduct adequate testing, clinical testing and post-marketing surveillance to determine the safety of Roundup;

(g)    Failed to conduct adequate testing, clinical testing, and post-marketing surveillance to determine the safety of Roundup's "inert" ingredients and adjuvants;

(h)    Negligently misrepresented the evidence of Roundup's genotoxicity and carcinogenicity;

(i)    Was otherwise careless and/or negligent.

141.   Despite the fact that Defendant knew or should have known that Roundup caused, or could cause, unreasonably dangerous side effects, Defendant continued and continues to market, manufacture, distribute, and sell Roundup to consumers, including Hutchison.

142.   Defendant knew or should have known that consumers such as Hutchison would foreseeably suffer injury as a result of Defendant's failure to exercise ordinary care, as set forth above.

143.   Defendant's violations of law and negligence were the proximate cause of Hutchison's injuries, harm, and economic loss, which Hutchison suffered and/or will continue to suffer.

144.   As a result of the foregoing acts and omissions, Hutchison suffered from serious and dangerous side effects including, but not limited to, non-Hodgkin's Lymphoma, and other severe and personal injuries which are permanent and lasting in nature, physical pain, and mental anguish, a diminished enjoyment of life, and substantial financial expenses for hospitalization and medical care.  Further, Hutchison suffered life-threatening non-Hodgkin's Lymphoma, and severe personal injuries, which are permanent and lasting in nature, physical pain, and mental anguish, including a diminished enjoyment of life.

## SECOND CAUSE OF ACTION
## (STRICT PRODUCTS LIABILITY – DESIGN DEFECT)

145.   Hutchison repeats every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

146.   At all times herein mentioned, Defendant designed, researched, manufactured, tested, advertised, promoted, sold, and distributed Roundup as hereinabove described that was used by Hutchison.

147.     Defendant's Roundup was expected to and did reach the usual consumers, handlers, and persons coming into contact with said product without substantial change in the condition in which it was produced, manufactured, sold, distributed, and marketed by Defendant.

148.     At those times, Roundup was in an unsafe, defective, and inherently dangerous condition, which was dangerous to users, and in particular, Hutchison herein.

149.     The Roundup designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed by Defendant was defective in design or formulation in that, when it left the hands of the manufacturer and/or suppliers, the foreseeable risks exceeded the benefits associated with the design or formulation of Roundup.

150.     The Roundup designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed by Defendant was defective in design and/or formulation, in that, when it left the hands of Defendant manufacturers and/or suppliers, it was unreasonably dangerous, unreasonably dangerous in normal use, and it was more dangerous than an ordinary consumer would expect.

151.     At all times herein mentioned, Roundup was in a defective condition and unsafe, and Defendant knew or had reason to know that said product was defective and unsafe, especially when used in the form and manner as provided by Defendant. In particular, Defendant's Roundup was defective in the following ways:

        (a)     When placed in the stream of commerce, Defendant's Roundup products were defective in design and formulation and, consequently, dangerous to an extent beyond that which an ordinary consumer would anticipate.

        (b)     When placed in the stream of commerce, Defendant's Roundup products were unreasonably dangerous in that they were hazardous and posed a grave risk of cancer and other serious illnesses when used in a reasonably anticipated manner.

    (c)    When placed in the stream of commerce, Defendant's Roundup products contained unreasonably dangerous design defects and were not reasonably safe when used in a reasonably anticipated manner.

    (d)    Defendant did not sufficiently test, investigate, or study its Roundup products.

    (e)    Exposure to Roundup presents a risk of harmful side effects that outweigh any potential utility stemming from the use of the herbicide.

    (f)    Defendant new or should have known at the time of marketing its Roundup products that exposure to Roundup and could result in cancer and other severe illnesses and injuries.

    (g)    Defendant did not conduct adequate post-marketing surveillance of its Roundup products.

152.    In addition, when Roundup left control of Defendant, there were practical and feasible alternative designs, which would have prevented and/or significantly reduced the risk of Hutchison's injury without impairing the reasonably anticipated or intended function of the product. These safer alternative designs were economically and technologically feasible, and would have prevented or significantly reduced the risk of Hutchison's injuries without substantially impairing the product's utility.

153.    Defendant knew, or should have known, that its Roundup was in a defective condition, and was and is inherently dangerous and unsafe.

154.    Hutchison was exposed to Defendant's Roundup, as described above, without knowledge of Roundup's dangerous characteristics.

155.    At the time of Hutchison's use of and exposure to Roundup, Hutchison used Roundup for the purposes and in a manner normally intended: as a broad-spectrum herbicide.

156.    Defendant voluntarily designed its Roundup with this knowledge of a dangerous condition for use by the public, and in particular Hutchison.

