# U.S. District Court
## Eastern District of Missouri (St. Louis)
## CIVIL DOCKET FOR CASE #: 4:20–cv–00635–SRC

Arsondi et al v. Monsanto Company

Assigned to: District Judge Stephen R. Clark

Case in other court:  Circuit Court, St. Louis County, Missouri, 20SL–CC01807

Cause: 28:1331 Fed. Question

Date Filed: 05/12/2020

Jury Demand: Both

Nature of Suit: 365 Personal Inj. Prod. Liability

Jurisdiction: Federal Question

**Plaintiff**

**William Arsondi**                     represented by   **Patrick R Dowd**
HOLLAND LAW FIRM LLC
300 N. Tucker Blvd.
Suite 801
St. Louis, MO 63101
314–244–2005
Fax: 314–241–5554
Email: pdowd@allfela.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Randall S. Crompton**
HOLLAND LAW FIRM LLC
300 N. Tucker Blvd.
Suite 801
St. Louis, MO 63101
314–241–8111
Fax: 314–241–5554
Email: scrompton@allfela.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Angela Ashby**                     represented by   **Patrick R Dowd**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Randall S. Crompton**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Mary Bauer**                     represented by   **Patrick R Dowd**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Randall S. Crompton**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Brittany Blackstock**                     represented by   **Patrick R Dowd**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Randall S. Crompton**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

Dianna Bloking                    represented by   **Patrick R Dowd**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Randall S. Crompton**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

Donald Boulware                   represented by   **Patrick R Dowd**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Randall S. Crompton**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

Lawrence Brooks                   represented by   **Patrick R Dowd**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Randall S. Crompton**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

Jose Cardona                      represented by   **Patrick R Dowd**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Randall S. Crompton**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

Gary Chant                        represented by   **Patrick R Dowd**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Randall S. Crompton**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Donna Cheever**                          represented by **Patrick R Dowd**
                                                          (See above for address)
                                                          *LEAD ATTORNEY*
                                                          *ATTORNEY TO BE NOTICED*

                                                          **Randall S. Crompton**
                                                          (See above for address)
                                                          *LEAD ATTORNEY*
                                                          *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Anne Cooper**                            represented by **Patrick R Dowd**
                                                          (See above for address)
                                                          *LEAD ATTORNEY*
                                                          *ATTORNEY TO BE NOTICED*

                                                          **Randall S. Crompton**
                                                          (See above for address)
                                                          *LEAD ATTORNEY*
                                                          *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Jill Dadeppo**                           represented by **Patrick R Dowd**
                                                          (See above for address)
                                                          *LEAD ATTORNEY*
                                                          *ATTORNEY TO BE NOTICED*

                                                          **Randall S. Crompton**
                                                          (See above for address)
                                                          *LEAD ATTORNEY*
                                                          *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Eithne Dalton**                          represented by **Patrick R Dowd**
                                                          (See above for address)
                                                          *LEAD ATTORNEY*
                                                          *ATTORNEY TO BE NOTICED*

                                                          **Randall S. Crompton**
                                                          (See above for address)
                                                          *LEAD ATTORNEY*
                                                          *ATTORNEY TO BE NOTICED*

**Plaintiff**

**George Doughty**                         represented by **Patrick R Dowd**
                                                          (See above for address)
                                                          *LEAD ATTORNEY*
                                                          *ATTORNEY TO BE NOTICED*

                                                          **Randall S. Crompton**
                                                          (See above for address)
                                                          *LEAD ATTORNEY*
                                                          *ATTORNEY TO BE NOTICED*

**Plaintiff**

**James Esposito**                         represented by **Patrick R Dowd**
                                                          (See above for address)
                                                          *LEAD ATTORNEY*
                                                          *ATTORNEY TO BE NOTICED*

                                                          **Randall S. Crompton**
                                                          (See above for address)

*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Lorne Fair**                                    represented by   **Patrick R Dowd**
                                                                  (See above for address)
                                                                  *LEAD ATTORNEY*
                                                                  *ATTORNEY TO BE NOTICED*

                                                                  **Randall S. Crompton**
                                                                  (See above for address)
                                                                  *LEAD ATTORNEY*
                                                                  *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Kevin Finnerty**                                represented by   **Patrick R Dowd**
                                                                  (See above for address)
                                                                  *LEAD ATTORNEY*
                                                                  *ATTORNEY TO BE NOTICED*

                                                                  **Randall S. Crompton**
                                                                  (See above for address)
                                                                  *LEAD ATTORNEY*
                                                                  *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Phillip Garrett**                               represented by   **Patrick R Dowd**
                                                                  (See above for address)
                                                                  *LEAD ATTORNEY*
                                                                  *ATTORNEY TO BE NOTICED*

                                                                  **Randall S. Crompton**
                                                                  (See above for address)
                                                                  *LEAD ATTORNEY*
                                                                  *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Leslie Gebow**                                  represented by   **Patrick R Dowd**
                                                                  (See above for address)
                                                                  *LEAD ATTORNEY*
                                                                  *ATTORNEY TO BE NOTICED*

                                                                  **Randall S. Crompton**
                                                                  (See above for address)
                                                                  *LEAD ATTORNEY*
                                                                  *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Timothy Gering**                                represented by   **Patrick R Dowd**
                                                                  (See above for address)
                                                                  *LEAD ATTORNEY*
                                                                  *ATTORNEY TO BE NOTICED*

                                                                  **Randall S. Crompton**
                                                                  (See above for address)
                                                                  *LEAD ATTORNEY*
                                                                  *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Angela Greeley**                                represented by   **Patrick R Dowd**
                                                                  (See above for address)

*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Randall S. Crompton**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

<u>**Plaintiff**</u>

**Vera Greene**                              represented by   **Patrick R Dowd**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Randall S. Crompton**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

<u>**Plaintiff**</u>

**Nancy Hammill**                            represented by   **Patrick R Dowd**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Randall S. Crompton**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

<u>**Plaintiff**</u>

**David Hansen**                             represented by   **Patrick R Dowd**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Randall S. Crompton**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

<u>**Plaintiff**</u>

**Scott Hassler**                            represented by   **Patrick R Dowd**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Randall S. Crompton**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

<u>**Plaintiff**</u>

**Arnold Heredia**                           represented by   **Patrick R Dowd**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Randall S. Crompton**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**<u>Plaintiff</u>**

**Ronald Johnson**                          represented by **Patrick R Dowd**
                                            (See above for address)
                                            *LEAD ATTORNEY*
                                            *ATTORNEY TO BE NOTICED*

                                            **Randall S. Crompton**
                                            (See above for address)
                                            *LEAD ATTORNEY*
                                            *ATTORNEY TO BE NOTICED*

**<u>Plaintiff</u>**

**Ruth Johnston**                           represented by **Patrick R Dowd**
                                            (See above for address)
                                            *LEAD ATTORNEY*
                                            *ATTORNEY TO BE NOTICED*

                                            **Randall S. Crompton**
                                            (See above for address)
                                            *LEAD ATTORNEY*
                                            *ATTORNEY TO BE NOTICED*

**<u>Plaintiff</u>**

**Jerome Jones**                            represented by **Patrick R Dowd**
                                            (See above for address)
                                            *LEAD ATTORNEY*
                                            *ATTORNEY TO BE NOTICED*

                                            **Randall S. Crompton**
                                            (See above for address)
                                            *LEAD ATTORNEY*
                                            *ATTORNEY TO BE NOTICED*

**<u>Plaintiff</u>**

**Linda Josefs**                            represented by **Patrick R Dowd**
                                            (See above for address)
                                            *LEAD ATTORNEY*
                                            *ATTORNEY TO BE NOTICED*

                                            **Randall S. Crompton**
                                            (See above for address)
                                            *LEAD ATTORNEY*
                                            *ATTORNEY TO BE NOTICED*

**<u>Plaintiff</u>**

**Barbara Langlois**                        represented by **Patrick R Dowd**
                                            (See above for address)
                                            *LEAD ATTORNEY*
                                            *ATTORNEY TO BE NOTICED*

                                            **Randall S. Crompton**
                                            (See above for address)
                                            *LEAD ATTORNEY*
                                            *ATTORNEY TO BE NOTICED*

**<u>Plaintiff</u>**

**David Laporte**                           represented by **Patrick R Dowd**
                                            (See above for address)
                                            *LEAD ATTORNEY*
                                            *ATTORNEY TO BE NOTICED*

**Randall S. Crompton**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

<u>**Plaintiff**</u>

**Russell Leonard**                                    represented by   **Patrick R Dowd**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Randall S. Crompton**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

<u>**Plaintiff**</u>

**April Mabe**                                    represented by   **Patrick R Dowd**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Randall S. Crompton**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

<u>**Plaintiff**</u>

**Gloria Marshall**                                    represented by   **Patrick R Dowd**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Randall S. Crompton**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

<u>**Plaintiff**</u>

**Katherine Mccrea**                                    represented by   **Patrick R Dowd**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Randall S. Crompton**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

<u>**Plaintiff**</u>

**Gail Meier**                                    represented by   **Patrick R Dowd**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Randall S. Crompton**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

<u>**Plaintiff**</u>

**Joseph Milanese**

represented by **Patrick R Dowd**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Randall S. Crompton**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Timmy Miller**

represented by **Patrick R Dowd**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Randall S. Crompton**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**David Moss**

represented by **Patrick R Dowd**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Randall S. Crompton**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Sally Moyer**

represented by **Patrick R Dowd**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Randall S. Crompton**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Donald Mueller**

represented by **Patrick R Dowd**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Randall S. Crompton**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Marian Murphy**

represented by **Patrick R Dowd**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Randall S. Crompton**
(See above for address)

*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Mark Neal**
                                    represented by   **Patrick R Dowd**
                                                     (See above for address)
                                                     *LEAD ATTORNEY*
                                                     *ATTORNEY TO BE NOTICED*

                                                     **Randall S. Crompton**
                                                     (See above for address)
                                                     *LEAD ATTORNEY*
                                                     *ATTORNEY TO BE NOTICED*

**Plaintiff**

**William Oelklaus**
                                    represented by   **Patrick R Dowd**
                                                     (See above for address)
                                                     *LEAD ATTORNEY*
                                                     *ATTORNEY TO BE NOTICED*

                                                     **Randall S. Crompton**
                                                     (See above for address)
                                                     *LEAD ATTORNEY*
                                                     *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Christina Pease**
                                    represented by   **Patrick R Dowd**
                                                     (See above for address)
                                                     *LEAD ATTORNEY*
                                                     *ATTORNEY TO BE NOTICED*

                                                     **Randall S. Crompton**
                                                     (See above for address)
                                                     *LEAD ATTORNEY*
                                                     *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Linda Pierson**
                                    represented by   **Patrick R Dowd**
                                                     (See above for address)
                                                     *LEAD ATTORNEY*
                                                     *ATTORNEY TO BE NOTICED*

                                                     **Randall S. Crompton**
                                                     (See above for address)
                                                     *LEAD ATTORNEY*
                                                     *ATTORNEY TO BE NOTICED*

**Plaintiff**

**James Restivo**
                                    represented by   **Patrick R Dowd**
                                                     (See above for address)
                                                     *LEAD ATTORNEY*
                                                     *ATTORNEY TO BE NOTICED*

                                                     **Randall S. Crompton**
                                                     (See above for address)
                                                     *LEAD ATTORNEY*
                                                     *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Donna Russell**
                                    represented by   **Patrick R Dowd**
                                                     (See above for address)

*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Randall S. Crompton**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

<u>**Plaintiff**</u>

**Susan Russell**                                    represented by   **Patrick R Dowd**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Randall S. Crompton**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

<u>**Plaintiff**</u>

**Barbara Schaecher**                               represented by   **Patrick R Dowd**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Randall S. Crompton**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

<u>**Plaintiff**</u>

**Michael Silbernagel**                             represented by   **Patrick R Dowd**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Randall S. Crompton**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

<u>**Plaintiff**</u>

**Richard Smith**                                   represented by   **Patrick R Dowd**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Randall S. Crompton**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

<u>**Plaintiff**</u>

**Alvin Taylor**                                    represented by   **Patrick R Dowd**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Randall S. Crompton**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Sergio Vasquez**

represented by **Patrick R Dowd**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Randall S. Crompton**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Rebecca Viands–Matthews**

represented by **Patrick R Dowd**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Randall S. Crompton**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Karen Wade**

represented by **Patrick R Dowd**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Randall S. Crompton**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Ronnie Waggy**

represented by **Patrick R Dowd**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Randall S. Crompton**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Eugene Williams**

represented by **Patrick R Dowd**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Randall S. Crompton**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Amber Copeland–Draxten**
*on behalf of*
Keith Draxten

represented by **Patrick R Dowd**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Randall S. Crompton**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Jamie Kavelak**                                   represented by   **Patrick R Dowd**
*on behalf of*                                                      (See above for address)
Timothy Kavelak                                                    *LEAD ATTORNEY*
                                                                   *ATTORNEY TO BE NOTICED*

**Randall S. Crompton**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Linda Olsen**                                     represented by   **Patrick R Dowd**
*on behalf of*                                                      (See above for address)
Diane Pedersen                                                     *LEAD ATTORNEY*
                                                                   *ATTORNEY TO BE NOTICED*

**Randall S. Crompton**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Patti Vasquez**                                   represented by   **Patrick R Dowd**
*on behalf of*                                                      (See above for address)
Rosemary Phelan                                                    *LEAD ATTORNEY*
                                                                   *ATTORNEY TO BE NOTICED*

**Randall S. Crompton**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Kenneth Romphf**                                  represented by   **Patrick R Dowd**
*on behalf of*                                                      (See above for address)
Judith Romphf                                                      *LEAD ATTORNEY*
                                                                   *ATTORNEY TO BE NOTICED*

**Randall S. Crompton**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Debbie Tice**                                     represented by   **Patrick R Dowd**
*on behalf of*                                                      (See above for address)
John Tice                                                          *LEAD ATTORNEY*
                                                                   *ATTORNEY TO BE NOTICED*

**Randall S. Crompton**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Mike West**
*on behalf of*
Dawn West

represented by **Patrick R Dowd**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Randall S. Crompton**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Monsanto Company**

represented by **Christine F. Miller**
HUSCH BLACKWELL LLP – St Louis
190 Carondelet Plaza
Suite 600
St. Louis, MO 63105
314–480–1500
Fax: 314–480–1505
Email: chris.miller@huschblackwell.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Erik L. Hansell**
HUSCH BLACKWELL LLP – St Louis
190 Carondelet Plaza
Suite 600
St. Louis, MO 63105
314–480–1500
Fax: 314–480–1505
Email: erik.hansell@huschblackwell.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Gregory J. Minana**
HUSCH BLACKWELL LLP – St Louis
190 Carondelet Plaza
Suite 600
St. Louis, MO 63105
314–480–1500
Fax: 314–480–1505
Email: greg.minana@huschblackwell.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 05/12/2020 | 1 | NOTICE OF REMOVAL from Circuit Court of St. Louis County, case number 20SL–CC01807, with receipt number AMOEDC–7910101, in the amount of $400 Jury Demand,, filed by Monsanto Company. (Attachments: # 1 Exhibit 1 – State Court File, # 2 Civil Cover Sheet, # 3 Original Filing Form)(Hansell, Erik) (Entered: 05/12/2020) |
| 05/12/2020 | 2 | NOTICE OF FILING NOTICE OF REMOVAL filed by Defendant Monsanto Company Sent To: Plaintiff (Hansell, Erik) (Entered: 05/12/2020) |
| 05/12/2020 | 3 | DISCLOSURE OF ORGANIZATIONAL INTERESTS CERTIFICATE by Defendant Monsanto Company. Parent companies: Bayer AG, Subsidiaries: None, Publicly held company: Bayer AG,. (Hansell, Erik) (Entered: 05/12/2020) |
| 05/13/2020 | 4 | SUPPLEMENTAL – State Court docket sheet. (BAK) (Entered: 05/13/2020) |

| 05/13/2020 | 5 | Petition (Removal/Transfer) Received From: Circuit Court, St. Louis County, Missouri, filed by Russell Leonard, David Laporte, Patti Vasquez, Angela Greeley, Lawrence Brooks, Arnold Heredia, Phillip Garrett, Lorne Fair, Mark Neal, Sergio Vasquez, Ronald Johnson, Karen Wade, Jamie Kavelak, Timothy Gering, Donna Cheever, Barbara Langlois, Gloria Marshall, Anne Cooper, James Restivo, Debbie Tice, Jerome Jones, Susan Russell, Timmy Miller, Kenneth Romphf, Ronnie Waggy, Sally Moyer, Jill Dadeppo, James Esposito, Michael Silbernagel, Amber Copeland–Draxten, Rebecca Viands–Matthews, Mike West, William Oelklaus, Leslie Gebow, Linda Olsen, Alvin Taylor, Angela Ashby, Kevin Finnerty, William Arsondi, Linda Josefs, Scott Hassler, Ruth Johnston, David Moss, George Doughty, Eugene Williams, Donna Russell, David Hansen, Richard Smith, Vera Greene, Donald Mueller, Christina Pease, Nancy Hammill, Eithne Dalton, Donald Boulware, Mary Bauer, Katherine Mccrea, Gary Chant, Barbara Schaecher, Linda Pierson, Jose Cardona, Joseph Milanese, Brittany Blackstock, April Mabe, Gail Meier, Marian Murphy, Dianna Bloking.(BAK) (Entered: 05/13/2020) |
| 05/13/2020 | 6 | ANSWER to Complaint by Monsanto Company.(BAK) (Entered: 05/13/2020) |
| 05/13/2020 | | Case Opening Notification: Judge Assigned: U.S. District Judge Stephen R. Clark. (BAK) (Entered: 05/13/2020) |

**20SL-CC01807**

IN THE CIRCUIT COURT OF ST. LOUIS COUNTY
STATE OF MISSOURI

| | |
|---|---|
| WILLIAM ARSONDI, ANGELA ASHBY, MARY BAUER, BRITTANY BLACKSTOCK, DIANNA BLOKING, DONALD BOULWARE, LAWRENCE BROOKS, JOSE CARDONA, GARY CHANT, DONNA CHEEVER, ANNE COOPER, JILL DADEPPO, EITHNE DALTON, GEORGE DOUGHTY, JAMES ESPOSITO, LORNE FAIR, KEVIN FINNERTY, PHILLIP GARRETT, LESLIE GEBOW, TIMOTHY GERING, ANGELA GREELEY, VERA GREENE, NANCY HAMMILL, DAVID HANSEN, SCOTT HASSLER, ARNOLD HEREDIA, RONALD JOHNSON, RUTH JOHNSTON, JEROME JONES, LINDA JOSEFS, BARBARA LANGLOIS, DAVID LAPORTE, RUSSELL LEONARD, APRIL MABE, GLORIA MARSHALL, KATHERINE MCCREA, GAIL MEIER, JOSEPH MILANESE, TIMMY MILLER, DAVID MOSS, SALLY MOYER, DONALD MUELLER, MARIAN MURPHY, MARK NEAL, WILLIAM OELKLAUS, CHRISTINA PEASE, LINDA PIERSON, JAMES RESTIVO, DONNA RUSSELL, SUSAN RUSSELL, BARBARA SCHAECHER, MICHAEL SILBERNAGEL, RICHARD SMITH, ALVIN TAYLOR, SERGIO VASQUEZ, REBECCA VIANDS-MATTHEWS, KAREN WADE, RONNIE WAGGY, EUGENE WILLIAMS, AMBER COPELAND-DRAXTEN on behalf of KEITH DRAXTEN, JAMIE KAVELAK on behalf of TIMOTHY KAVELAK, LINDA OLSEN on behalf of DIANE PEDERSEN, PATTI VASQUEZ on behalf of ROSEMARY PHELAN, KENNETH ROMPHF on behalf of JUDITH ROMPHF, DEBBIE TICE on behalf of JOHN TICE, and MIKE WEST on behalf of DAWN WEST, <br><br> Plaintiffs, | Case No.: _____ <br><br> Division No. _____ <br><br><br> JURY TRIAL DEMANDED |

vs.                                             )
                                                )
**MONSANTO COMPANY**                            )
                                                )
Serve: Registered Agent                         )
CSC of St. Louis County, Inc.                   )
MC-CSC1, 9666 Olive Blvd., Suite 600            )
St. Louis, MO  63132-3026                       )
                                                )
**Defendant.**                                  )

## PETITION

COME NOW, Plaintiffs, by and through their undersigned counsel, and for their causes of action against Defendant Monsanto Company, alleging the following upon information and belief (including investigation made by and through Plaintiffs' counsel), except those allegations that pertain to Plaintiffs, which are based on personal knowledge:

## INTRODUCTION

Plaintiffs bring this cause of action against Defendant pursuant to Rule 52.05(a) of the Missouri Rules of Civil Procedure, as their claims arise out of the same series of transactions and occurrences, and their claims involve common questions of law and/or fact.  All claims in this action are a direct and proximate result of Defendant's negligent, willful, and wrongful conduct in connection with the design, development, manufacture, testing, packaging, promoting, marketing, distribution, and/or sale of the products known as Roundup®.  All Plaintiffs in this action seek recovery for damages as a result of developing a form of Non-Hodgkin's Lymphoma ("NHL"), which was directly and proximately caused by such wrongful conduct by Defendant, the unreasonably dangerous and defective nature of Roundup®, and its active ingredient, glyphosate, and/or its surfactant(s) or other ingredients and the attendant effects of developing NHL.  All of the claims involve common questions of law and fact and share legal and medical issues that arise out of all of the Plaintiffs' exposure to Roundup®.

