# U.S. District Court
## Southern District of California (San Diego)
## CIVIL DOCKET FOR CASE #: 3:20–cv–00869–L–NLS

Britt v. Monsanto Company et al
Assigned to: Judge M. James Lorenz
Referred to: Magistrate Judge Nita L. Stormes
Cause: 28:1346wd Wrongful Death

Date Filed: 05/08/2020
Jury Demand: Plaintiff
Nature of Suit: 365 Personal Inj. Prod.
Liability
Jurisdiction: Federal Question

**Plaintiff**

**Nancy Britt**
*individually*

represented by **Tyler Jay Belong**
Hogue & Belong APC
170 Laurel Street
San Diego, CA 92101
(619) 238–4720
Fax: (619) 238–5260
Email: tbelong@hoguebelonglaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Monsanto Company**
*a Delaware Corporation*

**Defendant**

**DOES 1–50**

| Date Filed | # | Docket Text |
|---|---|---|
| 05/08/2020 | 1 | COMPLAINT with Jury Demand against DOES 1–50, Monsanto Company ( Filing fee $ 400 receipt number ACASDC–13848906.), filed by Nancy Britt. (Attachments: # 1 Civil Cover Sheet)<br><br>The new case number is 3:20–cv–869–L–NLS. Judge M. James Lorenz and Magistrate Judge Nita L. Stormes are assigned to the case. (Belong, Tyler)(vxc) (dsn) (Entered: 05/08/2020) |
| 05/08/2020 | 2 | Summons Issued.<br>**Counsel receiving this notice electronically should print this summons and serve it in accordance with Rule 4, Fed.R.Civ.P and LR 4.1.** (vxc) (dsn) (Entered: 05/08/2020) |

JEFFREY L. HOGUE (SBN 234557)
TYLER J. BELONG (SBN 234543)
MARISOL JIMENEZ GAYTAN (SBN 315894)
HOGUE & BELONG
170 Laurel Street
San Diego, CA 92101
Telephone: (619) 238-4720
Facsimile:  (619) 238-5260

Attorneys for Plaintiff

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| NANCY BRITT, individually, | CASE NO: **'20 CV 0869 L    NLS** |
| Plaintiff, | **PLAINTIFF'S COMPLAINT FOR DAMAGES AGAINST DEFENDANTS MONSANTO COMPANY, AND DOES 1-50** |
| v. | |
| MONSANTO COMPANY, a Delaware Corporation; and DOES 1-50, | |
| Defendants. | |

-1-

# INTRODUCTION

1.      In 1970, Defendant Monsanto Company, Inc. ("Monsanto") discovered the herbicidal properties of glyphosate and began marketing it in products in 1974 under the brand name Roundup®. Roundup® is a non-selective herbicide used to kill weeds that commonly compete with the growing of crops. In 2001, glyphosate was the most-used pesticide active ingredient in American agriculture with 85–90 million pounds used annually. That number grew to 185 million pounds used in 2007.[1] As of 2013, glyphosate was the world's most widely used herbicide.

2.      Monsanto is a multinational agricultural biotechnology corporation based in St. Louis, Missouri and incorporated in Delaware. It is the world's leading producer of glyphosate. As of 2009, Monsanto was the world's leading producer of seeds, accounting for 27% of the world seed market.[2] The majority of these seeds are of the Roundup® Ready® brand. The stated advantage of Roundup® Ready® crops is that they substantially improve a farmer's ability to control weeds, since glyphosate can be sprayed in the fields during the growing season without harming

---

[1] Arthur Grube et al., U.S. Environmental Protection Agency, Pesticides Industry Sales and Usage, 2006–2007 Market Estimates 14 (2011), available at http://www.epa.gov/pesticides/pestsales/07pestsales/market_estimates2007.pdf.

[2] ETC Group, Who Will Control the Green Economy? 22 (2011), available at http://www.etcgroup.org/files/publication/pdf_file/ETC_wwctge_4web_Dec2011.pdf.

1  the crops. In 2010, an estimated 70% of corn and cotton, and 90% of soybean,

2  fields in the United States were Roundup® Ready®.[3]

3
4      3.     Monsanto's glyphosate products are registered in 130 countries and

5  approved for use on over 100 different crops.[4] They are ubiquitous in the

6  environment. Numerous studies confirm that glyphosate is found in rivers, streams,

7
8  and groundwater in agricultural areas where Roundup® is used.[5] It has been found

9  in food,[6] in the urine of agricultural workers,[7] and even in the urine of urban

10
11  dwellers who are not in direct contact with glyphosate.[8]

12
13  [3] William Neuman & Andrew Pollack, Farmers Cope With Roundup®-Resistant Weeds, N.Y. Times, May 3, 2010, available at http://www.nytimes.com/2010/05/04/business/energyenvironment/04weed.html?pagewan.

14
15  [4] Monsanto, Backgrounder-History of Monsanto's Glyphosate Herbicides (Sep. 2, 2015), http://www.monsanto.com/products/documents/glyphosate-backgroundmaterials/back_history.pdf.

16
17  [5] See U.S. Geological Survey, USGS Technical Announcement: Widely Used Herbicide Commonly Found in Rain and Streams in the Mississippi River Basin (2011), available at http://www.usgs.gov/newsroom/article.asp?ID=2909; see also U.S. Envtl. Prot. Agency, Technical Factsheet on: Glyphosate, available at http://www.epa.gov/safewater/pdfs/factsheets/soc/tech/glyphosa.pdf.

18
19
20  [6] Thomas Bohn et al., Compositional Differences in Soybeans on the Market: Glyphosate Accumulates in Roundup® Ready GM Soybeans, 153 Food Chemistry 207 (2013), available at http://www.sciencedirect.com/science/article/pii/S0308814613019201.

21
22
23  [7] John F. Acquavella et al., Glyphosate Biomonitoring for Farmers and Their Families: Results from the Farm Family Exposure Study, 112(3) Environmental Health Perspectives 321 (2004), available at http://www.ncbi.nlm.nih.gov/pmc/articles/PMC1241861/; Kathryn Z. Guyton et al., Carcinogenicity of Tetrachlorvinphos, Parathion, Malathion, Diazinon & Glyphosate, 112 IARC Monographs 76, section 5.4 (2015), available at http://dx.doi.org/10.1016/S1470-2045(15)70134-8.

24
25
26
27  [8] Dirk Brändli & Sandra Reinacher, Herbicides found in Human Urine, 1 Ithaka Journal 270 (2012), available at http://www.ithaka-journal.net/druckversionen/e052012-herbicidesurine.pdf.

28

4. On March 20, 2015, the International Agency for Research on Cancer ("IARC"), an agency of the World Health Organization ("WHO"), issued an evaluation of several herbicides, including glyphosate. That evaluation was based, in part, on studies of exposures to glyphosate in several countries around the world, and it traces the health implications from exposure to glyphosate since 2001.

5. On July 29, 2015, IARC issued the formal monograph relating to glyphosate. In that monograph, the IARC Working Group provides a thorough review of the numerous studies and data relating to glyphosate exposure in humans.

6. The IARC Working Group classified glyphosate as a Group 2A herbicide, which means that it is probably carcinogenic to humans. The IARC Working Group concluded that the cancers most associated with glyphosate exposure are non-Hodgkin lymphoma and other haematopoietic cancers, including lymphocytic lymphoma/chronic lymphocytic leukemia, B-cell lymphoma, and multiple myeloma.[9]

7. The IARC evaluation is significant. It confirms what has been believed for years: that glyphosate is toxic to humans.

8. Nevertheless, Monsanto, since it began selling Roundup®, has represented it as safe to humans and the environment. Indeed, Monsanto has repeatedly

---

[9] See Guyton et al., Carcinogenicity of Tetrachlorvinphos, Parathion, Malathion, Diazinon & Glyphosate, supra.

proclaimed and continues to proclaim to the world, and particularly to United States consumers, that glyphosate-based herbicides, including Roundup®, create no unreasonable risks to human health or to the environment.

## JURISDICTION AND VENUE

9.      This Court has jurisdiction over MONSANTO COMPANY ("Monsanto" or "Defendant") and DOES 1-50 (hereinafter, collectively referred to as "Defendants") and this action pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship between Plaintiff and Defendants. Defendants are all either incorporated and/or have their principal place of business outside of the state in which the Plaintiff resides.

10.     The amount in controversy between Plaintiff and Defendants exceeds $75,000, exclusive of interest and cost.

11.     The Court also has supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

12.     Venue is proper within this district pursuant to 28 U.S.C. § 1391 in that Defendants conduct business here and are subject to personal jurisdiction in this district. Furthermore, Defendants sell, market, and/or distribute Roundup® within the District of California.  Also, a substantial part of the acts and/or omissions giving rise to these claims occurred within this district.

