Query    Reports    Utilities    Help    Log Out

# U.S. District Court
## Eastern District of Missouri (St. Louis)
## CIVIL DOCKET FOR CASE #: 4:20-cv-00517-PLC

Eichenberger et al v. Monsanto Company
Assigned to: Magistrate Judge Patricia L. Cohen
Cause: 28:1332 Diversity-Product Liability

Date Filed: 04/13/2020
Jury Demand: Plaintiff
Nature of Suit: 365 Personal Inj. Prod. Liability
Jurisdiction: Diversity

**Plaintiff**

**Valerie Eichenberger**                          represented by   **Matthew Crimmins**
CRIMMINS LAW FIRM LLC
214 S. Spring St.
Independence, MO 64055
816-974-7220
Fax: 855-974-7020
Email: m.crimmins@crimminslawfirm.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Stephen Nemec**
JAMES VERNON PA
1626 Lincoln Way
Coeur d'Alene, ID 83814
208-667-0683
Fax: 208-664-1684
Email: snemec@jvwlaw.net
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**William Eichenberger**                          represented by   **Matthew Crimmins**
*individually and as wife and husband*            (See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Stephen Nemec**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Monsanto Company**

| Date Filed | # | Docket Text |
|---|---|---|
| 04/13/2020 | 1 | COMPLAINT against defendant Monsanto Company with receipt number AMOEDC-7862868, in the amount of $400 Jury Demand,, filed by Valerie Eichenberger, William Eichenberger. (Attachments: # 1 Civil Cover Sheet, # 2 Original Filing Form, # 3 Summons)(Crimmins, Matthew) (Entered: 04/13/2020) |
| 04/13/2020 | 2 | NOTICE OF PROCESS SERVER by Plaintiffs Valerie Eichenberger, William Eichenberger Process Server: HPS Process Service (Crimmins, Matthew) (Entered: 04/13/2020) |
| 04/13/2020 | | Case Opening Notification: 1 Summons(es) issued. The summons was emailed to attorney Matthew Crimmins. All parties must file the Notice Regarding Magistrate Judge Jurisdiction Form consenting to or opting out of the Magistrate Judge jurisdiction. Click here for the instructions. and all non-governmental organizational parties (corporations, limited liability companies, limited liability partnerships) must file Disclosure of Organizational Interests Certificate (moed-0001.pdf). Judge Assigned: U.S. Magistrate Judge Patricia L. Cohen. (BAK) (Entered: 04/13/2020) |
| 04/13/2020 | 3 | Pursuant to Local Rule 2.08, the assigned/referred magistrate judge is designated and authorized by the court to exercise full authority in this assigned/referred action or matter under 28 U.S.C. Sec. 636 and 18 U.S.C Sec. 3401, including any case budgeting matters. (CSAW) (Entered: 04/13/2020) |
| 04/14/2020 | 4 | Electronic Notice re: Disclosure of Organizational Interests Certificate to Defendant Monsanto Company. Pursuant to Local Rule 2.09, every non-governmental organizational party must file a Disclosure of Organizational Interests Certificate within ten (10) days of the party's first pleading or entry of appearance. Please complete and file the certificate as soon as possible (moed-0001.pdf). Disclosure of Organizational Interests Certificate due by 4/24/2020. (CLO) (Entered: 04/14/2020) |
| 04/20/2020 | 5 | MOTION for Leave to Appear Pro Hac Vice Stephen Nemec. The Certificate of Good Standing was attached.(Filing fee $100 receipt number AMOEDC-7876455) by Plaintiffs Valerie Eichenberger, William Eichenberger. (Attachments: # 1 Certificate of Good Standing)(Nemec, Stephen) (Entered: 04/20/2020) |
| 04/21/2020 | 6 | Docket Text ORDER: GRANTING 5 MOTION for Leave to Appear Pro Hac Vice Stephen Nemec by Plaintiffs Valerie Eichenberger, William Eichenberger.. Signed by Magistrate Judge Patricia L. Cohen on 4/21/20. (KKS) (Entered: 04/21/2020) |

| PACER Service Center | | |
|---|---|---|
| **Transaction Receipt** | | |
| 06/06/2020 15:41:51 | | |
| **PACER Login:** | hllp1982 | **Client Code:** | 1417.0049 |
| **Description:** | Docket Report | **Search Criteria:** | 4:20-cv-00517-PLC |
| **Billable Pages:** | 2 | **Cost:** | 0.20 |

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| VALERIE EICHENBERGER, and WILLIAM EICHENBERGER, individually and as wife and husband, | |
| *Plaintiffs,* | CASE NO. 4:20-cv-517 |
| vs. | |
| MONSANTO COMPANY, | JURY TRIAL DEMANDED |
| *Defendant.* | |

## COMPLAINT

Plaintiffs, by and through the undersigned attorneys, bring this action against the above-named Defendant upon information and belief, at all times hereinafter mentioned, and allege as follows:

### NATURE OF THE CASE

1.     This is an action for damages suffered by Plaintiffs as a direct and proximate result of Defendant's negligent and wrongful conduct in connection with the design, development, manufacture, testing, packaging, promoting, marketing, advertising, distribution, labeling, and/or sale of the herbicide Roundup®, containing the active ingredient glyphosate.

2.     Plaintiffs maintain that Roundup® and/or glyphosate is defective, dangerous to human health, unfit and unsuitable to be marketed and sold in commerce and lacked proper warnings and directions as to the dangers associated with its use.

3.     Plaintiffs' respective injuries, like those striking thousands of similarly situated victims across the country, were avoidable.

COMPLAINT AND JURY DEMAND - 1

## JURISDICTION AND VENUE

4.      This Court has jurisdiction over Defendant and this action pursuant to 28 U.S.C. §
1332 because there is complete diversity of citizenship between Plaintiffs and Defendant.
Defendant is either incorporated and/or has its principal place of business outside of the state in
which the Plaintiffs reside.

5.      The amount in controversy between Plaintiffs and Defendant exceeds $75,000,
exclusive of interest and cost.

6.      The Court also has supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

7.      Venue is proper within this district pursuant to 28 U.S.C. § 1391 in that Defendant
conducts business here and is subject to personal jurisdiction in this district. Furthermore,
Defendant sells, markets, and/or distributes Roundup® within the Eastern District of Missouri.
Also, a substantial part of the acts and/or omissions giving rise to these claims occurred within this
district.

## PARTIES

8.      Plaintiff Valerie Eichenberger is a resident and citizen of Cook County, Illinois.
Plaintiff brings this action for personal injuries sustained by exposure to Roundup ("Roundup®")
containing the active ingredient glyphosate and the surfactant polyethoxylated tallow amine
("POEA"). As a direct and proximate result of being exposed to Roundup®, Plaintiff developed
Non-Hodgkin's small B-Cell Lymphoma with chronic lymphocytic leukemia (CLL), idiopathic
thrombocytopenic purpura (ITP), and hypogammaglobulinemia in 2006. Plaintiff William
Eichenberger has a claim for loss of consortium related to the injuries of his wife, Valerie
Eichenberger.

9.     "Roundup" refers to all formulations of Defendant's Roundup® products, including, but not limited to, Roundup® Concentrate Poison Ivy and Tough Brush Killer 1, Roundup® Custom Herbicide, Roundup® D-Pak herbicide, Roundup® Dry Concentrate, Roundup® Export Herbicide, Roundup® Fence & Hard Edger 1, Roundup® Garden Foam Weed & Grass Killer, Roundup® Grass and Weed Killer, Roundup® Herbicide, Roundup® Original 2k herbicide, Roundup® Original II Herbicide, Roundup® Pro Concentrate, Roundup® Prodry Herbicide, Roundup® Promax, Roundup® Quik Stik Grass and Weed Killer, Roundup® Quikpro Herbicide, Roundup® Rainfast Concentrate Weed & Grass Killer, Roundup® Rainfast Super Concentrate Weed & Grass Killer, Roundup® Ready-to-Use Extended Control Weed & Grass Killer 1 Plus Weed Preventer, Roundup® Readyto-Use Weed & Grass Killer, Roundup® Ready-to-Use Weed and Grass Killer 2, Roundup® Ultra Dry, Roundup® Ultra Herbicide, Roundup® Ultramax, Roundup® VM Herbicide, Roundup® Weed & Grass Killer Concentrate, Roundup® Weed & Grass Killer Concentrate Plus, Roundup® Weed & Grass killer Ready-to-Use Plus, Roundup® Weed & Grass Killer Super Concentrate, Roundup® Weed & Grass Killer Ready-to-Use, Roundup® WSD Water Soluble Dry Herbicide Deploy Dry Herbicide, or any other formulation of containing the active ingredient glyphosate.

10.     Defendant MONSANTO COMPANY is a Delaware corporation, Missouri Secretary of State Charter No. F00488018, with a principal place of business in St. Louis, Missouri.

11.     Defendant MONSANTO COMPANY is collectively referred to as "Monsanto" or "Defendant."

12.     Defendant advertises and sells goods, specifically Roundup®, in the State of Missouri.

13.     Defendant transacted and conducted business within the State of Missouri that relates to the allegations in this Complaint.

14.     Defendant derived substantial revenue from goods and products used in the State of Missouri.

15.     Defendant expected or should have expected its acts to have consequences within the State of Missouri, and derived substantial revenue from interstate commerce.

16.     Defendant engaged in the business of designing, developing, manufacturing, testing, packaging, marketing, distributing, labeling, and/or selling Roundup®.

17.     Defendant is authorized to do business in Missouri and derive substantial income from doing business in this state.

18.     Upon information and belief, Defendant purposefully availed itself of the privilege of conducting activities with the State of Missouri, thus invoking the benefits and protections of its laws.

19.     Upon information and belief, Defendant did design, sell, advertise, manufacture and/or distribute Roundup®, with full knowledge of its dangerous and defective nature.

## FACTUAL ALLEGATIONS

20.     At all relevant times, Defendant was in the business of, and did, design, research, manufacture, test, advertise, promote, market, sell, distribute, and/or has acquired and is responsible for the commercial herbicide Roundup®.

21.     Monsanto is a multinational agricultural biotechnology corporation based in St. Louis, Missouri. It is the world's leading producer of glyphosate.

22.     Defendant discovered the herbicidal properties of glyphosate during the 1970's and subsequently began to design, research, manufacture, sell and distribute glyphosate based "Roundup" as a broad-spectrum herbicide.

