## U.S. District Court Northern District of Indiana [LIVE]
## USDC Northern Indiana (South Bend)
## CIVIL DOCKET FOR CASE #: 3:20-cv-00451-RLM-MGG

v. Monsanto Company et al                          Date Filed: 06/08/2020
Assigned to: Judge Robert L Miller, Jr             Jury Demand: Both
Referred to: Magistrate Judge Michael G Gotsch, Sr  Nature of Suit: 245 Tort Product Liability
Case in other court:  Wabash Circuit Court, 85C01-2005-CT-  Jurisdiction: Diversity
    000261
Cause: 28:1332 Diversity-Petition for Removal

**Plaintiff**

**Paula Winer**                          represented by   **Daniel J Vanderpool**
*as Personal Representative of the Estate of*             Vanderpool Law Firm PC
*Brady Nelson Winer*                                      1810 E Center St
                                                          Warsaw, IN 46580
                                                          574-268-9995
                                                          Fax: 574-269-9994
                                                          Email: dan@vanderpoollaw.net
                                                          *LEAD ATTORNEY*
                                                          *ATTORNEY TO BE NOTICED*

                                                          **Isaiah P Vanderpool**
                                                          Vanderpool Law Firm PC
                                                          1810 E Center St
                                                          Warsaw, IN 46580
                                                          574-268-9995
                                                          Fax: 574-269-9994
                                                          Email: isaiah@vanderpoollaw.net
                                                          *LEAD ATTORNEY*
                                                          *ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Monsanto Company**                     represented by   **Daniel D Trachtman**
                                                          Wooden & McLaughlin LLP - Ind/IN
                                                          One Indiana Sq St 1800
                                                          211 N Pennsylvania St
                                                          Indianapolis, IN 46204-4208
                                                          317-639-6151
                                                          Fax: 317-639-6444
                                                          Email:
                                                          Dan.Trachtman@WoodenLawyers.com
                                                          *ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|------------|---|-------------|

| 05/14/2020 | 5 | STATE COURT COMPLAINT with Jury Demand against Monsanto Company, filed by Paula Winer. Filed in Wabash Circuit Court Case no. 85C01-2005-CT-000261. (shk) (Entered: 06/09/2020) |
| 06/08/2020 | 1 | NOTICE OF REMOVAL (Filing fee $ 400 receipt number 0755-4245813.) from Wabash Circuit Court, Cause No. 85C01-2005-CT-000261, filed by Monsanto Company. (Attachments: # 1 Exhibit 1 - Complaint for Wrongful Death, # 2 Exhibit 2 - Petition for Appointment, # 3 Exhibit 3 - Obituary)(Trachtman, Daniel) (Entered: 06/08/2020) |
| 06/08/2020 | 2 | NOTICE of Appearance by Daniel D Trachtman on behalf of Monsanto Company (Trachtman, Daniel) (Entered: 06/08/2020) |
| 06/08/2020 | 3 | Corporate Disclosure Statement by Monsanto Company. (Trachtman, Daniel) (Entered: 06/08/2020) |
| 06/08/2020 | 4 | ANSWER to Complaint by Monsanto Company.(Trachtman, Daniel) (Entered: 06/08/2020) |
| 06/09/2020 | | **NEW CASE** Judge Robert L Miller, Jr and Magistrate Judge Michael G Gotsch, Sr added. (shk) (Entered: 06/09/2020) |

| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 06/09/2020 16:03:21 | | | |
| **PACER Login:** | hllp1982:2634105:4722683 | **Client Code:** | 1417.0005 |
| **Description:** | Docket Report | **Search Criteria:** | 3:20-cv-00451-RLM-MGG |
| **Billable Pages:** | 1 | **Cost:** | 0.10 |

Filed: 5/14/2020 9:41 AM Clerk
Wabash County, Indiana

| | | |
|---|---|---|
| STATE OF INDIANA | ) | IN THE WABASH CIRCUIT COURT |
| | ) SS: | |
| WABASH COUNTY | ) | CAUSE NO. **85C01-2005-CT-000261** |


PAULA M. WINER, as Personal )
Representative of the Estate of )
BRADY NELSON WINER, )
                Plaintiff )
  )
VS. )
  )
MONSANTO COMPANY, )
              Defendant )

## **COMPLAINT FOR WRONGFUL DEATH**

Comes now the Plaintiff, Estate of Brady Nelson Winer, by and through the Personal

Representative of the Estate, Paula M. Winer, and for its cause of action against Defendant

Monsanto Company states to the Court as follows:

## **INTRODUCTION**

Paula M. Winer is the lawfully appointed Personal Representative of the Estate

of Brady Nelson Winer, her late husband. Brady Nelson Winer (Brady) was, for a

significant part of his life, engaged in farming. As a part of his farming operation,

Brady used a glyphosate-based herbicide (GBH) known and marketed as Roundup.

Roundup was manufactured and marketed by Monsanto Company. The herbicide was

applied during the operation of the farm using a pull behind tank sprayer, into which he

would pour the herbicide before use. After concluding his farming operation, he

continued to use Roundup at his farm home, often spraying weeds around the house,

fenced areas, pastures and barn. Application in these areas was completed using a hand

1

pumped sprayer and wand. It was not uncommon during the application process for the herbicide to be blown by the wind, and to be blown into the face and body of Brady.

The Plaintiff in this action seeks recovery for damages as a result of Brady developing Multiple Myeloma, a cancer of the plasma cells in the bone marrow. Brady's Multiple Myeloma was an aggressive version, caused by chromosomal changes making it harder to treat successfully. It was a tragic and frightening disease process which left Brady unable to fight infection and to finally wither and die in a hospital bed as his family surrounded him.

Brady's death was a direct and proximate result of Monsanto's negligent, willful, and wrongful conduct in connection with the design, development, manufacturing, testing, packaging, promoting, marketing, distribution, and/or sale of Roundup. Monsanto promoted Roundup as being safe for use by humans, going so far as to proclaim the product to be as "safe as table salt". In a course of operation over several decades, Monsanto became aware of the unreasonably dangerous and defective nature of Roundup, and its active ingredient, glyphosate, but did nothing to warn users of the danger.

