# U.S. District Court
# Eastern District of Louisiana (New Orleans)
# CIVIL DOCKET FOR CASE #: 2:20-cv-01666-CJB-DMD

Mayer et al v. Monsanto Company

Assigned to: Judge Carl Barbier

Referred to: Magistrate Judge Dana Douglas

Cause: 28:1332 Diversity-Product Liability

Date Filed: 06/10/2020

Jury Demand: Plaintiff

Nature of Suit: 365 Personal Inj. Prod. Liability

Jurisdiction: Diversity

### **Plaintiff**

**Joey Mayer**　　　　　　　　represented by　**Frank E. Lamothe , III**
Lamothe Law Firm, LLC (New Orleans)
400 Poydras Street
Suite 1760
New Orleans, LA 70130
504-704-1414
Email: felamothe@lamothefirm.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**James Patrick DeSonier**
James P. DeSonier, Attorney at Law
450 N. Causeway Blvd.
Suite C
Mandeville, LA 70448
985-951-8510
Email: jpdes@bellsouth.net
*ATTORNEY TO BE NOTICED*

**Richard Massie Martin , Jr.**
Lamothe Law Firm, LLC (New Orleans)
400 Poydras Street
Suite 1760
New Orleans, LA 70130
504-704-1414
Fax: 504-861-8476
Email: rmartin@lamothefirm.com
*ATTORNEY TO BE NOTICED*

### **Plaintiff**

**Michael Mayer**　　　　　　represented by　**Frank E. Lamothe , III**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**James Patrick DeSonier**
(See above for address)



CLERK'S OFFICE
A TRUE COPY
Jun 11 2020
Courtney Ancar
Deputy Clerk, U.S. District Court
Eastern District Of Louisiana
New Orleans, LA

*ATTORNEY TO BE NOTICED*

**Richard Massie Martin , Jr.**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Linda Mayer**                    represented by    **Frank E. Lamothe , III**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**James Patrick DeSonier**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Richard Massie Martin , Jr.**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Melvin Mayer , IV**              represented by    **Frank E. Lamothe , III**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**James Patrick DeSonier**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Richard Massie Martin , Jr.**
(See above for address)
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Monsanto Company**

| Date Filed | # | Docket Text |
|---|---|---|
| 06/10/2020 | 1 | COMPLAINT with jury demand against Monsanto Company (Filing fee $ 400 receipt number ALAEDC-8346729) filed by Linda Mayer, Joey Mayer, Melvin Mayer, Michael Mayer. (Attachments: # 1 Civil Cover Sheet)Attorney Richard Massie Martin, Jr added to party Joey Mayer(pty:pla), Attorney Richard Massie Martin, Jr added to party Linda Mayer(pty:pla), Attorney Richard Massie Martin, Jr added to party Melvin Mayer(pty:pla), Attorney Richard Massie Martin, Jr added to party Michael Mayer(pty:pla).(Martin, Richard) (Entered: 06/10/2020) |

| 06/10/2020 | 2 | Initial Case Assignment to Judge Carl Barbier and Magistrate Judge Dana Douglas. (cc) (Entered: 06/10/2020) |

# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **JOEY MAYER, MICHAEL MAYER,** | * | **CIVIL ACTION** |
| **MELVIN MAYER, IV, and LINDA MAYER,** | * | |
| *Plaintiffs,* | * | **No.** |
| | * | |
| **VERSUS** | * | **JUDGE** |
| | * | |
| **MONSANTO COMPANY,** | * | **MAGISTRATE JUDGE** |
| *Defendant.* | * | |

**********************************************

## COMPLAINT FOR WRONGFUL DEATH AND SURVIVAL DAMAGES

**NOW INTO COURT,** through undersigned Counsel, come Joey Mayer, Michael Mayer, Melvin Mayer, Jr., and Linda Mayer (collectively "Plaintiffs"), who for their Complaint for Damages respectfully represent as follows:

## I.  PARTIES

1. Appearing as Plaintiffs are:

    **A.** Joey Mayer, son of decedent Melvin Mayer III, is a person of the full age of majority and a resident citizen of the State of Louisiana;

    **B.** Michael Mayer, son of decedent Melvin Mayer III, is a person of the full age of majority and a resident citizen of the State of Louisiana;

    **C.** Melvin Mayer, IV, son of decedent Melvin Mayer III, is a person of the full age of majority and a resident citizen of the State of Louisiana; and

    **D.** Linda Mayer, surviving spouse of decedent Melvin Mayer III, is a person of the full age of majority and a resident citizen of the State of Louisiana.

2. Named as Defendant is Monsanto Company ("Monsanto"), a Delaware corporation with

its principal place of business located at St. Louis, Missouri.  Monsanto is licensed to do and does business in the State of Louisiana.

## II.  SUBJECT MATTER JURISDICTION

**3.**      Jurisdiction is vested in this Court pursuant to 28 U.S.C.A. § 1332(a)(1) because the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs, and the action is between citizens of different States.

## III.  PERSONAL JURISDICTION

**4.**      Monsanto engages in business and commerce within the Eastern District of Louisiana, is subject to the general personal jurisdiction and/or the specific personal jurisdiction of this Honorable Court, and has been or will be served with Summons and a copy of the instant Complaint for Damages in accordance with Fed. R. Civ. P. 4(h)(1).

## IV.  VENUE

**5.**      Venue is proper in the Eastern District of Louisiana under 28 U.S. C. § 1391(b)(2) because a substantial part of the acts or omissions giving rise to the claim occurred in this judicial district.

## V.  FACTS

### *Where are we now?*

**6.**      In 1970, Monsanto discovered the herbicidal properties of glyphosate and began marketing it in products in 1974, under the brand name Roundup®. Roundup® is a non-selective herbicide used to kill weeds that commonly compete with the growing of crops. In addition to the active ingredient glyphosate, Roundup® contains the surfactant Polyethoxylated tallow amine (POEA) and/or adjuvants and other so-called "inert" ingredients. In 2001, glyphosate was the most-used pesticide active ingredient in American agriculture with 85–90 millions of pounds used annually.

That number grew to 185 million pounds by 2007.[1] As of 2013, glyphosate was the world's most widely used herbicide.

7.      Monsanto is a multinational agricultural biotechnology corporation and the world's leading producer of glyphosate.  As of 2009, Monsanto was the world's leading producer of seeds, accounting for 27% of the world seed market.[2]  The majority of these seeds are of the Roundup® Ready® brand. The stated advantage of Roundup® Ready® crops is that they substantially improve a farmer's ability to control weeds, since glyphosate can be sprayed in the fields during the growing season without harming the crops. In 2010, an estimated 70% of corn and cotton, and 90% of soybean fields in the United States were Roundup® Ready®.[3]

8.      Monsanto's glyphosate products are registered in 130 countries and approved for use on over 100 different crops.[4]  They are ubiquitous in the environment. Numerous studies confirm that glyphosate is found in rivers, streams and groundwater in agricultural areas where Roundup® is

---

[1]Grube, *et al.*, on behalf of EPA, Pesticides Industry Sales and Usage, 2006-2007 Market Estimates, 14, (2011) available at Http://www.epa.gov/pesticides/pestsales/07pestsales/ market _ estimates2007.pdf.

[2]ETC Group, Who Will Control the Green Economy?, 22, (2011) available at http://www.etcgroup.org/files/publication/pdf_file/ETC_wwctge_4web_Dec2011.pdf.

[3]3 William Neuman and Andrew Pollack, Farmers Cope With Roundup-Resistant Weeds, N.Y. Times, May 3, 2010, available at http://www.nytimes.com/2010/05/04/business/ energyenvironment/04weed.html?pagewan.

[4]Monsanto, Backgrounder -History of Monsanto's Glyphosate Herbicides, (Sept. 2, 2015), available at http://www.monsanto.com/products/documents/glyphosate-background-materials/back_history.pdf.

used.[5]   It has been found in food,[6] in the urine of agricultural workers,[7],[8] and even in the urine of

urban dwellers who are not in direct contact with glyphosate.[9]

9.      On March 20, 2015, the International Agency for Research on Cancer ("IARC"), an agency

of the World Health Organization ("WHO"), issued an evaluation of several herbicides, including

glyphosate. That evaluation was based, in part, on studies of exposures to glyphosate in several

countries around the world, and it traces the health implications from exposure to glyphosate since

2001.

10.     On July 29, 2015, IARC issued the formal monograph relating to glyphosate. In that

monograph, the IARC Working Group provides a thorough review of the numerous studies and data

relating to glyphosate exposure in humans.

11.     The IARC Working Group classified glyphosate as a Group 2A herbicide, which means that

---

[5]See: USGS, USGS Technical Announcement: *Widely Used Herbicide Commonly Found in Rain and Streams in the Mississippi River Basin*, 2011, http://www.usgs.gov/newsroom/ article.asp?ID=2909; see also: U.S. Envtl. Prot. Agency, *Technical Factsheet on: Glyphosate*, available at http://www.epa.gov/safewater/pdfs/factsheets/ soc/tech/glyphosa.pdf.

[6]Bohn, et al., Compositional Differences in Soybeans on the Market: Glyphosate Accumulates in Roundup Ready GM Soybeans, 153 Food Chemistry, 207, (2013), available at http://www.sciencedirect.com/science/article/pii/S0308814613019201.

[7]Acquavella, et al., *Glyphosate Biomonitoring for Farmers and Their Families: Results from the Farm Family Exposure Study*, 112(3) Environmental Health Perspective, 321, (2004) available at http://www.ncbi.nlm.nih.gov/pmc/articles/PMC1241861/.

[8]Guyton, et al. *Carcinogenicity of Tetrachlorvinphos, Parathion, Malathion, Diazinon and Glyphosate,* 112 IARC Monographs , 76, section 5.4 (2015) available at http://dx.doi.org/ 10.1016/S14702045(15)70134-8.

[9]Brändli D, Reinacher S, *Herbicides found in Human Urine*, 1 Ithaka Journal, 270 (2012), available at http://www.ithaka-journal.net/druckversionen/e052012-herbicides-urine.pdf.

it is probably carcinogenic to humans. The IARC Working Group concluded that the cancers most associated with glyphosate exposure are non-Hodgkin lymphoma and other hematopoietic cancers, including lymphocytic lymphoma, chronic lymphocytic leukemia, B-cell lymphoma and multiple myeloma.[10]

12.     The IARC evaluation is significant. It confirms what has been believed for years: that glyphosate is toxic to humans.

13.     Nevertheless, Monsanto, since it began selling Roundup®, has represented it as safe to humans and the environment. Indeed, Monsanto has repeatedly proclaimed and continues to proclaim to the world, and particularly to United States consumers, that glyphosate-based herbicides, including Roundup®, create no unreasonable risks to human health or to the environment.

14.     Glyphosate is a broad-spectrum, non-selective herbicide used in a wide variety of herbicidal products around the world.

15.     Plants treated with glyphosate translocate the systemic herbicide to their roots, shoot regions and fruit, where it interferes with the plant's ability to form aromatic amino acids necessary for protein synthesis. Treated plants generally die within two to three days. Because plants absorb glyphosate, it cannot be completely removed by washing or peeling produce or by milling, baking or brewing grains.

