# U.S. District Court
## DISTRICT OF ARIZONA (Phoenix Division)
## CIVIL DOCKET FOR CASE #: 2:20-cv-01072-SMB

Hale et al v. Monsanto Company
Assigned to: Judge Susan M Brnovich
Cause: 28:1332 Diversity-Product Liability

Date Filed: 06/01/2020
Jury Demand: Plaintiff
Nature of Suit: 365 Personal Injury: Prod. Liability
Jurisdiction: Diversity

**Plaintiff**

**Ralph Hale**
*a married couple*

represented by   **Daniel Z Kolomitz**
Gallagher & Kennedy PA
2575 E Camelback Rd., Ste. 1100
Phoenix, AZ 85016-9225
602-530-8435
Email: danny.kolomitz@gknet.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Robert W Boatman**
Gallagher & Kennedy PA
2575 E Camelback Rd., Ste. 1100
Phoenix, AZ 85016-9225
602-530-8340
Fax: 602-530-8500
Email: rwb@gknet.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Shannon L Clark**
Gallagher & Kennedy PA
2575 E Camelback Rd., Ste. 1100
Phoenix, AZ 85016
602-530-8194
Fax: 602-530-8500
Email: slc@gknet.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Shelly Hale**
*a married couple*

represented by   **Daniel Z Kolomitz**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Robert W Boatman**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Shannon L Clark**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Monsanto Company**
*a corporation*

| Date Filed | # | Docket Text |
|---|---|---|
| 06/01/2020 | 1 | COMPLAINT. Filing fee received: $ 400.00, receipt number 0970-18335416 filed by Ralph Hale and Shelly Hale. (Kolomitz, Daniel) (Attachments: # 1 Civil Cover Sheet)(DLC) (Entered: 06/02/2020) |
| 06/01/2020 | 2 | SUMMONS Submitted by Ralph Hale and Shelly Hale. (Kolomitz, Daniel) (DLC) (Entered: 06/02/2020) |
| 06/01/2020 | 3 | Filing fee paid, receipt number 0970-18335416. This case has been assigned to the Honorable Susan M Brnovich. All future pleadings or documents should bear the correct case number: CV-20-1072-PHX-SMB. Notice of Availability of Magistrate Judge to Exercise Jurisdiction form attached. (DLC) (Entered: 06/02/2020) |
| 06/02/2020 | 4 | Summons Issued as to Monsanto Company. (DLC). *** IMPORTANT: When printing the summons, select "Document and stamps" or "Document and comments" for the seal to appear on the document. (Entered: 06/02/2020) |
| 06/03/2020 | 5 | ORDER Any motions, responses or replies filed for which a courtesy copy is not delivered to the Court, as required, will be stricken and not considered. Signed by Judge Susan M. Brnovich on 6/2/2020. (ESG) (Entered: 06/03/2020) |
| 06/03/2020 | 6 | ORDER that motions pursuant to Fed. R. Civ. P. 12(b) are discouraged if the defect can be cured by filing an amended pleading. The parties must meet and confer prior to the filing of such motions to determine whether it can be avoided. FURTHER ORDERED that Plaintiff(s) serve a copy of this Order upon Defendant(s) and file a notice of service. See attached Order for complete details. Signed by Judge Susan M. Brnovich on 6/02/2020. (ESG) (Entered: 06/03/2020) |
| 06/03/2020 | 7 | ORDER directing the Clerk of Court to terminate any or all Defendants in this matter, without further notice, that have not been served within the time required by Fed. R. Civ. P. 4(m) on August 31, 2020. Signed by Judge Susan M. Brnovich on 6/02/2020. (ESG) (Entered: 06/03/2020) |
| 06/03/2020 | 8 | NOTICE re: Certificate of Service by Ralph Hale, Shelly Hale . (Kolomitz, Daniel) (Entered: 06/03/2020) |
| 06/03/2020 | 9 | NOTICE re: Amended Certificate of Service by Ralph Hale, Shelly Hale . (Kolomitz, Daniel) (Entered: 06/03/2020) |

**PACER Service Center**

**Transaction Receipt**

| 06/15/2020 12:27:10 | | | |
|---|---|---|---|
| **PACER Login:** | hllp1982:2634105:4722683 | **Client Code:** | 1417.0049 |
| **Description:** | Docket Report | **Search Criteria:** | 2:20-cv-01072-SMB |
| **Billable Pages:** | 2 | **Cost:** | 0.20 |

1  Robert W. Boatman (009619)
   rwb@gknet.com
2  Shannon L. Clark (019708)
   slc@gknet.com
3  Daniel Z. Kolomitz (034073)
   danny.kolomitz@gknet.com
4  GALLAGHER & KENNEDY, P.A.
   2575 East Camelback Road
5  Phoenix, Arizona 85016-9225
   Telephone:   (602) 530-8000
6  Facsimile:   (602) 530-8500
   *Attorneys for Plaintiffs*

7

8                    **UNITED STATES DISTRICT COURT**

                          **DISTRICT OF ARIZONA**

9

| Ralph Hale and Shelly Hale, a married couple, | Case No.: |
|---|---|
| Plaintiffs, | **COMPLAINT** |
| v. | **(Tort; Strict Products Liability, Negligence, Failure to Warn; Breach of Warranty; Consumer Fraud; Punitive Damages; Loss of Consortium)** |
| Monsanto Company, Inc., a corporation, | |
| Defendant. | **Jury Trial Demanded** |

Gallagher & Kennedy, P.A.
2575 East Camelback Road
Phoenix, Arizona 85016-9225
(602) 530-8000

15

16     Plaintiffs, for their Complaint against Defendant, allege as follows:

17                 I.     <u>SUMMARY OF THE CASE</u>

18  1.       All claims in this action are a direct and proximate result of Defendant's negligent,

19  willful, and wrongful conduct in connection with the design, development, manufacturing,

20  testing, packaging, promoting, marketing, advertising, distribution, labeling, and/or sale of

21  Roundup®, containing the active ingredient glyphosate. Plaintiffs in this action seek

22  recovery for damages as a result of developing Non-Hodgkin's lymphoma, which was

7508641v3/99.8869

1
2
3
4
5

directly and proximately caused by such wrongful conduct by Defendant, the unreasonably dangerous and defective nature of Roundup® , and its active ingredient, glyphosate, and the attendant effects of developing Non-Hodgkin's lymphoma. All of the claims involve common questions of law and fact and share legal and medical issues that arise out of all of Plaintiff Ralph Hale's exposures to Roundup® .

6

## II.     **PARTIES**

7

### Plaintiffs

8

2.      Plaintiffs, at all relevant times, were and are residents of Arizona.

9
10
11

3.      Plaintiff Ralph Hale was exposed to Roundup® and/or other Monsanto glyphosate-containing products ("Roundup") for ten years, as he used the product to treat his large ranch property, which is roughly 60 acres.

12
13

4.      Plaintiff Ralph Hale was also exposed to Roundup during the same time period when he used to spray a neighboring 25 acre ranch where he worked.

14
15

5.      Plaintiff Ralph Hale sprayed his entire property with Roundup® 3-4 times a year. Each treatment would take roughly 40-60 hours due to the size of the property.

16
17
18

6.      Because Roundup® represented that it was a safe to be in contact with the Roundup® spray, Plaintiff Ralph Hale did not use any protective gear and would only wear summer clothes while spraying. His skin would often be in contact with the chemical when spraying.

19
20
21

7.      Plaintiff Ralph Hale was diagnosed with Non-Hodgkin's lymphoma in 2018. As a direct and proximate result of these injuries, Plaintiff Ralph Hale has sustained extensive medical costs, lost wages, and experienced tremendous pain and suffering.

22

2

**Defendant**

8.      Defendant Monsanto Company ("Monsanto") is a Delaware corporation with its headquarters and principal place of business in St. Louis, Missouri. At all times relevant to this complaint, Monsanto was the manufacturer of Roundup® and the entity that discovered the herbicidal properties of glyphosate.

9.      Plaintiffs are informed and believes, and thereon alleges, that in committing the acts alleged herein, each and every managing agent, agent, representative and/or employee of the Defendant was working within the course and scope of said agency, representation and/or employment with the knowledge, consent, ratification, and authorization of the Defendant and their directors, officers and/or managing agents.

## III.      JURISDICTION AND VENUE

10.      Personal jurisdiction is proper pursuant to Ariz. R. Civ. Pro. 4.2(a). Monsanto has conducted and continues to conduct substantial and systematic business activities related to Roundup, which are not isolated activities, within the State of Arizona. Such activities include, but are not limited to: (a) marketing and sale of Roundup®, including the Roundup® at issue in this case, in this jurisdiction; (b) hiring, training and deploying employees, including managers and sales representatives in this jurisdiction; (c) advertising and marketing Roundup® in this jurisdiction; (d) maintenance of company files and equipment relating to Roundup® in this jurisdiction; (e) payment of employee salaries in this jurisdiction; and (f) maintenance of a website directed to all states, including Arizona.

11.      In addition, personal jurisdiction is proper in that Defendant designed, manufactured, marketed, and sold Roundup® that was used by Plaintiff Ralph Hale. The marketing and

3

sale of the Roundup® in question occurred in Arizona. Plaintiff Ralph Hale was exposed to Roundup® in Arizona. Roundup® caused Plaintiff Ralph Hale's Non-Hodgkin's lymphoma in Arizona.

12.     Monsanto has regularly transacted and conducted business within the state of Arizona, and has derived substantial revenue from goods and products, including Roundup®, used in the State of Arizona. Monsanto expected or should have expected its acts to have consequences within the State of Arizona, and derived substantial revenue from interstate commerce.

13.     Jurisdiction is proper based on diversity under 28 U.S.C. § 1332 because Plaintiffs are a citizen of Arizona, a different state than the Defendant's states of citizenship, and the aggregate amount in controversy exceeds $75,000, exclusive of interest and costs.

14.     Venue is further proper in the District of Arizona because this is a tort case in which the Plaintiffs reside in Arizona and the cause of action arose in Arizona. See A.R.S. § 12-401.

**IV.     CASE FACTS**

15.     Glyphosate is a broad-spectrum, non-selective herbicide used in a wide variety of herbicidal products around the world.

16.     Plants treated with glyphosate translocate the systemic herbicide to their roots, shoot regions, and fruit, where it interferes with the plant's ability to form aromatic amino acids necessary for protein synthesis.

4

7508641 v1/99-8869

17.     Treated plants generally die within two to three days. Because plants absorb glyphosate, it cannot be completely removed by washing or peeling produce or by milling, baking, or brewing grains.

18.     For nearly 40 years, farms across the world have used Roundup® without knowing of the dangers its use poses. That is because when Monsanto first introduced Roundup®, it touted glyphosate as a technological breakthrough: it could kill almost every weed without causing harm either to people or to the environment. Of course, history has shown that not to be true. According to the WHO, the main chemical ingredient of Roundup®—glyphosate—is a probable cause of cancer. Those most at risk are farm workers and other individuals with workplace exposure to Roundup®, such as workers in garden centers, nurseries, and landscapers.

19.     Monsanto assured the public that Roundup® was harmless. In order to prove this, Monsanto championed falsified data and attacked legitimate studies that revealed its dangers. Monsanto led a prolonged campaign of misinformation to convince government agencies, farmers, and the general population that Roundup® was safe.

**The Discovery of Glyphosate and Development of Roundup®**

20.     The herbicidal properties of glyphosate were discovered in 1970 by Monsanto chemist John Franz. The first glyphosate-based herbicide was introduced to the market in the mid-1970s under the brand name Roundup®.[1] From the outset, Monsanto marketed

---

[1] Roundup, The History of Roundup, http://www.roundup.ca/en/rounduphistory (last visited August 27, 2019).

1

2
Roundup® as a "safe" general-purpose herbicide for widespread commercial and consumer

use. It still markets Roundup® as safe today.[2]

3
### Registration of Herbicides under Federal Law

4
21.     The manufacture, formulation and distribution of herbicides, such as Roundup®, are

5
regulated under the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA" or

6
"Act"), 7 U.S.C. § 136 et seq. FIFRA requires that all pesticides be registered with the

7
Environmental Protection Agency ("EPA" or "Agency") prior to their distribution, sale, or

8
use, except as described by the Act. 7 U.S.C. § 136a(a).

9
22.     Because pesticides are toxic to plants, animals, and humans, at least to some degree,

10
the EPA requires as part of the registration process, among other things, a variety of tests

11
to evaluate the potential for exposure to pesticides, toxicity to people and other potential

12
non-target organisms, and other adverse effects on the environment. Registration by the

13
EPA, however, is not an assurance or finding of safety. The determination the Agency must

14
make in registering or re-registering a product is not that the product is "safe," but rather

15
that use of the product in accordance with its label directions "will not generally cause

16
unreasonable adverse effects on the environment." 7 U.S.C. § 136a(c)(5)(D).

17

18
―――――――――

19
[2] Roundup®, Learning The Basics: Learn how Roundup® Weed & Grass Killer
products work, how to use them safely, which weeds they work on, and where to use them
(July 31, 2019), http://www.monsanto.com/sitecollectiondocuments/glyphosate-

20
safetyhealth.pdf; Bayer, Glyphosate's Impact on Human Health and Safety (July 31,
2019), https://www.bayer.com/en/glyphosate-impact-on-human-health-and-

21
safety.aspx?gclsrc=aw.ds&&gclid=EAIaIQobChMIlOLCzKng4wIV3__jBx0p1QmoEA

22
MYASAAEgLi-_D_BwE.

23.     FIFRA defines "unreasonable adverse effects on the environment" to mean "any unreasonable risk to man or the environment, taking into account the economic, social, and environmental costs and benefits of the use of any pesticide." 7 U.S.C. § 136(bb). FIFRA thus requires EPA to make a risk/benefit analysis in determining whether a registration should be granted or allowed to continue to be sold in commerce.

