# U.S. District Court
## SOUTHERN DISTRICT OF TEXAS (McAllen)
## CIVIL DOCKET FOR CASE #: 7:20-cv-00158

Gordon v. Monsanto Company

Assigned to: Judge Ricardo H Hinojosa

Cause: 28:1332 Diversity-Notice of Removal

Date Filed: 06/15/2020

Jury Demand: Plaintiff

Nature of Suit: 365 Personal Inj. Prod. Liability

Jurisdiction: Diversity

**Plaintiff**

**James R Gordon**                              represented by  **James R Gordon**
                                                                PRO SE

V.

**Defendant**

**Monsanto Company**                            represented by  **Elmore James Shepherd , III**
                                                                Shook, Hardy & Bacon LLP
                                                                600 Travis Street
                                                                Suite 3400
                                                                Houston, TX 77002-2926
                                                                713-227-8008
                                                                Fax: 713-227-9508
                                                                Email: eshepherd@shb.com
                                                                *LEAD ATTORNEY*
                                                                *ATTORNEY TO BE NOTICED*

                                                                **Jennise Walker-Stubbs**
                                                                Shook Hardy et al
                                                                600 Travis St
                                                                Suite 3400
                                                                Houston, TX 77002-2926
                                                                713-227-8008
                                                                Email: jstubbs@shb.com
                                                                *ATTORNEY TO BE NOTICED*

                                                                **Sonila Themeli**
                                                                Shook Hardy et al
                                                                600 Travis
                                                                Ste 3400
                                                                Houston, TX 77002
                                                                713-227-8008
                                                                Email: sthemeli@shb.com
                                                                *ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|------------|---|-------------|
|            |   |             |

| 06/15/2020 | 1 | NOTICE OF REMOVAL from 275th District Court, Hidalgo County, TX, case number C-1581-20-E (Filing fee $ 400 receipt number 0541-24798616) filed by Monsanto Company. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E) (Themeli, Sonila) (Entered: 06/15/2020) |
| 06/15/2020 | 2 | CORPORATE DISCLOSURE STATEMENT by Monsanto Company, filed.(Themeli, Sonila) (Entered: 06/15/2020) |
| 06/15/2020 | 3 | ORDER for Initial Pretrial and Scheduling Conference and Order to Disclose Interested Persons. Initial Conference set for 7/16/2020 at 02:30 PM before Judge Ricardo H Hinojosa(by Judge Ricardo H Hinojosa) Parties notified.(JenniferNogueira, 7) (Entered: 06/15/2020) |

<table>
<tr><td colspan="4" align="center"><strong>PACER Service Center</strong></td></tr>
<tr><td colspan="4" align="center"><strong>Transaction Receipt</strong></td></tr>
<tr><td colspan="4" align="center">06/16/2020 14:48:08</td></tr>
<tr><td><strong>PACER Login:</strong></td><td>hllp1982:2634105:4722683</td><td><strong>Client Code:</strong></td><td>1417.0049</td></tr>
<tr><td><strong>Description:</strong></td><td>Docket Report</td><td><strong>Search Criteria:</strong></td><td>7:20-cv-00158</td></tr>
<tr><td><strong>Billable Pages:</strong></td><td>1</td><td><strong>Cost:</strong></td><td>0.10</td></tr>
</table>

Electronically Filed
Hidalgo County District Clerks
Reviewed By: Armando Cantu
6/1/2020 1:35 AM

CAUSE NO. **C-1581-20-E** _____

| | | |
|---|---|---|
| **JAMES R. GORDON, PLAINTIFF** | § | **IN THE DISTRICT COURT OF** |
| | § | |
| **VS.** | § | **OF HIDALGO COUNTY** |
| | § | |
| **MONSANTO COMPANY, DEFENDANT** | § | _____ **JUDICIAL DISTRICT** |

## PLAINTIFF'S ORIGINAL PETITION

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW, James R. Gordon, hereinafter referred to as "Gordon," by and through counsel, complaining of Monsanto Company, hereinafter referred to respectively as "Monsanto" and for cause of action would show this Court the following, to wit:

### I. DISCOVERY CONTROL PLAN LEVEL

1.    Plaintiff intends that discovery be conducted under Discovery Level 2.

### II. PARTIES AND SERVICE

2.    Plaintiff, James R. Gordon, is an individual residing in Hidalgo County, Texas. Gordon brings this action for personal injuries sustained by exposure to Roundup® ("Roundup") containing the active ingredient glyphosate and the surfactant POEA. As a direct and proximate result of being exposed to Roundup, Gordon developed non-Hodgkin's Lymphoma.

3.    Defendant, Monsanto Company, is a Delaware Corporation whose principal place of business is at 800 Lindbergh Blvd., St. Louis, Missouri, 63167. Process may be served upon its registered agent, Corporation Service Company d/b/a CSC-Lawyers Incorporating Service Company at 211 East 7th Street, Suite 620, Austin, Texas, 78701.

### III. JURISDICTION AND VENUE

4.    The subject matter in controversy is within the jurisdictional limits of this Court.

1

Electronically Filed
5/1/2020 1:05 AM
Hidalgo County District Clerks
Reviewed By: Armando Cantu

**C-1581-20-E**

5.     Pursuant to Texas Rule of Civil Procedure 42(c), Plaintiff declares that he seeks monetary relief over $1,000,000, including damages of any kind, penalties, costs, expenses, pre-judgment interest, and post-judgment interest, and all other relief available to him.

6.     This Court has jurisdiction because the Plaintiff is a resident of the State of Texas and Defendant is a non-resident corporation conducting business in the State of Texas.

7.     Venue in Hidalgo County, Texas is proper in this cause under Tex. Civ. Prac. & Rem. Code §15.002 because all or a substantial part of the events herein described occurred in Hidalgo County, Texas.

## IV. FACTS

8.     This is an action for damages suffered by Gordon as a direct and proximate result of Defendants' wanton negligence and wrongful conduct in connection with the design, development, manufacture, testing, packaging, promoting, marketing, advertising, distribution, labeling, and/or sale of the herbicide Roundup®, containing the active ingredient glyphosate. Gordon maintains that Roundup and/or glyphosate is defective, dangerous to human health, unfit and unsuitable to be marketed and sold in commerce, and lacked proper warnings and directions as to the dangers associated with its use. Gordon's injuries, like those striking thousands of similarly situated victims across the country, were avoidable.

9.     "Roundup" refers to all formulations of Monsanto's Roundup products, including, but not limited to, Roundup Concentrate Poison Ivy and Tough Brush Killer 1, Roundup Custom Herbicide, Roundup D-Pak herbicide, Roundup Dry Concentrate, Roundup Export Herbicide, Roundup Fence & Hard Edger, Roundup Garden Foam Weed & Grass Killer, Roundup Grass and Weed Killer,

Electronically Filed
5/1/2020 1:05 AM
Hidalgo County District Clerks
Reviewed By: Armando Cantu

**C-1581-20-E**

Roundup Herbicide, Roundup Original 2k herbicide, Roundup Original II Herbicide, Roundup Pro Concentrate, Roundup Prodry Herbicide, Roundup Promax, Roundup Quik Stik Grass and Weed Killer, Roundup Quikpro Herbicide, Roundup Rainfast Concentrate Weed & Grass Killer, Roundup Rainfast Super Concentrate Weed & Grass Killer, Roundup Ready-to-Use Extended Control Weed & Grass Killer Plus Weed Preventer, Roundup Ready-to-Use Weed & Grass Killer, Roundup Ready-to-Use Weed and Grass Killer 2, Roundup Ultra Dry, Roundup Ultra Herbicide, Roundup Ultramax, Roundup VM Herbicide, Roundup Weed & Grass Killer Concentrate, Roundup Weed & Grass Killer Concentrate Plus, Roundup Weed & Grass killer Ready-to-Use Plus, Roundup Weed & Grass Killer Super Concentrate, Roundup Weed & Grass Killer1 Ready-to-Use, Roundup WSD Water Soluble Dry Herbicide Deploy Dry Herbicide, or any other formulation or compound containing the active ingredient glyphosate.

