# U.S. District Court
## Southern District of California (San Diego)
## CIVIL DOCKET FOR CASE #: 3:20-cv-00878-L-RBB

Glatt et al v. Monsanto Company et al
Assigned to: Judge M. James Lorenz
Referred to: Magistrate Judge Ruben B. Brooks
Cause: 28:1346wd Wrongful Death

Date Filed: 05/11/2020
Jury Demand: Plaintiff
Nature of Suit: 365 Personal Inj. Prod. Liability
Jurisdiction: Diversity

**Plaintiff**

**Fredda Glatt**
*individually and as successor in interest to the Estate of Aaron Leon Glatt*

represented by **Shannon Frances Nocon**
Law Offices of Alexander M Schack
16870 West Bernardo Drive
Suite 400
San Diego, CA 92127
858-485-6535
Fax: 858-485-0608
Email: shannonnocon@amslawoffice.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Andrew Glatt**
*an individual*

represented by **Shannon Frances Nocon**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Lisa Glatt**
*an individual*

represented by **Shannon Frances Nocon**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Monsanto Company**

**Defendant**

**John Does 1-50**

| Date Filed | # | Docket Text |
|---|---|---|
| 05/11/2020 | 1 | COMPLAINT With Jury Demand Against Monsanto Company, John Does 1-50, (Filing fee $400.00 receipt number ACASDC-13854935.), filed by Fredda Glatt, Andrew Glatt, Lisa Glatt. (Attachments: # 1 Civil Cover Sheet, # 2 Exhibit) |

| | | The new case number is 3:20-cv-878-L-RBB. Judge M. James Lorenz and Magistrate Judge Ruben B. Brooks are assigned to the case. (Nocon, Shannon)(jxv)(jrd) (Entered: 05/11/2020) |
|---|---|---|
| 05/11/2020 | 2 | Summons Issued. **Counsel receiving this notice electronically should print this summons and serve it in accordance with Rule 4, Fed.R.Civ.P and LR 4.1.** (jxv)(jrd) (Entered: 05/11/2020) |
| 06/19/2020 | 3 | WAIVER OF SERVICE Returned Executed by Fredda Glatt, Andrew Glatt, Lisa Glatt, as to Monsanto Company. (Nocon, Shannon) (Entered: 06/19/2020) |

| PACER Service Center | | |
|---|---|---|
| **Transaction Receipt** | | |
| 06/19/2020 13:31:27 | | |
| **PACER Login:** | hllp1982 | **Client Code:** | 1417.0005 |
| **Description:** | Docket Report | **Search Criteria:** | 3:20-cv-00878-L-RBB |
| **Billable Pages:** | 2 | **Cost:** | 0.20 |

Alexander M. Schack, Esq., Bar No. 99126
Natasha N. Serino, Esq., Bar No. 284711
Shannon F. Nocon, Esq., Bar No. 316523
SCHACK LAW GROUP
16870 West Bernardo Drive, Suite 400
San Diego, CA 92127
Tel: (858) 485-6535 Fax: (858) 485-0608
alexschack@schacklawgroup.com
natashaserino@schacklawgroup.com
shannonnocon@schacklawgroup.com

Attorneys for Plaintiff

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| FREDDA GLATT, individually and as successor in interest to the ESTATE OF AARON LEON GLATT, ANDREW GLATT, an individual; and LISA GLATT, and individual,<br><br>Plaintiffs,<br><br>v.<br><br>MONSANTO COMPANY and JOHN DOES 1-50.<br><br>Defendants. | Case No. _____<br><br>**COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiffs FREDDA GLATT, individually and as Successor in Interest to the ESTATE OF AARON LEON GLATT, ANDREW GLATT, and LISA GLATT ("Plaintiffs"), by and through their attorneys, bring this action against Defendant Monsanto Company and John Does 1-50 ("Defendants"), and alleges as follows:

1

## NATURE OF THE CASE

1. This is an action for damages suffered by Decedent Aaron Leon Glatt, his wife, Fredda Glatt, and their two children, Andrew Glatt and Lisa Glatt as a direct and proximate result of Defendants' negligent and wrongful conduct in connection with the design, development, manufacture, testing, packaging, promoting, marketing, advertising, distribution, labeling, and/or sale of the herbicide Roundup®, containing the active ingredient glyphosate.

2. Plaintiffs Fredda Glatt, Decedent's late wife and successor in interest to the Estate of Aaron Leon Glatt, and their children, Andrew Glatt and Lisa Glatt, maintain that Roundup® and/or glyphosate is defective, dangerous to human health, unfit and unsuitable to be marketed and sold in commerce, and lacked proper warnings and directions as to the dangers associated with its use.

3. Decedent's injuries, like those striking thousands of similarly situated victims across the country, were avoidable.

## PARTIES

4. Plaintiff Fredda Glatt, her late husband, Aaron Leon Glatt (the "Decedent"), and their children, Plaintiffs Andrew Glatt and Lisa Glatt, are and/or were natural persons and at all relevant times residents and citizens of San Diego County, California. Decedent died on January 4, 2019. Plaintiff Fredda Glatt is a successor in interest to the Estate of Aaron Glatt. The Decedent regularly used Roundup on their property for several years. Plaintiffs bring this action pursuant to the applicable wrongful death and survival statutes for injuries sustained by the Decedent as a result of his exposure to Roundup® ("Roundup"). As a direct and proximate result of being exposed to Roundup, the Decedent developed non-Hodgkin's Lymphoma.

5. "Roundup" refers to all formulations of Defendants' roundup products, including, but not limited to, Roundup Concentrate Poison Ivy and

2

Tough Brush Killer 1, Roundup Custom Herbicide, Roundup D-Pak herbicide, Roundup Dry Concentrate, Roundup Export Herbicide, Roundup Fence & Hard Edger 1, Roundup Garden Foam Weed & Grass Killer, Roundup Grass and Weed Killer, Roundup Herbicide, Roundup Original 2k herbicide, Roundup Original II Herbicide, Roundup Pro Concentrate, Roundup Prodry Herbicide, Roundup Promax, Roundup Quik Stik Grass and Weed Killer, Roundup Quikpro Herbicide, Roundup Rainfast Concentrate Weed & Grass Killer, Roundup Rainfast Super Concentrate Weed & Grass Killer, Roundup Ready-to-Use Extended Control Weed & Grass Killer 1 Plus Weed Preventer, Roundup Ready-to-Use Weed & Grass Killer, Roundup Ready-to- Use Weed and Grass Killer 2, Roundup Ultra Dry, Roundup Ultra Herbicide, Roundup Ultramax, Roundup VM Herbicide, Roundup Weed & Grass Killer Concentrate, Roundup Weed & Grass Killer Concentrate Plus, Roundup Weed & Grass killer Ready-to-Use Plus, Roundup Weed & Grass Killer Super Concentrate, Roundup Weed & Grass Killer1 Ready-to-Use, Roundup WSD Water Soluble Dry Herbicide Deploy Dry Herbicide, or any other formulation of containing the active ingredient glyphosate.

6.      Defendant MONSANTO COMPANY is a Delaware corporation, Calif. Secretary of State Entity No. C2362863, in "active" status, with a principle place of business in St. Louis, Missouri.

7.      Upon best information and belief, Defendants JOHN DOES 1-50 are subsidiaries, partners, or other entities that were involved in the design, development, manufacture, testing, packaging, promoting, marketing, advertising, distribution, labeling, and/or sale of the herbicide Roundup, containing the active ingredient glyphosate. The identities of JOHN DOES 1-50 are unknown to Plaintiffs at this time. Plaintiffs will move the Court to specifically name JOHN DOES 1- 50 as their identities becomes known to Plaintiffs through discovery.

8.      Defendant MONSANTO COMPANY and JOHN DOES 1-50 are

COMPLAINT AND DEMAND FOR JURY TRIAL

collectively referred to as "Monsanto Defendants" or "Defendants.

9.      Defendants advertise and sell goods, specifically Roundup, in San Diego County, California.

10.     Defendants transacted and conducted business within the State of California that relates to the allegations in this Complaint.

11.     Defendants derived substantial revenue from goods and products used in the State of California.

12.     Defendants expected or should have expected their acts to have consequences within the State of California, and derived substantial revenue from interstate commerce.

