# United States District Court
# Eastern District of Pennsylvania (Philadelphia)
# CIVIL DOCKET FOR CASE #: 2:20-cv-03483-CFK

Spector et al v. MONSANTO COMPANY

Assigned to: HONORABLE CHAD F. KENNEY

Cause: 28:1332 Diversity-Product Liability

Date Filed: 07/15/2020

Jury Demand: Plaintiff

Nature of Suit: 365 P.I.: Personal Inj. Prod. Liability

Jurisdiction: Diversity

**Plaintiff**

**Beth Spector**      represented by   **ROBERT S. MILLER**
WAPNER, NEWMAN, WIGRIZER, BRECHER AND MILLER
2000 MARKET STREET, STE 2750
PHILADELPHIA, PA 19103
215-569-0900
Fax: 215-569-4621
Email: millerr@wnwlaw.com
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Chuck Spector**      represented by   **ROBERT S. MILLER**
*WIFE AND HUSBAND*     (See above for address)
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**MONSANTO COMPANY**

| Date Filed | # | Docket Text |
|---|---|---|
| 07/15/2020 | 1 | COMPLAINT against MONSANTO COMPANY ( Filing fee $ 400 receipt number 0313-14423921.), filed by Beth Spector, Chuck Spector. (Attachments: # 1 Civil Cover Sheet, # 2 Designation Form, # 3 Case Management Track Form)(MILLER, ROBERT) (Entered: 07/15/2020) |
| 07/15/2020 | | DEMAND for Trial by Jury by Beth Spector, Chuck Spector. (tjd) (Entered: 07/16/2020) |
| 07/16/2020 | | Summons Issued as to MONSANTO COMPANY. E-mailed To: ROBERT S. MILLER, ESQ. on 7/16/2020 (dmc, ) (Entered: 07/16/2020) |

| PACER Service Center | | |
|---|---|---|
| Transaction Receipt | | |
| 07/23/2020 15:31:48 | | |

| PACER Login: | hllp1982:2634105:4722683 | Client Code: | 1417.0049 |
|---|---|---|---|
| Description: | Docket Report | Search Criteria: | 2:20-cv-03483-CFK |
| Billable Pages: | 1 | Cost: | 0.10 |

## IN THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **BETH SPECTOR and CHUCK SPECTOR, wife and husband**<br>1718 Sharpless Road<br>Meadowbrook, PA 19046<br><br>Plaintiffs,<br><br>**v.**<br><br>**MONSANTO COMPANY**<br>800 N. Linbergh Boulevard<br>St. Louis, MO 63167<br><br>Defendant. | Civil Action No: _____<br><br><br>JURY TRIAL DEMANDED |

### CIVIL ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiffs, Beth Spector (hereinafter "Plaintiff") and Chuck Spector, by and through the undersigned counsel files this Complaint against Defendant Monsanto Company (hereinafter "Defendant" or Monsanto") and in support thereof avers as follows:

### INTRODUCTION

1. This action arises out of Plaintiff's continued exposure to the herbicide Roundup since the 1980's, which she used regularly around her one and a quarter (1.25) acre family home. Plaintiff sprayed Roundup regularly to control weeds, poison ivy and other brush to maintain her lawns. After all, Defendant promoted Roundup as being harmless to humans. Defendant even went as far as to proclaim that the Roundup was "safe as table salt." The truth, however, is far more insidious. The active chemical ingredient in Roundup (glyphosate) is a carcinogen, and Defendant has known this fact for decades.

2. Because Plaintiff relied on Defendant's misrepresentations, she continued to use Roundup, and unfortunately, in 2008, was diagnosed with Non-Hodgkin's Lymphoma

(hereinafter "NHL"), specifically diffuse large B-cell lymphoma.

3.     Plaintiff would not have used Roundup had she known it could cause cancer.

4.     The International Agency for Research on Cancer ("IARC"), is an entity under the World Health Organization ("WHO").  It conducted an exhaustive analysis on the toxicity of glyphosate. The IARC has already reviewed hundreds of other chemical agents. It convened a panel of seventeen renowned scientists from eleven countries. The year-long study resulted in the publication of an IARC Monograph, the authoritative standard for cancer hazard assessment around the world. The IARC classified glyphosate as a Group 2A Carcinogenic Hazard, meaning it is "possibly carcinogenic to humans." Moreover, the IARC concluded there was a positive association between glyphosate exposure and NHL.  As a result of the IARC glyphosate study, the State of California Office of Environmental Health Hazard Assessment listed glyphosate as a chemical known to State to cause cancer under Proposition 65.

5.     In 1970, Defendant discovered the herbicidal properties of glyphosate and began using it in its products in 1974, marketing it under the brand name "Roundup."

6.     Roundup is a non-selective herbicide used to kill weeds that commonly compete with growing crops. By 2001, glyphosate had become the most actively used ingredient in American agriculture, averaging 85 to 90 million pounds annually. That number grew to 185 million pounds by 2007.

7.     Defendant has represented Roundup as being safe to humans and the environment since it began selling the herbicide. Indeed, Defendant has proclaimed (and continues to proclaim) to the world, and particularly to United States consumers, that glyphosate-based herbicides, including Roundup, create no unreasonable risk to human health or to the environment. This is false. Before glyphosate was first approved by the Environmental

~ 2 ~

Protection Agency ("EPA"), Defendant knew that glyphosate could pose significant risks to human health, including cancer. This lawsuit seeks to hold Defendant accountable for this misconduct.

## PARTIES

8.    Plaintiff Beth Spector is an adult individual who resides in the Commonwealth of Pennsylvania, in the County of Montgomery.

9.    Plaintiff Chuck Spector is an adult individual who resides in the Commonwealth of Pennsylvania, in the County of Montgomery, and is the husband of Beth Spector.

10.    "Roundup" refers to all formulations of Defendants' roundup products, including, but not limited to, Roundup Concentrate Poison Ivy and Tough Brush Killer 1, Roundup Custom Herbicide, Roundup D-Pak herbicide, Roundup Dry Concentrate, Roundup Export Herbicide, Roundup Fence & Hard Edger 1, Roundup Garden Foam Weed & Grass Killer, Roundup Grass and Weed Killer, Roundup Herbicide, Roundup Original 2k herbicide, Roundup Original II Herbicide, Roundup Pro Concentrate, Roundup Prodry Herbicide, Roundup Promax, Roundup Quik Stik Grass and Weed Killer, Roundup Quikpro Herbicide, Roundup Rainfast Concentrate Weed & Grass Killer, Roundup Rainfast Super Concentrate Weed & Grass Killer, Roundup Ready-to-Use Extended Control Weed & Grass Killer 1 Plus Weed Preventer, Roundup Ready-to-Use Weed & Grass Killer, Roundup Ready-to-Use Weed and Grass Killer 2, Roundup Ultra Dry, Roundup Ultra Herbicide, Roundup Ultramax, Roundup VM Herbicide, Roundup Weed & Grass Killer Concentrate, Roundup Weed & Grass Killer Concentrate Plus, Roundup Weed & Grass killer Ready-to-Use Plus, Roundup Weed & Grass Killer Super Concentrate, Roundup Weed & Grass Killerl Ready-to-Use, Roundup WSD Water Soluble Dry Herbicide Deploy Dry Herbicide, or any other

~ 3 ~

formulation of containing the active ingredient glyphosate.

11.     Defendant is a Delaware Corporation with its headquarters and principal place of business in St. Louis, Missouri. It is a registered business corporation in the Commonwealth of Pennsylvania, entity number 2963260.

