Query    Reports    Utilities    Help    Log Out

CONSENTPENDING

# U.S. District Court
# United States District Court - District of New Mexico (Albuquerque)
## CIVIL DOCKET FOR CASE #: 1:20-cv-00643-JHR-SCY

| | |
|---|---|
| Berry v. Monsanto Company | Date Filed: 07/01/2020 |
| Assigned to: Magistrate Judge Jerry H. Ritter | Jury Demand: Plaintiff |
| Referred to: Magistrate Judge Steven C. Yarbrough | Nature of Suit: 365 Personal Inj. Prod. Liability |
| Cause: 28:1332 Diversity-Personal Injury | Jurisdiction: Diversity |

**Plaintiff**

**Edward J. Berry**
*Jr.*

represented by **David M Houliston**
The Law Offices of David M Houliston
7500 Jefferson Street NE, Suite 106
Albuquerque, NM 87109
505-247-1223
Fax: 505-214-5204
Email: david@houlistonlaw.com
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Monsanto Company**

| Date Filed | # | Docket Text |
|---|---|---|
| 07/01/2020 | 1 | COMPLAINT *and Jury Demand* against Monsanto Company ( Filing Fee - Online Payment), filed by Edward J. Berry, Jr. (Houliston, David) (Entered: 07/01/2020) |
| 07/01/2020 | | Filing and Administrative Fees Received: $ 400 receipt number ANMDC-7192643 re 1 Complaint filed by Edward J. Berry, Jr. (Payment made via Pay.gov)(Houliston, David) (Entered: 07/01/2020) |
| 07/02/2020 | | United States Magistrate Judge Jerry H. Ritter and United States Magistrate Judge Steven C. Yarbrough assigned. (dr) (Entered: 07/02/2020) |
| 07/02/2020 | 2 | PLEASE TAKE NOTICE that this case has been randomly assigned to United States Magistrate Judge Jerry H. Ritter to conduct dispositive proceedings in this matter, including motions and trial. Appeal from a judgment entered by a Magistrate Judge will be to the United States Court of Appeals for the Tenth Circuit. **It is the responsibility of the case filer to serve a copy of this Notice upon all parties with the summons and complaint.** *Consent is strictly voluntary, and a party is free to withhold consent without adverse consequences. Should a party choose to consent, notice should be made no later than 21 days after entry of the Order setting the Rule 16 Initial Scheduling Conference.* For e-filers, visit our Web site at www.nmd.uscourts.gov for more information and instructions. |

| | | [THIS IS A TEXT-ONLY ENTRY. THERE ARE NO DOCUMENTS ATTACHED.] (dr) (Entered: 07/02/2020) |
|---|---|---|
| 07/02/2020 | 3 | APPENDIX/SUPPLEMENT re 1 Complaint by Edward J. Berry (Houliston, David) (Entered: 07/02/2020) |
| 07/24/2020 | | Summons Issued as to Monsanto Company. (arp) (Entered: 07/24/2020) |

<table>
<tr><td colspan="4" align="center"><strong>PACER Service Center</strong></td></tr>
<tr><td colspan="4" align="center"><strong>Transaction Receipt</strong></td></tr>
<tr><td colspan="4" align="center">08/03/2020 13:57:06</td></tr>
<tr><td><strong>PACER Login:</strong></td><td>hllp1982</td><td><strong>Client Code:</strong></td><td>1417.0005</td></tr>
<tr><td><strong>Description:</strong></td><td>Docket Report</td><td><strong>Search Criteria:</strong></td><td>1:20-cv-00643-JHR-SCY</td></tr>
<tr><td><strong>Billable Pages:</strong></td><td>1</td><td><strong>Cost:</strong></td><td>0.10</td></tr>
</table>

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

| | |
|---|---|
| EDWARD J. BERRY, JR.,<br><br>     PLAINTIFF,<br><br>V.<br><br>MONSANTO COMPANY,<br><br>     DEFENDANT. | CAUSE NO. 1:20-CV-00643<br><br>**COMPLAINT AND<br>JURY TRIAL DEMAND** |

Plaintiff, Edward J. Berry, for his cause of action, alleges and states as follows:

## NATURE OF THE CASE

1. This is an action for damages suffered by Plaintiff as a direct and proximate result of Defendant's negligent and wrongful conduct in connection with the design, development, manufacture, testing, packaging, promoting, marketing, advertising, distribution, labeling, and/or sale of the herbicide Roundup®, containing the active ingredient glyphosate (hereinafter "Roundup").

2. Plaintiff maintains that Roundup and/or glyphosate is defective, dangerous to human health, unfit, and unsuitable to be marketed and sold in commerce and lacked proper warnings and directions as to the dangers associated with its use.

## JURISDICTION AND VENUE

3. This Court has jurisdiction over Defendant and this action pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship between Plaintiff and Defendant. Defendant is incorporated and has its principal place of business outside of the state in which the Plaintiff resides.

4.      The amount in controversy between Plaintiff and Defendant exceeds $75,000, exclusive of interest and costs.

5.      Venue is proper within this district pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the acts and/or omissions giving rise to these claims occurred within this district.

