ACO

# U.S. District Court
## Eastern District of New York (Central Islip)
## CIVIL DOCKET FOR CASE #: 2:20-cv-00847-SJF-ST

White et. al. v. Monsanto Company et. al.
Assigned to: Judge Sandra J. Feuerstein
Referred to: Magistrate Judge Steven Tiscione
Cause: 28:1332 Diversity-Product Liability

Date Filed: 02/17/2020
Jury Demand: Plaintiff
Nature of Suit: 365 Personal Inj. Prod. Liability
Jurisdiction: Diversity

**Plaintiff**

**Mary Annne White**

represented by **Josephine Maria Lupis**
Lupis Law Firm
98 Cutter Mill Rd
Suite 332
Great Neck, NY 11021
(516) 242-8173
Fax: (516) 466-2799
Email: Josephine@LupisLawFirm.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Amanda Vignone**

represented by **Josephine Maria Lupis**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Jarret Vignone**

represented by **Josephine Maria Lupis**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Monsanto Company**

represented by **Brett Covington**
Hollingsworth LLP
1350 I Street, Nw
Washington, DC 20005
202-898-5800
Fax: 202-682-1639
Email: bcovington@hollingsworthllp.com
*ATTORNEY TO BE NOTICED*

**Defendant**

**Bayer AG**
*TERMINATED: 07/22/2020*

**Defendant**

**Home Depot, Inc.**

**Defendant**

**Lowes Companies, Inc.**

represented by **Brett Covington**
(See above for address)
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 02/17/2020 | 1 | COMPLAINT *Mary Anne White, Amanda Vignone & Jarret Vignone v. Monsanto Company, Bayer AG, Home Depot, Inc. & Lowes Companies, Inc.* against All Defendants filing fee $ 400, receipt number ANYEDC-12400695 Was the Disclosure Statement on Civil Cover Sheet completed -Yes, filed by Mary Anne White, Jarret Vignone, Amanda Vignone. (Attachments: # 1 Civil Cover Sheet, # 2 Proposed Summons) (Lupis, Josephine) Modified on 2/18/2020 (Vanderbilt, Evelyn). (Entered: 02/17/2020) |
| 02/17/2020 | 2 | DISCLOSURE of Interested Parties by Mary Anne White, Jarret Vignone, Amanda Vignone. (Lupis, Josephine) (Entered: 02/17/2020) |
| 02/17/2020 | | Case Assigned to Judge Sandra J. Feuerstein and Magistrate Judge Steven Tiscione. Please download and review the Individual Practices of the assigned Judges, located on our website. Attorneys are responsible for providing courtesy copies to judges where their Individual Practices require such. (Vanderbilt, Evelyn) (Entered: 02/18/2020) |
| 02/18/2020 | 3 | This attorney case opening filing has been checked for quality control. See the attachment for corrections that were made. (Vanderbilt, Evelyn) (Main Document 3 replaced on 2/18/2020) (Vanderbilt, Evelyn). (Entered: 02/18/2020) |
| 02/18/2020 | 4 | In accordance with Rule 73 of the Federal Rules of Civil Procedure and Local Rule 73.1, the parties are notified that *if* all parties consent a United States magistrate judge of this court is available to conduct all proceedings in this civil action including a (jury or nonjury) trial and to order the entry of a final judgment. Attached to the Notice is a blank copy of the consent form that should be filled out, signed and filed electronically **only if all** parties wish to consent. The form may also be accessed at the following link: http://www.uscourts.gov/uscourts/FormsandFees/Forms/AO085.pdf. **You may withhold your consent without adverse substantive consequences**. Do NOT return or file the consent unless all parties have signed the consent. (Vanderbilt, Evelyn) (Entered: 02/18/2020) |
| 02/18/2020 | | Your proposed summons was not issued for one of the following reasons: **Incorrect name and address on the To Section**<br><br>Please correct and resubmit using Proposed Summons/Civil Cover Sheet. (Vanderbilt, Evelyn) (Entered: 02/18/2020) |
| 02/19/2020 | 5 | Proposed Summons. Re 1 Complaint, by Amanda Vignone, Jarret Vignone, Mary Annne White (Lupis, Josephine) (Entered: 02/19/2020) |
| 02/19/2020 | 6 | Summons Issued as to Bayer AG, Home Depot, Inc., Lowes Companies, Inc., Monsanto Company. (Vanderbilt, Evelyn) (Entered: 02/19/2020) |
| 02/19/2020 | | NOTICE of Hearing: Initial Conference set for 6/22/2020 at 11:15 AM in Courtroom 1010 before Judge Sandra J. Feuerstein at the Central Islip Federal Courthouse, located at 100 Federal Plaza, Central Islip, New York 11722. The parties shall appear with authority, or |

| | | |
|---|---|---|
| | | with individuals with authority, to settle this matter. Plaintiff(s) shall serve a copy of this Notice of Hearing upon Defendant(s) and file proof of such service with the Court. c/ECF (Killigrew, Patricia) (Entered: 02/19/2020) |
| 05/15/2020 | | SCHEDULING ORDER: The Initial Conference scheduled to be held before the undersigned on 6/22/2020 is rescheduled for 11:00 AM . **FURTHER NOTE:** Said conference will be conducted telephonically. At the designated time, the Parties are to call Chambers' teleconferencing number, **(877) 336-1280,** and follow the automated instructions; the access code is: **7215690** . Ordered by Judge Sandra J. Feuerstein on 5/15/2020. c/ECF (Adell, April) (Entered: 05/15/2020) |
| 05/15/2020 | | ORDER re Scheduling Order: Plaintiffs shall serve a copy of the 5/15/2020 Scheduling Order upon defendants and file proof of such service with the Court. Ordered by Judge Sandra J. Feuerstein on 5/15/2020. c/ECF (Adell, April) (Entered: 05/15/2020) |
| 06/12/2020 | 7 | MOTION to Adjourn Conference *Motion Joint Letter Seeking Adjournment of June 22, 2020 Conference* by Lowes Companies, Inc., Monsanto Company. (Covington, Brett) (Entered: 06/12/2020) |
| 06/15/2020 | | ORDER granting 7 Motion to Adjourn Conference: The Initial Conference scheduled to be held before the undersigned on 6/22/2020 is adjourned to 8/27/2020 at 11:00 AM. FURTHER NOTE: Said conference will be conducted telephonically. At the designated time, the Parties are to call Chambers' teleconferencing number, **(877) 336-1280** , and follow the automated instructions; the access code is: **7215690** . Ordered by Judge Sandra J. Feuerstein on 6/15/2020. c/ECF (Adell, April) (Entered: 06/15/2020) |
| 07/22/2020 | 8 | NOTICE of Voluntary Dismissal by Mary Annne White *NOTICE OF DISMISSAL OF DEFENDANT, BAYER AG* (Lupis, Josephine) (Entered: 07/22/2020) |
| 07/22/2020 | 9 | AMENDED COMPLAINT *against defendant's properly named on consent of all parties* against All Defendants, filed by Mary Annne White. (Attachments: # 1 Certificate of Service) (Lupis, Josephine) (Entered: 07/22/2020) |

| **PACER Service Center** | | |
|---|---|---|
| **Transaction Receipt** | | |
| 08/10/2020 14:17:48 | | |
| **PACER Login:** | jmlupis13 | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 2:20-cv-00847-SJF-ST |
| **Billable Pages:** | 3 | **Cost:** | 0.30 |

UNITED STATES DISTRICT COURT
EASTERN DISTRICT: NEW YORK

-------------------------------------------------------------X

MARY ANNE WHITE, AMANDA VIGNONE,
and JARRET VIGNONE,

                Plaintiffs,

      -against-

MONSANTO COMPANY,
HOME DEPOT U.S.A., INC., and LOWES HOME
CENTERS, LLC.

                Defendant.

-------------------------------------------------------------X

**Case No.: 2:20-cv-00847-SJF-ST**

**PLAINTIFF'S FIRST
<u>AMENDED COMPLAINT</u>**

Jury Trial Demanded

SIR:

PLEASE TAKE NOTICE, that the Plaintiffs, MARY ANNE WHITE, AMANDA VIGNONE, and JARRET VIGNONE, hereby bring this complaint for damages against Monsanto Monsanto Company (hereinafter "Monsanto") as well as Home Depot U.S.A., Inc. (hereinafter "Home Depot") and Lowes Home Centers, LLC (hereinafter "Lowes") and alleges as follows:

## NATURE OF THE CASE

1. This is an action for damages suffered by Plaintiffs as a direct and proximate result of Monsanto's negligent and wrongful conduct in connection with the design, development, manufacture, testing, packaging, promoting, marketing, advertising, distribution, labeling, and/or sale of the herbicide Roundup® ("Roundup"), containing the active ingredient glyphosate. Together with Defendants' Home Depot's and Lowes's promoting, marketing,

advertising, distribution, labeling, and/or sale at the retail level of the herbicide Roundup® ("Roundup"), containing the active ingredient glyphosate. Glyphosate has been found to be carcinogenic, linked to various forms of cancer, and in particular non-Hodgkins Lymphoma. As such, Roundup is dangerous to human health and unfit to be marketed and sold in commerce, particularly without proper warnings and directions as to the dangers associated with its use. Plaintiffs' injuries, like those striking thousands of similarly situated victims across the country, were avoidable and Plaintiffs, who used Roundup extensively, now suffer from non-Hodgkins Lymphoma and bring this action for the harm they have incurred.

