# U.S. District Court
## Northern District of West Virginia (Clarksburg)
## CIVIL DOCKET FOR CASE #: 1:20-cv-00198-TSK

Romano v. Monsanto Company
Assigned to: District Judge Thomas S. Kleeh
Case in other court: Circuit Court of Harrison County, West
                             Virginia, 20-C-176-1
Cause: 28:1332 Diversity-Notice of Removal

Date Filed: 08/10/2020
Jury Demand: None
Nature of Suit: 365 Personal Inj. Prod. Liability
Jurisdiction: Diversity

**Plaintiff**

**Nathan P. Romano**                                    represented by   **David J. Romano**
Romano Law Office
363 Washington Ave.
Clarksburg, WV 26301
(304) 624-5600
Fax: 304-624-5627
Email: rlo@romanolawwv.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Monsanto Company**                                    represented by   **Floyd E. Boone , Jr.**
Bowles Rice LLP - Charleston
600 Quarrier Street
Charleston, WV 25301
(304) 347-1100
Fax: (304) 347-1756
Email: fboone@bowlesrice.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**William Austin Smith , II**
Bowles Rice LLP - Charleston
600 Quarrier Street
Charleston, WV 25301
(304) 347-1133
Fax: (304) 347-1746
Email: asmith@bowlesrice.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|------------|---|-------------|
| 08/10/2020 | 1 | NOTICE OF REMOVAL with State Court Papers from Circuit Court of Harrison County, West Virginia, (case number 20-C-176), filed by Monsanto Company. (Attachments: # 1 Exhibit 1, # 2 Civil Cover Sheet)(wrr) (Entered: 08/10/2020) |
| 08/10/2020 | 2 | VERIFICATION OF ATTORNEY ADMISSION as to Floyd E. Boone, Jr. (wrr) (Entered: |

| | | 08/10/2020) |
|---|---|---|
| 08/10/2020 | 3 | ANSWER to Complaint by Monsanto Company.(Smith, William) (Entered: 08/10/2020) |
| 08/10/2020 | 4 | Corporate Disclosure Statement by Monsanto Company identifying Other Affiliate Bayer AG for Monsanto Company.. (Smith, William) (Entered: 08/10/2020) |
| 08/11/2020 | 5 | NOTICE of Change of Address by William Austin Smith (Smith, William) (Entered: 08/11/2020) |
| 08/11/2020 | 6 | FIRST ORDER AND NOTICE REGARDING DISCOVERY AND SCHEDULING: ***_NOTICE TO ATTORNEYS_*** _: Pursuant to Rule 7.1 of the Federal Rules of Civil Procedure, ALL Non-governmental CORPORATE parties must file a DISCLOSURE STATEMENT with the Court. Forms are available on the Court's Web Site at http://www.wvnd.uscourts.gov/forms.htm_ Rule 26 Meeting to be held by 9/11/2020. Rule 26 Meeting Report due by 9/25/2020. Discovery due by 10/13/2020. Signed by District Judge Thomas S. Kleeh on 8/11/2020. (wrr) (Entered: 08/11/2020) |
| 08/11/2020 | 7 | Filing fee: $ 400.00, receipt number WVNE015638. (wrr) (Entered: 08/11/2020) |

| PACER Service Center | | |
|---|---|---|
| **Transaction Receipt** | | |
| 08/11/2020 16:24:40 | | |
| **PACER Login:** | hllp1982:2634105:4722683 | **Client Code:** 1417.0049 |
| **Description:** Docket Report | | **Search Criteria:** 1:20-cv-00198-TSK |
| **Billable Pages:** 1 | | **Cost:** 0.10 |

IN THE CIRCUIT COURT OF HARRISON COUNTY, WEST VIRGINIA

NATHAN P. ROMANO,

          Plaintiff,

v.

          Civil Action No. 20-C- **17 6 1**

          Judge **McCarthy**

MONSANTO COMPANY,

          Defendant.

## **COMPLAINT**

### **INTRODUCTION AND PARTIES**

    1)    Plaintiff, Nathan P. Romano ( known as "Nate"), is a resident of Harrison County, West Virginia and was at all times relevant herein. For more than 15 years, Nate worked at various times on parcels of land located in Harrison County and other areas that required mowing grasses and weed control. To help in the control of the undergrowth, Nate regularly used "Roundup", a herbicide created and manufactured by Defendant, Monsanto Company ("Monsanto") . Roundup was marketed as safe and Defendant Monsanto promoted Roundup as being harmless to humans for over thirty years as a completely safe herbicide for humans to use. However, Roundup was a dangerous chemical. The active chemical in Roundup, glyphosate, is a carcinogen, and upon information and belief Defendant Monsanto knew that Roundup was a carcinogen for many decades beforehand.

    2)    Defendant Monsanto is a Delaware corporation with its headquarters and principal place of business in St. Louis, Missouri and is authorized to do business in West Virginia and is registered with the West Virginia Secretary of State with an agent for the receipt of service of

process. At all times relevant to this Complaint, Defendant Monsanto was the entity that developed the herbicidal properties of glyphosate and is the manufacturer of Roundup. Defendant Monsanto has regularly transacted and conducted business within the State of West Virginia, and has derived substantial revenue from goods and products, including Roundup, used in the State of West Virginia. Defendant Monsanto expected or should have expected their acts to have consequences within the State of West Virginia.

