ACCO

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA (Southern Division - Santa Ana)
## CIVIL DOCKET FOR CASE #: 8:20-cv-01485

Gonzalez v. Monsanto Company et al
Assigned to:
Demand: $75,000
Case in other court:  Superior Court in the County of Orange, 30-
                02020-01145529
Cause: 28:1332 Diversity-Fraud

Date Filed: 08/11/2020
Jury Demand: Plaintiff
Nature of Suit: 365 Personal Inj. Prod.
Liability
Jurisdiction: Diversity

**Plaintiff**

**Benito Ornelas Gonzalez**        represented by   **Benito Ornelas Gonzalez**
                                                        PRO SE

V.

**Defendant**

**Monsanto Company**            represented by   **Eskandar Alex Beroukhim**
                                                        Arnold and Porter Kaye Scholer LLP
                                                        777 South Figueroa Street 44th Floor
                                                        Los Angeles, CA 90017-5844
                                                        213-243-4000
                                                        Fax: 213-243-4199
                                                        Email: alex.beroukhim@arnoldporter.com
                                                        *ATTORNEY TO BE NOTICED*

**Defendant**

**Does**
*1 through 100, Inclusive*

| Date Filed | # | Docket Text |
|---|---|---|
| 08/11/2020 | 1 | NOTICE OF REMOVAL from Superior Court in the County of Orange, case number 30-2020-01145529 Receipt No: ACACDC-27580331 - Fee: $400, filed by defendant Monsanto Company. (Attachments: # 1 Exhibit 1 (Complaint), # 2 Exhibit 2 (Civil Cover Sheet), # 3 Exhibit 3 (Summons), # 4 Exhibit 4 (Receipt), # 5 Exhibit 5 (Assignment), # 6 Exhibit 6 (Hearing Notice re MSC), # 7 Exhibit 7 (Notice re Jury Trial), # 8 Exhibit 8 (Proof of Service of Summons and Complaint), # 9 Exhibit 9 (Answer), # 10 Proof of Service of Notice of Removal) (Attorney Eskandar Alex Beroukhim added to party Monsanto Company(pty:dft))(Beroukhim, Eskandar) (Entered: 08/11/2020) |
| 08/11/2020 | 2 | CIVIL COVER SHEET filed by Defendant Monsanto Company. (Beroukhim, Eskandar) (Entered: 08/11/2020) |
| 08/11/2020 | 3 | Certification and Notice of Interested Parties filed by defendant Monsanto Company, identifying Bayer AG as indirect parent of Monsanto Company. (Beroukhim, Eskandar) |

| | | (Entered: 08/11/2020) |
|---|---|---|
| 08/11/2020 | 4 | CORPORATE DISCLOSURE STATEMENT filed by Defendant Monsanto Company identifying Bayer AG as Corporate Parent. (Beroukhim, Eskandar) (Entered: 08/11/2020) |

<table>
<tr><td colspan="4" align="center"><strong>PACER Service Center</strong></td></tr>
<tr><td colspan="4" align="center"><strong>Transaction Receipt</strong></td></tr>
<tr><td colspan="4" align="center">08/12/2020 13:14:16</td></tr>
<tr><td><strong>PACER Login:</strong></td><td>hllp1982</td><td><strong>Client Code:</strong></td><td>1417.0049</td></tr>
<tr><td><strong>Description:</strong></td><td>Docket Report</td><td><strong>Search Criteria:</strong></td><td>8:20-cv-01485 End date: 8/12/2020</td></tr>
<tr><td><strong>Billable Pages:</strong></td><td>1</td><td><strong>Cost:</strong></td><td>0.10</td></tr>
</table>

Majid Safaie (SBN 185129)
majid.safaie@aryalc.com
Brian T. Stuart (SBN 207118)
brian.stuart@aryalc.com
ARYA LAW CENTER, PC
3187 Red Hill Ave., Suite 115
Costa Mesa, CA 92626
Tel: 877-279-2523
Fax: 877-235-1558

Attorneys for Plaintiff BENITO ORNELAS GONZALEZ

# SUPERIOR COURT OF THE STATE OF CALIFORNIA

## IN AND FOR THE COUNTY OF ORANGE

| | |
|---|---|
| BENITO ORNELAS GONZALEZ, an Individual,<br><br>        Plaintiff,<br><br>vs.<br><br>MONSANTO COMPANY, and DOES 1 through 100, Inclusive,<br><br>        Defendants. | Assigned for all purposes<br>Judge Layne H. Melzer<br>Case No.: 30-2020-01145529-CU-PL-CJC<br><br>**COMPLAINT FOR DAMAGES:**<br><br>1. **STRICT LIABILITY-DESIGN DEFECT**<br>2. **STRICT LIABILITY-FAILURE TO WARN**<br>3. **NEGLIGENT MISREPRESENTATION**<br>4. **BREACH OF EXPRESS WARRANTY**<br>5. **BREACH OF IMPLIED WARRANTY (NON-PRIVITY)**<br>6. **BREACH OF IMPLIED WARRANTY (PRIVITY)**<br>7. **FRAUDULANT CONCEALMENT**<br><br>JURY TRIAL DEMANDED |

**COMES NOW,** Plaintiff, **BENITO ORNELAS GONZALEZ** by and through his attorneys, ARYA LAW CENTER, PC, and hereby alleges the following based on her knowledge, information, and belief:

## PARTIES

1.  Plaintiff, **BENITO ORNELAS GONZALEZ** ("Gonzalez or Plaintiff") is a natural person currently residing in City of Fullerton, County of Orange, and State of California.

