MEDIATION

# U.S. DISTRICT COURT
## U.S. District Court, Western District of New York (Buffalo)
## CIVIL DOCKET FOR CASE #: 1:20–cv–01068–WMS

Komm v. Monsanto Company et al
Assigned to: Hon. William M. Skretny
Cause: 28:1332 Diversity–Product Liability

Date Filed: 08/11/2020
Jury Demand: Plaintiff
Nature of Suit: 367 Personal Injury: Health
Care/Pharmaceutical Personal Injury
Product Liability
Jurisdiction: Diversity

**Plaintiff**

**Leon R. Komm**

represented by **Brian A. Goldstein**
Cellino & Barnes, P.C.
2500 Main Place Tower
350 Main Street
Buffalo, NY 14202
716–854–2020
Fax: 716–854–6291
Email: brian.goldstein@cellinoandbarnes.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Monsanto Company**

**Defendant**

**John Does 1–50**

| Date Filed | # | Docket Text |
|---|---|---|
| 08/11/2020 | 1 | COMPLAINT against All Defendants $ 400 receipt number 0209–3934255, filed by Leon R. Komm. (Attachments: # 1 Civil Cover Sheet)(Goldstein, Brian) (Entered: 08/11/2020) |
| 08/11/2020 | 2 | REQUEST FOR WAIVER of Service sent to Defendants on 08/11/2020 by Leon R. Komm. Waiver of Service due by 10/13/2020. (Goldstein, Brian) (Entered: 08/11/2020) |
| 08/12/2020 | | Case Assigned to Hon. William M. Skretny. Notification to Chambers of on–line civil case opening. (JD) (Entered: 08/12/2020) |
| 08/12/2020 | | AUTOMATIC REFERRAL to Mediation The ADR Plan is available for download at http://www.nywd.uscourts.gov/alternative–dispute–resolution.(JD) (Entered: 08/12/2020) |
| 08/12/2020 | | Notice of Availability of Magistrate Judge: A United States Magistrate of this Court is available to conduct all proceedings in this civil action in accordance with 28 U.S.C. 636c and FRCP 73. The Notice, Consent, and Reference of a Civil Action to a Magistrate Judge form (AO–85) is available for download at http://www.uscourts.gov/services–forms/forms. (JD) (Entered: 08/12/2020) |

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NEW YORK

LEON R. KOMM,

               **Plaintiff,**

    v.

MONSANTO COMPANY
and
JOHN DOES 1 - 50,

               **Defendants.**

**COMPLAINT**

**JURY TRIAL DEMANDED**

CIVIL ACTION No. 1:20-cv-01068

### COMPLAINT.

    Plaintiff, **LEON R. KOMM,** ("Plaintiff"), by and through his undersigned attorneys, hereby brings this Complaint for damages against Defendants Monsanto Company and John Does 1-50, and alleges the following:

### NATURE OF THE CASE.

    1.    This is an action for damages suffered by Plaintiff as a direct and proximate result of Defendants' negligent and wrongful conduct in connection with the design, development, manufacture, testing, packaging, promoting, marketing, advertising, distribution, labeling, and/or sale of the herbicide **Roundup®**, containing the active ingredient glyphosate.

    2.    Plaintiff maintains that **Roundup®**, and/or glyphosate is defective, dangerous to human health, unfit and unsuitable to be marketed and sold in commerce, and lacked proper warnings and directions as to the dangers associated with its use.

    3.    Plaintiff's injuries, like those striking thousands of similarly situated victims across the country, were avoidable.

## JURISDICTION AND VENUE.

4.    This Court has jurisdiction over Defendants and this action pursuant to 28 U.S.C. §1332 because there is complete diversity of citizenship between Plaintiff and Defendants. Defendants are all either incorporated, and/or have their principal place of business outside of the state in which the Plaintiff resides.

5.    The amount in controversy between Plaintiff and Defendants exceeds $75,000, exclusive of interest and cost.

6.    The Court also has supplemental jurisdiction pursuant to 28 U.S.C. §1367.

7.    Venue is proper within this district pursuant to 28 U.S.C. §1391 in that Defendants conduct business here and are subject to personal jurisdiction in this district. Furthermore, Defendants sell, market, and/or distribute **Roundup®** within the State of New York. Also, a substantial part of the acts, and/or omissions giving rise to these claims occurred within this District.

## PARTIES.

8.    Plaintiff, **LEON R. KOMM**,  is a natural person and at all relevant times a resident and citizen of Erie County, New York.  Plaintiff brings this action for personal injuries sustained by exposure to **Roundup®** ("**Roundup**") containing the active ingredient glyphosate and the surfactant POEA. As a direct and proximate result of being exposed to **Roundup**, Plaintiff developed non-Hodgkin's Lymphoma.

9.    "**Roundup**" refers to all formulations of Defendants' **Roundup** products, including, but not limited to, **Roundup** Concentrate Poison Ivy and Tough Brush Killer 1, **Roundup** Custom Herbicide, **Roundup** D-Pak herbicide, **Roundup** Dry Concentrate, **Roundup** Export Herbicide, **Roundup** Fence & Hard Edger 1, **Roundup** Garden Foam Weed & Grass

2

Killer, **Roundup** Grass and Weed Killer, **Roundup** Herbicide, **Roundup** Original 2k herbicide, **Roundup** Original II Herbicide, **Roundup** Pro Concentrate, **Roundup** Prodry Herbicide, **Roundup** Promax, **Roundup** Quik Stik Grass and Weed Killer, **Roundup** Quikpro Herbicide, **Roundup** Rainfast Concentrate Weed & Grass Killer, **Roundup** Rainfast Super Concentrate Weed & Grass Killer, **Roundup** Ready-to-Use Extended Control Weed & Grass Killer 1 Plus Weed Preventer, **Roundup** Ready-to-Use Weed & Grass Killer, **Roundup** Ready-to-Use Weed and Grass Killer 2, **Roundup** Ultra Dry, **Roundup** Ultra Herbicide, **Roundup** Ultramax, **Roundup** VM Herbicide, **Roundup** Weed & Grass Killer Concentrate, **Roundup** Weed & Grass Killer Concentrate Plus, **Roundup** Weed & Grass killer Ready-to-Use Plus, **Roundup** Weed & Grass Killer Super Concentrate, **Roundup** Weed & Grass Killer1 Ready-to-Use, **Roundup** WSD Water Soluble Dry Herbicide Deploy Dry Herbicide, or any other formulation of containing the active ingredient glyphosate.

10.     Defendant **MONSANTO COMPANY**, is a Delaware corporation, Calif. Secretary of State Entity No. C2362863, in "active" status, with a principle place of business in St. Louis, Missouri.

11.     Upon information and belief, Defendants **JOHN DOES 1 - 50** are subsidiaries, partners, or other entities that were involved in the design, development, manufacture, testing, packaging, promoting, marketing, advertising, distribution, labeling, and/or sale of the herbicide **Roundup**, containing the active ingredient glyphosate. The identities of **JOHN DOES 1 - 50** are unknown to Plaintiff at this time. Plaintiff will move the Court to specifically name **JOHN DOES 1 - 50** as their identities becomes known to Plaintiff through discovery.

3

12.     Defendant **MONSANTO COMPANY** and **JOHN DOES 1 - 50** are collectively referred to as "Monsanto Defendants", or "Defendants."

13.     Defendants advertise and sell goods, specifically **Roundup**, in Erie County, New York.

14.     Defendants transacted and conducted business within the State of New York that relates to the allegations in this Complaint.

15.     Defendants derived substantial revenue from goods and products used in the State of New York.

16.     Defendants expected, or should have expected their acts to have consequences within the State of New York, and derived substantial revenue from interstate commerce.

17.     Defendants engaged in the business of designing, developing, manufacturing, testing, packaging, marketing, distributing, labeling, and/or selling **Roundup**.

