JURY

# U.S. District Court
## District of South Carolina (Greenville)
## CIVIL DOCKET FOR CASE #: 6:20-cv-02688-MDL

Moore v. Monsanto Company
Assigned to: Unassigned - MDL
Cause: 28:1332 Diversity-Personal Injury

Date Filed: 07/20/2020
Jury Demand: Plaintiff
Nature of Suit: 367 Personal Injury: Health Care/Pharmaceutical Personal Injury Product Liability
Jurisdiction: Diversity

**Plaintiff**

**Gary R Moore**

represented by **Joshua D Christian**
Christian and Christian LLC
PO Box 332
Greenville, SC 29602
864-232-7363
Email: jchristian@cclawfirm.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Monsanto Company**

| Date Filed | # | Docket Text |
|---|---|---|
| 07/21/2020 | 1 | COMPLAINT against Monsanto Company ( Filing fee $ 400 receipt number 0420-9231026.), filed by Gary R Moore. Service due by 10/19/2020(alew, ) Modified on 7/22/2020 to correct filed date (alew, ). (Entered: 07/22/2020) |
| 07/21/2020 | 3 | Local Rule 26.01 Answers to Interrogatories by Gary R Moore.(alew, ) Modified on 7/22/2020 to correct filing date (alew, ). (Entered: 07/22/2020) |

| PACER Service Center | | |
|---|---|---|
| **Transaction Receipt** | | |
| 08/17/2020 15:36:10 | | |
| **PACER Login:** | hllp1982:2634105:4722683 | **Client Code:** 1417.0005 |
| **Description:** | Docket Report | **Search Criteria:** 6:20-cv-02688-MDL |
| **Billable Pages:** | 1 | **Cost:** 0.10 |

# UNITED STATES DISTRICT COURT
## FOR THE  DISTRICT OF SOUTH CAROLINA

| | |
|---|---|
| Gary R. Moore, * | |
| * | |
| Plaintiff, * | CIVIL ACTION |
| * | NO. _____ |
| v. * | |
| * | |
| MONSANTO COMPANY, * | |
| * | |
| Defendant. * | |
| * | |

## COMPLAINT FOR DAMAGES AND JURY DEMAND

Plaintiff, Gary R. Moore ("Plaintiff"), by and through his undersigned attorneys, hereby brings this Complaint for damages against Defendant Monsanto Company, and alleges the following:

## INTRODUCTION

1.      This action relates to In Re: Roundup Products Liability Litigation (MDL No. 2741), currently pending in the Northern District of California, Case No. 16-MD-2741-VC.

2.      In 1970, Defendant Monsanto Company, Inc. ("Monsanto") discovered the herbicidal properties of glyphosate and began marketing it in products in 1974 under the brand name Roundup®. Roundup® is a non-selective herbicide used to kill weeds that commonly compete with the growing of crops. In addition to the active ingredient glyphosate, Roundup® contains the surfactant Polyethoxylated tallow amine (POEA) and/or adjuvants and other so-called "inert" ingredients. In 2001, glyphosate was the most used pesticide active ingredient in American

agriculture with 85-90 million pounds used annually. That number grew to 185 million pounds in 2007.[1] As of 2013, glyphosate was the world's most widely used herbicide.

3.      Monsanto is a multinational agricultural biotechnology corporation based in St. Louis, Missouri, and incorporated in Delaware. It is the world's leading producer of glyphosate. As of 2009, Monsanto was the world's leading producer of seeds, accounting for 27% of the world seed market.[2] The majority of these seeds are of the Roundup Ready® brand. The stated advantage of Roundup Ready® crops is that they substantially improve a farmer's ability to control weeds, because glyphosate can be sprayed in the fields during the growing season without harming the crops. In 2010, an estimated 70% of corn and cotton and 90% of soybean fields in the United States were Roundup Ready®.[3]

4.      Monsanto's glyphosate products are registered in 130 countries and approved for use on over 100 different crops.[4] They are ubiquitous in the environment. Numerous studies confirm that glyphosate is found in rivers, streams, and groundwater in agricultural areas where

---

[1] Arthur Grube et al., U.S. Envtl. Prot. Agency, *Pesticides Industry Sales and Usage, 2006-2007 Market Estimates* 14 (2011), available at https://www.epa.gov/sites/production/files/2015-10/documents/market_estimates2007.pdf.
[2] ETC Group, *Who Will Control the Green Economy?* 22 (2011), available at http://www.etcgroup.org/files/publication/pdf_file/ETC_wwctge_4web_Dec2011.pdf.
[3] William Neuman & Andrew Pollack, *Farmers Cope With Roundup-Resistant Weeds*, N.Y. TIMES, May 3, 2010, available at http://www.nytimes.com/2010/05/04/business/energy-environment/04weed.html?pagewanted=all.
[4] Monsanto, *Backgrounder-History of Monsanto's Glyphosate Herbicides* (June 2005), available at https://monsanto.com/app/uploads/2017/06/back_history.pdf.

Roundup® is used.[5] It has been found in food,[6] in the urine of agricultural workers,[7] and even in the urine of urban dwellers who are not in direct contact with glyphosate.[8]

5.    On March 20, 2015, the International Agency for Research on Cancer ("IARC"), an agency of the World Health Organization ("WHO"), issued an evaluation of several herbicides, including glyphosate. That evaluation was based, in part, on studies of exposures to glyphosate in several countries around the world, and it traces the health implications from exposure to glyphosate since 2001.

6.    On July 29, 2015, IARC issued the formal monograph relating to glyphosate. In that monograph, the IARC Working Group provides a thorough review of the numerous studies and data relating to glyphosate exposure in humans.

7.    The IARC Working Group classified glyphosate as a Group 2A herbicide, which means that it is probably carcinogenic to humans. The IARC Working Group concluded that the cancers most associated with glyphosate exposure are non-Hodgkin lymphoma ("NHL") and other haematopoietic cancers, including lymphocytic lymphoma/chronic lymphocytic leukemia, B-cell lymphoma, and multiple myeloma.[9]

---

[5] See U.S. Geological Survey, *USGS Technical Announcement: Widely Used Herbicide Commonly Found in Rain and Streams in the Mississippi River Basin* (2011), available at https://archive.usgs.gov/archive/sites/www.usgs.gov/newsroom/article.asp-ID=2909.html; *see also* Nat'l Pesticide Info. Center, *Glyphosate: General Fact Sheet*, available at http://npic.orst.edu/factsheets/glyphogen.pdf.

[6] Thomas Bohn et al., *Compositional Differences in Soybeans on the Market: Glyphosate Accumulates in Roundup Ready GM Soybeans*, 153 FOOD CHEMISTRY 207 (2013), available at https://www.sciencedirect.com/science/article/pii/S0308814613019201.

[7] John F. Acquavella et al., *Glyphosate Biomonitoring for Farmers and Their Families: Results from the Farm Family Exposure Study*, 112(3) ENVTL. HEALTH PERSPECTIVES 321 (2004), available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC1241861/; Kathryn Z. Guyton et al., *Carcinogenicity of Tetrachlorvinphos, Parathion, Malathion, Diazinon & Glyphosate*, 112 IARC Monographs 76, section 5.4 (2015), available at http://www.thelancet.com/journals/lanonc/article/PIIS1470-2045(15)70134-8/fulltext.

[8] Dirk Brändli & Sandra Reinacher, *Herbicides found in Human Urine*, 1 ITHAKA JOURNAL 270 (2012), available at http://www.ithaka-journal.net/druckversionen/e052012-herbicides-urine.pdf.

[9] See Guyton et al., *Carcinogenicity of Tetrachlorvinphos, Parathion, Malathion, Diazinon & Glyphosate*, *supra*.

8.      The IARC evaluation is significant.  It confirms what has been believed for years: that glyphosate is toxic to humans.

9.      Nevertheless, Monsanto, since it began selling Roundup®, has represented it as safe to humans and the environment. Indeed, Monsanto has repeatedly proclaimed and continues to proclaim to the world, and particularly to United States consumers, that glyphosate-based herbicides, including Roundup®, create no unreasonable risks to human health or to the environment.

## JURISDICTION AND VENUE

10.     Federal diversity in this Court is proper under 28 U.S.C. § 1332 because Plaintiff is a citizen of South Carolina, a different state than the Defendant's place of incorporation (Delaware) and Defendant's headquarters (Missouri), and the aggregate amount in controversy exceeds $75,000, exclusive of interest and costs.

11.     This Court has personal jurisdiction over Monsanto because Monsanto transacts business in South Carolina and is a corporation doing business within South Carolina. Monsanto knows or should have known that its Roundup® products are and were sold throughout the state of South Carolina, and, more specifically, caused Roundup® to be sold to Plaintiff in South Carolina.

12.     In addition, Monsanto maintains sufficient contacts with the State of South Carolina such that this Court's exercise of personal jurisdiction over it does not offend traditional notions of fair play and substantial justice.

13.     Venue is proper within this District because the events giving rise to this action happened in or are closely related to this District.

## PARTIES

### Gary R. Moore, Plaintiff

14.     Plaintiff Gary R. Moore is a natural person, is a citizen of the State of South Carolina, and is a resident of Greenville, South Carolina.

15.     Mr. Moore was exposed to Roundup® in or around Greenville County, South Carolina from the mid 1980's through 2019.  He was diagnosed with Large B-Cell Lymphoma, a form of NHL in April of 2017.

### Monsanto Company, Defendant

16.     Defendant Monsanto Company is a corporation created under the laws of the State of Delaware with its headquarters and principal place of business in St. Louis, Missouri.

## FACTS

17.     At all times relevant to this complaint, Monsanto was the entity that discovered the herbicidal properties of glyphosate and the manufacturer of Roundup®, which contains the active ingredient glyphosate and the surfactant POEA, as well as adjuvants and other "inert" ingredients. Glyphosate is a broad-spectrum, non-selective herbicide used in a wide variety of herbicidal products around the world.

18.     Plants treated with glyphosate translocate the systemic herbicide to their roots, shoot regions, and fruit, where it interferes with the plant's ability to form aromatic amino acids necessary for protein synthesis. Treated plants generally die within two to three days. Because

plants absorb glyphosate, it cannot be completely removed by washing or peeling produce or by milling, baking, or brewing grains.

19.    For nearly 40 years, farms across the world have used Roundup® without knowing of the dangers its use poses. That is because when Monsanto first introduced Roundup®, it touted glyphosate as a technological breakthrough: it could kill almost every weed without causing harm either to people or to the environment. Of course, history has shown that not to be true. According to WHO, the main ingredient of Roundup® – glyphosate – is a probable cause of cancer. Those most at risk are farm workers and other individuals with workplace exposure to Roundup®, such as garden center workers, nursery workers, and landscapers. Agricultural workers are, once again, victims of corporate greed. Monsanto assured the public that Roundup® was harmless. In order to prove this, Monsanto has championed falsified data and has attacked legitimate studies that revealed Roundup®'s dangers. Monsanto has led a prolonged campaign of misinformation to convince government agencies, farmers and the general population that Roundup® is safe.

**The Discovery of Glyphosate and Development of Roundup®**

20.    The herbicidal properties of glyphosate were discovered in 1970 by Monsanto chemist John Franz. The first glyphosate-based herbicide was introduced to the market in the mid-1970's under the brand name Roundup®.[10] From the outset, Monsanto marketed Roundup® as a "safe" general purpose herbicide for widespread commercial and consumer use. It still markets Roundup® as safe today.[11]

21.    In addition to the active ingredient glyphosate, Roundup® formulations also contain adjuvants and other chemicals such as the surfactant POEA, which are considered "inert" and therefore protected as "trade secrets" in manufacturing. Growing evidence suggests that these

---

[10] Monsanto, *Backgrounder-History of Monsanto's Glyphosate Herbicides* (June 2005), *supra*.
[11] *See* Monsanto, *Crop Protection*, https://monsanto.com/innovations/crop-protection/ (last visited Mar. 21, 2018).

adjuvants and additional components of Roundup® formulations are not, in fact, inert and are toxic in their own right.

