# U.S. District Court
## District of Nebraska (8 Omaha)
## CIVIL DOCKET FOR CASE #: 8:20-cv-00331

Stockdale, as Personal Representative of the Estate of William G. Stockdale, Deceased et al v. Monsanto Company
Assigned to:
Case in other court:  District Court of Douglas County, Nebraska, CI 20-05454
Cause: 28:1332 Diversity-Product Liability

Date Filed: 08/17/2020
Jury Demand: Plaintiff
Nature of Suit: 365 Personal Inj. Prod. Liability
Jurisdiction: Diversity

**Plaintiff**

**Kara Stockdale**
*Personal Representative of Estate of William G. Stockdale, Deceased estate of*
William G. Stockdale

represented by   **David A. Domina**
DOMINA LAW GROUP
2425 South 144th Street
Omaha, NE 68144-3267
(402) 493-4100
Fax: (402) 493-9782
Email: ddomina@dominalaw.com
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Marilyn Kay Stockdale**
*Individually*

represented by   **David A. Domina**
(See above for address)
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Monsanto Company**

represented by   **Michael K. Huffer**
CASSEM, TIERNEY LAW FIRM
9290 West Dodge Road
Suite 302
Omaha, NE 68114-3320
(402) 390-0300
Fax: (402) 390-9676
Email: mhuffer@ctagd.com
*ATTORNEY TO BE NOTICED*

**Ronald F. Krause**
CASSEM, TIERNEY LAW FIRM
9290 West Dodge Road
Suite 302
Omaha, NE 68114-3320
(402) 390-0300
Fax: (402) 390-9676
Email: rkrause@ctagd.com
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 08/17/2020 | 1 | NOTICE OF REMOVAL against All Plaintiffs from District Court of Douglas County, Nebraska, Case number CI 20-5454 ( Filing fee $ 400, receipt number ANEDC-4218977) with attached state court pleadings, by Attorney Michael K. Huffer on behalf of Monsanto Company (Attachments:<br># 1 Exhibit 1,<br># 2 Exhibit 2)(Huffer, Michael) (Entered: 08/17/2020) |
| 08/17/2020 | 2 | NOTICE of *Request for Location of Trial* by Attorney Michael K. Huffer on behalf of Defendant Monsanto Company (Huffer, Michael) (Entered: 08/17/2020) |

<table>
<tr><td colspan="4" align="center">**PACER Service Center**</td></tr>
<tr><td colspan="4" align="center">**Transaction Receipt**</td></tr>
<tr><td colspan="4" align="center">08/17/2020 14:44:39</td></tr>
<tr><td>**PACER Login:**</td><td>hllp1982</td><td>**Client Code:**</td><td>1417.0005</td></tr>
<tr><td>**Description:**</td><td>Docket Report</td><td>**Search Criteria:**</td><td>8:20-cv-00331</td></tr>
<tr><td>**Billable Pages:**</td><td>1</td><td>**Cost:**</td><td>0.10</td></tr>
</table>

Filed in Douglas District Court
*** EFILED ***
Case Number: D01CI200005454
Transaction ID: 0011261486
Filing Date: 07/14/2020 04:01:14 PM CDT

## District Court, Douglas County, Nebraska

| | |
|---|---|
| **Kara Stockdale, Personal Representative of Estate of William G. Stockdale, Deceased,**<br>**and**<br>**Marilyn Kay Stockdale, Individually,** | **Case No.: CI 20-___** |
| **Plaintiffs,** | **Complaint**<br>**&**<br>**Jury Demand** |
| **v.** | |
| **Monsanto Company,**<br>**a Missouri Corporation,** | **Trial Location Designation** |
| **Defendant.** | |

### Overview

1.     Kara Stockdale is the Personal Representative ("PR") of the Estate of her deceased father, William G. Stockdale ("Decedent" or "Mr. Stockdale"). She was appointed by the County Court of Douglas County, Nebraska, in Case No. PR 17-518. She resides in Douglas County, Nebraska.   Marilyn Stockdale ("Mrs. Stockdale") is the surviving spouse of the Decedent. Plaintiffs sue Monsanto for Mr. Stockdale's personal injuries, and conscious pain and suffering incurred before his death and for his wrongful death. These injuries and this suffering were caused by Monsanto's Roundup® herbicide. The herbicide caused Mr. Stockdale to contract fatal  Non-Hodgkin's Lymphoma. ¶The Decedent was born in 1952 . He died March 27, 2017, at age 64 years, survived by this wife and five (5) children. Mr. Stockdale was diagnosed with non-Hodgkin's lymphoma, on July 19, 2016. He battled the disease until it caused his death.

2.     Monsanto failed to warn, and promoted its unsafe Roundup® herbicide products negligently, and wrongfully disregarded human safety in the product's design, formulation, testing, manufacture, advertising, promotion, and distribution.  Monsanto affirmatively concealed its awareness of scientific data linking Roundup® with non-Hodgkin's lymphoma and withheld information from the public disclosing the link.

Plaintiffs affirmatively relied on Monsanto's actions and could not learn of their falsity or deceit until June 2020 when Monsanto acted inconsistently with prior misrepresentations.

3.    Roundup®'s primary ingredient is glyphosate, a carcinogen. Monsanto formulates glyphosate to create Roundup® with surfactants that multiply the aggressive carcinogen quality of its product. Monsanto failed to warn consumers about what it knew; it perpetuated false representations of Roundup® dangers even though it knew or had reason to know of them. When confronted with the facts, Monsanto denied that its product was harmful and denied specifically that it causes non-Hodgkin's lymphoma.

4.    Mr. Stockdale was exposed to Roundup® as a residential herbicide user; he used Roundup® at his rental properties, residence and lake home. His exposure time is believed to have commenced approximately 1990 and continued through the early part of 2016, prior to his diagnosis. He used the product at four (4) locations over the years and an average of an estimated 15 application events per year, for approximately 30-35 minutes each, for an average annual usage of at least 8.0 hours of exposure to Roundup® over a period of at least 25 years for total of at least 200 hours of exposure. He applied Roundup® for weed control purposes as intended by Monsanto, using a handheld sprayer and wand. Mr. Stockdale dressed in shoes, jeans or slacks and a cotton shirt, when using the product, and he used it in accord with its instructions.

5.    Decedent's use of Roundup® occurred  principally in Nebraska. Mr. Stockdale did not use other herbicides, pesticides in any significant measure. He has no significant family history of non-Hodgkin's Lymphoma or other related diseases. Mr. Stockdale had no genetic or medical predisposition to NHL.

6.    Decedent and Plaintiffs did not know and could not discover that Roundup® causes non-Hodgkin's lymphoma ("NHL"). If Mr. Stockdale had known, or been warned by Monsanto, he would not have used it, and would have taken precautions against exposure to it. At all relevant times, the Decedent used Roundup® in accord with its label directions. The label did not caution about personal protective equipment or other precautions and gave no indications of any health risks associated with the product. Monsanto continues to deny the carcinogenic properties of Roundup®. As of March 2020,

2

10A2846

Monsanto continued to expressly state on its Australian website, www.roundup.com.au that:

> **Do I need to wear protective clothing when using Roundup products?**
> You are not required to use any protective clothing when using Roundup, although we do recommend that when using any lawn & garden products that you wear closed shoes, protective glasses, dust mask, and gloves, where appropriate. Don't forget a hat and sunscreen![1]

7.       Plaintiffs seek a money judgment for general and special damages sustained by the Decedent during life,  general damages and special damages for wrongful death, and general damages for the derivative, consortium losses of Mrs. Stockdale.

### Jurisdiction, Venue

8.       The District Court has subject matter jurisdiction pursuant to its general grant of jurisdictional authority. *Neb Rev Stat* § 24-302.  The Nebraska judiciary has subject matter and personal jurisdiction over the Defendant because Monsanto maintains a business presence here, is registered to transact business here, contracts for sale of, and sells its Roundup® herbicides here, promotes the sale of Roundup® here, and caused tortious injury by its failure to warn and misrepresentations of its product. *Neb Rev Stat* § 25-536. These events involving the Decedent occurred in Nebraska and in Douglas County where a substantial part of the activity giving rise to this claim occurred and, and where Decedent was mortally injured and suffered death.  *Neb Rev Stat* § 25-403.01. Defendant marketed its products in Douglas County Nebraska.

9.       Plaintiff, Kara Stockdale brings the Decedent's personal injury and wrongful death claims pursuant to *Neb Rev State* § 30-809  & 810 and Nebraska's tort law and warranty.  Mrs. Stockdale brings her claim under Nebraska state law.

10.      Mr. Stockdale was exposed to and used Roundup® as alleged in ¶ 4 above. Decedent purchased the product at a variety of different vendors and hardware or garden center stores.

---

[1]  https://www.roundup.com.au/faqs/do-i-need-to-wear-protective-clothing-when-using-roundup-products

10A2846

**Facts Concerning Glyphosate, Roundup® & Monsanto**

11.     Roundup® was sold as safe and not posing lethal dangers to human users. Decedent and his spouse were not warned otherwise. Roundup® is formulated with glyphosate as a principal ingredient. In 2019, in June, Monsanto purchased full-page advertisements in U.S. national newspapers advertising its Roundup® products as safe and as a product that cannot cause cancer despite the fact that the overwhelming evidence of the international scientific community, and the virtually universal judgments of courts in the United States and in international settings, is to the contrary. Monsanto gave no warning of these matters, even as late as the date of this filing. Up to and after the time of Decedent's diagnosis and death and throughout his life while Defendant marketed its Roundup® products, Monsanto advertised it as safe and a product that cannot cause cancer.  It denied contrary scientific evidence and touted research Monsanto sponsored or even altered but concealed that the research was actually objective.

