# U.S. District Court
## Middle District of Florida (Tampa)
### CIVIL DOCKET FOR CASE #: 8:20-cv-01973-TPB-CPT

Johnson v. Bayer Corporation
Assigned to: Judge Thomas P. Barber
Referred to: Magistrate Judge Christopher P. Tuite
Case in other court: Polk County, 2020CA-002303-0000-00
Cause: 28:1446 Notice of Removal-Personal Injury

Date Filed: 08/24/2020
Jury Demand: Both
Nature of Suit: 365 Personal Inj. Prod. Liability
Jurisdiction: Diversity

**Plaintiff**

**Walter Johnson**

represented by **William Lee Clark**
Knopf Bigger
511 W Bay St Ste 450
Tampa, FL 33606-2770
813-609-2993
Fax: 813-864-6777
Email: attorneyclark6619@gmail.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Shane A. Newlands**
Paul Knopf Bigger
511 W Bay St Ste 450
Tampa, FL 33606-2770
813-609-2993
Fax: 813-864-6777
Email: shane@newlandsclark.com
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Bayer Corporation**
*a foreign corporation, individually and successor by merger to Monsanto Company*

represented by **Melissa Raspall Alvarez**
McDermott, Will & Emery, LLP
Suite 4500
333 SE 2nd Ave
Miami, FL 33131
305/347-6551
Email: malvarez@mwe.com
*ATTORNEY TO BE NOTICED*

**Anthony Nolan Upshaw**
McDermott, Will & Emery, LLP
Suite 4500
333 SE 2nd Ave
Miami, FL 33131
305/358-3500
Fax: 305/347-6500
Email: aupshaw@mwe.com
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 08/24/2020 | 1 | COMPLAINT and NOTICE OF REMOVAL from Polk County Circuit Court, case number 2020CA-002303-0000-00 filed in State Court on 7/22/2020. Filing fee $ 400, receipt number 113A-17219501 filed by Bayer Corporation. (Attachments: # 1 State Court COMPLAINT Exhibit 1, # 2 State Court Other Documents Exhibit 2, # 3 State Court Docket Sheet, # 4 Civil Cover Sheet, # 5 Bayer's Corporate Disclosure)(Upshaw, Anthony) (Entered: 08/24/2020) |
| 08/24/2020 | 2 | ANSWER and affirmative defenses to Complaint with Jury Demand by Bayer Corporation. (Upshaw, Anthony) (Entered: 08/24/2020) |
| 08/25/2020 | 3 | NEW CASE ASSIGNED to Judge Thomas P. Barber and Magistrate Judge Christopher P. Tuite. New case number: 8:20-cv-1973-T-60CPT. (SJB) (Entered: 08/25/2020) |

| PACER Service Center | | |
|---|---|---|
| **Transaction Receipt** | | |
| 08/25/2020 16:25:43 | | |
| **PACER Login:** | hllp1982:2634105:4722683 | **Client Code:** | 1417.0049 |
| **Description:** | Docket Report | **Search Criteria:** | 8:20-cv-01973-TPB-CPT |
| **Billable Pages:** | 2 | **Cost:** | 0.20 |

Filing # 110653696 E-Filed 07/22/2020 05:35:31 PM

IN THE CIRCUIT COURT OF THE TENTH JUDICIAL CIRCUIT
IN AND FOR POLK COUNTY, FLORIDA
CIVIL DIVISION

WALTER JOHNSON,

Plaintiff,

v.

BAYER CORPORATION, a foreign
corporation, individually and successor
by merger to Monsanto Company,

Defendant.

Case No. _____

_____/

## COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

Plaintiff, WALTER JOHNSON ("Plaintiff") sues Defendant, BAYER
CORPORATION ("Bayer"), and alleges as follows:

1.     This case arises out of Defendant's wrongful conduct in connection with the
design, development, manufacture, testing, packaging, promoting, marketing, advertising,
distribution, labeling, and sale of the herbicide Roundup, containing the active ingredient
glyphosate. Glyphosate has been found to be carcinogenic, linked to causing various forms of
cancer, in particular Non-Hodgkin's Lymphoma ("NHL"). As such, and at all material times
hereto, as described herein below, Roundup is and was dangerous to human health and unfit to
be marketed and sold in commerce, particularly without proper warnings and directions as to
the dangers associated with its use. Plaintiff, WALTER JOHNSON, who used Roundup

extensively and now suffers from Non-Hodgkin's Lymphoma, brings this action for the harm he has incurred.

## JURISDICTION AND VENUE

2.  As to the claims asserted by Plaintiff, this is an action for personal injuries.

3.  At all times relevant to this action, Plaintiff was a citizen and resident of the State of Florida.

4.  This is an action for damages in excess of Thirty Thousand Dollars ($30,000.00) exclusive of interest, costs, and attorneys' fees.

5.  Bayer is an Indiana corporation, with its principal place of business in St. Louis, Missouri.

6.  In June 2018 Bayer acquired Monsanto Company and assumed all liabilities related to Roundup and glyphosate.

7.  As a result of the acquisition, Bayer is responsible for the harm caused by Roundup.

8.  At all times relevant to this action, Defendant either was in the business of designing, researching, manufacturing, testing, advertising, promoting, marketing, selling, and distributing the commercial herbicide Roundup; or acquired the company responsible for the same and is thereby responsible for the design, research, manufacture, testing, advertising, promotion, marketing, sale, and distribution of Roundup throughout the State of Florida including Polk County.

