DLB

# U.S. District Court
## Southern District of Florida (West Palm Beach)
## CIVIL DOCKET FOR CASE #: 9:20–cv–81358–RKA

Tejera v. Monsanto Company
Assigned to: Judge Roy K. Altman
Referred to: Magistrate Judge Dave Lee Brannon
Cause: 28:1332 Diversity–Product Liability

Date Filed: 08/20/2020
Jury Demand: Plaintiff
Nature of Suit: 365 Personal Inj. Prod.
Liability
Jurisdiction: Diversity

**Plaintiff**

**Ramon Tejera**                                represented by   **Kertch J. Conze**
Law Offices of Kertch Conze, P.A.
402
3600 Red Road
Miramar, FL 33025
954–342–9044
Fax: 954–342–9108
Email: conzelaw@aol.com *(Inactive)*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Monsanto Company**

| Date Filed | # | Docket Text |
|---|---|---|
| 08/20/2020 | 1 | COMPLAINT against Monsanto Company. Filing fees $ 400.00. Pay.gov Agency Tracking ID FLSDC–13383304, payment transferred from : 0:20–cv–61686, filed by Ramon Tejera. (Attachments: # 1 Civil Cover Sheet, # 2 Summon(s))(Conze, Kertch) (Entered: 08/20/2020) |
| 08/20/2020 | 2 | Clerks Notice of Judge Assignment to Judge Roy K. Altman and Magistrate Judge Dave Lee Brannon. Pursuant to 28 USC 636(c), the parties are hereby notified that the U.S. Magistrate Judge Dave Lee Brannon is available to handle any or all proceedings in this case. If agreed, parties should complete and file the Consent form found on our website. It is not necessary to file a document indicating lack of consent. Pro se (NON–PRISONER) litigants may receive Notices of Electronic Filings (NEFS) via email after filing a Consent by Pro Se Litigant (NON–PRISONER) to Receive Notices of Electronic Filing. The consent form is available under the forms section of our website. (cds) (Entered: 08/20/2020) |
| 08/20/2020 | 3 | Summons Issued as to Monsanto Company. (cds) (Entered: 08/20/2020) |

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

**RAMON TEJERA,**                            \*   CIVIL ACTION NO.
                                             \*
    Plaintiff,              \*
                                             \*
                                             \*
**vs.**                                      \*   **SECTION \_\_\_\_\_:**
                                             \*
**MONSANTO COMPANY**, a Missouri             \*
Corporation,                                 \*
                                             \*
                                             \*
    Defendant.              \*   **JUDGE:**
                                             \*
                                             \*   **MAGISTRATE JUDGE:**

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\* \*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## COMPLAINT FOR DAMAGES

**Plaintiff,** RAMON TEJERA, is a resident of the United States of America, and is domiciled in and resides in Palm Beach County, Florida, and for causes of action alleges as to the defendant(s) as follows:

### I.   PARTIES

The following are the parties to this cause of action:

1. Monsanto Company (hereinafter referred to as "MONSANTO"), is a Delaware corporation headquartered in St. Louis, Missouri, and a leading marketer of biocides nationwide. Monsanto is and was, at all relevant time hereto, engaged in commercial transactions throughout the United States, including in the State of Florida.

2. MONSANTO manufactured and/or causes the manufacture of Roundup Products, and markets and distributes the Products which were used in various golf courses throughout the United States.  The Roundup Products subject to this litigation were constantly in use by the Plaintiff while working at the Ocean Breeze Golf & Country Club, located in Boca Raton, Florida. MONSANTO is a multinational, agricultural biotechnology corporation

based in St. Louis, Missouri. It is the world's leading producer of glyphosate, a broad spectrum herbicide used to kill weeds and grasses. Monsanto markets, distributes and sells glyphosate under the name Roundup.

3. RAMON TEJERA (hereinafter referred to as "TEJERA"), at all times material hereto, used the Product, Roundup at work, and said product was developed, tested, manufactured, packaged, promoted, marketed and advertised by MONSANTO.

## II. NATURE OF LAWSUIT

4. TEJERA brings this lawsuit for personal injuries sustained by exposure to Roundup, which contained the active ingredient glyphosate. Since 1998, TEJERA used and has been exposed to Roundup while working at Ocean Breeze Golf & Country Club, located in Boca Raton, Florida. This is a lawsuit for damages, disability, pain and suffering resulting from the unfair and deceptive trade practices and negligent and wrongful conduct in connection with the design, development, manufacture, testing, packaging, promoting, marketing, advertising, distribution, labeling, failure to warn and/or sale of the herbicide Roundup®, manufactured by Defendant MONSANTO Company.

5. TEJERA maintains and asserts that Roundup® and/or glyphosate is defective, dangerous to human health, unfit and unsuitable to be marketed and to be sold in commerce, and lacked proper warnings and directions as to the dangers associated with its use.

6. The injuries sustained by TEJERA were avoidable.

8. MONSANTO labeled, advertised, and promoted its Roundup Products, including but not limited to its false statement, that Roundup's active ingredient, glyphosate, targets an enzyme that is not found "in people or pets."

