# U.S. District Court
## District of New Jersey [LIVE] (Newark)
## CIVIL DOCKET FOR CASE #: 2:20-cv-06194-SDW-LDW

PAYNE-LAUDER v. MONSANTO COMPANY et al
Assigned to: Judge Susan D. Wigenton
Referred to: Magistrate Judge Leda D. Wettre
Cause: 28:1332 Diversity-Personal Injury

Date Filed: 05/21/2020
Jury Demand: Plaintiff
Nature of Suit: 365 Personal Inj. Prod. Liability
Jurisdiction: Diversity

**Plaintiff**

**VICKIE PAYNE-LAUDER**
*VICKIE PAYNE-LAUDER, On Behalf of the Estate of MARTIN PAYNE*

represented by **TAYJES MATTHEW SHAH**
THE MILLER FIRM LLC
108 RAILROAD AVENUE
ORANGE, VA 22960
540-672-4224
Email: tshah@millerfirmllc.com
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**MONSANTO COMPANY**

**Defendant**

**BAYER CORPORATION**

| Date Filed | # | Docket Text |
|---|---|---|
| 05/21/2020 | 1 | COMPLAINT against BAYER CORPORATION, MONSANTO COMPANY ( Filing and Admin fee $ 400 receipt number ANJDC-10843110) with JURY DEMAND, filed by VICKIE PAYNE-LAUDER, VICKIE PAYNE-LAUDER(VICKIE PAYNE-LAUDER, On Behalf of the Estate of MARTIN PAYNE). (Attachments: # 1 Civil Cover Sheet)(SHAH, TAYJES) (Entered: 05/21/2020) |
| 05/21/2020 | | Judge Susan D. Wigenton and Magistrate Judge Leda D. Wettre added. (ps, ) (Entered: 05/21/2020) |
| 05/22/2020 | 2 | SUMMONS ISSUED as to BAYER CORPORATION, MONSANTO COMPANY. Attached is the official court Summons, please fill out Defendant and Plaintiffs attorney information and serve. (lag, ) (Entered: 05/22/2020) |

| PACER Service Center |
|---|
| **Transaction Receipt** |
| 09/09/2020 15:22:49 |

| PACER Login: | hllp1982 | Client Code: | 1417.0005 |
| Description: | Docket Report | Search Criteria: | 2:20-cv-06194-SDW-LDW Start date: 1/1/1971 End date: 9/9/2020 |
| Billable Pages: | 1 | Cost: | 0.10 |

Tayjes Shah, Esq.
Identification No.: 01750-2009
**The Miller Firm, LLC**
108 Railroad Avenue
Orange, VA 22960
Phone: (540) 672-4224
Fax: (540) 672-3055

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| **VICKIE PAYNE-LAUDER,** | : | |
| **INDIVIDUALLY ON BEHALF OF** | : | |
| **THE ESTATE OF MARTIN PAYNE** | : | |
| | : | **No.** |
| **Plaintiff,** | : | |
| **v.** | : | **JURY TRIAL DEMANDED** |
| | : | |
| | : | |
| **MONSANTO COMPANY and** | : | |
| **BAYER CORPORATION** | : | |
| | : | |
| | : | |
| **Defendants.** | : | |

### COMPLAINT

COMES NOW, ("Plaintiff") Vickie Payne-Lauder, by and through her undersigned

counsel, The Miller Firm LLC, and for her cause of action against Defendants Monsanto

Company and Bayer Corporation, state to the Court as follows:

### I.   INTRODUCTION

1.      Plaintiff's claims in this action are a direct and proximate result of Defendant's

negligent, willful, and wrongful conduct in connection with the design, development, manufacture,

testing, packaging, promoting, marketing, distribution, and/or sale of the products as Roundup®.

The Plaintiff in this action seeks recovery for damages as a result of the decedent developing Non-

Hodgkin's Lymphoma ("NHL"), which was directly and proximately caused by Defendant's

wrongful conduct, the unreasonably dangerous and defective nature of Roundup®, and its active ingredient, glyphosate, and the attendant effects of developing NHL.

## II.   THE PARTIES

2.      Plaintiff Vickie Payne-Lauder and the decedent, Martin Lauder have been at all relevant times residents of Missouri. The decedent Martin Lauder purchased and used Roundup and/or other Monsanto glyphosate-containing products (Roundup®) from 1976 to 2005 and was diagnosed with Non-Hodgkin's Lymphoma in 2006.  Plaintiff, Vickie Payne-Lauder was at all relevant times hereto, the spouse of the decedent, Martin Lauder.

3.      Defendant Monsanto Company ("Monsanto") is a Delaware corporation with its headquarters and principal place of business in St. Louis, County Missouri.

4.      At all times relevant to this complaint, Monsanto was the entity that discovered the herbicidal properties of glyphosate and the manufacturer of Roundup®.

5.      The expiration of any applicable statute of limitations is equitably tolled by reason of Monsanto's fraudulent misrepresentations and fraudulent concealment, detailed more fully below.

6.      Bayer Corporation is the United States subsidiary of Bayer AG, a German corporation. Bayer AG completed its purchase of Monsanto in 2018. Bayer Corporation is an Indiana company, with headquarters in New Jersey.

## III.   BACKGROUND

7.      In 1970, Defendant Monsanto Company, Inc. discovered the herbicidal properties of glyphosate and began marketing it in products in 1974 under the brand name Roundup®. Roundup® is a non-selective herbicide used to kill weeds that commonly compete with the

growing of crops. By 2001, glyphosate had become the most-used active ingredient in American agriculture with 85–90 millions of pounds used annually. That number grew to 185 million pounds by 2007. As of 2013, glyphosate was the world's most widely used herbicide.

8.     Monsanto is a multinational agricultural biotechnology corporation based in St. Louis, Missouri. It is the world's leading producer of glyphosate. As of 2009, Monsanto was the world's leading producer of seeds, accounting for 27% of the world seed market. The majority of these seeds are of the Roundup Ready® brand. The stated advantage of Roundup Ready® crops is that they substantially improve a farmer's ability to control weeds, since glyphosate can be sprayed in the fields during the growing season without harming their crops. In 2010, an estimated 70% of corn and cotton, and 90% of soybean fields in the United States were Roundup Ready®.

9.     Monsanto's glyphosate products are registered in 130 countries and approved for use on over 100 different crops. They are ubiquitous in the environment. Numerous studies confirm that glyphosate is found in rivers, streams, and groundwater in agricultural areas where Roundup® is used. It has been found in food, in the urine of agricultural workers, and even in the urine of urban dwellers who are not in direct contact with glyphosate.

10.     On March 20, 2015, the International Agency for Research on Cancer ("IARC"), an agency of the World Health Organization ("WHO"), issued an evaluation of several herbicides, including glyphosate. That evaluation was based, in part, on studies of exposures to glyphosate in several countries around the world, and it traces the health implications from exposure to glyphosate since 2001.

11.     On July 29, 2015, IARC issued the formal monograph relating to glyphosate. In that monograph, the IARC Working Group provides a thorough review of the numerous studies and data relating to glyphosate exposure in humans.

12.     The IARC Working Group classified glyphosate as a Group 2A herbicide, which means that it is probably carcinogenic to humans. The IARC Working Group concluded that the cancers most associated with glyphosate exposure are Non-Hodgkin's lymphoma and other haematopoietic cancers, including lymphocytic lymphoma/chronic lymphocytic leukemia, B-cell lymphoma, and multiple myeloma.

