# U.S. District Court
## District of Hawaii (Hawaii)
## CIVIL DOCKET FOR CASE #: 1:20-cv-00380-KJM-NONE

Witsell v. Monsanto Company

Assigned to: MAGISTRATE JUDGE KENNETH J. MANSFIELD

Referred to: UNASSIGNED

Cause: 28:1332 Diversity-Tort/Non-Motor Vehicle

Date Filed: 09/02/2020

Jury Demand: Plaintiff

Nature of Suit: 367 Personal Injury: Health Care/Pharmaceutical Personal Injury Product Liability

Jurisdiction: Diversity

## **Plaintiff**

**Mark A Witsell**

represented by **Denise M. Hevicon**
841 Bishop Street
Suite 2210
Honolulu, HI 96813
523-5751
Fax: 356-0628
Email: denise@dmheviconlaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Maria F. Penn**
Law Office of Maria F. Penn, AAL, ALC
841 Bishop Street Ste 2210
Honolulu, HI 96813
524-1730
Fax: (808) 532-2164
Email: mfpenn@hawaii.rr.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Michael Jay Green**
841 Bishop Street, Suite 2201
Honolulu, Hi 96813
521-3336
Email: michael@michaeljaygreen.com
*ATTORNEY TO BE NOTICED*

V.

## **Defendant**

**Monsanto Company**

| Date Filed | # | Docket Text |
|---|---|---|
| 09/02/2020 | 1 | COMPLAINT against Monsanto Company Filing fee $ 400, receipt number 0975-2418521., filed by Mark A Witsell. (Attachments: # 1 Demand for Jury, # 2 Summons, # 3 Civil Cover Sheet)(Green, Michael) (Entered: 09/02/2020) |
| 09/02/2020 | 2 | NOTICE of Case Assignment: Please reflect Civil case number CV 20-00380 KJM on all |

| | | |
|---|---|---|
| | | further pleadings.<br>(jni) (Entered: 09/02/2020) |
| 09/02/2020 | 3 | Order Setting Rule 16 Scheduling Conference is set for 9:30 AM on 11/2/2020 before MAGISTRATE JUDGE KENNETH J. MANSFIELD - Signed by CHIEF JUDGE J. MICHAEL SEABRIGHT on 9/2/2020. (Attachments: # 1 Memo Re: Corporate Disclosure Statements)<br><br>**ATTACH THE SCHEDULING ORDER TO THE INITIATING DOCUMENT (COMPLAINT/NOTICE OF REMOVAL).**<br>**THE SCHEDULING ORDER AND MEMO RE: CORPORATE DISCLOSURES MUST BE SERVED WITH THE DOCUMENT.**<br>(jni) (Entered: 09/02/2020) |
| 09/02/2020 | 4 | CIVIL Waiver of Service Packet - Notice to Parties Regarding Service Pursuant to Rule 4 of the Federal Rules of Civil Procedure (Attachments: # 1 Notice of a Lawsuit and Request to Waive Service of a Summons, # 2 Waiver of the Service of Summons)<br>(jni) (Entered: 09/02/2020) |
| 09/02/2020 | 5 | Summons Issued as to Monsanto Company.<br>(jni) (Entered: 09/02/2020) |
| 09/02/2020 | 6 | NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE. YOU MUST COMPLETE AND FILE THE ATTACHED ELECTION FORM. **Each party must indicate consent or decline to consent by completing the attached Election Form and returning it to the Clerk's Office no later than entry of twenty-one 21 days after entry of appearance.** In the event a dispositive motion is filed prior to the date on which the submission of the Election Form is required, the parties must return the completed Election Form within seven (7) calendar days after the motion is filed.<br><br>**FILING INSTRUCTIONS:** After completing the form, ALL registered CM/ECF participants are now required to e-file this document. Use the event *Consent Election Form* , found under Civil Events; Other Filings; Consent Election Form. All other parties MUST file the form by mail, or in person, at the Clerks Office: U.S. District Court, 300 Ala Moana Blvd Room C-338 Honolulu, HI 96850, Attention: Consent Clerk. The form can be found on the court's website http://www.hid.uscourts.gov<br><br>**ATTACH THE NOTICE AND ELECTION FORM TO THE INITIATING DOCUMENT (COMPLAINT/NOTICE OF REMOVAL). THE NOTICE AND ELECTION FORM MUST BE SERVED WITH THE DOCUMENT.**<br>(jni) (Entered: 09/02/2020) |
| 09/08/2020 | 7 | SUMMONS Returned Executed by Mark A Witsell. Monsanto Company served on 9/4/2020. (Green, Michael) (Entered: 09/08/2020) |

| PACER Service Center | | |
|---|---|---|
| **Transaction Receipt** | | |
| 09/10/2020 09:34:16 | | |
| PACER Login: | hllp1982:2634105:4722683 | Client Code: | 1417.0049 |
| Description: | Docket Report | Search Criteria: | 1:20-cv-00380-KJM-NONE |
| Billable Pages: | 2 | Cost: | 0.20 |

MICHAEL JAY GREEN          4451
841 Bishop Street, Suite 2201
Honolulu, Hawaii 96813
Telephone: (808) 521.3336
Facsimile: (808) 566.0347

DENISE M. HEVICON          7428
841 Bishop Street, Suite 2210
Honolulu, Hawaii 96813
Telephone: (808) 523.5751
Facsimile: (808) 356.0628

MARIA F. PENN          7870
841 Bishop Street, Suite 2210
Honolulu, Hawaii 96813
Telephone: (808) 523.5751
Facsimile: (808) 356.0628

Attorneys for Plaintiff
MARK A. WITSELL

## IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF HAWAII

| | |
|---|---|
| MARK A. WITSELL, ) | CIVIL NO.  CV _____ |
| ) | |
| Plaintiff, ) | COMPLAINT; DEMAND FOR |
| ) | JURY TRIAL; SUMMONS |
| vs. ) | |
| ) | |
| MONSANTO COMPANY, ) | |
| ) | |
| Defendant. ) | |
| ) | |
| _____ ) | |
| ) | |

## **COMPLAINT**

Plaintiff MARK WITSELL, by and through his undersigned counsel, for his Complaint against Defendant MONSANTO COMPANY, alleges and avers as follows:

## **I.     PARTIES**

1.     Plaintiff Mark Witsell is and was at all relevant times herein a resident of the City and County of Honolulu, State of Hawaii.

2.     From on or around 2006 through the summer of 2019, Plaintiff maintained his large yard with glyphosate- based herbicides (hereinafter referred to as "Roundup®") manufactured by Monsanto Company.  The Roundup® was originally purchased for use in a hand-held bottle sprayer.  Plaintiff then started to purchase the Roundup® in a 1.33 gallon pump sprayer.

3.     From 2006 through the summer of 2019, Plaintiff maintained the yard of his home with Roundup® and only discontinued doing so after the store he purchased the product from stopped selling it and he had seen the many commercials relating to the "Monsanto Litigation".

