CM/ECF - California Central District

Query    Reports    Utilities    Help    Log Out

ACCO

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA (Western Division - Los Angeles)
# CIVIL DOCKET FOR CASE #: 2:20-cv-08381

Chavez et al v. Monsanto Company et al
Assigned to:
Demand: $75,000
Case in other court:  Superior Court for the County of Los Angeles,
        20STCV25233
Cause: 28:1332 Diversity-Product Liability

Date Filed: 09/14/2020
Jury Demand: Both
Nature of Suit: 365 Personal Inj. Prod. Liability
Jurisdiction: Diversity

**Plaintiff**

**Livier Chavez**
*an individual*

represented by **Livier Chavez**
PRO SE

**Plaintiff**

**Juan Jose Brown**
*an individual*

represented by **Juan Jose Brown**
PRO SE

V.

**Defendant**

**Monsanto Company**
*a Delaware corporation*

represented by **Eskandar Alex Beroukhim**
Arnold and Porter Kaye Scholer LLP
777 South Figueroa Street 44th Floor
Los Angeles, CA 90017-5844
213-243-4000
Fax: 213-243-4199
Email: alex.beroukhim@arnoldporter.com
*ATTORNEY TO BE NOTICED*

**Defendant**

**Does**
*1 through 1000, inclusive*

| Date Filed | # | Docket Text |
|---|---|---|
| 09/14/2020 | 1 | NOTICE OF REMOVAL from Superior Court for the County of Los Angeles, case number 20STCV25233 Receipt No: ACACDC-28066678 - Fee: $400, filed by defendant Monsanto Company. (Attachments: # 1 Exhibit 1 (Complaint), # 2 Exhibit 2 (State Court Civil Cover Sheet), # 3 Exhibit 3 (Summons), # 4 Exhibit 4 (Case Assignment Notice), # 5 Exhibit 5 Proof of Service of Complaint), # 6 Exhibit 6 (Answer), # 7 Proof of Service of Notice of Removal) (Attorney Eskandar Alex Beroukhim added to party Monsanto Company(pty:dft))(Beroukhim, Eskandar) (Entered: 09/14/2020) |
| 09/14/2020 | 2 | CIVIL COVER SHEET filed by Defendant Monsanto Company. (Beroukhim, Eskandar) |

| | | (Entered: 09/14/2020) |
|---|---|---|
| 09/14/2020 | 3 | Certification and Notice of Interested Parties filed by defendant Monsanto Company, identifying Bayer AG as parent of Monsanto Company. (Beroukhim, Eskandar) (Entered: 09/14/2020) |
| 09/14/2020 | 4 | CORPORATE DISCLOSURE STATEMENT filed by Defendant Monsanto Company identifying Bayer AG as Corporate Parent. (Beroukhim, Eskandar) (Entered: 09/14/2020) |

| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 09/15/2020 12:44:40 | | | |
| **PACER Login:** | hllp1982 | **Client Code:** | 1417.0049 |
| **Description:** | Docket Report | **Search Criteria:** | 2:20-cv-08381 End date: 9/15/2020 |
| **Billable Pages:** | 1 | **Cost:** | 0.10 |

Electronically FILED by Superior Court of California, County of Los Angeles on 07/02/2020 02:49 PM Sherri R. Carter, Executive Officer/Clerk of Court, by H. Flores-Hernandez,Deputy Clerk
20STCV25233

Assigned for all purposes to: Spring Street Courthouse, Judicial Officer: Daniel Crowley

1  GIRARDI | KEESE
   THOMAS V. GIRARDI, State Bar No. 36603
2  tgirardi@girardikeese.com
   CHRISTOPHER T. AUMAIS, State Bar No. 249901
3  caumais@girardikeese.com
   ARIN SCAPA, State Bar No. 283400
4  ascapa@girardikeese.com
   1126 Wilshire Boulevard
5  Los Angeles, California 90017
   Telephone: (213) 977-0211
6  Facsimile: (213) 481-1554

7  FIRST LEGAL SOLUTION APC
   JOHN ABASSIAN, State Bar No. 258655
8  16255 Ventura Blvd Suite 1205
   Encino, CA 91436
9  Telephone: (818) 650-6363
   Facsimile: (818) 647-6402

10 Attorneys for Plaintiffs

11

12              SUPERIOR COURT OF THE STATE OF CALIFORNIA

13                COUNTY OF LOS ANGELES, CENTRAL DISTRICT

14

15 LIVIER CHAVEZ, an individual, JUAN         Case No.   20STCV25233
16 JOSE BROWN, and individual,

17           Plaintiffs,                       COMPLAINT FOR DAMAGES
                                                1.  NEGLIGENCE
18       v.                                     2.  STRICT PRODUCTS LIABILITY:
                                                    DESIGN DEFECT
19 MONSANTO COMPANY, a Delaware                 3.  STRICT PRODUCTS LIABILITY:
   Corporation and DOES 1-1000, inclusive,          FAILURE TO WARN
20                                              4.  BREACH OF WARRANTY
                                                5.  BREACH OF IMPLIED
21           Defendants.                            WARRANTY OF
                                                    MERCHANTABILITY
22

23       Plaintiff LIVIER CHAVEZ, an individual, and her spouse JUAN JOSE BROWN bring this

24 Complaint for damages against defendant MONSANTO COMPANY ("Monsanto"), and alleges as

25 follows:

26                                  **SUMMARY**

27

28 1.      This case arises out of Monsanto's wrongful conduct in connection with the design,

                                          1

development, manufacture, testing, packaging, promoting, marketing, advertising, distribution, labeling, and sale of the herbicide Roundup, containing the active ingredient glyphosate. Glyphosate has been found to be carcinogenic, linked to causing various forms of cancer, and in particular non-Hodgkins Lymphoma. As such, Roundup is dangerous to human health and unfit to be marketed and sold in commerce, particularly without proper warnings and directions as to the dangers associated with its use. On information and belief, Plaintiff, who was exposed to Roundup extensively, suffered from non-Hodgkins Lymphoma and bring this action for the harm she has incurred.

## JURISDICTION AND VENUE

2.   At all times relevant to this action, named Plaintiff, LIVIER CHAVEZ ("Plaintiff"), is an individual residing in Los Angeles County, State of California

3.   At all times relevant to this action, named Plaintiff, JUAN JOSE BROWN ("Plaintiff"), is an individual residing in Los Angeles County, State of California.

4.   Defendant, MONSANTO COMPANY ("Monsanto") is and at all relevant times herein was a Delaware Corporation, with substantial contacts in the County of Los Angeles, State of California.

5.   Defendant Monsanto marked, advertised, promoted, administered, promoted, sold, and/or otherwise facilitated the use of ROUNDUP that is the subject of the lawsuit.

6.   Defendant Monsanto has substantial contacts with the State of California, including but not limited to its contacts with Plaintiff, an individual who was, upon information an belief, exposed to Roundup.

7.   This Court has jurisdiction over this matter because Defendant Monsanto , is domiciled, conducts business in, and has substantial contacts within, the State of California.

8.   Venue is proper in the County of Los Angeles pursuant to section 395(a) of the *California Code of Civil Procedure* because the incident at the core of this lawsuit occurred in the City of Los Angeles, County of Los Angeles, State of California.

/ / /

/ / /

**PARTIES**

9.   At all times mentioned herein, Plaintiff LIVIER CHAVEZ, was, and is, an individual who resides in Los Angeles County, California.

10.  At all times mentioned herein, Plaintiff JUAN JOSE BROWN, was, and is, an individual who resides in Los Angeles County, California

11.  At all times mentioned herein, Defendant Monsanto., was, and is a business entity doing business in the County of Los Angeles, State of California.

