4months

# U.S. District Court
## Northern District of Georgia (Atlanta)
### CIVIL DOCKET FOR CASE #: 1:20-cv-03853-LMM

Lindvall v. Monsanto Company
Assigned to: Judge Leigh Martin May
Cause: 28:1332 Diversity-Product Liability

Date Filed: 09/17/2020
Jury Demand: Plaintiff
Nature of Suit: 365 Personal Inj. Prod. Liability
Jurisdiction: Diversity

**Plaintiff**

**Daniel Lindvall**

represented by **Christopher Baker Hall**
Hall & Lampros, LLP
Suite 1150
400 Galleria Pkwy
Atlanta, GA 30339
404-876-8100
Fax: 404-876-3477
Email: chall@hallandlampros.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Gordon Van Remmen**
Hall & Lampros, LLP
Suite 1150
400 Galleria Pkwy
Atlanta, GA 30339
404-876-8100
Fax: 404-876-3477
Email: gordon@hallandlampros.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Monsanto Company**

| Date Filed | # | Docket Text |
|---|---|---|
| 09/17/2020 | 1 | COMPLAINT with Jury Demand filed by Daniel Lindvall. (Filing fee $400, receipt number AGANDC-10154940) (Attachments: # 1 Civil Cover Sheet)(kt) Please visit our website at http://www.gand.uscourts.gov/commonly-used-forms to obtain Pretrial Instructions and Pretrial Associated Forms which includes the Consent To Proceed Before U.S. Magistrate form. (Entered: 09/18/2020) |
| 09/17/2020 | 2 | Electronic Summons Issued as to Monsanto Company. (kt) (Entered: 09/18/2020) |

| 09/17/2020 | 3 | SEVENTH AMENDED ORDER RE: COURT OPERATIONS UNDER THE EXIGENT CIRCUMSTANCES CREATED BY COVID-19 AND RELATED CORONAVIRUS. Signed by Judge Thomas W. Thrash, Jr. on 9/1/2020. (kt) (Entered: 09/18/2020) |
| 09/21/2020 | 4 | STANDING ORDER REGARDING CIVIL LITIGATION Signed by Judge Leigh Martin May on 9/21/2020. (tmf) (Entered: 09/21/2020) |
| 09/22/2020 | 5 | WAIVER OF SERVICE Returned Executed by Daniel Lindvall. Monsanto Company waiver mailed on 9/18/2020, answer due 11/17/2020. (Van Remmen, Gordon) (Entered: 09/22/2020) |

<table>
<tr><td colspan="4"><strong>PACER Service Center</strong></td></tr>
<tr><td colspan="4"><strong>Transaction Receipt</strong></td></tr>
<tr><td colspan="4">09/23/2020 15:12:02</td></tr>
<tr><td><strong>PACER Login:</strong></td><td>hllp1982</td><td><strong>Client Code:</strong></td><td>1417.0005</td></tr>
<tr><td><strong>Description:</strong></td><td>Docket Report</td><td><strong>Search Criteria:</strong></td><td>1:20-cv-03853-LMM</td></tr>
<tr><td><strong>Billable Pages:</strong></td><td>1</td><td><strong>Cost:</strong></td><td>0.10</td></tr>
</table>

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

| | | |
|---|---|---|
| DANIEL LINDVALL, | : | |
| | : | |
| Plaintiff, | : | |
| | : | CIVIL ACTION FILE |
| | : | NO.: |
| v. | : | |
| | : | **COMPLAINT AND** |
| MONSANTO COMPANY, | : | **JURY DEMAND** |
| | : | |
| Defendant. | : | |

## COMPLAINT

Plaintiff, Daniel Lindvall, by and through his undersigned counsel, files this Complaint against Monsanto Company, ("Defendant" or "Monsanto") for damages suffered by Plaintiff, as a direct and proximate result of Defendant's negligent and wrongful conduct in connection with the design, development, manufacture, testing, packaging, promoting, marketing, advertising, distribution, labeling, and/or sale of the herbicide Roundup, containing the active ingredient glyphosate. Plaintiff alleges as follows:

## Jurisdiction and Venue

1.      This Court has diversity jurisdiction under 28 U.S.C. § 1332 because Plaintiff is a citizen of Georgia, a different state than the Defendant's states of citizenship. The aggregate amount in controversy exceeds $75,000 exclusive of interest and costs.

1

2.    This Court has personal jurisdiction over Monsanto because Monsanto knows or should have known that its Roundup[1] products are sold throughout the State of Georgia.

3.    In addition, Monsanto maintains sufficient contacts with the State of Georgia such that this Court's exercise of personal jurisdiction over it does not offend traditional notions of fair play and substantial justice.

4.    Venue is proper within this District under 28 U.S.C. § 1391(b)(2) because Plaintiff was diagnosed in this District. Further, Monsanto, as a corporate entity, is deemed to reside in any judicial district in which it is subject to personal jurisdiction.

---

[1] Roundup refers to all formulations of Defendant's roundup products, including, but not limited to, Roundup Concentrate Poison Ivy and Tough Brush Killer 1, Roundup Custom Herbicide, Roundup D-Pak herbicide, Roundup Dry Concentrate, Roundup Export Herbicide, Roundup Fence & Hard Edger 1, Roundup Garden Foam Weed & Grass Killer, Roundup Grass and Weed Killer, Roundup Herbicide, Roundup Original 2k herbicide, Roundup Original II Herbicide, Roundup Pro Concentrate, Roundup Pro Dry Herbicide, Roundup Promax, Roundup Quik Stik Grass and Weed Killer, Roundup Quikpro Herbicide, Roundup Rainfast Concentrate Weed & Grass Killer, Roundup Rainfast Super Concentrate Weed & Grass Killer, Roundup Ready-to-Use Extended Control Weed & Grass Killer 1 Plus Weed Preventer, Roundup Ready-to-Use Weed & Grass Killer, Roundup Ready-to-Use Weed and Grass Killer 2, Roundup Ultra Dry, Roundup Ultra Herbicide, Roundup Ultramax, Roundup VM Herbicide, Roundup Weed & Grass Killer Concentrate, Roundup Weed & Grass Killer Concentrate Plus, Roundup Weed & Grass killer Ready-to-Use Plus, Roundup Weed & Grass Killer Super Concentrate, Roundup Weed & Grass Killer1 Ready-to-Use, Roundup WSD Water Soluble Dry Herbicide Deploy Dry Herbicide, or any other formulation of containing the active ingredient glyphosate.

## Parties

### *Plaintiff Daniel Lindvall*

5.      Plaintiff Daniel Lindvall is a citizen of Georgia and resides in Atlanta, Fulton County, Georgia.  Plaintiff Lindvall was exposed to Roundup in and around Valentine, Nebraska from approximately 1997 through 2010. Plaintiff was diagnosed with non-Hodgkin lymphoma ("NHL"), in Atlanta, Georgia on or about 2016.

6.      Plaintiff brings this action for injuries sustained by exposure to Roundup containing the active ingredient glyphosate and the surfactant polyethoxylated tallow amine ("POEA"). As a direct and proximate result of being exposed to Roundup, Plaintiff developed non-Hodgkin's Lymphoma.

### *Defendant Monsanto Company*

7.      Defendant Monsanto Company is a corporation created under the laws of the State of Delaware with its headquarters and principal place of business in St. Louis, Missouri.

8.      At all times relevant to this complaint, Defendant was the entity that discovered the herbicidal properties of glyphosate and the manufacturer of Roundup.

9.      Defendant's registered agent for service on file with the Georgia Secretary of State is Corporation Service Company, 40 Technology Pkwy South, #300, Norcross, Ga, 30092

## Facts

10.     Monsanto manufactured Roundup, which contains the active ingredient glyphosate and the surfactant POEA, as well as adjuvants and other "inert" ingredients.

11.     Glyphosate is a broad-spectrum, non-selective herbicide used in a wide variety of herbicidal products throughout the country and around the world.

12.     Monsanto was the corporate entity that discovered the herbicidal properties of the chemical glyphosate.

13.     Defendant discovered the herbicidal properties of glyphosate during the 1970's and subsequently began to design, research, manufacture, sell and distribute glyphosate based "Roundup" as a broad-spectrum herbicide.

14.     Plants treated with glyphosate transport the systemic herbicide to their roots, shoot regions, and fruit, where it interferes with the plant's ability to form aromatic amino acids necessary for protein synthesis. Treated plants generally die within two to three days. Because plants absorb glyphosate, it cannot be completely removed by washing or peeling produce or by milling, baking, or brewing grains.

