JURY

# U.S. District Court
## Southern District of Ohio (Columbus)
## CIVIL DOCKET FOR CASE #: 2:20-cv-04574-ALM-KAJ

Clark v. Monsanto Company                              Date Filed: 09/02/2020
Assigned to: Chief Judge Algenon L. Marbley            Jury Demand: Plaintiff
Referred to: Magistrate Judge Kimberly A. Jolson       Nature of Suit: 245 Tort Product Liability
Demand: $75,000                                        Jurisdiction: Diversity
Cause: 28:1391 Personal Injury

**Plaintiff**

**John T Clark**                          represented by **Mary Elizabeth Erney**
                                                         ROBERT D. ERNEY AND ASSOCIATES
                                                         CO., L.P.A.
                                                         1654 East Broad Street
                                                         Columbus, OH 43203
                                                         6142586100
                                                         Fax: 6142586600
                                                         Email: mary@erneylaw.com
                                                         *ATTORNEY TO BE NOTICED*

                                                         **Robert Duane Erney**
                                                         Robert D Erney & Associates Co LPA 2
                                                         1654 East Broad Street
                                                         Columbus, OH OH
                                                         614-258-6100
                                                         Fax: 614-258-6600
                                                         Email: robert.erney@erneylaw.com
                                                         *ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Monsanto Company**

| Date Filed | # | Docket Text |
|---|---|---|
| 09/02/2020 | 1 | COMPLAINT with JURY DEMAND against Monsanto Company ( Filing fee $ 400 paid - receipt number: 0648-7638537), filed by John T Clark. (Attachments: # 1 Civil Cover Sheet) (Erney, Robert) (Entered: 09/02/2020) |
| 09/02/2020 | 2 | REQUEST FOR WAIVER of Service sent to Monsanto Company on 09/02/2020 by Plaintiff John T Clark. Waiver of Service due by 10/2/2020. (Erney, Robert) (Entered: 09/02/2020) |
| 10/26/2020 | 3 | WAIVER OF SERVICE Returned Executed. Waiver sent to Monsanto Company on 10/23/2020, answer due 12/22/2020. (Erney, Robert) (Entered: 10/26/2020) |

## PACER Service Center

### Transaction Receipt

| | | | |
|---|---|---|---|
| 10/26/2020 16:12:31 | | | |
| **PACER Login:** | hllp1982:2634105:4722683 | **Client Code:** | 1417.0049 |
| **Description:** | Docket Report | **Search Criteria:** | 2:20-cv-04574-ALM-KAJ |
| **Billable Pages:** | 1 | **Cost:** | 0.10 |

## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | |
|---|---|
| **JOHN T. CLARK**<br>**305 SOUTH VIRGINIA LEE ROAD**<br>**COLUMBUS OH 43209**<br><br>**Plaintiff,**<br><br>v.<br><br>**MONSANTO COMPANY**<br>**800 North Lindbergh Boulevard**<br>**St. Louis, Missouri 63167**<br><br>**Also serve Statutory Agent:**<br>**Corporation Service Company**<br>**50 West Broad Street, Suite 1330**<br>**Columbus, Ohio 43215,**<br><br>**Defendant.** | **Case No.**     2:20-cv-4574<br><br>**COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff, John T. Clark, ("Plaintiff"), by and through his undersigned counsel, bring this Complaint for damages against Defendant Monsanto Company ("Defendant" or "Monsanto") and allege the following:

### **NATURE OF THE CASE**

1.     This is an action for damages suffered by Plaintiff as a direct and proximate result of Defendant's wrongful conduct in connection with the design, development, manufacture, testing, packaging, promoting, marketing, advertising, distribution, labeling, and/or sale of the herbicide Roundup®, containing the active ingredient glyphosate.

1

SCANNED

2.     Plaintiff maintains that Roundup® and/or glyphosate is defective,
dangerous to human health, unfit and unsuitable to be marketed and sold in commerce,
and lacked and/or continues to lack proper warnings and directions regarding the
dangers associated with its use.

3.     Plaintiff's injuries were avoidable, like those striking thousands of similarly-
situated victims across the country.

## JURISDICTION AND VENUE

4.     This Court has jurisdiction over Defendant and this action pursuant to 28
U.S.C. § 1332 because there is complete diversity of citizenship between Plaintiff and
Defendant. Defendant is incorporated in, and/or maintains its principal place of business
outside of the state in which the Plaintiff reside.

5.     The amount in controversy exceeds $75,000, exclusive of interest and
costs.

6.     The Court also has supplemental jurisdiction pursuant to 28 U.S.C. §
1367.

7.     Venue is proper within this district pursuant to 28 U.S.C. § 1391 in that
Defendant conducts business here and is subject to personal jurisdiction in this district.
Furthermore, Defendant sells, markets, and/or distributes Roundup within the Northern
District of Ohio.  Also, a substantial part of the acts and/or omissions giving rise to these
claims occurred within this district.

## PARTIES

8.     Plaintiff John T. Clark is over the age of 18 and is a resident and a citizen
of Franklin County, Ohio.

2

SCANNED

9.     Plaintiff brings this action for injuries that Mr. Clark sustained by exposure to Roundup containing the active ingredient glyphosate and the surfactant POEA. As a direct and proximate result of being exposed to Roundup, Mr. Clark developed mantle cell lymphoma, a type of non-Hodgkin's lymphoma ("NHL"), and melanoma in situ.

10.    "Roundup" refers to all formulations of Defendant's Roundup products, including, but not limited to: Roundup Concentrate Poison Ivy and Tough Brush Killer 1, Roundup Custom Herbicide, Roundup D-Pak herbicide, Roundup Dry Concentrate, Roundup Export Herbicide, Roundup Fence & Hard Edger 1, Roundup Garden Foam Weed & Grass Killer, Roundup Grass and Weed Killer, Roundup Herbicide, Roundup Original 2k herbicide, Roundup Original II Herbicide, Roundup Pro Concentrate, Roundup Prodry Herbicide, Roundup Promax, Roundup Quik Stik Grass and Weed Killer, Roundup Quikpro Herbicide, Roundup Rainfast Concentrate Weed & Grass Killer, Roundup Rainfast Super Concentrate Weed & Grass Killer, Roundup Ready-to-Use Extended Control Weed & Grass Killer 1 Plus Weed Preventer, Roundup Ready-to-Use Weed & Grass Killer, Roundup Ready-to-Use Weed and Grass Killer 2, Roundup Ultra Dry, Roundup Ultra Herbicide, Roundup Ultramax, Roundup VM Herbicide, Roundup Weed & Grass Killer Concentrate, Roundup Weed & Grass Killer Concentrate Plus, Roundup Weed & Grass killer Ready-to-Use Plus, Roundup Weed & Grass Killer Super Concentrate, Roundup Weed & Grass Killer1 Ready-to-Use, Roundup WSD Water Soluble Dry Herbicide Deploy Dry Herbicide, or any other formulation of Roundup containing the active ingredient glyphosate.

11.    Defendant Monsanto is incorporated in the state of Delaware, with a principal place of business in St. Louis, Missouri.

3

SCANNED

12. Defendant advertises and sells goods, specifically Roundup, throughout the United States, including in the State of Ohio.

13. Defendant transacted and conducted business within the State of Ohio that relates to the allegations in this Complaint.

14. Defendant derived substantial revenue from goods and products used in the State of Ohio.

15. Defendant expected or should have expected its acts to have consequences within the State of Ohio and derived substantial revenue from interstate commerce.

16. Defendant engaged in the business of designing, developing, manufacturing, testing, packaging, marketing, distributing, labeling, and/or selling Roundup.

