# U.S. District Court
## Middle District of Florida (Ft. Myers)
## CIVIL DOCKET FOR CASE #: 2:20-cv-00854-JLB-NPM

Drons v. Monsanto Company
Assigned to: Judge John L. Badalamenti
Referred to: Magistrate Judge Nicholas P. Mizell
Cause: 28:1332 Diversity-Product Liability

Date Filed: 10/28/2020
Jury Demand: Both
Nature of Suit: 365 Personal Inj. Prod. Liability
Jurisdiction: Diversity

**Plaintiff**

**Robert Drons**

represented by **Jesse Bernheim**
Bernheim Dolinsky Kelley, LLC
1936 S. Andrews Avenue
Fort Lauderdale, FL 33316
954/894-5900
Fax: 854/962-4224
Email: jbernheim@bkbblaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Monsanto Company**

represented by **Anthony Nolan Upshaw**
McDermott, Will & Emery, LLP
Suite 4500
333 SE 2nd Ave
Miami, FL 33131
305/358-3500
Fax: 305/347-6500
Email: aupshaw@mwe.com
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 10/28/2020 | 1 | COMPLAINT and NOTICE OF REMOVAL from Lee County, case number 20CA5203 filed in State Court on 08/07/2020. Filing fee $ 400, receipt number 113A-17482481 filed by Monsanto Company. (Attachments: # 1 State Court COMPLAINT, # 2 State Court Docket Sheet, # 3 Civil Cover Sheet)(Upshaw, Anthony) (Entered: 10/28/2020) |
| 10/28/2020 | 2 | NEW CASE ASSIGNED to Judge John L. Badalamenti and Magistrate Judge Nicholas P. Mizell. New case number: 2:20-cv-854-FtM-66NPM. (SJB) (Entered: 10/28/2020) |

| PACER Service Center | | |
|---|---|---|
| **Transaction Receipt** | | |
| 10/28/2020 15:54:18 | | |
| **PACER** | hllp1982:2634105:4722683 | **Client** | 1417.0049 |

Electronic Case Filing | U.S. District Court | Middle District of Florida

| Login: | | Code: | |
|---|---|---|---|
| **Description:** | Docket Report | **Search Criteria:** | 2:20-cv-00854-JLB-NPM |
| **Billable Pages:** | 1 | **Cost:** | 0.10 |

Filing # 111483810 E-Filed 08/07/2020 05:18:30 PM

IN THE CIRCUIT COURT OF THE TWENTIETH JUDICIAL CIRCUIT
IN AND FOR LEE COUNTY, FLORIDA

ROBERT DRONS,                                    Civil Action No.:

            Plaintiff,

v.

MONSANTO COMPANY, INC.

            Defendant

## COMPLAINT AND JURY DEMAND

NOW COMES the Plaintiff, Robert Drons, by and through his attorneys and in his Complaint at Law against Defendant Monsanto Company, Inc. (hereinafter referred to as "Monsanto"), hereby states as follows.

## I.   INTRODUCTION

1.   In 1970, Defendant Monsanto discovered the herbicidal properties of glyphosate and began marketing it in products in 1974 under the brand name Roundup®.

2.   Since that time, Defendant Monsanto has marketed and sold Roundup®, its formulations, and derivative products, including, but not limited to: RoundUp Quick-Pro, Roundup Concentrate Poison Ivy and Tough Brush Killer 1, Roundup Custom Herbicide, Roundup D-Pak Herbicide, Roundup Dry Concentrate, Roundup Export Herbicide, Roundup Fence & Hard Edger 1, Roundup Garden Foam Weed & Grass Killer, Roundup Grass and Weed Killer, Roundup Herbicide, Roundup Original 2k Herbicide, Roundup Original II Herbicide, Roundup Pro Concentrate, Roundup Prodry Herbicide, Roundup Promax, Roundup Quik Stik Grass and Weed Killer, Roundup Quikpro Herbicide, Roundup Rainfast Concentrate Weed & Grass Killer, Roundup Rainfast Super Concentrate Weed & Grass Killer, Roundup Ready- to-Use Extended

1

Control Weed & Grass Killer 1 Plus Weed Preventer, Roundup Ready-to-Use Weed & Grass Killer, Roundup Ready-to-Use Weed and Grass Killer 2, Roundup Ultra Dry, Roundup Ultra Herbicide, Roundup Ultramax, Roundup VM Herbicide, Roundup Weed & Grass Killer Concentrate, Roundup Weed & Grass Killer Concentrate Plus, Roundup Weed & Grass Killer Ready-to-Use Plus, Roundup Weed & Grass Killer Super Concentrate, Roundup Weed & Grass Killer 1 Ready-to-Use, Roundup WSD Water Soluble Dry Herbicide Deploy Dry Herbicide, or any other formulation of containing the active ingredient glyphosate, hereinafter referred to collectively as, "Roundup®" and/or "Roundup."

3.      Roundup® is a non-selective herbicide used to kill weeds that commonly compete with the growing of crops. By 2001, glyphosate had become the most-used active ingredient in American agriculture with 85–90 millions of pounds used annually. That number grew to 185 million pounds by 2007.[1] As of 2013, glyphosate was the world's most widely used herbicide.

4.      Defendant Monsanto is a multinational agricultural biotechnology corporation based in St. Louis, Missouri. It is the world's leading producer of glyphosate. As of 2009, Defendant Monsanto was the world's leading producer of seeds, accounting for 27% of the world seed market.[2] The majority of these seeds are of the Roundup Ready® brand. The stated advantage of Roundup Ready® crops is that they substantially improve a farmer's ability to control weeds, since glyphosate can be sprayed in the fields during the growing season without harming their crops. In 2010, an estimated 70% of corn and cotton, and 90% of soybean fields in the United States were Roundup Ready®.[3]

---

[1] Arthur Grube et al., U.S. Envtl. Prot. Agency, *Pesticides Industry Sales and Usage, 2006-2007 Market Estimates* 14 (2011), available at https://www.epa.gov/sites/production/files/2015-10/documents/market_estimates2007.pdf.
[2] ETC Group, *Who Will Control the Green Economy?* 22 (2011), available at http://www.etcgroup.org/files/publication/pdf_file/ETC_wwctge_4web_Dec2011.pdf.
[3] William Neuman & Andrew Pollack, *Farmers Cope With Roundup-Resistant Weeds*, N.Y. TIMES, May

5.      Monsanto's glyphosate products and glyphosate-based formulations are registered in 130 countries and approved for use on over 100 different crops.[4] They are ubiquitous in the environment. Numerous studies confirm that glyphosate is found in rivers, streams, and groundwater in agricultural areas where Roundup® is used.[5] It has been found in food,[6] in the urine of agricultural workers,[7] and even in the urine of urban dwellers who are not in direct contact with glyphosate.[8]

6.      On March 20, 2015, the International Agency for Research on Cancer ("IARC"), an agency of the World Health Organization ("WHO"), issued an evaluation of several herbicides, including glyphosate. That evaluation was based, in part, on studies of exposures to glyphosate in several countries around the world and it has traced the health implications from exposure to glyphosate since 2001.

7.      On July 29, 2015, IARC issued the formal monograph relating to glyphosate. In that monograph, the IARC Working Group provides a thorough review of the numerous studies and

---

3, 2010, available at http://www.nytimes.com/2010/05/04/business/energy-environment/04weed.html?pagewanted=all.

[4] Monsanto, *Backgrounder-History of Monsanto's Glyphosate Herbicides* (June 2005), available at https://monsanto.com/app/uploads/2017/06/back_history.pdf.

[5] *See* U.S. Geological Survey, *USGS Technical Announcement: Widely Used Herbicide Commonly Found in Rain and Streams in the Mississippi River Basin* (2011), available at https://archive.usgs.gov/archive/sites/www.usgs.gov/newsroom/article.asp-ID=2909.html; *see also* Nat'l Pesticide Info. Center, *Glyphosate: General Fact Sheet*, available at http://npic.orst.edu/factsheets/glyphogen.pdf.

[6] Thomas Bohn et al., *Compositional Differences in Soybeans on the Market: Glyphosate Accumulates in Roundup Ready GM Soybeans*, 153 FOOD CHEMISTRY 207 (2013), available at https://www.sciencedirect.com/science/article/pii/S0308814613019201.

[7] John F. Acquavella et al., *Glyphosate Biomonitoring for Farmers and Their Families: Results from the Farm Family Exposure Study*, 112(3) ENVTL. HEALTH PERSPECTIVES 321 (2004), available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC1241861/; Kathryn Z. Guyton et al., *Carcinogenicity of Tetrachlorvinphos, Parathion, Malathion, Diazinon & Glyphosate*, 112 IARC Monographs 76, section 5.4 (2015), available at http://www.thelancet.com/journals/lanonc/article/PIIS1470-2045(15)70134-8/fulltext.

[8] Dirk Brändli & Sandra Reinacher, *Herbicides found in Human Urine*, 1 ITHAKA JOURNAL 270 (2012), available at http://www.ithaka-journal.net/druckversionen/e052012-herbicides-urine.pdf.

data relating to glyphosate exposure in humans.

8.      The IARC Working Group classified glyphosate as a Group 2A carcinogen, which means that it is probably carcinogenic to humans. The IARC Working Group concluded that the cancers most associated with glyphosate exposure are non-Hodgkin's lymphoma and other hematopoietic cancers, including lymphocytic lymphoma/chronic lymphocytic leukemia, B-cell lymphoma, and multiple myeloma.[9]

9.      The IARC evaluation is significant. It confirms what has been believed for years: that glyphosate is toxic to humans.

10.      More likely than not, glyphosate causes non-Hodgkin's lymphoma.

11.      More likely than not, glyphosate-based formulations cause non-Hodgkin's lymphoma.

12.      More likely than not, Roundup causes non-Hodgkin's lymphoma.

13.      Nevertheless, Defendant Monsanto, since it began selling Roundup®, has represented it as safe to humans and the environment. Indeed, Defendant Monsanto has repeatedly proclaimed and continues to proclaim to the world, and particularly to United States consumers, that glyphosate-based herbicides, including Roundup®, create no unreasonable risks to human health or to the environment.

II.      **JURISDICTION AND VENUE**

14.      This Court has jurisdiction over the Defendant pursuant to F.S. §§ 48.193 (1)(a), (6)(b), and (9)(2) because Monsanto transacts business in Florida and maintains sufficient contacts with the State of Florida such that this Court's exercise of personal jurisdiction over it does not

---

[9] See Guyton et al., *Carcinogenicity of Tetrachlorvinphos, Parathion, Malathion, Diazinon & Glyphosate, supra.*

4

offend traditional notions of fair play and substantial justice.

15.     Venue is proper is this Judicial District pursuant to F.S. §§ 47.011 and 47.051.

III.    **THE PARTIES**

### Plaintiff

14.     Plaintiff Robert Drons is currently a citizen of the city of Bonita Springs, Lee County, Florida.

15.     In May 2012, Robert Drons, then a 70-year-old citizen of Florida was diagnosed with non-Hodgkin's lymphoma.

16.     For over forty years, Robert Drons regularly used Roundup® products at his at his home multiple times per month.

### Defendants

17.     Monsanto Company, Inc. is a Delaware corporation, with its headquarters and principal place of business in St. Louis, Missouri, is authorized to do business in the across the United States including Florida and conducted significant business within this judicial district at all times relevant herein.

