JURY

# U.S. District Court
## Northern District of Texas (San Angelo)
## CIVIL DOCKET FOR CASE #: 6:20-cv-00109-H

Waldrop v. Monsanto Company

Assigned to: Judge James Wesley Hendrix

Case in other court:  452nd District Court, Menard County, Texas, 20-05654

Cause: 28:1332 Diversity-Notice of Removal

Date Filed: 10/30/2020

Jury Demand: Both

Nature of Suit: 365 Torts/Pers Inj: Product Liability

Jurisdiction: Diversity

**Plaintiff**

**Molly Waldrop**                            represented by **Marcus Alan Smith**
Marcus Smith Law Firm
PO Box 60732
San Angelo, TX 76906
325-301-2746
Fax: 325-227-4095
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

V.

**Defendant**

**Monsanto Company**                         represented by **Jennise W Stubbs**
Shook Hardy & Bacon
600 Travis St
Suite 3400
Houston, TX 77002-2926
713-227-8008
Fax: 713-227-9508
Email: jstubbs@shb.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Ryan S Killian**
Shook Hardy & Bacon LLP
600 Travis Street
Suite 3400
Houston, TX 77002
713-227-8008
Fax: 713-227-9508
Email: rkillian@shb.com
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

| Date Filed | # | Docket Text |
| --- | --- | --- |

| 10/30/2020 | 1 | NOTICE OF REMOVAL WITH JURY DEMAND filed by Monsanto Company. (Filing fee $400; receipt number 0539-11316974) In each Notice of Electronic Filing, the judge assignment is indicated, and a link to the Judges Copy Requirements and Judge Specific Requirements is provided. The court reminds the filer that any required copy of this and future documents must be delivered to the judge, in the manner prescribed, within three business days of filing. Unless exempted, attorneys who are not admitted to practice in the Northern District of Texas must seek admission promptly. Forms and Instructions found at www.txnd.uscourts.gov, or by clicking here: Attorney Information - Bar Membership. If admission requirements are not satisfied within 21 days, the clerk will notify the presiding judge. (Attachments: # 1 Cover Sheet, # 2 Cover Sheet Supplement, # 3 Exhibit(s) 1, # 4 Exhibit(s) 2, # 5 Exhibit(s) 3, # 6 Exhibit(s) 4) (Stubbs, Jennise) (Entered: 10/30/2020) |
| 10/30/2020 | 2 | CERTIFICATE OF INTERESTED PERSONS/DISCLOSURE STATEMENT by Monsanto Company. (Stubbs, Jennise) (Entered: 10/30/2020) |
| 10/30/2020 | 3 | New Case Notes: A filing fee has been paid. (pnp) (Entered: 11/02/2020) |

| PACER Service Center | | | |
|---|---|---|---|
| Transaction Receipt | | | |
| 11/02/2020 14:48:20 | | | |
| PACER Login: | hllp1982:2634105:4722683 | Client Code: | 1417.0005 |
| Description: | Docket Report | Search Criteria: | 6:20-cv-00109-H |
| Billable Pages: | 2 | Cost: | 0.20 |

MARCUS SMITH (SBN: 24085591)
marcussmithlawyer@protonmail.com
Marcus Smith Law Office, PLLC
PO Box 60732
San Angelo, TX  76906
Phone) 325-716-8211
Facsimile) 325-227-4095

*Attorney for Plaintiff*

CAUSE NO. _____

| | | |
|---|---|---|
| **MOLLY WALDROP,** | | |
| *Plaintiff* | § | **IN THE DISTRICT COURT** |
| | § | |
| | § | |
| **V.** | § | **MENARD COUNTY,TEXAS** |
| | § | |
| **MONSANTO COMPANY** | § | **452nd JUDICIAL DISTRICT** |
| | § | |
| *Defendant.* | § | |

Serve: Corporation Service Company d/b/a
CSC-Lawyers Incorporating Service Company
211 E. 7th Street, Suite 620
Austin, TX 78701-3218 USA

---

# PLAINTIFF'S ORIGINAL PETITION

---

TO THE HONORABLE JUDGE OF THIS COURT:

**TOXIC CHEMICAL TORT ACTION: TEXAS PETITION**                    **PAGE 1**

COMES NOW, MOLLY-JACK WALDROP, complaining of MONSANTO COMPANY, and for cause of action would respectfully show the Court as follows:

## I. DISCOVERY PLAN

1.      Discovery Control Plan. Pursuant to Rule 190.4 of the TEXAS RULES OF CIVIL PROCEDURE, discovery in this case should be conducted under Level 3. Therefore, Plaintiff respectfully requests that this Court enter an appropriate Scheduling Order so that discovery may be conducted under Level 3.

## II. RULE 47 STATEMENT

2.      Plaintiff seeks relief as specified by Rules 47(c)(5) & 47(d) of the Texas Rules of Civil Procedure.

## III. JURISDICTION AND VENUE

3.      Plaintiff affirmatively pleads that this Court has jurisdiction because the amount in controversy exceeds the minimum jurisdictional limits of the Court. Monsanto Company is a foreign resident who does business in Texas and, thus, maintains sufficient minimum contacts with Texas; this suit arises out of those contacts.

4.      Venue is proper in Menard County, Texas because all or substantial portions of the events that make the basis of this claim occurred in Menard County. TEX.CIV.PRAC. & REM.CODE § 15.002. Specifically, Menard County is the location where Plaintiff was exposed to Monsanto's cancer-causing RoundUp®.

**TOXIC CHEMICAL TORT ACTION: TEXAS PETITION**                     **PAGE 2**

Therefore, this Court has subject matter and personal jurisdiction over all parties and all claims.

## IV. PARTIES

5.    Plaintiff Molly-Jack Waldrop is a citizen of Texas and she resides in Menard, Texas. Ms. Waldrop was exposed to RoundUp® in Menard, Texas, from approximately 1980 to 2010.

6.    As a direct and proximate result of being exposed to RoundUp®, Plaintiff developed Non-Hodgkin's Lymphoma. She was diagnosed with Non-Hodgkin's Lymphoma ("NHL") in Kerrville, Texas, in March of 2010.

7.    Defendant Monsanto Company is a Delaware corporation with its headquarters and principal place of business located at 800 N. Lindbergh Blvd. Saint Louis, MO 63167. Service of process upon MONSANTO COMPANY may be had by serving its Registered Agent for Service of Process: **Corporation Service Company d/b/a CSC-Lawyers Incorporating Service Company, 211 E. 7th Street, Suite 620, Austin, TX 78701-3218.**

8.    Defendant Monsanto transacted and conducted business within the State of Texas that relates to the allegations in this Petition.

## V. INTRODUCTION & FACTS

9.    At all times relevant to this complaint, Monsanto was the entity that discovered the herbicidal properties of glyphosate and the manufacturer of

**TOXIC CHEMICAL TORT ACTION: TEXAS PETITION**                              **PAGE 3**

RoundUp®, which contains the active ingredients glyphosate and the surfactant polyoxethyleneamine (POEA), as well as other ingredients. In addition to lowering surface tension pressure, POEA appears to exert a synergistic effect when combined with glyphosate that increases cell permeability to glyphosate.[1]

10.     At all relevant times, Monsanto was in the business of, and did, design, research, manufacture, test, advertise, promote, market, sell, and/or distribute RoundUp®.

11.     Monsanto is a multinational agricultural biotechnology corporation based in St. Louis, Missouri. Monsanto is the world's leading producer of glyphosate.

12.     As shown in Figure 1 (below), Monsanto's RoundUp® is used heavily in west Texas.

---

[1] Klaassen, C., *Casarett & Doull's Toxicology: The Basic Science of Poisons*, 8th Ed., at 965 (2013) (citing Benachour, N. and Seralini, G.E., *Glyphosate formulations induce apoptosis and necrosis in human umbilical, embryonic, and placental cells.*, Chem. Res. Toxicol., 22: 97-105 (2009)).

**TOXIC CHEMICAL TORT ACTION: TEXAS PETITION**                    **PAGE 4**



Figure 1: Estimated Glyphosate Use, 2017 (most recent data available).[2]

13.    Cancer is an insidious disease that manifests following a latency period of 10-40 years. Moreover, cancer, such as Non-Hodgkin's Lymphoma, often causes depression and physical pain— and carries a substantial risk of mortality.[3]

14.    Monsanto discovered the herbicidal properties of glyphosate during the 1970's and subsequently began to design, research, manufacture, sell and distribute glyphosate based RoundUp® as a broad-spectrum herbicide.

