# United States District Court
## District of Puerto Rico (San Juan)
## CIVIL DOCKET FOR CASE #: 3:20-cv-01198-JAG

Velez Rios et al v. Monsanto Company et al
Assigned to: Judge Jay A. Garcia-Gregory
Demand: $9,999,000
Cause: 28:1332 Diversity-Product Liability

Date Filed: 04/29/2020
Jury Demand: Plaintiff
Nature of Suit: 245 Tort Product Liability
Jurisdiction: Diversity

**Plaintiff**

**Martin Velez Rios**

represented by **Jorge Carazo-Quetglas**
Carazo Quetglas Law Office
#53 Esmeralda Ave.
Guaynabo, PR 00969-4429
787-707-0588
Fax: 787-707-0595
Email: jorge@jctuayudalegal.com
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Juan Rivera Pagan**

represented by **Jorge Carazo-Quetglas**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Luz Rodriguez Sanchez**

represented by **Jorge Carazo-Quetglas**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Carlos Plaza Gonzalez**

represented by **Jorge Carazo-Quetglas**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Jose Jimenez Yordan**

represented by **Jorge Carazo-Quetglas**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Rafael Shulze**

represented by **Jorge Carazo-Quetglas**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Jorge Caballero Jimenez**

represented by **Jorge Carazo-Quetglas**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Cecilio Reyes Garced**

represented by **Jorge Carazo-Quetglas**

(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Eroina Santiago**                    represented by **Jorge Carazo-Quetglas**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Luis Antonio Colon**                 represented by **Jorge Carazo-Quetglas**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Misael Batista Hernandez**           represented by **Jorge Carazo-Quetglas**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Jose Medina Olivera**                represented by **Jorge Carazo-Quetglas**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Alma Alvelo**                        represented by **Jorge Carazo-Quetglas**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Gabriel Ocacio Acevedo**             represented by **Jorge Carazo-Quetglas**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Neivida Torres Melendez**            represented by **Jorge Carazo-Quetglas**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Miguel Estrada Gonzalez**            represented by **Jorge Carazo-Quetglas**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Efran Ortiz Pomales**                represented by **Jorge Carazo-Quetglas**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Estate Ramon Berios**                represented by **Jorge Carazo-Quetglas**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

Ramon Berrios Rivera

represented by **Jorge Carazo-Quetglas**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

Estate of Ramon Antonio Galarza
Gonzalez

represented by **Jorge Carazo-Quetglas**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

Ramon Galarza Echevaria

represented by **Jorge Carazo-Quetglas**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

Estate of Ana Lydia Acevedo del Rio

represented by **Jorge Carazo-Quetglas**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

Gabriel Rodriguez

represented by **Jorge Carazo-Quetglas**
(See above for address)
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

Monsanto Company

represented by **Albeniz Couret-Fuentes**
Sepulvado & Maldonado PSC
304 Ponce de Leon Ave.
Suite 990
San Juan, PR 00918
787-765-5656 787-360-6962
Fax: 787-294-0073
Email: acouret@smclawpr.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Elaine Marie Maldonado-Matias**
Sepulvado & Maldonado PSC
304 Ponce de Leon Ave.
Suite 990
San Juan, PR 00918
787-765-5656 787-469-3897
Fax: 787-294-0073
Email: emaldonado@smclawpr.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**JOHN DOE 1" to "JOHN DOE 50"**

**Defendant**

## JOHN DOE 51" to "JOHN DOE 100"

| Date Filed | # | Docket Text |
|---|---|---|
| 04/29/2020 | 1 | ***FILED IN ERROR. Duplicate filing as in D.E. #2, which includes Civil Cover Sheet, Category Sheet and Summons.*** COMPLAINT against All Defendants ( Filing fee $400 receipt number 0104-6869650.), filed by Misael Batista Hernandez, Ramon Galarza Echevaria, Jorge Caballero Jimenez, Juan Rivera Pagan, Estate of Ana Lydia Acevedo del Rio, Martin Velez Rios, Estate Ramon Berios, Gabriel Rodriguez, Alma Alvelo, Miguel Estrada Gonzalez, Rafael Shulze, Luz Rodriguez Sanchez, Eroina Santiago, Jose Medina Olivera, Neivida Torres Melendez, Estate of Ramon Antonio Galarza Gonzalez, Gabriel Ocacio Acevedo, Cecilio Reyes Garced, Carlos Plaza Gonzalez, Luis Antonio Colon, Ramon Berrios Rivera, Jose Jimenez Yordan. Service due by 7/28/2020,(Carazo-Quetglas, Jorge) Modified on 5/1/2020 (mg). (Entered: 04/29/2020) |
| 04/29/2020 | 2 | COMPLAINT against All Defendants, filed by Misael Batista Hernandez, Ramon Galarza Echevaria, Jorge Caballero Jimenez, Juan Rivera Pagan, Efran Ortiz Pomales, Estate of Ana Lydia Acevedo del Rio, Martin Velez Rios, Estate Ramon Berios, Gabriel Rodriguez, Alma Alvelo, Miguel Estrada Gonzalez, Rafael Shulze, Luz Rodriguez Sanchez, Eroina Santiago, Jose Medina Olivera, Neivida Torres Melendez, Estate of Ramon Antonio Galarza Gonzalez, Gabriel Ocacio Acevedo, Cecilio Reyes Garced, Carlos Plaza Gonzalez, Luis Antonio Colon, Ramon Berrios Rivera, Jose Jimenez Yordan. Service due by 7/28/2020, (Attachments: # 1 Civil Cover Sheet, # 2 Category Sheet, # 3 Summons) (Carazo-Quetglas, Jorge) (Entered: 04/29/2020) |
| 04/29/2020 | 3 | NOTICE of Appearance by Jorge Carazo-Quetglas on behalf of All Plaintiffs (Carazo-Quetglas, Jorge) (Entered: 04/29/2020) |
| 04/30/2020 | 4 | NOTICE OF JUDGE ASSIGNMENT Case has been assigned to Judge Jay A. Garcia-Gregory (arg) (Entered: 04/30/2020) |
| 04/30/2020 | 5 | Summons Issued as to Monsanto Company (Attachments: # 1 Summons) (arg) (Entered: 04/30/2020) |
| 06/25/2020 | 6 | MOTION to transfer case *to the United States District Court for the Northern District of California for coordinated or consolidated pretrial proceedings in the case titled: IN RE: ROUNDUP PRODUCTS LIABILITY LITIGATION MDL No. 3:16-MD-02741 (VC).* filed by Jorge Carazo-Quetglas on behalf of All Plaintiffs Responses due by 7/6/2020. NOTE: Pursuant to FRCP 6(a) an additional three days does not apply to service done electronically. (Carazo-Quetglas, Jorge) (Entered: 06/25/2020) |
| 07/13/2020 | 7 | ***FILED IN ERROR. Transfer is to MDL case.***ORDER granting 6 Motion to transfer case. The Clerk of Court shall take notice. Signed by Judge Jay A. Garcia-Gregory on 7/13/2020. (MQ) Modified on 7/14/2020 to file in error (vso). (Entered: 07/13/2020) |
| 07/14/2020 | | ***FILED IN ERROR. District Transfer procedure does not apply for MDL case.*** Case Transferred Out to District of U.S. District Court for the Northern District of California. E-mail sent to help desk at USDC for the Northern District of California. Extraction completed. (vso) Modified on 7/14/2020 to file in error (vso). (Entered: 07/14/2020) |
| 07/14/2020 | | NOTICE of Docket Text Modification by Deputy Clerk re: 7 Order on Motion to transfer case, Case Transferred Out - District Transfer. ***FILED IN ERROR - Transfer is to MDL case. Not a civil case transfer.*** (vso) (Entered: 07/14/2020) |
| 07/14/2020 | 8 | ORDER noted 6 MOTION to transfer case *to the United States District Court for the* |

| | | |
|---|---|---|
| | | *Northern District of California for coordinated or consolidated pretrial proceedings in the case titled: IN RE: ROUNDUP PRODUCTS LIABILITY LITIGATION MDL No. 3:16-MD-02741 (VC).* Pursuant to 28 U.S.C. 1407, such a transfer request must be filed and approved by the judicial panel on multidistrict litigation. Signed by Judge Jay A. Garcia-Gregory on 7/14/2020. (MQ) (Entered: 07/14/2020) |
| 07/28/2020 | 9 | ***FILED IN ERROR Incorrect PDF.*** NOTICE of Appearance by Elaine Marie Maldonado-Matias on behalf of Monsanto Company (Maldonado-Matias, Elaine) Modified on 7/29/2020 (mg). (Entered: 07/28/2020) |
| 07/28/2020 | 10 | Corporate Disclosure Statement byMonsanto Company. (Maldonado-Matias, Elaine) (Entered: 07/28/2020) |
| 07/28/2020 | 11 | First MOTION for extension of time until 09/02/2020 to to answer complaint or otherwise plead filed by Elaine Marie Maldonado-Matias on behalf of Monsanto Company Responses due by 8/11/2020. NOTE: Pursuant to FRCP 6(a) an additional three days does not apply to service done electronically. (Maldonado-Matias, Elaine) (Entered: 07/28/2020) |
| 07/29/2020 | | NOTICE of Docket Text Modification re 9 Notice of Appearance. ***FILED IN ERROR Incorrect PDF. PDF filed in fillable format. Counsel to Refile Notice of Appearance.*** (mg) (Entered: 07/29/2020) |
| 07/29/2020 | 12 | NOTICE of Appearance by Elaine Marie Maldonado-Matias on behalf of Monsanto Company (Maldonado-Matias, Elaine) (Entered: 07/29/2020) |
| 08/11/2020 | 13 | ORDER granting 11 Motion for extension of time until 09/02/2020 to answer complaint or otherwise plead. Signed by Judge Jay A. Garcia-Gregory on 08/11/2020. (lir) (Entered: 08/11/2020) |
| 09/02/2020 | 14 | *Monsanto Company's Answer to Plaintiffs' Complaint* ANSWER to 2 Complaint,, with Jury Demand filed by Elaine Marie Maldonado-Matias on behalf of Defendant Monsanto Company.(Maldonado-Matias, Elaine) Modified on 9/3/2020 to replace all caps text. (mg). (Entered: 09/02/2020) |
| 09/03/2020 | 15 | NOTICE of Appearance by Albeniz Couret-Fuentes on behalf of Monsanto Company (Couret-Fuentes, Albeniz) (Entered: 09/03/2020) |
| 10/14/2020 | 16 | SCHEDULING ORDER/CASE MANAGEMENT ORDER. The Court hereby sets the following deadlines: **JOINT Initial Scheduling Memorandum due by 10/30/2020. Proposed JOINT Pretrial Order due by 6/6/2022. Pretrial/Settlement Conference set for 6/13/2022 03:00 PM before Judge Jay A. Garcia-Gregory. Jury Trial set for 6/27/2022 10:00 AM before Judge Jay A. Garcia-Gregory.** Signed by Judge Jay A. Garcia-Gregory on 10/14/2020. (MQ) (Entered: 10/14/2020) |
| 10/22/2020 | 17 | Joint MOTION for extension of time until 11/13/2020 to To file Initial Scheduling Memorandum filed by Albeniz Couret-Fuentes on behalf of all parties. Responses due by 11/5/2020. NOTE: Pursuant to FRCP 6(a) an additional three days does not apply to service done electronically. (Couret-Fuentes, Albeniz) Modified on 10/23/2020 to add filers (mg). (Entered: 10/22/2020) |

| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 11/10/2020 17:47:33 | | | |
| **PACER** | hllp1982:2634105:4722683 | **Client Code:** | 1417.0049 |

https://ecf.prd.uscourts.gov/cgi-bin/DktRpt.pl?105722741795595-L_1_0-1      5/6

| Login: | | | |
| --- | --- | --- | --- |
| **Description:** | Docket Report | **Search Criteria:** | 3:20-cv-01198-JAG |
| **Billable Pages:** | 5 | **Cost:** | 0.50 |

