Case MDL-No-2741-LDB Document 20943 Filed 12/05/20 Page 1 of 3

ELECTRONICALLY FILED
10/28/2020 11:06 AM
20-CV-2020-900237.00
CIRCUIT COURT OF
COLBERT COUNTY, ALABAMA
MARK R. EADY, CLERK

FILED
2020 Nov-05 AM 05:10
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE CIRCUIT COURT OF COLBERT COUNTY, ALABAMA

MICHAEL RANDY HAYES and wife,     :
KATRINA HAYES,
                                  :
      Plaintiffs,
                                  :
v.                                                20-CV-2020-900237
                                  :
MONSANTO COMPANY CORPORATION;
*et al.*,                         :

      Defendants.               :

               :   :   :

**EXHIBIT**
**C**

## NOTICE OF ENTRY OF APPEARANCE

    Comes now the undersigned counsel and hereby enters his appearance in the above-styled action as counsel of record for Defendant Monsanto Company, incorrectly designated in the Complaint as "Monsanto Company Corporation," reserving Defendant's right to assert all available defenses to the Complaint, including but not limited to lack of personal jurisdiction, insufficiency of process, insufficiency of service of process, improper venue, and inconvenient venue.

1

Dated:  October 28, 2020

Respectfully submitted,

/s/ Halron W. Turner

HALRON W. TURNER (TUR012)
Turner, Onderdonk, Kimbrough,
  Howell, Huggins & Bradley, PA
13212 West Central Avenue
Post Office Drawer 1389
Chatom, Alabama 36518
Telephone:  (251) 847-2237
Facsimile:  (251) 847-3115
Email:  hwt@tokh.com

**Attorneys for Defendant
Monsanto Company**

## CERTIFICATE OF SERVICE

I hereby certify that on October 28, 2020, I electronically
filed the foregoing document with the Clerk of the Court
utilizing the AlaFile system, which will send notification of
such filing to all registered counsel of record as listed below.

/s/ Halron W. Turner

HALRON W. TURNER
Counsel for Defendant

**Counsel of Record**:

Trey J. Malbrough, Esq. (trey@tmbfirm.com)
Bennett L. Pugh, Esq. (pughbennett@gmail.com)

ELECTRONICALLY FILED
10/28/2020 11:10 AM
20-CV-2020-900237.00
CIRCUIT COURT OF
COLBERT COUNTY, ALABAMA
MARK R. EADY, CLERK

## IN THE CIRCUIT COURT OF COLBERT COUNTY, ALABAMA

MICHAEL RANDY HAYES and wife,    :
KATRINA HAYES,
                                 :
        Plaintiffs,
                                 :
v.                                              20-CV-2020-900237
                                 :
MONSANTO COMPANY CORPORATION;
*et al.*,                        :

        Defendants.               :

                          :   :   :

### NOTICE OF ENTRY OF APPEARANCE

Comes now the undersigned counsel and hereby enters his appearance in the above-styled action as counsel of record for Defendant Red River Specialties, LLC, formerly known as Red River Specialties, Inc., reserving Defendant's right to assert all available defenses to the Complaint, including but not limited to lack of personal jurisdiction, insufficiency of process, insufficiency of service of process, improper venue, and inconvenient venue.

Dated:  October 28, 2020

Respectfully submitted,

/s/ Halron W. Turner

HALRON W. TURNER (TUR012)
Turner, Onderdonk, Kimbrough,
  Howell, Huggins & Bradley, PA
13212 West Central Avenue
Post Office Drawer 1389
Chatom, Alabama 36518
Telephone:  (251) 847-2237
Facsimile:  (251) 847-3115
Email:    hwt@tokh.com

**Attorneys for Defendant
Red River Specialties, LLC,
formerly known as Red River
Specialties, Inc.**

## CERTIFICATE OF SERVICE

I hereby certify that on October 28, 2020, I electronically filed the foregoing document with the Clerk of the Court utilizing the AlaFile system, which will send notification of such filing to all registered counsel of record as listed below.

/s/ Halron W. Turner

HALRON W. TURNER
Counsel for Defendant

**Counsel of Record:**

Trey J. Malbrough, Esq. (trey@tmbfirm.com)
Bennett L. Pugh, Esq. (pughbennett@gmail.com)

FILED

2020 Nov-05  AM 05:10
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## NORTHWESTERN DIVISION

| | | |
|---|---|---|
| **MICHAEL RANDY HAYES and KATRINA HAYES,** | } | |
| | } | |
| **Plaintiffs,** | } | |
| | } | **Case No: 3:20-cv-01736-LCB** |
| **v.** | } | |
| | } | |
| **MONSANTO COMPANY, et al.** | } | |
| | } | |
| **Defendants.** | } | |

## PLAINTIFFS' EMERGENCY MOTION TO REMAND

### INTRODUCTION

Monsanto's notice of removal is an egregious and transparent attempt to derail state court proceedings in this case. It is procedurally defective on its face and offers no good-faith basis for federal subject matter jurisdiction. This case should be remanded immediately. The removal is baseless:

- Monsanto filed the notice of removal after the 30-day deadline to remove under §1446(b)(2)(B), bizarrely asserting that an affidavit from an employee of the City of Sheffield triggered a new removal window for Monsanto.

- Monsanto's entire theory of federal jurisdiction rests on the false premise of fraudulent joinder of a non-diverse party.

- There is clearly not diversity in Plaintiffs' state court claims.

Monsanto's motive for pursuing such a frivolous removal is obvious: to delay and derail the state court action. In light of the removal, a Conditional Transfer Order to the Roundup MDL pending in California is bound to soon follow.

Resources of the judiciary will be needlessly consumed, and this action will be unnecessarily delayed.

The Plaintiff will be compelled to expend resources litigating both a CTO and a remand – Monsanto is already laying the groundwork for these delays and distractions by preemptively requesting the "opportunity to present written and oral argument" "if any question arises as to the propriety of this removal" - (Doc. 1 - Notice of Removal, p. 9, ¶24).

The motivation of Sheffield Utilities and Sheffield Light & Power Co. in gamesmanship and complicity in removal is also obvious: a transfer of this case to the MDL would dilute Plaintiffs' case among over 3,000 other MDL cases and easily allow these defendants to shift the blame fully to Monsanto. In turn, Monsanto gets to argue intermediary defenses in the MDL and blame parties back in Alabama.

## BACKGROUND

On September 24, 2020, Plaintiffs Michael Randy Hayes and Katrina Hayes filed a civil complaint in the Twentieth Judicial Circuit, in and for Colbert County, Alabama asserting state causes of action against Monsanto, Sheffield Utilities and Sheffield Light & Power arising out of Michael Randy Hayes' use of industrial glyphosate, a pesticide, that occurred in Colbert County, naming Monsanto, Red River Supplies, Sheffield Light & Power, and Sheffield Utilities as defendants. (Doc. 1-1).

On October 8, 2020, Sheffield Light & Power and Sheffield Utilities filed motions to dismiss in Colbert County Circuit Court. These motions (attached hereto as Exhibit "A") were supported only by the allegations of counsel and were signed by "Attorney for named Defendants."

On October 14, 2020, the Colbert County Circuit Court set the motions to dismiss for hearing on November 5, 2020.

On September 28, 2020, Plaintiffs properly served Monsanto via certified mail; the Colbert County Circuit Clerk entered a Notice of Service of such (attached hereto as Exhibit "B").

On October 28, 2020, Monsanto filed a notice of appearance in the Colbert County case. Company. That same day, counsel for Monsanto also filed a notice of appearance for defendant "Red River Specialties LLC, formerly known as Red River Specialties, Inc." A true and correct copy of those notices is attached hereto as Exhibit "C."

Immediately upon appearance in the state court case, Monsanto had access via AlaCourt to all prior filings in the action, including the pending motions to dismiss filed by Sheffield Utilities and Sheffield Light and Power, the identity of counsel for Sheffield Utilities and Sheffield Light and Power, the allegations by those defendants that they were not legal entities, and the hearing date for their motion.

At 11:11 a.m. on November 4, 2020, Plaintiffs filed in the Colbert County case an Amended Complaint in the state court action. Plaintiffs' amended complaint corrected the identity of "Sheffield Light & Power" as "Sheffield Light & Power Co." and specified Alabama Entity ID # number as listed with the Alabama secretary of state. A copy of the amended complaint is attached hereto as Exhibit "D".

Since Monsanto had appeared of record in the Colbert County case, it received immediate electronic notice via AlaCourt of the filing of plaintiffs' amended complaint. A true and correct copy of the AlaCourt "Notice of Electronic Transmittal" is attached hereto as Exhibit "E".

At 11:44 a.m. on November 4, 2020, Plaintiffs filed in Colbert County a Response to Motion to Dismiss and Motion to Vacate Hearing (attached hereto as Exhibit F) citing the filing of their amended complaint and requesting the pending motion to dismiss be denied as moot because:

- An amended complaint supersedes the previously filed complaint and becomes the operative pleading, unless it subsequently is modified. *Grayson v. Hanson*, 843 So. 2d 146 (Ala. 2002).

- Once an amended pleading is interposed, the original pleading no longer performs any function and any subsequent motion by an opposing party should be directed to the amended pleading. *Holley v. St. Paul Fire & Marine Ins. Co.*, 396 So. 2d 75 (Ala. 1981).

- Plaintiffs' Amended Complaint superseded the Complaint, making moot Defendants' Motion to Dismiss under *Ex parte Puccio*, 923 So. 2d 1069 (Ala. 2005).

Since Monsanto had appeared in the Colbert County case, it received through counsel via AlaCourt immediate electronic notice of the filing of Plaintiffs' Response to Motion to Dismiss and Motion to Vacate Hearing. A true and correct copy of the AlaCourt "Notice of Electronic Transmittal" of Plaintiff's Motion is attached hereto as Exhibit "G".

At 12:30 p.m. on November 4, 2020, in the face of notice that the amended complaint had identified an Alabama party specifically by Alabama Secretary of State Entity ID Number, and after receipt of a motion containing direct citations to Alabama precedent that the original complaint had been superseded and was no longer operative, Monsanto filed its notice of removal, attaching only Plaintiffs' original complaint filed in September. (Doc. 1, 1-1)

This Court should not countenance such vexatious tactics. For the reasons set forth below, the Court should expedite resolution of this motion, immediately remand this case to state court without awaiting an opposition from Monsanto.

## I.     The Notice of Removal is Untimely

Monsanto's disregard of the 30-day deadline to remove under § 1446(b)(3) is glaring and its attempt to resurrect its removal window transparent.

Monsanto had until October 29, 2020 to file its notice of removal – although it filed a notice of appearance on October 28, 2020 and had access to the pending motions to dismiss, Monsanto did not file its notice of removal until November 4, 2020 – 37 days after it was served with the state court complaint.  It is untimely.

The procedure for removal of civil actions, stated in 28 U.S.C. § 1446, requires "defendants desiring to remove any civil action from a State court [to] file in the district court the United States for the district and division within which such action is pending a notice of removal . . . ." 28 U.S.C. § 1446(a).  The removal procedure further requires that "[t]he notice of removal of a civil action . . . be filed within 30 days after the receipt by the defendant . . . [of] a copy of the initial pleading . . . ." 28 U.S.C. § 1446(b).

Under the procedure for removal of civil actions, stated in 28 U.S.C. § 1446, the Monsanto had thirty days from the date of service of the complaint to file a notice of removal with this court.  That thirty-day period began on September 29, 2020 and ended on October 28, 2020.

When interpreting a removal statute, this court should interpret the statute narrowly, with doubts resolved against removal. *Allen v. Chrsitenberry*, 327 F.3d 1290, 1293 (11th Cir. 2003). Failure to comply with § 1446(b) renders removal

defective and justifies remand. *Snapper v. Redan*, 171 F.3d 1249, 1253 (11th Cir. 1999).

Based on narrow construction of the language of the statute, the defendants have not timely filed a notice of removal. The statute plainly requires a removing defendant to file notice of removal in the Northern District of Alabama within thirty days of receiving the complaint.

## II.    Monsanto Relies on a Sham "Document" for Late Removal

To attempt to circumvent this time-bar, Monsanto relies on § 1446(b)(3), which provides  that, if a case is not removable based on the initial pleading, a defendant may file a notice of  removal within 30 days after receiving "an amended pleading, motion, order or other paper from which it may first be ascertained that the case is one which is or has become removable."  Monsanto contends that an affidavit of the dated November 3, 2020 is an "order or other paper" that triggered its deadline to remove.

The affidavit on which Monsanto relies as a trigger for removal was clearly created by Monsanto only for purposes of removal.  The affidavit is stylized with a federal court heading of this case and is notarized by one of the lawyers for Sheffield Utilities and Sheffield Light & Power in the very state court case that is the subject of this removal. (Doc. 1-3, page 2) Paradoxically, no affidavit was used by Sheffield Utilities or Sheffield Light & Power to support their state court motions to dismiss – instead those motions relied only on arguments of lawyers.  The affidavit cited by Monsanto as a triggering document should be disregarded as a self-serving sham.

This is not a close call.  Monsanto failed to remove the case within 30 days after it appeared in the state court case and had notice of filings by co-defendants alleging the very basis for which it now seeks out of time removal.  In light of

- 6 -

Monsanto's failure to satisfy the prerequisites for removal, this case should be remanded to state court.

## III. Probable Causes of Action in Colbert County Circuit Court

Finally, the outcome of Monsanto's fraudulent joinder argument is moot if the court finds that the case is due to be remanded. Accordingly, the court need not address the parties' fraudulent joinder arguments. See *Maxwell v. E-Z-Go*, 2012 U.S. Dist. LEXIS 19502, at \*17 n. 6 (M.D. Ala. Feb. 16, 2012) ("Because the Court has found that the removal is procedurally defective, § 1446(b)(3), the Court will not address Plaintiff's and Defendants' substantive contentions regarding the existence of subject matter jurisdiction.").

However, Plaintiff will address Monsanto's argument that there is "no reasonable possibility" that Plaintiffs can establish a cause of action against either Sheffield Light & Power or Sheffield Utilities. It is clear that Plaintiffs have viable claims against both:

### a. There is a viable claim against Sheffield Utilities

When considering a fraudulent joinder argument raised in a motion to remand, federal courts must not weigh the merits of a plaintiff's claim beyond asking whether there is an arguable claim under state law. *Crowe*, 113 F.3d at 1538; see *Coker v. Amoco Oil Co.*, 709 F.2d 1433, 1440-41 (11th Cir. 1983), superseded by statute on other grounds as stated in *Georgetown Manor, Inc. v. Ethan Allen, Inc.*, 991 F.2d 1533 (11th Cir. 1993) ("If there is even a possibility that a state court would find that the complaint states a cause of action against any one of the resident defendants, the federal court must find that joinder was proper and remand the case to state court.").

Sheffield Utilities faces a strong argument that it is judicially estopped from claiming status as a non-entity – among other reasons, for the simple fact that it has sued its customers and allowed itself to be sued as "Sheffield Utilities" for years. A true and correct copy of an AlaCourt search reflecting such is attached as Exhibit "H" and a Sworn Statement of Account chosen at random attached as Exhibit "I" reflecting Sheffield Utilities' suing as an entity. Exhibit "J" reflects just this years' litigation as Sheffield Utilities and Exhibit "K" reflects Plaintiff's pay stub at Sheffield Utilities. All of this is more than enough to rise to a "possibility" of Sheffield as an entity.

**b. There is a viable claim against Sheffield Light & Power Co.**

Where a plaintiff files an amended complaint adding a party defendant, the amended complaint becomes the operative complaint for purposes of determining jurisdiction at removal. *Malowney Fed. Collection Deposit Grp.*, 193 F.3d 1342, 1345 n.1 (11th Cir. 1999) (noting "[a]n amended complaint supersedes an original complaint"); see *Ross v. Sam's East, Inc.*, 2006 U.S. Dist. LEXIS 38838, 2006 WL 1643999, at *1 (M.D. Fla. 2006) (holding Court lacked diversity jurisdiction where plaintiff, a Florida citizen, filed an amended complaint in state court adding a party defendant who also was a Florida citizen).

Here, it is undisputed that Plaintiff's Amended Complaint supersedes the Initial Complaint. For removal purposes, diversity jurisdiction must exist not only when the original action is filed, but also at the time of removal. *Turner v. Pa. Lumbermen's Mut. Fire Ins. Co.*, 2007 U.S. Dist. LEXIS 78086, 2007 WL 3104930, at *2 (11th Cir. 2007) (citing *Stevens v. Nichols*, 130 U.S. 230, 231, 9 S. Ct. 518, 32 L. Ed. 914 (1889)). *Massey v. SOKC, LLC*, No. 6:12-CV-470-Orl-36TBS, 2012 U.S. Dist. LEXIS 147911, at *6-7 (M.D. Fla. Oct. 15, 2012).

Without question, both at the time of filing the initial complaint and at the time of Monsanto's removal of this action, after the filing of an amended complaint, there existed unquestionably party defendants who defeated diversity – and that is exactly why the record reflects a transparently backwards series of actions on the part of defendants in an attempt to frustrate the process. They have already succeeded at wasting the time and resources of the Court and delaying this action. Further tolerance this conduct will only serve to frustrate and delay this action and obfuscate justice.

## CONCLUSION

For the foregoing reasons, the Court should immediately remand this case to the Colbert County Circuit Court without reply from Monsanto.

