MITCHELL,_MS

# U.S. District Court
## Western District of Oklahoma[LIVE] (Oklahoma City)
## CIVIL DOCKET FOR CASE #: 5:20-cv-01173-PRW

Grubb et al v. Monsanto Company
Assigned to: Honorable Patrick R Wyrick
Cause: 28:1332 Diversity-Personal Injury

Date Filed: 11/20/2020
Jury Demand: Plaintiff
Nature of Suit: 365 Personal Inj. Prod.
Liability
Jurisdiction: Diversity

**Plaintiff**

**Shawn Grubb**

represented by **Bradley E Beckworth**
Nix Patterson LLP - AUSTIN
3600 N Capital of Texas Hwy
Bldg B Suite 350
Austin, TX 78746
512-328-5333
Fax: 512-328-5335
Email: bbeckworth@nixlaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Eric J Groves**
Eric Groves & Associates
119 N Robinson Ave
Suite 777
Oklahoma City, OK 73102
405-236-5303
Fax: 405-236-5309
Email: EJG777@aol.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jeffrey J Angelovich**
Nix Patterson LLP - AUSTIN
3600 N Capital of Texas Hwy
Bldg B Suite 350
Austin, TX 78746
512-328-5333
Fax: 512-328-5335
Email: jangelovich@nixlaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Michael Burrage**
Whitten Burrage
512 N Broadway Ave

Suite 300
Oklahoma City, OK 73102
405-516-7800
Fax: 405-516-7859
Email: mburrage@whittenburragelaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Reggie N Whitten**
Whitten Burrage
512 N Broadway Ave
Suite 300
Oklahoma City, OK 73102
405-516-7800
Fax: 405-516-7859
Email: rwhitten@whittenburragelaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Cody L Hill**
Nix Patterson LLP - AUSTIN
3600 N Capital of Texas Hwy
Bldg B Suite 350
Austin, TX 78746
512-328-5333
Fax: 512-328-5335
Email: codyhill@nixlaw.com
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Rachelle Grubb**                    represented by   **Bradley E Beckworth**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Eric J Groves**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jeffrey J Angelovich**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Michael Burrage**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Reggie N Whitten**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

Cody L Hill
(See above for address)
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Monsanto Company**

| Date Filed | # | Docket Text |
|---|---|---|
| 11/20/2020 | 1 | COMPLAINT against Monsanto Company filed by All Plaintiffs. (Attachments: # 1 Civil Cover Sheet)(dtb) (Entered: 11/20/2020) |
| 11/20/2020 | 2 | Summons Issued Electronically as to Monsanto Company. (dtb) (Entered: 11/20/2020) |
| 11/20/2020 | | PAYMENT FOR A CIVIL CASE Filing fee $ 400, receipt number AOKWDC-3393995. (Burrage, Michael) (Entered: 11/20/2020) |
| 11/24/2020 | 3 | ENTRY of Appearance by Michael Burrage on behalf of Rachelle Grubb, Shawn Grubb (Burrage, Michael) (Entered: 11/24/2020) |
| 11/24/2020 | 4 | ENTRY of Appearance by Reggie N Whitten on behalf of Rachelle Grubb, Shawn Grubb (Whitten, Reggie) (Entered: 11/24/2020) |
| 11/30/2020 | 5 | ENTRY of Appearance by Bradley E Beckworth on behalf of All Plaintiffs (Beckworth, Bradley) (Entered: 11/30/2020) |
| 11/30/2020 | 6 | ENTRY of Appearance by Jeffrey J Angelovich on behalf of All Plaintiffs (Angelovich, Jeffrey) (Entered: 11/30/2020) |
| 11/30/2020 | 7 | ENTRY of Appearance by Cody L Hill on behalf of All Plaintiffs (Hill, Cody) (Entered: 11/30/2020) |

| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 12/02/2020 15:46:38 | | | |
| **PACER Login:** | hllp1982 | **Client Code:** | 1417.0049 |
| **Description:** | Docket Report | **Search Criteria:** | 5:20-cv-01173-PRW Start date: 1/1/1971 End date: 12/2/2020 |
| **Billable Pages:** | 3 | **Cost:** | 0.30 |

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| **SHAWN GRUBB and** | ) | |
| **RACHELLE GRUBB,** | ) | |
| | ) | |
| *Plaintiffs,* | ) | **Case No.** CIV-20-1173-PRW _____ |
| | ) | |
| **v.** | ) | |
| | ) | |
| | ) | **JURY TRIAL DEMANDED** |
| **MONSANTO COMPANY,** | ) | |
| | ) | |
| *Defendant.* | ) | |

### PLAINTIFFS' ORIGINAL COMPLAINT

COMES NOW, Plaintiffs, Shawn Grubb and Rachelle Grubb (collectively, "Plaintiffs" and/or the "Grubbs"), and for their Complaint for damages against Defendant, Monsanto Company ("Defendant" or "Monsanto"), allege and state as follows:

### CASE SUMMARY

1.      This is an action for damages suffered by Plaintiffs as a direct and proximate result of Defendant's negligent and otherwise wrongful conduct in connection with the design, development, manufacture, testing, packaging, promoting, marketing, advertising, distribution, labeling and/or sale of the herbicide, Roundup®, containing the active ingredient glyphosate.

2.      Plaintiffs maintain that Roundup® and/or glyphosate is defective, dangerous to human health, unfit and unsuitable to be marketed and sold in commerce, and lacked proper warnings and directions as to the dangers associated with its use.

3.      Plaintiffs' injuries, like those suffered by thousands of similarly situated victims across the country, were avoidable.

1

## JURISDICTION AND VENUE

4.      This Court has jurisdiction over Defendant and this action pursuant to 28 U.S.C. §1332 because there is complete diversity of citizenship between Plaintiffs and Defendant. Defendant is incorporated and/or has its principal place of business outside of the State of Oklahoma in which Plaintiffs reside. As set forth in more detail below, Defendant has conducted and presently conducts business in and throughout the State of Oklahoma, and has purposefully directed its activities, from which the claims asserted herein arise, at the commercial marketplace, citizens and residents of Oklahoma, including Plaintiffs, such that the exercise of this Court's jurisdiction over Defendant does not and will not offend traditional notions of fair play and substantial justice due to Defendant's sufficient contacts with this jurisdiction.

5.      The amount in controversy between Plaintiffs and Defendant exceeds $75,000, exclusive of interest and costs.

6.      Venue is proper within this district pursuant to 28 U.S.C. §1391. Defendant has conducted and presently conducts business in Oklahoma, including in this Judicial District, is subject to personal jurisdiction in this Judicial District, and thus resides in this Judicial District. Defendant sells, markets and/or distributes Roundup® within the State of Oklahoma, including this Judicial District, and all or a substantial part of the events, acts and/or omissions giving rise to the claims asserted herein occurred within the State of Oklahoma, including this Judicial District.

## PARTIES

7.      Plaintiffs, Shawn Grubb and Rachelle Grubb (collectively, "Plaintiffs" and/or the "Grubbs"), are natural persons, who are and were at the relevant times citizens of the State of Oklahoma, residing and domiciled in Custer County, Oklahoma. Plaintiffs bring this action for the personal injuries that Mr. Grubb sustained due to exposure to Roundup® containing the active

ingredient glyphosate and the surfactant polyoxyethylene tallow amine ("POEA"). As a direct and proximate result of being exposed to Roundup®, Mr. Grubb developed and was diagnosed with Diffuse Large B-Cell Lymphoma—a deadly form of Non-Hodgkin's Lymphoma ("NHL"). As stated herein, Ms. Grubb brings a claim under Oklahoma law for loss of spousal consortium as a result of the injuries sustained by Mr. Grubb from his exposure to Roundup®.

