JURY,MDL

# U.S. District Court
## District of South Carolina (Charleston)
## CIVIL DOCKET FOR CASE #: 2:20-cv-04302-MDL

Kay et al v. Monsanto Company

Assigned to: Unassigned - MDL

Cause: 28:1332 Diversity-Product Liability

Date Filed: 12/11/2020

Jury Demand: Plaintiff

Nature of Suit: 365 Personal Inj. Prod. Liability

Jurisdiction: Diversity

**Plaintiff**

**Linda Kay**

represented by **Cameron L Marshall**
Cameron L Marshall Law Office
7 Gamecock Avenue
Suite 707
Charleston, SC 29407
843-795-2298
Email: cameron@attorneymarshall.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Todd Kay**

represented by **Cameron L Marshall**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Monsanto Company**

| Date Filed | # | Docket Text |
|---|---|---|
| 12/11/2020 | 1 | COMPLAINT against Monsanto Company ( Filing fee $ 402 receipt number 0420-9526200.), filed by Linda Kay, Todd Kay. Service due by 3/11/2021(jbry, ) (Entered: 12/14/2020) |
| 12/11/2020 | 2 | Local Rule 26.01 Answers to Interrogatories by Linda Kay, Todd Kay.(jbry, ) (Entered: 12/14/2020) |
| 12/17/2020 | 4 | Summons Issued as to Monsanto Company. (jbry, ) (Entered: 12/17/2020) |

| PACER Service Center |
|---|
| Transaction Receipt |
| 12/28/2020 15:29:29 |

12/28/2020

| PACER Login: | hllp1982:2634105:4722683 | Client Code: | 1417.0049 |
| --- | --- | --- | --- |
| Description: | Docket Report | Search Criteria: | 2:20-cv-04302-MDL |
| Billable Pages: | 1 | Cost: | 0.10 |

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | | |
|---|---|---|
| LINDA KAY,<br>TODD KAY, | ) | C.A. No.: 2:20-cv-04302-MDL |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| -versus- | ) | **COMPLAINT** |
| | ) | **(JURY TRIAL DEMANDED)** |
| MONSANTO COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

Plaintiffs, Linda Kay and Todd Kay, by and through undersigned counsel, bring this

Complaint for damages against Defendant, Monsanto Company, and state as follows:

## INTRODUCTION

1.      In 1970, Defendant Monsanto Company, Inc. ("Monsanto") discovered the herbicidal

properties of glyphosate and in 1974 began marketing it in products under the brand name

Roundup®. In addition to the active ingredient glyphosate, Roundup® contains surfactant

Polyehoxylated tallow amine ("POEA") and/or adjuvants and other so-called "inert" ingredients.

2.      Glyphosate, the active ingredient in Roundup®, is a broad-spectrum herbicide used to kill

weeds that commonly compete with crops. Glyphosate is a "non-selective" herbicide, meaning it

kills indiscriminately based only on whether a given organism produces a specific enzyme, 5-

enolpryuvylshikimic acid-3-phosate synthase, known as "EPSP synthase." Glyphosate inhibits

this enzyme and interferes with the shikimic pathway in plants, resulting in the accumulation of

shikimic acid in plant tissue and ultimately plant death. When sprayed as a liquid, plants absorb

glyphosate directly through their leaves, stems and roots, and detectable quantities accumulate in

the plants' tissues.

3.      Between 2012 and 2016, approximately 281 million pounds of glyphosate was applied

annually to 298 million agricultural acres and approximately 24 million pounds of glyphosate

was annually applied to non-agricultural acreage.[1] Today, glyphosate herbicides are among the

most widely used herbicides in the world.[2] Consumers and farmers have used Roundup® for

nearly 40 years, while unaware of its carcinogenic properties and long-term health consequences.

## PARTIES

4.      Defendant Monsanto Company is a corporation created under the laws of the State of

Delaware with its headquarters and principal place of business located in St. Louis, Missouri.

5.      Defendant is a multinational agricultural biotechnology corporation and is the world's

leading producer of glyphosate.

6.      "Roundup" refers to all formulations of Defendant's Roundup products, including, but

not limited to, Roundup Concentrate Poison Ivy and Tough Brush Killer 1, Roundup Custom

Herbicide, Roundup D-Pak Herbicide, Roundup Dry Concentrate, Roundup Export Herbicide,

Roundup Fence & Hard Edger 1, Roundup Garden Foam Weed & Grass Killer, Roundup Grass

and Weed Killer, Roundup Herbicide, Roundup Original 2k Herbicide, Roundup Original II

Herbicide, Roundup Pro Concentrate, Roundup Pro Dry Herbicide, Roundup Promax, Roundup

Quik Stik Grass and Weed Killer, Roundup Quikpro Herbicide, Roundup Rainfast Concentrate

Weed & Grass Killer, Roundup Rainfast Super Concentrate Weed & Grass Killer, Roundup

Ready-to-Use Extended Control Weed & Grass Killer 1 Plus Weed Preventer, Roundup Ready-

to- Use Weed & Grass Killer, Roundup Ready-to-Use Weed and Grass Killer 2, Roundup Ultra

---

[1] U.S. Envtl. Prot. Agency, *Glyphosate Interim Registration Review Decision January 2020* (2020), available at https://www.epa.gov/sites/production/files/2020-01/documents/glyphosate-interim-reg-review-decision-case-num-0178.pdf.

[2] Monsanto, *Backgrounder-History of Monsato's Glyphosate Herbicides* (June 2005), available at https://www.monsanto.com/app/uploads/2017/06/back_history.pdf.

Dry, Roundup Ultra Herbicide, Roundup Ultramax, Roundup VM Herbicide, Roundup Weed & Grass Killer Concentrate, Roundup Weed & Grass Killer Concentrate Plus, Roundup Weed & Grass Killer Ready-to-Use Plus, Roundup Weed & Grass Killer Super Concentrate, Roundup Weed & Grass Killer 1 Ready-to-Use, Roundup WSD Water Soluble Dry Herbicide Deploy Dry Herbicide, or any other formulation of containing the active ingredient glyphosate.

7.      Plaintiff Linda Kay (hereinafter "Mrs. Kay" and "Linda Kay") is a natural person, a citizen of the State of South Carolina and resident of Charleston County, South Carolina.

8.      For decades, Mrs. Kay was continuously exposed to Roundup® in and near Charleston County, South Carolina. As a direct and proximate result of Roundup® exposure, Plaintiff developed and continues to suffer Follicular B-Cell Lymphoma, a slow-growing type of non-Hodgkins Lymphoma ("NHL").

9.      Plaintiff Todd Kay (hereinafter "Mr. Kay" and "Todd Kay") is a natural person, a citizen of the State of South Carolina, and a resident of Charleston County, South Carolina.

10.      Todd and Linda Kay have been legally married for approximately 19 years. As a direct and proximate result of Monsanto's acts and omissions, Todd Kay has suffered loss of consortium.

## **JURISDICTION**

11.      This Court's jurisdiction is proper under 28 U.S.C. § 1332, as there is complete diversity of citizenship between Plaintiffs and Defendant Monsanto, and the aggregate amount in controversy exceeds $75,000, exclusive of interest and costs.

12.      This District of South Carolina possesses personal jurisdiction over Defendant Monsanto insofar as Monsanto delivered its products (Roundup® and/or glyphosate) into the stream of

commerce with the expectation that they would be purchased by consumers in the State of South Carolina and that those products subsequently injured the Plaintiffs.

13.     Venue lies in the District of South Carolina, pursuant to 28 U.S.C. § 1391(a), and within the Charleston Division, pursuant to Local Civil Rule 3.01 (D.S.C.), as it is the judicial district and division in which a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred, in which Defendant Monsanto does business relating to the claims, and wherein Plaintiffs reside.

## FACTUAL ALLEGATIONS

14.     At all times relevant, Monsanto was the entity which discovered the herbicidal properties of glyphosate and the manufacturer of Roundup®. At all times relevant, Monsanto was in the business of, and did, design, research, test, manufacture, advertise, promote, market, sell, and distribute the herbicide Roundup® to the public.

15.     Glyphosate is a broad-spectrum, non-selective herbicide used in a wide variety of herbicidal products around the world. Plants treated with glyphosate translocate the systemic herbicide to their roots, shoot regions, and fruit, where it interferes with the plant's ability to form aromatic amino acids necessary for protein synthesis. Treated plants generally die within two to three days. Because plants absorb glyphosate, it cannot be completely removed by washing or peeling produce or by milling, baking, or brewing grains.

16.     Monsanto's glyphosate products are registered in 130 countries and approved for use on over 100 different crops.[3] Defendant's glyphosate products are pervasive in the environment. Numerous studies confirm that glyphosate is found in rivers, streams, and groundwater in

---

[3] *Id.*

4

agricultural areas where Roundup® is used.[4] It has been found in food,[5] in the urine of agricultural workers,[6] and even in the urine of urban dwellers – who are not in direct contact with glyphosate.[7] Occupational workers and home gardeners alike are exposed to glyphosate by inhalation and dermal contact during spraying, mixing and cleanup, and by touching soil and plants to which glyphosate was applied.[8]

17.     In spite of studies and evaluations demonstrating glyphosate's toxicity to humans, discussed *infra*, Monsanto, since it began selling Roundup®, has always represented that Roundup® and glyphosate-based herbicides create no unreasonable risks to human health or to the environment. History has shown this to be false. In its effort to continue profiting from Roundup®, Monsanto has championed false data and attacked legitimate studies which reveal the dangers of glyphosate. For decades, Monsanto has led a continuous campaign of

---

[4] *See* U.S. Geological Survey, *USGS Technical Announcement: Widely Used Herbicide Commonly Found in Rain and Streams in the Mississippi River Basin* (2011), available at https://archive.usgs.gov/archive/sites/www.usgs.gov/newsroom/article.asp-ID=2909.html; *see also* Nat'l Pesticide Info. Center, *Glyphosate: General Fact Sheet*, available at http://npic.orst.edu/factsheets/glyphogen.pdf.

[5] Thomas Bohn et al., *Compositional Differences in Soybeans on the Market: Glyphosate Accumulates in Roundup Ready GM Soybeans*, 153 FOOD CHEMISTRY 207 (2013), available at https://www.sciencedirect.com/science/article/pii/S0308814613019201; Bai, Shahla Hosseini, and Steven M. Ogbourne. *Glyphosate: environmental contamination, toxicity and potential risks to human health via food contamination*, Environmental Science and Pollution Research 23.19: 18988-19001 (2016), available at http://cityofgenevany.com/wp-content/uploads/Bai-Ogbourne2016_Article_GlyphosateEnvironmentalContami.pdf.

[6] John F. Acquavella et al., *Glyphosate Biomonitoring for Farmers and Their Families: Results from the Farm Family Exposure Study*, 112(3) ENVTL. HEALTH PERSPECTIVES 321 (2004), available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC1241861/; Kathryn Z. Guyton et al., *Carcinogenicity of Tetrachlorvinphos, Parathion, Malathion, Diazinon & Glyphosate*, 112 IARC Monographs 76, section 5.4 (2015), available at http://www.thelancet.com/journals/lanonc/article/PIIS1470-2045(15)70134-8/fulltext.

[7] Dirk Brändli & Sandra Reinacher, *Herbicides found in Human Urine*, 1 ITHAKA JOURNAL 270 (2012), available at http://www.ithaka-journal.net/druckversionen/e052012-herbicides-urine.pdf.

[8] Nat'l Pesticide Info. Center, *Glyphosate: General Fact Sheet*, available at www.npic.orst.edu/factsheets/glyphogen.pdf.

misinformation to convince government agencies, farmers and the general population that Roundup® is safe.

