A TRUE COPY I CERTIFY
James W. McCormack, Clerk
By: TammyDowns D.C. on
Dec 28, 2020
For the United States District Court
Eastern District of Arkansas

JTR,JURY

# U.S. District Court
## Eastern District of Arkansas (Central Division)
## CIVIL DOCKET FOR CASE #: 4:20-cv-01495-BSM
## Internal Use Only

Fennell v. Monsanto Company

Assigned to: Judge Brian S. Miller

Cause: 28:1332 Diversity-Product Liability

Date Filed: 12/24/2020

Jury Demand: Plaintiff

Nature of Suit: 365 Personal Inj. Prod. Liability

Jurisdiction: Diversity

**Plaintiff**

**Linda D Fennell**                    represented by    **James W. Stanley , Jr.**
The Stanley Law Firm P.A.
201 South Izard Street
Little Rock, AR 72201
501-324-2889
Fax: 501-324-2820
Email: james@jwstanleylaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Monsanto Company**

| Date Filed | # | Docket Text |
|---|---|---|
| 12/24/2020 | 1 | COMPLAINT with Jury Demand against Monsanto Company, filed by Linda D Fennell. (Filing Fee of $402 paid. Receipt Number LIT080222. Summons not issued. (Attachments: # 1 Civil Cover Sheet)(kdr) (Entered: 12/24/2020) |
| 12/28/2020 | 2 | Deficiency Letter from Clerk of Court notifying party that 1 Complaint lacks an original signature (F.R.Cv.P.11(a) and Local Rule 5.5(c)(1)). (thd) (Entered: 12/28/2020) |

A TRUE COPY I CERTIFY

James W. McCormack, Clerk

By: TammyDowns D.C. on
**Dec 28, 2020**

For the United States District Court
Eastern District of Arkansas

**FILED**

U. S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS

DEC 2 4 2020

JAMES W. McCORMACK, CLERK

By:_____

**DEP CLERK**

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION

LINDA D. FENNELL,       )
                        )
PLAINTIFF               )
                        )
                        )
V.                      )  CASE NO.: 4:20-cv-01495-BSM
                        )
MONSANTO COMPANY,       )
                        )
DEFENDANT               )   This case assigned to District Judge Miller
                            and to Magistrate Judge Ray

## COMPLAINT

Comes, Linda D. Fennell, by and through her counsel, James W. Stanley, Jr., and hereby brings this Complaint seeking damages for her personal injuries against Defendant, Monsanto Company, and for her cause of action states unto this court as follows:

## NATURE OF THE CASE

1.  This is an action seeking damages for bodily injuries suffered by your Plaintiff as a direct and proximate result of Defendant's negligent and wrongful conduct in connection with the design, development, manufacture, testing, promoting, marketing, distribution, labeling, and sale of Defendant's herbicide product Roundup, containing the active agent glyphosate, *inter alia*.

2.   Plaintiff Fennell worked for and was employed in the vicinity of Remington Road in Lonoke, Arkansas.  During the time she was employed Plaintiff extensively used Roundup for weed control in approximately 2016 and in 2017.  Plaintiff was diagnosed with Leukocytic Leukemia (HCC), which is considered related to the use of Roundup.

Plaintiff Fennell is currently undergoing chemotherapy treatment for her HCC.  Plaintiff's life has been drastically affected, as she has lost her sense of smell and is no longer able to operate a motor vehicle because her vision has been impaired by the HCC and its accompanying therapy.

3.   Plaintiff Fennell avers and maintains Defendant's Roundup and its active ingredients such as glyphosate were defective and dangerous products, adversely impacting human health, are therefore unfit and unsuitable to be marketed and sold in commerce, and the products' container lacked proper warnings and notice as to all dangers associated with Roundup's intended use as a non selective type herbicide.

4.   Plaintiff's bodily injuries, similar to those of thousands of other users of Roundup could have been avoided by the Defendant.

5.   Roundup, for purposes of this litigation, herein refers to all formulations

2

of Defendant's Roundup products, including, but not limited to, Roundup

Concentrate Poison Ivy and Tough Brush Killer 1, Roundup Custom Herbicide,

Roundup D-Pak Herbicide, Roundup Dry Concentrate, Roundup Fence and Hard

Edger 1, Roundup Garden Foam Weed and Grass Killer, Roundup Grass and Weed

Killer, Roundup Herbicide, Roundup Original 2k Herbicide, Roundup Original II

Herbicide, Roundup Prodry Herbicide, Roundup Promax, Roundup Quik Stik

Grass and Weed Killer, Roundup Quikpro Herbicide, Roundup Rainfast

Concentrate Weed and Grass Killer, Roundup Rainfast Super Concentrate Weed

and Grass Killer, Roundup Ready-to-use Extended Control Weed and Grass Killer

1 Plus Weed Preventer, Roundup Ready-to-Use Weed and Grass Killer, Roundup

Weed and Grass killer II  Roundup Ultra Herbicide, Roundup Ultradry, Roundup

Ultra Herbicide, Roundup Ultramax, Roundup VM Herbicide, Roundup Weed and

Grass Killer Concentrate, Roundup Concentrate Plus, Roundup Weed & Grass

Killer Ready to Use Plus, Roundup Weed and Grass  super Concentrate, Roundup

Weed and Grass Killer 1 Ready-to-Use, Roundup WSD Water Soluble Dry

Herbicide Deploy Dry Herbicide, or any other formulation containing the active

ingredient glyphosate as manufactured by your Defendant.

## JURISDICTION AND VENUE

6.  This Court has jurisdiction over Defendant and this action pursuant to 28

U.S.C. 1332 as there is complete diversity of citizenship between Plaintiff and Defendant. Defendant is duly incorporated in the state of Delaware and has it principal place of business in the state of Missouri. Plaintiff is a citizen of Arkansas and a resident of Pulaski County, Arkansas.

6. The amount in controversy between Plaintiff and Defendant exceeds $75,000.00, exclusive of interest and costs.

7. The Court has further jurisdiction pursuant to 28 U.S.C. 1367.

8. Venue is properly within this district pursuant to 28 U.S.C. 1391 as Defendant conducts its business operation here and is subject to personal jurisdiction in this district. Furthermore, Defendant sells, markets, and/or distributes Roundup within the Central District of Arkansas. A substantial part of the acts and/or omissions giving rise to Plaintiff's cause of action occurred within this district.

9. Plaintiff is a member of the class of litigants injured by the use of Defendant's Roundup in MDL#2741.

## PARTIES

10. Plaintiff Linda Fennell was at all times relevant a resident and citizen of Pulaski County, Arkansas. Plaintiff has suffered personal injuries sustained by her exposure to Roundup containing the active ingredient glyphosate and the surfactant

4

polyethoxylated tallow amine ("POEA"). As a direct and proximate result of being so exposed to Roundup, Plaintiff Fennell has developed chronic lymphocytic leukemia (HCC).

