## United States District Court, Southern District of Ohio

Holly L. Burger, fka Holly L. Steinbrook

Plaintiff,

v.

Monsanto Company,
a Missouri Corporation,

Defendant.

Case No.: 1-20-cv-613

Complaint & Jury Demand

Related to MDL No. 2741

### Overview

1.     Holly L. Burger sues Monsanto for personal injuries caused by Monsanto its failure to warn, and its unsafe, negligent and intentional and wrongful disregard for human safety. Monsanto formulated, tested, represented, packaged, labeled, and marketed in various forms Roundup® herbicide products. For decades, Monsanto promoted Roundup® as harmless to human beings. Monsanto proclaimed that Roundup® was safe enough to drink, required no personal protection equipment and posed no risks to human health.  Monsanto continues to deny that Roundup® and its glyphosate component, are associated with and substantial causes of non-Hodgkin's lymphoma (NHL) despite contrary findings by the leading medical research scientists in the world. Monsanto's Roundup® was a substantial contributing factor in causing Plaintiff's NHL.

2.      Monsanto failed to warn and promoted its unsafe Roundup® herbicide products negligently; it wrongfully disregarded human safety in the product's design, formulation, testing, manufacture, advertising, promotion, and distribution.  Monsanto affirmatively concealed its awareness of scientific data linking Roundup® with non-Hodgkin's lymphoma and withheld information from the public disclosing the link. Plaintiff affirmatively relied on Monsanto's actions. Even as late as July 18, 2020 Monsanto's owner published this statement on its Bayer.com website with worldwide reach:

As part of our continued commitment to our customers around the world and driven by our desire to continue providing them with the tools they need for their operations, Bayer announced today a series of agreements to substantially resolve major outstanding legacy Monsanto litigation, including the U.S. Roundup[TM] product liability litigation, the dicamba drift litigation and most of the company's PCB water litigation.

These agreements are not a contradiction to our belief in the safety of our products. On the contrary, now, more than ever, we continue to proudly stand behind their safety and utility. The decision to resolve these cases was driven by our desire to bring greater certainty about the availability of our products to customers and to return our focus to our important work at hand-developing additional agricultural innovations to help growers around the world. We are committed to providing the innovative seeds & traits, crop protection and services our customers need to continue doing their jobs every day. To that end, we remain committed to the safety, access and availability of our Roundup[TM] and XtendiMax[TM] products, today and in the future.

**Liam Condon**, President of the Crop Science Division and Member of the Bayer AG Board of Management

**Brett Begemann**, Chief Operating Officer and Member of the Executive Leadership Team[1]

The website statements continue with this:

The problem is that juries in all of the trial settings to date have been presented with a very narrow slice of the science by plaintiffs' lawyers, and much of it is not reliable because of small samples or studies confounded by exposure to other chemicals. This is unlikely to change under the evidentiary rulings by trial courts to date and is emblematic of the types of

---

[1] https://www.cropscience.bayer.com/customer-updates (visited 7.18.2020).

difficulties faced by defendants dealing with medical causation issues under the U.S. mass tort legal system.[2]

3.     Roundup®'s primary ingredient is glyphosate, a carcinogen.  Monsanto formulates its glyphosate to create Roundup® with surfactants and other elements that multiply the aggressive carcinogenic quality of Roundup®  products.  Monsanto failed to warn consumers about what it knew  and perpetuated the false representation of its products dangers even though it knew or had reason to know of them.

4.     Plaintiff used Roundup® for commercial and residential purposes.  She did so from time to time as indicated below.

| Usage Period | Product | Used For | Exposures |
|---|---|---|---|
| Summers 1996 and 1997<br><br>Shorts<br>T Shirt<br>Tennis shoes<br>Hair in ponytail | Roundup®<br>Weed Killer<br>City Parks work<br><br>Used as employee of Chillicothe Ohio | Weed control<br><br>Sprayed using hand sprayer with handheld wand.<br>Used for weed control in and around city parks in Chillicothe, Ross County, Ohio. | 3 times per week<br>45-60 minutes per use<br>135-180 minutes per week<br>x 15 weeks<br>= 2025  to 2,700  minutes/ year<br>x 2 years<br>= 4050 to 5,400 minutes /yr<br>67.5 to 90 hours of exposure<br>90 exposures in two years |
| 1996–2001<br>Shorts<br>T Shirt<br>Tennis shoes<br>Hair in ponytail | Roundup®<br>Weed Killer<br>Residential | Sprayed using hand sprayer with handheld wand.<br>Weed control around<br>residence and driveway,<br>Chillicothe, Ross County, Ohio. | 1 time per week<br>45-60 minutes per use<br>x 20 weeks<br>= 900 to 1,200 minutes / yr<br>x 4 yrs until 2001<br>3,600 to 4,800 minutes<br>60 to 80 hours of exposure<br>80 exposures in four years |
| **Total  Exposures** | | | **127.5 to 180 hours**<br>**of total exposure**<br>**in 4 years and at least**<br>**170 exposure events** |

---

[2] *Id.*

Plaintiff has no:  a) significant history of use of any herbicides or pesticides other than Roundup®, b) genetic predisposition to any form of blood cancer, c) personal history of cancer, autoimmune diseases, or other medical conditions related to blood cancer, or d) history of exposures to carcinogenic solvents, other chemicals, gases, radiation, or other matters known to be associated with risk factors.

5.     Plaintiff  dressed and used Roundup® as instructed, in accord with the label, and for purposes intended. As late as 2020 Monsanto published this on one of its websites:

> **Do I need to wear protective clothing when using Roundup products?**
> You are not required to use any protective clothing when using Roundup, although we do recommend that when using any lawn & garden products that you wear closed shoes, protective glasses, dust mask, and gloves, where appropriate. Don't forget a hat and sunscreen![3]

6.     During early August, 2020, Plaintiff was informed, for the first time, by a physician providing care to her that her history of non-Hodgkin's lymphoma ("NHL") and her history of the extensive use of Roundup® as described in ¶ 4 were linked together. She received a verbal confirmation from her physician of this fact in early August, and written confirmation on August 6, 2020.

7.     Plaintiff did not know and could not discover that Roundup® would cause NHL. If she had known, or had been warned by Defendant, she would not have used Roundup® at home and would not have assented to use it at her seasonal part time work as a young person with the City of Chillicothe.

8.     Plaintiff was diagnosed with non-Hodgkin's lymphoma on April 20, 2001, her 24th birthday.  At the time she was injured, and at the time her NHL was diagnosed and treated in 2001, Mrs. Burger was pregnant with a desired pregnancy.  Mrs. Burger was compelled to terminate the pregnancy for medical reasons to protect her life  because

---

[3]  https://www.roundup.com.au/faqs/do-i-need-to-wear-protective-clothing-when-using-roundup-products

she suffered from NHL now known to have been caused by Defendant Monsanto's Roundup®. Pregnancy was terminated during an in-hospital surgical abortion.

9.    Mrs. Burger's diagnosis was of large T-cell anaplastic lymphoma involving the left anterior chest wall and requiring treatment initially with CHOP chemotherapy. In addition to termination of her pregnancy and intractable malignant pain requiring intravenous hydromorphone and other significant care. Plaintiff also suffered antineoplastic chemotherapy requiring blood transfusions and related medical procedures. including a bone marrow biopsy. Plaintiff's lymphoma initially presented as a large mass in the axilla near the breast. Diagnosis was delayed because of her age, the position of the mass, and her pregnancy status. Plaintiff's care included hospitalization as an inpatient from April 15 until May 8, 2001 and intermittently thereafter. Care continued   until her disease became remissive and throughout active follow up. For cancer survivors like Mrs. Burger, the waiting and watching is a lifelong process and it continues for her now.

## Jurisdiction, Venue

10.    This Court has subject matter jurisdiction pursuant to 28 USC §1332. There is complete diversity of citizenship between the parties. The Plaintiff is a resident of the Southern District of the State of Ohio. The Defendant has its headquarters and principal place of business in the Western District of the State of Missouri. Plaintiff seeks damages in excess of $75,000, exclusive of interests and costs. This Court also has supplemental jurisdiction pursuant to 28 USC § 1367.

