# United States District Court
## Northern District of Illinois - CM/ECF LIVE, Ver 6.3.3 (Chicago)
## CIVIL DOCKET FOR CASE #: 1:21-cv-00227

Wessels v. Monsanto Company
Assigned to: Honorable Charles P. Kocoras
Demand: $75,000
Case in other court: Circuit Court Cook County Illinois, Law
                 Division, 2020-L-012645
Cause: 28:1446 Petition for Removal

Date Filed: 01/14/2021
Jury Demand: Both
Nature of Suit: 367 Personal Injury: Health
Care/Pharmaceutical Personal Injury
Product Liability
Jurisdiction: Diversity

**Plaintiff**

**Robert Wessels**          represented by    **Britney Pennycook**
Corboy & Demetrio
33 North Dearborn Street
21st Floor
Chicago, IL 60602
(312) 346-3191
Email: brp@corboydemetrio.com
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Monsanto Company**      represented by    **Riley C. Mendoza**
Shook, Hardy & Bacon LLP
111 S. Wacker Drive
Suite 5100
Chicago, IL 60606
(312) 704-7700
Email: docket@shb.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Peter Francis O'Neill**
Shook, Hardy & Bacon Llp
111 S. Wacker
Chicago, IL 60606
(312) 704-7710
Email: pfoneill@shb.com
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 01/14/2021 | 1 | NOTICE of Removal from Circuit Court of Cook County, Illinois, Law Division, case number (2020-L-012645) filed by Monsanto Company Filing fee $ 402, receipt number 0752-17829158. *(SUMMONS AND COMPLAINT)* (Attachments: # 1 Exhibit 1 (Complaint))(Mendoza, Riley) (Entered: 01/14/2021) |

| 01/14/2021 | 2 | ATTORNEY Appearance for Defendant Monsanto Company by Riley C. Mendoza (Mendoza, Riley) (Entered: 01/14/2021) |
|---|---|---|
| 01/14/2021 | 3 | CIVIL Cover Sheet (Mendoza, Riley) (Entered: 01/14/2021) |
| 01/14/2021 | 4 | NOTIFICATION of Affiliates pursuant to Local Rule 3.2 by Monsanto Company (Mendoza, Riley) (Entered: 01/14/2021) |
| 01/14/2021 | 5 | ANSWER to Complaint with Jury Demand by Monsanto Company(Mendoza, Riley) (Entered: 01/14/2021) |
| 01/14/2021 | 6 | ATTORNEY Appearance for Defendant Monsanto Company by Peter Francis O'Neill (O'Neill, Peter) (Entered: 01/14/2021) |
| 01/14/2021 | | CASE ASSIGNED to the Honorable Charles P. Kocoras. Designated as Magistrate Judge the Honorable Susan E. Cox. Case assignment: Random assignment. (ng, ) (Entered: 01/14/2021) |
| 01/15/2021 | 7 | ATTORNEY Appearance for Plaintiff Robert Wessels by Britney Pennycook (Pennycook, Britney) (Entered: 01/15/2021) |
| 01/15/2021 | 8 | MAILED Notice of Removal letter to counsel of record. (rc, ) (Entered: 01/15/2021) |

| PACER Service Center | | |
|---|---|---|
| **Transaction Receipt** | | |
| 01/15/2021 14:07:29 | | |
| **PACER Login:** | hllp1982:2634105:4722683 | **Client Code:** 1417.0049 |
| **Description:** | Docket Report | **Search Criteria:** 1:21-cv-00227 |
| **Billable Pages:** | 2 | **Cost:** 0.20 |

**12-Person Jury**

#02329   KTL\MDDBRP   11/24/2020        2017N-1015

FILED
11/25/2020 2:51 PM
DOROTHY BROWN
CIRCUIT CLERK
COOK COUNTY, IL
2020L012645

11275861

### IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
### COUNTY DEPARTMENT, LAW DIVISION

ROBERT WESSELS,

> Plaintiff,

v.

MONSANTO COMPANY,

> Defendant.

No.   **2020L012645**

**PLAINTIFF DEMANDS TRIAL BY JURY**

## COMPLAINT AT LAW

Plaintiff, ROBERT WESSELS, by and through his attorneys, CORBOY & DEMETRIO,

P.C., complaining of Defendant, MONSANTO COMPANY, states:

### Allegations Common to All Counts

1.      Defendant, MONSANTO COMPANY ("Monsanto"), is a foreign corporation

licensed to do business in the State of Illinois.

2.      Robert Wessels is a resident of Illinois.

3.      At all times relevant, Monsanto designed, manufactured, marketed, and sold an

herbicide known as Roundup.

4.      Roundup is a non-selective herbicide marketed to homeowners and others to kill

weeds.

5.      Monsanto is a multinational biotechnology company with its principal place of

business in St. Louis, Missouri.

