ACCO,(SPx),DISCOVERY,MANADR

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA (Eastern Division - Riverside)
### CIVIL DOCKET FOR CASE #: 5:21-cv-00114-JGB-SP

Elpidia Martinez v. Monsanto Company
Assigned to: Judge Jesus G. Bernal
Referred to: Magistrate Judge Sheri Pym
Cause: 28:1332 Diversity-Product Liability

Date Filed: 01/21/2021
Jury Demand: Plaintiff
Nature of Suit: 365 Personal Inj. Prod. Liability
Jurisdiction: Diversity

**Plaintiff**

**Elpidia Martinez**
*individually and on behalf of Carlos Celedon*

represented by **Tomislav George Antunovich**
Bisnar Chase LLP
1301 Dove Street Suite 120
Newport Beach, CA 92660
949-752-2999
Fax: 949-752-2777
Email: tantunovich@bisnarchase.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Brian D Chase**
Bisnar Chase LLP
1301 Dove Street Suite 120
Newport Beach, CA 92660
949-752-2999
Fax: 949-752-2777
Email: bchase@bisnarchase.com
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Monsanto Company**

| Date Filed | # | Docket Text |
|---|---|---|
| 01/21/2021 | 1 | COMPLAINT Receipt No: ACACDC-30170606 - Fee: $402, filed by Plaintiff ELPIDIA MARTINEZ. (Attachments: # 1 Civil Cover Sheet) (Attorney Tomislav George Antunovich added to party ELPIDIA MARTINEZ(pty:pla)(Antunovich, Tomislav) (Entered: 01/21/2021) |
| 01/21/2021 | 2 | Request for Clerk to Issue Summons on Complaint (Attorney Civil Case Opening) 1 filed by Plaintiff ELPIDIA MARTINEZ. (Antunovich, Tomislav) (Entered: 01/21/2021) |
| 01/21/2021 | 3 | NOTICE of Interested Parties filed by Plaintiff ELPIDIA MARTINEZ, (Antunovich, Tomislav) (Entered: 01/21/2021) |

| 01/25/2021 | 4 | NOTICE OF ASSIGNMENT to District Judge Jesus G. Bernal and Magistrate Judge Sheri Pym. (ghap) (Entered: 01/25/2021) |
| 01/25/2021 | 5 | NOTICE TO PARTIES OF COURT-DIRECTED ADR PROGRAM filed. (ghap) (Entered: 01/25/2021) |
| 01/25/2021 | 6 | 21 DAY Summons Issued re Complaint (Attorney Civil Case Opening) 1 as to Defendant Monsanto Company. (ghap) (Entered: 01/25/2021) |
| 01/25/2021 | 7 | NOTICE OF DEFICIENCIES in Attorney Case Opening RE: Complaint (Attorney Civil Case Opening) 1 . The following error(s) was found: Other error(s) with document(s): Attachments 1 Civil Cover Sheet is attached to the Complaint. Each of these documents should have been filed and entered separately under its correct event/relief. You need not take any action in response to this notice unless and until the Court directs you to do so. (ghap) (Entered: 01/25/2021) |
| 01/26/2021 | 8 | STANDING ORDER upon filing of the complaint by Judge Jesus G. Bernal. (ima) (Entered: 01/26/2021) |

| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 02/11/2021 12:21:51 | | | |
| **PACER Login:** | hllp1982 | **Client Code:** | 1417.0005 |
| **Description:** | Docket Report | **Search Criteria:** | 5:21-cv-00114-JGB-SP End date: 2/11/2021 |
| **Billable Pages:** | 2 | **Cost:** | 0.20 |

1   Brian D. Chase (SBN 164109)
    bchase@bisnarchase.com
2   Tom G. Antunovich (SBN 305216)
3   tantunovich@bisnarchase.com
    **BISNAR | CHASE LLP**
4   1301 Dove Street, Suite 120
5   Newport Beach, CA 92660
    Tel: (949) 752-2999
6   Fax: (949) 752-2777
7
8   *Attorneys for Plaintiff*

9

10                **UNITED STATES DISTRICT COURT**

11          **FOR THE CENTRAL DISTRICT OF CALIFORNIA**

12

13

14   ELPIDIA MARTINEZ, individually          CASE NO.:  5:21-cv-00114
15   and on behalf of CARLOS CELEDON,
                                              JUDGE:
16            Plaintiff,
                                              **CIVIL COMPLAINT FOR**
17        v.                                  **COMPENSATORY AND**
                                              **PUNITIVE DAMAGES**
18
19   MONSANTO COMPANY,                        **JURY TRIAL DEMANDED**
20            Defendant.
21
22
23
24
25        COMES NOW Plaintiff Elpidia Martinez ("Plaintiff"), by and through her
26   attorneys Bisnar | Chase LLP, and brings this Complaint for damages against
27   Defendant Monsanto Company ("Defendant" or "Monsanto"), and alleges the
28   following:

                                        1

## NATURE OF THE CASE

1.     This is an action for damages suffered by Plaintiff as a direct and proximate result of Defendant's negligent and wrongful conduct in connection with the design, development, manufacture, testing, packaging, promoting, marketing, advertising, distribution, labeling, and/or sale of the herbicide Roundup®, containing the active ingredient glyphosate.

2.     Plaintiff alleges that Roundup® and/or glyphosate is defective, dangerous to human health, unfit and unsuitable to be marketed and sold in commerce, and lacked proper warnings and directions as to the dangers associated with its use.

3.     Plaintiff's injuries, like those striking thousands of similarly situated victims across the country, were avoidable.

## JURISDICTION AND VENUE

4.     This Court has jurisdiction over Defendant and this action pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship between Plaintiff and Defendant. Defendant is incorporated in, and/or maintains its principal place of business outside of the state in which the Plaintiff resides.

5.     The amount in controversy exceeds $75,000, exclusive of interest and cost.

6.     The Court also has supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

7.     Venue is proper within this district pursuant to 28 U.S.C. § 1391 in that Defendant is subject to personal jurisdiction in this district. Furthermore, Defendant sells, markets, and/or distributes Roundup within the Central District of California.

## PARTIES

8.     CARLOS CELEDON (deceased) ("Plaintiff's Decedent") was a resident of San Bernardino County, California. Plaintiff's Decedent's spouse, ELPIDIA MARTINEZ ("Plaintiff"), brings this action individually and as the surviving spouse

of Plaintiff's Decedent for personal injuries sustained by exposure to Roundup®
containing the active ingredient glyphosate and the surfactant polyethoxylated tallow
amine ("POEA"). Plaintiff is a resident of San Bernardino County, California.

9.     As a direct and proximate result of being exposed to Roundup,
Plaintiff's Decedent developed non-Hodgkin's lymphoma ("NHL").

10.    "Roundup" refers to all formulations of Defendant's Roundup products,
including, but not limited to, Roundup Concentrate Poison Ivy and Tough Brush
Killer 1, Roundup Custom Herbicide, Roundup D-Pak herbicide, Roundup Dry
Concentrate, Roundup Export Herbicide, Roundup Fence & Hard Edger 1, Roundup
Garden Foam Weed & Grass Killer, Roundup Grass and Weed Killer, Roundup
Herbicide, Roundup Original 2k herbicide, Roundup Original II Herbicide, Roundup
Pro Concentrate, Roundup Prodry Herbicide, Roundup Promax, Roundup Quik Stik
Grass and Weed Killer, Roundup Quikpro Herbicide, Roundup Rainfast Concentrate
Weed & Grass Killer, Roundup Rainfast Super Concentrate Weed & Grass Killer,
Roundup Ready-to-Use Extended Control Weed & Grass Killer 1 Plus Weed
Preventer, Roundup Ready-to-Use Weed & Grass Killer, Roundup Ready-to-Use
Weed and Grass Killer 2, Roundup Ultra Dry, Roundup Ultra Herbicide, Roundup
Ultramax, Roundup VM Herbicide, Roundup Weed & Grass Killer Concentrate,
Roundup Weed & Grass Killer Concentrate Plus, Roundup Weed & Grass killer
Ready-to-Use Plus, Roundup Weed & Grass Killer Super Concentrate, Roundup
Weed & Grass Killer1 Ready-to-Use, Roundup WSD Water Soluble Dry Herbicide
Deploy Dry Herbicide, or any other formulation of containing the active ingredient
glyphosate.

11.    Defendant Monsanto is incorporated in the state of Delaware, with a
principal place of business in St. Louis, Missouri.

12.    Defendant advertises and sells goods, specifically Roundup, throughout
the United States, including in California.

COMPLAINT

13.    Defendant transacted and conducted business within the State of California that relates to the allegations in this Complaint.

14.    Defendant derived substantial revenue from goods and products used in the State of California.

15.    Defendant expected or should have expected its acts to have consequences within the State of California, and derived substantial revenue from interstate commerce.

16.    Defendant engaged in the business of designing, developing, manufacturing, testing, packaging, marketing, distributing, labeling, and/or selling Roundup.

17.    Defendant is authorized to do business in the State of California and derive substantial income from doing business in this state.

18.    Defendant purposefully availed itself of the privilege of conducting activities with the State of California, thus invoking the benefits and protections of its laws.

19.    Defendant designed, sold, advertised, manufactured and/or distributed Roundup, with full knowledge of its dangerous and defective nature.

## FACTUAL ALLEGATIONS

20.    At all relevant times, Defendant was in the business of, and did, design, research, manufacture, test, advertise, promote, market, sell and distribute the commercial herbicide Roundup.

21.    Monsanto is a multinational agricultural biotechnology corporation based in St. Louis, Missouri.  It is the world's leading producer of glyphosate.

22.    Defendant discovered the herbicidal properties of glyphosate during the 1970s and subsequently began to design, research, manufacture, sell and distribute glyphosate-based Roundup as a broad spectrum herbicide.

23.    Glyphosate is the active ingredient in Roundup.

COMPLAINT

24.     Glyphosate is a broad-spectrum herbicide used to kill weeds and grasses known to compete with commercial crops grown around the globe.

25.     Glyphosate is a "non-selective" herbicide, meaning it kills indiscriminately based only on whether a given organism produces a specific enzyme, 5-enolpyruvylshikimic acid-3-phosphate synthase, known as EPSP synthase.

