# United States District Court
# Northern District of Illinois - CM/ECF LIVE, Ver 6.3.3 (Chicago)
# CIVIL DOCKET FOR CASE #: 1:20-cv-07656

Robinette v. Monsanto Company
Assigned to: Honorable Franklin U. Valderrama
Demand: $75,000
Cause: 28:1332 Diversity-Product Liability

Date Filed: 12/22/2020
Jury Demand: Plaintiff
Nature of Suit: 360 P.I.: Other
Jurisdiction: Diversity

**Plaintiff**

**Bart Robinette**

represented by **Jason Alan Ott**
Dailey Law Firm, PC
30 N. LaSalle
#3200
Chicago, IL 60602
(312) 288-1385
Email: jason@daileylawyers.com
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Monsanto Company**

| Date Filed | # | Docket Text |
|---|---|---|
| 12/22/2020 | 1 | COMPLAINT filed by Bart Robinette; jury demand. Filing fee $ 402, receipt number 0752-17770251. (Attachments: # 1 Attorney Appearance, # 2 Civil Cover Sheet)(Ott, Jason) (Entered: 12/22/2020) |
| 12/22/2020 | | CASE ASSIGNED to the Honorable Franklin U. Valderrama. Designated as Magistrate Judge the Honorable Jeffrey Cole. Case assignment: Random assignment. (crl, ) (Entered: 12/22/2020) |
| 12/23/2020 | 2 | MINUTE entry before the Honorable Franklin U. Valderrama: On or before 3/8/2021, the parties shall file a joint initial status report. A template for the Joint Initial Status Report, setting forth the information required, may be found at http://www.ilnd.uscourts.gov/Judges.aspx by clicking on Judge Valderrama's name and then again on the link entitled 'Joint Initial Status Report.' The court will enter a scheduling order in response. Plaintiff must serve this Minute Entry on all other parties. If the defendant(s) has not been served with process, plaintiff's counsel must contact the Courtroom Deputy at analeah_charles@ilnd.uscourts.gov to reschedule the Joint Initial Status Report deadline. Plaintiff should not file the Joint Initial Status Report before the defendant(s) has been served with process. The parties are further ordered to review all of Judge Valderrama's standing orders and the information available on his webpage. Mailed notice (Attachments: # 1 Joint Status Report) (axc). (Entered: 12/23/2020) |
| 01/15/2021 | | SUMMONS Issued as to Defendant Monsanto Company (jg, ) (Entered: 01/15/2021) |

| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 02/16/2021 14:13:13 | | | |
| **PACER Login:** | hllp1982:2634105:4722683 | **Client Code:** | 1417.0049 |
| **Description:** | Docket Report | **Search Criteria:** | 1:20-cv-07656 |
| **Billable Pages:** | 1 | **Cost:** | 0.10 |

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

BART ROBINETTE,

        Plaintiff,              Case No.:

V                               Hon.:

MONSANTO COMPANY,        PLAINTIFF DEMANDS TRIAL BY JURY

        Defendant

---

## PLAINTIFF'S COMPLAINT

Plaintiff, BART ROBINETTE, by and through his attorneys, DAILEY LAW FIRM, P.C., complaining of Defendant, MONSANTO COMPANY, states:

### Allegations Common to All Counts

1. Defendant, MONSANTO COMPANY ("Monsanto"), is a foreign corporation licensed to do business in the State of Illinois.

2. At all times relevant, Defendant Monsanto designed, manufactured, marketed, and sold an herbicide known as Roundup.

3. Roundup is a non-selective herbicide marketed to homeowners and others to kill weeds.

4. Monsanto is a multinational biotechnology company with its principal place of business in St. Louis, Missouri.

5. "Roundup" refers here to all formulations of Defendant's Roundup products that contain the active ingredient glyphosate, including, but not limited to, Roundup Concentrate Poison Ivy and Tough Brush Killer I, Roundup Concentrate, Roundup Custom Herbicide, Roundup D-Pak, Roundup Fence and Hard Edge I, Roundup Foam

Weed & Grass Killer, **Roundup** Grass and Weed Killer, Roundup Herbicide, Roundup **Original2K** Herbicide, **Roundup** Promax, Roundup QuikStik Grass and Weed Killer, Roundup Quickpro Herbicide, **Roundup** Rainforest Concentrate Weed and Grass Killer, Roundup Rainforest SuperConcentrate Weed & Grass Killer, and Roundup Ready-to-Use Extended Control Weed & Grass Killer I Plus Weed Preventer, *inter alia.*

6. Defendant Monsanto has advertised and sold goods, including Roundup, in Illinois for many years.

7. Defendant Monsanto has transacted and conducted business in Illinois for many years.

8. Defendant Monsanto has derived substantial revenue from goods and products sold and used in the State of Illinois.

9. Defendant Monsanto has transacted and conducted extensive business within the State of Illinois that directly relates to the allegations in this Complaint.

10. Defendant Monsanto expected or reasonably should have expected that its acts would have consequences within the State of Illinois, and derived substantial revenue from interstate commerce, including commerce in Illinois.

11. Defendant Monsanto purposely availed itself of the privileges of conducting activities within the State of Illinois and invoked the benefits and protections of Illinois law.

12. Bart Robinette is an Illinois resident and purchased or used Roundup in Illinois many times over many years, including within the Eastern Division.

13. Defendant Monsanto maintains sufficient and ongoing contacts within the State of Illinois such that this Court's exercise of personal jurisdiction does not offend traditional notions of fair play and substantial justice.

14. Defendant Monsanto is the world's leading producer of glyphosate.

15. Glyphosate is the active ingredient in Roundup.

16. Defendant Monsanto discovered the herbicidal properties of glyphosate during the 1970's and subsequently began to design, research, manufacture, sell, and distribute glyphosate-based Roundup as a broad-spectrum herbicide.

17. Glyphosate is a broad-spectrum herbicide used to kill weeds and grasses known to compete with desirable plants grown around the globe.

18. Glyphosate is a "non-selective" herbicide, meaning it kills indiscriminately based only on whether a given organism produces a specific enzyme, 5-enolpyruvylshikimic acid-3-phosphate synthase, known as EPSP synthase.

19. Glyphosate inhibits the enzyme 5-enolpyruvylshikimic acid-3-phosphate synthase that interferes with the shikimic pathway in plants, resulting in the accumulation of shikimic acid in plant tissue and ultimately in plant death.

20. Sprayed as a liquid, plants absorb glyphosate directly through their leaves, stems, and roots, and detectable quantities accumulate in the plant tissues.

21. Each year, approximately 250 million pounds of glyphosate are sprayed on crops, commercial nurseries, suburban lawns, parks, and golf courses.

22. Defendant is intimately involved in the development, design, manufacture, marketing, sale, and/or distribution of genetically modified ("GMO") crops, many of which are marketed as being resistant to Roundup *i.e.,* "Roundup Ready ®."

23. As of 2009, Defendant Monsanto was the world's leading producer of seeds designed to be Roundup Ready®. In 2010, an estimated 70% of corn and cotton, and 90% of soybean fields in the United States, contained Roundup Ready® seeds.

24. The original Roundup, containing the active ingredient glyphosate, was introduced in 1974. Today, glyphosate products are among the world's most widely used herbicides.

25. For nearly 40 years, consumers, farmers, and the public have used Roundup, unaware of its carcinogenic properties.

26. The manufacture, formulation and distribution of herbicides, such as Roundup, are regulated under the Federal Insecticide, Fungicide, and Rodentcide Act ("FIFRA"), 7 U.S.C. § 136 *et seq.* FIFRA requires that all pesticides be registered with the Environmental Protection Agency ("EPA") prior to their distribution, sale, or use, except as described by FIFRA 7 U.S.C. 136a(a).

