ACCO,(RAOx),DISCOVERY,MANADR

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA (Western Division - Los Angeles)
### CIVIL DOCKET FOR CASE #: 2:21-cv-01221-JVS-RAO

David Petrie et al v. Monsanto Company
Assigned to: Judge James V. Selna
Referred to: Magistrate Judge Rozella A. Oliver
Cause: 28:1332 Diversity-Product Liability

Date Filed: 02/10/2021
Jury Demand: Plaintiff
Nature of Suit: 365 Personal Inj. Prod.
Liability
Jurisdiction: Diversity

**Plaintiff**

**David Petrie**
*an individual*

represented by **Lee A Cirsch**
Brock and Gonzales LLP
6701 Center Drive West Suite 610
Los Angeles, CA 90045
310-294-9595
Fax: 310-961-3673
Email: lc@brockgonzales.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Sean T Cook**
Brock and Gonzales LLP
6701 Center Drive West Suite 610
Los Angeles, CA 90045
310-294-9595
Email: sc@brockgonzales.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Donald James Aaron Brock**
Brock and Gonzales LLP
6701 Center Drive West Suite 610
Los Angeles, CA 90045
310-294-9595
Fax: 310-961-3673
Email: ab@brockgonzales.com
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Felicia Petrie**
*an individual*

represented by **Lee A Cirsch**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Sean T Cook**
(See above for address)

*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Donald James Aaron Brock**
(See above for address)
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Monsanto Company**
*a Delaware Corporation*

**Defendant**

**DOES**
*1-50, inclusive*

| Date Filed | # | Docket Text |
|---|---|---|
| 02/10/2021 | 1 | COMPLAINT Receipt No: ACACDC-30489065 - Fee: $402, filed by Plaintiff David Petrie. (Attorney Donald James Aaron Brock added to party David Petrie(pty:pla))(Brock, Donald) (Entered: 02/10/2021) |
| 02/10/2021 | 2 | CIVIL COVER SHEET filed by Plaintiff David Petrie. (Brock, Donald) (Entered: 02/10/2021) |
| 02/10/2021 | 3 | Request for Clerk to Issue Summons on Complaint (Attorney Civil Case Opening) 1 filed by Plaintiff David Petrie. (Brock, Donald) (Entered: 02/10/2021) |
| 02/10/2021 | 4 | NOTICE of Interested Parties (Brock, Donald) (Entered: 02/10/2021) |
| 02/11/2021 | 5 | NOTICE OF ASSIGNMENT to District Judge James V. Selna and Magistrate Judge Rozella A. Oliver. (jtil) (Entered: 02/11/2021) |
| 02/11/2021 | 6 | NOTICE TO PARTIES OF COURT-DIRECTED ADR PROGRAM filed. (jtil) (Entered: 02/11/2021) |
| 02/11/2021 | 7 | 21 DAY Summons Issued re Complaint (Attorney Civil Case Opening) 1 as to Defendant Monsanto Company. (jtil) (Entered: 02/11/2021) |
| 02/12/2021 | 8 | INITIAL ORDER FOLLOWING FILING OF COMPLAINT ASSIGNED TO JUDGE SELNA. (kdu) (Entered: 02/12/2021) |

| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 02/18/2021 12:17:28 | | | |
| **PACER Login:** | hllp1982 | **Client Code:** | 1417.0049 |
| **Description:** | Docket Report | **Search Criteria:** | 2:21-cv-01221-JVS-RAO End date: 2/18/2021 |
| **Billable Pages:** | 2 | **Cost:** | 0.20 |

1

**BROCK & GONZALES, LLP**
6701 CENTER DRIVE WEST, SUITE 610
LOS ANGELES, CA 90045
Tel: (310) 294-9595
Fax: (310) 961-3673
D. AARON BROCK, STATE BAR NO. 241919
ab@brockgonzales.com
LEE A. CIRSCH, STATE BAR NO. 227668
lc@brockgonzales.com
SEAN T. COOK, STATE BAR NO. 318952
lb@brockgonzales.com

**Attorneys for Plaintiffs**
David Petrie & Felicia Petrie

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

DAVID PETRIE, an individual; and
FELICIA PETRIE, an individual,

        Plaintiffs,

    vs.

MONSANTO COMPANY, a
Delaware Corporation; and
DOES 1-50, inclusive,

        Defendants.

Case No.:    2:21-cv-1221

**PLAINTIFFS' COMPLAINT FOR DAMAGES FOR:**

1. **NEGLIGENCE;**

2. **STRICT PRODUCTS LIABIILTY (DESIGN DEFECT);**

3. **STRICT PRODUCTS LIABILITY (FAILURE TO WARN);**

4. **BREACH OF WARRANTIES;**

5. **BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY; and**

6. **LOSS OF CONSORTIUM.**

**DEMAND FOR JURY TRIAL**

1
**COMPLAINT FOR DAMAGES**

1    Plaintiffs DAVID PETRIE and FELICIA PETRIE brings this Complaint

2    damages against defendant MONSANTO COMPANY ("Monsanto"), demanding a

3    trial by jury, and alleges as follows:

### Nature of the Case

5    1. This case arises out of Monsanto's wrongful conduct in connection with

6    the design, development, manufacture, testing, packaging, promoting, marketing,

7    advertising, distribution, labeling, and sale of the herbicide Roundup, containing

8    the active ingredient glyphosate. Glyphosate has been found to be carcinogenic,

9    linked to causing various forms of cancer, and in particular non-Hodgkins

10   Lymphoma. As such, Roundup is dangerous to human health and unfit to be

11   marketed and sold in commerce, particularly without proper warnings and

12   directions as to the dangers associated with its use. Plaintiff DAVID PETRIE, who

13   used Roundup extensively, now suffers from non-Hodgkins Lymphoma, and

14   brings this action for the harm he has incurred.

### Jurisdiction and Venue

16   2. This Court has personal jurisdiction over Monsanto because Monsanto

17   transacts business in California and is a corporation doing business within

18   California. Monsanto knows that its Roundup products are and were sold

19   throughout California. In addition, Monsanto maintains sufficient contacts with the

20   State of California such that this Court's exercise of personal jurisdiction over it

21   does not offend traditional notions of fair play and substantial justice.

22   3. Monsanto advertises and sells goods, specifically Roundup, throughout

23   California. It derived substantial revenue from goods and products used in

24   California. It expected its acts to have consequences within California and derived

25   substantial revenue from interstate commerce. Specific to this case, Monsanto

26   engaged in the business of developing, manufacturing, testing, packaging,

27   marketing, distributing, labeling, and selling Roundup. Monsanto purposefully

28

2

**COMPLAINT FOR DAMAGES**

1   availed itself of the privilege of conducting activities within California, thus

2   invoking the benefits and protections of its laws.

3       4. This Court has subject matter jurisdiction over this action under 28 U.S.C.

4   § 1332 because there is complete diversity of citizenship between Plaintiffs and

5   Defendant. Monsanto is a citizen of Delaware (where it is incorporated) and

6   Missouri (where it has its principal place of business). Plaintiffs are citizens of

7   California, and the amount in controversy exceeds $75,000, exclusive of interest

8   and costs.

