# U.S. District Court
## Southern District of Indiana (Indianapolis)
## CIVIL DOCKET FOR CASE #: 1:21-cv-00384-JRS-MJD

HINKLE et al v. BAYER et al
Assigned to: Judge James R. Sweeney II
Referred to: Magistrate Judge Mark J. Dinsmore
Case in other court: Delaware County Circuit Court 1, 18C01-
           2101-CT-000006
Cause: 28:1332 Diversity-Petition for Removal

Date Filed: 02/18/2021
Jury Demand: Both
Nature of Suit: 365 Personal Inj. Prod.
Liability
Jurisdiction: Diversity

**Plaintiff**

**DAVID HINKLE**

represented by **Jasmine Schlick**
STARR AUSTEN & MILLER, LLP
201 S. Thrid Street
Logansport, IN 46947
(574) 722-6676
Fax: (574) 753-3299
*ATTORNEY TO BE NOTICED*

**Scott L. Starr**
STARR AUSTEN & MILLER LLP
201 South Third Street
Logansport, IN 46947
(574) 722-6676
Fax: (574) 753-3299
Email: starr@starrausten.com
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**MARY LOU HINKLE**

represented by **Jasmine Schlick**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Scott L. Starr**
(See above for address)
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**BAYER**

represented by **BAYER**
.
PRO SE

**Defendant**

**RK HOLDINGS, LLP**

represented by **Jessica Laurin Meek**
DENTONS BINGHAM GREENEBAUM
LLP (Indianapolis)
2700 Market Tower
10 West Market Street

Indianapolis, IN 46204
317-968-5335
Fax: 317-236-9907
Email: jessica.meek@dentons.com
*ATTORNEY TO BE NOTICED*

**Margaret M. Christensen**
DENTONS BINGHAM GREENEBAUM
LLP (Indianapolis)
2700 Market Tower
10 West Market Street
Indianapolis, IN 46204
(317) 635-8900
Fax: (317) 236-9907
Email: margaret.christensen@dentons.com
*ATTORNEY TO BE NOTICED*

**Defendant**

| | |
|---|---|
| **RURAL KING SUPPLY STORE NO. 25 (MUNCIE, INDIANA)** | represented by **RURAL KING SUPPLY STORE NO. 25 (MUNCIE, INDIANA)** . PRO SE |

| Date Filed | # | Docket Text |
|---|---|---|
| 02/18/2021 | 1 | NOTICE OF REMOVAL *by RK Holdings, LLP and Monsanto Company (Erroneously Named as "Bayer")* from Delaware County Circuit Court 1, case number 18C01-2101-CT-000006, filed by RK HOLDINGS, LLP. (Filing fee $402, receipt number 0756-6420830) (Attachments: # 1 Exhibit 1- Declaration of Keith R. Abrams, # 2 State Court Record 2- State Court Record (Docket, Appearance for SLR, Appearance for JES, Complaint, Summons Bayer, Summons RK Holdings, Summons Rural King, Alias Summons Bayer, Alias Summons RK Holdings, Praecipe for Summons to Bayer, Affidavit, Summons to Bayer, Affidavit of Service for RK Holdings, Affidavit of Service for Rural King), # 3 Exhibit 3- Operative Complaint, # 4 Civil Cover Sheet 4- Civil Cover Sheet)(Christensen, Margaret) (Entered: 02/18/2021) |
| 02/18/2021 | 2 | Corporate Disclosure Statement by RK HOLDINGS, LLP. (Christensen, Margaret) (Entered: 02/18/2021) |
| 02/18/2021 | 3 | NOTICE of Appearance by Margaret M. Christensen on behalf of Defendant RK HOLDINGS, LLP. (Christensen, Margaret) (Entered: 02/18/2021) |
| 02/18/2021 | 4 | NOTICE of Appearance by Jessica Laurin Meek on behalf of Defendant RK HOLDINGS, LLP. (Meek, Jessica) (Entered: 02/18/2021) |
| 02/18/2021 | 5 | *RK Holdings, LLP's* ANSWER to Complaint (Notice of Removal) with Jury Demand , filed by RK HOLDINGS, LLP.(Christensen, Margaret) (Entered: 02/18/2021) |
| 02/19/2021 | 6 | MAGISTRATE JUDGE's NOTICE of Availability to Exercise Jurisdiction issued. (REO) (Entered: 02/19/2021) |

**Case #: 1:21-cv-00384-JRS-MJD**

**PACER Service Center**

| Transaction Receipt | | | |
|---|---|---|---|
| 02/23/2021 15:15:02 | | | |
| **PACER Login:** | hllp1982:2634105:4722683 | **Client Code:** | 1417.0049 |
| **Description:** | Docket Report | **Search Criteria:** | 1:21-cv-00384-JRS-MJD |
| **Billable Pages:** | 2 | **Cost:** | 0.20 |

# EXHIBIT 3

Operative Complaint

Case 1:21Case 00384-JRS-2741D Document 1-2 CT-0000050 2/23/21 Page 2 of 54 PageID #: 98 Filed: 1/08/2021 10:54 AM
Clerk
Delaware County, Indiana

Delaware Circuit Court 1

STATE OF INDIANA      )    IN THE DELAWARE CIRCUIT COURT 1
                        ) SS:
COUNTY OF DELAWARE    )    2021 TERM

DAVID HINKLE and         )
MARY LOU HINKLE,       )
     Plaintiffs,         )
                        )
v.                    )    CAUSE NO.
                        )
BAYER, RK HOLDINGS, LLP, and  )
RURAL KING SUPPLY STORE NO. 25 )
(MUNCIE, INDIANA),       )
     Defendants.        )

## COMPLAINT FOR DAMAGES AND JURY DEMAND

Plaintiffs, David Hinkle ("David") and Mary Lou Hinkle ("Mary Lou")

(collectively "Hinkle's"), by counsel, Starr Austen & Miller, LLP, assert their claim(s) for

relief against the Defendants, Bayer, RK Holdings, LLP., Rural King Supply Store No.

25 (Muncie, Indiana), and state as follows:

## FACTS COMMON TO ALL COUNTS

### I.   PLAINTIFFS

1.    David and Mary Lou are residents of Muncie, Indiana

2.    David and Mary Lou were married on June 25, 1994.

3.    The Hinkle's have resided in Muncie (Delaware County), Indiana for

approximately 26 years.

4.    David, grew up and resided in Cass County, Indiana on a large farm. The

farm consisted of growing nearly One Thousand (1,000) acres of crops, raising cattle,

and raising swine. Part of David's responsibilities on the farm included the spraying of the weedkiller, Roundup® from approximately 1990 – 1994.

5.      David was also a public accountant from approximately 1977-1996.  David maintained his business property, Hinkle Accounting, by hand-spraying Roundup®.

6.      During the years of 1990-1994, David also maintained his personal residence in Cass County of approximately three (3) acres, by hand-spraying Roundup®.

7.      In 1997, David and Mary Lou built a home in Muncie, Indiana. The residence included several acres of land, a barn, and a pond – all of which required weed control. David personally maintained the property, hand spraying Roundup® for approximately Thirteen (13) years.

8.      In 1999, David and Mary Lou constructed a miniature golf course, batting cage(s), and Frozen Yogurt business. The property's landscape required weed control. Again, David hand sprayed Roundup® to accomplish this maintenance. David owned and operated this business for approximately Twenty (20) years and used Roundup® during the growing season for each of those years.

9.      Since moving to the Muncie area David purchased a large majority of his Roundup® at RK Holdings, LLP, more commonly known as, Rural King ("Rural King"). Specifically, Rural King Supply Store No. 25 ("RK Store No. 25"), located at 4000 West Bethel Ave., Muncie, Indiana 47304.

## II.    DEFENDANTS

10.    Bayer Crop Science Division ("Bayer") is located at 800 N. Lindbergh Blvd., St. Louis, Missouri.

11.    Bayer acquired Monsanto Company in June of 2018, while maintaining numerous products (and their market names) including, Roundup®

12.    Rural King Supply is a large, family-owned chain of stores with its corporate office located at 4216 DeWitt Avenue, Mattoon, Illinois.

13.    Rural King conducts business, including that relating to the sale of Roundup® to consumers, in Indiana, generally, and in Muncie (Delaware County), Indiana specifically. At all times relevant to this complaint, RK Store No. 25 sold and distributed Bayer products including Roundup®, within the state of Indiana.

