# United States District Court
## District of Massachusetts (Boston)
## CIVIL DOCKET FOR CASE #: 1:21-cv-10268-RWZ

May et al v. Monsanto Company
Assigned to: Judge Rya W. Zobel
Demand: $75,000
Cause: 28:1332 Diversity-Personal Injury

Date Filed: 02/17/2021
Jury Demand: Plaintiff
Nature of Suit: 365 Personal Inj. Prod.
Liability
Jurisdiction: Diversity

**Plaintiff**

**Dr. James May**                    represented by    **David A. Jagolinzer**
The Ferraro Law Firm, P.A..
Suite 3800
600 Brickell Avenue
Miami, FL 33131
305-375-0111
Fax: 305-379-6222
Email: daj@ferrarolaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Linda May**                    represented by    **David A. Jagolinzer**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Monsanto Company**

| Date Filed | # | Docket Text |
|---|---|---|
| 02/17/2021 | 1 | COMPLAINT *and Demand For Jury Trial* against Monsanto Company Filing fee: $ 402, receipt number 0101-8640650 (Fee Status: Filing Fee paid), filed by James May, Linda May. (Attachments: # 1 Civil Cover Sheet)(Jagolinzer, David) (Entered: 02/17/2021) |
| 02/18/2021 | 2 | **ELECTRONIC NOTICE TO COUNSEL:** Counsel shall complete and file in PDF format a Local Category Form. The form can be found on the court's website under Resources/Forms. Counsel will use the event under Other Documents - Civil Cover Sheet & Category Sheet. (Kelly, Danielle) (Entered: 02/18/2021) |
| 02/18/2021 | 3 | ELECTRONIC NOTICE of Case Assignment. Judge Rya W. Zobel assigned to case. If the trial Judge issues an Order of Reference of any matter in this case to a Magistrate Judge, the matter will be transmitted to Magistrate Judge Jennifer C. Boal. (Finn, Mary) (Entered: 02/18/2021) |
| 02/18/2021 | 4 | Summons Issued as to Monsanto Company. **Counsel receiving this notice electronically should download this summons, complete one for each defendant and serve it in accordance with Fed.R.Civ.P. 4 and LR 4.1. Summons will be mailed to plaintiff(s) not** |

| | | |
|---|---|---|
| | | **receiving notice electronically for completion of service.** (Kelly, Danielle) (Entered: 02/18/2021) |
| 02/23/2021 | 5 | Civil Cover Sheet & Category Sheet by James May, Linda May. (Jagolinzer, David) (Entered: 02/23/2021) |

<table>
<tr><td colspan="3" align="center">**PACER Service Center**</td></tr>
<tr><td colspan="3" align="center">**Transaction Receipt**</td></tr>
<tr><td colspan="3" align="center">02/26/2021 15:08:53</td></tr>
<tr><td>**PACER Login:**</td><td>hllp1982:2634105:4722683</td><td>**Client Code:** 1417.0049</td></tr>
<tr><td>**Description:**</td><td>Docket Report</td><td>**Search Criteria:** 1:21-cv-10268-RWZ</td></tr>
<tr><td>**Billable Pages:**</td><td>1</td><td>**Cost:** 0.10</td></tr>
</table>

# UNITED STATES DISCTRICT COURT
## DISTRICT OF MASSACHUSETTS

JAMES MAY and LINDA MAY,    )
his wife,    )
        Plaintiffs,    )
     v.    )    Case No.: <u>1:21-cv-10268</u>
    )
MONSANTO COMPANY,    )
        Defendant.    )

## COMPLAINT AND DEMAND FOR JURY TRIAL

**COME NOW**, Plaintiffs, JAMES MAY and LINDA MAY, by and through the undersigned counsel, hereby sue Defendant, MONSANTO COMPANY (hereinafter referred to as "MONSANTO") and allege as follows:

## I.    INTRODUCTION

1. Plaintiffs bring this cause of action for the significant damages sustained by JAMES MAY as a result of using Roundup®, an unreasonably dangerous and defective product. More specifically, Plaintiffs' claims involve the MONSANTO's negligent and wrongful conduct in connection with the design, development, manufacture, testing, packaging, promoting, marketing, distribution, supply and/or sale of the herbicide Roundup® containing the active ingredient glyphosate (hereinafter referred to as "Roundup").[1]

---

[1] "Roundup" refers to all formulations of Roundup® products, including, but not limited to, Roundup® Concentrate Poison Ivy and Tough Brush Killer 1, Roundup® Custom Herbicide, Roundup® D-Pak herbicide, Roundup® Dry Concentrate, Roundup® Export Herbicide, Roundup® Fence & Hard Edger 1, Roundup® Garden Foam Weed & Grass Killer, Roundup® Grass and Weed Killer, Roundup® Herbicide, Roundup® Original 2k herbicide, Roundup® Original II Herbicide, Roundup® Pro Concentrate, Roundup® Prodry Herbicide, Roundup® Promax, Roundup® Quik Stik Grass and Weed Killer, Roundup® Quikpro Herbicide, Roundup®

2.     Roundup is defective, dangerous to human health, unfit and unsuitable to be marketed, distributed and sold in commerce, and lacked proper warnings and directions as to the dangers associated with its use.

3.     As a direct and proximate result of JAMES MAY's exposure to Roundup, he developed non-Hodgkin's lymphoma.  Plaintiff, LINDA MAY, his wife, has also suffered a significant loss of consortium as a result of her husband's diagnosis, treatments and ongoing injuries.

## II.     THE PARTIES

### A.     Plaintiffs

4.     Plaintiff, JAMES MAY, was a resident of Middlesex County, Massachusetts from 1976 to 2014, and is otherwise *sui juris.*

5.     JAMES MAY, has been a resident of Lee County, Florida since 2014.

6.     At all times material, JAMES MAY was exposed to, ingested, inhaled, had dermal contact with, or otherwise was exposed to Roundup products that were designed, manufactured, sold, distributed, and/or supplied by the Defendant.

7.     More specifically, between approximately 1976 and 2014, JAMES MAY worked with and/or used Roundup products for personal purposes at his family residence located in

---

Rainfast Concentrate Weed & Grass Killer, Roundup® Rainfast Super Concentrate Weed & Grass Killer, Roundup® Ready-to-Use Extended Control Weed & Grass Killer 1 Plus Weed Preventer, Roundup® Ready-to-Use Weed & Grass Killer, Roundup® Ready-to-Use Weed and Grass Killer 2, Roundup® Ultra Dry, Roundup® Ultra Herbicide, Roundup® Ultramax, Roundup® VM Herbicide, Roundup® Weed & Grass Killer Concentrate, Roundup® Weed & Grass Killer Concentrate Plus, Roundup® Weed & Grass killer Ready-to-Use Plus, Roundup® Weed & Grass Killer Super Concentrate, Roundup® Weed & Grass Killer1 Ready-to-Use, Roundup® WSD Water Soluble Dry Herbicide Deploy Dry Herbicide, or any other formulation containing the active ingredient glyphosate.

Middlesex County, Massachusetts. Since approximately 2014, JAMES MAY worked with and/or used Roundup products for personal purposes at his family residence in Hancock County, Maine.

8.     At all times material, JAMES MAY worked with and/or used Roundup products in the intended manner, without significant change in the products' condition and, being unaware of the dangerous properties of glyphosate contained in Roundup products, relied on Defendant's instructions as to the proper methods of handling the products.

9.     As a direct and proximate result of JAMES MAY's exposure to, ingestion, inhalation, contact with and/or use of Roundup products, he was diagnosed with non-Hodgkin's lymphoma on or about June 2020.

10.     As a result of his non-Hodgkin's lymphoma, JAMES MAY has suffered serious physical injury, resulting pain and suffering, and mental anguish. He has undergone extensive and debilitating chemotherapy treatment. In addition, he must continually undergo medical monitoring. His injuries are permanent and continuing in nature.

11.     Plaintiff LINDA MAY, was a resident of Middlesex County, Massachusetts from 1976 to 2014, and is otherwise *sui juris*.

12.     LINDA MAY, has been a resident of Lee County, Florida since 2014.

13.     At all times material, LINDA MAY was and is the wife of JAMES MAY and has suffered loss of her husband's consortium.

**B.     Defendant**

14.     At all times material, Defendant, MONSANTO COMPANY, was and is a for-profit corporation organized and existing under the laws of the State of Delaware, having its principal place of business located at 800 North Lindbergh Blvd., St. Louis, Missouri 63167.

15.     MONSANTO, at all times material, was authorized to conduct and is conducting business throughout the Commonwealth of Massachusetts, including, but not limited to, conducting business in Massachusetts.

