Query    Reports    Utilities    Help    Log Out

# District Court of the Virgin Islands
## District of the Virgin Islands (St. Croix Division)
## CIVIL DOCKET FOR CASE #: 1:21-cv-00010-WAL-GWC

Rodgers v. Monsanto Company                           Date Filed: 02/26/2021
Assigned to: Chief Judge Wilma A. Lewis               Jury Demand: Both
Referred to: US Magistrate Judge George W. Cannon, Jr Nature of Suit: 245 Tort Product Liability
Cause: 28:1332 Diversity-Product Liability            Jurisdiction: Diversity

**Plaintiff**

**Roy Rodgers**                       represented by   **Lee J Rohn**
                                                       Lee J. Rohn & Associates
                                                       1101 King Street
                                                       St. Croix, VI 00820
                                                       340-778-8855
                                                       Fax: 340-773-2954
                                                       Email: lee@rohnlaw.com
                                                       *ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Monsanto Company**                  represented by   **Chad C. Messier**
                                                       Dudley Topper & Feuerzeig
                                                       1000 Frederiksberg Gade
                                                       P.O. Box 756
                                                       St Thomas, VI 00804
                                                       340-774-4422
                                                       Fax: 340-715-4400
                                                       Email: cmessier@dtflaw.com
                                                       *ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 02/26/2021 | 1 | NOTICE OF REMOVAL by Defendant Monsanto Company from Superior Court of the Virgin Islands, Division of St. Croix, case number SX-2021-CV-00065. ( Filing fee $ 402 receipt number BVIDC-918818)filed by Monsanto Company. (Attachments: # 1 Exhibit 1 - Pleadings and Process in Superior Court, # 2 Civil Cover Sheet) (Messier, Chad) (Entered: 02/26/2021) |
| 02/26/2021 | 2 | ANSWER to Complaint with Jury Demand by Monsanto Company. (Messier, Chad) (Entered: 02/26/2021) |
| 02/26/2021 | 3 | Corporate Disclosure Statement by Monsanto Company identifying Corporate Parent Bayer AG for Monsanto Company.. (Messier, Chad) (Entered: 02/26/2021) |
| 03/01/2021 | 4 | NOTICE of Appearance by Lee J Rohn on behalf of Plaintiff Roy Rodgers (Rohn, Lee) (Entered: 03/01/2021) |

| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 03/01/2021 16:10:21 | | | |
| **PACER Login:** | hllp1982 | **Client Code:** | 1417.0005 |
| **Description:** | Docket Report | **Search Criteria:** | 1:21-cv-00010-WAL-GWC |
| **Billable Pages:** | 1 | **Cost:** | 0.10 |

IN THE SUPERIOR COURT
OF THE VIRGIN ISLANDS



**FILED**

January 29, 2021
SX-2021-CV-00065
TAMARA CHARLES
CLERK OF THE COURT

**IN THE SUPERIOR COURT OF THE VIRGIN ISLANDS**
**DIVISION OF ST. CROIX**

ROY RODGERS,

       Plaintiff,

   v.

MONSANTO COMPANY and JOHN
DOES 1-50,

       Defendants.

CIVIL NO. SX-2021-CV-00065

**ACTION FOR DAMAGES**

**JURY TRIAL DEMANDED**

**COMPLAINT**

**COMES NOW** Plaintiff, **ROY RODGERS**, by and through undersigned counsel, and files his Complaint against Defendants **MONSANTO COMPANY and JOHN DOES 1-50**, and alleges the following:

**NATURE OF THE CASE**

1. This is an action for damages suffered by Plaintiff as a direct and proximate result of Defendants' negligent and wrongful conduct in connection with the design, development, manufacture, testing, packaging, promoting, marketing advertising, distribution, labeling, and/or sale of the herbicide Roundup ®, containing the active ingredient glyphosate.

2. Plaintiff maintains the Roundup ® and/ or glyphosate is defective, dangerous to human health, unfit and unsuitable to be marketed and sold in commerce, and lacked proper warning and directions, as to the dangers associates with its use.

3. Plaintiff's injuries, like those striking thousands of similarly situated victims across the country, were avoidable.

LEE J. ROHN AND
ASSOCIATES, LLC
1108 King St, Ste 3
Christiansted, VI
00820
Tel: 340.778.8855
Fax: 340.773.2954
lee@rohnlaw.com

RODGERS, ROY V. MONSANTO COMPANY and JOHN DOES 1-50, CIVIL NO. _____
**COMPLAINT**
Page 2

## JURISDICTION AND VENUE

4.   The Court has jurisdiction over Defendants and this action pursuant to 4 V.I.C. § 76.

## PARTIES

5.   Plaintiff, Roy Rodgers, is a natural person and at all relevant times a resident, and citizen St. Croix U.S. Virgin Islands. Plaintiff brings this action for personal injuries sustained by exposure to Roundup ® ("Roundup") containing the active ingredient glyphosate and the surfactant POEA. As a direct and proximate result of being exposed to Roundup, Plaintiff develop non-Hodgkin's Lymphoma.

6.   "Roundup" refers to all formulations of Defendants' roundup products, including, but not limited to, Roundup Concentrate Poison Ivy and Tough Brush Killer 1, Roundup Custom Herbicide, Roundup D-Pak herbicide, Roundup Dry Concentrate, Roundup Export Herbicide, Roundup Fence & Heard Edger 1, Roundup Garden Foam Weed & Grass Killer, Roundup Grass and Weed Killer, Roundup Herbicide, Roundup Original 2k herbicide, Roundup Original II Herbicide, Roundup Pro Concentrate, Roundup Prodry Herbicide, Roundup Promax, Roundup Quik Stik Grass and Weed Killer, Roundup Quikpro Herbicide, Roundup Rainfast Concentrate Weed & Grass Filler, Roundup Super Concentrate Weed &Grass Killer, Roundup Ready-to-Use Extended Control Weed & Grass Killer 1 Plus Weed Preventer, Roundup Ready-to-Use Weed & Grass Killer, Roundup Ready-to-Use Weed & Grass Killer 2, Roundup Ultra Dry, Roundup Ultra Herbicide, Roundup Ultramax, Rounup VM Herbicide, Roundup Weed & Grass Killer Concentrate, Roundup Weed & Grass Killer

RODGERS, ROY V. MONSANTO COMPANY and JOHN DOES 1-50, CIVIL NO. _____
**COMPLAINT**
Page 3

Concentrate Plus, Roundup Weed & Grass Killer Ready-to-Use Plus, Roundup

Weed & Grass Killer Super Concentrate, Roundup Weed Grass Killer 1 Ready-to-

Use, Roundup WSD Water Soluble Dry Herbicide Deploy Dry Herbicide, or any

other formulation of containing the active ingredient glyphosate.

7.   Defendant, Monsanto Company, is a Delaware corporation, Calif. Secretary of State

Entity No. C2362863, in "active" status, with a principle place of business in St.

Louis Missouri.

