Query    Reports    Utilities    Help    Log Out

# U. S. District Court
## Western District of Arkansas (El Dorado)
## CIVIL DOCKET FOR CASE #: 1:21-cv-01007-SOH

Shipman v. Monsanto Company
Assigned to: Honorable Susan O. Hickey
Cause: 28:1332 Diversity-Personal Injury

Date Filed: 01/19/2021
Jury Demand: Plaintiff
Nature of Suit: 365 Personal Inj. Prod. Liability
Jurisdiction: Diversity

**Plaintiff**

**Edward Shipman**

represented by **James Harrison Kemp**
Mann & Kemp, PLLC
221 West Second Street
Suite 408
AR
Little Rock, AR 72201
501-519-0186
Fax: 501-222-7478
Email: harrison@mannkemp.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Monsanto Company**

| Date Filed | # | Docket Text |
|---|---|---|
| 01/19/2021 | 1 | CIVIL COVER SHEET for case initiated by Edward Shipman. Please proceed with filing your case initiating document(s).<br><br>If the case initiating documents are not filed by Close of Business the next business day your case may be terminated. (cnn) (Entered: 01/19/2021) |
| 01/19/2021 | 2 | COMPLAINT with Jury Demand against Monsanto Company ( Filing fee $ 402 receipt number AARWDC-2315743), filed by Edward Shipman.(Kemp, James) (Entered: 01/19/2021) |
| 01/19/2021 | 3 | THE DOCUMENT IS RESTRICTED TO COURT USERS.<br><br>Summons Requested as to Shipman for service of the following document: 2 Complaint, 1 Civil Cover Sheet,. (Kemp, James) (Entered: 01/19/2021) |
| 01/20/2021 | 4 | THE DOCUMENT IS RESTRICTED TO COURT USERS AND CASE PARTICIPANTS.<br><br>Summons Issued as to Monsanto Company and returned to attorney or plaintiff for service. |

**YOU MUST PRINT THIS ISSUED SUMMONS, WHICH IS THE MAIN DOCUMENT. PAPER COPIES WILL <u>NOT</u> BE MAILED.**

(cnn) (Entered: 01/20/2021)

| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 03/04/2021 14:30:17 | | | |
| **PACER Login:** | hllp1982 | **Client Code:** | 1417.0049 |
| **Description:** | Docket Report | **Search Criteria:** | 1:21-cv-01007-SOH |
| **Billable Pages:** | 1 | **Cost:** | 0.10 |

# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF ARKANSAS
## (EL DORADO DIVISION)

EDWARD B. SHIPMAN,

                         *Plaintiff*,              Case No:

v.

MONSANTO COMPANY,            COMPLAINT
                                      JURY TRIAL DEMANDED

                 *Defendant*

_____

## COMPLAINT

COMES NOW, Edward B. Shipman ("Plaintiff"), by and through undersigned counsel, and for this cause of action against Defendant Monsanto Company, states to the Court as follows:

## I.  NATURE OF THE CASE

1.     This is an action for damages suffered by Plaintiff as a direct and proximate result of Defendant's negligent and wrongful conduct in connection with the design, development, manufacture, testing, packaging, promoting, marketing, advertising, distribution, labeling, and/or sale of the herbicide Roundup®, containing the active ingredient glyphosate.

2.     Plaintiff maintains that Roundup® and/or glyphosate is defective, dangerous to human health, unfit and unsuitable to be marketed and sold in commerce and lacked proper warnings and directions as to the dangers associated with its use.

3.     Plaintiff's injuries, like those striking thousands of similarly situated victims across the country, were avoidable.

## II.  THE PARTIES

4.      Plaintiff Edward Shipman is a citizen and resident of Mount Holly, Arkansas. Plaintiff purchased and used Roundup and/or other Monsanto glyphosate-containing products ("Roundup") from around 2004 through approximately 2019 in the state of Arkansas, and was diagnosed with Non-Hodgkin's Lymphoma on February 1, 2006, at the age of 50.

5.      "Roundup" refers to all formulations of Defendant's Roundup products, including, but not limited to, Roundup Concentrate Poison Ivy and Tough Brush Killer 1, Roundup Custom Herbicide, Roundup D-Pak herbicide, Roundup Dry Concentrate, Roundup Export Herbicide, Roundup Fence & Hard Edger 1, Roundup Garden Foam Weed & Grass Killer, Roundup Grass and Weed Killer, Roundup Herbicide, Roundup Original 2k herbicide, Roundup Original II Herbicide, Roundup Pro Concentrate, Roundup Prodry Herbicide, Roundup Promax, Roundup Quik Stik Grass and Weed Killer, Roundup Quikpro Herbicide, Roundup Rainfast Concentrate Weed & Grass Killer, Roundup Rainfast Super Concentrate Weed & Grass Killer, Roundup Ready-to-Use Extended Control Weed & Grass Killer 1 Plus Weed Preventer, Roundup Ready-to-Use Weed & Grass Killer, Roundup Ready-to-Use Weed and Grass Killer 2, Roundup Ultra Dry, Roundup Ultra Herbicide, Roundup Ultramax, Roundup VM Herbicide, Roundup Weed & Grass Killer Concentrate, Roundup Weed & Grass Killer Concentrate Plus, Roundup Weed & Grass Killer Ready-to-Use Plus, Roundup Weed & Grass Killer Super Concentrate, Roundup Weed & Grass Killer 1 Ready-to-Use, Roundup WSD Water Soluble Dry Herbicide Deploy Dry Herbicide, or any other formulation of containing the active ingredient glyphosate.

6.      Defendant MONSANTO COMPANY is a Delaware corporation, Missouri Secretary of State Charter No. F00488018, with a principle place of business in St. Louis, Missouri.

7.      Defendant MONSANTO COMPANY is collectively referred to as "Monsanto" or "Defendant."

8.      At all times relevant to this complaint, Monsanto was the entity that discovered the herbicidal properties of glyphosate and the manufacturer of Roundup.

9.      Defendant advertises and sells goods, specifically Roundup, in the State of Arkansas.

10.     Defendant derived substantial revenue from goods and products used in the State of Arkansas.

11.     Defendant expected or should have expected its acts to have consequences within the State of Arkansas, and derived substantial revenue from interstate commerce.

12.     Defendant engaged in the business of designing, developing, manufacturing, testing, packaging, marketing, distributing, labeling, and/or selling Roundup.

13.     Defendant is authorized to do business in Arkansas and derives substantial income from doing business in this state.

14.     Upon information and belief, Defendant purposefully availed itself of the privilege of conducting activities with the State of Arkansas, thus invoking the benefits and protections of its laws.

15.     Upon information and belief, Defendant did design, sell, advertise, manufacture and/or distribute Roundup, with full knowledge of its dangerous and defective nature.

16.     The expiration of any applicable statute of limitations is equitably tolled by reason of Monsanto's fraudulent misrepresentations and fraudulent concealment, detailed more fully below.

## III. BACKGROUND

17.     In 1970, Defendant Monsanto Company, Inc. discovered the herbicidal properties of glyphosate and began marketing it in products in 1974 under the brand name Roundup®. Roundup is a non-selective herbicide used to kill weeds that commonly compete with the growing of crops. By 2001, glyphosate had become the most-used active ingredient in American agriculture with 85–90 millions of pounds used annually. That number grew to 185 million pounds by 2007. As of 2013, glyphosate was the world's most widely used herbicide.

18.     Monsanto is a multinational agricultural biotechnology corporation based in St. Louis, Missouri. It is the world's leading producer of glyphosate. As of 2009, Monsanto was the world's leading producer of seeds, accounting for 27% of the world seed market. The majority of these seeds are of the Roundup Ready® brand. The stated advantage of Roundup Ready® crops is that they substantially improve a farmer's ability to control weeds, since glyphosate can be sprayed in the fields during the growing season without harming their crops. In 2010, an estimated 70% of corn and cotton, and 90% of soybean fields in the United States were Roundup Ready®.

