# U.S. District Court
## Southern District of Mississippi (Eastern (Hattiesburg))
## CIVIL DOCKET FOR CASE #: 2:21-cv-00030-TBM-FKB

Ready v. Monsanto Company, Inc. et al
Assigned to: District Judge Taylor B. McNeel
Referred to: Magistrate Judge F. Keith Ball
Cause: 28:1331 Fed. Question: Personal Injury

Date Filed: 03/05/2021
Jury Demand: Plaintiff
Nature of Suit: 365 Personal Inj. Prod. Liability
Jurisdiction: Federal Question

**Plaintiff**

**Kristina Boutwell Ready**

represented by **C. Victor Welsh , III**
PITTMAN, ROBERTS & WELSH, PLLC
P. O. Box 22985
410 S. President St. (39201)
Jackson, MS 39225-2985
601/948-6200
Email: cvw@pgrwlaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Monsanto Company, Inc.**

**Defendant**

**Does 1-10**

| Date Filed | # | Docket Text |
|---|---|---|
| 03/05/2021 | 1 | COMPLAINT against Does 1-10, Monsanto Company, Inc. (Filing fee $402 receipt number 0538-4498548), filed by Kristina Boutwell Ready. (Attachments: # 1 Civil Cover Sheet) (CS) (Entered: 03/05/2021) |
| 03/05/2021 | 2 | Summons Issued as to Monsanto Company, Inc. (CS) (Entered: 03/05/2021) |
| 03/08/2021 | 3 | Letter sent to MDL Clerk with docket entries and complaint. (CS) (Entered: 03/08/2021) |



A TRUE COPY, I HEREBY CERTIFY

**ARTHUR JOHNSTON, CLERK**
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI

By: _____, Deputy Clerk

**UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF MISSISSIPPI
EASTERN DIVISION**

**KRISTINA BOUTWELL READY**                                    **PLAINTIFF**

**VS.**                                    **CIVIL ACTION NO.** ___2:21cv30-TBM-FKB

**MONSANTO COMPANY, INC.,**
**and DOES 1-10**                                    **DEFENDANTS**

                                   **JURY TRIAL DEMANDED**

---

## COMPLAINT

---

### I.  SUMMARY OF THE CASE

1.      In 1970, Defendant Monsanto Company, Inc. ("Monsanto') discovered the herbicidal properties of glyphosate.   Monsanto began marketing glyphosate in products in 1974 under the brand name Roundup®.  Roundup® is a non-selective herbicide used to kill weeds that commonly compete with the growing of crops.   By 2001, glyphosate had become the most-used active ingredient in American agriculture with 85–90 millions pounds used annually.   That number grew to 185 million pounds by 2007.  As of 2013, glyphosate was the world's most widely used herbicide.

2.      Prior to its acquisition by Bayer AG, Monsanto was a multinational agricultural biotechnology corporation and the world's leading producer of glyphosate.  As of 2009, Monsanto was the world's leading producer of seeds, accounting for 27% of the world seed market. The majority of these seeds are of the Roundup Ready® brand.  The stated advantage of Roundup Ready® crops is that they substantially improve a farmer's ability to control weeds, since glyphosate can be sprayed in the fields during the growing season without harming their crops.  In 2010, an

estimated 70% of corn and cotton, and 90% of soybean fields in the United States were Roundup Ready®.

3.     Roundup Ready® seeds are known in the market as "terminator seeds," meaning the crops produced are sterile and their seed cannot be re-used.  This characteristics requires that farmers must purchase the most recent strain of seed each year from Monsanto, further strengthening Monsanto's stranglehold on the market.

4.     Monsanto's glyphosate products are registered in 130 countries and used on over 100 different crops.

5.     On March 20, 2015, the International Agency for Research on Cancer ("IARC"), an agency of the World Health Organization ("WHO"), issued an evaluation of several herbicides, including glyphosate. That evaluation was based, in part, on studies of exposures to glyphosate in several countries around the world.  The evaluation traces the health implications from exposure to glyphosate since 2001.

6.     On July 29, 2015, IARC issued a formal study relating to glyphosate.  In that study, the IARC Working Group provided a thorough review of the numerous studies and data relating to glyphosate exposure in humans.

7.     The IARC Working Group classified glyphosate as a Group 2A herbicide, which means that it is probably carcinogenic to humans. The IARC Working Group concluded that one of the cancers most associated with glyphosate exposure was non-Hodgkin's lymphoma.

8.     The IARC evaluation is significant. It confirms what has been believed for years, i.e that glyphosate is toxic to humans.

9.     Nevertheless, Monsanto, since it began selling Roundup®, has represented Roundup® as safe to humans and the environment.  Further Monsanto has repeatedly proclaimed

and continues to proclaim to the world, and particularly to United States consumers, that glyphosate-based herbicides, including Roundup®, create no unreasonable risks to human health or to the environment.

10. Since 1990, Kristina Boutwell Ready has used Roundup for gardening and home use. Since 1998, Kristina Boutwell Ready has used Roundup for farm and timber use. Kristina Boutwell Ready farmed large tracts of land in Mississippi and/or owned land in Mississippi. Kristina Boutwell Ready used Roundup® on a regular basis. Kristina Boutwell Ready has been diagnosed with chronic lymphocytic leukemia/CLL.

## JURISDICTION AND VENUE

11. Federal diversity jurisdiction in this Court is proper under 28 U.S.C. § 1332 because Plaintiff Kristina Boutwell Ready and Defendant Monsanto are citizens of a different state and the amount in controversy exceeds $75,000, exclusive of interest and costs.

12. This Court has personal jurisdiction over Defendant Monsanto pursuant to Miss. Code Ann. § 13-3-57 because it manufactured the Roundup® that caused the exposure and injuries to John W. Bussey, Jr..

13. Further, Defendant Monsanto sold and continues to sell Roundup® in the State of Mississippi and thereby maintains sufficient contacts with the State such that this Court's exercise of personal jurisdiction does not offend traditional notions of fair play and substantial justice.

14. Venue is proper within this District under 28 U.S.C. § 1391 because a substantial part of the events, omissions, and/or exposures giving rise to this claim occurred within this judicial District, specifically Monticello, Lawrence County, Mississippi.

## THE PARTIES

### Plaintiff

15.     Plaintiff Kristina Boutwell Ready is an adult resident citizen of the State of Mississippi who resides at 547 Old Highway 27 North, Monticello, Lawrence County, Mississippi.

### Defendants

16.     Defendant Monsanto is a Delaware corporation with its headquarters and principal place of business in St. Louis, Missouri.  At all times relevant to this Complaint, Monsanto was the entity that discovered the herbicidal properties of glyphosate and the manufacturer of Roundup®, as defined by the Mississippi Product Liability Act, and/or other provisions of law.  Monsanto may be served with a copy of the Complaint and Summons at: 800 North Lindbergh Blvd., St. Louis, MO 63167; and, through its agent for service of process, Corporation Service Company, 7716 Old Canton Road, Suite C, Madison, MS 39110.

17.     The identities of Defendants Does 1-10 are currently unknown.  Does 1-10, or some of them, will be added as party defendants when their identities become known.

