# U.S. District Court
# Eastern District of Louisiana (New Orleans)
# CIVIL DOCKET FOR CASE #: 2:21-cv-00576-MLCF-DMD

Sheldon v. Monsanto Company et al
Assigned to: Judge Martin L.C. Feldman
Referred to: Magistrate Judge Dana Douglas
Cause: 28:1332 Diversity-Product Liability

Date Filed: 03/22/2021
Jury Demand: Plaintiff
Nature of Suit: 365 Personal Inj. Prod. Liability
Jurisdiction: Diversity

**Plaintiff**

**Thomas A. Sheldon**

represented by **Antonio Le Mon , I**
Antonio Le Mon, Attorney at Law
Courthouse Square
321 N. Vermont St.
Suite 104
Covington, LA 70433
985-898-0024
Email: llemonlawyer@aol.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Monsanto Company**

**Defendant**

**Scotts Miracle-Gro Company**

| Date Filed | # | Docket Text |
|---|---|---|
| 03/22/2021 | 1 | COMPLAINT with jury demand against All Defendants (Filing fee $ 402 receipt number ALAEDC-8786046) filed by Thomas A. Sheldon. (Attachments: # 1 Civil Cover Sheet) Attorney Antonio Le Mon, I added to party Thomas Anthony Sheldon(pty:pla).(Le Mon, Antonio) Modified text on 3/23/2021 (sa). (Entered: 03/22/2021) |
| 03/22/2021 | 2 | Summons Submitted for Issuance (Attachments: # 1 Summons for 2nd defendant)(Le Mon, Antonio) Modified on 3/23/2021 (sa). (Entered: 03/22/2021) |
| 03/23/2021 | 3 | Initial Case Assignment to Judge Martin L.C. Feldman and Magistrate Judge Dana Douglas. (aj) (Entered: 03/23/2021) |
| 03/23/2021 | 4 | Summons Issued as to Monsanto Company, Scotts Miracle-Gro Company. (Attachments: # 1 Summons)(sa) (Entered: 03/23/2021) |

CLERK'S OFFICE
A TRUE COPY

**Mar 23 2021**

Deputy Clerk, U.S. District Court
Eastern District Of Louisiana
New Orleans, LA

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF LOUISIANA

**THOMAS A. SHELDON**
(a Louisiana Resident)
**PLAINTIFF/COMPLAIANT**

**Case No.** _____

**JURY DEMAND**

VS.

**MONSTANTO COMPANY**
(a Missouri Corporation)
**AND**
**SCOTTS MIRACLE GRO COMPANY**
(an Ohio Corporation)
**DEFENDANTS**



CLERK'S OFFICE
A TRUE COPY

**Mar 23 2021**

Deputy Clerk, U.S. District Court
Eastern District Of Louisiana
New Orleans, LA

1.

This lawsuit involves and alleges the unlawful promotion, marketing, and sale of various Roundup Products, manufactured by Defendant, Monsanto Company, and distributed, nationwide, by Defendant, Scotts Miracle-Gro Company.

2.

Defendants label, advertise, and promote their retail Roundup® products, including but not limited to their Roundup® "Garden Weeds" Weed & Grass Killer products ("Roundup" or "Roundup Products"),[1] with the false statement that Roundup's active ingredient, glyphosate, targets an enzyme that is ***not*** found "in people or pets."

3.

However, this claim is false, misleading and deceptive, as the enzyme that glyphosate targets ***is*** found in people and pets—specifically, in beneficial gut bacteria critical to their health and well being, including their immune system, digestion, allergies, metabolism, and even their brain function.

1

4.

Defendants repeat these false and misleading representations throughout their marketing, including in video advertisements produced for their websites and YouTube Channel.

5.

Glyphosate targets the enzyme EPSP synthase. The beneficial bacteria in our gut (and the gut of other mammals), on which our immune systems rely, produce and utilize EPSP synthase.[3] Thus, the targeted enzyme EPSP synthase *is* found in people and pets. Defendants' claim to the contrary is demonstrably false.

6.

Defendants' false statements and omissions regarding glyphosate and the enzyme it targets are material. There is widespread controversy and concern around glyphosate and its effects on humans and animals. Studies indicate that the health of the beneficial bacteria in our bodies is directly linked to our general health. Studies also suggest that interference with the gut flora may have serious effects on humans and pets.[4]

7.

In light of this controversy, and to exploit consumer concerns about glyphosate's effects, Monsanto markets Roundup with the false statement that it targets an enzyme that is *not* found in people or pets. Monsanto omits material, contrary information, namely, that human gut bacteria produce and utilize the enzyme targeted by Roundup.

