JJO

# U.S. District Court
## Southern District of Florida (Miami)
## CIVIL DOCKET FOR CASE #: 1:21-cv-21217-MGC

Salas v. Monsanto Company et al
Assigned to: Judge Marcia G. Cooke
Case in other court: 11th Judicial Circuit in and for Miami-Dade
                  County, 21-000615-CA-01
Cause: 28:1442 Notice of Removal

Date Filed: 03/30/2021
Jury Demand: None
Nature of Suit: 365 Personal Inj. Prod.
Liability
Jurisdiction: Diversity

**Plaintiff**

**Nancy C. Salas**

represented by **Kristina Marie Infante**
Podhurst Orseck PA
One SE 3rd Avenue
Suite 2300
Miami, FL 33131
3053582800
Email: kinfante@podhurst.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Pablo Rojas**
Podhurst Orseck, P.A.
SunTrust International Center
1 SE 3rd Avenue
Suite 2300
Miami, FL 33131
3053582800
Email: projas@podhurst.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Steven Craig Marks**
Podhurst Orseck, PA
Suntrust International Center
One S.E. 3rd Avenue
Suite 2300
Miami, FL 33131
305-358-2800
Fax: 305-358-2382
Email: smarks@podhurst.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Monsanto Company**
*a foreign corporation*

represented by **Melissa R. Alvarez**
McDermott Will & Emery
333 S.E. 2 Avenue
Suite 4500
Miami, FL 33131
305-347-6551
Fax: 305-468-6574
Email: malvarez@mwe.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Anthony Nolan Upshaw**
McDermott Will & Emery
333 SE 2 Avenue
Suite 4500
Miami, FL 33131
305-347-6540
Fax: 305-675-8031
Email: aupshaw@mwe.com
*ATTORNEY TO BE NOTICED*

**Defendant**

**Bayer Corporation**
*a foreign corporation*

represented by **Melissa R. Alvarez**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Anthony Nolan Upshaw**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Bayer AG**
*a foreign corporation*

**Defendant**

**Andrew Jack Conroy**
*a Florida resident*

represented by **Melissa R. Alvarez**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Anthony Nolan Upshaw**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Home Depot USA, Inc.**
*a foreign corporation*

represented by **Daniel Joseph Santaniello**
Luks, Santaniello, Petrillo & Jones
Stonegate Bank Plaza
301 Yamato Road
Suite 4150
Boca Raton, FL 33431
561-893-9088

Fax: 561-893-9048
Email: djs@insurancedefense.net
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Kelly L. Kesner**
Luks Santaniello Petrillo & Jones
150 W. Flagler St.
Suite 2600
Miami, FL 33130
305-379-8900
Email: kkesner@insurancedefense.net
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**KLI Shell Lumber & Hardware, LLC**
*a Florida company*

**Defendant**

**Orlando Valdes**
*a Florida resident*

**Defendant**

**TRANSFORM SR DEVELOPMENT
LLC**
*a foreign company*
*doing business as*
Kmart

**Defendant**

**Jose Luis Martinez-Alvarez**
*a Florida resident*

| Date Filed | # | Docket Text |
|---|---|---|
| 03/30/2021 | 1 | NOTICE OF REMOVAL (STATE COURT COMPLAINT - Complaint for Personal Injuries) Filing fee $ 402.00 receipt number AFLSDC-14565706,answer filed by Monsanto Company. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Civil Cover Sheet, # 8 Monsanto's Corporate Disclosure) (Upshaw, Anthony)Text Modified on 3/31/2021 (mee). (Entered: 03/30/2021) |
| 03/30/2021 | 2 | Clerks Notice of Judge Assignment to Judge Beth Bloom.<br><br>Pursuant to 28 USC 636(c), the parties are hereby notified that the U.S. Magistrate Judge Alicia M. Otazo-Reyes is available to handle any or all proceedings in this case. If agreed, parties should complete and file the Consent form found on our website. It is not necessary to file a document indicating lack of consent.<br><br>Pro se (NON-PRISONER) litigants may receive Notices of Electronic Filings (NEFS) via email after filing a Consent by Pro Se Litigant (NON-PRISONER) to Receive Notices of Electronic Filing. The consent form is available under the forms section of our website. (mee) (Entered: 03/31/2021) |

| 03/31/2021 | 3 | ORDER OF RECUSAL. Judge Beth Bloom recused. Case reassigned to Judge Marcia G. Cooke for all further proceedings Signed by Judge Beth Bloom on 3/31/2021. *See attached document for full details.* (jc) (Entered: 03/31/2021) |
|---|---|---|

| **PACER Service Center** | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 04/01/2021 10:55:41 | | | |
| **PACER Login:** | sh0019sh | **Client Code:** | 31943.356965 rhb |
| **Description:** | Docket Report | **Search Criteria:** | 1:21-cv-21217-MGC |
| **Billable Pages:** | 3 | **Cost:** | 0.30 |

IN THE CIRCUIT COURT OF THE
ELEVENTH JUDICIAL CIRCUIT IN AND
FOR MIAMI DADE COUNTY, FLORIDA

GENERAL JURISDICTION DIVISION

CASE NO.

NANCY C. SALAS,
a Florida Resident,

  Plaintiff,

vs.

MONSANTO COMPANY, a foreign
corporation; BAYER CORPORATION, a
foreign corporation; BAYER AG, a foreign
corporation; ANDREW JACK CONROY, a
Florida resident; and HOME DEPOT U.S.A,
INC., a foreign corporation,

  Defendants.

_____ /

## **COMPLAINT FOR PERSONAL INJURIES**

  Plaintiff, Nancy C. Salas, brings this action against Defendants, Monsanto Company, Bayer AG, and Bayer Corporation (collectively, "Monsanto"), Andrew Jack Conroy, and Home Depot U.S.A., Inc., and alleges as follows:

## **INTRODUCTION**

  1.  This is a civil action for damages suffered by Plaintiff as a direct and proximate result of Defendants' negligent and wrongful conduct in connection with the design, development, manufacture, testing, packaging, warning, promoting, marketing, advertising, distribution, labeling, and/or sale of glyphosate-containing products.

## **PARTIES**

2.     At all times material, Plaintiff Nancy C. Salas was a resident of Miami-Dade County, Florida.

3.     "Roundup" refers to all formulations of Defendants' Roundup products, including, but not limited to, Roundup Concentrate Poison Ivy and Tough Brush Killer 1, Roundup Custom Herbicide, Roundup D-Pak herbicide, Roundup Dry Concentrate, Roundup Export Herbicide, Roundup Fence & Hard Edger 1, Roundup Garden Foam Weed & Grass Killer, Roundup Grass and Weed Killer, Roundup Herbicide, Roundup Original 2k herbicide, Roundup Original II Herbicide, Roundup Pro Concentrate, Roundup Prodry Herbicide, Roundup Promax, Roundup Quik Stik Grass and Weed Killer, Roundup Quikpro Herbicide, Roundup Rainfast Concentrate Weed & Grass Killer, Roundup Rainfast Super Concentrate Weed & Grass Killer, Roundup Ready-to-Use Extended Control Weed & Grass Killer 1 Plus Weed Preventer, Roundup Readyto-Use Weed & Grass Killer, Roundup Ready-to-Use Weed and Grass Killer 2, Roundup Ultra Dry, Roundup Ultra Herbicide, Roundup Ultramax, Roundup VM Herbicide, Roundup Weed & Grass Killer Concentrate, Roundup Weed & Grass Killer Concentrate Plus, Roundup Weed & Grass killer Ready-to-Use Plus, Roundup Weed & Grass Killer Super Concentrate, Roundup Weed & Grass Killer1 Ready-to-Use, Roundup WSD Water Soluble Dry Herbicide Deploy Dry Herbicide, RangerPro Herbicide, AquaMaster, or any other formulation of containing the active ingredient glyphosate.

4.     At all times material, Defendant Monsanto Company (hereinafter "Monsanto") was a corporation organized under the laws of the State of Delaware with its principal place of business in St. Louis, Missouri.  Monsanto was the entity that discovered the herbicidal properties of glyphosate and manufactured Roundup, which contains the active ingredient glyphosate, as well as other "inert" ingredients.

5.      At all times material, Defendant Bayer AG was a corporation organized under the laws of Germany with its principal place of business in Leverkausen, Germany.  At all times material, Defendant Bayer Corporation was the American subsidiary of Bayer AG. Bayer Corporation was organized under the laws of the state of Delaware with its principal place of business in Pittsburgh, Pennsylvania. On June 7, 2018, Bayer announced that it had successfully completed its acquisition of Monsanto. For purposes of this complaint, Bayer AG, Bayer Corporation, and the Monsanto Company will be collectively referred to as "Monsanto."

6.      At all times material, Defendant Andrew Jack Conroy was employed by Monsanto as its industrial, turf and ornamental (ITO) herbicide Representative for the Eastern United States, including Florida.  Defendant Andrew Jack Conroy is a resident of Polk County, Florida.

7.      At all times material, Defendant Home Depot USA, Inc. (hereinafter "Home Depot") was and is a corporation organized under the laws of the State of Delaware with its principal place of business in Atlanta, Georgia.  Defendant Home Depot sold and distributed Monsanto products, including Roundup, within Miami Dade County, Florida.  Plaintiff bought Roundup products at the Home Depot stores located at 11905 SW 152nd Street, Miami, FL 33177, at 33001 S Dixie Hwy, Florida City, FL 33034, and at 11305 SW 40th Street, Miami, FL 33165.

## JURISDICTIONAL ALLEGATIONS

8.      This is an action for damages in excess of Thirty Thousand Dollars ($30,000.00), exclusive of costs, interest and attorneys' fees, and is therefore within the jurisdictional limits of this Court.

9.      Defendant Monsanto has been authorized to do business in the State of Florida and was transacting or conducting business in the State of Florida, and has derived substantial revenue from goods and products, including Roundup, used in the State of Florida.  At all times relevant

to this Complaint, Monsanto was the entity that discovered the herbicidal properties of glyphosate and the manufacturer of Roundup.

10.    Defendant Monsanto also consented to jurisdiction by registering to do business in Florida. Defendant Monsanto's Registered Agent is Corporation Service Company, 1201 Hays Street, Tallahassee, FL 32301-2525.

11.    Defendant Bayer Corporation has been authorized to do business in the State of Florida and at all relevant times was transacting or conducting business in the State of Florida, and has derived substantial revenue from goods and products, including Roundup, used in the State of Florida.

12.    Defendant Bayer Corporation also consented to jurisdiction by registering to do business in Florida. Defendant Bayer's Registered Agent is Corporation Service Company, 1201 Hays Street, Tallahassee, FL 32301.

13.    Defendant Andrew Jack Conroy is a resident of Polk County, Florida.

14.    Defendant Home Depot has been authorized to do business in the State of Florida and at all relevant times was transacting or conducting business in the State of Florida and has derived substantial revenue from goods and products sold and used in the State of Florida.  At all times relevant to this Complaint, Defendant Home Depot sold and distributed Monsanto products, including Roundup, within Miami-Dade County, Florida.

15.    Defendant Home Depot also consented to jurisdiction by registering to do business in Florida. Defendant Home Depot's Registered Agent is Corporation Service Company, 1201 Hays Street, Tallahassee, FL 32301-2525.