157.   Defendant had a duty to create a product that was not unreasonably dangerous for its normal, intended use.

158.   Defendant created a product that was and is unreasonably dangerous for its normal, intended use.

159.   Defendant marketed and promoted a product in such a manner so as to make it inherently defective as the product downplayed its suspected, probable, and established health risks inherent with its normal, intended use.

160.   The Roundup designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed by Defendant was manufactured defectively in that Roundup left the hands of Defendant in a defective condition and was unreasonably dangerous to its intended users.

161.   The Roundup designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed by Defendant reached its intended users in the same defective and unreasonably dangerous condition in which Defendant's Roundup was manufactured.

162.   Defendant designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed a defective product, which created an unreasonable risk to the health of consumers and to Hutchison in particular, and Defendant is therefore strictly liable for the injuries sustained by Hutchison.

163.   Hutchison could not, by the exercise of reasonable care, have discovered Roundup's defects herein mentioned or perceived its danger.

164.   By reason of the foregoing, Defendant has become strictly liable to Hutchison for the manufacturing, marketing, promoting, distribution, and selling of a defective product, Roundup.

165.    Defendant's defective design of Roundup amounts to willful, wanton, and reckless conduct by Defendant.

166.    Defects in Defendant's Roundup were the cause or a substantial factor in causing Hutchison's injuries.

167.    As a result of the foregoing acts and omission, Hutchison developed non-Hodgkin's Lymphoma, and suffered severe and personal injuries which are permanent and lasting in nature, physical pain, and mental anguish, including diminished enjoyment of life, and extensive financial expenses for hospitalization and medical care.

## THIRD CAUSE OF ACTION
### (STRICT PRODUCTS LIABILITY – FAILURE TO WARN)

168.    Hutchison repeats, reiterates and re-alleges each allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

169.    Defendant has engaged in the business of selling, testing, distributing, supplying, manufacturing, marketing, and promoting Roundup, and through that conduct has knowingly and intentionally placed Roundup into the stream of commerce with full knowledge that it reaches consumers such as Hutchison who are exposed to it through ordinary and reasonably foreseeable uses.

170.    Defendant did in fact sell, distribute, supply, manufacture, and/or promote Roundup to Hutchison.  Additionally, Defendant expected the Roundup that it was selling, distributing, supplying, manufacturing, and promoting to reach – and did in fact reach – consumers, including Hutchison, without any substantial change in the condition of the product from when it was initially distributed by Defendant.

171.    At the time of manufacture, Defendant could have provided the warnings or instructions regarding the full and complete risks of Roundup and glyphosate-containing products because it knew or should have known of the unreasonable risks of harm associated with the use of and exposure to such products.

172.    At all times herein mentioned, the aforesaid product was defective and unsafe in manufacture such that it was unreasonably dangerous to the user, and was so at the time it was distributed by Defendant and at the time Hutchison was exposed to and/or ingested the product. The defective condition of Roundup was due in part to the fact that it was not accompanied by proper warnings regarding its carcinogenic qualities and possible side effects, including, but not limited to, developing non-Hodgkin's lymphoma as a result of exposure and use.

173.    Roundup did not contain a warning or caution statement, which was necessary and, if complied with, was adequate to protect the health of those exposed in violation of 7 U.S.C. § 136j (a)(1)(E).

174.    Defendant's failure to include a warning or caution statement which was necessary and, if complied with, was adequate to protect the health of those exposed, violated 7 U.S.C. § 136j (a)(1)(E) as well as the laws of the states of Missouri and Texas.

175.    Defendant could have amended the label of Roundup to provide additional warnings.

176.    This defect caused serious injury to Hutchison, who used Roundup in its intended and foreseeable manner.

177.    At all times herein mentioned, Defendant had a duty to properly design, manufacture, compound, test, inspect, package, label, distribute, market, examine, maintain

supply, provide proper warnings, and take such steps to assure that the product did not cause users to suffer from unreasonable and dangerous side effects.

178.    Defendant labeled, distributed, and promoted the aforesaid product that was dangerous and unsafe for the use and purpose for which it was intended.

179.    Defendant failed to warn of the nature and scope of the side effects associated with Roundup, namely its carcinogenic properties and its propensity to cause or serve as a substantial contributing factor in the development of non-Hodgkin's Lymphoma.

180.    Defendant was aware of the probable consequences of the aforesaid conduct. Despite the fact that Defendant knew or should have known that Roundup caused serious injuries, Defendant failed to exercise reasonable care to warn of the dangerous carcinogenic properties and the side effect of developing non-Hodgkin's Lymphoma from Roundup exposure, even though these side effects were known or reasonably scientifically knowable at the time of distribution.  Defendant willfully and deliberately failed to avoid the consequences associated with its failure to warn, and in doing so, Defendant acted with a conscious disregard for the safety of Hutchison.