2

## THE PARTIES

### PLAINTIFFS

#### *William Arsondi*

1.      Plaintiff William Arsondi is a citizen of the State of California and was born on December 7. 1954. Mr. Arsondi resides in the City of Castro Valley, County of Alameda.

2.      Mr. Arsondi was exposed to Roundup® in California beginning in the 1970s through approximately 2018 while applying Roundup® on large areas as an agricultural worker. Mr. Arsondi sprayed Roundup® approximately daily during spring and summer.

3.      In approximately 2005, William Arsondi was diagnosed with a form of non-Hodgkin's Lymphoma in Castro Valley, California,

#### *Angela Ashby*

4.      Plaintiff Angela Ashby is a citizen of the State of Maryland and was born on July 19, 1962. Ms. Ashby resides in the City of Laurel, County of Prince George's.

5.      Ms. Ashby was exposed to Roundup® in Maine from approximately 1999 through 2016 while applying Roundup® to maintain her landscape, driveway and perimeter fence on her personal properties. Ms. Ashby applied Roundup® approximately three to six times per month.

6.      In November of 2018, Angela Ashby was diagnosed with a form of non-Hodgkin's lymphoma in Laurel, Maryland at Maryland Oncology Hematology.

#### *Mary Bauer*

7.      Plaintiff Mary Bauer is a citizen of the State of Michigan and was born on August 5, 1949. Ms. Bauer resides in the city of Auburn Hills, County of Oakland.

8.      Ms. Bauer was exposed to Roundup® in Michigan for many years while applying Roundup® at her residence, walkways, and landscaping and while landscaping for others in her neighborhood. Ms. Bauer sprayed Roundup® approximately weekly from early spring through the fall.

9.      In December of 2013, Mary Bauer was diagnosed with a form of non-Hodgkin's lymphoma in Village of Clarkston, Michigan at the Barbara Ann Karmanos Cancer Center.

### Brittany Blackstock

10.     Plaintiff Brittany Blackstock is a citizen of the State of Georgia and was born on March 7, 1989.  Ms. Blackstock resides in the City of Auburn, County of Barrow.

11.     Ms. Blackstock was exposed to Roundup® in Georgia beginning in approximately 2007 through 2018 while applying Roundup® at her residence, walkways, and landscaping.  Ms. Blackstock sprayed Roundup® approximately weekly during the spring and summer.

12.     In December of 2018, Brittany Blackstock was diagnosed with a form of non-Hodgkin's lymphoma in Athens, Georgia at Dermatology at Athens.

### Dianna Bloking

13.     Plaintiff Dianna Bloking is a citizen of the State of North Carolina and was born on January 13, 1961.  Ms. Bloking resides in the city of Mooresville, County of Iredell.

14.     Ms. Bloking was exposed to Roundup® in Florida and North Carolina for many years while applying Roundup® weekly around her residence, walkway, driveway and landscaping. She also applied Roundup® at her father's yard and her grandmother's yard.

15.     In approximately 2009, Dianna Bloking was diagnosed with a form of non-Hodgkin lymphoma in Mooresville, North Carolina at Lake Norman Hematology Oncology.

### Donald Boulware

16.     Plaintiff Donald Boulware is a citizen of the State of Missouri and was born on May 3, 1950. Mr. Boulware resides in the City of Laquey, County of Pulaski.

17.     Mr. Boulware was exposed to Roundup® in Missouri beginning in 2012 while applying Roundup® as an agricultural worker for Ossemma Excavating in Laquey, Missouri. He was further exposed to Roundup® while spraying Roundup® at Fairview Cemetery in Laquey, Missouri to maintain the grounds. Mr. Boulware sprayed on a monthly basis. Mr. Boulware also applied Roundup® to maintain his personal property.

18.     In May of 2017, Donald Boulware was diagnosed with a form of non-Hodgkin Lymphoma in Columbia, Missouri at University Hospital.

### Lawrence Brooks

19.     Plaintiff Lawrence Brooks is a citizen of the State of Colorado and was born on May 19, 1942.  Mr. Brooks resides in the City of Sterling, County of Logan.

20.     Mr. Brooks was exposed to Roundup® in Colorado and Nebraska beginning in approximately the mid 1970's through 2016 while spraying Roundup® around his residence, walkways, and surrounding landscapes. Mr. Brooks sprayed Roundup® approximately weekly.

21.     In approximately October of 2017, Lawrence Brooks was diagnosed with a form of non-Hodgkin's lymphoma in Sterling, Colorado at Sterling Regional MedCenter.

### Jose Cardona

22.     Plaintiff Jose Cardona is a citizen of the State of Florida and was born on October 30, 1956. Mr. Cardona resides in the City of Lecanto, County of Citrus.

23.     Mr. Cardona was exposed to Roundup® in Florida and South Carolina for many years through 2018 while applying Roundup® to maintain his personal property. Mr. Cardona

5

sprayed Roundup® monthly. Mr. Cardona also used the product in his job as a realtor to maintain properties.

24.     Jose Cardona was diagnosed with a form of non-Hodgkin's lymphoma around May of 2018 in Lecanto, Florida at Florida Cancer Specialists.

### *Gary Chant*

25.     Plaintiff Gary Chant is a citizen of the State of Michigan and was born on July 12, 1947. Mr. Chant resides in the City of St. Charles, County of Saginaw.

26.     Mr. Chant was exposed to Roundup® in Michigan for many years through 2018 while applying Roundup® to maintain his personal properties. Mr. Chant sprayed Roundup® monthly during the summer.

27.     Gary Chant was diagnosed with a form of non-Hodgkin's lymphoma in approximately October of 2018 in Sun City West, Arizona at Arizona Ear, Nose, and Throat Physicians.

### *Donna Cheever*

28.     Plaintiff Donna Cheever is a citizen of the State of Idaho and was born on March 6, 1940.  Ms. Cheever resides in the City of Weiser, County of Washington.

29.     Ms. Cheever was exposed to Roundup® in Idaho and California beginning in for many years through approximately 2018 while applying Roundup® at her residence, walkways, and landscaping. Ms. Cheever sprayed Roundup® weekly.

30.     In approximately 2017, Donna Cheever was diagnosed with a form of non-Hodgkin's Lymphoma in Fruitland, Idaho at St. Luke's Mountain States Tumor Institute.

### Anne Cooper

31.     Plaintiff Anne Cooper is a citizen of the State of Michigan and was born on July 25, 1960.  Ms. Cooper resides in the City of Saint Clair, County of Saint Clair.

32.     Ms. Cooper was exposed to Roundup® in Michigan for many years through approximately 2019 while applying Roundup® at her residence, walkways, and landscaping. Ms. Cooper sprayed Roundup® approximately monthly at her residence. Ms. Cooper also used Roundup® as a yard manager at St. Clair Nursery in St. Clair, Michigan on a weekly basis.

33.     In approximately 2010, Anne Cooper was diagnosed with a form of non-Hodgkin's Lymphoma in Detroit, Michigan at Barbara Ann Karmanos Cancer Institute.

### Jill Dadeppo

34.     Plaintiff Jill Dadeppo is a citizen of the State of Colorado and was born on July 31, 1956. Ms. Dadeppo resides in the City of St. Austin, County of Delta.

35.     Ms. Dadeppo was exposed to Roundup® in Colorado and California for many years while applying Roundup® to maintain her personal property. Ms. Dadeppo applied Roundup® approximately three times per week during the spring and summer.

36.     In January of 2019, Jill Dadeppo was diagnosed with a form of non-Hodgkin's lymphoma in Delta, Colorado at Colorado West Ophthalmology.

### Eithne Dalton

37.     Plaintiff Eithne Dalton is a citizen of the State of Massachusetts and was born on August 2, 1961. Ms. Dalton resides in the City of Needham Heights, County of Norfolk.

38.     Ms. Dalton was exposed to Roundup® in Massachusetts for many years while applying Roundup® to maintain her personal property. Ms. Dalton applied Roundup® approximately weekly.

7

39.     Eithne Dalton was diagnosed with a form of non-Hodgkin's lymphoma in approximately 2009 in Boston, Massachusetts at Beth Israel Deaconess Medical Center.

### George Doughty

40.     Plaintiff George Doughty is a citizen of the State of Washington and was born on March 3, 1951. Mr. Doughty resides in the City of Olympia, County of Thurston

41.     Mr. Doughty was exposed to Roundup® in Washington for many years while applying Roundup® to maintain his personal property. Mr. Doughty applied Roundup® approximately four to five times per year.

42.     George Doughty was diagnosed with a form of non-Hodgkin's lymphoma in approximately 2014 in Olympia, Washington at Kaiser Permanente Olympia Medical Center.

### James Esposito

43.     Plaintiff James Esposito is a citizen of the State of Pennsylvania and was born on July 2, 1970. Mr. Esposito resides in the City of Drexel Hill, County of Delaware.

44.     Mr. Esposito was exposed to Roundup® in Pennsylvania for many years while applying Roundup® working as an agricultural worker for Whalen Nursery in Drexel Hill, Pennsylvania. Mr. Esposito also applied it to maintain his personal property. Mr. Esposito applied Roundup® approximately fifty times per year.

45.     In October of 2010, James Esposito was diagnosed with a form of non-Hodgkin's lymphoma in Broomall, Pennsylvania at Crozer-Keystone Regional Cancer Center at Broomall.

### Lorne Fair

46.     Plaintiff Lorne Fair is a citizen of the State of Texas and was born on November 21, 1961. Mr. Fair resides in the City of Tomball, County of Harris.

47.     Lorne Fair was exposed to Roundup® in Pennsylvania for many years while applying Roundup® while working at the Pennsylvania State Park Service and for the United States Army Corps of Engineers. Mr. Fair also applied Roundup® to maintain his personal property. Mr. Fair applied Roundup® monthly to bi-weekly.

48.     Lorne Fair was diagnosed with a form of non-Hodgkin's lymphoma in September of 2018 in the Woodlands, Texas at the Brain and Spine Institute.

### Kevin Finnerty

49.     Plaintiff Kevin Finnerty is a citizen of the State of Michigan and was born on February 5, 1967. Mr. Finnerty resides in the City of East Jordan, County of Charlevoix.

50.     Kevin Finnerty was exposed to Roundup® in Michigan for many years while applying Roundup® as an agricultural worker at Esch Turkey Hill Dairy Farm in Fairview, Michigan. Mr. Finnerty applied Roundup® approximately five times per year. Mr. Finnerty also applied Roundup® to maintain his personal property.

51.     Kevin Finnerty was diagnosed with a form of non-Hodgkin's lymphoma in March of 2014 Charlevoix, Michigan at Munson Healthcare Charlevoix Hospital.

### Phillip Garrett

52.     Plaintiff Phillip Garrett is a citizen of the State of Texas and was born on September 1, 1953. Mr. Garrett resides in the City of Lampasas, County of Lampasas.

53.     Phillip Garrett was exposed to Roundup® in Texas and Arkansas for many years while applying Roundup® to maintain the grounds at East Camden Golf Course in Camden, Arkansas. Mr. Garrett also applied it to maintain his personal property. Mr. Garrett applied Roundup® approximately weekly.

54.     Phillip Garrett was diagnosed with a form of non-Hodgkin's lymphoma in approximately 2017 in Temple, Texas at Baylor Scott & White Vasicek Cancer Treatment.

### Leslie Gebow

55.     Plaintiff Leslie Gebow is a citizen of the State of Florida and was born on February 15, 1961. Mr. Gebow resides in the City of Orlando, County of Orange.

56.     Mr. Gebow was exposed to Roundup® in Florida for many years while applying Roundup® while working and to maintain his personal property. Mr. Gebow applied Roundup® approximately weekly.

57.     Leslie Gebow was diagnosed with a form of non-Hodgkin's lymphoma in 2006 in Orlando, Florida at Orlando Health Orlando Regional Medical Center.

### Timothy Gering

58.     Plaintiff Timothy Gering is a citizen of the State of Michigan and was born on May 4, 1960. Mr. Gering resides in the City of Allen Park, County of Wayne.

59.     Mr. Gering was exposed to Roundup® in Michigan for many years while applying Roundup® working and to maintain his personal property. Mr. Gering Roundup® approximately weekly.

60.     Timothy Gering was diagnosed with a form of non-Hodgkin's lymphoma in approximately 2012 in Dearborn, Michigan at Beaumont Medical Center.

### Angela Greeley

61.     Plaintiff Angela Greeley is a citizen of the State of Texas and was born on July 16, 1967. Ms. Greeley resides in the City of Sherman, County of Grayson.

62.     Angela Greeley was exposed to Roundup® in Texas for many years while applying Roundup® to maintain her personal property. Ms. Greeley applied Roundup® approximately weekly.

63.     Angela Greeley was diagnosed with a form of non-Hodgkin's lymphoma in January of 2016 in Sherman Texas at Wilson N. Jones Regional Medical Center.

### *Vera Greene*

64.     Plaintiff Vera Greene is a citizen of the State of Texas and was born on August 17, 1949. Ms. Greene resides in the City of Sante Fe, County of Galveston.

65.     Vera Greene was exposed to Roundup® in Texas beginning for many years while applying Roundup® to maintain her personal property. Ms. Greene applied Roundup® seasonally.

66.     Vera Greene was diagnosed with a form of non-Hodgkin's lymphoma in approximately 2015 in Webster, Texas at Texas Oncology.

### *Nancy Hammill*

67.     Plaintiff Nancy Hammill is a citizen of the State of Tennessee and was born on November 23, 1951. Ms. Hammill resides in the City of Hendersonville, County of Sumner.

68.     Nancy Hammill was exposed to Roundup® in California and Oregon for many years while applying Roundup® to maintain her personal property. Ms. Hammill applied Roundup® seasonally.

69.     Nancy Hammill was diagnosed with a form of non-Hodgkin's lymphoma in February of 2009 in Woodstock, Georgia at Northside Family Practice.

### David Hansen

70.    Plaintiff David Hansen is a citizen of the State of Maine and was born on July 28, 1955. Mr. Hansen resides in the City of South Portland, County of Cumberland.

71.    David Hansen was exposed to Roundup® in Maine and Utah for many years while applying Roundup® to maintain his personal property and in his work as a florist. Mr. Hansen applied Roundup® twenty times per year.

72.    David Hansen was diagnosed with a form of non-Hodgkin's lymphoma in July of 2007 in South Portland, Maine at Maine Medical Center.

### Scott Hassler

73.    Plaintiff Scott Hassler is a citizen of the State of South Carolina and was born on March 5, 1969. Mr. Hassler resides in the City of Fort Mill, County of York.

74.    Scott Hassler was exposed to Roundup® in New York for many years while applying Roundup® monthly to maintain his personal property. Mr. Hassler also applied Roundup® daily as a landscaper for his business, Hass Landscaping Lawn & Order Landscaping.

75.    Scott Hassler was diagnosed with a form of non-Hodgkin's lymphoma in March of 2019 at Stonybrook New York.

### Arnold Heredia

76.    Plaintiff Arnold Heredia is a citizen of the State of Florida and was born on July 17, 1951. Mr. Heredia resides in the City of Clermont, County of Lake.

77.    Arnold Heredia was exposed to Roundup® in Florida from approximately 2000 through 2018 while applying Roundup® to maintain his landscaping around his home. Mr. Heredia applied Roundup® approximately once per month.

78.     Arnold Heredia was diagnosed with a form of non-Hodgkin's lymphoma in June of 2018 in Clermont, Florida at Clermont Oncology Center.

### *Ronald Johnson*

79.     Plaintiff Ronald Johnson is a citizen of the State of North Carolina and was born on September 13, 1943. Mr. Johnson resides in the City of Franklinville, County of Randolph.

80.     Ronald Johnson was exposed to Roundup® in North Carolina from 1992 through 2018 while applying Roundup® to maintain his personal property. Mr. Johnson applied Roundup® weekly.

81.     Ronald Johnson was diagnosed with a form of non-Hodgkin's lymphoma in January of 2019 in Durham, North Carolina at Duke Clinic.

### *Ruth Johnston*

82.     Plaintiff Ruth Johnston is a citizen of the State of Ohio and was born on December 14, 1957. Ms. Johnston resides in the City of Orrville, County of Wayne.

83.     Ruth Johnston was exposed to Roundup® in Ohio for many years while applying Roundup® regularly to maintain her landscaping, driveway and walkways.

84.     Ruth Johnston was diagnosed with a form of non-Hodgkin's lymphoma in April of 2016 in Wooster, Ohio at Wooster Specialty Center.

### *Jerome Jones*

85.     Plaintiff Jerome Jones is a citizen of the State of Virginia and was born on September 10, 1936. Mr. Jones resides in the City of Fairfax, County of Fairfax.

86.     Jerome Jones was exposed to Roundup® in Virginia and Oklahoma for many years through 2019 while applying Roundup® while to maintain his personal property. Mr. Jones applied Roundup® approximately once per week.

87.      Jerome Jones was diagnosed with a form of non-Hodgkin's lymphoma in January of 2011 in Fairfax, Virginia at Northern Virginia Oncology Group.

### Linda Josefs

88.      Plaintiff Linda Josefs is a citizen of the State of Connecticut and was born on January 21, 1948. Ms. Josefs resides in the City of Newington, County of Hartford.

89.      Linda Josefs was exposed to Roundup® in Connecticut from approximately 1993 through 2018 while applying Roundup® to maintain her personal property. Ms. Josefs applied Roundup® weekly.

90.      Linda Josefs was diagnosed with a form of non-Hodgkin's lymphoma in March of 2011 in New Britain, Connecticut at Grove Hill Medical Center.

### Barbara Langlois

91.      Plaintiff Barbara Langlois is a citizen of the State of Mississippi and was born on September 28, 1947. Ms. Langlois resides in the City of Gulfport, County of Harrison.

92.      Barbara Langlois was exposed to Roundup® in Mississippi from the 1970's through approximately 2016 while applying Roundup® to maintain her personal property. Ms. Langlois applied Roundup® seasonally.

93.      Barbara Langlois was diagnosed with a form of non-Hodgkin's lymphoma in 2006 in Gulfport, Mississippi at Memorial Cancer Center.

### David LaPorte

94.      Plaintiff David LaPorte is a citizen of the State of Pennsylvania and was born on May 9, 1954. Mr. LaPorte resides in the City of Pittsburgh, County of Allegheny.

95.     David LaPorte was exposed to Roundup® in Pennsylvania for many years while applying Roundup® to maintain his ten acre personal property. Mr. LaPorte applied Roundup® every other week from April to October.

96.     David LaPorte was diagnosed with a form of non-Hodgkin's lymphoma in 2015 in Indiana, Pennsylvania at IRMC Cancer Center.

### *Russell Leonard*

97.     Plaintiff Russell Leonard is a citizen of the State of Missouri and was born on July 4, 1964. Mr. Leonard resides in the City of Farmington, County of St. Francois.

98.     Russell Leonard was exposed to Roundup® in Colorado for several years while applying Roundup® to maintain his personal property. Mr. Leonard applied Roundup® weekly.

99.     Russell Leonard was diagnosed with a form of non-Hodgkin's lymphoma in 2007 in Denver, Colorado at Kaiser Permanente Franklin.