///

**THE PARTIES**

**PLAINTIFFS**

13.     This is an action for damages suffered by Plaintiff as a direct and proximate result of Defendants' negligent and wrongful conduct in connection with the design, development, manufacture, testing, packaging, promoting, marketing, advertising, distribution, labeling, and/or sale of the herbicide Roundup®, containing the active ingredient glyphosate.

14.     Plaintiff maintains that Roundup® and/or glyphosate is defective, dangerous to human health, unfit and unsuitable to be marketed and sold in commerce and lacked proper warnings and directions as to the dangers associated with its use.

15.     Plaintiff Nancy Britt is the widow and next of kin of David Britt who is at all relevant times a resident of California. David Britt purchased and used Roundup® and/or other Monsanto glyphosate-containing products ("Roundup®) from 1983 to 2008 and was diagnosed with Non-Hodgkin's Lymphoma in and after 2006.

**DEFENDANTS**

16.     Defendant Monsanto is a Delaware corporation with its headquarters and principal place of business in St. Louis, Missouri and with multiple business locations and facilities operating in California. Defendant is

-6-

1   engaged in the business of designing, developing, manufacturing, testing,

2   packaging, marketing, distributing, labeling, and/or selling Roundup®. Defendant

3
    advertises and sells goods, specifically Roundup®, in California. Defendant
4

5   transacted and conducted business within the State of California that relates to the

6
    allegations in this Complaint.
7

8         17.    Bayer purchased Monsanto in or about 2018. Since that time, Bayer

9   and Monsanto have taken the position that its "risk assessment clearly showed that,
10
    when used as directed, the products of Monsanto containing glyphosate are safe.
11

12  Based on the views held by regulatory authorities worldwide and scientists, the

13
    board of management assessed the legal risks in connection with the use of
14

15  glyphosate as low."[10]

16        18.    At all times relevant to this complaint, Monsanto was the entity that
17
    discovered the herbicidal properties of glyphosate and the manufacturer of
18

19  Roundup®.

20        19.    Defendants derived substantial revenue from goods and products
21

22  used in the State of California and nationwide. Defendants expected or should have

23
    expected its acts to have consequences within the State of California, as well as
24

25  nationwide, and derived substantial revenue from interstate commerce. Upon

26

27

28  [10] https://fortune.com/2019/03/30/bayer-monsanto-merger-Roundup®-cancer/ (last accessed September 26, 2019).

information and belief, Defendants did design, sell, advertise, manufacture and/or

distribute Roundup®, with full knowledge of its dangerous and defective nature.

## FACTS

20.     Glyphosate is a broad-spectrum, non-selective herbicide used in a

wide variety of herbicidal products around the world.

21.     Plants treated with glyphosate translocate the systemic herbicide to

their roots, shoot regions, and fruit, where it interferes with the plant's ability to

form aromatic amino acids necessary for protein synthesis. Treated plants generally

die within two to three days. Because plants absorb glyphosate, it cannot be

completely removed by washing or peeling produce or by milling, baking, or

brewing grains.

22.     For nearly 40 years, farms across the world have used Roundup®

without knowing of the dangers its use poses. That is because when Monsanto first

introduced Roundup®, it touted glyphosate as a technological breakthrough: it could

kill almost every weed without causing harm either to people or to the environment.

Of course, history has recently shown that not to be true. According to the WHO,

the main chemical ingredient of Roundup®— glyphosate—is a probable cause of

cancer. Those most at risk are farm workers and other individuals with workplace

exposure to Roundup®, such as garden center workers, nursery workers, and

landscapers. Agricultural workers are, once again, victims of corporate greed.

-8-

Monsanto assured the public that Roundup® was harmless. In order to prove this, Monsanto championed falsified data and attacked legitimate studies that revealed Roundup®'s dangers. Monsanto led a prolonged campaign of misinformation to prevent discovery of the true dangers of Roundup® and convince government agencies, farmers and the general population that Roundup® was safe.

### The Discovery of Glyphosate and Development of Roundup®

23.    The herbicidal properties of glyphosate were discovered in 1970 by Monsanto chemist John Franz. The first glyphosate-based herbicide was introduced to the market in the mid-1970s under the brand name Roundup®.[11] From the outset, Monsanto marketed Roundup® as a "safe" general-purpose herbicide for widespread commercial and consumer use. It still markets Roundup® as safe today.[12]

### Registration of Herbicides under Federal Law

24.    The manufacture, formulation, and distribution of herbicides, such as Roundup®, are regulated under the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA" or "Act"), 7 U.S.C. § 136 et seq. FIFRA requires that all

[11] Monsanto, Backgrounder, History of Monsanto's Glyphosate Herbicide (Sep. 2, 2015), http://www.monsanto.com/products/documents/glyphosate-backgroundmaterials/back_history.pdf.

[12] Monsanto, What is Glyphosate? (Sep. 2, 2015), http://www.monsanto.com/sitecollectiondocuments/glyphosate-safety-health.pdf.

pesticides be registered with the Environmental Protection Agency ("EPA" or "Agency") prior to their distribution, sale, or use, except as described by the Act. 7 U.S.C. § 136a(a).

25.    Because pesticides are toxic to plants, animals, and humans, at least to some degree, the EPA requires as part of the registration process, among other things, a variety of tests to evaluate the potential for exposure to pesticides, toxicity to people and other potential nontarget organisms, and other adverse effects on the environment. Registration by the EPA, however, is not an assurance or finding of safety. The determination the Agency must make in registering or re-registering a product is not that the product is "safe," but rather that use of the product in accordance with its label directions "will not generally cause unreasonable adverse effects on the environment." 7 U.S.C. § 136a(c)(5)(D).

26.    FIFRA defines "unreasonable adverse effects on the environment" to mean "any unreasonable risk to man or the environment, taking into account the economic, social, and environmental costs and benefits of the use of any pesticide." 7 U.S.C. § 136(bb). FIFRA thus requires EPA to make a risk/benefit analysis in determining whether a registration should be granted or a pesticide allowed to continue to be sold in commerce.

27.    The EPA, the State of California, the State of Michigan, New York State, the State of Oregon, the State of Texas, and the State of Washington have

registered Roundup® for distribution, sale, and manufacture in the United States, California, Michigan, New York, Oregon, Texas, and Washington, respectively.

28.     FIFRA generally requires that the registrant, Monsanto in the case of Roundup®, conducts the health and safety testing of pesticide products. The EPA has protocols governing the conduct of tests required for registration and the laboratory practices that must be followed in conducting these tests. The data produced by the registrant must be submitted to the EPA for review and evaluation. The government is not required, nor is it able, however, to perform the product tests that are required of the manufacturer.

29.     The evaluation of each pesticide product distributed, sold, or manufactured is completed at the time the product is initially registered. The data necessary for registration of a pesticide has changed over time. The EPA is now in the process of re-evaluating all pesticide products through a Congressionally-mandated process called "re-registration." 7 U.S.C. § 136a1. In order to reevaluate these pesticides, the EPA is demanding the completion of additional tests and the submission of data for the EPA's recent review and evaluation.

30.     In the case of glyphosate, and therefore Roundup®, the EPA had planned on releasing its preliminary risk assessment—in relation to the reregistration process—no later than July 2015. The EPA completed its review of

glyphosate in early 2015, but it delayed releasing the risk assessment pending

further review in light of the WHO's health-related findings.

*Scientific Fraud Underlying the Marketing and Sale of Glyphosate/Roundup®*

31.     Based on early studies showing that glyphosate could cause cancer

in laboratory animals, the EPA originally classified glyphosate as possibly

carcinogenic to humans (Group C) in 1985. After pressure from Monsanto,

including contrary studies it provided to the EPA, the EPA changed its classification

to evidence of non-carcinogenicity in humans (Group E) in 1991. In so classifying

glyphosate, however, the EPA made clear that the designation did not mean the

chemical does not cause cancer: "It should be emphasized, however, that

designation of an agent in Group E is based on the available evidence at the time of

evaluation and should not be interpreted as a definitive conclusion that the agent

will not be a carcinogen under any circumstances."[13]

32.     On two occasions, the EPA found that the laboratories hired by

Monsanto to test the toxicity of its Roundup® products for registration purposes

committed fraud.

---

[13] U.S. Envtl. Prot. Agency, Memorandum, Subject: SECOND Peer Review of
Glyphosate 1 (1991), available at
http://www.epa.gov/pesticides/chem_search/cleared_reviews/csr_PC-103601_30-Oct91_265.pdf.

33.     In the first instance, Monsanto, in seeking initial registration of Roundup® by the EPA, hired Industrial Bio-Test Laboratories ("IBT") to perform and evaluate pesticide toxicology studies relating to Roundup®.[14] IBT performed about 30 tests on glyphosate and glyphosate-containing products, including nine of the 15 residue studies needed to register Roundup®.