23.     Glyphosate is the active ingredient in Roundup®.

24.     Glyphosate is a broad-spectrum herbicide used to kill weeds and grasses known to compete with commercial crops grown around the globe.

25.     Glyphosate is a "non-selective" herbicide, meaning it kills indiscriminately based only on whether a given organism produces a specific enzyme, 5-enolpyruvylshikimic acid-3-phosphate synthase, known as EPSP synthase.

26.     Glyphosate inhibits the enzyme 5-enolpyruvylshikimic acid-3-phosphate synthase that interferes with the shikimic pathway in plants, resulting in the accumulation of shikimic acid in plant tissue and ultimately plant death.

27.     Sprayed as a liquid, plants absorb glyphosate directly through their leaves, stems, and roots, and detectable quantities accumulate in the plant tissues.

28.     Each year, approximately 250 million pounds of glyphosate are sprayed on crops, commercial nurseries, suburban lawns, parks, and golf courses. This increase in use has been driven largely by the proliferation of genetically engineered crops, crops specifically tailored to resist the activity of glyphosate.

29.     Defendant is intimately involved in the development, design, manufacture, marketing, sale, and/or distribution of genetically modified ("GMO") crops, many of which are marketed as being resistant to Roundup i.e., "Roundup Ready®." As of 2009, Defendant was the world's leading producer of seeds designed to be Roundup Ready®. In 2010, an estimated 70% of corn and cotton, and 90% of soybean fields in the United States contained Roundup Ready® seeds.

30.     The original Roundup®, containing the active ingredient glyphosate, was introduced in 1974. Today, glyphosate products are among the world's most widely used herbicides.[1]

31.     For nearly 40 years, consumers, farmers, and the public have used Roundup®, unaware of its carcinogenic properties.

### A.     Registration of Herbicides Under Federal Law

32.     The manufacture, formulation and distribution of herbicides, such as Roundup®, are regulated under the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA"), 7. U.S.C. § 136 *et seq.* FIFRA requires that all pesticides be registered with the Environmental Protection Agency ("EPA") prior to their distribution, sale, or use, except as described by FIFRA 7 U.S.C. 136a(a).

33.     The EPA requires as part of the registration process, among other requirements, a variety of tests to evaluate the potential for exposure to pesticides, toxicity to people and other potential non-target organisms, and other adverse effects on the environment. Registration by the EPA, however, is not an assurance or finding of safety. The determination the EPA makes in registering or re-registering a product is not that the product is "safe," but rather that use of the product in accordance with its label directions "will not generally cause unreasonable adverse effects on the environment." 7 U.S.C. § 136a(c)(5)(D).

34.     FIFRA defines "unreasonable adverse effects on the environment" to mean "any unreasonable risk to man or the environment, taking into account the economic, social, and environmental costs and benefits of the use of any pesticide." 7 U.S.C. § 136(bb). FIFRA thus

---

[1] *Backgrounder*, History of Monsanto's Glyphosate Herbicides, June 2005.

requires the EPA to make a risk/benefit analysis in determining whether a registration should be granted or allowed to continue to be sold in commerce.

35.     The EPA and the State of Missouri registered Roundup® for distribution, sale, and manufacture in the United States and the State of Missouri.

36.     FIFRA generally requires that the registrant, Monsanto, conduct health and safety testing of pesticide products. The government is not required, nor is it able, to perform the product tests that are required of the manufacturer.

37.     The evaluation of each pesticide product distributed, sold, or manufactured is completed at the time the product is initially registered. The data necessary for registration of a pesticide has changed over time. The EPA is now in the process of re-evaluating all pesticide products through a Congressionally mandated process called "re-registration." 7 U.S.C. § 136a-1. In order to reevaluate these pesticides, the EPA demands the completion of additional tests and the submission of data for the EPA's review and evaluation.

## B.     IARC Classification of Glyphosate

38.     The International Agency for Research on Cancer ("IARC") is the specialized intergovernmental cancer agency the World Health Organization ("WHO") of the United Nations tasked with conducting and coordinating research into the causes of cancer.

39.     An IARC Advisory Group to Recommend Priorities for IARC Monographs during 2015–2019 met in April 2014. Though nominations for the review were solicited, a substance must meet two criteria to be eligible for review by the IARC Monographs: there must already be some evidence of carcinogenicity of the substance, and there must be evidence that humans are exposed to the substance.

40.     IARC set glyphosate for review in 2015-2016. IARC uses five criteria for determining priority in reviewing chemicals. The substance must have a potential for direct impact on public health; scientific literature to support suspicion of carcinogenicity; evidence of significant human exposure; high public interest and/or potential to bring clarity to a controversial area and/or reduce public anxiety or concern; related agents similar to one given high priority by the above considerations. Data reviewed is sourced preferably from publicly accessible, peer-reviewed data.

41.     On March 24, 2015, after its cumulative review of human, animal, and DNA studies for more than one (1) year, many of which have been in Defendant's possession since as early as 1985, the IARC's working group published its conclusion that the glyphosate contained in Defendant's Roundup® herbicide, is a Class 2A "probable carcinogen" as demonstrated by the mechanistic evidence of carcinogenicity in humans and sufficient evidence of carcinogenicity in animals.

42.     The IARC's full Monograph was published on July 29, 2015 and established glyphosate as a class 2A probable carcinogen to humans. According to the authors glyphosate demonstrated sufficient mechanistic evidence (genotoxicity and oxidative stress) to warrant a 2A classification based on evidence of carcinogenicity in humans and animals.

43.     The IARC Working Group found an increased risk between exposure to glyphosate and Non-Hodgkin's Lymphoma ("NHL") and several subtypes of NHL, and the increased risk continued after adjustment for other pesticides.

44.     The IARC also found that glyphosate caused DNA and chromosomal damage in human cells.

C.   Evidence of Carcinogenicity and Genotoxicity in Roundup

45.     Despite the new classification by the IARC, Defendant has had ample evidence of glyphosate and Roundup's carcinogenic[2] and genotoxic[3] properties since as early as the 1980s.

46.     On March 4, 1985, a group of the Environmental Protection Agency's ("EPA") Toxicology Branch published a memorandum classifying glyphosate as a "Category C oncogen."[4] Category C oncogenes are possible human carcinogens with limited evidence of carcinogenicity.

47.     In 1986, the EPA issued a Registration Standard for glyphosate (NTIS PB87-103214). The Registration Standard required additional phytotoxicity, environmental fate, toxicology, product chemistry, and residue chemistry studies. All of the data required was submitted and reviewed and/or waived.[5]

48.     In October 1991 the EPA published a Memorandum entitled "Second Peer Review of Glyphosate." The memorandum changed glyphosate's classification to Group E (evidence of non-carcinogenicity for humans). Two peer review committee members did not concur with the conclusions of the committee and one member refused to sign.[6]

49.     Despite the EPA's classification change, both human and animal studies have continued to demonstrate that glyphosate and glyphosate-based foundations such as Roundup were genotoxic and could induce carcinogenesis.

---

[2] Carcinogenicity in a chemical agent is a chemical property which promotes carcinogenesis, the formation of cancerous cells. Chemicals containing this property are referred to as carcinogens.

[3] Genotoxicity is a property of chemical agents that refers to their capacity to damage the DNA within a cell through genetic mutations, which is a process that is believed to substantially increase the likelihood of carcinogenesis and lead to cancer. Chemicals containing this property are referred to as genotoxins.

[4] Consensus Review of Glyphosate, Casewell No. 661A. March 4, 1985. United States Environmental Protection Agency.

[5] https://archive.epa.gov/pesticides/reregistration/web/pdf/0178fact.pdf.

[6] Second Peer Review of Glyphosate, CAS No. 1071-83-6. October 30, 1991. United States Environmental Protection Agency, https://archive.org/details/SecondPeerReviewOfGlyphosateEPAOct301991/page/n1.

COMPLAINT AND JURY DEMAND - 9

50.     In 1997, Chris Clements published "Genotoxicity of select herbicides in Rana catesbeiana tadpoles using the alkaline single-cell gel DNA electrophoresis (comet) assay." The study found that tadpoles exposed to Roundup® showed significant DNA damage when compared with unexposed control animals.[7]

51.     In 2006 César Paz-y-Miño published a study examining DNA damage in human subjects exposed to glyphosate. The study produced evidence of chromosomal damage in blood cells showing significantly greater damage after exposure to glyphosate than before in the same individuals, suggesting that the glyphosate formulation used during aerial spraying had a genotoxic effect on exposed individuals.[8]

52.     In addition to the toxicity of the active molecule, many studies support the hypothesis that glyphosate formulations found in Defendant's Roundup® products are more dangerous and toxic than glyphosate alone.[9] As early as 1991 evidence existed demonstrating that glyphosate formulations were significantly more toxic than glyphosate alone.[10]

53.     In 2002, Julie Marc published a study entitled "Pesticide Roundup Provokes Cell Division Dysfunction at the Level of CDK1/Cyclin B Activation."[11]

54.     The study found that Defendant's Roundup® caused delays in the cell cycles of sea urchins, while the same concentrations of glyphosate alone proved ineffective and did not alter

--------------------------------------

[7] https://www.ncbi.nlm.nih.gov/pubmed/9142171.
[8] http://www.scielo.br/scielo.php?script=sci_arttext&pid=S1415-47572007000300026.
[9] Martinez et al. 2007, https://www.ncbi.nlm.nih.gov/pubmed/17933590; Benachour 2009, https://www.ncbi.nlm.nih.gov/pubmed/19105591;Gasnier et al. 2009, https://www.researchgate.net/publication/26304486_Glyphosate-based_herbicides_are_toxic_and_endocrine_disruptors_in_human_cell_lines; Peixoto 2005, https://www.ncbi.nlm.nih.gov/pubmed/16263381; Marc 2004, https://www.ncbi.nlm.nih.gov/pubmed/15694458.
[10] Martinez et al 1991, https://www.ncbi.nlm.nih.gov/pubmed/1788325.
[11] https://www.ncbi.nlm.nih.gov/pubmed/11896679.

cell cycles. The study results caused the authors to question the safety of Roundup® on human health.[12]

55.     In 2004, Julie Marc published a second study entitled "Glyphosate-based pesticides affect cell cycle regulation." The study demonstrated a molecular link between glyphosate-based products and cell cycle dysregulation.[13]

56.     The study noted that "cell-cycle dysregulation is a hallmark of tumor cells and human cancer. Failure in the cell-cycle checkpoints leads to genomic instability and subsequent development of cancers from the initial affected cell."[14]

57.     In 2005, Francisco Peixoto published a study showing that Roundup's effects on rat liver mitochondria are much more toxic and harmful than the same concentrations of glyphosate alone.[15]

58.     The Peixoto study suggested that the harmful effects of Roundup® on mitochondrial bioenergetics could not be exclusively attributed to glyphosate and could be the result of other chemicals, or alternatively due to the possible synergy between glyphosate and Roundup® formulation products.