The Plaintiff did not know of an association between exposure to Roundup and the increased risk of developing Multiple Myeloma until well after Brady's death on November 27, 2013.

On July 29, 2015, the International Agency for Research on Cancer ("IARC"), an agency of the World Health Organization ("WHO"), first published its evaluation of glyphosate. It was not until late 2018, when more publicity was directed at the link

between GBH products and cancer, that Paula Winer became aware that it was linked to the death of her husband.

## THE ALLEGATIONS

1. The Plaintiff is the authorized representative of the estate of Brady Nelson Winer, a decedent's estate established in the Wabash Circuit Court under cause number 85C01-

   _____

2. Defendant Monsanto Company ("Monsanto") is a Delaware corporation with its headquarters and principal place of business in St. Louis, Missouri.

3. At all times relevant hereto, Monsanto was in the business of researching, designing, formulating, compounding, testing, manufacturing, producing, processing, assembling, inspecting, distributing, labeling, and packaging as well as the business of marketing, promoting, and/or advertising Roundup products in the State of Indiana.

4. In 1970, Defendant Monsanto Company discovered the herbicidal properties of glyphosate and began marketing it in products in 1974 under the brand name Roundup.

5. Roundup is a non-selective herbicide used to kill weeds that commonly compete with the growing of crops. By 2001, glyphosate had become the most-used active ingredient in American agriculture with 85–90 million pounds used annually. That number grew to 185 million pounds by 2007. Glyphosate became the world's most widely used herbicide.

6. Monsanto is a subsidiary of Bayer A.G. and is a multinational agricultural biotechnology corporation based in St. Louis, Missouri. It is the world's leading producer of glyphosate. As of 2009, Monsanto was the world's leading producer of seeds, accounting for 27% of the world seed market. The majority of these seeds are of the Roundup Ready brand. The stated advantage of Roundup Ready crops is that they substantially improve a farmer's

3

ability to control weeds, since glyphosate can be sprayed in the fields during the growing season without harming their crops. In 2010, an estimated 70% of corn and cotton, and 90% of soybean fields in the United States were Roundup Ready.

7.  Monsanto's glyphosate products are registered in 130 countries and approved for use on over 100 different crops. They are ubiquitous in the environment. Numerous studies confirm that glyphosate is found in rivers, streams, and groundwater in agricultural areas where Roundup is used. It has been found in food, in the urine of agricultural workers, and even in the urine of urban dwellers who are not in direct contact with glyphosate.

8.  On March 20, 2015, the International Agency for Research on Cancer ("IARC"), an agency of the World Health Organization ("WHO"), issued an evaluation of several herbicides, including glyphosate. That evaluation was based, in part, on studies of exposures to glyphosate in several countries around the world, and it traces the health implications from exposure to glyphosate since 2001.

9.  On July 29, 2015, IARC issued the formal monograph relating to glyphosate. In that monograph, the IARC Working Group provides a thorough review of the numerous studies and data relating to glyphosate exposure in humans.

10. The IARC Working Group classified glyphosate as a Group 2A herbicide, which means that it is probably carcinogenic to humans. The IARC Working Group concluded that the cancers most associated with glyphosate exposure include Multiple Myeloma.

11. The IARC evaluation is significant. It confirms what has been believed for years: that glyphosate is toxic to humans.

12. Nevertheless Monsanto, since it began selling Roundup, has represented it as safe to humans and the environment. Indeed, Monsanto has repeatedly proclaimed and continues

4

to proclaim to the world, and particularly to United States consumers, that glyphosate-based herbicides, including Roundup, create no unreasonable risks to human health or to the environment.

13. Glyphosate is a broad-spectrum, non-selective herbicide used in a wide variety of herbicidal products around the world.

14. Plants treated with glyphosate translocate the systemic herbicide to their roots, shoot regions and fruit, where it interferes with the plant's ability to form aromatic amino acids necessary for protein synthesis. Treated plants generally die within two to three days. Because plants absorb glyphosate, it cannot be completely removed by washing or peeling produce or by milling, baking, or brewing grains.

15. For nearly 45 years, farms across the world have used Roundup without knowing of the dangers its use poses. That is because when Monsanto first introduced Roundup, it touted glyphosate as a technological breakthrough: it could kill almost every weed without causing harm either to people or to the environment. History has now shown that not to be true. According to the WHO, the main chemical ingredient of Roundup – glyphosate - is a probable cause of cancer. Those most at risk are farm workers and other individuals with workplace exposure to Roundup, such as workers in garden centers, nurseries, and landscapers. Monsanto assured the public that Roundup was harmless. In order to prove this, Monsanto championed falsified data and attacked legitimate studies that revealed its dangers. Monsanto led a prolonged campaign of misinformation to convince government agencies, farmers, and the general population that Roundup was safe.

5

### *The Discovery of Glyphosate and Development of Roundup*

16. The herbicidal properties of glyphosate were discovered in 1970 by Monsanto chemist John Franz. The first GBH was introduced to the market in the mid-1970s under the brand name Roundup. From the outset, Monsanto marketed Roundup as a "safe" general-purpose herbicide for widespread commercial and consumer use; Monsanto still markets Roundup as safe today.[1]

### *Registration of Herbicides under Federal Law*

17. The manufacture, formulation and distribution of herbicides, such as Roundup, are regulated under the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA" or "Act"), 7 U.S.C. § 136 *et seq*. FIFRA requires that all pesticides be registered with the Environmental Protection Agency ("EPA" or "Agency") prior to their distribution, sale, or use, except as described by the Act. 7 U.S.C. § 136a(a).

18. Because herbicides are toxic to plants, and potentially to animals and humans, the EPA requires as part of the registration process a variety of tests to evaluate the potential for exposure to pesticides and herbicides, toxicity to people and other potential non-target organisms, and other adverse effects on the environment. Registration by the EPA, however, is not an assurance or finding of safety. The determination the Agency must make in registering or reregistering a product is not that the product is "safe," but rather that use of the product in accordance with its label directions "will not generally cause unreasonable adverse effects on the environment." 7 U.S.C. § 136a(c)(5)(D).