16.     For nearly 40 years, farms across the world have used Roundup® without knowing of the dangers its use poses. That is because when Monsanto first introduced Roundup®, it touted glyphosate as a technological breakthrough: it could kill almost every weed without causing harm

---

[10]See Guyton, et al., *Carcinogenicity of Tetrachlorvinphos, Parathion, Malathion, Diazinon and Glyphosate*, supra

either to people or to the environment. According to the WHO, the main chemical ingredient of

Roundup®—glyphosate—is a probable cause of cancer. Those most at risk are farm workers and

other individuals with workplace exposure to Roundup®, such as workers in garden centers,

nurseries and landscapers. Monsanto assured the public that Roundup®was harmless. In order to

prove this, Monsanto championed falsified data and attacked legitimate studies that revealed its

dangers. Monsanto led a prolonged campaign of misinformation to convince government agencies,

farmers and the general population that Roundup®is safe.

### *Discovery of Glyphosate.*

17.     The herbicidal properties of glyphosate were discovered in 1970 by Monsanto chemist

John Franz. The first glyphosate-based herbicide was introduced to the market in the

mid-1970s under the brand name Roundup®.[11] From the outset, Monsanto marketed Roundup® as

a "safe" general-purpose herbicide for widespread commercial and consumer use. It still

markets Roundup®as safe today.[12]

18.     In addition to the active ingredient glyphosate, Roundup® formulations also contain

adjuvants and other chemicals, such as the surfactant POEA, which are considered "inert" and

therefore protected as "trade secrets" in manufacturing. Growing evidence suggests that these

adjuvants and additional components of Roundup® formulations are not, in fact, inert and are toxic

in their own right.

---

[11]Monsanto, Backgrounder-History of Monsanto's Glyphosate Herbicide, Monsanto, (Sept. 2, 2015), http://www.monsanto.com/products/documents/glyphosate-background-materials/back_history.pdf.

[12]Monsanto, What is Glyphosate?, (Sept. 2, 2015), available at http://www.monsanto.com /sitecollectiondocuments/glyphosate-safety-health.pdf.

*Registration of Herbicides under Federal Law*

**19.**     The manufacture, formulation and distribution of herbicides, such as Roundup®, are

regulated under the Federal Insecticide, Fungicide and Rodenticide Act ("FIFRA" or "Act"), 7

U.S.C. § 136 et seq. FIFRA requires that all pesticides be registered with the Environmental

Protection Agency ("EPA" or "Agency") prior to their distribution, sale or use, except as described

by the Act. 7 U.S.C. § 136a(a).

**20.**     Because pesticides are toxic to plants, animals and humans, at least to some degree, the EPA

requires as part of the registration process, among other things, a variety of tests to evaluate

the potential for exposure to pesticides, toxicity to people and other potential non- target organisms

and other adverse effects on the environment. Registration by the EPA, however, is not an assurance

or finding of safety. The determination the Agency must make in registering or re-registering  a

product is not that the product is "safe," but rather that use of the product  in a accordance

with its label directions "will not generally cause unreasonable adverse effects on the

environment." 7 U.S.C. § 136a(c)(5)(D).

**21.**     FIFRA defines "unreasonable adverse effects on the environment" to mean "any

unreasonable risk to man or the environment, taking into account the economic, social and

environmental costs and benefits of the use of any pesticide." 7 U.S.C.  § 136(bb). FIFRA

thus  requires the EPA to make a risk/benefit analysis in determining whether a registration should

be granted or allowed to continue to be sold in commerce.

**22.**     The EPA and the State of Louisiana registered Roundup®for distribution, sale and

manufacture in the United States and the State of Louisiana.

**23.**     FIFRA generally requires that the registrant, Monsanto in the case of Roundup®, conduct

the health and safety testing of pesticide products. The EPA has protocols governing the conduct of tests required for registration and the laboratory practices that must be followed in conducting these tests. The data produced by the registrant must be submitted to the EPA for review and evaluation. The government is not required, nor is it able to perform the product tests that are required of the manufacturer.

24.     The evaluation of each pesticide product distributed, sold or manufactured is completed at the time the product is initially registered. The data necessary for registration of a pesticide has changed over time. The EPA is now in the process of re-evaluating all pesticide products through a Congressionally-mandated process called "re-registration." 7 U.S.C. § 136a-1. In order to reevaluate these pesticides, the EPA is demanding the completion of additional tests and the submission of data for the EPA's review and evaluation.

25.     In the case of glyphosate, and therefore Roundup®, the EPA had planned on releasing its preliminary risk assessment —in relation to the re-registration process—no later than July 2015. The EPA completed its review of glyphosate in early 2015, but it delayed releasing the risk assessment pending further review in light of the World Health Organization's health- related findings. Scientific Fraud Underlying the Marketing and Sale of Glyphosate/ Roundup®

26.     Based on early studies that glyphosate could cause cancer in laboratory animals, the EPA originally classified glyphosate as possibly carcinogenic to humans (Group C) in 1985. After pressure from Monsanto, including contrary studies it provided to the EPA, the EPA changed its classification to evidence of non-carcinogenicity in humans (Group E) in 1991. In so classifying glyphosate, however, the EPA made clear that the designation did not mean the chemical does not cause cancer: "It should be emphasized, however, that designation of an agent in Group E is based

on the available evidence at the time of evaluation and should not be interpreted as a definitive

conclusion that the agent will not be a carcinogen under any circumstances."[13]

27.     On two occasions, the EPA found that the laboratories hired by Monsanto to test the toxicity

of its Roundup® products for registration purposes committed fraud.

28.     In the first instance, Monsanto, in seeking initial registration of Roundup® by the EPA, hired

Industrial Bio-Test Laboratories ("IBT") to perform and evaluate pesticide toxicology studies

relating to Roundup®.[14] IBT performed about 30 tests on glyphosate and

glyphosate-containing products, including nine (9) of the 15 residue studies needed to register

Roundup®.

29.     In 1976, the United States Food and Drug Administration ("FDA") performed an inspection

of Industrial Bio-Test Industries ("IBT") that revealed discrepancies between the raw data and the

final report relating to the toxicological impacts of glyphosate. The EPA subsequently audited IBT;

it too found the toxicology studies conducted for the Roundup® herbicide to be invalid.[15] An

---

[13]U.S. Envtl. Prot. Agency, Memorandum, Subject: SECOND Peer Review of Glyphosate, 1, (1991) available at http://www.epa.gov/pesticides/chem_search/cleared _reviews/csr_PC-103601_30-Oct 91_265.pdf.

[14]Monsanto, Backgrounder. Testing Fraud: IBT and Craven Laboratories, (Sept. 2, 2015), http://www.monsanto.com/products/documents/glyphosate-background-materials/ibt_craven_bk g.pdf.

[15]U.S. Envtl. Prot. Agency, Summary of the IBT Review Program Office of Pesticide Programs, (1983), available at http://nepis.epa.gov/Exe/ZyNET.exe/91014ULV.TXT? ZyActionD=ZyDocument&Client=EPA&Index=1981+Thru+1985&Docs=&Query=&Time=E ndTime=&SearchMethod=1&TocRestrict=n&Toc=&TocEntry=&QField=&QFieldYear=&QFiel dMonth=&QFieldDay=&IntQFieldOp=0&ExtQFieldOp=0&XmlQuery=&File=D%3A%5Czyfil es%5CIndex%20Data%5C81thru85%5CTxt%5C00000022%5C91014ULV.txt&User=ANONY MOUS&Password=anonymous&SortMethod=h%7CMaximumDocuments=1&FuzzyDegree=0& ImageQuality=r75g8/r75g8/x150y150g16/i425&Display=p%7Cf&DefSeekPage=x&SearchBack =ZyActionL&Back=ZyActionS&BackDesc=Results%20page&MaximumPages=1&ZyEntry=1&

EPA reviewer stated, after finding "routine falsification of data" at IBT, that it was "hard to believe the scientific integrity of the studies when they said they took specimens of the uterus from male rabbits."[16]

**30.** Three top executives of IBT were convicted of fraud in 1983.

**31.** In the second incident of data falsification, Monsanto hired Craven Laboratories in 1991 to perform pesticide and herbicide studies, including for Roundup®. In that same year, the owner of Craven Laboratories and three of its employees were indicted, and later convicted, of fraudulent laboratory practices in the testing of pesticides and herbicides.[17]

*The Importance of Roundup® to Monsanto's Dominance Profits*

**32.** Despite the falsity of the tests that underlie its registration, within a few years of its launch, Roundup®was being marketed in 115 countries.

**33.** The success of Roundup®was key to Monsanto's continued reputation and dominance in the marketplace. Largely due to the success of Roundup®sales, Monsanto's agriculture division was out-performing its chemicals division's operating income, and that gap increased yearly. But with its patent for glyphosate expiring in the United States in the year 2000, Monsanto needed a strategy to maintain its Roundup®market dominance and to ward off impending competition. 34.In response, Monsanto began the development and sale of genetically engineered

---

SeekPage=x&ZyPURL.

[16]Marie-Monique Robin, *The World According to Monsanto: Pollution, Corruption and the Control of the World's Food Supply* (2011) (citing U.S. Envtl. Prot. Agency, Data Validation, Memo from K. Locke, Toxicology Branch, to R. Taylor, Registration Branch. Washington, D.C. (August 9, 1978.)).

[17]Monsanto, Backgrounder. Testing Fraud: IBT and Craven Laboratories, supra.

Roundup® Ready® seeds in 1996. Since Roundup® Ready® crops are resistant to glyphosate, farmers can spray Roundup®onto their fields during the growing season without harming the crop. This allowed Monsanto to expand its market for Roundup®even further; by 2000, Monsanto's biotechnology seeds were planted on more than 80 million acres worldwide and nearly 70% of American soybeans were planted from Roundup® Ready® seeds. It also secured Monsanto's dominant share of the glyphosate/Roundup®market through a marketing strategy that coupled proprietary Roundup® Ready® seeds with continued sales of its Roundup®herbicide. **35.**

Through a three-pronged strategy of increased production, decreased prices and by coupling with Roundup® Ready® seeds, Roundup® became Monsanto's most profitable product. In 2000, Roundup®accounted for almost $2.8 billion in sales, outselling other herbicides by a margin of five to one, and accounting for close to half of Monsanto's revenue.[18] Today, glyphosate remains one of the world's largest herbicides by sales volume.

### *Monsanto has known for decades that it falsely advertised the safety of Roundup®*

**36.** In 1996, the New York Attorney General ("NYAG") filed a lawsuit against Monsanto based on its false and misleading advertising of Roundup®products. Specifically, the lawsuit challenged Monsanto's general representations that its spray-on, glyphosate-based herbicides, including Roundup®, were "safer than table salt" and "practically non-toxic" to mammals, birds and fish. Among the representations the NYAG found deceptive and misleading about the human and environmental safety of Roundup®are the following:

    **a)** "Remember that environmentally friendly Roundup® herbicide is biodegradable. It

---

[18]David Barboza, *The Power of Roundup; A Weed Killer Is A Block for Monsanto to Build On,* N.Y. Times, Aug. 2, 2001, available at http://www.nytimes.com/2001/08/02/business/ the-power-of-roundup-a-weedkiller-is-a-block-for-monsanto-to-build-on.html.

won't build up in the soil so you can use Roundup® with confidence along customers' driveways, sidewalks and fences ..."

b) "And remember that Roundup® is biodegradable and won't build up in the soil. That will give you the environmental confidence you need to use Roundup® everywhere you've got a weed, brush, edging or trimming problem."

c) "Roundup® biodegrades into naturally occurring elements."

d) "Remember that versatile Roundup® herbicide stays where you put it. That means there's no washing or leaching to harm customers' shrubs or other desirable vegetation."

e) "This non-residual herbicide will not wash or leach in the soil. It ... stays where you apply it."

f) "Glyphosate is less toxic to rats than table salt following acute oral ingestion."

g) "Glyphosate's safety margin is much greater than required. It has over a 1,000-fold safety margin in food and over a 700-fold safety margin for workers who manufacture it or use it."

h) "You can feel good about using herbicides by Monsanto. They carry a toxicity category rating of 'practically non- toxic' as it pertains to mammals, birds and fish."