24.     The EPA and the State of Arizona registered Roundup® for distribution, sale, and manufacture in the United States and the State of Arizona.

25.     FIFRA generally requires that the registrant (Monsanto in the case of Roundup®) conducts the health and safety testing of pesticide products. The EPA has protocols governing the conduct of tests required for registration and the laboratory practices that must be followed in conducting these tests. The data produced by the registrant must be submitted to the EPA for review and evaluation. The government is not required, nor is it able, however, to perform the product tests that are required of the manufacturer.

26.     The evaluation of each pesticide product distributed, sold, or manufactured is completed at the time the product is initially registered. The data necessary for registration of a pesticide has changed over time. The EPA is now in the process of re-evaluating all pesticide products through a Congressionally-mandated process called "re-registration." 7 U.S.C. § 136a-1. In order to reevaluate these pesticides, the EPA is demanding the completion of additional tests and the submission of data for the EPA's review and evaluation.

27.     In the case of glyphosate, and therefore Roundup®, the EPA had planned on releasing its preliminary risk assessment —in relation to the reregistration process—no later

7

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

than July 2015. The EPA completed its review of glyphosate in early 2015, but it delayed

releasing the risk assessment pending further review in light of the WHO's health-related

findings.

**Scientific Fraud Underlying the Marketing and Sale of Glyphosate/Roundup®**

28.     Based on early studies that glyphosate could cause cancer in laboratory animals, the

EPA originally classified glyphosate as possibly carcinogenic to humans (Group C) in 1985.

After pressure from Monsanto, including contrary studies it provided to the EPA, the EPA

changed its classification to evidence of non-carcinogenicity in humans (Group E) in 1991.

In so classifying glyphosate, however, the EPA made clear that the designation did not mean

the chemical does not cause cancer: "It should be emphasized, however, that designation of

an agent in Group E is based on the available evidence at the time of evaluation and should

not be interpreted as a definitive conclusion that the agent will not be a carcinogen under

any circumstances."[3]

29.     On two occasions, the EPA found that the laboratories hired by Monsanto to test the

toxicity of its Roundup® products for registration purposes committed fraud.

30.     In the first instance, Monsanto, in seeking initial registration of Roundup® by EPA,

hired Industrial Bio-Test Laboratories ("IBT") to perform and evaluate pesticide toxicology

---

[3] U.S. Envtl. Prot. Agency, Memorandum, Subject: SECOND Peer Review of Glyphosate
1 (1991), available at
https://archive.epa.gov/pesticides/chemicalsearch/chemical/foia/web/pdf/103601/103601-
265.pdf.

7508641v3/99-8869

1

2   studies relating to Roundup®.[4] IBT performed about 30 tests on glyphosate and glyphosate-

containing products, including nine of the 15 residue studies needed to register Roundup®.

3

4   31.      In 1976, the United States Food and Drug Administration ("FDA") performed an

inspection of Industrial Bio-Test Industries ("IBT") that revealed discrepancies between the

5

raw data and the final report relating to the toxicological impacts of glyphosate. The EPA

6

subsequently audited IBT; it too found the toxicology studies conducted for the Roundup®

7

herbicide to be invalid.[5] An EPA reviewer stated, after finding "routine falsification of data"

8

at IBT, that it was "hard to believe the scientific integrity of the studies when they said they

9

took specimens of the uterus from male rabbits."[6]

10

31.      Three top executives of IBT were convicted of fraud in 1983.

11

33.      In the second incident of data falsification, Monsanto hired Craven Laboratories in

12   1991 to perform pesticide and herbicide studies, including for Roundup®. In that same year,

13

14   [4] Monsanto, Backgrounder, Testing Fraud: IBT and Craven Laboratories (Sep. 2, 2015),
https://monsanto.com/app/uploads/2017/06/ibt_craven_bkg.pdf.

15   [5] U.S. Envtl. Prot. Agency, Summary of the IBT Review Program Office of Pesticide
Programs (1983), available at

16   http://nepis.epa.gov/Exe/ZyNET.exe/91014ULV.TXT?ZyActionD=ZyDocument&Client
=EPA&Index=1981+Thru+1985&Docs=&Query=&Time=&EndTime=&SearchMethod=

17   1&TocRestrict=n&Toc=&TocEntry=&QField=&QFieldYear=&QFieldMonth=&QFieldD
ay=&IntQFieldOp=0&ExtQFieldOp=0&XmlQuery=&File=D%3A%5Czyfiles%5CIndex

18   %20Data%5C81thru85%5CTxt%5C00000022%5C91014ULV.txt&User=ANONYMOU
S&Password=anonymous&SortMethod=h%7C&MaximumDocuments=1&FuzzyDegree=

19   0&ImageQuality=r75g8/r75g8/x150y150g16/i425&Display=p%7Cf&DefSeekPage=x&S
earchBack=ZyActionL&Back=ZyActionS&BackDesc=Results%20page&MaximumPage

20   s=1&ZyEntry=1&SeekPage=x&ZyPURL.
[6] Marie-Monique Robin, The World According to Monsanto: Pollution, Corruption and

21   the Control of the World's Food Supply (2011) (citing U.S. Envtl. Prot. Agency, Data
Validation, Memo from K. Locke, Toxicology Branch, to R. Taylor, Registration Branch.

22   Washington, D.C. (August 9, 1978)).

9

1

2

the owner of Craven Laboratories and three of its employees were indicted, and later convicted, of fraudulent laboratory practices in the testing of pesticides and herbicides.[7]

3

4

34.      Despite the falsity of the tests that underlie its registration, within a few years of its launch, Monsanto was marketing Roundup® in 115 countries.

5

6

**The Importance of Roundup® to Monsanto's Market Dominance Profits**

35.      The success of Roundup® was key to Monsanto's continued reputation and

7

dominance the marketplace. Largely due to the success of Roundup® sales, Monsanto's

8

agriculture division was out-performing its chemicals division's operating income, and that

9

gap increased yearly. But with its patent for glyphosate expiring in the United States in the

10

year 2000, Monsanto needed a strategy to maintain its Roundup® market dominance and

11

to ward off impending competition.

12

36.      In response, Monsanto began the development and sale of genetically engineered

13

Roundup Ready® seeds in 1996. Since Roundup Ready® crops are resistant to glyphosate;

14

farmers can spray Roundup® onto their fields during the growing season without harming

15

the crop. This allowed Monsanto to expand its market for Roundup® even further. By 2000,

16

Monsanto's biotechnology seeds were planted on more than 80 million acres worldwide and

17

nearly 70% of American soybeans were planted from Roundup Ready® seeds. It also

18

secured Monsanto's dominant share of the glyphosate/Roundup® market through a

19

marketing strategy that coupled proprietary Roundup Ready® seeds with continued sales

20

of its Roundup® herbicide.

21

22

[7] Monsanto, Backgrounder, Testing Fraud: IBT and Craven Laboratories, *supra* note 4.

10

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

37.     Through a three-pronged strategy of increased production, decreased prices, and the coupling with Roundup Ready® seeds, Roundup® became Monsanto's most profitable product. In 2000, Roundup® accounted for almost $2.8 billion in sales, outselling other herbicides by a margin of five to one, and accounting for close to half of Monsanto's revenue.[8] Today, glyphosate remains one of the world's largest herbicides by sales volume.

38.     Monsanto has known for decades that it falsely advertises the safety of Roundup®.

39.     In 1996, the New York Attorney General ("NYAG") filed a lawsuit against Monsanto based on its false and misleading advertising of Roundup 8 products. Specifically, the lawsuit challenged Monsanto's general representations that its spray-on glyphosate-based herbicides, including Roundup®, were "safer than table salt" and "practically non-toxic" to mammals, birds, and fish. Among the representations the NYAG found deceptive and misleading about the human and environmental safety of Roundup® are the following:

a)     "Remember that environmentally friendly Roundup herbicide is biodegradable. It won't build up in the soil so you can use Roundup® with confidence along customers' driveways, sidewalks and fences..."

b)     "And remember that Roundup® is biodegradable and won't build up in the soil. That will give you the environmental confidence you need to use Roundup® everywhere you've got a weed, brush, edging or trimming problem."

c)     "Roundup® biodegrades into naturally occurring elements."

_____

[8] David Barboza, The Power of Roundup; A Weed Killer Is A Block for Monsanto to Build On, N.Y. TIMES, Aug. 2, 2001, available at https://www.nytimes.com/2001/08/02/business/the-power-of-roundup-a-weed-killer-is-a-block-for-monsanto-to-build-on.html.

11

1

d)   "Remember that versatile Roundup® herbicide stays where you put it.
     That means there's no washing or leaching to harm customers' shrubs
2    or other desirable vegetation."

3

e)   "This non-residual herbicide will not wash or leach in the soil. It ...
     stays where you apply it."
4

5    f)   "You can apply with "confidence because it will stay where you put
          it." It bonds tightly to soil particles, preventing leaching. Then, soon
          after application, soil microorganisms biodegrade into natural
6         products."

7    g)   "Glyphosate is less toxic to rats than table salt following acute oral
          ingestion."
8

9    h)   "Glyphosate's safety margin is much greater than required. It has over
          a 1,000-fold safety margin in food and over a 700-fold safety margin
          for workers who manufacture it or use it."
10

11   i)   "You can feel good about using herbicides by Monsanto. They carry a
          toxicity category rating of 'practically non-toxic' as it pertains to
          mammals, birds and fish."
12

13   j)   "Roundup® can be used where kids and pets will play and breaks down
          into natural material." This ad depicts a person with his head in the
          ground and a pet dog standing in an area which has been treated with
14        Roundup®.[9]

15   40.   On November 19, 1996, Monsanto entered into an Assurance of Discontinuance with

16   NYAG, in which Monsanto agreed, among other things, "to cease and desist from

17   publishing or broadcasting any advertisements [in New York] that represent, directly or by

18   implication" that:

     a)   its glyphosate-containing pesticide products or any component thereof
19        are safe, non-toxic, harmless or free from risk.

20

21   [9] Attorney General of the State of New York, In the Matter of Monsanto Company,
     Assurance of Discontinuance Pursuant to Executive Law § 63(15) (Nov. 1996).

22

                                          12

b)  its glyphosate-containing pesticide products or any component thereof manufactured, formulated, distributed or sold by Monsanto are biodegradable.

c)  its glyphosate-containing pesticide products or any component thereof stay where they are applied under all circumstances and will not move through the environment by any means.

d)  its glyphosate-containing pesticide products or any component thereof are "good" for the environment or are "known for their environmental characteristics."

e)  glyphosate-containing pesticide products or any component thereof are safer or less toxic than common consumer products other than herbicides;

f)  its glyphosate-containing products or any component thereof might be classified as "practically non-toxic.

41.   Monsanto did not alter its advertising in the same manner in any state other than New York, and on information and belief still has not done so today.

42.   In 2009, France's highest court ruled that Monsanto had not told the truth about the safety of Roundup®. The French court affirmed an earlier judgement that Monsanto had falsely advertised its herbicide Roundup® as "biodegradable" and that it "left the soil clean."[10]

**Classifications and Assessments of Glyphosate**

43.   The IARC process for the classification of glyphosate followed the stringent procedures for the evaluation of a chemical agent. Over time, the IARC Monograph program has reviewed 980 agents. Of those reviewed, it has determined 116 agents to be Group 1 (Known Human Carcinogens); 73 agents to be Group 2A (Probable Human

---

[10] Monsanto Guilty in 'False Ad' Row, BBC, Oct. 15, 2009, available at http://news.bbc.co.uk/2/hi/europe/8308903.stm.

13

7508641v3/09-8860

Carcinogens); 287 agents to be Group 2B (Possible Human Carcinogens); 503 agents to be Group 3 (Not Classified); and one agent to be Probably Not Carcinogenic.

44.     The established procedure for IARC Monograph evaluations is described in the IARC Programme's Preamble.[11] Evaluations are performed by panels of international experts, selected on the basis of their expertise and the absence of actual or apparent conflicts of interest.

45.     One year before the Monograph meeting, the meeting is announced and there is a call both for data and for experts. Eight months before the Monograph meeting, the Working Group membership is selected and the sections of the Monograph are developed by the Working Group members. One month prior to the Monograph meeting, the call for data is closed and the various draft sections are distributed among Working Group members for review and comment. Finally, at the Monograph meeting, the Working Group finalizes review of all literature, evaluates the evidence in each category, and completes the overall evaluation. Within two weeks after the Monograph meeting, the summary of the Working Group findings are published in Lancet Oncology, and within a year after the meeting, the final Monograph is finalized and published.

46.     In assessing an agent, the IARC Working Group reviews the following information: (a) human, experimental, and mechanistic data; (b) all pertinent epidemiological studies and cancer bioassays; and (c) representative mechanistic data. The studies must be publicly

[11] World Health Org., IARC Monographs on the Evaluation of Carcinogenic Risks to Humans: Preamble (2006), available at http://monographs.iarc.fr/ENG/Preamble/CurrentPreamble.pdf.

7508641v3/99-8869

available and have sufficient detail for meaningful review, and reviewers cannot be associated with the underlying study.

47.     In March 2015, IARC reassessed glyphosate. The summary published in The Lancet Oncology reported that glyphosate is a Group 2A agent and probably carcinogenic in humans.

48.     On July 29, 2015, IARC issued its Monograph for glyphosate, Monograph 112. For Volume 112, the volume that assessed glyphosate, a Working Group of 17 experts from 11 countries met at IARC from March 3-10, 2015, to assess the carcinogenicity of certain herbicides, including glyphosate. The March meeting culminated nearly a one-year review and preparation by the IARC Secretariat and the Working Group, including a comprehensive review of the latest available scientific evidence. According to published procedures, the Working Group considered "reports that have been published or accepted for publication in the openly available scientific literature" as well as "data from governmental reports that are publicly available."