10.  Monsanto advertises and sells goods, specifically Roundup, in Hidalgo County, Texas. Monsanto transacted and conducted business within the State of Texas that relates to the allegations in this Petition. Monsanto derived substantial revenue from goods and products used in the State of Texas. Monsanto expected or should have expected their acts to have consequences within the State of Texas, and derived substantial revenue from interstate commerce. Monsanto engaged in the business of designing, developing, manufacturing, testing, packaging, marketing, distributing, labeling, and/or selling Roundup. Monsanto is authorized to do business in the State of Texas and derives substantial income from doing business in The State of Texas. Monsanto purposefully availed itself of the privilege of conducting activities with the State of Texas, thus invoking the benefits and protections of its laws. Monsanto designed, sold,

Case MDL No. 2741   Document 1859-3   Filed 06/16/20   Page 6 of 41
Case 7:20-cv-00158   Document 1-2   Filed on 05/15/20 in TXSD   Page 6 of 41

Electronically Filed
5/1/2020 1:35 AM
Hidalgo County District Clerks
Reviewed By: Armando Cantu

**C-1581-20-E**

advertised, manufactured and/or distributed Roundup, with full knowledge of its dangerous and defective nature.

11. At all relevant times, Monsanto was in the business of, and did, design, research, manufacture, test, advertise, promote, market, sell, distribute the commercial herbicide Roundup.

12. Monsanto is a multinational agricultural biotechnology corporation based in St. Louis, Missouri. It is the world's leading producer of glyphosate.

13. Monsanto discovered the herbicidal properties of glyphosate during the 1970's and subsequently began to design, research, manufacture, sell and distribute glyphosate based "Roundup" as a broad-spectrum herbicide.

14. Glyphosate is the active ingredient in Roundup.

15. Glyphosate is a broad-spectrum herbicide used to kill weeds and grasses known to compete with commercial crops grown around the globe.

16. Glyphosate is a "non-selective" herbicide, meaning it kills indiscriminately based only on whether a given organism produces a specific enzyme, 5-enolpyruvylshikimic acid-3-phosphate synthase, known as EPSP synthase.

17. Glyphosate inhibits the enzyme 5-enolpyruvylshikimic acid-3-phosphate synthase that interferes with the shikimic pathway in plants, resulting in the accumulation of shikimic acid in plant tissue and ultimately plant death.

18. Sprayed as a liquid, plants absorb glyphosate directly through their leaves, stems, and roots, and detectable quantities accumulate in the plant tissues.

19. Each year, approximately 250 million pounds of glyphosate are sprayed on crops, commercial nurseries, suburban lawns, parks, and golf courses.

Case MDL No. 2741 Document 1859-3 Filed 06/16/20 Page 7 of 41
Case 7:20-cv-00158 Document 1-2 Filed on 06/15/20 in TXSD Page 7 of 41
Electronically Filed
4/1/2020 1:05 AM
Hidalgo County District Clerks
Reviewed By: Armando Cantu

**C-1581-20-E**

20. For nearly 40 years, farmers across the globe have used Roundup, unaware of its carcinogenic properties.

21. The original Roundup, containing the active ingredient glyphosate, was introduced in 1974. Today, glyphosate products are among the world's most widely used herbicides. Monsanto's glyphosate products are registered in more than 130 countries and are approved for weed control in more than 100 crops. No other herbicide active ingredient compares in terms of number of approved uses.

### REGISTRATION OF HERBICIDES UNDER FEDERAL LAW

22. The manufacture, formulation and distribution of herbicides, such as Roundup, are regulated under the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA"), 7. U.S.C. § 136 *et seq*. FIFRA requires that all pesticides (the definition of which includes herbicides such as Roundup) be registered with the Environmental Protection Agency ("EPA") prior to their distribution, sale, or use, except as described by FIFRA 7 U.S.C. 136a(a).

23. The EPA requires as part of the registration process, among other requirements, a variety of tests to evaluate the potential for exposure to pesticides, toxicity to people and other potential non-target organisms, and other adverse effects on the environment. Registration by the EPA, however, is not an assurance or finding of safety. The determination the EPA makes in registering or re-registering a product is not that the product is "safe," but rather that use of the product in accordance with its label directions "will not generally cause unreasonable adverse effects on the environment." 7 U.S.C. § 136(a)(c)(5)(D).

24. FIFRA defines "unreasonable adverse effects on the environment" to mean "any unreasonable risk to man or the environment, taking into account the economic, social, and

5

Case MDL No. 2741   Document 1859-3   Filed 06/16/20   Page 8 of 41
Case 7:20-cv-00158   Document 1-2   Filed on 06/15/20 in TXSD   Page 8 of 41
Electronically Filed
3/1/2020 1:35 AM
Hidalgo County District Clerks
Reviewed By: Armando Cantu

**C-1581-20-E**

environmental costs and benefits of the use of any pesticide." 7 U.S.C. § 136(bb). FIFRA thus requires the EPA to make a risk/benefit analysis in determining whether a registration should be granted or allowed to continue to be sold in commerce.

25. The EPA registered Roundup for distribution, sale, and manufacture in the United States and the State of Texas.

26. FIFRA requires that the registrant, Monsanto, conduct health and safety testing of pesticide products. The government is not required, nor is it able, to perform the product tests that are required of the manufacturer.

27. The evaluation of each pesticide product distributed, sold, or manufactured is completed at the time the product is initially registered. The data necessary for registration of a pesticide has changed over time. The EPA is now in the process of re-evaluating all pesticide products through a Congressionally-mandated process called "re-registration." 7 U.S.C. § 136a-1. In order to reevaluate these pesticides, the EPA demands the completion of additional tests and the submission of data for the EPA's review and evaluation.

28. In the case of glyphosate and Roundup, the EPA had planned on releasing its preliminary risk assessment – in relation to the registration process – no later than July 2015. The EPA completed its review of glyphosate in early 2015, but delayed releasing the assessment pending further review in light of the World Health Organization's findings.

29. On March 24, 2015, the World Health Organization found that glyphosate is a "probable carcinogen" as demonstrated by the mechanistic evidence of carcinogenicity in humans and sufficient evidence of carcinogenicity in animals.

Electronically Filed
6/1/2020 7:05 AM
Hidalgo County District Clerks
Reviewed By: Armando Cantu

**C-1581-20-E**

## MONSANTO'S FALSE REPRESENTATIONS
## REGARDING THE SAFETY OF ROUNDUP

30.  In 1996, the New York Attorney General ("NYAG")[1] filed a lawsuit against Monsanto based on its false and misleading advertising of Roundup products. Specifically, the lawsuit challenged Monsanto's general representations that its spray-on glyphosate-based herbicides, including Roundup, were "safer **than table salt**" and "practically **non-toxic**" to mammals, birds, and fish. Among the representations the NYAG found deceptive and misleading about the human and environmental safety of Roundup are the following:

a) Remember that environmentally friendly Roundup herbicide is biodegradable. It won't build up in the soil so you can use Roundup with confidence along customers' driveways, sidewalks and fences...

b) And remember that Roundup is biodegradable and won't build up in the soil. That will give you the environmental confidence you need to use Roundup everywhere you've got a weed, brush, edging or trimming problem.

c) Roundup biodegrades into naturally occurring elements.

d) Remember that versatile Roundup herbicide stays where you put it. That means there's no washing or leaching to harm customers' shrubs or other desirable vegetation.

e) This non-residual herbicide will not wash or leach in the soil. It ... stays where you apply it.

f) You can apply Accord with "confidence because it will stay where you put it" it bonds tightly to soil

---

[1] Attorney General of the State of New York, In the Matter of Monsanto Company, Assurance of Discontinuance Pursuant to Executive Law § 63(15) (Nov. 1996).