13.     Defendants engaged in the business of designing, developing, manufacturing, testing, packaging, marketing, distributing, labeling, and/or selling Roundup.

14.     Defendants are authorized to do business in California and derive substantial income from doing business in this state.

15.     Upon information and belief, Defendants purposefully availed themselves of the privilege of conducting activities with the State of California, thus invoking the benefits and protections of its laws.

16.     Upon information and belief, Defendants did act together to design, sell, advertise, manufacture and/or distribute Roundup, with full knowledge of its dangerous and defective nature.

## JURISDICTION AND VENUE

17.     This Court has jurisdiction over Defendants and this action pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship between Plaintiffs and Defendants. Defendants are all either incorporated and/or have their principal place of business outside of the state in which the Plaintiffs reside.

18.     The amount in controversy between Plaintiffs and Defendants

4

exceeds $75,000, exclusive of interest and cost

19.     This Court has personal jurisdiction over Monsanto insofar as Monsanto is authorized and licensed to conduct business in the State of California, maintains and carries on systematic and continuous contacts in this judicial district, regularly transacts business within this judicial district, and regularly avails itself of the benefits of this judicial district. Additionally, Monsanto caused tortious injury by acts and omissions in the judicial district and caused tortious injury in this district by acts and omissions outside this district while regularly doing and soliciting business, engaging in a persistent course of conduct, and deriving substantial revenue from goods used or consumed and services rendered in this judicial district.

20.     The Court also has supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

21.     Venue is proper within this district pursuant to 28 U.S.C. § 1391 in that Defendants conduct business here and are subject to personal jurisdiction in this district. Furthermore, Defendants sell, market, and/or distribute Roundup® within the District of California. Also, a substantial part of the acts and/or omissions giving rise to these claims occurred within this district.

## WRONGFUL DEATH AND SURVIVORSHIP ALLEGATIONS

22.     Plaintiffs Fredda Glatt, Andrew Glatt and Lisa Glatt are competent adults and the surviving spouse and children of Aaron Leon Glatt, deceased ("Decedent"). Plaintiff Fredda Glatt brings this action as a successor in interest to the Estate of Aaron Glatt and individually as the surviving spouse of Decedent for damages and injuries to, and the wrongful death of, the Decedent. Plaintiffs Andrew Glatt and Lisa Glatt bring this action individually as children of Decedent for the wrongful death of Decedent.

23.     Plaintiffs bring this action pursuant to the applicable wrongful death

5

1  and survival statutes.

2      24.    The survivors and heirs at law of the Decedent and their relationship

3  to the Decedent are:

4                    Name                              Relationship

5                                            Wife and Successor in
6            Fredda Glatt                    Interest of the Estate of
                                             Aaron Glatt
7
             Andrew Glatt                            Son
8
              Lisa Glatt                          Daughter
9

10     25.    On January 4, 2019, the Decedent died as a result of complications

11  associated with Roundup-induced cancer. Attached hereto as Exhibit 1 to the

12  Declaration of Fredda Glatt is a copy of the Decedent's death certificate.

13     26.    Pursuant to California Code of Civil Procedure § 337.32, attached

14  hereto as Exhibit A is a declaration by Fredda Glatt, a successor in interest of the

15  Estate of Aaron Glatt.

16

17                          **FACTUAL ALLEGATIONS**

18     27.    At all relevant times, Defendants were in the business of, and did,

19  design, research, manufacture, test, advertise, promote, market, sell, distribute,

20  and/or have acquired and are responsible for Defendants who have designed,

21  researched, manufactured, tested, advertised, promoted, marketed, sold, and

22  distributed the commercial herbicide Roundup.

23     28.    Monsanto is a multinational agricultural biotechnology corporation

24  based in St. Louis, Missouri. It is the world's leading producer of glyphosate.

25     29.    Defendants discovered the herbicidal properties of glyphosate during

26  the 1970's and subsequently began to design, research, manufacture, sell and

27  distribute glyphosate based "Roundup" as a broad-spectrum herbicide.

28

                                        6

30.     Glyphosate is the active ingredient in Roundup.

31.     Glyphosate is a broad-spectrum herbicide used to kill weeds and grasses known to compete with commercial crops grown around the globe.

32.     Glyphosate is a "non-selective" herbicide, meaning it kills indiscriminately based only on whether a given organism produces a specific enzyme, 5-enolpyruvylshikimic acid-3-phosphate synthase, known as EPSP synthase.

33.     Glyphosate inhibits the enzyme 5-enolpyruvylshikimic acid-3-phosphate synthase that interferes with the shikimic pathway in plants, resulting in the accumulation of shikimic acid in plant tissue and ultimately plant death.

34.     Sprayed as a liquid, plants absorb glyphosate directly through their leaves, stems, and roots, and detectable quantities accumulate in the plant tissues.

35.     Each year, approximately 250 million pounds of glyphosate are sprayed on crops, commercial nurseries, suburban lawns, parks, and golf courses. This increase in use has been driven largely by the proliferation of genetically engineered crops, crops specifically tailored to resist the activity of glyphosate.

36.     Defendants are intimately involved in the development, design, manufacture, marketing, sale, and/or distribution of genetically modified ("GMO") crops, many of which are marketed as being resistant to Roundup *i.e.,* "Roundup Ready®." As of 2009, Defendants were the world's leading producer of seeds designed to be Roundup Ready®. In 2010, an estimated 70% of corn and cotton, and 90% of soybean fields in the United States contained Roundup Ready® seeds.

37.     The original Roundup, containing the active ingredient glyphosate, was introduced in 1974. Today, glyphosate products are among the worlds most widely used herbicides. Monsanto's glyphosate products are registered in more than 130 countries and are approved for weed control in more than 100 crops. No

7

other herbicide active ingredient compares in terms of number of approved uses.[1]

38.     For nearly 40 years, farmers across the globe have used Roundup, unaware of its carcinogenic properties.

### REGISTRATION OF HERBICIDES UNDER FEDERAL LAW

39.     The manufacture, formulation and distribution of herbicides, such as Roundup, are regulated under the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA"), 7. U.S.C. § 136 *et seq*. FIFRA requires that all pesticides be registered with the Environmental Protection Agency ("EPA) prior to their distribution, sale, or use, except as described by FIFRA 7 U.S.C. 136a(a).

40.     The EPA requires as part of the registration process, among other requirements, a variety of tests to evaluate the potential for exposure to pesticides, toxicity to people and other potential non-target organisms, and other adverse effects on the environment. Registration by the EPA, however, is not an assurance or finding of safety. The determination the EPA makes in registering or re-registering a product is not that the product is "safe," but rather that use of the product in accordance with its label directions "will not generally cause unreasonable adverse effects on the environment." 7 U.S.C. § 136(a)(c)(5)(D).

41.     FIFRA defines "unreasonable adverse effects on the environment" to mean "any unreasonable risk to man or the environment, taking into account the economic, social, and environmental costs and benefits of the use of any pesticide." 7 U.S.C. § 136(bb). FIFRA thus requires the EPA to make a risk/benefit analysis in determining whether a registration should be granted or allowed to continue to be sold in commerce.

42.     The EPA and the State of California registered Roundup for distribution, sale, and manufacture in the United States and the State of

---

[1] *Backgrounder*, History of Monsanto's Glyphosate Herbicides, June 2005.

COMPLAINT AND DEMAND FOR JURY TRIAL

California.

43.     FIFRA generally requires that the registrant, Monsanto, conduct health and safety testing of pesticide products. The government is not required, nor is it able, to perform the product tests that are required of the manufacturer.

44.     The evaluation of each pesticide product distributed, sold, or manufactured is completed at the time the product is initially registered. The data necessary for registration of a pesticide has changed over time. The EPA is now in the process of re-evaluating all pesticide products through a Congressionally-mandated process called "re-registration." 7 U.S.C. § 136a-1. In order to reevaluate these pesticides, the EPA demands the completion of additional tests and the submission of data for the EPA's review and evaluation.

45.     In the case of glyphosate and Roundup, the EPA had planned on releasing its preliminary risk assessment – in relation to the registration process – no later than July 2015. The EPA completed its review of glyphosate in early 2015, but delayed releasing the assessment pending further review in light of the World Health Organization's findings.