12.     Defendant is credited for the discovery of the herbicidal properties of glyphosate, and was and is the manufacturer of Roundup.

13.     At all times material hereto, Defendant manufactured, distributed and sold Roundup throughout the United States, including the Commonwealth of Pennsylvania.

14.     At all times materials hereto, Defendant regularly conducted business in the Commonwealth of Pennsylvania through its distribution and sale of Roundup.

## JURISDICTION VENUE

15.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332. There is diversity of citizenship between the parties. Additionally, Plaintiff seeks damages that exceed $75,000.00, exclusive of interests and costs.

16.     This Court has personal jurisdiction because Defendant is authorized and licensed to conduct business in the Commonwealth of Pennsylvania, as it maintains systematic and continuous contacts in this jurisdictional district. Defendant regularly transacts business within this jurisdictional district, and regularly avails itself to the benefits of this jurisdictional district.

17.     This Court also has supplemental jurisdiction pursuant to 18 U.S.C. § 1367.

18.     Additionally, Defendant caused tortious injury by acts and omissions in this judicial district. It caused tortious injury in this district by acts and omissions outside this district, while regularly doing and soliciting business, engaging in a persistent course of conduct, and deriving substantial revenue from goods consumed and services rendered in this

~ 4 ~

jurisdictional district.

19.    Venue is proper pursuant to 28 U.S.C. §1391(b)(2) because a substantial part of the events or omissions giving rise to this action occurred within the jurisdictional district.

### FACTUAL ALLEGATIONS

20.    Glyphosate is a broad-spectrum, non-selective herbicide used in a wide variety of herbicidal products, including but not limited to the popular herbicide, Roundup.

21.    Glyphosate interferes with a plant's ability to form aromatic amino acids necessary for protein synthesis. Plants treated with glyphosate generally die within two to three days. Because plants absorb glyphosate, it cannot be completely removed by washing or peeling produce or by milling, baking or brewing grains.

22.    The herbicidal properties of glyphosate were discovered in 1970 by Monsanto chemist John Franz. The first glyphosate-based herbicide was introduced to the marked in the mid- 1970s under the brand name Roundup.

23.    For about 40 years, consumers around the world have used Roundup, containing glyphosate, without knowledge of the dangers its use poses. When Defendant first introduced Roundup, it touted glyphosate as a technological breakthrough: it could kill almost every weed without causing harm to either people or the environment. History, however, has demonstrated otherwise. According to WHO, the main chemical ingredient of Roundup— glyphosate—is a probable carcinogen. Nonetheless, Defendant assured the public that Roundup was harmless. In order to prove this, Defendant championed falsified data and attacked legitimate studies exposing glyphosate's dangers. Defendant orchestrated a prolonged campaign of misinformation to convince government agencies and the general population that Roundup was safe. As a result of this deception, the public has been exposed to a carcinogen, while Defendant has reaped

billions of dollars in profit.

I.    **Registration of Herbicides**

24.    The manufacture, formulation, and distribution of herbicides such as Roundup is regulated under the Federal Insecticide, Fungicide and Rodenticide Act, ("FIFRA"), 7 U.S.C. §§ 136, *et seq.*   FIFRA requires that all pesticides be registered with the EPA prior to distribution, sale or use, except as described by the Act. 7 U.S.C. §136a(a). Because pesticides are toxic to plants, animals and humans (at least to some degree), the EPA requires that as part of the registration process a variety of tests are performed and reported to evaluate the potential for pesticide exposure, toxicity to people and other non-target organisms, and other adverse environmental effects. Registration by the EPA, however, is not an assurance of a finding of public safety. The EPA does not deem certain products "safe," rather that the use of the product in accordance with its labeled directions "will not generally cause unreasonable adverse effects on the environment." 7 U.S.C. § 136a(c)(5)(D).

25.    FIFRA defines "unreasonable adverse effects on the environment" to mean "any unreasonable risk to humans or the environment, taking into account the economic, social and environmental costs and benefits of the use of any pesticide". 7 U.S.C. §136(bb).   FIFRA thus requires the EPA to conduct a risk/benefit analysis in determining whether a registration should be granted and the pesticide be permitted to be sold in commerce.

26.    FIFRA generally requires that the registrant conduct the health and safety testing of pesticide products. The EPA has protocols governing the conducting of tests required for registration and the related laboratory practices in conducting those tests. The date produced by the registrant must be submitted to the EPA for review and evaluation. The government is not required, nor is it able, to perform the tests that are required of a manufacturer.

27.    The evaluation of each pesticide product manufactured, distributed or sold is completed at the time the product is initially registered. The data necessary for a registration of a pesticide has changed over time. The EPA re-evaluates all pesticide products through a congressionally mandated process called "re-registration." 7 U.S.C. §136a-1. In order to reevaluate these pesticides, the EPA requires the completion of additional tests and the data submission for review and evaluation.

28.    In the case of glyphosate, the EPA planned on releasing its preliminary assessment, in relation to the re-registration process, no later than July 2015. The EPA completed its review of glyphosate in early 2015, but delayed releasing the risk assessment pending further review in light of the WHO health-related findings.

29.    In April 2016, the EPA posted a risk assessment of glyphosate on its website and then immediately retracted it. The EPA subsequently indicated that the posting was inadvertent, that the document posted was not the EPA's final assessment (or even a preliminary one), and that that EPA intended to issue a final report by the end of 2016.

**II.     Scientific Fraud Underlying the Marketing and Sale of Glyphosate**

30.    Based on early studies that glyphosate could cause cancer in laboratory animals, the EPA originally classified glyphosate as possibly carcinogenic to humans (Group C) in 1985. After pressure from Defendant, including contrary studies Defendant provided to the agency, the EPA changed its classification to evidence of non-carcinogenicity in humans (Group E) in 1993. In so classifying glyphosate, the EPA stated that "[it] should be emphasized, however, that designation of an agent in Group E is based on the available evidence at the time of the evaluation and should not be interpreted as a definitive conclusion that the agent will not be a carcinogen under any circumstances."

31.     On two occasions, the EPA found that laboratories hired by Defendant to test the toxicity of its Roundup products for registration purposes committed fraud.

32.     In the first instance, Monsanto hired Industrial Blu-Test Laboratories ("IBT") to perform and evaluate pesticide technology studies relating to Roundup. IBT performed approximately thirty (30) tests on glyphosate and glyphosate-containing products, including nine (9) of the sixteen (16) residue studies needed to register Roundup with the EPA.

33.     In 1976, the Food and Drug Administration ("FDA") performed an inspection of IBT and discovered discrepancies between the raw data and the final report relating to the toxicological impacts of glyphosate. The EPA subsequently audited IBT and determined that the toxicology studies conducted for Roundup here invalid. An EPA reviewer stated, after finding "routine falsification of data" at IBT, that it was "hard to believe the scientific integrity of the studies when they said they took specimens of the uterus from male rabbits." Three top executives were convicted of fraud in 1983.

34.     In the second instance, Defendant hired Craven Laboratories in 1991 to perform pesticide and herbicide studies, including several studies on Roundup. That same year, the owner of Craven Laboratories and three of its employees were indicted and later convicted of fraudulent laboratory practices in the testing of pesticides and herbicides.

**III.     Monsanto's Market Dominance**

35.     The success of Roundup was key to Defendant's continued reputation and dominance in the marketplace. Largely due to the success of Roundup sales, Defendant's agriculture division was outperforming the chemical division's operating income, and that gap increased yearly. But with its patent for glyphosate expiring in the United States in the year 2000, Defendant needed a strategy to maintain its Roundup market dominance and to ward off

impending competitors.