## PARTIES

6.      Plaintiff Edward J. Berry is a natural person and at all relevant times a resident and citizen of New Mexico.

7.      Defendant Monsanto Company (hereafter referred to as "Monsanto" or "Defendant") is a Delaware Corporation with a principal place of business in St. Louis, Missouri.

## FACTUAL ALLEGATIONS

8.      Plaintiff brings this action for personal injuries sustained by exposure to Roundup, which contains the active ingredient glyphosate and the surfactant polyethoxylated tallow amine ("POEA"). As a direct and proximate result of his exposure to Roundup, Plaintiff developed non-Hodgkin's lymphoma (hereinafter "NHL").

9.      "Roundup" refers to all formulations of Defendant's Roundup products, including, but not limited to, Roundup Concentrate Poison Ivy and Tough Brush Killer 1, Roundup Custom Herbicide, Roundup D-Pak Herbicide, Roundup Dry Concentrate, Roundup Export Herbicide, Roundup Fence & Hard Edger 1, Roundup Garden Foam Weed & Grass Killer, Roundup Grass and Weed Killer, Roundup Herbicide, Roundup Original 2k Herbicide, Roundup Original II Herbicide, Roundup Pro Concentrate, Roundup Pro Dry Herbicide, Roundup Promax, Roundup Quik Stik Grass and Weed Killer, Roundup Quikpro Herbicide, Roundup Rainfast Concentrate Weed & Grass Killer, Roundup Rainfast Super Concentrate Weed & Grass Killer, Roundup

2

Ready-to-Use Extended Control Weed & Grass Killer 1 Plus Weed Preventer, Roundup Ready-to- Use Weed & Grass Killer, Roundup Ready-to-Use Weed and Grass Killer 2, Roundup Ultra Dry, Roundup Ultra Herbicide, Roundup Ultramax, Roundup VM Herbicide, Roundup Weed & Grass Killer Concentrate, Roundup Weed & Grass Killer Concentrate Plus, Roundup Weed & Grass Killer Ready-to-Use Plus, Roundup Weed & Grass Killer Super Concentrate, Roundup Weed & Grass Killer 1 Ready-to-Use, Roundup WSD Water Soluble Dry Herbicide Deploy Dry Herbicide, or any other formulation of containing the active ingredient glyphosate.

10.     At all relevant times, Defendant was in the business of, and did, design, research, manufacture, test, advertise, promote, market, sell, distribute, and/or has acquired and is responsible for the commercial herbicide Roundup.

11.     Monsanto is a multinational agricultural biotechnology corporation based in St. Louis, Missouri. It is the world's leading producer of glyphosate.

12.     Defendant discovered the herbicidal properties of glyphosate during the 1970's and subsequently began to design, research, manufacture, sell and distribute glyphosate based "Roundup" as a broad-spectrum herbicide used to kill weeds and grasses known to compete with commercial crops grown throughout the world.

13.     Glyphosate is the active ingredient in Roundup.

14.     Glyphosate is a "non-selective" herbicide, meaning it kills indiscriminately based only on whether a given organism produces a specific enzyme, 5-enolpyruvylshikimic acid-3-phosphate synthase, known as EPSP synthase.

15.     Glyphosate inhibits the enzyme 5-enolpyruvylshikimic acid-3-phosphate synthase that interferes with the shikimic pathway in plants, resulting in the accumulation of shikimic acid in plant tissue and ultimately plant death.

16.     Sprayed as a liquid, plants absorb glyphosate directly through their leaves, stems, and roots, and detectable quantities accumulate in the plant tissues.

17.     Each year, approximately 250 million pounds of glyphosate are sprayed on crops, commercial nurseries, suburban lawns, parks, and golf courses. This increase in use has been driven largely by the proliferation of genetically engineered crops, crops specifically tailored to resist the activity of glyphosate.

18.     Defendant is intimately involved in the development, design, manufacture, marketing, sale, and/or distribution of genetically modified ("GMO") crops, many of which are marketed as being resistant to Roundup i.e., "Roundup Ready®." As of 2009, Defendant was the world's leading producer of seeds designed to be Roundup Ready®. In 2010, an estimated 70% of corn and cotton and 90% of soybean fields in the United States contained Roundup Ready® seeds.

19.     The original Roundup, containing the active ingredient glyphosate, was introduced in 1974. Today, glyphosate products are among the world's most widely used herbicides

20.     For nearly 40 years, consumers, farmers, and the public have used Roundup, unaware of its carcinogenic properties.

## REGISTRATION OF HERBICIDES UNDER FEDERAL LAW

21.     The manufacture, formulation and distribution of herbicides such as Roundup are regulated under the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA"), 7. U.S.C. § 136 et seq. FIFRA requires that all pesticides be registered with the Environmental Protection Agency ("EPA) prior to their distribution, sale, or use, except as described by FIFRA 7 U.S.C. 136a(a).