## JURISDICTION AND VENUE

2. This Court has jurisdiction over Monsanto and this action pursuant to 28 U.S.C.§1332 because there is complete diversity of citizenship between Plaintiffs and Monsanto. Monsanto are all either incorporated and/or have their principal place of business outside of the state in which the Plaintiffs reside. Plaintiff Mary Anne White (hereinafter "White" or "Mary Anne") and Amanda Vignone (hereinafter "Amanda"), are natural persons and at all relevant times residents of the State of New York. Plaintiff Jarret Vignone (hereinafter "Jarret"), is a natural person and at all relevant times is a resident of the State of Tennessee. The amount of controversy exceeds $75,000.00 exclusive of interest and costs. The Court also has supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

3. Venue is proper within this district pursuant to 28 U.S.C. § 1391 because Defendants individually and collectively sold, marketed, and distributed Roundup in this District and the acts/and or omissions including the Plaintiffs' exposure to Roundup were within this District.

**PARTIES**

4. Plaintiff, Mary Anne White is a resident of Suffolk County, New York. Plaintiff brings this action for personal injuries sustained by exposure to Roundup containing the active ingredient glyphosate and the surfactant POEA. As a direct and proximate result of being exposed to Roundup, Plaintiff developed breast cancer Her 2 positive/PR & ER negative. White is the mother of plaintiffs Amanda Vignone and Jarret Vignone each of which developed Hodgkin's Lymphoma as minors from their exposure to Roundup.

5. Plaintiff, Amanda Vignone is a resident of Nassau County, New York. Plaintiff brings this action for personal injuries sustained by exposure to Roundup containing the active ingredient glyphosate and the surfactant POEA. As a direct and proximate result of being exposed to Roundup, Plaintiff developed bulk Hodgkin's Lymphoma.

6. Plaintiff, Jarret Vignone is a resident of Knox County, Tennessee. Plaintiff brings this action for personal injuries sustained by exposure to Roundup containing the active ingredient glyphosate and the surfactant POEA. As a direct and proximate result of being exposed to Roundup, Plaintiff developed Hodgkin's Lymphoma stage 1 cancer.

7. Monsanto is a Delaware corporation, in "active" status, with a principle place of business in St. Louis, Missouri and a subsidiary of Bayer AG.

8. Home Depot USA is a Delaware corporation, in "active" status, with a principle place of business in Atlanta, Georgia.

9. Lowes Home Centers, LLC is a North Carolina corporation, in "active" status, with a principle place of business in Wilkesboro, North Carolina.

3

# FACTUAL ALLEGATIONS

10. At all relevant times, Monsanto designed, researched, manufactured, tested, advertised, promoted, marketed, distributed, and sold goods, specifically Roundup, in Suffolk County, New York.

11. At all relevant times, Monsanto advertised, promoted, marketed, distributed, and sold goods, specifically Roundup, in Suffolk County, New York through Home Depot and Lowes home improvement stores where it was purchased by Mary Anne.

12. "Roundup" refers to all formulations of Monsanto's roundup products, including, but not limited to, Roundup Concentrate Poison Ivy and Tough Brush Killer 1, Roundup Custom Herbicide, Roundup D-Pak herbicide, Roundup Dry Concentrate, Roundup Export Herbicide, Roundup Fence & Hard Edger, Roundup Garden Foam Weed & Grass Killer, Roundup Grass and Weed Killer, Roundup Herbicide, Roundup Original 2k herbicide, Roundup Original II Herbicide, Roundup Pro Concentrate, Roundup Prodry Herbicide, Roundup Promax, Roundup Quik Stik Grass and Weed Killer, Roundup Quikpro Herbicide, Roundup Rainfast Concentrate Weed & Grass Killer, Roundup Rainfast Super Concentrate Weed & Grass Killer, Roundup Ready-to-Use Extended Control Weed & Grass Killer 1 Plus Weed Preventer, Roundup Ready-to-Use Weed & Grass Killer, Roundup Ready-to-Use Weed and Grass Killer 2, Roundup Ultra Dry, Roundup Ultra Herbicide, Roundup Ultramax, Roundup VM Herbicide, Roundup Weed & Grass Killer Concentrate, Roundup Weed & Grass Killer Concentrate Plus, Roundup Weed & Grass killer Ready-to-Use Plus, Roundup Weed & Grass Killer Super Concentrate, Roundup Weed & Grass Killer1 Ready-to-Use, Roundup WSD Water Soluble Dry Herbicide Deploy Dry Herbicide, or any other formulation of containing the active ingredient glyphosate.

13. Monsanto is a multinational agricultural biotechnology corporation based out of St.

Louis, Missouri and is the world's leading producer of glyphosate.

14. Monsanto discovered the herbicidal properties of glyphosate during the 1970's and subsequently began to design, research, manufacture, sell and distribute glyphosate based "Roundup" as a broad-spectrum herbicide. Glyphosate is the active ingredient in Roundup.

15. Glyphosate is a broad-spectrum herbicide used to kill weeds and grasses known to compete with commercial crops grown around the globe.

16. Glyphosate is a "non-selective" herbicide, meaning it kills indiscriminately based only on whether a given organism produces a specific enzyme, 5-enolpyruvylshikimic acid-3-phosphate synthase, known as EPSP synthase.

17. Glyphosate inhibits the enzyme 5-enolpyruvylshikimic acid-3-phosphate synthase that interferes with the shikimic pathway in plants, resulting in the accumulation of shikimic acid in plant tissue and ultimately plant death.

18. Sprayed as a liquid, plants absorb glyphosate directly through their leaves, stems, and roots, and detectable quantities accumulate in the plant tissues.

19. For nearly 40 years, farmers across the globe have used Roundup, unaware of its carcinogenic properties.

20. Each year, approximately 250 million pounds of glyphosate are sprayed on crops, commercial nurseries, suburban lawns, parks, and golf courses. This increase in use has been driven largely by the proliferation of genetically engineered crops, crops specifically tailored to resist the activity of glyphosate.

21. Monsanto are intimately involved in the development, design, manufacture, marketing,

sale, and/or distribution of genetically modified ("GMO") crops, many of which are marketed as being resistant to Roundup *i.e.,* "Roundup Ready®." As of 2009, Monsanto were the world's leading producer of seeds designed to be Roundup Ready®. In 2010, an estimated 70% of corn and cotton, and 90% of soybean fields in the United States contained Roundup Ready® seeds.

22. The original Roundup, containing the active ingredient glyphosate, was introduced in 1974. Today, glyphosate products are among the world's most widely used herbicides. Monsanto's glyphosate products are registered in more than 130 countries and are approved for weed control in more than 100 crops. No other herbicide active ingredient compares in terms of number of approved uses.[1]

## REGISTRATION OF HERBICIDES UNDER FEDERAL LAW

23. The manufacture, formulation and distribution of herbicides, such as Roundup, are regulated under the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA"), 7. U.S.C. § 136 *et seq.* FIFRA requires that all pesticides be registered with the Environmental Protection Agency ("EPA) prior to their distribution, sale, or use, except as described by FIFRA 7 U.S.C. 136a(a).

24. The EPA requires as part of the registration process, among other requirements, a variety of tests to evaluate the potential for exposure to pesticides, toxicity to people and other potential non-target organisms, and other adverse effects on the environment. Registration by the EPA, however, is not an assurance or finding of safety. The determination the EPA makes in

---

[1] *Backgrounder,* History of Monsanto's Glyphosate Herbicides, June 2005 available at www.monsanto.com/products/glyphosate-background-materials/back_ground.pdf

registering or re-registering a product is not that the product is "safe," but rather that use of the product in accordance with its label directions "will not generally cause unreasonable adverse effects on the environment." 7 U.S.C. § 136(a)(c)(5)(D).

25. FIFRA defines "unreasonable adverse effects on the environment" to mean "any unreasonable risk to man or the environment, taking into account the economic, social, and environmental costs and benefits of the use of any pesticide." 7 U.S.C. § 136(bb). FIFRA thus requires the EPA to make a risk/benefit analysis in determining whether a registration should be granted or allowed to continue to be sold in commerce.

26. The EPA and the State of New York registered Roundup for distribution, sale, and manufacture in the United States and the State of New York.

27. FIFRA generally requires that the registrant, Monsanto, conduct health and safety testing of pesticide products. The government is not required, nor is it able, to perform the product tests that are required of the manufacturer.

28. The evaluation of each pesticide product distributed, sold, or manufactured is completed at the time the product is initially registered. The data necessary for registration of a pesticide has changed over time. The EPA is now in the process of re-evaluating all pesticide products through a Congressionally mandated process called "re-registration." 7 U.S.C. § 136a-1. In order to reevaluate these pesticides, the EPA demands the completion of additional tests and the submission of data for the EPA's review and evaluation.