3)      In 1970, Defendant Monsanto discovered the herbicidal properties of glyphosate and began using it in its products in 1974, and marketing it under the brand name Roundup. Roundup is a non-selective herbicide used to kill weeds that commonly compete with the growing of desired grasses and crops. By 2001, glyphosate had become the most-used active ingredient in American agriculture with 85–90 million pounds used annually. That number grew to 185 million pounds by 2007.

4)      In 2015, the International Agency for Research on Cancer (IARC), an organization within the World Health Organization (WHO), conducted an exhaustive analysis on the toxicity of glyphosate. The study resulted in the publication of an IARC Monograph—the authoritative standard for cancer hazard assessment around the World. The IARC classified glyphosate as a Group 2A hazard, meaning it is a probable human carcinogen—the second highest hazard rating. Additionally, the IARC concluded there was a positive association between glyphosate exposure and non-Hodgkin's lymphoma.

5)      Defendant Monsanto has represented Roundup as being safe to humans and the environment since it began selling the herbicide. Indeed, Defendant Monsanto had and still does proclaim to the World, and particularly to United States consumers, that glyphosate-based

2

herbicides, including Roundup, create no unreasonable risks to human health or to the environment. There is significant scientific literature that this is untrue. Before glyphosate was first approved by the Environmental Protection Agency (EPA), Defendant Monsanto knew that glyphosate could pose significant risks to human health, including a risk of causing cancer. This civil action seeks to hold Defendant Monsanto accountable for this misconduct.

6)      In July 2018, Nate was admitted to the hospital to treat enlarged lymph nodes in his neck. Later, after pathology review was completed, he was diagnosed with a form of non-Hodgkin's lymphoma, known as follicular cell lymphoma . His cancer was detected in four quadrants and he had to immediately start chemotherapy.

## JURISDICTION AND VENUE

7)      This Court has subject matter jurisdiction pursuant to West Virginia Code §56-3-33 among other statutory and common law grounds, as Defendant Monsanto delivered Roundup to citizens of West Virginia which caused harm in this State, including harm to Plaintiff.

8)      This Court has personal jurisdiction over Defendant Monsanto insofar as Defendant Monsanto is authorized and licensed to conduct business in the State of West Virginia, maintains and carries on systematic and continuous contacts in West Virginia, regularly transacts business within West Virginia , and regularly avails itself of the benefits of West Virginia including deriving substantial income from sales of Roundup in West Virginia .

9)      Venue is proper before this Court pursuant to West Virginia Code §56-3-33 and §56-1-1 and because a substantial part of the events or omissions giving rise to this claim occurred within Harrison County, West Virginia.

3

## FACTUAL ALLEGATIONS

10)     Based on information in the public domain, it is believed that, Glyphosate is a broad-spectrum, non-selective herbicide used in a wide variety of herbicidal products around the world, including the popular herbicide Roundup.

11)     Glyphosate interferes with a plant's ability to form aromatic amino acids necessary for protein synthesis. Plants treated with glyphosate generally die within two to three days. Because plants absorb glyphosate, it cannot be completely removed by washing or peeling produce, or by milling, baking, or brewing grains.

12)     The herbicidal properties of glyphosate were discovered in 1970 by Defendant Monsanto's chemist, John Franz. The first glyphosate-based herbicide was introduced to the market in the mid-1970s under the brand name Roundup.

13)     For about 40 years, consumers around the World have used Roundup, containing glyphosate, without knowing of the dangers its use poses. That is because, when Defendant Monsanto first introduced Roundup, it touted glyphosate as a technological break-through: it could kill almost every weed without causing harm either to people or to the environment. History, however, has demonstrated otherwise. According to the WHO, the main chemical ingredient of Roundup—glyphosate—is a probable carcinogen. Those most at risk are farm workers and other individuals with workplace exposure to Roundup, such as workers in garden centers, nurseries, and landscapers. Defendant Monsanto assured the public that Roundup was safe. In order to prove this, Defendant Monsanto championed falsified data and attacked legitimate studies exposing glyphosate's dangers. Defendant Monsanto orchestrated a prolonged campaign of misinformation to convince government agencies, farmers, and the general population that Roundup was safe. As

4

a result of this deception, agricultural workers and farmers have been exposed to a carcinogen, while Monsanto has made substantial revenue from this product.

### a)   Registration of Herbicides

14)   The manufacture, formulation, and distribution of herbicides, such as Roundup, is regulated under the Federal Insecticide, Fungicide, and Rodenticide Act (FIFRA), 7 U.S.C. §§ 136 et seq. FIFRA requires that all pesticides be registered with the EPA prior to distribution, sale, or use, except as described by the Act. 7 U.S.C. § 136a(a).