///

2. Defendant **MONSANTO COMPANY** ("Monsanto or Defendant") is a Delaware corporation with its headquarters and principal place of business in St. Louis, Missouri. At all times relevant to this complaint, Monsanto was the entity that discovered the herbicidal properties of glyphosate and is the manufacturer of Roundup. Monsanto has regularly transacted and conducted business within the state of California, and has derived substantial revenue from goods and products, including Roundup, sole in the State of California. Monsanto expected or should have expected their acts to have consequences within the State of California, given the fact that Defendant has gained substantial revenue from its operation in the State of California.

3. Further, MONSANTO has registered in the State of California as a foreign entity in order to be able to conduct business.

## JURISDICTION AND VENUE

4. Pursuant to California Constitution Article VI, Section 10, which grants the Superior Court "original jurisdiction in all causes except those given by statute to other trial courts." Therefore, Statutes under which this action brought do not specify any other basis for jurisdiction.

5. Further, the California Superior Court has jurisdiction over the Defendant because, based on information and belief, each  corporation and/or entity organized under different states which are considered a foreign corporation or association which is authorized to do business in California and registered with the California Secretary of State or has sufficient minimum contacts in California, or otherwise intentionally avails itself of the California market so as to render the exercise of jurisdiction over it by the California courts consistent with traditional notions of fair play and substantial justice.

6. Furthermore, the Defendant have intentionally availed themselves to the jurisdiction of State of California for the purposes of substantial benefits that they would receive as well as being under the protections of the laws within the State of California. Monsanto has

1  had vast and sufficient contact such that the exercise of jurisdiction would be consistent with the
2  traditional notions of fair play and substantial justice.

3      7.      Plaintiff seeks relief that is within the jurisdictional limits of the Court.

4                              **FACTS OF THE CASE**

5      8.      Plaintiff **GONZALEZ** has been working as ground maintenance and gardener for
6  27 years from 1992 to the present time working for San Philips Benizi Catholic Church located
7  in City of Fullerton, state of California.

8      9.      As part of his job, Plaintiff utilized a concentrated mix of Roundup in the garden,
9  driveway and under eaves and ownings and the yard. In November 2018, Plaintiff fell ill and had
10  to be hospitalized for over a week at St. Jude's Medical Center in City of Fullerton, California.
11  While Plaintiff being hospitalized, he went through series of examination and tests to determine
12  his illness. Plaintiff was diagnosed with cancer of Non-Hodgkin's Lymphomas (NHL) stage 4.

13      10.     Plaintiff was advised to maintain a good diet due to his health condition.  Plaintiff
14  has not received chemo therapy, but has been advised that chemo and other treatments may
15  become necessary, if the NHL progresses through his body.  Plaintiff only became aware that his
16  injuries were caused by Roundup, a Monsanto's product, by the medical specialists who
17  conducted very detailed examination and tests, which included blood tests.

18      11.     By and through the filing of  complaint, the Plaintiff seeks to obtain, in one
19  proceeding, before one trier of fact, a ruling on the issue of the relationship between the active
20  chemical glyphosate, contained in Monsanto Company's ("Monsanto" or "Defendant")
21  Roundup® weed killer products (collectively, "Roundup"), and the carcinogenic effects on
22  humans.

23      12.     The Plaintiff believes that the facts outlined below, and the facts discovered to
24  date establish, beyond dispute, that human exposure to glyphosate is a direct link to human
25  cancer, specifically, the deadly cancer virus known as Non-Hodgkin's Lymphoma ("NHL").

26

The Plaintiff intends to present facts, studies, and evidence to the jury for it to conclude that glyphosate causes NHL

13.     In seeking resolution of the general causation component contained in almost every state's product liability laws, the only remaining issue that the Plaintiff will need to show is that he has NHL due to exposure to Roundup and the amount of damages due to that plaintiff. Plaintiff must prove that his NHL is due to exposure to Roundup and the damages that he has suffered as the result.

## STATEMENT OF THE CASE ABOUT DEFENDANT

### The Discovery of Glyphosate and Development of Round Up

14.     In 1970, Defendant Monsanto Company, Inc. discovered the herbicidal properties of glyphosate and began marketing it in products in 1974 under the brand name Roundup®. Roundup® is a non-selective herbicide used to kill weeds that commonly compete with the growing of crops. By 2001, glyphosate had become the most-used active ingredient in American agriculture with 85-90 million of pounds used annually. That number grew to 185 million pounds by 2007.  As of 2013, glyphosate was the world's most widely used herbicide.

15.     Monsanto is a multinational agricultural biotechnology corporation based in St. Louis, Missouri. It is the world's leading producer of glyphosate. As of 2009, Monsanto was the world' leading producer of seeds, accounting for 27% of the world seed market. Most of these seeds are of the Roundup Ready® brand. The stated advantage of Roundup Ready® crops is that they substantially improve a farmer's ability to control weeds, since glyphosate can be sprayed in the fields during the growing season without harming their crops. In 2010, an estimated 70% of cotton, and 90% of soybean fields in the United States were Roundup Ready®.

16.     Monsanto's glyphosate products are registered in 130 countries and approved for use on over 100 different crops. They are ubiquitous in the environment. Numerous studies confirm that glyphosate is found in rivers, streams, and groundwater in agricultural areas where

1   Roundup® is used. It has been found in food, in the urine of agricultural workers, and even in
2   the urine of urban dwellers who are not in direct contact with glyphosate.

3       17.     On March 20, 2015, the International Agency for Research on Cancer ("IARC"),
4   an agency of the World Health Organization ("WHO"), issued an evaluation of several
5   herbicides, including glyphosate. That evaluation was based, in part, on studies of exposures to
6   glyphosate in several countries around the world, and it traces the health implications from
7   exposure to glyphosate since 2001.

8       18.     On July 29, 2015, IARC issued the formal monograph relating to glyphosate. In
9   that monograph, the IARC Working Group provides a thorough review of the numerous studies
10  and data relating to glyphosate exposure in humans.