18.     Defendants are authorized to do business in the State of New York and derive substantial income from doing business in this state.

19.     Upon information and belief, Defendants purposefully availed themselves of the privilege of conducting activities with the State of New York, thus invoking the benefits and protections of its laws.

20.     Upon information and belief, Defendants did act together to design, sell, advertise, manufacture, and/or distribute **Roundup**, with full knowledge of its dangerous and defective nature.

4

## FACTUAL ALLEGATIONS.

21.     At all relevant times, Defendants were in the business of, and did, design, research, manufacture, test, advertise, promote, market, sell, distribute, and/or have acquired and are responsible for Defendants who have designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed the commercial herbicide **Roundup**.

22.     Monsanto is a multinational agricultural biotechnology corporation based in St. Louis, Missouri. It is the world's leading producer of glyphosate.

23.     Defendants discovered the herbicidal properties of glyphosate during the 1970's and subsequently began to design, research, manufacture, sell and distribute glyphosate based "**Roundup**" as a broad spectrum herbicide.

24.     Glyphosate is the active ingredient in **Roundup**.

25.     Glyphosate is a broad-spectrum herbicide used to kill weeds and grasses known to compete with commercial crops grown around the globe.

26.     Glyphosate is a "non-selective" herbicide, meaning it kills indiscriminately based only on whether a given, organism produces a specific enzyme, 5-enolpyruvylshikimic acid-3-phosphate synthase, known as EPSP synthase.

27.     Glyphosate inhibits the enzyme 5-enolpyruvylshikimic acid-3-phosphate synthase that interferes with the shikimic pathway in plants, resulting in the accumulation of shikimic acid in plant tissue and ultimately plant death.

28.     Sprayed as a liquid, plants absorb glyphosate directly through their leaves, stems, and roots, and detectable quantities accumulate in the plant tissues.

29.     Each year, approximately 250 million pounds of glyphosate are sprayed on crops, commercial nurseries, suburban lawns, parks, and golf courses. This increase in use has

5

been driven largely by the proliferation of genetically engineered crops, crops specifically tailored to resist the activity of glyphosate.

30. Defendants are intimately involved in the development, design, manufacture, marketing, sale, and/or distribution of genetically modified ("GMO") crops, many of which are marketed as being resistant to **Roundup** i.e., "**Roundup** Ready®." As of 2009, Defendants were the world's leading producer of seeds designed to be **Roundup** Ready®. In 2010, an estimated 70% of corn and cotton, and 90% of soybean fields in the United States contained **Roundup** Ready® seeds.

31. The, original **Roundup**, containing the active ingredient glyphosate, was introduced in 1974. Today, glyphosate products are among the world's most widely used herbicides. Monsanto's glyphosate products are registered in more than 130 countries and are approved for weed control in more than 100 crops. No other herbicide active ingredient compares in terms of number of approved uses.

32. For nearly 40 years, farmers across the globe have used **Roundup**, unaware of its carcinogenic properties.

<u>**REGISTRATION OF HERBICIDES UNDER FEDERAL LAW.**</u>

33. The manufacture, formulation and distribution of herbicides, such as **Roundup**, are regulated under the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA"), 7. U.S.C. §136 et seq. FIFRA requires that all pesticides be registered with the Environmental Protection Agency ("EPA) prior to their distribution, sale, or use, except as described by FIFRA 7 U.S.C. 136a(a).

34. The EPA requires as part of the registration process, among other requirements, a variety of tests to evaluate the potential for exposure to pesticides, toxicity to

6

people and other potential non-target, organisms, and other adverse effects on the environment. Registration by the EPA, however, is not an assurance, or finding of safety. The determination the EPA makes in registering, or re-registering a product is not that the product is "safe," but rather that use of the product in accordance with its label directions "will not generally cause unreasonable adverse effects on the environment." 7 U.S.C. §136(a)(c)(5)(D).

35.    FIFRA defines "unreasonable adverse effects on the environment" to mean "any unreasonable risk to man, or the environment, taking into account the economic, social, and environmental costs and benefits of the use of any pesticide." 7 U.S.C. §136(bb). FIFRA thus requires the EPA to make a risk/benefit analysis in determining whether a registration should be granted, or allowed to continue to be sold in commerce.

36.    The EPA and the State of New York registered **Roundup** for distribution, sale, and manufacture in the United States and the State of New York.

37.    FIFRA generally requires that the registrant, Monsanto, conduct health and safety testing of pesticide products. The government is not required, nor is it able, to perform the product tests that are required of the manufacturer.

38.    The evaluation of each pesticide product distributed, sold, or manufactured is completed at the time the product is initially registered. The data necessary for registration of a pesticide has changed over time. The EPA is now in the process of re-evaluating all pesticide products through a Congressionally-mandated process called "re-registration." 7 U.S.C. §136a-1. In, order to reevaluate these pesticides, the EPA demands the completion of additional tests and the submission of data for the EPA's review and evaluation.

39.    In the case of glyphosate and **Roundup**, the EPA had planned on releasing its preliminary risk assessment – in relation to the registration process – no later than July 2015.

7

The EPA completed its review of glyphosate in early 2015, but delayed releasing the assessment pending further review in light of the World Health Organization's findings.

## MONSANTO'S FALSE REPRESENTATIONS
## REGARDING THE SAFETY OF ROUNDUP®.

40.     In 1996, the New York Attorney General ("NYAG") filed a lawsuit against Monsanto based on its false and misleading advertising of **Roundup** products. Specifically, the lawsuit challenged Monsanto's general representations that its spray-on glyphosate-based herbicides, including **Roundup**, were "safer **than table salt**" and "practically **non-toxic**" to mammals, birds, and fish. Among the representations the NYAG found deceptive and misleading about the human and environmental safety of **Roundup** are the following:

a.      remember that environmentally-friendly **Roundup** herbicide is biodegradable; **Roundup** won't build up in the soil so you can use **Roundup** with confidence along customers' driveways, sidewalks and fences...;

b.      and remember that **Roundup** is biodegradable and won't build up in the soil; that will give you the environmental confidence you need to use **Roundup** everywhere you've got a weed, brush, edging, or trimming problem;

c.      **Roundup** biodegrades into naturally-occurring elements; remember that versatile **Roundup** herbicide stays where you put it; that means there's no washing, or leaching to harm customers' shrubs, or other desirable vegetation.

d.      this non-residual herbicide will not wash, or leach in the soil. It ... stays where you apply it;

8

  e. you can apply Accord with "confidence because it will stay where you put it;" it bonds tightly to soil particles, preventing leaching. Then, soon after application, soil microorganisms biodegrade Accord into natural products;

  f. Glyphosate is less toxic to rats than table salt following acute, oral ingestion;

  g. Glyphosate's safety margin is much greater than required. It has over a 1,000-fold safety margin in food, and over a 700-fold safety margin for workers who manufacture it., or use it;

  h. you can feel good about using herbicides by Monsanto. They carry a toxicity category rating of 'practically non-toxic' as it pertains to mammals, birds and fish;

  i. "**Roundup** can be used where kids and pets will play and breaks down into natural material." This ad depicts a person with his head in the ground and a pet dog standing in an area which has been treated with **Roundup**;

  41. On November 19, 1996, Monsanto entered into an Assurance of Discontinuance with NYAG, in which Monsanto agreed, among other things, "to cease and desist from publishing, or broadcasting any advertisements [in New York] that represent, directly, or by implication" that:

  a. its glyphosate-containing pesticide products, or any component thereof are safe, non-toxic, harmless, or free from risk;

9

b.     its glyphosate-containing pesticide products, or any component thereof manufactured, formulated, distributed, or sold by Monsanto are biodegradable;

c.     its glyphosate-containing pesticide products, or any component thereof stay where they are applied under all circumstances and will not move through the environment by any means;

d.     its glyphosate-containing pesticide products, or any component thereof are "good" for the environment, or are "known for their environmental characteristics;"

e.     glyphosate-containing pesticide products, or any component thereof are safer, or less toxic than common consumer products other than herbicides;

f.     its glyphosate-containing products, or any component thereof might be classified as "practically non-toxic."