### Registration of Herbicides under Federal Law

22.     The manufacture, formulation, and distribution of herbicides, such as Roundup® , are regulated under the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA" or "Act"), 7 U.S.C. § 136 et seq. FIFRA requires that all pesticides be registered with the Environmental Protection Agency ("EPA" or "Agency") prior to their distribution, sale, or use, except as described by the Act. 7 U.S.C. § 136a(a).

23.     Because pesticides are toxic to plants, animals, and humans, at least to some degree, the EPA requires as part of the registration process, among other things, a variety of tests to evaluate the potential for exposure to pesticides, toxicity to people and other potential non-target organisms, and other adverse effects on the environment. Registration by the EPA, however, is not an assurance or finding of safety. The determination the Agency must make in registering or re-registering a product is not that the product is "safe," but rather that use of the product in accordance with its label directions "will not generally cause unreasonable adverse effects on the environment." 7 U.S.C. § 136a(c)(5)(D).

24.     FIFRA defines "unreasonable adverse effects on the environment" to mean "any unreasonable risk to man or the environment, taking into account the economic, social and environmental costs and benefits of the use of any pesticide." 7 U.S.C. § 136(bb). FIFRA thus requires EPA to make a risk/benefit analysis in determining whether a registration should be granted or a pesticide allowed to continue to be sold in commerce.

25.     The EPA and the State of South Carolina registered Roundup® for distribution, sale, and manufacture in the United States and the State of South Carolina.

26.     FIFRA generally requires that the registrant, Monsanto in the case of Roundup®,
conducts the health and safety testing of pesticide products. The EPA has protocols governing the
conduct of tests required for registration and the laboratory practices that must be followed in
conducting these tests. The data produced by the registrant must be submitted to the EPA for
review and evaluation. The government is not required, nor is it able, however, to perform the
product tests that are required of the manufacturer.

27.     The evaluation of each pesticide product distributed, sold, or manufactured is
completed at the time the product is initially registered. The data necessary for registration of a
pesticide has changed over time. The EPA is now in the process of re-evaluating all pesticide
products through a congressionally mandated process called "re-registration." 7 U.S.C. § 136a-1.
In order to reevaluate these pesticides, the EPA is demanding the completion of additional tests
and the submission of data for the EPA's recent review and evaluation.

28.     In the case of glyphosate, and therefore Roundup®, the EPA had planned on
releasing its preliminary risk assessment – in relation to the reregistration process – no later than
July 2015. The EPA completed review of glyphosate in early 2015, but it delayed releasing the
risk assessment pending further review in light of the WHO's health-related findings.

**Scientific Fraud Underlying the Marketing and Sale of Glyphosate/Roundup®**

29.     Based on early studies showing that glyphosate could cause cancer in laboratory
animals, the EPA originally classified glyphosate as possibly carcinogenic to humans (Group C)
in 1985. After pressure from Monsanto, including contrary studies it provided to the EPA, the EPA
changed its classification to evidence of non-carcinogenicity in humans (Group E) in 1991. In so
classifying glyphosate, however, the EPA made clear that the designation did not mean the
chemical does not cause cancer: "It should be emphasized, however, that designation of an agent

in Group E is based on the available evidence at the time of evaluation and should not be interpreted as a definitive conclusion that the agent will not be a carcinogen under any circumstances.[12]

30.    On two occasions, the EPA found that the laboratories hired by Monsanto to test the toxicity of its Roundup® products for registration purposes committed fraud.

31.    In the first instance, in seeking initial registration of Roundup® by the EPA, Monsanto, hired Industrial Bio-Test laboratories (hereinafter "IBT") to perform and evaluate pesticide toxicology studies relating to Roundup®.[13] IBT performed about 30 tests on glyphosate and glyphosate-containing products, including 9 of the 15 residue studies needed to register Roundup®.

32.    In 1976, the United States Food and Drug Administration (hereinafter "FDA") performed an inspection of IBT that revealed discrepancies between the raw data and the final report relating to the toxicological impacts of glyphosate. The EPA subsequently audited IBT; it too found the toxicology studies conducted for the Roundup® herbicide to be invalid.[14] An EPA reviewer stated, after finding "routine falsification of data" at IBT, that it was "hard to believe the

---

[12] U.S. Envtl. Prot. Agency, *Memorandum, Subject: SECOND Peer Review of Glyphosate 1* (1991), available at https://archive.epa.gov/pesticides/chemicalsearch/chemical/foia/web/pdf/103601/417300-1991-10-30a.pdf.
[13] Monsanto, *Backgrounder, Testing Fraud: IBT and Craven Laboratories* (June 2005), available at https://monsanto.com/app/uploads/2017/06/ibt_craven_bkg.pdf.
[14] U.S. Envtl. Prot. Agency, *Summary of the IBT Review Program Office of Pesticide Programs* (1983), available at https://nepis.epa.gov/Exe/ZyNET.exe/91014ULV.TXT?ZyActionD=ZyDocument&Client=EPA&Index=1981+Thru+1985&Docs=&Query=&Time=&EndTime=&SearchMethod=1&TocRestrict=n&Toc=&TocEntry=&QField=&QFieldYear=&QFieldMonth=&QFieldDay=&IntQFieldOp=0&ExtQFieldOp=0&XmlQuery=&File=D%3A%5Czyfiles%5CIndex%20Data%5C81thru85%5CTxt%5C00000022%5C91014ULV.txt&User=ANONYMOUS&Password=anonymous&SortMethod=h%7C&MaximumDocuments=1&FuzzyDegree=0&ImageQuality=r75g8/r75g8/x150y150g16/i425&Display=hpfr&DefSeekPage=x&SearchBack=ZyActionL&Back=ZyActionS&BackDesc=Results%20page&MaximumPages=1&ZyEntry=1&SeekPage=x&ZyPURL.

scientific integrity of the studies when they said they took specimens of the uterus from male rabbits."[15]

33.    Three top executives of IBT were convicted of fraud in 1983.

34.    In the second incident of data falsification, Monsanto hired Craven Laboratories in 1991 to perform pesticide and herbicide studies, including Roundup®. In that same year, the owner of Craven Laboratories and three of its employees were indicted and later convicted, of fraudulent laboratory practices in the testing of pesticides and herbicides.[16]

35.    Despite the falsity of the tests that underlie its registration, within a few years of its launch, Monsanto was marketing Roundup® in 115 countries.

## The Importance of Roundup® to Monsanto's Market Dominance Profits

36.    The success of Roundup® was key to Monsanto's continued reputation and dominance in the marketplace. Largely due to the success of Roundup® sales, Monsanto's agricultural division was out-performing its chemical division's operating income, and the gap increased yearly. But with its patent for glyphosate expiring in the United States in the year 2000, Monsanto needed a strategy to maintain its Roundup® market dominance and to ward off impending competition.

37.    In response, Monsanto began the development and sale of genetically engineered Roundup Ready® seeds in 1996. As Roundup Ready® crops are resistant to glyphosate, farmers can spray Roundup® onto their fields during the growing season without harming the crop. This allowed Monsanto to expand its market for Roundup® even further. By 2000, Monsanto's

---

[15] Marie-Monique Robin, *The World According to Monsanto: Pollution, Corruption and the Control of the World's Food Supply* (2011) (*citing* U.S. Envtl. Prot. Agency, *Data Validation, Memo from K. Locke, Toxicology Branch, to R. Taylor, Registration Branch.* Washington, D.C. (August 9, 1978)).

[16] Monsanto, *Backgrounder, Testing Fraud: IBT and Craven Laboratories*, *supra*.

biotechnology seeds were planted on more than 80 million acres worldwide and nearly 70% of American soybeans were planted from Roundup Ready® seeds, thereby securing Monsanto's dominant share of the glyphosate/Roundup® market through a marketing strategy that coupled proprietary Roundup Ready® seeds with continued sales of its Roundup® herbicide.

38.     Through a three-pronged strategy of increasing production, decreasing prices, and by coupling with Roundup Ready® seeds, Roundup® became Monsanto's most profitable product. In 2000, Roundup® accounted for almost $2.8 billion in sales, outselling other herbicides by a margin of 5 to 1, and accounting for close to half of Monsanto's revenue.[17] Today, glyphosate remains one of the world's largest herbicides by sales volume.

## Monsanto Has Known for Decades That It Falsely Advertises the Safety of Roundup®

39.     In 1996, the New York Attorney General (hereinafter "NYAG") filed a lawsuit against Monsanto based on its false and misleading advertising of Roundup® products. Specifically, the lawsuit challenged Monsanto's general representations that its spray-on glyphosate-based herbicides, including Roundup®, were "safer than table salt" and "practically non-toxic" to mammals, birds, and fish. Among the representations the NYAG found deceptive and misleading about the human and environmental safety of glyphosate and/or Roundup® are the following:

    a.  "Remember that environmentally friendly Roundup herbicide is biodegradable. It won't build up in the soil so you can use Roundup with confidence along customers' driveways, sidewalks, and fences…"

---

[17] David Barboza, *The Power of Roundup; A Weed Killer Is a Block for Monsanto to Build On,* N.Y. TIMES, Aug. 2, 2001, available at http://www.nytimes.com/2001/08/02/business/the-power-of-roundup-a-weed-killer-is-a-block-for-monsanto-to-build-on.html.

b.  "And remember that Roundup is biodegradable and won't buildup in the soil. That will give you the environmental confidence you need to use Roundup everywhere you've got a weed, brush, edging, or trimming problem."

c.  "Roundup biodegrades into naturally occurring elements."

d.  "Remember that versatile Roundup herbicide stays where you put it. That means there's no washing or leaching to harm customers' shrubs or other desirable vegetation."

e.  "This non-residual herbicide will not wash or leach in the soil. It…stays where you apply it."

f.  "You can apply Roundup with 'confidence because it will stay where you put it.' It binds tightly to soil particles, preventing leaching. Then, soon after application, soil microorganisms biodegrade Roundup into natural products."

g.  "Glyphosate is less toxic to rats than table salt following acute oral ingestion."

h.  "Glyphosate's safety margin is much greater than required. It has over a 1,000-fold safety margin in food and over a 700-fold safety margin for workers who manufacture it or use it."

i.  "You can feel good about using herbicides by Monsanto. They carry a toxicity category rating of 'practically non-toxic' as it pertains to mammals, birds, and fish."

j.  "Roundup can be used where kids and pets will play and breaks down into natural material." "This ad depicts a person with his head in the ground and a pet dog in an area which has been treated with Roundup®.[18]

---

[18] Attorney General of the State of New York, in the Matter of Monsanto Company, Assurance of Discontinuance Pursuant to Executive Law § 63(15) (Nov. 1996).

40.     On November 19, 1996 Monsanto entered into an Assurance of Discontinuance with the NYAG, in which Monsanto agreed, among other things, "to cease and desist from publishing or broadcasting any advertising [in New York] that represent, directly or by implication" that:

    a.  its glyphosate containing pesticide products or any component thereof are safe, non-toxic, harmless or free from risk.

    b.  its glyphosate containing pesticide products or any component thereof manufactured, formulated, distributed by Monsanto are biodegradable.

    c.  its glyphosate containing pesticide products or any component thereof stay where they are applied under all circumstances and will not move through the environment by any means.

    d.  its glyphosate containing pesticides products or any component thereof are "good" for the environment or are "known for their environmental characteristics."

    e.  glyphosate containing pesticide products or any component thereof are safer or less toxic than common consumer products other than herbicides.

    f.  its glyphosate containing products or any component thereof might be classified as "practically non-toxic."