12.     Glyphosate is a broad-spectrum, non-selective herbicide used in Roundup®. Glyphosate disrupts a plant's ability to form certain amino acids necessary for protein synthesis. Roundup® generally kills targeted plants within two to three days. Before they die, target and nontarget plants absorb Roundup® and glyphosate. The absorbed substance cannot be removed by washing, peeling, or even by milling, baking, or brewing.  In the human body, glyphosate, and Roundup® are absorbed through the skin and respiration. They introduce a foreign protein blood. Some cells and particularly lymphocytes are inclined to absorb this foreign protein, some but not all the time. When this occurs, the cell that absorbs the foreign protein is significantly more likely to divide irregularly and become cancerous. This also occurs some but not all the time, though it certainly occurs on a statistically significant basis.

13.     The first glyphosate-based herbicide was introduced by Monsanto in the mid-1970s as Roundup®.  Roundup® was not truthfully portrayed though Monsanto did, or should have, known the truth at the outset about the dangers of its product. It gave no warnings in the beginning, or thereafter. Despite known and mounting evidence of the

4

10A2846

dangers of Roundup® Monsanto did not change its formulation, marketing, or disclosure practices.

14.     Roundup® was marketed so aggressively commencing in 1976 and thereafter by Monsanto that it became a term synonymous with "weed killer" for residential and commercial users and later with the farming community.  Roundup® became the most used weed killer in Nebraska, in the United States and in the world.  Monsanto promotes its Roundup® as a remarkable technological breakthrough that can kill weeds without causing harm to people or the environment.

15.     Monsanto knew, for all or substantially all the years the Decedent used Roundup® that its statements were false.  Internally at Monsanto, Roundup® was so popular, and  had so much  profit potential for Monsanto that the company falsified data, sponsored, promoted, developed and distributed false studies masquerading as science, and vilified accurate studies all for the purpose of masking Monsanto's knowledge and Roundup®'s dangers from the unsuspecting public.  The Decedent and his spouse are victims of this deception.

16.     In the United States, Monsanto paid massive political campaign contributions, spent huge sums for "government relations", and expended large amounts of money on universities to influence and purchase their research and for university endorsements to disguise the dangers of Roundup®.

17.     On an ongoing basis, Monsanto engages in specific acts and omissions designed to conceal its awareness of  carcinogenic properties of Roundup®.  It did so for decades.  By doing so, it makes it impossible for members of the general public and consumers and users of the product like Plaintiff and the Decedent to learn of Roundup®'s cancer risks.  Plaintiffs could not discover these risks until after the Decedent's death. They were not reasonably discoverable until 2020 when Defendant, while still denying that Roundup® causes cancer, made a concession that belies its position. It did so publicly during the early summer months of 2020.

18.     Monsanto engaged in these acts, and others, to conceal the link between Roundup® or its glyphosate product, and non-Hodgkin's lymphoma:

10A2846

18.1   Since the 1970s. Monsanto consciously and deliberately elected against performing research studies and evaluations of its product because the risks of conducting the experiments indicated by the work of others was viewed as posing too great a risk of outcomes adverse to the health claims.

18.2   May 26, 1999. William F. Heydens of Roundup® emailed an internal group about a global scientific outreach council meeting for the purpose of communicating an internal plan at Monsanto to network its people to shut down persons who were early at advancing a claim that Roundup® and its glyphosate component are carcinogenic in order to get "people to get up and shout Glyphosate is Non-Toxic."

18.3   By 1999, Monsanto had a report from a scientist it engaged, Dr. James Parry detailing scientific findings of cancer risks associated with glyphosate and Roundup®. Monsanto severed its arrangements with Dr. Parry, stopped funding his research, and embarked upon a decades long effort to debunk the results of his work.

18.4   2004. Monsanto had toxicologist Dr. Donna Farmer prepare a "2004 product safety center-toxicology goals" internal document at Monsanto. The document details her successes in 2004 at suppressing medical information adverse to Roundup® and suggesting that it had carcinogenic properties or posed other hazards. She detailed a plan for continuing to do so. The plan was adopted and executed over ensuing years.

18.5   2011. Then and thereafter until at least 2016, Monsanto's scientists engaged in efforts to rebuff and suppress European scientific papers establishing dermal absorption rates for glyphosate into the human skin, and thereby explaining the pathway of Monsanto's glyphosate to the human blood arteries and veins, and the blood system where it tended to cause cancer, and particularly non-Hodgkin's lymphoma.

6

18.6   January 2013. Monsanto engaged in ghost writing papers posing as documents generated by objective, independent research scientists. However, Monsanto had compromised the authors of several of these papers, including David Saltmiras, but concealed its disqualifying business arrangements with them.  It continued a course of conduct and pattern of concealing this information.

18.7   2013 through 2019. Monsanto developed internal communications channels and methodologies with public officials and federal employees responsible for reviewing products like Roundup® and evaluating their safety.

18.8   Over Four Decades. Monsanto developed relationships with many of these persons, compromising them to make incomplete and Monsanto-friendly decisions notwithstanding contrary scientific evidence.

18.9   Over Four Decades. Monsanto manipulated and falsified the outcomes of research and efforts to submit information about Roundup® to federal regulators, thereby concealing its risks.

18.10  Between 2011 and 2015.   In this timeframe, Monsanto's chief toxicologist alerted Monsanto colleagues that the company could not claim glyphosate poses no risks as a carcinogen because the company had not performed the research necessary to reach a conclusion in that regard.  A recommendation against conducting the research followed, and the research was never undertaken by Monsanto.  Nonetheless, Monsanto promoted the product as safe.

18.11  March 2016. In or about then, Monsanto figures communicated with one another and developed a "Red Flag" campaign with a Dublin-based PR and lobbying firm to influence public officials and opinion to believe that Roundup® was safe.

10A2846

18.12  2016-Present. Monsanto continues to deny the existence of a cause and effect relationship making its Monsanto Roundup® herbicide products substantial factors in bringing about the occurrence of non-Hodgkin's lymphoma in the body of innocent persons including Decedent.

18.13  Beginning December 7, 2018 and continuing to the date of filing of this Complaint, Monsanto stood by glyphosate, stating the chemical has a "history as a safe and efficient weed control tool" and claimed that "more than 300 study summaries" proved it was safe. At that time and thereafter, It authorized these statements: "Trust in the integrity of crop protection science is core to us and our business," said Liam Condon, member of the Board of Management of Bayer AG and President of the Crop Science Division.[2]

18.14  March 2020: Monsanto declared Roundup® herbicide products to be so safe that no personal protection equipment is required on its Website.[3]

19.    In 2015, the World Health Organization's International Agency for Research of Cancer ("IARC") announced that the world's premier scientists established that glyphosate and Roundup® are probable carcinogens. Public awareness started slowly thereafter. Since then, other studies have also revealed this fact, and evidence of the cancerous nature of the substance continues to grow.  It is now established by objective scientific research that glyphosate and Roundup® cause NHL.  Roundup® caused the NHL that injured and killed the Decedent. This is why the Plaintiffs now sue Monsanto.

---

[2]  https://media.bayer.com/baynews/baynews.nsf/id/Bayer-committed-to-transparency-Posts-more-than-300-glyphosate-safety-study-summaries-online (last visited 7.14.2020)

[3]  https://monsanto.com/news-stories/statements/roundup-glyphosate-dewayne-johnson-trial/ as of March 8, 2020 it continued to publish an article by Scott Partridge, Monsanto Vice President, declarying "Glyphosate does not cause cancer" and otherwise denying health risks scientifically associated with Roundup®. Also, published as an article by David Saltmiras, a Monsanto employee involved in email communications to influence government agencies that continues the denial and is dated January 9, 2019, remaining published March 8, 2020 at https://monsanto.com/innovations/research-development/research-transparency/articles/no-evidence-glyphosate-causes-cancer/

10A2846

20.    In the United States, the manufacture, formulation, and distribution of certain chemicals, including herbicides and specifically including Roundup® are regulated under federal law by 7 U.S.C. §§ 136 et. seq.  The statute is known the *Federal Insecticide, Fungicide and Rodenticide Act* ("FIFRA").

21.    Under FIFRA, all pesticides must be registered with the Environmental Protection Agency ("EPA") before they may be distributed, sold, or used.  This is because they are toxic to plants, animals, and humans. The EPA, as a part of the registration process, requires that products be tested and evaluated, pass those tests, and that the results of the tests be submitted to the EPA for assessment.  Even after assessment by the EPA, its decision is not an assurance of safety or government endorsement.  EPA approval for marketing is not a regulatory decision about safety.

22.    The EPA does not deem products "safe," but only that use of the product in accordance with its label directions "will not generally cause unreasonable adverse effects on the environment."  7 U.S.C. § 136a(c)(5)(D).