9.  Bayer, individually and as successor by merger to Monsanto, conducts business in the State of Florida, including Polk County, and did so at all times relevant to this action.

10.    Venue is proper in Polk County because the cause of action accrued in Polk County and/or the Defendants have agents in Polk County.

## GENERAL ALLEGATIONS

11.    Monsanto is a multinational agricultural biotechnology corporation and operated as a biotechnology company for roughly a century.

12.    In the 1970's, Monsanto discovered the herbicidal properties of glyphosate and was the manufacturer of Roundup, which contains the active ingredient glyphosate and the surfactant POEA, as well as adjuvants and other "inert" ingredients.

13.    After discovering the herbicidal properties of glyphosate during the 1970's, Monsanto began to design, research, manufacture, sell, and distribute glyphosate-based "Roundup" as a broad-spectrum herbicide.

14.    Monsanto is the world's leading producer of glyphosate.

15.    "Roundup" or "Roundup products" refers to all formulations of Monsanto's Roundup products, including, but not limited to, Roundup Concentrate Poison Ivy and Tough Brush Killer 1, Roundup Custom Herbicide, Roundup D-Pak herbicide, Roundup Dry Concentrate, Roundup Export Herbicide, Roundup Fence & Hard Edger 1, Roundup Garden Foam Weed & Grass Killer, Roundup Grass and Weed Killer, Roundup Herbicide, Roundup Original 2k herbicide, Roundup Original II Herbicide, Roundup Pro Concentrate, Roundup Prodry Herbicide, Roundup Promax, Roundup Quik Stik Grass and Weed Killer, Roundup Quikpro Herbicide, Roundup Rainfast Concentrate Weed & Grass Killer, Roundup Rainfast Super Concentrate Weed & Grass Killer, Roundup Ready-to-Use Extended Control Weed & Grass Killer 1 Plus Weed Preventer, Roundup Ready- to-Use Weed & Grass Killer, Roundup

Ready-to-Use Weed and Grass Killer 2, Roundup Ultra Dry, Roundup Ultra Herbicide, Roundup Ultramax, Roundup VM Herbicide, Roundup Weed & Grass Killer Concentrate, Roundup Weed & Grass Killer Concentrate Plus, Roundup Weed & Grass killer Ready-to-Use Plus, Roundup Weed & Grass Killer Super Concentrate, Roundup Weed & Grass Killer1 Ready-to-Use, Roundup WSD Water Soluble Dry Herbicide Deploy Dry Herbicide, or any other formulation containing the active ingredient glyphosate.

16.     Glyphosate is the active ingredient in Roundup.

17.     Glyphosate is a broad-spectrum herbicide used to kill weeds and grasses known to compete with commercial crops grown around the globe.

18.     Glyphosate is a "non-selective" herbicide, meaning it kills indiscriminately based only on whether a given organism produces a specific enzyme, 5-enolpyruvylshikimic acid-3-phosphate synthase, known as EPSP synthase.

19.     Glyphosate inhibits the enzyme 5-enolpyruvylshikimic acid-3-phosphate synthase that interferes with the shikimic pathway in plants, resulting in the accumulation of shikimic acid in plant tissue and ultimately plant death.

20.     Sprayed as a liquid, plants absorb glyphosate directly through their leaves, stems, and roots, and detectable quantities accumulate in the plant tissues.

21.     Each year, approximately 250 million pounds of glyphosate are sprayed on crops, commercial nurseries, suburban lawns, parks, and golf courses. This increase in use has been driven largely by the proliferation of genetically engineered crops that are specifically tailored to resist the activity of glyphosate, which are commonly known as "Roundup Ready" crops.

22.     Defendant is responsible for the development, manufacture, marketing, sale, and distribution of Roundup Ready seeds. By 2009, Monsanto was the world's leading producer of Roundup Ready seeds. In 2010, roughly 70% of corn and cotton and 90% of soybean fields in the United States were grown with Roundup Ready seeds.

23.     Roundup was introduced in 1974 and has become one of the world's most widely used herbicides. Defendants' glyphosate products are registered in more than 130 countries and are approved for weed control in more than 100 crops.

24.     For over 45 years, consumers, farmers, the public, and in particular, Plaintiff, have used Roundup unaware of its carcinogenic properties.

### Registration of Herbicides Under Federal Law

25.     The manufacture, formulation, and distribution of herbicides, such as Roundup, are regulated under the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA"), 7 U.S.C. § 136 *et seq*. FIFRA requires that all pesticides be registered with the Environmental Protection Agency ("EPA") prior to their distribution, sale, or use, except as described by FIFRA 7 U.S.C. § 136a(a).

26.     The EPA requires as part of the registration process, among other requirements, a variety of tests to evaluate the potential for exposure to pesticides, toxicity to people and other potential non-target organisms, and other adverse effects on the environment. Registration by the EPA, however, is not an assurance or finding of safety. The determination the EPA makes in registering or re-registering a product is not that the product is "safe," but rather that use of the product in accordance with its label directions "will not generally cause unreasonable adverse effects on the environment." 7 U.S.C. § 136(a)(c)(5)(D).

27.     FIFRA defines "unreasonable adverse effects on the environment" to mean "any unreasonable risk to man or the environment; taking into account the economic, social and environmental costs and benefits of the use of any pesticide." 7 U.S.C. § 136(bb). FIFRA thus requires the EPA to make a risk/benefit analysis in determining whether a registration should be granted or allowed to continue to be sold in commerce.