9. However, this claim is false, misleading, and deceptive, as the enzyme that glyphosate
targets is found in people and pets—specifically, in beneficial gut bacteria critical to their
health and wellbeing, including their immune system, digestion, allergies, metabolism,
and even their brain function.

### III.   JURISDICTION

Jurisdiction is vested in this Court pursuant to 28 U.S.C.A. § 1332 because the matter in
controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs, and the
action is between TEJERA, a resident of the State of Florida, MONSANTO, a Delaware
corporation.

### IV. VENUE

Venue is proper in this District under 28 U.S.C. § 1391(b)(1). Substantial acts in
furtherance of the alleged improper conduct, including the dissemination of the false statement,
occurred within this district.

### V. ROUNDUP®

10. Roundup® is sprayed as a liquid, which plants absorb glyphosate directly through their
leaves, stems, and roots, and detectable quantities accumulate in the plant tissues.

11. Glyphosate inhibits the enzyme 5-enolpyruvylshikimic acid-3-phosphate synthase that
interferes with the shikimic pathway in plants, resulting in the accumulation of shikimic acid in
plant tissue and ultimately plant death.

12. The same enzyme—the EPSP synthase that glyphosate "targets"—is present in many
beneficial bacteria that inhabit the human and other mammalian gut. Hence, contrary to
Defendant's representation that the enzyme targeted by Roundup's glyphosate is not found in
people or pets, that enzyme is found in people and pets.

13. Glyphosate, the active ingredient in Roundup, is a non-selective biocide, meaning that it

will kill most plants and many simple organisms. Unlike selective biocides, glyphosate cannot be used on most conventional lawns, as it would kill grass that has not been genetically modified.

14. Today, glyphosate products are among the world's most widely used herbicides. Glyphosate-based products are registered in more than 130 countries and are approved for weed control in more than 100 crops.

15. The Roundup use by TEJERA on a daily basis had labels falsely stating, "glyphosate targets an enzyme not found in humans." TEJERA and his employer relied on this representation.  As such, the use of gloves and other protective gears was discouraged since everyone believed that glyphosate targeted an enzyme that was not found in humans.

16. MONSANTO repeated these false and misleading representations throughout its marketing, including in video advertisements.

17. Glyphosate targets the enzyme EPSP synthase. The beneficial bacteria in our gut (and the gut of other mammals), on which our immune systems rely, produce and utilize EPSP synthase.

18. Thus, the targeted enzyme EPSP synthase is found in people and pets. Defendant's claim to the contrary is demonstrably false.

19. MONSANTO's false statements and omissions regarding glyphosate and the enzyme it targets are material. There is widespread controversy and concern around glyphosate and its effects on humans and animals. Studies indicate that the health of the beneficial bacteria in our bodies is directly linked to our general health. Studies also suggest that interference with the gut flora may have serious effects on humans and pets.

20. In light of this controversy, and to exploit consumer concerns about glyphosate's effects,

MONSANTO marketed Roundup with the false statement that it targets an enzyme that is not found in people or pets. MONSANTO omitted material, contrary information, namely, that human gut bacteria produces and utilizes the enzyme targeted by Roundup.

21. These false statements deceived Plaintiff and all and caused TEJERA harm.

22. TEJERA would have acted differently had he known the material information omitted by MONSANTO and/or the falsity of the statements made by the Defendant.

23. Because of the false statements and material omissions, MONSANTO was able to sell more Roundup products and was able to charge more for Roundup than it otherwise would have been able to do.

24. Various studies showed that the health of beneficial gut bacteria is essential to the overall health of humans and other mammals.

25. Microorganisms that populate the human body outnumber human cells ten (10) to one (1).

26. Studies have also demonstrated that even exposure to low doses of glyphosate can have effects in humans and animals.

27. As a result of such studies, widespread controversy and consumer concern exist regarding glyphosate's effect on humans and animals.

28. The manufacture, formulation and distribution of herbicides, such as Roundup, are regulated under the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA"), 7. U.S.C. § 136 et seq.  FIFRA requires that all pesticides be registered with the Environmental Protection Agency ("EPA) prior to their distribution, sale, or use, except as described by FIFRA 7 U.S.C. 136a(a).

29. The EPA requires, as part of the registration process, among other requirements, a variety of tests to evaluate the potential for exposure to pesticides, toxicity to people and other potential non-target organisms, and other adverse effects on the environment. Registration by the EPA, however, is not an assurance or finding of safety. The determination the EPA makes in registering or re-registering a product is not that the product is "safe," but rather that use of the product in accordance with its label directions "will not generally cause unreasonable adverse effects on the environment." 7 U.S.C. § 136(a)(c)(5)(D).

30. FIFRA defines "unreasonable adverse effects on the environment" to mean "any unreasonable risk to man or the environment, taking into account the economic, social, and environmental costs and benefits of the use of any pesticide." 7 U.S.C. § 136(bb). FIFRA thus requires the EPA to make a risk/benefit analysis in determining whether a registration should be granted or allowed to continue to be sold in commerce.