13.     The IARC evaluation is significant. It confirms what has been believed for years: that glyphosate is toxic to humans.

14.     Nevertheless, Monsanto, since it began selling Roundup®, has represented it as safe to humans and the environment. Indeed, Monsanto and has repeatedly proclaimed and continues to proclaim to the world, and particularly to United States consumers, that glyphosate-based herbicides, including Roundup®, create no unreasonable risks to human health or to the environment.

## IV.     JURISDICTION AND VENUE

15.     At all times relevant hereto, Monsanto was in the business of researching, designing, formulating, compounding, testing, manufacturing, producing, processing, assembling, inspecting, distributing, labeling and packaging and was in the business of marketing, promoting, and/or advertising Roundup® products in the State of New Jersey.

16.     Defendant Bayer Corporation is a corporation incorporated in New Jersey.

17.     Plaintiff has filed this lawsuit in a timely fashion, from the time the Plaintiff knew or reasonably knew of the injury and that it may have been wrongfully caused.

## V.     **FACTS**

18.     Glyphosate is a broad-spectrum, non-selective herbicide used in a wide variety of herbicidal products around the world.

19.     Plants treated with glyphosate translocate the systemic herbicide to their roots, shoot regions and fruit, where it interferes with the plant's ability to form aromatic amino acids necessary for protein synthesis. Treated plants generally die within two to three days. Because plants absorb glyphosate, it cannot be completely removed by washing or peeling produce or by milling, baking, or brewing grains.

20.     For nearly 40 years, farms across the world have used Roundup® without knowing of the dangers its use poses. That is because when Monsanto first introduced Roundup®, it touted glyphosate as a technological breakthrough: it could kill almost every weed without causing harm either to people or to the environment. Of course, history has shown that not to be true. According to the WHO, the main chemical ingredient of Roundup®—glyphosate—is a probable cause of cancer. Those most at risk are farm workers and other individuals with workplace exposure to Roundup®, such as workers in garden centers, nurseries, and landscapers. Agricultural workers are, once again, victims of corporate greed. Monsanto assured the public that Roundup® was harmless. In order to prove this, Monsanto championed falsified data and attacked legitimate studies that revealed its dangers. Monsanto led a prolonged campaign of misinformation to convince government agencies, farmers and the general population that Roundup® was safe.

### *The Discovery of Glyphosate and Development of Roundup®*

21.     The herbicidal properties of glyphosate were discovered in 1970 by Monsanto chemist John Franz. The first glyphosate-based herbicide was introduced to the market in the

mid-1970s under the brand name Roundup®. From the outset, Monsanto marketed Roundup® as a "safe" general-purpose herbicide for widespread commercial and consumer use. Monsanto still markets Roundup® as safe today.

### *Registration of Herbicides under Federal Law*

22.     The manufacture, formulation and distribution of herbicides, such as Roundup®, are regulated under the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA" or "Act"), 7 U.S.C. § 136 *et seq.* FIFRA requires that all pesticides be registered with the Environmental Protection Agency ("EPA" or "Agency") prior to their distribution, sale, or use, except as described by the Act. 7 U.S.C. § 136a(a).

23.     Because pesticides are toxic to plants, animals, and humans, at least to some degree, the EPA requires as part of the registration process, among other things, a variety of tests to evaluate the potential for exposure to pesticides, toxicity to people and other potential non-target organisms, and other adverse effects on the environment. Registration by the EPA, however, is not an assurance or finding of safety. The determination the Agency must make in registering or re-registering a product is not that the product is "safe," but rather that use of the product in accordance with its label directions "will not generally cause unreasonable adverse effects on the environment." 7 U.S.C. § 136a(c)(5)(D).

24.     FIFRA defines "unreasonable adverse effects on the environment" to mean "any unreasonable risk to man or the environment, taking into account the economic, social, and environmental costs and benefits of the use of any pesticide." 7 U.S.C. § 136(bb). FIFRA thus requires EPA to make a risk/benefit analysis in determining whether a registration should be granted or allowed to continue to be sold in commerce.

25.    The EPA registered Roundup® for distribution, sale, and manufacture in the

United States and the States of Missouri and New Jersey.

26.    FIFRA generally requires that the registrant, Monsanto in the case of Roundup®,

conducts the health and safety testing of pesticide products. The EPA has protocols governing

the conduct of tests required for registration and the laboratory practices that must be followed in

conducting these tests. The data produced by the registrant must be submitted to the EPA for

review and evaluation. The government is not required, nor is it able, however, to perform the

product tests that are required of the manufacturer.

27.    The evaluation of each pesticide product distributed, sold, or manufactured is

completed at the time the product is initially registered. The data necessary for registration of a

pesticide has changed over time. The EPA is now in the process of re-evaluating all pesticide

products through a Congressionally-mandated process called "re-registration." 7 U.S.C. § 136a-

1.  In order to reevaluate these pesticides, the EPA is demanding the completion of additional

tests and the submission of data for the EPA's review and evaluation.

28.    In the case of glyphosate, and therefore Roundup®, the EPA had planned on

releasing its preliminary risk assessment —in relation to the re-registration process—no later

than July 2015. The EPA completed its review of glyphosate in early 2015, but it delayed

releasing the risk assessment pending further review in light of the WHO's health-related

findings.

### *Scientific Fraud Underlying the Marketing and Sale of Glyphosate/Roundup*

29.    Based on early studies that glyphosate could cause cancer in laboratory animals,

the EPA originally classified glyphosate as *possibly carcinogenic to humans* (Group C) in 1985.

After pressure from Monsanto, including contrary studies it provided to the EPA, the EPA

changed its classification to *evidence of non-carcinogenicity in humans* (Group E) in 1991. In so

classifying glyphosate, however, the EPA made clear that the designation did not mean the

chemical does not cause cancer: "It should be emphasized, however, that designation of an agent

in Group E is based on the available evidence at the time of evaluation and should not be

interpreted as a definitive conclusion that the agent will not be a carcinogen under any

circumstances."

30.     On two occasions, the EPA found that the laboratories hired by Monsanto to test

the toxicity of its Roundup® products for registration purposes committed fraud.

31.     In the first instance, Monsanto, in seeking initial registration of Roundup® by

EPA, hired Industrial Bio-Test Laboratories ("IBT") to perform and evaluate pesticide

toxicology studies relating to Roundup®. IBT performed about 30 tests on glyphosate and

glyphosate-containing products, including nine of the 15 residue studies needed to register

Roundup®.

32.     In 1976, the United States Food and Drug Administration ("FDA") performed an

inspection of Industrial Bio-Test Industries ("IBT") that revealed discrepancies between the raw

data and the final report relating to the toxicological impacts of glyphosate. The EPA

subsequently audited IBT; it too found the toxicology studies conducted for the Roundup®

herbicide to be invalid. An EPA reviewer stated, after finding "routine falsification of data" at

IBT, that it was "hard to believe the scientific integrity of the studies when they said they took

specimens of the uterus from male rabbits."

33.     Three top executives of IBT were convicted of fraud in 1983.

34.     In the second incident of data falsification, Monsanto hired Craven Laboratories

in 1991 to perform pesticide and herbicide studies, including for Roundup®. In that same year,

the owner of Craven Laboratories and three of its employees were indicted, and later convicted, of fraudulent laboratory practices in the testing of pesticides and herbicides.

35. Despite the falsity of the tests that underlie its registration, within a few years of its launch, Monsanto was marketing Roundup® in 115 countries.