4.     Mr. Witsell was rushed to the emergency room on January 6, 2020 with extreme abdominal pains.

5.     Plaintiff was diagnosed with Diffuse B-cell Non-Hodgkin's

2

Lymphoma as a direct and proximate result of his exposure to Roundup®. He underwent chemotherapy and completed his treatment May 28, 2020. He may need radiation treatments on his vertabrae. Prior to contracting Non-Hodgkin's Lymphoma, Plaintiff had taught health and fitness and is a retired school teacher. He had also started a business as a personal trainer.

6. Plaintiff was unaware of the connection between glyphosate and Non-Hodgkin's Lymphoma until 2019 based on the commercials he saw on television.

7. Defendant Monsanto Company (hereinafter "Monsanto") is a corporation created under the laws of the state of Delaware with its headquarters and principal place of business in St. Louis, Missouri.

8. At all times relevant to this complaint, Monsanto was the entity that discovered the herbicidal properties of glyphosate, marked, distributed and manufactured Roundup®.

9. Defendant Monsanto derived substantial revenue from goods and products used in the State of Hawaii.

## II.    JURISDICTION AND VENUE

10. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 in that the Plaintiffs and Defendant are citizens of different states and the

3

amount in controversy exceeds $75,000.00.

11.     Venue is proper pursuant to 28 U.S.C. § 1391 because the Defendant systematically and purposefully sells, markets and distributes Roundup® in the State of Hawaii and Plaintiffs' claims made in this case arose in this district.

12.     Defendant Monsanto purposefully availed itself of the privilege of conducting its activities in the State of Hawaii, thus invoking the benefits and protections of its laws.

## III.   FACTUAL ALLEGATIONS

13.     In 1970, Defendant Monsanto Company, Inc. discovered the herbicidal properties of glyphosate and began marketing it in products in 1974 under the brand name Roundup®.  Roundup® is a non-selective herbicide used to kill weeds that commonly compete with the growing of crops.  By 2001, glyphosate had become the most-used active ingredient in American agriculture with 85-90 millions of pounds used annually. That number grew to 185 million pounds by 2007.  As of 2013, glyphosate was the world's most widely used herbicide.  Glyphosate is the active ingredient in Roundup®.

14.     Monsanto is a multinational agricultural biotechnology corporation based in St. Louis, Missouri. It is the world's leading producer of glyphosate. As of 2009, Monsanto was the world's leading producer of seeds, accounting for 27%

4

of the world seed market. The majority of these seeds are of the Roundup Ready®
brand. The stated advantage of Roundup Ready® crops is that they substantially
improve a farmer's ability to control weeds, since glyphosate can be sprayed in the
fields during the growing season without harming their crops. In 2010, an
estimated 70% of com and cotton, and 90% of soybean fields in the United States
were Roundup Ready®.

15.     Monsanto's glyphosate products are registered in 130 countries and
approved for use on over 100 different crops. They are ubiquitous in the
environment. Numerous studies confirm that glyphosate is found in rivers,
streams, and groundwater in agricultural areas where Roundup® is used. It has
been found in food, in the urine of agricultural workers, and even in the urine of
urban dwellers who are not in direct contact with glyphosate.

16.     On March 20, 2015, the International Agency for Research on Cancer
(hereinafter "IARC"), an agency of the World Health Organization (hereinafter
"WHO"), issued an evaluation of several herbicides, including glyphosate. That
evaluation was based, in part, on studies of exposures to glyphosate in several
countries around the world, and it traces the health implications from exposure to
glyphosate since 2001.

17.     On July 29, 2015, IARC issued the formal monograph relating to

5

glyphosate. In that monograph, the IARC Working Group provides a thorough review of the numerous studies and data relating to glyphosate exposure in humans.

18.     The IARC Working Group classified glyphosate as a Group 2A herbicide, which means that it is probably carcinogenic to humans. The IARC Working Group concluded that the cancers most associated with glyphosate exposure are Non-Hodgkin's lymphoma and other haematopoietic cancers, including chronic lymphocytic leukemia/lymphocytic lymphoma, B-cell lymphoma, and multiple myeloma.

19.     The IARC evaluation is significant. It confirms what has been believed for years: that glyphosate is toxic to humans.

20.     Nevertheless, Monsanto, since it began selling Roundup®, has represented it as safe to humans and the environment.  Monsanto has repeatedly proclaimed and continues to proclaim to the world, and particularly to United States consumers, that glyphosate- based herbicides, including Roundup®, create no unreasonable risks to human health or to the environment.

21.     Glyphosate is a broad-spectrum, non-selective herbicide used in a wide variety of  herbicidal products around the world.  Plants treated with glyphosate translocate the systemic herbicide to their roots, shoot regions and

6

fruit, where it interferes with the plant's ability to form aromatic amino acids necessary for protein synthesis. Treated plants generally die within two to three days. Because plants absorb glyphosate, it cannot be completely removed by washing or peeling produce or by milling, baking, or brewing grains.

22.    For nearly 40 years, farms across the world have used Roundup® without knowing of the dangers its use poses. That is because when Monsanto first introduced Roundup®, it touted glyphosate as a technological breakthrough: it could kill almost every weed without causing harm either to people or to the environment. History has shown that not to be true. According to the WHO, the main chemical ingredient of Roundup® - glyphosate-is a probable cause of cancer. Those most at risk are farm workers and other individuals with workplace exposure to Roundup®, such as workers in garden centers, nurseries, and landscapers. Agricultural workers are, once again, victims of corporate greed. Monsanto assured the public that Roundup® was harmless. In order to prove this, Monsanto championed falsified data and attacked legitimate studies that revealed its dangers. Monsanto led a prolonged campaign of misinformation to convince government agencies, farmers and the general population that Roundup® was safe.

### *The Discovery of Glyphosate and Development of Roundup®*

7

23.    The herbicidal properties of glyphosate were discovered in 1970 by Monsanto chemist John Franz. The first glyphosate-based herbicide was introduced to the market in the mid- l 1970s under the brand name Roundup®. From the beginning, Monsanto marketed Roundup® as a "safe" general-purpose herbicide for widespread commercial and consumer use.  Defendant Monsanto still markets Roundup® as safe today.

### *Registration of Herbicides under Federal Law*

24.    The manufacture, formulation and distribution of herbicides, such as Roundup®,  are regulated under the Federal Insecticide, Fungicide, and Rodenticide Act (hereinafter  "FIFRA" or "Act"), 7 U.S.C. § 136 et seq. FIFRA requires that all pesticides be registered with the Environmental Protection Agency (hereinafter "EPA" or "Agency") prior to their distribution, sale, or use, except as described by the Act. 7 U.S.C. §136a(a).

25.    The EPA requires as part of the registration process, among other things, a variety of tests to evaluate the potential for exposure to pesticides, toxicity to people and other potential non- target organisms, and other adverse effects on the environment. Registration by the EPA, however, is not an assurance or finding of safety. The determination the Agency must make in registering or re-registering a product is not that the product is "safe," but rather that use of the

8

product in accordance with its label directions "will not generally cause unreasonable adverse effects on the environment." 7 U.S.C. §136a(c)(5)(D).