12.  The true names and/or capacities, whether individual, corporate, associate or otherwise, of Defendants Does 1 through 1000, inclusive, and each of them, are unknown to Plaintiffs, who therefore sue said Defendants by such fictitious names.  Plaintiffs are informed and believe, and upon such information and belief allege, that each of the Defendants fictitiously named herein as a Doe is legally responsible, negligently or in some other actionable manner, for the events and happenings hereinafter referred to, and proximately caused the injuries and damages to Plaintiffs hereinafter alleged.  Plaintiffs will seek leave of Court to amend this Complaint to assert the true names and/or capacities of such fictitiously named Defendants when the same have been ascertained.

13.  Plaintiffs are informed and believes and thereupon allege, that at all times mentioned herein, Defendants, and each of them, including Does 1 through 1000, were the agents, servants, employees and/or joint ventures of their co-Defendants, and were, as such, acting within the course, scope and authority of said agency, employment and/or joint venture, and that each and every Defendants, as aforesaid, when acting as a principal, was negligent in the selection and hiring of each and every Defendants as an agent, employee and/or joint venturers.

**FACTUAL ALLEGATIONS**

14.  At all relevant times, Monsanto designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed the commercial herbicide Roundup.

15. "Roundup" refers to all formulations of Monsanto's Roundup products, including, but not limited to, Roundup Concentrate Poison Ivy and Tough Brush Killer 1, Roundup Custom Herbicide, Roundup D-Pak herbicide, Roundup Dry Concentrate, Roundup Export Herbicide, Roundup Fence & Hard Edger 1, Roundup Garden Foam Weed & Grass Killer, Roundup Grass and Weed Killer, Roundup Herbicide, Roundup Original 2k herbicide, Roundup Original II Herbicide, Roundup Pro Concentrate, Roundup Prodry Herbicide, Roundup Promax, Roundup Quik Stik Grass and Weed Killer, Roundup Quikpro Herbicide, Roundup Rainfast Concentrate Weed & Grass Killer, Roundup Rainfast Super Concentrate Weed & Grass Killer, Roundup Ready-to-Use Extended Control Weed & Grass Killer 1 Plus Weed Preventer, Roundup Ready-to-Use Weed & Grass Killer, Roundup Ready-to- Use Weed and Grass Killer 2, Roundup Ultra Dry, Roundup Ultra Herbicide, Roundup Ultramax, Roundup VM Herbicide, Roundup Weed & Grass Killer Concentrate, Roundup Weed & Grass Killer Concentrate Plus, Roundup Weed & Grass killer Ready-to-Use Plus, Roundup Weed & Grass Killer Super Concentrate, Roundup Weed & Grass Killer1 Ready-to-Use, Roundup WSD Water Soluble Dry Herbicide Deploy Dry Herbicide, or any other formulation containing the active ingredient glyphosate.

16. Monsanto is a multinational agricultural biotechnology corporation based in   St. Louis, Missouri. It is the world's leading producer of glyphosate.

17. Monsanto  discovered the  herbicidal properties of glyphosate during  the  1970's and developed it as a broad-spectrum herbicide used to kill weeds and grasses known to compete with commercial crops grown around the globe.

18. Glyphosate is a "non-selective" herbicide, meaning it kills indiscriminately based only on whether a given organism produces a specific enzyme, 5-enolpyruvylshikimic acid-3-phosphate synthase, known as EPSP synthase.

19. Glyphosate inhibits the enzyme 5-enolpyruvylshikimic acid-3-phosphate synthase that interferes with the shikimic pathway in plants, resulting in the accumulation of shikimic acid in plant tissue and ultimately plant death.

20. Sprayed as a liquid, plants absorb glyphosate directly through their leaves, stems, and roots;

and detectable quantities accumulate in the plant tissues.

21. Each year, approximately 250 million pounds of glyphosate are sprayed on crops, commercial nurseries, suburban lawns, parks, and golf courses. This increase in use has been driven largely by the proliferation of "Roundup Ready" crops, which have been genetically engineered to resist the activity of glyphosate.

22. Monsanto is responsible for the development, manufacture, marketing, sale, and distribution of Roundup Ready seeds. By 2009, Monsanto was the world's leading producer of Roundup Ready seeds. In 2010, roughly 70% of corn and cotton and 90% of soybean fields in the United States were grown with Roundup Ready seeds.

23. Roundup was introduced in 1974 and is today one of the world's most widely- used herbicides. Monsanto's glyphosate products are registered in more than   130 countries and are approved for weed control in more than 100 crops. No other herbicide active ingredient compares in terms of number of uses.[1]

24. In all this time, farmers have used Roundup unaware it is a carcinogen.

## REGISTRATION OF HERBICIDES UNDER FEDERAL LAW

25. The manufacture, formulation, and distribution of herbicides, such as   Roundup, are regulated under the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA"), 7 U.S.C. § 136 *et seq*. FIFRA requires that all pesticides be registered with the Environmental Protection Agency ("EPA") prior to their distribution, sale, or use, except as described by FIFRA 7 U.S.C. § 136a(a).

26. The EPA requires a variety of tests as part of the registration process to evaluate the potential for exposure to pesticides, toxicity to people and other potential non-target organisms, and other adverse effects on the environment. Registration by the EPA, however, is not an assurance or finding of safety. The determination the EPA makes in registering or re-registering a product is not that the product is "safe," but rather that use of the product in accordance with its label directions

"will not generally cause unreasonable adverse effects on the envir[1]onment." 7 U.S.C. § 136(a)(c)(5)(D).

27. FIFRA defines "unreasonable adverse effects on the environment" to mean "any unreasonable risk to man or the environment, taking into account the economic, social, and environmental costs and benefits of the use of any pesticide." 7 U.S.C. § 136(bb). FIFRA thus requires the EPA to make a risk/benefit analysis in determining whether a registration should be granted or allowed to continue to be sold in commerce.

28. The EPA and the State of Califonia registered Roundup for distribution, sale, and manufacture in the United States and the State of California.

29. FIFRA generally requires that the registrant, here Monsanto, conduct health and safety testing of pesticide products. The government is not required, nor is it able, to perform the product tests that are required of the manufacturer.

30. Each pesticide product distributed, sold, or manufactured is evaluated at the time the product is initially registered. The data necessary for registration of a pesticide has changed over time. The EPA is now in the process of re-evaluating all pesticides through a Congressionally-mandated process called "re-registration." 7 U.S.C. § 136a-1. To reevaluate these pesticides, the EPA demands the completion of additional tests and the submission of data for the EPA's review and evaluation.

31. The EPA had planned to release its preliminary risk assessment of glyphosate and Roundup – in relation to the registration process – no later than July 2015. The EPA completed its review of glyphosate in early 2015 but delayed releasing the assessment pending further review in light of the World Health Organization's findings.

///

///

///

---

[1] *Backgroun[1]der*, History of Monsanto's Glyphosate Herbicides, June 2005, available at www.monsanto.com/products/documents/glyphosate-background-materials/back_ground.pdf

COMPLAINT FOR DAMAGES

## MONSANTO'S FALSE REPRESENTATIONS REGARDING THE SAFETY OF THE ROUNDUP

32. In 1996, the New York Attorney General ("NYAG") filed a lawsuit against Monsanto based on its false and misleading advertising of Roundup products. Specifically, the lawsuit challenged Monsanto's general representations that its spray-on glyphosate-based herbicides, including Roundup, were "safer than table salt" and "practically non-toxic" to mammals, birds, and fish. Among the representations the NYAG found deceptive and misleading about the human and environmental safety of Roundup are the following:

a. Remember that environmentally friendly Roundup herbicide is biodegradable. It won't build up in the soil so you can use Roundup with confidence along customers' driveways, sidewalks and fences.

b. And remember that Roundup is biodegradable and won't build up in the soil. That will give you the environmental confidence you need to use Roundup everywhere you've got a weed, brush, edging or trimming problem.

c. Roundup biodegrades into naturally occurring elements.

d. Remember that versatile Roundup herbicide stays where you put it. That means there's no washing or leaching to harm customers' shrubs or other desirable vegetation.