15.     For decades, commercial and residential users across the world have used Roundup without knowing of the dangers its use poses. That is because when Monsanto first introduced Roundup, it advertised glyphosate as a technological breakthrough: it could kill almost every weed without causing harm either to people

4

or to the environment. Of course, history has shown that not to be true.

16. Defendant did act to design, sell, advertise, manufacture and/or distribute Roundup, with full knowledge of its dangerous and defective nature.

17. Each year, approximately 250 million pounds of glyphosate are sprayed on crops, commercial nurseries, suburban lawns, parks, and golf courses. This increase in use has been driven largely by the proliferation of genetically engineered crops, crops specifically tailored to resist the activity of glyphosate.

18. According to the World Health Organization ("WHO"), the main chemical ingredient of Roundup—glyphosate—is a probable cause of cancer. Those most at risk are farm workers and other individuals with workplace exposure to Roundup, such as garden center workers, nursery workers, and landscapers.

**Federal Regulation**

19. The manufacture, design, and distribution of herbicides, such as Roundup, are regulated under the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA"), 7. U.S.C. § 136 et seq. FIFRA requires all pesticides to be registered with the Environmental Protection Agency ("EPA") prior to their distribution, sale, and/or use, except as described by FIFRA 7 U.S.C. § 136a(a).

20. The EPA requires, among other requirements, a variety of tests to determine the potential for exposure to pesticides, toxicity to people and other potential non-target organisms, as well as other harmful effects on the environment.

21.     Registration by the EPA, however, is not a guarantee or finding of safety. The determination the EPA makes in registering or re-registering a product is not that the product is "safe," but rather that use of the product in accordance with its label directions "will not generally cause unreasonable adverse effects on the environment." *See*, 7 U.S.C. § 136(a)(c)(5)(D).

22.     FIFRA defines "unreasonable adverse effects on the environment" to mean "any unreasonable risk to man or the environment, taking into account the economic, social, and environmental costs and benefits of the use of any pesticide." 7 U.S.C. § 136(bb). Therefore, FIFRA requires the EPA to make a risk versus benefit analysis in determining whether a registration should be granted or allowed to continue to be sold in commerce.

23.     The EPA registered Roundup for distribution, sale, and manufacture in the United States and Nebraska.

24.     FIFRA generally requires that the registrant, Monsanto, conduct health and safety testing of pesticide products. The government is not required, nor is it able, to perform the product tests that are required of the manufacturer.

25.     The assessment of each pesticide product designed, sold, or manufactured is completed at the time the product is initially registered. The data necessary for registration of a pesticide has changed over time. The EPA is now in the process of re-evaluating all pesticide products through a Congressionally-

mandated process called "re-registration." 7 U.S.C. § 136a-1. To reevaluate these pesticides, the EPA demands the completion of additional tests and the submission of data for the EPA's review and evaluation.

26.     In the case of Roundup, the EPA intended on releasing its preliminary risk assessment no later than July 2015. The EPA completed its review of glyphosate in early 2015 but delayed releasing the assessment pending further review.

**Monsanto's False Representations Regarding Roundup**

27.     Monsanto has led a prolonged campaign of misinformation to convince government agencies, farmers, and the general population that Roundup is safe.

28.     In 1996, the New York Attorney General ("NYAG") filed a lawsuit against Monsanto based on its false and misleading advertising of Roundup products. Specifically, the lawsuit disputed Monsanto's general representations that its spray-on glyphosate-based herbicides, including Roundup, were "safer than table salt" and "practically non-toxic" to mammals, birds, and fish. The NYAG found multiple deceptive and misleading representations regarding the human and environmental safety of Roundup, including the following:

a.     Remember that environmentally friendly Roundup herbicide is biodegradable. It will not build up in the soil so you can use Roundup with confidence along customers' driveways, sidewalks, and fences ...

b.     And remember that Roundup is biodegradable and will not build up in

the soil. That will give you the environmental confidence you need to use Roundup everywhere you have got a weed, brush, edging or trimming problem.

c.      Roundup biodegrades into naturally occurring elements.

d.      Remember that versatile Roundup herbicide stays where you put it. That means there is no washing or leaching to harm customers' shrubs or other desirable vegetation.

e.      This non-residual herbicide will not wash or leach in the soil. It ... stays where you apply it.

f.      You can apply Accord with "confidence because it will stay where you put it" it bonds tightly to soil particles, preventing leaching. Then, soon after application, soil microorganisms biodegrade Accord into natural products.

g.      Glyphosate is less toxic to rats than table salt following acute oral ingestion.

h.      Glyphosate's safety margin is much greater than required. It has over a 1,000-fold safety margin in food and over a 700-fold safety margin for workers who manufacture it or use it.

i.      You can feel good about using herbicides by Monsanto. They carry a toxicity category rating of 'practically non-toxic' as it pertains to

mammals, birds, and fish.

j.　"Roundup can be used where kids and pets will play and breaks down into natural material." This ad depicts a person with his head in the ground and a pet dog standing in an area which has been treated with Roundup.

Attorney General of the State of New York, In the Matter of Monsanto Company, Assurance of Discontinuance Pursuant to Executive Law § 63(15) (Nov. 1996).

29.　On November 19, 1996, Monsanto reached an agreement with the NYAG, in which Monsanto agreed "to cease and desist from publishing or broadcasting any advertisements [in New York] that represent, directly or by implication" that:

a.　its glyphosate-containing pesticide products or any component thereof are safe, non-toxic, harmless, or free from risk;

b.　its glyphosate-containing pesticide products or any component thereof manufactured, formulated, distributed, or sold by Monsanto are biodegradable;

c.　its glyphosate-containing pesticide products or any component thereof stay where they are applied under all circumstances and will not move through the environment by any means;

d.       its glyphosate-containing pesticide products or any component thereof are "good" for the environment or are "known for their environmental characteristics.";

e.       glyphosate-containing pesticide products or any component thereof are safer or less toxic than common consumer products other than herbicides; and

f.       its glyphosate-containing products or any component thereof might be classified as "practically non-toxic.

30.     Monsanto did not alter its marketing or advertising in the same manner in any state other than New York, and on information and belief still has not done so today.

31.     In 2009, France's highest court ruled that Monsanto had not told the truth about the safety of Roundup. The French court affirmed an earlier judgment that Monsanto had falsely advertised its herbicide Roundup as "biodegradable" and that it "left the soil clean."[2]

32.     On two separate occasions, the EPA found that laboratories hired by Monsanto to test the toxicity of its Roundup products for registration purposes committed fraud.

---

[2] *Monsanto Guilty in 'False Ad' Row,* BBC, Oct. 15, 2009, (http://news.bbc.co.uk/2/hi/europe/8308903.stm) (last visited September 17, 2020).

33.     In the first instance, when Monsanto was seeking initial registration of Roundup by the EPA, it hired Industrial Bio-Test Laboratories ("IBT") to perform and gauge pesticide toxicology studies relating to Roundup.[3] IBT performed approximately 30 tests on glyphosate and glyphosate- containing products, including nine of the 15 residue studies needed to register Roundup.

34.     In 1976, the United States Food and Drug Administration ("FDA") performed a review of IBT that revealed inconsistencies between the raw data and the final report relating to the toxicological impacts of glyphosate. The EPA subsequently audited IBT; it too found the toxicology studies conducted for the Roundup herbicide to be invalid.[4] An EPA reviewer stated, after finding "routine falsification of data" at IBT, that it was "hard to believe the scientific integrity of the studies when they said they took specimens of the uterus from male rabbits."[5]

35.     Three top executives of IBT were convicted of fraud in 1983.

36.     In the second incident of data falsification, Monsanto hired Craven

---

[3] Monsanto, *Backgrounder, Testing Fraud: IBT and Craven Laboratories* (Sep. 2, 2015), http://www.monsanto.com/products/documents/glyphosate-background-materials/ibt_craven_bkg.pdf.

[4] U.S. Envtl. Prot. Agency, *Summary of the IBT Review Program Office of Pesticide Programs* (1983), *available at* https://nepis.epa.gov/Exe/ZyPDF.cgi/91014ULV.PDF?Dockey=91014ULV.PDF (last visited September 17, 2020).

[5] Marie-Monique Robin, *The World According to Monsanto: Pollution, Corruption and the Control of the World's Food Supply* (2011) (*citing* U.S. Envtl. Prot. Agency, *Data Validation, Memo from K. Locke, Toxicology Branch, to R. Taylor, Registration Branch*. Washington, D.C. (August 9, 1978)).