17. Defendant is authorized to do business in the State of Ohio and derives substantial income from doing business in Ohio.

18. Defendant purposefully availed itself of the privilege of conducting activities within the State of Ohio, thus invoking the benefits and protections of its laws.

19. Defendant designed, sold, advertised, manufactured, and/or distributed Roundup with full knowledge of its dangerous and defective nature.

## **FACTUAL ALLEGATIONS**

20. At all relevant times, Defendant was in the business of, and did, design, research, manufacture, test, advertise, promote, market, sell, and distribute the commercial herbicide Roundup.

4

SCANNED

21.    Monsanto is a multinational agricultural biotechnology corporation based in St. Louis, Missouri. It is the world's leading producer of glyphosate.

22.    Defendant discovered the herbicidal properties of glyphosate during the 1970s and subsequently began to design, research, manufacture, sell, and distribute glyphosate-based Roundup as a broad-spectrum herbicide.

23.    Glyphosate is the active ingredient in Roundup.

24.    Glyphosate is a broad-spectrum herbicide used to kill weeds and grasses known to compete with commercial crops grown around the globe.

25.    Glyphosate is a "non-selective" herbicide, meaning it kills indiscriminately based only on whether a given organism produces a specific enzyme, 5-enolpyruvylshikimic acid-3-phosphate synthase, known as EPSP synthase.

26.    Glyphosate inhibits the EPSP synthase that normally interferes with the shikimic pathway in plants, resulting in the accumulation of shikimic acid in plant tissue and ultimately plant death.

27.    Sprayed as a liquid, plants absorb glyphosate directly through their leaves, stems, and roots, and detectable quantities accumulate in the plant tissues.

28.    The original Roundup, containing the active ingredient glyphosate, was introduced in 1974. Today, glyphosate products are among the world's most widely used herbicides.

29.    Defendant is intimately involved in the development, design, manufacture, marketing, sale, and/or distribution of genetically modified ("GMO") crops, many of which are marketed as being resistant to Roundup, i.e., Roundup Ready®. As of 2009, Defendant was the world's leading producer of seeds designed to be Roundup Ready.

5

SCANNED

In 2010, an estimated 70% of corn and cotton and 90% of soybean fields in the United States contained Roundup Ready seeds.

30.     Each year approximately 250 million pounds of glyphosate are sprayed on crops, commercial nurseries, suburban lawns, parks, and golf courses.  This increase in use has been driven largely by the proliferation of genetically engineered crops, crops specifically tailored to resist the activity of glyphosate.

31.     For nearly 40 years, consumers, farmers, and the general public, including Mr. Cira, have used Roundup, unaware of its carcinogenic properties.

## REGISTRATION OF HERBICIDES UNDER FEDERAL LAW

32.     The manufacture, formulation, and distribution of herbicides, such as Roundup, are regulated under the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA"), 7. U.S.C. § 136 et seq.  FIFRA requires that all pesticides be registered with the Environmental Protection Agency ("EPA) prior to their distribution, sale, or use, except as described by FIFRA 7 U.S.C. § 136a(a).

33.     The EPA requires as part of the registration process, among other requirements, a variety of tests to evaluate the potential for exposure to pesticides, toxicity to people and other potential non-target organisms, and other adverse effects on the environment.  Registration by the EPA, however, is not an assurance or finding of safety.  The determination the EPA makes in registering or re-registering a product is not that the product is "safe," but rather that use of the product in accordance with its label directions "will not generally cause unreasonable adverse effects on the environment."  7 U.S.C. § 136(a)(c)(5)(D).

6

SCANNED

34.    FIFRA defines "unreasonable adverse effects on the environment" to mean "any unreasonable risk to man or the environment, taking into account the economic, social, and environmental costs and benefits of the use of any pesticide." 7 U.S.C. § 136(bb). FIFRA thus requires the EPA to make a risk/benefit analysis in determining whether a registration should be granted or allowed to continue to be sold in commerce.

35.    Roundup is registered with the EPA for distribution, sale, and manufacture in the United States and the State of Ohio.

36.    FIFRA generally requires that the registrant, Monsanto, conduct health and safety testing of pesticide products. The government is not required, nor is it able, to perform the product tests that are required of the manufacturer.

37.    The evaluation of each pesticide product distributed, sold, or manufactured is completed at the time the product is initially registered. The data necessary for registration of a pesticide has changed over time. The EPA is now in the process of re-evaluating all pesticide products through a Congressionally-mandated process called "re-registration." 7 U.S.C. § 136a-1. In order to reevaluate these pesticides, the EPA demands the completion of additional tests and the submission of data for the EPA's review and evaluation.

38.    In the case of glyphosate and Roundup, the EPA had planned on releasing its preliminary risk assessment—in relation to the registration process—no later than July 2015. The EPA completed its review of glyphosate in early 2015, but delayed releasing the assessment pending further review in light of the World Health Organization's findings.

7

SCANNED

## MONSANTO'S FALSE REPRESENTATIONS REGARDING THE SAFETY OF ROUNDUP

39.    In 1996, the New York Attorney General ("NYAG") filed a lawsuit against Monsanto based on its false and misleading advertising of Roundup products. Specifically, the lawsuit challenged Monsanto's general representations that its spray-on glyphosate-based herbicides, including Roundup, were "safer than table salt" and "practically non-toxic" to mammals, birds, and fish.  Among the representations the NYAG found deceptive and misleading about the human and environmental safety of Roundup are the following:

a) Remember that environmentally friendly Roundup herbicide is biodegradable. It won't build up in the soil so you can use Roundup with confidence along customers' driveways, sidewalks and fences . . .

b) And remember that Roundup is biodegradable and won't build up in the soil. That will give you the environmental confidence you need to use Roundup everywhere you've got a weed, brush, edging or trimming problem.

c) Roundup biodegrades into naturally occurring elements.

d) Remember that versatile Roundup herbicide stays where you put it. That means there's no washing or leaching to harm customers' shrubs or other desirable vegetation.

e) This non-residual herbicide will not wash or leach in the soil. It stays where you apply it.

8

SCANNED

f) You can apply Accord with "confidence because it will stay where you put it" it bonds tightly to soil particles, preventing leaching. Then, soon after application, soil microorganisms biodegrade into natural products.

g) Glyphosate is less toxic to rats than table salt following acute oral ingestion.

h) Glyphosate's safety margin is much greater than required. It has over a 1,000-fold safety margin in food and over a 700-fold safety margin for workers who manufacture it or use it.

i) You can feel good about using herbicides by Monsanto. They carry a toxicity category rating of 'practically non-toxic' as it pertains to mammals, birds and fish.

j) "Roundup can be used where kids and pets will play and breaks down into natural material." This ad depicts a person with his head in the ground and a pet dog standing in an area which has been treated with Roundup.[1]

40.    On November 19, 1996, Monsanto entered into an Assurance of Discontinuance with NYAG, in which Monsanto agreed, among other things, "to cease and desist from publishing or broadcasting any advertisements [in New York] that represent, directly or by implication" that:

---

[1] Attorney General of the State of New York, In the Matter of Monsanto Company, Assurance of Discontinuance Pursuant to Executive Law § 63(15) (Nov. 1996).

SCANNED

a) its glyphosate-containing pesticide products or any
   component thereof are safe, non-toxic, harmless or free from
   risk.

***

b) its glyphosate-containing pesticide products or any
   component thereof manufactured, formulated, distributed or
   sold by Monsanto are biodegradable

***

c) its glyphosate-containing pesticide products or any
   component thereof stay where they are applied under all
   circumstances and will not move through the environment by
   any means.