18.     At all times relevant to this complaint, Defendant Monsanto discovered the herbicidal properties of glyphosate and was the manufacturer of Roundup®.

19.     Defendant Monsanto has regularly transacted and conducted business within this judicial district for years, and has derived substantial revenue from goods and products, including Roundup®, used in this judicial district during that same time.

20.     Defendant Monsanto expected or should have expected their acts to have consequences within the State of Florida, and derived substantial revenue from interstate commerce.

21.     Plaintiff is informed and believes that Defendant Monsanto did design, formulate,

5

sell, advertise, manufacture, and/or distribute Roundup® with full knowledge of its dangerous and defective nature.

22.     Plaintiff is informed and believes that in committing the acts alleged herein, each and every managing agent, agent, representative and/or employee of the Defendant was working within the course and scope of said agency, representation and/or employment with the knowledge, consent, ratification, and authorization of the Defendant and their directors, officers and/or managing agents.

## IV.     FACTS COMMON TO ALL COUNTS

23.     At all times relevant to this complaint, Monsanto was the entity that discovered the herbicidal properties of glyphosate and the manufacturer of Roundup®, which contains the active ingredient glyphosate and the surfactant POEA, as well as adjuvants and other "inert" ingredients.

24.     Glyphosate is a broad-spectrum, non-selective herbicide used in a wide variety of herbicidal products around the world.

25.     Plants treated with glyphosate translocate the systemic herbicide to their roots, shoot regions and fruit, where it interferes with the plant's ability to form aromatic amino acids necessary for protein synthesis. Treated plants generally die within two to three days. Because plants absorb glyphosate, it cannot be completely removed by washing or peeling produce or by milling, baking, or brewing grains.

26.     For nearly 40 years, farms across the world have used Roundup® without knowing of the dangers its use poses. That is because when Defendant Monsanto first introduced Roundup®, it touted glyphosate as a technological breakthrough: it could kill almost every weed without causing harm either to people or to the environment. Of course, history has shown that not

to be true. According to the WHO, the main chemical ingredient of Roundup®—glyphosate—is a probable cause of cancer. Defendant Monsanto assured the public that Roundup® was harmless. In order to prove this, Defendant Monsanto championed falsified data and attacked legitimate studies that revealed its dangers. Defendant Monsanto led a prolonged campaign of misinformation to convince government agencies, farmers and the general population that Roundup® was safe.

### The Discovery of Glyphosate and Development of Roundup®

27.     The herbicidal properties of glyphosate were discovered in 1970 by Defendant Monsanto chemist John Franz. The first glyphosate-based herbicide was introduced to the market in the mid-1970s under the brand name Roundup®.[10] From the outset, Defendant Monsanto marketed Roundup® as a "safe" general-purpose herbicide for widespread commercial and consumer use. It still markets Roundup® as safe today.[11]

28.     In addition to the active ingredient glyphosate, Roundup® formulations also contain adjuvants and other chemicals such as the surfactant POEA, which are considered "inert" and therefore protected as "trade secrets" in manufacturing. Growing evidence suggests that these adjuvants and additional components of Roundup® formulations are not, in fact, inert and are toxic in their own right.

### Registration of Herbicides under Federal Law

29.     The manufacture, formulation, and distribution of herbicides, such as Roundup®, are regulated under the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA" or "Act"), 7 U.S.C. § 136 et seq. FIFRA requires that all pesticides be registered with the Environmental

---

[10] Monsanto, *Backgrounder-History of Monsanto's Glyphosate Herbicides* (June 2005), *supra*.
[11] *See* Monsanto, *Crop Protection*, https://www.cropscience.bayer.com/customer-updates / (last visited July 13, 2020).

Protection Agency ("EPA" or "Agency") prior to their distribution, sale, or use, except as described by the Act. 7 U.S.C. § 136a(a)

30.     Because pesticides are toxic to plants, animals, and humans, at least to some degree, the EPA requires as part of the registration process, among other things, a variety of tests to evaluate the potential for exposure to pesticides, toxicity to people and other potential non-target organisms, and other adverse effects on the environment. Registration by the EPA, however, is not an assurance or finding of safety. The determination the Agency must make in registering or re-registering a product is not that the product is "safe," but rather that use of the product in accordance with its label directions "will not generally cause unreasonable adverse effects on the environment." 7 U.S.C. § 136a(c)(5)(D).

31.     FIFRA defines "unreasonable adverse effects on the environment" to mean "any unreasonable risk to man or the environment, taking into account the economic, social, and environmental costs and benefits of the use of any pesticide." 7 U.S.C. § 136(bb). FIFRA thus requires EPA to make a risk/benefit analysis in determining whether a registration should be granted or allowed to continue to be sold in commerce.

32.     The EPA and the State of Florida registered Roundup® for distribution, sale, and manufacture in the United States and the State of Florida.

33.     FIFRA generally requires that the registrant, Defendant Monsanto in the case of Roundup®, conducts the health and safety testing of pesticide products. The EPA has protocols governing the conduct of tests required for registration and the laboratory practices that must be followed in conducting these tests. The data produced by the registrant must be submitted to the EPA for review and evaluation. The government is not required, nor is it able, however, to perform the product tests that are required of the manufacturer.

34.     The evaluation of each pesticide product distributed, sold, or manufactured is completed at the time the product is initially registered. The data necessary for registration of a pesticide has changed over time. The EPA is now in the process of re-evaluating all pesticide products through a Congressionally- mandated process called "re-registration." 7 U.S.C. § 136a-1. In order to reevaluate these pesticides, the EPA is demanding the completion of additional tests and the submission of data for the EPA's review and evaluation.

35.     In the case of glyphosate, and therefore Roundup®, the EPA had planned on releasing its preliminary risk assessment —in relation to the reregistration process—no later than July 2015. The EPA completed its review of glyphosate in early 2015, but it delayed releasing the risk assessment pending further review in light of the WHO's health-related findings.

### Scientific Fraud Underlying the Marketing and Sale of Glyphosate/Roundup

36.     Based on early studies that glyphosate could cause cancer in laboratory animals, the EPA originally classified glyphosate as *possibly carcinogenic to humans* (Group C) in 1985. After pressure from Defendant Monsanto, including contrary studies it provided to the EPA, the EPA changed its classification to *evidence of non-carcinogenicity in humans* (Group E) in 1991. In so classifying glyphosate, however, the EPA made clear that the designation did not mean the chemical does not cause cancer: "It should be emphasized, however, that designation of an agent in Group E is based on the available evidence at the time of evaluation and should not be interpreted as a definitive conclusion that the agent will not be a carcinogen under any circumstances."[12]

37.     On two occasions, the EPA found that the laboratories hired by Defendant

---

[12] U.S. Envtl. Prot. Agency, *Memorandum, Subject: SECOND Peer Review of Glyphosate 1* (1991), available at https://archive.epa.gov/pesticides/chemicalsearch/chemical/foia/web/pdf/103601/417300-1991-10-30a.pdf.

Monsanto to test the toxicity of its Roundup® products for registration purposes committed fraud.

38.     In the first instance, Defendant Monsanto, in seeking initial registration of Roundup® by EPA, hired Industrial Bio-Test Laboratories ("IBT") to perform and evaluate pesticide toxicology studies relating to Roundup®.[13] IBT performed about 30 tests on glyphosate and glyphosate-based formulations, including nine of the 15 residue studies needed to register Roundup®.

39.     In 1976, the United States Food and Drug Administration ("FDA") performed an inspection of Industrial Bio-Test Industries ("IBT") that revealed discrepancies between the raw data and the final report relating to the toxicological impacts of glyphosate. The EPA subsequently audited IBT; it too found the toxicology studies conducted for the Roundup® herbicide to be invalid.[14] An EPA reviewer stated, after finding "routine falsification of data" at IBT, that it was "hard to believe the scientific integrity of the studies when they said they took specimens of the uterus from male rabbits."[15]

40.     Three top executives of IBT were convicted of fraud in 1983.

41.     In the second incident of data falsification, Defendant Monsanto hired Craven

---

[13] Monsanto, *Backgrounder, Testing Fraud: IBT and Craven Laboratories* (June 2005), available at https://monsanto.com/app/uploads/2017/06/ibt_craven_bkg.pdf.

[14] U.S. Envtl. Prot. Agency, *Summary of the IBT Review Program Office of Pesticide Programs* (1983), available at https://nepis.epa.gov/Exe/ZyNET.exe/91014ULV.TXT?ZyActionD=ZyDocument&Client=EPA&Index=1981+Thru+1985&Docs=&Query=&Time=&EndTime=&SearchMethod=1&TocRestrict=n&Toc=&TocEntry=&QField=&QFeldYear=&QFieldMonth=&QFieldDay=&IntQFieldOp=0&ExtQFieldOp=0&XmlQuery=&File=D%3A%5Czyfiles%5CIndex%20Data%5C81thru85%5CTxt%5C00000022%5C91014ULV.txt&User=ANONYMOUS&Password=anonymous&SortMethod=h%7C&MaximumDocuments=1&FuzzyDegree=0&ImageQuality=r75g8/r75g8/x150y150g16/i425&Display=hpfr&DefSeekPage=x&SearchBack=ZyActionL&Back=ZyActionS&BackDesc=Results%20page&MaximumPages=1&ZyEntry=1&SeekPage=x&ZyPURL.

[15] Marie-Monique Robin, *The World According to Monsanto: Pollution, Corruption and the Control of the World's Food Supply* (2011) (*citing* U.S. Envtl. Prot. Agency, *Data Validation, Memo from K. Locke, Toxicology Branch, to R. Taylor, Registration Branch.* Washington, D.C. (August 9, 1978)).

Laboratories in 1991 to perform pesticide and herbicide studies, including for Roundup®. In that same year, the owner of Craven Laboratories and three of its employees were indicted, and later convicted, of fraudulent laboratory practices in the testing of pesticides and herbicides.[16]

42.     Despite the falsity of the tests that underlie its registration, within a few years of its launch, Defendant Monsanto was marketing Roundup® in 115 countries.

### *The Importance of Roundup® to Defendant Monsanto's Market Dominance Profits*

43.     The success of Roundup® was key to Defendant Monsanto's continued reputation and dominance in the marketplace. Largely due to the success of Roundup® sales, Defendant Monsanto's agriculture division was outperforming its chemicals division's operating income, and that gap increased yearly. But with its patent for glyphosate expiring in the United States in the year 2000, Defendant Monsanto needed a strategy to maintain its Roundup® market dominance and to ward off impending competition.

44.     In response, Defendant Monsanto began the development and sale of genetically engineered Roundup Ready® seeds in 1996. Since Roundup Ready® crops are resistant to glyphosate; farmers can spray Roundup® onto their fields during the growing season without harming the crop. This allowed Defendant Monsanto to expand its market for Roundup® even further.