15.    The application of RoundUp® causes plants to translocate the systemic herbicide to their roots, shoot regions, and fruit, where it interferes with the plant's

---

[2] Available at https://water.usgs.gov/nawqa/pnsp/usage/maps/show_map.php?year=2016&hilo=&map=GLYPHOSATE. (last visited August 24, 2020).

[3] Kasper, Braunwald, Fauci, Hauser, Longo, and Jameson, *Harrison's Principles of Internal Medicine 16th Ed.,* at 435-441 (2005).

**TOXIC CHEMICAL TORT ACTION: TEXAS PETITION**                    **PAGE 5**

ability to form aromatic amino acids that are necessary for protein synthesis. Plants treated with glyphosate-based RoundUp® generally die within 2-3 days. After glyphosate is applied, it is absorbed and, thus, it cannot be completely removed by washing or peeling produce or by milling, baking, or brewing grains.

16.     Farmers throughout the world have used RoundUp® for decades without knowing of the dangers its use poses. That is because when Monsanto first introduced RoundUp®, it touted glyphosate as a technological breakthrough claiming that RoundUp® could kill almost every weed without causing harm either to people or to the environment. History has shown that to be untrue.

17.     According to the World Health Organization (WHO) and The International Agency for Research on Cancer (IARC), the main chemical ingredient of RoundUp® —glyphosate—is a *probable cause of cancer* (IARC, Group 2A).

18.     Monsanto falsely assured the public that RoundUp® was harmless. In order to conceal RoundUp®'s harmful effects, Monsanto funded, encouraged, facilitated, and/or endorsed false data and attacked legitimate studies that revealed RoundUp®'s dangers.

19.     Prioritizing profits over human health and safety, Monsanto led a multi-year campaign of misinformation to convince government agencies, farmers and the general population that RoundUp® is safe.

**The Discovery of Glyphosate and Development of RoundUp®**

20.     The herbicidal properties of glyphosate were discovered in 1970 by

Monsanto chemist John Franz. The first glyphosate-based herbicide was

introduced to the market in the mid- 1970s under the brand name RoundUp®.[4]

From the outset, Monsanto marketed RoundUp® as a "safe" general-purpose

herbicide for widespread commercial and consumer use. Doubling-down on its

public misinformation campaign, Monsanto still markets RoundUp® as safe

today.[5]

21.     In addition to the active ingredient glyphosate, RoundUp® formulations also

contain adjuvants and other chemicals, such as the surfactant polyoxethyleneamine

(POEA), which are considered "inert" and therefore protected as "trade secrets" in

manufacturing. Growing evidence suggests that these adjuvants and additional

components of RoundUp® formulations are not, in fact, inert and are toxic in their

own right.

### Registration of Herbicides under Federal Law

22.     The manufacture, formulation, and distribution of herbicides, such as

RoundUp®, are regulated under the Federal Insecticide, Fungicide, and

---

[4] Monsanto, *Backgrounder, History of Monsanto's Glyphosate Herbicide* (Sep. 2,
2015), http://www.monsanto.com/products/documents/glyphosate-background-
materials/back_history.pdf.

[5] Monsanto, *What is Glyphosate?* (Sep. 2, 2015),
http://www.monsanto.com/sitecollectiondocuments/glyphosate-safety-health.pdf.

Rodenticide Act ("FIFRA" or "Act"), 7 U.S.C. § 136 et seq. FIFRA requires that all pesticides be registered with the Environmental Protection Agency ("EPA" or "Agency") prior to their distribution, sale, or use, except as described by the Act. 7 U.S.C. § 136a(a).

23.     Pesticides are toxic to plants, animals, and humans, at least to some degree, therefore the EPA requires as part of the registration process, among other things, a variety of tests to evaluate the potential for exposure to pesticides, toxicity to people and other potential non-target organisms, and other adverse effects on the environment.

24.     Registration by the EPA, however, is not an assurance or finding of safety. The determination the Agency must make in registering or re-registering a product is not that the product is "safe," but rather that use of the product in accordance with its label directions "will not generally cause unreasonable adverse effects on the environment." 7 U.S.C. § 136a(c)(5)(D).

25.     FIFRA defines "unreasonable adverse effects on the environment" to mean "any unreasonable risk to man or the environment, taking into account the economic, social, and environmental costs and benefits of the use of any pesticide." 7 U.S.C. § 136(bb). FIFRA thus requires EPA to make a risk/benefit analysis in determining whether a registration should be granted or a pesticide allowed to continue to be sold in commerce.

**TOXIC CHEMICAL TORT ACTION: TEXAS PETITION**                    **PAGE 8**

26.     FIFRA generally requires that the registrant, Monsanto in the case of RoundUp®, conduct the health and safety testing of pesticide products. The EPA has protocols governing the conduct of tests required for registration and the laboratory practices that must be followed in conducting these tests. The data produced by the registrant must be submitted to the EPA for review and evaluation. The government is not required, nor is it able, however, to perform the product tests that are required of the manufacturer.

27.     The evaluation of each pesticide product distributed, sold, or manufactured is completed at the time the product is initially registered. The data necessary for registration of a pesticide has changed over time. The EPA is now in the process of re-evaluating all pesticide products through a Congressionally-mandated process called "re-registration." 7 U.S.C. § 136a-1. In order to reevaluate these pesticides, the EPA is demanding the completion of additional tests and the submission of data for the EPA's recent review and evaluation.

28.     In the case of glyphosate, and therefore RoundUp®, the EPA had planned on releasing its preliminary risk assessment—in relation to the reregistration process—no later than July 2015. The EPA completed its review of glyphosate in early 2015, but it delayed releasing the risk assessment pending further review in light of the WHO and IARC health-related findings.

**Scientific Fraud Underlying the Marketing and Sale of**

**TOXIC CHEMICAL TORT ACTION: TEXAS PETITION**                    **PAGE 9**

### Glyphosate/RoundUp®

29.   Based on early studies showing that glyphosate could cause cancer in laboratory animals, the EPA originally classified glyphosate as possibly carcinogenic to humans (Group C) in 1985. After pressure from Monsanto, including contrary studies it provided to the EPA, the EPA changed its classification to evidence of non-carcinogenicity in humans (Group E) in 1991. In so classifying glyphosate, however, the EPA made clear that the designation did not mean the chemical does not cause cancer: "It should be emphasized, however, that designation of an agent in Group E is based on the available evidence at the time of evaluation and should not be interpreted as a definitive conclusion that the agent will not be a carcinogen under any circumstances."[6]

30.   **On two occasions, the EPA found that the laboratories hired by Monsanto to test the toxicity of its RoundUp® products for registration purposes committed fraud.**

31.   In the first instance, Monsanto, in seeking initial registration of RoundUp® by the EPA, hired Industrial Bio-Test Laboratories ("IBT") to perform and evaluate pesticide toxicology studies relating to RoundUp®.[7] IBT performed about

---

[6] U.S. Envtl. Prot. Agency, *Memorandum, Subject: SECOND Peer Review of Glyphosate 1* (1991), available at http://www.epa.gov/pesticides/chem_search/cleared_reviews/csr_PC-103601_30-Oct-91_265.pdf.

[7] Monsanto, *Backgrounder, Testing Fraud: IBT and Craven Laboratories* (Sep. 2, 2015), http://www.monsanto.com/products/documents/glyphosate-background-

30 tests on glyphosate and glyphosate-containing products, including nine of the 15 residue studies needed to register RoundUp®.

32.    In 1976, the United States Food and Drug Administration ("FDA") performed an inspection of IBT that revealed discrepancies between the raw data and the final report relating to the toxicological impacts of glyphosate. The EPA subsequently audited IBT; it too found the toxicology studies conducted for the RoundUp® herbicide to be invalid.[8] An EPA reviewer stated, after finding "routine falsification of data" at IBT, that it was "hard to believe the scientific integrity of the studies when they said they took specimens of the uterus from male rabbits."[9]

33.    Thereafter, three top executives of IBT were convicted of fraud in 1983.

34.    In the second incident of data falsification, Monsanto hired Craven Laboratories in 1991 to perform pesticide and herbicide studies, including for

---

materials/ibt_craven_bkg.pdf.