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| MARTÍN VÉLEZ RÍOS; JUAN RIVERA PAGÁN; LUZ M. RODRÍGUEZ SÁNCHEZ; CARLOS M. PLAZA GONZÁLEZ; JOSÉ JIMENEZ YORDÁN; RAFAEL SHULZE; JORGE CABALLERO JIMENEZ; CECILIO REYES GARCED; EROINA SANTIAGO; LUIS ANTONIO COLÓN; MISAEL BATISTA HERNÁNDEZ; JOSÉ JUAN MEDINA OLIVERA; ALMA M. ALVELO; GABRIEL OCACIO ACEVEDO; NEIVIDA TORRES MELENDEZ; MIGUEL ESTRADA GONZÁLEZ; EFRAÍN ORTIZ POMALES; RAMÓN BERRIOS RIVERA, for himself and in representation of THE ESTATE OF RAMÓN BERRIOS; RAMÓN GALARZA ECHEVARÍA for himself and in representation of THE ESTATE OF RAMÓN ANTONIO GALARZA GONZÁLEZ; and, GABRIEL RODRÍGUEZ for himself and in representation of THE ESTATE OF ANA LYDIA ACEVEDO DEL RÍO | CIVIL NO. : |
| | PRODUCT LIABILITY, TORT, NEGLIGENCE |
| | TRIAL BY JURY REQUESTED |
| *Plaintiffs* | |
| vs. | |
| MONSANTO COMPANY, "JOHN DOE 1" to "JOHN DOE 50"; and, "JOHN DOE 51" to "JOHN DOE 100" | |
| *Defendants* | |

## COMPLAINT

**TO THE HONORABLE COURT:**

**COME NOW** plaintiffs, Martín Vélez Ríos, Juan Rivera Pagán, Luz M. Rodríguez Sánchez, Carlos M. Plaza González, José Jimenez Yordán, Rafael Shulze, Jorge Caballero Jimenez, Cecilio Reyes Garced, Eroina Santiago, Luis Antonio Colón, Misael Batista Hernández, José Juan Medina Olivera, Alma M. Alvelo, Gabriel Ocacio Acevedo, Neivida Torres

Melendez, Miguel Estrada González, Efraín Ortiz Pomales, Ramón Berrios Rivera for himself , and in representation of the Estate of Ramón Berrios, Ramón Galarza Echevaría for himself and in representation of the Estate of Ramón Antonio Galarza González and Gabriel Rodríguez for himself and in representation of the Estate of Ana Lydia Acevedo del Río (herein after referred collectively to as "**Plaintiffs**") , through the undersigned attorney, and very respectfully **STATE** and **PRAY**:

## I.     INTRODUCTION

1.     This is an action brought pursuant to 28 U.S.C. §1332, seeking damages sustained by **Plaintiffs** including, but not limited to, physical injuries, emotional and physiological pain and suffering, economic damages, wrongful death and punitive damages, in strict product liability, design defect, manufacturing defect, negligent design, negligent manufacturing, lack of adequate warnings, deficient warnings, negligence *per se*, breach of warranty and fraud, as a result of the use of the herbicide Roundup®, containing the active ingredient glyphosate, researched, developed, designed, tested, manufactured, inspected, labeled, distributed, marketed, promoted, sold, and otherwise released into the stream of commerce by defendants. Plaintiffs maintain that Roundup® and/or glyphosate is defective, dangerous to human health, unfit and unsuitable to be marketed and sold in commerce, and lacked proper warnings and directions as to the dangers associated with its use. Plaintiffs' injuries, like those striking thousands of similarly situated victims across the country, were avoidable.

## II.     JURISDICTIONAL PLEADINGS

2.     This Honorable Court has jurisdiction over the parties and the subject matter of this litigation pursuant to 28 U.S.C. § 1332, because all the parties on either part of the controversy are of diverse citizenship and the amount in controversy exceeds, for each individual plaintiff, the sum of **SEVENTY FIVE THOUSAND DOLLARS ($75,000.00),** exclusive of interest and costs.

The facts set forth in this complaint are actionable under Articles 1802, *et. seq.*, of the Civil Code of Puerto Rico, 31 L.P.R.A. § § 5141, *et. seq.*

3.      This Honorable Court also has supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

4.      Venue is proper in this District, pursuant to 28 U.S.C. § 1391, because: this action concerns acts occurring within the Commonwealth of Puerto Rico; all **Plaintiffs** are residents of and domiciled in the Commonwealth of Puerto Rico; defendants in this action are a entities and/or corporations organized under the laws of states of the United States other than the Commonwealth of Puerto Rico, with principal places of business and "nerve centers" located in states other than the Commonwealth of Puerto Rico. **Plaintiffs** in this action are persons who used in the Commonwealth of Puerto Rico the products researched, developed, designed, tested, manufactured, inspected, labeled, distributed, marketed, promoted, sold, and otherwise released into the stream of commerce by defendants (hereinafter "Roundup" or "**Defendant's Products**"). **Defendants' Products** are described in more detail herein bellow. Defendants in this action are entities and/or corporations that at all times relevant herein: researched, developed, designed, tested, manufactured, inspected, labeled, distributed, marketed, promoted, sold, and otherwise released into the stream of commerce **Defendants' Products**; promoted, marketed, distributed and/or sold **Defendants' Products** in the Commonwealth of Puerto Rico; purposefully availed themselves of the benefits and protections of the Commonwealth of Puerto Rico; and/or, have had sufficient contacts with the Commonwealth of Puerto Rico that maintenance of the action in this locale would be consistent with traditional notions of fair play and substantial justice. Defendants have, and at all times material had, representatives and distributors in this District and also advertised in this District and made material omissions and misrepresentations and breaches of warranties in the same.

5.      Plaintiffs demand trial by jury.

### III. **DEFENDANTS' PRODUCTS**

6.     Roundup is also referred herein to as **Defendants' Products**.

7.     Roundup consists of all formulations of defendants' Roundup products, including, but not limited to, Roundup Concentrate Poison Ivy and Tough Brush Killer 1, Roundup Custom Herbicide, Roundup D-Pak herbicide, Roundup Dry Concentrate, Roundup Export Herbicide, Roundup Fence & Hard Edger 1, Roundup Garden Foam Weed & Grass Killer, Roundup Grass and Weed Killer, Roundup Herbicide, Roundup Original 2k herbicide, Roundup Original II Herbicide, Roundup Pro Concentrate, Roundup Prodry Herbicide, Roundup Promax, Roundup Quik Stik Grass and Weed Killer, Roundup Quikpro Herbicide, Roundup Rainfast Concentrate Weed & Grass Killer, Roundup Rainfast Super Concentrate Weed & Grass Killer, Roundup Ready-to-Use Extended Control Weed & Grass Killer 1 Plus Weed Preventer, Roundup Ready-to-Use Weed & Grass Killer, Roundup Ready-toUse Weed and Grass Killer 2, Roundup Ultra Dry, Roundup Ultra Herbicide, Roundup Ultramax, Roundup VM Herbicide, Roundup Weed & Grass Killer Concentrate, Roundup Weed & Grass Killer Concentrate Plus, Roundup Weed & Grass killer Ready-to-Use Plus, Roundup Weed & Grass Killer Super Concentrate, Roundup Weed & Grass Killer1 Ready-to-Use, Roundup WSD Water Soluble Dry Herbicide Deploy Dry Herbicide, or any other formulation of containing the active ingredient glyphosate.

### IV. **THE PARTIES**

#### A. **Plaintiffs**

8.     Plaintiff Martín Vélez Ríos, is a natural person of legal age and resident of Yabucoa, Puerto Rico. He brings this action for personal injuries sustained by exposure to Roundup. As a direct and proximate result of being exposed to Roundup, he developed Lymphoma and has suffered effects attendant thereto. As a direct and proximate result of these injuries, he has sustained and will continue to sustain in the future severe and great physical damages which have permanently and partially disable him, which disability is progressive in

4

nature. As a direct and proximate result of these injuries, he has sustained and will continue to sustain in the future severe mental, moral, psychological, spiritual and emotional distress, pain and suffering, which have permanently and partially disabled him, which disability is progressive in nature. As a direct and proximate result of these injuries, he has incurred and will incur medical expenses, has endured and will endure pain and suffering and loss of enjoyment of life, and he has otherwise been damaged in a personal and pecuniary nature.  At all pertinent times, he used **Defendants' Products** in Puerto Rico.

9.      Plaintiff Juan Rivera Pagán, is a natural person of legal age and resident of Bayamón, Puerto Rico. He brings this action for personal injuries sustained by exposure to Roundup. As a direct and proximate result of being exposed to Roundup, he developed Leukemia and has suffered effects attendant thereto. As a direct and proximate result of these injuries, he has sustained and will continue to sustain in the future severe and great physical damages which have permanently and partially disable him, which disability is progressive in nature.  As a direct and proximate result of these injuries, he has sustained and will continue to sustain in the future severe mental, moral, psychological, spiritual and emotional distress, pain and suffering, which have permanently and partially disabled him, which disability is progressive in nature. As a direct and proximate result of these injuries, he has incurred and will incur medical expenses, has endured and will endure pain and suffering and loss of enjoyment of life, and he has otherwise been damaged in a personal and pecuniary nature.  At all pertinent times, he used **Defendants' Products** in Puerto Rico.