Respectfully Submitted,

**/s/Trey J. Malbrough**
**Trey J. Malbrough (MAL037)**
The Malbrough Firm LLC
Age Herald Building
2107 Fifth Avenue North, Suite 301
Birmingham, Alabama 35203
Telephone: (205) 701-0707
Facsimile: (205) 820-0123
Email: trey@tmbfirm.com

*One of the Attorneys for Plaintiffs*

- 9 -

## **CERTIFICATE OF SERVICE**

I hereby certify that I have served a copy of the foregoing to the person(s) named below via electronic service through the ECF system on this day, November 5, 2020:

Halron W. Turner, Esq.
Turner, Onderdonk, Kimbrough,
Howell, Huggins & Bradley, PA
13212 West Central Avenue
Post Office Drawer 1389
Chatom, AL 36518
Email: hwt@tokh.com
*Attorneys for Defendants Monsanto Company, Red River Specialties, LLC, & Red River Specialties, Inc.*

Steve A. Baccus, Esq.
R. Keith Worsham, Esq.
Almon, McAlister, Baccus & Worsham
P. O. Box 148
Tuscumbia, AL 35674
Email:  sbaccus_2000@yahoo.com
Email:  rkw11111@yahoo.com


/s/ Trey J. Malbrough
Trey J. Malbrough

- 10 -

ELECTRONICALLY FILED
10/8/2020 2:21 PM
20-CV-2020-900237.00
CIRCUIT COURT OF
COLBERT COUNTY, ALABAMA
MARK R. EADY, CLERK

**IN THE CIRCUIT COURT OF COLBERT COUNTY, ALABAMA**

| | |
|---|---|
| **MICHAEL RANDY HAYES, et al.,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **vs.** | ) **CASE NO. CV-2020-900237** |
| | ) |
| **SHEFFIELD UTILITIES, et al.** | ) |
| | ) |
| **Defendants.** | ) |

**EXHIBIT**

**A**

## MOTION TO DISMISS

**COMES NOW** the named Defendants, Sheffield Utilities and Sheffield Light & Power, and

move this Honorable Court to dismiss Plaintiffs' Complaint and all claims against these Defendants

based on the following grounds:

1.     For that there is no legal entity known as Sheffield Utilities

2.     For that there is no legal entity known as Sheffield Light & Power.

This _8_ day of October, 2020.

_____

**Steve A. Baccus (SAB002)**
**R. Keith Worsham (WOR010)**
**Attorney for named Defendants**

**OF COUNSEL:**
ALMON, McALISTER, BACCUS & WORSHAM
P. O. Box 148
Tuscumbia, AL   35674
Phone:  (256) 383-4448
Fax:  (256) 383-6523

## CERTIFICATE OF SERVICE

I hereby certify that I have served a copy of the above and foregoing Motion upon the
following Counsel electronically through the Court's CM/EFT system and/or by placing a copy of
the same in the United States Mail, postage prepaid, on the _8_ day of October, 2020:

Mr. Trey J. Malbrough
The Malbrough Firm LLC
Age Herald Building
2107 Fifth Avenue North, Suite 301
Birmingham, AL 35203

Mr. Bennett L. Pugh
Attorney at Law
300 N. Montgomery Ave.
Sheffield, AL 35660

_____

**OF COUNSEL**



FILED

2020 Nov-05 AM 05:10
U.S. DISTRICT COURT
N.D. OF ALABAMA

AlaFile E-Notice



EXHIBIT
**B**

20-CV-2020-900237.00

Judge: KYLE W BROWN

To: MALBROUGH TREY JOSEPH
trey@tmbfirm.com

---

# NOTICE OF SERVICE

---

IN THE CIRCUIT COURT OF COLBERT COUNTY, ALABAMA

MICHAEL RANDY HAYES ET AL V. MONSANTO COMPANY CORPORATION ET AL
20-CV-2020-900237.00

The following matter was served on 9/28/2020

**D001 MONSANTO COMPANY CORPORATION**

**Corresponding To**

CERTIFIED MAIL

MARK R. EADY
CIRCUIT COURT CLERK
COLBERT COUNTY, ALABAMA
P.O. BOX 740370
TUSCUMBIA, AL, 35674

256-386-8511
mark.eady@alacourt.gov

ELECTRONICALLY FILED
FILED
11/4/2020 11:11 AM
20-CV-2020-900205 AM 05:10
2023 No 005
CIRCUIT COURT OF
CIRCUIT COURT
COLBERT COUNTY, ALABAMA
COLBERT COUNTY, ALABAMA
MARK R. EADY, CLERK

## IN THE CIRCUIT COURT OF COLBERT COUNTY, ALABAMA

| | |
|---|---|
| MICHAEL RANDY HAYES and wife,  } | |
| KATRINA HAYES,  } | |
|  } | |
|  **Plaintiffs,**  } | |
|  } | |
| v.  } | **Case No: CV 2020 – 900237** |
|  } | |
| MONSANTO COMPANY,  } | **JURY TRIAL DEMANDED** |
| a corporation;  } | |
| RED RIVER SPECIALTIES,  } | |
| INC., a corporation;  } | |
| RED RIVER SPECIALTIES,  } | |
| LLC, a limited liability corporation;  } | |
| SHEFFIELD LIGHT & POWER CO.,  } | |
| a corporation,  } | |
| SHEFFIELD UTILITIES, a corporation,  } | |

**EXHIBIT**

**D**

Fictitious Defendants 1-10, intending thereby to designate the person, firm or corporation who manufactured and/or sold and/or distributed and/or designed and/or assembled and/or placed in the stream of commerce glyphosate-based pesticides, including Roundup®, which was involved in Michael Randy Hayes' injury and/or any products whose condition caused and/or contributed to the occurrence and/or injury described in the complaint; Fictitious Defendants 11-20, intending thereby to designate the person, firm or corporation who acted negligently and/or wantonly on the occasion of the occurrence and/or injury referred to in the complaint; Fictitious Defendants 21-30, intending thereby to designate those persons, firm, or corporation who were the employers, principals, joint venturers, partners, and/or otherwise entities vicariously responsible for the conduct of the named defendants and/or other persons liable and responsible for the occurrence and injuries and damages of plaintiffs; Fictitious Defendants 31-40, intending thereby to designate the person, firm or corporation whose negligence and/or wantonness caused and/or contributed to the occurrence and/or injury described in the complaint; Fictitious Defendants 41- 50, intending thereby to designate the persons who were the successors to Monsanto Company, Red River Specialties, Inc., Red River Specialties, LLC, Sheffield Light & Power Co., and/or Sheffield Utilities and/or to the manufacturers, sellers, distributors, designers, assemblers and/or the companies who placed into the stream of commerce glyphosate-based pesticides, including Roundup®, which Michael Randy Hayes was working with on or about 1979-2014 and thereafter; Fictitious Defendants 51- 60, intending thereby to designate the persons who, whether singular or plural, that entity or those entities who or which designed the glyphosate-based pesticides, including Roundup®, also known as Roundup®, involved in the occurrence made the basis of this lawsuit, or any component part thereof; Fictitious Defendants 61-70, intending thereby to designate the persons who, whether singular or plural, that entity or those entities who or which manufactured or assembled the glyphosate-based pesticides, including Roundup®, also known as Roundup®, involved in the occurrence made the basis of this lawsuit, or any component part thereof; Fictitious Defendants 71-80,

intending thereby to designate the persons who, whether singular or plural, that entity or those entities who or which had any role in the distributive chain regarding the glyphosate-based pesticides, including Roundup®, also known as Roundup®, involved in the occurrence made the basis of this lawsuit or any component part thereof; Fictitious Defendants 81-90, intending thereby to designate the persons who, whether singular or plural, that entity or those entities who or which, prior to the occurrence made the basis of this lawsuit, altered the glyphosate-based pesticides, including Roundup®, also known as Roundup®, involved in said occurrence or any component part thereof; Fictitious Defendants 91-100, intending thereby to designate the persons who, whether singular or plural, that entity or those entities who or which failed to warn or issued inadequate warnings or instructions regarding the use or operation of the glyphosate-based pesticides, including Roundup®, also known as Roundup®, involved in the occurrence made the basis of this lawsuit or any component part thereof; Fictitious Defendants 101-110, intending thereby to designate the persons who, whether singular or plural, that entity or those entities which provided product liability and/or general liability insurance coverage for the manufacturer and/or distributor of the glyphosate-based pesticides, including Roundup®, also known as Roundup®, involved in the occurrence made the basis of this lawsuit at the time of said occurrence or at any time prior thereto; Fictitious Defendants 111-120, intending thereby to designate the persons who, whether singular or plural, that entity or those entities, who or which tested, inspected, approved or issued any approval of the glyphosate-based pesticides, including Roundup®, also known as Roundup®, involved in the occurrence made the basis of this lawsuit, or any component part thereof; Fictitious Defendants 121-130, intending thereby to designate the persons who, whether singular or plural, that entity or those entities who or which conducted safety inspections or analyses of or with reference to the glyphosate-based pesticides, including Roundup®, also known as Roundup®, involved in the occurrence made the basis of this lawsuit, or any component part thereof, and/or the design or manufacturing process of each such product, including but not limited to the products liability insurance carrier for the manufacturer or distributor of any of the aforesaid products; Fictitious Defendants 131-140, intending thereby to designate the persons who, whether singular or plural, that entity or those entities who or which was responsible for the defective condition of the glyphosate-based pesticides, including Roundup®, also known as Roundup®, involved in the occurrence made the basis of this lawsuit on the date of said occurrence or any component part thereof; Fictitious Defendants 141-150, intending thereby to designate the persons who, whether singular or plural, that entity or those entities who allowed or placed the glyphosate-based pesticides, including Roundup®, also known as Roundup®, involved in the occurrence made the basis of this lawsuit into the stream of commerce in a defective and hence unreasonably dangerous condition; Fictitious Defendants 151-160, intending thereby to designate the persons who, whether singular or plural, that entity or those entities, other than those entities described above, whose breach of contract or warranty contributed to cause the occurrence made the basis of this lawsuit; Fictitious Defendants 161-170, intending thereby to designate the persons who, whether singular or plural, that entity or those entities who or which issued, or had a duty to issue, warnings or instructions regarding the use or operation of the glyphosate-based pesticides, including Roundup®, also known as Roundup®, involved in the occurrence made the basis of this lawsuit, any component part thereof, or any attendant equipment used or available for use therewith; Fictitious Defendants 171-180, intending thereby to designate the persons who caused and/or failed to correct dangerous conditions

within this glyphosate-based pesticides, including Roundup®, also known as Roundup®; Fictitious Defendants 181-190, intending thereby to designate the persons who, whether singular or plural, that entity or those entities other than those entities described above, which was the predecessor corporation and/or successor corporation of any of the entities described above; Fictitious Defendants 191-200, intending thereby to designate the persons who were vicariously responsible for the conduct of the named defendants and/or other persons or entities whose negligence caused and/or contributed to Michael Randy Hayes' injury; Fictitious Defendants 201-210, intending thereby to designate the persons who committed acts of negligence, wantonness, willfulness, violations of duties under the Alabama Extended Manufacturers Liability Doctrine, breach of warranty or contract concerning this glyphosate-based pesticides, including Roundup®, also known as Roundup®, which caused and/or contributed to Michael Randy Hayes' injuries. The names of said Fictitious Defendants, whose legal identities are otherwise unknown to the plaintiffs at this time, will be substituted by amendment when ascertained separately and severally.

## AMENDED COMPLAINT

1.      Plaintiffs, Michael Randy Hayes and wife, Katrina Hayes, (hereinafter "Plaintiff" / "Plaintiffs") by and through undersigned counsel, hereby brings this Complaint for damages against Defendant Monsanto Company, Defendant Red River Specialties, Inc., Defendant Red River Specialties, LLC, Defendant Sheffield Light & Power Co., and Defendant Sheffield Utilities, and in support thereof allege the following:

## NATURE OF THE ACTION

2.      This action seeks to recover damages for the injuries sustained by Plaintiff as the direct and proximate result of the wrongful conduct and negligence of the Defendants in connection with the defective design, development, manufacture, testing, packaging, promotion, marketing, advertising, distribution, labeling, and selling of glyphosate-based products, including the herbicide Roundup®, and herbicides containing the active ingredient glyphosate.

3.      Plaintiff maintains that Defendant Monsanto, Defendant Red River Specialties, Inc., and/or Defendant Red River Specialties, LLC's glyphosate-based products, including Roundup® are and were defective, are and were dangerous to human health, and are and were

unfit and unsustainable to be marketed and sold in commerce and lacked proper warnings and directions as to the dangers associated with its use.

4.     Plaintiff maintains that Defendants Red River Specialties, Inc. and/or Defendant Red River Specialties, LLC were negligent and breached warranties and duties to the Plaintiff as set out herein.

5.     Plaintiff maintains that Defendant Sheffield Light & Power Co. and/or Defendant Sheffield Utilities were negligent and/or breached its/their duty to provide a safe work environment to Plaintiff, and breached warranties and duties to the Plaintiff as set out herein.

6.     Plaintiff's injuries, like those striking thousands of similarly situated victims across Alabama and the country, were unavoidable and not warned against by Defendants.

## **INTRODUCTION**

7.     Monsanto is a multinational agricultural biotechnology corporation based in St. Louis, Missouri, and incorporated in Delaware. It is the world's leading producer of glyphosate.

8.     In 1970, Monsanto discovered the herbicidal properties of glyphosate and began marketing it in products in 1974, distributing it through wholesalers, distributors, and commercially under the brand name Roundup®.  Roundup® is a non-selective herbicide used to kill weeds that commonly compete with the growing of crops. In addition to the active ingredient glyphosate, Roundup® contains the surfactant Polyethoxylated tallow amine ("POEA") and/or adjuvants and other so-called "inert" ingredients.

9.     In 2001, glyphosate was the most widely used active ingredient in herbicides used in American agriculture, with 85–90 millions of pounds used annually. That number grew to 185 million pounds by 2007. As of 2013, glyphosate was the world's most widely used herbicide.

10.     Monsanto distributed, and distributes, glyphosate-based products, including Roundup®, in the business to business market through distributors, independent retailers and dealers, and agricultural cooperatives.

11.     As of 2009, Monsanto was the world's leading producer of seeds, accounting for 27% of the world seed market. The majority of these seeds are of the "Roundup Ready®" brand. The stated advantage of Roundup Ready® crops is that they substantially improve a farmer's ability to control weeds, since glyphosate can be sprayed in the fields during the growing season without harming the crops. In 2010, an estimated 70% of corn and cotton, and 90% of soybean fields in the United States were Roundup Ready®.

12.     Monsanto's glyphosate-based products, including Roundup®, are registered in 130 countries and approved for use on over 100 different crops. They are ubiquitous in the environment. Numerous studies confirm that glyphosate is found in rivers, streams and groundwater in agricultural areas where glyphosate-based products, including Roundup®, is used. It has been found in food, in the urine of agricultural workers and even in the urine of urban dwellers who are not in direct contact with glyphosate.

13.     On March 20, 2015, the International Agency for Research on Cancer ("IARC"), an agency of the World Health Organization ("WHO"), issued an evaluation of several herbicides, including glyphosate. That evaluation was based, in part, on studies of exposures to glyphosate in several countries around the world, and it traces the health implications from exposure to glyphosate since 2001.

14.     On July 29, 2015, IARC issued the formal monograph relating to glyphosate. In that monograph, the IARC Working Group provides a thorough review of the numerous studies and data relating to glyphosate exposure in humans.

15. The IARC Working Group classified glyphosate as a Group 2A herbicide, which means that it is *probably carcinogenic to humans*. The IARC Working Group concluded that the cancers most associated with glyphosate exposure are Non-Hodgkin's Lymphoma ("NHL") and other Hematopoietic cancers, including Lymphocytic Lymphoma, Chronic Lymphocytic Leukemia, B-cell Lymphoma and Multiple Myeloma.

16. The IARC evaluation is significant. It confirms what has been believed for years: that glyphosate is toxic to humans.

17. Nevertheless, Monsanto, since it began selling glyphosate-based herbicides, including Roundup®, has represented it as safe to humans and the environment. Indeed, Defendant have repeatedly proclaimed and continues to proclaim to the world, and particularly to United States consumers, that glyphosate-based herbicides, including Roundup®, do not create unreasonable risks to human health or to the environment.

## THE PARTIES

18. Michael Randy Hayes ("Plaintiff") is a natural person over the age of nineteen, is a citizen of the State of Alabama, and is a resident of Sheffield, Alabama, and brings this action for personal injuries sustained by his exposure to Defendant Monsanto's glyphosate-based product(s), including Roundup®, which contained the active ingredient glyphosate and the surfactant polyethoxylated tallow amine ("POEA").

19. Katrina Hayes is the spouse of Plaintiff and resides with him. Katrina Hayes brings a claim for loss of consortium.

20. Defendant Monsanto Company ("Monsanto") is a Delaware corporation with its headquarters and principal place of business in St. Louis, Missouri. Monsanto was the entity that discovered the herbicidal properties of glyphosate and the manufacturer of glyphosate-based

product(s), including Roundup®, which contains the active ingredient glyphosate and the surfactant POEA, as well as adjuvants and other "inert" ingredients.

21.     Plaintiff used and/or was exposed to Monsanto's glyphosate-based product(s), including Roundup®, in Alabama, from approximately 1979 to approximately 2014, while working for Defendant Sheffield Utilities, and thereafter.

22.     As a direct and proximate result of being exposed to Defendant's glyphosate-based product(s), including Roundup®, Plaintiff developed Non-Hodgkin's Lymphoma and was diagnosed on or about April 15, 2019 and is currently still being treated.

23.     Defendant Red River Specialties, Inc. is a Louisiana corporation with a business location in Shelby County, Alabama.  At all pertinent times herein, Red River Specialties, Inc. was registered with the Secretary of State of Alabama and doing business in Colbert County, Alabama.

24.     Defendant Red River Specialties, LLC is the present name of Red River Specialties, Inc.  On or about December 11, 2018, Red River Specialties, Inc. filed an amendment of foreign entity filing type with the Secretary of State of Alabama, changing its registration with the State of Alabama to "Red River Specialties, LLC."  Red River Specialties, LLC is presently registered with the Secretary of State of Alabama and does business in Colbert County, Alabama.

25.     For ease of reference herein, Red River Specialties, Inc. and Red River Specialties, LLC are collectively referred to as "Red River Specialties."  At all relevant times herein, Red River Specialties distributed and caused to be sold and/or used by Plaintiff, Monsanto's glyphosate-based product(s), including Roundup®.

26.     Defendant Sheffield Light & Power Co., AL Entity ID# 793-221, is a public utility company which operates in Colbert County, Alabama, and has as its principal place of business at

- 7 -

300 N. Nashville Avenue, Sheffield, Alabama, 35660 and was doing business in Colbert County, Alabama at all pertinent times herein.