8.      As used herein and throughout, "Roundup" and/or "Roundup®" refers to all formulations of Defendant's Roundup products, including, but not limited to, Roundup Herbicide, Roundup Concentrate Poison Ivy and Togh Brush Killer 1, Roundup Custom Herbicide, Roundup D-Pak Herbicide, Roundup Dry Concentrate, Roundup Export Herbicide, Roundup Fence & Hard Edger 1, Roundup Garden Foam Weed & Grass Killer, Roundup Grass and Weed Killer, Roundup Original 2k Herbicide, Roundup Original II Herbicide, Roundup Pro Concentrate, Roundup Prodry Herbicide, Roundup Promax, Roundup Quick Stik Grass and Weed Killer, Roundup Quikpro Herbicide, Roundup Rainfast Concentrate Weed & Grass Killer, Roundup Rainfast Super Concentrate Weed & Grass Killer, Roundup Ready-to-Use Extended Control Weed & Grass Killer 1 Plus Weed Preventer, Roundup Ready-to-Use Weed & Grass Killer, Roundup Ready-to-Use Weed and Grass Killer 2, Roundup Ultra Dry, Roundup Ultra Herbicide, Roundup Ultramax, Roundup VM Herbicide, Roundup Weed & Grass Killer Concentrate, Roundup Weed & Grass Killer Concentrate Plus, Roundup Weed & Grass Killer Ready-to-Use Plus, Roundup Weed & Grass Killer Super Concentrate, Roundup Weed & Grass Killer1 Ready-to-Use, Roundup WSD Water Soluble Dry Herbicide Deploy Dry Herbicide, or any other formulation containing the active ingredient glyphosate and/or POEA, whether or not expressly listed above.

9.      Defendant, Monsanto Company ("Defendant" or "Monsanto"), is a Delaware corporation that does business, and has at all relevant times done business, in the State of

3

Oklahoma pursuant to its registration with the Oklahoma Secretary of State. Defendant maintains its principal place of business in St. Louis, Missouri. Defendant may be served with service of process through its registered agent for process in the State of Oklahoma: Corporation Service Company, 10300 Greenbriar Place, Oklahoma City, OK 73159-7653.

10. At all times relevant to this Complaint, Defendant was the entity that discovered the herbicidal properties of glyphosate and the manufacturer of Roundup.

11. Defendant advertised, promoted, marketed and sold goods, specifically Roundup, in the State of Oklahoma, including in Custer County and numerous other Oklahoma counties.

12. Defendant transacted and conducted business within the State of Oklahoma that relates and gives rise to the allegations contained in this Complaint.

13. Defendant derived substantial revenue from goods and products, specifically Roundup, sold and used in the State of Oklahoma.

14. Defendant expected, or should have expected, its acts and omissions to have severe consequences within the State of Oklahoma.

15. Defendant engaged in the business of designing, developing, manufacturing, testing, packaging, marketing, distributing, labeling, and/or selling Roundup within the State of Oklahoma. As alleged herein, upon information and belief, Defendant designed, developed, manufactured, sold, tested, advertised, packaged, marketed, distributed, labeled and/or promoted Roundup within the State of Oklahoma with full knowledge of its dangerous and defective nature.

16. Defendant purposefully availed itself of the privilege of conducting activities within the State of Oklahoma, thus invoking the benefits and protections of the laws of the State of Oklahoma. Defendant purposefully directed its commercial activities that form the basis of the

4

allegations in this Complaint at the marketplace, citizens and residents of the State of Oklahoma, including in Custer County and numerous other Oklahoma counties.

## FACTUAL ALLEGATIONS

17.     At all relevant times, Defendant was in the business of, and did, design, research, manufacture, test, advertise, promote, market, sell, distribute, and/or acquired or otherwise become responsible for others who designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed the commercial herbicide, Roundup.

18.     Defendant is a multinational agricultural biotechnology corporation and the world's leading producer of glyphosate.

19.     Defendant discovered the herbicidal properties of glyphosate during the 1970s and subsequently began to design, research, manufacture, promote, market, sell and distribute glyphosate-based "Roundup" as a broad-spectrum herbicide.

20.     Glyphosate is the active ingredient in Roundup.

21.     Glyphosate is a broad-spectrum herbicide used to kill weeds and grasses known to compete with commercial crops grown around the globe.

22.     Glyphosate is a "non-selective" herbicide, meaning it kills indiscriminately based only on whether a given organism produces a specific enzyme, 5-enolpyruvylshikimic acid-3-phosphate synthase, known as "EPSP synthase."

23.     Glyphosate inhibits the enzyme EPSP synthase that interferes with the shikimic pathway in plants, resulting in the accumulation of shikimic acid in plant tissue and ultimately plant death.

24.     Sprayed as a liquid, plants absorb glyphosate directly through their leaves, stems, and roots, and detectable quantities accumulate in the plant tissues.

5

25.     Each year, approximately 250 million pounds of glyphosate are sprayed on plants, crops, commercial nurseries, suburban lawns, parks, and golf courses. The increase in use has been driven largely by the proliferation of genetically engineered crops specifically tailored to resist the activity of glyphosate.

26.     Defendant is intimately involved in the development, design, manufacture, marketing, sale, and/or distribution of genetically modified ("GMO") crops, many of which are marketed as being resistant to Roundup—*i.e.*, "Roundup Ready®." As of 2009, Defendant was the world's leading producer of seeds designed to be Roundup Ready®. In 2010, an estimated 70% of corn and cotton, and 90% of soybean fields in the U.S. contained Roundup Ready® seeds.

27.     The original Roundup, containing the active ingredient glyphosate, was introduced in 1974. Today glyphosate products are among the world's most widely used herbicides. Defendant's glyphosate products are registered in more than 130 countries and are approved for weed control in more than 100 crops. No other herbicide active ingredient compares in terms of number of approved uses.

28.     For approximately four (4) decades, individuals and entities across the globe have used Roundup, unaware of its dangerous, carcinogenic properties.

### *Registration of Herbicides Under Federal Law*

29.     The manufacture, formulation and distribution of herbicides, such as Roundup, are regulated under the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA"), 7 U.S.C. §136 *et seq.* FIFRA requires that all pesticides be registered with the Environmental Protection Agency ("EPA") prior to their distribution, sale, or use, except as described by FIFRA, 7 U.S.C. §136a(a).

30.     The EPA requires as part of the registration process, among other requirements, a variety of tests to evaluate the potential for exposure to pesticides, toxicity to people and other

potential non-target organisms, and other adverse effects on the environment. Registration by the EPA, however, is not an assurance or finding of safety. The determination the EPA makes in registering or re-registering a product is not that the product is "safe," but rather that use of the product in accordance with its label directions "will not generally cause unreasonable adverse effects on the environment." 7 U.S.C. §136(a)(c)(5)(D).

31.     FIFRA defines "unreasonable adverse effects on the environment" to mean "any unreasonable risk to man or the environment, taking into account the economic, social, and environmental costs and benefits of the use of any pesticide." 7 U.S.C. §136(bb). FIFRA thus requires the EPA to make a risk/benefit analysis in determining whether a registration should be granted or allowed to continue to be sold in commerce.

32.     The EPA registered Roundup for distribution, sale and manufacture in the U.S. and the State of Oklahoma.

33.     FIFRA generally requires that the registrant, Monsanto, conduct health and safety testing of pesticide products. The government is not required, nor is it able, to perform the product tests that are required of the manufacturer.

34.     The evaluation of each pesticide product distributed, sold, or manufactured is completed at the time the product is initially registered. The data necessary for registration of a pesticide has changed over time. In recent years, the EPA has been in the process of re-evaluating all pesticide products through a Congressionally-mandated process called "re-registration." 7 U.S.C. §136a-1. In order to reevaluate these pesticides, the EPA demands the completion of additional tests and the submission of data for the EPA's review and evaluation.