### The Discovery of Glyphosate & Development of Roundup®

18.    The herbicidal properties of glyphosate were discovered in 1970 by Monsanto chemist John Franz. The first glyphosate-based herbicide was introduced to the market in the mid-1970's under the brand name Roundup®.[9] From the outset, Monsanto marketed Roundup® as a "safe" general purpose herbicide for widespread commercial and consumer use. It still, falsely, markets Roundup® as safe today.[10]

19.    In addition to the active ingredient glyphosate, Roundup® formulations also contain adjuvants and other chemicals such as the surfactant POEA, which are considered "inert" and therefore protected as "trade secrets" in manufacturing. Growing evidence suggests that these adjuvants and additional components of Roundup® formulations are not, in fact, inert and are toxic in their own right.

### Registration of Herbicides Under Federal Law

20.    The manufacture, formulation, and distribution of herbicides, such as Roundup® , are regulated under the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA" or "Act"), 7 U.S.C. § 136 et seq. FIFRA requires that all pesticides be registered with the Environmental Protection Agency ("EPA" or "Agency") prior to their distribution, sale, or use, except as described by the Act. 7 U.S.C. § 136a(a).

21.    FIFRA defines "unreasonable adverse effects on the environment" to mean "any unreasonable risk to man or the environment, taking into account the economic, social and

---

[9] Monsanto, *supra*, note 2.
[10] Monsanto, *What is Glyphosate?* (Sep. 2, 2015), available at
https://www.monsantoglobal.com/global/au/products/Documents/what_is_glyphosate.pdf.

environmental costs and benefits of the use of any pesticide." 7 U.S.C. § 136(bb). FIFRA thus requires EPA to make a risk/benefit analysis in determining whether a registration should be granted or a pesticide allowed to continue to be sold in commerce.

22.     The EPA and the State of South Carolina registered Roundup® for distribution, sale, and manufacture in the United States and the State of South Carolina.

23.     FIFRA generally requires that the registrant, Monsanto in the case of Roundup®, conduct health and safety testing of pesticide products. The EPA has protocols governing the conduct of tests required for registration and the laboratory practices which must be followed in conducting these tests. The data produced by the registrant must be submitted to the EPA for review and evaluation. However, the government is not required, nor able, to perform the product tests that are required of the manufacturer.

24.     The evaluation of each pesticide product distributed, sold, or manufactured is completed at the time the product is initially registered. The data necessary for registration of a pesticide has changed over time. The EPA is now in the process of re-evaluating all pesticide products through a congressionally mandated process called "re-registration." 7 U.S.C. § 136a-1. In order to reevaluate these pesticides, the EPA is demanding the completion of additional tests and the submission of data for the EPA's review and evaluation.

25.     In the case of glyphosate, and therefore Roundup®, the EPA had planned on releasing its preliminary risk assessment – in relation to the reregistration process – no later than July 2015. The EPA completed review of glyphosate in early 2015, but it delayed releasing the risk assessment pending further review in light of the World Health Organization's health-related findings.

**The Scientific Fraud Underlying Monsanto's Marketing & Sale of Glyphosate/Roundup®**

26.     Based on early studies showing that glyphosate could cause cancer in laboratory animals, in 1985 the EPA originally classified glyphosate as possibly carcinogenic to humans (Group C). After pressure from Monsanto, the EPA changed its classification to evidence of non-carcinogenicity in humans (Group E) IN 1991. In re-classifying glyphosate, however, the EPA made clear that the designation did not mean the chemical does not cause cancer: "*It should be emphasized, however, that designation of an agent in Group E is based on the available evidence at the time of evaluation and should not be interpreted as a definitive conclusion that the agent will not be a carcinogen under any circumstances.*"[11]

27.     On two occasions, the EPA found that the laboratories hired by Monsanto to test the toxicity of its Roundup® products for registration purposes committed fraud.

28.     In the first instance, in seeking the EPA's initial registration of Roundup®, Monsanto hired Industrial Bio-Test laboratories (hereinafter "IBT") to perform and evaluate pesticide toxicology studies relating to Roundup®.[12] IBT performed about 30 tests on glyphosate and glyphosate containing products, including nine of the 15 residue studies needed to register Roundup®.

29.     In 1976, the United States Food and Drug Administration ("FDA") performed an inspection of IBT that revealed discrepancies between the raw data and the final report relating to the toxicological impacts of glyphosate. The EPA subsequently audited IBT and found the

---

[11] U.S. Envtl. Prot. Agency, *Memorandum, Subject: SECOND Peer Review of Glyphosate 1* (1991) (emphasis added), available at https://archive.epa.gov/pesticides/chemicalsearch/chemical/foia/web/pdf/103601/417300-1991-10-30a.pdf.

[12] Monsanto, *Backgrounder, Testing Fraud: IBT and Craven Laboratories* (June 2005), available at https://monsanto.com/app/uploads/2017/06/ibt_craven_bkg.pdf.

toxicology studies conducted for the Roundup® herbicide to be invalid.[13] After finding "routine falsification of data" at IBT, an EPA reviewer stated that it was "hard to believe the scientific integrity of the studies when they said they took specimens of the uterus from male rabbits."[14]

30.     Three top executives of IBT were convicted of fraud in 1983.

31.     In the second instance of data falsification in 1991, Monsanto hired Craven Laboratories to perform pesticide and herbicide studies, including Roundup®. In that same year, the owner of Craven Laboratories and three of its employees were indicted, and later convicted of fraudulent laboratory practices in the testing of pesticides and herbicides.[15]

32.     Despite the falsity of the tests underlying its registration, within a few years of its launch, Monsanto was marketing Roundup® in 115 countries.

**The Importance of Roundup® to Monsanto's Market Dominance & FIFRA Analysis**

33.     The success of Roundup® was key to Monsanto's continued reputation and dominance in the pesticide marketplace. Due largely to the success of Roundup® sales, Monsanto's agricultural division out-performed its chemical division's operating income, and the gap increased yearly. But with its patent for glyphosate expiring in the United States in the year

---

[13] U.S. Envtl. Prot. Agency, Summary of the IBT Review Program Office of Pesticide Programs (1983), available at
https://nepis.epa.gov/Exe/ZyNET.exe/91014ULV.TXT?ZyActionD=ZyDocument&Client=EPA &Index=1981+Thru+1985&Docs=&Query=&Time=&EndTime=&SearchMethod=1&TocRestri ct=n&Toc=&TocEntry=&QField=&QFieldYear=&QFieldMonth=&QFieldDay=&IntQFieldOp =0&ExtQFieldOp=0&XmlQuery=&File=D%3A%5Czyfiles%5CIndex%20Data%5C81thru85% 5CTxt%5C00000022%5C91014ULV.txt&User=ANONYMOUS&Password=anonymous&Sort Method=h%7C&MaximumDocuments=1&FuzzyDegree=0&ImageQuality=r75g8/r75g8/x150y1 50g16/i425&Display=hpfr&DefSeekPage=x&SearchBack=ZyActionL&Back=ZyActionS&Bac kDesc=Results%20page&MaximumPages=1&ZyEntry=1&SeekPage=x&ZyPURL.
[14] Marie-Monique Robin, *The World According to Monsanto: Pollution, Corruption and the Control of the World's Food Supply* (2011) (citing U.S. Envtl. Prot. Agency, *Data Validation, Memo from K. Locke, Toxicology Branch, to R. Taylor, Registration Branch*. Washington, D.C. (August 9, 1978)).
[15] Monsanto, *supra*, note 12.

2000, Monsanto needed a strategy to maintain its Roundup® market dominance and to ward off impending competition.

34.     In response, Monsanto began the development and sale of genetically engineered Roundup Ready® seeds in 1996. As Roundup Ready® crops are resistant to glyphosate, farmers can spray Roundup® onto their fields during the growing season without harming the crop. This allowed Monsanto to expand its market for Roundup® even further. By 2000, Monsanto's biotechnology seeds were planted on more than 80 million acres worldwide and nearly 70% of American soybeans were planted from Roundup Ready® seeds, thereby securing Monsanto's dominant share of the glyphosate/Roundup® market through a marketing strategy that coupled proprietary Roundup Ready® seeds with continued sales of its Roundup® herbicide.

35.     Through a three-pronged strategy of increasing production, decreasing prices, and selling Roundup Ready® seeds, Roundup® became Monsanto's most profitable product. In 2000, Roundup® accounted for almost $2.8 billion in sales, outselling other herbicides by a margin of 5 to 1, and accounting for close to half of Monsanto's revenue.[16] Today, glyphosate remains one of the world's largest herbicides by sales volume.

36.     The risk/benefit analysis integrated into FIRFA's registration standard balances economic considerations for beneficial use against the potential risk to human health and the environment. It cannot be ignored that Monsanto has unquestionably demonstrated its significant commercial potential – by volume, application of glyphosate-based herbicide ("GBH") products has increased a hundredfold since the 1970s as its uses have diversified and expanded.[17] In the year

---

[16] David Barboza, *The Power of Roundup; A Weed Killer Is a Block for Monsanto to Build On*, N.Y. TIMES, Aug. 2, 2001, available at http://www.nytimes.com/2001/08/02/business/the-power-of-roundup-a-weed-killer-is-a-block-for-monsanto-to-build-on.html.
[17] John Peterson Meyers et al., *Concerns Over Use of Glyphosate-Based Herbicides and Risks with Exposure: A Consensus Statement*, 15 ENVTL. HEALTH, Feb. 2016, at 5-6, 10.

2014, approximately 280-290 million pounds of glyphosate were used in the United States.[18] Thus, it is of no surprise that the EPA's favorable registration/classification of glyphosate conflicts with legitimate scientific findings.

### Monsanto Has Known For Decades That It's Roundup® Safety Claims Are False

37.    In 1996, the New York Attorney General (hereinafter "NYAG") filed a lawsuit against Monsanto based on its false and misleading advertising of Roundup® products. Specifically, the lawsuit challenged Monsanto's general representations that its spray-on glyphosate-based herbicides, including Roundup®, were "safer than table salt" and "practically non-toxic" to mammals, birds, and fish. Among the representations about the human and environmental safety of glyphosate and/or Roundup® which the New York Attorney General found deceptive and misleading about the human and environmental safety of glyphosate and/or Roundup® are the following:

  a. "Remember that environmentally friendly Roundup herbicide is biodegradable. It won't build up in the soil so you can use Roundup with confidence along customers' driveways, sidewalks, and fences..."

  b. "And remember that Roundup is biodegradable and won't buildup in the soil. That will give you the environmental confidence you need to use Roundup everywhere you've got a weed, brush, edging, or trimming problem."

  c. "Roundup biodegrades into naturally occurring elements."

  d. "Remember that versatile Roundup herbicide stays where you put it. That means there's no washing or leaching to harm customers' shrubs or other desirable vegetation."

---

[18] US ENVTL. PROT. AGENCY, *Glyphosate Issue Paper: Evaluation of Carcinogenic Potential*, EPA OFFICE OF PESTICIDE PROGRAMS (Sept. 2016), available at https://www.epa.gov/sites/production/files/2016-09/documents/glyphosate_issue_paper_evaluation_of_carcincogenic_potential.pdf.

e. "This non-residual herbicide will not wash or leach in the soil. It...stays where you apply it."

f. "You can apply Roundup with 'confidence because it will stay where you put it.' It binds tightly to soil particles, preventing leaching. Then, soon after application, soil microorganisms biodegrade Roundup into natural products."

g. "Glyphosate is less toxic to rats than table salt following acute oral ingestion."

h. "Glyphosate's safety margin is much greater than required. It has over a 1,000-fold safety margin in food and over a 700-fold safety margin for workers who manufacture it or use it."

i. "You can feel good about using herbicides by Monsanto. They carry a toxicity category rating of 'practically non-toxic' as it pertains to mammals, birds, and fish."

j. "Roundup can be used where kids and pets will play and breaks down into natural material." This ad depicts a person with his head in the ground and a pet dog in an area which has been treated with Roundup®."[19]

38.   On November 19, 1996 Monsanto entered into an Assurance of Discontinuance with the NYAG, in which Monsanto agreed, among other things, "to cease and desist from publishing or broadcasting any advertising [in New York] that represents, directly or by implication" that:

a. Its glyphosate containing pesticide products or any component thereof are safe, non-toxic, harmless or free from risk.

b. Its glyphosate containing pesticide products or any component thereof manufactured, formulated, distributed by Monsanto are biodegradable.