11. Defendant, Monsanto Company ("Defendant" of "Monsanto"), is, and at all times relevant times, a Delaware corporation, with its principal place of business in St. Louis, Missouri. Defendant is authorized to do business in the state of Arkansas.

12. Defendant Monsanto advertises and markets its products, specifically Roundup, in the state of Arkansas. Further, Defendant has transacted and conducted business within the state of Arkansas relating to the allegations as set forth in Plaintiff's Complaint. Defendant has derived revenue from the sale of Roundup in the state of Arkansas. It has sufficient minimum contacts with Arkansas for this court to have personal jurisdiction over it. Defendant expected or should have expected its acts to have direct consequences within the state of Arkansas, as it derived substantial revenue from its participation in interstate commerce.

13. Defendant is engaged in the business of designing, developing, manufacturing, testing, packaging, marketing, distributing, labeling, and/or selling its product Roundup. Defendant has designed, sell, marketed, advertised,

5

manufactured, and/or distributed Roundup having at all times, full knowledge of its dangerous and defective propensities.

14. Defendant Monsanto was in the business of, and did, design, research, manufacture, test, advertise, promote, market, sell, distribute, and/or has acquired and is responsible for the commercial herbicide Roundup. Glyphosate is the principal active ingredient of Roundup.

15. Monsanto is a multinational agricultural biotechnology corporation and is the principal producer of glyphosate, the active ingredient in Roundup.

16. Defendant Monsanto discovered herbicidal uses of glyphosate and it then began to design, research, manufacture, sell, and to distribute glyphosate by way of Roundup as a broad-spectrum type herbicide.

17. Glyphosate is considered the active agent in a broad-spectrum herbicide employed to kill weeds and grasses known to compete with commercial crops. Glyphosate is considered a "non-selective" herbicide, i.e.: it kills vegetation indiscriminately based only on whether a given organism produces a specific enzyme, a 5-enolpyruvylshikimic acid 3-phosphate synthase, known as EPSP synthase. Glyphosate inhibits this enzyme 5-enolpyruvylshikimic acid 3-phosphate synthase by interfering with the shikimic pathways in plants, resulting in

6

the accumulation of shikimic acid in plant tissue and ultimately resulting in plant tissue death.

18.  Roundup, when deployed as a liquid, causes plants to absorb glyphosate directly through their leaves, stems, and roots, so that detectable quantities will accumulate in plant tissues.

19.  Defendant Monsanto has been intimately involved in the development, design, manufacture, marketing, sale, and/or distribution of genetically modified ("GMO") crops, many of which are marketed as being resistant to Roundup, (i.e.: "Roundup Ready").  Defendant is a leading producer of seeds designed to be "Roundup Ready."

## REGISTRATION OF HERBICIDES UNDER FEDERAL LAW

20.  The manufacture, formulation, and distribution of herbicides, such as Roundup, are regulated under the Federal Insecticide, Fungicide, and Rodenticide Act (hereinafter "FIFRA"), 7 U.S.C. 136, *et. seq*. FIFRA mandates all pesticides be registered with the Environmental Protection Agency ("EPA") prior to their distribution, sale, or use, except as described in 7 U.S.C. 136a(a).  The EPA has required, as part of this registration process, a variety of tests be employed in order to evaluate the potential for exposure to pesticides of any toxicity to people and

7

any other potential non-target organisms, as well as other adverse effects on the environment.

Registration by the EPA, however, is not, by itself, an assurance of Roundup's safety. The determination the EPA makes in registering a product is not the product is necessarily safe, but rather use of the product in accordance with its label directions "will not cause unreasonable adverse effects on the environment." 7 U.S.C. 136(a)(c)(5)(D).

21. FIFRA defines "unreasonable adverse effects on the environment" to mean "any unreasonable risk to humans or the environment, taking into account the economic, social, and environmental costs and benefits of the use of any pesticide. 7 U.S.C. 136(bb). FIFRA requires the EPA to make a risk/benefit analysis in order to determine whether a registration should be granted or allowed to continue to be sold in commerce. FIFRA generally requires the registrant, Defendant Monsanto, herein, conduct health and safety testing of its pesticide products. The EPA is not required, nor is it able, to perform the product tests required of the manufacturer.

22. The evaluation of each pesticide product distributed, sold, or manufactured is completed at the time the produce is initially registered. The date necessary for registration of a pesticide has changed over time. The EPA is now in

8

the process of re-evaluating all pesticide products through a Congressionally

mandated process called "re-registration." 7 U.S.C. 136a-1. In order to re-evaluate

these pesticides, the EPA demands the completion of additional tests and the

submission of data for the EPA's review and evaluation.

23. In the case of glyphosate and Roundup, the EPA had planned on

releasing its preliminary risk assessment in relation to the registration process, no

later than July, 2015. The EPA completed its review of glyphosate in early 2018

but delayed releasing the assessment pending further review in light of the World

Health Organization's March 24, 2015 finding glyphosate to be a "probable

carcinogen" as demonstrated by the mechanistic evidence of carcinogenicity in

humans and sufficient evidence of carcinogenicity in animals.

## MONSANTO'S FALSE REPRESENTATIONS
## REGARDING THE SAFETY OF ROUNDUP

24. In 1996, the New York Attorney General filed litigation against

Defendant Monsanto based on its false and misleading advertising of Roundup.

Specifically, the lawsuit challenged Monsanto's general representations its spray-

on glyphosate-based herbicides, including Roundup, were "safer than table salt

"and practically non-toxic to mammals, birds, and fish. Among the representations

the Attorney General found deceptive and misleading about the human and

environmental safety of Roundup included the following, viz:

9

a. Environmentally friendly Roundup herbicide was biodegradable, would not accumulate in the soil and could be used with confidence along customers' driveways, sidewalks, and fences.

b. Roundup would not build up in the soil, giving the environmental confidence needed to use Roundup everywhere there were weeds, brush edging, or trimming concerns.

c. Roundup herbicide would remain where it was placed, meaning there would be no washing or offsite relocation leaching to harm customers' shrubs or other desirable vegetation.

d. The herbicide would not wash or leach in the soil and would remain where applied, as it bonded tightly to soil particles, thereby preventing such leaching, soon after application and soil microorganisms would biodegrade Roundup it into natural products.

e. Glyphosate was less toxic to rats than table salt following acute oral ingestion. Glyphosate's safety margin was much greater than required, having over a 1,000-fold safety margin in food and over a 700-fold safety margin for worker who manufacture it or use it.