11.    Venue is proper in this District to 28 USC § 1391(b)(2) because a substantial part of the activity giving rise to this claim occurred here. The Plaintiff is aware that a Transfer Order was issued by the United States Judicial Panel on Multi-District Litigation on October 4, 2016 creating MDL No. 2741. The Transfer Order requires that this case and all cases, be transferred to the United States District Court for the Northern District of California where MDL No. 2741 is pending as Case No. 3:16-MD-02741-VC.

## Facts

12.     Plaintiff, born in 1977, enjoyed good health and had no genetic predispositions, family history, or medical history that suggested any propensity to develop non-Hodgkin's lymphoma.  Plaintiff endured childhood routine appendectomy and tonsillectomy surgical procedures.  She did not use alcohol, tobacco products, and had no history of any significant use of or exposure to prescription or non-prescription drugs or medications.  Plaintiff had no significant exposure to any herbicide or pesticide, solvent, petroleum products, or other chemicals of any kind, except coincidentally in the ordinary course of life while using home products, except for her exposure to Roundup®. Plaintiff used Roundup®  as shown in the chart in ¶3 (3) above.

13.     Roundup® was sold as safe and not posing lethal dangers to human users. Plaintiff not warned otherwise. Roundup® is formulated with glyphosate as a principal ingredient.

14.     Glyphosate is a broad-spectrum, non-selective herbicide used in Monsanto's Roundup®. Glyphosate disrupts a plant's ability to form certain amino acids necessary for protein synthesis. Roundup® generally kills targeted plants within two to three days. Before they die, target and nontarget plants absorb Roundup® and glyphosate. The absorbed substance cannot be removed by washing, peeling, milling, baking or brewing.

15.     Herbicidal properties of glyphosate were discovered in 1970 by a Monsanto chemist. The first glyphosate-based herbicide was introduced by Monsanto in the mid-1970s under the brand name Roundup®.  Roundup® was not truthfully portrayed though Monsanto did know, or should have, known the truth about the dangers of its product. It gave no warnings in the beginning, or thereafter. Monsanto consciously elected against certain important testing in order to avoid confirmation in its own tests of scientific concerns about glyphosate and surfactants which were known to be harmful to plants and laboratory animals. Evidence of these dangers grew.

16.     Roundup® reached the marketplace in 1976 and gained acceptance as a popular weed killer. It became the most commonly used weed killer in the State of Ohio, in the United States and in the world. Since then, Monsanto promoted use of its

Roundup® product containing glyphosate, touting it as a remarkable technological breakthrough that could kill weeds without causing harm to people or the environment. Despite known and mounting evidence of the dangers of Roundup® Monsanto did not change its formulations, disclosures, labels, representations, marketing statements and representations, or disclosures to the public.

17.     In 1996, Monsanto introduced soybean seed with traits that made it tolerant of Roundup® , and in 1998 it produced seed corn with traits that made it tolerant of Roundup®. This dramatic change also expanded the use of markup in Chillicothe and other communities, and enhanced the likelihood of Plaintiff's exposure to it from time to time

18.     Monsanto knew, for all or substantially all of the past forty-four (44) years that its marketing statements and labeling of Roundup® products were false. But, internally at Monsanto, Roundup® was so popular, and had so much potential and profit potential for Monsanto that the company falsified data, sponsored, promoted, developed and distributed false studies masquerading as science, and vilified accurate studies all for the purpose of masking Monsanto's knowledge and Roundup®'s dangers from the unsuspecting public. The Plaintiff is a victim of this deception.

19.     In the United States, Monsanto paid massive political campaign contributions, spent huge sums for "government relations", and expended large amounts of money on universities to influence and purchase their research and for university endorsements to disguise dangers of Roundup®. This was also part of the deception.

20.     It was not until the World Health Organization's International Agency for Research of Cancer (IARC), an organization of the United Nations World Health Organization, announced in 2015 that its research established that glyphosate, and Roundup® are probable carcinogens, and that some members of the public involved in related scientific and medical fields had notice of the dangers. Since then, other studies have also revealed this fact, and evidence of the cancerous nature of the substance continues to grow. It is now established by objective scientific research that glyphosate

and Roundup® cause NHL. Roundup® caused the NHL of Ms. Burger. But, Monsanto continues to deny the science.

21.

**Registration of Herbicides**

22.     In the United States, the manufacture, formulation, and distribution of certain chemicals, including herbicides and specifically including Roundup® is regulated under federal law by 7 USC §§ 136 et. seq. The statute is known the *Federal Insecticide, Fungicide and Rodenticide Act* ("FIFRA").

23.     Under FIFRA, all pesticides must be registered with the Environmental Protection Agency before they may be distributed, sold, or used. This is because they are toxic to plants, animals, and humans. The EPA, as a part of the registration process, requires that products be tested and evaluated, pass those tests, and that the results of the tests be submitted to the EPA for assessment. Even after assessment by the EPA, its decision is not an assurance of safety or government endorsement. EPA approval for marketing is not a regulatory decision about safety.

24.     The EPA does not deem products "safe," but only that use of the product in accordance with its label directions "will not generally cause unreasonable adverse effects on the environment." 7 USC § 136a(c)(5)(D).

25.     FIFRA defines "unreasonable adverse effects on the environment" to mean "any unreasonable risk to man or the environment, taking into account the economic, social, and environmental costs and benefits of the use of any pesticide." 7 USC § 136(bb). FIFRA thus requires the EPA to conduct a risk/benefit analysis in determining whether a registration should be granted or allowed to continue to be sold in commerce.

26.     FIFRA generally requires that the registrant, Monsanto in the case of Roundup®, conduct the health and safety testing of pesticide products in accord with approved protocols. The data produced by the registrant must be submitted to the EPA for review and evaluation.

**Monsanto Act, Omissions**

27. Each product submitted to the EPA for evaluation undergoes initial registration. Singular registration is not an all-encompassing, all-times, and non-changing event. Data necessary to achieve registration has changed from time to time. Re-registration is required by 7 USC § 136a-1. This requires additional tests and submissions. In Monsanto's case, it undertook those additional tests and performed them. The tests were falsified[4] and laboratories that conducted them for Monsanto were caught and punished.[5] Monsanto concealed these events and used Roundup® profits to obscure and conceal adverse information with its marketing campaigns. It did so successfully for many years.

28. The EPA is believed to have completed its review of glyphosate, Roundup's chief ingredient in early 2015. But it chose to delay releasing the results because of World Health Organization health-related findings. Those findings, by the WHO's International Agency for Research of Cancer (IARC) affirmatively found that Roundup® and its glyphosate component are probably carcinogenic agents that cause cancer, and specifically non-Hodgkin's Lymphoma, in human beings.

29. Monsanto manipulated "scientific" data to market its Roundup® products using many of the tactics it perfected with dioxin[6], Pydraul 150[7] and PCBs.[8]

---

[4] U.S. EPA. Communications and Public Affairs. 1991. Note to correspondents. Washington, D.C. (March 1.);. U.S. EPA. Communications, Education, And Public Affairs. 1994. Press advisory. Craven Laboratories, owner, and 14 employees sentenced for falsifying pesticide tests. Washington, D.C. (March 4.); U.S. EPA. Communications and Public Affairs. 1991. Press advisory. EPA lists crops associated with pesticides for which residue and environmental fate studies were allegedly manipulated. Washington, D.C. (March 29.); U.S. Dept. of Justice. United States Attorney. Western District of Texas. 1992. Texas laboratory, its president, 3 employees indicted on 20 felony counts in connection with pesticide testing. Austin, TX. (September 29.)

[5] For example, U.S. Congress. House of Representatives. Committee on Government Operations. 1984. Problems plague the Environmental Protection Agency's pesticide registration activities. House Report 98-1147. Washington, D.C.: U.S. Government Printing Office; False data, Journal of Pesticide Reform, Volume 15, Number 3, Fall 1995. Northwest Coalition for Alternatives to Pesticides, Eugene, OR. Glyphosate, Part 1: Toxicology, by Caroline Cox

[6] The name dioxin refers to a group of highly toxic chemicals linked to heart disease, liver disease, human reproductive disorders, and developmental problems. Even in small amounts, dioxin persists in the environment and accumulates in the body. In 1997 the International Agency for Research on Cancer, classified dioxin as a substance that causes cancer in humans. In 2001 the U.S. government listed the chemical as a "known human carcinogen."