6.      "Roundup" refers here to all formulations of Defendant's Roundup products that contain the active ingredient glyphosate, including, but not limited to, Roundup Concentrate Poison Ivy and Tough Brush Killer1, Roundup Concentrate, Roundup Custom Herbicide, Roundup D-Pak, Roundup Fence and Hard Edge1, Roundup Foam Weed & Grass Killer, Roundup Grass and Weed Killer, Roundup Herbicide, Roundup Original 2K Herbicide, Roundup Promax, Roundup QuikStik Grass and Weed Killer, Roundup Quickpro Herbicide, Roundup Rainforest Concentrate Weed and Grass Killer, Roundup Rainforest SuperConcentrate Weed & Grass Killer, and Roundup Ready-to-Use Extended Control Weed & Grass Killer1 Plus Weed Preventer, *inter alia*.

7.      Defendant Monsanto has advertised and sold goods, including Roundup, in Cook County, Illinois, for many years.

8.      Defendant Monsanto has transacted and conducted business in Illinois for many years.

9.      Defendant Monsanto has derived substantial revenue from goods and products sold and used in the State of Illinois.

10.     Defendant Monsanto has transacted and conducted extensive business within the State of Illinois that directly relates to the allegations in this Complaint.

11.     Defendant Monsanto expected or reasonably should have expected that its acts would have consequences within the State of Illinois, and derived substantial revenue from interstate commerce, including commerce in Illinois.

12.     Defendant Monsanto purposely availed itself of the privileges of conducting activities within the State of Illinois and invoked the benefits and protections of Illinois law.

2

13.   Robert Wessels purchased and used Roundup many times over many years.

14.   Defendant Monsanto maintains sufficient and ongoing contacts within the State of Illinois such that this Court's exercise of personal jurisdiction does not offend traditional notions of fair play and substantial justice.

15.   Defendant Monsanto is the world's leading producer of glyphosate.

16.   Glyphosate is the active ingredient in Roundup.

17.   Defendant Monsanto discovered the herbicidal properties of glyphosate during the 1970's and subsequently began to design, research, manufacture, sell, and distribute glyphosate-based Roundup as a broad-spectrum herbicide.

18.   Glyphosate is a broad-spectrum herbicide used to kill weeds and grasses known to compete with desirable plants grown around the globe.

19.   Glyphosate is a "non-selective" herbicide, meaning it kills indiscriminately, based only on whether a given organism produces a specific enzyme, 5-enolpyruvylshikimic acid-3-phosphate synthase, known as EPSP synthase.

20.   Glyphosate inhibits the enzyme 5-enolpyruvylshikimic acid-3-phosphate synthase that interferes with the shikimic pathway in plants, resulting in the accumulation of shikimic acid in plant tissue and ultimately in plant death.

21.   Sprayed as a liquid, plants absorb glyphosate directly through their leaves, stems, and roots, and detectable quantities accumulate in the plant tissues.

22.   Each year, approximately 250 million pounds of glyphosate are sprayed on crops, commercial nurseries, suburban lawns, parks, and gold courses.

3

23.     Defendant is intimately involved in the development, design, manufacture, marketing, sale, and/or distribution of genetically modified ("GMO") crops, many of which are marketed as being resistant to Roundup *i.e.,* "Roundup Ready®."

24.     As of 2009, Defendant Monsanto was the world's leading producer of seeds designed to be Roundup Ready®. In 2010, an estimated 70% of corn and cotton, and 90% of soybean fields in the United States, contained Roundup Ready® seeds.

25.     The original Roundup, containing the active ingredient glyphosate, was introduced in 1974. Today, glyphosate products are among the world's most widely used herbicides.

26.     For nearly 40 years, consumers, farmers, and the public have used Roundup, unaware of its carcinogenic properties.

27.     The manufacture, formulation, and distribution of herbicides, such as Roundup, are regulated under the Federal Insecticide, Fungicide, and Rodentcide Act ("FIFRA"), 7 U.S.C. § 136 *et seq.* FIFRA requires that all pesticides be registered with the Environmental Protection Agency ("EPA") prior to their distribution, sale, or use, except as described by FIFRA 7 U.S.C. 136a(a).

28.     The EPA requires as part of the registration process, among other requirements, a variety of tests to evaluate the potential for exposure to pesticides, toxicity to people and other potential non-target organisms, and other adverse effects on the environment. Registration by the EPA, however, is not an assurance or finding of safety. The determination the EPA makes in registering or re-registering a product is not that the product is "safe," but rather that use of the product in accordance with its label directions "will not generally cause unreasonable adverse effects on the environment." 7 U.S.C. § 136(a)(c)(5)(D).