26.     Glyphosate inhibits the enzyme 5-enolpyruvylshikimic acid-3-phosphate synthase that interferes with the shikimic pathway in plants, resulting in the accumulation of shikimic acid in plant tissue and ultimately plant death.

27.     Sprayed as a liquid, plants absorb glyphosate directly through their leaves, stems, and roots, and detectable quantities accumulate in the plant tissues.

28.     The original Roundup, containing the active ingredient glyphosate, was introduced in 1974.  Today, glyphosate products are among the world's most widely used herbicides.

29.     Defendant is intimately involved in the development, design, manufacture, marketing, sale, and/or distribution of genetically modified ("GMO") crops, many of which are marketed as being resistant to Roundup i.e., Roundup Ready®.  As of 2009, Defendant was the world's leading producer of seeds designed to be Roundup Ready.  In 2010, an estimated 70% of corn and cotton, and 90% of soybean fields in the United States contained Roundup Ready seeds.

30.     Each year approximately 250 million pounds of glyphosate are sprayed on crops, commercial nurseries, suburban lawns, parks, and golf courses.  This increase in use has been driven largely by the proliferation of genetically engineered crops, crops specifically tailored to resist the activity of glyphosate.

31.     For nearly 40 years, consumers, farmers, and the general public, including Plaintiff, have used Roundup, unaware of its carcinogenic properties.

## REGISTRATION OF HERBICIDES UNDER FEDERAL LAW

32.     The manufacture, formulation and distribution of herbicides, such as Roundup, are regulated under the Federal Insecticide, Fungicide, and Rodenticide

Act ("FIFRA"), 7. U.S.C. § 136 et seq.  FIFRA requires that all pesticides be registered with the Environmental Protection Agency ("EPA) prior to their distribution, sale, or use, except as described by FIFRA 7 U.S.C. § 136a(a).

33.   The EPA requires as part of the registration process, among other requirements, a variety of tests to evaluate the potential for exposure to pesticides, toxicity to people and other potential non-target organisms, and other adverse effects on the environment. Registration by the EPA, however, is not an assurance or finding of safety.  The determination the EPA makes in registering or re-registering a product is not that the product is "safe," but rather that use of the product in accordance with its label directions "will not generally cause unreasonable adverse effects on the environment."  7 U.S.C. § 136(a)(c)(5)(D).

34.   FIFRA defines "unreasonable adverse effects on the environment" to mean "any unreasonable risk to man or the environment, taking into account the economic, social, and environmental costs and benefits of the use of any pesticide."  7 U.S.C. § 136(bb).  FIFRA thus requires the EPA to make a risk/benefit analysis in determining whether a registration should be granted or allowed to continue to be sold in commerce.

35.   The EPA and the State of California registered Roundup for distribution, sale, and manufacture in the United States and the State of California.

36.   FIFRA generally requires that the registrant, Monsanto, conduct health and safety testing of pesticide products.  The government is not required, nor is it able, to perform the product tests that are required of the manufacturer.

37.   The evaluation of each pesticide product distributed, sold, or manufactured is completed at the time the product is initially registered.  The data necessary for registration of a pesticide has changed over time.  The EPA is now in the process of re-evaluating all pesticide products through a Congressionally-mandated process called "re-registration."  7 U.S.C. § 136a-1. In order to reevaluate

1  these pesticides, the EPA demands the completion of additional tests and the

2  submission of data for the EPA's review and evaluation.

3      38.    In the case of glyphosate and Roundup, the EPA had planned on

4  releasing its preliminary risk assessment—in relation to the registration process—no

5  later than July 2015.  The EPA completed its review of glyphosate in early 2015, but

6  delayed releasing the assessment pending further review in light of the World Health

7  Organization's findings.

8              **MONSANTO'S FALSE REPRESENTATIONS**
             **REGARDING THE SAFETY OF ROUNDUP**
9

10     39.    In 1996, the New York Attorney General ("NYAG") filed a lawsuit

11  against Monsanto based on its false and misleading advertising of Roundup products.

12  Specifically, the lawsuit challenged Monsanto's general representations that its

13  spray-on glyphosate-based herbicides, including Roundup, were "safer than table

14  salt" and "practically non-toxic" to mammals, birds, and fish.  Among the

15  representations the NYAG found deceptive and misleading about the human and

16  environmental safety of Roundup are the following:

17      a) Remember that environmentally friendly Roundup herbicide
18         is biodegradable. It won't build up in the soil so you can use
       Roundup with confidence along customers' driveways,
19         sidewalks and fences ...

20      b) And remember that Roundup is biodegradable and won't
       build up in the soil. That will give you the environmental
21         confidence you need to use Roundup everywhere you've got
       a weed, brush, edging or trimming problem.
22

23      c) Roundup biodegrades into naturally occurring elements.

24      d) Remember that versatile Roundup herbicide stays where you
       put it. That means there's no washing or leaching to harm
25         customers' shrubs or other desirable vegetation.

26      e) This non-residual herbicide will not wash or leach in the
       soil.  It ... stays where you apply it.
27
    f) You can apply Accord with "confidence because it will stay
28         where you put it" it bonds tightly to soil particles, preventing

leaching.  Then, soon after application, soil microorganisms biodegrade into natural products.

g) Glyphosate is less toxic to rats than table salt following acute oral ingestion.

h) h) Glyphosate's safety margin is much greater than required. It has over a 1,000-fold safety margin in food and over a 700-fold safety margin for workers who manufacture it or use it.

i) You can feel good about using herbicides by Monsanto. They carry a toxicity category rating of 'practically non-toxic' as it pertains to mammals, birds and fish.

j) "Roundup can be used where kids and pets will play and breaks down into natural material."  This ad depicts a person with his head in the ground and a pet dog standing in an area which has been treated with Roundup.[1]

40.     On November 19, 1996, Monsanto entered into an Assurance of Discontinuance with NYAG, in which Monsanto agreed, among other things, "to cease and desist from publishing or broadcasting any advertisements [in New York] that represent, directly or by implication" that:

a) its glyphosate-containing pesticide products or any component thereof are safe, non-toxic, harmless or free from risk.

***

b) its glyphosate-containing pesticide products or any component thereof manufactured, formulated, distributed or sold by Monsanto are biodegradable

***

c) its glyphosate-containing pesticide products or any component thereof stay where they are applied under all circumstances and will not move through the environment by any means.

***

---

[1] Attorney General of the State of New York, In the Matter of Monsanto Company, Assurance of Discontinuance Pursuant to Executive Law § 63(15) (Nov. 1996).

COMPLAINT

d) its glyphosate-containing pesticide products or any component thereof are "good" for the environment or are "known for their environmental characteristics."

***

e) glyphosate-containing pesticide products or any component thereof are safer or less toxic than common consumer products other than herbicides;

f) its glyphosate-containing products or any component thereof might be classified as "practically non-toxic."

41.    Monsanto did not alter its advertising in the same manner in any state other than New York, and on information and belief still has not done so today.

42.    In 2009, France's highest court ruled that Monsanto had not told the truth about the safety of Roundup. The French court affirmed an earlier judgment that Monsanto had falsely advertised its herbicide Roundup as "biodegradable" and that it "left the soil clean."[2]

## EVIDENCE OF CARCINOGENICITY IN ROUNDUP

43.    As early as the 1980s Monsanto was aware of glyphosate's carcinogenic properties.

44.    On March 4, 1985, a group of the Environmental Protection Agency's ("EPA") Toxicology Branch published a memorandum classifying glyphosate as a Category C oncogene.[3] Category C oncogenes are possible human carcinogens with limited evidence of carcinogenicity.

45.    In 1986, the EPA issued a Registration Standard for glyphosate (NTIS PB87-103214). The Registration standard required additional phytotoxicity, environmental fate, toxicology, product chemistry, and residue chemistry studies. All of the data required was submitted and reviewed and/or waived.

---

[2] *Monsanto Guilty in 'False Ad' Row*, BBC, Oct. 15, 2009, *available at* http://news.bbc.co.uk/2/hi/europe/8308903.stm.
[3] Consensus Review of Glyphosate, Casewell No. 661A. March 4, 1985. United States Environmental Protection Agency.

COMPLAINT

46.   In October 1991, the EPA published a Memorandum entitled "Second Peer Review of Glyphosate." The memorandum changed glyphosate's classification to Group E (evidence of non-carcinogenicity for humans). Two peer review committee members did not concur with the conclusions of the committee and one member refused to sign.[4]

47.   In addition to the toxicity of the active molecule, many studies support the hypothesis that glyphosate formulations found in Defendant's Roundup products are more dangerous and toxic than glyphosate alone.[5] As early as 1991 evidence existed demonstrating that glyphosate formulations were significantly more toxic than glyphosate alone.[6]

48.   In 2002, Julie Marc published a study entitled "Pesticide Roundup Provokes Cell Division Dysfunction at the Level of CDK1/Cyclin B Activation."

49.   The study found that Roundup caused delays in the cell cycles of sea urchins, while the same concentrations of glyphosate alone proved ineffective and did not alter cell cycles.

50.   In 2004, Julie Marc published a study entitled "Glyphosate-based pesticides affect cell cycle regulation." The study demonstrated a molecular link between glyphosate-based products and cell cycle dysregulation.

51.   The study noted that "cell-cycle dysregulation is a hallmark of tumor cells and human cancer. Failure in the cell-cycle checkpoints leads to genomic instability and subsequent development of cancers from the initial affected cell." Further, "[s]ince cell cycle disorders such as cancer result from dysfunction of unique cell, it was of interest to evaluate the threshold dose of glyphosate affecting cells."[7]

---

[4] Second Peer Review of Glyphosate, CAS No. 1071-83-6. October 30, 1881. United States Environmental Protection Agency.
[5] Martinez et al. 2007; Benachour 2009; Gasnier et al. 2010; Peixoto 2005; Marc 2004.
[6] Martinez et al 1991.
[7] Molinari, 2000; Stewart et al., 2003.

COMPLAINT

1       52.    In 2005, Francisco Peixoto published a study showing that Roundup's

2   effects on rat liver mitochondria are much more toxic and harmful than the same

3   concentrations of glyphosate alone.

4       53.    The Peixoto study suggested that the harmful effects of Roundup on

5   mitochondrial bioenergetics could not be exclusively attributed to glyphosate and

6   could be the result of other chemicals, namely the surfactant POEA, or alternatively

7   due to the possible synergy between glyphosate and Roundup formulation products.