27. The EPA requires as part of the registration process, among other requirements, a variety of tests to evaluate the potential for exposure to pesticides, toxicity to people and other potential non-target organisms, and other adverse effects on the environment. Registration by the EPA, however, is not an assurance or finding of safety. The determination the EPA makes in registering or re-registering a product is not that the product is "safe," but rather that use of the product in accordance with its label directions "will not generally cause unreasonable adverse effects on the environment." 7 U.S.C. § 136(a)(c)(5)(D).

28. FIFRA defines "unreasonable adverse effects on the environment" to be "any unreasonable risk to man or the environment, taking into account the economic, social, and environmental costs and benefits of the use of any pesticide." 7 U.S.C. § 136(bb).

FIFRA thus requires the EPA to make a risk/benefit analysis in determining whether a registration should be granted or allowed to continue to be sold in commerce.

29. The EPA and the State of Illinois registered Roundup for the distribution, sale, and manufacture in the United States and the State of Illinois.

30. FIFRA generally requires that the registrant, Monsanto, conduct health and safety testing of pesticide products. The government is not required, nor is it able, to perform the product tests that are required of the manufacturer.

31. The evaluation of each pesticide product distributed, sold, or manufactured is completed at the time the product is initially registered. The data necessary for registration of a pesticide has changed over time. The EPA has reevaluated all pesticide products through a Congressionally-mandated process called "re-registration." 7 U.S.C. § 136a-l. In order to reevaluate these pesticides, the EPA demanded the completion of additional tests and the submission of data for the EPA's review and evaluation.

32. In the case of glyphosate and Roundup, the EPA had planned on releasing its preliminary risk assessment-in relation to the registration process- no later than July 2015. The EPA completed its review of glyphosate in early 2015, but delayed releasing the assessment pending further review in light of the World Health Organization's March 24, 2015, finding that glyphosate is a "probable carcinogen" as demonstrated by the mechanistic evidence of carcinogenicity in humans and sufficient evidence of carcinogenicity in animals.

33. In 1996, the New York Attorney General ("NYAG") filed a lawsuit against Monsanto based on its false and misleading advertising of Roundup products. Specifically, the

lawsuit challenged Monsanto's general representations that its spray-on glyphosate-based herbicides, including Roundup, were "safer than table salt" and "practically non-toxic" to mammals, birds, and fish. Among the representations the NYAG found deceptive and misleading about the human and environmental safety of Roundup are the following:

a. Remember that environmentally friendly Roundup herbicide is biodegradable. It won't build up in the soil so you can use Roundup with confidence along customers' driveways, sidewalks, and fences.

b. And remember that Roundup is biodegradable and won't build up in the soil. That will give you the environmental confidence you need to use Roundup everywhere you've got a weed, brush, edging, or trimming problem.

c. Roundup biodegrades into naturally occurring elements.

d. Remember that versatile Roundup herbicide stays where you put it. That means there's no washing or leaching to harm customers' shrubs or other desirable vegetation.

e. This non-residual herbicide will not wash or leach in the soil. It ... stays where you apply it.

f. Glyphosate is less toxic to rats than table salt following acute oral ingestion.

g. Glyphosate's safety margin is much greater than required. It has over a 1,000-fold safety margin in food an over a 700-fold safety margin for workers who manufacture it or use it.

  h. You can feel good about sing herbicides by Monsanto. They carry a toxicity category rating of 'practically non-toxic' as it pertains to mammals, birds, and fish.

  i. Roundup can be used where kids and pets will play and breaks down into natural material.

34. On November 19, 1996, Defendant Monsanto entered into an Assurance Discontinuance with the NYAG, in which Monsanto agreed, among other things, "to cease and desist from publishing or broadcasting any advertisements [in New York] that represent, directly or by implication, that:

  a. Its glyphosate-containing pesticide products or any component thereof are safe, non-toxic, harmless, or free from risk.

  b. Its glyphosate-containing pesticide products or any component thereof manufactured, formulated, distributed, or sold by Monsanto are biodegradable.

  c. Its glyphosate-containing pesticide products or any component thereof stay where they are applied under all circumstances and will not move through the environment by any means.

  d. Its glyphosate-containing pesticide products or any component thereof are "good" for the environment or are "known for their environmental characteristics."

  e. Glyphosate-containing pesticide products or any component thereof are safer or less toxic than common consumer products other than herbicides.

  f. Its glyphosate-containing products or any component thereof might be classified as "practically non-toxic."

35. Monsanto did not alter its advertising in the same manner in any other state.

36. In 2009, France's highest court ruled that Monsanto had not told the truth about the safety of Roundup. The French court affirmed an earlier judgment that Monsanto had falsely advertised its herbicide Roundup as "biodegradable" and that it "left the soil clean."

37. As early as the 1980's, Monsanto was aware of glyphosate's carcinogenic properties.

38. On March 4, 1985, a group of the EPA's Toxicology Branch published a memorandum classifying glyphosate as a Category C oncogene. Category C oncogenes are possible human carcinogens with limited evidence of carcinogenicity.

39. In 1986, the EPA issued a Registration Standard for glyphosate (NTIS PB87-103214). The Registration standard required additional phytotoxicity, environmental fate, toxicology, product chemistry, and residue chemistry studies. All of the data required was submitted and reviewed and/or waived.

40. In October 1991, the EPA published a Memorandum entitled  second Peer Review of Glyphosate." The memorandum changed glyphosate's classification to Group E (evidence of non-carcinogenicity for humans). Two peer review committee members did not concur with the conclusions of the committee and one member refused to sign.

41. In addition to the toxicity of the active molecule, many studies support the hypothesis that glyphosate formulations found in Defendant Monsanto's Roundup products are more dangerous and toxic than glyphosate alone. As early as 1991, evidence existed demonstrating that glyphosate formulations were significantly more toxic than glyphosate alone.

42. In 2002, Julie Marc published a study entitled "Pesticide Roundup Provokes Cell Division Dysfunction at the Level of CDK1/Cyclin B Activation."

43. The study found that **Defendant's** Roundup caused delays in the cell cycles of sea urchins, while the same concentrations of glyphosate alone did not alter cell cycles.

44. In 2004, Julie Marc published a study entitled "Glyphosate-based Pesticides Affect Cell Cycle Regulation." The study demonstrated a molecular link between glyphosate-based products and cell-cycle dysregulation.

45. The study noted that "cell-cycle dysregulation is a hallmark of tumor cells and human cancer. Failure in the cell-cycle checkpoints leads to genomic instability and subsequent development of cancers from the initial affected cell." Further, "[s]ince cell cycle disorders such as cancer result from dysfunction of unique cells, it was of interest to evaluate the threshold dose of glyphosate affecting cells."

46. In 2005, Francisco Peixoto published a study showing that Roundup's effects on rat liver mitochondria are much more toxic and harmful than the same concentrations of glyphosate alone.

47. The Peixoto study suggested that harmful effects of Roundup on mitochondrial bioenergetics could not be exclusively attributed to glyphosate and could be the result of other chemicals, such as the surfactant POEA, or alternatively due to the possible synergy between glyphosate and Roundup formulation products.

48. In 2009, Nora Benachour and Gilles-Eric Seralini published a study examining the effects of Roundup and glyphosate on human umbilical, embryonic, and placental cells.

49. The study used dilution levels of Roundup and glyphosate far below agricultural recommendations, corresponding with low levels of residues in food. The study concluded that supposed "inert" ingredients, and possibly POEA, change human cell permeability and amplify toxicity of glyphosate alone. The study further suggested that determinations of glyphosate toxicity should take into account the presence of adjuvants, or those chemicals used in the formulation of the complete pesticide. The study confirmed that the adjuvants in Roundup are not inert and that Roundup is always more toxic than its active ingredient glyphosate.