9       5. Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because

10  Plaintiff DAVID PETRIE was exposed to Roundup in this District.

11  **Parties**

12      6.  Plaintiffs are naturals persons and at all relevant times were

13  residents and citizens of California. Plaintiffs brings this action for personal

14  injuries sustained by exposure to Roundup, and its active ingredient glyphosate and

15  the surfactant POEA. As a direct and proximate result of being exposed to

16  Roundup, Plaintiff DAVID PETRIE developed non-Hodgkin's Lymphoma.

17      8. Monsanto is a Delaware corporation, California Secretary of State Entity

18  No. C2362863, in "active" status, with a principle place of business in St. Louis,

19  Missouri. The true names and capacities, whether individual, corporate, associate

20  or otherwise of DOES 1 through 50 are unknown to Plaintiff who therefore sues

21  these defendants under said fictitious names.  Plaintiff is informed and believes

22  that each of the defendants named as a Doe defendant is legally responsible in

23  some manner for the events referred to in this Complaint, is either negligently,

24  willfully, wantonly, recklessly, tortiously, strictly liable, statutorily liable or

25  otherwise, for the injuries and damages described below to this Plaintiff.  Plaintiff

26  will in the future seek leave of this court to show the true names and capacities of

27  these Doe defendants when it has been ascertained. Plaintiff is informed and

28

BROCK&
GONZALES
B&G

1  believes, and based thereon alleges, that each defendant acted in all respects

2  pertinent to this action as the agent of the other defendants, carried out a joint

3  scheme, business plan or policy in all respects pertinent hereto, and the acts of each

4  defendant are legally attributable to the other defendants.  Hereinafter in the

5  Complaint, unless otherwise specified, reference to a Defendant or Defendants

6  shall refer to all Defendants, and each of them.

7                                              **Factual Allegations**

8            9. At all relevant times, Monsanto designed, researched, manufactured,

9  tested, advertised, promoted, marketed, sold, and distributed the commercial

10  herbicide Roundup.

11          10. "Roundup" refers to all formulations of Monsanto's Roundup products,

12  including, but not limited to, Roundup Concentrate Poison Ivy and Tough Brush

13  Killer 1, Roundup Custom Herbicide, Roundup D-Pak herbicide, Roundup Dry

14  Concentrate, Roundup Export Herbicide, Roundup Fence & Hard Edger 1,

15  Roundup Garden Foam Weed & Grass Killer, Roundup Grass and Weed Killer,

16  Roundup Herbicide, Roundup Original 2k herbicide, Roundup Original II

17  Herbicide, Roundup Pro Concentrate, Roundup Prodry Herbicide, Roundup

18  Promax, Roundup Quik Stik Grass and Weed Killer, Roundup Quikpro Herbicide,

19  Roundup Rainfast Concentrate Weed & Grass Killer, Roundup Rainfast Super

20  Concentrate Weed & Grass Killer, Roundup Ready-to-Use Extended Control

21  Weed & Grass Killer 1 Plus Weed Preventer, Roundup Ready-to-Use

22  Weed & Grass Killer, Roundup Ready-to- Use Weed and Grass Killer 2, Roundup

23  Ultra Dry, Roundup Ultra Herbicide, Roundup Ultramax, Roundup VM Herbicide,

24  Roundup Weed & Grass Killer Concentrate, Roundup Weed & Grass Killer

25  Concentrate Plus, Roundup Weed & Grass killer Ready-to-Use Plus, Roundup

26  Weed & Grass Killer Super Concentrate, Roundup Weed & Grass Killer1 Ready-

27

28

                                        **COMPLAINT FOR DAMAGES**

to-Use, Roundup WSD Water Soluble Dry Herbicide Deploy Dry Herbicide, or any other formulation containing the active ingredient glyphosate.

11. Monsanto is a multinational agricultural biotechnology corporation based in St. Louis, Missouri. It is the world's leading producer of glyphosate.

12. Monsanto discovered the herbicidal properties of glyphosate during the 1970's and developed it as a broad-spectrum herbicide used to kill weeds and grasses known to compete with commercial crops grown around the globe.

13. Glyphosate is a "non-selective" herbicide, meaning it kills indiscriminately based only on whether a given organism produces a specific enzyme, 5-enolpyruvylshikimic acid-3-phosphate synthase, known as EPSP synthase.

14. Glyphosate inhibits the enzyme 5-enolpyruvylshikimic acid-3-phosphate synthase that interferes with the shikimic pathway in plants, resulting in the accumulation of shikimic acid in plant tissue and ultimately plant death.

15. Sprayed as a liquid, plants absorb glyphosate directly through their leaves, stems, and roots; and detectable quantities accumulate in the plant tissues.

16. Each year, approximately 250 million pounds of glyphosate are sprayed on crops, commercial nurseries, suburban lawns, parks, and golf courses. This increase in use has been driven largely by the proliferation of "Roundup Ready" crops, which have been genetically engineered to resist the activity of glyphosate.

17. Monsanto is responsible for the development, manufacture, marketing, sale, and distribution of Roundup Ready seeds. By 2009, Monsanto was the world's leading producer of Roundup Ready seeds. In 2010, roughly 70% of corn and cotton and 90% of soybean fields in the United States were grown with Roundup Ready seeds.

18. Roundup was introduced in 1974 and is today one of the world's most widely used herbicides. Monsanto's glyphosate products are registered in more

5

**COMPLAINT FOR DAMAGES**

1   than 130 countries and are approved for weed control in more than 100 crops. No

2   other herbicide active ingredient compares in terms of number of uses.

3       19. In all this time, farmers have used Roundup unaware it is a carcinogen.

4                   **Registration of Herbicides Under Federal Law**

5       20. The manufacture, formulation, and distribution of herbicides, such as

6   Roundup, are regulated under the Federal Insecticide, Fungicide, and Rodenticide

7   Act ("FIFRA"), 7 U.S.C. § 136 et seq. FIFRA requires that all pesticides be

8   registered with the Environmental Protection Agency ("EPA") prior to their

9   distribution, sale, or use, except as described by FIFRA 7 U.S.C. § 136a(a).

10      21. The EPA requires a variety of tests as part of the registration process to

11  evaluate the potential for exposure to pesticides, toxicity to people and other

12  potential non-target organisms, and other adverse effects on the environment.

13  Registration by the EPA, however, is not an assurance or finding of safety. The

14  determination the EPA makes in registering or re-registering a product is not that

15  the product is "safe," but rather that use of the product in accordance with its label

16  directions "will not generally cause unreasonable adverse effects on the

17  environment." 7 U.S.C. § 136(a)(c)(5)(D).

18      22. FIFRA defines "unreasonable adverse effects on the environment" to

19  mean "any unreasonable risk to man or the environment, taking into account the

20  economic, social, and environmental costs and benefits of the use of any

21  pesticide." 7 U.S.C. § 136(bb). FIFRA thus requires the EPA to make a risk/benefit

22  analysis in determining whether a registration should be granted or allowed to

23  continue to be sold in commerce.

24      23. The EPA and the State of California registered Roundup for distribution,

25  sale, and manufacture in the United States and the State of California.

26

27

28

1    24. FIFRA generally requires that the registrant, here Monsanto, conduct
2  health and safety testing of pesticide products. The government is not required, nor
3  is it able, to perform the product tests that are required of the manufacturer.

4    25. Each pesticide product distributed, sold, or manufactured is evaluated at
5  the time the product is initially registered. The data necessary for registration of a
6  pesticide has changed over time. The EPA is now in the process of re-evaluating
7  all pesticides through a Congressionally-mandated process called "re-registration."
8  7 U.S.C. § 136a-1. To reevaluate these pesticides, the EPA demands the
9  completion of additional tests and the submission of data for the EPA's review and
10  evaluation.

11    26. The EPA had planned to release its preliminary risk assessment of
12  glyphosate and Roundup – in relation to the registration process – no later than
13  July 2015. The EPA completed its review of glyphosate in early 2015 but delayed
14  releasing the assessment pending further review in light of the World Health
15  Organization's findings.

16        **Monsanto's False Representations Regarding the Safety of Roundup**

17    27. In 1996, the New York Attorney General ("NYAG") filed a lawsuit
18  against Monsanto based on its false and misleading advertising of Roundup
19  products. Specifically, the lawsuit challenged Monsanto's general representations
20  that its spray-on glyphosate-based herbicides, including Roundup, were "safer than
21  table salt" and "practically non-toxic" to mammals, birds, and fish. Among the
22  representations the NYAG found deceptive and misleading about the human and
23  environmental safety of Roundup are the following:

24      a.  Remember that environmentally friendly Roundup herbicide is
25           biodegradable. It won't build up in the soil so you can use Roundup with
26           confidence along customers' driveways, sidewalks and fences.