## III.    GENERAL BACKGROUND

14.    In 1970, Monsanto Company, Inc. discovered the herbicidal (weed killer) properties of glyphosate and patented it as such. In 1974, Monsanto Company began marketing its product under the brand name Roundup®. Roundup® is a non-selective herbicide used to kill weeds that commonly compete with the growing of crops. In 1996, the first genetically engineered, glyphosate tolerant crops were planted commercially in the U.S. By 2007, agricultural use of glyphosate (Roundup ®) was estimated to total

3

between 180-185 million pounds[1]. To date, glyphosate is the most widely used herbicide in the United States.

15.     Monsanto was an agrochemical and agricultural biotechnology corporation founded in 1901, based in St. Louis, Missouri. In 2018, Monsanto was acquired by Bayer AG as part of its crop science division.  However because Roundup® had become so popular, the Roundup® name was extremely valuable and Bayer maintained product brand name(s), including Round Up® and Roundup Ready®. Roundup Ready® seeds produce crops that substantially improve a farmer's ability to control weeds, because glyphosate can be sprayed in the fields during the growing season without harming the crops. In 2016, the Midwest (Illinois, Indiana, Iowa, Kansas, Missouri, Nebraska, and North Dakota) saw 65 percent of the nations total agricultural glyphosate use on crops, estimating 287 million pounds of usage.

16.     Glyphosate's boomed usage has led to numerous studies confirming glyphosate to be found in food, rivers, streams, and groundwater in agricultural areas where Roundup® is used. Moreover, glyphosate was discovered in 93% of urine samples collected across the U.S.

17.     In 2015, the International Agency for Research on Cancer ("IARC"), an agency of the World Health Organization ("WHO"), classified glyphosate as "probably carcinogenic to humans", a Group 2A herbicide. The IARC Working Group concluded

---

[1] Arthur Grube et al., U.S. Envtl. Prot. Agency, *Pesticides Industry Sales and Usage, 2006–2007 Market Estimates* 14 (2011), *available at* http://www.epa.gov/pesticides/pestsales/07pestsales/market_estimates2007.pdf.

that the cancer(s) most associated with glyphosate exposure is non-Hodgkin lymphoma.

18.     The IARC evaluation significantly confirms that glyphosate is toxic to humans.

19.     Nonetheless, Monsanto, since the conception of Roundup® and beyond has represented to consumers, it as safe to humans and the environment. Further, Bayer continues to proclaim to the world, its commitment to the environment and its consumers, including that glyphosate-based herbicides, such as Roundup®, create no risk of harm to human health or the environment.

20.     In fact, in 2017, internal Monsanto and EPA communications released, revealed Monsanto has colluded with the EPA to downplay glyphosate safety concerns, readily admitting that Roundup® could possibly cause cancer and other harm to human health. However, Roundup® remains on the market, and readily available to consumers.

### IV.    JURISDICTION AND VENUE

21.     The Delaware county court has jurisdiction over this action pursuant to Indiana Trial Rule 4.4 which states, "any person or organization that is a nonresident of this state submits to the jurisdiction of the courts of this state as to any action arising from…(1) doing business in this state; (2) causing personal injury by an act done within this state; (3) causing personal injury in this state by an occurrence, act done outside this state if he regularly does or solicits business or engages in any other persistent course of

5

conduction or derives substantial revenue or benefit from goods, materials, consumed in this state."

22.     The Delaware County Court has jurisdiction over the Defendant(s) because each defendant has sufficient minimum contacts in Indiana, or otherwise intentionally avails itself to the Indiana Market by selling Roundup® in Delaware County locations.

23.     Venue is proper in this Court under Indiana Trial Rule 75, which states preferred venue lies in "the county where agency of a defendant organization or *individual to which the claim relates* or *out of which the claim arose is located*, if one or more such organizations or individuals are included as defendants in the complaint; or the county where one or more individual plaintiffs reside."

24.      Furthermore, most of the Roundup® product used by David was purchased in Delaware County, insofar Bayer, purposely availed themselves of the benefits and the protections of the laws within the State of Indiana.

## V.    **GENERAL FACTS**

25.     Glyphosate is a non-selective herbicide used in a wide variety of herbicidal products throughout the world. Glyphosate prevents a plant from making certain proteins that are needed for plant growth. Treated plants generally die within two (2) or three (3) days. Plants absorb glyphosate; therefore, it cannot be completely removed by washing or peeling produce or by baking, or brewing grains.

26.     From its conception in the 1970s, by Monsanto chemist, Roundup® was marketed as a "safe" herbicide[2]. Perhaps its biggest lie was told to farmers, agricultural workers, and those who used Roundup® on a regular basis, touting the safety of the product.

27.     Simply, the safety of Roundup® is untrue as history has confirmed. Accordingly, the WHO, has cited glyphosate as a probable cause of cancer. Certainly, higher rates of exposure to Roundup®, such as a farmer/agricultural worker, business owner, or large property owners who regularly used Roundup® significantly exacerbates the risk of developing cancer.

28.     Bayer (Monsanto's successor) still praises the safety of Roundup® to its consumers.

**REGISTRATION OF HERBICIDES UNDER FEDERAL LAW**

29.      The manufacture, formulation, and distribution of herbicides, such as Roundup®, are regulated under the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA" or "Act"), 7 U.S.C. § 136 *et seq.*  FIFRA requires that all pesticides be registered with the Environmental Protection Agency ("EPA" or "Agency") prior to their distribution, sale, or use, except as described by the Act.  7 U.S.C. § 136a(a).

30.     Because pesticides are toxic to plants, animals, and humans, at least to some degree, the EPA requires as part of the registration process, among other things, a variety

---

[2] Monsanto, *What is Glyphosate?* (Sep. 2, 2015), http://www.monsanto.com/sitecollectiondocuments/glyphosate-safety-health.pdf.

of tests to evaluate the potential for exposure to pesticides, toxicity to people and other potential non-target organisms, and other adverse effects on the environment. Registration by the EPA, however, is not an assurance or finding of safety.  The determination the Agency must make in registering or re-registering a product is not that the product is "safe," but rather that use of the product in accordance with its label directions "will not generally cause unreasonable adverse effects on the environment."  7 U.S.C. § 136a(c)(5)(D).

31.      FIFRA defines "unreasonable adverse effects on the environment" to mean "any unreasonable risk to man or the environment, taking into account the economic, social, and environmental costs and benefits of the use of any pesticide."  7 U.S.C. § 136(bb).  FIFRA thus requires EPA to make a risk/benefit analysis in determining whether a registration should be granted or a pesticide allowed to continue to be sold in commerce.

32.      The EPA registered Roundup® for distribution, sale, and manufacture in the United States (including Indiana).

33.      FIFRA generally requires that the registrant, Monsanto in the case of Roundup®, conducts the health and safety testing of pesticide products.  The EPA has protocols governing the conduct of tests required for registration and the laboratory practices that must be followed in conducting these tests. The data produced by the registrant must be submitted to the EPA for review and evaluation.  The government is

not required, nor is it able, however, to perform the product tests that are required of the manufacturer.

34.     The evaluation of each pesticide product distributed, sold, or manufactured is completed at the time the product is initially registered. The data necessary for registration of a pesticide has changed over time.  The EPA is now in the process of re-evaluating all pesticide products through a Congressionally-mandated process called "re-registration."  7 U.S.C. § 136a-1.  In order to reevaluate these pesticides, the EPA is demanding the completion of additional tests and the submission of data for the EPA's recent review and evaluation.

35.     In the case of glyphosate, and therefore Roundup®, the EPA had planned on releasing its preliminary risk assessment—in relation to the reregistration process—no later than July 2015.  The EPA completed its review of glyphosate in early 2015, but it delayed releasing the risk assessment pending further review in light of the WHO's health-related findings.

### FRAUD IN THE CLASSIFICATION OF ROUNDUP®

36.     In 1985, the EPA categorized glyphosate as possibly carcinogenic to humans. Following pressure from Monsanto, the EPA changed its classification in 1991 to "evidence of non-carcinogenicity in humans."

37.     In subsequent queries, the EPA found that laboratories hired by Monsanto to test the toxicity of Roundup® committed fraud.

9

38.     First, Monsanto hired - Industrial Bio-Test Industries ("IBT"). Audit records revealed discrepancies between raw data and the final report relating to the toxicological impact of glyphosate[3]. IBT performed about 30 tests on glyphosate and glyphosate -containing products, including nine of the 15 residue studies needed to register Roundup®.