16.     At all times material, MONSANTO has had and continues to have substantial and not isolated contacts with Massachusetts and is subject to the jurisdiction of Massachusetts.

17.     At all times material, MONSANTO was the entity that discovered the herbicidal properties of glyphosate and is the manufacturer of Roundup products containing glyphosate as the active ingredient.

18.     At all times material, and while committing the acts alleged herein, each and every managing agent, agent, representative and/ or employee of Defendant MONSANTO was working within the course and scope of said agency, representation and/or employment with the knowledge, consent, ratification, and authorization of the Defendant and its directors, officers and/or managing agents.

### III.     JURISDICTION AND VENUE

19.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 because the amount in controversy exceeds $75,000, exclusive of interest and costs, and because there is complete diversity of citizenship between Plaintiffs and Defendant. Plaintiff at all times material, was a citizen of Massachusetts and currently is a citizen of Florida. Defendant, MONSANTO, is a citizen of Delaware (where it is incorporated) and Missouri (where it has its principal place of business).

20.     The Court also has supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

21.     This Court has personal jurisdiction over the Defendant because at all times material, MONSANTO was and is authorized and licensed to conduct business in Massachusetts,

maintains and carries on systematic and continuous contacts in the judicial district, regularly transacts business within this judicial district, and regularly and purposefully avails itself of the benefits of this judicial district and expected or should have expected that its acts would have consequences in Massachusetts because MONSANTO designed, manufactured, sold, distributed, and/or supplied Roundup products throughout the United States, including Massachusetts, which Defendant knew or should have known contained glyphosate, and which JAMES MAY purchased, used and/or was exposed to in his life, causing his non-Hodgkin's lymphoma and subsequent death. Defendant's affiliations with Massachusetts are so continuous and systematic as to render them essentially at home in Massachusetts.

22.     Additionally, MONSANTO caused tortious injury by acts and omissions in this judicial district and caused tortious injury in this district by acts and omissions outside this district while regularly doing and soliciting business, engaging in a persistent course of conduct, and deriving substantial revenue from goods used or consumed and services rendered in this judicial district.

23.     Venue is proper in United States District Court for the District of Massachusetts pursuant to 28 U.S.C § 1391(b)(2) and (3) because substantial parts of the events giving rise to the claim occurred in Massachusetts and the Defendant is subject to personal jurisdiction in this district.

## IV.     NATURE OF THE ACTION

24.     At all times material, MONSANTO was and is in the business of, and does, design, research, manufacture, test, advertise, promote, market, sell and/or distribute the commercial herbicide Roundup.

25.     MONSANTO is a multinational agricultural biotechnology corporation based in St. Louis, Missouri. It is the world's leading producer of glyphosate.

26.     MONSANTO discovered the herbicidal properties of glyphosate during the 1970's and subsequently began to design, research, manufacture, sell and distribute glyphosate-based Roundup as a broad-spectrum herbicide.

27.     Glyphosate is the active ingredient in Roundup.

28.     Glyphosate is a broad-spectrum herbicide used to kill weeds and grasses known to compete with crops grown around the globe.

29.     The original Roundup, containing the active ingredient glyphosate, was introduced in 1974. Today, glyphosate products are among the world's most widely used herbicides. MONSANTO's glyphosate products are registered in 130 countries and approved for weed control on more than 100 different crops.

30.     From the outset, MONSANTO marketed Roundup as a "safe" general-purpose herbicide for widespread commercial and consumer use; MONSANTO still markets Roundup as safe today.

31.     On March 24, 2015, the International Agency for Research on Cancer ("IARC"), an agency of the World Health Organization ("WHO"), issued an evaluation of several herbicides, including glyphosate. That evaluation was based, in part, on studies of exposures to glyphosate in several countries around the world, and it traces the health implications from exposure to glyphosate since 2001.

32.     Based on its cumulative review of human, animal, and DNA studies for more than one (1) year, many of which have been in MONSANTO's possession since as early as 1985, the IARC's working group published its conclusion that the glyphosate contained in MONSANTO's

6

Roundup herbicide, is a Class 2A "probable carcinogen" as demonstrated by the mechanistic evidence of carcinogenicity in humans and sufficient evidence of carcinogenicity in animals.

33.     The IARC's full Monograph was published on July 29, 2015 and established glyphosate as a class 2A *probable* carcinogen to humans. According to the authors, glyphosate demonstrated sufficient mechanistic evidence (genotoxicity and oxidative stress) to warrant a 2A classification based on evidence of carcinogenicity in humans and animals.

34.     The IARC Working Group found an increased risk between exposure to glyphosate and non-Hodgkin's lymphoma ("NHL") and several subtypes of NHL.

35.     The IARC evaluation is significant. It confirms that glyphosate is toxic to humans.

36.     For nearly 40 years, consumers, farmers, and the public have used Roundup unaware of its carcinogenic properties.

## V.     FACTS RELEVANT TO ALL CAUSES OF ACTION

### A.     Plaintiff's Use and Exposure to Roundup®

37.     Between approximately 1976 and 2014, JAMES MAY worked with and/or used Roundup products on a regular basis for personal purposes at his family residence including a three-acre fruit and nut tree farm located in Middlesex County, Massachusetts. Between approximately 2014 and 2020, JAMES MAY worked with and/or used Roundup products on a regular basis for personal purposes at his family residence including a twenty-five-acre property located in Hancock County, Maine.

38.     At all times material, JAMES MAY followed all safety and precautionary warnings during the course of his use of Roundup. He was directly involved in using, handling and spraying Roundup products at his residences.

39. At all times material, JAMES MAY used Roundup products that were manufactured, designed, sold, distributed and/or supplied by MONSANTO.

40. Defendant never warned JAMES MAY as to the actual and potential danger or risks of using Roundup products, never provided him with any written materials about the danger or risk of using Roundup products, and never advised him that he could contract non-Hodgkin's lymphoma as a result of using Roundup products.

41. As a direct and proximate result of JAMES MAY's use of and exposure to Roundup products, he contracted non-Hodgkin's lymphoma. JAMES MAY was diagnosed on or about June 2020.

42. It was not until on or after October 2020, that Plaintiffs JAMES MAY and LINDA MAY first discovered that using Roundup products containing glyphosate can result in non-Hodgkin's lymphoma after seeing various news stories and television advertisements relating to the actual and potential dangers of Roundup.

**B.    The Discovery of Glyphosate and Development of Roundup®**

43. The herbicidal properties of glyphosate were discovered in 1970 by MONSANTO chemist John Franz. The first glyphosate-based herbicide was introduced to the market in the mid-1970s under the brand name Roundup.

44. Glyphosate is a "non-selective" herbicide, meaning it kills indiscriminately based only on whether a given organism produces a specific enzyme, 5-enolpyruvylshikimic acid-3-phosphate synthase, known as EPSP synthase.

45. Glyphosate, among other things, inhibits the enzyme 5-enolpyruvylshikimic acid-3-phosphate synthase that interferes with the shikimic pathway in plants, resulting in the accumulation of shikimic acid in plant tissue and ultimately plant death.

46.     Sprayed as a liquid, plants absorb glyphosate directly through their leaves, stems, and roots, and detectable quantities accumulate in the plant tissues.

47.     Each year, approximately 250 million pounds of glyphosate are sprayed on crops, commercial nurseries, suburban lawns, parks, and golf courses.  This increase use has been driven largely by the proliferation of genetically engineered crops, crops specifically tailored to resist the activity of glyphosate.

48.     MONSANTO is intimately involved in the development, design, manufacture, marketing, sale, and/or distribution of genetically modified ("GMO") crops, many of which are marketed as being resistant to Roundup *i.e.*, "Roundup Ready®." As of 2009, MONSANTO was the world's leading producer of seeds, accounting for 27% of the world seed market, designed to be Roundup Ready®.   In 2010, an estimated 70% of corn and cotton, and 90% of soybean fields in the United States contained Roundup Ready® seeds.

49.     Glyphosate is ubiquitous in the environment. Numerous studies confirm that glyphosate is found in rivers, streams, and groundwater in agricultural areas where Roundup is used. It has been found in food, in the urine of agricultural workers, and even in the urine of urban dwellers who are not in direct contact with glyphosate.

50.     Nevertheless, MONSANTO, since it began selling Roundup, has represented it as safe to humans and the environment. Indeed, MONSANTO has repeatedly proclaimed and continues to proclaim to the world, and particularly to United States consumers, that glyphosate-based herbicides, including Roundup, create no unreasonable risks to human health or to the environment.

C.     **Registration of Herbicides under Federal Law**

51.     The manufacture, formulation and distribution of herbicides, such as Roundup, are regulated under the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA" or "Act"), 7 U.S.C. § 136 et seq. FIFRA requires that all pesticides be registered with the Environmental Protection Agency ("EPA" or "Agency") prior to their distribution, sale, or use, except as described by the Act. 7 U.S.C. § 136a(a).