8.   Upon best information and belief, Defendants John Does 1-50, are subsidiaries,

partners, or other entities that were involved in the design, development,

manufacture, testing, packaging, promoting, marketing, advertising, distribution,

labeling, and/or sale of the herbicide Roundup, containing the active ingredient

glyphosate. The identities of John Does 1-50 are unknown to Plaintiff at this time,

Plaintiff will move the Court to specifically name John Does 1-50 as their identities

become known to Plaintiff through discovery. Several of the John Does are

distributors of the products that reside in, or are corporations incorporated in the

U.S. Virgin Islands, the exact identity to be learned in discovery.

9.   Defendant Monsanto Company and John Does 1-50 are collectively referred to as

"Monsanto Defendants" or "Defendants".

10.  Defendants advertise and sell goods, specifically Roundup, in the U.S. Virgin

Islands.

11.  Defendants transacted and conducted business within the Territory of the U.S.

RODGERS, ROY V. MONSANTO COMPANY and JOHN DOES 1-50, CIVIL NO. _____
**COMPLAINT**
Page 4

Virgin Islands that relates to the allegations in this Complaint.

12. Defendants derived substantial revenue from good and products used in the U.S. Virgin Islands.

13. Defendant expected or should have expected their acts to have consequences within the U.S. Virgin Islands, and derived substantial revenue from interstate commerce.

14. Defendants engaged in the business of designing, developing, manufacturing, testing, packaging, marketing, distributing, labeling, and/or selling Roundup.

15. Defendants are authorized to do business in U.S. Virgin Islands and derive substantial income from doing business in this Territory.

16. Upon information and belief, Defendants purposefully availed themselves of the privilege of conduction activities with the U.S. Virgin Islands, thus invoking the benefits and protections of its laws.

17. Upon information and belief, Defendants did act together to design, sell, advertise, manufacture and/or distribute Roundup, with full knowledge of its dangerous and defective nature.

## FACTUAL ALLEGATIONS

18. At all relevant times, Defendants were in the business of, and did, design, research, manufacture, test, advertise, promote, market, sell, distribute, and/or have acquired and are responsible for Defendants, who have designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed the

RODGERS, ROY V. MONSANTO COMPANY and JOHN DOES 1-50, CIVIL NO. _____
**COMPLAINT**
Page 5

commercial herbicide Roundup.

19. Monsanto is a multinational agricultural biotechnology corporation based in St. Louis, Missouri. It is the world's leading producer of glyphosate.

20. Defendants discovered the herbicidal properties of glyphosate during the 1970's and subsequently began to design, research, manufacture, sell and distribute glyphosate based "Roundup" as a broad-spectrum herbicide.

21. Glyphosate is the active ingredient in Roundup.

22. Glyphosate is a broad-spectrum herbicide used to kill weeds and grass known to compete with commercial crops grown around the globe.

23. Glyphosate is a "non-selective" herbicide, meaning it kills indiscriminately based only on whether a given organism produces a specific enzyme, 5-enolpyruvylshikimic acid-3-phospate synthase, known as EPSP synthase.

24. Glyphosate inhibits the enzyme 5- enolpyruvylshikimic acid-3-phospate synthase that interferes with the shikimic pathway in plants, resulting in the accumulation of shikimic acid in plant tissue and ultimately plant death.

25. Sprayed as a liquid, plants absorb glyphosate directly through their leaves, stems, and roots, and detectable quantities accumulate in the plant tissues.

26. Each year. Approximately 250 million pounds of glyphosate are sprayed on crops, commercial nurseries, suburban lawns, parks, and golf courses. This increased in use has been driven largely by the proliferation of genetically engineered crops, crops specifically tailored to resist the activity of glyphosate.

RODGERS, ROY V. MONSANTO COMPANY and JOHN DOES 1-50, CIVIL NO. _____
**COMPLAINT**
Page 6

27. Defendants are intimately involved in the development, design, manufacture, marketing, sale, and/or distribution of genetically modified ("GMO") crops, many of which are marketed as being resistant to Roundup *i.e,* "Roundup Ready ®," As of 2009, Defendants were the world's leading producer of seeds designed to be Roundup Ready®. In 2010, an estimated 70% of corn and cotton, and 90% is soybean fields in the United States contained Roundup Ready® seeds.

28. The original Roundup, containing the active ingredient glyphosate, was introduced in 1974. Today, glyphosate products are among the world's most widely used herbicides, Monsanto's glyphosate products are registered in more than 130 countries and are approved for weed control in more than 100 crops. No other herbicide active ingredient compares in terms of number of approved uses.

29. For nearly 40 years, farmers across the globe have used Roundup, unaware of its carcinogenic properties.

## REGISTRATION OF HERBICIDES UNDER FEDERAL LAW

30.  The manufacture, formulation and distribution of herbicides, such as Roundup, are regulated under Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA"), 7 U.S.C. § 136 *et seq.* FIFRA requires that all pesticides be registered with the Environmental Protection Agency ("EPA") prior to their distribution, sale, or use, except as described by FIFRA 7 U.S.C. 136a(a).

31. The EPA requires as part of the registration process, among other requirements, a variety of tests to evaluate the potential for exposure to pesticides, toxicity to people

RODGERS, ROY V. MONSANTO COMPANY and JOHN DOES 1-50, CIVIL NO. _____
**COMPLAINT**
Page 7

and other potential non-target organisms, and other adverse effects on the environment, Registration by the EPA, however, is not an assurance or finding of safety. The determination to EPA makes in registering or re-registering a product is not that the product is "safe", but rather that use of the product in accordance with its label directions "will not generally cause unreasonable adverse effects on the environment." 7 U.S.C. § 136(a)(c)(5)(D).

32. FIFRA defines "unreasonable adverse effects on the environments" to mean "any unreasonable rick to man or the environment, taking into account the economic, social, and environmental costs and benefits of the use of any pesticide.": 7 U.S.C. § 136(bb). FIFRA thus requires the EPA to make a risk/benefit analysis in determining whether a registration should be granted or allowed to continue to be sold in commerce.

33. The EPA and the State of California registered Roundup for distribution, sale, and manufacture in the United States and the State of California.

34. FIFRA generally requires that the registrant, Monsanto, conduct health and safety testing of pesticide products. The government is not required, nor is it able, to perform the product tests that are required of the manufacturer.

35. The evaluation of each pesticide product distributed, sold, or manufactured is completed at the time the product is initially registered. The data necessary for registration of a pesticide has changed over time. The EPA is now in the process of re-evaluating all pesticide products through a Congressionally-mandated process

RODGERS, ROY V. MONSANTO COMPANY and JOHN DOES 1-50, CIVIL NO. _____
**COMPLAINT**
Page 8

called "re-registration." 7 U.S.C. § 136a-1. In order to reevaluate these pesticides, the EPA demands the completion of additional tests and the submission of data for the EPA's review and evaluation.

36. In the case of glyphosate and Roundup, the EPA had planned on releasing its preliminary rick assessment- in relation to the registration process – no later than July 2015. The EPA completed its review of glyphosate in early 2015, but delayed releasing the assessment pending further review in light of the World Health Organization's findings.