19.     Monsanto's glyphosate products are registered in 130 countries and approved for use on over 100 different crops. They are ubiquitous in the environment. Numerous studies confirm that glyphosate is found in rivers, streams, and groundwater in agricultural areas where Roundup® is used. It has been found in food, in the urine of agricultural workers, and even in the urine of urban dwellers who are not in direct contact with glyphosate.

20.     On March 20, 2015, the International Agency for Research on Cancer ("IARC"), an agency of the World Health Organization ("WHO"), issued an evaluation of several herbicides, including glyphosate. That evaluation was based, in part, on studies of exposures to glyphosate

4

in several countries around the world, and it traces the health implications from exposure to glyphosate since 2001.

21.     On July 29, 2015, IARC issued the formal monograph relating to glyphosate. In that monograph, the IARC Working Group provides a thorough review of the numerous studies and data relating to glyphosate exposure in humans.

22.     The IARC Working Group classified glyphosate as a Group 2A herbicide, which means that it is probably carcinogenic to humans. The IARC Working Group concluded that the cancers most associated with glyphosate exposure are Non-Hodgkin's lymphoma and other haematopoietic cancers, including lymphocytic lymphoma/chronic lymphocytic leukemia, B-cell lymphoma, and multiple myeloma.

23.     The IARC evaluation is significant. It confirms what has been believed for years: that glyphosate is toxic to humans.

24.     Nevertheless, Monsanto, since it began selling Roundup, has represented it as safe to humans and the environment. Indeed, Monsanto and has repeatedly proclaimed and continues to proclaim to the world, and particularly to United States consumers, that glyphosate-based herbicides, including Roundup, create no unreasonable risks to human health or to the environment.

## IV.  JURISDICTION AND VENUE

25.     This Court has jurisdiction over Defendant and this action pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship between Plaintiff and Defendant. Defendant is incorporated and has its principal place of business outside of the state in which the Plaintiff is a citizen.

26.     The amount in controversy between Plaintiff and Defendant exceeds $75,000, exclusive of interest and cost.

27.     Venue is proper within this district pursuant to 28 U.S.C. § 1391 in that Defendant conducts business here and is subject to personal jurisdiction in this district. Furthermore, Defendant sells, markets, and/or distributes Roundup within Arkansas. Also, a substantial part of the acts and/or omissions giving rise to these claims occurred within this District.

## V.  FACTS

28.     Glyphosate is a broad-spectrum, non-selective herbicide used in a wide variety of herbicidal products around the world.

29.     Plants treated with glyphosate translocate the systemic herbicide to their roots, shoot regions and fruit, where it interferes with the plant's ability to form aromatic amino acids necessary for protein synthesis. Treated plants generally die within two to three days. Because plants absorb glyphosate, it cannot be completely removed by washing or peeling produce or by milling, baking, or brewing grains.

30.     For nearly 40 years, farms across the world have used Roundup without knowing of the dangers its use poses. That is because when Monsanto first introduced Roundup, it touted glyphosate as a technological breakthrough: it could kill almost every weed without causing harm either to people or to the environment. Of course, history has shown that not to be true. According to the WHO, the main chemical ingredient of Roundup—glyphosate—is a probable cause of cancer. Those most at risk are farm workers and other individuals with workplace exposure to Roundup, such as workers in garden centers, nurseries, and landscapers. Monsanto assured the public that Roundup was harmless. In order to prove this, Monsanto championed falsified data and attacked legitimate studies that revealed its dangers. Monsanto led a prolonged

campaign of misinformation to convince government agencies, farmers and the general population that Roundup was safe.

### The Discovery of Glyphosate and Development of Roundup®

31.     The herbicidal properties of glyphosate were discovered in 1970 by Monsanto chemist John Franz. The first glyphosate-based herbicide was introduced to the market in the mid- 1970s under the brand name Roundup. From the outset, Monsanto marketed Roundup as a "safe" general-purpose herbicide for widespread commercial and consumer use. Monsanto still markets Roundup as safe today.

### Registration of Herbicides under Federal Law

32.     The manufacture, formulation and distribution of herbicides, such as Roundup, are regulated under the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA" or "Act"), 7 U.S.C. § 136 *et seq.* FIFRA requires that all pesticides be registered with the Environmental Protection Agency ("EPA" or "Agency") prior to their distribution, sale, or use, except as described by the Act. 7 U.S.C. § 136a(a).

33.     Because pesticides are toxic to plants, animals, and humans, at least to some degree, the EPA requires as part of the registration process, among other things, a variety of tests to evaluate the potential for exposure to pesticides, toxicity to people and other potential non-target organisms, and other adverse effects on the environment. Registration by the EPA, however, is not an assurance or finding of safety. The determination the Agency must make in registering or reregistering a product is not that the product is "safe," but rather that use of the product in accordance with its label directions "will not generally cause unreasonable adverse effects on the environment." 7 U.S.C. § 136a(c)(5)(D).

34.     FIFRA defines "unreasonable adverse effects on the environment" to mean "any unreasonable risk to man or the environment, taking into account the economic, social, and environmental costs and benefits of the use of any pesticide." 7 U.S.C. § 136(bb). FIFRA thus requires EPA to make a risk/benefit analysis in determining whether a registration should be granted or allowed to continue to be sold in commerce.

35.     The EPA registered Roundup® for distribution, sale, and manufacture in the United States.

36.     FIFRA generally requires that the registrant, Monsanto in the case of Roundup, conducts the health and safety testing of pesticide products. The EPA has protocols governing the conduct of tests required for registration and the laboratory practices that must be followed in conducting these tests. The data produced by the registrant must be submitted to the EPA for review and evaluation. The government is not required, nor is it able, however, to perform the product tests that are required of the manufacturer.

37.     The evaluation of each pesticide product distributed, sold, or manufactured is completed at the time the product is initially registered. The data necessary for registration of a pesticide has changed over time. The EPA is now in the process of re-evaluating all pesticide products through a Congressionally-mandated process called "re-registration." 7 U.S.C. § 136a-1. In order to re-evaluate these pesticides, the EPA is demanding the completion of additional tests and the submission of data for the EPA's review and evaluation.

38.     In the case of glyphosate, and therefore Roundup, the EPA had planned on releasing its preliminary risk assessment —in relation to the re-registration process—no later than July 2015. The EPA completed its review of glyphosate in early 2015, but it delayed releasing the risk assessment pending further review in light of the WHO's health-related findings.

*Scientific Fraud Underlying the Marketing and Sale of Glyphosate/Roundup*

39.     Based on early studies that glyphosate could cause cancer in laboratory animals, the EPA originally classified glyphosate as possibly carcinogenic to humans (Group C) in 1985. After pressure from Monsanto, including contrary studies it provided to the EPA, the EPA changed its classification to evidence of non-carcinogenicity in humans (Group E) in 1991. In so classifying glyphosate, however, the EPA made clear that the designation did not mean the chemical does not cause cancer: "It should be emphasized, however, that designation of an agent in Group E is based on the available evidence at the time of evaluation and should not be interpreted as a definitive conclusion that the agent will not be a carcinogen under any circumstances."

40.     On two occasions, the EPA found that the laboratories hired by Monsanto to test the toxicity of its Roundup products for registration purposes committed fraud.

41.     In the first instance, Monsanto, in seeking initial registration of Roundup by EPA, hired Industrial Bio-Test Laboratories ("IBT") to perform and evaluate pesticide toxicology studies relating to Roundup. IBT performed about 30 tests on glyphosate and glyphosate-containing products, including nine of the 15 residue studies needed to register Roundup.