### FACTS

18.     Glyphosate is a broad-spectrum, non-selective herbicide used in a wide variety of herbicidal products around the world.

19.     Plants treated with glyphosate translocate the systemic herbicide to their roots, shoot regions and fruit, where it interferes with the plant's ability to form aromatic amino acids necessary for protein synthesis.  Treated plants generally die within two to three days.  Because plants absorb glyphosate, it cannot be completely removed by washing or peeling produce, or by milling, baking, or brewing grains.

20.     For nearly 40 years, landowners across Mississippi and other parts of the world have used Roundup® without knowing of the dangers its use poses. That is because when Monsanto first introduced Roundup®, it touted glyphosate as a technological breakthrough: it could kill almost every weed without causing harm either to people or to the environment.  History has shown that not to be true.  According to the WHO, the main chemical ingredient of Roundup®—glyphosate—is a probable cause of cancer. Those most at risk are individuals such as Kristina Boutwell Bussey and other individuals who work large tracts of land. Monsanto assured the public that Roundup® was harmless.  In order to prove this, Monsanto championed falsified data and attacked legitimate studies that revealed its dangers.  Monsanto led a prolonged campaign of misinformation to convince government agencies, farmers and the general population that Roundup® was safe.

### The Discovery of Glyphosate and Development of Roundup®

21.     The herbicidal properties of glyphosate were discovered in 1970 by Monsanto chemist John Franz.  The first glyphosate-based herbicide was introduced to the market in the mid-1970s under the brand name Roundup®.  From the outset, Monsanto marketed Roundup® as a "safe" general-purpose herbicide for widespread commercial and consumer use.  It still markets Roundup® as safe today.

### Registration of Herbicides under Federal Law

22.     The manufacture, formulation and distribution of herbicides, such as Roundup®, are regulated under the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA" or "Act"), 7 U.S.C. § 136 *et seq.* FIFRA requires that all pesticides be registered with the Environmental Protection Agency ("EPA" or "Agency") prior to their distribution, sale, or use, except as described by the Act. 7 U.S.C. § 136a(a).

Page 5 of  34

23.     Because pesticides are toxic to plants, animals, and humans, at least to some degree, the EPA requires as part of the registration process, among other things, a variety of tests to evaluate the potential for exposure to pesticides, toxicity to people and other potential non-target organisms, and other adverse effects on the environment.   Registration by the EPA, however, is not an assurance or finding of safety.   The determination the Agency must make in registering or re-registering a product is not that the product is "safe," but rather that use of the product in accordance with its label directions "will not generally cause unreasonable adverse effects on the environment." 7 U.S.C. § 136a(c)(5)(D).

24.     FIFRA defines "unreasonable adverse effects on the environment" to mean "any unreasonable risk to man or the environment, taking into account the economic, social, and environmental costs and benefits of the use of any pesticide." 7 U.S.C. § 136(bb).   FIFRA thus requires EPA to make a risk/benefit analysis in determining whether a registration should be granted or allowed to continue to be sold in commerce.

25.     Roundup® was registered for distribution, sale, and manufacture in the United States and the State of Mississippi..

26.     FIFRA generally requires that the registrant, Monsanto in the case of Roundup®, conduct the health and safety testing of pesticide products.   The EPA has protocols governing the conduct of tests required for registration and the laboratory practices that must be followed in conducting these tests. The data produced by the registrant must be submitted to the EPA for review and evaluation.   The government is not required, nor is it able, however, to perform the product tests that are required of the manufacturer.

27.     The evaluation of each pesticide product distributed, sold, or manufactured is completed at the time the product is initially registered.  The data necessary for registration of a pesticide has changed over time.

28.     Monsanto used its superior position in the market to manipulate studies provided to the EPA, and pressure the current government to look the other way.  In a 2018 report from Monsanto's advisory firm Hakluyt & Company, it was reported that: "A domestic policy adviser at the White House said, for instance: 'We have Monsanto's back on pesticides regulation. We are prepared to go toe-to-toe on any disputes they may have with, for example, the EU.  Monsanto need not fear any additional regulation from this administration."

### *Scientific Fraud Underlying the Marketing and Sale of Glyphosate/Roundup*

29.     Based on early studies that glyphosate could cause cancer in laboratory animals, the EPA originally classified glyphosate as *possibly carcinogenic to humans* (Group C) in 1985.  After pressure from Monsanto, including contrary studies it provided to the EPA, the EPA changed its classification to *evidence of non-carcinogenicity in humans* (Group E) in 1991.  In so classifying glyphosate, however, the EPA made clear that the designation did not mean the chemical does not cause cancer: "It should be emphasized, however, that designation of an agent in Group E is based on the available evidence at the time of evaluation and should not be interpreted as a definitive conclusion that the agent will not be a carcinogen under any circumstances."

30.     On two occasions, the EPA found that the laboratories hired by Monsanto to test the toxicity of its Roundup® products for registration purposes committed fraud.

31.     In the first instance, Monsanto, in seeking initial registration of Roundup® by EPA, hired Industrial Bio-Test Laboratories ("IBT") to perform and evaluate pesticide toxicology studies

relating to Roundup®. IBT performed about 30 tests on glyphosate and glyphosate-containing products, including nine of the 15 residue studies needed to register Roundup®.

32.     In 1976, the United States Food and Drug Administration ("FDA") performed an inspection of IBT that revealed discrepancies between the raw data and the final report relating to the toxicological impacts of glyphosate. The EPA subsequently audited IBT; it too found the toxicology studies conducted for the Roundup® herbicide to be invalid. An EPA reviewer stated, after finding "routine falsification of data" at IBT, that it was "hard to believe the scientific integrity of the studies when they said they took specimens of the uterus from male rabbits."

33.     Three top executives of IBT were convicted of fraud in 1983.

34.     In the second incident of data falsification, Monsanto hired Craven Laboratories in 1991 to perform pesticide and herbicide studies, including for Roundup®. In that same year, the owner of Craven Laboratories and three of its employees were indicted, and later convicted, of fraudulent laboratory practices in the testing of pesticides and herbicides.

35.     Despite the falsity of the tests that underlie its registration, within a few years of its launch, Monsanto was marketing Roundup® in 115 countries.

### The Importance of Roundup® to Monsanto's Market Dominance Profits

36.     The success of Roundup® was key to Monsanto's continued reputation and dominance in the marketplace, both financially and, most recently, politically. Largely due to the success of Roundup® sales, Monsanto's agriculture division was out-performing its chemicals division's operating income, and that gap increased yearly. But with its patent for glyphosate expiring in the United States in the year 2000, Monsanto needed a strategy to maintain its Roundup® market dominance and to ward off impending competition.

37. In response, Monsanto began the development and sale of genetically engineered Roundup Ready® seeds in 1996. Since Roundup Ready® crops are resistant to glyphosate; farmers can spray Roundup® onto their fields during the growing season without harming the crop. This allowed Monsanto to expand its market for Roundup® even further; by 2000, Monsanto's biotechnology seeds were planted on more than 80 million acres worldwide and nearly 70% of American soybeans were planted from Roundup Ready® seeds. It also secured Monsanto's dominant share of the glyphosate/Roundup® market through a marketing strategy that coupled proprietary Roundup Ready® seeds with continued sales of its Roundup® herbicide.