8.

These false statements deceived Plaintiff and caused him harm. Plaintiff would have acted differently had he known the material information omitted by Defendants and/or the falsity of the statements made by the Defendants.

9.

Because of the false statements and material omissions, Defendants were able to sell more Roundup Products and were able to charge more for Roundup than they otherwise would have been able to charge.

10.

Defendants' actions violate, among other statutes, the Louisiana Unfair Trade Practices, LSA-R.S. 51:1401, which sets forth a private action for civil and penal remedies, LSA-R.S. 51:1409; the Louisiana Products Liability Act, LSA-R.S. 9:2800.51 et. seq.; Louisiana Civil Code arts. 2315 and 2316, and other consumer and statutory laws of Louisiana and, from information and belief, statutory violations in other states and jurisdictions.

11.

Defendants also breached an express warranty that their product targets an enzyme not found in people or pets.

12.

Defendants were unjustly enriched through utilizing the false statements and omitting material information.

13.

Plaintiff who purchased the Roundup Products suffered economic and other damages because he purchased more Roundup Products and/or paid more for Roundup Products than he would have had he not been deceived. Plaintiffs further suffered bodily injuries and other damages including but not limited to past, present and future pain and suffering, loss of enjoyment of life, medical and prescription expenses, emotional distress, disabilities, and such other damages that may be shown at trial. These economic losses exceed seventy-five thousand ($75,000), exclusive of interest and costs.

14.

Accordingly, Plaintiff seeks, in addition to any applicable equitable and monetary relief, compensation for himself equal to the amount of money he paid for Roundup Products that he would not have purchased had he known the truth, or in the alternative, the amount of money he paid based on the false statements.

## JURISDICTION AND VENUE

15.

This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d), diversity of jurisdiction.

16.

This Court has personal jurisdiction over Defendants because Defendants transact business throughout the United States, including in Louisiana and in this judicial district.

17.

Venue is proper in this District under 28 U.S.C. § 1391(b)(2) and (3) and (d) in that Plaintiff purchased Defendants' product at issue in the Parish of St. Tammany, State of Louisiana at all material times. Substantial acts in furtherance of the alleged improper conduct, including the dissemination of the false statement, occurred within this district.

## PARTIES

18.

Defendant Monsanto Company was and is a Delaware corporation headquartered in St. Louis, Missouri, and a leading marketer of biocides nationwide. Monsanto is and was, at all relevant times, engaged in commercial transactions throughout the United States, including in the states of Louisiana, Wisconsin, Illinois, California, New York, New Jersey, and Florida.

19.

Monsanto manufactures and/or causes the manufacture of Roundup Products, and markets and distributes the Products in retail stores throughout the United States, including in the states of Louisiana, Wisconsin, Illinois, California, New York, New Jersey, and Florida, and through the Internet nationwide.

20.

Defendant Scotts Miracle-Gro Company (Scotts) is an Ohio corporation headquartered in Marysville, Ohio. Scotts is and was, at all relevant times, engaged in commercial transactions throughout the United States, including in the states of Louisiana, Wisconsin, Illinois, California, New York, New Jersey, and Florida.

21.

Scotts is responsible for marketing and distributing Roundup Products around the United States, including in the states of Louisiana Wisconsin, Illinois, California, New York, New Jersey, and Florida, and through the Internet nationwide.

22.

Plaintiff Thomas A. Sheldon ("Sheldon") is a citizen of the state of Louisiana and a resident of Mandeville, St. Tammany Parish, Louisiana. He purchased Monsanto's Roundup Products on multiple occasions from the Home Depot stores and other commercial retailers doing business located in the Parish of St. Tammany, Louisiana and the Roundup Products he purchased bore labels falsely stating, "Glyphosate targets an enzyme not found in humans." Plaintiff Sheldon reasonably relied on this representation in deciding to purchase those Roundup Products and at all material times intended to use the Roundup Products for residential purposes at his residences in the Parish of St. Tammany, State of Louisiana.

23.

### FACTUAL ALLEGATIONS

### I.
### GLYPHOSATE AND THE ENZYME IT TARGETS

24.

Glyphosate, the active ingredient in Roundup, is a non-selective biocide, meaning that it will kill most plants and many simple organisms. Unlike selective biocides, glyphosate cannot be used on most conventional lawns, as it would kill grass that has not been genetically modified.

25.