16.    In addition to the allegations stated above, this Court has personal jurisdiction over all of the Defendants pursuant to Florida Statutes § 48.193(1)(a)(1), (2), and (6).  Plaintiff's claims

4

arise out of Defendants' operating, conducting, engaging in, or carrying on a business or business venture in this state or having an office or agency in this state, committing a tortious act in this state, and causing injury to life and property in this state arising out of Defendants' acts and omissions outside this state. At or about the time of such injuries, products, materials, or things processed, serviced, or manufactured by Defendants anywhere were used or consumed within this state in the ordinary course of commerce, trade, or use.

## GENERAL ALLEGATIONS APPLICABLE TO ALL COUNTS

17.     Glyphosate is the active ingredient in Roundup.

18.     Glyphosate is a non-selective herbicide, meaning it kills indiscriminately based only on whether a given organism produces a specific enzyme known as EPSP synthase.

19.     Plants treated with glyphosate translocate the systemic herbicide to their roots, shoot regions, and fruit, where it interferes with the plant's ability to form aromatic amino acids for protein synthesis. Treated plants generally die within two to three days.  Because plants absorb glyphosate, it cannot be completely removed by washing or peeling produce or by milling, baking, or brewing grains.

20.     In addition to the active ingredient glyphosate, Roundup formulations, as well as other glyphosate-based product formulations such as Rodeo and Aqua Star, also contain adjuvants and/or other chemicals, which are considered "inert" and therefore protected as "trade secrets" in manufacturing. Growing evidence suggests that these adjuvants and additional components of Roundup formulations are not, in fact, inert and are toxic in their own right.

21.     The herbicidal properties of glyphosate were discovered in 1970 by Monsanto chemist John Franz.  The first glyphosate-based herbicide was introduced to the market in the mid-1970s under the brand name Roundup.  From the outset, Monsanto marketed Roundup as a "safe"

general-purpose herbicide for widespread commercial and consumer use. It still markets Roundup as safe today.

22.     Today, glyphosate products are among the world's most widely used herbicides. Glyphosate-based products are registered in more than 130 countries and are approved for weed control in more than 100 crops.

23.     Since the mid-1970s, Roundup, and later other glyphosate-based products, have been used across the world by people who have not had knowledge of the dangers their use poses.

24.     Since Monsanto first introduced Roundup, it touted glyphosate as a technological breakthrough: it could kill almost every weed without causing harm either to people or to the environment. Monsanto assured the public that Roundup was harmless to humans and continues to assure the public that it is safe despite evidence to the contrary. Monsanto fails to disclose and actively conceals information demonstrating that its products are harmful to human health.

**Registration of Herbicides under Federal Law**

25.     The manufacture, formulation, and distribution of herbicides, such as Roundup, are regulated under the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA" or "Act"), 7 U.S.C. § 136 et seq.  FIFRA requires that all pesticides be registered with the Environmental Protection Agency ("EPA" or "Agency") prior to their distribution, sale, or use, except as described by the Act. 7 U.S.C. § 136a(a).

26.     The EPA requires as part of the registration process, among other things, a variety of tests to evaluate the potential for exposure to pesticides, toxicity to people and other potential non-target organisms, and other adverse effects on the environment. Registration by the EPA, however, is not an assurance or finding of safety.  The determination the Agency must make in registering or re-registering a product is not that the product is "safe," but rather that use of the

product in accordance with its label directions "will not generally cause unreasonable adverse effects on the environment." 7 U.S.C. § 136a(c)(5)(D).

27.     FIFRA defines "unreasonable adverse effects on the environment" to mean "any unreasonable risk to man or the environment, taking into account the economic, social, and environmental costs and benefits of the use of any pesticide." 7 U.S.C. § 136(bb).  FIFRA thus requires the EPA to make a risk/benefit analysis in determining whether a registration should be granted or a pesticide allowed to continue to be sold in commerce.

28.     The EPA registered Roundup for distribution, sale, and manufacture in the United States and the state of Florida.

29.     FIFRA generally requires that the registrant, Monsanto in the case of Roundup, conducts the health and safety testing of pesticide products. The EPA has protocols governing the conduct of tests required for registration and the laboratory practices that must be followed in conducting these tests.  The data produced by the registrant must be submitted to the EPA for review and evaluation.  The government is not required, nor is it able, however, to perform the product tests that are required of the manufacturer.

30.     Based on early studies showing that glyphosate could cause cancer in laboratory animals, the EPA originally classified glyphosate as possibly carcinogenic to humans (Group C) in 1985.  After pressure from Monsanto, including contrary studies it provided to the EPA, the EPA changed its classification to evidence of non-carcinogenicity in humans (Group E) in 1991. In so classifying glyphosate, however, the EPA made clear that the designation did not mean the chemical does not cause cancer: "It should be emphasized, however, that designation of an agent in Group E is based on the available evidence at the time of evaluation and should not be

interpreted as a definitive conclusion that the agent will not be a carcinogen under any circumstances."[1]

31.    On two occasions, the EPA found that the laboratories hired by Monsanto to test the toxicity of its Roundup products for registration purposes committed fraud.

32.    In the first instance, Monsanto, in seeking initial registration of Roundup by the EPA, hired Industrial Bio-Test Laboratories ("IBT") to perform and evaluate pesticide toxicology studies relating to Roundup.[2] IBT performed about 30 tests on glyphosate and glyphosate-containing products, including nine of the 15 residue studies needed to register Roundup.

33.    In 1976, the United States Food and Drug Administration ("FDA") performed an inspection of IBT that revealed discrepancies between the raw data and the final report relating to the toxicological impacts of glyphosate. The EPA subsequently audited IBT; it too found the toxicology studies conducted for the Roundup herbicide to be invalid.[3]  An EPA reviewer stated, after finding "routine falsification of data" at IBT, that it was "hard to believe the scientific integrity of the studies when they said they took specimens of the uterus from male rabbits."[4]

34.    Three top executives of IBT were convicted of fraud in 1983.

---

[1] U.S. Envtl. Prot. Agency, Memorandum, Subject: SECOND Peer Review of Glyphosate 1 (1991), available at https://archive.org/details/SecondPeerReviewOfGlyphosateEPAOct301991.

[2] Monsanto, Backgrounder, Testing Fraud: IBT and Craven Laboratories (Sep. 2, 2015), available at https://monsanto.com/app/uploads/2017/06/ibt_craven_bkg.pdf.

[3] U.S. Envtl. Prot. Agency, Summary of the IBT Review Program Office of Pesticide Programs (1983), available at
https://nepis.epa.gov/Exe/ZyNET.exe/91014ULV.TXT?ZyActionD=ZyDocument&Client=EPA&Index=1981+Thru+1985&Docs=&Query=&Time=&EndTime=&SearchMethod=1&TocRestrict=n&Toc=&TocEntry=&QField=&QFieldYear=&QFieldMonth=&QFieldDay=&IntQFieldOp=0&ExtQFieldOp=0&XmlQuery=&File=D%3A%5Czyfiles%5CIndex%20Data%5C81thru85%5CTxt%5C00000022%5C91014ULV.txt&User=ANONYMOUS&Password=anonymous&SortMethod=h%7C-&MaximumDocuments=1&FuzzyDegree=0&ImageQuality=r75g8/r75g8/x150y150g16/i425&Display=hpfr&DefSeekPage=x&SearchBack=ZyActionL&Back=ZyActionS&BackDesc=Results%20page&MaximumPages=1&ZyEntry=1&SeekPage=x&ZyPURL.

[4] Marie-Monique Robin, The World According to Monsanto: Pollution, Corruption and the Control of the World's Food Supply (2011) (citing U.S. Envtl. Prot. Agency, Data Validation, Memo from K. Locke, Toxicology Branch, to R. Taylor, Registration Branch. Washington, D.C (August 9, 1978)).

8

35.     In the second incident of data falsification, Monsanto hired Craven Laboratories in 1991 to perform pesticide and herbicide studies, including for Roundup.  In that same year, the owner of Craven Laboratories and three of its employees were indicted, and later convicted, of fraudulent laboratory practices in the testing of pesticides and herbicides.[5]

36.     Despite the falsity of the tests that underlie its registration, within a few years of its launch, Monsanto was marketing Roundup in over one hundred countries.

### The Importance of Roundup to Monsanto's Market Dominance Profits

37.     The success of Roundup was key to Monsanto's continued reputation and dominance in the marketplace. Largely due to the success of Roundup sales, Monsanto's agriculture division was out-performing its chemicals division's operating income, and that gap increased yearly. But with its patent for glyphosate expiring in the United States in the year 2000, Monsanto needed a strategy to maintain its Roundup market dominance and to ward off impending competition.

38.     In response, Monsanto began the development and sale of genetically-engineered Roundup Ready seeds in 1996. Since Roundup Ready crops are resistant to glyphosate, farmers can spray Roundup onto their fields during the growing season without banning the crop. This allowed Monsanto to expand its market for Roundup even further; by 2000, Monsanto's biotechnology seeds were planted on more than 80 million acres worldwide and nearly 70% of American soybeans were planted from Roundup Ready seeds. It also secured Monsanto's dominant share of the glyphosate/Roundup market through a marketing strategy that coupled proprietary Roundup Ready seeds with continued sales of its Roundup herbicide.

---

[5] Monsanto, Backgrounder, Testing Fraud: IBT and Craven Laboratories, supra note 2.

9

39.     Through a three-pronged strategy of increased production, decreased prices and by coupling with Roundup Ready seeds, Roundup became Monsanto's most profitable product. In 2000, Roundup accounted for almost $2.8 billion in sales, outselling other herbicides by a margin of five to one, and accounting for close to half of Monsanto's revenue. Today, glyphosate remains one of the world's largest herbicides by sales volume.

### Monsanto's Knowledge About the Toxicity of Roundup

40.     Since Roundup was introduced to the market, Monsanto has made broad claims through its advertising and promotional materials that its products are safe, non-toxic, and rigorously tested. But, in reality, the company hardly tested the real-world toxicity of its products, actively avoided pursuing studies which might show unwelcome results, and ghostwrote studies of supposedly independent scientists.

41.     The first valid chronic oncogenicity study on glyphosate was submitted to the EPA in 1983 (the Bio/dynamic mouse study). It showed an increase in renal tubular adenomas in the male mice that Monsanto claimed was not treatment-related. The EPA disagreed and classified glyphosate as a "possible human oncogen" in 1985.

42.     Monsanto challenged the EPA's determination through multiple avenues, for years, leading to an EPA request for Monsanto to do a new and better study. A Scientific Advisory Panel convened by the EPA to provide guidance in resolving the controversy over the 1983 Bio/dynamic study called for a repeat study. The EPA adopted the SAP's advice and required a repeat mouse 7study in its 1986 Registration Standard document on glyphosate. Monsanto refused to conduct it and, upon information and belief, has not done so to this day.

43.     The 1986 glyphosate Registration Standard document issued by the EPA required Monsanto to add several commonsense worker-safety provisions onto Roundup product labels

(e.g., wear gloves, chemical resistant shoes, and goggles or a face shield when applying Roundup; discard clothes that are drenched; wash clothes separately from other laundry). Monsanto refused to add the majority of these provisions to their product labels.