181.    At the time of exposure, Hutchison could not have reasonably discovered any defect in Roundup through the exercise of reasonable care.

182.    Defendant, as the manufacturer and distributor of the subject product, is held to the level of knowledge of an expert in the field.

183.    Hutchison reasonably relied upon the skill, superior knowledge, and judgment of Defendant.

32

184.    Had Defendant properly disclosed the risks associated with Roundup products, Hutchison would have avoided the risk of non-Hodgkin's Lymphoma by not using Roundup products.

185.    The information that Defendant did provide or communicate failed to contain adequate warnings and precautions that would have enabled Hutchison, and similarly situated individuals, to utilize the product safely and with adequate protection.  Instead, Defendant disseminated information that was inaccurate, false, and misleading, and which failed to communicate accurately or adequately the comparative severity, duration, and extent of the risk of injuries associated with use of and/or exposure to Roundup and glyphosate; continued to promote the efficacy of Roundup, even after it knew or should have known of the unreasonable risks from use or exposure; and concealed, downplayed, or otherwise suppressed, through aggressive marketing and promotion, any information or research about the risks and dangers of exposure to Roundup and glyphosate.

186.    To this day, Defendant has failed to adequately warn of the true risks of Hutchison's injuries associated with the use of and exposure to Roundup.

187.    As a result of its inadequate warnings, Defendant's Roundup products were defective and unreasonably dangerous when they left the possession and control of Defendant, were distributed by Defendant, and used by Hutchison.

188.    As a direct and proximate result of Defendant's actions as alleged herein, and in such other ways to be later shown, the subject product caused Hutchison to sustain injuries as herein alleged.

**FOURTH CAUSE OF ACTION**
**(BREACH OF IMPLIED WARRANTIES)**

33

189.    Hutchison repeats, reiterates, and re-alleges each allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect all if more fully set forth herein.

190.    At all times herein mentioned, Defendant manufactured, distributed, compounded, recommended, merchandized, advertised, promoted, and sold Roundup as a broad spectrum herbicide.  These actions were under the ultimate control and supervision of Defendant.

191.    At the time Defendant marketed, sold, and distributed Roundup for use by Hutchison, Defendant knew of Roundup's intended use and impliedly warranted the product to be or merchantable quality and safe and fit for this use.

192.    Defendant impliedly represented and warranted to Hutchison and users of Roundup, the agricultural community, and/or the EPA that Roundup was safe and of merchantable quality and fit for the ordinary purpose for which it was to be used.

193.    These representations and warranties were false, misleading, and inaccurate in that Roundup was unsafe, unreasonably dangerous, not of merchantable quality, and defective.

194.    Hutchison and/or the EPA did rely on said implied warranty of merchantability of fitness for particular use and purpose.

195.    Hutchison reasonably relied upon the skill and judgment of Defendant as to whether Roundup was of merchantable quality and safe and fit for its intended use.

196.    Roundup was injected into the stream of commerce by Defendant in a defective, unsafe, and inherently dangerous condition, and the products' materials were expected to and did reach users, handlers, and persons coming into contact with said products without substantial change in the condition in which they were sold.

197.   Defendant breached the aforesaid implied warranties, as its herbicide Roundup was not fit for its intended purposes and uses.

198.   As a result of the foregoing acts and omissions, Hutchison suffered from non-Hodgkin's Lymphoma and Hutchison suffered severe and personal injuries which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life, financial expenses for hospitalization and medical care, including medical expenses and other economic, and noneconomic damages.

## FIFTH CAUSE OF ACTION
### (BREACH OF EXPRESS WARRANTY)

199.   Hutchison repeats, reiterates, and re-alleges each allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

200.   At all relevant and material times, Defendant manufactured, distributed, advertised, promoted, and sold Roundup.

201.   At all relevant times, Defendant intended that its Roundup be used in the manner that Hutchison used it, and Defendant expressly warranted that each Roundup product was safe and fit for use by consumers, that it was of merchantable quality, that its health and side effects were minimal, and that it was adequately tested and fit for its intended use.

202.   At all relevant times, Defendant was aware that consumers, including Hutchison, would use Roundup products; which is to say that Hutchison was a foreseeable user of Defendant's Roundup products.

203.   Hutchison purchased Roundup manufactured by Defendant.

204.    Defendant's Roundup products were expected to reach and did reach consumers, including Hutchison, without any substantial change in the condition in which it was manufactured and sold by Defendant.

205.    Defendant expressly warranted that Roundup was safe and not dangerous to users.

206.    Defendant expressly represented to Hutchison, scientists, the agricultural community, and the EPA that Roundup was safe and fit for the purposes intended, that it was of merchantable quality, that it did not produce dangerous side effects in excess of those risks associated with other forms of herbicides, that the side effects it did produce were accurately reflected in the warnings, and that it was adequately tested and fit for its intended use.