### *April Mabe*

100.     Plaintiff April Mabe is a citizen of the State of Hawaii and was born on April 30, 1976. Ms. Mabe resides in the City of Honolulu, County of Honolulu.

101.     April Mabe was exposed to Roundup® in Hawaii for many years while applying Roundup® to maintain her personal property. Ms. Mabe applied Roundup® approximately monthly.

102.     April Mabe was diagnosed with a form of non-Hodgkin lymphoma in February of 2014 in Honolulu, Hawaii at The Queen's Medical Center.

### *Gloria Marshall*

103.     Plaintiff Gloria Marshall is a citizen of the State of Washington and was born on February 7, 1945. Ms. Marshall resides in the City of Yakima, County of Yakima.

104.    Gloria Marshall was exposed to Roundup® in Washington for many years while applying Roundup® to maintain her personal property. Ms. Marshall applied Roundup® monthly during spring and summer.

105.    Gloria Marshall was diagnosed with a form of non-Hodgkin's lymphoma in May of 2001 in Yakima, Washington at Quality Care Medical Clinic.

### *Katherine McCrea*

106.    Plaintiff Katherine McCrea is a citizen of the State of Ohio and was born on August 28, 1952. Ms. McCrea resides in the City of North Canton, County of Stark.

107.    Katherine McCrea was exposed to Roundup® in Ohio from 1990 to 2018 while applying Roundup® to maintain her personal property. Ms. McCrea applied Roundup® twice per month.

108.    Katherine McCrea was diagnosed with a form of non-Hodgkin's lymphoma in September of 2018.

### *Gail Meier*

109.    Plaintiff Gail Meier is a citizen of the State of New York and was born on July 11, 1945. Ms. Meier resides in the City of Honeoye, County of Ontario.

110.    Gail Meier was exposed to Roundup® in New York for many years while applying Roundup® to maintain her personal property. Ms. Meier applied Roundup® weekly during warm weather.

111.    Gail Meier was diagnosed with a form of non-Hodgkin's lymphoma in November 2006 in Canandaigua, New York at Sands Cancer Center.

### Joseph Milanese

112.     Plaintiff Joseph Milanese is a citizen of the State of Virginia and was born on November 27, 1973.  Mr. Milanese resides in the City of Big Stone Gap, County of Wise.

113.     Joseph Milanese was exposed to Roundup® in Virginia beginning in 2005 and through 2017 while applying Roundup® to maintain his personal property. Mr. Milanese sprayed Roundup® approximately monthly in late spring and summer.

114.     In July 2018, Joseph Milanese was diagnosed with a form of non-Hodgkin's Lymphoma in Norton, Virginia at WMA Hematology & Oncology SWVA.

### Timmy Miller

115.     Plaintiff Timmy Miller is a citizen of the State of Pennsylvania and was born on April 18, 1960. Mr. Miller resides in the City of Eynon, County of Lackawanna.

116.     Timmy Miller was exposed to Roundup® in Pennsylvania for many years while applying Roundup® while working and to maintain his personal property. Mr. Miller applied Roundup® many times per year.

117.     Timmy Miller was diagnosed with a form of non-Hodgkin's lymphoma in approximately 2006 in Scranton, Pennsylvania at Geisinger Community Medical Center.

### David Moss

118.     Plaintiff David Moss is a citizen of the State of Illinois and was born on May 27, 1958. Mr. Moss resides in the City of Peoria, County of Peoria.

119.     David Moss was exposed to Roundup® in Illinois for many years while applying Roundup® working and to maintain his personal property. Mr. Moss applied Roundup® three to five times per month.

17

120.    David Moss was diagnosed with a form of non-Hodgkin's lymphoma in May of 2018 in Peoria, Illinois at Illinois CancerCare, P.C.

### Sally Moyer

121.    Plaintiff Sally Moyer is a citizen of the State of Pennsylvania and was born on March 1, 1949. Ms. Moyer resides in the City of Selinsgrove, County of Snyder.

122.    Sally Moyer was exposed to Roundup® in Pennsylvania for many years while applying Roundup® to maintain her personal property. Ms. Moyer applied Roundup® approximately weekly.

123.    Sally Moyer was diagnosed with a form of non-Hodgkin's lymphoma in approximately 2002 in Camp Hill, Pennsylvania at Andrews Patel Hematology/Oncology.

### Donald Mueller

124.    Plaintiff Donald Mueller is a citizen of the State of Texas and was born on May 27, 1947. Mr. Mueller resides in the City of Burleson, County of Johnson.

125.    Donald Mueller was exposed to Roundup® in Texas beginning in 2004 through approximately 2016 while applying Roundup® at his residence, walkways, and landscaping. Mr. Mueller sprayed Roundup® monthly.

126.    In approximately 2016, Donald Mueller was diagnosed with a form of non-Hodgkin's Lymphoma in Dallas, Texas at VA North Texas Health Care System.

### Marian Murphy

127.    Plaintiff Marian Murphy is a citizen of the State of Massachusetts and was born on August 24, 1954. Ms. Murphy resides in the City of Bridgewater, County of Plymouth.

128.   Marian Murphy was exposed to Roundup® in Massachusetts beginning in 1980 through approximately 2016 while applying Roundup® at her residence, walkways, and landscaping. Ms. Murphy sprayed Roundup® approximately weekly.

129.   In approximately 2010, Marian Murphy was diagnosed with a form of non-Hodgkin's Lymphoma in Newton, Massachusetts at Newton-Wellesley Hospital.

### Mark Neal

130.   Plaintiff Mark Neal is a citizen of the State of Texas and was born on June 23, 1964. Mr. Neal resides in the City of San Antonio, County of Bexar.

131.   Mark Neal was exposed to Roundup® in Texas for many years while applying Roundup® at his residence and rental properties, walkways, and landscaping. Mr. Neal sprayed Roundup® approximately monthly.

132.   In June of 2015, Mark Neal was diagnosed with a form of non-Hodgkin's Lymphoma in Landstuhl, Germany at Landstuhl Regional Medical Center.

### William Oelklaus

133.   Plaintiff William Oelklaus is a citizen of the State of Idaho and was born on July 15, 1943. Mr. Oelklaus resides in the City of Boise, County of Ada.

134.   William Oelklaus was exposed to Roundup® in Wyoming while applying Roundup® working for Antelope Mining Company. Mr. Oelklaus applied Roundup® monthly. Mr. Oelklaus also applied it maintain his personal property for many years.

135.   William Oelklaus was diagnosed with a form of non-Hodgkin's lymphoma in December of 2018 in Boise, Idaho at St. Luke's Boise Medical Center.

### Christina Pease

136.    Plaintiff Christina Pease is a citizen of the State of Michigan and was born on April 26, 1956. Plaintiff Pease resides in the City of Galesburg, County of Kalamazoo.

137.    Christina Pease was exposed to Roundup® in Michigan for many years while applying Roundup® as a farmer in Michigan and to maintain her personal property. Ms. Pease applied Roundup® once per month on a large farm from 1974 to 2000. Ms. Pease applied it from 2000 to 2017 on her home garden.

138.    In February of 2018, Christina Pease was diagnosed with a form of non-Hodgkin's lymphoma in Grand Rapids, Michigan at Cancer Hematology Center.

### Linda Pierson

139.    Plaintiff Linda Pierson is a citizen of the State of Texas and was born on April 18, 1955. Ms. Pierson resides in the City of Denison, County of Grayson.

140.    Linda Pierson was exposed to Roundup® in Texas for many years while applying Roundup® to maintain her personal property. Ms. Pierson applied Roundup® weekly to monthly.

141.    Linda Pierson was diagnosed with a form of non-Hodgkin's lymphoma in 2002 in Sherman Texas at Texas Oncology-Sherman.

### James Restivo

142.    Plaintiff James Restivo is a citizen of the State of California and was born on February 5, 1968. Mr. Restivo resides in the City of Anaheim, County of Orange.

143.    James Restivo was exposed to Roundup® in California for many years while applying Roundup® as an agricultural worker for Golden West Landscape in Anaheim,

California. Mr. Restivo applied Roundup® approximately twenty to thirty times per month in his job at Golden West Landscape. Mr. Restivo also applied it monthly on his personal property.

144.    James Restivo was diagnosed with a form of non-Hodgkin's lymphoma in approximately 2011 in Anaheim, California at Anaheim Medical Center.

### *Donna Russell*

145.    Plaintiff Donna Russell is a citizen of the State of California and was born on January 22, 1944. Ms. Russell resides in the City of Huntington Beach, County of Orange.

146.    Donna Russell was exposed to Roundup® in California for many years while applying Roundup® to maintain her personal property. Ms. Russell applied Roundup® approximately weekly.

147.    Donna Russell was diagnosed with a form of non-Hodgkin's lymphoma in August of 2015 in Costa Mesa, California at UC Irvine Health Care Center Newport.

### *Susan Russell*

148.    Plaintiff Susan Russell is a citizen of the State of Florida and was born on May 12, 1954. Ms. Russell resides in the City of Pensacola, County of Escambia.

149.    Susan Russell was exposed to Roundup® in Florida from approximately 1993 through 2019 while applying Roundup® to maintain her personal property. Ms. Russell applied Roundup® approximately five times per year.

150.    Susan Russell was diagnosed with a form of non-Hodgkin's lymphoma in August of 2015 in Houston, Texas at MD Anderson Cancer Center Mays Clinic.

### *Barbara Schaecher*

151.    Plaintiff Barbara Schaecher is a citizen of the State of Indiana and was born on April 2, 1945.  Ms. Schaecher resides in the City of Indianapolis, County of Marion.

152.    Barbara Schaecher was exposed to Roundup® in Indiana for many years while applying Roundup® at her residence, walkways, and landscaping. Ms. Schaecher sprayed Roundup® approximately twenty times per year.

153.    In May of 2014, Barbara Schaecher was diagnosed with a form of non-Hodgkin's Lymphoma in Indianapolis, Indiana at Community Hospital East.

### Michael Silbernagel

154.    Plaintiff Michael Silbernagel is a citizen of the State of Oregon and was born on December 17, 1953. Mr. Silbernagel resides in the City of Eagle Creek, County of Clackamas.

155.    Michael Silbernagel was exposed to Roundup® in Oregon for many years while applying Roundup® at a family farm in Eagle Creek, Oregon. Mr. Silbernagel sprayed Roundup® approximately monthly.

156.    In approximately 2015, Michael Silbernagel was diagnosed with a form of non-Hodgkin's Lymphoma in Clackamas, Oregon at Kaiser Permanente Interstate Medical Office Central.

### Richard Smith

157.    Plaintiff Richard Smith is a citizen of the State of Michigan and was born on July 1, 1959. Mr. Smith resides in the City of Newaygo, County of Newaygo.

158.    Richard Smith was exposed to Roundup® in Michigan for many years while applying Roundup® to maintain his personal property. Mr. Smith applied Roundup® twice per month from the spring through the fall.

159.    Richard Smith was diagnosed with a form of non-Hodgkin's lymphoma in May of 2004 in Grand Rapids, Michigan at Cancer & Hematology Centers of Western Michigan P.C.

### *Alvin Taylor*

160.    Plaintiff Alvin Taylor is a citizen of the State of Idaho and was born on August 25, 1958. Mr. Taylor resides in the City of Idaho Falls, County of Bonneville.

161.    Alvin Taylor was exposed to Roundup® in Idaho from 1984 to 2018 while applying Roundup® as an agricultural worker for Taylor Quality Concrete Incorporated. Mr. Taylor applied Roundup® weekly. Mr. Taylor also applied it maintain his personal property.

162.    Alvin Taylor was diagnosed with a form of non-Hodgkin's lymphoma in May of 2018 in Idaho Falls, Idaho at Teton Cancer Institute.

### *Sergio Vasquez*

163.    Plaintiff Sergio Vasquez is a citizen of the State of California and was born on December 5, 1972. Mr. Vasquez resides in the City of Temecula, County of Riverside.

164.    Sergio Vasquez was exposed to Roundup® in California for many years while applying Roundup® to maintain his personal property. Mr. Vasquez applied Roundup® monthly.

165.    Sergio Vasquez was diagnosed with a form of non-Hodgkin's lymphoma in September 2001 in Chula Vista, California at Sharp Chula Vista Medical Center.

### *Rebecca Viands-Matthews*

166.    Plaintiff Rebecca Viands-Matthews is a citizen of the State of Maryland and was born on August 21, 1970. Ms. Viands-Matthews resides in the City of Rosedale, County of Baltimore.

167.    Rebecca Viands-Matthews was exposed to Roundup® in Maryland from 1985 to 2018 while applying Roundup® monthly to maintain her personal property. Ms. Viands-

Matthews was also exposed to Roundup® while working in the Lawn & Garden Department at Home Depot in Parkville, Maryland.

168.    Rebecca Viands-Matthews was diagnosed with a form of non-Hodgkin's lymphoma in 2014 in Lutherville-Timonium, Maryland at Lutherville Physicians.

### *Karen Wade*

169.    Plaintiff Karen Wade is a citizen of the State of Utah and was born on October 15, 1959. Ms. Wade resides in the City of Highland, County of Utah.

170.    Karen Wade was exposed to Roundup® in Utah from approximately 1983 through 2018 while applying Roundup® while working and to maintain his personal property. Ms. Wade applied Roundup® monthly during the summer.

171.    Karen Wade was diagnosed with a form of non-Hodgkin's lymphoma in 2004 in Salt Lake City, Utah at LDS Hospital.

### *Ronnie Waggy*

172.    Plaintiff Ronnie Waggy is a citizen of the State of West Virginia and was born on April 17, 1958. Mr. Waggy resides in the City of Weston, County of Lewis.

173.    Ronnie Waggy was exposed to Roundup® in Ohio for many years applying Roundup® as an agricultural worker at Decker Drilling in Vincent Ohio. Plaintiff also applied it maintain his personal property in West Virginia. Mr. Waggy applied Roundup® seasonally.

174.    Ronnie Waggy was diagnosed with a form of non-Hodgkin's lymphoma in September 2014 in Jane Lew, West Virginia at Lively Health Care.

### *Eugene Williams*

175.    Plaintiff Eugene Williams is a citizen of the State of Missouri and was born on August 30, 1967. Mr. Williams resides in Kansas City, County of Clay.

176.    Eugene Williams was exposed to Roundup® in Missouri for many years while applying Roundup® as an agricultural worker at Public Works Department for the City of Hollister in Missouri. Mr. Williams also occasionally applied it to maintain his personal property.

177.    Eugene Williams was diagnosed with a form of non-Hodgkin's lymphoma in 2001 in Leawood, Kansas at University of Missouri-Kansas City.

### Amber Copeland-Draxten on behalf of Keith Wayne Draxten

178.    Plaintiff **Amber Copeland-Draxten** is the surviving spouse of **Keith Wayne Draxten**, deceased, and lives in the State of California. She is the wife of and Personal Representative of the Estate of Keith Wayne Draxten, a California Estate. Mr. Keith Wayne Draxten was born on November 24, 1953. At the time of his death, Mr. Keith Wayne Draxten was a resident and citizen of California.

179.    Mr. Draxten was exposed to Roundup® in California beginning in the 1970's through 2013 while applying Roundup® to maintain his personal property. He applied Roundup® weekly during the spring and fall.

180.    Mr. Draxten was diagnosed with a form of non-Hodgkin's lymphoma in November of 2014 in Hemet, California at Hemet Valley Medical Center. Mr. Draxten died from his injuries on November 24, 2015.

### Jamie Kavelak on behalf of Timothy Kavelak

181.    Plaintiff **Jamie Kavelak** is the surviving spouse of **Timothy Kavelak**, deceased, and lives in the State of Delaware. She is the wife of and Personal Representative of the Estate of Timothy Kavelak, a Delaware Estate. Mr. Timothy Kavelak was born on October 17, 1962.

182.    Mr. Kavelak was exposed to Roundup® in Delaware, Kansas and Pennsylvania beginning in the 1980's through 2017. Mr. Kavelak applied Roundup® while working as a groundskeeper at the Federal Bureau of Prisons in Leavenworth, Kansas. Mr. Kavelak also applied it to maintain his personal property in Delaware and Pennsylvania. He applied Roundup® seasonally during the summer.

183.    Mr. Kavelak was diagnosed with a form of non-Hodgkin's lymphoma in August of 2007 in Newark, Delaware at Christiana Hospital. Mr. Kavelak died from his injuries on July 26, 2017.

### Linda Olsen on behalf of Diane Pedersen

184.    Plaintiff **Linda Olsen** is a surviving relative of **Diane Pedersen**, deceased, and lives in the State of Washington. She is the niece of and Personal Representative of the Estate of Diane Pedersen, a Washington Estate. Ms. Diane Pedersen was born on July 22, 1941.

185.    Ms. Pedersen was exposed to Roundup® in Washington beginning in the 1980's through 2017. Ms. Pederson applied Roundup® to maintain her personal property in Washington. She applied Roundup® bi-weekly during the spring, summer and fall.

186.    Ms. Pedersen was diagnosed with a form of non-Hodgkin's lymphoma in 2006 in Tacoma, Washington at Tacoma Medical Oncology. Ms. Pedersen died from her injuries on August 8, 2017.

### Patti Vasquez on behalf of Rosemary Phelan

187.    Plaintiff **Patti Vasquez** is the surviving relative of **Rosemary Phelan**, deceased, and lives in the State of Florida. She is the sister of and Personal Representative of the Estate of Rosemary Phelan, an Ohio Estate. Ms. Rosemary Phelan was born on July 28, 1957.

188.    Ms. Phelan was exposed to Roundup® in Ohio beginning in 2000 through 2019. Ms. Phelan applied Roundup® to maintain her personal property in Ohio. She applied Roundup® weekly to monthly.

189.    Ms. Phelan was diagnosed with a form of non-Hodgkin's lymphoma in January 2019 in Cleveland, Ohio at Cleveland Clinic. Ms. Phelan died from her injuries on February 18. 2019.

### Kenneth Romphf on behalf of Judith Romphf

190.    Plaintiff **Kenneth Romphf** is the surviving spouse of **Judith Romphf**, deceased, and lives in the State of Arizona. He is the husband of and Personal Representative of the Estate of Judith Romphf, an Arizona Estate. Judith Romphf was born on March 24, 1953. At the time of her death, Judith Romphf was a resident and citizen of Arizona.

191.    Judith Romphf was exposed to Roundup® in Michigan for several years while applying Roundup® to maintain her personal property. She applied Roundup® approximately twenty times per year.

192.    Judith Romphf was diagnosed with a form of non-Hodgkin's lymphoma in approximately 2016 at Sinai-Grace Hospital in Detroit, Michigan. Judith Romphf died from her injuries on April 4, 2019.

### Debbie Tice on behalf of John Tice

193.    Plaintiff **Debbie Tice** is the surviving relative of **John Tice**, deceased, and lives in the State of Florida. She is the daughter of and Personal Representative of the Estate of John Tice, a North Carolina Estate. Mr. John Tice was born on July 11, 1935.

194.   Mr. Tice was exposed to Roundup® in Florida and North Carolina for many years. Mr. Tice applied Roundup® to maintain his personal property in Florida and North Carolina. He applied Roundup® seasonally.

195.   Mr. Tice was diagnosed with a form of non-Hodgkin's lymphoma in 2004 at Sylva, North Carolina at West Care Harrison Regional Hospital. Mr. Tice died from his injuries on March 28, 2005.

### Mike West on behalf of Dawn West

196.   Plaintiff **Mike West** is the surviving spouse of **Dawn West**, deceased, and lives in the State of Delaware. He is the husband of and Personal Representative of the Estate of Dawn West, a Texas Estate. Ms. Dawn West was born on June 15, 1953.

197.   Ms. West was exposed to Roundup® in Texas for many years. Ms. West applied Roundup® to maintain her personal property in Texas. She applied Roundup® weekly during the spring and summer.

198.   Ms. West was diagnosed with a form of non-Hodgkin's lymphoma in 2000 in Dallas, Texas at Medical City Dallas Hospital. Ms. West died from her injuries on December 3, 2007.

### Plaintiffs

199.   Plaintiffs suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

200.   As a direct and proximate result of these injuries, Plaintiffs have incurred and will incur medical expenses in the future and has endured and will endure pain and suffering and loss

of enjoyment of life, and Plaintiffs have otherwise been damaged in a personal and pecuniary nature.

201.    During the relevant times, Plaintiffs did not know that exposure to Roundup® was injurious to his or her health or the health of others.