34.     In 1976, the United States Food and Drug Administration ("FDA") performed an inspection of IBT that revealed discrepancies between the raw data and the final report relating to the toxicological impacts of glyphosate. The EPA subsequently audited IBT; it too found the toxicology studies conducted for the Roundup® herbicide to be invalid.[15] An EPA reviewer stated, after finding "routine falsification of data" at IBT, that it was "hard to believe the scientific integrity of the studies when they said they took specimens of the uterus from male rabbits."[16]

[14] Monsanto, Backgrounder, Testing Fraud: IBT and Craven Laboratories (Sep. 2, 2015), http://www.monsanto.com/products/documents/glyphosate-backgroundmaterials/ibt_craven_bkg.pdf.

[15] U.S. Envtl. Prot. Agency, Summary of the IBT Review Program Office of Pesticide Programs (1983), available at http://nepis.epa.gov/Exe/ZyNET.exe/91014ULV.TXT?ZyActionD=ZyDocument&Client=EPA&Index=1981+Thru+1985&Docs=&Query=&Time=&EndTime=&SearchMethod=1&TocRestrict=n&Toc=&TocEntry=&QField=&QFieldYear=&QFieldMonth=&QFieldDay=&IntQFieldOp=0&ExtQFieldOp=0&XmlQuery=&File=D%3A%5Czyfiles%5CIndex%20Data%5C81thru85%5CTxt%5C00000022%5C91014ULV.txt&User=ANONYMOUS&Password=anonymous&SortMethod=h%7C-&MaximumDocuments=1&FuzzyDegree=0&ImageQuality=r75g8/r75g8/x150y150g16/i425&Display=p%7Cf&DefSeekPage=x&SearchBack=ZyActionL&Back=ZyActionS&BackDesc=Results%20page&MaximumPages=1&ZyEntry=1&SeekPage=x&ZyPURL.

[16] Marie-Monique Robin, The World According to Monsanto: Pollution, Corruption and

35.     Three top executives of IBT were convicted of fraud in 1983.

36.     In the second incident of data falsification, Monsanto hired Craven Laboratories in 1991 to perform pesticide and herbicide studies, including for Roundup®. In that same year, the owner of Craven Laboratories and three of its employees were indicted, and later convicted, of fraudulent laboratory practices in the testing of pesticides and herbicides.[17]

37.     Despite the falsity of the tests that underlie its registration, within a few years of its launch, Monsanto was marketing Roundup® in 115 countries, and actively touting it as a safe product for consumers.

### *The Importance of Roundup® to Monsanto's Market Dominance Profits*

38.     The success of Roundup® was key to Monsanto's continued reputation and dominance in the marketplace. Largely due to the success of Roundup® sales, Monsanto's agriculture division was out-performing its chemicals division's operating income, and that gap increased yearly. But with its patent for glyphosate expiring in the United States in the year 2000, Monsanto needed a strategy to maintain its Roundup® market dominance and to ward off impending competition.

the Control of the World's Food Supply (2011) (citing U.S. Envtl. Prot. Agency, Data Validation, Memo from K. Locke, Toxicology Branch, to R. Taylor, Registration Branch. Washington, D.C. (August 9, 1978)).

[17] Monsanto, Backgrounder, Testing Fraud: IBT and Craven Laboratories, *supra.*

39.     In response, Monsanto began the development and sale of genetically engineered Roundup® Ready® seeds in 1996. Since Roundup® Ready® crops are resistant to glyphosate, farmers can spray Roundup® onto their fields during the growing season without harming the crop. This allowed Monsanto to expand its market for Roundup® even further; by 2000, Monsanto's biotechnology seeds were planted on more than 80 million acres worldwide and nearly 70% of American soybeans were planted from Roundup® Ready® seeds. It also secured Monsanto's dominant share of the glyphosate/Roundup® market through a marketing strategy that coupled proprietary Roundup® Ready® seeds with continued sales of its Roundup® herbicide.

40.     Through a three-pronged strategy of increasing production, decreasing prices, and by coupling with Roundup® Ready® seeds, Roundup® became Monsanto's most profitable product. In 2000, Roundup® accounted for almost $2.8 billion in sales, outselling other herbicides by a margin of five to one, and accounting for close to half of Monsanto's revenue.[18] Today, glyphosate remains one of the world's largest herbicides by sales volume.

///

---

[18] David Barboza, The Power of Roundup®; A Weed Killer Is A Block for Monsanto to Build On, N.Y. Times, Aug. 2, 2001, available at http://www.nytimes.com/2001/08/02/business/the-power-of-Roundup®-a-weed-killer-is-a-blockfor-monsanto-to-build-on.html.

*Monsanto has known for decades that it falsely advertises the safety of Roundup®*

41.    In 1996, the New York Attorney General ("NYAG") filed a lawsuit against Monsanto based on its false and misleading advertising of Roundup® products. Specifically, the lawsuit challenged Monsanto's general representations that its spray-on glyphosate-based herbicides, including Roundup®, were "**safer than table salt**" and "**practically non-toxic**" to mammals, birds, and fish. Among the representations the NYAG found deceptive and misleading about the human and environmental safety of glyphosate and/or Roundup® are the following:

    a.    "Remember that environmentally friendly Roundup® herbicide is biodegradable. It won't build up in the soil so you can use Roundup® with confidence along customers' driveways, sidewalks and fences ..."

    b.    "And remember that Roundup® is biodegradable and won't build up in the soil. That will give you the environmental confidence you need to use Roundup® everywhere you've got a weed, brush, edging or trimming problem."

    c.    "Roundup® biodegrades into naturally occurring elements."

    d.    "Remember that versatile Roundup® herbicide stays where you put it. That means there's no washing or leaching to harm customers' shrubs or other desirable vegetation."

e. "This non-residual herbicide will not wash or leach in the soil. It ... stays where you apply it."

f. "You can apply Accord with 'confidence because it will stay where you put it' it bonds tightly to soil particles, preventing leaching. Then, soon after application, soil microorganisms biodegrade Accord into natural products."

g. Glyphosate is less toxic to rats than table salt following acute oral ingestion.

h. "Glyphosate's safety margin is much greater than required. It has over a 1,000-fold safety margin in food and over a 700-fold safety margin for workers who manufacture it or use it."

i. "You can feel good about using herbicides by Monsanto. They carry a toxicity category rating of 'practically non-toxic' as it pertains to mammals, birds and fish."

j. "Roundup® can be used where kids and pets will play and breaks down into natural material." This ad depicts a person with his head in the ground and a pet dog standing in an area which has been treated with Roundup®.[19]

---

[19] Attorney General of the State of New York, In the Matter of Monsanto Company, Assurance of Discontinuance Pursuant to Executive Law § 63(15) (Nov. 1996).

42.    On November 19, 1996, Monsanto entered into an Assurance of Discontinuance with NYAG, in which Monsanto agreed, among other things, "to cease and desist from publishing or broadcasting any advertisements [in New York] that represent, directly or by implication" that:

    a.  its glyphosate-containing pesticide products or any component thereof are safe, non-toxic, harmless or free from risk.

    b.  its glyphosate-containing pesticide products or any component thereof manufactured, formulated, distributed or sold by Monsanto are biodegradable.

    c.  its glyphosate-containing pesticide products or any component thereof stay where they are applied under all circumstances and will not move through the environment by any means.

    d.  its glyphosate-containing pesticide products or any component thereof are "good" for the environment or are "known for their environmental characteristics."

    e.  glyphosate-containing pesticide products or any component thereof are safer or less toxic than common consumer products other than herbicides;

    f.  its glyphosate-containing products or any component thereof might be classified as "practically non-toxic."

-18-

43.    Monsanto did not alter its advertising in the same manner in any state other than New York, and on information and belief it still has not done so today.

44.    In 2009, France's highest court ruled that Monsanto had not told the truth about the safety of Roundup®. The French court affirmed an earlier judgement that Monsanto had falsely advertised its herbicide Roundup® as "biodegradable" and that it "left the soil clean."[20]

### *Classifications and Assessments of Glyphosate*

45.    The IARC process for the classification of glyphosate followed IARC's stringent procedures for the evaluation of a chemical agent. Over time, the IARC Monograph program has reviewed 980 agents. Of those reviewed, it has determined 116 agents to be Group 1 (Known Human Carcinogens); 73 agents to be Group 2A (Probable Human Carcinogens); 287 agents to be Group 2B (Possible Human Carcinogens); 503 agents to be Group 3 (Not Classified); and one agent to be Probably Not Carcinogenic.

46.    The established procedure for IARC Monograph evaluations is described in the IARC Programme's Preamble.[21] Evaluations are performed by panels of

[20] Monsanto Guilty in 'False Ad' Row, BBC, Oct. 15, 2009, available at
http://news.bbc.co.uk/2/hi/europe/8308903.stm.

[21] World Health Organization, IARC Monographs on the Evaluation of Carcinogenic Risks to Humans: Preamble (2006), available at
http://monographs.iarc.fr/ENG/Preamble/CurrentPreamble.pdf.

international experts, selected on the basis of their expertise and the absence of actual or apparent conflicts of interest.