59.     In 2009, Nora Benachour and Gilles-Eric Seralini published a study examining the effects of Roundup® and glyphosate on human umbilical, embryonic, and placental cells.[16]

60.     The study suggested that determinations of glyphosate toxicity should take into account the presence of adjuvants, or those chemicals used in the formulation of the complete pesticide. The study confirmed that Roundup® was in all instances more toxic than its active

---

[12] *Id.*
[13] https://www.ncbi.nlm.nih.gov/pubmed/15182708.
[14] *Id.*
[15] https://www.ncbi.nlm.nih.gov/pubmed/16263381.
[16] https://www.ncbi.nlm.nih.gov/pubmed/17486286.

ingredient, glyphosate, suggesting a synergistic effect provoked by the adjuvants present in Roundup®.

61.    The results of these studies were confirmed in recently published peer-reviewed studies and were at all times available and/or known to Defendant.

62.    In spite of this knowledge, Defendant has continued to issue broad and sweeping statements suggesting that Roundup® was, and is, safer than ordinary household items such as table salt, despite a lack of scientific support for the accuracy and validity of these statements and, in fact, voluminous evidence to the contrary.

    D.    **Scientific Fraud Underlying the Safety Determinations of Glyphosate**

63.    After the EPA's 1985 classification of glyphosate as possibly carcinogenic to humans (Group C), Monsanto exerted pressure upon the EPA to change its classification.

64.    This culminated in the EPA's reclassification of glyphosate to Group E, which was based upon evidence of non-carcinogenicity in humans.

65.    In so classifying, the EPA stated that "[i]t should be emphasized, however, that designation of an agent in Group E is based on the available evidence at the time of evaluation and should not be interpreted as a definitive conclusion that the agent will not be a carcinogen under any circumstances." [17]

66.    On two occasions, the EPA found that laboratories hired by Monsanto to test the toxicity of its Roundup® products for registration purposes committed scientific fraud.

67.    In the first instance, Monsanto hired Industrial Bio-Test Laboratories ("IBT") to perform and evaluate pesticide toxicology studies relating to Roundup®. IBT performed

---

[17] Second Peer Review of Glyphosate, CAS No. 1071-83-6. October 30, 1991. United States Environmental Protection Agency, https://archive.org/details/SecondPeerReviewOfGlyphosateEPAOct301991/page/n1.

approximately 30 tests on glyphosate and glyphosate-containing products, including 11 of the 19 chronic toxicology studies needed to register Roundup® with the EPA.

68.     In 1976, the Food and Drug Administration ("FDA") performed an inspection of IBT. The inspection revealed shocking results. Fabrication of data, removal of health effect findings from reports, replacement of dead study animals with healthy ones, and changes in report conclusions to make them look more favorable were repeated occurrences at IBT.[18] The FDA inspection also discovered discrepancies between the raw data and the final report relating to toxicological impacts of pesticides including glyphosate. The EPA subsequently audited IBT and determined that the toxicology studies conducted for Roundup® were invalid.[19] An EPA reviewer stated, after finding "routine falsification of data" at IBT, that it was "hard to believe the scientific integrity of the studies when they said they took specimens of the uterus from male rabbits."

69.     Three top executives of IBT were convicted of fraud in 1983.

70.     In the second incident, the EPA was alerted in 1990 that another laboratory hired by Monsanto to conduct studies of its pesticide, Craven Laboratories ("Craven"), also had irregularities in its testing.[20] After an investigation, the EPA alleged that Craven employed a variety of "tricks" including "falsifying laboratory notebook entries" and "manually manipulating scientific equipment to produce false reports." The falsified studies included Roundup® residue studies on plums, potatoes, grapes and sugarbeets.[21]

71.     In 1994, the laboratory owner and fourteen other employees received punishments ranging from fines to prison terms for their roles in falsifying these pesticide studies. [22]

---

[18] *History of FDA Good Laboratory Practices*, Quality Assurance Journal 2003, 7, 157-161, https://onlinelibrary.wiley.com/doi/pdf/10.1002/qaj.228.
[19] *Backgrounder – Testing Fraud: IBT and Craven Laboratories*, June 2005.
[20] *Id.*
[21] Herbicide Factsheet, Glyphosate (Roundup), Journal of Pesticide Reform/Fall 1998, Vol. 18, No. 3, at 9.
[22] *Backgrounder – Testing Fraud: IBT and Craven Laboratories*, June 2005.

COMPLAINT AND JURY DEMAND - 13

E.    Monsanto's False Representations Regarding the Safety of Roundup

72.    In 1996, the New York Attorney General ("NYAG") filed a lawsuit against Monsanto based on its false and misleading advertising of Roundup® products. Specifically, the lawsuit challenged Monsanto's general representations that its spray-on glyphosate-based herbicides, including Roundup®, were "safer than table salt" and "practically non-toxic" to mammals, birds, and fish. Among the representations the NYAG found deceptive and misleading about the human and environmental safety of Roundup® are the following:

a.  "Remember that environmentally friendly Roundup herbicide is biodegradable. It won't build up in the soil so you can use Roundup with confidence along customers' driveways, sidewalks and fences . . . ."

b.  "And remember that Roundup is biodegradable and won't build up in the soil. That will give you the environmental confidence you need to use Roundup everywhere you've got a weed, brush, edging or trimming problem."

c.  "Roundup biodegrades into naturally occurring elements."

d.  "Remember that versatile Roundup herbicide stays where you put it. That means there's no washing or leaching to harm customers' shrubs or other desirable vegetation."

e.  "This non-residual herbicide will not wash or leach in the soil. It . . . stays where you apply it."

f.  "You can apply Accord with confidence because it will stay where you put it. It bonds tightly to soil particles, preventing leaching. Then, soon after application, soil microorganisms biodegrade Accord into natural products."

g.  "Glyphosate is less toxic to rats than table salt following acute oral ingestion."

h.  "Glyphosate's safety margin is much greater than required. It has over a 1,000-fold safety margin in food and over a 700-fold safety margin for workers who manufacture it or use it."

i.  "You can feel good about using herbicides by Monsanto. They carry a toxicity category rating of 'practically non-toxic' as it pertains to mammals, birds and fish."

j. "Roundup can be used where kids and pets will play and breaks down into natural material." This ad depicts a person with his head in the ground and a pet dog standing in an area which has been treated with Roundup.[23]

73. On November 19, 1996, Monsanto entered into an Assurance of Discontinuance with NYAG, in which Monsanto agreed, among other things, "to cease and desist from publishing or broadcasting any advertisements [in New York] that represent, directly or by implication" that:

a. its glyphosate-containing pesticide products or any component thereof are safe, non-toxic, harmless or free from risk.

b. its glyphosate-containing pesticide products or any component thereof manufactured, formulated, distributed or sold by Monsanto are biodegradable.

c. its glyphosate-containing pesticide products or any component thereof stay where they are applied under all circumstances and will not move through the environment by any means.

d. its glyphosate-containing pesticide products or any component thereof are "good" for the environment or are "known for their environmental characteristics."

e. glyphosate-containing pesticide products or any component thereof are safer or less toxic than common consumer products other than herbicides;

f. its glyphosate-containing products or any component thereof might be classified as "practically non-toxic.

74. Monsanto did not alter its advertising in the same manner in any state other than New York, and on information and belief still has not done so today.

75. In 2009, France's highest court ruled that Monsanto had not told the truth about the safety of Roundup®. The French court affirmed an earlier judgment that Monsanto had falsely advertised its herbicide Roundup® as "biodegradable" and that it "left the soil clean."[24]

---

[23] Attorney General of the State of New York, In the Matter of Monsanto Company, Assurance of Discontinuance Pursuant to Executive Law § 63(15) (Nov. 1996).

[24] *Monsanto Guilty in 'False Ad' Row*, BBC, Oct. 15, 2009, *available at* http://news.bbc.co.uk/2/hi/europe/8308903.stm.

COMPLAINT AND JURY DEMAND - 15

F.    **Monsanto's Continuing Disregard for the Safety of Plaintiff and the Public**

76.    Despite the repeated concerns expressed by the scientific community and governmental entities, Monsanto continued to represent to the public that "[r]egulatory authorities and independent experts around the world have reviewed numerous long-term/carcinogenicity and genotoxicity studies and agree that there is no evidence that glyphosate, the active ingredient in Roundup® brand herbicides and other glyphosate-based herbicides, causes cancer, even at very high doses, and that it is not genotoxic."[25]

77.    Ironically, the primary source for this statement is a 1986 report by the WHO, the same organization that now considers glyphosate to be a probable carcinogen.

78.    Glyphosate, and Defendant's Roundup® products in particular, have long been associated with serious side effects and many regulatory agencies around the globe have banned or are currently banning the use of glyphosate herbicide products.

79.    Despite Defendant's knowledge that Roundup® was associated with an elevated risk of developing cancer, Defendant's promotional campaigns focused on Roundup's purported "safety profile" with the intent that consumers believe that Roundup was safe for use.

G.    **Plaintiff's Exposure to Roundup**

80.    Despite Defendant's knowledge that Roundup® was associated with an elevated risk of developing cancer, Defendant's promotional campaigns focused on Roundup's purported "safety profile."

81.    Upon information and belief, these statements and representations about the safety of Roundup were made with the intent of inducing Plaintiff, the agricultural community, and the

---

[25] *Backgrounder - Glyphosate: No Evidence of Carcinogenicity*. Updated November 2014.

COMPLAINT AND JURY DEMAND - 16

public at large to purchase, and increase the use of, Defendant's Roundup® for Defendant's pecuniary gain.

82.     Defendant's statements proclaiming the safety of Roundup® and disregarding its dangers misled Plaintiffs.

83.     Defendant's statements resulted in (1) Plaintiff using and being exposed to glyphosate instead of using another acceptable and safe method of controlling unwanted weeds and pests; and (2) scientists and physicians failing to warn and instruct consumers about the risk of cancer, including NHL, and other injuries associated with Roundup®.