---

[1] Bayer Global, Glyphosate's Impact on Human Health and Safety, https://www.bayer.com/en/glyphosate-impact-on-human-health-and-safety.aspx

19. FIFRA defines "unreasonable adverse effects on the environment" to mean "any unreasonable risk to man or the environment, taking into account the economic, social, and environmental costs and benefits of the use of any pesticide." 7 U.S.C. § 136(bb). FIFRA thus requires EPA to make a risk/benefit analysis in determining whether a registration should be granted or allowed to continue to be sold in commerce.

20. The EPA registered Roundup for distribution, sale, and manufacture in the United States and the State of Indiana.

21. FIFRA generally requires that the registrant conduct health and safety testing of herbicide products. The EPA has protocols governing the conduct of tests required for registration and the laboratory practices that must be followed in conducting these tests. The data produced by the registrant must be submitted to the EPA for review and evaluation. However, the government is not required nor is it able, to perform the product tests that are required of the manufacturer.

22. The evaluation of each product distributed, sold, or manufactured is completed at the time that the product is initially registered. The data necessary for registration of a pesticide has changed over time, and re-registration is typically required.

23. In the case of glyphosate, and therefore Roundup, the EPA had planned on releasing its preliminary risk assessment —in relation to the re-registration process—no later than July 2015. The EPA completed its review of glyphosate in early 2015, but it delayed releasing the risk assessment pending further review in light of the WHO's health-related findings.

24. Based on early studies that glyphosate could cause cancer in laboratory animals, the EPA originally classified glyphosate as possibly carcinogenic to humans (Group C) in 1985.

25. After pressure from Monsanto, including contrary studies it provided to the EPA, the EPA changed its classification to evidence of non-carcinogenicity in humans (Group E) in 1991. In so classifying glyphosate, however, the EPA made clear that the designation did not mean the chemical does not cause cancer: "It should be emphasized, however, that designation of an agent in Group E is based on the available evidence at the time of evaluation and should not be interpreted as a definitive conclusion that the agent will not be a carcinogen under any circumstances."

26. On two occasions, the EPA found that the laboratories hired by Monsanto to test the toxicity of its Roundup products for registration purposes committed fraud.

27. In the first instance, Monsanto, in seeking initial registration of Roundup by the EPA, hired Industrial Bio-Test Laboratories ("IBT") to perform and evaluate its toxicology studies relating to Roundup. IBT performed about 30 tests on glyphosate and glyphosate-containing products, including nine of the 15 residue studies needed to register Roundup.

28. In 1976, the United States Food and Drug Administration ("FDA") performed an inspection of Industrial Bio-Test Industries ("IBT") that revealed discrepancies between the raw data and the final report relating to the toxicological impacts of glyphosate. The EPA subsequently audited IBT; it too found the toxicology studies conducted for the Roundup herbicide to be invalid. An EPA reviewer stated, after finding "routine falsification of data" at IBT, that it was "hard to believe the scientific integrity of the studies when they said they took specimens of the uterus from male rabbits."

29. Three top executives of IBT were convicted of fraud in 1983.

30. In the second incident of data falsification, Monsanto hired Craven Laboratories in 1991 to perform pesticide and herbicide studies, including for Roundup. In that same year, the

owner of Craven Laboratories and three of its employees were indicted, and later convicted, of fraudulent laboratory practices in the testing of pesticides and herbicides.

### *The Importance of Roundup to Monsanto's Market Dominance Profits*

31. The success of Roundup was key to Monsanto's continued reputation and dominance in the marketplace. Largely due to the success of Roundup sales, Monsanto's agriculture division was out-performing its chemical division's operating income, and that gap increased yearly. But with its patent for glyphosate expiring in the United States in the year 2000, Monsanto needed a strategy to maintain its Roundup market dominance and to ward off impending competition.

32. In response, Monsanto began the development and sale of genetically engineered Roundup Ready seeds in 1996. Since Roundup Ready crops are resistant to glyphosate; farmers can spray Roundup onto their fields during the growing season without harming the crop. This allowed Monsanto to expand its market for Roundup even further; by 2000, Monsanto's biotechnology seeds were planted on more than 80 million acres worldwide and nearly 70% of American soybeans were planted from Roundup Ready seeds. It also secured Monsanto's dominant share of the glyphosate/Roundup market through a marketing strategy that coupled proprietary Roundup Ready seeds with continued sales of its Roundup herbicide.

33. Through a three-pronged strategy of increased production, decreased prices, and by coupling with Roundup Ready seeds, Roundup became Monsanto's most profitable product. In 2000, Roundup accounted for almost $2.8 billion in sales, outselling other herbicides by a margin of five to one, and accounting for close to half of Monsanto's

9

revenue. Today, glyphosate remains one of the world's largest herbicides by sales volume.

***Monsanto has known for decades that it falsely advertises the safety of Roundup.***

34. In 1996, the New York Attorney General ("NYAG") filed a lawsuit against Monsanto based on its false and misleading advertising of Roundup products. Specifically, the lawsuit challenged Monsanto's general representations that its spray-on glyphosate-based herbicides, including Roundup, were "safer than table salt" and "practically non-toxic" to mammals, birds, and fish. Among the statements the NYAG found deceptive and misleading about the human and environmental safety of Roundup are the following representations made:

   a. Remember that environmentally friendly Roundup herbicide is biodegradable. It won't build up in the soil so you can use Roundup with confidence along customers' driveways, sidewalks and fences ...

   b. And remember that Roundup is biodegradable and won't build up in the soil. That will give you the environmental confidence you need to use Roundup everywhere you've got a weed, brush, edging or trimming problem.

   c. Roundup biodegrades into naturally occurring elements.

   d. Remember that versatile Roundup herbicide stays where you put it. That means there's no washing or leaching to harm customers' shrubs or other desirable vegetation.

   e. This non-residual herbicide will not wash or leach in the soil. It ... stays where you apply it.