I) "Roundup® can be used where kids and pets will play and breaks down into natural material." This ad depicts a person with his head in the ground and a pet dog standing in an area which has been treated with Roundup®.[19]

---

[19]Attorney General of the State of New York, *In the Matter of Monsanto Company*, Assurance of Discontinuance Pursuant to Executive Law § 63(15). (Nov. 1996).

37.     On November 19, 1996, Monsanto entered into an Assurance of Discontinuance with the NYAG, in which Monsanto agreed, among other things, "to cease and desist from publishing or broadcasting any advertisements [in New York] that represent, directly or by implication" that:

**a)**     Its glyphosate-containing pesticide products or any component thereof are safe, non-toxic, harmless or free from risk ...

**b)**     Its glyphosate-containing pesticide products or any component thereof manufactured, formulated, distributed or sold by Monsanto are biodegradable ...

**c)**     Its glyphosate-containing pesticide products or any component thereof stay where they are applied under all circumstances and will not move through the environment by any means ...

**d)**     Its glyphosate-containing pesticide products or any component thereof are "good" for the environment or are "known for their environmental characteristics." ...

**e)**     Glyphosate-containing pesticide products or any component thereof are safer or less toxic than common consumer products other than herbicides.

**f)**     Its glyphosate-containing products or any component thereof might be classified as "practically non-toxic.

38.     Monsanto did not alter its advertising in the same manner in any state other than New York, and on information and belief still has not done so today.

39.     In 2009, France's highest court ruled that Monsanto had not told the truth about the safety of Roundup®. The French court affirmed an earlier judgement that Monsanto had falsely advertised

its herbicide Roundup®as "biodegradable" and that it "left the soil clean."[20]

### *Classifications and Assessments of Glyphosate*

40.     The IARC process for the classification of glyphosate followed the IARC's stringent procedures for the evaluation of a chemical agent. Over time, the IARC Monograph program has reviewed 980 agents. Of those reviewed, it has determined 116 agents to be Group 1 (Known Human Carcinogens); 73 agents to be Group 2A (Probable Human Carcinogens); 287 agents to be Group 2B (Possible Human Carcinogens); 503 agents to be Group 3 (Not Classified); and one agent to be Probably Not Carcinogenic.

41.     The established procedure for the IARC Monograph evaluations is described in the IARC Programme's Preamble.[21]  Evaluations are performed by panels of international experts, selected on the basis of their expertise and the absence of actual or apparent conflicts of interest.

42.     One year before the Monograph meeting, the meeting is announced and there is a call both for data and for experts. Eight (8) months before the Monograph meeting, the Working Group membership is selected and the sections of the Monograph are developed by the Working Group members. One (1) month prior to the Monograph meeting, the call for data is closed and the various draft sections are distributed among Working Group members for review and comment. Finally, at the Monograph meeting, the Working Group finalizes review of all literature, evaluates the evidence in each category, and completes the overall evaluation. Within two (2) weeks

---

[20]Monsanto Guilty in 'False Ad' Row, BBC, Oct. 15, 2009, available at http://news.bbc. co.uk/2/hi/europe/8308903.stm.

[21]World Health Org., IARC Monographs on the Evaluation of Carcinogenic Risks to Humans: Preamble, (2006), available at http://monographs.iarc.fr/ENG/Preamble /Current Preamble.pdf.

after the Monograph meeting, the summary of the Working Group findings are published in *The Lancet Oncology*, and within one (1) year after the meeting, the finalized Monograph is published.

**43.**     In assessing an agent, the IARC Working Group reviews the following information: (a) human, experimental and mechanistic data; (b) all pertinent epidemiological studies and cancer bioassays; and © representative mechanistic data. The studies must be publicly available and have sufficient detail for meaningful review and reviewers cannot be associated with the underlying studies.

**44.**     In March 2015, IARC reassessed glyphosate. The summary published in *The Lancet Oncology* reported that glyphosate is a Group 2A agent and probably carcinogenic in humans.

**45.**     On July 29, 2015, the IARC issued its Monograph for glyphosate, Monograph Volume 112. For Volume 112, the volume that assessed glyphosate, a Working Group of 17 experts from 11 countries met at the IARC from March 3–10, 2015, to assess the carcinogenicity of certain herbicides, including glyphosate. The March meeting culminated nearly a one-year review and preparation by the IARC Secretariat and the Working Group, including a comprehensive review of the latest available scientific evidence. According to published procedures, the Working Group considered "reports that have been published or accepted for publication in the openly available scientific literature" as well as "data from governmental reports that are publicly available."

**46.**     The studies considered the following exposure groups: (1) occupational exposure of farmers and tree nursery workers in the United States, forestry workers in Canada and Finland and municipal

weed-control workers in the United Kingdom; and (2) para- occupational exposure in farming families.

47.     Glyphosate was identified as the second-most used household herbicide in the United States for weed control between 2001 and 2007, and the most heavily used herbicide in the world in 2012.

48.     Exposure pathways are identified as air (especially during spraying), water and food. Community exposure to glyphosate is widespread and found in soil, air, surface water and groundwater, as well as in food.

49.     The assessment of the IARC Working Group identified several case control studies of occupational exposure in the United States, Canada and Sweden. These studies show a human health concern from agricultural and other work-related exposure to glyphosate.

50.     The IARC Working Group found an increased risk between exposure to glyphosate and NHL and several subtypes of NHL, and the increased risk persisted after adjustment for other pesticides.

51.     The IARC Working Group also found that glyphosate caused DNA and chromosomal damage in human cells. One study in community residents reported increases in  blood markers of chromosomal damage (micronuclei) after glyphosate formulations were sprayed.

52.     In male CD-1 mice, glyphosate induced a positive trend in the incidence of a rare tumor: renal tubule carcinoma. A second study reported a positive trend for haemangiosarcoma in male mice. Glyphosate increased pancreatic islet-cell adenoma in male rats in two studies. A glyphosate formulation promoted skin tumors in an initiation-promotion study in mice.

53.     The IARC Working Group also noted that glyphosate has been detected in the urine of

agricultural workers, indicating absorption. Soil microbes degrade glyphosate to aminomethylphosphoric acid (AMPA). Blood AMPA detection after exposure suggests intestinal microbial metabolism in humans.

54.    The IARC Working Group further found that glyphosate and glyphosate formulations induced DNA and chromosomal damage in mammals, and in human and animal cells *in utero.*

55.    The IARC Working Group also noted genotoxic, hormonal and enzymatic effects in mammals exposed to glyphosate.[22] Essentially, glyphosate inhibits the biosynthesis of aromatic amino acids, which leads to several metabolic disturbances, including the inhibition of protein and secondary product biosynthesis and general metabolic disruption. 56. The IARC Working Group also reviewed an Agricultural Health Study, consisting of a prospective cohort of 57,311 licensed pesticide applicators in Iowa and North Carolina. While this study differed from others in that it was based on a self-administered questionnaire, the results support an association between glyphosate exposure and multiple myeloma, hairy cell leukemia (HCL) and chronic lymphocytic leukemia (CLL), in addition to several other cancers.

### Other Earlier Findings About Glyphosate's Dangers to Human Health

57.    The EPA has a technical fact sheet, as part of its Drinking Water and Health, National Primary Drinking Water Regulations publication, relating to glyphosate. This technical fact sheet predates the IARC March 20, 2015, evaluation. The fact sheet describes the release  patterns for glyphosate as follows:

---

[22]Guyton, et al., *Carcinogenicity of Tetrachlorvinphos, Parathion, Malathion, Diazinon & Glyphosate, supra* at 77.

**Release Patterns**

Glyphosate is released to the environment in its use as a herbicide for controlling woody and herbaceous weeds on forestry, right-of-way, cropped and non-cropped sites. These sites may be around water and in wetlands.

It may also be released to the environment during its manufacture, formulation, transport, storage, disposal and cleanup, and from spills. Since glyphosate is not a listed chemical in the Toxics Release Inventory, data on releases during its manufacture and handling are not available.

Occupational workers and home gardeners may be exposed to glyphosate by inhalation and dermal contact during spraying, mixing, and cleanup. They may also be exposed by touching soil and plants to which glyphosate was applied. Occupational exposure may also occur during glyphosate's manufacture, transport, storage, and disposal.[23]

58.    In 1995, the Northwest Coalition for Alternatives to Pesticides reported that in California, the state with the most comprehensive program for reporting of pesticide-caused illness, glyphosate was the third most commonly-reported cause of pesticide illness among agricultural workers.[24]

### The Toxicity of Other Ingredients in Roundup®

59.    In addition to the toxicity of the active ingredient, glyphosate, several studies support the hypothesis that the glyphosate-based formulation in Defendant's Roundup®products is more dangerous and toxic than glyphosate alone. Indeed, as early as 1991, available evidence

---

[23]U.S. Envtl. Prot. Agency, *Technical Factsheet on: Glyphosate*, supra.

[24]Caroline Cox, *Glyphosate, Part 2: Human Exposure and Ecological Effects*, 15 J. Pesticide Reform 4 (1995); W.S. Peas, et al., *Preventing Pesticide-Related Illness in California Agriculture: Strategies and Priorities. Environmental Health Policy Program Report*, Univ. of Calif. School of Public Health, Calif. Policy Seminar (1993).

demonstrated that glyphosate formulations were significantly more toxic than glyphosate alone.[25]

60.    In 2002, a study by Julie Marc, entitled "Pesticide Roundup® Provokes Cell Division Dysfunction at the Level of CDK1/Cyclin B Activation, revealed that Roundup®causes delays in the cell cycles of sea urchins but that the same concentrations of glyphosate alone were ineffective and did not alter cell cycles.[26]

61.    A 2004 study by Marc and others, entitled "Glyphosate-based pesticides affect cell cycle regulation," demonstrated a molecular link between glyphosate-based products and cell cycle dysregulation. The researchers noted that "cell-cycle dysregulation is a hallmark of tumor cells and human cancer. Failure in the cell-cycle checkpoints leads to genomic instability and subsequent development of cancers from the initial affected cell." Further, "[s]ince cell cycle disorders such as cancer result from dysfunction of a unique cell, it was of interest to evaluate the threshold dose of glyphosate affecting the cells."[27]

62.    In 2005, a study by Francisco Peixoto, entitled "Comparative effects of the Roundup® and glyphosate on mitochondrial oxidative phosphorylation," demonstrated that Roundup®'s effects on rat liver mitochondria are far more toxic than equal concentrations of glyphosate alone. The Peixoto study further suggested that the harmful effects of Roundup®on mitochondrial

---

[25]Martinez, T.T. and K. Brown, *Oral and pulmonary toxicology of the surfactant used in Roundup herbicide*, PROC.WEST.PHARMACOL.SOC. 34:43-46 (1991).