49.     The studies considered the following exposure groups: occupational exposure of farmers and tree nursery workers in the United States, forestry workers in Canada and Finland, and municipal weed-control workers in the United Kingdom. The studies also considered para-occupational exposure in farming families.

50.     Glyphosate was identified as the second-most used household herbicide in the United States for weed control between 2001 and 2007 and the most heavily used herbicide in the world in 2012.

51.     Exposure pathways are identified as air (especially during spraying), water, and food. Community exposure to glyphosate is widespread and found in soil, air, surface water, and groundwater, as well as in food.

52.     The assessment of the IARC Working Group identified several case control studies of occupational exposure in the United States, Canada, and Sweden. These studies show a human health concern from agricultural and other work-related exposure to glyphosate.

53.     The IARC Working Group found an increased risk between exposure to glyphosate and Non-Hodgkin's lymphoma and several subtypes of Non-Hodgkin's lymphoma, and the increased risk persisted after adjustment for other pesticides.

54.     The IARC Working Group also found that glyphosate caused DNA and chromosomal damage in human cells. One study in community residents reported increases in blood markers of chromosomal damage (micronuclei) after glyphosate formulations were sprayed.

55.     In male CD-1 mice, glyphosate induced a positive trend in the incidence of a rare tumor, renal tubule carcinoma. A second study reported a positive trend for haemangiosarcoma in male mice. Glyphosate increased pancreatic islet-cell adenoma in male rats in two studies. A glyphosate formulation promoted skin tumors in an initiation-promotion study in mice.

56.     The IARC Working Group also noted that glyphosate has been detected in the urine of agricultural workers, indicating absorption. Soil microbes degrade glyphosate to aminomethylphosphoric acid (AMPA). Blood AMPA detection after exposure suggests intestinal microbial metabolism in humans.

16

57.     The IARC Working Group further found that glyphosate and glyphosate formulations induced DNA and chromosomal damage in mammals, and in human and animal cells in utero.

58.     The IARC Working Group also noted genotoxic, hormonal, and enzymatic effects in mammals exposed to glyphosate.[12] Essentially, glyphosate inhibits the biosynthesis of aromatic amino acids, which leads to several metabolic disturbances, including the inhibition of protein and secondary product biosynthesis and general metabolic disruption.

59.     The IARC Working Group also reviewed an Agricultural Health Study, consisting of a prospective cohort of 57,311 licensed pesticide applicators in Iowa and North Carolina.[13] While this study differed from others in that it was based on a self-administered questionnaire, the results support an association between glyphosate exposure and multiple myeloma, hairy cell leukemia, and chronic lymphocytic leukemia, in addition to several other cancers.

**Other Earlier Findings About Glyphosate's Dangers to Human Health**

60.     The EPA has a technical fact sheet, as part of its Drinking Water and Health, National Primary Drinking Water Regulations publication, relating to glyphosate. This technical fact

---

[12] Guyton et al., Carcinogenicity of Tetrachlorvinphos, Parathion, Malathion, Diazinon & Glyphosate, available at https://www.thelancet.com/journals/lanonc/article/PIIS1470-2045(15)70134-8/fulltext.
[13] Anneclare J. De Roos et al., Cancer Incidence Among Glyphosate-Exposed Pesticide Applicators in the Agricultural Health Study, 113 Envt'l Health Perspectives 49–54 (2005), available at
http://www.ncbi.nlm.nih.gov/pmc/articles/PMC1253709/pdf/ehp0113-000049.pdf.

sheet predates the IARC March 20, 2015, evaluation. The fact sheet describes the release

patterns for glyphosate as follows:

### Release Patterns

Glyphosate is released to the environment in its use as an herbicide for controlling woody and herbaceous weeds on forestry, right-of-way, cropped, and non-cropped sites. These sites may be around water and in wetlands.

It may also be released to the environment during its manufacture, formulation, transport, storage, disposal and cleanup, and from spills. Since glyphosate is not a listed chemical in the Toxics Release Inventory, data on releases during its manufacture and handling are not available.

Occupational workers and home gardeners may be exposed to glyphosate by inhalation and dermal contact during spraying, mixing, and cleanup. They may also be exposed by touching soil and plants to which glyphosate was applied. Occupational exposure may also occur during glyphosate's manufacture, transport storage, and disposal.[14]

61.    In 1995, the Northwest Coalition for Alternatives to Pesticides reported that in California, the state with the most comprehensive program for reporting of pesticide-caused illness, glyphosate was the third most commonly-reported cause of pesticide illness among agricultural workers.[15]

---

[14] U.S. Envtl. Prot. Agency, National Primary Drinking Water Regulations: Glyphosate, available at https://nepis.epa.gov/Exe/ZyNET.exe/9100PO3S.txt?ZyActionD=ZyDocument&Client=EPA&Index=1995%20Thru%201999&Docs=&Query=&Time=&EndTime=&SearchMethod=1&TocRestrict=n&Toc=&TocEntry=&QField=&QFieldYear=&QFieldMonth=&QFieldDay=&UseQField=&IntQFieldOp=0&ExtQFieldOp=0&XmlQuery=&File=D%3A%5CZYFILES%5CINDEX%20DATA%5C95THRU99%5CTXT%5C00000029%5C9100PO3S.txt&User=ANONYMOUS&Password=anonymous&SortMethod=h%7C-&MaximumDocuments=1&FuzzyDegree=0&ImageQuality=r75g8/r75g8/x150y150g16/i425&Display=hpfr&DefSeekPage=x&SearchBack=ZyActionL&Back=ZyActionS&BackDesc=Results%20page&MaximumPages=1&ZyEntry=1.

[15] Caroline Cox, Glyphosate, Part 2: Human Exposure and Ecological Effects, 15 J. PESTICIDE REFORM 4 (1995); W.S. Peas et al., Preventing pesticide-related illness in

750R641v3/09-8869

**The Toxicity of Other Ingredients in Roundup®**

62.     In addition to the toxicity of the active ingredient, glyphosate, several studies support the hypothesis that the glyphosate-based formulation in Defendant's Roundup® products is more dangerous and toxic than glyphosate alone. Indeed, as early as 1991, available evidence demonstrated that glyphosate formulations were significantly more toxic than glyphosate alone.[16]

63.     In 2002, a study by Julie Marc, entitled "Pesticide Roundup Provokes Cell Division Dysfunction at the Level of CDK1/Cyclin B Activation," revealed that Roundup® causes delays in the cell cycles of sea urchins but that the same concentrations of glyphosate alone were ineffective and did not alter cell cycles.[17]

64.     A 2004 study by Marc and others, entitled "Glyphosate-based pesticides affect cell cycle regulation," demonstrated a molecular link between glyphosate-based products and cell cycle dysregulation. The researchers noted that "cell-cycle dysregulation is a hallmark of tumor cells and human cancer. Failure in the cell-cycle checkpoints leads genomic instability and subsequent development of cancers from the initial affected cell." Further,

California agriculture: Strategies and priorities. Environmental Health Policy Program Report, Univ. of Cal. School of Public Health, Calif. Policy Seminar (1993).
[16] Martinez, T.T. and K. Brown, Oral and pulmonary toxicology of the surfactant used in Roundup herbicide, PROC. WEST. PHARMACOL. SOC. 34:43–46 (1991).
[17] Julie Marc, et al., Pesticide Roundup Provokes Cell Division Dysfunction at the Level of CDK1/Cyclin B Activation, 15 CHEM. RES. TOXICOL. 326–331 (2002), available at http://pubs.acs.org/doi/full/10.1021/tx015543g.

19

75086641v3/99-8869

"[s]ince cell cycle disorders such as cancer result from dysfunction of a unique cell, it was of interest to evaluate the threshold dose of glyphosate affecting the cells."[18]

65.    In 2005, a study by Francisco Peixoto, entitled "Comparative effects of the Roundup and glyphosate on mitochondrial oxidative phosphorylation," demonstrated that Roundup®'s effects on rat liver mitochondria are far more toxic than equal concentrations of glyphosate alone. The Peixoto study further suggested that the harmful effects of Roundup® on mitochondrial bioenergetics could not be exclusively attributed to glyphosate but could be the result of other chemicals, such as the surfactant POEA, or in the alternative, due to a potential synergic effect between glyphosate and other ingredients in the Roundup® formulation.[19]

66.    In 2009, Nora Benachour and Gilles-Eric Seralini published a study examining the effects of Roundup® and glyphosate on human umbilical, embryonic, and placental cells. The study tested dilution levels of Roundup® and glyphosate that were far below agricultural recommendations, corresponding with low levels of residue in food. The researchers ultimately concluded that supposed "inert" ingredients, and possibly POEA, alter human cell permeability and amplify toxicity of glyphosate alone. The researchers further suggested that assessments of glyphosate toxicity should account for the presence

---

[18] Julie Marc, et al., Glyphosate-based pesticides affect cell cycle regulation, 96 BIOLOGY OF THE CELL 245, 245-249 (2004), available at http://onlinelibrary.wiley.com/doi/10.1016/j.biolcel.2003.11.010/epdf.
[19] Francisco Peixoto, Comparative effects of the Roundup and glyphosate on mitochondrial oxidative phosphorylation, 61 CHEMOSPHERE 1115, 1122 (2005), available at https://www.researchgate.net/publication/7504567_Comparative_effects_of_the_Roundup_and_glyphosate_on_mitochondrial_oxidative_phosphorylation.

7508641v1/99-8860

of adjuvants or additional chemicals used in the formulation of the complete pesticide. The study confirmed that the adjuvants present in Roundup® are not, in fact, inert and that Roundup® is potentially far more toxic than its active ingredient glyphosate alone.[20]

67.     The results of these studies were at all times available to Defendant.

68.     Monsanto's chief toxicologist Donna Farmer has admitted that she cannot say that Roundup® does not cause cancer because Monsanto has not performed carcinogenicity studies with the formulated product Roundup®, the very product that caused Plaintiff Ralph Hale's Non-Hodgkin's lymphoma.[21] Indeed, she further admitted that in the 35 years that Monsanto has marketed Roundup® to the public, Monsanto has conducted no chronic carcinogenicity studies on the formulated Roundup® product merely because EPA did not require that such a study be performed for registration of glyphosate.[22]

69.     Defendant thus knew or should have known that Roundup® is more toxic than glyphosate alone and that safety studies of Roundup®, Roundup's adjuvants and "inert" ingredients, and/or the surfactant POEA were necessary to protect Plaintiff Ralph Hale from Roundup®.

70.     Despite its knowledge that Roundup® is considerably more dangerous than glyphosate alone, Defendant continued to promote Roundup® as safe.

---

[20] Nora Benachour, et al., Glyphosate Formulations Induce Apoptosis and Necrosis in Human Umbilical, Embryonic, and Placental Cells, 22 CHEM. RES. TOXICOL. 97-105 (2008), available at http://big.assets.huffingtonpost.com/france.pdf.
[21] See Plaintiffs' Submission in Response to Pretrial Order No. 8, Ex. 7, In re: Roundup Products Liability Litigation, MDL No. 2741 (N.D. Cal., Mar. 14, 2017), ECF No. 187-7.
[22] See id.

21

1

## The EPA's Review of Glyphosate

2

71.     In April 2016, personnel within the EPA's Office of Pesticides Program (OPP)

3

leaked and posted on the internet a draft report on glyphosate carcinogenicity, entitled

4

Cancer Assessment Review Committee (CARC) report, dated October 2015. The EPA

5

removed the documents by May 2, 2016, within days of initially posting it online. An EPA

6

spokesperson subsequently issued a statement on the agency's glyphosate review:

7

> Glyphosate documents were inadvertently posted to the Agency's docket.
> These documents have now been taken down because our assessment is not
> final. EPA has not completed our cancer review. We will look at the work of
> other governments as well as work by HHS's Agricultural Health Study as
> we move to make a decision on glyphosate. Our assessment will be peer
> reviewed and completed by end of 2016.[23]

8

9

10

72.     On September 12, 2016, EPA's OPP submitted a report on the carcinogenic potential

11

of glyphosate, wherein it issued a "proposed conclusion" that glyphosate is "not likely to

12

be carcinogenic to humans at doses relevant to human health risk assessment."[24] There are

13

no authors listed on this issue paper, which reiterates and adopts the conclusions of the

14

October 2015 leaked assessment. The issue paper is based upon a review of industry-

15

sponsored articles and studies. The OPP acknowledged that it rejected all studies that

16

17

[23] Carey Gillam, What Is Going On With Glyphosate? EPA's Odd Handling of
Controversial Chemical, HUFFINGTON POST, May 2, 2016, available at

18

http://www.huffingtonpost.com/carey-gillam/what-is-going-on-withgly_b_9825326.html;
see also P.J. Huffstutter, EPA takes offline report that says glyphosate not likely

19

carcinogenic, REUTERS, May 2, 2016, available at http://www.reuters.com/article/us-
usa-glyphosate-epa-idUSKCN0XU01K.

20

[24] See EPA's Office of Pesticide Programs, Glyphosate Issue Paper: Evaluation of
Carcinogenic Potential (Sept. 12, 2016), available at

21

https://www.epa.gov/sites/production/files/2016-
09/documents/glyphosate_issue_paper_evaluation_of_carcincogenic_potential.pdf.

22

7508641v3/99-8869

considered Roundup® —the formulated product—instead of studies that isolated glyphosate because "[g]lyphosate formulations contain various components other than glyphosate and it has been hypothesized these components are more toxic than glyphosate alone."[25]

73.     Thus, the OPP notes dozens of studies considered by IARC were not reviewed by the OPP because the OPP's "evaluation focused on studies on the active ingredient glyphosate" and "additional research could also be performed to determine whether formulation components, such as surfactants, influence the toxicity of glyphosate formulations."[26]

74.     From December 13 to 16, 2016, the EPA held FIFRA Scientific Advisory Panel ("SAP") meetings to consider issues raised by the OPP's evaluation of glyphosate. Again, OPP only allowed the SAP to consider studies of glyphosate alone, and not any study of the formulated product. In its Charge to the FIFRA SAP, the OPP noted that "[a]lthough there are studies available on glyphosate-based pesticide formulations, the agency is soliciting advice from the FIFRA Scientific Advisory Panel (SAP) on this evaluation of human carcinogenic potential for the active ingredient glyphosate only at this time."[27]

---

[25] *Id.*
[26] *Id.*
[27] EPA OPP, Glyphosate: Evaluation of Carcinogenic Potential, Charge to the FIFRA SAP for the October 18-21, 2016 Meeting, available at, https://www.epa.gov/sites/production/files/2016-11/documents/glyphosate_sap_charge_questions_-final.pdf.