7

Electronically Filed
6/1/2020 7:35 AM
Hidalgo County District Clerks
Reviewed By: Armando Cantu

**C-1581-20-E**

particles, preventing leaching. Then, soon after application, soil microorganisms biodegrade Accord into natural products.

g) Glyphosate is less toxic to rats than table salt following acute oral ingestion.

h) Glyphosate's safety margin is much greater than required. It has over a 1,000-fold safety margin in food and over a 700-fold safety margin for workers who manufacture it or use it.

i) You can feel good about using herbicides by Monsanto. They carry a toxicity category rating of 'practically non-toxic' as it pertains to mammals, birds and fish.

j) "Roundup can be used where kids and pets will play and breaks down into natural material." This ad depicts a person with his head in the ground and a pet dog standing in an area which has been treated with Roundup.

31.   On November 19, 1996, Monsanto entered into an Assurance of Discontinuance with NYAG, in which Monsanto agreed, among other things, "to cease and desist from publishing or broadcasting any advertisements [in New York] that represent, directly or by implication" that:

a) its glyphosate-containing pesticide products or any component thereof are safe, non-toxic, harmless or free from risk.

b) its glyphosate-containing pesticide products or any component thereof manufactured, formulated, distributed or sold by Monsanto are biodegradable.

c) its glyphosate-containing pesticide products or any component thereof stay where they are applied under all circumstances and will not move through the environment by any means.

Electronically Filed
5/11/2020 1:05 AM
Hidalgo County District Clerks
Reviewed By: Armando Cantu

**C-1581-20-E**

d) its glyphosate-containing pesticide products or any component thereof are "good" for the environment or are "known for their environmental characteristics."

e) glyphosate-containing pesticide products or any component thereof are safer or less toxic than common consumer products other than herbicides;

f) its glyphosate-containing products or any component thereof might be classified as "practically non-toxic.

32. Monsanto did not alter its advertising in the same manner in any state other than New York, and on information and belief still has not done so today.

33. In 2009, France's highest court ruled that Monsanto had not told the truth about the safety of Roundup. The French court affirmed an earlier judgment that Monsanto had falsely advertised its herbicide Roundup as "biodegradable" and that it "left the soil clean."[2]

### EVIDENCE OF CARCINOGENICITY IN ROUNDUP

34. As early as the 1980's Monsanto was aware of glyphosate's carcinogenic properties.

35. On March 4, 1985, a group of the Environmental Protection Agency's ("EPA") Toxicology Branch published a memorandum classifying glyphosate as a Category C oncogene.[3] Category C oncogenes are possible human carcinogens with limited evidence of carcinogenicity.

36. In 1986, the EPA issued a Registration Standard for glyphosate (NTIS PB87-103214). The Registration standard required additional phytotoxicity, environmental fate, toxicology, product

---

[2] *Monsanto Guilty in 'False Ad' Row*, BBC, Oct. 15, 2009, *available at* http://news.bbc.co.uk/2/hi/europe/8308903.stm.

[3] Consensus Review of Glyphosate, Casewell No. 661A. March 4, 1985. United States Environmental Protection Agency.

Case 7:20-cv-00158   Document 1-2   Filed on 06/15/20 in TXSD   Page 12 of 40

Case MDL No. 2741   Document 1859-3   Filed 06/16/20   Page 12 of 40

Electronically Filed
6/11/2020 1:05 AM
Hidalgo County District Clerks
Reviewed By: Armando Cantu

C-1581-20-E

chemistry, and residue chemistry studies. All of the data required was submitted and reviewed and/or waived.[4]

37.   In October 1991 the EPA published a Memorandum entitled "Second Peer Review of Glyphosate." The memorandum changed glyphosate's classification to Group E (evidence of non-carcinogenicity for humans). Two peer review committee members did not concur with the conclusions of the committee and one member refused to sign.[5]

38.   In addition to the toxicity of the active molecule, many studies support the hypothesis that glyphosate formulations found in Defendant's Roundup products are more dangerous and toxic than glyphosate alone.[6] As early as 1991 evidence existed demonstrating that glyphosate formulations were significantly more toxic than glyphosate alone.[7]

39.   In 2002, Julie Marc published a study entitled "Pesticide Roundup Provokes Cell Division Dysfunction at the Level of CDK1/Cyclin B Activation." The study found that Defendant's Roundup caused delays in the cell cycles of sea urchins, while the same concentrations of glyphosate alone proved ineffective and did not alter cell cycles.

40.   In 2004, Julie Marc published a study entitled "Glyphosate-based pesticides affect cell cycle regulation." The study demonstrated a molecular link between glyphosate-based products and cell cycle dysregulation. The study noted that "cell-cycle dysregulation is a hallmark of tumor cells and human cancer.

---

[4] https://nepis.epa.gov/Exe/ZyPDF.cgi?Dockey=9100AGUQ.PDF
[5] https://archive.epa.gov/pesticides/chemicalsearch/chemical/foia/web/pdf/103601/417300-1991-10-30a.pdf
[6] Martinez et al. 2007 (see infra, paragraph 42); Benachour 2009 (see infra, paragraph 43); Peixoto 2005 (see infra, paragraph 41); Marc 2004 (see infra, paragraph 40)
[7] Martinez et al 1991

Electronically Filed
9/11/2020 1:05 AM
Hidalgo County District Clerks
Reviewed By: Armando Cantu

**C-1581-20-E**

Failure in the cell-cycle checkpoints leads to genomic instability and subsequent development of cancers from the initial affected cell. Further, "[s]ince cell cycle disorders such as cancer result from dysfunction of unique cell, it was of interest to evaluate the threshold dose of glyphosate affecting cells."

41.  In 2005, Francisco Peixoto published a study showing that Roundup's effects on rat liver mitochondria are much more toxic and harmful than the same concentrations of glyphosate alone. The Peixoto study suggested that the harmful effects of Roundup on mitochondrial bioenergetics could not be exclusively attributed to glyphosate and could be the result of other chemicals, namely the surfactant POEA, or alternatively due to the possible synergy between glyphosate and Roundup formulation products.

42.  In 2007, A. Martinez, I. Reyes, and N. Reyes published a study examining cytotoxicity of glyphosate in human peripheral blood mononuclear cells. The study found that the cytotoxicity of Roundup was higher than cytotoxicity of glyphosate alone. The study suggested that commercial formulations using glyphosate were more cytotoxic than glyphosate alone, supporting the belief that additives in commercial formulations play a role in the toxicity attributed to glyphosate-based herbicides.

43.  In 2009, Nora Benachour and Gilles-Eric Seralini published a study examining the effects of Roundup and glyphosate on human umbilical, embryonic, and placental cells. The study used dilution levels of Roundup and glyphosate far below agricultural recommendations, corresponding with low levels of residues in food. The study concluded that supposed "inert" ingredients, and possibly POEA, change human cell permeability and amplify toxicity of glyphosate alone. The study further suggested that determinations of glyphosate toxicity should take into account the presence of adjuvants, or those chemicals used in the formulation

Case MDL No. 2741   Document 1859-3   Filed 06/16/20   Page 14 of 41
Case 7:20-cv-00158   Document 1-2   Filed on 06/15/20 in TXSD   Page 138 of 267

Electronically Filed
5/11/2020 1:05 AM
Hidalgo County District Clerks
Reviewed By: Armando Cantu

C-1581-20-E

of the complete pesticide. The study confirmed that the adjuvants in Roundup are not inert and that Roundup is always more toxic than its active ingredient glyphosate.

44.   The results of these studies were confirmed in recently published peer-reviewed studies and were at all times available and/or known to Defendant.

45.   Defendant knew or should have known that Roundup is more toxic than glyphosate alone and that safety studies on Roundup, Roundup's adjuvants and "inert" ingredients, and/or the surfactant POEA were necessary to protect Gordon from Roundup.

46.   Defendant knew or should have known that tests limited to Roundup's active ingredient glyphosate were insufficient to prove the safety of Roundup.

47.   Defendant failed to appropriately and adequately test Roundup, Roundup's adjuvants and "inert" ingredients, and/or the surfactant POEA to protect Gordon from Roundup.

48.   Rather than performing appropriate tests, Defendant relied upon flawed industry-supported studies designed to protect Defendant's economic interests rather than Gordon and the consuming public.