## MONSANTO'S FALSE REPRESENTATIONS REGARDING THE SAFETY OF ROUNDUP®

46.     In 1996, the New York Attorney General ("NYAG") filed a lawsuit against Monsanto based on its false and misleading advertising of Roundup products. Specifically, the lawsuit challenged Monsanto's general representations that its spray-on glyphosate-based herbicides, including Roundup, were "safer **than table salt"** and "practically **non-toxic"** to mammals, birds, and fish. Among the representations the NYAG found deceptive and misleading about the human and environmental safety of Roundup are the following:

> a) Remember that environmentally friendly Roundup herbicide is biodegradable. It won't build up in the soil so you can use Roundup with confidence along

9

customers' driveways, sidewalks and fences ...

b) And remember that Roundup is biodegradable and won't build up in the soil. That will give you the environmental confidence you need to use Roundup everywhere you've got a weed, brush, edging or trimming problem.

c) Roundup biodegrades into naturally occurring elements.

d) Remember that versatile Roundup herbicide stays where you put it. That means there's no washing or leaching to harm customers' shrubs or other desirable vegetation.

e) This non-residual herbicide will not wash or leach in the soil. It ... stays where you apply it.

f) You can apply Accord with "confidence because it will stay where you put it" it bonds tightly to soil particles, preventing leaching. Then, soon after application, soil microorganisms biodegrade Accord into natural products.

g) Glyphosate is less toxic to rats than table salt following acute oral ingestion.

h) Glyphosate's safety margin is much greater than required. It has over a 1,000-fold safety margin in food and over a 700-fold safety margin for workers who manufacture it or use it.

i) You can feel good about using herbicides by Monsanto. They carry a toxicity category rating of 'practically non-toxic' as it pertains to mammals, birds and fish.

j) "Roundup can be used where kids and pets will play and breaks down into natural material." This ad

10

depicts a person with his head in the ground and a pet dog standing in an area which has been treated with Roundup.[2]

47. On November 19, 1996, Monsanto entered into an Assurance of Discontinuance with NYAG, in which Monsanto agreed, among other things, "to cease and desist from publishing or broadcasting any advertisements [in New York] that represent, directly or by implication" that:

    a) its glyphosate-containing pesticide products or any component thereof are safe, non-toxic, harmless or free from risk.

                    ***

    b) its glyphosate-containing pesticide products or any component thereof manufactured, formulated, distributed or sold by Monsanto are biodegradable

                    ***

    c) its glyphosate-containing pesticide products or any component thereof stay where they are applied under all circumstances and will not move through the environment by any means.

                    ***

    d) its glyphosate-containing pesticide products or any component thereof are "good" for the environment or are "known for their environmental characteristics."

                    ***

    e) glyphosate-containing pesticide products or any

---

[2] Attorney General of the State of New York, In the Matter of Monsanto Company, Assurance of Discontinuance Pursuant to Executive Law § 63(15) (Nov. 1996).

11

component thereof are safer or less toxic than common consumer products other than herbicides;

\*\*\*

f) its glyphosate-containing products or any component thereof might be classified as "practically non-toxic.

48. Monsanto did not alter its advertising in the same manner in any state other than New York, and on information and belief still has not done so today.

49. In 2009, France's highest court ruled that Monsanto had not told the truth about the safety of Roundup. The French court affirmed an earlier judgment that Monsanto had falsely advertised its herbicide Roundup as "biodegradable" and that it "left the soil clean."[3]

## EVIDENCE OF CARCINOGENICITY IN ROUNDUP

50. As early as the 1980's Monsanto was aware of glyphosate's carcinogenic properties.

51. On March 4, 1985, a group of the Environmental Protection Agency's ("EPA") Toxicology Branch published a memorandum classifying glyphosate as a Category C oncogene.[4] Category C oncogenes are possible human carcinogens with limited evidence of carcinogenicity.

52. In 1986, the EPA issued a Registration Standard for glyphosate (NTIS PB87-103214). The Registration standard required additional phytotoxicity, environmental fate, toxicology, product chemistry, and residue

---

[3] *Monsanto Guilty in 'False Ad' Row,* BBC, Oct. 15, 2009, *available at* http://news.bbc.co.uk/2/hi/europe/8308903.stm.
[4] Consensus Review of Glyphosate, Casewell No. 661A. March 4, 1985. United States Environmental Protection Agency.

chemistry studies. All of the data required was submitted and reviewed and/or waived.[5]

53.     In October 1991, the EPA published a Memorandum entitled "Second Peer Review of Glyphosate." The memorandum changed glyphosate's classification to Group E (evidence of non- carcinogenicity for humans). Two peer review committee members did not concur with the conclusions of the committee and one member refused to sign.[6]

54.     In addition to the toxicity of the active molecule, many studies support the hypothesis that glyphosate formulations found in Defendants' Roundup products are more dangerous and toxic than glyphosate alone.[7] As early as 1991 evidence existed demonstrating that glyphosate formulations were significantly more toxic than glyphosate alone. [8]

55.     In 2002, Julie Marc published a study entitled "Pesticide Roundup Provokes Cell Division Dysfunction at the Level of CDK1/Cyclin B Activation."

56.     The study found that Defendants' Roundup caused delays in the cell cycles of sea urchins, while the same concentrations of glyphosate alone proved ineffective and did not alter cell cycles.

57.     In 2004, Julie Marc published a study entitled "Glyphosate-based pesticides affect cell cycle regulation." The study demonstrated a molecular link between glyphosate-based products and cell cycle dysregulation.

58.     The study noted that "cell-cycle dysregulation is a hallmark of tumor cells and human cancer. Failure in the cell-cycle checkpoints leads to genomic instability and subsequent development of cancers from the initial affected cell."

---

[5] http://www.epa.gov/oppsrrd1/reregistration/REDs/factsheets/0178fact.pdf
[6] Second Peer Review of Glyphosate, CAS No. 1071-83-6. October 30, 1881. United States Environmental Protection Agency.
[7] Martinez et al. 2007; Benachour 2009; Gasnier et al. 2010; Peixoto 2005; Marc 2004
[8] Martinez et al 1991

13

Further, "[s]ince cell cycle disorders such as cancer result from dysfunction of unique cell, it was of interest to evaluate the threshold dose of glyphosate affecting cells." [9]

59. In 2005, Francisco Peixoto published a study showing that Roundup's effects on rat liver mitochondria are much more toxic and harmful than the same concentrations of glyphosate alone.

60. The Peixoto study suggested that the harmful effects of Roundup on mitochondrial bioenergetics could not be exclusively attributed to glyphosate and could be the result of other chemicals, namely the surfactant POEA, or alternatively due to the possible synergy between glyphosate and Roundup formulation products.

61. In 2009, Nora Benachour and Gilles-Eric Seralini published a study examining the effects of Roundup and glyphosate on human umbilical, embryonic, and placental cells.

62. The study used dilution levels of Roundup and glyphosate far below agricultural recommendations, corresponding with low levels of residues in food. The study concluded that supposed "inert" ingredients, and possibly POEA, change human cell permeability and amplify toxicity of glyphosate alone. The study further suggested that determinations of glyphosate toxicity should take into account the presence of adjuvants, or those chemicals used in the formulation of the complete pesticide. The study confirmed that the adjuvants in Roundup are not inert and that Roundup is always more toxic than its active ingredient glyphosate.

63. The results of these studies were confirmed in recently published peer-reviewed studies and were at all times available and/or known to

---

[9] (Molinari, 2000; Stewart et al., 2003)

14

Defendants.

64.     Defendants knew or should have known that Roundup is more toxic than glyphosate alone and that safety studies on Roundup, Roundup's adjuvants and "inert" ingredients, and/or the surfactant POEA were necessary to protect Decedent from Roundup.

65.     Defendants knew or should have known that tests limited to Roundup's active ingredient glyphosate were insufficient to prove the safety of Roundup.

66.     Defendants failed to appropriately and adequately test Roundup, Roundup's adjuvants and "inert" ingredients, and/or the surfactant POEA to protect Decedent from Roundup.

67.     Rather than performing appropriate tests, Defendants relied upon flawed industry-supported studies designed to protect Defendants' economic interests rather than Decedent and the consuming public.

68.     Despite their knowledge that Roundup was considerably more dangerous than glyphosate alone, Defendants continued to promote Roundup as safe.

## IARC CLASSIFICATION OF GLYPHOSATE

69.     The International Agency for Research on Cancer ("IARC") is the specialized intergovernmental cancer agency the World Health Organization ("WHO") of the United Nations tasked with conducting and coordinating research into the causes of cancer.