36.     In response, Defendant began the development and sale of genetically engineered "Roundup Ready" Seeds in 1996. Since "Roundup Ready" crops are resistant to glyphosate, farmers can spray Roundup onto their fields during the growing season without harming the crop. This allowed Defendant to further expand its market for Roundup. By 2000, Defendant's biotechnology seeds were planted on more than 80 million acres worldwide. Nearly 70% of American soybeans were planted from "Roundup Ready" Seeds. Defendant secured its dominant share of the glyphosate/Roundup market through a marketing strategy that coupled proprietary "Roundup Ready" Seeds with continued sales of its Roundup herbicide.

37.     Through the three-pronged strategy of (a) increased production; (b) decreased prices; and (c) coupling with "Roundup Ready" Seeds, Roundup became Defendant's most profitable product. In 2000, Roundup accounted for almost $2.8 billion in sales, outselling other herbicides by a margin of five to one, and accounting for close to half of Defendant's sales.

IV.     **Monsanto Falsely Advertised Roundup as Being Safe for Decades**

38.     In 1996, the New York Attorney General ("NYAG") sued Defendant for false and misleading advertising of Roundup products. Specifically, the lawsuit challenged Defendant's general representations that its spray-on glyphosate-based herbicides, including Roundup, were "safer than table salt" and "practically non-toxic" to mammals, birds, and fish. Among the representations the NYAG found deceptive and misleading about the human and environmental safety of Roundup were:

> a.     "Remember that environmentally friendly Roundup herbicide is biodegradable. It won't build up in the soil so you can use Roundup with confidence along customers' driveways, sidewalks and fences."

b.   "And remember that Roundup is biodegradable and won't build up in the soil. That will give you the environmental confidence you need to use Roundup everywhere you've got a weed, brush, edging or trimming problem."

c.   "Roundup biodegrades into naturally occurring elements."

d.   "Remember that versatile Roundup herbicide stays where you put it. That means there's no washing or leaching to harm customers' shrubs or other desirable vegetation."

e.   "This non-residual herbicide will not wash or leach in the soil. It ... stays where you apply it."

f.   You can apply Roundup with "confidence because it will stay where you put it," it bonds tightly to soil particles, preventing leaching. Then, soon after application, soil microorganisms biodegrade Roundup into natural products.

g.   "Glyphosate is less toxic to rats than table salt following acute oral ingestion."

h.   "Glyphosate's safety margin is much greater than required. It has over a 1,000- fold safety margin in food and over a 700-fold safety margin for workers who manufacture it or use it."

i.   "You can feel good about using herbicides by Monsanto. They carry a toxicity category rating of 'practically non-toxic' as it pertains to mammals, birds and fish."

j.   "Roundup can be used where kids and pets will play and breaks down into natural material." This ad depicts a person with his head in the ground and a pet dog standing in an area that has been treated with Roundup.

39.   On November 19, 1996, Defendant entered into an Assurance of Discontinuance

with the NYAG, in which it agreed, amongst other things, "to cease and desist from publishing or

broadcasting any advertisements [in New York] that represent, directly or by implication" that:

a.   glyphosate-containing pesticide products or any component thereof are safe, non- toxic, harmless or free from risk;

b.   glyphosate-containing pesticide products or any component thereof manufactured, formulated, distributed or sold by Monsanto are biodegradable;

c.   glyphosate-containing pesticide products or any component thereof stay where they are applied under all circumstances and will not move through the environment by any means;

d.   glyphosate-containing pesticide products or any component thereof are

"good" for the environment or are "known for their environmental characteristics";

e.     glyphosate-containing pesticide products or any component thereof are safer or less toxic than common consumer products other than herbicides; and,

f.     glyphosate-containing products or any component thereof might be classified as "practically non-toxic."

40.     Defendant did not alter its advertising in the same manner in any state other than New York and, based on information and belief, still has not done so today.

41.     In 2009, France's highest court ruled that Defendant had been deceitful about the safety of Roundup. The French court affirmed an earlier judgment that Defendant had falsely advertised its herbicide Roundup as "biodegradable" and that it "left the soil clean."

## V.     Assessments of Glyphosate and Roundup

42.     IARC was created in 1965 as the specialized cancer agency of the WHO with support of the United States. IARC promotes international collaboration in cancer research, "bringing together skills in epidemiology, laboratory sciences, and biostatistics to identify the causes of cancer[.]"

43.     IARC is a transparent, semi-autonomous body of the WHO. Minutes and documents from its council meetings are publicly available and, thus, are subject to scientific scrutiny. Since 1971, IARC has assessed whether chemicals were carcinogenic through the "Monograph" program.

44.     The IARC process for the classification of glyphosate followed the stringent procedures for the evaluation of a chemical agent. Over time, the IARC Monograph program has reviewed 1,017 agents. Of those reviewed, it has determined 120 agents to be Group 1 (Known Human Carcinogens); 83 agents to be Group 2A (Probable Human Carcinogens); 314 agents to be Group 2B (Possible Human Carcinogens); and 500 agents to be Group 3 (Not Classified).

45.     The established procedure for IARC Monograph evaluations is described in the IARC Programme's Preamble. Evaluations are performed by panels of international experts, selected on the basis of their expertise and the absence of actual or apparent conflicts of interest.

46.     The Monograph meeting is announced one year prior to the meeting date, and there is a call both for data and experts. Eight months before the meeting, an IARC Working Group (hereinafter "Working Group") membership is selected to develop the sections of the Monograph. One month prior to the Monograph meeting, the call for data is closed and the various draft sections are distributed among Working Group members for review and comment. Finally, at the Monograph meeting, the Working Group finalizes review of all literature, evaluates the evidence in each category, and completes the overall evaluation. Within two weeks after the Monograph meeting, the summary of the Working Group findings are published in Lancet Oncology, and within the following year, the final Monograph is finalized and published.

47.     In assessing an agent, the Working Group reviews the following information: (a) human, experimental, and mechanistic data; (b) all pertinent epidemiological studies and cancer bioassays; and (c) representative mechanistic data. The studies must be publicly available and have sufficient detail for meaningful review. Moreover, reviewers cannot be associated with the underlying study.

48.     In March 2015, IARC reassessed glyphosate. The summary published in The Lancet Oncology reported that glyphosate is a Group 2A agent and "probably carcinogenic" in humans.

49.     On July 29, 2015, IARC issued its, Monograph 112 for glyphosate.   17 experts from 11 countries had met from March 3–10, 2015 to assess the carcinogenicity of certain herbicides, including glyphosate. Among the members were Lauren Zeise, Ph.D., of the California

Environmental Protection Agency, Matthew T. Martin, Ph.D, a scientist with the U.S. Environmental Protection Agency, and Gloria D. Jahnke, D.V.M., D.A.B.T. of the National Institute of Environmental Health Sciences.

50. The March 2015 meeting culminated after nearly one year of review and preparation by the IARC Secretariat and the Working Group, including a comprehensive review of the latest scientific evidence. According to published procedures, the Working Group considered "reports that have been published or accepted for publication in the openly available scientific literature" as well as "data from governmental reports that are publicly available."

51. The study considered various exposure groups, including occupational exposure of farmers and tree nursery workers in the United States, forestry workers in Canada and Finland, municipal weed-control workers in the United Kingdom, and para-occupational exposure in farming families.

52. Glyphosate was identified as the second leading household herbicide used in the United States for weed control between 2001 and 2007, and the most heavily used herbicide in the world in 2012.