4

22.     The EPA requires as part of the registration process, among other things, the performance of a variety of tests to evaluate the potential for exposure to pesticides, toxicity to people and other potential non-target organisms, and other adverse effects on the environment. Registration by the EPA, however, is not an assurance or finding of safety. The determination the EPA makes in registering or re-registering a product is not that the product is "safe," but rather that use of the product in accordance with its label directions "will not generally cause unreasonable adverse effects on the environment." 7 U.S.C. § 136(a)(c)(5)(D).

23.     FIFRA defines "unreasonable adverse effects on the environment" to mean "any unreasonable risk to man or the environment, taking into account the economic, social, and environmental costs and benefits of the use of any pesticide." 7 U.S.C. § 136(bb). FIFRA thus requires the EPA to make a risk/benefit analysis in determining whether a registration should be granted or allowed to continue to be sold in commerce.

24.     The EPA and the State of New Mexico registered Roundup for distribution, sale, and manufacture in the United States and the State of New Mexico.

25.     FIFRA generally requires that the registrant, Monsanto, conduct health and safety testing of pesticide products. The government is not required, nor is it able, to perform the product tests that are required of the manufacturer.

26.     The evaluation of each pesticide product is initially registered. The data necessary for registration of a pesticide has changed over time. The EPA is now in the process of re-evaluating all pesticide products through a Congressionally mandated process called "re-registration." 7 U.S.C. § 136a-1. In order to reevaluate these pesticides, the EPA demands the completion of additional tests and the submission of data for the EPA's review and evaluation.

27.     In the case of glyphosate and Roundup, the EPA had planned on releasing its preliminary risk assessment – in relation to the registration process – no later than July 2015. The EPA completed its review of glyphosate in early 2015, but delayed releasing the assessment pending further review in light of World Health Organization's finding that glyphosate is a "probable carcinogen" as demonstrated by the mechanistic evidence of carcinogenicity in humans and sufficient evidence of carcinogenicity in animals.

## MONSANTO'S FALSE REPRESENTATIONS REGARDING THE SAFETY OF ROUNDUP

28.     In 1996, the New York Attorney General ("NYAG") filed a lawsuit against Monsanto based on its false and misleading advertising of Roundup products. Specifically, the lawsuit challenged Monsanto's general representations that its spray-on glyphosate-based herbicides, including Roundup, were "safer than table salt" and "practically non-toxic" to mammals, birds, and fish. Among the representations the NYAG found deceptive and misleading about the human and environmental safety of Roundup are the following:

a)     Remember that environmentally friendly Roundup herbicide is biodegradable. It won't build up in the soil so you can use Roundup with confidence along customers' driveways, sidewalks and fences.

b)     And remember that Roundup is biodegradable and won't build up in the soil. That will give you the environmental confidence you need to use Roundup everywhere you've got a weed, brush, edging or trimming problem.

c)     Roundup biodegrades into naturally occurring elements.

d)     Remember that versatile Roundup herbicide stays where you put it. That means there's no washing or leaching to harm customers' shrubs or other desirable vegetation.

e)     This non-residual herbicide will not wash or leach in the soil. It ... stays where you apply it.

f)     You can apply Accord with "confidence because it will stay where you put it" [;] it bonds tightly to soil particles, preventing leaching. Then, soon after application, soil microorganisms biodegrade Accord into natural products.

g)     Glyphosate is less toxic to rats than table salt following acute oral ingestion.

6

h)  Glyphosate's safety margin is much greater than required. It has over a 1,000-fold safety margin in food and over a 700-fold safety margin for workers who manufacture it or use it.

i)  You can feel good about using herbicides by Monsanto. They carry a toxicity category rating of 'practically non-toxic' as it pertains to mammals, birds and fish.

j)  "Roundup can be used where kids and pets will play and breaks down into natural material." This ad depicts a person with his head in the ground and a pet dog standing in an area which has been treated with Roundup

29  On November 19, 1996, Monsanto entered into an Assurance of Discontinuance with NYAG in which Monsanto agreed, among other things, "to cease and desist from publishing or broadcasting any advertisements [in New York] that represent, directly or by implication" that:

a)  Its glyphosate-containing pesticide products or any component thereof are safe, non-toxic, harmless or free from risk;

b)  Its glyphosate-containing pesticide products or any component thereof manufactured, formulated, distributed or sold by Monsanto are biodegradable;

c)  Its glyphosate-containing pesticide products or any component thereof stay where they are applied under all circumstances and will not move through the environment by any means;

d)  Its glyphosate-containing pesticide products or any component thereof are "good" for the environment or are "known for their environmental characteristics";

e)  Glyphosate-containing pesticide products or any component thereof are safer or less toxic than common consumer products other than herbicides; and

f)  Its glyphosate-containing products or any component thereof might be classified as "practically non-toxic."

31.  Monsanto did not alter its advertising in the same manner in any state other than New York and, on information and belief, still has not done so today.

30.  In 2009, France's highest court ruled that Monsanto had not told the truth about the safety of Roundup. The French court affirmed an earlier judgment that Monsanto had falsely advertised its herbicide Roundup as "biodegradable" and that it "left the soil clean."