29. In the case of glyphosate and Roundup, the EPA had planned on releasing its preliminary risk assessment – in relation to the registration process – no later than July 2015. The EPA completed its review of glyphosate in early 2015 but delayed releasing the assessment pending further review in light of the World Health Organization's findings.

## MONSANTO'S FALSE REPRESENTATIONS REGARDING THE SAFETY OF ROUNDUP®

30.  In 1996, the New York Attorney General ("NYAG") filed a lawsuit against Monsanto based on its false and misleading advertising of Roundup products. Specifically, the lawsuit challenged Monsanto's general representations that its spray-on glyphosate-based herbicides, including Roundup, were "safer **than table salt**" and "practically **non-toxic**" to mammals, birds, and fish. Among the representations the NYAG found deceptive and misleading about the human and environmental safety of Roundup are the following:

a)  Remember that environmentally friendly Roundup herbicide is biodegradable. It won't build up in the soil so you can use Roundup with confidence along customers' driveways, sidewalks and fences.

b)  And remember that Roundup is biodegradable and won't build up in the soil. That will give you the environmental confidence you need to use Roundup everywhere you've got a weed, brush, edging or trimming problem.

c)  This non-residual herbicide will not wash or leach in the soil. It ... stays where you apply it.

d)  You can apply Accord with *"confidence because it will stay where you put it"* it bonds tightly to soil particles, preventing leaching. Then, soon after application, soil microorganisms biodegrade Accord into natural products.

e)  Glyphosate is less toxic to rats than table salt following acute oral ingestion.

f) Roundup biodegrades into naturally occurring elements.

g) Remember that versatile Roundup herbicide stays where you put it. That means there's no washing or leaching to harm customers' shrubs or after application, soil microorganisms biodegrade Accord into natural ingestion.

h) Glyphosate's safety margin is much greater than required. It has over a 1,000-fold safety margin in food and over a 700-fold safety margin for workers who manufacture it or use it.

i) You can feel good about using herbicides by Monsanto. They carry a toxicity category rating of 'practically non-toxic' as it pertains to mammals, birds and fish.

j) "Roundup can be used where kids and pets will play and breaks down into natural material." This ad depicts a person with his head in the ground and a pet dog standing in an area which has been treated with Roundup[2].

31. On November 19, 1996, Monsanto entered into an Assurance of Discontinuance with NYAG, in which Monsanto agreed, among other things, "to cease and desist from publishing or broadcasting any advertisements [in New York] that represent, directly or by implication" that:

   a. its glyphosate-containing pesticide products or any component thereof are safe, non-toxic, harmless or free from risk;

   ***

   b. its glyphosate-containing pesticide products or any component thereof manufactured, formulated, distributed or sold by Monsanto are biodegradable;

---

[2] Attorney General of the State of New York, in the Matter of Monsanto Company, Assurance of Discontinuance Pursuant to Executive Law §63(15) (Nov.1996).

\*\*\*

   c.  its glyphosate-containing pesticide products or any component thereof stay where they are applied under all circumstances and will not move through the environment by any means;

\*\*\*

   d.  its glyphosate-containing pesticide products or any component thereof are "good" for the environment or are "known for their environmental characteristics;" \*\*\*

   e.  glyphosate-containing pesticide products or any component thereof are f) its glyphosate-containing products or any component thereof might be classified as "practically non-toxic.

32. Monsanto did not alter its advertising in the same manner in any state other than New York, and on information and belief still has not done so today.

33. In 2009, France's highest court ruled that Monsanto had not told the truth about the safety of Roundup. The French court affirmed an earlier judgment that Monsanto had falsely advertised its herbicide Roundup as "biodegradable" and that it "left the soil clean.[3]

## EVIDENCE OF CARCINOGENICITY IN ROUNDUP

34. As early as the 1980's Monsanto was aware of glyphosate's carcinogenic properties.

35. On March 4, 1985 a group of the EPA's Toxicology Branch published a

---

[3] *Monsanto Guilty in 'False Ad' Row,* BBC, Oct. 15, 2009, *available at* http://news.bbc.co.uk/2/hi/europe/8308903.stm.

memorandum classifying glyphosate as a Category C oncogene[4]. Category C oncogenes are possible human carcinogens with limited evidence of carcinogenicity.

36. In 1986, the EPA issued a Registration Standard for glyphosate (NTIS PB87-103214). The Registration standard required additional phytotoxicity, environmental fate, toxicology, product chemistry, and residue chemistry studies. All of the data required was submitted and reviewed and/or waived.[5]

37. In October 1991 the EPA published a Memorandum entitled "Second Peer Review of Glyphosate." The memorandum changed glyphosate's classification to Group E (evidence of non- carcinogenicity for humans). Two peer review committee members did not concur with the conclusions of the committee and one member refused to sign.[6]

38. In addition to the toxicity of the active molecule, many studies support the hypothesis that glyphosate formulations found in Monsanto's Roundup products are more dangerous and toxic than glyphosate alone.[7] As early as 1991 evidence existed demonstrating that glyphosate formulations were significantly more toxic than glyphosate alone.

39. In 2002, Julie Marc published a study entitled "Pesticide Roundup Provokes Cell

---

[4] Consensus Review of Glyphosate, Casewell No. 661A. March 4, 1985. United States Environmental Protection Agency.
[5] http://www.epa.gov/oppsrrd1/reregistration/REDs/factsheets/0178fact.pdf
[6] U.S. EPA, *Memorandum Subject Second Peer Review of Glyphosate*, CAS No. 1071-83-6. October 30, 1881. United States Environmental Protection Agency.
[7] Martinez et al. *Oral and pulmonary toxicology of the surfactant used in Roundup herbicide*, PROC. WEST. PHARMACOL. SOC. 34:43-46 (1991); Nora Benachour, et. al. *Glyphosate Formulations Induce Apoptosis and Necrosis in Human Umbilical, Embryotic, and Placental Cells*, 22 CHEM. RES. TOXICOL. 97-105 (2009); Gasnier et al. 2010; Francisco Peixoto *Comparative Effects of the Roundup and glyphosate on mitochrondial oxidative phosphorylation*, 61 CHEMOSPHERE 1115, 1122 (2005); March 2004

Division Dysfunction at the Level of CDK1/Cyclin B Activation.[8]" The study found that Monsanto's Roundup caused delays in the cell cycles of sea urchins, while the same concentrations of glyphosate alone proved ineffective and did not alter cell cycles.

40. In 2004, Julie Marc published a study entitled "Glyphosate-based pesticides affect cell cycle regulation." The study demonstrated a molecular link between glyphosate-based products and cell cycle dysregulation.[9]

41. The study noted that "cell-cycle dysregulation is a hallmark of tumor cells and human cancer. Failure in the cell-cycle checkpoints leads to genomic instability and subsequent development of cancers from the initial affected cell." Further, "[s]ince cell cycle disorders such as cancer result from dysfunction of unique cell, it was of interest to evaluate the threshold dose of glyphosate affecting cells."[10]

42. In 2005, Francisco Peixoto published a study showing that Roundup's effects on rat liver mitochondria are much more toxic and harmful than the same concentrations of glyphosate alone.

43. The Peixoto study suggested that the harmful effects of Roundup on mitochondrial bioenergetics could not be exclusively attributed to glyphosate and could be the result of other chemicals, namely the surfactant POEA, or alternatively due to the possible synergy between glyphosate and Roundup formulation products.

44. In 2009, Nora Benachour and Gilles-Eric Seralini published a study examining the

---

[8] Julie Marc, et. al., *Pesticide Roundup Provokes Cell Division Dysfunction at the Level of CDK1/Cyclin B Activation,* 15 CHEM. RES. TOXICOL. 326-331 (2002).
[9] Julie Marc, et. al., *Glycophosate-based pesticides affect cell cycle regulation,* 96 BIOLOGY OF THE CELLS 245, 245-249 (2004).
[10] (Molinari, 2000; Stewart et al., 2003)

effects of Roundup and glyphosate on human umbilical, embryonic, and placental cells.

45. The study used dilution levels of Roundup and glyphosate far below agricultural recommendations, corresponding with low levels of residues in food. The Study concluded that supposed "inert" ingredients, and possibly POEA, change human cell permeability and amplify toxicity of glyphosate alone. The study further suggested that determinations of glyphosate toxicity should consider the presence of adjuvants, or those chemicals used in the formulation of the complete pesticide. The study confirmed that the adjuvants in Roundup are not inert and that Roundup is always more toxic than its active ingredient glyphosate.

46. The results of these studies were confirmed in recently published peer-reviewed studies and were at all times available and/or known to Monsanto.

47. Monsanto knew or should have known that Roundup is more toxic than glyphosate alone and that safety studies on Roundup, Roundup's adjuvants and "inert" ingredients, and/or the surfactant POEA were necessary to protect Plaintiff from Roundup.

48. Monsanto knew or should have known that tests limited to Roundup's active ingredient glyphosate were insufficient to prove the safety of Roundup.