15)   Because pesticides are toxic to plants, animals, and humans, at least to some degree, the EPA requires as part of the registration process, among other things, a variety of tests to evaluate the potential for exposure to pesticides, toxicity to people and other potential non-target organisms, and other adverse effects on the environment. Registration by the EPA, however, is not an assurance or finding of safety. The EPA does not deem certain products "safe," but only that use of the product in accordance with its label directions "will not generally cause unreasonable adverse effects on the environment." 7 U.S.C. § 136a(c)(5)(D).

16)   FIFRA defines "unreasonable adverse effects on the environment" to mean "any unreasonable risk to man or the environment, taking into account the economic, social, and environmental costs and benefits of the use of any pesticide." 7 U.S.C. § 136(bb). FIFRA thus requires EPA to make a risk/benefit analysis in determining whether a registration should be granted or allowed to continue to be sold in commerce.

17)   FIFRA generally requires that the registrant, here Defendant Monsanto in the case of Roundup, to conduct the health and safety testing of pesticide products. The EPA has protocols governing the conduct of tests required for registration and the laboratory practices that must be

5

followed in conducting those tests. The data produced by the registrant must be submitted to the EPA

for review and evaluation. The government is not required, nor is it able, to perform the tests that

are required of the manufacturer.

18)     The evaluation of each pesticide product distributed, sold, or manufactured is

completed at the time the product is initially registered. The data necessary for registration of a

pesticide has changed over time. The EPA is now in the process of re-evaluating all pesticide

products through a congressionally-mandated process called "re-registration." 7 U.S.C. § 136a-1.

In order to reevaluate these pesticides, the EPA is demanding the completion of additional tests and

the submission of data for the EPA's review and evaluation.

19)     In the case of glyphosate, the EPA planned on releasing its preliminary risk

assessment—in relation to the re-registration process—no later than July 2015. The EPA completed

its review of glyphosate in early 2015, but it delayed releasing the risk assessment pending further

review in light of the WHO's health-related findings.

**b)     Scientific Fraud Underlying the Marketing and Sale of Glyphosate**

20)     Based on early studies that glyphosate could cause cancer in laboratory animals, the

EPA originally classified glyphosate as possibly carcinogenic to humans (Group C) in 1985. After

pressure from Defendant Monsanto, including contrary studies it provided to the EPA, the EPA

changed its classification to evidence of non-carcinogenicity in humans (Group E) in 1991. In so

classifying glyphosate, however, the EPA stated that "[i]t should be emphasized, however, that

designation of an agent in Group E is based on the available evidence at the time of evaluation and

should not be interpreted as a definitive conclusion that the agent will not be a carcinogen under any

circumstances."

6

21)     On two occasions, the EPA found that laboratories hired by Defendant Monsanto to test the toxicity of its Roundup products for registration purposes committed infractions calling into questions their results and conclusions.

22)     In the first instance, Defendant Monsanto hired Industrial Bio-Test Laboratories ("IBT") to perform and evaluate pesticide toxicology studies relating to Roundup. IBT performed approximately 30 tests on glyphosate and glyphosate-containing-products, including 9 of the 15 residue studies needed to register Roundup with the EPA.

23)     In 1976, the Food and Drug Administration ("FDA") performed an inspection of IBT and discovered discrepancies between the raw data and the final report relating to the toxicological impacts of glyphosate. The EPA subsequently audited IBT and determined that the toxicology studies conducted for the Roundup were invalid. An EPA reviewer stated, after finding "routine falsification of data" at IBT, that it was "hard to believe the scientific integrity of the studies when they said they took specimens of the uterus from male rabbits."

24)     Three top executives of IBT were convicted of fraud in 1983.

25)     In the second incident, Defendant Monsanto hired Craven Laboratories in 1991 to perform pesticide and herbicide studies, including several studies on Roundup. That same year, the owner of Craven Laboratories and three of its employees were indicted, and later convicted, of fraudulent laboratory practices in the testing of pesticides and herbicides.

**c)     Monsanto Falsely Advertised Roundup as Being Safe for Decades**

26)     In 1996, the New York Attorney General ("NYAG") filed a lawsuit against Defendant Monsanto based on its false and misleading advertising of Roundup products. Specifically, the lawsuit challenged Defendant Monsanto's general representations that its spray-on glyphosate-based

7

herbicides, including Roundup, were "safer than table salt" and "practically non-toxic" to mammals, birds, and fish. Among the representations the NYAG found deceptive and misleading about the human and environmental safety of Roundup are:

a.  "Remember that environmentally friendly Roundup herbicide is biodegradable. It won't build up in the soil so you can use Roundup with confidence along customers' driveways, sidewalks and fences."

b.  "And remember that Roundup is biodegradable and won't build up in the soil. That will give you the environmental confidence you need to use Roundup everywhere you've got a weed, brush, edging or trimming problem."

c.  "Roundup biodegrades into naturally occurring elements."

d.  "Remember that versatile Roundup herbicide stays where you put it. That means there's no washing or leaching to harm customers' shrubs or other desirable vegetation."

e.  "This non-residual herbicide will not wash or leach in the soil. It ... stays where you apply it."

f.  You can apply Roundup with "confidence because it will stay where you put it," it bonds tightly to soil particles, preventing leaching. Then, soon after application, soil microorganisms biodegrade Roundup into natural products.

g.  "Glyphosate is less toxic to rats than table salt following acute oral ingestion."

h.  "Glyphosate's safety margin is much greater than required. It has over a 1,000-fold safety margin in food and over a 700-fold safety margin for workers who manufacture it or use it."

i.  "You can feel good about using herbicides by Monsanto. They carry a toxicity category rating of 'practically non-toxic' as it pertains to mammals, birds and fish."

j.  "Roundup can be used where kids and pets will play and breaks down into natural material." This ad depicts a person with his head in the ground and a pet dog standing in an area that has been treated with Roundup.