11      19.     The IARC Working Group classified glyphosate as a Group 2A herbicide, which
12  mean that it is probably carcinogenic to humans and could cause diseases. The IARC Working
13  Group concluded that the cancers most associated with glyphosate exposure are non-Hodgkin
14  lymphoma and other hematopoietic cancers, including lymphocytic lymphoma/chronic
15  lymphocytic leukemia B-cell lymphoma, an IS multiple myeloma.

16      20.     The IARC evaluation is significant. It confirms what has been believed for years:
17  that glyphosate is toxic to humans.

18      21.     Nevertheless, Monsanto, since it began selling Roundup®, has represented it as
19  safe to humans and the environment. Indeed, Monsanto has repeatedly proclaimed and continues
20  to proclaim to the world, and particularly to United States consumers, that glyphosate-based
21  herbicides, including Roundup®, create no unreasonable risks to human health or to the
22  environment.

23      22.     Through massive advertisement and its effectiveness in killing weeds and other
24  unwanted plants, etc. Roundup became very popular and became the key to Monsanto's
25  continued brand recognition and its dominance in the marketplace, which has been attributed
26  largely to the success of Roundup sales.  In fact, Monsanto's agriculture division was

outperforming its chemicals division's operating income, and that gap increased annually.  But with its patent for glyphosate, expiring in the United States in the year 2000 Monsanto needed a strategy to maintain its market dominance and to ward off impending competition.

23.     In response, Monsanto commenced the development and sale of genetically engineered Roundup Ready® seeds in 1996. Since Roundup Ready® crops are resistant to glyphosate, farmers can spray Roundup onto their fields during the growing season without harming the crop. This allowed Monsanto to expand its market for Roundup even further; by 2000, Monsanto's biotechnology seeds were planted on more than 80 million acres worldwide and nearly 70% of American soybeans were planted from Roundup Ready® seeds. It also secured Monsanto's dominant share of the glyphosate/Roundup market through a marketing strategy that coupled proprietary Roundup Ready® seeds with continued sales of its Roundup weed killer herbicide.

24.     For nearly 40 years, farms across the world have used Roundup® without knowing of the dangers its use poses. That is because when Monsanto first introduced Roundup®, it touted glyphosate as a technological breakthrough: it could kill almost every weed without causing harm either to people or to the environment. Of course, history has shown that not to be true. According to the World Health Organization ("WHO"), the main chemical ingredient of Roundup®-glyphosate-is a probable cause of cancer. Those most at risk are farm workers and other individuals with workplace exposure to Roundup®, such as workers in garden centers, nurseries, and landscapers. Agricultural workers are, once again, victims of corporate greed.

25.     Monsanto assured the public that Roundup® was handless. In order to prove this, Monsanto championed falsified data and attacked legitimate studies that revealed its dangers. Monsanto led a prolonged campaign of misinformation to convince government agencies farmers and the general population that Roundup® was safe.

///

**Registration of Herbicides Under Federal Law**

26.     The manufacture, formulation and distribution of herbicides, such as Roundup®, are regulated under the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA" or "Act"), U.S.C. § 136 *et seq*. FIFRA requires that all pesticides be registered with the Environmental Protection Agency ("EPA") prior to their distribution, sale, or use, except as described by the Act. 7 U.S.C. § 136a(a).

27.     Because pesticides are toxic to plants, animals, and humans, at least to some degree, the EPA requires as part of the registration process, among other things, a variety of tests to evaluate the potential for exposure to pesticides, toxicity to people and other potential non-target organisms, and other adverse effects on the environment Registration by the EPA, however, is not an assurance or finding of safety. The determination the Agency must make in registering or re-registering a product is not that the product is "safe," but rather that use of the product in accordance with its label directions "will not generally cause unreasonable adverse effects on the environments." 7 U.S.C. § 136a(c)(S)(D).

28.     FIFRA defines "unreasonable adverse effects on the environment" to mean "any unreasonable risk to human or the environment, taking into account the economic, social, and environmental costs and benefits of the use of any pesticide." 7 U.S.C. § 136(bb).  FIFRA thus requires EPA to make a risk/benefit analysis in determining whether a registration should be granted or allowed to continue to be sold in commerce.

29.     The EPA and the State of California registered Roundup® for distribution, sale, and manufacture in the United States and the State of California.

30.     FIFRA generally requires that the registrant, Monsanto in the case of Roundup, conducts the health and safety testing of pesticide products. The EPA has protocols governing the conduct of tests required for registration and the laboratory practices that must be followed conducting these tests. The data produced by the registrant must be submitted to the EPA for

review and evaluation. The government is not required, nor is it able, however, to perform the product tests that are required of the manufacturer.

31.     The evaluation of each pesticide product distributed, sold, or manufactured is completed at the time the product is initially registered. The data necessary for registration of pesticide changed over time. The EPA is now in the process of re-evaluating all pesticide products through a congressionally mandated process called "re-registration." 7 U.S.C. § 136a-In order to reevaluate these pesticides, the EPA is demanding the completion of additional tests and the submission of data for the EPA's review and evaluation.

32.     In the case of glyphosate, and therefore Roundup®, the EPA had planned on releasing its preliminary risk assessment-in relation to the reregistration process-no later than July 2015. The EPA completed its review of glyphosate in early 2015, but it delayed releasing the risk assessment pending further review in light of the WHO's health-related findings.