42.     Monsanto did not alter its advertising in the same manner in any state other than New York, and on information and belief still has not done so today.

43.     In 2009, France's highest court ruled that Monsanto had not told the truth about the safety of **Roundup**. The French court affirmed an earlier judgment that Monsanto had falsely advertised its herbicide **Roundup** as "biodegradable" and that it "left the soil clean."

## EVIDENCE OF CARCINOGENICITY IN ROUNDUP.

44.     As early as the 1980s, Monsanto was aware of glyphosate's carcinogenic properties.

45.     On March 4, 1985, a group of the Environmental Protection Agency's ("EPA") Toxicology Branch published a memorandum classifying glyphosate as a Category C oncogene. Category C oncogenes are possible human carcinogens with limited evidence of carcinogenicity.

46.     In 1986, the EPA issued a Registration Standard for glyphosate (NTIS PB87-103214). The Registration standard required additional phytotoxicity, environmental fate, toxicology, product chemistry, and residue chemistry studies. All of the data required was submitted and reviewed, and/or waived.

47.     In October 1991 the EPA published a Memorandum entitled "Second Peer Review of Glyphosate." The memorandum changed glyphosate's classification to Group E (evidence of non-carcinogenicity for humans). Two peer review committee members did not concur with the conclusions of the committee and one member refused to sign.

48.     In addition to the toxicity of the active molecule, many studies support the hypothesis that glyphosate formulations found in Defendants' **Roundup** products are more dangerous and toxic than glyphosate alone.  As early as 1991 evidence existed demonstrating that glyphosate formulations were significantly more toxic than glyphosate alone.

49.     In 2002, Julie Marc published a study entitled "Pesticide **Roundup** Provokes Cell Division Dysfunction at the Level of CDK1/Cyclin B Activation."

50.     The study found that Defendants' **Roundup** caused delays in the cell cycles of sea urchins, while the same concentrations of glyphosate alone proved ineffective and did not alter cell cycles.

51.     In 2004, Julie Marc published a study entitled "Glyphosate-based pesticides affect cell cycle regulation." The study demonstrated a molecular link between glyphosate-based products and cell cycle dysregulation.

52.     The study noted that "cell-cycle dysregulation is a hallmark of tumor cells and human cancer. Failure in the cell-cycle checkpoints leads to genomic instability and subsequent development of cancers from the initial affected cell." Further, "[s]ince cell cycle disorders such as cancer result from dysfunction of unique cell, it was of interest to evaluate the threshold dose of glyphosate affecting cells."

53.     In 2005, Francisco Peixoto published a study showing that **Roundup**'s effects on rat liver mitochondria are much more toxic and harmful than the same concentrations of glyphosate alone.

54.     The Peixoto study suggested that the harmful effects of **Roundup** on mitochondrial bioenergetics could not be exclusively attributed to glyphosate and could be the result of other chemicals, namely the surfactant POEA, or alternatively due to the possible synergy between glyphosate and **Roundup** formulation products.

55.     In 2009, Nora Benachour and Gilles-Eric Seralini published a study examining the effects of **Roundup** and glyphosate on human umbilical, embryonic, and placental cells.

56.     The study used dilution levels of **Roundup** and glyphosate far below agricultural recommendations, corresponding with low levels of residues in food. The study concluded that supposed "inert" ingredients, and possibly POEA, change human cell permeability and amplify toxicity of glyphosate alone. The study further suggested that determinations of glyphosate toxicity should take into account the presence of adjuvants, or those

12

chemicals used in the formulation of the complete pesticide. The study confirmed that the adjuvants in **Roundup** are not inert and that **Roundup** is always more toxic than its active ingredient glyphosate.

57.     The results of these studies were confirmed in recently published peer-reviewed studies and were at all times available, and/or known to Defendants.

58.     Defendants knew, or should have known that **Roundup** is more toxic than glyphosate alone and that safety studies on **Roundup**, **Roundup**'s adjuvants and "inert" ingredients, and/or the surfactant POEA were necessary to protect Plaintiff from **Roundup**.

59.     Defendants knew, or should have known that tests limited to **Roundup**'s active ingredient glyphosate were insufficient to prove the safety of **Roundup**.

60.     Defendants failed to appropriately and adequately test **Roundup**, **Roundup**'s adjuvants and "inert" ingredients, and/or the surfactant POEA to protect Plaintiff from **Roundup**.

61.     Rather than performing appropriate tests, Defendants relied upon flawed industry-supported studies designed to protect Defendants' economic interests rather than Plaintiff and the consuming public.

62.     Despite their knowledge that **Roundup** was considerably more dangerous than glyphosate alone, Defendants continued to promote **Roundup** as safe.

### IARC CLASSIFICATION OF GLYPHOSATE.

63.     The International Agency for Research on Cancer ("IARC") is the specialized intergovernmental cancer agency the World Health Organization ("WHO") of the United Nations tasked with conducting and coordinating research into the causes of cancer.

64. An IARC Advisory Group to Recommend Priorities for IARC Monographs during 2015–2019 met in April 2014. Though nominations for the review were solicited, a substance must meet two criteria to be eligible for review by the IARC Monographs: there must already be some evidence of carcinogenicity of the substance, and there must be evidence that humans are exposed to the substance.

65. IARC set glyphosate for review in 2015-2016. IARC uses five criteria for determining priority in reviewing chemicals. The substance must have a potential for direct impact on public health; scientific literature to support suspicion of carcinogenicity; evidence of significant human exposure; high public interest, and/or potential to bring clarity to a controversial area, and/or reduce public anxiety, or concern; related agents similar to one given high priority by the above considerations. Data reviewed is sourced preferably from publicly accessible, peer-reviewed data.

66. On March 24, 2015, after its cumulative review of human, animal, and DNA studies for more than one (1) year, many of which have been in Defendants' possession since as early as 1985, the IARC's working group published its conclusion that the glyphosate contained in Defendants' **Roundup** herbicide, is a Class 2A "probable carcinogen" as demonstrated by the mechanistic evidence of carcinogenicity in humans and sufficient evidence of carcinogenicity in animals.

67. The IARC's full Monograph was published on July 29, 2015, and established glyphosate as a class 2A probable carcinogen to humans. According to the authors glyphosate demonstrated sufficient mechanistic evidence (genotoxicity and oxidative stress) to warrant a 2A classification based on evidence of carcinogenicity in humans and animals.

68.     The IARC Working Group found an increased risk between exposure to glyphosate and non-Hodgkin's lymphoma ("NHL") and several subtypes of NHL, and the increased risk continued after adjustment for other pesticides.

69.     The IARC also found that glyphosate caused DNA and chromosomal damage in human cells.

## EARLIER EVIDENCE OF GLYPHOSATE'S DANGER.

70.     Despite the new classification by the IARC, Defendants have had ample evidence of glyphosate and **Roundup**'s genotoxic properties for decades.

71.     Genotoxicity refers to chemical agents that are capable of damaging the DNA within a cell through genetic mutations, which is a process that is believed to lead to cancer.

72.     In 1997, Chris Clements published "Genotoxicity of select herbicides in Rana catesbeiana tadpoles using the alkaline single-cell gel DNA electrophoresis (comet) assay."

73.     The study found that tadpoles exposed to **Roundup** showed significant DNA damage when compared with unexposed control animals.

74.     Both human and animal studies have shown that glyphosate and glyphosate-based formulations such as **Roundup** can induce oxidative stress.

75.     Oxidative stress and associated chronic inflammation are believed to be involved in carcinogenesis.

76.     The IARC Monograph notes that "[s]trong evidence exists that glyphosate, AMPA and glyphosate-based formulations can induce oxidative stress."