41.     Monsanto did not alter its advertising in the same manner in any state other than New York, and on information and belief it still has not done so as of today.

42.    In 2009, France's highest court ruled that Monsanto had not told the truth about the safety of Roundup®. The French court affirmed an earlier judgment that Monsanto had falsely advertised its herbicide Roundup® as "biodegradable" and that it "left the soil clean."[19]

**Classification and Assessments of Glyphosate**

43.    The IARC process for the classification of glyphosate followed IARC's stringent procedures for the evaluation of a chemical agent. Over time, the IARC Monograph program has reviewed 980 agents. Of those reviewed, it has determined that 116 agents to be Group 1 (Known Human Carcinogens); 73 agents to be Group 2A (Probable Human Carcinogens); 287 agents to be Group 2B (Possible Human Carcinogens); 503 agents to be Group 3 (Not Classified); and 1 agent to be Probably Not Carcinogenic.

44.    The established procedure for IARC Monograph evaluations is described in the IARC Programme's Preamble.[20] Evaluations are performed by panels of international experts, selected on the basis of their expertise and the absence of actual or apparent conflicts of interest.

45.    One year before the Monograph meeting, the meeting is announced and there is a call both for data and for experts. Eight months before the Monograph meeting, the Working Group membership is selected and the sections of the Monograph are developed by the Working Group members. One month prior to the Monograph meeting, the call for data is closed and the various draft sections are distributed among Working Group members for review and comment. Finally, at the Monograph meeting, the Working Group finalizes review of all literature, evaluates the evidence in each category, and completes the overall evaluation. Within two weeks after the

---

[19] *Monsanto Guilty in 'False Ad' Row*, BBC, Oct. 15, 2009, available at
http://news.bbc.co.uk/2/hi/europe/8308903.stm.
[20] World Health Org., *IARC Monographs on the Evaluation of Carcinogenic Risks to Humans: Preamble* (2006), available at http://monographs.iarc.fr/ENG/Preamble/CurrentPreamble.pdf.

Monograph meeting, the summary of the Working Group findings are published in The Lance Oncology, and within a year after the meeting, the finalized Monograph is published.

46.    In assessing an agent, the IARC Working Group reviews the following information: (a) human, experimental, and mechanistic data; (b) all pertinent epidemiological studies and cancer bioassays; and (c) representative mechanistic data. The studies must be publically available and have sufficient detail for meaningful review, and reviewers cannot be associated with the underlying study.

47.    In March 2015, the IARC reassessed glyphosate. The summary published in The Lancet Oncology reported that glyphosate is a Group 2A agent and probably carcinogenic in humans.

48.    On July 29, 2015, the IARC issued its Monograph for glyphosate, Monograph Volume 112. For Volume 112, a Working Group of 17 experts from 11 countries met at the IARC from March 3-10, 2015, to assess the carcinogenicity of certain herbicides, including glyphosate. The March meeting culminated an almost year-long review and preparation by the IARC Secretariat and the Working Group, including a comprehensive review of the latest available scientific evidence. According to published procedures, the Working Group considered "reports that have been published or accepted for publication in the openly available scientific literature" as well as "data from governmental reports that are publically available."

49.    The studies considered the following exposure groups: (1) occupational exposure of farmers and tree nursery workers in the United States, forestry workers in Canada and Finland and municipal weed-control workers in the United Kingdom; and (2) para-occupational exposure in farming families.

50.    Glyphosate was identified as the second most used household herbicide in the

United States for weed control between 2001 and 2007 and the most heavily used herbicide in the world in 2012.

51.    Exposure pathways are identified as air (especially during spraying), water, and food. Community exposure to glyphosate is widespread and found in soil, air, surface water, and groundwater as well as food.

52.    The assessment of the IARC Working Group identified several case control studies of occupational exposure in the United States, Canada, and Sweden. These studies show a human health concern from agricultural and other work-related exposure to glyphosate.

53.    The IARC Working Group found an increased risk between exposure to glyphosate and NHL and several subtypes of NHL, and the increased risk persisted after adjustment for other pesticides.

54.    The IARC Working Group also found that glyphosate caused DNA and chromosomal damage in human cells. One study in community residents reported increases in blood markers of chromosomal damage (micronuclei) after glyphosate formulations were sprayed.

55.    In male CD-1 mice, glyphosate induced a positive trend in the incidence of a rare tumor: renal tubule carcinoma. A second study report a positive trend for haemangiosarcoma in male mice. Glyphosate increased pancreatic islet-cell adenoma in male rats in two studies. A glyphosate formulation promoted skin tumors in an initiation promotion study in mice.

56.    The IARC Working Group also noted that glyphosate has been detected in the urine of agricultural workers, indicating absorption. Soil microbes degrade glyphosate to aminomethylphosphoric acid (AMPA). Blood AMPA detection after exposure suggests intestinal microbial metabolism in humans.

57.     The IARC Working Group further found that glyphosate and glyphosate formations induced DNA and chromosomal damage in mammals, and in human and animal cells in utero.

58.     The IARC Working Group also noted genotoxic, hormonal, and enzymatic effects in mammals exposed to glyphosate.[21] Essentially, glyphosate inhibits the biosynthesis of aromatic amino acids, which leads to several metabolic disturbances, including the inhibition of protein and secondary product biosynthesis and general metabolic disruption.

59.     The IARC Working Group also reviewed an Agricultural Health Study, consisting of a prospective cohort of 57,311 licensed pesticide applicators in Iowa and North Carolina.[22] While this study differed from other in that it was based on a self-administered questionnaire, the results support an association between glyphosate exposure and multiple myeloma, hairy cell leukemia (HCL), and chronic lymphocytic leukemia (CLL), in addition to several other cancers.

**Other Earlier Findings About Glyphosate's Dangers to Human Health**

60.     The EPA published a technical fact sheet as part of its Drinking Water and Health, National Primary Drinking Water Regulations publication relating to glyphosate. This technical fact sheet predates IARC's March 20, 2015 evaluation. The fact sheet describes the release patterns for glyphosate as follows:

**Release Patterns**

Glyphosate is released to the environment in its use as an herbicide for controlling woody and herbaceous weeds on forestry, right-of-way, cropped and non-cropped sites. These sites may be around water and in wetlands. It may also be released to the environment during its manufacture, formulation, transport, storage, disposal

---

[21] Guyton et al., Carcinogenicity of Tetrachlorvinphos, Parathion, Malathion, Diazinon & Glyphosate, supra at 77.
[22] Anneclare J. De Roos et al., Cancer Incidence Among Glyphosate-Exposed Pesticide Applicators in the Agricultural Health Study, 113 Envt'l Health Perspectives 49-54 (2005), available at http://www.ncbi.nlm.nih.gov/pmc/articles/PMC1253709/pdf/ehp0113-000049.pdf.

and cleanup, and from spills. Since glyphosate is not a listed chemical in the

Toxics Release Inventory, data on releases during its manufacture and handling

are not available. Occupational workers and home gardeners may be exposed to

glyphosate by inhalation and dermal contact during spraying, mixing, and

cleanup. They may also be exposed by touching soil and plants to which

glyphosate was applied. Occupational exposure may also occur during

glyphosate's manufacture, transport storage, and disposal.[23]

61.     In 1995, the Northwest Coalition for Alternatives to Pesticides reports that in

California, the state with the most comprehensive program for reporting of pesticide-caused

illness, glyphosate was the third most commonly reported cause of pesticide illness among

agricultural workers.[24]

### The Toxicity of Other Ingredients in Roundup®

62.     In addition to the toxicity of the active ingredient glyphosate, several studies

support the hypothesis that the glyphosate-based formulation in Defendant's Roundup® products

is more dangerous and toxic than glyphosate alone. Indeed, as early as 1991, available evidence

demonstrated that glyphosate formulations were significantly more toxic than glyphosate alone.[25]

63.     In 2002, a study by Julie Marc, entitled "Pesticide Roundup Provokes Cell Division

Dysfunction at the Level of CDK1/Cyclin B Activation," revealed that Roundup® causes delays

---

[23] Nat'l Pesticide Info. Center, *Glyphosate: General Fact Sheet*, supra.
[24] Caroline Cox, *Glyphosate, Part 2: Human Exposure and Ecological Effects*, 15 J. PESTICIDE REFORM 4
(1995); W.S. Peas et al., *Preventing pesticide-related illness in*
*California agriculture: Strategies and priorities. Environmental Health Policy Program Report*, Univ. of Cal.
School of Public Health, Calif. Policy Seminar (1993).
[25] Martinez, T.T. and K. Brown, *Oral and pulmonary toxicology of the surfactant used in Roundup herbicide*,
PROC. WEST. PHARMACOL. SOC. 34:43-46 (1991).

in the cell cycles of sea urchins but that the same concentrations of glyphosate alone were ineffective and did not alter cell cycles.[26]

64.     A 2004 study by Marc and others, entitled "Glyphosate-based pesticides affect cell cycle regulation," demonstrated a molecular link between glyphosate-based products and cell cycle dysregulation. The researchers noted that "cell cycle dysregulation is a hallmark of tumor cells and human cancer. Failure in the cell cycle checkpoints leads to genomic instability and subsequent development of cancer from the initial affect cell." Further, "[s]ince cell cycle disorder such as cancer result from dysfunctions of a unique cell, it was of interest to evaluate the threshold dose of glyphosate affecting the cells."[27]

65.     In 2005, a study by Francisco Peixoto entitled "Comparative effects of Roundup® and glyphosate on mitochondrial oxidative phosphorylation," demonstrated that Roundup®'s effects on rat liver mitochondria are far more toxic than equal concentrations of glyphosate alone. The Peixoto study further suggested that the harmful effects of Roundup® on mitochondrial bioenergetics could not be exclusively attributed to glyphosate but could be the result of other chemicals, such as the surfactant POEA, or in the alternative, due to a potential synergic effect between glyphosate and other ingredients in the Roundup® formulation.[28]

66.     In 2009, Nora Benachour and Gilles-Eric Seralini published a study examining the effects of Roundup® and glyphosate on human umbilical, embryonic, and placental cells. The study tested dilution levels of Roundup® and glyphosate that were far below agricultural

---

[26] Julie Marc, et al., *Pesticide Roundup Provokes Cell Division Dysfunction at the Level of CDK1/Cyclin B Activation*, 15 CHEM. RES. TOXICOL. 326-331 (2002), available at http://pubs.acs.org/doi/full/10.1021/tx015543g.

[27] Julie Marc, et al., *Glyphosate-based pesticides affect cell cycle regulation*, 96 BIOLOGY OF THE CELL 245, 245-249 (2004), available at https://www.ncbi.nlm.nih.gov/pubmed/15182708.

[28] Francisco Peixoto, *Comparative effects of the Roundup and glyphosate on mitochondrial oxidative phosphorylation*, 61 CHEMOSPHERE 1115, 1122 (2005), available at https://www.ncbi.nlm.nih.gov/pubmed/16263381.

recommendations, corresponding with low levels of residue in food. The researchers ultimately concluded that supposed "inert" ingredients, and possibly POEA, alter human cell permeability and amplify toxicity of glyphosate alone. The researchers further suggested that assessments of glyphosate toxicity should account for the presence of adjuvants or additional chemicals used in the formulation of the complete pesticide. The study confirmed that the adjuvants present in Roundup® are not, in fact, inert and that Roundup® is potentially far more toxic than its active ingredient glyphosate alone.[29]

67.    The results of these studies were at all times available to Monsanto. Monsanto thus knew or should have known that Roundup® was, and is more toxic than glyphosate alone and that safety studies of Roundup®, Roundup®'s adjuvants and "inert" ingredients, and/or the surfactant POEA were necessary to protect Gary Moore from Roundup®.