23.    FIFRA defines "unreasonable adverse effects on the environment" to mean "any unreasonable risk to man or the environment, considering the economic, social, and environmental costs and benefits of the use of any pesticide." 7 U.S.C. § 136(bb). FIFRA thus requires the EPA to conduct a risk/benefit analysis in determining whether a registration should be granted or allowed to continue to be sold in commerce.

24.    FIFRA generally requires that the registrant, Monsanto, in the case of Roundup®, conduct the health and safety testing of pesticide products in accord with approved protocols. The data produced by the registrant must be submitted to the EPA for review and evaluation.

### Monsanto's Acts, Omissions

25.    Each product submitted to the EPA for evaluation undergoes initial registration.  Singular registration is not an all-encompassing, all-times, and non-changing event.  Data necessary to achieve registration has changed from time to time.  Re-registration is required by 7 U.S.C. § 136a-1.  This requires additional tests and

9

submissions. In Monsanto's case, it undertook those additional tests and performed them. The tests were falsified[4] and the laboratories that conducted them for Monsanto were caught and punished.[5] Still, Monsanto concealed these events and used Roundup® profits to obscure and conceal adverse information with its marketing campaigns. It did so successfully for many years. Originally named "Monsanto Chemical Works", Monsanto has a history of dangerous products including polychlorinated biphenyls, dioxin, 2-4D-T, Agent Orange, and others. Monsanto denied in each instance, that these substances were carcinogenic and lethal to humans, just as it does with Roundup® now.

26.     By the late 1990s, Monsanto concealed its indifference to human health by rebranding itself as a "life sciences" company, reorganizing, and re-incorporating in 2002 and officially declared itself an "agricultural company." In its company literature in about 2005-10, Monsanto referred to itself disingenuously as a "relatively new company" whose primary goal is helping "farmers around the world in their mission to feed, clothe, and fuel" a growing planet. Monsanto tried to conceal its history of bad acts by advertising itself as "Today's Monsanto", but it continued the pattern of actions of its past with Roundup®.

27.     Before Decedent's diagnosis, but after his exposure to Roundup®, the EPA announced plans to release a preliminary risk assessment of Roundup®. This was to be done in relation to the re-registration process and to be completed not later than July 2015. The EPA is believed to have completed its review of glyphosate, Roundup's chief ingredient in early 2015. But it chose to delay releasing the results because of the World Health Organization's health-related findings. Those findings, by the WHO's International

---

[4] U.S. EPA. Communications and Public Affairs. 1991. Note to correspondents. Washington, D.C. (March 1.); U.S. EPA. Communications, Education, And Public Affairs. 1994. Press advisory. Craven Laboratories, owner, and 14 employees sentenced for falsifying pesticide tests. Washington, D.C. (March 4.); U.S. EPA. Communications and Public Affairs. 1991. Press advisory. EPA lists crops associated with pesticides for which residue and environmental fate studies were allegedly manipulated. Washington, D.C. (March 29.); U.S. Dept. of Justice. United States Attorney. Western District of Texas. 1992. Texas laboratory, its president, 3 employees indicted on 20 felony counts in connection with pesticide testing. Austin, TX. (September 29.)

[5] For example, U.S. Congress. House of Representatives. Committee on Government Operations. 1984. Problems plague the Environmental Protection Agency's pesticide registration activities. House Report 98-1147. Washington, D.C.: U.S. Government Printing Office; False data, Journal of Pesticide Reform, Volume 15, Number 3, Fall 1995. Northwest Coalition for Alternatives to Pesticides, Eugene, OR. Glyphosate, Part 1: Toxicology, by Caroline Cox

Agency for Research of Cancer (IARC) affirmatively found that Roundup® and its glyphosate component are probably carcinogenic agents that cause cancer, and specifically non-Hodgkin's lymphoma, in human beings.

28.     In April 2016, the EPA posted a risk assessment of glyphosate on its website and then immediately retracted it. The EPA subsequently indicated that the posting was inadvertent, that the document posted was not the EPA's final assessment or even a preliminary one, and that the EPA intended to issue a final report by the end of 2016.

29.     Monsanto manipulated "scientific" data to market its Roundup® products, using many of the tactics it perfected with dioxin[6], Pydraul 150[7] and PCBs.[8]

30.     At least as early as 1985, studies existed demonstrating that the glyphosate component of Roundup® was believed to be an agent that caused cancer in laboratory animals and that it was possibly carcinogenic to humans. However, Monsanto flexed its political and government relations muscles, provided studies to the EPA, and the EPA changed its classification of the substance. When it did so in 1991, the EPA classified the glyphosate component of Roundup® as yielding evidence of non-carcinogenicity in humans. The EPA announcement, however, emphasized that the designation of Roundup® or glyphosate in what it called Group E, i.e., non-carcinogenicity in humans, was "based on the available evidence at the time of evaluation and should not be interrupted as a definitive conclusion that the agent will not be a carcinogen...." Monsanto continued to sell its Roundup® products as safe, noncarcinogenic, and without warnings. It also denied any health hazard associated with exposure to Roundup® products.

---

[6] The name dioxin refers to a group of highly toxic chemicals linked to heart disease, liver disease, human reproductive disorders, and developmental problems. Even in small amounts, dioxin persists in the environment and accumulates in the body. In 1997 the International Agency for Research on Cancer, classified dioxin as a substance that causes cancer in humans. In 2001 the U.S. government listed the chemical as a "known human carcinogen."

[7] Pydraul 150 was a lethal hydraulic for submarines manufactured and sold by Monsanto as safe for humans at the same time the company concealed that it knew the product was too toxic for use in submarines.

[8] PCBs were versatile and fire-resistant, and became accepted in lubricants, hydraulic fluids, and sealants. But PCBs are toxic. A member of a family of chemicals that mimic hormones, PCBs have been linked to damage in the liver and in the neurological, immune, endocrine, and reproductive systems. The Environmental Protection Agency (E.P.A.) and the Agency for Toxic Substances and Disease Registry, part of the Department of Health and Human Services, now classify PCBs as "probable carcinogens."

11

31.     The EPA, itself, however found that Monsanto, and laboratories it employed, manipulated tests of toxicity, misrepresented them, and affirmatively committed fraud. Monsanto's laboratories used for this purpose in committing these wrongful acts included Industrial Bio-Test Laboratories ("IBT"). The studies falsified included at least thirty (30) test runs on glyphosate and products containing it including residue studies required by the EPA to register Roundup® for sale.

32.     The U.S. Food and Drug Administration discovered in an inspection of IBT, significant discrepancies between raw data and final reports. This led to an EPA audit of IBT and a determination that its toxicology studies on Roundup® were invalid. The EPA found the firm engaged in routine falsification of data making it "hard to believe the scientific integrity of the studies when they said they took specimens from the uterus of male rabbits." Three (3) senior executives of IBT were convicted of criminal fraud.[9]

33.     Monsanto engaged Craven Laboratories to preform tests, including studies of Roundup®. During the same year that they were engaged by Monsanto, Craven Laboratories had three (3) of its employees indicted and convicted of fraudulent laboratory testing practices involving pesticides and herbicides.[10] Monsanto denied that the laboratories acted at its direction, but it did not disavow the results until it was forced in the prosecutions noted above to do so. Monsanto has failed to explain why it did not aggressively and publicly disavow the occurrences and make its customers and the public aware of the testing results. It continues to market Roundup® and continues, even on its website, to contend glyphosate is safe. It has made no new disclosures or warnings but marches on with its statements, undaunted by rejection from science, courts, juries, and hundreds of national and local governments.[11]

---

[9] Id.

[10] Id.

[11] R. Raman, the impact of Genetically Modified (GM) crops in modern agriculture: A review, 8, Biotechnology and Agriculture and the Food Chain, No. 4 (2017) available at
https://www.tandfonline.com/doi/full/10.1080/21645698.2017.1413522 Also see, Ashley Hutchinson et al., "Roundup® Ready": the first widely used genetically modified crop, the environment and society portal
http://www.environmentandsociety.org/tools/keywords/roundup-ready-first-widely-used-genetically-modified-crop

10A2846

34.     Monsanto dominates and controls the market. Its RoundupReady® seed, which became so dominant in row crop production, and production of many small grains and alfalfa, that farmers across the United States were forced to use Roundup® and RoundupReady® seed. Urban dwellers came to know Roundup® as a synonym for "weed killer". This was true for the Decedent and Mrs. Stockdale.

35.     Monsanto concealed what it knew or should have known about Roundup®. It continues to perpetuate its conscious, deliberate disregard for the truth about Roundup® and harvest huge profits from the product at the expense of innocent users.

36.     Monsanto became so dominant in the marketplace that its product crowded out competitors, and it became virtually impossible in many markets to find or secure herbicides that were compatible with seeds and grasses that were not Monsanto products containing glyphosate marketed under the Roundup® label. The Decedent and many others, faced this circumstance.[12]

37.     Monsanto's biotechnology seeds became dominant worldwide. Roundup® was the odds-on, and virtually ubiquitous herbicide with what, through the company's marketing strategy, became a household term synonymous with weed killer or herbicide. Roundup®, and weed killer, and herbicide, became indistinguishable in the minds of many Americans.   Plaintiff and Decedent were among these victims.