28.     The EPA and the State of Florida registered Roundup for distribution, sale, and manufacture in the United States and the State of Florida.

29.     FIFRA generally requires that the registrant, here Monsanto, conduct health and safety testing of pesticide products. The government is not required, nor is it able, to perform the product tests that are required of the manufacturer.

30.     Each pesticide product distributed, sold, or manufactured is evaluated at the time the product is initially registered. The data necessary for registration of a pesticide has changed over time. The EPA is now in the process of re-evaluating all pesticides through a Congressionally mandated program called "re-registration." 7 U.S.C. § 136a-1. To re-evaluate these pesticides, the EPA demands the completion of additional tests and the submission of data for the EPA's review and evaluation.

31.     The EPA had planned to release its preliminary risk assessment of glyphosate and Roundup—in relation to the registration process—no later than July 2015. The EPA completed its review of glyphosate in early 2015 but delayed releasing the assessment pending further review in light of the World Health Organization's March 24, 2015, finding that glyphosate is a "probable carcinogen," as demonstrated by the mechanistic evidence of carcinogenicity in humans and sufficient evidence of carcinogenicity in animals.

## Monsanto's Knowledge of Roundup's Toxicity and Carcinogenic Properties

32.     As early as 1991, research readily available to Monsanto, but not readily available to the general public including Plaintiff, demonstrated that glyphosate formulations, like those used in Roundup, are significantly more toxic than glyphosate alone.

33.     As early as 1997, research readily available to Monsanto, but not readily available to the general public including Plaintiff, demonstrated that glyphosate is a genotoxic chemical, meaning one that is capable of damaging DNA within cells through genetic mutation, a process which is believed to be linked to cancer.

34.     As early as 2002, research readily available to Monsanto, but not readily available to the general public including Plaintiff, confirmed that glyphosate formulations used in Roundup cause harmful effects on cell cycle regulation that are more severe than those caused by glyphosate alone.

35.     Cell cycle dysregulation, such as that caused by glyphosate formulations in Roundup, is a hallmark of tumor cells and cancers, including NHL.

36.     As early as 2003, research studies readily available to Monsanto, but not readily available to the general public including Plaintiff, showed a statistically significant relationship between glyphosate exposure and the development of NHL.

37.     Monsanto knew or should have known that Roundup is more toxic than glyphosate alone and that safety studies on Roundup, Roundup's adjuvants and "inert" ingredients, and/or the surfactant POEA were necessary to protect Plaintiff from the harmful and carcinogenic properties of Roundup that Monsanto knew but the general public including Plaintiff was unaware.

38.    Monsanto knew or should have known that tests limited to Roundup's active ingredient glyphosate were insufficient to prove the safety of Roundup.

39.    Monsanto failed to appropriately and adequately test Roundup, Roundup's adjuvants and "inert" ingredients, and/or the surfactant POEA to protect Plaintiff from the harmful and carcinogenic properties of Roundup that Monsanto knew but the general public including Plaintiff was unaware.

40.    Rather than performing appropriate tests, Monsanto relied on flawed, industry-supported studies designed to protect Monsanto's economic interests rather than Plaintiff and the consuming public.

41.    Despite its internal knowledge that Roundup was considerably more dangerous than glyphosate alone, Monsanto continued to promote Roundup as safe and sell Roundup to unsuspecting consumers, including Plaintiff.

42.    Numerous human and animal studies have proved the carcinogenicity of glyphosate and/or Roundup, and despite the fact that Defendants have known of this association since the early to mid-1980s, Defendants have denied, and continue to deny to this day, that glyphosate and Roundup are harmful to human health.

### Monsanto's False Representations Regarding Roundup's Safety

43.    In 1996, the New York Attorney General ("NYAG") filed a lawsuit against Monsanto based on its false and misleading advertising of Roundup products. Specifically, the lawsuit challenged Monsanto's general representations that its spray-on glyphosate-based herbicides, including Roundup, were "safer than table salt" and "practically non-toxic" to

mammals, birds, and fish. Among the representations the NYAG found deceptive and misleading about the human and environmental safety of Roundup are the following:

> a) Remember that environmentally friendly Roundup herbicide is biodegradable. It won't build up in the soil so you can use Roundup with confidence along customers' driveways, sidewalks and fences.

> b) And remember that Roundup is biodegradable and won't build up in the soil. That will give you the environmental confidence you need to use Roundup everywhere you've got a weed, brush, edging or trimming problem.

> c) Roundup biodegrades into naturally occurring elements.

> d) Remember that versatile Roundup herbicide stays where you put it. That means there's no washing or leaching to harm customers' shrubs or other desirable vegetation.

> e) This non-residual herbicide will not wash or leach in the soil. It . . . stays where you apply it.

> f) You can apply Accord with "confidence because it will stay where you put it" it bonds tightly to soil particles, preventing leaching. Then, soon after application, soil microorganisms biodegrade Accord into natural products.

> g) Glyphosate is less toxic to rats than table salt following acute oral ingestion.

> h) Glyphosate's safety margin is much greater than required. It has over a 1,000-fold safety margin in food and over a 700-fold safety margin for workers who manufacture it or use it.

> i) You can feel good about using herbicides by Monsanto. They carry a toxicity category rating of 'practically non-toxic' as it pertains to mammals, birds and fish.