31. The EPA and the State of Florida registered Roundup for distribution, sale, and manufacture in the United States.

32. FIFRA generally requires that the registrant, MONSANTO, to conduct health and safety testing of pesticide products, but the government is not required, nor is it able, to perform the product tests that are required of the manufacturer.

33. The evaluation of each pesticide product distributed, sold, or manufactured is completed at the time the product is initially registered.

34. EPA demands the completion of additional tests and the submission of data for the EPA's review and evaluation.

35. In the case of glyphosate and Roundup, the EPA had planned on releasing its preliminary

risk assessment – in relation to the registration process – no later than July 2015. The EPA completed its review of glyphosate in early 2015, but delayed releasing the assessment pending further review in light of the World Health Organization's findings.

36. MONSANTO included a false statement on the labels of its Roundup products, stating, "glyphosate targets an enzyme found in plants but not in people or pets."

37. This misrepresentation is presented on certain Roundup product labels under the phrase "DID YOU KNOW?"

38. MONSANTO knew or should have known that consumers and users were becoming increasingly concerned about Roundup's potential effects on people and animals and that consumers were more likely to buy, use—and would pay more for—Roundup; if, they believe it targets an enzyme that is not found in people and animals.

39. MONSANTO included these false statements to induce consumers and users to purchase and use (or to purchase or use more of) the Roundup products and/or to pay more for them.

40. In 1996, the New York Attorney General ("NYAG") filed a lawsuit against MONSANTO based on its false and misleading advertising of Roundup products. Specifically, the lawsuit challenged MONSANTO's general representations that its spray-on glyphosate-based herbicides, including Roundup, were "safer than table salt" and "practically non-toxic" to mammals, birds, and fish. Among the representations the NYAG found deceptive and misleading about the human and environmental safety of Roundup are the following:

a) Remember that environmentally friendly Roundup herbicide is biodegradable. It won't build up in the soil so you can use Roundup with confidence along customers' driveways, sidewalks and fences ...

b) And remember that Roundup is biodegradable and won't build up in the soil. That will give you the environmental confidence you need to use Roundup everywhere you've got a weed, brush, edging or trimming problem.

c) Roundup biodegrades into naturally occurring elements.

d) Remember that versatile Roundup herbicide stays where you put it. That means there's no washing or leaching to harm customers' shrubs or other desirable vegetation.

e) This non-residual herbicide will not wash or leach in the soil. It ... stays where you apply it.

f) You can apply it with "confidence because it will stay where you put it;" it bonds tightly to soil particles, preventing leaching. Then, soon after application, soil microorganisms biodegrade accord into natural products.

g) Glyphosate is less toxic to rats than table salt following acute oral ingestion.

h) Glyphosate's safety margin is much greater than required. It has over a 1,000-fold safety margin in food and over a 700-fold safety margin for workers who manufacture it or use it.

i) You can feel good about using herbicides by MONSANTO. They carry a toxicity category rating of 'practically non-toxic' as it pertains to mammals, birds and fish.

j) "Roundup can be used where kids and pets will play and breaks down into natural material." [This ad depicts a person with his head in the ground and a pet dog standing in an area which has been treated with Roundup].

41. On November 19, 1996, MONSANTO entered into an Assurance of Discontinuance with NYAG, in which MONSANTO agreed, among other things, "to cease and desist from publishing or broadcasting any advertisements [in New York] that represent, directly or by implication"

that: a) its glyphosate-containing pesticide products or any component thereof are safe, non-toxic, harmless or free from risk. *** b) its glyphosate-containing pesticide products or any component thereof manufactured, formulated, distributed or sold by MONSANTO are biodegradable *** c) its glyphosate-containing pesticide products or any component thereof stay where they are applied under all circumstances and will not move through the environment by any means. *** d) its glyphosate-containing pesticide products or any component thereof are "good" for the environment or are "known for their environmental characteristics." *** e) glyphosate-containing pesticide products or any component thereof are safer or less toxic than common consumer products other than herbicides; f) its glyphosate-containing products or any component thereof might be classified as "practically non-toxic".

42. On information and belief, MONSANTO did not alter its advertising in the same manner in any state other than New York.

43. In 2009, France's highest court reviewing a 2007 and 2008 opinion ruled that MONSANTO had not told the truth about the safety of Roundup. The French court affirmed an earlier judgment that MONSANTO had falsely advertised its herbicide Roundup as "biodegradable" and that it "left the soil clean."

## VI.   ROUNDUP USE BY TEJERA

Defendant herein is liable and indebted unto Plaintiff for such damages as are reasonable in the premises, including past/future physical pain and suffering, mental pain and suffering, medical expenses, loss of earnings, loss of earning capacity and permanent disability to the body, loss of consortium, together with expert witness fees and legal interest, from the date of judicial demand until paid, and for all costs of these proceedings for the following reasons, to wit:

44. At all times relevant hereto, MONSANTO was in the business of, and did, design, research, manufacture, test, advertise, promote, market, sell, distribute, and/or have acquired and are responsible for the advertising, promotion, sale, distribution of herbicide Roundup.