36. Multiple studies have been ghostwritten in part and/or published by Monsanto through companies such as Intertek and Exponent, Inc. from 2000-present which minimize any safety concerns about the use of glyphosate; are used to convince regulators to allow the sale of Roundup, and are used to convince customers to use Roundup. Such studies include, but are not limited to Williams (2000); Williams (2012); Kier & Kirkland (2013); Kier (2015); Bus (2016); Chang (2016); and the Intertek Expert Panel Manuscripts. All of these studies have been submitted to and relied upon the public and the EPA in assessing the safety of glyphosate. Through these means Monsanto has fraudulently represented that independent scientists have concluded that Glyphosate is safe. In fact, these independent experts have been paid by Monsanto and have failed to disclose the significant role Monsanto had in creating the manuscripts. Monsanto has further ghostwritten editorials for scientists such as Robert Tarone and Henry Miller to advocate for the safety of glyphosate in Newspapers and Magazines. Monsanto has also ghostwritten letters by supposed independent scientists submitted to regulatory agencies who are reviewing the safety of glyphosate.

37. Monsanto has also violated federal regulations in holding secret ex parte meetings and conversations with certain EPA employees to collude in a strategy to re-register glyphosate and to quash investigations into the carcinogenicity of glyphosate by other federal agencies such as the Agency for Toxic Substances and Disease Registry. Monsanto's close connection with the EPA arises in part from its offering of lucrative consulting gigs to retiring EPA officials.

38.    In March 2015, The Joint Glyphosate Task Force at Monsanto's behest issued a press release sharply criticizing IARC, stating that IARC's conclusion was "baffling" and falsely claiming that "IARC did not consider any new or unique research findings when making its decision. It appears that only by deciding to exclude certain available scientific information and by adopting a different approach to interpreting the studies was this possible."

39.    Beginning in 2011, the Federal Institute for Risk Assessment (BfR) in Germany began preparing a study on the safety of glyphosate. Through the Glyphosate Task Force, Defendants were able to co-opt this study becoming the sole providers of data and ultimately wrote the report which was rubber-stamped by the BfR. The Glyphosate Task Force was solely responsible for preparing and submitting summary of studies relied upon by the by the BfR. Defendants have used this report, which they wrote, to falsely proclaim the safety of glyphosate.

40.    In October 2015, the Defendants as members of the Joint Glyphosate Task Force wrote to the state of California to try to stop California from warning the public about the carcinogenicity of glyphosate arguing that the IARC classification is mistaken.   In January of 2016 Monsanto filed a lawsuit to stop California from warning the public about the carcinogenicity of glyphosate.

### The Importance of Roundup® to Monsanto's Market Dominance Profits

41.    The success of Roundup® was key to Monsanto's continued reputation and dominance in the marketplace.  Largely due to the success of Roundup® sales, Monsanto's agriculture division was out-performing its chemicals division's operating income, and that gap increased yearly. But with its patent for glyphosate expiring in the United States in the year 2000, Monsanto needed a strategy to maintain its Roundup® market dominance and to ward off impending competition.

42.     In response, Monsanto began the development and sale of genetically engineered Roundup Ready® seeds in 1996. Since Roundup Ready® crops are resistant to glyphosate; farmers can spray Roundup® onto their fields during the growing season without harming the crop. This allowed Monsanto to expand its market for Roundup® even further; by 2000, Monsanto's biotechnology seeds were planted on more than 80 million acres worldwide and nearly 70% of American soybeans were planted from Roundup Ready® seeds. It also secured Monsanto's dominant share of the glyphosate/Roundup® market through a marketing strategy that coupled proprietary Roundup Ready® seeds with continued sales of its Roundup® herbicide.

43.     Through a three-pronged strategy of increased production, decreased prices and by coupling with Roundup Ready® seeds, Roundup® became Monsanto's most profitable product. In 2000, Roundup® accounted for almost $2.8 billion in sales, outselling other herbicides by a margin of five to one, and accounting for close to half of Monsanto's revenue. Today, glyphosate remains one of the world's largest herbicides by sales volume.

***Monsanto has known for decades that it falsely advertises the safety of Roundup®.***

44.     In 1996, the New York Attorney General ("NYAG") filed a lawsuit against Monsanto based on its false and misleading advertising of Roundup ® products. Specifically, the lawsuit challenged Monsanto's general representations that its spray-on glyphosate-based herbicides, including Roundup®, were **"safer than table salt"** and **"practically non-toxic"** to mammals, birds, and fish. Among the representations the NYAG found deceptive and misleading about the human and environmental safety of Roundup® are the following:

a)      Remember that environmentally friendly Roundup herbicide is biodegradable.  It won't build up in the soil so you can use Roundup with confidence along customers' driveways, sidewalks and fences ...

b)      And remember that Roundup is biodegradable and won't build up in the soil. That will give you the environmental confidence you need to use Roundup everywhere you've got a weed, brush, edging or trimming problem.

c)      Roundup biodegrades into naturally occurring elements.

d)      Remember that versatile Roundup herbicide stays where you put it. That means there's no washing or leaching to harm customers' shrubs or other desirable vegetation.

e)      This non-residual herbicide will not wash or leach in the soil. It ... stays where you apply it.

f)      You can apply Accord with "confidence because it will stay where you put it" it bonds tightly to soil particles, preventing leaching. Then, soon after application, soil microorganisms biodegrade Accord into natural products.

g)      Glyphosate is less toxic to rats than table salt following acute oral ingestion.

h)      Glyphosate's safety margin is much greater than required. It has over a 1,000-fold safety margin in food and over a 700-fold safety margin for workers who manufacture it or use it.

i)      You can feel good about using herbicides by Monsanto. They carry a toxicity category rating of 'practically non-toxic' as it pertains to mammals, birds and fish.

j)       "Roundup can be used where kids and pets will play and breaks down into

natural material." This ad depicts a person with his head in the ground and a pet

dog standing in an area which has been treated with Roundup.

45.     November 19, 1996, Monsanto entered into an Assurance of Discontinuance with

NYAG, in which Monsanto agreed, among other things, "to cease and desist from publishing or

broadcasting any advertisements [in New York] that represent, directly or by implication" that:

a)       its glyphosate-containing pesticide products or any component thereof are

safe, non-toxic, harmless or free from risk. * * *

b)       its glyphosate-containing pesticide products or any component thereof

manufactured, formulated, distributed or sold by Monsanto are biodegradable * *

*

c)       its glyphosate-containing pesticide products or any component thereof stay

where they are applied under all circumstances and will not move through the

environment by any means.

* * *

d)       its glyphosate-containing pesticide products or any component thereof are

"good" for the environment or are "known for their environmental

characteristics." * * *

e)       glyphosate-containing pesticide products or any component thereof are

safer or less toxic than common consumer products other than herbicides;

f)       its glyphosate-containing products or any component thereof might be

classified as "practically non-toxic.

46.     Monsanto did not alter its advertising in the same manner in any state other than New York, and on information and belief still has not done so today.

47.     In 2009, France's highest court ruled that Monsanto had not told the truth about the safety of Roundup®. The French court affirmed an earlier judgment that Monsanto had falsely advertised its herbicide Roundup® as "biodegradable" and that it "left the soil clean."