26.    FIFRA defines "unreasonable adverse effects on the environment" to mean "any unreasonable risk to man or the environment, taking into account the economic, social, and environmental costs and benefits of the use of any pesticide." 7 U.S.C. §136(bb). FIFRA thus requires EPA to make a risk/benefit analysis in determining whether a registration should be granted or allowed to continue to be sold in commerce.

27.    The EPA registered Roundup® for distribution, sale, and manufacture in the United States and the State of Hawaii.

28.    FIFRA generally requires that the registrant, Monsanto, conduct health and safety testing of pesticide products. The EPA has protocols governing the conduct of tests required for registration and the laboratory practices that must be followed in conducting these tests. The data produced by the registrant must be submitted to the EPA for review and evaluation. The government is not required, nor is it able, however, to perform the product tests that are required of the manufacturer.

29.    The evaluation of each pesticide product distributed, sold, or manufactured is completed at the time the product is initially registered. The data

necessary for registration of a pesticide has changed over time. The EPA is now in the process of re-evaluating all pesticide products through a Congressionally-mandated process called "re-registration." 7 U.S.C. § 136a-1. In order to reevaluate these pesticides, the EPA is demanding the completion of additional tests and the submission of data for the EPA's review and evaluation.

30. In the case of glyphosate, and therefore Roundup®, the EPA had planned on releasing its preliminary risk assessment -in relation to the re-registration process-no later than July 2015. The EPA completed its review of glyphosate in early 2015, but it delayed releasing the risk assessment pending further review in light of the WHO's findings.

### *Scientific Fraud Underlying the Marketing and Sale of Glyphosate/Roundup*

31. Based on early studies that glyphosate could cause cancer in laboratory animals, the EPA originally classified glyphosate as possibly carcinogenic to humans (Group C) in 1985. After pressure from Monsanto, including contrary studies it provided to the EPA, the EPA changed its classification to evidence of non-carcinogenicity in humans (Group E) in 1991. In so classifying glyphosate, however, the EPA made clear that the designation did not mean the chemical does not cause cancer: "It should be emphasized, however, that designation of an agent in Group E is based on the available evidence at the

time of evaluation and should not be interpreted as a definitive conclusion that the agent will not be a carcinogen under any circumstances."

32.     On two occasions, the EPA found that the laboratories hired by Monsanto to test the toxicity of its Roundup® products for registration purposes committed fraud.

33.     In the first instance, Monsanto, in seeking initial registration of Roundup® by EPA, hired Industrial Bio-Test Laboratories ("IBT") to perform and evaluate pesticide toxicology studies relating to Roundup®. IBT performed about 30 tests on glyphosate and glyphosate-containing products, including nine of the 15 residue studies needed to register Roundup®.

34.     In 1976, the United States Food and Drug Administration (hereinafter "FDA") performed an inspection of IBT that revealed discrepancies between the raw data and the final report relating to the toxicological impacts of glyphosate. The EPA subsequently audited IBT; it too found the toxicology studies conducted for the Roundup® herbicide to be invalid. An EPA reviewer stated, after finding "routine falsification of data" at IBT, that it was "hard to believe the scientific integrity of the studies when they said they took specimens of the uterus from male rabbits."  Three top executives of IBT were convicted of fraud in 1983.

35.     In the second incident of data falsification, Monsanto hired Craven

Laboratories in 1991 to perform pesticide and herbicide studies, including for Roundup®. In that same year, the owner of Craven Laboratories and three of its employees were indicted, and later convicted, of fraudulent laboratory practices in the testing of pesticides and herbicides.

36.     Despite the falsity of the tests that underlie its registration, within a few years of its launch, Monsanto was marketing Roundup® in 115 countries.

### *The Importance of Roundup® to Monsanto's Market Dominance Profits*

37.     The success of Roundup® was key to Monsanto's continued reputation and dominance in the marketplace. Largely due to the success of Roundup® sales, Monsanto's agriculture division was out-performing its chemicals division's operating income, and that gap increased yearly. But with its patent for glyphosate expiring in the United States in the year 2000, Monsanto needed a strategy to maintain its Roundup® market dominance and to ward off impending competition.

38.     In response, Monsanto began the development and sale of genetically engineered Roundup Ready® seeds in 1996. Since Roundup Ready® crops are resistant to glyphosate; farmers can spray Roundup® onto their fields during the growing season without harming the crop. This allowed Monsanto to expand its market for Roundup® even further; by 2000, Monsanto's biotechnology seeds

12

were planted on more than 80 million acres worldwide and nearly 70% of American soybeans were planted from Roundup Ready® seeds. It also secured Monsanto's dominant share of the glyphosate/Roundup® market through a marketing strategy that coupled proprietary Roundup Ready® seeds with continued sales of its Roundup® herbicide.

39.     Through a three-pronged strategy of increased production, decreased prices and by coupling with Roundup Ready® seeds, Roundup® became Monsanto's most profitable product. In 2000, Roundup® accounted for almost $2.8 billion in sales, outselling other herbicides by a margin of 5-1, and accounting for a close to half of Monsanto's revenue. Today, glyphosate remains one of the world's largest herbicides by sales volume.

### *Monsanto has known for decades that it falsely advertises the safety of Roundup®*

40.     In 1996, the New York Attorney General (hereinafter "NYAG") filed a lawsuit against Monsanto based on its false and misleading advertising of Roundup® products. Specifically, the lawsuit challenged Monsanto's general representations that its spray-on glyphosate-based herbicides, including Roundup®, were "safer than table salt" and "practically non-toxic" to mammals, birds, and fish. Among the representations the NYAG found deceptive and

13

misleading about the human and environmental safety of Roundup® are the following:

a) Remember that environmentally friendly Roundup herbicide is biodegradable. It won't build up in the soil so you can use Roundup with confidence along customers' driveways, sidewalks and fences...

b) And remember that Roundup is biodegradable and won't build up the soil. That will give you the environmental confidence you need to use Roundup everywhere you've got a weed, brush, edging or trimming problem.

c) Roundup biodegrades into naturally occurring elements.

d) Remember that versatile Roundup herbicide stays where you put it. That means there's no washing or leaching to harm customers' shrubs or other desirable vegetation.

e) This non-residual herbicide will not wash or leach in the soil. It ... stays where you apply it.

f) You can apply Accord with "confidence because it will stay where you put it" it bonds tightly to soil particles, preventing leaching. Then, soon after application, soil microorganisms

14

biodegrade Accord into natural products.

g)     Glyphosate is less toxic to rats than table salt following acute oral ingestion.

h)     Glyphosate's safety margin is much greater than required. It has over a 1,000-fold safety margin in food and over a 700-fold safety margin for workers who manufacture it or use.

i)     You can feel good about using herbicides by Monsanto. They carry a toxicity category rating of 'practically non-toxic' as it pertains to mammals, birds and fish.

j)     "Roundup can be used where kids and pets will play and breaks down into natural material." This ad depicts a person with his head in the ground and pet dog standing in an area which has been treated with Roundup.