e. This non-residual herbicide will not wash or leach in the soil. It ... stays where you apply it.

f. You can apply Accord with "confidence because it will stay where you put it" it bonds tightly to soil particles, preventing leaching. Then, soon after application, soil microorganisms biodegrade Accord into natural products.

g. Glyphosate is less toxic to rats than table salt following acute oral ingestion.

h. Glyphosate's safety margin is much greater than required. It has over a 1,000-fold safety margin in food and over a 700-fold safety margin for workers who

manufacture it or use it.

i.  You can feel good about using herbicides by Monsanto. They carry a toxicity category rating of 'practically non-toxic' as it pertains to mammals, birds and fish.

j.  "Roundup can be used where kids and pets will play and breaks down into natural material." This ad depicts a person with his head in the ground and a pet dog standing in an area which has been treated with Roundup.[2]

33. On November 19, 1996, Monsanto entered into an Assurance of Discontinuance with the NYAG, in which Monsanto agreed, among other things, "to cease and desist from publishing or broadcasting any advertisements [in New York] that represent, directly or by implication" that:

a.  its glyphosate-containing pesticide products or any component thereof are safe, non-toxic, harmless or free from risk;

    ***

b.  its glyphosate-containing pesticide products or any component thereof manufactured, formulated, distributed or sold by Monsanto are biodegradable;

    ***

c.  its glyphosate-containing pesticide products or any component thereof stay where they are applied under all circumstances and will not move through the environment by any means;

    ***

d.  its glyphosate-containing pesticide products or any component thereof are "good" for the environment or are "known for their environmental characteristics;"

    ***

e.  glyphosate-containing pesticide products or any component thereof are safer or less toxic than common consumer products other than herbicides; and

    ***

f.  its glyphosate-containing products or any component thereof might be classified as

---

[2] Attorney General of the State of New York, In the Matter of Monsanto Company, Assurance of Discontinuance Pursuant to Executive Law § 63(15) (Nov. 1996).[2]

COMPLAINT FOR DAMAGES

"practically non-toxic."

34. Monsanto did not alter its advertising in the same manner in any state other than New York, and on information and belief still has not done so today.

35. In 2009, France's highest court ruled that Monsanto had not told the truth about the safety of Roundup and affirmed an earlier judgment that Monsanto had falsely advertised its herbicide Roundup as "biodegradable" and that it "left the soil clean."[3]

### Evidence of Carcinogenicity in Roundup

36. As early as the 1980's Monsanto was aware of glyphosate's carcinogenic properties.

37. On March 4, 1985, a group of the EPA's Toxicology Branch published a memorandum classifying glyphosate as a Category C oncogene.[4] Category C oncogenes are possible human carcinogens with limited evidence of carcinogenicity.

38. In 1986, the EPA issued a Registration Standard for glyphosate (NTIS PB87- 103214). The Registration standard required additional phytotoxicity, environmental fate, toxicology, product chemistry, and residue chemistry studies. All of the data required was submitted and reviewed and/or waived.[5]

39. In October 1991, the EPA published a Memorandum entitled "Second Peer Review of Glyphosate." The memorandum changed glyphosate's classification to Group E concur with the conclusions of the committee and one member refused to sign.[6]

---

[3]*Monsanto   Guilty   in   'False   Ad'   Row*, BBC,   Oct.   15,   2009,   *available   at*   http://news.bbc.co.uk/2/hi/europe/8308903.stm.

[4] Consensus Review of Glyphosate, Casewell No. 661A. March 4, 1985. United States Environmental Protection Agency.

[5] http://www.epa.gov/oppsrrd1/reregistration/REDs/factsheets/0178fact.pdf.

(evidence of non-carcinogenicity for humans). Two peer review committee members did not

[6] U.S. EPA, *Memorandum, Subject: SECOND Peer Review of Glyphosate* 1 (1991), *available   at*

http://www.epa.gov/pesticides/chem_search/cleared_reviews/csr_PC-103601_30-Oct-91_265.pdf.

9

40. In addition to the toxicity of the active molecule, many studies support the hypothesis that glyphosate formulations found in Monsanto's Roundup products are more dangerous and toxic than glyphosate alone.[7] As early as 1991, evidence existed demonstrating that glyphosate formulations were significantly more toxic than glyphosate alone.

41. In 2002, Julie Marc published a study entitled "Pesticide Roundup Provokes Cell Division Dysfunction at the Level of CDK1/Cyclin B Activation."[8] The study found that Monsanto's Roundup caused delays in the cell cycles of sea urchins, while the same concentrations of glyphosate alone proved ineffective and did not alter cell cycles.

42. In 2004, Julie Marc published a study entitled "Glyphosate-based pesticides affect cell cycle regulation." The study demonstrated a molecular link between glyphosate-based products and cell cycle dysregulation.[9]

43. The study noted that "cell-cycle dysregulation is a hallmark of tumor cells and human cancer. Failure in the cell-cycle checkpoints leads to genomic instability and subsequent development of cancers from the initial affected cell." Further, "[s]ince cell cycle disorders such as cancer result from dysfunction of unique cell, it was of interest to evaluate the threshold dose of glyphosate affecting cells."[10]

---

[7] See Martinez, et al. *Oral and pulmonary toxicology of the surfactant used in Roundup herbicide*, PROC. WEST. PHARMACOL. SOC. 34:43-46 (1991); Nora Benachour, et al., *Glyphosate Formulations Induce Apoptosis and Necrosis in Human Umbilical, Embryonic, and Placental Cells*, 22 CHEM. RES. TOXICOL. 97-105 (2009), *available at* http://big.assets.huffington.com/france.pdf; Gasnier et al. 2010; Francisco Peixoto, *Comparative effects of the Roundup and glyphosate on mitochondrial oxidative phosphorylation*, 61 CHEMOSPHERE 1115, 1122 (2005), *available at* https://www.researchgate.net/publication/7504567_Comparative_effects_of_the_Roundup_and_gl yphos ate_on_mitochondrial_oxidative_phosphorylation; March 2004.

[8] Julie Marc, et al., *Pesticide Roundup Provokes Cell Division Dysfunction at the Level of CDK1/Cyclin B Activation*, 15 CHEM. RES. TOXICOL. 326-331 (2002), *available at* http://pubs.acs.org/doi/full/10.1021/tx015543g.

[9] Julie Marc, et al., *Glyphosate-based pesticides affect cell cycle regulation,* 96 BILIOGY OF THE CELLS 245, 245- 249 (2004), *available at* http://onlinelibrary.wiley.com/doi/10.1016/j.biolcel.2003.11.010/epdf.

[10] Molinari, 2000; Stewart et al., 2003.

10

44. In 2005, Francisco Peixoto published a study showing that Roundup's effects on rat liver mitochondria are much more toxic and harmful than the same concentrations of glyphosate alone.

45. The Peixoto study suggested that the harmful effects of Roundup on mitochondrial bioenergetics could not be exclusively attributed to glyphosate and could be the result of other chemicals, namely the surfactant POEA, or alternatively due to the possible synergy between glyphosate and Roundup formulation products.

46. In 2009, Nora Benachour and Gilles-Eric Seralini published a study of the effects of Roundup and glyphosate on human umbilical, embryonic, and placental cells.

47.     The study used dilution levels of Roundup and glyphosate far below agricultural recommendations, corresponding with low levels of residues in food. The study concluded that supposed "inert" ingredients, and possibly POEA, change human cell permeability and amplify toxicity of glyphosate alone. The study further suggested that determinations of glyphosate toxicity should take into account the presence of adjuvants, or those chemicals used in the formulation of the complete pesticide. The study confirmed that the adjuvants in Roundup are not inert and that Roundup is always more toxic than its active ingredient glyphosate.

48. The results of these studies were confirmed in peer-reviewed studies that were known to Monsanto.

49. Monsanto knew or should have known that Roundup is more toxic than glyphosate alone and that safety studies on Roundup, Roundup's adjuvants and "inert" ingredients, and/or the surfactant POEA were necessary to protect Plaintiffs from Roundup.