Laboratories in 1991 to perform pesticide and herbicide studies for Roundup. In that same year, the owner of Craven Laboratories and three of its employees were indicted, and later convicted, of fraudulent laboratory practices in the testing of pesticides and herbicides.[6]

37.     Despite the falsity of the tests that underlie its registration, within a few years of its launch, Monsanto was marketing Roundup in 115 countries.

**Roundup Causes Cancer**

38.     Monsanto was aware of glyphosate's carcinogenic properties in the 1980's.

39.     Based on early studies demonstrating that glyphosate could cause cancer in laboratory animals, the EPA originally classified glyphosate as *possibly carcinogenic to humans* (Group C) in 1985.[7]

40.     In addition to the toxicity of the glyphosate by itself, several studies support the theory that glyphosate formulations found in Defendant's Roundup products are more dangerous and toxic than glyphosate alone. As early as 1991 evidence existed demonstrating that glyphosate formulations were significantly more toxic than glyphosate alone.

41.     In 2002, Julie Marc published a report entitled "Pesticide Roundup

---

[6] Monsanto, *Backgrounder, Testing Fraud: IBT and Craven Laboratories*, *supra*.
[7] Consensus Review of Glyphosate, Casewell No. 661A. March 4, 1985. United States Environmental Protection Agency.

Provokes Cell Division Dysfunction at the Level of CDK1/Cyclin B Activation." This report found that Defendant's Roundup caused delays in the cell cycles of sea urchins, while the same concentrations of glyphosate alone proved ineffective and did not alter cell cycles.

42.     In 2004, Julie Marc published a new report entitled "Glyphosate-based pesticides affect cell cycle regulation." The study demonstrated a molecular link between glyphosate-based products and cell cycle dysregulation.

43.     The 2004 report noted that "cell-cycle dysregulation is a hallmark of tumor cells and human cancer. Failure in the cell-cycle checkpoints leads to genomic instability and subsequent development of cancers from the initial affected cell." Further, "[s]ince cell cycle disorders such as cancer result from dysfunction of unique cell, it was of interest to evaluate the threshold dose of glyphosate affecting cells."

44.     The findings of these reports were confirmed in recently published peer-reviewed studies and were always available and/or known to Defendant.

45.     The International Agency for Research on Cancer ("IARC") is the specialized international cancer agency the WHO of the United Nations tasked with conducting and managing research into causes of cancer.

46.     IARC set glyphosate for review in 2015-2016.

47.     IARC uses five criteria for determining priority in reviewing chemicals:

a. the substance must have a potential for direct impact on public health;

b. scientific literature to support suspicion of carcinogenicity;

c. evidence of significant human exposure;

d. high public interest and/or potential to bring clarity to a controversial area and/or reduce public anxiety or concern; and

e. related agents similar to one given high priority by the above considerations.

48. On March 24, 2015, the IARC's working group published its conclusion that the glyphosate contained in Roundup is a Class 2A "probable carcinogen" as demonstrated by the mechanistic evidence of carcinogenicity in humans and sufficient evidence of carcinogenicity in animals. This finding came after a collective review of human, animal, and DNA studies for more than one year, many of which Defendant had in its possession since as early as 1985.

49. The IARC's full Article was published on July 29, 2015 and established glyphosate as a class 2A probable carcinogen to humans. According to the authors, glyphosate demonstrated sufficient mechanistic evidence (genotoxicity and oxidative stress) to warrant a 2A classification based on evidence of carcinogenicity in humans and animals.

50. The IARC found an increased risk between exposure to glyphosate and non-Hodgkin's lymphoma ("NHL") and several subtypes of NHL, and the increased

risk remained after adjustment for other pesticides.

51.     The IARC also found that glyphosate caused DNA and chromosomal damage in human cells.

**Defendant's Failure to Act**

52.     Glyphosate, and specifically Defendant's Roundup products, have long been linked with serious side effects and many regulatory agencies around the world have prohibited the use of glyphosate herbicide products.

53.     Defendant's statements asserting the safety of Roundup and discounting its dangers misled the Plaintiff and the public.

54.     Despite Defendant's knowledge that Roundup was link to an elevated risk of developing cancer, Defendant's promotional campaigns focused on Roundup's purported "safety profile."

55.     Defendant knew or should have known that Roundup is more toxic than glyphosate alone and that safety studies on Roundup, its other ingredients, and/or the surfactant POEA were necessary to protect Plaintiff from Roundup.

56.     Defendant knew or should have known that tests limited to Roundup's active ingredient glyphosate were insufficient to prove the safety of Roundup.

57.     Defendant failed to test Roundup, its other ingredients, and/or the surfactant POEA to protect Plaintiff from Roundup.

58.     Rather than performing proper tests, Defendant relied upon flawed

studies conducted by industrial-supported interests designed to protect Defendant's economic interests rather than the Plaintiff and the public.

59.     Despite its knowledge that Roundup was substantially more dangerous than glyphosate alone, Defendant continued to market and promote Roundup as safe.

60.     Defendant's failure to adequately warn Plaintiff and the public resulted in (1) the Plaintiff being exposed to glyphosate instead of using another acceptable and safe method of controlling unwanted weeds and pests; and (2) scientists and physicians failing to warn and instruct consumers about the risk of cancer, including NHL, and other injuries associated with Roundup.

61.     Defendant failed to modify the labeling of Roundup to include relevant information regarding the risks and dangers associated with Roundup exposure.

62.     Defendant's failure to adequately warn and inform the EPA has resulted in inadequate warnings in safety information presented directly to users and consumers.

63.     Defendant's failure to appropriately warn and inform the EPA has resulted in the absence of warning or caution statements that are adequate to protect health and the environment.

64.     Defendant's failure to appropriately warn and inform the EPA has resulted in the directions for use that are not adequate to protect health and the environment.

65.     By reason of the foregoing acts and omissions, Plaintiff seeks compensatory damages as a result of Plaintiff's exposure to Roundup which caused or was a substantial contributing factor in causing Plaintiff to suffer from cancer, specifically NHL, and Plaintiff suffered severe and personal injuries which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life.

66.     By reason of the foregoing, Plaintiff is severely and permanently injured.

67.     By reason of the foregoing acts and omissions, Plaintiff has endured and, in some categories continues to suffer, emotional and mental anguish, medical expenses, and other economic and non-economic damages, as a result of the actions and inactions of the Defendant.

**Statement of Concern Regarding Glyphosate-Based Herbicides**

68.     On February 17, 2016, a consensus statement published in the journal Environmental Health, entitled "Concerns over use of glyphosate-based herbicides and risks associated with exposures: a consensus statement," assessed the safety of glyphosate-based  herbicides ("GBHs").[8] The paper's "focus is on the unanticipated

---

[8] John P. Myers, et al, *Concerns over use of glyphosate-based herbicides and risks associated with exposures: a consensus statement*, Environmental Health (2016) (http://ehjournal.biomedcentral.com/articles/10.1186/s12940-016-0117-0)      (last visited September 17, 2020).

effects arising from the worldwide increase in use of GBHs, coupled with recent discoveries about the toxicity and human health risks stemming from use of GBHs."[9] The researchers drew seven factual conclusions about GBHs:

1. GBHs are the most heavily applied herbicide in the world and usage continues to rise;

2. Worldwide, GBHs often contaminate drinking water sources, precipitation, and air, especially in agricultural regions;

3. The half-life of glyphosate in water and soil is longer than previously recognized;

4. Glyphosate and its metabolites are widely present in the global soybean supply;

5. Human exposures to GBHs are rising;

6. Glyphosate is now authoritatively classified as a probable human carcinogen; and

7. Regulatory estimates of tolerable daily intakes for glyphosate in the United States and European Union are based on outdated science.[10]

69. The researchers noted that GBH use has increased approximately 100-

---

[9] *Id.*

[10] *Id.*

fold since the 1970s. Further, far from posing a limited hazard to vertebrates, as previously believed, two decades of evidence demonstrated that "several vertebrate pathways are likely targets of action, including hepatorenal damage, effects on nutrient balance through glyphosate chelating action and endocrine disruption."[11]

70.     The paper attributes uncertainties in current assessments of glyphosate formulations to the fact that "[t]he full list of chemicals in most commercial GBHs is protected as 'commercial business information,' despite the universally accepted relevance of such information to scientists hoping to conduct an accurate risk assessment of these herbicide formulations." Further, the researchers argue, "[t]he distinction in regulatory review and decision processes between 'active' and 'inert' ingredients has no toxicological justification, given increasing evidence that several so-called 'inert' adjuvants are toxic in their own right."[12]