***

d) its glyphosate-containing pesticide products or any
   component thereof are "good" for the environment or are
   "known for their environmental characteristics."

***

e) glyphosate-containing pesticide products or any component
   thereof are safer or less toxic than common consumer
   products other than herbicides;

f) its glyphosate-containing products or any component thereof
   might be classified as "practically non-toxic."

SCANNED

41.    Monsanto did not alter its advertising in the same manner in any state other than New York, and on information and belief still has not done so today.

42.    In 2009, France's highest court ruled that Monsanto had not told the truth about the safety of Roundup.  The French court affirmed an earlier judgment that Monsanto had falsely advertised its herbicide Roundup as "biodegradable" and that it "left the soil clean."[2]

## EVIDENCE OF CARCINOGENICITY IN ROUNDUP

43.    As early as the 1980s, Monsanto was aware of glyphosate's carcinogenic properties.

44.    On March 4, 1985, a group of the Environmental Protection Agency's ("EPA") Toxicology Branch published a memorandum classifying glyphosate as a Category C oncogene.[3] Category C oncogenes are possible human carcinogens with limited evidence of carcinogenicity.

45.    In 1986, the EPA issued a Registration Standard for glyphosate (NTIS PB87-103214).  The Registration standard required additional phytotoxicity, environmental fate, toxicology, product chemistry, and residue chemistry studies.  All of the data required was submitted and reviewed and/or waived.

---

[2] *Monsanto Guilty in 'False Ad' Row,* BBC, Oct. 15, 2009, *available at* http://news.bbc.co.uk/2/hi/europe/8308903.stm.
[3] Consensus Review of Glyphosate, Casewell No. 661A. March 4, 1985. United States Environmental Protection Agency.

SCANNED

46. In October 1991, the EPA published a Memorandum entitled "Second Peer Review of Glyphosate." The memorandum changed glyphosate's classification to Group E (evidence of non-carcinogenicity for humans). Two peer review committee members did not concur with the conclusions of the committee, and one member refused to sign.[4]

47. In addition to the toxicity of the active molecule, many studies support the hypothesis that the glyphosate formulations found in Defendant's Roundup products are more dangerous and toxic than glyphosate alone.[5] As early as 1991, evidence existed demonstrating that glyphosate formulations were significantly more toxic than glyphosate alone.[6]

48. In 2002, Julie Marc published a study entitled "Pesticide Roundup Provokes Cell Division Dysfunction at the Level of CDK1/Cyclin B Activation."[7]

49. The study found that Roundup caused delays in the cell cycles of sea urchins, while the same concentrations of glyphosate alone proved ineffective and did not alter cell cycles.

_____

[4] Second Peer Review of Glyphosate, CAS No. 1071-83-6. October 30, 1881. United States Environmental Protection Agency.
[5] Martinez *et al.* 2007; Benachour 2009; Gasnier *et al.* 2010; Peixoto 2005; Marc 2004.
[6] Martinez *et al.* 1991.
[7] A full version of the study can be found at
https://www.stopogm.net/old/sites/stopogm.nct/upload/abc/JulieMarc2002.pdf (last visited August 27, 2019).

12

SCANNED

50.    In 2004, Julie Marc published a study entitled "Glyphosate-based pesticides affect cell cycle regulation."[8] The study demonstrated a molecular link between glyphosate-based products and cell cycle dysregulation.

51.    The study noted that "cell-cycle dysregulation is a hallmark of tumor cells and human cancer. Failure in the cell-cycle checkpoints leads to genomic instability and subsequent development of cancers from the initial affected cell." Further, "[s]ince cell cycle disorders such as cancer result from dysfunction of unique cell, it was of interest to evaluate the threshold dose of glyphosate affecting cells."

52.    In 2005, Francisco Peixoto published a study showing that Roundup's effects on rat liver mitochondria are much more toxic and harmful than the same concentrations of glyphosate alone.[9]

53.    The Peixoto study suggested that the harmful effects of Roundup on mitochondrial bioenergetics could not be exclusively attributed to glyphosate and could be the result of other chemicals, namely the surfactant POEA, or alternatively due to the possible synergy between glyphosate and Roundup formulation products.

54.    In 2009, Nora Benachour and Gilles-Eric Seralini published a study examining the effects of Roundup and glyphosate on human umbilical, embryonic, and placental cells.[10]

_____

[8] A full version of the study can be found at
https://onlinelibrary.wiley.com/doi/pdf/10.1016/j.biolcel.2003.11.010 (last visited August 27, 2019).
[9] The abstract can be found at https://www.greenmedinfo.com/article/comparative-effects-roundup-and-glyphosate-mitochondrial-oxidative-phosphoryla (last visited August 27, 2019).
[10] The abstract can be found at https://www.ncbi.nlm.nih.gov/pubmed/19105591/ (last visited August 27, 2019).

SCANNED

55. The study used dilution levels of Roundup and glyphosate far below agricultural recommendations, corresponding with low levels of residues in food. The study concluded that supposed "inert" ingredients, and possibly POEA, change human cell permeability and amplify toxicity of glyphosate alone. The study further suggested that determinations of glyphosate toxicity should take into account the presence of adjuvants, or those chemicals used in the formulation of the complete pesticide. The study confirmed that the adjuvants in Roundup are not inert and that Roundup is always more toxic than its active ingredient glyphosate.

56. The results of these studies were confirmed in recently published peer-reviewed studies and were at all times available and/or known to Defendant.

57. Defendant knew or should have known that Roundup is more toxic than glyphosate alone and that safety studies on Roundup, Roundup's adjuvants and "inert" ingredients, and/or the surfactant POEA were necessary to protect Plaintiffs from Roundup.

58. Defendant knew or should have known that tests limited to Roundup's active ingredient glyphosate were insufficient to prove the safety of Roundup.

59. Defendant failed to appropriately and adequately test Roundup, Roundup's adjuvants and "inert" ingredients, and/or the surfactant POEA to protect Plaintiffs from Roundup.

60. Rather than performing appropriate tests, Defendant relied upon flawed industry-supported studies designed to protect Defendant's economic interests rather than Plaintiffs and the consuming public.

14

SCANNED

61.    Despite possessing knowledge that Roundup was considerably more
dangerous than glyphosate alone, Defendant continued to promote Roundup as safe.

## SCIENTIFIC FRAUD UNDERLYING THE MARKETING AND SALE OF GLYPHOSATE/ROUNDUP

62.    Based on early studies that glyphosate could cause cancer in laboratory
animals, the EPA originally classified glyphosate as *possibly carcinogenic to humans*
(Group C) in 1985.  After pressure from Monsanto, including contrary studies it provided
to the EPA, the EPA changed its classification to *evidence of non-carcinogenic in
humans* (Group E) in 1991.  In so classifying glyphosate, however, the EPA made clear
that the designation did not mean the chemical does not cause cancer: " It should be
emphasized, however, that designation of an agent in Group E is based on the available
evidence at the time of evaluation and should not be interpreted as a definitive
conclusion that the agent will not be a carcinogen under any circumstances."

63.    On two occasions, the EPA found that the laboratories hired by Monsanto
to test the toxicity of its Roundup products for registration purposes committed fraud.

64.    In the first instance, Monsanto, in seeking initial registration of Roundup by
the EPA, hired Industrial Bio-Test Laboratories ("IBT") to perform and evaluate herbicide
toxicology studies relating to Roundup.  IBT performed about 30 tests on glyphosate
and glyphosate-containing products, including 9 of the 15 residue studies needed to
register Roundup.