45.     By 2000, Defendant Monsanto's biotechnology seeds were planted on more than 80 million acres worldwide and nearly 70% of American soybeans were planted from Roundup Ready® seeds. It also secured Defendant Monsanto's dominant share of the glyphosate/Roundup® market through a marketing strategy that coupled proprietary Roundup Ready® seeds with continued sales of its Roundup® herbicide.

---

[16] Monsanto, *Backgrounder, Testing Fraud: IBT and Craven Laboratories, supra.*

11

46.     Through a three-pronged strategy of increased production, decreased prices and by coupling Roundup® with Roundup Ready® seeds, Roundup® became Defendant Monsanto's most profitable product. In 2000, Roundup® accounted for almost $2.8 billion in sales, outselling other herbicides by a margin of five to one, and accounting for close to half of Defendant Monsanto's revenue.[17] Today, glyphosate remains one of the world's largest herbicides by sales volume.

*Defendant Monsanto has known for decades that it falsely advertises the safety of Roundup®*

47.     In 1996, the New York Attorney General ("NYAG") filed a lawsuit against Defendant Monsanto based on its false and misleading advertising of Roundup® products. Specifically, the lawsuit challenged Defendant Monsanto's general representations that its spray-on glyphosate-based herbicides, including Roundup®, were **"safer than table salt"** and **"practically non-toxic"** to mammals, birds, and fish. Among the representations the NYAG found deceptive and misleading about the human and environmental safety of Roundup® are the following:

a)  Remember that environmentally friendly Roundup herbicide is biodegradable. It won't build up in the soil so you can use Roundup with confidence along customers' driveways, sidewalks and fences …

b)  And remember that Roundup is biodegradable and won't build up in the soil. That will give you the environmental confidence you need to use Roundup everywhere you've got a weed, brush, edging or trimming problem.

c)  Roundup biodegrades into naturally occurring elements.

d)  Remember that versatile Roundup herbicide stays where you put it. That means there's no washing or leaching to harm customers' shrubs or other desirable vegetation.

e)  This non-residual herbicide will not wash or leach in the soil. It …

---

[17] David Barboza, *The Power of Roundup; A Weed Killer Is a Block for Monsanto to Build On*, N.Y. TIMES, Aug. 2, 2001, available at http://www.nytimes.com/2001/08/02/business/the-power-of-roundup-a-weed-killer-is-a-block- for-monsanto-to-build-on.html.

stays where you apply it.

f) You can apply Accord with "confidence because it will stay where you put it" it bonds tightly to soil particles, preventing leaching. Then, soon after application, soil microorganisms biodegrade Accord into natural products.

g) Glyphosate is less toxic to rats than table salt following acute oral ingestion.

h) Glyphosate's safety margin is much greater than required. It has over a 1,000-fold safety margin in food and over a 700-fold safety margin for workers who manufacture it or use it.

i) You can feel good about using herbicides by Monsanto. They carry a toxicity category rating of 'practically non-toxic' as it pertains to mammals, birds and fish.

j) "Roundup can be used where kids and pets will play and breaks down into natural material." This ad depicts a person with his head in the ground and a pet dog standing in an area which has been treated with Roundup.[18]

48.     On November 19, 1996, Defendant Monsanto entered into an Assurance of Discontinuance with NYAG, in which Defendant Monsanto agreed, among other things, "to cease and desist from publishing or broadcasting any advertisements [in New York] that represent, directly or by implication" that:

a) its glyphosate-based pesticide products or any component thereof are safe, non-toxic, harmless or free from risk.

b) its glyphosate-based pesticide products or any component thereof manufactured, formulated, distributed or sold by Monsanto are biodegradable

c) its glyphosate-based pesticide products or any component thereof stay where they are applied under all circumstances and will not move through the environment by any means.

d) its glyphosate-based pesticide products or any component thereof are "good" for the environment or are "known for their environmental characteristics."

e) glyphosate-based pesticide products or any component thereof are safer or less toxic than common consumer products other than herbicides;

---

[18] Attorney General of the State of New York, in the Matter of Monsanto Company, Assurance of Discontinuance Pursuant to Executive Law § 63(15) (Nov. 1996).

13

f) its glyphosate-based formulations or any component thereof might be classified as "practically non-toxic."

49.     Defendant Monsanto did not alter its advertising in the same manner in any state other than New York, and on information and belief still has not done so today.

50.     In 2009, France's highest court ruled that Defendant Monsanto had not told the truth about the safety of Roundup®. The French court affirmed an earlier judgement that Defendant Monsanto had falsely advertised its herbicide Roundup® as "biodegradable" and that it "left the soil clean."[19]

### Classifications and Assessments of Glyphosate

51.     The IARC process for the classification of glyphosate followed the stringent procedures for the evaluation of a chemical agent. Over time, the IARC Monograph program has reviewed 980 agents. Of those reviewed, it has determined 116 agents to be Group 1 (Known Human Carcinogens); 73 agents to be Group 2A (Probable Human Carcinogens); 287 agents to be Group 2B (Possible Human Carcinogens); 503 agents to be Group 3 (Not Classified); and one agent to be Probably Not Carcinogenic.

52.     The established procedure for IARC Monograph evaluations is described in the IARC Program's Preamble.[20] Evaluations are performed by panels of international experts, selected on the basis of their expertise and the absence of actual or apparent conflicts of interest.

53.     One year before the Monograph meeting, the meeting is announced and there is a call both for data and for experts. Eight months before the Monograph meeting, the Working Group membership is selected and the sections of the Monograph are developed by the Working

---

[19] *Monsanto Guilty in 'False Ad' Row*, BBC, Oct. 15, 2009, available at http://news.bbc.co.uk/2/hi/europe/8308903.stm.
[20] World Health Org., *IARC Monographs on the Evaluation of Carcinogenic Risks to Humans: Preamble* (2006), available at http://monographs.iarc.fr/ENG/Preamble/CurrentPreamble.pdf.

Group members. One month prior to the Monograph meeting, the call for data is closed and the various draft sections are distributed among Working Group members for review and comment. Finally, at the Monograph meeting, the Working Group finalizes review of all literature, evaluates the evidence in each category, and completes the overall evaluation. Within two weeks after the Monograph meeting, the summary of the Working Group findings are published in Lancet Oncology, and within a year after the meeting, the final Monograph is finalized and published.

54.     In assessing an agent, the IARC Working Group reviews the following information: (a) human, experimental, and mechanistic data; (b) all pertinent epidemiological studies and cancer bioassays; and (c) representative mechanistic data. The studies must be publicly available and have sufficient detail for meaningful review, and reviewers cannot be associated with the underlying study.

55.     In March 2015, IARC reassessed glyphosate. The summary published in *The Lancet Oncology* reported that glyphosate is a Group 2A agent and probably carcinogenic in humans.

56.     On July 29, 2015, IARC issued its Monograph for glyphosate, Monograph 112. For Volume 112, the volume that assessed glyphosate, a Working Group of 17 experts from 11 countries met at IARC from March 3–10, 2015, to assess the carcinogenicity of certain herbicides, including glyphosate. The March meeting culminated nearly a one-year review and preparation by the IARC Secretariat and the Working Group, including a comprehensive review of the latest available scientific evidence. According to published procedures, the Working Group considered "reports that have been published or accepted for publication in the openly available scientific literature" as well as "data from governmental reports that are publicly available."

57.     The studies considered the following exposure groups: occupational exposure of farmers and tree nursery workers in the United States, forestry workers in Canada and Finland and

municipal weed-control workers in the United Kingdom; and para-occupational exposure in farming families.

58.     Glyphosate was identified as the second-most used household herbicide in the United States for weed control between 2001 and 2007 and the most heavily used herbicide in the world in 2012.

59.     Exposure pathways are identified as air (especially during spraying), water, and food. Community exposure to glyphosate is widespread and found in soil, air, surface water, and groundwater, as well as in food.

60.     The assessment of the IARC Working Group identified several case-control studies of occupational exposure in the United States, Canada, and Sweden. These studies show a human health concern from agricultural and other work-related exposure to glyphosate.

61.     The IARC Working Group found an increased risk between exposure to glyphosate and non-Hodgkin's lymphoma ("NHL") and several subtypes of NHL, and the increased risk persisted after adjustment for other pesticides.

62.     The IARC Working Group also found that glyphosate caused DNA and chromosomal damage in human cells. One study in community residents reported increases in blood markers of chromosomal damage (micronuclei) after glyphosate formulations were sprayed.

63.     In male CD-1 mice, glyphosate induced a positive trend in the incidence of a rare tumor, renal tubule carcinoma. A second study reported a positive trend for hemangiosarcoma in male mice. Glyphosate increased pancreatic islet-cell adenoma in male rats in two studies. A glyphosate formulation promoted skin tumors in an initiation-promotion study in mice.

64.     The IARC Working Group also noted that glyphosate has been detected in the urine of agricultural workers, indicating absorption. Soil microbes degrade glyphosate to

aminomethylphosphoric acid (AMPA). Blood AMPA detection after exposure suggests intestinal microbial metabolism in humans.

65.     The IARC Working Group further found that glyphosate and glyphosate formulations induced DNA and chromosomal damage in mammals, and in human and animal cells in utero.

66.     The IARC Working Group also noted genotoxic, hormonal, and enzymatic effects in mammals exposed to glyphosate.[21] Essentially, glyphosate inhibits the biosynthesis of aromatic amino acids, which leads to several metabolic disturbances, including the inhibition of protein and secondary product biosynthesis and general metabolic disruption.

67.     The IARC Working Group also reviewed an Agricultural Health Study, consisting of a prospective cohort of 57,311 licensed pesticide applicators in Iowa and North Carolina.[22] While this study differed from others in that it was based on a self- administered questionnaire, the results support an association between glyphosate exposure and Multiple Myeloma, Hairy Cell Leukemia (HCL), and Chronic Lymphocytic Leukemia (CLL), in addition to several other cancers.

### *Other Earlier Findings About Glyphosate's Dangers to Human Health*

68.     The EPA has a technical fact sheet, as part of its Drinking Water and Health, National Primary Drinking Water Regulations publication, relating to glyphosate. This technical fact sheet predates the IARC March 20, 2015, evaluation. The fact sheet describes the release patterns for glyphosate as follows:

**Release Patterns**

---

[21] Guyton et al., Carcinogenicity of Tetrachlorvinphos, Parathion, Malathion, Diazinon & Glyphosate, supra at 77.
[22] Anneclare J. De Roos et al., Cancer Incidence Among Glyphosate-Exposed Pesticide Applicators in the Agricultural Health Study, 113 Envt'l Health Perspectives 49-54 (2005), available at http://www.ncbi.nlm.nih.gov/pmc/articles/PMC1253709/pdf/ehp0113-000049.pdf.