[8] U.S. Envtl. Prot. Agency, *Summary of the IBT Review Program Office of Pesticide Programs* (1983), available at
http://nepis.epa.gov/Exe/ZyNET.exe/91014ULV.TXT?ZyActionD=ZyDocument&Client=EPA
&Index=1981+Thru+1985&Docs=&Query=&Time=&EndTime=&SearchMethod=1&TocRestri
ct=n&Toc=&TocEntry=&QField=&QFieldYear=&QFieldMonth=&QFieldDay=&IntQFieldOp
=0&ExtQFieldOp=0&XmlQuery=&File=D%3A%5Czyfiles%5CIndex%20Data%5C81thru85%
5CTxt%5C00000022%5C91014ULV.txt&User=ANONYMOUS&Password=anonymous&Sort
Method=h%7C&MaximumDocuments=1&FuzzyDegree=0&ImageQuality=r75g8/r75g8/x150y1
50g16/i425&Display=p%7Cf&DefSeekPage=x&SearchBack=ZyActionL&Back=ZyActionS&B
ackDesc=Results%20page& MaximumPages=1&ZyEntry=1&SeekPage=x&ZyPURL.

[9] Marie-Monique Robin, *The World According to Monsanto: Pollution, Corruption and the Control of the World's Food Supply* (2011) (citing U.S. Envtl. Prot. Agency, Data Validation, Memo from K. Locke, Toxicology Branch, to R. Taylor, Registration Branch. Washington, D.C. (August 9, 1978)).

RoundUp®. In that same year, the owner of Craven Laboratories and three of its employees were indicted, and later convicted, of fraudulent laboratory practices in the testing of pesticides and herbicides.[10]

35.    Despite the falsity of the tests that underlie its registration, within a few years of its launch, Monsanto was marketing RoundUp® in 115 countries.

### The Importance of RoundUp® ® to Monsanto's Market Dominance Profits

36.    The success of RoundUp® was key to Monsanto's continued reputation and dominance in the marketplace. Largely due to the success of RoundUp® sales, Monsanto's agriculture division was out-performing its chemicals division's operating income, and that gap increased yearly. But with its patent for glyphosate expiring in the United States in the year 2000, Monsanto needed a strategy to maintain its RoundUp® market dominance and to ward off impending competition.

37.    In response, Monsanto began the development and sale of genetically engineered RoundUp Ready® seeds in 1996. Since RoundUp Ready® crops are resistant to glyphosate, farmers can spray RoundUp® onto their fields during the growing season without harming the crop.

38.    This allowed Monsanto to expand its market for RoundUp® even further; by 2000, Monsanto's biotechnology seeds were planted on more than 80 million acres

---

[10] Monsanto, *Backgrounder, Testing Fraud: IBT and Craven Laboratories*, supra.

**TOXIC CHEMICAL TORT ACTION: TEXAS PETITION**                    **PAGE 12**

worldwide and nearly 70% of American soybeans were planted from RoundUp

Ready® seeds. It also secured Monsanto's dominant share of the

glyphosate/RoundUp® market through a marketing strategy that coupled

proprietary RoundUp Ready® seeds with continued sales of its RoundUp®

herbicide.

39.     Through a three-pronged strategy of increasing production, decreasing

prices, and by coupling with RoundUp Ready® seeds, RoundUp® became

Monsanto's most profitable product. In 2000, RoundUp® accounted for almost

$2.8 billion in sales, outselling other herbicides by a margin of five to one, and

accounting for close to half of Monsanto's revenue.[11] Today, glyphosate remains

one of the world's largest herbicides by sales volume.

### Monsanto knew that it was falsely advertising
### regarding the safety of RoundUp®

40.     In 1996, the New York Attorney General ("NYAG") filed a lawsuit against

Monsanto based on its false and misleading advertising of RoundUp® products.

Specifically, the lawsuit challenged Monsanto's general representations that its

---

[11] David Barboza, *The Power of RoundUp® ; A Weed Killer Is A Block for Monsanto to Build On*, N.Y. TIMES, Aug. 2, 2001, available at http://www.nytimes.com/2001/08/02/business/the-power-of- RoundUp® -a-weed-killer-is-a-block-for-monsanto-to-build-on.html.

spray-on glyphosate-based herbicides, including RoundUp®, were "safer than table salt" and "practically non-toxic" to mammals, birds, and fish. Among the representations the NYAG found deceptive and misleading about the human and environmental safety of glyphosate and/or RoundUp® are the following:

a) "Remember that environmentally friendly RoundUp® herbicide is biodegradable. It won't build up in the soil so you can use RoundUp® with confidence along customers' driveways, sidewalks and fences ..."

b) "And remember that RoundUp® is biodegradable and won't build up in the soil. That will give you the environmental confidence you need to use RoundUp® everywhere you've got a weed, brush, edging or trimming problem."

c) "RoundUp® biodegrades into naturally occurring elements."

d) "Remember that versatile RoundUp® herbicide stays where you put it. That means there's no washing or leaching to harm customers' shrubs or other desirable vegetation."

e) "This non-residual herbicide will not wash or leach in the soil. It ... stays where you apply it."

f) "You can apply Accord[12] with 'confidence because it will stay where you put it' it bonds tightly to soil particles, preventing leaching. Then, soon after

---

[12] Accord is Monsanto branded herbicide. See https://www3.epa.gov/pesticides/chem_search/ppls/000524-00326-19990811.pdf.

**TOXIC CHEMICAL TORT ACTION: TEXAS PETITION**                    **PAGE 14**

application, soil microorganisms biodegrade Accord into natural products."

g) "Glyphosate is less toxic to rats than table salt following acute oral ingestion."

h) "Glyphosate's safety margin is much greater than required. It has over a 1,000-fold safety margin in food and over a 700-fold safety margin for workers who manufacture it or use it."

i) "You can feel good about using herbicides by Monsanto. They carry a toxicity category rating of 'practically non-toxic' as it pertains to mammals, birds and fish."

j) "RoundUp® can be used where kids and pets will play and breaks down into natural material." This advertisement depicts a person with his head in the ground and a pet dog standing in an area that has been treated with RoundUp®.[13]

41.     Despite the NYAG's findings, and Monsanto's agreement to discontinue such advertising, Monsanto failed to alter its advertising in any state other than New York, and on information and belief it still has not done so today.

**The International Agency for Research on Cancer Classifies Glyphosate as a "Probable Carcinogen"[14]**

---

[13] Attorney General of the State of New York, In the Matter of Monsanto Company, Assurance of Discontinuance Pursuant to Executive Law § 63(15) (Nov. 1996).

[14] The International Agency for Research on Cancer (IARC) is part of the World Health

42.     In March 2015, The International Agency for Research on Cancer (IARC) reassessed glyphosate. The summary published in The Lancet Oncology reported that glyphosate is a Group 2A agent and probably carcinogenic in humans.

43.     Glyphosate was identified as the second-most used household herbicide in the United States for weed control between 2001 and 2007 and the most heavily used herbicide in the world in 2012.

44.     Exposure pathways were identified as air (especially during spraying), water, and food. Community exposure to glyphosate is widespread and found in soil, air, surface water, and groundwater, as well as in food.

45.     The IARC Working Group found an increased risk between exposure to glyphosate and NHL and several subtypes of NHL, and the increased risk persisted after adjustment for other pesticides.

46.     The IARC Working Group also found that glyphosate caused DNA and chromosomal damage in human cells. One study in community residents reported increases in blood markers of chromosomal damage (micronuclei) after glyphosate formulations were sprayed.

47.     In male CD-1 mice, glyphosate induced a positive trend in the incidence of a rare tumor: renal tubule carcinoma. A second study reported a positive trend for haemangiosarcoma in male mice. Glyphosate increased pancreatic islet-cell

---

Organization. IARC coordinates and conducts both epidemiological and laboratory research into the causes of human cancer. See https://www.iarc.fr.

**TOXIC CHEMICAL TORT ACTION: TEXAS PETITION**                    **PAGE 16**

adenoma in male rats in two studies. A glyphosate formulation promoted skin tumors in an initiation-promotion study in mice.

48.     The IARC Working Group also noted that glyphosate has been detected in the urine of agricultural workers, indicating absorption. Soil microbes degrade glyphosate to aminomethylphosphoric acid (AMPA). Blood AMPA detection after exposure suggests intestinal microbial metabolism in humans.