10.      Plaintiff Luz M. Rodríguez Sánchez , is a natural person of legal age and resident of Caguas, Puerto Rico. She brings this action for personal injuries sustained by exposure to Roundup. As a direct and proximate result of being exposed to Roundup, she developed Lymphoma and has suffered effects attendant thereto. As a direct and proximate result of these injuries, she has sustained and will continue to sustain in the future severe and great physical

5

damages which have permanently and partially disable her, which disability is progressive in nature. As a direct and proximate result of these injuries, she has sustained and will continue to sustain in the future severe mental, moral, psychological, spiritual and emotional distress, pain and suffering, which have permanently and partially disabled her, which disability is progressive in nature. As a direct and proximate result of these injuries, she has incurred and will incur medical expenses, has endured and will endure pain and suffering and loss of enjoyment of life, and she has otherwise been damaged in a personal and pecuniary nature. At all pertinent times, she used **Defendants' Products** in Puerto Rico.

11.    Plaintiff Carlos M. Plaza González, is a natural person of legal age and resident of Adjuntas, Puerto Rico. He brings this action for personal injuries sustained by exposure to Roundup. As a direct and proximate result of being exposed to Roundup, he developed Lymphoma and has suffered effects attendant thereto. As a direct and proximate result of these injuries, he has sustained and will continue to sustain in the future severe and great physical damages which have permanently and partially disable him, which disability is progressive in nature. As a direct and proximate result of these injuries, he has sustained and will continue to sustain in the future severe mental, moral, psychological, spiritual and emotional distress, pain and suffering, which have permanently and partially disabled him, which disability is progressive in nature. As a direct and proximate result of these injuries, he has incurred and will incur medical expenses, has endured and will endure pain and suffering and loss of enjoyment of life, and he has otherwise been damaged in a personal and pecuniary nature. At all pertinent times, he used **Defendants' Products** in Puerto Rico.

12.    Plaintiff José Jimenez Yordán, is a natural person of legal age and resident of San Juan, Puerto Rico. He brings this action for personal injuries sustained by exposure to Roundup. As a direct and proximate result of being exposed to Roundup, he developed Myeloma and has suffered effects attendant thereto. As a direct and proximate result of these injuries, he has

6

sustained and will continue to sustain in the future severe and great physical damages which have permanently and partially disable him, which disability is progressive in nature. As a direct and proximate result of these injuries, he has sustained and will continue to sustain in the future severe mental, moral, psychological, spiritual and emotional distress, pain and suffering, which have permanently and partially disabled him, which disability is progressive in nature. As a direct and proximate result of these injuries, he has incurred and will incur medical expenses, has endured and will endure pain and suffering and loss of enjoyment of life, and he has otherwise been damaged in a personal and pecuniary nature. At all pertinent times, he used **Defendants' Products** in Puerto Rico.

13.     Plaintiff Rafael Shulze, is a natural person of legal age and resident of Vega Alta, Puerto Rico. He brings this action for personal injuries sustained by exposure to Roundup. As a direct and proximate result of being exposed to Roundup, he developed Lymphoma and has suffered effects attendant thereto. As a direct and proximate result of these injuries, he has sustained and will continue to sustain in the future severe and great physical damages which have permanently and partially disable him, which disability is progressive in nature. As a direct and proximate result of these injuries, he has sustained and will continue to sustain in the future severe mental, moral, psychological, spiritual and emotional distress, pain and suffering, which have permanently and partially disabled him, which disability is progressive in nature. As a direct and proximate result of these injuries, he has incurred and will incur medical expenses, has endured and will endure pain and suffering and loss of enjoyment of life, and he has otherwise been damaged in a personal and pecuniary nature. At all pertinent times, he used **Defendants' Products** in Puerto Rico.

14.     Plaintiff Jorge Caballero Jimenez, is a natural person of legal age and resident of Caguas, Puerto Rico. He brings this action for personal injuries sustained by exposure to Roundup. As a direct and proximate result of being exposed to Roundup, he developed

Myeloma and has suffered effects attendant thereto. As a direct and proximate result of these injuries, he has sustained and will continue to sustain in the future severe and great physical damages which have permanently and partially disable him, which disability is progressive in nature. As a direct and proximate result of these injuries, he has sustained and will continue to sustain in the future severe mental, moral, psychological, spiritual and emotional distress, pain and suffering, which have permanently and partially disabled him, which disability is progressive in nature. As a direct and proximate result of these injuries, he has incurred and will incur medical expenses, has endured and will endure pain and suffering and loss of enjoyment of life, and he has otherwise been damaged in a personal and pecuniary nature. At all pertinent times, he used **Defendants' Products** in Puerto Rico.

15.     Plaintiff Cecilio Reyes Garced, is a natural person of legal age and resident of San Juan, Puerto Rico. He brings this action for personal injuries sustained by exposure to Roundup. As a direct and proximate result of being exposed to Roundup, he developed Lymphoma and has suffered effects attendant thereto. As a direct and proximate result of these injuries, he has sustained and will continue to sustain in the future severe and great physical damages which have permanently and partially disable him, which disability is progressive in nature. As a direct and proximate result of these injuries, he has sustained and will continue to sustain in the future severe mental, moral, psychological, spiritual and emotional distress, pain and suffering, which have permanently and partially disabled him, which disability is progressive in nature. As a direct and proximate result of these injuries, he has incurred and will incur medical expenses, has endured and will endure pain and suffering and loss of enjoyment of life, and he has otherwise been damaged in a personal and pecuniary nature. At all pertinent times, he used **Defendants' Products** in Puerto Rico.

16.     Plaintiff Eroina Santiago, is a natural person of legal age and resident of Caguas, Puerto Rico. She brings this action for personal injuries sustained by exposure to Roundup. As

8

a direct and proximate result of being exposed to Roundup, she developed Carcinoma and has suffered effects attendant thereto. As a direct and proximate result of these injuries, she has sustained and will continue to sustain in the future severe and great physical damages which have permanently and partially disable her, which disability is progressive in nature. As a direct and proximate result of these injuries, she has sustained and will continue to sustain in the future severe mental, moral, psychological, spiritual and emotional distress, pain and suffering, which have permanently and partially disabled her, which disability is progressive in nature. As a direct and proximate result of these injuries, she has incurred and will incur medical expenses, has endured and will endure pain and suffering and loss of enjoyment of life, and she has otherwise been damaged in a personal and pecuniary nature. At all pertinent times, she used **Defendants' Products** in Puerto Rico.

17.     Plaintiff Luis Antonio Colón, is a natural person of legal age and resident of Villalba, Puerto Rico. He brings this action for personal injuries sustained by exposure to Roundup. As a direct and proximate result of being exposed to Roundup, he developed Carcinoma in bladder and has suffered effects attendant thereto. As a direct and proximate result of these injuries, he has sustained and will continue to sustain in the future severe and great physical damages which have permanently and partially disable him, which disability is progressive in nature. As a direct and proximate result of these injuries, he has sustained and will continue to sustain in the future severe mental, moral, psychological, spiritual and emotional distress, pain and suffering, which have permanently and partially disabled him, which disability is progressive in nature. As a direct and proximate result of these injuries, he has incurred and will incur medical expenses, has endured and will endure pain and suffering and loss of enjoyment of life, and he has otherwise been damaged in a personal and pecuniary nature. At all pertinent times, he used **Defendants' Products** in Puerto Rico.

9

18.     Plaintiff Misael Batista Hernández, is a natural person of legal age and resident of Gurabo, Puerto Rico. He brings this action for personal injuries sustained by exposure to Roundup. As a direct and proximate result of being exposed to Roundup, he developed Carcinoma and has suffered effects attendant thereto. As a direct and proximate result of these injuries, he has sustained and will continue to sustain in the future severe and great physical damages which have permanently and partially disable him, which disability is progressive in nature. As a direct and proximate result of these injuries, he has sustained and will continue to sustain in the future severe mental, moral, psychological, spiritual and emotional distress, pain and suffering, which have permanently and partially disabled him, which disability is progressive in nature. As a direct and proximate result of these injuries, he has incurred and will incur medical expenses, has endured and will endure pain and suffering and loss of enjoyment of life, and he has otherwise been damaged in a personal and pecuniary nature. At all pertinent times, he used **Defendants' Products** in Puerto Rico.

19.     Plaintiff José Juan Medina Olivera, is a natural person of legal age and resident of Jayuya, Puerto Rico. He brings this action for personal injuries sustained by exposure to Roundup. As a direct and proximate result of being exposed to Roundup, he developed Myeloma and has suffered effects attendant thereto. As a direct and proximate result of these injuries, he has sustained and will continue to sustain in the future severe and great physical damages which have permanently and partially disable him, which disability is progressive in nature. As a direct and proximate result of these injuries, he has sustained and will continue to sustain in the future severe mental, moral, psychological, spiritual and emotional distress, pain and suffering, which have permanently and partially disabled him, which disability is progressive in nature. As a direct and proximate result of these injuries, he has incurred and will incur medical expenses, has endured and will endure pain and suffering and loss of enjoyment of

life, and he has otherwise been damaged in a personal and pecuniary nature. At all pertinent times, he used **Defendants' Products** in Puerto Rico.

20.     Plaintiff Alma M. Alvelo, is a natural person of legal age and resident of Camuy, Puerto Rico. She brings this action for personal injuries sustained by exposure to Roundup. As a direct and proximate result of being exposed to Roundup, she developed Carcinoma and has suffered effects attendant thereto. As a direct and proximate result of these injuries, she has sustained and will continue to sustain in the future severe and great physical damages which have permanently and partially disable her, which disability is progressive in nature. As a direct and proximate result of these injuries, she has sustained and will continue to sustain in the future severe mental, moral, psychological, spiritual and emotional distress, pain and suffering, which have permanently and partially disabled her, which disability is progressive in nature. As a direct and proximate result of these injuries, she has incurred and will incur medical expenses, has endured and will endure pain and suffering and loss of enjoyment of life, and she has otherwise been damaged in a personal and pecuniary nature. At all pertinent times, she used **Defendants' Products** in Puerto Rico.

21.     Plaintiff Gabriel Ocacio Acevedo, is a natural person of legal age and resident of Quebradilla, Puerto Rico. He brings this action for personal injuries sustained by exposure to Roundup. As a direct and proximate result of being exposed to Roundup, he developed Carcinoma and has suffered effects attendant thereto. As a direct and proximate result of these injuries, he has sustained and will continue to sustain in the future severe and great physical damages which have permanently and partially disable him, which disability is progressive in nature. As a direct and proximate result of these injuries, he has sustained and will continue to sustain in the future severe mental, moral, psychological, spiritual and emotional distress, pain and suffering, which have permanently and partially disabled him, which disability is progressive in nature. As a direct and proximate result of these injuries, he has incurred and will incur

11

medical expenses, has endured and will endure pain and suffering and loss of enjoyment of life, and he has otherwise been damaged in a personal and pecuniary nature. At all pertinent times, he used **Defendants' Products** in Puerto Rico.