27.     Defendant Sheffield Utilities is a public utility company which operates in Colbert County, Alabama, and has as its principal place of business at 300 N. Nashville Avenue, Sheffield, Alabama, 35660 and was doing business in Colbert County, Alabama at all pertinent times herein.

28.     At all times pertinent herein, Defendant Sheffield Utilities and/or Defendant Sheffield Light & Power Co., and/or, or as, the Electric Department of Sheffield Utilities, was serving Colbert County, Alabama and the City of Sheffield, Alabama as a public power utility. The company has about 18,500 business and residential customers and maintains about 1,650 miles of transmission line.

29.     "Roundup®" refers to any and all formulations of Defendant Monsanto's Roundup® products that contain the active ingredient glyphosate.

30.     "Glyphosate-based product(s)" refers to any and all formulations of Defendant Monsanto's products containing the active ingredient glyphosate.

## JURISDICTION & VENUE

31.     This Court has jurisdiction over this matter as Plaintiff's use of and exposure to the subject glyphosate-based herbicide products, including Roundup® products, took place in Colbert County, Alabama.

32.     This Court has personal jurisdiction over Monsanto because Monsanto transacts business in Colbert County, Alabama and did so at all times relevant herein. Monsanto knew or should have known that its glyphosate-based product(s), including Roundup® products, are and were sold in Colbert County, Alabama, and, more specifically, caused glyphosate-based

- 8 -

product(s), including Roundup®, to be sold to and/or used by Plaintiff in Colbert County, Alabama.

33.    Monsanto maintains sufficient contacts with the State of Alabama and particularly with Colbert County, Alabama that this Court's exercise of personal jurisdiction over it does not offend traditional notions of fair play and substantial justice.

34.    This Court has personal jurisdiction over Red River Specialties because Red River Specialties transacts business in Colbert County, Alabama and did so at all times relevant herein. Red River Specialties knew or should have known that glyphosate-based product(s), including Roundup® products, are and were sold in Colbert County, Alabama, and, more specifically, distributed glyphosate-based product(s), including Roundup®, and caused them to be sold to and/or used by Plaintiff in Colbert County, Alabama.

35.    Defendant Red River Specialties maintains sufficient contacts with the State of Alabama and particularly with Colbert County, Alabama that this Court's exercise of personal jurisdiction over it does not offend traditional notions of fair play and substantial justice.

36.    Defendant Sheffield Light & Power Co. is a public utility company which operates in  Colbert County, Alabama, and has as its principal  place  of business at 300 N. Nashville Avenue, Sheffield, Alabama, 35660 and was doing business in Colbert County, Alabama at all pertinent times herein.

37.    Defendant Sheffield Utilities is a public utility company which operates in Colbert County, Alabama, and has as its principal place of business at 300 N. Nashville Avenue, Sheffield, Alabama, 35660 and was doing business in Colbert County, Alabama at all pertinent times herein.

38.    At all times pertinent herein, Defendant Sheffield Utilities and/or Defendant Sheffield Light & Power Co., and/or, or as, the Electric Department of Sheffield Utilities, was

serving Colbert County, Alabama and the City of Sheffield, Alabama as a public power utility. The company has about 18,500 business and residential customers and maintains about 1,650 miles of transmission line.

39.     Venue is proper within this Court because the purchase of, and exposure to, the glyphosate-based product(s), including Roundup®, complained of herein took place in Colbert County, Alabama.  Plaintiffs reside in Colbert County; Plaintiffs' harms, losses, and damages occurred in Colbert County; Defendants do substantial business in the State of Alabama and in Colbert County; and at all times relevant hereto, Defendants developed, manufactured, promoted, marketed, distributed, warranted, and/or sold glyphosate-based products and Roundup® in interstate commerce.  Further, Defendants, as corporate entities, are deemed to reside where they are subject to personal jurisdiction.


## STATEMENT OF THE FACTS

40.     At all times relevant to this Complaint, Monsanto was the manufacturer of glyphosate-based product(s), including Roundup®, which contains the active ingredient glyphosate and the surfactant POEA, as well as adjuvants and other "inert" ingredients.

41.     Glyphosate is a broad-spectrum, non-selective herbicide used in a wide variety of herbicidal products around the world.

42.     Plants treated with glyphosate translocate the systemic herbicide to their roots, shoot regions, and fruit, where it interferes with the plant's ability to form aromatic amino acids necessary for protein synthesis. Treated plants generally die within two to three days. Because plants absorb glyphosate, it cannot be completely removed by washing or peeling produce, or by milling, baking, or brewing grains.

- 10 -

43.     For nearly 40 years, farmers, homeowners and others across the world have used glyphosate-based products, including Roundup®, without knowledge of the dangers its use poses. That is because when Monsanto first introduced Roundup®, it touted glyphosate as a technological breakthrough: it could kill almost every weed without causing harm either to people or to the environment. Of course, history has shown that not to be true. According to the WHO, the main chemical ingredient of Roundup® - glyphosate – is a probable cause of cancer. Monsanto assured the public that Roundup® was harmless. In order to prove this, Monsanto has championed falsified data and has attacked legitimate studies that revealed the dangers of glyphosate-based product(s), including Roundup®. Monsanto has led a prolonged campaign of misinformation to convince government agencies, farmers and the general population that glyphosate-based product(s), including Roundup® are safe.

**THE DISCOVERY OF GLYPHOSATE AND DEVELOPMENT OF ROUNDUP®**

44.     The herbicidal properties of glyphosate were discovered in 1970 by a Monsanto chemist, John Franz.  The first glyphosate-based herbicide was introduced to the market in the mid-1970's under the brand name Roundup®. From the outset, Defendant marketed glyphosate-based product(s), including Roundup®, as "safe" general-purpose herbicide for widespread commercial and consumer use. It still markets and advertises glyphosate-based product(s), including Roundup®, as safe today.

45.     In addition to the active ingredient glyphosate, Defendants' glyphosate-based product(s), including Roundup®, also contain adjuvants and other chemicals, such as the surfactant POEA, which are considered "inert" and therefore protected as "trade secrets" in manufacturing. Growing evidence suggests that these adjuvants and additional components of

glyphosate-based product(s), including Roundup®, are not, in fact, inert and are toxic in their own right, and that may be toxic by formulation

## REGISTRATION OF HERBICIDES UNDER FEDERAL LAW

46.     The manufacture, formulation and distribution of herbicides, such as glyphosate-based product(s), including Roundup®, are regulated under the Federal Insecticide, Fungicide and Rodenticide Act ("FIFRA" or "Act"), 7 U.S.C. § 136 *et seq*. FIFRA requires that all pesticides be registered with the Environmental Protection Agency ("EPA" or "Agency") prior to their distribution, sale or use, except as described by the Act. 7 U.S.C. § 136a(a).

47.     Because pesticides are toxic to plants, animals and humans, at least to some degree, the EPA requires as part of the registration process, a variety of tests to evaluate the potential for exposure to pesticides, toxicity to people and other potential non-target organisms and other adverse effects on the environment. Registration by the EPA, however, is not an assurance or finding of safety. The determination the Agency must make in registering or re- registering a product is not that the product is "safe," but rather that use of the product in accordance with its label directions "will not generally cause unreasonable adverse effects on the environment." 7 U.S.C. § 136a(c)(5)(D).

48.     FIFRA defines "unreasonable adverse effects on the environment" to mean "any unreasonable risk to man or the environment, taking into account the economic, social and environmental costs and benefits of the use of any pesticide." 7 U.S.C. § 136(bb). FIFRA thus requires the EPA to make a risk/benefit analysis in determining whether a registration should be granted or allowed to continue to be sold in commerce.

49.     The EPA and the State of Alabama registered Roundup® for distribution, sale and manufacture in the United States and the State of Alabama.

50.     FIFRA generally requires that the registrant - Defendant Monsanto in the case of glyphosate-based product(s), including Roundup®, conduct the health and safety testing of pesticide products. The EPA has protocols governing the conduct of tests required for registration and the laboratory practices that must be followed in conducting these tests. The data produced by the registrant must be submitted to the EPA for review and evaluation. The government is not required, nor is it able to perform the product tests that are required of the manufacturer.

51.     The evaluation of each pesticide product distributed, sold or manufactured is completed at the time the product is initially registered. The data necessary for registration of a pesticide has changed over time. The EPA is now in the process of re-evaluating all pesticide products through a Congressionally mandated process called "re-registration." 7 U.S.C. § 136a-1. In order to reevaluate these pesticides, the EPA is demanding the completion of additional tests and the submission of data for the EPA's review and evaluation.

52.     In the case of glyphosate, and therefore glyphosate-based product(s), including Roundup®, the EPA had planned on releasing its preliminary risk assessment in relation to the re-registration process no later than July 2015. The EPA completed its review of glyphosate in early 2015, but it delayed releasing the risk assessment pending further review in light of the World Health Organization's health- related findings.

## SCIENTIFIC FRAUD UNDERLYING THE MARKETING AND SALE OF GLYPHOSATE/ ROUNDUP®

53.     Based on early studies that glyphosate could cause cancer in laboratory animals, the EPA originally classified glyphosate as *possibly carcinogenic to humans* (Group C) in 1985. After pressure from Defendant, including contrary studies it provided to the EPA, the EPA

changed its classification to *evidence of non-carcinogenicity in humans* (Group E) in 1991. In so classifying glyphosate, however, the EPA made clear that the designation did not mean the chemical does not cause cancer: "[i]t should be emphasized, however, that designation of an agent in Group E is based on the available evidence at the time of evaluation and should not be interpreted as a definitive conclusion that the agent will not be a carcinogen under any circumstances."

54. On two occasions, the EPA found that the laboratories hired by Defendant to test the toxicity of its Roundup® products for registration purposes committed fraud.

55. In the first instance, Defendant, in seeking initial registration of Roundup® by the EPA, hired Industrial Bio-Test Laboratories ("IBT") to perform and evaluate pesticide toxicology studies relating to Roundup®. IBT performed about thirty (30) tests on glyphosate and glyphosate-containing products, including nine (9) of the fifteen (15) residue studies needed to register Roundup® .

56. In 1976, the United States Food and Drug Administration ("FDA") performed an inspection of Industrial Bio-Test Industries ("IBT") that revealed discrepancies between the raw data and the final report relating to the toxicological impacts of glyphosate. The EPA subsequently audited IBT; it too found the toxicology studies conducted for the Roundup® herbicide to be invalid. An EPA reviewer stated, after finding "routine falsification of data" at IBT, that it was "hard to believe the scientific integrity of the studies when they said they took specimens of the uterus from male rabbits."

57. Three top executives of IBT were convicted of fraud in 1983.

58. In the second incident of data falsification, Defendant hired Craven Laboratories in 1991 to perform pesticide and herbicide studies, including for Roundup®. In that same year, the

owner of Craven Laboratories and three of its employees were indicted, and later convicted, of fraudulent laboratory practices in the testing of pesticides and herbicides.

## THE IMPORTANCE OF ROUNDUP® TO DEFENDANT'S DOMINANCE PROFITS

59.     Despite the falsity of the tests that underlie its registration, within a few years of its launch, Roundup® was being marketed in 115 countries.

60.     The success of Roundup® was key to Monsanto's continued reputation and dominance in the marketplace. Largely due to the success of Roundup® sales, Monsanto's agriculture division was out-performing its chemicals division's operating income, and that gap increased yearly. But with its patent for glyphosate expiring in the United States in the year 2000, Defendant needed a strategy to maintain its Roundup® market dominance and to ward off impending competition.

61.     In response, Monsanto began the development and sale of genetically engineered Roundup Ready® seeds in 1996. Since Roundup Ready® crops are resistant to glyphosate, farmers can spray Roundup® onto their fields during the growing season without harming the crop. This allowed Defendant to expand its market for Roundup® even further. By 2000, Monsanto's biotechnology seeds were planted on more than 80 million acres worldwide and nearly 70% of American soybeans were planted from Roundup Ready® seeds. It also secured Monsanto's dominant share of the glyphosate/Roundup market through a marketing strategy that coupled proprietary Roundup Ready® seeds with continued sales of its Roundup® herbicide.

62.     Through a three-pronged strategy of increased production, decreased prices and by coupling with Roundup Ready® seeds, Roundup® became Monsanto's most profitable product. In 2000, Roundup® accounted for almost $2.8 billion in sales, outselling other herbicides by a

- 15 -

margin of five to one, and accounting for close to half of Monsanto's revenue. Today, glyphosate remains one of the world's largest herbicides by sales volume.

## DEFENDANT HAS KNOWN FOR DECADES THAT IT FALSELY ADVERTISED THE SAFETY OF ROUNDUP®

63.     In 1996, the New York Attorney General ("NYAG") filed a lawsuit against Monsanto based on its false and misleading advertising of Roundup® products. Specifically, the lawsuit challenged Monsanto's general representations that its spray-on, glyphosate-based herbicides, including Roundup®, were "**safer than table salt**" and "**practically non-toxic**" to mammals, birds and fish. Among the representations the NYAG found deceptive and misleading about the human and environmental safety of Roundup® are the following:

a) "Remember that environmentally friendly Roundup herbicide is biodegradable. It won't build up in the soil so you can use Roundup with confidence along customers' driveways, sidewalks and fences..."
And remember that Roundup is biodegradable and won't build up in the soil. That will give you the environmental confidence you need to use Roundup everywhere you've got a weed, brush, edging or trimming problem."

b) "Roundup biodegrades into naturally occurring elements."

c) "Remember that versatile Roundup herbicide stays where you put it. That means there's no washing or leaching to harm customers' shrubs or other desirable vegetation."

d) "This non-residual herbicide will not wash or leach in the soil. It ... stays where you apply it."

e) "Glyphosate is less toxic to rats than table salt following acute oral ingestion."

f) "Glyphosate's safety margin is much greater than required. It has over a 1,000- fold safety margin in food and over a 700-fold safety margin for workers who manufacture it or use it."

g) "You can feel good about using herbicides by Defendant. They carry a toxicity category rating of 'practically non- toxic' as it pertains to mammals, birds and fish."

h) "Roundup can be used where kids and pets will play and breaks down into natural material." This ad depicts a person with his head in the ground and a pet dog standing in an area which has been treated with Roundup.

64.     On November 19, 1996, Monsanto entered into an Assurance of Discontinuance with the NYAG, in which Defendant agreed, among other things, "to cease and desist from publishing or broadcasting any advertisements [in New York] that represent, directly or by implication" that:

a) Its glyphosate-containing pesticide products or any component thereof are safe, non-toxic, harmless or free from risk.

b) Its glyphosate-containing pesticide products or any component thereof manufactured, formulated, distributed or sold by Monsanto are biodegradable...

c) Its glyphosate-containing pesticide products or any component thereof stay where they are applied under all circumstances and will not move through the environment by any means.

d) Its glyphosate-containing pesticide products or any component thereof are "good" for the environment or are "known for their environmental characteristics."

e) Glyphosate-containing pesticide products or any component thereof are safer or less toxic than common consumer products other than herbicides.

f) Its glyphosate-containing products or any component thereof might be classified as "practically non-toxic."

65.     Monsanto did not alter its advertising in the same manner in any state other than New York, and on information and belief still has not done so today.

66.     In 2009, France's highest court ruled that Monsanto had not told the truth about the safety of Roundup®. The French court affirmed an earlier judgement that Monsanto had falsely advertised its herbicide Roundup® as "biodegradable" and that it "left the soil clean."

## CLASSIFICATIONS AND ASSESSMENTS OF GLYPHOSATE

67.     The IARC process for the classification of glyphosate followed the IARC's stringent procedures for the evaluation of a chemical agent. Over time, the IARC Monograph program has reviewed 980 agents. Of those reviewed, it has determined 116 agents to be Group 1 (Known Human Carcinogens); 73 agents to be Group 2A (Probable Human Carcinogens); 287 agents to be Group 2B (Possible Human Carcinogens); 503 agents to be Group 3 (Not Classified); and one agent to be Probably Not Carcinogenic.

68.     The established procedure for the IARC Monograph evaluations is described in the IARC Programme's Preamble. Evaluations are performed by panels of international experts, selected on the basis of their expertise and the absence of actual or apparent conflicts of interest.

69.     One year before the Monograph meeting, the meeting is announced and there is a call both for data and for experts. Eight (8) months before the Monograph meeting, the Working Group membership is selected, and the sections of the Monograph are developed by the Working Group members. One (1) month prior to the Monograph meeting, the call for data is closed and the various draft sections are distributed among Working Group members for review and comment. Finally, at the Monograph meeting, the Working Group finalizes review of all literature,

evaluates the evidence in each category, and completes the overall evaluation. Within two (2) weeks after the Monograph meeting, the summary of the Working Group findings is published in *The Lancet Oncology*, and within one (1) year after the meeting, the finalized Monograph is published.

70.     In assessing an agent, the IARC Working Group reviews the following information: (a) human, experimental and mechanistic data; (b) all pertinent epidemiological studies and cancer bioassays; and (c) representative mechanistic data. The studies must be publicly available and have sufficient detail for meaningful review and reviewers cannot be associated with the underlying studies.

71.     In March 2015, IARC reassessed glyphosate. The summary published in *The Lancet Oncology* reported that glyphosate is a Group 2A agent and probably carcinogenic in humans.

72.     On July 29, 2015, the IARC issued its Monograph for glyphosate, Monograph Volume 112. For Volume 112, the volume that assessed glyphosate, a Working Group of 17 experts from 11 countries met at the IARC from March 3–10, 2015, to assess the carcinogenicity of certain herbicides, including glyphosate. The March meeting culminated nearly a one-year review and preparation by the IARC Secretariat and the Working Group, including a comprehensive review of the latest available scientific evidence. According to published procedures, the Working Group considered "reports that have been published or accepted for publication in the openly available scientific literature" as well as "data from governmental reports that are publicly available."

73.     The studies considered the following exposure groups: (a) occupational exposure of farmers and tree nursery workers in the United States, forestry workers in Canada and Finland

and municipal weed-control workers in the United Kingdom; and (b) para-occupational exposure in farming families.

74.     Glyphosate was identified as the second-most used household herbicide in the United States for weed control between 2001 and 2007, and the most heavily used herbicide in the world in 2012.