35.     In the case of glyphosate and Roundup, the EPA had planned on releasing its preliminary risk assessment – in relation to the registration process – no later than July 2015. The

7

EPA completed its review of glyphosate in early 2015, but delayed releasing the assessment pending further review in light of the World Health Organization's findings, further described below, that glyphosate is a "probable carcinogen" as demonstrated by the mechanistic evidence of carcinogenicity in humans and sufficient evidence of carcinogenicity in animals.

*Defendant's False and Misleading Representations Regarding the Safety of Roundup*

36.   In 1996, the New York Attorney General ("NYAG") filed a lawsuit against Monsanto based on its false and misleading advertising of Roundup products. Specifically, the lawsuit challenged Monsanto's general representations that its spray-on glyphosate-based herbicides, including Roundup, were "*safer than table salt*" and "*practically non-toxic*" to mammals, birds, and fish. Among the representations the NYAG found deceptive and misleading about the human and environmental safety of Roundup are the following:

a.   Remember that environmentally friendly Roundup herbicide is biodegradable. It won't build up in the soil so you can use Roundup with confidence along customers' driveways, sidewalks and fences;

b.   And remember that Roundup is biodegradable and won't build up in the soil. That will give you the environmental confidence you need to use Roundup everywhere you've got a weed, brush, edging or trimming problem;

c.   Roundup biodegrades into naturally occurring elements;

d.   Remember that versatile Roundup herbicide stays where you put it. That means there's no washing or leaching to harm customers' shrubs or other desirable vegetation;

e.   This non-residual herbicide will not wash or leach in the soil. It…stays where you apply it;

f.   You can apply Accord with confidence because it will stay where you put it, it bonds tightly to soil particles, preventing leaching. Then, soon after application, soil microorganisms biodegrade Accord into natural products;

8

g. Glyphosate is less toxic to rats than table salt following acute oral ingestion;

h. Glyphosate's safety margin is much greater than required. It has over a 1,000-fold safety margin in food and over a 700-fold safety margin for workers who manufacture it or use it;

i. You can feel good about using herbicides by Monsanto. They carry a toxicity category rating of 'practically non-toxic' as it pertains to mammals, birds and fish; and

j. "Roundup can be used where kids and pets will play and breaks down into natural material." *(This ad depicts a person with his head in the ground and a pet dog standing in an area which has been treated with Roundup.)*[1]

37.   On November 19, 1996, Monsanto entered into an Assurance of Discontinuance with NYAG, in which Monsanto agreed, among other things, "to cease and desist from publishing or broadcasting any advertisements [in New York] that represent, directly or by implication" that:

a. Monsanto's glyphosate-containing pesticide products or any component thereof are safe, non-toxic, harmless or free from risk;

b. Monsanto's glyphosate-containing pesticide products or any component thereof manufactured, formulated, distributed or sold by Monsanto are biodegradable;

c. Monsanto's glyphosate-containing pesticide products or any component thereof stay where they are applied under all circumstances and will not move through the environment by any means;

d. Monsanto's glyphosate-containing pesticide products or any component thereof are "good" for the environment or are "known for their environmental characteristics";

e. Glyphosate-containing pesticide products or any component thereof are safer or less toxic than common consumer products other than herbicides; and

---

[1] Attorney General of the State of New York, *In the Matter of Monsanto Company*, Assurance of Discontinuance Pursuant to Executive Law §63(15) (Nov. 1996).

9

        f.   Monsanto's glyphosate-containing products or any component thereof might be classified as "practically non-toxic."

38.     Monsanto did not alter its advertising in the same manner in any State other than New York, and upon information and belief, still has not done so today.

39.     In 2009, France's highest court ruled that Monsanto had not told the truth about the safety of Roundup. The French court affirmed an earlier judgment, which had found that Monsanto had falsely advertised its herbicide Roundup as "biodegradable" and that it "left the soil clean."[2]

### *Evidence of Carcinogenicity in Roundup*

40.     By the 1980s, Monsanto was aware of glyphosate's carcinogenic properties.

41.     On March 4, 1985, a group of the EPA's Toxicology Branch published a memorandum classifying glyphosate as a Category C oncogene.[3] Category C oncogenes are possible human carcinogens with limited evidence of carcinogenicity.

42.     In 1986, the EPA issued a Registration Standard for glyphosate (NTIS PB87-103214), which required additional phytotoxicity, environmental fate, toxicology, product chemistry, and residue chemistry studies. Those data were submitted and reviewed and/or waived.

43.     In October 1991, the EPA published a Memorandum entitled "Second Peer Review of Glyphosate." The memorandum changed glyphosate's classification to Group E (evidence of non-carcinogenicity for humans). Two peer review committee members did not concur with the conclusions of the committee and one member refused to sign.[4]

---

[2] *Monsanto Guilty in 'False Ad' Row*, BBC, Oct. 15, 2009, *available at* http://news.bbc.co.uk/2/hi/europe/8308903.stm.

[3] Consensus Review of Glyphosate, Casewell No. 661A. March 4, 1985. United States Environmental Protection Agency.

[4] Second Peer Review of Glyphosate, CAS No. 1071-83-6. October 30, 1991. United States Environmental Protection Agency.

10

44.    In addition to the toxicity of the active molecule, many studies support the hypothesis that glyphosate formulations found in Defendant's Roundup products are more dangerous and toxic than glyphosate alone.[5] As early as 1991, evidence existed demonstrating that glyphosate formulations were significantly more toxic than glyphosate alone.[6]

45.    In 2002, Julie Marc published a study entitled "Pesticide Roundup Provokes Cell Division Dysfunction at the Level of CDK1/Cyclin B Activation."

46.    The study found that Defendant's Roundup caused delays in the cell cycles of sea urchins, while the same concentrations of glyphosate alone proved ineffective and did not alter cell cycles.

47.    In 2004, Julie Marc published a study entitled "Glyphosate-based pesticides affect cell cycle regulation." The study demonstrated a molecular link between glyphosate-based products and cell cycle dysregulation.

48.    The study noted that "cell-cycle dysregulation is a hallmark of tumor cells and human cancer. Failure in the cell-cycle checkpoints leads to genomic instability and subsequent development of cancers from the initial affected cell." Further, "[s]ince cell cycle disorders such as cancer result from dysfunction of unique cell, it was of interest to evaluate the threshold dose of glyphosate affecting cells."[7]

49.    In 2005, Francisco Peixoto published a study showing that Roundup's effects on rat liver mitochondria are much more toxic and harmful than the same concentrations of glyphosate alone.

---

[5] Martinez, et al. 2007; Benachour 2009; Gasnier, et al. 2010; Peixoto 2005; Marc 2004.
[6] Martinez, et al. 1991.
[7] Molinari, 2000; Stewart, et al., 2003.

11

50.     The Peixoto study suggested that the harmful effects of Roundup on mitochondrial bioenergetics could not be exclusively attributed to glyphosate and could be the result of other chemicals, namely the surfactant POEA, or alternatively due to the possible synergy between glyphosate and Roundup formulation products.

51.     In 2009, Nora Benachour and Gilles-Eric Sarlini published a study examining the effects of Roundup and glyphosate on human umbilical, embryonic, and placental cells.

52.     The study used dilution levels of Roundup and glyphosate far below agricultural recommendations, corresponding with low levels of residues in food. The study concluded that supposed "inert" ingredients, and possibly POEA, change human cell permeability and amplify toxicity of glyphosate alone. The study further suggested that determinations of glyphosate toxicity should take into account the presence of adjuvants, or those chemicals used in the formulation of the complete pesticide. The study confirmed that the adjuvants in Roundup are not inert and that Roundup is always more toxic than its active ingredient glyphosate.