---

[19] Attorney General of the State of New York, in the Matter of Monsanto Company, Assurance of Discontinuance Pursuant to Executive Law § 63(15) (Nov. 1996).

c.  Its glyphosate containing pesticide products or any component thereof stay where they are applied under all circumstances and will not move through the environment by any means.

d.  Its glyphosate containing pesticides products or any component thereof are "good" for the environment or are "known for their environmental characteristics."

e.  Glyphosate containing pesticide products or any component thereof are safer or less toxic than common consumer products other than herbicides.

f.  Its glyphosate containing products or any component thereof might be classified as "practically non-toxic."

39.     Monsanto did not alter its advertising in the same manner in any state other than New York and, upon information and belief, it still has not done so as of today.

40.     In 2009, France's highest court ruled that Monsanto had not told the truth about the safety of Roundup®. The French court affirmed an earlier judgment that Monsanto had falsely advertised its herbicide Roundup® as "biodegradable" and that it "left the soil clean."[20]

### IARC Classification & Assessment of Glyphosate

41.     The International Agency for Research on Cancer ("IARC") is the specialized intergovernmental cancer agency tasked by the World Health Organization ("WHO") of the United Nations with conducting and coordinating research into the causes of cancer.

42.     An IARC Advisory Group to Recommend Priorities for IARC Monographs during 2015-2019 met in April 2014. Though nominations for the review were solicited, a substance must meet two criteria to be eligible for review by the IARC Monographs: there must already exist

---

[20] *Monsanto Guilty in 'False Ad' Row*, BBC, Oct. 15, 2009, available at http://news.bbc.co.uk/2/hi/europe/8308903.stm.

some evidence of the substance's carcinogenicity, and there must exist evidence of human exposure to the substance.

43.    IARC set glyphosate for review in 2015-2016. IARC uses five criteria for determining priority in reviewing chemicals. The substance must have a potential for directly impacting public health; scientific literature must support suspicion of carcinogenicity; there must be evidence of significant human exposure; there must be high public interest and/or potential to bring clarity to a controversial area and/or reduce public anxiety or concern; related agents must be similar to ones given high priority by the above considerations. Data reviewed is preferably sourced from publicly accessible, peer-reviewed data.

44.    On March 24, 2015, after its year-plus cumulative review of human, animal, and DNA studies, many of which Defendant has possessed since as early as 1985, the IARC' s working group published its conclusion that the glyphosate contained in Defendant's Roundup herbicide is a Class 2A "probable carcinogen" as demonstrated by the mechanistic evidence of carcinogenicity in humans and sufficient evidence of carcinogenicity in animals.

45.    The IARC's full Monograph was published on July 29, 2015 and established glyphosate as a class 2A probable carcinogen to humans. The authors found that glyphosate demonstrated sufficient mechanistic evidence (genotoxicity and oxidative stress) to warrant a 2A classification based on evidence of carcinogenicity in humans and animals.[21]

46.    The IARC Working Group found an increased risk between exposure to glyphosate and non-Hodgkin's lymphoma ("NHL") and several subtypes of NHL, and the increased risk continued after adjustment for other pesticides.

---

[21] Kathryn Z. Guyton et al., *Carcinogenicity of Tetrachlorvinphos, Parathion, Malathion, Diazinon & Glyphosate*, 112 IARC Monographs 76, section 5.4 (2015), available at http://www.thelancet.com/journals/lanonc/article/PIIS1470-2045(15)70134-8/fulltext.

47.     The IARC Working Group also found that glyphosate caused DNA and chromosomal damage in human cells. One study in community residents reported increases in blood markers of chromosomal damage (micronuclei) after glyphosate formulations were sprayed.

### Earlier Findings of Glyphosate's Danger to Human Health

48.     The EPA published a technical fact sheet relating to glyphosate as part of its Drinking Water and Health, National Primary Drinking Water Regulations publication. This technical fact sheet predates IARC's March 20, 2015 evaluation. The fact sheet describes the release patterns for glyphosate as follows:

**Release Patterns**

> Glyphosate is released to the environment in its use as an herbicide for controlling woody and herbaceous weeds on forestry, right-of-way, cropped and non-cropped sites. These sites may be around water and in wetlands. It may also be released to the environment during its manufacture, formulation, transport, storage, disposal and cleanup, and from spills. Since glyphosate is not a listed chemical in the Toxics Release Inventory, data on releases during its manufacture and handling are not available. Occupational workers and home gardeners may be exposed to glyphosate by inhalation and dermal contact during spraying, mixing, and cleanup. They may also be exposed by touching soil and plants to which glyphosate was applied. Occupational exposure may also occur during glyphosate's manufacture, transport storage, and disposal.[22]

49.     In 1995, the Northwest Coalition for Alternatives to Pesticides reports that in California, the state with the most comprehensive program for reporting of pesticide-caused illness,

---

[22] Nat'l Pesticide Info. Center, *supra*, note 8.

glyphosate was the third most commonly reported cause of pesticide illness among agricultural workers.[23]

## **Evidence of Roundup®'s Carcinogenic Properties**

50.     As early as the 1980's Monsanto was aware of glyphosate's carcinogenic properties.

51.     On March 4, 1985, a group of the Environmental Protection Agency's ("EPA") Toxicology Branch published a memorandum classifying glyphosate as a Category C oncogene.[24] Category C oncogenes are possible human carcinogens with limited evidence of carcinogenicity.

52.     In 1986, the EPA issued a Registration Standard for glyphosate (NTIS PB87-103214). The Registration standard required additional phytotoxicity, environmental fate, toxicology, product chemistry, and residue chemistry studies. All of the data required was submitted and reviewed and/or waived.[25]

53.     In October 1991 the EPA published a Memorandum entitled "Second Peer Review of Glyphosate." The memorandum changed glyphosate's classification to Group E (evidence of non-carcinogenicity for humans). Two peer review committee members did not concur with the conclusions of the committee and one member refused to sign.[26]

---

[23] Caroline Cox, *Glyphosate, Part 2: Human Exposure and Ecological Effects*, 15 J. PESTICIDE REFORM 4 (1995); W.S. Peas et al., *Preventing pesticide-related illness in California agriculture: Strategies and priorities. Environmental Health Policy Program Report*, Univ. of Cal. School of Public Health, Calif. Policy Seminar (1993).
[24] Consensus Review of Glyphosate, Casewell No. 661A. March 4, 1985. United States Environmental Protection Agency.
[25] http://www.epa.gov/oppsrrd1/reregistration/REDs/factsheets/0178fact.pdf.
[26] Second Peer Review of Glyphosate, CAS No. 1071-83-6. October 30, 1991. United States Environmental Protection Agency.

**The Toxicity of Other Ingredients in Roundup®**

54.     In addition to the toxicity of the active molecule, many studies support the finding that glyphosate formulations found in Defendant's Roundup products are more dangerous and toxic than glyphosate alone. As early as 1991, evidence was available to Monsanto that demonstrated that glyphosate formulations were significantly more toxic than glyphosate alone.[27]

55.     In 2002, a study by Julie Marc, entitled "Pesticide Roundup Provokes Cell Division Dysfunction at the Level of CDK1/Cyclin B Activation," revealed that Roundup® causes delays in the cell cycles of sea urchins but that the same concentrations of glyphosate alone were ineffective and did not alter cell cycles.[28]

56.     A 2004 study by Marc and others, entitled "Glyphosate-based pesticides affect cell cycle regulation," demonstrated a molecular link between glyphosate-based products and cell cycle dysregulation. The researchers noted that "cell cycle dysregulation is a hallmark of tumor cells and human cancer. Failure in the cell cycle checkpoints leads to genomic instability and subsequent development of cancer from the initial affected cell." Further, "[s]ince cell cycle disorder such as cancer results from dysfunctions of a unique cell, it was of interest to evaluate the threshold dose of glyphosate affecting the cells."[29]

57.     In 2005, a study by Francisco Peixoto entitled "Comparative effects of Roundup® and glyphosate on mitochondrial oxidative phosphorylation," demonstrated that Roundup®'s effects on rat liver mitochondria are far more toxic than equal concentrations of glyphosate alone. The

---

[27] Martinez, T.T. and K. Brown, *Oral and pulmonary toxicology of the surfactant used in Roundup herbicide*, PROC. WEST. PHARMACOL. SOC. 34:43-46 (1991).

[28] Julie Marc, et al., *Pesticide Roundup Provokes Cell Division Dysfunction at the Level of CDK1/Cyclin B Activation*, 15 CHEM. RES. TOXICOL. 326-331 (2002), available at http://pubs.acs.org/doi/full/10.1021/tx015543g.

[29] Julie Marc, et al., *Glyphosate-based pesticides affect cell cycle regulation*, 96 BIOLOGY OF THE CELL 245, 245-249 (2004), available at https://www.ncbi.nlm.nih.gov/pubmed/15182708.

Peixoto study further suggested that the harmful effects of Roundup® on mitochondrial bioenergetics could not be exclusively attributed to glyphosate but could be the result of other chemicals, such as the surfactant POEA, or in the alternative, due to a potential synergic effect between glyphosate and other ingredients in the Roundup® formulation.[30]

58.     In 2009, Nora Benachour and Gilles-Eric Seralini published a study examining the effects of Roundup® and glyphosate on human umbilical, embryonic, and placental cells. The study tested dilution levels of Roundup® and glyphosate that were far below agricultural recommendations, corresponding with low levels of residue in food. The researchers ultimately concluded that supposed "inert" ingredients, and possibly POEA, alter human cell permeability and amplify toxicity of glyphosate alone. The researchers further suggested that assessments of glyphosate toxicity should account for the presence of adjuvants or additional chemicals used in the formulation of the complete pesticide. The study confirmed that the adjuvants present in Roundup® are not, in fact, inert and that Roundup® is potentially far more toxic than its active ingredient glyphosate alone.[31]

59.     The results of these studies were at all times available to Monsanto. Monsanto thus knew or should have known that Roundup® was, and is more toxic than glyphosate alone and that safety studies of Roundup®, Roundup®'s adjuvants and "inert" ingredients, and/or the surfactant POEA were necessary to protect Plaintiffs from Roundup®.

60.     Monsanto knew or should have known that tests limited to Roundup's active ingredient glyphosate were insufficient to prove the safety of Roundup®.

---

[30] Francisco Peixoto, *Comparative effects of the Roundup and glyphosate on mitochondrial oxidative phosphorylation*, 61 CHEMOSPHERE 1115, 1122 (2005), available at https://www.ncbi.nlm.nih.gov/pubmed/16263381.

[31] Nora Benachour, et al., *Glyphosate Formulations Induce Apoptosis and Necrosis in Human Umbilical, Embryonic, and Placental Cells*, 22 CHEM. RES. TOXICOL. 97-105 (2008), available at http://big.assets.huffingtonpost.com/france.pdf.

61.     Rather than performing appropriate tests, Monsanto relied upon flawed industry-supported studies designed to protect their own economic interests rather than Plaintiffs and the consuming public.