10

f. Users could feel good about utilizing herbicides made by Defendant Monsanto as they were "practically non-toxic" as pertaining to mammals, birds, and fish.

g. Roundup could be used where children and pets played and would break down into natural materials.

25. On November 19, 1996, Defendant Monsanto entered into an "Assurance of Discontinuance" agreement with the New York Attorney General , by which Defendant Monsanto agreed, among other things, "to cease and desist from publishing or broadcasting any advertisements representing, directly or by implication" that:

a. its glyphosate-containing pesticide products or any component thereof are safe, non-toxic, harmless, or free from risk.

b. its glyphosate-containing pesticide products or any component thereof manufactured, formulated, distributed, or sold by Monsanto are biodegradable.

c. its glyphosate-containing pesticide products or any component thereof stay where they are applied under all circumstances and will not move through the environment by any means.

d. its glyphosate-containing pesticide products or any component thereof are "good" for the environment or are known for their environmental characteristics."

11

e. glyphosate-containing pesticide products or any component thereof are safer or less toxic than common consumer products other than herbicides.

f. its glyphosate-containing products or any component thereof might be classified as practically non-toxic.

26. Defendant Monsanto did not alter its advertising in any state other than New York, and on information and belief, it still has not done so. This included Arkansas.

## EVIDENCE OF CARCINOGENICITY IN ROUNDUP

27. Plaintiff avers early as the 1980's Defendant Monsanto was fully aware of glyphosate's carcinogenic properties and propensities.

28. On March 4, 1985, a group of the Environmental Protection Agency's ("EPA") Toxicology Branch published a memorandum classifying glyphosate as a Category C oncogene. Category C oncogenes are considered possible human carcinogens with limited evidence of carcinogenicity.

29. In 1986, the EPA issued a Registration Standard for glyphosate (NTIS PB87-103214). The Registration standard required additional phytotoxicity, environmental fate, toxicology, product chemistry, and residue chemistry studies. All of the data required was submitted and reviewed and/or waived.

30. In October 1991, the EPA published a Memorandum entitled "Second Peer Review of Glyphosate." The memorandum changed glyphosate's classification to Group E (evidence of non-carcinogenicity for humans). Two peer review committee members did not concur with the conclusions of the committee and one member refused to sign these memorandums.

31. In addition to the toxicity of the active ingredients in Roundup, studies have supported the hypothesis glyphosate formulations such as contained in Defendant's Roundup, were more dangerous and toxic than glyphosate alone. As early as 1991 evidence existed demonstrating glyphosate formulations were significantly more toxic than glyphosate by itself.

32. A study noted "cell-cycle dysregulation was a hallmark of tumor cells in human cancer, noting failure in the cell-cycle checkpoints leads to genomic instability and subsequent development of cancers from the initial affective cell. Further, as cell cycle disorders, such as cancer, result from dysfunction of unique cells, it was of interest to evaluate the threshold does of glyphosate affecting the cells.

33. Studies have revealed Roundup and glyphosate, at far below agricultural recommendations, changed human cell permeability and amplified toxicity of glyphosate. Studies further has confirmed the adjuvants used in Roundup are not

13

inert and Roundup is always more toxic than its active ingredient glyphosate alone. The results of these studies were confirmed in recently published peer-reviewed studies and were at all times available and/or known to Defendant Monsanto. Defendant knew or should have known Roundup was more toxic than glyphosate alone and that safety studies on Roundup, Roundup's adjuvants, and inert ingredients, and/or the surfactant were necessary to protect Plaintiff from Roundup's chemical contents. And, Defendant Monsanto knew or should have known Roundup's active ingredient glyphosate was insufficient to prove the safety of Roundup.

34. Your Defendant failed to appropriately and adequately test Roundup, Roundup's adjuvants, and inert ingredients, and/or the surfactant to protect Plaintiff from Roundup. Rather than performing appropriate tests, Defendant Monsanto relied upon flawed industry-supported studied designed in order to protect Defendant's pecuniary interests rather than Plaintiff and the consuming public. Despite its knowledge Roundup was considerably more dangerous than glyphosate alone, Defendant continued to promote Roundup as being safe.

## IARC CLASSIFCATION OF GLYPHOSATE

35. The Internal Agency for Research on Cancer ("IARC") is the specialized intergovernmental cancer agency the World Health Organization of the

14

United Nations tasked with conducting and coordinating research into the causes of cancer.

An IARC Advisory Group to Recommend Priorities for IARC Monographs during 2015-2019 met in April, 2014. Though nominations for the review were solicited, a substance must meet two criteria to be eligible for review by the IARC Monographs: there must already be some evidence of carcinogenicity of the substance, and there must be evidence that humans are exposed to the substance.

IARC set glyphosate for review in 2015-2016. IARC uses five criteria for determining priority in reviewing chemicals. The substance must have a potential for direct impact on public health; scientific literature to support suspicion or carcinogenicity; evidence of significant human exposure; high public interest and/or potential to bring clarity to a controversial area and/or reduce public anxiety or concern; related agents similar to one given high priority by the above considerations. Data reviewed is sources preferably from publicly assessable, peer-reviewed data.

On March 25, 2015, after its cumulative review of human, animal, and DNA studies for more than (a) year, many of which have been in Defendant's possession since as early as 1985, the IRAC's working group publishes its conclusion that the glyphosate contained in Defendant's Roundup herbicide, is a Class 2A "probable

carcinogen" as demonstrated by the mechanistic evidence of carcinogenicity in humans and sufficient evidence of carcinogenicity in animals.

The IARC's full Monograph was published on July 29, 2015. It established glyphosate as a class 2A probable carcinogen to humans. According to the authors, glyphosate demonstrated sufficient mechanistic evidence (genotoxicity and oxidative stress) to warrant a 2A classification based on evidence of carcinogenicity in humans and animals.

The IARC Working Group found an increased risk between exposure between glyphosate and non-Hodgkin's' lymphoma ("NHL") and several subtypes of NHL, and the increased risk continued after adjustment for other pesticides.

The IARC also found glyphosate caused DNA and chromosomal damage in human cells.

## EARLIER EVIDENCE OF GLYPHOSATE'S DANGER

36. Despite the new classification by the IARC, Defendant Monsanto has had ample evidence of glyphosate and Roundup genotoxic properties for many decades. Genotoxicity refers to chemicals agents that are capable of damaging the DNA within a cell through genetic mutations, which is a process that is believed to lead to the development of cancer.

16

37. Both human and animal studies have shown glyphosate and glyphosate-based formulations such as Roundup can induce oxidative stress. Oxidative stress and associated chronic inflammation are believed to be involved in carcinogenesis. The IARC Monograph notes strong evidence exists glyphosate, AMPA and glyphosate-based formulations can induce oxidative stress.