[7] Pydraul 150 was a lethal hydraulic for submarines manufactured and sold by Monsanto as safe for humans at the same time the company concealed that it knew the product was too toxic for use in submarines.

[8] PCBs were versatile and fire-resistant, and became accepted in lubricants, hydraulic fluids, and sealants. But PCBs are toxic. A member of a family of chemicals that mimic hormones, PCBs have been linked to damage in the liver and in the neurological, immune, endocrine, and reproductive systems. The Environmental Protection Agency

9

30.     At least as early as 1985, studies existed demonstrating that the glyphosate component of Roundup® was believed to be an agent that caused cancer in laboratory animals and that it was possibly carcinogenic to humans.  However, Monsanto flexed its political and government relations muscles, provided studies to the EPA, and the EPA changed its classification of the substance.  When it did so in 1991, the EPA classified the glyphosate component of Roundup® as yielding evidence of non-carcinogenicity in humans.   The EPA announcement, however, emphasized that the designation of Roundup® or glyphosate in what it called Group E, i.e., non-carcinogenicity in humans, was "based on the available evidence at the time of evaluation and should not be interpreted as a definitive conclusion that the agent will not be a carcinogen…."  Monsanto continued to sell its Roundup® products as safe, noncarcinogenic, and without warnings.  It also aggressively denied any health hazard associated with the use of Roundup® products.

31.     The EPA found that Monsanto, and laboratories it employed, manipulated tests of toxicity, misrepresented them, and affirmatively committed fraud.  Monsanto's laboratories used for this purpose in committing these wrongful acts included Industrial Bio-Test Laboratories ("IBT").  The studies falsified included at least thirty (30) test runs on glyphosate and products containing it including residue studies required by the EPA to register Roundup® for sale.

32.     The U.S. Food and Drug Administration discovered in an inspection of IBT, significant discrepancies between raw data and final reports.  This led to an EPA audit of IBT and a determination that its toxicology studies on Roundup® were invalid. The EPA found the firm engaged in routine falsification of data making it "hard to believe the scientific integrity of the studies when they said they took specimens from the uterus of male rabbits."  Three (3) senior executives of IBT were convicted of criminal fraud.[9]

---

(E.P.A.) and the Agency for Toxic Substances and Disease Registry, part of the Department of Health and Human Services, now classify PCBs as "probable carcinogens."
[9] Id.

33.     Monsanto engaged Craven Laboratories to preform tests, including studies of Roundup®.  During the same year that they were engaged by Monsanto, Craven Laboratories had three (3) of its employees were indicted and convicted of fraudulent laboratory testing practices involving pesticides and herbicides.[10] Monsanto knew this but did not disavow the work of Craven. While Monsanto denies that the laboratories acted at its direction, it did not disavow the results until it was forced to occur by the Federal Government through the prosecutions noted above.  Monsanto has been unable to explain why it did not aggressively and publicly disavow the occurrences and make its customers and the public aware of the testing results immediately. It continues to market Roundup® and continues, even on its website, to contend glyphosate is safe. It has made no new disclosures or warnings but marches on with its statements, undaunted by rejection from science, courts, juries and hundreds of national and local governments

34.     Monsanto  refrained from disclosing what it knew or should have known about Roundup®. It continued to perpetuate its conscious, deliberate disregard for the truth about Roundup® because the product was a key ingredient to Monsanto's dominance in the market place, its dramatically expanding market share, and its assumption of a position of influence, power and authority in the industry that was essentially unparalleled.

**Monsanto   Falsely   Promoted   Roundup®   as   Safe   Despite   Contrary Acknowledgements**

35.     Monsanto has been taken to task and promised to discontinue its false statements about Roundup® but failed to keep its word, even after being ordered by a Court  in the United States to do so.

36.      In 1996, the New York Attorney General ("NYAG") sued Monsanto for false and misleading advertising of Roundup® products. The New York case challenged Monsanto's representations that its spray-on glyphosate-based herbicides, including Roundup®, were:

---

[10] Id.

34.1  "Safer than table salt" and "practically non-toxic" to mammals, birds, and fish.

34.2  "Remember that environmentally friendly Roundup® herbicide is biodegradable. It won't build up in the soil so you can use Roundup® with confidence along customers' driveways, sidewalks and fences."

34.3  "And remember that Roundup® is biodegradable and won't build up in the soil. That will give you the environmental confidence you need to use Roundup® everywhere you've got a weed, brush, edging or trimming problem."

34.4  "Roundup® biodegrades into naturally occurring elements."

34.5  "Remember that versatile Roundup® herbicide stays where you put it. That means there's no washing or leaching to harm customers' shrubs or other desirable vegetation."

34.6  "This non-residual herbicide will not wash or leach in the soil. It … stays where you apply it."

34.7  You can apply Roundup® with "confidence because it will stay where you put it," it bonds tightly to soil particles, preventing leaching. Then, soon after application, soil microorganisms biodegrade Roundup® into natural products.

34.8  "Glyphosate is less toxic to rats than table salt following acute oral ingestion."

34.9  "Glyphosate's safety margin is much greater than required. It has over a 1,000-fold safety margin in food and over a 700-fold safety margin for workers who manufacture it or use it."

34.10 "You can feel good about using herbicides by Monsanto. They carry a toxicity category rating of 'practically non-toxic' as it pertains to mammals, birds and fish."

34.11 "Roundup® can be used where kids and pets will play and breaks down into natural material." This ad depicts a person with his head in the ground and a pet dog standing in an area that has been treated with Roundup®.

35 Monsanto could not, or chose not to, defend these and similar hyperbolic false statements. On November 19, 1996, Monsanto entered into an agreement called an *Assurance of Discontinuance* with the Attorney General of New York.[11] In it, Monsanto agreed, among other things, "to cease and desist from publishing or broadcasting any advertisements [in New York] that represent, directly or by implication" that Monsanto Glyphosate-containing pesticide products or any of them,      possessed any features, advantages or elements described below. These are assurances made by Monsanto to the Attorney General: Glyphosate-containing pesticide products or any component thereof of Monsanto:

35.1 Are safe, non- toxic, harmless or free from risk;

35.2 Are biodegradable;

35.3 Will stay where applied and will not move through the environment;

35.4 Are "good" for the environment or are "known for their environmentally friendly characteristics";

35.5 Are    safer or less toxic than consumer products other than herbicides; and,

35.6 Might be classified as "practically non-toxic."

37. Monsanto double crossed the Attorney General of New York, and the public because it did not alter its advertising in the same manner in any state other than New York and, based on information and belief, still has not done so today.

---

[11] In the matter of Monsanto Company, respondent.
Assurance of Discontinuance pursuant to executive law § 63(15) (Attorney General of the State of New York, Consumer Frauds and Protection Bureau. Environmental Protection. November 1996. Available at https://big.assets.huffingtonpost.com/fraud.pdf.

38.     Monsanto also double crossed and misled the people of the world. In 2009, France's highest court ruled that Monsanto had not told the truth about the safety of Roundup®. The French court affirmed that Monsanto had falsely advertised its herbicide Roundup® as "biodegradable" and that it "left the soil clean."  Around the world, nations, cities, and counties have banned Roundup® and glyphosate herbicides. Countries with bans include Germany, France, Vietnam, Sri Lanka, Colombia, El Salvador, Saudi Arabia, Kuwait, Qatar, Bahrain, Oman, United  Arab Emirates, Argentina and others.   Warnings are required, or other sales curbs are in place, in multiple U.S. States and local governments.

39.     Monsanto concealed what it knew of glyphosate and Roundup® from the scientific community and the world for many years. The International Agency for Research of Cancer ("IARC") is the specialized cancer agency of the World Health Organization, and organization of the United Nations.  IARC promotes international collaboration in cancer research, "bringing together skills in epidemiology, laboratory sciences, and biostatistics to identify the causes of cancer[.]" IARC assesses whether chemicals are carcinogenic through its Monograph issuance program and protocol.