4

29.     FIFRA defines "unreasonable adverse effects on the environment" to be "any unreasonable risk to man or the environment, taking into account the economic, social, and environmental costs and benefits of the use of and pesticide." 7 U.S.C. § 136(bb). FIFRA thus requires the EPA to make a risk/benefit analysis in determining whether a registration should be granted or allowed to continue to be sold in commerce.

30.     The EPA and the State of Illinois registered Roundup for the distribution, sale, and manufacture in the United States and the State of Illinois.

31.     FIFRA generally requires that the registrant, Monsanto, conduct health and safety testing of pesticide products. The government is not required, nor is it able, to perform the product tests that are required of the manufacturer.

32.     The evaluation of each pesticide product distributed, sold, or manufactured is completed at the time the product is initially registered. The data necessary for registration of a pesticide has changed over time. The EPA has reevaluated all pesticide products through a Congressionally mandated process called "re-registration." 7 U.S.C. § 136a-1. In order to reevaluate these pesticides, the EPA demanded the completion of additional tests and the submission of data for the EPA's review and evaluation.

33.     In the case of glyphosate and Roundup, the EPA had planned on releasing its preliminary risk assessment – in relation to the registration process – no later than July 2015. The EPA completed its review of glyphosate in early 2015, but delayed releasing the assessment pending further review in light of the World Health Organization's March 24, 2015, finding that glyphosate is a "probable carcinogen" as demonstrated by the mechanistic evidence of carcinogenicity in humans and sufficient evidence of carcinogenicity in animals.

34.     In 1996, the New York Attorney General ("NYAG") filed a lawsuit against Monsanto based on its false and misleading advertising of Roundup products. Specifically, the lawsuit challenged Monsanto's general representations that its spray-on glyphosate-based herbicides, including Roundup, were "safer than table salt" and "practically non-toxic" to mammals, birds, and fish. Among the representations the NYAG found deceptive and misleading about the human and environmental safety of Roundup are the following:

a)      Remember that environmentally friendly Roundup herbicide is biodegradable. It won't build up in the soil so you can use Roundup with confidence along customers' driveways, sidewalks and fences.

b)      And remember that Roundup is biodegradable and won't build up in the soil. That will give you the environmental confidence you need to use Roundup everywhere you've got a weed, brush, edging or trimming problem.

c)      Roundup biodegrades into naturally occurring elements.

d)      Remember that versatile Roundup herbicide stays where you put it. That means there's no washing or leaching to harm customers' shrubs or other desirable vegetation.

e)      This non-residual herbicide will not wash or leach in the soil. It ... stays where you apply it.

f)      Glyphosate is less toxic to rats than table salt following acute oral ingestion.

g)      Glyphosate's safety margin is much greater than required. It has over a 1,000-fold safety margin in food and over a 700-fold safety margin for workers who manufacture it or use it.

h)      You can feel good about using herbicides by Monsanto. They carry a toxicity category rating of 'practically non-toxic' as it pertains to mammals, birds, and fish.

i)      Roundup can be used where kids and pets will play and breaks down into natural material.

6

35. On November 19, 1996, Defendant Monsanto entered into an Assurance of Discontinuance with the NYAG, in which Monsanto agreed, among other things, "to cease and desist from publishing or broadcasting any advertisements [in New York] that represent, directly or by implication" that:

a) its glyphosate-containing pesticide products or any component thereof are safe, non-toxic, harmless or free from risk.

b) its glyphosate-containing pesticide products or any component thereof manufactured, formulated, distributed or sold by Monsanto are biodegradable.

c) its glyphosate-containing pesticide products or any component thereof stay where they are applied under all circumstances and will not move through the environment by any means.

d) its glyphosate-containing pesticide products or any component thereof are "good" for the environment or are "known for their environmental characteristics."

e) glyphosate-containing pesticide products or any component thereof are safer or less toxic than common consumer product other than herbicides.

f) its glyphosate-containing products or any component thereof might be classified as "practically non-toxic."

36. Monsanto did not alter its advertising in the same manner in any other state.

37. In 2009, France's highest court ruled that Monsanto had not told the truth about the safety of Roundup. The French court affirmed an earlier judgment that Monsanto had falsely advertised its herbicide Roundup as "biodegradable" and that it "left the soil clean."

38. As early as the 1980's Monsanto was aware of glyphosate's carcinogenic properties.

7

39.     On March 4, 1985, a group of the Environmental Protection Agency's ("EPA") Toxicology Branch published a memorandum classifying glyphosate as a Category C oncogene. Category C oncogenes are possible human carcinogens with limited evidence of carcinogenicity.

40.     In 1986, the EPA issued a Registration Standard for glyphosate (NTIS PB87-103214). The Registration standard required additional phytotoxicity, environmental fate, toxicology, product chemistry, and residue chemistry studies. All of the data required was submitted and reviewed and/or waived.