8       54.    In 2009, Nora Benachour and Gilles-Eric Seralini published a study

9   examining the effects of Roundup and glyphosate on human umbilical, embryonic,

10   and placental cells.

11       55.    The study used dilution levels of Roundup and glyphosate far below

12   agricultural recommendations, corresponding with low levels of residues in food.

13   The study concluded that supposed "inert" ingredients, and possibly POEA, change

14   human cell permeability and amplify toxicity of glyphosate alone.  The study further

15   suggested that determinations of glyphosate toxicity should take into account the

16   presence of adjuvants, or those chemicals used in the formulation of the complete

17   pesticide.  The study confirmed that the adjuvants in Roundup are not inert and that

18   Roundup is always more toxic than its active ingredient glyphosate.

19       56.    The results of these studies were confirmed in recently published peer-

20   reviewed studies and were at all times available and/or known to Defendant.

21       57.    Defendant knew or should have known that Roundup is more toxic than

22   glyphosate alone and that safety studies on Roundup, Roundup's adjuvants and

23   "inert" ingredients, and/or the surfactant POEA were necessary to protect Plaintiff

24   from Roundup.

25       58.    Defendant knew or should have known that tests limited to Roundup's

26   active ingredient glyphosate were insufficient to prove the safety of Roundup.

27

28

COMPLAINT

59.     Defendant failed to appropriately and adequately test Roundup, Roundup's adjuvants and "inert" ingredients, and/or the surfactant POEA to protect Plaintiff from Roundup.

60.     Rather than performing appropriate tests, Defendant relied upon flawed industry-supported studies designed to protect Defendant's economic interests rather than Plaintiff and the consuming public.

61.     Despite possessing knowledge that Roundup was considerably more dangerous than glyphosate alone, Defendant continued to promote Roundup as safe.

## IARC CLASSIFICATION OF GLYPHOSATE

62.     The International Agency for Research on Cancer ("IARC") is the specialized intergovernmental cancer agency the World Health Organization ("WHO") of the United Nations tasked with conducting and coordinating research into the causes of cancer.

63.     An IARC Advisory Group to Recommend Priorities for IARC Monographs during 2015–2019 met in April 2014.  Though nominations for the review were solicited, a substance must meet two criteria to be eligible for review by the IARC Monographs: there must already be some evidence of carcinogenicity of the substance, and there must be evidence that humans are exposed to the substance.

64.     IARC set glyphosate for review in 2015-2016.  IARC uses five criteria for determining priority in reviewing chemicals.  The substance must have a potential for direct impact on public health; scientific literature to support suspicion of carcinogenicity; evidence of significant human exposure; high public interest and/or potential to bring clarity to a controversial area and/or reduce public anxiety or concern; related agents similar to one given high priority by the above considerations. Data reviewed is sourced preferably from publicly accessible, peer-reviewed data.

65.     On March 24, 2015, after its cumulative review of human, animal, and DNA studies for more than one (1) year, many of which have been in Defendant's possession since as early as 1985, the IARC's working group published its

COMPLAINT

conclusion that the glyphosate contained in Defendant's Roundup herbicide, is a Class 2A "probable carcinogen" as demonstrated by the mechanistic evidence of carcinogenicity in humans and sufficient evidence of carcinogenicity in animals.

66. The IARC's full Monograph was published on July 29, 2015 and established glyphosate as a class 2A probable carcinogen to humans. According to the authors glyphosate demonstrated sufficient mechanistic evidence (genotoxicity and oxidative stress) to warrant a 2A classification based on evidence of carcinogenicity in humans and animals.

67. The IARC Working Group found an increased risk between exposure to glyphosate and NHL and several subtypes of NHL, and the increased risk continued after adjustment for other pesticides.

68. The IARC also found that glyphosate caused DNA and chromosomal damage in human cells.

## EARLIER EVIDENCE OF GLYPHOSATE'S DANGER

69. Despite the new classification by the IARC, Defendant has had ample evidence of glyphosate and Roundup's genotoxic properties for decades.

70. Genotoxicity refers to chemical agents that are capable of damaging the DNA within a cell through genetic mutations, which is a process that is believed to lead to cancer.

71. In 1997, Chris Clements published "Genotoxicity of select herbicides in Rana catesbeiana tadpoles using the alkaline single-cell gel DNA electrophoresis (comet) assay."

72. The study found that tadpoles exposed to Roundup showed significant DNA damage when compared with unexposed control animals.

73. Both human and animal studies have shown that glyphosate and glyphosate-based formulations such as Roundup can induce oxidative stress.

74. Oxidative stress and associated chronic inflammation are believed to be involved in carcinogenesis.

75. The IARC Monograph notes that "[s]trong evidence exists that glyphosate, AMPA and glyphosate-based formulations can induce oxidative stress."

76. In 2006 César Paz-y-Miño published a study examining DNA damage in human subjects exposed to glyphosate.

77. The study produced evidence of chromosomal damage in blood cells showing significantly greater damage after exposure to glyphosate than before in the same individuals, suggesting that the glyphosate formulation used during aerial spraying had a genotoxic effect on exposed individuals.

78. The IARC Monograph reflects the volume of evidence of glyphosate pesticides' genotoxicity noting "[t]he evidence for genotoxicity caused by glyphosate-based formulations is strong."

79. Despite knowledge to the contrary, Defendant maintains that there is no evidence that Roundup is genotoxic, that regulatory authorities and independent experts are in agreement that Roundup is not genotoxic, and that there is no evidence that Roundup is genotoxic.

80. In addition to glyphosate and Roundup's genotoxic properties, Defendant has long been aware of glyphosate's carcinogenic properties.

81. Glyphosate and Roundup in particular have long been associated with carcinogenicity and the development of numerous forms of cancer, including, but not limited to, NHL, Hodgkin's lymphoma, multiple myeloma, and soft tissue sarcoma.

82. Defendant has known of this association since the early to mid-1980s and numerous human and animal studies have evidenced the carcinogenicity of glyphosate and/or Roundup.

83. In 1985 the EPA studied the effects of glyphosate in mice finding a dose related response in male mice linked to renal tubal adenomas, a rare tumor. The study concluded the glyphosate was oncogenic.

84.   In 2003 Lennart Hardell and Mikael Eriksson published the results of two case controlled studies on pesticides as a risk factor for NHL and hairy cell leukemia.

85.   The study concluded that glyphosate had the most significant relationship to NHL among all herbicides studies with an increased odds ratio of 3.11.

86.   In 2003 AJ De Roos published a study examining the pooled data of mid-western farmers, examining pesticides and herbicides as risk factors for NHL.

87.   The study, which controlled for potential confounders, found a relationship between increased NHL incidence and glyphosate.

88.   In 2008 Mikael Eriksson published a study a population based case-control study of exposure to various pesticides as a risk factor for NHL.

89.   This strengthened previous associations between glyphosate and NHL.

90.   In spite of this knowledge, Defendant continued to issue broad and sweeping statements suggesting that Roundup was, and is, safer than ordinary household items such as table salt, despite a lack of scientific support for the accuracy and validity of these statements and, in fact, voluminous evidence to the contrary.

91.   Upon information and belief, these statements and representations have been made with the intent of inducing Plaintiff's Decedent and the public at large to purchase, and increase the use of, Roundup for Defendant's pecuniary gain, and in fact did induce Plaintiff's Decedent to use Roundup.

92.   Defendant made these statements with complete disregard and reckless indifference to the safety of Plaintiff's Decedent and the general public.

93.   Notwithstanding Defendant's representations, scientific evidence has established a clear association between glyphosate and genotoxicity, inflammation, and an increased risk of many cancers, including, but not limited to, NHL, multiple myeloma, and soft tissue sarcoma.

94.     Defendant knew or should have known that glyphosate is associated with an increased risk of developing cancer, including, but not limited to, NHL, multiple myeloma, and soft tissue sarcomas.

95.     Defendant failed to appropriately and adequately inform and warn Plaintiff's Decedent of the serious and dangerous risks associated with the use of and exposure to glyphosate and/or Roundup, including, but not limited to, the risk of developing NHL, as well as other severe and personal injuries, which are permanent and/or long-lasting in nature, cause significant physical pain and mental anguish, diminished enjoyment of life, and the need for medical treatment, monitoring and/or medications.

96.     Despite the IARC's classification of glyphosate as a class 2A probable carcinogen, Defendant continues to maintain that glyphosate and/or Roundup is safe, non-carcinogenic, non-genotoxic, and falsely warrant to users and the general public that independent experts and regulatory agencies agree that there is no evidence of carcinogenicity or genotoxicity in glyphosate and Roundup.

97.     Defendant has claimed and continue to claim that Roundup is safe, non-carcinogenic, and non-genotoxic.

98.     Glyphosate, and Roundup products in particular, have long been associated with serious side effects and many regulatory agencies around the globe have banned or are currently banning the use of glyphosate herbicide products.

99.     Defendant's statements proclaiming the safety of Roundup and disregarding its dangers misled Plaintiff's Decedent.

100.    Despite Defendant's knowledge that Roundup was associated with an elevated risk of developing cancer, Defendant's promotional campaigns focused on Roundup's purported "safety profile."

101.    Defendant's failure to adequately warn Plaintiff's Decedent resulted in (1) Plaintiff's Decedent using and being exposed to glyphosate instead of using another acceptable and safe method of controlling unwanted weeds and pests; and (2)

1    scientists and physicians failing to warn and instruct consumers about the risk of

2    cancer, including NHL, and other injuries associated with Roundup.

3        102.   Defendant failed to seek modification of the labeling of Roundup to

4    include relevant information regarding the risks and dangers associated with

5    Roundup exposure.

6        103.   The failure of Defendant to appropriately warn and inform the EPA has

7    resulted in inadequate warnings in safety information presented directly to users and

8    consumers.

9        104.   The failure of Defendant to appropriately warn and inform the EPA has

10   resulted in the absence of warning or caution statements that are adequate to protect

11   health and the environment.

12       105.   The failure of Defendant to appropriately warn and inform the EPA has

13   resulted in the directions for use that are not adequate to protect health and the

14   environment.