50. The results of these studies were confirmed in recently published peer-reviewed studies and were at all times available and/or known to Defendant Monsanto.

51. Defendant Monsanto knew or should have known that Roundup is more toxic than glyphosate alone and that safety studies on Roundup, Roundup's adjuvants and "inert" ingredients, and/or the surfactant POEA were necessary to protect Bart Robinette from Roundup.

52. Defendant Monsanto knew or should have known that tests limited to Roundup's active ingredient glyphosate were insufficient to prove the safety of Roundup.

53. Defendant Monsanto failed to appropriately and adequately test Roundup, Roundup's adjuvants and "inert" ingredients, and/or the surfactant POEA to protect Bart Robinette from Roundup.

54. Rather than performing appropriate tests, Defendant Monsanto relied upon flawed industry-supported studies designed to protect Defendant Monsanto's economic interests rather than Bart Robinette and the consuming public.

55. Despite its knowledge that Roundup was considerably more dangerous than glyphosate alone, Defendant continued to promote Roundup as safe.

56. The International Agency for Research on Cancer {"IARC") is the specialized intergovernmental cancer agency which the World Health Organization ("WHO") of the United Nations tasked with conducting and coordinating research into the causes of cancer.

57. An IARC Advisory Group to Recommend Priorities for IARC Monographs during 2015-2019 met in April 2014. Though nominations for the review were solicited, a substance must meet two criteria to be eligible for review by the IARC Monographs: there must already be some evidence of carcinogenicity of the substance, and there must be evidence that humans are exposed to the substance.

58. IARC set glyphosate for review in 2015-2016. IARC uses five criteria for determining priority in reviewing chemicals. The substance must have a potential for direct impact on public health; scientific literature to support suspicion of carcinogenicity; evidence of significant human exposure; high public interest and/or potential to bring clarity to a controversial area and/or reduce public anxiety or concern; and related agents similar to one given high priority by the above considerations. Data reviewed is sourced preferably from publicly accessible, peer-reviewed data.

59. On March 24,2015, after its cumulative review of human, animal, and DNA studies for more than one (1) year, many of which have been in Defendant's possession since as early as 1985, the IARC's Working Group published its conclusion that the glyphosate contained in Defendant's Roundup herbicide is a Class 2A "probable

carcinogen" as demonstrated by the mechanistic evidence of carcinogenicity in humans and sufficient evidence of carcinogenicity in animals.

60. The **IARC's** full Monograph was published on July 29, 2015, and **established** glyphosate as a Class 2A *probable* carcinogen to humans. According to the authors, **glyphosate** demonstrated sufficient mechanistic evidence (genotoxicity and oxidative stress) to warrant a 2A classification based on evidence of carcinogenicity in humans and **animals**.

61. The IARC's Working Group found an increased risk between exposure to glyphosate and **non-Hodgkin's** lymphoma ("NHL") and several subtypes **of NHL,** and the increased risk continued after adjustment for other **pesticides.**

62. The IARC also found that glyphosate caused DNA and chromosomal damage in human **cells.**

63. Even without the new classification by the IARC, Defendant has had ample evidence of glyphosate and Roundup's genotoxic properties for decades.

64. Genotoxic chemical agents are those that are capable of damaging the DNA within a cell through genetic mutations, which is a process that can lead to cancer.

65. In 1997, Chris Clements published "Genotoxicity of select herbicides in *Rana catesbeiana* tadpoles using the alkaline single-cell gel DNA electrophoresis (comet) assay."

66. The study found that tadpoles exposed to Roundup showed significant DNA damage when compared with unexposed control animals.

67. Both human and animal studies have shown that glyphosate and glyphosate-based formulations such as Roundup can induce oxidative stress.

68. Oxidative stress and associated chronic inflammation are believed to be involved in carcinogenesis.

69. The IARC Monograph notes that "[s]trong evidence exists that glyphosate, AMPA and glyphosate-based formulations can induce oxidative stress."

70. In 2006 Cesar Paz-y Mino published a study examining DNA damage in human subjects exposed to glyphosate.

71. The study produced evidence of chromosomal damage in blood cells showing significantly greater damage after exposure to glyphosate than before in the same individuals, suggesting that the glyphosate formulation used during aerial spraying had a genotoxic effect on exposed individuals.

72. The IARC Monograph reflects the volume of evidence of glyphosate pesticides' genotoxicity noting "[t]he evidence for genotoxicity caused by glyphosate-based formulations is strong."

73. Despite knowledge to the contrary, Defendant Monsanto maintains that there is no evidence that Roundup is genotoxic, that regulatory authorities and independent experts are in agreement that Roundup is not genotoxic, and that there is no evidence that Roundup is genotoxic.

74. In addition to glyphosate and Roundup's genotoxic properties, Defendant Monsanto has long been aware of glyphosate's carcinogenic properties.

75. Glyphosate and Roundup, in particular, have long been associated with carcinogenicity and the development of numerous forms of cancer, including, but not limited to, non-Hodgkin's lymphoma, Hodgkin's lymphoma, multiple myeloma, and soft tissue sarcoma.

76. Defendant Monsanto has known of this association since the early to mid-1980s and numerous human and animal studies have evidenced the carcinogenicity of glyphosate and/or Roundup.

77. In 1985, the EPA studied the effects of glyphosate in mice, finding a dose-related response in male mice linked to renal tubal adenomas, a rare tumor. The study concluded that glyphosate was oncogenic.

78. In 2003, Lennart Hardell and Mikael Eriksson published the results of two case-controlled studies on pesticides as a risk factor for NHL and hairy cell leukemia.

79. The study concluded that glyphosate had the most significant relationship to NHL among all herbicides studied.

80. In 2003, AJ DeRoos published a study examining the pooled data of midwestern farmers, examining pesticides and herbicides as risk factors for NHL.

81. The study, which controlled for potential confounders, found a relationship between increased NHL incidence and glyphosate.

82. In 2008, Mikael Eriksson published a population-based case-controlled study of exposure to various pesticides as a risk factor for NHL.

83. This study strengthened previous associations between glyphosate and NHL.

84. In spite of this knowledge, Defendant Monsanto continued to issue broad and sweeping statements suggesting that Roundup was, and is, safer than ordinary household items such as table salt, despite a lack of scientific support for the accuracy and validity of these statements and, in fact, voluminous evidence to the contrary.

85. These statements and representations have been made with the intent of inducing homeowners, the agricultural community, and the public at large to purchase and increase the use of Defendant Monsanto's Roundup for Defendant Monsanto's pecuniary gain, and in fact, did induce Bart Robinette to use Roundup.

86. Defendant Monsanto made these statements with complete disregard and reckless indifference to the safety of Bart Robinette and the general public.

87. Notwithstanding Defendant Monsanto's representations, scientific evidence has established a clear association between glyphosate and genotoxicity, inflammation, and an increased risk of many cancers, including, but not limited to, NHL, multiple myeloma, and soft tissue sarcoma.

88. Defendant Monsanto knew or should have known that glyphosate is associated with an increased risk of developing cancer, including, but not limited to, NHL, multiple myeloma, and soft tissue sarcomas.

89. Defendant Monsanto failed to appropriately and adequately inform and warn Bart Robinette of the serious and dangerous risks associated the with use of and exposure to glyphosate and/or Roundup, including, but not limited to, the risk of developing NHL.

90. Despite the IARC's classification of glyphosate as a Class 2A probable carcinogen, Defendant Monsanto continues to maintain that glyphosate and/or Roundup is safe, non-carcinogenic, non-genotoxic, and falsely warrants to users and the general public that independent experts and regulatory agencies agree that there is no evidence of carcinogenicity or genotoxicity in glyphosate and Roundup.