27

28

**COMPLAINT FOR DAMAGES**

b. And remember that Roundup is biodegradable and won't build up in the soil. That will give you the environmental confidence you need to use Roundup everywhere you've got a weed, brush, edging or trimming Problem.

c. Roundup biodegrades into naturally occurring elements.

d. Remember that versatile Roundup herbicide stays where you put it. That means there's no washing or leaching to harm customers' shrubs or other desirable vegetation.

e. This non-residual herbicide will not wash or leach in the soil. It ... stays where you apply it.

f.  You can apply Accord with "confidence because it will stay where you put it" it bonds tightly to soil particles, preventing leaching. Then, soon after application, soil microorganisms biodegrade Accord into natural products.

g. Glyphosate is less toxic to rats than table salt following acute oral ingestion.

h. Glyphosate's safety margin is much greater than required. It has over a 1,000-fold safety margin in food and over a 700-fold safety margin for workers who manufacture it or use it.

i.  You can feel good about using herbicides by Monsanto. They carry a toxicity category rating of 'practically non-toxic' as it pertains to mammals, birds and fish.

j.  "Roundup can be used where kids and pets will play and breaks down into natural material." This ad depicts a person with his head in the ground and a pet dog standing in an area which has been treated with Roundup.

1      28. On November 19, 1996, Monsanto entered into an Assurance of

2  Discontinuance with the NYAG, in which Monsanto agreed, among other things,

3  "to cease and desist from publishing or broadcasting any advertisements [in New

4  York] that represent, directly or by implication" that:

5         a.  its glyphosate-containing pesticide products or any component thereof

6            are safe, non-toxic, harmless or free from risk;

7            ***

8         b.  its glyphosate-containing pesticide products or any component thereof

9            manufactured, formulated, distributed or sold by Monsanto are

10           biodegradable;

11           ***

12         c.  its glyphosate-containing pesticide products or any component thereof

13            stay where they are applied under all circumstances and will not move

14            through the environment by any means;

15           ***

16         d.  its glyphosate-containing pesticide products or any component thereof

17            are "good" for the environment or are "known for their environmental

18            characteristics;"

19           ***

20         e.  glyphosate-containing pesticide products or any component thereof are

21            safer or less toxic than common consumer products other than herbicides;

22            and

23          f.  its glyphosate-containing products or any component thereof might be

24            classified as "practically non-toxic."

25      29. Monsanto did not alter its advertising in the same manner in any state

26  other than New York, and on information and belief still has not done so today.

27

28

9

**COMPLAINT FOR DAMAGES**

BROCK&
GONZALES
B&G

1    30. In 2009, France's highest court ruled that Monsanto had not told the

2    truth about the safety of Roundup and affirmed an earlier judgment that Monsanto

3    had falsely advertised its herbicide Roundup as "biodegradable" and that it "left

4    the soil clean."

5                    **Evidence of Carcinogenicity in Roundup**

6    31. As early as the 1980's Monsanto was aware of glyphosate's carcinogenic

7    properties.

8    32. On March 4, 1985, a group of the EPA's Toxicology Branch published a

9    memorandum classifying glyphosate as a Category C oncogene. Category C

10   oncogenes are possible human carcinogens with limited evidence of

11   carcinogenicity.

12   33. In 1986, the EPA issued a Registration Standard for glyphosate (NTIS

13   PB87-103214). The Registration standard required additional phytotoxicity,

14   environmental fate, toxicology, product chemistry, and residue chemistry studies.

15   All of the data required was submitted and reviewed and/or waived.

16   34. In October 1991, the EPA published a Memorandum entitled "Second

17   Peer Review of Glyphosate." The memorandum changed glyphosate's

18   classification to Group E (evidence of non-carcinogenicity for humans). Two peer

19   review committee members did not concur with the conclusions of the committee

20   and one member refused to sign.

21   35. In addition to the toxicity of the active molecule, many studies support

22   the hypothesis that glyphosate formulations found in Monsanto's Roundup

23   products are more dangerous and toxic than glyphosate alone. As early as 1991,

24   evidence existed demonstrating that glyphosate formulations were significantly

25   more toxic than glyphosate alone.

26   36. In 2002, Julie Marc published a study entitled "Pesticide Roundup

27   Provokes Cell Division Dysfunction at the Level of CDK1/Cyclin B Activation."

28
                                            10
                            **COMPLAINT FOR DAMAGES**

BROCK&
GONZALES
B&G

1   The study found that Monsanto's Roundup caused delays in the cell cycles of sea
2   urchins, while the same concentrations of glyphosate alone proved ineffective and
3   did not alter cell cycles.

4        37. In 2004, Julie Marc published a study entitled "Glyphosate-based
5   pesticides affect cell cycle regulation." The study demonstrated a molecular link
6   between glyphosate- based products and cell cycle dysregulation.

7   38. The study noted that "cell-cycle dysregulation is a hallmark of tumor cells and
8   human cancer. Failure in the cell-cycle checkpoints leads to genomic instability
9   and subsequent development of cancers from the initial affected cell." Further,
10  "[s]ince cell cycle disorders such as cancer result from dysfunction of unique cell,
11  it was of interest to evaluate the threshold dose of glyphosate affecting cells."

12        39. In 2005, Francisco Peixoto published a study showing that Roundup's
13  effects on rat liver mitochondria are much more toxic and harmful than the same
14  concentrations of glyphosate alone.

15        40. The Peixoto study suggested that the harmful effects of Roundup on
16  mitochondrial bioenergetics could not be exclusively attributed to glyphosate and
17  could be the result of other chemicals, namely the surfactant POEA, or
18  alternatively due to the possible synergy between glyphosate and Roundup
19  formulation products.

20        41. In 2009, Nora Benachour and Gilles-Eric Seralini published a study of
21  the effects of Roundup and glyphosate on human umbilical, embryonic, and
22  placental cells.

23        42. The study used dilution levels of Roundup and glyphosate far below
24  agricultural recommendations, corresponding with low levels of residues in food.
25  The study concluded that supposed "inert" ingredients, and possibly POEA,
26  change human cell permeability and amplify toxicity of glyphosate alone. The
27  study further suggested that determinations of glyphosate toxicity should take into

28

11

**COMPLAINT FOR DAMAGES**

BROCK&
GONZALES
B&G

1   account the presence of adjuvants, or those chemicals used in the formulation of

2   the complete pesticide. The study confirmed that the adjuvants in Roundup are not

3   inert and that Roundup is always more toxic than its active ingredient glyphosate.

4       43. The results of these studies were confirmed in peer-reviewed studies that

5   were known to Monsanto.

6       44. Monsanto knew or should have known that Roundup is more toxic than

7   glyphosate alone and that safety studies on Roundup, Roundup's adjuvants and

8   "inert" ingredients, and/or the surfactant POEA were necessary to protect Plaintiff

9   from Roundup.

10      45. Monsanto knew or should have known that tests limited to Roundup's

11  active ingredient glyphosate were insufficient to prove the safety of Roundup.

12      46. Monsanto failed to appropriately and adequately test Roundup,

13  Roundup's adjuvants and "inert" ingredients, and/or the surfactant POEA to

14  protect Plaintiff from Roundup.

15  47. Rather than performing appropriate tests, Monsanto relied on flawed industry

16  supported studies designed to protect Monsanto's economic interests rather than

17  Plaintiff and the consuming public.

18  48. Despite its knowledge that Roundup was considerably more dangerous than

19  glyphosate alone, Monsanto continued to promote Roundup as safe.

20                      **IARC Classification of Glyphosate**

21      49. The International Agency for Research on Cancer ("IARC") is the

22  specialized intergovernmental agency that the World Health Organization

23  ("WHO") of the United Nations tasked with conducting and coordinating research

24  into the causes of cancer.