39.     In 1976, the United States Food and Drug Administration ("FDA") performed an inspection of IBT that revealed discrepancies between the raw data and the final report relating to the toxicological impacts of glyphosate.  The EPA subsequently audited IBT; it too found the toxicology studies conducted for the Roundup® herbicide to be invalid.[4]

40.     In 1983, three top executives of IBT were convicted of fraud.

41.     Second, Monsanto hired Craven laboratories in 1991 to perform pesticide and herbicide studies, including studies on Roundup®, in the same year, the owner of

---

[3] Monsanto, *Backgrounder, Testing Fraud: IBT and Craven Laboratories* (Sep. 2, 2015), http://www.monsanto.com/products/documents/glyphosate-background-materials/ibt_craven_bkg.pdf

[4] U.S. Envtl. Prot. Agency, *Summary of the IBT Review Program Office of Pesticide Programs* (1983), *available at* http://nepis.epa.gov/Exe/ZyNET.exe/91014ULV.TXT?ZyActionD=ZyDocument&Client=EPA&Index= 1981+Thru+1985&Docs=&Query=&Time=&EndTime=&SearchMethod=1&TocRestrict=n&Toc=&TocEntr y=&QField=&QFieldYear=&QFieldMonth=&QFieldDay=&IntQFieldOp=0&ExtQFieldOp=0&XmlQuery =&File=D%3A%5Czyfiles%5CIndex%20Data%5C81thru85%5CTxt%5C00000022%5C91014ULV.txt&User =ANONYMOUS&Password=anonymous&SortMethod=h%7C- &MaximumDocuments=1&FuzzyDegree=0&ImageQuality=r75g8/r75g8/x150y150g16/i425&Display=p %7Cf&DefSeekPage=x&SearchBack=ZyActionL&Back=ZyActionS&BackDesc=Results%20page&Maximu mPages=1&ZyEntry=1&SeekPage=x&ZyPURL

Craven Laboratories and three of its employees were indicted (and later convicted) of fraudulent practices involving the testing of herbicides[5].

42.     As aforementioned, in 2017, internal emails between Monsanto and EPA showcased the collusion to down-play glyphosate safety; including admittance Roundup® caused cancer and other harm to human health.

43.     Despite the clear-cut falsities of tests, underling its registration, Monsanto was marketing Roundup® in 115 countries.

## ROUNDUP® MARKET DOMINANCE

44.      Roundup® was key to Monsanto's success and dominance in the market; Largely due to the success of Roundup® sales, Monsanto's agriculture division was out-performing its chemicals division's operating income, and that gap increased yearly.  But with its patent for glyphosate expiring in the United States in the year 2000, Monsanto needed a strategy to maintain its Roundup® market dominance and to ward off impending competition.

45.     In 1996, Monsanto developed and began to sell genetically engineered Roundup Ready® seed. These seeds are genetically modified to resist glyphosate, subsequently allowing farmers to spray Roundup® onto fields during the growing season without harming crops. This two-prong development allowed not only

---

[5] Monsanto, *Backgrounder, Testing Fraud: IBT and Craven Laboratories, supra.*

Monsanto's Roundup Ready® seed market to grow substantially, but consequently grew the Roundup® market.

46.     In 2000, Roundup® accounted for almost $2.8 billion in sales, outselling other herbicides by a five-to-one (5-1) margin, accounting for close to half of Monsanto's revenue[6]. In 2018, after Bayer's acquisition of Monsanto, Roundup® sales totaled approximately $5 billion.

47.     Glyphosate remains one of the world's largest herbicides by sales volume.

**BAYER (MONSANTO) FALSELY ADVERTISES THE SAFETY OF ROUNDUP®**

48.     Monsanto (and now Bayer) has known for decades Roundup® was unsafe.

49.     In 1996, the New York Attorney General ("NYAG") filed a lawsuit against Monsanto based on its false and misleading advertising of Roundup® products. Specifically, the lawsuit challenged Monsanto's general representations that its spray on glyphosate-based herbicides, including Roundup® was "safer than table salt" and "practically non-toxic" to mammals, birds, and fish.

50.     Among the representations the NYAG found deceptive and misleading about the human and environmental safety of glyphosate and/or Roundup® are the following:

> a)  "Remember that environmentally friendly Roundup herbicide is biodegradable. It won't build up in the soil so you

---

[6] David Barboza, *The Power of Roundup; A Weed Killer Is A Block for Monsanto to Build On*, N.Y. TIMES, Aug. 2, 2001, *available at* http://www.nytimes.com/2001/08/02/business/the-power-of-roundup-a-weed-killer-is-a-block-for-monsanto-to-build-on.html

can use Roundup with confidence along customers' driveways, sidewalks and fences ..."

b) "And remember that Roundup is biodegradable and won't build up in the soil. That will give you the environmental confidence you need to use Roundup everywhere you've got a weed, brush, edging or trimming problem."

c) "Roundup biodegrades into naturally occurring elements."

d) "Remember that versatile Roundup herbicide stays where you put it. That means there's no washing or leaching to harm customers' shrubs or other desirable vegetation."

e) "This non-residual herbicide will not wash or leach in the soil. It ... stays where you apply it."

f) "You can apply Accord with 'confidence because it will stay where you put it' it bonds tightly to soil particles, preventing leaching. Then, soon after application, soil microorganisms biodegrade Accord into natural products."

g) "Glyphosate is less toxic to rats than table salt following acute oral ingestion."

h) "Glyphosate's safety margin is much greater than required. It has over a 1,000-fold safety margin in food and over a 700-fold safety margin for workers who manufacture it or use it."

i) "You can feel good about using herbicides by Monsanto. They carry a toxicity category rating of 'practically non-toxic' as it pertains to mammals, birds and fish."

j) "Roundup can be used where kids and pets will play and breaks down into natural material." This ad depicts a

13

person with his head in the ground and a pet dog standing in
an area which has been treated with Roundup.[7]

51.    Monsanto entered into an Assurance of Discontinuance with the New York

Attorney General to "cease and desist" from publishing or broadcasting the like that:

>    a) its glyphosate-containing pesticide products or any
>    component thereof are safe, non-toxic, harmless or free from risk.
>
>    b) its glyphosate-containing pesticide products or any
>    component thereof manufactured, formulated, distributed or sold by
>    Monsanto are biodegradable
>
>    c) its glyphosate-containing pesticide products or any
>    component thereof stay where they are applied under all
>    circumstances and will not move through the environment by any
>    means.
>
>    d) its glyphosate-containing pesticide products or any
>    component thereof are "good" for the environment or are "known
>    for their environmental characteristics."
>
>    e) glyphosate-containing pesticide products or any
>    component thereof are safer or less toxic than common consumer
>    products other than herbicides;
>
>    f) its glyphosate-containing products or any component
>    thereof might be classified as "practically non-toxic."

52.    Unfortunately, this was only required in New York. Upon information

and belief, alteration in advertisement(s) in other states were not and have not been

made.

---

[7] Attorney General of the State of New York, In the Matter of Monsanto Company, Assurance of
Discontinuance Pursuant to Executive Law § 63(15) (Nov. 1996).

53.     In 2009, France's highest court ruled that Monsanto had not told the truth about the safety of Roundup®.  The French court affirmed an earlier judgement that Monsanto had falsely advertised its herbicide Roundup® as "biodegradable" and that it "left the soil clean."[8]

## ASSESSMENT OF GLYPHOSATE BY THE IARC

54.     The IARC process for the classification of glyphosate followed IARC's stringent procedures for the evaluation of a chemical agent.  Over time, the IARC Monograph program has reviewed 980 agents.  Of those reviewed, it has determined 116 agents to be Group 1 (Known Human Carcinogens); 73 agents to be Group 2A (Probable Human Carcinogens); 287 agents to be Group 2B (Possible Human Carcinogens); 503 agents to be Group 3 (Not Classified); and one agent to be Probably Not Carcinogenic

55.     In 2015, IARC reassessed glyphosate. The summary reported glyphosate is a Group 2A agent and probably carcinogenic in humans.

56.     The IARC Working Group considered studies of the several exposure groups including occupational exposure of farmers, municipal weed-control workers, and para-occupational exposure in farming families.

---

[8] *Monsanto Guilty in 'False Ad' Row*, BBC, Oct. 15, 2009, *available at* http://news.bbc.co.uk/2/hi/europe/8308903.stm.