52.     Because pesticides are toxic to plants, animals, and humans, at least to some degree, the EPA requires as part of the registration process, among other things, a variety of tests to evaluate the potential for exposure to pesticides, toxicity to people and other potential non-target organisms, and other adverse effects on the environment. Registration by the EPA, however, is not an assurance or finding of safety. The determination the Agency must make in registering or re-registering a product is not that the product is "safe," but rather that use of the product in accordance with its label directions "will not generally cause unreasonable adverse effects on the environment." 7 U.S.C. § 136a(c)(5)(D).

53.     FIFRA defines "unreasonable adverse effects on the environment" to mean "any unreasonable risk to man or the environment, taking into account the economic, social, and environmental costs and benefits of the use of any pesticide." 7 U.S.C. § 136(bb). FIFRA thus requires EPA to make a risk/benefit analysis in determining whether a registration should be granted or allowed to continue to be sold in commerce.

54.     The EPA registered Roundup for distribution, sale, and manufacture in the United States, including, North Carolina.

55.     FIFRA generally requires that the registrant, MONSANTO, conduct health and safety testing of pesticide products. The EPA has protocols governing the conduct of tests required

10

for registration and the laboratory practices that must be followed in conducting these tests. The data produced by the registrant must be submitted to the EPA for review and evaluation. The government is not required, nor is it able, however, to perform the product tests that are required of the manufacturer.

56.     The evaluation of each pesticide product distributed, sold, or manufactured is completed at the time the product is initially registered. The data necessary for registration of a pesticide has changed over time. The EPA is now in the process of re-evaluating all pesticide products through a Congressionally-mandated process called "re-registration." 7 U.S.C. § 136a-1. In order to reevaluate these pesticides, the EPA is demanding the completion of additional tests and the submission of data for the EPA's review and evaluation.

57.     In the case of glyphosate and Roundup, the EPA had planned on releasing its preliminary risk assessment —in relation to the registration process—no later than July 2015. The EPA completed its review of glyphosate in early 2015, but it delayed releasing the risk assessment pending further review in light of the WHO's health-related findings.

**D.     The Importance of Roundup® to MONSANTO's Market Dominance Profits**

58.     The success of Roundup was key to MONSANTO's continued reputation and dominance in the marketplace.

59.     Largely due to the success of Roundup sales, MONSANTO's agriculture division was out-performing its chemicals division's operating income, and that gap increased yearly. But with its patent for glyphosate expiring in the United States in the year 2000, MONSANTO needed a strategy to maintain its Roundup market dominance and to ward off impending competition.

60.     In response, MONSANTO began the development and sale of genetically engineered Roundup Ready® seeds in 1996. Since Roundup Ready® crops are resistant to

11

glyphosate; farmers can spray Roundup onto their fields during the growing season without harming the crop. This allowed MONSANTO to expand its market for Roundup even further; by 2000, MONSANTO's biotechnology seeds were planted on more than 80 million acres worldwide and nearly 70% of American soybeans were planted from Roundup Ready® seeds. It also secured MONSANTO's dominant share of the glyphosate market through a marketing strategy that coupled proprietary Roundup Ready® seeds with continued sales of its Roundup herbicide.

61.     Through a three-pronged strategy of increased production, decreased prices, and by coupling with Roundup Ready® seeds, Roundup became MONSANTO's most profitable product. In 2000, Roundup accounted for almost $2.8 billion in sales, outselling other herbicides by a margin of five to one, and accounting for close to half of MONSANTO's revenue.

**E.      MONSANTO's False Representations Regarding the Safety of Roundup®**

62.     In 1996, the New York Attorney General ("NYAG") filed a lawsuit against MONSANTO based on its false and misleading advertising of Roundup products. Specifically, the lawsuit challenged MONSANTO's general representations that its spray-on glyphosate-based herbicides, including Roundup, were "safer than table salt" and "practically non-toxic" to mammals, birds, and fish. Among the representations the NYAG found deceptive and misleading about the human and environmental safety of Roundup are the following:

    a.     Remember that environmentally friendly Roundup herbicide is biodegradable. It won't build up in the soil so you can use Roundup with confidence along customers' driveways, sidewalks and fences.

    b.     And remember that Roundup is biodegradable and won't build up in the soil. That will give you the environmental confidence you need to use Roundup everywhere you've got a weed, brush, edging or trimming problem.

    c.     Roundup biodegrades into naturally occurring elements.

    d.     Remember that versatile Roundup herbicide stays where you put it. That means there's no washing or leaching to harm customers' shrubs or other

desirable vegetation.

    e.    This non-residual herbicide will not wash or leach in the soil. It ... stays where you apply it.

    f.    You can apply Accord (another glyphosate-containing MONSANTO herbicide) with "confidence because it will stay where you put it" it bonds tightly to soil particles, preventing leaching. Then, soon after application, soil microorganisms biodegrade Accord into natural products.

    g.    Glyphosate is less toxic to rats than table salt following acute oral ingestion.

    h.    Glyphosate's safety margin is much greater than required. It has over a 1,000-fold safety margin in food and over a 700-fold safety margin for workers who manufacture it or use it.

    i.    You can feel good about using herbicides by MONSANTO. They carry a toxicity category rating of 'practically non-toxic' as it pertains to mammals, birds and fish.

    j.    "Roundup can be used where kids and pets will play and breaks down into natural material." This ad depicts a person with his head in the ground and a pet dog standing in an area which has been treated with Roundup.

63.    On November 19, 1996, MONSANTO entered into an Assurance of Discontinuance with NYAG, in which MONSANTO agreed, among other things, "to cease and desist from publishing or broadcasting any advertisements [in New York] that represent, directly or by implication" that:

    a.    its glyphosate-containing pesticide products or any component thereof are safe, non-toxic, harmless or free from risk;

    b.    its glyphosate-containing pesticide products or any component thereof manufactured, formulated, distributed or sold by MONSANTO are biodegradable;

    c.    its glyphosate-containing pesticide products or any component thereof stay where they are applied under all circumstances and will not move through the environment by any means.;

    d.    its glyphosate-containing pesticide products or any component thereof are "good" for the environment or are "known for their environmental characteristics";

    e.     glyphosate-containing pesticide products or any component thereof are safer or less toxic than common consumer products other than herbicides; and

    f.     its glyphosate-containing products or any component thereof might be classified as "practically non-toxic."

64.     MONSANTO did not alter its advertising in the same manner in any state other than New York, and on information and belief still has not done so today.

65.     In 2009, France's highest court ruled that MONSANTO had not told the truth about the safety of Roundup. The French court affirmed an earlier judgement that MONSANTO had falsely advertised its herbicide Roundup as "biodegradable" and that it "left the soil clean."

**F.    Classifications and Assessments of Glyphosate**

66.     The IARC process for the classification of glyphosate followed the stringent procedures for the evaluation of a chemical agent. Over time, the IARC Monograph program has reviewed 980 agents. Of those reviewed, it has determined 116 agents to be Group 1 (Known Human Carcinogens); 73 agents to be Group 2A (Probable Human Carcinogens); 287 agents to be Group 2B (Possible Human Carcinogens); 503 agents to be Group 3 (Not Classified); and one agent to be Probably Not Carcinogenic.

67.     The established procedure for IARC Monograph evaluations is described in the IARC Programme's Preamble. Evaluations are performed by panels of international experts, selected on the basis of their expertise and the absence of actual or apparent conflicts of interest.

68.     One year before the Monograph meeting, the meeting is announced and there is a call both for data and for experts. Eight months before the Monograph meeting, the Working Group membership is selected and the sections of the Monograph are developed by the Working Group members. One month prior to the Monograph meeting, the call for data is closed and the various draft sections are distributed among Working Group members for review and comment. Finally,

at the Monograph meeting, the Working Group finalizes review of all literature, evaluates the evidence in each category, and completes the overall evaluation. Within two weeks after the Monograph meeting, the summary of the Working Group findings is published in Lancet Oncology, and within a year after the meeting, the final Monograph is finalized and published.

69.     In assessing an agent, the IARC Working Group reviews the following information:

    a.     human, experimental, and mechanistic data;

    b.     all pertinent epidemiological studies and cancer bioassays; and

    c.     representative mechanistic data. The studies must be publicly available and have sufficient detail for meaningful review, and reviewers cannot be associated with the underlying study.

70.     In March 2015, IARC reassessed glyphosate. The summary published in The Lancet Oncology reported that glyphosate is a Group 2A agent and probably carcinogenic in humans.