## MONSANTO'S FALSE REPRESENTATIONS REGARDING THE SAFETY OF ROUNDOP®

37. In 1996, the New York Attorney General ("NYAG") filed a lawsuit against Monsanto based on its false and misleading advertising of Roundup products. Specifically, the lawsuit challenged Monsanto's general representations that its spray-on glyphosate-based herbicides, including Roundup, were "safer **than table salt**" and "practically **non-toxic**" to mammals, birds, and fish. Among representations the NYAG found deceptive and misleading about the human and environmental safety of Roundup are the following:

   a) Remember that environmentally friendly Roundup herbicide is biodegradable. It won't build up in the soil so you can use Roundup with confidence along customers' driveways. Sidewalks and fences…

   b) And remember that Roundup is biodegradable and won't build up in the soil. That will give you the environmental confidence you need to use Roundup everywhere you've got a weed, brush, edging or trimming problem.

RODGERS, ROY V. MONSANTO COMPANY and JOHN DOES 1-50, CIVIL NO. _____
**COMPLAINT**
Page 9

        c) Roundup biodegradables into naturally occurring elements.

        d) Remember that versatile Roundup herbicide stays where you put it. That means there's no washing or leaching o harm customers' shrubs or other desirable vegetation.

        e) This no-residual herbicide will not wash or leach in the soil. It... stays where you apply it.

        f) You can apply Accord with "confidence because it will stay where you put it" it bonds tightly to soil particles, preventing leaching. Then, soon after application, soil microorganisms biodegrade Accord into natural products.

        g) Glyphosate is less toxic to rate that table salt following acute oral ingestion.

        h) Glyphosate's safety margin is much greater than required. It has over a 1,000-fold safety margin in food and over a 700-fold safety margin for workers who manufacture it or use it.

        i) You can feel good about using herbicides by Monsanto. They carry a toxicity category rating of "practically non-toxic' as it pertains to mammals, birds and fish.

        j) "Roundup can be used where kids and pets will play and break down into natural material." This ad depicts a person with his head in the ground and a pet dog standing in an area which has been treated with Roundup.

38. On November 19, 1996, Monsanto entered into an Assurance of Discontinuance with NYAG, in which Monsanto agreed, among other things, "to cease and desist from publishing or broadcasting any advertisements [in New York] that represent, directly or by implication: that:

        a) its glyphosate-containing pesticide products or any component thereof are safe, non-toxic, harmless or free from risk.

        b) its glyphosate-containing pesticide products or any component thereof

RODGERS, ROY V. MONSANTO COMPANY and JOHN DOES 1-50, CIVIL NO. _____
**COMPLAINT**
Page 10

          manufactured, formulated, distributed or sold by Monsanto are biodegradable.

    c)  its glyphosate-containing pesticide products or any component thereof stay where they are applied under all circumstance and will not move through the environment by any means.

    d)  its glyphosate-containing pesticide products or any component thereof are "good" for the environment or are "known for their environmental characteristics."

    e)  glyphosate-containing pesticide products or any component thereof are safer or less toxic than common consumer products other than herbicides;

    f)  its glyphosate-containing pesticide products or any component thereof might be classified as "practically non-toxic."

39. Monsanto did not alter its advertising in the same manner on any state other than New York, and on information and belief still has not done so today.

40. In 2009, France's highest court ruled that Monsanto has not told the truth about the safety of Roundup. The French court affirmed an earlier judgment that Monsanto has falsely advertised its herbicide Roundup as "biodegradable" and that it "left the soil clean."

## EVIDENCE OF CARCINOGENICITY IN ROUNDUP

41. As early as the 1980's Monsanto was aware of glyphosate's carcinogenic properties.

42. On March 4, 1985, a group of the Environmental Protection Agency's ("EPA") Toxicology Branch published a memorandum classifying glyphosate as a Category

RODGERS, ROY V. MONSANTO COMPANY and JOHN DOES 1-50, CIVIL NO. _____
**COMPLAINT**
Page 11

C oncogene. Category C oncogene are possible human carcinogens with limited evidence of carcinogenicity.

43. In 1986, the EPA issued a Registration Standard for glyphosate (NTIS PB87-103214). The Registration standard required additional phytotoxicity, environmental fate, toxicology, product chemistry, and residue chemistry studies. All of the data requires was submitted and reviewed and/or waived.

44. In October 1991, the EPA published a Memorandum entitled "Second Peer Review of Glyphosate." The memorandum changes glyphosate's classification to Group E (evidence of no-carcinogenicity for humans). Two peer review committee members did not concur with the conclusion of the committee and one member refused to sign.

45. In addition to the toxicity of the active molecule, many studies support the hypothesis that glyphosate formulations found in Defendants' Roundup products are more dangerous and toxic that glyphosate alone. As early as 1991 evidence existed demonstrating that glyphosate formulations were significantly more toxic that glyphosate alone.

46. In 2002, Julie Marc published a study entitled "Pesticide Roundup Provokes Cell Division Dysfunction at the Level of CDK1/Cyclin B Activation."

47. The study found that Defendants' Roundup caused delays in the cell cycles of sea urchins, while the same concentration of glyphosate alone proved ineffective and did not alter cell cycles.

RODGERS, ROY V. MONSANTO COMPANY and JOHN DOES 1-50, CIVIL NO. _____
**COMPLAINT**
Page 12

48. In 2004, Julie Marc published a study entitled "Glyphosate-based pesticide affect cell cycle regulation." The study demonstrated a molecular link between glyphosate-based products and cell cycles dysregulation.

49. The study noted that "cell-cycle dysregulation is a hallmark of tumor cells and human cancer. Failure in the cell-cycle checkpoints leads to genomic instability and subsequent development of cancers from the initial affected cell, it was of interest to evaluate the threshold does of glyphosate affecting cells.

50. In 2005, Francisco Peixoto published a study showing that Roundup's effects on rat liver mitochondria are much more toxic and harmful that the same concentrations of glyphosate alone.

51. The Peixoto study suggested that the harmful effects of Roundup on mitochondrial bioenergetics could not be exclusively attributed glyphosate and could be the result of other chemicals, namely the surfactant POEA, or alternatively due to the possible synergy between glyphosate and Roundup formulation products.

52. In 2009, Nora Benachour and Gilles-Eric Seralini published a study examining the effects of Roundup and glyphosate on human umbilical, embryonic, and placental cells.

53. The study used dilution levels of Roundup and glyphosate far below agricultural recommendations, corresponding with low levels of residues in food. Th study concluded that supposed "inert" ingredients, and possibly POEA, change human cell permeability and amplify toxicity of glyphosate alone.  The study further

RODGERS, ROY V. MONSANTO COMPANY and JOHN DOES 1-50, CIVIL NO. _____
**COMPLAINT**
Page 13

suggested that determinations of glyphosate toxicity should take into account the presence of adjuvants, or those chemicals used in the formulation of the complete pesticide. The study confirmed that the adjuvants in Roundup are not inert and that Roundup is always more toxic that its active ingredient glyphosate.

54. The result of these studies were confirmed in recently published peer-reviewed studies an went at all time available and/or known to Defendants.

55. Defendants knew or should have known that Roundup is more toxic than glyphosate alone and that safety studies on Roundup, Roundup's adjuvants and "inert" ingredients, and/or the surfactant POEA were necessary to protect Plaintiff from Roundup.

56. Defendants knew or should have known that tests limited to Roundup's active ingredient glyphosate were sufficient to prove the safety of Roundup.