42.     In 1976, the United States Food and Drug Administration ("FDA") performed an inspection of Industrial Bio-Test Industries ("IBT") that revealed discrepancies between the raw data and the final report relating to the toxicological impacts of glyphosate. The EPA subsequently audited IBT; it too found the toxicology studies conducted for the Roundup herbicide to be invalid. An EPA reviewer stated, after finding "routine falsification of data" at IBT, that it was "hard to believe the scientific integrity of the studies when they said they took specimens of the uterus from male rabbits."

43.     Three top executives of IBT were convicted of fraud in 1983.

44.     In the second incident of data falsification, Monsanto hired Craven Laboratories in 1991 to perform pesticide and herbicide studies, including for Roundup.  In that same year, the owner of Craven Laboratories and three of its employees were indicted, and later convicted, of fraudulent laboratory practices in the testing of pesticides and herbicides.

45.     Despite the falsity of the tests that underlie its registration, within a few years of its launch, Monsanto was marketing Roundup in 115 countries.

46.     Multiple studies have been ghostwritten in part and/or published by Monsanto through companies such as Intertek and Exponent, Inc. from 2000-present which minimize any safety concerns about the use of glyphosate; are used to convince regulators to allow the sale of Roundup and are used to convince customers to use Roundup. Such studies include but are not limited to Williams (2000); Williams (2012); Kier & Kirkland (2013); Kier (2015); Bus (2016); Chang (2016); and the Intertek Expert Panel Manuscripts. All of these studies have been submitted to and relied upon the public and the EPA in assessing the safety of glyphosate. Through these means Monsanto has fraudulently represented that independent scientists have concluded that Glyphosate is safe. In fact, these independent experts have been paid by Monsanto and have failed to disclose the significant role Monsanto had in creating the manuscripts. Monsanto has further ghostwritten editorials for scientists such as Robert Tarone and Henry Miller to advocate for the safety of glyphosate in Newspapers and Magazines. Monsanto has also ghostwritten letters by supposed independent scientists submitted to regulatory agencies who are reviewing the safety of glyphosate.

47.     Monsanto has also violated federal regulations in holding secret ex parte meetings and conversations with certain EPA employees to collude in a strategy to re-register glyphosate and to quash investigations into the carcinogenicity of glyphosate by other federal agencies such as

the Agency for Toxic Substances and Disease Registry. Monsanto's close connection with the EPA arises in part from its offering of lucrative consulting positions to retiring EPA officials.

48.     In March 2015, The Joint Glyphosate Task Force at Monsanto's behest issued a press release sharply criticizing IARC, stating that IARC's conclusion was "baffling" and falsely claiming that "IARC did not consider any new or unique research findings when making its decision. It appears that only by deciding to exclude certain available scientific information and by adopting a different approach to interpreting the studies was this possible."

49.     Beginning in 2011, the Federal Institute for Risk Assessment (BfR) in Germany began preparing a study on the safety of glyphosate. Through the Glyphosate Task Force, Defendant was able to co-opt this study becoming the sole providers of data and ultimately wrote the report which was rubber-stamped by the BfR. The Glyphosate Task Force was solely responsible for preparing and submitting summary of studies relied upon by the by the BfR. Defendant has used this report, which it wrote, to falsely proclaim the safety of glyphosate.

50.     In October 2015, the Defendant, as a member of the Joint Glyphosate Task Force, wrote to the state of California to try to stop California from warning the public about the carcinogenicity of glyphosate arguing that the IARC classification is mistaken. In January of 2016 Monsanto filed a lawsuit to stop California from warning the public about the carcinogenicity of glyphosate.

### *The Importance of Roundup® to Monsanto's Market Dominance Profits*

51.     The success of Roundup was key to Monsanto's continued reputation and dominance in the marketplace. Largely due to the success of Roundup sales, Monsanto's agriculture division was out-performing its chemicals division's operating income, and that gap increased yearly. But

with its patent for glyphosate expiring in the United States in the year 2000, Monsanto needed a strategy to maintain its Roundup market dominance and to ward off impending competition.

52.     In response, Monsanto began the development and sale of genetically engineered Roundup Ready seeds in 1996. Since Roundup Ready crops are resistant to glyphosate; farmers can spray Roundup onto their fields during the growing season without harming the crop. This allowed Monsanto to expand its market for Roundup even further; by 2000, Monsanto's biotechnology seeds were planted on more than 80 million acres worldwide and nearly 70% of American soybeans were planted from Roundup Ready seeds. It also secured Monsanto's dominant share of the glyphosate/Roundup market through a marketing strategy that coupled proprietary Roundup Ready seeds with continued sales of its Roundup herbicide.

53.     Through a three-pronged strategy of increased production, decreased prices and by coupling with Roundup Ready seeds, Roundup became Monsanto's most profitable product. In 2000, Roundup accounted for almost $2.8 billion in sales, outselling other herbicides by a margin of five to one, and accounting for close to half of Monsanto's revenue. Today, glyphosate remains one of the world's largest herbicides by sales volume.

***Monsanto has known for decades that it falsely advertises the safety of Roundup®.***

54.     In 1996, the New York Attorney General ("NYAG") filed a lawsuit against Monsanto based on its false and misleading advertising of Roundup products. Specifically, the lawsuit challenged Monsanto's general representations that its spray-on glyphosate-based herbicides, including Roundup, were "**safer than table salt**" and "**practically non-toxic**" to mammals, birds, and fish. Among the representations the NYAG found deceptive and misleading about the human and environmental safety of Roundup are the following:

a.     Remember that environmentally friendly Roundup herbicide is biodegradable. It won't build up in the soil, so you can use Roundup with confidence along customers' driveways, sidewalks and fences ...

b.     And remember that Roundup is biodegradable and won't build up in the soil. That will give you the environmental confidence you need to use Roundup everywhere you've got a weed, brush, edging or trimming problem.

c.     Roundup biodegrades into naturally occurring elements.

d.     Remember that versatile Roundup herbicide stays where you put it. That means there's no washing or leaching to harm customers' shrubs or other desirable vegetation.

e.     This non-residual herbicide will not wash or leach in the soil. It ... stays where you apply it.

f.     You can apply Accord with "confidence because it will stay where you put it" it bonds tightly to soil particles, preventing leaching. Then, soon after application, soil microorganisms biodegrade Accord into natural products.

g.     Glyphosate is less toxic to rats than table salt following acute oral ingestion.

h.     Glyphosate's safety margin is much greater than required. It has over a 1,000-fold safety margin in food and over a 700-fold safety margin for workers who manufacture it or use it.

i.     You can feel good about using herbicides by Monsanto. They carry a toxicity category rating of 'practically non-toxic' as it pertains to mammals, birds and fish.

j.　　"Roundup can be used where kids and pets will play and breaks down into natural material." This ad depicts a person with his head in the ground and a pet dog standing in an area which has been treated with Roundup.

55.　On November 19, 1996, Monsanto entered into an Assurance of Discontinuance with NYAG, in which Monsanto agreed, among other things, "to cease and desist from publishing or broadcasting any advertisements [in New York] that represent, directly or by implication" that:

a.　　its glyphosate-containing pesticide products or any component thereof are safe, non-toxic, harmless or free from risk.

b.　　its glyphosate-containing pesticide products or any component thereof manufactured, formulated, distributed or sold by Monsanto are biodegradable

c.　　its glyphosate-containing pesticide products or any component thereof stay where they are applied under all circumstances and will not move through the environment by any means.

d.　　its glyphosate-containing pesticide products or any component thereof are "good" for the environment or are "known for their environmental characteristics."

e.　　glyphosate-containing pesticide products or any component thereof are safer or less toxic than common consumer products other than herbicides;

f.　　its glyphosate-containing products or any component thereof might be classified as "practically non-toxic."