38. Through a three-pronged strategy of increased production, decreased prices and by coupling with Roundup Ready® seeds, Roundup® became Monsanto's most profitable product. In 2000, Roundup® accounted for almost $2.8 billion in sales, outselling other herbicides by a margin of five to one, and accounting for close to half of Monsanto's revenue. Today, glyphosate remains one of the world's largest herbicides by sales volume.

***Monsanto has known for decades that it falsely advertises the safety of Roundup®.***

39. In 1996, the New York Attorney General ("NYAG") filed a lawsuit against Monsanto based on its false and misleading advertising of Roundup® products. Specifically, the lawsuit challenged Monsanto's general representations that its spray-on glyphosate-based herbicides, including Roundup®, were "**safer than table salt**" and "**practically non-toxic**" to mammals, birds, and fish. Among the representations the NYAG found deceptive and misleading about the human and environmental safety of Roundup® are the following:

a) Remember that environmentally friendly Roundup herbicide is biodegradable. It won't build up in the soil so you can use Roundup with confidence along customers' driveways, sidewalks and fences ...

b) And remember that Roundup is biodegradable and won't build up in the soil. That will give you the environmental confidence you need to use Roundup everywhere you've got a weed, brush, edging or trimming problem.

c) Roundup biodegrades into naturally occurring elements.

d) Remember that versatile Roundup herbicide stays where you put it. That means there's no washing or leaching to harm customers' shrubs or other desirable vegetation.

e) This non-residual herbicide will not wash or leach in the soil. It ... stays where you apply it.

f) You can apply Roundup with " confidence because it will stay where you put it" it bonds tightly to soil particles, preventing leaching. Then, soon after application, soil microorganisms biodegrade Roundup into natural products.

g) Glyphosate is less toxic to rats than table salt following acute oral ingestion.

h) Glyphosate's safety margin is much greater than required. It has over a 1,000-fold safety margin in food and over a 700-fold safety margin for workers who manufacture it or use it.

i) You can feel good about using herbicides by Monsanto. They carry a toxicity category rating of 'practically non-toxic' as it pertains to mammals, birds and fish.

j) Roundup can be used where kids and pets will play and breaks down into natural material." This ad depicts a person with his head in the ground and a pet dog standing in an area that has been treated with Roundup.

40.  On November 19, 1996, Monsanto entered into an Assurance of Discontinuance with NYAG, in which Monsanto agreed, among other things, "to cease and desist from publishing or

broadcasting any advertisements [in New York] that represent, directly or by implication" that:

    a)    its glyphosate-containing pesticide products or any component thereof are safe, non-toxic, harmless or free from risk;

    b)    its glyphosate-containing pesticide products or any component thereof manufactured, formulated, distributed or sold by Monsanto are biodegradable;

    c)    its glyphosate-containing pesticide products or any component thereof stay where they are applied under all circumstances and will not move through the environment by any means;

    d)    its glyphosate-containing pesticide products or any component thereof are "good" for the environment or are "known for their environmental characteristics";

    e)    glyphosate-containing pesticide products or any component thereof are safer or less toxic than common consumer products other than herbicides; and,

    f)    its glyphosate-containing products or any component thereof might be classified as "practically non-toxic."

41.    Monsanto did not alter its advertising in the same manner in any state other than New York, and on information and belief still has not done so today.

42.    In 2009, France's highest court ruled that Monsanto had not told the truth about the safety of Roundup®. The French court affirmed an earlier judgement that Monsanto had falsely advertised its herbicide Roundup® as "biodegradable" and that it "left the soil clean."

### *Classifications and Assessments of Glyphosate*

43.    The IARC process for the classification of glyphosate followed the stringent procedures for the evaluation of a chemical agent. Over time, the IARC Monograph program has reviewed 980 agents. Of those reviewed, it has determined 116 agents to be Group 1 (Known

Human Carcinogens); 73 agents to be Group 2A (Probable Human Carcinogens); 287 agents to be Group 2B (Possible Human Carcinogens); 503 agents to be Group 3 (Not Classified); and one agent to be Probably Not Carcinogenic.

44.     The established procedure for IARC Monograph evaluations is described in the IARC Programme's Preamble.  Evaluations are performed by panels of international experts, selected on the basis of their expertise and the absence of actual or apparent conflicts of interest.

45.     One year before the Monograph meeting, the meeting is announced and there is a call both for data and for experts.  Eight months before the Monograph meeting, the Working Group membership is selected and the sections of the Monograph are developed by the Working Group members.  One month prior to the Monograph meeting, the call for data is closed and the various draft sections are distributed among Working Group members for review and comment.  Finally, at the Monograph meeting, the Working Group finalizes review of all literature, evaluates the evidence in each category, and completes the overall evaluation.  Within two weeks after the Monograph meeting, the summary of the Working Group findings are published in Lancet Oncology, and within a year after the meeting, the final Monograph is finalized and published.

46.     In assessing an agent, the IARC Working Group reviews the following information: (a) human, experimental, and mechanistic data; (b) all pertinent epidemiological studies and cancer bioassays; and (c) representative mechanistic data.  The studies must be publicly available and have sufficient detail for meaningful review, and reviewers cannot be associated with the underlying study.

47.     In March 2015, IARC reassessed glyphosate.  The summary published in *The Lancet Oncology* reported that glyphosate is a Group 2A agent and probably carcinogenic in humans.

48.     On July 29, 2015, IARC issued its Monograph for glyphosate, Monograph 112. For Volume 112, the volume that assessed glyphosate, a Working Group of 17 experts from 11 countries met at IARC from March 3–10, 2015, to assess the carcinogenicity of certain herbicides, including glyphosate. The March meeting culminated nearly a one-year review and preparation by the IARC Secretariat and the Working Group, including a comprehensive review of the latest available scientific evidence. According to published procedures, the Working Group considered "reports that have been published or accepted for publication in the openly available scientific literature" as well as "data from governmental reports that are publicly available."

49.     The studies considered the following exposure groups: occupational exposure of farmers and tree nursery workers in the United States, forestry workers in Canada and Finland and municipal weed-control workers in the United Kingdom; and para-occupational exposure in farming families.

50.     Glyphosate was identified as the second-most used household herbicide in the United States for weed control between 2001 and 2007 and the most heavily used herbicide in the world in 2012.

51.     Exposure pathways are identified as air (especially during spraying), water, and food. Community exposure to glyphosate is widespread and found in soil, air, surface water, and groundwater, as well as in food.

52.     The assessment of the IARC Working Group identified several case control studies of occupational exposure in the United States, Canada, and Sweden. These studies show a human health concern from agricultural and other work- related exposure to glyphosate.

53.     The IARC Working Group found an increased risk between exposure to glyphosate and non-Hodgkin lymphoma ("NHL") and several subtypes of NHL, and the increased risk persisted after adjustment for other pesticides.