Glyphosate kills plants by inhibiting the enzyme 5-enolpyruvylshikimate-3-phosphate ("EPSP") synthase, disrupting the fifth of six enzymatic steps in the shikimate pathway, which processes aromatic amino acids.[5]

26.

The same enzyme—the EPSP synthase that glyphosate "targets"—is present in many beneficial bacteria that inhabit the human and other mammalian gut.[6] Hence, contrary to Defendants' representation that the enzyme targeted by Roundup's glyphosate is *not* found in people or pets, that enzyme *is* found in people and pets.

27.

Studies show that the health of beneficial gut bacteria is essential to the overall health of humans and other mammals.[7] Microorganisms that populate the human body outnumber human cells 10 to one.[8]

28.

Studies have also demonstrated that even exposure to low doses of glyphosate can have negative and unhealthy effects in humans and animals.

6

As a result of such studies, widespread controversy and consumer concern exist regarding glyphosate's effect on humans and animals.

## II.
## FALSE STATEMENTS AND MATERIAL OMISSIONS ON ROUNDUP LABELING

30.

Defendants include a false statement on the labels of their Roundup Products, stating, "Glyphosate targets an enzyme found in plants but not people or pets."

31.

This misrepresentation is presented on certain Roundup product labels under the phrase "DID YOU KNOW?" As shown below, for the Roundup Weed & Grass Killer III and Roundup Weed & Grass Killer Concentrate Plus, the label states, "Glyphosate targets an enzyme found in plants but not people or pets.":

 

 

32.

Defendants know[10] consumers, including Plaintiff, have become increasingly concerned about Roundup's potential effects on people and animals[11] and that consumers are more likely to buy— and will pay more for—Roundup if they believe it targets an enzyme that is not found in people and animals.

33.

Defendants include these false statements to induce members of the public to purchase (or to purchase more of) the Roundup Products and/or to pay more for them.

34.

Defendants omit material information from the label of Roundup Products to induce members of the public, including Plaintiff, to purchase (or to purchase more of) their Products and/or to pay more for them.

**III.**
**DEFENDANTS' KNOWLEDGE THAT THEIR REPRESENTATION ARE FALSE AND OMISSIONS OF MATRIAL INFORMATION**

35.

Glyphosate was invented by Monsanto, an agrochemical and agricultural biotechnology corporation, which began marketing the chemical in 1974 under the trade name Roundup.

36.

Monsanto holds itself out to the public as a trusted expert in herbicides.[12]

37.

In 2003, Monsanto sought a patent for the antimicrobial properties of glyphosate, specifically citing in its application to glyphosate's effect on the shikimate pathway; this United States patent was granted in 2010.[13] Monsanto is therefore well aware of how glyphosate works on the shikimate pathway,[14] and upon information and belief is aware of studies showing that the shikimate pathway is present in bacteria integral to the digestive systems of people and pets.

38.

Scotts has been distributing consumer Roundup Products exclusively for Monsanto for for many years and also knows that glyphosate targets an enzyme found in humans.

39.

Defendants, therefore, know that glyphosate targets an enzyme present not only in plants, but also in people and pets.

40.

Despite this knowledge, Defendants willfully advertised these Roundup Products using the material false statement.

41.

Defendants willfully omitted material information from Roundup Products' labeling concerning the use of EPSP synthase by bacteria within the human gut biome.

42.

Through the false statements made in their labeling, and through their material omissions, Defendants conceal the truth. Defendants' concealment tolls the applicable statute of limitations.

43.

To this day, Defendants continue to conceal, suppress, and misrepresent the true nature of Roundup and its active ingredient, glyphosate.

## IV.
## REASONABLE CONSUMERS DECEIVED BY FALSE STATEMENTS

44.

The statement "Glyphosate targets an enzyme found in plants but not in people or pets" was on the label of the Roundup Products that Plaintiff purchased.

45.

Plaintiff saw and was deceived by the false statements, and by the omission of material information.

46.

Consumers, including Plaintiff, have been deceived by these false statements and material omissions.

47.

Consumers, including Plaintiff, cannot discover the falsity of the statement from reading the label. Nor can they discover the falsity of the statement from visiting Roundup's website. Indeed, the website also states, on each Roundup Product's individual webpage, "Glyphosate targets an enzyme found in plants but not people or pets."[15]

48.

Other Roundup webpages, such as one titled "How Do Roundup® Weed & Grass Killer Products Work?", repeat the false statement both in writing and in videos.[16]

49.