44.     Monsanto has refused since the mid-1980s to conduct the studies needed to resolve uncertainty over the oncogenicity of Roundup, including studies specifically requested by the EPA. The failure of Monsanto to invest in new and better science, such as the more powerful mouse cancer replacement study requested by the EPA in 1986, has perpetuated scientific uncertainty and undermined the EPA's ability to understand and quantify the health risks of Roundup.

45.     Dr. Donna Farmer, a senior Monsanto scientist, wrote the following to a Monsanto communications professional: "You cannot say that Roundup is not a carcinogen…we have not done the necessary testing on the formulation to make that statement. The testing of the formulations are not anywhere near the level of the [testing on] the active ingredient."

The terms glyphosate and Roundup cannot be used interchangeably nor can you use "Roundup" for all glyphosate-based herbicides any more.  For example you cannot say that Roundup is not a carcinogen...we have not done the necessary testing on the formulation to make that statement.  The testing on the formulations are not anywhere near the level of the active ingredient. We can make that statement about glyphosate and can infer that there is no reason to believe that Roundup would cause cancer.

46.     In the same email, Dr. Farmer warned that Monsanto "cannot support the statement" that Roundup produces "'no adverse effects whatsoever on flora, or fauna or on the human body.'" This is because, as Dr. Farmer explained, "[a]dverse effects are seen on flora (glyphosate is meant to kill vegetation), adverse effects on fauna – in studies with laboratory animals – even death is seen (LD50 studies for example) and in humans – mild reversible eye and skin irritation are seen with normal use and death can occur in suicide attempts."

> We cannot support the statement about "no adverse effects whatsoever on flora, or fauna or on the human body".  Adverse effects are seen on flora (glyphosate is meant to kill vegetation), adverse effects on fauna - in studies with laboratory animals - even death is seen (LD50 studies for example) and in humans - mild reversible eye and skin irritation are seen with normal use and death can occur in suicide attempts.  Therefore we advise using the phrase...."When Roundup herbicides are used according to label directions, no unreasonable adverse effects to people, wildlife, and the environment are expected."

47.     In addition to the active ingredient glyphosate, surfactants are added to Roundup products to speed up the movement of glyphosate through weed leaf surfaces, and then into the cells of weeds. Roundup surfactants act roughly the same way when Roundup comes into contact with human skin. In other words, the formulation penetrates human skin, making Roundup markedly more toxic to exposed humans than glyphosate alone.

48.     For decades, there have been multiple studies showing that formulated Roundup is more toxic than pure, 100% technical glyphosate. Most of the surfactants in Roundup-brand herbicides are even more toxic, ounce for ounce, than glyphosate. Plus, pure glyphosate does not move as readily through the skin or into cells, whereas Roundup does.

49.     Despite knowledge of the differences in toxicity and risks arising from exposures to formulated Roundup in contrast to pure glyphosate, Monsanto has not carried out critical, long-term cancer feeding studies with Roundup. Nor has anyone else.

50.     Monsanto has refused to conduct state-of-the-art genotoxicity assays in mammals and in human populations exposed to formulated Roundup.

51.     In 1999, Monsanto hired Dr. James Parry, a world-renowned genotoxicity expert, to advise the company on what steps it should take to better understand and respond to public literature studies reporting evidence of a genotoxic response following exposures to glyphosate and/or a glyphosate-based herbicide. Dr. Parry identified several deficiencies in the available data on glyphosate. For one, he explained there is "[n]o adequate in vitro clastogenicity data available

for glyphosate formulations." He thus recommended that Monsanto "provide comprehensive in vitro cytogenetic data on glyphosate formulations." He also concluded, "[m]y overall view is that if the reported genotoxicity of glyphosate and glyphosate formulations can be shown to be due to the production of oxidative damage then a case could be made that any genetic damage would be thresholded . . . it may be necessary to consider the possibility of susceptible groups within the human population."

52.     In total, Dr. Parry provided Monsanto 11 specific recommendations for further genotoxicity research. Monsanto refused to conduct new studies in 9 of the 11 areas. In a September 1999 email, Monsanto's chief of regulatory science, William Heydens, wrote to his Monsanto colleagues after reading Dr. Parry's report on glyphosate. In his correspondence, Heydens stated: "We want to find/develop someone who is comfortable with the genetox profile of glyphosate/Roundup and who can be influential with regulators and Scientific Outreach operations when genetox issues arise. My read is that Parry is not currently such a person, and it would take quite some time and $$$/studies to get him there. We simply aren't going to do the studies Parry suggests."

> However, let's step back and look at what we are really trying to achieve here.  We want to find/develop someone who is comfortable with the genetox profile of glyphosate/Roundup and who can be influential with regulators and Scientific Outreach operations when genetox. issues arise.  My read is that Parry is not currently such a person, and it would take quite some time and $$$/studies to get him there.  We simply aren't going to do the studies Parry suggests.  Mark, do you think Parry can become a strong advocate without doing this work Parry?  If not, we should *__seriously__* start looking for one or more other individuals to work with.  Even if we think we can eventually bring Parry around closer to where we need him, we should be currently looking for a second/back-up genetox. supporter.  We have not made much progress and are currently very vulnerable in this area.  We have time to fix that, but only if we make this a high priority now.

53.     In another email the same month, Monsanto executive Stephen Wratten said he was "disappointed in the Parry report," asking "[h]as he ever worked with industry before on this sort of project?" Later in the same email, Wratten intoned that the Parry report is not useful for Monsanto: "I do not see that he has stuck his neck out on anything at all controversial, and

therefore, there is little value in the write-up as written that could be useful. Hope it didn't cost much…."

> Overall, I guess we have his recommendation of studies that could be used to strengthen the database on p. 4. , but that is about it.  I do not see that he has stuck his neck out on anything at all controversial, and therefore, there is little value in the write-up as written that could be useful.  Hope it didn't cost much. Perhaps this is too harsh, and I don't know what your proposal to him was, but I guess I would expect more than this of a Professor.

54.     Later on, in the same email chain, Monsanto toxicologist Donna Farmer discussed the fallout from Dr. Parry's report on glyphosate with her colleagues. She wrote: "right now the only person I think that can dig us out of this 'genetox hole' is the Good Dr. Kier . . . I am concerned about leaving Perry [sic] out there with this as the final project/his final impressions . . . ."

> One option…I agree we need someone else to interface with Perry…right now the only person I think that can dig us out of this "genotox hole" is the Good Dr. Kier….
>
> other option….I am concerned about leaving Perry out there with this as the final project/his final impressions……………if you remember his first report…he was looking for work for a graduate student (I wonder if this evaluation was his or someone else's?)
>
> Maybe you, Bill, Larry, Steve and I can get together to figure out where and how we go from here…Steve's opinion of the report was pretty clear….he also suggested as an option to drop Perry.

55.     In correspondence, Monsanto personnel expressed reluctance to conduct studies on glyphosate, Roundup formulations, or surfactant ingredients, suggesting Monsanto was concerned about the results it would find it if did the tests. In a September 1999 email, for example, Stephen Wratten criticized the Parry report by noting that "of course" Monsanto knew there was no data to support points it wanted to make relating to Roundup's genotoxicity, and Monsanto scientists "didn't need [Dr. Parry] to tell [them] that." What Monsanto wanted Dr. Parry to do (instead of suggesting additional independent and rigorous testing) was to argue *against* the reliability of independent studies that were bad for Monsanto's bottom line:

> 8. Of course we know there were no data of the type listed in points 2, 3, and 4 on p. 3. We didn't need him to tell us that. The key point is whether the conclusions of Bolognesi, and Rank can be discounted on the basis of the strength and number of studies at hand, or whether their experiments need to be repeated independently to credibly refute the findings. Of course we knew that the latter would be the most convincing approach, but we need him to make any arguments that can be made on the data we have.

56.    In another email from 1999, Dr. Farmer resisted the suggestion that the company do additional studies on the genotoxicity of Roundup, including formulations or other surfactant ingredients:

> It is too premature to discuss conducting any studies. I will not support doing any studies on glyphosate, formulations or other surfactant ingredients at this time with the limited information we have on the situation. As Bill indicated below we have a ton of data .....that was submitted and reviewed.

57.    Other internal correspondence demonstrates that some of Monsanto's executives were concerned about the safety of Roundup and results that would be obtained if Roundup were rigorously tested according to Parry's recommendations. One Monsanto scientist wrote in 2001: "If someone came to me and said they wanted to test Roundup I know how I would react – with serious concern."

58.    Comments made by other Monsanto executives indicate their awareness that glyphosate becomes toxic when mixed with other ingredients. Thus, the formulated product—Roundup—is more toxic than its active ingredient. In 2002, William Heydens and Donna Farmer discussed various studies observing adverse effects by the formulated Roundup product. Specifically, Farmer acknowledged: "[t]he interest point is glyphosate all basically had no effect the formulated product did – does this point us to the coformulants – sufactants? [sic]" Heydens also admitted, after discussing with Monsanto consultant John DeSesso, that "we are in pretty good shape with glyphosate but vulnerable with surfactants. . . . What I've been hearing from you is that

this continues to be the case with these studies – Glyphosate is OK but the formulated product (and thus the surfactant) does the damage."

> Your last comment hits exactly where I am coming from. We discussed the situation with Holson and DeSesso and concluded, not surprisingly, that we are in pretty good shape with glyphosate but vulnerable with surfactants. What I've been hearing from you is that this continues to be the case with these studies - Glyphosate is OK but the formulated product (and thus the surfactant) does the damage.

59.    Despite Monsanto's longstanding awareness of the danger of the formulated product, and the damage caused by the addition to Roundup of the surfactants in particular, Monsanto's website continues to advertise, to this day, that "Glyphosate-based herbicides, including Roundup-brand formulated products with surfactants, all have a long history of safe use and do not pose any unreasonable risk to human health when used according to label directions."[6]



60.    Rather than conduct the more sophisticated genotoxicity studies recommended by Dr. Parry and others, Monsanto instead commissioned members of its third-party network of glyphosate-friendly scientists to write and publish articles arguing that evidence of genotoxicity in public literature studies is the result of flawed study designs, excessive dose levels, inappropriate

---

[6]    *See*  Monsanto's  webpage  "What  is  a  surfactant?,"  available  at.  It  is  available  at
https://monsanto.com/products/safety-information/what-is-a-surfactant/.

routes of administration, overt toxicity, or other technical problems. Many of these reviews were ghost-written by Monsanto scientists not listed among the co-authors.

61.     Monsanto made heavy use of supposedly independent scientists in its "Scientific Outreach" and PR campaigns in support of the safety of glyphosate and Roundup-brand herbicides. In some instances, such individuals were appointed to an ad hoc, or standing advisory committee or panel. In other cases, they simply worked on a fee-for-service basis on a defined task. Many of these glyphosate-friendly experts had once worked for Monsanto. Many have authored or co-authored papers commissioned and paid for by Monsanto. Most of these papers contained passages ghost-written by Monsanto scientists, and some were largely ghost-written by Monsanto. "Ghost-writing" refers to contributions to a written document by a person not listed as the author, or among the co-authors of the document. The practice is considered to be serious ethical misconduct.