207.    Defendant breached various express warranties with respect to Roundup including the following particulars: a) Defendant Monsanto's website expressly states that "[r]egulatory authorities and independent experts around the world have reviewed numerous long term/carcinogenicity and genotoxicity studies and agree that there is no evidence that glyphosate, the active ingredient in Roundup brand herbicides and other glyphosate based herbicides, causes cancer, even at very high doses, and that it is not genotoxic"; b) Defendant has expressly warrantied that Roundup is "safer than table salt" and "practically nontoxic."

208.    Roundup did not conform to these express representations because Roundup was not safe and had, at all relevant times, an increased risk of serious side effects, including non-Hodgkin's Lymphoma, when used according to Defendant's instructions.

209.    Defendant fraudulently concealed information from Hutchison regarding the true dangers and relative risks of Roundup.

210.    The global scientific community is not, and never was, in agreement that Roundup is non-carcinogenic.

36

211.    Hutchison relied on the express warranties of Defendant herein.

212.    Hutchison, consumers, and members of the agricultural community relied upon the representation and warranties of Defendant for the use of Roundup in using, purchasing, mixing, handling, applying, and dispensing Roundup.

213.    Defendant breached the aforesaid express warranties, as its product Roundup was defective.

214.    Defendant knew or should have known that, in fact, said representations and warranties were false, misleading, and untrue in that Roundup was not safe and fit for the use intended, and, in fact, produced serious injuries to the users that were not accurately identified and represented by Defendant.

215.    Defendant knew or should have known that, in fact, said warranties were false, misleading, and untrue in that there is evidence that Roundup is toxic, genotoxic, and carcinogenic and that scientists and/or regulatory authorities around the world are not in agreement that Roundup is not carcinogenic or genotoxic and that it is safe.

216.    As a result of the foregoing acts and omissions, Hutchison suffered from life threatening non-Hodgkin's Lymphoma and suffered severe and personal injuries, which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life, and extensive financial expenses for hospitalization and medical care.

217.    As a result of the foregoing acts and omissions, Hutchison has suffered and incurred damages, including medical expenses and other economic and non-economic damages.

**FIFTH CAUSE OF ACTION**
**(FRAUD, MISREPRESENTATION, AND SUPPRESSION)**

218.   Hutchison repeats, reiterates, and re-alleges each allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

219.   Defendant fraudulently, intentionally, and negligently misrepresented to the public, and to Hutchison, both directly and by and through the media, the scientific literature and purported "community outreach" programs, the safety of Roundup products, and fraudulently, intentionally, and negligently concealed, suppressed, or omitted material, adverse information regarding the safety of Roundup.

220.   Defendant's intentional and negligent misrepresentations and omissions regarding the safety of Roundup products were communicated to Hutchison directly through ghostwritten articles, editorials, national and regional advertising, marketing and promotion efforts, as well as the Roundup packaging and sales aids.  The safety of Roundup products was also intentionally and/or negligently misrepresented to Hutchison and the public with the intent that such misrepresentations would cause Hutchison and other potential consumers to purchase and use or continue to purchase and use Roundup products.

221.   Defendant either knew or should have known of the material representations they were making regarding the safety and relative utility of Roundup products.

222.   Defendant fraudulently, intentionally, and negligently made the misrepresentations and/or actively concealed, suppressed, or omitted this material information with the specific desire to induce Hutchison, and the consuming public to purchase and use Roundup products.  Defendant fraudulently, intentionally, and negligently, knew or should have known that Hutchison and the consuming public would rely on such material misrepresentations

38

and omissions in selecting and applying Roundup products. Defendant knew or should have known that Hutchison would rely on their false representations and omissions.

223.    Defendant made these misrepresentations and actively concealed adverse information including the risk of non-Hodgkin's Lymphoma, at a time when their agents and employees knew or should have known the product had defects, dangers, and characteristics that were other than what was represented to the consuming public. Specifically, Monsanto's hired advertising firm Osborn & Barr misrepresented and actively concealed, suppressed, and omitted that there had been inadequate testing of the safety and efficacy of Roundup, and that prior studies, research, reports, and/or testing had been conducted linking the use of the drug with serious health events, including non-Hodgkin's Lymphoma.

224.    Despite the fact that Defendant knew or should have known of reports of severe risks, including non-Hodgkin's Lymphoma, with Roundup use and exposure, this information was strategically minimized, understated, or omitted in order to create the impression that the human dangers of Roundup were nonexistent, particularly in light of its purported utility.

225.    The fraudulent, intentional and/or negligent material misrepresentations and/or active concealment, suppression, and omissions by Defendant were perpetuated directly and indirectly through the advertisements, packaging, sales aids, furtive public relations efforts, and other marketing and promotional pieces authored, analyzed, created, compiled, designed, drafted, disseminated, distributed, edited, evaluated, marketed, published, and supplied by Osborn & Barr.