**DEFENDANT MONSANTO**

202.    Defendant Monsanto Company ("Monsanto") is a Delaware corporation with its headquarters and principal place of business in St. Louis, Missouri.  At all relevant times, Monsanto also regularly conducted, transacted, and solicited business in St. Louis, Missouri, as well as in all States of the United States. Monsanto's world headquarters are located at 800 Lindbergh Boulevard in St. Louis, Missouri, County of St. Louis.

203.    At all times relevant to this Petition, Monsanto was the entity that discovered the herbicidal properties of glyphosate and the manufacturer of Roundup® products, which contains the active ingredient glyphosate and surfactants including Polyethoxylated tallow amine (POEA), as well as adjuvants and other "inert" ingredients.  On information and belief, important scientific, manufacturing, marketing, sales and other business decisions regarding Roundup® were made from and in the State of Missouri and contributed to Defendant's wrongdoing as to each plaintiff herein.

204.    At all times relevant to this Petition, Monsanto was engaged in the business of manufacturing, marketing, testing, promoting, selling, and/or distributing Roundup® in the State of Missouri.

205.    At all relevant times, Monsanto had, and continues to have, regular and systematic contact with and conducts business in and from the State of Missouri, such that it has purposefully availed itself of the laws of the State and expects to both sue and be sued in Missouri.  Further,

Monsanto's agent for services of process is located in St. Louis County.  In the alternative, Monsanto's presence in the State of Missouri satisfies the due process requirements for Missouri courts to exercise jurisdiction over it.  In the alternative, Monsanto's domicile in the State of Missouri satisfies the due process requirements for Missouri courts to exercise jurisdiction over it.

206.    Moreover, Defendant is further subject to the personal jurisdiction of this state and court in that Defendant has purposefully and systematically selected the State of Missouri as its venue of choice when suing its own customers or seeking relief for its own interests, having filed over 100 cases in the State of Missouri.

207.    Defendant's development, marketing, promotion, labeling, and packaging analyses and decisions for its Roundup® occurred in and came from St. Louis, Missouri, which is also the location where Defendant worked on the regulatory approval for Roundup®.  The cause of action for each plaintiff herein related to or arose from Defendant's Missouri-based conduct.

## VENUE

208.    Plaintiffs were first injured outside the state of Missouri.  Thus, venue is proper in this Court pursuant to Mo. Rev. Stat. § 508.010.5, which provides:

> Notwithstanding any other provisions of law, in all actions in which there is any count alleging a tort and in which the plaintiff was first injured outside the state of Missouri, venue shall be determined as follows:
>
> > (1) If the defendant is a corporation, then venue shall be in any county where a defendant corporation's registered agent is located or, if the plaintiff's principal place of residence was in the state of Missouri on the date the plaintiff was first injured, then venue may be in the county of the plaintiff's principal place of residence on the date the plaintiff was first injured;

## ALLEGATIONS COMMON TO ALL COUNTS

209.    In 1970, Defendant Monsanto discovered the herbicidal properties of glyphosate and began marketing it in products in 1974, under the brand name Roundup®. Roundup® is a non-selective herbicide used to kill weeds that commonly compete with the growing of crops. In addition to the active ingredient glyphosate, Roundup® contains surfactants including POEA and/or adjuvants and other so-called "inert" ingredients. In 2001, glyphosate was the most-used pesticide active ingredient in American agriculture with 85–90 million pounds used annually. That number grew to 185 million pounds by 2007.[1] As of 2013, glyphosate was the world's most widely used herbicide.

210.    Monsanto is a multinational agricultural biotechnology corporation based in St. Louis, Missouri, and incorporated in Delaware. It is the world's leading producer of glyphosate. As of 2009, Monsanto was the world's leading producer of seeds, accounting for 27% of the world seed market.[2] The majority of these seeds are of the Roundup Ready® brand. The stated advantage of Roundup Ready® crops is that they substantially improve a farmer's ability to control weeds, since glyphosate can be sprayed in the fields during the growing season without harming the crops. In 2010, an estimated 70% of corn and cotton, and 90% of soybean fields in the United States were Roundup Ready®.[3]

211.    Monsanto's glyphosate products are registered in 130 countries and approved for use on over 100 different crops.[4] They are ubiquitous in the environment. Numerous studies

---

[1] Arthur Grube, et al., U.S. Envtl. Prot. Agency, *Pesticides Industry Sales and Usage, 2006-2007 Market Estimates*, 14, (2011) *available at* http://www.epa.gov/pesticides/pestsales/07pestsales/market_estimates2007.pdf.
[2] ETC Group, *Who Will Control the Green Economy?*, 22, (2011) *available at* http://www.etcgroup.org/files/publication/pdf_file/ETC_wwctge_4web_Dec2011.pdf.
[3] William Neuman and Andrew Pollack, *Farmers Cope with Roundup-Resistant Weeds*, N.Y. TIMES, May 3, 2010, *available at* http://www.nytimes.com/2010/05/04/business/energy-environment/04weed.html?pagewan.
[4] Monsanto, *Backgrounder-History of Monsanto's Glyphosate Herbicides*, (Sept. 2, 2015), http://www.monsanto.com/products/documents/glyphosate-background-materials/back_history.pdf.

confirm that glyphosate is found in rivers, streams and groundwater in agricultural areas where Roundup® is used.[5] It has been found in food,[6] in the urine of agricultural workers[7] and even in the urine of urban dwellers who are not in direct contact with glyphosate.[8]

212.    On March 20, 2015, the International Agency for Research on Cancer ("IARC"), an agency of the World Health Organization ("WHO"), issued an evaluation of several herbicides, including glyphosate. That evaluation was based, in part, on studies of exposures to glyphosate in several countries around the world, and it traces the health implications from exposure to glyphosate since 2001.

213.    On July 29, 2015, IARC issued the formal monograph relating to glyphosate. In that monograph, the IARC Working Group provides a thorough review of the numerous studies and data relating to glyphosate exposure in humans.

214.    The IARC Working Group classified glyphosate as a Group 2A herbicide, which means that it is *probably carcinogenic to humans*. The IARC Working Group concluded that the cancers most associated with glyphosate exposure are non-Hodgkin lymphoma and other hematopoietic cancers, including lymphocytic lymphoma, chronic lymphocytic leukemia, B-cell lymphoma and multiple myeloma.[9]

---

[5] *See*: U.S. Geological Survey, *USGS Technical Announcement: Widely Used Herbicide Commonly Found in Rain and Streams in the Mississippi River Basin*, 2011, *available at* http://www.usgs.gov/newsroom/article.asp?ID=2909; *see also*: U.S. Envtl. Prot. Agency, *Technical Factsheet on: Glyphosate, available at* http://www.epa.gov/safewater/pdfs/factsheets/soc/tech/glyphosa.pdf.

[6] Thomas Bohn, et al., *Compositional Differences in Soybeans on the Market: Glyphosate Accumulates in Roundup Ready GM Soybeans*, 153 FOOD CHEMISTRY, 207, (2013), *available at* http://www.sciencedirect.com/science/article/pii/S0308814613019201.

[7] John F. Acquavella, et al., *Glyphosate Biomonitoring for Farmers and Their Families: Results from the Farm Family Exposure Study*, 112(3) ENVIRONMENTAL HEALTH PERSPECTIVE, 321, (2004) *available at* http://www.ncbi.nlm.nih.gov/pmc/articles/PMC1241861/; Guyton, et al. *Carcinogenicity of Tetrachlorvinphos, Parathion, Malathion, Diazinon and Glyphosate*, 112 IARC Monographs , 76, section 5.4 (2015) *available at* http://dx.doi.org/10.1016/S1470-2045(15)70134-8.

[8] Dirk Brändli & Sandra Reinacher, *Herbicides found in Human Urine*, 1 ITHAKA JOURNAL, 270 (2012), *available at* http://www.ithaka-journal.net/druckversionen/e052012-herbicides-urine.pdf.

[9] *See* Guyton, et al., *Carcinogenicity of Tetrachlorvinphos, Parathion, Malathion, Diazinon and Glyphosate, supra.*

215.    The IARC evaluation is significant. It confirms what has been believed for years: that glyphosate is toxic to humans.

216.    Nevertheless, Monsanto, since it began selling Roundup®, has represented it as safe to humans and the environment. Indeed, Monsanto has repeatedly proclaimed and continues to proclaim to the world, and particularly to United States consumers, that glyphosate-based herbicides, including Roundup®, create no unreasonable risks to human health or to the environment.

## FACTS

217.    Glyphosate is a broad-spectrum, non-selective herbicide used in a wide variety of herbicidal products around the world.

218.    Plants treated with glyphosate translocate the systemic herbicide to their roots, shoot regions and fruit, where it interferes with the plant's ability to form aromatic amino acids necessary for protein synthesis. Treated plants generally die within two to three days. Because plants absorb glyphosate, it cannot be completely removed by washing or peeling produce or by milling, baking or brewing grains.

219.    For nearly 40 years, farms across the world have used Roundup® without knowing of the dangers its use poses. That is because when Monsanto first introduced Roundup®, it touted glyphosate as a technological breakthrough: it could kill almost every weed without causing harm either to people or to the environment. According to the WHO, the main chemical ingredient of Roundup®—glyphosate—is a probable cause of cancer. Those at risk include farm workers and other individuals with workplace exposure to Roundup®, such as workers in garden centers, nurseries and landscapers. Monsanto assured the public that Roundup® was harmless. In order to prove this, Monsanto championed falsified data and attacked legitimate studies that revealed

Roundup®'s dangers. Monsanto has led a prolonged campaign of misinformation to convince government agencies, farmers and the general population that Roundup® is safe.

### The Discovery of Glyphosate and Development of Roundup®

220.    The herbicidal properties of glyphosate were discovered in 1970 by Monsanto chemist John Franz. The first glyphosate-based herbicide was introduced to the market in the mid-1970s under the brand name Roundup®.[10] From the outset, Monsanto marketed Roundup® as a "safe" general-purpose herbicide for widespread commercial and consumer use. It still markets Roundup® as safe today.[11]

221.    In addition to the active ingredient glyphosate, Roundup® formulations also contain adjuvants and other chemicals, such as the surfactant POEA, which are considered "inert" and therefore protected as "trade secrets" in manufacturing.  Growing evidence suggests that these adjuvants and additional components of Roundup® formulations are not, in fact, inert and are toxic in their own right.

### Registration of Herbicides under Federal Law

222.    The manufacture, formulation and distribution of herbicides, such as Roundup®, are regulated under the Federal Insecticide, Fungicide and Rodenticide Act ("FIFRA" or "Act"), 7 U.S.C. § 136 et seq. FIFRA requires that all pesticides be registered with the Environmental Protection Agency ("EPA" or "Agency") prior to their distribution, sale or use, except as described by the Act. 7 U.S.C. § 136a(a).

223.    Because pesticides are toxic to plants, animals and humans, at least to some degree, the EPA requires as part of the registration process, among other things, a variety of tests to

---

[10] Monsanto, *Backgrounder-History of Monsanto's Glyphosate Herbicide*, Monsanto, (Sept. 2, 2015), http://www.monsanto.com/products/documents/glyphosate-background- materials/back_history.pdf.
[11] Monsanto, *What is Glyphosate?* (Sept. 2, 2015), http://www.monsanto.com/sitecollectiondocuments/glyphosate-safety-health.pdf.

evaluate the potential for exposure to pesticides, toxicity to people and other potential non-target organisms and other adverse effects on the environment. Registration by the EPA, however, is not an assurance or finding of safety. The determination the Agency must make in registering or re-registering a product is not that the product is "safe," but rather that use of the product in accordance with its label directions "will not generally cause unreasonable adverse effects on the environment." 7 U.S.C. § 136a(c)(5)(D).

224.   FIFRA defines "unreasonable adverse effects on the environment" to mean "any unreasonable risk to man or the environment, taking into account the economic, social and environmental costs and benefits of the use of any pesticide." 7 U.S.C. § 136(bb). FIFRA thus requires the EPA to make a risk/benefit analysis in determining whether a registration should be granted or allowed to continue to be sold in commerce.

225.   The EPA and the State of Missouri registered Roundup® for distribution, sale and manufacture in the United States and the State of Missouri.

226.   FIFRA generally requires that the registrant, Monsanto in the case of Roundup®, conduct the health and safety testing of pesticide products. The EPA has protocols governing the conduct of tests required for registration and the laboratory practices that must be followed in conducting these tests. The data produced by the registrant must be submitted to the EPA for review and evaluation. The government is not required, nor is it able to perform the product tests that are required of the manufacturer.

227.   The evaluation of each pesticide product distributed, sold or manufactured is completed at the time the product is initially registered. The data necessary for registration of a pesticide has changed over time. The EPA is now in the process of re-evaluating all pesticide products through a Congressionally-mandated process called "re-registration." 7 U.S.C. § 136a-1.

In order to reevaluate these pesticides, the EPA is demanding the completion of additional tests and the submission of data for the EPA's review and evaluation.

228.    In the case of glyphosate, and therefore Roundup®, the EPA had planned on releasing its preliminary risk assessment —in relation to the reregistration process—no later than July 2015. The EPA completed its review of glyphosate in early 2015, but it delayed releasing the risk assessment pending further review in light of the World Health Organization's health-related findings.  In December 2017, the EPA released a draft risk assessment for glyphosate, allowing a comment period through April 30, 2018.  The EPA is scheduled to publish the interim registration review decision for glyphosate in 2019.

### Scientific Fraud Underlying the Marketing and Sale of Glyphosate/ Roundup®

229.    Based on early studies that glyphosate could cause cancer in laboratory animals, the EPA originally classified glyphosate as *possibly carcinogenic to humans* (Group C) in 1985. After pressure from Monsanto, including contrary studies it provided to the EPA, the EPA changed its classification to *evidence of non-carcinogenicity in humans* (Group E) in 1991. In so classifying glyphosate, however, the EPA made clear that the designation did not mean the chemical does not cause cancer: "It should be emphasized, however, that designation of an agent in Group E is based on the available evidence at the time of evaluation and should not be interpreted as a definitive conclusion that the agent will not be a carcinogen under any circumstances."[12]

230.    On two occasions, the EPA found that the laboratories hired by Monsanto to test the toxicity of its Roundup® products for registration purposes committed fraud.

231.    In the first instance, Monsanto, in seeking initial registration of Roundup® by the EPA, hired Industrial Bio-Test Laboratories ("IBT") to perform and evaluate pesticide toxicology

---

[12] U.S. Envtl. Prot. Agency, *Memorandum, Subject: SECOND Peer Review of Glyphosate*, 1, (1991) *available at* http://www.epa.gov/pesticides/chem_search/cleared_reviews/csr_PC-103601_30-Oct-91_265.pdf.

studies relating to Roundup®.[13] IBT performed about 30 tests on glyphosate and glyphosate-containing products, including nine of the 15 residue studies needed to register Roundup®.

232.    In 1976, the United States Food and Drug Administration ("FDA") performed an inspection of IBT that revealed discrepancies between the raw data and the final report relating to the toxicological impacts of glyphosate. The EPA subsequently audited IBT; it too found the toxicology studies conducted for the Roundup® herbicide to be invalid.[14] An EPA reviewer stated, after finding "routine falsification of data" at IBT, that it was "hard to believe the scientific integrity of the studies when they said they took specimens of the uterus from male rabbits."[15]

233.    Three top executives of IBT were convicted of fraud in 1983.

234.    In the second incident of data falsification, Monsanto hired Craven Laboratories in 1991 to perform pesticide and herbicide studies, including for Roundup®. In that same year, the owner of Craven Laboratories and three of its employees were indicted, and later convicted, of fraudulent laboratory practices in the testing of pesticides and herbicides.[16]

235.    Despite the falsity of the tests that underlie its registration, within a few years of its launch, Roundup® was being marketed in 115 countries.

### *The Importance of Roundup® to Monsanto's Market Dominance and Profits*

---

[13]    Monsanto, *Backgrounder, Testing Fraud: IBT and Craven Laboratories* (Sept. 2, 2015), http://www.monsanto.com/products/documents/glyphosate-background-materials/ibt_craven_bkg.pdf.

[14] U.S. Envtl. Prot. Agency, *Summary of the IBT Review Program Office of Pesticide Programs* (1983), *available at* http://nepis.epa.gov/Exe/ZyNET.exe/91014ULV.TXT?ZyActionD=ZyDocument&Client=EPA&Index=1981+Thru +1985&Docs=&Query=&Time=&EndTime=&SearchMethod=1&TocRestrict=n&Toc=&TocEntry=&QField=&QF ieldYear=&QFieldMonth=&QFieldDay=&IntQFieldOp=0&ExtQFieldOp=0&XmlQuery=&File=D%3A%5Czyfiles %5CIndex%20Data%5C81thru85%5CTxt%5C00000022%5C91014ULV.txt&User=ANONYMOUS&Password=an onymous&SortMethod=h%7CMaximumDocuments=1&FuzzyDegree=0&ImageQuality=r75g8/r75g8/x150y150g1 6/i425&Display=p%7Cf&DefSeekPage=x&SearchBack=ZyActionL&Back=ZyActionS&BackDesc=Results%20pa ge&MaximumPages=1&ZyEntry=1&SeekPage=x&ZyPURL.

[15] Marie-Monique Robin, *The World According to Monsanto: Pollution, Corruption and the Control of the World's Food Supply* (2011) (citing U.S. Envtl. Prot. Agency, *Data Validation, Memo from K. Locke, Toxicology Branch, to R. Taylor, Registration Branch. Washington, D.C.* (August 9, 1978.)).

[16] Monsanto, *Backgrounder, Testing Fraud: IBT and Craven Laboratories, supra.*

236. The success of Roundup® was key to Monsanto's continued reputation and dominance in the marketplace. Largely due to the success of Roundup® sales, Monsanto's agriculture division was out-performing its chemicals division's operating income, and that gap increased yearly. But with its patent for glyphosate expiring in the United States in the year 2000, Monsanto needed a strategy to maintain its Roundup® market dominance and to ward off impending competition.

237. In response, Monsanto began the development and sale of genetically engineered Roundup Ready® seeds in 1996. Since Roundup Ready® crops are resistant to glyphosate, farmers can spray Roundup® onto their fields during the growing season without harming the crop. This allowed Monsanto to expand its market for Roundup® even further; by 2000, Monsanto's biotechnology seeds were planted on more than 80 million acres worldwide and nearly 70% of American soybeans were planted from Roundup Ready® seeds. It also secured Monsanto's dominant share of the glyphosate/Roundup® market through a marketing strategy that coupled proprietary Roundup Ready® seeds with continued sales of its Roundup® herbicide.

238. Through a three-pronged strategy of increasing production, decreasing prices and by coupling with Roundup Ready® seeds, Roundup® became Monsanto's most profitable product. In 2000, Roundup® accounted for almost $2.8 billion in sales, outselling other herbicides by a margin of five to one, and accounting for close to half of Monsanto's revenue.[17] Today, glyphosate remains one of the world's largest herbicides by sales volume.

***Monsanto Has Known for Decades That It Falsely Advertised the Safety of Roundup®***

---

[17] David Barboza, *The Power of Roundup; A Weed Killer Is a Block for Monsanto to Build On*, N.Y. TIMES, Aug. 2, 2001, *available at* http://www.nytimes.com/2001/08/02/business/the-power-of-roundup-a-weed-killer-is-a-block-for-monsanto-to-build-on.html.

239.   In 1996, the New York Attorney General ("NYAG") filed a lawsuit against Monsanto based on its false and misleading advertising of Roundup® products. Specifically, the lawsuit challenged Monsanto's general representations that its spray-on, glyphosate-based herbicides, including Roundup®, were **"safer than table salt"** and **"practically non-toxic"** to mammals, birds and fish. Among the representations the NYAG found deceptive and misleading about the human and environmental safety of Roundup® are the following:

> a)      "Remember that environmentally friendly Roundup herbicide is biodegradable. It won't build up in the soil so you can use Roundup with confidence along customers' driveways, sidewalks and fences ..."

> b)      "And remember that Roundup is biodegradable and won't build up in the soil. That will give you the environmental confidence you need to use Roundup everywhere you've got a weed, brush, edging or trimming problem."

> c)      "Roundup biodegrades into naturally occurring elements."

> d)      "Remember that versatile Roundup herbicide stay where you put it. That means there's no washing or leaching to harm customers' shrubs or other desirable vegetation."