47.     One year before the Monograph meeting, the meeting is announced and there is a call both for data and for experts. Eight months before the Monograph meeting, the Working Group membership is selected, and the sections of the Monograph are developed by the Working Group members. One month prior to the Monograph meeting, the call for data is closed and the various draft sections are distributed among Working Group members for review and comment. Finally, at the Monograph meeting, the Working Group finalizes review of all literature, evaluates the evidence in each category, and completes the overall evaluation. Within two weeks after the Monograph meeting, the summary of the Working Group findings are published in The Lancet Oncology, and within a year after the meeting, the finalized Monograph is published.

48.     In assessing an agent, the IARC Working Group reviews the following information: (a) human, experimental, and mechanistic data; (b) all pertinent epidemiological studies and cancer bioassays; and (c) representative mechanistic data. The studies must be publicly available and have sufficient detail for meaningful review, and reviewers cannot be associated with the underlying study.

-20-

49.     In March 20, 2015, IARC reassessed glyphosate. The summary published in The Lancet Oncology reported that glyphosate is a Group 2A agent and probably carcinogenic in humans.

50.     On July 29, 2015, IARC issued its Monograph for glyphosate, Monograph Volume 112. For Volume 112, a Working Group of 17 experts from 11 countries met at IARC from March 3–10, 2015 to assess the carcinogenicity of certain herbicides, including glyphosate. The March meeting culminated a nearly one-year review and preparation by the IARC Secretariat and the Working Group, including a comprehensive review of the latest available scientific evidence. According to published procedures, the Working Group considered "reports that have been published or accepted for publication in the openly available scientific literature" as well as "data from governmental reports that are publicly available."

51.     The studies considered the following exposure groups: (1) occupational exposure of farmers and tree nursery workers in the United States, forestry workers in Canada and Finland and municipal weed-control workers in the United Kingdom; and (2) para-occupational exposure in farming families.

52.     Glyphosate was identified as the second-most used household herbicide in the United States for weed control between 2001 and 2007 and the most heavily used herbicide in the world in 2012.

53.    Exposure pathways are identified as air (especially during spraying), water, and food. Community exposure to glyphosate is widespread and found in soil, air, surface water, and groundwater, as well as in food.

54.    The assessment of the IARC Working Group identified several case control studies of occupational exposure in the United States, Canada, and Sweden. These studies show a human health concern from agricultural and other work-related exposure to glyphosate.

55.    The IARC Working Group found an increased risk between exposure to glyphosate and non-Hodgkin lymphoma ("NHL") and several subtypes of NHL, and the increased risk persisted after adjustment for other pesticides.

56.    The IARC Working Group also found that glyphosate caused DNA and chromosomal damage in human cells. One study in community residents reported increases in blood markers of chromosomal damage (micronuclei) after glyphosate formulations were sprayed.

57.    In male CD-1 mice, glyphosate induced a positive trend in the incidence of a rare tumor: renal tubule carcinoma. A second study reported a positive trend for haemangiosarcoma in male mice. Glyphosate increased pancreatic islet-cell adenoma in male rats in two studies. A glyphosate formulation promoted skin tumors in an initiation-promotion study in mice.

58.    The IARC Working Group also noted that glyphosate has been detected in the urine of agricultural workers, indicating absorption. Soil microbes degrade glyphosate to aminomethylphosphoric acid (AMPA). Blood AMPA detection after exposure suggests intestinal microbial metabolism in humans.

59.    The IARC Working Group further found that glyphosate and glyphosate formulations induced DNA and chromosomal damage in mammals, and in human and animal cells in utero.

60.    The IARC Working Group also noted genotoxic, hormonal, and enzymatic effects in mammals exposed to glyphosate.[22] Essentially, glyphosate inhibits the biosynthesis of aromatic amino acids, which leads to several metabolic disturbances, including the inhibition of protein and secondary product biosynthesis and general metabolic disruption.

61.    The IARC Working Group also reviewed an Agricultural Health Study, consisting of a prospective cohort of 57,311 licensed pesticide applicators in Iowa and North Carolina.[23] While this study differed from others in that it was based on a self-administered questionnaire, the results support an association between

[22] Guyton et al., Carcinogenicity of Tetrachlorvinphos, Parathion, Malathion, Diazinon & Glyphosate, supra at 77.

[23] Anneclare J. De Roos et al., Cancer Incidence Among Glyphosate-Exposed Pesticide Applicators in the Agricultural Health Study, 113 Envt'l Health Perspectives 49–54 (2005), available at http://www.ncbi.nlm.nih.gov/pmc/articles/PMC1253709/pdf/ehp0113-000049.pdf.

1   glyphosate exposure and multiple myeloma, hairy cell leukemia (HCL), and

2   chronic lymphocytic leukemia (CLL), in addition to several other cancers.

3
        62.    Because of its rigorous scientific method and independence, IARC is a
4

5   widely respected organization and its findings are considered authoritative.

6
    Organizations such as the American Cancer Society and Federal Judicial Center
7

8   hold IARC in high esteem The Federal Judicial Center describes IARC as "well-

9   respected and prestigious" and notes that IARC's assessment of carcinogenicity is
10
    "generally recognized as authoritative." Reference Manual on Scientific Evidence
11

12   20, 565 n. 46 (3D ED. 2011). The U.S. Department of Labor's Occupational Safety

13
    and Health Administration ("OSHA") also relies on IARC assessments when
14

15   requiring manufactures to warn of the potential carcinogenicity of chemicals. (29

16
    C.F.R. § 1910.1200(d)(4) (2010). California Chamber of Commerce v. Brown, 196
17

18   Cal. App. 4th 233, 242, 126 Cal. Rptr. 3d 214, 219 (2011).

19
        63.    In 2017, California, based on IARC's finding, listed glyphosate as a
20

21   chemical known to the State of California to cause cancer, though the fact and

22   amount of glyphosate contained in Roundup® remained almost undisclosed

23
    publicly, and Monsanto continued to downplay and coverup the amount of
24

25   glyphosate contained in Roundup® and the true facts about the dangers of

26   Roundup® to the public.

27

28

64.   The EPA has a technical fact sheet, as part of its Drinking Water and Health, National Primary Drinking Water Regulations publication, relating to glyphosate. This technical fact sheet predates IARC's March 20, 2015 evaluation. The fact sheet describes the release patterns for glyphosate as follows:

**Release Patterns**

Glyphosate is released to the environment in its use as a herbicide for controlling woody and herbaceous weeds on forestry, right-of-way, cropped and non-cropped sites. These sites may be around water and in wetlands.

It may also be released to the environment during its manufacture, formulation, transport, storage, disposal and cleanup, and from spills. Since glyphosate is not a listed chemical in the Toxics Release Inventory, data on releases during its manufacture and handling are not available.

Occupational workers and home gardeners may be exposed to glyphosate by inhalation and dermal contact during spraying, mixing, and cleanup. They may also be exposed by touching soil and plants to which glyphosate was applied. Occupational exposure may also occur during glyphosate's manufacture, transport storage, and disposal.[24]

65.   In 1995, the Northwest Coalition for Alternatives to Pesticides reported that in California, the state with the most comprehensive program for reporting of pesticide-caused illness, glyphosate was the third most commonly-reported cause of pesticide illness among agricultural workers.[25]

[24] U.S. Envtl. Prot. Agency, Technical Factsheet on: Glyphosate, supra.

[25] Caroline Cox, Glyphosate, Part 2: Human Exposure and Ecological Effects, 15 J.

-25-

### *Recent Worldwide Bans on Roundup®/Glyphosate*

66.     Though not widely published in the United States at the time, several countries around the world have instituted bans on the sale of Roundup® and other glyphosate-containing herbicides, both before and since IARC first announced its assessment for glyphosate in March 20, 2015, and more countries undoubtedly will follow suit as the dangers of the use of Roundup® become more widely known. The Netherlands issued a ban on all glyphosate-based herbicides in April 2014, including Roundup®, which will take effect by the end of 2015. In issuing the ban, the Dutch Parliament member who introduced the successful legislation stated: "Agricultural pesticides in user-friendly packaging are sold in abundance to private persons. In garden centers, Roundup® is promoted as harmless, but unsuspecting customers have no idea what the risks of this product are. Especially children are sensitive to toxic substances and should therefore not be exposed to it."[26]

67.     The Brazilian Public Prosecutor in the Federal District requested that the Brazilian Justice Department suspend the use of glyphosate.[27]

Pesticide Reform 4 (1995); W.S. Peas et al., Preventing pesticide-related illness in California agriculture: Strategies and priorities. Environmental Health Policy Program Report, Univ. of Cal. School of Public Health, Calif. Policy Seminar (1993).

[26] Holland's Parliament Bans Glyphosate Herbicides, The Real Agenda, April 14, 2014, available at http://real-agenda.com/hollands-parliament-bans-glyphosate-herbicides/.