84.     Defendant failed to seek modification of the labeling of Roundup® to include relevant information regarding the risks and dangers associated with Roundup® exposure.

85.     Unaware of these risks, Plaintiff Valerie Eichenberger used Roundup® to control weeds on the grounds of her home and property beginning in approximately 1992 and continued to use it until about 2018.

86.     For years, Plaintiff sprayed Roundup® on a regular basis. Plaintiff followed all safety and precautionary warnings during the course of use.

87.     Plaintiff was subsequently diagnosed with Non-Hodgkin's small B-Cell Lymphoma in about June of 2006.

88.     By reason of the foregoing, Plaintiff is severely and permanently injured. As a result of Defendant's actions and/or omissions, Plaintiffs have incurred and will continue to incur significant medical expenses, pain and suffering, emotional and mental anguish, and other associated economic and noneconomic damages.

## EQUITABLE TOLLING OF APPLICABLE STATUTE OF LIMITATIONS

89.     Plaintiffs incorporate by reference all previous paragraphs of this Complaint as if fully set forth herein and further allege as follows:

90.     The running of any statute of limitations has been tolled by reason of Defendant's fraudulent concealment. Defendant, through its affirmative misrepresentations and omissions, actively concealed from Plaintiff the true risks associated with Roundup® and glyphosate.

91.     At all relevant times, Defendant has maintained that Roundup® is safe, non-toxic, and non-carcinogenic.

92.     Indeed, even as of July 2016, Defendant continues to represent to the public that "Regulatory authorities and independent experts around the world have reviewed numerous long-term/carcinogenicity and genotoxicity studies and agree that there is no evidence that glyphosate, the active ingredient in Roundup® brand herbicides and other glyphosate-based herbicides, causes cancer, even at very high doses, and that it is not genotoxic."[26]

93.     As a result of Defendant's actions, Plaintiff was unaware, and could not reasonably know or have learned through reasonable diligence that Roundup® and/or glyphosate contact, exposed Plaintiff to the risks alleged herein and that those risks were the direct and proximate result of Defendant's acts and omissions.

94.     Furthermore, Defendant is estopped from relying on any statute of limitations because of its fraudulent concealment of the true character, quality and nature of Roundup®.

95.     Defendant was under a duty to disclose the true character, quality, and nature of Roundup® because this was non-public information over which Defendant had and continues to have exclusive control, and because Defendant knew that this information was not available to

---

[26] *Backgrounder - Glyphosate: No Evidence of Carcinogenicity.* Updated November 2014.

COMPLAINT AND JURY DEMAND - 18

Plaintiff or to distributors of Roundup®. In addition, Defendant is estopped from relying on any statute of limitations because of its intentional concealment of these facts.

96.     Plaintiff had no knowledge that Defendant was engaged in the wrongdoing alleged herein. Because of the fraudulent acts of concealment of wrongdoing by Defendant, Plaintiff could not have reasonably discovered the wrongdoing at any time prior. Also, the economics of this fraud should be considered. Defendant had the ability to and did spend enormous amounts of money in furtherance of its purpose of marketing, promoting and/or distributing a profitable herbicide, notwithstanding the known or reasonably known risks. Plaintiff and medical professionals could not have afforded and could not have possibly conducted studies to determine the nature, extent, and identity of related health risks, and were forced to rely on only the Defendant's representations. Accordingly, Defendant is precluded by the discovery rule and/or the doctrine of fraudulent concealment from relying upon any statute of limitations.

## FIRST CAUSE OF ACTION:
## STRICT LIABILITY (DESIGN DEFECT)

97.     Plaintiffs incorporate by reference all previous paragraphs of this Complaint as if fully set forth herein and further allege as follows:

98.     Plaintiffs bring this strict liability claim against Monsanto for defective design.

99.     At all times relevant to this litigation, Monsanto engaged in the business of testing, developing, manufacturing, selling, distributing, and engaged in the marketing, packaging design, and promotion of Roundup® products, which are defective and unreasonably dangerous to consumers, including Plaintiff, thereby placing Roundup® products into the stream of commerce. These actions were under the ultimate control and supervision of Monsanto. At all times relevant to this litigation, Monsanto designed, researched, developed, manufactured, produced, tested,

assembled, labeled, advertised, promoted, marketed, sold, and distributed the Roundup® products used by the Plaintiff, as described above.

100.    At all times relevant to this litigation, Roundup® products were manufactured, designed, and labeled in an unsafe, defective, and inherently dangerous manner that was dangerous for use by or exposure to the public, and, in particular, the Plaintiff.

101.    At all times relevant to this litigation, Roundup® products reached the intended consumers, handlers, and users or other persons coming into contact with these products in Missouri and throughout the United States, including Plaintiff, without substantial change in their condition as designed, manufactured, sold, distributed, labeled, and marketed by Monsanto.

102.    Roundup® products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold, and marketed by Monsanto were defective in design and formulation in that when they left the hands of the manufacturers and/or suppliers, they were unreasonably dangerous and dangerous to an extent beyond that which an ordinary consumer would contemplate.

103.    Roundup® products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold, and marketed by Monsanto were defective in design and formulation in that when they left the hands of the manufacturers and/or suppliers, the foreseeable risks exceeded the alleged benefits associated with their design and formulation.

104.    At all times relevant to this action, Monsanto knew or had reason to know that Roundup® products were defective and were inherently dangerous and unsafe when used in the manner instructed and provided by Monsanto.

105.    Therefore, at all times relevant to this litigation, Roundup® products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold and

marketed by Monsanto were defective in design and formulation, in one or more of the following ways:

    a.  When placed in the stream of commerce, Roundup® products were defective in design and formulation, and, consequently, dangerous to an extent beyond that which an ordinary consumer would contemplate.

    b.  When placed in the stream of commerce, Roundup® products were unreasonably dangerous in that they were hazardous and posed a grave risk of cancer and other serious illnesses when used in a reasonably anticipated manner.

    c.  When placed in the stream of commerce, Roundup® products contained unreasonably dangerous design defects and were not reasonably safe when used in a reasonably anticipated or intended manner.

    d.  Monsanto did not sufficiently test, investigate, or study Roundup® products and, specifically, the active ingredient glyphosate.

    e.  Exposure to Roundup® and glyphosate-containing products presents a risk of harmful side effects that outweigh any potential utility stemming from the use of the herbicide.

    f.  At the time of marketing its Roundup® products, Roundup® was defective in that exposure to Roundup® and specifically, its active ingredient glyphosate, could result in cancer and other severe illnesses and injuries.

    g.  Monsanto did not conduct adequate post-marketing surveillance of its Roundup® products.

    h.  Monsanto could have employed safer alternative designs and formulations.

    i.  Monsanto did not conduct adequate post-marketing surveillance of its Roundup® products.

    j.  Monsanto could have employed safer alternative designs and formulations.

    106.  Plaintiff Valerie Eichenberger was exposed to Roundup® products in the maintenance of her home and property, as described above, without knowledge of their dangerous characteristics.

COMPLAINT AND JURY DEMAND - 21

107.    At all times relevant to this litigation, Plaintiff used and/or was exposed to the use of Roundup® products in an intended or reasonably foreseeable manner without knowledge of their dangerous characteristics.

108.    Plaintiff could not have reasonably discovered the defects and risks associated with Roundup® or glyphosate-containing products before or at the time of exposure.

109.    The harm caused by Roundup® products far outweighed their benefit, rendering these products dangerous to an extent beyond that which an ordinary consumer would contemplate.

110.    Roundup® products were and are more dangerous than alternative products and Monsanto could have designed Roundup® products (including their packaging and sales aids) to make them less dangerous. Indeed, at the time that Monsanto designed Roundup® products, the state of the industry's scientific knowledge was such that a less risky design or formulation was attainable.

111.    At the time Roundup® products left Monsanto's control, there was a practical, technically feasible and safer alternative design that would have prevented the harm without substantially impairing the reasonably anticipated or intended function of those herbicides.

112.    Monsanto's defective design of Roundup® products was willful, wanton, fraudulent, malicious, and conducted with reckless disregard for the health and safety of users of the Roundup® products, including the Plaintiff herein.

113.    Therefore, as a result of the unreasonably dangerous condition of its Roundup® products, Monsanto is strictly liable to Plaintiffs.

114.    The defects in Roundup® products caused or contributed to cause Plaintiff's grave injuries, and, but for Monsanto's misconduct and omissions, Plaintiff would not have sustained her injuries.

115.    Monsanto's conduct, as described above, was reckless. Monsanto risked the lives of consumers and users of its products, including Plaintiff, with knowledge of the safety problems associated with Roundup® and glyphosate-containing products, and suppressed this knowledge from the general public. Monsanto made conscious decisions not to redesign, warn or inform the unsuspecting public. Monsanto's reckless conduct warrants an award of aggravated damages.

116.    As a direct and proximate result of Monsanto placing defective Roundup® products into the stream of commerce, Plaintiff has suffered and continue to suffer grave injuries, and have endured physical pain and discomfort, as well as economic hardship, including considerable financial expenses for medical care, and treatment.

WHEREFORE, Plaintiffs pray for judgment against Defendant in such sum as is fair and reasonable, including:

    i.    Awarding compensatory damages in excess of the jurisdictional amount, including, but not limited to pain, suffering, emotional distress, loss of enjoyment of life, loss of consortium, and other noneconomic damages in an amount to be determined at trial of this action;

    ii.    Awarding compensatory damages to Plaintiffs for past and future damages, including, but not limited to, Plaintiffs' pain and suffering and for severe and permanent personal injuries sustained by the Plaintiffs including health care costs and economic loss;

    iii.    Awarding economic damages in the form of medical expenses, out of pocket expenses, lost earnings and other economic damages in an amount to be determine at trial of this action;

    iv.    Awarding punitive damages in an amount sufficient to both punish Defendant for its misconduct and to deter such actions in the future;

v.   Awarding pre-judgment interest;

vi.  Awarding post-judgment interest;

vii. Awarding Plaintiffs their reasonable attorney fees;

viii. Awarding Plaintiffs the costs of these proceedings; and

ix.  Awarding Plaintiffs such other and future relief as this Court deems just and

proper.