10

    f.   You can apply Roundup with "confidence because it will stay where you put it" it bonds tightly to soil particles, preventing leaching. Then, soon after application, soil microorganisms biodegrade Roundup into natural products.

    g.   Glyphosate is less toxic to rats than table salt following acute oral ingestion.

    h.   Glyphosate's safety margin is much greater than required. It has over a 1,000-fold safety margin in food and over a 700-fold safety margin for workers who manufacture it or use it.

    i.   You can feel good about using herbicides by Monsanto. They carry a toxicity category rating of 'practically non-toxic' as it pertains to mammals, birds and fish.

    j.   "Roundup can be used where kids and pets will play and breaks down into natural material." This ad depicts a person with his head in the ground and a pet dog standing in an area which has been treated with Roundup.

35. On November 19, 1996, Monsanto entered into an Assurance of Discontinuance with the NYAG, in which Monsanto agreed, among other things, "to cease and desist from publishing or broadcasting any advertisements [in New York] that represent, directly or by implication" that:

    a.   its glyphosate-containing pesticide products or any component thereof are safe, non-toxic, harmless or free from risk.

    b.   its glyphosate-containing pesticide products or any component thereof manufactured, formulated, distributed or sold by Monsanto are biodegradable

    c.   its glyphosate-containing pesticide products or any component thereof stay where they are applied under all circumstances and will not move through the environment by any means.

    d.  its glyphosate-containing pesticide products or any component thereof are "good" for the environment or are "known for their environmental characteristics."

    e.  glyphosate-containing pesticide products or any component thereof are safer or less toxic than common consumer products other than herbicides;

    f.  its glyphosate-containing products or any component thereof might be classified as "practically non-toxic."

36. Monsanto did not alter its advertising in the same manner in any state other than New York, and on information and belief still has not done so today.

### *Classifications and Assessments of Glyphosate*

37. The IARC was created in 1965 as the specialized cancer agency of the World Health Organization with the support of the United States. The IARC promotes international collaboration in cancer research, "bringing together skills in epidemiology, laboratory sciences, and biostatistics to identify the causes of cancer." The IARC is transparent. The minutes and documents presented at its council meetings are all publicly available and subject to scientific scrutiny.

38. The IARC process for the classification of glyphosate followed the stringent procedures for the evaluation of a chemical agent. Over time, the IARC Monograph program has reviewed 980 agents. Of those reviewed, it has determined 116 agents to be Group 1 (Known Human Carcinogens); 73 agents to be Group 2A (Probable Human Carcinogens); 287 agents to be Group 2B (Possible Human Carcinogens); 503 agents to be Group 3 (Not Classified); and one agent to be Probably Not Carcinogenic.

39. The established procedure for IARC Monograph evaluations is described in the IARC Programme's Preamble. Evaluations are performed by panels of international experts, selected on the basis of their expertise and the absence of actual or apparent conflicts of interest.

40. One year before the Monograph meeting, the meeting is announced and there is a call both for data and for experts. Eight months before the Monograph meeting, the Working Group membership is selected and the sections of the Monograph are developed by the Working Group members. One month prior to the Monograph meeting, the call for data is closed and the various draft sections are distributed among Working Group members for review and comment. Finally, at the Monograph meeting, the Working Group finalizes review of all literature, evaluates the evidence in each category, and completes the overall evaluation. Within two weeks after the Monograph meeting, the summary of the Working Group findings is published in Lancet Oncology, and within a year after the meeting, the final Monograph is finalized and published.

41. In assessing an agent, the IARC Working Group reviews the following information:

   a.  human, experimental, and mechanistic data;

   b.  all pertinent epidemiological studies and cancer bioassays; and

   c.  representative mechanistic data. The studies must be publicly available and have sufficient detail for meaningful review, and reviewers cannot be associated with the underlying study.

42. In March 2015, IARC reassessed glyphosate. The summary published in The Lancet Oncology reported that glyphosate is a Group 2A agent and *probably carcinogenic* in humans.

13

43. On July 29, 2015, IARC issued its Monograph for glyphosate, Monograph 112. For Volume 112, the volume that assessed glyphosate, a Working Group of 17 experts from 11 countries met at IARC from March 3–10, 2015, to assess the carcinogenicity of certain herbicides, including glyphosate. The March meeting culminated nearly a one-year review and preparation by the IARC Secretariat and the Working Group, including a comprehensive review of the latest available scientific evidence. According to published procedures, the Working Group considered "reports that have been published or accepted for publication in the openly available scientific literature" as well as "data from governmental reports that are publicly available."

44. The studies considered the following exposure groups: occupational exposure of farmers and tree nursery workers in the United States, forestry workers in Canada and Finland, and municipal weed-control workers in the United Kingdom; and para-occupational exposure in farming families.

45. Glyphosate was identified as the second-most used household herbicide in the United States for weed control between 2001 and 2007 and the most heavily used herbicide in the world in 2012.

46. Exposure pathways are identified as air (especially during spraying), water, and food. Community exposure to glyphosate is widespread and found in soil, air, surface water, and groundwater, as well as in food.

47. The assessment of the IARC Working Group identified several case control studies of occupational exposure in the United States, Canada, and Sweden. These studies show a human health concern from agricultural and other work-related exposure to glyphosate.

14

48. The IARC Working Group found an increased risk between exposure to glyphosate and non-Hodgkin lymphoma ("NHL") and several subtypes of NHL, and the increased risk persisted after adjustment for other pesticides.

49. The IARC Working Group also found that glyphosate caused DNA and chromosomal damage in human cells. One study in community residents reported increases in blood markers of chromosomal damage (micronuclei) after glyphosate formulations were sprayed.

50. In male CD-1 mice, glyphosate induced a positive trend in the incidence of a rare tumor, renal tubule carcinoma. A second study reported a positive trend for haemangiosarcoma in male mice. Glyphosate increased pancreatic islet-cell adenoma in male rats in two studies. A glyphosate formulation promoted skin tumors in an initiation-promotion study in mice.

51. The IARC Working Group also found that glyphosate caused DNA and chromosomal damage in human cells. One study in community residents reported increases in blood markers of chromosomal damage after glyphosate formulations were sprayed. In assessing the genotoxicity (the property of chemical agents that damages the genetic information within a cell, causing mutations) of glyphosate, the IARC Working Group concluded "there is strong evidence that glyphosate causes genotoxicity."