[26]Julie Marc, et al., *Pesticide Roundup Provokes Cell Division Dysfunction at the Level of CDK1/Cyclin B Activation,* 15 Chem. Res. Toxical. 326-331 (2002), available at http://pubs.acs.org/doi/full/10.1021/tx015543g.

[27]Julie Marc, et al., *Glyphosate-Based Pesticides Affect Cell Cycle Regulation*, 96 BIOLOGY OF THE CELL 245, 245-249 (2004), available at http://onlinelibrary.wiley.com/doi/10.1016/j.biolcel.2003.11.010/epdf.

bioenergetics could not be exclusively attributed to glyphosate but could be the result of other chemicals, such as the surfactant POEA, or in the alternative, due to the potential synergistic effect between glyphosate and other ingredients in the Roundup® formulation.[28]

63.    In 2009, Nora Benachour and Gilles-Eric Seralini published a study examining the effects of Roundup® and glyphosate on human umbilical, embryonic and placental cells. The study tested dilution levels of Roundup® and glyphosate that were far below agricultural recommendations, corresponding with low levels of residue in food. The researchers ultimately concluded that supposed "inert" ingredients, and possibly POEA, alter human cell permeability and amplify toxicity of glyphosate alone. The researchers further suggested that assessments of glyphosate toxicity should account for the presence of adjuvants or additional chemicals used in the formulation of the complete pesticide. The study confirmed that the adjuvants present in Roundup® are not, in fact, inert and that Roundup® is potentially far more toxic than its active ingredient glyphosate alone.[29]

64.    The results of these studies were at all times available to Defendant. Defendant thus knew or should have known that Roundup® is more toxic than glyphosate alone and that safety studies of Roundup®, Roundup®'s adjuvants and "inert" ingredients, and/or the surfactant POEA were necessary to protect Plaintiff from Roundup® products.

---

[28]Francisco Peixoto, *Comparative Effects of the Roundup and Glyphosate on Mitochondrial Oxidative Phosphorylation*, 61 CHEMOSPHERE 1115, 1122 (2005), available athttps://www.researchgate.net/publication/7504567_Comparative_effects_of_the_Roundup_and _glyphosate_on_mitochondrial_oxidative_phosphorylation.

[29]Nora Benachour, et al., *Glyphosate Formulations Induce Apoptosis and Necrosis in Human Umbilical, Embryonic and Placental Cells*, 22 Chem. Res. Toxicol. 97-105 (2008), available at http://big.assets.huffingtonpost.com/france.pdf.

65.    Despite its knowledge that Roundup® is considerably more dangerous than glyphosate alone, Defendant continued to promote Roundup® as safe.

### The EPA's Review of Glyphosate

66.    On September 12, 2016, EPA's OPP submitted a report on the carcinogenic potential of glyphosate, wherein it issued a "proposed conclusion" that glyphosate is "'not likely to be carcinogenic to humans' at doses relevant to human health risk assessment.[30] There are no authors listed on this issue paper, which reiterates and adopts the conclusions of the October 2015 leaked assessment. The issue paper is based upon a review of industry-sponsored articles and studies. The OPP acknowledged that it rejected all studies that considered Roundup®—the formulated product—instead of studies that isolated glyphosate because "[g]lyphosate formulations contain various components other than glyphosate and it has been hypothesized these components are more toxic than glyphosate alone.[31]

67.    Thus, the OPP notes dozens of studies considered by IARC were not reviewed by the OPP because the OPP's "evaluation focused on studies on the active ingredient glyphosate" and "additional research could also be performed to determine whether formulation components, such as surfactants, influence the toxicity of glyphosate formulations.[32]

68.    From December 13 to 16, 2016, the EPA held FIFRA Scientific Advisory Panel ("SAP") meetings to consider issues raised by the OPP's evaluation of glyphosate. Again, OPP only

---

[30] See EPA's Office of Pesticide Programs, Glyphosate Issue Paper: Evaluation of Carcinogenic Potential (Sept. 12, 2016), available at https://www.epa.gov/sites/production/ files/201609/documents/glyphosate_issue_paper_evaluation_of_carcincogenic_potential.pdf.

[31] Id.

[32] Id.

allowed the SAP to consider studies of glyphosate alone, and not any study of the formulated product. In its Charge to the FIFRA SAP, the OPP noted that "[a]lthough there are studies available on glyphosate-based pesticide formulations, the agency is soliciting advice from the FIFRA Scientific Advisory Panel (SAP) on this evaluation of human carcinogenic potential for the active ingredient glyphosate only at this time.[33]

69.     The OPP draft assessment therefore does not actually consider the product at issue in this litigation or, more importantly, how glyphosate, in conjunction with surfactants and other chemicals, affects carcinogenicity.

70.     On March 16, 2017, the final SAP meeting minutes and report were released, revealing disagreement and lack of consensus among the scientists on whether there was a positive association between glyphosate exposure and NHL.[34]

### *Recent Worldwide Bans on Roundup®/Glyphosate*

71.     Several countries around the world have instituted bans on the sale of Roundup® and other glyphosate-containing herbicides, both before and since the IARC first announced its assessment for glyphosate in March 2015, and more countries undoubtedly will follow suit as the dangers of the use of Roundup® become more widely known. The Netherlands issued a ban on all glyphosate-based herbicides in April 2014, including Roundup®, which took effect at the end of 2015. In issuing the

---

[33]EPA OPP, Glyphosate: Evaluation of Carcinogenic Potential, Charge to the FIFRA SAP for the October 18-21, 2016 Meeting, available at, https://www.epa.gov/sites/production/files/ 201611/documents/glyphosate_sap_charge_questions_-final.pdf.

[34]FIFRA Scientific Advisory Panel Meeting Minutes and Final Report No. 2017-01, A Set of Scientific Issues Being Considered by the Environmental Protection Agency Regarding: EPA's Evaluation of the Carcinogenic Potential of Glyphosate, available at https://www.epa.gov/sites/production/files/2017-03/documents/december_13-16_2016_final_rep ort_03162017.pdf.

ban, the Dutch Parliament member who introduced the successful legislation stated: "Agricultural pesticides in user-friendly packaging are sold in abundance to private persons. In garden centers, Roundup®is promoted as harmless, but unsuspecting customers have no idea what the risks of this product are. Especially children are sensitive to toxic substances and should therefore not be exposed to it."[35]

72.     The Brazilian Public Prosecutor in the Federal District requested that the Brazilian Justice Department suspend the use of glyphosate.[36]

73.     France banned the private sale of Roundup®and glyphosate following the IARC assessment for glyphosate.[37]

74.     Bermuda banned both the private and commercial sale of glyphosate, including Roundup®. The Bermuda government explained its ban as follows: "Following a recent scientific study carried out by a leading cancer agency, the importation of weed spray 'Roundup®' has been

----

[35]Holland's Parliament Bans Glyphosate Herbicides, The Real Agenda, 14 April 2014, available at http://real-agenda.com/hollands-parliament-bans-glyphosate-herbicides/.

[36]Christina Sarich, *Brazil's Public Prosecutor Wants to Ban Monsanto's Chemicals Following Recent Glyphosate-Cancer Link*, Global Research, May 14, 2015, available at http://www.globalresearch.ca/brazils-public-prosecutor-wants-to-ban-monsantos-chemicals-follo wing-recentglyphosate-cancer-link/5449440; see Ministério Público Federal, MPF/DF *reforça pedido para que glifosato seja banido do mercado naciona*, April, 14, 2015, available athttp://noticias.pgr.mpf.mp.br/noticias/noticias-do-site/copy_of_meio-ambiente-e-patrimonio-cu ltural/mpf-dfreforca-pedido-para-que-glifosato-seja-banido-do-mercado-nacional.

[37]Zoe Schlanger, France Bans Sales of Monsanto's Roundup in Garden Centers, 3 Months After U.N. Calls it "*Probable Carcinogen*," Newsweek, June 15, 2015, available at http:// www. newsweek.com/france-banssale-monsantos-roundup-garden-centers-after-un-names-it-probable-343311

suspended."[38]

**75.**     The Sri Lankan government banned the private and commercial use of glyphosates,

particularly out of concern that glyphosate has been linked to fatal kidney disease in agricultural

workers.[39]

**76.**     The government of Columbia announced its ban on using  Roundup®and glyphosate

to destroy illegal plantations of coca, the raw ingredient for cocaine, because of the WHO's

fining that glyphosate is probably carcinogenic.[40]

### *EFSA Report on Glyphosate*

**77.**     On November 12, 2015, the European Food Safety Authority (EFSA), the European Union's

primary agency for food safety, reported on its evaluation of the Renewal Assessment Report

(RAR) on glyphosate.[41] The Rapporteur Member State assigned to glyphosate, the German Federal

Institute for Risk Assessment (BfR), had produced the RAR as part of the renewal process for

glyphosate in the EU.

**78.**     The BfR sent its draft RAR to the EFSA and the RAR underwent a peer review

---

[38]Health Minister: Importation of Roundup Weed Spray Suspended, Today in Bermuda, May 11, 2015, available at http://www.todayinbermuda.com/news/health/item/ 1471-health-minister-importation-of-roundup-weedspray-suspended.

[39]Sri Lanka's New President Puts Immediate Ban on Glyphosate Herbicides, Sustainable Pulse, May 25, 2015, available at http://sustainablepulse.com/2015/05/25/sri-lankas-new-president-puts-immediate-ban-onglyphosate-herbicides/#.VeduYk3bKAw.

[40]Columbia to ban coca spraying herbicide glyphosate, BBC, May 10, 2015, available at http://www.bbc.com/news/world-latin-america-32677411.

[41]European Food Safety Auth., Conclusion on the peer review of the pesticide risk assessment of the active substance glyphosate, EFSA Journal (2015), available at http://www. efsa.europa.eu/sites/default/files/scientific_output/files/main_documents/4302.pdf.

process by the EFSA, other member states and industry groups. As part of the on-going peer review of Germany's reevaluation of glyphosate, the EFSA had also received a second mandate from the European Commission to consider the IARC's findings regarding the potential carcinogenicity of glyphosate and glyphosate-containing products.

79.     Based on a review of the RAR, which included data from industry-submitted, unpublished studies, the EFSA sent its own report ("Conclusion") to the European Commission, finding that "glyphosate is unlikely to pose a carcinogenic hazard to humans and the evidence does not support classification with regard to its carcinogenic potential according to Regulation (EC) No. 1272/2008."[42] The EFSA therefore disagreed with the IARC: glyphosate was not genotoxic and did not present a carcinogenic threat to humans.

80.     In explaining why its results departed from the IARC's conclusion, the EFSA drew a distinction between the EU and the IARC approaches to the study and classification of chemicals.[43] Although the IARC examined "both glyphosate—an active substance—and glyphosate-based formulations, grouping all formulations regardless of their composition," the EFSA explained that it considered only glyphosate and that its assessment focuses on "each individual chemical, and each marketed mixture separately."[44] The IARC, on the other hand, "assesses generic agents, including groups of related chemicals, as well as occupational or

---

[42] Id.

[43] European Food Safety Auth., The EFSA Fact Sheet: Glyphosate, available at http:// www.efsa.europa.eu/sites/default/files/corporate_publications/files/efsaexplainsglyphosate15112 en.pdf.