23

75.     The OPP draft assessment therefore does not actually consider the product at issue in this litigation or, more importantly, how glyphosate, in conjunction with surfactants and other chemicals, affects carcinogenicity.

76.     On March 16, 2017, the final SAP meeting minutes and report were released, revealing disagreement and lack of consensus among the scientists on whether there was a positive association between **glyphosate** exposure and Non-Hodgkin's lymphoma.[28]

**Monsanto's Industry Ties**

77.     Recently unsealed documents in the federal Roundup® MDL litigation reveal the extent to which Monsanto has been able to leverage its contacts within the EPA to protect glyphosate and Roundup® from scrutiny and review.

78.     Internal Monsanto documents, including email communications, demonstrate that Jess Rowland, former Deputy Division Director, Health Effects Division of the EPA's OPP, and formerly the chair of the CARC (the same committee that inadvertently leaked the EPA's glyphosate report in April 2016), repeatedly and directly intervened on Monsanto's behalf. These same documents reveal that Monsanto was secure in the knowledge that it had allies within the EPA.

79.     To begin, in the months following IARC's initial March 2015 announcement that it had classified glyphosate as a probable carcinogen, Monsanto turned its attention to the

---

[28] FIFRA Scientific Advisory Panel Meeting Minutes and Final Report No. 2017-01, A Set of Scientific Issues Being Considered by the Environmental Protection Agency Regarding: EPA's Evaluation of the Carcinogenic Potential of Glyphosate, available at https://www.epa.gov/sites/production/files/2017-03/documents/december_13-16_2016_final_report_03162017.pdf.

24

EPA's review of glyphosate. In one April 27, 2015 email, Monsanto official Bill Heydens wrote to colleagues to suggest "approaching EPA and.... ask if there is anything that would help them defend the situation?" His colleague Dan Jenkins responded: "I think you and I could get on the phone w Jess Rowland and discuss this pretty openly. He'll give us straight talk."[29]

80.     The following day, Mr. Jenkins spoke to Mr. Rowland by telephone and then relayed the substance of the conversation for his colleagues in an April 28, 2015 email. Specifically, he reported back that with respect to the CARC investigation, Mr. Rowland had stated: "We have enough to sustain our conclusions. Don't need gene tox or epi . . . . I am the chair of the CARC and my folks are running this process for glyphosate in reg review. I have called a CARC meeting in June."[30] Thus, even though the ostensible purpose of the CARC review was to evaluate the exhaustive IARC assessment on glyphosate, and even though the full IARC monograph on glyphosate would not be completed until July 2015, Mr. Rowland had already formed his conclusion months earlier—in April 2015.

81.     Mr. Rowland also intervened to halt another agency's review of glyphosate. When the Agency for Toxic Substances and Disease Registry (ATSDR), a federal public health agency of the U.S. Department of Health and Human Services, announced in February 2015 that it planned to publish a toxicological review of glyphosate, it was Mr. Rowland who helped Monsanto stop the ATSDR's investigation. In the same April 28, 2015, email

---

[29] See Plaintiffs' Motion to Compel the Deposition of Jess Rowland, Ex. D, In re: Roundup Products Liability Litigation, MDL No. 2741 (N.D. Cal., Mar. 14, 2017), ECF No. 189-4.
[30] Id.

25

discussed above, Mr. Jenkins explained that Mr. Rowland wanted to help Monsanto stop an investigation concerning the carcinogenicity of glyphosate being conducted by ATSDR.[31] Since ATSDR is not controlled by the EPA, according to Mr. Jenkins, Mr. Rowland had bragged: "If I can kill this I should get a medal."[32] Jenkins cautioned, however, that Monsanto should not "get your hopes up, I doubt EPA and Jess can kill this; but it's good to know they are going to actually make the effort now to coordinate due to our pressing and their shared concern that ATSDR is consistent in its conclusions with the EPA."[33] The ATSDR never published its toxicological profile of glyphosate.

82.     Further, the released documents reveal Monsanto's confidence that its allies within the EPA would continue to support glyphosate. In an internal memo on glyphosate, Monsanto executives wrote: "We know, but cannot say, that EPA's Office of Pesticide Program scientists strongly feel that glyphosate does not cause cancer and have defended their written determination internally for months."[34] Notably, when Mr. Rowland attended the IARC glyphosate meetings as an observer for the EPA, internal communications indicate Monsanto was not displeased with his attendance since, "we all know Jess."[35]

---

[31] *See id.*
[32] *Id.*
[33] *Id.*
[34] See Plaintiffs' Motion to Compel the Deposition of Jess Rowland, Ex. E, In re: Roundup Products Liability Litigation, MDL No. 2741 (N.D. Cal., Mar. 14, 2017), ECF No. 189-5 (emphasis original).
[35] See Plaintiffs' Motion to Compel the Deposition of Jess Rowland, Ex. G, In re: Roundup Products Liability Litigation, MDL No. 2741 (N.D. Cal., Mar. 14, 2017), ECF No. 189-7.

26

7508641v3/00-8860

### Recent Worldwide Bans on Roundup®/Glyphosate

83.    Several countries around the world have instituted bans on the sale of Roundup®
and other glyphosate-containing herbicides, both before and since IARC first announced its
assessment for glyphosate in March 2015, and more countries undoubtedly will follow suit
as the dangers of the use of Roundup® are more widely known. The Netherlands issued a
ban on all glyphosate-based herbicides in April 2014, including Roundup®, which took
effect at the end of 2015. In issuing the ban, the Dutch Parliament member who introduced
the successful legislation stated: "Agricultural pesticides in user-friendly packaging are sold
in abundance to private persons. In garden centers, Roundup® is promoted as harmless, but
unsuspecting customers have no idea what the risks of this product are. Especially children
are sensitive to toxic substances and should therefore not be exposed to it."[36]

84.    The Brazilian Public Prosecutor in the Federal District requested that the Brazilian
Justice Department suspend the use of glyphosate.[37]

85.    France banned the private sale of Roundup® and glyphosate following the IARC
assessment for Glyphosate.[38]

---

[36] Holland's Parliament Bans Glyphosate Herbicides, The Real Agenda, April 14, 2014, available at http://real-agenda.com/hollands-parliament-bans-glyphosateherbicides/.
[37] Christina Sarich, Brazil's Public Prosecutor Wants to Ban Monsanto's Chemicals Following Recent Glyphosate-Cancer Link, GLOBAL RESEARCH, May 14, 2015, available at http://www.globalresearch.ca/brazils-public-prosecutor-wants-to-banmonsantos-chemicals-following-recent-glyphosate-cancer-link/5449440.
[38] Zoe Schlanger, France Bans Sales of Monsanto's Roundup in Garden Centers, 3 Months After U.N. Calls it 'Probable Carcinogen", NEWSWEEK, June 15, 2015, available at http://www.newsweek.com/france-bans-sale-monsantos-roundup-gardencenters-after-un-names-it-probable-343311.

7508641v3/99-8869

86.     Bermuda banned both the private and commercial sale of glyphosates, including

Roundup®. The Bermuda government explained its ban as follows: "Following a recent

scientific study carried out by a leading cancer agency, the importation of weed spray

'Roundup' has been suspended."[39]

87.     The Sri Lankan government banned the private and commercial use of glyphosates,

particularly out of concern that glyphosate has been linked to fatal kidney disease in

agricultural workers.[40]

88.     The government of Columbia announced its ban on using Roundup® and glyphosate

to destroy illegal plantations of coca, the raw ingredient for cocaine, because of the WHO's

finding that glyphosate is probably carcinogenic.[41]

**Proposition 65 Listing**

89.     On September 4, 2015, California's Office of Environmental Health Hazard

Assessment ("OEHHA") published a notice of intent to include glyphosate on the state's

list of known carcinogens under Proposition 65.[42] California's Safe Drinking Water and

---

[39] Bermuda Suspends Glyphosate-Ridden Monsanto Roundup Indefinitely, Global Research, May, 13, 2015, available at https://www.globalresearch.ca/bermuda-suspends-glyphosate-ridden-monsanto-roundup-indefinitely/5449207.
[40] Sri Lanka's President Bans Glyphosate Nationwide to Protect the Health of the People, Global Research, June 8, 2015, available at https://www.globalresearch.ca/sri-lankas-president-bans-glyphosate-nationwide-to-protect-the-health-of-the-people/5454581.
[41] Columbia to ban coca spraying herbicide glyphosate, BBC, May 10, 2015, available at http://www.bbc.com/news/world-latin-america-32677411
[42] Cal. Envtl. Prot. Agency Office of Envtl. Health Hazard Assessment, Notice of Intent to List Chemicals by the Labor Code Mechanism: Tetrachlorvinphos, Parathion, Malathion, Glyphosate (Sept. 4, 2015), https://oehha.ca.gov/media/downloads/crnr/090415noillcset27.pdf.

28

7508641v3/99-8869

Toxic Enforcement Act of 1986 (informally known as "Proposition 65"), requires the state to maintain and, at least once a year, revise and republish a list of chemicals "known to the State of California to cause cancer or reproductive toxicity."[43] The OEHHA determined that glyphosate met the criteria for the listing mechanism under the Labor Code following IARC's assessment of the chemical.[44]

90.     The listing process under the Labor Code is essentially automatic. The list of known carcinogens, at a minimum, must include substances identified by reference in Labor Code § 6382(b)(1). That section of the Labor Code identifies "[s]ubstances listed as human or animal carcinogens by the International Agency for Research on Cancer (IARC)." IARC's classification of glyphosate as a Group 2A chemical ("probably carcinogenic to humans") therefore triggered the listing.

91.     A business that deploys a listed chemical in its products must provide "clear and reasonable warnings" to the public prior to exposure to the chemical. To be clear and reasonable, a warning must "(1) clearly communicate that the chemical is known to cause cancer, and/or birth defects or other reproductive harm; and (2) effectively reach the person before exposure."[45] The law also prohibits the discharge of listed chemicals into drinking water.

---

[43] Frequently Asked Questions, STATE OF CAL. DEP'T OF JUSTICE, OFFICE OF THE ATTORNEY GENERAL, http://oag.ca.gov/prop65/faq (last visited August 27, 2019).
[44] Notice of Intent to List Chemicals by the Labor Code Mechanism: Tetrachlorvinphos, Parathion, Malathion, Glyphosate, *supra* note 42.
[45] Frequently Asked Questions, STATE OF CAL. DEPARTMENT OF JUSTICE, OFFICE OF THE ATTORNEY GENERAL, *supra* note 43.

7508641 v3/99-8869

92.     Monsanto disputed the listing decision and, in January 2016, filed a lawsuit against OEHHA and the agency's acting director, Lauren Zeise, in California state court, seeking declaratory and injunctive relief to prevent OEHHA from listing glyphosate.[46]

93.     Monsanto alleged that OEHHA's exclusive reliance on the IARC decision signified that "OEHHA effectively elevated the determination of an ad hoc committee of an unelected, foreign body, which answers to no United States official (let alone any California state official), over the conclusions of its own scientific experts."[47] Monsanto further alleged that the Labor Code listing mechanism presented various constitutional violations because it "effectively empowers an unelected, undemocratic, unaccountable and foreign body to make laws applicable in California."[48] Among other things, Monsanto argued that Proposition 65's requirement to provide a "clear and reasonable warning" to consumers that the chemical is a known carcinogen would damage its reputation and violate its First Amendment rights.[49]

94.     On January 27, 2017, the Superior Court of California – Fresno issued a tentative ruling granting, among other things, OEHHA's motion for judgment on the pleadings, thus

---

[46] Monsanto Company's Verified Petition for Writ of Mandate and Complaint for Preliminary and Permanent Injunctive and Declaratory Relief, Monsanto Co. v. Office of the Envt'l Health Hazard Assessment, et al., No. 16-CECG-00183 (Cal. Super. Ct.) available at https://www.schiffhardin.com/Templates/media/files/Other%20PDFs/Monsanto_petition.pdf.
[47] Id. at 2.
[48] Id. at 3.
[49] Id.

7508641v3/99-8869

1  rejecting Monsanto's arguments. On March 10, 2017, the Court issued a final order

2  adopting in full the earlier tentative ruling.[50]

3  95.     On March 28, 2017 OEHHA posted Notice on its website that glyphosate would be

4  added to the list of chemicals known to the state of California to cause cancer for purposes

5  of Proposition 65.