49.   Despite its knowledge that Roundup was considerably more dangerous than glyphosate alone, Defendant continued to promote Roundup as safe.

### IARC CLASSIFICATION OF GLYPHOSATE

50.   The International Agency for Research on Cancer ("IARC") is the specialized intergovernmental cancer agency the World Health Organization ("WHO") of the United Nations tasked with conducting and coordinating research into the causes of cancer.

51.   An IARC Advisory Group to Recommend Priorities for IARC Monographs during 2015-2019 met in April 2014. Though nominations for the review were solicited, a substance must meet two criteria

Electronically Filed
9/11/2020 1:05 AM
Hidalgo County District Clerks
Reviewed By: Armando Cantu

**C-1581-20-E**

to be eligible for review by the IARC Monographs: there must already be some evidence of carcinogenicity of the substance, and there must be evidence that humans are exposed to the substance.

52. IARC set glyphosate for review in 2015-2016. IARC uses five criteria for determining priority in reviewing chemicals: 1) the substance must have a potential for direct impact on public health; 2) scientific literature to support suspicion of carcinogenicity; 3) evidence of significant human exposure; 4) high public interest and/or potential to bring clarity to a controversial area and/or reduce public anxiety or concern; and, 5) related agents similar to one given high priority by the above considerations. The reviewed data is preferably sourced from publicly accessible, peer-reviewed data.

53. On March 24, 2015, after its cumulative review of human, animal, and DNA studies for more than one (1) year, many of which have been in Defendant's possession since as early as 1985, IARC's working group published its conclusion that the glyphosate contained in Defendant's Roundup herbicide, is a Class 2A "probable carcinogen" as demonstrated by the mechanistic evidence of carcinogenicity in humans and sufficient evidence of carcinogenicity in animals.

54. IARC's full Monograph, Volume 112, was published on July 29, 2015.[8] The Monograph established glyphosate as a class 2A *probable* carcinogen to humans. According to the authors, glyphosate demonstrated sufficient mechanistic evidence (genotoxicity and oxidative stress) to warrant a 2A classification based on evidence of carcinogenicity in humans and animals.

55. The IARC Working Group found an increased risk between exposure to glyphosate and non-Hodgkin's lymphoma ("NHL") and

---

[8] https://monographs.iarc.fr/wp-content/uploads/2018/06/mono112-10.pdf

Electronically Filed
9/11/2020 1:05 AM
Hidalgo County District Clerks
Reviewed By: Armando Cantu

**C-1581-20-E**

several subtypes of NHL, and the increased risk continued after adjustment for other pesticides.

56.  The IARC also found that glyphosate caused DNA and chromosomal damage in human cells.

**EARLIER EVIDENCE OF GLYPHOSATE'S DANGER**

57.  Despite the new classification by IARC, Defendant has had ample evidence of glyphosate and Roundup's genotoxic and oxidative stress properties for decades.

58.  Genotoxicity refers to chemical agents that are capable of damaging the DNA within a cell through genetic mutations, which is a process that is believed to lead to cancer. In 1997, Chris Clements et al. published "Genotoxicity of select herbicides in *Rana catesbeiana* tadpoles using the alkaline single-cell gel DNA electrophoresis (comet) assay." The study found that tadpoles exposed to Roundup showed significant DNA damage when compared with unexposed control animals. The IARC Monograph also established that there was strong evidence that exposure to glyphosate or glyphosate-based formulations is genotoxic.

59.  Both human and animal studies have shown that glyphosate and glyphosate-based formulations such as Roundup can induce oxidative stress. Oxidative stress and associated chronic inflammation are believed to be involved in carcinogenesis. The IARC Monograph notes that "[s]trong evidence exists that glyphosate, AMPA and glyphosate-based formulations can induce oxidative stress."

60.  In 2006, César Paz-y-Miño et al. published a study examining DNA damage in human subjects exposed to glyphosate. The study produced evidence of chromosomal damage in blood cells showing significantly greater damage after exposure to glyphosate than before in the same individuals, suggesting that the glyphosate

14

Case MDL No. 2741 Document 1859-3 Filed 06/16/20 Page 17 of 41
Case 7:20-cv-00158 Document 1-2 Filed on 06/15/20 in TXSD Page 17 of 40
Electronically Filed
6/1/2020 1:05 AM
Hidalgo County District Clerks
Reviewed By: Armando Cantu

C-1581-20-E

formulation used during aerial spraying had a genotoxic effect on exposed individuals.

61. Despite knowledge to the contrary, Defendant maintains that there is no evidence that Roundup is genotoxic, that regulatory authorities and independent experts are in agreement that Roundup is not genotoxic, and that there is no evidence that Roundup is genotoxic.

62. In addition to glyphosate and Roundup's genotoxic properties, Defendant has long been aware of glyphosate's carcinogenic properties.

63. Glyphosate and glyphosate-based formulations, and Roundup in particular, have long been associated with carcinogenicity and the development of numerous forms of cancer, including, but not limited to, NHL, Hodgkin's lymphoma, multiple myeloma, and soft tissue sarcoma.

64. Defendant has known of this association since the early to mid-1980s and numerous human and animal studies have evidenced the carcinogenicity of glyphosate, glyphosate-based formulations and/or Roundup.

65. In 1985, the EPA studied the effects of glyphosate in mice finding a dose related response in male mice linked to renal tubal adenomas, a rare tumor. The study concluded the glyphosate was oncogenic.

66. In 2003, Lennart Hardell, Mikael Eriksson, and Marie Nordstrom published the results of two case-controlled studies on pesticides as a risk factor for NHL and hairy cell leukemia. The studies concluded that glyphosate had the most significant relationship to NHL among all herbicides studied with an increased odds ratio of 3.04.

15

Electronically Filed
9/11/2020 1:05 AM
Hidalgo County District Clerks
Reviewed By: Armando Cantu

**C-1581-20-E**

67.   In 2003, A.J. De Roos et al. also published a study[9] examining the pooled data of mid-western farmers, examining pesticides and herbicides as risk factors for NHL. The study, which controlled for potential confounders, found a relationship between increased NHL incidence and glyphosate with an odds ratio of 2.1.

68.   In 2008, Mikael Eriksson, Lennart Hardell, Michael Carlberg, and Mans Akerman published a population-based case-control study[10] of exposure to various pesticides as a risk factor for NHL. This strengthened previous associations between glyphosate and NHL, reporting an odds ratio of 2.02.

69.   Despite this knowledge, Defendant continued to issue broad and sweeping statements suggesting that Roundup was, and is, safer than ordinary household items such as table salt, disregarding a lack of scientific support for the accuracy and validity of these statements while, in fact, voluminous evidence showed the contrary.

70.   Upon information and belief, these statements and representations have been made with the intent of inducing Gordon, the agricultural community, and the public at large to purchase and increase the use of Roundup for Defendant's pecuniary gain, and did, in fact, induce Gordon to use Roundup.

71.   Defendant made these statements with complete disregard and reckless indifference to the safety of Gordon and the general public.

72.   Notwithstanding Defendant's representations, scientific evidence has established a clear association between glyphosate and genotoxicity, inflammation, and an increased risk of many cancers, including, but not limited to, NHL, Multiple Myeloma, and soft tissue sarcoma.

---

[9] https://www.ncbi.nlm.nih.gov/pmc/articles/PMC1740618/pdf/v060p00e11.pdf
[10] https://onlinelibrary.wiley.com/doi/full/10.1002/ijc.23589

**C-1581-20-E**

73.   Defendant knew or should have known that glyphosate is associated with an increased risk of developing cancer, including, but not limited to, NHL, Multiple Myeloma, and soft tissue sarcomas.

74.   Defendant failed to appropriately and adequately inform and warn Gordon of the serious and dangerous risks associated with the use of and exposure to glyphosate and/or Roundup, including, but not limited to, the risk of developing NHL, as well as other severe and personal injuries, which are permanent and/or long-lasting in nature, cause significant physical pain and mental anguish, diminished enjoyment of life, and the need for medical treatment, monitoring and/or medications.