70.     An IARC Advisory Group to Recommend Priorities for IARC Monographs during 2015–2019 met in April 2014. Though nominations for the review were solicited, a substance must meet two criteria to be eligible for review by the IARC Monographs: there must already be some evidence of

15

carcinogenicity of the substance, and there must be evidence that humans are exposed to the substance.

71. IARC set glyphosate for review in 2015-2016. IARC uses five criteria for determining priority in reviewing chemicals. The substance must have a potential for direct impact on public health; scientific literature to support suspicion of carcinogenicity; evidence of significant human exposure; high public interest and/or potential to bring clarity to a controversial area and/or reduce public anxiety or concern; related agents similar to one given high priority by the above considerations. Data reviewed is sourced preferably from publicly accessible, peer-reviewed data.

72. On March 24, 2015, after its cumulative review of human, animal, and DNA studies for more than one (1) year, many of which have been in Defendants' possession since as early as 1985, the IARC's working group published its conclusion that the glyphosate contained in Defendants' Roundup herbicide, is a Class 2A "probable carcinogen" as demonstrated by the mechanistic evidence of carcinogenicity in humans and sufficient evidence of carcinogenicity in animals.

73. The IARC's full Monograph was published on July 29, 2015 and established glyphosate as a class 2A *probable* carcinogen to humans. According to the authors glyphosate demonstrated sufficient mechanistic evidence (genotoxicity and oxidative stress) to warrant a 2A classification based on evidence of carcinogenicity in humans and animals.

74. The IARC Working Group found an increased risk between exposure to glyphosate and non-Hodgkin's lymphoma ("NHL") and several subtypes of NHL, and the increased risk continued after adjustment for other pesticides.

75. The IARC also found that glyphosate caused DNA and chromosomal

COMPLAINT AND DEMAND FOR JURY TRIAL

damage in human cells.

## **EARLIER EVIDENCE OF GLYPHOSATE'S DANGER**

76.     Despite the new classification by the IARC, Defendants have had ample evidence of glyphosate and Roundup's genotoxic properties for decades.

77.     Genotoxicity refers to chemical agents that are capable of damaging the DNA within a cell through genetic mutations, which is a process that is believed to lead to cancer.

78.     In 1997, Chris Clements published "Genotoxicity of select herbicides in *Rana catesbeiana* tadpoles using the alkaline single-cell gel DNA electrophoresis (comet) assay."

79.     The study found that tadpoles exposed to Roundup showed significant DNA damage when compared with unexposed control animals.

80.     Both human and animal studies have shown that glyphosate and glyphosate-based formulations such as Roundup can induce oxidative stress.

81.     Oxidative stress and associated chronic inflammation are believed to be involved in carcinogenesis.

82.     The IARC Monograph notes that "[s]trong evidence exists that glyphosate, AMPA and glyphosate-based formulations can induce oxidative stress."

83.     In 2006 César Paz-y-Miño published a study examining DNA damage in human subjects exposed to glyphosate.

84.     The study produced evidence of chromosomal damage in blood cells showing significantly greater damage after exposure to glyphosate than before in the same individuals, suggesting that the glyphosate formulation used during aerial spraying had a genotoxic effect on exposed individuals.

85.     The IARC Monograph reflects the volume of evidence of glyphosate

17

pesticides' genotoxicity noting "[t]he evidence for genotoxicity caused by glyphosate-based formulations is strong."

86. Despite knowledge to the contrary, Defendants maintain that there is no evidence that Roundup is genotoxic, that regulatory authorities and independent experts are in agreement that Roundup is not genotoxic, and that there is no evidence that Roundup is genotoxic.

87. In addition to glyphosate and Roundup's genotoxic properties, Defendants have long been aware of glyphosate's carcinogenic properties.

88. Glyphosate and Roundup in particular have long been associated with carcinogenicity and the development of numerous forms of cancer, including, but not limited to, non-Hodgkin's lymphoma, Hodgkin's lymphoma, multiple myeloma, and soft tissue sarcoma.

89. Defendants have known of this association since the early to mid-1980s and numerous human and animal studies have evidenced the carcinogenicity of glyphosate and/or Roundup.

90. In 1985 the EPA studied the effects of glyphosate in mice finding a dose related response in male mice linked to renal tubal adenomas, a rare tumor. The study concluded the glyphosate was oncogenic.

91. In 2003 Lennart Hardell and Mikael Eriksson published the results of two case controlled studies on pesticides as a risk factor for NHL and hairy cell leukemia.

92. The study concluded that glyphosate had the most significant relationship to NHL among all herbicides studies with an increased odds ratio of 3.11.

93. In 2003 AJ De Roos published a study examining the pooled data of mid-western farmers, examining pesticides and herbicides as risk factors for NHL.

COMPLAINT AND DEMAND FOR JURY TRIAL

94.     The study, which controlled for potential confounders, found a relationship between increased NHL incidence and glyphosate.

95.     In 2008 Mikael Eriksson published a study a population based case-control study of exposure to various pesticides as a risk factor for NHL.

96.     This strengthened previous associations between glyphosate and NHL.

97.     In spite of this knowledge, Defendants continued to issue broad and sweeping statements suggesting that Roundup was, and is, safer than ordinary household items such as table salt, despite a lack of scientific support for the accuracy and validity of these statements and, in fact, voluminous evidence to the contrary.

98.     Upon information and belief, these statements and representations have been made with the intent of inducing Decedent, the agricultural community, and the public at large to purchase, and increase the use of, Defendants' Roundup for Defendants' pecuniary gain, and in fact did induce Decedent to use Roundup.

99.     Defendants made these statements with complete disregard and reckless indifference to the safety of Decedent and the general public.

100.    Notwithstanding Defendants' representations, scientific evidence has established a clear association between glyphosate and genotoxicity, inflammation, and an increased risk of many cancers, including, but not limited to, NHL, Multiple Myeloma, and soft tissue sarcoma.

101.    Defendants knew or should have known that glyphosate is associated with an increased risk of developing cancer, including, but not limited to, NHL, Multiple Myeloma, and soft tissue sarcomas.

102.    Defendants failed to appropriately and adequately inform and warn Decedent of the serious and dangerous risks associated with the use of and

19

exposure to glyphosate and/or Roundup including, but not limited to, the risk of developing NHL, as well as other severe and personal injuries, which are permanent and/or long-lasting in nature, cause significant physical pain and mental anguish, diminished enjoyment of life, and the need for medical treatment, monitoring and/or medications.

103. Despite the IARC's classification of glyphosate as a class 2A probable carcinogen, Defendants continue to maintain that glyphosate and/or Roundup is safe, non-carcinogenic, non- genotoxic, and falsely warrant to users and the general public that independent experts and regulatory agencies agree that there is no evidence of carcinogenicity or genotoxicity in glyphosate and Roundup.

104. Defendants have claimed and continue to claim that Roundup is safe, non-carcinogenic, and non-genotoxic.

105. Monsanto claims on its website that "[r]egulatory authorities and independent experts around the world have reviewed numerous long-term/carcinogenicity and genotoxicity studies and agree that there is no evidence that glyphosate, the active ingredient in Roundup brand herbicides and other glyphosate-based herbicides, causes cancer, even at very high doses, and that it is not genotoxic".[10]

106. Ironically, the primary source for this statement is a 1986 report by the WHO, the same organization that now considers glyphosate to be a probable carcinogen.

107. Glyphosate, and Defendants' Roundup products in particular, have long been associated with serious side effects and many regulatory agencies around the globe have banned or are currently banning the use of glyphosate

---

[10] Backgrounder - Glyphosate: No Evidence of Carcinogenicity. Updated November 2014. (downloaded October 9 2015)

herbicide products.

108. Defendants' statements proclaiming the safety of Roundup and disregarding its dangers misled Decedent.

109. Despite Defendants' knowledge that Roundup was associated with an elevated risk of developing cancer, Defendants' promotional campaigns focused on Roundup's purported "safety profile."

110. Defendants' failure to adequately warn Decedent resulted in (1) Decedent using and being exposed to glyphosate instead of using another acceptable and safe method of controlling unwanted weeds and pests; and (2) scientists and physicians failing to warn and instruct consumers about the risk of cancer, including NHL, and other injuries associated with Roundup.