53. Exposure pathways were identified as air (especially during spraying), water, and food. Community exposure to glyphosate was widespread and found in soil, air, surface water, and groundwater, and food.

54. The assessment of the Working Group identified several case control studies of occupational exposure in the United States, Canada, and Sweden. These studies showed a human health concern from agricultural and other work-related exposure to glyphosate.

55. The Working Group conducted a systematic review of over 15 studies designed to assess whether there was an association between Roundup exposure in agricultural workers

and NHL. The Working Group concluded that despite the limited evidence concerning the carcinogenicity of glyphosate in humans, a "positive association has been observed for non-Hodgkin's lymphoma."

56.     Overall, nine epidemiological studies showed positive associations between glyphosate and NHL, with several studies showing statistically significant relative risks of NHL exceeding 2.0 and even 3.0.

57.     In male CD-1 mice, glyphosate induced a positive trend in the incidence of a rare tumor, renal tubule carcinoma. A second study reported a positive trend for haemangiosarcoma in male mice. Glyphosate increased pancreatic islet-cell adenoma in male rats in two studies. A glyphosate formulation promoted skin tumors in an initiation-promotion study in mice.

58.     The Working Group also found that glyphosate caused DNA and chromosomal damage in human cells. One study in community residents reported increases in blood markers of chromosomal damage (micronuclei) after glyphosate formulations were sprayed. In assessing the genotoxicity of glyphosate (the property of chemical agents that damages the genetic information within a cell causing mutations which may lead to cancer), the Working Group concluded "[t]here is strong evidence that glyphosate causes genotoxicity."

59.     Additionally, the IARC assessed whether glyphosate exposure can induce oxidative stress, which is thought to be involved in the development of numerous conditions, including cancer, autism, and Parkinson's disease. The IARC concluded that "strong evidence exists that glyphosate . . . can induce oxidative stress." This could be an important mechanism by which Roundup causes cancer.[1]

---

[1] In addition to DNA damage and oxidative stress, scientists have suggested Roundup's association with various serious health conditions is linked to the effect Roundup has on the digestive system. Specifically, scientists believe the same mechanism that makes Roundup toxic to weeds also makes it toxic to the microbes within the human gut. When humans are exposed to Roundup, it leads to a chronic

60.     Monograph 112 contains an entire section devoted to exposure to humans, citing studies that examined glyphosate exposures in various settings including those agriculturally-based.   The Working Group noted that glyphosate was detected in the urine of agricultural workers, indicating absorption. Additionally, it noted that soil microbes degrade glyphosate to aminomethylphosphoric acid ("AMPA"). Blood AMPA detection after exposure suggests intestinal microbial metabolism in humans.

61.     The Working Group also reviewed an Agricultural Health Study, consisting of a prospective cohort of 57,311 licensed pesticide applicators in Iowa and North Carolina. While this study differed from others in that it was based on a self-administered questionnaire, the results supported an association between glyphosate exposure and Multiple Myeloma, Hairy Cell Leukemia ("HCL"), and Chronic Lymphocytic Leukemia ("CLL"), in addition to several other cancers.

62.     Even before the IARC's assessment, in 2014, scientists published a systematic review and meta-analysis on the relationship between NHL and occupational exposure to agricultural pesticides (including glyphosate), in the International Journal of Environmental Research and Public Health. The study showed a statistically significant association between farm workers exposed to Roundup and NHL. The study confirmed two smaller studies from 2002 and 2008, published in the Leukemia & Lymphoma (2002) and the International Journal on Cancer (2008).

63.     Other studies, including a glyphosate residue study from the Journal of Environmental & Analytical Toxicology in 2014, indicate that "chronically ill humans showed significantly higher glyphosate residues in urine than healthy population."

inflammatory state in the gut, as well an impaired gut barrier, which can lead to many long-term health effects, including an increased risk of cancer, statistically significant increase in NHL among agricultural workers exposed to glyphosate.

64.     In addition to the studies examining glyphosate, research also suggests that Roundup's carcinogenic properties are magnified by the addition of adjuvants its formulation. Adjuvants are chemicals that are designed to modify or enhance the effects of other agents. Defendant has included adjuvants with glyphosate in its Roundup products, which are designed to increase the effectiveness of the herbicide. Studies show, however, that the addition of adjuvants also greatly increases Roundup's carcinogenic properties.  Notably, Defendant systematically tested glyphosate without the adjuvants and used those test results to lobby to the EPA about the "safety" of Roundup.

65.     Several countries around the world have banned the sale of Roundup and other glyphosate-containing herbicides, both before and after IARC announced its assessment of glyphosate in March 2015.  More countries undoubtedly will follow suit as the dangers of Roundup become more widely known.

66.     The Netherlands issued a ban on all glyphosate-based herbicides in April 2014, including Roundup, which took effect by the end of 2015. In issuing the ban, the Dutch Parliament member who introduced the successful legislation stated: "Agricultural pesticides in user-friendly packaging are sold in abundance to private persons. In garden centers, Roundup is promoted as harmless, but unsuspecting customers have no idea what the risks of this product are. Especially children are sensitive to toxic substances and should therefore not be exposed to it."

67.     The Brazilian Public Prosecutor in the Federal District requested that the Brazilian Justice Department suspend the use of glyphosate.

68.     France banned the private sale of Roundup and glyphosate following the IARC assessment.

69.     Bermuda banned both the private and commercial sale of glyphosate, including

Roundup. Its government explained: "Following a recent scientific study carried out by a leading cancer agency, the importation of weed spray 'Roundup' has been suspended."

70.    The Sri Lankan government banned the private and commercial use of glyphosate out of concern that glyphosate has been linked to fatal kidney disease in agricultural workers.

71.    The government of Colombia announced a ban on using Roundup and glyphosate to destroy illegal plantations of coca, the raw ingredient for cocaine, in response to the IARC's assessment.

72.    In November 2015, 96 prominent experts, including nearly the entire IARC team, reiterated IARC's assessment that Roundup is probably a human carcinogen.

73.    In late February 2016, another 14 scientists signed a consensus statement in the Environmental Health journal, stating regulatory estimates of tolerable exposure levels for glyphosate were based on outdated science.

74.    In June 2016, the European Union parliament refused to re-register glyphosate containing herbicides due to safety concerns.

**VI.    Plaintiff's Exposure to Glyphosate and Discovery Rule; Equitable Estoppel**

75.    Plaintiff used Roundup regularly from the 1980s through 2020 on the outdoor areas of her 1.25 acre family home in Meadowbrook, Pennsylvania.

76.    In 2008, Plaintiff was diagnosed with NHL, specifically diffuse large B-cell lymphoma.

77.    It was not until June 2020 that Plaintiff learned that her NHL was caused by her exposure to Roundup. Prior to this, she was unaware of any connection between Roundup exposure and cancer.

78.    Defendant engaged in two separate but parallel actions including:

~ 17 ~

a.  Affirmatively claiming that Roundup and glyphosate are safe to human users like Plaintiff. It affirmatively denied the probability that Roundup and glyphosate are probably carcinogenic to humans and are linked to blood born cancers including NHL.

b.  Continuing its campaign of denial of the scientific data amassed by the WHO. This continuing denial is designed to cause confusion, create credibility concerns, and cause consumers to continue to use Roundup.

79.     Defendant is equitably estopped to assert a statute of limitations defense. It made, and continues to make, statements intended to be relied upon by the public that Roundup is safe and harmless to humans. Plaintiff relied upon these statements.