7

## EVIDENCE OF CARCINOGENICITY IN ROUNDUP

31.     As early as the 1980's Monsanto was aware of glyphosate's carcinogenic properties.

32.     On March 4, 1985, a group of the EPA Toxicology Branch published a memorandum classifying glyphosate as a Category C oncogene. Category C oncogenes are possible human carcinogens with limited evidence of carcinogenicity.

33.     In 1986, the EPA issued a Registration Standard for glyphosate (NTIS PB87-103214). The Registration standard required additional phytotoxicity, environmental fate toxicology, product chemistry, and residue chemistry studies. All of the data required was submitted and reviewed and/or waived.

34.     In October 1991, the EPA published a Memorandum entitled "Second Peer Review of Glyphosate." The memorandum changed glyphosate's classification to Group E (evidence of noncarcinogenicity for humans). Two peer review committee members did not concur with the conclusions of the committee and one member refused to sign.

35.     In addition to the toxicity of the active molecule, many studies support the hypothesis that glyphosate formulations found in Defendant's Roundup products are more dangerous and toxic than glyphosate alone. As early as 1991, evidence existed demonstrating that glyphosate formulations were significantly more toxic than glyphosate alone.

36.     In 2002, Julie Marc published a study entitled "Pesticide Roundup Provokes Cell Division Dysfunction at the Level of CDK1/Cyclin B Activation."

37.     The 2002 Marc study found that Defendant's Roundup caused delays in the cell cycles of sea urchins, while the same concentrations of glyphosate alone proved ineffective and did not alter cell cycles.

8

38.     In 2004, Julie Marc published a study entitled "Glyphosate-based pesticides affect cell cycle regulation". The study demonstrated a molecular link between glyphosate-based products and cell cycle dysregulation.

39.     The 2004 Marc study noted that "cell-cycle dysregulation is a hallmark of tumor cells and development of cancers from the initial affected cell." Further, "[s]ince cell cycle disorders such as cancer result from dysfunction of unique cell, it was of interest to evaluate the threshold dose of glyphosate affecting cells."

40.     In 2005, Francisco Peixoto published a study showing that Roundup's effects on rat liver mitochondria are much more toxic and harmful than the same concentrations of glyphosate alone.

41.     The Peixoto study suggested that the harmful effects of Roundup on mitochondrial bioenergetics could not be exclusively attributed to glyphosate and could be the result of other chemicals, namely the surfactant POEA, or, alternatively, due to the possible synergy between glyphosate and Roundup formulation products.

42.     In 2009, Nora Benachour and Gilles-Eric Seralini published a study examining the effects of Roundup and glyphosate on human umbilical, embryonic, and placental cells.

43.     The Benachour study used dilution levels of Roundup and glyphosate far below agricultural recommendations, corresponding with low levels of residues in food. The study concluded that supposed "inert" ingredients, and possibly POEA, change human cell permeability and amplify toxicity of glyphosate alone. The study further suggested that determinations of glyphosate toxicity should take into account the presence of adjuvants, or those chemicals used in the formulation of the complete pesticide. The study confirmed that the

9

adjuvants in Roundup are not inert and that Roundup is always more toxic than its active ingredient glyphosate.

44.     The results of these studies were confirmed in recently published peer-reviewed studies and were at all times available and/or known to Defendant.

45.     Defendant knew or should have known that Roundup is more toxic than glyphosate alone and that safety studies on Roundup, Roundup's adjuvants and "inert" ingredients, and/or the surfactant POEA were necessary to protect Plaintiff from Roundup.

46.     Defendant knew or should have known that tests limited to Roundup's active ingredient glyphosate were insufficient to prove the safety of Roundup.

47.     Defendant failed to appropriately and adequately test Roundup, Roundup's adjuvants and "inert" ingredients, and/or the surfactant POEA to protect Plaintiff from Roundup.

48.     Rather than performing appropriate tests, Defendant relied upon flawed industry-supported studies designed to protect Defendant's economic interests rather than Plaintiff and the consuming public.

49.     Despite its knowledge that Roundup was considerably more dangerous than glyphosate alone, Defendant continued to promote Roundup as safe.

## IARC CLASSIFICATION OF GLYPHOSATE

50.     The International Agency for Research on Cancer ("IARC") is the specialized intergovernmental cancer agency the World Health Organization ("WHO") of the United Nations tasked with conducting and coordinating research into the causes of cancer.

51.     An IARC Advisory Group to Recommend Priorities for IARC Monographs during 2015–2019 met in April 2014. Though nominations for the review were solicited, a submission must meet two criteria to be eligible for review by the IARC Monographs: there must

already be some evidence of carcinogenicity of the substance and there must be evidence that humans are exposed to the substance.

52.     IARC set glyphosate for review in 2015-2016. IARC uses five criteria for determining priority in reviewing chemicals. The substance must have a potential for direct impact on public health; scientific literature to support suspicion of carcinogenicity; evidence of significant human exposure; high public interest and/or potential to bring clarity to a controversial area and/or reduce public anxiety or concern; related agents similar to one given high priority by the above considerations. Data reviewed is sourced preferably from publicly accessible, peer-reviewed data.