49. Monsanto failed to appropriately and adequately test Roundup, Roundup's adjuvants and "inert" ingredients, and/or the surfactant POEA to protect Plaintiff from Roundup.

50. Rather than performing appropriate tests, Monsanto relied upon flawed industry-supported studies designed to protect Monsanto's economic interests rather than Plaintiff and the consuming public.

51. Despite their knowledge that Roundup was considerably more dangerous than glyphosate alone, Monsanto continued to promote Roundup as safe.

## IARC CLASSIFICATION OF GLYPHOSATE

52. The International Agency for Research on Cancer ("IARC") is the specialized intergovernmental cancer agency the World Health Organization ("WHO") of the United Nations tasked with conducting and coordinating research into the causes of cancer.

53. An IARC Advisory Group to Recommend Priorities for IARC Monographs during 2015–2019 met in April 2014. Though nominations for the review were solicited, a substance must meet two criteria to be eligible for review by the IARC Monographs: there must already be some evidence of carcinogenicity of the substance, and there must be evidence that humans are exposed to the substance.

54. IARC set glyphosate for review in 2015-2016. IARC uses five criteria for determining priority in reviewing chemicals. The substance must have a potential for direct impact on public health; scientific literature to support suspicion of carcinogenicity; evidence of significant human exposure; high public interest and/or potential to bring clarity to a controversial area and/or reduce public anxiety or concern; related agents similar to one given high priority by the above considerations. Data reviewed is sourced preferably from publicly accessible, peer-reviewed data.

55. On March 24, 2015, after its cumulative review of human, animal, and DNA studies for more than one (1) year, many of which have been in Monsanto's possession since as early as 1985, the IARC's working group published its conclusion that the glyphosate contained in Monsanto's Roundup herbicide, is a Class 2A "probable carcinogen" as demonstrated by the mechanistic evidence of carcinogenicity in humans and sufficient evidence of carcinogenicity in animals.

56. The IARC's full Monograph was published on July 29, 2015 and established

14

glyphosate as a class 2A *probable* carcinogen to humans. According to the authors glyphosate demonstrated sufficient mechanistic evidence (genotoxicity and oxidative stress) to warrant a 2A classification based on evidence of carcinogenicity in humans and animals.

57. The IARC Working Group found an increased risk between exposure to glyphosate and non-Hodgkin's lymphoma ("NHL") and several subtypes of NHL, and the increased risk continued after adjustment for other pesticides.

58. The IARC also found that glyphosate caused DNA and chromosomal damage in human cells.

## EARLIER EVIDENCE OF GLYPHOSATE'S DANGER

59. Despite the new classification by the IARC, Monsanto have had ample evidence of glyphosate and Roundup's genotoxic properties for decades.

60. Genotoxicity refers to chemical agents that can damage the DNA within a cell through genetic mutations, which is a process that is believed to lead to cancer.

61. In 1997, Chris Clements published "Genotoxicity of select herbicides in *Rana catesbeiana* tadpoles using the alkaline single-cell gel DNA electrophoresis (comet) assay."

62. The study found that tadpoles exposed to Roundup showed significant DNA damage when compared with unexposed control animals.

63. Both human and animal studies have shown that glyphosate and glyphosate-based formulations such as Roundup can induce oxidative stress.

64. Oxidative stress and associated chronic inflammation are believed to be involved in carcinogenesis.

65. The IARC Monograph notes that "[s]trong evidence exists that glyphosate, AMPA and lyphosate-based formulations can induce oxidative stress."

66. In 2006 César Paz-y-Miño published a study examining DNA damage in human subjects exposed to glyphosate.

67. The study produced evidence of chromosomal damage in blood cells showing significantly greater damage after exposure to glyphosate than before in the same individuals, suggesting that the glyphosate formulation used during aerial spraying had a genotoxic effect on exposed individuals.

68. The IARC Monograph reflects the volume of evidence of glyphosate pesticides' genotoxicity noting "[t]he evidence for genotoxicity caused by glyphosate-based formulations is strong."

69. Despite knowledge to the contrary, Monsanto maintain that there is no evidence that Roundup is genotoxic, that regulatory authorities and independent experts are in agreement that Roundup is not genotoxic, and that there is no evidence that Roundup is genotoxic.

70. In addition to glyphosate and Roundup's genotoxic properties, Monsanto have long been aware of glyphosate's carcinogenic properties.

71. Glyphosate and Roundup in particular have long been associated with carcinogenicity and the development of numerous forms of cancer, including, but not limited to, non-Hodgkin's lymphoma, Hodgkin's lymphoma, multiple myeloma, and soft tissue sarcoma.

72. Monsanto have known of this association since the early to mid-1980s and numerous human and animal studies have evidenced the carcinogenicity of glyphosate and/or Roundup.

73. In 1985 the EPA studied the effects of glyphosate in mice finding a dose related response in male mice linked to renal tubal adenomas, a rare tumor. The study concluded the glyphosate was oncogenic.

74. In 2003 Lennart Hardell and Mikael Eriksson published the results of two case

16

controlled studies on pesticides as a risk factor for NHL and hairy cell leukemia.

75. The study concluded that glyphosate had the most significant relationship to NHL among all herbicide's studies with an increased odds ratio of 3.11.

76. In 2003 AJ De Roos published a study examining the pooled data of mid-western farmers, examining pesticides and herbicides as risk factors for NHL.

77. The study, which controlled for potential confounders, found a relationship between increased NHL incidence and glyphosate.

78. In 2008 Mikael Eriksson published a study a population-based case-control study of exposure to various pesticides as a risk factor for NHL.

79. This strengthened previous associations between glyphosate and NHL.

80. Despite this knowledge, Monsanto continued to issue broad and sweeping statements suggesting that Roundup was, and is, safer than ordinary household items such as table salt, despite a lack of scientific support for the accuracy and validity of these statements and, in fact, voluminous evidence to the contrary.

81. Upon information and belief, these statements and representations have been made with the intent of inducing Plaintiff, the agricultural community, and the public at large to purchase, and increase the use of, Monsanto's Roundup for Monsanto's pecuniary gain, and in fact did induce Plaintiff to use Roundup.

82. Monsanto made these statements with complete disregard and reckless indifference to the safety of Plaintiff and the general public.

83. Notwithstanding Monsanto's representations, scientific evidence has established a clear association between glyphosate and genotoxicity, inflammation, and an increased risk of many cancers, including, but not limited to, NHL, Multiple Myeloma, and soft tissue sarcoma.

17

84. Monsanto knew or should have known that glyphosate is associated with an increased risk of developing cancer, including, but not limited to, NHL, Multiple Myeloma, and soft tissue sarcoma.

85. Monsanto failed to appropriately and adequately inform and warn Plaintiffs of the serious and dangerous risk associated with the use and exposure to glyphosate and/or Roundup, including but not limited to, the risk of developing NHL, as well as other severe and personal injuries, which are permanent and/or long-lasting in nature, cause significant physical pain and mental anguish, diminished enjoyment of life, and the need for medical treatment, monitoring and/or medications.

86. Despite the IARC's classification of glyphosate as a class 2A probable carcinogen, Monsanto continue to maintain that glyphosate and/or Roundup is safe, non-carcinogenic, non-genotoxic, and falsely warrant to users and the general public that independent experts and regulatory agencies agree that there is no evidence of carcinogenicity or genotoxicity in glyphosate and Roundup.

87. Monsanto have claimed and continue to claim that Roundup is safe, non-carcinogenic, and non-genotoxic.

88. Monsanto claims on its website that "[r]egulatory authorities and independent experts around the world have reviewed numerous long-term/carcinogenicity and genotoxicity studies and agree that there is no evidence that glyphosate, the active ingredient in Roundup brand herbicides and other glyphosate-based herbicides, causes cancer, even at very high doses, and that it is not genotoxic".[11]

---

[11] Backgrounder - Glyphosate: No Evidence of Carcinogenicity. Updated November 2014. (downloaded October 9 2015)

89. Ironically, the primary source for this statement is a 1986 report by the WHO, the same organization that now considers glyphosate to be a probable carcinogen.

90. Glyphosate, and Monsanto's Roundup products have long been associated with serious side effects and many regulatory agencies around the globe have banned or are currently banning the use of glyphosate herbicide products.

91. Monsanto's statements proclaiming the safety of Roundup and disregarding its dangers misled Plaintiffs.

92. Despite Monsanto's knowledge that Roundup was associated with an elevated risk of developing cancer, Monsanto's promotional campaigns focused on Roundup's purported "safety profile".

93. Monsanto's failure to adequately warn Plaintiff resulted in (1) Plaintiff using and being exposed to glyphosate instead of using another acceptable and safe method of controlling unwanted weeds and pests; and (2) scientists and physicians failing to warn and instruct consumers about the risk of cancer, including NHL, and other injuries associated with Roundup.

94. Monsanto failed to seek modification of the labeling of Roundup to include relevant information regarding the risks and dangers associated with Roundup exposure.

95. The failure of Monsanto to appropriately warn and inform the EPA has resulted in inadequate warnings in safety information presented directly to users and consumers.