27)   On November 19, 1996, Defendant Monsanto entered into an Assurance of Discontinuance with NYAG, in which Monsanto agreed, among other things, "to cease and desist

8

from publishing or broadcasting any advertisements [in New York] that represent, directly or by implication" that:

    a.    glyphosate-containing pesticide products or any component thereof are safe, non-toxic, harmless or free from risk;

    b.    glyphosate-containing pesticide products or any component thereof manufactured, formulated, distributed or sold by Monsanto are biodegradable;

    c.    glyphosate-containing pesticide products or any component thereof stay where they are applied under all circumstances and will not move through the environment by any means;

    d.    glyphosate-containing pesticide products or any component thereof are "good" for the environment or are "known for their environmental characteristics";

    e.    glyphosate-containing pesticide products or any component thereof are safer or less toxic than common consumer products other than herbicides; and,

    f.    glyphosate-containing products or any component thereof might be classified as "practically non-toxic."

28)    Defendant Monsanto did not alter its advertising in the same manner in any State other than New York, and on information and belief still has not done so today.

29)    In 2009, France's highest court ruled that Defendant Monsanto had not told the truth about the safety of Roundup. The French Court affirmed an earlier judgment that Defendant Monsanto had falsely advertised its herbicide Roundup as "biodegradable" and that it "left the soil clean."

    **d)    Assessments of Glyphosate**

30)    The IARC process for the classification of glyphosate followed the stringent procedures for the evaluation of a chemical agent. Over time, the IARC Monograph program has reviewed 980 agents. Of those reviewed, it has determined 116 agents to be Group 1 (Known Human Carcinogens); 73 agents to be Group 2A (Probable Human Carcinogens); 287 agents to be

Group 2B (Possible Human Carcinogens); 503 agents to be Group 3 (Not Classified); and one agent to be Probably Not Carcinogenic.

31)   In March 2015, IARC reassessed glyphosate. The summary published in The Lancet Oncology reported that glyphosate is a Group 2A agent and probably carcinogenic in humans.

32)   On July 29, 2015, IARC issued its Monograph for glyphosate, Monograph 112. For Volume 112, the volume that assessed glyphosate, the Working Group consisted of 17 experts from 11 countries who met from March 3–10, 2015, to assess the carcinogenicity of certain herbicides, including glyphosate. The March meeting culminated after a nearly one-year review and preparation by the IARC Secretariat and the Working Group, including a comprehensive review of the latest available scientific evidence. According to published procedures, the Working Group considered "reports that have been published or accepted for publication in the openly available scientific literature" as well as "data from governmental reports that are publicly available."

33)   The studies considered the various exposure groups, including occupational exposure of farmers and tree nursery workers in the United States, forestry workers in Canada and Finland, municipal weed-control workers in the United Kingdom, and para-occupational exposure in farming families.

34)   Glyphosate was identified as the second-most used household herbicide in the United States for weed control between 2001 and 2007 and the most heavily used herbicide in the World in 2012.

35)   Exposure pathways are identified as air (especially during spraying), water, and food. Community exposure to glyphosate is widespread and found in soil, air, surface water, and groundwater, as well as in food.

10

36)     The assessment of the IARC Working Group identified several case control studies of occupational exposure in the United States, Canada, and Sweden. These studies showed a human health concern from agricultural and other work-related exposure to glyphosate.

37)     The IARC Working Group conducted a systematic review of over 15 studies designed to assess whether there was an association between Roundup exposure in agricultural workers and Non-Hodgkin Lymphoma (NHL). The researchers reviewed each study, identified the results and assessed each study's strengths and weaknesses. The IARC Working Group concluded that, despite the limited evidence concerning the carcinogenicity of glyphosate in humans, a "positive association has been observed for non-Hodgkin lymphoma."

38)     The IARC Working Group also reviewed an Agricultural Health Study, consisting of a prospective cohort of 57,311 licensed pesticide applicators in Iowa and North Carolina. While this study differed from others in that it was based on a self-administered questionnaire, the results support an association between glyphosate exposure and Multiple Myeloma, Hairy Cell Leukemia (HCL), and Chronic Lymphocytic Leukemia (CLL), in addition to several other cancers.

39)     In addition to the IARC's assessment, in 2014, scientists published a systematic review and meta-analysis on the relationship between non-Hodgkin lymphoma and occupational exposure to agricultural pesticides, including glyphosate, in the International Journal of Environmental Research and Public Health. The study showed a statistically significant association between farm workers exposed to Roundup and non-Hodgkin lymphoma. The study confirmed two smaller studies from 2002 and 2008, published in the journal Leukemia & Lymphoma (2002) and the International Journal on Cancer (2008), both of which also showed a statistically significant increase in non-Hodgkin lymphoma among agricultural workers exposed to glyphosate.