**Scientific Fraud Underlying the Marketing and Sale of Glyphosate! Roundup**

33.     Based on early studies that glyphosate could cause cancer in laboratory animals, and in 1985, the EPA originally classified glyphosate as possibly carcinogenic to humans (Group C). After pressure from Monsanto, including contrary studies it provided to the EPA, the EPA changed its classification to evidence of non-carcinogenicity in humans (Group E) in 1991. In so classifying glyphosate, however, the EPA made clear that the designation did not mean the chemical does not cause cancer: "It should be emphasized, however, that designation of an agent in Group is based on the available evidence at the time of evaluation and should not be interpreted as a definitive conclusion that the agent will not be a carcinogen under any circumstances."

34.     On two occasions, the EPA found that the laboratories hired by Monsanto to test the toxicity of its Roundup® products for registration purposes committed fraud._In the first instance, Monsanto, in seeking initial registration of Roundup® by EPA hired Industrial Bio-Test Laboratories ("IBT") to perform and evaluate pesticide toxicology studies relating to

Roundup®. IBT performed about 30 tests on glyphosate and glyphosate-containing products, including nine of the 15 residue studies needed to register Roundup®.

35.     In 1976, the United States Food and Drug Administration ("FDA") performed an inspection of Industrial Bio-Test Industries ("IBT") that revealed discrepancies between the raw data and the final report relating to the toxicological impacts of glyphosate. The EPA subsequently audited IBT; it too found the toxicology studies conducted for the Roundup® herbicide to be invalid. An EPA reviewer, after finding stated "routine falsification of data" at IBT, that it was "hard to believe the scientific integrity of the studies when they said they took specimens of the uterus from male rabbits.

36.     Three top executives of IBT were convicted of fraud in 1983.

37.     In the second incident of data falsification, Monsanto hired Craven Laboratories in 1991 to perform pesticide and herbicide studies, including for Roundup®. In that same year, the town of Craven Laboratories and three of its employees were indicted, and later convicted, of fraudulent laboratory practices in the testing of pesticides and herbicides.

38.     Despite the falsity of the tests that underlie its registration, within a few years of its launch, Monsanto was marketing Roundup® in 115 countries.

## THE IMPORTANCE OF ROUNDUP® TO MONSANTO'S MARKET DOMINANCE PROFITS

39.     The success of Roundup® was key to Monsanto's continued reputation and dominance the marketplace. Largely due to the success of Roundup® sales, Monsanto's agriculture division was outperforming its chemicals division's operating income, and that gap increased yearly. But with its patent for glyphosate expiring in the United States in the year 2000, Monsanto needed a strategy to maintain its Roundup® market dominance and to ward off impending competition.

40.     In response, Monsanto began the development and sale of genetically engineered Roundup Ready® seeds in 1996. Since Roundup Ready® crops are resistant to glyphosate;

farmers can spray Roundup® onto their fields during the growing season without harming the crop. This allowed Monsanto to expand its market for Roundup® even further; by 2000, Monsanto's biotechnology seeds were planted on more than 80 million acres worldwide and nearly 70% of American soybeans were planted from Roundup Ready® seeds. It also secured Monsanto's dominant share of the glyphosate/Roundup® market through a marketing strategy that coupled proprietary Roundup Ready® seeds with continued sales of its Roundup® herbicide.

41.     Through a three-pronged strategy of increased production, decreased prices and by coupling with Roundup Ready® seeds, Roundup® became Monsanto's most profitable product. In 2000, Roundup® accounted for almost $2.8 billion in sales, outselling other herbicides by a margin of five to one, and accounting for close to half of Monsanto's revenue. Today, glyphosate remains one of the world's largest herbicides by sales volume.

## MONSANTO HAS KNOWN FOR DECADES THAT IT FALSELY ADVERTISED THE SAFETY OF ROUNDUP®

42.     In 1996, the New York Attorney General ("NYAG") filed a lawsuit against Monsanto based on its false and misleading advertising of Roundup ® products. Specifically, the lawsuit challenged Monsanto's general representations that its spray-on glyphosate-based herbicides including Roundup®, were "safer than table salt" and "practically non-toxic" to mammals, birds, and fish. Among the representations the NYAG found deceptive and misleading about the human and environmental safety of Roundup® are the following:

a) Remember that environmentally friendly Roundup herbicide is biodegradable. It will not build up in the soil so you can use Roundup with confidence along customers' driveways, sidewalks, and fences.

b) And remember that Roundup is biodegradable and will not build up in the soil. That will give you the environmental confidence you need to use Roundup everywhere you have got a weed, brush, edging or trimming problem.

c) Roundup biodegrades into naturally occurring elements.

d) Remember that versatile Roundup herbicide stays where you put it. That means there is no washing or leaching to harm customers' shrubs or other desirable vegetation.

e) This non-residual herbicide will not wash or leach in the soil. It stays where you apply it.

f) You can apply Accord with "confidence because it will stay where you put it " It bonds tightly to soil particles, preventing leaching. Then, soon after application, soil microorganisms biodegrade Accord into natural products."

g) Glyphosate is less toxic to rats than table salt following acute oral ingestion.

h) Glyphosate's safety margin is much greater than required. It has over a 1,000-fold safety margin in food and over a 700-fold safety margin for workers who manufacture it or use it.

i) You can feel good about using herbicides by Monsanto. They carry a toxicity category rating of 'practically non-toxic' as it pertains to mammals, birds, and fish.

j) "Roundup can be used where kids and pets will play and breaks down into natural material." This ad depicts a person with his head in the ground and a pet dog standing in an area, which has been treated with Roundup.

43.    On November 19, 1996, Monsanto entered into an Assurance of Discontinuance with NYAG, in which Monsanto agreed, among other things, "to cease and desist from publishing or broadcasting any advertisements [in New York] that represent, directly or by implication" that:

a) its glyphosate-containing pesticide products or any component thereof are safe, non-toxic, harmless, or free from risk.

b) its glyphosate-containing pesticide products or any component thereof manufactured, formulated, distributed, or sold by Monsanto are biodegradable

c) Its glyphosate-containing pesticide products or any component thereof stay where they are applied under all circumstances and will not move through the environment by any means.

d) Its glyphosate-containing pesticide products or any component thereof are good II for the environment or are ''known for their environmental characteristics.''

e) glyphosate-containing pesticide products or any component thereof are safer or less toxic than common consumer products other than herbicides.

f) Its glyphosate-containing products or any component thereof might be classified as "practically non-toxic.