77.     In 2006 César Paz-y-Miño published a study examining DNA damage in human subjects exposed to glyphosate.

78.    The study produced evidence of chromosomal damage in blood cells showing significantly greater damage after exposure to glyphosate than before in the same individuals, suggesting that the glyphosate formulation used during aerial spraying had a genotoxic effect on exposed individuals.

79.    The IARC Monograph reflects the volume of evidence of glyphosate pesticides' genotoxicity noting "[t]he evidence for genotoxicity caused by glyphosate-based formulations is strong."

80.    Despite knowledge to the contrary, Defendants maintain that there is no evidence that **Roundup** is genotoxic, that regulatory authorities and independent experts are in agreement that **Roundup** is not genotoxic, and that there is no evidence that **Roundup** is genotoxic.

81.    In addition to glyphosate and **Roundup**'s genotoxic properties, Defendants have long been aware of glyphosate's carcinogenic properties.

82.    Glyphosate and **Roundup** in particular have long been associated with carcinogenicity and the development of numerous forms of cancer, including, but not limited to, non-Hodgkin's lymphoma, Hodgkin's lymphoma, multiple myeloma, and soft tissue sarcoma.

83.    Defendants have known of this association since the early to mid-1980s and numerous human and animal studies have evidenced the carcinogenicity of glyphosate, and/or **Roundup**.

84.    In 1985 the EPA studied the effects of glyphosate in mice finding a dose related response in male mice linked to renal tubal adenomas, a rare tumor. The study concluded the glyphosate was oncogenic.

85.     In 2003 Lennart Hardell and Mikael Eriksson published the results of two case controlled studies on pesticides as a risk factor for NHL and hairy cell leukemia.

86.     The study concluded that glyphosate had the most significant relationship to NHL among all herbicides studies with an increased odds ratio of 3.11.

87.     In 2003 AJ De Roos published a study examining the pooled data of mid-western farmers, examining pesticides and herbicides as risk factors for NHL.

88.     The study, which controlled for potential confounders, found a relationship between increased NHL incidence and glyphosate.

89.     In 2008 Mikael Eriksson published a study a population based case-control study of exposure to various pesticides as a risk factor for NHL.

90.     This strengthened previous associations between glyphosate and NHL.

91.     In spite of this knowledge, Defendants continued to issue broad and sweeping statements suggesting that **Roundup** was, and is, safer than, ordinary household items such as table salt, despite a lack of scientific support for the accuracy and validity of these statements and, in fact, voluminous evidence to the contrary.

92.     Upon information and belief, these statements and representations have been made with the intent of inducing Plaintiff, the agricultural community, and the public at large to purchase, and increase the use of, Defendants' **Roundup** for Defendants' pecuniary gain, and in fact did induce Plaintiff to use **Roundup**.

93.     Defendants made these statements with complete disregard and reckless indifference to the safety of Plaintiff and the general public.

94.     Notwithstanding Defendants' representations, scientific evidence has established a clear association between glyphosate and genotoxicity, inflammation, and an

increased risk of many cancers, including, but not limited to, NHL, Multiple Myeloma, and soft tissue sarcoma.

95.     Defendants knew, or should have known that glyphosate is associated with an increased risk of developing cancer, including, but not limited to, NHL, Multiple Myeloma, and soft tissue sarcomas.

96.     Defendants failed to appropriately and adequately inform and warn Plaintiff of the serious and dangerous risks associated with the use of and exposure to glyphosate, and/or **Roundup**, including, but not limited to, the risk of developing NHL, as well as other severe and personal injuries, which are permanent, and/or long-lasting in nature, cause significant physical pain and mental anguish, diminished enjoyment of life, and the need for medical treatment, monitoring, and/or medications.

97.     Despite the IARC's classification of glyphosate as a class 2A probable carcinogen, Defendants continue to maintain that glyphosate, and/or **Roundup** is safe, non-carcinogenic, non-genotoxic, and falsely warrant to users and the general public that independent experts and regulatory agencies agree that there is no evidence of carcinogenicity, or genotoxicity in glyphosate and **Roundup**.

98.     Defendants have claimed and continue to claim that **Roundup** is safe, non-carcinogenic, and non-genotoxic.

99.     Monsanto claims on its website that "[r]egulatory authorities and independent experts around the world have reviewed numerous long-term/carcinogenicity and genotoxicity studies and agree that there is no evidence that glyphosate, the active ingredient in **Roundup** brand herbicides and other glyphosate-based herbicides, causes cancer, even at very high doses, and that it is not genotoxic."

100.    Ironically, the primary source for this statement is a 1986 report by the WHO, the same, organization that now considers glyphosate to be a probable carcinogen.

101.    Glyphosate, and Defendants' **Roundup** products in particular, have long been associated with serious side effects and many regulatory agencies around the globe have banned, or are currently banning the use of glyphosate herbicide products.

102.    Defendants' statements proclaiming the safety of **Roundup** and disregarding its dangers misled Plaintiff.

103.    Despite Defendants' knowledge that **Roundup** was associated with an elevated risk of developing cancer, Defendants' promotional campaigns focused on **Roundup**'s purported "safety profile."

104.    Defendants' failure to adequately warn Plaintiff resulted in (1) Plaintiff using and being exposed to glyphosate instead of using another acceptable and safe method of controlling unwanted weeds and pests; and (2) scientists and physicians failing to warn and instruct consumers about the risk of cancer, including NHL, and other injuries associated with **Roundup**.

105.    Defendants failed to seek modification of the labeling of **Roundup** to include relevant information regarding the risks and dangers associated with **Roundup** exposure.

106.    The failure of Defendants to appropriately warn and inform the EPA has resulted in inadequate warnings in safety information presented directly to users and consumers.

107.    The failure of Defendants to appropriately warn and inform the EPA has resulted in the absence of warning, or caution statements that are adequate to protect health and the environment.

108.    The failure of Defendants to appropriately warn and inform the EPA has resulted in the directions for use that are not adequate to protect health and the environment.

109.    By reason of the foregoing acts and omissions, Plaintiff seeks compensatory damages as a result of Plaintiff's use of, and exposure to, **Roundup** which caused, or was a substantial contributing factor in causing Plaintiff to suffer from cancer, specifically NHL, and Plaintiff suffered severe and personal injuries which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life.

110.    By reason of the foregoing, Plaintiff is severely and permanently injured.

111.    By reason of the foregoing acts and omissions, Plaintiff has endured and, in some categories continues to suffer, emotional and mental anguish, medical expenses, and other economic and non-economic damages, as a result of the actions and inactions of the Defendants.

## PLAINTIFF'S EXPOSURE TO ROUNDUP.

112.    Plaintiff used **Roundup** beginning in 2003, and continuing through 2016, to control weeds in/on his personal property.

113.    For many years, Plaintiff sprayed **Roundup** on a regular basis as directed by the manufacturer. Plaintiff followed all safety and precautionary warnings during the course of use and utilized **Roundup** as it came from the manufacturer and in accordance with its intended use.

114.    Plaintiff was subsequently diagnosed with Non-Hodgkin Lymphoma in 06/2016.

115.    As a result of his/her injury, Plaintiff has incurred significant economic and non-economic damages.

## EQUITABLE TOLLING OF
## APPLICABLE STATUTE OF LIMITATIONS.

116.    Plaintiff incorporates by reference all prior paragraphs of this Complaint as if fully set forth herein.

117.    The running of any statute of limitations has been tolled by reason of Defendants' fraudulent concealment. Defendants, through their affirmative misrepresentations and omissions, actively concealed from Plaintiff the true risks associated with **Roundup** and glyphosate. Indeed, even as of October 2015, Defendants continue to represent to the public that "Scientists are in agreement that there is no evidence glyphosate causes cancer." (emphasis added)

118.    As a result of Defendants' actions, Plaintiff was unaware, and could not reasonably know, or have learned through reasonable diligence that **Roundup**, and/or glyphosate contact, exposed Plaintiff to the risks alleged herein and that those risks were the direct and proximate result of Defendants' acts and omissions.