68.    Despite its knowledge that Roundup® is considerably more dangerous than glyphosate alone, Monsanto continued to promote Roundup® as safe.

## Recent Worldwide Bans on Roundup®/Glyphosate

69.    Several countries around the world have instituted bans on the sale of Roundup® and other glyphosate-containing herbicides, both before and since IARC first announced its assessment for glyphosate in March 2015, and more countries undoubtedly will follow suit as the dangers of the use of Roundup® become more widely known. The Netherlands issued a ban on all glyphosate-based herbicides, including Roundup®, in April 2014 and which took effect at the end of 2015. In issuing the ban, the Dutch Parliament member who introduced the successful legislation stated: "Agricultural pesticides in user-friendly packaging are sold in abundance to

---

[29] Nora Benachour, et al., *Glyphosate Formulations Induce Apoptosis and Necrosis in Human Umbilical, Embryonic, and Placental Cells*, 22 CHEM. RES. TOXICOL. 97-105 (2008), available at http://big.assets.huffingtonpost.com/france.pdf.

private persons. In garden centers, Roundup® is promoted as harmless, but unsuspecting customers have no idea what the risks of this product are. Especially children are sensitive to toxic substances and should therefore not be exposed to it."[30]

70.    The Brazilian Public Prosecutor in the Federal District requested that the Brazilian Justice Department suspend the use of glyphosate.[31]

71.    France banned the private sale of Roundup® and glyphosate following the IARC assessment for glyphosate.[32]

72.    Bermuda banned both the private and commercial sale of glyphosates, including Roundup®. The Bermuda government explained its ban as follows: "Following a recent scientific study carried out be a leading cancer agency, the importation of weed spray 'Roundup' has been suspended."[33]

73.    The Sri Lankan government banned the private and commercial use of glyphosate, particularly out of concern that glyphosate has been linked to fatal kidney disease in agricultural workers.[34]

---

[30] *Holland's Parliament Bans Glyphosate Herbicides*, The Real Agenda, April 14, 2014, available at http://real-agenda.com/hollands-parliament-bans-glyphosate-herbicides/.
[31] Christina Sarich, *Brazil's Public Prosecutor Wants to Ban Monsanto's Chemicals Following Recent Glyphosate-Cancer Link*, GLOBAL RESEARCH, MAY 14, 2015, available at https://www.globalresearch.ca/brazils-public-prosecutor-wants-to-ban-monsantos-chemicals-following-recent-glyphosate-cancer-link/5449440; see Ministério Público Federal, *MPF/DF reforça pedido para que glifosato seja banido do Mercado nacional*, April 14, 2015, available at http://www.mpf.mp.br/df/sala-de-imprensa/noticias-df/mpf-df-reforca-pedido-para-que-glifosato-seja-banido-do-mercado-nacional.
[32] Zoe Schlanger, *France Bans Sales of Monsanto's Roundup in Garden Centers, 3 Months After U.N. Calls it "Probable Carcinogen"*, NEWSWEEK, JUNE 15, 2015, available at http://www.newsweek.com/france-bans-sale-monsantos-roundup-garden-centers-after-un-names-it-probable-343311.
[33] *Health Minister: Importation of Roundup Weed Spray Suspended*, Today in Bermuda, May 11, 2015, available at http://bernews.com/2015/05/importation-weed-spray-round-suspended/.
[34] *Sri Lanka's New President Puts Immediate Ban on Glyphosate Herbicides*, Sustainable Pulse, May 25, 2015, available at https://sustainablepulse.com/2015/05/25/sri-lankas-new-president-puts-immediate-ban-on-glyphosate-herbicides/.

74.    The government of Columbia announced its ban on using Roundup® and glyphosate to destroy illegal plantations of coca, the raw ingredient for cocaine, because of the WHO's finding that glyphosate is probably carcinogenic.[35]

## Proposition 65 Listing

75.    On September 4, 2015, California's Office of Environmental Health Hazard Assessment ("OEHHA") published a notice of intent to include glyphosate on the state's list of known carcinogens under Proposition 65.[36] California's Safe Drinking Water and Toxic Enforcement Act of 1986 (informally known as "Proposition 65"), requires the state to maintain and, at least, once a year, revise and republish a list of chemicals "known to the State of California to cause cancer or reproductive toxicity."[37] The OEHHA determined that glyphosate met the criteria for the listing mechanism under the Labor Code following the IARC's assessment of the chemical.[38]

76.    The listing process under the Labor Code is essentially automatic. The list of known carcinogens, at a minimum, must include substances identified by reference in Labor Code § 6382(b)(1). That section of the Labor Code identifies "[s]ubstances listed as human or animal carcinogens by the International Agency for Research on Cancer (IARC)." The IARC's classification of glyphosate as a Group 2A chemical ("probably carcinogenic to humans") therefore triggered the listing.

---

[35] *Columbia to ban coca spraying herbicide glyphosate*, BBC, May 10, 2015, available at http://www.bbc.com/news/world-latin-america-32677411.
[36] Cal. Envtl. Prot. Agency Office of Envtl. Health Hazard Assessment, *Notice of Intent to List Chemicals by the Labor Code Mechanism: Tetrachlorvinphos, Parathion, Malathion, Glyphosate* (Sept. 4, 2015), available at https://oehha.ca.gov/proposition-65/crnr/notice-intent-list-tetrachlorvinphos-parathion-malathion-glyphosate.
[37] Frequently Asked Questions, STATE OF CAL. DEPT OF JUSTICE, OFFICE OF THE ATTORNEY GENERAL, available at http://oag.ca.gov/prop65/faq.
[38] Cal. Envtl. Prot. Agency Office of Envtl. Health Hazard Assessment, *Notice of Intent to List Chemicals by the Labor Code Mechanism: Tetrachlorvinphos, Parathion, Malathion, Glyphosate, supra*.

77.    A business that deploys a listed chemical in its products must provide "clear and reasonable warnings" to the public prior to exposure to the chemical. To be clear and reasonable, a warning must "(1) clearly communicate that the chemical is known to cause cancer, and/or birth defects or other reproductive harm; and (2) effectively reach the person before exposure."[39] The law also prohibits the discharge of listed chemicals into drinking water.

78.    Monsanto disputed the listing decision and, in January 2016, filed a lawsuit against OEHHA and the agency's acting director, Lauren Zeise, in California state court, seeking declaratory and injunctive relief to prevent OEHHA from listing glyphosate.[40]

79.    Monsanto alleged that OEHHA's exclusive reliance of the IARC decision signified that "OEHHA effectively elevated the determination of an ad hoc committee of an unelected, foreign body, which answers to no United States official (let alone any California state official), over the conclusions of its own scientific experts."[41] Monsanto further alleged that the Labor Code listing mechanism presented various constitutional violations because it "effectively empowers an unelected, undemocratic, unaccountable, and foreign body to make laws applicable in California."[42] Among other things, Monsanto argued that Proposition 65's requirement to provide a "clear and reasonable warning" to consumers that the chemical is a known carcinogen would damage its reputation and violate First Amendment rights.[43]

80.    On November 12, 2015, the European Food Safety Authority ("EFSA"), the European Union's primary agency for food safety, reported on its evaluation of the Renewal

---

[39] *Frequently Asked Questions*, STATE OF CAL. DEPARTMENT OF JUSTICE, OFFICE OF THE ATTORNEY GENERAL, *supra*.
[40] Monsanto Company's Verified Petition for Writ of Mandate and Complaint for Preliminary and Permanent Injunctive and Declaratory Relief, *Monsanto Co. v. Office of the Envt'l Health Hazard Assessment, et al.*, No. 16-CECG-00183 (Cal. Super. Ct.).
[41] *Id.* at 2.
[42] *Id.* at 3.
[43] *Id.*

Assessment Report ("RAR") on glyphosate.[44] The Rapporteur Member State assigned to glyphosate, the German Federal Institute for Risk Assessment ("BfR"), had produced the RAR as part of the renewal process for glyphosate in the EU.

81.    The BfR sent its draft RAR to the EFSA and the RAR underwent a peer review process by EFSA, other member states, and industry groups. As part of the on-going peer review of Germany's reevaluation of glyphosate, the EFSA had also received a second mandate from the European Commission to consider the IARC's findings regarding the potential carcinogenicity of glyphosate and glyphosate-containing products.

82.    Based on a review of the RAR, which included data from industry-submitted unpublished studies, the EFSA sent its own report ("Conclusion") to the European Commission, finding that "glyphosate is unlikely to pose a carcinogenic hazard to humans and the evidence does not support classification with regard to its carcinogenic potential according to Regulation ("EC") No. 1271/2008."[45] The EFSA therefore disagreed with the IARC: glyphosate was not genotoxic and did not present a carcinogenic threat to humans.

83.    In explaining why its results departed from the IARC's conclusion, the EFSA drew a distinction between the EU and the IARC approaches to the study and classification of chemicals.[46] Although the IARC examined "both glyphosate – an active substance – and glyphosate-based formulations, grouping all formulations regardless of their composition," the EFSA explained that it considered only glyphosate and that its assessment focuses on "each individual chemical, and each marketed mixture separately."[47] The IARC, on the other hand,

---

[44] European Food Safety Auth., *Conclusion on the peer review of the pesticide risk assessment of the active substance glyphosate*, available at
http://www.efsa.europa.eu/sites/default/files/scientific_output/files/main_documents/4302.pdf.
[45] *Id.*
[46] *EFSA Fact Sheet: Glyphosate, EFSA*, available at
http://www.efsa.europa.eu/sites/default/files/corporate_publications/files/efsaexplainsglyphosate151112en.pdf.
[47] *Id.*

"assesses generic agents, including groups of related chemicals, as well as occupational or environmental exposure, and cultural or behavioral practices."[48] The EFSA accorded greater weight to studies conducted with glyphosate alone than studies of formulated products.[49]

84.     The EFSA went further and noted:

[A]lthough some studies suggest that certain glyphosate-based formulations may be genotoxic (i.e. damaging to DNA), other that look solely at the active substance glyphosate do not show this effect. It is likely, therefore, that the **genotoxic effects observed in some glyphosate-based formulations are related to the other constituents or "co-formulants."** Similarly, certain glyphosate-based formulations display higher toxicity than that of the active ingredient, presumably because of the presence of co-formulants. In its assessment, the **EFSA proposes that the toxicity of each pesticide formulation and in particular its genotoxic potential should be further considered and addressed by Member State authorities while they re-assess used of glyphosate-based formulations in their own territories.**[50] **(Emphasis added).**

85.     Notwithstanding its conclusion, the EFSA did set exposure levels for glyphosate. Specifically, the EFSA proposed an acceptable daily intake ("ADI") of 0.5 mg/kg of body weight per day; an acute reference dose ("ARfD) of 0.5 mg/kg of body weight; and an acceptable operator exposure level of ("AOEL") of 0.1 mg/kg of body weight per day.[51]

### Leading Scientists Dispute the EFSA's Conclusion

---

[48] *Id.*
[49] *Id.*
[50] *Id.*
[51] European Food Safety Auth., *Conclusion on the peer review of the pesticide risk assessment of the active substance glyphosate, supra.*

86.     On November 27, 2015, 96 independent academic and governmental scientists from around the world submitted an open letter to the EU health commissioner, Vytenis Andriukaitis.[52] The scientists expressed their strong concerns and urged the commissioner to disregard the "flawed" EFSA report, arguing that "the BfR decision is not credible because it is not supported by the evidence and it was not reached in an open and transparent manner."[53]

87.     Signatories to the letter included Dr. Christopher J. Portier, Ph.D., and other renowned international experts in the field, some of whom were part of the IARC Working Group assigned to glyphosate.