### Monsanto Falsely Promoted Roundup® as
### Safe Despite Contrary Acknowledgements

38.     Monsanto has been taken to task and promised to discontinue its false statements about Roundup® but failed to keep its word, even after being ordered by a U.S. Court to do so.

39.     In 1996, the New York Attorney General ("NYAG") sued Monsanto for false and misleading advertising of Roundup® products. The New York case challenged

---

11. Philip H. Howard, PhD, *Concentration and Power in the Food System: Who Controls What We Eat?* (London, Bloomsbury Academic  Feb 25, 2016); Howard, Philip H., *Intellectual Property and Consolidation in the Seed Industry. Crop Science*, 55(6), 2489-2495 (2015).

13

Monsanto's representations that its spray-on glyphosate-based herbicides, including Roundup®, were:

39.1   "Safer than table salt" and "practically non-toxic" to mammals, birds and fish.

39.2   "Remember that environmentally friendly Roundup® herbicide is biodegradable. It won't build up in the soil so you can use Roundup® with confidence along customers' driveways, sidewalks and fences."

39.3   "And remember that Roundup® is biodegradable and won't build up in the soil. That will give you the environmental confidence you need to use Roundup® everywhere you've got a weed, brush, edging or trimming problem."

39.4   "Roundup® biodegrades into naturally occurring elements."

39.5   "Remember that versatile Roundup® herbicide stays where you put it. That means there's no washing or leaching to harm customers' shrubs or other desirable vegetation."

39.6   "This non-residual herbicide will not wash or leach in the soil. It … stays where you apply it."

39.7   You can apply Roundup® with "confidence because it will stay where you put it," it bonds tightly to soil particles, preventing leaching. Then, soon after application, soil microorganisms biodegrade Roundup® into natural products.

39.8   "Glyphosate is less toxic to rats than table salt following acute oral ingestion."

39.9   "Glyphosate's safety margin is much greater than required. It has over a 1,000-fold safety margin in food and over a 700-fold safety margin for workers who manufacture it or use it."

39.10  "You can feel good about using herbicides by Monsanto. They carry a toxicity category rating of 'practically non-toxic' as it pertains to mammals, birds and fish."

14

39.11 "Roundup® can be used where kids and pets will play and breaks down into natural material." This ad depicts a person with his head in the ground and a pet dog standing in an area that has been treated with Roundup®.

40.     Monsanto either could not, or chose not to, defend these and similar hyperbolic false statements. On November 19, 1996, Monsanto entered into an agreement called an *Assurance of Discontinuance* with the Attorney General of New York.[13] In it, Monsanto agreed, among other things, "to cease and desist from publishing or broadcasting any advertisements [in New York] that represent, directly or by implication" that Monsanto Glyphosate-containing pesticide products or any of them, possessed any of these features, advantages or elements described below.   These are assurances made by Monsanto to the Attorney General: Glyphosate-containing pesticide products or any component thereof of Monsanto:

40.1   Are safe, non- toxic, harmless, or free from risk;

40.2   Are biodegradable;

40.3   Will stay where applied and will not move through the environment;

40.4   Are "good" for the environment or are "known for their environmentally friendly characteristics";

40.5   Are safer or less toxic than consumer products other than herbicides; and,

40.6   Might be classified as "practically non-toxic."

41.     Monsanto double crossed the Attorney General of New York, and the public because it did not alter its advertising in the same manner in any state other than New York and, based on information and belief, still has not done so today. Indeed, Monsanto's bad acts in connection with is crop chemicals business continues with its wrongdoing in ways

---

[13] *In the Matter of Monsanto Company*, Respondent.
Assurance of Discontinuance pursuant to executive law § 63(15) (Attorney General of the State of New York, Consumer Frauds and Protection Bureau. Environmental Protection. November 1996. Available at https://big.assets.huffingtonpost.com/fraud.pdf.

10A2846

that produced criminal convictions and admissions of guilt as late as November 2019 in connection with other products.[14]

42.    Monsanto also double crossed and misled the people of the world. In 2009, France's highest court ruled that Monsanto had not told the truth about the safety of Roundup®. The French court affirmed that Monsanto had falsely advertised its herbicide Roundup® as "biodegradable" and that it "left the soil clean." Around the world, nations, cities, and counties have banned Roundup® and glyphosate herbicides. Countries with bans include Germany, France, Vietnam, Sri Lanka, Colombia, El Salvador, Saudi Arabia, Kuwait, Qatar, Bahrain, Oman, United Arab Emirates, Argentina, and others.  Warnings are also required, or other sales curbs are in place, in multiple U.S. States and by local governments.

43.    Monsanto concealed what it knew of glyphosate and Roundup® from the scientific community and the world for many years. The International Agency for Research of Cancer ("IARC") is the specialized cancer agency of the World Health Organization, and organization of the United Nations.  IARC promotes international collaboration in cancer research, "bringing together skills in epidemiology, laboratory sciences, and

---

[14]  In 2005, Monsanto was convicted on felony bribery-related charges under the U.S. Foreign Corrupt Practices Act, 15 USC §§78dd-1 and 78m(b). On November 21, 2019, the U.S. Department of Justice announced a settlement in which Monsanto agreed to plead guilty to a misdemeanor count of illegally using the pesticide Penncap-M, a methyl parathion product that was cancelled by the U.S. Environmental Protection Agency (EPA) on July 27, 2010. US Dist Ct Hawaii, CR19-00162. This settlement of several criminal counts by Monsanto followed an investigation by the EPA Criminal Investigation Division.  Under the existing stocks provision in the EPA cancellation order, continued use of Penncap-M became unlawful after December 31, 2013.  Monsanto admits that its employees knowingly violated this order by using Penncap-M on July 15, 2014, to treat corn seed research crops at Monsanto's Valley Farm research facility in Maui, Hawaii. Monsanto also admits that its employees directed other employees to re-enter the treated site seven days after the July 15, 2014, application, although the re-entry period established for this pesticide prior to its cancellation was 31 days.  Monsanto further admits that it stored stocks of Penncap-M after December 31, 2013, when unused stocks of this product became an acute hazardous waste under the Resource Conservation and Recovery Act (RCRA), at several locations in Hawaii without obtaining the required permits.  Monsanto agreed to pay a total of $10.2 million in fines and penalties, which includes a maximum fine of $200,000 for illegal use of a cancelled pesticide, $6 million in fines for the hazardous waste violations, and $4 million in community service payments.  Monsanto agreed to be sentenced to two years of probation.  https://www.justice.gov/usao-cdca/pr/monsanto-agrees-plead-guilty-illegally-spraying-banned-pesticide-maui-facility

10A2846

biostatistics to identify the causes of cancer[.]" IARC assesses whether chemicals are carcinogenic through its Monograph issuance program and protocol.

44.     IARC Monographs identify environmental factors that are carcinogenic hazards to humans. These include chemicals, complex mixtures, occupational exposures, physical agents, biological agents, and lifestyle factors. National health agencies can use this information as scientific support for their actions to prevent exposure to potential carcinogens. Interdisciplinary working groups of expert scientists review the published studies and assess the strength of the available evidence that an agent can cause cancer in humans.

45.     The principles, procedures, and scientific criteria that guide the evaluations are described in the Preamble to the IARC Monographs. The preamble is an over forty page expression of one of the most sophisticated scientific processes used in the world to review and evaluate substances for their impact on human health. The procedure requires evaluations to be performed by panels of international experts, selected based on their expertise and the absence of actual or apparent conflicts of interest. The studies considered the various exposure groups, including occupational exposure of farmers and tree nursery workers in the United States, forestry workers in Canada and Finland, municipal weed-control workers in the United Kingdom, and para-occupational exposure in farming families.

46.     In March 2015, IARC reassessed glyphosate. The summary published in The Lancet Oncology journal reported that glyphosate is a Group 2A agent and probably carcinogenic in humans.

47.     The assessment of the IARC Working Group identified several case controlled studies of occupational exposure in the United States, Canada, and Sweden. These studies showed a human health concern from agricultural and other work-related exposure to glyphosate. The IARC Working Group conducted a systematic review of 15 or more studies designed to assess whether there was an association between Roundup® exposure in agricultural workers and non-Hodgkin lymphoma (NHL). The researchers reviewed each study, identified the results, and assessed each study's strengths and

17

10A2846

weaknesses. The IARC Working Group concluded that, despite the limited evidence concerning the carcinogenicity of glyphosate in humans, a "positive association has been observed for non-Hodgkin lymphoma."

48.     On July 29, 2015, IARC issued its Monograph for glyphosate, Monograph 112. It was authored with input of 17 experts from 11 countries who met from March 3– 10, 2015, to assess the carcinogenicity of certain herbicides, including glyphosate. Among the members were Lauren Zeise, Ph.D., of the California Environmental Protection Agency, Matthew T. Martin, Ph.D, a scientist with the U.S. Environmental Protection Agency, and Gloria D. Jahnke, D.V.M., D.A.B.T. of the National Institute of Environmental Health Sciences. Plaintiff did not learn of this information until much later.

49.     After adherence to its established procedures, the IARC Working Group considered "reports that have been published or accepted for publication in the openly available scientific literature" as well as "data from governmental reports that are publicly available."