> j) "Roundup can be used where kids and pets will play and breaks down into natural material." This ad depicts a person with his head in the

ground and a pet dog standing in an area which has been treated with Roundup.[1]

44.     On November 19, 1996, Monsanto entered into an Assurance of Discontinuance with the NYAG, in which Monsanto agreed, among other things, "to cease and desist from publishing or broadcasting any advertisements [in New York] that represent, directly or by implication" that:

> a) its glyphosate-containing pesticide products or any component thereof are safe, non-toxic, harmless or free from risk;
>
> b) its glyphosate-containing pesticide products or any component thereof manufactured, formulated, distributed or sold by Monsanto are biodegradable;
>
> c) its glyphosate-containing pesticide products or any component thereof stay where they are applied under all circumstances and will not move through the environment by any means;
>
> d) its glyphosate-containing pesticide products or any component thereof are "good" for the environment or are "known for their environmental characteristics";
>
> e) glyphosate-containing pesticide products or any component thereof are safer or less toxic than common consumer products other than herbicides; and
>
> f) its glyphosate-containing products or any component thereof might be classified as "practically non-toxic."

45.     Monsanto did not alter its advertising of Roundup products in the same manner in any state other than New York, and on information and belief Monsanto, and now Bayer, still have not done so today.

---

[1] Attorney General of the State of New York, In the Matter of Monsanto Company, Assurance of Discontinuance Pursuant to Executive Law § 63(15) (Nov. 1996).

46. In 2009, France's highest court ruled that Monsanto had not told the truth about the safety of Roundup and affirmed an earlier judgment that Monsanto had falsely advertised its herbicide Roundup as "biodegradable" and that it "left the soil clean."[2]

### Scientific Fraud Underlying the Safety Determinations of Glyphosate

47. After the EPA's 1985 classification of glyphosate as possibly carcinogenic to humans (Group C), Monsanto exerted pressure upon the EPA to change its classification.

48. This pressure culminated in the EPA's reclassification of glyphosate to Group E in 1991, which was based upon evidence of non-carcinogenicity in humans.

49. In so classifying, the EPA stated that "[i]t should be emphasized, however, that designation of an agent in Group E is based on the available evidence at the time of evaluation and should not be interpreted as a definitive conclusion that the agent will not be a carcinogen under any circumstances."

50. On two occasions, the EPA found that laboratories hired by Monsanto to test the toxicity of its Roundup products for registration purposes committed scientific fraud.

51. In the first instance, Monsanto hired Industrial Bio-Test Laboratories ("IBT") to perform and evaluate pesticide toxicology studies relating to Roundup. IBT performed approximately 30 tests on glyphosate and glyphosate-containing products, including 11 of the 19 chronic toxicology studies needed to register Roundup with the EPA.

---

[2] *Monsanto Guilty in 'False Ad' Row*, BBC News, Oct. 15, 2009, *available at* http://news.bbc.co.uk/2/hi/europe/8308903.stm#:~:text=France's%20highest%20court%20ruled,selling %20weed%2Dkiller%2C%20Roundup,&text=Monsanto%20also%20sells%20crops%20genetically%2Dengine ered%20to%20be%20tolerant%20to%20Roundup.

52.    In 1976, the Food and Drug Administration ("FDA") performed an inspection of IBT and discovered discrepancies between the raw data and the final report relating to toxicological impacts of glyphosate. The EPA subsequently audited IBT and determined that the toxicology studies conducted for Roundup were invalid. An EPA reviewer stated, after finding "routine falsification of data" at IBT, that it was "hard to believe the scientific integrity of the studies when they said they took specimens of the uterus from male rabbits."

53.    Three top executives of IBT were convicted of fraud in 1983.

54.    In the second incident, Monsanto hired Craven Laboratories ("Craven") in 1990 to perform pesticide and herbicide studies, including several studies on Roundup.

55.    In March of 1991, the EPA announced that it was investigating Craven for "allegedly falsifying test data used by chemical firms to win EPA approval of pesticides."

56.    The investigation led to the indictments of the laboratory owner and a handful of employees.

### IARC Classification of Glyphosate

57.    The International Agency for Research on Cancer ("IARC") is the specialized intergovernmental agency that the World Health Organization ("WHO") of the United Nations tasked with conducting and coordinating research into the causes of cancer.

58.    An IARC Advisory Group to Recommend Priorities for IARC Monographs during 2015–2019 met in April 2014. Though nominations for the review were solicited, a substance must meet two criteria to be eligible for review by the IARC Monographs: there must already be some evidence of carcinogenicity of the substance, and there must be evidence that humans are exposed to the substance.

59.    IARC set glyphosate for review in 2015–2016. IARC uses five criteria for determining priority in reviewing chemicals. The substance must have (1) a potential for direct impact on public health; (2) scientific literature to support suspicion of carcinogenicity; (3) evidence of significant human exposure; (4) high public interest and/or potential to bring clarity to a controversial area and/or reduce public anxiety or concern; and (5) related agents similar to one given high priority by the above considerations. Data reviewed is sourced preferably from publicly accessible, peer-reviewed data.

60.    On March 24, 2015, after its cumulative review of human, animal, and DNA studies for more than one (1) year, many of which have been in Monsanto's possession since as early as 1985, the IARC's working group published its conclusion that the glyphosate contained in Monsanto's Roundup herbicide, is a Class 2A "probable carcinogen" as demonstrated by the mechanistic evidence of carcinogenicity in humans and sufficient evidence of carcinogenicity in animals.