45. MONSANTO is a multinational agricultural biotechnology corporation based in St. Louis, Missouri. It is the world's leading producer of glyphosate.

46. MONSANTO discovered the herbicidal properties of glyphosate during the 1970's and subsequently began to design, research, manufacture, sell and began distributing glyphosate based "Roundup" as a broad spectrum herbicide in approximately 1974.

47. TEJERA was hired to work in the lawn and garden maintenance department of Ocean Breeze Golf and Country Club in Boca Raton from 1998 until about 2005.

48. A major part of TEJERA's duties at the country club was to cut the grass, to maintain the golf course bunkers, spray plants and weeds with Roundup products on a daily basis in order to maintain the lawn of the country club in a pristine manner.

49. Given the fact that MONSANTO advertised its Roundup products to be safe to humans and the environment, TEJERA and his co-workers never used gloves or protective gears as they relied on the representation made by MONSANTO.

50. On or about 2019, TEJERA, a married father two children, was diagnosed with non-Hodgkin lymphoma (acute lymphocytic leukemia).  Through information and belief, at least three other individuals who worked in maintaining the golf course at Ocean Breeze Country Club in Boca also died of non-Hodgkin lymphoma. It was after making such a discovery and conducting research that TEJERA's wife learned that the potential cause of the non-Hodgkin lymphoma was linked to usage of Roundup and its active ingredient, glyphosate.

51. TEJERA is now undergoing chemotherapy and under doctor's supervision due his

precarious health issues.   TEJERA and his co-workers used the MONSANTO Roundup product from the day he was hired until TEJERA left Ocean Breeze County Club.

52. The use of MONSANTO Roundup products resulted in personal injury, including but not limited to physical pain and suffering, mental pain and suffering, disability and loss of consortium relating to TEJERA.

## VII.   EVIDENCE OF CARCINOGENICITY IN ROUNDUP

53. As early as the 1980's MONSANTO was aware of glyphosate's carcinogenic properties.

54.  On March 4, 1985, a group of the Environmental Protection Agency's ("EPA") Toxicology Branch published a memorandum classifying glyphosate as a Category C oncogene. Category C oncogenes are possible human carcinogens with limited evidence of carcinogenicity.

55. In 1986, the EPA issued a Registration Standard for glyphosate (NTIS PB87-103214). The Registration standard required additional phytotoxicity, environmental fate, toxicology, product chemistry, and residue chemistry studies. All of the data required was submitted and reviewed and/or waived.

56. In October 1991, the EPA published a Memorandum entitled "Second Peer Review of Glyphosate." The memorandum changed glyphosate's classification to Group E (evidence of non-carcinogenicity for humans). Two peer review committee members did not concur with the conclusions of the committee and one member refused to sign[1].

57. In addition to the toxicity of the active molecule, many studies support the hypothesis

---

[1] Second Peer Review of Glyphosate, CAS No. 1071-83-6. October 30, 1881. United States Environmental Protection Agency.

11

that glyphosate formulations found in MONSANTO's Roundup products are more dangerous and toxic than glyphosate alone[2]. As early as 1991, evidence existed demonstrating that glyphosate formulations were significantly more toxic than glyphosate alone[3].

58. Studies have established that "cell-cycle dysregulation is a hallmark of tumor cells and human cancer. Failure in the cell-cycle checkpoints leads to genomic instability and subsequent development of cancers from the initial affected cell." Further, "[s]ince cell cycle disorders such as cancer result from dysfunction of unique cell, it was of interest to evaluate the threshold dose of glyphosate affecting cells[4]."

59. Many studies have been conducted over time establish that Roundup is always more toxic than its active ingredient glyphosate.

60. The results of these studies were confirmed in other recently published peer-reviewed studies and were at all times available and/or known to MONSANTO.

61. MONSANTO knew or should have known that Roundup was more toxic than glyphosate alone and that safety studies on Roundup, Roundup's adjuvants and "inert" ingredients, and/or the surfactant POEA were necessary to protect Plaintiff from Roundup.

62. MONSANTO knew or should have known that tests limited to Roundup's active ingredient glyphosate were insufficient to prove the safety of Roundup.

63. A working Group of 17 experts from 11 countries met at the International Agency for Research on Cancer (IARC) on March 3 - through March 10, 2015 to review the available published scientific evidence and evaluate the carcinogenicity of organophosphate insecticides including glyphosate and on March 24, 2015, after its cumulative review of human, animal, and

---

[2] Martinez et al. 2007; Benachour 2009; Gasnier et al. 2010; Peixoto 2005; March 2004.
[3] Martinez et al 1991
[4] (Molinari, 2000; Stewart et al., 2003)

DNA studies for more than one (1) year, many of which on information and belief have been in MONSANTO's possession since as early as 1985, the IARC's working group published its conclusion that the glyphosate contained in MONSANTO's Roundup herbicide, is a Class 2A "probable carcinogen" as demonstrated by the mechanistic evidence of carcinogenicity in humans and sufficient evidence of carcinogenicity in animals.