### *Classifications and Assessments of Glyphosate*

48.     The IARC process for the classification of glyphosate followed the stringent procedures for the evaluation of a chemical agent. Over time, the IARC Monograph program has reviewed 980 agents. Of those reviewed, it has determined 116 agents to be Group 1 (Known Human Carcinogens); 73 agents to be Group 2A (Probable Human Carcinogens); 287 agents to be Group 2B (Possible Human Carcinogens); 503 agents to be Group 3 (Not Classified); and one agent to be Probably Not Carcinogenic.

49.     The established procedure for IARC Monograph evaluations is described in the IARC Programme's Preamble.  Evaluations are performed by panels of international experts, selected on the basis of their expertise and the absence of actual or apparent conflicts of interest.

50.     One year before the Monograph meeting, the meeting is announced and there is a call both for data and for experts. Eight months before the Monograph meeting, the Working Group membership is selected and the sections of the Monograph are developed by the Working Group members. One month prior to the Monograph meeting, the call for data is closed and the various draft sections are distributed among Working Group members for review and comment. Finally, at the Monograph meeting, the Working Group finalizes review of all literature, evaluates the evidence in each category, and completes the overall evaluation. Within two weeks after the Monograph meeting, the summary of the Working Group findings are published in

Lancet Oncology, and within a year after the meeting, the final Monograph is finalized and published.

51.     In assessing an agent, the IARC Working Group reviews the following information:

        (a)     human, experimental, and mechanistic data;

        (b)     all pertinent epidemiological studies and cancer bioassays; and

        (c)     representative mechanistic data. The studies must be publicly available and have sufficient detail for meaningful review, and reviewers cannot be associated with the underlying study.

52.     In March 2015, IARC reassessed glyphosate. The summary published in *The Lancet Oncology* reported that glyphosate is a Group 2A agent and probably carcinogenic in humans.

53.     On July 29, 2015, IARC issued its Monograph for glyphosate, Monograph 112. For Volume 112, the volume that assessed glyphosate, a Working Group of 17 experts from 11 countries met at IARC from March 3–10, 2015, to assess the carcinogenicity of certain herbicides, including glyphosate. The March meeting culminated nearly a one-year review and preparation by the IARC Secretariat and the Working Group, including a comprehensive review of the latest available scientific evidence. According to published procedures, the Working Group considered "reports that have been published or accepted for publication in the openly available scientific literature" as well as "data from governmental reports that are publicly available."

54.     The studies considered the following exposure groups: occupational exposure of farmers and tree nursery workers in the United States, forestry workers in Canada and Finland

and municipal weed-control workers in the United Kingdom; and para-occupational exposure in farming families.

55.     Glyphosate was identified as the second-most used household herbicide in the United States for weed control between 2001 and 2007 and the most heavily used herbicide in the world in 2012[1].

56.     Exposure pathways are identified as air (especially during spraying), water, and food. Community exposure to glyphosate is widespread and found in soil, air, surface water, and groundwater, as well as in food.

57.     The assessment of the IARC Working Group identified several case control studies of occupational exposure in the United States, Canada, and Sweden. These studies show a human health concern from agricultural and other work-related exposure to glyphosate.

58.     The IARC Working Group found an increased risk between exposure to glyphosate and Non-Hodgkin's lymphoma ("NHL") and several subtypes of NHL, and the increased risk persisted after adjustment for other pesticides.

59.     The IARC Working Group also found that glyphosate caused DNA and chromosomal damage in human cells. One study in community residents reported increases in blood markers of chromosomal damage (micronuclei) after glyphosate formulations were sprayed.

60.     In male CD-1 mice, glyphosate induced a positive trend in the incidence of a rare tumor, renal tubule carcinoma. A second study reported a positive trend for haemangiosarcoma

_____

in male mice. Glyphosate increased pancreatic islet-cell adenoma in male rats in two studies. A glyphosate formulation promoted skin tumors in an initiation-promotion study in mice.

61.    The IARC Working Group also noted that glyphosate has been detected in the urine of agricultural workers, indicating absorption. Soil microbes degrade glyphosate to aminomethylphosphoric acid (AMPA). Blood AMPA detection after exposure suggests intestinal microbial metabolism in humans.

62.    The IARC Working Group further found that glyphosate and glyphosate formulations induced DNA and chromosomal damage in mammals, and in human and animal cells in utero.

63.    The IARC Working Group also noted genotoxic, hormonal, and enzymatic effects in mammals exposed to glyphosate. Essentially, glyphosate inhibits the biosynthesis of aromatic amino acids, which leads to several metabolic disturbances, including the inhibition of protein and secondary product biosynthesis and general metabolic disruption.

64.    The IARC Working Group also reviewed an Agricultural Health Study, consisting of a prospective cohort of 57,311 licensed pesticide applicators in Iowa and North Carolina. While this study differed from others in that it was based on a self-administered questionnaire, the results support an association between glyphosate exposure and Multiple Myeloma, Hairy Cell Leukemia (HCL), and Chronic Lymphocytic Leukemia (CLL), in addition to several other cancers.

### Other Earlier Findings About Glyphosate's Dangers to Human Health

65.    The EPA has a technical fact sheet, as part of its Drinking Water and Health, National Primary Drinking Water Regulations publication, relating to glyphosate. This technical

fact sheet predates the IARC March 20, 2015, evaluation. The fact sheet describes the release

patterns for glyphosate as follows:

### Release Patterns

66.     Glyphosate is released to the environment in its use as a herbicide for controlling

woody and herbaceous weeds on forestry, right-of-way, cropped and non-cropped sites. These

sites may be around water and in wetlands. It may also be released to the environment during its

manufacture, formulation, transport, storage, disposal and cleanup, and from spills. Since

glyphosate is not a listed chemical in the Toxics Release Inventory, data on releases during its

manufacture and handling are not available. Occupational workers and home gardeners may be

exposed to glyphosate by inhalation and dermal contact during spraying, mixing, and cleanup.

They may also be exposed by touching soil and plants to which glyphosate was applied.

Occupational exposure may also occur during glyphosate's manufacture, transport storage, and

disposal.

67.     In 1995, the Northwest Coalition for Alternatives to Pesticides reported that in

California, the state with the most comprehensive program for reporting of pesticide-caused

illness, glyphosate was the third most commonly-reported cause of pesticide illness among

agricultural workers.

### Recent Worldwide Bans on Roundup®/Glyphosate

68.     Several countries around the world have instituted bans on the sale of Roundup®

and other glyphosate-containing herbicides, both before and since IARC first announced its

assessment for glyphosate in March 2015, and more countries undoubtedly will follow suit in

light of the as the dangers of the use of Roundup® are more widely known. The Netherlands

issued a ban on all glyphosate-based herbicides in April 2014, including Roundup®, which takes

effect by the end of 2015. In issuing the ban, the Dutch Parliament member who introduced the successful legislation stated: "Agricultural pesticides in user-friendly packaging are sold in abundance to private persons. In garden centers, Roundup® is promoted as harmless, but unsuspecting customers have no idea what the risks of this product are. Especially children are sensitive to toxic substances and should therefore not be exposed to it."

69.     The Brazilian Public Prosecutor in the Federal District requested that the Brazilian Justice Department suspend the use of glyphosate.

70.     France banned the private sale of Roundup® and glyphosate following the IARC assessment for Glyphosate.

71.     Bermuda banned both the private and commercial sale of glyphosates, including Roundup®. The Bermuda government explained its ban as follows: "Following a recent scientific study carried out by a leading cancer agency, the importation of weed spray 'Roundup' has been suspended."