41.     November 19, 1996, Monsanto entered into an Assurance of Discontinuance with NYAG, in which Monsanto agreed, among other things, "to cease and desist from publishing or broadcasting any advertisements [in New York] that represent, directly or by implication" that:

a)     its glyphosate-containing pesticide products or any component thereof are safe, non-toxic, harmless or free from risk;

15

b) its glyphosate-containing pesticide products or any component thereof manufactured, formulated, distributed or sold by Monsanto are biodegradable ;

c) its glyphosate-containing pesticide products or any component thereof stay where they are applied under all circumstances and will not move through the environment by any means;

d) its glyphosate-containing pesticide products or any component thereof are "good" for the environment or are "known for their environmental characteristics." ;

e) glyphosate-containing pesticide products or any component thereof are safer or less toxic than common consumer products other than herbicides;

f) its glyphosate-containing products or any component thereof might be classified as "practically non-toxic."

42.  Monsanto did not alter its advertising in the same manner in any state other than New York, and on information and belief still has not done so today.

43.  In 2009, France's highest court ruled that Monsanto had not told the truth about the safety of Roundup®. The French court affirmed an earlier judgement that Monsanto had falsely advertised its herbicide Roundup® as

16

"biodegradable" and that it "left the soil clean."

## *Classifications and Assessments of Glyphosate*

44.     The IARC process for the classification of glyphosate followed the stringent procedures for the evaluation of a chemical agent.  Over time, the IARC Monograph program has reviewed 980 agents.  Of those reviewed, it has deteremined 116 agents to be Group 1 (Known Human Carcinogens); 73 agents to be Group 2A ( Probable Human Carcinogens); 287 agents to be Group 2B (Possible Human Carcinogens); 503 agents to be Group 3 (Not Classified); and one agent to be Probably Not Carcinogenic.

45.     The established procedure for IARC Monograph evaluations is described in the IARC Programme's Preamble.  Evaluations are performed by panels of international experts, selected on the basis of their expertise and the absence of actual or apparent conflicts of interest.

46.     One year before the Monograph meeting, the meeting is announced and there is a call both for data and for experts. Eight months before the Monograph meeting, the Working Group membership is selected and the sections of the Monograph are developed by the Working Group members. One month prior to the Monograph meeting, the call for data is closed and the various draft sections are distributed among Working Group members for review and comment.

17

Finally, at the Monograph meeting, the Working Group finalizes review of all

literature, evaluates the evidence in each category, and completes the overall

evaluation. Within two weeks after the Monograph meeting, the summary of the

Working Group findings are published in Lancet Oncology, and within a year after

the meeting, the final Monograph is finalized and published.

47.     In assessing an agent, the IARC Working Group reviews the

following information:  (a)  human, experimental, and mechanistic data; (b)  all

pertinent epidemiological studies and cancer bioassays; and ( c) representative

mechanistic data.  The studies must be publicly available and have sufficient detail

for meaningful review, and reviewers cannot be associated with the underlying

study.

48.     In March 2015, IARC reassessed glyphosate. The summary published

in *The Lancet Oncology* reported that glyphosate is a Group 2A agent and

probably carcinogenic in humans.

49.     On July 29, 2015, IARC issued its Monograph for glyphosate,

Monograph 112.  For Volume 112, the volume that assessed glyphosate, a

Working Group of 17 experts from 11 countries met at IARC from March 3-10,

2015, to assess the carcinogenicity of certain herbicides, including glyphosate. The

March meeting culminated nearly a one-year review and preparation by the IARC

Secretariat and the Working Group, including a comprehensive review of the latest available scientific evidence. According to published procedures, the Working Group considered "reports that have been published or accepted for publication in the openly available scientific literature" as well as "data from governmental reports that are publicly available."

50.     The studies considered the following exposure groups: occupational exposure of farmers and tree nursery workers in the United States, forestry workers in Canada and Finland and municipal weed-control workers in the United Kingdom; and para-occupational exposure in farming families.

51.     Glyphosate was identified as the second-most used household herbicide in the United States for weed control between 2001 and 2007 and the most heavily used herbicide in the world in 2012.

52.     Exposure pathways are identified as air (especially during spraying), water, and food. Community exposure to glyphosate is widespread and found in soil, air, surface water, and groundwater, as well as in food.

53.     The assessment of the IARC Working Group identified several case control  studies of occupational exposure in the United States, Canada, and Sweden. These studies show a human health concern from agricultural and other work-related exposure to glyphosate.

54.     The IARC Working Group found an increased risk between exposure to glyphosate and Non-Hodgkin's lymphoma ("NHL") and several subtypes of NHL, and the increased risk persisted after adjustment for other pesticides.

55.     The IARC Working Group also found that glyphosate caused DNA and chromosomal damage in human cells. One study in community residents reported increases in blood markers of chromosomal damage (micronuclei) after glyphosate formulations were sprayed.

56.     In male CD-1 mice, glyphosate induced a positive trend in the incidence of a rare tumor, renal tubule carcinoma. A second study reported a positive trend for haemangiosarcoma in male mice. Glyphosate increased pancreatic islet-cell adenoma in male rats in two studies. A glyphosate formmlation promoted skin tumors in an initiation-promotion study in mice.

57.     The IARC Working Group also noted that glyphosate has been detected in the urine of agricultural workers, indicating absorption.  Soil microbes degrade glyphosate to aminomethylphosphoric acid (AMPA).  Blood AMPA detection after exposure suggests intestinal microbial metabolism in humans.

58.     The IARC Working Group further found that glyphosate and glyphosate formulations induced DNA and chromosomal damage in mammals, and in human and animal cells in utero.

20

59.     The IARC Working Group also noted genotoxic, hormonal, and enzymatic effects in mammals exposed to glyphosate.  Essentially, glyphosate inhibits the biosynthesis of aromatic amino acids, which leads to several metabolic disturbances, including the inhibition of protein and secondary product biosynthesis and general metabolic disruptions.

60.     The IARC Working Group also reviewed an Agricultural Health Study, consisting of a prospective cohort of 57,311 licensed pesticide applicators in Iowa and North Carolina. While this study differed from others in that it was based on a self-administered questionnaire, the results support an association between glyphosate exposure and Multiple Myeloma, Hairy Cell Leukemia (HCL), and Chronic Lymphocytic Leukemia (CLL), in addition to several other cancers.

### Other Earlier Findings About Glyphosate's Dangers to Human Health

61.     The EPA has a technical fact sheet, as part of its Drinking Water and Health, National Primary Drinking Water Regulations publication, relating to glyphosate.  This technical fact sheet predates the IARC March 20, 2015, evaluation.  The fact sheet describes the release patterns for glyphosate as follows:

**Release Patterns:**

Glyphosate is released to the environment in its use as a herbicide for

controlling woody and herbaceous weeds on forestry, right-of-way, cropped and non-cropped sites. These sites may be around water and in wetlands. It may also be released to the environment during its manufacture, formulation, transport, storage, disposal and cleanup, and from spills. Since glyphosate is not a listed chemical in the Toxics Release Inventory, data on releases during its manufacture and handling are not available. Occupational workers and home gardeners may be exposed to glyphosate by inhalation and dermal contact during spraying, mixing, and cleanup. They may also be exposed by touching soil and plants to which glyphosate was applied. Occupational exposure may also occur during glyphosate's manufacture, transport storage, and disposal.