50. Monsanto knew or should have known that tests limited to Roundup's active ingredient glyphosate were insufficient to prove the safety of Roundup.

51. Monsanto failed to appropriately and adequately test Roundup, Roundup's adjuvants and "inert" ingredients, and/or the surfactant POEA to protect Plaintiffs from Roundup.

52. Rather than performing appropriate tests, Monsanto relied on flawed industry- supported studies designed to protect Monsanto's economic interests rather than Plaintiffs and the consuming public.

53. Despite its knowledge that Roundup was considerably more dangerous than glyphosate alone, Monsanto continued to promote Roundup as safe.

## IARC CLASSIFICATION OF GLYPHOSATE

54. The International Agency for Research on Cancer ("IARC") is the specialized intergovernmental agency that the World Health Organization ("WHO") of the United Nations tasked with conducting and coordinating research into the causes of cancer.

55. An IARC Advisory Group to Recommend Priorities for IARC Monographs during 2015–2019 met in April 2014. Though nominations for the review were solicited, a substance must meet two criteria to be eligible for review by the IARC Monographs: there must already be some evidence of carcinogenicity of the substance, and there must be evidence that humans are exposed to the substance.

56. IARC set glyphosate for review in 2015-2016. IARC uses five criteria for determining priority in reviewing chemicals. The substance must have a potential for direct impact on public health; scientific literature to support suspicion of carcinogenicity; evidence of significant human exposure; high public interest and/or potential to bring clarity to a controversial area and/or reduce public anxiety or concern; and related agents similar to one given high priority by the above considerations. Data reviewed is sourced preferably from publicly accessible, peer-reviewed data.

57. On March 24, 2015, after its cumulative review of human, animal, and DNA studies for more than one (1) year, many of which have been in Monsanto's possession since as early as 1985, the IARC's working group published its conclusion that the glyphosate contained in Monsanto's Roundup herbicide, is a Class 2A "probable carcinogen" as demonstrated by the mechanistic evidence of carcinogenicity in humans and sufficient evidence of carcinogenicity in animals.

58. The IARC's full Monograph was published on July 29, 2015, and established glyphosate as a class 2A probable carcinogen to humans. According to the authors, glyphosate demonstrated sufficient mechanistic evidence (genotoxicity and oxidative stress) to warrant a 2A classification based on evidence of carcinogenicity in humans and animals.

59. The IARC Working Group found an increased risk between exposure to glyphosate and non-

12

Hodgkin's Lymphoma ("NHL") and several subtypes of NHL, and the increased risk continued after adjustment for other pesticides.

60. The IARC also found that glyphosate caused DNA and chromosomal damage in human cells.

## EARLIER EVIDENCE OF GLYPHOSATE'S DANGER

61. Despite the new classification by the IARC, Monsanto has had ample evidence of glyphosate and Roundup's genotoxic properties for decades.

62. Genotoxicity refers to chemical agents capable of damaging the DNA within a cell through genetic mutations, which is a process that is believed to lead to cancer.

63. In 1997, Chris Clements published "Genotoxicity of select herbicides in Rana catesbeiana tadpoles using the alkaline single-cell gel DNA electrophoresis (comet) assay."

64. The study found that tadpoles exposed to Roundup showed significant DNA damage when compared with unexposed control animals.

65. Both human and animal studies have shown that glyphosate and glyphosate-base formulations such as Roundup can induce oxidative stress.

66. Oxidative stress and associated chronic inflammation are believed to be involved in carcinogenesis.

67. The IARC Monograph notes that "[s]trong evidence exists that glyphosate, AMPA and glyphosate-based formulations can induce oxidative stress."

68. In 2006, César Paz-y-Miño published a study examining DNA damage in human subjects exposed to glyphosate.

69. The study produced evidence of chromosomal damage in blood cells showing significantly greater damage after exposure to glyphosate than before in the same individuals, suggesting that the glyphosate formulation used during aerial spraying had a genotoxic effect on exposed individuals.

70. The IARC Monograph reflects the volume of evidence of glyphosate pesticides' genotoxicity noting "[t]he evidence for genotoxicity caused by glyphosate-based formulations is

strong."

71. Despite knowledge to the contrary, Monsanto denies that Roundup is genotoxic.

72. In addition to glyphosate and Roundup's genotoxic properties, Monsanto has long been aware of glyphosate's carcinogenic properties.

73. Glyphosate and Roundup in particular have long been associated with carcinogenicity and the development of numerous forms of cancer, including, but not limited to, NHL, Hodgkin's Lymphoma, Multiple Myeloma, and soft tissue sarcoma.

74. Monsanto has known of this association since the mid-1980s and numerous human and animal studies evidence the carcinogenicity of glyphosate and/or Roundup.

75. In 1985, the EPA studied the effects of glyphosate in mice finding a dose related response in male mice linked to renal tubal adenomas, a rare tumor. The study concluded the glyphosate was oncogenic.

76. In 2003, Lennart Hardell and Mikael Eriksson published the results of two case controlled studies on pesticides as a risk factor for NHL and hairy cell leukemia.

77. The study concluded that glyphosate had the most significant relationship to NHL among all herbicide studies with an increased odds ratio of 3.11.

78. In 2003, AJ De Roos published a study examining the pooled data of mid-western farmers, examining pesticides and herbicides as risk factors for NHL.

79. The study, which controlled for potential confounders, found a relationship between increased NHL incidence and glyphosate.

80. In 2008, Mikael Eriksson published a population based case-control study of exposure to various pesticides as a risk factor for NHL.

81. This strengthened previous associations between glyphosate and NHL.

82. In spite of this knowledge, Monsanto continued to issue broad and sweeping statements suggesting that Roundup was, and is, safer than ordinary household items such as table salt, despite a lack of scientific support for the accuracy and validity of these statements and, in fact, voluminous evidence to the contrary.

83. On information and belief, these statements and representations have been made with the intent of inducing Plaintiff, the agricultural community, and the public at large to purchase, and increase the use of, Roundup for Monsanto's pecuniary gain, and in fact did induce Plaintiffs to use Roundup.

84. Monsanto made these statements with complete disregard and reckless indifference to the safety of Plaintiffs and the general public.

85. Notwithstanding Monsanto's representations, scientific evidence has established a clear association between glyphosate and genotoxicity, inflammation, and an increased risk of many cancers, including, but not limited to, NHL, Multiple Myeloma, and soft tissue sarcoma.

86. Monsanto knew or should have known that glyphosate is associated with an increased risk of developing cancer, including, but not limited to, NHL, Multiple Myeloma, and soft tissue sarcomas.

87. Monsanto failed to appropriately and adequately inform and warn Plaintiffs of the serious and dangerous risks associated with the use of and exposure to glyphosate and/or Roundup, including, but not limited to, the risk of developing NHL, as well as other severe and personal injuries, which are permanent and/or long-lasting in nature, cause significant physical pain and mental anguish, diminished enjoyment of life, and the need for medical treatment, monitoring, and/or medications.

88. Despite the IARC's classification of glyphosate as a class 2A probable carcinogen, Monsanto continues to maintain that glyphosate and/or Roundup is safe, non- carcinogenic, non-genotoxic, and falsely warrant to users and the general public that independent experts and regulatory agencies agree that there is no evidence of carcinogenicity or genotoxicity in glyphosate and Roundup.

89. Monsanto has claimed and continues to claim that Roundup is safe, non- carcinogenic, and non-genotoxic.

90. Monsanto claims on its website that "[r]egulatory authorities and independent experts around the world have reviewed numerous long-term/carcinogenicity and genotoxicity studies and

agree that there is no evidence that glyphosate, the active ingredient in Roundup brand herbicides and other glyphosate-based herbicides, causes cancer, even at very high doses, and that it is not genotoxic."[11]

91. Ironically, the primary source for this statement is a 1986 report by the WHO, the same organization that now considers glyphosate to be a probable carcinogen.