71.     Among various implications, the researchers conclude that "existing toxicological data and risk assessments are not sufficient to infer that GBHs, as currently used, are safe." Further, "GBH-product formulations are more potent, or toxic, than glyphosate alone to a wide array of non-target organisms including mammals, aquatic insects, and fish." Accordingly, "risk assessments of GBHs that are based on studies quantifying the impacts of glyphosate alone underestimate both

---

[11] *Id.*

[12] *Id.*

toxicity and exposure, and thus risk." The paper concludes that this "shortcoming has repeatedly led regulators to set inappropriately high exposure thresholds."[13]

72.    The researchers also critique the current practice of regulators who largely rely on "unpublished, non-peer reviewed data generated by the registrants" but ignore "published research because it often uses standards and procedures to assess quality that are different from those codified in regulatory agency data requirements, which largely focus on avoiding fraud."  In the researchers' view, "[s]cientists independent of the registrants should conduct regulatory tests of GBHs that include glyphosate alone, as well as GBH-product formulations."[14]

73.    The researchers also call for greater inclusion of GBHs in government-led toxicology testing programs:

> [A] fresh and independent examination of GBH toxicity should be undertaken, and . . . this re-examination be accompanied by systematic efforts by relevant agencies to monitor GBH levels in people and in the food supply, none of which are occurring today. The U.S. National Toxicology Program should prioritize a thorough toxicological assessment of the multiple pathways now identified as potentially vulnerable to GBHs.[15]

74.    The researchers suggest that, in order to fill the gap created by an absence of government funds to support research on GBHs, regulators could adopt a system through which manufacturers fund the registration process and the

---

[13] *Id.*

[14] *Id.*

[15] *Id.*

necessary testing:

> "[W]e recommend that a system be put in place through which manufacturers of GBHs provide funds to the appropriate regulatory body as part of routine registration actions and fees. Such funds should then be transferred to appropriate government research institutes, or to an agency experienced in the award of competitive grants. In either case, funds would be made available to independent scientists to conduct the appropriate long-term (minimum 2 years) safety studies in recognized animal model systems. A thorough and modern assessment of GBH toxicity will encompass potential endocrine disruption, impacts on the gut microbiome, carcinogenicity, and multigenerational effects looking at reproductive capability and frequency of birth defects."[16]

## FDA Announces Testing of Glyphosate Residue in Foods

75.     On February 17, 2016, the U.S. Food and Drug Administration ("FDA") announced that, for the first time in its history, the agency planned to start testing certain foods for glyphosate residues. FDA spokeswoman Lauren Sucher explained: "The agency is now considering assignments for Fiscal Year 2016 to measure glyphosate in soybeans, corn, milk, and eggs, among other potential foods."[17]

76.     In 2014, the U.S. Government Accountability Office (GAO) had severely rebuked the FDA for its failures to both monitor for pesticide residue, including that of glyphosate, and to disclose the limitations of its monitoring and

---

[16] *Id.*

[17] Carey Gillam, *FDA to Start Testing for Glyphosate in Food*, TIME, Feb. 17, 2016, *available at* http://time.com/4227500/fda-glyphosate-testing/?xid=tcoshare (last visited September 17, 2020).

testing efforts to the public.[18] The GAO had cited numerous undisclosed deficiencies in the FDA's process, specifically highlighting its omission of glyphosate testing.

77.    Indeed, in the past, both the FDA and the U.S. Department of Agriculture (USDA) had routinely excluded glyphosate from their testing for the residues of hundreds of other pesticides, on the rationale that it was too expensive and unnecessary to protect public health. Ms. Sucher, the FDA spokeswoman, however, now states that "the agency has developed 'streamlined methods' for testing for the weed killer."[19]

78.    The FDA's move is significant as the agency possesses enforcement authority and can seek action if pesticide residues exceed enforcement guidelines.[20]

**Plaintiff Lindvall's Exposure to Roundup**

79.    Plaintiff incorporates by reference all prior paragraphs of this Complaint as if fully set forth herein.

---

[18] U.S. Gov't Accountability Office, Gao-15-38, FDA And USDA Should Strengthen Pesticide Residue Monitoring Programs and Further Disclose Monitoring Limitations (2014), *available at* http://www.gao.gov/products/GAO-15-38 (last visited September 17, 2020).

[19] Carey Gillam, *FDA to Start Testing for Glyphosate in Food*, TIME, Feb. 17, 2016, *available at* https://civileats.com/2016/02/17/fda-to-start-testing-for-glyphosate-in-food (last visited September 17, 2020).

[20] *Id*.; Pesticide Q&A, U.S. FOOD AND DRUG ADMINISTRATION, http://www.fda.gov/Food/FoodborneIllnessContaminants/Pesticides/ucm114958.htm (last visited September 17, 2020).

80.    Plaintiff was exposed to Roundup for over 10 years, from approximately 1997 to 2010.

81.    Plaintiff was exposed to Roundup while living immediately next door to Les Harm, the Cherry County Weed Superintendent.

82.    Mr. Harm, as the Cherry County Weed Superintendent, stored large amounts of herbicides, including Roundup, on his property.

83.     Mr. Harm, as the Cherry County Weed Superintendent, stored large amounts of herbicides, including Roundup, in a shed in his backyard in close proximity to Plaintiff's home.

84.    Mr. Harm, as the Cherry County Weed Superintendent, stored large amounts of herbicides, including Roundup, in a tank attached to his vehicle.  This vehicle was parked in Mr. Harm's driveway in close proximity to Plaintiff's home.

85.    Mr. Harm regularly sprayed his property and the surrounding area, including Plaintiff's property with Roundup.

86.    Plaintiff would often visit Mr. Harm's property where Plaintiff came in contact with and was exposed to Roundup.

87.    In April 2016, Plaintiff was diagnosed with large B-cell, Non-Hodgkin lymphoma ("NHL").

88.    Plaintiff has sought and is continuing to seek treatment for his NHL, including chemotherapy.

89.    Presently, Plaintiff is in remission.

90.    During the entire time in which Plaintiff was exposed to Roundup, he did not know that exposure to Roundup was injurious to his health or the health of others.

91.    Plaintiff's exposure to Roundup products designed, formulated, supplied, and distributed by Defendant Monsanto was a direct and proximate cause of his developing NHL. As a result of his illness, Plaintiff has incurred physical injury, significant economic and non-economic damages.

92.    As a direct and proximate result of these injuries, Plaintiff has incurred and will incur medical expenses in the future and has endured and will endure pain and suffering and loss of enjoyment of life, and Plaintiff has otherwise been damaged in a personal and pecuniary nature.

### **Tolling of the Statute of Limitations**

93.    Plaintiff incorporates by reference all prior paragraphs of this Complaint as if fully set forth herein.

### *Discovery Rule Tolling*

94.    Plaintiff had no way of knowing about the risk of serious illness associated with the use of and/or exposure to Roundup and glyphosate during the entire time he was exposed to the product.  This is the quintessential case for tolling.

95.    Within the period of any applicable statutes of limitations, Plaintiff

could not have discovered, through the exercise of reasonable diligence, that exposure to Roundup and glyphosate is injurious to human health.

96.    Plaintiff did not discover, and did not know of facts that would cause a reasonable person to suspect, the risks associated with the use of and/or exposure to Roundup and glyphosate; nor would a reasonable and diligent investigation by him have disclosed that Roundup and glyphosate would cause his illness.

97.    For these reasons, all applicable statutes of limitations have been tolled by operation of the discovery rule with respect to Plaintiff's claims.

### Fraudulent Concealment Tolling

98.    All applicable statutes of limitations have also been tolled by Monsanto's knowing and active fraudulent concealment, actual misrepresentation, and denial of the facts alleged herein throughout the time period relevant to this action.

99.    Instead of disclosing critical safety information about Roundup and glyphosate, Monsanto has consistently and falsely represented the safety of its Roundup products.

100.   Defendant, through its affirmative misrepresentations and omissions, actively concealed from Plaintiff, and the public, the true risks associated with Roundup and glyphosate.

101.   Rather than disclosing critical safety information about Roundup and

glyphosate, Monsanto has consistently and falsely represented the safety of its Roundup products.

102.   At all relevant times, Defendant has maintained that Roundup is safe, non-toxic, and non-carcinogenic.

103.   Indeed, even as of July 2016, Defendant continued to represent to the public that regulatory authorities and independent experts have reviewed numerous long-term carcinogenicity and genotoxicity studies and that there is no evidence that glyphosate (the active ingredient in Roundup brand herbicides and other glyphosate-based herbicides) causes cancer, even at very high doses, and that it is not genotoxic.