65.    In 1976, the United States Food and Drug Administration ("FDA")
performed an inspection of IBT that revealed discrepancies between the raw data and
the final report relating to the toxicological impacts of glyphosate.  The EPA
subsequently audited IBT, at which time is also found the toxicology studies conducted

SCANNED

on the Roundup herbicide were invalid. As one EPA reviewer was quoted as saying after finding "routine falsification of data" at IBT, it was "hard to believe the scientific integrity of studies when they said they took specimens of the uterus from male rabbits."

66.     Three top executives of IBT were convicted of fraud in 1983.

67.     Then, in 1991, Monsanto hired Craven Laboratories to perform pesticide and herbicide studies, including for Roundup. In that same year, the owner of Craven Laboratories and three of its employees were indicted then later convicted of fraudulent laboratory practices in testing pesticides and herbicides.

68.     Despite the falsity of the tests for Monsanto's registration, Monsanto was marketing Roundup in 115 countries within a few years of its launch.

69.     Multiple studies have been ghostwritten in part and/or published by Monsanto through companies such as Intertek and Exponent, Inc. These studies ranged from 2000-present and minimized safety concerns associated with Roundup. Monsanto used the studies to convince regulators to allow the sale of Roundup and permit consumers to use Roundup. Examples of these studies included, but are not limited to: Williams (2000); Williams (2012); Kier & Kirkland (2013), Kier (2015); Bus (2016); Chang (2016); and the Intertek Expert Panel Manuscripts. These studies have been submitted and relied upon by the public and the EPA in assessing the safety of glyphosate. Consequently, Monsanto has fraudulently represented that independent scientists have concluded that glyphosate is safe. Monsanto paid these allegedly "independent" experts without disclosing the fact that Monsanto had a significant role in their studies. In addition, Monsanto has ghostwritten editorials that advocate for the

16

SCANNED

safety of glyphosate in newspaper and magazines for scientists such as Robert Tarone
and Henry Miller.

70.     Monsanto has also violated federal regulations in holding secret *ex parte*
meetings and conversations with certain EPA employees to collude in a strategy to re-
register glyphosate and to quash investigations into the carcinogenicity of glyphosate by
other agencies such as the Agency for Toxic Substances and Disease Registry.
Monsanto's close connection with the EPA arises in part from its offering of lucrative
consulting opportunities to retiring EPA officials.

## IARC CLASSIFICATION OF GLYPHOSATE

71.     The International Agency for Research on Cancer ("IARC") is the
specialized intergovernmental cancer agency the World Health Organization ("WHO") of
the United Nations tasked with conducting and coordinating research into the causes of
cancer.

72.     An IARC Advisory Group to Recommend Priorities for IARC Monographs
during 2015–2019 met in April 2014. Though nominations for the review were solicited,
a substance must meet two criteria to be eligible for review by the IARC Monographs:
there must already be some evidence of carcinogenicity of the substance, and there
must be evidence that humans are exposed to the substance.

73.     IARC set glyphosate for review in 2015-2016. IARC uses five criteria for
determining priority in reviewing chemicals. The substance must have a potential for
direct impact on public health; scientific literature to support suspicion of carcinogenicity;
evidence of significant human exposure; high public interest and/or potential to bring
clarity to a controversial area and/or reduce public anxiety or concern; related agents

17

SCANNED

similar to one given high priority by the above considerations. Data reviewed is sourced preferably from publicly accessible, peer-reviewed data.

74.    On March 24, 2015, after its cumulative review of human, animal, and DNA studies for more than one year, the IARC's working group published its conclusion that the glyphosate contained in Defendant's Roundup herbicide, is a Class 2A "probable carcinogen," as demonstrated by the mechanistic evidence of carcinogenicity in humans and sufficient evidence of carcinogenicity in animals. Notably, many of the studies relied upon by the IARC in its review were in the possession of Defendant since 1985.

75.    The IARC's full Monograph was published on July 29, 2015, and established glyphosate as a class 2A probable carcinogen to humans. According to the authors, glyphosate demonstrated sufficient mechanistic evidence (genotoxicity and oxidative stress) to warrant a 2A classification based on evidence of carcinogenicity in humans and animals.

76.    The IARC Working Group found an increased risk between exposure to glyphosate and NHL and several subtypes of NHL, and the increased risk continued after adjustment for other pesticides.

77.    The IARC also found that glyphosate caused DNA and chromosomal damage in human cells.

## EARLIER EVIDENCE OF GLYPHOSATE'S DANGER

78.    Consistent with the new classification by the IARC, Defendant has had ample evidence of glyphosate and Roundup's genotoxic properties for decades.

18

SCANNED

79.     Genotoxicity refers to chemical agents that are capable of damaging the DNA within a cell through genetic mutations, which is a process that is believed to lead to cancer.

80.     In 1997, Chris Clements published "Genotoxicity of select herbicides in Rana catesbeiana tadpoles using the alkaline single-cell gel DNA electrophoresis (comet) assay."

81.     The study found that tadpoles exposed to Roundup showed significant DNA damage when compared with unexposed control animals.

82.     Both human and animal studies have shown that glyphosate and glyphosate-based formulations such as Roundup can induce oxidative stress.

83.     Oxidative stress and associated chronic inflammation are believed to be involved in carcinogenesis.

84.     The IARC Monograph notes that "[s]trong evidence exists that glyphosate, AMPA and glyphosate-based formulations can induce oxidative stress."

85.     In 2006, César Paz-y-Miño published a study examining DNA damage in human subjects exposed to glyphosate.

86.     The study produced evidence of chromosomal damage in blood cells showing significantly greater damage after exposure to glyphosate than before in the same individuals, suggesting that the glyphosate formulation used during aerial spraying had a genotoxic effect on exposed individuals.

87.     The IARC Monograph reflects the volume of evidence of glyphosate pesticides' genotoxicity noting "[t]he evidence for genotoxicity caused by glyphosate-based formulations is strong."

19

SCANNED

88.     Despite knowledge to the contrary, Defendant maintains that there is no evidence that Roundup is genotoxic, that regulatory authorities and independent experts are in agreement that Roundup is not genotoxic, and that there is no evidence that Roundup is genotoxic.

89.     In addition to glyphosate and Roundup's genotoxic properties, Defendant has long been aware of glyphosate's carcinogenic properties.

90.     Glyphosate, and Roundup in particular, have long been associated with carcinogenicity and the development of numerous forms of cancer, including, but not limited to, NHL, Hodgkin's lymphoma, multiple myeloma, and soft tissue sarcoma.

91.     Defendant has known of this association since the early-to-mid-1980s, and numerous human and animal studies have evidenced the carcinogenicity of glyphosate and/or Roundup.

92.     In 1985, the EPA studied the effects of glyphosate in mice finding a dose-related response in male mice linked to renal tubal adenomas, a rare tumor. The study concluded the glyphosate was oncogenic.

93.     In 2003, Lennart Hardell and Mikael Eriksson published the results of two case-controlled studies on pesticides as a risk factor for NHL and hairy cell leukemia.

94.     The study concluded that glyphosate had the most significant relationship to NHL among all herbicides studies with an increased odds ratio of 3.11.

95.     In 2003, AJ De Roos published a study examining the pooled data of mid-western farmers, examining pesticides and herbicides as risk factors for NHL.

96.     The study, which controlled for potential confounders, found a relationship between increased NHL incidence and glyphosate.

20

SCANNED

97.    In 2008, Mikael Eriksson published a study a population-based, case-control study of exposure to various pesticides as a risk factor for NHL.