Glyphosate is released to the environment in its use as an herbicide for controlling woody and herbaceous weeds on forestry, right-of-way, cropped and non-cropped sites. These sites may be around water and in wetlands. It may also be released to the environment during its manufacture, formulation, transport, storage, disposal and cleanup, and from spills. Since glyphosate is not a listed chemical in the Toxics Release Inventory, data on releases during its manufacture and handling are not available.[23]

69.     Occupational workers and home gardeners may be exposed to glyphosate by inhalation and dermal contact during spraying, mixing, and cleanup. They may also be exposed by touching soil and plants to which glyphosate was applied. Occupational exposure may also occur during glyphosate's manufacture, transport storage, and disposal.

70.     In 1995, the Northwest Coalition for Alternatives to Pesticides reported that in California, the state with the most comprehensive program for reporting of pesticide-caused illness, glyphosate was the third most commonly reported cause of pesticide illness among agricultural workers.[24]

### The Toxicity of Other Ingredients in Roundup®

71.     In addition to the toxicity of the active ingredient glyphosate, several studies support the hypothesis that the glyphosate-based formulation in Defendant's Roundup® products is more dangerous and toxic than glyphosate alone. Indeed, as early as 1991, available evidence demonstrated that glyphosate formulations were significantly more toxic than glyphosate alone.[25]

---

[23] Nat'l Pesticide Info. Center, *Glyphosate: General Fact Sheet*, supra.
[24] Caroline Cox, *Glyphosate, Part 2: Human Exposure and Ecological Effects*, 15 J. PESTICIDE REFORM 4 (1995); W.S. Peas et al., *Preventing pesticide-related illness in California agriculture: Strategies and priorities. Environmental Health Policy Program Report*, Univ. of Cal. School of Public Health, Calif. Policy Seminar (1993). [25] Martinez, T.T. and K. Brown, *Oral and pulmonary toxicology of the surfactant used in Roundup herbicide*, PROC. WEST. PHARMACOL. SOC. 34:43-46 (1991).
[25] Martinez, T.T. and K. Brown, *Oral and pulmonary toxicology of the surfactant used in Roundup*

18

72.    In 2002, a study by Julie Marc, entitled "Pesticide Roundup Provokes Cell Division Dysfunction at the Level of CDK1/Cyclin B Activation," revealed that Roundup® causes delays in the cell cycles of sea urchins but that the same concentrations of glyphosate alone were ineffective and did not alter cell cycles.[26]

73.    A 2004 study by Marc and others, entitled "Glyphosate-based pesticides affect cell cycle regulation," demonstrated a molecular link between glyphosate-based products and cell cycle dysregulation. The researchers noted that "cell cycle dysregulation is a hallmark of tumor cells and human cancer. Failure in the cell cycle checkpoints leads to genomic instability and subsequent development of cancer from the initial affect cell." Further, "[s]ince cell cycle disorder such as cancer result from dysfunctions of a unique cell, it was of interest to evaluate the threshold dose of glyphosate affecting the cells."[27]

74.    In 2005, a study by Francisco Peixoto entitled "Comparative effects of Roundup® and glyphosate on mitochondrial oxidative phosphorylation," demonstrated that Roundup®'s effects on rat liver mitochondria are far more toxic than equal concentrations of glyphosate alone. The Peixoto study further suggested that the harmful effects of Roundup® on mitochondrial bioenergetics could not be exclusively attributed to glyphosate but could be the result of other chemicals, such as the surfactant POEA, or in the alternative, due to a potential synergic effect between glyphosate and other ingredients in the Roundup® formulation.[28]

---

*herbicide*, PROC. WEST. PHARMACOL. SOC. 34:43-46 (1991).

[26] Julie Marc, et al., *Pesticide Roundup Provokes Cell Division Dysfunction at the Level of CDK1/Cyclin B Activation*, 15 CHEM. RES. TOXICOL. 326-331 (2002), available at http://pubs.acs.org/doi/full/10.1021/tx015543g.

[27] Julie Marc, et al., *Glyphosate-based pesticides affect cell cycle regulation*, 96 BIOLOGY OF THE CELL 245, 245-249 (2004), available at https://www.ncbi.nlm.nih.gov/pubmed/15182708.

[28] Francisco Peixoto, *Comparative effects of the Roundup and glyphosate on mitochondrial oxidative phosphorylation*, 61 CHEMOSPHERE 1115, 1122 (2005), available at https://www.ncbi.nlm.nih.gov/pubmed/16263381.

75.     In 2009, Nora Benachour and Gilles-Eric Seralini published a study examining the effects of Roundup® and glyphosate on human umbilical, embryonic, and placental cells. The study tested dilution levels of Roundup® and glyphosate that were far below agricultural recommendations, corresponding with low levels of residue in food. The researchers ultimately concluded that supposed "inert" ingredients, and possibly POEA, alter human cell permeability and amplify toxicity of glyphosate alone. The researchers further suggested that assessments of glyphosate toxicity should account for the presence of adjuvants or additional chemicals used in the formulation of the complete pesticide. The study confirmed that the adjuvants present in Roundup® are not, in fact, inert and that Roundup® is potentially far more toxic than its active ingredient glyphosate alone.[29]

76.     The results of these studies were at all times available to Monsanto. Monsanto thus knew or should have known that Roundup® was, and is more toxic than glyphosate alone and that safety studies of Roundup®, Roundup®'s adjuvants and "inert" ingredients, and/or the surfactant POEA were necessary to protect Plaintiff from Roundup®.

77.     Despite its knowledge that Roundup® is considerably more dangerous than glyphosate alone, Monsanto continued to promote Roundup® as safe.

### *Recent Worldwide Bans on Roundup®/Glyphosate*

78.     Several countries around the world have instituted bans on the sale of Roundup® and other glyphosate-based herbicides, both before and since IARC first announced its assessment for glyphosate in March 2015, and more countries undoubtedly will follow suit in light of the as the dangers of the use of Roundup® are more widely known.

---

[29] Nora Benachour, et al., *Glyphosate Formulations Induce Apoptosis and Necrosis in Human Umbilical, Embryonic, and Placental Cells*, 22 CHEM. RES. TOXICOL. 97-105 (2008), available at http://big.assets.huffingtonpost.com/france.pdf.

79.      The Netherlands issued a ban on all glyphosate-based herbicides in April 2014, including Roundup®, which takes effect by the end of 2015. In issuing the ban, the Dutch Parliament member who introduced the successful legislation stated: "Agricultural pesticides in user-friendly packaging are sold in abundance to private persons. In garden centers, Roundup® is promoted as harmless, but unsuspecting customers have no idea what the risks of this product are. Especially children are sensitive to toxic substances and should therefore not be exposed to it."[30]

80.      The Brazilian Public Prosecutor in the Federal District requested that the Brazilian Justice Department suspend the use of glyphosate.[31]

81.      France banned the private sale of Roundup® and glyphosate following the IARC assessment for Glyphosate.[32]

82.      Bermuda banned both the private and commercial sale of glyphosates, including Roundup®. The Bermuda government explained its ban as follows: "Following a recent scientific study carried out by a leading cancer agency, the importation of weed spray 'Roundup' has been suspended."[33]

83.      The Sri Lankan government banned the private and commercial use of

---

[30] *Holland's Parliament Bans Glyphosate Herbicides*, The Real Agenda, April 14, 2014, available at http://real- agenda.com/hollands-parliament-bans-glyphosate-herbicides/.

[31] Christina Sarich, *Brazil's Public Prosecutor Wants to Ban Monsanto's Chemicals Following Recent Glyphosate- Cancer Link*, GLOBAL RESEARCH, MAY 14, 2015, available at https://www.globalresearch.ca/brazils-public- prosecutor-wants-to-ban-monsantos-chemicals-following-recent-glyphosate-cancer-link/5449440; see Ministério Público Federal, *MPF/DF reforça pedido para que glifosato seja banido do Mercado nacional*, April 14, 2015, available at http://www.mpf.mp.br/df/sala-de-imprensa/noticias-df/mpf-df-reforca-pedido-para-que-glifosato-seja-banido-do-mercado-nacional.

[32] Zoe Schlanger, *France Bans Sales of Monsanto's Roundup in Garden Centers, 3 Months After U.N. Calls it "Probable Carcinogen"*, NEWSWEEK, JUNE 15, 2015, available at http://www.newsweek.com/france-bans-sale- monsantos-roundup-garden-centers-after-un-names-it-probable-343311.

[33] *Health Minister: Importation of Roundup Weed Spray Suspended*, Today in Bermuda, May 11, 2015, available at http://bernews.com/2015/05/importation-weed-spray-round-suspended/.

glyphosates, particularly out of concern that glyphosate has been linked to fatal kidney disease in agricultural workers.[34]

84.     The government of Columbia announced its ban on using Roundup® and glyphosate to destroy illegal plantations of coca, the raw ingredient for cocaine, because of the WHO's finding that glyphosate is probably carcinogenic.[35]

### *Proposition 65 Listing*

85.     On September 4, 2015, California's Office of Environmental Health Hazard Assessment ("OEHHA") published a notice of intent to include glyphosate on the state's list of known carcinogens under Proposition 65.[36] California's Safe Drinking Water and Toxic Enforcement Act of 1986 (informally known as "Proposition 65"), requires the state to maintain and, at least, once a year, revise and republish a list of chemicals "known to the State of California to cause cancer or reproductive toxicity."[37] The OEHHA determined that glyphosate met the criteria for the listing mechanism under the Labor Code following the IARC's assessment of the chemical.[38]

86.     The listing process under the Labor Code is essentially automatic. The list of known carcinogens, at a minimum, must include substances identified by reference in Labor Code

---

[34] *Sri Lanka's New President Puts Immediate Ban on Glyphosate Herbicides*, Sustainable Pulse, May 25, 2015, available at https://sustainablepulse.com/2015/05/25/sri-lankas-new-president-puts-immediate-ban-on-glyphosate- herbicides/.
[35] *Columbia to ban coca spraying herbicide glyphosate*, BBC, May 10, 2015, available at http://www.bbc.com/news/world-latin-america-32677411.
[36] Cal. Envtl. Prot. Agency Office of Envtl. Health Hazard Assessment, *Notice of Intent to List Chemicals by the Labor Code Mechanism: Tetrachlorvinphos, Parathion, Malathion, Glyphosate* (Sept. 4, 2015), available at https://oehha.ca.gov/proposition-65/crnr/notice-intent-list-tetrachlorvinphos-parathion-malathion-glyphosate.
[37] Frequently Asked Questions, STATE OF CAL. DEPT OF JUSTICE, OFFICE OF THE ATTORNEY GENERAL, available at http://oag.ca.gov/prop65/faq.
[38] Cal. Envtl. Prot. Agency Office of Envtl. Health Hazard Assessment, *Notice of Intent to List Chemicals by the Labor Code Mechanism: Tetrachlorvinphos, Parathion, Malathion. Glyphosate*, *supra*.

§ 6382(b)(1). That section of the Labor Code identifies "[s]ubstances listed as human or animal carcinogens by the International Agency for Research on Cancer (IARC)." The IARC's classification of glyphosate as a Group 2A chemical ("probably carcinogenic to humans") therefore triggered the listing.