49.     The IARC Working Group further found that glyphosate and glyphosate formulations induced DNA and chromosomal damage in mammals, and in human and animal cells in utero.

50.     The IARC Working Group also noted genotoxic, hormonal, and enzymatic effects in mammals exposed to glyphosate.[15] Essentially, glyphosate inhibits the biosynthesis of aromatic amino acids, which leads to several metabolic disturbances, including the inhibition of protein and secondary product biosynthesis and general metabolic disruption.

**The Toxicity of Other Ingredients in RoundUp®**

51.     In addition to the toxicity of the active ingredient, glyphosate, several studies support the hypothesis that the glyphosate-based formulation in Defendant's RoundUp® products is more dangerous and toxic than glyphosate alone. Indeed, as

---

[15] Kathryn Z. Guyton et al., *Carcinogenicity of Tetrachlorvinphos, Parathion, Malathion, Diazinon & Glyphosate*, 112 IARC Monographs 76, section 5.4 (2015), available at http://dx.doi.org/10.1016/S1470-2045(15)70134-8.

**TOXIC CHEMICAL TORT ACTION: TEXAS PETITION**                    **PAGE 17**

early as 1991, available evidence demonstrated that glyphosate formulations were significantly more toxic than glyphosate alone.[16]

52.    In 2002, a study by Julie Marc, entitled "Pesticide RoundUp® Provokes Cell Division Dysfunction at the Level of CDK1/Cyclin B Activation," revealed that RoundUp® causes delays in the cell cycles of sea urchins but that the same concentrations of glyphosate alone were ineffective and did not alter cell cycles.[17]

53.    A 2004 study by Marc and others, entitled "Glyphosate-based pesticides affect cell cycle regulation," demonstrated a molecular link between glyphosate-based products and cell cycle dysregulation. The researchers noted that "cell-cycle dysregulation is a hallmark of tumor cells and human cancer. Failure in the cell-cycle checkpoints leads genomic instability and subsequent development of cancers from the initial affected cell." Further, "[s]ince cell cycle disorders such as cancer result from dysfunction of a unique cell, it was of interest to evaluate the threshold dose of glyphosate affecting the cells."[18]

54.    In 2005, a study by Francisco Peixoto, entitled "Comparative effects of the

---

[16] Martinez, T.T. and K. Brown, *Oral and pulmonary toxicology of the surfactant used in RoundUp® herbicide,* PROC. WEST. PHARMACOL. SOC. 34:43-46 (1991).

[17] Julie Marc, et al., *Pesticide RoundUp® Provokes Cell Division Dysfunction at the Level of CDK1/Cyclin B Activation, 15 CHEM.* RES. TOXICOL. 326–331 (2002), available at http://pubs.acs.org/doi/full/10.1021/tx015543g.

[18] Julie Marc, et al., *Glyphosate-based pesticides affect cell cycle regulation*, 96 BIOLOGY OF THE CELL 245, 245-249 (2004), available at http://onlinelibrary.wiley.com/doi/10.1016/j.biolcel.2003.11.010/epdf.

**TOXIC CHEMICAL TORT ACTION: TEXAS PETITION**                    **PAGE 18**

RoundUp® and glyphosate on mitochondrial oxidative phosphorylation," demonstrated that RoundUp®'s effects on rat liver mitochondria are far more toxic than equal concentrations of glyphosate alone. The Peixoto study further suggested that the harmful effects of RoundUp® on mitochondrial bioenergetics could not be exclusively attributed to glyphosate but could be the result of other chemicals, such as the surfactant POEA, or in the alternative, due to a potential synergic effect between glyphosate and other ingredients in the RoundUp® formulation.[19]

55.     In 2009, Nora Benachour and Gilles-Eric Seralini published a study examining the effects of RoundUp® and glyphosate on human umbilical, embryonic, and placental cells. The study tested dilution levels of RoundUp® and glyphosate that were far below agricultural recommendations, corresponding with low levels of residue in food. The researchers ultimately concluded that supposed "inert" ingredients, and possibly POEA, alter human cell permeability and amplify toxicity of glyphosate alone. The researchers further suggested that assessments of glyphosate toxicity should account for the presence of adjuvants or additional chemicals used in the formulation of the complete pesticide. The study confirmed that the adjuvants present in RoundUp® are not, in fact, inert and that RoundUp®

---

[19] Francisco Peixoto, *Comparative effects of the RoundUp® and glyphosate on mitochondrial oxidative phosphorylation*, 61 CHEMOSPHERE 1115, 1122 (2005), available at https://www.researchgate.net/publication/7504567_Comparative_effects_of_the_RoundUp® _and_glyphos ate_on_mitochondrial_oxidative_phosphorylation.

**TOXIC CHEMICAL TORT ACTION: TEXAS PETITION**                    **PAGE 19**

is potentially far more toxic than its active ingredient glyphosate alone.[20]

56.     The results of these studies were at all times available to Defendant.
Defendant thus knew or should have known that RoundUp® is more toxic than
glyphosate alone and that safety studies of RoundUp®, RoundUp® 's adjuvants
and "inert" ingredients, and/or the surfactant POEA were necessary to protect
Plaintiff from RoundUp®.

57.     Despite its knowledge that RoundUp® is considerably more dangerous than
glyphosate alone, Defendant continued to promote RoundUp® as safe.

### Plaintiff's Exposure to RoundUp®

58.     Plaintiff Molly-Jack Waldrop is 66 years old. From 1980 to 2010, Ms.
Waldrop regularly sprayed RoundUp® to control the spread of weeds on her
property in Menard, Texas, and at the tennis facility where she officiated.

59.     Ms. Waldrop sprayed RoundUp® every year. She sprayed/applied
Monsanto's toxic formulation almost every week from March thru November but
she applied RoundUp® at a minimum of every month. Each application took about
60 minutes.

60.     Ms. Waldrop wore no protective gear such as gloves or a mask while
spraying RoundUp®.

---

[20] Nora Benachour, et al., *Glyphosate Formulations Induce Apoptosis and Necrosis in Human
Umbilical, Embryonic, and Placental Cells,* 22 CHEM. RES. TOXICOL. 97-105 (2008),
available at http://big.assets.huffingtonpost.com/france.pdf.

**TOXIC CHEMICAL TORT ACTION: TEXAS PETITION**          **PAGE 20**

61.     Ms. Waldrop purchased RoundUp® at her local Home Depot or Wal-Mart. She always purchased the pre-mixed solution. Whenever she ran out of RoundUp®, she would buy another bottle of the same product. Ms. Waldrop read the product's label and followed the instruction for application.

62.     On or about March 22, 2010, Ms. Waldrop was diagnosed with NHL in Kerrville, Texas. Thereafter, she underwent approximately ten months of continuous cancer treatment at the University of Texas MD Anderson Cancer Center located in Houston, Texas.

63.     After years of doctor visits, vast numbers of tests, exams, scans, including invasive needle biopsies, venipunctures, cancer treatments, cancer medications, blood and platelet transfusions, and injections, Ms. Waldrop achieved remission.

64.     Ms. Waldrop is required to continue regular evaluations and on-going medical monitoring with her physicians. Despite her optimistic attitude and her easy-going personality, her quality of life was irreparably damaged.

65.     During the entire time that Ms. Waldrop was exposed to Roundup®, she did not know that exposure to Roundup® was injurious to her health or the health of others.

## VI. TOLLING OF THE STATUTE OF LIMITATIONS

### Discovery Rule Tolling

66.     Plaintiff had no way of knowing about the risk of serious illness associated

**TOXIC CHEMICAL TORT ACTION: TEXAS PETITION**                    **PAGE 21**

with the use of and/or exposure to Roundup® and glyphosate until well after IARC

released its formal assessment of glyphosate in July 2015. Therefore, the discovery

rule applies to this case, and the statute of limitations has been tolled until the day

that Plaintiff knew or had reason to know that her NHL was linked to her use of

and/or exposure to Roundup®.

67.     Within the time period of any applicable statutes of limitations, Plaintiff

could not have discovered, through the exercise of reasonable diligence, that

exposure to Roundup® and glyphosate is injurious to human health.