22.    Plaintiff Neivida Torres Melendez, is a natural person of legal age and resident of Vega Baja, Puerto Rico. She brings this action for personal injuries sustained by exposure to Roundup. As a direct and proximate result of being exposed to Roundup, she developed Carcinoma and has suffered effects attendant thereto. As a direct and proximate result of these injuries, she has sustained and will continue to sustain in the future severe and great physical damages which have permanently and partially disable her, which disability is progressive in nature. As a direct and proximate result of these injuries, she has sustained and will continue to sustain in the future severe mental, moral, psychological, spiritual and emotional distress, pain and suffering, which have permanently and partially disabled her, which disability is progressive in nature. As a direct and proximate result of these injuries, she has incurred and will incur medical expenses, has endured and will endure pain and suffering and loss of enjoyment of life, and she has otherwise been damaged in a personal and pecuniary nature. At all pertinent times, she used **Defendants' Products** in Puerto Rico.

23.    Plaintiff Miguel Estrada González, is a natural person of legal age and resident of Conóvanas, Puerto Rico. He brings this action for personal injuries sustained by exposure to Roundup. As a direct and proximate result of being exposed to Roundup, he developed Leukemia and has suffered effects attendant thereto. As a direct and proximate result of these injuries, he has sustained and will continue to sustain in the future severe and great physical damages which have permanently and partially disable him, which disability is progressive in nature. As a direct and proximate result of these injuries, he has sustained and will continue to sustain in the future severe mental, moral, psychological, spiritual and emotional distress, pain and suffering, which have permanently and partially disabled him, which disability is progressive

in nature. As a direct and proximate result of these injuries, he has incurred and will incur medical expenses, has endured and will endure pain and suffering and loss of enjoyment of life, and he has otherwise been damaged in a personal and pecuniary nature. At all pertinent times, he used **Defendants' Products** in Puerto Rico.

24.     Plaintiff Efraín Ortiz Pomales, is a natural person of legal age and resident of Orocovis, Puerto Rico. He brings this action for personal injuries sustained by exposure to Roundup. As a direct and proximate result of being exposed to Roundup, he developed Carcinoma and has suffered effects attendant thereto. As a direct and proximate result of these injuries, he has sustained and will continue to sustain in the future severe and great physical damages which have permanently and partially disable him, which disability is progressive in nature. As a direct and proximate result of these injuries, he has sustained and will continue to sustain in the future severe mental, moral, psychological, spiritual and emotional distress, pain and suffering, which have permanently and partially disabled him, which disability is progressive in nature. As a direct and proximate result of these injuries, he has incurred and will incur medical expenses, has endured and will endure pain and suffering and loss of enjoyment of life, and he has otherwise been damaged in a personal and pecuniary nature. At all pertinent times, he used **Defendants' Products** in Puerto Rico.

25.     Plaintiff Ramón Berrios Rivera represents the Estate of Ramón Berrios. Deceased Ramón Berrios was a natural person of legal age and resident of San Germán, Puerto Rico. He brings this action for personal injuries sustained by his father related to exposure to Roundup. As a direct and proximate result of being exposed to Roundup, deceased Ramón Berrios developed Lymphoma and suffered effects attendant thereto. As a direct and proximate result of these injuries, deceased Ramón Berrios sustained severe and great physical damages. As a direct and proximate result of these injuries, deceased Ramón Berrios sustained severe mental, moral, psychological, spiritual and emotional distress, pain and suffering. As a direct

and proximate result of these injuries, deceased Ramón Berrios incurred medical expenses, endured pain and suffering and loss of enjoyment of life, and he was damaged in a personal and pecuniary nature. At all pertinent times, deceased Ramón Berrios used **Defendants' Products** in Puerto Rico. Plaintiff Ramón Berrios Rivera also appears in his personal capacity and claims the damages he has sustained as a result of the loss of his father.

26. Plaintiff Ramón Galarza Echevaría represents the Estate of Ramón Antonio Galarza González. Deceased Ramón Antonio Galarza González was a natural person of legal age and resident of Carolina Puerto Rico. He brings this action for personal injuries sustained by his father related to exposure to Roundup. As a direct and proximate result of being exposed to Roundup, deceased Ramón Antonio Galarza González developed Myeloma and suffered effects attendant thereto. As a direct and proximate result of these injuries, deceased Ramón Antonio Galarza González sustained severe and great physical damages. As a direct and proximate result of these injuries, deceased Ramón Antonio Galarza González sustained severe mental, moral, psychological, spiritual and emotional distress, pain and suffering. As a direct and proximate result of these injuries, deceased Ramón Antonio Galarza González incurred medical expenses, endured pain and suffering and loss of enjoyment of life, and he was damaged in a personal and pecuniary nature. At all pertinent times, deceased Ramón Antonio Galarza González used **Defendants' Products** in Puerto Rico. Plaintiff Ramón Galarza Echevaría also appears in his personal capacity and claims the damages he has sustained as a result of the loss of his father.

27. Plaintiff Gabriel Rodríguez represents the Estate of Ana Lydia Acevedo del Río. Deceased Ana Lydia Acevedo del Río was a natural person of legal age and resident of Río Grande, Puerto Rico. He brings this action for personal injuries sustained by his mother related to exposure to Roundup. As a direct and proximate result of being exposed to Roundup, deceased Ana Lydia Acevedo del Río developed Lymphoma and suffered effects attendant

14

thereto. As a direct and proximate result of these injuries, deceased Ana Lydia Acevedo del Río sustained severe and great physical damages. As a direct and proximate result of these injuries, deceased Ana Lydia Acevedo del Río sustained severe mental, moral, psychological, spiritual and emotional distress, pain and suffering. As a direct and proximate result of these injuries, deceased Ana Lydia Acevedo del Río incurred medical expenses, endured pain and suffering and loss of enjoyment of life, and she was damaged in a personal and pecuniary nature. At all pertinent times, deceased Ana Lydia Acevedo del Río used **Defendants' Products** in Puerto Rico. Plaintiff Gabriel Rodríguez also appears in his personal capacity and claims the damages he has sustained as a result of the loss of his father.

## B.      Defendants

28.      Defendant Monsanto Company ("**Monsanto**") is a Delaware corporation, with principle place of business in St. Louis, Missouri. **Monsanto**: researched, developed, designed, tested, manufactured, inspected, labeled, distributed, marketed, promoted, sold, and otherwise released into the stream of commerce **Defendants' Products**; purposefully availed itself of the benefits and protections of the Commonwealth of Puerto Rico; and/or, has had sufficient contacts with the Commonwealth of Puerto Rico that maintenance of the action in this locale would be consistent with traditional notions of fair play and substantial justice. Additionally, it advertised in Puerto Rico and made material omissions and misrepresentations and breaches of warranties in Puerto Rico.

29.      Defendants **"JOHN DOE 1"** to **"JOHN DOE 50"** are persons that are residents of a state other than Puerto Rico and/or are entities and/or corporations organized under the laws of states of the United States other than the Commonwealth of Puerto Rico, with principal places of business and "nerve centers" located in states other than the Commonwealth of Puerto Rico, who are liable to **Plaintiffs** for the damages claimed herein because they were involved in the research, development, design, testing, manufacture, inspection, labeling, distribution,

15

marketing, promotion, sale and/or release into the stream of commerce of **Defendants'** **Products** and because they made material omissions and misrepresentations and breaches of warranties in Puerto Rico regarding **Defendants' Products**. Upon determination of the true name of defendants **"JOHN DOE 1"** to **"JOHN DOE 50", Plaintiffs** herein will move forthwith to substitute their actual names for their fictitious name.

30.      Defendants **"JOHN DOE 51"** to **"JOHN DOE 100"** are insurance companies that are residents of a state other than Puerto Rico and, at all pertinent times, were and still are the insurers of the remaining defendants, and had issued one or more insurance policies that cover risks and liabilities such as the ones described in this Complaint, and as a result thereof they are liable to **Plaintiffs** for the events described herein. **Plaintiffs** will move for substitution of parties once the true names of these insurance companies become known.

2.      Defendant **Monsanto** and defendants **JOHN DOES 1- 50** are collectively referred to as "**Defendants**".

3.      **Defendants** sold **Defendants' Products** to its distributors in Commonwealth of Puerto Rico, with knowledge that they would in turn sell and distribute the same in the Commonwealth of Puerto Rico.

4.      **Defendants** manufactured and produced **Defendants' Products** for the Commonwealth of Puerto Rico.

5.      **Defendants** worked with its distributors on the island of Puerto Rico to market and promote **Defendants' Products** in the Commonwealth of Puerto Rico.

6.      **Defendants**' executives visited its distributors on the island of Puerto Rico to promote the sale of **Defendants' Products** in the Commonwealth of Puerto Rico.

7.      **Defendants**' developed and presented videos to promote the sale of **Defendants' Products** in the Commonwealth of Puerto Rico.

16

8.     **Defendants** also advertised in the Commonwealth of Puerto Rico and made material omissions and misrepresentations and breaches of warranties in the same.

9.     **Defendants** expected or should have expected their acts to have consequences within the Commonwealth of Puerto Rico, and derived substantial revenue from interstate commerce.

10.     **Defendants** purposefully availed themselves of the privilege of conducting activities with the Commonwealth of Puerto Rico, thus invoking the benefits and protections of its laws.

11.     **Defendants** did act together to design, sell, advertise, manufacture and/or distribute **Defendants' Products**, with full knowledge of its dangerous and defective nature.

## IV.     FACTUAL BACKGROUND

### A. Production of Defendants' Products

12.     At all relevant times, **Defendants** were in the business of, and did, design, research, manufacture, test, advertise, promote, market, sell, distribute, and/or have acquired and are responsible for **Defendants** who have designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed **Defendants' Products**.

13.     **Monsanto** is a multinational agricultural biotechnology corporation based in St. Louis, Missouri. It is the world's leading producer of glyphosate.

14.     **Defendants** discovered the herbicidal properties of glyphosate during the 1970's and subsequently began to design, research, manufacture, sell and distribute glyphosate **Defendants' Products** as a broad spectrum herbicide.

15.     Glyphosate is the active ingredient in **Defendants' Products**.

16.     Glyphosate is a broad-spectrum herbicide used to kill weeds and grasses known to compete with commercial crops grown around the globe.

17

17.    Glyphosate is a "non-selective" herbicide, meaning it kills indiscriminately based only on whether a given organism produces a specific enzyme, 5-enolpyruvylshikimic acid-3-phosphate synthase, known as EPSP synthase.

18.    Glyphosate inhibits the enzyme 5-enolpyruvylshikimic acid-3-phosphate synthase that interferes with the shikimic pathway in plants, resulting in the accumulation of shikimic acid in plant tissue and ultimately plant death.

19.    Sprayed as a liquid, plants absorb glyphosate directly through their leaves, stems, and roots, and detectable quantities accumulate in the plant tissues.

20.    Each year, approximately 250 million pounds of glyphosate are sprayed on crops, commercial nurseries, suburban lawns, parks, and golf courses. This increase in use has been driven largely by the proliferation of genetically engineered crops, crops specifically tailored to resist the activity of glyphosate.