75.     Exposure pathways are identified as air (especially during spraying), water and food. Community exposure to glyphosate is widespread and found in soil, air, surface water and groundwater, as well as in food.

76.     The assessment of the IARC Working Group identified several case control studies of occupational exposure in the United States, Canada and Sweden. These studies show a human health concern from agricultural and other work-related exposure to glyphosate.

77.     The IARC Working Group found an increased risk between exposure to glyphosate and NHL and several subtypes of NHL, and the increased risk persisted after adjustment for other pesticides.

78.     The IARC Working Group also found that glyphosate caused DNA and chromosomal damage in human cells. One study in community residents reported increases in blood markers of chromosomal damage (micronuclei) after glyphosate formulations were sprayed.

79.     In male CD-1 mice, glyphosate induced a positive trend in the incidence of a rare tumor: renal tubule carcinoma. A second study reported a positive trend for haemangiosarcoma in male mice. Glyphosate increased pancreatic islet-cell adenoma in male rats in two studies. A glyphosate formulation promoted skin tumors in an initiation-promotion study in mice.

80.     The IARC Working Group also noted that glyphosate has been detected in the urine of agricultural workers, indicating absorption. Soil microbes degrade glyphosate to

aminomethylphosphoric acid ("AMPA"). Blood AMPA detection after exposure suggests intestinal microbial metabolism in humans.

81.     The IARC Working Group further found that glyphosate and glyphosate formulations induced DNA and chromosomal damage in mammals, and in human and animal cells in utero.

82.     The IARC Working Group also noted genotoxic, hormonal and enzymatic effects in mammals exposed to glyphosate. Essentially, glyphosate inhibits the biosynthesis of aromatic amino acids, which leads to several metabolic disturbances, including the inhibition of protein and secondary product biosynthesis and general metabolic disruption.

83.     The IARC Working Group also reviewed an Agricultural Health Study, consisting of a prospective cohort of 57,311 licensed pesticide applicators in Iowa and North Carolina. While this study differed from others in that it was based on a self-administered questionnaire, the results support an association between glyphosate exposure and multiple myeloma, hairy cell leukemia ("HCL") and chronic lymphocytic leukemia ("CLL"), in addition to several other cancers.

## OTHER EARLIER FINDINGS ABOUT

## GLYPHOSATE'S DANGERS TO HUMAN HEALTH

84.     The EPA has a technical fact sheet, as part of its Drinking Water and Health, National Primary Drinking Water Regulations publication, relating to glyphosate. This technical fact sheet predates the IARC March 20, 2015, evaluation. The fact sheet describes the release patterns for glyphosate as follows:

## RELEASE PATTERNS

Glyphosate is released to the environment in its use as a herbicide for controlling woody and herbaceous weeds on forestry, right-of-way, cropped and non-cropped sites. These

sites may be around water and in wetlands. It may also be released to the environment during its manufacture, formulation, transport, storage, disposal and cleanup, and from spills. Since glyphosate is not a listed chemical in the Toxics Release Inventory, data on releases during its manufacture and handling are not available. Occupational workers and home gardeners may be exposed to glyphosate by inhalation and dermal contact during spraying, mixing, and cleanup. They may also be exposed by touching soil and plants to which glyphosate was applied. Occupational exposure may also occur during glyphosate's manufacture, transport, storage, and disposal.

85.     In 1995, the Northwest Coalition for Alternatives to Pesticides reported that in California, the state with the most comprehensive program for reporting of pesticide-caused illness, glyphosate was the third most commonly-reported cause of pesticide illness among agricultural workers.

## THE TOXICITY OF OTHER INGREDIENTS IN ROUNDUP®

86.     In addition to the toxicity of the active ingredient, glyphosate, several studies support the hypothesis that the glyphosate-based formulation in Monsanto's Roundup® products is more dangerous and toxic than glyphosate alone. Indeed, as early as 1991, available evidence demonstrated that glyphosate formulations were significantly more toxic than glyphosate alone.

87.     In 2002, a study by Julie Marc, entitled "Pesticide Roundup® Provokes Cell Division Dysfunction at the Level of CDK1/Cyclin B Activation", revealed that Roundup® causes delays in the cell cycles of sea urchins but that the same concentrations of glyphosate alone were ineffective and did not alter cell cycles.

88.     A 2004 study by Marc and others, entitled "Glyphosate-based Pesticides Affect Cell Cycle Regulation," demonstrated a molecular link between glyphosate-based products and

cell cycle dysregulation. The researchers noted that "cell-cycle dysregulation is a hallmark of tumor cells and human cancer. Failure in the cell-cycle checkpoints leads to genomic instability and subsequent development of cancers from the initial affected cell." Further, "[s]ince cell cycle disorders such as cancer result from dysfunction of a unique cell, it was of interest to evaluate the threshold dose of glyphosate affecting the cells."

89.     In 2005, a study by Francisco Peixoto, entitled "Comparative Effects of the Roundup® and Glyphosate on Mitochondrial Oxidative Phosphorylation," demonstrated that Roundup's effects on rat liver mitochondria are far more toxic than equal concentrations of glyphosate alone. The Peixoto Study further suggested that the harmful effects of Roundup® on mitochondrial bioenergetics could not be exclusively attributed to glyphosate but could be the result of other chemicals, such as the surfactant POEA, or in the alternative, due to the potential synergistic effect between glyphosate and other ingredients in the Roundup® formulation.

90.     In 2009, Nora Benachour and Gilles-Eric Seralini published a study examining the effects of Roundup® and glyphosate on human umbilical, embryonic and placental cells. The study tested dilution levels of Roundup and glyphosate that were far below agricultural recommendations, corresponding with low levels of residue in food. The researchers ultimately concluded that supposed "inert" ingredients, and possibly POEA, alter human cell permeability and amplify toxicity of glyphosate alone. The researchers further suggested that assessments of glyphosate toxicity should account for the presence of adjuvants or additional chemicals used in the formulation of the complete pesticide. The Benachour/Seralini Study confirmed that the adjuvants present in Roundup are not, in fact, inert and that Roundup is potentially far more toxic than its active ingredient glyphosate alone.

91.     The results of these studies were at all times available to Monsanto. Monsanto thus knew or should have known that Roundup is more toxic than glyphosate alone and that safety studies of Roundup, Roundup's adjuvants and "inert" ingredients, and/or the surfactant POEA were necessary to protect Randy Hayes s from Roundup® products.

92.     Despite its knowledge that Roundup® is considerably more dangerous than glyphosate alone, Monsanto continued to promote Roundup® as safe.

## THE EPA'S REVIEW OF GLYPHOSATE

93.     On September 12, 2016, EPA's OPP submitted a report on the carcinogenic potential of glyphosate, wherein it issued a "proposed conclusion" that glyphosate is "'not likely to be carcinogenic to humans at doses relevant to human health risk assessment. There are no authors listed on this issue paper, which reiterates and adopts the conclusions of the October 2015 leaked assessment. The issue paper is based upon a review of industry-sponsored articles and studies. The OPP acknowledged that it rejected all studies that considered Roundup®—the formulated product—instead of studies that isolated glyphosate because "[g]lyphosate formulations contain various components other than glyphosate and it has been hypothesized these components are more toxic than glyphosate alone."

94.     Thus, the OPP notes dozens of studies considered by IARC were not reviewed by the OPP because the OPP's "evaluation focused on studies on the active ingredient glyphosate" and "additional research could also be performed to determine whether formulation components, such as surfactants, influence the toxicity of glyphosate formulations.

95.     From December 13 to 16, 2016, the EPA held FIFRA Scientific Advisory Panel ("SAP") meetings to consider issues raised by the OPP's evaluation of glyphosate. Again, OPP only allowed the SAP to consider studies of glyphosate alone, and not any study of the formulated

product. In its Charge to the FIFRA SAP, the OPP noted that "[a]lthough there are studies available on glyphosate-based pesticide formulations, the agency is soliciting advice from the FIFRA Scientific Advisory Panel ("SAP") on this evaluation of human carcinogenic potential for the active ingredient glyphosate only at this time.

96.     The OPP draft assessment therefore does not actually consider the product at issue in this litigation or, more importantly, how glyphosate, in conjunction with surfactants and other chemicals, affects carcinogenicity.

97.     On March 16, 2017, the final SAP meeting minutes and report were released, revealing disagreement and lack of consensus among the scientists on whether there was a positive association between glyphosate exposure and NHL.

## RECENT WORLDWIDE BANS ON ROUNDUP®/GLYPHOSATE

98.     Several countries around the world have instituted bans on the sale of Roundup® and other glyphosate-containing herbicides, both before and since the IARC first announced its assessment for glyphosate in March 2015, and more countries undoubtedly will follow suit as the dangers of the use of Roundup® become more widely known. The Netherlands issued a ban on all glyphosate-based herbicides in April 2014, including Roundup®, which took effect at the end of 2015. In issuing the ban, the Dutch Parliament member who introduced the successful legislation stated: "Agricultural pesticides in user-friendly packaging are sold in abundance to private persons. In garden centers, Roundup® is promoted as harmless, but unsuspecting customers have no idea what the risks of this product are. Especially children are sensitive to toxic substances and should therefore not be exposed to it."

99.     The Brazilian Public Prosecutor in the Federal District requested that the Brazilian Justice Department suspend the use of glyphosate.

100.    France banned the private sale of Roundup® and glyphosate following the IARC assessment for glyphosate.

101.    Bermuda banned both the private and commercial sale of glyphosate, including Roundup® The Bermuda government explained its ban as follows: "[f]ollowing a recent scientific study carried out by a leading cancer agency, the importation of weed spray 'Roundup' has been suspended."

102.    The Sri Lankan government banned the private and commercial use of glyphosates, particularly out of concern that glyphosate has been linked to fatal kidney disease in agricultural workers.

103.    The government of Columbia announced its ban on using Roundup® and glyphosate to destroy illegal plantations of coca, the raw ingredient for cocaine, because of the WHO's finding that glyphosate is probably carcinogenic.


## EFSA REPORT ON GLYPHOSATE

104.    On November 12, 2015, the European Food Safety Authority ("EFSA"), the European Union's ("EU") primary agency for food safety, reported on its evaluation of the Renewal Assessment Report ("RAR") on glyphosate. The Rapporteur Member State assigned to glyphosate, the German Federal Institute for Risk Assessment ("BfR"), had produced the RAR as part of the renewal process for glyphosate in the EU.

105.    The BfR sent its draft RAR to the EFSA and the RAR underwent a peer review process by the EFSA, other member states and industry groups. As part of the on-going peer review of Germany's re-evaluation of glyphosate, the EFSA had also received a second mandate from the

European Commission to consider the IARC's findings regarding the potential carcinogenicity of glyphosate and glyphosate-containing products.

106.    Based on a review of the RAR, which included data from industry-submitted, unpublished studies, the EFSA sent its own report ("Conclusion") to the European Commission, finding that "glyphosate is unlikely to pose a carcinogenic hazard to humans and the evidence does not support classification with regard to its carcinogenic potential according to Regulation ("EC") No. 1272/2008." The EFSA therefore disagreed with the IARC: glyphosate was not genotoxic and did not present a carcinogenic threat to humans.

107.    In explaining why its results departed from the IARC's conclusion, the EFSA drew a distinction between the EU and the IARC approaches to the study and classification of chemicals. Although the IARC examined "both glyphosate—an active substance—and glyphosate-based formulations, grouping all formulations regardless of their composition," the EFSA explained that it considered only glyphosate and that its assessment focuses on "each individual chemical, and each marketed mixture separately." The IARC, on the other hand, "assesses generic agents, including groups of related chemicals, as well as occupational or environmental exposure, and cultural or behavioral practices." The EFSA accorded greater weight to studies conducted with glyphosate alone than studies of formulated products.

108.    The EFSA went further and noted:

Although some studies suggest that certain glyphosate -based formulations may be genotoxic (i.e. damaging to DNA), others that look solely at the active substance glyphosate do not show this effect. It is likely, therefore, that ***the genotoxic effects observed in some glyphosate-based formulations are related to the other constituents or "co-formulants"***. Similarly, certain glyphosate-based formulations display higher toxicity

than that of the active ingredient, presumably because of the presence of co-formulants, In its assessment, ***EFSA proposes that the toxicity of each pesticide formulation and in particular its genotoxic potential should be further considered and addressed by Member State authorities*** while they reassess uses of glyphosate-based formulations in their own territories.***(Emphasis added.)***

109.    Notwithstanding its conclusion, the EFSA did set exposure levels for glyphosate. Specifically, the EFSA proposed an acceptable daily intake ("ADI") of 0.5 mg/kg of body weight per day; an acute reference dose ("ARfD") of 0.5 mg/kg of body weight; and an acceptable operator exposure level ("AOEL") of 0.1 mg/kg of body weight per day.

## LEADING SCIENTISTS DISPUTE EFSA'S CONCLUSION

110.    On November 27, 2015, 96 independent academic and governmental scientists from around the world submitted an open letter to the EU health commissioner, Vytenis Andriukaitis. The scientists expressed their strong concerns and urged the commissioner to disregard the "flawed" EFSA report, arguing that "the BfR decision is not credible because it is not supported by the evidence and it was not reached in an open and transparent manner."

111.    Signatories to the letter included Dr. Christopher J. Portier, Ph.D., and other renowned international experts, some of whom were part of the IARC Working Group assigned to glyphosate.

112.    In an exhaustive and careful examination, the scientists scrutinized the EFSA's conclusions and outlined why the IARC Working Group decision was "by far the more credible":

The IARC WG decision was reached relying on open and transparent procedures by independent scientists who completed thorough conflict-of- interest statements and were

not affiliated or financially supported in any way by the chemical manufacturing industry. It is fully referenced and depends entirely on reports published in the open, peer-reviewed biomedical literature. It is part of a long tradition of deeply researched and highly credible reports on the carcinogenicity of hundreds of chemicals issued over the past four decades by IARC and used today by international agencies and regulatory bodies around the world as a basis for risk assessment, regulation and public health policy.

113.    With respect to human data, the scientists pointed out that the EFSA agreed with the IARC that there was "*limited evidence* of carcinogenicity for NHL, but the EFSA nonetheless dismissed an association between glyphosate exposure and carcinogenicity. The IARC applies three (3) levels of evidence in its analyses of human data, including sufficient evidence and limited evidence. The EFSA's ultimate conclusion that "there was no unequivocal evidence for a clear and strong association of NHL with glyphosate" was misleading because it was tantamount to IARC's highest level of evidence: "sufficient evidence," which means that a causal relationship has been established. However, the scientists argued, "[legitimate public health concerns arise when 'causality is credible,' i.e., when there is *limited evidence*."

114.    Among its many other deficiencies, the EFSA's conclusions regarding animal carcinogenicity data were "scientifically unacceptable," particularly in BfR's use of historical control data and in its trend analysis. Indeed, BfR's analysis directly contradicted the Organization for Economic Co-operation and Development ("OECD") testing guidelines while citing and purporting to follow those same guidelines. For instance, the EFSA report dismisses observed trends in tumor incidence "because there are no individual treatment groups that are significantly different from controls and because the maximum observed response is reportedly within the range of the historical control data." However, according to the scientists, concurrent controls are

recommended over historical controls in all guidelines, scientific reports and publications, and, if it is employed, historical control data "should be from studies in the same timeframe, for the same exact animal strain, preferably from the same laboratory or the same supplier and preferably reviewed by the same pathologist." BfR's use of historical control data violated the precautions: "only a single study used the same mouse strain as the historical controls but was reported more than 10 years after the historical control dataset was developed." Further deviating from sound scientific practices, the data used by the BfR came from studies in seven different laboratories. The scientists concluded:

> BfR reported seven positive mouse studies with three studies showing increases in renal tumors, two with positive findings for hemangiosarcomas, and two with positive findings for malignant lymphomas. BfR additionally reported two positive findings for tumors in rats. Eliminating the inappropriate use of historical data, the unequivocal conclusion is that these are not negative studies, but in fact document the carcinogenicity of glyphosate in laboratory animals.

115. The letter also critiqued the EFSA report's lack of transparency and the opacity surrounding the data cited in the report: "citations for almost all of the references, even those from the open scientific literature, have been redacted from the document" and "there are no authors or contributors listed for either document, a requirement for publication in virtually all scientific journals." Because the BfR relied on unpublished, confidential industry-provided studies, it is "impossible for any scientist not associated with the BfR to review this conclusion with scientific confidence."

116. On March 3, 2016, the letter was published in the *Journal of Epidemiology & Community Health*.

## STATEMENT OF CONCERN REGARDING GLYPHOSATE-BASED HERBICIDES

117. On February 17, 2016, a consensus statement published in the journal *Environmental Health*, entitled "Concerns Over Use of Glyphosate-based Herbicides and Risks Associated with Exposures: a Consensus Statement," assessed the safety of glyphosate-based herbicides ("GBHs"). The paper's focus was "on the unanticipated effects arising from the worldwide increase in use of GBHs, coupled with recent discoveries about the toxicity and human health risks stemming from use of GBHs." The researchers drew seven factual conclusions about GBHs:

1. GBHs are the most heavily applied herbicide in the world and usage continues to rise;

2. Worldwide, GBHs often contaminate drinking water sources, precipitation and air, especially in agricultural regions;

3. The half-life of glyphosate in water and soil is longer than previously recognized;

4. Glyphosate and its metabolites are widely present in the global soybean supply;

5. Human exposures to GBHs are rising;

6. Glyphosate is now authoritatively classified as a probable human carcinogen; and

7. Regulatory estimates of tolerable daily intakes for glyphosate in the United States and EU are based on outdated science.

118. The researchers noted that GBH use has increased approximately 100-fold since the 1970s. Further, far from posing a limited hazard to vertebrates, as previously believed, two-decades of evidence demonstrated that "several vertebrate pathways are likely targets of action, including hepatorenal damage, effects on nutrient balance through glyphosate chelating action and endocrine disruption."

119. The paper attributes uncertainties in current assessments of glyphosate formulations to the fact that "[t]he full list of chemicals in most commercial GBHs is protected as 'commercial business information,' despite the universally accepted relevance of such information to scientists hoping to conduct an accurate risk assessment of these herbicide formulations." Further, the researchers argue, "[t]he distinction in regulatory review and decision processes between 'active' and 'inert' ingredients has no toxicological justification, given increasing evidence that several so- called 'inert' adjuvants are toxic in their own right."