53.     The results of these studies were confirmed in recently published peer-reviewed studies and were at all times available and/or known to Defendant.

54.     Defendant knew or should have known that Roundup is more toxic than glyphosate alone and that safety studies of Roundup, Roundup's adjuvants and "inert" ingredients, and/or the surfactant POEA were necessary to protect Plaintiffs from Roundup.

55.     Defendant knew or should have known that tests limited to Roundup's active ingredient glyphosate were insufficient to prove the safety of Roundup.

56.     Defendant failed to appropriately and adequately test Roundup, Roundup's adjuvants and "inert" ingredients, and/or the surfactant POEA to protect Plaintiffs from Roundup.

57.    Rather than performing appropriate tests, Defendant relied upon flawed industry-supported studies designed to protect Defendant's economic interests, rather than Plaintiffs and the consuming public.

58.    Despite its knowledge that Roundup was considerably more dangerous than glyphosate alone, Defendant continued to promote Roundup as safe.

59.    Both before and after Defendant marketed and obtained approval to market Roundup, Defendant withheld and/or misrepresented to government agencies information relevant to governmental determinations of safety standards or regulations related to Roundup and information that was material and relevant to the performance of Roundup, which was causally related to Plaintiffs' injuries alleged herein.

### *IARC Classification of Glyphosate*

60.    The International Agency for Research on Cancer ("IARC") is the specialized intergovernmental cancer agency that the World Health Organization ("WHO") of the United Nations tasked with conducting and coordinating research into the causes of cancer.

61.    An IARC Advisory Group to Recommend Priorities for IARC Monographs during 2015-2019 met in April 2014. Though nominations for the review were solicited, a substance must meet two criteria to be eligible for review by the IARC Monographs: there must already be some evidence of carcinogenicity of the substance, and there must be evidence that humans are exposed to the substance.

62.    IARC set glyphosate for review in 2015-2016. IARC uses five criteria for determining priority in reviewing chemicals. The substance must have a potential for direct impact on health; scientific literature to support suspicion of carcinogenicity; evidence of significant human exposure; high public interest and/or potential to bring clarity to a controversial area and/or

reduce public anxiety or concern; related agents similar to one given high priority by the above considerations. Data reviewed are sourced preferably from publicly accessible, peer-reviewed data.

63.     On March 24, 2015, after its cumulative review of human, animal, and DNA studies for more than one (1) year, many of which have been in Defendant's possession since as early as 1985, the IARC's working group published its conclusion that the glyphosate contained in Defendant's Roundup herbicide is a Class 2A "probable carcinogen" as demonstrated by the mechanistic evidence of carcinogenicity in humans and sufficient evidence of carcinogenicity in animals.

64.     The IARC's full Monograph was published on July 29, 2015 and established glyphosate as a Class 2A probable carcinogen to humans. According to the authors, glyphosate demonstrated sufficient mechanistic evidence (genotoxicity and oxidative stress) to warrant a 2A classification based on evidence of carcinogenicity in humans and animals.

65.     The IARC working group found an increased risk between exposure to glyphosate and NHL, including several subtypes of NHL, and the increased risk continued after adjustment for other pesticides.

66.     The IARC also found that glyphosate caused DNA and chromosomal damage in human cells.

*Earlier Evidence of Glyphosate's Danger*

67.     Despite the relatively new classification by the IARC, Defendant has had—but covered up—ample evidence of glyphosate and Roundup's genotoxic properties for decades.

68.     Genotoxicity refers to chemical agents that are capable of damaging the DNA within a cell through genetic mutations, which is a process that is believed to lead to cancer.

14

69.     In 1997, Chris Clements published "Genotoxicity of select herbicides in *Rana catesbeiana* tadpoles using the alkaline single-cell gel DNA electrophoresis (comet) assay."

70.     The study found that tadpoles exposed to Roundup showed significant DNA damage when compared with unexposed control animals.

71.     Both human and animal studies have shown that glyphosate and glyphosate-based formulations such as Roundup can introduce oxidative stress.

72.     Oxidative stress and associated chronic inflammation are believed to be involved in carcinogenesis.

73.     The IARC Monograph found that "[s]trong evidence exists that glyphosate, AMPA and glyphosate-based formulations can induce oxidative stress."

74.     In 2006, César Paz-y-Miño published a study examining DNA damage in human subjects exposed to glyphosate.

75.     The study produced evidence of chromosomal damage in blood cells showing significantly greater damage after exposure to glyphosate than before in the same individuals, suggesting that the glyphosate formulation used during aerial spraying had a genotoxic effect on exposed individuals.

76.     The IARC Monograph reflects the volume of evidence of glyphosate pesticides' genotoxicity: "The evidence for genotoxicity caused by glyphosate-based formulations is strong."

77.     Despite knowledge to the contrary, Defendant still deceptively maintains that there is no evidence that Roundup is genotoxic, and that regulatory authorities and independent experts are in agreement that Roundup is not genotoxic.

78.     In addition to glyphosate and Roundup's genotoxic properties, Defendant has long been aware of glyphosate's carcinogenic properties.

15

79.     Glyphosate and Roundup, in particular, have long been associated with carcinogenicity and the development of numerous forms of cancer, including, but not limited, to NHL, Hodgkin's lymphoma, multiple myeloma, and soft tissue sarcoma.

80.     Defendant has known of this association since the early to mid-1980s. Numerous human and animal studies have evidenced the carcinogenicity of glyphosate and/or Roundup.

81.     In 1985, the EPA studied the effects of glyphosate in mice, finding a dose-related response in male mice linked to renal tubal adenomas, a rare tumor. The study concluded the glyphosate was oncogenic.

82.     In 2003, Lennart Hardell and Mikal Eriksson published the results of two case-controlled studies on pesticides as a risk for NHL and hairy cell leukemia.

83.     The study concluded that glyphosate had the most significant relationship to NHL among all herbicides studied with an increased odds ratio of 3.11.

84.     In 2003, AJ De Roos published a study examining the pooled data of mid-western farmers, examining pesticides and herbicides as risk factors for NHL.

85.     The study, which controlled for potential confounders, found a relationship between increased NHL incidence and glyphosate.

86.     In 2008, Mikael Eriksson published a population-based case-control study of exposure to various pesticides as a risk factor for NHL.

87.     This strengthened previous associations between glyphosate and NHL.

88.     In spite of this knowledge, Defendant continued to issue broad and sweeping statements suggesting that Roundup was, and is, safer than ordinary household items such as table salt, despite a lack of scientific support for the accuracy and validity of these statements and, in fact, voluminous evidence to the contrary.

16

89.     Upon information and belief, Defendant made these statements and representations with the intent of inducing Plaintiff, the agricultural community and the public at large to purchase and increase the use of Defendant's Roundup for Defendant's pecuniary gain, and did, in fact, induce Plaintiff to use Roundup.

90.     Defendant made these statements with complete disregard and reckless indifference to the safety of Plaintiff and the general public.

91.     Notwithstanding Defendant's representations, scientific evidence has established a clear association between glyphosate and genotoxicity, inflammation, and an increased risk of many cancers, including, but not limited to, NHL, multiple myeloma, and soft tissue sarcoma.

92.     Defendant knew or should have known that glyphosate is associated with an increased risk of developing cancer, including, but not limited to, NHL, multiple myeloma, and soft tissue sarcomas.

93.     Defendant failed to appropriately and adequately inform and warn Plaintiff of the serious and dangerous risks associated with the use of and exposure to glyphosate and/or Roundup, including, but not limited to, the risk of developing NHL, as well as other severe and personal injuries, which are permanent and/or long-lasting in nature, cause significant physical pain and mental anguish, diminished enjoyment of life, loss of consortium, and the need for medical treatment, monitoring and/or medications.