62.     Despite its knowledge that Roundup® is considerably more dangerous than glyphosate alone, Monsanto continued to promote Roundup® as safe.

### Recent Worldwide Bans of Roundup®/Glyphosate

63.     Several countries around the world have instituted bans on the sale of Roundup® and other glyphosate-containing herbicides, both before and since IARC first announced its assessment for glyphosate in March 2015, and more countries undoubtedly will follow suit as the dangers of the use of Roundup® become more widely known. In April 2014, the Netherlands issued a ban on all glyphosate-based herbicides, including Roundup® and which took effect at the end of 2015. In issuing the ban, the Dutch Parliament member who introduced the successful legislation stated: *"Agricultural pesticides in user-friendly packaging are sold in abundance to private persons. In garden centers, Roundup® is promoted as harmless, but unsuspecting customers have no idea what the risks of this product are. Especially children are sensitive to toxic substances and should therefore not be exposed to it."*[32]

64.     The Brazilian Public Prosecutor in the Federal District requested that the Brazilian Justice Department suspend the use of glyphosate.[33]

---

[32] *Holland's Parliament Bans Glyphosate Herbicides*, The Real Agenda, April 14, 2014 (emphasis added), available at http://real-agenda.com/hollands-parliament-bans-glyphosate-herbicides/.

[33] Christina Sarich, *Brazil's Public Prosecutor Wants to Ban Monsanto's Chemicals Following Recent Glyphosate-Cancer Link*, GLOBAL RESEARCH, MAY 14, 2015, available at https://www.globalresearch.ca/brazils-public-prosecutor-wants-to-ban-monsantos-chemicals-following-recent-glyphosate-cancer-link/5449440; see Ministério Público Federal, *MPF/DF reforça pedido para que glifosato seja banido do Mercado nacional*, April 14, 2015, available at

65.    France banned the private sale of Roundup® and glyphosate following the IARC assessment for glyphosate.[34]

66.    Bermuda banned both the private and commercial sale of glyphosates, including Roundup®. The Bermuda government explained its ban as follows: "*Following a recent scientific study carried out by a leading cancer agency, the importation of weed spray 'Roundup' has been suspended.*"[35]

67.    The Sri Lankan government banned the private and commercial use of glyphosate, particularly out of concern that glyphosate has been linked to fatal kidney disease in agricultural workers.[36]

68.    The government of Columbia announced its ban on using Roundup® and glyphosate to destroy illegal plantations of coca, the raw ingredient for cocaine, because of the WHO's finding that glyphosate is probably carcinogenic.[37]

### Proposition 65 Listing

69.    On September 4, 2015, California's Office of Environmental Health Hazard Assessment ("OEHHA") published a notice of intent to include glyphosate on the state's list of known

---

http://www.mpf.mp.br/df/sala-de-imprensa/noticias-df/mpf-df-reforca-pedido-para-que-glifosato-seja-banido-do-mercado-nacional.
[34] Zoe Schlanger, *France Bans Sales of Monsanto's Roundup in Garden Centers, 3 Months After U.N. Calls it "Probable Carcinogen"*, NEWSWEEK, JUNE 15, 2015, available at http://www.newsweek.com/france-bans-sale-monsantos-roundup-garden-centers-after-un-names-it-probable-343311.
[35] *Health Minister:Importation of Roundup Weed Spray Suspended*, Today in Bermuda, May 11, 2015 (emphasis added), available at http://bernews.com/2015/05/importation-weed-spray-round-suspended/.
[36] *Sri Lanka's New President Puts Immediate Ban on Glyphosate Herbicides*, Sustainable Pulse, May 25, 2015, available at https://sustainablepulse.com/2015/05/25/sri-lankas-new-president-puts-immediate-ban-on-glyphosate-herbicides/.
[37] *Columbia to ban coca spraying herbicide glyphosate*, BBC, May 10, 2015, available at http://www.bbc.com/news/world-latin-america-32677411.

carcinogens under Proposition 65.[38] California's Safe Drinking Water and Toxic Enforcement Act of 1986 (informally known as "Proposition 65"), requires the state to maintain and, at least once a year, revise and republish a list of chemicals *"known to the State of California to cause cancer or reproductive toxicity."*[39] The OEHHA determined that glyphosate met the criteria for the listing mechanism under the Labor Code following the IARC's assessment of the chemical.[40]

70.     The listing process under the Labor Code is essentially automatic. The list of known carcinogens, at a minimum, must include substances identified by reference in Labor Code § 6382(b)(1). That section of the Labor Code identifies "[s]ubstances listed as human or animal carcinogens by the International Agency for Research on Cancer (IARC)." The IARC's classification of glyphosate as a Group 2A chemical ("probably carcinogenic to humans") therefore triggered the listing.

71.     A business that deploys a listed chemical in its products must provide "clear and reasonable warnings" to the public prior to exposure to the chemical. To be clear and reasonable, a warning must "(1) clearly communicate that the chemical is known to cause cancer, and/or birth defects or other reproductive harm; and (2) effectively reach the person before exposure."[41] The law also prohibits the discharge of listed chemicals into drinking water.

---

[38] Cal. Envtl. Prot. Agency Office of Envtl. Health Hazard Assessment, *Notice of Intent to List Chemicals by the Labor Code Mechanism: Tetrachlorvinphos, Parathion, Malathion, Glyphosate* (Sept. 4, 2015), available at https://oehha.ca.gov/proposition-65/crnr/notice-intent-list-tetrachlorvinphos-parathion-malathion-glyphosate.

[39] Frequently Asked Questions, STATE OF CAL. DEPT OF JUSTICE, OFFICE OF THE ATTORNEY GENERAL, (emphasis added), available at http://oag.ca.gov/prop65/faq.

[40] Cal. Envt. Prot. Agency Office of Envtl. Healh Hazard Assessment, *supra*, note 38.

[41] STATE OF CAL. DEPARTMENT OF JUSTICE, OFFICE OF THE ATTORNEY GENERAL, *supra*, note 39.

72.     In January 2016, Monsanto disputed the listing decision and filed a lawsuit against OEHHA and the agency's acting director, Lauren Zeise, in California state court, seeking declaratory and injunctive relief to prevent OEHHA from listing glyphosate.[42]

73.     Monsanto alleged that OEHHA's exclusive reliance of the IARC decision signified that "OEHHA effectively elevated the determination of an ad hoc committee of an unelected, foreign body, which answers to no United States official (let alone any California state official), over the conclusions of its own scientific experts."[43] Monsanto further alleged that the Labor Code listing mechanism presented various constitutional violations because it "effectively empowers an unelected, undemocratic, unaccountable, and foreign body to make laws applicable in California."[44] Among other things, Monsanto argued that Proposition 65's requirement to provide a "clear and reasonable warning" to consumers that the chemical is a known carcinogen would damage its reputation and violate First Amendment rights.[45]

74.     On November 12, 2015, the European Food Safety Authority ("EFSA"), the European Union's primary agency for food safety, reported on its evaluation of the Renewal Assessment Report ("RAR") on glyphosate.[46] The Rapporteur Member State assigned to glyphosate, the German Federal Institute for Risk Assessment ("BfR"), had produced the RAR as part of the renewal process for glyphosate in the EU.

---

[42] Monsanto Company's Verified Petition for Writ of Mandate and Complaint for Preliminary and Permanent Injunctive and Declaratory Relief, *Monsanto Co. v. Office of the Envt'l Health Hazard Assessment, et al.*, No. 16-CECG-00183 (Cal. Super. Ct.).
[43] *Id.* at 2.
[44] *Id.* at 3.
[45] *Id.*
[46] European Food Safety Auth., *Conclusion on the peer review of the pesticide risk assessment of the active substance glyphosate*, available at http://www.efsa.europa.eu/sites/default/files/scientific_output/files/main_documents/4302.pdf.

75.     The BfR sent its draft RAR to the EFSA and the RAR underwent a peer review process by EFSA, other member states, and industry groups. As part of the on-going peer review of Germany's reevaluation of glyphosate, the EFSA had also received a second mandate from the European Commission to consider the IARC's findings regarding the potential carcinogenicity of glyphosate and glyphosate-containing products.

76.     Based on a review of the RAR, which included data from industry-submitted unpublished studies, the EFSA sent its own report ("Conclusion") to the European Commission, finding that "glyphosate is unlikely to pose a carcinogenic hazard to humans and the evidence does not support classification with regard to its carcinogenic potential according to Regulation ("EC") No. 1271/2008."[47] The EFSA therefore disagreed with the IARC, instead finding that glyphosate was not genotoxic and did not present a carcinogenic threat to humans.

77.     In explaining why its results departed from the IARC's conclusion, the EFSA drew a distinction between the EU and the IARC approaches to the study and classification of chemicals.[48] Although the IARC examined "both glyphosate – an active substance – and glyphosate-based formulations, grouping all formulations regardless of their composition," the EFSA explained that it considered only glyphosate and that its assessment focuses on "each individual chemical, and each marketed mixture separately."[49] The IARC, on the other hand, "assesses generic agents, including groups of related chemicals, as well as occupational or

_____

[47] *Id.*

[48] *EFSA Fact Sheet: Glyphosate, EFSA*, available at
http://www.efsa.europa.eu/sites/default/files/corporate_publications/files/efsaexplainsglyphosate
151112en.pdf.

[49] *Id.*

environmental exposure, and cultural or behavioral practices."[50] The EFSA accorded greater
weight to studies conducted with glyphosate alone than studies of formulated products.[51]

78.     The EFSA went further, stating:

> [A]lthough some studies suggest that certain glyphosate-based formulations may
> be genotoxic (i.e. damaging to DNA), others that look solely at the active
> substance glyphosate do not show this effect. It is likely, therefore, that the
> *genotoxic effects observed in some glyphosate-based formulations are related to*
> *the other constituents or "co-formulants."* Similarly, certain glyphosate-based
> formulations display higher toxicity than that of the active ingredient, presumably
> because of the presence of co-formulants. In its assessment, the *EFSA proposes*
> *that the toxicity of each pesticide formulation and in particular its genotoxic*
> *potential should be further considered and addressed by Member State authorities*
> *while they re-assess used of glyphosate-based formulations in their own*
> *territories.*[52]

79.     Notwithstanding its conclusion, the EFSA did set exposure levels for glyphosate.
Specifically, the EFSA proposed an acceptable daily intake ("ADI") of 0.5 mg/kg of body weight
per day; an acute reference dose ("ARfD") of 0.5 mg/kg of body weight; and an acceptable
operator exposure level of ("AOEL") of 0.1 mg/kg of body weight per day.[53]

### Leading Scientists Dispute the EFSA's Conclusion

80.     On November 27, 2015, ninety-six independent academic and governmental scientists
from around the world submitted an open letter to the EU health commissioner, Vytenis

---

[50] *Id.*
[51] *Id.*
[52] *Id.* (emphasis added).
[53] European Food Safety Auth., *supra*, note 46.

Andriukaitis. The scientists expressed their strong concerns and urged the commissioner to disregard the "flawed" EFSA report, arguing that *the BfR decision is not credible because it is not supported by the evidence and it was not reached in an open and transparent manner.*"[54]

81.     Signatories to the letter included Dr. Christopher J. Portier, Ph.D., and other renowned international experts in the field, some of whom were part of the IARC Working Group assigned to glyphosate.