38. A study has produced evidence of chromosomal damage in blood cells showing significantly greater damage after exposure to glyphosate than before in the same individuals, suggesting that the glyphosate formulation used during aerial spraying had a genotoxic effect on exposed individuals.

39. Despite knowledge to the contrary, Defendant Monsanto has maintained there was no evidence Roundup was genotoxic, that regulatory authorities and independent experts were in agreement Roundup was not genotoxic, and there was no evidence Roundup was genotoxic. However, Defendant has long been aware of glyphosate's carcinogenic properties.

40. Glyphosate and Roundup in particular have long been associated with carcinogenicity and the development of numerous forms of cancer, including, but not limited to, non-Hodgkin's lymphoma, Hodgkin's lymphoma, multiple myeloma, HCC, and soft tissue sarcoma.

17

Defendant Monsanto has known of this association since the early to mid-1980's and numerous human and animal studies have evidenced the carcinogenicity of glyphosate and/or Roundup.

41. In 2003, Lennart Hardell and Mikael Eriksson published the results of two case-controlled studies on pesticides finding a risk factor for leukemia. In spite of this knowledge, Defendant Monsanto continued to issue broad and sweeping announcements implying its Roundup was, and is, safer than ordinary household items such as table salt, despite a lack of scientific support the accuracy and validity of these statements and voluminous peer-reviewed scientific evidence to the contrary.

42. Upon Plaintiff's information and belief, Defendant's statements and representations have been made with the intent of including Plaintiff, and the public at large, to acquire and utilized Defendant's Roundup for Defendant's pecuniary gain, and in fact, did induce Plaintiff to so employ Roundup.

43. Defendant made these statements with complete disregard and reckless indifference to the safety of Plaintiff and the general public. Notwithstanding Defendant's representations, scientific evidence hs established a clear association between glyphosate and genotoxicity, inflammation, and an increased risk of many cancers.

Defendant knew or should have known glyphosate was associated with an increased risk of developing cancer, including, leukemia such as you Plaintiff suffers from.

44. Defendant Monsanto failed to appropriately and adequately inform and warn Plaintiff of the serious and dangerous risks associated with the use of exposure to glyphosate and/or Roundup, including, but not limited to, the risk of developing leukemia, as well as other and severe personal injuries, which are permanent and/or long-lasting in nature, can cause significant physical pain suffering and mental anguish, a diminished enjoyment of live, and the need for medical intervention monitoring, and/or medications all at considerable expenses to your Plaintiff.

45. Despite the IRA's classification of glyphosate as a class 2A probable carcinogen, Defendant has continued to maintain glyphosate and/or Roundup is safe, non-carcinogenic, non-genotoxic, and falsely warranted to users such as Plaintiff and to the general public independent experts and regulatory agencies agree there was no evidence of carcinogenicity in glyphosate and Roundup. Defendant has claimed and continues to claim Roundup is safe, non-carcinogenic, and non-genotoxic.

19

46. Defendant Monsanto claims regulatory authorities and independent experts around the world have reviewed numerous long-term/carcinogenicity and genotoxicity studies and have concluded there was no evidence glyphosate, the active ingredient in Roundup and other glyphosate-based herbicides, caused cancer, even at very high does, and that it was not genotoxic. The primary source for this statement was a 1986 report by the WHO, the same organization that now considers glyphosate to be a probable carcinogen.

Glyphosate, and the Defendant's Roundup products have long been associated with serious side effects and many regulatory agencies around the globe have banned or are currently banning the use of glyphosate herbicide products.

Defendant's statements proclaiming the safety of Roundup and disregarding its dangers misled Plaintiff. Had your Plaintiff been duly informed of the dangers she would have avoided using Roundup.

Despite Defendant's knowledge Roundup was associated with an elevated risk of developing cancer, Defendant's promotional campaigns focused on Roundups purported "safety profile."

47. Defendant's Monsanto's failure to adequately warn Plaintiff resulted in (1) Plaintiff using and being exposed to glyphosate instead of using another acceptable and safe method of controlling unwanted vegetation; and (2) scientists

20

and physicians failing to warn and instruct consumers such as your Plaintiff

regarding the risk of cancer, including leukemia, and other disorders associated

with Roundup.

Defendant Monsanto failed to seek a modification of the labeling of

Roundup to include relevant information regarding the risks and dangers

associated with Roundup exposure including leukemia.

The failure of Defendant to appropriately warn and to inform the EPA has

resulted in inadequate warnings in safety information presented directly to users

such as your Plaintiff. Further, the failure of Defendant Monsanto to appropriately

warn and inform the EPA has resulted in the absence of warning or caution labels

needed to protect the public including the Plaintiff.

48. By reason of the foregoing acts, errors, and omissions, all proximately

causing Plaintiff's bodily injury (e.g.: HCC), Plaintiff Fennell seeks compensatory

damages as a result of her use of and exposure to Roundup such as it has or was a

substantial contributing factor in causing Plaintiff to suffer from leukemia, and

severe bodily injuries which are permanent and lasting in nature, with physical

pain, suffering, and mental anguish, as well as a diminished enjoyment of her life.

49. By reason of the foregoing acts of omissions and providing a dangerous

and defective herbicide. By virtue of the foregoing acts and omissions, Plaintiff

21

has endured and continues to suffer, emotional and mental anguish, medical

expenses, and other economic and non-economic damages, as a result of the

actions and inactions of the Defendant Monsanto.

## PLAINTIFF'S EXPOSURE TO ROUNDUP

50. Plaintiff Fennell commenced using Defendant's Roundup beginning in

approximately 2016 and continuing thereafter. Plaintiff frequently sprayed

Roundup on lands on a regular basis. She followed all safety and precautionary

warnings during the course of her use of Roundup. She breathed in Roundup

fumes and the liquid permeated to her skin and clothing.

51. Plaintiff Fennell was subsequently diagnosed with chronic lymphocytic

leukemia (HCC) in approximately August, 2019. The development of Plaintiff's

Leukemia was proximately and actually caused by her long-term exposure to

Defendant's Roundup products and to no other known carcinogen such as radio-

active agents. But for such exposure it is very unlikely Plaintiff would have

developed HCC.

As a result of her HCC, Plaintiff Fennell has incurred significant bodily

damages.

## FIRST CAUSE OF ACTION
### (NEGLIGENCE)

52. Plaintiff Fennell repeats, reavers, and realleges each and every material allegation of her Complaint contained in each of the foregoing paragraphs.

Defendant Monsanto had a duty to exercise ordinary and reasonable care in its designing, researching, testing, manufacturing, marketing, supplying, promoting, packaging, sale, and/or distribution of Roundup into the stream of commerce, including a duty to assure that the product would not cause users to suffers unreasonable, dangerous side effects.