40.     IARC Monographs identify environmental factors that are carcinogenic hazards to humans. These include chemicals, complex mixtures, occupational exposures, physical agents, biological agents, and lifestyle factors. National health agencies can use this information as scientific support to prevent exposure to potential carcinogens. Interdisciplinary working groups of expert scientists review the published studies and assess the strength of the available evidence that an agent can cause cancer in humans.

41.     The principles, procedures, and scientific criteria that guide the evaluations are described in the Preamble to the IARC Monographs. The preamble is a forty + page expression of one of the most sophisticated scientific processes used in the world to review and evaluate substances for their impact on human health.  The procedure requires evaluations to be performed by panels of international experts, selected on the basis of their expertise and the absence of actual or apparent conflicts of interest. The studies considered the various exposure groups, including occupational exposure of farmers and

14

tree nursery workers in the United States, forestry workers in Canada and Finland, municipal weed-control workers in the United Kingdom, and para-occupational exposure in farming families.

42.    In March 2015, the IARC reassessed glyphosate. The summary published in The *Lancet Oncology* journal reported that glyphosate is a Group 2A agent and probably carcinogenic in humans.

43.    The assessment of the IARC Working Group identified several case-control studies of occupational exposure in the United States, Canada, and Sweden. These studies showed a human health concern from agricultural and other work-related exposure to glyphosate. The IARC Working Group conducted a systematic review of over 15 studies designed to assess whether there was an association between Roundup® exposure in agricultural workers and non-Hodgkin Lymphoma (NHL). The researchers reviewed each study, identified the results and assessed each study's strengths and weaknesses. The IARC Working Group concluded that, despite the limited evidence concerning the carcinogenicity of glyphosate in humans, a "positive association has been observed for non-Hodgkin lymphoma."

44.    On July 29, 2015, IARC issued its Monograph for glyphosate, Monograph 112. It was authored with input of 17 experts from 11 countries who met from March 3–10, 2015, to assess the carcinogenicity of certain herbicides, including glyphosate. Among the members were Lauren Zeise, Ph.D., of the California Environmental Protection Agency, Matthew T. Martin, Ph.D, a scientist with the U.S. Environmental Protection Agency, and Gloria D. Jahnke, D.V.M., D.A.B.T. of the National Institute of Environmental Health Sciences.

45.    After adherence to its established procedures, the IARC Working Group considered "reports that have been published or accepted for publication in the openly available scientific literature" as well as "data from governmental reports that are publicly available."

46.    Glyphosate was the second-most used household herbicide in the United States for weed control between 2001 and 2007 and the most heavily used herbicide in

the world in 2012. Exposure pathways are identified as air (especially during spraying), water, and food. Community exposure to glyphosate is widespread and found in soil, air, surface water, and groundwater, as well as in food.

47.     The IARC Working Group found that glyphosate caused DNA and chromosomal damage in human cells. One study in community residents reported increases in blood markers of chromosomal damage (micronuclei) after glyphosate formulations were sprayed. In assessing the genotoxicity of glyphosate (the property of chemical agents that damages the genetic information within a cell causing mutations, which may lead to cancer), the IARC Working Group concluded "[t]here is strong evidence that glyphosate causes genotoxicity."

48.     The IARC also assessed whether glyphosate exposure can induce oxidative stress, which is thought to be involved in the development of numerous conditions, including cancer, autism, and Parkinson's disease.   The IARC concluded that "strong evidence exists that glyphosate … can induce oxidative stress." This could be an important mechanism by which Roundup® causes cancer.

49.     A   section of the IARC monograph for glyphosate is devoted to exposure to humans; it examines studies of glyphosate exposures in various settings including agricultural ones. The IARC Working Group noted that glyphosate has been detected in urine of agricultural workers, indicating absorption. The IARC Working Group specifically evaluated farm workers in the United States, and found that, within the days following the application of Roundup® to a crop, approximately 60% of farm workers tested positive for glyphosate in the urine. Additionally, the IARC Working Group noted that soil microbes degrade glyphosate to aminomethylphosphoric acid (AMPA). Blood AMPA detection after exposure suggests intestinal microbial metabolism in humans.

50.     The IARC reviewed an Agricultural Health Study, consisting of a prospective cohort of 57,311 licensed pesticide applicators in Iowa and North Carolina. It found that results of this study support an association between glyphosate exposure and Multiple Myeloma, Hairy Cell Leukemia (HCL), and Chronic Lymphocytic Leukemia (CLL), and several other cancers.

51.     In 2014 and before, scientists published a systematic review and meta-analysis on the relationship between non-Hodgkin lymphoma and occupational exposure to agricultural pesticides, including glyphosate, in the *International Journal of Environmental Research and Public Health*. The study showed a statistically significant association between farm workers exposed to Roundup® and non- Hodgkin lymphoma. The study confirmed two smaller studies from 2002 and 2008, published in the journal, Leukemia & Lymphoma (2002) and the *International Journal on Cancer* (2008).

52.     Recent studies, including a glyphosate residue study published in the *Journal of Environmental & Analytical Toxicology* in 2014, concludes that "chronically ill humans showed significantly higher glyphosate residues in urine than healthy population." Glyphosate has been detected in the blood and urine of agricultural workers, indicating that agricultural use of Roundup® leads to its absorption. Monsanto continues to promote Roundup® as safe even in May 2019. During May, Monsanto ran newspaper advertisements, full-page in size, in the *Wall Street Journal* and other widespread magazines, as well as in advertisements and promotions on television, radio, in other media, and multiple languages, across the United States. It did not acknowledge or change its actions after researchers at the University of Washington disclosed, on February 13, 2019, findings and a new study conducted there, including a comprehensive review of existing literature, that exposure to Roundup® increases the risks of certain cancers, including NHL, by more than 40%. The University of Washington studies, entitled *Mutation Research - Fundamental and Molecular Mechanisms of Mutagenesis* (2019) (ISSN:0027-5107, available at https://www.journals.elsevier.com/mutation-research-fundamental-and-molecular-mechanisms-of-mutagenesis).

53.     Scientific research also discloses that carcinogenic properties of Roundup® are magnified by the addition of adjuvants in the Roundup® formulation. Adjuvants are chemicals designed to modify or enhance the effects of other agents. Monsanto includes adjuvants with glyphosate in its Roundup® products; they are designed to increase the effectiveness of the herbicide. But the added adjuvants greatly increase the carcinogenic properties of Roundup®. Monsanto systematically tested glyphosate without adjuvants.

The results are misleading. Yet, Monsanto used those tests and results to tout Roundup® as safe to U.S. federal regulators.

54.     Between the years of 2001 and  2019 and on an ongoing basis, Monsanto engaged in specific acts and omissions designed to conceal its awareness of the carcinogenic properties of Roundup®.

55.     Among other events, Monsanto engaged in these acts to conceal information that suggested a link between Roundup® or its glyphosate product, and non-Hodgkin's lymphoma.

53.1    May 26, 1999 William F. Heydens of Roundup® emailed an internal group and called about a global scientific outreach council meeting for the purpose of communicating an internal plan at Monsanto to network its people to shut down persons who were early at advancing a claim that Roundup® and its glyphosate component are carcinogenic in order to get "people to get up and shout Glyphosate is Non-Toxic."

53.2    By 1999, Monsanto had a report from a scientist it engaged, Dr. James Parry detailing scientific findings of cancer risks associated with glyphosate and Roundup®.  Monsanto severed its arrangements with Dr. Parry, stopped funding his research, and embarked upon a decades long effort to debunk the results of his work.

53.3     2004, Monsanto had toxicologist Dr. Donna Farmer prepare a "2004 product safety center-toxicology goals" internal document at Monsanto.  The document details her successes in 2004 at suppressing medical information adverse to Roundup® and suggesting that it had carcinogenic properties or posed other hazards.  She detailed a plan for continuing to do so in the future. The plan was adopted and executed over a period of years.

53.4 January 2013, Monsanto engaged in ghost writing papers posing as documents generated by objective, independent research scientists. However, Monsanto had compromised the authors of several of these papers, including David Saltmiras, but concealed its disqualifying business arrangements with them. It continued a course of conduct and pattern of concealing this information.