41.     In October 1991, the EPA published a Memorandum entitled "Second Peer Review of Glyphosate." The memorandum changed glyphosate's classification to Group E (evidence of non-carcinogenicity for humans). Two peer review committee members did not concur with the conclusions of the committee and one member refused to sign.

42.     In addition to the toxicity of the active molecule, many studies support the hypothesis that glyphosate formulations found in Defendant Monsanto's Roundup products are more dangerous and toxic than glyphosate alone. As early as 1991, evidence existed demonstrating that glyphosate formulations were significantly more toxic than glyphosate alone.

43.     In 2002, Julie Marc published a study entitled "Pesticide Roundup Provokes Cell Division Dysfunction at the Level of CDK1/Cyclin B Activation."

44.     The study found that Defendant's Roundup caused delays in the cell cycles of sea urchins, while the same concentrations of glyphosate alone did not alter cell cycles.

45.     In 2004, Julie Marc published a study entitled "Glyphosate-based Pesticides Affect Cell Cycle Regulation." The study demonstrated a molecular link between glyphosate-based products and cell cycle dysregulation.

8

46.     The study noted that "cell-cycle dysregulation is a hallmark of tumor cells and human cancer. Failure in the cell-cycle checkpoints leads to genomic instability and subsequent development of cancers from the initial affected cell." Further, "[s]ince cell cycle disorders such as cancer result from dysfunction of unique cells, it was of interest to evaluate the threshold dose of glyphosate affecting cells."

47.     In 2005, Francisco Peixoto published a study showing that Roundup's effects on rat liver mitochondria are much more toxic and harmful than the same concentrations to glyphosate alone.

48.     The Peixoto study suggested that the harmful effects of Roundup on mitochondrial bioenergetics could not be exclusively attributed to glyphosate and could be the result of other chemicals, such as the surfactant POEA, or alternatively due to the possible synergy between glyphosate and Roundup formulation products.

49.     In 2009, Nora Benachour and Gilles-Eric Seralini published a study examining the effects of Roundup and glyphosate on human umbilical, embryonic, and placental cells.

50.     The study used dilution levels of Roundup and glyphosate far below agricultural recommendations, corresponding with low levels of residues in food. The study concluded that supposed "inert" ingredients, and possibly POEA, change human cell permeability and amplify toxicity of glyphosate alone. The study further suggested that determinations of glyphosate toxicity should take into account the presence of adjuvants, or those chemicals used in the formulation of the complete pesticide. The study confirmed that the adjuvants in Roundup are not inert and that Roundup is always more toxic than its active ingredient glyphosate.

51.     The results of these studies were confirmed in recently published peer-reviewed studies and were at all times available and/or known to Defendant Monsanto.

9

52.     Defendant Monsanto knew or should have known that Roundup is more toxic than glyphosate alone and that safety studies on Roundup, Roundup's adjuvants and "inert" ingredients, and/or the surfactant POEA were necessary to protect Robert Wessels from Roundup.

53.     Defendant Monsanto knew or should have known that tests limited to Roundup's active ingredient glyphosate were insufficient to prove the safety of Roundup.

54.     Defendant Monsanto failed to appropriately and adequately test Roundup, Roundup's adjuvants and "inert" ingredients, and/or the surfactant POEA to protect Robert Wessels from Roundup.

55.     Rather than performing appropriate tests, Defendant Monsanto relied upon flawed industry-supported studies designed to protect Defendant Monsanto's economic interests rather than Robert Wessels and the consuming public.

56.     Despite its knowledge that Roundup was considerably more dangerous than glyphosate alone, Defendant continued to promote Roundup as safe.

57.     The International Agency for Research on Cancer ("IARC") is the specialized intergovernmental cancer agency which the World Health Organization ("WHO") of the United Nations tasked with conducting and coordinating research into the causes of cancer.

58.     An IARC Advisory Group to Recommend Priorities for IARC Monographs during 2015-2019 met in April 2014. Though nominations for the review were solicited, a substance must meet two criteria to be eligible for review by the IARC Monographs: there must already be some evidence of carcinogenicity of the substance, and there must be evidence that humans are exposed to the substance.

59.     IARC set glyphosate for review in 2015-2016.  IARC uses five criteria for determining priority in reviewing chemicals.  The substance must have a potential for direct impact on public health; scientific literature to support suspicion of carcinogenicity; evidence of significant human exposure; high public interest and/or potential to bring clarity to a controversial area and/or reduce public anxiety or concern; and related agents similar to one given high priority by the above considerations.  Data reviewed is sourced preferably from publicly accessible, peer-reviewed data.

60.     On March 24, 2015, after its cumulative review of human, animal, and DNA studies for more than one (1) year, many of which have been in Defendant's possession since as early as 1985, the IARC's Working Group published its conclusion that the glyphosate contained in Defendant's Roundup herbicide is a Class 2A "probable carcinogen" as demonstrated by the mechanistic evidence of carcinogenicity in humans and sufficient evidence of carcinogenicity in animals.