15       106.   By reason of the foregoing acts and omissions, Plaintiff seeks

16   compensatory damages as a result of Plaintiff's Decedent's use of, and exposure to,

17   Roundup which caused or was a substantial contributing factor in causing Plaintiff's

18   Decedent to suffer from cancer, specifically NHL, and Plaintiff suffered severe and

19   personal injuries which are permanent and lasting in nature, physical pain and mental

20   anguish, including diminished enjoyment of life, and death.

21       107.   By reason of the foregoing, Plaintiff and Plaintiff's Decedent were

22   severely and permanently injured.

23       108.   By reason of the foregoing acts and omissions, Plaintiff and Plaintiff's

24   Decedent have endured and, in some categories continue to suffer, emotional and

25   mental anguish, medical expenses, and other economic and non-economic damages,

26   as a result of the actions and inactions of Defendant.

27

28

## PLAINTIFF'S DECEDENT'S EXPOSURE TO ROUNDUP

109.   For decades, Plaintiff's Decedent sprayed Roundup on a regular basis. Plaintiff's Decedent followed all safety and precautionary warnings during the course of use.

110.   Plaintiff's Decedent was diagnosed with NHL on or around March 2, 2019.

111.   Plaintiff's Decedent developed NHL as a result of his exposure to Roundup product.  As a result of his injury, Plaintiff's Decedent incurred significant economic and non-economic damages. Plaintiff also incurred significant economic and non-economic damages.

112.   Plaintiff's Decedent died as a result of NHL on March 6, 2019.

## EQUITABLE TOLLING OF APPLICABLE STATUTE OF LIMITATIONS

113.   Plaintiff incorporates by reference all prior paragraphs of this Complaint as if fully set forth herein.

114.   The running of any statute of limitations has been tolled by reason of Defendant's fraudulent concealment.  Defendant, through affirmative misrepresentations and omissions, actively concealed from Plaintiff and Plaintiff's Decedent the true risks associated with Roundup and glyphosate.

115.   At all relevant times, Defendant has maintained that Roundup is safe, non-toxic, and non-carcinogenic.

116.   As a result of Defendant's actions, Plaintiff and Plaintiff's Decedent were unaware, and could not reasonably have known or have learned through reasonable diligence, that Roundup and/or glyphosate contact exposed Plaintiff's Decedent to the risks alleged herein and that those risks were the direct and proximate result of Defendant's acts and omissions.

117.   Furthermore, Defendant is estopped from relying on any statute of limitations because of its fraudulent concealment of the true character, quality and nature of Roundup. Defendant was under a duty to disclose the true character,

1   quality, and nature of Roundup because this was non-public information over which
2   Defendant had and continues to have exclusive control, and because Defendant knew
3   that this information was not available to Plaintiff, Plaintiff's Decedent or to
4   distributors of Roundup. In addition, Defendant is estopped from relying on any
5   statute of limitations because of their intentional concealment of these facts.

6       118.   Plaintiff and Plaintiff's Decedent had no knowledge that Defendant was
7   engaged in the wrongdoing alleged herein. Because of the fraudulent acts of
8   concealment of wrongdoing by Defendant, Plaintiff and Plaintiff's Decedent could
9   not have reasonably discovered the wrongdoing at any time prior. Also, the
10   economics of this fraud should be considered. Defendant had the ability to and did
11   spend enormous amounts of money in furtherance of its purpose of marketing,
12   promoting and/or distributing a profitable herbicide, notwithstanding the known or
13   reasonably known risks. Plaintiff, Plaintiff's Decedent and medical professionals
14   could not have afforded and could not have possibly conducted studies to determine
15   the nature, extent, and identity of related health risks, and were forced to rely on only
16   the Defendant's representations. Accordingly, Defendant is precluded by the
17   discovery rule and/or the doctrine of fraudulent concealment from relying upon any
18   statute of limitations.

## FIRST CAUSE OF ACTION
## (NEGLIGENCE)

21       119.   Plaintiff repeats, reiterates, and re-alleges each and every allegation of
22   this Complaint contained in each of the foregoing paragraphs inclusive, with the
23   same force and effect as if more fully set forth herein.

24       120.   Defendant had a duty to exercise reasonable care in the designing,
25   researching, testing, manufacturing, marketing, supplying, promoting, packaging,
26   sale, and/or distribution of Roundup into the stream of commerce, including a duty to
27   assure that the product would not cause users to suffer unreasonable, dangerous side
28   effects.

1    121.   Defendant failed to exercise ordinary care in the designing, researching,

2    testing, manufacturing, marketing, supplying, promoting, packaging, sale, testing,

3    quality assurance, quality control, and/or distribution of Roundup into interstate

4    commerce in that Defendant knew or should have known that using Roundup created

5    a high risk of unreasonable, dangerous side effects, including, but not limited to, the

6    development of NHL, as well as other severe and personal injuries which are

7    permanent and lasting in nature, physical pain and mental anguish, including

8    diminished enjoyment of life, as well as need for lifelong medical treatment,

9    monitoring, and/or medications.

10    122.   The negligence by Defendant, its agents, servants, and/or employees,

11   included but was not limited to the following acts and/or omissions:

12        a) Manufacturing, producing, promoting, formulating, creating,
13            and/or designing Roundup without thoroughly testing it;

14        b) Failing to test Roundup and/or failing to adequately,
             sufficiently, and properly test Roundup;

15        c) Not conducting sufficient testing programs to determine
16            whether or not Roundup was safe for use; in that Defendant
              knew or should have known that Roundup was unsafe and
17            unfit for use by reason of the dangers to its users;

18        d) Not conducting sufficient testing programs and studies to
19            determine Roundup's carcinogenic properties even after
              Defendant had knowledge that Roundup is, was, or could be
20            carcinogenic;

21        e) Failing to conduct sufficient testing programs to determine
              the safety of "inert" ingredients and/or adjuvants contained
22            within Roundup, and the propensity of these ingredients to
              render Roundup toxic, increase the toxicity of Roundup,
23            whether these ingredients are carcinogenic, magnify the
              carcinogenic properties of Roundup, and whether or not
24            "inert" ingredients and/or adjuvants were safe for use;

25        f) Negligently failing to adequately and correctly warn
              Plaintiff, the public, the medical and agricultural
26            professions, and the EPA of the dangers of Roundup;

27        g) Negligently failing to petition the EPA to strength the
              warnings associated with Roundup;

28

h) Failing to provide adequate cautions and warnings to protect the health of users, handlers, applicators, and persons who would reasonably and foreseeably come into contact with Roundup;

i) Negligently marketing, advertising, and recommending the use of Roundup without sufficient knowledge as to its dangerous propensities;

j) Negligently representing that Roundup was safe for use for its intended purpose, and/or that Roundup was safer than ordinary and common items such as table salt, when, in fact, it was unsafe;

k) Negligently representing that Roundup had equivalent safety and efficacy as other forms of herbicides;

l) Negligently designing Roundup in a manner, which was dangerous to its users;

m) Negligently manufacturing Roundup in a manner, which was dangerous to its users;

n) Negligently producing Roundup in a manner, which was dangerous to its users;

o) Negligently formulating Roundup in a manner, which was dangerous to its users;

p) Concealing information from Plaintiff while knowing that Roundup was unsafe, dangerous, and/or non-conforming with EPA regulations;

q) Improperly concealing and/or misrepresenting information from Plaintiff, scientific and medical professionals, and/or the EPA, concerning the severity of risks and dangers of Roundup compared to other forms of herbicides; and

r) Negligently selling Roundup with a false and misleading label.

123. Defendant under-reported, underestimated, and downplayed the serious dangers of Roundup.

124. Defendant negligently and deceptively compared the safety risks and/or dangers of Roundup with common everyday foods such as table salt, and other forms of herbicides.

21

COMPLAINT

125. Defendant was negligent and/or violated California law in the designing, researching, supplying, manufacturing, promoting, packaging, distributing, testing, advertising, warning, marketing, and selling of Roundup in that it:

a) Failed to use ordinary care in designing and manufacturing Roundup so as to avoid the aforementioned risks to individuals when Roundup was used as an herbicide;

b) Failed to accompany their product with proper and/or accurate warnings regarding all possible adverse side effects associated with the use of Roundup;

c) Failed to accompany their product with proper warnings regarding all possible adverse side effects concerning the failure and/or malfunction of Roundup;

d) Failed to accompany their product with accurate warnings regarding the risks of all possible adverse side effects concerning Roundup;

e) Failed to warn Plaintiff of the severity and duration of such adverse effects, as the warnings given did not accurately reflect the symptoms, or severity of the side effects including, but not limited to, the development of NHL;

f) Failed to conduct adequate testing, clinical testing and post-marketing surveillance to determine the safety of Roundup;

g) Failed to conduct adequate testing, clinical testing, and post-marketing surveillance to determine the safety of Roundup's "inert" ingredients and/or adjuvants;

h) Negligently misrepresented the evidence of Roundup's genotoxicity and carcinogenicity; and

i) Was otherwise careless and/or negligent.

126. Despite the fact that Defendant knew or should have known that Roundup caused, or could cause, unreasonably dangerous side effects, Defendant continued and continue to market, manufacture, distribute, and/or sell Roundup to consumers, including to Plaintiff's Decedent.

127. Defendant knew or should have known that consumers such as Plaintiff's Decedent would foreseeably suffer injury as a result of Defendant's failure to exercise ordinary care, as set forth above.

128.  Defendant's violations of law and/or negligence were the proximate cause of Plaintiff's and Plaintiff's Decedent's injuries, harm and economic loss, which Plaintiff suffered and/or will continue to suffer.

129.  As a result of the foregoing acts and omissions, Plaintiff's Decedent suffered from serious and dangerous side effects including, but not limited to, NHL, as well as other severe and personal injuries which are permanent and lasting in nature, physical pain and mental anguish, diminished enjoyment of life, and financial expenses for hospitalization and medical care.  Further, Plaintiff's Decedent suffered life-threatening NHL, and severe personal injuries, which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life, and death.

130.  WHEREFORE, Plaintiff respectfully request that this Court enter judgment in Plaintiff's favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all relief as this Court deems just and proper.

## SECOND CAUSE OF ACTION
## (STRICT PRODUCTS LIABILITY—DESIGN DEFECT)

131.  Plaintiff repeats, reiterates and, re-alleges each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

132.  At all times herein mentioned, Defendant designed, researched, manufactured, tested, advertised, promoted, sold, distributed, and/or had acquired the entity who has designed, researched, tested, advertised, promoted, marketed, sold, and distributed Roundup as hereinabove described that was used by Plaintiff's Decedent.