91. Defendant Monsanto has claimed and continues to claim that Roundup is safe, non-carcinogenic, and non-genotoxic. These misrepresentations are consistent with

Defendant Monsanto's cavalier approach to investigating and ensuring the safety of its products, the safety of the public at large, and the safety of Bart Robinette.

92. After the EPA's 1985 classification of glyphosate as possibly carcinogenic to humans (Group C), Defendant Monsanto exerted pressure upon the EPA to change its classification.

93. This culminated in the EPA's reclassification of glyphosate to Group E, which was based upon evidence of non-carcinogenicity in humans.

94. In so classifying, the EPA stated that "[i]t should be emphasized, however, that designation of an agent in Group E is based on the available evidence at the time of evaluation and should not be interpreted as a definitive conclusion that the agent will not be a carcinogen under any circumstances."

95. On two occasions, the EPA found that laboratories hired by Defendant Monsanto to test the toxicity of its Roundup products for registration purposes committed scientific fraud.

96. In the first instance, Defendant Monsanto hired Industrial Bio-Test Laboratories ("IBT") to perform and evaluate pesticide toxicology studies relating to Roundup. IBT performed approximately 30 tests on glyphosate and glyphosate-containing products, including 11 of the 19 chronic toxicology studies needed to register Roundup with the EPA.

97. In 1976, the Food and Drug Administration ("FDA") performed an inspection of IBT and discovered discrepancies between the raw data and the final report relating to toxicological impacts of glyphosate. The EPA subsequently audited IBT and determined that the toxicology studies conducted for Roundup were invalid. An EPA reviewer

stated, after finding "routine falsification of data" at IBT, that it was "hard to believe the scientific integrity of the studies when they said they took specimens of the uterus from male rabbits."

98. Three top executives of IBT were convicted of fraud in 1983.

99. In the second incident, Monsanto hired Craven Laboratories ("Craven") in 1990 to perform pesticide and herbicide studies, including several studies on Roundup.

100. In March of 1991, the EPA announced that it was investigating Craven for allegedly falsifying test data used by chemical firms to win EPA approval of pesticides."

101. The investigation led to the indictments of the laboratory owner and a handful of employees.

102. Defendant Monsanto claims on its website that "[r]egulatory authorities and independent experts around the world have reviewed numerous long-term/carcinogenicity and genotoxicity studies and agree that there is no evidence that glyphosate, the active ingredient in Roundup brand herbicides and other glyphosate-based herbicides, causes cancer, even at very high doses, and that it is not genotoxic."

103. Ironically, the primary source for this statement is an outdated 1986 report by the WHO, the same organization that now considers glyphosate to be a probable carcinogen.

104. Glyphosate, and Defendant Monsanto's Roundup products in particular, have long been associated with serious side effects and many regulatory agencies around

the globe have banned or are currently banning the use of glyphosate-containing herbicide products.

105.     Defendant **Monsanto's** statements proclaiming the safety of Roundup and disregarding its dangers misled Bart Robinette.

106.     Despite Defendant **Monsanto's** knowledge that Roundup was associated with an elevated risk of developing cancer, Defendant **Monsanto's** promotional campaigns focused on Roundup's purported "safety profile."

107.     Defendant Monsanto's failure to adequately warn consumers resulted in (1) Bart Robinette using and being exposed to glyphosate instead of using another acceptable and safe method of controlling unwanted weeds and pests; and (2) scientists and physicians failing to warn and instruct consumers about the risk of cancer, including NHL, and other injuries associated with Roundup.

108.     Defendant Monsanto failed to seek modification of the labeling of Roundup to include relevant information regarding the risks and dangers associated with Roundup exposure.

109.     The failure of Defendant Monsanto to appropriately warn and inform the EPA has resulted in inadequate instructions and warnings in safety information presented directly to users and consumers.

110.     The failure of Defendant Monsanto to appropriately warn and inform the EPA has resulted in the lack of warning or caution statements that are adequate to protect health and the environment.

## COUNT I

### Strict Products Liability—Design Defect

1-110. Plaintiff repeats, realleges, and incorporates herein all Allegations Common to
All Counts.

111.  Bart Robinette brings this strict liability claim against Defendant
Monsanto for defective design.

112.  Bart Robinette used Roundup regularly on his farm over the course of
several years beginning in or around 1980, as well as at his home and
campground.

113.  Bart Robinette followed all instructions and safety and precautionary
warnings provided by Monsanto.

114.  At all times relevant, Defendant Monsanto designed, researched,
manufactured, tested, advertised, promoted, sold, and distributed the Roundup that
Bart Robinette used.

115.  Defendant Monsanto's Roundup was expected to and did reach the usual
consumers, handlers, and persons coming into contact, including Bart Robinette,
without substantial change in the condition in which it was produced, manufactured,
sold, distributed, and marketed by Defendant Monsanto.

116.  At the time it left the control of the Defendant Monsanto, Roundup was in
an unsafe, defective, and inherently dangerous condition, which was dangerous to
users, and in particular, Bart Robinette.

117.  The Roundup designed, researched, manufactured, tested, advertised,
promoted, marketed, sold, and distributed by Defendant Monsanto was defective in

design or formulation in that, when it left the hands of the manufacturer and/or suppliers, the foreseeable risks exceeded the benefits associated with the design or formulation of Roundup.

118. The Roundup designed, researched, manufactured, tested, advertised, promoted, marketed, sold and distributed by Defendant Monsanto was defective in design and/or formulations, in that, when it left the hands of the Defendant Monsanto's manufacturers and/or suppliers, it was unreasonably dangerous, unreasonably dangerous in normal use, and it was more dangerous than an ordinary consumer would expect.

119. At all times herein, Roundup was in a defective condition and unsafe, and Defendant Monsanto knew or had reason to know that said product was defective and unsafe, especially when used in the form and manner as provided by the Defendant Monsanto. In particular, Defendant Monsanto's Roundup was defective in one or more of the following ways:

    a. When placed in the stream of commerce, Defendant Monsanto's Roundup products were defective in design and formulation and, consequently, dangerous to an extent beyond that which an ordinary consumer would anticipate;

    b. When placed in the stream of commerce, Defendant Monsanto's Roundup products were unreasonably dangerous in that they were hazardous and posed a grave risk of cancer and other serious illnesses when used in a reasonably anticipated manner;

    c.   When placed in the stream of commerce, Defendant Monsanto's Roundup products contained unreasonably dangerous design defects and were not reasonably safe when used in a reasonably anticipated manner;

    d.   Defendant Monsanto did not sufficiently test, investigate, or study its Roundup products;

    e.   Exposure to Roundup presents a risk of harmful side effects that outweigh any potential utility stemming from the use of the herbicide;

    f.   Defendant Monsanto knew or should have known at the time of marketing its Roundup products that exposure to Roundup could result in cancer and other severe illnesses and injuries;

    g.   Defendant Monsanto did not conduct adequate post-marketing surveillance of its Roundup products;

    h.   Defendant Monsanto could have employed safer alternative designs and formulations; and

    i.   Defendant Monsanto failed to warn consumers, foreseeable users, government agencies, and others that exposure to Roundup could result in cancer and other severe illnesses and injuries.

120.    Defendant Monsanto knew, or should have known, that Roundup was in a defective condition, and was and is inherently dangerous and unsafe.

121.    Bart Robinette was exposed to Defendant Monsanto's Roundup, as described above, without knowledge of Roundup's dangerous characteristics.

122.    At the time of Bart Robinette's use and exposure to Roundup, Roundup was being used for the purposes and in a manner normally intended, as a broad-spectrum herbicide.

123.    Defendant Monsanto with this knowledge voluntarily designed its Roundup with a dangerous condition for use by the public, and in particular, Bart Robinette.