25      50. An IARC Advisory Group to Recommend Priorities for IARC

26  Monographs during 2015–2019 met in April 2014. Though nominations for the

27  review were solicited, a substance must meet two criteria to be eligible for review

28

**COMPLAINT FOR DAMAGES**

1    by the IARC Monographs: there must already be some evidence of carcinogenicity

2    of the substance, and there must be evidence that humans are exposed to the

3    substance.

4        51. IARC set glyphosate for review in 2015-2016. IARC uses five criteria

5    for determining priority in reviewing chemicals. The substance must have a

6    potential for direct impact on public health; scientific literature to support

7    suspicion of carcinogenicity; evidence of significant human exposure; high public

8    interest and/or potential to bring clarity to a controversial area and/or reduce public

9    anxiety or concern; and related agents similar to one given high priority by the

10   above considerations. Data reviewed is sourced preferably from publicly

11   accessible, peer-reviewed data.

12       52. On March 24, 2015, after its cumulative review of human, animal, and

13   DNA studies for more than one (1) year, many of which have been in Monsanto's

14   possession since as early as 1985, the IARC's working group published its

15   conclusion that the glyphosate contained in Monsanto's Roundup herbicide, is a

16   Class 2A "probable carcinogen" as demonstrated by the mechanistic evidence of

17   carcinogenicity in humans and sufficient evidence of carcinogenicity in animals.

18       53. The IARC's full Monograph was published on July 29, 2015, and

19   established glyphosate as a class 2A probable carcinogen to humans. According to

20   the authors, glyphosate demonstrated sufficient mechanistic evidence (genotoxicity

21   and oxidative stress) to warrant a 2A classification based on evidence of

22   carcinogenicity in humans and animals.

23       54. The IARC Working Group found an increased risk between exposure to

24   glyphosate and non-Hodgkin's Lymphoma ("NHL") and several subtypes of NHL,

25   and the increased risk continued after adjustment for other pesticides.

26       55. The IARC also found that glyphosate caused DNA and chromosomal

27   damage in human cells.

28

BROCK & GONZALES

13

**COMPLAINT FOR DAMAGES**

**Earlier Evidence of Glyphosate's Danger**

56. Despite the new classification by the IARC, Monsanto has had ample evidence of glyphosate and Roundup's genotoxic properties for decades.

57. Genotoxicity refers to chemical agents capable of damaging the DNA within a cell through genetic mutations, which is a process that is believed to lead to cancer.

58. In 1997, Chris Clements published "Genotoxicity of select herbicides in Rana catesbeiana tadpoles using the alkaline single-cell gel DNA electrophoresis (comet) assay."

59. The study found that tadpoles exposed to Roundup showed significant DNA damage when compared with unexposed control animals.

60. Both human and animal studies have shown that glyphosate and glyphosate-base formulations such as Roundup can induce oxidative stress.

61. Oxidative stress and associated chronic inflammation are believed to be involved in carcinogenesis.

62. The IARC Monograph notes that "[s]trong evidence exists that glyphosate, AMPA and glyphosate-based formulations can induce oxidative stress."

63. In 2006, César Paz-y-Miño published a study examining DNA damage in human subjects exposed to glyphosate.

64. The study produced evidence of chromosomal damage in blood cells showing significantly greater damage after exposure to glyphosate than before in the same individuals, suggesting that the glyphosate formulation used during aerial spraying had a genotoxic effect on exposed individuals.

65. The IARC Monograph reflects the volume of evidence of glyphosate pesticides' genotoxicity noting "[t]he evidence for genotoxicity caused by glyphosate-based formulations is strong."

14

**COMPLAINT FOR DAMAGES**

1    66. Despite knowledge to the contrary, Monsanto denies that Roundup is

2    genotoxic.

3    67. In addition to glyphosate and Roundup's genotoxic properties, Monsanto

4    has long been aware of glyphosate's carcinogenic properties.

5    68. Glyphosate and Roundup in particular have long been associated with

6    carcinogenicity and the development of numerous forms of cancer, including, but

7    not limited to, NHL, Hodgkin's Lymphoma, Multiple Myeloma, and soft tissue

8    sarcoma.

9    69. Monsanto has known of this association since the mid-1980s and

10   numerous human and animal studies evidence the carcinogenicity of glyphosate

11   and/or Roundup.

12   70. In 1985, the EPA studied the effects of glyphosate in mice finding a dose

13   related response in male mice linked to renal tubal adenomas, a rare tumor. The

14   study concluded the glyphosate was oncogenic.

15   71. In 2003, Lennart Hardell and Mikael Eriksson published the results of

16   two case controlled studies on pesticides as a risk factor for NHL and hairy cell

17   leukemia.

18   72. The study concluded that glyphosate had the most significant

19   relationship to NHL among all herbicide studies with an increased odds ratio of

20   3.11.

21   73. In 2003, AJ De Roos published a study examining the pooled data of

22   mid-western farmers, examining pesticides and herbicides as risk factors for NHL.

23   74. The study, which controlled for potential confounders, found a

24   relationship between increased NHL incidence and glyphosate.

25   75. In 2008, Mikael Eriksson published a population based case-control

26   study of exposure to various pesticides as a risk factor for NHL.

27   76. This strengthened previous associations between glyphosate and NHL.

28

15

**COMPLAINT FOR DAMAGES**

77. In spite of this knowledge, Monsanto continued to issue broad and sweeping statements suggesting that Roundup was, and is, safer than ordinary household items such as table salt, despite a lack of scientific support for the accuracy and validity of these statements and, in fact, voluminous evidence to the contrary. 78. On information and belief, these statements and representations have been made with the intent of inducing Plaintiff, the agricultural community, and the public at large to purchase, and increase the use of, Roundup for Monsanto's pecuniary gain, and in fact did induce Plaintiff to use Roundup.

79. Monsanto made these statements with complete disregard and reckless indifference to the safety of Plaintiff and the general public.

80. Notwithstanding Monsanto's representations, scientific evidence has established a clear association between glyphosate and genotoxicity, inflammation, and an increased risk of many cancers, including, but not limited to, NHL, Multiple Myeloma, and soft tissue sarcoma.

81. Monsanto knew or should have known that glyphosate is associated with an increased risk of developing cancer, including, but not limited to, NHL, Multiple Myeloma, and soft tissue sarcomas.

82. Monsanto failed to appropriately and adequately inform and warn Plaintiff of the serious and dangerous risks associated with the use of and exposure to glyphosate and/or Roundup, including, but not limited to, the risk of developing NHL, as well as other severe and personal injuries, which are permanent and/or long-lasting in nature, cause significant physical pain and mental anguish, diminished enjoyment of life, and the need for medical treatment, monitoring, and/or medications.

83. Despite the IARC's classification of glyphosate as a class 2A probable carcinogen, Monsanto continues to maintain that glyphosate and/or Roundup is safe, noncarcinogenic, non-genotoxic, and falsely warrant to users and the general

16

**COMPLAINT FOR DAMAGES**

1    public that independent experts and regulatory agencies agree that there is no

2    evidence of carcinogenicity or genotoxicity in glyphosate and Roundup.

3        84. Monsanto has claimed and continues to claim that Roundup is safe,

4    noncarcinogenic, and non-genotoxic.

5        85. Monsanto claims on its website that "[r]egulatory authorities and

6    independent experts around the world have reviewed numerous long-

7    term/carcinogenicity and genotoxicity studies and agree that there is no evidence

8    that glyphosate, the active ingredient in Roundup brand herbicides and other

9    glyphosate-based herbicides, causes cancer, even at very high doses, and that it is

10   not genotoxic."11

11       86. Ironically, the primary source for this statement is a 1986 report by the

12   WHO, the same organization that now considers glyphosate to be a probable

13   carcinogen.