57. Exposure pathways were identified as air (more critical during spraying), water, and food. With community exposure widespread, found in soil, air, surface water, and groundwater, as well as food.

58. IARC also noted detection of glyphosate in the urine of agricultural workers – certainly establishing absorption.

59. Glyphosate was identified as the second-most used household herbicide in the United States for weed control and the most heavily used herbicide in the world in 2012.

60. IARC Working Group found an increased risk between exposure to glyphosate and non-Hodgkin lymphoma. Further, noting genotoxic, hormonal, and enzymatic effects in mammals exposed to glyphosate; and glyphosate formation induced DNA and chromosomal damage in mammals and in human cells in utero.

61. Other glyphosate studies have linked the chemical to a number of health issues including Attention Deficit Hyperactivity Disorder (commonly known as "ADHD"), Alzheimer's Disease, Autism, birth defects, and various forms of cancer.

**EARLIER FINDINGS ABOUT GLYPHOSATE**

62. The EPA has a technical fact sheet, as part of its Drinking Water and Health, National Primary Drinking Water Regulations publication, relating to glyphosate. This technical fact sheet predates IARC's March 20, 2015 evaluation. The fact sheet describes the release patterns for glyphosate as follows:

16

### Release Patterns

Glyphosate is released to the environment in its use as a herbicide for controlling woody and herbaceous weeds on forestry, right-of-way, cropped and non-cropped sites. These sites may be around water and in wetlands.

It may also be released to the environment during its manufacture, formulation, transport, storage, disposal and cleanup, and from spills. Since glyphosate is not a listed chemical in the Toxics Release Inventory, data on releases during its manufacture and handling are not available.

Occupational workers and home gardeners may be exposed to glyphosate by inhalation and dermal contact during spraying, mixing, and cleanup. They may also be exposed by touching soil and plants to which glyphosate was applied. Occupational exposure may also occur during glyphosate's manufacture, transport storage, and disposal.[9]

63. In 1995, the Northwest Coalition for Alternatives to Pesticides reported that in California, the state with the most comprehensive program for reporting of pesticide-caused illness, glyphosate was the third most commonly-reported cause of pesticide illness among agricultural workers.[10]

### MONSANTO'S INDUSTRY TIES TO EPA

64. Unsealed documents in the federal Roundup® MDL litigation reveal the extent to which Monsanto has been able to leverage its contacts within the EPA to protect glyphosate and Roundup® from scrutiny and review.

---

[9] U.S. Envtl. Prot. Agency, *Technical Factsheet on: Glyphosate*, *supra*.

[10] Caroline Cox, *Glyphosate, Part 2: Human Exposure and Ecological Effects*, 15 J. PESTICIDE REFORM 4 (1995); W.S. Peas et al., *Preventing pesticide-related illness in California agriculture: Strategies and priorities. Environmental Health Policy Program Report*, Univ. of Cal. School of Public Health, Calif. Policy Seminar (1993).

65.     Internal Monsanto documents, including email communications, demonstrate that Jess Rowland, former Deputy Division Director, Health Effects Division of the EPA's OPP, and formerly the chair of the CARC (the same committee that inadvertently leaked the EPA's glyphosate report in April 2016), repeatedly and directly intervened on Monsanto's behalf.  These same documents reveal that Monsanto was secure in the knowledge that it had allies within the EPA.

66.     To begin, in the months following IARC's initial March 2015 announcement that it had classified glyphosate as a probable carcinogen, Monsanto turned its attention to the EPA's review of glyphosate.  In one April 27, 2015 email, Monsanto official Bill Heydens wrote to colleagues to suggest "approaching EPA and…. ask if there is anything that would help them defend the situation?"  His colleague Dan Jenkins responded: "I think you and I could get on the phone w Jess Rowland and discuss this pretty openly. He'll give us straight talk."[11]

67.     The following day, Mr. Jenkins spoke to Mr. Rowland by telephone and then relayed the substance of the conversation for his colleagues in an April 28, 2015 email.  Specifically, he reported back that with respect to the CARC investigation, Mr. Rowland had stated: "We have enough to sustain our conclusions. Don't need gene tox or epi . . . . I am the chair of the CARC and my folks are running this process for

---

[11] *See* Plaintiff's Motion to Compel the Deposition of Jess Rowland, Ex. D, In re: Roundup Products Liability Litigation, MDL No. 2741 (N.D. Cal., Mar. 14, 2017), ECF No. 189-4.

glyphosate in reg review. I have called a CARC meeting in June."[12]  Thus, even though the ostensible purpose of the CARC review was to evaluate the exhaustive IARC assessment on glyphosate, and even though the full IARC monograph on glyphosate would not be completed until July 2015, Mr. Rowland appears to have already formed his conclusion months earlier — in April 2015.

68.    Mr. Rowland also intervened to halt another agency's review of glyphosate. When the Agency for Toxic Substances and Disease Registry (ATSDR), a federal public health agency of the U.S. Department of Health and Human Services, announced in February 2015 that it planned to publish a toxicological review of glyphosate, it was Mr. Rowland who helped Monsanto stop the ATSDR's investigation.  In the same April 28, 2015, email discussed above, Mr. Jenkins explained that Mr. Rowland wanted to help Monsanto stop an investigation concerning the carcinogenicity of glyphosate being conducted by ATSDR.[13]  Since ATSDR is not controlled by the EPA, according to Mr. Jenkins, Mr. Rowland had bragged: "If I can kill this I should get a medal."[14]  Jenkins cautioned, however, that Monsanto should not "get your hopes up, I doubt EPA and Jess can kill this; but it's good to know they are going to actually make the effort now to coordinate due to our pressing and their shared concern that ATSDR is consistent in its

---

[12] *Id.*
[13] See id.
[14] Id.

19

conclusions with the EPA."[15]   The ATSDR never published its toxicological profile of glyphosate.

69.      Further, the released documents reveal Monsanto's confidence that its allies within the EPA would continue to support glyphosate.  In an internal memo on glyphosate, Monsanto executives wrote: "We know, *but cannot say*, that EPA's Office of Pesticide Program scientists strongly feel that glyphosate does not cause cancer and have defended their written determination internally for months."[16]   Notably, when Mr. Rowland attended the IARC glyphosate meetings as an observed for the EPA, internal communications indicate Monsanto was not displeased with his attendance since, "we all know Jess."[17]

### WORLDWIDE BANS AND RESTRICTIONS ON GLYPHOSATE

70.      Following the glyphosate assessment numerous cities, states, and countries throughout the world have restricted or banned glyphosate.

71.      In total Forty-One (41) countries across the world have either banned, restricted, required special licensing or have began conducting their own studies on glyphosate.  For example, Germany will ban glyphosate by 2023; Italy voted against relicensing of glyphosate (and placed heavy restrictions on its usage); Mexico

---

[15] *Id.*

[16] See Plaintiff's Motion to Compel the Deposition of Jess Rowland, Ex. E, In re: Roundup Products Liability Litigation, MDL No. 2741 (N.D. Cal., Mar. 14, 2017), ECF No. 189-5 (emphasis original).

[17] *See* Plaintiff's Motion to Compel the Deposition of Jess Rowland, Ex. G, *In re: Roundup Products Liability Litigation*, MDL No. 2741 (N.D. Cal., Mar. 14, 2017), ECF No. 189-7.

announced it will phase out the use of glyphosate by 2024; and the United Kingdom's largest retailer announced it would review the sale of Roundup® within its stores.

72.     In 2017, California became the first state in the United States to issue a warning against glyphosate by adding the chemical to the State's Proposition 65 list of chemical and substances known to cause cancer. Moreover, Boulder, Colorado, issued a ban on the use of Roundup® in city parks, with Chicago, Illinois following suit.