71.     On July 29, 2015, IARC issued its Monograph for glyphosate, Monograph 112. For Volume 112, the volume that assessed glyphosate, a Working Group of 17 experts from 11 countries met at IARC from March 3–10, 2015, to assess the carcinogenicity of certain herbicides, including glyphosate. The March meeting culminated nearly a one-year review and preparation by the IARC Secretariat and the Working Group, including a comprehensive review of the latest available scientific evidence. According to published procedures, the Working Group considered "reports that have been published or accepted for publication in the openly available scientific literature" as well as "data from governmental reports that are publicly available."

72.     The studies considered the following exposure groups: occupational exposure of farmers and tree nursery workers in the United States, forestry workers in Canada and Finland,

and municipal weed-control workers in the United Kingdom; and para-occupational exposure in farming families.

73.     Glyphosate was identified as the second-most used household herbicide in the United States for weed control between 2001 and 2007 and the most heavily used herbicide in the world in 2012.

74.     Exposure pathways are identified as air (especially during spraying), water, and food. Community exposure to glyphosate is widespread and found in soil, air, surface water, and groundwater, as well as in food.

75.     The assessment of the IARC Working Group identified several case control studies of occupational exposure in the United States, Canada, and Sweden. These studies show a human health concern from agricultural and other work-related exposure to glyphosate.

76.     The IARC Working Group found an increased risk between exposure to glyphosate and non-Hodgkin lymphoma ("NHL") and several subtypes of NHL, and the increased risk persisted after adjustment for other pesticides.

77.     The IARC Working Group also found that glyphosate caused DNA and chromosomal damage in human cells. One study in community residents reported increases in blood markers of chromosomal damage (micronuclei) after glyphosate formulations were sprayed.

78.     In male CD-1 mice, glyphosate induced a positive trend in the incidence of a rare tumor, renal tubule carcinoma. A second study reported a positive trend for hemangiosarcoma in male mice. Glyphosate increased pancreatic islet-cell adenoma in male rats in two studies. A glyphosate formulation promoted skin tumors in an initiation-promotion study in mice.

79.     The IARC Working Group also noted that glyphosate has been detected in the urine of agricultural workers, indicating absorption. Soil microbes degrade glyphosate to

16

aminomethylphosphoric acid (AMPA). Blood AMPA detection after exposure suggests intestinal microbial metabolism in humans.

80.     The IARC Working Group further found that glyphosate and glyphosate formulations induced DNA and chromosomal damage in mammals, and in human and animal cells in utero.

81.     The IARC Working Group also noted genotoxic, hormonal, and enzymatic effects in mammals exposed to glyphosate. Essentially, glyphosate inhibits the biosynthesis of aromatic amino acids, which leads to several metabolic disturbances, including the inhibition of protein and secondary product biosynthesis and general metabolic disruption.

82.     The IARC Working Group also reviewed an Agricultural Health Study, consisting of a prospective cohort of 57,311 licensed pesticide applicators in Iowa and North Carolina. While this study differed from others in that it was based on a self-administered questionnaire, the results support an association between glyphosate exposure and Multiple Myeloma, Hairy Cell Leukemia (HCL), and Chronic Lymphocytic Leukemia (CLL), in addition to several other cancers.

G.     **Other Earlier Findings about Glyphosate's Dangers to Human Health and Release Patterns**

83.     The EPA has a technical fact sheet, as part of its Drinking Water and Health, National Primary Drinking Water Regulations publication, relating to glyphosate. This technical fact sheet predates the IARC March 20, 2015, evaluation. The fact sheet describes the release patterns for glyphosate as follows:

*Release Patterns*

84.     Glyphosate is released to the environment in its use as an herbicide for controlling woody and herbaceous weeds on forestry, right-of-way, cropped and non-cropped sites. These sites may be around water and in wetlands. It may also be released to the environment during its

17

manufacture, formulation, transport, storage, disposal, and cleanup, and from spills. Since glyphosate is not a listed chemical in the Toxics Release Inventory, data on releases during its manufacture and handling are not available. Occupational workers and home gardeners may be exposed to glyphosate by inhalation and dermal contact during spraying, mixing, and cleanup. They may also be exposed by touching soil and plants to which glyphosate was applied. Occupational exposure may also occur during glyphosate's manufacture, transport storage, and disposal.

85. In 1995, the Northwest Coalition for Alternatives to Pesticides reported that in California, the state with the most comprehensive program for reporting of pesticide-caused illness, glyphosate was the third most commonly-reported cause of pesticide illness among agricultural workers.

**H.     Recent Worldwide Bans on Glyphosate/Roundup®**

86. Several countries around the world have instituted bans on the sale of Roundup and other glyphosate-containing herbicides, both before and since IARC first announced its assessment for glyphosate in March 2015, and more countries undoubtedly will follow suit as the dangers of the use of Roundup are more widely known. The Netherlands issued a ban on all glyphosate-based herbicides in April 2014, including Roundup, which took effect by the end of 2015. In issuing the ban, the Dutch Parliament member who introduced the successful legislation stated: "Agricultural pesticides in user-friendly packaging are sold in abundance to private persons. In garden centers, Roundup is promoted as harmless, but unsuspecting customers have no idea what the risks of this product are. Especially children are sensitive to toxic substances and should therefore not be exposed to it."

18

87.     The Brazilian Public Prosecutor in the Federal District requested that the Brazilian Justice Department suspend the use of glyphosate.

88.     France banned the private sale of Roundup and glyphosate following the IARC assessment for Glyphosate.

89.     Bermuda banned both the private and commercial sale of glyphosates, including Roundup. The Bermuda government explained its ban as follows: "Following a recent scientific study carried out by a leading cancer agency, the importation of weed spray 'Roundup' has been suspended."

90.     The Sri Lankan government banned the private and commercial use of glyphosates, particularly out of concern that glyphosate has been linked to fatal kidney disease in agricultural workers.

91.     The government of Colombia announced its ban on using Roundup and glyphosate to destroy illegal plantations of coca, the raw ingredient for cocaine, because of the WHO's finding that glyphosate is probably carcinogenic.

92.     Despite numerous scientific findings from around the world demonstrating the highly-carcinogenic nature of Roundup and its main active ingredient, glyphosate, MONSANTO knowingly and willfully misrepresented Roundup as safe to humans and the environment. MONSANTO repeatedly claimed to the world and, particularly to United States consumers, that its Roundup products pose no unreasonable risks to human health or to the environment.

## VI.     EQUITABLE TOLLING OF THE APPLICABLE STATUTE OF LIMITATIONS

93.     Plaintiffs hereby plead and invoke the "discovery rule" if necessary. Plaintiff JAMES MAY will show that after reasonably exercising due diligence, neither he nor LINDA MAY learned the nature of the cause of his cancer or that such cancer was chemically-related until

less than the time periods provided by the relevant statutes of limitations. Plaintiffs also specifically invoke the federally required commencement date as set forth in 42 U.S.C. § 9658 (Actions under State law for damages from exposure to hazardous substances).

94. The running of any statute of limitations has been tolled by reason of the Defendant's fraudulent concealment. Defendant, through its affirmative misrepresentations and omissions, actively concealed from Plaintiffs the true risks associated with Roundup and glyphosate.

95. At all times material, MONSANTO has maintained that Roundup products are safe, non-toxic, and non-carcinogenic.

96. Indeed, even as recent as December 2019, MONSANTO continues to represent to the public that "regulatory authorities around the world have comprehensively and routinely reviewed glyphosate and glyphosate-based herbicides for more than 40 years and their conclusions consistently support the safety of glyphosate and glyphosate-based herbicides when used as directed." *See* Figure 1, below.



*** 



Figure 1. Source: https://www.bayer.com/en/glyphosate/is-glyphosate-safe (last visited Feb. 1, 2021).

97.　　As a result of the Defendant's actions, Plaintiffs were unaware, and could not reasonably know or have learned through reasonable diligence that Roundup and/or glyphosate contact, exposed JAMES MAY to the risks alleged herein and that those risks were the direct and proximate result of the Defendant's acts and omissions.

98.　　Furthermore, the Defendant is estopped from relying on any statute of limitations because of its fraudulent concealment of the true character, quality and nature of Roundup. Defendant was under a duty to disclose the true character, quality, and nature of Roundup because this was non-public information over which Defendant had and continues to have exclusive control, and because Defendant knew that this information was not available to the Plaintiffs or JAMES MAY. In addition, Defendant is estopped from relying on any statute of limitations because of its intentional concealment of these facts.

21

99.     Plaintiffs had no knowledge that Defendant was engaged in the wrongdoing alleged herein. Because of the fraudulent acts of concealment of wrongdoing by the Defendant, Plaintiffs JAMES MAY or LINDA MAY could not have reasonably discovered the wrongdoing at any time prior.