57. Defendants failed to appropriately and adequately test Roundup, Roundup's adjuvants and "inert" ingredients, and/or the surfactant POEA to protect Plaintiff from Roundup.

58. Rather than performing appropriate tests, Defendants relied upon flawed industry-supported studies designed to protect Defendants' economic interests rather that Plaintiff and the consuming public.

59. Despite their knowledge that roundup was considerably more dangerous than glyphosate alone, Defendants continued to promote Roundup as safe.

RODGERS, ROY V. MONSANTO COMPANY and JOHN DOES 1-50, CIVIL NO. _____
**COMPLAINT**
Page 14

## IARC CLASSIFICATION OF GLYPHOSATE

60. The International Agency for Research on Cancer ("IARC") is the specialized intergovernmental cancer agency the World Health Organization ("WHO") of the United Nations tasked with conducting and coordinating research into the causes of cancer.

61. An IARC Advisory Group to Recommend Priorities for IARC Monographs during 2015-2019 met in April 2014. Though nominations for the review were solicited, a substance must meet two criteria to be eligible for review by the IARC Monographs: there must already be some evidence of carcinogenicity of the substance, and there must be evidence that humans are exposed to the substance.

62. IARC set glyphosate for review in 2015-2016. IARC uses five criteria for determining priority in reviewing chemicals. The substance must have a potential for direct impact on public health; scientific literature to support suspicion of carcinogenicity; evidence of significant human exposure; high public interest and/or potential to bring clarity to a controversial area and/or reduce public anxiety or concern; related agents similar to one given high priority by the above considerations. Data reviewed is sourced preferably from publicly accessible; peer-reviewed data.

63. On March 24, 2015, after its cumulative review of human, animal, and DNA studies for more than one (1) year, many of which have been in Defendants' possession since as early as 1985, the IARC's working group published its conclusion that the glyphosate contained in Defendants' Roundup herbicide, is a Class 2A "probable

RODGERS, ROY V. MONSANTO COMPANY and JOHN DOES 1-50, CIVIL NO. _____
**COMPLAINT**
Page 15

carcinogen" as demonstrated by the mechanistic evidence of carcinogenicity in humans and insufficient evidence of carcinogenicity in animals

64. The IARC's full Monograph was published on July 29, 2015 and established glyphosate as a Class 2A *probable* carcinogen to humans. According to the authors glyphosate demonstrated sufficient mechanic evidence (genotoxicity and oxidative stress) to warrant a 2A classification based on evidence of carcinogenicity in humans and animals.

65. The IARC Working Group found an increased risk between exposure to glyphosate and non-Hodgkin's lymphoma ("NHL") and several subtypes of NHL, and the increased risk continued after adjustment for other pesticides.

66. The IARC also found that glyphosate caused DNA and chromosomal damage in human cells.

## EARLIER EVIDENCE OF GLYPHOSATE'S DANGER

67.  Despite the new classification by the IARC, Defendants have had ample evidence of glyphosate and Roundup's genotoxic properties for decades.

68. Genotoxicity refers to chemical agents that are capable of damaging the DNA within a cell through genetic mutations, which is a process that is believed to lead to cancer.

69. In 1997, Chris Clements published "Genotoxicity of select herbicides in *Rana castesbeiana* tadpoles using the alkaline single-cell gel DNA electrophoresis (comet) assay."

RODGERS, ROY V. MONSANTO COMPANY and JOHN DOES 1-50, CIVIL NO. _____
**COMPLAINT**
Page 16

70. The study found that tadpoles exposed to Roundup showed significant DNA damage when compared with unexposed control animals.

71. Both human and animal studies have shown that glyphosate and glyphosate -based formulations such as Roundup can induce oxidative stress.

72. Oxidative stress and associated chronic inflammation are believed to be involved in carcinogenesis.

73. The IARC Monograph notes that "[s]trong evidence exists that glyphosate, AMPA and glyphosate-based formulations can induce oxidative stress."

74. In 2006, Cesar Paz-y-Mino published a study examining DNA damage in human subjects exposed to glyphosate.

75. The study produced evidence of chromosomal damage in blood cell showing significantly greater damage after exposure to glyphosate than before in the same individuals, suggesting that the glyphosate formulation used during aerial spraying had a genotoxic effect on exposed individuals.

76. The IARC Monograph reflects the volume of evidence of glyphosate pesticides' genotoxicity noting "[t]he evidences for genotoxicity caused by glyphosate-based formulations is strong."

77. Despite knowledge to the contrary, Defendants maintain that there is no evidence that Roundup is genotoxic, that regulatory authorities and independent experts are in agreement that Roundup is not genotoxic, and that there is no evidence that Roundup is genotoxic.

RODGERS, ROY V. MONSANTO COMPANY and JOHN DOES 1-50, CIVIL NO. _____
**COMPLAINT**
Page 17

78. In addition to glyphosate and Roundup's genotoxic properties, Defendants have long been aware of glyphosate's carcinogenic properties.

79. Glyphosate and Roundup in particular have long been associates with carcinogenicity and the development of numerous forms of cancer, including, but not limited to, non-Hodgkin's lymphoma, Hodgkin's lymphoma, multiple myeloma, and soft tissue sarcoma.

80. Defendants have known of this association since the early to mid-198s and numerous human and animal studies have evidenced the carcinogenicity of glyphosate and/or Roundup.

81. In 1985, the EPA studied the effects of glyphosate in mice finding a dose related response in male mice linked to renal tubal adenomas, a rare tumor. The study concluded the glyphosate was oncogenic.

82. In 2003, Lennart Hardell and Mikael Eriksson published the results of two case-controlled studies on pesticides as a risk factor for NHL and hairy cell leukemia.

83. The study concluded that glyphosate had the most significant relationship to NHL among all herbicide's studies with an increased odds ratio of 3.11.

84. In 2003, AJ De Roos published a study examining the pooled date of mid-western farmers, examining pesticides and herbicides as rick factor for NHL.

85. The study, which controlled for potential confounders, found a relationship between increased NHL incidence and glyphosate.

86. In 2008, Mike Eriksson published a study a population-based case-control study of

RODGERS, ROY V. MONSANTO COMPANY and JOHN DOES 1-50, CIVIL NO. _____
**COMPLAINT**
Page 18

exposure to various pesticides as a risk factors for NHL.

87. This strengthened previous association between glyphosate and NHL.

88. In spite of this knowledge, Defendants continued to issue broad and sweeping statements suggesting that Roundup was, and is, safer than ordinary household items such as table salt, despite a lack of scientific support for the accuracy and validity of these statements and, in fact voluminous evidence to the contrary.

89. Upon information and belief, these statements and representations have been made with the intent if inducing Plaintiff, the agricultural community, and the public at large to purchase, and increased the use of, Defendants' Roundup for Defendants' pecuniary gain, and in fact did induce Plaintiff to use Roundup.

90. Defendants made these statements with complete disregard and reckless indifference to the safety to Plaintiff and the general public.

91. Notwithstanding Defendants' representations, scientific evidence has established a clear association between glyphosate and genotoxicity, inflammation, and an increased risk of many cancers, including, but not limited to, NHL, Multiple Myeloma, and soft tissue sarcomas.