56.　Monsanto did not alter its advertising in the same manner in any state other than New York, and on information and belief still has not done so today.

57.    In 2009, France's highest court ruled that Monsanto had not told the truth about the safety of Roundup. The French court affirmed an earlier judgment that Monsanto had falsely advertised its herbicide Roundup as "biodegradable" and that it "left the soil clean."

*Classifications and Assessments of Glyphosate*

58.    The IARC process for the classification of glyphosate followed the stringent procedures for the evaluation of a chemical agent. Over time, the IARC Monograph program has reviewed 980 agents. Of those reviewed, it has determined 116 agents to be Group 1 (Known Human Carcinogens); 73 agents to be Group 2A (Probable Human Carcinogens); 287 agents to be Group 2B (Possible Human Carcinogens); 503 agents to be Group 3 (Not Classified); and one agent to be Probably Not Carcinogenic.

59.    The established procedure for IARC Monograph evaluations is described in the IARC Programme's Preamble. Evaluations are performed by panels of international experts, selected on the basis of their expertise and the absence of actual or apparent conflicts of interest.

60.    One year before the Monograph meeting, the meeting is announced and there is a call both for data and for experts. Eight months before the Monograph meeting, the Working Group membership is selected, and the sections of the Monograph are developed by the Working Group members. One month prior to the Monograph meeting, the call for data is closed and the various draft sections are distributed among Working Group members for review and comment. Finally, at the Monograph meeting, the Working Group finalizes review of all literature, evaluates the evidence in each category, and completes the overall evaluation. Within two weeks after the Monograph meeting, the summary of the Working Group findings are published in Lancet Oncology, and within a year after the meeting, the final Monograph is finalized and published.

61.    In assessing an agent, the IARC Working Group reviews the following information:

a.      human, experimental, and mechanistic data;

b.      all pertinent epidemiological studies and cancer bioassays; and

c.      representative mechanistic data. The studies must be publicly available and have sufficient detail for meaningful review, and reviewers cannot be associated with the underlying study.

62.      In March 2015, IARC reassessed glyphosate. The summary published in The Lancet Oncology reported that glyphosate is a Group 2A agent and probably carcinogenic in humans.

63.      On July 29, 2015, IARC issued its Monograph for glyphosate, Monograph 112. For Volume 112, the volume that assessed glyphosate, a Working Group of 17 experts from 11 countries met at IARC from March 3–10, 2015, to assess the carcinogenicity of certain herbicides, including glyphosate. The March meeting culminated nearly a one-year review and preparation by the IARC Secretariat and the Working Group, including a comprehensive review of the latest available scientific evidence. According to published procedures, the Working Group considered "reports that have been published or accepted for publication in the openly available scientific literature" as well as "data from governmental reports that are publicly available."

64.      The studies considered the following exposure groups: occupational exposure of farmers and tree nursery workers in the United States, forestry workers in Canada and Finland and municipal weed-control workers in the United Kingdom; and para-occupational exposure in farming families.

65.      Glyphosate was identified as the second-most used household herbicide in the United States for weed control between 2001 and 2007 and the most heavily used herbicide in the world in 2012.

66.     Exposure pathways are identified as air (especially during spraying), water, and food. Community exposure to glyphosate is widespread and found in soil, air, surface water, and groundwater, as well as in food.

67.     The assessment of the IARC Working Group identified several case control studies of occupational exposure in the United States, Canada, and Sweden. These studies show a human health concern from agricultural and other work-related exposure to glyphosate.

68.     The IARC Working Group found an increased risk between exposure to glyphosate and Non-Hodgkin's lymphoma ("NHL") and several subtypes of NHL, and the increased risk persisted after adjustment for other pesticides.

69.     The IARC Working Group also found that glyphosate caused DNA and chromosomal damage in human cells. One study in community residents reported increases in blood markers of chromosomal damage (micronuclei) after glyphosate formulations were sprayed.

70.     In male CD-1 mice, glyphosate induced a positive trend in the incidence of a rare tumor, renal tubule carcinoma. A second study reported a positive trend for haemangiosarcoma in male mice. Glyphosate increased pancreatic islet-cell adenoma in male rats in two studies. A glyphosate formulation promoted skin tumors in an initiation-promotion study in mice.

71.     The IARC Working Group also noted that glyphosate has been detected in the urine of agricultural workers, indicating absorption. Soil microbes degrade glyphosate to aminomethylphosphoric acid (AMPA). Blood AMPA detection after exposure suggests intestinal microbial metabolism in humans.

72.     The IARC Working Group further found that glyphosate and glyphosate formulations induced DNA and chromosomal damage in mammals, and in human and animal cells in utero.

73.     The IARC Working Group also noted genotoxic, hormonal, and enzymatic effects in mammals exposed to glyphosate. Essentially, glyphosate inhibits the biosynthesis of aromatic amino acids, which leads to several metabolic disturbances, including the inhibition of protein and secondary product biosynthesis and general metabolic disruption.

74.     The IARC Working Group also reviewed an Agricultural Health Study, consisting of a prospective cohort of 57,311 licensed pesticide applicators in Iowa and North Carolina. While this study differed from others in that it was based on a self-administered questionnaire, the results support an association between glyphosate exposure and Multiple Myeloma, Hairy Cell Leukemia (HCL), and Chronic Lymphocytic Leukemia (CLL), in addition to several other cancers.

***Other Earlier Findings About Glyphosate's Dangers to Human Health***

75.     Despite the new classification by the IARC, Defendant previously had ample evidence of glyphosate and Roundup's genotoxic properties for decades.

76.     Genotoxicity refers to chemical agents that are capable of damaging the DNA within a cell through genetic mutations, which is a process that is believed to lead to cancer.

77.     In 1997, Chris Clements published "Genotoxicity of select herbicides in Rana catesbeiana tadpoles using the alkaline single-cell gel DNA electrophoresis (comet) assay."

78.     The study found that tadpoles exposed to Roundup showed significant DNA damage when compared with unexposed control animals.

79.     Both human and animal studies have shown that glyphosate and glyphosate-based formulations such as Roundup can induce oxidative stress.

80.     Oxidative stress and associated chronic inflammation are believed to be involved in carcinogenesis.

81.     The IARC Monograph notes that "[s]trong evidence exists that glyphosate, AMPA and glyphosate-based formulations can induce oxidative stress."

82.     In 2006 César Paz-y-Miño published a study examining DNA damage in human subjects exposed to glyphosate.

83.     The study produced evidence of chromosomal damage in blood cells showing significantly greater damage after exposure to glyphosate than before in the same individuals, suggesting that the glyphosate formulation used during aerial spraying had a genotoxic effect on exposed individuals.

84.     The IARC Monograph reflects the volume of evidence of glyphosate pesticides' genotoxicity noting "[t]he evidence for genotoxicity caused by glyphosate-based formulations is strong."

85.     Despite knowledge to the contrary, Defendant maintains that there is no evidence  that Roundup is genotoxic, that regulatory authorities and independent experts are in agreement that Roundup is not genotoxic, and that there is no evidence that Roundup is genotoxic.

86.     In addition to glyphosate and Roundup's genotoxic properties, Defendant has long been aware of glyphosate's carcinogenic properties.

87.     Glyphosate and Roundup in particular have long been associated with carcinogenicity and the development of numerous forms of cancer, including, but not limited to, Non-Hodgkin's lymphoma, Hodgkin's lymphoma, multiple myeloma, and soft tissue sarcoma.

88.     Defendant has known of this association since the early to mid-1980s and numerous human and animal studies have evidenced the carcinogenicity of glyphosate and/or Roundup.