54.     The IARC Working Group also found that glyphosate caused DNA and chromosomal damage in human cells. One study in community residents reported increases in blood markers of chromosomal damage (micronuclei) after glyphosate formulations were sprayed.

55.     In male CD-1 mice, glyphosate induced a positive trend in the incidence of a rare tumor, renal tubule carcinoma.  A second study reported a positive trend for haemangiosarcoma in male mice.  Glyphosate increased pancreatic islet-cell adenoma in male rats in two studies.  A glyphosate formulation promoted skin tumors in an initiation-promotion study in mice.

56.     The IARC Working Group also noted that glyphosate has been detected in the urine of agricultural workers, indicating absorption.   Soil microbes degrade glyphosate to aminomethylphosphoric acid (AMPA).  Blood AMPA detection after exposure suggests intestinal microbial metabolism in humans.

57.     The IARC Working Group further found that glyphosate and glyphosate formulations induced DNA and chromosomal damage in mammals, and in human and animal cells in utero.

58.     The IARC Working Group also noted genotoxic, hormonal, and enzymatic effects in mammals exposed to glyphosate.  Essentially, glyphosate inhibits the biosynthesis of aromatic amino acids, which leads to several metabolic disturbances, including the inhibition of protein and secondary product biosynthesis and general metabolic disruption.

59.     The IARC Working Group also reviewed an Agricultural Health Study, consisting of a prospective cohort of 57,311 licensed pesticide applicators in Iowa and North Carolina.  While this study differed from others in that it was based on a self-administered questionnaire, the results

support an association between glyphosate exposure and Multiple Myeloma, Hairy Cell Leukemia (HCL), and Chronic Lymphocytic Leukemia (CLL), in addition to several other cancers.

### *Other Earlier Findings About Glyphosate's Dangers to Human Health*

60.     The EPA has a technical fact sheet, as part of its Drinking Water and Health, National Primary Drinking Water Regulations publication, relating to glyphosate. This technical fact sheet predates the IARC March 20, 2015, evaluation. The fact sheet describes the release patterns for glyphosate as follows:

**Release Patterns**

Glyphosate is released to the environment in its use as a herbicide for controlling woody and herbaceous weeds on forestry, right-of-way, cropped and non-cropped sites. These sites may be around water and in wetlands.

It may also be released to the environment during its manufacture, formulation, transport, storage, disposal and cleanup, and from spills. Since glyphosate is not a listed chemical in the Toxics Release Inventory, data on releases during its manufacture and handling are not available.

Occupational workers and home gardeners may be exposed to glyphosate by inhalation and dermal contact during spraying, mixing, and cleanup. They may also be exposed by touching soil and plants to which glyphosate was applied. Occupational exposure may also occur during glyphosate's manufacture, transport storage, and disposal.

61.     In 1995, the Northwest Coalition for Alternatives to Pesticides reported that in California, the state with the most comprehensive program for reporting of pesticide-caused illness, glyphosate was the third most commonly-reported cause of pesticide illness among agricultural workers.

*Recent Worldwide Bans on Roundup®/Glyphosate*

62.     Several countries around the world have instituted bans on the sale of Roundup® and other glyphosate-containing herbicides, both before and since IARC first announced its assessment for glyphosate in March 2015, and more countries undoubtedly will follow suit as the dangers of the use of Roundup® are more widely known.  The Netherlands issued a ban on all glyphosate-based herbicides in April 2014, including Roundup®, which takes effect by the end of 2015.  In issuing the ban, the Dutch Parliament member who introduced the successful legislation stated: "Agricultural pesticides in user-friendly packaging are sold in abundance to private persons.  In garden centers, Roundup® is promoted as harmless, but unsuspecting customers have no idea what the risks of this product are.  Especially children are sensitive to toxic substances and should therefore not be exposed to it."

63.     The Brazilian Public Prosecutor in the Federal District requested that the Brazilian Justice Department suspend the use of glyphosate.

64.     France banned the private sale of Roundup® and glyphosate following the IARC assessment for Glyphosate.

65.     Bermuda banned both the private and commercial sale of glyphosates, including Roundup®.  The Bermuda government explained its ban as follows: "Following a recent scientific study carried out by a leading cancer agency, the importation of weed spray 'Roundup' has been suspended."

66.     The Sri Lankan government banned the private and commercial use of glyphosates, particularly out of concern that glyphosate has been linked to fatal kidney disease in agricultural workers.

67. The government of Columbia announced its ban on using Roundup® and glyphosate to destroy illegal plantations of coca, the raw ingredient for cocaine, because of the WHO's finding that glyphosate is probably carcinogenic.

### Kristina Boutwell Ready's Exposure to Roundup®

68. Kristina Boutwell Ready has farmed large tracts of land in Lawrence County, Mississippi for approximately twenty three (23) years. From its introduction onto the market, Kristina Boutwell Ready used Roundup and/or Roundup products to spray and maintain large tracts of farm land used for cattle and timber. She also used Roundup on a regular basis at her home.

69. Kristina Boutwell Ready has been diagnosed with chronic lymphocytic leukemia/CLL.

70. As a result of her illness, Kristina Boutwell Ready will require a lifetime of treatment.

## CLAIM ONE

## STRICT LIABILITY (DESIGN DEFECT)

71. Plaintiff incorporates by reference all allegation of her Complaint.

72. Plaintiff brings this strict liability claim against Defendant for defective design.

73. At all times relevant to this litigation, Defendant engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting Roundup® products, which are defective and unreasonably dangerous to consumers, including Kristina Boutwell Ready, thereby placing Roundup® products into the stream of commerce. These actions were under the ultimate control and supervision of Defendant. At all times relevant to this litigation, Defendant designed, researched, developed, manufactured, produced, tested, assembled, advertised, promoted, marketed, sold, and distributed the Roundup® products used by Kristina Boutwell Ready as described above, and as will be proven at trial.

74.     At all times relevant to this litigation, Defendant's Roundup® products were manufactured, and designed in an unsafe, defective, and inherently dangerous manner that was dangerous for use by or exposure to the public, and, in particular, Kristina Boutwell Ready.

75.     At all times relevant to this litigation, Defendant's Roundup® products reached the intended consumers, handlers, and users or other persons coming into contact with these products in Mississippi and throughout the United States, including Kristina Boutwell Ready without substantial change in their condition as designed, manufactured, sold, distributed, and marketed by Defendant.

76.     Defendant's Roundup® products, as researched, tested, developed, designed, licensed, manufactured, packaged, distributed, sold, and marketed by Defendant were defective in design and formulation in that when they left the hands of the Defendant's manufacturers and/or suppliers, they were unreasonably dangerous and dangerous to an extent beyond that which an ordinary consumer would contemplate.

77.     Defendant's Roundup® products, as researched, tested, developed, designed, licensed, manufactured, packaged, distributed, sold, and marketed by Defendant were defective in design and formulation in that when they left the hands of Defendant's manufacturers and/or suppliers, the foreseeable risks exceeded the alleged benefits associated with their design and formulation.

78.     At all times relevant to this action, Defendant knew or had reason to know that its Roundup® products were defective and were inherently dangerous and unsafe when used in the manner instructed and provided by Defendant.