Discovery of the true nature of Roundup requires scientific knowledge and research that the average reasonable consumer would or could not undertake. Thus, a reasonable consumer is likely to be deceived by these false statements and material omissions.

50.

These deceptive representations and omissions are material in that an ordinary reasonable person would attach importance to such information and would be induced to act upon such information in making purchasing decisions.

## V.
## INJURY TO PLAINTIFF CAUSED BY DEFENDANTS' FALSE STATEMENTS AND OMISSIONS

51.

As an immediate, direct, and proximate result of the Defendants' misrepresentations and omissions, Defendants injured Plaintiff in that they: (i)paid more for Roundup Products that were falsely represented than they would have had the Roundup Product not been falsely represented; (ii) purchased Roundup Products that he otherwise would not have purchased had he not been deceived; (iii) caused bodily injury to Plaintiff along with past, present and future pain and suffering, emotional distress and trauma, disabilities, medical and prescription expenses; (iv) purchased Roundup Products that he otherwise would not have purchased, had he known the truth about glyphosate;(v)was deprived of the benefit of the bargain because the Roundup Products he purchased were different from what Defendants promised and/or had less value that what was represented; and/or (vi)did not receive Roundup Products that measured up to his reasonable expectations as created and distributed by Defendants.

52.

Plaintiff purchased, purchased more of, and/or paid more for Roundup Products than he would have had he not been deceived by the representations and omissions. Had Defendants not

made the false statements and omitted material information, Plaintiff would not have been injured as asserted hereinabove.

## COUNT I

## LOUISANA'S UNFAIR TRADE PRACTICES ACT

53.

All of the foregoing paragraphs are re-alleged as if fully set forth herein.

54.

This cause of action is brought pursuant to Louisiana Unfair Trade Practices and Consumer Protection Law, LSA- R.S. 51:1401, et. seq., in that Defendants committed unfair and deceptive trade practices knowingly resulting in the aforesaid damages to Plaintiff, together with attorney's fees and penal damages to the extent allowed under law with intent to sell, distribute, increase the consumption of merchandise directly or indirectly, to the public for sale and did make, publish, disseminate, circulate, or place before the public in this state, in a label or in any other way similar or dissimilar to the foregoing, an advertisement, announcement, statement or representation of any kind to the public which contains any assertion, representation or statement of fact which is untrue, deceptive or misleading.

55.

As alleged throughout this Complaint, Defendants deliberately engaged in deceptive and unlawful marketing in violation of Louisiana law by representing to Plaintiff that glyphosate targets an enzyme not found in humans, when in fact, it does.

56.

Plaintiff reasonably relied upon Defendants' deceptive and unlawful marketing practices.

## COUNT II

## VIOLATION OF LOUISIANA PRODUCTS LIABILITY ACT

57.

All of the foregoing paragraphs are re-alleged as if fully set forth herein.

58.

This cause of action is brought pursuant to the Louisiana Products Liability Act, LSA-R.S. 9:2800.19 et. seq.

59.

Defendants as manufacturer and/or distributor of the Round Up Products did knowingly commit unfair and deceptive trade practices knowingly resulting in the aforesaid damages to Plaintiff, together with attorney's fees and penal damages to the extent allowed under law with intent to sell, distribute, increase the consumption of merchandise directly or indirectly, to the public for sale and did make, publish, disseminate, circulate, or place before the public in this state, in a label or in any other way similar or dissimilar to the foregoing, an advertisement, announcement, statement or representation of any kind to the public which contains any assertion, representation or statement of fact which is untrue, deceptive or misleading.

60.

Defendants knowingly placed in commerce unreasonably dangerous products and knowingly and/or negligently represented that their products had characteristics, standards, qualities, grades and/or benefits that they did not have, and advertised those products with intent not to sell them as advertised.

61.

As alleged throughout this Complaint, Defendants deliberately engaged in deceptive and unlawful marketing in violation of Louisiana law by representing to Plaintiff that glyphosate targets an enzyme not found in humans, when in fact, it does.

62.

Plaintiff reasonably relied upon Defendants' deceptive/negligent and unlawful marketing practices. Defendants failed to give reasonable notice to Plaintiff of the dangers of their products even though the reasonably anticipated use and/or misuse of their products would more likely than not cause and/or unreasonably expose Plaintiff to bodily injury and damages without any, adequate

and/or misleading warnings to consumers, including Plaintiff, which unreasonably dangerous conditions and characteristics were not open and obvious dangers in violation of all written, express and legal warranties of merchantability and otherwise in violation of sales, marketing and consumer laws. The Round Products were unreasonably dangerous in design and/or composition at the time it was distributed and/or left the possession of Defendants in that those products left Defendants' possession deviating in a material way from the Defendants' specifications for performance and/or characteristic standards for the products and/or identical products manufactured by the same or similar manufacturers/distributors.