62.     As far back as 1999, Monsanto was operating behind the scenes to influence the science and bolster the public perception of the safety of glyphosate and Roundup. William Heydens, the Monsanto executive who spearheaded Monsanto's manipulation of the scientific literature via ghostwriting, wrote in a May 1999 email that Monsanto's plan for scientific outreach planning involved maintaining a cohort of "outside scientific experts who are influential at driving science, regulators, public opinion, etc. We would have they [sic] people directly or indirectly/behind-the-scenes work on our behalf."

```
2)  Outside scientific experts who are influential at driving science, regulators, public opinion, etc.
We would have they people directly or indirectly/behind-the-scenes work on our behalf.

3)  Presentations/publications in the scientific literature.  Get our data out there so it can be
referenced and used to counter-balance the negative stuff.  In some cases, we may want to publish
specific work in certain world areas to help out in that region.  We may use our experts as authors (eg.
the CanTox project in which you were fortunate enough to participate).
```

63.     Heydens succinctly summarized Monsanto's goal: to encourage "people to get up and shout Glyphosate is Non-toxic."

64.     The more formal statement of the "Overall purpose" of Monsanto's "Glyphosate Scientific Outreach Plan" (SO Plan) appears at the beginning of a June 1999 document: "Ensure that Monsanto's glyphosate-containing herbicides are widely viewed throughout the scientific community as posing no threat to human health or the environment. This support [from third-party network experts] will be used to favorably influence current and future possible challenges in the regulatory and public arena."

65.     The unconditional statement in the above-quoted paragraph—"no threat to human health or the environment"—stands in sharp contrast to the more nuanced statements by scientists Monsanto itself commissioned to review the genotoxicity or oncogenicity literature, or by the EPA. No scientist has been willing to say that Roundup poses no threat to human health. For example, Kier and Kirkland, two Monsanto-commissioned scientists, concluded in a 2013 review of glyphosate genotoxicity that "Glyphosate and typical [glyphosate-based herbicides] do not appear to present significant genotoxic risk under normal conditions of human or environmental exposures." The scientists do not rule out the possibility of *some* genotoxic risk from exposures to glyphosate-based herbicides under normal conditions, nor the possibility of *significant* genotoxic risk in the event of unusually high glyphosate-based herbicide exposure episodes.

66.     Over the years, Monsanto systematically attacked scientists whose research threatened their profits. For example, in an April 2001 email, Heydens warned his colleagues that "[d]ata generated by academics has always been a major concern for us in the defense of our products."

18

Message

| From: | HEYDENS, WILLIAM F [FND/1000] [/O=MONSANTO/OU=NA-1000-01/CN=RECIPIENTS/CN=230737] |
| Sent: | 4/10/2001 6:09:25 PM |
| To: | JACOBS, ERIK [AG/5040] [erik.jacobs@monsanto.com]; MARTENS, MARK A [AG/5040] [mark.a.martens@monsanto.com]; MCKENNA, RUTH M [AG/5040] [ruth.m.mckenna@monsanto.com]; VAN BOSSUYT, ALFRED [AG/5035] [alfred.van.bossuyt@monsanto.com] |
| Subject: | RE: Propachlor sample request |

All,

Please don't do anything until we discuss this. Data generated by academics has always been a major concern for us in the defense of our products.

67.    In an email from October 2008, Dean Nasser, a Monsanto employee, sent his colleagues a study showing the link between glyphosate and non-Hodgkin's lymphoma:

-----Original Message-----
From: Nasser Dean
Sent: Tuesday, October 14, 2008 11:33 AM
To: Scott Kohne ; Karen Cain ; FARMER, DONNA R [AG/1000]; GOUGH, GEORGE N [AG/1230];
Cc: McAllister, Ray
Subject: Study Shows Herbicides Increase Risk of Non-Hodgkin's Lymphoma - Beyond Pesticides, October 14

**Study Shows Herbicides Increase Risk of Non-Hodgkin's Lymphoma**

**(Beyond Pesticides, October 14, 2008)**

68.    Dr. Farmer responded: "We have been aware of this paper for awhile and knew it would only be a matter of time before the activists pick it up… how do we combat this?"

Nassar,

Thank you for fowarding this. We have been aware of this paper for awhile and knew it would only be a matter of time before the activists pick it up. I have some epi experts reviewing it. As soon as I have that review we will pull together a backgrounder to use in response.

Here is their bottom line...how do we combat this?

Avoid carcinogenic herbicides in foods by supporting organic agriculture, and on lawns by using non-toxic land care strategies that rely on soil health, not toxic herbicides.

69.    In 2012, Monsanto executives discussed their efforts to retract a paper written by Professor Seralini in the journal Food and Chemical Toxicology, which pertained to the biological

plausibility of glyphosate as a human carcinogen—a conclusion adverse to Monsanto's commercial agenda. Specifically, Monsanto executives galvanized scientists to send letters to the magazine's Editor-in-Chief seeking retraction of the Seralini study. In correspondence from September 2012, Monsanto employee Dr. Goldstein stated: "I was uncomfortable even letting shareholders know we are aware of this LTE…it implies we had something to do with it-otherwise how do we have knowledge of it? I could add 'Aware of multiple letters to editor including one signed by 25 scientists from 14 countries' if you both think this is OK." He added that he was being asked "to keep internal correspondence down on this subject."

> Considered doing this already- but I was uncomfortable even letting shareholders know we are aware of this LTE…. It implies we had something to do with it- otherwise how do we have knowledge of it?
>
> I could add "Aware of multiple letters to editor including one signed by 25 scientists from 14 countries" if you both think this is OK.
>
> We are being asked to keep internal correspondence down on this subject.

70.    In response, Eric Sachs said: "We are 'connected' but did not write the letter or encourage anyone to sign it."

71.    In a document outlining the "Business Goals" of Monsanto employee David Saltmiras for the fiscal year 2013, Dr. Saltmiras wrote: "Throughout the late 2012 Seralini rat cancer publication and media campaign, I leveraged my relationship the Editor of Chief of the publishing journal, Food and Chemical Toxicology and was the single point of contact between Monsanto and the Journal." Moreover, Dr. Saltmiras acknowledged that he "[s]uccessfully facilitated numerous third party expert letters to the editor which were subsequently published,

reflecting the numerous significant deficiencies, poor study design, biased reporting and selective statistics employed by Seralini."

72.    In multiple other letters and correspondence, Monsanto has expressed its intent to attack independent scientists who raised concerns about the toxicity of its products.

73.    In late 2014, the International Agency for Research on Cancer (IARC) announced that it was recommending dozens of pesticides for evaluation, including glyphosate. When the IARC review was announced, Monsanto's Donna Farmer wrote to former employee, John Acquavella, in an email dated September 18, 2014: "Just wanted to let you that what we have long been concerned about has happened. [sic] Glyphosate is on for an IARC review in March 2015." Farmer then wrote: "Glyphosate had been listed as a medium priority for 2015-2016 but clearly something happened and it got *moved* up to ultra priority."

74.    Monsanto not only anticipated the carcinogenic classification for glyphosate and glyphosate-based formulations, but pro-actively sought to combat the expected result by engaging supposed third-party academics who acted on Monsanto's behalf as purportedly "independent" experts in signing onto Monsanto ghostwritten reports which were then published in leading toxicology journals and in the media.

75.    In an email dated February 19, 2015, one month prior to the release of the IARC report on glyphosate, Monsanto executive William Heydens proposed that the company "ghost-write" sections of a paper on Roundup's toxicity. In the email, Heydens wrote that they would "add Greim and Kier or Kirkland to have their names on the publication, but we would be keeping the cost down by us doing the writing and they would just edit & sign their names so to speak." Heydens also wrote that this is how Monsanto had "handled" an earlier paper on glyphosate's safety.

76.     As discussed more fully in the following section, the IARC released its findings in March 2015. The report classified Roundup as "probably carcinogenic." After the release of the IARC report, Monsanto set to work on a campaign to influence the press and public perception regarding the safety of its products. Again, the campaign involved ghostwriting drafts of articles that would appear in respected news magazines. In an email dated March 12, 2015, Eric Sachs of Monsanto asked Henry Miller, a Forbes contributor and fellow of the Stanford Hoover Institute, to write about the IARC "process and controversial decision" to classify Roundup as probably carcinogenic. Mr. Miller responded that he would be willing to assist Monsanto if he "could start from a high-quality draft." In response, Monsanto informed Mr. Miller that Monsanto already had "a draft nearly done" that it would send to Mr. Miller by tomorrow.

From: "ERIC S SACHS [AG/1000]" <​█████████████>
To: "Henry Miller" <​██████████@​██████████>
Sent: Tuesday, March 17, 2015 10:23:03 AM
Subject: RE: IARC Outcomes, Process, and Response


We have a draft nearly done and will send to you by tomorrow.

Eric

77.     In another email dated May 11, 2015 and entitled "RE: Post-IARC Activities to Support Glyphosate," Heydens wrote that Monsanto would ghost-write a manuscript refuting the animal data cited by the IARC, noting that the manuscript "would be more powerful if authored by non-Monsanto scientists (e.g., Kirkland, Kier, Williams, Greim, and maybe Keith Solomon)":

Publication on Animal Data Cited by IARC
- It was noted that this is only other idea that could be done prior to IARC Monograph publication
- Manuscript to be initiated by MON as ghost writers
- It was noted this would be more powerful if authored by non-Monsanto scientists  (e.g., Kirkland, Kier, Williams, Greim and maybe Keith Solomon)
- Decide within 1-2 weeks if we will recommend going forward with this

78.     After the IARC report came out, Monsanto also organized an ostensibly independent "Expert Panel" for the purpose of conducting an evaluation of the IARC data. But the Expert Panel was anything but an independent collection of neutral scientists rendering an opinion on the toxicity of glyphosate. The conclusions of the Expert Panel were substantially edited and/or authored by Monsanto's own executives.

79.     The question of the ethical permissibility of ghostwriting arose when, in the course of assigning authorship, a member of the Expert Panel and former Monsanto employee, John Acquavella, was excluded from a poster planned for a 2015 Society for Risk Analysis meeting. In response, Heydens wrote in an email to Acquavella dated November 3, 2015: "I thought we discussed previously that it was decided by our management that we would not be able to use you or Larry [Kier] as Panelists/authors because of your prior employment at Monsanto . . . ." Acquavella responded: "I didn't realize that Bill. Also, I don't think that will be okay with my panelists. We call that ghost writing and it is unethical." In another email to Heydens in the same chain, Acquavella wrote: "I can't be part of deceptive authorship on a presentation or publication. Please note the ICJME guidelines below that everyone goes by to determine what is honest/ethical regarding authorship."

You guys know me. I can't be a part of deceptive authorship on a presentation or publication. Please note the ICJME guidelines below that everyone goes by to determine what is honest/ethical regarding authorship.