226.    If Hutchison had known the true facts concerning the risks associated with Roundup exposure, Hutchison would have used a safer alternative.

227.     Hutchison's reliance upon the material misrepresentations and omissions was

justified, among other reasons, because said misrepresentations and omissions were made by

individuals and entities who were in a position to know the true facts concerning Roundup.

Hutchison was not in a position to know the true facts because Defendant overstated the benefits

and safety of Roundup and downplayed the risk of lymphoma, thereby inducing Hutchison to use

the herbicide rather than safer alternatives.

228.     As a direct and proximate result of Defendant' actions and inactions, Hutchison

was exposed to Roundup and suffered and will continue to suffer injuries and damages, as set

forth herein.

### SIXTH CAUSE OF ACTION
### (VIOLATION OF THE CONSUMER FRAUD ACTS)

229.     Hutchison repeats, reiterates, and re-alleges each allegation of this Complaint

contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more

fully set forth herein.

230.     Hutchison brings this cause of action pursuant to Missouri's and Texas's

consumer protection statutes, the Missouri Merchandising Practices Act ("MMPA"), Mo. Rev.

Stat. 407.025, and the Texas Deceptive Trade Practices-Consumer Protection Act ("DTPCPA"),

Tex. Bus. & Com. Code Ann. § 17.41 et seq.  Defendant fraudulently, intentionally, and

negligently misrepresented to the public, and to Hutchison, both directly and by and through the

media and purported "community outreach" programs, the safety of Roundup products, and

fraudulently, intentionally, and negligently concealed, suppressed, or omitted material, adverse

information regarding the safety of Roundup.  This deception caused injury to Hutchison in

violation of the MMPA and the DTPCPA, which provide a private right of action by Hutchison.

231.    The intentional, negligent, and innocent misrepresentations and omissions of
Defendant regarding the safety of Roundup products were communicated to Hutchison directly
through national and regional advertising, marketing and promotional efforts, as well as the
Roundup packaging and sales aids.  The safety of Roundup products was also intentionally,
negligently, and innocently misrepresented to Hutchison and the public with the intent that such
misrepresentations would cause Hutchison and other potential consumers to purchase and use or
continue to purchase and use Roundup products.

232.    Defendant either knew or should have known of the material representations it
was making regarding the safety and relative utility of Roundup products.

233.    Defendant fraudulently, intentionally, negligently, and innocently made the
misrepresentations and actively concealed, suppressed, or omitted this material information with
the specific desire to induce Hutchisons, and the consuming public to purchase and use Roundup
products.  Defendant fraudulently, intentionally, negligently, and innocently, knew or should have
known that Hutchisons and the consuming public would rely on such material misrepresentations
and/or omissions in selecting and applying Roundup products.  Defendant knew or should have
known that Hutchison would rely on its false representations and omissions.

234.    Defendant made these misrepresentations and actively concealed adverse
information including the risk of non-Hodgkin's Lymphoma, at a time when their agents and/or
employees knew or should have known the product had defects, dangers, and characteristics that
were other than what was represented to the consuming public.  Specifically, Defendant
misrepresented and actively concealed, suppressed, and omitted that there had been inadequate
testing of the safety and efficacy of Roundup, and that prior studies, research, reports, and/or

testing had been conducted linking the use of the drug with serious health events, including non-Hodgkin's Lymphoma.

235.    Despite the fact that Defendant knew or should have known of reports of severe risks including non-Hodgkin's Lymphoma with Roundup use and exposure, this information was strategically minimized, understated, or omitted in order to create the impression that the human dangers of Roundup were nonexistent, particularly in light of its purported utility.

236.    The fraudulent, intentional, negligent and/or innocent material misrepresentations and active concealment, suppression, and omissions by Defendant were perpetuated directly and indirectly through the advertisements, packaging, sales aids, furtive public relations efforts, and other marketing and promotional pieces authored, analyzed, created, compiled, designed, drafted, disseminated, distributed, edited, evaluated, marketed, published, and supplied by Defendant.

237.    If Hutchison had known the true facts concerning the risks associated with Roundup exposure, Hutchison would have used a safer alternative.

238.    Hutchison's reliance upon the material misrepresentations and omissions was justified, among other reasons, because said misrepresentations and omissions were made by individuals and entities who were in a position to know the true facts concerning Roundup. Hutchison was not in a position to know the true facts because Defendant overstated the benefits and safety of Roundup and downplayed the risk of lymphoma, thereby inducing Hutchison to use the herbicide rather than safer alternatives.

239.    Federal law and the EPA do not authorize and specifically prohibit the deceptions, misrepresentations and omissions made by Defendant.