> e)      "This non-residual herbicide will not wash or leach in the soil. It ... stays where you apply it."

> f)      "Glyphosate is less toxic to rats than table salt following acute oral ingestion."

> g)      "Glyphosate's safety margin is much greater than required. It has over a 1,000-fold safety margin in food and over a 700-fold safety margin for workers who manufacture it or use it."

> h)      "You can feel good about using herbicides by Monsanto. They carry a toxicity category rating of 'practically non- toxic' as it pertains to mammals, birds and fish."

> i)      "Roundup can be used where kids and pets will play and breaks down into natural material." This ad depicts a person with his

head in the ground and a pet dog standing in an area which has been treated with Roundup.[18]

240.    On November 19, 1996, Monsanto entered into an Assurance of Discontinuance with the NYAG, in which Monsanto agreed, among other things, "to cease and desist from publishing or broadcasting any advertisements [in New York] that represent, directly or by implication" that:

> a)    Its glyphosate-containing pesticide products or any component thereof are safe, non-toxic, harmless or free from risk
>
> ...
>
> b)    Its glyphosate-containing pesticide products or any component thereof manufactured, formulated, distributed or sold by Monsanto are biodegradable
>
> ...
>
> c)    Its glyphosate-containing pesticide products or any component thereof stay where they are applied under all circumstances and will not move through the environment by any means
>
> ...
>
> d)    Its glyphosate-containing pesticide products or any component thereof are "good" for the environment or are "known for their environmental characteristics".
>
> ...
>
> e)    Glyphosate-containing pesticide products or any component thereof are safer or less toxic than common consumer products other than herbicides.
>
> f)    Its glyphosate-containing products or any component thereof might be classified as "practically non-toxic".

241.    In 2009, France's highest court ruled that Monsanto had not told the truth about the safety of Roundup®. The French court affirmed an earlier judgement that Monsanto had falsely advertised its herbicide Roundup® as "biodegradable" and that it "left the soil clean."[19]

---

[18] Attorney General of the State of New York, In the Matter of Monsanto Company, Assurance of Discontinuance Pursuant to Executive Law § 63(15) (Nov. 1996).

[19] *Monsanto Guilty in 'False Ad' Row*, BBC, Oct. 15, 2009, *available at* http://news.bbc.co.uk/2/hi/europe/8308903.stm.

### Classifications and Assessments of Glyphosate

242.    The IARC process for the classification of glyphosate followed the IARC's stringent procedures for the evaluation of a chemical agent.  Over time, the IARC Monograph program has reviewed 1,013 agents. Of those reviewed, it has determined 120 agents to be Group 1 (Known Human Carcinogens); 82 agents to be Group 2A (Probable Human Carcinogens); 311 agents to be Group 2B (Possible Human Carcinogens); 499 agents to be Group 3 (Not Classified); and one agent to be Probably Not Carcinogenic.

243.    The established procedure for the IARC Monograph evaluations is described in the IARC Programme's Preamble.[20] Evaluations are performed by panels of international experts, selected on the basis of their expertise and the absence of actual or apparent conflicts of interest.

244.    One year before the Monograph meeting, the meeting is announced and there is a call both for data and for experts. Eight months before the Monograph meeting, the Working Group membership is selected and the sections of the Monograph are developed by the Working Group members. One month prior to the Monograph meeting, the call for data is closed and the various draft sections are distributed among Working Group members for review and comment. Finally, at the Monograph meeting, the Working Group finalizes review of all literature, evaluates the evidence in each category, and completes the overall evaluation. Within two weeks after the Monograph meeting, the summary of the Working Group findings is published in *The Lancet Oncology*, and within one year after the meeting, the finalized Monograph is published.

245.    In assessing an agent, the IARC Working Group reviews the following information: (a) human, experimental and mechanistic data; (b) all pertinent epidemiological studies and cancer

---

[20] World Health Org., *IARC Monographs on the Evaluation of Carcinogenic Risks to Humans: Preamble*, (2006), *available at* http://monographs.iarc.fr/ENG/Preamble/CurrentPreamble.pdf.

bioassays; and (c) representative mechanistic data. The studies must be publicly available and have sufficient detail for meaningful review.

246.    In March 2015, IARC reassessed glyphosate. The summary published in *The Lancet Oncology* reported that glyphosate is a Group 2A agent, probably carcinogenic in humans.

247.    On July 29, 2015, the IARC issued its Monograph for glyphosate, Monograph Volume 112. For Volume 112, the volume that assessed glyphosate, a Working Group of 17 experts from 11 countries met at the IARC from March 3–10, 2015, to assess the carcinogenicity of certain herbicides, including glyphosate. The March meeting culminated nearly a one-year review and preparation by the IARC Secretariat and the Working Group, including a comprehensive review of the latest available scientific evidence. According to published procedures, the Working Group considered "reports that have been published or accepted for publication in the openly available scientific literature" as well as "data from governmental reports that are publicly available."

248.    The studies considered the following exposure groups: (1) occupational exposure of farmers and tree nursery workers in the United States, forestry workers in Canada and Finland and municipal weed-control workers in the United Kingdom; and (2) para-occupational exposure in farming families.

249.    Glyphosate was identified as the second-most used household herbicide in the United States for weed control between 2001 and 2007, and the most heavily used herbicide in the world in 2012.

250.    Exposure pathways are identified as air (especially during spraying), dermal, water and food. Community exposure to glyphosate is widespread and found in soil, air, surface water and groundwater, as well as in food.

251.   The assessment of the IARC Working Group identified several case control studies of occupational exposure in the United States, Canada and Sweden. These studies show a human health concern from agricultural and other work-related exposure to glyphosate.

252.   The IARC Working Group found an increased risk between exposure to glyphosate and NHL and several subtypes of NHL, and the increased risk persisted after adjustment for other pesticides.

253.   The IARC Working Group also found that glyphosate caused DNA and chromosomal damage in human cells. One study in community residents reported increases in blood markers of chromosomal damage (micronuclei) after glyphosate formulations were sprayed.

254.   In male CD-1 mice, glyphosate induced a positive trend in the incidence of a rare tumor: renal tubule carcinoma. A second study reported a positive trend for haemangiosarcoma in male mice. Glyphosate increased pancreatic islet-cell adenoma in male rats in two studies. A glyphosate formulation promoted skin tumors in an initiation-promotion study in mice.

255.   The IARC Working Group also noted that glyphosate has been detected in the urine of agricultural workers, indicating absorption. Soil microbes degrade glyphosate to aminomethylphosphoric acid (AMPA). Blood AMPA detection after exposure suggests intestinal microbial metabolism in humans.

256.   The IARC Working Group further found that glyphosate and glyphosate formulations induced DNA and chromosomal damage in mammals, and in human and animal cells in utero.

257.   The IARC Working Group also noted genotoxic, hormonal and enzymatic effects in mammals exposed to glyphosate.[21] Essentially, glyphosate inhibits the biosynthesis of aromatic

---

[21] Guyton, et al., *Carcinogenicity of Tetrachlorvinphos, Parathion, Malathion, Diazinon & Glyphosate, supra* at 77.

amino acids, which leads to several metabolic disturbances, including the inhibition of protein and secondary product biosynthesis and general metabolic disruption.

258.    The IARC Working Group also reviewed an Agricultural Health Study, consisting of a prospective cohort of 57,311 licensed pesticide applicators in Iowa and North Carolina.[22] While this study differed from others in that it was based on a self-administered questionnaire, the results support an association between glyphosate exposure and multiple myeloma, hairy cell leukemia (HCL) and chronic lymphocytic leukemia (CLL), in addition to several other cancers.

*Other Earlier Findings About Glyphosate's Dangers to Human Health*

259.    The EPA has a technical fact sheet, as part of its Drinking Water and Health, National Primary Drinking Water Regulations publication, relating to glyphosate. This technical fact sheet predates the IARC March 20, 2015, evaluation. The fact sheet describes the release patterns for glyphosate as follows:

**Release Patterns**

Glyphosate is released to the environment in its use as a herbicide for controlling woody and herbaceous weeds on forestry, right-of-way, cropped and non-cropped sites. These sites may be around water and in wetlands.

It may also be released to the environment during its manufacture, formulation, transport, storage, disposal and cleanup, and from spills. Since glyphosate is not a listed chemical in the Toxics Release Inventory, data on releases during its manufacture and handling are not available.

Occupational workers and home gardeners may be exposed to glyphosate by inhalation and dermal contact during spraying, mixing, and cleanup. They may also be exposed by touching soil and plants to

---

[22] Anneclare J. DeRoos, et al., *Cancer Incidence Among Glyphosate-Exposed Pesticide Applicators in the Agricultural Health Study*, 113 ENVTL. HEALTH PERSPECTIVES 49-54 (2005), *available at* hhttp://www.ncbi.nlm.nih.gov/pmc/articles/PMC1253709/pdf/ehp0113-000049.pdf.

which glyphosate was applied. Occupational exposure may also occur during glyphosate's manufacture, transport, storage, and disposal.[23]

260. In 1995, the Northwest Coalition for Alternatives to Pesticides reported that in California, the state with the most comprehensive program for reporting of pesticide-caused illness, glyphosate was the third most commonly-reported cause of pesticide illness among agricultural workers.[24]

### The Toxicity of Other Ingredients in Roundup®

261. In addition to the toxicity of the active ingredient, glyphosate, several studies support the hypothesis that the glyphosate-based formulation in Defendant's Roundup® products is more dangerous and toxic than glyphosate alone. Indeed, as early as 1991, available evidence demonstrated that glyphosate formulations were significantly more toxic than glyphosate alone.[25]

262. In 2002, a study by Julie Marc, entitled "Pesticide Roundup Provokes Cell Division Dysfunction at the Level of CDK1/Cyclin B Activation", revealed that Roundup® causes delays in the cell cycles of sea urchins but that the same concentrations of glyphosate alone were ineffective and did not alter cell cycles.[26]

263. A 2004 study by Marc and others, entitled "Glyphosate-based pesticides affect cell cycle regulation," demonstrated a molecular link between glyphosate-based products and cell cycle dysregulation. The researchers noted that "cell-cycle dysregulation is a hallmark of tumor cells and human cancer. Failure in the cell-cycle checkpoints leads to genomic instability and subsequent development of cancers from the initial affected cell." Further, "[s]ince cell cycle

---

[23] U.S. Envtl. Prot. Agency, *Technical Factsheet on: Glyphosate, supra.*
[24] Caroline Cox, *Glyphosate, Part 2: Human Exposure and Ecological Effects*, 15 J. PESTICIDE REFORM 4 (1995); W.S. Peas, et al., *Preventing pesticide-related illness in California agriculture: Strategies and priorities. Environmental Health Policy Program Report*, Univ. of Cal. School of Public Health, Calif. Policy Seminar (1993).
[25] T.T. Martinez and K. Brown, *Oral and pulmonary toxicology of the surfactant used in Roundup herbicide*, PROC. WEST. PHARMACOL. SOC. 34:43-46 (1991).
[26] Julie Marc, et al., *Pesticide Roundup Provokes Cell Division Dysfunction at the Level of CDK1/Cyclin B Activation*, 15 CHEM. RES. TOXICOL. 326-331 (2002), *available at* http://pubs.acs.org/doi/full/10.1021/tx015543g.

disorders such as cancer result from dysfunction of a unique cell, it was of interest to evaluate the threshold dose of glyphosate affecting the cells."[27]

264.    In 2005, a study by Francisco Peixoto, entitled "Comparative effects of the Roundup® and glyphosate on mitochondrial oxidative phosphorylation," demonstrated that Roundup®'s effects on rat liver mitochondria are far more toxic than equal concentrations of glyphosate alone. The Peixoto study further suggested that the harmful effects of Roundup® on mitochondrial bioenergetics could not be exclusively attributed to glyphosate but could be the result of other chemicals, such as the surfactant POEA, or in the alternative, due to the potential synergistic effect between glyphosate and other ingredients in the Roundup® formulation.[28]

265.    In 2009, Nora Benachour and Gilles-Eric Seralini published a study examining the effects of Roundup® and glyphosate on human umbilical, embryonic and placental cells. The study tested dilution levels of Roundup® and glyphosate that were far below agricultural recommendations, corresponding with low levels of residue in food. The researchers ultimately concluded that supposed "inert" ingredients, and possibly POEA, alter human cell permeability and amplify toxicity of glyphosate alone. The researchers further suggested that assessments of glyphosate toxicity should account for the presence of adjuvants or additional chemicals used in the formulation of the complete pesticide. The study confirmed that the adjuvants present in Roundup® are not, in fact, "inert" and that Roundup® is potentially far more toxic than its active ingredient glyphosate alone.[29]

---

[27] Julie Marc, et al., *Glyphosate-based pesticides affect cell cycle regulation*, 96 BIOLOGY OF THE CELL 245, 245-249 (2004), *available at* http://onlinelibrary.wiley.com/doi/10.1016/j.biolcel.2003.11.010/epdf.

[28] Francisco Peixoto, *Comparative effects of the Roundup and Glyphosate on mitochondrial oxidative phosphorylation*, 61 CHEMOSPHERE 1115, 1122 (2005), *available at* https://www.researchgate.net/publication/7504567_Comparative_effects_of_the_Roundup_and_glyphosate_on_mit ochondrial_oxidative_phosphorylation.

[29] Nora Benachour, et al., *Glyphosate Formulations Induce Apoptosis and Necrosis in Human Umbilical, Embryonic and Placental Cells*, 22 Chem. Res. Toxicol. 97-105 (2008), *available at* http://big.assets.huffingtonpost.com/france.pdf.

266.    The results of these studies were at all times available to Defendant.

267.    Monsanto's chief toxicologist Donna Farmer has admitted that she cannot say that Roundup® does not cause cancer because Monsanto has not performed carcinogenicity studies with the formulated product Roundup®, the very product that caused Plaintiffs' NHL.[30] She further admitted that in the 35 years that Monsanto has marketed Roundup® to the public, Monsanto has conducted no chronic carcinogenicity studies on the formulated Roundup® product merely because EPA did not require that such a study be performed for registration of glyphosate.[31]

268.    Defendant thus knew or should have known that Roundup® is more toxic than glyphosate alone and that safety studies of Roundup® and Roundup®'s adjuvants, "inert" ingredients, and/or surfactant(s) including POEA were necessary to protect Plaintiff from Roundup® products.

269.    Despite its knowledge that Roundup® is considerably more dangerous than glyphosate alone, Defendant continued to promote Roundup® as safe.

### The EPA's Review of Glyphosate

270.    In April 2016, personnel within the EPA's Office of Pesticides Program (OPP) leaked and posted on the internet a draft report on glyphosate carcinogenicity, entitled Cancer Assessment Review Committee (CARC) report, dated October 2015.    The EPA removed the documents by May 2, 2016, within days of initially posting it online.    An EPA spokesperson subsequently issued a statement on the agency's glyphosate review:

> Glyphosate documents were inadvertently posted to the Agency's docket. These documents have now been taken down because our assessment is not final.    EPA has not completed our cancer review.    We will look at the work of other governments as well as work by HHS's Agricultural Health Study

---

[30] *See* Plaintiffs' Submission in Response to Pretrial Order No. 8, Ex. 7, *In re: Roundup Products Liability Litigation*, MDL No. 2741 (N.D. Cal., Mar. 14, 2017), ECF No. 187-7.
[31] *See id.*

as we move to make a decision on glyphosate. Our assessment will be peer reviewed and completed by end of 2016.[32]

271.     On September 12, 2016, EPA's OPP submitted a report on the carcinogenic potential of glyphosate, wherein it issued a "proposed conclusion" that glyphosate is "'not likely to be carcinogenic to humans at doses relevant to human health risk assessment."[33] There are no authors listed on this issue paper, which reiterates and adopts the conclusions of the October 2015 leaked assessment. The issue paper is based upon a review of industry-sponsored articles and studies. The OPP acknowledged that it rejected all studies that considered Roundup®—the formulated product—instead of studies that isolated glyphosate because "[g]lyphosate formulations contain various components other than glyphosate and it has been hypothesized these components are more toxic than glyphosate alone.[34]

272.     Thus, the OPP notes dozens of studies considered by the IARC were not reviewed by the OPP because the OPP's "evaluation focused on studies on the active ingredient glyphosate" and "additional research could also be performed to determine whether formulation components, such as surfactants, influence the toxicity of glyphosate formulations."[35]

273.     From December 13 to 16, 2016, the EPA held the FIFRA Scientific Advisory Panel ("SAP") meetings to consider issues raised by the OPP's evaluation of glyphosate. Again, the OPP allowed the SAP to consider studies of glyphosate alone, and not any study of the formulated product. In its charge to the FIFRA SAP, the OPP noted that "[a]lthough there are studies available

---

[32] Carey Gillam, *What Is Going On With Glyphosate? EPA's Odd Handling of Controversial Chemical*, HUFFINGTON POST, May 2, 2016 *available at* http://www.huffingtonpost.com/care-gilliam/what-is-going-on-with-gly_b_9825326.html; *see also* P.J. Huffstutter, *EPA takes offline report that says glyphosate not likely carcinogenic*, REUTERS, May 2, 2016, *available at* http://www.reuters.com/article/us-usa-glyphosate-epa-idUSKCN0XU01K.
[33] *See* EPA's Office of Pesticide Programs, Glyphosate Issue Paper: Evaluation of Carcinogenic Potential (Sept. 12, 2016), *available at* https://www.epa.gov/sites/production/files/2016-09/documents/glyphosate_issue_paper_evaluation_of_carcincogenic_potential.pdf
[34] *Id.*
[35] *Id*

on glyphosate-based pesticide formulations, the agency is soliciting advice from the FIFRA SAP

on this evaluation of human carcinogenic potential for the active ingredient glyphosate only at this

time."[36]

274.    The OPP draft assessment therefore does not actually consider the product at issue

in this litigation or, more importantly, how glyphosate, in conjunction with surfactants and other

chemicals, affects carcinogenicity.

275.    On March 16, 2017, the final SAP meeting minutes and report were released,

revealing disagreement and lack of consensus among the scientists on whether there was a positive

association between *glyphosate* exposure and NHL.[37]

### *Recent Worldwide Bans on Roundup®/Glyphosate*

276.    Several countries around the world have instituted bans on the sale of Roundup®

and other glyphosate-containing herbicides, both before and since the IARC first announced its

assessment for glyphosate in March 2015, and more countries undoubtedly will follow suit as the

dangers of the use of Roundup® become more widely known. The Netherlands issued a ban on all

glyphosate-based herbicides in April 2014, including Roundup®, which took effect at the end of

2015. In issuing the ban, the Dutch Parliament member who introduced the successful legislation

stated: "Agricultural pesticides in user-friendly packaging are sold in abundance to private persons.

In garden centers, Roundup® is promoted as harmless, but unsuspecting customers have no idea

---

[36] EPA OPP, Glyphosate: Evaluation of Carcinogenic Potential, Charge to the FIFRA SAP for the October 18-21, 2016 Meeting, *available at* https://www.epa.gov/sites/production/files/2016-11/documents/glyphosate_sap_charge_questions_-final.pdf.
[37] FIFRA Scientific Advisory Panel Meeting Minutes and Final Report No. 2017-01, A Set of Scientific Issues Being Considered by the Environmental Protection Agency Regarding: EPA's Evaluation of the Carcinogenic Potential of Glyphosate, *available at* https://www.epa.gov/sites/production/files/2017-03/documents/december_13-16_2016_final_report_03162017.pdf.

what the risks of this product are. Especially children are sensitive to toxic substances and should therefore not be exposed to it."[38]

277.    The Brazilian Public Prosecutor in the Federal District requested that the Brazilian Justice Department suspend the use of glyphosate.[39]

278.    France banned the private sale of Roundup® and glyphosate following the IARC assessment for glyphosate.[40]

279.    In 2017, Bermuda banned both the private and commercial sale of glyphosate, including Roundup®. The Bermuda government explained its ban as follows: "Following a recent scientific study carried out by a leading cancer agency, the importation of weed spray 'Roundup' has been suspended."[41]

### Proposition 65 Listing

280.    On September 4, 2015, California's Office of Environmental Health Hazard Assessment ("OEHHA") published a notice of intent to include glyphosate on the state's list of known carcinogens under Proposition 65.[42]    California's Safe Drinking Water and Toxic Enforcement Act of 1986 (informally known as "Proposition 65") requires the state to maintain

---

[38] *Holland's Parliament Bans Glyphosate Herbicides*, THE REAL AGENDA, 14 April 2014, *available at* http://real-agenda.com/hollands-parliament-bans-glyphosate-herbicides/.