[27] Christina Sarich, Brazil's Public Prosecutor Wants to Ban Monsanto's Chemicals Following Recent Glyphosate-Cancer Link, Global Research, May 14, 2015, available at

68.     France banned the private sale of Roundup® and glyphosate following the

IARC assessment for Glyphosate.[28]

69.     Bermuda banned both the private and commercial sale of glyphosates,

including Roundup®. The Bermuda government explained its ban as follows:

"Following a recent scientific study carried out by a leading cancer agency, the

importation of weed spray 'Roundup®' has been suspended."[29]

70.     The Sri Lankan government banned the private and commercial use of

glyphosate, particularly out of concern that glyphosate has been linked to fatal

kidney disease in agricultural workers.[30]

---

http://www.globalresearch.ca/brazils-public-prosecutor-wants-to-ban-monsantos-chemicalsfollowing-recent-glyphosate-cancer-link/5449440; see Ministério Público Federal, MPF/DF
reforça pedido para que glifosato seja banido do mercado naciona, April, 14, 2015, available at http://noticias.pgr.mpf.mp.br/noticias/noticias-do-site/copy_of_meio-ambiente-e-patrimoniocultural/mpf-df-reforca-pedido-para-que-glifosato-seja-banido-do-mercado-nacional.

[28] Zoe Schlanger, France Bans Sales of Monsanto's Roundup® in Garden Centers, 3 Months After U.N. Calls it 'Probable Carcinogen", Newsweek, June 15, 2015, available at http://www.newsweek.com/france-bans-sale-monsantos-Roundup®-garden-centers-after-un-namesit-probable-343311.

[29] Health Minister: Importation of Roundup® Weed Spray Suspended, Today in Bermuda, May, 11 2015, available at http://www.todayinbermuda.com/news/health/item/1471-healthminister-importation-of-Roundup®-weed-spray-suspended.

[30] Sri Lanka's New President Puts Immediate Ban on Glyphosate Herbicides, Sustainable Pulse, May 25, 2015, available at http://sustainablepulse.com/2015/05/25/sri-lankas-newpresident-puts-immediate-ban-on-glyphosate-herbicides/#.VeduYk3bKAw.

-27-

71.     The government of Colombia announced its ban on using Roundup® and glyphosate to destroy illegal plantations of coca, the raw ingredient for cocaine, because of the WHO's finding that glyphosate is probably carcinogenic.[31]

### *First United States Public Awareness of Roundup® Likelihood of Causing Cancer*

72.     None of the forgoing facts concerning Roundup®'s true nature and propensity to cause cancer were publicized to consumers, and it certainly was never widely disseminated among the United States populous that Roundup® caused cancer and even death among even its consumers who used the product for only residential gardening and only periodically.  In fact, August 2018, was the date when the first bellwether glyphosate trial was decided in favor of a plaintiff suing Monsanto for Roundup® causing cancer.  The Plaintiff did not learn that Roundup® exposure was responsible for her late husband's death until many months after that California jury found that Roundup® caused non-Hodgkin's lymphoma in former school groundskeeper who regularly sprayed the weed killer, and the case was later publicized in mainstream news outlets. The case being referenced was brought by DeWayne Lee Johnson, the plaintiff, who was awarded $289 million dollars having developed non-Hodgkin's lymphoma – the very first the first attention-grabbing verdict of its kind against Monsanto for Roundup®'s causation of cancer. Prior to publicity following the Johnson verdict, the Plaintiff, and most reasonable plaintiffs

---

[31] 30 Columbia to ban coca spraying herbicide glyphosate, BBC, May 10, 2015, available at http://www.bbc.com/news/world-latin-america-32677411.

or plaintiff's attorneys could not have discovered, through the exercise of reasonable

diligence, the exposure to Roundup® and glyphosate were so injurious to human

health that they caused cancer when used only residentially and periodically – as

opposed to on a daily basis in professional agriculture.   The fact that Monsanto

executives deliberately manipulated data to cause the FDA to conclude at the time

that glyphosate was safe for humans and failed to warn the public made it even

more improbable that a reasonable injured party in Plaintiff's position would have

been able to discover that Roundup® caused her husband's cancer. For instance,

documents show that Monsanto scientists ghostwrote the findings of scientific

testing of glyphosate to conclude that the chemical was safe for humans and passed

the conclusions on to the Food and Drug Administration as independent and

objective scientific research.   This type of deliberate cover-up and false spin on the

facts made it exceedingly difficult for any reasonable Plaintiff to know that

Roundup® used residentially and periodically caused cancer.   The publication

following the *Johnson* jury verdict was the first possible turning point in the ability

for Plaintiff to discover Roundup®'s causation of her late husband's cancer.

### *Plaintiff's Exposure to Roundup®*

73.   Plaintiff's husband, David Britt, used Roundup® residentially but

consistently from 1983 to 2008; Mr. Britt used Roundup® 15 to 20 times per year in

Roundup®'s gallon jug with handle form beginning in 1983.

74.     Mr. Britt was extremely healthy prior to his exposure to Roundup® and only developed the specific illness linked to Roundup® - non-Hodgkin lymphoma - many years after Mr. Britt began using the Roundup® product on a consistent basis.

75.     Following this exposure to Roundup®, David Britt was diagnosed in and after 2006 with non-Hodgkin lymphoma and Pancreatic cancer.

76.     Mr. Britt and Mrs. Britt never had reason to suspect an injury from using Roundup® and had no knowledge of facts that Roundup® was involved in the wrongdoing that injured him. To the contrary, based on the manner in which Monsanto held out Roundup® as a product that was completely safe for residential gardening use, Plaintiff and Mr. Britt believed the product was completely safe for such regular usage. As a result of his illness, David Britt died from using Roundup®.

### *Equitable Tolling of Applicable Statute of Limitations*

77.     Plaintiff incorporates by reference all prior paragraphs of this Complaint as if fully set forth herein.

78.     The running of any statute of limitations has been tolled by reason of Defendants' fraudulent concealment. Defendants, through their affirmative misrepresentations and omissions, actively concealed from Plaintiff the true risks associated with Roundup® and glyphosate. Indeed, even as of approximately late 2018, Defendants continued resist liability for Roundup®'s cancer causing

properties and otherwise represented to the public that "Scientists are in agreement that there is no evidence glyphosate causes cancer." (emphasis added)[32]

79.    As a result of Defendants' actions, Plaintiff was unaware, and could not reasonably know or have learned through reasonable diligence that Roundup® and/or glyphosate contact, exposed Plaintiff's husband to the risks alleged herein and that those risks were the direct and proximate result of Defendants' acts and omissions.

80.    Furthermore, Defendants are estopped from relying on any statute of limitations because of their fraudulent concealment of the true character, quality and nature of Roundup®. Defendants were under a duty to disclose the true character, quality, and nature of Roundup® because this was non-public information over which Defendants had and continue to have exclusive control, and because Defendants knew that this information was not available to Plaintiff or to distributors of Roundup®. In addition, Defendants are estopped from relying on any statute of limitations because of their intentional concealment of these facts.

81.    Plaintiff and Plaintiff's husband had no knowledge that Defendants were engaged in the wrongdoing alleged herein. Because of the fraudulent acts of concealment of wrongdoing by Defendants, Plaintiff could not have reasonably

[32] Backgrounder - Glyphosate: No Evidence of Carcinogenicity. Updated November 2014. (downloaded October 9 2015)

-31-

discovered the wrongdoing at any time prior. Also, the economics of this fraud should be considered. Defendants had the ability to and did spend enormous amounts of money in furtherance of their purpose of marketing, promoting and/or distributing a profitable herbicide, notwithstanding the known or reasonably known risks. Plaintiff and medical professionals could not have afforded and could not have possibly conducted studies to determine the nature, extent, and identity of related health risks, and were forced to rely on only the Defendants' representations. Accordingly, Defendants are precluded by the **discovery rule** and/or the **doctrine of fraudulent concealment** from relying upon any statute of limitations.

## CLAIM ONE

## WRONGFUL DEATH

82.     Plaintiffs incorporate by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein:

83.     Plaintiff is the surviving heir of the Decedent, or other persons authorized to bring an action for the wrongful death of the Decedent, who used Defendants' Roundup® product and were injured and died as a result.

84.     The injuries and damages of Plaintiff and Decedent were caused by the wrongful acts, omissions, and fraudulent misrepresentations of Defendants.

85.     As a result of the conduct of Defendants and ingestion of Defendants' Roundup® product, the Decedent suffered fatal injuries.

86.    As a result of the death of the Decedent, Plaintiff was deprived of love, companionship, comfort, support, affection, society, solace, and moral support of the Decedent.

87.    Plaintiff is entitled to recover economic and non-economic damages against all Defendants for wrongful death directly and legally caused by the defects in Defendants' product and the negligent conduct, acts, errors, omissions and intentional and negligent misrepresentations of Defendants, and each of them.

88.    Plaintiff respectfully request that this Court enter judgment in Plaintiff's favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees, and all such other and further relief as this Court deems just and proper. Plaintiff also demands a jury trial on all issues contained herein.