## SECOND CAUSE OF ACTION:
## STRICT LIABILITY (FAILURE TO WARN)

117.   Plaintiffs incorporate by reference all previous paragraphs of this Complaint as if fully set forth herein and further allege as follows:

118.   Plaintiffs bring this strict liability claim against Monsanto for failure to warn.

119.   At all times relevant to this litigation, Monsanto engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting Roundup® products, which are defective and unreasonably dangerous to consumers, including Plaintiff, because they do not contain adequate warnings or instructions concerning the dangerous characteristics of Roundup® and specifically, the active ingredient glyphosate. These actions were under the ultimate control and supervision of Monsanto.

120.   Monsanto researched, developed, designed, tested, manufactured, inspected, labeled, distributed, marketed, promoted, sold, and otherwise released into the stream of commerce Roundup® products, and in the course of same, directly advertised or marketed the products to consumers and end users, including the Plaintiff, and therefore had a duty to warn of the risks associated with the use of Roundup® and glyphosate-containing products.

121.   At all times relevant to this litigation, Monsanto had a duty to properly test, develop, design, manufacture, inspect, package, label, market, promote, sell, distribute, maintain supply,

COMPLAINT AND JURY DEMAND - 24

provide proper warnings, and take such steps as necessary to ensure that Roundup® products did not cause users and consumers to suffer from unreasonable and dangerous risks. Monsanto had a continuing duty to warn the Plaintiff of the dangers associated with Roundup® use and exposure.

122.   Monsanto, as manufacturer, seller, promoter, marketer, or distributor of chemical herbicides are held to the knowledge of an expert in the field.

123.   At the time of manufacture, Monsanto could have provided the warnings or instructions regarding the full and complete risks of Roundup® and glyphosate-containing products because they knew or should have known of the unreasonable risks of harm associated with the use of and/or exposure to such products.

124.   At all times relevant to this litigation, Monsanto failed to investigate, study, test, or promote the safety or to minimize the dangers to users and consumers of its product and to those who would foreseeably use or be harmed by these herbicides, including Plaintiff.

125.   Despite the fact that Monsanto knew or should have known that Roundup® posed a grave risk of harm, it failed to exercise reasonable care to warn of the dangerous risks associated with use and exposure. The dangerous propensities of these products and the carcinogenic characteristics of glyphosate, as described above, were known to Monsanto, or scientifically knowable to Monsanto through appropriate research and testing by known methods, at the time they distributed, marketed, promoted, supplied or sold the product, and not known to end users and consumers, such as Plaintiff.

126.   These products created significant risks of serious bodily harm to consumers, as alleged herein, and Monsanto failed to adequately warn consumers and reasonably foreseeable users of the risks of exposure to its products. Monsanto has wrongfully concealed information

concerning the dangerous nature of Roundup® and its active ingredient glyphosate, and further made false and/or misleading statements concerning the safety of Roundup® and glyphosate.

127.    At all times relevant to this litigation, Roundup® products reached the intended consumers, handlers, and users or other persons coming into contact with these products in Missouri and throughout the United States, including Plaintiff, without substantial change in their condition as designed, manufactured, sold, distributed, labeled, promoted and marketed by Monsanto.

128.    Plaintiff Valerie Eichenberger was exposed to Roundup® products in the maintenance of her home and property, without knowledge of their dangerous characteristics.

129.    At all times relevant to this litigation, Plaintiff used and/or was exposed to the use of Roundup® products in their intended or reasonably foreseeable manner without knowledge of their dangerous characteristics.

130.    Plaintiff could not have reasonably discovered the defects and risks associated with Roundup® or glyphosate-containing products prior to or at the time of Plaintiff's exposure. Plaintiff relied upon the skill, superior knowledge, and judgment of Monsanto.

131.    These product were defective because the minimal warnings disseminated with Roundup® products were inadequate, and they failed to communicate adequate information on the dangers and safe use/exposure and failed to communicate warnings and instructions that were appropriate and adequate to render the products safe for their ordinary, intended and reasonably foreseeable uses, including agricultural and landscaping applications.

132.    The information that Monsanto did provide or communicate failed to contain relevant warnings, hazards, and precautions that would have enabled consumers such as Plaintiff to utilize the products safely and with adequate protection. Instead, Monsanto disseminated

information that was inaccurate, false, and misleading and which failed to communicate accurately or adequately the comparative severity, duration, and extent of the risk of injuries with use of and/or exposure to Roundup® and glyphosate; continued to aggressively promote the efficacy of its products, even after it knew or should have known of the unreasonable risks from use or exposure; and concealed, downplayed, or otherwise suppressed, through aggressive marketing and promotion, any information or research about the risks and dangers of exposure to Roundup® and glyphosate.

133.   To this day, Monsanto has failed to adequately and accurately warn of the true risks of Plaintiff's injuries associated with the use of and exposure to Roundup® and its active ingredient glyphosate, a probable carcinogen.

134.   As a result of their inadequate warnings, Roundup® products were defective and unreasonably dangerous when they left the possession and/or control of Monsanto, were distributed, marketed, and promoted by Monsanto, and used by Plaintiff in the maintenance of her home.

135.   Monsanto is liable to Plaintiff for injuries caused by their negligent or willful failure, as described above, to provide adequate warnings or other clinically relevant information and data regarding the appropriate use of these products and the risks associated with the use of or exposure to Roundup® and glyphosate.

136.   The defects in Roundup® products caused or contributed to cause Plaintiff's injuries, and, but for this misconduct and omissions, Plaintiffs would not have sustained his injuries.

137.     Had Monsanto provided adequate warnings and instructions and properly disclosed and disseminated the risks associated with Roundup® products, Plaintiff could have avoided the risk of developing injuries as alleged herein.

138.     As a direct and proximate result of Monsanto placing defective Roundup® products into the stream of commerce, Plaintiff has suffered severe injuries and have endured physical pain and discomfort, as well as economic hardship, including considerable financial expenses for medical care and treatment.

WHEREFORE, Plaintiffs pray for judgment against Defendant in such sum as is fair and reasonable, including:

     i.    Awarding compensatory damages in excess of the jurisdictional amount, including, but not limited to pain, suffering, emotional distress, loss of enjoyment of life, loss of consortium, and other noneconomic damages in an amount to be determined at trial of this action;

     ii.   Awarding compensatory damages to Plaintiffs for past and future damages, including, but not limited to, Plaintiffs' pain and suffering and for severe and permanent personal injuries sustained by the Plaintiffs including health care costs and economic loss;

     iii.  Awarding economic damages in the form of medical expenses, out of pocket expenses, lost earnings and other economic damages in an amount to be determine at trial of this action;

     iv.   Awarding punitive damages in an amount sufficient to both punish Defendant for its misconduct and to deter such actions in the future;

     v.    Awarding pre-judgment interest;

     vi.   Awarding post-judgment interest;

vii.   Awarding Plaintiffs their reasonable attorney fees;

viii.   Awarding Plaintiffs the costs of these proceedings; and

ix.   Awarding Plaintiffs such other and future relief as this Court deems just and proper.

### THIRD CAUSE OF ACTION: NEGLIGENCE

139.   Plaintiffs incorporate by reference all previous paragraphs of this Complaint as if fully set forth herein and further allege as follows:

140.   Monsanto, directly or indirectly, caused Roundup® products to be sold, distributed, packaged, labeled, marketed, promoted, and/or used by Plaintiff.

141.   At all times relevant to this litigation, Monsanto had a duty to exercise reasonable care in the design, research, manufacture, marketing, advertisement, supply, promotion, packaging, sale, and distribution of Roundup® products, including the duty to take all reasonable steps necessary to manufacture, promote, and/or sell a product that was not unreasonably dangerous to consumers and users of the product.

142.   At all times relevant to this litigation, Monsanto had a duty to exercise reasonable care in the marketing, advertisement, and sale of the Roundup® products. Monsanto's duty of care owed to consumers and the general public included providing accurate, true, and correct information concerning the risks of using Roundup® and appropriate, complete, and accurate warnings concerning the potential adverse effects of exposure to Roundup®, and, in particular, its active ingredient glyphosate.

143.   At all times relevant to this litigation, Monsanto knew or, in the exercise of reasonable care, should have known of the hazards and dangers of Roundup® and specifically, the carcinogenic properties of the chemical glyphosate.

144.    Accordingly, at all times relevant to this litigation, Monsanto knew or, in the exercise of reasonable care, should have known that use of or exposure to its Roundup® products could cause or be associated with Plaintiff's injuries and thus created a dangerous and unreasonable risk of injury to the users of these products, including Plaintiff.

145.    Monsanto also knew or, in the exercise of reasonable care, should have known that users and consumers of Roundup® were unaware of the risks and the magnitude of the risks associated with use of and/or exposure to Roundup® and glyphosate-containing products.

146.    As such, Monsanto breached the duty of reasonable care and failed to exercise ordinary care in the design, research, development, manufacture, testing, marketing, supply, promotion, advertisement, packaging, sale, and distribution of its Roundup® products, in that Monsanto manufactured, marketed, promoted, and sold defective herbicides containing the chemical glyphosate, knew or had reason to know of the defects inherent in these products, knew or had reason to know that a user's or consumer's exposure to the products created a significant risk of harm and unreasonably dangerous side effects, and failed to prevent or adequately warn of these risks and injuries.

147.    Despite an ability and means to investigate, study, and test these products and to provide adequate warnings, Monsanto has failed to do so. Indeed, Monsanto has wrongfully concealed information and have further made false and/or misleading statements concerning the safety and/or exposure to Roundup® and glyphosate.