52. The IARC Working Group also noted that glyphosate has been detected in the urine of agricultural workers, indicating absorption. Soil microbes degrade glyphosate to aminomethylphosphoric acid (AMPA). Blood AMPA detection after exposure suggests intestinal microbial metabolism in humans.

15

53. The IARC Working Group further found that glyphosate and glyphosate formulations induced DNA and chromosomal damage in mammals, and in human and animal cells *in utero*.

54. The IARC Working Group also noted genotoxic, hormonal, and enzymatic effects in mammals exposed to glyphosate. Essentially, glyphosate inhibits the biosynthesis of aromatic amino acids, which leads to several metabolic disturbances, including the inhibition of protein and secondary product biosynthesis and general metabolic disruption.

55. The IARC Working Group also reviewed an Agricultural Health Study, consisting of a prospective cohort of 57,311 licensed pesticide applicators in Iowa and North Carolina. While this study differed from others in that it was based on a self-administered questionnaire, the results support an association between glyphosate exposure and Multiple Myeloma, Hairy Cell Leukemia (HCL), and Chronic Lymphocytic Leukemia (CLL), in addition to several other cancers.

56. In addition to the studies examining glyphosate, research also suggests that the carcinogenic properties of Roundup are magnified by the addition of adjuvants in the Roundup formulation. Adjuvants are chemicals that are designed to enhance or modify the effectiveness of other agents. Monsanto has been including adjuvants with glyphosate in its Roundup products, which are designed to increase the effectiveness of the herbicide. Studies show, however, that the addition of adjuvants greatly increases the carcinogenic properties of Roundup. Notably, Monsanto has systematically tested Roundup *without* the adjuvants, using those tests to lobby the EPA that Roundup is safe.

16

*Other Earlier Findings About Glyphosate's Dangers to Human Health*

57. The EPA has a technical fact sheet, as part of its Drinking Water and Health, National Primary Drinking Water Regulations publication, relating to glyphosate. This technical fact sheet predates the IARC March 20, 2015, evaluation. The fact sheet describes the release patterns for glyphosate as follows:

58. Glyphosate is released to the environment in its use as a herbicide for controlling woody and herbaceous weeds on forestry, right-of-way, cropped and non-cropped sites. These sites may be around water and in wetlands. It may also be released to the environment during its manufacture, formulation, transport, storage, disposal, and cleanup, and from spills. Since glyphosate is not a listed chemical in the Toxics Release Inventory, data on releases during its manufacture and handling are not available. Occupational workers and home gardeners may be exposed to glyphosate by inhalation and dermal contact during spraying, mixing, and cleanup. They may also be exposed by touching soil and plants to which glyphosate was applied. Occupational exposure may also occur during glyphosate's manufacture, transport storage, and disposal.

59. In 1995, the Northwest Coalition for Alternatives to Pesticides reported that in California, the state with the most comprehensive program for reporting of pesticide-caused illness, glyphosate was the third most commonly-reported cause of pesticide illness among agricultural workers.

*Recent Worldwide Bans on Roundup/Glyphosate*

60. Several countries around the world have instituted bans on the sale of Roundup and other glyphosate-containing herbicides, both before and since IARC first announced its assessment for glyphosate in March 2015.

17

61. The Netherlands issued a ban on all glyphosate-based herbicides in April 2014, including Roundup, which took effect by the end of 2015. In issuing the ban, the Dutch Parliament member who introduced the successful legislation stated: "Agricultural pesticides in user-friendly packaging are sold in abundance to private persons. In garden centers, Roundup is promoted as harmless, but unsuspecting customers have no idea what the risks of this product are. Especially children are sensitive to toxic substances and should therefore not be exposed to it."

62. France banned the private sale of Roundup and glyphosate following the IARC assessment for Glyphosate.

63. Bermuda banned both the private and commercial sale of glyphosates, including Roundup. The Bermuda government explained its ban as follows: "Following a recent scientific study carried out by a leading cancer agency, the importation of weed spray 'Roundup' has been suspended."

64. The Sri Lankan government banned the private and commercial use of glyphosates, particularly out of concern that glyphosate has been linked to fatal kidney disease in agricultural workers.

65. The government of Columbia announced its ban on using Roundup and glyphosate to destroy illegal plantations of coca, the raw ingredient for cocaine, because of the IARC's finding that glyphosate is probably carcinogenic.

## EQUITABLE TOLLING OF APPLICABLE STATUTE OF LIMITATIONS

66. Plaintiff incorporates by reference all prior paragraphs of this Complaint as if fully set forth herein.

18

67. The running of any statute of limitations has been tolled by reason of Monsanto's fraudulent concealment. Monsanto, through its affirmative misrepresentations and omissions, actively concealed from Plaintiffs the true risks associated with Roundup and glyphosate. *I.C. 34-11-5-1.*

68. At all relevant times, Monsanto has maintained that Roundup is safe, non-toxic, and non-carcinogenic.

69. Indeed, even as of April, 2020, Monsanto continues to represent to the public that glyphosate is not carcinogenic.

70. As a result of Monsanto's actions, the Personal Representative of the Estate of Brady Nelson Winer was unaware, and could not reasonably know or have learned through reasonable diligence that Roundup and/or glyphosate contact, exposed Brady to the risks alleged herein and that those risks were the direct and proximate result of Monsanto's acts and omissions.

71. Furthermore, Monsanto is estopped from relying on any statute of limitations because of its fraudulent concealment of the true character, quality and nature of Roundup. Monsanto was under a duty to disclose the true character, quality, and nature of Roundup because this was non-public information over which Monsanto had and continues to have exclusive control, and because Monsanto knew that this information was not available to Plaintiffs or to distributors of Roundup. In addition, Monsanto is estopped from relying on any statute of limitations because of its intentional concealment of these facts.