[44] Id.

environmental exposure, and cultural or behavioral practices."[45] The EFSA accorded greater weight to studies conducted with glyphosate alone than studies of formulated products.[46]

81.     The EFSA went further and noted:

> Although some studies suggest that certain glyphosate-based formulations may be genotoxic (i.e. damaging to DNA), others that look solely at the active substance glyphosate do not show this effect. It is likely, therefore, that the genotoxic effects observed in some glyphosate-based formulations are related to the other constituents or "co-formulants". Similarly, certain glyphosate-based formulations display higher toxicity than that of the active ingredient, presumably because of the presence of co-formulants, In its assessment, EFSA proposes that the toxicity of each pesticide formulation and in particular its genotoxic potential should be further considered and addressed by Member State authorities while they reassess uses of glyphosate-based formulations in their own territories.[47]

82.     Notwithstanding its conclusion, the EFSA did set exposure levels for glyphosate. Specifically, the EFSA proposed an acceptable daily intake (ADI) of 0.5 mg/kg of body weight per day; an acute reference dose (ARfD) of 0.5 mg/kg of body weight; and an acceptable operator exposure level (AOEL) of 0.1 mg/kg of body weight per day.[48]

### *Leading Scientists Dispute EFSA's Conclusion*

83.     On November 27, 2015, 96 independent academic and governmental scientists from around the world submitted an open letter to the EU health commissioner, Vytenis

---

[45]Id.

[46]Id.

[47]Id.

[48]European Food Safety Auth., Conclusion on the peer review of the pesticide risk assessment of the active substance glyphosate, EFSA JournalL (2015), supra.

Andriukaitis.[49] The scientists expressed their strong concerns and urged the commissioner to disregard the "flawed" EFSA report, arguing that "the BfR decision is not credible because it is not supported by the evidence and it was not reached in an open and transparent manner."[50]

84.     Signatories to the letter included Dr. Christopher J. Portier, Ph.D., and other renowned international experts, some of whom were part of the IARC Working Group assigned to glyphosate.

85.     In an exhaustive and careful examination, the scientists scrutinized the EFSA's conclusions and outlined why the IARC Working Group decision was "by far the more credible":

> The IARC WG decision was reached relying on open and transparent procedures by independent scientists who completed thorough conflict-of-interest statements and were not affiliated or financially supported in any way by the chemical manufacturing industry. It is fully referenced and depends entirely on reports published in the open, peer-reviewed biomedical literature. It is part of a long tradition of deeply researched and highly credible reports on the carcinogenicity of hundreds of chemicals issued over the past four decades by IARC and used today by international agencies and regulatory bodies around the world as a basis for risk assessment, regulation and public health policy.[51]

86.     With respect to human data, the scientists pointed out that the EFSA agreed with the IARC that there was "limited evidence of carcinogenicity for non- Hodgkin lymphoma, but the EFSA nonetheless dismissed an association between glyphosate exposure and carcinogenicity. The IARC applies three (3) levels of evidence in its analyses of human data, including sufficient evidence and limited evidence. The EFSA's ultimate conclusion that "there was no unequivocal evidence for

---

[49]Letter from Christopher J. Portier, et al. to Commissioner Vytenis Andriukaitis, *Open Letter: Review of the Carcinogenicity of Glyphosate by EFSA and BfR* (Nov. 27, 2015), available athttp://www.zeit.de/wissen/umwelt/2015-11/glyphosat-scientists-in-row-over-safety-of=glyphosate-weedkiller

[50]Id.

[51]Id.

a clear and strong association of NHL with glyphosate" was misleading because it was tantamount to IARC's highest level of evidence: "sufficient evidence," which means that a causal relationship has been established. However, the scientists argued, "[l]egitimate public health concerns arise when 'causality is credible,' i.e., when there is limited evidence."[52]

87.     Among its many other deficiencies, the EFSA's conclusions regarding animal carcinogenicity data were "scientifically unacceptable," particularly in BfR's use of historical control data and in its trend analysis. Indeed, BfR's analysis directly contradicted the Organisation for Economic Co-operation and Development ("OECD") testing guidelines while citing and purporting to follow those same guidelines. For instance, the EFSA report dismisses observed trends in tumor incidence "because there are no individual treatment groups that are significantly different from controls and because the maximum observed response is reportedly within the range of the historical control data." However, according to the scientists, concurrent controls are recommended over historical controls in all guidelines, scientific reports and publications, and, if it is employed, historical control data "should be from studies in the same time frame, for the same exact animal strain, preferably from the same laboratory or the same supplier and preferably reviewed by the same pathologist." BfR's use of historical control data violated the precautions: "only a single study used the same mouse strain as the historical controls, but was reported more than 10 years after the historical control data set was developed." Further deviating from sound scientific practices, the data used by the BfR came from studies in seven different laboratories. The scientists concluded: BfR reported seven positive mouse studies with three studies showing increases in renal tumors, two with positive findings for hemangiosarcomas,

---

[52]Id.

and two with positive findings for malignant lymphomas. BfR additionally reported two positive findings for tumors in rats. Eliminating the inappropriate use of historical data, the unequivocal conclusion is that these are not negative studies, but in fact document the carcinogenicity of glyphosate in laboratory animals.[53]

88.    The letter also critiqued the EFSA report's lack of transparency and the opacity surrounding the data cited in the report: "citations for almost all of the references, even those from the open scientific literature, have been redacted from the document" and "there are no authors or contributors listed for either document, a requirement for publication in virtually all scientific journals." Because the BfR relied on unpublished, confidential industry- provided studies, it is "impossible for any scientist not associated with the BfR to review this conclusion with scientific confidence."[54]

89.    On March 3, 2016, the letter was published in the Journal of Epidemiology & Community Health.[55]

Statement of Concern Regarding Glyphosate-Based Herbicides

90.    On February 17, 2016, a consensus statement published in the journal Environmental Health, entitled "Concerns over use of glyphosate-based herbicides and risks associated with exposures: a consensus statement," assessed the safety of glyphosate-based

---

[53]Id.

[54]Id.

[55]Christopher J. Portier, et al., *Differences in the carcinogenic evaluation of glyphosate between the International Agency for Research on Cancer (IARC) and the European Food Safety Authority (EFSA), Journal Of Epidemiology & CMTY*. Health, Mar. 3, 2016, available athttp:// jech.bmj.com/content/early/2016/03/03/jech-2015-207005.full.

herbicides (GBHs):[56]

    **a)**    GBHs are the most heavily applied herbicide in the world and usage continues to rise;

    **b)**    Worldwide, GBHs often contaminate drinking water sources, precipitation and air, especially in agricultural regions;

    **c)**    The half-life of glyphosate in water and soil is longer than previously recognized;

    **d)**    Glyphosate and its metabolites are widely present in the global soybean supply;

    **e)**    Human exposures to GBHs are rising;

    **f)**    Glyphosate is now authoritatively classified as a probable human carcinogen; and

    **g)**    Regulatory estimates of tolerable daily intakes for glyphosate in the United States and European Union are based on outdated science.

**91.**    The researchers noted that GBH use has increased approximately 100-fold since the 1970s. Further, far from posing a limited hazard to vertebrates, as previously believed, two decades of evidence demonstrated that "several vertebrate pathways are likely targets of action, including hepatorenal damage, effects on nutrient balance through glyphosate chelating action and endocrine disruption."[57]

**92.**    The paper attributes uncertainties in current assessments of glyphosate formulations to the fact that "[t]he full list of chemicals in most commercial GBHs is protected as 'commercial business information,' despite the universally accepted relevance of such information

---

[56]John P. Myers, et al., *Concerns Over Use of Glyphosate-Based Herbicides and Risks Associated with Exposures: A Consensus Statement, Environmental Health* (2016), available at http://ehjournal.biomedcentral.com/articles/10.1186/s12940-016-0117-0.

[57]Id.

to scientists hoping to conduct an accurate risk assessment of these herbicide formulations." Further, the researchers argue, "[t]he distinction in regulatory review and decision processes between 'active' and 'inert' ingredients has no toxicological justification, given increasing evidence that several so-called 'inert' adjuvants are toxic in their own right."[58]

93.     Among various implications, the researchers conclude that "existing toxicological data and risk assessments are not sufficient to infer that GBHs, as currently used, are safe." Further, "GBH-product formulations are more potent, or toxic, than glyphosate alone to a wide array of non-target organisms including mammals, aquatic insects, and fish." Accordingly, "risk assessments of GBHs that are based on studies quantifying the impacts of glyphosate alone underestimate both toxicity and exposure, and thus risk." The paper concludes that this "shortcoming has repeatedly led regulators to set inappropriately high exposure thresholds."[59]

94.     The researchers also critique the current practice of regulators who largely rely on "unpublished, non-peer reviewed data generated by the registrants" but ignore "published research because it often uses standards and procedures to assess quality that are different from those codified in regulatory agency data requirements, which largely focus on avoiding fraud." In the researchers' view, "[s]cientists independent of the registrants should conduct regulatory tests of GBHs that include glyphosate alone, as well as GBH-product formulations."[60]

95.     The researchers also call for greater inclusion of GBHs in government-led toxicology testing programs:

---

[58]Id.

[59]Id.

[60]Id.

A fresh and independent examination of GBH toxicity should be undertaken, and . . . this re-examination be accompanied by systematic efforts by relevant agencies to monitor GBH levels in people and in the food supply, none of which are occurring today. The U.S. National Toxicology Program should prioritize a thorough toxicological assessment of the multiple pathways now identified as potentially vulnerable to GBHs.

96.     The researchers suggest that, in order to fill the gap created by an absence of government funds to support research on GBHs, regulators could adopt a system through which manufacturers fund the registration process and the necessary testing:

[W]e recommend that a system be put in place through which manufacturers of GBHs provide funds to the appropriate regulatory body as part of routine registration actions and fees. Such funds should then be transferred to appropriate government research institutes, or to an agency experienced in the award of competitive grants. In either case, funds would be made available to independent scientists to conduct the appropriate long-term (minimum 2 years) safety studies in recognized animal model systems. A thorough and modern assessment of GBH toxicity will encompass potential endocrine disruption, impacts on the gut microbiome, carcinogenicity and multigenerational effects looking at reproductive capability and frequency of birth defects.

### *European Union Vote on Glyphosate Renewal*

97.     The license for glyphosate in the European Union (EU) was set to expire on June 30, 2016.

98.     Without an extension of the license, Monsanto's Roundup® and other glyphosate- based herbicides faced a general phase out in EU markets.[61]

99.     In the months leading up to the license expiration date, protracted meetings and votes among national experts from the 28 EU Member States failed to produce agreement on an extension.

100.     For instance, on March 4, 2016, The Guardian reported that France, the

---

[61]Philip Blenkinsop, Alissa de Carbonnel & Barbara Lewis European, *Commission to extend glyphosate license for 18 months*, REUTERS, June 28, 2016, available at http://www.reuters.com/article/us-health-euglyphosate-idUSKCN0ZE25B

Netherlands, and Sweden did not support EFSA's assessment that glyphosate was harmless.[62] The

paper quoted the Swedish environment minister, Åsa Romson, as stating: "We won't take risks with

glyphosate and we don't think that the analysis done so far is good enough. We will propose that no

decision is taken until further analysis has been done and the Efsa scientists have been more

transparent about their considerations.[63]

101.     The Netherlands argued that re-licensing should be placed on hold until after a

separate evaluation of glyphosate's toxicity can be conducted.[64]   Leading up to the vote, Italy joined

the other EU states in opposing the license renewal, citing health concerns.[65]

102.     On June 6, 2016, Member States voted but failed to reach a qualified majority in favor or

against the re-authorization of glyphosate.[66]

103.     On June 29, 2016, the EU Commission extended the European license for glyphosate

for 18 months to allow the European Chemical Agency to rule on the safety of the

chemical, which is expected by the end of 2017. Growing public awareness and concern over the

chemical "led 1.4 million people to sign a petition against glyphosate in the biggest online

---

[62]Arthur Neslen, *EU states rebel against plans to relicense weedkiller glyphosate*, THE
GUARDIAN, Mar. 4, 2016, available at http://www.theguardian.com/environment/2016/ mar/
04/eu-states-rebel-against-plans-to-reliceseweedkiller-glyphosate.