6  96.     On November 15, 2017, Monsanto and various agricultural groups, including the

7  National Association of Wheat Growers, the National Corn Growers Association, the Iowa

8  Soybean Association, and others, filed a complaint against the OEHHA and California's

9  Attorney General in the Eastern District of California seeking, among other things, to enjoin

10  California's application of Prop 65 to glyphosate.[51] On January 3, 2018, Attorneys General

11  in Idaho, Indiana, Iowa, Kansas, Louisiana, Michigan, Missouri, North Dakota, Oklahoma,

12  South Dakota, and Wisconsin filed an amicus brief in support of injunctive relief.[52]

13  97.     On February 26, 2018, the Eastern District of California denied Monsanto's motion

14  for a preliminary injunction enjoining California from listing glyphosate as a chemical

15  known to the State of California to cause cancer and granted the injunction enjoining

16  California from requiring Monsanto provide a warning label on its products.[53]

17

18  [50] See Notice of Supplemental Authority, In re: Roundup Products Liability Litigation,
MDL No. 2741 (N.D. Cal., Mar. 13, 2017), ECF No. 185.
19  [51] See Nat'l Ass'n. of Wheat Growers, et al., v. Zeise, et al., No. 2:17-at-01224 (E.D. Cal),
available at https://dlbjbjzgnk95t.cloudfront.net/0985000/985621/monsanto.pdf.
20  [52] Attorneys General support Prop 65 injunction, FarmFutures, Jan. 4, 2018, available at
https://www.farmprogress.com/farm-policy/attorneys-general-support-prop-65-injunction.
21  [53] See Memorandum and Order Re: Motion For Preliminary Injunction, Nat'l Assoc. of
Wheat Growers, et al., v. Zeise, et al., No. 2:17-2401 WBS EFB (E.D. Cal., Feb. 26,
2018), ECF No. 75, available at
22  http://www.caed.uscourts.gov/caednew/assets/File/17cv2401%20doc%2075.pdf.

1

**EFSA Report on Glyphosate**

2

98.     On November 12, 2015, the European Food Safety Authority (EFSA), the European

3

Union's primary agency for food safety, reported on its evaluation of the Renewal

4

Assessment Report (RAR) on glyphosate.[54] The Rapporteur Member State assigned to

5

glyphosate, the German Federal Institute for Risk Assessment (BfR), had produced the

6

RAR as part of the renewal process for glyphosate in the EU.

7

99.     BfR sent its draft RAR to EFSA and the RAR underwent a peer review process by

8

EFSA, other member states, and industry groups. As part of the on-going peer review of

9

Germany's reevaluation of glyphosate, EFSA had also received a second mandate from the

10

European Commission to consider IARC's findings regarding the potential carcinogenicity

11

of glyphosate and glyphosate-containing products.

12

100.    Based on a review of the RAR, which included data from industry-submitted

13

unpublished studies, EFSA sent its own report ("Conclusion") to the European

14

Commission, finding that "glyphosate is unlikely to pose a carcinogenic hazard to humans

15

and the evidence does not support classification with regard to its carcinogenic potential

16

according to Regulation (EC) No 1272/2008."[55] EFSA therefore disagreed with IARC:

17

glyphosate was not genotoxic and did not present a carcinogenic threat to humans.

18

19

20

[54] European Food Safety Auth., Conclusion on the peer review of the pesticide risk assessment of the active substance glyphosate, available at

21

http://www.efsa.europa.eu/sites/default/files/scientific_output/files/main_documents/4302.pdf.

22

[55] *Id.*

32

101.   In explaining why its results departed from IARC's conclusion, EFSA drew a distinction between the EU and IARC approaches to the study and classification of chemicals.[56] Although IARC examined "both glyphosate—an active substance—and glyphosate-based formulations, grouping all formulations regardless of their composition," EFSA explained that it considered only glyphosate and that its assessment focuses on "each individual chemical, and each marketed mixture separately."[57] IARC, on the other hand, "assesses generic agents, including groups of related chemicals, as well as occupational or environmental exposure, and cultural or behavioural practices."[58] EFSA accorded greater weight to studies conducted with glyphosate alone than studies of formulated products.[59]

102.   EFSA went further and noted:

> [A]lthough some studies suggest that certain glyphosate-based formulations may be genotoxic (i.e. damaging to DNA), others that look solely at the active substance glyphosate do not show this effect. It is likely, therefore, that **the genotoxic effects observed in some glyphosate-based formulations are related to the other constituents or "co-formulants"**. Similarly, certain glyphosate-based formulations display higher toxicity than that of the active ingredient, presumably because of the presence of co-formulants. In its assessment, EFSA proposes that the toxicity of each pesticide formulation **and in particular its genotoxic potential should be further considered and addressed by Member State authorities while they re-assess uses of glyphosate-based formulations in their own territories**. (Emphasis added).[60]

---

[56] EFSA Fact Sheet: Glyphosate, EFSA
http://www.efsa.europa.eu/sites/default/files/corporate_publications/files/efsaexplainsglyphosate151112en.pdf.
[57] *Id.*
[58] *Id.*
[59] *Id.*
[60] *Id.*

103.   Notwithstanding its conclusion, EFSA did set exposure levels for glyphosate. Specifically, EFSA proposed an acceptable daily intake (ADI) of 0.5 mg/kg of body weight per day; an acute reference dose (ARfD) of 0.5 mg/kg of body weight; and an acceptable operator exposure level (AOEL) of 0.1 mg/kg bw per day.[61]

### Leading Scientists Dispute EFSA's Conclusion

104.   On November 27, 2015, 96 independent academic and governmental scientists from around the world submitted an open letter to the EU health commissioner, Vytenis Andriukaitis.[62] The scientists expressed their strong concerns and urged the commissioner to disregard the "flawed" EFSA report, arguing that "the BfR decision is not credible because it is not supported by the evidence and it was not reached in an open and transparent manner."[63]

105.   Signatories to the letter included Dr. Christopher J. Portier, Ph.D., and other renowned international experts in the field, some of whom were part of the IARC Working Group assigned to glyphosate.

106.   In an exhaustive and careful examination, the scientists scrutinized EFSA's conclusions and outlined why the IARC Working Group decision was "by far the more credible":

---

[61] European Food Safety Auth., Conclusion on the peer review of the pesticide risk assessment of the active substance glyphosate, *supra* note 54.

[62] Letter from Christopher J. Portier et al. to Commission Vytenis Andriukaitis, Open letter: Review of the Carcinogenicity of Glyphosate by EFSA and BfR (Nov. 27, 2015), https://www.efsa.europa.eu/sites/default/files/Prof_Portier_letter.pdf; https://www.theguardian.com/environment/2016/jan/13/eu-scientists-in-row-over-safety-of-glyphosate-weedkiller.

[63] *Id.*

34

The IARC WG decision was reached relying on open and transparent procedures by independent scientists who completed thorough conflict-of-interest statements and were not affiliated or financially supported in any way by the chemical manufacturing industry. It is fully referenced and depends entirely on reports published in the open, peer reviewed biomedical literature. It is part of a long tradition of deeply researched and highly credible reports on the carcinogenicity of hundreds of chemicals issued over the past four decades by IARC and used today by international agencies and regulatory bodies around the world as a basis for risk assessment, regulation and public health policy.[64]

107.   With respect to human data, the scientists pointed out that EFSA agreed with IARC that there was "limited evidence of carcinogenicity" for Non-Hodgkin's lymphoma, but EFSA nonetheless dismissed an association between glyphosate exposure and carcinogenicity. IARC applies three levels of evidence in its analyses of human data, including sufficient evidence and limited evidence. EFSA's ultimate conclusion that "there was no unequivocal evidence for a clear and strong association of NHL with glyphosate" was misleading because it was tantamount to IARC's highest level of evidence: "sufficient evidence," which means that a causal relationship has been established. However, the scientists argued, "[l]egitimate public health concerns arise when 'causality is credible,' i.e., when there is *limited evidence*."[65]

108.   Among its many other deficiencies, EFSA's conclusions regarding animal carcinogenicity data were "scientifically unacceptable," particularly in BfR's use of historical control data and in its trend analysis. Indeed, BfR's analysis directly contradicted the Organisation for Economic Co-operation and Development ("OECD") testing guidelines while citing and purporting to follow those same guidelines. For instance, the

---

[64] *Id.*
[65] *Id.*

35

EFSA report dismisses observed trends in tumor incidence "because there are no individual treatment groups that are significantly different from controls and because the maximum observed response is reportedly within the range of the historical control data." However, according to the scientists, concurrent controls are recommended over historical controls in all guidelines, scientific reports, and publications, and, if it is employed, historical control data "should be from studies in the same timeframe, for the same exact animal strain, preferably from the same laboratory or the same supplier and preferably reviewed by the same pathologist." BfR's use of historical control data violated these precautions: "only a single study used the same mouse strain as the historical controls, but was reported more than 10 years after the historical control dataset was developed." Further deviating from sound scientific practices, the data used by the BfR came from studies in seven different laboratories. The scientists concluded:

> BfR reported seven positive mouse studies with three studies showing increases in renal tumors, two with positive findings for hemangiosarcomas, and two with positive findings for malignant lymphomas. BfR additionally reported two positive findings for tumors in rats. Eliminating the inappropriate use of historical data, the unequivocal conclusion is that these are not negative studies, but in fact document the carcinogenicity of glyphosate in laboratory animals.[66]

109.    The letter also critiqued the EFSA report's lack of transparency and the opacity surrounding the data cited in the report: "citations for almost all of the references, even those from the open scientific literature, have been redacted from the document" and "there are no authors or contributors listed for either document, a requirement for publication in virtually all scientific journals." Because BfR relied on unpublished, confidential industry-

[66] *Id.*

36

750R641v3/99-8869

provided studies, it is "impossible for any scientist not associated with BfR to review this conclusion with scientific confidence."[67]

110.   On March 3, 2016, the letter was published in the Journal of Epidemiology & Community Health.[68]

**Statement of Concern Regarding Glyphosate-Based Herbicides**

111.   On February 17, 2016, a consensus statement published in the journal Environmental Health, entitled "Concerns over use of glyphosate-based herbicides and risks associated with exposures: a consensus statement," assessed the safety of glyphosate-based herbicides (GBHs).[69] The paper's "focus is on the unanticipated effects arising from the worldwide increase in use of GBHs, coupled with recent discoveries about the toxicity and human health risks stemming from use of GBHs."[70] The researchers drew seven factual conclusions about GBHs:

> 1. GBHs are the most heavily applied herbicide in the world and usage continues to rise;
>
> 2. Worldwide, GBHs often contaminate drinking water sources, precipitation, and air, especially in agricultural regions;
>
> 3. The half-life of glyphosate in water and soil is longer than previously recognized;

---

[67] Id.

[68] Christopher J. Portier, et al., Differences in the carcinogenic evaluation of glyphosate between the International Agency for Research on Cancer (IARC) and the European Food Safety Authority (EFSA), JOURNAL OF EPIDEMIOLOGY & CMTY. HEALTH, Mar. 3, 2016, available at http://jech.bmj.com/content/early/2016/03/03/jech-2015-207005.full.

[69] John P. Myers, et al, Concerns over use of glyphosate-based herbicides and risks associated with exposures: a consensus statement, Environmental Health (2016), available at http://ehjournal.biomedcentral.com/articles/10.1186/s12940-016-0117-0.

[70] Id.

7508641v3/99-8869

1    4. Glyphosate and its metabolites are widely present in the global
        soybean supply;

2

3    5. Human exposures to GBHs are rising;

4    6. Glyphosate is now authoritatively classified as a probable
        human carcinogen; and

5    7. Regulatory estimates of tolerable daily intakes for glyphosate
        in the United States and European Union are based on outdated science.[71]

6

7    112.    The researchers noted that GBH use has increased approximately 100-fold since the

1970s. Further, far from posing a limited hazard to vertebrates, as previously believed, two

8    decades of evidence demonstrated that "several vertebrate pathways are likely targets of

9    action, including hepatorenal damage, effects on nutrient balance through glyphosate

10   chelating action and endocrine disruption.[72]

11   113.    The paper attributes uncertainties in current assessments of glyphosate formulations

12   to the fact that "[t]he full list of chemicals in most commercial GBHs is protected as

13   'commercial business information,' despite the universally accepted relevance of such

14   information to scientists hoping to conduct an accurate risk assessment of these herbicide

15   formulations." Further, the researchers argue, "[t]he distinction in regulatory review and

16   decision processes between 'active' and 'inert' ingredients has no toxicological

17   justification, given increasing evidence that several so-called 'inert' adjuvants are toxic in

18   their own right."[73]

19

20

21   [71] *Id.*
     [72] *Id.*
22   [73] *Id.*

7508641v3/99-8869

114.    Among various implications, the researchers conclude that "existing toxicological data and risk assessments are not sufficient to infer that GBHs, as currently used, are safe." Further, "GBH-product formulations are more potent, or toxic, than glyphosate alone to a wide array of non-target organisms including mammals, aquatic insects, and fish." Accordingly, "risk assessments of GBHs that are based on studies quantifying the impacts of glyphosate alone underestimate both toxicity and exposure, and thus risk." The paper concludes that this "shortcoming has repeatedly led regulators to set inappropriately high exposure thresholds."[74]

115.    The researchers also critique the current practice of regulators who largely rely on "unpublished, non-peer reviewed data generated by the registrants" but ignore "published research because it often uses standards and procedures to assess quality that are different from those codified in regulatory agency data requirements, which largely focus on avoiding fraud." In the researchers' view, "[s]cientists independent of the registrants should conduct regulatory tests of GBHs that include glyphosate alone, as well as GBH-product formulations."[75]

116.    The researchers also call for greater inclusion of GBHs in government-led toxicology testing programs:

> [A] fresh and independent examination of GBH toxicity should be undertaken, and . . . this re-examination be accompanied by systematic efforts by relevant agencies to monitor GBH levels in people and in the food supply, none of which are occurring today. The U.S. National Toxicology Program

---

[74] *Id.*
[75] *Id.*

7508641 v1/99-8860

1
2     should prioritize a thorough toxicological assessment of the multiple pathways now identified as potentially vulnerable to GBHs.[76]

117.    The researchers suggest that, in order to fill the gap created by an absence of

3 government funds to support research on GBHs, regulators could adopt a system through

4 which manufacturers fund the registration process and the necessary testing:

5
    [W]e recommend that a system be put in place through which manufacturers
6     of GBHs provide funds to the appropriate regulatory body as part of routine
    registration actions and fees. Such funds should then be transferred to
7     appropriate government research institutes, or to an agency experienced in the
    award of competitive grants. In either case, funds would be made available to
8     independent scientists to conduct the appropriate long-term (minimum 2
    years) safety studies in recognized animal model systems. A thorough and
9     modern assessment of GBH toxicity will encompass potential endocrine
    disruption, impacts on the gut microbiome, carcinogenicity, and
10     multigenerational effects looking a reproductive capability and frequency of
    birth defects.[77]

11 118.    Despite these stated concerns, Monsanto, to date, has failed to test its formulated

12 Roundup® products.

13                       **European Union Vote on Glyphosate Removal**

14 119.    The license for glyphosate in the European Union (EU) was set to expire on June 30,

15 2016.