75.   Despite the IARC's classification of glyphosate as a class 2A probable carcinogen, Defendant continues to maintain that glyphosate and/or Roundup is safe, non-carcinogenic, non-genotoxic, and falsely warrant to users and the general public that independent experts and regulatory agencies agree that there is no evidence of carcinogenicity or genotoxicity in glyphosate and Roundup.

76.   Defendant has claimed and continues to claim that Roundup is safe, non-carcinogenic, and non-genotoxic.

77.   Glyphosate, and Defendant's Roundup products in particular, have long been associated with serious side effects and many regulatory agencies around the globe have banned or are currently banning the use of glyphosate herbicide products.

78.   Defendant's statements proclaiming the safety of Roundup and disregarding its dangers misled Gordon.

79.   Despite Defendant's knowledge that Roundup was associated with an elevated risk of developing cancer, Defendant's promotional campaigns focused on Roundup's purported "safety profile."

Case MDL No. 2741   Document 1850-3   Filed 06/16/20   Page 20 of 41
Case 7:20-cv-00158   Document 1-2   Filed on 06/15/20 in TXSD   Page 20 of 41
Electronically Filed
5/11/2020 1:05 AM
Hidalgo County District Clerks
Reviewed By: Armando Cantu

C-1581-20-E

80.   Defendant's failure to adequately warn Gordon resulted in (1) Gordon using and being exposed to glyphosate instead of using another acceptable and safe method of controlling unwanted weeds and pests; and (2) scientists and physicians failing to warn and instruct consumers about the risk of cancer, including NHL, and other injuries associated with Roundup.

81.   Defendant failed to seek modification of the labeling of Roundup to include relevant information regarding the risks and dangers associated with Roundup exposure.

82.   The failure of Defendant to appropriately warn and inform the EPA has resulted in inadequate warnings in safety information presented directly to users and consumers.

83.   The failure of Defendant to appropriately warn and inform the EPA has resulted in the absence of warning or caution statements that are adequate to protect health and the environment.

84.   The failure of Defendant to appropriately warn and inform the EPA has resulted in the directions for use that are not adequate to protect health and the environment.

85.   By reason of the foregoing acts and omissions, Gordon seeks compensatory damages as a result of Gordon's use of, and exposure to, Roundup which caused or was a substantial contributing factor in causing Gordon to suffer from cancer, specifically NHL, and Gordon suffered severe and personal injuries which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life.

86.   By reason of the foregoing, Gordon is severely and permanently injured.

87.   By reason of the foregoing acts and omissions, Gordon has endured and, in some categories continues to suffer, emotional and mental anguish, medical expenses, and other economic and non-

Case MDL No. 2741   Document 1859-3   Filed 06/16/20   Page 21 of 41
Case 7:20-cv-00158   Document 1-2   Filed on 06/15/20 in TXSD   Page 21 of 41

Electronically Filed
5/11/2020 1:05 AM
Hidalgo County District Clerks
Reviewed By: Armando Cantu

C-1581-20-E

economic damages, as a result of the actions and inactions of the Defendant.

## PLAINTIFF'S EXPOSURE TO ROUNDUP

88. Gordon used Roundup consecutively for 28 years. Gordon began using Roundup at a business location starting in late 1985, spraying Roundup 4 to 8 times per year through 1994, when the business was sold. However, Gordon also used Roundup at his residence 4 to 8 times per years from 1985 through 2013, when the residence was sold.

89. Gordon's use of Roundup was regularly between 8 and 15 times a year from 1985 through 1994, and between 4 and 8 times a year between 1995 and 2013. At all times, Gordon followed all safety and precautionary warnings during the course of use.

90. Gordon was subsequently diagnosed with Large Diffuse B-cell NHL in November 2018.

91. Gordon's NHL developed as a result of his exposure to Roundup. As a result of his injury, Plaintiff has incurred significant economic and non-economic damages.

## EQUITABLE TOLLING OF APPLICABLE STATUTE OF LIMITATIONS

92. Gordon incorporates by reference all prior paragraphs of this Complaint as if fully set forth herein.

93. To the extent there is any question as to the timeline of the filing of this action, the running of any statute of limitations has been tolled by reason of Defendant's fraudulent concealment. Defendant, through affirmative misrepresentations and omissions, actively concealed from Plaintiff the true risks associated with Roundup and glyphosate.

94. At all relevant times, Defendant has maintained that Roundup is safe, non-toxic, and non-carcinogenic.

95. As a result of Defendant's actions, Gordon was unaware, and could not reasonably have known or have learned through

19

Electronically Filed
5/11/2020 1:05 AM
Hidalgo County District Clerks
Reviewed By: Armando Cantu

**C-1581-20-E**

reasonable diligence, that Roundup and/or glyphosate contact exposed him to the risks alleged herein and that those risks were the direct and proximate result of Defendant's acts and omissions.

96.  Furthermore, Defendant is estopped from relying on any statute of limitations because of its fraudulent concealment of the true character, quality and nature of Roundup. Defendant was under a duty to disclose the true character, quality, and nature of Roundup because this was non-public information over which Defendant had and continues to have exclusive control, and because Defendant knew that this information was not available to Gordon or to distributors of Roundup. In addition, Defendant is estopped from relying on any statute of limitations because of their intentional concealment of these facts.

97.  Gordon had no knowledge that Defendant was engaged in the wrongdoing alleged herein. Because of the fraudulent acts of concealment of wrongdoing by Defendant, Gordon could not have reasonably discovered the wrongdoing at any time prior. Also, the economics of this fraud should be considered. Defendant had the ability to and did spend enormous amounts of money in furtherance of its purpose of marketing, promoting and/or distributing a profitable herbicide, notwithstanding the known or reasonably known risks. Gordon and medical professionals could not have afforded and could not have possibly conducted studies to determine the nature, extent, and identity of related health risks, and were forced to rely on only the Defendant's representations. Accordingly, Defendant is precluded by the discovery rule and/or the doctrine of fraudulent concealment from relying upon any statute of limitations.

Electronically Filed
9/17/2020 1:05 AM
Hidalgo County District Clerks
Reviewed By: Armando Cantu

**C-1581-20-E**

## V. CAUSES OF ACTION

### A. NEGLIGENCE AND GROSS NEGLIGENCE

98.  Gordon incorporates by reference each and every allegation of this Petition contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

99.  Defendant had a duty to exercise reasonable care in the designing, researching, testing, manufacturing, marketing, supplying, promoting, packaging, sale, and/or distribution of Roundup into the stream of commerce, including a duty to assure that the product would not cause users, such as Gordon, to suffer unreasonable, dangerous side effects.

100. Defendant failed to exercise ordinary care in the designing, researching, testing, manufacturing, marketing, supplying, promoting, packaging, sale, testing, quality assurance, quality control, and/or distribution of Roundup into interstate commerce in that Defendants knew or should have known that using Roundup created a high risk of unreasonable, dangerous side effects, including, but not limited to, the development of NHL, as well as other severe and personal injuries which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life, as well as need for lifelong medical treatment, monitoring, and/or medications. Such acts and/or omissions by Defendant were negligent and/or rose to the level of gross negligence. Gordon would show that Defendant's conduct constitutes a reckless disregard for the rights of Roundup's users, and Gordon in particular, and/or was the result of conscious indifference to the rights, welfare and safety of consumers, and Gordon in particular.