111. Defendants failed to seek modification of the labeling of Roundup to include relevant information regarding the risks and dangers associated with Roundup exposure.

112. The failure of Defendants to appropriately warn and inform the EPA has resulted in inadequate warnings in safety information presented directly to users and consumers.

113. The failure of Defendants to appropriately warn and inform the EPA has resulted in the absence of warning or caution statements that are adequate to protect health and the environment.

114. The failure of Defendants to appropriately warn and inform the EPA has resulted in the directions for use that are not adequate to protect health and the environment.

115. By reason of the foregoing acts and omissions, Plaintiffs seek compensatory damages as a result of Decedent's use of, and exposure to, Roundup which caused or was a substantial contributing factor in causing Decedent to suffer from cancer, specifically NHL, and resulted in his death.

COMPLAINT AND DEMAND FOR JURY TRIAL

116.  By reason of the foregoing, Decedent's life was cut short and the lives of his wife, Fredda Glatt, and children, Andrew Glatt and Lisa Glatt, are severely and permanently injured.

117.  By reason of the foregoing acts and omissions, Decedent and his heirs have endured and, in some categories continues to suffer, emotional and mental anguish, medical expenses, and other economic and non-economic damages, as a result of the actions and inactions of the Defendants.

## THE DECEDENT'S EXPOSURE TO ROUNDUP

118.  Decedent Aaron Leon Glatt used Roundup to control weeds on his property.

119.  For many years, Decedent sprayed Roundup on a regular basis. Decedent followed all safety and precautionary warnings during the course of use.

120.  Decedent was subsequently diagnosed with Non-Hodgkin Lymphoma and died on January 4, 2019.

121.  As a result of Decedent's injury and death, Plaintiffs have incurred significant economic and non-economic damages.

## EQUITABLE TOLLING OF APPLICABLE STATUTE OF LIMITATIONS

122.  Plaintiffs incorporate by reference all prior paragraphs of this Complaint as if fully set forth herein.

123.  The running of any statute of limitations has been tolled by reason of Defendants' fraudulent concealment. Defendants, through their affirmative misrepresentations and omissions, actively concealed from Decedent and Plaintiffs the true risks associated with Roundup and glyphosate. Indeed, even as of October 2015, Defendants continue to represent to the public that "*Scientists are in agreement* that there is *no evidence* glyphosate causes cancer." (emphasis

COMPLAINT AND DEMAND FOR JURY TRIAL

added)[11]

124.    As a result of Defendants' actions, Decedent was unaware, and could not reasonably know or have learned through reasonable diligence that Roundup and/or glyphosate contact, exposed Decedent to the risks alleged herein and that those risks were the direct and proximate result of Defendants' acts and omissions.

125.    Furthermore, Defendants are estopped from relying on any statute of limitations because of their fraudulent concealment of the true character, quality and nature of Roundup. Defendants were under a duty to disclose the true character, quality, and nature of Roundup because this was non-public information over which Defendants had and continue to have exclusive control, and because Defendants knew that this information was not available to Decedent or to distributors of Roundup. In addition, Defendants are estopped from relying on any statute of limitations because of their intentional concealment of these facts.

126.    Decedent and Plaintiffs had no knowledge that Defendants were engaged in the wrongdoing alleged herein. Because of the fraudulent acts of concealment of wrongdoing by Defendants, Decedent and Plaintiffs could not have reasonably discovered the wrongdoing at any time prior. Also, the economics of this fraud should be considered. Defendants had the ability to and did spend enormous amounts of money in furtherance of their purpose of marketing, promoting and/or distributing a profitable herbicide, notwithstanding the known or reasonably known risks. Decedent, Plaintiffs and medical professionals could not have afforded and could not have possibly conducted studies to determine the nature, extent, and identity of related health risks, and

---

[11] _Backgrounder - Glyphosate: No Evidence of Carcinogenicity._ Updated November 2014. (downloaded October 9 2015)

were forced to rely on only the Defendants' representations. Accordingly, Defendants are precluded by the discovery rule and/or the doctrine of fraudulent concealment from relying upon any statute of limitations.

### FIRST CAUSE OF ACTION
**Negligence – Wrongful Death and Survival Action**
**(Against Defendant and DOES 1 through 50, Inclusive)**

127.    Plaintiffs repeat, reiterate, and re-allege each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

128.    Defendants had a duty to exercise reasonable care in the designing, researching, testing, manufacturing, marketing, supplying, promoting, packaging, sale, and/or distribution of Roundup into the stream of commerce, including a duty to assure that the product would not cause users to suffer unreasonable, dangerous side effects.

129.    Defendants failed to exercise ordinary care in the designing, researching, testing, manufacturing, marketing, supplying, promoting, packaging, sale, testing, quality assurance, quality control, and/or distribution of Roundup into interstate commerce in that Defendants knew or should have known that using Roundup created a high risk of unreasonable, dangerous side effects, including, but not limited to, the development of NHL, as well as other severe and personal injuries which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life, as well as need for lifelong medical treatment, monitoring, and/or medications.

130.    The negligence by the Defendants, their agents, servants, and/or employees, included but was not limited to the following acts and/or omissions:

a.    Manufacturing, producing, promoting, formulating, creating, and/or designing Roundup without thoroughly testing it;

b.    Failing to test Roundup and/or failing to adequately,

24

1    sufficiently, and properly test Roundup;

2
     c.    Not conducting sufficient testing programs to determine
3    whether or not Roundup was safe for use; in that Defendants herein knew
     or should have known that Roundup was unsafe and unfit for use by reason
4    of the dangers to its users;

5
     d.    Not conducting sufficient testing programs and studies to
6    determine Roundup's carcinogenic properties even after Defendants had
7    knowledge that Roundup is, was, or could be carcinogenic;

8
     e.    Failing to conduct sufficient testing programs to determine the
9    safety of "inert" ingredients and/or adjuvants contained within Roundup,
     and the propensity of these ingredients to render Roundup toxic, increase
10   the toxicity of Roundup, whether these ingredients are carcinogenic,
11   magnify the carcinogenic properties of Roundup, and whether or not
     "inert" ingredients and/or adjuvants were safe for use;
12

13   f.    Negligently failing to adequately and correctly warn the
14   Decedent, the public, the medical and agricultural professions, and the EPA
     of the dangers of Roundup;
15

16   g.    Negligently failing to petition the EPA to strength the warnings
     associated with Roundup;
17

18   h.    Failing to provide adequate cautions and warnings to protect
19   the health of users, handlers, applicators, and persons who would
     reasonably and foreseeably come into contact with Roundup;
20

21   i.    Negligently marketing, advertising, and recommending the use
     of Roundup without sufficient knowledge as to its dangerous propensities;
22

23   j.    Negligently representing that Roundup was safe for use for its
     intended purpose, and/or that Roundup was safer than ordinary and
24   common items such as table salt, when, in fact, it was unsafe;

25
     k.    Negligently representing that Roundup had equivalent safety
26   and efficacy as other forms of herbicides;

27
     l.    Negligently designing Roundup in a manner, which was
28

25

dangerous to its users;

m. Negligently manufacturing Roundup in a manner, which was dangerous to its users;

n. Negligently producing Roundup in a manner, which was dangerous to its users;

o. Negligently formulating Roundup in a manner, which was dangerous to its users;

p. Concealing information from the Decedent while knowing that Roundup was unsafe, dangerous, and/or non-conforming with EPA regulations; and

q. Improperly concealing and/or misrepresenting information from the Decedent, scientific and medical professionals, and/or the EPA, concerning the severity of risks and dangers of Roundup compared to other forms of herbicides.

r. Negligently selling Roundup with a false and misleading label.

131. Defendants under-reported, underestimated, and downplayed the serious dangers of Roundup.

132. Defendants negligently and deceptively compared the safety risks and/or dangers of Roundup with common everyday foods such as table salt, and other forms of herbicides.