80.     Plaintiff did not discover, and did not know of facts that would cause a reasonable person to suspect, the risks associated with the use of and/or exposure to Roundup and glyphosate, nor would a reasonable and diligent investigation by her have disclosed that Roundup and glyphosate would cause her illness. For these reasons, all applicable statutes of limitations have been tolled by operation of the discovery rule and its invocation is estopped by Defendant's actions.

81.     Defendant was under a continuous duty to disclose to consumers, users and other persons coming into contact with its products, including Plaintiff, accurate safety information concerning its products and the risks associated with the use of and/or exposure to Roundup and glyphosate. Instead, Defendant knowingly, affirmatively, and actively concealed safety information concerning Roundup and glyphosate and the risks associated with the use of and/or exposure to its products.

82.     As a proximate result of Defendant's wrongful acts and omissions in placing its defective Roundup products into the stream of commerce without adequate warnings of the hazardous and carcinogenic nature of glyphosate, and in breach of its warranties, negligence and strict liability, Plaintiff has suffered and continues to suffer severe and permanent physical and

emotional injuries. Plaintiff has endured the anguish of a cancer diagnosis, pain and suffering, and economic losses and special damages, which are accruing and not now known.

## LIMITATION ON ALLEGATIONS

83.     Plaintiffs incorporate by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

84.     The allegations in this pleading are made pursuant to Pennsylvania law. To the extent Pennsylvania law imposes a duty or obligation on Defendant that exceeds those required by federal law, Plaintiff does not assert such claims. All claims asserted herein run parallel to federal law, *i.e.*, Defendant's violations of Pennsylvania law were also violations of federal law. Had Defendant honestly complied with Pennsylvania law, it would also have complied with federal law.

85.     Additionally, Plaintiff's claims do not seek to enforce federal law. These claims are brought under Pennsylvania law, notwithstanding the fact that such claims run parallel to federal law.

86.     As alleged in this pleading, Defendant violated U.S.C. § 136(j) and 40 C.F.R. §156.10(a)(5) by distributing Roundup, which was misbranded pursuant to 7 U.S.C. §136(g). Federal law specifically prohibits the distribution of a misbranded herbicide.

## COUNT I
## STRICT LIABLITY (DESIGN DEFECT)

87.     Plaintiffs incorporate by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

88.     Plaintiff brings this strict liability claim against Defendant for defective design.

89.     At all times relevant to this litigation, Defendant engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing and promoting

Roundup products, which are defective and unreasonably dangerous to consumers, including Plaintiff, thereby placing Roundup products into the stream of commerce. These actions were under the ultimate control and supervision of Defendant. At all times relevant hereto, Defendant designed, researched, developed, manufactured, produced, tested, assembled, labeled, advertised, promoted, marketed, sold, and distributed the Roundup products used by Plaintiff, as described above.

90.     At all times relevant to this litigation, Defendant's Roundup products were manufactured, designed, and labeled in an unsafe, defective, and inherently dangerous manner that was dangerous for use by or exposure to the public, and, in particular, Plaintiff.

91.     At all times relevant to this litigation, Defendant's Roundup products reached the intended consumers, handlers, and users or other persons coming into contact with these products in Pennsylvania and throughout the United States, including Plaintiff, without substantial change in their condition as designed, manufactured, sold, distributed, labeled, and marketed by Defendant.

92.     Defendant's Roundup products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold, and marketed were defective in design and formulation in that, when they left the hands of Defendant's manufacturers and/or suppliers, they were unreasonably dangerous and dangerous to an extent beyond that which an ordinary consumer would contemplate.

93.     Defendant's Roundup products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold and marketed were defective in design and formulation in that, when they left the hands of Defendant's manufacturers and/or suppliers, the foreseeable risks exceeded the alleged benefits associated with their design and

formulation.

94.     At all times relevant to this action, Defendant knew or had reason to know that its Roundup products were defective and were inherently dangerous and unsafe when used in the manner instructed and provided by Defendant.

95.     Therefore, at all times relevant to this litigation, Defendant's Roundup products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold and marketed were defective in design and formulation, in one or more of the following ways:

    a.     When placed in the stream of commerce, Defendant's Roundup products were defective in design and formulation, and, consequently, dangerous to an extent beyond that which an ordinary consumer would contemplate;

    b.     When placed in the stream of commerce, Defendant's Roundup products were unreasonably dangerous in that they were hazardous and posed a grave risk of cancer and other serious illnesses when used in a reasonably anticipated manner; and

    c.     When placed in the stream of commerce, Defendant's Roundup products contained unreasonably dangerous design defects and were not reasonably safe when used in a reasonably anticipated or intended manner.

96.     Defendant did not sufficiently test, investigate, or study its Roundup products and, specifically, the active ingredient glyphosate.

97.     Exposure to Roundup and glyphosate-containing products presents a risk of harmful side effects that outweigh any potential utility stemming from its use.

98.     Defendant knew or should have known at the time of marketing its Roundup products that exposure to Roundup and specifically, its active ingredient glyphosate, could cause cancer and other severe illnesses and injuries.

99.     Defendant did not conduct adequate post-marketing surveillance of its Roundup products.

100.    Defendant could have employed safer alternative designs and formulations.

101.    Plaintiff was exposed to Defendant's Roundup products in the course of spraying his property, as described above, without knowledge of Roundup's dangerous characteristics.

102.    At all times relevant to this litigation, Plaintiff used and/or was exposed to the use of Defendant's Roundup products in an intended or reasonably foreseeable manner, i.e., as a consumer, without knowledge of Roundup's dangerous characteristics.

103.    Plaintiff could not reasonably have discovered the defects and risks associated with Roundup or glyphosate-containing products before or at the time of exposure due to Defendant's suppression of scientific information linking glyphosate to cancer.

104.    The harm caused by Defendant's Roundup products far outweighed their benefit, rendering the product dangerous to an extent beyond that which an ordinary consumer would contemplate. Defendant's Roundup products were and are more dangerous than alternative products and Defendant could have designed its Roundup products to make them less dangerous. Indeed, at the time Defendant designed its Roundup products, the state of the industry's scientific knowledge was such that a less risky design or formulation was attainable.

105.    At the time Roundup products left Defendant's control, there was a practical, technically feasible and safer alternative design that would have prevented the harm without substantially impairing the reasonably anticipated or intended function of Defendant's herbicides.

106.    Defendant's defective design of its Roundup products was willful, wanton, fraudulent, malicious, and conducted with reckless disregard for the health and safety of users of the Roundup products, including Plaintiff herein.

107.    Therefore, as a result of the unreasonably dangerous condition of its Roundup products, Defendant is strictly liable to Plaintiff.

108.    The defects in the Roundup products were substantial and contributing factors in causing Plaintiff's injuries and, but for Defendant's misconduct and omissions, Plaintiff would not have sustained his injuries.

109.    Defendant's conduct, as described above, was reckless. It risked the lives of consumers and users of its products, including Plaintiff with knowledge of the safety problems associated with Roundup and glyphosate-containing products, and suppressed this knowledge from the general public. Defendant made conscious decisions not to redesign, warn or inform the unsuspecting public. Defendant's reckless conduct warrants an award of punitive damages.

110.    As a direct and proximate result of Defendant placing its defective Roundup products into the stream of commerce, Plaintiff developed NHL.

111.    As a proximate result of Defendant placing its defective Roundup products into the stream of commerce, as alleged herein, there was a measurable and significant interval of time during which Plaintiff suffered personal injury.