53.     On March 24, 2015, after its cumulative review of human, animal, and DNA studies for more than one (1) year, many of which have been in Defendant's possession since as early as 1985, the IARC's working group published its conclusion that the glyphosate contained in Defendant's Roundup herbicide is a Class 2A "probable carcinogen" as demonstrated by the mechanistic evidence of carcinogenicity in humans and sufficient evidence of carcinogenicity in animals.

54.     The IARC's full Monograph was published on July 29, 2015 and established glyphosate as a class 2A probable carcinogen to humans. According to the authors, glyphosate demonstrated sufficient mechanistic evidence (genotoxicity and oxidative stress) to warrant a 2A classification based on evidence of carcinogenicity in humans and animals.

55.     The IARC Working Group found an increased risk between exposure to glyphosate and NHL and several subtypes of NHL, and the increased risk continued after adjustment for other pesticides.

11

56.     The IARC also found that glyphosate caused DNA and chromosomal damage in human cells.

## EARLIER EVIDENCE OF GLYPHOSATE'S DANGER

57.     Despite the new classification by the IARC, Defendant has had ample evidence of glyphosate and Roundup's genotoxicity for decades.

58.     Genotoxicity refers to chemical agents that are capable of damaging the DNA within a cell through genetic mutations, which is a process that is believed to lead to cancer.

59.     In 1997, Chris Clements published "Genotoxicity of select herbicides in Rana catesbeiana tadpoles using the alkaline single-cell gel DNA electrophoresis (comet) assay."

60.     The Clements study found that tadpoles exposed to Roundup showed significant DNA damage when compared with unexposed control animals.

61.     Both human and animal studies have shown that glyphosate and glyphosate-based formulations such as Roundup can induce oxidative stress.

62.     Oxidative stress and associated chronic inflammation are believed to be involved in carcinogenesis.

63.     The IARC Monograph notes that "[s]trong evidence exists that glyphosate, AMPA and glyphosate-based formulations can induce oxidative stress."

64.     In 2006, César Paz-y-Miño published a study examining DNA damage in human subjects exposed to glyphosate.

65.     The Paz-y-Miño study produced evidence of chromosomal damage in blood cells showing significantly greater damage after exposure to glyphosate than before in the same individuals, suggesting that the glyphosate formulation used during aerial spraying had a genotoxic effect on exposed individuals.

12

66.     The IARC Monograph reflects the volume of evidence of glyphosate pesticides' genotoxicity, noting "[t]he evidence for genotoxicity caused by glyphosate-based formulations is strong."

67.     Despite knowledge to the contrary, Defendant maintains that there is no evidence that Roundup is genotoxic, that regulatory authorities and independent experts agree that Roundup is not genotoxic, and that there is no evidence that Roundup is genotoxic.

68.     In addition to glyphosate and Roundup's genotoxic properties, Defendant has long been aware of glyphosate's carcinogenic properties.

69.     Glyphosate and Roundup in particular have long been associated with carcinogenicity and the development of numerous forms of cancer, including, but not limited to, NHL, Hodgkin's lymphoma, multiple myeloma, and soft tissue sarcoma.

70.     Defendant has known of this association since the early to mid-1980s and numerous human and animal studies have evidenced the carcinogenicity of glyphosate and/or Roundup.

71.     In 1985, the EPA studied the effects of glyphosate in mice finding a dose related response in male mice linked to renal tubal adenomas, a rare tumor. The study concluded the glyphosate was oncogenic.

72.     In 2003, Lennart Hardell and Mikael Eriksson published the results of two case controlled studies on pesticides as a risk factor for NHL and hairy cell leukemia.

73.     The Hardell study concluded that glyphosate had the most significant relationship to NHL among all herbicides studies with an increased odds ratio of 3.11.

74.     In 2003, AJ De Roos published a study examining the pooled data of mid-western farmers, examining pesticides and herbicides as risk factors for NHL.

13

75.     The De Roos study, which controlled for potential confounders, found a relationship between increased NHL incidence and glyphosate.

76.     In 2008, Mikael Eriksson published a population based case-control study of exposure to various pesticides as a risk factor for NHL.

77.     This Eriksson study strengthened previous associations between glyphosate and NHL.

78.     In spite of this knowledge, Defendant continued to issue broad and sweeping statements suggesting that Roundup was, and is, safer than ordinary household items such as table salt, despite a lack of scientific support for the accuracy and validity of these statements and, in fact, voluminous evidence to the contrary.

79.     Upon information and belief, these statements and representations have been made with the intent of inducing Plaintiff, the agricultural community, and the public at large to purchase and increase the use of Defendant's Roundup for Defendant's pecuniary gain and, in fact, did induce Plaintiff to use Roundup.

80.     Defendant made these statements with complete disregard and reckless indifference to the safety of Plaintiff and the general public.

81.     Notwithstanding Defendant's representations, scientific evidence has established a clear association between glyphosate and genotoxicity, inflammation, and an increased risk of many cancers, including, but not limited to, NHL, Multiple Myeloma, and soft tissue sarcoma.