96. The failure of Monsanto to appropriately warn and inform the EPA has resulted in the absence of warning or caution statements that are adequate to protect health and the environment.

97. The failure of Monsanto to appropriately warn and inform the EPA has resulted in the directions for use that are not adequate to protect health and the environment.

98. By reason of the foregoing acts and omissions, Plaintiffs seek compensatory damages as a result of Plaintiff's use of, and exposure to, Roundup which caused or was a substantial contributing factor in causing Plaintiffs to suffer from cancer and Plaintiffs suffered severe and personal injuries which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life.

99. By reason of the foregoing, Plaintiffs are severely and permanently injured.

100. By reason of the foregoing acts and omissions, Plaintiffs have endured and, in some categories continue to suffer, emotional and mental anguish, medical expenses, and other economic and non-economic damages, as a result of the actions and inactions of the Monsanto.

## PLAINTIFFS' EXPOSURE TO ROUNDUP

101. Plaintiff, Mary Anne White began using Roundup on her brick patio on or about 1995, walkways, lawn and flower beds as frequently as 2-3 times per week continuously during the spring, summer and into the fall until 2004.

102. Mary Anne White purchased Roundup at both her local Home Depot and Lowes home improvement stores.

103. Plaintiffs followed all safety and precautionary warnings during their use.

104. Plaintiff Mary Anne White's then minor children, Plaintiffs Jarret Vignone (then six-years old) and Amanda Vignone (then twelve-years old) assisted in removing the weeds from the brick patio, walkways, and flower beds after the Roundup was used.

105. Plaintiffs Jarret and Amanda Vignone also played in or around the yard on or about the brick patio, walkways, lawn and flower beds where Roundup was applied.

106. In April 2004, Jarret, then 15 years of age, was playing with a friend when he was

accidentally kicked in the side and experienced unusual pain after the incident.

107.    In addition to complaining of pain, Jarret contracted a cough and was promptly brought to his Pediatrician who conducted an x-ray which revealed a mass. At the doctor's instructions, Plaintiff Mary Anne White, Jarret Vignone's mother, immediately went to Schneider Children's Hospital.

108.    The tests conducted at Schneider Children's Hospital confirmed a mass on Jarret Vignone between his lung and heart that was biopsied and found to be Hodgkin's Lymphoma requiring chemotherapy and radiation.

109.    During Plaintiff Jarret Vignone's treatment, he was removed from school and his friends and "home schooled" to facilitate an aggressive treatment of four months of chemotherapy and one month of radiation that would not have been possible had he remained enrolled in his current school district.

110.    When Jarret Vignone turned 18, he continued monitoring at Memorial Sloan Kettering Hospital.

111.    Upon information and belief, due to the Hodgkin's Lymphoma requiring chemotherapy and radiation, it is believed that Plaintiff, Jarret Vignone is unable to father children.

112.    In June of 2004, during a routine mammogram of Plaintiff Mary Anne White, a spot was discovered on the films.

113.    A subsequent sonogram did not reveal the spot, so she was instructed to return in six months for another mammogram and sonogram.

114.    In October of 2004, Plaintiff Mary Anne Vignone returned to the Huntington

Woman's Center in Huntington, New York for a follow up mammogram and sonogram. Both the mammography and sonogram revealed the previously detected spot on her left breast.

115.    A subsequent biopsy revealed that the mass on her left breast was malignant and in December 2004, Plaintiff Mary Anne White had a Lumpectomy performed.

116.    The Lumpectomy revealed that Plaintiff Mary Anne White had breast cancer, Her2 positive/PR & ER negative.[12]

117.    In January 2005, Plaintiff Mary Anne White at the instruction of her oncologist, sought treatment at Memorial Sloan Kettering where she underwent a standard protocol of chemotherapy from January 2005 until May 2005. Following the chemotherapy, Plaintiff Mary Anne White was placed on the then clinical trial drug Herceptin due to the aggressive nature of Her2 breast cancer for an additional year.

118.    Plaintiff Mary Anne White was subjected to 4 months of chemotherapy, 1 month of radiation and 1 year of Herceptin and was followed at Memorial Sloan Kettering for five years post treatment for yearly mammograms and sonograms to date.

119.    In May of 2006 while attending her senior year at UCLA, Plaintiff Amanda Vignone felt ill and noticed a strange lump on her neck. She immediately reported to the Arthur Ashe Medical Center on campus where a lump was detected on her neck, and a later biopsy revealed a malignant mass.

120.    Plaintiff Amanda Vignone promptly returned to New York to seek treatment at Memorial Sloan Kettering.

121.    While undergoing testing at Memorial Sloan Kettering upon her return to New

---

[12] Her2 breast cancer is most likely associated with environmental factors, one of which has been linked to repeated use and prolonged exposure to Roundup.

York, one evening while at home with Plaintiff Maryanne White, Plaintiff Amanda Vignone became very ill and arrived at St Catherine's Hospital Emergency Room Hospital where she was admitted into the cardiac care unit to monitor her arrythmia as the lymphoma began affecting her heart as well.

122.   The testing performed at Memorial Sloan Kettering revealed that Plaintiff, Amanda Vignone had presence of bulk Hodgkin's Lymphoma and the recommended course of treatment was to commence aggressive chemotherapy.

123.   Amanda Vignone began chemotherapy in November of 2006 that continued for 4 months followed by 2 months of radiation.

124.   Amanda Vignone continued treatment and monitoring with Memorial Sloan Kettering for approximately the next 5 years.

125.   Upon information and belief due to the bulk Hodgkin's Lymphoma and the chemotherapy and radiation treatments, Plaintiff Amanda Vignone is unable to bear a child.

126.   In addition to the foregoing, in July 2006 the family Cocker Spaniel, belonging to Plaintiffs Mary Anne White, Amanda Vignone and Jarret Vignone who enjoyed playing in the yard with Plaintiffs, was diagnosed with Melanoma in her back paw and underwent surgery to remove the mass. In September of 2006 the dog was having trouble breathing. Plaintiff Mary Anne White took the dog to a 24-hour specialized emergency clinic where x-rays of her lungs revealed she had terminal and inoperable cancer with estimated hours to live. The dog passed away that evening at the emergency veterinary hospital.

## EQUITABLE TOLLING OF APPLICABLE STATUTE OF LIMITATIONS

127.   Plaintiff incorporates by reference all prior paragraphs of this Complaint as if

fully set forth herein.

### a. *Fraudulent Concealment Tolling*

128.    The running of any statute of limitations has been tolled by reason of Monsanto's fraudulent concealment. Monsanto, through their affirmative misrepresentations and omissions, actively concealed from Plaintiff the true risks associated with Roundup and glyphosate.

129.    Indeed, even as of October 2015, Monsanto continue to represent to the public that "*Scientists are in agreement* that there is *no evidence* glyphosate causes cancer." (emphasis added).[13]

130.    As a result of Monsanto's actions, Plaintiff was unaware, and could not reasonably know or have learned through reasonable diligence that Roundup and/or glyphosate contact, exposed Plaintiff to the risks alleged herein and that those risks were the direct and proximate result of Monsanto's acts and omissions.

### b. *Estoppel*

131.    Furthermore, Monsanto are estopped from relying on any statute of limitations because of their fraudulent concealment of the true character, quality and nature of Roundup.

132.    Monsanto were under a duty to disclose the true character, quality, and nature of Roundup because this was non-public information over which Monsanto had and continue to have exclusive control, and because Monsanto knew that this information was not available to Plaintiff or to distributors of Roundup.

133.    In addition, Monsanto are estopped from relying on any statute of limitations

---

[13] Backgrounder - Glyphosate: No Evidence of Carcinogenicity. Updated November 2014. (downloaded October 9 2015)

because of their intentional concealment of these facts.

134.    Plaintiff had no knowledge that Monsanto were engaged in the wrongdoing alleged herein. Because of the fraudulent acts of concealment of wrongdoing by Monsanto, Plaintiff could not have reasonably discovered the wrongdoing at any time prior. Also, the economics of this fraud should be considered. Monsanto had the ability to and did spend enormous amounts of money in furtherance of their purpose of marketing, promoting and/or distributing a profitable herbicide, notwithstanding the known or reasonably known risks. Plaintiff and medical professionals could not have afforded and could not have possibly conducted studies to determine the nature, extent, and identity of related health risks, and were forced to rely on only the Monsanto's representations.

135.    Accordingly, Monsanto are precluded by the discovery rule and/or the doctrine of fraudulent concealment from relying upon any statute of limitations.

## FIRST CAUSE OF ACTION (NEGLIGENCE)

136.    Plaintiff repeats, reiterates, and re-alleges each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

137.    Monsanto had a duty to exercise reasonable care in the designing, researching, testing, manufacturing, marketing, supplying, promoting, packaging, sale, and/or distribution of Roundup into the stream of commerce, including a duty to assure that the product would not cause users to suffer unreasonable, dangerous side effects.

138.    Home Depot had a duty to exercise reasonable care in the marketing, supplying,

promoting, sale, and/or distribution of Roundup into the stream of commerce, including a duty to assure that the product would not cause users to suffer unreasonable, dangerous side effects.