11

## COUNT I:    STRICT LIABILITY (DESIGN DEFECT)

40)      Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

41)      Plaintiff brings this strict liability claim against Defendant Monsanto for defective design and marketing.

42)      At all times relevant to this litigation, Defendant engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting Roundup products, which are defective and unreasonably dangerous to consumers, including the Plaintiff, thereby placing Roundup products into the stream of commerce. These actions were under the ultimate control and supervision of Defendant. At all times relevant to this litigation, Defendant designed, researched, developed, manufactured, produced, tested, assembled, labeled, advertised, promoted, marketed, sold, and distributed the Roundup products used by Plaintiff, as described above.

43)      At all times relevant to this litigation, Defendant's Roundup products were manufactured, designed, and labeled in an unsafe, defective, and inherently dangerous manner that was dangerous for use by or exposure to the public, and, in particular, the Plaintiff.

44)      At all times relevant to this litigation, Defendant's Roundup products reached the intended consumers, handlers, and users or other persons coming into contact with these products in West Virginia and throughout the United States, including the Plaintiff, without substantial change in their condition as designed, manufactured, sold, distributed, labeled, and marketed by Defendant.

45)      Defendant's Roundup products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold, and marketed by Defendant were defective in

12

design and formulation in that, when they left the hands of the Defendant's manufacturers and/or suppliers, they were unreasonably dangerous and dangerous to an extent beyond that which an ordinary consumer would contemplate.

46)   Defendant's Roundup products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold, and marketed by Defendant were defective in design and formulation in that, when they left the hands of Defendant's manufacturers and/or suppliers, the foreseeable risks exceeded the alleged benefits associated with their design and formulation.

47)   At all times relevant to this action, Defendant knew or had reason to know that its Roundup products were defective and were inherently dangerous and unsafe when used in the manner instructed and provided by Defendant.

48)   Therefore, at all times relevant to this litigation, Defendant's Roundup products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold and marketed by Defendant were defective in design and formulation, in one or more of the following ways:

a.   When placed in the stream of commerce, Defendant's Roundup products were defective in design and formulation, and, consequently, dangerous to an extent beyond that which an ordinary consumer would contemplate.

b.   When placed in the stream of commerce, Defendant's Roundup products were unreasonably dangerous in that they were hazardous and posed a grave risk of cancer and other serious illnesses when used in a reasonably anticipated manner.

c.   When placed in the stream of commerce, Defendant's Roundup products contained unreasonably dangerous design defects and were not reasonably safe when used in a reasonably anticipated or intended manner.

d.   Defendant did not sufficiently test, investigate, or study its Roundup products and, specifically, the active ingredient glyphosate.

13

e.      Exposure to Roundup and glyphosate-containing products presents a risk of harmful side effects that outweigh any potential utility stemming from the use of the herbicide.

f.      Defendant knew or should have known at the time of marketing its Roundup products that exposure to Roundup and specifically, its active ingredient glyphosate, could result in cancer and other severe illnesses and injuries.

g.      Defendant did not conduct adequate post-marketing surveillance of its Roundup products.

h.      Defendant could have employed safer alternative designs and formulations.

49)     The Plaintiff was exposed to Defendant's Roundup products in the course of his use as described above, without knowledge of Roundup's dangerous characteristics.

50)     At all times relevant to this litigation, the Plaintiff used and/or was exposed to the use of Defendant's Roundup products in an intended or reasonably foreseeable manner, without knowledge of Roundup's dangerous characteristics.

51)     The Plaintiff could not reasonably have discovered the defects and risks associated with Roundup or glyphosate-containing products before or at the time of exposure due to the Defendant's suppression of scientific information linking glyphosate to cancer.

52)     The harm caused by Defendant's Roundup products far outweighed their benefit, rendering Defendant's product dangerous to an extent beyond that which an ordinary consumer would contemplate. Defendant's Roundup products were and are more dangerous than alternative products and Defendant could have designed its Roundup products to make them less dangerous. Indeed, at the time Defendant designed its Roundup products, the state of the industry's scientific knowledge was such that a less risky design or formulation was attainable.

53)     At the time Roundup products left Defendant's control, there may have been a practical, technically feasible and safer alternative design that would have prevented the harm

14

without substantially impairing the reasonably anticipated or intended function of Defendant's herbicides.

54)     Defendant's defective design of its Roundup products was willful, wanton, fraudulent, malicious, and conducted with reckless disregard for the health and safety of users of the Roundup products, including Plaintiff herein.

55)     Therefore, as a result of the unreasonably dangerous condition of its Roundup products, Defendant is strictly liable to Plaintiff.

56)     The defects in Defendant's Roundup products were substantial and contributing factors in causing Plaintiff's injuries, and, but for Defendant's misconduct and omissions, Plaintiff would not have sustained his injuries.

57)     Defendant's conduct, as described above, was reckless. Defendant risked the health of consumers and users of its products, including Plaintiff, with knowledge of the safety problems associated with Roundup and glyphosate-containing products, and suppressed this knowledge from the general public. Defendant made conscious decisions not to redesign, warn or inform the unsuspecting public. Defendant's reckless conduct warrants an award of punitive damages.