44.     Monsanto did not alter its advertising in the same manner in any state other than New York, and on information and belief still has not done so today.

45.     In 2009, France's highest court ruled that Monsanto had not told the truth about the safety of Roundup®. The French court affirmed an earlier judgement that Monsanto had falsely advertised its herbicide Roundup® as "biodegradable" and that it "left the soil clean."

**FIRST CAUSE OF ACTION**
**STRICT LIABILITY - DESIGN DEFECT**
(Against All Defendants)

46.     Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

47.     Plaintiff brings this strict liability claim against Defendant for defective design.

48.     At all times relevant to this litigation, Defendant engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting Roundup products, which are defective and unreasonably dangerous to consumers, including Plaintiff, thereby placing Roundup products into the stream of commerce. These actions were under the ultimate control and supervision of Defendant. At all times relevant to this litigation, Defendant designed, researched, developed, manufactured, produced, tested, assembled, labeled,

advertised, promoted, marketed, sold, and distributed the Roundup products that Plaintiff was exposed to.

49.     At all times relevant to this litigation, Defendant manufactured, designed, and labeled its Roundup products in an unsafe, defective, and inherently dangerous manner that was dangerous for use by or exposure to the public, and, in particular, the Plaintiff.

50.     At all times relevant to this litigation, Defendant's Roundup products reached the intended consumers, handlers, and users or other persons coming into contact with these products throughout the United States, including Plaintiff, without the substantial change in the condition as designed, manufactured, sold, distributed, labeled, and marketed by Defendant.

51.     Defendant's Roundup products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold, and marketed by Defendant were defective in design and formulation in that when the Defendant distributed the Roundup products to the consumers at the public through its distributers and suppliers the products were unreasonably dangerous to an extent beyond which an ordinary consumer would contemplate.

52.     Defendant's Roundup products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold, and marketed by Defendant were defective in design and formulation in that when they left the hands of Defendant's manufacturers and/or suppliers, the foreseeable risks exceeded the alleged benefits associated with their design and formulation.

53.     At all times relevant to this action, Defendant knew or had reason to know that its Roundup products were defective and were inherently dangerous and unsafe when used in the manner instructed and provided by Defendant.

54.     Therefore, at all times relevant to this litigation, Defendant' Roundup products, as researched, tested, developed, designed, licensed, manufactured, packaged, and labeled, distributed, sold, and marketed by Defendant were defective in design and formulation, in one or more of the following ways:

i.    When placed in the stream of commerce, Defendant's Roundup products

ii.    were defective in design and formulation, and, consequently, dangerous to an extent beyond that which an ordinary consumer would contemplate.

iii.    When placed in the stream of commerce, Defendant's Roundup products were unreasonably dangerous in that they were hazardous and posed a grave risk of cancer and other serious illnesses when used in a reasonably anticipated manner.

iv.    When placed in the stream of commerce, Defendant's Roundup products contained unreasonably dangerous design defects and were not reasonably safe when used in a reasonably anticipated or intended manner.

v.    Defendant did not sufficiently test, investigate, or study its Roundup products and, specifically, the active ingredient glyphosate.

vi.    Exposure to Roundup and glyphosate-containing products presents a risk of harmful side effects that outweigh any potential utility stemming from the use of the herbicide.

vii.    Defendant knew or should have known at the time of marketing its Roundup products that exposure to Roundup and specifically, its active ingredient glyphosate could result in cancer and other severe illnesses and injuries.

viii.    Defendant did not conduct adequate post-marketing surveillance of its Roundup products.

ix.    Defendant could have employed safer alternative designs and formulations.

55.    Plaintiff was exposed to Defendant's Roundup products without knowledge of its dangerous characteristics.

56.    At all times relevant to this litigation, Plaintiff was exposed to Defendant's Roundup products in an intended or reasonably foreseeable manner without knowledge of their dangerous characteristics. Plaintiff could not have reasonably discovered the defects and risks associated with Roundup® or glyphosate-containing products before or at the time of exposure.

57.     The harm caused by Defendant's Roundup products far outweighed their benefit, rendering Defendant's products dangerous to an extent beyond that which an ordinary consumer would contemplate. Defendant's Roundup products were and are more dangerous than alternative products and Defendant could have designed its Roundup products to make them less dangerous. Indeed, at the time that Defendant designed its Roundup the state of the industry's scientific knowledge was such that a less risky design or formulation was attainable.

58.     At the time Roundup products left Defendant's control, there was a practical, technically feasible and safer alternative design that would have prevented the harm without substantially impairing the reasonably anticipated or intended function of Defendant' herbicides.

59.     Defendant's defective design of its Roundup products was willful, wanton, fraudulent, malicious, and conducted with reckless disregard for the health and safety of users of the Roundup products, including the Plaintiff herein.

60.     Therefore, as a result of the unreasonably dangerous condition of its Roundup products, Defendant are strictly liable to Plaintiff.

61.     The defects in Defendant's Roundup products were substantial and contributing factors in causing Plaintiff grave injuries, specifically NHL, and, but for Defendant' misconduct and omissions, Plaintiff would not have sustained their injuries.

62.     Defendant's conduct, as described above, was reckless. Defendant risked the lives of consumers and users of its products, including Plaintiff with knowledge of the safety problems associated with Roundup and glyphosate-containing products, and suppressed this knowledge from the general public. Defendant made conscious decisions not to redesign, warn or inform the unsuspecting public. Defendant's reckless conduct warrants an award of punitive damages.