119.    Furthermore, Defendants are estopped from relying on any statute of limitations because of their fraudulent concealment of the true character, quality and nature of **Roundup**. Defendants were under a duty to disclose the true character, quality, and nature of **Roundup** because this was non-public information over which Defendants had and continue to have exclusive control, and because Defendants knew that this information was not available to Plaintiff, or to distributors of **Roundup**. In addition, Defendants are estopped from relying on any statute of limitations because of their intentional concealment of these facts.

120.    Plaintiff had no knowledge that Defendants were engaged in the wrongdoing alleged herein. Because of the fraudulent acts of concealment of wrongdoing by Defendants, Plaintiff could not have reasonably discovered the wrongdoing at any time prior.

21

Also, the economics of this fraud should be considered. Defendants had the ability to and did spend enormous amounts of money in furtherance of their purpose of marketing, promoting, and/or distributing a profitable herbicide, notwithstanding the known, or reasonably known risks. Plaintiff and medical professionals could not have afforded and could not have possibly conducted studies to determine the nature, extent, and identity of related health risks, and were forced to rely on only the Defendants' representations. Accordingly, Defendants are precluded by the discovery rule, and/or the doctrine of fraudulent concealment from relying upon any statute of limitations.

### FIRST CAUSE OF ACTION
### (NEGLIGENCE).

121.    Plaintiff repeats, reiterates, and re-alleges each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

122.    Defendants had a duty to exercise reasonable care in the designing, researching, testing, manufacturing, marketing, supplying, promoting, packaging, sale, and/or distribution of **Roundup** into the stream of commerce, including a duty to assure that the product would not cause users to suffer unreasonable, dangerous side effects.

123.    Defendants failed to exercise, ordinary care in the designing, researching, testing, manufacturing, marketing, supplying, promoting, packaging, sale, testing, quality assurance, quality control, and/or distribution of **Roundup** into interstate commerce in that Defendants knew, or should have known that using **Roundup** created a high risk of unreasonable, dangerous side effects, including, but not limited to, the development of NHL, as well as other severe and personal injuries which are permanent and lasting in nature, physical

22

pain and mental anguish, including diminished enjoyment of life, as well as need for lifelong medical treatment, monitoring, and/or medications.

124.   The negligence by the Defendants, their agents, servants, and/or employees, included but was not limited to the following acts, and/or omissions:

a.   manufacturing, producing, promoting, formulating, creating, and/or designing **Roundup** without thoroughly testing it;

b.   failing to test **Roundup**, and/or failing to adequately, sufficiently, and properly test **Roundup**;

c.   not conducting sufficient testing programs to determine whether, or not **Roundup** was safe for use; in that Defendants herein knew, or should have known that **Roundup** was unsafe and unfit for use by reason of the dangers to its users;

d.   not conducting sufficient testing programs and studies to determine **Roundup**'s carcinogenic properties even after Defendants had knowledge that **Roundup** is, was, or could be carcinogenic;

e.   failing to conduct sufficient testing programs to determine the safety of "inert" ingredients, and/or adjuvants contained within **Roundup**, and the propensity of these ingredients to render **Roundup** toxic, increase the toxicity of **Roundup**, whether these ingredients are carcinogenic, magnify the carcinogenic properties of **Roundup**, and whether, or not "inert" ingredients, and/or adjuvants were safe for use;

23

f.    negligently failing to adequately and correctly warn the Plaintiff, the public, the medical and agricultural professions, and the EPA of the dangers of **Roundup**;

g.    negligently failing to petition the EPA to strength the warnings associated with **Roundup**;

h.    failing to provide adequate cautions and warnings to protect the health of users, handlers, applicators, and persons who would reasonably and foreseeably come into contact with **Roundup**;

i.    negligently marketing, advertising, and recommending the use of **Roundup** without sufficient knowledge as to its dangerous propensities;

j.    negligently representing that **Roundup** was safe for use for its intended purpose, and/or that **Roundup** was safer than, ordinary and common items such as table salt, when, in fact, it was unsafe;

k.    negligently representing that **Roundup** had equivalent safety and efficacy as other forms of herbicides;

l.    negligently designing **Roundup** in a manner, which was dangerous to its users;

m.   negligently manufacturing **Roundup** in a manner, which was dangerous to its users;

n.    negligently producing **Roundup** in a manner, which was dangerous to its users;

o.      negligently formulating **Roundup** in a manner, which was dangerous to its users;

p.      concealing information from the Plaintiff while knowing that **Roundup** was unsafe, dangerous, and/or non-conforming with EPA regulations;

q.      improperly concealing, and/or misrepresenting information from the Plaintiff, scientific and medical professionals, and/or the EPA, concerning the severity of risks and dangers of **Roundup** compared to other forms of herbicides; and

r.      negligently selling **Roundup** with a false and misleading label.

125.      Defendants under-reported, underestimated, and downplayed the serious dangers of **Roundup**.

126.      Defendants negligently and deceptively compared the safety risks, and/or dangers of **Roundup** with common everyday foods such as table salt, and other forms of herbicides.

127.      Defendants were negligent, and/or violated New York law in the designing, researching, supplying, manufacturing, promoting, packaging, distributing, testing, advertising, warning, marketing, and selling of **Roundup** in that they:

a.      failed to use, ordinary care in designing and manufacturing **Roundup** so as to avoid the aforementioned risks to individuals when **Roundup** was used as an herbicide;

b.   failed to accompany their product with proper, and/or accurate warnings regarding all possible adverse side effects associated with the use of **Roundup**;

c.   failed to accompany their product with proper warnings regarding all possible adverse side effects concerning the failure, and/or malfunction of **Roundup**;

d.   failed to accompany their product with accurate warnings regarding the risks of all possible adverse side effects concerning **Roundup**;

e.   failed to warn Plaintiff of the severity and duration of such adverse effects, as the warnings given did not accurately reflect the symptoms, or severity of the side effects including, but not limited to, the development of NHL;

f.   failed to conduct adequate testing, clinical testing and post-marketing surveillance to determine the safety of **Roundup**;

g.   failed to conduct adequate testing, clinical testing, and post-marketing surveillance to determine the safety of **Roundup**'s "inert" ingredients, and/or adjuvants;

h.   negligently misrepresented the evidence of **Roundup**'s genotoxicity and carcinogenicity; and

i.   Were otherwise careless, and/or negligent.

128.   Despite the fact that Defendants knew, or should have known that **Roundup** caused, or could cause, unreasonably dangerous side effects, Defendants continued

26

and continue to market, manufacture, distribute, and/or sell **Roundup** to consumers, including the Plaintiff.

129.     Defendants knew, or should have known that consumers such as the Plaintiff would foreseeably suffer injury as a result of Defendants' failure to exercise, ordinary care, as set forth above.

130.     Defendants' violations of law, and/or negligence were the proximate cause of Plaintiff's injuries, harm and economic loss, which Plaintiff suffered, and/or will continue to suffer.

131.     As a result of the foregoing acts and omissions, the Plaintiff suffered from serious and dangerous side effects including, but not limited to, NHL, as well as other severe and personal injuries which are permanent and lasting in nature, physical pain and mental anguish, diminished enjoyment of life, and financial expenses for hospitalization and medical care. Further, Plaintiff suffered life-threatening NHL, and severe personal injuries, which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life.

132.     WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in Plaintiff's favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all relief as this Court deems just and proper. Additionally, Plaintiff demands a jury trial on all issues contained herein.