88.     In an exhaustive and careful examination, the scientists scrutinized the EFSA's conclusions and outlined why the IARC Working Group decision was "by far the more credible":

The IARC WG decision was reached relying on open and transparent procedures by independent scientists who completed thorough conflict-of-interest statements and were not affiliated or financially supported in any way by the chemical manufacturing industry. It is fully referenced and depends entirely on reports published in the open, peer-reviewed biomedical literature. It is part of a long tradition of deeply researched and highly credible reports on the carcinogenicity of hundreds of chemicals issued over the past four decades by IARC and used today by international agencies and regulatory bodies around the world as a basis for risk assessment, regulation, and public health policy.[54]

89.     With respect to human data, the scientists pointed out that the EFSA agreed with the IARC that there was "limited evidence of carcinogenicity" for non-Hodgkin lymphoma, but

---

[52] Letter from Christopher J. Portier et al. to Commission Vytenis Andriukaitis, Open letter: Review of the Carcinogenicity of Glyphosate by EFSA and BfR (Nov. 27, 2015), available at https://www.nrdc.org/sites/default/files/open-letter-from-dr-christopher-portier.pdf and https://www.theguardian.com/environment/2016/jan/13/eu-scientists-in-row-over-safety-of-glyphosate-weedkiller.
[53] Id.
[54] Id.

the EFSA nonetheless dismissed an association between glyphosate exposure and carcinogenicity. The IARC applied three levels of evidence in its analysis of human data, including sufficient evidence and limited evidence. The EFSA's ultimate conclusion that "there was no unequivocal evidence for a clear and strong association of NHL with glyphosate" was misleading because it was tantamount to the IARC's highest level of evidence: "sufficient evidence," which means that a causal relationship has been established. However, the scientist argued, '[l]egitimate public health concerns arise when 'causality is credible,' i.e. when there is limited evidence."[55]

90.    Among its many other deficiencies, the EFSA's conclusions regarding animal carcinogenicity data were "scientifically unacceptable," particularly in BfR's use of historical control data and in its trend analysis. Indeed, the BfR's analysis directly contradicted the Organization for Economic Co-operation and Development ("OECD") testing guidelines while citing and purporting to follow those same guidelines. For instance, the EFSA report dismisses observed trends in tumor incidence "because there are no individual treatment groups that are significantly different from control and because the maximum observed response is reportedly within the range of the historical control data." However, according to the scientists, concurrent controls are recommended over historical control in all guidelines, scientific reports, and publications, and, if historical control data is employed, such data "should be from studies in the same timeframe, for the same exact animal strain, preferably from the same laboratory or the same supplier and preferably reviewed by the same pathologist." The BfR's use of historical control data violated these precautions: "only single study used the same mouse strain as the historian controls, but was reported more than 10 years after the historical control dataset was developed."

---

[55] Id.

Further deviating from sound scientific practices, the data used by the BfR came from studies in seven different laboratories. The scientists concluded:

> BfR reported seven positive mouse studies with three studies showing increases in renal tumors, two with positive findings for hemangiosarcomas, and two with positive findings for malignant lymphomas. BfR additionally reported two positive findings for tumors in rats. Eliminating the inappropriate use of historical data, the unequivocal conclusion is that these are not negative studies, but in fact document the carcinogenicity of glyphosate in laboratory animals.[56]

91.     The letter also critiques the EFSA's report's lack of transparency and the opacity surrounding the data cited in the report: "citations for almost all of the references, even those from the open scientific literature, have been redacted from the document" and "there are no authors or contributors listed for either document, a requirement for publication in virtually all scientific journals." Because the BfR relied on unpublished, confidential industry provided studies, it is "impossible for any scientist not associated with BfR to review this conclusion with scientific confidence."[57]

92.     On March 3, 2016, the letter was published in the Journal of Epidemiology & Community Health.[58]

**Statement of Concern Regarding Glyphosate-Based Herbicides**

93.     On February 17, 2016, a consensus statement published in the Journal of Environmental Health, entitled "Concerns over use of glyphosate-based herbicides and risks

---

[56] *Id.*
[57] *Id.*
[58] Christopher J. Portier, et al., *Differences in the carcinogenic evaluation of glyphosate between the International Agency for Research on Cancer (IARC) and the European Food Safety Authority (EFSA)*, JOURNAL OF EPIDEMIOLOGY & CMTY. HEALTH, Marc. 3, 2016, available at http://jech.bmj.com/content/early/2016/03/03/jech-2015-207005.

associated with exposures: a consensus statement, "assessed the safety of glyphosate-based herbicides ("GBHs").[59] The paper's "...focus is on the unanticipated effects arising from the worldwide increase in use of GBHs, coupled with recent discoveries about the toxicity and human health risks stemming from use of GBHs."[60] The researchers drew seven factual conclusions about GBHs:

1. GBHs are the most heavily applied herbicide in the world and usage continues to rise;

2. Worldwide, GBHs often contaminate drinking water sources, precipitation, and air, especially in agricultural regions;

3. The half-life of glyphosate in water and soil is longer than previously recognized;

4. Glyphosate and its metabolics are widely present in the global soybean supply;

5. Human exposures to GBHs are rising;

6. Glyphosate is now authoritatively classified as a probable human carcinogen; and

7. Regulatory estimates of tolerable daily intakes for glyphosate in the United States and European Union are based on outdated science.[61]

94. The researchers noted that GBH use has increased approximately 100-fold since the 1970s. Further, far from posing a limited hazard to vertebrates, as previously believed, two

---

[59] John P. Myers, et al., *Concerns over use of glyphosate-based herbicides and risks associated with exposures: a consensus statement*, Environmental Health (2016), available at http://ehjournal.biomedcentral.com/articles/10.1186/s12940-016-0117-0.
[60] *Id.*
[61] *Id.*

decades of evidence demonstrated that "several vertebrate pathways are likely targets of action, including hepatorenal damage, effects on nutrient balance through glyphosate chelating action and endocrine disruption."[62]

95.    The paper attributed uncertainties in current assessments of glyphosate formulations to the fact that "[t]he full list of chemicals in most commercial GBHs is protected as 'commercial business information,' despite the universally accepted relevance of such information to scientists hoping to conduct an accurate risk assessment of these herbicide formulations." Further, the researchers argue, "[t]he distinction in regulatory review and decision processes between 'active' and 'inert' ingredients has no toxicological justification, given increasing evidence that several so-called 'inert' adjuvants are toxic in their own right."[63]

96.    Among various implications, the researchers conclude that "existing toxicological data and risk assessments are not sufficient to infer that GBHs, as currently used, are safe." Further, "GBH-product formulations are more potent, or toxic, than glyphosate alone to a wide array of non-target organisms including mammals, aquatic insects, and fish." Accordingly, "risk assessments of GBHs that are based on studies quantifying the impacts of glyphosate alone underestimate both toxicity and exposure, and thus risk." The paper concludes that this "shortcoming has repeatedly led regulators to set inappropriately high exposure thresholds."[64]

97.    The researchers also critique the current practice of regulators who largely rely on "unpublished, non-peer-reviewed data generated by the registrants" but ignore "published research because it often uses standards and procedures to assess quality that are different from those codified in regulatory agency data requirements, which largely focus on avoiding fraud." In

---

[62] *Id.*
[63] *Id.*
[64] *Id.*

the researchers' view, "[s]cientists independent of the registrants should conduct regulatory tests of GBHs that include glyphosate alone, as well as GBH-product formulations."[65]

98.     The researchers also call for greater inclusion of GBHs in government-led toxicology testing programs:

> [A] fresh and independent examination of GBH toxicity should be undertaken, and ... this reexamination be accompanied by systemic efforts by relevant agencies to monitor GBH levels in people and in the food supply, none of which are occurring today. The U.S. National Toxicology Program should prioritize a thorough toxicology assessment of the multiple pathways now identified as potentially vulnerable of GBHs.[66]

99.     The researchers suggest that, in order to fill the gap created by an absence of government funds to support research on GBHs, regulators could adopt a system through which manufacturers fund the registration process and the necessary testing:

> [W]e recommend that a system be put in place through which manufacturers of GBHs provide funds to the appropriate regulatory body as part of routine registration actions and fees. Such finds should then be transferred to appropriate government research institutes, or to an agency experienced in the award of competitive grants. In either case, funds would be made available to independent scientists to conduct the appropriate long-term (minimum 2 years) safety studies in recognized animal model systems. A thorough and modern assessment of GBH toxicity will encompass potential endocrine disruption, impacts on the gut

---

[65] *Id.*
[66] *Id.*

microbiome, carcinogenicity, and multigenerational effects looking a reproductive capability and frequency of birth defects.[67]

### The FDA Announces Testing of Glyphosate Residue in Foods

100.    On February 17, 2016, the U.S. Food and Drug Administration ("FDA") announced that, for the first time in its history, the agency planned to start testing certain foods for glyphosate residues. FDA spokesperson Lauren Sucher explained: "The agency is now considering assignments for Fiscal Year 2016 to measure glyphosate in soybeans, corn, milk, and eggs, among other potential foods."[68]

101.    In 2004, the U.S. Government Accountability Office ("GAO") had severely rebuked the FDA for its failures to both monitor for pesticide residue, including that of glyphosate, and to disclose the limitations of its monitoring and testing efforts to the public.[69]

102.    Indeed, in the past, both the FDA and the U.S. Department of Agriculture ("USDA") had routinely excluded glyphosate from their testing for the residues of hundreds of other pesticides, on the rationale that it was too expensive and unnecessary to protect public health. Ms. Sucher (the FDA spokesperson) now states, however, that "the agency has developed 'streamlined methods' for testing for the weed killer."[70]

103.    The FDA's move is significant as the agency possesses enforcement authority and can seek action if pesticide residues exceed enforcement guidelines.[71]

---

[67] *Id.*

[68] Carey Gillam, *FDA to Start Testing for Glyphosate in Food*, TIME, Feb. 17, 2016, available at http://time.com/4227500/fda-glyphosate-testing/?xid=tcoshare.

[69] U.S. GOV'T ACCOUNTABILITY OFFICE, GAO-15-38, *FDA AND USDA SHOULD STRENGTHEN PESTICIDE RESIDUE MONITORING PROGRAMS AND FURTHER DISCLOSE MONITORING LIMITATIONS* (2014), available at http://www.gao.gov/products/GAO-15-38.

[70] Gilliam, *supra* note 68.

[71] *Id.*; Pesticide Q&A, U.S. FOOD AND DRUG ADMINISTRATION, available at https://www.fda.gov/food/foodborneillnesscontaminants/pesticides/ucm583711.htm.

### European Union Vote on Glyphosate Renewal

104.    The license for glyphosate in the European Union was set to expire in June 2016.

105.    Without extension of the license, Monsanto's Roundup® and other glyphosate-based herbicides faced a general phase out in EU markets.[72]

106.    In the months leading up to the license expiration date, protracted meetings and votes among national experts from the 28 EU Member States failed to produce agreement on an extension.