50.     Glyphosate was the second-most used household herbicide in the United States for weed control between 2001 and 2007 and the most heavily used herbicide in the world in 2012. Exposure pathways are identified as air (especially during spraying), water, and food. Community exposure to glyphosate is widespread and found in soil, air, surface water, and groundwater, as well as in food.

51.     The IARC Working Group found that glyphosate caused DNA and chromosomal damage in human cells. One study in community residents reported increases in blood markers of chromosomal damage (micronuclei) after glyphosate formulations were sprayed. In assessing the genotoxicity of glyphosate (the property of chemical agents that damages the genetic information within a cell causing mutations, which may lead to cancer), the IARC Working Group concluded "[t]here is strong evidence that glyphosate causes genotoxicity."

52.     IARC also assessed whether glyphosate exposure can induce oxidative stress, which is thought to be involved in the development of numerous conditions, including cancer, autism, and Parkinson's disease.  IARC concluded that "strong evidence

18

exists that glyphosate … can induce oxidative stress." This could be an important mechanism by which Roundup® causes cancer.

53.     A  section of the IARC monograph for glyphosate is devoted to exposure to humans; it examines studies of glyphosate exposures in various settings including agricultural ones. The IARC Working Group noted that glyphosate has been detected in urine of agricultural workers, indicating absorption. The IARC Working Group specifically evaluated farm workers in the United States, and found that, within the days following the application of Roundup® to a crop, approximately 60% of farm workers tested positive for glyphosate in the urine. Additionally, the IARC Working Group noted that soil microbes degrade glyphosate to aminomethylphosphoric acid ("AMPA"). Blood AMPA detection after exposure suggests intestinal microbial metabolism in humans.

54.     The IARC reviewed an Agricultural Health Study, consisting of a prospective cohort of 57,311 licensed pesticide applicators in Iowa and North Carolina. It found that results of this study support an association between glyphosate exposure and Multiple Myeloma, Hairy Cell Leukemia ("HCL"), and Chronic Lymphocytic Leukemia ("CLL"), and several other cancers including NHL.

55.     In 2014 and before, scientists published a systematic review and meta-analysis on the relationship between non-Hodgkin lymphoma and occupational exposure to agricultural pesticides, including glyphosate, in the *International Journal of Environmental Research and Public Health.* The study showed a statistically significant association between farm workers exposed to Roundup® and non-Hodgkin lymphoma. The study confirmed two smaller studies from 2002 and 2008, published in the journal Leukemia & Lymphoma (2002) and the International Journal on Cancer (2008).

56.     Recent studies, including a glyphosate residue study published in the *Journal of Environmental & Analytical Toxicology* in 2014, concludes that "chronically ill humans showed significantly higher glyphosate residues in urine than healthy population." Glyphosate has been detected in the blood and urine of agricultural workers, indicating that agricultural use of Roundup® leads to its absorption. Monsanto continues to promote Roundup® as safe even in 2019 and 2020.

19

57.    In 2019 and 2020, Monsanto ran newspaper advertisements, full-page in size, in the *Wall Street Journal* and other widespread magazines, as well as in advertisements and promotions on television, radio, in other media, and multiple languages, across the United States. It did not acknowledge or change its actions after researchers at the University of Washington disclosed, on February 13, 2019, findings and a new study conducted there, including a comprehensive review of existing literature, that exposure to Roundup® increases the risks of certain cancers, including NHL, by more than 40%. The University of Washington studies, entitled *Mutation Research - Fundamental and Molecular Mechanisms of Mutagenesis* (2019)   (ISSN:0027-5107, available at https://www.journals.elsevier.com/mutation-research-fundamental-and-molecular-mechanisms-of-mutagenesis).

58.    Scientific research discloses that carcinogenic properties of Roundup® are magnified by the addition of adjuvants in the Roundup® formulation. Adjuvants are chemicals designed to modify or enhance the effects of other agents. Monsanto includes adjuvants with glyphosate in its Roundup® products; they are designed to increase the effectiveness of the herbicide. But added adjuvants greatly increase carcinogenic properties of Roundup®. Monsanto tested glyphosate without adjuvants. The results are misleading. Monsanto used those tests and results to tout Roundup® as safe to U.S. federal regulators. None of the IARC or other scientific data was known to Plaintiffs or Decedent, or reasonably discoverable by them.

### William G. Stockdale's Health

59.    The Decedent was diagnosed with non-Hodgkin's lymphoma on July 19, 2016.  He was treated intensively into November of 2016, and then enjoyed about six (6) weeks of better health and some stability.  In January, 2017 his disease returned and was diffuse.  It was no longer treatable successfully and it caused the Decedent's death on March 27, 2017.

### Continuing Concealment

20

10A2846

60.     Monsanto effectively concealed the dangers of Roundup® and glyphosate. Many steps were taken by Monsanto to achieve this objective. They include the matters alleged in ¶¶ 25-59 above. In addition, Monsanto disregarded or rejected:

      60.1    Scientific studies drawing a link between Roundup® and glyphosates herbicides in general, and human illness including blood born cancers and NHL.

      60.2    Genotoxicology and toxicology studies establishing the damage caused by Roundup® to human lymphocytes.

      60.3    Epidemiologic studies disclosing the link the between Roundup®, glyphosates and blood born cancers including NHL.

      60.4    Internal scientific data, warnings and revelations from its own personnel which were quashed by Monsanto internally.

Monsanto also improperly used financial and corruptive influences to:

      60.5    Influence practiced on politicians and government officials to paralyze, delay, or wholly prevent government action to protect the public from Roundup® and glyphosate.

      60.6    Conduct campaigns, which continue to present, designed to teach the safety of Roundup® and to deny the scientific evidence linking it to cancers, including NHL, that are lethal to human beings.

      60.7    Assert, despite contrary evidence by objective scientific research not financed by Monsanto, disclosing that glyphosate causes changes in the human body that produce cancers because of cellular level damage to human tissue.

      60.8    Affirmatively finance activities masked as objective scientific studies, despite the lack of objectivity in the studies, in order to produce skewed results, further masquerading as research.  These results were used by Monsanto to promote, teach, and advance use of its products despite the dangers posed by them.

10A2846

61.     Monsanto's conduct induced members of the public, including Decedent, to rely upon its representations about Roundup®. Monsanto is by virtue of the its conduct equitably estopped to assert certain defenses, including a) contributory fault, b) comparative fault, c) alternate causation, d) the statute of limitations, and e) use of its products without wearing protective equipment.  Monsanto's statements inducing reliance and action by users like Decedent were false statements of material fact. They were intended to induce reliance and did so.  These statements were made when Monsanto knew they were false or at a minimum knew that they were highly controverted and that substantial scientific evidence, denied by Monsanto, concluded that a causal connection exists between Roundup® and cancers including NHL.

62.     Plaintiff, Decedent and Mrs. Stockdale did not discover, and did not know of facts that would cause a reasonable person to suspect, the risks associated with the use of and/or exposure to Roundup® and glyphosate, nor would a reasonable and diligent investigation have disclosed that Roundup® and glyphosate would cause Decedent's illnesses. For these reasons, all applicable statutes of limitations have been tolled by operation of the discovery rule and invocation of a statute of limitations is estopped by Monsanto's actions.[15]

63.     Monsanto was under a continuing duty to disclose to consumers, users and other persons encountering its products, including Decedent and Mrs. Stockdale, accurate safety information concerning its products and the risks associated with the use of and/or exposure to Roundup® and glyphosate. Instead, Monsanto knowingly, affirmatively, and actively concealed safety information concerning Roundup® and glyphosate and the risks associated with the use of and/or exposure to its products.

64.     As a proximate result of Monsanto's wrongful acts and omissions in placing its defective Roundup® products into the stream of commerce without adequate warnings of the hazardous and carcinogenic nature of glyphosate, and in breach of its warranties, negligence and strict liability, Decedent endured the anguish of an aggressive blood cancer

---

[15] *Muller v. Thaut*, 430 NW2d 884 (Neb.,1988).

22

diagnosis, pain, suffering and mortal illness, awareness of his impending mortality, and wrongful death.

**Legal Theories**

65.    All allegations above are renewed here.

66.    Plaintiffs' claims are made under the law of the State of Nebraska where Decedent's primary use of Roundup® and injuries occurred.  In the event Nebraska law imposes a duty or obligation on Monsanto in excess of those required by Federal Law, the Plaintiffs do not assert the State law claims.  On the contrary, all claims asserted by Plaintiffs claims are parallel with Federal law and Federal legal duties. Accordingly, Monsanto violations of Nebraska law, so limited, were also violations of Federal law. If Monsanto had honorably complied with the law, there likely would have been no Federal violations.

68.    Plaintiffs do not seek to enforce Federal law.  Instead, they invoke the law of Nebraska, but limit their claims to the scope and extent to which Nebraska law is equal to, but not greater than, Federal law in its imposition of duties on Monsanto. Accordingly, Plaintiffs claim that Monsanto violated 7 USC § 136, including subparts (g) & (j), and Federal regulations including 40 CFR § 156.10 (a) (5) andthgat this violation is evidence of negligence under state law. . Monsanto did so by distributing Roundup® when it was misbranded contrary to legal requirements. The distribution of a misbranded herbicide is a violation of law and is a tort because it violates Nebraska law when considered in parallel with Federal requirements.  These violations are evidence of negligence and support the Plaintiff's claims of strict liability in tort, strict liability for failure to warn, negligence, and breaches of implied warranties and express warranties.