61.    The IARC's full Monograph was published on July 29, 2015, and established glyphosate as a Class 2A probable carcinogen to humans. According to the authors, glyphosate demonstrated sufficient mechanistic evidence (genotoxicity and oxidative stress) to warrant a 2A classification based on evidence of carcinogenicity in humans and animals.

62.    The IARC Working Group found an increased risk between exposure to glyphosate and non-Hodgkin's Lymphoma ("NHL") and several subtypes of NHL, and the increased risk continued after adjustment for other pesticides.

63.    The IARC also found that glyphosate caused DNA and chromosomal damage in human cells.

**Monsanto's Ongoing Disregard for the Safety of Plaintiff and the Public**

64.     Monsanto claims on its website that "[r]egulatory authorities and independent experts around the world have reviewed numerous long-term/carcinogenicity and genotoxicity studies and agree that there is no evidence that glyphosate, the active ingredient in Roundup brand herbicides and other glyphosate-based herbicides, causes cancer, even at very high doses, and that it is not genotoxic."[3]

65.     Ironically, the primary source for this statement is a 1986 report by the WHO, the same organization that now considers glyphosate to be a probable carcinogen.

66.     Glyphosate, and Monsanto's Roundup products in particular, have long been associated with serious side effects, and many regulatory agencies around the globe have banned or are currently banning the use of glyphosate herbicide products.

67.     Monsanto's public statements proclaiming the safety of Roundup and disregarding its dangers was misleading, fraudulent, and deceptive, and those public statements misled Plaintiff who relied upon Monsanto's public statements to his deteriment.

68.     Despite Monsanto's knowledge that Roundup was associated with an elevated risk of developing cancer, Monsanto's promotional campaigns focused on Roundup's purported "safety profile."

69.     Monsanto's failure to adequately warn Plaintiff resulted in (1) Plaintiff using and being exposed to glyphosate instead of using another acceptable and safe method of controlling unwanted weeds and pests; and (2) scientists and physicians failing to warn and

---

[3] Monsanto, *Backgrounder—Glyphosate: No Evidence of Carcinogenicity*, updated November 2014, *available at* https://www.monsanto.com/app/uploads/2017/06/no-evidence-of-carcinogenicity.pdf.

instruct consumers about the risk of cancer, including NHL, and other injuries associated with Roundup.

70.     Monsanto failed to seek modification of the labeling of Roundup to include relevant information regarding the risks and dangers associated with Roundup exposure.

71.     The failure of Monsanto to appropriately warn and inform the EPA has resulted in inadequate warnings in safety information presented directly to users and consumers.

72.     The failure of Monsanto to appropriately warn and inform the EPA has resulted in the absence of warning or caution statements that are adequate to protect human health and the environment.

73.     The failure of Monsanto to appropriately warn and inform the EPA has resulted in directions for use that are not adequate to protect human health and the environment.

**Plaintiff's Exposure to Roundup**

74.     Plaintiff regularly and continuously used Roundup multiple times per week for more than ten years.

75.     Plaintiff followed all safety and precautionary warnings that were available to him during the course of use of Roundup and otherwise used the product as Monsanto intended.

76.     In August 2017, Plaintiff was diagnosed with Non-Hodgkin's Lymphoma.

77.     The development of Plaintiff's NHL was a direct and proximate result of exposure to Roundup products designed, manufactured, promoted, and sold by Defendant.

78.     During the entire time that Plaintiff was exposed to Roundup, he did not know that exposure to Roundup was injurious to his health or the health of others.

79.   Plaintiff relied to his detriment on the false warnings, statements, omissions, and misrepresentations made by Monsanto over the last forty years.

### Monsanto's Placement of Roundup into the Stream of Commerce

80.   At all times herein mentioned, Defendant engaged in the business of designing, researching, manufacturing, testing, advertising, promoting, selling, and distributing Roundup products, thus placing Roundup products into the stream of commerce.

81.   Defendant's actions placing Roundup products into the stream of commerce were under the ultimate control and supervision of Defendant.

82.   At all times relevant to this litigation, Defendant designed, researched, developed, formulated, manufactured, produced, tested, assembled, labeled, advertised, promoted, marketed, sold, and distributed the Roundup products used by Plaintiff and/or to which Plaintiff was exposed, as described above.

### Equitable Tolling of Applicable Statute of Limitations

83.   The running of any statute of limitations has been tolled by reason of Defendant's fraudulent concealment. Defendant, through its affirmative misrepresentations and omissions, actively concealed from Plaintiff the true risks associated with Roundup and glyphosate.

84.   At all relevant times, Defendant has maintained that Roundup is safe, non-toxic, and non-carcinogenic.

85.   Indeed, Defendant continues to represent to the public through its website that "[r]egulatory authorities and independent experts around the world have reviewed numerous long-term/carcinogenicity and genotoxicity studies and agree that there is no evidence that

glyphosate, the active ingredient in Roundup brand herbicides and other glyphosate-based herbicides, causes cancer, even at very high doses, and that it is not genotoxic."[4]

86.    The full extent of Defendant's representations, contained in the aforementioned fact sheet that is hosted on Defendant's website to this day, will be filed with the Clerk of Court, as they are thereby more easily and comprehensively integrated than by being recited within this Complaint itself.

87.    Plaintiff relied to his detriment on these statements and similar statements made by Monsanto over the years in deciding to use Roundup.