64. In 1985, the EPA studied the effects of glyphosate in mice finding a dose related response in male mice linked to renal tubal adenomas, a rare tumor. The study concluded that glyphosate was oncogenic.

65. In 2003, Lennart Hardell and Mikael Eriksson published the results of two case controlled studies on pesticides as a risk factor for NHL and hairy cell leukemia. The study concluded that glyphosate had the most significant relationship to NHL among all herbicides studies with an increased odds ratio of 3.11.

66. In 2003, AJ De Roos published a study examining the pooled data of mid-western farmers, examining pesticides and herbicides as risk factors for NHL. The study, which controlled for potential confounders, found a relationship between increased NHL incidence and glyphosate.

67. In 2008, Mikael Eriksson published a population-based case-control study of exposure to various pesticides as a risk factor for NHL. This study strengthened previous associations between glyphosate and NHL.

68. MONSANTO failed to appropriately and adequately test Roundup, Roundup's adjuvants and "inert" ingredients, and/or the surfactant POEA to protect Plaintiff from Roundup.

69. Rather than performing appropriate tests, MONSANTO relied upon flawed industry supported studies designed to protect Defendant's economic interests rather than Plaintiff and the consuming public.

70. Despite its knowledge that Roundup was considerably more dangerous than glyphosate alone, MONSANTO continued to promote Roundup as safe.

71. In spite of this knowledge, MONSANTO continued to issue broad and sweeping statements suggesting that Roundup was, and is, safer than ordinary household items such as table salt, despite a lack of scientific support for the accuracy and validity of these statements and, in fact, voluminous evidence to the contrary.

72. Upon information and belief, these statements and representations have been made with the intent of inducing Plaintiff and the public at large to purchase and increase the use of, Defendant's Roundup for Defendant's pecuniary gain, and in fact did induce Plaintiff to use Roundup based on the representation made by MONSANTO.

73. MONSANTO made these statements with complete disregard and reckless indifference to the safety of Plaintiff and the general public. Notwithstanding MONSANTO's representations, scientific evidence has established a clear association between glyphosate and genotoxicity, inflammation, and an increased risk of many cancers, including, but not limited to, NHL, Multiple Myeloma, and soft tissue sarcoma.

74. MONSANTO knew or should have known that glyphosate is associated with an increased risk of developing cancer, including, but not limited to, NHL, Multiple Myeloma, and soft tissue sarcomas. MONSANTO failed to appropriately and adequately inform and warn Plaintiff of the serious and dangerous risks associated with the use of and exposure to glyphosate and/or Roundup, including, but not limited to, the risk of developing NHL, as well as other severe and personal injuries, which are permanent and/or long-lasting in nature, cause significant physical pain and mental anguish, diminished enjoyment of life, and the need for medical treatment, monitoring and/or medications.

75. Despite MONSANTO's knowledge that Roundup was associated with an elevated risk of developing cancer, MONSANTO's promotional campaigns focused on Roundup's purported "safety profile." MONSANTO's failure to adequately warn TEJERA and the general public resulted in (1) TEJERA using and being exposed to glyphosate instead of using another acceptable and safe method of controlling unwanted weeds and other undesirable plants; and (2) scientists and physicians failing to warn and instruct consumers about the risk of cancer, including NHL, and other injuries associated with Roundup.

76. MONSANTO failed to seek modification of the labeling of Roundup to include relevant information regarding the risks and dangers associated with Roundup exposure.

77. The failure of MONSANTO to appropriately warn and inform the EPA has resulted in inadequate warnings in safety information presented directly to users and consumers.

78. The failure of MONSANTO to appropriately warn and inform the EPA has resulted in the absence of warning or caution statements that are adequate to protect health and the environment.

79. The failure of MANSONTO to appropriately warn and inform the EPA has resulted in the directions for use that are not adequate to protect health and the environment.

## VIII.   Damages

80. By reason of the foregoing acts and omissions, Plaintiff seeks compensatory damages as a result of TEJERA's use of, and exposure to, Roundup which caused or was a substantial contributing factor in causing TEJERA to suffer from cancer, specifically NHL, suffered severe and personal injuries which were permanent and lasting in nature, physical pain and mental anguish, multiple surgical procedures, severe stress, medical expenses, economic and non-

economic damages, including diminished enjoyment of life, termination from employment, loss

of earning capacity and substantial medical expenses.

81. At all material times herein, TEJERA was married to his loving wife who depended on

him for love, affection, sexual relations, companionship, material services, support, and felicity.

82. TEJERA's wife became the primary caregiver for her disabled husband as a result of the

NHL and multiple aggravating medical disabling conditions that resulted from the use of

Roundup.