72.     The Sri Lankan government banned the private and commercial use of glyphosates, particularly out of concern that Glyphosate has been linked to fatal kidney disease in agricultural workers.

73.     The government of Columbia announced its ban on using Roundup® and glyphosate to destroy illegal plantations of coca, the raw ingredient for cocaine, because of the WHO's finding that glyphosate is probably carcinogenic.

V.     **CLAIMS**

**COUNT I**
**STRICT LIABILITY (DESIGN DEFECT)**

74.     The Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

75.     The Plaintiff brings this strict liability claim against Monsanto for defective design.

76.     At all times relevant to this litigation, Monsanto engaged in the business of testing, developing, manufacturing, selling, distributing, and Monsanto a engaged in the marketing, packaging design, and promotion of Roundup® products, which are defective and unreasonably dangerous to consumers, including the decedent, thereby placing Roundup® products into the stream of commerce. These actions were under the ultimate control and supervision of Monsanto. At all times relevant to this litigation, Monsanto designed, researched, developed, manufactured, produced, tested, assembled, labeled, advertised, promoted, marketed, sold, and distributed the Roundup® products used by the decedent, as described above.

77.     At all times relevant to this litigation, Roundup® products were manufactured, designed, and labeled in an unsafe, defective, and inherently dangerous manner that was dangerous for use by or exposure to the public, and, in particular, the decedent.

78.     At all times relevant to this litigation, Roundup® products reached the intended consumers, handlers, and users or other persons coming into contact with these products in Missouri and throughout the United States, including the decedent, without substantial change in their condition as designed, manufactured, sold, distributed, labeled, and marketed by Monsanto.

79.     Roundup® products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold, and marketed by Monsanto were defective in design and formulation in that when they left the hands of the manufacturers and/or suppliers, they were unreasonably dangerous and dangerous to an extent beyond that which an ordinary consumer would contemplate.

80.     Roundup® products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold, and marketed by Monsanto were defective in design and formulation in that when they left the hands of the manufacturers and/or suppliers, the foreseeable risks exceeded the alleged benefits associated with their design and formulation.

81.     At all times relevant to this action, Monsanto knew or had reason to know that Roundup® products were defective and were inherently dangerous and unsafe when used in the manner instructed and provided by Monsanto.

82.     Therefore, at all times relevant to this litigation, Roundup® products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold and marketed by Monsanto were defective in design and formulation, in one or more of the following ways:

> (a)     When placed in the stream of commerce, Roundup® products were defective in design and formulation, and, consequently, dangerous to an extent beyond that which an ordinary consumer would contemplate.
>
> (b)     When placed in the stream of commerce, Roundup® products were unreasonably dangerous in that they were hazardous and posed a grave risk of cancer and other serious illnesses when used in a reasonably anticipated manner.
>
> (c)     When placed in the stream of commerce, Roundup® products contained unreasonably dangerous design defects and were not reasonably safe when used in a reasonably anticipated or intended manner.
>
> (d)     Monsanto did not sufficiently test, investigate, or study Roundup® products and, specifically, the active ingredient glyphosate.

(e)      Exposure to Roundup® and glyphosate-containing products presents a risk

of harmful side effects that outweigh any potential utility stemming from the use

of the herbicide.

(f)      At the time of marketing its Roundup® products, Roundup® was

defective in that exposure to Roundup® and specifically, its active ingredient

glyphosate, could result in cancer and other severe illnesses and injuries.

(g)      Monsanto did not conduct adequate post-marketing surveillance of its

Roundup® products.

(h)      Monsanto could have employed safer alternative designs and

formulations.

83.      The decedent was exposed to Roundup® products, as described above, without

knowledge of their dangerous characteristics.

84.      At all times relevant to this litigation, the decedent used and/or was exposed to the

use of Roundup® products in an intended or reasonably foreseeable manner without knowledge

of their dangerous characteristics.

85.      The decedent could not have reasonably discovered the defects and risks

associated with Roundup® or glyphosate-containing products before or at the time of exposure.

86.      The harm caused by Roundup® products far outweighed their benefit, rendering

these products dangerous to an extent beyond that which an ordinary consumer would

contemplate. Roundup® products were and are more dangerous than alternative products and

Monsanto could have designed Roundup® products (including their packaging and sales aids) to

make them less dangerous. Indeed, at the time that Monsanto designed Roundup® products, the

state of the industry's scientific knowledge was such that a less risky design or formulation was attainable.

87.    At the time Roundup® products left Monsanto's control, there was a practical, technically feasible and safer alternative design that would have prevented the harm without substantially impairing the reasonably anticipated or intended function of those herbicides.

88.    Monsanto's defective design of Roundup® products was willful, wanton, fraudulent, malicious, and conducted with reckless disregard for the health and safety of users of the Roundup® products, including the Plaintiff herein.

89.    Therefore, as a result of the unreasonably dangerous condition of its Roundup® products, Monsanto is strictly liable to the Plaintiff.

90.    The defects in Roundup® products caused or contributed to cause the decedent grave injuries, and, but for Monsanto's misconduct and omissions, the decedent would not have sustained their injuries.

91.    Monsanto's conduct, as described above, was reckless. Monsanto risked the lives of consumers and users of its products, including the decedent, with knowledge of the safety problems associated with Roundup® and glyphosate-containing products, and suppressed this knowledge from the general public. Monsanto made conscious decisions not to redesign, warn or inform the unsuspecting public. Monsanto's reckless conduct warrants an award of aggravated damages.

92.    As a direct and proximate result of Monsanto placing defective Roundup® products into the stream of commerce, the decedent have suffered and continue to suffer grave injuries, and have endured physical pain and discomfort, as well as economic hardship, including considerable financial expenses for medical care, and treatment.

WHEREFORE, the Plaintiff respectfully requests that this Court enter judgment in Plaintiff's favor for compensatory and punitive damages in an amount in excess of Seventy Five Thousand Dollars ($75,000.00), together with interest, costs herein incurred, and all such other and further relief as this Court deems just and proper. The Plaintiff also demands a jury trial on the issues contained herein.

## COUNT II
## STRICT LIABILITY (FAILURE TO WARN)

93.     The Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

94.     The Plaintiff brings this strict liability claim against Monsanto for failure to warn.

95.     At all times relevant to this litigation, Monsanto engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting Roundup® products, , which are defective and unreasonably dangerous to consumers, including the decedent, because they do not contain adequate warnings or instructions concerning the dangerous characteristics of Roundup® and specifically, the active ingredient glyphosate. These actions were under the ultimate control and supervision of Monsanto.

96.     Monsanto researched, developed, designed, tested, manufactured, inspected, labeled, distributed, marketed, promoted, sold, and otherwise released into the stream of commerce Roundup® products, and in the course of same, directly advertised or marketed the products to consumers and end users, including the decedent, and therefore had a duty to warn of the risks associated with the use of Roundup® and glyphosate-containing products.

97.     At all times relevant to this litigation, Monsanto had a duty to properly test, develop, design, manufacture, inspect, package, label, market, promote, sell, distribute, maintain supply, provide proper warnings, and take such steps as  necessary to ensure that Roundup®

products did not cause users and consumers to suffer from unreasonable and dangerous risks.
Monsanto had a continuing duty to warn the decedent of the dangers associated with Roundup®
use and exposure. Monsanto, as manufacturer, seller, promoter, marketer, or distributor of
chemical herbicides are held to the knowledge of an expert in the field.