62.     In 1995, the Northwest Coalition for Alternatives to Pesticides reported that in California, the state with the most comprehensive program for reporting of pesticide-caused illness, glyphosate was the third most commonly-reported cause of pesticide illness among agricultural workers.

### *The Toxicity of Other Ingredients in Roundup®*

63.     In addition to the toxicity of the active ingredient glyphosate, several studies support the hypothesis that the glyphosate-based formulation in Defendant's Roundup® products is more dangerous and toxic than glyphosate alone. Indeed, as early as 1991, available evidence demonstrated that glyphosate formulations were significantly more toxic than glyphosate alone.

64.     In 2002, a study by Julie Marc, entitled "Pesticide Roundup Provokes Cell Division Dysfunction at the Level of CDK1/Cyclin B Activation," revealed that Roundup® causes delays in the cell cycles of sea urchins but that the same

22

concentrations of glyphosate alone were ineffective and did not alter cell cycles.

65.     A 2004 study by Marc and others, entitled "Glyphosate-based pesticides affect cell cycle regulation," demonstrated a molecular link between glyphosate-based products and cell cycle dysregulation. The researchers noted that "cell cycle dysregulation is a hallmark of tumor cells and human cancer. Failure in the cell cycle checkpoints leads to genomic instability and subsequent development of cancer from the initial affect cell."  Further, "[s]ince cell cycle disorder such as cancer result from dysfunctions of a unique cell, it was of interest to evaluate the threshold dose of glyphosate affecting the cells.

66.     In 2005, a study by Francisco Peixoto entitled "Comparative effects of Roundup® and glyphosate on mitochondrial oxidative phosphorylation," demonstrated that Roundup®'s effects on rat liver mitochondria are far more toxic than equal concentrations of glyphosate alone. The Peixoto study further suggested that the harmful effects of Roundup® on mitochondrial bioenergetics could not be exclusively attributed to glyphosate but could be the result of other chemicals, such as the surfactant POEA, or in the alternative, due to a potential synergic effect between glyphosate and other ingredients in the Roundup® formulation.

67.     In 2009, Nora Benachour and Gilles-Eric Seralini published a study

23

examining the effects of Roundup® and glyphosate on human umbilical, embryonic, and placental cells. The study tested dilution levels of Roundup® and glyphosate that were far below agricultural recommendations, corresponding with low levels of residue in food. The researchers ultimately concluded that supposed "inert" ingredients, and possibly POEA, alter human cell permeability and amplify toxicity of glyphosate alone. The researchers further suggested that assessments of glyphosate toxicity should account for the presence of adjuvants or additional chemicals used in the formulation of the complete pesticide. The study confirmed that the adjuvants present in Roundup® are not, in fact, inert and that Roundup® is potentially far more toxic than its active ingredient glyphosate alone.

68.     The results of these studies were at all times available to Monsanto. Monsanto thus knew or should have known that Roundup® was, and is more toxic than glyphosate alone and that safety studies of Roundup®, Roundup®'s adjuvants and "inert" ingredients, and/or the surfactant POEA were necessary to protect Plaintiff from Roundup®.

69.     Despite its knowledge that Roundup® is considerably more dangerous than glyphosate alone, Monsanto continued to promote Roundup® as safe.

*Recent Worldwide Bans on Roundup®/Glyphosate*

24

70.     Several countries around the world have instituted bans on the sale of Roundup® and other glyphosate-containing herbicides, both before and since IARC first announced its assessment for glyphosate in March 2015, and more countries undoubtedly will follow suit in light of the as the dangers of the use of Roundup® are more widely known. The Netherlands issued a ban on all glyphosate-based herbicides in April 2014, including Roundup®, which takes effect by the end of 2015. In issuing the ban, the Dutch Parliament member who introduced the successful legislation stated: "Agricultural pesticides in user-friendly packaging are sold in abundance to private persons. In garden centers, Roundup® is promoted as harmless, but unsuspecting customers have no idea what the risks of this product are. Especially children are sensitive to toxic substances and should therefore not be exposed to it."

71.     The Brazilian Public Prosecutor in the Federal District requested that the Brazilian Justice Department suspend the use of glyphosate.

72.     France banned the private sale of Roundup® and glyphosate following the IARC assessment for Glyphosate.

73.     Bermuda banned both the private and commercial sale of glyphosates, including Roundup® .  The Bermuda government explained its ban as follows: "Following a recent scientific study carried out by a leading cancer agency, the

25

importation of weed spray 'Roundup' has been suspended."

74.     The Sri Lankan government banned the private and commercial use of glyphosates, particularly out of concern that Glyphosate has been linked to fatal kidney disease in agricultural workers.

75.     The government of Columbia announced its ban on using Roundup® and glyphosate to destroy illegal plantations of coca, the raw ingredient for cocaine, because of the WHO's finding that glyphosate is probably carcinogenic.

### *Plaintiff Mark Witsell's Exposure to Roundup®*

76.     From on or around 2006 through the summer of 2019, Plaintiff maintained his large yard with glyphosate- based herbicides (hereinafter referred to as "Roundup®") manufactured by Monsanto Company.  The Roundup® was originally purchased for use in a hand-held bottle sprayer.  Plaintiff then started to purchase the Roundup® in a 1.33 gallon pump sprayer.

77.     From 2006 through the summer of 2019, Plaintiff maintained the yard of his home with Roundup® and only discontinued doing so after the store he purchased the product from stopped selling it and he had seen the many commercials relating to the "Monsanto Litigation".

78.     Mr. Witsell was rushed to the emergency room on January 6, 2020 with extreme abdominal pains.  Plaintiff was diagnosed with Diffuse B-cell Non-

Hodgkin's Lymphoma as a direct and proximate result of his exposure to

Roundup®. He underwent chemotherapy and completed his treatment May 28,

2020. He may need radiation treatments on his vertabrae. Prior to contracting

Non-Hodgkin's

Lymphoma, Plaintiff had taught health and fitness and is a retired school teacher.

He had also started a business as a personal trainer.

79.    Plaintiff was unaware of the connection between glyphosate and

Non-Hodgkin's Lymphoma until 2019 based on the commercials he saw on

television.

## VI.    CAUSES OF ACTION

### COUNT I
### STRICT LIABILITY (DESIGN DEFECT)

80.    Plaintiff incorporates by reference each and every allegation set forth

in the preceding paragraphs as if fully stated herein.

81.    At all times mentioned herein, Defendant engaged in the business of

testing, developing, manufacturing, selling, and/or distributing, marketing,

packaging design, and promotion of Roundup® products, which are defective and

unreasonably dangerous to consumers, including Plaintiff, thereby placing

Roundup® products into the stream of commerce.

82.    These actions were under the ultimate control and supervision of Defendant Monsanto.

83.    At all times relevant herein, Roundup® products were manufactured, designed, and labeled in an unsafe, defective, and inherently dangerous manner that was dangerous for use by or exposure to the public, and, in particular, Plaintiff.

84.    At all times relevant herein, Roundup® products reached the intended consumers, handlers, and users or other persons coming into contact with these products in Hawaii and throughout the United States, including Plaintiff, without substantial change in their condition as designed, manufactured, sold, distributed, labeled, and marketed by Defendant Monsanto.