92. Glyphosate, and Monsanto's Roundup products in particular, have long been associated with serious side effects and many regulatory agencies around the globe have banned or are currently banning the use of glyphosate herbicide products.

93. Monsanto's statements proclaiming the safety of Roundup and disregarding its dangers misled Plaintiffs.

94. Despite Monsanto's knowledge that Roundup was associated with an elevated risk of developing cancer, Monsanto's promotional campaigns focused on Roundup's purported "safety profile."

95. Monsanto's failure to adequately warn Plaintiffs resulted in (1) Plaintiffs using and being exposed to glyphosate instead of using another acceptable and safe method of controlling unwanted weeds and pests; and (2) scientists and physicians failing to warn and instruct consumers about the risk of cancer, including NHL, and other injuries associated with Roundup.

96. Monsanto failed to seek modification of the labeling of Roundup to include relevant information regarding the risks and dangers associated with Roundup exposure.

97. Monsanto's failure to appropriately warn and inform the EPA has resulted in inadequate warnings in safety information presented directly to users and consumers.

98. Monsanto's failure to appropriately warn and inform the EPA has resulted in the absence of warning or caution statements that are adequate to protect health and the environment.

99. Monsanto's failure to appropriately warn and inform the EPA has resulted in the directions for use that are not adequate to protect health and the environment.

---

[11] *Backgrounder* - Glyphosate: No Evidence of Carcinogenicity, updated November 2014, available at www.monsanto.com/glyphosate/documents/no-evidence-of-carcinogenicity.pdf.

100. By reason of the foregoing acts and omissions, Plaintiffs seek compensatory damages as a result of Plaintiffs' use of, and exposure to, Roundup, which caused or was a substantial contributing factor in causing Plaintiffs to suffer from cancer, specifically NHL, and Plaintiffs suffered severe and personal injuries that are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life.

101. By reason of the foregoing, Plaintiffs are severely and permanently injured.

102. By reason of the foregoing acts and omissions, Plaintiffs have endured and continue to suffer, emotional and mental anguish, medical expenses, and other economic and non-economic damages, as a result of Monsanto's actions and inactions.

## PLAINTIFF'S EXPOSURE TO ROUNDUP

103. Upon information an belief, Plaintiff LIVIER CHAVEZ was regularly exposed to Roundup while working in Los Angeles County.

104. At all relevant times, Plaintiffs were married.

105. Plaintiff LIVIER CHAVEZ was subsequently diagnosed in approximately June 2017 with Diffuse Large B-Cell Non-Hodgkins Lymphoma.

106. As a result of Plaintiff LIVIER CHAVEZ's injuries, Plaintiffs have incurred significant economic and non-economic damages.

107. During the entire time that Plaintiff was exposed to Roundup, she did not know that exposure to Roundup was injurious to his health or the health of others.

108. Plaintiffs first learned that exposure to Roundup can cause NHL and other serious illnesses sometime after June 2017 when Plaintiff was diagnosed with Diffuse Large B-Cell Non-Hodgkins Lymphoma.

109. At all times mentioned herein, Plaintiff JUAN JOSE BROWN was the wife of Plaintiff LIVIER CHAVEZ. As a result of Plaintiff LIVIER CHAVEZ damages, Plaintiff JUAN JOSE BROWN has suffered the loss of love, companionship, comfort, care, assistance, protection,

affection, society, and moral support.

## TOLLING OF APPLICABLE STATUTE OF LIMITATIONS
## DISCOVERY RULE TOLLING

110. Plaintiffs had no way of knowing about the risk of serious illness associated with the use of and/or exposure to Roundup and glyphosate until IARC release its formal assessment of glyphosate in July 2015. This is the quintessential case for tolling.

111. Within the time period of any applicable statutes of limitations, Plaintiffs could not have discovered, through the exercise of reasonable diligence, that exposure to Roundup and glyphosate is injurious to human health.

112. Plaintiffs did not discover, and did not know the facts that would cause a reasonable person to suspect, the risks associated with the use of and/or exposure to Roundup and glyphosate; nor would a reasonable and diligent investigation by them have disclosed that Roundup and glyphosate would cause their cancers.

113. For these reasons, all applicable statutes of limitations have been tolled by operation of the discovery rule with respect to Plaintiffs' claims.

## FRAUDULENT CONCEALMENT TOLLING

114. All applicable statutes of limitations have also been tolled by Monsanto's knowing and active fraudulent concealment and denial of the facts alleged herein throughout the time period relevant to this action.

115. Instead of disclosing critical safety information about Roundup and glyphosate, Monsanto has consistently and falsely represented the safety of its Roundup products.

## ESTOPPEL

116. Monsanto was under a continuous duty to disclose to consumers, users, and other persons coming into contact with its products, including Plaintiffs, accurate safety information concerning its products and the risks associated with the use of and/or exposure to Roundup and

18

glyphosate.

117.    Instead, Monsanto knowingly, affirmatively, and actively concealed safety information concerning Roundup and glyphosate and the serious risks associated with the use of and/or exposure to its products.

118.    Based on the foregoing, Monsanto is estopped from relying on any statutes of limitations in defense of this action.

## FIRST CAUSE OF ACTION
### NEGLIGENCE
### (By PLAINTIFF against DEFENDANTS AND DOES 1-1000)

119.    Plaintiffs re-allege each paragraph above as if fully set forth herein.

120.    Monsanto had a duty to exercise reasonable care in the designing, researching, testing, manufacturing, marketing, supplying, promoting, packaging, sale, and/or distribution of Roundup into the stream of commerce, including a duty to assure that the product would not cause users to suffer unreasonable, dangerous side effects.

121.    Monsanto failed to exercise ordinary care in the designing, researching, testing, manufacturing, marketing, supplying, promoting, packaging, sale, testing, quality assurance, quality control, and/or distribution of Roundup into interstate commerce in that Monsanto knew or should have known that using Roundup created a high risk of unreasonable, dangerous side effects, including, but not limited to, the development of NHL, as well as other severe and personal injuries that are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life, as well as need for lifelong medical treatment, monitoring, and/or medications.

122.    The negligence by Monsanto, its agents, servants, and/or employees, included but was not limited to the following acts and/or omissions:

a.  Manufacturing, producing, promoting, formulating, creating, and/or designing Roundup without thoroughly testing it;

b.  Failing to test Roundup and/or failing to adequately, sufficiently, and properly test

Roundup;

   c.  Not conducting sufficient testing programs to determine whether or not Roundup was safe for use; in that Monsanto knew or should have known that Roundup was unsafe and unfit for use by reason of the dangers to its users;

   d.  Not conducting sufficient testing programs and studies to determine Roundup's carcinogenic properties even after Monsanto had knowledge that Roundup is, was, or could be carcinogenic;

e.  Failing to conduct sufficient testing programs to determine the safety of "inert" ingredients and/or adjuvants contained within Roundup, and the propensity of these ingredients to render Roundup toxic, increase the toxicity of Roundup, whether these ingredients are carcinogenic, magnify the carcinogenic properties of Roundup, and whether or not "inert" ingredients and/or adjuvants were safe for use;

f.  Negligently failing to adequately and correctly warn the Plaintiffs, the public, the medical and agricultural professions, and the EPA of the dangers of Roundup;

g.  Negligently failing to petition the EPA to strengthen the warnings associated with Roundup;

h.  Failing to provide adequate cautions and warnings to protect the health of users, handlers, applicators, and persons who would reasonably and foreseeably come into contact with Roundup;

i.  Negligently marketing, advertising, and recommending the use of Roundup without sufficient knowledge as to its dangerous propensities;

j.  Negligently representing that Roundup was safe for use for its intended purpose, and/or that Roundup was safer than ordinary and common items such as table salt, when, in fact, it was unsafe;

k.  Negligently representing that Roundup had equivalent safety and efficacy as other forms of herbicides;

l.  Negligently designing Roundup in a manner that was dangerous to its users;

m.  Negligently manufacturing Roundup in a manner that was dangerous to its users;

COMPLAINT FOR DAMAGES

n.  Negligently producing Roundup in a manner that was dangerous to its users;

o.  Negligently formulating Roundup in a manner that was dangerous to its users;

p.  Concealing information from the Plaintiffs while knowing that Roundup was unsafe, dangerous, and/or non-conforming with EPA regulations;

q.  Improperly concealing and/or misrepresenting information from the Plaintiffs, scientific and medical professionals, and/or the EPA, concerning the severity of risks and dangers of Roundup compared to other forms of herbicides; and

r.  Negligently selling Roundup with a false and misleading label.