104.   As a result of Defendant's actions, Plaintiff was unaware, and could not reasonably known or have learned through reasonable diligence that Roundup and/or glyphosate contact, exposed Plaintiff to the risks alleged herein and that those risks were the direct and proximate result of Defendant's acts and omissions.

*Estoppel*

105.   Defendant is estopped from relying on any statute of limitations due to its fraudulent concealment of the true character, quality, and nature of Roundup.

106.   Defendant was under a continuous duty to disclose to consumers, users and other persons coming into contact with its products, including Plaintiff, accurate safety information concerning its products and the risks associated with the use of and/or exposure to Roundup and glyphosate.

107. Defendant was under a continuous duty to disclose the true character, quality, and nature of Roundup because this was non-public information over which Defendant had and continues to have exclusive control, and because Defendant knew that this information was not available to Plaintiff or to distributors of Roundup and such concealment contributed to Plaintiff's harm.

108. Instead, Monsanto knowingly, affirmatively, and actively concealed safety information concerning Roundup and glyphosate and the serious risks associated with the use of and/or exposure to its products.

109. Defendant is estopped from relying on any statute of limitations because of its intentional concealment of these facts

110. Plaintiff had no knowledge that Defendant was engaged in the wrongdoing alleged herein. Due to the fraudulent acts of concealment of wrongdoing by Defendant, Plaintiff could not have reasonably discovered the wrongdoing.

111. Defendant had the ability to and did spend enormous amounts of money marketing, promoting, and distributing a profitable herbicide, notwithstanding the known or reasonably known risks. Plaintiff and medical professionals could not have afforded and could not have possibly conducted studies to determine the nature, extent, and identity of related health risks, and were forced to rely on only the Defendant's representation. Accordingly, Defendant is precluded by both the discovery rule and the doctrine of fraudulent concealment from relying upon any

statutes of limitations.

112.   Based on the foregoing, Monsanto is estopped from relying on any statutes of limitations in defense of this action.

## CLAIMS FOR RELIEF

### Count I
### Negligence

113.   Plaintiff incorporates by reference all preceding paragraphs of this Complaint as if fully set forth herein, and further allege:

114.   Defendant, directly or indirectly, caused Roundup products to be sold, distributed, packaged, labeled, marketed, and/or promoted.

115.   Defendant, directly or indirectly, caused Roundup products to be purchased and/or used by Plaintiff.

116.   At all times relevant to this litigation, Defendant had a duty to exercise reasonable care in the design, research, manufacture, marketing, advertisement, supply, promotion, packaging, sale, and distribution of its Roundup products, including the duty to take all reasonable steps necessary to manufacture, promote, and/or sell a product that was not unreasonably dangerous to consumers, users, and other persons coming into contact with the product.

117.   At all times relevant to this litigation, Defendant had a duty to exercise reasonable care in the marketing, advertisement, and sale of its Roundup products. Defendant's duty of care owed to consumers and the general public included

providing accurate, true, and correct information concerning the risks of using Roundup and appropriate, complete, and accurate warnings concerning the potential adverse effects of exposure to Roundup and, in particular, its active ingredient glyphosate.

118.   At all times relevant to this litigation, Defendant knew or, in the exercise of reasonable care, should have known of the hazards and dangers of Roundup and specifically, the carcinogenic properties of the chemical glyphosate.

119.   Accordingly, at all times relevant to this litigation, Defendant knew or, in the exercise of reasonable care, should have known that use of or exposure to its Roundup products could cause Plaintiff's injuries and thus created a dangerous and unreasonable risk of injury to the users of these products, including Plaintiff.

120.   Defendant knew or, in the exercise of reasonable care, should have known that  Roundup is more toxic than glyphosate alone and that safety studies on Roundup, Roundup's adjuvants and "inert" ingredients, and/or the surfactant POEA were necessary to protect Plaintiff from Roundup.

121.   Defendant knew or, in the exercise of reasonable care, should have known that tests limited to Roundup's active ingredient glyphosate were insufficient to prove the safety of Roundup.

122.   Defendant also knew or, in the exercise of reasonable care, should have known that users and consumers of Roundup were unaware of the risks and the

magnitude of the risks associated with the use of and/or exposure to Roundup and glyphosate-containing products.

123.   As such, Defendant breached its duty of reasonable care and failed to exercise ordinary care in the design, research, development, manufacture, testing, marketing, supply, promotion, advertisement, packaging, sale, and distribution of its Roundup products, in that Defendant manufactured and produced defective herbicides containing the chemical glyphosate, knew or had reason to know of the defects inherent in its products, knew or had reason to know that a user's or consumer's exposure to the products created a significant risk of harm and unreasonably dangerous side effects, and failed to prevent or adequately warn of these risks and injuries.

124.   Defendant failed to test Roundup, Roundup's adjuvants and "inert" ingredients, and/or the surfactant POEA appropriately and adequately to protect Plaintiff from Roundup.

125.   Despite its ability and means to investigate, study, and test its products and to provide adequate warnings, Defendant has failed to do so. Indeed, Defendant has wrongfully concealed information and has further made false and/or misleading statements concerning the safety and/or exposure to Roundup and glyphosate.

126.   Defendant's negligence included:

a)      Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing its Roundup products

30

without thorough and adequate pre- and post-market testing;

b)    Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing Roundup while negligently and/or intentionally concealing and failing to disclose the results of trials, tests, and studies of exposure to glyphosate, and, consequently, the risk of serious harm associated with human use of and exposure to Roundup;

c)    Failing to undertake sufficient studies and conduct necessary tests to determine whether or not Roundup products and glyphosate-containing products were safe for their intended use in agriculture, horticulture, and at-home use;

d)    Failing to undertake sufficient studies and conduct necessary tests to determine the safety of "inert" ingredients and/or adjuvants contained within Roundup, and the propensity of these ingredients to render Roundup toxic, increase the toxicity of Roundup, whether these ingredients are carcinogenic, magnify the carcinogenic properties of Roundup, and whether or not "inert" ingredients and/or adjuvants were safe for use;

e)    Failing to use reasonable and prudent care in the design, research, manufacture, formulation, and development of Roundup products so as to avoid the risk of serious harm associated with the prevalent use of Roundup/glyphosate as an herbicide;

f)    Failing to design and manufacture Roundup products so as to ensure they were at least as safe and effective as other herbicides on the market;

g)    Failing to provide adequate instructions, guidelines, and safety precautions to those persons who Defendant could reasonably foresee would use and/or be exposed to its Roundup products;

h)    Failing to disclose to Plaintiff, users, consumers, and the public that the use of and exposure to Roundup presented severe risks of cancer and other grave illnesses;

i)    Failing to warn Plaintiff, users, consumers, and the public that the

product's risk of harm was unreasonable and that there were safer and effective alternative herbicides available to Plaintiff and other users or consumers;

j)    Systematically suppressing or downplaying contrary evidence about the risks, incidence, and prevalence of the side effects of Roundup and glyphosate- containing products;

k)    Representing that its Roundup products were safe for their intended use when, in fact, Defendant knew or should have known that the products were not safe for their intended use;

l)    Declining to make or propose any changes to Roundup products' labeling or other promotional materials that would alert the consumers and the public of the risks of Roundup and glyphosate;

m)    Advertising, marketing, and recommending the use of Roundup products, while concealing and failing to disclose or warn of the dangers known by Defendant to be associated with or caused by the use of or exposure to Roundup and glyphosate;

n)    Continuing to disseminate information to its consumers, which indicate or imply that Defendant's Roundup products are not unsafe for use in the agricultural, horticultural industries, and/or home use; and

o)    Continuing the manufacture and sale of its products with the knowledge that the products were unreasonably unsafe and dangerous.

127.    Defendant knew and/or should have known that it was foreseeable that consumers and/or users, such as Plaintiff, would suffer injuries as a result of Defendant's failure to exercise ordinary care in the manufacturing, marketing, labeling, distribution, and sale of Roundup.

128.    Defendant under-reported, underestimated, and downplayed the serious dangers of Roundup.

129. Defendant negligently and deceptively compared the safety risks and/or dangers of Roundup with common everyday foods such as table salt, and other forms of herbicides.

130. Plaintiff did not know the nature and extent of the injuries that could result from the intended use of and/or exposure to Roundup or its active ingredient glyphosate.

131. Defendant's negligence was the proximate cause of the injuries, harm, and economic losses that Plaintiff suffered, and will continue to suffer, as described herein.