98.    The Eriksson study strengthened previous associations between glyphosate and NHL.

99.    In spite of this knowledge, Defendant continued to issue broad and sweeping statements suggesting that Roundup was, and is, safer than ordinary household items such as table salt, despite a lack of scientific support for the accuracy and validity of these statements and, in fact, voluminous evidence to the contrary.

100.    Upon information and belief, these statements and representations have been made with the intent of inducing Plaintiffs and the public at large to purchase and increase the use of Roundup for Defendant's pecuniary gain, and in fact did induce Plaintiffs to use Roundup.

101.    Defendant made these statements with complete disregard and reckless indifference to the safety of Plaintiffs and the general public.

102.    Notwithstanding Defendant's representations, scientific evidence has established a clear association between glyphosate and genotoxicity, inflammation, and an increased risk of many cancers, including, but not limited to, NHL, multiple myeloma, and soft tissue sarcoma.

103.    Defendant knew or should have known that glyphosate is associated with an increased risk of developing cancer, including, but not limited to, NHL, multiple myeloma, and soft tissue sarcomas.

21

SCANNED

104.   Defendant failed to appropriately and adequately inform and warn
Plaintiffs of the serious and dangerous risks associated with the use of and exposure to
glyphosate and/or Roundup, including, but not limited to, the risk of developing NHL, as
well as other severe and personal injuries, which are permanent and/or long-lasting in
nature, cause significant physical pain and mental anguish, diminished enjoyment of
life, loss of consortium, and the need for medical treatment, monitoring and/or
medications.

105.   Despite the IARC's classification of glyphosate as a class 2A probable
carcinogen, Defendant continues to maintain that glyphosate and/or Roundup is safe,
non-carcinogenic, non-genotoxic, and falsely warrants to users and the general public
that independent experts and regulatory agencies agree that there is no evidence of
carcinogenicity or genotoxicity in glyphosate and Roundup.

106.   Defendant has claimed and continues to claim that Roundup is safe, non-
carcinogenic, and non-genotoxic.

107.   Glyphosate, and Roundup products in particular, have long been
associated with serious side effects, and many regulatory agencies around the globe
have banned or are currently banning the use of glyphosate herbicide products.

108.   Defendant's statements proclaiming the safety of Roundup and
disregarding its dangers misled Plaintiffs.

109.   Despite Defendant's knowledge that Roundup was associated with an
elevated risk of developing cancer, Defendant's promotional campaigns focused on
Roundup's purported "safety profile."

SCANNED

110.    Defendant's failure to adequately warn Plaintiffs resulted in (1) Mr. Cira using and being exposed to glyphosate instead of using another acceptable and safe method of controlling unwanted weeds and pests; and (2) scientists and physicians failing to warn and instruct consumers about the risk of cancer, including NHL, and other injuries associated with Roundup.

111.    Defendant failed to seek modification of the labeling of Roundup to include relevant information regarding the risks and dangers associated with Roundup exposure.

112.    The failure of Defendant to appropriately warn and inform the EPA has resulted in inadequate warnings in safety information presented directly to users and consumers.

113.    The failure of Defendant to appropriately warn and inform the EPA has resulted in the absence of warning or caution statements that are adequate to protect health and the environment.

114.    The failure of Defendant to appropriately warn and inform the EPA has resulted in the directions for use that are not adequate to protect health and the environment.

115.    By reason of the foregoing acts and omissions, Plaintiff seeks compensatory damages as a result of Mr. Clark's use of, and exposure to, Roundup which caused or was a substantial contributing factor in causing Mr. CIEK to suffer from cancer, specifically mantle cell lymphoma, a type of NHL, and Plaintiff suffered severe and personal injuries which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life and loss of consortium.

SCANNED

116. By reason of the foregoing, Plaintiff has been severely and permanently injured.

117. By reason of the foregoing acts and omissions, Plaintiff has endured and continues to suffer, emotional and mental anguish, medical expenses, loss of consortium, and other economic and non-economic damages, as a result of the actions and inactions of Defendant.

## THE IMPORTANCE OF ROUNDUP TO MONSANTO'S MARKET DOMINANCE

118. The success of Roundup was key to Monsanto's continued reputation and dominance in the marketplace. Because of the success of Roundup's sales, Monsanto's agricultural division out-performed its chemicals division, a gap which continued to increase. But Monsanto's patent for glyphosate expired in 2000, so Monsanto needed a strategy to maintain its Roundup market dominance and ward off potential competition.

119. Consequently, Monsanto began developing and selling genetically-engineered Roundup Ready seeds in 1996. Roundup Ready seeds are resistant to glyphosate, so farmers can spray Roundup onto their fields during the growing season without harming their crops. Monsanto was able to expand its market even further using this ingenuity. By 2000, Monsanto's biotechnology seeds were used in more than 80 million acres worldwide, with nearly 70% of American soybeans being planted with Roundup Ready seeds  This strategy also secured Monsanto's market dominance through the strategy of coupling proprietary Roundup Ready seeds with sales of Roundup herbicide.

24

SCANNED

120.    Through its strategies of increased production, decreased prices, and by coupling Roundup Ready sees with Roundup herbicide, Roundup became Monsanto's most profitable product. In 2000, Roundup accounted for almost $2.8 billion in sales, outselling its other herbicides by a 5-1 margin and accounting for almost half of Monsanto's revenue. Even today glyphosate remains one of the world's largest herbicides by sales volume.

## PLAINTIFF'S EXPOSURE TO ROUNDUP

121.    Mr. Clark was first exposed to Roundup in or around 2000. From 2000 through 2019, Mr. Clark used Roundup three or four times a month from May through September. He used it in the front and back yard of his home, and his fence lines.

122.    Mr. Clark followed all safety and precautionary warnings during the course of use.

123.    Mr. Clark purchased Roundup in one gallon containers. Mr. Clark used Roundup with a one gallon manual sprayer.

124.    Mr. Clark was subsequently diagnosed with cutaneous mantle cell lymphoma, a type of Non – Hodgkins Lymphoma ("NHL").

125.    Mr. Clark developed NHL as a result of his exposure to Roundup product. As a result of his injury, Mr. Clark has incurred significant economic and non-economic damages.

## EQUITABLE TOLLING OF APPLICABLE STATUTE OF LIMITATIONS

126.    Plaintiff incorporates by reference all prior paragraphs of this Complaint, as if fully set forth herein.

SCANNED

127. The running of any statute of limitations has been tolled by reason of Defendant's fraudulent concealment. Defendant, through affirmative misrepresentations and omissions, actively concealed from Plaintiffs the true risks associated with Roundup and glyphosate.

128. At all relevant times, Defendant has maintained that Roundup is safe, non-toxic, and non-carcinogenic.

129. As a result of Defendant's actions, Plaintiff was unaware, and could not reasonably have known or have learned through reasonable diligence, that Roundup and/or glyphosate contact exposed her to the risks alleged herein and that those risks were the direct and proximate result of Defendant's acts and omissions.

130. Furthermore, Defendant is estopped from relying on any statute of limitations because of its fraudulent concealment of the true character, quality, and nature of Roundup. Defendant was under a duty to disclose the true character, quality, and nature of Roundup because this was non-public information over which Defendant had and continues to have exclusive control, and because Defendant knew that this information was not available to Plaintiff or to distributors of Roundup. In addition, Defendant is estopped from relying on any statute of limitations because of its intentional concealment of these facts.