87.     A business that deploys a listed chemical in its products must provide "clear and reasonable warnings" to the public prior to exposure to the chemical. To be clear and reasonable, a warning must "(1) clearly communicate that the chemical is known to cause cancer, and/or birth defects or other reproductive harm; and (2) effectively reach the person before exposure."[39] The law also prohibits the discharge of listed chemicals into drinking water.

88.     Monsanto disputed the listing decision and, in January 2016, filed a lawsuit against OEHHA and the agency's acting director, Lauren Zeise, in California state court, seeking declaratory and injunctive relief to prevent OEHHA from listing glyphosate.[40]

89.     Monsanto alleged that OEHHA's exclusive reliance of the IARC decision signified that "OEHHA effectively elevated the determination of an ad hoc committee of an unelected, foreign body, which answers to no United States official (let alone any California state official), over the conclusions of its own scientific experts."[41] Monsanto further alleged that the Labor Code listing mechanism presented various constitutional violations because it "effectively empowers an unelected, undemocratic, unaccountable, and foreign body to make laws applicable in California."[42] Among other things, Monsanto argued that Proposition 65's requirement to provide

---

[39] *Frequently Asked Questions*, STATE OF CAL. DEPARTMENT OF JUSTICE, OFFICE OF THE ATTORNEY GENERAL, *supra*.
[40] Monsanto Company's Verified Petition for Writ of Mandate and Complaint for Preliminary and Permanent Injunctive and Declaratory Relief, *Monsanto Co. v. Office of the Envt'l Health Hazard Assessment, et al.*, No. 16- CECG-00183 (Cal. Super. Ct.).
[41] *Id.* at 2.
[42] *Id.* at 3.

a "clear and reasonable warning" to consumers that the chemical is a known carcinogen would damage its reputation and violate First Amendment rights.[43]

90.      On November 12, 2015, the European Food Safety Authority ("EFSA"), the European Union's primary agency for food safety, reported on its evaluation of the Renewal Assessment Report ("RAR") on glyphosate.[44] The Rapporteur Member State assigned to glyphosate, the German Federal Institute for Risk Assessment ("BfR"), had produced the RAR as part of the renewal process for glyphosate in the EU.

91.      The BfR sent its draft RAR to the EFSA and the RAR underwent a peer review process by EFSA, other member states, and industry groups. As part of the on-going peer review of Germany's reevaluation of glyphosate, the EFSA had also received a second mandate from the European Commission to consider the IARC's findings regarding the potential carcinogenicity of glyphosate and glyphosate-containing products.

92.      Based on a review of the RAR, which included data from industry-submitted unpublished studies, the EFSA sent its own report ("Conclusion") to the European Commission, finding that "glyphosate is unlikely to pose a carcinogenic hazard to humans and the evidence does not support classification with regard to its carcinogenic potential according to Regulation ("EC") No. 1271/2008."[45] The EFSA therefore disagreed with the IARC: glyphosate was not genotoxic and did not present a carcinogenic threat to humans.

93.      In explaining why its results departed from the IARC's conclusion, the EFSA drew a distinction between the EU and the IARC approaches to the study and classification of

---

[43] *Id.*

[44] European Food Safety Auth., *Conclusion on the peer review of the pesticide risk assessment of the active substance glyphosate*, available at
http://www.efsa.europa.eu/sites/default/files/scientific_output/files/main_documents/4302.pdf.

[45] *Id.*

chemicals.[46] Although the IARC examined "both glyphosate – an active substance – and glyphosate-based formulations, grouping all formulations regardless of their composition," the EFSA explained that it considered only glyphosate and that its assessment focuses on "each individual chemical, and each marketed mixture separately."[47] The IARC, on the other hand, "assesses generic agents, including groups of related chemicals, as well as occupational or environmental exposure, and cultural or behavioral practices."[48] The EFSA accorded greater weight to studies conducted with glyphosate alone than studies of formulated products.[49]

94.     The EFSA went further and noted:

> [A]lthough some studies suggest that certain glyphosate-based formulations may be genotoxic (i.e. damaging to DNA), other that look solely at the active substance glyphosate do not show this effect. It is likely, therefore, that the *genotoxic effects observed in some glyphosate-based formulations are related to the other constituents or "co-formulants."* Similarly, certain glyphosate-based formulations display higher toxicity than that of the active ingredient, presumably because of the presence of co-formulants. In its assessment, the *EFSA proposes that the toxicity of each pesticide formulation and in particular its genotoxic potential should be further considered and addressed by Member State authorities while they re-assess used of glyphosate-based formulations in their own territories.*[50] **(Emphasis added).**

95.     Notwithstanding its conclusion, the EFSA did set exposure levels for glyphosate. Specifically, the EFSA proposed an acceptable daily intake ("ADI") of 0.5 mg/kg of body weight per day; an acute reference dose ("ARfD") of 0.5 mg/kg of body weight; and an acceptable operator exposure level of ("AOEL") of 0.1 mg/kg of body weight per day.[51]

*Leading Scientists Dispute the EFSA's Conclusion*

---

[46] *EFSA Fact Sheet: Glyphosate, EFSA*, available at http://www.efsa.europa.eu/sites/default/files/corporate_publications/files/efsaexplainsglyphosate151112en.pdf.
[47] *Id.*
[48] *Id.*
[49] *Id.*
[50] *Id.*
[51] European Food Safety Auth., *Conclusion on the peer review of the pesticide risk assessment of the active substance glyphosate*, *supra.*

96.     On November 27, 2015, 96 independent academic and governmental scientists from around the world submitted an open letter to the EU health commissioner, Vytenis Andriukaitis.[52] The scientists expressed their strong concerns and urged the commissioner to disregard the "flawed" EFSA report, arguing that "the BfR decision is not credible because it is not supported by the evidence and it was not reached in an open and transparent manner."[53]

97.     Signatories to the letter included Dr. Christopher J. Portier, Ph.D., and other renowned international experts in the field, some of whom were part of the IARC Working Group assigned to glyphosate.

98.     In an exhaustive and careful examination, the scientists scrutinized the EFSA's conclusions and outlined why the IARC Working Group decision was "by far the more credible":

> The IARC WG decision was reached relying on open and transparent procedures by independent scientists who completed thorough conflict-of-interest statements and were not affiliated or financially supported in any way by the chemical manufacturing industry. It is fully referenced and depends entirely on reports published in the open, peer-reviewed biomedical literature. It is part of a long tradition of deeply researched and highly credible reports on the carcinogenicity of hundreds of chemicals issued over the past four decades by IARC and used today by international agencies and regulatory bodies around the world as a basis for risk assessment, regulation, and public health policy.[54]

99.     With respect to human data, the scientists pointed out that the EFSA agreed with the IARC that there was "limited evidence of carcinogenicity" for non-Hodgkin lymphoma, but the EFSA nonetheless dismissed an association between glyphosate exposure and carcinogenicity. The IARC applied three levels of evidence in its analysis of human data, including sufficient

---

[52] Letter from Christopher J. Portier et al. to Commission Vytenis Andriukaitis, Open letter: Review of the Carcinogenicity of Glyphosate by EFSA and BfR (Nov. 27, 2015), available at https://www.nrdc.org/sites/default/files/open-letter-from-dr-christopher-portier.pdf and https://www.theguardian.com/environment/2016/jan/13/eu-scientists-in-row-over-safety-of-glyphosate-weedkiller.
[53] Id.
[54] Id.

evidence and limited evidence. The EFSA's ultimate conclusion that "there was no unequivocal evidence for a clear and strong association of NHL with glyphosate" was misleading because it was tantamount to the IARC's highest level of evidence: "sufficient evidence," which means that a causal relationship has been established. However, the scientist argued, '[l]egitimate public health concerns arise when 'causality is credible,' i.e. when there is limited evidence."[55]

100.    Among its many other deficiencies, the EFSA's conclusions regarding animal carcinogenicity data were "scientifically unacceptable," particularly in BfR's use of historical control data and in its trend analysis. Indeed, the BfR's analysis directly contradicted the Organization for Economic Co-operation and Development ("OECD") testing guidelines while citing and purporting to follow those same guidelines.

101.    For instance, the EFSA report dismisses observed trends in tumor incidence "because there are no individual treatment groups that are significantly different from control and because the maximum observed response is reportedly within the range of the historical control data." However, according to the scientists, concurrent controls are recommended over historical control in all guidelines, scientific reports, and publications, and, if historical control data is employed, such data "should be from studies in the same timeframe, for the same exact animal strain, preferably from the same laboratory or the same supplier and preferably reviewed by the same pathologist." The BfR's use of historical control data violated these precautions: "only single study used the same mouse strain as the historian controls, but was reported more than 10 years after the historical control dataset was developed." Further deviating from sound scientific practices, the data used by the BfR came from studies in seven different laboratories. The scientists concluded:

BfR reported seven positive mouse studies with three studies showing increases in

---
[55] *Id.*

renal tumors, two with positive findings for hemangiosarcomas, and two with positive findings for malignant lymphomas. BfR additionally reported two positive findings for tumors in rats. Eliminating the inappropriate use of historical data, the unequivocal conclusion is that these are not negative studies, but in fact document the carcinogenicity of glyphosate in laboratory animals.[56]

102.     The letter also critiques the EFSA's report's lack of transparency and the opacity surrounding the data cited in the report: "citations for almost all of the references, even those from the open scientific literature, have been redacted from the document" and "there are no authors or contributors listed for either document, a requirement for publication in virtually all scientific journals." Because the BfR relied on unpublished, confidential industry provided studies, it is "impossible for any scientist not associated with BfR to review this conclusion with scientific confidence."[57]

103.     On March 3, 2016, the letter was published in the Journal of Epidemiology & Community Health.[58]

### Statement of Concern Regarding Glyphosate-Based Herbicides

104.     On February 17, 2016, a consensus statement published in the Journal of Environmental Health, entitled "Concerns over use of glyphosate-based herbicides and risks associated with exposures: a consensus statement, "assessed the safety of glyphosate-based herbicides ("GBHs").[59] The paper's "focus is on the unanticipated effects arising from the worldwide increase in use of GBHs, coupled with recent discoveries about the toxicity and human

---

[56] *Id.*
[57] *Id.*
[58] Christopher J. Portier, et al., *Differences in the carcinogenic evaluation of glyphosate between the International Agency for Research on Cancer (IARC) and the European Food Safety Authority (EFSA)*, JOURNAL OF EPIDEMIOLOGY & CMTY. HEALTH, Marc. 3, 2016, available at http://jech.bmj.com/content/early/2016/03/03/jech-2015-207005.
[59] John P. Myers, et al., *Concerns over use of glyphosate-based herbicides and risks associated with exposures: a consensus statement*, Environmental Health (2016), available at http://ehjournal.biomedcentral.com/articles/10.1186/s12940-016-0117-0.

health risks stemming from use of GBHs."[60] The researchers drew seven factual conclusions about GBHs:

1. GBHs are the most heavily applied herbicide in the world and usage continues to rise;

2. Worldwide, GBHs often contaminate drinking water sources, precipitation, and air, especially in agricultural regions;

3. The half-life of glyphosate in water and soil is longer than previously recognized;

4. Glyphosate and its metabolics are widely present in the global soybean supply;

5. Human exposures to GBHs are rising;

6. Glyphosate is now authoritatively classified as a probable human carcinogen; and

7. Regulatory estimates of tolerable daily intakes for glyphosate in the United States and European Union are based on outdated science.[61]

105.    The researchers noted that GBH use has increased approximately 100-fold since the 1970s. Further, far from posing a limited hazard to vertebrates, as previously believed, two decades of evidence demonstrated that "several vertebrate pathways are likely targets of action, including hepatorenal damage, effects on nutrient balance through glyphosate chelating action and endocrine disruption."[62]

106.    The paper attributed uncertainties in current assessments of glyphosate formulations to the fact that "[t]he full list of chemicals in most commercial GBHs is protected as 'commercial business information,' despite the universally accepted relevance of such information to scientists hoping to conduct an accurate risk assessment of these herbicide formulations." Further, the researchers argue, "[t]he distinction in regulatory review and decision processes between 'active' and 'inert' ingredients has no toxicological justification, given increasing

---

[60] *Id.*
[61] *Id.*
[62] *Id.*

29

evidence that several so-called 'inert' adjuvants are toxic in their own right."[63]

107.   Among various implications, the researchers conclude that "existing toxicological data and risk assessments are not sufficient to infer that GBHs, as currently used, are safe." Further, "GBH-product formulations are more potent, or toxic, than glyphosate alone to a wide array of non-target organisms including mammals, aquatic insects, and fish." Accordingly, "risk assessments of GBHs that are based on studies quantifying the impacts of glyphosate alone underestimate both toxicity and exposure, and thus risk." The paper concludes that this "shortcoming has repeatedly led regulators to set inappropriately high exposure thresholds."[64]

108.   The researchers also critique the current practice of regulators who largely rely on "unpublished, non-peer-reviewed data generated by the registrants" but ignore "published research because it often uses standards and procedures to assess quality that are different from those codified in regulatory agency data requirements, which largely focus on avoiding fraud." In the researchers' view, "[s]cientists independent of the registrants should conduct regulatory tests of GBHs that include glyphosate alone, as well as GBH-product formulations."[65]

109.   The researchers also call for greater inclusion of GBHs in government-led toxicology testing programs:

> [A] fresh and independent examination of GBH toxicity should be undertaken, and ... this reexamination be accompanied by systemic efforts by relevant agencies to monitor GBH levels in people and in the food supply, none of which are occurring today. The U.S. National Toxicology Program should prioritize a thorough toxicology assessment of the multiple pathways now identified as potentially vulnerable of GBHs.[66]

110.   The researchers suggest that, in order to fill the gap created by an absence of

---

[63] *Id.*
[64] *Id.*
[65] *Id.*
[66] *Id.*

government funds to support research on GBHs, regulators could adopt a system through which manufacturers fund the registration process and the necessary testing:

> [W]e recommend that a system be put in place through which manufacturers of GBHs provide funds to the appropriate regulatory body as part of routine registration actions and fees. Such finds should then be transferred to appropriate government research institutes, or to an agency experienced in the award of competitive grants. In either case, funds would be made available to independent scientists to conduct the appropriate long-term (minimum 2 years) safety studies in recognized animal model systems. A thorough and modern assessment of GBH toxicity will encompass potential endocrine disruption, impacts on the gut microbiome, carcinogenicity, and multigenerational effects looking a reproductive capability and frequency of birth defects.[67]

### The FDA Announces Testing of Glyphosate Residue in Foods

111.    On February 17, 2016, the U.S. Food and Drug Administration ("FDA") announced that, for the first time in its history, the agency planned to start testing certain foods for glyphosate residues. FDA spokesperson Lauren Sucher explained: "The agency is now considering assignments for Fiscal Year 2016 to measure glyphosate in soybeans, corn, milk, and eggs, among other potential foods."[68]

112.    In 2004, the U.S. Government Accountability Office ("GAO") had severely rebuked the FDA for its failures to both monitor for pesticide residue, including that of glyphosate, and to disclose the limitations of its monitoring and testing efforts to the public.[69]

113.    Indeed, in the past, both the FDA and the U.S. Department of Agriculture ("USDA") had routinely excluded glyphosate from their testing for the residues of hundreds of other pesticides, on the rationale that it was too expensive and unnecessary to protect public health.

---

[67] *Id.*
[68] Carey Gillam, *FDA to Start Testing for Glyphosate in Food*, TIME, Feb. 17, 2016, available at http://time.com/4227500/fda-glyphosate-testing/?xid=tcoshare.
[69] U.S. GOV'T ACCOUNTABILITY OFFICE, GAO-15-38, *FDA AND USDA SHOULD STRENGTHEN PESTICIDE RESIDUE MONITORING PROGRAMS AND FURTHER DISCLOSE MONITORING LIMITATIONS* (2014), available at http://www.gao.gov/products/GAO-15-38.

Ms. Sucher (the FDA spokesperson) now states, however, that "the agency has developed 'streamlined methods' for testing for the weed killer."[70]

114.    The FDA's move is significant as the agency possesses enforcement authority and can seek action if pesticide residues exceed enforcement guidelines.[71]

### European Union Vote on Glyphosate Renewal

115.    The license for glyphosate in the European Union was set to expire in June 2016.

116.    Without extension of the license, Monsanto's Roundup® and other glyphosate-based herbicides faced a general phase out in EU markets.[72]

117.    In the months leading up to the license expiration date, protracted meetings and votes among national experts from the 28 EU Member States failed to produce agreement on an extension.

118.    For instance, on March 4, 2016, *The Guardian* reported that France, the Netherlands, and Sweden did not support the EFSA's assessment that glyphosate was harmless.[73] The paper quoted the Swedish Environmental Minister, Åsa Romson, as stating: "We won't take risks with glyphosate and we don't think that the analysis done so far is good enough. We will propose that no decision is taken until further analysis has been done and the EFSA scientists have been more transparent about their considerations."[74]

119.    The Netherlands argued that relicensing should be placed on hold until after a

---

[70] Gilliam, *supra* note 68.

[71] *Id.*; Pesticide Q&A, U.S. FOOD AND DRUG ADMINISTRATION, available at https://www.fda.gov/food/foodborneillnesscontaminants/pesticides/ucm583711.htm.

[72] Philip Blenkinsop, Alissa de Carbonnel & Barbara Lewis, *European Commission to extend glyphosate license for 18 months*, REUTERS, June 28, 2016, available at http://www.reuters.com/article/us-health-eu-glyphosate- idUSKCN0ZE25B.

[73] Arthur Neslen, *EU States rebel against plans to relicense weedkiller glyphosate*, THE GUARDIAN, Mar. 4, 2016, available at https://www.theguardian.com/environment/2016/mar/04/eu-states-rebel-against-plans-to- relicense-weedkiller-glyphosate.

[74] *Id.*

separate evaluation of glyphosate's toxicity can be conducted.[75] Leading up to the vote, Italy joined the other EU states in opposing licensing renewal, citing health concerns.[76]

120.   On June 6, 2016, the Member States voted but failed to reach a qualified majority in favor or against the re-authorization of glyphosate.[77]

121.   On June 29, 2016, the EU Commission extended the European license for glyphosate for 18 months to allow the European Chemical Agency to rule on the safety of the chemical.[78]

122.   On July 11, 2016, the EU voted in favor of a proposal to restrict the conditions of use of glyphosate in the EU, including a ban on common co-formulant POEA from all glyphosate- based herbicides, including Roundup®.[79]

123.   On November 13, 2017, after heated debate over whether it causes cancer, and in a very tight vote, the EU voted in favor of a limited (5-year) license for the use of glyphosate.[80]

### Robert Drons's Exposure to Roundup®

124.   Robert Drons began using Roundup® at his home in Florida in the early 1970s.

125.   Over the next forty-five years, Robert Drons would repeatedly spray Roundup®

---

[75] Arthur Neslen, *Vote on controversial weedkiller's European license postponed*, THE GUARDIAN, Mar. 8, 2016, available at https://www.theguardian.com/environment/2016/mar/08/eu-vote-on-controversial-weedkiller-licence- postponed-glyphosate.
[76] *Id.*
[77] Manon Flausch, *Commission prolongs glyphosate license by 18 months*, EURACTIV, June 29, 2016, available at https://www.euractiv.com/section/agriculture-food/news/commission-prolongs-glyphosate-licence-by-18-months/.
[78] Arthur Neslen, *Controversial chemical in Roundup weedkiller escapes immediate ban*, THE GUARDIAN, June 29, 2016, available at https://www.theguardian.com/business/2016/jun/29/controversial-chemical-roundup- weedkiller-escapes-immediate-ban.
[79] Sarantis Michalopoulos, *EU agrees ban on glyphosate co-formulant*, EURACTIV, July 11, 2016, available at https://www.euractiv.com/section/agriculture-food/news/eu-agrees-ban-on-glyphosate-co-formulant/.
[80] Caterina Tano, *German vote swings EU decision on 5-year glyphosate renewal*, November 27, 2016, available at https://euobserver.com/environment/140042.

products across this property monthly to control weeds across the property.

126.     After forty years of exposure to Roundup products, in May 2012, Robert Drons was diagnosed with non-Hodgkin's lymphoma specifically Large B-cell lymphoma.

## V.     TOLLING OF THE STATUTE OF LIMITATION

129.     Plaintiff had no way of knowing about the risk of serious illness associated with the use of and/or exposure to Roundup® and glyphosate during the entire time Plaintiff was using the product.

130.     Within the time period of any applicable statute of limitations, Plaintiff could not have discovered, through the exercise of reasonable diligence, that exposure to Roundup® and glyphosate is injurious to human health.

131.     Plaintiff did not discover, and did not know of facts that would cause a reasonable person to suspect, the risks associated with the use of and/or exposure to Roundup® and glyphosate; nor would a reasonable and diligent investigation by Plaintiff have disclosed that Roundup® and glyphosate would have caused Plaintiff's illness.

132.     For these reasons, all applicable statutes of limitations have been tolled by operation of the discovery rule with respect to Plaintiff's claims.

## VI.     FRAUDULENT CONCEALMENT

133.     All applicable statutes of limitations have also been tolled by Monsanto's knowing and active fraudulent concealment and denial of the facts alleged herein through the time period relevant to this action.

134.     Instead of disclosing critical safety information about Roundup® and glyphosate, Monsanto has consistently and falsely represented the safety of its Roundup® products.

135.     Monsanto was under a continuous duty to disclose to consumer, users and other

34

persons coming into contact with its products, including Plaintiff, accurate safety information concerning its products and the risks associated with the use of and/or exposure to Roundup® and glyphosate.

136.    Instead, Monsanto knowingly, affirmatively, and actively concealed safety information concerning Roundup® and glyphosate and the serious risks with the use of and/or exposure to its products.