68.     Plaintiff did not discover, and did not know of facts that would cause a

reasonable person to suspect the risks associated with the use of and/or exposure to

Roundup® and glyphosate; nor would a reasonable and diligent investigation by

her have revealed that Roundup® and glyphosate would cause her illness.

69.     For these reasons, all applicable statutes of limitations have been tolled by

operation of the discovery rule with respect to Plaintiff's claims.

### Fraudulent Concealment Tolling

70.     All applicable statutes of limitations have also been tolled by Monsanto's

knowing and active fraudulent concealment and denial of the facts alleged herein

throughout the time period relevant to this action, because rather than disclosing

critical safety information about Roundup® and glyphosate, Monsanto consistently

and falsely represented the safety of its Roundup® products.

**TOXIC CHEMICAL TORT ACTION: TEXAS PETITION**                 **PAGE 22**

71.     For example, even after the IARC's July 2015 classification that Roundup®'s glyphosate is a probable carcinogen, Defendant, in September and/or October of 2015, continued to represent that there is no evidence that glyphosate based Roundup® causes cancer.[21,22]

### Estoppel

72.     Monsanto was under a continuous duty to disclose to consumers, users and other persons coming into contact with its products, including Plaintiff, accurate safety information concerning its products and the risks associated with the use of and/or exposure to Roundup® and glyphosate.

73.     Instead, Monsanto knowingly, affirmatively, and actively concealed safety information concerning Roundup® and glyphosate and the serious risks associated with the use of and/or exposure to its products.

74.     Consequently, Monsanto is estopped from relying on any statutes of limitations in defense of this action.

### VII. CAUSES OF ACTION

---

[21] Backgrounder - *Glyphosate: No Evidence of Carcinogenicity.* Updated November 2014, at 1. Available at https://www.monsanto.com/app/uploads/2017/06/no-evidence-of-carcinogenicity.pdf
(stating " Regulatory authorities and independent experts around the world have reviewed numerous long-term/carcinogenicity and genotoxicity studies and agree that there is no evidence that glyphosate, the active ingredient in Roundup® brand herbicides and other glyphosate-based herbicides, causes cancer, even at very high doses, and that it is not genotoxic.").

[22] Available at http://www.monsantoglobal.com/global/au/products/Documents/what_is_glyphosate.pdf.

**TOXIC CHEMICAL TORT ACTION: TEXAS PETITION**                    **PAGE 23**

## COUNT ONE:

## STRICT PRODUCTS LIABILITY

## DEFECTIVELY DESIGNED PRODUCT

## (TEXAS COMMON LAW & TEXAS PRODUCTS LIABLITY STATUTE §§ 82.001- 82.008)

75.　Plaintiff re-alleges and incorporates by reference the allegations set forth in all preceding paragraphs as if set forth fully and reiterated here in their entirety.

76.　Defendant's defective Roundup® products brought upon Plaintiff severe injuries and personal misery and suffering. Despite using Roundup® as it was intended, Plaintiff suffered injury that was caused by Defendant's products.

77.　At all times relevant to this litigation, Defendant engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting Roundup® products, which are defective and unreasonably dangerous to consumers and users and other persons coming into contact them, including Plaintiff, thereby placing Roundup® products into the stream of commerce, including Texas commerce. These actions were under the ultimate control and supervision of Defendant.

78.　At all times relevant to this litigation, Defendant designed, researched, developed, formulated, manufactured, produced, tested, assembled, labeled, advertised, promoted, marketed, sold, and distributed the Roundup® products used

**TOXIC CHEMICAL TORT ACTION: TEXAS PETITION**　　　　**PAGE 24**

by Plaintiff, and/or to which Plaintiff was exposed, as described above.

79.    At all times relevant to this litigation, Defendant's Roundup® products were manufactured, designed, and labeled in an unsafe, defective, and inherently dangerous manner that was dangerous for use by or exposure to the public, and, in particular, the Plaintiff.

80.    At all times relevant to this litigation, Defendant's Roundup® products reached the Plaintiff without substantial change in the product's condition as designed, manufactured, sold, distributed, labeled, and marketed by Defendant.

81.    Defendant's Roundup® products, as researched, tested, developed, designed, licensed, formulated, manufactured, packaged, labeled, distributed, sold, and marketed by Defendant were defective in design and formulation in that when they left the hands of the Defendant's manufacturers and/or suppliers, they were unreasonably dangerous and dangerous to an extent beyond that which an ordinary consumer would contemplate.

82.    Defendant's Roundup® products, as researched, tested, developed, designed, licensed, formulated, manufactured, packaged, labeled, distributed, sold, and marketed by Defendant were defective in design and formulation in that when they left the hands of Defendant's manufacturers and/or suppliers, the foreseeable risks associated with these products' reasonably foreseeable uses exceeded the alleged benefits associated with their design and formulation.

**TOXIC CHEMICAL TORT ACTION: TEXAS PETITION**                    **PAGE 25**

83.     Thus, at all times relevant to this litigation, Defendant's Roundup®
products, as researched, tested, developed, designed, licensed, manufactured,
packaged, labeled, distributed, sold and marketed by Defendant, were defective in
design and formulation, in one or more of the following ways:

    a.  When placed in the stream of commerce, Defendant's Roundup®
products were defective in design and formulation, and, consequently,
dangerous to an extent beyond that which an ordinary consumer
would contemplate;

    b.  When placed in the stream of commerce, Defendant's Roundup®
products were unreasonably dangerous in that they were hazardous
and posed a grave risk of cancer and other serious illnesses when used
in a reasonably anticipated manner;

    c.  When placed in the stream of commerce, Defendant's Roundup®
products contained unreasonably dangerous design defects and were
not reasonably safe when used in a reasonably anticipated or intended
manner;

    d.  Defendant failed to sufficiently test, investigate, or study its
Roundup® products and, specifically, the active ingredient
glyphosate;

    e.  Exposure to Roundup® and glyphosate-containing products presents a

**TOXIC CHEMICAL TORT ACTION: TEXAS PETITION**                **PAGE 26**

risk of harmful side effects that outweighs any potential utility

stemming from the use of the herbicide;

    f.  Defendant knew or should have known at the time of marketing its

Roundup® products that exposure to Roundup® and specifically, its

active ingredient glyphosate, could result in cancer and other severe

illnesses and injuries;

    g.  Defendant failed to conduct adequate post-marketing surveillance of

its Roundup® products; and

    h.  Defendant could have employed safer alternative designs and

formulations.

84.    At all times relevant to this litigation, Plaintiff used and/or was exposed to

the use of Defendant's Roundup® products in an intended or reasonably

foreseeable manner without knowledge of their dangerous characteristics.

85.    Plaintiff could not have reasonably discovered the defects and risks

associated with Roundup® or glyphosate-containing products before or at the time

of exposure.

86.    The harm caused by Defendant's Roundup® products far outweighed their

benefit, rendering Defendant's products dangerous to an extent beyond that which

an ordinary consumer would contemplate. Defendant's Roundup® products were

and are more dangerous than alternative products and Defendant could have

**TOXIC CHEMICAL TORT ACTION: TEXAS PETITION**         **PAGE 27**

designed its Roundup® products to make them less dangerous.

87.     Defendant knew about the risks of Roundup® and nevertheless marketed, sold, and placed its unreasonably dangerous products into the stream of commerce— even though at the time that Defendant designed its Roundup® products, the state of the industry's scientific knowledge was such that a less risky design or formulation was attainable. Therefore, Plaintiff's injuries were foreseeable and reasonably preventable.

88.     At the time Roundup® products left Defendant's control, there was a practical, technically feasible, and safer alternative design that would have prevented the harm without substantially impairing the reasonably anticipated or intended function of Defendant's Roundup® herbicides.

89.     Defendant's defective design of Roundup® amounts to willful, wanton, and/or reckless conduct by Defendant.

90.     Therefore, as a result of the unreasonably dangerous condition of its Roundup® products, Defendant is strictly liable to Plaintiff.

91.     The defects in Defendant's Roundup® products were substantial and contributing factors in causing Plaintiff's grave injuries, and, but for Defendant's misconduct and omissions, Plaintiff would not have sustained her injuries.

92.     As a direct and proximate result of Defendant placing its defective Roundup® products into the stream of commerce and in Texas, Plaintiff has

**TOXIC CHEMICAL TORT ACTION: TEXAS PETITION**          **PAGE 28**

suffered severe and permanent physical and emotional injuries, including losses
and damages in excess of the minimal jurisdictional limits of this Court.