21.    **Defendants** are intimately involved in the development, design, manufacture, marketing, sale, and/or distribution of genetically modified ("GMO") crops, many of which are marketed as being resistant to **Defendants' Products** i.e., "Roundup Ready®."

22.    As of 2009, **Defendants** were the world's leading producer of seeds designed to be Roundup Ready®.

23.    In 2010, an estimated 70% of corn and cotton, and 90% of soybean fields in the United States contained Roundup Ready® seeds.

24.    The original Roundup, containing the active ingredient glyphosate, was introduced in 1974.

25.    Today, glyphosate products are among the world most widely used herbicides. Monsanto's glyphosate products are registered in more than 130 countries and are approved

for weed control in more than 100 crops. No other herbicide active ingredient compares in terms of number of approved uses.[1]

26.     For nearly 40 years, farmers across the globe have used **Defendants' Products**, unaware of its carcinogenic properties.

### B. Registration of Herbicides under Federal Law

27.     The manufacture, formulation and distribution of herbicides, such as **Defendants' Products**, are regulated under the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA"), 7. U.S.C. § 136 et seq. FIFRA requires that all pesticides be registered with the Environmental Protection Agency ("EPA") prior to their distribution, sale, or use, except as described by FIFRA 7 U.S.C. 136a(a).

28.     The EPA requires as part of the registration process, among other requirements, a variety of tests to evaluate the potential for exposure to pesticides, toxicity to people and other potential non-target organisms, and other adverse effects on the environment. Registration by the EPA, however, is not an assurance or finding of safety. The determination the EPA makes in registering or re-registering a product is not that the product is "safe," but rather that use of the product in accordance with its label directions "will not generally cause unreasonable adverse effects on the environment." 7 U.S.C. § 136(a)(c)(5)(D).

29.     FIFRA defines "unreasonable adverse effects on the environment" to mean "any unreasonable risk to man or the environment, taking into account the economic, social, and environmental costs and benefits of the use of any pesticide." 7 U.S.C. § 136(bb). FIFRA thus requires the EPA to make a risk/benefit analysis in determining whether a registration should be granted or allowed to continue to be sold in commerce.

---

[1] Backgrounder, History of Monsanto's Glyphosate Herbicides, June 2005.

30.     The EPA and the Commonwealth of Puerto Rico registered **Defendants' Products**
for distribution, sale, and manufacture in the United States and the Commonwealth of Puerto
Rico.

31.     FIFRA generally requires that the registrant, Monsanto, conduct health and safety
testing of pesticide products. The government is not required, nor is it able, to perform the
product tests that are required of the manufacturer.

32.     The evaluation of each pesticide product distributed, sold, or manufactured is
completed at the time the product is initially registered. The data necessary for registration of a
pesticide has changed over time. The EPA is now in the process of re-evaluating all pesticide
products through a Congressionally-mandated process called "re-registration." 7 U.S.C. § 136a-
1.

33.     In order to reevaluate these pesticides, the EPA demands the completion of
additional tests and the submission of data for the EPA's review and evaluation.

34.     In the case of glyphosate and Commonwealth of Puerto Rico, the EPA had planned
on releasing its preliminary risk assessment – in relation to the registration process – no later
than July 2015. The EPA completed its review of glyphosate in early 2015, but delayed
releasing the assessment pending further review in light of the World Health Organization's
findings.

### C. Monsanto's False Representations Regarding the Safety of Roundup®

35.     In 1996, the New York Attorney General ("NYAG") filed a lawsuit against
**Monsanto** based on its false and misleading advertising of Roundup products. Specifically, the
lawsuit challenged **Monsanto**'s general representations that its spray-on glyphosate-based
herbicides, including Roundup, were "safer than table salt" and "practically non-toxic" to
mammals, birds, and fish. Among the representations the NYAG found deceptive and
misleading about the human and environmental safety of Roundup are the following:

a) Remember that environmentally friendly Roundup herbicide is biodegradable. It won't build up in the soil so you can use Roundup with confidence along customers' driveways, sidewalks and fences...

b) And remember that Roundup is biodegradable and won't build up in the soil. That will give you the environmental confidence you need to use Roundup everywhere you've got a weed, brush, edging or trimming problem.

c) Roundup biodegrades into naturally occurring elements.

d) Remember that versatile Roundup herbicide stays where you put it. That means there's no washing or leaching to harm customers' shrubs or other desirable vegetation.

e) This non-residual herbicide will not wash or leach in the soil. It ... stays where you apply it.

f) You can apply Accord with "confidence because it will stay where you put it" it bonds tightly to soil particles, preventing leaching. Then, soon after application, soil microorganisms biodegrade Accord into natural products.

g) Glyphosate is less toxic to rats than table salt following acute oral

h) Glyphosate's safety margin is much greater than required. It has over a 1,000-fold safety margin in food and over a 700-fold safety margin for workers who manufacture it or use it.

i) You can feel good about using herbicides by Monsanto. They carry a toxicity category rating of 'practically non-toxic' as it pertains to mammals, birds and fish.

21

j) "Roundup can be used where kids and pets will play and breaks down into natural
material." This ad depicts a person with his head in the ground and a pet dog
standing in an area which has been treated with Roundup.[2]

36.   On November 19, 1996, **Monsanto** entered into an Assurance of Discontinuance
with NYAG, in which **Monsanto** agreed, among other things, "to cease and desist from
publishing or broadcasting any advertisements [in New York] that represent, directly or by
implication" that:

a) its glyphosate-containing pesticide products or any component thereof are safe,
non-toxic, harmless or free from risk.

b) its glyphosate-containing pesticide products or any component thereof
manufactured, formulated, distributed or sold by Monsanto are biodegradable

c) its glyphosate-containing pesticide products or any component thereof stay
where they are applied under all circumstances and will not move through the
environment by any means.

d) its glyphosate-containing pesticide products or any component thereof are
"good" for the environment or are "known for their environmental
characteristics."

e) glyphosate-containing pesticide products or any component thereof are safer or
less toxic than common consumer products other than herbicides;

f) its glyphosate-containing products or any component thereof might be classified
as "practically non-toxic.

37.   **Monsanto** did not alter its advertising in the same manner in any state other than
New York, and on information and belief still has not done so today.

---

[2] Attorney General of the State of New York, In the Matter of Monsanto Company, Assurance of Discontinuance Pursuant to
Executive Law § 63(15) (Nov. 1996).

38.     In 2009, France's highest court ruled that **Monsanto** had not told the truth about the safety of **Defendants' Products**. The French court affirmed an earlier judgment that Monsanto had falsely advertised its herbicide Roundup as "biodegradable" and that it "left the soil clean."[3]

### D. Evidence of Carcinogenicity in Roundup

39.     As early as the 1980's **Monsanto** was aware of glyphosate's carcinogenic properties.

40.     On March 4, 1985, a group of the Environmental Protection Agency's ("EPA") Toxicology Branch published a memorandum classifying glyphosate as a Category C oncogene. Category C oncogenes are possible human carcinogens with limited evidence of carcinogenicity.[4]

41.     In 1986, the EPA issued a Registration Standard for glyphosate (NTIS PB87-103214). The Registration standard required additional phytotoxicity, environmental fate, toxicology, product chemistry, and residue chemistry studies. All of the data required was submitted and reviewed and/or waived.[5]

42.     In October 1991 the EPA published a Memorandum entitled "Second Peer Review of Glyphosate." The memorandum changed glyphosate's classification to Group E (evidence of noncarcinogenicity for humans). Two peer review committee members did not concur with the conclusions of the committee and one member refused to sign.[6]

43.     In addition to the toxicity of the active molecule, many studies support the hypothesis that glyphosate formulations found in **Defendants' Products** are more dangerous

---

[3] Monsanto Guilty in 'False Ad' Row, BBC, Oct. 15, 2009, available at http://news.bbc.co.uk/2/hi/europe/8308903.stm.
[4] Consensus Review of Glyphosate, Casewell No. 661A. March 4, 1985. United States Environmental Protection Agency
[5] http://www.epa.gov/oppsrrd1/reregistration/REDs/factsheets/0178fact.pdf
[6] Second Peer Review of Glyphosate, CAS No. 1071-83-6. October 30, 1881. United States Environmental Protection Agency

and toxic than glyphosate alone.[7] As early as 1991 evidence existed demonstrating that glyphosate formulations were significantly more toxic than glyphosate alone.[8]

44.     In 2002, Julie Marc published a study entitled "Pesticide Roundup Provokes Cell Division Dysfunction at the Level of CDK1/Cyclin B Activation."

45.     The study found that Defendants' Roundup caused delays in the cell cycles of sea urchins, while the same concentrations of glyphosate alone proved ineffective and did not alter cell cycles.

46.     In 2004, Julie Marc published a study entitled "Glyphosate-based pesticides affect cell cycle regulation." The study demonstrated a molecular link between glyphosate-based products and cell cycle dysregulation.

47.     The study noted that "cell-cycle dysregulation is a hallmark of tumor cells and human cancer. Failure in the cell-cycle checkpoints leads to genomic instability and subsequent development of cancers from the initial affected cell." Further, "[s]ince cell cycle disorders such as cancer result from dysfunction of unique cell, it was of interest to evaluate the threshold dose of glyphosate affecting cells."[9]

48.     In 2005, Francisco Peixoto published a study showing that Roundup's effects on rat liver mitochondria are much more toxic and harmful than the same concentrations of glyphosate alone.

49.     The Peixoto study suggested that the harmful effects of Roundup on mitochondrial bioenergetics could not be exclusively attributed to glyphosate and could be the result of other chemicals, namely the surfactant POEA, or alternatively due to the possible synergy between glyphosate and Roundup formulation products.

---

[7] Martinez et al. 2007; Benachour 2009; Gasnier et al. 2010; Peixoto 2005; Marc 2004
[8] Martinez et al 1991
[9] (Molinari, 2000; Stewart et al., 2003)

24

50.    In 2009, Nora Benachour and Gilles-Eric Seralini published a study examining the effects of Roundup and glyphosate on human umbilical, embryonic, and placental cells.

51.    The study used dilution levels of Roundup and glyphosate far below agricultural recommendations, corresponding with low levels of residues in food. The study concluded that supposed "inert" ingredients, and possibly POEA, change human cell permeability and amplify toxicity of glyphosate alone. The study further suggested that determinations of glyphosate toxicity should take into account the presence of adjuvants, or those chemicals used in the formulation of the complete pesticide. The study confirmed that the adjuvants in Roundup are not inert and that Roundup is always more toxic than its active ingredient glyphosate.

52.    The results of these studies were confirmed in recently published peer-reviewed studies and were at all times available and/or known to **Defendants**.

53.    **Defendants** knew or should have known that Roundup is more toxic than glyphosate alone and that safety studies on Roundup, Roundup's adjuvants and "inert" ingredients, and/or the surfactant POEA were necessary to protect **Plaintiffs** from Roundup.