120. Among various implications, the researchers conclude that "existing toxicological data and risk assessments are not sufficient to infer that GBHs, as currently used, are safe." Further, "GBH-product formulations are more potent, or toxic, than glyphosate alone to a wide array of non-target organisms including mammals, aquatic insects, and fish." Accordingly, "risk assessments of GBHs that are based on studies quantifying the impacts of glyphosate alone underestimate both toxicity and exposure, and thus risk." The paper concludes that this "shortcoming has repeatedly led regulators to set inappropriately high exposure thresholds."

121. The researchers also critique the current practice of regulators who largely rely on "unpublished, non-peer reviewed data generated by the registrants" but ignore "published research because it often uses standards and procedures to assess quality that are different from those codified in regulatory agency data requirements, which largely focus on avoiding fraud." In the researchers' view, "[s]cientists independent of the registrants should conduct regulatory tests of GBHs that include glyphosate alone, as well as GBH-product formulations."

122. The researchers also call for greater inclusion of GBHs in government-led toxicology testing programs:

A fresh and independent examination of GBH toxicity should be undertaken, and . . . this re-examination be accompanied by systematic efforts by relevant agencies to monitor GBH levels in people and in the food supply, none of which are occurring today. The U.S. National Toxicology Program should prioritize a thorough toxicological assessment of the multiple pathways now identified as potentially vulnerable to GBHs.

123.     The researchers suggest that, in order to fill the gap created by an absence of government funds to support research on GBHs, regulators could adopt a system through which manufacturers fund the registration process and the necessary testing:

[W]e recommend that a system be put in place through which manufacturers of GBHs provide funds to the appropriate regulatory body as part of routine registration actions and fees. Such funds should then be transferred to appropriate government research institutes, or to an agency experienced in the award of competitive grants. In either case, funds would be made available to independent scientists to conduct the appropriate long-term (minimum 2 years) safety studies in recognized animal model systems. A thorough and modern assessment of GBH toxicity will encompass potential endocrine disruption, impacts on the gut microbiome, carcinogenicity and multigenerational effects looking at reproductive capability and frequency of birth defects.

**EUROPEAN UNION VOTE ON GLYPHOSATE RENEWAL**

124.     The license for glyphosate in the EU was set to expire on June 30, 2016.

125.     Without an extension of the license, Defendant's Roundup® and other glyphosate-based herbicides faced a general phase out in EU markets." In the months leading up to the license expiration date, protracted meetings and votes among national experts from the 28 EU Member States failed to produce agreement on an extension.

126.    For instance, on March 4, 2016, The Guardian reported that France, the Netherlands, and Sweden did not support EFSA's assessment that glyphosate was harmless. The paper quoted the Swedish environment minister, Asa Romson, as stating: "[w]e won't take risks with glyphosate and we don't think that the analysis done so far is good enough. We will propose that no decision is taken until further analysis has been done and the EFSA's scientists have been more transparent about their considerations.

127.    The Netherlands argued that relicensing should be placed on hold until after a separate evaluation of glyphosate's toxicity can be conducted. Leading up to the vote, Italy joined the other EU states in opposing the license renewal, citing health concerns.

128.    On June 6, 2016, Member States voted but failed to reach a qualified majority in favor or against the re-authorization of glyphosate.

129.    On June 29, 2016, the EU Commission extended the European license for glyphosate for 18 months to allow the European Chemical Agency to rule on the safety of the chemical, which is expected by the end of 2017. Growing public awareness and concern over the chemical "led 1.4 million people to sign a petition against glyphosate in the biggest online campaign since neonicotinoid pesticides were banned during the last commission."

130.    On July 11, 2016, the EU voted in favor of a proposal to restrict the conditions of use of glyphosate in the EU, including a ban on common co-formulant POE-tallowamine ("POEA") from all glyphosate-based herbicides, including Roundup®.

131.    These restrictions, which are non-binding on the EU states, are expected to apply until the European Chemicals Agency issues an opinion on the chemical's safety.

## PLAINTIFF MICHAEL RANDY HAYES'S EXPOSURE TO MONSANTO'S GLYPHOSATE-BASED PRODUCTS AND "ROUNDUP®"

132.    Plaintiff Randy Hayes is fifty-nine (59) years old. From 1979 to 2014, he was employed by the Electric Utility Department of Sheffield Utilities.  For a substantial period of his employment, Plaintiff worked on the "tree crew," clearing rights-of-way and managing vegetation through use of chemical pesticides.

133.    Plaintiff used Monsanto's glyphosate-based product(s), including Roundup®, regularly during the entire time employed by Sheffield Utilities, and thereafter, when Plaintiff used Roundup® regularly for personal use.

134.    Because Monsanto held the exclusive patent on glyphosate through the year 2000, the glyphosate-based product(s), including Roundup®, to which Plaintiff was exposed between 1979 and 2000 could only have been manufactured and distributed by, or on behalf of, Monsanto.  Thereafter,

135.    Specifically, Plaintiff mixed and applied Monsanto's glyphosate-based product(s), including Roundup®, on the Sheffield Utilities property and rights-of-way located in Colbert County, Alabama by and through the direction and assistance of Red River Specialties.

136.    Specifically, Plaintiff mixed and applied Monsanto's glyphosate-based product(s), including Roundup®, on the Sheffield Utilities property and rights-of-way located in Colbert County, Alabama by and through the direction and assistance of Sheffield Utilities.

137.    Sheffield Utilities purchased Monsanto's glyphosate-based product(s), including Roundup®, from Red River Specialties.

138.    Red River Specialties provided Plaintiff instructions and assisted Plaintiff with the usage, handling, mixing, applying, and spreading of Roundup® and in doing so provided Plaintiff assurances of the safety of glyphosate-based product(s), including Roundup®,

139.    Red River Specialties along with Monsanto never provided any warning that glyphosate-based product(s), including Roundup®, provided to Plaintiff which included the ingredient glyphosate were injurious to Plaintiff's health, did not recommend safety gear, did not provide nor sell to Plaintiff or his employer protective gear and did not provide, recommend or sell to Plaintiff or his employer applicators, sprayers or other equipment or products which would have provided less exposure to Plaintiff to glyphosate.

140.    Red River Specialties undertook to select for Sheffield Utilities and for Hayes the product(s) to be used. This Defendant had the opportunity to inspect and the superior knowledge of the product to that of Hayes. The subject product was not displayed or sold in such a way to notify Hayes that the glyphosate-based product(s), including Roundup® were carcinogenic and hazardous substances that could and more than likely would lead to lymphoma, from which Hayes now suffers, and its future effects.  Hayes has Non-Hodgkin's Lymphoma due to his exposure to glyphosate-based product(s), including Roundup® as manufactured, designed, advertised, sold, distributed and provided by these Defendants.

141.    At all relevant times herein, Plaintiff was required, pursuant to Ala. Code § 2-27-1, et seq., and Alabama Administrative Code Chapter 80-1-13, to obtain and maintain a certification for to purposes of applying pesticides.

142.    At all relevant times herein, Sheffield Utilities knew, or reasonably should have known, that Plaintiff was required, pursuant to Ala. Code § 2-27-1, et seq., and Alabama

Administrative Code Chapter 80-1-13, to obtain and maintain a certification for to purposes of applying pesticides.

143. At all relevant times herein, Sheffield Utilities did not require Plaintiff, pursuant to Ala. Code § 2-27-1, et seq., and Alabama Administrative Code Chapter 80-1-13, to obtain and maintain a certification for to purposes of applying pesticides.

144. At all relevant times herein, Sheffield Light & Power Co. and/or Sheffield Utilities knew that the requirements under the Alabama Code and Alabama Administrative Code related to the use of pesticides existed for the provision of a safe work environment, to protect the health and safety of employees, and for the protection of employees, Plaintiff specifically.

145. Sheffield Utilities provided Plaintiff instructions and assisted Plaintiff with the usage, handling, mixing, applying, and spreading of Roundup® and in doing so provided Plaintiff assurances of the safety of Roundup®. Sheffield Utilities, never provided any warning to Plaintiff regarding the labels on the Roundup® products which cautioned that the ingredients therein were injurious to Plaintiff's health, did not recommend safety gear, did not provide nor sell to Plaintiff protective gear and did not provide, recommend or sale to Plaintiff applicators, sprayers or other equipment or products which would have provided less exposure to Plaintiff to glyphosate.

146. All of these Defendants' knowledge of the fact the product caused cancer of the type now debilitating Hayes's life was far superior to that of Hayes and despite their knowledge did not revealed these crucial facts to Hayes. These Defendants worked together all for their own betterment. They were all financially rewarded by the selling of the glyphosate-based product(s), including Roundup® and all had vested interest in it being sold without warning of its hazardous components.

147. All of these Defendants worked in concert with each other.

148.    All of these Defendants worked together to promote the sale and distribution of the Roundup® product and to conceal the fact that it was a true carcinogenic.

149.    On or about April 15, 2019, Plaintiff was diagnosed with Non-Hodgkin's Lymphoma and is currently being treated.  His prognosis includes a high risk of likelihood of cancer relapse / recurrence.  Plaintiff has suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of glyphosate-based product(s), including Roundup®  and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, advertising and sale of Roundup®.

150.    During the entire time that Plaintiff was exposed to glyphosate-based product(s), including Roundup® he did not know that exposure was injurious to his health or the health of others.

## TOLLING OF THE STATUTE OF LIMITATIONS

### Discovery Rule Tolling

151.    Plaintiff had no way of knowing about the risk of serious illness associated with the use of and/or exposure to glyphosate-based product(s), including Roundup® until well after IARC released its formal assessment of glyphosate in July 2015. This is the quintessential case for tolling.

152.    Within the time period of any applicable statutes of limitations, Plaintiff did not know and could not have discovered, through the exercise of reasonable diligence, that exposure to glyphosate-based product(s), including Roundup® is injurious to human health.

153.    Plaintiff did not discover and did not know of facts that would cause a reasonable person to suspect, the risks associated with the use of and/or exposure glyphosate-based product(s),

including Roundup®; nor would a reasonable and diligent investigation by her have disclosed that glyphosate-based product(s), including Roundup® would cause his illness.

154. For these reasons, all applicable statutes of limitations have been tolled by operation of the discovery rule with respect to Plaintiff's claims.

## FRAUDULENT CONCEALMENT TOLLING

155. All applicable statutes of limitations have also been tolled by Defendants' knowing and active fraudulent concealment and denial of the facts alleged herein throughout the time period relevant to this action.

156. Instead of disclosing critical safety information about Roundup® and glyphosate, Defendants have consistently and falsely represented the safety of glyphosate-based product(s), including Roundup®.

## ESTOPPEL

157. Defendants were under a continuous duty to disclose to consumers, users and other persons coming into contact with its products, including Plaintiff, accurate safety information concerning its products and the risks associated with the use of and/or exposure to Roundup® and glyphosate.

158. Instead, Defendants knowingly, affirmatively, and actively concealed safety information concerning Roundup® and glyphosate and the serious risks associated with the use of and/or exposure to its products.

159. Defendants each worked in concert with the other to promote the sale and distribution of the Roundup® and to downplay, hide and disguise the cancer-causing component contained therein.

160.     Based on the foregoing, Defendants are estopped from relying on any statutes of limitations in defense of this action.

161.     Red River Specialties sold the subject Roundup used by Plaintiff and by Plaintiff's employer during the period of Plaintiff's employment with Sheffield Utilities.   Red River Specialties is an agricultural specialist which held knowledge of the Roundup® product, its ingredients, its proper usage, the fact it was a carcinogenic, and like the other Defendants failed to reveal their full source of information as set forth above.

162.     Defendants all had significantly greater knowledge of the product than did the consuming public, including Plaintiff, by virtue of the fact that these defendants worked in the agricultural industry and/or were aware of related safety statutes and regulations.   In fact, all of the Defendants in concert together, all with advanced levels of education on the product, worked to conceal the carcinogenic nature of the Roundup® product and to promote it above others despite alternatives being available in order to effectuate a financial gain for them all. All to the detriment of Plaintiff who now faces a fatal diagnosis of Non-Hodgkin's Lymphoma. All of the Defendants knew or reasonably should have known because of their knowledge and information that the Roundup® sold would cause injury to persons such as Plaintiff and death to a large number of consumers, including Plaintiff. These Defendants have been educated in and are aware of the carcinogenic nature of Roundup® for many years, thus giving these Defendants superior knowledge of these facts by virtue of the knowledge, experience and training of their employees. They knew consumers, such as Plaintiff, would likely contract Non-Hodgkin's Lymphoma and similar cancers and would likely die as a result. Defendant Red River Specialties, Inc.'s position with Monsanto and their own resources provided them with superior knowledge to that of the

average consumer as it relates to the use of and the dangers and hazards involved in the use of Roundup.

163.    Red River Specialties worked together with Monsanto to promote the sale and distribution of Roundup®, a product that when used as intended will likely injury and very likely kill the consumer, such as Plaintiff. All Defendants knew that their actions would result in the continued use of the product and enhanced sales of the product that would likely result in injury or death. The Defendants have gone to great lengths to conceal from the public the true carcinogenic nature of Roundup®. Their motivation for doing so was a desire to gather in new customers and to increase the use of this dangerous product among farmers in particular. They all had an intent to keep from the public the carcinogenic nature of Roundup®, as well as the intent to keep from the general public the extreme hazard of Roundup®. The Defendants worked in concert with or individually with knowledge and ratification in such a way to control and manipulate the sales of the Roundup® product and to quieten any concern about its carcinogenic nature.

164.    Plaintiff has suffered and continues to suffer tremendous physical pain as a result of his cancer and suffered and continues to suffer mental anguish and emotional distress as a result of his cancer.

165.    Defendants all had an opportunity to inspect the Roundup® that is superior to Plaintiff. Moreover, Defendants had more knowledge of the product that is superior to that of the Plaintiff. These Defendants concealed information about risks of Roundup® and aggressively marketed the herbicide as safe for humans and the environment. The Defendants championed falsified data while attacking legitimate research linking Roundup® to cancer. Defendants made a conscious decision not to redesign or withdraw from the market Roundup® so that it was less dangerous to humans and the environment. Defendants knew or should have known that Roundup®

caused cancer but failed to adequately warn. Defendants also failed to adequately monitor Roundup® after bringing it to the market.

166.     Defendants undertook a concerted effort to disguise the information they had concerning Roundup® being a carcinogenic, the actions they undertook were done negligently, wantonly and with reckless disregard for the lives and safety of the public and with knowledge that serious injury and death would likely result from continued use of Roundup® by the public including Plaintiff.

<u>**COUNT I**</u>

**Product Liability**
**(Against Monsanto and Red River Specialties)**

167.     Plaintiffs incorporate by reference Paragraphs 1-166 as though set forth fully at length herein.

168.     At all times relevant to this litigation, Defendant engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, advertising and promoting Roundup® products, which are defective and unreasonably dangerous to consumers, including the Plaintiff, thereby placing Roundup® products into the stream of commerce. These actions were under the ultimate control and supervision of Defendant. At all times relevant to this litigation, Defendant designed, researched, developed, manufactured, produced, tested, assembled, labeled, advertised, promoted, marketed, sold, and distributed the Roundup® products used by Plaintiff, as described above.

169.     At all times relevant to this litigation, Defendant's Roundup® products were defectively designed by causing an increased risk of cancer and by containing additives that, when combined with glyphosate, significantly increased the risk of developing cancer.

170.     These design defects rendered Roundup® unreasonably dangerous.

171.     The dangers posed by Roundup® go beyond that which would be contemplated by the ordinary consumer with ordinary knowledge common to the community as to its characteristics.

172.     Additionally, the benefits of the Roundup® design are outweighed by the design's inherent risk of danger in causing cancer.

173.     At all times relevant to this litigation, Roundup® products reached the intended consumers, handlers, and users or other persons coming into contact with these products in the State of Alabama and throughout the United States, including Plaintiff, without substantial change in their condition as designed, manufactured, sold, distributed, labeled, and marketed by Defendant.

174.     At all times relevant to this action, Defendant knew or had reason to know that its Roundup® products were defective and were inherently dangerous and unsafe when used in the manner instructed and provided by Defendant.

175.     Defendant could have employed a safer alternative design to render Roundup® safe or, in the alternative, provided proper instructions for use on how to limit the potential risk associated with Roundup's defective design. Defendant's Roundup® products were and are more dangerous than alternative products and Defendant could have designed its Roundup® products to make them less dangerous. At the time Defendant designed its Roundup® products, the state of the industry's scientific knowledge was such that a less risky design or formulation was attainable. Thus, at the time Roundup® products left Defendant's control, there was a practical, technically feasible and safer alternative design that would have prevented the harm without substantially impairing the reasonably anticipated or intended function of Defendant's herbicides.

176.     At all times relevant to this litigation, Plaintiff used and/or was exposed to the use of Defendant's Roundup® products in an intended or reasonably foreseeable manner, without knowledge of the products' dangerous characteristics.

177.     Plaintiff could not reasonably have discovered the defects and risks associated with Roundup® or glyphosate-containing products before or at the time of exposure due to Defendant's suppression of scientific information linking glyphosate to cancer.

178.     The defects in Defendant's Roundup® products were substantial and contributing factors in causing Plaintiff's injuries, and, but for Defendant's misconduct and omissions, Plaintiff would not have sustained said injuries. Defendant's defective design of its Roundup products was willful, wanton, fraudulent, malicious, and conducted with reckless disregard for the health and safety of users of the Roundup products, including Plaintiff herein.

179.     Defendant's conduct, as described above, was reckless. Defendant risked the lives of consumers and users of its products, including Plaintiff, with knowledge of the safety problems associated with Roundup® and glyphosate-containing products, and suppressed this knowledge from the general public. Defendant made conscious decisions not to redesign, warn or inform the unsuspecting public. Defendant's reckless conduct warrants an award of punitive damages.

180.     As a direct and proximate result of Defendants' fraudulent and deceitful conduct, advertisements, and representations, Plaintiff suffered grave and severe personal injuries, economic and noneconomic damages, harms, and losses, including, but not limited to: past medical expenses, future medical expenses, mental anguish; severe emotional distress; physical and mental pain and suffering, and discomfort; and loss and impairment of the quality and enjoyment of life.