94.     Despite the IARC's classification of glyphosate as a Class 2A probable carcinogen, Defendant continues to maintain that glyphosate and/or Roundup is safe, non-carcinogenic, non-genotoxic, and falsely warrant to users and the general public that independent experts and regulatory agencies agree that there is no evidence of carcinogenicity or genotoxicity in glyphosate and Roundup.

95.    Defendant has claimed and continues to claim that Roundup is safe, non-carcinogenic, and non-genotoxic.

96.    Defendant claims on its own website, accessible in the State of Oklahoma, that "[r]egulatory authorities and independent experts around the world have reviewed numerous long-term/carcinogenicity and genotoxicity studies and agree that there is no evidence that glyphosate, the active ingredient in Roundup® brand herbicides and other glyphosate-based herbicides, causes cancer, even at very high doses, and that it is not genotoxic."[8]

97.    Ironically, the primary source for Defendant's statement is a 1986 report by the WHO, the same organization that now has found and declared glyphosate to be a probable carcinogen.

98.    Glyphosate, and Defendant's Roundup products in particular, have long been associated with serious side effects and many regulatory agencies around the globe have banned or are currently banning the use of glyphosate herbicide products.

99.    Defendant's statements proclaiming the safety of Roundup and disregarding its dangers misled Plaintiff.

100.    Despite Defendant's knowledge that Roundup was associated with an elevated risk of developing cancer, Defendant's promotional campaigns focused on Roundup's purported "safety profile."

101.    Defendant's failure to adequately warn Plaintiffs resulted in: (1) Mr. Grubb using and being exposed to glyphosate and Roundup instead of using another acceptable and safe method of controlling unwanted plants, weeds and pests; and (2) scientists and physicians failing to warn

---

[8] MONSANTO.COM, *Backgrounder – Glyphosate: No Evidence of Carcinogenicity* (Nov. 2014), *available at* https://monsanto.com/app/uploads/2017/06/no-evidence-of-carcinogenicity.pdf.

and instruct consumers about the risk of cancer, including NHL, and other injuries associated with Roundup.

102.    Defendant failed to seek modification of the labeling of Roundup to include relevant information regarding the risks and dangers associated with Roundup exposure.

103.    Defendant's failure to appropriately warn and inform the EPA of information known to Defendant that was material and relevant to the performance of Roundup, which is causally related to Plaintiffs' injuries alleged herein, has resulted in: (a) inadequate warnings in safety information presented directly to users and consumers; (b) the absence of warning or caution statements that are adequate to protect health and the environment; and (c) directions for use that are not adequate to protect health and the environment.

104.    By reason of the foregoing acts and omissions, Plaintiffs seek compensatory damages as a result of Mr. Grubb's use of, and exposure to, Roundup which caused and/or was a substantial contributing factor in causing Mr. Grubb to suffer from cancer, specifically NHL, and Mr. Grubb suffered severe and personal injuries which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life. Likewise, by reason of the foregoing acts and omissions, Mrs. Grubb has suffered from the loss of consortium.

105.    By reason of the foregoing, Plaintiffs are severely and permanently injured.

106.    By reason of the foregoing acts and omissions, Plaintiffs have endured and, in some categories, continue to suffer, emotional and mental anguish, medical expenses, and other economic and non-economic damages, as a result of the actions and inactions of Defendant.

### *Plaintiff's Exposure to, and Harm from, Defendant's Roundup*

107.    Plaintiff, Mr. Grubb, began using Roundup in substantial quantities in the late 1980s and consistently through the decades that followed to eradicate weeds and otherwise treat

the grounds of commercial properties, farmland and crops owned by Mr. Grubb and/or his family across the State of Oklahoma, including in at least Oklahoma and Custer Counties.

108.    Over this period, Mr. Grubb sprayed Roundup in substantial quantities on a regular and consistent basis to treat said properties. Mr. Grubb followed all safety and precautionary warnings of which he had been warned or notified during the course of use.

109.    Mr. Grubb subsequently developed a large lump under his right arm and suffered from severe fatigue and flu-like symptoms. After obtaining a biopsy of the growth that had developed on his body, Mr. Grubb was diagnosed with Diffuse Large B-Cell Lymphoma—a deadly (B-Cell) subtype of NHL.

110.    As a result of Mr. Grubb's injuries, Plaintiffs have incurred significant economic and non-economic damages.

### *Tolling of Any Statute of Limitations*

111.    Plaintiffs expressly incorporate by reference all prior paragraphs of this Complaint as if fully set forth herein.

112.    The running of any statute of limitations has been tolled by reason of Defendant's fraudulent concealment. Defendant, through its affirmative misrepresentations and omissions, actively concealed from Plaintiffs the true risks associated with Roundup and glyphosate. Indeed, even as of today, Defendant continues to misrepresent to the public that "[s]cientists are in agreement that there is no evidence glyphosate causes cancer."[9]

113.    As a result of Defendant's actions, Plaintiffs were unaware, and could not reasonably have known or learned through reasonable diligence, that Roundup and/or glyphosate

---

[9] MONSANTO.COM, *Backgrounder – Glyphosate: No Evidence of Carcinogenicity* (Nov. 2014), *available at* https://monsanto.com/app/uploads/2017/06/no-evidence-of-carcinogenicity.pdf.

contact exposed Plaintiffs to the risks alleged herein and that those risks were the direct and proximate result of Defendant's acts and omissions.

114.    Moreover, as a result of Defendant's affirmative acts of concealment and dissemination of misinformation, upon being diagnosed with NHL, Mr. Grubb was unaware, and could not reasonably have known or learned through reasonable diligence, that his contact with Roundup and/or glyphosate had caused, or otherwise been a substantial factor in causing, his development of this disease. To the contrary, Plaintiffs acted fairly and with reasonable diligence in attempting to discover the acts or omissions that give rise to their claims alleged herein—those perpetrated by Defendant in secrecy over the course of the past four (4) decades.

115.    Furthermore, Defendant is estopped from relying on any statute of limitations because of the Defendant's fraudulent concealment of the true character, quality and nature of Roundup and/or glyphosate. Defendant was under a duty to disclose the true character, quality, and nature of Roundup because Defendant had and continues to have exclusive control over this non-public information, and because Defendant knew that this information was not available to Plaintiffs or to distributors or other users and/or consumers of Roundup.

116.    Plaintiffs had no knowledge, and had no reason to know, that Defendant was engaged in the wrongdoing alleged herein. Because of the fraudulent acts of concealment and wrongdoing by Defendant, Plaintiffs could not have reasonably discovered Defendant's wrongdoing at any time prior. Moreover, the economics of this fraudulent concealment should be considered. Defendant had the ability to and did spend enormous amounts of money in furtherance of Defendant's purpose of marketing, promoting and/or distributing a profitable herbicide, notwithstanding the known or reasonably known risks. Plaintiffs and medical professionals could not have afforded and could not have possibly conducted studies to determine the nature, extent,

and identity of related health risks, and were forced to rely on only the Defendant's representations. Accordingly, Defendant is precluded by tolling doctrines, including the discovery rule, equitable estoppel, fraudulent concealment, and/or any other legal or equitable doctrines that account for any basic notion of fairness and/or public health and safety, from relying upon any statute of limitations to avoid or limit liability for Plaintiffs' claims alleged herein.

## FIRST CAUSE OF ACTION
## (NEGLIGENCE)

117.   Plaintiffs repeat, reiterate, and re-allege each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth and quoted verbatim herein.

118.   Defendant had a duty to exercise reasonable care in the designing, researching, testing, manufacturing, marketing, supplying, promoting, packaging, advertising, sale, quality assurance, quality control and/or distribution of Roundup into the stream of commerce, including a duty to assure that Roundup would not cause users to suffer unreasonable, dangerous side effects.