82.     In an exhaustive and careful examination, the scientists scrutinized the EFSA's conclusions and outlined why the IARC Working Group decision was *"by far the more credible"*:

> The IARC WG decision was reached relying on open and transparent procedures by independent scientists who completed thorough conflict-of-interest statements and were not affiliated or financially supported in any way by the chemical manufacturing industry. It is fully referenced and depends entirely on reports published in the open, peer-reviewed biomedical literature. It is part of a long tradition of deeply researched and highly credible reports on the carcinogenicity of hundreds of chemicals issued over the past four decades by IARC and used today by international agencies and regulatory bodies around the world as a basis for risk assessment, regulation, and public health policy.[55]

83.     With respect to human data, the scientists pointed out that the EFSA agreed with the IARC that there was "limited evidence of carcinogenicity" causing non-Hodgkin lymphoma, but

---

[54] Letter from Christopher J. Portier et al. to Commission Vytenis Andriukaitis, Open letter: Review of the Carcinogenicity of Glyphosate by EFSA and BfR (Nov. 27, 2015) (emphasis added), available at https://www.nrdc.org/sites/default/files/open-letter-from-dr-christopher-portier.pdf and https://www.theguardian.com/environment/2016/jan/13/eu-scientists-in-row-over-safety-of-glyphosate-weedkiller.
[55] *Id.* (emphasis added).

the EFSA nonetheless dismissed an association between glyphosate exposure and carcinogenicity. The IARC applied three levels of evidence in its analysis of human data, including sufficient evidence and limited evidence. The EFSA's ultimate conclusion that "there was no unequivocal evidence for a clear and strong association of NHL with glyphosate" was misleading because it was tantamount to the IARC's highest level of evidence: "sufficient evidence," which means that a causal relationship has been established. However, the scientist argued, '[l]egitimate public health concerns arise when 'causality is credible,' i.e. when there is limited evidence."[56]

84.    Among its many other deficiencies, the EFSA's conclusions regarding animal carcinogenicity data were "scientifically unacceptable," particularly in BfR's use of historical control data and in its trend analysis. Indeed, the BfR's analysis directly contradicted the Organization for Economic Co-operation and Development ("OECD") testing guidelines while citing and purporting to follow those same guidelines. For instance, the EFSA report dismisses observed trends in tumor incidence "because there are no individual treatment groups that are significantly different from control and because the maximum observed response is reportedly within the range of the historical control data." However, according to the scientists, concurrent controls are recommended over historical controls in all guidelines, scientific reports, and publications, and, if historical control data is employed, such data "should be from studies in the same timeframe, for the same exact animal strain, preferably from the same laboratory or the same supplier and preferably reviewed by the same pathologist." The BfR's use of historical control data violated these precautions: "only a single study used the same mouse strain as the

---

[56] *Id.*

historian controls, but was reported more than 10 years after the historical control dataset was developed."

85.    Further deviating from sound scientific practices, the data used by the BfR came from studies done in seven different laboratories. The scientists concluded:

> BfR reported seven positive mouse studies with three studies showing increases in renal tumors, two with positive findings for hemangiosarcomas, and two with positive findings for malignant lymphomas. BfR additionally reported two positive findings for tumors in rats. Eliminating the inappropriate use of historical data, the unequivocal conclusion is that these are not negative studies, but in fact document the carcinogenicity of glyphosate in laboratory animals.[57]

86.    The letter also critiques the EFSA's report's lack of transparency and the opacity surrounding the data cited in the report: "citations for almost all of the references, even those from the open scientific literature, have been redacted from the document" and "there are no authors or contributors listed for either document, a requirement for publication in virtually all scientific journals." Because the BfR relied on unpublished, confidential industry provided studies, it is "impossible for any scientist not associated with BfR to review this conclusion with scientific confidence."[58]

87.    On March 3, 2016, the letter was published in the Journal of Epidemiology & Community Health.[59]

---

[57] Id.

[58] Id.

[59] Christopher J. Portier, et al., *Differences in the carcinogenic evaluation of glyphosate between the International Agency for Research on Cancer (IARC) and the European Food Safety Authority (EFSA)*, JOURNAL OF EPIDEMIOLOGY & CMTY. HEALTH, Marc. 3, 2016, available at http://jech.bmj.com/content/early/2016/03/03/jech-2015-207005.

**Statement of Concern Regarding Glyphosate-Based Herbicides**

88.     On February 17, 2016, a consensus statement published in the Journal of Environmental

Health, entitled "*Concerns over use of glyphosate-based herbicides and risks associated with

exposures: a consensus statement,*" assessed the safety of glyphosate-based herbicides

("GBHs").[60] The paper's "...focus is on the unanticipated effects arising from the worldwide

increase in use of GBHs, coupled with recent discoveries about the toxicity and human health

risks stemming from use of GBHs."[61]

89.     The researchers drew seven factual conclusions about GBHs:

1.  GBHs are the most heavily applied herbicide in the world and usage continues to
    rise;

2.  Worldwide, GBHs often contaminate drinking water sources, precipitations, and
    air, especially in agricultural regions;

3.  The half-life of glyphosate in water and soil is longer than previously recognized;

4.  Glyphosate and its metabolics are widely present in the global soybean supply;

5.  Human exposure to GBHs is rising;

6.  Glyphosate is now authoritatively classified as a probable human carcinogen; and

7.  Regulatory estimates of tolerable daily intake for glyphosate in the United States
    and European Union are based on outdated science.[62]

90.     The researchers noted that GBH use has increased approximately 100-fold since the

1970s. Further, far from posing a limited hazard to vertebrates, as previously believed, two

---

[60] John P. Myers, et al., *Concerns over use of glyphosate-based herbicides and risks associated with exposures: a consensus statement*, Environmental Health (2016), available at http://ehjournal.biomedcentral.com/articles/10.1186/s12940-016-0117-0.
[61] *Id.*
[62] *Id.*

decades of evidence demonstrates that "several vertebrate pathways are likely targets of action, including hepatorenal damage, effects on nutrient balance through glyphosate chelating action and endocrine disruption."[63]

91.   The paper attributed uncertainties in current assessments of glyphosate formulations to the fact that "[t]he full list of chemicals in most commercial GBHs is protected as 'commercial business information,' despite the universally accepted relevance of such information to scientists hoping to conduct an accurate risk assessment of these herbicide formulations." Further, the researchers argue, "[t]he distinction in regulatory review and decision processes between 'active' and 'inert' ingredients has no toxicological justification, given increasing evidence that several so-called 'inert' adjuvants are toxic in their own right."[64]

92.   Among various implications, the researchers conclude that "existing toxicological data and risk assessments are not sufficient to infer that GBHs, as currently used, are safe." Further, "GBH-product formulations are more potent, or toxic, than glyphosate alone to a wide array of non-target organisms including mammals, aquatic insects, and fish." Accordingly, "risk assessments of GBHs that are based on studies quantifying the impacts of glyphosate alone underestimate both toxicity and exposure, and thus risk." The paper concludes that this "shortcoming has repeatedly led regulators to set inappropriately high exposure thresholds."[65]

93.   The researchers also critique the current practice of regulators who largely rely on "unpublished, non-peer-reviewed data generated by the registrants" but ignore "published research because it often uses standards and procedures to assess quality that are different from those codified in regulatory agency data requirements, which largely focus on avoiding fraud."

---

[63] *Id.*
[64] *Id.*
[65] *Id.*

In the researchers' view, "[s]cientists independent of the registrants should conduct regulatory tests of GBHs that include glyphosate alone, as well as GBH-product formulations."[66]

94.    The researchers also call for greater inclusion of GBHs in government-led toxicology testing programs:

> [A] fresh and independent examination of GBH toxicity should be undertaken, and ... this reexamination be accompanied by systemic efforts by relevant agencies to monitor GBH levels in people and in the food supply, none of which are occurring today. The U.S. National Toxicology Program should prioritize a thorough toxicology assessment of the multiple pathways now identified as potentially vulnerable of GBHs.[67]

95.    The researchers suggest that, in order to fill the gap created by an absence of government funds to support research on GBHs, regulators could adopt a system through which manufacturers fund the registration process and the necessary testing:

> [W]e recommend that a system be put in place through which manufacturers of GBHs provide funds to the appropriate regulatory body as part of routine registration actions and fees. Such funds should then be transferred to appropriate government research institutes, or to an agency experienced in the award of competitive grants. In either case, funds would be made available to independent scientists to conduct the appropriate long-term (minimum 2 years) safety studies in recognized animal model systems. A thorough and modern assessment of GBH toxicity will encompass potential endocrine disruption, impacts on the gut

---

[66] *Id.*

[67] *Id.*

microbiome, carcinogenicity, and multigenerational effects looking a reproductive capability and frequency of birth defects.[68]

### The FDA Announces Testing of Glyphosate Residue in Foods

96.     On February 17, 2016, the U.S. Food and Drug Administration ("FDA") announced that, for the first time in its history, the agency planned to start testing certain foods for glyphosate residues. FDA spokesperson Lauren Sucher explained: "The agency is now considering assignments for Fiscal Year 2016 to measure glyphosate in soybeans, corn, milk, and eggs, among other potential foods."[69]

97.     In 2004, the U.S. Government Accountability Office ("GAO") had severely rebuked the FDA for its failures to both monitor for pesticide residue, including that of glyphosate, and to disclose the limitations of its monitoring and testing efforts to the public.[70]

98.     Indeed, in the past, both the FDA and the U.S. Department of Agriculture ("USDA") had routinely excluded glyphosate from their testing for the residues of hundreds of other pesticides, on the rationale that it was too expensive and unnecessary to protect public health. Ms. Sucher (the FDA spokesperson) now states, however, that "the agency has developed 'streamlined methods' for testing for the weed killer."[71]

---

[68] *Id.*

[69] Carey Gillam, *FDA to Start Testing for Glyphosate in Food*, TIME, Feb. 17, 2016, available at http://time.com/4227500/fda-glyphosate-testing/?xid=tcoshare.

[70] U.S. GOV'T ACCOUNTABILITY OFFICE, GAO-15-38, *FDA AND USDA SHOULD STRENGTHEN PESTICIDE RESIDUE MONITORING PROGRAMS AND FURTHER DISCLOSE MONITORING LIMITATIONS* (2014), available at http://www.gao.gov/products/GAO-15-38.

[71] Gilliam, *supra*, note 69.

99.     The FDA's move is significant because the agency possesses enforcement authority and can seek action if pesticide residues exceed enforcement guidelines.[72]

### Mrs. Kay's Exposure to Roundup®/Glyphosate

100.    Between the years 1976 and 2016 Ms. Kay's family maintained a large, year-round fruit and vegetable garden in the backyard of their home in Hannahan, South Carolina. The family's consumption of fruits and vegetables was sourced almost entirely by those grown in the garden. On average, Mrs. Kay worked in the family's garden at least once a week, and regularly sprayed and was exposed to Roundup® in and around the garden, and the property's lengthy fence directly abutting the garden, following all safety and precautionary warnings during use. After leaving the family home in or about 1992, Mrs. Kay's mother continued to provide her with fresh and jarred Roundup-exposed fruits and vegetables from the garden. The produce from the garden remained Plaintiffs' and their child's primary source of fruits and vegetables until Mrs. Kay's mother died of cancer in 2016, at the age of 59.

101.    In September of 2007, Mrs. Kay was diagnosed with Follicular B-Cell Lymphoma, a form of NHL. Since her diagnosis, Mrs. Kay has undergone three separate surgeries necessitated by her NHL and continues to receive treatment. Among the many painful, devastating injuries Roundup has caused Plaintiffs, they are prevented from expanding their family because chemotherapy has caused Mrs. Kay to become infertile. Mrs. Kay has also been permanently disfigured as a result of her chemotherapy treatment port, which has been opened in her chest.