53. Defendant Monsanto failed to exercise ordinary care in the designing, researching, testing, quality assurance, quality control, and/or distribution of Roundup created s high risk of unreasonable, dangerous side effects, including, but not limited to, the development of leukemia, as well as other severe and personal injuries which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of live, as well as the need for lifelong medical treatment, monitoring, and/or medications.

54. The negligence by the Defendant, its agents, servants, and/or employees, includes but was not limited to the following acts and/or omissions, viz:

23

a.  Manufacturing, producing, promoting, formulating, creating, and/or designing Roundup without thoroughly testing it;

b.  Failing to test Roundup and/or failing to adequately, sufficiently, and properly test Roundup.

c.  Not conducing sufficient testing programs to determine whether or not Roundup was safe for use; in that Defendant herein knew or should have known that Roundup was unsafe and unfit for the use by reason of the dangers to its users.

d. Not conducing sufficient testing programs and studies to determine Roundup's carcinogenic properties even after Defendant had knowledge that Roundup is, was, or could be carcinogenic.

e. Failing to conduct sufficient testing programs to determine the safety of "inert" ingredients and/or adjuvants contained within Roundup and the propensity of these ingredients to render Roundup toxic, increase the toxicity of Roundup, whether these ingredients are carcinogenic, magnify the carcinogen properties of Roundup toxic, and whether or not "inert" ingredients and/or adjuvants were safe for use;

f.  Negligently failing to adequately and correctly warn the Plaintiff, the public, the medical and agricultural professions, and the EPA of the dangers of Roundup.

g. Negligently failing to petition the EPA to strengthen the warnings associated with Roundup.

h. Failing to provide adequate cautions and warnings to protect the health of users, handlers, applicators and persons who would reasonably and foreseeable come into contact with Roundup.

i. Negligently marketing, advertising, and recommending the use of Roundup without significant knowledge as to its dangerous propensitites;

j. Negligently representing that Roundup was safe for use for its intended purposes, and/or Roundup was safer than ordinary and common items such as table salt, when, in fact, it was unsafe;

k. Negligently representing that Roundup had equivalent safety and efficacy as with other herbicides.

l. Negligently designing Roundup in such a manner which was dangerous to users such as Plaintiff;

m. Negligently manufacturing Roundup in a manner, which was dangerous to its users such as Plaintiff;

n. Negligently producing Roundup in a manner, which was dangerous to its users, such as Plaintiff;

o. Negligently formulating Roundup in a manner, which was dangerous to its users, such as Plaintiff;

p. Concealing information from the Plaintiff knowing Roundup to be unsafe, dangerous, and/or non-conforming with applicable EPA regulations.

q. Improperly concealing and/or misrepresenting information from the Plaintiff, scientific and medical professionals, and/or the EPA, concerning the severity of risks and dangers of Roundup; and

r. Negligently selling Roundup with a false and misleading label.

55. Defendant negligently and deceptively compared the safety risks and/or dangers of Roundup with common everyday foods such as table salt, and forms of herbicides, thereby misleading your Plaintiff.

56. At all times relevant, Defendant Monsanto was aware Roundup was dangerous and defective concealed the dangers and risks from Plaintiff made misrepresentations to Plaintiff and the public in general as to the safety of Roundup and with full knowledge of the risks associated with Roundup, without adequate warnings of same, manufactured, designed, packaged, labeled, marketed, advertised, distributed, and sold Roundup to the general public, and to Plaintiff. Defendant accordingly has engaged in grossly negligently conduct toward Plaintiff

and the public and has, acted with willful and wanton and/or reckless disregard for the safety of your Plaintiff.

57. Defendant Monsanto was careless and negligent in the designing, researching, supplying, manufacturing, promotion, packaging, distributing, testing, advertising, warning, marketing, and selling of Roundup in that they:

a. Failed to use ordinary care in designing and manufacturing Roundup so as to avoid the aforementioned risks to individuals when Roundup was use as an herbicide;

b. Failed to accompany its product with proper and/or accurate warnings regarding all possible adverse side effects associated with the use of Roundup;

c. Failed to accompany its product with proper warnings regarding all possible adverse side effects concerning the failure and/or malfunction of Roundup;

d. Failed to accompany its product with accurate warnings regarding the risks of all possible adverse side effects concerning Roundup;

e. Failed to warn Plaintiff of the severity and duration of such adverse effects, as the warnings given did not accurately reflect the symptoms or severity of the side effects including, but not limited to, the development of leukemia;

f. Failed to conduct adequate testing, clinical testing post-marketing surveillance to determine the safety of Roundup;

g. Failed to conduct adequate testing, clinical testing and post-marketing surveillance to determine the safety of Roundup's "inert" ingredients and/or adjuvants;

h. Negligently misrepresented evidence of Roundup's genotoxicity and carcinogenicity.

58.  Despite the fact Defendant knew or should have known Roundup caused or could cause, unreasonably dangerous side effects, Defendant continued and continues to market, manufacture, distribute, and/or sell Rounddup to consumers, including the Plaintiff.

59.  Defendant knew or in the exercise of reasonably introspection, should have known consumers such as your Plaintiff would foreseeably suffer bodily injury as a result of Defendant's failure to exercise ordinary care as set forth above.

60.  Defendant's negligence aforesaid was the sole proximate cause of Plaintiff's injuries, harm and economic loss, which Plaintiff has suffered and/or will continue to suffer.

61.  As a result of the foregoing acts of careless and omissions.  Plaintiff has suffered from serious and dangerous side effects including, but not limited to

leukemia, as well as other severe and personal injuries which are permanent and lasting in nature, physical pain and mental anguish, diminished enjoyment of life, and financial expenses for hospitalization and medical and kindred care. Further, Plaintiff suffered life-threatening HCC, and severe personal injuries, which are permanent and lasting in nature, with concerned physical pain and mental anguish including a diminished enjoyment of life.

62. Defendant Monsanto's conduct was committed with knowing, reckless, conscious, wanton, willful, and deliberate disregard for the value of human life and the rights and safety of consumers, including Plaintiff, thereby entitling Plaintiff to punitive and exemplary damages so as to punish and deter similar conduct in the future.

WHEREFORE, Plaintiff Monsanto respectfully request this Court enter judgment in Plaintiff's favor for compensatory and punitive damages together with interest, costs herein incurred, attorney's fees and all relief as this Court deems just and proper. Additionally, Plaintiff demands a jury trial on all issues contained herein.