53.5 Further, commencing in 2011 and continuing thereafter until at least 2016, Monsanto's scientists engaged in efforts to rebuff and suppress European scientific papers establishing dermal absorption rates for glyphosate into the human skin, and thereby explaining the pathway of Monsanto's glyphosate to the human blood arteries and veins, and the blood system where it tended to cause cancer, and particularly non-Hodgkin's lymphoma.

53.6 From 2013 through 2019, Monsanto has developed internal communications channels and methodologies with public officials and federal employees responsible for reviewing products like Roundup® and evaluating their safety.

53.7 Monsanto developed relationships with many of these persons, compromising them to make incomplete and Monsanto-friendly decisions notwithstanding contrary scientific evidence.

53.8 Monsanto manipulated and falsified the outcomes of research and efforts to submit information about Roundup® to federal regulators, thereby concealing its risks.

53.9 In or about March 2016, Monsanto figures communicated with one another and developed a "Red Flag" campaign with a Dublin-based PR and lobbying firm to influence public officials and opinion to believe that Roundup® was safe.

53.10 Throughout this time, Monsanto consciously and deliberately elected against performing research studies and evaluations of its

19

product because the risks of conducting the experiments indicated by the work of others was viewed as posing too great a risk of outcomes adverse to the health claims.

53.11 Between 2011 and 2015, Monsanto's chief toxicologist alerted her colleagues at Monsanto that the company could not claim glyphosate poses no risks as a carcinogen because the company had not performed the research necessary to reach a conclusion in that regard. A recommendation against conducting the research followed, and the research was never undertaken by Monsanto. Nonetheless, Monsanto promoted the product as safe.

54 Monsanto concealed the dangers of Roundup® and glyphosate. Many steps were taken by Monsanto to achieve this objective. Among others they included:

54.1 Disregarded scientific studies drawing a link between Roundup® and glyphosates herbicides in general, and human illness including blood born cancers and NHL;

54.2 Disregard of pidemiologic studies disclosing the link the between Roundup®, glyphosates and blood born cancers including NHL.

54.3 Internal Monsanto scientific data, warnings and revelations from its own personnel which were quashed by Monsanto internally.

54.4 Influence practiced by Monsanto on politicians and government officials to paralyze, delay, or wholly prevent government action to protect the public from Roundup® and glyphosate.

54.5 An aggressive campaign, which continues to present, designed to teach the safety of Roundup® and to deny the scientific evidence linking it to cancers, including NHL, that are lethal to human beings.

54.6 Assertion, despite overwhelming contrary evidence by objective scientific research not financed by Monsanto, disclosing that glyphosate causes changes in the human body that produce cancers because of cellular level damage to human tissue.

      54.7    Affirmative financing activities masked as objective scientific studies, despite the lack of objectivity in the studies, in order to produce skewed results, further masquerading as research. These results were used by Monsanto to promote, teach, and advance used of its products despite the dangers posed by them.

55    Monsanto's conduct induced members of the public, including Plaintiff, to rely upon it. Monsanto is by virtue of the its conduct equitably estopped to assert certain defenses, including a) contributory fault, b) comparative fault, c) alternate causation, d) the statute of limitations, and e) use of its products without wearing protective equipment. Monsanto's statements inducing reliance and action by users like Plaintiff were false statements of material fact. They were intended to induce reliance and did so. These statements were made when Monsanto knew they were false or at a minimum knew that they were highly controverted, and that substantial scientific evidence concluded that a causal connection exists between Roundup® and cancers including NHL. They induced reliance by Plaintiff who did rely upon the Monsanto statements.

56    Monsanto was under a continuous duty to disclose to consumers, users and other persons having contact with its products, including Plaintiff, accurate safety information concerning its products and the risks associated with the use of and/or exposure to Roundup® and glyphosate. Instead, Monsanto knowingly, affirmatively, and actively concealed safety information concerning Roundup® and glyphosate and the risks associated with the use of and/or exposure to its products.

57    Plaintiff suffered severe and permanent physical and emotional injuries. She has endured the anguish of a dramatic cancer that caused intense pain, required surgical and other intervention, caused termination of her pregnancy at age twenty-four (24) years, and required that she undergo life-altering therapies. She continues to be at risk for recurrence of NHL.

58    Plaintiff's claims are made under the law of the State of Ohio where Plaintiff's primary use of Roundup® and injuries occurred. In the event Ohio law imposes a duty or obligation on Monsanto in excess of those required by Federal Law,

the Plaintiff does not assert the State law claims.  On the contrary, all claims asserted by Plaintiff here are claims parallel with Federal law and Federal legal duties. Monsanto's violations of Ohio law, so limited, were also violations of Federal law. If Monsanto had complied with the law, there likely would have been no Federal violations.

59     In addition, Plaintiff does not seek, here to enforce Federal law.  Instead, she invokes the law of Ohio, but limits her claims to the scope and extent to which Ohio law is equal to, but not greater than, Federal law in its imposition of duties on Monsanto. Plaintiffs claim that Monsanto violated 7 USC § 136, including subparts (g) & (j), and Federal regulations including 40 CFR § 156.10(a)(5). They did so by distributing Roundup® when it was misbranded contrary to legal requirements. The distribution of a misbranded herbicide is a violation of law and is a tort because it violates Ohio law when considered in parallel with Federal requirements.   These violations are evidence of negligence and support the Plaintiff's claims of strict liability in tort, strict liability for failure to warn, negligence, and breaches  of implied warranties and express warranties.

### First Theory: Strict Liability (Design Defect)

60     All allegations above are renewed here.

61     Plaintiff respectfully asserts that Monsanto is strictly liable in tort to her for defective design of its Roundup® products. A substantial part of the activity undertaken by Monsanto as described in this Complaint, putting in the allegations above and below, occurred in the Southern  District of Ohio.

62     Monsanto formulated, developed, designed chemically, manufactured, marketed and distributed Roundup® products.  But the products themselves did not match their labeling and to be safe they were required to do so. Since the products were designed and manufactured at variance with their labels, they were defectively designed when compared with the representations in their labels.[12] These products, including the

---

[12]  Ohio Stat §§ 2307.74-77. Section 2307.77 provides, "A product is defective if it did not conform, when it left the control of its manufacturer, to a representation made by that manufacturer. A product may be defective because it did not conform to a representation even though its manufacturer did not act fraudulently, recklessly, or negligently in making the representation." See, *Jordan v. Paccar, Inc.,* 37 F3d 1181 (10th Cir 1994); *Monroe v. Novartis Pharma. Corp.,* 29 F Supp3d 1114 (SD Ohio 2014).

ones used by Plaintiff, were defective and unreasonably dangerous to foreseeable users like Plaintiff and including her. The products were unreasonably dangerous when they were placed by Monsanto into the stream of commerce. Monsanto ultimately controlled and supervised these actions. At all times relevant to this litigation, Monsanto designed, researched, developed, manufactured, produced, tested, assembled, labeled, advertised, promoted, marketed, sold, and distributed the Roundup® products used by Plaintiff as safe when they were not as described above.

63      Monsanto's Roundup® products were manufactured, designed, and labeled in an unsafe, defective, and inherently dangerous manner that was dangerous for use by or exposure to the public, and Plaintiff. These products left Monsanto's immediate control and were placed onto the market and reached intended consumers, handlers, and users coming into contact with these products in Ohio and throughout the United States, including Plaintiff, without substantial change in their condition as designed, manufactured, sold, distributed, labeled, and marketed by Monsanto.

64      Monsanto's Roundup® products including those to which Plaintiff was exposed were unreasonably dangerous and dangerous to an extent beyond that which an ordinary consumer would contemplate. The risks and dangers of those products exceeded the benefits allegedly associated with them as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold, and marketed by Monsanto. Exposure to Roundup® and glyphosate-containing products presents a risk of harmful side effects that outweigh any potential utility stemming from the use of the herbicide.[13]

---

[13] "A product contains a design defect, if at the time it left the control of its manufacturer, the foreseeable risks associated with the product's design exceeded the benefits of the design. R.C. 2307.75(A). R.C. 2307.75(B) and (C) provides a list of factors to determine the foreseeable risks and benefits associated with the product's design. In determining a product's foreseeable risks, some of the factors to be considered include: (1) the nature and magnitude of the risks of harm associated with that design in light of the intended and reasonably foreseeable uses; (2) the likely awareness of product users, whether based on warnings, general knowledge, or otherwise, of those risks of harm; (3) the likelihood that the design would cause harm in light of the intended and reasonably foreseeable uses; (4) the extent to which the design conformed to any applicable public or private product standard that was in effect when the product left the control of its manufacturer; (5) the extent to which the design is more dangerous than a reasonably prudent consumer would expect. R.C. 2307.75(B)(1)-(5). In assessing the benefits associated with the design or formulation of a product, factors such as the following should be considered: (1) the intended utility of the product, including any safety advantages associated with the design; (2) the technical and economic feasibility of an alternative design; and (3) any foreseeable risks associated with the alternative design. R.C. 2307.75(C)(1)-(3)."