61.     The IARC's full Monograph was published on July 29, 2015, and established glyphosate as a class 2A *probable* carcinogen to humans.  According to the authors, glyphosate demonstrated sufficient mechanistic evidence (genotoxicity and oxidative stress) to warrant a 2A classification based on evidence of carcinogenicity in humans and animals.

62.     The IARC's Working Group found an increased risk between exposure to glyphosate and non-Hodgkin's lymphoma ("NHL") and several subtypes of NHL, and the increased risk continued after adjustment for other pesticides.

63.     The IARC also found that glyphosate caused DNA and chromosomal damage in human cells.

64.    Even without the new classification by the IARC, Defendant has had ample evidence of glyphosate and Roundup's genotoxic properties for decades.

65.    Genotoxic chemical agents are those that are capable of damaging the DNA within a cell through genetic mutations, which is a process that can lead to cancer.

66.    In 1997, Chris Clements published "Genotoxicity of select herbicides in *Rana catesbeiana* tadpoles using the alkaline single-cell gel DNA electrophoresis (comet) assay."

67.    The study found that tadpoles exposed to Roundup showed significant DNA damage when compared with unexposed control animals.

68.    Both human and animal studies have shown that glyphosate and glyphosate-based formulations such as Roundup can induce oxidative stress.

69.    Oxidative stress and associated chronic inflammation are believed to be involved in carcinogenesis.

70.    The IARC Monograph notes that "[s]trong evidence exists that glyphosate, AMPA and glyphosate-based formulations can induce oxidative stress."

71.    In 2006 César Paz-y-Miño published a study examining DNA damage in human subjects exposed to glyphosate.

72.    The study produced evidence of chromosomal damage in blood cells showing significantly greater damage after exposure to glyphosate than before in the same individuals, suggesting that the glyphosate formulation used during aerial spraying had a genotoxic effect on exposed individuals.

73.    The IARC Monograph reflects the volume of evidence of glyphosate pesticides' genotoxicity noting "[t]he evidence for genotoxicity caused by glyphosate-based formulations is strong."

12

74. Despite knowledge to the contrary, Defendant Monsanto maintains that there is no evidence that Roundup is genotoxic, that regulatory authorities and independent experts are in agreement that Roundup is not genotoxic, and that there is no evidence that Roundup is genotoxic.

75. In addition to glyphosate and Roundup's genotoxic properties, Defendant Monsanto has long been aware of glyphosate's carcinogenic properties.

76. Glyphosate and Roundup in particular have long been associated with carcinogenicity and the development of numerous forms of cancer, including, but not limited to, non-Hodgkin's lymphoma, Hodgkin's lymphoma, multiple myeloma, and soft tissue sarcoma.

77. Defendant Monsanto has known of this association since the early to mid-1980s and numerous human and animal studies have evidenced the carcinogenicity of glyphosate and/or Roundup.

78. In 1985, the EPA studied the effects of glyphosate in mice, finding a dose-related response in male mice linked to renal tubal adenomas, a rare tumor. The study concluded the glyphosate was oncogenic.

79. In 2003, Lennart Hardell and Mikael Eriksson published the results of two case-controlled studies on pesticides as a risk factor for NHL and hairy cell leukemia.

80. The study concluded that glyphosate had the most significant relationship to NHL among all herbicides studied.

81. In 2003, AJ De Roos published a study examining the pooled data of midwestern farmers, examining pesticides and herbicides as risk factors for NHL.

82. The study, which controlled for potential confounders, found a relationship between increased NHL incidence and glyphosate.

13

83.     In 2008, Mikael Eriksson published a population-based case-controlled study of exposure to various pesticides as a risk factor for NHL.

84.     This study strengthened previous associations between glyphosate and NHL.

85.     In spite of this knowledge, Defendant Monsanto continued to issue broad and sweeping statements suggesting that Roundup was, and is, safer than ordinary household items such as table salt, despite a lack of scientific support for the accuracy and validity of these statements and, in fact, voluminous evidence to the contrary.

86.     These statements and representations have been made with the intent of inducing homeowners, the agricultural community, and the public at large to purchase and increase the use of Defendant Monsanto's Roundup for Defendant Monsanto's pecuniary gain, and, in fact, did induce Robert Wessels to use Roundup.

87.     Defendant Monsanto made these statements with complete disregard and reckless indifference to the safety of Robert Wessels and the general public.

88.     Notwithstanding Defendant Monsanto's representations, scientific evidence has established a clear association between glyphosate and genotoxicity, inflammation, and an increased risk of many cancers, including, but not limited to, NHL, multiple myeloma, and soft tissue sarcoma.

89.     Defendant Monsanto knew, or should have known, that glyphosate is associated with an increased risk of developing cancer, including, but not limited to, NHL, multiple myeloma, and soft tissue sarcomas.