133.  Defendant's Roundup was expected to and did reach the usual consumers, handlers, and persons coming into contact with said product without

1   substantial change in the condition in which it was produced, manufactured, sold,
2   distributed, and marketed by the Defendant.

3       134.   At those times, Roundup was in an unsafe, defective, and inherently
4   dangerous condition, which was dangerous to users, and in particular, Plaintiff's
5   Decedent.

6       135.   The Roundup designed, researched, manufactured, tested, advertised,
7   promoted, marketed, sold, and distributed by Defendant was defective in design or
8   formulation in that, when it left the hands of the manufacturer and/or suppliers, the
9   foreseeable risks exceeded the benefits associated with the design or formulation of
10   Roundup.

11       136.   The Roundup designed, researched, manufactured, tested, advertised,
12   promoted, marketed, sold, and distributed by Defendant was defective in design
13   and/or formulation, in that, when it left the hands of the Defendant's manufacturer
14   and/or supplier, it was unreasonably dangerous, unreasonably dangerous in normal
15   use, and it was more dangerous than an ordinary consumer would expect.

16       137.   At all times herein mentioned, Roundup was in a defective condition
17   and unsafe, and Defendant knew or had reason to know that said product was
18   defective and unsafe, especially when used in the form and manner as provided by
19   Defendant.  In particular, Roundup was defective in the following ways:

20         a)   When placed in the stream of commerce, Roundup Products
21            were defective in design and formulation and, consequently,
22            dangerous to an extent beyond that which an ordinary
         consumer would anticipate.

23         b)   When placed in the stream of commerce, Roundup products
24            were unreasonably dangerous in that they were hazardous
         and posed a grave risk of cancer and other serious illnesses
         when used in a reasonably anticipated manner.

25         c)   When placed in the stream of commerce, Roundup products
26            contained unreasonably dangerous design defects and were
27            not reasonably safe when used in a reasonably anticipated
         manner.

28         d)   Defendant did not sufficiently test, investigate, or study its
         Roundup products.

e)  Exposure to Roundup presents a risk of harmful side effects that outweigh any potential utility stemming from the use of the herbicide.

f)  Defendant knew or should have known at the time of marketing its Roundup products that exposure to Roundup and could result in cancer and other severe illnesses and injuries.

g)  Defendant did not conduct adequate post-marketing surveillance of its Roundup products.

138.   Defendant knew, or should have known that at all times herein mentioned its Roundup was in a defective condition, and was and is inherently dangerous and unsafe.

139.   Plaintiff's Decedent was exposed to Roundup, as described above, without knowledge of Roundup's dangerous characteristics.

140.   At the time of Plaintiff's Decedent's use of and exposure to Roundup, Roundup was being used for the purposes and in a manner normally intended, as a broad-spectrum herbicide.

141.   Defendant with this knowledge voluntarily designed its Roundup with a dangerous condition for use by the public, and in particular Plaintiff's Decedent.

142.   Defendant had a duty to create a product that was not unreasonably dangerous for its normal, intended use.

143.   Defendant created a product that was and is unreasonably dangerous for its normal, intended use.

144.   Defendant marketed and promoted a product in such a manner so as to make it inherently defective as the product downplayed its suspected, probable, and established health risks inherent with its normal, intended use.

145.   The Roundup designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed by Defendant was manufactured defectively in that Roundup left the hands of Defendant in a defective condition and was unreasonably dangerous to its intended users.

146.   The Roundup designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed by Defendant reached their intended users in the same defective and unreasonably dangerous condition in which the Defendant's Roundup was manufactured.

147.   Defendant designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed a defective product, which created an unreasonable risk to the health of consumers and to Plaintiff's Decedent in particular, and Defendant is therefore strictly liable for the injuries sustained by Plaintiff and Plaintiff's Decedent.

148.   Plaintiff and Plaintiff's Decedent could not, by the exercise of reasonable care, have discovered Roundup's defects herein mentioned or perceived its danger.

149.   By reason of the foregoing, Defendant has become strictly liable to the Plaintiff and Plaintiff's Decedent for the manufacturing, marketing, promoting, distribution, and selling of a defective product, Roundup.

150.   Defendant's defective design, of Roundup amounts to willful, wanton, and/or reckless conduct by Defendant.

151.   Defects in Defendant's Roundup were the cause or a substantial factor in causing Plaintiff's and Plaintiff's Decedent's injuries.

152.   As a result of the foregoing acts and omission, Plaintiff's Decedent developed NHL, and suffered severe and personal injuries, which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life, and financial expenses for hospitalization and medical care.

153.   WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in Plaintiff's favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all relief as this Court deems just and proper.

### THIRD CAUSE OF ACTION
### (STRICT PRODUCTS LIABILITY—FAILURE TO WARN)

154.   Plaintiff repeats, reiterates and re-alleges each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

155.   Defendant has engaged in the business of selling, testing, distributing, supplying, manufacturing, marketing, and/or promoting Roundup, and through that conduct has knowingly and intentionally placed Roundup into the stream of commerce with full knowledge that it reaches consumers such as Plaintiff's Decedent who are exposed to it through ordinary and reasonably foreseeable uses.

156.   Defendant did in fact sell, distribute, supply, manufacture, and/or promote Roundup to Plaintiff's Decedent.  Additionally, Defendant expected the Roundup that they were selling, distributing, supplying, manufacturing, and/or promoting to reach—and Roundup did in fact reach—consumers, including Plaintiff's Decedent, without any substantial change in the condition of the product from when it was initially distributed by Defendant.

157.   At the time of manufacture, Defendant could have provided the warnings or instructions regarding the full and complete risks of Roundup and glyphosate-containing products because it knew or should have known of the unreasonable risks of harm associated with the use of and/or exposure to such products.

158.   At all times herein mentioned, the aforesaid product was defective and unsafe in manufacture such that it was unreasonably dangerous to the user, and was so at the time it was distributed by Defendant and at the time Plaintiff's Decedent was exposed to and/or ingested the product. The defective condition of Roundup was due in part to the fact that it was not accompanied by proper warnings regarding its carcinogenic qualities and possible side effects, including, but not limited to, developing NHL as a result of exposure and use.

159.   Roundup did not contain a warning or caution statement, which was necessary and, if complied with, was adequate to protect health those exposed in violation of 7 U.S.C. § 136j(a)(1)(E).

160.   Defendant's failure to include a warning or caution statement which was necessary and, if complied with, was adequate to protect the health of those exposed, violated 7 U.S.C. § 136j(a)(1)(E) as well as the laws of the State of California.

161.   Defendant could have amended the label of Roundup to provide additional warnings.

162.   This defect caused serious injury to Plaintiff and Plaintiff's Decedent, who used Roundup in its intended and foreseeable manner.

163.   At all times herein mentioned, Defendant had a duty to properly design, manufacture, compound, test, inspect, package, label, distribute, market, examine, maintain supply, provide proper warnings, and take such steps to assure that the product did not cause users to suffer from unreasonable and dangerous side effects.

164.   Defendant labeled, distributed, and promoted the aforesaid product that it was dangerous and unsafe for the use and purpose for which it was intended.

165.   Defendant failed to warn of the nature and scope of the side effects associated with Roundup, namely its carcinogenic properties and its propensity to cause or serve as a substantial contributing factor in the development of NHL.

166.   Defendant was aware of the probable consequences of the aforesaid conduct. Despite the fact that Defendant knew or should have known that Roundup caused serious injuries, Defendant failed to exercise reasonable care to warn of the dangerous carcinogenic properties and side effect of developing NHL from Roundup exposure, even though these side effects were known or reasonably scientifically knowable at the time of distribution.  Defendant willfully and deliberately failed to avoid the consequences associated with their failure to warn, and in doing so, Defendant acted with a conscious disregard for the safety of Plaintiff and Plaintiff's Decedent.

167.   At the time of exposure, Plaintiff and Plaintiff's Decedent could not have reasonably discovered any defect in Roundup prior through the exercise of reasonable care.

168.   Defendant, as the manufacturer and/or distributor of the subject product, is held to the level of knowledge of an expert in the field.

169.   Plaintiff and Plaintiff's Decedent reasonably relied upon the skill, superior knowledge, and judgment of Defendant.

170.   Had Defendant properly disclosed the risks associated with Roundup, Plaintiff and Plaintiff's Decedent would have avoided the risk of NHL by not using Roundup.

171.   The information that Defendant did provide or communicate failed to contain adequate warnings and precautions that would have enabled Plaintiff's Decedent, and similarly situated individuals, to utilize the product safely and with adequate protection.  Instead, Defendant disseminated information that was inaccurate, false, and misleading and which failed to communicate accurately or adequately the comparative severity, duration, and extent of the risk of injuries associated with use of and/or exposure to Roundup and glyphosate; continued to promote the efficacy of Roundup, even after it knew or should have known of the unreasonable risks from use or exposure; and concealed, downplayed, or otherwise suppressed, through aggressive marketing and promotion, any information or research about the risks and dangers of exposure to Roundup and glyphosate.

172.   To this day, Defendant has failed to adequately warn of the true risks of Plaintiff's and Plaintiff's Decedent's injuries associated with the use of and exposure to Roundup.

173.   As a result of their inadequate warnings, Roundup was defective and unreasonably dangerous when it left the possession and/or control of Defendant, were distributed by Defendant, and used by Plaintiff's Decedent.

174.   As a direct and proximate result of Defendant's actions as alleged

1    herein, and in such other ways to be later shown, the subject product caused

2    Plaintiff's and Plaintiff's Decedent to sustain injuries herein alleged.

3    175.   WHEREFORE, Plaintiff respectfully requests that this Court enter

4    judgment in Plaintiff's favor for compensatory and punitive damages, together with

5    interest, costs herein incurred, attorneys' fees and all relief as this Court deems just

6    and proper.

**FOURTH CAUSE OF ACTION**
**(BREACH OF IMPLIED WARRANTIES)**

9    176.   Plaintiff repeats, reiterates, and re-alleges each and every allegation of

10   this Complaint contained in each of the foregoing paragraphs inclusive, with the

11   same force and effect all if more fully set forth herein.