124.    Defendant Monsanto marketed and promoted a product in such a manner so as to make it inherently defective as the product downplayed its suspected, probable, and established health risks inherent with its normal, intended use.

125.    The harm caused by Roundup products far outweighed their benefit, rendering these products dangerous to an extent beyond that which an ordinary consumer would contemplate. Roundup products were and are more dangerous than alternative products and Defendant Monsanto could have designed Roundup products (including their packaging and sales aids) to make them less dangerous. Indeed, at the time that Monsanto designed Roundup products, the state of the industry's scientific knowledge was such that a less risky design or formulation was attainable.

126.    At the time Roundup products left Monsanto's control, there was a practical, technically feasible, and safer alternative design that would have prevented the harm without substantially impairing the reasonably anticipated or intended function of those herbicides.

127.    Monsanto's defective design of Roundup products was willful, wanton, fraudulent, malicious, and conducted with reckless disregard for the health and safety of users of the Roundup products, including Bart Robinette.

128.     Therefore, as a result of the unreasonably dangerous condition of its Roundup products, Monsanto is strictly liable to Plaintiff, Bart Robinette.

129.     The defects in Roundup products caused or contributed to cause Plaintiff's grave injuries, and, but for Monsanto's misconduct and omissions, Plaintiff would not have sustained his injuries.

130.     Monsanto's conduct, as described above, was reckless. Monsanto risked the lives of consumers and users of its products, including Plaintiff's, with knowledge of the safety problems associated with Roundup and glyphosate-containing products, and suppressed this knowledge from the general public. Monsanto's reckless conduct warrants an award of aggravated damages.

131.     As a proximate result of one or more of the foregoing unreasonably dangerous conditions of Defendant Monsanto's Roundup, Bart Robinette was exposed to it.

132.     As a proximate result of one or more of the foregoing unreasonably dangerous conditions of Defendant Monsanto's Roundup, Bart Robinette was diagnosed with Small Lymphocytic lymphoma/chronic lymphocytic leukemia on December 28, 2018.

133.     As a proximate result of one or more of the foregoing unreasonably dangerous conditions, Bart Robinette has suffered and continues to suffer grave injuries, has endured pain and discomfort, as well as economic hardship, including but not limited to financial expenses for medical care and treatment. Plaintiff will continue to incur these expenses in the future.

WHEREFORE, Plaintiff, Bart Robinette, demands judgment against Defendant, Monsanto Company, in an amount in excess of $75,000.

## COUNT II

### Strict Products Liability—Failure to Warn

1-110. Plaintiff repeats, realleges, and incorporates herein all Allegations Common to All Counts.

134.    Plaintiff brings this strict liability claim against Defendant Monsanto for failure to warn.

135.    At all times relevant to this litigation, Defendant Monsanto engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting Roundup products, which are defective and unreasonably dangerous to consumers, including Plaintiff, because they do not contain adequate warnings or instructions concerning the dangerous characteristics of Roundup® and, specifically, the active ingredient glyphosate. These actions were under the ultimate control and supervision of Monsanto.

136.    Monsanto researched, developed, designed, tested, manufactured, inspected, labeled, distributed, marketed, promoted, sold, and otherwise released into the stream of commerce Roundup® products, and in the course of same, directly advertised or marketed the products to consumers and end users, including the Plaintiff, and therefore had a duty to warn of the risks associated with the use of Roundup® and glyphosate-containing products.

137.    At all times relevant to this litigation, Monsanto had a duty to properly test, develop, design, manufacture, inspect, package, label, market, promote, sell, distribute, maintain supply, provide proper warnings, and take such steps as necessary to ensure that Roundup® products did not cause users and consumers to suffer from

unreasonable and dangerous risks. Monsanto had a continuing duty to warn the Plaintiff of the dangers associated with Roundup® use and exposure. Monsanto, as manufacturer, seller, promoter, marketer, or distributor of chemical herbicides are held to the knowledge of an expert in the field.

138.     At the time of manufacture, Monsanto could have provided the warnings or instructions regarding the full and complete risks of Roundup® and glyphosate-containing products because it knew or should have known of the unreasonable risks of harm associated with the use of and/or exposure to such products.

139.     At all times relevant to this litigation, Monsanto failed to investigate, study, test, or promote the safety or to minimize the dangers to users and consumers of its product and to those who would foreseeably use or be harmed by these herbicides, including Plaintiff.

140.     Despite the fact that Monsanto knew or should have known that Roundup® posed a grave risk of harm, it failed to exercise reasonable care to warn of the dangerous risks associated with use and exposure. The dangerous propensities of these products and the carcinogenic characteristics of glyphosate, as described above, were known to Monsanto, or scientifically knowable to Monsanto through appropriate research and testing by known methods, at the time it distributed, marketed, promoted, supplied, or sold the product, and not known to end users and consumers, such as Plaintiff.

141.     These products created significant risks of serious bodily harm to consumers, as alleged herein, and Monsanto failed to adequately warn consumers and reasonably foreseeable users of the risks of exposure to its products. Monsanto has wrongfully

concealed information concerning the dangerous nature of Roundup® and its active ingredient glyphosate, and further made false and/or misleading statements concerning the safety of Roundup® and glyphosate.

142.    At all times relevant to this litigation, Roundup® products reached the intended consumers, handlers, and users or other persons coming into contact with these products in Missouri and throughout the United States, including Plaintiff, without substantial change in their condition as designed, manufactured, sold, distributed, labeled, promoted, and marketed by Monsanto.

143.    Plaintiff was exposed to Roundup® products in the course of her employment and/or personal use of Roundup, without knowledge of its dangerous characteristics.

144.    At all times relevant to this litigation, Plaintiff used and/or was exposed to the use of Roundup® products in their intended or reasonably foreseeable manner without knowledge of their dangerous characteristics.

145.    Plaintiff could not have reasonably discovered the defects and risks associated with Roundup® or glyphosate-containing products prior to or at the time of Plaintiff's exposure. Plaintiff relied upon the skill, superior knowledge, and judgment of Monsanto.

146.    These products were defective because the minimal warnings disseminated with Roundup® products were inadequate, and they failed to communicate adequate information on the dangers and safe use/exposure and failed to communicate warnings and instructions that were appropriate and adequate to render the products safe for their ordinary, intended, and reasonably foreseeable uses, including agricultural and landscaping applications.

147.     The information that Monsanto did provide or communicate failed to contain relevant warnings, hazards, and precautions that would have enabled consumers such as Plaintiff to utilize the products safely and with adequate protection. Instead, Monsanto disseminated information that was inaccurate, false, and misleading and which failed to communicate accurately or adequately the comparative severity, duration, and extent of the risk of injuries with use of and/or exposure to Roundup® and glyphosate; continued to aggressively promote the efficacy of its products, even after it knew or should have known of the unreasonable risks from use or exposure; and concealed, downplayed, or otherwise suppressed, through aggressive marketing and promotion, any information or research about the risks and dangers of exposure to Roundup® and glyphosate.

148.     To this day, Monsanto has failed to adequately and accurately warn of the true risks of Plaintiff's injuries associated with the use of and exposure to Roundup® and its active ingredient glyphosate, a probable carcinogen.

149.     As a result of their inadequate warnings, Roundup® products were defective and unreasonably dangerous when they left the possession and/or control of Monsanto, were distributed, marketed, and promoted by Monsanto, and used by Plaintiff on his farm, at his home, and at his campground.

150.     As a result of their inadequate warnings, Roundup® products were defective and unreasonably dangerous when they left the possession and/or control of Monsanto, were distributed, marketed, and promoted by Monsanto, and used by Plaintiff on his farm, at his home, and at his campground.