14       87. Glyphosate, and Monsanto's Roundup products in particular, have long

15   been associated with serious side effects and many regulatory agencies around the

16   globe have banned or are currently banning the use of glyphosate herbicide

17   products.

18       88. Monsanto's statements proclaiming the safety of Roundup and

19   disregarding its dangers misled Plaintiff.

20       89. Despite Monsanto's knowledge that Roundup was associated with an

21   elevated risk of developing cancer, Monsanto's promotional campaigns focused on

22   Roundup's purported "safety profile."

23       90. Monsanto's failure to adequately warn Plaintiff resulted in (1) Plaintiff

24   using and being exposed to glyphosate instead of using another acceptable and safe

25   method of controlling unwanted weeds and pests; and (2) scientists and physicians

26   failing to warn and instruct consumers about the risk of cancer, including NHL,

27   and other injuries associated with Roundup.

28

17

**COMPLAINT FOR DAMAGES**

1    91. Monsanto failed to seek modification of the labeling of Roundup to

2 include relevant information regarding the risks and dangers associated with

3 Roundup exposure.

4    92. Monsanto's failure to appropriately warn and inform the EPA has

5 resulted in inadequate warnings in safety information presented directly to users

6 and consumers.

7    93. Monsanto's failure to appropriately warn and inform the EPA has

8 resulted in the absence of warning or caution statements that are adequate to

9 protect health and the environment.

10    94. Monsanto's failure to appropriately warn and inform the EPA has

11 resulted in the directions for use that are not adequate to protect health and the

12 environment.

13    95. By reason of the foregoing acts and omissions, Plaintiff seeks

14 compensatory damages as a result of Plaintiff's use of, and exposure to, Roundup,

15 which caused or was a substantial contributing factor in causing Plaintiff to suffer

16 from cancer, specifically NHL, and Plaintiff suffered severe and personal injuries

17 that are permanent and lasting in nature, physical pain and mental anguish,

18 including diminished enjoyment of life.

19    96. By reason of the foregoing, Plaintiff is severely and permanently injured.

20    97. By reason of the foregoing acts and omissions, Plaintiff has endured and

21 continues to suffer, emotional and mental anguish, medical expenses, and other

22 economic and non-economic damages, as a result of Monsanto's actions and

23 inactions.

24    **Plaintiff DAVID PETRIE;s Exposure to Roundup**

25    98. Plaintiff DAVID PETRIE is a Diamond Bar, California who regularly

26 used Roundup for approximately years to landscape individual residences.

27

28

1    99. Plaintiff DAVID PETRIE followed all safety and precautionary
2  warnings during the course of use.

3    100. Plaintiff DAVID PETRIE was subsequently diagnosed in
4  approximately June 2019 with non-Hodgkin's Lymphoma.

5    101. As a result of Plaintiff DAVID PETRIE's injuries, Plaintiff DAVID
6  PETRIE has incurred significant economic and non-economic damages.

7    102. During the entire time that Plaintiff DAVID PETRIE was exposed to
8  Roundup, he did not know that exposure to Roundup was injurious to his health or
9  the health of others.

10    103. Plaintiff DAVID PETRIE first learned that exposure to Roundup after
11  his diagnosis.

**Tolling of Applicable Statute of Limitations**

**Discovery Rule Tolling**

14    104. Plaintiffs had no way of knowing about the risk of serious illness
15  associated with the use of and/or exposure to Roundup.

16    105. Within the time period of any applicable statutes of limitations,
17  Plaintiffs could not have discovered, through the exercise of reasonable diligence,
18  that exposure to Roundup and glyphosate is injurious to human health.

19    106. Plaintiffs did not discover, and did not know the facts that would cause
20  a reasonable person to suspect, the risks associated with the use of and/or exposure
21  to Roundup and glyphosate; nor would a reasonable and diligent investigation by
22  them have disclosed that Roundup and glyphosate would cause his cancer.

23    107. For these reasons, all applicable statutes of limitations have been tolled
24  by operation of the discovery rule with respect to Plaintiffs' claims.

25  ///
26  ///
27  ///
28

19

**COMPLAINT FOR DAMAGES**

**Fraudulent Concealment Tolling**

108. All applicable statutes of limitations have also been tolled by Monsanto's knowing and active fraudulent concealment and denial of the facts alleged herein throughout the time period relevant to this action.

109. Instead of disclosing critical safety information about Roundup and glyphosate, Monsanto has consistently and falsely represented the safety of its Roundup products.

**Estoppel**

110. Monsanto was under a continuous duty to disclose to consumers, users, and other persons coming into contact with its products, including Plaintiffs, accurate safety information concerning its products and the risks associated with the use of and/or exposure to Roundup and glyphosate.

111. Instead, Monsanto knowingly, affirmatively, and actively concealed safety information concerning Roundup and glyphosate and the serious risks associated with the use of and/or exposure to its products.

112. Based on the foregoing, Monsanto is estopped from relying on any statutes of limitations in defense of this action.

## FIRST CAUSE OF ACTION

### Negligence

**By Plaintiff DAVID PETRIE Against ALL Defendants**

113. Plaintiff re-alleges each paragraph above as if fully set forth herein.

114. Monsanto had a duty to exercise reasonable care in the designing, researching, testing, manufacturing, marketing, supplying, promoting, packaging, sale, and/or distribution of Roundup into the stream of commerce, including a duty to assure that the product would not cause users to suffer unreasonable, dangerous side effects.

**COMPLAINT FOR DAMAGES**

115. Monsanto failed to exercise ordinary care in the designing, researching, testing, manufacturing, marketing, supplying, promoting, packaging, sale, testing, quality assurance, quality control, and/or distribution of Roundup into interstate commerce in that Monsanto knew or should have known that using Roundup created a high risk of unreasonable, dangerous side effects, including, but not limited to, the development of NHL, as well as other severe and personal injuries that are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life, as well as need for lifelong medical treatment, monitoring, and/or medications.

116. The negligence by Monsanto, its agents, servants, and/or employees, included but was not limited to the following acts and/or omissions:

    a.  Manufacturing, producing, promoting, formulating, creating, and/or designing Roundup without thoroughly testing it;

    b.  Failing to test Roundup and/or failing to adequately, sufficiently, and properly test Roundup;

    c.  Not conducting sufficient testing programs to determine whether or not Roundup was safe for use; in that Monsanto knew or should have known that Roundup was unsafe and unfit for use by reason of the dangers to its users;

    d.  Not conducting sufficient testing programs and studies to determine Roundup's carcinogenic properties even after Monsanto had knowledge that Roundup is, was, or could be carcinogenic;

    e.  Failing to conduct sufficient testing programs to determine the safety of "inert" ingredients and/or adjuvants contained within Roundup, and the propensity of these ingredients to render Roundup toxic, increase the toxicity of Roundup, whether these ingredients are carcinogenic, magnify the carcinogenic properties

21

**COMPLAINT FOR DAMAGES**

BROCK &
GONZALES
B&G

of Roundup, and whether or not "inert" ingredients and/or adjuvants were safe for use;

f. Negligently failing to adequately and correctly warn Plaintiff, the public, the medical and agricultural professions, and the EPA of the dangers of Roundup;

g. Negligently failing to petition the EPA to strengthen the warnings associated with Roundup;

h. Failing to provide adequate cautions and warnings to protect the health of users, handlers, applicators, and persons who would reasonably and foreseeably come into contact with Roundup;

i. Negligently marketing, advertising, and recommending the use of Roundup without sufficient knowledge as to its dangerous propensities;

j. Negligently representing that Roundup was safe for use for its intended purpose, and/or that Roundup was safer than ordinary and common items such as table salt, when, in fact, it was unsafe;

k. Negligently representing that Roundup had equivalent safety and efficacy as other forms of herbicides;

l. Negligently designing Roundup in a manner that was dangerous to its users;

m. Negligently manufacturing Roundup in a manner that was dangerous to its users;

n. Negligently producing Roundup in a manner that was dangerous to its users;

o. Negligently formulating Roundup in a manner that was dangerous to its users;

**COMPLAINT FOR DAMAGES**

    p. Concealing information from Plaintiff while knowing that Roundup was unsafe, dangerous, and/or non-conforming with EPA regulations;

    q. Improperly concealing and/or misrepresenting information from Plaintiff, scientific and medical professionals, and/or the EPA, concerning the severity of risks and dangers of Roundup compared to other forms of herbicides; and

    r. Negligently selling Roundup with a false and misleading label.