73.     To date, it does not appear that Indiana has any bans or regulations on the use of glyphosate.

**STATEMENT OF CONCERN REGARDING GLYPHOSATE HERBICIDES**

74.     On February 17, 2016, a consensus statement published in the journal *Environmental Health*, entitled "Concerns over use of glyphosate-based herbicides and risks associated with exposures: a consensus statement," assessed the safety of glyphosate-based herbicides (GBHs).[18]  The paper's "focus is on the unanticipated effects arising from the worldwide increase in use of GBHs, coupled with recent discoveries about the toxicity and human health risks stemming from use of GBHs."[19]   The researchers drew seven factual conclusions about GBHs:

1.     GBHs are the most heavily applied herbicide in the world and usage continues to rise;

2.     Worldwide, GBHs often contaminate drinking water sources, precipitation, and air, especially in agricultural regions;

---

[18] John P. Myers, et al, *Concerns over use of glyphosate-based herbicides and risks associated with exposures: a consensus statement*, Environmental Health (2016), *available at* http://ehjournal.biomedcentral.com/articles/10.1186/s12940-016-0117-0.
[19] *Id.*

21

3.   The half-life of glyphosate in water and soil is longer than previously recognized;

4.   Glyphosate and its metabolites are widely present in the global soybean supply;

5.   Human exposures to GBHs are rising;

6.   Glyphosate is now authoritatively classified as a probable human carcinogen; and

7.   Regulatory estimates of tolerable daily intakes for glyphosate in the United States and European Union are based on outdated science.[20]

75.   The researchers noted that GBH use has increased approximately 100-fold since the 1970s.  Further, far from posing a limited hazard to vertebrates, as previously believed, two decades of evidence demonstrated that "several vertebrate pathways are likely targets of action, including hepatorenal damage, effects on nutrient balance through glyphosate chelating action and endocrine disruption."[21]

76.   The paper attributes uncertainties in current assessments of glyphosate formulations to the fact that "[t]he full list of chemicals in most commercial GBHs is protected as 'commercial business information,' despite the universally accepted relevance of such information to scientists hoping to conduct an accurate risk assessment of these herbicide formulations."  Further, the researchers argue, "[t]he distinction in regulatory review and decision processes between 'active' and 'inert' ingredients has no

---

[20] *Id.*

[21] *Id.*

toxicological justification, given increasing evidence that several so-called 'inert' adjuvants are toxic in their own right."[22]

77.     Among various implications, the researchers conclude that "existing toxicological data and risk assessments are not sufficient to infer that GBHs, as currently used, are safe."  Further, "GBH-product formulations are more potent, or toxic, than glyphosate alone to a wide array of non-target organisms including mammals, aquatic insects, and fish."  Accordingly, "risk assessments of GBHs that are based on studies quantifying the impacts of glyphosate alone underestimate both toxicity and exposure, and thus risk."  The paper concludes that this "shortcoming has repeatedly led regulators to set inappropriately high exposure thresholds."[23]

78.     The researchers also critique the current practice of regulators who largely rely on "unpublished, non-peer reviewed data generated by the registrants" but ignore "published research because it often uses standards and procedures to assess quality that are different from those codified in regulatory agency data requirements, which largely focus on avoiding fraud."  In the researchers' view, "[s]cientists independent of the registrants should conduct regulatory tests of GBHs that include glyphosate alone, as well as GBH-product formulations."[24]

79.     The researchers also call for greater inclusion of GBHs in government-led toxicology testing programs:

---

[22] *Id.*
[23] *Id.*
[24] *Id.*

[A] fresh and independent examination of GBH toxicity should be undertaken, and . . . this re-examination be accompanied by systematic efforts by relevant agencies to monitor GBH levels in people and in the food supply, none of which are occurring today. The U.S. National Toxicology Program should prioritize a thorough toxicological assessment of the multiple pathways now identified as potentially vulnerable to GBHs.[25]

80.     The researchers suggest that, in order to fill the gap created by an absence of government funds to support research on GBHs, regulators could adopt a system through which manufacturers fund the registration process and the necessary testing:

"[W]e recommend that a system be put in place through which manufacturers of GBHs provide funds to the appropriate regulatory body as part of routine registration actions and fees. Such funds should then be transferred to appropriate government research institutes, or to an agency experienced in the award of competitive grants. In either case, funds would be made available to independent scientists to conduct the appropriate long-term (minimum 2 years) safety studies in recognized animal model systems. A thorough and modern assessment of GBH toxicity will encompass potential endocrine disruption, impacts on the gut microbiome, carcinogenicity, and multigenerational effects looking at reproductive capability and frequency of birth defects."[26]

81.      Despite these stated concerns, Monsanto (and now Bayer), to date, has failed to perform such tests to its formulated Roundup® products.

## TOLLING OF STATUTE OF LIMITATIONS

82.     Hinkles incorporate by reference all preceding paragraphs as if fully set forth herein.

---

[25] *Id*.
[26] *Id*.

83.     Plaintiffs have suffered an illness that has a latency period and does not arise until years after exposure.  David had no way of knowing about the risks of serious illness associated with the use of and/or exposure to Roundup® and glyphosate until he was made aware that their NHL could be caused by his use of and/or exposure to Roundup®.   Consequently, the discovery rule applies to this case, and the statute of limitations has been tolled until the day that David knew or had reason to know that their NHL was linked to the use of and/or exposure to Roundup®.

84.      Within the time period of any applicable statutes of limitations, David could not have discovered, through the exercise of reasonable diligence, that exposure to Roundup® and glyphosate is injurious to human health.

85.     David did not discover, and did not know of facts that would cause a reasonable person to suspect, the risks associated with the use of and/or exposure to Roundup® and glyphosate; nor would a reasonable and diligent investigation by him have disclosed that Roundup® and glyphosate would cause his NHL.

86.     For these reasons, all applicable statutes of limitations have been tolled by operation of the discovery rule with respect to Plaintiff's claims.

### DAVID'S DIAGNOSIS

87.     In the last week of November 2020, David noticed lumps on the right side of his neck. A week later, David scheduled and visited his local Express Med in Muncie, Indiana. He was prescribed an antibiotic.

88.     After a week of taking the prescribed antibiotic, David noted the lumps had grown, at which time David scheduled an appointment with his regular doctor. Based on the doctor's initial review, the doctor was sufficiently concerned about David's condition that David was scheduled for imagining.

89.      Imagining resulted in a determination David needed a biopsy immediately.

90.     David had three (3) biopsies. First, a biopsy on his lymph nodes; Second, a biopsy on his tonsils; and Third, a bone-marrow biopsy.

91.     On Wednesday December 23, 2020, David was diagnosed with non-Hodgkin lymphoma ("NHL").

92.     A mere six-days later, on December 29, 2020, David received his first chemo treatment, lasting a grueling six (6) hours. Unfortunately, following his first treatment and the return of the bone-marrow biopsy results, it was determined David's lymphoma was a "triple hit[27]" the most aggressive type of non-Hodgkin lymphoma.

93.     David's type of NHL has forced him to endure a much more potent mixture of chemotherapy to fight the cancer; requiring an inpatient hospital stay of four (4) days, per each treatment.

---

[27] Triple-hit lymphomas have morphologic, biologic, and cytogenetic properties similar to both DLBCL and BL, but possess three, instead of two, gene rearrangements. These are associated with a more aggressive clinical course, as they tend to spread to extranodal sites. In short, David was diagnosed with the worst possible NHL, which carried with it a significantly reduced life expectancy.

94.     David has been told that he will need to undergo these chemo treatments every three (3) weeks.

### COUNT I – STRICT LIABILITY AGAINST BAYER (DESIGN DEFECT)

95.     Hinkles incorporate and reallege as if stated fully herein all other allegations set forth in this Complaint.

96.     At all times relevant, Defendant, Bayer, engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting Roundup®. Roundup® is defective and unreasonably dangerous to consumers, including plaintiff, thereby placing Roundup® products into the stream of commerce.

97.     At all times relevant, Defendant, Bayer's, Roundup® product(s) were manufactured, designed, and labeled in an unsafe, defective, and inherently dangerous manner that was dangerous for use by or exposure to the public, and, in particular, David.

98.     At all times relevant, Defendant, Bayer's, Roundup® reached the intended consumer, David, coming into contact with the product in Indiana, without substantial change in its condition as designed, manufactured, sold, distributed, labeled, and marketed by Defendant.

99.     Roundup® as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold, and marketed by Bayer was defective in design and formulation in when leaving the hands of the defendants'

manufactures and/or suppliers, they were unreasonably dangerous and dangerous to an extent beyond that which, plaintiff, an ordinary consumer, would contemplate.

100.    Roundup® as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold, and marketed by Defendants were defective in design and formulation in when leaving the hands of the defendants' manufactures and/or suppliers, the foreseeable risks exceeded the alleged benefits associated with their design and formulation.

101.    At all times relevant, Defendant, Bayer, knew or had reason to know that Roundup® products were defective and were inherently dangerous and unsafe when used in the manner instructed and provided by Defendant.