100.     Also, the economics of this fraud should be considered. Defendant had the ability to and did spend enormous amounts of money in furtherance of its purpose of marketing, promoting and/or distributing a profitable herbicide, notwithstanding the known or reasonably known risks.

101.     Plaintiffs and medical professionals could not have afforded and could not have possibly conducted studies to determine the nature, extent, and identity of related health risks, and were forced to rely on only the Defendant's representations.

102.     Accordingly, Defendant is precluded by the discovery rule and/or the doctrine of fraudulent concealment from relying upon any statute of limitations.

## VII.    CAUSES OF ACTION

### COUNT I
### NEGLIGENCE OF MONSANTO COMPANY

Plaintiffs adopt, reallege, and incorporate the allegations in paragraphs 1 through 102 above, and further allege the following:

103.     Defendant MONSANTO, directly or indirectly, caused Roundup products to be sold, distributed, packaged, designed, labeled, marketed, promoted, and/or used by consumers, including JAMES MAY.

104.     At all times relevant to this litigation, Defendant MONSANTO, by and through its agents, employees, representatives and/or others over whom it exercised control, including its predecessor(s) and/or subsidiaries, had a duty to exercise reasonable care in the design, research,

22

manufacture, marketing, advertisement, supply, promotion, packaging, sale, and distribution of Roundup products, including the duty to take all reasonable steps necessary to manufacture, promote, and/or sell a product that was not unreasonably dangerous to consumers and users of the product.

105.    At all times material, Defendant MONSANTO had a duty to exercise reasonable care in the marketing, advertisement, and sale of the Roundup products. MONSANTO's duty of care owed to consumers and the general public included providing accurate, true, and correct information concerning the risks of using Roundup and appropriate, complete, and accurate warnings concerning the potential adverse effects of exposure to Roundup, and, in particular, its active ingredient glyphosate.

106.    At all times relevant to this litigation, Defendant MONSANTO knew or, in the exercise of reasonable care, should have known of the hazards and dangers of Roundup and specifically, the carcinogenic properties of the chemical glyphosate.

107.    Accordingly, at all times material, Defendant MONSANTO knew or, in the exercise of reasonable care, should have known that use of or exposure to its Roundup products could cause or be associated with JAMES MAY's injuries and thus created a dangerous and unreasonable risk of injury to the users of these products, including to JAMES MAY.

108.    Defendant MONSANTO also knew or, in the exercise of reasonable care, should have known that users and consumers of Roundup were unaware of the risks and the magnitude of the risks associated with use of and/or exposure to Roundup and glyphosate-containing products.

109.    As such, Defendant MONSANTO breached the duty of reasonable care and failed to exercise ordinary care in the design, research, development, manufacture, testing, marketing,

supply, promotion, advertisement, packaging, sale, and distribution of its Roundup products, in

that MONSANTO manufactured, marketed, promoted, and sold defective herbicides containing

the chemical glyphosate, knew or had reason to know of the defects inherent in these products,

knew or had reason to know that a user's or consumer's exposure to the products created

a significant risk of harm and unreasonably dangerous side effects, and failed to prevent or

adequately warn of these risks and injuries.

110.    Despite an ability and means to investigate, study, and test these products and to

provide adequate warnings, Defendant MONSANTO failed to do so. Indeed, MONSANTO has

wrongfully concealed information and has further made false and/or misleading statements

concerning the safety and/or exposure to Roundup and glyphosate.

111.    At all times material, Defendant MONSANTO, by and through its agents, servants,

or employees, breached its duty of care and acted in a careless and negligent manner through the

following acts of omission or commission:

      a.    Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing Roundup products without thorough and adequate pre- and post-market testing;

      b.    Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing Roundup while negligently and/or intentionally concealing and failing to disclose the results of trials, tests, and studies of exposure to glyphosate, and, consequently, the risk of serious harm associated with human use of and exposure to Roundup;

      c.    Failing to undertake sufficient studies and conduct necessary tests to determine whether or not Roundup products and glyphosate-containing products were safe for their intended use in agriculture and horticulture;

      d.    Failing to use reasonable and prudent care in the design, research, manufacture, and development of Roundup products so as to avoid the risk of serious harm associated with the prevalent use of Roundup/glyphosate as an herbicide;

      e.    Failing to design and manufacture Roundup products so as to ensure they

24

were at least as safe and effective as other herbicides on the market;

f.   Failing to provide adequate instructions, guidelines, and safety precautions to those persons who Defendant could reasonably foresee would use and be exposed to its Roundup products;

g.   Failing to disclose to Plaintiff, users/consumers, and the general public that use of and exposure to Roundup presented severe risks of cancer and other grave illnesses;

h.   Failing to warn Plaintiff, users/consumers, and the general public that the product's risk of harm was unreasonable and that there were safer and effective alternative herbicides available to Plaintiff and other consumers;

i.   Systematically suppressing or downplaying contrary evidence about the risks, incidence, and prevalence of the side effects of Roundup and glyphosate-containing products;

j.   Representing that its Roundup products were safe for their intended use when, in fact, Defendant knew or should have known that the products were not safe for their intended purpose;

k.   Declining to make or propose any changes to Roundup products' labeling or other promotional materials that would alert the consumers and the general public of the risks of Roundup and glyphosate;

l.   Advertising, marketing, and recommending the use of the Roundup products, while concealing and failing to disclose or warn of the dangers known by Defendant to be associated with or caused by the use of or exposure to Roundup and glyphosate;

m.   Continuing to disseminate information to its consumers, which indicate or imply that Defendant's Roundup products are not unsafe for use in the agricultural and horticultural industries; and

n.   Continuing the manufacture and sale of its products with the knowledge that the products were unreasonably unsafe and dangerous.

112.   Defendant MONSANTO knew and/or should have known that it was foreseeable that consumers, such as JAMES MAY, would suffer injuries as a result of MONSANTO's failure to exercise ordinary care in the manufacturing, marketing, promotion, labeling, distribution, and sale of Roundup.

113.     JAMES MAY did not know the nature and extent of the injuries that could result from the intended use of and/or exposure to Roundup or its active ingredient glyphosate.

114.     Defendant MONSANTO's negligence was the proximate cause of the injuries, harm, and economic losses that JAMES MAY suffered, as described herein.

115.     Defendant MONSANTO's conduct, as described above, was reckless. MONSANTO regularly risked the lives of consumers and users of its products, including JAMES MAY, with full knowledge of the dangers of these products. Defendant MONSANTO has made conscious decisions not to redesign, re-label, warn, or inform the unsuspecting public, including warning JAMES MAY.

116.     As a direct and proximate result of Defendant MONSANTO's negligent acts and/or omissions in placing defective Roundup products into the stream of commerce without adequate warnings of the hazardous and carcinogenic nature of glyphosate, JAMES MAY contracted non-Hodgkin's lymphoma.

117.     As a direct and proximate result of the Defendant MONSANTO's negligent acts and/or omissions described in this Count, JAMES MAY contracted non-Hodgkin's lymphoma and has suffered significant bodily injury and resulting pain and suffering, disability, mental anguish, loss of capacity for the enjoyment of life, embarrassment, inconvenience, expense of hospitalization, medical and nursing care and treatment, loss of earnings, and loss of ability to earn money.

WHEREFORE, Plaintiffs, JAMES MAY and LINDA MAY, respectfully request that this Court enter judgment in their favor for compensatory and punitive damages, together with interest, costs herein incurred, attorney's fees and all relief as this Court deems just and proper.

**COUNT II**
**STRICT LIABILITY OF MONSANTO COMPANY**
**(Design Defect)**

Plaintiffs adopt, reallege, and incorporate the allegations in paragraphs 1 through 102 above, and further allege the following:

118.    Plaintiffs bring this strict liability claim against Defendant MONSANTO for defective design.

119.    At all times material, Defendant MONSANTO engaged in the business of testing, developing, manufacturing, selling, distributing, marketing, packaging, design, and promotion of Roundup products, which are defective and unreasonably dangerous to consumers, including JAMES MAY, thereby placing Roundup products into the stream of commerce. These actions were under the ultimate control and supervision of Defendant MONSANTO. At all times relevant to this litigation, Defendant MONSANTO designed, researched, developed, manufactured, produced, tested, assembled, labeled, advertised, promoted, marketed, sold, and distributed the Roundup products used by JAMES MAY, as described above.

120.    At all times material, Roundup products were manufactured, designed, and labeled in an unsafe, defective, and inherently dangerous manner that was dangerous for use by or exposure to the public, and, in particular to JAMES MAY.