92. Defendants knew or should have known that glyphosate is associated with an increased risk of developing cancer, including, but not limited to, NHL, Multiple Myeloma, and soft tissue sarcoma.

93. Defendants failed to appropriately and adequately inform and warn Plaintiff of the serious and dangerous ricks associates with the use of and exposure to glyphosate

RODGERS, ROY V. MONSANTO COMPANY and JOHN DOES 1-50, CIVIL NO. _____
**COMPLAINT**
Page 19

and/or Roundup, including, but not limited to, the risk of developing NHL, as well as other severe and personal injuries, which are permanent and/or long-lasting in nature, cause significant physical pain and mental anguish, diminished enjoyment of life, and the need for medical treatment, monitoring and/or medications.

94. Despite the IARC's classification of glyphosate as a class 2A probable carcinogen, Defendants continue to maintain that glyphosate and/or Roundup is safe, non-carcinogenic, non-genotoxic, and falsely warrant to users and general public that independent experts and regulatory agencies agree that there is no evidence of carcinogenicity in glyphosate and Roundup.

95. Defendants have claimed and continue to claim that Roundup is safe, non-carcinogenic, and non-genotoxic.

96. Monsanto claims on its website that "[r]egulatory authorities and independent experts around the world have reviewed numerous long-term/carcinogenicity studies and agree that there is no evidence that glyphosate, the active ingredient in Roundup brand herbicides and other glyphosate-based herbicides, causes cancer, even at very high doses, and that it is not genotoxic."

97. Ironically, the primary source for this statement is a 1986 report by the WHO, the same organization that not considers glyphosate to be a probable carcinogen.

98. Glyphosate, and Defendants' Roundup products in particular, have long been associates with serious side effects and many regulatory agencies around the globe have banned or are currently banning the use of glyphosate herbicide products.

RODGERS, ROY V. MONSANTO COMPANY and JOHN DOES 1-50, CIVIL NO. _____
COMPLAINT
Page 20

99. Defendants' statements proclaiming the safety of Roundup and disregarding its dangers misled Plaintiff.

100. Despite Defendants' knowledge that Roundup was associated with an elevated rick of developing cancer, Defendants' promotional campaigns focused on Roundup's purported "safety profile."

101. Defendants' failure to adequately warn Plaintiff resulted in (1) Plaintiff using and being exposed to glyphosate instead of using another acceptable and safe method of controlling unwanted weeds and pests; and (2) scientist and physicians failing to warn and instruct consumers about the risk of cancer, including NHL, and other injuries associates with Roundup.

102. Defendants failed to seek modification of the labeling of Roundup to include relevant information regarding the risks and dangers associates with Roundup exposure.

103. The failure of Defendants to appropriately warn and inform the EPA has resulted in inadequate warnings in safety information presented directly to users and consumers.

104. The failure of Defendants to appropriately warn and informed the EPA has resulted in the absence of warning or caution statements are adequate to protect health and the environment.

105. The failure of Defendants to appropriately warn and inform EPA has resulted in the directions for use that are not foregoing acts and omissions, Plaintiff seeks

RODGERS, ROY V. MONSANTO COMPANY and JOHN DOES 1-50, CIVIL NO. _____
**COMPLAINT**
Page 21

compensatory damages as a result of Plaintiff's use od, and exposure to, Roundup

which caused or was a substantial contributing factor in causing Plaintiff to suffer

from cancer, specifically NHL, and Plaintiff suffered severe and personal injuries

which are permanent and lasting in nature, physical pain and mental anguish,

including diminished enjoyment of life.

106.    By reason of the foregoing, Plaintiff is severely and permanently injured.

107.    By reason of the foregoing acts and omissions, Plaintiff has endured and, in some

categories continues to suffer, emotional and mental anguish, medical expenses,

and other economic and non-economic damages, as a result if the actions and

inactions of the Defendants.

### PLAINTIFF'S EXPOSURE TO ROUNDUP

108.    Plaintiff used Roundup beginning in 1968 to control weeds around his agriculture

plants around the island.

109.    For many years, Plaintiff sprayed Roundup on a regular basis. Plaintiff followed all

safety and precautionary warnings during the course of use.

110.    Plaintiff was subsequently diagnosed with large B-cell Non-Hodgkin Lymphoma in,

or around 2012, but was unaware of the connection to Roundup.

111.    As a result of his injury, Plaintiff has incurred significant economic and non-

economic damages.

### EQUTIABLE TOLLING OF APPLICANBLE STATUS OF LIMITATIONS

112.    Plaintiff incorporate by reference all prior paragraphs of this Complaint as if fully set

RODGERS, ROY V. MONSANTO COMPANY and JOHN DOES 1-50, CIVIL NO. _____
**COMPLAINT**
Page 22

forth herein.

113. The running of any statute of limitation has been told by reason of Defendants' fraudulent concealment. Defendants, through their affirmative misrepresentations and omissions, actively concealed from Plaintiff the true risks associate with Roundup and glyphosate. Indeed, even as of October 2015, Defendants continue to represent to the public that "Scientists are in agreement that there is no evidence glyphosate causes cancer." (emphasis added)

114. As a result of Defendants' actions, Plaintiff was unaware, and could not reasonably know or have learned through reasonable diligence that Roundup and/or glyphosate contact, exposed Plaintiff to the risks alleged herein and that those risks were the direct and proximate result of Defendants' act and omissions.

115. Furthermore, Defendants are estopped from relying on any statute of limitations because of their fraudulent concealment of the true character, quality and nature of Roundup. Defendants were under a duty to disclose the true character, quality and nature of Roundup because this was non-public information over which Defendants had and continue to have exclusive control, and because Defendants know that this information was not available to Plaintiff or to distributors of Roundup. In addition, Defendants are estopped from relying on any statute of limitations because of their intention concealment of these facts.

116. Plaintiff had no knowledge that Defendants were engaged in the wrongdoing alleged herein. Because of the fraudulent acts of concealment of wrongdoing by

RODGERS, ROY V. MONSANTO COMPANY and JOHN DOES 1-50, CIVIL NO. \_\_\_\_\_
**COMPLAINT**
Page 23

Defendants, Plaintiff could not have reasonably discovered the wrongdoing at any time prior. Also, the economics of this fraud should be considered. Defendants had the ability to and did spend enormous amount of money in furtherance of their purpose of marketing, promoting and/or distributing a profitable herbicide, notwithstanding the known or reasonably known ricks. Plaintiff and medical professionals could not have afforded and could not have possibly conducted studies to determine the nature extent, and identity of related health risks, and were forced to rely on only the Defendants' representations, Accordingly, Defendants are precluded by the discovery rule and/or the doctrine of fraudulent concealment from r relying upon any statute of limitations.

### FIRST CAUSE OF ACTION
### (NEGLIGENCE)

117. Plaintiff repeats, reiterates, and re-alleges each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

118. Defendants had a duty to exercise reasonable care in the designing, researching, testing, manufacturing, marketing, supplying promoting, packaging, sale, and/or distribution of Roundup into the stream of commerce, including a duty a assure that the product would not cause users to suffer unreasonable, dangerous side effects.