89.     In 1985 the EPA studied the effects of glyphosate in mice finding a dose related response in male mice linked to renal tubal adenomas, a rare tumor. The study concluded the glyphosate was oncogenic.

90.     In 2003 Lennart Hardell and Mikael Eriksson published the results of two case controlled studies on pesticides as a risk factor for NHL and hairy cell leukemia.

91.     The study concluded that glyphosate had the most significant relationship to NHL among all herbicides studies with an increased odds ratio of 3.11.

92.     In 2003 AJ De Roos published a study examining the pooled data of mid-western farmers, examining pesticides and herbicides as risk factors for NHL.

93.     The study, which controlled for potential confounders, found a relationship between increased NHL incidence and glyphosate.

94.     In 2008 Mikael Eriksson published a population based case-control study of exposure to various pesticides as a risk factor for NHL.

95.     This strengthened previous associations between glyphosate and NHL.

96.     In spite of this knowledge, Defendant continued to issue broad and sweeping statements suggesting that Roundup was, and is, safer than ordinary household items such as table salt, despite a lack of scientific support for the accuracy and validity of these statements and, in fact, voluminous evidence to the contrary.

97.     Upon information and belief, these statements and representations have been made with the intent of inducing Plaintiff, the agricultural community, and the public at large to purchase and increase the use of Defendant's Roundup for Defendant's pecuniary gain, and in fact, did induce Plaintiff to use Roundup.

98.     Defendant made these statements with complete disregard and reckless indifference to the safety of Plaintiff and the general public.

99.     Notwithstanding Defendant's representations, scientific evidence has established a clear association between glyphosate and genotoxicity, inflammation, and an increased risk of many cancers, including, but not limited to, NHL, Multiple Myeloma, and soft tissue sarcoma.

100.     Defendant knew or should have known that glyphosate is associated with an increased risk of developing cancer, including, but not limited to, NHL, Multiple Myeloma, and soft tissue sarcomas.

101.     Defendant failed to appropriately and adequately inform and warn Plaintiff of the serious and dangerous risks associated with the use of and exposure to glyphosate and/or Roundup, including, but not limited to, the risk of developing NHL, as well as other severe and personal injuries, which are permanent and/or long-lasting in nature, cause significant physical pain and mental anguish, diminished enjoyment of life, and the need for medical treatment, monitoring and/or medications.

102.     Despite the IARC's classification of glyphosate as a class 2A probable carcinogen, Defendant continues to maintain that glyphosate and/or Roundup is safe, non-carcinogenic, nongenotoxic, and falsely warrant to users and the general public that independent experts and regulatory agencies agree that there is no evidence of carcinogenicity or genotoxicity in glyphosate and Roundup.

103.     Defendant has claimed and continues to claim that Roundup is safe, noncarcinogenic, and non-genotoxic. These misrepresentations are consistent with Defendant's cavalier approach to investigating and ensuring the safety of its products, the safety of the public at large, and the safety of Plaintiff.

*Release Patterns*

104.    Glyphosate is released to the environment in its use as a herbicide for controlling woody and herbaceous weeds on forestry, right-of-way, cropped and non-cropped sites. These sites may be around water and in wetlands. It may also be released to the environment during its manufacture, formulation, transport, storage, disposal and cleanup, and from spills. Since glyphosate is not a listed chemical in the Toxics Release Inventory, data on releases during its manufacture and handling are not available. Occupational workers and home gardeners may be exposed to glyphosate by inhalation and dermal contact during spraying, mixing, and cleanup. They may also be exposed by touching soil and plants to which glyphosate was applied. Occupational exposure may also occur during glyphosate's manufacture, transport storage, and disposal.

105.    In 1995, the Northwest Coalition for Alternatives to Pesticides reported that in California, the state with the most comprehensive program for reporting of pesticide-caused illness, glyphosate was the third most commonly-reported cause of pesticide illness among agricultural workers.

*Recent Worldwide Bans on Roundup®/Glyphosate*

106.    Several countries around the world have instituted bans on the sale of Roundup and other glyphosate-containing herbicides, both before and since IARC first announced its assessment for glyphosate in March 2015, and more countries undoubtedly will follow suit in light of the as the dangers of the use of Roundup are more widely known. The Netherlands issued a ban on all glyphosate-based herbicides in April 2014, including Roundup, which takes effect by the end of 2015. In issuing the ban, the Dutch Parliament member who introduced the successful legislation

stated: "Agricultural pesticides in user-friendly packaging are sold in abundance to private persons. In garden centers, Roundup is promoted as harmless, but unsuspecting customers have no idea what the risks of this product are. Especially children are sensitive to toxic substances and should therefore not be exposed to it."

107.    The Brazilian Public Prosecutor in the Federal District requested that the Brazilian Justice Department suspend the use of glyphosate.

108.    France banned the private sale of Roundup and glyphosate following the IARC assessment for Glyphosate.

109.    Bermuda banned both the private and commercial sale of glyphosates, including Roundup. The Bermuda government explained its ban as follows: "Following a recent scientific study carried out by a leading cancer agency, the importation of weed spray 'Roundup' has been suspended."

110.    The Sri Lankan government banned the private and commercial use of glyphosates, particularly out of concern that Glyphosate has been linked to fatal kidney disease in agricultural workers.

111.    The government of Columbia announced its ban on using Roundup and glyphosate to destroy illegal plantations of coca, the raw ingredient for cocaine, because of the WHO's finding that glyphosate is probably carcinogenic.

## VI.  PLAINTIFF'S EXPOSURE TO ROUNDUP

112.    Plaintiff used Roundup beginning around 2004 and continued to use the product through 2019.

113.    For years, Plaintiff sprayed Roundup on a regular basis. Plaintiff followed all safety and precautionary warnings during the course of use.

114.     Plaintiff was subsequently diagnosed with a form of Non-Hodgkin's lymphoma On

February 1, 2006.  The development of Plaintiff's Non-Hodgkin's lymphoma was proximately

and actually caused by exposure to Defendant's Roundup products.

115.     As a result of these injuries, Plaintiff has incurred significant economic and noneconomic

damages.

## VII.  CLAIMS

### TOLLING OF APPLICABLE STATUTE OF LIMITATIONS

### DISCOVERY RULE TOLLING

116.     Plaintiff had no way of knowing about the risk of serious illness associated

with the use of and/or exposure to Roundup and glyphosate until IARC released its

formal assessment of glyphosate in July 2015. This is the quintessential case for tolling.


117.     Within the time period of any applicable statutes of limitations, Plaintiff could

not have discovered, through the exercise of reasonable diligence, that exposure to

Roundup and glyphosate is injurious to human health.

118.     Plaintiff did not discover and did not know the facts that would cause a

### COUNT I.  NEGLIGENCE

112. Plaintiff re-alleges each paragraph above as if fully set forth herein.

113. Monsanto had a duty to exercise reasonable care in the designing, researching,

testing, manufacturing, marketing, supplying, promoting, packaging, sale, and/or

distribution of Roundup into the stream of commerce, including a duty to assure that the

product would not cause users to suffer unreasonable, dangerous side effects.

114. Monsanto failed to exercise ordinary care in the designing, researching, testing,

manufacturing, marketing, supplying, promoting, packaging, sale, testing, quality

assurance, quality control, and/or distribution of Roundup into interstate commerce in

that Monsanto knew or should have known that using Roundup created a high risk of

unreasonable, dangerous side effects, including, but not limited to, the development of

NHL, as well as other severe and personal injuries that are permanent and lasting in

nature, physical pain and mental anguish, including diminished enjoyment of life, as well

as need for lifelong medical treatment, monitoring, and/or medications.