79.     Therefore, at all times relevant to this litigation, Defendant's Roundup® products, as researched, tested, developed, designed, licensed, manufactured, packaged, distributed, sold and

marketed by Defendant were defective in design and formulation, in one or more of the following ways:

a)      When placed in the stream of commerce, Defendant's Roundup® products were defective in design and formulation, and, consequently, dangerous to an extent beyond that which an ordinary consumer would contemplate.

b)      When placed in the stream of commerce, Defendant's Roundup® products were unreasonably dangerous in that they were hazardous and posed a grave risk of cancer and other serious illnesses when used in a reasonably anticipated manner.

c)      When placed in the stream of commerce, Defendant's Roundup® products contained unreasonably dangerous design defects and were not reasonably safe when used in a reasonably anticipated or intended manner.

d)      Defendant did not sufficiently test, investigate, or study its Roundup® products and, specifically, the active ingredient glyphosate.

e)      Exposure to Roundup® and glyphosate-containing products presents a risk of harmful side effects that outweigh any potential utility stemming from the use of the herbicide.

f)      Defendant knew or should have known at the time of marketing its Roundup® products that exposure to Roundup® and specifically, its active ingredient glyphosate, could result in cancer and other severe illnesses and injuries.

g)      Defendant did not conduct adequate post-marketing surveillance of its Roundup® products.

h)      Defendant could have employed safer alternative designs and formulations.

     i)     Kristina Boutwell Ready was exposed to Defendant's Roundup® products as described above, without knowledge of their dangerous characteristics.

80.     At all times relevant to this litigation, Kristina Boutwell Ready used and/or was exposed to the use of Defendant's Roundup® products in an intended or reasonably foreseeable manner without knowledge of their dangerous characteristics.

81.     Kristina Boutwell Ready could not have reasonably discovered the defects and risks associated with Roundup® or glyphosate-containing products before or at the time of exposure.

82.     The harm caused by Defendant's Roundup® products far outweighed their benefit, rendering Defendant's products dangerous to an extent beyond that which an ordinary consumer would contemplate. Defendant's Roundup® products were and are more dangerous than alternative products and Defendant could have designed its Roundup® products to make them less dangerous. Indeed, at the time that Defendant designed its Roundup® products, the state of the industry's scientific knowledge was such that a less risky design or formulation was attainable.

83.     At the time Roundup® products left Defendant's control, there was a practical, technically feasible and safer alternative design that would have prevented the harm without substantially impairing the reasonably anticipated or intended function of Defendant's herbicides.

84.     Defendant's defective design of its Roundup® products was willful, wanton, fraudulent, malicious, and conducted with reckless disregard for the health and safety of users of the Roundup® products, including Kristina Boutwell Ready.

85.     Therefore, as a result of the unreasonably dangerous condition of its Roundup® products, Defendant is liable to Plaintiff under the MPLA, and other provisions of law.

86.     The defects in Defendant's Roundup® products were substantial and contributing factors in causing Kristina Boutwell Ready's grave injuries, and, but for Defendant's misconduct

Page 20 of 34

and omissions, Kristina Boutwell Ready would not have been diagnosed with chronic lymphocytic leukemia/CLL.

87.    Defendant's conduct, as described above, was reckless. Defendant risked the lives of consumers and users of its products, including Kristina Boutwell Ready with knowledge of the safety problems associated with Roundup® and glyphosate-containing products, and suppressed this knowledge from the general public.  Defendant made conscious decisions not to redesign, warn or inform the unsuspecting public.  Defendant's reckless conduct warrants an award of punitive damages.

88.    As a direct and proximate result of Defendant placing its defective Roundup® products into the stream of commerce, Kristina Boutwell Ready endured extreme mental anguish, loss of enjoyment of life, physical pain and discomfort, as well as economic hardship, including considerable financial expenses for medical care and treatment.

89.    WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in Plaintiff's favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all such other and further relief as this Court deems just and proper. Plaintiff **DEMANDS A JURY TRIAL** on all issues.

## CLAIM TWO

### STRICT LIABILITY (FAILURE TO WARN)

90.    Plaintiff incorporates all allegation of her Complaint.

91.    Plaintiff brings this strict liability claim against Defendant for failure to warn.

92.    At all times relevant to this litigation, Defendant engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting Roundup® products, which are defective and unreasonably dangerous to consumers, including Kristina

Boutwell Ready because they do not contain adequate warnings or instructions concerning the dangerous characteristics of Roundup® and specifically, the active ingredient glyphosate. These actions were under the ultimate control and supervision of Defendant.

93.     Defendant researched, developed, designed, tested, manufactured, inspected, distributed, marketed, promoted, sold, and otherwise released into the stream of commerce its Roundup® products, and in the course of same, directly advertised or marketed the products to consumers and end users, including  Kristina Boutwell Ready and therefore had a duty to warn of the risks associated with the use of Roundup® and glyphosate-containing products.

94.     At all times relevant to this litigation, Defendant had a duty to properly test, develop, design, manufacture, inspect, package, market, promote, sell, distribute, maintain supply, provide proper warnings, and take such steps as necessary to ensure that its Roundup® products did not cause users and consumers to suffer from unreasonable and dangerous risks. Defendant had a continuing duty to warn the Kristina Boutwell Ready of the dangers associated with Roundup® use and exposure. Defendant, as manufacturer, seller, or distributor of chemical herbicides is held to the knowledge of an expert in the field.

95.     At the time of manufacture, Defendant could have provided the warnings or instructions regarding the full and complete risks of Roundup® and glyphosate-containing products because it knew or should have known of the unreasonable risks of harm associated with the use of and/or exposure to such products.

96.     At all times relevant to this litigation, Defendant failed to investigate, study, test, or promote the safety or to minimize the dangers to users and consumers of its product and to those who would foreseeably use or be harmed by Defendant's herbicides, including Kristina Boutwell Ready.

97.     Despite the fact that Defendant knew or should have known that Roundup® posed a grave risk of harm, it failed to exercise reasonable care to warn of the dangerous risks associated with use and exposure. The dangerous propensities of its products and the carcinogenic characteristics of glyphosate, as described above, were known to Defendant, or scientifically knowable to Defendant through appropriate research and testing by known methods, at the time it distributed, supplied or sold the product, and not known to end users and consumers, such as Kristina Boutwell Ready.

98.     Defendant knew or should have known that its products created significant risks of serious bodily harm to consumers, as alleged herein, and Defendant failed to adequately warn consumers and reasonably foreseeable users of the risks of exposure to its products. Defendant has wrongfully concealed information concerning the dangerous nature of Roundup® and its active ingredient glyphosate, and further made false and/or misleading statements concerning the safety of Roundup® and glyphosate.

99.     At all times relevant to this litigation, Defendant's Roundup® products reached the intended consumers, handlers, and users or other persons coming into contact with these products in New York and throughout the United States, including Kristina Boutwell Ready without substantial change in their condition as designed, manufactured, sold, distributed, and marketed by Defendant.

100.     Kristina Boutwell Ready was exposed to Defendant's Roundup® products in the course of her timber and cattle work, as well as gardening and home use, as described above, without knowledge of their dangerous characteristics.