63.

At all material times herein, there were alternative designs and compositions for the products at issue that could have prevented the damages to Plaintiff notwithstanding that Defendants represented that the Roundup Products were of a particular standard, quality, and grade and engaging in conduct which similarly creates a likelihood of confusion or misunderstanding.

64.

Defendants' conduct offends public policies and is immoral, unethical, unscrupulous, and substantially injurious to consumers, including Plaintiff, who reasonably relied upon the Defendants' deceptive and unlawful marketing practices, including, *inter alia*, the representation that glyphosate targets an enzyme not found in humans, in deciding to purchase Roundup Products as advertised and promoted by Defendants for personal, family and household purposes.

65.

Because Defendants misrepresent the characteristics, ingredients, and benefits of Roundup Products; misrepresents the standard, quality, and grade of Roundup Products; misrepresent, fail to state, and use innuendo and ambiguity in ways which tend to mislead and deceive reasonable consumers with regard to material facts about Roundup Products; and advertise

Roundup Products without the intent to sell it as advertised, Defendants' labeling and marketing of Roundup Products violates Louisiana law.

66.

Defendants violated the Louisiana product and consumer laws by advertising and promoting Roundup Products in the manner described hereinabove, when they knew, or should have known, that those representations and advertisements were false and/or misleading.

67.

Defendants intended that Plaintiff would rely on their deception by purchasing the Roundup Products, unaware of the material facts described above. This conduct constitutes consumer fraud within the meaning of Louisiana law and violated the Louisiana Products Liability Act.

68.

Defendants' conduct constitutes malicious, fraudulent, and/or wanton disregard for the safety of consumers, including Plaintiff, by providing misleading information concerning Roundup, indicating that glyphosate targets an enzyme found only in plants and *not* in people and pets, when in fact scientific evidence indicates that glyphosate targets an enzyme that *is* found in people and pets.

69.

Had Defendants disclosed all material information regarding Roundup Products in their advertising, marketing, and/or labeling, Plaintiff would not have purchased the Roundup Products, would have paid less, or would have placed a significantly different value on the product than what Defendants received.

## COUNT III

## BREACH OF EXPRESS AND IMPLIED WARRANTIES

70.

All of the foregoing paragraphs are re-alleged as if fully set forth herein.

71.

Defendants provided Plaintiff with written/express and implied warranties including, but not limited to, warranties that the glyphosate present in Roundup "targets an enzyme found in plants but not in people or pets" and that their products were safe and fit for their intended uses and misuses. Defendants expressed and impliedly represented that Roundup was safe for and fit for its intended uses.

72.

Plaintiff purchased Roundup Products believing them to conform to the express warranties.

73.

Defendants breached these warranties.

74.

As a proximate result of the breach of warranties by Defendants, Plaintiff did not receive goods as warranted and did not receive the benefit of the bargain. They have, therefore, been injured and have suffered damages in an amount to be proven at trial.

## COUNT IV
## FRAUD VIOLATION

75.

All of the foregoing paragraphs are re-alleged as if fully set forth herein.

76.

Plaintiff further alleges that Defendants violated the fraud laws of Louisiana, including but not limited to La. Civil Code art. 1953 by its misrepresentations and/or suppressions of the truth by its actions and silences as set forth hereinabove, entitling Plaintiff to all compensatory damages and attorney's fees.

## COUNT V
## UNJUST ENRICHMENT

77.

All of the foregoing paragraphs are re-alleged as if fully set forth herein.

78.

To the extent required by law, this cause of action is pleaded in the alternative to Plaintiff's contract-based claims.

79.

As the intended, direct, and proximate result of Defendants' conduct, Defendants have been unjustly enriched through sales of Roundup Products at the expense of Plaintiff.

80.

Under the circumstances, it would be against equity and good conscience to permit Defendants to retain the ill-gotten benefits that it received from Plaintiff in light of the fact that the Roundup Products they purchased were not what Defendants purported them to be and have been shown to cause cancer.

81.

As the intended, direct, and proximate result of Defendants' conduct, Defendants have been unjustly enriched through sales of Roundup Products at the expense of Plaintiff.

## **COUNT VI**

## **OFFENSES AND QUASI OFFENSES**

82.

All of the foregoing paragraphs are re-alleged as if fully set forth herein.