80.     These concerns did not stop Monsanto from continuing to influence and author reviews on the safety of glyphosate, while advertising the work as independent. In July 2016, the journal Critical Reviews in Toxicology published "A review of the carcinogenic potential of glyphosate by four independent expert panels and comparison to the IARC assessment." Sixteen scientists signed their names to the published work, declaring to readers that their conclusions were free of Monsanto's intervention. Underscoring the supposed independence of the work, the declaration of interest section of the published review stated: "Neither any Monsanto company employees nor any attorneys reviewed any of the Expert Panel's manuscripts prior to submission to the journal." This was false. Internal Monsanto documents reveal that Heydens not only reviewed the manuscripts but had a hand in drafting and editing them. The finished papers were aimed directly at discrediting IARC's classification. In one internal email, Heydens told the organizer of the panel: "I have gone through the entire document and indicated what I think should stay, what can go, and in a couple spots I did a little editing."

| From: | HEYDENS, WILLIAM F [AG/1000] [/O=MONSANTO/OU=NA-1000-01/CN=RECIPIENTS/CN=230737] |
|---|---|
| Sent: | 2/9/2016 11:43:08 PM |
| To: | Ashley Roberts Intertek ███████████ |
| Subject: | RE: summary article |
| Attachments: | Summary Manuscript Draft 2 0 Feb 5 2016_jfa_wfh.docx |

Ashley,

OK, I have gone through the entire document and indicated what I think should stay, what can go, and in a couple spots I did a little editing.  I took a crack at adding a little text on page 10 to address John's comments about toxicologists' use of Hill's criteria – see what you think; it made sense to me, but I'm not sure if it will to others - please feel free to further modify and/or run by Gary.

After you have looked through this, let's discuss.

81.     Internal Monsanto documents show that Heydens even argued over statements that he wanted included but that John Acquavella deemed "inflammatory" and "not necessary"

criticisms of the IARC. Heydens' edits to draft documents contradicted Acquavella, even though Heydens was not supposed to have even reviewed the papers. Heydens went so far as to state: "I would ignore John's comment" and "I don't see a reason for deleting the text that John did below."

82.   The scientific literature is littered with ghostwritten papers declaring Roundup and glyphosate to be safe. Through its ghostwriting campaigns, Monsanto sought to hide or discredit independent research showing that its products are hazardous to human health. All the while, Monsanto advertised its products as completely safe and non-toxic to an unsuspecting public.

**False Representations Regarding the Safety of Roundup**

83.   In 1996, the New York Attorney General ("NYAG") filed a lawsuit against Monsanto based on its false and misleading advertising of Roundup products.  Specifically, the lawsuit challenged Monsanto's general representations that its spray-on glyphosate-based herbicides, including Roundup, were "safer than table salt" and "practically non-toxic" to mammals, birds, and fish. Among the representations the NY AG found deceptive and misleading about the human and environmental safety of glyphosate and/or Roundup are the following:

    a.   "Remember that environmentally friendly Roundup herbicide is biodegradable.  It won't build up in the soil so you can use Roundup with confidence along customers' driveways, sidewalks and fences..."

    b.   "And remember that Roundup is biodegradable and won't build up in the soil. That will give you the environmental confidence you need to use Roundup everywhere you've got weed, brush, edging or trimming problem."

    c.   "Roundup biodegrades into naturally occurring elements."

    d.   "Remember that versatile Roundup herbicide stays where you put it. That means there's no washing or leaching to harm customers' shrubs or other desirable vegetation."

e. "This non-residual herbicide will not wash or leach in the soil. It... stays where you apply it."

f. "You can apply Accord with…confidence because it will stay where you put it…it bonds tightly to soil particles, preventing leaching. Then, soon after application, soil microorganisms biodegrade Accord into natural products."

g. "Glyphosate is less toxic to rats than table salt following acute oral ingestion."

h. "Glyphosate's safety margin is much greater than required. It has over a 1,000-fold safety margin in food and over a 700-fold safety margin for workers who manufacture it or use it."

i. "You can feel good about using herbicides by Monsanto. They carry a toxicity category rating of 'practically non-toxic' as it pertains to mammals, birds and fish."

j. "Roundup can be used where kids and pets will play and breaks down into natural material." This ad depicts a person with his head in the ground and a pet dog standing in an area which has been treated with Roundup.[7]

84.     On November 19, 1996, Monsanto entered into an Assurance of Discontinuance with NYAG, in which Monsanto agreed, among other things, "to cease and desist from publishing or broadcasting any advertisements [in New York] that represent, directly or by implication" that:

a. its glyphosate-containing pesticide products or any component thereof are safe, non-toxic, harmless or free from risk.

b. its glyphosate-containing pesticide products or any component thereof manufactured, formulated, distributed or sold by Monsanto are biodegradable

c. its glyphosate-containing pesticide products or any component thereof stay where they are applied under all circumstances and will not move through the environment by any means.

---

[7] Attorney General of the State of New York, In the Matter of Monsanto Company, Assurance of Discontinuance Pursuant to Executive Law § 63(15) (Nov. 1996).

d.  its glyphosate-containing pesticide products or any component thereof are "good" for the environment or are "known for their environmental characteristics."

e.  glyphosate-containing pesticide products or any component thereof are safer or less toxic than common consumer products other than herbicides

f.   its glyphosate-containing products or any component thereof might be classified as "practically non-toxic."

85.     Monsanto did not alter its advertising in the same manner in any state other than New York, and on information and belief it still has not done so today.


**IARC Classification of Glyphosate**

86.     On March 15, 2015, the International Agency for Research on Cancer ("IARC"), an agency of the World Health Organization ("WHO"), issued an evaluation of several herbicides, including glyphosate.  That evaluation was based, in part, on studies of exposure to glyphosate in several countries around the world, and it traces the health implications from exposure to glyphosate since 2001.  The summary published in The Lancet Oncology reported that glyphosate is a Group 2A agent and probably carcinogenic in humans.

87.     On July 29, 2015, IARC issued the formal monograph relating to glyphosate.  In that monograph, the IARC Working Group provides a thorough review of the numerous studies and dates relating to glyphosate exposure in humans.

88.     The IARC process for the classification of glyphosate followed IARC's stringent procedures for the evaluation of a chemical agent. Evaluations are performed by panels of international experts, selected based on their expertise and the absence of actual or apparent conflicts of interest.

89.     In preparing its Monograph, a Working Group of 17 experts from 11 countries met at IARC from March 3-10, 2015 to assess the carcinogenicity of certain herbicides, including glyphosate.

90.     The March meeting culminated a nearly one-year review and preparation by the IARC Secretariat and the Working Group, including a comprehensive review of the latest available scientific evidence.

91.     Glyphosate was identified as the second-most used household herbicide in the United States for weed control between 2001 and 2007 and the most heavily used herbicide in the world in 2012.

92.     Exposure pathways are identified as air (especially during spraying), water, and food. Community exposure to glyphosate is widespread and found in soil, air, surface water, and groundwater, as well as in food.

93.     The assessment of the IARC Working Group identified several case control studies of occupational exposure in the United States, Canada, and Sweden.  These studies show a human health concern from agricultural and other work-related exposure to glyphosate.

94.     The IARC Working Group found an increased risk between exposure to glyphosate and non-Hodgkin lymphoma and several subtypes of non-Hodgkin lymphoma, and the increased risk persisted after adjustment for other pesticides.

95.     The IARC Working Group also found that glyphosate caused DNA and chromosomal damage in human cells.  One study in community residents reported increases in blood markers of chromosomal damage (micronuclei) after glyphosate formulations were sprayed.

96.     In male CD-I mice, glyphosate induced a positive trend in the incidence of a rare tumor: renal tubule carcinoma. A second study reported a positive trend for haemangiosarcoma in

28

male mice. Glyphosate increased pancreatic islet-cell adenoma in male rats in two studies. A glyphosate formulation promoted skin tumors in an initiation-promotion study in mice.

97.    The IARC Working Group also noted that glyphosate has been detected in the urine of agricultural workers, indicating absorption. Soil microbes degrade glyphosate to aminomethylphosphoric acid (AMPA).  Blood AMPA detection after exposure suggests intestinal microbial metabolism in humans.

98.    In addition, the IARC Working Group found that glyphosate and glyphosate formulations induced DNA and chromosomal damage in mammals, and in human and animal cells in utero.

99.    The IARC Working Group also noted genotoxic, hormonal, and enzymatic effects in mammals exposed to glyphosate. Essentially, glyphosate inhibits the biosynthesis of aromatic amino acids, which leads to several metabolic disturbances, including the inhibition of protein and secondary product biosynthesis and general metabolic disruption.

100.    Additionally, the IARC Working Group reviewed an Agricultural Health Study, consisting of a prospective cohort of 57,311 licensed pesticide applicators in Iowa and North Carolina. While this study differed from others in that it was based on a self-administered questionnaire, the results support an association between glyphosate exposure and multiple myeloma, hairy cell leukemia (HCL), and chronic lymphocytic leukemia (CLL), in addition to several other cancers.

101.    The IARC evaluation confirms that glyphosate is toxic to humans.

102.    Nevertheless, Monsanto since it began selling Roundup has represented it as safe to humans and the environment. Monsanto has repeatedly proclaimed and continues to proclaim

that glyphosate-based herbicides, including Roundup, create no unreasonable risk to human health or to the environment.

103.    In a document titled "Glyphosate/Roundup in the News, Safety Information" issued on March 27, 2017, Monsanto disputes the findings of the IARC and states the following: "All labeled uses of glyphosate are safe for human health and supported by one of the most extensive worldwide human health databases ever compiled on a pesticide."[8]

104.    Dow and Albaugh, who manufacture the aquatic glyphosate-based products Rodeo and Aqua Star respectively, also continue to sell their products containing glyphosate, thereby assuring the public that their products are not hazardous to human health or to the environment.

### The EPA's Review of Glyphosate

105.    On September 12, 2016, the EPA's Office of Pesticides Program ("OPP") submitted a report, titled "Glyphosate Issue Paper: Evaluation of Carcinogenic Potential," wherein it issued a "proposed conclusion" that glyphosate is "'not likely to be carcinogenic to humans' at doses relevant to human health risk assessment."[9]

106.    The report is based upon a review of industry-sponsored articles and studies. The OPP acknowledged that it rejected all studies that considered Roundup—the formulated product—instead of studies that isolated glyphosate because "[g]lyphosate formulations contain various components other than glyphosate and it has been hypothesized these components are more toxic than glyphosate alone."[10]

---

[8] Monsanto, *Glyphosate/Roundup In the News, Safety Information*,
http://www.monsantoito.com/docs/Glyphosate_IT_O_Briefing.pdf, at 1 (March 27, 2015).
[9] *See* EPA's Office of Pesticide Programs, Glyphosate Issue Paper: Evaluation of Carcinogenic Potential (Sept. 12, 2016), available at https://www.epa.gov/sites/production/files/2016-09/documents/glyphosate_issue_paper_evaluation_of_carcinogenic_potential.pdf.
[10] *Id.*

107.    Thus, the OPP notes in the report that dozens of studies considered by IARC were not reviewed by the OPP because the OPP's "evaluation focused on studies on the active ingredient glyphosate" and "additional research could also be performed to determine whether formulation components, such as surfactants, influence the toxicity of glyphosate formulations."[11]

108.    From December 13 to 16, 2016, the EPA held FIFRA Scientific Advisory Panel ("SAP") meetings to consider issues raised by the OPP's evaluation of glyphosate.  Again, OPP only allowed the SAP to consider studies of glyphosate alone, and not any study of the formulated product. In its Charge to the FIFRA SAP, the OPP noted that "[a]lthough there are studies available on glyphosate-based pesticide formulations, the agency is soliciting advice from the FIFRA Scientific Advisory Panel (SAP) on this evaluation of human carcinogenic potential for the active ingredient glyphosate only at this time."[12]

109.    The OPP draft assessment does not actually consider how glyphosate, in conjunction with other chemicals, affects not only carcinogenicity but other physical injuries and illnesses.