240.    As a direct and proximate result of Defendant' actions and inactions, Hutchison was exposed to Roundup and suffered and will continue to suffer injuries and damages, as set forth herein.

## SEVENTH CAUSE OF ACTION
## (MISSOURI PRODUCTS LIABILITY – DEFECTIVE CONDITION)

241.    Hutchison repeats, reiterates, and re-alleges each allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

242.    Missouri Statute § 537.760 states that a "products liability claim" means a claim or portion of a claim in which the Hutchison seeks relief in the form of damages on a theory that the defendant is strictly liable for such damages because: (1) the defendant, wherever situated in the chain of commerce, transferred a product in the course of his business; and (2) the product was used in a manner reasonably anticipated; and (3) either or both of the following: (a) the product was then in a defective condition unreasonably dangerous when put to a reasonably anticipated use, and the Hutchison was damaged as a direct result of such defective condition as existed when the product was sold; or (b) the product was then unreasonably dangerous when put to a reasonably anticipated use without knowledge of its characteristics, and the Hutchison was damaged as a direct result of the product being sold without an adequate warning.

243.    At all times herein mentioned, Defendant designed, researched, manufactured, tested, advertised, promoted, sold, and distributed Roundup as hereinabove described that was used by Hutchison.

244.    Defendant's Roundup was expected to and did reach the usual consumers, handlers, and persons coming into contact with said product without substantial change in the condition in which it was produced, manufactured, sold, distributed, and marketed by Defendant.

245.     At those times, Roundup was in an unsafe, defective, and inherently dangerous condition, which was dangerous to users, and in particular, Hutchison herein.

246.     The Roundup designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed by Defendant was defective in design or formulation in that, when it left the hands of the manufacturer and suppliers, the foreseeable risks exceeded the benefits associated with the design or formulation of Roundup.

247.     The Roundup designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed by Defendant was defective in design and/or formulation, in that, when it left the hands of Defendant manufacturers and/or suppliers, it was unreasonably dangerous, unreasonably dangerous in normal use, and it was more dangerous than an ordinary consumer would expect.

248.     At all times herein mentioned, Roundup was in a defective condition and unsafe, and Defendant knew or had reason to know that said product was defective and unsafe, especially when used in the form and manner as provided by Defendant.  In particular, Defendant's Roundup was defective in the following ways:

     (a)     When placed in the stream of commerce, Defendant's Roundup products were defective in design and formulation and, consequently, dangerous to an extent beyond that which an ordinary consumer would anticipate.

     (b)     When placed in the stream of commerce, Defendant's Roundup products were unreasonably dangerous in that they were hazardous and posed a grave risk of cancer and other serious illnesses when used in a reasonably anticipated manner.

     (c)     When placed in the stream of commerce, Defendant's Roundup products contained unreasonably dangerous design defects and were not reasonably safe when used in a reasonably anticipated manner.

     (d)     Defendant did not sufficiently test, investigate, or study its Roundup products.

44

   (e)  Exposure to Roundup presents a risk of harmful side effects that outweigh any potential utility stemming from the use of the herbicide.

   (f)  Defendant new or should have known at the time of marketing its Roundup products that exposure to Roundup and could result in cancer and other severe illnesses and injuries.

   (g)  Defendant did not conduct adequate post-marketing surveillance of its Roundup products.

249. In addition, when Roundup left control of Defendant, there were practical and feasible alternative designs, which would have prevented and/or significantly reduced the risk of Hutchison's injury without impairing the reasonably anticipated or intended function of the product. These safer alternative designs were economically and technologically feasible, and would have prevented or significantly reduced the risk of Hutchison's injuries without substantially impairing the product's utility.

250. Defendant knew, or should have known, that its Roundup was in a defective condition, and was and is inherently dangerous and unsafe.

251. Hutchison was exposed to Defendant's Roundup, as described above, without knowledge of Roundup's dangerous characteristics.

252. At the time of Hutchison's use of and exposure to Roundup, Hutchison used Roundup for the purposes and in a manner normally intended: as a broad-spectrum herbicide.

253. Defendant voluntarily designed its Roundup with this knowledge of a dangerous condition for use by the public, and in particular Hutchison.

254. Defendant had a duty to create a product that was not unreasonably dangerous for its normal, intended use.

255. Defendant created a product that was and is unreasonably dangerous for its normal, intended use.

256.    Defendant marketed and promoted a product in such a manner so as to make it inherently defective as the product downplayed its suspected, probable, and established health risks inherent with its normal, intended use.

257.    The Roundup designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed by Defendant was manufactured defectively in that Roundup left the hands of Defendant in a defective condition and was unreasonably dangerous to its intended users.

258.    The Roundup designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed by Defendant reached its intended users in the same defective and unreasonably dangerous condition in which Defendant's Roundup was manufactured.