[39] Christina Sarich, *Brazil's Public Prosecutor Wants to Ban Monsanto's Chemicals Following Recent Glyphosate-Cancer Link*, Global Research, May 14, 2015, *available at*
http://www.globalresearch.ca/brazils-public-prosecutor-wants-to-ban-monsantos-chemicals-following-recent-glyphosate-cancer-link/5449440; *see* Ministério Público Federal, MPF/DF *reforça pedido para que glifosato seja banido do mercado naciona*, April, 14, 2015, *available at*
http://noticias.pgr.mpf.mp.br/noticias/noticias-do-site/copy_of_meio-ambiente-e-patrimonio-cultural/mpf-df-reforca-pedido-para-que-glifosato-seja-banido-do-mercado-nacional.

[40] Zoe Schlanger, *France Bans Sales of Monsanto's Roundup in Garden Centers, 3 Months After U.N. Calls it "Probable Carcinogen,"* NEWSWEEK, June 15, 2015, *available at* http://www.newsweek.com/france-bans-sale-monsantos-roundup-garden-centers-after-un-names-it- probable-343311.

[41] *Health Minister: Importation of Roundup Weed Spray Suspended*, TODAY IN BERMUDA, May 11, 2015, *available at* http://www.todayinbermuda.com/news/health/item/1471-health-minister-importation-of-roundup-weed-spray-suspended.

[42] Cal. Envtl. Prot. Agency Office of Envtl. Health Hazard Assessment, Notice of Intent to List Chemicals by the Labor Code Mechanism: Tetrachlorvinphos, Parathion, Malathion, Glyphosate (Sept. 4, 2015),
http://oehha.ca.gov/prop65/CRNR_notices/admin_listing/intent_to_list/pdf_zip/090415NOIL_LCSet27.pdf.

and, at least once a year, revise and republish a list of chemicals "known to the State of California to cause cancer or reproductive toxicity."[43]  The OEHHA determined that glyphosate met the criteria for the listing mechanism under the Labor Code following IARC's assessment of the chemical.[44]

281.    The listing process under the Labor Code is essentially automatic.  The list of known carcinogens, at a minimum, must include substances identified by reference in Labor Code § 6382(b)(1).  That section of the Labor Code identifies "[s]ubstances listed as human or animal carcinogens by the International Agency for Research on Cancer (IARC)."  IARC's classification of glyphosate as a Group 2A chemical ("probably carcinogenic to humans") therefore triggered the listing.

282.    A business that deploys a listed chemical in its products must provide "clear and reasonable warnings" to the public prior to exposure to the chemical. To be clear and reasonable, a warning must "(1) clearly communicate that the chemical is known to cause cancer, and/or birth defects or other reproductive harm; and (2) effectively reach the person before exposure."[45]  The law also prohibits the discharge of listed chemicals into drinking water.

283.    Monsanto disputed the listing decision and, in January 2016, filed a lawsuit against OEHHA and the agency's acting director, Lauren Zeise, in California state court, seeking declaratory and injunctive relief to prevent OEHHA from listing glyphosate.[46]

---

[43] *Frequently Asked Questions*, STATE OF CAL. DEP'T OF JUSTICE, OFFICE OF THE ATTORNEY GENERAL, http://oag.ca.gov/prop65/faq (last visited April 19, 2016).
[44] Cal. Envtl. Prot. Agency Office of Envtl. Health Hazard Assessment, Notice of Intent to List Chemicals by the Labor Code Mechanism: Tetrachlorvinphos, Parathion, Malathion, Glyphosate (Sept. 4, 2015), http://oehha.ca.gov/prop65/CRNR_notices/admin_listing/intent_to_list/pdf_zip/090415NOIL_LCSet27.pdf.
[45] *Frequently Asked Questions*, STATE OF CAL. DEPARTMENT OF JUSTICE, OFFICE OF THE ATTORNEY GENERAL, *supra*.
[46] Monsanto Company's Verified Petition for Writ of Mandate and Complaint for Preliminary and Permanent Injunctive Relief, Monsanto Co. v. Office of the Envt'l Health Hazard Assessment, et al., No. 16-CECG-00183 (Cal. Super. Ct.) *available at* http://www.monsanto.com/files/documents/monvoehha.pdf.

284.    Monsanto alleged that OEHHA's exclusive reliance on the IARC decision signified that "OEHHA effectively elevated the determination of an ad hoc committee of an unelected, foreign body, which answers to no United States official (let alone any California state official), over the conclusions of its own scientific experts."[47] Monsanto further alleged that the Labor Code listing mechanism presented various constitutional violations because it "effectively empowers an unelected, undemocratic, unaccountable, and foreign body to make laws applicable in California."[48] Among other things, Monsanto argued that Proposition 65's requirement to provide a "clear and reasonable warning" to consumers that the chemical is a known carcinogen would damage its reputation and violate its First Amendment rights.[49]

285.    On January 27, 2017, the Superior Court of California – Fresno issued a tentative ruling granting, among other things, OEHHA's motion for judgment on the pleadings, thus rejecting Monsanto's arguments.  On March 10, 2017, the Court issued a final order adopting in full the earlier tentative ruling.[50]  On July 7, 2017, the listing of glyphosate "as known to the state to cause cancer" became effective under Proposition 65.

### EFSA Report on Glyphosate

286.    On November 12, 2015, the European Food Safety Authority (EFSA), the European Union's primary agency for food safety, reported on its evaluation of the Renewal Assessment Report (RAR) on glyphosate.[51] The Rapporteur Member State assigned to glyphosate, the German

---

[47] *Id.* at 2.
[48] *Id.* at 3.
[49] *Id.*
[50] *See* Notice of Supplemental Authority, In re: Roundup Products Liability Litigation, MDL No. 2741 (N.D. Cal., Mar. 13, 2017), ECF No. 185.
[51] European Food Safety Auth., *Conclusion on the peer review of the pesticide risk assessment of the active substance glyphosate*, EFSA Journal (2015), *available at* http://www.efsa.europa.eu/sites/default/files/scientific_output/files/main_documents/4302.pdf.

Federal Institute for Risk Assessment (BfR), had produced the RAR as part of the renewal process for glyphosate in the EU.

287.    The BfR sent its draft RAR to the EFSA and the RAR underwent a peer review process by the EFSA, other member states and industry groups. As part of the on-going peer review of Germany's reevaluation of glyphosate, the EFSA had also received a second mandate from the European Commission to consider the IARC's findings regarding the potential carcinogenicity of glyphosate and glyphosate-containing products.

288.    Based on a review of the RAR, which included data from industry-submitted, unpublished studies, the EFSA sent its own report ("Conclusion") to the European Commission, finding that "glyphosate is unlikely to pose a carcinogenic hazard to humans and the evidence does not support classification with regard to its carcinogenic potential according to Regulation (EC) No. 1272/2008."[52] The EFSA therefore disagreed with the IARC: glyphosate was not genotoxic and did not present a carcinogenic threat to humans.

289.    In explaining why its results departed from the IARC's conclusion, the EFSA drew a distinction between the EU and the IARC approaches to the study and classification of chemicals.[53] Although the IARC examined "both glyphosate—an active substance—and glyphosate-based formulations, grouping all formulations regardless of their composition," the EFSA explained that it considered only glyphosate and that its assessment focuses on "each individual chemical, and each marketed mixture separately."[54] The IARC, on the other hand, "assesses generic agents, including groups of related chemicals, as well as occupational or

---

[52] *Id.*
[53] European Food Safety Auth., *The EFSA Fact Sheet: Glyphosate, available at*
http://www.efsa.europa.eu/sites/default/files/corporate_publications/files/efsaexplainsglyphosate15112en.pdf.
[54] *Id.*

environmental exposure, and cultural or behavioral practices."[55] The EFSA accorded greater weight to studies conducted with glyphosate alone than studies of formulated products.[56]

290.   The EFSA went further and noted:

> [A]lthough some studies suggest that certain glyphosate-based formulations may be genotoxic (i.e. damaging to DNA), others that look solely at the active substance glyphosate do not show this effect. It is likely, therefore, that *the genotoxic effects observed in some glyphosate-based formulations are related to the other constituents or "co-formulants"*. Similarly, certain glyphosate-based formulations display higher toxicity than that of the active ingredient, presumably because of the presence of co-formulants, In its assessment, *EFSA proposes that the toxicity of each pesticide formulation and in particular its genotoxic potential should be further considered and addressed by Member State authorities while they reassess uses of glyphosate-based formulations in their own territories*.[57]

291.   Notwithstanding its conclusion, the EFSA did set exposure levels for glyphosate. Specifically, the EFSA proposed an acceptable daily intake (ADI) of 0.5 mg/kg of body weight per day; an acute reference dose (ARfD) of 0.5 mg/kg of body weight; and an acceptable operator exposure level (AOEL) of 0.1 mg/kg of body weight per day.[58]

### *Leading Scientists Dispute EFSA's Conclusion*

292.   On November 27, 2015, 96 independent academic and governmental scientists from around the world submitted an open letter to the EU health commissioner, Vytenis Andriukaitis.[59] The scientists expressed their strong concerns and urged the commissioner to

---

[55] *Id.*
[56] *Id.*
[57] *Id.*
[58] European Food Safety Auth., *Conclusion on the peer review of the pesticide risk assessment of the active substance glyphosate*, EFSA JOURNAL (2015), *supra*.
[59] Letter from Christopher J. Portier, et al. to Commissioner Vytenis Andriukaitis, Open Letter: Review of the Carcinogenicity of Glyphosate by EFSA and BfR (Nov. 27, 2015), *available at* http://www.zeit.de/wissen/umwelt/2015-11/glyphosat-scientists-in-row-over-safety-of=glyphosate-weedkiller.

disregard the "flawed" EFSA report, arguing that "the BfR decision is not credible because it is not supported by the evidence and it was not reached in an open and transparent manner."[60]

293.    Signatories to the letter included Dr. Christopher J. Portier, Ph.D., and other renowned international experts, some of whom were part of the IARC Working Group assigned to glyphosate.

294.    In an exhaustive and careful examination, the scientists scrutinized the EFSA's conclusions and outlined why the IARC Working Group decision was "by far the more credible":

> The IARC WG decision was reached relying on open and transparent procedures by independent scientists who completed thorough conflict-of-interest statements and were not affiliated or financially supported in any way by the chemical manufacturing industry. It is fully referenced and depends entirely on reports published in the open, peer-reviewed biomedical literature. It is part of a long tradition of deeply researched and highly credible reports on the carcinogenicity of hundreds of chemicals issued over the past four decades by IARC and used today by international agencies and regulatory bodies around the world as a basis for risk assessment, regulation and public health policy.[61]

295.    With respect to human data, the scientists pointed out that the EFSA agreed with the IARC that there was "*limited evidence* of carcinogenicity for non- Hodgkin lymphoma, but the EFSA nonetheless dismissed an association between glyphosate exposure and carcinogenicity. The IARC applies three levels of evidence in its analyses of human data, including sufficient evidence and limited evidence. The EFSA's ultimate conclusion that "there was no unequivocal evidence for a clear and strong association of NHL with glyphosate" was misleading because it was tantamount to IARC's highest level of evidence: "sufficient evidence," which means that a causal relationship has been established. However, the scientists argued, "[l]egitimate public health concerns arise when 'causality is credible,' i.e., when there is *limited evidence*."[62]

---

[60] *Id.*
[61] *Id.*
[62] *Id.*

296.    Among its many other deficiencies, the EFSA's conclusions regarding animal carcinogenicity data were "scientifically unacceptable," particularly in BfR's use of historical control data and in its trend analysis. Indeed, BfR's analysis directly contradicted the Organization for Economic Co-operation and Development ("OECD") testing guidelines while citing and purporting to follow those same guidelines. For instance, the EFSA report dismisses observed trends in tumor incidence "because there are no individual treatment groups that are significantly different from controls and because the maximum observed response is reportedly within the range of the historical control data." However, according to the scientists, concurrent controls are recommended over historical controls in all guidelines, scientific reports and publications, and, if it is employed, historical control data "should be from studies in the same timeframe, for the same exact animal strain, preferably from the same laboratory or the same supplier and preferably reviewed by the same pathologist." BfR's use of historical control data violated the precautions: "only a single study used the same mouse strain as the historical controls, but was reported more than 10 years after the historical control dataset was developed." Further deviating from sound scientific practices, the data used by the BfR came from studies in seven different laboratories. The scientists concluded:

> BfR reported seven positive mouse studies with three studies showing increases in renal tumors, two with positive findings for hemangiosarcomas, and two with positive findings for malignant lymphomas. BfR additionally reported two positive findings for tumors in rats. Eliminating the inappropriate use of historical data, the unequivocal conclusion is that these are not negative studies, but in fact document the carcinogenicity of glyphosate in laboratory animals.[63]

297.    The letter also critiqued the EFSA report's lack of transparency and the opacity surrounding the data cited in the report: "citations for almost all of the references, even those from

---

[63] *Id.*

the open scientific literature, have been redacted from the document" and "there are no authors or contributors listed for either document, a requirement for publication in virtually all scientific journals." Because the BfR relied on unpublished, confidential industry-provided studies, it is "impossible for any scientist not associated with the BfR to review this conclusion with scientific confidence."[64]

298.    On March 3, 2016, the letter was published in the *Journal of Epidemiology & Community Health.*[65]

### Statement of Concern Regarding Glyphosate-Based Herbicides

299.    On February 17, 2016, a consensus statement published in the journal *Environmental Health*, entitled "Concerns over use of glyphosate-based herbicides and risks associated with exposures: a consensus statement," assessed the safety of glyphosate-based herbicides (GBHs).[66]    The paper's "focus is on the unanticipated effects arising from the worldwide increase in the use of GBHs, coupled with recent discoveries about the toxicity and human health risks stemming from use of GBHs", including the following:

> a)    GBHs are the most heavily applied herbicide in the world and usage continues to rise;
>
> b)    Worldwide, GBHs often contaminate drinking water sources, precipitation and air, especially in agricultural regions;
>
> c)    The half-life of glyphosate in water and soil is longer than previously recognized;
>
> d)    Glyphosate and its metabolites are widely present in the global soybean supply;

---

[64] *Id.*

[65] Christopher J. Portier, et al., *Differences in the carcinogenic evaluation of glyphosate between the International Agency for Research on Cancer (IARC) and the European Food Safety Authority (EFSA)*, JOURNAL OF EPIDEMIOLOGY & CMTY. HEALTH, Mar. 3, 2016, *available at* http://jech.bmj.com/content/early/2016/03/03/jech-2015-207005.full.

[66] John P. Myers, et al., *Concerns over use of glyphosate-based herbicides and risks associated with exposures: a consensus statement*, ENVIRONMENTAL HEALTH (2016), *available at* http://ehjournal.biomedcentral.com/articles/10.1186/s12940-016-0117-0.

e)    Human exposures to GBHs are rising;

f)    Glyphosate is now authoritatively classified as a probable human carcinogen; and

g)    Regulatory estimates of tolerable daily intakes for glyphosate in the United States and European Union are based on outdated science.[67]

300.    The researchers noted that GBH use has increased approximately 100-fold since the 1970s. Further, far from posing a limited hazard to vertebrates, as previously believed, two decades of evidence demonstrated that "several vertebrate pathways are likely targets of action, including hepatorenal damage, effects on nutrient balance through glyphosate chelating action and endocrine disruption."[68]

301.    The paper attributes uncertainties in current assessments of glyphosate formulations to the fact that "[t]he full list of chemicals in most commercial GBHs is protected as 'commercial business information,' despite the universally accepted relevance of such information to scientists hoping to conduct an accurate risk assessment of these herbicide formulations." Further, the researchers argue, "[t]he distinction in regulatory review and decision processes between 'active' and 'inert' ingredients has no toxicological justification, given increasing evidence that several so-called 'inert' adjuvants are toxic in their own right."[69]

302.    Among various implications, the researchers conclude that "existing toxicological data and risk assessments are not sufficient to infer that GBHs, as currently used, are safe." Further, "GBH-product formulations are more potent, or toxic, than glyphosate alone to a wide array of non-target organisms including mammals, aquatic insects, and fish." Accordingly, "risk

---

[67] *Id.*
[68] *Id.*
[69] *Id.*

assessments of GBHs that are based on studies quantifying the impacts of glyphosate alone underestimate both toxicity and exposure, and thus risk." The paper concludes that this "shortcoming has repeatedly led regulators to set inappropriately high exposure thresholds."[70]

303.    The researchers also critique the current practice of regulators who largely rely on "unpublished, non-peer reviewed data generated by the registrants" but ignore "published research because it often uses standards and procedures to assess quality that are different from those codified in regulatory agency data requirements, which largely focus on avoiding fraud." In the researchers' view, "[s]cientists independent of the registrants should conduct regulatory tests of GBHs that include glyphosate alone, as well as GBH-product formulations."[71]

304.    The researchers also call for greater inclusion of GBHs in government-led toxicology testing programs:

> A fresh and independent examination of GBH toxicity should be undertaken, and . . . this re-examination be accompanied by systematic efforts by relevant agencies to monitor GBH levels in people and in the food supply, none of which are occurring today. The U.S. National Toxicology Program should prioritize a thorough toxicological assessment of the multiple pathways now identified as potentially vulnerable to GBHs.

305.    The researchers suggest that, in order to fill the gap created by an absence of government funds to support research on GBHs, regulators could adopt a system through which manufacturers fund the registration process and the necessary testing:

> [W]e recommend that a system be put in place through which manufacturers of GBHs provide funds to the appropriate regulatory body as part of routine registration actions and fees. Such funds should then be transferred to appropriate government research institutes, or to an agency experienced in the award of competitive grants. In either case, funds would be made available to independent scientists to conduct the appropriate long-term (minimum 2 years) safety studies in recognized animal model systems. A thorough and modern assessment of GBH toxicity will encompass potential endocrine disruption, impacts on the gut microbiome, carcinogenicity and

---

[70] *Id.*
[71] *Id.*

multigenerational effects looking at reproductive capability and frequency of birth defects.

### *European Union Vote on Glyphosate Renewal*

306.    The license for glyphosate in the European Union (EU) was set to expire on June 30, 2016.

307.    Without an extension of the license, Monsanto's Roundup® and other glyphosate-based herbicides faced a general phase out in EU markets.[72]

308.    In the months leading up to the license expiration date, protracted meetings and votes among national experts from the 28 EU Member States failed to produce agreement on an extension.

309.    For instance, on March 4, 2016, The Guardian reported that France, the Netherlands, and Sweden did not support the EFSA's assessment that glyphosate was harmless.[73] The paper quoted the Swedish environment minister, Åsa Romson, as stating: "We won't take risks with glyphosate and we don't think that the analysis done so far is good enough. We will propose that no decision is taken until further analysis has been done and the EFSA scientists have been more transparent about their considerations."[74]

---

[72] Philip Blenkinsop, Alissa de Carbonnel & Barbara Lewis European, *Commission to extend glyphosate license for 18 months*, REUTERS, June 28, 2016, *available at* http://www.reuters.com/article/us-health-eu-glyphosate-idUSKCN0ZE25B.

[73] Arthur Neslen, *EU states rebel against plans to relicense weedkiller glyphosate*, THE GUARDIAN, Mar. 4, 2016, *available at* http://www.theguardian.com/environment/2016/mar/04/eu-states-rebel-against-plans-to-relicense-weedkiller-glyphosate.

[74] *Id.*

310.    The Netherlands argued that relicensing should be placed on hold until after a separate evaluation of glyphosate's toxicity can be conducted.[75]   Leading up to the vote, Italy joined the other EU states in opposing the license renewal, citing health concerns.[76]

311.    On June 6, 2016, Member States voted but failed to reach a qualified majority in favor or against the re-authorization of glyphosate.[77]

312.    On June 29, 2016, the EU Commission extended the European license for glyphosate for 18 months to allow the European Chemical Agency to rule on the safety of the chemical.

313.    On July 11, 2016, the EU voted in favor of a proposal to restrict the conditions of use of glyphosate in the EU, including a ban on the common co-formulant or surfactant, POEA, from all glyphosate-based herbicides, including Roundup®[78]

314.    These restrictions, which are non-binding on the EU states, are expected to apply until the European Chemicals Agency issues an opinion on the chemical's safety.[79]

315.    In November 2017, the EU countries renewed the license for glyphosate for five years rather than the requested ten years.