## CLAIM TWO

### STRICT LIABILITY (DESIGN DEFECT)

89.    Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

90.    Plaintiff brings this strict liability claim against Defendant for defective design.

91.    At all times relevant to this litigation, Defendant engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing,

-33-

and promoting Roundup® products, which are defective and unreasonably

dangerous to consumers, including Plaintiffs, thereby placing Roundup® products

into the stream of commerce. These actions were under the ultimate control and

supervision of Defendant. At all times relevant to this litigation, Defendant

designed, researched, developed, manufactured, produced, tested, assembled,

labeled, advertised, promoted, marketed, sold, and distributed the Roundup®

products used by the Plaintiff, as described above.

92.   At all times relevant to this litigation, Defendant's Roundup® products

were manufactured, designed, and labeled in an unsafe, defective, and inherently

dangerous manner that was dangerous for use by or exposure to the public, and, in

particular, the Plaintiff.

93.   At all times relevant to this litigation, Defendant's Roundup® products

reached the intended consumers, handlers, and users or other persons coming into

contact with these products in California and throughout the United States,

including Plaintiff, without substantial change in their condition as designed,

manufactured, sold, distributed, labeled, and marketed by Defendant.

94.   Defendant's Roundup® products, as researched, tested, developed,

designed, licensed, manufactured, packaged, labeled, distributed, sold, and marketed

by Defendant were defective in design and formulation in that when they left the

hands of the Defendant's manufacturers and/or suppliers, they were unreasonably

dangerous and dangerous to an extent beyond that which an ordinary consumer would contemplate.

95.     Defendant's Roundup® products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold, and marketed by Defendant were defective in design and formulation in that when they left the hands of Defendant's manufacturers and/or suppliers, the foreseeable risks exceeded the alleged benefits associated with their design and formulation.

96.     At all times relevant to this action, Defendant knew or had reason to know that its Roundup® products were defective and were inherently dangerous and unsafe when used in the manner instructed and provided by Defendant.

97.     Therefore, at all times relevant to this litigation, Defendant's Roundup® products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold and marketed by Defendant were defective in design and formulation, in one or more of the following ways:

a.  When placed in the stream of commerce, Defendant's Roundup® products were defective in design and formulation, and, consequently, dangerous to an extent beyond that which an ordinary consumer would contemplate.

b.  When placed in the stream of commerce, Defendant's Roundup® products were unreasonably dangerous in that they were hazardous and

1    posed a grave risk of cancer and other serious illnesses when used in a

2    reasonably anticipated manner.

3

4    c.  When placed in the stream of commerce, Defendant's Roundup®

5    products contained unreasonably dangerous design defects and were

6    not reasonably safe when used in a reasonably anticipated or intended

7

8    manner.

9    d.  Defendant did not sufficiently test, investigate, or study its Roundup®

10    products and, specifically, the active ingredient glyphosate.

11

12    e.  Exposure to Roundup® and glyphosate-containing products presents a

13    risk of harmful side effects that outweigh any potential utility

14    stemming from the use of the herbicide.

15

16    f.  Defendant knew or should have known at the time of marketing its

17

18    Roundup® products that exposure to Roundup® and specifically, its

19    active ingredient glyphosate, could result in cancer and other severe

20    illnesses and injuries.

21

22    g.  Defendant did not conduct adequate post-marketing surveillance of its

23    Roundup® products.

24

25    h.  Defendant could have employed safer alternative designs and

26    formulations.

27

28

98.    Plaintiff's husband was exposed to Defendant's Roundup® products by purchasing and using them in the grounds of his premises, as described above, without knowledge of their dangerous characteristics.

99.    At all times relevant to this litigation, Plaintiff's husband used and/or was exposed to the use of Defendant's Roundup® products in an intended or reasonably foreseeable manner without knowledge of their dangerous characteristics.

100.    Plaintiff and her husband could not have reasonably discovered the defects and risks associated with Roundup® or glyphosate containing products before or at the time of exposure.

101.    The harm caused by Defendant's Roundup® products far outweighed their benefit, rendering Defendant's products dangerous to an extent beyond that which an ordinary consumer would contemplate. Defendant's Roundup® products were and are more dangerous than alternative products and Defendant could have designed its Roundup® products to make them less dangerous. Indeed, at the time that Defendant designed its Roundup® products, the state of the industry's scientific knowledge was such that a less risky design or formulation was attainable.

102.    At the time Roundup® products left Defendant's control, there was a practical, technically feasible and safer alternative design that would have prevented the harm without substantially impairing the reasonably anticipated or intended function of Defendant's herbicides.

-37-

103.    Defendant's defective design of its Roundup® products was willful, wanton, fraudulent, malicious, and conducted with reckless disregard for the health and safety of users of the Roundup® products, including the Plaintiffs herein.

104.    Therefore, as a result of the unreasonably dangerous condition of its Roundup® products, Defendant is strictly liable to Plaintiff for causing her husband's death.

105.    The defects in Defendant's Roundup® products were substantial and contributing factors in causing Plaintiff's husband's grave injuries, and, but for Defendant's misconduct and omissions, Plaintiff would not have sustained her injuries.

106.    Defendant's conduct, as described above, was reckless. Defendant risked the lives of consumers and users of its products, including Plaintiffs, with knowledge of the safety problems associated with Roundup® and glyphosate-containing products, and suppressed this knowledge from the general public. Defendant made conscious decisions not to redesign, warn or inform the unsuspecting public. Defendant's reckless conduct warrants an award of punitive damages.

107.    As a direct and proximate result of Defendant placing its defective Roundup® products into the stream of commerce, Plaintiff has suffered and continues to suffer grave injuries, and has endured psychological and emotional

distress, was deprived of love, companionship, comfort, support, affection, society, solace, and moral support of the Decedent, and suffered economic hardship, including considerable financial expenses for medical care and treatment of her husband.

108.     Plaintiff respectfully requests that this Court enter judgment in Plaintiff's favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all such other and further relief as this Court deems just and proper. Plaintiff also demands a jury trial on all issues contained herein.

## CLAIM THREE

## STRICT LIABILITY (FAILURE TO WARN)

109.     Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

110.     Plaintiff brings this strict liability claim against Defendant for failure to warn.

111.     At all times relevant to this litigation, Defendant engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting Roundup® products, which are defective and unreasonably dangerous to consumers, including Plaintiff and her husband, because they do not contain adequate warnings or instructions concerning the dangerous

-39-

characteristics of Roundup® and specifically, the active ingredient glyphosate. These actions were under the ultimate control and supervision of Defendant.

112.    Defendant researched, developed, designed, tested, manufactured, inspected, distributed, marketed, promoted, sold, and otherwise released into the stream of commerce its Roundup® products, and in the course of same, directly advertised or marketed the products to consumers and end users, including the Plaintiff and Plaintiff's husband, and therefore had a duty to warn of the risks associated with the use of Roundup® and glyphosate-containing products.

113.    At all times relevant to this litigation, Defendant had a duty to properly test, develop, design, manufacture, inspect, package, market, promote, sell, distribute, maintain supply, provide proper warnings, and take such steps as necessary to ensure that its Roundup® products did not cause users and consumers to suffer from unreasonable and dangerous risks. Defendant had a continuing duty to warn the Plaintiffs of the dangers associated with Roundup® use and exposure. Defendant, as manufacturer, seller, or distributor of chemical herbicides is held to the knowledge of an expert in the field.

114.    At the time of manufacture, Defendant could have provided the warnings or instructions regarding the full and complete risks of Roundup® and glyphosate-containing products because it knew or should have known of the

unreasonable risks of harm associated with the use of and/or exposure to such products.

115.    At all times relevant to this litigation, Defendant failed to investigate, study, test, or promote the safety or to minimize the dangers to users and consumers of its product and to those who would foreseeably use or be harmed by Defendant's herbicides, including Plaintiff and her husband.

116.    Despite the fact that Defendant knew or should have known that Roundup® posed a grave risk of harm, it failed to exercise reasonable care to warn of the dangerous risks associated with use and exposure. The dangerous propensities of its products and the carcinogenic characteristics of glyphosate, as described above, were known to Defendant, or scientifically knowable to Defendant through appropriate research and testing by known methods, at the time it distributed, supplied or sold the product, and not known to end users and consumers, such as Plaintiff and her husband.

117.    Defendant knew or should have known that its products created significant risks of serious bodily harm to consumers, as alleged herein, and Defendant failed to adequately warn consumers and reasonably foreseeable users of the risks of exposure to its products. Defendant has wrongfully concealed information concerning the dangerous nature of Roundup® and its active ingredient

glyphosate, and further made false and/or misleading statements concerning the

safety of Roundup® and glyphosate.

118.    At all times relevant to this litigation, Defendant's Roundup® products

reached the intended consumers, handlers, and users or other persons coming into

contact with these products in California and throughout the United States,

including Plaintiff, without substantial change in their condition as designed,

manufactured, sold, distributed, and marketed by Defendant.