148.    Monsanto was negligent in the following respects:

    a.  Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing its Roundup® products without thorough and adequate pre- and post-market testing;

    b.  Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing Roundup® while negligently and/or intentionally concealing and failing to disclose the

results of trials, tests, and studies of exposure to glyphosate, and, consequently, the risk of serious harm associated with human use of and exposure to Roundup®;

c.  Failing to undertake sufficient studies and conduct necessary tests to determine whether or not Roundup® products and glyphosate-containing products were safe for their intended use in agriculture and horticulture;

d.  Failing to use reasonable and prudent care in the design, research, manufacture, and development of Roundup® products so as to avoid the risk of serious harm associated with the prevalent use of Roundup®/glyphosate as an herbicide;

e.  Failing to design and manufacture Roundup® products so as to ensure they were at least as safe and effective as other herbicides on the market;

f.  Failing to provide adequate instructions, guidelines, and safety precautions to those persons who Monsanto could reasonably foresee would use and be exposed to its Roundup® products;

g.  Failing to disclose to Plaintiff, users/consumers, and the general public that use of and exposure to Roundup® presented severe risks of cancer and other grave illnesses;

h.  Failing to warn Plaintiff, consumers, and the general public that the product's risk of harm was unreasonable and that there were safer and effective alternative herbicides available to Plaintiff and other consumers;

i.  Systematically suppressing or downplaying contrary evidence about the risks, incidence, and prevalence of the side effects of Roundup® and glyphosate- containing products;

j.  Representing that its Roundup® products were safe for their intended use when, in fact, Monsanto knew or should have known that the products were not safe for their intended purpose;

k.  Declining to make or propose any changes to Roundup® products' labeling or other promotional materials that would alert the consumers and the general public of the risks of Roundup® and glyphosate;

l.  Advertising, marketing, and recommending the use of the Roundup® products, while concealing and failing to disclose or warn of the dangers known by Monsanto to be associated with or caused by the use of or exposure to Roundup® and glyphosate;

m. Continuing to disseminate information to its consumers, which indicate or imply that Monsanto's Roundup® products are not unsafe for use in the agricultural and horticultural industries; and

n. Continuing the manufacture and sale of its products with the knowledge that the products were unreasonably unsafe and dangerous.

149.  Monsanto knew and/or should have known that it was foreseeable that consumers such as Plaintiff would suffer injuries as a result of Monsanto's failure to exercise ordinary care in the manufacturing, marketing, promotion, labeling, distribution, and sale of Roundup®.

150.  Plaintiff did not know the nature and extent of the injuries that could result from the intended use of and/or exposure to Roundup® or its active ingredient glyphosate.

151.  Monsanto's negligence was the proximate cause of the injuries, harm, and economic losses that Plaintiff suffered, as described herein.

152.  Monsanto's conduct, as described above, was reckless. Monsanto regularly risked the lives of consumers and users of their products, including Plaintiff, with full knowledge of the dangers of these products. Monsanto has made conscious decisions not to redesign, re-label, warn, or inform the unsuspecting public, including Plaintiff. Monsanto's reckless conduct therefore warrants an award of aggravated or punitive damages.

153.  Furthermore, at all times herein mentioned, Defendant Monsanto was subject to federal, state, and local laws, rules, regulations, and ordinances concerning the manufacture, design, testing, production, processing, assembling, inspection, research, promotion, advertising, distribution, marketing, promotion, labeling, packaging, preparation for use, consulting, sale, warning, and post-sale warning and other communications of the risks and dangers of the Defendant's Roundup® products.

154.  By reason of its conduct as alleged herein, the Defendant violated provisions of statutes and regulations, including but not limited to:

154.A. The Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA"), 7 U.S.C. § 136 *et seq*, as enumerated in Paragraphs 32 through 37 above.

154.B. The Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1, *et seq.*, as enumerated in Paragraphs 169-178 below.

154.C. The Missouri Merchandise Practices Act, Mo. Rev. Stat. §§ 407.010, *et seq.*as enumerated in Paragraphs 179-188 below.

154.D. The Magnuson-Moss Warranty Act, 15 U.S.C. §§ 2301, *et seq.*, as enumerated in Paragraphs 215-225 below.

155. These and other applicable statutes, rules, and regulations are designed to protect the health, safety, and well-being of consumers like the Plaintiff.

156. The Defendant's violations of these and other applicable statutes, rules, and regulations constitute negligence *per se* and a willful, reckless, and wanton disregard for life.

157. As a proximate result of Monsanto's wrongful acts and omissions in placing defective Roundup® products into the stream of commerce without adequate warnings of the hazardous and carcinogenic nature of glyphosate, Plaintiffs have suffered severe and permanent physical and emotional injuries. Plaintiffs have endured pain and suffering, and have suffered economic losses (including significant expenses for medical care and treatment) in an amount to be determined.

WHEREFORE, Plaintiffs pray for judgment against Defendant in such sum as is fair and reasonable, including:

i. Awarding compensatory damages in excess of the jurisdictional amount, including, but not limited to pain, suffering, emotional distress, loss of enjoyment of life,

loss of consortium, and other noneconomic damages in an amount to be determined at trial of this action;

  ii. Awarding compensatory damages to Plaintiffs for past and future damages, including, but not limited to, Plaintiffs' pain and suffering and for severe and permanent personal injuries sustained by the Plaintiffs including health care costs and economic loss;

  iii. Awarding economic damages in the form of medical expenses, out of pocket expenses, lost earnings and other economic damages in an amount to be determine at trial of this action;

  iv. Awarding punitive damages in an amount sufficient to both punish Defendant for its misconduct and to deter such actions in the future;

  v. Awarding pre-judgment interest;

  vi. Awarding post-judgment interest;

  vii. Awarding Plaintiffs their reasonable attorney fees;

  viii. Awarding Plaintiffs the costs of these proceedings; and

  ix. Awarding Plaintiffs such other and future relief as this Court deems just and proper.

**FOURTH CAUSE OF ACTION:**
**FRAUD, MISREPRESENTATION, AND SUPPRESSION**

158. Plaintiffs incorporate by reference all previous paragraphs of this Complaint as if fully set forth herein, particularly Paragraphs 63-79 above which detail fraud with specificity, and further allege as follows:

159. Defendant fraudulently, intentionally, and/or negligently misrepresented to the public, and to the Plaintiff, both directly and by and through the media, the scientific literature and purported "community outreach" programs, the safety of Roundup® products, and/or fraudulently,

intentionally, and/or negligently concealed, suppressed, or omitted material, adverse information regarding the safety of Roundup®.

160.    The intentional and/or negligent misrepresentations and omissions of Defendant regarding the safety of Roundup® products were communicated to Plaintiff directly through ghostwritten articles, editorials, national and regional advertising, marketing and promotion efforts, as well as the packaging and sales aids. The safety of Roundup® products was also intentionally and/or negligently misrepresented to Plaintiff and the public with the intent that such misrepresentations would cause Plaintiff and other potential consumers to purchase and use or continue to purchase and use Roundup® products.

161.    Defendant either knew or should have known of the material representations they were making regarding the safety and relative utility of Roundup® products.

162.    Defendant   fraudulently,   intentionally,   and/or   negligently   made   the misrepresentations and/or actively concealed, suppressed, or omitted this material information with the specific desire to induce Plaintiff, and the consuming public to purchase and use Roundup® products. Defendant fraudulently, intentionally, and/or negligently, knew or should have known that Plaintiff and the consuming public would rely on such material misrepresentations and/or omissions in selecting and applying Roundup® products. Defendant knew or should have known that Plaintiff would rely on their false representations and omissions.

163.    Defendant made these misrepresentations and actively concealed adverse information including the risk of Non-Hodgkin's Lymphoma, at a time when, their agents and/or employees knew or should have known, the product had defects, dangers, and characteristics that were other than what was represented to the consuming public. Specifically, Osborn & Barr misrepresented and actively concealed, suppressed, and omitted that there had been inadequate

testing of the safety and efficacy of Roundup®, and that prior studies, research, reports, and/or testing had been conducted linking the use of the drug with serious health events, including Non-Hodgkin's Lymphoma.

164.    Despite the fact that Defendant knew or should have known of reports of severe risks including Non-Hodgkin's Lymphoma, with Roundup® use and exposure, this information was strategically minimized, understated, or omitted in order to create the impression that the human dangers of Roundup® were nonexistent, particularly in light of its purported utility.

165.    The fraudulent, intentional and/or negligent material misrepresentations and/or active concealment, suppression, and omissions by Defendant were perpetuated directly and/or indirectly through the advertisements, packaging, sales aids, furtive public relations efforts, and other marketing and promotional pieces authored, analyzed, created, compiled, designed, drafted, disseminated, distributed, edited, evaluated, marketed, published, and supplied by Osborn & Barr.

166.    If Plaintiff had known the true facts concerning the risks associated with Roundup® exposure, Plaintiff would have used a safer alternative.

167.    Plaintiff's reliance upon the material misrepresentations and omissions was justified, among other reasons, because said misrepresentations and omissions were made by individuals and entities who were in a position to know the true facts concerning Roundup® while Plaintiff was not in a position to know the true facts because Defendant overstated the benefits and safety of Roundup® and downplayed the risk of lymphoma, thereby inducing Plaintiff to use the herbicide rather than safer alternatives.

168.    As a direct and proximate result of Defendant's actions and inactions, Plaintiff was exposed to Roundup® and suffered and will continue to suffer injuries and damages, as set forth herein.

COMPLAINT AND JURY DEMAND - 36

WHEREFORE, Plaintiffs pray for judgment against Defendant in such sum as is fair and reasonable, including:

     i.   Awarding compensatory damages in excess of the jurisdictional amount, including, but not limited to pain, suffering, emotional distress, loss of enjoyment of life, loss of consortium, and other noneconomic damages in an amount to be determined at trial of this action;

     ii.   Awarding compensatory damages to Plaintiffs for past and future damages, including, but not limited to, Plaintiffs' pain and suffering and for severe and permanent personal injuries sustained by the Plaintiffs including health care costs and economic loss;

     iii.   Awarding economic damages in the form of medical expenses, out of pocket expenses, lost earnings and other economic damages in an amount to be determine at trial of this action;

     iv.   Awarding punitive damages in an amount sufficient to both punish Defendant for its misconduct and to deter such actions in the future;

     v.   Awarding pre-judgment interest;

     vi.   Awarding post-judgment interest;

     vii.   Awarding Plaintiffs their reasonable attorney fees;

     viii.   Awarding Plaintiffs the costs of these proceedings; and

     ix.   Awarding Plaintiffs such other and future relief as this Court deems just and proper.

### FIFTH CAUSE OF ACTION:
### VIOLATION OF THE ILLINOIS CONSUMER FRAUD AND DECEPTIVE BUSINESS PRACTICES ACT

169.   Plaintiffs incorporate by reference all previous paragraphs of this Complaint as if fully set forth herein and further allege as follows:

COMPLAINT AND JURY DEMAND - 37

170.   Plaintiffs bring this cause of action pursuant to the private right of action of the Illinois Consumer Fraud and Deceptive Business Practices Act, §815 ILCS 505/1, *et seq.* as the Plaintiffs are residents and citizens of the State of Illinois.