72. Plaintiff had no knowledge that Monsanto was engaged in the wrongdoing alleged herein. Because of the fraudulent acts of concealment of wrongdoing by Monsanto, Plaintiff could not have reasonably discovered the wrongdoing at any time prior. Also, the

economics of this fraud should be considered. Monsanto had the ability to and did spend enormous amounts of money in furtherance of its purpose of marketing, promoting and/or distributing a profitable herbicide, notwithstanding the known or reasonably known risks. Plaintiff and medical professionals could not have afforded and could not have possibly conducted studies to determine the nature, extent, and identity of related health risks, and were forced to rely on only Monsanto's representations. Accordingly, Monsanto is precluded by the discovery rule and/or the doctrine of fraudulent concealment from relying upon any statute of limitations.

## COUNT I
## STRICT LIABILITY (DESIGN DEFECT)

73. Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

74. Plaintiffs bring this strict liability claim against Monsanto for defective design.

75. At all times relevant to this litigation, Monsanto engaged in the business of testing, developing, manufacturing, selling, distributing, and Monsanto engaged in the marketing, packaging design, and promotion of Roundup products, which are defective and unreasonably dangerous to consumers, including Brady, thereby placing Roundup products into the stream of commerce. These actions were under the ultimate control and supervision of Monsanto. At all times relevant to this litigation, Monsanto designed, researched, developed, manufactured, produced, tested, assembled, labeled, advertised, promoted, marketed, sold, and distributed the Roundup products used by Brady Nelson Winer, as described above.

20

76. At all times relevant to this litigation, Roundup products were manufactured, designed, and labeled in an unsafe, defective, and inherently dangerous manner that was dangerous for use by or exposure to the public, and, in particular, Brady Nelson Winer.

77. At all times relevant to this litigation, Roundup products reached the intended consumers, handlers, and users or other persons coming into contact with these products in Indiana and throughout the United States, including Brady Nelson Winer, without substantial change in their condition as designed, manufactured, sold, distributed, labeled, and marketed by Monsanto.

78. Roundup products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold, and marketed by Monsanto were defective in design and formulation in that when they left the hands of the manufacturers and/or suppliers, they were unreasonably dangerous and dangerous to an extent beyond that which an ordinary consumer would contemplate.

79. Roundup products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold, and marketed by Monsanto were defective in design and formulation in that when they left the hands of the manufacturers and/or suppliers, the foreseeable risks exceeded the alleged benefits associated with their design and formulation.

80. At all times relevant to this action, Monsanto knew or had reason to know that Roundup products were defective and were inherently dangerous and unsafe when used in the manner instructed and provided by Monsanto.

81. Therefore, at all times relevant to this litigation, Roundup products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold, and

marketed by Monsanto were defective in design and formulation, in one or more of the following ways:

a)  When placed in the stream of commerce, Roundup products were defective in design and formulation, and, consequently, dangerous to an extent beyond that which an ordinary consumer would contemplate.

b)  When placed in the stream of commerce, Roundup products were unreasonably dangerous in that they were hazardous and posed a grave risk of cancer and other serious illnesses when used in a reasonably anticipated manner.

c)  When placed in the stream of commerce, Roundup products contained unreasonably dangerous design defects and were not reasonably safe when used in a reasonably anticipated or intended manner.

d)  Monsanto did not sufficiently test, investigate, or study Roundup products and, specifically, the active ingredient glyphosate.

e)  Exposure to Roundup and glyphosate-containing products presents a risk of harmful side effects that outweigh any potential utility stemming from the use of the herbicide.

f)  At the time of marketing its Roundup products, Roundup was defective in that exposure to Roundup and specifically, its active ingredient glyphosate enhanced by adjuvants, could result in cancer and other severe illnesses and injuries.

g)  Monsanto did not conduct adequate post-marketing surveillance of its Roundup products.

22

       h)      Monsanto could have employed safer alternative designs and formulations.

82. Brady was exposed to Roundup products in the course of his work, as described above, without knowledge of their dangerous characteristics.

83. At all times relevant to this litigation, Brady used and/or was exposed to the use of Roundup products in an intended or reasonably foreseeable manner without knowledge of their dangerous characteristics.

84. Neither Brady nor the Personal Representative of his Estate could not have reasonably discovered the defects and risks associated with Roundup or glyphosate-containing products before or at the time of exposure.

85. The harm caused by Roundup products far outweighed their benefit, rendering these products dangerous to an extent beyond that which an ordinary consumer would contemplate. Roundup products were and are more dangerous than alternative products and Monsanto could have designed Roundup products (including their packaging and sales aids) to make them less dangerous. Indeed, at the time that Monsanto designed Roundup products, the state of the industry's scientific knowledge was such that a less risky design or formulation was attainable.

86. At the time Roundup products left Monsanto's control, there was a practical, technically feasible and safer alternative design that would have prevented the harm without substantially impairing the reasonably anticipated or intended function of those herbicides.

87. Monsanto's defective design of Roundup products was willful, wanton, fraudulent, malicious, and conducted with reckless disregard for the health and safety of users of the Roundup products, including the decedent herein.

88. Therefore, as a result of the unreasonably dangerous condition of its Roundup products, Monsanto is strictly liable to the Estate of Brady Nelson Winer.

89. The defects in Roundup products caused or contributed to cause Brady's death, and, but for Monsanto's misconduct and omissions, Brady would not have died as he did.

90. Monsanto's conduct, as described above, was reckless. Monsanto risked the lives of consumers and users of its products, including Brady, with knowledge of the safety problems associated with Roundup and glyphosate-containing products, and suppressed this knowledge from the general public. Monsanto made conscious decisions not to redesign, warn, or inform the unsuspecting public. Monsanto's reckless conduct warrants an award of aggravated damages.

91. As a direct and proximate result of Monsanto placing defective Roundup products into the stream of commerce, Brady suffered and died, and his Estate and heirs at law have been damaged.

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in Plaintiff's favor for compensatory and punitive damages in an amount in excess of Seventy-Five Thousand Dollars ($75,000.00), together with interest, costs herein incurred, and all such other and further relief as this Court deems just and proper.

## COUNT II
## STRICT LIABILITY (FAILURE TO WARN)

92. Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

93. Plaintiff brings this strict liability claim against Monsanto for failure to warn.

94. At all times relevant to this litigation, Monsanto engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting Roundup products, which are defective and unreasonably dangerous to consumers, including Plaintiff, because they do not contain adequate warnings or instructions concerning the dangerous characteristics of Roundup and, specifically, the active ingredient glyphosate. These actions were under the ultimate control and supervision of Monsanto.