[63]Id.

[64]Arthur Neslen, *Vote on Controversial weedkiller's European licence postponed*, THE
GUARDIAN, Mar. 8, 2016, available at http://www.theguardian.com/environment/2016/mar/
08/eu-vote-on-controversial-weedkillerlicence-postponed-glyphosate

[65]Id.

[66]Manon Flausch, *Commission prolongs glyphosate license by 18 months*, EURACTIV,
June 29, 2016, available at http://www.euractiv.com/section/agriculture-food/ news/ commission
-prolongs-glyphosate-licence-by-18-months/.

campaign since neonicotinoid pesticides were banned during the last commission."[67]

**104.** On July 11, 2016, the EU voted in favor of a proposal to restrict the conditions of use of glyphosate in the EU, including a ban on common co-formulant POE-tallowamine (POEA) from all glyphosate-based herbicides, including Roundup®.[68]

**105.** These restrictions, which are non-binding on the EU states, are expected to apply until the European Chemicals Agency issues an opinion on the chemical's safety.[69]

### *Melvin James Mayer III's Exposure to Roundup®.*

**106.** Melvin Mayer III was exposed to Roundup® for over twenty-five years, including during forestry jobs and during self-employment in lawn and garden care d/b/a "Mighty Mowers," a business he operated in Gretna, Louisiana, in the Eastern District of Louisiana. Mr. Mayer mixed and applied concentrated Roundup®, which was purchased from local farm supply stores.

**107.** On October 15, 2013 Mr. Mayer had an inguinal mass surgically removed at Leonard J. Chaubert Medical Center/Ochsner Health in Houma, Louisiana. On October 15, 2013, a needle biopsy identified the mass as B-cell lymphoma. Thereafter, Mr. Mayer's November 6, 2013 Surgical Pathology Consultation Report Fluorescence noted that an *in situ* hybridization (FISH) analysis was performed on Mr. Mayer's paraffin embedded specimen using DNA probes for IGH/BCL1 and

---

[67]Arthur Neslen, *Controversial chemical in Roundup weedkiller escapes immediate ban*, THE GUARDIAN, June 29, 2016, available at https://www.theguardian.com/business/2016/ jun/29/controversial-chemical-roundupweedkiller-escapes-immediate-ban.

[68]Sarantis Michalopoulos, *EU agrees ban on glyphosate co-formulant*, EURACTIV, July 11, 2016, available at http://www.euractiv.com/section/agriculture-food/news/eu-agrees-ban-on-glyphosate-coformulant/?nl_ref=16562829.

[69]See Arthur Neslen, *Controversial chemical in Roundup weedkiller escapes immediate ban*, THE GUARDIAN, June 29, 2016.

IGH/BCL2. [70]   At this time, it was determined that the groin mass was follicular grade III non-Hodgkins lymphoma.

108.    However, by February 7 2018, Ochsner Medical Center in New Orleans, Louisiana, had determined that Mr. Mayer was suffering from Diffuse large B-cell lymphoma in "unspecified body regions."  Despite aggressive and through cancer treatment, Mr. Mayer died on August 10, 2018.

109.    Mr. Mayer suffered terrible attendant physical pain as his cancer progressed,  and he died as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

110.    During the entire time that Melvin Mayer was exposed to Roundup®, he did not know that exposure to Roundup® was injurious to his health or the health of others.

**COUNT I**

**(Design Defect under LSA-RS 9:2800.5)**

111.    Plaintiffs incorporate by reference each and every allegation set forth in the preceding  paragraphs as if fully stated herein.

112.    Plaintiffs brings this strict liability claim against Monsanto for defective design.

113.    At all times relevant to this litigation, Monsanto engaged in the business of testing,

---

[70]One hundred interphase nuclei were examined for each probe an revealed an IGH/BCL2 translocation in a total of 40% of the nuclei.  Translocation (14,18) results in the fusion of the immunoglobulin heavy chain gene (IgH) at 14q32 with BCL2 gene at 18q21.3.  While it is the characteristic genetic alteration of follicular lymphoma (detected in 89-90% of cases), it is also found in ~20 to 30% of cases of diffuse large B-cell lymphoma. Neoplastic follicular cell stains were positive fo CD20, CD10, BCL-2, and CD79a and negative for all others.

developing, designing, manufacturing, marketing, selling, distributing, and promoting Roundup®products, which are defective and unreasonably dangerous to consumers, including the Plaintiffs, thereby placing Roundup®products into the stream of commerce. These actions were under the ultimate control and supervision of Monsanto. At all times relevant to this litigation, Monsanto designed, researched, developed, manufactured, produced, tested, assembled, labeled, advertised, promoted, marketed, sold, and distributed the Roundup®products used by Melvin Mayer III, as described above.

114.    At all times relevant to this litigation, Monsanto's Roundup®products were defectively designed by causing an increased risk of cancer and by containing additives that, when combined with glyphosate, significantly increased the risk of developing cancer.

115.    These design defects rendered Roundup®unreasonably dangerous.

116.    The dangers posed by Roundup®go beyond that which would be contemplated by the ordinary consumer with ordinary knowledge common to the community as to its characteristics.

117.    Additionally, the benefits of the Roundup®design are outweighed by the design's inherent risk of danger in causing cancer.

118.    At all times relevant to this litigation, Roundup®products reached the intended consumers, handlers, and users or other persons coming into contact with these products in Louisiana and throughout the United States, including Mr. Mayer, without substantial change in their condition as designed, manufactured, sold, distributed, labeled, and marketed by Monsanto.

119.    At all times relevant to this action, Monsanto knew or had reason to know that its Roundup®products were defective and were inherently dangerous and unsafe when used in the

manner instructed and provided by Monsanto.

120.    Monsanto could have employed a safer alternative design to render Roundup®safe or, in the alternative, provided proper instructions for use on how to limit the potential risk associated with Roundup®'s defective design. Monsanto's Roundup®products were and are more dangerous than alternative products and Monsanto could have designed its Roundup®products to make them less dangerous. At the time Monsanto designed its Roundup®products, the state of the industry's scientific knowledge was such that a less risky design or formulation was attainable. Thus, at the time Roundup®products left Monsanto's control, there was a practical, technically feasible and safer alternative design that would have prevented the harm without substantially impairing the reasonably anticipated or intended function of Monsanto's herbicides.

121.    Mr. Mayer was exposed to Monsanto's Roundup®products in the course of caring for his property as described above, without knowledge of Roundup®'s dangerous characteristics.

122.    At all times relevant to this litigation, Mr. Mayer used and/or was exposed to the use of Monsanto's Roundup®products in an intended or reasonably foreseeable manner, without knowledge of Roundup®'s dangerous characteristics.

123.    Mr. Mayer could not reasonably have discovered the defects and risks associated with Roundup®or glyphosate-containing products before or at the time of exposure due to Monsanto's suppression of scientific information linking glyphosate to cancer.

124.    The defects in Monsanto's Roundup®products were substantial and contributing factors in causing Mr. Mayer's injuries, and, but for Monsanto's misconduct and omissions, he would not have sustained said injuries.

125.    Monsanto's defective design of its Roundup®products was willful, wanton, fraudulent,

malicious, and conducted with reckless disregard for the health and safety of users of the Roundup®products, including Mr. Mayer.

126. Monsanto's conduct, as described above, was reckless. Monsanto risked the lives of consumers and users of its products, including Mr. Mayer, with knowledge of the safety problems associated with Roundup®and glyphosate-containing products, and suppressed this knowledge from the general public. Monsanto made conscious decisions not to redesign, warn or inform the unsuspecting public. Monsanto's reckless conduct warrants an award of punitive damages.

127. As a direct and proximate result of Monsanto placing its defective Roundup®products into the stream of commerce, Melvin Mayer III contracted cancer, suffered terrible physical and mental pain while slowly dying, and died on August 10, 2018, and before death suffered pecuniary losses in a sum in excess of the jurisdictional minimum of this Court.

128. **WHEREFORE,** Plaintiff respectfully requests that this Court enter judgment in his favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all such other and further relief as this Court deems just and proper.

**COUNT II**

**(Inadequate Warning under LSA-RS 9:2800.57)**

129. Plaintiffs incorporate by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

130. Plaintiffs bring this strict liability claim against Monsanto for failure to warn.

131. At all times relevant to this litigation, Monsanto engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting

Page 38 of 56

Roundup®products, which are defective and unreasonably dangerous to consumers, including Melvin Mayer III, because they do not contain adequate warnings or instructions concerning the dangerous characteristics of Roundup®and specifically, the active ingredient glyphosate. These actions were under the ultimate control and supervision of Monsanto.

132.    Monsanto researched, developed, designed, tested, manufactured, inspected, labeled, distributed, marketed, promoted, sold, and otherwise released into the stream of commerce its Roundup® products, and in the course of same, directly advertised or marketed the products to consumers and end users, including Mr. Mayer, and therefore had a duty to warn of the risks  associated with the use of Roundup® and glyphosate-containing products.

133.    At all times relevant to this litigation, Monsanto had a duty to properly test, develop, design, manufacture, inspect, package, label, market, promote, sell, distribute, maintain, supply, provide proper warnings, and take such steps as necessary to ensure its Roundup® products did not cause users and consumers to suffer from unreasonable and dangerous risks. Monsanto had a continuing duty to warn Mr. Mayer of the dangers associated with Roundup® use and exposure. Monsanto, as manufacturer, seller, or distributor of chemical herbicides is held to the knowledge of an expert in the field.

134.    At the time of manufacture, Monsanto could have provided the warnings or instructions regarding the full and complete risks of Roundup® and glyphosate-containing products because it knew or should have known of the unreasonable risks of harm associated with the use of and/or exposure to such products. Such warnings could have been disclosed in circumstances not limited to the Roundup® labeling.

135.    At all times relevant to this litigation, Monsanto failed to investigate, study, test, or promote

the safety or to minimize the dangers to users and consumers of its product and to those who would foreseeably use or be harmed by Monsanto's herbicides, including Mr. Mayer.

136. Despite the fact that Monsanto knew or should have known that Roundup®posed a grave risk of harm, it failed to exercise reasonable care to warn of the dangerous risks associated with use and exposure. The dangerous propensities of its products and the carcinogenic characteristics of glyphosate, as described above, were known to Monsanto, or scientifically knowable to Monsanto through appropriate research and testing by known methods, at the time it distributed, supplied or sold the product, and not known to end users and consumers, such as Mr. Mayer.