16 120.    Without an extension of the license, Monsanto's Roundup® and other glyphosate-

17 based herbicides faced a general phase out in EU markets.[78]

18

19

20 [76] *Id.*
    [77] *Id.*
21 [78] Philip Blenkinsop, Alissa de Carbonnel & Barbara Lewis European, Commission to extend glyphosate license for 18 months, REUTERS, June 28, 2016, available at
22 http://www.reuters.com/article/us-health-eu-glyphosate-idUSKCN0ZE25B.

75086641v3/99-8860

121.    In the months leading up to the license expiration date, protracted meetings and votes among national experts from the 28 EU Member States failed to produce agreement on an extension.

122.    On June 29, 2016, the EU Commission extended the European license for glyphosate for 18 months to allow the European Chemical Agency (ECHA) to rule on the safety of the chemical, which was expected by the end of 2017.[79]

123.    On July 11, 2016, the EU voted in favor of a proposal to restrict the conditions of use of glyphosate in the EU, including a ban on common co-formulant POE-tallowamine (POEA) from all glyphosate-based herbicides, including Roundup®.[80]

124.    In March 2017, ECHA's Committee for Risk Assessment (RAC) concluded that the available scientific evidence did not meet the criteria to classify glyphosate as a carcinogen.[81]

125.    With the glyphosate license set to again expire on December 15, 2017, and after months of indecision among EU member states, on November 27, 2017, the EU voted to extend the glyphosate license for five more years.[82] Of the 28 EU members, 18 countries

---

[79] Arthur Neslen, Controversial chemical in Roundup weedkiller escapes immediate ban, THE GUARDIAN, June 29, 2016, available at https://www.theguardian.com/business/2016/jun/29/controversial-chemical-roundup-weedkiller-escapes-immediate-ban.

[80] Sarantis Michalopoulos, EU agrees ban on glyphosate co-formulant, EURACTIV, July 11, 2016, available at http://www.euractiv.com/section/agriculturefood/news/eu-agrees-ban-on-glyphosate-co-formulant/?nl_ref=16562829.

[81] Glyphosate not classified as a carcinogen by ECHA, March 15, 2017, available at https://echa.europa.eu/-/glyphosate-not-classified-as-a-carcinogen-by-echa.

[82] See Philip Blenkinsop, Germany swings EU vote in favor of weed-killer glyphosate, Reuters, Nov. 27, 2017, https://www.reuters.com/article/us-eu-health-

41

voted in favor of a European Commission proposal to extend the glyphosate license, 9 countries voted against, and 1 country abstained.[83]

## TOLLING OF THE STATUTE OF LIMITATIONS

### Discovery Rule Tolling

126.    Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

127.    Plaintiff Ralph Hale has suffered an illness that has a latency period and does not arise until years after exposure. Plaintiffs had no way of knowing about the risks of serious illness associated with the use of and/or exposure to Roundup® and glyphosate until Plaintiff Ralph Hale was made aware that his Non-Hodgkins lymphoma could be caused by his use of and/or exposure to Roundup®. Plaintiffs became aware of the connection between Roundup® and Non-Hodgkins lymphoma in 2019. Consequently, the discovery rule applies to these cases, and the statute of limitations has been tolled until the day that Plaintiff Ralph Hale knew or had reason to know that his Non-Hodgkins lymphoma was linked to his use of and/or exposure to Roundup® .

128.    Within the time period of any applicable statutes of limitations, Plaintiffs could not have discovered, through the exercise of reasonable diligence, that exposure to Roundup® and glyphosate is injurious to human health. Plaintiffs did not discover, and did not know of facts that would cause a reasonable person to suspect, the risks associated with the use

---

glyphosate/germany-swings-eu-vote-in-favor-of-weed-killer-glyphosate-idUSKBN1DR1SG.
[83] *Id.*

42

of and/or exposure to Roundup® and glyphosate; nor would a reasonable and diligent investigation by them have disclosed that Roundup® and glyphosate would cause their Non-Hodgkin lymphoma.

129.    For these reasons, all applicable statutes of limitations have been tolled by operation of the discovery rule with respect to Plaintiffs' claims.

**Fraudulent Concealment**

130.    Furthermore, the running of the statute of limitations has been equitably tolled by reason of Defendant's fraudulent concealment and conduct, as alleged above. Through its affirmative misrepresentations and omissions, Defendant actively concealed from Plaintiffs the true risks associated with use of or exposure to Roundup®.

131.    As a result of Defendant's actions, Plaintiffs were unaware, and could not reasonably know or have learned through reasonable diligence, that he had been exposed to the risks alleged herein and that those risks were the direct and proximate result of Defendant's acts and omissions.

132.    Defendant is estopped from relying on any statute of limitations because of its concealment of the truth regarding the safety of Roundup®. Defendant was under a continuous duty to disclose the true character, quality, and nature of Roundup® because this was non-public information over which it continues to have exclusive control. Defendant knew that this information was not available to Plaintiffs, Plaintiff Ralph Hale's medical providers, or his health facilities, yet it failed to disclose the information to the public.

43

7508641v3/99-8869

133.   Defendant had the ability to and did spend enormous amounts of money in furtherance of its purposes of marketing and promoting a profitable product, notwithstanding the known or reasonably knowable risks. Plaintiffs and medical professionals could not have afforded to and could not have possibly conducted studies to determine the nature, extent and identity of related health risks, and they were forced to rely on Defendant's representations.

**Estoppel**

134.   Monsanto was under a continuous duty to disclose to consumers, users and other persons coming into contact with its products, including Plaintiff Ralph Hale, accurate safety information concerning its products and the risks associated with the use of and/or exposure to Roundup® and glyphosate.

135.   Instead, Monsanto knowingly, affirmatively, and actively concealed safety information concerning Roundup® and glyphosate and the serious risks associated with the use of and/or exposure to its products.

136.   Based on the foregoing, Monsanto is estopped from relying on any statutes of limitations in defense of this action.

**<u>CLAIM ONE</u>**

**STRICT LIABILITY – DEFECTIVE MANUFACTURE AND DESIGN**

137.   Plaintiffs incorporate by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

138.   Plaintiffs bring this strict liability claim against Defendant for defective manufacture and design.

139.   At all times relevant to this litigation, Defendant engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting Roundup® products, which are defective and unreasonably dangerous to consumers, including Plaintiff Ralph Hale, thereby placing Roundup® products into the stream of commerce. These actions were under the ultimate control and supervision of Defendant.

140.   At all times relevant to this litigation, Defendant designed, researched, developed, manufactured, produced, tested, assembled, labeled, advertised, promoted, marketed, sold, and distributed the Roundup® products that Plaintiff Ralph Hale was exposed to, as described above.

141.   At all times relevant to this litigation, Defendant's Roundup® products were manufactured, designed, and labeled in an unsafe, defective, and inherently dangerous manner that was dangerous for use by or exposure to the public, and, in particular, the Plaintiff Ralph Hale.

142.   At all times relevant to this litigation, Defendant's Roundup® products reached the intended consumers, handlers, and users or other persons coming into contact with these products in Arizona and throughout the United States, including Plaintiff Ralph Hale, without substantial change in their condition as designed, manufactured, sold, distributed, labeled, and marketed by Defendant.

143.   Defendant's Roundup® products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold, and marketed by Defendant were defective in design and formulation in that when they left the hands of the Defendant's

45

manufacturers and/or suppliers, they were unreasonably dangerous and dangerous to an extent beyond that which an ordinary consumer would contemplate.

144. Defendant's Roundup® products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold, and marketed by Defendant were defective in design and formulation in that when they left the hands of Defendant's manufacturers and/or suppliers, the foreseeable risks exceeded the alleged benefits associated with their design and formulation.

145. At all times relevant to this action, Defendant knew or had reason to know that its Roundup® products were defective and were inherently dangerous and unsafe when used in the manner instructed and provided by Defendant.

146. Therefore, at all times relevant to this litigation, Defendant's Roundup® products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold and marketed by Defendant were defective in design and formulation, in one or more of the following ways:

a.   When placed in the stream of commerce, Defendant's Roundup® products were defective in design and formulation, and, consequently, dangerous to an extent beyond that which an ordinary consumer would contemplate.

b.   When placed in the stream of commerce, Defendant's Roundup® products were unreasonably dangerous in that they were hazardous and posed a grave risk of cancer and other serious illnesses when used in a reasonably anticipated manner.

c.   When placed in the stream of commerce, Defendant's Roundup® products contained unreasonably dangerous design defects and were not reasonably safe when used in a reasonably anticipated or intended manner.

46

7508641v3/99-8860

    d.      Defendant did not sufficiently test, investigate, or study its Roundup® products and, specifically, the active ingredient glyphosate.

    e.      Exposure to Roundup® and glyphosate-containing products presents a risk of harmful side effects that outweigh any potential utility stemming from the use of the herbicide.

    f.      Defendant knew or should have known at the time of marketing its Roundup® products that exposure to Roundup® and specifically, its active ingredient glyphosate, could result in cancer and other severe illnesses and injuries.

    g.      Defendant did not conduct adequate post-marketing surveillance of its Roundup® products.

    h.      Defendant could have employed safer alternative designs and formulations.

147.    Plaintiff Ralph Hale was exposed to Defendant's Roundup® products without knowledge of its dangerous characteristics.

148.    At all times relevant to this litigation, Plaintiff Ralph Hale was exposed to the use of Defendant's Roundup® products in an intended or reasonably foreseeable manner without knowledge of their dangerous characteristics.

149.    Plaintiff Ralph Hale could not have reasonably discovered the defects and risks associated with Roundup® or glyphosate-containing products before or at the time of exposure.

150.    The harm caused by Defendant's Roundup® products far outweighed their benefit, rendering Defendant's products dangerous to an extent beyond that which an ordinary consumer would contemplate. Defendant' Roundup® products were and are more dangerous than alternative products and Defendant could have designed its Roundup®

47

products to make them less dangerous. Indeed, at the time that Defendant designed its Roundup® products, the state of the industry's scientific knowledge was such that a less risky design or formulation was attainable.

151.   At the time Roundup® products left Defendant's control, there was a practical, technically feasible and safer alternative design that would have prevented the harm without substantially impairing the reasonably anticipated or intended function of Defendant' herbicides.

152.   Defendant's defective design of its Roundup® products was willful, wanton, fraudulent, malicious, and conducted with reckless disregard for the health and safety of users of the Roundup® products, including the Plaintiff Ralph Hale herein.

153.   Therefore, as a result of the unreasonably dangerous condition of its Roundup® products, Defendant is strictly liable to Plaintiffs.

154.   The defects in Defendant's Roundup® products were substantial and contributing factors in causing Plaintiff Ralph Hale's injury, and, but for Defendant's misconduct and omissions, Plaintiff Ralph Hale would not have sustained his injuries.

155.   Defendant's conduct, as described above, was reckless. Defendant risked the lives of consumers and users of its products, including Plaintiff Ralph Hale, with knowledge of the safety problems associated with Roundup® and glyphosate-containing products, and suppressed this knowledge from the general public. Defendant made conscious decisions not to redesign, warn, or inform the unsuspecting public. Defendant's reckless conduct warrants an award of punitive damages.

7508641v3/99-8869

156.   As a direct and proximate result of Defendant placing defective Roundup® products into the stream of commerce, and the resulting injuries, Plaintiffs have suffered pecuniary loss through healthcare costs they sustained.

157.   As a proximate result of the Defendant placing its defective Roundup® products into the stream of commerce, as alleged herein, Plaintiffs suffered personal injury and damages.

158.   WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in Plaintiff's favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all such other and further relief as this Court deems just and proper. Plaintiffs also demand a jury trial on the issues contained herein.

## CLAIM TWO

## STRICT LIABILITY - FAILURE TO WARN

159.   Plaintiffs incorporate by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

160.   Plaintiffs bring this strict liability claim against Defendant for failure to warn.

161.   At all times relevant to this litigation, Defendant engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, promoting and applying Roundup® products, which are defective and unreasonably dangerous to consumers, including Plaintiff Ralph Hale, because they do not contain adequate warnings or instructions concerning the dangerous characteristics of Roundup® and specifically, the active ingredient glyphosate. These actions were under the ultimate control and supervision of Defendant.

49

7508641 v3/99-8869

162.   Defendant researched, developed, designed, tested, manufactured, inspected, labeled, distributed, marketed, promoted, sold, and otherwise released into the stream of commerce its Roundup® products, and in the course of same, directly advertised or marketed the products to consumers and end users, including the Plaintiff Ralph Hale, and persons responsible for consumers (such as employers), and therefore had a duty to warn of the risks associated with the use of Roundup® and glyphosate-containing products.

163.   At all times relevant to this litigation, Defendant had a duty to properly test, develop, design, manufacture, inspect, package, label, market, promote, sell, distribute, maintain, supply, provide proper warnings, and take such steps as necessary to ensure that Roundup® products did not cause users and consumers to suffer from unreasonable and dangerous risks. Defendant had a continuing duty to warn the Plaintiff Ralph Hale of the dangers associated with Roundup® use and exposure. Defendant, as manufacturer, seller, or distributor of chemical herbicides, are held to the knowledge of an expert in the field.

164.   At the time of manufacture, Defendant could have provided the warnings or instructions regarding the full and complete risks of Roundup® and glyphosate-containing products because they knew or should have known of the unreasonable risks of harm associated with the use of and/or exposure to such products.