Electronically Filed
5/11/2020 1:05 AM
Hidalgo County District Clerks
Reviewed By: Armando Cantu

**C-1581-20-E**

101. The negligence by the Defendant, its agents, servants, and/or employees, included but was not limited to the following acts and/or omissions:

a. Manufacturing, producing, promoting, formulating, creating, and/or designing Roundup without thoroughly testing it;

b. Failing to test Roundup and/or failing to adequately, sufficiently, and properly test Roundup;

c. Not conducting sufficient testing programs to determine whether or not Roundup was safe for use in that Defendant herein knew or should have known that Roundup was unsafe and unfit for use by reason of the dangers to its users;

d. Not conducting sufficient testing programs and studies to determine Roundup's carcinogenic properties even after Defendant had knowledge that Roundup is, was, or could be carcinogenic;

e. Failing to conduct sufficient testing programs to determine the safety of "inert" ingredients and/or adjuvants contained within Roundup, and the propensity of these ingredients to render Roundup toxic, increase the toxicity of Roundup, whether these ingredients are carcinogenic, magnify the carcinogenic properties of Roundup, and whether or not "inert" ingredients and/or adjuvants were safe for use;

f. Negligently failing to adequately and correctly warn the Plaintiff, the public, the medical and agricultural professions, and the EPA of the dangers of Roundup;

g. Negligently failing to petition the EPA to strength the warnings associated with Roundup;

22

Electronically Filed
9/11/2020 1:05 AM
Hidalgo County District Clerks
Reviewed By: Armando Cantu

**C-1581-20-E**

h. Failing to provide adequate cautions and warnings to protect the health of users, handlers, applicators, and persons who would reasonably and foreseeably come into contact with Roundup;

i. Negligently marketing, advertising, and recommending the use of Roundup without sufficient knowledge as to its dangerous propensities;

j. Negligently representing that Roundup was safe for use for its intended purpose, and/or that Roundup was safer than ordinary and common items such as table salt, when, in fact, it was unsafe;

k. Negligently representing that Roundup had equivalent safety and efficacy as other forms of herbicides;

l. Negligently designing Roundup in a manner, which was dangerous to its users;

m. Negligently manufacturing Roundup in a manner, which was dangerous to its users;

n. Negligently producing Roundup in a manner, which was dangerous to its users;

o. Negligently formulating Roundup in a manner, which was dangerous to its users;

p. Concealing information from Gordon and the general public while knowing that Roundup was unsafe, dangerous, and/or non-conforming with EPA regulations;

q. Improperly concealing and/or misrepresenting information from the Plaintiff, scientific and medical professionals, and/or the EPA, concerning the severity of risks and dangers of Roundup compared to other forms of herbicides; and,

r. Negligently selling Roundup with a false and misleading label.

Electronically Filed
9/11/2020 1:05 AM
Hidalgo County District Clerks
Reviewed By: Armando Cantu

**C-1581-20-E**

102. Defendant under-reported, underestimated, and downplayed the serious dangers of Roundup.

103. Defendant negligently and deceptively compared the safety risks and/or dangers of Roundup with common everyday foods such as table salt, and other forms of herbicides.

104. Defendant was negligent and/or violated Texas law in the designing, researching, supplying, manufacturing, promoting, packaging, distributing, testing, advertising, warning, marketing, and selling of Roundup in that they:

a. Failed to use ordinary care in designing and manufacturing Roundup so as to avoid the aforementioned risks to individuals when Roundup was used as an herbicide;

b. Failed to accompany their product with proper and/or accurate warnings regarding all possible adverse side effects associated with the use of Roundup;

c. Failed to accompany their product with proper warnings regarding all possible adverse side effects concerning the failure and/or malfunction of Roundup;

d. Failed to accompany their product with accurate warnings regarding the risks of all possible adverse side effects concerning Roundup;

e. Failed to warn Plaintiff of the severity and duration of such adverse effects, as the warnings given did not accurately reflect the symptoms, or severity of the side effects including, but not limited to, the development of NHL;

f. Failed to conduct adequate testing, clinical testing and post-marketing surveillance to determine the safety of Roundup;

24

Case MDL No. 2741   Document 18593   Filed 06/16/20   Page 278 of 745

Case 7:20-cv-00158   Document 1-2   Filed on 06/15/20 in TXSD   Page 27 of 40

Electronically Filed
4/17/2020 1:05 AM
Hidalgo County District Clerks
Reviewed By: Armando Cantu

**C-1581-20-E**

g. Failed to conduct adequate testing, clinical testing, and post-marketing surveillance to determine the safety of Roundup's "inert" ingredients and/or adjuvants;

h. Negligently misrepresented the evidence of Roundup's genotoxicity and carcinogenicity; and,

i. Were otherwise careless and/or negligent.

105. Despite the fact that Defendant knew or should have known that Roundup caused, or could cause, unreasonably dangerous side effects, Defendants continued and continue to market, manufacture, distribute, and/or sell Roundup to consumers, including Gordon.

106. Defendant knew or should have known that consumers such as Gordon would foreseeably suffer injury as a result of Defendant's failure to exercise ordinary care, as set forth above.

107. Defendant's violations of Texas law and/or negligence were the proximate cause of Gordon's injuries, harm and economic loss, which Gordon suffered and will continue to suffer.

108. As a result of the foregoing acts and omissions, Gordon suffered from serious and dangerous side effects including, but not limited to NHL, as well as other severe and personal injuries which are permanent and lasting in nature, physical pain and mental anguish, diminished enjoyment of life, and financial expenses for hospitalization and medical care. Further, Gordon suffered life-threatening NHL, and severe personal injuries, which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life.

109. As a result of Defendant's negligence, Gordon respectfully requests that this Court enter judgment in Gordon's favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all relief as this Court deems just and proper.

Electronically Filed
9/17/2020 1:05 AM
Hidalgo County District Clerks
Reviewed By: Armando Cantu

**C-1581-20-E**

## B. STRICT PRODUCTS LIABILITY – DESIGN DEFECT

110. Gordon incorporates by reference each and every allegation of this Petition contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

111. At all times herein mentioned, the Defendant designed, researched, manufactured, tested, advertised, promoted, sold, distributed, and/or have acquired the Defendant who have designed, researched, tested, advertised, promoted, marketed, sold, and distributed Roundup as hereinabove described that was used by Gordon.

112. Roundup was expected to and did reach the usual consumers, handlers, and persons coming into contact with said product without substantial change in the condition in which it was produced, manufactured, sold, distributed, and marketed by the Defendant.

113. At those times, Roundup was in an unsafe, defective, and inherently dangerous condition, which was dangerous to users, and in particular, Gordon.

114. Roundup as designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed by Defendant was defective in design or formulation in that, when it left the hands of the manufacturer and/or suppliers, the foreseeable risks exceeded the benefits associated with the design or formulation of Roundup.

115. Roundup as designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed by Defendant was defective in design and/or formulation, in that, when it left the hands of the Defendant manufacturer and/or supplier, it was unreasonably dangerous, unreasonably dangerous in normal use, and it was more dangerous than an ordinary consumer would expect.

26

Electronically Filed
5/11/2020 1:05 AM
Hidalgo County District Clerks
Reviewed By: Armando Cantu

C-1581-20-E

116. At all times herein mentioned, Roundup was in a defective condition and unsafe, and Defendant knew or had reason to know that said product was defective and unsafe, especially when used in the form and manner as provided by the Defendant. In particular, Roundup was defective in the following ways:

a. When placed in the stream of commerce, Roundup products were defective in design and formulation and, consequently, dangerous to an extent beyond that which an ordinary consumer would anticipate;

b. When placed in the stream of commerce, Roundup products were unreasonably dangerous in that they were hazardous and posed a grave risk of cancer and other serious illnesses when used in a reasonably anticipated manner;

c. When placed in the stream of commerce, Roundup products contained unreasonably dangerous design defects and were not reasonably safe when used in a reasonably anticipated manner;

d. Defendant did not sufficiently test, investigate, or study its Roundup products;

e. Exposure to Roundup presents a risk of harmful side effects that outweigh any potential utility stemming from the use of the herbicide;

f. Defendant knew or should have known at the time of marketing its Roundup products that exposure to Roundup and could result in cancer and other severe illnesses and injuries; and,

g. Defendant did not conduct adequate post-marketing surveillance of its Roundup products.

Electronically Filed
9/11/2020 1:05 AM
Hidalgo County District Clerks
Reviewed By: Armando Cantu

**C-1581-20-E**

117. Defendant knew, or should have known that at all times herein mentioned its Roundup was in a defective condition, and was and is inherently dangerous and unsafe.