133. Defendants were negligent and/or violated California law in the designing, researching, supplying, manufacturing, promoting, packaging, distributing, testing, advertising, warning, marketing, and selling of Roundup in that they:

a. Failed to use ordinary care in designing and manufacturing Roundup so as to avoid the aforementioned risks to individuals when Roundup was used as an herbicide;

b. Failed to accompany their product with proper and/or accurate warnings regarding all possible adverse side effects associated with the use

26

of Roundup;

      c.    Failed to accompany their product with proper warnings regarding all possible adverse side effects concerning the failure and/or malfunction of Roundup;

      d.    Failed to accompany their product with accurate warnings regarding the risks of all possible adverse side effects concerning Roundup;

      e.    Failed to warn Decedent of the severity and duration of such adverse effects, as the warnings given did not accurately reflect the symptoms, or severity of the side effects including, but not limited to, the development of NHL;

      f.    Failed to conduct adequate testing, clinical testing and post-marketing surveillance to determine the safety of Roundup;

      g.    Failed to conduct adequate testing, clinical testing, and post-marketing surveillance to determine the safety of Roundup's "inert" ingredients and/or adjuvants;

      h.    Negligently misrepresented the evidence of Roundup's genotoxicity and carcinogenicity;

      i.    Were otherwise careless and/or negligent.

134.    Despite the fact that Defendants knew or should have known that Roundup caused, or could cause, unreasonably dangerous side effects, Defendants continued and continue to market, manufacture, distribute, and/or sell Roundup to consumers, including the Decedent.

135.    Defendants knew or should have known that consumers such as the Decedent would foreseeably suffer injury as a result of Defendants' failure to exercise ordinary care, as set forth above.

136.    Defendants' violations of law and/or negligence were the proximate cause of Decedent's and Plaintiffs' injuries, harm and economic loss, which they

COMPLAINT AND DEMAND FOR JURY TRIAL

1    suffered and/or will continue to suffer.

2    137.    As a result of the foregoing acts and omissions, the Decedent
3    suffered from serious and dangerous side effects including, but not limited to,
4    NHL, and ultimately death. Further, Plaintiffs have suffered lasting mental
5    anguish, diminished enjoyment of life and financial expenses for hospitalization
6    and medical care of Decedent.

7    138.    As a direct and proximate result of Defendant placing its defective
8    Roundup products into the stream of commerce, Decedent died and Decedent's
9    heirs, including Plaintiffs, have sustained pecuniary loss resulting from the loss of
10   Decedent's society, comfort, attention, protection, services and support and
11   general damages in a sum in excess of the jurisdictional minimum of this Court.

12   139.    As a direct and proximate result of Defendant's negligence, as
13   alleged herein, there was a measurable and significant interval of time during
14   which Decedent suffered great mental anguish and other personal injury before
15   his death.

16   140.    As a further proximate result of the conduct of Defendant, Plaintiffs
17   have incurred expenses for funeral, burial and other related costs pertaining to
18   Decedent's death, in amounts to be proved at trial.

19   141.    WHEREFORE, Plaintiffs respectfully request that this Court enter
20   judgment in Plaintiffs' favor for compensatory and punitive damages, together
21   with interest, costs herein incurred, attorneys' fees and all relief as this Court
22   deems just and proper. Additionally, Plaintiffs demand a jury trial on all issues
23   contained herein.

24   **SECOND CAUSE OF ACTION**
25   **Strict Products Liability – Design Defect – Wrongful Death and Survival Action**
     **(Against Defendant and DOES 1 through 50, Inclusive)**
26

27   142.    Plaintiffs repeat, reiterate and, re-allege each and every allegation of

28

this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

143. At all times herein mentioned, the Defendants designed, researched, manufactured, tested, advertised, promoted, sold, distributed, and/or have acquired the Defendants who have designed, researched, tested, advertised, promoted, marketed, sold, and distributed Roundup as hereinabove described that was used by the Plaintiffs.

144. Defendants' Roundup was expected to and did reach the usual consumers, handlers, and persons coming into contact with said product without substantial change in the condition in which it was produced, manufactured, sold, distributed, and marketed by the Defendants.

145. At those times, Roundup was in an unsafe, defective, and inherently dangerous condition, which was dangerous to users, and in particular, the Plaintiffs herein.

146. The Roundup designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed by Defendants was defective in design or formulation in that, when it left the hands of the manufacturer and/or suppliers, the foreseeable risks exceeded the benefits associated with the design or formulation of Roundup.

147. The Roundup designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed by Defendants was defective in design and/or formulation, in that, when it left the hands of the Defendants manufacturers and/or suppliers, it was unreasonably dangerous, unreasonably dangerous in normal use, and it was more dangerous than an ordinary consumer would expect.

148. At all times herein mentioned, Roundup was in a defective condition and unsafe, and Defendants knew or had reason to know that said product was

29

defective and unsafe, especially when used in the form and manner as provided by the Defendants. In particular, Defendants' Roundup was defective in the following ways:

a. When placed in the stream of commerce, Defendants' Roundup Products were defective in design and formulation and, consequently, dangerous to an extent beyond that which an ordinary consumer would anticipate.

b. When placed in the stream of commerce, Defendants' Roundup products were unreasonably dangerous in that they were hazardous and posed a grave risk of cancer and other serious illnesses when used in a reasonably anticipated manner.

c. When placed in the stream of commerce, Defendants' Roundup products contained unreasonably dangerous design defects and were not reasonably safe when used in a reasonably anticipated manner.

d. Defendants did not sufficiently test, investigate, or study its Roundup products.

e. Exposure to Roundup presents a risk of harmful side effects that outweigh any potential utility stemming from the use of the herbicide.

f. Defendants new or should have known at the time of marketing its Roundup products that exposure to Roundup and could result in cancer and other severe illnesses and injuries.

g. Defendants did not conduct adequate post-marketing surveillance of its Roundup products.

149. Defendants knew, or should have known, that at all times herein mentioned its Roundup was in a defective condition, and was and is inherently dangerous and unsafe.

150. Decedent was exposed to Defendants' Roundup, as described above, without knowledge of Roundup's dangerous characteristics.

151. At the time of the Decedent's use of and exposure to Roundup,

30

Roundup was being used for the purposes and in a manner normally intended, as a broad-spectrum herbicide.

152.     Defendants with this knowledge voluntarily designed its Roundup with a dangerous condition for use by the public, and in particular the Decedent.

153.     Defendants had a duty to create a product that was not unreasonably dangerous for its normal, intended use.

154.     Defendants created a product that was and is unreasonably dangerous for its normal, intended use.

155.     Defendants marketed and promoted a product in such a manner so as to make it inherently defective as the product downplayed its suspected, probable, and established health risks inherent with its normal, intended use.

156.     The Roundup designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed by Defendants was manufactured defectively in that Roundup left the hands of Defendants in a defective condition and was unreasonably dangerous to its intended users.

157.     The Roundup designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed by Defendants reached their intended users in the same defective and unreasonably dangerous condition in which the Defendants' Roundup was manufactured.

158.     Defendants designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed a defective product, which created an unreasonable risk to the health of consumers and to the Decedent in particular, and Defendants are therefore strictly liable for the injuries sustained by the Decedent and Plaintiff.

159.     Decedent could not, by the exercise of reasonable care, have discovered Roundup's defects herein mentioned or perceived its danger.

160.     By reason of the foregoing, the Defendants have become strictly

COMPLAINT AND DEMAND FOR JURY TRIAL

1  liable to the Decedent and Plaintiffs for the manufacturing, marketing, promoting,
2  distribution, and selling of a defective product, Roundup.

3      161.   Defendants' defective design, of Roundup amounts to willful,
4  wanton, and/or reckless conduct by Defendants.

5      162.   Defects in Defendants' Roundup were the cause or a substantial
6  factor in causing Decedent's injuries.

7      163.   As a result of the foregoing acts and omission, Decedent developed
8  NHL, and suffered severe and personal injuries, which are permanent and lasting
9  in nature, physical pain and mental anguish, including diminished enjoyment of
10  life, and financial expenses for hospitalization and medical care.

11      164.   As a direct and proximate result of Defendant placing its defective
12  Roundup products into the stream of commerce, Decedent died and Decedent's
13  heirs, including Plaintiffs, have sustained pecuniary loss resulting from the loss of
14  Decedent's society, comfort, attention, protection, services and support and
15  general damages in a sum in excess of the jurisdictional minimum of this Court.

16      165.   As a direct and proximate result of Defendant placing its defective
17  Roundup products into the stream of commerce, as alleged herein, there was a
18  measurable and significant interval of time during which Decedent suffered great
19  mental anguish and other personal injury before his death.