112.    As a proximate result of Defendant placing its defective Roundup products into the stream of commerce, as alleged herein, Plaintiff sustained a loss of income, loss of earning capacity and property damage

**WHEREFORE,** Plaintiff respectfully request that this Court enter judgment in Plaintiff's favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all such other and further relief as this Court deems just and proper.

## COUNT II
## STRICT LIABILITY (FAILURE TO WARN)

113.    Plaintiffs incorporate by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

114.    Plaintiff brings this strict liability claim against Defendant for failure to warn.

115.    At all times relevant to this litigation, Defendant engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing and promoting Roundup products, which are defective and unreasonably dangerous to consumers, including Plaintiff, because they do not contain adequate warnings or instructions concerning the dangerous characteristics of Roundup and specifically, the active ingredient glyphosate. These actions were under Defendant's ultimate control and supervision.

116.    Defendant researched, developed, designed, tested, manufactured, inspected, labeled, distributed, marketed, promoted, sold, and otherwise released into the stream of commerce its Roundup products, and in the course of same, directly advertised or marketed the products to consumers and end users, including Plaintiff, and therefore had a duty to warn of the risks associated with the use of Roundup and glyphosate-containing products.

117.    At all times relevant to this litigation, Defendant had a duty to properly test, develop, design, manufacture, inspect, package, label, market, promote, sell, distribute, maintain, supply, provide proper warnings, and take such steps as necessary to ensure its Roundup products did not cause users and consumers to suffer from unreasonable and dangerous risks. Defendant had a continuing duty to warn Plaintiff of the dangers associated with Roundup use and exposure. Defendant, as manufacturer, seller, or distributor of chemical herbicides is held to the knowledge of an expert in the field.

118.    At the time of manufacture, Defendant could have provided the warnings or instructions regarding the full and complete risks of Roundup and glyphosate-containing products because it knew or should have known of the unreasonable risks of harm associated with the use of and/or exposure to such products.

119.    At all times relevant to this litigation, Defendant failed to investigate, study, test,

or promote the safety or to minimize the dangers to users and consumers of its product and to those who would foreseeably use or be harmed by Defendant's herbicides, including Plaintiff.

120.    Despite the fact that Defendant knew or should have known that Roundup posed a grave risk of harm, it failed to exercise reasonable care to warn of the dangerous risks associated with use and exposure. The dangerous propensities of its products and the carcinogenic characteristics of glyphosate, as described above, were known to, or scientifically knowable to Defendant through appropriate research and testing by known methods, at the time it distributed, supplied or sold the product, and not known to end users and consumers, such as Plaintiff.

121.    Defendant knew or should have known that its products created significant risks of serious bodily harm to consumers, as alleged herein, and it failed to adequately warn consumers, i.e., the reasonably foreseeable users, of the risks of exposure to its products. Defendant has wrongfully concealed information concerning the dangerous nature of Roundup and its active ingredient glyphosate, and further made false and/or misleading statements concerning the safety of Roundup and glyphosate.

122.    At all times relevant to this litigation, Defendant's Roundup products reached the intended consumers, handlers, and users or other persons coming into contact with these products in the Commonwealth of Pennsylvania and throughout the United States, including Plaintiff, without substantial change in their condition as designed, manufactured, sold, distributed, labeled, and marketed by Defendant.

123.    Plaintiff was exposed to Defendant's Roundup products in the course of spraying his property, as described above, without knowledge of their dangerous characteristics.

124.    At all times relevant to this litigation, Plaintiff used and/or was exposed to the use of Defendant's Roundup products while using them for their intended or reasonably foreseeable

purposes, without knowledge of their dangerous characteristics.

125. Plaintiff could not have reasonably discovered the defects and risks associated with Roundup or glyphosate-containing products prior to or at the time of Plaintiff's exposure. Plaintiff relied upon Defendant's skill, superior knowledge and judgment to disclose serious health risks associated with using the products.

126. Defendant knew or should have known that the minimal warnings disseminated with its Roundup products were inadequate, failed to communicate adequate information on the dangers and safe use/exposure, and failed to communicate warnings and instructions that were appropriate and adequate to render the products safe for their ordinary, intended and reasonably foreseeable uses, including agricultural and horticultural applications.

127. The information that Defendant did provide or communicate failed to contain relevant warnings, hazards, and precautions that would have enabled consumers such as Plaintiff to utilize the products safely and with adequate protection. Instead, Defendant disseminated information that was inaccurate, false and misleading, and which failed to communicate accurately or adequately the comparative severity, duration, and extent of the risk of injuries with use of and/or exposure to Roundup and glyphosate; continued to aggressively promote the efficacy of its products, even after it knew or should have known of the unreasonable risks from use or exposure; and concealed, downplayed, or otherwise suppressed, through aggressive marketing and promotion, any information or research about the risks and dangers of exposure to Roundup and glyphosate

128. This alleged failure to warn is not limited to the information contained on Roundup's labeling. Defendant was able, in accord with federal law, to comply with Pennsylvania law by disclosing the known risks associated with Roundup through other non-

labeling mediums, i.e., promotion, advertisements, public service announcements, and/or public information sources. Defendant however, did not disclose these known risks through any medium.

129.    To this day, Defendant has failed to adequately and accurately warn of the risks of cancer associated with the use of and exposure to Roundup and its active ingredient glyphosate.

130.    As a result of their inadequate warnings, Defendant's Roundup products were defective and unreasonably dangerous when they left its possession and/or control. The Products were distributed by Defendant, and used by Plaintiff in the spraying of her property.

131.    Defendant is liable to Plaintiff for injuries caused by its negligent or willful failure, as described above, to provide adequate warnings or other clinically relevant information and data regarding the appropriate use of its products and the risks associated with the use of or exposure to Roundup and glyphosate.

132.    Had Defendant provided adequate warnings and instructions and properly disclosed and disseminated the risks associated with its Roundup products, Plaintiff could have avoided the risk of developing injuries and could have obtained or used alternative herbicides.

133.    As a direct and proximate result of Defendant placing its defective Roundup products into the stream of commerce, Plaintiff developed NHL and sustained a loss of income, loss of earning capacity and property damage.

134.    As a proximate result of Defendant placing its defective Roundup products into the stream of commerce, as alleged herein, there was a measurable and significant interval of time during which Plaintiff suffered great mental anguish and other personal injury.

**WHEREFORE,** Plaintiff respectfully requests that this Court enter judgment in Plaintiff's favor for compensatory and punitive damages, together with interest, costs herein

incurred, attorneys' fees and all such other and further relief as this Court deems just and proper.

## COUNT III
## NEGLIGENCE

135.   Plaintiffs incorporate by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

136.   Defendant, directly or indirectly, caused Roundup products to be sold, distributed, packaged, labeled, marketed, promoted, and/or used by Plaintiff.

137.   At all times relevant to this litigation, Defendant had a duty to exercise reasonable care in the design, research, manufacture, marketing, advertisement, supply, promotion, packaging, sale, and distribution of its Roundup products, including the duty to take all reasonable steps necessary to manufacture, promote, and/or sell a product that was not unreasonably dangerous to consumers and users of the product.

138.   At all times relevant to this litigation, Defendant had a duty to exercise reasonable care in the marketing, advertisement, and sale of the Roundup products. Defendant's duty of care owed to consumers and the general public included providing accurate, true, and correct information concerning the risks of using Roundup and appropriate, complete, and accurate warnings concerning the potential adverse effects of exposure to Roundup, and, in particular, its active ingredient glyphosate.

139.   At all times relevant to this litigation, Defendant knew or, in the exercise of reasonable care, should have known of the hazards and dangers of Roundup and specifically, the carcinogenic properties of the chemical glyphosate.