82.     Defendant knew or should have known that glyphosate is associated with an increased risk of developing cancer, including, but not limited to, NHL, Multiple Myeloma, and soft tissue sarcomas.

14

83.     Defendant failed to appropriately and adequately inform and warn Plaintiff of the

serious and dangerous risks associated with the use of and exposure to glyphosate and/or

Roundup, including, but not limited to, the risk of developing NHL, as well as other severe and

personal injuries, which are permanent and/or long-lasting in nature, cause significant physical

pain and mental anguish, diminished enjoyment of life, and require the need for medical

treatment, monitoring and/or medications.

84.     Despite the IARC's classification of glyphosate as a class 2A probable

carcinogen, Defendant continues to maintain that glyphosate and/or Roundup is safe, non-

carcinogenic, non-genotoxic, and falsely warrant to users and the general public that independent

experts and regulatory agencies agree that there is no evidence of carcinogenicity or genotoxicity

in glyphosate and Roundup.

85.     Defendant has claimed and continues to claim that Roundup is safe, non-

carcinogenic, and non-genotoxic. These misrepresentations are consistent with Defendant's

cavalier approach to investigating and ensuring the safety of its products, the safety of the public

at large, and the safety of the Plaintiff.

### SCIENTIFIC FRAUD UNDERLYING THE SAFTY DETERMINATIONS OF GLYPHOSATE

86.     After the EPA's 1985 classification of glyphosate as possibly carcinogenic to

humans (Group C), Monsanto exerted pressure upon the EPA to change its classification. This

culminated in the EPA's reclassification of glyphosate to Group E, which was based upon

evidence of non-carcinogenicity in humans.

87.     In so classifying, the EPA stated that "[i]t should be emphasized, however, that

designation of an agent in Group E is based on the available evidence at the time of evaluation

and should not be interpreted as a definitive conclusion that the agent will not be a carcinogen under any circumstances."

88.     On two occasions, the EPA found that laboratories hired by Monsanto to test the toxicity of its Roundup products for registration purposes committed scientific fraud.

89.     In the first instance, Monsanto hired Industrial Bio-Test Laboratories ("IBT") to perform and evaluate pesticide toxicology studies relating to Roundup. IBT performed approximately 30 tests on glyphosate and glyphosate-containing products, including 11 of the 19 chronic toxicology studies needed to register Roundup with the EPA.

90.     In 1976, the Food and Drug Administration ("FDA") performed an inspection of IBT and discovered discrepancies between the raw data and the final report relating to toxicological impacts of glyphosate. The EPA subsequently audited IBT and determined that the toxicology studies conducted for Roundup were invalid. An EPA reviewer stated, after finding "routine falsification of data" at IBT, that it was "hard to believe the scientific integrity of the studies when they said they took specimens of the uterus from male rabbits."

91.     Three top executives of IBT were convicted of fraud in 1983.

92.     In the second incident, Monsanto hired Craven Laboratories ("Craven") in 1990 to perform pesticide and herbicide studies, including several studies on Roundup.

93.     In March of 1991, the EPA announced that it was investigating Craven for "allegedly falsifying test data used by chemical firms to win EPA approval of pesticides."

94.     This investigation lead to the indictments of the laboratory owner and a handful of employees.

## MONSANTO'S CONTINUING DISREGARD FOR THE SAFETY OF THE PLAINTIFF AND THE PUBLIC

95.     Monsanto has claimed on its website that "[r]egulatory authorities and independent experts around the world have reviewed numerous long-term/carcinogenicity and genotoxicity studies and agree that there is no evidence that glyphosate, the active ingredient in Roundup brand herbicides and other glyphosate-based herbicides, causes cancer, even at very high doses, and that it is not genotoxic."

96.     Ironically, the primary source for this statement is a 1986 report by the WHO, the same organization that now considers glyphosate to be a probable carcinogen.

97.     Glyphosate, and Defendant's Roundup products in particular, have long been associated with serious side effects, and many regulatory agencies around the globe have banned or are currently banning the use of glyphosate herbicide products.

98.     Defendant's statements proclaiming the safety of Roundup and disregarding its dangers misled the Plaintiff.

99.     Despite Defendant's knowledge that Roundup was associated with an elevated risk of developing cancer, Defendant's promotional campaigns focused on Roundup's purported "safety profile."

100.    Defendant's failure to adequately warn Plaintiff resulted in (1) Plaintiff using and being exposed to glyphosate instead of using another acceptable and safe method of controlling unwanted weeds and pests; and (2) scientists and physicians failing to warn and instruct consumers about the risk of cancer, including NHL, and other injuries associated with Roundup.

101.    Defendant failed to seek modification of the labeling of Roundup to include relevant information regarding the risks and dangers associated with Roundup exposure.

102.    The failure of Defendant to appropriately warn and inform the EPA has resulted in inadequate warnings in safety information presented directly to users and consumers.

17

103.     The failure of Defendant to appropriately warn and inform the EPA has resulted in the absence of warning or caution statements that are adequate to protect health and the environment.