139.   Lowes had a duty to exercise reasonable care in the marketing, supplying, promoting, sale, and/or distribution of Roundup into the stream of commerce, including a duty to assure that the product would not cause users to suffer unreasonable, dangerous side effects.

140.   Monsanto failed to exercise ordinary care in the designing, researching, testing, manufacturing, marketing, supplying, promoting, packaging, sale, testing, quality assurance, quality control, and/or distribution of Roundup into interstate commerce in that Monsanto knew or should have known that using Roundup created a high risk of unreasonable, dangerous side effects, including, but not limited to, the development of NHL, as well as other severe and personal injuries which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life, as well as need for lifelong medical treatment, monitoring, and/or medications.

141.   Home Depot failed to exercise ordinary care in the marketing, supplying, promoting, sale, testing, and/or distribution of Roundup into interstate commerce in that Home Depot knew or should have known that using Roundup created a high risk of unreasonable, dangerous side effects, including, but not limited to, the development of NHL, as well as other severe and personal injuries which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life, as well as need for lifelong medical treatment, monitoring, and/or medications.

142.   Lowes failed to exercise ordinary care in the marketing, supplying, promoting, sale, testing, and/or distribution of Roundup into interstate commerce in that  Lowes knew or should have known that using Roundup created a high risk of unreasonable, dangerous side

26

effects, including, but not limited to, the development of NHL, as well as other severe and personal injuries which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life, as well as need for lifelong medical treatment, monitoring, and/or medications.

143. The negligence by Monsanto, their agents, servants, and/or employees, included but was not limited to the following acts and/or omissions:

a. Manufacturing, producing, promoting, formulating, creating, and/or designing Roundup without thoroughly testing it;

b. Failing to test Roundup and/or failing to adequately, sufficiently, and properly test Roundup;

c. Not conducting sufficient testing programs to determine whether or not Roundup was safe for use; in that Monsanto herein knew or should have known that Roundup was unsafe and unfit for use by reason of the dangers to its users;

d. Not conducting sufficient testing programs and studies to determine Roundup's carcinogenic properties even after Monsanto had knowledge that Roundup is, was, or could be carcinogenic;

e. Failing to conduct sufficient testing programs to determine the safety of "inert" ingredients and/or adjuvants contained within Roundup, and the propensity of these ingredients to render Roundup toxic, increase the toxicity of Roundup, whether these ingredients are carcinogenic, magnify the carcinogenic properties of Roundup, and whether or not "inert" ingredients and/or adjuvants were safe for use;

27

f.  Negligently failing to adequately and correctly warn the Plaintiff, the public, the medical and agricultural professions, and the EPA of the dangers of Roundup;

g.  Negligently failing to petition the EPA to strength the warnings associated with Roundup;

h.  Failing to provide adequate cautions and warnings to protect the health of users, handlers, applicators, and persons who would reasonably and foreseeably come into contact with Roundup;

i.  Negligently marketing, advertising, and recommending the use of Roundup without sufficient knowledge as to its dangerous propensities;

j.  Negligently representing that Roundup was safe for use for its intended purpose, and/or that Roundup was safer than ordinary and common items such as table salt, when, in fact, it was unsafe;

k.  Negligently representing that Roundup had equivalent safety and efficacy as other forms of herbicides;

l.  Negligently designing Roundup in a manner, which was dangerous to its users;

m.  Negligently manufacturing Roundup in a manner, which was dangerous to its users;

n.  Negligently producing Roundup in a manner, which was dangerous to its users;

o.  Negligently formulating Roundup in a manner, which was dangerous to its users;

     p.   Concealing information from the Plaintiff while knowing that Roundup was unsafe, dangerous, and/or non-conforming with EPA regulations; and

     q.   Improperly concealing and/or misrepresenting information from the Plaintiff, scientific and medical professionals, and/or the EPA, concerning the severity of risks and dangers of Roundup compared to other forms of herbicides;

     r.   Negligently selling Roundup with a false and misleading label.

144.   The negligence by Home Depot, their agents, servants, and/or employees, included but was not limited to the following acts and/or omissions:

     a.   Negligently marketing, advertising, selling, and recommending the use of Roundup without sufficient knowledge as to its dangerous propensities;

     b.   Negligently selling Roundup with a false and misleading label.

145.   The negligence by Lowes, their agents, servants, and/or employees, included but was not limited to the following acts and/or omissions:

     a.   Negligently marketing, advertising, selling, and recommending the use of Roundup without sufficient knowledge as to its dangerous propensities;

     b.   Negligently selling Roundup with a false and misleading label.

146.   Monsanto under-reported, underestimated, and downplayed the serious dangers of Roundup.

147.   Monsanto negligently and deceptively compared the safety risks and/or dangers of Roundup with common everyday foods such as table salt, and other forms of herbicides.

148.   Monsanto were negligent and/or violated New York law in the designing, researching, supplying, manufacturing, promoting, packaging, distributing, testing, advertising, warning, marketing, and selling of Roundup in that they:

    a.  Failed to use ordinary care in designing and manufacturing Roundup to avoid the risks to individuals when Roundup was used as an herbicide;

    b.  Failed to accompany their product with proper and/or accurate warnings regarding all possible adverse side effects associated with the use of Roundup;

    c.  Failed to accompany their product with proper warnings regarding all possible adverse side effects concerning the failure and/or malfunction of Roundup;

    d.  Failed to accompany their product with accurate warnings regarding the risks of all possible adverse side effects concerning Roundup;

    e.  Failed to warn Plaintiff of the severity and duration of such adverse effects, as the warnings given did not accurately reflect the symptoms, or severity of the side effects including, but not limited to, the development of NHL;

    f.  Failed to conduct adequate testing, clinical testing and post-marketing surveillance to determine the safety of Roundup;

    g.  Failed to conduct adequate testing, clinical testing, and post-marketing surveillance to determine the safety of Roundup's "inert" ingredients and/or adjuvants;

    h.  Negligently misrepresented the evidence of Roundup's genotoxicity and carcinogenicity;

    i.  Were otherwise careless and/or negligent.

149.   Even though Monsanto knew or should have known that Roundup caused, or could cause, unreasonably dangerous side effects, Monsanto continued and continue to market, manufacture, distribute, and/or sell Roundup to consumers, including the Plaintiff.

150.   Despite the fact that Home Depot knew or should have known that Roundup

caused, or could cause, unreasonably dangerous side effects, Monsanto continued and continue to market, distribute, and/or sell Roundup to consumers, including the Plaintiffs.

151.    Even though Lowes knew or should have known that Roundup caused, or could cause, unreasonably dangerous side effects, Monsanto continued and continue to market, distribute, and/or sell Roundup to consumers, including the Plaintiff.

152.    Monsanto knew or should have known that consumers such as the Plaintiff would foreseeably suffer injury as a result of Monsanto's failure to exercise ordinary care, as set forth above.

153.    Home Depot knew or should have known that consumers such as the Plaintiff would foreseeably suffer injury as a result of Home Depot's failure to exercise ordinary care, as set forth above.

154.    Lowes knew or should have known that consumers such as the Plaintiff would foreseeably suffer injury as a result of Lowes's failure to exercise ordinary care, as set forth above.

155.    Monsanto's violations of law and/or negligence were the proximate cause of Plaintiff's injuries, harm and economic loss, which Plaintiff suffered and/or will continue to suffer.

156.    Home Depot's violations of law and/or negligence were the proximate cause of Plaintiff's injuries, harm and economic loss, which Plaintiff suffered and/or will continue to suffer.

157.    Lowes's violations of law and/or negligence were the proximate cause of Plaintiff's injuries, harm and economic loss, which Plaintiff suffered and/or will continue to suffer.

31

158.    As a result of the foregoing acts and omissions, the Plaintiffs suffered from serious and dangerous side effects including, breast cancer Her2 positive/PR & ER and bulk Hodgkin's Lymphoma, as well as other severe and personal injuries which are permanent and lasting in nature, physical pain and mental anguish, diminished enjoyment of life, and financial expenses for hospitalization and medical care. Further, Plaintiff suffered life- threatening breast cancer Her2 positive/PR & ER negative and bulk Hodgkin's Lymphoma, and severe personal injuries, which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life.

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in Plaintiff's favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all relief as this Court deems just and proper. Additionally, Plaintiff demands a jury trial on all issues contained herein.

## SECOND CAUSE OF ACTION (STRICT PRODUCTS LIABILITY – DESIGN DEFECT)

159.    Plaintiff repeats, reiterates and, re-alleges each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

160.    At all times herein mentioned, the Monsanto designed, researched, manufactured, tested, advertised, promoted, sold, distributed, and/or have acquired the Monsanto who have designed, researched, tested, advertised, promoted, marketed, sold, and distributed Roundup as hereinabove described that was used by the Plaintiff.

161.    Monsanto's Roundup was expected to and did reach the usual consumers,

handlers, and persons coming into contact with said product without substantial change in the condition in which it was produced, manufactured, sold, distributed, and marketed by the Monsanto.

162. At those times, Roundup was in an unsafe, defective, and inherently dangerous condition, which was dangerous to users, and in particular, the Plaintiff herein.