58)     Defendant's  placing its defective Roundup products into the stream of commerce, proximately caused or contributed to Plaintiff's disease and/or exacerbated it  and Plaintiff has sustained substantial damages.

59)     The Defendant's conduct as alleged herein has proximately  caused or contributed to damage to Plaintiff including but not limited to a loss of income, loss of earning capacity and personal injury including mental anguish, emotional distress, loss of the enjoyment of life and other damages both special and general.

60)    WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in Plaintiff's favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all such other and further relief as this Court deems just and proper.

## COUNT II:    STRICT LIABILITY (FAILURE TO WARN)

61)    Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

62)    Plaintiff brings this strict liability claim against Defendant for failure to warn.

63)    At all times relevant to this litigation, Defendant engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting Roundup products, which are defective and unreasonably dangerous to consumers, including Plaintiff, because they do not contain adequate warnings or instructions concerning the dangerous characteristics of Roundup and specifically, the active ingredient glyphosate. These actions were under the ultimate control and supervision of Defendant.

64)    Defendant researched, developed, designed, tested, manufactured, inspected, labeled, distributed, marketed, promoted, sold, and otherwise released into the stream of commerce its Roundup products, and in the course of same, directly advertised or marketed the products to consumers and end users, including Plaintiff, and therefore had a duty to warn of the risks associated with the use of Roundup and glyphosate-containing products.

65)    At all times relevant to this litigation, Defendant had a duty to properly test, develop, design, manufacture, inspect, package, label, market, promote, sell, distribute, maintain, supply, provide proper warnings, and take such steps as necessary to ensure its Roundup products did not

16

cause users and consumers to suffer from unreasonable and dangerous risks. Defendant had a continuing duty to warn Plaintiff of the dangers associated with Roundup use and exposure. Defendant, as manufacturer, seller, or distributor of chemical herbicides is held to the knowledge of an expert in the field.

66)    At the time of manufacture, Defendant could have provided the warnings or instructions regarding the full and complete risks of Roundup and glyphosate-containing products because it knew or should have known of the unreasonable risks of harm associated with the use of and/or exposure to such products.

67)    At all times relevant to this litigation, Defendant failed to investigate, study, test, or promote the safety or to minimize the dangers to users and consumers of its product and to those who would foreseeable use or be harmed by Defendant's herbicides, including Plaintiff.

68)    Despite the fact that Defendant knew or should have known that Roundup posed a grave risk of harm, it failed to exercise reasonable care to warn of the dangerous risks associated with use and exposure. The dangerous propensities of its products and the carcinogenic characteristics of glyphosate, as described above, were known to Defendant, or scientifically knowable to Defendant through appropriate research and testing by known methods, at the time it distributed, supplied or sold the product, and not known to end users and consumers, such as Plaintiff.

69)    Defendant knew or should have known that its products created significant risks of serious bodily harm to consumers, as alleged herein, and Defendant failed to adequately warn consumers, i.e., the reasonably foreseeable users, of the risks of exposure to its products. Defendant has wrongfully concealed information concerning the dangerous nature of Roundup and its active

17

ingredient glyphosate, and further made false and/or misleading statements concerning the safety of Roundup and glyphosate.

70)     At all times relevant to this litigation, Defendant's Roundup products reached the intended consumers, handlers, and users or other persons coming into contact with these products in West Virginia and throughout the United States, including Plaintiff, without substantial change in their condition as designed, manufactured, sold, distributed, labeled, and marketed by Defendant.

71)     Plaintiff could not have reasonably discovered the defects and risks associated with Roundup or glyphosate-containing products prior to or at the time of Plaintiff's exposure. Plaintiff relied upon the skill, superior knowledge, and judgment of Defendant to know about and disclose serious health risks associated with using the products.

72)     Defendant knew or should have known that the minimal warnings disseminated with its Roundup products were inadequate, failed to communicate adequate information on the dangers and safe use/exposure, and failed to communicate warnings and instructions that were appropriate and adequate to render the products safe for their ordinary, intended and reasonably foreseeable uses, including agricultural and horticultural applications.

73)     The information that Defendant  did provide or communicate failed to contain relevant warnings, hazards, and precautions that would have enabled the Plaintiff to utilize the products safely and with adequate protection. Instead, Defendant disseminated information that was inaccurate, false and misleading, and which failed to communicate accurately or adequately the comparative severity, duration, and extent of the risk of injuries with use of and/or exposure to Roundup and glyphosate; continued to aggressively promote the efficacy of its products, even after it knew or should have known of the unreasonable risks from use or exposure; and concealed,

18

downplayed, or otherwise suppressed, through aggressive marketing and promotion, any information or research about the risks and dangers of exposure to Roundup and glyphosate.

74)    This alleged failure to warn is not limited to the information contained on Roundup's labeling. The Defendant was able, to disclose the known risks associated with Roundup through other non-labeling mediums, i.e., promotion, advertisements, public service announcements, and/or public information sources. The Defendant, however, did not disclose these known risks through any medium.