63.     As a direct and proximate result of Defendant placing defective Roundup products into the stream of commerce, Plaintiff suffered damages and continue to suffer grave injuries, and has endured physical pain and discomfort, as well as economic hardship, including

considerable financial expenses for medical care and treatment. Plaintiff will continue to incur these expenses in the future.

64.     Plaintiff is entitled to recover the damages suffered at the result of Defendant's products for which the amount to be proven at the trial.

## SECOND CAUSE OF ACTION
## STRICT LIABILITY - FAILURE TO WARN
(Against All Defendants)

65.     Plaintiff incorporates by reference each and every allegation set forth in the Preceding paragraphs as if fully stated herein.

66.     Plaintiff brings this strict liability claim against Defendant for failure to warn.

67.     At all times relevant to this litigation, Defendant engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, promoting and applying Roundup products, which are defective and unreasonably dangerous to consumers, including Plaintiff, because they do not contain adequate warnings or instructions concerning the dangerous characteristics of Roundup and specifically, the active ingredient glyphosate. These actions were under the ultimate control and supervision of Defendant.

68.     Monsanto researched, developed, designed, tested, manufactured, inspected, labeled, distributed, marketed, promoted, sold, and otherwise released into the stream of commerce its Roundup products, and in the course of same, directly advertised or marketed the products to consumers and end users, including the Plaintiff, and persons responsible for consumers (such as employers), and therefore had a duty to warn of the risks associated with the use of Roundup and glyphosate-containing products.

69.     At all times relevant to this litigation, Defendant had a duty to properly test, develop, design, manufacture, inspect, package, label, market, promote, sell, distribute, maintain supply, provide proper warnings, and take such steps as necessary to ensure that Roundup products did not cause users and consumers to suffer from unreasonable and dangerous risks. Defendant had a continuing duty to warn the Plaintiff of the dangers associated with Roundup

use and exposure. Defendant, as manufacturer, seller, or distributor of chemical herbicides, is held to the knowledge of an expert in the field.

70.   Defendant could have provided the warnings or instructions regarding the full and complete risks of Roundup and glyphosate-containing products because they knew or should have known of the unreasonable risks of harm associated with the use of and/or exposure to such products.

71.   Defendant failed to promote the safety or to minimize the dangers to users and consumers of this product and to those who would foreseeably be harmed by Roundup, including Plaintiff.

72.   Defendant knew or should have known that Roundup posed a grave risk of harm, but Defendant failed to exercise reasonable care to warn of the dangerous risks associated with use and exposure to its product. As previously described the dangerous propensities of its products and the carcinogenic characteristics of glyphosate which were known to Defendant or Defendant could have known through scientific research and testing at the time that Defendant distributed, supplied and or sold its product to the end users, including Plaintiff.

73.   Defendant knew or should have known that these products created significant risks of serious bodily harm to consumers, as alleged herein, and Defendant failed to adequately warn consumers of the risks of exposure to its products. Defendant have wrongfully concealed information concerning the dangerous nature of Roundup and its active ingredient glyphosate, and further made false and/or misleading statements concerning the safety of Roundup and glyphosate.

74.   Defendant's Roundup products reached the intended consumers, handlers, and users or other persons coming into contact with these products in California and throughout the United States, including Plaintiff, without substantial change in their condition as designed, manufactured, sold, distributed, labeled, marketed and sprayed/applied by Defendant.

75.     Plaintiff was exposed to Roundup product, as described above, without knowledge of their dangerous characteristics.

76.     At all times relevant to this litigation, Plaintiff was exposed to the use of Defendant's Roundup product in its intended or reasonably foreseeable manner without knowledge of their dangerous characteristics.

77.     Plaintiff could not have reasonably discovered the defects and risks associated with Roundup or glyphosate-containing products prior to or at the time of Plaintiff's exposure. Plaintiff relied upon the skill, superior knowledge, judgment of Defendant, and the promotional materials published by the Defendant with regards to the Roundup.

78.     Defendant knew or should have known that the minimal warnings disseminated with or accompanying the application of Roundup products were inadequate, and they failed to communicate adequate information on the dangers and safe use/exposure and failed to communicate warnings and instructions that were appropriate and adequate to render the products safe for their ordinary, intended and reasonably foreseeable uses, including agricultural and horticultural applications.

79.     The information that Defendant provided or communicated failed to contain relevant warnings as to the hazardous effect of the use of the product and publish necessary precautions and instruction for safe use of the Roundup, that would have enabled the end user such as Plaintiff to utilize the products safely and with adequate protection. Instead, Defendant disseminated information that was inaccurate, false, and misleading and which failed to communicate accurately or adequately the comparative severity, duration, and extent of the risk of injuries with use of and/or exposure to Roundup and glyphosate; and Defendant continued to aggressively promote the efficacy of its products, even after Defendant knew or should have known of the unreasonable risks from use or exposure; and concealed, downplayed, or otherwise suppressed, through aggressive marketing and promotion, any information or research about the risks and dangers of exposure to Roundup and glyphosate.

80.     To this day, Defendant has failed to adequately and accurately warn of the true risks of injuries associated with the use of and exposure to Roundup and its active ingredient glyphosate, which the Plaintiff is injured from, and probable human carcinogen.

81.     As a direct and proximate result of Defendant's inadequate warnings, Roundup products were defective and unreasonably dangerous when they were sold to the end users, including the Plaintiff, and causing severe injuries to the Plaintiff which recovery from his injuries are impossible and as the result the Plaintiff's health is in serious and dangerous condition.