### SECOND CAUSE OF ACTION
### (STRICT PRODUCTS LIABILITY – DESIGN DEFECT).

133.     Plaintiff repeats, reiterates and, re-alleges each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

134.    At all times herein mentioned, the Defendants designed, researched, manufactured, tested, advertised, promoted, sold, distributed, and/or have acquired the Defendants who have designed, researched, tested, advertised, promoted, marketed, sold, and distributed **Roundup** as hereinabove described that was used by the Plaintiff.

135.    Defendants' **Roundup** was expected to and did reach the usual consumers, handlers, and persons coming into contact with said product without substantial change in the condition in which it was produced, manufactured, sold, distributed, and marketed by the Defendants.

136.    At those times, **Roundup** was in an unsafe, defective, and inherently dangerous condition, which was dangerous to users, and in particular, the Plaintiff herein.

137.    The **Roundup** designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed by Defendants was defective in design, or formulation in that, when it left the hands of the manufacturer, and/or suppliers, the foreseeable risks exceeded the benefits associated with the design, or formulation of **Roundup**.

138.    The **Roundup** designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed by Defendants was defective in design, and/or formulation, in that, when it left the hands of the Defendants manufacturers, and/or suppliers, it was unreasonably dangerous, unreasonably dangerous in normal use, and it was more dangerous than an, ordinary consumer would expect.

139.    At all times herein mentioned, **Roundup** was in a defective condition and unsafe, and Defendants knew, or had reason to know that said product was defective and unsafe, especially when used in the form and manner as provided by the Defendants. In particular, Defendants' **Roundup** was defective in the following ways:

28

a. when placed in the stream of commerce, Defendants' **Roundup** Products were defective in design and formulation and, consequently, dangerous to an extent beyond that which an, ordinary consumer would anticipate.

b. when placed in the stream of commerce, Defendants' **Roundup** products were unreasonably dangerous in that they were hazardous and posed a grave risk of cancer and other serious illnesses when used in a reasonably anticipated manner.

c. when placed in the stream of commerce, Defendants' **Roundup** products contained unreasonably dangerous design defects and were not reasonably safe when used in a reasonably anticipated manner.

d. Defendants did not sufficiently test, investigate, or study its **Roundup** products.

e. exposure to **Roundup** presents a risk of harmful side effects that outweigh any potential utility stemming from the use of the herbicide.

f. Defendants new, or should have known at the time of marketing its **Roundup** products that exposure to **Roundup** and could result in cancer and other severe illnesses and injuries.

g. Defendants did not conduct adequate post-marketing surveillance of its **Roundup** products.

29

140.    Defendants knew, or should have known that at all times herein mentioned its **Roundup** was in a defective condition, and was and is inherently dangerous and unsafe.

141.    Plaintiff was exposed to Defendants' **Roundup** in the course of his employment, as described above, without knowledge of **Roundup**'s dangerous characteristics.

142.    At the time of the Plaintiff's use of and exposure to **Roundup, Roundup** was being used for the purposes and in a manner normally intended, as a broad-spectrum herbicide.

143.    Defendants with this knowledge voluntarily designed its **Roundup** with a dangerous condition for use by the public, and in particular the Plaintiff.

144.    Defendants had a duty to create a product that was not unreasonably dangerous for its normal, intended use.

145.    Defendants created a product that was and is unreasonably dangerous for its normal, intended use.

146.    Defendants marketed and promoted a product in such a manner so as to make it inherently defective as the product downplayed its suspected, probable, and established health risks inherent with its normal, intended use.

147.    The **Roundup** designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed by Defendants was manufactured defectively in that **Roundup** left the hands of Defendants in a defective condition and was unreasonably dangerous to its intended users.

148.    The **Roundup** designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed by Defendants reached their intended users in the same

defective and unreasonably dangerous condition in which the Defendants' **Roundup** was manufactured.

149.    Defendants designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed a defective product, which created an unreasonable risk to the health of consumers and to the Plaintiff in particular, and Defendants are therefore strictly liable for the injuries sustained by the Plaintiff.

150.    The Plaintiff could not, by the exercise of reasonable care, have discovered **Roundup**'s defects herein mentioned, or perceived its danger.

151.    By reason of the foregoing, the Defendants have become strictly liable to the Plaintiff for the manufacturing, marketing, promoting, distribution, and selling of a defective product, **Roundup**.

152.    Defendants' defective design, of **Roundup** amounts to willful, wanton, and/or reckless conduct by Defendants.

153.    Defects in Defendants' **Roundup** were the cause, or a substantial factor in causing Plaintiff's injuries.

154.    As a result of the foregoing acts and omission, the Plaintiff developed NHL, and suffered severe and personal injuries, which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life, and financial expenses for hospitalization and medical care.

**155.**    WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in Plaintiff's favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all relief as this Court deems just and proper. Additionally, Plaintiff demands a jury trial on all issues contained herein.

## THIRD CAUSE OF ACTION
## (STRICT PRODUCTS LIABILITY – FAILURE TO WARN).

156.    Plaintiff repeats, reiterates and re-alleges each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

157.    Defendants have engaged in the business of selling, testing, distributing, supplying, manufacturing, marketing, and/or promoting **Roundup**, and through that conduct have knowingly and intentionally placed **Roundup** into the stream of commerce with full knowledge that it reaches consumers such as Plaintiff who are exposed to it through, ordinary and reasonably foreseeable uses.

158.    Defendants did in fact sell, distribute, supply, manufacture, and/or promote **Roundup** to Plaintiff. Additionally, Defendants expected the **Roundup** that they were selling, distributing, supplying, manufacturing, and/or promoting to reach – and **Roundup** did in fact reach – consumers, including Plaintiff, without any substantial change in the condition of the product from when it was initially distributed by Defendants.

159.    At the time of manufacture, Defendant could have provided the warnings, or instructions regarding the full and complete risks of **Roundup** and glyphosate-containing products because it knew, or should have known of the unreasonable risks of harm associated with the use of, and/or exposure to such products.

160.    At all times herein mentioned, the aforesaid product was defective and unsafe in manufacture such that it was unreasonably dangerous to the user, and was so at the time it was distributed by Defendants and at the time Plaintiff was exposed to, and/or ingested the product. The defective condition of **Roundup** was due in part to the fact that it was not accompanied by proper warnings regarding its carcinogenic qualities and possible side effects,

32

including, but not limited to, developing Non-Hodgkin's lymphoma as a result of exposure and use.

161.   **Roundup** did not contain a warning, or caution statement, which was necessary and, if complied with, was adequate to protect health those exposed in violation of 7 U.S.C. §136j(a)(1)(E).

162.   Defendants' failure to include a warning, or caution statement which was necessary and, if complied with, was adequate to protect the health of those exposed, violated 7 U.S.C. §136j(a)(1)(E) as well as the laws of the State of New York.

163.   Defendants could have amended the label of **Roundup** to provide additional warnings.

164.   This defect caused serious injury to Plaintiff, who used **Roundup** in its intended and foreseeable manner.

165.   At all times herein mentioned, Defendants had a duty to properly design, manufacture, compound, test, inspect, package, label, distribute, market, examine, maintain supply, provide proper warnings, and take such steps to assure that the product did not cause users to suffer from unreasonable and dangerous side effects.

166.   Defendants labeled, distributed, and promoted the aforesaid product that it was dangerous and unsafe for the use and purpose for which it was intended.

167.   Defendants failed to warn of the nature and scope of the side effects associated with **Roundup**, namely its carcinogenic properties and its propensity to cause, or serve as a substantial contributing factor in the development of NHL.

168.   Defendants were aware of the probable consequences of the aforesaid conduct. Despite the fact that Defendants knew, or should have known that **Roundup** caused

serious injuries, Defendants failed to exercise reasonable care to warn of the dangerous carcinogenic properties and side effect of developing NHL from **Roundup** exposure, even though these side effects were known, or reasonably scientifically knowable at the time of distribution. Defendants willfully and deliberately failed to avoid the consequences associated with their failure to warn, and in doing so, Defendants acted with a conscious disregard for the safety of Plaintiff.