107.    For instance, on March 4, 2016, *The Guardian* reported that France, the Netherlands, and Sweden did not support the EFSA's assessment that glyphosate was harmless.[73] The paper quoted the Swedish Environmental Minister, Åsa Romson, as stating: "We won't take risks with glyphosate and we don't think that the analysis done so far is good enough. We will propose that no decision is taken until further analysis has been done and the EFSA scientists have been more transparent about their considerations."[74]

108.    The Netherlands argued that relicensing should be placed on hold until after a separate evaluation of glyphosate's toxicity can be conducted.[75] Leading up to the

---

[72] Philip Blenkinsop, Alissa de Carbonnel & Barbara Lewis, *European Commission to extend glyphosate license for 18 months*, REUTERS, June 28, 2016, available at http://www.reuters.com/article/us-health-eu-glyphosate-idUSKCN0ZE25B.
[73] Arthur Neslen, *EU States rebel against plans to relicense weedkiller glyphosate*, THE GUARDIAN, Mar. 4, 2016, available at https://www.theguardian.com/environment/2016/mar/04/eu-states-rebel-against-plans-to-relicense-weedkiller-glyphosate.
[74] *Id.*
[75] Arthur Neslen, *Vote on controversial weedkiller's European license postponed*, THE GUARDIAN, Mar. 8, 2016, available at https://www.theguardian.com/environment/2016/mar/08/eu-vote-on-controversial-weedkiller-licence-postponed-glyphosate.

vote, Italy joined the other EU states in opposing licensing renewal, citing health concerns.[76]

109.    On June 6, 2016, the Member States voted but failed to reach a qualified majority in favor or against the re-authorization of glyphosate.[77]

110.    On June 29, 2016, the EU Commission extended the European license for glyphosate for 18 months to allow the European Chemical Agency to rule on the safety of the chemical.[78]

111.    On July 11, 2016, the EU voted in favor of a proposal to restrict the conditions of use of glyphosate in the EU, including a ban on common co-formulant POEA from all glyphosate-based herbicides, including Roundup®.[79]

112.    On November 13, 2017, after heated debate over whether it causes cancer, and in a very tight vote, the EU voted in favor of a limited (5-year) license for the use of glyphosate.[80]

113.    Plaintiff Gary Moore regularly used Roundup® for at least 20 years at his home in Greenville County, South Carolina from the mid 1980's until 2019.

114.    Mr. Moore frequently purchased Roundup® in South Carolina.

115.    In July 2019, doctors diagnosed Mr. Moore with Large B-Cell lymphoma, a form of NHL.

---

[76] *Id.*

[77] Manon Flausch, *Commission prolongs glyphosate license by 18 months*, EURACTIV, June 29, 2016, available at https://www.euractiv.com/section/agriculture-food/news/commission-prolongs-glyphosate-licence-by-18-months/.

[78] Arthur Neslen, *Controversial chemical in Roundup weedkiller escapes immediate ban*, THE GUARDIAN, June 29, 2016, available at https://www.theguardian.com/business/2016/jun/29/controversial-chemical-roundup-weedkiller-escapes-immediate-ban.

[79] Sarantis Michalopoulos, *EU agrees ban on glyphosate co-formulant*, EURACTIV, July 11, 2016, available at https://www.euractiv.com/section/agriculture-food/news/eu-agrees-ban-on-glyphosate-co-formulant/.

[80] Caterina Tano, *German vote swings EU decision on 5-year glyphosate renewal*, November 27, 2016, available at https://euobserver.com/environment/140042.

116.    During the entire time in which Mr. Moore was exposed to Roundup®, he did not know that Roundup® was injurious to his health or the health of others.

117.    As a result of Mr. Moore's injuries, he has incurred significant economic and non-economic damages.

## TOLLING OF THE STATUTE OF LIMITATIONS

### Discovery Rule Tolling

118.    Plaintiff Gary Moore had no way of knowing about the risk of serious illness associated with the use of and/or exposure to Roundup® and glyphosate during the entire time he was using the product.

119.    Within the time period of any applicable statute of limitations, Plaintiff could not have discovered, through the exercise of reasonable diligence, that exposure to Roundup® and glyphosate is injurious to human health.

120.    Plaintiff did not discover, and did not know of facts that would cause a reasonable person to suspect, the risks associated with the use of and/or exposure to Roundup® and glyphosate; nor would a reasonable and diligent investigation by Plaintiff have disclosed that Roundup® and glyphosate would have caused his illness.

121.    For these reasons, all applicable statutes of limitations have been tolled by operation of the discovery rule with respect to Plaintiff's claims.

### Fraudulent Concealment

122.    All applicable statutes of limitations have also been tolled by Monsanto's knowing and active fraudulent concealment and denial of the facts alleged herein through the time period relevant to this action.

123.    Instead of disclosing critical safety information about Roundup® and glyphosate, Monsanto has consistently and falsely represented the safety of its Roundup® products.

124.    Monsanto was under a continuous duty to disclose to consumer, users, and other persons coming into contact with its products, including Gary Moore, accurate safety information concerning its products and the risks associated with the use of and/or exposure to Roundup® and glyphosate.

125.    Instead, Monsanto knowingly, affirmatively, and actively concealed safety information concerning Roundup® and glyphosate and the serious risks with the use of and/or exposure to its products.

126.    Based on the foregoing, Monsanto is estopped from relying on any statutes of limitations in defense of this action.

### COUNT I – STRICT LIABILITY
### (DESIGN DEFECT)

127.    Plaintiff Gary Moore realleges paragraphs 1 through 126 above as if fully set forth herein.

128.    Plaintiff brings this strict liability claim against Defendant for defective design.

129.    At all times relevant to this litigation, Defendant engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting Roundup® products, which are defective and unreasonably dangerous to consumers, users and other per-sons coming into contact with them, including Gary Moore, thereby placing Roundup® products into the stream of commerce. These actions were under the ultimate control and supervision of Defendant.

130.    At all times relevant to this litigation, Defendant designed, researched, developed, formulated, manufactured, produced, tested, assembled, labeled, advertised, promoted, marketed, sold and distributed the Roundup® products used by Gary Moore, and/or to which Gary Moore was exposed, as described above.

131.    At all times relevant to this litigation, Defendant's Roundup® products were manufactured, designed and labeled in an unsafe, defective, and inherently dangerous manner that was dangerous for use by or exposure to the public, and, in particular, Gary Moore.

132.    At all times relevant to this litigation, Defendant's Roundup® products reached the intended consumers, handlers, and users or other persons coming into contact with these products in South Carolina and throughout the United States, including Gary Moore without substantial change in their condition as designed, manufactured, sold, distributed, labeled, and marketed by Defendants.

133.    Defendant's Roundup® products, as researched, tested, developed, designed, licensed, formulated, manufactured, packaged, labeled, distributed, sold, and marketed by Defendant, were defective in design and formulation in that when they left the hands of the Defendant's manufacturers and/or suppliers, they were unreasonably

dangerous because they were not as safe as an ordinary consumer would expect when used in an intended or reasonably foreseeable manner.

134.    Defendant's Roundup® products as researched, tested, developed, designed, licensed, formulated, manufactured, packaged, labeled, distributed, sold, and marketed by Defendant, were defective in design and formulation in that when they left the hands of the Defendant's manufacturers and/or suppliers, the foreseeable risks associated with these products' reasonably foreseeable uses exceeded the alleged benefits associated with their design and formulation.

135.    Therefore, at all times relevant to this litigation, Defendant's Roundup® products, as re-searched, tested, developed, designed, licenses, manufactured, packaged, labeled, distributed, sold, and marketed by Defendant, were defective in design and formulation, in one or more of the following ways:

   a.   When placed in the stream of commerce, Defendant's Roundup® products were defective in design and formulation, and, consequently, dangerous to an extent beyond that which an ordinary consumer would expect.

   b.   When placed in the stream of commerce, Defendant's Roundup® products were un-reasonably dangerous in that they were hazardous and posed a grave risk of cancer and other serious illness when used in a reasonably anticipated manner.

   c.   When placed in the stream of commerce, Defendant's Roundup® products contained unreasonably dangerous design defects and were not reasonably safe when used in a reasonably anticipated or intended manner.

    d.   Defendant did not sufficiently test, investigate, or study its Roundup® products and, specifically, the active ingredient glyphosate.

    e.   Exposure to Roundup® and the glyphosate containing products presents a risk of harmful side effects that outweighs a potential utility stemming from the use of the herbicide.

    f.   Defendant knew or should have known at the time of marketing its Roundup® products that exposure to Roundup® and specifically, its active ingredient glyphosate, could result in cancer and other severe illness and injuries.

    g.   Defendant did not conduct adequate post-marketing surveillance of its Roundup® products.

    h.   Defendant could have employed safer alternative designs and formulations.

136.    At all times relevant to this litigation, Gary Moore used and/or was exposed to the use of Defendant's Roundup® products in an intended and reasonably foreseeable manner without knowledge of their dangerous characteristics.

137.    Gary Moore could have not reasonably discovered the defects and risk associated with Roundup® or glyphosate-containing products before or at time of exposure.

138.    The harm caused by Defendant's Roundup® products far outweighed their benefit, rendering Defendant's products dangerous to an extent beyond that which an ordinary consumer would contemplate. Defendant's Roundup® products were and are more dangerous than alternative products and Defendant could have designed its Roundup® products to make them less dangerous. Indeed, at the time that Defendant designed its Roundup® products, the state of the industry's scientific knowledge was such that a less risky design or formulation was attainable.

139.    At the time Roundup® products left Defendant's control, there was a practical, technically feasible, and safer alternative design that would have prevented the harm without substantially impairing the reasonably anticipated or intended function of Defendant's Roundup® herbicides.

140.    Defendant's defective design of Roundup® amounts to willful, wanton, and/or reckless conduct by Defendant.

141.    Therefore, as a result of unreasonably dangerous condition of its Roundup® products, Defendant is strictly liable to Plaintiff.

142.    The defects in Defendant's Roundup® products were substantial and contributing factors in causing Gary Moore grave injuries, and if not for Defendant's misconduct and omissions, Mr. Moore would not have sustained his injuries.

143.    As a direct and proximate result of Defendant placing its defective Roundup® products into the stream of commerce, Gary Moore developed NHL and suffered grave injuries that are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life, as well as economic hardship, including considerable financial expenses for medical care and treatment.

WHEREFORE, Plaintiff respectfully request that this Court enter judgment in his favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees, and all such other costs and further relief as this Court deems just and proper. Plaintiff also demands a jury trial on the issues contained herein.

## COUNT II – STRICT LIABILITY
## (FAILURE TO WARN)

144.    Plaintiff Gary Moore re-alleges paragraphs 1 through 126 above as if fully set forth herein.

145.    Plaintiff brings this strict liability claim against Defendant for failure to warn.

146.    At all times relevant to this litigation, Defendant engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting Roundup® products, which are defective and unreasonably dangerous to consumers, including Gary Moore, because they do not contain adequate warnings or instructions concerning the dangerous characteristics of Roundup® and specifically, the active ingredient glyphosate. These actions were under the ultimate control and supervision of Defendant.

147.    Defendant researched, developed, designed, tested, manufactured, inspected, labeled, distributed, marketed, promoted, sold, and otherwise released into the stream of commerce its Roundup® products, and in the course of same, directly advertised or marketed the products to consumers and end users, including Gary Moore, and Defendant therefore had a duty to warn of the risks associated with the reasonably foreseeable uses (and misuses) of Roundup® and glyphosate-containing products and a duty to instruct on the proper, safe use of these products.