**First Theory: Strict Liability (Design Defect)**

69.    All allegations above are renewed here.

70.    Monsanto is strictly liable in tort to Plaintiffs for defective design of its Roundup® products. A substantial part of the activity undertaken by Monsanto as described in this Complaint occurred in the Nebraska.

23

71.     At relevant times, Monsanto was engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting Roundup® products. These products, including the ones used by Decedent, were defective and unreasonably dangerous to foreseeable users like Decedent. The products were unreasonably dangerous when they were placed by Monsanto into the stream of commerce. Monsanto ultimately controlled and supervised these actions. At all times relevant to this litigation, Monsanto designed, researched, developed, manufactured, produced, tested, assembled, labeled, advertised, promoted, marketed, sold, and distributed the Roundup® products used by Decedent as safe when they were not, as described above.

72.     On the contrary, Monsanto's Roundup® products were manufactured, designed, and labeled in an unsafe, defective, and inherently dangerous manner that was dangerous for use by or exposure to the public, and Decedent and Plaintiffs. These products left Monsanto's immediate control and were placed onto the market and reached intended consumers, handlers, and users contacting with these products in Nebraska and throughout the United States, including Decedent, without substantial change in their condition as designed, manufactured, sold, distributed, labeled, and marketed by Monsanto.

73.     Monsanto's Roundup® products including those to which Decedent was exposed were unreasonably dangerous and dangerous to an extent beyond that which an ordinary consumer would contemplate. The risks and dangers of those products exceeded the benefits allegedly associated with them as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold, and marketed by Monsanto. Exposure to Roundup® and glyphosate-containing products presents a risk of harmful side effects that outweigh any potential utility stemming from the use of the herbicide.

74.     Monsanto knew or had reason to know that its Roundup® products were defective and inherently dangerous and unsafe when used in the manner instructed by Monsanto in one or more of these ways when placed in the stream of commerce:

> 74.1    Monsanto's Roundup® products were defective in design and formulation, and, consequently, dangerous to an extent beyond that which an ordinary consumer would contemplate.

24

10A2846

      74.2   Monsanto's Roundup® products were unreasonably dangerous in that they were hazardous and posed a grave risk of cancer and other serious illnesses when used in a reasonably anticipated manner.

      74.3   Monsanto did not sufficiently test, investigate, or study its Roundup® products and, specifically, the active ingredient glyphosate alone or with surfactants added by Monsanto.

      74.4   Monsanto did not conduct adequate post-marketing surveillance of its Roundup® products.

      74.5   Monsanto could have employed safer alternative designs and formulations but did not do so. Furthermore, safer alternative formulations and safer alternative weed killers were available without glyphosate.

75.    At all times relevant to this litigation, Decedent used and/or was exposed to the use of Monsanto's Roundup® products in an intended or reasonably foreseeable manner, i.e., as a consumer, without knowledge of Roundup®'s dangerous characteristics and without knowledge of Roundup®'s dangerous characteristics.

76.    Monsanto's Roundup® products were and are more dangerous than alternative products and Monsanto could have designed its Roundup® products to make them less dangerous. Indeed, at the time Monsanto designed its Roundup® products, the state of the industry's scientific knowledge was such that a less risky design or formulation was attainable.

77.    At the time Roundup® products left Monsanto's control, there were practical, feasible and safer alternative designs that would have prevented the harm without substantially impairing the reasonably anticipated or intended function of Monsanto's herbicides.

78.    As a result of the unreasonably dangerous condition of its Roundup® products, Monsanto is strictly liable to Plaintiffs. The defects in Monsanto's Roundup® products were substantial and contributing factors in causing Plaintiffs' injuries and, but for Monsanto's misconduct and omissions, Decedent would not have sustained injuries.

25

79.     Monsanto's defective design of its Roundup® products was willful, wanton, fraudulent, malicious, and conducted with reckless disregard for the health and safety of users of the Roundup® products, including Decedent and his spouse.

80.     Monsanto's conduct, as described above, was reckless. Monsanto risked the lives of consumers and users of its products, including Decadent, with knowledge of the safety problems associated with Roundup® and glyphosate-containing products, and suppressed this knowledge from the general public. Monsanto made conscious decisions not to redesign, warn or inform the public. Monsanto's reckless conduct warrants an award of punitive damages.

81.     As a direct and proximate result of Monsanto placing its defective Roundup® products into the stream of commerce, Decedent developed non-Hodgkin's lymphoma and personal injuries. These injuries afflicted the Decedent until his death.

82.     As a proximate result of Monsanto placing its defective Roundup® products into the stream of commerce, as alleged herein, Decedent's loss of earning capacity and property damage.

### Second Theory:  Strict Liability (Failure to Warn)

83.     All allegations above are renewed here.

84.     Plaintiffs contend that Monsanto had a duty to exercise reasonable care to avoid physical harm to Decedent and his spouse by preventing the recognizable and foreseeable harm it would cause by its marketing of its Roundup ® products.[16] They contend that Monsanto sold its Roundup® products in a defective condition unreasonably dangerous to consumers, including them. Plaintiffs contend Monsanto was engaged in the business of selling the product which was expected to and did reach them without substantial change in condition from that in which it was sold, and that it was not misused by Decedent. Plaintiffs' damages are not subject to the economic loss rule.[17]

---

[16] *Stahlecker v. Ford Motor Co.,* 266 Neb 601, 667 NW2d 244 (2003) Restatement (Third) of Torts: Liability for Physical and Emotional Harm § 7 (2010), and Restatement (Second) of Torts § 402A. Also, *Jay v. Moog Automotive, Inc.,* 264 Neb 875, 652 NW2d 872 (2002)(defective design).

[17] See *Lesiak v. Central Valley Ag.,* 283 Neb 103, 808 NW2d 67 (2012).

10A2846

85.     Monsanto is strictly liable in tort for failure to warn of the dangers of its Roundup® products. At all times relevant to this litigation, Monsanto engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting Roundup® products, which are defective and unreasonably dangerous to consumers, including Decedent, because they do not contain adequate warnings or instructions concerning the dangerous characteristics of Roundup® and specifically, the active ingredient glyphosate either alone or with adjuvants and surfactants. These actions were under the ultimate control and supervision of Monsanto. It did so from its headquarters in St. Louis, Missouri.

86.     Defendant Monsanto researched, developed, designed, tested, manufactured, inspected, labeled, distributed, marketed, promoted, sold, and otherwise released into the stream of commerce its Roundup® products. While doing so, Monsanto advertised or marketed Roundup® to consumers including Decedent, and Monsanto had, but failed to discharge, a duty to warn Decedent and the public of risks associated with use of Roundup®.

87.     Monsanto had a duty to reasonably test, develop, design, manufacture, inspect, package, label, market, promote, sell, distribute, maintain, supply, provide proper warnings, and take such steps as necessary to ensure its Roundup® products did not cause users and consumers to suffer from unreasonable and dangerous risks. Monsanto had a continuing duty to warn Decedent of dangers associated with Roundup® use and exposure. Monsanto, as manufacturer, seller, or distributor of chemical herbicides is held to the knowledge of an expert in the field.

88.     At the time of manufacture, Monsanto could have provided the warnings or instructions regarding the full and complete risks of Roundup® and glyphosate-containing products because it knew or should have known of the unreasonable risks of harm associated with the use of and/or exposure to such products.

89.     Monsanto failed to investigate, study, test, or promote the safety or to minimize the dangers to users and consumers of its product and to those who would

27

foreseeably use or be harmed by Monsanto's herbicides, including Decedent and his spouse.

90.     Despite knowing or having a duty to know, that Roundup® posed a grave risk of harm, Monsanto failed to exercise reasonable care to warn of the dangerous risks associated with use and exposure. Monsanto failed to adequately warn consumers, i.e., the reasonably foreseeable users, of the risks of exposure to its products. Monsanto wrongfully concealed information concerning the dangerous nature of Roundup® and glyphosate, and further made false and/or misleading statements concerning the safety of Roundup® and glyphosate.

91.     At all times relevant to this litigation, Monsanto's Roundup® reached the intended consumers, handlers, and users or other persons coming into contact with these products, including Decedent, without substantial change in their condition as designed, manufactured, sold, distributed, labeled, and marketed by Monsanto.

92.     Decedent could not have reasonably discovered the defects and risks associated with Roundup® or glyphosate-containing products prior to and at the times of exposure. Decedent relied upon the skill, superior knowledge, and judgment of Monsanto to know about and disclose serious health risks associated with using the products.

93.     Monsanto knew or should have known that the minimal cautions disseminated with its Roundup® products were inadequate, failed to communicate adequate information on the dangers and safe use/exposure, and failed to communicate warnings and instructions that were appropriate and adequate to render the products safe for their ordinary, intended and reasonably foreseeable uses, including agricultural and horticultural applications.

94.     The information Monsanto did impart failed to contain relevant warnings, hazards, and precautions that would have enabled consumers such as Decedent to utilize the products safely and with adequate protection. Instead, Monsanto disseminated information that was inaccurate, false, and misleading. This misleading information and denial of the danger of glyphosate has been ongoing and unremitting conduct of Monsanto to the present day.