88.    As a result of Defendant's actions, Plaintiff was unaware and could not reasonably have known or have learned through reasonable diligence that Roundup and/or glyphosate contact exposed Plaintiff to the risks alleged herein and that those risks were the direct and proximate result of Defendant's acts and omissions.

89.    Furthermore, Defendant is estopped from relying on any statute of limitations and/or statute of repose, because of its fraudulent concealment of the true character, quality, and nature of Roundup. Defendant was under a duty to disclose the true character, quality, and nature of Roundup because this was non-public information over which Defendant had and continues to have exclusive control, and because Defendant knew that this information was not available to Plaintiff or to any distributors of Roundup. In addition, Defendant is estopped from relying on any statute of limitations and/or statute of repose because of its intentional concealment of these facts.

---

[4] Monsanto, *Backgrounder—Glyphosate: No Evidence of Carcinogenicity*, updated November 2014, *available at* https://www.monsanto.com/app/uploads/2017/06/no-evidence-of-carcinogenicity.pdf (last visited June 8, 2020).

90.     Plaintiff had no knowledge that Defendant was engaged in the wrongdoing alleged herein. Because of the fraudulent acts of concealment and wrongdoing by Defendant, Plaintiff could not have reasonably discovered the wrongdoing at any time prior.

91.     Also, the economics of this fraud should be considered. Defendant had the ability to and did spend enormous amounts of money in furtherance of its purpose of marketing, promoting, and/or distributing a profitable herbicide, notwithstanding the known or reasonably known risks.

92.     Plaintiff and medical professionals could not have afforded and could not have possibly conducted studies to determine the nature, extent, and identity of related health risks, and were thus forced to rely on Defendant's representations. Accordingly, Defendant is precluded by the discovery rule and/or the doctrine of fraudulent concealment from relying upon any statute of limitations or statute of repose.

## COUNT I
## STRICT LIABILITY

93.     Plaintiff re-alleges and incorporates Paragraphs 1 through 92 as if fully stated herein.

94.     Defendant's Roundup products are defective and unreasonably dangerous to consumers and users and other persons coming into contact with them, including Plaintiff.

95.     Defendant's actions placing Roundup products into the stream of commerce were under the ultimate control and supervision of Defendant.

96.     Roundup was expected to and did reach the usual consumers, handlers, and persons coming into contact with said product, including Plaintiff, without substantial change

in the condition in which it was designed, produced, manufactured, sold, distributed, labeled, and marketed by Defendant.

97.     At all times relevant to this litigation, Defendant's Roundup was manufactured, designed, and labeled in an unsafe, defective, and inherently dangerous manner that was dangerous for use by or exposure to the public, and in particular, to Plaintiff.

98.     The Roundup designed, researched, manufactured, tested, advertised, promoted, marketed, sold, labeled and distributed by Defendant was defective in design or formulation in that, when it left the hands of the manufacturers and/or suppliers, the foreseeable risks associated with Roundup's reasonably foreseeable use exceeded the alleged benefits associated with the design or formulation of Roundup.

99.     The Roundup designed, researched, manufactured, tested, advertised, developed, licensed, promoted, marketed, sold, labeled and distributed by Defendant was defective in design and/or formulation, in that, when it left the hands of the manufacturers and/or suppliers, it was unreasonably dangerous, unreasonably dangerous in normal use, and more dangerous than an ordinary consumer would expect.

100.     At all times herein mentioned, Roundup was in a defective condition and unsafe, and Defendant knew or had reason to know that said product was defective and unsafe, especially when used in the form and manner as provided by Defendant. In particular, Monsanto's Roundup was defective in the following ways:

> a) Roundup products were defective in design and formulation and, consequently, dangerous to an extent beyond that which an ordinary consumer would anticipate.

b) Roundup products were unreasonably dangerous in that they were hazardous and posed a grave risk of cancer and other serious illnesses when used in a reasonably anticipated manner.

c) Defendant did not sufficiently test, investigate, or study their Roundup products and, specifically, the active ingredient glyphosate.

d) Defendant did not sufficiently test, investigate, or study Roundup's "inert" ingredients, adjuvants, and/or the surfactant POEA.

e) Exposure to Roundup presents a risk of harmful side effects, specifically, cancer, that outweighs any potential utility stemming from the use of the herbicide.

f) Defendant knew or should have known at the time of marketing their Roundup products that exposure to Roundup and, specifically, its active ingredient glyphosate could result in cancer and other severe illnesses and injuries.

g) Defendant did not conduct adequate post-marketing surveillance of its Roundup products.

h) Defendant could have employed safer alternative designs and formulations.

i) Roundup does not contain adequate warnings or instructions concerning the dangerous characteristics of Roundup and, specifically, the active ingredient glyphosate.

101.    At all times relevant to this litigation, Plaintiff used, and/or was exposed to the use of, Roundup in an intended or reasonably foreseeable manner without knowledge of Roundup's dangerous characteristics.

102.    Plaintiff could not have reasonably discovered the defects and risks associated with Roundup before or at the time of exposure.

103.    The harm caused by Defendant's Roundup products far outweighed their benefit, rendering Defendant's products dangerous to an extent beyond that which an ordinary consumer would contemplate. Defendant's Roundup products were and are more dangerous

than alternative products, and Defendant could have designed Roundup to make it less dangerous. Indeed, at the time Defendant designed Roundup, the state of the industry's scientific knowledge was such that a less risky design or formulation was attainable.