83. At all material times herein, TEJERA was the father of two children.

84. TEJERA's children had a very close and loving relationship with their father.

85. As a result of the NHL and multiple aggravating medical disabling conditions that

resulted from the use of Roundup, TEJERA's wife and children have suffered and will continue

to suffer from the loss of consortium and financial support due to Plaintiff's illness.

## IX.    FIRST CAUSE OF ACTION -NEGLIGENCE AGAINST MONSANTO

86. Plaintiff repeats, reiterates, and re-alleges, each and every allegation of this Complaint

contained in each of the foregoing paragraphs inclusive, with the same force and effect as if

more fully set forth herein.

87. **Duty**: MONSANTO had a duty to exercise reasonable care in the designing,

researching, testing, manufacturing, marketing, supplying, promoting, packaging, sale,

and/or distribution of Roundup into the stream of commerce, including a duty to assure

that the product would not cause users to suffer unreasonable, dangerous side effects.

88. The conduct of which the Plaintiff complained of is a cause-in-fact of the resulting NHL.

89. MONSANTO failed to exercise ordinary care in the designing, researching, testing,

manufacturing, marketing, supplying, promoting, packaging, sale, testing, quality assurance,

quality control, and/or distribution of Roundup into interstate commerce in that MONSANTO

knew or should have known that using Roundup created a high risk of unreasonable, dangerous side effects, including, but not limited to, the development of NHL, as well as other severe and personal injuries which were permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life, loss of earning capacity as well as need for lifelong medical treatment, monitoring, and/or medications of TEJERA and loss of consortium to the Plaintiff.

90. **Breach:** The risk of harm was foreseeable.

91. The negligence by the Defendant, its agents, servants, and/or employees, included but was not limited to the following acts and/or omissions:

    a)  Manufacturing, producing, promoting, formulating, creating, and/or designing Roundup without thoroughly testing it;

    b)  Failing to test Roundup and/or failing to adequately, sufficiently, and properly test Roundup;

    c)  Failing to adequately train its employees in adequately, sufficiently, and properly testing Roundup;

    d)  Not conducting sufficient testing programs to determine whether or not Roundup was safe for use; in that Defendant herein knew or should have known that Roundup was unsafe and unfit for use by reason of the dangers to its users;

    e)  Not conducting sufficient testing programs and studies to determine Roundup's carcinogenic properties even after Defendant had knowledge that Roundup is, was, or could be carcinogenic;

f)  Failing to conduct sufficient testing programs to determine the safety of "inert" ingredients and/or adjuvants contained within Roundup, and the propensity of these ingredients to render Roundup toxic, increase the toxicity of Roundup, whether these ingredients are carcinogenic, magnify the carcinogenic properties of Roundup, and whether or not "inert" ingredients and/or adjuvants were safe for use;

g)  Negligently failing to adequately and correctly warn the Plaintiff, the public, the medical and agricultural professions, and the EPA of the dangers of Roundup;

h)   Negligently failing to petition the EPA to strength the warnings associated with Roundup;

i)  Failing to provide adequate cautions and warnings to protect the health of users, handlers, applicators, and persons who would reasonably and foreseeably come into contact with Roundup;

j)  Negligently marketing, advertising, and recommending the use of Roundup without sufficient knowledge as to its dangerous propensities;

k)  Negligently representing that Roundup was safe for use for its intended purpose, and/or that Roundup was safer than ordinary and common items such as table salt, when, in fact, it was unsafe;

l)  Negligently representing that Roundup had equivalent safety and efficacy as other forms of herbicides;

m) Negligently designing Roundup in a manner, which was dangerous to its users;

n)  Negligently manufacturing Roundup in a manner, which was dangerous to its users;

o)  Negligently producing Roundup in a manner, which was dangerous to its users;

p)  Negligently formulating Roundup in a manner, which was dangerous to its users;

q) Concealing information from the Plaintiff while knowing that Roundup was unsafe, dangerous, and/or non-conforming with EPA regulations;

r) Manufacturing and distributing a product that was unreasonably dangerous at the time that it was placed in commerce;

s) Negligent breach of a duty which defendant voluntarily assumed;

t) selling and distributing Roundup, a product that was unreasonably dangerous from a reasonably anticipated use of the product;

u) Improperly concealing and/or misrepresenting information from the Plaintiff, scientific and medical professionals, and/or the EPA, concerning the severity of risks and dangers of Roundup compared to other forms of herbicides.

v) Negligently selling Roundup with a false and misleading label.

w) Any and all other breaches of negligence and Florida Products liability law that may be proven at the trial of this matter.

92. MONSANTO under-reported, underestimated, and downplayed the serious dangers of Roundup.

93. MONSANTO negligently and deceptively compared the safety risks and/or dangers of Roundup with common everyday foods such as table salt, and other forms of herbicides.