98.     At the time of manufacture, Monsanto could have provided the warnings or
instructions regarding the full and complete risks of Roundup® and glyphosate-containing
products because they knew or should have known of the unreasonable risks of harm associated
with the use of and/or exposure to such products.

99.     At all times relevant to this litigation, Monsanto failed to investigate, study, test,
or promote the safety or to minimize the dangers to users and consumers of its product and to
those who would foreseeably use or be harmed by these herbicides, including the decedent.

100.     Despite the fact that Monsanto knew or should have known that Roundup® posed
a grave risk of harm, it failed to exercise reasonable care to warn of the dangerous risks
associated with use and exposure. The dangerous propensities of these products and the
carcinogenic characteristics of glyphosate, as described above, were known to Monsanto, or
scientifically knowable to Monsanto through appropriate research and testing by known
methods, at the time they distributed, marketed, promoted, supplied or sold the product, and not
known to end users and consumers, such as the decedent.

101.     These products created significant risks of serious bodily harm to consumers, as
alleged herein, and Monsanto failed to adequately warn consumers and reasonably foreseeable
users of the risks of exposure to its products. Monsanto has wrongfully concealed information
concerning the dangerous nature of Roundup® and its active ingredient glyphosate, and further
made false and/or misleading statements concerning the safety of Roundup® and glyphosate.

102.    At all times relevant to this litigation, Roundup® products reached the intended

consumers, handlers, and users or other persons coming into contact with these products in

Missouri and throughout the United States, including the decedent, without substantial change in

their condition as designed, manufactured, sold, distributed, labeled, promoted and marketed by

Monsanto.

103.    The decedent was exposed to Roundup® products in the course of their personal

use on their garden and farm, without knowledge of their dangerous characteristics.

104.    At all times relevant to this litigation, the decedent used and/or was exposed to the

use of Roundup® products in their intended or reasonably foreseeable manner without

knowledge of their dangerous characteristics.

105.    The decedent could not have reasonably discovered the defects and risks

associated with Roundup® or glyphosate-containing products prior to or at the time of the

decedent's exposure. The decedent relied upon the skill, superior knowledge, and judgment of

Monsanto.

106.    These products were defective because the minimal warnings disseminated with

Roundup® products were inadequate, and they failed to communicate adequate information on

the dangers and safe use/exposure and failed to communicate warnings and instructions that were

appropriate and adequate to render the products safe for their ordinary, intended and reasonably

foreseeable uses, including agricultural and landscaping applications.

107.    The information that Monsanto did provide or communicate failed to contain

relevant warnings, hazards, and precautions that would have enabled consumers such as the

decedent to utilize the products safely and with adequate protection. Instead, Monsanto

disseminated information that was inaccurate, false, and misleading and which failed to

communicate accurately or adequately the comparative severity, duration, and extent of the risk

of injuries with use of and/or exposure to Roundup® and glyphosate; continued to aggressively

promote the efficacy of its products, even after it knew or should have known of the

unreasonable risks from use or exposure; and concealed, downplayed, or otherwise suppressed,

through aggressive marketing and promotion, any information or research about the risks and

dangers of exposure to Roundup® and glyphosate.

108.     To this day, Monsanto has failed to adequately and accurately warn of the true

risks of the decedent's injuries associated with the use of and exposure to Roundup® and its

active ingredient glyphosate, a probable carcinogen.

109.     As a result of their inadequate warnings, Roundup® products were defective and

unreasonably dangerous when they left the possession and/or control of Monsanto, were

distributed, marketed, and promoted by Monsanto.

110.     Monsanto is liable to the decedent, for injuries caused by their negligent or willful

failure, as described above, to provide adequate warnings or other clinically relevant information

and data regarding the appropriate use of these products and the risks associated with the use of

or exposure to Roundup® and glyphosate.

111.     The defects in Roundup® products caused or contributed to cause decedent's

injuries, and, but for this misconduct and omissions, the decedent would not have sustained their

injuries.

112.     Had Monsanto provided adequate warnings and instructions and properly

disclosed and disseminated the risks associated with Roundup® products, the decedent could

have avoided the risk of developing injuries as alleged herein.

113.     As a direct and proximate result of Monsanto placing defective Roundup®

products into the stream of commerce, the decedent suffered severe injuries and endured physical

pain and discomfort, as well as economic hardship, including considerable financial expenses for

medical care and treatment.

WHEREFORE, the Plaintiff respectfully request that this Court enter judgment in the

Plaintiff's favor for compensatory and punitive damages in an amount in excess of Seventy Five

Thousand Dollars ($75,000.00)  together with interest, costs herein incurred, and all such other

and further relief as  this Court deems just and proper. The Plaintiff also demands a jury trial on

the issues contained herein.

## COUNT III

## NEGLIGENCE

114.     The Plaintiff incorporates by reference each and every allegation set forth in the

preceding paragraphs as if fully stated herein.

115.     Monsanto, directly or indirectly, caused Roundup® products to be sold,

distributed, packaged, labeled, marketed, promoted, and/or used by the decedent.

116.     At all times relevant to this litigation, Monsanto had a duty to exercise reasonable

care in the design, research, manufacture, marketing, advertisement, supply, promotion,

packaging, sale, and distribution of Roundup® products, including the duty to take all reasonable

steps necessary to manufacture, promote, and/or sell a product that was not unreasonably

dangerous to consumers and users of the product.

117.     At all times relevant to this litigation, Monsanto had a duty to exercise reasonable

care in the marketing, advertisement, and sale of the Roundup® products. Monsanto's duty of

care owed to consumers and the general public included providing accurate, true, and correct

information concerning the risks of using Roundup® and appropriate, complete, and accurate warnings concerning the potential adverse effects of exposure to Roundup®, and, in particular, its active ingredient glyphosate.

118.    At all times relevant to this litigation, Monsanto knew or, in the exercise of reasonable care, should have known of the hazards and dangers of Roundup® and specifically, the carcinogenic properties of the chemical glyphosate.

119.    Accordingly, at all times relevant to this litigation, Monsanto knew or, in the exercise of reasonable care, should have known that use of or exposure to its Roundup® products could cause or be associated with the decedent's injuries and thus created a dangerous and unreasonable risk of injury to the users of these products, including the decedent.

120.    Monsanto also knew or, in the exercise of reasonable care, should have known that users and consumers of Roundup® were unaware of the risks and the magnitude of the risks associated with use of and/or exposure to Roundup® and glyphosate-containing products.

121.    As such, Monsanto breached the duty of reasonable care and failed to exercise ordinary care in the design, research, development, manufacture, testing, marketing, supply, promotion, advertisement, packaging, sale, and distribution of its Roundup® products, in that Monsanto manufactured, marketed, promoted, and sold defective herbicides containing the chemical glyphosate, knew or had reason to know of the defects inherent in these products, knew or had reason to know that a user's or consumer's exposure to the products created a significant risk of harm and unreasonably dangerous side effects, and failed to prevent or adequately warn of these risks and injuries.

122.    Despite an ability and means to investigate, study, and test these products and to provide adequate warnings, Monsanto has failed to do so. Indeed, Monsanto has wrongfully

concealed information and have further made false and/or misleading statements concerning the

safety and/or exposure to Roundup® and glyphosate.