85.    Roundup® products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold, and marketed by Defendant Monsanto were defective in design and formulation in that when they left the hands of the manufacturers and/or suppliers, they were unreasonably dangerous and dangerous to an extent beyond that which an ordinary consumer would contemplate.

86.    Roundup® products, as researched, tested, developed, designed,

28

licensed, manufactured, packaged, labeled, distributed, sold, and/or marketed by
Defendant were defective in design formulation in that when they left the hands of
the manufactures and/or suppliers, the foreseeable risks exceeded the alleged
benefits associated with their design and formulation.

87.     At all times relevant to this action, Defendant knew or had reason to
know that Roundup® products were defective and were inherently dangerous and
unsafe when used in the manner instructed and provided by Defendant.

88.     Plaintiff did, in fact, follow all directions for use provided by
Defendant.

89.     Therefore, at all times relevant herein, Roundup® products, as
researched, tested, developed, designed, licensed, manufactured, packaged,
labeled, distributed, sold and/or marketed by Defendant were defective in design
and formulation, in one or more of the following ways:

> (a)     When placed in the stream of commerce, Roundup® products
> were defective in design and formulation, and, consequently,
> dangerous to an extent beyond that which as ordinary consumer
> would contemplate.

> (b)     When placed in the stream of commerce, Roundup® products
> were unreasonably dangerous in that they were hazardous and

posed a grave risk of cancer and other serious illnesses when used in a reasonably anticipated manner.

(c)    When placed in the stream of commerce, Roundup® products contained unreasonably dangerous design defects and were not reasonably safe when used in a reasonably anticipated or intended manner.

(d)    Monsanto did not sufficiently test, investigate, or study Roundup® products and, specifically, the active ingredient glyphosate.

(e)    Exposure to Roundup® and glyphosate-containing products presents a risk of harmful side effects that outweigh any potential utility stemming from the use of the herbicide.

(f)    At the time of marketing its Roundup® products, Roundup® was defective in that exposure to Roundup® and specifically, its active ingredient glyphosate, could result in cancer and other severe illness and injuries.

(g)    Monsanto did not conduct adequate post-marketing surveillance of its  Roundup® products.

(h)    Monsanto could have employed safer alternative designs and

formulations.

90.     Plaintiff was exposed to Roundup® products as described above, without knowledge of their dangerous characteristics.

91.     At all times relevant herein, Plaintiff used and/or was exposed to the use of Roundup® products in an intended or reasonably foreseeable manner without knowledge of their dangerous characteristics.

92.     Plaintiff could not have and did not reasonably discover the defects and risks associated with Roundup® or glyphosate-containing products before or at the time of exposure.

93.     The harm caused by Roundup® products far outweighed their benefit, rendering these products dangerous to an extent beyond that which an ordinary consumer would contemplate. Roundup® products were and are more dangerous than alternative products and Defendant could have designed Roundup® products (including their packaging and sales aids) to make them less dangerous. Indeed, at the time that Monsanto designed Roundup® products, the state of the industry's scientific knowledge was such that a less risky design or formulation was attainable.

94.     At the time Roundup® products left Monsanto's control, there was a practical, technically feasible and safer alternative design that would have

prevented the harm without substantially impairing the reasonably anticipated or intended function of those herbicides.

95.     Monsanto's defective design of Roundup® products was willful, wanton,  fraudulent, malicious, and conducted with reckless disregard for the health and safety of users of the Roundup® products, including Plaintiff herein.

96.     Therefore, as a result of the unreasonably dangerous condition of its Roundup® products, Defendant is strictly liable to Plaintiff.

97.     The defects in Roundup® products caused or contributed to cause Plaintiff's grave injuries, and, but for Defendant's misconduct and omissions, Plaintiff would not have sustained his injuries.

98.     Monsanto's conduct, as described above, was reckless. Monsanto risked the lives of consumers and users of its products, including Plaintiff, with knowledge of the safety problems associated with Roundup® and glyphosate-containing products, and suppressed this knowledge from the general public. Monsanto made conscious decisions not to redesign, warn or inform the unsuspecting public. Monsanto's reckless conduct warrants an award of aggravated damages.

99.     As a direct and proximate result of Defendant placing defective Roundup® products into the stream of commerce, Plaintiff has suffered and will

continue to suffer grave injuries, including but not limited to, enduring physical pain and discomfort, extreme emotional disturbance, as well as economic hardship, including considerable financial expenses for medical care, and treatment.

## COUNT II
## STRICT LIABILITY (FAILURE TO WARN)

100.   Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

101.   At all times relevant to this litigation, Defendant engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and/or promoting Roundup® products, which are defective and unreasonably dangerous to consumers, including Plaintiff, because they do not contain adequate warnings or instructions concerning the dangerous characteristics of Roundup® and specifically, the active ingredient glyphosate. These actions were under the ultimate control and supervision of Defendant Monsanto.

102.   Defendant researched, developed, designed, tested, manufactured, inspected, labeled, distributed, marketed, promoted, sold, and/or otherwise released into the stream of commerce Roundup® products, and in the course of

33

same, directly advertised or marketed the products to consumers and end users, including Plaintiff, and therefore had a duty to warn of the risks associated with the use of Roundup® and glyphosate-containing products.

103.    At all times relevant herein, Defendant had a duty to properly test, develop, design, manufacture, inspect, package, label, market, promote, sell, distribute, maintain supply, provide proper warnings, and take such steps as necessary to ensure that Roundup® products did not cause users and consumers to suffer from unreasonable and dangerous risks.  Defendant had a continuing duty to warn Plaintiff of the dangers associated with Roundup® use and exposure. Defendant, as manufacturer, seller, promoter, marketer, and/or distributor of chemical herbicides is held to the knowledge of an expert in the field.

104.    At the time of manufacture, Defendant could have provided the warnings or instructions regarding the full and complete risks of Roundup® and glyphosate-containing products because they knew or should have known of the unreasonable risks of harm associated with the use of and/or exposure to such products.

105.    At all times relevant to this litigation, Defendant failed to investigate, study, test, or promote the safety or to minimize the dangers to users and consumers of its product and to those who would foreseeably use or be harmed by

these herbicides, including Plaintiff.

106.   Despite the fact that Defendant knew or should have known that Roundup® posed a grave risk of harm, it failed to exercise reasonable care to warn of the dangerous risks associated with use and exposure.  The dangerous propensities of these products and they carcinogenic characteristics of glyphosate, as described above, were known to Defendant, or scientifically knowable to Defendant through appropriate research and testing by known methods, at the time they distributed, marketed, promoted, supplied or sold the product, and not known to end users an consumers, such as Plaintiff.

107.   These products created significant risks of serious bodily harm to consumers, as alleged herein, and Defendant failed to adequately warn consumers and reasonably foreseeable users of the risks of exposure to its products. Defendant Monsanto has wrongfully concealed information concerning the dangerous nature of Roundup® and its active ingredient glyphosate, and further made false and/or misleading statements concerning the safety of Roundup® and glyphosate.