123.    Monsanto under-reported, underestimated, and downplayed the serious dangers of Roundup.

124.    Monsanto negligently and deceptively compared the safety risks and/or dangers of Roundup with common everyday foods such as table salt, and other forms of herbicides.

125.    Monsanto was negligent and/or violated California law in the designing, researching, supplying, manufacturing, promoting, packaging, distributing, testing, advertising, warning, marketing, and selling of Roundup in that it:

a.  Failed to use ordinary care in designing and manufacturing Roundup so as to avoid the aforementioned risks to individuals when Roundup was used as an herbicide;

b.  Failed to accompany its product with proper and/or accurate warnings regarding all possible adverse side effects associated with the use of Roundup;

c.  Failed to accompany its product with proper warnings regarding all possible adverse side effects concerning the failure and/or malfunction of Roundup;

d.  Failed to accompany its product with accurate warnings regarding the risks of all possible adverse side effects concerning Roundup;

e.  Failed to warn Plaintiffs of the severity and duration of such adverse effects, as the warnings given did not accurately reflect the symptoms, or severity of the side effects including, but not limited to, the development of NHL;

f.  Failed to conduct adequate testing, clinical testing and post-marketing surveillance to

determine the safety of Roundup;

g.  Failed to conduct adequate testing, clinical testing, and post-marketing surveillance to determine the safety of Roundup's "inert" ingredients and/or adjuvants;

h.  Negligently misrepresented the evidence of Roundup's genotoxicity and carcinogenicity; and

i.  Was otherwise careless and/or negligent.

126.    Despite the fact that Monsanto knew or should have known that Roundup caused, or could cause, unreasonably dangerous side effects, Monsanto continues to market, manufacture, distribute, and/or sell Roundup to consumers, including Plaintiffs.

127.    Monsanto knew or should have known that consumers such as Plaintiffs would foreseeably suffer injury as a result of Monsanto's failure to exercise ordinary care.

128.    Monsanto's violations of law and/or negligence were the proximate cause of Plaintiffs' injuries, harm and economic loss, which Plaintiffs suffered and will continue to suffer.

129.    As a result of the foregoing acts and omissions, Plaintiffs suffered life-threatening NHL, and severe personal injuries, which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life, as well as financial expenses for hospitalization and medical care.

130.    As a further result of Defendant's conduct, Plaintiffs were was unable to continue in their trade and business in the usual manner and suffered a loss of income that she will continue to suffer in the future. Also as a further result of the Plaintiff suffered and continues to suffer emotional distress, pain, frustration and inconvenience.

131.    At all times mentioned herein, Plaintiff JUAN JOSE BROWN was the husband of Plaintiff LIVIER CHAVEZ. As a result of Plaintiff LIVIER CHAVEZ damages, Plaintiff JUAN JOSE BROWN has suffered the loss of love, companionship, comfort, care, assistance, protection, affection, society, and moral support.

WHEREFORE, Plaintiffs respectfully requests that this Court enter judgment in Plaintiffs' favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees

and all relief as this Court deems just and proper.

## SECOND CAUSE OF ACTION

### STRICT PRODUCTS LIABILITY: DESIGN DEFECT

### (By PLAINTIFF against DEFENDANTS and DOES 1-1000)

132.    Plaintiffs re-allege each paragraph above as if fully set forth herein.

133.    At all times herein mentioned, Monsanto designed, researched, manufactured, tested, advertised, promoted, sold, and distributed Roundup as hereinabove described that was used by Plaintiffs.

134.    Roundup was expected to and did reach the usual consumers, handlers, and persons coming into contact with it without substantial change in the condition in which it was produced, manufactured, sold, distributed, and marketed by Monsanto.

135.    At those times, Roundup was in an unsafe, defective, and inherently dangerous condition, which was dangerous to users, and in particular, Plaintiffs herein.

136.    The Roundup designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed by Monsanto was defective in design or formulation in that, when it left the hands of the manufacturer and/or suppliers, the foreseeable risks exceeded the benefits associated with the design or formulation of Roundup.

137.    The Roundup designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed by Monsanto was defective in design and/or formulation, in that, when it left the hands of Monsanto or its manufacturers and/or suppliers, it was unreasonably dangerous, unreasonably dangerous in normal use, and it was more dangerous than an ordinary consumer would expect.

138.    At all times herein mentioned, Roundup was in a defective condition and unsafe, and Monsanto knew or had reason to know that it was defective and unsafe, especially when used in the form and manner as provided by Monsanto. In particular, Roundup was defective in the following ways:

a. When placed in the stream of commerce, Monsanto's Roundup products were defective in design and formulation and, consequently, dangerous to an extent beyond that which an ordinary consumer would anticipate.

b. When placed in the stream of commerce, Monsanto's Roundup products were unreasonably dangerous in that they were hazardous and posed a grave risk of cancer and other serious illnesses when used in a reasonably anticipated manner.

c. When placed in the stream of commerce, Monsanto's Roundup products contained unreasonably dangerous design defects and were not reasonably safe when used in a reasonably anticipated manner.

d. Monsanto did not sufficiently test, investigate, or study its Roundup products.

e. Exposure to Roundup presents a risk of harmful side effects that outweigh any potential utility stemming from the use of the herbicide.

f. Monsanto new or should have known at the time of marketing its Roundup products that exposure to Roundup could result in cancer and other severe illnesses and injuries.

g. Monsanto did not conduct adequate post-marketing surveillance of its Roundup products.

139. Monsanto knew, or should have known that at all times herein mentioned its Roundup was in a defective condition and was and is inherently dangerous and unsafe.

140. Plaintiffs were exposed to Monsanto's Roundup without knowledge    of Roundup's dangerous characteristics.

141. At the time of Plaintiffs' use of and exposure to Roundup, Roundup was being used for the purposes and in a manner normally intended, as a broad-spectrum herbicide.

142. Armed with this knowledge, Monsanto voluntarily designed its Roundup with a dangerous condition for use by the public, and in particular Plaintiffs.

143. Monsanto had a duty to create a product that was not unreasonably dangerous for its normal, intended use.

144. Monsanto created a product that was and is unreasonably dangerous for its normal,

24

COMPLAINT FOR DAMAGES

intended use.

145.    Monsanto marketed and promoted a product in such a manner so as to make it inherently defective as the product downplayed its suspected, probable, and established health risks inherent with its normal, intended use.

146.    The Roundup designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed by Monsanto was manufactured defectively in that Roundup left the hands of Monsanto in a defective condition and was unreasonably dangerous to its intended users.

147.    The Roundup designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed by Monsanto reached its intended users in the same defective and unreasonably dangerous condition in which Monsanto's Roundup was manufactured.

148.    Monsanto designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed a defective product, which created an unreasonable risk to the health of consumers and to Plaintiffs in particular, and Monsanto is therefore strictly liable for the injuries sustained by Plaintiffs.

149.    Plaintiffs could not, by the exercise of reasonable care, have   discovered Roundup's defects herein mentioned or perceived its danger.

150.    Monsanto is thus strictly liable to Plaintiffs for the manufacturing, marketing, promoting, distribution, and selling of a defective product, Roundup.