132. Defendant's conduct, as described above, was reckless. Defendant regularly risks the lives of consumers and users of its products, including Plaintiff, with full knowledge of the dangers of its products. Defendant has made conscious decisions not to redesign, re-label, warn, or inform the unsuspecting public, including Plaintiff. Defendant's reckless conduct therefore warrants an award of punitive damages.

133. As a proximate result of Defendant's wrongful acts and omissions in placing its defective Roundup products into the stream of commerce without adequate warnings of the hazardous and carcinogenic nature of glyphosate, Plaintiff has suffered and continues to suffer severe and permanent physical and emotional injuries. Plaintiff has endured pain and suffering, has suffered economic losses

(including significant expenses for medical care and treatment) and will continue to incur these expenses in the future.

**WHEREFORE**, Plaintiff requests that the Court enter judgment in their favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees, and all such other and further relief as this Court deems just and proper. Plaintiff also demands a jury trial on the issues contained herein.

<u>**Count II**</u>
**Strict Liability (Defective Manufacture and Design)**

134. Plaintiff incorporates by reference all preceding paragraphs of this Complaint as if fully set forth herein.

135. Plaintiff brings this strict liability claim against Defendant for defective manufacture and design.

136. At all times relevant to this litigation, Defendant engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting Roundup products, which are defective and unreasonably dangerous to consumers, users, and other persons coming into contact with them, including Plaintiff, thereby placing Roundup products into the stream of commerce. These actions were under the ultimate control and supervision of Defendant.

137. At all times relevant to this litigation, Defendant designed, researched, developed, formulated, manufactured, produced, tested, assembled, labeled,

advertised, promoted, marketed, sold, and distributed the Roundup products used by Plaintiff, and/or to which Plaintiff were exposed, as described above.

138.   At all times relevant to this litigation, Defendant's Roundup products were manufactured, designed, and labeled in an unsafe, defective, and inherently dangerous manner that was dangerous for use by or exposure to the public, and, in particular, Plaintiff.

139.   At all times relevant to this litigation, Defendant's Roundup products reached the intended consumers, handlers, and users or other persons coming into contact with these  products in Illinois and throughout the United States, including Plaintiff, without substantial change in their condition as designed, manufactured, sold, distributed, labeled, and marketed by Defendant.

140.   Defendant's Roundup products, as researched, tested, developed, designed, licensed, formulated, manufactured, packaged, labeled, distributed, sold, and marketed by Defendant, were defective in design and formulation in that when they left the hands of the Defendant's manufacturers and/or suppliers, they were unreasonably dangerous because they were not as  safe as an ordinary consumer would expect when used in an intended or reasonably foreseeable manner.

141.   Defendant's Roundup products, as researched, tested, developed, designed, licensed, formulated, manufactured, packaged, labeled, distributed, sold, and marketed by Defendant,  were defective in design and formulation in that when

they left the hands of Defendant's manufacturers and/or suppliers, the foreseeable risks associated with these products' reasonably foreseeable uses exceeded the alleged benefits associated with their design and formulation.

142.    Therefore, at all times relevant to this litigation, Defendant's Roundup products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold and marketed by Defendant, were defective in design and formulation, in one or more of the following ways:

    a)    When placed in the stream of commerce, Defendant's Roundup products were defective in design and formulation, and, consequently, dangerous to an extent beyond that which an ordinary consumer would expect;

    b)    When placed in the stream of commerce, Defendant's Roundup products were unreasonably dangerous in that they were hazardous and posed a grave risk of cancer and other serious illnesses when used in a reasonably anticipated manner;

    c)    When placed in the stream of commerce, Defendant's Roundup products contained unreasonably dangerous design defects and were not reasonably safe when used in a reasonably anticipated or intended manner;

    d)    Defendant did not sufficiently test, investigate, or study its Roundup products and, specifically, the active ingredient glyphosate;

    e)    Exposure to Roundup and glyphosate-containing products presents a risk of harmful side effects that outweighs any potential utility stemming from the use of the herbicide;

    f)    Defendant knew or should have known at the time of marketing its Roundup products that exposure to Roundup and specifically, its active ingredient glyphosate, could result in cancer and other severe illnesses and injuries;

g)   Defendant did not conduct adequate post-marketing surveillance of its Roundup products; and

h)   Defendant could have employed safer alternative designs and formulations.

143.   Defendant knew or should have known that at all times herein mentioned its Roundup was in a defective condition and was and is unreasonably dangerous and unsafe.

144.   At all times relevant to this litigation, Plaintiff used and/or was exposed to the use of Defendant's Roundup products in an intended or reasonably foreseeable manner without knowledge of their dangerous characteristics.

145.   Plaintiff could not have reasonably discovered the defects and risks associated with Roundup or glyphosate-containing products before or at the time of exposure.

146.   The harm caused by Defendant's Roundup products far outweighed their benefit, rendering Defendant's products dangerous to an extent beyond that which an ordinary consumer would contemplate. Defendant's Roundup products were and are more dangerous than alternative products and Defendant could have designed its Roundup products to make them less dangerous.  At the time that Defendant designed its Roundup products, the state of the industry's scientific knowledge was such that a less risky design or formulation was attainable.

147.   At the time Roundup products left Defendant's control, there was a

practical, technically feasible, and safer alternative design that would have prevented the harm without substantially impairing the reasonably anticipated or intended function of Defendant's Roundup herbicides.

148. Defendant's defective design of Roundup amounts to willful, wanton, and/or reckless conduct by Defendant.

149. Therefore, as a result of the unreasonably dangerous condition of its Roundup products, Defendant is strictly liable to Plaintiff.

150. The defects in Defendant's Roundup products were substantial and contributing factors in causing Plaintiff's grave injuries, and, but for Defendant's misconduct and omissions, Plaintiff would not have sustained his injuries.

151. As a direct and proximate result of Defendant placing its defective Roundup products into the stream of commerce, Plaintiff has suffered and continues to suffer grave injuries, and he has endured pain and discomfort, as well as economic hardship, including considerable financial expenses for medical care and treatment. Plaintiff will continue to incur these expenses in the future.

**WHEREFORE**, Plaintiff requests that the Court enter judgment in their favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees, and all such other and further relief as this Court deems just and proper. Plaintiff also demands a jury trial on the issues contained herein.

## Count III
### Strict Liability (Failure to Warn)

152. Plaintiff incorporates by reference all preceding paragraphs of this Complaint as if fully set forth herein.

153. Plaintiff brings this strict liability claim against Defendant for failure to warn.

154. At all times relevant to this litigation, Defendant engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting Roundup products, which are defective and unreasonably dangerous to consumers, including Plaintiff, because they do not contain adequate warnings or instructions concerning the dangerous characteristics of Roundup and specifically, the active ingredient glyphosate. These actions were under the ultimate control and supervision of Defendant.

155. Defendant researched, developed, designed, tested, manufactured, inspected, labeled, distributed, marketed, promoted, sold, and otherwise released into the stream of commerce its Roundup products, and in the course of same, directly advertised or marketed the products to consumers and end users, including Plaintiff and the public, and Defendant therefore had a duty to warn of the risks associated with the reasonably foreseeable uses (and misuses) of Roundup and glyphosate-containing products and a duty to instruct on the proper, safe use of these products.

156.   At all times relevant to this litigation, Defendant had a duty to properly test, develop, design, manufacture, inspect, package, label, market, promote, sell, distribute, maintain supply, provide proper warnings, and take such steps as necessary to ensure that its Roundup products did not cause users and consumers to suffer from unreasonable and dangerous risks. Defendant had a continuing duty to warn Plaintiff of the dangers associated with Roundup use and exposure, and a continuing duty to instruct on the proper, safe use of these products. Defendant, as manufacturer, seller, or distributor of chemical herbicides, is held to the knowledge of an expert in the field.

157.   At the time of manufacture, Defendant could have provided warnings or instructions regarding the full and complete risks of Roundup and glyphosate-containing products because it knew or should have known of the unreasonable risks of harm associated with the use of and/or exposure to these products.

158.   At all times relevant to this litigation, Defendant failed to investigate, study, test, or promote the safety of its Roundup products. Defendant also failed to minimize the dangers to users and consumers of its Roundup products and to those who would foreseeably use or be harmed by Defendant's herbicides, including Plaintiff.

159.   Even though Defendant knew or should have known that Roundup products posed a grave risk of harm, it failed to warn of the dangerous risks

associated with their use and exposure. The dangerous propensities of its products and the carcinogenic characteristics of glyphosate, as described above, were known to Defendant, or scientifically knowable to Defendant through appropriate research and testing by known methods, at the time  it  distributed, supplied, or sold the product, and not known to end users and consumers, such as Plaintiff and the public.