131. Plaintiff had no knowledge that Defendant was engaged in the wrongdoing alleged herein. Because of the fraudulent acts of concealment of wrongdoing by Defendant, Plaintiffs could not have reasonably discovered the wrongdoing at any time before now. Moreover, Defendant had the ability to and did spend enormous amounts of money in furtherance of its purpose of marketing, promoting, and/or distributing a

26

SCANNED

profitable herbicide, notwithstanding the known or reasonably known risks.  Plaintiffs and medical professionals could not have afforded and could not have possibly conducted studies to determine the nature, extent, and identity of related health risks, and were forced to rely on only the Defendant's representations.  Accordingly, Defendant is precluded by the discovery rule and/or the doctrine of fraudulent concealment from relying upon any statute of limitations.

132.    In addition, Ohio Revised Code § 2305.10 tolled any applicable statutes of limitations.

## FIRST CLAIM FOR RELIEF

### (NEGLIGENCE)

133.    Plaintiff re-alleges each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, as if fully set forth herein.

134.    Defendant had a duty to exercise reasonable care in the researching, testing, marketing, supplying, promoting, packaging, sale, and/or distribution of Roundup into the stream of commerce, including a duty to assure that the product would not cause users to suffer unreasonable, dangerous side effects.

135.    Defendant failed to exercise ordinary care (or any care for that matter) in the researching, testing, marketing, supplying, promoting, packaging, sale, testing, quality assurance, quality control, and/or distribution of Roundup into interstate commerce in that Defendant knew or should have known that using Roundup created a high risk of unreasonable, dangerous side effects, including, but not limited to, the development of cutaneous T – cell lymphoma, a type of NHL, and / or melanoma in situ, as well as other severe and personal injuries which are permanent and lasting in nature,

27

SCANNED

physical pain and mental anguish, including diminished enjoyment of life and loss of consortium, as well as need for lifelong medical treatment, monitoring, and/or medications.

136. The negligence by Defendant, its agents, servants, and/or employees, included, but was not limited to, the following acts and/or omissions:

a) Promoting Roundup without thoroughly testing it;

b) Failing to test Roundup and/or failing to adequately, sufficiently, and properly test Roundup;

c) Not conducting sufficient testing programs to determine whether Roundup was safe for use; in that Defendant knew or should have known that Roundup was unsafe and unfit for use by reason of the dangers to its users;

d) Not conducting sufficient testing programs and studies to determine Roundup's carcinogenic properties even after Defendant had knowledge that Roundup is, was, or could be carcinogenic;

e) Failing to conduct sufficient testing programs to determine the safety of "inert" ingredients and/or adjuvants contained within Roundup, and the propensity of these ingredients to render Roundup toxic, increase the toxicity of Roundup, whether these ingredients are carcinogenic, magnify the carcinogenic properties of Roundup, and whether or not "inert" ingredients and/or adjuvants were safe for use;

28

SCANNED

f) Negligently failing to adequately and correctly warn Plaintiffs,
the public, the medical and agricultural professions, and the
EPA of the dangers of Roundup;

g) Negligently failing to petition the EPA to strength the warnings
associated with Roundup;

h) Failing to provide adequate cautions and warnings to protect
the health of users, handlers, applicators, and persons who
would reasonably and foreseeably come into contact with
Roundup;

i) Negligently marketing, advertising, and recommending the
use of Roundup without sufficient knowledge as to its
dangerous propensities;

j) Negligently representing that Roundup was safe for use for its
intended purpose, and/or that Roundup was safer than
ordinary and common items such as table salt, when, in fact,
it was unsafe;

k) Negligently representing that Roundup had equivalent safety
and efficacy as other forms of herbicides;

p) Concealing information from Plaintiffs while knowing that
Roundup was unsafe, dangerous, and/or non-conforming with
EPA regulations;

q) Improperly concealing and/or misrepresenting information
from Plaintiffs, scientific, and medical professionals, and/or

SCANNED

the EPA, concerning the severity of risks and dangers of

Roundup compared to other forms of herbicides; and

r) Negligently selling Roundup with a false and misleading label.

137. Defendant under-reported, underestimated, and downplayed the serious dangers of Roundup.

138. Defendant negligently and deceptively compared the safety risks and/or dangers of Roundup with common everyday foods such as table salt, and other forms of herbicides.

139. Defendant was negligent and/or violated Ohio law in the researching, supplying, promoting, packaging, distributing, testing, advertising, warning, marketing, and selling of Roundup in that it:

a) Failed to accompany their product with proper and/or accurate warnings regarding all possible adverse side effects associated with the use of Roundup;

b) Failed to accompany their product with proper warnings regarding all possible adverse side effects concerning the failure and/or malfunction of Roundup;

c) Failed to accompany their product with accurate warnings regarding the risks of all possible adverse side effects concerning Roundup;

d) Failed to warn Plaintiffs of the severity and duration of such adverse effects, as the warnings given did not accurately

30

> reflect the symptoms, or severity of the side effects including,
>
> but not limited to, the development of NHL;
>
> e) Failed to conduct adequate testing, clinical testing and post-
>    marketing surveillance to determine the safety of Roundup;
>
> f) Failed to conduct adequate testing, clinical testing, and post-
>    marketing surveillance to determine the safety of Roundup's
>    "inert" ingredients and/or adjuvants;
>
> g) Negligently misrepresented the evidence of Roundup's
>    genotoxicity and carcinogenicity; and

140. Despite the fact that Defendant knew or should have known that Roundup caused, or could cause, unreasonably dangerous side effects, Defendant continued and continue to market, manufacture, distribute, and/or sell Roundup to consumers, including to Plaintiff.

141. Defendant knew or should have known that consumers such as Plaintiff would foreseeably suffer injury as a result of Defendant's failure to exercise any care, as set forth above.

142. Based upon the allegations in the Complaint immediately above and throughout, Defendant's actions constitute willful and wanton conduct for which punitive damages are available.

143. Defendant's negligence was the proximate cause of Mr. Clark's injuries, harm and economic loss, which Plaintiffs suffered and/or will continue to suffer.

144. As a result of the foregoing acts and omissions, Plaintiff suffered from serious and dangerous side effects including, but not limited to, mantle cell lymphoma, a

SCANNED

type of NHL, as well as other severe and personal injuries that are permanent and lasting in nature, physical pain and mental anguish, diminished enjoyment of life, and financial expenses for hospitalization and medical care. Further, Plaintiff suffered life-threatening mantle cell lymphoma, a type of NHL, and / or melanoma in situ, and severe personal injuries that are permanent and lasting in nature, physical pain and mental anguish and loss of consortium, including diminished enjoyment of life.

145. As a result, Plaintiff seeks compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees, and all relief as this Court deems just and proper.

## SECOND CLAIM FOR RELIEF

## (STRICT PRODUCTS LIABILITY—DESIGN DEFECT UNDER OHIO REV. CODE § 2307.75)

146. Plaintiff re-alleges each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, as if fully set forth herein.

147. At all times herein mentioned, Defendant designed, researched, manufactured, tested, advertised, promoted, sold, distributed, and/or had acquired the entity who has designed, researched, tested, advertised, promoted, marketed, sold, and distributed Roundup as hereinabove described that was used by Plaintiffs.

148. Defendant's Roundup was expected to and did reach the usual consumers, handlers, and persons coming into contact with said product without substantial change in the condition in which it was produced, manufactured, sold, distributed, and marketed by the Defendant.

149. At those times, Roundup was in an unsafe, defective, and inherently dangerous condition, which was dangerous to users, and in particular, Plaintiffs.

32

SCANNED

150.    The Roundup designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed by Defendant was defective in design or formulation in that, when it left the hands of the manufacturer and/or suppliers, the foreseeable risks exceeded the benefits associated with the design or formulation of Roundup.