138.    Based on the foregoing, Monsanto is estopped from relying on any statutes of limitations in defense of this action

### COUNT I
### STRICT LIABILITY (DESIGN DEFECT)

139.    Plaintiff incorporates by reference each and every allegation set forth above as if fully stated herein.

140.    Plaintiff brings this breach of warranty claim against Defendant Monsanto for defective design.

141.    Robert Drons developed non-Hodgkin's lymphoma which caused him *inter alia* pain, suffering, disability and loss of normal life as a result of using Monsanto's Roundup products.

142.    At the time Monsanto's Roundup products left its control, it was unreasonably dangerous in that it was a carcinogenic glyphosate-based formulation.

143.    At all times relevant to this litigation, Defendant Monsanto engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting Roundup® products, which are defective and unreasonably dangerous to consumers and laborers using the products, including Robert Drons, thereby placing Roundup® products into the stream of commerce. These actions were under the ultimate control and supervision of Defendant Monsanto. At all times relevant to this litigation, Defendant Monsanto designed,

35

researched, developed, manufactured, produced, tested, assembled, labeled, advertised, promoted, marketed, sold, and distributed the Roundup® products that Robert Drons was exposed to, as described above.

144.     At all times relevant to this litigation, Defendant Monsanto's Roundup® products were manufactured, designed, formulated and labeled in an unsafe, defective, and inherently dangerous manner that was dangerous for use by or exposure to the public, and, in particular, Robert Drons.

145.     At all times relevant to this litigation, Defendant's Roundup® products reached the intended consumers, handlers, and users or other persons coming into contact with these products in Florida and throughout the United States, including Robert Drons, without substantial change in their condition as designed, manufactured, sold, distributed, labeled, and marketed by Defendant.

146.     Defendant Monsanto's Roundup® products, as researched, tested, developed, designed, formulated, licensed, manufactured, packaged, labeled, distributed, sold, and marketed by Defendant Monsanto were defective in design and formulation in that when they left the hands of the Defendant Monsanto's manufacturers and/or suppliers, they were unreasonably dangerous and dangerous to an extent beyond that which an ordinary consumer would contemplate.

147.     Defendant Monsanto's Roundup® products, as researched, tested, developed, designed, formulated, licensed, manufactured, packaged, labeled, distributed, sold, and marketed by Defendant Monsanto were defective in design and formulation in that when they left the hands of Defendant Monsanto's manufacturers and/or suppliers, the foreseeable risks exceeded the alleged benefits associated with their design and formulation.

148.     At all times relevant to this action, Defendant Monsanto knew or had reason to

know that its Roundup® products were defective and were inherently dangerous and unsafe when used in the manner instructed and provided by Defendant Monsanto.

149.    Therefore, at all times relevant to this litigation, Defendant Monsanto's Roundup® products, as researched, tested, developed, designed, formulated, licensed, manufactured, packaged, labeled, distributed, sold and marketed by Defendant Monsanto were defective in design and formulation, in one or more of the following ways:

a. When placed in the stream of commerce, Defendant Monsanto's Roundup® products were defective in design and formulation, and, consequently, dangerous to an extent beyond that which an ordinary consumer would contemplate;

b. When placed in the stream of commerce, Defendant Monsanto's Roundup® products were unreasonably dangerous in that they were hazardous and posed a grave risk of cancer and other serious illnesses when used in a reasonably anticipated manner;

c. When placed in the stream of commerce, Defendant Monsanto's Roundup® products contained unreasonably dangerous design defects and were not reasonably safe when used in a reasonably anticipated or intended manner;

d. Defendant Monsanto did not sufficiently test, investigate, or study its Roundup® products and, specifically, the active ingredient glyphosate;

e. Exposure to Roundup® and glyphosate-based formulations presents a risk of harmful side effects including without limitation causing non-Hodgkin's lymphoma, that outweigh any potential utility stemming from the use of the herbicide;

f. Defendant Monsanto knew or should have known at the time of marketing its Roundup® products that exposure to Roundup® and specifically, its active ingredient glyphosate, could result in cancer and other severe illnesses and injuries;

g. Defendant Monsanto did not conduct adequate post-marketing surveillance of its Roundup® products; and/or

h. Defendant Monsanto could have employed safer alternative designs and formulations.

150.    Robert Drons was exposed to Defendant Monsanto's Roundup® products as a homeowner regularly and consistently using those products around his home.

151.    At all times relevant to this litigation, Robert Drons was exposed to the use of

Defendant Monsanto's Roundup® products in an intended or reasonably foreseeable manner without knowledge of their dangerous characteristics.

152. Robert Drons could not have reasonably discovered the defects and risks associated with Roundup® or glyphosate-based formulations before or at the time of exposure.

153. The harm caused by Defendant Monsanto's Roundup® products, (i.e. non-Hodgkin's lymphoma), far outweighed their benefit, getting rid of weeds, rendering Defendant Monsanto's products dangerous to an extent beyond that which an ordinary consumer would contemplate.

154. Defendant Monsanto's Roundup® products were and are more dangerous than alternative products and Defendant Monsanto could have designed its Roundup® products to make them less dangerous. Indeed, at the time that Defendant Monsanto designed its Roundup® products, the state of the industry's scientific knowledge was such that a less risky design or formulation was attainable.

155. At the time Roundup® products left Defendant Monsanto's control, there was a practical, technically feasible and safer alternative design that would have prevented the harm without substantially impairing the reasonably anticipated or intended function of Defendant Monsanto's herbicides.

156. Therefore, as a result of the unreasonably dangerous condition of its Roundup® products, Defendant Monsanto is strictly liable to Robert Drons.

157. The defects in Defendant Monsanto's Roundup® products were substantial and contributing factors in causing Robert Drons's grave and permanent injuries, including his non-Hodgkin's lymphoma, and, but for Defendant Monsanto's misconduct and omissions, Robert Drons would not have sustained his injuries.

158.     Defendant Monsanto risked the lives of consumers and users of its products, including Robert Drons, with knowledge of the safety problems associated with Roundup® and glyphosate-based formulations, and suppressed this knowledge from the general public.

159.     As a direct proximate result of Defendant Monsanto's wrongful acts and omissions, Robert Drons has suffered and continues to suffer pecuniary loss including without limitation injuries of a personal and pecuniary nature including, but not limited to hospital, medical, and related expenses; loss of income; disability and disfigurement; loss of normal life; pain and suffering; risk of susceptibility and future injury and relapse; and physical and emotional trauma.

## COUNT II
## STRICT LIABILITY (FAILURE TO WARN)

160.     Plaintiff incorporates by reference each and every allegation set forth above as if fully stated herein.

161.     Plaintiff brings this breach of warranty claim against Defendant Monsanto for failure to warn.

162.     Robert Drons developed non-Hodgkin's lymphoma which caused him *inter alia* pain, suffering, disability and loss of normal life as a result of using Monsanto's Roundup products.

163.     At the time Monsanto's Roundup products left its control, it was unreasonably dangerous in that it was a carcinogenic glyphosate-based formulation.

164.     At all times relevant to this litigation, Defendant Monsanto engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, promoting and applying Roundup® products, which are defective and unreasonably dangerous to consumers, including Robert Drons, because they do not contain adequate warnings or instructions concerning the dangerous characteristics of Roundup® and specifically, the active ingredient

glyphosate. These actions were under the ultimate control and supervision of Defendant Monsanto.

165.     Defendant Monsanto researched, developed, designed, tested, manufactured, inspected, labeled, distributed, marketed, promoted, sold, and otherwise released into the stream of commerce its Roundup® products, and in the course of same, directly advertised or marketed the products to consumers and end users, including Robert Drons, and persons responsible for consumers (such as employers), and therefore had a duty to warn of the risks associated with the use of Roundup® and glyphosate-based formulations.

166.     At all times relevant to this litigation, Defendant Monsanto had a duty to properly test, develop, design, manufacture, inspect, package, label, market, promote, sell, distribute, maintain supply, provide proper warnings, and take such steps as necessary to ensure that Roundup® products did not cause users and consumers to suffer from unreasonable and dangerous risks. Defendant Monsanto had a continuing duty to warn Robert Drons of the dangers associated with Roundup® use and exposure. Defendant Monsanto, as manufacturer, seller, or distributor of chemical herbicides is held to the knowledge of an expert in the field.

167.     At the time of manufacture, Defendant Monsanto could have provided the warnings or instructions regarding the full and complete risks of Roundup® and glyphosate-based formulations because they knew or should have known of the unreasonable risks of harm associated with the use of and/or exposure to such products.

168.     At all times relevant to this litigation, Defendant Monsanto failed to investigate, study, test, or promote the safety or to minimize the dangers to users and consumers of this product and to those who would foreseeably use or be harmed by Roundup, including Robert Drons.

169.     Despite the fact that Defendant Monsanto knew or should have known that Roundup® posed a grave risk of harm, it failed to exercise reasonable care to warn of the

dangerous risks associated with use and exposure. The dangerous propensities of its products and the carcinogenic characteristics of glyphosate, as described above, were known to Defendant Monsanto, or scientifically knowable to Defendant Monsanto through appropriate research and testing by known methods, at the time it distributed, supplied or sold the product, and not known to end users and consumers, such as Robert Drons.

170.     Defendant Monsanto knew or should have known that these products created significant risks of serious bodily harm to consumers, as alleged herein, and Defendant Monsanto failed to adequately warn consumers and reasonably foreseeable users of the risks of exposure to its products. Defendant Monsanto has wrongfully concealed information concerning the dangerous nature of Roundup® and its active ingredient glyphosate, and further made false and/or misleading statements concerning the safety of Roundup® and glyphosate.

171.     At all times relevant to this litigation, Defendant Monsanto's Roundup® products reached the intended consumers, handlers, and users or other persons coming into contact with these products in Florida and throughout the United States, including Robert Drons, without substantial change in their condition as designed, manufactured, sold, distributed, labeled, marketed and sprayed/applied by Defendant Monsanto.

172.     Robert Drons was exposed to Roundup® products, as described above, without knowledge of their dangerous characteristics.

173.     At all times relevant to this litigation, Robert Drons was exposed to the use of Defendant Monsanto's Roundup® products in their intended or reasonably foreseeable manner without knowledge of their dangerous characteristics.

174.     Robert Drons could not have reasonably discovered the defects and risks associated with Roundup® or glyphosate-based formulations prior to or at the time of Robert

41

Drons's exposure due to this failure to warn. Robert Drons relied upon the skill, superior knowledge, and judgment of Defendant Monsanto.

175.     Defendant Monsanto knew or should have known that the minimal warnings disseminated with or accompanying the application of Roundup® products were inadequate, but they failed to communicate adequate information on the dangers and safe use/exposure and failed to communicate warnings and instructions that were appropriate and adequate to render the products safe for their ordinary, intended and reasonably foreseeable uses, including agricultural and horticultural applications.

176.     The information that Defendant Monsanto did provide or communicate failed to contain relevant warnings, hazards, and precautions that would have enabled those exposed, such as Robert Drons, to utilize the products safely and with adequate protection.