93.     Plaintiff has endured pain and suffering, has suffered economic loss
(including significant expenses for medical care and treatment), and will continue
to incur these expenses in the future.

## COUNT TWO:

## STRICT PRODUCTS LIABILITY

## FAILURE TO WARN

## (TEXAS COMMON LAW & TEXAS PRODUCTS LIABLITY STATUTE §§ 82.001- 82.008)

94.     Plaintiff re-alleges and incorporates by reference the allegations set forth in
all preceding paragraphs as if set forth fully and reiterated here in their entirety.

95.     At all times relevant to this litigation, Defendant engaged in the business of
testing, developing, designing, manufacturing, marketing, selling, distributing, and
promoting Roundup® products, which are defective and unreasonably dangerous
to consumers, including Plaintiff, because they do not contain adequate warnings
or instructions concerning the dangerous characteristics of Roundup® and
specifically, the active ingredient glyphosate. These actions were under the
ultimate control and supervision of Defendant.

96.     Defendant researched, developed, designed, tested, manufactured, inspected,

**TOXIC CHEMICAL TORT ACTION: TEXAS PETITION**                    **PAGE 29**

labeled, distributed, marketed, promoted, sold, and otherwise released into the stream of commerce, including Texas commerce, its Roundup® products, and in the course of same, directly advertised or marketed the products to consumers and end users, including Plaintiff. Defendant therefore had a duty to warn of the risks associated with the reasonably foreseeable uses (and misuses) of Roundup® and glyphosate-containing products.

97.     At all times relevant to this litigation, Defendant had a duty to properly test, develop, design, manufacture, inspect, package, label, market, promote, sell, distribute, maintain supply, provide proper warnings, and take such steps as necessary to ensure that its Roundup® products did not cause users and consumers to suffer from unreasonable and dangerous risks.

98.     Defendant had a continuing duty to warn Plaintiff of the dangers associated with Roundup® use and exposure. Defendant, as manufacturer, seller, or distributor of chemical herbicides, is held to the knowledge of an expert in the field.

99.     At the time of manufacture, Defendant could have provided warnings or instructions regarding the full and complete risks of Roundup® and glyphosate-containing products because it knew or should have known of the unreasonable risks of harm associated with the use of and/or exposure to these products.

100.   At all times relevant to this litigation, Defendant failed to investigate, study,

**TOXIC CHEMICAL TORT ACTION: TEXAS PETITION**                    **PAGE 30**

test, or promote the safety or to minimize the dangers to users and consumers of its Roundup® products and to those who would foreseeably use, or be harmed by Defendant's herbicides, including Plaintiff.

101.    Despite the fact that Defendant knew or should have known that Roundup® products posed a severe risk of harm, it failed to warn of the dangerous risks associated with their use and exposure.

102.    The dangerous propensities of its products and the carcinogenic characteristics of glyphosate, as described above, were known to Defendant, or were scientifically knowable to Defendant through appropriate research and testing by known methods, at the time it distributed, supplied, or sold the product, and not known to end users and consumers, such as Plaintiff.

103.    Defendant knew or should have known that its Roundup® and glyphosate-containing products created significant risks of serious bodily harm to consumers, as alleged herein, and Defendant failed to adequately warn consumers and reasonably foreseeable users of the risks of exposure to these products. Defendant wrongfully concealed information concerning the dangerous nature of Roundup® and its active ingredient glyphosate, and further, made false and/or misleading statements concerning the safety of Roundup® and glyphosate.

104.    At all times relevant to this litigation, Defendant's Roundup® products reached the intended consumers, handlers, and users or other persons coming into

**TOXIC CHEMICAL TORT ACTION: TEXAS PETITION**                    **PAGE 31**

contact with these products throughout Texas, including Plaintiff, without substantial change in their condition as designed, manufactured, sold, distributed, labeled, and marketed by Defendant.

105.   At all times relevant to this litigation, Plaintiff used and/or was exposed to the use of Defendant's Roundup® products in their intended or reasonably foreseeable manner without knowledge of their dangerous characteristics.

106.   Plaintiff could not have reasonably discovered the defects and risks associated with Roundup® or glyphosate-containing products before or at the time of Plaintiff's exposure. Plaintiff relied upon the skill, superior knowledge, and judgment of Defendant.

107.   Defendant knew or should have known that the minimal warnings disseminated with its Roundup® products were inadequate, but to boost profits and market share, Defendant failed to communicate adequate information on the dangers and safe use/exposure and failed to communicate warnings and instructions that were appropriate and adequate to render the products safe for their ordinary, intended, and reasonably foreseeable uses, including agricultural and horticultural applications.

108.   The information that Defendant did provide or communicate failed to contain relevant warnings, hazards, and precautions that would have enabled agricultural workers, horticultural workers and/or at-home users such as Plaintiff to

utilize the products safely and with adequate protection.

109.   Instead, Defendant disseminated information that was inaccurate, false, and misleading and failed to communicate accurately or adequately the comparative severity, duration, and extent of the risk of injuries associated with use of and/or exposure to Roundup® and glyphosate. Defendant continued to aggressively promote the efficacy of its products, even after it knew or should have known of the unreasonable risks from use or exposure; and concealed, downplayed, or otherwise suppressed, through aggressive marketing and promotion, any information or research about the risks and dangers of exposure to Roundup® and glyphosate.

110.   Defendant failed to adequately and accurately warn of the true risks of Plaintiff's injuries associated with the use of and exposure to Roundup® and its active ingredient glyphosate, a probable carcinogen.

111.   As a result of their inadequate warnings, Defendant's Roundup® products were defective and unreasonably dangerous when they left the possession and/or control of Defendant, were distributed by Defendant, and used by Plaintiff.

112.   Therefore, Defendant is liable to Plaintiff for injuries caused by its failure to provide adequate warnings or other clinically relevant information and data regarding the appropriate use of its Roundup® products and the risks associated with the use of or exposure to Roundup® and glyphosate.

113.    The defects in Defendant's Roundup® products were substantial and contributing factors in causing Plaintiff's injuries, and, but for Defendant's misconduct and omissions, Plaintiff would not have sustained her injuries.

114.    Had Defendant provided adequate warnings and instructions and properly disclosed and disseminated the risks associated with its Roundup® products, Plaintiff could have avoided the risk of developing injuries as alleged herein.

115.    As a direct and proximate result of Defendant placing its defective Roundup® products into the stream of commerce and in Texas, Plaintiff has suffered severe and permanent physical and emotional injuries, including losses and damages in excess of the minimal jurisdictional limits of this Court.

116.    Plaintiff has endured pain and suffering, has suffered economic loss (including significant expenses for medical care and treatment), and will continue to incur these expenses in the future.

## COUNT THREE:

## NEGLIGENCE

117.    Plaintiff re-alleges and incorporates by reference the allegations set forth in all preceding paragraphs as if set forth fully and reiterated here in their entirety.

118.    Monsanto, directly or indirectly, caused Roundup® products to be sold, distributed, packaged, labeled, marketed, promoted, and/or used by Plaintiff.

119.    Defendant had a duty to exercise reasonable care in the designing,

**TOXIC CHEMICAL TORT ACTION: TEXAS PETITION**          **PAGE 34**

researching, testing, manufacturing, marketing, supplying, promoting, packaging, sale, and/or distribution of Roundup® into the stream of commerce and Texas, including a duty to assure that the product would not cause users to suffer unreasonable, dangerous side effects.

120.    At all times relevant to this litigation, Monsanto had a duty to exercise reasonable care in the marketing, advertisement, and sale of the Roundup® products. Monsanto's duty of care owed to consumers and the general public included providing accurate, true, and correct information concerning the risks of using Roundup® and appropriate, complete, and accurate warnings concerning the potential adverse effects of exposure to Roundup®, and, in particular, its active ingredient glyphosate.

121.    At all times relevant to this litigation, Monsanto knew or, in the exercise of reasonable care, should have known of the hazards and dangers of Roundup® and specifically, the carcinogenic properties of the chemical glyphosate.

122.    At all times relevant to this litigation, Monsanto knew or, in the exercise of reasonable care, should have known that use of or exposure to its Roundup® products could cause or be associated with Plaintiff's injuries and thus created a dangerous and unreasonable risk of injury to the users of these products, including Plaintiff.