54.    **Defendants** knew or should have known that tests limited to Roundup's active ingredient glyphosate were insufficient to prove the safety of Roundup.

55.    **Defendants** failed to appropriately and adequately test Roundup, Roundup's adjuvants and "inert" ingredients, and/or the surfactant POEA to protect Plaintiff from Roundup.

56.    Rather than performing appropriate tests, **Defendants** relied upon flawed industry supported studies designed to protect **Defendants'** economic interests rather than **Plaintiffs** and the consuming public.

57.    Despite their knowledge that Roundup was considerably more dangerous than glyphosate alone, **Defendants** continued to promote Roundup as safe.

### E. IARC Classification of Glyphosat

58.     The International Agency for Research on Cancer ("IARC") is the specialized intergovernmental cancer agency the World Health Organization ("WHO") of the United Nations tasked with conducting and coordinating research into the causes of cancer.

59.     An IARC Advisory Group to Recommend Priorities for IARC Monographs during 2015–2019 met in April 2014. Though nominations for the review were solicited, a substance must meet two criteria to be eligible for review by the IARC Monographs: there must already be some evidence of carcinogenicity of the substance, and there must be evidence that humans are exposed to the substance.

60.     IARC set glyphosate for review in 2015-2016. IARC uses five criteria for determining priority in reviewing chemicals. The substance must have a potential for direct impact on public health; scientific literature to support suspicion of carcinogenicity; evidence of significant human exposure; high public interest and/or potential to bring clarity to a controversial area and/or reduce public anxiety or concern; related agents similar to one given high priority by the above considerations. Data reviewed is sourced preferably from publicly accessible, peer-reviewed data.

61.     On March 24, 2015, after its cumulative review of human, animal, and DNA studies for more than one (1) year, many of which have been in Defendants' possession since as early as 1985, the IARC's working group published its conclusion that the glyphosate contained in Defendants' Roundup herbicide, is a Class 2A "probable carcinogen" as demonstrated by the mechanistic evidence of carcinogenicity in humans and sufficient evidence of carcinogenicity in animals.

62.     The IARC's full Monograph was published on July 29, 2015 and established glyphosate as a class 2A probable carcinogen to humans. According to the authors glyphosate

demonstrated sufficient mechanistic evidence (genotoxicity and oxidative stress) to warrant a 2A classification based on evidence of carcinogenicity in humans and animals.

63.     The IARC Working Group found an increased risk between exposure to glyphosate and non-Hodgkin's lymphoma ("NHL") and several subtypes of NHL, and the increased risk continued after adjustment for other pesticides.

64.     The IARC also found that glyphosate caused DNA and chromosomal damage in human cells.

### F. Earlier Evidence of Glyphosate's Danger

65.     Despite the new classification by the IARC, **Defendants** have had ample evidence of glyphosate and Roundup's genotoxic properties for decades.

66.     Genotoxicity refers to chemical agents that are capable of damaging the DNA within a cell through genetic mutations, which is a process that is believed to lead to cancer.

67.     In 1997, Chris Clements published "Genotoxicity of select herbicides in Rana catesbeiana tadpoles using the alkaline single-cell gel DNA electrophoresis (comet) assay."

68.     The study found that tadpoles exposed to Roundup showed significant DNA damage when compared with unexposed control animals.

69.     Both human and animal studies have shown that glyphosate and glyphosate-based formulations such as Roundup can induce oxidative stress.

70.     Oxidative stress and associated chronic inflammation are believed to be involved in carcinogenesis.

71.     The IARC Monograph notes that "[s]trong evidence exists that glyphosate, AMPA and glyphosate-based formulations can induce oxidative stress."

72.     In 2006 César Paz-y-Miño published a study examining DNA damage in human subjects exposed to glyphosate.

27

73.    The study produced evidence of chromosomal damage in blood cells showing significantly greater damage after exposure to glyphosate than before in the same individuals, suggesting that the glyphosate formulation used during aerial spraying had a genotoxic effect on exposed individuals.

74.    The IARC Monograph reflects the volume of evidence of glyphosate pesticides' genotoxicity noting "[t]he evidence for genotoxicity caused by glyphosate-based formulations is strong."

75.    Despite knowledge to the contrary, **Defendants** maintain that there is no evidence that Roundup is genotoxic, that regulatory authorities and independent experts are in agreement that Roundup is not genotoxic, and that there is no evidence that Roundup is genotoxic.

76.    In addition to glyphosate and Roundup's genotoxic properties, Defendants have long been aware of glyphosate's carcinogenic properties.

77.    Glyphosate and Roundup in particular have long been associated with carcinogenicity and the development of numerous forms of cancer, including, but not limited to, non-Hodgkin's lymphoma, Hodgkin's lymphoma, multiple myeloma, and soft tissue sarcoma.

78.    **Defendants** have known of this association since the early to mid-1980s and numerous human and animal studies have evidenced the carcinogenicity of glyphosate and/or Roundup.

79.    In 1985 the EPA studied the effects of glyphosate in mice finding a dose related response in male mice linked to renal tubal adenomas, a rare tumor. The study concluded the glyphosate was oncogenic.

80.    In 2003 Lennart Hardell and Mikael Eriksson published the results of two case controlled studies on pesticides as a risk factor for NHL and hairy cell leukemia.

81.    The study concluded that glyphosate had the most significant relationship to NHL among all herbicides studies with an increased odds ratio of 3.11.

28

82.     In 2003 AJ De Roos published a study examining the pooled data of mid-western farmers, examining pesticides and herbicides as risk factors for NHL.

83.     The study, which controlled for potential confounders, found a relationship between increased NHL incidence and glyphosate.

84.     In 2008 Mikael Eriksson published a study a population based case-control study of exposure to various pesticides as a risk factor for NHL.

85.     This strengthened previous associations between glyphosate and NHL.

86.     In spite of this knowledge, **Defendants** continued to issue broad and sweeping statements suggesting that Roundup was, and is, safer than ordinary household items such as table salt, despite a lack of scientific support for the accuracy and validity of these statements and, in fact, voluminous evidence to the contrary.

87.     Upon information and belief, these statements and representations have been made with the intent of inducing **Plaintiffs**, the agricultural community, and the public at large to purchase, and increase the use of, **Defendants' Products** for **Defendants'** pecuniary gain, and in fact did induce Plaintiffs to use **Defendants' Products**.

88.     **Defendants** made these statements with complete disregard and reckless indifference to the safety of Plaintiffs and the general public.

89.     Notwithstanding **Defendants'** representations, scientific evidence has established a clear association between glyphosate and genotoxicity, inflammation, and an increased risk of many cancers, including, but not limited to, NHL, Multiple Myeloma, and soft tissue sarcoma.

90.     **Defendants** knew or should have known that glyphosate is associated with an increased risk of developing cancer, including, but not limited to, NHL, Multiple Myeloma, and soft tissue sarcomas.

91.     **Defendants** failed to appropriately and adequately inform and warn **Plaintiffs** of the serious and dangerous risks associated with the use of and exposure to glyphosate and/or

29

**Defendants' Products**, including, but not limited to, the risk of developing NHL, as well as other severe and personal injuries, which are permanent and/or long-lasting in nature, cause significant physical pain and mental anguish, diminished enjoyment of life, and the need for medical treatment, monitoring and/or medications.

92.     Despite the IARC's classification of glyphosate as a class 2A probable carcinogen, **Defendants** continue to maintain that glyphosate and/or **Defendants' Products** are safe, non-carcinogenic, nongenotoxic, and falsely warrant to users and the general public that independent experts and regulatory agencies agree that there is no evidence of carcinogenicity or genotoxicity in glyphosate and **Defendants' Products**.

93.     **Defendants** have claimed and continue to claim that **Defendants' Products** are safe, non-carcinogenic, and non-genotoxic.

94.     Monsanto claims on its website that "[r]egulatory authorities and independent experts around the world have reviewed numerous long-term/carcinogenicity and genotoxicity studies and agree that there is no evidence that glyphosate, the active ingredient in **Defendants' Products** brand herbicides and other glyphosate-based herbicides, causes cancer, even at very high doses, and that it is not genotoxic".[10]

95.     Ironically, the primary source for this statement is a 1986 report by the WHO, the same organization that now considers glyphosate to be a probable carcinogen.

96.     Glyphosate, and **Defendants' Products** in particular, have long been associated with serious side effects and many regulatory agencies around the globe have banned or are currently banning the use of glyphosate herbicide products.

97.     **Defendants'** statements proclaiming the safety of **Defendants' Products** and disregarding its dangers misled Plaintiffs.

---

[10] Backgrounder - Glyphosate: No Evidence of Carcinogenicity. Updated November 2014. (downloaded October 9 2015)

98.     Despite **Defendants**' knowledge that **Defendants' Products** was associated with an elevated risk of developing cancer, **Defendants**' promotional campaigns focused on **Defendants' Products** purported "safety profile."

99.     **Defendants**' failure to adequately warn **Plaintiffs** resulted in **Plaintiffs** using and being exposed to glyphosate instead of using another acceptable and safe method of controlling unwanted weeds and pests; and scientists and physicians failing to warn and instruct consumers about the risk of cancer, including NHL, and other injuries associated with **Defendants' Products**.

100.    **Defendants** failed to seek modification of the labeling of **Defendants' Products** to include relevant information regarding the risks and dangers associated with **Defendants' Products** exposure.

101.    The failure of **Defendants** to appropriately warn and inform the EPA has resulted in inadequate warnings in safety information presented directly to users and consumers.

102.    The failure of **Defendants** to appropriately warn and inform the EPA has resulted in the absence of warning or caution statements that are adequate to protect health and the environment.

103.    The failure of **Defendants** to appropriately warn and inform the EPA has resulted in the directions for use that are not adequate to protect health and the environment.

104.    By reason of the foregoing acts and omissions, **Plaintiffs** seek compensatory damages as a result of **Plaintiffs**' use of, and exposure to, **Defendants' Products** which caused or was a substantial contributing factor in causing **Plaintiffs** to suffer from cancer and severe personal injuries which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life.

105.    By reason of the foregoing, **Plaintiffs** are severely and permanently injured.

106. By reason of the foregoing acts and omissions, **Plaintiffs** have endured and, in some categories continue to suffer, emotional and mental anguish, medical expenses, and other economic and non-economic damages, as a result of the actions and inactions of the **Defendants**.