  **WHEREFORE, premises considered,** Plaintiff claims that the named and fictitious party Defendants are jointly, separately and severally liable to him as a result of the combining and concurring wrongful conduct of each of them as set out above. Plaintiff demands judgment of said Defendants, separately, and severally, for all injuries and damages including but not limited to: pain, suffering, personal injury, permanent disability and disfigurement, medical expenses and loss of enjoyment of life. Plaintiff demands compensatory and punitive damages in such type and quantity as a jury may find appropriate under the circumstances of this case and the purposes allowed by law, including but not limited to the preservation of human life, the protection of the public by deterring these Defendants and other from doing such wrong in the future, and as exemplary damages. Plaintiff further requests any other, further or different relief as to which he may be entitled.

**COUNT II**
**INADEQUATE WARNING**
**(Against All Defendants)**

  181. Plaintiffs incorporate by reference Paragraphs 1-166 as though set forth fully at length herein.

  182. At all times relevant to this litigation, Defendant engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting Roundup® products, which are defective and unreasonably dangerous to consumers, including Plaintiff specifically, because they do not contain adequate warnings or instructions concerning the dangerous characteristics of Roundup® and specifically, the active ingredient glyphosate. These actions were under the ultimate control and supervision of Defendant.

  183. Defendant researched, developed, designed, tested, manufactured, inspected, labeled, distributed, marketed, promoted, sold, and otherwise released into the stream of commerce

- 45 -

its Roundup® products, and in the course of same, directly advertised or marketed the products to consumers and end users, including Plaintiffs, and therefore had a duty to warn of the risks associated with the use of Roundup® and glyphosate-containing products.

184.    At all times relevant to this litigation, Defendant had a duty to properly test, develop, design, manufacture, inspect, package, label, market, promote, sell, distribute, maintain, supply, provide proper warnings, and take such steps as necessary to ensure its Roundup® products did not cause users and consumers to suffer from unreasonable and dangerous risks. Defendant had a continuing duty to warn Plaintiff of the dangers associated with Roundup® use and exposure. Defendant, as manufacturer, seller, or distributor of chemical herbicides is held to the knowledge of an expert in the field.

185.    At the time of manufacture, Defendant could have provided the warnings or instructions regarding the full and complete risks of Roundup® and glyphosate-containing products because it knew or should have known of the unreasonable risks of harm associated with the use of and/or exposure to such products. Such warnings could have been disclosed in circumstances not limited to the Roundup® labeling.

186.    At all times relevant to this litigation, Defendant failed to investigate, study, test, or promote the safety or to minimize the dangers to users and consumers of its product and to those who would foreseeably use or be harmed by Defendant's herbicides, including Plaintiff.

187.    Despite the fact that Defendant knew or should have known that Roundup® posed a grave risk of harm, it failed to exercise reasonable care to warn of the dangerous risks associated with use and exposure. The dangerous propensities of its products and the carcinogenic characteristics of glyphosate, as described above, were known to Defendant, or scientifically knowable to Defendant through appropriate research and testing by known methods, at the time it

distributed, supplied or sold the product, and not known to end users and consumers, such as Plaintiff.

188.    Defendant knew or should have known that its products created significant risks of serious bodily harm to consumers, as alleged herein, and Defendant failed to adequately warn consumers, i.e., the reasonably foreseeable users, of the risks of exposure to its products. Defendant has wrongfully concealed information concerning the dangerous nature of Roundup® and its active ingredient glyphosate, and further made false and/or misleading statements concerning the safety of Roundup® and glyphosate.

189.    At all times relevant to this litigation, Defendant's Roundup® products reached the intended consumers, handlers, and users or other persons coming into contact with these products in the State of Alabama and throughout the United States, including Plaintiff, without substantial change in their condition as designed, manufactured, sold, distributed, labeled, and marketed by Defendant.

190.     Plaintiff Michael Randy Hayes was exposed to Defendant's Roundup® products in the course of using the product during his employment on and about his property, as described above, without knowledge of their dangerous characteristics.

191.    At all times relevant to this litigation, Plaintiff used and/or was exposed to the use of Roundup® products while using them for their intended or reasonably foreseeable purposes without knowledge of their dangerous characteristics.

192.    Plaintiff could not have reasonably discovered the defects and risks associated with Roundup® or glyphosate-containing products prior to or at the time of exposure. Plaintiff relied upon the skill, superior knowledge, and judgment of Defendant to know about and disclose serious health risks associated with using the products.

193.    Defendant knew or should have known that the minimal warnings disseminated with its Roundup® products were inadequate, failed to communicate adequate information on the dangers and safe use/exposure, and failed to communicate warnings and instructions that were appropriate and adequate to render the products safe for their ordinary, intended and reasonably foreseeable uses, including agricultural and horticultural applications.

194.    This alleged failure to warn is not limited to the information contained on Roundup's labeling. Defendant was able to disclose the known risks associated with Roundup® through other non-labeling mediums, i.e., promotion, advertisements, public service announcements, and/or public information sources. Defendant, however, did not disclose these known risks through any medium.

195.    To this day, Defendant have failed to adequately and accurately warn of the risks of cancer associated with the use of and exposure to Roundup® and its active ingredient glyphosate.

196.    As a result of their inadequate warnings, Defendant's Roundup® products were defective and unreasonably dangerous when they left the possession and/or control of Defendant, were distributed by Defendant, and used by Plaintiff as described herein.

197.    Defendant is liable to Plaintiff for his injuries caused by its negligent or willful failure, as described above, to provide adequate warnings or other clinically relevant information and data regarding the appropriate use of its products and the risks associated with the use of or exposure to Roundup® and glyphosate. Had Defendant provided adequate warnings and instructions and properly disclosed and disseminated the risks associated with its Roundup® products, Plaintiff could have obtained or used alternative herbicides and avoided the risk of developing the injuries set forth herein.

198.     As a direct and proximate result of the Defendant's overt unlawful acts regarding the nature of the Roundup® products, including, but not limited to, placing its defective Roundup® products into the stream of commerce, Plaintiff developed cancer, suffered grave injuries, physical pain and suffering, mental anguish, including diminished enjoyment of life, as well as economic loss, including financial expenses for medical care and treatment.

**WHEREFORE, premises considered,** Plaintiff claims that the named and fictitious party Defendants are jointly, separately and severally liable to him as a result of the combining and concurring wrongful conduct of each of them as set out above. Plaintiff demands judgment of said Defendants, separately, and severally, for all injuries and damages including but not limited to: pain, suffering, personal injury, permanent disability and disfigurement, medical expenses and loss of enjoyment of life. Plaintiff demands compensatory and punitive damages in such type and quantity as a jury may find appropriate under the circumstances of this case and the purposes allowed by law, including but not limited to the preservation of human life, the protection of the public by deterring these Defendants and other from doing such wrong in the future, and as exemplary damages. Plaintiff further requests any other, further or different relief as to which he may be entitled.

### COUNT III
### NEGLIGENCE
### (Against All Defendants)

199.     Plaintiffs incorporate by reference Paragraphs 1-166 as though set forth fully at length herein.

200.     At all times relevant to this litigation, Defendants Monsanto and Red River Specialties had a duty to exercise reasonable care in the design, research, manufacture, marketing, advertisement, supply, promotion, packaging, sale, and distribution of glyphosate-based

product(s), including Roundup®, including the duty to take all reasonable steps necessary to manufacture, promote, advertise, and/or sell a product that was not unreasonably dangerous to consumers and users of the product.

201.   At all times relevant to this litigation, Defendants Monsanto and Red River Specialties had a duty to exercise reasonable care in the marketing, advertisement, and sale of the glyphosate-based product(s), including Roundup®. Defendant's duty of care owed to consumers and the general public included providing accurate, true, and correct information concerning the risks of using and appropriate, complete, and accurate warnings concerning the potential adverse effects of exposure to Roundup®, and, in particular, its active ingredient glyphosate.

202.   At all times relevant to this litigation, Defendants knew or, in the exercise of reasonable care, should have known of the hazards and dangers of Roundup® and specifically, the carcinogenic properties of the chemical glyphosate.

203.   Accordingly, at all times relevant to this litigation, Defendants knew or, in the exercise of reasonable care, should have known that use of or exposure to glyphosate-based product(s), including Roundup®, could cause or be associated with Plaintiff's injuries and thus, created a dangerous and unreasonable risk of injury to the users of these products, including Plaintiff specifically.

204.   Defendant also knew or, in the exercise of reasonable care, should have known that users and consumers of glyphosate-based product(s), including Roundup®, were unaware of the risks and the magnitude of the risks associated with use of and/or exposure to Roundup® and glyphosate-containing products.

205.   As such, Defendant breached its duty of reasonable care and failed to exercise ordinary care in the design, research, development, manufacture, testing, marketing, supply,

promotion, advertisement, packaging, sale, and distribution of its Roundup® products, in that Defendant manufactured and produced defective herbicides containing the chemical glyphosate, knew or had reason to know of the defects inherent in its products, knew or had reason to know that a user's or consumer's exposure to the products created a significant risk of harm and unreasonably dangerous side effects, and failed to prevent or adequately warn of these risks and injuries.

206.    Defendant was negligent in its promotion of Roundup®, outside of the labeling context, by failing to disclose material risk information as part of its promotion and marketing of Roundup®, including the internet, television, print advertisements, etc. Nothing prevented Defendant from being honest in its promotional activities, and in fact, Defendant had a duty to disclose the truth about the risks associated with Roundup® in its promotional efforts, outside of the of the context of labeling.

207.    Defendant had and has the ability and means to investigate, study, and test its products and to provide adequate warnings, Defendant has failed to do so. Indeed, Defendant has wrongfully concealed information and has further made false and/or misleading statements concerning the safety and/or exposure to Roundup® and glyphosate.

208.    Defendant's negligence included:

a.  Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, advertising and/or distributing its Roundup products without thorough and adequate pre- and post-market testing;

b.  Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, advertising and/or distributing Roundup® while negligently and/or intentionally concealing and failing to disclose the results of trials, tests, and studies of exposure to

glyphosate, and, consequently, the risk of serious harm associated with human use of and exposure to Roundup®;

c.  Failing to undertake sufficient studies and conduct necessary tests to determine whether or not Roundup products and glyphosate-containing products were safe for their intended use in agriculture and horticulture;

d.  Failing to use reasonable and prudent care in the design, research, manufacture, and development of Roundup® products so as to avoid the risk of serious harm associated with the prevalent use of Roundup® /glyphosate as an herbicide;

e.  Failing to design and manufacture Roundup® products so as to ensure they were at least as safe and effective as other herbicides on the market;

f.  Failing to provide adequate instructions, guidelines, and safety precautions to those persons Defendant could reasonably foresee would use and be exposed to its Roundup® products;

g.  Failing to disclose to Plaintiff, users/consumers, and the general public that use of and exposure to Roundup® presented severe risks of cancer and other grave illnesses;

h.  Failing to warn Plaintiffs, users/consumers, and the general public that the product's risk of harm was unreasonable and that there were safer and effective alternative herbicides available to Plaintiffs and other consumers;

i.  Systematically suppressing or downplaying contrary evidence about the risks, incidence, and prevalence of the side effects of Roundup® and glyphosate- containing products;

j.  Representing that its Roundup® products were safe for their intended use when, in fact, Defendant knew or should have known the products were not safe for their intended purpose;

k. Declining to make or propose any changes to Roundup® products' labeling or other promotional materials that would alert consumers and the general public of the risks of Roundup® and glyphosate;

l. Advertising, marketing, and recommending the use of the Roundup® products, while concealing and failing to disclose or warn of the dangers known by Defendant to be associated with or caused by the use of or exposure to Roundup® and glyphosate;

m. Continuing to disseminate information to its consumers, which indicate or imply that Defendant Roundup® products are safe for use in the agricultural and horticultural industries; and

n. Continuing the manufacture and sale of its products with the knowledge that the products were unreasonably unsafe and dangerous.

209. Defendants knew and/or should have known that it was foreseeable consumers such as Plaintiff would suffer injuries as a result of Defendants' failure to exercise ordinary care in the manufacturing, marketing, labeling, distribution, and sale of Roundup® .

210. Plaintiff did not know the nature and extent of the injuries that could result from the intended use of and/or exposure to Roundup® or its active ingredient glyphosate. Defendant's negligence was the proximate cause of injuries, i.e., absent Defendant's negligence, Plaintiff would not have developed cancer.

211. Defendant's conduct, as described above, was negligent, wanton and reckless. Defendant regularly risks the lives of consumers and users of its products, including Plaintiffs, with full knowledge of the dangers of its products. Defendant has made conscious decisions not to redesign, re-label, warn, or inform the unsuspecting public, including Plaintiff specifically. Defendant's reckless conduct therefore warrants an award of punitive damages.

212.     As a direct and proximate result of Defendants' fraudulent and deceitful conduct, advertisements, and representations, Plaintiff suffered grave and severe personal injuries, economic and noneconomic damages, harms, and losses, including, but not limited to: past medical expenses, future medical expenses, mental anguish; severe emotional distress; physical and mental pain and suffering, and discomfort; and loss and impairment of the quality and enjoyment of life.

**WHEREFORE, premises considered,** Plaintiff claims that the named and fictitious party Defendants are jointly, separately and severally liable to him as a result of the combining and concurring wrongful conduct of each of them as set out above.  Plaintiff demands judgment of said Defendants, separately, and severally, for all injuries and damages including but not limited to: pain, suffering, personal injury, permanent disability and disfigurement, medical expenses and loss of enjoyment of life.  Plaintiff demands compensatory and punitive damages in such type and quantity as a jury may find appropriate under the circumstances of this case and the purposes allowed by law, including but not limited to the preservation of human life, the protection of the public by deterring these Defendants and other from doing such wrong in the future, and as exemplary damages.  Plaintiff further requests any other, further or different relief as to which he may be entitled.

### COUNT IV
### FRAUD
### (Against Monsanto)

213.     Plaintiffs incorporate by reference Paragraphs 1-166 as though set forth fully at length herein.

214.     Defendant has defrauded the agricultural and gardening communities in general and Plaintiff in particular by misrepresenting the true safety of Roundup® and by failing to disclose known risks of cancer.

215. Defendant misrepresented and/or failed to disclose, inter alia, that: glyphosate and its major metabolite aminomethylphosphonic acid ("AMPA") could cause cancer; glyphosate and AMPA are known to be genotoxic in humans and laboratory animals because exposure is known to cause DNA strand breaks (a precursor to cancer); glyphosate and AMPA are known to induce oxidative stress in humans and laboratory animals (a precursor to cancer); glyphosate and AMPA interfere with the aromatic amino acids within the human gut, leading to downstream health conditions including cancer; exposure to glyphosate and AMPA is causally associated with NHL; and the laboratory tests attesting to the safety of glyphosate were flawed and/or fraudulent.

216. Due to these misrepresentations and omissions, at all times relevant to this litigation, Roundup® was misbranded under 7 U.S.C. § 136(q) and its distribution within the State of Alabama and around the United States was a violation of 7 U.S.C. § 136(j) and 40 C.F.R. § 156.10(a)(5).

217. When Plaintiff used Roundup® from approximately the 1979 through 2014 while working for Sheffield utilities and thereafter, for personal use, neither the labeling on the product nor Defendant general promotion warned or disclosed the true safety risks of Roundup® or that the product could cause cancer, as described above. Since the true risk information was known to Defendant and was not reasonably knowable to reasonable consumers, Plaintiff were unaware of these material facts and/or omissions prior to using the product.

218. Plaintiff relied on Defendants' misrepresentations and/or material omissions regarding the safety of Roundup® and products containing its active ingredient glyphosate in deciding whether to use the product. Plaintiff did not know, nor could they reasonably have known, of the misrepresentations and/or material omissions by Defendants concerning Roundup® and its active ingredient glyphosate.

219.     The misrepresentations and/or material omissions that form the basis of this fraud claim is not limited to statements made on the Roundup® labeling, as defined under federal law, but also involve Defendant's representations and omissions made as part of its promotion and marketing of Roundup®, including on the internet, television, in print advertisements, etc. Nothing prevented Defendant from disclosing the truth about the risks associated with Roundup® in its promotional efforts outside of the labeling context, using the forms of media and promotion Defendant traditionally used to promote the product's efficacy and benefits.

220.     When Defendant made the misrepresentations and/or omissions as alleged in this pleading, it did so with the intent of defrauding and deceiving the public in general and with the intent of inducing the public to purchase and use Roundup®.

221.     Defendant made these misrepresentations and/or material omissions with malicious, fraudulent, and/or oppressive intent toward Plaintiff and the public generally. Defendant's conduct was willful, wanton, and/or reckless. Defendant deliberately manufactured, produced, marketed, sold, distributed, merchandized, packaged, promoted and advertised the dangerous and defective herbicide Roundup®. This constitutes an utter, wanton, and conscious disregard of the rights and safety of a large segment of the public including Plaintiff, and by reason thereof, Defendant, are liable for reckless, willful, and wanton acts and omissions which evidence a total and conscious disregard for the safety of Plaintiff and others which proximately caused the injuries as set forth herein.

222.     As a direct and proximate result of Defendants' fraudulent and deceitful conduct, advertisements, and representations, Plaintiff suffered grave and severe personal injuries, economic and noneconomic damages, harms, and losses, including, but not limited to: past medical

expenses, future medical expenses, mental anguish; severe emotional distress; physical and mental pain and suffering, and discomfort; and loss and impairment of the quality and enjoyment of life.

**WHEREFORE, premises considered**, Plaintiff claims that the named and fictitious party Defendants are jointly, separately and severally liable to him as a result of the combining and concurring wrongful conduct of each of them as set out above. Plaintiff demands judgment of said Defendants, separately, and severally, for all injuries and damages including but not limited to: pain, suffering, personal injury, permanent disability and disfigurement, medical expenses and loss of enjoyment of life. Plaintiff demands compensatory and punitive damages in such type and quantity as a jury may find appropriate under the circumstances of this case and the purposes allowed by law, including but not limited to the preservation of human life, the protection of the public by deterring these Defendants and other from doing such wrong in the future, and as exemplary damages. Plaintiff further requests any other, further or different relief as to which he may be entitled.