119.   Defendant failed to exercise ordinary or reasonable care in the designing, researching, testing, manufacturing, marketing, supplying, promoting, packaging, advertising, sale, quality assurance, quality control and/or distribution of Roundup into interstate commerce.

120.   Defendant knew or should have known that using Roundup created a high risk of unreasonable, dangerous side effects, including, but not limited to, the development of NHL, as well as other severe and personal injuries that are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life and loss of consortium, as well as the need for lifelong medical treatment, monitoring and/or medications.

121.   The negligence by Defendant, its agents, servants, and/or employees, included, but was not limited to, at least the following specific acts and/or omissions:

a.   Manufacturing, producing, promoting, formulating, creating, and/or designing Roundup without thoroughly or adequately testing it;

b.   Failing to test Roundup and/or failing to adequately, sufficiently and properly test Roundup;

c.   Not conducting sufficient testing programs to determine whether or not Roundup was in fact safe for use, despite the fact that Defendant knew or should have known that Roundup was unsafe and unfit for use by reason of the dangers to its users;

d.   Not conducting sufficient testing programs and studies to determine Roundup's carcinogenic properties even after Defendant had knowledge that Roundup is, was, or could be carcinogenic;

e.   Failing to conduct sufficient testing programs to determine the safety of "inert" ingredients and/or adjuvants contained within Roundup, and the propensity of these ingredients to render Roundup toxic, increase the toxicity of Roundup, whether these ingredients are carcinogenic, magnify the carcinogenic properties of Roundup, and whether or not "inert" ingredients and/or adjuvants were safe for use;

f.   Negligently failing to adequately, appropriately and correctly warn Plaintiffs, the public, the medical and agricultural professions and communities, and the EPA of the dangers of Roundup;

g.   Negligently failing to petition the EPA to strengthen the warnings associated with Roundup;

h.   Failing to provide adequate cautions and warnings to protect the health of users, handlers, applicators, and persons who would reasonably and foreseeably come into contact with Roundup;

i.   Negligently marketing, advertising, and recommending the use of Roundup without sufficient knowledge as to its dangerous propensities;

j.   Negligently representing that Roundup was safe for use for its intended purpose, and/or that Roundup was safer than ordinary and common items such as table salt, when, in fact, it was unsafe and Defendant knew or should have known it;

23

k.  Negligently representing that Roundup had equivalent safety and efficacy as other forms of herbicides;

l.  Negligently designing Roundup in a manner that was dangerous to its users;

m.  Negligently manufacturing Roundup in a manner that was dangerous to its users;

n.  Negligently producing Roundup in a manner that was dangerous to its users;

o.  Negligently formulating Roundup in a manner that was dangerous to its users;

p.  Concealing information from Plaintiffs and the public, while knowing that Roundup was unsafe, dangerous and/or non-conforming with EPA regulations;

q.  Improperly concealing from and/or misrepresenting information to Plaintiffs, scientific and medical professionals, and/or the EPA concerning the severity of risks and dangers of Roundup compared to other forms of herbicides; and

r.  Negligently selling Roundup with a false and misleading label.

122.    Defendant under-reported, underestimated, and downplayed the serious dangers of exposure to Roundup for decades, and continue to do so today.

123.    Defendant negligently and deceptively compared the safety risks and/or dangers of Roundup with common everyday foods, such as table salt, and other forms of herbicides.

124.    Defendant was negligent and/or violated Oklahoma law in the designing, researching, supplying, manufacturing, promoting, packaging, distributing, testing, advertising, warning, marketing, and selling of Roundup in that Defendant:

a.  Failed to use ordinary care in designing and manufacturing Roundup so as to avoid the aforementioned risks to individuals when Roundup was used as an herbicide;

b.  Failed to accompany Defendant's products with proper and/or accurate warnings regarding all possible adverse side effects associated with the use of and exposure to Roundup;

24

    c.  Failed to accompany Defendant's products with proper warnings regarding all possible adverse side effects concerning the failure and/or malfunction of Roundup;

    d.  Failed to accompany Defendant's products with accurate or sufficient warnings regarding the risks of all possible adverse side effects concerning Roundup;

    e.  Failed to warn Plaintiffs of the severity and duration of such adverse effects, as the warnings given did not accurately reflect the symptoms, or severity of the side effects including, but not limited to, the development of cancer, including NHL;

    f.  Failed to conduct adequate testing, clinical testing and post-marketing surveillance to determine the safety of Roundup;

    g.  Failed to conduct adequate testing, clinical testing, and post-marketing surveillance to determine the safety of Roundup's "inert" ingredients and/or adjuvants;

    h.  Negligently misrepresented the evidence of Roundup's genotoxicity and carcinogenicity; and

    i.  Were otherwise careless and/or negligent in the sale and distribution of Roundup.

125.    Despite the fact that Defendant knew or should have known that Roundup caused, or could cause, unreasonably dangerous side effects, Defendant continued and continues to market, manufacture, distribute, promote, and/or sell Roundup to consumers, including Plaintiffs.

126.    Defendant knew or should have known that individuals and users of Roundup, such as Plaintiffs, would foreseeably suffer injury as a result of Defendant's failure to exercise ordinary care, as set forth above.

127.    Defendant's violations of law and/or negligence were the proximate cause of Plaintiffs' injuries, harm, economic loss and non-economic loss, which Plaintiffs suffered and/or will continue to suffer.

25

128.    As a result of the foregoing acts and omissions, Mr. Grubb specifically suffered from serious and dangerous side effects including, but not limited to, developing, suffering from and being diagnosed with NHL, as well as other severe and personal injuries which are permanent and lasting in nature, physical pain and mental anguish, diminished enjoyment of life, and financial expenses for medical care.

129.    Further, Mr. and Mrs. Grubb were married at the time Mr. Grubb sustained the injuries set forth above. As a result of the injuries sustained by Mr. Grubb, Mrs. Grubb also sustained a loss of her right of consortium.

130.    At all relevant times herein, Plaintiffs acted with ordinary care and followed all safety and precautionary warnings of which they were notified in the course of use of Roundup.

## SECOND CAUSE OF ACTION
## (GROSS NEGLIGENCE)

131.    Plaintiffs repeat, reiterate, and re-allege each and every allegation of this Petition contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth and quoted verbatim herein.

132.    Defendant's acts and omissions set forth above constitute and amount to gross negligence in that Defendant's conduct was in reckless disregard of the rights of others, including Plaintiffs, as Defendant was either aware, or did not care, that there was a substantial and unnecessary risk that Defendant's conduct would cause serious injury to others.

133.    Defendant's conduct in this regard was unreasonable under the circumstances, and there was a high probability that Defendant's conduct would cause serious harm to another person, including Plaintiffs.

26

134.   As a result of Defendant's reckless actions, Mr. Grubb specifically suffered from serious and dangerous side effects including, but not limited to, developing, suffering from and being diagnosed with NHL, as well as other severe and personal injuries which are permanent and lasting in nature, physical pain and mental anguish, diminished enjoyment of life, and financial expenses for medical care. Further, as a result of the injuries sustained by Mr. Grubb, Mrs. Grubb also sustained a loss of her right of consortium.

135.   As a result of Defendant's acts in reckless disregard of the rights of others, Defendant should be punished and made an example for other potential malfeasors through an award of exemplary or punitive damages.

### THIRD CAUSE OF ACTION
### (STRICT PRODUCTS LIABILITY – DESIGN DEFECT)

136.   Plaintiffs repeat, reiterate, and re-allege each and every allegation of this Petition contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth and quoted verbatim herein.