102.    Mrs. Kay's exposure to Roundup®, which is designed, formulated, produced supplied, and distributed by Monsanto, is the direct and proximate cause of her NHL. As a result of her

---

[72] *Id.*; Pesticide Q&A, U.S. FOOD AND DRUG ADMINISTRATION, available at
https://www.fda.gov/food/foodborneillnesscontaminants/pesticides/ucm583711.htm.

exposure, Mrs. Kay has incurred physical injury, and significant economic and non-economic damages. Also a result of Mrs. Kay's exposure, Mr. Kay has suffered loss of consortium.

## TOLLING OF THE STATUTE OF LIMITATIONS

103.    Plaintiffs re-allege the allegations contained in the foregoing Paragraphs of this Complaint and incorporate the same herein as if repeated verbatim.

104.    The running of the Statute of Limitations has been tolled under the discovery rule and by reason of Monsanto's fraudulent concealment.

### Discovery Rule Tolling

105.    Linda Kay had no way of knowing about the risk of serious illness caused by Roundup® and glyphosate during the entire time she used and/or was exposed to the product.

106.    Within the time period of any applicable statute of limitations, Mrs. Kay could not have discovered, through the exercise of reasonable diligence, that exposure to Roundup® and glyphosate is injurious to human health.

107.    Within the time period of any applicable statute of limitations, Mrs. Kay did not discover, and did not know of facts which would cause a reasonable person to suspect, the risks associated with the use of and exposure to Roundup® and glyphosate; nor would a reasonable and diligent investigation by Mrs. Kay or her treating physicians have disclosed that Roundup® and glyphosate caused her cancer.

108.    For these reasons, all applicable statutes of limitations have been tolled by operation of the discovery rule.

### Fraudulent Concealment

109.    All applicable statutes of limitations have also been tolled by Monsanto's knowing and active fraudulent concealment and denial of the facts alleged herein through the time period relevant to this action.

110.    Instead of disclosing critical safety information about Roundup® and glyphosate, Monsanto has consistently and falsely represented that its Roundup® products are safe to humans. To this day, Monsanto continues to represent to the public that there are no risks of serious illness associated with use of and/or exposure to Roundup® or glyphosate.

111.    Monsanto was under a continuous duty to disclose to consumers, users, and other persons coming into contact with its products, including Plaintiffs, accurate safety information concerning its products and the risks associated with the use of and/or exposure to Roundup® and glyphosate.

112.    Instead, Monsanto knowingly, affirmatively, and actively concealed safety information concerning Roundup® and glyphosate and concealed the serious health risks caused by use of and/or exposure to Roundup®.

113.    Based on the foregoing, Monsanto is estopped by the doctrine of fraudulent concealment from relying on any statutes of limitations in defense of this action.

### COUNT I – STRICT LIABILITY
### (DESIGN DEFECT)

114.    Plaintiffs re-allege the allegations contained in the foregoing Paragraphs of this Complaint and incorporate the same herein as if repeated verbatim.

115.    Plaintiff Linda Kay brings this strict liability claim against Monsanto for defective design.

116. At all times relevant to this litigation, Monsanto engaged in the testing, developing, designing, manufacturing, marketing, promoting, selling, distributing, and placing into the stream of commerce Roundup products, which are defective and unreasonably dangerous to Mrs. Kay and other consumers and users. These actions were under the ultimate control and supervision of Monsanto.

117. Monsanto designed, researched, developed, formulated, manufactured, produced, tested, assembled, labeled, advertised, promoted, marketed, sold and distributed the Roundup® products used by Mrs. Kay, and/or to which she was exposed, as described above.

118. At all times relevant to this litigation, Monsanto's Roundup® products were manufactured, designed and labeled in an unsafe, defective manner, inherently dangerous to Mrs. Kay and the public.

119. At all times relevant to this litigation, Monsanto's Roundup® products reached the intended consumers, handlers, users or other persons coming into contact with these products in South Carolina and throughout the United States, including Mrs. Kay, without substantial change in their condition as designed, manufactured, sold, distributed, labeled, and marketed by Monsanto.

120. Monsanto's Roundup® products, as researched, tested, developed, designed, licensed, formulated, manufactured, packaged, labeled, distributed, sold, and marketed by Monsanto, were defective in design and formulation in that when they left the hands of Monsanto's manufacturers and/or suppliers, they were unreasonably dangerous because they were not as safe as an ordinary consumer would expect when used in an intended or reasonably foreseeable manner.

121.   Monsanto's Roundup® products as researched, tested, developed, designed, licensed, formulated, manufactured, packaged, labeled, distributed, sold, and marketed by Monsanto, were defective in design and formulation in that when they left the hands of the Monsanto's manufacturers and/or suppliers, the foreseeable risks associated with these products' uses exceeded the alleged benefits associated with their design and formulation.

122.   Monsanto's Roundup® products, as re-searched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold and marketed by Monsanto were defective in design and formulation in one or more of the following ways:

a.   When placed in the stream of commerce, Monsanto's Roundup® products were defective in design and formulation and, consequently, dangerous to an extent beyond that which an ordinary consumer would expect.

b.   When placed in the stream of commerce, Monsanto's Roundup® products were unreasonably dangerous in that they were hazardous and posed a grave risk of cancer and other serious illness when used in a reasonably anticipated manner.

c.   When placed in the stream of commerce, Monsanto's Roundup® products contained unreasonably dangerous design defects and were not reasonably safe when used in a reasonably anticipated or intended manner.

d.   Monsanto did not properly and sufficiently test, investigate, or study its Roundup® products and the active ingredient glyphosate.

e.   Exposure to Roundup® and its glyphosate containing ingredients presents a risk of harmful side effects which outweigh a potential utility stemming from the herbicide's use.

f.  Monsanto knew or should have known while marketing its Roundup® products that exposure to Roundup®, and its active ingredient glyphosate, could result in cancer and other severe illness and injuries.

g.  Monsanto did not conduct adequate post-marketing surveillance of its Roundup® products.

h.  Monsanto could have employed safer alternative designs and formulations.

i.  In other particulars as the evidence may show.

123.  At all times relevant to this litigation, Mrs. Kay used and/or was exposed to the use of Monsanto's Roundup® products in an intended and reasonably foreseeable manner without knowledge of their dangerous characteristics.

124.  Mrs. Kay could not reasonably have discovered the defects and risk associated with Roundup® or glyphosate-containing ingredients before or at time of exposure.

125.  The harm caused by Monsanto's Roundup® products far outweighed their benefit, rendering Monsanto's products dangerous to an extent beyond which an ordinary consumer would contemplate. Monsanto's Roundup® products were and are more dangerous than alternative products and Monsanto could have designed its Roundup® products to make them less dangerous. At the time Monsanto designed its Roundup® products, the state of the industry's scientific knowledge was such that a less risky design or formulation was attainable.

126.  At the time Roundup® products left Monsanto's control, there was a practical, technically feasible, and safer alternative design which would have prevented Mrs. Kay's harm without substantially impairing the reasonably anticipated or intended function of the herbicide.

127.  Monsanto's defective design of Roundup® amounts to willful, wanton, and/or reckless conduct.

128.    Therefore, as a result of unreasonably dangerous condition of its Roundup® products, Monsanto is strictly liable to Linda Kay.

129.    The defects in Monsanto's Roundup® products were substantial contributing factors in causing Plaintiffs' grave injuries, and if not for Monsanto's misconduct and omissions, Linda Kay would not have sustained their injuries.

130.    As a direct proximate result of Monsanto placing its defective Roundup® products into the stream of commerce, Mrs. Kay developed NHL and has, is, and will continue to suffer permanent injuries including, but not limited to, physical pain, emotional distress, mental anguish, loss of enjoyment of life, infertility, disfigurement, diminished life expectancy, lost wages, as well as economic hardship, including financial expenses for medical care and treatment.

WHEREFORE, Linda Kay seeks judgment in her favor, all damages recoverable by law including, but not limited to, compensatory, consequential and punitive damages, together with interest, costs herein incurred, attorneys' fees, and all such other relief as this Court deems just and proper.

## COUNT II – STRICT LIABILITY
### (FAILURE TO WARN)

131.    Plaintiffs re-allege the allegations contained in the foregoing Paragraphs of this Complaint and incorporate the same herein as if repeated verbatim.

132.    Linda Kay brings this strict liability claim against Monsanto for failure to warn.

133.    At all times relevant to this litigation, Defendant engaged in the business of testing, developing, designing, formulating, manufacturing, marketing, promoting, selling, and distributing, Roundup® products, which are defective and unreasonably dangerous to consumers, including Mrs. Kay, because they do not contain adequate warnings or instructions

concerning the dangerous characteristics of Roundup® and its active ingredient, glyphosate. These actions were taken under Defendant's ultimate control and supervision.

134.    Defendant researched, developed, designed, formulated, tested, manufactured, inspected, labeled, distributed, marketed, promoted, sold, and otherwise released into the stream of commerce its Roundup® products, and in the course of same, directly advertised or marketed the products to consumers and end users, including Linda Kay, and Defendant therefore had a duty to warn of the risks associated with the reasonably foreseeable uses (and misuses) of its glyphosate-contain Roundup® products and had a duty to instruct on the proper and safe use of its products.

135.    At all times relevant, Defendant had a duty to properly test, develop, design, formulate, manufacture, inspect, package, label, market, promote, sell, distribute, maintain, supply and provide proper warnings, and take such steps as necessary to ensure that its Roundup® products did not cause users and consumers exposure to unreasonably dangerous risks. Defendant had a continuing duty to instruct consumers on the proper, safe use of its products. As manufacturer, seller, or distributor of chemical herbicides, Defendant is held to the knowledge of an expert in the field.

136.    At the time of manufacture, Defendant could have provided warnings or instructions regarding the full and complete risks of Roundup® and glyphosate because it knew or should have known of the unreasonable risks of harm associated with the use of and/or exposure to its products.

137.    Defendant failed to investigate, study, test, or promote the safety of its Roundup® products. Defendant also failed to minimize the dangers of its Roundup® products to Linda Kay and to those who would foreseeably use or be harmed by its herbicides.

138.    Despite the fact that Defendant knew or should have known that Roundup® products posed a grave risk of harm, it failed to warn Linda Kay and other consumers of the dangerous risks associated with use of and exposure to Roundup®. Roundup's dangerousness and the carcinogenic effects of glyphosate were known to Defendant, or scientifically knowable through appropriate research and testing by scientifically accepted methods, at the time Monsanto distributed, supplied, or sold Roundup® and were not known to end users and consumers, including Mrs. Kay.

139.    Monsanto knew or should have known that Roundup®'s glyphosate-containing ingredients created significant consumer risk of serious bodily injury and death. Defendant failed to adequately warn consumers and reasonably foreseeable users of the risks of Roundup exposure. Defendant has wrongfully concealed information concerning the dangerous nature of Roundup® and its active ingredient glyphosate, and has made false and/or misleading statements concerning the product's safety.

140.    Defendant's Roundup® products reached the intended consumers, handlers, users or other persons coming into contact with the products throughout the United States, including Linda Kay, without substantial change in condition as designed, manufactured, sold, distributed, labeled, and marketed by Defendant.

141.    Mrs. Kay used and/or was exposed to the use of Defendant's Roundup® products in their intended or reasonably foreseeable manner without knowledge of their dangerousness.

142.    Mrs. Kay could not have reasonably discovered Roundup's defects and the risks associated with the product's glyphosate-containing ingredients before or at the time of exposure. Mrs. Kay relied upon Defendant's skill, superior knowledge and resources, and judgment.

143.    Monsanto, as the manufacturer and/or distributor of Roundup®, is held to the level of knowledge of an expert the field of herbicide safety.