## SECOND CASE OF ACTION
## (STRICT PRODUCTS LIABILITY – DEFECTIVE DESIGN)

63. Plaintiff repeats, and re-alleges each and every allegation of her Complaint contained in each of the foregoing paragraphs, with the same force and

effect as if more fully set forth herein. At all times herein, Defendant Monsanto designed, researched, manufactured, tested, advertised, promoted, sold, and distributed Roundup as hereinabove described that was used by the Plaintiff. Defendant's Roundup was expected to and did reach the usual consumers, handlers, and person such as Plaintiff coming into contact with said product without substantial change in the condition in which it was produced, manufactured, sold, distributed, and marketed by the Defendant. At such times, Roundup was delivered in an unsafe, defective, and inherently dangerous condition, which was dangerous to users, and in particular, Plaintiff herein.

64. Defendant's Roundup designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed by Defendant was defective in design or formulation in that, when it left the hands of the manufacturer and/or suppliers, it weas unreasonably dangerous, unreasonably dangerous in normal use, and it was more dangerous than an ordinary consumer would expect.

65. At all times herein mention, Roundup in defective condition and unsafe, and Defendant knew or had reason to know that said product was defective and unsafe, especially when used in the form and manner as provided by the Defendant. In particular, Defendant's Roundup was defective in the following ways:

30

a. When placed in the stream of commerce, Defendant's Roundup products were defective in design and formulation and, consequently, dangerous to an extent beyond that which an ordinary consumer would anticipate.

b. When placed in the stream of commerce, Defendant's Roundup prodcucts were unreasonably dangerous in that they were hazardous and posed a grave risk of cancer and other serious illnesses when used in a reasonably anticipated manner.

c. When placed in the stream of commerce, Defendant's Roundup products contained unreasonably dangerous design defects and were not reasonably safe when used in a reasonably anticipated manner.

d. Defendant did not sufficiently test, investigate, or study its Roundup products.

e. Exposure to Roundup presents a risk of harmful side effects that outweigh any potential utility stemming from the use of the herbicide.

f. Defendant knew or should have known at the time of marketing its Roundup products that exposure to Roundup and could result in cancer and other severe illness and injuries.

g. Defendant did not conduct adequate post-marketing surveillance of the effects of its Roundup products.

31

Defendant therefore knew of ought to have known, at all times relevant its Roundup was supplied in a defective condition and was and is inherently dangerous and unsafe for users such as the Plaintiff.

66. Plaintiff Fennell was regularly exposed to Defendant's Roundup, as described hereinabove, without knowledge of Roundup's dangerous characteristics and propensities. At the time of the Plaintiff's use of and exposure to Roundup, it was being used for the purposes and in a manner normally intended, i.e: as a broad-spectrum herbicide.

Defendant, with this knowledge, voluntarily designed its Roundup with a dangerous condition for use by the public, and in particular the Plaintiff. Defendant had a duty to create a product that was not unreasonably dangerous for its normal, intended use. Defendant created a product, Roundup, that was and is unreasonably dangerous for its normal use and intended use.

Defendant marketed and promoted a product in such a manner so as to make it inherently defective as the product downplayed its suspected, probably, and established health risks inherent with its normal, intended use.

The Roundup designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed by Defendant was manufactured

32

defectively in that Roundup left the hands of Defendant in a defective condition
and was unreasonably dangerous to its intended users.

The Roundup designed, researched, manufactured, tested, advertised,
promoted, marketed, sold, and distributed by Defendant reached its intended users
in the same defective and unreasonably dangerous condition in which the
Defendant's Roundup was manufactured.

Defendant designed, researched, manufactured, tested, advertised, promoted,
marketed, sold, and distributed a defective product, which created an unreasonable
risk to the health of consumers and to the Plaintiff in particular, and Defendant is
therefore strictly liable for the injuries (e.g. leukemia) sustained by Plaintiff.

67. Plaintiff could not, by the exercise or reasonable care, have discovered
Roundup's defects herein mentioned or perceived of its dangers.

68. By reason of the foregoing, Defendant Monsanto has become strictly
liable to the Plaintiff for the manufacturing, marketing, promoting, distribution,
and selling of a defective product, Roundup. Defendant's defective design of
Roundup amounts to willful, wanton, and/or reckless conduct by it.

The inherent defects in Defendant's Roundup rendered it dangerous and
defective and were the cause or a substantial factor in causing the development of
Plaintiff's leukemia.

33

69. As a result of the foregoing acts of carelessness and omission, the Plaintiff developed leukemia and has suffered severe and personal injuries, which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life, and financial expenses for hospitalization and medical care.

70. Defendant's conduct was committed with knowing, reckless, conscious, wanton, willful, and deliberate disregard for the value of human life and the rights and safety of consumers, including Plaintiff, thereby entitling Plaintiff to punitive and exemplary damages so as to punish and deter similar conduct in the future.

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in Plaintiff's favor for compensatory and punitive damages, together with interest, costs herein incurred, attorney's fees and all relief as this Court deems just and proper. Plaintiff Fennell demands a jury trial on all issues contained herein.

## THIRD CAUSE OF ACTION
## (STRICT PRODUCTS LIABLITY – BREACH OF DUTY TO WARN)

71. Plaintiff repeats, reavers, and realleges each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

72. Defendant Monsanto has engaged in the business of selling, testing, distributing, supplying, manufacturing, marketing, and/or promoting Roundup, and

34

through that conduct have knowingly and intentionally placed Roundup into the stream of commerce with full knowledge that it reaches consumers such as Plaintiff who are exposed to it through ordinary and reasonably foreseeable uses.

Defendant did in fact, sell, distribute, supply, manufacture, and/or promote Roundup to Plaintiff Fennell. Additionally, Defendant expected the Roundup it was selling, distributing, supplying, manufacturing, and/or promoting to reach – and Roundup did in fact reach – consumers, including your Plaintiff, without any substantial change in the condition of the product from when it was initially distributed by Defendant.

At the time of its manufacture, Defendant Monsanto could have provided the warnings or instructions regarding the full and complete risks of Roundup and glyphosate-containing products because it knew or should have known of the unreasonable risks of harm associated with the use of and/or exposure to such products.

At all times herein mentioned, Roundup was inherently dangerous and defective and unsafe in its manufacture such it was unreasonably dangerous to uses and was so at the time it was distributed by Defendant and at the time Plaintiff was exposed to Roundup. The defective condition of Roundup was due in part to the fact it was not accompanied by proper warnings regarding its carcinogenic

qualities and possible side effects, including, but not limited to, developing

leukemia as a result of her exposure and use.

73.  Roundup did not contain a warning or any caution, any statement, which

was necessary and, if complied with, was adequate to protect the health of those

exposed in violation of 7 U.S.C. 136j(a)(1)(E).  Defendant's failure to include a

warning or caution statement which was necessary and, if complied with, was

adequate to protect the health of those exposed, violated 7 U.S.C. 136j(a)(1)(E).