65    Monsanto knew or had reason to know that its Roundup® products were defective and were inherently dangerous and unsafe when used in the manner instructed and provided by Monsanto in one or more of these ways when placed in the stream of commerce:

    65.1 Monsanto's Roundup® products were defective in design and formulation, and, consequently, dangerous to an extent beyond that which an ordinary consumer would contemplate.

    65.2 Monsanto's Roundup® products were unreasonably dangerous in that they were hazardous and posed a grave risk of cancer and other serious illnesses when used in a reasonably anticipated manner.

    65.3 Monsanto did not sufficiently test, investigate, or study its Roundup® products and, specifically, the active ingredient glyphosate alone or with surfactants added by Monsanto.

    65.4 Monsanto did not conduct adequate post-marketing surveillance of its Roundup® products.

    65.5 Monsanto could have employed safer alternative designs and formulations but did not do so.  Furthermore, safer alternative formulations and safer alternative weed killers were available without glyphosate.

66    At all times relevant to this litigation, Plaintiff used and/or was exposed to the use of Monsanto's Roundup® products in an intended or reasonably foreseeable manner, i.e., as a consumer, without knowledge of Roundup®'s dangerous characteristics.

67    Monsanto's Roundup® products were and are more dangerous than alternative products and Monsanto could have designed its Roundup® products to make them less dangerous. At the time Monsanto designed its Roundup® products, the state of the industry's scientific knowledge was such that a less risky design or formulation was

---

*Zager v. Johnson Controls, Inc.*, 18 NE3d 533, 541–42  (Ohio App. 12 Dist.,2014). Roundup® was defective on this basis.

attainable. When Roundup® products left Monsanto's control, there were practical, feasible and safer alternative designs that would have prevented the harm without substantially impairing the reasonably anticipated or intended function of Monsanto's herbicides.

68      The defects in Monsanto's Roundup® products were substantial and contributing factors in causing Plaintiff's  injuries and, but for Monsanto's misconduct and omissions, Plaintiff would not have sustained her injuries.

69      Monsanto's defective design of its Roundup® products was willful, wanton, fraudulent, malicious, and conducted with reckless disregard for the health and safety of users of the Roundup® products, including Plaintiff. Monsanto's conduct above, was reckless. Monsanto risked the lives of consumers and users of its products, including Plaintiff, with knowledge of the safety problems associated with Roundup® and glyphosate-containing products, and suppressed this knowledge from the general public. Monsanto made conscious decisions not to redesign, warn or inform the public. Monsanto's reckless conduct warrants an award of punitive damages.

70      As a direct and proximate result of Monsanto placing its defective Roundup® products into the stream of commerce, Plaintiff developed non-Hodgkin's lymphoma and personal injuries which are permanent in nature. As a further proximate result, Plaintiff sustained a past and future loss of income, loss of earning capacity and property damage.

**Second Theory:  Strict Liability (Failure to Warn)**

71      All allegations above are renewed here.

72      Monsanto had a duty to exercise reasonable care to avoid physical harm to Plaintiff by preventing the recognizable and foreseeable harm it would cause by its marketing of its Roundup ® products.[14]   Monsanto sold its Roundup® products at the time of sale in a defective condition unreasonably dangerous to consumers, including her and her employer. Monsanto then kept the products on the market without warning of

---

[14]  Ohio Stat §§ 2307.74-77.

defects that became known after sale.[15] Monsanto was engaged in the business of selling the product which was expected to and did reach her without substantial change in condition from that in which it was sold, and that it was not misused by Plaintiff. The Plaintiff's damages are not subject to the economic loss rule.[16]

73      Plaintiff respectfully asserts that Monsanto is strictly liable in tort to her for failure to warn of the dangers of its Roundup® products. At all times relevant to this litigation, Monsanto engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting Roundup® products, which are defective and unreasonably dangerous to consumers, including Plaintiff, because they do not contain adequate warnings or instructions concerning the dangerous characteristics of Roundup® and specifically, the active ingredient glyphosate either alone or with adjuvants and surfactants. These actions were under the ultimate control and supervision of Monsanto. It did so from its headquarters in St. Louis Missouri.

74      Monsanto researched, developed, designed, tested, manufactured, inspected, labeled, distributed, marketed, promoted, sold, and otherwise released into the stream of commerce its Roundup® products. While doing so, Monsanto advertised or marketed Roundup® to consumers including Plaintiff.  Monsanto had, but failed to discharge,  a duty to warn Plaintiff and the public  of risks associated with use of Roundup®.

75      Monsanto had a duty to reasonably test, develop, design, manufacture, inspect, package, label, market, promote, sell, distribute, maintain, supply, provide proper warnings, and take such steps as necessary to ensure its Roundup® products did not cause users and consumers to suffer from unreasonable and dangerous risks. Monsanto had a continuing duty to warn Plaintiff of dangers associated with Roundup®'s use and exposure. Monsanto, as manufacturer, seller, or distributor of chemical herbicides is held to the knowledge of an expert in the field.

---

[15] *Linert v. Foutz,* 75 NE2d 1218 (Ohio 2016); Ohio Stat § 2307.76.
[16] See  *Netherlands Ins Co. v. BSHM Architects, Inc.,* 111 NE3d 1229 (Ohio App 7th Dist 2018); *Chemtrol Adhesives, Inc. v. American Manufacturers Mut. Ins. Co.*, 537 N.E.2d 624 (Ohio 1989).

76     At the time of manufacture, Monsanto could have provided the warnings or instructions regarding the full and complete risks of Roundup® and glyphosate-containing products because it knew or should have known of the unreasonable risks of harm associated with the use of and/or exposure to such products.

77     Monsanto failed to investigate, study, test, or promote the safety or to minimize the dangers to users and consumers of its product and to those who would foreseeably use or be harmed by Monsanto's herbicides, including Plaintiff.

78     Despite  knowing or having a duty to know, that Roundup® posed a grave risk of harm, Monsanto failed to exercise reasonable care to warn of the dangerous risks associated with use and exposure. Monsanto failed to adequately warn consumers, i.e., the reasonably foreseeable users, of the risks of exposure to its products. Monsanto wrongfully concealed information concerning the dangerous nature of Roundup® and glyphosate, and made false, misleading statements concerning the safety of Roundup® and glyphosate.

79     Monsanto's Roundup® reached targeted consumers, handlers, and users or other persons coming into contact with these products, including Plaintiff, without substantial change in their condition as designed, manufactured, sold, distributed, labeled, and marketed by Monsanto.

80     Plaintiff was exposed to Monsanto's Roundup® products in the course of spraying Roundup® products without knowledge of their  dangerous propensities. Plaintiff used the dangerous product for its intended purpose and without misuse.

81     Plaintiff could not have reasonably discovered the defects and risks associated with Roundup® or glyphosate-containing products prior to and at the times of exposure. Plaintiff relied upon the skill, superior knowledge, and judgment of Monsanto to know about and disclose serious health risks associated with using the products.

82     Monsanto knew or should have known that the minimal cautions disseminated with its Roundup® products were inadequate, failed to communicate adequate information on the dangers and safe use/exposure, and failed to communicate warnings and instructions that were appropriate and adequate to render the products safe

for their ordinary, intended and reasonably foreseeable uses, including agricultural and horticultural applications.

83    The information Monsanto did impart failed to contain relevant warnings, hazards, and precautions that would have enabled consumers such as Mrs. Burger to utilize the products safely and with adequate protection. Instead, Monsanto disseminated information that was inaccurate, false and misleading. This misleading information and denial of the danger of glyphosate has been ongoing and unremitting conduct of Monsanto to the present day.