90.     Defendant Monsanto failed to appropriately and adequately inform and warn Robert Wessels of the serious and dangerous risks associated with the use of and exposure to glyphosate and/or Roundup, including, but not limited to, the risk of developing NHL.

14

91.     Despite the IARC's classification of glyphosate as a Class 2A probable carcinogen, Defendant Monsanto continues to maintain that glyphosate and/or Roundup is safe, non-carcinogenic, non-genotoxic, and falsely warrant to users and the general public that independent experts and regulatory agencies agree that there is no evidence of carcinogenicity or genotoxicity in glyphosate and Roundup.

92.     Defendant Monsanto has claimed and continues to claim that Roundup is safe, non-carcinogenic, and non-genotoxic.  These misrepresentations are consistent with Defendant Monsanto's cavalier approach to investigating and ensuring the safety of its products, the safety of the public at large, and the safety of Robert Wessels.

93.     After the EPA's 1985 classification of glyphosate as possibly carcinogenic to humans (Group C), Defendant Monsanto exerted pressure upon the EPA to change its classification.

94.     This culminated in the EPA's reclassification of glyphosate to Group E, which was based upon evidence of non-carcinogenicity in humans.

95.     In so classifying, the EPA stated that "[i]t should be emphasized, however, that designation of an agent in Group E is based on the available evidence at the time of evaluation and should not be interpreted as a definitive conclusion that the agent will not be a carcinogen under any circumstances."

96.     On two occasions, the EPA found that laboratories hired by Defendant Monsanto to test the toxicity of its Roundup products for registration purposes committed scientific fraud.

97.     In the first instance, Defendant Monsanto hired Industrial Bio-Test Laboratories ("IBT") to perform and evaluate pesticide toxicology studies relating to Roundup.  IBT

15

performed approximately 30 tests on glyphosate and glyphosate-containing products, including 11 of the 19 chronic toxicology studies needed to register Roundup with the EPA.

98.     In 1976, the Food and Drug Administration ("FDA") performed an inspection of IBT and discovered discrepancies between the raw data and the final report relating to toxicological impacts of glyphosate. The EPA subsequently audited IBT and determined that the toxicology studies conducted for Roundup were invalid. An EPA reviewer stated, after finding "routine falsification of data" at IBT, that it was "hard to believe the scientific integrity of the studies when they said they took specimens of the uterus from male rabbits."

99.     Three top executives of IBT were convicted of fraud in 1983.

100.     In the second incident, Monsanto hired Craven Laboratories ("Craven") in 1990 to perform pesticide and herbicide studies, including several studies on Roundup.

101.     In March of 1991, the EPA announced that it was investigating Craven for "allegedly falsifying test data used by chemical firms to win EPA approval of pesticides."

102.     The investigation led to the indictments of the laboratory owner and a handful of employees.

103.     Defendant Monsanto claims on its website that "[r]egulatory authorities and independent experts around the world have reviewed numerous long-term/carcinogenicity and genotoxicity studies and agree that there is no evidence that glyphosate, the active ingredient in Roundup brand herbicides and other glyphosate-based herbicides, causes cancer, even at very high doses, and that it is not genotoxic."

104.     Ironically, the primary source for this statement is an outdated 1986 report by the WHO, the same organization that now considers glyphosate to be a probable carcinogen.

105.    Glyphosate, and Defendant Monsanto's Roundup products, in particular, have long been associated with serious side effects and many regulatory agencies around the globe have banned or are currently banning the use of glyphosate-containing herbicide products.

106.    Defendant Monsanto's statements proclaiming the safety of Roundup and disregarding its dangers misled Robert Wessels.

107.    Despite Defendant Monsanto's knowledge that Roundup was associated with an elevated risk of developing cancer, Defendant Monsanto's promotional campaigns focused on Roundup's purported "safety profile."

108.    Defendant Monsanto's failure to adequately warn consumers resulted in (1) Robert Wessels using and being exposed to glyphosate instead of using another acceptable and safe method of controlling unwanted weeds and pests; and (2) scientists and physicians failing to warn and instruct consumers about the risk of cancer, including NHL, and other injuries associated with Roundup.

109.    Defendant Monsanto failed to seek modification of the labeling of Roundup to include relevant information regarding the risks and dangers associated with Roundup exposure.

110.    The failure of Defendant Monsanto to appropriately warn and inform the EPA has resulted in inadequate instructions and warnings in safety information presented directly to users and consumers.

111.    The failure of Defendant Monsanto to appropriately warn and inform the EPA has resulted in the lack of warning or caution statements that are adequate to protect health and the environment.

17

## COUNT I

**Strict Liability**

1-111. Plaintiff repeats, realleges, and incorporates herein all Allegations Common to All Counts.