12   177.   At all times herein mentioned, Defendant manufactured, distributed,

13   compounded, recommended, merchandized, advertised, promoted, and sold Roundup

14   and/or has acquired the entity who manufactured, compound portrayed, distributed,

15   recommended, merchandized, advertised, promoted, and sold Roundup, as a broad

16   spectrum herbicide.  These actions were under the ultimate control and supervision of

17   Defendant.

18   178.   At the time Defendant marketed, sold, and distributed Roundup for use

19   by Plaintiff's Decedent, Defendant knew of Roundup's intended use and impliedly

20   warranted the product to be or merchantable quality and safe and fit for this use.

21   179.   The Defendant impliedly represented and warranted to Plaintiff,

22   Plaintiff's Decedent and users of Roundup, the agricultural community, and/or the

23   EPA that Roundup was safe and of merchantable quality and fit for the ordinary

24   purpose for which it was to be used.

25   180.   These representations and warranties were false, misleading, and

26   inaccurate in that Roundup was unsafe, unreasonably dangerous, not of merchantable

27   quality, and defective.

28

181. Plaintiff, Plaintiff's Decedent and/or the EPA did rely on said implied warranty of merchantability of fitness for particular use and purpose.

182. Plaintiff and Plaintiff's Decedent reasonably relied upon the skill and judgment of Defendant as to whether Roundup was of merchantable quality and safe and fit for its intended use.

183. Roundup was injected into the stream of commerce by Defendant in a defective, unsafe, and inherently dangerous condition, and the products' materials were expected to and did reach users, handlers, and persons coming into contact with said products without substantial change in the condition in which they were sold.

184. The Defendant breached the aforesaid implied warranties, as their herbicide Roundup was not fit for its intended purposes and uses.

185. As a result of the foregoing acts and omissions, Plaintiff's Decedent suffered from NHL and suffered severe and personal injuries which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life, financial expenses for hospitalization and medical care, including medical expenses and other economic, and non-economic damages.

186. WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in Plaintiff's favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all relief as this Court deems just and proper.

## FIFTH CAUSE OF ACTION
### (FRAUD AND MISREPRESENTATION)

187. Plaintiff repeats, reiterates, and re-alleges each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect all if more fully set forth herein.

188. Defendant fraudulently, intentionally and/or negligently misrepresented to the public and to the Plaintiff and Plaintiff's Decedent, both directly and by and through the medica, the scientific literature and purported "community outreach"

programs, the safety of Roundup products, and/or fraudulently, intentionally and/or negligently concealed, suppressed, or omitted material, adverse information regarding the safety of Roundup.

189.   The intentional and/or negligent misrepresentations and omissions of Defendant regarding the safety of Roundup products were communicated to Plaitniffs directly through ghostwritten articles, editorials, national and regional advertising, marketing and promotion efforts, as well as the packaging and sales aids. The safety of Roundup was also intentionally and/or negligently misrepresented to Plaintiff and Plaintiff's Decedent and the public with the intent that such misrepresentations would cause Plaintiff's Decedent and other potential consumers to purchase and use or continue to purchase and use Roundup.

190.   Defendant either knew or should have known of the material representations they were making regarding the safety and relative utility of Roundup products.

191.   Defendant fraudulently, intentionally and/or negligently made the misrepresentations and/or actively concealed, suppressed, or omitted this material information with the specific desire to indue Plaintiff and Plaintiff's Decedent, and the consuming public to purchase and use Roundup. Defendant knew or should have known that Plaintiff and Plaintiff's Decedent and the consuming public would rely on such material misrepresentations and/or omissions in selecting and using Roundup. Defendant knew or should have known that Plaintiff and Plaintiff's Decedent would rely on Defendant's false representations and omissions.

192.   Defendant made these misrepresentations and actively concealed adverse information including the risk of non-Hodgkin lymphoma, at a time when, their agents and/or employees knew or should have known, the product had defects, dangers, and characteristics that were other than what was represented to the consuming public. Specifically, Monsanto misrepresented and actively concealed, suppressed and omitted that there had been inadequate testing of the safety and

efficacy of Roundup, and that prior studies, research, reports and/or testing had been conducted linking the use of Roundup with serious health events, including non-Hodgkin lymphoma.

193. Despite the fact that Defendant knew or should have known of reports of severe risks including non-Hodgkin lymphoma, with Roundup use and exposure, this information was strategically minimized, understated, or omitted in order to create the impression that the human dangers of Roundup were nonexistent, particularly in light of its purported utility.

194. The fraudulent, intentional and/or negligent material misrepresentations and/or active concealment, suppression and omissions by Defendant were perpetuated directly and/or indirectly through the advertisements, packaging, sales aids, furtive public relations efforts, and other marketing and promotional pieces authored, analyzed, created, compiled, designed, drafted, disseminated, edited, evaluated, marketed, published and supplied by Monsanto.

195. If Plaintiff or Plaintiff's Decedent had known the true facts concerning the risks associated with Roundup exposure, Plaintiff's Decedent would have used a safer alternative.

196. Plaintiff's and Plaintiff's Decedent's reliance upon the material misrepresentations and omissions was justified, among other reasons, because said misrepresentations and omissions were made by individuals and entities who were in a position to know the true facts concerning Roundup while Plaintiff and Plaintiff's Decedent were not in a position to know the true facts because Defendant overstated the benefits and safety of Roundup and downplayed the risk of lymphoma, thereby inducing Plaintiff and Plaintiff's Decedent to use the herbicide rather than safer alternatives.

197. As a direct and proximate result of Defendant's actions and inactions, Plaintiff and Plaintiff's Decedent were exposed to Roundup and suffered and will continue to suffer injuries and damages, as set forth herein.

1    198.   WHEREFORE, Plaintiff respectfully requests that this Court enter

2    judgment in Plaintiff's favor for compensatory and punitive damages, together with

3    interest, costs herein incurred, attorneys' fees and all relief as this Court deems just

4    and proper.

5                          **SIXTH CAUSE OF ACTION**

6                          **(WRONGFUL DEATH)**

7    199.   Plaintiff repeats, reiterates, and re-alleges each and every allegation of

8    this Complaint contained in each of the foregoing paragraphs inclusive, with the

9    same force and effect all if more fully set forth herein.

10   200.   Plaintiff ELPIDIA MARTINEZ is the lawful surviving spouse and

11   widow of Plaintiff's Decedent, CARLOS CELEDON.

12   201.   As a direct and proximate result of the Defendants and the defective

13   nature of Roundup as outlined above, Plaintiff's Decedent suffered bodily injury

14   resulting in pain and suffering, disability to earn, funeral expenses and death.

15   202.   As a direct and proximate cause of conduct of Defendants, Plaintiff's

16   Decedent's beneficiaries have incurred hospital, nursing and medical expenses, loss

17   of financial support, loss of gifts and/or benefits, funeral and burial expenses, loss of

18   household services, non-economic damages including but not limited to loss of love,

19   companionship, comfort, care, assistance, protection, affection, society, moral

20   support, loss of the enjoyment of sexual relations, and loss of Plaintiff's Decedent's

21   training and guidance.

22   203.   WHEREFORE, Plaintiff respectfully requests that this Court enter

23   judgment in Plaintiff's favor for compensatory and punitive damages, together with

24   interest, costs herein incurred, attorneys' fees and all relief as this Court deems just

25   and proper.

26   ///

27   ///

28   ///

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands judgment against Defendant on each of the above-referenced claims and causes of action and as follows:

1.      Awarding compensatory damages in excess of the jurisdictional amount, including, but not limited to pain, suffering, emotional distress, loss of enjoyment of life, and other non-economic damages in an amount to be determined at trial of this action;

2.      Awarding compensatory damages to Plaintiff for past and future damages, including, but not limited to, Plaintiff's pain and suffering and for severe and permanent personal injuries sustained by Plaintiff's Decedent including health care costs and economic loss;

3.      Awarding economic damages to Plaintiff for past and future loss of financial support, loss of gifts and/or benefits, funeral and burial expenses, loss of household services;

4.      Awarding non-economic damages to Plaintiff including but not limited to loss of love, companionship, comfort, care, assistance, protection, affection, society, moral support, loss of the enjoyment of sexual relations, and loss of Plaintiff's Decedent's training and guidance.

5.      Awarding economic damages in the form of medical expenses, out of pocket expenses, lost earnings and other economic damages in an amount to be determine at trial of this action;

6.      Punitive and/or exemplary damages for the wanton, willful, fraudulent, and reckless acts of the Defendant which demonstrated a complete disregard and reckless indifference for the safety and welfare of the general public and to Plaintiff and Plaintiff's Decedent in an amount sufficient to punish Defendant and deter future similar conduct, to the extent allowed by applicable law;

7.      Pre-judgment interest;

8.      Post-judgment interest;

COMPLAINT

9.    Awarding Plaintiff reasonable attorneys' fees;

10.    Awarding Plaintiff the costs of these proceedings; and

11.    Such other and further relief as this Court deems just and proper.

## **DEMAND FOR JURY TRIAL**

Plaintiff hereby demands trial by jury as to all issues.

Dated:  January 21, 2021                    **BISNAR | CHASE LLP**

By:    */s/ Tom G. Antunovich*
Brian D. Chase
Tom G. Antunovich

Brian D. Chase (SBN 164109)
bchase@bisnarchase.com
Tom G. Antunovich (SBN 305216)
tantunovich@bisnarchase.com
**BISNAR | CHASE LLP**
1301 Dove Street, Suite 120
Newport Beach, CA 92660
Tel: (949) 752-2999
Fax: (949) 752-2777

*Attorneys for Plaintiff*

COMPLAINT

NAME, ADDRESS, AND TELEPHONE NUMBER OF ATTORNEY(S)
OR OF PARTY APPEARING IN PRO PER
Brian D. Chase (CA SBN 164109)
Tom G. Antunovich (CA SBN 305216)
BISNAR CHASE LLP
1301 Dove Street, Suite 120
Newport Beach, CA 92660
Tel: (949) 752-2999

ATTORNEY(S) FOR: Plaintiff, Elpidia Martinez

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ELPIDIA MARTINEZ, individually and on behalf of CARLOS CELEDON, <br><br> Plaintiff(s), <br><br> v. <br><br> MONSANTO COMPANY, <br><br> Defendant(s) | CASE NUMBER: <br><br> 5:21-cv-00114 <br><br> **CERTIFICATION AND NOTICE OF INTERESTED PARTIES** <br> (Local Rule 7.1-1) |

TO:     THE COURT AND ALL PARTIES OF RECORD:

The undersigned, counsel of record for             Plaintiff, Elpidia Martinez
or party appearing in pro per, certifies that the following listed party (or parties) may have a pecuniary interest in the outcome of this case.  These representations are made to enable the Court to evaluate possible disqualification or recusal.