151.    The defects in Roundup® products caused or contributed to cause Plaintiff's injuries, and, but for this misconduct and omissions, Plaintiff would not have sustained his injuries.

152.    Had Monsanto provided adequate warnings and instructions and properly disclosed and disseminated the risks associated with Roundup® products, Plaintiff could have avoided the risk of developing injuries as alleged herein.

153.     As a direct and proximate result of Monsanto placing defective Roundup® products into the stream of commerce, Plaintiff has suffered severe injuries and has endured physical pain and discomfort, as well as economic hardship, including considerable financial expenses for medical care and treatment.

WHEREFORE, Plaintiff, Bart Robinette, demands judgment against Defendant Monsanto Company in an amount in excess of $75,000.

## COUNT III

### Negligence/Gross Negligence/Personal Injury

1-110. Plaintiff repeats, realleges, and incorporates herein all Allegations Common to All Counts.

154.    At all times relevant, Defendant Monsanto designed, researched, **manufactured**, tested, advertised, promoted, sold, and distributed the Roundup that **Bart Robinette used**.

155.    Defendant **Monsanto's** Roundup was expected to and did reach the usual consumers, handlers, and persons coming into contact, including **Bart Robinette**, **without** substantial change in the condition in which it was produced, manufactured, sold, **distributed**, and marketed by Defendant **Monsanto**.

156.    At the time it left the control of the Defendant Monsanto, Roundup was in an unsafe, defective, and inherently dangerous condition, which was dangerous to users, and in particular, Bart Robinette.

157.    The Roundup designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed by Defendant Monsanto was defective in design or formulation in that, when it left the hands of the manufacturer and/or suppliers, the foreseeable risks exceeded the benefits associated with the design or formulation of Roundup.

158.    The Roundup designed, researched, manufactured, tested, advertised, promoted, marketed, sold and distributed by Defendant Monsanto was defective in design and/or formulations, in that, when it left the hands of Defendant Monsanto's manufacturers and/or suppliers, it was unreasonably dangerous, unreasonably dangerous in normal use, and it was more dangerous than an ordinary consumer would expect.

159.    At all times relevant to this litigation, Defendant Monsanto had a duty to exercise reasonable care in the design, research, manufacture, marketing, advertisement, supply, promotion, packaging, sale, and distribution of Roundup products, including the duty to take all reasonable steps necessary to manufacture, promote, and/or sell a product that was not unreasonably dangerous to consumers and users of the product, including Plaintiff Bart Robinette.

160.    At all times relevant to this litigation, Defendant Monsanto had a duty to exercise reasonable care in the marketing, advertisement, and sale of Roundup products. Defendant Monsanto's duty of care owed to consumers and the general

public, including Plaintiff Bart Robinette, included providing accurate, true, and correct information concerning the risks of using Roundup and appropriate, complete, and accurate warnings concerning the potential adverse effects of exposure to Roundup, and, in particular, its active ingredient glyphosate.

161.    At all times relevant to this litigation, Monsanto knew or, in the exercise of reasonable care, should have known of the hazards and dangers of Roundup and specifically, the carcinogenic properties of the chemical glyphosate.

162.    Accordingly, at all times relevant to this litigation, Defendant Monsanto knew or, in the exercise of reasonable care, should have known that use of or exposure to its Roundup products could cause or be associated with Plaintiff's injuries and thus created a dangerous and unreasonable risk of injury to the users of these products, including Plaintiff Bart Robinette.

163.    Defendant Monsanto also knew or, in the exercise of reasonable care, should have known that users and consumers of Roundup were unaware of the risks and the magnitude of the risks associated with the use of and/or exposure to Roundup and glyphosate-containing products.

164.    As such, Defendant Monsanto breached the duty of reasonable care and failed to exercise ordinary care in the design, research, development, manufacture, testing, marketing, supply, promotion, advertisement, packaging, sale, and distribution of its Roundup® products, in that Monsanto manufactured, marketed, promoted, and sold defective herbicides containing the chemical glyphosate, knew or had reason to know of the defects inherent in these products, knew or had reason to know that a user's or consumer's exposure to the products created a significant risk of harm and unreasonably

dangerous side effects, and failed to prevent or adequately warn of these risks and injuries.

165.    Despite an ability and means to investigate, study, and test these products and to provide adequate warnings, Monsanto has failed to do so. Indeed, Monsanto has wrongfully concealed information and has further made false and/or misleading statements concerning the safety and/or exposure to Roundup® and glyphosate.

166.    Defendant Monsanto, individually and by and through its agents and employees, was negligent in one or more of the following ways:

a.  Manufactured, produced, promoted, formulated, created, and/or designed Roundup without thoroughly testing it;

b.  Failed to test Roundup and/or failed to adequately, sufficiently, and properly test Roundup;

c.  Failed to conduct sufficient testing to determine the safety of "inert" ingredients and/or adjuvants contained within Roundup; the propensity of these ingredients to render Roundup toxic, increase the toxicity of Roundup, or magnify the carcinogenic properties of Roundup; whether these ingredients are carcinogenic; and whether or not "inert" ingredients and/or adjuvants were safe for us;

d.  Failed to adequately and correctly warn the Plaintiff, Bart Robinette, the public, and the EPA of the dangers of Roundup;

e.  Failed to provide adequate cautions and warnings to protect the health of users, handlers, applicators, and persons who would reasonably and foreseeably come into contact with Roundup;

f. Marketed, advertised, and recommended the use of Roundup without sufficient knowledge as to its dangerous propensities;

g. Represented that Roundup was safe for use for its intended purpose, and/or that Roundup was safer than ordinary and common items such as table salt, when in fact it was unsafe;

h. Manufactured, produced, and formulated Roundup in a manner which was dangerous to its users;

i. Fraudulently withheld and concealed information from the Public while knowing that Roundup was unsafe, dangerous, and/or non-conforming with EPA regulations; and

j. Sold Roundup with a false and misleading label.

167. Defendant Monsanto knew, or should have known, that Roundup was in a defective condition, and was and is inherently dangerous and unsafe.

168. Defendant Monsanto knew and/or should have known that it was foreseeable that consumers such as Plaintiff Bart Robinette would suffer injuries as a result of its failure to exercise ordinary care in the manufacturing, marketing, promotion, labeling, distribution, and sale of Roundup.

169. Plaintiff, Bart Robinette, did not know the nature and extent of the injuries that could result from the intended use of and/or exposure to Roundup or its active ingredient glyphosate.

170. Plaintiff, Bart Robinette, was exposed to Defendant Monsanto's Roundup, as described above, without knowledge of Roundup's dangerous characteristics.

171.    At the time of Bart Robinette's use and exposure to Roundup, Roundup was being used for the purposes and in a manner normally intended, as a broad-spectrum herbicide.

172.    Defendant Monsanto with this knowledge voluntarily designed its Roundup with a dangerous condition for used by the public and in particular, Bart Robinette.

173.    Defendant Monsanto marketed and promoted a product in such a manner so as to make it inherently defective as the product downplayed its suspected, probable, and established health risks inherent with its normal, intended use.

174.    As a proximate result of one or more of the foregoing negligent acts and/or omissions, Bart Robinette was exposed to Roundup.

175.    As a proximate result of one or more of the foregoing negligent acts and/or omissions, Bart Robinette was diagnosed with Small Lymphocytic lymphoma/chronic lymphocytic leukemia on December 28, 2018.

176.    As a proximate result of one or more of the foregoing negligent acts and/or omissions, Bart Robinette has suffered and continues to suffer grave injuries, has endured pain and discomfort, as well as economic hardship, including, but not limited to, considerable financial expenses for medical care and treatment. Plaintiff Bart Robinette will continue to incur these expenses in the future.