117. Monsanto under-reported, underestimated, and downplayed the serious dangers of Roundup.

118. Monsanto negligently and deceptively compared the safety risks and/or dangers of Roundup with common everyday foods such as table salt, and other forms of herbicides.

119. Monsanto was negligent and/or violated California law in the designing, researching, supplying, manufacturing, promoting, packaging, distributing, testing, advertising, warning, marketing, and selling of Roundup in that it:

    a. Failed to use ordinary care in designing and manufacturing Roundup so as to avoid the aforementioned risks to individuals when Roundup was used as an herbicide;

    b. Failed to accompany its product with proper and/or accurate warnings regarding all possible adverse side effects associated with the use of Roundup;

    c. Failed to accompany its product with proper warnings regarding all possible adverse side effects concerning the failure and/or malfunction of Roundup;

**COMPLAINT FOR DAMAGES**

   d.  Failed to accompany its product with accurate warnings regarding the
       risks of all possible adverse side effects concerning Roundup;

   e.  Failed to warn Plaintiff of the severity and duration of such adverse
       effects, as the warnings given did not accurately reflect the symptoms,
       or severity of the side effects including, but not limited to, the
       development of NHL;

   f.  Failed to conduct adequate testing, clinical testing and post-marketing
       surveillance to determine the safety of Roundup;

   g.  Failed to conduct adequate testing, clinical testing, and post-marketing
       surveillance to determine the safety of Roundup's "inert" ingredients
       and/or adjuvants;

   h.  Negligently misrepresented the evidence of Roundup's genotoxicity
       and carcinogenicity; and

   i.  Was otherwise careless and/or negligent.

120. Despite the fact that Monsanto knew or should have known that
Roundup caused, or could cause, unreasonably dangerous side effects, Monsanto
continues to market, manufacture, distribute, and/or sell Roundup to consumers,
including Plaintiff.

121. Monsanto knew or should have known that consumers such as Plaintiff
would foreseeably suffer injury as a result of Monsanto's failure to exercise
ordinary care.

122. Monsanto's violations of law and/or negligence were the proximate
cause of Plaintiff's injuries, harm and economic loss, which Plaintiff suffered and
will continue to suffer.

123. As a result of the foregoing acts and omissions, Plaintiff suffered life-
threatening NHL, and severe personal injuries, which are permanent and lasting in

**COMPLAINT FOR DAMAGES**

1   nature, physical pain and mental anguish, including diminished enjoyment of life,

2   as well as financial expenses for hospitalization and medical care.

3   WHEREFORE, Plaintiff respectfully requests that this Court enter judgment

4   in Plaintiff's favor for compensatory and punitive damages, together with interest,

5   costs herein incurred, attorneys' fees and all relief as this Court deems just and

6   proper.

7   ## SECOND CAUSE OF ACTION

8   **Strict Products Liability (Design Defect)**

9   **By Plaintiff DAVID PETRIE Against ALL Defendants**

10   124. Plaintiff re-alleges each paragraph above as if fully set forth herein.

11   125. At all times herein mentioned, Monsanto designed, researched,

12   manufactured, tested, advertised, promoted, sold, and distributed Roundup as

13   hereinabove described that was used by Plaintiff.

14   126. Roundup was expected to and did reach the usual consumers, handlers,

15   and persons coming into contact with it without substantial change in the condition

16   in which it was produced, manufactured, sold, distributed, and marketed by

17   Monsanto.

18   127. At those times, Roundup was in an unsafe, defective, and inherently

19   dangerous condition, which was dangerous to users, and in particular, Plaintiff

20   herein.

21   128. The Roundup designed, researched, manufactured, tested, advertised,

22   promoted, marketed, sold, and distributed by Monsanto was defective in design or

23   formulation in that, when it left the hands of the manufacturer and/or suppliers, the

24   foreseeable risks exceeded the benefits associated with the design or formulation of

25   Roundup.

26   129. The Roundup designed, researched, manufactured, tested, advertised,

27

28

25

**COMPLAINT FOR DAMAGES**

1   promoted, marketed, sold, and distributed by Monsanto was defective in design

2   and/or formulation, in that, when it left the hands of Monsanto or its manufacturers

3   and/or suppliers, it was unreasonably dangerous, unreasonably dangerous in

4   normal use, and it was more dangerous than an ordinary consumer would expect.

5   130. At all times herein mentioned, Roundup was in a defective condition and

6   unsafe, and Monsanto knew or had reason to know that it was defective and

7   unsafe, especially when used in the form and manner as provided by Monsanto. In

8   particular, Roundup was defective in the following ways:

9       a. When placed in the stream of commerce, Monsanto's Roundup
10          products were defective in design and formulation and, consequently,
11          dangerous to an extent beyond that which an ordinary consumer
12          would anticipate.
13      b. When placed in the stream of commerce, Monsanto's Roundup
14          products were unreasonably dangerous in that they were hazardous
15          and posed a grave risk of cancer and other serious illnesses when used
16          in a reasonably anticipated manner.
17      c. When placed in the stream of commerce, Monsanto's Roundup
18          products contained unreasonably dangerous design defects and were
19          not reasonably safe when used in a reasonably anticipated manner.
20      d. Monsanto did not sufficiently test, investigate, or study its Roundup
21          products.
22      e. Exposure to Roundup presents a risk of harmful side effects that
23          outweigh any potential utility stemming from the use of the herbicide.
24      f. Monsanto new or should have known at the time of marketing its
25          Roundup products that exposure to Roundup could result in cancer
26          and other severe illnesses and injuries.

27
28

26
**COMPLAINT FOR DAMAGES**

g.  Monsanto did not conduct adequate post-marketing surveillance of its Roundup products.

131. Monsanto knew, or should have known that at all times herein mentioned its Roundup was in a defective condition and was and is inherently dangerous and unsafe.

132. Plaintiff was exposed to Monsanto's Roundup without knowledge of Roundup's dangerous characteristics.

133. At the time of Plaintiff's use of and exposure to Roundup, Roundup was being used for the purposes and in a manner normally intended, as a broad-spectrum herbicide.

134. Armed with this knowledge, Monsanto voluntarily designed its Roundup with a dangerous condition for use by the public, and in particular Plaintiff.

135. Monsanto had a duty to create a product that was not unreasonably dangerous for its normal, intended use.

136. Monsanto created a product that was and is unreasonably dangerous for its normal, intended use.

137. Monsanto marketed and promoted a product in such a manner so as to make it inherently defective as the product downplayed its suspected, probable, and established health risks inherent with its normal, intended use.

138. The Roundup designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed by Monsanto was manufactured defectively in that Roundup left the hands of Monsanto in a defective condition and was unreasonably dangerous to its intended users.

139. The Roundup designed, researched, manufactured, tested, advertised,

1  promoted, marketed, sold, and distributed by Monsanto reached its intended users
2  in the same defective and unreasonably dangerous condition in which Monsanto's
3  Roundup was manufactured.

4        140. Monsanto designed, researched, manufactured, tested, advertised,
5  promoted, marketed, sold, and distributed a defective product, which created an
6  unreasonable risk to the health of consumers and to Plaintiff in particular, and
7  Monsanto is therefore strictly liable for the injuries sustained by Plaintiff.