102.    At all times relevant, Defendant, Bayer's, Roundup® product as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, and sold and marketed by Defendant's were defective in design and formulation, in one or more of the following ways: when placed in stream of commerce, Roundup® were defective in design and formulation; unreasonably dangerous in posing hazardous and a grave risk of cancer when used in a reasonably anticipated manner; defendants did not sufficient investigate, test, or study the active ingredient, glyphosate; exposure to glyphosate, specifically, Roundup® presents a risk of harmful side-effects, including cancer; defendant knew or should have known while marketing Roundup® that exposure could result in cancer; defendant did not conduct adequate

28

post-market investigation of Roundup®; Defendants could have employed safer alternate designs and formulations.

103.    David was exposed to Roundup® while utilizing it in the prevention of weeds on residential, commercial, and agriculture property, without knowledge of its dangerous characteristics or risks.

104.    David could not have reasonably discovered the defects and risks associated with Roundup® either before or at time of exposure.

105.    Defendant, Bayer, could have designed Roundup® to make it less dangerous.

106.    Defendant, Bayer's, defective design of Roundup® was willful, wanton, fraudulent, malicious, and conducted with reckless disregard for the health and safety of its users and consumers, including David.

107.    Indeed, as a result of the unreasonably dangerous condition of Roundup®, defendant, Bayer is strictly liable to Plaintiffs.

108.    Moreover, defects in Roundup® were substantial and contributing factor(s) in causing David's grave injury, and, but for Defendant, Bayer's, misconduct, Plaintiffs would not have sustained said injuries.

109.    Punitive damages would both serve to punish Monsanto/Bayer and deter others from engaging in similar misconduct.

WHEREFORE, Hinkles request that this Court enter judgment against Bayer, in Plaintiff's favor for compensatory damages to fully compensate Hinkles for all their

injuries and damages, and for punitive damages, together with interest, costs herein incurred, and all such other relief as this Court deems just and proper.

**COUNT II – STRICT LIABILITY AGAINST MONSANTO/BAYER (FAILURE TO WARN)**

110.     Hinkles incorporate and reallege as if stated fully herein all other allegations set forth in this Complaint.

111.     A person or entity who sells or otherwise puts into the stream of commerce any product in a defective condition unreasonably dangerous to any user or consumer, including David, is subject to liability for the physical harm caused by the product.

112.     At all times relevant hereto, Defendant, Bayer, engaged in marketing, selling, distributing, promoting, and supplying Roundup® products without providing adequate warnings or instructions regarding the use of the product.

113.     Further, Defendant, Bayer, manufactured, labeled, distributed, marketed, promoted, sold, and released into the stream of commerce its glyphosate (Roundup®) product, directly advertising and marketing said product as "safe" to reasonably foreseeable consumers.

114.     At all times relevant hereto, Defendant, Bayer, did fail to provide proper packaging and/or labeling to give reasonable warnings of dangers about Roundup®, and specifically glyphosate. Moreover, failing to provide such warnings caused injury to consumers, specifically, David.

115.     At all times relevant hereto, Defendant, Bayer, had a duty to properly design, manufacture, inspect, package, label, market, sell, properly warn and take steps necessary to ensure Roundup® did not cause users and consumers to suffer dangerous risks/injury associated with glyphosate.

116.     At all times relevant, Defendant, Bayer, could have provided adequate warnings and/or instructions regarding the dangers of glyphosate products, specifically Roundup®, because they knew of the likelihood such product causing unreasonable risks of harm to humans, specifically cancer, as early as 1985.

117.     At all times relevant hereto, Defendant, Bayer, was engaged in the business of selling product(s) containing glyphosate, specifically, Roundup®. Moreover, Roundup® reached the consumer, specifically, David, without substantial alternation to the product.

118.      At all times relevant hereto, David, was a reasonably foreseeable consumer subject to the harm caused by the defective condition.

119.     As a direct and proximate result of Defendant, Bayer's, defective Roundup® product(s) in the stream of commerce, David has suffered severe, life-altering injury.

WHEREFORE, Hinkles pray for judgment against Monsanto/Bayer in an amount that will fully compensate them for all injuries and damages, together with interest, the costs expended herein, punitive damages, and such further and other relief as the Court deems just and reasonable.

## COUNT III – NEGLIGENCE AGAINST ALL DEFENDANTS

120.    Hinkles incorporate and reallege as if stated fully herein all other allegations set forth in this Complaint.

121.    Defendants, Bayer, Rural King Supply, and Rural King Supply Store No. 25 directly or indirectly, caused Roundup® products to be purchased and/or used by David.

122.    At all relevant times, Defendants breached their duty to David and were otherwise negligent in marketing, designing, manufacturing, producing, supplying, inspecting, testing, selling and/or distributing Roundup® products.

123.    At all times relevant, Defendants had a duty to exercise reasonable care in the design, research, manufacture, marketing, advertisement, supply, promotion, packaging, sale, and distribution of its Roundup® products, including the duty to take all reasonable steps necessary to manufacture, promote, and/or sell a product that was not unreasonably dangerous to consumers, users, and other persons coming into contact with the product.

124.    At all times relevant, Defendants had a duty to exercise reasonable care in the marketing, advertisement, and sale of its Roundup® products.  Defendant's duty of care owed to consumers and the general public included providing accurate, true, and correct information concerning the risks of using Roundup® and appropriate, complete, and accurate warnings concerning the potential adverse effects of exposure to Roundup® and, in particular, its active ingredient glyphosate.

125.    At all times relevant, Defendants knew or, in the exercise of reasonable care, should have known of the hazards and dangers of Roundup® and specifically, the carcinogenic properties of the chemical glyphosate.

126.    Accordingly, at all times relevant, Defendants knew or, in the exercise of reasonable care, should have known that use of or exposure to its Roundup® products could cause David's injuries and thus created a dangerous and unreasonable risk of injury to the users of these products, including David.

127.    Defendants knew or, in the exercise of reasonable care, should have known that Roundup® is more toxic than glyphosate alone and that safety studies on Roundup®, Roundup®'s adjuvants and "inert" ingredients, and/or the surfactant POEA were necessary to protect Plaintiff from Roundup®.

128.    Defendants also knew or, in the exercise of reasonable care, should have known that users and consumers of Roundup® were unaware of the risks and the magnitude of the risks associated with the use of and/or exposure to Roundup® and glyphosate-containing products.

129.    Indeed, Defendants breached their duty of reasonable care and failed to exercise ordinary care in the design, research, development, manufacture, testing, marketing, supply, promotion, advertisement, packaging, sale, and/or distribution of its Roundup® products, in that Defendant, Bayer, manufactured and produced defective herbicides containing the chemical glyphosate, knew or had reason to know of the defects inherent in its products, knew or had reason to know that a user's or consumer's exposure

to the products created a significant risk of harm and unreasonably dangerous side effects, and failed to prevent or adequately warn of these risks and injuries.

130.    Defendants failed to appropriately and adequately test Roundup®, Roundup®'s adjuvants and "inert" ingredients, and/or the surfactant POEA to protect Plaintiff from Roundup®.

131.    Despite their ability and means to investigate, study, and test their products and to provide adequate warnings, Defendants have failed to do so.  Indeed, Defendants have wrongfully concealed information and have further made false and/or misleading statements concerning the safety and/or exposure to Roundup® and glyphosate.