121.    At all times relevant to this litigation, Roundup products reached the intended consumers, handlers, and users or other persons coming into contact with these products in Massachusetts and throughout the United States, including JAMES MAY, without substantial change in their condition as designed, manufactured, sold, distributed, labeled, and marketed by Defendant MONSANTO.

27

122. Roundup products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold, and marketed by Defendant MONSANTO were defective in design and formulation in that when they left the hands of the manufacturers and/or suppliers, they were unreasonably dangerous and dangerous to an extent beyond that which an ordinary consumer would contemplate.

123. Roundup products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold, and marketed by Defendant MONSANTO were defective in design and formulation in that when they left the hands of the manufacturers and/or suppliers, the foreseeable risks exceeded the alleged benefits associated with their design and formulation.

124. At all times relevant to this action, Defendant MONSANTO knew or had reason to know that Roundup products were defective and were inherently dangerous and unsafe when used in the manner instructed and provided by Defendant MONSANTO. Therefore, at all times relevant to this litigation, Roundup products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold, and marketed by Defendant MONSANTO were defective in design and formulation, in one or more of the following ways:

    a.      When placed in the stream of commerce, Roundup products were defective in design and formulation, and, consequently, dangerous to an extent beyond that which an ordinary consumer would contemplate;

    b.      When placed in the stream of commerce, Roundup products were unreasonably dangerous in that they were hazardous and posed a grave risk of cancer and other serious illnesses when used in a reasonably anticipated manner;

    c.      When placed in the stream of commerce, Roundup products contained unreasonably dangerous design defects and were not reasonably safe when used in a reasonably anticipated or intended manner;

    d.      Defendant did not sufficiently test, investigate, or study Roundup products

and, specifically, the active ingredient glyphosate;

  e.    Exposure to Roundup and glyphosate-containing products presents a risk of harmful side effects that outweigh any potential utility stemming from the use of the herbicide;

  f.    At the time of marketing its Roundup products, Roundup was defective in that exposure to Roundup and specifically, its active ingredient glyphosate, could result in cancer and other severe illnesses and injuries and/or death;

  g.    Defendant did not conduct adequate post-marketing surveillance of their Roundup products; and

  h.    Defendant could have employed safer alternative designs and formulations.

125.   JAMES MAY was exposed to Roundup products in the course of his personal use, as described above, without knowledge of their dangerous characteristics.

126.   At all times relevant to this litigation, JAMES MAY used and/or was exposed to the use of Roundup products in an intended or reasonably foreseeable manner without knowledge of their dangerous characteristics.

127.   JAMES MAY could not have reasonably discovered the defects and risks associated with Roundup or glyphosate-containing products before or at the time of exposure.

128.   The harm caused by Roundup products far outweighed their benefit, rendering these products dangerous to an extent beyond that which an ordinary consumer would contemplate. Roundup products were and are more dangerous than alternative products and Defendant MONSANTO could have designed Roundup products (including their packaging and sales aids) to make them less dangerous. Indeed, at the time that Defendant MONSANTO designed Roundup products, the state of the industry's scientific knowledge was such that a less risky design or formulation was attainable.

129. At the time Roundup products left Defendant MONSANTO's control there was a practical, technically feasible and safer alternative design that would have prevented the harm without substantially impairing the reasonably anticipated or intended function of those herbicides.

130. Defendant MONSANTO's defective design of Roundup products was willful, wanton, fraudulent, malicious, and conducted with reckless disregard for the health and safety of users of the Roundup products, including JAMES MAY.

131. Therefore, as a result of the unreasonably dangerous condition of its Roundup products, Defendant MONSANTO is strictly liable to Plaintiffs.

132. The defects in Roundup products caused or contributed to cause JAMES MAY's non-Hodgkin's lymphoma, and, but for Defendant MONSANTO's misconduct and omissions, JAMES MAY would not have sustained his injuries.

133. Defendant MONSANTO's conduct, as described above, was reckless. Defendant risked the lives of consumers and users of its products, including JAMES MAY, with knowledge of the safety problems associated with Roundup and glyphosate-containing products, and suppressed this knowledge from the general public. Defendant MONSANTO made conscious decisions not to redesign, warn, or inform the unsuspecting public.

134. As a direct and proximate result of the Defendant MONSANTO's wrongful acts and/or omissions described in this Count, JAMES MAY contracted non-Hodgkin's lymphoma and has suffered significant bodily injury and resulting pain and suffering, disability, mental anguish, loss of capacity for the enjoyment of life, embarrassment, inconvenience, expense of hospitalization, medical and nursing care and treatment, loss of earnings, and loss of ability to earn money.

WHEREFORE, Plaintiffs, JAMES MAY and LINDA MAY, respectfully request that this Court enter judgment in their favor for compensatory and punitive damages, together with interest, costs herein incurred, attorney's fees and all relief as this Court deems just and proper.

## COUNT III
## STRICT LIABILITY OF MONSANTO COMPANY
### (Failure to Warn)

Plaintiffs adopt, reallege, and incorporate the allegations in paragraphs 1 through 102 above, and further allege the following:

135.   Plaintiffs bring this strict liability claim against Defendant MONSANTO for failure to warn.

136.   At all times material, Defendant MONSANTO engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting Roundup products, which are defective and unreasonably dangerous to consumers, including JAMES MAY, because they do not contain adequate warnings or instructions concerning the dangerous characteristics of Roundup and, specifically, the active ingredient glyphosate. These actions were under the ultimate control and supervision of the Defendant.

137.   Defendant MONSANTO researched, developed, designed, tested, manufactured, inspected, labeled, distributed, marketed, promoted, sold, and otherwise released into the stream of commerce Roundup products, and in the course of same, directly advertised or marketed the products to consumers and end users, including JAMES MAY, and therefore had a duty to warn of the risks associated with the use of Roundup and glyphosate-containing products.

138.   At all times material, Defendant MONSANTO had a duty to properly test, develop, design, manufacture, inspect, package, label, market, promote, sell, distribute, maintain supply, provide proper warnings, and take such steps as necessary to ensure that Roundup products did

not cause users and consumers to suffer from unreasonable and dangerous risks. Defendant MONSANTO had a continuing duty to warn JAMES MAY of the dangers associated with Roundup use and exposure. Defendant MONSANTO, as manufacturer, seller, promoter, marketer, or distributor of chemical herbicides is held to the knowledge of an expert in the field.

139.    At the time of manufacture, Defendant MONSANTO could have provided the warnings or instructions regarding the full and complete risks of Roundup and glyphosate-containing products because it knew or should have known of the unreasonable risks of harm associated with the use of and/or exposure to such products.

140.    At all times material, Defendant MONSANTO failed to investigate, study, test, or promote the safety or to minimize the dangers to users and consumers of its product and to those who would foreseeably use or be harmed by these herbicides, including JAMES MAY.

141.    Despite the fact that Defendant MONSANTO knew or should have known that Roundup posed a grave risk of harm, they failed to exercise reasonable care to warn of the dangerous risks associated with use and exposure. The dangerous propensities of these products and the carcinogenic characteristics of glyphosate, as described above, were known to Defendant MONSANTO or scientifically knowable to Defendant through appropriate research and testing by known methods, at the time they distributed, marketed, promoted, supplied, or sold the product, and not known to end users and consumers, such as JAMES MAY.

142.    These products created significant risks of serious bodily harm to consumers, as alleged herein, and Defendant MONSANTO failed to adequately warn consumers and reasonably foreseeable users of the risks of exposure to its products. Defendant MONSANTO has wrongfully concealed information concerning the dangerous nature of Roundup and its active ingredient

glyphosate, and further made false and/or misleading statements concerning the safety of Roundup and glyphosate.

143. At all times material, Roundup products reached the intended consumers, handlers, and users or other persons coming into contact with these products in Massachusetts and throughout the United States, including JAMES MAY, without substantial change in their condition as designed, manufactured, sold, distributed, labeled, promoted, and marketed by Defendant MONSANTO.

144. JAMES MAY was exposed to Roundup products in the course of his personal use of Roundup without knowledge of its dangerous characteristics.

145. At all times relevant to this litigation, JAMES MAY used and/or was exposed to the use of Roundup products in their intended or reasonably foreseeable manner without knowledge of their dangerous characteristics.

146. JAMES MAY nor LINDA MAY could have reasonably discovered the defects and risks associated with Roundup or glyphosate-containing products prior to or at the time of JAMES MAY's exposure. JAMES MAY relied upon the skill, superior knowledge, and judgment of Defendant MONSANTO.

147. These products were defective because the minimal warnings disseminated with Roundup products were inadequate, and they failed to communicate adequate information on the dangers and safe use/exposure and failed to communicate warnings and instructions that were appropriate and adequate to render the products safe for their ordinary, intended, and reasonably foreseeable uses, including agricultural and landscaping applications.