119. Defendants failed to exercise ordinary care in the designing researching, testing, manufacturing, marketing, supplying promoting, packaging, sale, testing, quality

RODGERS, ROY V. MONSANTO COMPANY and JOHN DOES 1-50, CIVIL NO. _____
**COMPLAINT**
Page 24

assurance, quality control and/or distribution of Roundup into interstate commerce in that Defendants knew or should have known that using Roundup created a high risk of unreasonable, dangerous side effects, including, but not limited to, the development of NHL, as well as other severe and personal injuries which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life, as well as need for lifelong medical treatment, monitoring, and/or medications.

120. The negligence by the Defendants, their agent, servants, and/or employees, included, but was not limited to the following acts and/or omissions:

a) Manufacturing, producing promoting, formulating, creating, and/or designing Roundup without thoroughly testing it;

b) Failing to test Roundup and/or failing to adequately, sufficiently, and properly test Roundup;

c) Not conducting sufficient testing programs to determine whether or not Roundup was safe for use; in that Defendants herein knew or should have known that Roundup was unsafe and unfit for use by reason of the dangers to its users;

d) Not conducting sufficient testing programs and studies to determine Roundup's carcinogenic properties even after Defendants had knowledge that Roundup is, was, or could be carcinogenic;

e) Failing to conduct sufficient testing programs to determine the safety of

RODGERS, ROY V. MONSANTO COMPANY and JOHN DOES 1-50, CIVIL NO. _____
**COMPLAINT**
Page 25

"inert" ingredients and/or adjuvants contained within Roundup, and the
propensity of these ingredients to render Roundup toxic, increase the toxicity
of Roundup, whether these ingredients are carcinogenic, magnify the
carcinogenic properties of Roundup, and whether or not "inert" ingredients
and/or adjuvants were safe for use;

f) Negligently failing to adequately and correctly warn the Plaintiff, the public,
the medical and agricultural professions, and the EPA of the dangers of
Roundup;

g) Negligently failing to petition the EPA to strength the warnings associates
with Roundup;

h) Failing to provide adequate cautions and warnings to protect the health of
users, handlers, applications, and persons who would reasonably and
foreseeably come into contact with Roundup;

i) Negligently marketing, advertising, and recommending the use of Roundup
without sufficient knowledge as to its dangerous propensities;

j) Negligently representing hat Roundup was safe for use for its intend
purpose, and/or that Roundup was safer that ordinary and common items
such as table salt, when, in fact, it was unsafe;

k) Negligently representing that Roundup had equivalent safety and efficacy as
other forms of herbicides;

l) Negligently designing Roundup in a manner, which was dangerous to its

RODGERS, ROY V. MONSANTO COMPANY and JOHN DOES 1-50, CIVIL NO. _____
**COMPLAINT**
Page 26

                users;

    m) Negligently manufacturing Roundup in a manner, which dangerous to its users;

    n) Negligently producing Roundup in a manner, which was dangerous to its users;

    o) Negligently formulating Roundup in a manner, which was dangerous to its users;

    p) Concealing information from the Plaintiff while knowing that Roundup was unsafe, dangerous and/or non-conforming with EPA regulations; and

    q) Improperly concealing and/or misrepresenting information form the Plaintiff, scientific and medical professionals, and/or the EPA, concerning the severity of ricks and dangers of Roundup compared to other forms of herbicides.

    r) Negligently selling Roundup with a false and misleading label.

121. Defendants under-reported, underestimated, and downplayed the serious dangers of Roundup.

122. Defendants negligently and deceptively compared the safety risks and/or dangers of Roundup with common everyday foods such as table salt, and other forms of herbicides.

123. Defendants were negligent and/or violated California law in the designing, researching, supplying, manufacturing, promoting, packaging, distributing, testing, advertising, warning marketing, and selling of Roundup in that key:

RODGERS, ROY V. MONSANTO COMPANY and JOHN DOES 1-50, CIVIL NO. _____
**COMPLAINT**
Page 27

a)  Failed to use ordinary care in designing and manufacturing Roundup so as to avoid the aforementioned risks to individuals when Roundup was used as an herbicide;

b)  Failed to accompany their product with proper and/or accurate warnings regarding all possible adverse side effects associates with the use of Roundup;

c)  Failed to accompany their product with proper warnings regarding all possible adverse side effects concerning the failure and/or malfunction of Roundup;

d)  Failed to accompany their product with accurate warnings regarding risks of all possible adverse side effects concerning Roundup;

e)  Failed to warn Plaintiff of the severity and duration of such adverse effects, as the warning given did not accurately reflect the symptoms, or severity of the side effects including, but not limited to, the development of NHL;

f)  Failed to conduct adequate testing clinical testing and post-marketing surveillance to determine the safety of Roundup;

g)  Failed to conduct adequate testing, clinical testing, and post-marketing surveillance to determine the safety of Roundup's "inert" ingredients and/or adjuvants;

h)  Negligently misrepresented the evidence of Roundup's genotoxicity and carcinogenicity;

RODGERS, ROY V. MONSANTO COMPANY and JOHN DOES 1-50, CIVIL NO. _____
**COMPLAINT**
Page 28

      i)   Were otherwise careless and/or negligent.

124. Despite the fact that Defendant knew or should have known that Roundup caused, or could cause, unreasonably dangerous side effects, Defendants continued and continue to market, manufacture, distribute, and/or sell Roundup to consumers, including the Plaintiff.

125. Defendants knew or should know that consumers such as the Plaintiff would foreseeably suffer injury as a result of Defendants' failure to exercise ordinary care, as set forth above.

126. Defendants' violation of law and/or negligence were the proximate cause of Plaintiff's injuries, harm and economic loss, which Plaintiff suffered and/or will continue to suffer.

127. As a result of the foregoing acts and omissions, the Plaintiff suffered from serious and dangerous side effects including, but not limited to, NHL, as well as other severe and personal injuries which are permanent and lasting in nature, physical pain and mental anguish, diminished enjoyment of life, and financial expenses for hospitalization and medical care. Further, Plaintiff suffered life-threatening NHL, and severe personal injuries, which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life.

128. **WHEREFORE**, Plaintiff respectfully requests that this Court enter judgment in Plaintiff's favor compensatory and punitive damages, together with interest, costs herein incurred, attorney's fees and all relief as this Court deems just and proper.

RODGERS, ROY V. MONSANTO COMPANY and JOHN DOES 1-50, CIVIL NO. _____
**COMPLAINT**
Page 29

Additionally, Plaintiff demands a jury trial on all issues contained herein.

## SECOND CAUSE OF ACTION
## (STRICT PRODUCTS LIABILITY-DESIGN DEFECT)

129. Plaintiff repeats, reiterate and, re-alleges each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effects as if more fully set forth herein.

130. At all-time herein mentioned, the Defendants designed, researched, manufactured, tested, advertised, promoted, sold, distributed, and/or have acquired the Defendants who have designed, researched, tested, advertised, promoted, marketed, sold, and distributed Roundup as hereinabove described that was used by the Plaintiff.

131. Defendants' Roundup was expected to and did reach the usual consumers, handlers, and persons coming into contact with said product without substantial change in the condition in which it was produced, manufactured, sold distributed, and marketed by the Defendants.

132. At those times, Roundup was in an unsafe, defective, and inherently dangerous condition, which was dangerous to users, and in particular, the Plaintiff herein.