115. The negligence by Monsanto, its agents, servants, and/or employees, included

but was not limited to the following acts and/or omissions:

a. Manufacturing, producing, promoting, formulating, creating, and/or

designing Roundup without thoroughly testing it;

b. Failing to adequately, sufficiently, and properly test Roundup;

c. Not conducting sufficient testing programs to determine whether or not

Roundup was safe for use; in that Monsanto knew or should have known that

Roundup was unsafe and unfit for use by reason of the dangers to its users;

d. Not conducting sufficient testing programs and studies to determine

Roundup's carcinogenic properties even after Monsanto had knowledge that

Roundup is, was, or could be carcinogenic;

e. Failing to conduct sufficient testing programs to determine the safety of "inert"

ingredients and/or adjuvants contained within Roundup, and the propensity

of these ingredients to render Roundup toxic, increase the toxicity of Roundup,

whether these ingredients are carcinogenic, magnify the carcinogenic

properties of Roundup, and whether or not "inert" ingredients and/or

adjuvants were safe for use;

f. Negligently failing to adequately and correctly warn Plaintiff, the public, the medical and agricultural professions, and the EPA of the dangers of Roundup;

g. Negligently failing to petition the EPA to strengthen the warnings associated with Roundup;

h. Failing to provide adequate cautions and warnings to protect the health of users, handlers, applicators, and persons who would reasonably and foreseeably come into contact with Roundup;

1. Negligently marketing, advertising, and recommending the use of Roundup without sufficient knowledge as to its dangerous propensities;

J· Negligently representing that Roundup was safe for use for its intended purpose, and/or that Roundup was safer than ordinary and common items such as table salt, when, in fact, it was unsafe;

k. Negligently representing that Roundup had equivalent safety and efficacy as other forms of herbicides;

I. Negligently designing Roundup in a manner that was dangerous to its users;

m. Negligently manufacturing Roundup in a manner that was dangerous to its users;

n. Negligently producing Roundup in a manner that was dangerous to its users;

o. Negligently formulating Roundup in a manner that was dangerous to its users;

p. Concealing information from the Plaintiff while knowing that Roundup was unsafe, dangerous, and/or non-conforming with EPA regulations;

q. Improperly concealing and/or misrepresenting information from the Plaintiff,

26

scientific and medical professionals, and/or the EPA, concerning the severity

of risks and dangers of Roundup compared to other forms of herbicides; and

r. Negligently selling Roundup with a false and misleading label.

116. Monsanto under-reported, underestimated, and downplayed the serious

dangers of Roundup.

117. Monsanto negligently and deceptively compared the safety risks and dangers

of Roundup with common everyday foods such as table salt and other herbicides.

118. Monsanto was negligent and/or violated Arkansas law in the designing,

researching, supplying, manufacturing, promoting, packaging, distributing, testing,

advertising, warning, marketing, and selling of Roundup in that it:

a. Failed to use ordinary care in designing and manufacturing Roundup to avoid the

aforementioned risks to individuals when Roundup was used as an herbicide;

b. Failed to accompany its product with proper and/or accurate warnings regarding

all possible adverse side effects associated with the use of Roundup;

c. Failed to accompany its product with proper warnings regarding all possible

adverse side effects concerning the failure and/or malfunction of Roundup;

d. Failed to accompany its product with accurate warnings regarding the risks of all

possible adverse side effects concerning Roundup;

e. Failed to warn Plaintiff of the severity and duration of such adverse effects, as the warnings

given did not accurately reflect the symptoms, or severity of the side

effects including, but not limited to, the development of NHL;

f. Failed to conduct adequate testing, clinical testing and post-marketing

surveillance to determine the safety of Roundup;

g. Failed to conduct adequate testing, clinical testing, and post-marketing

surveillance to determine the safety of Roundup's "inert" ingredients and/or

adjuvants;

h. Negligently misrepresented the evidence of Roundup's genotoxicity and

carcinogenicity; and

1. Was otherwise careless and/or negligent.

119. Despite the fact that Monsanto knew or should have known that Roundup

caused, or could cause, unreasonably dangerous side effects, Monsanto continues to

market, manufacture, distribute, and/or sell Roundup to consumers, including Plaintiff.

120. Monsanto knew or should have known that consumers such as Plaintiff would

foreseeably suffer injury because of Monsanto's failure to exercise ordinary care.

121. Monsanto's violations of law and/or negligence proximately caused Plaintiff's

injuries, harm and economic loss, which Plaintiff suffered and will continue to suffer.

122. As a result of the foregoing acts and omissions, Plaintiff suffered life threatening

NHL, and severe personal injuries, which are permanent and lasting in

nature, physical pain and mental anguish, including diminished enjoyment of life, as well

as financial expenses for hospitalization and medical care.

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in Plaintiff's favor

for compensatory and punitive damages, together with interest, costs

herein incurred, attorneys' fees and all relief as this Court deems just and proper.

### COUNT II - STRICT PRODUCTS LIABILITY (DESIGN DEFECT)

123. Plaintiff re-alleges each paragraph above as if fully set forth herein.

124. At all times herein mentioned, Monsanto designed, researched, manufactured,

tested, advertised, promoted, sold, and distributed Roundup (as described throughout this complaint) that was used by Plaintiff.

125. Roundup was expected to and did reach the usual consumers, handlers, and persons coming into contact with it without substantial change in the condition in which it was produced, manufactured, sold, distributed, and marketed by Monsanto.

126. At those times, Roundup was in an unsafe, defective, and unreasonably dangerous condition, which was dangerous to users, and in particular, Plaintiff herein.

127. The Roundup designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed by Monsanto was defective in design or formulation in that, when it left the hands of the manufacturer and/or suppliers, the foreseeable risks exceeded the benefits associated with the design or formulation of Roundup.

128. The Roundup designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed by Monsanto was defective in design and/or formulation, in that, when it left the hands of Monsanto or its manufacturers and/or suppliers, it was unreasonably dangerous, unreasonably dangerous in normal use, and it was more dangerous than an ordinary consumer would expect.

129. At all relevant times, Roundup was in a defective condition and unsafe, and Monsanto knew or had reason to know that it was defective and unsafe, especially when used in the form and manner as provided by Monsanto. In particular, Roundup was defective in the following ways:

a. When placed in the stream of commerce, Monsanto's Roundup products were defective in design and formulation and, consequently, dangerous to an extent

beyond that which an ordinary consumer would anticipate.

b. When placed in the stream of commerce, Monsanto's Roundup products were unreasonably dangerous in that they were hazardous and posed a grave risk of cancer and other serious illnesses when used in a reasonably anticipated manner.

c. When placed in the stream of commerce, Monsanto's Roundup products contained unreasonably dangerous design defects and were not reasonably safe when used in a reasonably anticipated manner.

d. Monsanto did not sufficiently test, investigate, or study its Roundup products.

e. Exposure to Roundup presents a risk of harmful side effects that outweigh any potential utility stemming from the use of the herbicide.

f. Monsanto knew or should have known at the time of marketing its Roundup products that exposure to Roundup could result in cancer and other severe illnesses and injuries.

g. Monsanto did not conduct adequate post-marketing surveillance of its Roundup products.

130. Monsanto knew, or should have known, that at all times herein mentioned its Roundup was in a defective condition and was and is inherently unsafe. 131. Plaintiff was exposed to Monsanto's Roundup without knowledge of Roundup's dangerous characteristics.

132. At the time of Plaintiff's use of and exposure to Roundup, Roundup was being used for the purposes and in a manner normally intended, as a broad-spectrum herbicide.

133. Armed with this knowledge, Monsanto voluntarily designed its Roundup with

a dangerous condition for use by the public generally, and in particular Plaintiff.

134. Monsanto had a duty to create a product that was not unreasonably dangerous for its normal, intended use.

135. Monsanto created a product that was and is unreasonably dangerous for its normal, intended use.

136. Monsanto marketed and promoted a product in such a manner so as to make it inherently defective as the product downplayed its suspected, probable, and established health risks inherent with its normal, intended use.