101.    At all times relevant to this litigation, Kristina Boutwell Ready used and/or was exposed to the use of Defendant's Roundup® products in their intended or reasonably foreseeable manner without knowledge of their dangerous characteristics.

102.    Kristina Boutwell Ready could not have reasonably discovered the defects and risks associated with Roundup® or glyphosate-containing products prior to or at the time of Kristina Boutwell Ready's exposure. Kristina Boutwell Ready relied upon the skill, superior knowledge, and judgment of Defendant.

103.    Defendant knew or should have known that the minimal warnings disseminated with its Roundup® products were inadequate, but they failed to communicate adequate information on the dangers and safe use/exposure and failed to communicate warnings and instructions that were appropriate and adequate to render the products safe for their ordinary, intended and reasonably foreseeable uses, including agricultural and horticultural applications.

104.    The information that Defendant did provide or communicate failed to contain relevant warnings, hazards, and precautions that would have enabled farmers such as Kristina Boutwell Ready to utilize the products safely and with adequate protection. Instead, Defendant disseminated information that was inaccurate, false, and misleading and which failed to communicate accurately or adequately the comparative severity, duration, and extent of the risk of injuries with use of and/or exposure to Roundup® and glyphosate; continued to aggressively promote the efficacy of its products, even after it knew or should have known of the unreasonable risks from use or exposure; and concealed, downplayed, or otherwise suppressed, through aggressive marketing and promotion, any information or research about the risks and dangers of exposure to Roundup® and glyphosate.

105. To this day, Defendant has failed to adequately and accurately warn of the true risks of Kristina Boutwell Ready's injuries associated with the use of and exposure to Roundup® and its active ingredient glyphosate, a probable carcinogen.

106. As a result of their inadequate warnings, Defendant's Roundup® products were defective and unreasonably dangerous when they left the possession and/or control of Defendant, were distributed by Defendant, and used by Kristina Boutwell Ready.

107. Defendant is liable to Plaintiff for injuries caused by its negligent or willful failure, as described above, to provide adequate warnings or other clinically relevant information and data regarding the appropriate use of its products and the risks associated with the use of or exposure to Roundup® and glyphosate.

108. The defects in Defendant's Roundup® products were substantial and contributing factors in causing Kristina Boutwell Ready's injuries, and, but for Defendant's misconduct and omissions, Kristina Boutwell Ready would not have sustained their injuries.

109. Had Defendant provided adequate warnings and instructions and properly disclosed and disseminated the risks associated with its Roundup® products, Kristina Boutwell Ready could have avoided the risk of developing injuries as alleged herein.

110. As a direct and proximate result of Defendant placing its defective Roundup® products into the stream of commerce, Kristina Boutwell Ready endured extreme mental anguish, loss of enjoyment of life, physical pain and discomfort, as well as economic hardship, including considerable financial expenses for medical care and treatment.

111. WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in Plaintiff's favor for compensatory and punitive damages, together with interest, costs herein

incurred, attorneys' fees and all such other and further relief as this Court deems just and proper. Plaintiff also demands a jury trial on the issues contained herein.

## CLAIM THREE

### NEGLIGENCE

112.     Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

113.     Defendant, directly or indirectly, caused Roundup® products to be sold, distributed, packaged, labeled, marketed, promoted, and/or used by Kristina Boutwell Ready.

114.     At all times relevant to this litigation, Defendant had a duty to exercise reasonable care in the design, research, manufacture, marketing, advertisement, supply, promotion, packaging, sale, and distribution of its Roundup® products, including the duty to take all reasonable steps necessary to manufacture, promote, and/or sell a product that was not unreasonably dangerous to consumers and users of the product.

115.     At all times relevant to this litigation, Defendant had a duty to exercise reasonable care in the marketing, advertisement, and sale of the Roundup® products. Defendant's duty of care owed to consumers and the general public included providing accurate, true, and correct information concerning the risks of using Roundup® and appropriate, complete, and accurate warnings concerning the potential adverse effects of exposure to Roundup®, and, in particular, its active ingredient glyphosate.

116.     At all times relevant to this litigation, Defendant knew or, in the exercise of reasonable care, should have known of the hazards and dangers of Roundup® and specifically, the carcinogenic properties of the chemical glyphosate.

117. Accordingly, at all times relevant to this litigation, Defendant knew or, in the exercise of reasonable care, should have known that use of or exposure to its Roundup® products could cause or be associated with Kristina Boutwell Ready's injuries and thus created a dangerous and unreasonable risk of injury to the users of these products, including Kristina Boutwell Ready.

118. Defendant also knew or, in the exercise of reasonable care, should have known that users and consumers of Roundup® were unaware of the risks and the magnitude of the risks associated with use of and/or exposure to Roundup® and glyphosate-containing products.

119. As such, Defendant breached its duty of reasonable care and failed to exercise ordinary care in the design, research, development, manufacture, testing, marketing, supply, promotion, advertisement, packaging, sale, and distribution of its Roundup® products, in that Defendant manufactured and produced defective herbicides containing the chemical glyphosate, knew or had reason to know of the defects inherent in its products, knew or had reason to know that a user's or consumer's exposure to the products created a significant risk of harm and unreasonably dangerous side effects, and failed to prevent or adequately warn of these risks and injuries.

120. Despite its ability and means to investigate, study, and test its products and to provide adequate warnings, Defendant has failed to do so. Indeed, Defendant has wrongfully concealed information and has further made false and/or misleading statements concerning the safety and/or exposure to Roundup® and glyphosate.

121. Defendant's negligence included:

a) Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing its Roundup® products without thorough and adequate pre- and post- market testing;

b)    Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing Roundup® while negligently and/or intentionally concealing and failing to disclose the results of trials, tests, and studies of exposure to glyphosate, and, consequently, the risk of serious harm associated with human use of and exposure to Roundup®;

c)    Failing to undertake sufficient studies and conduct necessary tests to determine whether or not Roundup® products and glyphosate-containing products were safe for their intended use in agriculture and horticulture;

d)    Failing to use reasonable and prudent care in the design, research, manufacture, and development of Roundup® products so as to avoid the risk of serious harm associated with the prevalent use of Roundup®/glyphosate as an herbicide;

e)    Failing to design and manufacture Roundup® products so as to ensure they were at least as safe and effective as other herbicides on the market;

f)    Failing to provide adequate instructions, guidelines, and safety precautions to those persons who Defendant could reasonably foresee would use and be exposed to its Roundup® products;

g)\    Failing to disclose to Kristina Boutwell Ready, users/consumers, and the general public that use of and exposure to Roundup® presented severe risks of cancer and other grave illnesses;

h)    Failing to warn Kristina Boutwell Ready, consumers, and the general public that the product's risk of harm was unreasonable and that there were safer and effective alternative herbicides available to Kristina Boutwell Ready and other consumers;

Page 28 of 34

i) Systematically suppressing or downplaying contrary evidence about the risks, incidence, and prevalence of the side effects of Roundup® and glyphosate-containing products;

j) Representing that its Roundup® products were safe for their intended use when, in fact, Defendant knew or should have known that the products were not safe for their intended purpose;

k) Declining to make or propose any changes to Roundup® products' labeling or other promotional materials that would alert the consumers and the general public of the risks of Roundup® and glyphosate;

l) Advertising, marketing, and recommending the use of the Roundup® products, while concealing and failing to disclose or warn of the dangers known by Defendant to be associated with or caused by the use of or exposure to Roundup® and glyphosate;

m) Continuing to disseminate information to its consumers, which indicate or imply that Defendant's Roundup® products are not unsafe for use in the agricultural and horticultural industries; and

n) Continuing the manufacture and sale of its products with the knowledge that the products were unreasonably unsafe and dangerous.