83.

Plaintiff further maintains that Defendants' by their aforedescribed acts and omissions constitute offenses and quasi offenses and negligent acts and omissions pursuant to La. Civil Code arts. 2315 and 2316 for which Defendants are liable to Plaintiff for all compensatory damages.

## GENERAL ALLEGATIONS

### 84.

Defendants were in the business of, and did, design, research, manufacture, test advertise, promote, market, sell, distribute and/or have acquired and are responsible for the promotion, marketing, sale and distribution of the herbicide Roundup.

### 85.

Defendants discovered the herbicidal properties of glyphosate during the 1970's and subsequently began to design, research, manufacture, sell and/or distribute glyphosate Roundup as a broad spectrum herbicide. Glyphosate is an active ingredient in Roundup.

### 86.

Glyphosate is a broad-based herbicide used to kill weed and grasses known top compete with commercial crops grown throughout the world.

### 87.

Each year, approximately 250 million pounds of glyphosate are sprayed on crops, commercial nurseries, suburban lawns, parks and golf courses. Defendants are intimately involved in the development, design, manufacture, marketing, sale and/or distribution of genetically modified crops, many marketed as resistant to Roundup. As early as the 1980's, Defendants were aware of glyphosate's carcinogenic properties. On March 4, 1985, the Environmental Protection Agency ("EPA") published a memorandum classifying glyphosate as a Category C oncogene, which are possible human carcinogens with limited evidence of carcinogenicity. In 1985, Francisco Peixoto published a study showing that Roundup's effects on rat liver are much more toxic and harmful than the same concentrations of glyphosate alone. In 2009, Nora Benachour and Gilles-Eric Seralini published a study examining the effects of Roundup and glyphosate on human umbilical, embryonic and placental cells which concluded that the Roundup is always more toxic than it active ingredient glyphosate and amplify toxicity. Defendants knew at all material

times that the safety studies for glyphosate were insufficient to prove the safety of Roundup yet Defendants relied on those studies in its marketing, sale, and distribution of Roundup to consumers, including Plaintiff.

88.

The International Agency for Research on Cancer ("IARC") is a specialized intergovernmental cancer agency of the World Health Organization ("WHO") of the United Nation. In 1985, after a cumulative review of human, animal, and DNA studies for more than one year, many of which had been in Defendants' possession since as early as 1985, the LARC's working group published its conclusion that the glyphosate contained in Defendants' Roundup herbicide, is a Class 2A "probable carcinogen" and a "probable carcinogen to humans" and that glyphosate caused DNA and chromosomal damage to human cells. Glyphosate and Roundup, in particular, have long been associated with carcinogenicity and the development of numerous forms of cancer, including but not limited to non-Hodgkin's lymphoma, Hodgkin's lymphoma, multiple myeloma, and soft tissue sarcoma of which Defendants have been aware since the early to mid 1980's. Notwithstanding, Defendants have continued to use broad and sweeping statements in their marketing and other representations of Roundup that their product is safer than ordinary household items such as table salt, despite lack of scientific support for the accuracy and validity of those statements and, in fact, voluminous evidence to the contrary and have falsely warranted to users of Roundup and the general public that glyphosate and/or Roundup is safe, non-carcinogenic and that its sue, even at high dose levels, does not cause cancer.

89.

Glyphosate, and Defendants' Round Up products in particular, have long been associated with serious side effects and many regulatory agencies around the world have banned or are currently banning the use of glyphosate herbicide products.

19

## PLAINTIFF'S EXPOSURE TO ROUNDUP PRODUCTS

90.

Beginning in the 1980 and continuing yearly for over thirty five years, Plaintiff was exposed to significant levels of Round Up Products for use in treating his residential lawn, garden, and trees or. almost a weekly basis, either spraying or pouring it without use of a mask or other respiratory device or protection. Plaintiff has been diagnosed with small cell, aggressive Cutaneous T-Cell Lymphoma in 2015. However, plaintiff was not advised nor did he have a reasonable belief until approximately July 2020, after further consult with his health care providers treating his Lymphoma, that this serious medical condition could likely be caused by his repeated exposure to glyphosate and/or Round Up Products during his years of use of Defendants' products.

## PRESCRIPTIVE PERIOD(S) NOT TOLLED

91.