### Other Studies on the Toxicity of Glyphosate

110.    In 2013, a study published in the scientific journal *Entropy* found that contrary to the current widely-held misconception that glyphosate is relatively harmless to humans, the available evidence shows that glyphosate may be the most important factor in the development of multiple chronic diseases and conditions such as inflammatory bowel disease, anorexia nervosa, obesity, diabetes, heart disease, depression, autism, infertility, cancer and Alzheimer's disease.  By

---

[11] *Id.*
[12] EPA OPP, Glyphosate: Evaluation of Carcinogenic Potential, Charge to the FIFRA SAP for the October 18-21, 2016 Meeting, available at, https://www.epa.gov/sites/production/files/2016-11/documents/glyphosate_sap_charge_questions_-final.pdf.

interfering with the biochemistry of bacteria in our gastrointestinal tract, consumption of glyphosate depletes essential amino acids and predisposes humans to a host of chronic health problems.[13]

111.   In 2016, the Ramazzini Institute, along with Bologna University, the Italian National Health Institute, George Washington State University and the Icahn School of Medicine, launched the Global Glyphosate Study as a pilot study. It was a single-dose study on the health effects of glyphosate-based herbicides on Sprague Dawley rats, which had been dosed with the U.S. EPA-determined safe limit of 1.75 micrograms per kilo of body weight.  The results published in May 2018 showed that glyphosate-based herbicides—at doses deemed safe and over a relatively short exposure time—can alter certain important biological parameters, markers chiefly relating to sexual development, genotoxicity, and alteration of the intestinal microbiome. In sum, the scientists involved concluded that the results show that glyphosate poses a significant public health concern.

112.   Several other studies have demonstrated that exposure to low doses of glyphosate can have detrimental health effects on humans and animals.[14]

---

[13] Anthony Samsel and Stephanie Seneff, *Glyphosate's Suppression of Cytochrome P450 Enzymes and Amino Acid Biosynthesis by the Gut Microbiome: Pathways to Modern Diseases*, ENTROPY, 2013 at 15.

[14] John P. Myers, et al., Concerns over use of glyphosate-based herbicides and risks associated with exposures: a consensus statement, 15 Environ. Health 9 (2016), available at https://ehjournal.biomedcentral.com/articles/10.1186/s12940-016-0117-0; *see also* Gilles-Eric Seralini, et al, Republished study: long-term toxicity of a Roundup herbicide and a Roundup tolerant genetically modified maize, 26 Environ. Sci. Europe 14 (2014), available at http://enveurope.springeropen.com/articles/10.1186/s12302-014-0014-5; A.L. Benedetti, et al., The effects of sub-chronic exposure of Wistar rats to the herbicide Glyphosate-Biocarb, 153(2) Toxicol. Lett. 227-32 (2004), available at http://www.ncbi.nlm.nih.gov/pubmed/15451553; K. Larsen, et al., Effects of Sublethal Exposure to a Glyphosate-Based Herbicide Formulation on Metabolic Activities of Different Xenobiotic-Metabolizing Enzymes in Rats, 33(4) Int. J. Toxicol. 307-18 (Jul. 2014), available at http://www.ncbi.nlm.nih.gov/pubmed/24985121; Robin Mesnage, et al., Transcriptome profile analysis reflects rat liver and kidney damage following chronic ultra-low dose Roundup exposure, 14 Environ. Health 70 (2015), available at http://www.ncbi.nlm.nih.gov/pmc/articles/PMC4549093.

113.    In addition to the toxicity of the active ingredient, glyphosate, several studies support the hypothesis that glyphosate-based formulations in Roundup and other products are more dangerous and toxic that glyphosate alone.

114.    Several countries around the world have instituted bans on the sale of Roundup and other glyphosate-containing herbicides, both before and after the IARC first announced its assessment for glyphosate in March 2015.

115.    Defendant Home Depot was at all relevant times, engaged in the retail and sale of Roundup products manufactured by Monsanto throughout Miami-Dade County Florida.  Plaintiff purchased Roundup products for use at her residences at the Home Depot stores set forth above.

116.    Defendant Home Depot had superior knowledge compared to Roundup users and consumers, including regarding the carcinogenic properties of the product, yet failed to accompany its sales and/or marketing of Roundup with any warnings or precautions for that grave danger.

117.    Andrew Jack Conroy is an IT&O Account Representative for Monsanto, responsible for sales and marketing to distributors, retailers, and users of Roundup and other glyphosate-containing products in Florida. Mr. Conroy engaged in the marketing, promotion and sale of these products, aware of their carcinogenic or potentially carcinogenic properties, but failed to inform any of his sales targets of such danger.

### Plaintiff's Exposure to Roundup

118.    Plaintiff Nancy C. Salas has been a Florida resident since childhood.

119.    Ms. Salas used Roundup products at her residences in Key Largo, Florida, and Miami, Florida, from approximately 2004 through 2014.

120.    Ms. Salas was recommended Roundup herbicide at The Home Depot and exclusively purchased the product at the aforementioned store locations.

121.    Ms. Salas would spray Roundup year-round to control the weeds on her properties. Ms. Salas used both the premixed and the concentrated varieties of Roundup. She mixed the Roundup herself into the container and used a handheld sprayer. Additionally, she also used the premixed Roundup bottles that have an attached spray nozzle

122.    Ms. Salas stopped spraying Roundup in approximately 2014.

123.    In June of 2020 Ms. Salas began to feel ill and underwent various diagnostic tests.

124.    In July of 2020 Ms. Salas was diagnosed with Stage IV non-Hodgkin's lymphoma. She immediately began aggressive chemotherapy treatments.

125.    During the entire time that Plaintiff was exposed to Roundup, she did not know that exposure to Roundup was injurious to her health or to the health of others.

<u>**COUNT I**</u>
**STRICT PRODUCTS LIABILITY**
**(Against Monsanto and Andrew Jack Conroy)**

126.    Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

127.    This is a cause of action for strict products liability, including design defect, manufacturing defect, and failure to warn.

128.    **Product**: Monsanto and Mr. Conroy designed, developed, manufactured, marketed, tested, assembled, labeled, distributed, sold, advertised, promoted, and placed into the stream of commerce Roundup products, which are defective and unreasonably dangerous, and to which Plaintiff was exposed.  Monsanto and Mr. Conroy knew or reasonably should have foreseen that the ultimate users, consumers, and persons exposed to Roundup products could not properly inspect for defects or dangers and that the detection of such defects or dangers could be beyond the capabilities of such persons.

129.   **Defects**: Roundup products as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold, and marketed were defective and unreasonably dangerous. At the time Roundup left Defendants' control and was placed in the stream of commerce, Roundup had been manufactured defectively and designed defectively because it was in a condition that was unreasonably dangerous to the users and persons in the vicinity of the product; Roundup had been designed defectively because it failed to perform as safely as an ordinary consumer would expect when used as intended or when used in a manner reasonably foreseeable by the manufacturer; Roundup had been designed defectively because the risk of danger in its design and formulation outweighed its benefits, and because there were alternative, safer designs and formulations that were feasible; and Roundup was defective because the foreseeable risks of harm from Roundup could have been reduced or avoided by providing reasonable instructions or warnings, yet no such instructions or warnings were given. Specifically, Roundup was defective and unreasonably dangerous when placed in the stream of commerce for one or more of the following reasons:

   a.   It was defective in design and formulation and dangerous to an extent beyond that which an ordinary consumer would contemplate;

   b.   It was unreasonably dangerous in that it was hazardous and posed a grave risk of serious illness when used in a reasonably anticipated manner;

   c.   It was otherwise designed in a way that exposed persons to unnecessary and unreasonable risks, including by failing to provide adequate safeguards to protect persons exposed to foreseeable injuries;

   d.   Defendants failed to adequately test, investigate, and/or study Roundup products, including both its active ingredient glyphosate and any other ingredients, to ensure their safety;

   e.   Exposure to Roundup products presents a risk of harmful side effects that outweigh any potential utility stemming from use;

f.    Defendants knew or should have known at the time of marketing Roundup products that exposure to Roundup products could result in severe injuries and illness;

g.    Defendants did not conduct adequate post-marketing surveillance of its Roundup products;

h.    Defendants could have employed safer alternative designs and formulations;

i.    Defendants failed to use due care in the manufacturing and formulation of Roundup products;

j.    Defendants failed to use due care in warning of the risks associated with the use of and exposure to Roundup products;

k.    Defendants failed to use due care in minimizing the dangers to users, consumers, and persons exposed to Roundup products, and to those who would foreseeably use or be harmed by Roundup products;

l.    Defendants failed to provide adequate warnings or instructions concerning the dangerous characteristics of Roundup and/or the full and complete risks of exposure to Roundup and glyphosate-containing products.

m.   Defendants failed to adequately label, market, and promote Roundup products to ensure that such products did not cause persons exposed to them to suffer from unreasonable and dangerous risks;

n.    Defendants failed to give appropriate warnings about other risks of which Monsanto knew or should have known are involved in the reasonably foreseeable use of Roundup products.

130.   The defects described above rendered Roundup unreasonably dangerous by making it dangerous to an extent beyond that which would be contemplated by the ordinary consumer with the knowledge common to the community as to its characteristics.

131.   The defects in Roundup products were present when Monsanto and Mr. Conroy placed them into the stream of commerce.  Roundup products reached the intended consumers, handlers, users and other persons coming into contact and exposed with these products in Florida,

including Plaintiff, without substantial change in their condition as designed, manufactured, sold, distributed labeled, and marketed by Monsanto and Mr. Conroy.

132.    At all times material, Roundup products were being used in a manner intended by Monsanto and Mr. Conroy, and in a manner that was reasonably foreseeable by them as involving a substantial danger not readily apparent.

133.    It was foreseeable that Plaintiff would be exposed to Roundup products.

134.    **Causation**: As a direct and proximate result of the defects in Roundup products, Plaintiff was exposed to glyphosate and other ingredients in Roundup products, causing or substantially contributing to Plaintiff's injuries. But for the defects in Roundup products, Plaintiffs injuries would not have occurred.

135.    **Damages**: Plaintiff has been damaged and claims all damages to which she is entitled, including, as applicable law may provide, but not limited to:

    a.  bodily injury resulting in pain and suffering, disability and/or disfigurement;

    b.  mental anguish;

    c.  loss of capacity for enjoyment of life;

    d.  loss of earnings and/or loss of ability to earn money;

    e.  expensive hospitalization, medical treatment and/or care which losses are either permanent or will continue; and/or

    f.  all damages available under applicable law.

<u>**COUNT II**</u>
**NEGLIGENCE**
**(Against Monsanto and Andrew Jack Conroy)**

136.    Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

137.   This is a cause of action for negligence, including design defect, manufacturing defect, and failure to warn.

138.   **Duty**: Monsanto and Mr. Conroy had a duty to use reasonable care in the design, research, development, testing, assembly, packaging, manufacture, labeling, marketing, advertisement, promotion, sale, and distribution of its Roundup products in order to avoid persons exposed to Roundup products to unnecessary and unreasonable risks.