259.    Defendant designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed a defective product, which created an unreasonable risk to the health of consumers and to Hutchison in particular, and Defendant is therefore strictly liable for the injuries sustained by Hutchison.

260.    Hutchison could not, by the exercise of reasonable care, have discovered Roundup's defects herein mentioned or perceived its danger.

261.    By reason of the foregoing, Defendant has become strictly liable to Hutchison for the manufacturing, marketing, promoting, distribution, and selling of a defective product, Roundup.

262.    Defendant's defective design of Roundup amounts to willful, wanton, and reckless conduct by Defendant.

263.    Defects in Defendant's Roundup were the cause or a substantial factor in causing Hutchison's injuries.

264.     As a result of the foregoing acts and omission, Hutchison developed non-Hodgkin's Lymphoma, and suffered severe and personal injuries which are permanent and lasting in nature, physical pain, and mental anguish, including diminished enjoyment of life, and extensive financial expenses for hospitalization and medical care.

## EIGHTH CAUSE OF ACTION
### (MISSOURI PRODUCTS LIABILITY – FAILURE TO WARN OF UNREASONABLE DANGER)

265.     Hutchison repeats, reiterates and re-alleges each allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

266.     Missouri Statute § 537.760 states that a "products liability claim" means a claim or portion of a claim in which the Hutchison seeks relief in the form of damages on a theory that the defendant is strictly liable for such damages because: (1) the defendant, wherever situated in the chain of commerce, transferred a product in the course of his business; and (2) the product was used in a manner reasonably anticipated; and (3) either or both of the following: (a) the product was then in a defective condition unreasonably dangerous when put to a reasonably anticipated use, and the Hutchison was damaged as a direct result of such defective condition as existed when the product was sold; or (b) the product was then unreasonably dangerous when put to a reasonably anticipated use without knowledge of its characteristics, and the Hutchison was damaged as a direct result of the product being sold without an adequate warning.

267.     Defendant has engaged in the business of selling, testing, distributing, supplying, manufacturing, marketing, and promoting Roundup, and through that conduct has knowingly and intentionally placed Roundup into the stream of commerce with full knowledge that Roundup reaches consumers such as Hutchison who are exposed to it through ordinary and reasonably foreseeable uses.

268.    Defendant did in fact sell, distribute, supply, manufacture, and promote Roundup to Hutchison. Additionally, Defendant expected the Roundup that it was selling, distributing, supplying, manufacturing, and promoting to reach – and did in fact reach – consumers, including Hutchison, without any substantial change in the condition of the product from when the Roundup was initially distributed by Defendant.

269.    At the time of manufacture, Defendant could have provided the warnings or instructions regarding the full and complete risks of Roundup and glyphosate-containing products because it knew or should have known of the unreasonable risks of harm associated with the use of and exposure to such products.

270.    At all times herein mentioned, the aforesaid product was defective and unsafe in manufacture such that it was unreasonably dangerous to the user, and was so at the time it was distributed by Defendant and at the time Hutchison was exposed to and/or ingested the product. The defective condition of Roundup was due in part to the fact that it was not accompanied by proper warnings regarding its carcinogenic qualities and possible side effects, including, but not limited to, developing non-Hodgkin's Lymphoma as a result of exposure and use.

271.    Roundup did not contain a warning or caution statement, which was necessary and, if complied with, was adequate to protect the health of those exposed in violation of the laws of the state of Missouri.

272.    Defendant's failure to include a warning or caution statement which was necessary and, if complied with, was adequate to protect the health of those exposed, violated the laws of the state of Missouri.

273.    Defendant could have amended the label of Roundup to provide additional warnings.

48

274.   This defect caused serious injury to Hutchison, who used Roundup in its intended and foreseeable manner.

275.   At all times herein mentioned, Defendant had a duty to properly design, manufacture, compound, test, inspect, package, label, distribute, market, examine, maintain supply, provide proper warnings, and take such steps to assure that the product did not cause users to suffer from unreasonable and dangerous side effects.

276.   Defendant labeled, distributed, and promoted the aforesaid product that was dangerous and unsafe for the use and purpose for which it was intended.

277.   Defendant failed to warn of the nature and scope of the side effects associated with Roundup, namely its carcinogenic properties and its propensity to cause or serve as a substantial contributing factor in the development of non-Hodgkin's Lymphoma.

278.   Defendant was aware of the probable consequences of the aforesaid conduct. Despite the fact that Defendant knew or should have known that Roundup caused serious injuries, Defendant failed to exercise reasonable care to warn of the dangerous carcinogenic properties and the side effect of developing non-Hodgkin's Lymphoma from Roundup exposure, even though these side effects were known or reasonably scientifically knowable at the time of distribution.  Defendant willfully and deliberately failed to avoid the consequences associated with its failure to warn, and in doing so, Defendant acted with a conscious disregard for the safety of Hutchison.