## TOLLING OF THE STATUTE OF LIMITIATIONS

### *Discovery Rule Tolling*

---

[75] Arthur Neslen, *Vote on Controversial weedkiller's European licence postponed*, THE GUARDIAN, Mar. 8, 2016, *available at* http://www.theguardian.com/environment/2016/mar/08/eu-vote-on-controversial-weedkiller-licence-postponed-glyphosate
[76] *Id.*
[77] Manon Flausch, *Commission prolongs glyphosate license by 18 months*, EURACTIV, June 29, 2016, *available at* http://www.euractiv.com/section/agriculture-food/news/commission-prolongs-glyphosate-licence-by-18-months/
[78] Sarantis Michalopoulos, *EU agrees ban on glyphosate co-formulant*, EURACTIV, July 11, 2016, *available at* http://www.euractiv.com/section/agriculture-food/news/eu-agrees-ban-on-glyphosate-co-formulant/?nl_ref=16562829
[79] *See* Arthur Neslen, *Controversial chemical in Roundup weedkiller escapes immediate ban*, THE GUARDIAN, June 29, 2016.

316.    Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

317.    Plaintiffs have suffered an illness that has a latency period and does not arise until years after exposure.  Plaintiffs had no way of knowing about the risk of serious illness associated with the use of and/or exposure to Roundup® and glyphosate until they were made aware that their NHL could be caused by their use and/or exposure to Roundup®.  Consequently, the discovery rule applies to these cases, and the statute of limitations has been tolled until the day that Plaintiffs knew or had reason to know that their NHL was linked to their use of and/or exposure to Roundup®.

318.    Within the time period of any applicable statutes of limitations, Plaintiffs could not have discovered, through the exercise of reasonable diligence, that exposure to Roundup® and glyphosate is injurious to human health.

319.    Plaintiffs did not discover, and did not know of facts that would cause a reasonable person to suspect the risks associated with the use of and/or exposure to Roundup® and glyphosate; nor would a reasonable and diligent investigation by them have disclosed that Roundup® and glyphosate would cause their NHL.

320.    Furthermore, the running of the statute of limitations has been equitably tolled by reason of Defendant's fraudulent concealment and conduct.  Through its affirmative misrepresentations and omissions, Defendant actively concealed from Plaintiffs the true risks associated with use of or exposure to Roundup®.

321.    As a result of Defendant's actions, Plaintiffs were unaware, and could not reasonably know or have learned through reasonable diligence, that Plaintiffs had been exposed to

the risks alleged herein and that those risks were the direct and proximate result of Defendant's acts and omissions.

322.    Furthermore, Defendant is estopped from relying on any statute of limitations because of its fraudulent concealment of the truth regarding the safety of Roundup®. Defendant was under a duty to disclose the true character, quality and nature of Roundup® because this was non-public information over which it continues to have exclusive control. Defendant knew that this information was not available to Plaintiffs, their medical providers and/or their health facilities, yet it failed to disclose the information to the public.

323.    Defendant had the ability to and did spend enormous amounts of money in furtherance of their purposes of marketing and promoting a profitable product, notwithstanding the known or reasonably knowable risks. Plaintiffs and medical professionals could not have afforded to and could not have possibly conducted studies to determine the nature, extent and identity of related health risks, and they were forced to rely on Defendant's representations.

324.    For these reasons, all applicable statutes of limitations have been tolled by operation of the discovery rule with respect to Plaintiffs' claims.

### *Estoppel*

325.    Monsanto was under a continuous duty to disclose to consumers, users and other persons coming into contact with its products, including Plaintiffs, accurate safety information concerning its products and the risks associated with the use of and/or exposure to Roundup® and glyphosate.

326.    Instead, Monsanto knowingly, affirmatively, and actively concealed safety information concerning Roundup® and glyphosate and the serious risks associated with the use of and/or exposure to its products.

327.    Based on the foregoing, Monsanto is estopped from relying on any statutes of limitations in defense of this action.

## COUNT ONE: STRICT LIABILITY FOR
## DEFECTIVE MANUFACTURE AND DESIGN

328.    Plaintiffs incorporate by reference each and every other paragraph of this Petition as if each were set forth fully and completely herein.

329.    Plaintiffs brings this strict liability claim against Defendant for defective manufacture and design.

330.    At all times relevant to this litigation, Defendant engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting Roundup® products, which are defective and unreasonably dangerous to consumers, users and other persons coming into contact with them, including Plaintiffs, thereby placing Roundup® products into the stream of commerce. These actions were under the ultimate control and supervision of Defendant.

331.    At all times relevant to this litigation, Defendant designed, researched, developed, formulated, manufactured, produced, tested, assembled, labeled, advertised, promoted, marketed, sold, and distributed the Roundup® products used by Plaintiffs and/or to which Plaintiffs were exposed, as described above.

332.    At all times relevant to this litigation, Defendant's Roundup® products were manufactured, designed, and labeled in an unsafe, defective, and inherently dangerous manner that was dangerous for use by or exposure to the public, and in particular, Plaintiffs.

333.    At all times relevant to this litigation, Defendant's Roundup® products reached the intended consumers, handlers, and users or other persons coming into contact with these products in Missouri and throughout the United States, including Plaintiffs, without substantial change in their condition as designed, manufactured, sold, distributed, labeled, and marketed by Defendant.

334.    Defendant's Roundup® products, as researched, tested, developed, designed, licensed, formulated, manufactured, packaged, labeled, distributed, sold and marketed by Defendant, were defectively manufactured and designed by Defendant in that when they left the hands of Defendant's manufacturers and/or suppliers, they were unreasonably dangerous because they were not as safe as an ordinary consumer would expect when used in an intended or reasonably foreseeable manner.

335.    Defendant's Roundup® products, as researched, tested, developed, designed, licensed, formulated, manufactured, packaged, labeled, distributed, sold, and marketed by Defendant, were defective in manufacture, design, and formulation in that when they left the hands of Defendant's manufacturers and/or suppliers, the foreseeable risks associated with these products' reasonably foreseeable uses exceeded the alleged benefits associated with their design and formulation.

336.    At all relevant times, Defendant's Roundup® products created significant risks to the health and safety of consumers and others who were exposed to the products that far outweigh the risks posed by other products on the market used for the same or similar purpose.

337.    Therefore, at all times relevant to this litigation, Defendant's Roundup® products, as researched, tested, developed, designed, licensed, formulated, manufactured, produced, assembled, packaged, labeled, advertised, promoted, marketed, sold, supplied and distributed by Defendant were defective in design and formulation, in one or more of the following ways:

a)      When placed in the stream of commerce, Defendant's Roundup® products were defective in design and formulation, and, consequently, dangerous to an extent beyond that which an ordinary consumer would expect.

b)      When placed in the stream of commerce, Defendant's Roundup® products were unreasonably dangerous in that they were

hazardous and posed a grave risk of cancer and other serious illnesses when used in a reasonably anticipated manner.

c)    When placed in the stream of commerce, Defendant's Roundup® products contained unreasonably dangerous design defects and were not reasonably safe when used in a reasonably anticipated or intended manner.

d)    Defendant did not sufficiently test, investigate, or study its Roundup® products and, specifically, the active ingredient glyphosate.

e)    Exposure to Roundup® and glyphosate-containing products presents a risk of harmful side effects that outweighs any potential utility stemming from the use of the herbicide.

f)    Defendant knew or should have known at the time of marketing its Roundup® products that exposure to Roundup® and specifically, its active ingredient glyphosate, could result in cancer and other severe illnesses and injuries.

g)    Defendant did not conduct adequate post-marketing surveillance of its Roundup® products.

h)    Defendant could have employed safer alternative designs and formulations.

338.    At all times relevant to this litigation, Plaintiffs used and/or were exposed to Defendant's Roundup® products in an intended or reasonably foreseeable manner without knowledge of their dangerous characteristics.

339.    Plaintiffs could not have reasonably discovered the defects and risks associated with Roundup® or glyphosate-containing products before or at the time of exposure.

340.    The harm caused by Defendant's Roundup® products far outweighed their benefit, rendering Defendant's products dangerous to an extent beyond that which an ordinary consumer would contemplate.    Defendant's Roundup® products were and are more dangerous than alternative products and Defendant could have designed its Roundup® products to make them less

dangerous. Indeed, at the time that Defendant designed its Roundup® products, the state of the industry's scientific knowledge was such that a less risky design or formulation was attainable.

341. Defendant's defective design of Roundup® amounts to willful, wanton, and/or reckless conduct by Defendant.

342. As a direct and proximate result of the defective design and manufacture of Roundup® products, Plaintiffs developed NHL and have been injured catastrophically and have been caused severe and permanent pain, suffering, disability, impairment, loss of enjoyment of life, loss of care and comfort, and economic damages.

343. Therefore, as a result of the unreasonably dangerous condition of its Roundup® products, Defendant is strictly liable to Plaintiffs.

344. The defects in Defendant's Roundup® products were substantial and contributing factors in causing Plaintiffs' grave injuries, and, but for Defendant's misconduct and omissions, Plaintiffs would not have sustained their injuries.

345. As a direct and proximate result of Defendant's placing its defective Roundup® products into the stream of commerce, Plaintiffs have suffered and continue to suffer grave injuries, and they have endured pain and discomfort, as well as economic hardship, including considerable financial expenses for medical care and treatment. Plaintiffs will continue to incur these expenses in the future.

WHEREFORE, Plaintiffs pray for judgment against Defendant Monsanto in a fair and reasonable sum in excess of $25,000, for punitive damages, together with interest and costs expended herein and such further and other relief as the Court deems just and appropriate.

## COUNT TWO: STRICT LIABILITY FOR FAILURE TO WARN

346.    Plaintiffs incorporate by reference each and every other paragraph of this Petition as if each were set forth fully and completely herein.

347.    Plaintiffs bring this strict liability claim against Defendant for failure to warn.

348.    At all times relevant to this litigation, Defendant engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting Roundup® products, which are defective and unreasonably dangerous to consumers, including Plaintiffs, because they do not contain adequate warnings or instructions concerning the dangerous characteristics of Roundup® and specifically, the active ingredient glyphosate. These actions were under the ultimate control and supervision of Defendant.

349.    Defendant researched, developed, designed, tested, manufactured, inspected, labeled, distributed, marketed, promoted, sold, and otherwise released into the stream of commerce its Roundup® products, and in the course of same, directly advertised or marketed the products to consumers and end users, including Plaintiffs, Plaintiffs' employers, Plaintiffs' co-workers, and persons responsible for consumers (such as employers), and Defendant therefore had a duty to warn of the risks associated with the reasonably foreseeable uses (and misuses) of Roundup® and glyphosate-containing products and a duty to instruct on the proper, safe use of these products.

350.    At all times relevant to this litigation, Defendant had a duty to properly test, develop, design, manufacture, inspect, package, label, market, promote, sell, distribute, maintain, supply, provide proper warnings, and take such steps as necessary to ensure its Roundup® products did not cause users and consumers to suffer from unreasonable and dangerous risks. Defendant had a continuing duty to warn Plaintiffs of the dangers associated with Roundup® use and exposure, and a continuing duty to instruct on the proper, safe use of these products.  Defendant,

as manufacturer, seller, or distributor of chemical herbicides is held to the knowledge of an expert in the field.

351. At the time of manufacture, Defendant could have provided warnings or instructions regarding the full and complete risks of Roundup® and glyphosate-containing products because it knew or should have known of the unreasonable risks of harm associated with the use of and/or exposure to these products.

352. At all times relevant to this litigation, Defendant failed to investigate, study, test, or promote the safety of its Roundup® products. Defendant also failed to minimize the dangers to users and consumers of its Roundup® product and to those who would foreseeably use or be harmed by Defendant's herbicides, including Plaintiffs.

353. Despite the fact that Defendant knew or should have known that Roundup® products posed a grave risk of harm, it failed to warn of the dangerous risks associated with their use and exposure. The dangerous propensities of its products and the carcinogenic characteristics of glyphosate, as described above, were known to Defendant, or scientifically knowable to Defendant through appropriate research and testing by known methods, at the time it distributed, supplied, or sold the product, and not known to end users and consumers, such as Plaintiffs and Plaintiffs' employers.

354. Defendant knew or should have known that its Roundup® and glyphosate-containing products created significant risks of serious bodily harm to consumers, as alleged herein, and Defendant failed to adequately warn consumers and reasonably foreseeable users of the risks of exposure to these products. Defendant has wrongfully concealed information concerning the dangerous nature of Roundup® and its active ingredient glyphosate, and further made false and/or misleading statements concerning the safety of Roundup® and glyphosate.

355.    At all times relevant to this litigation, Defendant's Roundup® products reached the intended consumers, handlers, and users or other persons coming into contact with these products in Missouri and throughout the United States, including Plaintiffs, without substantial change in their condition as designed, manufactured, sold, distributed, labeled, and marketed by Defendant.

356.    At all times relevant to this litigation, Plaintiffs used and/or were exposed to the use of Roundup® products in their intended or reasonably foreseeable manner, without knowledge of their dangerous characteristics.

357.    Plaintiffs could not have reasonably discovered the defects and risks associated with Roundup® or glyphosate-containing products prior to or at the time of Plaintiffs' exposure. Plaintiffs relied upon the skill, superior knowledge, and judgment of Defendant.

358.    Defendant knew or should have known that the minimal warnings disseminated with its Roundup® products were inadequate, but it failed to communicate adequate information on the dangers and safe use/exposure and failed to communicate warnings and instructions that were appropriate and adequate to render the products safe for their ordinary, intended, and reasonably foreseeable uses, including agricultural and horticultural applications.

359.    The information that Defendant did provide or communicate failed to contain relevant warnings, hazards, and precautions that would have enabled agricultural workers, horticultural workers and/or at-home users such as Plaintiffs to utilize the products safely and with adequate protection.  Instead, Defendant disseminated information that was inaccurate, false, and misleading and which failed to communicate accurately or adequately the comparative severity, duration, and extent of the risk of injuries associated with use of and/or exposure to Roundup® and glyphosate; continued to aggressively promote the efficacy of its products, even after it knew or should have known of the unreasonable risks from use or exposure; and concealed, downplayed,

or otherwise suppressed, through aggressive marketing and promotion, any information or research about the risks and dangers of exposure to Roundup® and glyphosate.

360.    To this day, Defendant has failed to adequately and accurately warn of the true risks of Plaintiffs' injuries associated with the use of and exposure to Roundup® and its active ingredient glyphosate, a probable carcinogen.

361.    As a result of their inadequate warnings, Defendant's Roundup® products were defective and unreasonably dangerous when they left the possession and/or control of Defendant, were distributed by Defendant, and used by Plaintiffs.

362.    Defendant is liable to Plaintiffs for injuries caused by its failure, as described above, to provide adequate warnings or other clinically relevant information and data regarding the appropriate use of its Roundup® products and the risks associated with the use of or exposure to Roundup® and glyphosate.

363.    The defects in Defendant's Roundup® products were substantial and contributing factors in causing Plaintiffs' injuries, and, but for Defendant's misconduct and omissions, Plaintiffs would not have sustained their injuries.

364.    Had Defendant provided warnings and instructions and properly disclosed and disseminated the risks associated with its Roundup® products, Plaintiffs could have avoided the risk of developing injuries as alleged herein and Plaintiffs and Plaintiffs' employers could have obtained alternative herbicides.

365.    As a direct and proximate result of Defendant's placing its defective Roundup® products into the stream of commerce and failing to warn Plaintiffs of the increased risk of NHL associated with the use of and/or exposure to Roundup® products as described herein, Plaintiffs have developed NHL and have been injured catastrophically and have been caused severe and

permanent pain, suffering, disability, impairment, loss of enjoyment of life, loss of care and comfort, and economic damages, including for medical care and treatment. Plaintiffs will continue to incur these expenses in the future.

WHEREFORE, Plaintiffs pray for judgment against Defendant Monsanto in a fair and reasonable sum in excess of $25,000, for punitive damages, together with interest and costs expended herein and such further and other relief as the Court deems just and appropriate.

## COUNT THREE: VIOLATION OF MISSOURI MERCHANDIZING PRACTICE ACT, § 407.020 et seq.

366.    Plaintiffs incorporate by reference each and every other paragraphs of this Petition as if each were set forth fully and completely herein.

367.    At all relevant times, Defendant knew or should have known of the unreasonably dangerous and carcinogenic nature of the use of and/or exposure to Roundup®.

368.    At all relevant times, Defendant, through its labeling, advertisements, public representations and marketing of Roundup®, intentionally used deception, fraud, false pretenses, false promises, misrepresentations and unfair trade practices in order to mislead consumers that Roundup® products are safe for use.

369.    At all relevant times, Defendant also engaged in the concealment, suppression and/or omission of material facts in connection with the sale and/or advertisement of Roundup® products in trade or commerce. In particular, Defendant failed to disclose to the public that Roundup® is unsafe and poses serious health hazards, particularly NHL. Defendant was aware of the hazardous risks posed by Roundup® and yet failed to inform the public of these risks through their advertisements, labeling, or other means available to them. Defendant's failure to state material facts about Roundup® constitutes a violation of Mo. Rev. Stat. § 407.020.

370.    At all relevant times, Plaintiffs were deceived by Defendant's intentional misrepresentations and omissions, including by the orchestrated claims made on or in television commercials, advertising materials, websites, and on product labels and packaging regarding the usage and safety of Roundup®.

371.    At all relevant times, Plaintiffs acted in reasonable reliance upon Defendant's unlawful trade practices, and had the Defendant not engaged in the deceptive conduct described herein, Plaintiffs would not have purchased Roundup® and/or would have protected themselves from exposure to Roundup®.

372.    As a direct and proximate result of Defendant's unlawful trade practices, Plaintiffs developed NHL and have been injured catastrophically and have been caused severe and permanent pain, suffering, disability, impairment, loss of enjoyment of life, loss of care and comfort, and economic damages.

WHEREFORE, Plaintiffs pray for judgment against Defendant in a fair and reasonable sum in excess of $25,000, for punitive damages, together with interest and costs expended herein and such further and other relief as the Court deems just and appropriate.

## COUNT FOUR: NEGLIGENCE

373.    Plaintiffs incorporate by reference each and every other paragraph of this Petition as if each were set forth fully and completely herein.

374.    At all relevant times, Defendant breached its duty to Plaintiffs and was otherwise negligent in marketing, designing, manufacturing, producing, supplying, inspecting, testing, selling, and/or distributing Roundup® products.

375.    Defendant, directly or indirectly, caused Roundup® products to be purchased and/or used by Plaintiffs

376.    At all times relevant to this litigation, Defendant had a duty to exercise reasonable care in the design, research, manufacture, marketing, advertisement, supply, promotion, packaging, sale, and distribution of its Roundup® products, including the duty to take all reasonable steps necessary to manufacture, promote, and/or sell a product that was not unreasonably dangerous to consumers, users, and other persons coming into contact with the product.

377.    At all times relevant to this litigation, Defendant had a duty to exercise reasonable care in the marketing, advertisement, and sale of its Roundup® products. Defendant's duty of care owed to consumers and the general public included providing accurate, true, and correct information concerning the risks of using Roundup® and appropriate, complete, and accurate warnings concerning the potential adverse effects of exposure to Roundup®, and, in particular, its active ingredient glyphosate.

378.    At all times relevant to this litigation, Defendant knew or, in the exercise of reasonable care, should have known of the hazards and dangers of Roundup® and specifically, the carcinogenic properties of the chemical glyphosate.

379.    Accordingly, at all times relevant to this litigation, Defendant knew or, in the exercise of reasonable care, should have known that use of or exposure to its Roundup® products could cause Plaintiffs' injuries, and thus, created a dangerous and unreasonable risk of injury to the users of these products, including Plaintiffs.

380.    Defendant knew or, in the exercise of reasonable care, should have known that Roundup® is more toxic than glyphosate alone and that the safety studies on Roundup®, Roundup®'s adjuvants and "inert" ingredients, and/or the surfactant POEA were necessary to protect Plaintiffs from Roundup®.

381.     Defendant knew or, in the exercise of reasonable care, should have known that tests limited to Roundup®'s active ingredient glyphosate were insufficient to prove the safety of Roundup®.