119.    Plaintiff's husband was exposed to Defendant's Roundup® products by

purchasing and using them on the grounds of his property, as described above,

without knowledge of their dangerous characteristics.

120.    At all times relevant to this litigation, Plaintiff's husband used and/or

was exposed to the use of Defendant's Roundup® products in their intended or

reasonably foreseeable manner without knowledge of their dangerous

characteristics.

121.    Plaintiff and her husband could not have reasonably discovered the

defects and risks associated with Roundup® or glyphosate-containing products prior

to or at the time of Plaintiff's exposure. Plaintiff relied upon the skill, superior

knowledge, and judgment of Defendant.

122.    Defendant knew or should have known that the minimal warnings

disseminated with its Roundup® products were inadequate, but they failed to

communicate adequate information on the dangers and safe use/exposure and failed to communicate warnings and instructions that were appropriate and adequate to render the products safe for their ordinary, intended and reasonably foreseeable uses, including agricultural and landscaping applications.

123.     The information that Defendant did provide or communicate failed to contain relevant warnings, hazards, and precautions that would have enabled residential gardeners such as Plaintiff's husband to utilize the products safely and with adequate protection. Instead, Defendant disseminated information that was inaccurate, false, and misleading and which failed to communicate accurately or adequately the comparative severity, duration, and extent of the risk of injuries with use of and/or exposure to Roundup® and glyphosate; continued to aggressively promote the efficacy of its products, even after it knew or should have known of the unreasonable risks from use or exposure; and concealed, downplayed, or otherwise suppressed, through aggressive marketing and promotion, any information or research about the risks and dangers of exposure to Roundup® and glyphosate.

124.     To this day, Defendant has failed to adequately and accurately warn of the true risks of Plaintiff and Plaintiff's husband's injuries associated with the use of and exposure to Roundup® and its active ingredient glyphosate, a probable carcinogen.

125.    As a result of their inadequate warnings, Defendant's Roundup® products were defective and unreasonably dangerous when they left the possession and/or control of Defendant, were distributed by Defendant, and used by Plaintiff and her husband.

126.    Defendant is liable to Plaintiff for injuries caused by its negligent or willful failure as described above, to provide adequate warnings or other clinically relevant information and data regarding the appropriate use of its products and the risks associated with the use of or exposure to Roundup® and glyphosate.

127.    The defects in Defendant's Roundup® products were substantial and contributing factors in causing Plaintiffs' injuries, and, but for Defendant's misconduct and omissions, Plaintiffs would not have sustained their injuries.

128.    Had Defendant provided adequate warnings and instructions and properly disclosed and disseminated the risks associated with its Roundup® products, Plaintiff's husband could have avoided the risk of developing injuries as alleged herein and the company who employed Plaintiffs could have obtained alternative herbicides.

129.    As a direct and proximate result of Defendant placing its defective Roundup® products into the stream of commerce, Plaintiff has suffered and continues to suffer grave injuries, and has endured psychological and emotional distress, was deprived of love, companionship, comfort, support, affection, society,

solace, and moral support of the Decedent, and suffered economic hardship, including considerable financial expenses for medical care and treatment of her husband.

130.     Plaintiff respectfully requests that this Court enter judgment in Plaintiff's favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all such other and further relief as this Court deems just and proper. Plaintiff also demands a jury trial on all issues contained herein.

## CLAIM FOUR

### NEGLIGENCE

131.     Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

132.     Defendant, directly or indirectly, caused Roundup® products to be sold, distributed, packaged, labeled, marketed, promoted, and/or used by Plaintiff.

133.     At all times relevant to this litigation, Defendant had a duty to exercise reasonable care in the design, research, manufacture, marketing, advertisement, supply, promotion, packaging, sale, and distribution of its Roundup® products, including the duty to take all reasonable steps necessary to manufacture, promote, and/or sell a product that was not unreasonably dangerous to consumers and users of the product.

-45-

134.     At all times relevant to this litigation, Defendant had a duty to exercise reasonable care in the marketing, advertisement, and sale of the Roundup® products. Defendant's duty of care owed to consumers and the general public included providing accurate, true, and correct information concerning the risks of using Roundup® and appropriate, complete, and accurate warnings concerning the potential adverse effects of exposure to Roundup®, and, in particular, its active ingredient glyphosate.

135.     At all times relevant to this litigation, Defendant knew or, in the exercise of reasonable care, should have known of the hazards and dangers of Roundup® and specifically, the carcinogenic properties of the chemical glyphosate.

136.     Accordingly, at all times relevant to this litigation, Defendant knew or, in the exercise of reasonable care, should have known that use of or exposure to its Roundup® products could cause or be associated with Plaintiff's injuries and thus created a dangerous and unreasonable risk of injury to the users of these products, including Plaintiff and her husband.

137.     Defendant also knew or, in the exercise of reasonable care, should have known that users and consumers of Roundup® were unaware of the risks and the magnitude of the risks associated with use of and/or exposure to Roundup® and glyphosate-containing products.

138.    As such, Defendant breached its duty of reasonable care and failed to exercise ordinary care in the design, research, development, manufacture, testing, marketing, supply, promotion, advertisement, packaging, sale, and distribution of its Roundup® products, in that Defendant manufactured and produced defective herbicides containing the chemical glyphosate, knew or had reason to know of the defects inherent in its products, knew or had reason to know that a user's or consumer's exposure to the products created a significant risk of harm and unreasonably dangerous side effects, and failed to prevent or adequately warn of these risks and injuries.

139.    Despite its ability and means to investigate, study, and test its products and to provide adequate warnings, Defendant has failed to do so. Indeed, Defendant has wrongfully concealed information and has further made false and/or misleading statements concerning the safety and/or exposure to Roundup® and glyphosate.

140.    Defendant's negligence included:

   a.  Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing its Roundup® products without thorough and adequate pre- and post-market testing;

   b.  Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing Roundup® while negligently and/or intentionally concealing and failing to disclose the

-47-

results of trials, tests, and studies of exposure to glyphosate, and, consequently, the risk of serious harm associated with human use of and exposure to Roundup®;

c.  Failing to undertake sufficient studies and conduct necessary tests to determine whether or not Roundup® products and glyphosate-containing products were safe for their intended use in agriculture and horticulture;

d.  Failing to use reasonable and prudent care in the design, research, manufacture, and development of Roundup® products so as to avoid the risk of serious harm associated with the prevalent use of Roundup®/glyphosate as an herbicide;

e.  Failing to design and manufacture Roundup® products so as to ensure they were at least as safe and effective as other herbicides on the market;

f.  Failing to provide adequate instructions, guidelines, and safety precautions to those persons who Defendant could reasonably foresee would use and be exposed to its Roundup® products;

g.  Failing to disclose to Plaintiff and her husband, users/consumers, and the general public that use of and exposure to Roundup® presented severe risks of cancer and other grave illnesses;

h. Failing to warn Plaintiff and her husband, consumers, and the general public that the product's risk of harm was unreasonable and that there were safer and effective alternative herbicides available to Plaintiff, her husband, and other consumers;

i. Systematically suppressing or downplaying contrary evidence about the risks, incidence, and prevalence of the side effects of Roundup® and glyphosate-containing products;

j. Representing that its Roundup® products were safe for their intended use when, in fact, Defendant knew or should have known that the products were not safe for their intended purpose;

k. Declining to make or propose any changes to Roundup® products' promotional materials that would alert the consumers and the general public of the risks of Roundup® and glyphosate;

l. Advertising, marketing, and recommending the use of the Roundup® products, while concealing and failing to disclose or warn of the dangers known by Defendant to be associated with or caused by the use of or exposure to Roundup® and glyphosate;

m. Continuing to disseminate information to its consumers, which indicate or imply that Defendant's Roundup® products are not unsafe for use in the agricultural and horticultural industries; and

n.  Continuing the manufacture and sale of its products with the

knowledge that the products were unreasonably unsafe and dangerous.

141.    Defendant knew and/or should have known that it was foreseeable that consumers such as Plaintiff's husband (and by virtue thereof, Plaintiff) would suffer injuries as a result of Defendant's failure to exercise ordinary care in the manufacturing, marketing, labeling, distribution, and sale of Roundup®.

142.    Plaintiff and her husband did not know the nature and extent of the injuries that could result from the intended use of and/or exposure to Roundup® or its active ingredient glyphosate.

143.    Defendant's negligence was the proximate cause of the injuries, harm, and economic losses that Plaintiffs suffered, and will continue to suffer, as described herein.

144.    Defendant's conduct, as described above, was reckless. Defendant regularly risks the lives of consumers and users of their products, including Plaintiff, with full knowledge of the dangers of its products. Defendant has made conscious decisions not to redesign, re-label, warn, or inform the unsuspecting public, including Plaintiff and her husband. Defendant's reckless conduct therefore warrants an award of punitive damages.