171.   At all times material herein, Plaintiffs have been entitled to the rights, protections and benefits provided under the Illinois Consumer Fraud and Deceptive Business Practices Act, *et seq.* The Consumer Fraud and Deceptive Business Practices Act provides consumers with a right, among other things, to seek relief from deceptive and unfair practices.

172.   Defendant is subject to the provisions of the Consumer Fraud and Deceptive Business Practices Act as they engaged in unlawful practices in connection with the sale or advertisement of Roundup® products, as is more fully described herein.

173.   Plaintiff used Defendant's Roundup® products primarily for personal use.

174.   Defendant engaged in deception, fraud, false pretenses, misrepresentations, unfair practices and concealment, omission and suppression of material facts in connection with design, labeling, development, manufacture, marketing, promotion and sale of Roundup® products.

175.   If Defendant had not engaged in deception, fraud, false pretenses, misrepresentations, unfair practices and concealment, omission and suppression of material facts, Plaintiff would not have purchased Defendant's products.

176.   As a direct and proximate result of Defendant's illegal conduct, including deception, fraud, false pretenses, misrepresentations, unfair practices and concealment, omission and suppression of material facts, Plaintiffs have been damaged and suffered and will continue to suffer ascertainable losses, including, but not limited to, permanent physical and emotional injuries and incurred medical costs, as further described herein.

177.   Defendant at all times acted intentionally, maliciously, willfully, outrageously and knowingly in violation of the Consumer Fraud and Deceptive Business Practices Act, as a result, Defendant is liable for punitive damages.

178.   Plaintiffs have incurred and will incur attorneys' fees in prosecuting this action, for which Defendant is liable under Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/10a.

WHEREFORE, Plaintiffs pray for judgment against Defendant in such sum as is fair and reasonable, including:

    i.   Awarding compensatory damages in excess of the jurisdictional amount, including, but not limited to pain, suffering, emotional distress, loss of enjoyment of life, loss of consortium, and other noneconomic damages in an amount to be determined at trial of this action;

    ii.   Awarding compensatory damages to Plaintiffs for past and future damages, including, but not limited to, Plaintiffs' pain and suffering and for severe and permanent personal injuries sustained by the Plaintiffs including health care costs and economic loss;

    iii.   Awarding economic damages in the form of medical expenses, out of pocket expenses, lost earnings and other economic damages in an amount to be determine at trial of this action;

    iv.   Awarding punitive damages in an amount sufficient to both punish Defendant for its misconduct and to deter such actions in the future;

    v.   Awarding pre-judgment interest;

    vi.   Awarding post-judgment interest;

    vii.   Awarding Plaintiffs their reasonable attorney fees;

viii.  Awarding Plaintiffs the costs of these proceedings; and

ix.  Awarding Plaintiffs such other and future relief as this Court deems just and proper.

## SIXTH CAUSE OF ACTION:
## VIOLATION OF THE MISSOURI MERCHANDISE PRACTICES ACT

179.   Plaintiffs incorporate by reference all previous paragraphs of this Complaint as if fully set forth herein and further allege as follows:

180.   Plaintiffs bring this cause of action pursuant to the private right of action of the Missouri Merchandise Practices Act, Mo. Rev. Stat. §§ 407.010, *et seq.*, as the Defendant's headquarters and primary place of business are located in the State of Missouri.

181.   At all times material herein, Plaintiffs have been entitled to the rights, protections and benefits provided under the Missouri Merchandise Practices Act, Mo. Rev. Stat. §§ 407.010, *et seq.* The Missouri Merchandise Practices Act provides consumers with a right, among other things, to seek relief from deceptive and unfair practices.

182.   Defendant is subject to the provisions of the Missouri Merchandise Practices Act, Mo. Rev. Stat. §§ 407.010, *et seq.*, as they engaged in unlawful practices in connection with the sale or advertisement of Roundup® products, as is more fully described herein.

183.   Plaintiff used Defendant's Roundup® products primarily for personal use.

184.   Defendant engaged in deception, fraud, false pretenses, misrepresentations, unfair practices and concealment, omission and suppression of material facts in connection with design, labeling, development, manufacture, marketing, promotion and sale of Roundup® products.

185.   If Defendant had not engaged in deception, fraud, false pretenses, misrepresentations, unfair practices and concealment, omission and suppression of material facts, Plaintiff would not have purchased Defendant's products.

COMPLAINT AND JURY DEMAND - 40

186.   As a direct and proximate result of Defendant's illegal conduct, including deception, fraud, false pretenses, misrepresentations, unfair practices and concealment, omission and suppression of material facts, Plaintiffs have been damaged and suffered and will continue to suffer ascertainable losses, including, but not limited to, permanent physical and emotional injuries and incurred medical costs, as further described herein.

187.   Defendant at all times acted intentionally, maliciously, willfully, outrageously and knowingly in violation of the Missouri Merchandise Practices Act, Mo. Rev. Stat. §§ 407.010, *et seq.* As a result, Defendant is liable for punitive damages.

188.   Plaintiffs have incurred and will incur attorneys' fees in prosecuting this action, for which Defendant is liable under Mo. Rev. Stat. § 407.025.

WHEREFORE, Plaintiffs pray for judgment against Defendant in such sum as is fair and reasonable, including:

i.   Awarding compensatory damages in excess of the jurisdictional amount, including, but not limited to pain, suffering, emotional distress, loss of enjoyment of life, loss of consortium, and other noneconomic damages in an amount to be determined at trial of this action;

ii.   Awarding compensatory damages to Plaintiffs for past and future damages, including, but not limited to, Plaintiffs' pain and suffering and for severe and permanent personal injuries sustained by the Plaintiffs including health care costs and economic loss;

iii.   Awarding economic damages in the form of medical expenses, out of pocket expenses, lost earnings and other economic damages in an amount to be determine at trial of this action;

iv. Awarding punitive damages in an amount sufficient to both punish Defendant for its misconduct and to deter such actions in the future;

v. Awarding pre-judgment interest;

vi. Awarding post-judgment interest;

vii. Awarding Plaintiffs their reasonable attorney fees;

viii. Awarding Plaintiffs the costs of these proceedings; and

ix. Awarding Plaintiffs such other and future relief as this Court deems just and proper.

## SEVENTH CAUSE OF ACTION:
## BREACH OF EXPRESS WARRANTY

189.     Plaintiffs incorporate by reference all previous paragraphs of this Complaint as if fully set forth herein and further allege as follows:

190.     At all times relevant to this litigation, Defendant engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting its Roundup® products, which are defective and unreasonably dangerous to consumers, including Plaintiff, thereby placing Roundup® products into the stream of commerce. These actions were under the ultimate control and supervision of Defendant.

191.     At all times relevant to this litigation, Defendant expressly represented and warranted to the purchasers of its Roundup® products, by and through statements made by Defendant in labels, publications, package inserts, and other written materials intended for consumers and the general public, that its Roundup® products were safe to human health and the environment, effective, fit, and proper for their intended use. Defendant advertised, labeled, marketed, and promoted Roundup® products, representing the quality to consumers and the public

in such a way as to induce their purchase or use, thereby making an express warranty that its Roundup® products would conform to the representations.

192.    These express representations include incomplete warnings and instructions that purport, but fail, to include the complete array of risks associated with use of and/or exposure to Roundup® and glyphosate. Defendant knew and/or should have known that the risks expressly included in Roundup® warnings and labels did not and do not accurately or adequately set forth the risks of developing the serious injuries complained of herein. Nevertheless, Defendant expressly represented that its Roundup® products were safe and effective, that they were safe and effective for use by individuals such as Plaintiff, and/or that they were safe and effective as agricultural herbicides.

193.    The representations about Roundup®, as set forth herein, contained or constituted affirmations of fact or promises made by the seller to the buyer, which related to the goods and became part of the basis of the bargain, creating an express warranty that the goods would conform to the representations.

194.    Defendant placed its Roundup® products into the stream of commerce for sale and recommended their use to consumers and the public without adequately warning of the true risks of developing the injuries associated with the use of and exposure to Roundup® and its active ingredient glyphosate.

195.    Defendant breached these warranties because, among other things, its Roundup® products were defective, dangerous, unfit for use, did not contain label representing the true and adequate nature of the risks associated with their use, and were not merchantable or safe for their intended, ordinary, and foreseeable use and purpose. Specifically, Defendant breached the warranties in the following ways:

a. Defendant represented through its labeling, advertising, and marketing materials that its Roundup® products were safe, and fraudulently withheld and concealed information about the risks of serious injury associated with use of and/or exposure to Roundup® and glyphosate by expressly limiting the risks associated with use and/or exposure within its warnings and labels; and

b. Defendant represented that its Roundup® products were safe for use and fraudulently concealed information that demonstrated that glyphosate, the active ingredient in Roundup®, had carcinogenic properties, and that its Roundup® products, therefore, were not safer than alternative available on the market.

196.     Defendant had sole access to material facts concerning the nature of the risks associated with its Roundup® products as expressly stated within its warnings and labels, and Defendant knew that consumers and users such as Plaintiff could not have reasonably discovered that the risks expressly included in Roundup® warnings and labels were inadequate and inaccurate.

197.     Plaintiff had no knowledge of the falsity or incompleteness of Defendant's statements and representations concerning Roundup®.

198.     Plaintiff used and/or was exposed to the use of Roundup® as researched, developed, designed, tested, formulated, manufactured, inspected, labeled, distributed, packaged, marketed, promoted, sold, or otherwise released into the stream of commerce by Defendant.

199.     Had the warnings and labels for Roundup® products accurately and adequately set forth the true risks associated with the use of such products, including Plaintiff's injuries, rather than expressly excluding such information and warranting that the products were safe for their intended use, Plaintiff could have avoided the injuries complained of herein.

200.     As a direct and proximate result of Defendant's wrongful acts and omissions, Plaintiffs have suffered severe injuries. Plaintiffs have endured pain and suffering, have suffered economic losses (including significant expenses for medical care and treatment), and will continue to incur these expenses in the future.