95. Monsanto researched, developed, designed, tested, manufactured, inspected, labeled, distributed, marketed, promoted, sold, and otherwise released into the stream of commerce Roundup products, and in the course of same, directly advertised or marketed the products to consumers and end users, including Brady Nelson Winer, and therefore had a duty to warn of the risks associated with the use of Roundup and glyphosate-containing products.

96. At all times relevant to this litigation, Monsanto had a duty to properly test, develop, design, manufacture, inspect, package, label, market, promote, sell, distribute, maintain supply, provide proper warnings, and take such steps as necessary to ensure that Roundup products did not cause users and consumers to suffer from unreasonable and dangerous risks. Monsanto had a continuing duty to warn Brady Nelson Winer of the dangers associated with Roundup use and exposure. Monsanto, as manufacturer, seller, promoter, marketer, or distributor of chemical herbicides are held to the knowledge of an expert in the field.

97. At the time of manufacture, Monsanto could have provided the warnings or instructions regarding the full and complete risks of Roundup and glyphosate-containing products

because it knew or should have known of the unreasonable risks of harm associated with the use of and/or exposure to such products.

98. At all times relevant to this litigation, Monsanto failed to investigate, study, test, or promote the safety or to minimize the dangers to users and consumers of its product and to those who would foreseeably use or be harmed by these herbicides, including Brady Nelson Winer.

99. Despite the fact that Monsanto knew or should have known that Roundup posed a grave risk of harm, it failed to exercise reasonable care to warn of the dangerous risks associated with use and exposure. The dangerous propensities of these products and the carcinogenic characteristics of glyphosate, as described above, were known to Monsanto, or scientifically knowable to Monsanto through appropriate research and testing by known methods, at the time it distributed, marketed, promoted, supplied, or sold the product, and not known to end users and consumers, such as Brady Nelson Winer.

100. These products created significant risks of serious bodily harm to consumers, as alleged herein, and Monsanto failed to adequately warn consumers and reasonably foreseeable users of the risks of exposure to its products. Monsanto has wrongfully concealed information concerning the dangerous nature of Roundup and its active ingredient glyphosate, and further made false and/or misleading statements concerning the safety of Roundup and glyphosate.

101. At all times relevant to this litigation, Roundup products reached the intended consumers, handlers, and users or other persons coming into contact with these products in Indiana and throughout the United States, including Brady Nelson Winer, without

substantial change in their condition as designed, manufactured, sold, distributed, labeled, promoted, and marketed by Monsanto.

102.     Brady was exposed to Roundup products in the course of his employment and/or personal use of Roundup, without knowledge of its dangerous characteristics.

103.     At all times relevant to this litigation, Brady used and/or was exposed to the use of Roundup products in their intended or reasonably foreseeable manner without knowledge of their dangerous characteristics.

104.     Neither Brady nor the Personal Representative of his Estate could have reasonably discovered the defects and risks associated with Roundup or glyphosate-containing products prior to or at the time of Brady's exposure. Brady relied upon the skill, superior knowledge, and judgment of Monsanto.

105.     These products were defective because the minimal warnings disseminated with Roundup products were inadequate, and they failed to communicate adequate information on the dangers and safe use/exposure and failed to communicate warnings and instructions that were appropriate and adequate to render the products safe for their ordinary, intended, and reasonably foreseeable uses, including agricultural and landscaping applications.

106.     The information that Monsanto did provide or communicate failed to contain relevant warnings, hazards, and precautions that would have enabled consumers such as Brady Nelson Winer to utilize the products safely and with adequate protection. Instead, Monsanto disseminated information that was inaccurate, false, and misleading and which failed to communicate accurately or adequately the comparative severity, duration, and extent of the risk of injuries with use of and/or exposure to Roundup and glyphosate;

27

continued to aggressively promote the efficacy of its products, even after it knew or should have known of the unreasonable risks from use or exposure; and concealed, downplayed, or otherwise suppressed, through aggressive marketing and promotion, any information or research about the risks and dangers of exposure to Roundup and glyphosate.

107.    To this day, Monsanto has failed to adequately and accurately warn of the true risks of death or injury associated with the use of and exposure to Roundup and its active ingredient glyphosate, a probable carcinogen.

108.    As a result of their inadequate warnings, Roundup products were defective and unreasonably dangerous when they left the possession and/or control of Monsanto, were distributed, marketed, and promoted by Monsanto, and used by Brady at his work and home.

109.    Monsanto is liable to the Estate of Brady Nelson Winer for injuries caused by its negligent or willful failure, as described above, to provide adequate warnings or other clinically relevant information and data regarding the appropriate use of these products and the risks associated with the use of or exposure to Roundup and glyphosate.

110.    The defects in Roundup products caused or contributed to cause Brady's death, and, but for this misconduct and omissions, Brady would not have passed away.

111.    Had Monsanto provided adequate warnings and instructions and properly disclosed and disseminated the risks associated with Roundup products, Brady could have avoided the risk of developing injuries or death as alleged herein.

112.    As a direct and proximate result of Monsanto placing defective Roundup products into the stream of commerce, Brady suffered and died, and his Estate and heirs at law have been damaged.

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in Plaintiff's favor for compensatory and punitive damages in an amount in excess of Seventy-Five Thousand Dollars ($75,000.00) together with interest, costs herein incurred, and all such other and further relief as this Court deems just and proper.

## COUNT III
## NEGLIGENCE

113.    Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

114.    Monsanto, directly or indirectly, caused Roundup products to be sold, distributed, packaged, labeled, marketed, promoted, and/or used by Brady Nelson Winer.

115.    At all times relevant to this litigation, Monsanto had a duty to exercise reasonable care in the design, research, manufacture, marketing, advertisement, supply, promotion, packaging, sale, and distribution of Roundup products, including the duty to take all reasonable steps necessary to manufacture, promote, and/or sell a product that was not unreasonably dangerous to consumers and users of the product.