137. Monsanto knew or should have known that its products created significant risks of serious bodily harm to consumers, as alleged herein, and Monsanto failed to adequately warn consumers, i.e., the reasonably foreseeable users, of the risks of exposure to its products. Monsanto has wrongfully concealed information concerning the dangerous nature of Roundup®and its active ingredient glyphosate, and further made false and/or misleading statements concerning the safety of Roundup®and glyphosate.

138. At all times relevant to this litigation, Monsanto's Roundup®products reached the intended consumers, handlers, and users or other persons coming into contact with these products in Louisiana and throughout the United States, including Mr. Mayer, without substantial change in their condition as designed, manufactured, sold, distributed, labeled, and marketed by Monsanto.

139. Melvin Mayer III was exposed to Monsanto's Roundup®products, as described above, without knowledge of their dangerous characteristics.

140. At all times relevant to this litigation, Mr. Mayer used and/or was exposed to the use of Roundup®products while using them for their intended or reasonably foreseeable purposes, without

knowledge of their dangerous characteristics.

141.    Mr. Mayer could not have reasonably discovered the defects and risks associated with Roundup®or glyphosate-containing products prior to or at the time of his exposure. Mr. Mayer relied upon the skill, superior knowledge, and judgment of Monsanto to know about and disclose serious health risks associated with using the products.

142.    Monsanto knew or should have known that the minimal warnings disseminated with its Roundup® products were inadequate, failed to communicate adequate information on the dangers and safe use/exposure, and failed to communicate warnings and instructions that were appropriate and adequate to render the products safe for their ordinary, intended and reasonably foreseeable uses, including agricultural and horticultural applications.

143.    This alleged failure to warn is not limited to the information contained on Roundup®'s labeling. Monsanto was able, in accord with federal law, to comply with Louisiana law by disclosing the known risks associated with Roundup® through other non-labeling mediums, i.e., promotion, advertisements, public service announcements, and/or public information sources. Monsanto, however, did not disclose these known risks through any medium.

144.    To this day, Monsanto has failed to adequately and accurately warn of the risks of cancer associated with the use of and exposure to Roundup® and its active ingredient glyphosate.

145.    As a result of their inadequate warnings, Monsanto's Roundup® products were defective and unreasonably dangerous when they left the possession and/or control of Monsanto, were distributed by Monsanto, and used by Mr. Mayer as described.

146.    Monsanto is liable to Plaintiffs for their father's injuries and wrongful death caused by its negligent or willful failure, as described above, to provide adequate warnings or other

clinically relevant information and data regarding the appropriate use of its products and the risks associated with the use of or exposure to Roundup® and glyphosate.

147.    Had Monsanto provided adequate warnings and instructions and properly disclosed and disseminated the risks associated with its Roundup® products, Mr. Mayer could have avoided the risk of developing injuries and could have obtained or used alternative herbicides.

148.    As a direct and proximate result of Monsanto placing its defective Roundup® products into the stream of commerce, Plaintiffs' father sustained pecuniary loss and general damages in a sum in excess of the jurisdictional minimum of this Court.

149.    **WHEREFORE,** Plaintiffs respectfully request that this Court enter judgment in their favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all such other and further relief as this Court deems just and proper.

## COUNT III

### (Breach of Express Warranty under LSA-RS 9:2800.58)

150.    Plaintiffs incorporate by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

151.    Defendant expressly warranted that Roundup® was safe and well accepted by consumers.

152.    Roundup® does not conform to these express representations, because Roundup® is not safe and carries with it an increased risk of cancer by containing additives that, when combined with glyphosate, significantly increased the risk of developing cancer.

153.    Melvin Mayer III relied on Monsanto's express warranties. Furthermore, the express warranties represented by Defendant were a part of the basis for Mr. Mayer's use of Roundup® and

he relied upon these warranties in deciding to use Roundup®.

154.     At the time of the making of express warranties, Monsanto had knowledge of the purpose for which Roundup®was to be used, and warranted same to be in all respects safe, effective, and proper for such use.

155.     Monsanto expressly represented to Mr. Mayer that Roundup®was safe and fit for use for the purposes intended, that it was of merchantable quality, that it did not produce any dangerous side effects in excess of those risks associated with other herbicides, that the side effects it did produce were accurately reflected in the warnings, and that it was adequately tested and fit for its intended use.

156.     Monsanto knew or should have known that, in fact, their representations and warranties were false, misleading, and untrue in that Roundup®was not safe and fit for the use intended, and, in fact, Roundup®produced serious injuries to the users that were not accurately identified and represented by Monsanto.

157.     As a result of the foregoing acts and omissions, Monsanto caused Melvin Mayer III to suffer serious and dangerous side effects, severe and personal injuries, and economic and non-economic damages, harms, and losses, including, but not limited to: past medical expenses; past and future loss of earnings; mental anguish; severe and debilitating emotional distress; physical and mental pain, suffering, and discomfort; and loss and impairment of the quality and enjoyment of life; and wrongful death.

158.     **WHEREFORE,** Plaintiffs respectfully request that this Court enter judgment in their favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all such other and further relief as this Court deems just and proper.

## COUNT IV

### (Breach of Warranty in Redhibition)

**159.** Plaintiffs incorporate by reference each and every allegation set forth in the preceding paragraphs as if fully stated.

**160.** Roundup®contains a vice or defect which renders it useless or its use so inconvenient that consumers would not have purchased it had they known about the vice or defect.

**161.** Pursuant to Louisiana Civil code article 2520, a seller warrants the buyer against redhibitory defects, or vices, in the thing sold. Roundup®, which was sold and promoted by Monsanto, possesses a redhibitory defect because it is unreasonably dangerous, as described above, which renders Roundup®useless or so inconvenient that it must be presumed that Plaintiffs' decedent, Melvin Mayer III, would not have bought or used Roundup®had he known of the defects.

**162.** Monsanto was fully aware of the substantial risks of associated with Roundup®but failed to fully disclose those risks to Mr. Mayer.

**163.** In accordance with Louisiana Civil Code article 2545, Monsanto, as the manufacturer, distributor and seller of Roundup®, is deemed to be aware of its redhibitory defects.

**164.** Had Mr. Mayer been made aware of the defects contained in Roundup®, he would not have purchased or used Roundup®. This characteristic rendered Roundup®unfit for its intended purposes.

**165.** Monsanto is liable to Plaintiffs under the theory of redhibition as a consequence of the sale to Plaintiffs' decedent of a product unfit for its intended use.

**165.** Plaintiffs are entitled to the return of purchase price paid for Roundup®, including, but not limited to, purchase price, interest on these amounts from the date of purchase, attorneys' fees and

costs, pecuniary and non-pecuniary damages, as well as any other legal and equitable relief to which Plaintiffs may be entitled.

### COUNT V

### (Negligence)

**166.**    Plaintiffs incorporate by reference each and every allegation set forth in the preceding paragraphs as if fully stated.

**167.**    Monsanto, directly or indirectly, caused Roundup® products to be sold, distributed, packaged, labeled, marketed, promoted, and/or used by Melvin Mayer III.

**168.**    At all times relevant to this litigation, Monsanto had a duty to exercise reasonable care  in the design, research, manufacture, marketing, advertisement, supply, promotion, packaging, sale, and distribution of its Roundup® products, including the duty to take all reasonable steps necessary to manufacture, promote, and/or sell a product that was not unreasonably dangerous to consumers and users of the product.

**169.**    At all times relevant to this litigation, Monsanto had a duty to exercise reasonable care in the marketing, advertisement, and sale of the Roundup® products. Monsanto's duty of care owed  to consumers and the general public included providing accurate, true, and correct information concerning the risks of using Roundup® and appropriate, complete, and accurate warnings concerning the potential adverse effects of exposure to Roundup®, and, in particular, its active ingredient glyphosate.

**170.**    At all times relevant to this litigation, Monsanto knew or, in the exercise of reasonable care, should have known of the hazards and dangers of Roundup® and specifically, the carcinogenic properties of the chemical glyphosate.

171.     Accordingly, at all times relevant to this litigation, Monsanto knew or, in the exercise

of reasonable care, should have known that use of or exposure to its Roundup®products could cause

or be associated with Melvin Mayer III's injuries, and thus, created a dangerous and

unreasonable risk of injury to the users of these products, including Mr. Mayer.

172.     Monsanto also knew or, in the exercise of reasonable care, should have known that users and

consumers of Roundup®were unaware of the risks and the magnitude of the risks associated

with use of and/or exposure to Roundup®and glyphosate-containing products.

173.     As such, Monsanto breached its duty of reasonable care and failed to exercise

ordinary care in the design, research, development, manufacture, testing, marketing, supply,

promotion, advertisement, packaging, sale, and distribution of its Roundup®products, in that

Monsanto manufactured and produced defective herbicides containing the chemical glyphosate,

knew or had reason to know of the defects inherent in its products, knew or had reason to know that

a user's or consumer's exposure to the products created a significant risk of harm and

unreasonably dangerous side effects, and failed to prevent or adequately warn of these risks and

injuries.

174.     Monsanto was negligent in its promotion of Roundup®, outside of the labeling

context, by failing to disclose material risk information as part of its promotion and marketing of

Roundup®, including the internet, television, print advertisements, etc. Nothing prevented

Monsanto from being honest in its promotional activities, and in fact, Monsanto had a duty

to  disclose the truth about the risks associated with Roundup®in its promotional efforts, outside of

the of the context of labeling.

175.     Monsanto has/had the ability and means to investigate, study, and test its products and to

provide adequate warnings, Monsanto has failed to do so. Indeed, Monsanto has wrongfully
concealed information and has further made false and/or misleading statements concerning
the safety and/or exposure to Roundup®and glyphosate.

176.    Monsanto's negligence included:

    **a)**      Manufacturing, producing, promoting, formulating, creating, developing, designing,

selling, and/or distributing its Roundup®products without thorough and adequate pre- and

post-market testing;

    **b)**      Manufacturing, producing, promoting, formulating, creating, developing, designing,

selling, and/or distributing Roundup®while negligently and/or intentionally concealing and

failing to disclose the results of trials, tests, and studies of exposure to glyphosate, and,

consequently, the risk of serious harm associated with human use of and exposure to

Roundup®;

    **c)**      Failing to undertake sufficient studies and conduct necessary tests to determine

whether or not Roundup®products and glyphosate-containing products were safe for their

intended use in agriculture and horticulture;

    **d)**      Failing to use reasonable and prudent care in the design, research, manufacture, and

development of Roundup®products so as to avoid the risk of serious harm associated with

the prevalent use of Roundup®/glyphosate as an herbicide;

    **e)**      Failing to design and manufacture Roundup®products so as to ensure they

were  at least as safe and effective as other herbicides on the market;

    **f)**      Failing to provide adequate instructions, guidelines, and safety precautions to those

persons Monsanto could reasonably foresee would use and be exposed to its

Roundup®products;

**g)**     Failing to disclose to Mr. Mayer, users/consumers, and the general public that use

of and exposure to Roundup®presented severe risks of cancer and other grave illnesses;

**h)**     Failing to warn Mr. Mayer, users/consumers, and the general public that the product's

risk of harm was unreasonable and that there were safer and effective alternative herbicides

available to Mr. Mayer and other consumers;

**I)**     Systematically suppressing or downplaying contrary evidence about the risks,

incidence, and prevalence of the side effects of Roundup®and glyphosate- containing

products;

**j)**     Representing that its Roundup®products were safe for their intended use when, in

fact, Monsanto knew or should have known the products were not safe for their intended

purpose;

**k)**     Declining to make or propose any changes to Roundup®products' labeling or other

promotional materials that would alert consumers and the general public of the risks of

Roundup®and glyphosate;

**l)**     Advertising, marketing, and recommending the use of the Roundup®products, while

concealing and failing to disclose or warn of the dangers known by Monsanto to be

associated with or caused by the use of or exposure to Roundup®and glyphosate; **m)**

Continuing to disseminate information to its consumers, which indicate or imply that

Monsanto's Roundup®products are safe for use in the agricultural and horticultural

industries; and

**n)**     Continuing the manufacture and sale of its products with the knowledge that the

products were unreasonably unsafe and dangerous.