165.   At all times relevant to this litigation, Defendant failed to investigate, study, test, increase the safety, or minimize the dangers to users and consumers of this product and to those who would foreseeably use or be harmed by Roundup®, including Plaintiff Ralph Hale.

50

7508641v3/99-8869

166.   Despite the fact that Defendant knew or should have known that Roundup® posed a grave risk of harm, they failed to exercise reasonable care to warn of the dangerous risks associated with use and exposure. The dangerous propensities of its products and the carcinogenic characteristics of glyphosate, as described above, were known to Defendant, or scientifically knowable to Defendant through appropriate research and testing by known methods, at the time Defendant distributed, supplied, or sold the product, and not known to end users and consumers, such as Plaintiff Ralph Hale.

167.   Defendant knew or should have known that these products created significant risks of serious bodily harm to consumers, as alleged herein, and Defendant failed to adequately warn consumers and reasonably foreseeable users of the risks of exposure to its products. Defendant has wrongfully concealed information concerning the dangerous nature of Roundup® and its active ingredient glyphosate, and further made false and/or misleading statements concerning the safety of Roundup® and glyphosate.

168.   At all times relevant to this litigation, Defendant's Roundup® products reached the intended consumers, handlers, and users or other persons coming into contact with these products in Arizona and throughout the United States, including Plaintiff Ralph Hale, without substantial change in their condition as designed, manufactured, sold, distributed, labeled, and marketed by Defendant.

169.   Plaintiff Ralph Hale was exposed to Roundup® products, as described above, without knowledge of their dangerous characteristics.

51

170.    At all times relevant to this litigation, Plaintiff Ralph Hale was exposed to the use of Defendant's Roundup® products in their intended or reasonably foreseeable manner without knowledge of their dangerous characteristics.

171.    Plaintiff Ralph Hale could not have reasonably discovered the defects and risks associated with Roundup® or glyphosate-containing products prior to or at the time of Plaintiff Ralph Hale's exposure. Plaintiff Ralph Hale relied upon the skill, superior knowledge, and judgment of Defendant.

172.    Defendant knew or should have known that the minimal warnings disseminated with or accompanying the application of Roundup® products were inadequate, but they failed to communicate adequate information on the dangers and safe use/exposure and failed to communicate warnings and instructions that were appropriate and adequate to render the products safe for their ordinary, intended, and reasonably foreseeable uses, including agricultural and horticultural applications.

173.    The information that Defendant did provide or communicate failed to contain relevant warnings, hazards, and precautions that would have enabled those exposed such as Plaintiff Ralph Hale to utilize the products safely and with adequate protection. Instead, Defendant disseminated information that was inaccurate, false, and misleading and which failed to communicate accurately or adequately the comparative severity, duration, and extent of the risk of injuries with use of and/or exposure to Roundup® and glyphosate; continued to aggressively promote the efficacy of its products, even after it knew or should have known of the unreasonable risks from use or exposure; and concealed, downplayed,

52

or otherwise suppressed, through aggressive marketing and promotion, any information or research about the risks and dangers of exposure to Roundup® and glyphosate.

174.   To this day, Defendant has failed to adequately and accurately warn of the true risks of Plaintiff Ralph Hale's injuries associated with the use of and exposure to Roundup® and its active ingredient glyphosate, a probable carcinogen.

175.   As a result of their inadequate warnings, Roundup® products were defective and unreasonably dangerous when they left the possession and/or control of Defendant, were sold or distributed by Defendant, were applied by Plaintiff Ralph Hale, and when Plaintiff Ralph Hale became exposed.

176.   Defendant is liable to Plaintiff Ralph Hale for injuries caused by negligent or willful failure, as described above, to provide adequate warnings or other clinically relevant information and data regarding the appropriate use of their products and the risks associated with the use of or exposure to Roundup® and glyphosate.

177.   The defects in these Roundup® products were substantial and contributing factors in causing Plaintiff Ralph Hale's injuries, and, but for Defendant's misconduct and omissions, Plaintiff Ralph Hale would not have sustained their injuries.

178.   Had Defendant provided adequate warnings and instructions and properly disclosed and disseminated the risks associated with Roundup® products and application, Plaintiff Ralph Hale could have avoided the amount of contact he had with Roundup and the risk of developing injuries as alleged herein. Plaintiff Ralph Hale could have also obtained alternative herbicides.

7508641v3/99-8869

179.   As a direct and proximate result of Defendant placing defective Roundup® products into the stream of commerce, and the resulting injuries, Plaintiffs have suffered pecuniary loss through healthcare costs they sustained.

180.   As a proximate result of the Defendant placing its defective Roundup® products into the stream of commerce, as alleged herein, Plaintiffs suffered great pain, mental anguish, and other personal injury and damages.

181.   WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in Plaintiffs' favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all such other and further relief as this Court deems just and proper. Plaintiffs also demand a jury trial on the issues contained herein.

## CLAIM THREE

## NEGLIGENCE

182.   Plaintiffs incorporate by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

183.   Defendant, directly or indirectly, caused Roundup® products to be sold, distributed, packaged, labeled, marketed, promoted, and/or used by Plaintiff Ralph Hale.

184.   At all times relevant to this litigation, Defendant had a duty to exercise reasonable care in the design, research, manufacture, marketing, advertisement, supply, promotion, packaging, sale, and distribution of Roundup® products, including the duty to take all reasonable steps necessary to manufacture, promote, and/or sell a product that was not unreasonably dangerous to consumers and users of the product.

54

7508641v3/99-8860

185.    At all times relevant to this litigation, Defendant had a duty to exercise reasonable care in the marketing, advertisement, and sale of the Roundup® products. Defendant's duty of care, owed to consumers and the general public, included providing accurate, true, and correct information concerning the risks of using Roundup® and appropriate, complete, and accurate warnings concerning the potential adverse effects of exposure to Roundup®, and, in particular, its active ingredient glyphosate.

186.    At all times relevant to this litigation, Defendant knew or, in the exercise of reasonable care, should have known of the hazards and dangers of Roundup® and specifically, the carcinogenic properties of the chemical glyphosate.

187.    Accordingly, at all times relevant to this litigation, Defendant knew or, in the exercise of reasonable care, should have known that use of or exposure to Roundup® products could cause or be associated with Plaintiff Ralph Hale's injuries, and thus created a dangerous and unreasonable risk of injury to the users of these products, including Plaintiff Ralph Hale.

188.    Defendant also knew or, in the exercise of reasonable care, should have known that users and consumers of Roundup® were unaware of the risks and the magnitude of the risks associated with use of and/or exposure to Roundup® and glyphosate-containing products.

189.    As such, Defendant breached their duty of reasonable care and failed to exercise ordinary care in the design, research, development, manufacture, testing, marketing, supply, promotion, advertisement, packaging, sale, and distribution of its Roundup® products, in that Defendant manufactured and produced defective herbicides containing the chemical glyphosate, knew or had reason to know of the defects inherent in its products, knew or had

7508641 v3/99-8860

1

2    reason to know that a user's or consumer's exposure to the products created a significant

3    risk of harm and unreasonably dangerous side effects, and failed to prevent or adequately

     warn of these risks and injuries.

4    190.   Despite having the ability and means to investigate, study, and test products and to

5    provide adequate warnings, Defendant failed to do so. Indeed, Defendant wrongfully

6    concealed information and further made false and/or misleading statements concerning the

7    safety and/or exposure to Roundup® and glyphosate.

8    191.   Defendant's negligence included, but is not limited to:

9          a.    Manufacturing, producing, promoting, formulating, creating, developing,

10               designing, selling, and/or distributing Roundup® products without thorough

11               and adequate pre- and post-market testing;

12         b.    Manufacturing, producing, promoting, formulating, creating, developing,

13               designing, selling, and/or distributing Roundup® while negligently and/or

14               intentionally concealing and failing to disclose the results of trials, tests, and

15               studies of exposure to glyphosate, and, consequently, the risk of serious harm

16               associated with human use of and exposure to Roundup®;

17         c.    Failing to undertake sufficient studies and conduct necessary tests to

18               determine whether or not Roundup® products and glyphosate-containing

19               products were safe for their intended use in agriculture and horticulture;

20         d.    Failing to use reasonable and prudent care in the design, research,

21               manufacture, and development of Roundup® products so as to avoid the risk

22

of serious harm associated with the prevalent use of Roundup®/glyphosate as an herbicide;

e.    Failing to design and manufacture Roundup® products so as to ensure they were at least as safe and effective as other herbicides on the market;

f.    Failing to provide adequate instructions, guidelines, and safety precautions to those persons whom Defendant could reasonably foresee would use and be exposed to its Roundup® products;

g.    Failing to disclose to Plaintiff Ralph Hale, users/consumers, and the general public that use of and exposure to Roundup® presented severe risks of cancer and other grave illnesses;

h.    Failing to warn Plaintiff Ralph Hale, consumers, and the general public that the product's risk of harm was unreasonable and that there were safer and effective alternative herbicides available to Plaintiff Ralph Hale and other consumers;

i.    Systematically suppressing or downplaying contrary evidence about the risks, incidence, and prevalence of the side effects of Roundup® and glyphosate-containing products;

j.    Representing that its Roundup® products were safe for their intended use when, in fact, Defendant knew or should have known that the products were not safe for their intended purpose;

57

7508641v3/99-8869

k.  Declining to make or propose any changes to Roundup® products' labeling or other promotional materials that would alert the consumers and the general public of the risks of Roundup® and glyphosate;

l.  Advertising, marketing, and recommending the use of the Roundup® products, while concealing and failing to disclose or warn of the dangers known by Defendant to be associated with or caused by the use of or exposure to Roundup® and glyphosate;

m.  Continuing to disseminate information to its consumers, which indicate or imply that Defendant's Roundup® products are not unsafe for use in the agricultural and horticultural industries; and

n.  Continuing the manufacture and sale of its products with the knowledge that the products were unreasonably unsafe and dangerous.

192.  Defendant knew and/or should have known that it was foreseeable that consumers such as Plaintiff Ralph Hale would suffer injuries as a result of Defendant's failure to exercise ordinary care in the manufacturing, marketing, labeling, distribution, and sale of Roundup®.

193.  Plaintiff Ralph Hale did not know the nature and extent of the injuries that could result from the intended use of and/or exposure to Roundup® or its active ingredient glyphosate.

194.  Defendant's negligence was the proximate cause of the injuries that Plaintiff Ralph Hale suffered, and will continue to suffer, as described herein.

7508641v3/99-8869

195.    Defendant's conduct, as described above, was reckless. Defendant regularly risked the lives of consumers and users of their products, including Plaintiff Ralph Hale, with full knowledge of the dangers of its products. Defendant made conscious decisions not to redesign, re-label, warn, or inform the unsuspecting public, including Plaintiff Ralph Hale. Defendant's reckless conduct therefore warrants an award of punitive damages.

196.    As a direct and proximate result of Defendant placing defective Roundup® products into the stream of commerce, and the resulting injuries, Plaintiffs have suffered pecuniary loss through healthcare costs they have sustained.

197.    As a proximate result of the Defendant placing its defective Roundup® products into the stream of commerce, as alleged herein, Plaintiffs have suffered great pain, mental anguish, and other personal injury and damages.

198.    WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in Plaintiff's favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all such other and further relief as this Court deems just and proper. Plaintiffs also demand a jury trial on the issues contained herein.

**CLAIM FOUR**

**BREACH OF EXPRESS WARRANTY**

199.    Plaintiffs incorporate by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

200.    At all times relevant to this litigation, Defendant engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting Roundup® products, which are defective and unreasonably dangerous to

59

7508641v3/99-8869

consumers, including Plaintiff Ralph Hale, thereby placing Roundup® products into the stream of commerce. These actions were under the ultimate control and supervision of Defendant.

201.   Defendant had a duty to exercise reasonable care in the research, development, design, testing, packaging, manufacture, inspection, labeling, distributing, marketing, promotion, sale, and release of Roundup® products, including a duty to:

    a.    ensure that their products did not cause the user unreasonably dangerous side effects;

    b.    warn of dangerous and potentially fatal side effects; and

    c.    disclose adverse material facts, such as the true risks associated with the use of and exposure to Roundup® and glyphosate-containing products, when making representations to consumers and the general public, including Plaintiff Ralph Hale.

202.   As alleged throughout this pleading, the ability of Defendant to properly disclose those risks associated with Roundup® is not limited to representations made on the labeling.

203.   At all times relevant to this litigation, Defendant expressly represented and warranted to the purchasers of their products, by and through statements made by Defendant in labels, publications, package inserts, and other written materials intended for consumers and the general public, that Roundup® products were safe to human health and the environment, effective, fit, and proper for their intended use. Defendant advertised, labeled, marketed, and promoted Roundup® products, representing the quality to

consumers and the public in such a way as to induce their purchase or use, thereby making an express warranty that Roundup® products would conform to the representations.

204.   These express representations include incomplete warnings and instructions that purport, but fail, to include the complete array of risks associated with use of and/or exposure to Roundup® and glyphosate. Defendant knew and/or should have known that the risks expressly included in Roundup® warnings and labels did not and do not accurately or adequately set forth the risks of developing the serious injuries complained of herein. Nevertheless, Defendant expressly represented that Roundup® products were safe and effective, that they were safe and effective for use by individuals such as the Plaintiff Ralph Hale, and/or that they were safe and effective as agricultural herbicides.

205.   The representations about Roundup®, as set forth herein, contained or constituted affirmations of fact or promises made by the seller to the buyer, which related to the goods and became part of the basis of the bargain, creating an express warranty that the goods would conform to the representations.

206.   Defendant placed Roundup® products into the stream of commerce for sale and recommended their use to consumers and the public without adequately warning of the true risks of developing the injuries associated with the use of and exposure to Roundup and its active ingredient glyphosate.