118. Gordon was exposed to Roundup, as described above, without knowledge of Roundup's dangerous characteristics.

119. At the time of Gordon's use of and exposure to Roundup, Roundup was being used for the purposes and in a manner normally intended, as a broad-spectrum herbicide.

120. Defendant, with this knowledge, voluntarily designed Roundup with a dangerous condition for use by the public, and in particular, Gordon.

121. Defendant had a duty to create a product that was not unreasonably dangerous for its normal, intended use.

122. Defendant created a product that was and is unreasonably dangerous for its normal, intended use.

123. Defendant marketed and promoted a product in such a manner so as to make it inherently defective as the product downplayed its suspected, probable, and established health risks inherent with its normal, intended use.

124. Roundup as designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed by Defendant was manufactured defectively in that Roundup left the hands of Defendant in a defective condition and was unreasonably dangerous to its intended users.

125. Roundup as designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed by Defendant reached its intended users in the same defective and unreasonably dangerous condition in which Roundup was manufactured.

126. Defendant designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed a defective product, which created an unreasonable risk to the health of

28

Electronically Filed
6/11/2020 1:05 AM
Hidalgo County District Clerks
Reviewed By: Armando Cantu

**C-1581-20-E**

consumers, and to Gordon in particular, and Defendant is therefore strictly liable for the injuries sustained by Gordon.

127. Gordon could not, by the exercise of reasonable care, have discovered Roundup's defects herein mentioned or perceived its danger.

128. By reason of the foregoing, the Defendant has become strictly liable to Gordon for the manufacturing, marketing, promoting, distribution, and selling of a defective product, namely Roundup.

129. Defendant's defective design, of Roundup amounts to willful, wanton, and/or reckless conduct by Defendant.

130. Defects in Roundup were the cause or a substantial factor in causing Gordon's injuries.

131. As a result of the foregoing acts and omission, Gordon developed Large Diffuse B-cell NHL, and suffered severe and personal injuries, which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life, and financial expenses for hospitalization and medical care.

132. Gordon respectfully requests that this Court enter judgment in Gordon's favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all relief as this Court deems just and proper.

## C. STRICT PRODUCTS LIABILITY – FAILURE TO WARN

133. Gordon incorporates by reference each and every allegation of this Petition contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

134. Defendant has engaged in the business of selling, testing, distributing, supplying, manufacturing, marketing, and/or promoting Roundup, and through that conduct have knowingly and

Electronically Filed
5/11/2020 1:05 AM
Hidalgo County District Clerks
Reviewed By: Armando Cantu

C-1581-20-E

intentionally placed Roundup into the stream of commerce with full knowledge that it reaches consumers, such as Gordon, who are exposed to it through ordinary and reasonably foreseeable uses.

135. Defendant did in fact sell, distribute, supply, manufacture, and/or promote Roundup to Gordon. Additionally, Defendant expected the Roundup that they were selling, distributing, supplying, manufacturing, and/or promoting to reach – and Roundup did in fact reach – consumers, including Gordon, without any substantial change in the condition of the product from when it was initially distributed by Defendant.

136. At the time of manufacture, Defendant could have provided the warnings or instructions regarding the full and complete risks of Roundup and glyphosate-containing products because it knew or should have known of the unreasonable risks of harm associated with the use of and/or exposure to such products.

137. At all times herein mentioned, Roundup was defective and unsafe in manufacture such that it was unreasonably dangerous to the user, and was so at the time it was distributed by Defendant and at the time Gordon was exposed to Roundup. The defective condition of Roundup was due in part to the fact that it was not accompanied by proper warnings regarding its carcinogenic qualities and possible side effects, including, but not limited to, developing non-Hodgkin's lymphoma as a result of exposure and use.

138. Roundup did not contain a warning or caution statement, which was necessary and, if complied with, was adequate to protect health those exposed in violation of 7 U.S.C. § 136j(a)(1)€.

139. Defendant's failure to include a warning or caution statement which was necessary and, if complied with, was adequate to protect the health of those exposed, violated 7 U.S.C. § 136j(a)(1)€ as well as the laws of the State of Texas.

Case 7:20-cv-00158 Document 1-2 Filed on 06/15/20 in TXSD Page 33 of 41

Case MDL No. 2741 Document 1859-3 Filed 06/16/20 Page 33 of 41

Electronically Filed
9/17/2020 1:05 AM
Hidalgo County District Clerks
Reviewed By: Armando Cantu

C-1581-20-E

140. Defendant could have amended the label of Roundup to provide additional warnings.

141. This defect caused serious injury to Gordon, who used Roundup in its intended and foreseeable manner.

142. At all times herein mentioned, Defendant had a duty to properly design, manufacture, compound, test, inspect, package, label, distribute, market, examine, maintain supply, provide proper warnings, and take such steps to assure that the product did not cause users to suffer from unreasonable and dangerous side effects.

143. Defendant labeled, distributed, and promoted the aforesaid product that it was dangerous and unsafe for the use and purpose for which it was intended.

144. Defendant failed to warn of the nature and scope of the side effects associated with Roundup, namely its carcinogenic properties and its propensity to cause or serve as a substantial contributing factor in the development of NHL.

145. Defendant was aware of the probable consequences of the aforesaid conduct. Despite the fact that Defendant knew or should have known that Roundup caused serious injuries, Defendant failed to exercise reasonable care to warn of the dangerous carcinogenic properties and side effect of developing NHL from Roundup exposure, even though these side effects were known or reasonably scientifically knowable at the time of distribution. Defendant willfully and deliberately failed to avoid the consequences associated with their failure to warn, and in doing so, Defendant acted with a conscious disregard for the safety of Gordon.

146. At the time of exposure, Gordon could not have reasonably discovered any defect in Roundup prior through the exercise of reasonable care.

Electronically Filed
5/11/2020 1:05 AM
Hidalgo County District Clerks
Reviewed By: Armando Cantu

**C-1581-20-E**

147. Defendant, as the manufacturer and/or distributor of the subject product, are held to the level of knowledge of an expert in the field.

148. Plaintiff reasonably relied upon the skill, superior knowledge, and judgment of Defendant.

149. Had Defendant properly disclosed the risks associated with Roundup, Gordon would have avoided the risk of NHL by not using Roundup.

150. The information that Defendant did provide or communicate failed to contain adequate warnings and precautions that would have enabled Gordon, and similarly situated individuals, to utilize the product safely and with adequate protection. Instead, Defendant disseminated information that was inaccurate, false, and misleading and which failed to communicate accurately or adequately the comparative severity, duration, and extent of the risk of injuries associated with use of and/or exposure to Roundup and glyphosate; continued to promote the efficacy of Roundup, even after it knew or should have known of the unreasonable risks from use or exposure; and concealed, downplayed, or otherwise suppressed, through aggressive marketing and promotion, any information or research about the risks and dangers of exposure to Roundup and glyphosate.

151. To this day, Defendant has failed to adequately warn of the true risks of Gordon's injuries associated with the use of and exposure to Roundup.

152. As a result of their inadequate warnings, Roundup products were defective and unreasonably dangerous when they left the possession and/or control of Defendant, were distributed by Defendant, and used by Gordon.

153. As a direct and proximate result of Defendant's actions or omissions as alleged herein, and in such other ways to be later

32

Electronically Filed
9/11/2020 1:05 AM
Hidalgo County District Clerks
Reviewed By: Armando Cantu

**C-1581-20-E**

shown, the subject product caused Gordon to sustain injuries as herein alleged. Gordon developed Large Diffuse B-cell NHL, and suffered severe and personal injuries, which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life, and financial expenses for hospitalization and medical care.

154. Gordon respectfully requests that this Court enter judgment in Gordon's favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all relief as this Court deems just and proper.

### D. BREACH OF IMPLIED WARRANTIES

155. Gordon incorporates by reference each and every allegation of this Petition contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

156. At all times herein mentioned, the Defendant manufactured, distributed, compounded, recommended, merchandized, advertised, promoted, and sold Roundup and/or have recently acquired the Defendant who has manufactured, distributed, compounded, recommended, merchandized, advertised, promoted, and sold Roundup, as a broad spectrum herbicide. These actions were under the ultimate control and supervision of Defendant.