20      166.   As a further proximate result of the conduct of Defendant, Plaintiffs
21  have incurred expenses for funeral, burial and other related costs pertaining to
22  Decedent's death, in amounts to be proved at trial.

23      167.   WHEREFORE, Plaintiffs respectfully request that this Court enter
24  judgment in Plaintiffs; favor for compensatory and punitive damages, together
25  with interest, costs herein incurred, attorneys' fees and all relief as this Court
26  deems just and proper. Additionally, Plaintiffs demand a jury trial on all issues
27  contained herein.

28

COMPLAINT AND DEMAND FOR JURY TRIAL

### THIRD CAUSE OF ACTION

**Strict Products Liability–Failure to Warn–Wrongful Death and Survival Action
(Against Defendant and DOES 1 through 50, Inclusive)**

168. Plaintiffs repeat, reiterate and re-allege each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

169. Defendants have engaged in the business of selling, testing, distributing, supplying, manufacturing, marketing, and/or promoting Roundup, and through that conduct have knowingly and intentionally placed Roundup into the stream of commerce with full knowledge that it reaches consumers such as Plaintiffs who are exposed to it through ordinary and reasonably foreseeable uses.

170. Defendants did in fact sell, distribute, supply, manufacture, and/or promote Roundup to Decedent. Additionally, Defendants expected the Roundup that they were selling, distributing, supplying, manufacturing, and/or promoting to reach – and Roundup did in fact reach – consumers, including Plaintiffs, without any substantial change in the condition of the product from when it was initially distributed by Defendants.

171. At the time of manufacture, Defendant could have provided the warnings or instructions regarding the full and complete risks of Roundup and glyphosate-containing products because it knew or should have known of the unreasonable risks of harm associated with the use of and/or exposure to such products.

172. At all times herein mentioned, the aforesaid product was defective and unsafe in manufacture such that it was unreasonably dangerous to the user, and was so at the time it was distributed by Defendants and at the time Decedent was exposed to and/or ingested the product. The defective condition of Roundup was due in part to the fact that it was not accompanied by proper warnings regarding its carcinogenic qualities and possible side effects, including, but not

33

limited to, developing non-Hodgkin's lymphoma as a result of exposure and use.

173.    Roundup did not contain a warning or caution statement, which was necessary and, if complied with, was adequate to protect health those exposed in violation of 7 U.S.C. § 136j(a)(1)(E).

174.    Defendants' failure to include a warning or caution statement which was necessary and, if complied with, was adequate to protect the health of those exposed, violated 7 U.S.C. § 136j(a)(1)(E) as well as the laws of the State of California.

175.    Defendants could have amended the label of Roundup to provide additional warnings.

176.    This defect caused serious injury to Decedent, who used Roundup in its intended and foreseeable manner.

177.    At all times herein mentioned, Defendants had a duty to properly design, manufacture, compound, test, inspect, package, label, distribute, market, examine, maintain supply, provide proper warnings, and take such steps to assure that the product did not cause users to suffer from unreasonable and dangerous side effects.

178.    Defendants labeled, distributed, and promoted the aforesaid product that it was dangerous and unsafe for the use and purpose for which it was intended.

179.    Defendants failed to warn of the nature and scope of the side effects associated with Roundup, namely its carcinogenic properties and its propensity to cause or serve as a substantial contributing factor in the development of NHL.

180.    Defendants were aware of the probable consequences of the aforesaid conduct. Despite the fact that Defendants knew or should have known that Roundup caused serious injuries, Defendants failed to exercise reasonable care to warn of the dangerous carcinogenic properties and side effect of

COMPLAINT AND DEMAND FOR JURY TRIAL

developing NHL from Roundup exposure, even though these side effects were known or reasonably scientifically knowable at the time of distribution. Defendants willfully and deliberately failed to avoid the consequences associated with their failure to warn, and in doing so, Defendants acted with a conscious disregard for the safety of Decedent.

181.    At the time of exposure, Decedent could not have reasonably discovered any defect in Roundup prior through the exercise of reasonable care.

182.    Defendants, as the manufacturers and/or distributors of the subject product, are held to the level of knowledge of an expert in the field.

183.    Decedent reasonably relied upon the skill, superior knowledge, and judgment of Defendants.

184.    Had Defendants properly disclosed the risks associated with Roundup, Decedent would have avoided the risk of NHL by not using Roundup.

185.    The information that Defendants did provide or communicate failed to contain adequate warnings and precautions that would have enabled Decedent, and similarly situated individuals, to utilize the product safely and with adequate protection. Instead, Defendants disseminated information that was inaccurate, false, and misleading and which failed to communicate accurately or adequately the comparative severity, duration, and extent of the risk of injuries associated with use of and/or exposure to Roundup and glyphosate; continued to promote the efficacy of Roundup, even after it knew or should have known of the unreasonable risks from use or exposure; and concealed, downplayed, or otherwise suppressed, through aggressive marketing and promotion, any information or research about the risks and dangers of exposure to Roundup and glyphosate.

186.    To this day, Defendants have failed to adequately warn of the true risks of Decedent's injuries associated with the use of and exposure to Roundup.

COMPLAINT AND DEMAND FOR JURY TRIAL

187. As a result of their inadequate warnings, Defendants' Roundup products were defective and unreasonably dangerous when they left the possession and/or control of Defendant, were distributed by Defendant, and used by Decedent.

188. As a direct and proximate result of Defendants' actions as alleged herein, and in such other ways to be later shown, the subject product caused Decedent to sustain injuries as herein alleged.

189. Defendant is liable to Plaintiffs for injuries caused by its negligent or willful failure, as described above, to provide adequate warnings or other clinically relevant information and data regarding the appropriate use of its products and the risks associated with the use of or exposure to Roundup and glyphosate.

190. As a direct and proximate result of Defendant placing its defective Roundup products into the stream of commerce, Decedent died and Decedent's heirs, including Plaintiffs, have sustained pecuniary loss resulting from the loss of Decedent's society, comfort, attention, protection, services and support and general damages in a sum in excess of the jurisdictional minimum of this Court.

191. As a direct and proximate result of Defendant placing its defective Roundup products into the stream of commerce, as alleged herein, there was a measurable and significant interval of time during which Decedent suffered great mental anguish and other personal injury before his death.

192. As a further proximate result of the conduct of Defendant, Plaintiffs have incurred expenses for funeral, burial and other related costs pertaining to Decedent's death, in amounts to be proved at trial.

193. WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in Plaintiffs' favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all relief as this Court

36

deems just and proper. Additionally, Plaintiffs demand a jury trial on all issues contained herein.

## **FOURTH CAUSE OF ACTION**
### **Breach of Express Warranties – Wrongful Death and Survival Action (Against Defendant and DOES 1 through 50, Inclusive)**

194.    Plaintiffs repeat, reiterate, and re-allege each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

195.    At all times relevant to this litigation, Defendant engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting its Roundup products, which are defective and unreasonably dangerous to consumers, including Decedent, thereby placing Roundup products into the stream of commerce. These actions were under the ultimate control and supervision of Defendant.

196.    Defendant had a duty to exercise reasonable care in the research, development, design, testing, packaging, manufacture, inspection, labeling, distributing, marketing, promotion, sale, and release of its Roundup products, including, but not limited to, a duty to:

   a) Ensure that its products did not cause the user unreasonably dangerous side effects;

   b) Warn of dangerous and potentially fatal side effects; and

   c) Disclose adverse material facts, such as the true risks associated with the use of and exposure to Roundup and glyphosphate-containing products, when making representations to consumers and the general public, including Plaintiff.

197.    As alleged throughout this pleading, the ability of Defendant to properly disclose those risks associated with Roundup is not limited to representations made on the labeling.

COMPLAINT AND DEMAND FOR JURY TRIAL

198.     At all times relevant to this litigation, Defendant expressly represented and warranted to the purchasers of its products, by and through statements made by Defendant in labels, publications, package inserts, and other written materials intended for consumers and the general public, that its Roundup products were safe to human health and the environment, effective, fit, and proper for their intended use. Defendant advertised, labeled, marketed, and promoted Roundup products, representing the quality to consumers and the public in such a way as to induce their purchase or use, thereby making an express warranty that its Roundup products would conform to the representations.