140.   Accordingly, at all times relevant to this litigation, Defendant knew or, in the exercise of reasonable care, should have known that use of or exposure to its Roundup products could cause or be associated with Plaintiff's injuries and thus, created a dangerous and

unreasonable risk of injury to the users of these products, including Plaintiff.

141.   Defendant also knew or, in the exercise of reasonable care, should have known that users and consumers of Roundup were unaware of the risks and the magnitude of the risks associated with use of and/or exposure to Roundup and glyphosate-containing products.

142.   As such, Defendant breached its duty of reasonable care and failed to exercise ordinary care in the design, research, development, manufacture, testing, marketing, supply, promotion, advertisement, packaging, sale, and distribution of its Roundup products, in that Defendant manufactured and produced defective herbicides containing the chemical glyphosate, knew or had reason to know of the defects inherent in its products, knew or had reason to know that a user's or consumer's exposure to the products created a significant risk of harm and unreasonably dangerous side effects, and failed to prevent or adequately warn of these risks and injuries.

143.   Defendant was negligent in its promotion of Roundup, outside of the labeling context, by failing to disclose material risk information as part of its promotion and marketing of Roundup, including the Internet, television, print advertisements, etc. Nothing prevented Defendant from being honest in its promotional activities, and in fact, Defendant had a duty to disclose the truth about the risks associated with Roundup in its promotional efforts, outside of the of the context of labeling.

144.   Despite its ability and means to investigate, study, and test its products and to provide adequate warnings, Defendant has failed to do so. Indeed, Defendant has wrongfully concealed information and has further made false and/or misleading statements concerning the safety and/or exposure to Roundup and glyphosate.

145.   Defendant's negligence included:

~ 29 ~

a.  Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing its Roundup products without thorough and adequate pre- and post-market testing;

b.  manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing Roundup while negligently and/or intentionally concealing and failing to disclose the results of trials, tests, and studies of exposure to glyphosate, and, consequently, the risk of serious harm associated with human use of and exposure to Roundup;

c.  Failing to undertake sufficient studies and conduct necessary tests to determine whether or not Roundup products and glyphosate-containing products were safe for their intended use in agriculture and horticulture;

d.  Failing to use reasonable and prudent care in the design, research, manufacture, and development of Roundup products so as to avoid the risk of serious harm associated with the prevalent use of Roundup/glyphosate as an herbicide;

e.  Failing to design and manufacture Roundup products so as to ensure they were at least as safe and effective as other herbicides on the market;

f.  Failing to provide adequate instructions, guidelines, and safety precautions to those persons Defendant could reasonably foresee would use and be exposed to its Roundup products;

g.  Failing to disclose to Plaintiff, users/consumers, and the general public that use of and exposure to Roundup presented severe risks of cancer and other grave illnesses;

h.  Failing to warn Plaintiff, consumers, and the general public that the product's risk of harm was unreasonable and that there were safer and effective alternative herbicides available to the Plaintiff and other consumers;

i.  Systematically suppressing or downplaying contrary evidence about the risks, incidence, and prevalence of the side effects of Roundup and glyphosate- containing products;

j.  Representing that its Roundup products were safe for their intended use when, in fact, Defendant knew or should have known the products were not safe for their intended purpose;

k.  Declining to make or propose any changes to Roundup products' labeling or other promotional materials that would alert consumers and the general public of the risks of Roundup and glyphosate;

l.  Advertising, marketing, and recommending the use of the Roundup products, while concealing and failing to disclose or warn of the dangers known (by Defendant) to be associated with or caused by the use of or exposure to Roundup and glyphosate;

m.  Continuing to disseminate information to its consumers, which indicate or

imply that Defendant's Roundup products are not unsafe for use in the agricultural and horticultural industries; and

n.   Continuing the manufacture and sale of its products with the knowledge that the products were unreasonably unsafe and dangerous.

146.   Defendant knew and/or should have known that it was foreseeable consumers such as Plaintiff would suffer injuries as a result of Defendant's failure to exercise ordinary care in the manufacturing, marketing, labeling, distribution, and sale of Roundup.

147.   Plaintiff did not know the nature and extent of the injuries that could result from the intended use of and/or exposure to Roundup or its active ingredient glyphosate.

148.   Defendant's negligence was the proximate cause of Plaintiff's injuries, i.e., absent Defendant's negligence, Plaintiff would not have developed cancer.

149.   Defendant's conduct, as described above, was reckless. Defendant regularly risks the lives of consumers and users of its products, including Plaintiff, with full knowledge of the dangers of its products. Defendant has made conscious decisions not to redesign, re-label, warn, or inform the unsuspecting public, including Plaintiff. Defendant's reckless conduct therefore warrants an award of punitive damages.

150.   As a proximate result of Defendant's negligence, as alleged herein, there was a measurable and significant interval of time during which Plaintiff suffered great mental anguish and other personal injury and damages.

151.   As a proximate result of Defendant's negligence, as alleged herein, Plaintiff sustained a loss of income, loss of earning capacity and property damage.

**WHEREFORE**, Plaintiff respectfully requests that this Court enter judgment in Plaintiff's favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all such other and further relief as this Court deems just and proper.

## COUNT IV
## BREACH OF IMPLIED WARRANTIES

152.   Plaintiffs incorporate by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

153.   At all times relevant to this litigation, Defendant engaged in the business of testing developing, designing, manufacturing, marketing, selling, distributing, and promoting its Roundup products, which are defective and unreasonably dangerous to consumers, including the Plaintiff, thereby placing Roundup products into the stream of commerce. These actions were under the ultimate control and supervision of Defendant.

154.   Before the time Plaintiff was exposed to the aforementioned Roundup products, Defendant impliedly warranted to its consumers—including Plaintiff—that its Roundup products were of merchantable quality and safe and fit for the use for which they were intended; specifically, as agricultural herbicides.

155.   Defendant, however, failed to disclose that Roundup has dangerous propensities when used as intended and that use of and/or exposure to Roundup and glyphosate-containing products carries an increased risk of developing severe injuries and death, including Plaintiff's NHL.

156.   Plaintiff was the intended beneficiary of the implied warranties made by Defendant to the purchasers of its herbicides.

157.   The Roundup products were expected to reach and did in fact reach consumers and users, including Plaintiff, without substantial change in the condition in which they were manufactured and sold by Defendant.

158.   At all times relevant to this litigation, Defendant was aware that consumers and users of its products, including Plaintiff, would use Roundup products it marketed e.g. that

Plaintiff was a foreseeable user of Roundup.

159.    Defendant intended that its Roundup products be used in the manner in which Plaintiff in fact used them and which Defendant impliedly warranted each product to be of merchantable quality, safe, and fit for this use, despite the fact that Roundup was not adequately tested or researched.

160.    In reliance upon Defendant's implied warranty, Plaintiff used Roundup as instructed and labeled and in the foreseeable manner intended, recommended, promoted and marketed by Defendant.

161.    Plaintiff could not have reasonably discovered or known of the risks of serious injury associated with Roundup or glyphosate.

162.    Defendant breached its implied warranty to the Plaintiff in that its Roundup products were not of merchantable quality, safe, or fit for their intended use, or adequately tested. Roundup has dangerous propensities when used as intended and can cause serious injuries, including those injuries complained of herein.

163.    The harm caused by Defendant's Roundup products far outweighed their benefit, rendering the products more dangerous than an ordinary consumer or user would expect and more dangerous than alternative products.