104.     The failure of Defendant to appropriately warn and inform the EPA has resulted in directions for use that are not adequate to protect health and the environment.

## PLAINTIFF EXPOSURE TO ROUNDUP

105.     Plaintiff was exposed to Roundup on golf courses where he was a teaching professional and as a result of using Roundup in connection with his honey and food distribution businesses and residentially.

106.     Plaintiff followed all safety and precautionary warnings and usage instructions while using the product.

107.     Plaintiff did not know of the dangerous condition of Roundup and did not voluntarily expose himself to the danger.

108.     Plaintiff was diagnosed with and began treatment for NHL in July 2019.

109.     Plaintiff's NHL was directly caused by Roundup products.

110.     As a result of his NHL, Plaintiff has incurred and will incur significant economic and non-economic damages including, but not limited to, permanent physical and emotional injury, past and future medical expense, past wage loss and future diminished earning capacity, and past and future pain, suffering, discomfort, disability, and loss of enjoyment of life.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### (Strict Products Liability)

111.     Plaintiff re-alleges the preceding paragraphs as if fully set forth herein.

112.   Defendant Monsanto was the manufacturer and designer of the Roundup products purchased and used by Plaintiff. As such, Defendant Monsanto had a duty to design its Roundup products so that they would not create an unreasonable risk of injury to persons using or otherwise being exposed to them.

113.   Defendant Monsanto breached this duty. Specifically, the foreseeable use of its Roundup products created the unreasonable risk of dermal exposure to glyphosate - a human carcinogen - and the development of NHL.

114.   Defendant Monsanto's breach of this duty was a direct cause of Plaintiff's NHL.

115.   As a result, Defendant Monsanto is liable to the Plaintiff for actual damages sufficient to compensate him for his injuries. Furthermore, Defendant's conduct rose to the level of grossly negligent, reckless, willful and wanton conduct, and therefore Defendant Monsanto is liable to the Plaintiff for an amount of punitive damages sufficient to impress upon it the seriousness of its misconduct.

## SECOND CAUSE OF ACTION
### (Negligence)

116.   Plaintiff re-alleges the preceding paragraphs as if fully set forth herein.

117.   As the designer, manufacturer, and seller of Roundup, Defendant Monsanto had a duty to exercise reasonable care in the designing, researching, testing, manufacturing, marketing, supplying, promoting, packaging, sale, and/or distribution of Roundup into the stream of commerce, including a duty to assure that the product would not cause users to suffer unreasonable, dangerous side effects.

118.   Defendant Monsanto was negligent in the designing, researching, testing, manufacturing, marketing, supplying, promoting, packaging, sale, testing, quality assurance, quality control, and/or distribution of Roundup into interstate commerce in that Defendant knew

19

or should have known that using Roundup created a high risk of unreasonable, dangerous side effects, including, but not limited to, the development of NHL, as well as other severe and personal injuries that are permanent and lasting in nature, cause physical pain and mental anguish, including diminished enjoyment of life, as well as the need for lifelong medical treatment, monitoring, and/or medications.

119.    The negligence by the Defendant, its agents, servants, and/or employees, included, but was not limited to, the following acts and/or omissions:

a)    Manufacturing, producing, promoting, formulating, creating, and/or designing Roundup without thoroughly and sufficiently testing it;

b)    Failing to adequately and correctly warn the Plaintiff, the public, the medical and agricultural professions, and the EPA of the dangers of Roundup;

c)    Failing to petition the EPA to strengthen the warnings associated with Roundup;

d)    Failing to provide adequate cautions and warnings to protect the health of users, handlers, applicators, and persons who would reasonably and foreseeably come into contact with Roundup;

e)    Marketing, advertising, and recommending the use of Roundup without sufficient knowledge as to its dangerous propensities;

f)    Representing that Roundup had equivalent safety and efficacy as other forms of herbicides;

g)    Designing Roundup in a manner that was dangerous to its users;

h)    Manufacturing Roundup in a manner that was dangerous to its users; and

i)    Producing Roundup in a manner that was dangerous to its users.

120.    Defendant Monsanto's breach of this duty was a direct cause of the damages suffered by Plaintiff, namely the NHL contracted by Plaintiff.

121.    As a result, Defendant Monsanto is liable to the Plaintiff for actual damages sufficient to compensate him for his injuries. Furthermore, Defendant's conduct rose to the level of grossly negligent, reckless, willful and wanton conduct, and therefore Defendant Monsanto is

20

liable to the Plaintiff for an amount of punitive damages sufficient to impress upon it the seriousness of its misconduct.

### THIRD CAUSE OF ACTION
### (Products Liability—Failure to Warn)

122.    Plaintiff re-alleges the preceding paragraphs as if fully set forth herein.

123.    Defendant Monsanto was the manufacturer and seller of the Roundup products purchased and used by Plaintiff. As such, Defendant Monsanto had a duty to provide adequate warnings and instructions to Plaintiff and other users of Roundup of the foreseeable risks associated with its products, namely, the risk of NHL associated with dermal exposure to the products.