163. The Roundup designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed by Monsanto was defective in design or formulation in that, when it left the hands of the manufacturer and/or suppliers, the foreseeable risks exceeded the benefits associated with the design or formulation of Roundup.

164. The Roundup designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed by Monsanto was defective in design and/or formulation, in that, when it left the hands of the Monsanto manufacturers and/or suppliers, it was unreasonably dangerous, unreasonably dangerous in normal use, and it was more dangerous than an ordinary consumer would expect.

165. At all times herein mentioned, Roundup was in a defective condition and unsafe, and Monsanto knew or had reason to know that said product was defective and unsafe, especially when used in the form and manner as provided by the Monsanto. In particular, Monsanto's Roundup was defective in the following ways:

      a. When placed in the stream of commerce, Monsanto's Roundup Products were defective in design and formulation and, consequently, dangerous to an extent beyond that which an ordinary consumer would anticipate.

      b. When placed in the stream of commerce, Monsanto's Roundup products were unreasonably dangerous in that they were hazardous and posed a grave risk of

cancer and other serious illnesses when used in a reasonably anticipated
manner.

c.  When placed in the stream of commerce, Monsanto' Roundup products
contained unreasonably dangerous design defects and were not reasonably
safe when used in a reasonably anticipated manner.

d.  Monsanto did not sufficiently test, investigate, or study its Roundup products.

e.  Exposure to Roundup presents a risk of harmful side effects that outweigh any
potential utility stemming from the use of the herbicide.

f.  Monsanto new or should have known at the time of marketing its Roundup
products that exposure to Roundup and could result in cancer and other severe
illnesses and injuries.

g.  Monsanto did not conduct adequate post-marketing surveillance of its
Roundup products.

166.  Monsanto knew, or should have known that at all times herein mentioned its
Roundup was in a defective condition and was and is inherently dangerous and unsafe.

167.  Plaintiffs were exposed to Monsanto's Roundup as described above, without
knowledge of Roundup's dangerous characteristics.

168.  At the time of the Plaintiff's use of and exposure to Roundup, Roundup was being
used for the purposes and in a manner normally intended, as a broad-spectrum herbicide.

169.  Monsanto, armed with this knowledge, voluntarily designed its Roundup with a
dangerous condition for use by the public, and the Plaintiffs, Mary Anne White, Amanda
Vignone and Jarret Vignone.

170.  Monsanto had a duty to create a product that was not unreasonably dangerous for

34

its normal, intended use.

171.   Monsanto created a product that was and is unreasonably dangerous for its normal, intended use.

172.   Monsanto marketed and promoted a product in such a manner so as to make it inherently defective as the product downplayed its suspected, probable, and established health risks inherent with its normal, intended use.

173.   The Roundup designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed by Monsanto was manufactured defectively in that Roundup left the hands of Monsanto in a defective condition and was unreasonably dangerous to its intended users.

174.   The Roundup designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed by Monsanto reached their intended users in the same defective and unreasonably dangerous condition in which the Monsanto' Roundup was manufactured.

175.   Monsanto designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed a defective product, which created an unreasonable risk to the health of consumers and to the Plaintiff in particular, and Monsanto are therefore strictly liable for the injuries sustained by the Plaintiff.

176.   The Plaintiff could not, by the exercise of reasonable care, have discovered Roundup's defects herein mentioned or perceived its danger.

177.   By reason of the foregoing, the Monsanto have become strictly liable to the Plaintiff for the manufacturing, marketing, promoting, distribution, and selling of a defective product, Roundup.

178.   Monsanto's defective design, of Roundup amounts to willful, wanton, and/or

reckless conduct by Monsanto.

179.    Defects in Monsanto's Roundup were the cause or a substantial factor in causing Plaintiff's injuries.

180.    As a result of the foregoing acts and omission, the Plaintiff Mary Anne suffered from breast cancer Her2 positive/PR & ER negative and Jarret and Amanda suffered from bulk Hodgkin's Lymphoma, and suffered severe and personal injuries, all of which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life, and financial expenses for hospitalization and medical care.

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in Plaintiff's favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all relief as this Court deems just and proper. Additionally, Plaintiff demands a jury trial on all issues contained herein.

## THIRD CAUSE OF ACTION (STRICT PRODUCTS LIABILITY – FAILURE TO WARN)

181.    Plaintiff repeats, reiterates and re-alleges each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

182.    Monsanto have engaged in the business of selling, testing, distributing, supplying, manufacturing, marketing, and/or promoting Roundup, and through that conduct have knowingly and intentionally placed Roundup into the stream of commerce with full knowledge that it reaches consumers such as Plaintiff who are exposed to it through ordinary and reasonably foreseeable uses.

183.    Monsanto did in fact sell, distribute, supply, manufacture, and/or promote Roundup to Plaintiff. Additionally, Monsanto expected the Roundup that they were selling, distributing, supplying, manufacturing, and/or promoting to reach – and Roundup did in fact reach – consumers, including Plaintiff, without any substantial change in the condition of the product from when it was initially distributed by Monsanto.

184.    At the time of manufacture, Monsanto could have provided the warnings or instructions regarding the full and complete risks of Roundup and glyphosate-containing products because it knew or should have known of the unreasonable risks of harm associated with the use of and/or exposure to such products.

185.    At all times herein mentioned, the aforesaid product was defective and unsafe in manufacture such that it was unreasonably dangerous to the user, and was so at the time it was distributed by Monsanto and at the time Plaintiff was exposed to and/or ingested the product. The defective condition of Roundup was due in part to the fact that it was not accompanied by proper warnings regarding its carcinogenic qualities and possible side effects, including, but not limited to, developing non-Hodgkin's lymphoma as a result of exposure and use.

186.    Roundup did not contain a warning or caution statement, which was necessary and, if complied with, was adequate to protect health those exposed in violation of 7 U.S.C. § 136j(a)(1)(E).

187.    Monsanto' failure to include a warning or caution statement which was necessary and, if complied with, was adequate to protect the health of those exposed, violated 7 U.S.C. § 136j(a)(1)(E) as well as the laws of the State of New York.

188.    Monsanto could have revised and/or amended the label of Roundup to provide additional warnings.

37

189.    This defect caused serious injury to Plaintiff, who used Roundup in its intended and foreseeable manner.

190.    At all times herein mentioned, Monsanto had a duty to properly design, manufacture, compound, test, inspect, package, label, distribute, market, examine, maintain supply, provide proper warnings, and take such steps to assure that the product did not cause users to suffer from unreasonable and dangerous side effects.

191.    Monsanto labeled, distributed, and promoted the aforesaid product that it was dangerous and unsafe for the use and purpose for which it was intended.

192.    Monsanto failed to warn of the nature and scope of the side effects associated with Roundup, namely its carcinogenic properties and its propensity to cause or serve as a substantial contributing factor in the development of NHL.

193.    Monsanto were aware of the probable consequences of the aforesaid conduct. Despite the fact that Monsanto knew or should have known that Roundup caused serious injuries, Monsanto failed to exercise reasonable care to warn of the dangerous carcinogenic properties and side effect of developing NHL from Roundup exposure, even though these side effects were known or reasonably scientifically knowable at the time of distribution. Monsanto willfully and deliberately failed to avoid the consequences associated with their failure to warn, and in doing so, Monsanto acted with a conscious disregard for the safety of Plaintiff.

194.    At the time of exposure, Plaintiff could not have reasonably discovered any defect in Roundup prior through the exercise of reasonable care.

195.    Monsanto, as the manufacturers and/or distributors of the subject product, are held to the level of knowledge of an expert in the field.

196.    Plaintiff reasonably relied upon the skill, superior knowledge, and judgment of

38

Monsanto.

197.    Had Monsanto properly disclosed the risks associated with Roundup, Plaintiff would have avoided the risk of NHL by not using Roundup.

198.    The information that Monsanto did provide or communicate failed to contain adequate warnings and precautions that would have enabled Plaintiff, and similarly situated individuals, to utilize the product safely and with adequate protection. Instead, Monsanto disseminated information that was inaccurate, false, and misleading and which failed to communicate accurately or adequately the comparative severity, duration, and extent of the risk of injuries associated with use of and/or exposure to Roundup and glyphosate; continued to promote the efficacy of Roundup, even after it knew or should have known of the unreasonable risks from use or exposure; and concealed, downplayed, or otherwise suppressed, through aggressive marketing and promotion, any information or research about the risks and dangers of exposure to Roundup and glyphosate.

199.    To this day, Monsanto have failed to adequately warn of the true risks of Plaintiff's injuries associated with the use of and exposure to Roundup.

200.    As a result of their inadequate warnings and actions, Monsanto' Roundup products were defective and unreasonably dangerous when they left the possession and/or control of Monsanto, were distributed by Monsanto, and used by Plaintiff.

201.    As a direct and proximate result of Monsanto' actions as alleged herein, and in such other ways to be later shown, the subject product caused Plaintiff to sustain injuries as herein alleged.