75)    As a result of their inadequate warnings, Defendant's Roundup products were defective and unreasonably dangerous when they left the possession and/or control of Defendant, were distributed by Defendant, and used by the Plaintiff in the course of his work.

76)    Defendant is liable to Plaintiff for injuries caused by its negligent or willful failure, as described above, to provide adequate warnings or other clinically relevant information and data regarding the appropriate use of its products and the risks associated with the use of or exposure to Roundup and glyphosate.

77)    Had Defendant provided adequate warnings and instructions and properly disclosed and disseminated the risks associated with its Roundup products, Plaintiff would likely have avoided the risk of developing injuries and could have obtained or used alternative herbicides.

78)    Defendant's placing its defective Roundup products into the stream of commerce, proximately caused or contributed to Plaintiff's harm and injury as set forth herein.

79)    WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in Plaintiff's favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all such other and further relief as this Court deems just and proper.

19

## COUNT III:  NEGLIGENCE

80)     Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

81)     Defendant, directly or indirectly, caused Roundup products to be sold, distributed, packaged, labeled, marketed, promoted, and/or used by Plaintiff.

82)     Defendant's conduct was negligent and grossly negligent including reckless conduct with indifference to the welfare of Plaintiff and others as set forth herein.

83)     Defendant knew and/or should have known that it was foreseeable consumers such as the Plaintiff would suffer injuries as a result of Defendant's failure to exercise ordinary care in the manufacturing, marketing, labeling, distribution, and sale of Roundup.

84)     The Plaintiff did not know the nature and extent of the injuries that could result from the intended use of and/or exposure to Roundup or its active ingredient glyphosate.

85)     Defendant's negligence proximately caused or contributed to Plaintiff's harm and injuries as set forth herein.

86)     WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in Plaintiff's favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all such other and further relief as this Court deems just and proper.


## COUNT IV:  FRAUD

87)     Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

88)     Defendant has defrauded the users of its product by misrepresenting the true safety

of Roundup and by failing to disclose known risks of cancer, including so disclosing such to the Plaintiff.

89)     Defendant misrepresented and/or failed to disclose, inter alia, that: glyphosate and its major metabolite aminomethylphosphonic acid (AMPA) could cause cancer; glyphosate and AMPA are known to be genotoxic in humans and laboratory animals because exposure is known to cause DNA strand breaks (a precursor to cancer); glyphosate and AMPA are known to induce oxidative stress in humans and laboratory animals (a precursor to cancer); glyphosate and AMPA interfere with the aromatic amino acids within the human gut, leading to downstream health conditions including cancer; exposure to glyphosate and AMPA is causally associated with non-Hodgkin lymphoma; and the laboratory tests attesting to the safety of glyphosate were flawed and/or fraudulent.

90)     Due to these misrepresentations and omissions, at all times relevant to this litigation, Defendant's Roundup was deliberately and recklessly misbranded under the statutory and common law.

91)     The Defendant's fraudulent and deceitful conduct and representations, proximately caused or contributed to Plaintiff 's harm and damages as setforth herein.

92)     WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in Plaintiff's favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all such other and further relief as this Court deems just and proper.


## COUNT V:   BEACH OF EXPRESS WARRANTIES

93)     Plaintiff incorporates by reference each and every allegation set forth in the preceding

21

paragraphs as if fully stated herein.

94)    At all times relevant to this litigation, Defendant engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting its Roundup products, which are defective and unreasonably dangerous to consumers, including Plaintiff, thereby placing Roundup products into the stream of commerce. These actions were under the ultimate control and supervision of Defendant.

95)    Defendant had a duty to exercise reasonable care in the research, development, design, testing, packaging, manufacture, inspection, labeling, distributing, marketing, promotion, sale, and release of its Roundup products, including a duty to:

a.    ensure that its products did not cause the user unreasonably dangerous side effects;

b.    warn of dangerous and potentially fatal side effects; and

c.    disclose adverse material facts, such as the true risks associated with the use of and exposure to Roundup and glyphosate-containing products, when making representations to consumers and the general public, including Plaintiff.

96)    As alleged throughout this pleading, the ability of Defendant to properly disclose those risks associated with Roundup is not limited representations made on the labeling.

97)    At all times relevant to this litigation, Defendant expressly represented and warranted to the purchasers of its products, by and through statements made by Defendant in labels, publications, package inserts, and other written materials intended for consumers and the general public, that its Roundup products were safe to human health and the environment, effective, fit, and proper for their intended use. Defendant advertised, labeled, marketed, and promoted Roundup products, representing the quality to consumers and the public in such a way as to induce their purchase or use, thereby making an express warranty that its Roundup products would conform to

22

the representations.

98)     These express representations include incomplete warnings and instructions that purport, but failed, to include the complete array of risks associated with use of and/or exposure to Roundup and glyphosate. Defendant knew and/or should have known that the risks expressly included in Roundup warnings and labels did not and do not accurately or adequately set forth the risks of developing the serious injuries complained of herein. Nevertheless, Defendant expressly represented that its Roundup products were safe and effective, that they were safe and effective for use by individuals such as the Plaintiff, and/or that they were safe and effective as agricultural herbicides.