82.     Defendant are liable to Plaintiff for injuries caused by negligent or willful failure, as described above, to provide adequate warnings or other clinically relevant information and data regarding the appropriate use of their products and the risks associated with the use of or exposure to Roundup and glyphosate.

83.     The defects in these Roundup products were substantial and contributing factors in causing Plaintiff injuries, and, but for Defendant' misconduct and omissions, Plaintiff would not have sustained such serious injuries which are life threatening.

84.     Had Defendant provided adequate warnings and instructions and properly disclosed and disseminated the risks associated with Roundup products and application, Plaintiff would not have purchased this dangerous product, or in the alternative would have taken steps to avoid or minimize the risk of injuries as alleged herein and the company who employed Plaintiff could have obtained alternative herbicides.  Plaintiff was deprived of the opportunity to purchase and use less dangerous products and as the result has been injured with a life-threatening health injury.

85.     As a direct and proximate result of Defendant' placing defective Roundup products into the stream of commerce and exposing Plaintiff to them, Plaintiff has suffered and continue to suffer severe injuries, and has endured physical pain and discomfort, as well as

1 economic hardship, including considerable financial expenses for medical care and treatment.

2 Plaintiff will continue to incur these expenses in the future.

3    86.    Plaintiff is entitled to recover the actual damages suffered from Defendant's

4 conduct as well as for pain and suffering in an amount to be determined at the trial.

5    87.    Further given the fact that Defendant's conduct was malicious and intentional;

6 Plaintiff is entitled to recover punitive damages which the amount to be determined by Court at

7 the trial. Furthermore, due to malicious and intentional conduct of Defendant, Plaintiff is

8 entitled to recover reasonable attorney fees and cost which the amount to be proven at the trial.

9
**THIRD CAUSE OF ACTION**
**NEGLIGENT MISREPRESENTATION**
10
(Against All Defendants)

11    88.    Plaintiff re-alleges and incorporates by reference the allegations contained in all

12 preceding paragraphs of this Complaint, as though set forth fully herein.

13    89.    Defendant manufactured and heavily marketed and advertised Roundup and sold

14 it an effective "weed killer."

15    90.    Defendant intentionally failed to disclose to the end-users, including Plaintiff, of

16 material information regarding the link between the minimal usage of Roundup and the risk of

17 exposure and suffering from serious injuries such as NHL.

18    91.    Defendant knew or should have known about Roundup's propensity to cause

19 NHL.

20    92.    Defendant concealed, suppressed and omitted material information concerning

21 Roundup and intentionally failed to disclose the truth regarding the various studies about

22 Roundup, which could have been cited to support its false claim that Roundup did not cause any

23 serious injuries including NHL.

24    93.    Defendant intended that Plaintiff rely upon its material misrepresentations and

25 omissions to purchase more Roundup.

26

94.     As the direct and proximate result of Defendant's negligence misrepresentation Plaintiff has received injuries to his body and emotion as well as financially and as such Plaintiff is entitled to recover the actual damages which the amount to be proved at the trial.

95.     Further, given the conduct of Defendant was intentional, Plaintiff is entitled to recover punitive damages in an amount to be determined by Court at the trial.

## FOURTH CAUSE OF ACTION
## BREACH OF EXPRESS WARRANTY
(Against All Defendants)

96.     Plaintiff re-alleges and incorporates by reference the allegations contained in all preceding paragraphs of this Complaint, as though set forth fully herein.

97.     Defendant made several express warranties regarding Roundup, these representations and promises became part of the basis of the bargain between the parties and created a collective "express warranty" that Roundup would conform to Defendant's affirmations and promises.

98.     Defendant knew or should have known that Roundup could cause serious injuries, including cancer if the end-users is exposed to Roundup for any short period of time.

99.     The fact that Plaintiff has been diagnosed with NHL stage four (4) cancer constitutes Defendant's breach of the express warranty.

100.    Further, under the California state statutes, Cal. Com. Code § 2313, et seq, Defendant's conduct as described in this cause of action constitutes a breach of express warranties.

101.    Plaintiff has complied with the warranty terms, including application Instructions.

102.    As a direct and proximate result of the breach of the express warranty, Plaintiff suffered serious injuries to his body and his life expectancy has been shorten due to having NHL, stage four (4), as well as receiving other damages and injury in fact and/or ascertainable loss in an amount to be determined at trial,

103.    Plaintiff is entitled to recover the actual damages suffered from Defendant's conduct as well as for pain and suffering in an amount to be determined at the trial.

### FIFTH CAUSE OF ACTION
### BREACH OF IMPLIED WARRANTY (NON-PRIVITY)
(Against All Defendants)

104.    Plaintiff re-alleges and incorporates by reference the allegations contained in all preceding paragraphs of this Complaint, as though set forth fully herein

105.    Defendant is in the business of manufacturing, designing, supplying, marketing, advertising, warranting, and selling Roundup. Defendant impliedly warranted to Plaintiff and the consumers that Roundup was of a certain quality, was free from defects, was fit for its ordinary purpose of killing 'weeds' and was fit for use without causing material harm to the class.

106.    In reality Roundup was unfit for its ordinary use and was not of merchantable quality, as warranted by Defendant, because it was defective and had caused serious injuries such as NHL. Plaintiff and the other consumers could not have readily discovered that the product was not fit for its ordinary purpose prior to purchase of the Roundup.

107.    Roundup was similarly unfit for its particular purpose. However, Defendant's product was not suitable for this purpose at the point of sale because it had the propensity to cause cancer, specifically NHL.

108.    Defendant has failed to provide adequate remedies under its written express warranty, which has caused the express warranty to fail its essential purpose, thereby permitting remedies under implied warranties.

109.    Defendant has not sufficiently disclaimed the implied warranty of merchantability (specifically, and conspicuously) or the implied warranty of fitness (in writing and conspicuously). Defendant knew or should have known that Roundup causes NHL to those exposed to the product.