169.     At the time of exposure, Plaintiff could not have reasonably discovered any defect in **Roundup** prior through the exercise of reasonable care.

170.     Defendants, as the manufacturers, and/or distributors of the subject product, are held to the level of knowledge of an expert in the field.

171.     Plaintiff reasonably relied upon the skill, superior knowledge, and judgment of Defendants.

172.     Had Defendants properly disclosed the risks associated with **Roundup**, Plaintiff would have avoided the risk of NHL by not using **Roundup**.

173.     The information that Defendants did provide, or communicate failed to contain adequate warnings and precautions that would have enabled Plaintiff, and similarly situated individuals, to utilize the product safely and with adequate protection. Instead, Defendants disseminated information that was inaccurate, false, and misleading and which failed to communicate accurately, or adequately the comparative severity, duration, and extent of the risk of injuries associated with use of, and/or exposure to **Roundup** and glyphosate; continued to promote the efficacy of **Roundup**, even after it knew, or should have known of the unreasonable risks from use, or exposure; and concealed, downplayed, or otherwise suppressed, through

34

aggressive marketing and promotion, any information, or research about the risks and dangers of exposure to **Roundup** and glyphosate.

174.    To this day, Defendants have failed to adequately warn of the true risks of Plaintiff's injuries associated with the use of and exposure to **Roundup**.

175.    As a result of their inadequate warnings, Defendants' **Roundup** products were defective and unreasonably dangerous when they left the possession, and/or control of Defendant, were distributed by Defendant, and used by Plaintiff.

176.    As a direct and proximate result of Defendants' actions as alleged herein, and in such other ways to be later shown, the subject product caused Plaintiff to sustain injuries as herein alleged.

177.    WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in Plaintiff's favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all relief as this Court deems just and proper. Additionally, Plaintiff demands a jury trial on all issues contained herein.

## FOURTH CAUSE OF ACTION
### (BREACH OF IMPLIED WARRANTIES).

178.    Plaintiff repeats, reiterates, and re-alleges each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect all if more fully set forth herein.

179.    At all times herein mentioned, the Defendants manufactured, distributed, compounded, recommended, merchandized, advertised, promoted, and sold **Roundup**, and/or have recently acquired the Defendants who have manufactured, compound portrayed, distributed, recommended, merchandized, advertised, promoted, and sold **Roundup**, as a broad

35

spectrum herbicide. These actions were under the ultimate control and supervision of Defendants.

180.    At the time Defendants marketed, sold, and distributed **Roundup** for use by Plaintiff, Defendants knew of **Roundup**'s intended use and impliedly warranted the product to be, or merchantable quality and safe and fit for this use.

181.    The Defendants impliedly represented and warranted to Plaintiff and users of **Roundup**, the agricultural community, and/or the EPA that **Roundup** was safe and of merchantable quality and fit for the, ordinary purpose for which it was to be used.

182.    These representations and warranties were false, misleading, and inaccurate in that **Roundup** was unsafe, unreasonably dangerous, not of merchantable quality, and defective.

183.    Plaintiff, and/or the EPA did rely on said implied warranty of merchantability of fitness for particular use and purpose.

184.    Plaintiff reasonably relied upon the skill and judgment of Defendants as to whether **Roundup** was of merchantable quality and safe and fit for its intended use.

185.    **Roundup** was injected into the stream of commerce by the Defendants in a defective, unsafe, and inherently dangerous condition, and the products' materials were expected to and did reach users, handlers, and persons coming into contact with said products without substantial change in the condition in which they were sold.

186.    The Defendants breached the aforesaid implied warranties, as their herbicide **Roundup** was not fit for its intended purposes and uses.

187.    As a result of the foregoing acts and omissions, Plaintiff suffered from NHL and Plaintiff suffered severe and personal injuries which are permanent and lasting in

nature, physical pain and mental anguish, including diminished enjoyment of life, financial expenses for hospitalization and medical care, including medical expenses and other economic, and non-economic damages.

188. WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in Plaintiff's favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all relief as this Court deems just and proper. Additionally, Plaintiff demands a jury trial on all issues contained herein.

### FIFTH CAUSE OF ACTION
### (CONSUMER PROTECTION VIOLATIONS).

189. Plaintiff hereby incorporates by reference each of the preceding paragraphs as if fully set forth herein.

190. Defendants have a statutory duty to refrain from unfair, or deceptive acts, or trade practices in the design, development, approval, manufacture, promotion, marketing and sale of **Roundup®**.

191. Had the Defendants not engaged in the deceptive conduct described herein, Plaintiff would not have purchased, and/or paid for **Roundup** and would not have suffered the injuries and damages related to **Roundup**. Specifically, Plaintiff was misled by the deceptive conduct described herein.

192. Defendants' deceptive, unconscionable, and/or fraudulent representations, misrepresentations and material omissions directly and indirectly to consumers, including Plaintiff, constituted unfair and deceptive acts and trade practices in violation of the state consumer protection statutes listed below.

193.    Defendants engaged in wrongful conduct while at the same time obtaining, under false pretenses, substantial sums of money from Plaintiff for **Roundup** that they would not have paid had Defendants not engaged in unfair and deceptive conduct.

194.    Defendants have engaged in unfair competition, or unfair, or deceptive acts, or practices, or made false representation in violation of New York General Business Law §349 et seq. and §350 et seq., and Executive Law §63(12).

195.    Plaintiff was injured by the cumulative and indivisible nature of Defendants' conduct.  The cumulative effect of Defendants' conduct directed at consumers including the Plaintiff was to create a demand for and sell **Roundup**.  Each aspect of Defendants' conduct combined to artificially create sales of **Roundup**.

196.    Consumers including the Plaintiff relied upon Defendants' misrepresentations and omissions in determining to use **Roundup**.

197.    By reason of the unlawful acts engaged in by the Defendants, Plaintiff has suffered ascertainable loss and damages.

198.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff has been damaged by paying in whole, or in part for **Roundup**.

199.    As a direct and proximate result of Defendants' violations of New York's unfair trade practice acts, Plaintiff has sustained economic losses and other damages for which Plaintiff is entitled to statutory and compensatory damages, and declaratory relief in amounts to be proven at trial.

200.    WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in Plaintiff's favor for compensatory and punitive damages, together with multiplicative damages as prescribed by statute, interest, costs herein incurred, attorneys' fees

and all relief as this Court deems just and proper. Additionally, Plaintiff demands a jury trial on all issues contained herein.

## PRAYER FOR RELIEF.

WHEREFORE, Plaintiff demands judgment against the Defendants on each of the above-referenced claims and causes of action and as follows:

1. awarding compensatory damages in excess of the jurisdictional amount, including, but not limited to pain, suffering, emotional distress, loss of enjoyment of life, and other non-economic damages in an amount to be determined at trial of this action;

2. awarding compensatory damages to Plaintiff for past and future damages, including, but not limited to, Plaintiff's pain and suffering and for severe and permanent personal injuries sustained by the Plaintiff including health care costs and economic loss;

3. awarding economic damages in the form of medical expenses, out of pocket expenses, lost earnings and other economic damages in an amount to be determine at trial of this action;

4. punitive, and/or exemplary damages for the wanton, willful, fraudulent, and reckless acts of the Defendants who demonstrated a complete disregard and reckless indifference for the safety and welfare of the general public and to the Plaintiff in an amount sufficient to punish Defendants and deter future similar conduct, to the extent allowed by applicable law;

5. multiplicative damages as prescribed by statute;

39

6.  pre-judgment interest;

7.  post-judgment interest;

8.  awarding Plaintiff reasonable attorneys' fees;

9.  awarding Plaintiff the costs of these proceedings; and

10. such other and further relief as this Court deems just and proper.