148.    At all times relevant to this litigation, Defendant had a duty to properly test, develop, design, manufacture, inspect, package, label, market, promote, sell, distribute, maintain, supply, provide proper warnings, and take such steps as necessary to ensure that its Roundup® products did not cause users and consumers to suffer from unreasonably and dangerous risks. Defendant had a continuing duty to instruct on the proper, safe use of these products. Defendant, as manufacturer, seller, or distributor of chemical herbicides, is held to the knowledge of an expert in the field.

149.    At the time of manufacture, Defendant could have provided warnings or instructions regarding the full and complete risks of Roundup® and glyphosate-containing

products because it knew or should have known of the unreasonable risks of harm associated with the use of and/or exposure to these products.

150.    At all times relevant to this litigation, Defendant failed to investigate, study, test, or promote the safety of its Roundup® products. Defendant also failed to minimize the dangers to users and consumers of its Roundup® products and to those who would foreseeably use or be harmed by Defendant's herbicides, including Gary Moore.

151.    Despite the fact that Defendant knew or should have known that Roundup® products posed a grave risk of harm, it failed to warn of the dangerous risks associated with their use and exposure. The dangerous propensities of its products and the carcinogenic characteristics of glyphosate, as described above, were known to Defendant, or scientifically knowable to Defendant through appropriate research and testing by known methods, at the time it distributed, supplied, or sold the product and not known to end users and consumers, such as Gary Moore.

152.    Defendant knew or should have known that its Roundup® and glyphosate-containing products created significant risks of serious bodily harm to consumers, as alleged herein, and Defendant failed to adequately warn consumers and reasonably foreseeable users of the risks of exposure to these products. Defendant has wrongfully concealed information concerning the dangerous nature of Roundup® and its active ingredient glyphosate, and further made false and/or misleading statements concerning the safety of Roundup® and glyphosate.

153.    At all times relevant to this litigation, Defendant's Roundup® products reached the intended consumers, handlers, and users or other persons coming into contact with the products throughout the United States, including Gary Moore, without substantial change in their condition as designed, manufactured, sold, distributed, labeled, and marketed by Defendant.

154.    At all times relevant to this litigation, Gary Moore used and/or was exposed to the use of Defendant's Roundup® products in their intended or reasonably foreseeable manner without knowledge of their dangerous characteristics.

155.    Gary Moore could not have reasonably discovered the defects and risk associated with Roundup® or glyphosate-containing products before or at the time of his exposure. Mr. Moore relied upon the skill, superior knowledge, and judgment of Defendant.

156.    Monsanto, as the manufacturer and/or distributor of Roundup®, is held to the level of knowledge of an expert in the field.

157.    Defendant knew or should have known that the minimal warnings disseminated with its Roundup® products were inadequate, but it failed to communicate adequate information on the dangers and safe use/exposure and failed to communicate warnings and instructions that were appropriate and adequate to render the products safe for their ordinary, intended, and reasonably foreseeable uses, including agricultural and horticultural applications.

158.    The information that Defendant did provide or communicate failed to contain relevant warnings, hazards, and precautions that would have enabled agricultural workers, horticultural workers, and /or at-home users to utilize the products safely and with adequate protection. Instead, Defendant disseminated information that was inaccurate, false, and misleading and which failed to communicate accurately or adequately the comparative severity, duration, and extent of the risk of injuries associated with use of and/or exposure of Roundup and glyphosate. Defendant continued to aggressively promote the efficacy of its products, even after it knew or should have known of the unreasonable risks from use or exposure and concealed, downplayed, or otherwise suppressed, through aggressive marketing and promotion, any information or research about the risks and dangers of exposure to Roundup® and glyphosate.

159.    To this day, Defendant has failed to adequately and accurately warn of the true risks of Gary Moore injuries associated with the use of and exposure to Roundup® and its active ingredient glyphosate, a probable carcinogen.

160.    As a result of their inadequate warnings, Defendant's Roundup® products were defective and unreasonably dangerous when they left the possession and/or control of Defendant, were distributed by Defendant, and used by Gary Moore.

161.    Defendant is liable to Plaintiff for injuries caused by its failure, as described above, to provide adequate warnings or other clinically relevant information and data regarding the appropriate use of its Roundup products and the risk associated with the use of or exposure to Roundup® and glyphosate.

162.    The defects in Defendant's Roundup® products were substantial and contributing factors in causing Gary Moore's injuries, and if not for Defendant's misconduct and omissions, Mr. Moore would not have sustained his injuries.

163.    Had Defendant provided adequate warnings and instructions and properly disclosed and disseminated the risk associated with its Roundup® products, Gary Moore could have avoided the risk of developing injuries as alleged herein and Mr. Moore could have obtained alternative herbicides.

164.    As a direct and proximate result of Defendant placing its defective Roundup® products into the stream of commerce, Gary Moore developed NHL and suffered grave injuries that are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life, as well as economic hardship, including considerable financial expenses for medical care and treatment.

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in his favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all such other and further relief as this Court deems just and proper. Plaintiff also demands a jury trial on the issues contained herein.

## COUNT III – NEGLIGENCE

165.   Plaintiff Gary Moore re-alleges paragraphs 1 through 126 above as if fully set forth herein.

166.   Defendant, directly or indirectly, caused Roundup® products to be sold, distributed, packaged, labeled, marketed, and/or promoted.

167.   Defendant, directly or indirectly, caused Roundup® products to be purchased and/or used by Gary Moore.

168.   At all times relevant to this litigation, Defendant had a duty to exercise reasonable care in the design, research, manufacture, marketing, advertisement, supply, promotion, packaging, sale, and distribution of its Roundup® products, including the duty to take all reasonable steps necessary to manufacture, promote, and/or sell a product that was not unreasonably dangerous to consumers, users, and other persons coming into contact with the product.

169.   At all times relevant to this litigation, Defendant had a duty to exercise reasonable care in the marketing, advertising, and sale of its Roundup® products. Defendant's duty of care owed to consumer and the general public included providing accurate, true, and correct information concerning the risks of using Roundup® and appropriate, complete, and accurate warnings concerning the potential adverse effects of exposure to Roundup® and, in particular, its active ingredient glyphosate.

170.   At all times relevant to this litigation, Defendant knew or, in the exercise of reasonable care, should have known of the hazards and dangers of Roundup® and specifically, the carcinogenic properties of the chemical glyphosate.

171.   Accordingly, at all times relevant to this litigation, Defendant knew or, in the exercise of reasonable care, should have known that use or exposure to its Roundup® products could cause Gary Moore's injuries and thus, created a dangerous and unreasonable risk of injury to the users of these products, including Mr. Moore.

172.   Defendant knew or, in the exercise of reasonable care, should have known that Roundup® is more toxic than glyphosate alone and that safety studies on Roundup®, Roundup®'s adjuvants and "inert" ingredients, and/or the surfactant POEA were necessary to protect Gary Moore from Roundup®.

173.   Defendant knew or, in the exercise of reasonable care, should have known that tests limited to Roundup®'s active ingredient glyphosate were insufficient to prove the safety of Roundup®.

174.   Defendant also knew or, in the exercise of reasonable care, should have known that users and consumers of Roundup® were unaware of the risks and the magnitude of the risks associated with the use of and/or exposure to Roundup® and glyphosate-containing products.

175.   As such, Defendant breached its duty of reasonable care and failed to exercise ordinary care in the design, research, development, manufacture, testing, marketing, supply, promotion, advertisement, packaging, sale, and distribution of its Roundup® products, in that Defendant manufactured and produced defective herbicides containing the chemical glyphosate, knew or had reason to know of the defects inherent in its products, knew or had reason to know that a user's or consumer's exposure to the products created a significant risk of harm and

unreasonably dangerous side effects, and failed to prevent or adequately warn of these risks and injuries.

176.    Defendant failed to appropriately and adequately test Roundup®, Roundup® adjuvants and "inert" ingredients, and/or the surfactant POEA to protect Gary Moore from Roundup®.

177.    Despite the ability and means to investigate, study, and test its products and to provide adequate warnings, Defendant has failed to do so. Indeed, Defendant has wrongfully concealed information and has further made false and/or misleading statements concerning the safety and/or exposure to Roundup® and glyphosate.

178.    Defendant's negligence included:

   a.   Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing its Roundup® products without thorough and adequate pre- and post-market testing.

   b.   Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing Roundup® while negligently and/or intentionally concealing and failing to disclose the results of trials, tests and studies of exposure to glyphosate, and, consequently, the risk of serious harm associated with human use of and exposure to Roundup®.

   c.   Failing to undertake sufficient studies and conduct necessary tests to determine whether or not Roundup® products and glyphosate-containing products were safe for their intended use in agriculture, horticulture, and at-home use;

   d.   Failing to undertake sufficient studies and conduct necessary tests to determine the safety of "inert" ingredients and/or adjuvants contained within Roundup®,

and the propensity of these ingredients to render Roundup® toxic, increase the toxicity of Roundup®, whether these ingredients are carcinogenic, magnify the carcinogenic properties of Roundup®, and whether or not "inert" ingredients and/or adjuvants were safe for use;

e.   Failing to use reasonable and prudent care in the design, research, manufacture, formulation, and development of Roundup® products so as to avoid the risk of serious harm associated with the prevalent use of Roundup®/glyphosate as a herbicide;

f.   Failing to design and manufacture Roundup® products so as to ensure they were at least as safe and effective as other herbicides on the market;

g.   Failing to provide adequate instructions, guidelines, and safety precautions to those persons who Defendant could reasonably foresee would use and/or be exposed to its Roundup® products;

h.   Failing to disclose to Gary Moore, users, consumers, and the general public that the use of and exposure to Roundup® presented severe risks of cancer and other grave illnesses;

i.   Failing to warn Gary Moore, users, consumers, and the general public that the products' risk of harm was unreasonable and that there were safer and effective alternative herbicides available to Mr. Moore and other users or consumers;

j.   Systemically suppressing or downplaying contrary evidence about the risks, incidence, and prevalence of the side effects of Roundup® and glyphosate-containing products;

    k.  Representing that its Roundup® products were safe for their intended use when in fact, Defendant knew or should have known that the products were not safe for their intended use;

    l.  Declining to make or propose any changes to Roundup® products' labeling or other promotional materials that would alert the consumers and the general public of the risk of Roundup® and glyphosate.

    m.  Advertising, marketing, and recommending the use of Roundup® products, whole concealing and failing to disclose or warn of the dangers known by defendant to be associated with or caused by the use of and exposure to Roundup® and glyphosate;

    n.  Continuing to disseminate information to its consumers, which indicate or imply that Defendant's Roundup® products are not unsafe for use in the agricultural, horticultural industries, and/or home use; and

    o.  Continuing the manufacture and sale of its products with the knowledge that the products were unreasonably unsafe and dangerous.

179.    Further, Monsanto under-reported, underestimated, and downplayed the serious dangers of its Roundup® products. Specifically, Monsanto negligently and deceptively compared the safety risks and/or dangers of Roundup® with common everyday foods such as table salt and other available forms of herbicides.

180.    Defendant knew or should have known that it was foreseeable that consumers and/or users, such as Gary Moore, would suffer injuries as a result of Defendant's failure to exercise ordinary care in the manufacturing, marketing, labeling, distribution, and sale from Roundup®.

181.    Gary Moore did not know the nature and extent of the injuries that could result from the intended use of and/or exposure to Roundup® or its active ingredient glyphosate.

182.    Defendant's negligence was the proximate cause of the injuries, harm, and economic losses that Gary Moore suffered, as described herein.