10A2846

95. This alleged failure to warn is not limited to the information contained on Roundup®'s labeling. Monsanto was able, in accord with federal law, to comply with Nebraska law by disclosing the known risks associated with Roundup® through other non-labeling mediums, i.e., promotion, advertisements, public service announcements, and/or public information sources. Monsanto, however, deliberately did not do so.

96. Monsanto is liable to the Plaintiffs for injuries caused by its negligent or willful failure, as described above, to provide adequate warning as alleged. As a direct and proximate result of Monsanto placing its defective Roundup® products into the stream of commerce, Decedent developed non-Hodgkin's Lymphoma and sustained a loss of income, loss of earning capacity and property damage, as well as non-economic damages. As a further proximate result of Monsanto 's actions, from diagnosis until death Decedent suffered great mental anguish, fear of death, anxiety for his family, physical and emotional pain and suffering, hospitalization, debilitation, and disability. Decedent's spouse suffered from anxiety, depression, stress and mental anguish regarding her husband's declining health and fear of his mortality until death occurred. The amount of special damages are under investigation but medical care costs and funeral and burial expenses are in excess of $100,000 collectively.

### Third Theory:  Negligence

97. All allegations above are renewed here.

98. Monsanto owed a duty of reasonable care to all foreseeable users, including the Plaintiff and Decedent, but it breached that duty is alleged below. The breach proximately caused damages to the Decedent and his spouse.[18]

99. Monsanto, directly or indirectly, caused Roundup® products to be sold, distributed, packaged, labeled, marketed, promoted, and/or used by Decedent.

100. Monsanto owed to Decedent and his spouse and the public the duties that follows:

---

[18] *Deviney v. UPRR*, 280 Neb 450, 786 NW2d 902 (2010).

10A2846

100.1 To exercise reasonable care in the design, research, manufacture, marketing, advertisement, supply, promotion, packaging, sale, and distribution of its Roundup® products. This included the duty to take all reasonable steps necessary to manufacture, promote, and/or sell a product that was not unreasonably dangerous to consumers and users of the product.

100.2 To exercise reasonable care in the marketing, advertisement, and sale of the Roundup® products. Monsanto's duty of care owed to consumers and the general public. This included the duty to provide accurate, true, and correct information concerning the risks of using Roundup® and appropriate, complete, and accurate warnings concerning the potential adverse effects of exposure to Roundup®. Monsanto knew or, in the exercise of reasonable care, should have known of the hazards and dangers of Roundup® and specifically, the carcinogenic properties of the chemical glyphosate and its Roundup® products.

100.3 To warn of the risks.

100.4 To withhold the product from the market.

100.5 To inform Decedent and his spouse of known risks.

100.6 To exercise reasonable care in the marketing and representation of Roundup® to the public.

100.7 To refrain from falsifying, withholding, or manipulating unfavorable research data, or feigning the favorable research data.

100.8 To label its product with complete disclosures of risks.

101. Monsanto breached each and all its duties as alleged above. It was negligent in that:

101.1 It negligently designed and formulated its Roundup® products.

101.2 It negligently tested its Roundup® products and negligently failed to continue to test them.

30

10A2846

101.3  It negligently mixed and batched its Roundup® products.

101.4  It negligently submitted and withheld information about its Roundup® products for governmental regulatory purposes.

101.5  It negligently failed to supplement its governmental submissions with new information about the dangers of Glyphosate and its Roundup® products.

101.6  It negligently manufactured its Roundup® products.

101.7  It negligently labeled its Roundup® products.

101.8  It negligently marketed its Roundup® products.

101.9  It negligently packaged its Roundup® products.

101.10 It negligently advertised and commercialized its Roundup® products.

101.11 It negligently distributed its Roundup® products and placed them in commerce.

101.12 It continued to wrongly advertise and commercialize Roundup® after agreeing with the New York Attorney General not to do so.

101.13 It negligently failed to disclose the truth about the risks associated with Roundup® in its promotional efforts, outside of the context of labeling.

101.14 It negligently disregarded scientific, medical, and epidemiological studies and findings about the dangers of Roundup®.

101.15 It negligently caused or permitted its advertising inaccuracies to continue even after it knew exposure to the products created a significant risk of harm and unreasonably dangerous side effects, and it failed to prevent or adequately warn these risks and injuries.

101.16 It negligently packaged its Roundup® products.

101.17 It negligently failed to provide adequate instructions, guidelines, and safety precautions to reasonable users including the Decedent and his spouse.

31

101.18 It negligently failed to inform Decedent and his spouse and the public of safer alternatives though it knew they existed.

101.19 It negligently failed to disclose that its Roundup® products are probably carcinogens and do cause NHL in a population of foreseeable users including Decedent and his spouse.

101.20 It negligently withheld information necessary to permit an informed user with an option to use something else to make an informed selection.

101.21 It negligently failed to comply with safe practices and standards, including federal regulations governing the design and formulation, testing, continuing testing, disclosure, approval procurement, labeling, advertising, promotion, and distribution of its product and thereby failed to inform both government regulators and foreseeable users, including Decedent and his spouse.

102.   These negligent acts and omissions occurred when and after Monsanto, knew or had reason to know of the defects inherent in its products, and knew or had reason to know that a user's or consumer's exposure to the products created a significant risk of harm and unreasonably dangerous side effects, and failed to prevent or adequately warn of these risks and injuries.

103.   Monsanto knew and/or should have known that it was foreseeable consumers such as and including Decedent would suffer injuries as a result of Monsanto's failure to exercise ordinary care in the manufacturing, marketing, labeling, distribution, and sale of Roundup®.

104.   Monsanto's conduct was negligent. But it was also reckless. Monsanto has made conscious decisions not to redesign, re-label, warn, or inform the unsuspecting public, including Decedent and his spouse. Monsanto's reckless conduct therefore warrants an award of punitive damages.

105.   As a proximate result of Monsanto's negligence, Decedent sustained temporary and permanent lost income, personal injuries, illness, medical and rehabilitation

32

care, and emotional distress. He also suffered permanent loss of his ability to enjoy life with confidence of good health, and a permanently impaired body, and wrongful death. Monsanto's negligence was a proximate cause of the Decedent's injuries and death, i.e., absent Monsanto's negligence, Decedent would not have developed cancer.

### Fourth Theory: Implied Warranty

106. All allegations above are renewed here.

107. Monsanto engaged in the business of testing developing, designing, manufacturing, marketing, selling, distributing, and promoting its Roundup® products, which are defective and unreasonably dangerous to consumers, including Decedent and his spouse, thereby placing Roundup® products into the stream of commerce. These actions were under the ultimate control and supervision of Monsanto. Monsanto impliedly warranted each product to be of merchantable quality, safe, and fit for this use, even though Roundup® was not adequately tested or researched.

108. Before Decedent was exposed to the Roundup® products, Monsanto impliedly warranted to its consumers—including Decedent and Plaintiffs —that its Roundup® products were of merchantable quality and safe and fit for the use for which they were intended; specifically, as agricultural herbicides to kill weeds without harm to humans.

109. Monsanto failed to disclose that Roundup® has dangerous propensities when used as intended and that use of and/or exposure to Roundup® and glyphosate-containing products carries an increased risk of developing severe injuries and death, including's cancer. Decedent and his spouse were the intended beneficiary of the implied warranties made by Monsanto to the purchasers of its herbicides as a foreseeable human user. Decedent used the Roundup® products as intended and without alteration.

110. Decedent used the Roundup® product as Monsanto intended that its Roundup® products. In reliance upon Monsanto's implied warranty, Decedent used Roundup® as instructed and labeled and in the foreseeable manner intended, recommended, promoted, and marketed by Monsanto.

33

111.    Decedent and his spouse could not have reasonably discovered or known of the risks of serious injury and death associated with Roundup® or glyphosate. Monsanto concealed it.

112.    Monsanto breached its implied warranties to the Decedent and his spouse in that its Roundup® products were not of merchantable quality, safe, or fit for their intended use, or adequately tested. Roundup® has dangerous propensities when used as intended and can cause serious injuries, including those injuries complained of herein.

113.    The harm caused by Monsanto's Roundup® products far outweighed their benefit, rendering the products more dangerous than an ordinary consumer or user would expect and more dangerous than alternative products.

114.    As a direct and proximate result of Monsanto's breach of implied warranty, the Decedent sustain personal injuries, loss of earning capacity and property damage, and death.[19]

### Fifth Theory: Breach of Express Warranties

115.    All allegations above are renewed here.

116.    Decedent was exposed to and used Roundup® products. Plaintiffs contend Monsanto is liable for breach of express warranties. They assert this position because Monsanto made  affirmative representations and warranties about its Roundup® products which were material parts the basis of the bargain whereby Decedent purchased and used Roundup® products.[20] These affirmative representations effectively promised a specific result, i.e., that Roundup® products could be used by Decedent without personal injury, illness, or cancer caused or induced by the products; Monsanto represented that the products were safe, but knew or should have known, they were not. Decedent was a person whom Monsanto might reasonably expect to use, consume, and be affected by the Roundup® products.[21]

---

[19] Proof of negligence establishes breach of implied warranty. *Adams v. American Cyanamid Co.*, 1 Neb. App. 337, 498 N.W.2d 577 (1992). *El Fredo Pizza, Inc. v. Roto-Flex Oven Co*, 199 Neb 697, 261 NW2d 358 (1978); *Christensen v. Eastern Nebraska Equip Co.*, 199 Neb 741, 261 NW2d 367 (1978).