104.   At the time Roundup products left Defendant's control, there was a practical, technically feasible, and safer alternative design that would have prevented the harm without substantially impairing Roundup's reasonably anticipated or intended function.

105.   Therefore, as a result of the unreasonably dangerous condition of their Roundup products, Defendant is strictly liable to Plaintiff.

106.   Defendant knew, or should have known, that at all times herein mentioned its Roundup was in a defective condition and was and is inherently dangerous and unsafe.

107.   Armed with this knowledge, Defendant voluntarily designed Roundup with a dangerous condition for use by the public, and in particular Plaintiff.

108.   The defects in Defendant's Roundup were substantial and contributing factors in causing Plaintiff's grave injuries, and, but for Defendant's misconduct and omissions, Plaintiff would not have sustained his injuries.

109.   As a proximate result of using the defective Roundup sold and placed on the market by Defendant, Plaintiff has suffered severe and permanent bodily injury; resulting pain and suffering; permanent and total disability; disfigurement; mental anguish; loss of capacity for the enjoyment of life; the expense of hospital, medical, and nursing care and treatment; loss of earnings; and loss of ability to earn money. These injuries and losses have been suffered in the past, are permanent and continuing, and as such will be suffered into the future.

WHEREFORE, Plaintiff demands (i) a trial by jury on all issues so triable, and (ii) judgment against Bayer for: (a) compensatory damages for all injuries and losses described above; (b) all recoverable costs of this action; (c) all legally recoverable interest; and (d) any other relief to which Plaintiff may be legally or equitably entitled, respectively.

## COUNT II
## FRAUDULENT CONCEALMENT

110.    Plaintiff hereby realleges and incorporates the allegations contained in paragraphs 1 through 92 as if asserted herein.

111.    From at least 1987 until the present day, Defendant concealed or omitted material information not otherwise known or available to the public regarding Roundup's toxicity and carcinogenicity, or failed to disclose a material fact concerning the toxicity and carcinogenicity of Roundup and its active ingredient glyphosate, or both.

112.    Plaintiff relied to his detriment on the omissions and concealment of material facts by Defendant.

113.    As a proximate result of the fraud committed by Defendant, Plaintiff has suffered severe and permanent bodily injury; resulting pain and suffering; permanent and total disability; disfigurement; mental anguish; loss of capacity for the enjoyment of life; the expense of hospital, medical, and nursing care and treatment; loss of earnings; and loss of ability to earn money. These injuries and losses have been suffered in the past, are permanent and continuing, and as such will be suffered into the future.

WHEREFORE, Plaintiff demands (i) a trial by jury on all issues so triable, and (ii) judgment against Bayer for: (a) compensatory damages for all injuries and losses described

above; (b) all recoverable costs of this action; (c) all legally recoverable interest; and (d) any other relief to which Plaintiff may be legally or equitably entitled, respectively.

## COUNT III
## NEGLIGENCE

114. Plaintiff hereby realleges and incorporates the allegations contained in paragraphs 1 through 92 as if asserted herein.

115. **DUTY:** At all times relevant, Defendant had a duty to exercise reasonable care in the design, research, manufacture, marketing, advertisement, supply, promotion, packaging, sale, labeling, testing, quality assurance, quality control, and distribution of Roundup, including a duty to take all reasonable steps necessary to assure that Roundup would not cause unreasonable and dangerous side effects to consumers, users, and other persons who might foreseeably be exposed to the product.

116. At all times relevant to this litigation, Defendant knew or should have known of Roundup's hazards and dangers, in particular the carcinogenic properties of its active ingredient glyphosate.

117. Accordingly, at all times relevant to this litigation, Defendant knew or should have known that use of, or exposure to, Roundup could cause Plaintiff's injuries and thus created a dangerous and unreasonable risk of injury to the users of Roundup, including Plaintiff.

118. Defendant knew or should have known that Roundup is more toxic than glyphosate alone and that safety studies on Roundup, Roundup's adjuvants and "inert" ingredients, and/or the surfactant POEA were necessary to protect Plaintiff from Roundup.

119. Defendant knew or should have known that tests limited to glyphosate, Roundup's active ingredient, were insufficient to prove the safety of Roundup.

120. Defendant also knew or should have known that users and consumers of Roundup were unaware of the risks and the magnitude of the risks associated with the use of, and/or exposure to, Roundup.

121. **BREACH:** Defendant breached their duty of reasonable care in the designing, researching, testing, manufacturing, marketing, supplying, promoting, packaging, sale, testing, quality assurance, quality control, and/or distribution of Roundup in that Defendant knew or should have known that using Roundup created a high risk of unreasonable, dangerous side effects including, but not limited to, the development of NHL, as well as other severe and personal injuries that are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life, as well as the need for lifelong medical treatment, monitoring, and/or medications.