94. MONSANTO was negligent and/or violated Florida law in the designing, researching, supplying, manufacturing, promoting, packaging, distributing, testing, advertising, warning, marketing, and selling of Roundup in that it:

a) Failed to use ordinary care in designing and manufacturing Roundup so as to avoid the aforementioned risks to individuals when Roundup was used as an herbicide;

b) Failed to accompany its product with proper and/or accurate warnings regarding all possible adverse side effects associated with the use of Roundup;

c) Failed to accompany its product with proper warnings regarding all possible adverse side effects concerning the failure and/or malfunction of Roundup;

d) Failed to accompany its product with accurate warnings regarding the risks of all possible adverse side effects concerning Roundup;

e) Failed to warn TEJERA of the severity and duration of such adverse effects, as the warnings given did not accurately reflect the symptoms, or severity of the side effects including, but not limited to, the development of NHL;

f) Failed to conduct adequate testing, clinical testing and post-marketing surveillance to determine the safety of Roundup;

g) Failed to conduct adequate testing, clinical testing, and post-marketing surveillance to determine the safety of Roundup's "inert" ingredients and/or adjuvants;

h) Negligently misrepresented the evidence of Roundup's genotoxicity and carcinogenicity;

i) Was otherwise careless and/or negligent.

95. Despite the fact that MONSANTO knew or should have known that Roundup caused, or could cause, unreasonably dangerous side effects, MONSANTO continued and continues to market, manufacture, distribute, and/or sell Roundup to consumers, including to TEJERA and his employer.

96. MONSANTO knew or should have known that users such as the TEJERA would foreseeably suffer injury as a result of MONSANTOS' failure to exercise ordinary care, as set forth above.

97. MONSANTOS' inadequate warnings, defective design, etc. of Roundup amounts to willful, wanton, and/or reckless conduct by MONSANTO.

98.      **Causation:** Defects in MONSANTO's Roundup were the direct and proximate cause or a substantial factor in causing Plaintiff's injuries as well as economic and non-economic damages.  But for MONSANTO's negligence, these injuries, damages, and losses would not have occurred.

99.      At the time of manufacture, MONSANTO could have provided the warnings or instructions regarding the full and complete risks of Roundup and glyphosate-containing products because it knew or should have known of the unreasonable risks of harm associated with the use of and/or exposure to such products.

100.      **Damages:** As a result of the foregoing acts and omissions, TEJERA suffered from serious and dangerous side effects including, but not limited to, excessive stress, disability which was permanent and lasting in nature, physical pain and mental anguish, diminished enjoyment of life, loss of earning capacity and financial expenses for hospitalization and medical care. Further, Plaintiff suffered life threatening NHL, and severe personal injuries, which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life.

101.      **WHEREFORE,** Plaintiff respectfully requests that this honorable Court enter judgment in Plaintiff's favor for compensatory and punitive damages, including physical pain and suffering, mental pain and suffering, medical expenses, loss of earnings, future loss of earnings, loss of earning capacity, loss of enjoyment of life, permanent disability to the body, and such other causes of action and damages as are reasonable in the premises, together with expert witness fees and legal interest from the date of judicial demand, until paid, attorney's fees, for all costs of these proceedings and for all general and equitable relief as the nature of the case may permit. Plaintiff further prays for trial by jury.

## SECOND CAUSE OF ACTION - BREACH OF IMPLIED WARRANTIES BY MONSANTO

102.      Plaintiff repeats, reiterates, and re-alleges each and every allegation of this

Complaint contained in each of the foregoing paragraphs inclusive, with the same force and

effect all if more fully set forth herein.

103.      At all times herein mentioned, MONSANTO manufactured, distributed,

compounded, recommended, merchandized, advertised, promoted, and sold Roundup and/or

BAYER that has recently acquired  MONSANTO which manufactured, compounded

portrayed, distributed, recommended, merchandized, advertised, promoted, and sold

Roundup, as a broad spectrum herbicide. These actions were under the ultimate control and

supervision of Defendant.

104.      At the time MONSANTO marketed, sold, and distributed Roundup for use

by TEJERA, MONANTO knew of Roundup's intended use and impliedly warranted the

product to be of merchantable quality and safe and fit for this use.

105.       MONSANTO impliedly represented and warranted to TEJERA and his

employer and users of Roundup, the agricultural community, and/or the EPA that Roundup was

safe and of merchantable quality and fit for the ordinary purpose for which it was to be used.

106.       These representations and warranties were false, misleading, and inaccurate in

that Roundup was unsafe, unreasonably dangerous, not of merchantable quality, and defective.

107.       TEJERA and/or the EPA did rely on said implied warranty of merchantability of

fitness for particular use and purpose.

108.       TEJERA reasonably relied upon the skill and judgment of MONSANTO as to

whether Roundup was of merchantable quality and safe and fit for its intended use.

109.       Roundup was injected into the stream of commerce by the Defendant in a

defective, unsafe, and inherently dangerous condition, and the products' materials were expected to and did reach users, handlers, and persons coming into contact with said products without substantial change in the condition in which they were sold.

110.    The Defendant breached the aforesaid implied warranties, as its herbicide Roundup was not fit for its intended purposes and uses.