123.    Monsanto was negligent in the following respects:

(a)    Manufacturing, producing, promoting, formulating, creating, developing,

designing, selling, and/or distributing its Roundup® products without thorough

and adequate pre- and post-market testing;

(b)    Manufacturing, producing, promoting, formulating, creating, developing,

designing, selling, and/or distributing Roundup® while negligently and/or

intentionally concealing and failing to disclose the results of trials, tests, and

studies of exposure to glyphosate, and, consequently, the risk of serious harm

associated with human use of and exposure to Roundup®;

(c)    Failing to undertake sufficient studies and conduct necessary tests to

determine whether or not Roundup® products and glyphosate-containing products

were safe for their intended use in agriculture and horticulture;

(d)    Failing to use reasonable and prudent care in the design, research,

manufacture, and development of Roundup® products so as to avoid the risk of

serious harm associated with the prevalent use of Roundup®/glyphosate as an

herbicide;

(e)    Failing to design and manufacture Roundup® products so as to ensure

they were at least as safe and effective as other herbicides on the market;

(f)    Failing to provide adequate instructions, guidelines, and safety precautions

to those persons who Monsanto could reasonably foresee would use and be

exposed to its Roundup® products;

(g)     Failing to disclose to the decedent, users/consumers, and the general

public that use of and exposure to Roundup® presented severe risks of cancer and

other grave illnesses;

(h)     Failing to warn the decedent, consumers, and the general public that the

product's risk of harm was unreasonable and that there were safer and effective

alternative herbicides available to the decedent and other consumers;

(i)     Systematically suppressing or downplaying contrary evidence about the

risks, incidence, and prevalence of the side effects of Roundup® and glyphosate-

containing products;

(j)     Representing that its Roundup® products were safe for their intended use

when, in fact,   Monsanto knew or should have known that the products were not

safe for their intended purpose;

(k)     Declining to make or propose any changes to Roundup® products'

labeling or other promotional materials that would alert the consumers and the

general public of the risks of Roundup® and glyphosate;

(l)     Advertising, marketing, and recommending the use of the Roundup®

products, while concealing and failing to disclose or warn of the dangers known

by Monsanto to be associated with or caused by the use of or exposure to

Roundup® and glyphosate;

(m)     Continuing to disseminate information to its consumers, which indicate or

imply that Monsanto's Roundup® products are not unsafe for use in the

agricultural and horticultural industries; and

(n)     Continuing the manufacture and sale of its products with the knowledge
that the products were unreasonably unsafe and dangerous.

124.     Monsanto knew and/or should have known that it was foreseeable that consumers
such as the decedent would suffer injuries as a result of Monsanto's failure to exercise ordinary
care in the manufacturing, marketing, promotion, labeling, distribution, and sale of Roundup®.

125.     The decedent did not know the nature and extent of the injuries that could result
from the intended use of and/or exposure to Roundup® or its active ingredient glyphosate.

126.     Monsanto's negligence was the proximate cause of the injuries, harm, and
economic losses that the decedent suffered, as described herein.

127.     Monsanto's conduct, as described above, was reckless. Monsanto regularly risked
the lives of consumers and users of their products, including the decedent, with full knowledge
of the dangers of these products. Monsanto has made conscious decisions not to redesign, re-
label, warn, or inform the unsuspecting public, including the decedent. Monsanto's reckless
conduct therefore warrants an award of aggravated or punitive damages.

128.     As a proximate result of Monsanto's wrongful acts and omissions in placing
defective Roundup® products into the stream of commerce without adequate warnings of the
hazardous and carcinogenic nature of glyphosate, the decedent had suffered severe and
permanent physical and emotional injuries. The decedent, have endured pain and suffering, has
suffered economic losses (including significant expenses for medical care and treatment) in an
amount to be determined.

WHEREFORE, the Plaintiff respectfully request that this Court enter judgment in
Plaintiff's favor for compensatory and punitive damages in an amount in excess of Seventy Five
Thousand Dollars ($75,000.00) together with interest, costs herein incurred, and all such other and

further relief as this Court deems just and proper. The Plaintiff also demands a jury trial on the
issues contained herein.

**COUNT IV**

**FRAUD, MISREPRESENTATION, AND SUPPRESION**

129.     The Plaintiff incorporates by reference all of the above paragraphs as if set forth in
full herein.

130.     Defendants fraudulently, intentionally, and/or negligently misrepresented to the
public, and to the decedent, both directly and by and through the media, the scientific literature
and purported "community outreach" programs, the safety of Roundup products, and/or
fraudulently, intentionally, and/or negligently concealed, suppressed, or omitted material, adverse
information regarding the safety of Roundup.

131.     The intentional and/or negligent misrepresentations and omissions of Defendants
regarding the safety of Roundup products were communicated to the decedent directly through
ghostwritten articles, editorials, national and regional advertising, marketing and promotion
efforts, as well as the packaging and sales aids.  The safety of Roundup products was also
intentionally and/or negligently misrepresented to the decedent and the public with the intent that
such misrepresentations would cause the decedent and other potential consumers to purchase and
use or continue to purchase and use Roundup products.

132.     Defendants either knew or should have known of the material representations they
were making regarding the safety and relative utility of Roundup products.

133.     Defendants fraudulently, intentionally, and/or negligently made the
misrepresentations and/or actively concealed, suppressed, or omitted this material information
with the specific desire to induce the decedent, and the consuming public to purchase and use

Roundup products. Defendants fraudulently, intentionally, and/or negligently, knew or should

have known that the decedent and the consuming public would rely on such material

misrepresentations and/or omissions in selecting and applying Roundup products.  Defendants

knew or should have known that the decedent would rely on their false representations and

omissions.

134.     Defendants made these misrepresentations and actively concealed adverse

information including the risk of Non-Hodgkin's lymphoma, at a time when, their agents and/or

employees knew or should have known, the product had defects, dangers, and characteristics that

were other than what was represented to the consuming public.  Despite the fact that Defendants

knew or should have known of reports of severe risks including Non-Hodgkin's lymphoma, with

Roundup use and exposure, this information was strategically minimized, understated, or omitted

in order to create the impression that the human dangers of Roundup were nonexistent,

particularly in light of its purported utility.

135.     The fraudulent, intentional and/or negligent material misrepresentations and/or

active concealment, suppression, and omissions by Defendants were perpetuated directly and/or

indirectly through the advertisements, packaging, sales aids, furtive public relations efforts, and

other marketing and promotional pieces authored, analyzed, created, compiled, designed, drafted,

disseminated, distributed, edited, evaluated, marketed, published, and supplied by Monsanto.

136.     If the decedent had known the true facts concerning the risks associated with

Roundup exposure, the decedent would have used a safer alternative.

137.     The decedent's reliance upon the material misrepresentations and omissions was

justified, among other reasons, because said misrepresentations and omissions were made by

individuals and entities who were in a position to know the true facts concerning Roundup while

the decedent was not in a position to know the true facts because Defendants overstated the

benefits and safety of Roundup and downplayed the risk of lymphoma, thereby inducing the

decedent to use the herbicide rather than safer alternatives.

138.    As a direct and proximate result of Defendants' actions and inactions, the

decedent was exposed to Roundup and suffered and will continue to suffer injuries and damages,

as set forth herein.

WHEREFORE, Plaintiff demand judgment for compensatory, treble, and punitive

damages, together with interest, costs of suit, attorneys' fees, in an amount greater than Seventy-

Five Thousand Dollars ($75,000.00), and all such other relief as the Court deems proper.

## COUNT V

## VIOLATION OF THE CONSUMER FRAUD ACTS

139.    Plaintiff incorporates by reference all of the above paragraphs as if set forth in full

herein.