108.   At all times relevant to this litigation, Roundup® products reached the intended consumers, handlers, and users or other persons coming into contact with these products in Hawaii and throughout the United States, including

35

Plaintiff, without substantial change in their condition as designed, manufactured, sold, distributed, labeled, promoted and/or marketed by Defendant.

109.   Plaintiff was exposed to Roundup® products in the course of his work as an agricultural worker and in the maintenance of his cow pasture without knowledge of their dangerous characteristics.

110.   At all times relevant to this litigation, Plaintiff used and/or was exposed to the use of Roundup® products in their intended or reasonably foreseeable manner without knowledge of their dangerous characteristics.

111.   Plaintiff could not have reasonably discovered the defects and risks associated with Roundup® or glyphosate-containing products prior to or at the time of Plaintiff's exposure.  Plaintiff relied upon the skill, superior knowledge, and judgment of Defendant.

112.    These product were defective because the minimal warnings disseminated with Roundup® products were inadequate, and they failed to communicate adequate information on the dangers and safe use/exposure and failed to communicate warnings and instructions that were appropriate and adequate to render the products safe for their ordinary, intended and reasonably foreseeable uses, including agricultural and landscaping applications.

113.   The information that Defendant did provide or communicate failed to

contain relevant warnings, hazards, and precautions that would have enabled

consumers such as Plaintiff to utilize the products safely and with adequate

protection. Instead, Defendant disseminated information that was inaccurate,

false, and misleading and which failed to communicate accurately or adequately

the comparative severity, duration, and extent of the risk of injuries with use of

and/or exposure to Roundup® and glyphosate; continued to aggressively promote

the efficacy of its products, even after it knew or should have known of the

unreasonable risks from use or exposure; and concealed, downplayed, or otherwise

suppressed, through aggressive marketing and promotion, any information or

research about the risks and dangers of exposure to Roundup® and glyphosate.

114. To this day, Defendant has failed to adequately and accurately warn

of the true risks of Plaintiff's injuries associated with the use of and exposure to

Roundup® and its active ingredient glyphosate, a probable carcinogen.

115. As a result of the inadequate warnings, Roundup® products were

defective and unreasonable dangerous when they left the possession and/or control

of Defendant, were distributed, marketed, and/or promoted by Defendant, and

used by Plaintiff Witsell.

116. Defendant is liable to Plaintiff for injuries caused by its negligent or

willful failure, as described above, to provide adequate warnings or other

clinically relevant information and data regarding the appropriate use of products and the risks associated with the use of or exposure to Roundup® and glyphosate.

117. The defects in Roundup® products caused or contributed to cause Plaintiff's injuries, and, but for this misconduct and omissions, Plaintiff would not have sustained his injuries.

118. Had Defendant provided adequate warnings and instructions and properly disclosed and disseminated the risks associated with Roundup® products, Plaintiff could have avoided the risk of developing injuries alleged herein.

119. As a direct and proximate result of Defendant placing defective Roundup® products into the stream of commerce, Plaintiff has suffered and will continue to suffer grave injuries, including but not limited to, enduring physical pain and discomfort, extreme emotional disturbance, as well as economic hardship, including considerable financial expenses for medical care, and treatment.

## COUNT III
## NEGLIGENCE

120. Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

121. Defendant, directly or indirectly, caused Roundup® products to be

38

sold, distributed, packaged, labeled, marketed, promoted, and/or used by Plaintiff.

122.   At all times relevant to this litigation, Defendant had a duty to exercise reasonable care in the design, research, manufacture, marketing, advertisement, supply, promotion, packaging, sale, and distribution of Roundup® products, including the duty to take all reasonable steps necessary to manufacture, promote, and/or sell a product that was not unreasonably dangerous to consumers and users of the product.

123.   At all times relevant to this litigation, Defendant had a duty to exercise reasonable care in the marketing, advertisement, and sale of the Roundup® products.  Monsanto's duty of care owed to consumers and the general public included providing accurate, true, and correct information concerning the risks of using Roundup® and appropriate, complete, and accurate warnings concerning the potential adverse effects of exposure to Roundup®, and, in particular, its active ingredient glyphosate.

124.   At all times relevant to this litigation, Defendant knew or, in the exercise of reasonable care, should have known of the hazards and dangers of Roundup® and specifically, the carcinogenic properties of the chemical glyphosate.

125.   Accordingly, at all times relevant to this litigation, Defendant knew

or, in the exercise of reasonable care, should have known that use of or exposure to its Roundup® products could cause or be associated with Plaintiff's injuries and thus created a dangerous and unreasonable risk of injury to the users of these products, including Plaintiff.

126.    Defendant also knew or, in the exercise of reasonable care, should have known that users and consumers of Roundup® were unaware of the risks and the magnitude of the risks associated with use of and/or exposure to Roundup® and glyphosate-containing products.

127.    As such, Defendant breached the duty of reasonable care and failed to exercise ordinary care in the design, research, development, manufacture, testing, marketing, supply, promotion, advertisement, packaging, sale, and distribution of its Roundup® products, in that Defendant manufacture, marketed, promoted, and/or sold defective herbicides containing the chemical glyphosate, knew or had reason to know of the defects inherent in these products, knew or had reason to know that a user's or consumer's exposure to the products created a significant risk of harm and unreasonably dangerous side effects, and failed to prevent or adequately warn of these risks and injuries.

128.    Despite an ability and means to investigate, study, and test these products and to provide adequate warnings, Defendant has failed to do so. Indeed,

Monsanto has wrongfully concealed information and have further made false and/or misleading statements concerning the safety and/or exposure to Roundup® and glyphosate.

129. Defendant was negligent in the following respects:

(a) Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing its Roundup® products without thorough and adequate pre- and post-market testing;

(b) Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing Roundup® while negligently and/or intentionally concealing and failing to disclose the results of trials, tests, and studies of exposure to glyphosate, and, consequently, the risk of serious harm associated with human use of and exposure to Roundup®;

(c) Failing to undertake sufficient studies and conduct necessary tests to determine whether or not Roundup® products and glyphosate-containing products were safe for their intended use in agriculture and horticulture;

(d) Failing to use reasonable and prudent care in the design,

41

research, manufacture, and development of Roundup®

products so as to avoid the risk of serious harm associated with

the prevalent use of Roundup®/glyphosate as an herbicide;

(e) Failing to design and manufacture Roundup® products so as to

ensure they were at least as safe and effective as other

herbicides on the market;

(f) Failing to provide adequate instructions, guidelines, and safety

precautions to those persons who Monsanto could reasonably

foresee would use and be exposed to its Roundup® products;

(g) Failing to disclose to Plaintiff, users/consumers, and the

general public that use of and exposure to Roundup® presented

severe risks of cancer and other grave illnesses;

(h) Failing to warn Plaintiff, consumers, and the general public that

the product's risk of harm was unreasonable and that there were

safer and effective alternative herbicides available to Plaintiff

and other consumers;

(i) Systematically suppressing or downplaying contrary evidence

about the risks, incidence, and prevalence of the side effects of

Roundup® and glyphosate- containing products;

(j)     Representing that its Roundup® products were safe for their intended use when, in fact, Defendant knew or should have known that the products were not safe for their intended purpose;

(k)     Declining to make or propose any changes to Roundup® products' labeling or other promotional materials that would alert the consumers and the general public of the risks of Roundup® and glyphosate;

(l)     Advertising, marketing, and recommending the use of Roundup® products, while concealing and failing to disclose or warn of the dangers known by Monsanto to be associated with or caused by the use of or exposure to Roundup® and glyphosate;

(m)     Continuing to disseminate information to its consumers, which indicate or imply that Monsanto's Roundup® products are not unsafe for use in the agricultural and horticultural industries; and

(n)     Continuing the manufacture and sale of its products with the knowledge that the products were unreasonably unsafe and

dangerous.