151.    Monsanto's defective design of Roundup amounts to willful, wanton, and/or reckless conduct.

152.    Defects in Monsanto's Roundup were the cause or a substantial factor in causing Plaintiffs' injuries.

153.    As a result of the foregoing acts and omission, Plaintiffs developed NHL, and suffered severe and personal injuries that are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life, and financial expenses for hospitalization and medical care.

154.    As a further result of Defendant's conduct, Plaintiffs were was unable to continue in their

trade and business in the usual manner and suffered a loss of income that she will continue to suffer in the future. Also as a further result of the Plaintiff suffered and continues to suffer emotional distress, pain, frustration and inconvenience.

155.   At all times mentioned herein, Plaintiff JUAN JOSE BROWN was the husband of Plaintiff LIVIER CHAVEZ. As a result of Plaintiff LIVIER CHAVEZ damages, Plaintiff JUAN JOSE BROWN has suffered the loss of love, companionship, comfort, care, assistance, protection, affection, society, and moral support.

WHEREFORE, Plaintiffs respectfully requests that this Court enter judgment in Plaintiffs' favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all relief as this Court deems just and proper.

## THIRD CAUSE OF ACTION

### STRICT PRODUCTS LIABILITY: FAILURE TO WARN

### (By PLAINTIFF against DEFENDANTS and DOES 1-1000)

156.   Plaintiffs re-allege each paragraph above as if fully set forth herein.

157.   Monsanto has engaged in the business of selling, testing, distributing, supplying, manufacturing, marketing, and/or promoting Roundup, and through that conduct has knowingly and intentionally placed Roundup into the stream of commerce with full knowledge that it reaches consumers such as Plaintiffs who are exposed to it through ordinary and reasonably foreseeable uses.

158.   Monsanto did in fact sell, distribute, supply, manufacture, and/or promote Roundup to Plaintiffs. Additionally, Monsanto expected Roundup that it was selling, distributing, supplying, manufacturing, and/or promoting to reach – and Roundup did in fact reach – consumers, including Plaintiffs, without any substantial change in the condition of the product from when it was initially distributed by Monsanto.

159.   At the time of manufacture, Monsanto could have provided the warnings or instructions regarding the full and complete risks of Roundup and glyphosate-containing products because it

knew or should have known of the unreasonable risks of harm associated with the use of and/or exposure to such products.

160.    At all relevant times, Roundup was defective and unsafe in manufacture such that it was unreasonably dangerous to the user, and was so at the time it was distributed by Monsanto and at the time Plaintiffs were exposed to and/or ingested the product. The defective condition of Roundup was due in part to the fact that it was not accompanied by proper warnings regarding its carcinogenic qualities and possible side effects, including, but not limited to, developing NHL as a result of exposure and use.

161.    Roundup did not contain a warning or caution statement, which was necessary and, if complied with, was adequate to protect the health of those exposed in violation of California law.

162.    Monsanto's failure to include a warning or caution statement that was necessary and, if complied with, was adequate to protect the health of those exposed, the laws of the State of California.

163.    Monsanto could have revised Roundup's label to provide additional warnings.

164.    This defect caused serious injury to Plaintiffs, who used Roundup in its intended and foreseeable manner.

165.    At all relevant times, Monsanto had a duty to properly design, manufacture, compound, test, inspect, package, label, distribute, market, examine, maintain supply, provide proper warnings, and take such steps to assure that the product did not cause users to suffer from unreasonable and dangerous side effects.

166.    Monsanto labeled, distributed, and promoted a product that was dangerous and unsafe for the use and purpose for which it was intended.

167.    Monsanto failed to warn of the nature and scope of the health risks associated with Roundup, namely its carcinogenic properties and its propensity to cause or serve as a substantial contributing factor in the development of NHL.

168.    Monsanto knew of the probable consequences of Roundup. Despite this fact, Monsanto failed to exercise reasonable care to warn of the dangerous carcinogenic properties and risks

COMPLAINT FOR DAMAGES

of developing NHL from Roundup exposure, even though these risks were known or reasonably scientifically knowable at the time of distribution. Monsanto willfully and deliberately failed to avoid the consequences associated with its failure to warn, and in doing so, acted with conscious disregard for Plaintiffs' safety.

169.     At the time of exposure, Plaintiffs could not have reasonably discovered any defect in Roundup through the exercise of reasonable care.

170.     Monsanto, as the manufacturer and/or distributor of Roundup, is held to the level of knowledge of an expert in the field.

171.     Plaintiffs reasonably relied on the skill, superior knowledge, and judgment of Monsanto.

172.     Had Monsanto properly disclosed the risks associated with Roundup, Plaintiffs would have avoided the risk of NHL by not using Roundup.

173.     The information that Monsanto provided failed to contain adequate warnings and precautions that would have enabled Plaintiffs, and similarly situated individuals, to utilize the product safely and with adequate protection. Instead, Monsanto disseminated information that was inaccurate, false, and misleading and that failed to communicate accurately or adequately the comparative severity, duration, and extent of the risk of injuries associated with use of and/or expo exposure to Roundup and glyphosate; continued to promote the efficacy of Roundup, even after it knew or should have known of the unreasonable risks from use or exposure; and concealed, downplayed, or otherwise suppressed, through aggressive marketing and promotion, any information or research about the risks and dangers of exposure to Roundup and glyphosate.

174.     To this day, Monsanto has failed to adequately warn of the true risks of Plaintiffs' injuries associated with the use of and exposure to Roundup.

175.     As a result of its inadequate warnings, Monsanto's Roundup products were defective and unreasonably dangerous when they left Monsanto's possession and/or control, were distributed by Monsanto, and used by Plaintiffs.

176.     As a direct and proximate result of Monsanto's actions as alleged herein, and in such other ways to be later shown, the subject product caused Plaintiffs to sustain injuries as herein

alleged.

177.    As a further result of Defendant's conduct, Plaintiffs were was unable to continue in their trade and business in the usual manner and suffered a loss of income that she will continue to suffer in the future. Also as a further result of the Plaintiff suffered and continues to suffer emotional distress, pain, frustration and inconvenience.

178.    At all times mentioned herein, Plaintiff JUAN JOSE BROWN was the wife of Plaintiff LIVIER CHAVEZ. As a result of Plaintiff LIVIER CHAVEZ damages, Plaintiff JUAN JOSE BROWN has suffered the loss of love, companionship, comfort, care, assistance, protection, affection, society, and moral support.

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in Plaintiffs' favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all relief as this Court deems just and proper.

## FOURTH CAUSE OF ACTION

### BREACH OF WARRANTY

### (By PLAINTIFF against DEFENDANTS and DOES 1-1000)

179.    Plaintiffs re-allege each paragraph above as if fully stated herein.

180.    At all times relevant to this litigation, Monsanto engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting its Roundup products, which are defective and unreasonably dangerous to consumers, including Plaintiffs, thereby placing Roundup products into the stream of commerce. These actions were under Monsanto's ultimate control and supervision.

181.    At all relevant times, Monsanto expressly and impliedly represented and warranted to the purchasers of its Roundup products, by and through statements made in labels, publications, package inserts, and other written materials intended for consumers and the general public, that its Roundup products were safe to human health and the environment, effective, fit, and proper for their intended use. Monsanto advertised, labeled, marketed, and promoted Roundup products,

representing the quality to consumers and the public so as to induce their purchase or use, thereby making an express and implied warranty that Roundup products would conform to the representations.

182.   These express and implied representations include incomplete warnings and instructions that purport, but fail, to include the complete array of risks associated with use of and/or exposure to Roundup and glyphosate. Monsanto knew and/or should have known that the risks expressly included in Roundup warnings and labels did not and do not accurately or adequately set forth the risks of developing the serious injuries complained of herein. Nevertheless, Monsanto expressly and impliedly represented that its Roundup products were safe and effective, including for use as agricultural herbicides.