160.   Defendant knew or should have known that its Roundup and glyphosate-containing products created significant risks of serious bodily harm to consumers, as alleged herein, and Defendant failed to adequately warn consumers and reasonably foreseeable users of the risks of exposure to these products. Defendant has wrongfully concealed information concerning the dangerous nature of Roundup and its active ingredient glyphosate, and further made false and/or misleading statements concerning the safety of Roundup and glyphosate.

161.   At all times relevant to this litigation, Defendant's Roundup products reached the intended consumers, handlers, and users or other persons coming into contact with these products throughout the United States, including Plaintiff, without substantial change in their condition as designed, manufactured, sold, distributed, labeled, and marketed by Defendant.

162.   At all times relevant to this litigation, Plaintiff used and/or was exposed to the use of Defendant's Roundup products in their intended or reasonably foreseeable manner without knowledge of their dangerous characteristics.

163.   Plaintiff could not have reasonably discovered the defects and risks associated with Roundup or glyphosate-containing products before or at the time of Plaintiff's exposure. Plaintiff relied upon the skill, superior knowledge, and judgment of Defendant.

164.   Defendant knew or should have known that the minimal warnings disseminated with its Roundup products were inadequate, but it failed to communicate adequate information on the dangers and safe use/exposure and failed to communicate warnings and instructions that were appropriate and adequate to render the products safe for their ordinary, intended, and reasonably foreseeable uses, including agricultural and horticultural applications.

165.   The information that Defendant did provide or communicate failed to contain relevant warnings, hazards, and precautions that would have enabled agricultural workers, horticultural workers and/or at-home users such as Plaintiff to utilize the products safely and with adequate protection. Instead, Defendant disseminated information that was inaccurate, false, and misleading and which failed to communicate accurately or adequately the comparative severity, duration, and extent of the risk of injuries associated with use of and/or exposure to Roundup and glyphosate; continued to aggressively promote the efficacy of its products, even after it knew or should have known of the unreasonable risks from use or exposure; and concealed, downplayed, or otherwise suppressed, through aggressive marketing and

promotion, any information or research about the risks and dangers of exposure to Roundup and glyphosate.

166.  To this day, Defendant has failed to adequately and accurately warn of the true risks of Plaintiff's injuries associated with the use of and exposure to Roundup and its active ingredient glyphosate, a probable carcinogen.

167.  As a result of their inadequate warnings, Defendant's Roundup products were defective and unreasonably dangerous when they left the possession and/or control of Defendant, were distributed by Defendant, and used by Plaintiff.

168.  Defendant is liable to Plaintiff for injuries caused by its failure, as described above, to provide adequate warnings or other clinically relevant information and data regarding the appropriate use of its Roundup products and the risks associated with the use of or exposure to Roundup and glyphosate.

169.  The defects in Defendant's Roundup products were substantial and contributing factors in causing Plaintiff's injuries, and, but for Defendant's misconduct and omissions, Plaintiff would not have sustained his injuries.

170.  Had Defendant provided adequate warnings and instructions and properly disclosed and disseminated the risks associated with its Roundup products, Plaintiff could have avoided the risk of developing injuries as alleged herein and Plaintiff and the public could have obtained alternative herbicides.

171.  As a direct and proximate result of Defendant placing its defective

Roundup products into the stream of commerce, Plaintiff has suffered and continues to suffer severe injuries, and had endured physical pain and discomfort, as well as economic hardship, including considerable financial expenses for medical care and treatment. Plaintiff will continue to incur these expenses in the future.

**WHEREFORE**, Plaintiff requests that the Court enter judgment in their favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees, and all such other and further relief as this Court deems just and proper. Plaintiff also demands a jury trial on the issues contained herein.

### Count IV
### Breach of Express Warranty

172. Plaintiff incorporates by reference all preceding paragraphs of this Complaint as if fully set forth herein.

173. At all times relevant to this litigation, Defendant engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting its Roundup products, which are defective and unreasonably dangerous to consumers, including Plaintiff, thereby placing Roundup products into the stream of commerce. These actions were under the ultimate control and supervision of Defendant.

174. At all times relevant to this litigation, Defendant expressly represented and warranted to the purchasers of its Roundup products, by and through statements made by Defendant in labels, publications, package inserts, and other written

materials intended for consumers and the general public, that its Roundup products were safe to human health and the environment, effective, fit, and proper for their intended use. Defendant advertised, labeled, marketed, and promoted Roundup products, representing the quality to consumers and the public in such a way as to induce their purchase or use, thereby making an express warranty that its Roundup products would conform to the representations.

175.   These express representations include incomplete warnings and instructions that purport, but fail, to include the complete array of risks associated with use of and/or exposure to Roundup and glyphosate. Defendant knew and/or should have known that the risks expressly included in Roundup warnings and labels did not and do not accurately or adequately set forth the risks of developing the serious injuries complained of herein. Nevertheless, Defendant expressly represented that its Roundup products were safe and effective, that they were safe and effective for use by individuals such as Plaintiff, and/or that they were safe and effective as agricultural herbicides.

176.   The representations about Roundup, as set forth herein, contained or constituted affirmations of fact or promises made by the seller to the buyer, which related to the goods and became part of the basis of the bargain, creating an express warranty that the goods would conform to the representations.

177.   Defendant placed its Roundup products into the stream of commerce

for sale and recommended their use to consumers and the public without adequately

warning of the true risks of developing the injuries associated with the use of and

exposure to Roundup and its active ingredient glyphosate.

178.   Defendant breached these warranties because, among other things, its

Roundup products were defective, dangerous, unfit for use, did not contain labels

representing the true and  adequate nature of the risks associated with their use, and

were not merchantable or safe for their intended, ordinary, and foreseeable use and

purpose. Specifically, Defendant breached the warranties in the following ways:

    a)    Defendant represented through its labeling, advertising, and marketing materials that its Roundup products were safe, and fraudulently withheld and concealed information about the risks of serious injury associated with use of and/or exposure to Roundup and glyphosate by expressly limiting the risks associated with use and/or exposure within its warnings and labels; and

    b)    Defendant represented that its Roundup products were safe for use and fraudulently concealed information that demonstrated that glyphosate, the active ingredient in Roundup, had carcinogenic properties, and that its Roundup products, therefore, were not safer than alternatives available on the market.

179.   Monsanto's warranties and representations, as described herein,

concerning the qualities of Roundup products, became a basis of the bargain for the

public's purchases of Roundup products, including Plaintiff and Les Harm,

Plaintiff's neighbor and Cherry County Weed Superintendent. Therefore, vertical

privity is not required.

180.   On information and belief, Plaintiff and Les Harm, Plaintiff's neighbor

and Cherry County Weed Superintendent, justifiably and detrimentally relied on the express warranties and representations of Defendant in the purchase and use of its Roundup products. When Plaintiff and Les Harm, Plaintiff's neighbor and Cherry County Weed Superintendent, made the decision to purchase Roundup, they reasonably relied upon Defendant to disclose known defects, risks, dangers, and side effects of Roundup and glyphosate.

181.   Plaintiff was exposed to the labels on the Roundup products that he mixed and applied as part of his job.

182.   Defendant had sole access to material facts concerning the nature of the risks associated with its Roundup products as expressly stated within its warnings and labels, and Defendant knew that consumers and users such as Plaintiff could not have reasonably discovered that the risks expressly included in Roundup warnings and labels were inadequate and inaccurate.

183.   Plaintiff had no knowledge of the falsity or incompleteness of Defendant's statements and representations concerning Roundup.

184.   Plaintiff used and/or was exposed to the use of Roundup as researched, developed, designed, tested, formulated, manufactured, inspected, labeled, distributed, packaged, marketed, promoted, sold, or otherwise released into the stream of commerce by Defendant.

185.   Had the warnings and labels for Roundup products accurately and

adequately set forth the true risks associated with the use of such products, including Plaintiff's injuries, rather than expressly excluding such information and warranting that the products were safe for their intended use, Plaintiff could have avoided the injuries complained of herein.

186.   As a direct and proximate result of Defendant's wrongful acts and omissions, Plaintiff has suffered severe injuries. Plaintiff has endured pain and suffering, has suffered economic losses (including significant expenses for medical care and treatment), and will continue to incur these expenses in the future.

**WHEREFORE**, Plaintiff requests that the Court enter judgment in their favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees, and all such other and further relief as this Court deems just and proper. Plaintiff also demands a jury trial on the issues contained herein.