151.    The Roundup designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed by Defendant was defective in design and/or formulation, in that, when it left the hands of the Defendant's manufacturer and/or supplier, it was unreasonably dangerous, unreasonably dangerous in normal use, and it was more dangerous than an ordinary consumer would expect.

152.    At all times herein mentioned, Roundup was in a defective condition and unsafe, and Defendant knew or had reason to know that said product was defective and unsafe, especially when used in the form and manner as provided by Defendant.  In particular, Roundup was defective in the following ways:

> a) When placed in the stream of commerce, Roundup Products
>    were defective in design and formulation and, consequently,
>    dangerous to an extent beyond that which an ordinary
>    consumer would anticipate.
>
> b) When placed in the stream of commerce, Roundup products
>    were unreasonably dangerous in that they were hazardous
>    and posed a grave risk of cancer and other serious illnesses
>    when used in a reasonably anticipated manner.

33

SCANNED

c) When placed in the stream of commerce, Roundup products contained unreasonably dangerous design defects and were not reasonably safe when used in a reasonably anticipated manner.

d) Defendant did not sufficiently test, investigate, or study its Roundup products.

e) Exposure to Roundup presents a risk of harmful side effects that outweigh any potential utility stemming from the use of the herbicide.

f) Defendant knew or should have known at the time of marketing its Roundup products that exposure to Roundup and could result in cancer and other severe illnesses and injuries.

g) Defendant did not conduct adequate post-marketing surveillance of its Roundup products.

153. Defendant knew or should have known that at all times herein mentioned its Roundup was in a defective condition and was and is inherently dangerous and unsafe

154. Mr. Clark was exposed to Roundup, as described above, without knowledge of Roundup's dangerous characteristics.

155. At the time of Mr. Clark's use of and exposure to Roundup, Roundup was being used for the purposes and in a manner normally intended, as a broad-spectrum herbicide.

34

156.   Despite its knowledge that Roundup was an unreasonably dangerous and defective product whose risks of causing cancer and other diseases outweighed its benefits, it voluntarily designed, marketed, distributed, and sold Roundup.

157.   Defendant had a duty to create a product that was not unreasonably dangerous for its normal, intended use.

158.   Defendant created a product that was and is unreasonably dangerous for its normal, intended use.

159.   Defendant marketed and promoted a product in such a manner so as to make it inherently defective, as the product downplayed its suspected, probable, and established health risks inherent with its normal, intended use.

160.   The Roundup designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed by Defendant was manufactured defectively in that Roundup left the hands of Defendant in a defective condition and was unreasonably dangerous to its intended users.

161.   Defendant created an unreasonable risk to the health of consumers and to Plaintiff in particular, and Defendant is therefore strictly liable for the injuries sustained by Plaintiff.

162.   Plaintiff could not, by the exercise of reasonable care, have discovered Roundup's defects herein mentioned or perceived its danger.

163.   By reason of the foregoing, Defendant has become strictly liable to the Plaintiff for the manufacturing, marketing, promoting, distribution, and selling of a defective product, Roundup.

35

SCANNED

164.    Defendant's defective design of Roundup amounts to willful, wanton, and/or reckless conduct by Defendant.

165.    Defects in Defendant's Roundup were the cause or a substantial factor in causing Plaintiffs' injuries.

166.    As a result of the foregoing acts and omission, Mr. Clark developed mantle cell lymphoma, a type of NHL, and suffered severe and personal injuries, which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life and Mr. Clark's loss of consortium, and financial expenses for hospitalization and medical care.

167.    As a result, Plaintiff seeks compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees, and all relief as this Court deems just and proper.

### THIRD CLAIM FOR RELIEF

### (STRICT PRODUCTS LIABILITY—FAILURE TO WARN UNDER OHIO REV. CODE § 2307.76)

168.    Plaintiff re-alleges each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, as if fully set forth herein.

169.    Defendant has engaged in the business of selling, testing, distributing, supplying, manufacturing, marketing, and/or promoting Roundup, and through that conduct has knowingly and intentionally placed Roundup into the stream of commerce with full knowledge that it reaches consumers such as Plaintiff who are exposed to it through ordinary and reasonably foreseeable uses.

36

SCANNED

170.    Defendant did in fact sell, distribute, supply, manufacture, and/or promote Roundup to Plaintiff. Additionally, Defendant expected the Roundup that they were selling, distributing, supplying, manufacturing, and/or promoting to reach—and Roundup did in fact reach—consumers, including Plaintiff, without any substantial change in the condition of the product from when it was initially distributed by Defendant.

171.    At the time of manufacture, Defendant could have provided the warnings or instructions regarding the full and complete risks of Roundup and glyphosate-containing products because it knew or should have known of the unreasonable risks of harm associated with the use of and/or exposure to such products.

172.    At all times herein mentioned, the aforesaid product was defective and unsafe in manufacture such that it was unreasonably dangerous to the user, and was so at the time it was distributed by Defendant and at the time Mr. Clark was exposed to and/or ingested the product. The defective condition of Roundup was due in part to the fact that it was not accompanied by proper warnings regarding its carcinogenic qualities and possible side effects, including, but not limited to, developing NHL as a result of exposure and use.

173.    Roundup did not contain a warning or caution statement, which was necessary and, if complied with, was adequate to protect health those exposed in violation of 7 U.S.C. § 136j(a)(1)(E).

174.    Defendant's failure to include a warning or caution statement that was necessary and, if complied with, was adequate to protect the health of those exposed, violated 7 U.S.C. § 136j(a)(1)(E) as well as the laws of the State of Ohio.

SCANNED

175.    Defendant could have amended the label of Roundup to provide additional warnings.

176.    This defect caused serious injury to Plaintiff, who used Roundup in its intended and foreseeable manner.

177.    At all times herein mentioned, Defendant had a duty to properly design, manufacture, compound, test, inspect, package, label, distribute, market, examine, maintain supply, provide proper warnings, and take such steps to assure that the product did not cause users to suffer from unreasonable and dangerous side effects.

178.    Defendant labeled, distributed, and promoted Roundup even though it was dangerous and unsafe for the use and purpose for which it was intended.

179.    Defendant failed to warn of the nature and scope of the side effects associated with Roundup, namely its carcinogenic properties and its propensity to cause or serve as a substantial contributing factor in the development of NHL.

180.    Defendant was aware of the probable consequences of the aforesaid conduct. Despite the fact that Defendant knew or should have known that Roundup caused serious injuries, Defendant failed to warn of the dangerous carcinogenic properties and side effects of developing NHL from Roundup exposure, even though these side effects were known or reasonably scientifically knowable at the time of distribution. Defendant willfully and deliberately failed to avoid the consequences associated with their failure to warn, and in doing so, Defendant acted with a conscious disregard for the safety of Plaintiff.

181.    At the time of exposure, Plaintiff could not have reasonably discovered any defect in Roundup prior through the exercise of reasonable care.

38

SCANNED

182. Defendant, as the manufacturer and/or distributor of the subject product, is held to the level of knowledge of an expert in the field.

183. Plaintiff reasonably relied upon the skill, superior knowledge, and judgment of Defendant.

184. Had Defendant properly disclosed the risks associated with Roundup, Mr. Clark would have avoided the risk of mantle cell lymphoma, a type of NHL, by not using Roundup.

185. The information that Defendant did provide or communicate failed to contain adequate warnings and precautions that would have enabled Plaintiffs, and similarly-situated individuals, to utilize the product safely and with adequate protection. Instead, Defendant disseminated information that was inaccurate, false, and misleading and which failed to communicate accurately or adequately the comparative severity, duration, and extent of the risk of injuries associated with use of and/or exposure to Roundup and glyphosate; continued to promote the efficacy of Roundup, even after it knew or should have known of the unreasonable risks from use or exposure; and concealed, downplayed, or otherwise suppressed, through aggressive marketing and promotion, any information or research about the risks and dangers of exposure to Roundup and glyphosate.