177.     Instead, Defendant Monsanto disseminated information that was inaccurate, false, and misleading and which failed to communicate accurately or adequately the comparative severity, duration, and extent of the risk of injuries with use of and/or exposure to Roundup® and glyphosate; continued to aggressively promote the efficacy of its products, even after it knew or should have known of the unreasonable risks from use or exposure; and concealed, downplayed, or otherwise suppressed, through aggressive marketing and promotion, any information or research about the risks and dangers of exposure to Roundup® and glyphosate.

178.     To this day, Defendant Monsanto has failed to adequately and accurately warn of the true risks of Robert Drons's injuries associated with the use of and exposure to Roundup® and its active ingredient glyphosate, a probable carcinogen.

179.     As a result of their inadequate warnings, Roundup® products were defective and unreasonably dangerous when they left the possession and/or control of Defendant Monsanto, were

distributed by Defendant Monsanto and when Robert Drons became exposed.

180.     Defendant Monsanto is liable to Robert Drons for injuries caused by its failure, as described above, to provide adequate warnings or other clinically relevant information and data regarding the appropriate use of their products and the risks associated with the use of or exposure to Roundup®, glyphosate and glyphosate-based formulations.

181.     The defects in these Roundup® products were substantial and contributing factors in causing Robert Drons's injuries, and, but for Defendant Monsanto's misconduct and omissions, Robert Drons would not have sustained his injuries.

182.     Had Defendant Monsanto provided adequate warnings and instructions and properly disclosed and disseminated the risks associated with Roundup® products and application, Robert Drons could have avoided the risk of developing injuries as alleged herein.

183.     As a direct and proximate result of Defendant Monsanto placing its defective Roundup into the stream of commerce without appropriate warnings as further set forth above, Robert Drons has suffered and continues to suffer pecuniary loss including without limitation injuries of a personal and pecuniary nature including, but not limited to hospital, medical, and related expenses; loss of income; loss of normal life; pain and suffering; risk of susceptibility and future injury and relapse; and physical and emotional trauma.

<u>COUNT III</u>
**NEGLIGENCE**

184.     Plaintiff incorporates by reference each and every allegation set forth above as if fully stated herein.

185.     Robert Drons developed non-Hodgkin's lymphoma which caused him *inter alia* pain, suffering, disability and loss of normal life as a result of using Monsanto's Roundup products.

186.     Defendant Monsanto, directly or indirectly, caused Roundup® products to be

43

sold, distributed, packaged, labeled, marketed, promoted, and/or used by Robert Drons.

187.    At all times relevant to this litigation, Defendant Monsanto knew or, in the exercise of reasonable care, should have known of the hazards and dangers of Roundup® and specifically, the carcinogenic properties of the chemical glyphosate.

188.    Accordingly, at all times relevant, Monsanto knew or, in the exercise of reasonable care, should have known that use of or exposure to its Roundup® products could cause or be associated with Robert Drons's injuries and thus created a dangerous and unreasonable risk of injury to the users of these products, including Robert Drons

189.    Defendant Monsanto also knew or, in the exercise of reasonable care, should have known that users and consumers of Roundup® were unaware of the risks and the magnitude of the risks associated with use of and/or exposure to Roundup® and glyphosate-based formulations.

190.    It was the duty of the defendant, Monsanto, before and at the time of the occurrences, to use ordinary care for the safety of Robert Drons.

191.    Notwithstanding said duty, the defendant, Monsanto, committed one or more of the following acts and/or omissions:

a. Promoted, developed, designed, sold, and/or distributed its Roundup® products without thorough and adequate pre-and post-market testing;

b. Promoted, developed, designed, sold, and/or distributed Roundup® while concealing and failing to disclose the results of trials, tests, and studies of exposure to glyphosate, and, consequently, the risk of serious harm associated with human use of and exposure to Roundup®;

c. Failed to undertake sufficient studies and conduct necessary tests to determine whether or not Roundup® products and glyphosate-based formulations were safe for their intended use in agriculture and horticulture;

d. Failed to use reasonable and prudent care in the design, research, manufacture, and development of Roundup® products so as to avoid the risk of serious harm associated with the prevalent use of Roundup®/glyphosate as an herbicide;

44

e.  Failed to design and manufacture Roundup® products so as to ensure they were at least as safe and effective as other herbicides on the market;

f.  Failed to provide adequate instructions, guidelines, and safety precautions to those persons who Defendant Monsanto could reasonably foresee would use and be exposed to its Roundup® products;

g.  Failed to disclose to Robert Drons, users/consumers, and the general public that use of and exposure to Roundup® presented severe risks of cancer and other grave illnesses;

h.  Failed to warn Robert Drons, consumers, and the general public that the product's risk of harm was unreasonable and that there were safer and effective alternative herbicides available to Robert Drons and other consumers;

i.  Systematically suppressed or downplayed contrary evidence about the risks, incidence, and prevalence of the side effects of Roundup® and glyphosate-based formulations;

j.  Represented that its Roundup® products were safe for their intended use when, in fact, Defendant Monsanto knew or should have known that the products were not safe for their intended purpose;

k.  Declined to make or propose any changes to Roundup® products' labeling or other promotional materials that would alert the consumers and the general public of the risks of Roundup® and glyphosate;

l.  Advertised, marketed, and recommended the use of the Roundup® products, while concealing and failing to disclose or warn of the dangers known by Defendant Monsanto to be associated with or caused by the use of or exposure to Roundup® and glyphosate;

m.  Continued to disseminate information to its consumers, which indicate or imply that Defendant Monsanto's Roundup® products are not unsafe for use in the agricultural and horticultural industries; and/or

n.  Continued the manufacture and sale of its products with the knowledge that the products were unreasonably unsafe and dangerous.

192.    As a result of one or more of the above acts and/or omissions, Robert Drons

developed non-Hodgkin's lymphoma.

193.    Defendant Monsanto knew and/or should have known that it was foreseeable that

consumers, such as Robert Drons, would suffer injuries, including without limitation non-

45

Hodgkin's lymphoma, as a result of Defendant Monsanto's failure to exercise ordinary care.

194.     Robert Drons did not know the nature and extent of the injuries that could result from the intended use of and/or exposure to Roundup® or its active ingredient glyphosate.

195.     Defendant Monsanto's negligence was the proximate cause of the injuries, harm, and economic losses that Robert Drons suffered and will continue to suffer, as described herein.

196.     As a direct and proximate result of Defendant Monsanto's acts and/or omissions, Robert Drons has suffered and continues to suffer pecuniary loss including without limitation injuries of a personal and pecuniary nature including, but not limited to hospital, medical, and related expenses; loss of income; disability; loss of normal life; pain and suffering; risk of susceptibility and future injury and relapse; and physical and emotional trauma.

**COUNT IV**
**NEGLIGENT MISREPRESENTATION AND/OR FRAUD**

197.     Plaintiff repeats, reiterates, and re-alleges each and every allegation of the complaint above as if fully set forth herein.

198.     Defendant is the manufacturer, designer, distributor, seller or supplier of Roundup® and, while engaged in the course of such business, made representations to Plaintiff regarding the character and/or quality of, for guidance in Decedent Plaintiff's decision to select Roundup for use.

199.     Defendant had a duty to disclose material information about serious health effects to consumers such as Plaintiff. Defendant intentionally failed to disclose this information for the purpose of inducing consumers, including Plaintiff, to purchase Defendant's dangerous products.

200.     Specifically, Defendant's advertisements regarding Roundup® made material misrepresentations to the effect that Roundup® was safe, which misrepresentations Defendant knew to be false, for the purpose of fraudulently inducing consumers, such as Plaintiff, to purchase

46

said product. Defendant further misrepresented that its products were just as safe, and just as effective or more effective, than other weed control products on the market.

201.     Defendant's representations regarding the character or quality of Roundup® were untrue. In addition, Defendant fraudulently suppressed material information regarding the safety of Roundup®, including the dangers known by Defendant to be associated with or caused by the use of or exposure to Roundup® and glyphosate.

202.     Defendant had actual knowledge based on the results of trials, tests, and studies of exposure to glyphosate, of the risk of serious harm associated with human use of and exposure to Roundup®.

203.     Defendant negligently and or intentionally misrepresented or omitted this information in its product labeling, promotions and advertisements and instead labeled, promoted and advertised its products as safe and effective in order to avoid losses and sustain profits in its sales to consumers.

204.     In supplying the false information, Defendant failed to exercise reasonable care or competence in obtaining or communicating information to their intended recipients, including Plaintiff.

205.     Plaintiff reasonably relied to Plaintiff's detriment upon Defendant's misrepresentations and/or omissions in its labeling, advertisements, and promotions concerning the serious risks posed by the product. Plaintiff reasonably relied upon Defendant's representations to Plaintiff that Roundup® was safe for use and that Defendant's labeling, advertisements and promotions fully described all known risks of the product.

206.     Defendant is estopped from relying on any statute of limitations defenses because Defendant actively concealed the defects from consumers, such as the Plaintiff. Instead of

47

revealing the defects, Defendant continued to represent its product as safe for its intended use.

207.     As a direct and proximate result of Plaintiff's use of Roundup® as manufactured, designed, sold, supplied and introduced into the stream of commerce by Defendant, Plaintiff suffered personal injury, non-economic damages, and will continue to suffer such harm and damages in the future.

## **PRAYER FOR RELIEF**

WHEREFORE: Plaintiff Robert Drons, requests judgment against Defendant for damages for all injuries and losses recoverable, but not limited to:

a. Awarding compensatory damages in excess of the jurisdictional amount, including, but not limited to pain, suffering, emotional distress, loss of enjoyment of life, and other non-economic damages in an amount to be determined at trial of this action;

b. Awarding compensatory damages to Plaintiff for past and future damages, including, but not limited to, Plaintiff's pain and suffering and for severe and permanent personal injuries sustained by the Plaintiff including health care costs and economic loss;

c. Awarding economic damages in the form of medical expenses, out of pocket expenses, lost earnings and other economic damages in an amount to be determine at trial of this action;

d. Pre-judgment interest;

e. Post-judgment interest;

f. Awarding Plaintiff reasonable attorneys' fees;

g. Awarding Plaintiff the costs of these proceedings; and

h. Such other and further relief as this Court deems just.

## DEMAND FOR JURY TRIAL

Plaintiff demands trial by jury of all claims so triable.

Dated: August 7, 2020

BERNHEIM KELLEY BATTISTA
& BLISS, LLC
Attorneys for Plaintiff
P.O. Box 290787
Fort Lauderdale, FL 33329
Telephone     :(954) 866-1111
Facsimile     :(954) 252-4532
JBernheim@bkbblaw.com; Service@bkbblaw.com

BY___/s/Jesse N. Bernheim_____
    JESSE N. BERNHEIM
    Florida Bar No.  0525421

FRIEDMAN RODMAN FRANK &
ESTRADA, P.A.
Attorneys for Plaintiff
3636 West Flagler Street
Miami, Florida 33135-1030
Telephone 305-448-8585
Facsimile 305-448-9818

BY___/s/Ronald D. Rodman_____
    RONALD D. RODMAN
    Florida Bar No. 664332
    ronrod@frflawgroup.com
    LAUREN E. GERAGHTY
    Florida Bar No. 124697
    lgeraghty@frflawgroup.com