123.    Monsanto knew or, in the exercise of reasonable care, should have known

**TOXIC CHEMICAL TORT ACTION: TEXAS PETITION**                    **PAGE 35**

that users and consumers of Roundup®, such as Plaintiff, were unaware of the risks and the magnitude of the risks associated with use of and/or exposure to Roundup® and glyphosate-containing products.

124.   Consequently, Monsanto breached the duty of reasonable care and failed to exercise ordinary care in the design, research, development, manufacture, testing, marketing, supply, promotion, advertisement, packaging, sale, and distribution of its Roundup® products, in that Monsanto manufactured, marketed, promoted, and sold defective herbicides containing the chemical glyphosate, knew or had reason to know of the defects inherent in these products, knew or had reason to know that a user's or consumer's exposure to the products created a significant risk of harm and unreasonably dangerous side effects, and failed to prevent or adequately warn of these risks and injuries.

125.   Even though Monsanto had the ability and means to investigate, study, and test these products and to provide adequate warnings, Monsanto failed to do so. Further, Monsanto wrongfully concealed information and made false and/or misleading statements concerning the safety and/or exposure to Roundup® and glyphosate.

126.   Monsanto was negligent in at least the following respects:

    a.  Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing its Roundup®

products without thorough and adequate pre- and post-market testing;

b.  Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing Roundup® while negligently and/or intentionally concealing and failing to disclose the results of trials, tests, and studies of exposure to glyphosate, and, consequently, the risk of serious harm associated with human use of and exposure to Roundup®;

c.  Failing to undertake sufficient studies and conduct necessary tests to determine whether or not Roundup® products and glyphosate-containing products were safe for their intended use in agriculture and horticulture;

d.  Failing to use reasonable and prudent care in the design, research, manufacture, and development of Roundup® products so as to avoid the risk of serious harm associated with the prevalent use of Roundup®/glyphosate as an herbicide;

e.  Failing to design and manufacture Roundup® products so as to ensure they were at least as safe and effective as other herbicides on the market;

f.  Failing to provide adequate instructions, guidelines, and safety precautions to those persons who Monsanto could reasonably foresee

would use and be exposed to its Roundup® products;

g.  Failing to disclose to Plaintiff, users/consumers, and the general public that use of and exposure to Roundup® presented severe risks of cancer and other serious illnesses;

h.  Failing to warn Plaintiff, consumers, and the general public that the product's risk of harm was unreasonable and that there were safer and effective alternative herbicides available to Plaintiff and other consumers;

i.  Systematically suppressing or downplaying contrary evidence about the risks, incidence, and prevalence of the side effects of Roundup® and glyphosate-containing products;

j.  Representing that its Roundup® products were safe for their intended use when, in fact, Monsanto knew or should have known that the products were not safe for their intended purpose;

k.  Declining to make or propose any changes to Roundup® products' labeling or other promotional materials that would alert the consumers and the general public of the risks of Roundup® and glyphosate;

l.  Advertising, marketing, and recommending the use of the Roundup® products, while concealing and failing to disclose or warn of the dangers known by Monsanto to be associated with or caused by the

use of or exposure to Roundup® and glyphosate;

   m. Continuing to disseminate information to its consumers, which

   indicate or imply that Monsanto's Roundup® products are not unsafe;

   and

   n. Continuing the manufacture and sale of its products with the

   knowledge that the products were unreasonably unsafe and

   dangerous.

127.   Monsanto knew and/or should have known that it was foreseeable that

consumers such as Plaintiff would suffer injuries as a result of Monsanto's failure

to exercise ordinary care in the manufacturing, marketing, promotion, labeling,

distribution, and sale of Roundup®.

128.   Plaintiff did not know the nature and extent of the injuries that could result

from the intended use of and/or exposure to Roundup® or its active ingredient

glyphosate.

129.   Monsanto's negligence was the proximate cause of the injuries, harm, and

economic losses that Plaintiff suffered, as described herein.

130.   As a direct and proximate result of Defendant's wrongful acts and

omissions, Plaintiff has suffered severe and permanent physical and emotional

injuries, including losses and damages in excess of the minimal jurisdictional

limits of this Court.

**TOXIC CHEMICAL TORT ACTION: TEXAS PETITION**          **PAGE 39**

131.   Plaintiff has endured pain and suffering, has suffered economic loss

(including significant expenses for medical care and treatment), and will continue

to incur these expenses in the future.

## COUNT FOUR:

### BREACH OF EXPRESS WARRANTY

132.   Plaintiff re-alleges and incorporates by reference the allegations set forth in

all preceding paragraphs as if set forth fully and reiterated here in their entirety.

133.   Defendant engaged in the business of design, research, testing,

manufacturing, marketing, advertisement, supply, promotion, packaging, sale

and/or distribution of Roundup®, which is defective and unreasonably dangerous

to consumers, including Plaintiff, thereby placing Roundup® into the stream of

commerce, including Texas commerce.

134.   Defendant expressly represented and warranted to the purchasers of

Roundup®, by and through statements made by Defendant in labels, publications,

package inserts, and other written materials intended for consumers and the general

public, that its Roundup® products were safe to human health and the

environment, effective, fit, and proper for their intended use.

135.   Defendant advertised, labeled, marketed, and promoted Roundup® products,

representing the quality to consumers and the public in such a way as to induce

their purchase or use, thereby making an express warranty that its Roundup®

**TOXIC CHEMICAL TORT ACTION: TEXAS PETITION**          **PAGE 40**

products would conform to the representations.

136.   Defendant's express representations include incomplete warnings and instructions that purport, but fail, to include the complete array of risks associated with use of and/or exposure to Roundup® and glyphosate.

137.   Defendant knew and/or should have known that the risks expressly included in Roundup® warnings and labels did not and do not accurately or adequately set forth the risks of developing the serious injuries complained of herein.

138.   Putting profits over and above human health and safety, Defendant expressly represented that its Roundup® products were safe and effective, that they were safe and effective for use by individuals such as Plaintiff, and/or that they were safe and effective as herbicides.

139.   The representations about Roundup®, as set forth herein, contained or constituted affirmations of fact or promises made by the seller to the buyer, which related to the goods and became part of the basis of the bargain, creating an express warranty that the goods would conform to the representations.

140.   Defendant placed its Roundup® products into the stream of commerce for sale and recommended their use to Texas consumers and the public without adequately warning of the true risks of developing the injuries associated with the use of and exposure to Roundup® and its active ingredient glyphosate.

141.   Defendant breached these warranties because, among other things, its

**TOXIC CHEMICAL TORT ACTION: TEXAS PETITION**                    **PAGE 41**

Roundup® products were defective, dangerous, unfit for use, did not contain labels representing the true and adequate nature of the risks associated with their use, and were not merchantable or safe for their intended, ordinary, and foreseeable use and purpose. Specifically, Defendant breached the warranties in the following ways:

    a. Defendant represented through its labeling, advertising, and marketing materials that its Roundup® products were safe, and fraudulently withheld and concealed information about the risks of serious injury associated with use of and/or exposure to Roundup® and glyphosate by expressly limiting the risks associated with use and/or exposure within its warnings and labels; and

    b. Defendant represented that its Roundup® products were safe for use and fraudulently concealed information that demonstrated that glyphosate, the active ingredient in Roundup®, had carcinogenic properties, and that its Roundup® products, therefore, were not safer than alternatives available on the market.

142.   On information and belief, Plaintiff justifiably and detrimentally relied on the express warranties and representations of Defendant in the purchase and use of its Roundup® products. When Plaintiff made the decision to purchase Roundup®, she reasonably relied upon Defendant to disclose known defects, risks, dangers, and side effects of Roundup® and glyphosate.

**TOXIC CHEMICAL TORT ACTION: TEXAS PETITION**　　　　　　**PAGE 42**

143.   Defendant had sole access to material facts concerning the nature of the risks associated with its Roundup® products as expressly stated within its warnings and labels, and Defendant knew that consumers and users such as Plaintiff could not have reasonably discovered that the risks expressly included in Roundup® warnings and labels were inadequate and inaccurate.

144.   Plaintiff had no knowledge of the falsity or incompleteness of Defendant's statements and representations concerning Roundup®.

145.   Plaintiff used and/or was exposed to the use of Roundup® as researched, developed, designed, tested, formulated, manufactured, inspected, labeled, distributed, packaged, marketed, promoted, sold, or otherwise released into the stream of commerce, including Texas commerce, by Defendant.