## V. DEFENDANTS' NEGLIGENCE AND FAULT

107. The specific allegations of negligence and/or fault against **Defendants** are the following:

a. **Defendants** researched, developed, designed, tested, manufactured, inspected, labeled, distributed, marketed, promoted, sold, and otherwise released into the stream of commerce **Defendants' Products** which were defectively designed.

b. **Defendants** researched, developed, designed, tested, manufactured, inspected, labeled, distributed, marketed, promoted, sold, and otherwise released into the stream of commerce **Defendants' Products** which were defectively manufactured.

c. **Defendants** researched, developed, designed, tested, manufactured, inspected, labeled, distributed, marketed, promoted, sold, and otherwise released into the stream of commerce **Defendants' Products** which were negligently designed.

d. **Defendants** researched, developed, designed, tested, manufactured, inspected, labeled, distributed, marketed, promoted, sold, and otherwise released into the stream of commerce **Defendants' Products** which were negligently manufactured.

e. **Defendants' Products** were negligently manufactured, were dangerous and could cause the damages described herein.

f. **Defendants' Products** were defective due to the failure to provide any written instructions, warnings, means or methods as its proper use and its dangers.

g. **Defendants' Products** were defective in that they were marketed and sold without adequate warnings as to its proper use and dangers.

32

h.     **Defendants' Products** were defective in that they failed to provide sufficient warnings and instructions.

i.     **Defendants** failed to warn **Plaintiffs** of the hazards associated with the use of **Defendants' Products**.

j.     **Defendants** failed to properly test **Defendants' Products** to determine adequacy and effectiveness or safety measures, if any, prior to releasing the same for consumer use.

k.     **Defendants** failed to properly test **Defendants' Products** to determine the increased risk of cancer during the normal and/or intended use of the same.

l.     **Defendants** failed to inform ultimate users, such as **Plaintiffs** as to the safe and proper methods of handling and using **Defendants' Products**.

m.     **Defendants** failed to remove **Defendants' Products** from the market when the **Defendants** knew or should have known that said products were defective.

n.     **Defendants** failed to instruct the ultimate users, such as **Plaintiffs**, as to the methods for reducing the type of exposure to **Defendants' Products** which caused increased risk in cancer.

o.     **Defendants** failed to inform the public in general and the **Plaintiffs** in particular of the known dangers of using the **Defendants' Products**.

p.     **Defendants** failed to advice users how to prevent or reduce exposure that caused increase risk for cancer.

q.     **Defendants** marketed and labeled **Defendants' Products** as safe for all uses despite **Defendants**' knowledge to the contrary.

r.     **Defendants' Products** were defective because they failed to contain warnings and/or instructions, and breached express warranties and/or failed to conform to other

express factual representation upon which the **Plaintiffs** justifiably relied in electing to use the products.

s. The defect or defects made **Defendants' Products** unreasonably dangerous to those persons, such as **Plaintiffs**, who could reasonably be expected to use and rely upon such products. As a result, the defect or defects were a producing cause of the **Plaintiffs**' injuries and damages.

t. **Defendants' Products** failed to contain, and continue to this day not to contain, warnings and/or instructions regarding the increased risk of cancer with the use of the products. **Defendants** continue to market, advertise, and expressly represent to the general public that it is safe to use their product.

u. **Defendants** failed to take any other action that would have prevented the occurrences described herein.

v. **Defendants** were negligent or at fault in other regards.

108. Each and all of these aforementioned facts, acts and omissions, taken singularly or in combination, were a proximate cause of the injuries and damages sustained by **Plaintiffs**.

109. As a direct result of the aforementioned defects, negligence and/or fault detailed above, **Defendants** and **JOHN DOE 1** to **JOHN DOE 100** are jointly liable to **Plaintiffs** for their damages.

## VI. PLAINTIFFS' DAMAGES

110. **Plaintiffs** requests the following damages be considered separately and individually for the purpose of determining the sum of money that will fairly and reasonably compensate each of the **Plaintiffs**:

a. Physical damages in general.

b. Emotional damages in general.

c. Medical treatment in general.

   d.  Surgical interventions.

   e.  Fear related to imminent surgical interventions.

   f.  Fear related to future surgical interventions.

   g.  Fear of other future medical intervention.

   h.  Fear of death.

   i.  Severe impairment to her ovaries and reproductive system.

   j.  Medical Expenses, past and future.

   k.  Pain and Suffering, past and future.

   l.  Mental Anguish, Anxiety, and Discomfort, past and future.

  m.  Lost wages and income, past and future.

   n.  Fear of Cancer or other related diseases, past and future.

   o.  Physical Impairment.

   p.  Physical Disfigurement.

   q.  Loss of Enjoyment of Life.

   r.  Pre and post judgment interest.

   s.  Exemplary and Punitive Damages.

   t.  Treble damages.

   u.  Litigation costs.

   v.  Reasonable and necessary attorney's fees.

   w.  Such other relief to which Plaintiff may be justly entitled.

111.   As a proximate result of **Defendants**' conduct, each of the **Plaintiffs** has sustained and suffered and still continues to sustain and suffer bodily and physical personal injuries as well as expense and economic loss. Each and every of the **Plaintiffs** is entitled to recover from **Defendants**, joint and severally, as a full, just and fair compensation for the aforementioned concepts a reasonable sum of no less than **TEN MILLION DOLLARS ($10,000,000.00)**.

112.  As a proximate result of **Defendants**' conduct, and the consequent direct result of **Plaintiffs**' bodily and physical injuries, each of the **Plaintiffs** has sustained and will continue to sustain severe mental, moral, psychological, spiritual and emotional distress, pain and suffering. Each and every of the **Plaintiffs** is entitled to recover from **Defendants**, jointly and severally, as a full, just and fair compensation for the aforementioned concepts a reasonable sum of no less than **SEVEN MILLION DOLLARS ($7,000,000.00)**.

## VII.    FIRST CAUSE OF ACTION – STRICT LIABILITY

113.  The preceding paragraphs are incorporated as if fully set forth herein.

114.  **Defendant** carelessly, negligently, recklessly, wantonly and willfully designed, manufactured, distributed, labeled, marketed and/or sold **Defendants' Products**.

115.  It was the duty of the **Defendant** to design, manufacture, label, distribute, market and/or sell **Defendants' Products** in such a condition that would make them reasonably safe for use by **Plaintiffs**.

116.  At all relevant times, **Defendants** had actual and/or constructive knowledge of the nature and condition **Defendants' Products**.

117.  **Defendants' Products** was expected to and did reach the usual consumers, handlers, and persons coming into contact with said product without substantial change in the condition in which it was produced, manufactured, sold, distributed, and marketed by the **Defendants**.

118.  The **Defendants' Products** designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed by **Defendants** was defective in design or formulation in that, when it left the hands of the manufacturer and/or suppliers, the foreseeable risks exceeded the benefits associated with the design or formulation of **Defendants' Products**.

36

119.  **Defendants** owed to **Plaintiffs** a duty of strict liability not to harm them through the use of **Defendants' Products**.

120.  **Defendants**' breach of their duty was the proximate cause and the substantial factor in causing the damages sustained **Plaintiffs**.

121.  **Plaintiffs** used **Defendants' Products** without any substantial change in the condition of the products from when they were initially distributed by **Defendants**.

122.  Therefore, the **Defendants** are liable to **Palintiffs** under the Doctrine of Strict Liability in Tort.

123.  As a result of thereof, **Plaintiffs** are entitled to be compensated for the concepts and sums stated above including compensation for punitive damages..

## VIII.  SECOND CAUSE OF ACTION – DANGEROUS CONDITION

124.  The preceding paragraphs are incorporated as if fully set forth herein.

125.  **Defendants** designed, manufactured, labeled, distributed, marketed and/or sold **Defendants' Products**.

126.  **Defendants' Products** were not reasonably safe and were dangerous for their intended use when they were placed into the stream of commerce.

127.  At all relevant times, **Defendants** had actual and/or constructive knowledge of the nature and condition of **Defendants' Products**.

128.  At the time of the occurrence, **Defendants' Products** were being used for the purpose for which they were designed, manufactured and sold.

129.  **Plaintiffs** could not, by the exercise of reasonable care, have discovered their dangerous condition or perceived their danger, and could not have avoided their injuries.

130.  The acts and omissions of **Defendants** and the unreasonably dangerous condition of **Defendants' Products** caused the injuries sustained by **Plaintiffs**.

131.   As a result of thereof, **Plaintiffs** are entitled to be compensated for the concepts and sums stated above including compensation for punitive damages..

## IX.   THIRD CAUSE OF ACTION – DEFECTIVE CONDITION

132.   The preceding paragraphs are incorporated as if fully set forth herein.

133.   **Defendant** designed, manufactured, labeled, distributed, marketed and/or sold **Defendants' Products**.

134.   **Defendants' Products** were defective when they were placed into the stream of commerce.

135.   At all relevant times, **Defendants** had actual and/or constructive knowledge of the nature and condition of **Defendants' Products**.

136.   At the time of the occurrence, **Defendants' Products** were being used for the purpose for which they were designed.

137.   **Plaintiffs** could not, by the exercise of reasonable care, have discovered the defect and could not have avoided their injuries.

138.   As a result of thereof, **Plaintiffs** are entitled to be compensated for the concepts and sums stated above including compensation for punitive damages..

## X.   FOURTH CAUSE OF ACTION – FAILURE TO WARN

139.   The preceding paragraphs are incorporated as if fully set forth herein.

140.   **Defendants** have engaged in the business of selling, testing, distributing, supplying, manufacturing, marketing, and/or promoting **Defendants' Products**, and through that conduct have knowingly and intentionally placed **Defendants' Products** into the stream of commerce with full knowledge that it reaches consumers such as **Plaintiffs** who are exposed to it through ordinary and reasonably foreseeable uses.

141.  **Defendants** did in fact sell, distribute, supply, manufacture, and/or promote **Defendants' Products** to **Plaintiffs**. Additionally, **Defendants** expected the **Defendants' Products** that they were selling, distributing, supplying, manufacturing, and/or promoting to reach – and **Defendants' Products** did in fact reach – consumers, including **Plaintiffs**, without any substantial change in the condition of the product from when it was initially distributed by **Defendants**.

142.  At the time of manufacture, **Defendants** could have provided the warnings or instructions regarding the full and complete risks of **Defendants' Products** because they knew or should have known of the unreasonable risks of harm associated with the use of and/or exposure to such products.

143.  At all times herein mentioned, **Defendants' Products** were defective and unsafe in manufacture such that it was unreasonably dangerous to the user, and was so at the time it was distributed by **Defendants** and at the time **Plaintiffs** were exposed to said products. The defective condition of **Defendants' Products** was due in part to the fact that it was not accompanied by proper warnings regarding its carcinogenic properties and possible side effects, including, but not limited to, developing various types of cancer as a result of exposure and use.

144.  **Defendants' Products** did not contain a warning or caution statement, which was necessary and, if complied with, was adequate to protect health those exposed in violation of 7 U.S.C. § 136j(a)(1)(E).

145.  **Defendants**' failure to include a warning or caution statement which was necessary and, if complied with, was adequate to protect the health of those exposed, violated 7 U.S.C. § 136j(a)(1)(E).

146.  **Defendants** could have amended the label of **Defendants' Products** to provide additional warnings.