## COUNT V
### Breach of Express Warranty
### (Against Monsanto and Red River Specialties)

223.    Plaintiffs incorporate by reference Paragraphs 1-166 as though set forth fully at length herein.

224.    Defendants expressly warranted that Roundup® was safe and accepted by consumers.

225.    Roundup® does not conform to these express representations, because Roundup® is not safe and carries with it an increased risk of cancer by containing additives that, when combined with glyphosate, significantly increased the risk of developing cancer.

226.    Plaintiff relied on Defendants' express warranties. Furthermore, the express warranties represented by Defendants were relied on by Plaintiff and a part of the basis for Plaintiff deciding to use Roundup®.

227.    At the time of the making of express warranties, Defendant had knowledge of the purpose for which Roundup® was to be used, and warranted same to be in all respects safe, effective, and proper for such use.

228.    Defendant expressly represented to Plaintiff that Roundup® was safe and fit for use for the purposes intended, that it was of merchantable quality, that it did not produce any dangerous side effects in excess of those risks associated with other herbicides, that the side effects it did produce were accurately reflected in the warnings, and that it was adequately tested and fit for its intended use.

229.    Defendant knew or should have known that, in fact, their representations and warranties were false, misleading, and untrue in that Roundup® was not safe and fit for the use intended, and, in fact, Roundup® produced serious injuries to the users that were not accurately identified and represented by Defendant.

230.    As a result of the foregoing acts and omissions and breach of express warranty, Defendants caused Plaintiff to suffer serious and dangerous side effects, severe and personal injuries, including economic and noneconomic damages, harms, and losses, including, but not limited to: past medical expenses; past and future loss of earnings; mental anguish; severe emotional distress; physical and mental pain and suffering, and discomfort; and loss and impairment of the quality and enjoyment of life.

**WHEREFORE, premises considered**, Plaintiff claims that the named and fictitious party Defendants are jointly, separately and severally liable to him as a result of the combining and

concurring wrongful conduct of each of them as set out above. Plaintiff demands judgment of said Defendants, separately, and severally, for all injuries and damages including but not limited to: pain, suffering, personal injury, permanent disability and disfigurement, medical expenses and loss of enjoyment of life. Plaintiff demands compensatory and punitive damages in such type and quantity as a jury may find appropriate under the circumstances of this case and the purposes allowed by law, including but not limited to the preservation of human life, the protection of the public by deterring these Defendants and other from doing such wrong in the future, and as exemplary damages. Plaintiff further requests any other, further or different relief as to which he may be entitled.

## COUNT VI
## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (Against Monsanto and Red River Specialties)

231.    Plaintiffs incorporate by reference Paragraphs 1-166 as though set forth fully at length herein.

232.    At the time Defendant manufactured, marketed, labeled, promoted, distributed and/or sold Roundup® products, Defendant knew of the uses for which the Roundup® products were intended, and impliedly warranted the Roundup® products were merchantable and fit for the ordinary purposes for which they were intended.

233.    Members of the consuming public, including consumers such as Plaintiff, were intended third-party beneficiaries of the warranty.

234.    The Roundup® products were not merchantable or fit for their ordinary purposes, because they had a propensity to lead to the serious personal injuries described herein.

235.    Plaintiff reasonably relied on Defendant's representations that Roundup® products were safe and free of defects.

236. Defendant's breach of the implied warranty of merchantability was the direct and proximate cause of Plaintiff's injuries.

237. Defendant's conduct, as described above, was extreme and outrageous. Defendant risked the lives of the consumers and users of their Roundup® products, including Plaintiff with knowledge of the safety and efficacy problems, and suppressed this knowledge from Plaintiff and the general public. Defendant made conscious decisions not to redesign, relabel, warn or inform Plaintiff or the unsuspecting consuming public.

238. As a direct and proximate result of Defendant's implied warranties of merchantability concerning the Roundup® products, as described herein, Plaintiff Michael Randy Hayes developed cancer, suffered grave injuries, physical pain and suffering, mental anguish, including diminished enjoyment of life, as well as economic loss, including financial expenses for medical care and treatment.

**WHEREFORE, premises considered,** Plaintiff claims that the named and fictitious party Defendants are jointly, separately and severally liable to him as a result of the combining and concurring wrongful conduct of each of them as set out above. Plaintiff demands judgment of said Defendants, separately, and severally, for all injuries and damages including but not limited to: pain, suffering, personal injury, permanent disability and disfigurement, medical expenses and loss of enjoyment of life. Plaintiff demands compensatory and punitive damages in such type and quantity as a jury may find appropriate under the circumstances of this case and the purposes allowed by law, including but not limited to the preservation of human life, the protection of the public by deterring these Defendants and other from doing such wrong in the future, and as exemplary damages. Plaintiff further requests any other, further or different relief as to which he may be entitled.

## <u>COUNT VII</u>
## BREACH OF IMPLIED WARRANTY OF FITNESS FOR A PARTICULAR PURPOSE
### (Against Monsanto and Red River Specialties)

239.    Plaintiffs incorporate by reference Paragraphs 1-166 as though set forth fully at length herein.

240.    Defendant manufactured, supplied and sold Roundup® products with an implied warranty that they were fit for the particular purpose for which they were warranted.

241.    Members of the consuming public, including Plaintiff specifically, were the intended third-party beneficiaries of the warranty.

242.    The Roundup® products were not fit for the particular purpose for which they were warranted without serious risk of personal injury, which risk is much higher than other products designed to perform the same function.

243.    Plaintiff reasonably relied on Defendant's representations that the Roundup® products were safe and effective for use.

244.    Defendant's breach of the implied warranty of fitness for a particular purpose was the direct and proximate cause of Plaintiff's injuries and damages.

245.    Defendants' conduct, as described above, was extreme and outrageous. Defendants risked the lives of the consumers and users of their Roundup® products, including Plaintiff, by having knowledge of the safety and efficacy problems associated with the Roundup® products, but suppressing this knowledge from the public. Defendants made a conscious decision not to redesign, relabel, warn or inform the unsuspecting consuming public. Defendants' outrageous conduct warrants an award of punitive damages.

246. As a direct and proximate result of Defendants' conduct with regard to implied warranties of fitness concerning Roundup® products, Plaintiff was directly or indirectly caused to suffer the injuries and damages as set out herein.

**WHEREFORE, premises considered**, Plaintiff claims that the named and fictitious party Defendants are jointly, separately and severally liable to him as a result of the combining and concurring wrongful conduct of each of them as set out above. Plaintiff demands judgment of said Defendants, separately, and severally, for all injuries and damages including but not limited to: pain, suffering, personal injury, permanent disability and disfigurement, medical expenses and loss of enjoyment of life. Plaintiff demands compensatory and punitive damages in such type and quantity as a jury may find appropriate under the circumstances of this case and the purposes allowed by law, including but not limited to the preservation of human life, the protection of the public by deterring these Defendants and other from doing such wrong in the future, and as exemplary damages. Plaintiff further requests any other, further or different relief as to which he may be entitled.

## COUNT VIII
## FAILURE TO PROVIDE A SAFE WORK ENVIRONMENT
### (Against Sheffield Light & Power Co. and Sheffield Utilities)

247. Plaintiffs incorporate by reference Paragraphs 1-166 as though set forth fully at length herein.

248. Sheffield Light & Power Co. and Sheffield Utilities and its Electric Division had a duty to provide a safe work environment for Plaintiff.

249. Plaintiff's injuries were caused by the negligence and/or wantonness of Sheffield Light & Power Co. and Sheffield Utilities and its Electric Division in that these named and fictitious Defendants failed to adequately warn of the hazards associated with the use of pesticides,

failing to enforce and require certification of pesticide applicators, failed to provide literature and training aids and to train Plaintiff relating to the hazards associated with the use of pesticides, and failed to provide a safe work environment for Plaintiff.

250. Sheffield Light & Power Co. and Sheffield Utilities and its Electric Division ordered and/or directed Plaintiff to use pesticides when Sheffield Light & Power Co. and Sheffield Utilities and its Electric Division , knew or should have known the pesticides were in a defective condition or knew or should have known such were harmful, knew or should have known that failure to require certification in pesticide spraying/application would likely lead to injury and Plaintiff was bound to conform and did conform to said orders or directions and Plaintiff's injuries resulted from his having so conformed.

**WHEREFORE, premises considered,** Plaintiff claims that Sheffield Light & Power Co. and Sheffield Utilities and its Electric Division and fictitious party Defendants related to these defendants are jointly, separately and severally liable to him as a result of the combining and concurring wrongful conduct of each of them as set out above. Plaintiff demands judgment of said named and fictitious Defendants, separately, and severally, for all injuries and damages including but not limited to: pain, suffering, personal injury, permanent disability and disfigurement, medical expenses and loss of enjoyment of life. Plaintiff demands compensatory and punitive damages in such type and quantity as a jury may find appropriate under the circumstances of this case and the purposes allowed by law, including but not limited to the preservation of human life, the protection of the public by deterring these Defendants and other from doing such wrong in the future, and as exemplary damages. Plaintiff further requests any other, further or different relief as to which he may be entitled.

## COUNT IX
## LOSS OF CONSORTIUM
### (Against All Defendants)

100.     Plaintiffs incorporate by reference Paragraphs 1-166 as though set forth fully at length herein.

101.     Plaintiff Katrina Hayes is the spouse of Plaintiff Michael Randy Hayes and as such, lives and cohabitates with him.

102.     By reason of the foregoing, Plaintiff's spouse has necessarily paid and has become liable to pay for medical aid, treatment, attendance, and for medications, and will necessarily incur further expenses of a similar nature in the future.

103.     By reason of the foregoing, Plaintiff's spouse has been caused, presently and in the future, the loss of Plaintiff's companionship, service and society.

104.     As a foreseeable, direct and proximate result of the wrongful acts and omissions of Defendant, Plaintiffs were caused to suffer economic damages, including medical and hospital expenses, severe and possible permanent injuries, pain, suffering and emotional distress.

**WHEREFORE, PREMISES CONSIDERED**, Plaintiffs demand judgment against the Defendants, each of them individually, jointly and severally, and compensatory and punitive damages against the named and fictitious-party Defendants in an amount to be determined by the trier-of-fact, including interest, costs, attorney's fees, and any such other, further and different relief this Court deems appropriate.

## COUNT X
## COMBINED AND CONCURRING CONDUCT
### (Against All Defendants)

251.    Plaintiffs incorporate by reference Paragraphs 1-166 as though set forth fully at length herein.

252.    The tortious conduct of all Defendants as described in the foregoing paragraphs combined and concurred to cause the injuries sustained by Plaintiff. Moreover, the Defendants worked in concert to achieve financial gain to each of their own benefits.


**WHEREFORE, premises considered,** Plaintiff claims that the named and fictitious party Defendants are jointly, separately and severally liable to him as a result of the combining and concurring wrongful conduct of each of them as set out above. Plaintiff demands judgment of said Defendants, separately, and severally, for all injuries and damages including but not limited to: pain, suffering, personal injury, permanent disability and disfigurement, medical expenses and loss of enjoyment of life. Plaintiff demands compensatory and punitive damages in such type and quantity as a jury may find appropriate under the circumstances of this case and the purposes allowed by law, including but not limited to the preservation of human life, the protection of the public by deterring these Defendants and other from doing such wrong in the future, and as exemplary damages. Plaintiff further requests any other, further or different relief as to which he may be entitled.


## PUNITIVE DAMAGES ALLEGATIONS

253.    Plaintiffs incorporate by reference each preceding and succeeding paragraph as though set forth fully at length herein.

254.     Defendants' conduct as alleged herein was done with oppression, fraud, and malice. Defendants were fully aware of Roundup's safety risks. Nonetheless, Defendants deliberately crafted the label, marketing, and promotion pf to mislead farmers and consumers.

255.     This was not done by accident or through some justifiable negligence. Rather, Defendants knew that it could turn a profit by convincing the agricultural industry and the general population that glyphosate-based products, including Roundup®, was harmless to humans, and that full disclosure of the true risks would limit the amount of money Defendants would make selling glyphosate-based products, including Roundup®, in the State of Alabama. This was accomplished not only through its misleading, deceptive, fraudulent and unfair labeling, but also through a comprehensive scheme of selective fraudulent research and testing, misleading advertising, and deceptive omissions as more fully alleged throughout this pleading. Plaintiff was robbed of their right to make an informed decision about whether to use an herbicide, knowing the full risks attendant to that use. Such conduct was done with conscious disregard of Plaintiff's rights.

256.     There is no indication that Defendants swill stop deceptive, unfair, fraudulent, misleading and unlawful marketing practices unless it is punished and deterred. Accordingly, Plaintiffs request punitive damages against Defendants for the harms caused to Plaintiffs.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs requests that the Court enter judgment in his favor and against Defendant, awarding:

a) Consequential damages and ascertainable losses in such amount to be determined at trial and as provided by applicable law;

b) Exemplary and punitive damages sufficient to punish and deter Defendant and others from future deceptive, fraudulent, unfair, misleading, illegal and fraudulent practices;

c) Pre-judgment and post-judgment interest;

d) Costs including reasonable attorneys' fees and costs, court costs, and other litigation expenses; and

e) Any other relief the Court may deem just and proper.

## JURY TRIAL DEMAND

Plaintiffs demand a trial by jury on all of the triable issues within this pleading.

Dated: November 4, 2020

/s/Trey J. Malbrough
**Trey J. Malbrough (MAL037)**
The Malbrough Firm LLC
Age Herald Building
2107 Fifth Avenue North, Suite 301
Birmingham, Alabama 35203
Telephone: (205) 701-0707
Facsimile: (205) 820-0123
Email: trey@tmbfirm.com

/s/ Bennett L. Pugh
**Bennett L. Pugh (PUG004)**
300 N. Montgomery Ave.
Sheffield, AL 35660
Telephone: (205) 901-1116
Email: pughbennett@gmail.com

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that I have served a copy of the foregoing to the person(s) named below via electronic service through the AlaFile system on this day, November 4, 2020:

| | |
|---|---|
| Halron W. Turner, Esq. | Steve A. Baccus, Esq. |
| Turner, Onderdonk, Kimbrough, Howell, Huggins & Bradley, PA | R. Keith Worsham, Esq. |
| 13212 West Central Avenue | Almon, McAlister, Baccus & Worsham |
| Post Office Drawer 1389 | P. O. Box 148 |
| Chatom, AL 36518 | Tuscumbia, AL 35674 |
| Email: hwt@tokh.com | Email: sbaccus_2000@yahoo.com |
| *Attorneys for Defendants Monsanto Company, Red River Specialties, LLC, & Red River Specialties, Inc.* | Email: rkw11111@yahoo.com |

/s/ Trey J. Malbrough
Trey J. Malbrough

**\*\* <u>Please serve the following Defendants by Certified Mail</u> \*\***

**<u>return receipt requested, to the following addresses:</u>**

Sheffield Light & Power Co.
300 N. Nashville Ave.
Sheffield, AL 35660

Sheffield Utilities
300 N. Nashville Ave.
Sheffield, AL 35660



AlaFile E-Notice

20-CV-2020-900237.00

FILED
2020 Nov-05  AM 05:10
U.S. DISTRICT COURT
N.D. OF ALABAMA

To:  TURNER HALRON WAITES
hwt@tokh.com



EXHIBIT
E

# NOTICE OF ELECTRONIC FILING

IN THE CIRCUIT COURT OF COLBERT COUNTY, ALABAMA

MICHAEL RANDY HAYES ET AL V. MONSANTO COMPANY CORPORATION ET AL
20-CV-2020-900237.00

The following complaint was FILED on 11/4/2020 11:11:23 AM

Notice Date:     11/4/2020 11:11:23 AM

MARK R. EADY
CIRCUIT COURT CLERK
COLBERT COUNTY, ALABAMA
P.O. BOX 740370
TUSCUMBIA, AL, 35674

256-386-8511
mark.eady@alacourt.gov



FILED

2020 Nov-05 AM 05:10
U.S. DISTRICT COURT
N.D. OF ALABAMA

AlaFile E-Notice

20-CV-2020-900237.00

Judge: KYLE W BROWN

To:  SHEFFIELD LIGHT & POWER CO. (PRO SE)
     300 N. NASHVILLE AVE.
     SHEFFIELD, AL, 35660-0000

---

# NOTICE OF ELECTRONIC FILING

IN THE CIRCUIT COURT OF COLBERT COUNTY, ALABAMA

MICHAEL RANDY HAYES ET AL V. MONSANTO COMPANY CORPORATION ET AL
20-CV-2020-900237.00

The following matter was FILED on 11/4/2020 11:44:43 AM

**C001 HAYES MICHAEL RANDY**
**C002 HAYES KATRINA**

MOTION TO VACATE OR MODIFY

[Filer: MALBROUGH TREY JOSEPH]

Notice Date:     11/4/2020 11:44:43 AM

MARK R. EADY
CIRCUIT COURT CLERK
COLBERT COUNTY, ALABAMA
P.O. BOX 740370
TUSCUMBIA, AL, 35674

256-386-8511
mark.eady@alacourt.gov

Case 3:20-cv-01745-UBB Document 109-3 Filed 11/01/2020 Page 5 of 96

ELECTRONICALLY FILED
11/4/2020 11:44 AM
20-CV-2020-900237.00
CIRCUIT COURT OF
COLBERT COUNTY, ALABAMA
MARK R. EADY, CLERK

| STATE OF ALABAMA | Revised 3/5/08 | Cas |
|---|---|---|
| Unified Judicial System | | |
| 20-COLBERT | ☐ District Court   ☑ Circuit Court | CV2 |

| MICHAEL RANDY HAYES ET AL V. MONSANTO COMPANY CORPORATION ET AL | **CIVIL MOTION COVER SHEET** *Name of Filing Party:* C001 - HAYES MICHAEL RANDY C002 - HAYES KATRINA |
|---|---|

| *Name, Address, and Telephone No. of Attorney or Party. If Not Represented.* | ☐ Oral Arguments Requested |
|---|---|
| TREY JOSEPH MALBROUGH P.O. BOX 531383 BIRMINGHAM, AL 35253 *Attorney Bar No.:* MAL037 | |