137.   At all times herein mentioned, Defendant designed, researched, manufactured, tested, advertised, promoted, sold, distributed, and/or owned otherwise acquired the persons who designed, researched, tested, advertised, promoted, marketed, sold and distributed Roundup as hereinabove described that was used by Plaintiff, Mr. Grubb.

138.   Defendant's Roundup was expected to and did reach the usual consumers, handlers, users and persons coming into contact with said product without substantial or material change in the condition in which it was produced, manufactured, sold, distributed, promoted and marketed by Defendant.

27

139.   At those times, Roundup was in an unsafe, defective, and inherently dangerous condition, which was dangerous to users, and in particular, Plaintiffs herein.

140.   The Roundup that Defendant designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed was defective in design or formulation in that, when it left the hands of the manufacturer and/or suppliers, the foreseeable risks exceeded the benefits associated with the design or formulation of Roundup.

141.   The Roundup that Defendant designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed was defective in design and/or formulation, in that, when it left the hands of Defendant, it was unreasonably dangerous, unreasonably dangerous in normal use, and more dangerous than an ordinary user or consumer would expect.

142.   At all times herein mentioned, Roundup was in a defective condition and unsafe, and Defendant knew or had reason to know that said product was defective and unsafe, especially when used in the form and manner as provided by Defendant. In particular, Defendant's Roundup was defective in at least the following ways:

   a.   When placed in the stream of commerce, Defendant's Roundup products were defective in design and formulation and, consequently, dangerous to an extent beyond that which an ordinary user or consumer would anticipate;

   b.   When placed in the stream of commerce, Defendant's Roundup products were unreasonably dangerous in that they were hazardous and posed a grave risk of cancer, including NHL, and other serious illnesses when used in a reasonably anticipated manner;

   c.   When placed in the stream of commerce, Defendant's Roundup products contained unreasonably dangerous design defects and were not reasonably safe when used in a reasonably anticipated manner;

   d.   Defendant did not sufficiently test, investigate, or study its Roundup products or their safety;

28

e.  Exposure to Roundup presents a risk of harmful side effects that outweigh any potential utility stemming from the use of the herbicide;

f.  Defendant knew or should have known at the time of marketing and promoting its Roundup products that exposure to Roundup could result in cancer, including NHL, and other severe illnesses and injuries; and

g.  Defendant did not conduct adequate post-marketing surveillance of its Roundup products.

143.    Defendant knew, or should have known, that at all times herein mentioned, its Roundup was in a defective condition, and was and is inherently dangerous and unsafe.

144.    Plaintiff, Mr. Grubb, was exposed to Defendant's Roundup in the course of his work, employment, and personal life, duties and obligations, as described above, without knowledge of Roundup's dangerous characteristics.

145.    At the time of Mr. Grubb's use of and exposure to Roundup, Roundup was being used for the purposes and in a manner normally intended, as a broad-spectrum herbicide.

146.    Defendant, with this knowledge, voluntarily designed its Roundup with a dangerous condition for use by the public, and in particular, Mr. Grubb.

147.    Defendant had a duty to create a product that was not unreasonably dangerous for its normal, intended use. But Defendant created a product that was and is unreasonably dangerous for its normal, intended use.

148.    Defendant marketed and promoted a product in such a manner so as to make it inherently defective, as Defendant downplayed the suspected, probable, and established health risks inherent with its product's normal, intended use.

149.    The Roundup that Defendant designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed was manufactured defectively in that

Roundup left the hands of Defendant in a defective condition and was unreasonably dangerous to its intended users.

150.    The Roundup that Defendant designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed reached Defendant's intended users, including Mr. Grubb, in the same defective and unreasonably dangerous condition in which Defendant's Roundup was manufactured.

151.    Defendant designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed a defective product, which created an unreasonable risk to the health of users and consumers, and Mr. Grubb in particular. Defendant is therefore strictly liable for the injuries sustained by Plaintiffs.

152.    Plaintiffs could not, by the exercise of reasonable care, have discovered Roundup's defects herein mentioned or otherwise perceived its true danger.

153.    By reason of the foregoing, Defendant has become strictly liable to Plaintiffs for the manufacturing, marketing, promoting, distribution, and selling of a defective product, Roundup.

154.    Defendant's defective design of Roundup amounts to willful, wanton and/or reckless conduct by Defendant, for which an award of exemplary or punitive damages is necessary and appropriate under Oklahoma law.

155.    Defects in Defendant's Roundup were the cause or a substantial factor in causing Plaintiffs' injuries.

156.    As a result of the foregoing acts and omissions, Mr. Grubb specifically suffered from serious and dangerous side effects including, but not limited to, developing, suffering from and being diagnosed with NHL, as well as other severe and personal injuries which are permanent

30

and lasting in nature, physical pain and mental anguish, diminished enjoyment of life, and financial expenses for medical care.

157.    Further, as a result of the injuries sustained by Mr. Grubb, Mrs. Grubb also sustained a loss of her right of consortium.

## FOURTH CAUSE OF ACTION
## (STRICT PRODUCTS LIABILITY – FAILURE TO WARN)

158.    Plaintiffs repeat, reiterate, and re-allege each and every allegation of this Petition contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth and quoted verbatim herein.

159.    Defendant has engaged in the business of selling, testing, distributing, supplying, manufacturing, marketing, advertising, and/or promoting Roundup, and through that conduct has knowingly and intentionally placed Roundup into the stream of commerce with full knowledge that it reaches users and consumers, such as Mr. Grubb, who are exposed to it through ordinary and reasonably foreseeable uses.

160.    Defendant did in fact sell, distribute, supply, manufacture, advertise, and/or promote Roundup to Plaintiffs. Additionally, Defendant expected the Roundup that Defendant was selling, distributing, supplying, manufacturing, advertising and/or promoting to reach – and Roundup did in fact reach – ordinary users and consumers, including Mr. Grubb, without any substantial change in the condition of product from when it was initially distributed by Defendant.

161.    At the time of manufacture, Defendant could have and should have provided the warnings or instructions regarding the full and complete risks Roundup and glyphosate-containing products because Defendant knew or should have known of the unreasonable risks of harm associated with the use of and/or exposure to such products.

162.    At all times herein mentioned, the aforesaid product was defective and unsafe in manufacture such that it was unreasonably dangerous to the user at the time it was distributed by Defendant and at the time Plaintiff, Mr. Grubb, used and was exposed to and/or ingested the product. The defective condition of Roundup was due at least in part to the fact that it was not accompanied by proper warnings regarding its carcinogenic qualities and possible side effects, including, but not limited to developing cancer—*i.e.*, NHL—as a result of exposure and use.

163.    Defendant's Roundup did not contain a warning or caution statement, which was necessary and, if complied with, was adequate to protect the health of those exposed to it.

164.    Defendant's failure to include a warning or caution statement, which was necessary and, if complied with, was adequate to protect the health of those exposed, violated the laws of the State of Oklahoma.

165.    Defendant could have amended the label of Roundup to provide additional and sufficient warnings.

166.    This defect caused serious injury to Plaintiff, Mr. Grubb, who used Roundup in its intended and foreseeable manner.

167.    At all times herein mentioned, Defendant had a duty to properly design, manufacture, compound, test, inspect, package, label, distribute, market, examine, maintain supply, provide proper warnings, and take such steps to assure that Defendant's Roundup products did not cause users or those exposed to it to suffer from unreasonable and dangerous side effects.

168.    Defendant labeled, distributed, marketed and promoted Roundup products that were dangerous and unsafe for the use and purpose for which the products were intended.

169.    Defendant failed to warn of the nature and scope of the side effects associated with Roundup, namely its carcinogenic properties and its propensity to cause or serve as a substantial contributing factor in the development of NHL.