144.    Defendant knew or should have known that the minimal warnings disseminated with its Roundup® products were inadequate to protect Linda Kay and other consumers, but it failed to communicate sufficient information on the product's dangers and safe use/exposure and failed to communicate warnings and instructions which were appropriate and adequate to render Roundup safe for its ordinary, intended, and reasonably foreseeable uses, including agricultural and horticultural applications.

145.    The information Defendant provided or communicated failed to contain relevant warnings, hazards, and precautions to enable agricultural workers, horticultural workers, and at-home users to utilize Roundup® safely and with adequate protection. Instead, Defendant disseminated inaccurate, false and misleading information and failed to accurately or adequately communicate the comparative severity, duration, and extent of injury risk associated with Roundup and glyphosate exposure. Defendant continued to aggressively promote the efficacy of its products even after it knew or should have known of the unreasonable risks from use or exposure and concealed, downplayed, or otherwise suppressed, through aggressive marketing and promotion, any information or research about the risks and dangers of exposure to Roundup® and glyphosate.

146.    To this day, Defendant has failed to adequately and accurately warn of the true risks of to human health associated with the use of and/or exposure to Roundup® and its active ingredient glyphosate, a probable carcinogen.

147.    As a result of their inadequate warnings, Defendant's Roundup® products were defective and unreasonably dangerous when they left Monsanto's possession and/or control, were distributed by Defendant, and used by Mrs. Kay.

148.    Defendant is liable to Linda Kay for injuries caused by its failure to provide adequate warnings or other clinically relevant information and data regarding the appropriate use of Roundup products and the risks associated with the use of and/or exposure to Roundup® and glyphosate.

149.    The defects in Defendant's Roundup® products are substantial contributing proximate causes of Linda Kay's NHL, and if not for Defendant's misconduct and omissions, Mrs. Kay would not have sustained her injuries and damages.

150.    Had Defendant provided adequate warnings and instructions and properly disclosed and disseminated the risks associated with its Roundup® products, Mrs. Kay would not have used and been exposed to Roundup.

151.    As a direct and proximate result of Defendant placing its defective Roundup® products into the stream of commerce, Mrs. Kay developed NHL and has, is, and will continue to suffer permanent injuries including, but not limited to, physical pain, emotional distress, mental anguish, loss of enjoyment of life, infertility, disfigurement, diminished life expectancy, lost wages, as well as economic hardship, including considerable financial expenses for medical care and treatment.

WHEREFORE, Linda Kay seeks judgment in her favor for compensatory, consequential and punitive damages, in addition to all other damages recoverable by law, together with interest, costs herein incurred, attorneys' fees and all other relief this Court deems just and proper.

## COUNT III – NEGLIGENCE/GROSS NEGLIGENCE

152.   Plaintiffs re-assert the allegations contained in the foregoing Paragraphs of this Complaint and incorporate the same herein as if repeated verbatim.

153.   Defendant, directly or indirectly, caused Roundup® products to be developed, formulated, packaged, labeled, marketed, promoted, sold, and distributed.

154.   Defendant, directly or indirectly, caused Roundup® products to be purchased and/or used by Linda Kay.

155.   Defendant had a duty to exercise reasonable care in the design, formulation, testing research, manufacture, marketing, advertisement, promotion, supply, packaging, labeling, sale, and distribution of its Roundup® products, including the duty to take all reasonable steps necessary to design, manufacture, promote, and/or sell a product not unreasonably dangerous to consumers, users, and other persons, including Linda Kay, coming into contact with the product.

156.   Monsanto's duty of care to consumers, purchasers, and the general public included providing accurate, true, and correct information concerning the risks of using Roundup® and included appropriate, truthful, complete, and accurate warnings concerning the potential adverse effects of exposure to Roundup® and its active ingredient, glyphosate.

157.   Defendant knew, or in the exercise of reasonable care should have known, of the hazards, dangers and probable injuries and deaths caused by of Roundup® and the carcinogenic properties of the product and its active ingredient, glyphosate.

158.   Defendant knew or in the exercise of reasonable care should have known, that use of or exposure to its Roundup® products could cause non-Hodgkin's lymphoma and other diseases and injuries to those exposed to the products, including Mrs. Kay.

159.    Defendant knew, or in the exercise of reasonable care should have known, that Roundup® is more toxic than glyphosate alone and that scientifically accepted safety studies on Roundup® and Roundup®'s adjuvants and "inert" ingredients and/or the surfactant POEA were necessary to protect Plaintiffs from being harmed by Roundup®.

160.    Defendant knew, or in the exercise of reasonable care should have known, that tests limited to Roundup®'s active ingredient glyphosate were insufficient to prove the products safety.

161.    Defendant also knew, or in the exercise of reasonable care should have known, that users and consumers of Roundup® were unaware of the risks associated with the use of and/or exposure to Roundup® and its glyphosate ingredient.

162.    Defendant breached its duty of reasonable care and failed to exercise ordinary care in the design, formulation, research, development, manufacture, testing, marketing, promotion, advertisement, packaging, labeling, supply, sale, and distribution of its Roundup® products, in that Defendant produced and manufactured defective herbicides containing the chemical glyphosate, knew or had reason to know of the defects inherent in its products, knew or had reason to know that a user's or consumer's exposure to the products created a significant risk of harm and unreasonably dangerous side effects, including premature death, and failed to prevent or adequately warn of these risks.

163.    Defendant failed to appropriately, adequately and scientifically test Roundup®, Roundup® adjuvants and "inert" ingredients, and/or the surfactant POEA to protect Linda Kay from Roundup®.

164.    Despite the ability and means to investigate, study, and test its products and to provide adequate warnings, Defendant failed to do so. Monsanto has wrongfully concealed information

44

and made false and/or misleading statements concerning the risks of Roundup® and glyphosate exposure.

165.   Defendant's negligence includes, but is not limited to:

a.  Formulating, creating, developing, designing, producing, manufacturing, promoting, advertising, selling, and/or distributing its Roundup® products without thorough and adequate pre- and post-market testing;

b.  Formulating, creating, developing, designing, producing, manufacturing, promoting, advertising, selling, and/or distributing Roundup® while negligently and/or intentionally concealing and failing to disclose the results of trials, tests and studies of glyphosate exposure, and, consequently, the risk of serious harm associated with human use of and exposure to Roundup®;

c.  Failing to conduct reputable scientifically accepted studies and tests to determine whether or not Roundup® products with glyphosate ingredients are safe for their intended use in agriculture, horticulture, and at-home use;

d.  Failing to conduct reputable scientific studies and tests to determine the safety of "inert" ingredients and/or adjuvants contained within Roundup®, and determine the propensity of these ingredients to render Roundup® toxic, increase Roundup's toxicity and determine whether these ingredients are carcinogenic, magnify Roundup®'s carcinogenic properties, and determine whether or not "inert" ingredients and/or adjuvants are safe for use;

e.  Failing to use reasonable and prudent care in the design, formulation, development, research, testing, manufacturing, advertising, labeling and distribution of Roundup®

45

products so as to avoid the risk of serious harm associated with the prevalent use of Roundup®/glyphosate as a herbicide;

f.  Failing to design and manufacture Roundup® products so as to ensure they were at least as safe as other herbicides on the market;

g.  Failing to provide adequate instructions, guidelines, and safety precautions to those persons, including Mrs. Kay, whom Defendant could reasonably foresee would use and/or be exposed to its Roundup® products;

h.  Failing to disclose to Linda Kay, other users, consumers, and the general public that the use of and exposure to Roundup® presented severe risks of cancer and other grave illnesses;

i.  Failing to warn Linda Kay, users, consumers, and the general public that the products' risk of harm was unreasonable and that there were safer effective alternative herbicides available;

j.  Systemically suppressing or downplaying contrary evidence about the risks, incidence, and prevalence of side effects from Roundup® and its glyphosate;

k.  Representing that its Roundup® products were safe for their intended use when Monsanto knew or should have known that the products were not safe for their intended use;

l.  Declining to make or propose any changes to Roundup® products' labeling or other promotional materials which would alert Linda Kay, consumers and the general public of the risk of Roundup® and glyphosate;

m. Advertising, marketing, and recommending the use of Roundup® products while concealing and failing to disclose or warn of the dangers known by Monsanto to be associated with or caused by the use of and exposure to Roundup® and glyphosate;

n. Continuing to disseminate information to Linda Kay, other consumers and the general public which indicated or implied that Defendant's Roundup® products are safe for use in the agricultural, horticultural industries, and/or home use; and

o. Continuing the manufacture and sale of its products with the knowledge that the products were unreasonably unsafe, dangerous, and potentially lethal.

166. Monsanto under-reported, underestimated, and downplayed the serious dangers of its Roundup® products, negligently and deceptively comparing the safety risks and/or dangers of Roundup® with other available herbicides and common everyday foods, such as table salt.

167. Monsanto knew or should have known that it was foreseeable that consumers and/or users, including Mrs. Kay, would suffer injuries as a result of Defendant's failure to exercise reasonable ordinary care in the design, formulation, researching, testing, manufacturing, marketing, labeling, distribution, and sale of Roundup®.

168. Mrs. Kay did not know that serious injuries could result from the intended use of and/or exposure to Roundup® and its active ingredient glyphosate.

169. Defendant's negligence is the proximate cause of the injuries, harm, and economic losses that Linda Kay suffered, as described herein.

170. Defendant's conduct was, and remains, reckless, willful, and wanton. Defendant continues to risk the lives of its product's consumers and users with full knowledge of its products dangerousness. Defendant has made conscious decisions not to redesign or re-label

Roundup, or to warn or inform the public that Roundup is harmful. Defendant's grossly negligent conduct demands an award of punitive damages.

171.    As a proximate result of Defendant's wrongful acts and omissions in placing its defective Roundup® products into the stream of commerce without adequate warnings of its hazardous and carcinogenic properties, Linda Kay developed NHL and has, is, and will continue to suffer permanent injuries including, but not limited to, physical pain, emotional distress, mental anguish, loss of enjoyment of life, infertility, disfigurement, diminished life expectancy, lost wages, as well as economic hardship, including considerable financial expenses for medical care and treatment.

WHEREFORE, Linda Kay seeks judgment in her favor for compensatory, consequential and punitive damages, interest, costs herein incurred, attorneys' fees, and all such other and further relief allowed by law and which this Court deems proper and just.

## COUNT IV – BREACH OF EXPRESS WARRANTY
### (S.C. CODE ANN. § 36-2-313)

172.    Plaintiffs re-allege the allegations contained in the foregoing Paragraphs of this Complaint and incorporate the same herein as if repeated verbatim.

173.    At all times relevant to this litigation, Defendant engaged in the business of developing, designing, formulating, labeling, manufacturing, marketing, promoting, selling, and distributing its Roundup® products, which are defective and unreasonably dangerous to Linda Kay and other consumers, thereby placing Roundup® products into the stream of commerce. Monsanto exercised ultimate control and supervision over these actions.

174.    At all times relevant to this litigation, Defendant expressly represented and warranted to Linda Kay and the general public, by and through statements it made in labels, publications, package insert, and other written materials intended for Roundup consumers and the general

public, that its Roundup® products were safe to human health and the environment. Monsanto further expressly represented roundup as effective, fit, proper for its intended use as advertised, labeled, marketed, and promoted representing their products' quality to consumers and the public in such a way as to induce Roundup's purchase or use, thereby making an express warranty that its Roundup® products would conform to the representations.

175. These express representations included incomplete warnings and instructions which purport, but fail, to include the complete array of risks associated with use of and/or exposure to Roundup® and its glyphosate ingredient. Defendant knew or should have known that the risks expressly included in Roundup® warnings and labels did not, and still does not, accurately and adequately set forth the risks of developing the serious injuries. Defendant expressly represented that it's Roundup® products were safe and effective herbicides for use by Mrs. Kay and the public.