This defect caused serious injury to Plaintiff, who used Roundup in its intended

and foreseeable manner.

74.  At all times herein mentioned, Defendant Monsanto had a nondelegable

duty to properly design, manufacture, compound, test, inspect, package, label,

distribute, market, examine, maintain supply provide proper warnings, and take

such steps to assure that the product did not cause users to suffer from

unreasonable and  dangerous side effects.  Defendant labeled, distributed, and

promoted the aforesaid product that it was dangerous and unsafe for the use and

purpose for which it was intended.  Defendant failed to warn of the nature and

scope of the side effects associated with Roundup, namely its carcinogenic

properties and its propensity to cause of serve as a substantial contributing factor in

the development of leukemia.

Defendant was fully aware of the probable consequences of the aforesaid conduct. Despite the fact Defendant knew of should have known Roundup caused serious injuries, Defendant failed to exercise reasonable care to warn of the dangerous carcinogenic properties and side effects of developing HCC from Roundup exposure, even though these side effects were known or reasonably scientifically knowable at the time of distribution. Defendant willfully and deliberately failed to avoid the consequences associated with its failure to warn, and in doing so, Defendant acted with a conscious disregard for the safety of Plaintiff.

At the time of her considerable exposure to Roundup, Plaintiff could not have reasonably discovered any defect in Roundup prior through the exercise of reasonable care. Defendant, as the manufacturer and/or distributor of the subject product, is held to the level of knowledge of an expert in the herbicide field.

Plaintiff reasonably relied upon the skill, superior knowledge, and judgment of Defendant Monsanto.

Had Defendant properly disclosed the risks associated with Roundup products, Plaintiff would have avoided the risk of leukemia by not using Roundup products.

75. The information Defendant failed to provide or to communicate, failed to contain adequate warnings and precautions that would have enable Plaintiff, and similarly situated individuals, to utilize the product safely and with adequate protection. Instead, Defendant disseminated information that was inaccurate, false, and misleading and which failed to communicate accurately or adequately the comparative severity, duration, and extent of the risk of injuries associated with use of and/or exposure to Roundup and glyphosate; continued to promote the efficacy of Roundup, even after it knew or should have known of the unreasonable risks from use or exposure; and concealed, downplayed, or otherwise suppressed, through aggressive marketing and promotion, and information or research about the risks and dangers of exposure to Roundup and glyphosate.

76. As a result of its inadequate warnings, Defendant's Roundup products were defective and unreasonably dangerous when they left the possession and/or control of Defendant, were distributed by Defendant, and used by Plaintiff Fennell. As a direct and proximate result of Defendant's actions as alleged herein, and in such other ways to be later shown, the subject product caused Plaintiff to incur leukemia.

77. Defendant Monsanto's conduct was committed with knowing, reckless, conscious, wanton, willful, and deliberate disregard for the value of human life and

the rights and safety of consumers, including Plaintiff, thereby entitling Plaintiff to punitive and exemplary damages so as to punish and deter similar conduct in the future.

WHEREFORE, Plaintiff respectfully requests that this Court enter judgement in Plaintiff's favor for compensatory and punitive damages, together with interest, costs herein incurred, attorney's fees and all relief as this Court deems just and proper. Additionally, Plaintiff demands a jury trial on all issues contained herein.

## FOURTH CAUSE OF ACTIONS
### (BREACH OF IMPLIED WARRANTIES)

78. Plaintiff Fennell repeats, reavers and realleges each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect all if more fully set forth herein. At all times herein mentioned, the Defendant manufactured, distributed, compounded, recommended, merchandized, advertised, promotion, and sold Roundup as a broad-spectrum herbicide. These actions were under ultimate control and supervision of Monsanto. At the time Defendant marketed, sold, and distributed Roundup for use by Plaintiff, Defendant knew Roundup's intended use and impliedly warranted the product to be merchantable quality and safe and fit for this use. The Defendant

39

impliedly represented and warranted to Plaintiff and users of Roundup, the agricultural community, and/or the EPA that Roundup was safe and of merchantable quality and fit for the ordinary purpose for which it was to be used.

These representations and warranties were false, misleading, and inaccurate in that Roundup was unsafe, unreasonably dangerous, not of merchantable quality, and defective.

79. Plaintiff Fennell reasonably relied upon the skill and judgement of Defendant Monsanto as to whether Roundup was of merchantable quality and safe and fit for its intended use.

80. Roundup was injected into the stream of commerce by the Defendant Monsanto, in a defective, unsafe, and inherently dangerous condition, and the products' materials were expected to and did reach users, handlers, and persons coming into contact with said products without substantial change in the condition in which they were sold. The Defendant breached the aforesaid implied warranties, as its herbicide Roundup was not fit for its intended purposes and uses.

81. As a result of the foregoing acts and omissions of your Defendant, Plaintiff suffered from HCC with severe and personal injuries which are permanent and lasting in nature, together with physical pain, nausea, and mental anguish, including diminished enjoyment of life, financial expenses for hospitalization and

medical care, including medical expenses and other economic, and non-economic damages.

82. Defendant's conduct was committed with knowing, reckless, conscious, wanton, willful, and deliberate disregard for the value of human life and the rights and safety of consumers, including Plaintiff, thereby entitling Plaintiff to punitive damages so as to punish and deter similar conduct in the future.

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in Plaintiff's favor for compensatory and punitive damages, together with interest, costs herein incurred, attorney's fees and all relief as this Court deems just and proper. Additionally, Plaintiff demands a jury trial on all issued contained

### RELIEF

WHEREFORE, premises considered, Plaintiff, Linda Fennell seeks judgment against the Defendant on each of the above-referenced claims and causes of action and as follows:

1. Awarding compensatory damages in excess of the court's jurisdictional amount, including but not limited to pain, suffering, emotional distress, loss of enjoyment of life, and other non-economic damages in an amount to be determined at trial of this action;

2. Awarding compensatory damages to Plaintiff for past and future

41

damages, including, but not limited to, Plaintiff's pain and suffering and for severe and permanent personal injuries sustained by the Plaintiff including health care costs and economic loss;

3. Awarding economic damages in the form of Plaintiff's medical expenses, out of pocket expenses, other economic damages in an amount to be determined at trial of this action;

4. Punitive damages for Defendant's misconduct;

5. Pre-judgment and post judgment interest;

6. Awarding Plaintiff the costs of these proceedings.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands trial by jury as to all issues.