84    This alleged failure to warn is not limited to the information contained on Roundup®'s labeling. Monsanto was able, in accord with federal law, to comply with Ohio law by disclosing the known risks associated with Roundup® through other non-labeling mediums, i.e., promotion, advertisements, public service announcements, and/or public information sources. Monsanto, however, deliberately did not do so.

85    Monsanto is liable to the Plaintiff for injuries caused by its negligent or willful failure, as described above, to provide adequate warnings as alleged. As a direct and proximate result of Monsanto placing its defective Roundup® products into the stream of commerce, Mrs. Burger developed non-Hodgkin Lymphoma and sustained a loss of income, loss of earning capacity and property damage, as well as non-economic damages. As a further proximate result of Monsanto placing its defective Roundup® products into the stream of commerce, as alleged herein, there was a measurable and significant interval of time during which Plaintiff suffered great mental anguish and other personal injury. Plaintiff suffered mental anguish in addition to lymphoma, a blood cancer and other personal injuries and medical problems.

### Third Theory:  Negligence

86    All allegations above are renewed here.

87    Monsanto owed a duty of reasonable care to all foreseeable users, including the Plaintiff , but it breached that duty is alleged below.  Monsanto's duty existed because Monsanto knew or in this exercise of reasonable prudence and ordinary care, it should have known, that it's Roundup® products were dangerous to known and foreseeable

users including Plaintiff, and are substantial factors in bringing about and causing non-Hodgkin's lymphoma, the kind that Plaintiff contracted and suffered to which she remains at risk for recurrence. The breach proximately caused damages to the Plaintiff.[17]

88    Monsanto, directly or indirectly, caused Roundup® products to be sold, distributed, packaged, labeled, marketed, promoted, and/or used by Plaintiff.

89    Monsanto owed to Plaintiff and the public the duties that follows:

89.1    To exercise reasonable care in the design, research, manufacture, marketing, advertisement, supply, promotion, packaging, sale, and distribution of its Roundup® products. This included the duty to take all reasonable steps necessary to manufacture, promote, and/or sell a product that was not unreasonably dangerous to consumers and users of the product.

89.2    To exercise reasonable care in the marketing, advertisement, and sale of the Roundup® products. Monsanto's duty of care owed to consumers and the general public. This included the duty to provide accurate, true, and correct information concerning the risks of using Roundup® and appropriate, complete, and accurate warnings concerning the potential adverse effects of exposure to Roundup®, and, in particular, its active ingredient glyphosate. Monsanto knew or, in the exercise of reasonable care, should have known of the hazards and dangers of Roundup® and specifically, the carcinogenic properties of the chemical glyphosate and its Roundup® products.

89.3    To warn of the risks.

89.4    To withhold the product from the market.

89.5    To inform Plaintiff of the risks.

---

[17]    "It is rudimentary that in order to establish actionable negligence, one must show the existence of a duty, a breach of the duty, and an injury resulting proximately therefrom." *Menifee v. Ohio Welding Products, Inc.*, 472 N.E.2d 707, 710 (Ohio,1984).

89.6    To exercise reasonable care in the marketing and representation of Roundup® to the public.

89.7    To refrain from falsifying, withholding or manipulating unfavorable research data, or feigning the favorable research data.

89.8    To label its product with complete disclosures of risks.

90    Monsanto breached each and all  its duties as alleged above. It was negligent in that:

90.1    It negligently designed  and formulated its Roundup® products.

90.2    It negligently tested its Roundup® products and negligently failed to continue to test them.

90.3    It negligently mixed and batched its Roundup® products.

90.4    It negligently submitted and withheld information about its Roundup® products for governmental regulatory purposes.

90.5    It negligently failed to supplement its governmental submissions with new information about dangers of Glyphosate and its Roundup® products.

90.6    It negligently manufactured its Roundup® products.

90.7    It negligently labeled its Roundup® products.

90.8    It negligently marketed its Roundup® products.

90.9    It negligently packaged its Roundup® products.

90.10    It negligently advertised and commercialized its Roundup® products.

90.11    It negligently distributed its Roundup® products and placed them in commerce.

90.12    It continued to improperly commercialize  its Roundup® products after agreeing with the New York Attorney General not to do so.

90.13    It negligently failed to disclose the truth about the risks associated with Roundup® in its promotional efforts, outside of the context of labeling.

90.14    It negligently disregarded scientific, medical and epidemiological studies and findings about the dangers of Roundup® .

90.15  It negligently caused or permitted its advertising inaccuracies to continue even after it knew exposure to the products created a significant risk of harm and unreasonably dangerous side effects, and it failed to prevent or adequately warn of these risks and injuries.

90.16  It negligently packaged its Roundup® products.

90.17  It negligently failed to provide adequate instructions, guidelines, and safety precautions to reasonable users including Plaintiff.

90.18  It negligently failed to inform Plaintiff and the public of safer alternatives though it knew they existed.

90.19  It negligently failed to disclose that its Roundup® products are probably carcinogens and do cause NHL in a population of foreseeable users including Plaintiff after they use the product.

90.20  It negligently withheld information necessary permit an informed user with an option to use something else to make an informed selection.

90.21  It negligently failed to comply with safe practices and standards, including federal regulations governing, design, formulation, testing, continuing testing, disclosure, approval procurement, labeling, advertising, promotion, and distribution Roundup® and failed to inform both government regulators and foreseeable users, including Plaintiff.

91    These negligent acts and omissions occurred when and after Monsanto, knew or had reason to know of defects inherent in its products, and knew or had reason to know that a user's exposure to the products created a significant risk of harm and unreasonably dangerous side effects, and failed to prevent or adequately warn of these risks.

92    Monsanto knew and/or should have known that it was foreseeable consumers such as and including Plaintiff would suffer injuries as a result of Monsanto's failure to exercise ordinary care in the manufacturing, marketing, labeling, distribution, and sale of Roundup®.

93    Plaintiff did not know the nature and extent of the injuries that could result from the intended use of and/or exposure to Roundup® or its active ingredient glyphosate.

94    Monsanto's conduct was negligent. But it was also reckless. Monsanto `made conscious decisions not to redesign, re-label, warn, or inform the unsuspecting public, including Plaintiff Monsanto's reckless conduct therefore warrants an award of punitive damages.

95    As a proximate result of Monsanto's negligence, Plaintiff sustained temporary and permanent lost income personal injuries, illness, medical and rehabilitation care and emotional distress. She also suffered permanent loss of ability to enjoy life with confidence of good health, and a permanently impaired body. Monsanto's negligence was a proximate cause of the Plaintiff's injuries, i.e., absent Monsanto's negligence, Plaintiff would not have developed cancer.

## Fourth Theory: Implied Warranty

96    All allegations above are renewed here.

97    Monsanto engaged in the business of testing developing, designing, manufacturing, marketing, selling, distributing, and promoting its Roundup® products, which are defective and unreasonably dangerous to consumers, including Plaintiff thereby placing Roundup® products into the stream of commerce. These actions were under the ultimate control and supervision of Monsanto. Monsanto impliedly warranted each product to be of merchantable quality, safe, and fit for this use, despite the fact that Roundup® was not adequately tested or researched.

98    Before Plaintiff was exposed to Roundup® products, Monsanto impliedly warranted to its consumers—including Plaintiff —that its Roundup® products were of merchantable quality and safe and fit for the use for which they were intended; specifically, as agricultural herbicides to kill weeds without harm to humans.

99    Monsanto failed to disclose that Roundup® has dangerous propensities when used as intended and that use of and/or exposure to Roundup® and glyphosate-containing products carries an increased risk of developing severe injuries and death,

including 's cancer. Plaintiff was the intended beneficiary of the implied warranties made by Monsanto to the purchasers of its herbicides as a foreseeable human user. She used the Roundup® products as intended and without alteration.

100    Plaintiff used the Roundup® product as Monsanto intended the use of its Roundup® products.  In reliance upon Monsanto's implied warranty, Plaintiff used Roundup® as instructed and labeled and in the foreseeable manner intended, recommended, promoted and marketed by Monsanto.

101    The Plaintiff could not have reasonably discovered or known of the risks of serious injury and death associated with Roundup® or glyphosate.