112.    Robert Wessels used Roundup regularly before he was diagnosed with non-Hodgkin's B-cell lymphoma in 2016.

113.    Robert Wessels mixed and sprayed Roundup for at least twenty-three years.

114.    Robert Wessels followed instructions and safety and precautionary warnings provided by Monsanto.

115.    At all times relevant, Defendant Monsanto designed, researched, manufactured, tested, advertised, promoted, sold, and distributed the Roundup that Robert Wessels used.

116.    Defendant Monsanto's Roundup was expected to and did reach the usual consumers, handlers, and persons coming into contact, including Robert Wessels, without substantial change in the condition in which it was produced, manufactured, sold, distributed, and marketed by Defendant Monsanto.

117.    At the time it left the control of the Defendant Monsanto, Roundup was in an unsafe, defective, and inherently dangerous condition, which was dangerous to users and, in particular, Robert Wessels.

118.    The Roundup designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed by Defendant Monsanto was defective in design or formulation in that, when it left the hands of the manufacturer and/or suppliers, the foreseeable risks exceeded the benefits associated with the design or formulation of Roundup.

119.    The Roundup designed, researched, manufactured, tested, advertised, promoted,

18

marketed, sold, and distributed by Defendant Monsanto was defective in design and/or

formulations, in that, when it left the hands of the Defendant Monsanto's manufacturers and/or

suppliers, it was unreasonably dangerous, unreasonably dangerous in normal use, and it was

more dangerous than an ordinary consumer would expect.

120.   At all times herein mentioned, Roundup was in a defective condition and unsafe,

and Defendant Monsanto knew or had reason to know that said product was defective and

unsafe, especially when used in the form and manner as provided by the Defendant Monsanto. In

particular, Defendant Monsanto's Roundup was defective in one or more of the following ways:

a.   When placed in the stream of commerce, Defendant Monsanto's Roundup products were defective in design and formulation and, consequently, dangerous to an extent beyond that which an ordinary consumer would anticipate;

b.   When placed in the stream of commerce, Defendant Monsanto's Roundup products were unreasonably dangerous in that they were hazardous and posed a grave risk of cancer and other serious illnesses when used in a reasonably anticipated manner;

c.   When placed in the stream of commerce, Defendant Monsanto's Roundup products contained unreasonably dangerous design defects and were not reasonably safe when used in a reasonably anticipated manner;

d.   Defendant Monsanto did not sufficiently test, investigate, or study its Roundup products;

e.   Exposure to Roundup presents a risk of harmful side effects that outweigh any potential utility stemming from the use of the herbicide;

f.   Defendant Monsanto knew or should have known at the time of marketing its Roundup products that exposure to Roundup could result in cancer and other severe illnesses and injuries;

g.   Defendant Monsanto did not conduct adequate post-marketing surveillance of its Roundup products; and

19

h.   Defendant Monsanto failed to warn consumers, foreseeable users, government agencies and others that exposure to Roundup could result in cancer and other severe illnesses and injuries.

121.   Defendant Monsanto knew, or should have known, that Roundup was in a defective condition and was and is inherently dangerous and unsafe.

122.   Robert Wessels was exposed to Defendant Monsanto's Roundup, as described above, without knowledge of Roundup's dangerous characteristics.

123.   At the time of Robert Wessels's use and exposure to Roundup, Roundup was being used for the purposes and in a manner normally intended, as a broad-spectrum herbicide.

124.   Defendant Monsanto with this knowledge voluntarily designed its Roundup with a dangerous condition for use by the public and, in particular, Robert Wessels.

125.   Defendant Monsanto marketed and promoted its product, including in Illinois, to consumers like Robert Wessels in such a manner so as to make it inherently defective as the product downplayed its suspected, probable, and established health risks inherent with its normal, intended use.

126.   As a proximate result of one or more of the foregoing unreasonably dangerous conditions of Defendant Monsanto's Roundup, Robert Wessels was exposed to it.

127.   As a proximate result of one or more of the foregoing unreasonably dangerous conditions of Defendant Monsanto's Roundup, Robert Wessels was diagnosed with non-Hodgkin's B-Cell lymphoma in 2016.

128.   As a proximate result of one or more of the foregoing negligent acts or omissions, Robert Wessels suffered personal and pecuniary injuries.

129.   Robert Wessels did not discover any link between the use of Defendant's products and his non-Hodgkin's lymphoma until after December 1, 2018.

20

WHEREFORE, Plaintiff, Robert Wessels, demands judgment against Defendant, Monsanto Company, in an amount in excess of the minimum amount required for jurisdiction in the Law Division of the Circuit Court of Cook County, Illinois.

## COUNT II

**Negligence**

1-111.   Plaintiff repeats, realleges, and incorporates herein all Allegations Common to All Counts.