(List the names of all such parties and identify their connection and interest. Use additional sheet if necessary.)

| PARTY | CONNECTION / INTEREST |
|---|---|
| No such interest is known other than that of the named parties to this action. | N/a |

| | |
|---|---|
| January 21, 2021 | /S/ Tom G. Antunovich |
| Date | Signature |

Attorney of record for (or name of party appearing in pro per):

Plaintiff, Elpidia Martinez

CV-30 (05/13)                    NOTICE OF INTERESTED PARTIES

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

### NOTICE OF ASSIGNMENT TO UNITED STATES JUDGES

This case has been assigned to:

District Judge   **Jesus G. Bernal**
Magistrate Judge   **Sheri Pym**

The case number on all documents filed with the Court should read as follows:

### 5:21−cv−00114 JGB (SPx)

District judges in the Central District of California refer all discovery-related motions to the assigned magistrate judge pursuant to General Order No. 05-07. Discovery-related motions should be noticed for hearing before the assigned magistrate judge. Please refer to the assigned judges' Procedures and Schedules, available on the Court's website at www.cacd.uscourts. gov/judges-requirements, for additional information.

Clerk, U.S. District Court

January 25, 2021
Date

By  /s/ Geneva Hunt
Deputy Clerk

## ATTENTION

*The party that filed the case-initiating document in this case (for example, the complaint or the notice of removal) must serve a copy of this Notice on all parties served with the case-initiating document. In addition, if the case-initiating document in this case was electronically filed, the party that filed it must, upon receipt of this Notice, promptly deliver mandatory chambers copies of all previously filed documents to the newly assigned-district judge. See L.R. 5-4.5. A copy of this Notice should be attached to the first page of the mandatory chambers copy of the case-initiating document.*

CV-18 (08/19)          NOTICE OF ASSIGNMENT TO UNITED STATES JUDGES

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

ELPIDIA MARTINEZ

Plaintiff(s)

v.

MONSANTO COMPANY

Defendant(s).

CASE NUMBER:

5:21-cv-00114-JGB-SP

**NOTICE TO PARTIES OF
COURT-DIRECTED ADR PROGRAM**

## NOTICE TO PARTIES:

It is the policy of this Court to encourage settlement of civil litigation when such is in the best interest of the parties. The Court favors any reasonable means, including alternative dispute resolution (ADR), to accomplish this goal. *See* L.R. 16-15. Unless exempted by the trial judge, parties in all civil cases must participate in an ADR process before trial. *See* L.R. 16-15.1.

The district judge to whom the above-referenced case has been assigned is participating in an ADR Program that presumptively directs this case to either the Court Mediation Panel or to private mediation. *See* General Order No. 11-10, §5. For more information about the Mediation Panel, visit the Court website, www.cacd.uscourts.gov, under "ADR."

Pursuant to L.R. 26-1(c), counsel are directed to furnish and discuss with their clients the attached ADR Notice To Parties *before* the conference of the parties mandated by Fed.R.Civ.P. 26(f). Based upon the consultation with their clients and discussion with opposing counsel, counsel must indicate the following in their Joint 26(f) Report: 1) whether the case is best suited for mediation with a neutral from the Court Mediation Panel or private mediation; and 2) when the mediation should occur. *See* L.R. 26-1(c).

At the initial scheduling conference, counsel should be fully prepared to discuss their preference for referral to the Court Mediation Panel or to private mediation and when the mediation should occur. The Court will enter an Order/Referral to ADR at or around the time of the scheduling conference.

Clerk, U.S. District Court

January 25, 2021
Date

By  /s/ *Geneva Hunt*
Deputy Clerk

ADR-08 (04/18)          NOTICE TO PARTIES OF COURT-DIRECTED ADR PROGRAM

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

## NOTICE TO PARTIES: COURT POLICY ON SETTLEMENT
## AND USE OF ALTERNATIVE DISPUTE RESOLUTION (ADR)
### Counsel are required to furnish and discuss this Notice with their clients.

Despite the efforts of the courts to achieve a fair, timely and just outcome in all cases, litigation has become an often lengthy and expensive process. For this reason, it is this Court's policy to encourage parties to attempt to settle their disputes, whenever possible, through alternative dispute resolution (ADR).

ADR can reduce both the time it takes to resolve a case and the costs of litigation, which can be substantial. ADR options include mediation, arbitration (binding or non-binding), neutral evaluation (NE), conciliation, mini-trial and fact-finding. ADR can be either Court-directed or privately conducted.

The Court's ADR Program offers mediation through a panel of qualified and impartial attorneys who will encourage the fair, speedy and economic resolution of civil actions. Panel Mediators each have at least ten years of legal experience and are appointed by the Court. They volunteer their preparation time and the first three hours of a mediation session. This is a cost-effective way for parties to explore potential avenues of resolution.

This Court requires that counsel discuss with their clients the ADR options available and instructs them to come to the initial scheduling conference prepared to discuss the parties' choice of ADR option. The ADR options available are: a settlement conference before the magistrate judge assigned to the case or the magistrate judge in Santa Barbara, the Court Mediation Panel, and private mediation. Counsel are also required to indicate the client's choice of ADR option in advance of the initial scheduling conference. *See* L.R. 26-1(c) and Fed.R.Civ.P. 26(f).

Clients and their counsel should carefully consider the anticipated expense of litigation, the uncertainties as to outcome, the time it will take to get to trial, the time an appeal will take if a decision is appealed, the burdens on a client's time, and the costs and expenses of litigation in relation to the amounts or stakes involved.

Each year thousands of civil cases are filed in this district, yet typically no more than one percent go to trial. Most cases are settled between the parties, voluntarily dismissed, resolved through Court-directed or other forms of ADR, or dismissed by the Court as lacking in merit or for other reasons provided by law.

For more information about the Court's ADR Program, the Mediation Panel, and the profiles of mediators, visit the Court website, www.cacd.uscourts.gov, under "ADR."

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ELPIDIA MARTINEZ | CASE NO: 5:21–cv–00114–JGB–SP |
| Plaintiff(s), | STANDING ORDER |
| v. | |
| MONSANTO COMPANY | |
| Defendant(s). | |

**READ THIS ORDER CAREFULLY. IT CONTROLS THIS CASE**

**AND DIFFERS IN SOME RESPECTS FROM THE LOCAL RULES.**

- Plaintiff(s) shall immediately serve this Order on all parties along with the Summons and Complaint.
- If this case came to the Court by noticed removal, the removing Defendant(s) shall serve this Order on all other parties.

This action has been assigned to the calendar of Judge Jesus G. Bernal.

///

///

1   The Court and litigants bear joint responsibility for the progress of

2   litigation in the Federal Courts. To secure the just, speedy, and inexpensive

3   determination of every action, (Fed. R. Civ. P. 1), all counsel are hereby

4   ordered to become familiar with the Federal Rules of Civil Procedure and the

5   Local Rules of the Central District of California.*

6

7   The Court further orders as follows:

8

9   **1.      Service of the Complaint.**  Plaintiff shall serve the Complaint

10  promptly in accordance with Fed. R. Civ. P. 4 and file the proofs of service

11  pursuant to L.R. 5-3.1.

12

13  **2.      Removed Actions.**  Any answers filed in state court must be

14  re-filed in this Court (separately) as a supplement to the petition. Any pending

15  motions must be re-noticed in accordance with L.R. 6-1.

16

17  **3.      Assignment to a Magistrate Judge.**  Under 28 U.S.C. § 636,

18  the parties may consent to have a Magistrate Judge preside over all proceedings.

19  The Magistrate Judges who accept those designations are identified on the

20  Central District's website, which also contains the consent form.

21

22  **4.      Electronic Filing.**  As of January 1, 2008, the United States

23  District Court for the Central District of California implemented mandatory

24  electronic filing ("e-filing") of documents in all new and pending civil cases.

25  Information about the Court's Electronic Case Filing system is available on

26  the Court's website at www.cacd.uscourts.gov/cmecf.

27  All documents required to be "e-filed" in this matter can be found in

28  General Order No. 10-07 and L.R. 5-4. The Court specifically directs litigants

1  to L.R. 5−4.3.1, requiring that all electronically filed documents be created by

2  publishing the document to PDF, and not by scanning paper documents.

3

4      **5.      Mandatory Chambers Copies. Counsel shall provide one**

5  **conformed chambers copy of ONLY the following filed documents.**

6      **Civil matters:** Motions and related documents (opposition, replies,

7      exhibits); ex parte applications and related documents oppositions and

8      exhibits); and Joint Rule 26(f) reports;

9

10     **Criminal matters:** All motions and related documents and exhibits;

11     plea agreements(s); and sentencing memorandum and objections to the

12     pre−sentence reports.

13

14     Chambers copies shall be delivered to the "Courtesy Box," located

15  outside of Courtroom 1 on the 2nd floor at the United States District Court,

16  3470 Twelfth Street, Riverside, California 92501, **no later than 5:00 p.m. on**

17  **the day following the "e−filing."** All chambers copies shall comply fully with

18  the document formatting requirements of L.R. 11−3, including the "backing"

19  and "tabbing" requirements of Local Rules 11−3.5 and 11−5.3, respectively.

20  If the filing party and their counsel fail to deliver a mandatory chambers copy

21  in full compliance with this Order and L.R. 11−3, the Court may, on its own

22  motion, reschedule any related hearing and impose sanctions.

23

24     **6.      Proposed Orders.**  Each party filing or opposing a motion or

25  seeking the determination of any matter shall serve and electronically lodge a

26  proposed order which sets forth the relief or action sought and a brief statement

27  of the rationale for the decision with appropriate citations.

28  ///

Revised March 24, 2016                    −3−

7.    **Presence of Lead Counsel.**  Lead trial counsel for each party must attend any scheduling and pretrial conferences set by the Court. Failure of lead trial counsel to appear for those proceedings is a basis for sanctions.