177.    Defendant Monsanto's conduct, as described above, was reckless. Monsanto regularly risked the lives of consumers and users of its products, including Plaintiff Bart Robinette, with full knowledge of the dangers of these products. Monsanto has made conscious decisions not to redesign, re-label, warn,

or inform the unsuspecting public, including Plaintiff Bart Robinette. Monsanto's reckless conduct therefore warrants an award of aggravated or punitive damages.

178.     **Bart Robinette** had no knowledge regarding **Roundup's** carcinogenicity until December 28, 2018.

## COUNT IV

### Fraudulent Concealment

1-110. Plaintiff repeats, realleges, and incorporates herein all Allegations Common to All Counts.

179.     Plaintiff **Bart Robinette** had no way of knowing about the risk of serious illness associated with the use of and/or exposure to Roundup® and glyphosate. The earliest date one could have learned of the link would have been after IARC released its formal assessment of glyphosate in July 2015. This is the quintessential case for tolling.

180.     Within the time period of any applicable statutes of limitations, Plaintiff **Bart Robinette** could not have discovered, through the exercise of reasonable diligence, that exposure to Roundup® and glyphosate is injurious to human health.

181.     Plaintiff **Bart Robinette** did not discover, and did not know of facts that would cause a reasonable person to suspect, the risks associated with the use of and/or exposure to Roundup® and glyphosate; nor would a reasonable and diligent investigation by Plaintiff **Bart Robinette** have disclosed that Roundup and glyphosate would cause Plaintiff's illness.

182.     For these reasons, all applicable statutes of limitations have been tolled by operation of the discovery rule with respect to Plaintiff's claim.

183.     All applicable statutes of limitations have also been tolled by Monsanto's

knowing and active fraudulent concealment and denial of the facts alleged herein throughout the time period relevant to this action.

184.    Instead of disclosing critical safety information about Roundup and glyphosate, Monsanto has consistently and falsely represented the safety of its Roundup products.

185.    Monsanto was under a continuous duty to disclose to consumers, users, and other persons coming into contact with its products, including Plaintiff **Bart Robinette**, accurate safety information concerning its products and the risks associated with the use of an/or exposure to Roundup and glyphosate.

186.    Instead, Monsanto knowingly, affirmatively, and actively concealed safety information concerning Roundup and glyphosate and the serious risks associated with the use of an/or exposure to its products.

187.    Based on the foregoing, Monsanto is estopped from relying of any statutes of limitations in defense of this action.

WHEREFORE, Plaintiff, Bart Robinette, demands judgment against Defendant Monsanto Company in an amount in excess of $75,000.

## COUNT V

### Fraud/Misrepresentation/Silent Fraud

1-110.    Plaintiff repeats, realleges, and incorporates herein all Allegations Common to All Counts.

188.    Defendant Monsanto represented to the general public, including Bart Robinette, that its Roundup products were safe to use for their intended purposes.

189.    As has been more thoroughly discussed above herein, Defendant's

Roundup products are not safe to use for their intended purposes and in fact when used for their intended purposes cause severe and permanent injuries including but not limited to non-Hodgkin's lymphoma, various leukemias, other forms of cancer, and death.

190.    At all times relevant Defendant Monsanto knew that its Roundup products were not safe to use in their intended manner and for their intended purposes.

191.    Defendant Monsanto nevertheless marketed and continued to market its Roundup products as safe, natural, environmentally friendly, and not harmful to induce consumers including Plaintiff Bart Robinette to purchase its products.

192.    Defendant Monsanto had a duty to disclose the truth about its Roundup products, specifically that Roundup products and their active ingredient, glyphosate, posed an increased risk of serious injury including but not limited to the development of Non-Hodgkin's Lymphoma, various leukemias, and other forms of cancer, when used for their intended purposes.

193.    Defendant Monsanto intentionally suppressed material facts regarding the safety of its Roundup products to create an impression to consumers and to the general public that Roundup products are safe, natural, nontoxic, and nonharmful to health.

194.    Defendant Monsanto intended for the general public, including Plaintiff, Bart Robinette, to rely upon its statements that its Roundup products were safe, natural, nontoxic, and nonharmful to health.

195.    Plaintiff Bart Robinette, relying upon Defendant's representations that

Roundup products are safe to use, purchased and used Defendant's Roundup products since 1980.

196.     Plaintiff Bart Robinette did not know and could not have reasonably known of the falsity of Defendant's claims or of the dangers and harmful effects of Roundup products.

197.     Plaintiff Bart Robinette was justified in relying upon Defendant's representations as to the safety of Roundup products and did not/could not have known of the dangers or harmful effects of Defendant's Roundup products.

198.     As a direct and proximate result of Plaintiff's reliance on Defendant's representations regarding the safety of its Roundup products and of Plaintiff's use of Defendant's Roundup products, Plaintiff developed Small Lymphocytic lymphoma/chronic lymphocytic leukemia and suffered physical, emotional, and economic damages including but not limited to expenses for medical treatment and care.

WHEREFORE, Plaintiff, Bart Robinette, demands judgment against Defendant Monsanto Company in an amount in excess of $75,000.

## COUNT VI

### Breach of Express Warranty

1-110.  Plaintiff repeats, realleges, and incorporates herein all Allegations Common to All Counts.

199.     At all times relevant to this litigation, Defendant Monsanto engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting its Roundup products, which are defective

and unreasonably dangerous to consumers including Plaintiff, Bart Robinette, thereby placing Roundup products into the stream of commerce. These actions were under the ultimate control and supervision of Defendant Monsanto.

200.     At all times relevant to this litigation, Defendant intended that Roundup be used in the manner Plaintiff Bart Robinette used it, and Defendant expressly warranted that each Roundup product was safe and fit for use by consumers, that it was of merchantable quality, that its health and side effects were minimal, and that it was adequately tested and fit for this intended use.

201.     At all relevant times, Defendant was aware that consumers, including Plaintiff Bart Robinette, would use Roundup products, which is to say that Plaintiff Bart Robinette was a foreseeable user of the Defendant's Roundup products.

202.     At all times relevant to this litigation, Defendant Monsanto expressly represented and warranted to the purchasers of its Roundup products, by and through statements made by Defendants in labels, publications, package inserts, and other written materials intended for consumers and the general public, that its Roundup products were safe to human health and the environment, effective, fit, and proper for their intended use. Defendant Monsanto advertised, labeled, marketed, and promoted Roundup products, representing the quality to consumers and the public in such a way as to induce their purchase or use, thereby making an express warranty that its Roundup products would conform to the representations.

203.    These express representations include incomplete warnings and instructions that purport, but fail, to include the complete array of risks associated with the use of and/or exposure to Roundup and glyphosate. Defendant Monsanto knew and/or should have known that the risks expressly included in Roundup warnings and labels did not and do not accurately or adequately set forth the risks of developing the serious injuries complained of herein. Nevertheless, Defendant expressly represented that its Roundup products were safe and effective, that they were safe and effective for use by individuals such as Bart Robinette, and/or that they were safe and effective as agricultural herbicides.

204.    The representations about Roundup, as set forth herein, contained or constituted affirmations of fact or promises made by the seller to the buyer, which related to the goods and became part of the basis of the bargain creating an express warranty that the goods would conform to the representations.

205.    Defendant Monsanto placed its Roundup products into the stream of commerce for sale and recommended their use to consumers and the public without adequately warning of the true risks of developing the injuries associated with the use of and exposure to Roundup and its active ingredient glyphosate.