8        141. Plaintiff could not, by the exercise of reasonable care, have discovered
9  Roundup's defects herein mentioned or perceived its danger.

10        142. Monsanto is thus strictly liable to Plaintiff for the manufacturing,
11  marketing, promoting, distribution, and selling of a defective product, Roundup.

12        143. Monsanto's defective design of Roundup amounts to willful, wanton,
13  and/or reckless conduct.

14        144. Defects in Monsanto's Roundup were the cause or a substantial factor
15  in causing Plaintiff's injuries.

16        145. As a result of the foregoing acts and omission, Plaintiff developed
17  NHL, and suffered severe and personal injuries that are permanent and lasting in
18  nature, physical pain and mental anguish, including diminished enjoyment of life,
19  and financial expenses for hospitalization and medical care.

20        WHEREFORE, Plaintiff respectfully requests that this Court enter judgment
21  in Plaintiff's favor for compensatory and punitive damages, together with interest,
22  costs herein incurred, attorneys' fees and all relief as this Court deems just and
23  proper.

24                    **THIRD CAUSE OF ACTION**
25              **Strict Products Liability (Failure to Warn)**
26          **By Plaintiff DAVID PETRIE Against ALL Defendants**
27        146. Plaintiff re-allege each paragraph above as if fully set forth herein.

28
28
**COMPLAINT FOR DAMAGES**

1    147. Monsanto has engaged in the business of selling, testing, distributing,

2    supplying, manufacturing, marketing, and/or promoting Roundup, and through that

3    conduct has knowingly and intentionally placed Roundup into the stream of

4    commerce with full knowledge that it reaches consumers such as Plaintiff who are

5    exposed to it through ordinary and reasonably foreseeable uses.

6    148. Monsanto did in fact sell, distribute, supply, manufacture, and/or

7    promote Roundup to Plaintiff. Additionally, Monsanto expected Roundup that it

8    was selling, distributing, supplying, manufacturing, and/or promoting to reach –

9    and Roundup did in fact reach – consumers, including Plaintiff, without any

10   substantial change in the condition of the product from when it was initially

11   distributed by Monsanto.

12   149. At the time of manufacture, Monsanto could have provided the

13   warnings or instructions regarding the full and complete risks of Roundup and

14   glyphosate-containing products because it knew or should have known of the

15   unreasonable risks of harm associated with the use of and/or exposure to such

16   products.

17   150. At all relevant times, Roundup was defective and unsafe in manufacture

18   such that it was unreasonably dangerous to the user, and was so at the time it was

19   distributed by Monsanto and at the time Plaintiff was exposed to and/or ingested

20   the product. The defective condition of Roundup was due in part to the fact that it

21   was not accompanied by proper warnings regarding its carcinogenic qualities and

22   possible side effects, including, but not limited to, developing NHL as a result of

23   exposure and use.

24   151. Roundup did not contain a warning or caution statement, which was

25   necessary and, if complied with, was adequate to protect the health of those

26   exposed in violation of 7 U.S.C. § 136j(a)(1)(E).

27   152. Monsanto's failure to include a warning or caution statement that was

28

**COMPLAINT FOR DAMAGES**

1   necessary and, if complied with, was adequate to protect the health of those

2   exposed, violated 7 U.S.C. § 136j(a)(1)(E) as well as the laws of the State of

3   California.

4   153. Monsanto could have revised Roundup's label to provide additional

5   warnings.

6   154. This defect caused serious injury to Plaintiff, who used Roundup in its

7   intended and foreseeable manner.

8   155. At all relevant times, Monsanto had a duty to properly design,

9   manufacture, compound, test, inspect, package, label, distribute, market, examine,

10   maintain supply, provide proper warnings, and take such steps to assure that the

11   product did not cause users to suffer from unreasonable and dangerous side effects.

12   156. Monsanto labeled, distributed, and promoted a product that was

13   dangerous and unsafe for the use and purpose for which it was intended.

14   157. Monsanto failed to warn of the nature and scope of the health risks

15   associated with Roundup, namely its carcinogenic properties and its propensity to

16   cause or serve as a substantial contributing factor in the development of NHL.

17   158. Monsanto knew of the probable consequences of Roundup. Despite this

18   fact, Monsanto failed to exercise reasonable care to warn of the dangerous

19   carcinogenic properties and risks of developing NHL from Roundup exposure,

20   even though these risks were known or reasonably scientifically knowable at the

21   time of distribution. Monsanto willfully and deliberately failed to avoid the

22   consequences associated with its failure to warn, and in doing so, acted with

23   conscious disregard for Plaintiff's safety.

24   159. At the time of exposure, Plaintiff could not have reasonably discovered

25   any defect in Roundup through the exercise of reasonable care.

26   160. Monsanto, as the manufacturer and/or distributor of Roundup, is held to

27   the level of knowledge of an expert in the field.

28

30

**COMPLAINT FOR DAMAGES**

1    161. Plaintiff reasonably relied on the skill, superior knowledge, and

2    judgment of Monsanto.

3    162. Had Monsanto properly disclosed the risks associated with Roundup,

4    Plaintiff would have avoided the risk of NHL by not using Roundup.

5    163. The information that Monsanto provided failed to contain adequate

6    warnings and precautions that would have enabled Plaintiff, and similarly situated

7    individuals, to utilize the product safely and with adequate protection. Instead,

8    Monsanto disseminated information that was inaccurate, false, and misleading and

9    that failed to communicate accurately or adequately the comparative severity,

10   duration, and extent of the risk of injuries associated with use of and/or exposure to

11   Roundup and glyphosate; continued to promote the efficacy of Roundup, even

12   after it knew or should have known of the unreasonable risks from use or exposure;

13   and concealed, downplayed, or otherwise suppressed, through aggressive

14   marketing and promotion, any information or research about the risks and dangers

15   of exposure to Roundup and glyphosate.

16   164. To this day, Monsanto has failed to adequately warn of the true risks of

17   Plaintiff's injuries associated with the use of and exposure to Roundup.

18   165. As a result of its inadequate warnings, Monsanto's Roundup products

19   were defective and unreasonably dangerous when they left Monsanto's possession

20   and/or control, were distributed by Monsanto, and used by Plaintiff.

21   166. As a direct and proximate result of Monsanto's actions as alleged

22   herein, and in such other ways to be later shown, the subject product caused

23   Plaintiff to sustain injuries as herein alleged.

24   WHEREFORE, Plaintiff respectfully request that this Court enter judgment

25   in Plaintiff's favor for compensatory and punitive damages, together with interest,

26   costs herein incurred, attorneys' fees and all relief as this Court deems just and

27   proper.

28

31

**COMPLAINT FOR DAMAGES**

1

## FOURTH CAUSE OF ACTION

2

### Breach of Warranties

3

### By Plaintiff DAVID PETRIE Against ALL Defendants

4     167. Plaintiff re-allege each paragraph above as if fully stated herein.

5     168. At all times relevant to this litigation, Monsanto engaged in the

6     business of testing, developing, designing, manufacturing, marketing, selling,

7     distributing, and

8     promoting its Roundup products, which are defective and unreasonably dangerous

9     to consumers, including Plaintiff, thereby placing Roundup products into the

10    stream of commerce. These actions were under Monsanto's ultimate control and

11    supervision.

12    169. At all relevant times, Monsanto expressly and impliedly represented

13    and warranted to the purchasers of its Roundup products, by and through

14    statements made in labels, publications, package inserts, and other written

15    materials intended for consumers and the general public, that its Roundup products

16    were safe to human health and the environment, effective, fit, and proper for their

17    intended use. Monsanto advertised, labeled, marketed, and promoted Roundup

18    products, representing the quality to consumers and the public so as to induce their

19    purchase or use, thereby making an express and implied warranty that Roundup

20    products would conform to the representations.