132.    Defendants' negligence included:

    a.    Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing its Roundup® products without thorough and adequate pre- and post-market testing;

    b.    Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing Roundup® while negligently and/or intentionally concealing and failing to disclose the results of trials, tests, and studies of exposure to glyphosate, and, consequently, the risk of serious harm associated with human use of and exposure to Roundup®;

c. Failing to undertake sufficient studies and conduct necessary tests to determine whether or not Roundup® products and glyphosate-containing products were safe for their intended use in agriculture, horticulture, and at-home use;

d. Failing to test, investigate, or study its formulated Roundup® products;

e. Failing to undertake sufficient studies and conduct necessary tests to determine the safety of "inert" ingredients and/or adjuvants contained within Roundup®, and the propensity of these ingredients to render Roundup® toxic, increase the toxicity of Roundup®, whether these ingredients are carcinogenic, magnify the carcinogenic properties of Roundup®, and whether or not "inert" ingredients and/or adjuvants were safe for use;

f. Failing to use reasonable and prudent care in the design, research, manufacture, formulation, and development of Roundup® products so as to avoid the risk of serious harm associated with the prevalent use of Roundup®/glyphosate as an herbicide;

g. Failing to design and manufacture Roundup® products so as to ensure they were at least as safe and effective as other herbicides on the market;

35

h. Failing to provide adequate instructions, guidelines, and safety precautions to those persons who Defendants could reasonably foresee would use and/or be exposed to its Roundup® products;

i. Failing to disclose to Plaintiff, users, consumers, and the general public that the use of and exposure to Roundup® presented severe risks of cancer and other grave illnesses;

j. Failing to warn Plaintiff, users, consumers, and the general public that the product's risk of harm was unreasonable and that there were safer and effective alternative herbicides available to Plaintiff and other users or consumers;

k. Systematically suppressing or downplaying contrary evidence about the risks, incidence, and prevalence of the side effects of Roundup® and glyphosate-containing products;

l. Representing that its Roundup® products were safe for their intended use when, in fact, Defendants knew or should have known that the products were not safe for their intended use;

m. Declining to make or propose any changes to Roundup® products' labeling or other promotional materials that would alert the consumers and the general public of the risks of Roundup® and glyphosate;

n.  Advertising, marketing, and recommending the use of Roundup® products, while concealing and failing to disclose or warn of the dangers known by Defendant to be associated with or caused by the use of or exposure to Roundup® and glyphosate;

o.  Continuing to disseminate information to its consumers, which indicate or imply that Defendant's Roundup® products are not unsafe for use in the agricultural, horticultural industries, and/or home use; and

p.  Continuing the manufacture and sale of its products with the knowledge that the products were unreasonably unsafe and dangerous.

133.  Defendants knew and/or should have known that it was foreseeable that consumers and/or users, such as David, would suffer injuries as a result of Defendants' failure to exercise ordinary care in the manufacturing, marketing, labeling, distribution, and sale of Roundup®.

134.  David did not know the nature and extent of the injuries that could result from the intended use of and/or exposure to Roundup® or its active ingredient glyphosate.

135.  Defendants' negligence was the proximate cause of the injuries, harm, and economic losses that Hinkles have suffered, and will continue to suffer, as described herein.

136.    Defendants' conduct, as described above, was reckless.    Defendant regularly risks the lives of consumers and users of its products, including Plaintiff, with full knowledge of the dangers of its products.  Defendants have made conscious decisions not to redesign, re-label, warn, or inform the unsuspecting public, including David.  Defendant's reckless conduct therefore warrants an award of punitive damages.

137.    As a proximate result of Defendant's wrongful acts and omissions in placing its defective Roundup® products into the stream of commerce without adequate warnings of the hazardous and carcinogenic nature of glyphosate, David developed NHL and has been injured catastrophically and has been caused severe and permanent pain, suffering, disability, impairment, loss of enjoyment of life, loss of care, comfort and economic damages, including significant expenses for medical care and treatment, and will continue to incur these expenses in the future.

WHEREFORE, Hinkles pray for judgment against Defendants, Monsanto/Bayer, Rural King, and RK Store No. 25 in an amount that will fully compensate them for all injuries and damages, together with costs expended herein, interest, punitive damages, and such further and other relief as the Court deems just and reasonable.

## COUNT IV – BREACH OF EXPRESS WARRANTIES AGAINST ALL DEFENDANTS

138.    Hinkles incorporate and reallege as if stated fully herein all other allegations set forth in this Complaint.

139.     At all relevant times, Defendants engaged in the business of testing, developing, designing, formulating, manufacturing, marketing, selling, distributing, and promoting its Roundup® products, which are defective and unreasonably dangerous to users, consumers and those in proximity to users, including David, thereby placing Roundup® products into the stream of commerce.  These actions were under the ultimate control and supervision of Defendants.

140.     Before the time that David was exposed to the use of the aforementioned Roundup® products, Defendants expressly warranted to its consumers and users—including David—that its Roundup® products were of merchantable quality and safe and fit for the use for which they were intended; specifically, as horticultural herbicides.

141.     Defendants, however, failed to disclose that Roundup® has dangerous propensities when used as intended and that the use of and/or exposure to Roundup® and glyphosate-containing products carries an increased risk of developing severe injuries, including David's injuries.

142.     Defendants further failed to test, investigate, or study its formulated Roundup® product(s).

143.     The representations, as set forth above, contained or constituted affirmations of fact or promises made by the sellers to the buyer which related to the goods and became part of the basis of the bargain creating an express warranty that the goods shall conform to the affirmations of fact or promises.

144.    Roundup® did not conform to the representations made by Defendants as Roundup® was not safe for use by individuals such as David.

145.    At all times relevant, David used and/or was exposed to the use of Defendants Roundup® products in their intended or reasonably foreseeable manner without knowledge of their dangerous characteristics.

146.    David could not have reasonably discovered or known the risks of serious injury associated with Roundup® or glyphosate.

147.    Defendants' breaches constitute violations of Ind. Code. Ann. §26-1-2-313.

148.    The breach of the warranty was a substantial factor in bringing about David's injuries.  As a direct and proximate result of Defendants placing their defective Roundup® products into the stream of commerce and failing to warn David of the increased risk of NHL associated with the use of and/or exposure to Roundup® products as described herein, David has developed NHL and has been injured catastrophically and has been caused severe and permanent pain, suffering, disability, impairment, loss of enjoyment of life, loss of care, comfort and economic damages, including for medical care and treatment.

149.    The harm caused by Defendants Roundup® products far outweighed their benefit, rendering the products more dangerous than an ordinary consumer or user would expect and more dangerous than alternative products.

150.    As a direct and proximate result of Defendants wrongful acts and omissions, David has suffered severe and permanent physical and emotional injuries.

40

David has endured pain and suffering, have suffered economic loss, including significant expenses for medical care and treatment, and will continue to incur these expenses in the future.

WHEREFORE, Hinkles pray for judgment against Monsanto/Bayer, Rural King, and RK Store No. 25 in an amount that will fully compensate them for all injuries and damages, together with costs expended herein, interest, punitive damages, and such further and other relief as the Court deems just and reasonable.

**COUNT V – BREACH OF IMPLIED WARRANTIES AGAINST ALL DEFENDANTS**

151.    Hinkles incorporate and reallege as if stated fully herein all other allegations set forth in this Complaint.

152.    At all relevant times, Defendants engaged in the business of testing, developing, designing, formulating, manufacturing, marketing, selling, distributing, and/or promoting its Roundup® products, which are defective and unreasonably dangerous to users, consumers and those in proximity to users, including David, thereby placing Roundup® products into the stream of commerce.  These actions were under the ultimate control and supervision of Defendants.

153.    Before the time that David was exposed to the use of the aforementioned Roundup® products, Defendants impliedly warranted to their consumers and users—including David that its Roundup® products were of merchantable quality and safe and fit for the use for which they were intended; specifically, as horticultural herbicides.

41

154.    Defendants, however, failed to disclose that Roundup® has dangerous propensities when used as intended and that the use of and/or exposure to Roundup® and glyphosate-containing products carries an increased risk of developing severe injuries, including David's injuries.

155.    Defendants, further failed to test, investigate, or study its Roundup® products.

156.    David reasonably relied upon the skill, superior knowledge and judgment of Defendants and upon its implied warranties that the Roundup® products were of merchantable quality and fit for their intended purpose or use.

157.    The Roundup® products were expected to reach and did in fact reach consumers, users and those in proximity to users, including David, without substantial change in the condition in which they were manufactured and sold by Defendants.

158.    At all relevant times, Defendants were aware that consumers, users, and those in proximity of users of its products, including David, would use Roundup® products as marketed by Defendants, which is to say that David was the foreseeable user of Roundup®.

159.    Defendants intended that its Roundup® products be used in the manner in which David in fact used or was exposed to them and Defendants impliedly warranted each product to be of merchantable quality, safe, and fit for this use, despite the fact that Roundup® was not adequately tested or researched.

160.    In reliance upon Defendants' implied warranty, David used or was in proximity to the use of Roundup® as instructed and labeled and in the foreseeable manner intended, recommended, promoted and marketed by Defendants.

161.    David could not have reasonably discovered or known the risks of serious injury associated with Roundup® or glyphosate.

162.    Defendants breached their implied warranty to David in that its Roundup® products were not of merchantable quality, safe, or fit for their intended use, or adequately tested.  Roundup® has dangerous propensities when used as intended and can cause serious injuries, including those injuries complained of herein.