148. The information that Defendant MONSANTO did provide or communicate failed to contain relevant warnings, hazards, and precautions that would have enabled consumers such as

JAMES MAY to utilize the products safely and with adequate protection. Instead, Defendant MONSANTO disseminated information that was inaccurate, false, and misleading and which failed to communicate accurately or adequately the comparative severity, duration, and extent of the risk of injuries with use of and/or exposure to Roundup and glyphosate; continued to aggressively promote the efficacy of its products, even after it knew or should have known of the unreasonable risks from use or exposure; and concealed, downplayed, or otherwise suppressed, through aggressive marketing and promotion, any information or research about the risks and dangers of exposure to Roundup and glyphosate.

149.    To this day, Defendant MONSANTO has failed to adequately and accurately warn of the true risks of JAMES MAY's injuries associated with the use of and exposure to Roundup and its active ingredient glyphosate, a probable carcinogen.

150.    As a result of their inadequate warnings, Roundup products were defective and unreasonably dangerous when they left the possession and/or control of Defendant MONSANTO, were distributed, marketed, and promoted by Defendant MONSANTO and used by JAMES MAY in his personal use.

151.    Defendant MONSANTO is liable to Plaintiffs for JAMES MAY's injuries caused by its negligent or willful failure, as described above, to provide adequate warnings or other clinically relevant information and data regarding the appropriate use of these products and the risks associated with the use of or exposure to Roundup and glyphosate.

152.    The defects in Roundup products caused or contributed to cause JAMES MAY's injuries and, but for this misconduct and omissions, JAMES MAY would not have sustained his injuries.

153.    Moreover, had Defendant MONSANTO provided adequate warnings and instructions and properly disclosed and disseminated the risks associated with Roundup products, JAMES MAY could have avoided the risk of developing injuries as alleged herein.

154.    As a direct and proximate result of Defendant MONSANTO placing defective Roundup products into the stream of commerce and engaging in the acts and/or omissions described in this Count, JAMES MAY contracted non-Hodgkin's lymphoma and has suffered significant bodily injury and resulting pain and suffering, disability, mental anguish, loss of capacity for the enjoyment of life, embarrassment, inconvenience, expense of hospitalization, medical and nursing care and treatment, loss of earnings, and loss of ability to earn money.

WHEREFORE, Plaintiffs, JAMES MAY and LINDA MAY, respectfully request that this Court enter judgment in their favor for compensatory and punitive damages, together with interest, costs herein incurred, attorney's fees and all relief as this Court deems just and proper.

## COUNT IV
## FRAUDULENT CONCEALMENT AGAINST MONSANTO COMPANY

Plaintiffs adopt, reallege, and incorporate the allegations in paragraphs 1 through 102 above, and further allege the following:

155.    Defendant MONSANTO fraudulently, intentionally, and/or negligently misrepresented to the public, and to Plaintiff JAMES MAY both directly and by and through the media, the scientific literature and purported "community outreach" programs, the safety of Roundup products, and/or fraudulently, intentionally, and/or negligently concealed, suppressed, or omitted material, adverse information regarding the safety of Roundup.

156.    The intentional and/or negligent misrepresentations and omissions of Defendant MONSANTO regarding the safety of Roundup products were communicated to JAMES MAY directly through ghostwritten articles, editorials, national and regional advertising, marketing and

promotion efforts, as well as the packaging and sales aids. The safety of Roundup products was also intentionally and/or negligently misrepresented to JAMES MAY and the public with the intent that such misrepresentations would cause JAMES MAY and other potential consumers to purchase and use or continue to purchase and use Roundup products.

157. Defendant MONSANTO either knew or should have known of the material representations they were making regarding the safety and relative utility of Roundup products.

158. Defendant MONSANTO fraudulently, intentionally, and/or negligently made the misrepresentations and/or actively concealed, suppressed, or omitted this material information with the specific desire to induce JAMES MAY, and the consuming public to purchase and use Roundup products. Defendants fraudulently, intentionally, and/or negligently, knew or should have known that JAMES MAY and the consuming public would rely on such material misrepresentations and/or omissions in selecting and applying Roundup products. Defendants knew or should have known that JAMES MAY would rely on their false representations and omissions.

159. Defendant made these misrepresentations and actively concealed adverse information including the risk of non-Hodgkin's lymphoma, at a time when, their agents and/or employees knew or should have known, the product had defects, dangers, and characteristics that were other than what was represented to the consuming public. Specifically, Defendant MONSANTO misrepresented and actively concealed, suppressed, and omitted that there had been inadequate testing of the safety and efficacy of Roundup and that prior studies, research, reports, and/or testing had been conducted linking the use of the drug with serious health events, including non-Hodgkin's lymphoma.

36

160.     Despite the fact that Defendant MONSANTO knew or should have known of reports of severe risks including non-Hodgkin's lymphoma, with Roundup use and exposure, this information was strategically minimized, understated, or omitted in order to create the impression that the human dangers of Roundup were nonexistent, particularly in light of its purported utility.

161.     The fraudulent, intentional and/or negligent material misrepresentations and/or active concealment, suppression, and omissions by Defendant was perpetuated directly and/or indirectly through the advertisements, packaging, sales aids, furtive public relations efforts, and other marketing and promotional pieces authored, analyzed, created, compiled, designed, drafted, disseminated, distributed, edited, evaluated, marketed, published, and supplied by Defendant. If JAMES MAY had known the true facts concerning the risks associated with Roundup exposure, he would have used a safer alternative.

162.     JAMES MAY's reliance upon the material misrepresentations and omissions was justified, among other reasons, because said misrepresentations and omissions were made by individuals and entities who were in a position to know the true facts concerning Roundup while JAMES MAY was not in a position to know the true facts because Defendant overstated the benefits and safety of Roundup and downplayed the risk of lymphoma, thereby inducing JAMES MAY to use the herbicide rather than safer alternatives.

163.     As a direct and proximate result of Defendant MONSANTO's actions and inactions, JAMES MAY was exposed to Roundup, contracted non-Hodgkin's lymphoma and has suffered significant bodily injury and resulting pain and suffering, disability, mental anguish, loss of capacity for the enjoyment of life, embarrassment, inconvenience, expense of hospitalization, medical and nursing care and treatment, loss of earnings, and loss of ability to earn money.

WHEREFORE, Plaintiffs, JAMES MAY and LINDA MAY, respectfully request that this Court enter judgment in their favor for compensatory and punitive damages, together with interest, costs herein incurred, attorney's fees and all relief as this Court deems just and proper.

## COUNT V
## BREACH OF EXPRESS WARRANTY

Plaintiffs adopt, reallege, and incorporate the allegations in paragraphs 1 through 102 above, and further allege the following:

164.    Defendant made several express warranties regarding Roundup.

165.    These representations and promises became part of the basis of the bargain between the parties and created a collective "express warranty" that Roundup would conform to Defendant's affirmations and promises.

166.    Defendant knew or should have known that Roundup® was susceptible to causing non-Hodgkin's lymphoma for those exposed to Roundup.

167.    Defendant has breached the express warranty.

168.    Defendant's conduct described in this Complaint constitutes a breach of express warranties under Mass. Gen Laws ch. 106 § 2-313, et seq. (2020).

169.    JAMES MAY complied with the warranty terms, including application instructions and maintaining residence in his home.

170.    As a direct and proximate result of Defendant MONSANTO's breach of express warranty, JAMES MAY was exposed to Roundup, contracted non-Hodgkin's lymphoma and has suffered significant bodily injury and resulting pain and suffering, disability, mental anguish, loss of capacity for the enjoyment of life, embarrassment, inconvenience, expense of hospitalization, medical and nursing care and treatment, loss of earnings, and loss of ability to earn money.

WHEREFORE, Plaintiffs, JAMES MAY and LINDA MAY, respectfully request that this Court enter judgment in their favor for compensatory and punitive damages, together with interest, costs herein incurred, attorney's fees and all relief as this Court deems just and proper.

<div align="center">

**COUNT VI**
**BREACH OF IMPLIED WARRANTY**

</div>

Plaintiffs adopt, reallege, and incorporate the allegations in paragraphs 1 through 102 above, and further allege the following:

171. Defendant is in the business of manufacturing, designing, supplying, marketing, advertising, warranting, and selling Roundup, which has been used as a weed killer. Defendant impliedly warranted to JAMES MAY that Roundup was of a certain quality, was free from defects, and was fit for its ordinary purpose.