133. The Roundup designed, research, manufactured, tested advertised, promoted, marketed, sold, and distributed by Defendants was defective in design or formulation in that, when it left the hands of the Defendants manufacturers and/or suppliers, it was unreasonably dangerous, unreasonably dangerous in normal use, and it was more dangerous than an ordinary consumer would expect.

RODGERS, ROY V. MONSANTO COMPANY and JOHN DOES 1-50, CIVIL NO. _____
**COMPLAINT**
Page 30

134. At all times herein mentioned, Roundup was in a defective condition and unsafe, and Defendants knew or had reason to know that said product was defective and unsafe, especially when used in the form and manner as provided by the Defendants. In particular, Defendants' Roundup was defective in the following ways:

   a) When placed in the stream of commerce, Defendants' Roundup Products were defective in design and formulation and, consequently, dangerous to an extent beyond that which an ordinary consumer would anticipate.

   b) When placed in the stream of commerce, Defendants' Roundup Products were unreasonably dangerous in that they were hazardous and posed a grave risk of cancer and other serious illnesses when used in a reasonably anticipated manner.

   c) When placed in the stream of commerce, Defendants' Roundup products contained unreasonably dangerous design defects and were not reasonably safe when sued in a reasonably anticipated manner.

   d) Defendants did not sufficiently test, investigate, or study its Roundup products.

   e) Exposure to Roundup presents a risk of harmful side effects that outweigh any potential utility stemming from the use of the herbicide.

   f) Defendants new or should have known at the time of marketing its Roundup products that exposure to Roundup and could result in cancer and other severe illnesses and injuries.

   g) Defendant did not conduct adequate post-marketing surveillance of its Roundup products.

135. Defendant knew, or should have known that at all times herein mentioned its Roundup was in defective condition, and was and is inherently dangerous and unsafe.

136. Plaintiff was exposed to Defendants' Roundup in the course of his employment, as

RODGERS, ROY V. MONSANTO COMPANY and JOHN DOES 1-50, CIVIL NO. _____
**COMPLAINT**
Page 31

described above, without knowledge of Roundup's dangerous characteristics.

137. At the time of the Plaintiff' use of and exposure to Roundup, Roundup was being used for the purposes and in a manner normally intended, as a broad-spectrum herbicide.

138. Defendants with this knowledge voluntarily designed its Roundup with a dangerous condition for use by the public, and in particular the Plaintiff.

139. Defendants has a duty to create a product that was not unreasonably dangerous for its normal, intended use.

140. Defendants created a product that was and is unreasonably dangerous for its normal, intended use.

141. Defendants marketed and promoted a product in such a manner so as to male it inherently defective as the product downplayed its suspected, probable, and established health risks inherent with normal, intended use.

142. The Roundup designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed by Defendants was manufactured defectively in that Roundup left the hands of Defendants in a defective condition and was unreasonably dangerous to its intended users.

143. The Roundup designed, research, manufactured, tested, advertised, promoted, marketed, sold, and distributed by Defendants reached their intended users in the same defective and unreasonably dangerous condition in which the Defendants' Roundup was manufactured.

RODGERS, ROY V. MONSANTO COMPANY and JOHN DOES 1-50, CIVIL NO. _____
**COMPLAINT**
Page 32

144. Defendants designed, researched, tested, advertised, promoted, marketed, sold, and distributed a defective product, which created an unreasonable risk to the heath of consumers and to the Plaintiff in particular, and Defendants are therefore strictly liable for the injuries sustained by the Plaintiff.

145. The Plaintiff could not, by the exercise of reasonable care, have discovered Roundup's defects herein mentioned or perceived its danger.

146. By reason of the foregoing, the Defendants have become strictly liable to the Plaintiff for the manufacturing, marketing, promoting, distribution, and selling of a defective product, Roundup.

147. Defendants' defective design, of Roundup amounts to willful, wanton, and/or reckless conduct by Defendants.

148. Defects in Defendants' Roundup were the cause or a substantial factor in causing Plaintiff's injuries.

149. As a result of the foregoing acts and omission, the Plaintiff developed NHL, and suffered severe and personal injuries, which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life and financial expenses for hospitalization and medical care.

150. **WHEREFORE,** Plaintiff respectfully requests that this Court enter judgment in Plaintiff's favor for compensatory and punitive damages, together with interest, cost herein incurred, attorneys' fees and all relief as this Court deems just and proper. Additionally, Plaintiff demands a jury trial on all issues contained herein.

RODGERS, ROY V. MONSANTO COMPANY and JOHN DOES 1-50, CIVIL NO. _____
**COMPLAINT**
Page 33

## THIRD CAUSE OF ACTION
## (STRICT PRODUCTS LIABILITY-FAILURE TO WARN)

151. Plaintiff repeats, reiterates and re-alleges each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effects as if more fully set forth herein.

152. Defendants have engaged in the business of selling, testing, distributing, supplying, manufacturing, marketing, and/or promoting Roundup, and through that conduct have knowingly and intentionally placed Roundup into the stream of commerce with full knowledge that it reached consumer such as Plaintiff who are exposed to tit through ordinary and reasonably foreseeable uses.

153. Defendant did in fact sell, distribute, supply, manufacture, and/or promote Roundup to Plaintiff. Additionally, Defendants expected the Roundup that they selling, distributing supplying, manufacturing, and/or promoting to reach-and Roundup did in fact reach – consumers, including Plaintiff, without any substantial change in the condition of the product from when it was initially distributed by Defendants.

154. At the time of manufacture, Defendant could have provided the warnings or instructions regarding the full and complete risks of Roundup and glyphosate-containing productions because it knew or should have known of the unreasonable risks of harm associates with the use of and/or exposure to such products.

155. At all times herein mentioned, the aforesaid product was defective and unsafe in manufacture such that it was unreasonably dangerous to the user, and was so at

RODGERS, ROY V. MONSANTO COMPANY and JOHN DOES 1-50, CIVIL NO. _____
**COMPLAINT**
Page 34

the time it was distributed by Defendants and at the time Plaintiff was exposed to

an/or ingested the product. The defective condition of Roundup was due in part to

fact that it was not accompanied by proper warning regarding its carcinogenic

qualities and possible side effects, including, but not limited to, developing non-

Hodgkin's lymphoma as a result of exposure and use.

156.  Roundup did not contain a warning or caution statement, which was necessary and,

if complied with, was adequate to protect health those exposed in violation of 7

U.S.C.§ 136j(a)(1)(E).

157.  Defendants could have amended the label of Roundup to provide additional

warnings.

158.  This defect caused serious injury to Plaintiff, who used Roundup in its intended and

foreseeable manner.

159.  At all times herein mentioned, Defendants and a duty to properly design,

manufacture, compound, test, inspect, package, label, distribute, market, examine,

maintain supply, provide proper warning, and take such steps to assure that the

product did not cause users to suffer from unreasonable and dangerous side

effects.

160.  Defendants labeled, distributed, and promoted the aforesaid product that it was

dangerous and unsafe for the use and purpose for which it was intended.