137. The Roundup designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed by Monsanto was manufactured defectively in that Roundup left the hands of Monsanto in a defective condition and was unreasonably dangerous to its intended users.

138. The Roundup designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed by Monsanto reached its intended users in the same defective and unreasonably dangerous condition in which Monsanto's Roundup was manufactured.

139. Monsanto designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed a defective product, which created an unreasonable risk to the health of consumers and to Plaintiff in particular, and Monsanto is therefore strictly liable for the injuries sustained by Plaintiff.

140. Plaintiff could not, by the exercise of reasonable care, have discovered Roundup's defects herein mentioned or perceived its danger.

141. Monsanto is thus strictly liable to Plaintiff for the manufacturing, marketing,

promoting, distribution, and selling of a defective product, Roundup.

142. Monsanto's defective design of Roundup amounts to willful, wanton, and/or reckless conduct.

143. Defects in Monsanto's Roundup were the cause or a substantial factor in causing Plaintiff's injuries.

144. As a result of the foregoing acts and omissions, Plaintiff developed NHL, and suffered severe and personal injuries that are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life, and financial expenses for hospitalization and medical care.

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in Plaintiff's favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all relief as this Court deems just and proper.

## COUNT III – **STRICT PRODUCTS LIABILITY (FAIL URE TO WARN)**

145. Plaintiff re-alleges each paragraph above as if fully set forth herein.

146. Monsanto has engaged in the business of selling, testing, distributing, supplying, manufacturing, marketing, and/or promoting Roundup, and through that conduct has knowingly and intentionally placed Roundup into the stream of commerce with full knowledge that it reaches consumers such as Plaintiff who are exposed to it through ordinary and reasonably foreseeable uses.

147. Monsanto did in fact sell, distribute, supply, manufacture, and/or promote Roundup to Plaintiff. Additionally, Monsanto expected the Roundup it was selling, distributing, supplying, manufacturing, and/or promoting to reach - and Roundup did in fact reach - consumers, including Plaintiff, without any substantial change in the

condition of the product from when it was initially distributed by Monsanto.

148. At the time of manufacture, Monsanto could have provided the warnings or instructions regarding the full and complete risks of Roundup and glyphosate-containing products because it knew or should have known of the unreasonable risks of harm associated with the use of and/or exposure to such products.

149. At all relevant times, Roundup was defective and unsafe in manufacture such that it was unreasonably dangerous to the user and was so at the time it was distributed by Monsanto, including when Plaintiff was exposed to and/or ingested the product. The defective condition of Roundup was due in part to the fact that it was not accompanied by proper warnings regarding its carcinogenic qualities and possible side effects, including, but not limited to, developing NHL because of exposure and use.

150. Roundup did not contain a warning or caution statement, which was necessary and, if complied with, was adequate to protect the health of those exposed, in violation of 7 U.S.C. § 136j(a)(l)(E).

151. Monsanto's failure to include a warning or caution statement that was necessary and, if complied with, was adequate to protect the health of those exposed, violated 7 U.S.C. § 136j(a)(l)(E) as well as the laws of the State of Arkansas.

152. Monsanto could have revised Roundup's label to provide additional warnings.

153. This defect caused serious injury to Plaintiff, who used and was exposed to Roundup in its intended and foreseeable manner.

154. At all relevant times, Monsanto had a duty to properly design, manufacture, compound, test, inspect, package, label, distribute, market, examine, maintain supply, provide proper warnings, and take such steps to assure that the product did not cause

33

users to suffer from unreasonable and dangerous side effects.

155. Monsanto labeled, distributed, and promoted a product that was dangerous and unsafe for the use and purpose for which it was intended.

156. Monsanto failed to warn of the nature and scope of the health risks associated with Roundup, namely its carcinogenic properties and its propensity to cause or serve as a substantial contributing factor in the development of NHL. 157. Monsanto knew of the probable consequences of Roundup. Despite this fact,

Monsanto failed to exercise reasonable care to warn of the dangerous carcinogenic properties and risks of developing NHL from Roundup exposure, even though these risks were known or reasonably scientifically knowable at the time of distribution. Monsanto willfully and deliberately failed to avoid the consequences associated with its failure to warn, and in doing so, acted with conscious disregard for Plaintiff's safety.

158. At the time of exposure, Plaintiff could not have reasonably discovered any defect in Roundup through the exercise of reasonable care.

159. Monsanto, as the manufacturer and/or distributor of Roundup, is held to the level of knowledge of an expert in the field.

160. Plaintiff reasonably relied on the skill, superior knowledge, and judgment of Monsanto.

161. Had Monsanto properly disclosed the risks associated with Roundup, Plaintiff would have avoided the risk of NHL by not using Roundup.

162. The information that Monsanto provided failed to contain adequate warnings and precautions that would have enabled Plaintiff, and similarly situated individuals, to utilize the product safely and with adequate protection. Instead, Monsanto disseminated

information that was inaccurate, false, and misleading and that failed to communicate accurately or adequately the comparative severity, duration, and extent of the risk of injuries associated with use of and/or exposure to Roundup and glyphosate; continued to promote the efficacy of Roundup, even after it knew or should have known of the unreasonable risks from use or exposure; and concealed, downplayed, or otherwise suppressed, through aggressive marketing and promotion, any information or research about the risks and dangers of exposure to Roundup and glyphosate.

163. To this day, Monsanto has failed to adequately warn of the true risks of Plaintiff's injuries associated with the use of and exposure to Roundup.

164. As a result of its inadequate warnings, Monsanto's Roundup products were defective and unreasonably dangerous when they left Monsanto's possession and/or control, were distributed by Monsanto, and used by Plaintiff.

165. As a direct and proximate result of Monsanto's actions as alleged herein, and in such other ways to be later shown, the subject product caused Plaintiff to sustain injuries as herein alleged.

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in Plaintiff's favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all relief as this Court deems just and proper.

## COUNT IV - BREACH OF WARRANTIES

166. Plaintiff re-alleges each paragraph above as if fully stated herein.

167. At all times relevant to this litigation, Monsanto engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and

promoting its Roundup products, which are defective and unreasonably dangerous to consumers, including Plaintiff, thereby placing Roundup products into the stream of commerce. These actions were under Monsanto's ultimate control and supervision.

168. At all relevant times, Monsanto expressly and impliedly represented and warranted to the purchasers of Roundup products, by and through statements made in labels, publications, package inserts, and other written materials intended for consumers and the general public, that its Roundup products were safe to human health and the environment, effective, fit, and proper for their intended use. Monsanto advertised, labeled, marketed, and promoted Roundup products, representing the quality to consumers and the public to induce their purchase or use, thereby making an express and implied warranty that Roundup products would conform to the representations.

169. These express and implied representations include incomplete warnings and instructions that purport, but fail, to include the complete array of risks associated with use of and/or exposure to Roundup and glyphosate. Monsanto knew and/or should have known that the risks expressly included in Roundup warnings and labels did not and do not accurately or adequately set forth the risks of developing the serious injuries complained of herein. Nevertheless, Monsanto expressly and impliedly represented that its Roundup products were safe and effective, including for use as agricultural herbicides.

170. The representations about Roundup, as set forth herein, contained or constituted affirmations of fact or promises made by the seller to the buyer, which related to the goods and became part of the basis of the bargain, creating an express and implied warranty that the goods would conform to the representations.

171. Monsanto placed its Roundup products into the stream of commerce for sale

and recommended their use to consumers and the public without adequately warning of the true risks of developing the injuries associated with the use of and exposure to Roundup and its active ingredient glyphosate.