122. Defendant knew and/or should have known that it was foreseeable that consumers such as Kristina Boutwell Ready would suffer injuries as a result of Defendant's failure to exercise ordinary care in the manufacturing, marketing, labeling, distribution, and sale of Roundup®.

123. Kristina Boutwell Ready did not know the nature and extent of the injuries that could result from the intended use of and/or exposure to Roundup® or its active ingredient glyphosate.

124. Defendant's negligence was the proximate cause of the injuries, harm, economic losses of Kristina Boutwell Ready.

125. Defendant's conduct, as described above, was reckless. Defendant regularly risks the lives of consumers and users of their products, including Kristina Boutwell Ready with full knowledge of the dangers of its products. Defendant has made conscious decisions not to redesign, re-label, warn, or inform the unsuspecting public, including Kristina Boutwell Ready. Defendant's reckless conduct therefore warrants an award of punitive damages.

126. As a proximate result of Defendant's wrongful acts and omissions in placing its defective Roundup® products into the stream of commerce without adequate warnings of the hazardous and carcinogenic nature of glyphosate, Kristina Boutwell Ready endured extreme mental anguish, loss of enjoyment of life, physical pain and discomfort, as well as economic hardship, including considerable financial expenses for medical care and treatment.

127. WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in Plaintiff's favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all such other and further relief as this Court deems just and proper. Plaintiff also demands a jury trial on the issues contained herein.

## **CLAIM FOUR**

### **BREACH OF IMPLIED WARRANTIES**

128. Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

129. At all times relevant to this litigation, Defendant engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting its Roundup® products, which are defective and unreasonably dangerous to consumers, including Kristina

Boutwell Ready, thereby placing Roundup® products into the stream of commerce. These actions were under the ultimate control and supervision of Defendant.

130. Before the time that Kristina Boutwell Ready was exposed to the use of the aforementioned Roundup® products, Defendant impliedly warranted to its consumers—including Kristina Boutwell Ready—that its Roundup® products were of merchantable quality and safe and fit for the use for which they were intended; specifically, as horticultural herbicides.

131. Defendant, however, failed to disclose that Roundup® has dangerous propensities when used as intended and that the use of and/or exposure to Roundup® and glyphosate-containing products carries an increased risk of developing severe injuries, including Kristina Boutwell Ready's injuries.

132. Kristina Boutwell Ready reasonably relied upon the skill, superior knowledge and judgment of Defendant and upon its implied warranties that the Roundup® products were of merchantable quality and fit for their intended purpose or use.

133. Upon information and belief, Kristina Boutwell Ready was at all relevant times in privity with Defendant.

134. Kristina Boutwell Ready is the intended third-party beneficiaries of implied warranties made by Defendant to the purchasers of its horticultural herbicides, and as such Plaintiff is entitled to assert this claim.

135. The Roundup® products were expected to reach and did in fact reach consumers and users, including Kristina Boutwell Ready, without substantial change in the condition in which they were manufactured and sold by Defendant.

136. At all times relevant to this litigation, Defendant was aware that consumers and users of its products, including Kristina Boutwell Ready, would use Roundup® products as marketed by

Defendant, which is to say that Kristina Boutwell Ready was a foreseeable user of Roundup®.

137. Defendant intended that its Roundup® products be used in the manner in which Kristina Boutwell Ready in fact used them and Defendant impliedly warranted each product to be of merchantable quality, safe, and fit for this use, despite the fact that Roundup® was not adequately tested or researched.

138. In reliance upon Defendant's implied warranty, Kristina Boutwell Ready used Roundup® as instructed and labeled and in the foreseeable manner intended, recommended, promoted and marketed by Defendant.

139. Kristina Boutwell Ready could not have reasonably discovered or known of the risks of serious injury associated with Roundup® or glyphosate.

140. Defendant breached its implied warranty to Kristina Boutwell Ready in that its Roundup® products were not of merchantable quality, safe, or fit for their intended use, or adequately tested. Roundup® has dangerous propensities when used as intended and can cause serious injuries, including those injuries complained of herein.

141. The harm caused by Defendant's Roundup® products far outweighed their benefit, rendering the products more dangerous than an ordinary consumer or user would expect and more dangerous than alternative products.

142. As a direct and proximate result of Defendant's wrongful acts and omissions, Kristina Boutwell Ready endured extreme mental anguish, loss of enjoyment of life, physical pain and discomfort, as well as economic hardship, including considerable financial expenses for medical care and treatment.

143. WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in Plaintiff's favor for compensatory and punitive damages, together with interest, costs herein

incurred, attorneys' fees, and all such other and further relief as this Court deems just and proper. Plaintiff also demands a jury trial on the issues contained herein.

## CLAIM FIVE

## BREACH OF EXPRESS WARRANTIES

144.    Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

145.    The law imposes a duty on Monsanto to be responsible in the event the product sold, namely Roundup, is fit for the use and purposes intended.

146.    Defendant breached its contractually assumed implied warranty by supplying a product that caused Kristina Boutwell Ready's chronic lymphocytic leukemia/CLL.

147.    Any warranty disclaimer or limitation of liability clause offered by Defendant for a product as dangerous as Roundup would be unconscionable and unenforceable by law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests that the Court enter judgment in her favor and against Monsanto, awarding as follows:

A.    compensatory damages in an amount to be proven at trial;

B.    punitive damages;

C.    costs including reasonable attorneys' fees, court costs, and other litigation expenses; and,

D.    any other relief the Court may deem just and proper.

DATED this the 2nd day of March, 2021.

Respectfully submitted,

PITTMAN, ROBERTS & WELSH, PLLC

BY:  /s/C. Victor Welsh, III
C. VICTOR WELSH, III (MSB #7107)

*Counsel for Plaintiff*

OF COUNSEL:

PITTMAN, ROBERTS & WELSH, PLLC
410 South President Street
Jackson, Mississippi 39201
Telephone: (601) 948-6200
Facsimile: (601) 948-6187
cvw@prwlaw.com

J. DAMOND READY
P. O. Box 958
Monticello, Mississippi 39654-0958
Telephone: (601) 587-0029
Facsimile: (601) 587-0740
readyjohn@bellsouth.net



I hereby certify that this document No. __1__,
filed on _03/05/2021_, is a true and correct
copy of the electronically filed original.