The running of any applicable prescription period has not occurred by reason of Defendants' fraudulent concealments and misrepresentations of their Roundup products and Defendants actively concealed the true risks associated with Roundup and glyphosate. Even as last as October 2015 if not later, Defendants have represented that there is no evidence that glyphosate causes cancer. Plaintiff was not aware and could not have reasonably known that his recent medical illness was caused by his exposure to Roundup Products and glyphosate contact and were the direct result of Defendants' acts and omissions as set forth hereinabove. Defendants fraudulently concealed the true character, quality and nature of Roundup and had a duty to disclose and continue to have a duty to disclose the true character, quality and nature of Roundup to the general public and consumers, including Plaintiff, but continue to the present to make such disclosures. Defendants continue to have sole control of the aforesaid non-public information but have failed to the present to share that information with the general public and consumers, including Plaintiff. Defendants have known that this non-public information continues to be

20

unavailable to the general public and consumers, including Plaintiff. Defendants are equitably estopped from relying on any prescriptive period because of these intentional concealment of facts and wrongdoings. Moreover, Plaintiff had no knowledge that the Defendants were engaged in these wrongdoings and could not have reasonably discovered Defendants' wrongdoing and connection to his Lymphoma at any time prior to July 2020. Defendants have had the ability and have spent significant monies in furtherance of their purpose of marketing, promoting, and distributing a profitable herbicide, notwithstanding its knowledge of the unreasonable dangers and risks. On the other hand, plaintiffs and medical professionals could not have afforded and could not have possibility conducted studies to determine the nature, extent, and identity of related health risks, and were forced to rely on only the Defendants' representations. Accordingly, Defendants are precluded by the reasonable discovery, the doctrine of contra non-valentem, and by their fraudulent concealment from relying upon any prescription statute that may apply to this matter. Pursuant to the legal doctrine of contra non-valentem, the tolling of any prescriptive period applicable to Plaintiff herein did not commence until Plaintiff knew or should have reasonably known that his medical conditions at issue were caused by his use and/or exposure to the Roundup Products.

92.

Defendants were well aware of the unreasonably dangerous and cancer and other harmful properties of their products and had non-public information (internal audits, field test results, and other evidence) of the unreasonably dangerous and cancer and other harmful properties of their products, but failed to release that non-public information to the general public and its consumers, including Plaintiff, and accordingly Defendants are equitably stopped from raising prescription as a defense to this action.

## PRAYER FOR RELIEF

**WHEREFORE** Thomas A. Sheldon, Plaintiff/Complainant demands a trial by jury and that after due proceedings that there be a judgment in his favor and against the defendants, Monsanto Company and Scotts Miracle-Gro Company, jointly, severally and in solido, as follows:

1) Awarding compensatory damages in excess of the jurisdictional amount, including but not limited to past, present and future: pain and suffering, loss of enjoyment of life, emotional distress, medical and prescription expenses, permanent and partial disabilities, loss of earnings, and other economic and non-economic losses and damages in an amount to be determined at the trial of this action;

2) Exemplary and/or punitive damages to the extent allowed under law;

3) Pre and post judgment legal interest on all damage awards from the date of judicial demand;

4) All costs of this proceeding, including court and expert fees; and

5) Such other relief as justice and equity may allow.

Respectfully submitted,

*Antonio Le Mon /s/*
Antonio Le Mon, Esq.
(LSBA #17320)
llemonlawyer@aol.com
512 East Boston Street
Covington, LA 70433
Telephone: (985) 302-5555 o
Facsimile: (985) 893-3252 f
ATTORNEY FOR THOMAS A. SHELDON,
PLAINTIFF/COMPLAINANT

[1] Plaintiffs reserve the right to add any additional Roundup® products labeled with the false statement as may be identified through discovery.

[2] *See, e.g.*, Monsanto Company, Are Roundup® Weed & Grass Killer Products Safe?, YouTube (Dec. 5, 2016), https://www.youtube.com/watch?v=vJboNdWoFws; Monsanto Company, How Do Roundup® Weed and Grass Killer Products Work?, YouTube (Dec. 5, 2016), https://www.youtube.com/watch?v=4UyjQxeRCWM.

[3] Beneficial bacteria that produce and utilize the enzyme EPSP synthase are also in other parts of human bodies, such as the reproductive tracts.

[4] *See generally* Austin Wilson, et al., "Roundup Revealed: Glyphosate in Our Food System," As You Sow (2017), available at http://www.asyousow.org/ays_report/roundup-revealed.