139.   Monsanto and Mr. Conroy's duty of care included providing accurate, true, and correct warnings concerning the potential adverse effects of exposure to Roundup products.

140.   **Breach**: Monsanto and Mr. Conroy breached that duty by acting in a way that a reasonably careful manufacturer, designer, advertiser, marketer, promotor, and distributor would not act under like circumstances and by failing to take actions that a reasonably careful manufacturer, designer, advertiser, marketer, promotor and distributor would take under like circumstances.   Specifically, Defendants breached their duty of care in one or more of the following ways:

     a.   By manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing Roundup products without thorough and adequate pre- and post-market testing;

     b.   By manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing Roundup products while negligently and/or intentionally concealing and failing to disclose the results of trials, tests, and studies of exposure to glyphosate and other ingredients in Roundup products, and consequently the risk of serious harm associated with human use and exposure to Roundup;

     c.   By failing to undertake sufficient studies and conduct necessary tests to determine whether or not Roundup products and glyphosate-containing products were safe for their intended use;

     d.   By failing to use reasonable and prudent care in the design, research, manufacture, and development of Roundup products so as to avoid the risk of harm associated with exposure to Roundup and/or glyphosate as an herbicide;

e.  By failing to design and manufacture Roundup products so as to ensure they were at least as safe and effective as other herbicides on the market;

f.  By failing to provide adequate instructions, guidelines, and safety precautions to those persons who Defendants could reasonably foresee would use and/or be exposed to its Roundup products;

g.  By failing to disclose to consumers and the general public, including Plaintiff, that the product's risk of harm was unreasonable and that there were safer and effective alternative herbicides available;

h.  By failing to give appropriate warnings about other risks of which Defendants knew or should have known are involved in the reasonably foreseeable use of and/or exposure to Roundup products;

i.  By systemically suppressing or downplaying contrary evidence about the risks, incidence, and/or prevalence of the side effects of Roundup and glyphosate-containing products;

j.  By representing that its Roundup products were safe for their intended use when, in fact, Defendants knew or should have known that the products were not safe for their intended purpose;

k.  By declining to make or propose any changes to Roundup products' labeling or other promotional materials that would alert consumers and the general public of the risks of Roundup, glyphosate, and any other ingredients in Roundup products;

l.  By advertising, marketing, and recommending the use of Roundup products, while concealing and/or failing to disclose or warn of the dangers known by Defendants to be associated with or caused by the use of or exposure to Roundup, glyphosate, and any other ingredients in Roundup products;

m.  By continuing to disseminate information to its consumers, which indicate or imply that Roundup products are not unsafe for use;

n.  By continuing the manufacture and sale of its products with the knowledge that the products were unreasonably unsafe and dangerous.

141.  Monsanto and Mr. Conroy knew or reasonably should have foreseen that individuals such as Plaintiff would suffer injuries as a result of their failure to exercise reasonable care in the manufacturing, marketing, labeling, distribution, and sale of Roundup products.

142.  **Causation**: As a direct and proximate result of the negligence of Monsanto and Mr. Conroy, Roundup products caused Plaintiff's injuries. Defendant's negligence caused or

substantially contributed to causing Plaintiff to suffer economic and non-economic damages. But for their negligence, these injuries, damages, and losses would not have occurred.

143. **Damages**: Plaintiff has been damaged and claims all damages to which she is entitled, including, as applicable law may provide, but not limited to:

    a.  bodily injury resulting in pain and suffering, disability and/or disfigurement;

    b.  mental anguish;

    c.  loss of capacity for enjoyment of life;

    d.  loss of earnings and/or loss of ability to earn money;

    e.  expensive hospitalization, medical treatment and/or care which losses are either permanent or will continue; and/or

    f.  all damages available under applicable law.

### <u>COUNT III</u>
### BREACH OF EXPRESS WARRANTIES
### (Against Monsanto Company)

144. Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

145. At all relevant times, Defendant Monsanto engaged in the business of testing, developing, designing, formulating, manufacturing, marketing, selling, distributing, and promoting its Roundup products, which are defective and unreasonably dangers to users and consumers, including Plaintiff, thereby placing Roundup products into the stream of commerce. These actions were under the ultimate control and supervision of Defendant.

146. Roundup products were expected to reach and did in fact reach consumers and users, including Plaintiff, without substantial change in the condition in which they were manufactured and sold by Defendant Monsanto.

147.    Before the time that Plaintiff was exposed to Roundup products, Defendant expressly warranted to its consumers and users, including Plaintiff, that its Roundup products were of merchantable quality and safe and fit for the use for which they were intended and were not unreasonably dangerous for their intended purpose, specifically, as horticultural herbicides.

148.    Defendant Monsanto, through its advertising and promotional materials, expressly warranted that Roundup products were safe for their intended use and were not unreasonable dangerous for their intended purpose.

149.    Defendant Monsanto, however, failed to disclose that Roundup products have dangerous propensities when used as intended and that the use of and/or exposure to Roundup and glyphosate-containing products carries an increased risk of developing severe injuries, including Plaintiff's injuries.

150.    The representations, as set forth above, contained or constituted affirmations of fact or promises made by the seller to the buyer which related to the goods and became part of the basis of the bargain creating an express warranty that the goods shall conform to the affirmations of fact or promises.

151.    Defendant Monsanto breached its express warranties, and Roundup did not conform to the representations made by Monsanto, in that Roundup products were not safe for their intended use.

152.    Plaintiff reasonably relied to her detriment on Defendant Monsanto's express warranties.

153.    As a proximate result of Defendant's wrongful acts and omissions in placing its defective Roundup products into the stream of commerce and failing to warn Plaintiff of the increases risk of NHL associated with the use of and/or exposure to Roundup products as described

herein, Plaintiff has suffered and continues to suffer severe physical and emotional injuries. Plaintiff has been damaged and claims all damages to which she is entitled, including, as applicable law may provide, but not limited to:

    a.  bodily injury resulting in pain and suffering, disability and/or disfigurement;

    b.  mental anguish;

    c.  loss of capacity for enjoyment of life;

    d.  loss of earnings and/or loss of ability to earn money;

    e.  expensive hospitalization, medical treatment and/or care which losses are either permanent or will continue; and/or

    f.  all damages available under applicable law.

**COUNT IV**
**FRAUDULENT MISREPRESENTATION**
**(Against Monsanto Company)**

154.    Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

155.    This is a cause of action for fraudulent misrepresentation under Florida common law.

156.    Defendant Monsanto is the manufacturer, designer, distributor, seller or supplier of Roundup and, while engaged in the course of such business, made representations about material facts to Plaintiff regarding the character and/or quality of Roundup for guidance in her decision to select Roundup for use.

157.    Monsanto had a duty to disclose material information about the serious health effects of its products to consumers such as Plaintiff.  Monsanto intentionally failed to disclose

this information for the purpose of inducing consumers, including Plaintiff, to purchase Monsanto's dangerous products.

158.    Specifically, Monsanto's advertisements and promotions, regarding Roundup, during the time when Plaintiff purchased and applied Roundup products from April 2001 to February 2012, made material misrepresentations to the effect that Roundup was safe and non-toxic, which Monsanto knew to be false, for the purpose of inducing consumers, such as Plaintiff, to purchase said product. Monsanto further misrepresented that its products were just as safe, just as effective or more effective, than other weed control products on the market.

159.    Monsanto's representations regarding the character or quality of Roundup were untrue. In addition, Monsanto fraudulently suppressed material information regarding the safety of Roundup, including the dangers known by Monsanto to be associated with or caused by the use of or exposure to Roundup products and glyphosate.

160.    Monsanto had actual knowledge based on the results of trials, tests, and studies of exposure to glyphosate, of the risk of serious harm associated with human use of and exposure to Roundup.

161.    Moreover, Monsanto purposely failed to conduct trials, tests, and studies of the risks associated with the full Roundup formulation—rather than merely the active ingredient glyphosate—because it knew that these tests were likely to reveal that Roundup was unsafe and toxic to humans.

162.    Despite this knowledge, Monsanto intentionally misrepresented or omitted this information in its product labeling, promotions and advertisements. Instead, Monsanto labeled, promoted, and advertised its products as safe and effective when it knew such statements to be

false or when it knew that it did not know the truth of such statements in order to avoid losses and sustain profits in its sale of Roundup products to consumers, including Plaintiff.

163.   In supplying the false information, Monsanto failed to exercise reasonable care or competence in obtaining or communicating information to its intended recipients, including Plaintiff.

164.   Plaintiff relied to her detriment upon Monsanto's misrepresentations and/or omissions in its labeling, advertisements, and promotions concerning the serious risks posed by the product.  Plaintiff relied upon Monsanto's representations that Roundup was safe for use and that Monsanto's labeling, advertisements, and promotions fully described all known risks of the product.

165.   Monsanto is estopped from relying on any statute of limitations defenses because Monsanto actively concealed the defects from consumers. Instead of revealing the defects, Monsanto continued to represent its products as safe for their intended use.

166.   As a direct and proximate result of Monsanto's negligent misrepresentations, Plaintiff has been damaged and claims all damages to which she is entitled, including, as applicable law may provide, but not limited to:

    a.  bodily injury resulting in pain and suffering, disability and/or disfigurement;

    b.  mental anguish;

    c.  loss of capacity for enjoyment of life;

    d.  loss of earnings and/or loss of ability to earn money;

    e.  expensive hospitalization, medical treatment and/or care which losses are either permanent or will continue; and/or

    f.  all damages available under applicable law.

## COUNT V
## NEGLIGENT MISREPRESENTATION
### (Against Monsanto Company)

167.    Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

168.    This is a cause of action for negligent misrepresentation under Florida common law.

169.    Defendant Monsanto is the manufacturer, designer, distributor, seller or supplier of Roundup and, while engaged in the course of such business, made representations about material facts to Plaintiff regarding the character and/or quality of Roundup for guidance in his decision to select Roundup for use.

170.    Monsanto had a duty to disclose material information about the serious health effects of its products to consumers such as Plaintiff.  Monsanto negligently failed to disclose this information for the purpose of inducing consumers, including Plaintiff, to purchase Monsanto's dangerous products.

171.    Specifically, Monsanto's advertisements and promotions regarding Roundup, during the time when Plaintiff purchased and applied Roundup products from April 2001 to February 2012, made material misrepresentations to the effect that Roundup was safe and non-toxic, which Monsanto should have known to be false, for the purpose of inducing consumers, such as Plaintiff, to purchase said product. Monsanto further misrepresented that its products were just as safe, just as effective or more effective, than other weed control products on the market.

172.    Monsanto's representations regarding the character or quality of Roundup were untrue.

173.    Monsanto negligently suppressed material information regarding the safety of Roundup, including the dangers known by Monsanto to be associated with or caused by the use of or exposure to Roundup products and glyphosate.

174.    Based on the results of trials, tests, and studies of exposure to glyphosate, Monsanto should have known or could have reasonably discovered the risk of serious harm associated with human use of and exposure to Roundup.

175.    Monsanto purposely and/or negligently failed to conduct trials, tests, and studies of the risks associated with the full Roundup formulation—rather than merely the active ingredient glyphosate—because it knew that these tests were likely to reveal that Roundup was unsafe and toxic to humans and/or because it wanted to avoid discovering whether Roundup was unsafe or toxic to humans.