279.   At the time of exposure, Hutchison could not have reasonably discovered any defect in Roundup through the exercise of reasonable care.

280.   Defendant, as the manufacturer and distributor of the subject product, is held to the level of knowledge of an expert in the field.

281.    Hutchison reasonably relied upon the skill, superior knowledge, and judgment of Defendant.

282.    Had Defendant properly disclosed the risks associated with Roundup products, Hutchison would have avoided the risk of non-Hodgkin's Lymphoma by not using Roundup products.

283.    The information that Defendant did provide or communicate failed to contain adequate warnings and precautions that would have enabled Hutchison, and similarly situated individuals, to utilize the product safely and with adequate protection. Instead, Defendant disseminated information that was inaccurate, false, and misleading, and which failed to communicate accurately or adequately the comparative severity, duration, and extent of the risk of injuries associated with use of and exposure to Roundup and glyphosate; continued to promote the efficacy of Roundup, even after it knew or should have known of the unreasonable risks from use or exposure; and concealed, downplayed, or otherwise suppressed, through aggressive marketing and promotion, any information or research about the risks and dangers of exposure to Roundup and glyphosate.

284.    To this day, Defendant has failed to adequately warn of the true risks of Hutchison's injuries associated with the use of and exposure to Roundup.

285.    As a result of its inadequate warnings, Defendant's Roundup products were defective and unreasonably dangerous when they left the possession and control of Defendant, were distributed by Defendant, and used by Hutchison.

286.    As a direct and proximate result of Defendant's actions as alleged herein, and in such other ways to be later shown, the subject product caused Hutchison to sustain injuries as herein alleged.

## PRAYER FOR RELIEF

WHEREFORE, Hutchison demands judgment against Defendant on each of the above-referenced claims and causes of action and as follows:

a)    Awarding compensatory damages in excess of the jurisdictional amount, including, but not limited to pain, suffering, emotional distress, loss of enjoyment of life, and other non-economic damages in an amount to be determined at trial of this action;

b)    Awarding compensatory damages to Hutchison for past and future damages, including, but not limited to, Hutchison's pain and suffering and for severe and permanent personal injuries sustained by Hutchison including health care costs and economic loss;

c)    Awarding economic damages in the form of medical expenses, out of pocket expenses, lost earnings and other economic damages in an amount to be determine at trial of this action;

d)    Pre-judgment interest;

e)    Post-judgment interest;

f)    Awarding Hutchison reasonable attorneys' fees;

g)    Awarding Hutchison the costs of these proceedings; and

h)    Such other and further relief as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Hutchison hereby demands trial by jury as to all issues.

Dated: March 16, 2020

Carl J. Lumley
Bar number 32869(MO)
Curtis, Heinz, Garrett, & O'Keefe P.C.
130 S Bemiston, Suite 200
St. Louis, MO 63105-1913

Tel: (314) 725-8788
CLumley@chgolaw.com
*Counsel for Leslie Hutchison*

OF COUNSEL:

James Nealon
Joseph Gallo
Withers Bergman LLP
430 Park Avenue
New York, New York 10022
Tel: (212) 848-9800
James.Nealon@withersworldwide.com
Joseph.Gallo@withersworldwide.com

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI

Leslie Hutchison                    )
                          ,         )
                                    )
              Plaintiff,            )
                                    )
        v.                          )     Case No.
Monsanto Company                    )
                          ,         )
                                    )
              Defendant,            )
                                    )

## ORIGINAL FILING FORM

**THIS FORM MUST BE COMPLETED AND VERIFIED BY THE FILING PARTY
WHEN INITIATING A NEW CASE.**

☐     THIS SAME CAUSE, OR A SUBSTANTIALLY EQUIVALENT COMPLAINT, WAS

PREVIOUSLY FILED IN THIS COURT AS CASE NUMBER _____

AND ASSIGNED TO THE HONORABLE JUDGE _____.

☐     THIS CAUSE IS RELATED, BUT IS NOT SUBSTANTIALLY EQUIVALENT TO ANY

PREVIOUSLY FILED COMPLAINT. THE RELATED CASE NUMBER IS _____ AND

THAT CASE WAS ASSIGNED TO THE HONORABLE _____. THIS CASE MAY,

THEREFORE, BE OPENED AS AN ORIGINAL PROCEEDING.

☒     NEITHER THIS SAME CAUSE, NOR A SUBSTANTIALLY EQUIVALENT

COMPLAINT, HAS BEEN PREVIOUSLY FILED IN THIS COURT, AND THEREFORE

MAY BE OPENED AS AN ORIGINAL PROCEEDING.

The undersigned affirms that the information provided above is true and correct.

Date: ___3/31/20___          _____
                                   Signature of Filing Party