382.     Defendant also knew or, in the exercise of reasonable care, should have known that users and consumers of Roundup® were unaware of the risks and the magnitude of the risks associated with the use of and/or exposure to Roundup® and glyphosate-containing products.

383.     As such, Defendant breached its duty of reasonable care and failed to exercise ordinary care in the design, research, development, manufacture, testing, marketing, supply, promotion, advertisement, packaging, sale, and distribution of its Roundup® products, in that Defendant manufactured and produced defective herbicides containing the chemical glyphosate, knew or had reason to know of the defects inherent in its products, knew or had reason to know that a user's or consumer's exposure to the products created a significant risk of harm and unreasonably dangerous side effects, and failed to prevent or adequately warn of these risks and injuries.

384.     Defendant failed to appropriately and adequately test Roundup®, Roundup®'s adjuvants and "inert" ingredients, and/or the surfactant POEA to protect Plaintiffs from Roundup®.

385.     Despite its ability and means to investigate, study, and test its products and to provide adequate warnings, Defendant has failed to do so. Indeed, Defendant has wrongfully concealed information and has further made false and/or misleading statements concerning the safety and/or exposure to Roundup® and glyphosate.

386.     Defendant's negligence included one or more of the following:

75

a.      Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing its Roundup® products without thorough and adequate pre- and post-market testing;

b.      Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing Roundup® while negligently and/or intentionally concealing and failing to disclose the results of trials, tests, and studies of exposure to glyphosate, and, consequently, the risk of serious harm associated with human use of and exposure to Roundup®;

c.      Failing to undertake sufficient studies and conduct necessary tests to determine whether or not Roundup® products and glyphosate-containing products were safe for their intended use in agriculture, horticulture, and at-home use;

d.      Failing to undertake sufficient studies and conduct necessary tests to determine the safety of "inert" ingredients and/or adjuvants contained within Roundup®, and the propensity of these ingredients to render Roundup® toxic, increase the toxicity of Roundup®, whether these ingredients are carcinogenic, magnify the carcinogenic properties of Roundup®, and whether or not "inert" ingredients and/or adjuvants were safe for use;

e.      Failing to use reasonable and prudent care in the design, research, manufacture, formulation, and development of Roundup® products so as to avoid the risk of serious harm associated with the prevalent use of Roundup®/glyphosate as an herbicide;

f.      Failing to design and manufacture Roundup® products so as to ensure they were at least as safe and effective as other herbicides on the market;

g.      Failing to provide adequate instructions, guidelines, and safety precautions to those persons who Defendant could reasonably foresee would use and/or be exposed to its Roundup® products;

h.      Failing to disclose to Plaintiffs, users, consumers, and the general public that use of and exposure to Roundup® presented severe risks of cancer and other grave illnesses;

i.      Failing to warn Plaintiffs, users, consumers, and the general public that the product's risk of harm was unreasonable and that there were safer and effective alternative herbicides available to Plaintiffs and other users or consumers;

j.      Systematically suppressing or downplaying contrary evidence about the risks, incidence, and prevalence of the side effects of Roundup® and glyphosate- containing products;

k.      Representing that its Roundup® products were safe for their intended use when, in fact, Defendant knew or should have known the products were not safe for their intended purpose;

l.      Declining to make or propose any changes to Roundup® products' labeling or other promotional materials that would alert consumers and the general public of the risks of Roundup® and glyphosate;

m.      Advertising, marketing, and recommending the use of the Roundup® products, while concealing and failing to disclose or warn of the dangers known by Defendant to be associated with or caused by the use of or exposure to Roundup® and glyphosate;

n.      Continuing to disseminate information to its consumers, which indicate or imply that Defendant's Roundup® products are safe for use in the agricultural and horticultural industries and/or home use; and

o.      Continuing the manufacture and sale of its products with the knowledge that the products were unreasonably unsafe and dangerous.

387.    Defendant knew and/or should have known that it was foreseeable that consumers and/or users, such as Plaintiffs, would suffer injuries as a result of Defendant's failure to exercise ordinary care in the manufacturing, marketing, labeling, distribution, and sale of Roundup®.

388.    Plaintiffs did not know the nature and extent of the injuries that could result from the intended use of and/or exposure to Roundup® or its active ingredient glyphosate.

389.    Defendant's negligence was the proximate cause of the injuries, harm, and economic losses Plaintiffs suffered, and will continue to suffer, as described herein.

390.    Defendant's conduct, as described herein, was reckless. Defendant regularly risks the lives of consumers and users of its products, including Plaintiffs, with full knowledge of the dangers of its products. Defendant has made conscious decisions not to redesign, re-label, warn, or inform the unsuspecting public, including Plaintiffs. Defendant's reckless conduct therefore warrants an award of punitive damages.

391.    As a proximate result of Defendant's wrongful acts and omissions in placing its defective Roundup products into the stream of commerce without adequate warnings of the hazardous and carcinogenic nature of glyphosate, Plaintiffs developed NHL and have been injured catastrophically and have been caused severe and permanent pain, suffering, disability, impairment, loss of enjoyment of life, loss of care and comfort, and economic damages, including significant expenses for medical care and treatment and will continue to incur these expenses in the future.

WHEREFORE, Plaintiffs pray for judgment against Defendant Monsanto in a fair and reasonable sum in excess of $25,000, for punitive damages, together with interest and costs expended herein and such further and other relief as the Court deems just and appropriate.

## COUNT FIVE: BREACH OF EXPRESS WARRANTIES

392.    Plaintiffs incorporate by reference each and every other paragraph of this Petition as if each were set forth fully and completely herein.

393.    At all relevant times, Defendant engaged in the business of testing, developing, designing, formulating, manufacturing, marketing, selling, distributing and promoting its Roundup® products, which are defective and unreasonably dangerous to users, consumers, and those in proximity to users, including Plaintiffs, thereby placing Roundup® products into the stream of commerce. These actions were under the ultimate control and supervision of Defendant.

394.    Before the time that Plaintiffs were exposed to the use of the aforementioned Roundup® products, Defendant expressly warranted to its consumers and users—including Plaintiffs and Plaintiffs' employers—that its Roundup® products were of merchantable quality and safe and fit for the use for which they were intended; specifically, as horticultural herbicides.

395.    Defendant, however, failed to disclose that Roundup® had dangerous propensities when used as intended and that the use of and/or exposure to roundup and glyphosate-containing products carries an increased risk of developing severe injuries, including Plaintiffs' injuries.

396.    The representations, as set forth above, contained or constituted affirmations of fact or promises made by the seller to the buyer which related to the goods and became part of the basis of the bargain creating an express warranty that the goods shall conform to the affirmations of fact or promises.

397.    Roundup® did not conform to the representations made by Monsanto as Roundup® was not safe for use by individuals such as Plaintiffs.

398.    At all times relevant to this litigation, Plaintiffs used and/or were exposed to the use of Defendant's Roundup products in their intended or reasonably foreseeable manner without knowledge of their dangerous characteristics.

399.    Neither Plaintiffs nor Plaintiffs' employers could have reasonably discovered or known of the risks of serious injury associated with Roundup or glyphosate.

400.    Defendant's breaches constitute violations of state common laws, including, but not limited to, the following statutory provisions as applicable:

- Ala. Code §§ 7-2-313, 7-2-314 (2017);

- Alaska St. § 45.02.313 (effective 2016);

- Ariz. Rev. Stat. Ann. § 47-2313 (2016);

- Ark. Code Ann. § 4-2-313 (2016);

- Cal. U. Com. Code § 2313(1) (2017); Cal. Civ. Code §1791.2(a) (2017);

- Co. Rev. St. § 4-2-316 (2017);

- Conn. Gen. Stat. Ann. § 42a-2-313 (effective 2017);

- 6 Del. C. § 2-313 (2017);

- D.C. Code Ann. § 28.2-313 (2017);

- Fla. Stat. Ann. § 672.313 (2017);

- O.C.G.A. § 11-2-318 (2017);

- Haw. Rev. Stat. § 490:2-313 (2016);

- Id. Code § 28-2-314(2)(c) (2017);

- Ill. Comp. Stat. Ann. Ch. 810, 5/2-313 (2016);

- Ind. Code Ann. § 26-1-2-313 (2016);

- Iowa Code Ann. § 554.2313 (2016);

- Kans. Stat. Ann. § 84-2-313 (2017); KRS § 355.2-318 (2017); Kan. Stat. Ann. § 60-3302 (c) (2017);

- Ky. Rev. Stat. § 355.2-318 (2017);

- La. Rev. Stat. § 9:2800.58 (2016);

- Me. Rev. Stat. Ann. tit. 11, § 2-314 and 2-315 (2017); 14 M.R.S. § 221 (2017);

- Md. Code Ann. Com. Law § 2-318 (2017);

- Mass. Gen. Laws c. 106, § 2-313 (2017);

- Mich. Comp. Laws Ann. § 440.2313 (2016);

- Minn. Stat. Ann. § 336.2-313 Through 315 (2016);

- Miss. Code Ann. § 11-1-63(i)(3) and 75-2-313 (2017);

- Mo. Rev. Stat. Ann. § 400.2-313 (2016);

- Mont. Code Ann. § 30-2-313 ( 2017);

- Neb. Rev. Stat. U.C.C. § 2-313 et seq. (2017);

- Nev. Rev. Stat. U.C.C. § 104.2313, et seq. (2016); Nev. Rev. Stat. §§ 104.2312-104.2318 (2016);

- N.H. Rev. Stat. Ann. § 382-A:2-313. et seq. (2017);

- N.M. Stat. Ann. §§ 55-2-313 to -318 (2017); see also UJI 13-1428 to 1433 NRMA (2016);

- N.Y. U. C.C. Law 2-313, et seq. (2017);

- N.C. Gen. Stat. Ann. § 25-2-313, et seq. (2017);

- N.D. Cent. Code § 41-02-30, et seq. (2017);

- Ohio Rev. Code Ann. § 1302.26, et seq. (2016);

- Okla. Stat. tit. 12A, § 2-313 et seq. (2017);

- Or. Rev. Stat. § 72.3130, et seq. (2016);

- 13 Pa. Stat. Ann. § 2313, et seq. (2016);

- R. I. Gen. Laws § 6A-2-313 (2016);

- S.C. Code Ann. § 36-2-313, et seq. (2016);

- S.D. Stat. 57A-2-313, et seq. (2017);

- Tenn. Code Ann. § 47-2-313, et seq. (2016);

- Tex. Bus. & Com. Code Ann. § 2.313, et seq. (2015);

- Ut. Code Ann. § 70A-2-313, et seq. (2016);

- Va. Code Ann. § 8.2-318, et seq. (2016);

- Vt. Stat, Ann. tit. 9A, § 2-313, et seq. (2016);

- Wa. Rev. Code § 62A.2-313, et seq. (2016); § 7.72.030(2) (2016);

- W.Va. Code § 46A-6-108, et seq. (2016);

- Wis. Stat. Ann. § 402.313, et seq. (2017); and

- Wyo. Stat. § 34.1-2-313 through 315 (2017).

401. The breach of the warranty was a substantial factor in bringing about Plaintiffs' injuries. As a direct and proximate result of Defendant's placing its defective Roundup® products into the stream of commerce and failing to warn Plaintiffs of the increased risk of NHL associated with the use of and/or exposure to Roundup® products as described herein, Plaintiffs have developed NHL and have been injured catastrophically and have been caused severe and permanent pain, suffering, disability, impairment, loss of enjoyment of life, loss of care and comfort, and economic damages, including for medical care and treatment.

402.    The harm caused by Defendant's Roundup® products far outweigh their benefit, rendering the products more dangerous than an ordinary consumer or user would expect and more dangerous than alternative products.

403.    As a direct and proximate result of Defendant's wrongful acts and omissions Plaintiffs have suffered severe and permanent physical and emotional injuries.  Plaintiffs have endured pain and suffering, have suffered economic loss, including significant expenses for medical care and treatment, and will continue to incur these expenses in the future.

WHEREFORE, Plaintiffs pray for judgment against Defendant Monsanto in a fair and reasonable sum in excess of $25,000, for punitive damages, together with interest and costs expended herein and such further and other relief as the Court deems just and appropriate.

## COUNT SIX: IMPLIED WARRANTIES

404.    Plaintiffs incorporate by reference each and every other paragraph of this Petition as if each were set forth fully and completely herein.

405.    At all times relevant, Defendant engaged in the business of testing, developing, designing, formulating, manufacturing, selling, distributing, and promoting its Roundup® products, which are defective and unreasonably dangerous to users, consumers, and those in proximity to users, including Plaintiffs, thereby placing Roundup® products into the stream of commerce.  These actions were under the ultimate control and supervision of Defendant.

406.    Before the time Plaintiffs were exposed to the use of the aforementioned Roundup® products, Defendant impliedly warranted to its consumers and users—including Plaintiffs and Plaintiffs' employers—that its Roundup® products were of merchantable quality and safe and fit for the use for which they were intended; specifically, as horticultural herbicides.

83

407.   Defendant, however, failed to disclose that Roundup® has dangerous propensities when used as intended and that the use of and/or exposure to Roundup® and glyphosate-containing products carries an increased risk of developing severe injuries, including Plaintiffs' injuries.

408.   Upon information and belief, Plaintiffs and/or Plaintiffs' employers reasonably relied upon the skill, superior knowledge and judgment of Defendant and upon its implied warranties that the Roundup® products were of merchantable quality and fit for their intended purpose or use.

409.   The Roundup® products were expected to reach and did in fact reach consumers, users, and those in proximity to users, including Plaintiffs, without substantial change in the condition in which they were manufactured and sold by Defendant.

410.   At all relevant times, Defendant was aware that consumers, users, and those in proximity of users of its products, including Plaintiffs, would use Roundup® products as marketed by Defendant, which is to say that Plaintiffs were the foreseeable users of Roundup®.

411.   Defendant intended that its Roundup® products be used in the manner in which Plaintiffs in fact used or were exposed to them and Defendant impliedly warranted each product to be of merchantable quality, safe and fit for this use, despite the fact that Roundup® was not adequately tested or researched.

412.   In reliance upon Defendant's implied warranty, Plaintiffs used or were in proximity to the use of Roundup® as instructed and labeled and in the foreseeable manner intended, recommended, promoted and marketed by Defendant.

413.   Neither Plaintiffs nor Plaintiffs' employers could have reasonably discovered or known of the risks of serious injury associated with Roundup® products or glyphosate.

414.    Defendant breached its implied warranty to Plaintiffs in that its Roundup® products were not of merchantable quality, safe, or fit for their intended use, or adequately tested. Roundup® has dangerous propensities when used as intended and can cause serious injuries, including those injuries complained of herein.

415.    The harm caused by Defendant's Roundup® products far outweighed their benefit, rendering the products more dangerous than an ordinary consumer or user would expect and more dangerous than alternative products.

416.    As a direct and proximate result of Defendant's wrongful acts and omissions Plaintiffs have suffered severe and permanent physical and emotional injuries.  Plaintiffs have endured pain and suffering, have suffered economic loss, including significant expenses for medical care and treatment, and will continue to incur these expenses in the future.

WHEREFORE, Plaintiffs pray for judgment against Defendant Monsanto in a fair and reasonable sum in excess of $25,000, for punitive damages, together with interest and costs expended herein and such further and other relief as the Court deems just and appropriate.

## COUNT SEVEN: PUNITIVE DAMAGES

417.    Plaintiffs incorporate by reference each and every other paragraph of this Petition as if each were set forth fully and completely herein.

418.    Defendant has acted willfully, wantonly, maliciously, with an evil motive, and recklessly in one or more of the following ways:

419.    Defendants knew of the unreasonably high risk of NHL posed by the Roundup® products before manufacturing, marketing, distributing and/or selling its Roundup® products, yet purposefully proceeded with such action;

420.     Despite its knowledge of the high risk of NHL associated with use and/or exposure to Roundup® products, Defendant affirmatively minimized this risk through marketing and promotional efforts and product labeling; and

421.     Through the actions outlined above, Defendant expressed a reckless indifference to the safety of users of Roundup® products, including Plaintiffs.

422.     Defendant knew of the dangers and risks of Roundup® products, yet it concealed and/or omitted this information from labels and warnings contained on Roundup® products in furtherance of its knowing and willful actions.

423.     These actions were outrageous because of Defendant's evil motive or a reckless indifference to the safety of users of Roundup® products and/or those who became exposed to it.

424.     As a direct and proximate result of the willful, wanton, malicious, evilly motivated and/or reckless conduct of Defendant, Plaintiffs have sustained damages set forth above.

WHEREFORE, Plaintiffs pray for a judgment for punitive damages against Defendant, in a fair and reasonable amount sufficient to punish Defendant and deter it and others from engaging in similar conduct in the future, costs expended herein, and such further and other relief as the Court deems just and appropriate.

## COUNT EIGHT: WRONGFUL DEATH

425.     Plaintiffs incorporate by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

426.     Plaintiffs brings this claim on behalf of and for the benefit of Keith Draxten, Timothy Kavelak, Diane Pedersen, Rosemary Phelan, Judith Romphf, John Tice and Dawn West (herein after referred to as "Decedent Plaintiffs") and their lawful beneficiaries.

427.    As a direct and proximate result of the conduct of the Defendant and the defective nature of Roundup as outlined above, Decedent Plaintiffs suffered bodily injury resulting in pain and suffering, disability, disfigurement, mental anguish, loss of capacity of the enjoyment of life, shortened life expectancy, expenses for hospitalization, medical and nursing treatment, loss of earnings, loss of ability to earn, funeral expenses and death.

428.    As a direct and proximate cause of the conduct of Defendant, Decedent Plaintiffs' beneficiaries have incurred hospital, nursing and medical expenses, and estate administration expenses as a result of Decedent Plaintiffs' death. Decedent Plaintiffs bring this claim on behalf of their lawful beneficiaries for these damages and for all pecuniary losses under applicable state statutory and/or common laws.

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in Plaintiffs' favor for compensatory and punitive damages in an amount in excess of Twenty-Five Thousand Dollars ($25,000.00) together with interest, costs herein incurred, and all such other and further relief as this Court deems just and proper. Plaintiffs also demand a jury trial on the issues contained herein.

## COUNT NINE: SURVIVAL ACTION

429.    Plaintiffs incorporate by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

430.    As a direct and proximate result of the conduct of Defendant, where appropriate, Decedent Plaintiffs, prior to their death, were obligated to spend various sums of money to treat their injuries, which debts have been assumed by his Estate. As a direct and proximate cause of the aforesaid, Decedent Plaintiffs endured pain and suffering, mental anguish and impairment of the enjoyment of life, until the date of his death; and, as a direct and proximate result of the

aforesaid, Decedent Plaintiffs' lawful beneficiaries suffered a loss of earnings and earning capacity. Decedent Plaintiffs bring this claim on behalf of his estate under applicable state statutory and/or common laws.

431.    As a direct and proximate result of the conduct of Defendants, Decedent Plaintiffs and their spouse and heirs, until the time of their death, suffered a disintegration and deterioration of the family unit and the relationships existing therein, resulting in enhanced anguish, depression and other symptoms of psychological stress and disorder.

432.    As a direct and proximate result of the aforesaid, and including the observance of the suffering and physical deterioration of Decedent Plaintiffs until the date of his death, Decedent Plaintiffs' spouses and heirs have and will continue to suffer permanent and ongoing psychological damage which may require future psychological and medical treatment. Decedent Plaintiffs' spouses and/or heirs, Personal Representatives of their estate, brings the claim on behalf of the estate for damages under applicable statutory and/or common laws, and in their own right.

WHEREFORE, Decedent Plaintiffs respectfully request that this Court enter judgment in Plaintiffs' favor for compensatory and punitive damages in an amount in excess of Twenty-Five Thousand Dollars ($25,000.00) together with interest, costs herein incurred, and all such other and further relief as this Court deems just and proper. Plaintiffs also demand a jury trial on the issues contained herein.

Respectfully Submitted,


<u>/s/ Patrick R. Dowd</u>
Patrick R. Dowd (Mo. Bar #64820)
R. Seth Crompton (Mo. Bar #57448)
**HOLLAND LAW FIRM, LLC**
300 N. Tucker, Suite 801
St. Louis, MO 63101
Tel: (314) 241-8111
Fax: (314) 241-5554
Email:  <u>pdowd@allfela.com</u>
Email:  <u>scrompton@allfela.com</u>

*Attorney for Plaintiff*