145.    As a proximate result of Defendant's wrongful acts and omissions in placing its defective Roundup® products into the stream of commerce without

adequate warnings of the hazardous and carcinogenic nature of glyphosate, Plaintiff has suffered and continues to suffer grave injuries, and has endured psychological and emotional distress, was deprived of love, companionship, comfort, support, affection, society, solace, and moral support of the Decedent, and suffered economic hardship, including considerable financial expenses for medical care and treatment of her husband.

146.    Plaintiff respectfully requests that this Court enter judgment in Plaintiff's favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all such other and further relief as this Court deems just and proper. Plaintiff also demands a jury trial on all issues contained herein.

## CLAIM FIVE

## BREACH OF IMPLIED WARRANTIES

147.    Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

148.    At all times relevant to this litigation, Defendant engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting its Roundup® products, which are defective and unreasonably dangerous to consumers, including Plaintiff and her husband, thereby

placing Roundup® products into the stream of commerce. These actions were under the ultimate control and supervision of Defendant.

149.    Before the time that Plaintiff's husband was exposed to the use of the aforementioned Roundup® products, Defendant impliedly warranted to its consumers—including Plaintiff and her husband—that its Roundup® products were of merchantable quality and safe and fit for the use for which they were; specifically, as horticultural herbicides.

150.    Defendant, however, failed to disclose that Roundup® has dangerous propensities when used as intended and that the use of and/or exposure to Roundup® and glyphosate containing products carries an increased risk of developing severe injuries, including Plaintiff's husband's injuries.

151.    Plaintiff and her husband reasonably relied upon the skill, superior knowledge and judgment of Defendant and upon its implied warranties that the Roundup® products were of merchantable quality and fit for their intended purpose or use.

152.    Upon information and belief, Plaintiff and her husband were at all relevant times in privity with Defendant.

153.    Plaintiff and her husband were the intended third-party beneficiaries of implied warranties made by Defendant to the purchasers of its horticultural herbicides, and as such Plaintiff is entitled to assert this claim.

154.    The Roundup® products were expected to reach and did in fact reach consumers and users, including Plaintiff and her husband, without substantial change in the condition in which they were manufactured and sold by Defendant.

155.    At all times relevant to this litigation, Defendant was aware that consumers and users of its products, including Plaintiff and her husband, would use Roundup® products as marketed by Defendant, which is to say that Plaintiff and her husband were foreseeable users of Roundup®.

156.    Defendant intended that its Roundup® products be used in the manner in which Plaintiff and her husband in fact used them and Defendant impliedly warranted each product to be of merchantable quality, safe, and fit for this use, despite the fact that Roundup® was not adequately tested or researched.

157.    In reliance upon Defendant's implied warranty, Plaintiff and her husband used Roundup® as instructed and labeled and in the foreseeable manner intended, recommended, promoted and marketed by Defendant.

158.    Plaintiff could not have reasonably discovered or known of the risks of serious injury associated with Roundup® or glyphosate.

159.    Defendant breached its implied warranty to Plaintiff and her husband in that its Roundup® products were not of merchantable quality, safe, or fit for their intended use, or adequately tested. Roundup® has dangerous propensities when

-53-

used as intended and can cause serious injuries, including those injuries complained of herein.

160.     The harm caused by Defendant's Roundup® products far outweighed their benefit, rendering the products more dangerous than an ordinary consumer or user would expect and more dangerous than alternative products.

161.     As a direct and proximate result of Defendant's wrongful acts and omissions Plaintiff has suffered severe and permanent physical and emotional injuries. Plaintiff has suffered and continues to suffer grave injuries, and has endured psychological and emotional distress, was deprived of love, companionship, comfort, support, affection, society, solace, and moral support of the Decedent, and suffered economic hardship, including considerable financial expenses for medical care and treatment of her husband.

162.     Plaintiff respectfully requests that this Court enter judgment in Plaintiff's favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees, and all such other and further relief as this Court deems just and proper. Plaintiff also demands a jury trial on all issues contained herein.

///

///

///

## CLAIM SIX

### BREACH OF EXPRESS WARRANTIES

163.    Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

164.    The law imposes a duty on Monsanto to be responsible in the event the product sold, namely Roundup®, is fit for the use and purposes intended.

165.    Defendant breached its contractually assumed implied warranty by supplying a product that caused Mr. Britt non-Hodgkin lymphoma and related injuries, including death.

166.    Any warranty disclaimer or limitation of liability clause offered by Defendant for a product as dangerous as Roundup® would be unconscionable and unenforceable by law.

## CLAIM SEVEN

### LOSS OF CONSORTIUM

167.    Plaintiffs incorporate by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

168.    Plaintiff and her husband were married at the time of Mr. Britt's injuries, and Mrs. Britt was entitled to comfort, care, affection, companionship, services, society, advice, guidance, counsel, and consortium.

169.     As a direct and proximate result of one or more of those wrongful acts or omissions of the Defendants described above, Mrs. Britt has been and will be deprived of Mr. Britt's comfort, care, affection, companionship, services, society, advice, guidance, counsel and consortium.

170.     Plaintiffs demand judgment against Defendants for compensatory, treble, and punitive damages, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## CLAIM EIGHT

## PUNITIVE DAMAGES

171.     Plaintiffs repeat and reiterate the allegations previously set forth herein.

172.     At all times material hereto, the Defendants knew or should have known that the subject was inherently dangerous with respect to its health risks

173.     At all times material hereto, the Defendants attempted to misrepresent and did misrepresent facts concerning the safety of the subject product.

174.     Defendants' misrepresentations included knowingly withholding material information from the public, including the Plaintiff and her husband herein, concerning the safety of the subject product.

175.    At all times material hereto, the Defendants knew and recklessly disregarded the fact that human exposure to Roundup® can and does cause health hazard, including non-Hodgkin lymphoma.

176.    Notwithstanding the foregoing, the Defendants continued to aggressively market and apply the subject product without disclosing the aforesaid risks.

177.    Defendants knew of the subject product's defective and unreasonably dangerous nature, as set forth herein, but continued to design, develop, manufacture, market, distribute, sell, and apply it so as to maximize sales and profits at the expense of the health and safety of the public, including the Plaintiff and her husband herein, in conscious and/or negligent disregard of the foreseeable harm caused by Roundup®.

178.    The Defendants intentionally concealed and/or recklessly failed to disclose to the public, including the Plaintiff and her husband herein, the potentially life-threatening hazards of Roundup® in order to ensure continued and increased sales.

179.    The Defendants' intentional and/or reckless failure to disclose information deprived the Plaintiff and her husband of necessary information to enable Plaintiff and her husband to weigh the true risks of using or being exposed to the subject product against its benefits.

-57-

180.     As a direct and proximate result of the Defendants' conscious and deliberate disregard for the rights and safety of consumers such as the Plaintiff and her husband, Plaintiffs suffered severe and permanent physical injuries. The Plaintiff – as a result of her husband's suffering, medical bills and death - has incurred significant expenses for medical care and treatment, funeral bills, and will continue to incur such expenses in the future. Plaintiff has also suffered and continues to suffer grave injuries, and has endured psychological and emotional distress, was deprived of love, companionship, comfort, support, affection, society, solace, and moral support of the Decedent, and suffered economic hardship, including considerable financial expenses for medical care and treatment of her husband. The Plaintiffs' injuries and damages are permanent and will continue into the future.

181.     The aforesaid conduct of the Defendants was committed with knowing, conscious, and deliberate disregard for the rights and safety of consumers, including the Plaintiffs herein, thereby entitling the Plaintiffs to punitive damages in an amount appropriate to punish the Defendants and deter them from similar conduct in the future.

## LIMITATION ON ALLEGATIONS

182.     The allegations in this pleading are made pursuant to California law. To the extent California law imposes a duty or obligation on the Defendant that

-58-

exceeds those required by federal law, Plaintiffs do not assert such claims. All claims asserted herein run parallel to federal law, i.e., the Defendant's violations of California law were also violations of federal law. Had Defendant honestly complied with California law, it would also have complied with federal law.

183.     Additionally, Plaintiffs' claims do not seek to enforce federal law. These claims are brought under California law, notwithstanding the fact that such claims run parallel to federal law.

184.     As alleged in this pleading, the Defendant violated U.S.C. § 136j and 40 C.F.R. § 156.10(a)(5) by distributing Roundup®, which was misbranded pursuant to 7 U.S.C. § 136(g). Federal law specifically prohibits the distribution of a misbranded herbicide.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request that the Court enter judgment in their favor and against Monsanto, awarding as follows:

A. compensatory damages in an amount to be proven at trial;

B. punitive damages;

C. costs including reasonable attorneys' fees, court costs, and other litigation expenses; and

D. any other relief the Court may deem just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiff hereby demands trial by jury.


DATED: May 8, 2020                    **HOGUE & BELONG**

                                        s/ Tyler Belong
                                        JEFFREY L. HOGUE, ESQ.
                                        TYLER J. BELONG, ESQ.
                                        MARISOL JIMENEZ GAYTAN, ESQ.
                                        Attorneys for Plaintiff