WHEREFORE, Plaintiffs pray for judgment against Defendant in such sum as is fair and reasonable, including:

i.   Awarding compensatory damages in excess of the jurisdictional amount, including, but not limited to pain, suffering, emotional distress, loss of enjoyment of life, loss of consortium, and other noneconomic damages in an amount to be determined at trial of this action;

ii.   Awarding compensatory damages to Plaintiffs for past and future damages, including, but not limited to, Plaintiffs' pain and suffering and for severe and permanent personal injuries sustained by the Plaintiffs including health care costs and economic loss;

iii.   Awarding economic damages in the form of medical expenses, out of pocket expenses, lost earnings and other economic damages in an amount to be determine at trial of this action;

iv.   Awarding punitive damages in an amount sufficient to both punish Defendant for its misconduct and to deter such actions in the future;

v.   Awarding pre-judgment interest;

vi.   Awarding post-judgment interest;

vii.   Awarding Plaintiffs their reasonable attorney fees;

viii.   Awarding Plaintiffs the costs of these proceedings; and

ix.   Awarding Plaintiffs such other and future relief as this Court deems just and proper.

## EIGHTH CAUSE OF ACTION:
## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY

201.   Plaintiffs incorporate by reference all previous paragraphs of this Complaint as if fully set forth herein and further allege as follows:

202.    At all times relevant to this litigation, Defendant engaged in the business of testing, developing, designing, formulating, manufacturing, marketing, selling, distributing, and promoting its Roundup® products, which are defective and unreasonably dangerous to users and consumers, including Plaintiff, thereby placing Roundup® products into the stream of commerce.

203.    These actions were under the ultimate control and supervision of Defendant.

204.    Before the time that Plaintiff was exposed to the use of the aforementioned Roundup® products, Defendant impliedly warranted to its consumers and users, including Plaintiff, that its Roundup® products were of merchantable quality and safe and fit for the use for which they were intended; specifically, as horticultural herbicides.

205.    Defendant, however, failed to disclose that Roundup® has dangerous propensities when used as intended and that the use of and/or exposure to Roundup® and glyphosate-containing products carries an increased risk of developing severe injuries, including Plaintiff's injuries.

206.    Upon information and belief, Plaintiff reasonably relied upon the skill, superior knowledge and judgment of Defendant and upon its implied warranties that the Roundup® products were of merchantable quality and fit for their intended purpose or use.

207.    The Roundup® products were expected to reach and did in fact reach consumers and users, including Plaintiff, without substantial change in the condition in which they were manufactured and sold by Defendant.

208.    At all times relevant to this litigation, Defendant was aware that consumers and users of its products, including Plaintiff, would use Roundup® products as marketed by Defendant, which is to say that Plaintiff was the foreseeable user of Roundup®.

209.    Defendant intended that its Roundup® products be used in the manner in which Plaintiff in fact used them and Defendant impliedly warranted each product to be of merchantable

quality, safe, and fit for this use, despite the fact that Roundup® was not adequately tested or researched.

210.    In reliance upon Defendant's implied warranty, Plaintiff used Roundup® as instructed and labeled and in the foreseeable manner intended, recommended, promoted and marketed by Defendant.

211.    Plaintiff could not have reasonably discovered or known of the risks of serious injury associated with Roundup® or glyphosate.

212.    Defendant breached its implied warranty to Plaintiff in that its Roundup® products were not of merchantable quality, safe, or fit for their intended use, or adequately tested. Roundup® has dangerous propensities when used as intended and can cause serious injuries, including those injuries complained of herein.

213.    The harm caused by Defendant's Roundup® products far outweighed their benefit, rendering the products more dangerous than an ordinary consumer or user would expect and more dangerous than alternative products.

214.    As a direct and proximate result of Defendant's wrongful acts and omissions Plaintiffs have suffered severe and permanent physical and emotional injuries. Plaintiffs have endured pain and suffering, have suffered economic loss (including significant expenses for medical care and treatment) and will continue to incur these expenses in the future.

WHEREFORE, Plaintiffs pray for judgment against Defendant in such sum as is fair and reasonable, including:

i.    Awarding compensatory damages in excess of the jurisdictional amount, including, but not limited to pain, suffering, emotional distress, loss of enjoyment of life,

loss of consortium, and other noneconomic damages in an amount to be determined at trial of this action;

ii. Awarding compensatory damages to Plaintiffs for past and future damages, including, but not limited to, Plaintiffs' pain and suffering and for severe and permanent personal injuries sustained by the Plaintiffs including health care costs and economic loss;

iii. Awarding economic damages in the form of medical expenses, out of pocket expenses, lost earnings and other economic damages in an amount to be determine at trial of this action;

iv. Awarding punitive damages in an amount sufficient to both punish Defendant for its misconduct and to deter such actions in the future;

v. Awarding pre-judgment interest;

vi. Awarding post-judgment interest;

vii. Awarding Plaintiffs their reasonable attorney fees;

viii. Awarding Plaintiffs the costs of these proceedings; and

ix. Awarding Plaintiffs such other and future relief as this Court deems just and proper.

## NINTH CAUSE OF ACTION:
## VIOLATION OF THE MAGNUSON-MOSS WARRANTY ACT

215. Plaintiffs incorporate by reference all previous paragraphs of this Complaint as if fully set forth herein and further allege as follows:

216. Plaintiffs bring this cause of action pursuant to the private right of action of the Magnuson-Moss Warranty Act, 15 U.S.C. §§ 2301, *et seq.*

217. Defendant's Roundup® products are "consumer products" within the meaning of 15 U.S.C. § 2301(1).

218. Plaintiff Valerie Eichenberger is a "consumer" within the meaning of 15 U.S.C. § 2301(3).

219. Defendant Monsanto Company is a supplier and warrantor within the meaning of 15 U.S.C. § 2301(4), (5).

220. In connection with the sale of its Roundup® products, Defendant gave multiple warranties that the products were safe for use as horticultural herbicides.

221. Defendant breached these written warranties because its Roundup® products are not, in fact, safe. The products at issue here do not live up to the Defendant's express warranties.

222. In connection with the sale of its Roundup® products, Defendant also gave multiple implied warranties as defined in 15 U.S.C. § 2301(7), including but not limited to the implied warranty of merchantability and the implied warranty of fitness for a particular purpose.

223. Defendant breached these implied warranties, in that its Roundup® products are not fit for the ordinary purpose for which they are used, namely as horticultural herbicides.

224. Plaintiff Valerie Eichenberger was injured as a direct and proximate result of Defendant's breach of its warranties because Plaintiff: (a) would not have purchased the product if he had known that the product did not have the characteristics or qualities as impliedly warranted by Defendant; (b) paid a premium price for the Roundup® Product as a result of Defendant's false warranties and misrepresentations; and (c) purchased a product that did not have the safe and harmless characteristics, qualities, or value promised by Defendant.

225. Plaintiffs have incurred and will incur attorneys' fees in prosecuting this action, for which Defendant is liable under 15 U.S.C. § 2310(d)(2).

WHEREFORE, Plaintiffs pray for judgment against Defendant in such sum as is fair and reasonable, including:

COMPLAINT AND JURY DEMAND - 49

i. Awarding compensatory damages in excess of the jurisdictional amount, including, but not limited to pain, suffering, emotional distress, loss of enjoyment of life, loss of consortium, and other noneconomic damages in an amount to be determined at trial of this action;

ii. Awarding compensatory damages to Plaintiffs for past and future damages, including, but not limited to, Plaintiffs' pain and suffering and for severe and permanent personal injuries sustained by the Plaintiffs including health care costs and economic loss;

iii. Awarding economic damages in the form of medical expenses, out of pocket expenses, lost earnings and other economic damages in an amount to be determine at trial of this action;

iv. Awarding punitive damages in an amount sufficient to both punish Defendant for its misconduct and to deter such actions in the future;

v. Awarding pre-judgment interest;

vi. Awarding post-judgment interest;

vii. Awarding Plaintiffs their reasonable attorney fees;

viii. Awarding Plaintiffs the costs of these proceedings; and

ix. Awarding Plaintiffs such other and future relief as this Court deems just and proper.

## TENTH CAUSE OF ACTION:
## LOSS OF CONSORTIUM

226. Plaintiffs incorporate by reference all previous paragraphs of this Complaint as if fully set forth herein and further allege as follows:

227.   Plaintiff Valerie Eichenberger's spouse, William Eichenberger, was entitled to the comfort, care, affection, companionship, services, society, advice, guidance, counsel, and consortium of his spouse.

228.   As a direct and proximate result of one or more of those wrongful acts or omissions of the Defendant described above, Plaintiff William Eichenberger has been and will be deprived of the comfort, care, affection, companionship, services, society, advice, guidance, counsel, and consortium.

WHEREFORE, Plaintiffs pray for judgment against Defendant in such sum as is fair and reasonable, including:

      i.   Awarding compensatory damages in excess of the jurisdictional amount, including, but not limited to pain, suffering, emotional distress, loss of enjoyment of life, loss of consortium, and other noneconomic damages in an amount to be determined at trial of this action;

      ii.   Awarding compensatory damages to Plaintiffs for past and future damages, including, but not limited to, Plaintiffs' pain and suffering and for severe and permanent personal injuries sustained by the Plaintiffs including health care costs and economic loss;

      iii.   Awarding economic damages in the form of medical expenses, out of pocket expenses, lost earnings and other economic damages in an amount to be determine at trial of this action;

      iv.   Awarding punitive damages in an amount sufficient to both punish Defendant for its misconduct and to deter such actions in the future;

      v.   Awarding pre-judgment interest;

      vi.   Awarding post-judgment interest;

vii.  Awarding Plaintiffs their reasonable attorney fees;

viii.  Awarding Plaintiffs the costs of these proceedings; and

ix.  Awarding Plaintiffs such other and future relief as this Court deems just and

proper.

### DEMAND FOR JURY TRIAL

Plaintiffs hereby demand trial by jury as to all issues.

Dated:  April 10, 2020

                               Respectfully submitted,

                               **CRIMMINS LAW FIRM, LLC**

                               */s/ Matthew R. Crimmins*
                               Matthew R. Crimmins, MO #53138
                               Virginia Stevens Crimmins, MO Bar #53139
                               214 S. Spring Street
                               Independence, Missouri 64050
                               Tel: (816) 974-7220
                               Fax: (855) 974-7020
                               v.crimmins@crimminslawfirm.com
                               m.crimmins@crimminslawfirm.com

                               and

                               Stephen J. Nemec (*pro hac vice* admission pending)
                               **JAMES, VERNON & WEEKS, P.A.**
                               1626 Lincoln Way
                               Coeur d'Alene, ID 83814
                               Telephone: (208) 667-0683
                               Facsimile: (208) 664-1684
                               Email: snemec@jvwlaw.net

                               **ATTORNEYS FOR PLAINTIFFS**