116.    At all times relevant to this litigation, Monsanto had a duty to exercise reasonable care in the marketing, advertisement, and sale of the Roundup products. Monsanto's duty of care owed to consumers and the general public included providing accurate, true, and correct information concerning the risks of using Roundup and appropriate, complete,

29

and accurate warnings concerning the potential adverse effects of exposure to Roundup, and, in particular, its active ingredient glyphosate.

117.     At all times relevant to this litigation, Monsanto knew or, in the exercise of reasonable care, should have known of the hazards and dangers of Roundup and specifically, the carcinogenic properties of the chemical glyphosate.

118.     Accordingly, at all times relevant to this litigation, Monsanto knew or, in the exercise of reasonable care, should have known that use of or exposure to its Roundup products could cause or be associated with Brady Nelson Winer's death and thus created a dangerous and unreasonable risk of injury to the users of these products, including Plaintiff.

119.     Monsanto also knew or, in the exercise of reasonable care, should have known that users and consumers of Roundup were unaware of the risks and the magnitude of the risks associated with use of and/or exposure to Roundup and glyphosate-containing products.

120.     As such, Monsanto breached the duty of reasonable care and failed to exercise ordinary care in the design, research, development, manufacture, testing, marketing, supply, promotion, advertisement, packaging, sale, and distribution of its Roundup products, in that Monsanto manufactured, marketed, promoted, and sold defective herbicides containing the chemical glyphosate, knew or had reason to know of the defects inherent in these products, knew or had reason to know that a user's or consumer's exposure to the products created a significant risk of harm and unreasonably dangerous side effects, and failed to prevent or adequately warn of these risks and injuries.

121.     Despite an ability and means to investigate, study, and test these products and to provide adequate warnings, Monsanto has failed to do so. Indeed, Monsanto has wrongfully concealed information and has further made false and/or misleading statements concerning the safety and/or exposure to Roundup and glyphosate.

122.     Monsanto was negligent in the following respects:

  a.  Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing its Roundup products without thorough and adequate pre- and post-market testing;

  b.  Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing Roundup while negligently and/or intentionally concealing and failing to disclose the results of trials, tests, and studies of exposure to glyphosate, and, consequently, the risk of serious harm associated with human use of and exposure to Roundup;

  c.  Failing to undertake sufficient studies and conduct necessary tests to determine whether or not Roundup products and glyphosate-containing products were safe for their intended use in agriculture and horticulture;

  d.  Failing to use reasonable and prudent care in the design, research, manufacture, and development of Roundup products so as to avoid the risk of serious harm associated with the prevalent use of Roundup/glyphosate as an herbicide;

  e.  Failing to design and manufacture Roundup products so as to ensure they were at least as safe and effective as other herbicides on the market;

f.  Failing to provide adequate instructions, guidelines, and safety precautions to those persons who Monsanto could reasonably foresee would use and be exposed to its Roundup products;

g.  Failing to disclose to Brady Nelson Winer, users/consumers, and the general public that use of and exposure to Roundup presented severe risks of cancer and other grave illnesses;

h.  Failing to warn Brady Nelson Winer, consumers, and the general public that the product's risk of harm was unreasonable and that there were safer and effective alternative herbicides available to Brady and other consumers;

i.  Systematically suppressing or downplaying contrary evidence about the risks, incidence, and prevalence of the side effects of Roundup and glyphosate-containing products;

j.  Misleading authorities in charge of the regulation of Roundup of the true nature of glyphosate and adjuvants in creating a significant risk of cancer;

k.  Representing that its Roundup products were safe for their intended use when, in fact, Monsanto knew or should have known that the products were not safe for their intended purpose;

l.  Declining to make or propose any changes to Roundup products' labeling or other promotional materials that would alert the consumers and the general public of the risks of Roundup and glyphosate;

m. Advertising, marketing, and recommending the use of the Roundup products, while concealing and failing to disclose or warn of the dangers known by

32

Monsanto to be associated with or caused by the use of or exposure to Roundup and glyphosate;

n. Continuing to disseminate information to its consumers, which indicate or imply that Monsanto's Roundup products are not unsafe for use in the agricultural and horticultural industries; and

o. Continuing the manufacture and sale of its products with the knowledge that the products were unreasonably unsafe and dangerous.

123.   Monsanto knew and/or should have known that it was foreseeable that consumers such as Brady Nelson Winer would suffer injuries as a result of Monsanto's failure to exercise ordinary care in the manufacturing, marketing, promotion, labeling, distribution, and sale of Roundup.

124.   Neither Brady nor the Personal Representative of his Estate could have reasonably discovered the risks associated with Roundup or glyphosate-containing products prior to or at the time of Brady's exposure.

125.   Monsanto's negligence was the proximate cause of the injuries, harm, and economic losses that Plaintiff suffered, as described herein.

126.   Monsanto's conduct, as described above, was reckless. Monsanto regularly risked the lives of consumers and users of its products, including Brady Nelson Winer, with full knowledge of the dangers of these products. Monsanto has made conscious decisions not to redesign, re-label, warn, or inform the unsuspecting public, including Plaintiff. Monsanto's reckless conduct therefore warrants an award of aggravated or punitive damages.

127.    As a proximate result of Monsanto's negligent and wrongful acts and omissions, Brady suffered and died, and his Estate and heirs at law have been damaged in an amount to be determined.

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in Plaintiff's favor for compensatory and punitive damages in an amount in excess of Seventy-Five Thousand Dollars ($75,000.00) together with interest, costs herein incurred, and all such other and further relief as this Court deems just and proper. Plaintiffs also demand a jury trial on the issues contained herein.

## JURY DEMAND

PLAINTIFFS DEMAND A TRIAL BY JURY ON ALL COUNTS.

_____
Daniel J. Vanderpool, Attorney for Plaintiff (1620-85)

/s/ *Isaiah P. Vanderpool*

_____
Isaiah P. Vanderpool, Attorney for Plaintiff (34239-49)

VANDERPOOL LAW FIRM PC
1810 E. Center Street
Warsaw, IN 46580
P. 574.268.9995
F. 574.269.9994
Email: dan@vanderpoollaw.net
        isaiah@vanderpoollaw.net

34