177.    Monsanto knew and/or should have known that it was foreseeable consumers such as Mr. Mayer would suffer injuries as a result of Monsanto's failure to exercise ordinary care in the manufacturing, marketing, labeling, distribution, and sale of Roundup®.

178.    Melvin Mayer III did not know the nature and extent of the injuries that could result from the intended use of and/or exposure to Roundup®or its active ingredient glyphosate. Monsanto's negligence was the proximate cause of Mr. Mayer's injuries and wrongful death, i.e., absent Monsanto's negligence, Mr. Mayer would not have developed Diffuse Large B-cell Lymphoma.

179.    Monsanto's conduct, as described above, was reckless. Monsanto regularly risks the lives of consumers and users of its products, including Mr. Mayer, with full knowledge of the dangers of its products. Monsanto has made conscious decisions not to redesign, re-label, warn, or inform the unsuspecting public, including Mr. Mayer. Monsanto's reckless conduct therefore warrants an award of punitive damages.

180.    **WHEREFORE,** Plaintiffs respectfully request that this Court enter judgment in their favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all such other and further relief as this Court deems just and proper.

## COUNT VI

### (Fraud)

181.    Plaintiffs incorporate by reference each and every allegation set forth in the preceding paragraphs as if fully stated.

182.    Monsanto has defrauded the agricultural community in general and Mr. Mayer in particular by misrepresenting the true safety of Roundup®and by failing to disclose known risks of cancer.

183.    Monsanto misrepresented and/or failed to disclose, inter alia, that: glyphosate and its major metabolite aminomethylphosphonic acid (AMPA) could cause cancer; glyphosate and AMPA are known to be genotoxic in humans and laboratory animals because exposure is known to cause DNA strand breaks (a precursor to cancer); glyphosate and AMPA are known to induce oxidative stress in humans and laboratory animals (a precursor to cancer); glyphosate and AMPA interfere with the aromatic amino acids within the human gut, leading to downstream health conditions including cancer; exposure to glyphosate and AMPA is causally associated with non-Hodgkin lymphoma; and the laboratory tests attesting to the safety of glyphosate were flawed and/or fraudulent.

184.    Due to these misrepresentations and omissions, at all times relevant to this litigation, Roundup®was misbranded under 7 U.S.C. § 136(g) and its distribution within Louisiana and around the United States was a violation of 7 U.S.C. § 136j and 40 C.F.R. § 156.10(a)(5).

185.    When Melvin Mayer III purchased Roundup®from his local supply stores, and/or when he used this product, neither the labeling on the product nor Monsanto's general promotion warned or disclosed the true safety risks of Roundup®or that the product could cause cancer, as described above. Since the true risk information was known to Monsanto and was not reasonably knowable to reasonable consumers, Mr. Mayer and Plaintiffs were unaware of these material facts and/or omissions prior to purchasing the product. Mr. Mayer paid for the product using his own money, money he would not have expended absent Monsanto's misrepresentations and/or material omissions concerning the fact that Roundup®is a carcinogen.

186.    Melvin Mayer III relied on Monsanto's misrepresentations and/or material omissions regarding the safety of Roundup®and its active ingredient glyphosate in deciding whether

to purchase and/or use the product on his property. Mr. Mayer did not know nor could he reasonably have known of the misrepresentations and/or material omissions by Monsanto concerning Roundup®and its active ingredient glyphosate.

187.    The misrepresentations and/or material omissions that form the basis of this fraud claim are not limited to statements made on the Roundup®labeling, as defined under federal law, but also involve Monsanto's representations and omissions made as part of its promotion and marketing of Roundup®, including on the internet, television, in print advertisements, etc. Nothing prevented Monsanto from disclosing the truth about the risks associated with Roundup®in its promotional efforts outside of the labeling context, using the forms of media and promotion Monsanto traditionally used to promote the product's efficacy and benefits.

188.    When Monsanto made the misrepresentations and/or omissions as alleged in this pleading, it did so with the intent of defrauding and deceiving the public in general and with the intent of inducing the public to purchase and use Roundup®.

189.    Monsanto made these misrepresentations and/or material omissions with malicious, fraudulent and/or oppressive intent toward **Mr. Mayer** and the public generally. Monsanto's conduct was willful, wanton, and/or reckless. Monsanto deliberately manufactured, produced, marketed, sold, distributed, merchandized, packaged, promoted and advertised the dangerous and defective herbicide Roundup®. This constitutes an utter, wanton, and conscious disregard of the rights and safety of a large segment of the public including Melvin Mayer III, and by reason thereof, Monsanto, is liable for reckless, willful, and wanton acts and omissions which evidence a total and conscious disregard for the safety of Mr. Mayer and others which proximately caused the injuries as set forth herein.

190. As a proximate result of Monsanto's fraudulent and deceitful conduct and representations, Plaintiffs and Melvin Mayer III sustained damages and other losses in an amount to be proven at trial.

191. **WHEREFORE,** Plaintiffs respectfully request that this Court enter judgment in their favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all such other and further relief as this Court deems just and proper.

**DISCOVERY RULE AND EQUITABLE TOLLING**

192. Plaintiffs asserts all applicable state statutory and common law rights and theories related to the tolling or extension of any applicable statute of limitations, including the discovery rule, delayed discovery, equitable tolling, and fraudulent concealment.

193. The discovery rule should be applied to toll the running of the statute of limitations until Plaintiffs knew, or through the exercise of reasonable care and diligence should have known of the cause of their father's injury and wrongful death, and the tortious nature of the wrongdoing that caused their injuries.

194. Despite diligent investigation by Plaintiffs into the cause of their late father's injury and death, they did not and could not have discovered the cause until recently. Accordingly, their claim has been filed within the applicable statutory period. In fact, Monsanto continues to deny any causal connection between Roundup® and Diffuse Large B-cell Lymphoma and thus should be estopped from asserting a statute of limitations defense based on Plaintiffs' failure to discover the cause of his injury until recently.

195. The running of the statute of limitations in this cause should also be tolled due to equitable tolling based on Defendant's fraudulent concealment. Defendant is estopped from asserting

a statute of limitations defense due to its fraudulent concealment, through affirmative misrepresentations and deliberate omissions, regarding the true risks associated with Roundup®, which were known by Defendant.

196.    Monsanto's affirmative misrepresentations were known by it to be false and were calculated to mislead or deceive and to induce inaction by Melvin Mayer III, Plaintiffs, and others harmed by Roundup®.  The information Defendant misrepresented was material to consumers and Mr. Mayer with regard to their decision to use Roundup®.  Defendant made these material misrepresentations knowing they were false, deceptive, and misleading and made them intending to defraud, deceive, and mislead.

197.    Because of the fraudulent acts of concealment of the true risks of Roundup® to users, Melvin Mayer III and Plaintiffs were unaware, and could not reasonably have known, ascertained, or learned through the exercise of reasonable due diligence, the true cause of Melvin Mayer III's injuries and wrongful death until recently.  Accordingly, Plaintiffs' claim has been filed within the applicable statutory period.

## EXEMPLARY DAMAGES ALLEGATIONS

198.    Plaintiff incorporate by reference each and every allegation set forth in the preceding paragraphs as if fully stated.

199.    Monsanto's conduct as alleged herein was done with oppression, fraud, and malice. Monsanto was fully aware of Roundup®'s safety risks. Nonetheless, Monsanto deliberately crafted its label, marketing, and promotion to mislead farmers and consumers.

200.    This was not done by accident or through some justifiable negligence. Rather, Monsanto knew that it could turn a profit by convincing the agricultural industry and the general

population that Roundup® was harmless to humans, and that full disclosure of Roundup®'s true risks would limit the amount of money Monsanto would make selling Roundup® in Louisiana. This was accomplished not only through its misleading labeling, but through a comprehensive scheme of selective fraudulent research and testing, misleading advertising, and deceptive omissions as more fully alleged throughout this pleading. Melvin Mayer III was robbed of his right to make an informed decision about whether to purchase and use an herbicide on his property, knowing the full risks attendant to that use. Such conduct was done with conscious disregard of the Mr. Mayer's rights.

**201.** There is no indication that Monsanto will stop its deceptive and unlawful marketing practices unless it is punished and deterred. Accordingly, Plaintiff requests punitive damages against Monsanto for the harms caused to the Plaintiffs and their late father.

### SURVIVAL ACTION AND WRONGFUL DEATH ACTION DAMAGES

**202.** For all the reasons stated herein, and pursuant to La. C.C. art. 2315.1 (survival action) and La. C.C. art. 2315.2 (wrongful death action), Plaintiffs are entitled to recover those survival damages and wrongful death damages consequential to the events complained of in this Complaint.

**203.** The damages sought to be recovered include, but are not necessarily limited to, any mental or physical pain and suffering endured by Plaintiffs and their late father; and include all general damages reasonable in the premises; for the costs of all medical care and treatment incurred as a result of Melvin Mayer III's exposure to Roundup®; for all special expenses reasonable in the premises; for all general and equitable relief under the circumstances; for legal interest from date of judicial demand; and any expenses incurred or to be incurred that are consequential to the events complained of in this Complaint, and for such other damages as may be established at the trial

of this action.

## JURY TRIAL DEMAND

204.   Plaintiffs demand trial by jury pursuant to Fed. R. Civ. P. 38 on all of the triable issues

within this Complaint.

## PRAYER FOR RELIEF

205.   **WHEREFORE,** Plaintiffs request that the Court enter judgment in their favor and

against Monsanto, awarding:

a)   Special and general damages in such amount to be determined at trial and as provided

by applicable law;

b)   Exemplary and punitive damages sufficient to punish and deter Monsanto and others

from future fraudulent practices;

c)   Pre-judgment and post-judgment interest;

d)   Costs including reasonable attorneys' fees, court costs, and other litigation expenses;

and. any other relief the Court may deem just and proper.

Respectfully submitted:

*/s/ Frank E. Lamothe, III*
FRANK E. LAMOTHE, III, TA (#07945)
RICHARD M. MARTIN, JR. (#08998)
**LAMOTHE LAW FIRM, LLC**
400 Poydras Street, Suite 1760
New Orleans, Louisiana 70130
Telephone: (504) 704-1414
felamothe@lamothefirm.com
rmartin@lamothefirm.com

And:

CLERK'S OFFICE
A TRUE COPY
Jun 11 2020
Courtney Ancar
Deputy Clerk, U.S. District Court
Eastern District Of Louisiana
New Orleans, LA
UNITED STATES DISTRICT COURT

*/s/ James P. DeSonier*
JAMES P. DeSONIER (#04907)
**LAW OFFICE OF JAMES P. DESONIER**
450 N. Causeway Blvd., Suite C
Mandeville, LA  70448
Telephone: (985) 951-8510
Facsimile: (985) 951-8545
james@jpdesonier.com