207.   Defendant breached these warranties because, among other things, Roundup products were defective, dangerous, unfit for use, did not contain labels representing the true and adequate nature of the risks associated with their use, and were not merchantable

or safe for their intended, ordinary, and foreseeable use and purpose. Specifically, Defendant breached the warranties in the following ways:

a.    Defendant represented through their labeling, advertising, and marketing materials that Roundup® products were safe, and fraudulently withheld and concealed information about the risks of serious injury associated with use of and/or exposure to Roundup® and glyphosate by expressly limiting the risks associated with use and/or exposure within its warnings and labels; and

b.    Defendant represented that Roundup® products were safe for use and fraudulently concealed information that demonstrated that glyphosate, the active ingredient in Roundup®, had carcinogenic properties, and that Roundup® products, therefore, were not safer than alternatives available on the market.

208.    Plaintiff Ralph Hale detrimentally relied on the express warranties and representations of Defendant concerning the safety and/or risk profile of Roundup® in making a decision to purchase the product. Plaintiff Ralph Hale reasonably relied upon Defendant to disclose known defects, risks, dangers, and side effects of Roundup and glyphosate. Plaintiff Ralph Hale would not have purchased or used Roundup® had the Defendant properly disclosed the risks associated with the product, either through advertising, labeling, or any other form of disclosure.

209.    Defendant had sole access to material facts concerning the nature of the risks associated with their Roundup® products as expressly stated within their warnings and

7508641v3/99-8860

labels, and Defendant knew that consumers and users such as Plaintiff Ralph Hale could not have reasonably discovered that the risks expressly included in Roundup warnings and labels were inadequate and inaccurate.

210.   Plaintiff Ralph Hale had no knowledge of the falsity or incompleteness of Defendant's statements and representations concerning Roundup®.

211.   Plaintiff Ralph Hale used and/or was exposed to the use of Roundup® as researched, developed, designed, tested, manufactured, inspected, labeled, distributed, packaged, marketed, promoted, sold, or otherwise released into the stream of commerce by Defendant.

212.   Had the warnings, labels, advertisements, or promotional material for Roundup® products accurately and adequately set forth the true risks associated with the use of such products, including Plaintiff Ralph Hale's injuries, rather than expressly excluding such information and warranting that the products were safe for their intended use, Plaintiff Ralph Hale could have avoided the injuries complained of herein.

213.   As a direct and proximate result of Defendant's breach of express warranty, and the resulting injuries, Plaintiffs have suffered pecuniary loss through healthcare costs they sustained.

214.   As a proximate result of the Defendant's breach of express warranty, as alleged herein, there was a measurable and significant interval of time during which Plaintiffs suffered personal injury and damages.

215.   WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in Plaintiffs' favor for compensatory and punitive damages, together with interest, costs

63

7508641v3/99-8869

herein incurred, attorneys' fees, and all such other and further relief as this Court deems just and proper.

## CLAIM FIVE

### BREACH OF IMPLIED WARRANTIES

216.   Plaintiffs incorporate by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

217.   At all times relevant to this litigation, Defendant engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting Roundup® products, which are defective and unreasonably dangerous to consumers, including Plaintiff Ralph Hale, thereby placing Roundup® products into the stream of commerce. These actions were under the ultimate control and supervision of Defendant.

218.   Before the time that Plaintiff Ralph Hale was exposed to the use of the aforementioned Roundup® products, Defendant impliedly warranted to consumers and those exposed—including Plaintiff Ralph Hale—that Roundup® products were of merchantable quality and safe and fit for the use for which they were intended; specifically, as horticultural herbicides.

219.   Defendant, however, failed to disclose that Roundup® has dangerous propensities when used as intended and that the use of and/or exposure to Roundup® and glyphosate-containing products carries an increased risk of developing severe injuries, including Plaintiff Ralph Hale's injuries.

7508641v3/09-8869

220.   Plaintiff Ralph Hale reasonably relied upon the skill, superior knowledge and judgment of Defendant and upon their implied warranties that the Roundup® products were of merchantable quality and fit for their intended purpose or use.

221.   Upon information and belief, Plaintiff Ralph Hale was at all relevant times in privity with Defendant.

222.   Plaintiff Ralph Hale is the intended beneficiary of implied warranties made by Defendant to the purchasers and/or users of their horticultural herbicides, and as such Plaintiff Ralph Hale is entitled to assert this claim.

223.   The Roundup® products were expected to reach and did in fact reach consumers and/or users, including Plaintiff Ralph Hale, without substantial change in the condition in which they were manufactured and sold by Defendant.

224.   At all times relevant to this litigation, Defendant were aware that consumers and users of their products, including Plaintiff Ralph Hale, would use Roundup® products as marketed by Defendant, which is to say that Plaintiff Ralph Hale was a foreseeable user of Roundup®.

225.   Defendant intended that Roundup® products be used in the manner in which Plaintiff Ralph Hale was exposed to it and Defendant impliedly warranted each product to be of merchantable quality, safe, and fit for this use, despite the fact that Roundup® was not adequately tested and/or researched.

226.   In reliance upon Defendant's implied warranty, Plaintiff Ralph Hale used or was exposed to Roundup® as instructed and labeled and in the foreseeable manner intended, recommended, promoted, and marketed by Defendant.

65

227.   Plaintiff Ralph Hale could not have reasonably discovered or known of the risks of serious injury associated with Roundup® or glyphosate.

228.   Defendant breached their implied warranty to Plaintiff Ralph Hale in that Roundup® products were not of merchantable quality, safe, or fit for their intended use, and/or adequately tested. Roundup® has dangerous propensities when used as intended and can cause serious injuries, including those injuries complained of herein.

229.   The harm caused by Roundup® products far outweighed their benefit, rendering the products more dangerous than an ordinary consumer or user would expect and more dangerous than alternative products.

230.   As a direct and proximate result of Defendant placing defective Roundup® products into the stream of commerce, and the resulting injuries, Plaintiffs have sustained pecuniary loss including loss of the medical costs related to Plaintiff Ralph Hale's Non-Hodgkin's Lymphoma.

231.   As a proximate result of the Defendant placing its defective Roundup® products into the stream of commerce, as alleged herein, Plaintiffs suffered great pain, mental anguish, and other personal injury and damages.

232.   WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in Plaintiffs favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees, and all such other and further relief as this Court deems just and proper. Plaintiffs also demand a jury trial on the issues contained herein.

**COUNT SIX**

**FRAUDULENT CONCEALMENT – VIOLATION OF ARIZONA CONSUMER FRAUD ACT A.R.S. § 44-1521 et seq.**

233.   Plaintiffs incorporate by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

234.   Plaintiff Ralph Hale is a person within the meaning of the Arizona Consumer Fraud Act ("the Act").

235.   Defendant is a person within the meaning of the Act for all purposes herein.

236.   Defendant is estopped from asserting a statute of limitations defense because it fraudulently concealed its wrongful conduct from Plaintiff Ralph Hale with the intent that Plaintiff Ralph Hale and other consumers and users of Roundup® would rely on such material representations.

237.   Defendant had actual knowledge that exposure to Roundup® and specifically, its active ingredient glyphosate, could result in cancer and other severe illnesses and injuries. Defendant knew or should have known that Roundup® is more toxic than glyphosate alone and that safety studies of Roundup®, Roundup's adjuvants and "inert" ingredients, and/or the surfactant POEA were necessary to protect Plaintiff Ralph Hale from Roundup®.

238.   Defendant failed to conduct adequate testing of glyphosate and the Roundup® formulation.

239.   Defendant had actual knowledge of its misrepresentations, negligence, breach of warranties, and false, misleading, deceptive, and unconscionable conduct, including statements and representations. Even so, Defendant perpetuated its wrongful conduct with

7508641 v3/99-8869

1

2   the intent and fixed purpose of concealing its wrongs from Plaintiff Ralph Hale and the

3   public at large. Despite its knowledge that Roundup® is considerably more dangerous than

    glyphosate alone, Defendant continued to promote Roundup® as safe.

4   240.   Plaintiff Ralph Hale  was unaware of the falsity of these representations, acted in

5   actual and justifiable reliance on such material misrepresentations, and were injured as a

6   direct and proximate result.

7   241.   Additionally, Defendant knowingly omitted material information and remained

8   silent regarding said misrepresentations despite the fact that it had a duty to inform Plaintiff

9   Ralph Hale and the general public of the inaccuracy of said misrepresentations, which

10  omission constitutes a positive misrepresentation of material fact, with the intent that

11  Plaintiff Ralph Hale and the public would rely on Defendant's misrepresentations.

12  242.   Plaintiff Ralph Hale did, in fact, act in actual and justifiable reliance on Defendant's

13  representations, and Plaintiff Ralph Hale was injured as a result.

14  243.   Defendant, as the manufacturer of Roundup®, was in a position of superior

15  knowledge and judgment regarding any potential risks associated with its products.

16  244.   Defendant committed constructive fraud by breaching one or more legal or equitable

17  duties owed to Plaintiff Ralph Hale relating to Roundup®, said breach or breaches

18  constituting fraud because of its propensity to deceive others or constitute an injury to public

19  interests or public policy.

20  245.   In breaching its duties to Plaintiff Ralph Hale, Defendant used its position of trust as

21  the manufacturer and/or distributor of Roundup® to increase sales of its products at the

22

7508641v3/00-8860

expense of informing Plaintiff Ralph Hale that use of or exposure to Roundup® carries the risk of serious illness, such as Non-Hodgkin's lymphoma.

246.   Plaintiff Ralph Hale is entitled to all damages permitted by the A.R.S. § 44-1528 and A.R.S. § 44-1534 of this Act, including actual damages sustained, civil penalties, attorneys' fees, and costs of this action. Also, the State of Arizona is entitled to statutory penalties from Defendant for each violation of the Act pursuant to A.R.S. § 44-1531.

247.   WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in Plaintiffs' favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees, and all such other and further relief as this Court deems just and proper. Plaintiffs also demand a jury trial on the issues contained herein.

## COUNT SEVEN
## LOSS OF CONSORTIUM

248.   Plaintiffs hereby incorporate by reference all preceding paragraphs.

249.   Plaintiff Shelly Hale is the spouse of Plaintiff Ralph Hale, and as a direct and proximate result of Defendant's conduct as described in this Complaint, Plaintiff Shelly Hale has necessarily paid and has become liable to pay for medical aid, treatment, attendance, and medications, and will necessarily incur further expenses of a similar nature in the future.

250.   As a direct and proximate result of Defendant's conduct as described in this complaint, Plaintiffs suffered and in the future will suffer the loss of spousal affection, companionship, services, society, and other damages.

69

7508641v3/99-8869

251.   As a direct and proximate result of Defendants' negligence, Plaintiffs have suffered a loss of consortium of and with each other.

## COUNT EIGHT

### PUNITIVE DAMAGES

252.   Plaintiffs repeat and reiterate the allegations previously set forth herein.

253.   At all times material hereto, the Defendant knew or should have known that the subject product was inherently dangerous with respect to its health risks.

254.   At all times material hereto, the Defendant attempted to misrepresent and did misrepresent facts concerning the safety of the subject product.

255.   Defendant's misrepresentations included knowingly withholding material information from the public, including the Plaintiffs herein, concerning the safety of the subject product.

256.   At all times material hereto, the Defendant knew and recklessly disregarded the fact that human exposure to Roundup® can and does cause health hazards, including Non-Hodgkin's lymphoma.

257.   Notwithstanding the foregoing, the Defendant continued to aggressively market and apply the subject product without disclosing the aforesaid risks.

258.   Defendant knew of the subject product's defective and unreasonably dangerous nature, as set forth herein, but continued to design, develop, manufacture, market, distribute, sell, and apply it so as to maximize sales and profits at the expense of the health and safety of the public, including the Plaintiffs herein, in conscious and/or negligent disregard of the foreseeable harm caused by Roundup®.

70

7508641v3/09-8869

259.   The Defendant intentionally concealed and/or recklessly failed to disclose to the public, including the Plaintiffs herein, the potentially life threatening hazards of Roundup® in order to ensure continued and increased sales.

260.   The Defendant's intentional and/or reckless failure to disclose information deprived the Plaintiffs of necessary information to enable Plaintiffs to weigh the true risks of using or being exposed to the subject product against its benefits.

261.   As a direct and proximate result of the Defendant's conscious and deliberate disregard for the rights and safety of consumers such as the Plaintiff Ralph Hale suffered severe and permanent physical injuries. Plaintiff Ralph Hale endured substantial pain and suffering and underwent extensive medical and surgical procedures. Plaintiffs incurred significant expenses for medical care and treatment.

262.   The aforesaid conduct of the Defendant was committed with knowing, conscious, and deliberate disregard for the rights and safety of consumers, including the Plaintiffs herein, thereby entitling the Plaintiffs to punitive damages in an amount appropriate to punish the Defendant and deter them from similar conduct in the future.

263.   WHEREFORE, Plaintiffs demand judgment against Defendant for punitive damages, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## **PRAYER**

THEREFORE, Plaintiffs pray for a judgment against Defendant as follows:

A.      For past and future special damages to compensate Plaintiffs for their personal injuries and damages described above, including, without limitation, the reasonable value

71

750R6641v3/99-8869

of his past and future medical expenses, and other past and future economic losses;

B.      For general damages to Plaintiffs including pain, suffering, anguish, loss of consortium, and other harms;

C.      For punitive damages to punish the Defendant and deter them and others from engaging in like conduct in the future;

D.      For Plaintiffs' costs of suit, including reasonable attorneys' fees, court costs, and other litigation expenses; and

E.      For such other and further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demands a jury trial on all claims so triable in this action.

RESPECTFULLY SUBMITTED this 1st day of June, 2020.

GALLAGHER & KENNEDY, P.A.

By: /s/ *Daniel Z. Kolomitz*

Robert W. Boatman
Shannon L. Clark
Daniel Z. Kolomitz
2575 East Camelback Road, Suite 1100
Phoenix, Arizona  85016

*Attorneys for Plaintiffs Ralph Hale*

7508641v3/99-8869