157. At the time Defendant marketed, sold, and distributed Roundup for use by Gordon, Defendant knew of Roundup's intended use and impliedly warranted the product to be or merchantable quality and safe and fit for this use.

158. Defendant impliedly represented and warranted to Gordon and users of Roundup, the agricultural community, and/or the EPA that Roundup was safe and of merchantable quality and fit for the ordinary purpose for which it was to be used.

Electronically Filed
3/11/2020 1:05 AM
Hidalgo County District Clerks
Reviewed By: Armando Cantu

**C-1581-20-E**

159. These representations and warranties were false, misleading, and inaccurate in that Roundup was unsafe, unreasonably dangerous, not of merchantable quality, and defective.

160. Gordon and/or the EPA relied on said implied warranty of merchantability of fitness for particular use and purpose.

161. Gordon reasonably relied upon the skill and judgment of Defendant as to whether Roundup was of merchantable quality and safe and fit for its intended use.

162. Roundup was injected into the stream of commerce by the Defendant in a defective, unsafe, and inherently dangerous condition, and the products' materials were expected to and did reach users, handlers, and persons coming into contact with said products without substantial change in the condition in which they were sold.

163. Defendant breached the aforesaid implied warranties, as their herbicide Roundup was not fit for its intended purposes and uses.

164. As a result of the foregoing acts and omissions, Gordon suffered from Large Diffuse B-cell NHL and Gordon suffered severe and personal injuries which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life, financial expenses for hospitalization and medical care, including medical expenses and other economic, and non-economic damages.

165. Gordon respectfully requests that this Court enter judgment in Gordon's favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all relief as this Court deems just and proper.

Electronically Filed
4/1/2020 1:05 AM
Hidalgo County District Clerks
Reviewed By: Armando Cantu

**C-1581-20-E**

### E. BREACH OF EXPRESS WARRANTIES

166. Gordon incorporates by reference each and every allegation of this Petition contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

167. At all relevant and material times herein mentioned, Defendant manufactured, distributed, compounded, recommended, merchandized, advertised, promoted, and sold Roundup.

168. At all relevant and material times herein mentioned, Defendant intended that Roundup be used in the manner in which Gordon used it, and Defendant expressly warranted that Roundup was safe and fit for use by consumers, including Gordon, that it was of merchantable quality, that its health and side effects were minimal, and that it was adequately tested and fit for its intended use.

169. At all relevant and material times, Defendant was aware that consumers, including Gordon, would use Roundup; which is to say that Gordon was a foreseeable user of Roundup.

170. Based upon these representations and warranties herein described above, Gordon purchased Roundup as manufactured, distributed, compounded, recommended, merchandized, advertised, promoted, and sold by Defendant.

171. Roundup was expected to reach and did, in fact, reach consumers, including Gordon, without any substantial change in the condition in which it was manufactured, distributed, compounded, recommended, merchandized, advertised, promoted, and sold by Defendant.

172. Defendant expressly warranted to consumers, including Gordon, that Roundup was safe and not dangerous to users.

173. Defendant expressly warranted to consumers, including Gordon, scientists, the agricultural community, and/or the EPA

35

Electronically Filed
3/11/2020 1:55 AM
Hidalgo County District Clerks
Reviewed By: Armando Cantu

**C-1581-20-E**

that Roundup was safe and fit for use for the purpose intended, that it was of merchantable quality, that it did not produce dangerous side effects in excess of those risks associated with other forms of herbicides, that the side effects it did produce were accurately reflected in the warnings, and that it was adequately tested and fit for its intended use.

174. Defendant breached various express warranties with respect to Roundup including the following particulars: 1) as recently as 2015, Defendant stated on its website that"[r]egulatory authorities and independent experts around the world have reviewed numerous long-term/carcinogenicity and genotoxicity studies and agree that there is no evidence that glyphosate, the active ingredient in Roundup brand herbicides and other glyphosate-based herbicides, causes cancer, even at very high doses, and that it is not genotoxic;" 2) prior to 1996, when it agreed to stop making such ridiculous claims, Defendant expressly warranted that Roundup was "safer than table salt;" and, 3) that Roundup was "practically non-toxic."

175. Roundup did not conform to these express representations because Roundup was not safe and, at all relevant and material times, had an increased risk of serious side effects, including NHL, when used according to Defendant's instructions.

176. Defendant fraudulently concealed information from Gordon regarding the true dangers and relative risks of Roundup.

177. The global scientific community is not, and never was, in agreement that Roundup is non-carcinogenic.

178. Gordon relied upon the express warranties of Defendant as related herein.

179. Consumers of Roundup, including Gordon, and members of the agricultural community relied upon the representations and

Electronically Filed
9/1/2020 1:05 AM
Hidalgo County District Clerks
Reviewed By: Armando Cantu

**C-1581-20-E**

warranties of Defendant for use of Roundup in recommending, using, purchasing, mixing, handling, applying, and/or dispensing Roundup.

180. Defendant breached the aforesaid express warranties, as its product was defective.

181. Defendant knew, or should have known, that said representations and warranties were false, misleading, and untrue in that Roundup was not safe and fit for the intended use, and, in fact, produced serious injuries to the users that were not accurately identified and represented by Defendant.

182. Defendant knew, or should have known, that said warranties were false, misleading, and untrue in that there is evidence that Roundup is toxic, genotoxic, and carcinogenic and that scientists and/or regulatory authorities around the world are not in agreement that Roundup is not carcinogenic or genotoxic and it is safe.

183. As a result of the foregoing acts or omissions, Gordon suffered from Large Diffuse B-cell NHL and Gordon suffered severe and personal injuries which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life, financial expenses for hospitalization and medical care, including medical expenses and other economic, and non-economic damages.

184. Gordon respectfully requests that this Court enter judgment in Gordon's favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all relief as this Court deems just and proper.

### VI. JURY DEMAND REQUESTED

28. Plaintiff hereby respectfully demands a trial by jury.

### VII. REQUESTS FOR DISCLOSURE

29. Pursuant to Rule 194 of the Texas Rules of Civil Procedure, you are requested to disclose, within 50 days of service

Electronically Filed
6/11/2020 1:05 AM
Hidalgo County District Clerks
Reviewed By: Armando Cantu

**C-1581-20-E**

of this request, the information or material as set forth in Rule 194.2(a) through (l), inclusive.

### PRAYER FOR RELIEF

WHEREFORE PREMISES CONSIDERED, Gordon requests that Defendant be cited to appear and answer, and that on final trial, Gordon have:

A. All damages requested, including, but not limited to, compensatory damages; economic damages in the form of medical expenses, out of pocket expenses, lost earnings and other economic damages in an amount to be determine at trial of this action; non-economic damages including, but not limited to, pain, suffering, emotional distress, loss of enjoyment of life, past and future damages and other non-economic damages in an amount to be determined at trial of this action;

B. Costs of the suit;

C. Reasonable Attorney's fees for trial and appeal as pleaded;

D. Pre-judgment and post-judgment interest as provided by law;

E. Punitive and/or exemplary damages for the wanton, willful, fraudulent, and reckless acts of the Defendants who demonstrated a complete disregard and reckless indifference for the safety and welfare of the general public and to Gordon in an amount sufficient to punish Defendants and deter future similar conduct, to the extent allowed by applicable law; and,

F. Such other and further relief to which Gordon may be justly entitled.

Respectfully submitted,

JOEL AMOS GORDON, ESQUIRE
Post Office Box 52688
Midland, TX 79710
Phone: (432) 242-4899

38

PLAINTIFF'S ORIGINAL PETITION

Electronically Filed
9/11/2020 1:05 AM
Hidalgo County District Clerks
Reviewed By: Armando Cantu

**C-1581-20-E**

joel@joelgordonlaw.com

By: _____

**Joel Amos Gordon**
**State Bar No. 24086325**
**ATTORNEY FOR PLAINTIFF**

PLAINTIFF'S ORIGINAL PETITION