199.     These express representations include incomplete warnings and instructions that purport, but fail, to include the complete array of risks associated with use of and/or exposure to Roundup and glyphosate. Defendant knew and/or should have known that the risks expressly included in Roundup warnings and labels did not and do not accurately or adequately set forth the risks of developing the serious injuries complained of herein. Nevertheless, Defendant expressly represented that its Roundup products were safe and effective, that they were safe and effective for use by individuals such as the Decedent, and/or that they were safe and effective as agricultural herbicides.

200.     The representations about Roundup, as set forth herein, contained or constitute affirmations of fact or promises made by the seller to the buyer, which related to the goods and became part of the basis of the bargain, creating an express warranty that the goods would conform to the representations.

201.     Defendant placed its Roundup products into the stream of commerce for sale and recommended their use to consumers and the public without adequately warning of the true risks of developing the injuries associated with the use of and exposure to Roundup and its active ingredient glyphosate.

202.     Defendant breached these warranties because, among other things,

38

its Roundup products were defective, dangerous, unfit for use, did not contain labels representing the true and adequate nature of the risks associated with their use, and were not merchantable or safe for their intended, ordinary, and foreseeable use and purpose. Specifically, Defendant breached the warranties in the following ways:

a) Defendant represented through its labeling, advertising, and marketing materials that its Roundup products were safe, and fraudulently withheld and concealed information about the risks of serious injury associated with use of and/or exposure to Roundup and glyphosate by expressly limiting the risks associated with use and/or exposure within its warnings and labels; and

b) Defendant represented that its Roundup products were safe for use and fraudulently concealed information that demonstrated that glyphosate, the active ingredient in Roundup, had carcinogenic properties, and that its Roundup products, therefore, were not safer than alternatives available on the market.

203.    The Decedent detrimentally relied on the express warranties and representations of the Defendant concerning the safety and/or risk profile of Roundup in making a decision to purchase the product. Decedent reasonably relied upon Defendant to disclose known defects, risks, dangers, and side effects of Roundup and glyphosate. Decedent would not have purchased or used Roundup had the Defendant properly disclosed the risks associated with the product, either through advertising, labeling, or any other form of disclosure.

204.    Defendant had sole access to material facts concerning the nature of the risks associated with its Roundup products as expressly stated within its warnings and labels, and Defendant knew that consumers and users such as Decedent could not have reasonably discovered that the risks expressly included in Roundup warnings and labels were inadequate and inaccurate.

205.    Decedent had no knowledge of the falsity or incompleteness of Defendant's statements and representations concerning Roundup.

39

206.     Decedent used and/or was exposed to the use of Roundup as researched, developed, designed, tested, manufactured, inspected, labeled, distributed, packaged, marketed, promoted, sold, or otherwise released into the stream of commerce by Defendant.

207.     Had the warnings, labels, advertisements, or promotional material for Roundup products accurately and adequately set forth the true risks associated with the use of such products, including Decedent's injuries, rather than expressly excluding such information and warranting that the products were safe for their intended use, Decedent could have avoided the injuries complained of herein.

208.     As a direct and proximate result of Defendant's breach of express warranty, Decedent died and Decedent's heirs, including Plaintiffs, have sustained pecuniary loss resulting from the loss of Decedent's society, comfort, attention, protection, services, and support and general damages in a sum in excess of the jurisdictional minimum of this Court.

209.     As a proximate result of Defendant's breach of express warranty, as alleged herein, there was a measurable and significant interval of time during which Decedent suffered great mental anguish and other personal injury before his death.

210.     As a further proximate result of the conduct of Defendant, Plaintiffs have incurred expenses for funeral, burial and other related costs pertaining to Decedent's death, in amounts to be proved at trial.

211.     WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in Plaintiffs' favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all relief as this Court deems just and proper. Additionally, Plaintiffs demand a jury trial on all issues contained herein.

COMPLAINT AND DEMAND FOR JURY TRIAL

## FIFTH CAUSE OF ACTION

**Breach of Implied Warranties – Wrongful Death and Survival Action**
**(Against Defendant and DOES 1 through 50, Inclusive)**

212.    Plaintiffs repeat, reiterate, and re-allege each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect all if more fully set forth herein.

213.    At all times herein mentioned, the Defendants manufactured, distributed, compounded, recommended, merchandized, advertised, promoted, and sold Roundup and/or have recently acquired the Defendants who have manufactured, compound portrayed, distributed, recommended, merchandized, advertised, promoted, and sold Roundup, as a broad-spectrum herbicide. These actions were under the ultimate control and supervision of Defendants.

214.    At the time Defendants marketed, sold, and distributed Roundup for use by Decedent, Defendants knew of Roundup's intended use and impliedly warranted the product to be or merchantable quality and safe and fit for this use.

215.    The Defendants impliedly represented and warranted to Decedent and users of Roundup, the agricultural community, and/or the EPA that Roundup was safe and of merchantable quality and fit for the ordinary purpose for which it was to be used.

216.    These representations and warranties were false, misleading, and inaccurate in that Roundup was unsafe, unreasonably dangerous, not of merchantable quality, and defective.

217.    Decedent and/or the EPA did rely on said implied warranty of merchantability of fitness for particular use and purpose.

218.    Decedent reasonably relied upon the skill and judgment of Defendants as to whether Roundup was of merchantable quality and safe and fit for its intended use.

41

219. Roundup was injected into the stream of commerce by the Defendants in a defective, unsafe, and inherently dangerous condition, and the products' materials were expected to and did reach users, handlers, and persons coming into contact with said products without substantial change in the condition in which they were sold.

220. The Defendants breached the aforesaid implied warranties, as their herbicide Roundup was not fit for its intended purposes and uses.

221. As a direct and proximate result of Defendant's breach of implied warranty, Decedent died and Decedent's heirs, including Plaintiffs have sustained pecuniary loss resulting from the loss of Decedent's society, comfort, attention, protection, services and support and general damages in a sum in excess of the jurisdictional minimum of this Court.

222. As a direct and proximate result of Defendant's breach of implied warranty, as alleged herein, there was a measurable and significant interval of time during which Decedent suffered great mental anguish and other personal injury before his death.

223. As a further proximate result of Defendant's breach of implied warranty, Plaintiffs have incurred expenses for funeral, burial and other related costs pertaining to Decedent's death, in amounts to be proved at trial.

224. WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in Plaintiffs' favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all relief as this Court deems just and proper. Additionally, Plaintiffs demand a jury trial on all issues contained herein.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs demand judgment against the Defendants on each of the above-referenced claims and causes of action and as follows:

1. Awarding compensatory damages to Plaintiffs FREDDA GLATT, ANDREW GLATT and LISA GLATT, for non-economic damages suffered, including, but not limited to, loss of love, affection, care, society, service, comfort, support, right to support, companionship, solace or moral support, expectations of future support and counseling, other benefits and assistance of Decedent Aaron Glatt, in an amount in excess of the jurisdictional minimum, according to proof;

2. Awarding compensatory damages to Plaintiffs for funeral and burial expenses suffered by Plaintiffs, according to proof;

3. Awarding compensatory damages to Plaintiffs for economic damages in the form of hospital, medical, professional and incidental expenses, out of pocket expenses, lost earnings and other economic damages suffered by Plaintiffs, according to proof;

4. Awarding compensatory damages to Plaintiffs for past and future damages, including, but not limited to, Plaintiffs' pain and suffering and for severe and permanent personal injuries sustained by the Plaintiffs including health care costs and economic loss;

5. Punitive and/or exemplary damages for the wanton, willful, fraudulent, and reckless acts of the Defendants who demonstrated a complete disregard and reckless indifference for the safety and welfare of the general public and to the Plaintiffs in an amount sufficient to punish Defendants and deter future similar conduct, to the extent allowed by applicable law;

6. Pre-judgment interest;

7. Post-judgment interest;

8. Awarding Plaintiffs reasonable attorneys' fees;

9. Awarding Plaintiffs the costs of these proceedings; and

10. Such other and further relief as this Court deems just and proper.

**JURY DEMAND**

Plaintiffs demand trial by jury on each and every triable issue.

43

Date:  March 31, 2020          Respectfully submitted,

*Shannon Nocon*

Shannon F. Nocon, Esq.
SCHACK LAW GROUP
16870 W. Bernardo Drive, #400
San Diego, CA 92128
(858) 485-6535  (858) 485-0608 fax
shannonnocon@schacklawgroup.com

44