164.    As a direct and proximate result of Defendant's breach of implied warranty, Plaintiff sustained a loss of income, loss of earning capacity and property damage.

**WHEREFORE**, Plaintiff respectfully request that this Court enter judgment in Plaintiff's favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all such other and further relief as this Court deems just and proper.

## COUNT V
## BREACH OF EXPRESS WARRANTIES

165.   Plaintiffs incorporate by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

166.   Defendant has special knowledge skill and expertise germane to herbicides and their design, manufacture testing, and marketing. At all times relevant, Defendant engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting its Roundup products, which are defective and unreasonably dangerous to consumers, including Plaintiff, thereby placing Roundup products into the stream of commerce. These actions were under Defendant's ultimate control and supervision. Plaintiff asserts a breach of express warranty claim.

167.   Defendant had a duty to exercise reasonable care in the research, development, design, testing, packaging, manufacture, inspection, labeling, distributing, marketing, promotion, sale, and release of its Roundup products, including a duty to:

    a.    Reasonable assure that its products did not cause the user unreasonably dangerous side effects;

    b.    Warn of dangerous and potentially fatal side effects; and

    c.    Disclose adverse material facts, such as the true risks associated with use of Roundup and glyphosate-containing products, when making representations to consumers and the general public, including Plaintiff.

168.   Defendant expressly represented and warranted matters to Plaintiff and other consumers and users, and through statements made by Defendant in labels, publications, package inserts, and other written materials. These representations included assurances that its Roundup products were safe to human health and the environment, effective, fit, and proper for their intended use and posed on risks of harm to humans. Defendant advertised, labeled, marketed, and promoted Roundup products, representing the quality to consumers and the public in such a

~ 34 ~

way as to induce purchase or use, thereby making an express warranty that its Roundup products would conform to the representations.

169.    These express representations include incomplete warnings and instructions that purport, but fail, to include the complete array of risks associated with use of and/or exposure to Roundup and glyphosate. Defendant knew and/or should have known that the risks expressly included in Roundup warnings and labels did not and do not accurately or adequately set forth the risks of developing the serious injuries complained of herein. Nevertheless, Defendant expressly represented that its Roundup products were safe and effective, that they were safe and effective for use by individuals such as Plaintiff, and/or that they were safe and effective as agricultural herbicides.

170.    The representations about Roundup, as set forth herein, contained or constituted affirmations of fact or promises made by the seller to the buyer, which related to the goods and became part of the basis of the bargain, creating an express warranty that the goods would conform to the representations. Defendant placed its Roundup products into the stream of commerce for sale and recommended use without adequately warning of the true risks of developing the injuries associated with the use of and exposure to Roundup and its active ingredient glyphosate.

171.    Defendant breached these warranties. Its Roundup products were defective, dangerous, and unfit for use, did not contain labels representing the true and adequate nature of the risks associated with their use, and were not merchantable or safe for their intended, ordinary, and foreseeable use and purpose.

172.    Defendant breached the warranties as follows:

      a.    It represented through its labeling, advertising, and marketing materials that its Roundup products were safe, and intentionally withheld and concealed information about the risks of serious injury and disease associated with use of and/or exposure to Roundup and glyphosate by

expressly limiting the risks associated with use and/or exposure within its warnings and labels; and

b.    It represented that its Roundup products were safe for use and fraudulently concealed information that demonstrated that glyphosate, the active ingredient in Roundup, had carcinogenic properties, and that its Roundup products, therefore, were not safer than alternatives available on the market.

173.    Plaintiff justifiably and detrimentally relied on Defendant's express warranties and representations in the purchase and use of its Roundup products. When Plaintiff made the decision to purchase Roundup, he reasonably relied upon Defendant to disclose known risks, dangers, and effects of Roundup and glyphosate and he relied on Defendant's continuing representations that the product is safe.

174.    Plaintiff had no knowledge of the falsity or incompleteness of Defendant's statements and representations concerning Roundup.

175.    As a direct and proximate result of Defendant's breach of implied warranty, Plaintiff sustained a loss of income, loss of earning capacity and property damage.

**WHEREFORE**, Plaintiff respectfully requests that this Court enter judgment in Plaintiff's favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all such other and further relief as this Court deems just and proper

<u>**COUNT VI**</u>
**EXEMPLARY AND PUNITIVE DAMAGES ALLEGATIONS**

176.    Plaintiffs incorporate by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

177.    Defendant's conduct as alleged herein was done with oppression and malice.

178.    Defendant was fully aware of Roundup's safety risks. Nonetheless, Defendant deliberately crafted its label, marketing, and promotion to mislead consumers.

179.    This was not done by accident or through some justifiable negligence. Rather,

Defendant knew that it could turn a profit by convincing the agricultural industry that Roundup was harmless to humans, and that full disclosure of Roundup's true risks would limit the amount of money Defendant would make selling Roundup in the Commonwealth of Pennsylvania.

180.    This was accomplished not only through its misleading labeling, but through a comprehensive scheme of selective fraudulent research and testing, misleading advertising, and deceptive omissions as more fully alleged throughout this pleading. Plaintiff, like all other consumers of Pennsylvania, was robbed of his right to make an informed decision about whether to purchase and use an herbicide on his property, knowing the full risks attendant to that use. Such conduct was done with conscious disregard of the Plaintiff's rights.

181.    There is no indication that Defendant will stop its deceptive and unlawful marketing practices unless it is punished and deterred. Accordingly, Plaintiff requests punitive damages against Defendant for the harms caused to the Plaintiff.

**COUNT VII**
**LOSS OF CONSORTIUM**

182.    Plaintiffs incorporate by reference each and every allegation set forth in the preceding paragraphs as fully stated herein.

183.    As a result of the injuries sustained by Wife-Plaintiff, Beth Spector, as aforesaid, Husband-Plaintiff, Chuck Spector has been deprived of the society, companionship, and consortium of his wife and he will be deprived of same for an indefinite time in the future, to his great detriment and loss.

## JURY DEMAND

Plaintiff demands a trial by jury on all of the triable issues within this pleading.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff requests that the Court enter judgment in his favor and against

Defendant, awarding Plaintiff:

      a.    actual or compensatory damages in such amount to be determined at trial and as provided by applicable law;

      b.    exemplary and punitive damages sufficient to punish and deter Monsanto and others from future fraudulent practices;

      c.    pre-judgment and post-judgment interest;

      d.    costs including reasonable attorneys' fees, court costs, and other litigation expenses; and

      e.    any other relief the Court may deem just and proper.

Robert S. Miller, Esquire
(PA Bar ID No.: 65854)
Jarad L. Silverstein, Esquire
(PA Bar ID No.: 206157)
**WAPNER, NEWMAN, WIGRIZER,**
**BRECHER & MILLER, P.C.**
2000 Market Street, Suite 2750
Philadelphia, PA 19103
Phone: (215) 569-0900
Fax:   (215) 569-4621
Email: rmiller@wapnernewman.com
         jsilverstein@wapnernewman.com

Dated:  **July 15, 2020**

~ 38 ~

## V E R I F I C A T I O N

The undersigned, having read the attached which was prepared by my attorneys, hereby

verifies that the information contained therein may include information furnished to my attorneys

by individuals other than myself; that the language used therein is that of my attorneys, and that

to the extent the information set forth therein is not known to me, I have relied upon my

attorneys in taking this Verification.  Subject to the above limitations, the information contained

therein is true and correct to the best of my information, knowledge and belief, subject to the

penalties imposed by 18 Pa. C.S. 4904.

_____          _____
Beth Spector                                              Chuck Spector