124.    Defendant Monsanto failed to provide an adequate warning or instruction on its Roundup products by failing to warn that dermal exposure to the products could result in the contraction of NHL.

125.    Defendant Monsanto's failure to provide an adequate warning of the cancer risk associated with its Roundup products was unreasonable. A reasonable and prudent manufacturer and seller, acting under the same or similar circumstances, would have provided an adequate warning or instruction.

126.    At the time the Roundup products left the control of Defendant Monsanto, the lack of an adequate warning or instruction pertaining to the cancer risk associated with the products created an unreasonably dangerous condition that the Defendant knew or, in the exercise of ordinary care, should have known posed a substantial risk of harm to a reasonably foreseeable person, namely, Plaintiff.

127.    Defendant Monsanto's failure to warn or otherwise instruct Plaintiff and other users of Roundup of the cancer risk associated with its Roundup products was a direct cause of the damages suffered Plaintiff, particularly the NHL he contracted.

128.    As a result, Defendant Monsanto is liable to the Plaintiff for actual damages sufficient to compensate him for his injuries. Furthermore, Defendant's conduct rose to the level of grossly negligent, reckless, willful and wanton conduct, and therefore Defendant Monsanto is liable to the Plaintiff for an amount of punitive damages sufficient to impress upon it the seriousness of its misconduct.

## FOURTH CAUSE OF ACTION
### (Breach of Warranty—Express and Implied)

129.    Plaintiff re-alleges the preceding paragraphs as if fully set forth herein.

130.    Monsanto expressly warranted to Plaintiff that its Roundup products would conform to Monsanto's promises of safety and fitness for use in commercial and residential settings.

131.    Monsanto created this express warranty by making its description of Roundup as part of the basis of the bargain with Plaintiff and an intentional means of enticing him to purchase the Roundup products.

132.    Defendant Monsanto also impliedly warranted that its Roundup products were merchantable in that they were fit for the ordinary purposes for which the products were to be used.

133.    Defendant Monsanto breached these express and implied warranties by inserting into the stream of commerce Roundup products that contained undisclosed risks of cancer while the Defendants either knew or should have known of such risks.

134.   Plaintiff did not know and had no way of knowing of the defects in the Defendant's Roundup products.

135.   As a direct and proximate result of Defendant Monsanto's breaches of warranty, Plaintiff was exposed to Roundup's carcinogenic properties and ultimately developed NHL. But for Defendant Monsanto's deceptive acts and/or practices, this illness would not have occurred.

### FIFTH CAUSE OF ACTION
### (Negligent Misrepresentation and/or Fraud)

136.   Plaintiff re-alleges the preceding paragraphs as if fully set forth herein.

137.   Defendant described and represented its Roundup products as safe for use by and around humans.

138.   Defendant knew or should have known that these descriptions and representation were not true.

138.   Defendant made these descriptions and representations with the intent to induce the purchase and use of its Roundup products.

139.   Plaintiff and other purchasers of defendant's Roundup products to which plaintiff was exposed relied upon these descriptions and representations.

140.   Defendant's descriptions and representations of its Roundup products were a direct cause of Plaintiff's contraction of NHL

141.   As a result, Defendant Monsanto is liable to the Plaintiff for actual damages sufficient to compensate him for his injuries. Furthermore, Defendant's conduct rose to the level of grossly negligent, reckless, willful and wanton conduct, and therefore Defendant Monsanto is liable to the Plaintiff for an amount of punitive damages sufficient to impress upon it the seriousness of its misconduct.

23

## SIXTH CAUSE OF ACTION
### (Punitive Damages)

142.    Plaintiff re-alleges the preceding paragraphs as if fully set forth herein.

143.    Defendant's decision to sell its Roundup products was willful, malicious, reckless, wanton, fraudulent, and/or in bad faith, thus entitling plaintiff to punitive damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment against Defendant as follows:

1.    Compensatory damages according to proof and in an amount that will fully compensate Plaintiff for all of his injuries and damages, both past and present;

2.    Punitive damages according to proof and in an amount that will adequately punish defendant and deter others from similar conduct;

3.    Disgorgement of profits;

4.    All other damages as allowed by law;

5.    Costs and expenses of this litigation;

6.    Reasonable attorneys' fees and costs as provided by law; and

7.    Such further relief as this Court deems necessary, just, and proper.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff hereby demands a trial by jury as to all claims in this Complaint so triable.

Dated: July 1, 2020

**LAW OFFICES OF DAVID M. HOULISTON**


By:   */s/ David M. Houliston*
     David M. Houliston (NM #4711)
7500 Jefferson St. NE, #106
Albuquerque, NM 87109
david@houlistonlaw.com
(505) 247-1223


        AND


**CIRESI CONLIN LLP**
Michael V. Ciresi (MN #16949)
Robert J. King, Jr. (MN #55906)
225 S. 6th St., Suite 4600
Minneapolis, MN 55402
RJK@CiresiConlin.com
(612) 361-8200


**ATTORNEYS FOR PLAINTIFF**