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in Plaintiff's favor for compensatory and punitive damages, together with interest, costs herein incurred,

attorneys' fees and all relief as this Court deems just and proper. Additionally, Plaintiff demands a jury trial on all issues contained herein.

### FOURTH CAUSE OF ACTION (BREACH OF IMPLIED WARRANTIES)

202. Plaintiff repeats, reiterates, and re-alleges each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect all if more fully set forth herein.

203. At all times herein mentioned, the Monsanto manufactured, distributed, compounded, recommended, merchandized, advertised, promoted, and sold Roundup and/or have recently acquired the Monsanto who have manufactured, compound portrayed, distributed, recommended, merchandized, advertised, promoted, and sold Roundup, as a broad spectrum herbicide. These actions were under the ultimate control and supervision of Monsanto.

204. At the time Monsanto marketed, sold, and distributed Roundup for use by Plaintiff, Monsanto knew of Roundup's intended use and impliedly warranted the product to be or merchantable quality and safe and fit for this use.

205. The Monsanto impliedly represented and warranted to Plaintiff and users of Roundup, the agricultural community, and/or the EPA that Roundup was safe and of merchantable quality and fit for the ordinary purpose for which it was to be used.

206. These representations and warranties were false, misleading, and inaccurate in that Roundup was unsafe, unreasonably dangerous, not of merchantable quality, and defective.

207. Plaintiffs and/or the EPA did rely on said implied warranty of merchantability of fitness for particular use and purpose.

208. Plaintiffs reasonably relied upon the skill and judgment of Monsanto as to whether Roundup was of merchantable quality and safe and fit for its intended use.

209.   Roundup was injected into the stream of commerce by the Monsanto in a defective, unsafe, and inherently dangerous condition, and the products' materials were expected to and did reach users, handlers, and persons coming into contact with said products without substantial change in the condition in which they were sold.

210.   The Monsanto breached the aforesaid implied warranties, as their herbicide Roundup was not fit for its intended purposes and uses.

211.   As a result of the foregoing acts and omissions, Plaintiff Mary Anne suffered from breast cancer Her2 positive/PR & ER negative and Jarret and Amanda suffered from bulk Hodgkin's Lymphoma and Plaintiffs all suffered severe and personal injuries which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life, financial expenses for hospitalization and medical care, including medical expenses and other economic, and non-economic damages.

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in Plaintiff's favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all relief as this Court deems just and proper. Additionally, Plaintiff demands a jury trial on all issues contained herein.

### FIFTH CAUSE OF ACTION (LOSS OF SOCIETY, COMPANIONSHIP, AND CONSORTIUM)

212.   Plaintiff repeats, reiterates, and re-alleges each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect all if more fully set forth herein.

213.   Plaintiff, White is the parent of plaintiffs Amanda and Jarret Vignone and was

their legal guardian when they were diagnosed with Hodgkin's Lymphoma. As a result of Jarret Vignone's treatment, he required constant monitoring and "home schooling" which was done by Plaintiff White.

214.   Plaintiff White not only cared for and attended to Jarret's and Amanda's additional needs while at home but also transported them to and attended their treatment and doctor's appointments.

215.   The extra care Jarret and Amanda required and "home schooling" required by Jarret forced White to spend a substantial greater amount of time at home dedicated to the ongoing care of her children and their needs and to focus on her own illness and cancer treatment.

216.   As a result of Jarret's and Amanda's injuries they were unable to or had difficulty completing simple household chores requiring them to be completed by White.

217.   As a result of Jarret's and Amanda's injuries they were unable to provide the companionship to White that they did previously.

218.   As a result of Jarret's and Amanda's injuries, White was deprived the parental society, companionship, and consortium of her children as well as pain and suffering and other non-economic damages.

WHEREFORE, Plaintiffs respectfully requests that this Court enter judgment in Plaintiffs' favor for compensatory and punitive damages, together with interest, costs herein

incurred, attorneys' fees and all relief as this Court deems just and proper. Additionally,

Plaintiffs demands a jury trial on all issues contained herein.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment against the Defendants on each of the above-referenced claims and causes of action and as follows:

1. Awarding compensatory damages in excess of the jurisdictional amount, including, but not limited to pain, suffering, emotional distress, loss of enjoyment of life, loss of society, companionship, and consortium and other non-economic damages in an amount to be determined at trial of this action;

2. Awarding compensatory damages to Plaintiff(s) for past and future damages, including, but not limited to, Plaintiffs' pain and suffering and for severe and permanent personal injuries sustained by the Plaintiff(s) including health care costs and economic loss;

3. Awarding economic damages in the form of medical expenses, out of pocket expenses, lost earnings and other economic damages in an amount to be determine at trial of this action;

4. Punitive and/or exemplary damages for the wanton, willful, fraudulent, and reckless acts of the Defendants who demonstrated a complete disregard and reckless indifference for the safety and welfare of the general public and to the Plaintiff(s) in an amount sufficient to punish Defendants and deter future similar conduct, to the extent allowed by applicable law;

5. Pre-judgment interest;

6. Post-judgment interest;

7. Awarding Plaintiff(s) reasonable attorneys' fees;

8. Awarding Plaintiff(s) the costs of these proceedings; and

9. Such other and further relief as this Court deems just and proper.

WHEREFORE, Plaintiffs demand judgment against the Monsanto on each of the above-referenced claims and causes of action and awarding with interest compensatory damages in excess of the jurisdictional amount, including, but not limited to pain, suffering, emotional distress, loss of enjoyment of life, together with punitive damages, reasonable attorneys' fees, costs incurred herein, and such other and further relief as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demands trial by jury as to all issues.

Respectfully submitted,

Dated: July 20, 2020

By:  /s/ Josephine M. Lupis, Esq.
_____

**LUPIS LAW FIRM**
*Attorney for Plaintiff(s): Mary Anne White, Amanda Vignone and Jarret Vignone*
98 Cutter Mill Road, Suite 332
Great Neck, NY 11021
Tel: (516) 570-6636
Email: Josephine@LupisLawFirm.com

TO:

**HOLLINGSWORTH LLP**
Martin Calhoun
Brett S. Covington
1350 I Street, NW
Washington, DC 20005
Tel: (202) 898-5867
Email: mcalhoun@Hollingsworthllp.com
    bcovington@Hollingsworthllp.com
*Attorneys for Defendant, Monsanto Company & Lowes Home Centers, LLC.*

**MORRIS, MANNING & MARTIN, LLP**
Patrick Lowther
1600 Atlanta Financial Center
3343 Peachtree Road, NE
Atlanta, GA 30326
Tel: 404-495-3633
Email: plowther@mmmlaw.com
*Attorneys for Defendant, Home Depot U.S.A., Inc.*

## LUPIS LAW FIRM

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

CASE No. 2:20-cv-00847-SJF-ST

MARY ANNE WHITE, AMANDA VIGNONE & JARRET VIGNONE,

Plaintiff(s)

-against-

MONSANTO COMPANY, HOME DEPOT U.S.A., INC. & LOWES HOME CENTERS, LLC.

Defendant(s)

---

## PLAINTIFFS' FIRST AMENDED COMPLAINT

*Pursuant to 22 NYCRR Rule 130-1.1-a, the undersigned, an attorney admitted to practice in the State of New York certifies that, upon information and belief and reasonable inquiry, the contentions contained in the annexed paper(s) are not frivolous.*

_____/s/ Josephine M. Lupis, Esq._____
*{Josephine M. Lupis}*
*LUPIS LAW FIRM*
*Attorney(s) for Defendant*
*98 Cutter Mill Road, Suite 332*
*Great Neck, New York 11021*
*Tel: (516) 570-6636*

To:
Attorney(s) for
Office Address & Tel. No.

Service of a copy of the within

is hereby admitted.

_____    Dated: _____

Attorneys for

---

PLEASE TAKE NOTICE

____    **Notice of Entry**
that that within is a (certified) true copy of a                duly entered in the office of the clerk of the within court on

* *    **Notice of Settlement/Order**
that a                        which within is a true copy will be presented to Hon.
one of the judges of the within named court on                    at            a.m./p.m.

Dated: _____

# CERTIFICATION OF SERVICE

I hereby certify that on July 22, 2020, a copy of the within

## PLAINTIFF'S FIRST AMENDED COMPLAINT

was served and addressed to each of the following person on consent of the named defendants at

the last known address set forth after each name via email and uploaded electronically through the

ECF system to the following:

To:

**HOLLINGSWORTH LLP**
Martin Calhoun
Brett S. Covington
1350 I Street, NW
Washington, DC 20005
Tel: (202) 898-5867
Email: mcalhoun@Hollingsworthllp.com
        bcovington@Hollingsworthllp.com
*Attorneys for Defendant, Monsanto Company & Lowes Home Centers, LLC.*

**MORRIS, MANNING & MARTIN, LLP**
Patrick Lowther
1600 Atlanta Financial Center
3343 Peachtree Road, NE
Atlanta, GA 30326
Tel: 404-495-3633
Email: plowther@mmmlaw.com
*Attorneys for Defendant, Home Depot U.S.A., Inc.*


_____
JOSEPHINE M. LUPIS, ESQ.