99)     The representations about Roundup, as set forth herein, contained or constituted affirmations of fact or promises made by the seller to the buyer, which related to the goods and became part of the basis of the bargain, creating an express warranty that the goods would conform to the representations.

100)    Defendant placed its Roundup products into the stream of commerce for sale and recommended their use to consumers and the public without adequately warning of the true risks of developing the injuries associated with the use of and exposure to Roundup and its active ingredient glyphosate.

101)    Defendant breached these warranties because, among other things, its Roundup products were defective, dangerous, unfit for use, did not contain labels representing the true and adequate nature of the risks associated with their use, and were not merchantable or safe for their intended, ordinary, and foreseeable use and purpose.

102)    The Defendant's breach of express warranty, as alleged herein, proximately caused

23

or contributed to Plaintiff 's harm and damages as set forth herein.

103)   WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in Plaintiff's favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees, and all such other and further relief as this Court deems just and proper.

## COUNT VI:   BREACH OF IMPLIED WARRANTIES

104)   Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

105)   At all times relevant to this litigation, Defendant engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting its Roundup products, which are defective and unreasonably dangerous to consumers, including the Plaintiff, thereby placing Roundup products into the stream of commerce. These actions were under the ultimate control and supervision of Defendant.

106)   Before the time Plaintiff was exposed to the aforementioned Roundup products, Defendant impliedly warranted to its consumers—including Plaintiff—that its Roundup products were of merchantable quality and safe and fit for the use for which they were intended; specifically, as agricultural herbicides.

107)   Defendant, however, failed to disclose that Roundup has dangerous propensities when used as intended and that use of and/or exposure to Roundup and glyphosate-containing products carries an increased risk of developing severe injuries and death, including Plaintiff's injuries.

108)   Plaintiff was one of the intended beneficiary of the implied warranties made by Defendant to the purchasers of its herbicides.

24

109)  The Roundup products were expected to reach and did in fact reach consumers and users, including Plaintiff, without substantial change in the condition in which they were manufactured and sold by Defendant.

110)  At all times relevant to this litigation, Defendant was aware that consumers and users of its products, including Plaintiff, would use Roundup products as marketed by Defendant, which is to say that Plaintiff was a foreseeable user of Roundup.

111)  Defendant intended that its Roundup products be used in the manner in which Plaintiff in fact used them and which Defendant impliedly warranted each product to be of merchantable quality, safe, and fit for this use, despite the fact that Roundup was not adequately tested or researched.

112)  In reliance upon Defendant's implied warranty, Plaintiff used Roundup as instructed and labeled and in the foreseeable manner intended, recommended, promoted and marketed by Defendant.

113)  Plaintiff could not  have reasonably discovered or known of the risks of serious injury associated with Roundup or glyphosate.

114)  Defendant breached its implied warranty to the Plaintiff in that its Roundup products were not of merchantable quality, safe, or fit for their intended use, or adequately tested. Roundup has dangerous propensities when used as intended and can cause serious injuries, including those injuries complained of herein.

115)  The harm caused by Defendant's Roundup products far outweighed their benefit, rendering the products more dangerous than an ordinary consumer or user would expect and more dangerous than alternative products.

116)    The Defendant's breech of implied warranties, as alleged herein, proximately caused or contributed to Plaintiff's harm and damages as set forth herein.

117)    WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in Plaintiff's favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all such other and further relief as this Court deems just and proper.


## COUNT VII: VIOLATION OF THE WEST VIRGINIA CONSUMER PROTECTION ACT

118)    Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

119)    Plaintiff at all relevant times herein was and is a consumer at that term is defined in West Virginia Code §46A-1-1 *et.seq.* and was entitled to the protection of such provisions.

120)    Defendant Monsanto violated such Consumer protections by its conduct set forth herein, including violations of §§46A-6-1 including 46A-6-104 and 46A-5-1 *et. seq.*

121)    Plaintiff is entitled to all lawful damages, both compensatory and punitive, as a proximate result or contribution by such Consumer protection violations.


## COUNT VIII:   EXEMPLARY DAMAGES ALLEGATIONS:

122)    Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

123)    Defendant's conduct as alleged herein was done with actual malice toward Plaintiff or a conscious, reckless and outrageous indifference to the health, safety and welfare of others, especially consumers of Roundup.

26

**PRAYER FOR RELIEF:**

124)   WHEREFORE, Plaintiff requests that the Court enter judgment in his favor and against the Defendant as setforth herein:

a.      actual and compensatory damages in such amount to be determined at trial and as provided by applicable law;

b.      exemplary and punitive damages sufficient to punish and deter the Defendant and others from future fraudulent and unlawful practices;

c.      pre-judgment and post-judgment interest;

d.      costs including reasonable attorneys' fees, court costs, and other litigation expenses; and,

e.      any other relief, both specific and general, the Court may deem just and proper.

Plaintiff, By Counsel

David J. Romano
W.Va. State Bar ID No. 3166
**ROMANO LAW OFFICE, LC**
363 Washington Avenue
Clarksburg, West Virginia  26301
(304) 624-5600

27