110.    Defendant's conduct described in this Complaint constitutes a breach of implied warranties as described under California *Comercial Code* §§ 2314-2315, et seq., and California *Civil Code* § 1790, et seq.

111.    Constructive notice was duly given to Defendant of the breaches of these warranties, and Defendant has failed to cure.

112.    As a direct and proximate result of the breaches of these warranties, Plaintiff as well as other consumers have been damaged and in the case of Plaintiff, he has sustained life threatening/shortening NHL which Plaintiff currently suffers from a stage four due to use of Roundup. Plaintiff shall prove the amount of his injuries at the trial.

113.    Plaintiff is entitled to recover the actual damages suffered from Defendant's conduct as well as for pain and suffering which the amount to be determined at the trial.

**SIXTH CAUSE OF ACTION**
**BREACH OF IMPLIED WARRANTY (PRIVITY)**
(Against All Defendant)

114.    Plaintiff re-alleges and incorporates by reference the allegations contained in all preceding paragraphs of this Complaint, as though set forth fully herein.

115.    Defendant is in the business of manufacturing, designing, supplying, marketing, advertising, and selling Roundup, which has been used as a weed killer. Defendant impliedly warranted to Plaintiff through its distributers that Roundup was of a certain quality, was free from defects, and was fit for its ordinary purpose, which was killing weeds.

116.    Roundup was unfit for its ordinary use and was not of merchantable quality, as warranted by Defendant, because it was defective, and studies have shown that it causes cancer. Prior to purchase, Plaintiff could not have readily discovered that the product was not fit for its ordinary purpose and would potentially cause NHL,

117.    Roundup was similarly unfit for its particular purpose.

118.    Defendant has not sufficiently disclaimed the implied warranty of merchantability (specifically, and conspicuously) or the implied warranty of fitness (in writing and

COMPLAINT FOR DAMAGES
23

conspicuously). Further, the purported limitations in the warranty, including limiting the "exclusive remedy" to a refund or replacement, are procedurally and substantively unconscionable.

119.    Defendant was and is in privity with each of the Plaintiff by law and/or by fact. First, Plaintiff has had sufficient direct dealings with Defendant and/or its authorized dealers, franchisees, representatives, and agents to establish privity of contract. Alternatively, Plaintiff is intended third-party beneficiaries of contracts, including express warranties, amongst Defendant and its dealers, franchisees, representatives and agents; Defendant's advertisements were aimed at end users such as Plaintiff and Defendant's warranties were expressly written for the purposes of persuasion of Plaintiff and other end users of Roundup. Defendant's authorized dealers, franchisees, representatives, and agents, on the other hand, were not intended to be the ultimate consumers of Roundup and have no rights under the warranty agreements provided by Defendant; these intermediary entities made no changes to Defendant's product, nor made any additions to the warranties issued by Defendant. Further, Defendant is estopped from limiting claims for common law and statutory violations based on a defense of lack of privity.

120.    Defendant's conduct described in this Complaint constitutes a breach of implied warranties fit for a particular use.

121.    Actual and/or constructive notice was duly given to Defendant of the breaches of these warranties, and Defendant has failed to take effective steps to cure.

122.    As a direct and proximate result of the breaches of these warranties, Plaintiff have Suffered serious physical injuries and damages which the amount to be proven at the trial.

## SEVENTH CAUSE OF ACTION
### FRAUDULENT CONCEALMENT
(Against all Defendants)

123.    Plaintiff re-alleges and incorporates by reference the allegations contained in all preceding paragraphs of this Complaint, as though set forth fully herein.

124.    Defendant knowingly and intentionally concealed material facts regarding Roundup.

125.    Defendant knew that it was omitting material facts at the time it sold Roundup to Plaintiff while Defendant had a duty to disclose these facts.

126.    In omitting these crucial facts, Defendant had the intent to defraud Plaintiff and the intent to entice and persuade Plaintiff to purchase more Roundup.

127.    Plaintiff reviewed and reasonably relied on Defendant's representations and not knowing that Defendant had intentionally concealed material harmful facts about the Roundup and Plaintiff purchased the Roundup.  Had the Defendant disclosed the true material facts about the risk of exposure to the Roundup, Plaintiff would not have purchased the Roundup or would have taken appropriate steps to protect himself for such dangerous exposure when using the Roundup.

128.    As the direct and proximate result of Defendant's fraudulent concealment, Plaintiff has been seriously injured and has suffered and continue to suffer from pain and suffering as well as financial losses, not to mention that his life expectancy has been shortened due to his injuries and as such Plaintiff is entitle to recover damages which the amount to be determined at the trial.

129.    Further, given the fact that Defendant's conduct was intentional and fraudulent, Plaintiff is entitled to recover punitive damages which the amount to be determined by the Court.

130.    Furthermore, Plaintiff is entitled to recover attorney fees and legal costs which the amount to be proven at the trial.

## **PRAYER FOR RELIEF**

**WHEREFORE** Plaintiff, BENITO ORNELAS GONZALEZ, Plaintiff prays for judgment and for the following to be awarded for each of the **SEVEN CAUSES OF ACTION:**

1. For General compensatory Damages in an amount within this Court's jurisdiction to be determined at the time of trial.

2. For Special Consequential Damages incurred including costs of additional hospital and medical expenses to be determined according to proof at time of trial.

3. For Punitive Damages for Defendant' intentional and malicious conducts;

4. For attorney's fees and costs as stated; and

5. For such other and further relief as the court may deem just and proper.

Dated: May 14, 2020                          ARYA LAW CENTER, PC


Majid Safaie, Attorneys for
Plaintiff, BENITO ORNELAS GONZALEZ

COMPLAINT FOR DAMAGES
26