## DEMAND FOR JURY TRIAL.

Plaintiff hereby demands trial by jury as to all issues.

Dated: 08/4/2020

By:  _____

Brian A. Goldstein, Esq.
*Attorneys for Plaintiff(s)*
*LEON R. KOMM*
Cellino & Barnes, P.C.
2500 Main Place Tower,
350 Main Street
Buffalo, New York 14202-3725
Telephone: (716)888-8888
Fax: (716)854-6291
*Brian.Goldstein@cellinoandbarnes.com*

40

# 1:20-cv-01068

JS 44 (Rev. 08/18)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

| I. (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| LEON R. KOMM | Monsanto Company and John Does 1-50 |

| **(b)** County of Residence of First Listed Plaintiff  ERIE COUNTY | County of Residence of First Listed Defendant |
|---|---|
| *(EXCEPT IN U.S. PLAINTIFF CASES)* | *(IN U.S. PLAINTIFF CASES ONLY)*<br>NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF<br>THE TRACT OF LAND INVOLVED. |

| **(c)** Attorneys *(Firm Name, Address, and Telephone Number)*<br>Brian A. Goldstein, Esq., Cellino & Barnes, PC<br>2500 Main Place Tower, 350 Main Street, Buffalo, NY  14202<br>(716) 888-8888 | Attorneys *(If Known)* |
|---|---|

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

☐ 1  U.S. Government
    Plaintiff

☐ 3  Federal Question
    *(U.S. Government Not a Party)*

☐ 2  U.S. Government
    Defendant

☒ 4  Diversity
    *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)*                *and One Box for Defendant)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☐ 1 | Incorporated *or* Principal Place<br>of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place<br>of Business In Another State | ☐ 5 | ☒ 5 |
| Citizen or Subject of a<br>Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment<br>  & Enforcement of Judgment<br>☐ 151 Medicare Act<br>☐ 152 Recovery of Defaulted<br>  Student Loans<br>  (Excludes Veterans)<br>☐ 153 Recovery of Overpayment<br>  of Veteran's Benefits<br>☐ 160 Stockholders' Suits<br>☐ 190 Other Contract<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | **PERSONAL INJURY**<br>☐ 310 Airplane<br>☐ 315 Airplane Product<br>  Liability<br>☐ 320 Assault, Libel &<br>  Slander<br>☐ 330 Federal Employers'<br>  Liability<br>☐ 340 Marine<br>☐ 345 Marine Product<br>  Liability<br>☐ 350 Motor Vehicle<br>☐ 355 Motor Vehicle<br>  Product Liability<br>☐ 360 Other Personal<br>  Injury<br>☐ 362 Personal Injury -<br>  Medical Malpractice | **PERSONAL INJURY**<br>☐ 365 Personal Injury -<br>  Product Liability<br>☒ 367 Health Care/<br>  Pharmaceutical<br>  Personal Injury<br>  Product Liability<br>☐ 368 Asbestos Personal<br>  Injury Product<br>  Liability<br>**PERSONAL PROPERTY**<br>☐ 370 Other Fraud<br>☐ 371 Truth in Lending<br>☐ 380 Other Personal<br>  Property Damage<br>☐ 385 Property Damage<br>  Product Liability | ☐ 625 Drug Related Seizure<br>  of Property 21 USC 881<br>☐ 690 Other | ☐ 422 Appeal 28 USC 158<br>☐ 423 Withdrawal<br>  28 USC 157<br><br>**PROPERTY RIGHTS**<br>☐ 820 Copyrights<br>☐ 830 Patent<br>☐ 835 Patent - Abbreviated<br>  New Drug Application<br>☐ 840 Trademark<br>**SOCIAL SECURITY**<br>☐ 861 HIA (1395ff)<br>☐ 862 Black Lung (923)<br>☐ 863 DIWC/DIWW (405(g))<br>☐ 864 SSID Title XVI<br>☐ 865 RSI (405(g)) | ☐ 375 False Claims Act<br>☐ 376 Qui Tam (31 USC<br>  3729(a))<br>☐ 400 State Reapportionment<br>☐ 410 Antitrust<br>☐ 430 Banks and Banking<br>☐ 450 Commerce<br>☐ 460 Deportation<br>☐ 470 Racketeer Influenced and<br>  Corrupt Organizations<br>☐ 480 Consumer Credit<br>☐ 485 Telephone Consumer<br>  Protection Act<br>☐ 490 Cable/Sat TV<br>☐ 850 Securities/Commodities/<br>  Exchange<br>☐ 890 Other Statutory Actions<br>☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | **LABOR** | **FEDERAL TAX SUITS** | ☐ 893 Environmental Matters |
| ☐ 210 Land Condemnation<br>☐ 220 Foreclosure<br>☐ 230 Rent Lease & Ejectment<br>☐ 240 Torts to Land<br>☐ 245 Tort Product Liability<br>☐ 290 All Other Real Property | ☐ 440 Other Civil Rights<br>☐ 441 Voting<br>☐ 442 Employment<br>☐ 443 Housing/<br>  Accommodations<br>☐ 445 Amer. w/Disabilities -<br>  Employment<br>☐ 446 Amer. w/Disabilities -<br>  Other<br>☐ 448 Education | **Habeas Corpus:**<br>☐ 463 Alien Detainee<br>☐ 510 Motions to Vacate<br>  Sentence<br>☐ 530 General<br>☐ 535 Death Penalty<br>**Other:**<br>☐ 540 Mandamus & Other<br>☐ 550 Civil Rights<br>☐ 555 Prison Condition<br>☐ 560 Civil Detainee -<br>  Conditions of<br>  Confinement | ☐ 710 Fair Labor Standards<br>  Act<br>☐ 720 Labor/Management<br>  Relations<br>☐ 740 Railway Labor Act<br>☐ 751 Family and Medical<br>  Leave Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Employee Retirement<br>  Income Security Act<br>**IMMIGRATION**<br>☐ 462 Naturalization Application<br>☐ 465 Other Immigration<br>  Actions | ☐ 870 Taxes (U.S. Plaintiff<br>  or Defendant)<br>☐ 871 IRS—Third Party<br>  26 USC 7609 | ☐ 895 Freedom of Information<br>  Act<br>☐ 896 Arbitration<br>☐ 899 Administrative Procedure<br>  Act/Review or Appeal of<br>  Agency Decision<br>☐ 950 Constitutionality of<br>  State Statutes |

## V. ORIGIN *(Place an "X" in One Box Only)*

☒ 1  Original
  Proceeding

☐ 2  Removed from
  State Court

☐ 3  Remanded from
  Appellate Court

☐ 4  Reinstated or
  Reopened

☐ 5  Transferred from
  Another District
  *(specify)*

☐ 6  Multidistrict
  Litigation -
  Transfer

☐ 8  Multidistrict
  Litigation -
  Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
28 USC Section 1332

Brief description of cause:
Product liability involving RoundUp, relating to MDL 2741

| VII. REQUESTED IN<br>COMPLAINT: | ☐ CHECK IF THIS IS A CLASS ACTION<br>UNDER RULE 23, F.R.Cv.P. | DEMAND $ | CHECK YES only if demanded in complaint:<br>JURY DEMAND:  ☒ Yes  ☐ No |
|---|---|---|---|

| VIII. RELATED CASE(S)<br>IF ANY | *(See instructions):* | JUDGE  Hon. Vince Chhabria | DOCKET NUMBER  16-md-02741-VC |
|---|---|---|---|

| DATE<br>08/11/2020 | SIGNATURE OF ATTORNEY OF RECORD<br>/s/ Brian A. Goldstein |
|---|---|

**FOR OFFICE USE ONLY**

RECEIPT #_____  AMOUNT_____  APPLYING IFP_____  JUDGE_____  MAG. JUDGE_____