183.    Defendant's conduct, as described above, was reckless. Defendant regularly risks the lives of consumers and users of its products, including Gary Moore, with full knowledge of the dangers of its products. Defendant has made conscious decisions not to redesign, re-label, warn, or inform the unsuspecting public, including Mr. Moore. Defendant's reckless conduct therefore warrants an award of punitive damages.

184.    As a proximate result of Defendant's wrongful acts and omission in placing its defective Roundup® products into the stream of commerce without adequate warnings of the hazardous and carcinogenic nature of glyphosate, Gary Moore developed NHL and suffered grave injuries that are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life, as well as economic hardship, including considerable financial expenses for medical care and treatment.

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in his favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees, and all such other and further relief as this Court deems proper and just. Plaintiff also demands a jury trial on the issues contained herein.

## COUNT IV – BREACH OF EXPRESS WARRANTY
## (S.C. CODE ANN. § 36-2-313)

185.    Plaintiff Gary Moore re-alleges paragraphs 1 through 126 above as if fully set forth herein.

186.   At all times relevant to this litigation, Defendant engaged in the business of testing, developing, designing manufacturing, marketing, selling, distributing, and promoting its Roundup® products, which are defective and unreasonably dangerous to consumers, including Gary Moore thereby placing Roundup® products into the stream of commerce. These actions were under the ultimate control and supervision of Defendant.

187.   At all times relevant to this litigation, Defendant expressly represented and warranted to the purchasers of its Roundup® products, by and through statements made by Defendant in labels, publications, package insert, and other written materials intended to consumers and the general public, that its Roundup® products were safe to human health and the environment, effective, fit, and proper for their intended use. Defendant advertised, labeled, marketed, and promoted Roundup® products, representing the quality to consumers and the public in such a way as to induce their purchase or use, thereby making an express warranty that its Roundup® products would conform to the representations.

188.   These express representations included incomplete warnings and instructions that purport, but fail, to include the complete array of risks associated with use of and/or exposure to Roundup® and glyphosate. Defendant knew or should have known that the risks expressly included in Roundup® warnings and labels did not and do not accurately and adequately set forth the risks of developing the serious injuries complained of herein. Nevertheless, Defendant expressly represented that its Roundup® products were safe and effective, that they were safe and effective for use by individuals such as Gary Moore, and/or that they were safe and effective as agricultural herbicides.

189.   The representations about Roundup®, as set forth herein, contained or constituted affirmations of fact or promises made by the seller to the buyer, which related to the goods and

became part of the basis of the bargain, creating an express warranty that the goods would conform to the representations.

190.    Defendant placed its Roundup® products into the stream of commerce for sale and recommended their use to consumers and the public without adequately warning of the true risks of developing the injuries associated with the use of and exposure to Roundup® and its active ingredient glyphosate.

191.    Defendant breached these warranties because, among other things, its Roundup® products were defective, dangerous, unfit for use, did not contain labels representing the true and adequate nature of the risk associated with their use, and were not merchantable or safe for their intended, ordinary, and foreseeable use and purpose. Specifically Defendant breached the warranties in the following ways:

a.  Defendant represented through its labeling, advertising, and marketing materials that its Roundup® products were safe, and fraudulently withheld and concealed information about the risks of serious injury associated with use of and/or exposure to Roundup® and glyphosate by expressly limiting the risks associated with use and/or exposure within its warnings and labels; and

b.  Defendant represented that its Roundup® products were safe for use and fraudulently concealed information that demonstrated that glyphosate, the active ingredient in Roundup®, had carcinogenic properties, and that its Roundup® products, therefore, were not safer than alternatives available on the market.

192.    Defendant has sole access to material facts concerning the nature of risks associated with its Roundup® products as expressly stated within its warnings and labels, and Defendant

knew that consumers and users such as Gary Moore could not have reasonably discovered that the risks expressly included in Roundup® warnings and labels were inadequate and inaccurate.

193.    Gary Moore had no knowledge of the falsity or incompleteness of Defendant's statements and representations concerning Roundup®.

194.    Gary Moore used and/or was exposed to the use of Roundup® as researched, developed, designed, tested, formulated, manufactured, inspected, labeled, distributed, packaged, marketed, promoted, sold, or otherwise released into the stream of commerce by Defendant.

195.    Had the warning and labels for Roundup® products accurately and adequately set forth the true risks associated with the use of such products, including Gary Moore's injuries, rather than expressly excluding such information and warranting that the products were safe for their intended use, Mr. Moore could have avoided the injuries complained of herein.

196.    As a direct and proximate result of Defendant's wrongful acts and omissions, Gary Moore suffered severe injuries. Mr. Moore developed NHL and suffered grave injuries that are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life, as well as economic hardship, including considerable financial expenses for medical care and treatment.

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in his favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees, and all such other and further relief as this Court deems proper and just. Plaintiff also demands a jury trial on the issues contained herein.

## COUNT V – BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY (S.C. CODE ANN. § 36-2-315)

197.    Plaintiff Gary Moore re-alleges paragraphs 1 through 126 above as if fully set forth herein.

198.    At all times relevant to this litigation, Defendant engaged in the business of testing, developing, designing, formulating, manufacturing, marketing, selling, distributing, and promoting its Roundup® products, which are defective and unreasonably dangerous to users and consumers, including Gary Moore, thereby placing Roundup® products into the stream of commerce.

199.    These actions were under the ultimate control and supervision of Defendant.

200.    Before the time that Gary Moore was exposed to the use of the aforementioned Roundup® products, Defendant impliedly warranted to its consumers and users, including Mr. Moore, that its Roundup® products were of merchantable quality and safe and fit for the use for which they were intended; specifically, as horticultural herbicides.

201.    Defendant, however, failed to disclose that Roundup has dangerous propensities when used as intended and that the use of and/or exposure to Roundup® and glyphosate-containing products carries an increased risk of developing severe injuries, including Gary Moore's injuries.

202.    Upon information and belief, Gary Moore reasonably relied upon the skill, superior knowledge, and judgment of Defendant and upon its implied warranties that the Roundup® products were of merchantable quality and for their intended purpose or use.

203.    The Roundup® products were expected to reach and did in fact reach consumers and users, including Gary Moore, without substantial change in the condition in which they were manufactured and sold by Defendant.

204.    At all times relevant to this litigation, Defendant was aware that consumers and users of its products, including Gary Moore, would use Roundup® products as marketed by Defendant, which is to say that Mr. Moore was the foreseeable user of Roundup®.

205.    Defendant intended that its Roundup® products be used in the manner in which Gary Moore in fact used them and Defendant impliedly warranted each product to be of merchantable quality, safe, and fit for this use, despite the fact that Roundup® was not adequately tested or researched.

206.    In reliance upon Defendant's implied warranty, Gary Moore used Roundup® as instructed and labeled and in the foreseeable manner intended, recommended promoted, and marketed by Defendant.

207.    Gary Moore could not have reasonably discovered or known of the risk of serious injury associated with Roundup® or glyphosate.

208.    Defendant breached its implied warranty to Gary Moore in that its Roundup® products were not of merchantable quality, safe, or fit for their intended use, or adequately tested. Roundup® has dangerous propensities when used as intended and can cause serious injuries, including those injuries complained of herein.

209.    The harm caused by Defendant's Roundup® products far outweighed their benefit, rending the products more dangerous than an ordinary customer or user would expect and more dangerous than alternative products.

210.    As a direct and proximate result of Defendant's wrongful acts and omissions Gary Moore suffered severe physical and emotional injuries. Mr. Moore developed NHL and suffered grave injuries that are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life, as well as economic hardship, including considerable financial expenses for medical care and treatment.

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in his favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys'

fees, and all such other and further relief as this Court deems proper and just. Plaintiff also demands a jury trial on the issues contained herein.

## COUNT VI – VIOLATION OF SOUTH CAROLINA'S CODE ANNOTATED §36 and §39

211.    Plaintiff Gary Moore realleges paragraphs 1 through 126 above as if fully set forth herein.

212.    S.C. Code Ann. § 39-5-20 declares unlawful "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce" *Id.* at § 39-5-20.

213.    Plaintiff Gary Moore is an intended beneficiary of the S.C. Code Ann. § 39-5-20 as a citizen of South Carolina because that section applies to "the conduct of any trade or commerce" in the state of South Carolina. S.C. Code Ann. § 39-5-20.

214.    Plaintiff Gary Moore is an intended beneficiary of the S.C. Code Ann. § 36 as a citizen of South Carolina because the Chapter applies to "transactions in goods" in the state of South Carolina. S.C. Code Ann. § 36-2-102.

215.    Defendant violated and continues to violate the S.C. Code Ann. by engaging in the described unconscionable, deceptive, unfair acts or practice proscribed by S.C. Code Ann. § 39-5-20, *et seq.* Defendant's practices were likely to, and did in fact, deceive and mislead members of the public, including users and consumers, including Gary Moore, acting reasonably under the circumstances, to their detriment. These practices include, but are not limited to, Defendant's use of false or misleading representations or omissions of material fact in connection with the testing, developing, designing, formulating, manufacturing, marketing, selling, distributing, and promoting its Roundup® products.

216.    Defendant has engaged in unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of its trade and commerce by,

*inter alia*, offering and selling its Roundup® products for sale as horticultural herbicides while negligently and/or intentionally concealing and failing to disclose the results of trials, tests and studies of exposure to glyphosate, and, consequently, the risk of serious harm associated with human use of and exposure to Roundup®.

217.    Additionally, in connection with the sale of the unsafe and/or defective product to Plaintiffs, Defendant, through its employees, agents and representatives, violated the S.C. Code Ann. by engaging in unfair or deceptive acts or practices by expressly and/or impliedly warranting each product to be of merchantable quality, safe, and fit for this use, despite the fact that Roundup® was not adequately tested or researched.

218.    As a direct and proximate result of Defendant's unfair and/or deceptive acts or practices, Plaintiff suffered injuries, damages and losses resulting from the negligent and/or intentional acts or omissions of Defendant as well as the dangerous defects of its Roundup® products as more fully described herein. Mr. Moore developed NHL and suffered grave injuries that are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life, as well as economic hardship, including considerable financial expenses for medical care and treatment.

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in his favor for compensatory damages, together with interest, costs herein incurred, attorneys' fees, and all such other and further relief as this Court deems proper and just. Plaintiff also demands a jury trial on the issues contained herein.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in his favor and against Monsanto, awarding as follows:

A. Compensatory damages in the form of medical expenses, out-of-pocket expenses, lost earnings, and other economic damages in an amount to be proven at trial;

B. Compensatory damages for pain and suffering, emotional distress, loss of enjoyment of life, and other non-economic damages in an amount to be determined at trial;

C. Punitive damages for the wanton, willful, fraudulent, and reckless acts of the Defendant who demonstrated a complete disregard and reckless indifference for the safety and welfare of the general public and to the Plaintiff in an amount sufficient to punish Defendant and deter future similar conduct, to the extent allowable by applicable law;

D. Pre- and post-judgment interest;

E. Costs including attorneys' fees, court costs, and other litigation expenses; and

F. Any other relief that this Court may deem just and proper.

Dated: July 17, 2020                          Respectfully Submitted,

/s/ Joshua Christian
Joshua Christian
Christian & Davis Attorneys, LLC
1007 E. Washington St.
Greenville, SC 29601
(864) 232 - 7363 (Ph.)
(864) 370 - 3731 (Fax)
jchristian@cclawfirm.com


Alex C. Davis          (Pro Hac Vice Pending)
JONES WARD PLC
1205 E. Washington St., Suite 111
Louisville, KY 40206
(502) 587- 6000 (Ph.)
(502) 587- 2007 (Fax)
alex@jonesward.com