[20] Neb UCC  § 2-313(a) and (b).

[21] Neb UCC  § 2-318.

10A2846

117.    Monsanto has special knowledge, skill, and expertise germane to herbicides and their design, manufacture testing, and marketing. At all times relevant, Monsanto engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting its Roundup® products, which are defective and unreasonably dangerous to consumers, including Decedent and his spouse, thereby placing Roundup® products into the stream of commerce. These actions were under the ultimate control and supervision of Monsanto.

118.    Monsanto expressly represented and warranted matters to Decedent and his spouse and other consumers and users, and through statements made by Monsanto in labels, publications, package inserts, and other written materials that its Roundup® products were:

> 118.1 Safe to human health and the environment.

> 118.2 Effective, fit, and proper for their intended use and posed no risks of harm to humans.

> 118.3 Did not cause unreasonably dangerous side effects.

> 118.4 Is a product of Monsanto's "safety is a top priority for us" approach to its chemicals business.

> 118.5 Is safe enough to drink.

> 118.6 Monsanto Roundup® spray-on glyphosate-based herbicides, were "safer than table salt" and "practically non-toxic" to mammals, birds, and fish despite its agreement with the New York Attorney General to the contrary.

> 118.7 Roundup®'s glyphosate is good for the environment.

119.    These representations about Roundup® were affirmations of fact or promises made by Monsanto to the public including Decedent and his spouse. The representations related to the goods and became part of the basis of the bargain, creating an express warranty that the goods would conform to the representations. Monsanto placed its Roundup® products into the stream of commerce for sale and recommended use without adequately warning of the true risks of developing the injuries associated with the use of and exposure to Roundup® and its active ingredient glyphosate.

35

10A2846

120.   Monsanto breached these warranties because its affirmations were not true. Its Roundup® products were defective, dangerous, unfit for use, did not contain labels representing the true and adequate nature of the risks associated with their use, and were not merchantable or safe for their intended, ordinary, and foreseeable use and purpose.

121.   Decedent justifiably and detrimentally relied on the express warranties and representations of Monsanto in the purchase and use of its Roundup® products. When Decedent decided to purchase Roundup®, he reasonably relied upon Monsanto to disclose known risks, dangers, and effects of Roundup® and glyphosate. He did not know the representations were false.

122.   As a direct and proximate result of Monsanto's breach of implied warranties, Decedent sustained personal injuries and illness, loss of income, loss of earning capacity and financial losses and their consequences.

### First Claim: Decedent's Pre-Morbidity Personal Injuries; Economic and Non-Economic Damages

123.   All allegations above are renewed and all theories above are invoked here.

124.   As a direct, proximate result of the acts and omissions of Monsanto, Decedent contracted non-Hodgkin's lymphoma underwent extensive care, including life-altering and debilitating chemical and other therapies, and total partial impairment of his body during his lifetime.

125.   Decedent's noneconomic damages include emotional and physical pain and anguish; cancer treatment pain; anxiety, depression, uncertainty and fear associated with cancer diagnoses, treatment and uncertain outcomes; nausea and illness associated with medical care for his condition; sleep disruption; loss of self-confidence and change of personality; emotional distress; loss of ability to engage in the activities of daily living including the daily joys of life. Decedent's life was shortened.  All these damages were sustained between the time of Decedent's diagnosis and his death.

126.   Plaintiffs seek general and special damages for Decedent's pain, suffering and general and special damages during Decedent's lifetime. The PR seeks these damages in her capacity as PR for the estate.

## Second Claim:  Wrongful Death

127.   All allegations above are renewed and all theories above are invoked here.

128.   Decedent was wrongfully killed by Defendant's Roundup® because it was a substantial contributing factor that caused his fatal non-Hodgkin's lymphoma and wrongful death. As alleged in ¶¶ 3,11, 15,18, 38-44 and 61-65 above, Monsanto concealed the truth about Roundup® and its causal connection to cancer. Decedent read and relied on Monsanto's false claims and did so reasonably. Monsanto is estopped to assert the statute of limitations in defense of the wrongful death claim.[22]

129.   Plaintiffs seek general damages for Decedent's next of kin. The PR also seeks judgment for Decedent's necessary funeral, burial, estate, and estate administration expenses and all other expenses associated with his death.  The PR affirmatively asserts that the wrongful conduct of Monsanto and the connection between non-Hodgkin's Lymphoma and Roundup® herbicide was concealed and was not reasonably discoverable by Decedent or Plaintiffs until weeks before  this Complaint's filing. The claim could not be discovered in sufficient time to bring this action for wrongful death during the two (2) years following the Decedent's death, because Monsanto asserted that its product was safe and concealed the scientific evidence about Roundup®;  it continues to try to do so.

## Third Claim: Mrs. Stockdale's
## Loss of Spousal Support & Services

130.   All allegations above are renewed and all theories above are invoked here.

131.   Plaintiff, Marilyn Stockdale, is the spouse of Decedent.  She relied upon her spouse for care and comfort before his injury and death but was deprived of spousal support and services.  This is because Monsanto caused Decedent to suffer personal injury and eventual death.[23]

---

[22] *Muller v. Thaut*, 430 NW2d 884 (Neb.,1988), fn 15, above.

[23] "We have defined consortium to mean comfort, society, love, and protection. *[Citations omitted.]* We have long held that a husband may recover for the loss of his nonfatally injured wife's consortium, *Omaha & R. V. R. Co. v. Chollette*, 41 Neb. 578, 59 N.W. 921 (1894), and permit a wife to recover for the loss of her nonfatally injured husband's consortium, *Anson v. Fletcher*, 192 Neb. 317, 220 N.W.2d 371 (1974)." *Guenther by Guenther v. Stollberg*, 242 Neb. 415, 416, 495 N.W.2d 286, 286 (1993).

37

10A2846

132. As a direct, proximate result of the acts and omissions of Monsanto, Mrs. Stockdale suffered the loss of her spouse's care, comfort, guidance, companionship, advice, support, services, love and affection.

133. Mrs. Stockdale seeks general damages for the noneconomic losses and associated losses caused by her spouse's unavailability in good health including all elements of that loss prior to Decedent's death.

### Exemplary and Punitive Damages

134. All allegations above are renewed here. Plaintiffs are aware that Nebraska law permits the recovery of punitive damages in wrongful death cases but does not do so in personal injury cases.[24] However, Monsanto's willful, wanton, reckless, and malicious conduct in pursuit of profit at the expense of human safety and well-being of foreseeable users of its Roundup® products was caused, effectuated, or directed from Missouri.

135. Plaintiffs contend that Missouri law governs the punitive damages aspect of their case. The most significant contacts between Monsanto's products and Decedent occurred in Nebraska making Nebraska law the governing law on compensatory claims. But the reprehensible conduct justifying punitive damages occurred in Missouri and may be policed and prevented only by judicial proceedings against Monsanto inflicting punishment for its wrongdoing in Missouri. Missouri's contact with an interest in this subject is governing. Plaintiffs seek punitive damages against Monsanto under Missouri law for this reason.

136. In addition, and in the alternative in the event the Court concludes that Missouri law does not govern the punitive damages aspects of this case, Plaintiffs seek punitive damages under the law of Nebraska and request that the punitive damages recovery, subject to payment of proportionate fees and expenses, be awarded to the common school fund the State of Nebraska.

---

[24] Neb Const Art VII, Sec 5. *Abel v. Conover*, 170 Neb. 926, 939–40, 104 N.W.2d 684, 693 (1960); *School District of City of Omaha v. Adams*, 147 Neb. 1060, 26 N.W.2d 24, 27 (1947); *Graham v. Kibble*, 9 Neb. 182, 2 N.W. 455 (1879).

38

10A2846

## Requests For Relief

137.   On the foregoing basis, Plaintiffs request judgment in their favor on their First, Second and Third claims, and all their theories of recovery, for actual and compensatory damages, including economic and noneconomic or general and special damages, wrongful death damages, costs, prejudgment interest to the extent permitted by law, and attorney's fees to the extent permitted by law.

138.   Plaintiffs also seek  punitive damages under Missouri law and Nebraska law because the conduct of Monsanto's acts, omissions, and display of the requisite contempt for public health, self-serving greed motivation, and malice, and judgment for costs.

## Jury Demand & Trial Designation

139.   Plaintiffs demand trial by jury.

140.   In the event this case is not tried in District Court, Douglas County, Nebraska or in the State Court of Nebraska and is removed to Federal Court, then Plaintiffs demand trial by jury at Omaha, Nebraska.  In the event this case is transferred from State Court to District Court, the Court is alerted that this case is associated with those consolidated by MDL2741 in the federal judicial system.

Kara Stockdale, Personal Representative of Estate of William G. Stockdale, Deceased, and Marilyn Kay Stockdale, Individually, Plaintiffs,

By: /s/ *David A. Domina*
David A. Domina 11043NE
Domina Law Group pc llo
2425 South 144th St. Omaha NE 68144-3267
402 493 4100
ddomina@dominalaw.com

Plaintiffs' Lawyers

39

10A2846