122. The negligence by Defendant, their agents, servants, and/or employees, included, but was not limited to, the following acts and/or omissions:

> a) Manufacturing, producing, promoting, formulating, creating, and/or designing Roundup without thoroughly testing it;
>
> b) Failing to test Roundup and/or failing to adequately, sufficiently, and properly test Roundup;
>
> c) Not conducting sufficient testing programs to determine whether or not Roundup was safe for use, in that Defendant knew or should have known that Roundup was unsafe and unfit for use by reason of the dangers to its users;
>
> d) Not conducting sufficient testing programs and studies to determine Roundup's carcinogenic properties even after Defendant had knowledge that Roundup is, was, or could be carcinogenic;

e) Failing to conduct sufficient testing programs to determine the safety of "inert" ingredients and/or adjuvants contained within Roundup; the propensity of these ingredients to render Roundup toxic or increase its toxicity; whether these ingredients are carcinogenic or magnify the carcinogenic properties of Roundup; and whether or not "inert" ingredients and/or adjuvants were safe for use;

f) Failing to adequately and correctly warn the Plaintiff, the public, the medical and agricultural professions, and the EPA of the dangers of Roundup;

g) Negligently failing to petition the EPA to strengthen the warnings associated with Roundup;

h) Failing to provide adequate cautions and warnings to protect the health of users, handlers, applicators, and the persons who would reasonably and foreseeably come into contact with Roundup;

i) Negligently marketing, advertising, and recommending the use of Roundup without sufficient knowledge as to its dangerous propensities;

j) Negligently representing that Roundup was safe for use for its intended purpose, and/or that Roundup was safer than ordinary and common items such as table salt, when, in fact, Roundup was unsafe;

k) Negligently representing that Roundup had equivalent safety and efficacy as other forms of herbicides;

l) Negligently designing Roundup in a manner that was dangerous to its users;

m) Negligently manufacturing Roundup in a manner that was dangerous to its users;

n) Negligently producing Roundup in a manner that was dangerous to its users;

o) Negligently formulating Roundup in a manner that was dangerous to its users;

p) Concealing information from the Plaintiff while knowing that Roundup was unsafe, dangerous, and/or non-conforming with EPA regulations;

q) Improperly concealing and/or misrepresenting information from Plaintiff, scientific and medical professionals, and/or the EPA, concerning the severity of risks and dangers of Roundup compared to other forms of herbicides; and

r) Negligently selling Roundup with a false and misleading label.

123.     Defendant under-reported, underestimated, and downplayed the serious dangers of Roundup.

124.     Defendant negligently and deceptively compared the safety risks and/or dangers of Roundup with common everyday foods, such as table salt, and other forms of herbicides.

125.     Defendant was negligent and/or violated Florida law in the designing, researching, supplying, manufacturing, promoting, packaging, distributing, testing, advertising, warning, marketing, and selling of Roundup in that they:

a) Failed to use ordinary care in designing and manufacturing Roundup so as to avoid the aforementioned risks to individuals when Roundup was used as an herbicide;

b) Failed to accompany their product with proper and/or accurate warnings regarding all possible adverse side effects associated with the use of Roundup;

c) Failed to accompany their product with proper warnings regarding all possible adverse side effects concerning the failure and/or malfunction of Roundup;

d) Failed to accompany their product with accurate warnings regarding the risks of all possible adverse side effects concerning Roundup;

e) Failed to warn Plaintiff of the severity and duration of such adverse effects, as the warnings given did not accurately reflect the symptoms or severity of the side effects including, but not limited to, the development of NHL;

f) Failed to conduct adequate testing, clinical testing, and post-marketing surveillance to determine the safety of Roundup;

g) Failed to conduct adequate testing, clinical testing, and post-marketing surveillance to determine the safety of Roundup's "inert" ingredients, adjuvants, and/or the surfactant POEA;

h) Negligently misrepresented the evidence of Roundup's genotoxicity and carcinogenicity; and

i) Were otherwise careless and/or negligent.

126.    Despite the fact that Defendant knew or should have known that Roundup caused, or could cause, unreasonably dangerous side effects, Defendant continue to market, manufacture, distribute, and/or sell Roundup to consumers, including Plaintiff.

127.    Defendant knew or should have known that consumers, such as Plaintiff, would foreseeably suffer injury as a result of Defendant's failure to exercise ordinary care.

128.    **CAUSATION AND DAMAGES:**    As a proximate result of the negligence by Defendant, Plaintiff has suffered severe and permanent bodily injury; resulting pain and suffering; permanent and total disability; disfigurement; mental anguish; loss of capacity for the enjoyment of life; the expense of hospital, medical, and nursing care and treatment; loss of earnings; and loss of ability to earn money. These injuries and losses have been suffered in the past, are permanent and continuing, and as such will be suffered into the future.

WHEREFORE, Plaintiff demands (i) a trial by jury on all issues so triable, and (ii) judgment against Bayer for: (a) compensatory damages for all injuries and losses described above; (b) all recoverable costs of this action; (c) all legally recoverable interest; and (d) any other relief to which Plaintiff may be legally or equitably entitled, respectively.

WHEREFORE, for the above-listed counts, Plaintiff demands (i) a trial by jury on all issues so triable, and (ii) judgment against Defendant for: (a) compensatory damages for all injuries and losses described above; (b) all recoverable costs of this action; (c) all legally recoverable interest; and (d) any other relief to which Plaintiff may be legally or equitably entitled, respectively.

Plaintiff Demands a Trial by Jury on all issues so triable.

### CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was furnished to

Defendant via service of process.

Dated: July 22, 2020

/s/ William L. Clark
Shane A. Newlands, ESQUIRE
Florida Bar No.: 116908
William L. Clark, ESQUIRE
Florida Bar No.: 089785
**NEWLANDS & CLARK**
11161 East State Road 70
Suite 110-168
Lakewood Ranch, FL 34202
Phone: (813) 438-3435
Phone: (813) 783-4900
Primary Email: shane@newlandsclark.com
Primary Email: lee@newlandsclark.com

*Counsel for Plaintiff*