111.    As a result of the foregoing acts and omissions, Plaintiff suffered from NHL and Plaintiff suffered severe and personal injuries which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life, financial expenses for hospitalization and medical care, including medical expenses and other economic, and non-economic damages.

112.    **WHEREFORE**, Plaintiff respectfully requests that this honorable Court enter judgment in Plaintiff's favor for compensatory and punitive damages, including physical pain and suffering, mental pain and suffering, medical expenses, loss of earnings, future loss of earnings, loss of earning capacity, loss of enjoyment of life, permanent disability to the body, survivor's pain and suffering, wrongful death loss of consortium, and such other causes of action and damages as are reasonable in the premises, together with expert witness fees and legal interest from the date of judicial demand, until paid, attorney's fees, for all costs of these proceedings and for all general and equitable relief as the nature of the case may permit. Plaintiff further prays for trial by jury.

## CAUSE OF ACTION III
## STRICT PRODUCT LIABILITY AGAINST MONSANTO

113.    Plaintiff repeats, reiterates, and re-alleges each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect all if more fully set forth herein.

114.    This is a cause of action for strict product liability based on design defect, manufacturing/production defect and MONSANTO's failure to warn users of Roundup dangers.

115.    **Product**: MONSANTO knowingly designed, manufactured, tested advertised, sold and introduced into the stream of commerce its Roundup products, which are defective and dangerous. TEJERA was, in fact, exposed to said Roundup products. From an early stage, It was only MONSANTO that knew of the various unreasonable dangers presented by its Roundup products. TEJERA was in no way able to detect such defects as same were beyond his ability.

116.    **Defects**: The manner in which Roundup was developed, researched, tested, manufactured, packaged, advertised, distributed and sold was defective and unreasonably dangerous. Despite the fact that MONSANTO was aware of the product defect and its dangerous aspects, MONSANTO allowed Roundup products to be sold and entered the stream of commerce. TEJERA used the Roundup products, believing that said products were safe to be used at work without any gloves or personal protection gears. MONSANTO's Roundup products failed to perform, as directed by its label, in a safe manner as an ordinary user would have expected it to perform.

117.    The risk/benefit analysis was greatly outweighed against TEJERA in using MONSANTO Roundup products. TEJERA could have easily reduced the risks posed by MONSANTO's Roundup products only if MONSANTO gave reasonable instructions to TEJERA in the true manner in which the products were supposed to be used. It is the Plaintiff's position that MONSANTO's Roundup products were unsafe for the following reasons:

a)    Despite knowing the dangers posed by Roundup Products, MONSANTO did not disclose post marketing test results, showing the danger posed by Roundup.

b) MONSANTO knew or should have known the danger posed by Roundup.  Yet, it allowed the general public, including TEJERA, to use said products without adequate instructions/warnings.

c) MONSANTO's Roundup product unreasonably exposed the public, including TEJERA, to unnecessary and unreasonable risks.  MONSANTO failed to property test and warn the public about the danger posed by the active ingredient in Roundup products, to wit, glyphosate.

d) It was within MONSANTO's ability to use a less intrusive or safer alternative in its design of the Roundup products.

e) MONSANTO was negligent in the manner in which it developed, manufactured, tested, labeled, marketed, sold and warned the public about its Roundup products.

118.    Based on the defects above-described, Roundup products became unreasonably dangerous and outside the risk that could have been contemplated by any reasonable person in TEJERA's position.

119.    Despite using MONSANTO's Roundup products in the manner instructed by MONSANTO, TEJERA suffered injuries.  The injuries sustained by TEJERA were foreseeable and avoidable if MONSANTO acted reasonably under the circumstances.

120.    **Causation**: Based on TEJERA's daily contacts with MONSANTO products for many years, TEJERA became exposed to Roundup's active ingredients, including glyphosate, and developed NHL in the process.

121.    TEJERA's many contacts with MONSANTO's Roundup products were the substantial contributing factors to TEJERA's NHL.  It is unlikely that TEJERA would have suffered NHL if he were not in daily contact with MONSANTO's Roundup products.

122.    **Damages**: TEJERA has been damaged by MONSANTO's Roundup products.

TEJERA's damages, include, but are not limited to, loss of enjoyment of life, loss of earning,

medical expenses, mental anguish, bodily injuries and any and all damages available to Plaintiff

under Florida laws.

123.   **WHEREFORE**, Plaintiff respectfully requests that this honorable Court enter

judgment in Plaintiff's favor for compensatory damages, costs and other reliefs that this Court

deems fair and just under the circumstances.

124.   Plaintiff hereby demands trial by jury as to all issues.

Respectfully submitted,

**Kertch J. Conze, Esq.**
**Law Offices of Kertch Conze, P.A.**

/s/ Kertch J. Conze, Esq.

Kertch J. Conze, Esq. (FBN: 233020)
3600 Red Road, Suite 402
Miramar, Florida 33025
Telephone (954) 342.9044
Facsimile: (954) 342.9208
Email:conze@conzelaw.com