140.    Defendants fraudulently, intentionally, negligently, and/or innocently

misrepresented to the public, and to the decedent, both directly and by and through the media and

purported "community outreach" programs, the safety of Roundup products, and/or fraudulently,

intentionally, negligently and/or innocently concealed, suppressed, or omitted material, adverse

information regarding the safety of Roundup.  This deception caused injury to the decedent in

violation of the Consumer Fraud Act of the decedent's home states which create private rights of

action by the Plaintiff.

141.    The intentional, negligent, and/or innocent misrepresentations and omissions of

Defendants regarding the safety of Roundup products were communicated to the decedent

directly through national and regional advertising, marketing and promotion efforts, as well as

the packaging and sales aids. The safety of Roundup products was also intentionally, negligently, and/or innocently misrepresented to the decedent and the public with the intent that such misrepresentations would cause the decedent and other potential consumers to purchase and use or continue to purchase and use Roundup products.

142.     Defendants either knew or should have known of the material representations they were making regarding the safety and relative utility of Roundup products.

143.     Defendants fraudulently, intentionally, negligently, and/or innocently made the misrepresentations and/or actively concealed, suppressed, or omitted this material information with the specific desire to induce Plaintiff, and the consuming public to purchase and use Roundup products. Defendants fraudulently, intentionally, negligently, and/or innocently, knew or should have known that the decedent and the consuming public would rely on such material misrepresentations and/or omissions in selecting and applying Roundup products. Defendants knew or should have known that decedent would rely on their false representations and omissions.

144.     Defendants made these misrepresentations and actively concealed adverse information including the risk of Non-Hodgkin's lymphoma, at a time when, their agents and/or employees knew or should have known, the product had defects, dangers, and characteristics that were other than what was represented to the consuming public. Specifically, Defendants misrepresented and actively concealed, suppressed, and omitted that there had been inadequate testing of the safety and efficacy of Roundup, and that prior studies, research, reports, and/or testing had been conducted linking the use of the drug with serious health events, including Non-Hodgkin lymphoma.

145.    Despite the fact that Defendants knew or should have known of reports of severe

risks including Non-Hodgkin's lymphoma, with Roundup use and exposure, this information

was strategically minimized, understated, or omitted in order to create the impression that the

human dangers of Roundup were nonexistent, particularly in light of its purported utility.

146.    The fraudulent, intentional, negligent and/or innocent material misrepresentations

and/or active concealment, suppression, and omissions by Defendants were perpetuated directly

and/or indirectly through the advertisements, packaging, sales aids, furtive public relations

efforts, and other marketing and promotional pieces authored, analyzed, created, compiled,

designed, drafted, disseminated, distributed, edited, evaluated, marketed, published, and supplied

by Defendants.

147.    If the decedent had known the true facts concerning the risks associated with

Roundup exposure, the decedent would have used a safer alternative.

148.    The decedent's reliance upon the material misrepresentations and omissions was

justified, among other reasons, because said misrepresentations and omissions were made by

individuals and entities who were in a position to know the true facts concerning Roundup while

the decedent was not in a position to know the true facts because Defendants overstated the

benefits and safety of Roundup and downplayed the risk of lymphoma, thereby inducing the

decedent to use the herbicide rather than safer alternatives.

149.    Federal law and the EPA do not authorize and specifically prohibit the deceptions,

misrepresentations and omissions made by Defendants.

150.    As a direct and proximate result of Defendants' actions and inactions, the

decedent was exposed to Roundup and suffered and will continue to suffer injuries and damages,

as set forth herein.

WHEREFORE, Plaintiff demand judgment for compensatory, treble, and punitive damages, together with interest, costs of suit, attorneys' fees, in an amount greater than Seventy-Five Thousand Dollars ($75,000.00), and all such other relief as the Court deems proper.

## COUNT VI

## LOSS OF CONSORTIUM

151.    The Plaintiff repeats and reiterates the allegations previously set forth herein.

152.    Plaintiff, Ms. Payne-Lauder was entitled to the comfort, care, affection, companionship, services, society, advice, guidance, counsel, and consortium of her spouse.

153.    As a direct and proximate result of one or more of those wrongful acts or omissions of the Defendants described above, Plaintiff has been and will be deprived of the comfort, care, affection, companionship, services, society, advice, guidance, counsel and consortium.

154.    WHEREFORE, Plaintiff demands judgment against Defendants for compensatory, treble, and punitive damages, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## COUNT VII

## WRONGFUL DEATH

155.    The Plaintiff repeats and reiterates the allegations previously set forth herein.

156.    The Plaintiff is the surviving heir of the decedent, or other persons authorized to bring an action for the wrongful death of the decedent, who used Defendants' Roundup product and were injured and died as a result.

157.    The injuries and damages of the Plaintiff and decedent were caused by the wrongful acts, omissions, and fraudulent misrepresentations of Defendants.

158.    As a result of the conduct of Defendants and ingestion of Defendants' Roundup product, the decedent suffered fatal injuries.

159.    As a result of the death of the decedent, Plaintiff was deprived of love, companionship, comfort, support, affection, society, solace, and moral support of the Decedents.

160.    Plaintiff is entitled to recover economic and non-economic damages against all Defendants for wrongful death directly and legally caused by the defects in Defendants' product and the negligent conduct, acts, errors, omissions and intentional and negligent misrepresentations of Defendants, and each of them.

## LIMITATION ON ALLEGATIONS

161.    The allegations in this pleading are made pursuant to the laws of Plaintiff's home state. To the extent state law imposes a duty or obligation on the Defendants that exceeds those required by federal law, Plaintiff does not assert such claims.  All claims asserted herein run parallel to federal law, i.e., the Defendants' violations of state law were also violations of federal law. Had Defendants honestly complied with state law, they would also have complied with federal law.

162.    Additionally, Plaintiff's claims do not seek to enforce federal law. These claims are brought under State law, notwithstanding the fact that such claims run parallel to federal law.

163.    As alleged in this pleading, Monsanto violated U.S.C. § 136j and 40 C.F.R. § 10(a)(5) by distributing Roundup, which was misbranded pursuant to 7 U.S.C. § 136(g).  Federal law specifically prohibits the distribution of a misbranded herbicide.

WHEREFORE, Plaintiff pray for judgment against Defendants for compensatory damages as set forth above and for exemplary damages for the in an amount in excess of Seventy Five Thousand Dollars ($75,000.00) to punish Defendants, and to deter Defendants and other

businesses from like conduct, and such other and further relief as this Court deems just, proper, and equitable.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment and an award of damages against Defendants, as follows:

a.    special damages, to include past and future medical and incidental expenses, according to proof;

b.    past and future loss of earnings and/or earning capacity, according to proof;

c.    past and future general damages, to include pain and suffering, emotional distress and mental anguish, according to proof;

d.    pre-judgment and post-judgment interest;

e.    costs of this action;

f.    treble and/or punitive damages to Plaintiff; and

g.    any and all such other and further legal and equitable relief as the Court deems necessary, just and proper.

## **DEMAND FOR TRIAL BY JURY**

Plaintiff hereby demands a trial by jury to the full extent permitted by law.

*/s/    Tayjes Shah*
Tayjes Shah, Esq.
Identification No.: 01750-2009
**The Miller Firm, LLC**
108 Railroad Avenue
Orange, VA 22960
Phone: (540) 672-4224

Fax: (540) 672-3055

**Dated: May 21, 2020**