130.   Defendant knew and/or should have known that it was foreseeable that consumers such as Plaintiff would suffer injuries as a result of Monsanto's failure to exercise ordinary care in the manufacturing, marketing, promotion, labeling, distribution, and sale of Roundup®.

131.   Plaintiff did not know the nature and extent of the injuries that could result from the intended use of and/or exposure to Roundup® or its active ingredient glyphosate.

132.   Defendant's negligence was the proximate cause of the injuries, harm, and economic losses that Plaintiff suffered, as described herein.

133.   Monsanto's conduct, as described above, was reckless.  Monsanto regularly risked the lives of consumers and users of their products, including Plaintiff, with full knowledge of the dangers of these products.  Monsanto has made conscious decisions not to redesign, re-label, warn, or inform the unsuspecting public, including Plaintiff. Monsanto's reckless conduct therefore warrants an award of aggravated or punitive damages.

134.   As a proximate result of Defendant's wrongful acts and omissions in placing defective Roundup® products into the stream of commerce without adequate warnings of the hazardous and carcinogenic nature of glyphosate,

Plaintiff has suffered severe and permanent physical and/or emotional injuries. Plaintiff has endured pain and suffering, has suffered economic losses (including significant expenses for medical care and treatment) in an amount to be determined.

**COUNT IV**
**FRAUD, MISREPRESENTATION, AND SUPPRESSION**

135.   Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

136.   Monsanto fraudulently, intentionally, and/or negligently misrepresented to the public, and to the Plaintiff both directly and by and through the media, the scientific literature and purported "community outreach" programs, the safety of Roundup® products, and/or fraudulently, intentionally, and/or negligently concealed, suppressed, or omitted material, adverse information regarding the safety of Roundup®.

137.   The intentional and/or negligent misrepresentations and omissions of Monsanto regarding the safety of Roundup® products were communicated to Plaintiff directly through ghostwritten articles, editorials, national and regional advertising, marketing and promotion efforts, as well as the packaging and sales aids.  The safety of Roundup® products was also intentionally and/or negligently

misrepresented to Plaintiff and the public with the intent that such misrepresentations would cause Plaintiff and other potential consumers to purchase and use or continue to purchase and use Roundup® products.

138. Monsanto either knew or should have known of the material misrepresentations it was making regarding the safety and relative utility of Roundup® products.

139. Monsanto fraudulently, intentionally, and/or negligently made the misrepresentations and/or actively concealed, suppressed, or omitted this material information with the specific desire to induce Plaintiff, and the consuming public to purchase and use Roundup® products. Monsanto fraudulently, intentionally, and/or negligently, knew or should have known that Plaintiff and the consuming public would rely on such material misrepresentations and/or omissions in selecting and applying Roundup® products. Monsanto knew or should have known that Plaintiffs would rely on their false representations and omissions.

140. Monsanto made these misrepresentations and actively concealed adverse information including the risk of Non-Hodgkin's lymphoma, at a time when, its agents and/or employees knew or should have known, the product had defects, dangers, and characteristics that were other than what was represented to the consuming public. Despite the fact that Monsanto knew or should have known

of reports of severe risks including Non-Hodgkin's lymphoma, with Roundup® use and exposure, this information was strategically minimized, understated, or omitted in order to create the impression that the human dangers of Roundup® were nonexistent, particularly in light of its purported utility.

141. The fraudulent, intentional and/or negligent material misrepresentations and/or active concealment, suppression, and omissions by Monsanto were perpetuated directly and/or indirectly through the advertisements, packaging, sales aids, furtive public relations efforts, and other marketing and promotional pieces authored, analyzed, created, compiled, designed, drafted, disseminated, distributed, edited, evaluated, marketed, published, and supplied by Monsanto.

142. If Plaintiff had known the true facts concerning the risks associated with Roundup® exposure, Plaintiff would have used a safer alternative.

143. Plaintiff's reliance upon the material misrepresentations and omissions was justified, among other reasons, because said misrepresentations and omissions were made by individuals and entities who were in a position to know the true facts concerning Roundup® while Plaintiff was not in a position to know the true facts because Monsanto overstated the benefits and safety of Roundup® and downplayed the risk of lymphoma, thereby inducing Plaintiff to use the

herbicide rather than safer alternatives.

144.   As a direct and proximate result of Monsanto's actions and inactions, Plaintiff was exposed to Roundup®  and suffered and will continue to suffer injuries and damages, as set forth herein.

## COUNT V
## BREACH OF IMPLIED WARRANTY

145.   Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

146.   The law imposes a duty on Defendant to be responsible in the event the product sold, namely Roundup®, is fit for use and purposes intended.

147.   Defendant breached its contractually assumed implied warranty by supplying a product that caused Plaintiff to develop Non-Hodgkin's Lymphoma.

## COUNT VI
## NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

148.   Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

149.   Defendant owed a duty to consumers of their product to not cause mental distress as a result of using their product, Roundup®.

150.   Defendant breached that duty when they supplied a dangerous product, Roundup®, to Plaintiff intending for him to use it.

151.    Plaintiff's use of Roundup® and the resulting injuries that the use caused, resulted in serious mental distress of Plaintiff.

<u>COUNT VII</u>
**INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**

152.    Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

153.    Monsanto recklessly designed, manufacture, marketed and sold Roundup®, an inherently dangerous product.

154.    Monsanto acted outrageously in providing Roundup® to the public, in general and to Plaintiff Witsell in particular.

155.    Monsanto caused extreme emotional distress to Plaintiff by outrageously supplying him with Roundup®, an inherently dangerous product, all the while representing to them that it was safe to use and would flush from his system with no ill effects.

156.    Monsanto is liable for intentional infliction of the emotional distress that Plaintiff suffered as a result of its conduct.

WHEREFORE, Plaintiff MARK A WITSELL prays for judgment against Defendant, as follows:

A.      Special damages in an amount to be determined at a trial;

B.      General damages in an amount to be determined at a trial;

C.      Actual or compensatory damages in an amount to be determined at a trial;

D.      Punitive, exemplary, and/or treble damages in an amount to be determined at a trial;

E.      Future earnings of Mr. Witsell as provided by HRS § 663-8;

F.      Reasonable attorneys' fees and costs;

G.      Pre-judgment and post-judgment interest; and

H.      Any and all other relief as may be deemed just and equitable by the Court.

DATED: Honolulu, Hawaii, September 2, 2020.

/s/ Michael Jay Green
MICHAEL JAY GREEN
DENISE M. HEVICON
MARIA F. PENN

Attorneys for Plaintiff
MARK A. WITSELL