183.   The representations about Roundup, as set forth herein, contained or constituted affirmations of fact or promises made by the seller to the buyer, which related to the goods and became part of the basis of the bargain, creating an express and implied warranty that the goods would conform to the representations.

184.   Monsanto placed its Roundup products into the stream of commerce for sale and recommended their use to consumers and the public without adequately warning of the true risks of developing the injuries associated with the use of and exposure to Roundup and its active ingredient glyphosate.

185.   Monsanto breached these warranties because, among other things, its Roundup products were defective, dangerous, unfit for use, did not contain labels representing the true and adequate nature of the risks associated with their use, and were not merchantable or safe for their intended, ordinary, and foreseeable use and purpose. Specifically, Monsanto breached the warranties in the following ways:

    a.   Monsanto represented through its labeling, advertising, and marketing materials that its Roundup products were safe, and fraudulently withheld and concealed information about the risks of serious injury associated with use of and/or exposure to Roundup and glyphosate by expressly limiting the risks associated with use and/or exposure within its

warnings and labels; and

    b.   Monsanto represented that its Roundup products were safe for use and fraudulently concealed information demonstrating that glyphosate, the active ingredient in Roundup, had carcinogenic properties, and that its Roundup products, therefore, were not safer than alternatives available on the market.

186.    Plaintiffs were exposed to the labels on the Roundup products that he mixed and applied.

187.    Monsanto had sole access to material facts concerning the nature of the risks associated with its Roundup products as expressly stated within its warnings and labels, and Monsanto knew that consumers and users such as Plaintiffs could not   have reasonably discovered that the risks expressly included in Roundup warnings and labels were inadequate and inaccurate.

188.    Plaintiffs had no knowledge of the falsity or incompleteness of Monsanto's statements and representations concerning Roundup.

189.    Plaintiffs used and/or were exposed to the use of Roundup as researched, developed, designed, tested, formulated, manufactured, inspected, labeled, distributed, packaged, marketed, promoted, sold, or otherwise released into the stream of commerce by Monsanto.

190.    Had the warnings and labels for Roundup products accurately and adequately set forth the true risks associated with the use of such products, including Plaintiffs' injuries, rather than expressly excluding such information and warranting that the products were safe for their intended use, Plaintiffs could have avoided the injuries complained of herein.

191.    As a direct and proximate result of Monsanto's wrongful acts and omissions, Plaintiffs have suffered severe injuries. Plaintiffs have endured pain and suffering, has suffered economic losses (including significant expenses for medical care and treatment), and will continue to incur these expenses in the future.

192.    As a further result of Defendant's conduct, Plaintiffs were was unable to continue in their trade and business in the usual manner and suffered a loss of income that she will continue to suffer in the future. Also as a further result of the Plaintiff suffered and continues to suffer emotional

distress, pain, frustration and inconvenience.

193.    At all times mentioned herein, Plaintiff JUAN JOSE BROWN was the husband of Plaintiff LIVIER CHAVEZ. As a result of Plaintiff LIVIER CHAVEZ damages, Plaintiff JUAN JOSE BROWN has suffered the loss of love, companionship, comfort, care, assistance, protection, affection, society, and moral support.

WHEREFORE, Plaintiffs respectfully requests that this Court enter judgment in Plaintiffs' favor for compensatory and punitive damages, together with interest, costs herein incurred, attorney's fees, and all such other and further relief as this Court deems just and proper. Plaintiffs also demand a jury trial on the issues contained herein.

## FIFTH CAUSE OF ACTION
### BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (By PLAINTIFF against DEFENDANTS and DOES 1-1000)

194.    Plaintiffs re-allege the paragraphs above as if fully stated herein.

195.    At all times relevant, Monsanto engaged in the business of testing, developing, designing, formulating, manufacturing, marketing, selling, distributing, and promoting its Roundup products, which are defective and unreasonably dangerous to users and consumers, including Plaintiffs, thereby placing Roundup products into the stream of commerce. These actions were under Monsanto's ultimate control and supervision.

196.    Before Plaintiffs were exposed to the use of Roundup products, Monsanto impliedly warranted to its consumers and users – including Plaintiffs – that Roundup products were of merchantable quality and safe and fit for the use for which they were intended; specifically, as horticultural herbicides.

197.    Monsanto, however, failed to disclose that Roundup has dangerous propensities when used as intended and that the use of and/or exposure to Roundup and glyphosate-containing products carries an increased risk of developing severe injuries, including Plaintiffs' injuries.

198.    Plaintiffs reasonably relied on the skill, superior knowledge and judgment of Monsanto

and on its implied warranties that Roundup products were of merchantable quality and fit for their intended purpose or use.

199.    Roundup products were expected to reach and in fact reached consumers and users, including Plaintiffs, without substantial change in the condition in which they were manufactured and sold by Monsanto.

200.    At all relevant times, Monsanto was aware that consumers and users of its products, including Plaintiffs, would use Roundup products as marketed by Monsanto, which is to say that Plaintiffs was foreseeable user of Roundup.

201.    Monsanto intended that its Roundup products be used in the manner in which Plaintiffs in fact used them and Monsanto impliedly warranted each product to be of merchantable quality, safe, and fit for this use, despite the fact that Roundup was not adequately tested or researched.

202.    In reliance on Monsanto's implied warranty, Plaintiffs used Roundup as instructed and labeled and in the foreseeable manner intended, recommended, promoted and marketed by Monsanto.

203.    Plaintiffs could not have reasonably discovered or known of the risks of serious injury associated with Roundup or glyphosate.

204.    Monsanto breached its implied warranty to Plaintiffs in that its Roundup products were not of merchantable quality, safe, or fit for their intended use. Roundup has dangerous propensities when used as intended and can cause serious injuries, including those injuries complained of herein.

205.    The harm caused by Roundup products far outweighed their benefit, rendering the products more dangerous than an ordinary consumer or user would expect and more dangerous than alternative products.

206.    As a direct and proximate result of Monsanto's wrongful acts and omissions, Plaintiffs have suffered severe and permanent physical and emotional injuries. Plaintiffs have endured pain and suffering, suffered economic loss (including significant expenses for medical care and treatment) and will continue to incur these expenses in the future.

207.    As a further result of Defendant's conduct, Plaintiffs were was unable to continue in their

trade and business in the usual manner and suffered a loss of income that she will continue to suffer in the future.  Also as a further result of the Plaintiff suffered and continues to suffer emotional distress, pain, frustration and inconvenience.

208.  At all times mentioned herein, Plaintiff JUAN JOSE BROWN was the husband of Plaintiff LIVIER CHAVEZ. As a result of Plaintiff LIVIER CHAVEZ damages, Plaintiff JUAN JOSE BROWN has suffered the loss of love, companionship, comfort, care, assistance, protection, affection, society, and moral support.

WHEREFORE, Plaintiffs respectfully requests that this Court enter judgment in Plaintiffs' favor for compensatory and punitive damages, together with interest, costs herein incurred, attorney's fees, and all such other and further relief as this Court deems just and proper. Plaintiffs also demand a jury trial on the issues contained herein.

## **PRAYER FOR RELIEF**

Wherefore, PLAINTIFFS, pray for judgment against Defendant MONSANTO COMPANY and DOES 1 through 1000, inclusive, as follows:

1.  For compensatory and general damages;

2.  For past, current, and future medical expenses;

3.  For costs of suit herein incurred;

4.  For punitive damages;

5.  For interest upon any judgment entered as provided by law; and

6.  For such other and further relief as the Court may deem proper.

/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /

COMPLAINT FOR DAMAGES

1

## DEMAND FOR JURY TRIAL

2

PLAINTIFF demands a trial by jury on all claims so triable.

3

4

5

DATED:  July 1, 2020

6

7

By:  _____

8

THOMAS V. GIRARDI
CHRISTOPHER T. AUMAIS

9

ARIN SCAPA
Attorneys for Plaintiffs

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

35
COMPLAINT FOR DAMAGES