## <u>Count V</u>
### Breach of Implied Warranties

187.   Plaintiff incorporates by reference all preceding paragraphs of this Complaint as if fully set forth herein.

188.   At all relevant times, Defendant engaged in the business of testing, developing, designing, formulating, manufacturing, marketing, selling, distributing, and promoting its Roundup products, which are defective and unreasonably dangerous to users and consumers, including Plaintiff, thereby placing Roundup products into the stream of commerce.  These actions were under the ultimate control

and supervision of Defendant.

189. Before the time that Plaintiff was exposed to the use of Roundup, Defendant impliedly warranted to its consumers and users—including Plaintiff and the public—that its Roundup products were of merchantable quality and safe and fit for the use for which they were intended; specifically, as horticultural herbicides.

190. Defendant, however, failed to disclose that Roundup has dangerous propensities when used as intended and that the use of and/or exposure to Roundup and glyphosate- containing products carries an increased risk of developing severe injuries, including Plaintiff's injuries.

191. Upon information and belief, Plaintiff and the public reasonably relied upon the skill, superior knowledge, and judgment of Defendant and upon its implied warranties that the Roundup products were of merchantable quality and fit for their intended purpose or use.

192. Upon information and belief, Plaintiff and the public reasonably relied upon the skill, superior knowledge, and judgment of Defendant and upon its implied warranties that the Roundup products were of merchantable quality and fit for their intended purpose or use.

193. The Roundup products were expected to reach and did in fact reach consumers and users, including Plaintiff, without substantial change in the condition in which they were manufactured and sold by Defendant.

194.  At all times relevant to this litigation, Defendant was aware that consumers and users of its products, including Plaintiff, would use Roundup products as marketed by Defendant, which is to say that Plaintiff was the foreseeable user of Roundup.

195.  Defendant intended that its Roundup products be used in the manner in which Plaintiff in fact used them and Defendant impliedly warranted each product to be of merchantable quality, safe, and fit for this use, despite the fact that Roundup was not adequately tested or researched.

196.  In reliance upon Defendant's implied warranty, Plaintiff used Roundup as instructed and labeled and in the foreseeable manner intended, recommended, promoted and marketed by Defendant.

197.  Neither Plaintiff nor the public could have reasonably discovered or known of the risks of serious injury associated with Roundup or glyphosate.

198.  Defendant breached its implied warranty to Plaintiff in that its Roundup products were not of merchantable quality, safe, or fit for their intended use, or adequately tested. Roundup has dangerous propensities when used as intended and can cause serious injuries, including those injuries complained of herein.

199.  The harm caused by Defendant's Roundup products far outweighed their benefit, rendering the products more dangerous than an ordinary consumer or user would expect and more dangerous than alternative products.

200.   As a direct and proximate result of Defendant's wrongful acts and omissions Plaintiff has suffered severe and permanent physical and emotional injuries. Plaintiff has endured pain and suffering, has suffered economic loss (including significant expenses for medical care and treatment) and will continue to incur these expenses in the future.

**WHEREFORE**, Plaintiff requests that the Court enter judgment in their favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees, and all such other and further relief as this Court deems just and proper. Plaintiff also demands a jury trial on the issues contained herein.

### Count VI
### Fraud, Misrepresentation, and Suppression

201.   Plaintiff incorporates by reference all preceding paragraphs of this Complaint as if fully set forth herein.

202.   Defendant is the manufacturer, designer, distributor, seller or supplier of Roundup and, while engaged in the course of such business, made representations to Plaintiff regarding the character and/or quality of, for guidance in his decision to select Roundup for use.

203.   Defendant had a duty to disclose material information about serious health effects to consumers such as Plaintiff. Defendant intentionally failed to disclose this information for the purpose of inducing consumers, including Plaintiff, to purchase Defendant's dangerous products.

204. Defendant fraudulently, intentionally, and negligently misrepresented to the public, and to Plaintiff, both directly and by and through the media, the scientific literature and purported "community outreach" programs, the safety of Roundup products, and fraudulently, intentionally, and negligently concealed, suppressed, or omitted material, adverse information regarding the safety of Roundup.

205. Defendant's intentional and negligent misrepresentations and omissions regarding the safety of Roundup products were communicated to Plaintiff directly through ghostwritten articles, editorials, national and regional advertising, marketing, and promotion efforts, as well as the Roundup packaging and sales aids. The safety of Roundup products was also intentionally and/or negligently misrepresented to Plaintiff and the public with the intent that such misrepresentations would cause Plaintiff and other potential consumers to purchase and use or continue to purchase and use Roundup products.

206. Defendant either knew or should have known of the material representations they were making regarding the safety and relative utility of Roundup products.

207. Defendant fraudulently, intentionally, and negligently made the misrepresentations and/or actively concealed, suppressed, or omitted this material information with the specific desire to induce Plaintiff, and the consuming public to

purchase and use Roundup products. Defendant fraudulently, intentionally, and negligently, knew or should have known that Plaintiff and the consuming public would rely on such material misrepresentations and omissions in selecting and applying Roundup products. Defendant knew or should have known that Plaintiff would rely on its false representations and omissions.

208. Defendant made these misrepresentations and actively concealed adverse information including the risk of non-Hodgkin's Lymphoma, at a time when their agents and employees knew or should have known the product had defects, dangers, and characteristics that were other than what was represented to the consuming public.

209. Specifically, Monsanto's hired advertising firm Osborn & Barr to misrepresent and actively conceal, suppress, and omit that there had been inadequate testing of the safety and efficacy of Roundup, and that prior studies, research, reports, and/or testing had been conducted linking the use of the drug with serious health events, including non-Hodgkin's Lymphoma.

210. Despite the fact that Defendant knew or should have known of reports of severe risks, including non-Hodgkin's Lymphoma, with Roundup use and exposure, this information was strategically minimized, understated, or omitted in order to create the impression that the human dangers of Roundup were nonexistent, particularly in light of its purported utility.

211. The fraudulent, intentional and/or negligent material misrepresentations and/or active concealment, suppression, and omissions by Defendant were perpetuated directly and indirectly through the advertisements, packaging, sales aids, furtive public relations efforts, and other marketing and promotional pieces authored, analyzed, created, compiled, designed, drafted, disseminated, distributed, edited, evaluated, marketed, published, and supplied by Osborn & Barr.

212. If Plaintiff and Les Harm, Plaintiff's neighbor and Cherry County Weed Superintendent, had known the true facts concerning the risks associated with Roundup exposure, Plaintiff and Les Harm, Plaintiff's neighbor and Cherry County Weed Superintendent, would have used a safer alternative or, at the very least, been more cautious when using Roundup and significantly reduced their exposure.

213. Plaintiff's reliance upon the material misrepresentations and omissions was justified, among other reasons, because said misrepresentations and omissions were made by individuals and entities who were in a position to know the true facts concerning Roundup. Plaintiff was not in a position to know the true facts because Defendant overstated the benefits and safety of Roundup and downplayed the risk of lymphoma, thereby inducing Plaintiff to use the herbicide rather than safer alternatives.

214. Defendant is estopped from relying on any statute of limitations defenses because Defendant actively concealed the defects from consumers, such as Plaintiff. Instead of revealing the defects, Defendant continued to represent its product as safe for its intended use.

215. As a direct and proximate result of Plaintiff's use of Roundup as manufactured, designed, sold, supplied and introduced into the stream of commerce by Defendant, Plaintiff suffered personal injury, non-economic damages, and will continue to suffer such harm and damages in the future.

**WHEREFORE**, Plaintiff requests that the Court enter judgment in their favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees, and all such other and further relief as this Court deems just and proper. Plaintiff also demands a jury trial on the issues contained herein.

## <u>Prayer for Relief</u>

**WHEREFORE**, Plaintiff requests that the Court enter judgment in his favor and against Monsanto, awarding as follows:

A. compensatory damages in an amount to be proven at trial;

B. punitive damages;

C. costs including reasonable attorneys' fees, court costs, and other litigation expenses; and

D. any other relief the Court may deem just and proper.

This September 17, 2020,

                                    **HALL & LAMPROS, LLP**

                                    /s/ *Gordon Van Remmen*
                                    Christopher B. Hall
                                    Ga Bar No. 318380
                                    Gordon Van Remmen
                                    Ga Bar No. 215512

**HALL & LAMPROS, LLP**
400 Galleria Parkway
Suite 1150
Atlanta, GA 30339
(404) 876-8100 telephone
(404) 876-3477 facsimile
chall@hallandlampros.com
gordon@hallandlampros.com

*Attorneys for Plaintiff*