186. To this day, Defendant has failed to adequately warn of the true risks of Plaintiff's injuries associated with the use of and exposure to Roundup.

187. As a result of their inadequate warnings, Roundup was defective and unreasonably dangerous when it left the possession and/or control of Defendant, were distributed by Defendant, and used by Plaintiff.

SCANNED

188. As a direct and proximate result of Defendant's actions as alleged herein, and in such other ways to be later shown, the subject product caused Plaintiff to sustain injuries herein alleged.

189. Plaintiff seeks compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees, and all relief as this Court deems just and proper.

## FOURTH CLAIM FOR RELIEF

## (FRAUDULENT OMISSION)

190. Plaintiff re-alleges each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, as if more set forth herein.

191. At all times relevant, Defendant fraudulent and deceptively sold Roundup as a safe product with disclosing its harmful defects, when Defendant knew otherwise.

192. Defendant had a duty to disclose material facts to Plaintiff, as alleged throughout this Complaint, such as:

      a) the carcinogenic effects of using Roundup;

      b) that the risks associated with using Roundup exceed those represented by Defendants;

      c) proper warning labels on its products;

      d) that users of Roundup needed to undertake proper safety gear while using Roundup;

      e) all other material facts pleaded in this Complaint that would have property warned Plaintiffs and consumers of the risks associated with Roundup.

40

SCANNED

193. At all times relevant, Defendant fraudulent and deceptively sold Roundup to Plaintiffs as safe or not harmful, when Defendants knew it to be untrue.

194. Defendant fraudulently and deceptively failed to disclose to Plaintiff that Roundup presents serious risks of deleterious health effects, including, but not limited to, the mantle cell lymphoma, a type of NHL, that Mr. Clark suffers from.

195. Defendant fraudulently and deceptively failed to disclose that it had not adequately researched or tested Roundup to assess its safety.

196. Each of Defendant's omissions were material. In particular, each of the omissions concerned facts that were essential to the analysis undertaken by Plaintiffs as to whether to purchase Roundup.

197. Plaintiff did not know the facts that Defendant concealed.

198. Defendant intended to deceive Plaintiff and the public by concealing these facts.

199. Defendant had a duty to accurately provide this information to Plaintiff. In not so informing Plaintiff, Defendant breached its duty. Defendant also gained financially from, and as a result of, that breach.

200. Defendant had ample opportunities to disclose these facts to Plaintiff, through packaging, advertising, retail outlets, and on social media. Defendant concealed material information at all relevant times to this Complaint and continue to do so.

201. Plaintiff relied to his detriment on Defendant's fraudulent omissions. Had Plaintiff been adequately informed of the material facts concealed from them regarding

41

the safety of Roundup and not intentionally deceived by Defendant, he would not have purchased Roundup.

202. As a result of the foregoing acts and omissions, Plaintiff suffered from NHL and suffered severe and personal injuries that are permanent and lasting in nature, physical pain and mental anguish, loss of consortium, including diminished enjoyment of life, financial expenses for hospitalization and medical care, including medical expenses and other economic and non-economic damages.

203. Plaintiff respectfully seeks compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees, and all relief as this Court deems just and proper.

## FIFTH CLAIM FOR RELIEF

## (AFFIRMATIVE FRAUD)

204. Plaintiff re-alleges each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, as if more set forth herein.

205. At all times relevant, Defendant represented to Plaintiff via the media, advertising, website, social media, packaging, and motions that Roundup was safe.

206. This representation was false, as alleged throughout the Complaint.

207. Defendant knew that its representation that Roundup was safe was false and made such representations recklessly without regard for the truth.

208. Defendant intended for Plaintiff and consumers to rely in its representations.

42

209.    Each time these misrepresentations were made it was material. In particular, the representations were essential to the analysis undertaken by Plaintiffsto decide whether to purchase and use Roundup.

210.    Defendant has yet to disclose correct representations concerning Roundup.

211.    Plaintiff reasonably relied upon these representations and were harmed as described herein. Plaintiff's reliance on Defendant's representations regarding safety was a substantial factor in focusing his harms. Had Defendant told Plaintiff the truth about the safety of Roundup, he would not have purchased the product.

212.    Defendant's acts as described herein were committed maliciously, oppressively, deliberately, and with intent to defraud, in reckless disregard of Plaintiff's rights, interests, and well-being to enrich Defendant.

213.    As a result of the foregoing acts, Plaintiff suffered from mantle cell lymphoma, a type of NHL, and suffered severe and personal injuries which are permanent and lasting in nature, physical pain and mental anguish, loss of consortium, including diminished enjoyment of life, financial expenses for hospitalization and medical care, including medical expenses and other economic, and non-economic damages.

214.    Plaintiff respectfully seeks compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees, and all relief as this Court deems just and proper.

SCANNED

## SIXTH CLAIM FOR RELIEF

## (UNJUST ENRICHMENT)

215.    Plaintiff re-alleges each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, as if more set forth herein.

216.    As described in this Complaint, Defendant knowingly sold Roundup to Plaintiff in a manner that was unfair, unreasonable, unconscionable, and oppressive.

217.    As a result of Defendant's intentional, unlawful, and deceptive actions described above, Defendant was enriched at the expense of Plaintiff. Plaintiff has conferred a benefit or benefits on Defendant to which Defendant was not entitled. Defendant is fully away of this enrichment and/or benefit.

218.    Under these circumstances, it would be against equity and good conscience to permit Defendant to retain the ill-gotten benefits received from Plaintiff. Thus, it would be unjust and inequitable for Defendant to retain the benefits without restitution to Plaintiff for the monies paid to Defendant for its harmful Roundup products.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment against Defendant on each of the above-referenced claims as follows:

1.    Awarding compensatory damages in excess of the jurisdictional amount, including, but not limited to, pain, suffering, emotional distress, loss of enjoyment of life, and other non-economic damages in an amount to be determined at trial of this action;

2.    Awarding compensatory damages to Plaintiff for past and future damages, including, but not limited to, Mr. Clark's pain and suffering and for severe and

44

SCANNED

permanent personal injuries sustained by Mr. Clark, including health care costs and economic loss;

     3.     Awarding economic damages in the form of medical expenses, out-of-pocket expenses, lost earnings, and other economic damages in an amount to be determine at trial of this action;

     4.     Awarding punitive and/or exemplary damages for the wanton, willful, fraudulent, and reckless acts of Defendant that demonstrated a complete disregard and reckless indifference for the safety and welfare of the general public and to Plaintiffs in an amount sufficient to punish Defendant and deter future similar conduct, to the extent allowed by applicable law;

     5.     Awarding pre-judgment interest;

     6.     Awarding post-judgment interest;

     7.     Awarding Plaintiff reasonable attorney's fees;

     8.     Awarding Plaintiff the costs of these proceedings; and

     9.     Such other and further relief as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand trial by jury as to all issues.

SCANNED

Respectfully submitted,

Robert D. Erney (0016350)
Mary E. Erney (0096646)
ROBERT D. ERNEY & ASSOCIATES CO., LPA
1654 East Broad Street
Columbus OH 43203
(614) 258 – 6100
(614) 258 – 6600 fax
Email: robert.erney@erneylaw.com
Email: mary@erneylaw.com
**Attorneys for Plaintiff, John T. Clark**

SCANNED