146.   Had the warnings and labels for Roundup® products accurately and adequately set forth the true risks associated with the use of such products, including Plaintiff's injuries, rather than expressly excluding such information and warranting that the products were safe for their intended use, Plaintiff could have avoided the injuries complained of herein.

147.   As a direct and proximate result of Defendant's wrongful acts and omissions, Plaintiff has suffered severe and permanent physical and emotional injuries, including losses and damages in excess of the minimal jurisdictional limits of this Court.

**TOXIC CHEMICAL TORT ACTION: TEXAS PETITION**                    **PAGE 43**

148.   Plaintiff has endured pain and suffering, has suffered economic loss (including significant expenses for medical care and treatment), and will continue to incur these expenses in the future.

## COUNT FIVE:

## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY

149.   Plaintiff re-alleges and incorporates by reference the allegations set forth in all preceding paragraphs as if set forth fully and reiterated here in their entirety.

150.   Defendant engaged in the business of design, research, testing, manufacturing, marketing, advertisement, supply, promotion, packaging, sale and/or distribution of Roundup®, which was defective and unreasonably dangerous to users and consumers, including Plaintiff, thereby placing Roundup® into the stream of commerce, including Texas. These actions were under the ultimate control and supervision of Defendant.

151.   Before the time that Plaintiff was exposed to Roundup®, Defendant impliedly warranted to its consumers and users—including Plaintiff—that its Roundup® products were of merchantable quality and safe and fit for the use for which they were intended; specifically, as herbicides.

152.   Defendant, however, failed to disclose that Roundup® has dangerous propensities when used as intended and that the use of and/or exposure to Roundup® carries an increased risk of developing severe injuries, including

**TOXIC CHEMICAL TORT ACTION: TEXAS PETITION**          **PAGE 44**

Plaintiff's injuries.

153.   Upon information and belief, Plaintiff reasonably relied upon the skill, superior knowledge and judgment of Defendant and upon its implied warranties that the Roundup® products were of merchantable quality and fit for their intended purpose or use.

154.   The Roundup® products were expected to reach and did in fact reach consumers and users, including Plaintiff, without substantial change in the condition in which they were manufactured and sold by Defendant.

155.   At all times relevant to this litigation, Defendant was aware that consumers and users of its products, including Plaintiff, would use Roundup® products as marketed by Defendant, which is to say that Plaintiff was the foreseeable user of Roundup®.

156.   Defendant intended that its Roundup® products be used in the manner in which Plaintiff in fact used them and Defendant impliedly warranted each product to be of merchantable quality, safe, and fit for this use, despite the fact that Roundup® was not adequately tested or researched.

157.   Plaintiff used Roundup® as instructed and labeled and in the foreseeable manner intended, recommended, promoted, and marketed by Defendant— in reliance upon Defendant's implied warranty.

158.   Plaintiff could not have reasonably discovered or known of the risks of

serious injury associated with Roundup® or glyphosate.

159.   Defendant breached its implied warranty to Plaintiff in that Defendant's Roundup® products were not of merchantable quality, safe, or fit for their intended use, or adequately tested. Instead, Roundup® contained dangerous propensities when used as intended and can cause serious injuries, including those injuries complained of herein.

160.   The harm caused by Defendant's Roundup® products far outweighed their benefit, rendering the products more dangerous than an ordinary consumer or user would expect and more dangerous than alternative products.

161.   As a direct and proximate result of Defendant's wrongful acts and omissions, Plaintiff has suffered severe and permanent physical and emotional injuries, including losses and damages in excess of the minimal jurisdictional limits of this Court.

162.   Plaintiff has endured pain and suffering, has suffered economic loss (including significant expenses for medical care and treatment), and will continue to incur these expenses in the future.

## VIII. AGGRAVATING CONDUCT, EXEMPLARY & PUNITIVE DAMAGES

### DEFENDANT'S FRAUD, MALICE, & GROSS NEGLIGENCE

163.   Plaintiff re-alleges and incorporates by reference the allegations set forth in

**TOXIC CHEMICAL TORT ACTION: TEXAS PETITION**               **PAGE 46**

all preceding paragraphs as if set forth fully and reiterated here in their entirety.

164.    Plaintiff would further show Monsanto's conduct, viewed objectively, involved an extreme degree of risk, considering the probability and magnitude of the potential harm, and that Monsanto had actual subjective awareness of the risk involved, but nevertheless proceeded with conscious indifference to the rights, safety, and/or welfare of others, including Plaintiff. Such conduct constitutes gross negligence.

165.    Defendant acted willfully, wantonly, maliciously, with an evil motive, and recklessly in one or more of the following ways:

  a.  Defendant knew of the unreasonably high risk of NHL posed by the Roundup® products before manufacturing, marketing, distributing and/or selling the Roundup® products, yet purposefully proceeded with such action;

  b.  Despite their knowledge of the high risk of NHL associated with use and/or exposure to Roundup® products, Defendant affirmatively minimized this risk through marketing and promotional efforts and product labeling;

  c.  Defendant knew of the dangers and risks of Roundup® products, yet it concealed and/or omitted this information from labels and warnings contained on Roundup® products in furtherance of its knowing and

**TOXIC CHEMICAL TORT ACTION: TEXAS PETITION**                    **PAGE 47**

willful actions.

    d. Defendant's conduct demonstrates a reckless indifference to the safety of the consuming public such as users of Roundup® products, including Plaintiff.

166. As a direct and proximate result of the willful, wanton, malicious, outrageous, and/or reckless conduct of Defendant, the Plaintiff has sustained damages as set forth herein. Therefore, Plaintiff seeks exemplary damages as provided for by § 41.003 of TEX. CIV. PRAC. & REM. CODE.

167. Monsanto's calloused conduct clearly and convincingly warrants an award of exemplary damages, costs expended, and any and all further relief that the Court finds just and necessary.

## IX. DAMAGES

168. As a proximate and producing cause of the acts and omissions outlined above, Plaintiff has suffered, and will continue to suffer in the future, general and special damages exceeding the minimal jurisdictional limits of this Court. These damages include:

    a. Pain and suffering (past and future);

    b. Mental anguish (past and future);

    c. Medical, pharmaceutical, and hospital expenses (past and future);

    d. Healthcare related travel expenses (past and future);

e. Physical impairment (past and future);

f. Disfigurement (past and future).

g. Loss of past earnings; and

h. Loss of future earnings.

## X. DEMAND FOR JURY TRIAL

169.    Pursuant to TEX. R. CIV. P. 216, Plaintiff requests a jury trial. The jury fee has been, or will be paid.

## XI. CONDITIONS PRECEDENT

170.    All conditions precedent have been performed or have occurred.

## XII. PRAYER FOR RELIEF

171.    WHEREFORE, PREMISES CONSIDERED, as a direct and proximate cause of Defendant's acts or omissions, Plaintiff suffered injuries, losses, and damages.

172.    Therefore, the Plaintiff, **Ms. Molly-Jack Waldrop**, prays that the Defendant be cited to appear, that upon trial by a jury the Defendant be held liable for the causes of action pled, and that a judgment be entered awarding to Plaintiff all of the following:

a. Actual and general damages;

b. Special damages;

c. Exemplary-Punitive damages;

**TOXIC CHEMICAL TORT ACTION: TEXAS PETITION**                    **PAGE 49**

d.  Costs of court and filing fees;

e.  Attorney's fees;

f.  Pre- and post-judgment interest at the highest applicable rate on any

award of damages, costs and/or attorneys' fees; and

g.  All general and equitable relief, and any other relief to which she is

entitled.


Respectfully submitted,


**/s/ Marcus Smith** _____
Marcus Smith

The Smith Law Office, PLLC
State Bar No. 24085591
PO Box 60732
San Angelo, TX  76906

P) 325-716-8211
F) 325-227-4095
E) marcussmithlawyer@protonmail.com


*Attorney for Plaintiff*


**TOXIC CHEMICAL TORT ACTION: TEXAS PETITION**                    **PAGE 50**

## CERTIFICATE OF SERVICE

The undersigned certifies that private process server served a true and correct copy of the foregoing document upon Defendant at the time and in the manner set forth in the return of service.


/s/ **Marcus Smith**
Marcus Smith