147.     This defect caused serious injury to Plaintiffs, who used **Defendants' Products** in their intended and foreseeable manner.

148.     At all times herein mentioned, **Defendants** had a duty to properly design, manufacture, compound, test, inspect, package, label, distribute, market, examine, maintain supply, provide proper warnings, and take such steps to assure that **Defendants' Products** did not cause users to suffer from unreasonable and dangerous side effects.

149.     **Defendants** labeled, distributed, and promoted **Defendants' Products** which were dangerous and unsafe for the use and purpose for which they were intended.

150.     **Defendants** failed to warn of the nature and scope of the side effects associated with **Defendants' Products**, namely its carcinogenic properties and its propensity to cause or serve as a substantial contributing factor in the development of various types of cancer.

151.     **Defendants** were aware of the probable consequences of the aforesaid conduct. Despite the fact that **Defendants** knew or should have known that **Defendants' Products** caused serious injuries, **Defendants** failed to exercise reasonable care to warn of the dangerous carcinogenic properties and side effect of developing various types of cancer from **Defendants' Products** exposure, even though these side effects were known or reasonably scientifically knowable at the time of distribution. **Defendants** willfully and deliberately failed to avoid the consequences associated with their failure to warn, and in doing so, **Defendants** acted with a conscious disregard for the safety of **Plaintiffs**.

152.     At the time of exposure, **Plaintiffs** could not have reasonably discovered any defect in **Defendants' Products** prior through the exercise of reasonable care.

153.     **Defendants**, as the manufacturers and/or distributors of the subject product, are held to the level of knowledge of an expert in the field.

154.     **Plaintiffs** reasonably relied upon the skill, superior knowledge, and judgment of **Defendants**.

155. Had **Defendants** properly disclosed the risks associated with **Defendants' Products**, **Plaintiffs** would have avoided the risks of using **Defendants' Products**.

156. The information that **Defendants** did provide or communicate failed to contain adequate warnings and precautions that would have enabled **Plaintiffs**, and similarly situated individuals, to utilize the product safely and with adequate protection. Instead, **Defendants** disseminated information that was inaccurate, false, and misleading and which failed to communicate accurately or adequately the comparative severity, duration, and extent of the risk of injuries associated with use of and/or exposure to **Defendants' Products**; continued to promote the efficacy of **Defendants' Products**, even after it knew or should have known of the unreasonable risks from use or exposure; and concealed, downplayed, or otherwise suppressed, through aggressive marketing and promotion, any information or research about the risks and dangers of exposure to **Defendants' Products**.

157. To this day, Defendants have failed to adequately warn of the true risks of Plaintiff's injuries associated with the use of and exposure to Roundup.

158. As a result thereof, **Defendants' Products** failed to contain adequate warnings when they were placed into the stream of commerce.

159. **Defendants** had a duty to warn against latent dangers in **Defendants' Products** resulting from foreseeable uses of **Defendants' Products** of which they knew or should have known.

160. **Defendants** failed to warn against said latent dangers in **Defendants' Products**.

161. **Defendants**' failure to warn against such latent dangers was the proximate cause and a substantial factor in causing **Plaintiffs**' injuries.

162. As a result of thereof, **Plaintiffs** are entitled to be compensated for the concepts and sums stated above including compensation for punitive damages.

## XI.    FIFTH CAUSE OF ACTION – WARRANTY

163.    The preceding paragraphs are incorporated as if fully set forth herein.

164.    At the time and place of design, manufacture, distribution, marketing and sale of **Plaintiffs**, **Defendants** expressly and/or impliedly warranted to potential and actual buyers and users thereof, including **Plaintiffs**, that **Defendants' Products** were reasonably safe and fit for their intended uses, including the use that resulted in **Plaintiffs'** injurie.

165.    **Defendants' Products** were not fit for the ordinary purposes for which they were to be used.

166.    **Defendants** breached the implied and/or express warranties, and said breach was the proximate cause and a substantial factor in causing **Plaintiffs'** injuries.

167.    As a result of thereof, **Plaintiffs** are entitled to be compensated for the concepts and sums stated above including compensation for punitive damages.

## XII.    SIXTH CAUSE OF ACTION – NEGLIGENCE *PER SE*

168.    The preceding paragraphs are incorporated as if fully set forth herein.

169.    **Defendants** had a duty to exercise reasonable care in the designing, researching, testing, manufacturing, marketing, supplying, promoting, packaging, sale, and/or distribution of Roundup into the stream of commerce, including a duty to assure that the product would not cause users to suffer unreasonable, dangerous side effects.

170.    **Defendants** failed to exercise ordinary care in the designing, researching, testing, manufacturing, marketing, supplying, promoting, packaging, sale, testing, quality assurance, quality control, and/or distribution of Roundup into interstate commerce in that **Defendants** knew or should have known that using Roundup created a high risk of unreasonable, dangerous side effects, including, but not limited to, the development of NHL, as well as other severe and personal injuries which are permanent and lasting in nature, physical pain and mental anguish,

42

including diminished enjoyment of life, as well as need for lifelong medical treatment, monitoring, and/or medications.

171.   The negligence by the **Defendants** included but was not limited to the following acts and/or omissions:

      a. Manufacturing, producing, promoting, formulating, creating, and/or designing Roundup without thoroughly testing it;

      b. Failing to test Roundup and/or failing to adequately, sufficiently, and properly test Roundup;

      c. Not conducting sufficient testing programs to determine whether or not Roundup was safe for use; in that Defendants herein knew or should have known that Roundup was unsafe and unfit for use by reason of the dangers to its users;

      d. Not conducting sufficient testing programs and studies to determine Roundup's carcinogenic properties even after Defendants had knowledge that Roundup is, was, or could be carcinogenic;

      e. Failing to conduct sufficient testing programs to determine the safety of "inert" ingredients and/or adjuvants contained within Roundup, and the propensity of these ingredients to render Roundup toxic, increase the toxicity of Roundup, whether these ingredients are carcinogenic, magnify the carcinogenic properties of Roundup, and whether or not "inert" ingredients and/or adjuvants were safe for use;

      f. Negligently failing to adequately and correctly warn the Plaintiff, the public, the medical and agricultural professions, and the EPA of the dangers of Roundup;

      g. Negligently failing to petition the EPA to strength the warnings associated with Roundup;

h. Failing to provide adequate cautions and warnings to protect the health of users, handlers, applicators, and persons who would reasonably and foreseeably come into contact with Roundup;

i. Negligently marketing, advertising, and recommending the use of Roundup without sufficient knowledge as to its dangerous propensities;

j. Negligently representing that Roundup was safe for use for its intended purpose, and/or that Roundup was safer than ordinary and common items such as table salt, when, in fact, it was unsafe;

k. Negligently representing that Roundup had equivalent safety and efficacy as other forms of herbicides;

l. Negligently designing Roundup in a manner, which was dangerous to its users;

m. Negligently manufacturing Roundup in a manner, which was dangerous to its users;

n. Negligently producing Roundup in a manner, which was dangerous to its users;

o. Negligently formulating Roundup in a manner, which was dangerous to its users;

p. Concealing information from the Plaintiff while knowing that Roundup was unsafe, dangerous, and/or non-conforming with EPA regulations;

q. Improperly concealing and/or misrepresenting information from the Plaintiff, scientific and medical professionals, and/or the EPA, concerning the severity of risks and dangers of Roundup compared to other forms of herbicides.

r. Negligently selling Roundup with a false and misleading label.

172.  **Defendants** under-reported, underestimated, and downplayed the serious dangers of Roundup.

173.  **Defendants** negligently and deceptively compared the safety risks and/or dangers of Roundup with common everyday foods such as table salt, and other forms of herbicides.

174. **Defendants** were negligent and/or violated California law in the designing, researching, supplying, manufacturing, promoting, packaging, distributing, testing, advertising, warning, marketing, and selling of Roundup in that they:

    a. Failed to use ordinary care in designing and manufacturing Roundup so as to avoid the aforementioned risks to individuals when Roundup was used as an herbicide;

    b. Failed to accompany their product with proper and/or accurate warnings regarding all possible adverse side effects associated with the use of Roundup;

    c. Failed to accompany their product with proper warnings regarding all possible adverse side effects concerning the failure and/or malfunction of Roundup;

    d. Failed to accompany their product with accurate warnings regarding the risks of all possible adverse side effects concerning Roundup;

    e. Failed to warn Plaintiff of the severity and duration of such adverse effects, as the warnings given did not accurately reflect the symptoms, or severity of the side effects including, but not limited to, the development of NHL;

    f. Failed to conduct adequate testing, clinical testing and post-marketing surveillance to determine the safety of Roundup;

    g. Failed to conduct adequate testing, clinical testing, and post-marketing surveillance to determine the safety of Roundup's "inert" ingredients and/or adjuvants;

    h. Negligently misrepresented the evidence of Roundup's genotoxicity and carcinogenicity; i. Were otherwise careless and/or negligent.

175. Despite the fact that **Defendants** knew or should have known that Roundup caused, or could cause, unreasonably dangerous side effects, **Defendants** continued and

continue to market, manufacture, distribute, and/or sell Roundup to consumers, including the Plaintiff.

176.   **Defendants** knew or should have known that consumers such as the Plaintiff would foreseeably suffer injury as a result of Defendants' failure to exercise ordinary care, as set forth above.

177.   The conduct of **Defendants**, described in detail above, was negligent, wanton, willful and grossly negligent and amounts to a reckless disregard for the health and wellbeing of **Plaintiffs**.

178.   As a direct and proximate cause of **Defendants**' negligent, wanton, willful and grossly negligent conduct, **Plaintiffs** sustained the injuries detailed above.

179.   As a result of thereof, **Plaintiffs** are entitled to be compensated for the concepts and sums stated above including compensation for punitive damages.

## XIII.   TEMERITY

180.   The preceding paragraphs are incorporated as if fully set forth herein.

181.   In the event that defendants deny responsibility for the damages claimed herein, due to **Defendants**' obstinate and temerarious denial, **Plaintiffs** are also entitled to be awarded pre-judgment and post-judgment interests to be computed from the amount finally adjudged to them, plus a reasonable amount for attorney's fees.

## XIV.   PETITION FOR RELIEF

**WHEREFORE**, it is respectfully requested from this Honorable Court that it grant the present Complaint and it enter judgment against the **Defendants** for the sums claimed herein.

**RESPECTFULLY SUBMITTED.**

In San Juan, Puerto Rico, on this 29th day of April 2020.

**CARAZO QUETGLAS LAW OFFICES**
**PMB 133**
**Ave. Esmeralda #53, Ste. 2**
**GUAYNABO, PR 00969-4461**
**TEL (787) 707-0588/ FAX (787) 707-0595**
**E mail: jorge@jctuayudalegal.com**

**s/ JORGE CARAZO-QUETGLAS**
**Jorge Carazo-Quetglas**
**USDC-PR:      201305**

47