## TYPE OF MOTION

| Motions Requiring Fee | Motions Not Requiring Fee |
|---|---|
| ☐ Default Judgment ($50.00) | ☐ Add Party |
| ☐ Joinder in Other Party's Dispositive Motion (i.e.Summary Judgment, Judgment on the Pleadings, orother Dispositive Motion not pursuant to Rule 12(b)) ($50.00) | ☐ Amend |
| | ☐ Change of Venue/Transfer |
| | ☐ Compel |
| ☐ Judgment on the Pleadings ($50.00) | ☐ Consolidation |
| ☐ Motion to Dismiss, or in the Alternative SummaryJudgment($50.00) | ☐ Continue |
| | ☐ Deposition |
| ☐ Renewed Dispositive Motion(Summary Judgment,Judgment on the Pleadings, or other DispositiveMotion not pursuant to Rule 12(b)) ($50.00) | ☐ Designate a Mediator |
| | ☐ Judgment as a Matter of Law (during Trial) |
| ☐ Summary Judgment pursuant to Rule 56($50.00) | ☐ Disburse Funds |
| ☐ Motion to Intervene ($297.00) | ☐ Extension of Time |
| ☐ Other _____ | ☐ In Limine |
| pursuant to Rule _____ ($50.00) | ☐ Joinder |
| | ☐ More Definite Statement |
| *Motion fees are enumerated in §12-19-71(a). Fees pursuant to Local Act are not included. Please contact the Clerk of the Court regarding applicable local fees.* | ☐ Motion to Dismiss pursuant to Rule 12(b) |
| | ☐ New Trial |
| | ☐ Objection of Exemptions Claimed |
| ☐ Local Court Costs $ 0 | ☐ Pendente Lite |
| | ☐ Plaintiff's Motion to Dismiss |
| | ☐ Preliminary Injunction |
| | ☐ Protective Order |
| | ☐ Quash |
| | ☐ Release from Stay of Execution |
| | ☐ Sanctions |
| | ☐ Sever |
| | ☐ Special Practice in Alabama |
| | ☐ Stay |
| | ☐ Strike |
| | ☐ Supplement to Pending Motion |
| | ☑ Vacate or Modify |
| | ☐ Withdraw |
| | ☐ Other _____ |
| | pursuant to Rule _____ (Subject to Filing Fee) |

| Check here if you have filed or are filing contemporaneously with this motion an Affidavit of Substantial Hardship or if you are filing on behalf of an agency or department of the State, county, or municipal government. (Pursuant to §6-5-1 Code of Alabama (1975), governmental entities are exempt from prepayment of filing fees) ☐ | Date: 11/4/2020 11:43:52 AM | Signature of Attorney or Party /s/ TREY JOSEPH MALBROUGH |
|---|---|---|

*This Cover Sheet must be completed and submitted to the Clerk of Court upon the filing of any motion. Each motion should contain a separate Cover Sheet.
**Motions titled 'Motion to Dismiss' that are not pursuant to Rule 12(b) and are in fact Motions for Summary Judgments are subject to filing fee.

ELECTRONICALLY FILED
11/4/2020 11:44 AM
20-CV-2020-900237.00
CIRCUIT COURT OF
COLBERT COUNTY, ALABAMA
MARK R. EADY, CLERK

# IN THE CIRCUIT COURT OF COLBERT COUNTY, ALABAMA

MICHAEL RANDY HAYES and }
KATRINA HAYES, }
  }
    Plaintiffs, }
  }    **Case No: CV 2020 – 900237 – KWB**
v. }
  }
MONSANTO COMPANY, et al. }
  }
    Defendants. }

## PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION TO DISMISS and MOTION TO VACATE HEARING

COME NOW the Plaintiffs for response to the Motion to Dismiss filed by Defendant Sheffield Light & Power and Defendant Sheffield Utilities (hereinafter Defendants' "*Motion*"). Plaintiffs respectfully request such Motion be DENIED, and in support thereof, aver as follows:

1. Defendants' Motion purportedly seeks to dismiss Plaintiffs' <u>Complaint</u> (Document 2), filed on September 24, 2020.

2. Defendants' Motion is set for hearing on **November 5, 2020 at 1:30 p.m.**

### Defendant's Motion is Moot

3. On November 4, 2020, Plaintiffs filed an <u>Amended Complaint</u> (Document 26).

4. An amended complaint supersedes the previously filed complaint and becomes the operative pleading, unless it subsequently is modified. *Grayson v. Hanson*, 843 So. 2d 146 (Ala. 2002).

5. Once an amended pleading is interposed, the original pleading no longer performs any function and any subsequent motion by an opposing party should be directed to the amended pleading. *Holley v. St. Paul Fire & Marine Ins. Co.*, 396 So. 2d 75 (Ala. 1981).

6. Plaintiffs' <u>Amended Complaint</u> superseded the Complaint, making moot Defendants' Motion. *Ex parte Puccio*, 923 So. 2d 1069 (Ala. 2005).

7. Accordingly, Defendants' Motion is due to be **DENIED** as **MOOT**.

**WHEREFORE**, PREMISES CONSIDERED, Plaintiffs pray this Honorable Court will enter an Order denying as moot Defendants' Motion to Dismiss and vacating the hearing presently set on November 5, 2020 at 1:30 p.m.

Respectfully Submitted,

**/s/Trey J. Malbrough**
**Trey J. Malbrough (MAL037)**
The Malbrough Firm LLC
Age Herald Building
2107 Fifth Avenue North, Suite 301
Birmingham, Alabama 35203
Telephone:  (205) 701-0707
Facsimile:  (205) 820-0123
Email:  trey@tmbfirm.com

*One of the Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that I have served a copy of the foregoing to the person(s) named below via electronic service through the AlaFile system on this day, November 4, 2020:

| | |
|---|---|
| Halron W. Turner, Esq. | Steve A. Baccus, Esq. |
| Turner, Onderdonk, Kimbrough, Howell, Huggins & Bradley, PA | R. Keith Worsham, Esq. |
| 13212 West Central Avenue | Almon, McAlister, Baccus & Worsham |
| Post Office Drawer 1389 | P. O. Box 148 |
| Chatom, AL 36518 | Tuscumbia, AL 35674 |
| Email: hwt@tokh.com | Email:  sbaccus_2000@yahoo.com |
| *Attorneys for Defendants Monsanto Company, Red River Specialties, LLC, & Red River Specialties, Inc.* | Email:  rkw11111@yahoo.com |

/s/ Trey J. Malbrough
Trey J. Malbrough

- 2 -

FILED

2020 Nov-05 AM 05:10
U.S. DISTRICT COURT
N.D. OF ALABAMA



AlaFile E-Notice

20-CV-2020-900237.00

Judge: KYLE W BROWN

To:  PUGH BENNETT LEE
     pughbennett@gmail.com

---

# NOTICE OF ELECTRONIC FILING

---

IN THE CIRCUIT COURT OF COLBERT COUNTY, ALABAMA

MICHAEL RANDY HAYES ET AL V. MONSANTO COMPANY CORPORATION ET AL
20-CV-2020-900237.00

The following matter was FILED on 11/4/2020 11:44:43 AM

**C001 HAYES MICHAEL RANDY**

**C002 HAYES KATRINA**

MOTION TO VACATE OR MODIFY

[Filer: MALBROUGH TREY JOSEPH]

Notice Date:     11/4/2020 11:44:43 AM

MARK R. EADY
CIRCUIT COURT CLERK
COLBERT COUNTY, ALABAMA
P.O. BOX 740370
TUSCUMBIA, AL, 35674

256-386-8511
mark.eady@alacourt.gov

ELECTRONICALLY FILED
11/4/2020 4:32 PM
20-SM-2020-900005
COLBERT COUNTY, ALABAMA
MARK R. EADY, CLERK

State of Alabama
Unified Judicial System

Form SM-1 (front)   Rev.3/95

### STATEMENT OF CLAIM
### (Complaint)
### General

FILED
11/4/2020 4:32 PM
20-SM-2020-900005  AM 05:10
CIRCUIT COURT OF
CIRCUIT DISTRICT COURT
COLBERT COUNTY, ALABAMA
MARK R. EADY, CLERK

Case No.
20-S

IN THE SMALL CLAIMS COURT OF ____COLBERT_____ , ALABAMA

*(Name of County)*

SHEFFIELD UTILITIES                                    v.  ████████████████████████

_____Plaintiff_____                              _____Defendant_____

Plaintiff's
Home Address

SHEFFIELD UTILITIES
PO BOX 3664
FLORENCE, AL 35630

Defendant's
Home Address

████████████████████

HUNTSVILLE, AL 35810

**EXHIBIT**

**H**
_____

Plaintiff's Attorney's
Address

JANICE KEETON

206 S. Pine Street, Suite 100

FLORENCE, AL 35630

---

### NOTICE TO EACH DEFENDANT - READ CAREFULLY

YOU ARE BEING SUED IN THE SMALL CLAIMS COURT BY THE PLAINTIFF(S) SHOWN ABOVE. THE JUDGE HAS NOT YET MADE ANY DECISION IN THIS CASE, AND YOU HAVE THE RIGHT TO A TRIAL TO TELL YOUR SIDE.

HOWEVER, IF YOU, OR YOUR LAWYER, FAIL TO FILL OUT THE ENCLOSED ANSWER FORM AND DELIVER OR MAIL IT TO THE CLERK AT THE ADDRESS SHOWN BELOW, SO THAT IT WILL GET TO THE CLERK'S OFFICE WITHIN FOURTEEN (14) DAYS AFTER YOU RECEIVE THESE PAPERS, A JUDGMENT CAN BE TAKEN AGAINST YOU FOR THE MONEY OR PROPERTY DEMANDED IN THE FOLLOWING COMPLAINT, ONCE A JUDGMENT HAS BEEN ENTERED AGAINST YOU, YOUR PAYCHECK CAN BE GARNISHED AND/OR YOUR HOME OR PROPERTY SOLD TO SATISFY THAT JUDGMENT.

---

### COMPLAINT

1. I claim the defendant owes the plaintiff the sum of $ ____465.41_____ because:

The Defendant owes the above debt for services and/or goods rendered by the Plaintiff to the Defendant for which the Defendant has not paid or has not fully paid.  Plaintiff intends to enforce the Defendant's waiver of exemption, if any.

2. Plaintiff also claims from the defendant court costs in the sum of $ ____52.00_____ (see note below, plus $_____ for interest and $ ___156.36_____ for lawyers' fees (only if plaintiff is represented by a licensed, practicing attorney and if the contract or note you signed so provides.)

NOTE: The total amount of court costs may be more than this amount when the case is finally settled. The clerk will inform you of any additional costs at the close of the case.

CLERK'S ADDRESS:

MARK R. EADY
P.O. BOX 740370

TUSCUMBIA, AL 35674

Clerk's Phone No. _256-386-8511_____

/s/ JANICE KEETON
_____
Plaintiff or Plaintiff's Attorney (Signature)

Attorney Code ___KEE018_____

2562753123
_____
Plaintiff or Plaintiff's Attorney's Phone Number

Date of Filing ____11/04/2020_____

*(See instructions on the Back)*

ELECTRONICALLY FILED
11/15/2018 11:48 AM
20-SM-2018-900005
CIRCUIT COURT OF
COLBERT COUNTY, ALABAMA
NANCY L. HEARN, CLERK

FILED
11/15/2018 11:48 AM
2018-900005 AM 05:10
OUR DISTRICT COURT
ALD OF ALABAMA

SWORN STATEMENT OF ACCOUNT        STATE OF ALABAMA

BALANCE   $    825.91

REFERENCE

**EXHIBIT**

**I**

_____

Having been first duly sworn, I do hereby state

that I am employed by SHEFFIELD UTILITIES

here and after referred to as creditor, that

████████████████ is indebted to creditor in the amount of

$825.91 for goods and/or services, that all just credits

have been given and there are no offsets or counterclaims.

_Lori Talley_
SIGNATURE

Sworn to and subscribed to before me this **13** day of

**September**, 20**18**.

_Ginger M Hubbard_
NOTARY PUBLIC

My commission expires: **7/6/2022**

GINGER M HUBBARD
Notary Public
Alabama State at Large

50A

FILED

2020 Nov-05 AM 05:10
U.S. DISTRICT COURT
N.D. OF ALABAMA

**EXHIBIT**

**J**



| LogOff

Name: Trey Malbrough    User ID: Tmalbrou    Last login Date: 11/5/2020 4:18:14 AM

**Main Menu**

**Search**
- Party Search
- Case Lookup
- UTC Lookup
- SSN Enforcement
- Attorney Search
- Warrant Search
- Witness Search
- Docket Search
- HotSheet™

**Tracking**
- Attorney Tracker
- Case Monitor
- Name Tracker

**Desktop**
- My Alacourt

**Administration**
- Update User Info

**Alabama SJIS Index Search**

**Search Criteria: Name: sheffield utilities, SSN: None, County:ALL, Division: SM, DOB: None, Case Year: ALL, Filing Date: None**

Search Results: 100 records returned.

Print View

| County | | Case Number | Name | JID | Original Charge | Status | DOB | Sex | Race | Court Action Date | Court Action | SSN |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 20 | Monitor → | SM-2019-900733.00 | SHEFFIELD UTILITIES | CDC | D | SORRELL DANI | DISPOSED | | | | 1/8/2020 | See Detail | XXX-XX-X999 |
| 20 | Monitor → | SM-2019-900555.00 | SHEFFIELD UTILITIES | CDC | D | STONE DENISE | DISPOSED | | | | 7/25/2019 | See Detail | XXX-XX-X999 |
| 20 | Monitor → | SM-2019-900540.00 | SHEFFIELD UTILITIES | CDC | D | BATES JOSHUA | DISPOSED | | | | 10/18/2019 | See Detail | XXX-XX-X999 |
| 20 | Monitor → | SM-2019-900331.00 | SHEFFIELD UTILITIES | CDC | D | MURPHY JASON | DISPOSED | | | | 9/16/2019 | See Detail | XXX-XX-X999 |
| 20 | Monitor → | SM-2019-900333.00 | SHEFFIELD UTILITIES | CDC | D | YOUNG STEVEN | DISPOSED | | | | 4/26/2019 | See Detail | XXX-XX-X999 |
| 20 | Monitor → | SM-2019-900334.00 | SHEFFIELD UTILITIES | CDC | D | SMITH SHANE | DISPOSED | | | | 9/16/2019 | See Detail | XXX-XX-X999 |
| 20 | Monitor → | SM-2019-900330.00 | SHEFFIELD UTILITIES | CDC | D | MILLS MATTHE | DISPOSED | | | | 9/16/2019 | See Detail | XXX-XX-X999 |
| 20 | Monitor → | SM-2019-900219.00 | SHEFFIELD UTILITIES | CDC | D | WHITE KOREY | DISPOSED | | | | 8/12/2019 | See Detail | XXX-XX-X999 |
| 20 | Monitor → | SM-2019-900221.00 | SHEFFIELD UTILITIES | CDC | D | DAVIS JOSHUA | DISPOSED | | | | 9/18/2019 | See Detail | XXX-XX-X999 |
| 20 | Monitor → | SM-2019-900220.00 | SHEFFIELD UTILITIES | CDC | D | ROWELL AMBRE | DISPOSED | | | | 9/18/2019 | See Detail | XXX-XX-X999 |
| 20 | Monitor → | SM-2019-900158.00 | SHEFFIELD UTILITIES | CDC | D | JACK RICHARD | DISPOSED | | | | 3/19/2019 | See Detail | XXX-XX-X999 |
| 20 | Monitor → | SM-2018-901030.00 | SHEFFIELD UTILITIES | CDC | D | SHERER PAULA | DISPOSED | | | | 5/30/2019 | See Detail | XXX-XX-X999 |
| 20 | Monitor → | SM-2018-900960.00 | SHEFFIELD UTILITIES | CDC | D | ISBELL TONYA | DISPOSED | | | | 1/16/2019 | See Detail | XXX-XX-X999 |
| 20 | Monitor → | SM-2018-900961.00 | SHEFFIELD UTILITIES | CDC | D | WILBANKS ANT | DISPOSED | | | | 2/20/2019 | See Detail | XXX-XX-X999 |
| 20 | Monitor → | SM-2018-900965.00 | SHEFFIELD UTILITIES | CDC | D | WHITE KENNY | DISPOSED | | | | 1/16/2019 | See Detail | XXX-XX-X999 |

Page 2 of 7    |◄ ◄ ► ►|    Page: 2 ▾




FILED

2020 Nov 05 AM 05:10
U.S. DISTRICT COURT
N.D. OF ALABAMA

**EXHIBIT**

K



**Sheffield Utilities**
300 North Nashville Avenue
PO Box 580
Sheffield, AL 35660

*PLEASE DETACH AND RETAIN*

No. 48197

Date: 12/17/2014

**Employee:** 291 MICHAEL HAYES

| | | |
|---|---|---|
| **Period Beg** | 11/29/2014 | |
| **Period Ending** | 12/12/2014 | Year-To-Date |

| PTO | Balance | Amount | Current | YTD Taken |
|---|---|---|---|---|

| Pays | Job | Hours | Rate | Amount | YTD Hours | YTD Amount | Deductions | Amount | YTD Amount |
|---|---|---|---|---|---|---|---|---|---|
| REGULAR | | | | | | | | | |
| ANNUALLV | | | | | | | | | |
| SICKLEAV | | | | | | | | | |
| HOLIDAY | | | | | | | | | |
| WORKCOMP | | | | | | | | | |
| TRAINING | | | | | | | | | |
| COMP | | | | | | | | | |
| CLOTHING | | | | | | | | | |

| Employee Taxes | Ex | Amount | Taxable | YTD Amount | YTD Taxable | Txbl Benefits | Amount | YTD Amount |
|---|---|---|---|---|---|---|---|---|
| FEDERAL | | | | | | | | |
| STATE | | | | | | | | |
| FICA | | | | | | | | |
| MEDI | | | | | | | | |

| Financial Institution | Account Number | Amount |
|---|---|---|