170.    Defendant was aware of the probable consequences of the aforesaid conduct. Despite the fact that Defendant knew or should have known that Roundup caused serious injuries, Defendant failed to exercise reasonable care to warn of the dangerous carcinogenic properties and side effect of developing cancer, including NHL, from Roundup exposure, even though these side effects were known or reasonably scientifically knowable at the time of distribution.

171.    Defendant willfully, deliberately and recklessly failed to avoid the consequences associated with Defendant's failure to warn, and in doing so, Defendant acted with a conscious disregard for the safety of Plaintiffs and others.

172.    Defendant's failure to warn of the nature and scope of the side effects associated with Roundup amounts to willful, wanton and/or reckless conduct by Defendant, for which an award of exemplary or punitive damages is necessary and appropriate under Oklahoma law.

173.    At the time of exposure, Plaintiff, Mr. Grubb, could not have reasonably discovered any defect in Roundup through the exercise of reasonable care.

174.    Defendant, as the manufacturer and/or distributor of the subject product, is held to the level of knowledge of an expert in the field.

175.    Plaintiffs reasonably relied upon the skill, superior knowledge, and judgment of Defendant.

176.    Had Defendant properly disclosed the risks associated with Roundup, Plaintiffs would have avoided the risk of NHL by not using Roundup.

177.    The information that Defendant did provide, disseminate and/or communicate failed to contain adequate warnings and precautions that would have enabled Plaintiffs, and similarly situated individuals, to utilize the product safely and with adequate protection.

178.    Instead, Defendant disseminated information that was inaccurate, false, and misleading and which failed to communicate accurately or adequately the comparative severity, duration, and extent of the risk of injuries associated with use of and/or exposure to Roundup and glyphosate; continued to promote the efficacy of Roundup, even after it knew or should have known of the unreasonable risks from use or exposure; and concealed, downplayed, and otherwise suppressed, through aggressive marketing and promotion, any information or research about the risks and dangers of exposure to Roundup and glyphosate.

179.    To this day, Defendant has failed to adequately warn of the true risk of Plaintiffs' injuries associated with the use of and exposure to Roundup.

180.    As a result of its inadequate warnings, Defendant's Roundup products were defective and unreasonably dangerous when they left the possession and/or control of Defendant, were distributed by Defendant, and were used by Plaintiff, Mr. Grubb.

181.    As a direct and proximate result of Defendant's actions and omissions as alleged herein, and in such other ways to be shown at trial, the subject product caused Plaintiffs to sustain injuries as alleged herein.

### FIFTH CAUSE OF ACTION
### (BREACH OF IMPLIED WARRANTIES)

182.    Plaintiffs repeat, reiterate, and re-allege each and every allegation of this Petition contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth and quoted verbatim herein.

183.    At all times herein mentioned, Defendant manufactured, distributed, compounded, recommended, merchandized, advertised, promoted, and sold Roundup and/or owned or otherwise acquired the entities that manufactured, compounded, distributed, recommended, merchandized, advertised, promoted and sold Roundup, as a broad-spectrum herbicide. These actions were under the ultimate control and supervision of Defendant.

184.    At the time Defendant marketed, sold, and distributed Roundup for use by Plaintiff, Mr. Grubb, Defendant knew of Roundup's intended use and impliedly warranted the product to be of merchantable quality and safe and fit for this use.

185.    Defendant impliedly warranted to Plaintiff, Mr. Grubb, and other users of Roundup, the agricultural community, the medical profession, and/or the EPA that Roundup was safe and of merchantable quality and fit for the ordinary purpose for which it was to be used.

186.    These representations and warranties were false, misleading, and inaccurate because Roundup was unsafe, unreasonably dangerous, not of merchantable quality, defective, and unfit for the ordinary purpose for which it was to be used. And Defendant knew it.

187.    Plaintiffs and/or the EPA did rely on said implied warranties.

188.    Plaintiffs reasonably relied upon the skill and judgment of Defendant as to whether Roundup was of merchantable quality and safe and fit for its intended use.

189.    Defendant injected Roundup into the stream of commerce in a defective, unsafe, and inherently dangerous condition. Defendant expected the product's materials to reach users, handlers, and persons coming into contact with said products without substantial change in the condition in which they were sold. Roundup's materials did reach users, handlers and others, including Plaintiff, Mr. Grubb, without substantial change in the condition in which they were sold.

35

190.   Defendant breached the aforesaid implied warranties, as its herbicide Roundup was not fit for its intended purposes and uses.

191.   Defendant's acts and omissions amount to willful, wanton and/or reckless conduct by Defendant, for which an award of exemplary or punitive damages is necessary and appropriate under Oklahoma law

192.   As a result of the foregoing acts and omissions, Mr. Grubb specifically suffered from serious and dangerous side effects including, but not limited to, developing, suffering from and being diagnosed with NHL, as well as other severe and personal injuries which are permanent and lasting in nature, physical pain and mental anguish, diminished enjoyment of life, and financial expenses for medical care.

193.   Further, as a result of the injuries sustained by Mr. Grubb, Mrs. Grubb also sustained a loss of her right of consortium.

## DEMAND FOR JURY TRIAL

194.   Plaintiffs hereby demand trial by jury as to all facts, issues, claims and causes of action pled and set forth herein.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs demand judgment against Defendant on each of the above-referenced claims and causes of action, including at least as follows:

(a)   Awarding compensatory damages to Plaintiffs for non-economic damages, including, but not limited to, pain, suffering, emotional distress, lost consortium, loss of enjoyment of life, and other non-economic damages in an amount to be determined at trial;

(b)   Awarding compensatory damages to Plaintiffs for past and future damages, including but limited to, pain and suffering and for severe and permanent personal injuries

36

sustained by Plaintiffs, including health care costs and economic loss in an amount to be determined at trial;

     (c)     Awarding economic damages to Plaintiffs in the form of medical expenses, out-of-pocket expenses, lost earnings and other economic damages in an amount to be determined at trial;

     (d)     Awarding punitive and/or exemplary damages for the wanton, willful and reckless acts and omissions of Defendant, who has exhibited a complete disregard and reckless indifference for the safety and welfare of the general public and to Plaintiffs in an amount sufficient to punish Defendant and deter future similar misconduct, to the maximum extent and in the maximum amount allowed by applicable law;

     (e)     Awarding Plaintiffs pre-judgment interest, post-judgment interest, reasonable attorneys' and experts fees, litigation costs and costs of proceedings, to the extent allowed by applicable law; and

     (f)     Awarding such other and further relief as Plaintiffs may be entitled to by law or equity.

**JURY TRIAL DEMANDED**
**ATTORNEY'S LIEN CLAIMED**

DATED:     November 20, 2020

               */s/ Michael Burrage*
               Michael Burrage, OBA No. 1350
               Reggie Whitten, OBA No. 9576
               **WHITTEN BURRAGE**
               512 N. Broadway Ave., Suite 300
               Oklahoma City, OK 73102
               Telephone:    (405) 516-7800
               Facsimile:    (405) 516-7859
               mburrage@whittenburragelaw.com
               rwhitten@whittenburragelaw.com

37

Bradley E. Beckworth, OBA No. 19982
Jeffrey J. Angelovich, OBA No. 19981
Cody L. Hill, TX Bar No. 24095836
**NIX PATTERSON, LLP**
3600 N. Capital of Texas Hwy.
Bldg. B, Suite 350
Austin, TX 78746
Telephone:     (512) 328-5333
Facsimile:     (512) 328-5335
bbeckworth@nixlaw.com
jangelovich@nixlaw.com
codyhill@nixlaw.com

Eric J. Groves, OBA No. 3643
Groves & Associates
3601 N. Classen Boulevard, Suite 207
Oklahoma City, OK 73118
Telephone:     (405) 236-5303
Facsimile:     (405) 236-5309
ejg777@aol.com

**ATTORNEYS FOR PLAINTIFFS**