176. Monsanto's representations concerning Roundup® contained or constituted affirmations of fact or promises made by the seller to the buyer relating to the goods, and became part of the basis of the bargain, creating an express warranty that the goods would conform to the representations.

177. Monsanto placed its Roundup® products into the stream of commerce for sale and recommended their use to consumers and the public without adequately warning of the true risks of developing injuries, including NHL, associated with the use of and exposure to Roundup® and it's active ingredient glyphosate.

178. Monsanto breached these warranties because, *inter alia*, its Roundup® products were defective, dangerous, unfit for use, did not contain labels representing the true risks associated

49

with their use, and were not merchantable or safe for their intended, ordinary, and foreseeable use and purpose.

179.    Defendant's breach of express warranties includes, but is not limited to, the following particulars:

    a.   Defendant represented through its labeling, advertising, and marketing materials that its Roundup® products were safe, and fraudulently withheld and concealed information about the risks of serious injury associated with use of and/or exposure to Roundup® and glyphosate by expressly limiting, within warnings, materials and labels, the risks associated with use of and/or exposure to Roundup; and

    b.   Defendant represented that its Roundup® products were safe for use and fraudulently concealed scientific information and evidence demonstrating that glyphosate, the active ingredient in Roundup®, has carcinogenic properties, and that its Roundup® products are not safer than alternatives available on the market.

180.    Defendant had sole access to material facts concerning the risks associated with its Roundup® products as expressly stated within its warnings, labels and materials and Defendant knew that consumers and users, including Linda Kay, could not reasonably discover that the risks expressly included in Roundup® warnings and labels were inadequate and inaccurate.

181.    Mrs. Kay had no knowledge of the falsity or incompleteness of Monsanto's statements and representations concerning Roundup®.

182.    Linda Kay used and was exposed to Roundup® as researched, developed, designed, tested, formulated, manufactured, inspected, labeled, distributed, packaged, marketed, promoted, sold, or otherwise released by Defendant into the stream of commerce.

183.    Had the warning and labels for Roundup® products accurately, adequately and truthfully set forth the risks of Roundup® exposure, including Linda Kay's injuries, rather than expressly excluding such information and warranting that the products were safe for their intended use, Plaintiffs could have avoided the injuries complained of herein.

184.    As a direct and proximate result of Monsanto's wrongful acts and omissions. Mrs. Kay developed NHL and has, is, and will continue to suffer permanent injuries including, but not limited to, physical pain, emotional distress, mental anguish, loss of enjoyment of life, infertility, disfigurement, diminished life expectancy, lost wages, as well as economic hardship, including considerable financial expenses for medical care and treatment.

WHEREFORE, Linda Kay seeks judgment in her favor, compensatory, consequential and punitive damages, costs herein incurred, interest, attorneys' fees, and all such other and further relief allowed by law and which this Court deems proper and just.

### COUNT V – BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (S.C. CODE ANN. § 36-2-315)

185.    Plaintiffs re-allege the allegations contained in the foregoing Paragraphs of this Complaint and incorporate the same herein as if repeated verbatim.

186.    At all times relevant to this litigation, Defendant engaged in the business of testing, developing, designing, formulating, manufacturing, marketing, promoting, selling, and distributing its Roundup® products, which are defective and unreasonably dangerous to Linda Kay and other users and consumers, thereby placing Roundup® products into the stream of commerce.

187.    These actions were taken under Monsanto's ultimate control and supervision.

188.    Before Mrs. Kay used and was exposed to Roundup®, Monsanto impliedly warranted to her and other consumers and users that its Roundup® products were of merchantable quality and safe and fit for the use for which they were intended, horticultural herbicides.

189.    Defendant failed to disclose to Mrs. Kay and the general public that Roundup, even when used as intended, carries an increased risk of persons exposed being injured.

190.    Mrs. Kay reasonably relied upon Monsanto's skill, superior knowledge and judgment and upon its implied warranties that Roundup® products were of merchantable quality and fit for their intended purpose or use.

191.    The Roundup® products were expected by Monsanto to reach, and did in fact reach, Linda Kay without substantial change in the condition in which Defendant manufactured and sold them.

192.    Mrs. Kay was a foreseeable user and consumer of Roundup® products because Monsanto was aware that consumers would use Roundup® products in a manner marketed by Defendant.

193.    Defendant intended that its Roundup® products be used in the manner which Linda Kay and her family members in fact used them and Defendant impliedly warranted the products to be of merchantable quality, safe, and fit for the marketed uses, despite the fact that Roundup® was not adequately tested or researched.

194.    In reliance upon Defendant's implied warranty, Linda Kay and her family members, including her deceased mother and grandmother, used Roundup® as instructed and labeled and in the foreseeable manner intended, recommended, promoted, and marketed by Defendant.

195.    Mrs. Kay could not have reasonably discovered or known of the risk of serious injury associated with Roundup® or its glyphosate formulation.

196.    Defendant breached its implied warranty of merchantability to Linda Kay because its Roundup® products were not of merchantable quality, safe, fit for their intended use, or adequately tested or labeled. Roundup® has dangerous propensities when used as intended and can cause serious injuries, including non-Hodgkin's lymphoma.

197.    The harm caused by Defendant's Roundup® products far outweighed their benefit, rendering the products more dangerous than Mrs. Kay and other ordinary customers or users would expect, and more dangerous than alternative products.

198.    As a direct and proximate result of Monsanto's wrongful acts and omissions Linda Kay suffers severe physical and emotional injuries. Mrs. Kay developed NHL and has, is, and will continue to suffer permeant injuries including, but not limited to, physical pain, emotional distress, mental anguish, loss of enjoyment of life, infertility, diminished life expectancy, lost wages, as well as economic hardship, including considerable financial expenses for medical care and treatment.

WHEREFORE, Linda Kay seeks judgment in her favor, compensatory, consequential and punitive damages, costs herein incurred, interest, attorneys' fees, all other available legal remedies, and relief as this Court deems proper and just.

### COUNT VI – UNFAIR TRADE PRACTICES
### (SOUTH CAROLINA UNFAIR TRADE PRACTICES ACT)

199.    Plaintiffs re-allege the allegations contained in the foregoing Paragraphs of this Complaint and incorporate the same herein as if repeated verbatim.

200.    The South Carolina Unfair Trade Practices Act (hereinafter "SCUTPA" and "the Act") declares unlawful "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." S.C. Code Ann. § 39-5-20(a).

201.    In violation of S.C. Code Ann. § 39-5-10, *et seq*, Monsanto has committed and continues to commit "unfair or deceptive method[s], act[s], or practice[s]." Defendant's practices were likely to, and did in fact, deceive and mislead members of the public, including Linda Kay and other users and consumers, acting reasonably under the circumstances, to their detriment. These practices include, but are not limited to, Defendant's use of false or misleading representations or omissions of material fact in connection with the testing, developing, designing, formulating, manufacturing, marketing, promoting, labeling, selling, and distributing, of its Roundup products.

202.    Defendant has engaged in unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of its trade and commerce by, *inter alia*, offering and selling its Roundup® products as horticultural herbicides while negligently and/or intentionally concealing or failing to disclose the results of trials, tests and studies of exposure to Roundup and glyphosate and, consequently, the risk of serious harm associated with human use of and exposure to Roundup®.

203.    Additionally, in connection with the sale of the unsafe and/or defective product to Plaintiff, Defendant, through its employees, agents and representatives, violated SCUTPA by engaging in unfair or deceptive acts or practices by expressly and/or impliedly warranting Roundup to be of merchantable quality, safe, and fit for their intended use, despite the fact that Roundup® was not adequately tested, researched, or labeled.

204.    Monsanto continues to represent Roundup®/glyphosate as safe for consumer use, and denies all risks of serious harm associated with human use of and exposure to Roundup®, presenting an unhindered potential for repetition, thus having a severe impact on public interest.

205.    Linda Kay is an intended beneficiary of SCUTPA as a citizen of South Carolina because the Act includes "any trade or commerce directly or indirectly affecting the people of this State." S.C. Code Ann. § 39-5-10(b). Mrs. Kay has suffered ascertainable loss of money as the result of Monsanto's use and employment of unlawful, unfair, and deceptive methods, acts and practices. S.C. Code Ann. § 39-5-140(a).

206.    As a direct and proximate result of Monsanto's unlawful, unfair, and deceptive methods, acts, and practices, Linda Kay has suffered injuries, damages and losses resulting from Monsanto's negligent, reckless, willful and/or intentional acts and omissions as well as the dangerous effects of its Roundup® products. Mrs. Kay developed NHL and has, is, and will continue to suffer permeant injuries including, but not limited to, physical pain, emotional distress, mental anguish, loss of enjoyment of life, infertility, disfigurement, diminished life expectancy, lost wages, as well as economic hardship, including considerable financial expenses for medical care and treatment.

207.    Pursuant to S.C. Code Ann. § 39-5-140(a), any damages awarded for this claim should be trebled, as Monsanto's violations of the Act were, and are, willful and knowing.

WHEREFORE, Linda Kay seeks judgment in her favor, compensatory damages, together with interest, costs herein incurred, attorney's fees, and all such other and further relief as this Court deems just and proper.

## COUNT VII – LOSS OF CONSORTIUM

208.    Plaintiffs re-allege the allegations contained in the foregoing Paragraphs of this Complaint and incorporate the same herein as if repeated verbatim.

209.    Todd Kay brings this action for loss of consortium.

210.     Plaintiffs Todd Kay and Linda Lay are currently married, and were married to one another at the time Linda Kay's cancer was first discovered.

211.     As described more fully herein, Linda Kay has developed NHL as a direct and proximate result of Monsanto's negligent and/or reckless conduct. The injuries Mrs. Kay has and continues to suffer have damaged Plaintiffs' marriage.

212.     As a direct and proximate result of Monsanto's conduct, Todd Kay has been deprived of Mrs. Kay's full society, care, comfort, affection, services, companionship, and has otherwise suffered loss of consortium.

WHEREFORE, Todd Kay seeks judgment in his favor, compensatory, consequential and punitive damages in excess of the jurisdictional minimum of this Court, together with interest, costs of suit, attorney's fees, and all such other and further relief as allowed by law as this Court deems just and proper.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment against Defendant in their favor on each of the above-referenced claims and causes of action as follows:

A.  Compensatory damages in excess of the jurisdictional limit, including, but not limited to, medical expenses, out-of-pocket expenses, lost earnings, and other economic damages in an amount to be proven at trial;

B.  Compensatory damages in excess of the jurisdictional limit, including, but not limited to, pain and suffering, emotional distress, loss of enjoyment of life, loss of consortium and other non-economic damages in an amount to be determined at trial;

C.  Punitive damages for Defendant's wanton, willful, fraudulent, and reckless acts demonstrating a complete disregard and reckless indifference for the safety and welfare

of Plaintiffs and the general public in an amount sufficient to punish Defendant and deter future similar conduct, to the extent allowable by applicable law;

D.  Default judgment for the bad faith destruction of evidence, if any, and according to proof, if any;

E.  Pre and post-judgment interest;

F.  Costs including attorney's fees, court costs, interest and other litigation expenses; and

G.  All other further relief this Court may deem just and proper.

## **DEMAND FOR JURY TRIAL**

Plaintiffs hereby demand trial by jury as to all issues raised herein.

*s/ Cameron L. Marshall*
Cameron L. Marshall (D.S.C. Bar No. 7678)
7 Gamecock Ave., Ste. 707
Charleston, S.C. 29407
P: (843) 795-2298
F: (843) 795-5081
cameron@attorneymarshall.com
*Attorney for the Plaintiffs*

December 11, 2020
Charleston, South Carolina