Respectfully submitted,


/s/James W. Stanley, Jr. 75124

STANLEY LAW FIRM, P.A.
201 S. Izard Street
Little Rock, AR 72201
(501) 324-2889 FAX (501) 324-2820
james@jwstanleylaw.com
cassandra@jwstanleylaw.com

JS 44 (Rev. 10/20)

# CIVIL COVER SHEET

4:20-cv-01495-BSM-JTR

The JS 44 civil cover sheet and the information contained herein neither replacc nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

LINDA FENNELL

### DEFENDANTS

MONSANTO COMPANY

**(b)** County of Residence of First Listed Plaintiff    PULASKI
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
STANLEY LAW FIRM, P.A.
201 S. IZARD STREET   LITTLE ROCK, AR 72201

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- [ ] 1 U.S. Government Plaintiff
- [ ] 2 U.S. Government Defendant
- [ ] 3 Federal Question *(U.S. Government Not a Party)*
- [X] 4 Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | [X] 1 | [ ] 1 | Incorporated *or* Principal Place of Business In This State | [ ] 4 | [ ] 4 |
| Citizen of Another State | [ ] 2 | [ ] 2 | Incorporated *and* Principal Place of Business In Another State | [ ] 5 | [X] 5 |
| Citizen or Subject of a Foreign Country | [ ] 3 | [ ] 3 | Foreign Nation | [ ] 6 | [ ] 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| [ ] 110 Insurance | **PERSONAL INJURY**   **PERSONAL INJURY** | [ ] 625 Drug Related Seizure of Property 21 USC 881 | [ ] 422 Appeal 28 USC 158 | [ ] 375 False Claims Act |
| [ ] 120 Marine | [ ] 310 Airplane   [X] 365 Personal Injury - | [ ] 690 Other | [ ] 423 Withdrawal | [ ] 376 Qui Tam (31 USC |
| [ ] 130 Miller Act | [ ] 315 Airplane Product    Product Liability | |    28 USC 157 |    3729(a)) |
| [ ] 140 Negotiable Instrument |    Liability   [ ] 367 Health Care/ | | | [ ] 400 State Reapportionment |
| [ ] 150 Recovery of Overpayment | [ ] 320 Assault, Libel &    Pharmaceutical | | **PROPERTY RIGHTS** | [ ] 410 Antitrust |
|    & Enforcement of Judgment |    Slander    Personal Injury | | [ ] 820 Copyrights | [ ] 430 Banks and Banking |
| [ ] 151 Medicare Act | [ ] 330 Federal Employers'    Product Liability | | [ ] 830 Patent | [ ] 450 Commerce |
| [ ] 152 Recovery of Defaulted |    Liability   [ ] 368 Asbestos Personal | | [ ] 835 Patent - Abbreviated | [ ] 460 Deportation |
|    Student Loans | [ ] 340 Marine    Injury Product | |    New Drug Application | [ ] 470 Racketeer Influenced and |
|    (Excludes Veterans) | [ ] 345 Marine Product    Liability | | [ ] 840 Trademark |    Corrupt Organizations |
| [ ] 153 Recovery of Overpayment |    Liability   **PERSONAL PROPERTY** | **LABOR** | [ ] 880 Defend Trade Secrets | [ ] 480 Consumer Credit |
|    of Veteran's Benefits | [ ] 350 Motor Vehicle   [ ] 370 Other Fraud | [ ] 710 Fair Labor Standards |    Act of 2016 |    (15 USC 1681 or 1692) |
| [ ] 160 Stockholders' Suits | [ ] 355 Motor Vehicle   [ ] 371 Truth in Lending |    Act | | [ ] 485 Telephone Consumer |
| [ ] 190 Other Contract |    Product Liability   [ ] 380 Other Personal | [ ] 720 Labor/Management | **SOCIAL SECURITY** |    Protection Act |
| [ ] 195 Contract Product Liability | [ ] 360 Other Personal    Property Damage |    Relations | [ ] 861 HIA (1395ff) | [ ] 490 Cable/Sat TV |
| [ ] 196 Franchise |    Injury   [ ] 385 Property Damage | [ ] 740 Railway Labor Act | [ ] 862 Black Lung (923) | [ ] 850 Securities/Commodities/ |
| | [ ] 362 Personal Injury -    Product Liability | [ ] 751 Family and Medical | [ ] 863 DIWC/DIWW (405(g)) |    Exchange |
| |    Medical Malpractice |    Leave Act | [ ] 864 SSID Title XVI | [ ] 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS**   **PRISONER PETITIONS** | [ ] 790 Other Labor Litigation | [ ] 865 RSI (405(g)) | [ ] 891 Agricultural Acts |
| [ ] 210 Land Condemnation | [ ] 440 Other Civil Rights   **Habeas Corpus:** | [ ] 791 Employee Retirement | | [ ] 893 Environmental Matters |
| [ ] 220 Foreclosure | [ ] 441 Voting   [ ] 463 Alien Detainee |    Income Security Act | **FEDERAL TAX SUITS** | [ ] 895 Freedom of Information |
| [ ] 230 Rent Lease & Ejectment | [ ] 442 Employment   [ ] 510 Motions to Vacate | | [ ] 870 Taxes (U.S. Plaintiff |    Act |
| [ ] 240 Torts to Land | [ ] 443 Housing/    Sentence | |    or Defendant) | [ ] 896 Arbitration |
| [ ] 245 Tort Product Liability |    Accommodations   [ ] 535 Death Penalty | **IMMIGRATION** | [ ] 871 IRS—Third Party | [ ] 899 Administrative Procedure |
| [ ] 290 All Other Real Property | [ ] 445 Amer. w/Disabilities -   **Other:** | [ ] 462 Naturalization Application |    26 USC 7609 |    Act/Review or Appeal of |
| |    Employment   [ ] 540 Mandamus & Other | [ ] 465 Other Immigration | |    Agency Decision |
| | [ ] 446 Amer. w/Disabilities -   [ ] 550 Civil Rights |    Actions | | [ ] 950 Constitutionality of |
| |    Other   [ ] 555 Prison Condition | | |    State Statutes |
| | [ ] 448 Education   [ ] 560 Civil Detainee - | | | |
| |    Conditions of | | | |
| |    Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

- [X] 1 Original Proceeding
- [ ] 2 Removed from State Court
- [ ] 3 Remanded from Appellate Court
- [ ] 4 Reinstated or Reopened
- [ ] 5 Transferred from Another District *(specify)*
- [ ] 6 Multidistrict Litigation - Transfer
- [ ] 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
28 USC 1332

Brief description of cause: Per Inj - Prod Liability

## VII. REQUESTED IN COMPLAINT:

- [ ] CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND: [X] Yes [ ] No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*
JUDGE _____ DOCKET NUMBER _____

DATE   12·17·20

SIGNATURE OF ATTORNEY OF RECORD
*[signature]*

### FOR OFFICE USE ONLY

RECEIPT # _____ AMOUNT _____ APPLYING IFP _____ JUDGE _____ MAG. JUDGE _____