102    Monsanto breached its implied warranty to the Plaintiff in that its Roundup® products were not of merchantable quality, safe, or fit for their intended use, or adequately tested. Roundup® has dangerous propensities when used as intended and can cause serious injuries, including those injuries complained of herein.

103    The harm caused by Monsanto's Roundup® products far outweighed their benefit, rendering the products more dangerous than an ordinary consumer or user would expect and more dangerous than alternative products.

104    As a direct and proximate result of Monsanto's breach of implied warranty, the Plaintiff sustained damages as previously alleged.[18]

### Mrs. Burger's First Claim

### Personal Injuries; Economic and Non-Economic Damages

105    All allegations above are renewed here and all theories above are invoked here.

106    As a direct, proximate result of the acts and omissions of Monsanto, Plaintiff contracted and suffers from non-Hodgkin's Lymphoma ("NHL") and has been required to undergo extensive care, including life altering and debilitating chemical and other therapies.

---

[18]    Proof of negligence establishes breach of implied warranty. *White v. DePuy, Inc.,*  718 N.E.2d 450 (12th Dist.1998), quoting 76 Ohio Jurisprudence 3d, Products Liability  § 39, at 470 (1987).

107     Plaintiff's noneconomic damages include emotional and physical pain and anguish; cancer treatment pain; anxiety, depression, uncertainty and fear associated with cancer diagnoses, treatment and uncertain outcomes; nausea and illness associated with medical care for her condition; sleep disruption; loss of self-confidence and change of personality; emotional distress; loss of ability to engage in the activities of daily living including the daily joys of life. Plaintiff has also incurred a probable loss of reasonable life expectancy. She also suffers from depression, stress and mental anguish over her inestimable life and livelihood lost.

108     Plaintiff's economic damages include: lost earnings; medical expenses and medical care costs; transportation and over-the-counter expenses; adaptations and accommodations to the household; lost retirement security; and related economic losses.

109     Plaintiff loss the joy and event of giving birth to her first child, and to the bond of motherhood with her aborted fetus because NHL made it necessary for Plaintiff to make a life and death chose of either the fetus or the mother.

### Exemplary and Punitive Damages

110     All allegations above are renewed here.

111     Monsanto's liable to Plaintiff for both compensatory and punitive or exemplary damages. Monsanto is liable for these damages because Monsanto's acts and omissions described above, including its suppression of information, manipulation of scientific research, abuse of the facts in its advertising, and its public relations, governmental relations, and advertising campaigns and programs have intentionally and deliberately distorted and suppressed known facts concerning the causal connection between Roundup® and non-Hodgkin's lymphoma. Defendant, as the employer of personnel who were assigned and discharged responsibilities to alter studies, prepare false messages and studies, and take action to diminish, or drown out expressions of scientific fact and opinion concerning the cause and effect relationship between Roundup® and non-Hodgkin's lymphoma. It directed these activities through its senior executives and personnel. This conduct demonstrates malice and aggravated, egregious fraud on the public. Plaintiff is a victim of this malice and fraud.

112    Punitive damages in the maximum amount permitted by Ohio law are reasonable and appropriate.[19]  Attorney's fees must be excluded from the results of a claim for punitive or exemplary damages to determine the cap on those damages.

113    Punitive damages have been awarded against Defendant Monsanto in the State of California in state and federal lawsuits tried against it because its Roundup® herbicide products caused non-Hodgkin's lymphoma and its conduct was determined to be so wrongful as to justify punitive damages in that State.

### Requests For Relief

114    On the foregoing basis, Plaintiff respectfully requests judgment against Defendant Monsanto for:

114.1.1    Compensatory damages including both economic and non-economic damages. Plaintiff requests leave to amend this complaint at the time of the final pre-trial conference to allege a total amount of her non-economic damages as they are accruing.

114.1.2    Attorney's fees

114.1.3    Prejudgment interest to the extent permitted by law

114.1.4    Punitive damages in the maximum amount permitted by law

114.1.5    Taxable costs.

### Jury Demand.  Trial Location Designation.

114.2  Plaintiff demands trial by jury.  Plaintiff requests trial at Cincinnati, Ohio.


Holly L. Burger, fka Holly L. Steinbrook,

Plaintiff,


/s/ *Kelsey J. Reno,*
/s/ *Anna J. Villarreal*
Villarreal Law Firm, LLC
2 W. Main St.
Chillicothe, OH 45601
Ph: (740) 772-4466

---

[19] Ohio Stat § 2315.21 provides a formula for punitive damages of two times compensatory damages.

Fx: (740) 772-4467
kelsey@avlawohio.com
anna@avlawohio.com

 And

David A. Domina, #11043NE
Domina Law Group pc llo
2425 South 144th St.
Omaha NE 68144-3267
Ph: (402)493-4100
ddomina@dominalaw.com

*Pro Hac Vice* Admission Requested

Plaintiff's Lawyers

JURY

# U.S. District Court
## Southern District of Ohio (Columbus)
### CIVIL DOCKET FOR CASE #: 2:20–cv–04212–SDM–EPD

Burger v. Monsanto Company
Assigned to: Judge Sarah D. Morrison
Referred to: Magistrate Judge Elizabeth Preston Deavers
Case in other court:  Northern District of California,
                   16–MD–2741
Cause: 28:1332 Diversity–Personal Injury

Date Filed: 08/10/2020
Jury Demand: Plaintiff
Nature of Suit: 365 Personal Inj. Prod. Liability
Jurisdiction: Diversity

**Plaintiff**

**Holly L Burger**
*formerly known as*
Holly L. Steinbrook

represented by **Kelsey Reno**
Villarreal Law Firm, LLC
2 West Main Street
Chillicothe, OH 45601
740–772–4466
Fax: 740–772–4467
Email: kelsey@avlawohio.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Anna Villarreal**
Villarreal Law Firm
2 West Main Street
Chillicothe, OH 45601
740–772–4466
Fax: 740–772–4467
Email: kelsey@avlawohio.com
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Monsanto Company**

| Date Filed | # | Docket Text |
|---|---|---|
| 08/10/2020 | 1 | COMPLAINT with JURY DEMAND against Monsanto Company ( Filing fee $ 400 paid – receipt number: 0648–7598226), filed by Holly L Burger. (Attachments: # 1 Civil Cover Sheet, # 2 Summons Form) (Reno, Kelsey) (Entered: 08/10/2020) |
| 08/18/2020 | 2 | ORDER transferring this case from the docket of the Honorable Douglas R. Cole to the Office of the Clerk for reassignment to the Eastern Division of the Southern District of Ohio at Columbus. Signed by Judge Douglas R. Cole on 8/18/20. (sct) (Entered: 08/18/2020) |
| 08/18/2020 |  | Case transferred in from Cincinnati Division on 08/18/2020, Case Number 1:20–cv–613. Case assigned to Judge Sarah D. Morrison and Magistrate Judge Elizabeth Preston Deavers. (sct) (Entered: 08/18/2020) |
| 08/19/2020 | 3 | Summons Issued as to Monsanto Company (kk2) (Entered: 08/19/2020) |
| 09/01/2020 | 4 | NOTICE *Letter to MDL Panel* by Plaintiff Holly L Burger (Reno, Kelsey) Modified text on 9/2/2020 (kk2) (Entered: 09/01/2020) |
| 12/08/2020 | 5 | STATUS REPORT ORDER – Plaintiff is ORDERED to file a STATUS REPORT updating the Court on the status of this case as it relates to the MDL no later than JANUARY 8, 2021. Signed by Magistrate Judge Elizabeth Preston Deavers on December 8, 2020. (jlk) (Entered: 12/08/2020) |

| 12/29/2020 | 6 | NOTICE *of Letter to MDL* by Plaintiff Holly L Burger (Reno, Kelsey) Modified on 12/30/2020 (kk2) (Entered: 12/29/2020) |
|---|---|---|
| 01/11/2021 | 7 | STATUS REPORT ORDER: Plaintiff is ORDERED to file a STATUS REPORT updating the Court on the status of this case as it relates to the MDL no later than 1/15/2021. Signed by Magistrate Judge Elizabeth Preston Deavers on 1/11/2021. (er) (Entered: 01/11/2021) |