112.   Robert Wessels used Roundup regularly before he was diagnosed with non-Hodgkin's B-Cell lymphoma in 2016.

113.   Robert Wessels mixed and sprayed Roundup for at least twenty-three years.

114.   Robert Wessels followed instructions and safety and precautionary warnings provided by Defendant Monsanto.

115.   At all times relevant, Defendant Monsanto designed, researched, manufactured, tested, advertised, promoted, sold, and distributed the Roundup that Robert Wessels used.

116.   Defendant Monsanto's Roundup was expected to and did reach the usual consumers, handlers, and persons coming into contact, including Robert Wessels, without substantial change in the condition in which it was produced, manufactured, sold, distributed, and marketed by Defendant Monsanto.

117.   At the time it left the control of the Defendant Monsanto, Roundup was in an unsafe, defective, and inherently dangerous condition, which was dangerous to users and, in particular, Robert Wessels.

21

118.    The Roundup designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed by Defendant Monsanto was defective in design or formulation in that, when it left the hands of the manufacturer and/or suppliers, the foreseeable risks exceeded the benefits associated with the design or formulation of Roundup.

119.    The Roundup designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed by Defendant Monsanto was defective in design and/or formulations, in that, when it left the hands of Defendant Monsanto's manufacturers and/or suppliers, it was unreasonably dangerous, unreasonably dangerous in normal use, and it was more dangerous than an ordinary consumer would expect.

120.    At all relevant times herein, Defendant Monsanto, individually and by and through its agents and employees, was negligent in one or more of the following ways:

a.      Manufactured, produced, promoted, formulated, created, and/or designed Roundup without thoroughly testing it;

b.      Failed to test Roundup and/or failed to adequately, sufficiently, and properly test Roundup;

c.      Failed to conduct sufficient testing to determine the safety of "inert" ingredients and/or adjuvants contained within Roundup; the propensity of these ingredients to render Roundup toxic, increase the toxicity of Roundup, or magnify the carcinogenic properties of Roundup; whether these ingredients are carcinogenic; and whether or not "inert" ingredients and/or adjuvants were safe for use;

d.      Failed to adequately and correctly warn Robert Wessels, the public, and the EPA of the dangers of Roundup;

e.      Failed to provide adequate cautions and warnings to protect the health of users, handlers, applicators, and persons who would reasonably and foreseeably come into contact with Roundup;

f.      Marketed, advertised, and recommended the use of Roundup without sufficient knowledge as to its dangerous propensities;

22

g.   Represented that Roundup was safe for use for its intended purpose, and/or that Roundup was safer than ordinary and common items such as table salt, when, in fact, it was unsafe;

h.   Manufactured, produced, and formulated Roundup in a manner, which was dangerous to its users;

i.   Concealed information from the public while knowing that Roundup was unsafe, dangerous, and/or non-conforming with EPA regulations; and

j.   Sold Roundup with a false and misleading label.

121.   Defendant Monsanto knew, or should have known, that Roundup was in a defective condition and was and is inherently dangerous and unsafe.

122.   Robert Wessels was exposed to Defendant Monsanto's Roundup, as described above, without knowledge of Roundup's dangerous characteristics.

123.   At the time of Robert Wessels' use and exposure to Roundup, Roundup was being used for the purposes and in a manner normally intended, as a broad-spectrum herbicide.

124.   Defendant Monsanto with this knowledge voluntarily designed its Roundup with a dangerous condition for use by the public and, in particular, Robert Wessels.

125.   Defendant Monsanto marketed and promoted its product, including in Illinois, to consumers like Robert Wessels in such a manner so as to make it inherently defective as the product downplayed its suspected, probably, and established health risks inherent with its normal, intended use.

126.   As a proximate result of one or more of the foregoing negligent acts and/or omissions, Robert Wessels was exposed to Roundup.

127.   As a proximate result of one or more of the foregoing negligent acts and/or omissions, Robert Wessels was diagnosed with non-Hodgkin's B-cell lymphoma in 2016.

128.    As a proximate result of one or more of the foregoing negligent acts and/or omissions, Robert Wessels suffered personal and pecuniary injuries.

129.    Robert Wessels did not discover any link between the use of Defendant's products and his non-Hodgkin's lymphoma until after December 1, 2018.

WHEREFORE, Plaintiff, Robert Wessels, demands judgment against Defendant, Monsanto Company, in an amount in excess of the minimum amount required for jurisdiction in the Law Division of the Circuit Court of Cook County, Illinois.


CORBOY & DEMETRIO, P.C.
By: Britney R. Pennycook


Kenneth T. Lumb
Michael D. Ditore
Britney R. Pennycook
Corboy & Demetrio, P.C.
Attorneys for Plaintiff
33 North Dearborn Street, 21st Floor
Chicago, Illinois  60602
(312) 346-3191
Firm I.D. No. 02329
Primary E-Mail: ccfiling@corboydemetrio.com