8.    **Discovery.**  All discovery matters have been referred to a United States Magistrate Judge. The Magistrate Judge's initials follow the District Judge's initials in the case number assigned to the matter. The words "DISCOVERY MATTER" shall appear in the caption of all documents relating to discovery to insure proper routing. Counsel shall deliver mandatory chambers copies of discovery—related papers to the Magistrate Judge assigned to the case rather than to this Court.

9.    **Motions – General Requirements.**

a.    <u>Time for Hearing Motions.</u>  Motions shall be filed and set for hearing in accordance with L.R. 6–1. Motions will be heard on Mondays commencing at 9:00 a.m. Any motion noticed for a holiday shall automatically be set to the next Monday without further notice to the parties.

b.    <u>Length and Format of Motions.</u>  Memoranda of Points and Authorities in support of or in opposition to motions shall not exceed 25 pages. Replies shall not exceed 12 pages. Only in rare instances, and for good cause shown, will the Court grant an application to extend these page limitations. When citing to legal databases, wherever possible cite to Westlaw rather than Lexis.

If documentary evidence in support of or in opposition to a motion exceeds 50 pages, the evidence must be separately bound and tabbed and include an index. If such evidence exceeds 200 pages, the documents shall be placed in a binder, with an index and with each item of evidence separated by a tab divider.

c.    <u>Withdrawal or Non–Opposition of Motions.</u>  **In the event that the parties resolve a pending motion, *they must notify the Court***

1  **approximately one week before the hearing date.** Sanctions may issue for

2  failure to comply with this requirement, or the broader requirement in L.R. 7–16

3  that any party who intends to withdraw a motion, not oppose a motion, or seek

4  a continuance of the hearing date for a motion, must notify the court by noon

5  on the Tuesday preceding the hearing date.

6

7      **10.**  **Motions to Amend.**  In addition to the requirements of L.R. 15,

8  all motions to amend pleadings shall (1) state the effect of the amendment and

9  (2) identify the page(s), line number(s), and wording of any proposed change

10  or addition of material.

11

12      **11.**  **Class Actions.**  Not withstanding Local Rule 23–3, the deadline

13  for the filing of a motion for class certification will be set during the Scheduling

14  Conference and/or in a Scheduling Order. **NO REQUEST FOR RELIEF FROM**

15  **LOCAL RULE 23–3 IS NECESSARY.**

16

17      **12.**  **Motions for Summary Judgment or Partial Summary Judgment.**

18  No party may file more than one motion pursuant to Fed. R. Civ. P. 56 regardless

19  of whether such motion is denominated as a motion for summary judgment or

20  summary adjudication. Parties offering evidence in support of, or in opposition

21  to, a Rule 56 motion must cite to specific page and line numbers in depositions

22  and paragraph numbers in affidavits. Furthermore, such evidence must be

23  authenticated properly. The Court directs the parties to become familiar with

24  Orr v. Bank of America, NT & SA, 285 F.3d 764 (9th Cir. 2002).

25      a.  Statements of Undisputed Facts and Genuine Disputes.

26  The moving party's brief shall be accompanied by a Statement of Undisputed

27  Facts ("SUF"). The SUF shall be presented in a table format and include the

28  following columns:

     i.    The first column shall contain the number of the fact alleged to be undisputed.

     ii.    The second column shall contain a plain statement of the fact. **Facts shall not be compound.** If, for instance, the required response is that the fact is disputed in part, the fact is compound. Further, neither legal arguments nor conclusions constitute facts.

     iii.    The third column shall contain a citation to admissible evidence the party believes supports the proffered fact.

For example:

| Pl.'s SUF No. | Fact | Supporting Evidence |
|---|---|---|
| 1. | Plaintiff was driving her car when she went through the intersection. | Decl. of Plaintiff ¶ 2. |
| 2. | The light was green when Plaintiff went through the intersection. | Decl. of Plaintiff ¶4. |
| 3. | Plaintiff was driving at 35 miles per hour when she traveled through the intersection. | Decl. of Plaintiff ¶ 7; Decl. of Plaintiff's Expert ¶ 14. |
| . . . | . . . | . . . |

    The party opposing the summary judgment motion shall include with its opposition a Statement of Genuine Disputes of Material Fact that includes the moving party's table; but the opposing party shall add a fourth column to the moving party's table identifying those facts that are in dispute, briefly explaining the dispute, and citing the evidence supporting the dispute. The opposing party shall not set forth legal or evidentiary objections in the statement of genuine disputes of material fact. For example:

| Pl.'s SUF No. | Fact | Supporting Evidence | Def.'s Response |
|---|---|---|---|
| 1. | Plaintiff was driving her car when she went through the intersection. | Decl. of Plaintiff ¶ 2. | Undisputed. |
| 2. | The light was green when Plaintiff went through the intersection. | Decl. of Plaintiff ¶ 4. | Disputed. The light was red when Plaintiff traveled through the intersection. (Decl. of Defendant ¶ 6.) |
| 3. | Plaintiff was driving at 35 miles per hour when she traveled through the intersection. | Decl. of Plaintiff ¶ 7; Dec. of Plaintiff's Expert ¶ 14. | Disputed. Plaintiff was driving 52 miles per hour when she went through the intersection. (Decl. of Defendant's Expert ¶ 9.) |
| . . . | . . . | . . . | . . . |

If a party fails to dispute a fact properly by offering evidence that does not contradict the proffered fact, the Court will deem the fact undisputed for purposes of the motion. See Fed. R. Civ. P. 56(e)(2), L.R. 56–3.

If the party opposing the summary judgment motion wishes to include its own set of undisputed facts, it may include them in a second table at the end of its statement of genuine disputes of material fact. The opposing party's undisputed facts shall be set forth in the same manner as the moving party's SUF. For example:

| Def.'s SUF No. | Fact | Supporting Evidence |
|---|---|---|
| 1. | The tires on Plaintiff's car had only 1 millimeter of tread remaining at the time of the accident. | Decl. of Mechanic ¶ 5. |
| . . . | . . . | . . . |

If either party fails to provide a pincite to the supporting evidence, the Court will deem the proffered fact (or dispute) unsupported. See generally

1   Christian Legal Soc. v. Wu, 626 F.3d 483, 488 (9th Cir. 2010) ("Judges are not

2   like pigs, hunting for truffles buried in briefs." (quoting Greenwood v. FAA,

3   28 F.3d 971, 977 (9th Cir. 1994) (quoting United States v. Dunkel, 927 F.2d

4   955, 956 (7th Cir. 1991) (per curiam)) (alteration omitted)))).

5              b.    Objections to Evidence. Parties shall file any legal objections

6   to the other party's proffered evidence under separate cover. The evidentiary

7   objections should be presented in a three–column format and include the following

8   columns:

9              i.    The first column shall contain the number of the

10                   the fact objected to, using the numbering submitted

11                   in the moving party's SUF if applicable.

12             ii.   The second column shall identify the item objected

13                   to, including its page and line number if applicable.

14             iii.  The third column shall set forth a concise objection

15                   (e.g., hearsay, lacks foundation, etc.) with a citation

16                   to the Federal Rules of Evidence or, where applicable,

17                   a case citation.

18   For example:

| Fact No. | Fact | Objection |
|---|---|---|
| 3. | Plaintiff was driving at 35 miles per hour when she traveled through the intersection. (Decl. of Plaintiff ¶ 7; Decl. of Plaintiff's Expert ¶ 14) | Irrelevant. F.R.E. 402. |
| . . . | . . . | . . . |

26   **13.    _Ex Parte_ Applications.** _Ex parte_ applications are considered on

27   the papers and are not usually set for hearing. Counsel are advised that this

28   Court allows ex parte applications solely for extraordinary relief. Sanctions may

1   be imposed for misuse of *ex parte* applications. See In re Intermagnetics Am.,

2   Inc., 101 B.R. 191 (Bankr. C.D. Cal. 1989). Counsel also should become familiar

3   with Mission Power Engineering Co. v. Continental Casualty Co., 883 F. Supp.

4   488 (C.D. Cal. 1995), regarding *ex parte* applications.

5          Counsel's attention is directed to L.R. 7–19. The moving party's declaration

6   in support of an ex parte application shall show compliance with L.R. 7–19 and

7   this Order and shall include a statement of opposing counsel's position. Failure

8   to do so ensures the application will be DENIED. If counsel does not intend to

9   oppose an *ex parte* application, counsel must inform the Courtroom Deputy

10  Clerk, (951) 328–2254. As with all motion papers, counsel must deliver a

11  conformed courtesy copy of the papers to the "Courtesy Box", located outside

12  of Courtroom 1 on the 2nd floor at United States District Court, 3470 Twelfth

13  Street, Riverside, California 92501. Counsel will be notified by the Courtroom

14  Deputy Clerk of the Court's ruling or of a hearing time and date should the

15  Court determine that a hearing is necessary.

16

17      **14.    Stipulations**. Stipulations extending scheduling dates set by this

18  Court are not effective unless approved by the Court. Continuances will be

19  granted only upon a showing of good cause.

20

21      **15.    Communications with Chambers.** Unless requested to do so,

22  counsel shall not attempt to contact the Court or its staff by telephone or by

23  any other ex parte means. Counsel are directed to review the Central District's

24  at http://www.cacd.uscourts.gov for the Local Rules, filing procedures, judges'

25  procedures and schedules, calendars, forms, and Pacer access. Counsel may

26  contact the Courtroom Deputy Clerk, Maynor Galvez, by telephone at (951) 328–

27  2254 or by email at maynor_galvez@cacd.uscourts.gov only in the event that

28  counsel cannot find the desired information through all available resources.

**16.** **Telephonic Appearances.** Telephonic appearances will only be allowed upon good cause. To request a telephonic appearance counsel must file a request with a proposed order one week before the scheduling conference.

**IT IS SO ORDERED.**

Dated: January 26, 2021

Jesus G. Bernal
United States District Judge

\*      Copies of the Local Rules are available on our website at "http://www.cacd.uscourts.gov" or they may be purchased from one of the following:

Los Angeles Daily Journal
915 East 1st Street
Los Angeles, California 90012

West Publishing Company
610 Opperman Drive
Post Office Box 64526
St. Paul, Minnesota 55164−0526

Metropolitan News
210 South Spring Street
Los Angeles, California 90012