206.    Defendant breached these warranties because, among other things, its Roundup products were defective, dangerous, unfit for use, did not contain label representing the true and adequate nature of the risks associated with their use,

and were not merchantable or safe for their intended, ordinary, and foreseeable use and purpose. Specifically, Defendant breached the warranties in the following ways:

    a. Defendant represented through its labeling, advertising, and marketing materials that its Roundup products were safe, and fraudulently withheld and concealed information about the risks of serious injury associated with use of and/or exposure to Roundup and glyphosate by expressly limiting the risks associated with the use and/or exposure within its warnings and labels; and

    b. Defendant represented that its Roundup products were safe for use and fraudulently concealed information that demonstrated that glyphosate, the active ingredient in Roundup, had carcinogenic properties, and that its Roundup products, therefore, were not safer than alternatives available on the market.

207.    Defendant Monsanto had sole access to the material facts concerning the nature of the risks associated with its Roundup products as expressly stated within its warnings and labels, and Defendant knew that consumers and users such as Bart Robinette could not have reasonably discovered that the risks expressly included in Roundup warnings and labels were inadequate and inaccurate.

208.    Defendant's Roundup did not conform to these express representations because Roundup was not safe and had, at all relevant times, an increased risk of

serious side effects including but not limited to non-Hodgkin's Lymphoma small lymphocytic lymphoma/chronic lymphocytic leukemia, when used according to Defendant's directions.

209.     Plaintiff Bart Robinette purchased Roundup manufactured by Defendant.

210.     Defendant fraudulently concealed information from Plaintiff Bart Robinette regarding the true dangers and relative risks of Roundup.

211.     Bart Robinette had no knowledge of the falsity or incompleteness of Defendant's statements and representations concerning Roundup.

212.     Plaintiff Bart Robinette did rely on the express warranties of the Defendant herein.

213.     Bart Robinette used and/or was exposed to the use of Roundup as researched, developed, designed, tested, formulated, manufactured, inspected, labeled, distributed, packaged, marketed, promoted, sold, or otherwise released into the stream of commerce by Defendant.

214.     Had the warning labels for Roundup products accurately and adequately set forth the true risks associated with the use of such products, including Bart Robinette's injuries, rather than expressly excluding such information and warranting that the products were safe for their intended use, Bart Robinette could have avoided the injuries complained of herein.

215.     Defendant herein breached the aforesaid express warranties, as its product Roundup is defective.

216.     Defendant knew or should have known that, in fact, said warranties were

false, misleading, and untrue in that there is evidence that Roundup is toxic, genotoxic, and carcinogenic, and that scientists and/or regulatory authorities around the world are not in agreement that Roundup is not carcinogenic or genotoxic and that it is safe.

217.     As a direct and proximate result of Defendant's wrongful acts and omissions, Bart Robinette suffered severe injuries. Bart Robinette endured pain and suffering and suffered economic losses (including significant expenses for medical care and treatment).

WHEREFORE, Plaintiff, Bart Robinette, demands judgment against Defendant Monsanto Company in an amount in excess of $75,000.

## COUNT VII

### Breach of Implied Warranty

1-110.  Plaintiff repeats, realleges, and incorporates herein all Allegations Common to All Counts.

218.     At all times relevant to this litigation, Defendant Monsanto engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting its Roundup products, which are defective and unreasonably dangerous to consumers including Bart Robinette, thereby placing Roundup products into the stream of commerce. These actions were under the ultimate control and supervision of Defendant Monsanto.

219.     Before the time that Bart Robinette was exposed to the use of the aforementioned Roundup products, Defendant Monsanto impliedly warranted to its consumers and users, including Bart Robinette, that its Roundup products

were of merchantable quality and safe and fit for the use for which they were intended; specifically, as horticultural herbicides.

220.     At the time Defendant marketed, sold, and distributed Roundup for use by Plaintiff, Defendant knew of Roundup's intended use and impliedly warranted the product to be of merchantable quality and safe and fit for this use.

221.     These representations and warranties were false, misleading, and inaccurate in that Roundup was unsafe, unreasonably dangerous, not of merchantable quality, and defective.

222.     Defendant, however, failed to disclose that Roundup has dangerous propensities when used as intended and that the use of and/or exposure to Roundup and glyphosate-containing products carries an increased risk of developing severe injuries, including Bart Robinette's injuries.

223.     Upon information and belief, Bart Robinette reasonably relied upon the skill, superior knowledge and judgment of Defendant and upon its implied warranties that the Roundup products were of merchantable quality and fit for their intended purpose or use.

224.     The Roundup products were expected to reach and did in fact reach consumers and users, including Bart Robinette, without substantial change in the condition in which they were manufactured and sold by Defendant.

225.     At all times relevant to this litigation, Defendant was aware that consumers and users of its products, including Bart Robinette, would use Roundup products as marketed by Defendant, which is to say that Bart

Robinette was the foreseeable user of Roundup.

226. Defendant intended that its Roundup products be used in the manner in which Bart Robinette in fact used them and Defendant impliedly warranted each product to be of merchantable quality, safe, and fit for this use, despite the fact that Roundup was not adequately tested or researched.

227. In reliance upon Defendant's implied warranty, Bart Robinette used Roundup as instructed and labeled and in the foreseeable manner intended, recommended, and promoted and marketed by Defendant.

228. Bart Robinette could not have reasonably discovered or known of the risks of serious injury associated with Roundup or glyphosate.

229. Defendant breached its implied warranty to Bart Robinette in that its Roundup products were not of merchantable quality, safe, or fit for their intended use, or adequately tested, Roundup has dangerous propensities when used as intended and can cause serious injuries, including the injuries complained of herein.

230. The harm caused by Defendant's Roundup products far outweighed their benefit, rendering the products more dangerous than an ordinary consumer or user would expect and more dangerous than alternative products.

231. As a direct and proximate result of Defendant's wrongful acts and omissions, Bart Robinette suffered from NHL and severe and permanent physical and emotional injuries, pain and suffering, and economic loss (including significant expenses for medical care and treatment).

WHEREFORE, Plaintiff, Bart Robinette, demands judgment against Defendant Monsanto Company in an amount in excess of $75,000.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, Bart Robinette, demands judgment against the Defendant on each of the above-referenced claims and causes of action and as follows:

1. Awarding compensatory damages in excess of the jurisdictional amount, including but not limited to pain, suffering, emotional distress, loss of enjoyment of life, and economic damages in an amount to be determined at trial of this action;

2. Awarding compensatory damages to Plaintiff for past and future damages, including but not limited to Plaintiff's pain and suffering and for severe and permanent personal injuries sustained by Plaintiff including health care costs and economic loss;

3. Awarding economic damages in the form of medical expenses, out-of-pocket expenses, lost earnings, and other economic damages in an amount to be determined at trial in this action;

4. Punitive damages for Defendant's knowingly placing an unreasonably dangerous product into the stream of commerce, knowing of its defective and dangerous condition and indifference to or conscious disregard for the safety of others;

5. Pre-judgment interest;

6. Post-judgment interest;

7. Awarding Plaintiff reasonable attorney's fees;

8. Awarding Plaintiff the costs of these proceedings; and

9.  Such other relief as this Court deems just and proper for Defendant's gross negligence and other counts included in this Complaint.


## PLAINTIFF REQUESTS A TRIAL BY JURY


RESPECTFULLY SUBMITTED,


Dailey Law Firm, P.C.

/s/ ___ Jason A. Ott _____
Jason A. Ott
Dailey Law Firm, P.C.
Attorneys for Plaintiff
30 N. LaSalle St, Suite 3200
Chicago, IL 60602
312-765-7191 (direct)
jason@daileylawyers.com


Jason A. Ott
Brian T. Dailey
Dailey Law Firm, P.C.
Attorneys for Plaintiff
30 N. LaSalle St, Suite 3200
Chicago, IL 60602
312-765-7191 (direct)
jason@daileylawyers.com
briandailey@daileylawyers.com
ARDC: 6300487
ARDC: 6199883


Dated: December 22, 2020