21    170. These express and implied representations include incomplete warnings

22    and instructions that purport, but fail, to include the complete array of risks

23    associated with use of and/or exposure to Roundup and glyphosate. Monsanto

24    knew and/or should have known that the risks expressly included in Roundup

25    warnings and labels did not and do not accurately or adequately set forth the risks

26    of developing the serious injuries complained of herein. Nevertheless, Monsanto

27

28

**COMPLAINT FOR DAMAGES**

1   expressly and impliedly represented that its Roundup products were safe and
2   effective, including for use as agricultural herbicides.

3      171. The representations about Roundup, as set forth herein, contained or
4   constituted affirmations of fact or promises made by the seller to the buyer, which
5   related to the goods and became part of the basis of the bargain, creating an
6   express and implied warranty that the goods would conform to the representations.

7      172. Monsanto placed its Roundup products into the stream of commerce for
8   sale and recommended their use to consumers and the public without adequately
9   warning of the true risks of developing the injuries associated with the use of and
10  exposure to Roundup and its active ingredient glyphosate.

11     173. Monsanto breached these warranties because, among other things, its
12  Roundup products were defective, dangerous, unfit for use, did not contain labels
13  representing the true and adequate nature of the risks associated with their use, and
14  were not merchantable or safe for their intended, ordinary, and foreseeable use and
15  purpose. Specifically, Monsanto breached the warranties in the following ways:

16         a. Monsanto represented through its labeling, advertising, and marketing
17            materials that its Roundup products were safe, and fraudulently
18            withheld and concealed information about the risks of serious injury
19            associated with use of and/or exposure to Roundup and glyphosate by
20            expressly limiting the risks associated with use and/or exposure within
21            its warnings and labels; and

22         b. Monsanto represented that its Roundup products were safe for use and
23            fraudulently concealed information demonstrating that glyphosate, the
24            active ingredient in Roundup, had carcinogenic properties, and that its
25            Roundup products, therefore, were not safer than alternatives
26            available on the market.

27

28

1    174. Plaintiff was exposed to the labels on the Roundup products that he

2    mixed and applied.

3    175. Monsanto had sole access to material facts concerning the nature of the

4    risks associated with its Roundup products as expressly stated within its warnings

5    and labels, and Monsanto knew that consumers and users such as Plaintiff could

6    not have reasonably discovered that the risks expressly included in Roundup

7    warnings and labels were inadequate and inaccurate.

8    176. Plaintiff had no knowledge of the falsity or incompleteness of

9    Monsanto's statements and representations concerning Roundup.

10    177. Plaintiff used and/or were exposed to the use of Roundup as researched,

11    developed, designed, tested, formulated, manufactured, inspected, labeled,

12    distributed, packaged, marketed, promoted, sold, or otherwise released into the

13    stream of commerce by Monsanto.

14    178. Had the warnings and labels for Roundup products accurately and

15    adequately set forth the true risks associated with the use of such products,

16    including Plaintiff's injuries, rather than expressly excluding such information and

17    warranting that the products were safe for their intended use, Plaintiff could have

18    avoided the injuries complained of herein.

19    179. As a direct and proximate result of Monsanto's wrongful acts and

20    omissions, Plaintiff has suffered severe injuries. Plaintiff has endured pain and

21    suffering, has suffered economic losses (including significant expenses for medical

22    care and treatment), and will continue to incur these expenses in the future.

23    WHEREFORE, Plaintiff respectfully requests that this Court enter judgment

24    in Plaintiff's favor for compensatory and punitive damages, together with interest,

25    costs herein incurred, attorney's fees, and all such other and further relief as this

26    Court deems just and proper. Plaintiff also demands a jury trial on the issues

27    contained herein.

28
**COMPLAINT FOR DAMAGES**

## FIFTH CAUSE OF ACTION

### Breach of Implied Warranty of Merchantability

### By Plaintiff DAVID PETRIE Against ALL Defendants

180. Plaintiff re-allege the paragraphs above as if fully stated herein.

181. At all times relevant, Monsanto engaged in the business of testing, developing, designing, formulating, manufacturing, marketing, selling, distributing, and promoting its Roundup products, which are defective and unreasonably dangerous to users and consumers, including Plaintiff thereby placing Roundup products into the stream of commerce. These actions were under Monsanto's ultimate control and supervision.

182. Before Plaintiff was exposed to the use of Roundup products, Monsanto impliedly warranted to its consumers and users – including Plaintiff – that Roundup products were of merchantable quality and safe and fit for the use for which they were intended; specifically, as horticultural herbicides.

183. Monsanto, however, failed to disclose that Roundup has dangerous propensities when used as intended and that the use of and/or exposure to Roundup and glyphosate-containing products carries an increased risk of developing severe injuries, including Plaintiff's injuries.

184. Plaintiff reasonably relied on the skill, superior knowledge and judgment of Monsanto and on its implied warranties that Roundup products were of merchantable quality and fit for their intended purpose or use.

185. Roundup products were expected to reach and in fact reached consumers and users, including Plaintiff, without substantial change in the condition in which they were manufactured and sold by Monsanto.

186. At all relevant times, Monsanto was aware that consumers and users of its products, including Plaintiff, would use Roundup products as marketed by Monsanto, which is to say that Plaintiff was a foreseeable user of Roundup.

**COMPLAINT FOR DAMAGES**

187. Monsanto intended that its Roundup products be used in the manner in which Plaintiff in fact used them and Monsanto impliedly warranted each product to be of merchantable quality, safe, and fit for this use, despite the fact that Roundup was not adequately tested or researched.

188. In reliance on Monsanto's implied warranty, Plaintiff used Roundup as instructed and labeled and in the foreseeable manner intended, recommended, promoted and marketed by Monsanto.

189. Plaintiff could not have reasonably discovered or known of the risks of serious injury associated with Roundup or glyphosate.

190. Monsanto breached its implied warranty to Plaintiff in that its Roundup products were not of merchantable quality, safe, or fit for their intended use. Roundup has dangerous propensities when used as intended and can cause serious injuries, including those injuries complained of herein.

191. The harm caused by Roundup products far outweighed their benefit, rendering the products more dangerous than an ordinary consumer or user would expect and more dangerous than alternative products.

192. As a direct and proximate result of Monsanto's wrongful acts and omissions, Plaintiff has suffered severe and permanent physical and emotional injuries. Plaintiff has endured pain and suffering, suffered economic loss (including significant expenses for medical care and treatment) and will continue to incur these expenses in the future.

## SIXTH CAUSE OF ACTION

## LOSS OF CONSORTIUM

### (By Plaintiff FELICIA PETRIE Against ALL Defendants)

193. Plaintiffs re-allege and incorporate herein by reference each and every allegation in paragraphs 1 to 22 above as though set forth in full herein.

**COMPLAINT FOR DAMAGES**

1       194. As a direct and proximate result of the negligence of Defendants, and

2   each of them, and the resulting injuries to Plaintiff DAVID PETRIE, Plaintiff

3   FELICIA PETRIE has been deprived of the consortium of her spouse, including

4   work, services, care, society and companionship, all to her general damages in a

5   sum within the jurisdiction of this Court according to proof at time of trial.

6

7       WHEREFORE, Plaintiff respectfully requests that this Court enter judgment

8   in Plaintiffs' favor for compensatory and punitive damages, together with interest,

9   costs herein incurred, attorney's fees, and all such other and further relief as this

10   Court deems just and proper. Plaintiffs also demand a jury trial on the issues

11   contained herein.

12

13                    **<ins>DEMAND FOR JURY TRIAL</ins>**

14       Plaintiffs hereby demand trial by jury as to all issues.

15

16

17   DATED:     February 3, 2021          BROCK & GONZALES, LLP

18

19

20                        By:       _____

21                             D. AARON BROCK

22                             LEE A CIRSCH

23                             SEAN T COOK

                              Attorneys for Plaintiffs

24

25

26

27

28

**COMPLAINT FOR DAMAGES**

BROCK & GONZALES