163.    The harm caused by Defendants' Roundup® products far outweighed their benefit, rendering the products more dangerous than an ordinary consumer or user would expect and more dangerous than alternative products.

164.    As a direct and proximate result of Defendants wrongful acts and omissions David has suffered severe and permanent physical and emotional injuries.  David has endured pain and suffering, has suffered economic loss, including significant expenses for medical care and treatment, and will continue to incur these expenses in the future.

WHEREFORE, Hinkles pray for judgment against Monsanto/Bayer, Rural King, and RK Store No. 25 in an amount that will fully compensate them for all injuries and damages, together with costs expended herein, interest, punitive damages, and such further and other relief as the Court deems just and reasonable.

## COUNT VI - FRAUDULENT CONCEALMENT AGAINST ALL DEFENDANTS

165.    Hinkles incorporate and reallege as if stated fully herein all other allegations set forth in this Complaint.

166.    Defendants are estopped from asserting a statute of limitations defense because they fraudulently concealed their wrongful conduct from David with the intent that David and other consumers and users of Roundup® would rely on such material representations.

167.    Defendants had actual knowledge that exposure to Roundup® and specifically, its active ingredient glyphosate, could result in cancer and other severe illnesses and injuries.  Defendants knew or should have known that Roundup® is more toxic than glyphosate alone and that safety studies of Roundup®, Roundup's adjuvants and "inert" ingredients, and/or the surfactant POEA were necessary to protect David from Roundup®.

168.    Astonishingly, even after acquiring Monsanto, Bayer failed to conduct adequate testing of glyphosate and the Roundup® formulation.

169.    Defendants had actual knowledge of its misrepresentations, negligence, breach of warranties, and false, misleading, deceptive, and unconscionable conduct. Even so, Bayer perpetuated its wrongful conduct with the intent and fixed purpose of concealing its wrongs from David and the public at large. Despite its knowledge that Roundup® is considerably more dangerous than glyphosate alone, Defendant continues to promote Roundup® as safe.

44

170.    David was unaware of the falsity of these representations, acted in actual and justifiable reliance on such material misrepresentations, and was injured as a direct and proximate result.

171.    Additionally, Defendants knowingly omitted material information and Defendants remained silent regarding said misrepresentations despite the fact that it had a duty to inform David and the general public of the inaccuracy of said misrepresentations, which omission constitutes a positive misrepresentation of material fact, with the intent that David and the public would rely on Defendants' misrepresentations.

172.    David did act in actual and justifiable reliance on Defendants' representations and David was injured as a result.

173.    Bayer, as the manufacturer of Roundup®, was in a position of superior knowledge and judgment regarding any potential risks associated with its products.

174.    RK Holdings, LLP and Rural King Supply Store No. 25, as the seller of great quantities of Roundup®, was in a position of superior knowledge and judgment regarding the potential risks associated with its products.

175.    Defendants committed constructive fraud by breaching one or more legal or equitable duties owed to Plaintiff relating to Roundup®, said breach or breaches constituting fraud because of its propensity to deceive others or constitute an injury to public interests or public policy.

176.    In breaching duties to David, Defendants used their position of trust as the manufacturer and/or distributor of Roundup® to increase sales of its products at the expense of informing David that use of or exposure to Roundup® carries the risk of serious illness, such as NHL.

WHEREFORE, Hinkles pray for judgment against all Defendants in an amount that willfully compensate them for all injuries and damages, together with costs expended herein, interest, punitive damages, and such further and other relief as the Court deems just and reasonable.

## COUNT VII – DECEPTIVE PRACTICE UNDER INDIANA LAW AGAINST ALL DEFENDANTS

177.    Hinkles incorporate and reallege as if stated fully herein all other allegations set forth in this Complaint.

178.    At all relevant times, Defendants knew or should have known of the unreasonably dangerous and carcinogenic nature of the use of and/or exposure to Roundup®.

179.    At all relevant times, Defendants through its labeling, advertisements, public representations and marketing of Roundup®, intentionally used deception, fraud, false pretenses, false promises, misrepresentations and unfair trade practices in order to mislead consumers that Roundup® products are safe for use as horticultural herbicides.

180.    At all relevant times, Defendants engaged in the concealment, suppression and/or omission of material facts and misrepresentation of material facts in connection

with the sale and/or advertisement of Roundup® products in trade or commerce. In particular, Defendants failed to disclose to the public that Roundup® is unsafe and poses serious health hazards, particularly NHL. Furthermore, Defendants represented and warranted that Roundup® was safe for use as a horticultural herbicide. Defendants were aware of the hazardous risks posed by Roundup® and yet failed to inform the public of these risks through their advertisements, labeling, or other means available to them. Defendants misstated material facts and omitted material facts with the intent to mislead consumers. Defendants' conduct constitutes violations of Indiana Code 24-5-0.5-1 *et seq.*

181.    At all relevant times, David was mislead and deceived by Defendants intentional misrepresentations and omissions, regarding the usage and safety of Roundup®.

182.    At all relevant times, David acted in reasonable reliance upon Defendants misrepresentations and omissions, and had the Defendants not engaged in the deceptive conduct described herein, David would not have purchased Roundup® and/or would have protected themselves from exposure to Roundup®.

183.    As a direct and proximate result of Defendants misrepresentations and omissions, David developed NHL and has been injured catastrophically and has been caused severe and permanent pain, suffering, disability, impairment, loss of enjoyment of life, loss of care, comfort and economic damages.

WHEREFORE, Hinkles pray for judgment against Monsanto/Bayer, Rural King, and RK Store No. 25 in an amount that will fully compensate them for all injuries and

damages, together with costs expended herein, interest, punitive damages, and such further and other relief as the Court deems just and reasonable.

## COUNT VIII – PUNITIVE DAMAGES AGAINST ALL DEFENDANTS

184.    Hinkles incorporate and reallege as if stated fully herein all other allegations set forth in this Complaint.

185.    Defendants have acted willfully, wantonly, maliciously, with a self serving  motive and recklessly in one or more of the following ways:

       a.    Defendants knew of the unreasonably high risk of NHL posed by the Roundup® products before manufacturing, marketing, distributing and/or selling the Roundup® products, yet purposefully proceeded with such action;

       b.    Despite their knowledge of the high risk of NHL associated with use and/or exposure to Roundup® products, Defendants affirmatively minimized this risk through marketing and promotional efforts and product labeling;

       c.    Through the actions outlined above, Defendants expressed a reckless indifference to the safety of users of Roundup® products, including David.

186.    Defendants knew of the dangers and risks of Roundup® products, yet it concealed and/or omitted this information from labels and warnings contained on Roundup® products in furtherance of its knowing and willful actions.

187.    Defendants' actions deserve to be punished and punitive damages would deter others from similar misconduct.

188.    As a direct and proximate result of the willful, wanton, malicious, evilly motivated and/or reckless conduct of Defendants, David has sustained damages as set forth above.

WHEREFORE, Hinkles pray for a judgment for punitive damages against Defendants, jointly and severally, in a fair and reasonable amount sufficient to punish Defendants and deter it and others from engaging in similar conduct in the future, costs expended herein, and such further and other relief as the Court deems just and appropriate.

### COUNT IX – LOSS OF CONSORTIUM AGAINST ALL DEFENDANTS

189.    Hinkles incorporate by reference every other paragraph of this Complaint as if each were set forth fully and completely herein.

190.    At all times relevant, Hinkles were married and remain so.

191.    As a result of the wrongful and negligent acts by the Defendants, Mary Lou is caused to suffer, and will continue to suffer in the future, loss of consortium, support, affection, and assistance of her husband, David.

WHEREFORE, Mary Lou prays for judgment against Monsanto/Bayer, Rural King, and RK Store No. 25 in an amount that will fully compensate her for all injuries and damages, together with costs expended herein, interest, punitive damages, and such further and other relief as the Court deems just and reasonable.

49

## JURY DEMAND

Comes now Plaintiffs, David and Mary Lou Hinkle, and hereby demand a trial by jury on all counts of their Complaint.

/s/Scott L. Starr
Scott L. Starr, I.D. 1601-09
/s/ Jasmine E. Schlick
Jasmine E. Schlick, I.D. 36464-09
Starr Austen & Miller, LLP
201 South Third Street
Logansport, IN 46947
Telephone (574) 722-6676
Facsimile (574) 753-3299
Email  starr@starrausten.com
        jasmine@starrausten.com
*Attorneys for Plaintiffs,*