172. Roundup was unfit for its ordinary use and was not of merchantable quality, as warranted by Defendant, because it was defective and studies show that it increases the risk of non-Hodgkin's lymphoma. Prior to purchase, JAMES MAY could not have readily discovered that the product was not fit for its ordinary purpose and would potentially cause non-Hodgkin's lymphoma.

173. Roundup was similarly unfit for its particular purpose.

174. Defendant has not sufficiently disclaimed the implied warranty of merchantability (specifically and conspicuously) or the implied warranty of fitness (in writing and conspicuously). Further, the purported limitations in the warranty, including limiting the "exclusive remedy" to a refund or replacement, are procedurally and substantively unconscionable.

175. Defendant was in privity with JAMES MAY by law and/or by fact. First, JAMES MAY had sufficient direct dealings with Defendant and/or its authorized dealers, franchisees, representatives, and agents to establish privity of contract. Alternatively, JAMES MAY was the

intended third-party beneficiary of contracts, including express warranties, amongst Defendant and its dealers, franchisees, representatives and agents; Defendant's advertisements were aimed at JAMES MAY, and Defendant's warranties were expressly written for the benefit of JAMES MAY as an end user of Roundup. Defendant's authorized dealers, franchisees, representatives, and agents, on the other hand, were not intended to be the ultimate consumers of Roundup and have no rights under the warranty agreements provided by Defendant; these intermediary entities made no changes to Defendant's product, nor made any additions to the warranties issued by Defendant. Further, Defendant is estopped from limiting claims for common law and statutory violations based on a defense of lack of privity.

176. Defendant's conduct described in this Complaint constitutes a breach of implied warranty under Mass. Gen Laws ch. 106 § 2-314, et seq. (2020).

177. Actual and/or constructive notice was duly given to Defendant of the breach of the warranty, and Defendant has failed to cure.

178. As a direct and proximate result of Defendant MONSANTO's breach of implied warranty, JAMES MAY was exposed to Roundup, contracted non-Hodgkin's lymphoma and has suffered significant bodily injury and resulting pain and suffering, disability, mental anguish, loss of capacity for the enjoyment of life, embarrassment, inconvenience, expense of hospitalization, medical and nursing care and treatment, loss of earnings, and loss of ability to earn money.

WHEREFORE, Plaintiffs, JAMES MAY and LINDA MAY, respectfully request that this Court enter judgment in their favor for compensatory and punitive damages, together with interest, costs herein incurred, attorney's fees and all relief as this Court deems just and proper.

## COUNT VII
## VIOLATION OF MASSACHUSETTS CONSUME PROTECTION LAWS

Plaintiffs adopt, reallege, and incorporate the allegations in paragraphs 1 through 102 above, and further allege the following:

179.  Defendant has violated the Massachusetts Consumer Protection law by engaging in unfair methods of competition and unfair, deceptive, fraudulent, unconscionable and/or unlawful acts or practices, including without limitation, by defective design and manufacture of Roundup as well as misleading marketing, advertising, selling, and warranting of Roundup to consumers. In connection with these sales, Defendant omitted material information about Roundup that it was legally obligated to disclose. Defendant never informed JAMES MAY, at the point of sale or otherwise, that Roundup was linked to non-Hodgkin's lymphoma, and failed to disclose this information in a timely manner.

180.  Among other things, Defendant made numerous deceptive statements regarding Roundup.

181.  Through its conduct, Defendant has violated the Massachusetts Consumer Protection law prohibiting unfair methods of competition and unfair, deceptive, unconscionable, fraudulent and/or unlawful acts or practices, violating the Regulation of Business Practices for Consumers Protection, codified in Mass. Gen. Laws ch. 93A (2020).

182.  As a direct and proximate result of Defendant MONSANTO's violation of North Carolina state consumer laws, JAMES MAY was exposed to Roundup, contracted non-Hodgkin's lymphoma and has suffered significant bodily injury and resulting pain and suffering, disability, mental anguish, loss of capacity for the enjoyment of life, embarrassment, inconvenience, expense of hospitalization, medical and nursing care and treatment, loss of earnings, and loss of ability to earn money.

41

WHEREFORE, Plaintiffs, JAMES MAY and LINDA MAY, respectfully request that this Court enter judgment in their favor for compensatory and punitive damages, together with interest, costs herein incurred, attorney's fees and all relief as this Court deems just and proper.

<div align="center">

**COUNT VIII**
**VIOLATION OF MASSACHUSETTS FALSE ADVERTISING LAWS**

</div>

Plaintiffs adopt, reallege, and incorporate the allegations in paragraphs 1 through 102 above, and further allege the following:

183.    Plaintiffs bring this claim pursuant to applicable Massachusetts False Advertising Laws, codified in Mass. Gen. Laws ch. 266, § 91, et seq. and Mass. Gen. Laws ch. 93A (2020), which prohibit deceptive, misleading, and/or false advertising.

184.    Defendant violated Massachusetts False Advertising Laws by advertising and representing—on product labels, advertisements, and warranties—that Roundup was dependable and reliable when in fact it was not. As alleged, these representations were false, misleading, and likely to deceive JAMES MAY as well as other reasonable consumers.

185.    In connection with these sales, Defendant also omitted material information about Roundup that it was legally obligated to disclose. Defendant never informed JAMES MAY, at the point of sale or otherwise, that Roundup would and could cause non-Hodgkin's lymphoma if exposed to the active ingredient.

186.    At the time of sale, Defendant knew, or by the exercise of reasonable care should have known—given internal data—that its representations and omissions were false and misleading.

187.    Defendant made these representations and omissions for the purpose of inducing, and did induce, JAMES MAY, and/or other consumers to purchase Roundup.

188.    JAMES MAY reviewed and reasonably relied on Defendant's representations and omissions regarding Roundup and incurred damages as a direct and proximate result.

189.    As a direct and proximate result of Defendant MONSANTO's violation of Massachusetts False Advertising Laws, JAMES MAY was exposed to Roundup, contracted non-Hodgkin's lymphoma and has suffered significant bodily injury and resulting pain and suffering, disability, mental anguish, loss of capacity for the enjoyment of life, embarrassment, inconvenience, expense of hospitalization, medical and nursing care and treatment, loss of earnings, and loss of ability to earn money.

WHEREFORE, Plaintiffs, JAMES MAY and LINDA MAY, respectfully request that this Court enter judgment in their favor for compensatory and punitive damages, together with interest, costs herein incurred, attorney's fees and all relief as this Court deems just and proper.

## COUNT IX
## LOSS OF CONSORTIUM ON BEHALF OF LINDA MAY

Plaintiffs adopt, reallege, and incorporate the allegations in paragraphs 1 through 189 above, and further allege the following:

190.    As a direct and proximate result of all of the foregoing allegations and injuries, JAMES MAY's wife, LINDA MAY, has suffered and will continue to suffer from the loss of her husband's services, his support, income, consortium and the care and comfort of his society; and due to the injuries and disabilities suffered by JAMES MAY as alleged herein, Plaintiff's spouse has also incurred expenses for medical attention rendered to her husband.

WHEREFORE, Plaintiff, LINDA MAY, respectfully requests that this Court enter in her favor for compensatory and punitive damages, together with interest, costs herein incurred, attorney's fees and all relief as this Court deems just and proper.

43

## VIII.   DEMAND FOR JURY TRIAL

191.    Plaintiffs, JAMES MAY and LINDA MAY, demand a trial by jury of all issues so triable as a matter of right.

DATED: this 17th day of February, 2021.

<div style="margin-left: 40%;">

Respectfully submitted,

**THE FERRARO LAW FIRM**

*s/ David A. Jagolinzer, Esq.*
David A. Jagolinzer, Esq.
BBO NO.: 643971
James L. Ferraro, Jr. Esq.
*To Be Admitted Pro Hac Vice*
THE FERRARO LAW FIRM, P.A.
600 Brickell Avenue, Suite 3800
Miami, Florida 33131
Email: DAJ@ferrarolaw.com
Email: JJR@ferrarolaw.com
Tel: (305) 375-0111
Fax: (305) 379-6222

*Attorneys for Plaintiffs*

</div>

44

## CERTIFICATE OF SERVICE

I hereby certify that on the 17th day of February, 2021, I electronically transmitted the attached documents to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to all parties of record.

/s/ David A. Jagolinzer, Esq.
David A. Jagolinzer, Esq.
BBO NO.: 643971
James L. Ferraro, Jr. Esq.
*To Be Admitted Pro Hac Vice*
THE FERRARO LAW FIRM, P.A.
600 Brickell Avenue, Suite 3800
Miami, Florida 33131
Email: DAJ@ferrarolaw.com
Email: JJR@ferrarolaw.com
Tel: (305) 375-0111
Fax: (305) 379-6222

**Attorneys for Plaintiffs**