161.  Defendants failed to warn of the nature and scope of the side effects associates

with Roundup, namely its carcinogenic properties and its propensity to cause or

RODGERS, ROY V. MONSANTO COMPANY and JOHN DOES 1-50, CIVIL NO. _____
**COMPLAINT**
Page 35

serve as a substantial contributing factor in the development of NHL.

162.  Defendants were aware of the probable consequences of the aforesaid conduct. Despite the fact that Defendants knew or should have known that Roundup caused serious injuries, Defendants failed to exercise reasonable acre to warn of the dangerous carcinogenic properties and side effect of developing NHL from Roundup exposure, even though these side effects were known or reasonably scientifically knowable at the time of distribution. Defendants willfully and deliberately failed to avoid the consequences associates with their failure to warn, and in doing so, Defendants acted with a conscious disregard for the safety of Plaintiff.

163.  At the time of exposure, Plaintiff could not have reasonably discovered any defect in Roundup prior through the exercise of reasonable care.

164.  Defendants, as the manufacturers and/or distributors of the subject product, are held to the level of knowledge of an expert in the field.

165.  Plaintiff reasonably relied upon the skill, superior knowledge, and judgment of Defendants.

166.  Had Defendants properly disclosed the risks associates with Roundup, Plaintiff would have avoided the risk of NHL by not using Roundup.

167.  The information that Defendants did provide or communicate failed to contain adequate warnings and precautions that would have enabled Plaintiff, and similarly situated individuals, to utilize the product safely and with adequate protection. Instead, Defendants disseminated information that was inaccurate, false, and

RODGERS, ROY V. MONSANTO COMPANY and JOHN DOES 1-50, CIVIL NO. _____
**COMPLAINT**
Page 36

misleading and which failed to communicate accurately or adequately the comparative severity, duration, and extent of the rick of injuries associates with use if and/or exposure to Roundup and glyphosate; continued to promote the efficacy of Roundup, even after it knew or should have known of the unreasonable risks from use or exposure; and concealed, downplayed, or otherwise suppressed, through aggressive marketing and promotion, and information or research about the risks and dangers of exposure to Roundup and glyphosate.

168. To this day, Defendants have failed to adequately warn of the true risk of Plaintiff's injuries associated with the use of exposure to Roundup.

169. As a result of their inadequate warning, Defendants' Roundup products were defective and unreasonably dangerous when they left the possession and/or control of Defendant, were distributed by Defendant, and use by Plaintiff.

170. As a direct and proximate result of Defendants'' actions as alleged herein, and in such other ways to be later shown, the subject product caused Plaintiff to sustain injuries as herein alleged.

171. **WHEREFORE,** Plaintiff respectfully requests that this Court enter judgment in Plaintiff's favor for compensatory and punitive damages, together with interest, cost herein incurred, attorneys' fees and all relief as this Court deems just and proper. Additionally, Plaintiff demands a jury trial on all issues contained herein.

RODGERS, ROY V. MONSANTO COMPANY and JOHN DOES 1-50, CIVIL NO. _____
**COMPLAINT**
Page 37

## FOURTH CAUSE OF ACTION
### (BREACH OF IMPLIED WARRANTIES)

172. Plaintiff repeats, reiterates, and re-alleges each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect all if more fully set forth herein.

173. At all times herein mentioned, the Defendants manufactured, distributed, compounded, recommended, merchandize, advertised, promoted, and sold Roundup and/or have recently acquired the Defendants who have manufactured, compound portrayed, distributed, recommended, merchandized, advertised, promoted, and sol Roundup, as a broad-spectrum herbicide. These actions were under the ultimate control and supervision of Defendants.

174. At the time Defendants marketed, sold, and distributed Roundup for use by Plaintiff, Defendants knew of Roundup's intended use and impliedly warranted the product to be or merchantable quality and safe and fit for this use.

175. The Defendants impliedly represented and warranted to Plaintiff and users of Roundup, the agricultural community, and/or the EPA that Roundup was safe and of merchantable quality and fit for the ordinary purpose for which it was to be used.

176. These representations and warranties were false, misleading, and inaccurate in that Roundup was unsafe, unreasonably dangerous, not of merchantable quality, and defective.

177. Plaintiff and/or the EPA did rely on said implied warranty of merchantability of

RODGERS, ROY V. MONSANTO COMPANY and JOHN DOES 1-50, CIVIL NO. _____
**COMPLAINT**
Page 38

fitness for particular use and purpose.

178.  Plaintiff reasonable relied upon the skill and judgment of Defendants as to whether Roundup was of merchantable quality and safe fit for its intended use.

179.  Roundup was injected into the stream of commerce by the Defendants in a defective, unsafe, and inherently dangerous condition, and the products' materials were expected to and did reach users, handlers, and persona coming into contact with said products without substantial change in the condition in which they were sold.

180.  The Defendants breached the aforesaid implied warranties, as their herbicide Roundup was not fit for its intended purposes and uses.

181.  As a result of the foregoing acts and omission, Plaintiff suffered from NHL and Plaintiff suffered severe and personal injuries which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life, financial expenses for hospitalization and medical care, including medical expense and other economic, and non-economic damages.

182.  **WHEREFORE,** Plaintiff respectfully requests that this Court enter judgment in Plaintiff's favor for compensatory and punitive damages, together with interest, cost herein incurred, attorneys' fees and all relief as this Court deems just and proper. Additionally, Plaintiff demands a jury trial on all issues contained herein.

RODGERS, ROY V. MONSANTO COMPANY and JOHN DOES 1-50, CIVIL NO. _____
**COMPLAINT**
Page 39

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff demands judgment against the Defendants each of the above-referenced claims and causes of action and as follows:

1.  Awarding compensatory damages, including, but not limited to medical expenses, pain, suffering, emotional distress, loss of enjoyment of life, and other non-economic damages in amount to be determined at trial of this action;

2.  Awarding compensatory damages to Plaintiff for past and future damages, including, but not limited to, Plaintiff's pain and suffering and for severe and permanent personal injuries sustained by the Plaintiff including health acre costs and economic loss;

3.  Awarding economic damages in the form of medical expenses, out of pocket expenses, lost earnings and other economic damages in an amount to be determine at trial of this action;

4.  Punitive and/or exemplary damages for the wanton, willful, fraudulent, and reckless acts of the Defendants who demonstrated a compete disregard and reckless indifference for the safety and welfare of the general public and to the Plaintiff in an amount sufficient to punish Defendants and deter future similar conduct, to the extent allowed by applicable law;

5.  Pre-Judgment interest;

6.  Post-judgment interest;

RODGERS, ROY V. MONSANTO COMPANY and JOHN DOES 1-50, CIVIL NO. _____
**COMPLAINT**
Page 40


7.    Awarding Plaintiff reasonable attorneys' fees;

8.    Such other and further relief as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands trial by jury as to all issues.



LEE J. ROHN AND ASSOCIATES, LLC
Attorneys for Plaintiff


DATED:  January 29, 2021            BY:   /s/ *Lee J. Rohn*
                                    Lee J. Rohn, Esq.
                                    VI Bar No. 52
                                    1108 King Street, Suite 3 (mailing)
                                    56 King Street, Third Floor (physical)
                                    Christiansted, St. Croix
                                    U.S. Virgin Islands 00820
                                    Telephone: (340) 778-8855
                                    lee@rohnlaw.com