172. Monsanto breached these warranties because, among other things, its Roundup products were defective, dangerous, unfit for use, did not contain labels representing the true and adequate nature of the risks associated with their use, and were not merchantable or safe for their intended, ordinary, and foreseeable use and purpose. Specifically, Monsanto breached the warranties in the following ways:

a. Monsanto represented through its labeling, advertising, and marketing materials that its Roundup products were safe, and fraudulently withheld and concealed information about the risks of serious injury associated with use of and/or exposure to Roundup and glyphosate by expressly limiting the risks associated with use and/or exposure within its warnings and labels; and

b. Monsanto represented that its Roundup products were safe for use and fraudulently concealed information demonstrating that glyphosate, the active ingredient in Roundup, had carcinogenic properties, and that its Roundup products, therefore, were not safer than alternatives available on the market.

173. Plaintiff was exposed to the labels on the Roundup products that he mixed.

174. Monsanto had sole access to material facts concerning the nature of the risks associated with its Roundup products as expressly stated within its warnings and labels, and Monsanto knew that consumers and users such as Plaintiff could not have reasonably discovered that the risks expressly included in Roundup warnings and labels were inadequate and inaccurate.

175. Plaintiff had no knowledge of the falsity or incompleteness of Monsanto's statements and representations concerning Roundup.

176. Plaintiff used and/or were exposed to the use of Roundup as researched, developed, designed, tested, formulated, manufactured, inspected, labeled, distributed, packaged, marketed, promoted, sold, or otherwise released into the stream of commerce by Monsanto.

177. Had the warnings and labels for Roundup products accurately and adequately set forth the true risks associated with the use of such products, including Plaintiff's injuries, rather than expressly excluding such information and warranting that the products were safe for their intended use, Plaintiff could have avoided the injuries complained of herein.

178. As a direct and proximate result of Monsanto's wrongful acts and omissions, Plaintiff have suffered severe injuries. Plaintiff have endured pain and suffering, has suffered economic losses (including significant expenses for medical care and treatment), and will continue to incur these expenses in the future.

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in Plaintiff's favor for compensatory and punitive damages, together with interest, costs herein incurred, attorney's fees, and all such other and further relief as this Court deems just and proper.

### COUNT V - BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY

179. Plaintiff re-alleges the paragraphs above as if fully stated herein.

180. At all times relevant, Monsanto engaged in the business of testing, developing, designing, formulating, manufacturing, marketing, selling, distributing, and promoting

its Roundup products, which are defective and unreasonably dangerous to users and consumers, including Plaintiff, thereby placing Roundup products into the stream of commerce. These actions were under Monsanto's ultimate control and supervision.

181. Before Plaintiff was exposed to the use of Roundup products, Monsanto impliedly warranted to its consumers and users - including Plaintiff - that Roundup products were of merchantable quality and safe and fit for the use for which they were intended; specifically, as horticultural herbicides.

182. Monsanto, however, failed to disclose that Roundup has dangerous propensities when used as intended and that the use of and/or exposure to Roundup and glyphosate-containing products carries an increased risk of developing severe injuries, including Plaintiff's injuries.

183. Plaintiff reasonably relied on the skill, superior knowledge and judgment of Monsanto and on its implied warranties that Roundup products were of merchantable quality and fit for their intended purpose or use.

184. Roundup products were expected to reach and in fact reached consumers and users, including Plaintiff, without substantial change in the condition in which they were manufactured and sold by Monsanto.

185. At all relevant times, Monsanto was aware that consumers and users of its products, including Plaintiff, would use Roundup products as marketed by Monsanto, which is to say that Plaintiff was a foreseeable user of Roundup.

186. Monsanto intended that its Roundup products be used in the manner in which Plaintiff in fact used them and Monsanto impliedly warranted each product to be of merchantable quality, safe, and fit for this use, despite the fact that Roundup was not

adequately tested or researched.

187. Plaintiff used Roundup as instructed and labeled and in the foreseeable

manner intended, recommended, promoted and marketed by Monsanto.

188. Plaintiff could not have reasonably discovered or known of the risks of serious

injury associated with Roundup or glyphosate.

189. Monsanto breached its implied warranty to Plaintiff in that its Roundup

products were not of merchantable quality, safe, or fit for their intended use. Roundup

has dangerous propensities when used as intended and can cause serious injuries,

including those injuries complained of herein.

190. The harm caused by Roundup products far outweighed their benefit,

rendering the products more dangerous than an ordinary consumer or user would expect

and more dangerous than alternative products.

191. As a direct and proximate result of Monsanto's wrongful acts and omissions, Plaintiff have

suffered severe and permanent physical and emotional injuries. Plaintiff

have endured pain and suffering, suffered economic loss (including significant expenses

for medical care and treatment) and will continue to incur these expenses in the future.

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in

Plaintiff's favor for compensatory and punitive damages, together with interest, costs

herein incurred, attorney's fees, and all such other and further relief as this Court deems

just and proper.

## **EXEMPLARY AND PUNITIVE DAMAGES ALLEGATIONS**

176. Plaintiff incorporates by reference each and every allegation set forth in the

preceding paragraphs as if fully stated herein.

177. Monsanto's conduct as alleged herein was done with oppression and malice. Monsanto was fully aware of Roundup's safety risks. Nonetheless, Monsanto deliberately crafted its label, marketing, and promotion to mislead consumers.

178. This was not done by accident or through some justifiable negligence. Rather, Monsanto knew that it could turn a profit by convincing the agricultural industry that Roundup was harmless to humans, and that full disclosure of Roundup's true risks would limit the amount of money Monsanto would make selling Roundup in Arkansas.

179. This was accomplished not only through its misleading labeling, but through a comprehensive scheme of selective fraudulent research and testing, misleading advertising, and deceptive omissions as more fully alleged throughout this pleading. Plaintiff, like all other consumers of Arkansas, was robbed of the right to make an informed decision about whether to purchase and use an herbicide, knowing the full risks attendant to that use. Such conduct was done with conscious disregard of the Plaintiff's rights.

180. There is no indication that Monsanto will stop its deceptive and unlawful marketing practices unless it is punished and deterred. Accordingly, Plaintiff requests punitive damages against Monsanto for the harms caused to the Plaintiff.

## JURY DEMAND

181. Plaintiff demands a trial by jury on all of the triable issues within this pleading.

## TRANSFER TO MASTER DOCKET

182. Plaintiff requests for his case to be transferred to the UNITED STATES JUDICIAL PANEL on MULTIDISTRICT LITIGATION Master Docket, under the style "In Re: Roundup

Products Liability Litigation" and the identification MDL No. 2741, within the Northern

District of California as so ordered in the Transfer Order attached hereto as Exhibit A.

**PRAYER FOR RELIEF**

183. WHEREFORE, Plaintiff requests that the Court enter judgment in his favor and against

Monsanto, awarding Plaintiff:

a. actual or compensatory damages in such amount to be determined at trial and as provided by

applicable law;

b. exemplary and punitive damages sufficient to punish and deter Monsanto and others from

future fraudulent practices;

c. pre-judgment and post-judgment interest;

d. costs including reasonable attorneys' fees, court costs, and other litigation expenses; and

e. any other relief the Court may deem just and proper.

f. transfer to the UNITED STATES JUDICIAL PANEL, on MULTIDISTRICT LITIGATION

Master Docket, under the style "In Re: Roundup Products Liability Litigation" and the

identification MDL No. 2741, within the Northern District of California as so ordered in the

Transfer Order attached hereto.

<div style="margin-left:50%">

Respectfully submitted,

/s/   *Harrison Kemp*
Harrison Kemp, ABA No. 2008307
MANN & KEMP
221 West 2nd Street, Suite 408
Little Rock, AR 72201
P: (501) 222-7378
F: (501) 222-7478
harrison@mannkemp.com

</div>