**ATTEST:**

**ARTHUR JOHNSTON, CLERK**
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI

By: _____, Deputy Clerk

JS 44 (Rev. 09/19)

# CIVIL COVER SHEET  Civil No.: 2:21cv30-TBM-FKB

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

| I. (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| KRISTINA BOUTWELL READY | MONSANTO COMPANY, INC. and DOES 1-10 |

| (b) County of Residence of First Listed Plaintiff MONTICELLO, MS | County of Residence of First Listed Defendant St. Louis County |
|---|---|
| *(EXCEPT IN U.S. PLAINTIFF CASES)* | *(IN U.S. PLAINTIFF CASES ONLY)* |
| | NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED. |

| (c) Attorneys *(Firm Name, Address, and Telephone Number)* | Attorneys *(If Known)* |
|---|---|
| C. Victor Welsh, III, PITTMAN, ROBERTS & WELSH, PLLC 410 S President Street, Jackson, MS  39201 (601) 948-6200 | |

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- ❑ 1  U.S. Government Plaintiff
- ❑ 3  Federal Question  *(U.S. Government Not a Party)*
- ❑ 2  U.S. Government Defendant
- ❑ 4  Diversity  *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)*                    *and One Box for Defendant)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ❑ 1 | Incorporated *or* Principal Place of Business In This State | ❑ 4 | ❑ 4 |
| Citizen of Another State | ❑ 2 | ❑ 2 | Incorporated *and* Principal Place of Business In Another State | ❑ 5 | ☒ 5 |
| Citizen or Subject of a Foreign Country | ❑ 3 | ❑ 3 | Foreign Nation | ❑ 6 | ❑ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ❑ 110 Insurance | PERSONAL INJURY   PERSONAL INJURY | ❑ 625 Drug Related Seizure of Property 21 USC 881 | ❑ 422 Appeal 28 USC 158 | ❑ 375 False Claims Act |
| ❑ 120 Marine | ❑ 310 Airplane   ☒ 365 Personal Injury - | ❑ 690 Other | ❑ 423 Withdrawal 28 USC 157 | ❑ 376 Qui Tam (31 USC 3729(a)) |
| ❑ 130 Miller Act | ❑ 315 Airplane Product Liability       Product Liability | | | ❑ 400 State Reapportionment |
| ❑ 140 Negotiable Instrument | ❑ 320 Assault, Libel & ❑ 367 Health Care/ | | PROPERTY RIGHTS | ❑ 410 Antitrust |
| ❑ 150 Recovery of Overpayment & Enforcement of Judgment | Slander        Pharmaceutical ❑ 330 Federal Employers'    Personal Injury | | ❑ 820 Copyrights ❑ 830 Patent | ❑ 430 Banks and Banking ❑ 450 Commerce |
| ❑ 151 Medicare Act | Liability       Product Liability | | ❑ 835 Patent - Abbreviated New Drug Application | ❑ 460 Deportation |
| ❑ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ❑ 340 Marine     ❑ 368 Asbestos Personal ❑ 345 Marine Product    Injury Product Liability       Liability | | ❑ 840 Trademark | ❑ 470 Racketeer Influenced and Corrupt Organizations ❑ 480 Consumer Credit |
| ❑ 153 Recovery of Overpayment of Veteran's Benefits | ❑ 350 Motor Vehicle   PERSONAL PROPERTY ❑ 355 Motor Vehicle   ❑ 370 Other Fraud | LABOR | SOCIAL SECURITY | (15 USC 1681 or 1692) ❑ 485 Telephone Consumer |
| ❑ 160 Stockholders' Suits | Product Liability   ❑ 371 Truth in Lending | ❑ 710 Fair Labor Standards Act | ❑ 861 HIA (1395ff) ❑ 862 Black Lung (923) | Protection Act |
| ❑ 190 Other Contract | ❑ 360 Other Personal  ❑ 380 Other Personal | ❑ 720 Labor/Management Relations | ❑ 863 DIWC/DIWW (405(g)) | ❑ 490 Cable/Sat TV |
| ❑ 195 Contract Product Liability | Injury        Property Damage ❑ 362 Personal Injury -  ❑ 385 Property Damage | ❑ 740 Railway Labor Act | ❑ 864 SSID Title XVI ❑ 865 RSI (405(g)) | ❑ 850 Securities/Commodities/ Exchange |
| ❑ 196 Franchise | Medical Malpractice   Product Liability | ❑ 751 Family and Medical Leave Act | | ❑ 890 Other Statutory Actions |
| REAL PROPERTY | CIVIL RIGHTS   PRISONER PETITIONS | ❑ 790 Other Labor Litigation | FEDERAL TAX SUITS | ❑ 891 Agricultural Acts |
| ❑ 210 Land Condemnation | ❑ 440 Other Civil Rights   Habeas Corpus: | ❑ 791 Employee Retirement Income Security Act | ❑ 870 Taxes (U.S. Plaintiff or Defendant) | ❑ 893 Environmental Matters ❑ 895 Freedom of Information |
| ❑ 220 Foreclosure | ❑ 441 Voting     ❑ 463 Alien Detainee | | ❑ 871 IRS—Third Party | Act |
| ❑ 230 Rent Lease & Ejectment | ❑ 442 Employment   ❑ 510 Motions to Vacate | | 26 USC 7609 | ❑ 896 Arbitration |
| ❑ 240 Torts to Land | ❑ 443 Housing/       Sentence | | | ❑ 899 Administrative Procedure |
| ❑ 245 Tort Product Liability | Accommodations  ❑ 530 General | | | Act/Review or Appeal of |
| ❑ 290 All Other Real Property | ❑ 445 Amer. w/Disabilities -  ❑ 535 Death Penalty | IMMIGRATION | | Agency Decision |
| | Employment     Other: | ❑ 462 Naturalization Application | | ❑ 950 Constitutionality of |
| | ❑ 446 Amer. w/Disabilities -  ❑ 540 Mandamus & Other | ❑ 465 Other Immigration | | State Statutes |
| | Other       ❑ 550 Civil Rights | Actions | | |
| | ❑ 448 Education    ❑ 555 Prison Condition | | | |
| | ❑ 560 Civil Detainee - | | | |
| | Conditions of | | | |
| | Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

- ☒ 1 Original Proceeding
- ❑ 2 Removed from State Court
- ❑ 3 Remanded from Appellate Court
- ❑ 4 Reinstated or Reopened
- ❑ 5 Transferred from Another District *(specify)*
- ❑ 6 Multidistrict Litigation - Transfer
- ❑ 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:

Brief description of cause:
Exposure to Roundup.

| VII. REQUESTED IN COMPLAINT: | ❑ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P. | DEMAND $ | CHECK YES only if demanded in complaint: JURY DEMAND: ☒ Yes ❑ No |
|---|---|---|---|

| VIII. RELATED CASE(S) IF ANY | *(See instructions):*  JUDGE | DOCKET NUMBER |
|---|---|---|

DATE 03/05/2021       SIGNATURE OF ATTORNEY OF RECORD *C. Chit Welsin*

FOR OFFICE USE ONLY

| RECEIPT # | AMOUNT $402.00 | APPLYING IFP | JUDGE McNeel | MAG. JUDGE Ball |
|---|---|---|---|---|

0538-4498548