[5] Klaus M. Hermann, *The Shikimate Pathway as an Entry to Aromatic Secondary Metabolism*, 107 Plant Physiology 7 (1995),*available at* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC161158/pdf/1070007.pdf; Herke Hollander & Nikolaus Amrhein, *The Site of the Inhibition of the Shikimate Pathway by Glyphosate*, 66 Plant Physiology 823, (1980), *available at* http://www.plantphysiol.org/content/66/5/823.full.pdf; Industry Task Force on Glyphosate, *Glyphosate: Mechanism of Action*, Glyphosate Facts (June 19, 2013), *available at* http://www.glyphosate.eu/glyphosate-mechanism-action.

[6] Anthony Samsel & Stephanie Sneff, *Glyphosate's Suppression of Cytochrome P450 Enzymes and Amino Acid Biosynthesis by the Gut Microbiome: Pathways to Modern Diseases*, 15(4) Entropy 1416 (2013), *available at* http://www.mdpi.com/1099-4300/15/4/1416/htm.

[7] Sai Manasa Jandhyala, et al., *Role of the Normal Gut Microbiota*, 21 World J. of Gastroenterology 8787 (2015), *available at* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4528021/.

[8] Andrea G. Braundmeier, et al., *Individualized Medicine and the Microbiome in Reproductive Tract*, 6 Frontiers in Physiology 97 (2015), *available at* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4381647/.

[9] John P. Myers, et al., *Concerns over use of glyphosate-based herbicides and risks associated with exposures: a consensus statement*, 15 Environ. Health 9 (2016), *available at* https://ehjournal.biomedcentral.com/articles/10.1186/s12940-016-0117-0; *see also* Gilles-Eric Seralini, et al, *Republished study: long-term toxicity of a Roundup herbicide and a Roundup-tolerant genetically modified maize*, 26 Environ. Sci. Europe 14 (2014), *available at* http://enveurope.springeropen.com/articles/10.1186/s12302-014-0014-5; A.L. Benedetti, et al., *The effects of sub-chronic exposure of Wistar rats to the herbicide Glyphosate-Biocarb*, 153(2) Toxicol. Lett. 227-32 (2004), *available at* http://www.ncbi.nlm.nih.gov/pubmed/15451553; K. Larsen, et al., *Effects of Sublethal Exposure to a Glyphosate-Based Herbicide Formulation on Metabolic Activities of Different Xenobiotic-Metabolizing Enzymes in Rats*, 33(4) Int. J. Toxicol. 307-18 (Jul. 2014), *available at* http://www.ncbi.nlm.nih.gov/pubmed/24985121; Robin Mesnage, et al., *Transcriptome profile analysis reflects rat liver and kidney damage following chronic ultra-low dose Roundup exposure*, 14 Environ. Health 70 (2015), *available at* http://www.ncbi.nlm.nih.gov/pmc/articles/PMC4549093.

[10] *See, e.g.*, Eric Sachs, *Conversation Questions Regarding Glyphosate*, Monsanto, http://discover.monsanto.com/posts/conversation-questions-regarding-glyphosate/ (last visited June 19, 2017).

[11] *See, e.g., Two-Thirds of Europeans Support Glyphosate Ban, Says Yougov Poll*, The Guardian, Apr. 11, 2016, *available at* https://www.theguardian.com/environment/2016/apr/11/two-thirds-of-europeans-support-ban-on-glyphosate-says-yougov-poll; *Fears Over Roundup Herbicide Residues Prompt Private Testing*, Washington Post, Apr. 13, 2015, *available at* https://www.washingtonpost.com/national/health-science/worries-about-an-ingredient-in-widely-used-lawn-herbicide-after-who-report/2015/04/13/f6b0a418-df8a-11e4-a1b8-2ed88bc190d2_story.html.

[12] *See, e.g., Roundup/Glyphosate Background Materials*, Monsanto,

http://www.monsanto.com/products/pages/roundup-safety-background-materials.aspx

[13] U.S. Patent No. 7,771,736 (filed Aug. 29, 2003).

[14] Id.; see also, Monsanto, supra note 14.

[15] *See, e.g.*, Scotts Miracle-Gro Co., *Roundup® Ready-To-Use Weed & Grass Killer III with Sure Shot® Wand*, Roundup.com, http://www.roundup.com/smg/goprod/roundup-ready-to-use-weed-grass-killer-iii-with-sure-shot-wand/prod11330002?& (last visited June 19, 2017)

[16] Scotts Miracle-Gro Co., *How Do Roundup® Weed & Grass Killer Products Work?*, Roundup.com, http://www.roundup.com/smg/goART3/Howto/how-do-roundup-weed-and-grass-killer-products-work/43200019 (last visited June 19, 2017); *see also* Sachs, *supra* n.11.