176.    As a result, Monsanto negligently misrepresented or omitted this information in its product labeling, promotions and advertisements. Instead, Monsanto labeled, promoted, and advertised its products as safe and effective when it should have known such statements to be false or when it should have known that it did not know the truth of such statements in order to avoid losses and sustain profits in its sale of Roundup products to consumers, including Plaintiff.

177.    In supplying the false information, Monsanto failed to exercise reasonable care or competence in obtaining or communicating information to its intended recipients, including Plaintiff.

178.    Plaintiff justifiably relied to her detriment upon Monsanto's misrepresentations and/or omissions in its labeling, advertisements, and promotions concerning the serious risks posed by the product.  Plaintiff justifiably relied upon Monsanto's representations that Roundup was safe

for use and that Monsanto's labeling, advertisements, and promotions fully described all known risks of the product.

179.   Plaintiff could not have reasonably discovered or known of the risks of serious injury associated with Roundup products or glyphosate.

180.   Monsanto is estopped from relying on any statute of limitations defenses because Monsanto actively concealed the defects from consumers. Instead of revealing the defects, Monsanto continued to represent its products as safe for their intended use.

181.   As a direct and proximate result of Monsanto's negligent misrepresentations, Plaintiff has been damaged and claims all damages to which she is entitled, including, as applicable law may provide, but not limited to:

    a.   bodily injury resulting in pain and suffering, disability and/or disfigurement;

    b.   mental anguish;

    c.   loss of capacity for enjoyment of life;

    d.   loss of earnings and/or loss of ability to earn money;

    e.   expensive hospitalization, medical treatment and/or care which losses are either permanent or will continue; and/or

    f.   all damages available under applicable law.

**COUNT VI**
**STRICT LIABILITY**
**(Against Home Depot U.S.A, Inc.)**

182.   Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

183.     Defendant Home Depot engaged in the business of selling and distributing glyphosate-based products, including Roundup, to the public for application throughout Miami-Dade County.

184.     Plaintiff purchased Roundup products from Home Depot at the specific store addresses listed above, for use at her residences from approximately 2004 through 2014.

185.     **Product**: Defendant Home Depot directly placed glyphosate-based herbicides, including Roundup products, on the market (by selling them) for use throughout Miami-Dade County with knowledge that they would be used and applied without inspection for defects and dangers. Defendant knew or should have known that ultimate users and consumers, such as Plaintiff, would not and could not properly inspect these product for defects and dangerous conditions, and that detection of such defects and dangers would be beyond the capabilities of such persons.

186.     **Defects**: Glyphosate-based herbicides, such as Roundup, were defective and unreasonably dangerous when sold by Defendant Home Depot because they failed to perform as safely as an ordinary consumer would expect when used as intended or used in a reasonably foreseeable manner, because the risk of danger in their design outweighed any benefits, and because there were alternative, safer designs that were both technologically and economically feasible.  Specifically, glyphosate-based herbicides, including Roundup products, sold for use throughout Miami-Dade County were defective and unreasonably dangerous for one or more of the following reasons:

  a.  They contain chemicals and ingredients that expose individuals coming into contact with them to unnecessary and unreasonable risks;

  b.  They failed to provide warnings that would alert users and persons exposed to their dangerous conditions;

    c.  They failed to provide users and persons exposed with reasonable safety in the event of foreseeable uses.

    d.  They have a propensity to interact in the body of a person exposed to them in such a way as to cause serious harm;

187.    These defects were present when Defendant Home Depot sold Roundup products to Plaintiff for application at her residences resulting in Plaintiff's exposure to such products. The defects were expected to and did reach Plaintiff without substantial change affecting their condition.

188.    **Causation**: As a direct and proximate result of the defects in Roundup products sold to Plaintiff, Plaintiff was exposed to unreasonably dangerous chemicals and ingredients. But for the defects in the Roundup products sold to Plaintiff, Plaintiff's injuries would not have occurred.

189.    **Damages**: Plaintiff has been damaged and claims all damages to which she is entitled, including, as applicable law may provide, but not limited to:

    a.  bodily injury resulting in pain and suffering, disability and/or disfigurement;

    b.  mental anguish;

    c.  loss of capacity for enjoyment of life;

    d.  loss of earnings and/or loss of ability to earn money;

    e.  expensive hospitalization, medical treatment and/or care which losses are either permanent or will continue; and/or

    f.  all damages available under applicable law.

<u>**COUNT VII**</u>
**NEGLIGENCE**
**(Against Home Depot U.S.A, Inc.)**

190.    Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

191.    Defendant Home Depot engaged in the business of selling and distributing Roundup products.

192.    Plaintiff purchased Roundup products from Home Depot at the specific store addresses listed above, for use at her residences from approximately 2004 through 2014.

193.    Defendant Home Depot knew or should have known that Roundup products purchased by Plaintiff were unreasonably dangerous and unsafe, and created a foreseeable and unreasonable risk to persons that were exposed to such products, such as Plaintiff.

194.    **Duty**: Defendant Home Depot had a duty to use reasonable care in the marketing, distribution, and sale of Roundup products purchased by Plaintiff.  They had a duty to sell Roundup products in a reasonably safe condition so as not to present a danger to individuals who would be exposed to them, such as Plaintiff.

195.    **Breach**: Defendant Home Depot breached that duty both by acting in a way that a reasonably careful marketer, distributor, and seller of glyphosate-based herbicides , including Roundup products, would not act under like circumstances and by failing to take actions that a reasonably careful marketer, distributor, and seller of glyphosate-based herbicides, including Roundup, would take under like circumstances.  Home Depot failed to ensure that the glyphosate-based herbicides it sold to Plaintiff for use at her residences were reasonably safe.  Specifically, Home Depot breached that duty in one or more of the following ways by marketing, distributing, and selling glyphosate-based herbicides, including Roundup, that:

      a.  Have a propensity to be unreasonably dangerous, hazardous, and unsafe when exposed to them;

b.  Failed to provide adequate instructions, guidelines, warnings, and/or safety precautions regarding the risk of foreseeable exposures, ultimately harming persons, such as Plaintiff, who Home Depot could reasonably foresee would be exposed to such products as a result of its sales and distribution;

c.  Failed to disclose that the product's risk of harm was unreasonable and that there were safer and effective alternative herbicides available;

d.  Failed to give appropriate warnings regarding other foreseeable risks that would result when exposed to such products;

196.  Home Depot breached their duty of care by failing to adequately investigate and ensure that the glyphosate-based herbicides, including Roundup products, that they sold to Plaintiff were reasonably safe for their intended use.

197.  Home Depot failed to warn purchasers of glyphosate-based products, including Roundup, that reasonably foreseeable exposure to such products were unsafe, ultimately harming persons, such as Plaintiff, who Home Depot could reasonably foresee would be exposed to such products as a result of their sales and distribution.

198.  **Causation**: As a direct and proximate result of the negligence of Defendant Home Depot Plaintiff was harmed. Home Depot's negligence caused or substantially contributed to causing Plaintiff to suffer economic and non-economic damages. But for Home Depot's negligence, Plaintiff's injuries, damages, and losses would not have occurred.

199.  **Damages**: Plaintiff has been damaged and claims all damages to which she is entitled, including, as applicable law may provide, but not limited to:

a.  bodily injury resulting in pain and suffering, disability and/or disfigurement;

b.  mental anguish;

c.  loss of capacity for enjoyment of life;

d.  loss of earnings and/or loss of ability to earn money;

    e.   expensive hospitalization, medical treatment and/or care which losses are either permanent or will continue; and/or

    f.   all damages available under applicable law.

**COUNT VIII**
**BREACH OF IMPLIED WARRANTIES**
**(Against Home Depot U.S.A, Inc.)**

200.   Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

201.   At all times relevant to this litigation, Defendant Home Depot engaged in the business of selling and distributing Roundup products, which are defective and unreasonably dangerous to consumers, including Plaintiff, thereby placing Roundup products into the stream of commerce. These actions were under the ultimate control and supervision of the Defendant.

202.   Defendant Home Depot sold the defective Roundup products to Plaintiff that she applied at her residences.

203.   Before the time that Plaintiff was exposed to the use of Roundup products, Defendant Home Depot impliedly warranted to consumers, including Plaintiff, that Roundup products were of merchantable quality and safe and fit for the use for which they were intended; specifically, as horticultural herbicides.

204.   Defendant Home Depot, however, failed to disclose that Roundup has dangerous propensities when used as intended and that the use of and/or exposure to Roundup and glyphosate-containing products carries an increased risk of developing severe injuries, including Plaintiff's injuries.

205.    Plaintiff reasonably relied upon the skill, superior knowledge and judgment of Defendant Home Depot and upon their implied warranties that the Roundup products were of merchantable quality and fit for their intended purpose or use.

206.    The Roundup products purchased by Plaintiff from Defendant Home Depot were expected to reach and did in fact reach consumers and users, including Plaintiff, without substantial change in the condition in which they were manufactured and sold.

207.    Defendants Home Depot intended that Roundup products be used in the manner in which Plaintiff was exposed to them and Defendant impliedly warranted each product to be of merchantable quality, safe, and fit for this use.

208.    In reliance upon Defendant Home Depot's implied warranty, Plaintiff used or was exposed to Roundup in the foreseeable manner intended, recommended, promoted and/or marketed by Defendant.

209.    Plaintiff could not have reasonably discovered or known of the risks of serious injury associated with Roundup or glyphosate.

210.    Defendant Home Depot breached their implied warranty to Plaintiff in that Roundup products were not of merchantable quality, safe, or fit for their intended use. Roundup has dangerous propensities when used as intended and can cause serious injuries, including those injuries complained of herein.

211.    The harm caused by Roundup products far outweighed their benefit, rendering the products more dangerous than an ordinary consumer or user would expect and more dangerous than alternative products.

212.    As a direct and proximate result of Defendant Home Depot's breaches of implied warranties, Plaintiff has suffered and continues to suffer severe physical and emotional injuries.

Plaintiff has been damaged and claims all damages to which she is entitled, including, as applicable law may provide, but not limited to:

    a.   bodily injury resulting in pain and suffering, disability and/or disfigurement;

    b.   mental anguish;

    c.   loss of capacity for enjoyment of life;

    d.   loss of earnings and/or loss of ability to earn money;

    e.   expensive hospitalization, medical treatment and/or care which losses are either permanent or will continue; and/or

    f.   all damages available under applicable law.

WHEREFORE, Plaintiff, Nancy C. Salas, sues Defendants for compensatory damages, costs and such other relief as this Court deems appropriate.  Furthermore, Plaintiff demands a trial by jury of all issues triable as of right by a jury.


Dated: September 28, 2020                  Respectfully submitted,

                                  **PODHURST ORSECK, P.A.**
                                  Counsel for Plaintiff
                                  One Southeast 3rd Avenue, Suite 2300
                                  Miami, Florida 33131
                                  (305) 358-2800 / Fax (305) 358-2382


                                  By: *_/s/ Steven C. Marks_____*
                                      STEVEN C. MARKS
                                      Fla. Bar No. 516414
                                      smarks@podhurst.com
                                      KRISTINA M. INFANTE
                                      Fla. Bar No. 112557
                                      kinfante@podhurst.com