# United States District Court
## Northern District of Illinois - CM/ECF LIVE, Ver 6.3.3 (Chicago)
## CIVIL DOCKET FOR CASE #: 1:21-cv-01914

Moreno v. Monsanto et al
Assigned to:
Case in other court: Circuit Court Cook County Illinois, Law
       Division, 2021-L-002820
Cause: 28:1446 Petition for Removal

Date Filed: 04/09/2021
Jury Demand: Both
Nature of Suit: 367 Personal Injury: Health
Care/Pharmaceutical Personal Injury
Product Liability
Jurisdiction: Diversity

**Plaintiff**

| | | |
|---|---|---|
| **Marcia Moreno** | represented by | **Marcia Moreno**<br>PRO SE |

V.

**Defendant**

| | | |
|---|---|---|
| **Monsanto** | represented by | **Riley C. Mendoza**<br>Shook, Hardy & Bacon LLP<br>111 S. Wacker Drive<br>Suite 5100<br>Chicago, IL 60606<br>(312) 704-7700<br>Email: docket@shb.com<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |
| | | **Peter Francis O'Neill**<br>Shook, Hardy & Bacon Llp<br>111 S. Wacker<br>Chicago, IL 60606<br>(312) 704-7710<br>Email: pfoneill@shb.com<br>*ATTORNEY TO BE NOTICED* |

**Defendant**

| | | |
|---|---|---|
| **Akzo Nobel Incorporated** | represented by | **Riley C. Mendoza**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |
| | | **Peter Francis O'Neill**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED* |

**Defendant**

| | | |
|---|---|---|
| **Akzo Surface Chemistry LLC** | represented by | **Riley C. Mendoza**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |

**Peter Francis O'Neill**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Akzo Nobel Functional Chemicals LLC**                 represented by    **Riley C. Mendoza**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Peter Francis O'Neill**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Akzo Nobel Chemicals LLC**                 represented by    **Riley C. Mendoza**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Peter Francis O'Neill**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Nouryan Chemicals LLC**                 represented by    **Riley C. Mendoza**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Peter Francis O'Neill**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Nouryan Functional Chemicals LLC**                 represented by    **Riley C. Mendoza**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Peter Francis O'Neill**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Nouryan Surface Chemicals**                 represented by    **Riley C. Mendoza**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Peter Francis O'Neill**

(See above for address)
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 04/09/2021 | 1 | NOTICE of Removal from Circuit Court of Cook County, Illinois, Law Division, case number (2021-L-002820) filed by Akzo Nobel Chemicals LLC, Akzo Nobel Functional Chemicals LLC, Akzo Nobel Incorporated, Akzo Surface Chemistry LLC, Monsanto, Nouryan Chemicals LLC, Nouryan Functional Chemicals LLC, Nouryan Surface Chemicals Filing fee $ 402, receipt number 0752-18110587. *SUMMONS AND COMPLAINT* (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7)(O'Neill, Peter) (Entered: 04/09/2021) |
| 04/09/2021 | 2 | CIVIL Cover Sheet (O'Neill, Peter) (Entered: 04/09/2021) |
| 04/09/2021 | 3 | ATTORNEY Appearance for Defendants Akzo Nobel Chemicals LLC, Akzo Nobel Functional Chemicals LLC, Akzo Nobel Incorporated, Akzo Surface Chemistry LLC, Monsanto, Nouryan Chemicals LLC, Nouryan Functional Chemicals LLC, Nouryan Surface Chemicals by Peter Francis O'Neill (O'Neill, Peter) (Entered: 04/09/2021) |
| 04/09/2021 | 4 | NOTIFICATION of Affiliates pursuant to Local Rule 3.2 by Monsanto *Company* (O'Neill, Peter) (Entered: 04/09/2021) |
| 04/09/2021 | 5 | NOTIFICATION of Affiliates pursuant to Local Rule 3.2 by Akzo Nobel Incorporated (O'Neill, Peter) (Entered: 04/09/2021) |
| 04/09/2021 | 6 | NOTIFICATION of Affiliates pursuant to Local Rule 3.2 by Nouryan Surface Chemicals *Nouryon Surface Chemistry LLC f/k/a Akzo Nobel Surface Chemistry LLC* (O'Neill, Peter) (Entered: 04/09/2021) |
| 04/09/2021 | 7 | NOTIFICATION of Affiliates pursuant to Local Rule 3.2 by Nouryan Functional Chemicals LLC *Nouryon Functional Chemicals LLC f/k/a Akzo Nobel Functional Chemicals LLC* (O'Neill, Peter) (Entered: 04/09/2021) |
| 04/09/2021 | 8 | NOTIFICATION of Affiliates pursuant to Local Rule 3.2 by Nouryan Chemicals LLC *Nouryon Chemicals LLC f/k/a Starfruit US Merger Sub 1 LLC, successor in interest to Akzo Nobel Chemicals LLC* (O'Neill, Peter) (Entered: 04/09/2021) |
| 04/09/2021 | 9 | ATTORNEY Appearance for Defendants Akzo Nobel Chemicals LLC, Akzo Nobel Functional Chemicals LLC, Akzo Nobel Incorporated, Akzo Surface Chemistry LLC, Monsanto, Nouryan Chemicals LLC, Nouryan Functional Chemicals LLC, Nouryan Surface Chemicals by Riley C. Mendoza (Mendoza, Riley) (Entered: 04/09/2021) |
| 04/09/2021 | 10 | *Monsanto Company's* ANSWER to Complaint with Jury Demand by Monsanto(O'Neill, Peter) (Entered: 04/09/2021) |

| PACER Service Center | | |
|---|---|---|
| **Transaction Receipt** | | |
| 04/12/2021 12:16:34 | | |
| **PACER Login:** | sh0019sh:2634072:0 | **Client Code:** | 31943.356965 rhb |
| **Description:** | Docket Report | **Search Criteria:** | 1:21-cv-01914 |
| **Billable Pages:** | 3 | **Cost:** | 0.30 |

FILED DATE: 3/15/2021 11:55 AM   2021L002820

20-1458 MCC/ei

FILED
3/15/2021 11:55 AM
IRIS Y. MARTINEZ
CIRCUIT CLERK
COOK COUNTY, IL
12571809

STATE OF ILLINOIS      )
                         ) §

COUNTY OF C O O K     )

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
### COUNTY DEPARTMENT, LAW DIVISION

MARCIA MORENO,

           Plaintiff,

    vs.

MONSANTO,
AKZO NOBEL INCORPORATED,
AKZO SURFACE CHEMISTRY LLC,
AKZO NOBEL FUNCTIONAL CHEMICALS LLC,
AKZO NOBEL CHEMICALS LLC,
NOURYAN CHEMICALS LLC,
NOURYAN FUNCTIONAL CHEMICALS LLC, and
NOURYAN SURFACE CHEMICALS,

           Defendants.

CASE NO: **2021L002820**

## COMPLAINT

NOW COMES the Plaintiff, MARCIA MORENO, by and through her attorney, COONEY & CONWAY, and in their Complaint at Law against Defendants Monsanto Company (hereinafter referred to as "Monsanto"), Akzo Nobel Incorporated, Akzo Surface Chemistry LLC, Akzo Nobel Functional Chemicals LLC, Akzo Nobel Chemicals LLC, Nouryan Chemicals LLC, Nouryan Functional Chemicals LLC, And Nouryan Surface Chemicals hereby alleges as follows:

## INTRODUCTION

All claims in this action are a direct and proximate result of Defendants' negligent, willful, and wrongful conduct in connection with the design, development, manufacture, testing,

FILED DATE: 3/15/2021 11:55 AM   2021L002820

packaging, promoting, marketing, distribution, and/or sale of the products as Roundup®[1].

Plaintiff's decedent in this action seeks recovery for damages as a result of developing non-

Hodgkin Lymphoma (hereinafter referred to as "NHL"), which was directly and proximately

caused by such wrongful conduct by Defendants, the unreasonably dangerous and defective nature

of Roundup®, and its active ingredient, glyphosate, and the attendant effects of developing NHL.

Plaintiff's decedent did not know of an association between exposure to Roundup® and the

increased risk of developing NHL until well after the International Agency for Research on Cancer

("IARC"), an agency of the World Health Organization ("WHO"), first published its evaluation of

glyphosate.

**THE PARTIES**

**PLAINTIFF**

**MARCIA MORENO**

1.      Plaintiff Marcia Moreno is a citizen of the State of Illinois and was born on July 12,

1958.  Plaintiff Moreno resides in Aurora, IL.

---

[1] "Roundup" refers to all formulations of Monsanto's Roundup products, including, but not limited to, Roundup Concentrate Poison Ivy and Tough Brush Killer 1, Roundup Custom Herbicide, Roundup D-Pak herbicide, Roundup Dry Concentrate, Roundup Export Herbicide, Roundup Fence & Hard Edger 1, Roundup Garden Foam Weed & Grass Killer, Roundup Grass and Weed Killer, Roundup Herbicide, Roundup Original 2k herbicide, Roundup Original II Herbicide, Roundup Pro Concentrate, Roundup Prodry Herbicide, Roundup Promax, Roundup Quik Stik Grass and Weed Killer, Roundup Quikpro Herbicide, Roundup Rainfast Concentrate Weed & Grass Killer, Roundup Rainfast Super Concentrate Weed & Grass Killer, Roundup Ready-to-Use Extended Control Weed & Grass Killer 1 Plus Weed Preventer, Roundup Ready-to-Use Weed & Grass Killer, Roundup Ready-to- Use Weed and Grass Killer 2, Roundup Ultra Dry, Roundup Ultra Herbicide, Roundup Ultramax, Roundup VM Herbicide, Roundup Weed & Grass Killer Concentrate, Roundup Weed & Grass Killer Concentrate Plus, Roundup Weed & Grass killer Ready-to-Use Plus, Roundup Weed & Grass Killer Super Concentrate, Roundup Weed & Grass Killer1 Ready-to-Use, Roundup WSD Water Soluble Dry Herbicide Deploy Dry Herbicide, or any other formulation containing the active ingredient glyphosate.

FILED DATE: 3/15/2021 11:55 AM   2021L002820

2.      Plaintiff Moreno was first exposed to Roundup® in Woodridge, IL around 1988. She was exposed there until approximately 1990.

3.      Plaintiff Moreno was further exposed to Roundup® in Woodridge, IL beginning again in 1995.  She was exposed there until approximately 2004.

4.      Plaintiff Moreno was further exposed to Roundup® in Aurora, IL beginning in 2010.  She was exposed there until approximately 2015.

5.      Plaintiff Moreno purchased Roundup® products at Builder's Square and Home Depots stores.

6.      On or about August 3, 2018, Plaintiff Moreno was diagnosed with Follicular Lymphoma, a subtype of NHL, in Winfield, IL at Northwestern Medicine, and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendants' wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

7.      As a direct and proximate result of these injuries, Plaintiff Moreno has incurred and will incur in the future medical expenses and has endured and will endure pain and suffering and loss of enjoyment of life.  Plaintiff Moreno has otherwise been damaged in a personal and pecuniary nature.

8.      During the entire time that Plaintiff Moreno was exposed to Roundup®, she did not know that exposure to Roundup® was injurious to her health or the health of others.

FILED DATE: 3/15/2021 11:55 AM   2021L002820

## DEFENDANTS

### MONSANTO COMPANY

9.      Defendant Monsanto Company ("Monsanto") is a Delaware Corporation, Illinois Secretary of State Identification No. 61261028, with its headquarters and principal place of business in Creve Coeur, Missouri.  Defendant Monsanto is authorized to do business in the State of Illinois and conducted significant business within this judicial district at all times relevant herein.  Its authorized agent is Illinois Corporation Service C, which is located at 801 Adlai Stevenson Drive, Springfield, IL.

10.     Defendant Monsanto has regularly transacted and conducted business within this judicial district for years, and has derived substantial revenue from goods and products, including Roundup, used in this judicial district during that same time.

11.     Defendant Monsanto expected or should have expected their actions to have consequences within the State of Illinois, and derived substantial revenue from interstate commerce.

### AKZO NOBEL INCORPORATED

12.     Defendant Akzo Nobel Incorporated (hereinafter referred as "Akzo Nobel Inc.") is an Illinois corporation with its headquarters and principal place of business in Waukegan, Illinois. Defendant Akzo Nobel Inc. is authorized to do business in the State of Illinois and conducted significant business within this judicial district at all times relevant herein.

13.     At all times relevant to this complaint, Defendant Akzo Nobel Inc. sold and distributed surfactant materials to Monsanto to be used in their Roundup formula.

14.     Upon information and belief, Plaintiff Bennett was exposed to surfactant materials sold to Monsanto Corporation by defendant Akzo Nobel Inc.

FILED DATE: 3/15/2021 11:55 AM   2021L002820

## AKZO SURFACE CHEMISTRY, LLC

15.    Defendant Akzo Surface Chemistry, LLC is an Illinois corporation with its headquarters and principal place of business in Chicago, Illinois.  Defendant Akzo Surface Chemistry, LLC is authorized to do business in the State of Illinois and conducted significant business within this judicial district at all times relevant herein.

16.    At all times relevant to this complaint, Defendant Akzo Surface Chemistry, LLC sold and distributed surfactant materials to Monsanto to be used in their Roundup formula.

17.    Upon information and belief, Plaintiff Bennett was exposed to surfactant materials sold to Monsanto Corporation by defendant Akzo Surface Chemistry, LLC.

## AKZO NOBEL FUNCTIONAL CHEMICALS, LLC

18.    Defendant Akzo Nobel Functional Chemicals, LLC is an Illinois corporation with its headquarters and principal place of business in Chicago, Illinois.  Defendant Akzo Nobel Functional Chemicals, LLC is authorized to do business in the State of Illinois and conducted significant business within this judicial district at all times relevant herein.

19.    At all times relevant to this complaint, Defendant Akzo Nobel Functional Chemicals, LLC sold and distributed surfactant materials to Monsanto to be used in their Roundup formula.

20.    Upon information and belief, Plaintiff Bennett was exposed to surfactant materials sold to Monsanto Corporation by defendant Akzo Nobel Functional Chemicals, LLC.

## AKZO NOBEL CHEMICALS, LLC

21.    Defendant Akzo Nobel Chemicals, LLC is an Illinois corporation with its headquarters and principal place of business in Chicago, Illinois.  Defendant Akzo Nobel

FILED DATE: 3/15/2021 11:55 AM   2021L002820

Chemicals, LLC is authorized to do business in the State of Illinois and conducted significant business within this judicial district at all times relevant herein.

22.    At all times relevant to this complaint, Defendant Akzo Nobel Chemicals, LLC sold and distributed surfactant materials to Monsanto to be used in their Roundup formula.

Upon information and belief, Plaintiff Bennett was exposed to surfactant materials sold to Monsanto Corporation by defendant Akzo Nobel Chemicals, LLC.

## NOURYAN CHEMICALS, LLC

23.    Defendant Nouryan Chemicals, LLC is an Illinois corporation with its headquarters and principal place of business in Chicago, Illinois.  Defendant Nouryan Chemicals, LLC is authorized to do business in the State of Illinois and conducted significant business within this judicial district at all times relevant herein.

24.    At all times relevant to this complaint, Defendant Nouryan Chemicals, LLC sold and distributed surfactant materials to Monsanto to be used in their Roundup formula.

25.    Upon information and belief, Plaintiff Bennett was exposed to surfactant materials sold to Monsanto Corporation by defendant Nouryan Chemicals, LLC.

## NOURYAN FUNCTIONAL CHEMICALS, LLC

26.    Defendant Nouryan Functional Chemicals, LLC is an Illinois corporation with its headquarters and principal place of business in Chicago, Illinois.  Defendant Nouryan Functional Chemicals, LLC is authorized to do business in the State of Illinois and conducted significant business within this judicial district at all times relevant herein.

27.    At all times relevant to this complaint, Defendant Nouryan Functional Chemicals, LLC sold and distributed surfactant materials to Monsanto to be used in their Roundup formula.

FILED DATE: 3/15/2021 11:55 AM   2021L002820

28.     Upon information and belief, Plaintiff Bennett was exposed to surfactant materials sold to Monsanto Corporation by defendant Nouryan Functional Chemicals, LLC.

## NOURYAN SURFACE CHEMICALS, LLC

29.     Defendant Nouryan Surface Chemicals, LLC is an Illinois corporation with its headquarters and principal place of business in Chicago, Illinois.  Defendant Nouryan Surface Chemicals, LLC is authorized to do business in the State of Illinois and conducted significant business within this judicial district at all times relevant herein.

30.     At all times relevant to this complaint, Defendant Nouryan Surface Chemicals, LLC sold and distributed surfactant materials to Monsanto to be used in their Roundup formula.

31.     Upon information and belief, Plaintiff Bennett was exposed to surfactant materials sold to Monsanto Corporation by defendant Nouryan Surface Chemicals, LLC.

## PERSONAL JURISDICTION

32.     The Circuit Court of Cook County has personal jurisdiction over Defendant Monsanto under 735 Ill. Comp. Stat. 5/2-209(a)(1) and (b)(4) because Defendant Monsanto is authorized to do business in Illinois and has sufficient minimum contacts within this judicial district, or otherwise intentionally avails itself of this judicial district's market so as to render the exercise of jurisdiction over it by this court consistent with traditional notions of fair play and substantial justice.

33.     Monsanto knows that its Roundup products are and were sold throughout Illinois, and more specifically, caused Roundup to be sold to Plaintiff in Illinois.  Monsanto advertises and sells goods, specifically Roundup, throughout Illinois.  It derived substantial revenue from goods and products used in Illinois.  Monsanto expected its acts to have consequences within Illinois and derived substantial revenue from interstate commerce.  Specific to this case, Monsanto engaged in

FILED DATE: 3/15/2021 11:55 AM   2021L002820

the business of developing, manufacturing, testing, packaging, marketing, distributing, labeling, and selling Roundup. Monsanto purposefully availed itself of the privilege of conducting activities within Illinois, thus invoking the benefits and protections of its laws.

34.     Defendant Monsanto's minimum contacts within this judicial district are sufficiently related to Plaintiff's exposure, diagnosis, and claim in this matter to render personal jurisdiction in this judicial district proper.

35.     Monsanto maintains sufficient contacts with the State of Illinois such that this Court's exercise of personal jurisdiction over it does not offend traditional notions of fair play and substantial justice.

36.     The Circuit Court of Cook County has personal jurisdiction over Defendants Akzo Nobel Incorporated, Akzo Surface Chemistry LLC, Akzo Nobel Functional Chemicals LLC, Akzo Nobel Chemicals LLC, Nouryan Chemicals LLC, Nouryan Functional Chemicals LLC, and Nouryan Surface Chemicals under 735 Ill. Comp. Stat. 5/2-209(a)(1) and (b)(3) because Akzo Nobel Incorporated, Akzo Surface Chemistry LLC, Akzo Nobel Functional Chemicals LLC, Akzo Nobel Chemicals LLC, Nouryan Chemicals LLC, Nouryan Functional Chemicals LLC, and Nouryan Surface Chemicals are corporations organized under the laws of Illinois and are headquartered in the State of Illinois.

37.     Further, upon information and belief, Akzo Nobel Incorporated, Akzo Surface Chemistry LLC, Akzo Nobel Functional Chemicals LLC, Akzo Nobel Chemicals LLC, Nouryan Chemicals LLC, Nouryan Functional Chemicals LLC, and Nouryan Surface Chemicals engaged in the business of manufacturing and selling surfactant materials within Illinois, thus invoking the benefits and protections of its laws.

FILED DATE: 3/15/2021 11:55 AM   2021L002820

## VENUE

38.     At all times relevant hereto, Monsanto was in the business of marketing, promoting, and/or advertising Roundup® products in the State of Illinois and the Cook County.

39.     Venue is proper in this Court in that Defendants Akzo Nobel Incorporated, Akzo Surface Chemistry LLC, Akzo Nobel Functional Chemicals LLC, Akzo Nobel Chemicals LLC, Nouryan Chemicals LLC, Nouryan Functional Chemicals LLC, and Nouryan Surface Chemicals are headquartered and maintain their principal places of business in Illinois.

40.     Venue is proper because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this judicial district.

41.     Specifically, Plaintiff's exposure to Defendant Monsanto's Roundup-branded products and subsequent diagnoses with non-Hodgkin lymphoma all occurred within this judicial district.

## ALLEGATIONS COMMON TO ALL COUNTS

42.     In 1970, Defendant Monsanto discovered the herbicidal properties of glyphosate and began marketing it in products in 1974 under the brand name Roundup®. Roundup® is a non-selective herbicide used to kill weeds that commonly compete with the growing of crops. In addition to the active ingredient glyphosate, Roundup® contains the surfactant Polyethoxylated tallow amine (POEA) and/or adjuvants and other so-called "inert" ingredients. In 2001, glyphosate was the most-used pesticide active ingredient in American agriculture with 85–90 million pounds used annually. That number grew to 185 million pounds in 2007.[2] As of 2013, glyphosate was the world's most widely used herbicide.

---

[2] Arthur Grube et al., U.S. Envtl. Prot. Agency, *Pesticides Industry Sales and Usage, 2006–2007 Market Estimates* 14 (2011), *available at* http://www.epa.gov/pesticides/pestsales/07pestsales/market_estimates2007.pdf.

FILED DATE: 3/15/2021 11:55 AM    2021L002820

43.    Monsanto is a multinational agricultural biotechnology corporation based in St. Louis, Missouri, and incorporated in Delaware.  It is the world's leading producer of glyphosate. As of 2009, Monsanto was the world's leading producer of seeds, accounting for 27% of the world seed market.[3]  The majority of these seeds are of the Roundup Ready® brand.  The stated advantage of Roundup Ready® crops is that they substantially improve a farmer's ability to control weeds, because glyphosate can be sprayed in the fields during the growing season without harming the crops.  In 2010, an estimated 70% of corn and cotton and 90% of soybean fields in the United States were Roundup Ready®.[4]

44.    Monsanto's glyphosate products are registered in 130 countries and approved for use on over 100 different crops.[5]  They are ubiquitous in the environment.  Numerous studies confirm that glyphosate is found in rivers, streams, and groundwater in agricultural areas where

---

[3] ETC Group, *Who Will Control the Green Economy?* 22 (2011), *available at* http://www.etcgroup.org/files/publication/pdf_file/ETC_wwctge_4web_Dec2011.pdf.

[4] William Neuman & Andrew Pollack, *Farmers Cope With Roundup-Resistant Weeds*, N.Y. TIMES, May 3, 2010, *available at* http://www.nytimes.com/2010/05/04/business/energy-environment/04weed.html?pagewan.

[5] Monsanto, *Backgrounder-History of Monsanto's Glyphosate Herbicides* (Sep. 2, 2015), http://www.monsanto.com/products/documents/glyphosate-background-materials/back_history.pdf.

FILED DATE: 3/15/2021 11:55 AM   2021L002820

Roundup® is used.[6]  It has been found in food,[7] in the urine of agricultural workers,[8] and even in the urine of urban dwellers who are not in direct contact with glyphosate.[9]

45.    On March 20, 2015, the International Agency for Research on Cancer ("IARC"), an agency of the World Health Organization ("WHO"), issued an evaluation of several herbicides, including glyphosate.  That evaluation was based, in part, on studies of exposures to glyphosate in several countries around the world, and it traces the health implications from exposure to glyphosate since 2001.

46.    On July 29, 2015, IARC issued the formal monograph relating to glyphosate.  In that monograph, the IARC Working Group provides a thorough review of the numerous studies and data relating to glyphosate exposure in humans.

47.    The IARC Working Group classified glyphosate as a Group 2A herbicide, which means that it is *probably carcinogenic to humans*.  The IARC Working Group concluded that the cancers most associated with glyphosate exposure are NHL and other haematopoietic cancers,

---

[6] *See* U.S. Geological Survey, *USGS Technical Announcement: Widely Used Herbicide Commonly Found in Rain and Streams in the Mississippi River Basin* (2011), *available at* http://www.usgs.gov/newsroom/article.asp?ID=2909; *see also* U.S. Envtl. Prot. Agency, *Technical Factsheet on: Glyphosate*, *available at* http://www.epa.gov/safewater/pdfs/factsheets/soc/tech/glyphosa.pdf.

[7] Thomas Bohn et al., *Compositional Differences in Soybeans on the Market: Glyphosate Accumulates in Roundup Ready GM Soybeans*, 153 FOOD CHEMISTRY 207 (2013), *available at* http://www.sciencedirect.com/science/article/pii/S0308814613019201.

[8] John F. Acquavella et al., *Glyphosate Biomonitoring for Farmers and Their Families: Results from the Farm Family Exposure Study*, 112(3) ENVTL. HEALTH PERSPECTIVES 321 (2004), *available at* http://www.ncbi.nlm.nih.gov/pmc/articles/PMC1241861/; Kathryn Z. Guyton et al., *Carcinogenicity of Tetrachlorvinphos, Parathion, Malathion, Diazinon & Glyphosate*, 112 IARC Monographs 76, section 5.4 (2015), *available at* http://dx.doi.org/10.1016/S1470-2045(15)70134-8.

[9] Dirk Brändli & Sandra Reinacher, *Herbicides found in Human Urine*, 1 ITHAKA JOURNAL 270 (2012), *available at* http://www.ithaka-journal.net/druckversionen/e052012-herbicides-urine.pdf.

FILED DATE: 3/15/2021 11:55 AM    2021L002820

including lymphocytic lymphoma / chronic lymphocytic leukemia, B-cell lymphoma, and multiple myeloma.[10]

48.    The IARC evaluation is significant.  It confirms what has been believed for years: that glyphosate is toxic to humans.

49.    Nevertheless, Monsanto, since it began selling Roundup®, has represented it as safe to humans and the environment.  Indeed, Monsanto has repeatedly proclaimed and continues to proclaim to the world, and particularly to United States consumers, that glyphosate-based herbicides, including Roundup®, create no unreasonable risks to human health or to the environment.

## FACTS COMMON TO ALL COUNTS

50.    Glyphosate is a broad-spectrum, non-selective herbicide used in a wide variety of herbicidal products around the world.

51.    Plants treated with glyphosate translocate the systemic herbicide to their roots, shoot regions, and fruit, where it interferes with the plant's ability to form aromatic amino acids necessary for protein synthesis.  Treated plants generally die within two to three days.  Because plants absorb glyphosate, it cannot be completely removed by washing or peeling produce or by milling, baking, or brewing grains.

52.    For nearly 40 years, farms across the world have used Roundup® without knowing of the dangers its use poses.  That is because when Monsanto first introduced Roundup®, it touted glyphosate as a technological breakthrough: it could kill almost every weed without causing harm either to people or to the environment.  Of course, history has shown that not to be true.

---

[10] *See* Guyton et al., *Carcinogenicity of Tetrachlorvinphos, Parathion, Malathion, Diazinon & Glyphosate*, *supra*.

FILED DATE: 3/15/2021 11:55 AM   2021L002820

According to the WHO, the main chemical ingredient of Roundup®—glyphosate—is a probable cause of cancer. Those most at risk are farm workers and other individuals with workplace exposure to Roundup®, such as garden center workers, nursery workers, and landscapers. Agricultural workers are, once again, victims of corporate greed. Monsanto assured the public that Roundup® was harmless. In order to prove this, Monsanto has championed falsified data and has attacked legitimate studies that revealed Roundup®'s dangers. Monsanto has led a prolonged campaign of misinformation to convince government agencies, farmers and the general population that Roundup® is safe.

### The Discovery of Glyphosate and Development of Roundup®

53.    Monsanto chemist John Franz discovered the herbicidal properties of glyphosate in 1970. Monsanto introduced the first glyphosate-based herbicide to the market in the mid-1970s under the brand name Roundup®.[11] From the outset, Monsanto marketed Roundup® as a "safe" general-purpose herbicide for widespread commercial and consumer use. It still markets Roundup® as safe today.[12]

54.    In addition to the active ingredient glyphosate, Roundup® formulations also contain adjuvants and other chemicals, such as the surfactant POEA, which are considered "inert" and therefore protected as "trade secrets" in manufacturing. Growing evidence suggests that these adjuvants and additional components of Roundup® formulations are not, in fact, inert and are toxic in their own right.

---

[11] Monsanto, *Backgrounder, History of Monsanto's Glyphosate Herbicide* (Sep. 2, 2015), http://www.monsanto.com/products/documents/glyphosate-background-materials/back_history.pdf.

[12] Monsanto, *What is Glyphosate?* (Sep. 2, 2015), http://www.monsanto.com/sitecollectiondocuments/glyphosate-safety-health.pdf.

FILED DATE: 3/15/2021 11:55 AM   2021L002820

### Registration of Herbicides under Federal Law

55.     The manufacture, formulation, and distribution of herbicides, such as Roundup®, are regulated under the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA" or "Act"), 7 U.S.C. § 136 *et seq.* FIFRA requires that all pesticides be registered with the Environmental Protection Agency ("EPA" or "Agency") prior to their distribution, sale, or use, except as described by the Act. 7 U.S.C. § 136a(a).

56.     Because pesticides are toxic to plants, animals, and humans, at least to some degree, the EPA requires as part of the registration process, among other things, a variety of tests to evaluate the potential for exposure to pesticides, toxicity to people and other potential non-target organisms, and other adverse effects on the environment. Registration by the EPA, however, is not an assurance or finding of safety. The determination the Agency must make in registering or re-registering a product is not that the product is "safe," but rather that use of the product in accordance with its label directions "will not generally cause unreasonable adverse effects on the environment." 7 U.S.C. § 136a(c)(5)(D).

57.     FIFRA defines "unreasonable adverse effects on the environment" to mean "any unreasonable risk to man or the environment, taking into account the economic, social, and environmental costs and benefits of the use of any pesticide." 7 U.S.C. § 136(bb). FIFRA thus requires EPA to make a risk/benefit analysis in determining whether a registration should be granted or a pesticide allowed to continue to be sold in commerce.

58.     The EPA registered Roundup® for distribution, sale, and manufacture in the United States.

59.     FIFRA generally requires that the registrant, Monsanto in the case of Roundup®, conducts the health and safety testing of pesticide products. The EPA has protocols governing

FILED DATE: 3/15/2021 11:55 AM   2021L002820

the conduct of tests required for registration and the laboratory practices that must be followed in conducting these tests. The data produced by the registrant must be submitted to the EPA for review and evaluation. The government is not required, nor is it able, however, to perform the product tests that are required of the manufacturer.

60.     The evaluation of each pesticide product distributed, sold, or manufactured is completed at the time the product is initially registered. The data necessary for registration of a pesticide has changed over time. The EPA is now in the process of re-evaluating all pesticide products through a Congressionally-mandated process called "re-registration." 7 U.S.C. § 136a-1. In order to reevaluate these pesticides, the EPA is demanding the completion of additional tests and the submission of data for the EPA's recent review and evaluation.

61.     In the case of glyphosate, and therefore Roundup®, the EPA had planned on releasing its preliminary risk assessment—in relation to the reregistration process—no later than July 2015. The EPA completed its review of glyphosate in early 2015, but it delayed releasing the risk assessment pending further review in light of the WHO's health-related findings.

### *Scientific Fraud Underlying the Marketing and Sale of Glyphosate/Roundup®*

62.     Based on early studies showing that glyphosate could cause cancer in laboratory animals, the EPA originally classified glyphosate as *possibly carcinogenic to humans* (Group C) in 1985. After pressure from Monsanto, including contrary studies it provided to the EPA, the EPA changed its classification to *evidence of non-carcinogenicity in humans* (Group E) in 1991. In so classifying glyphosate, however, the EPA made clear that the designation did not mean the chemical does not cause cancer: "It should be emphasized, however, that designation of an agent in Group E is based on the available evidence at the time of evaluation and should not be

FILED DATE: 3/15/2021 11:55 AM   2021L002820

interpreted as a definitive conclusion that the agent will not be a carcinogen under any circumstances."[13]

63.    On two occasions, the EPA found that the laboratories hired by Monsanto to test the toxicity of its Roundup® products for registration purposes committed fraud.

64.    In the first instance, Monsanto, in seeking initial registration of Roundup® by the EPA, hired Industrial Bio-Test Laboratories ("IBT") to perform and evaluate pesticide toxicology studies relating to Roundup®.[14]  IBT performed about 30 tests on glyphosate and glyphosate-containing products, including nine of the 15 residue studies needed to register Roundup®.

65.    In 1976, the United States Food and Drug Administration ("FDA") performed an inspection of IBT that revealed discrepancies between the raw data and the final report relating to the toxicological impacts of glyphosate.  The EPA subsequently audited IBT; it too found the toxicology studies conducted for the Roundup® herbicide to be invalid.[15]  An EPA reviewer

---

[13]  U.S. Envtl. Prot. Agency, *Memorandum, Subject: SECOND Peer Review of Glyphosate* 1 (1991), *available at* http://www.epa.gov/pesticides/chem_search/cleared_reviews/csr_PC-103601_30-Oct-91_265.pdf.

[14]  Monsanto, *Backgrounder, Testing Fraud: IBT and Craven Laboratories* (Sep. 2, 2015), http://www.monsanto.com/products/documents/glyphosate-background-materials/ibt_craven_bkg.pdf.

[15] U.S. Envtl. Prot. Agency, *Summary of the IBT Review Program Office of Pesticide Programs* (1983), *available at* http://nepis.epa.gov/Exe/ZyNET.exe/91014ULV.TXT?ZyActionD=ZyDocument&Client=EPA&Index=1981+Thru+1985&Docs=&Query=&Time=&EndTime=&SearchMethod=1&TocRestrict=n&Toc=&TocEntry=&QField=&QFieldYear=&QFieldMonth=&QFieldDay=&IntQFieldOp=0&ExtQFieldOp=0&XmlQuery=&File=D%3A%5Czyfiles%5CIndex%20Data%5C81thru85%5CTxt%5C00000022%5C91014ULV.txt&User=ANONYMOUS&Password=anonymous&SortMethod=h%7C-&MaximumDocuments=1&FuzzyDegree=0&ImageQuality=r75g8/r75g8/x150y150g16/i425&Display=p%7Cf&DefSeekPage=x&SearchBack=ZyActionL&Back=ZyActionS&BackDesc=Results%20page&MaximumPages=1&ZyEntry=1&SeekPage=x&ZyPURL.

stated, after finding "routine falsification of data" at IBT, that it was "hard to believe the scientific integrity of the studies when they said they took specimens of the uterus from male rabbits."[16]

66.   Three top executives of IBT were convicted of fraud in 1983.

67.   In the second incident of data falsification, Monsanto hired Craven Laboratories in 1991 to perform pesticide and herbicide studies, including for Roundup®.  In that same year, the owner of Craven Laboratories and three of its employees were indicted, and later convicted, of fraudulent laboratory practices in the testing of pesticides and herbicides.[17]

68.   Despite the falsity of the tests that underlie its registration, within a few years of its launch, Monsanto was marketing Roundup® in 115 countries.

### The Importance of Roundup® to Monsanto's Market Dominance Profits

69.   The success of Roundup® was key to Monsanto's continued reputation and dominance in the marketplace.  Largely due to the success of Roundup® sales, Monsanto's agriculture division was out-performing its chemicals division's operating income, and that gap increased yearly.  But with its patent for glyphosate expiring in the United States in the year 2000, Monsanto needed a strategy to maintain its Roundup® market dominance and to ward off impending competition.

70.   In response, Monsanto began the development and sale of genetically engineered Roundup Ready® seeds in 1996.  Since Roundup Ready® crops are resistant to glyphosate, farmers can spray Roundup® onto their fields during the growing season without harming the crop.  This allowed Monsanto to expand its market for Roundup® even further; by 2000,

---

[16] Marie-Monique Robin, *The World According to Monsanto: Pollution, Corruption and the Control of the World's Food Supply* (2011) (citing U.S. Envtl. Prot. Agency, *Data Validation, Memo from K. Locke, Toxicology Branch, to R. Taylor, Registration Branch. Washington, D.C.* (August 9, 1978)).

[17] Monsanto, *Backgrounder, Testing Fraud: IBT and Craven Laboratories*, *supra* at fn 5.

FILED DATE: 3/15/2021 11:55 AM   2021L002820

Monsanto's biotechnology seeds were planted on more than 80 million acres worldwide and nearly 70% of American soybeans were planted from Roundup Ready® seeds. It also secured Monsanto's dominant share of the glyphosate/Roundup® market through a marketing strategy that coupled proprietary Roundup Ready® seeds with continued sales of its Roundup® herbicide.

71.     Through a three-pronged strategy of increasing production, decreasing prices, and by coupling with Roundup Ready® seeds, Roundup® became Monsanto's most profitable product. In 2000, Roundup® accounted for almost $2.8 billion in sales, outselling other herbicides by a margin of five to one, and accounting for close to half of Monsanto's revenue.[18] Today, glyphosate remains one of the world's largest herbicides by sales volume.

*Monsanto has known for decades that it falsely advertises the safety of Roundup®*

72.     In 1996, the New York Attorney General ("NYAG") filed a lawsuit against Monsanto based on its false and misleading advertising of Roundup® products. Specifically, the lawsuit challenged Monsanto's general representations that its spray-on glyphosate-based herbicides, including Roundup®, were **"safer than table salt"** and **"practically non-toxic"** to mammals, birds, and fish. Among the representations the NYAG found deceptive and misleading about the human and environmental safety of glyphosate and/or Roundup® are the following:

a) "Remember that environmentally friendly Roundup herbicide is biodegradable. It won't build up in the soil so you can use Roundup with confidence along customers' driveways, sidewalks and fences ..."

b) "And remember that Roundup is biodegradable and won't build up in the soil. That will give you the environmental confidence you need to use Roundup everywhere you've got a weed, brush, edging or trimming problem."

---

[18] David Barboza, *The Power of Roundup; A Weed Killer Is A Block for Monsanto to Build On*, N.Y. TIMES, Aug. 2, 2001, *available at* http://www.nytimes.com/2001/08/02/business/the-power-of-roundup-a-weed-killer-is-a-block-for-monsanto-to-build-on.html.

FILED DATE: 3/15/2021 11:55 AM 2021L002820

c) "Roundup biodegrades into naturally occurring elements."

d) "Remember that versatile Roundup herbicide stays where you put it. That means there's no washing or leaching to harm customers' shrubs or other desirable vegetation."

e) "This non-residual herbicide will not wash or leach in the soil. It ... stays where you apply it."

f) "You can apply Accord with 'confidence because it will stay where you put it' it bonds tightly to soil particles, preventing leaching. Then, soon after application, soil microorganisms biodegrade Accord into natural products."

g) "Glyphosate is less toxic to rats than table salt following acute oral ingestion."

h) "Glyphosate's safety margin is much greater than required. It has over a 1,000-fold safety margin in food and over a 700-fold safety margin for workers who manufacture it or use it."

i) "You can feel good about using herbicides by Monsanto. They carry a toxicity category rating of 'practically non-toxic' as it pertains to mammals, birds and fish."

j) "Roundup can be used where kids and pets will play and breaks down into natural material." This ad depicts a person with his head in the ground and a pet dog standing in an area which has been treated with Roundup.[19]

73.    On November 19, 1996, Monsanto entered into an Assurance of Discontinuance with NYAG, in which Monsanto agreed, among other things, "to cease and desist from publishing or broadcasting any advertisements [in New York] that represent, directly or by implication" that:

a) its glyphosate-containing pesticide products or any component thereof are safe, non-toxic, harmless or free from risk.

\*     \*     \*

b) its glyphosate-containing pesticide products or any component thereof manufactured, formulated, distributed or sold by Monsanto are biodegradable

\*     \*     \*

---

[19] Attorney General of the State of New York, In the Matter of Monsanto Company, Assurance of Discontinuance Pursuant to Executive Law § 63(15) (Nov. 1996).

FILED DATE: 3/15/2021 11:55 AM   2021L002820

c) its glyphosate-containing pesticide products or any component thereof stay where they are applied under all circumstances and will not move through the environment by any means.

        *      *      *

d) its glyphosate-containing pesticide products or any component thereof are "good" for the environment or are "known for their environmental characteristics."

        *      *      *

e) glyphosate-containing pesticide products or any component thereof are safer or less toxic than common consumer products other than herbicides;

        *      *      *

f) its glyphosate-containing products or any component thereof might be classified as "practically non-toxic."

74.    Monsanto did not alter its advertising in the same manner in any state other than New York, and on information and belief it still has not done so today.

75.    In 2009, France's highest court ruled that Monsanto had not told the truth about the safety of Roundup®. The French court affirmed an earlier judgement that Monsanto had falsely advertised its herbicide Roundup® as "biodegradable" and that it "left the soil clean."[20]

### *Classifications and Assessments of Glyphosate*

76.    The IARC process for the classification of glyphosate followed IARC's stringent procedures for the evaluation of a chemical agent. Over time, the IARC Monograph program has reviewed 980 agents. Of those reviewed, it has determined 116 agents to be Group 1 (Known Human Carcinogens); 73 agents to be Group 2A (Probable Human Carcinogens); 287 agents to

---

[20] *Monsanto Guilty in 'False Ad' Row*, BBC, Oct. 15, 2009, *available at* http://news.bbc.co.uk/2/hi/europe/8308903.stm.

FILED DATE: 3/15/2021 11:55 AM   2021L002820

be Group 2B (Possible Human Carcinogens); 503 agents to be Group 3 (Not Classified); and one agent to be Probably Not Carcinogenic.

77.    The established procedure for IARC Monograph evaluations is described in the IARC Programme's Preamble.[21]  Evaluations are performed by panels of international experts, selected on the basis of their expertise and the absence of actual or apparent conflicts of interest.

78.    One year before the Monograph meeting, the meeting is announced and there is a call both for data and for experts.  Eight months before the Monograph meeting, the Working Group membership is selected and the sections of the Monograph are developed by the Working Group members.  One month prior to the Monograph meeting, the call for data is closed and the various draft sections are distributed among Working Group members for review and comment.  Finally, at the Monograph meeting, the Working Group finalizes review of all literature, evaluates the evidence in each category, and completes the overall evaluation.  Within two weeks after the Monograph meeting, the summary of the Working Group findings are published in *The Lancet Oncology*, and within a year after the meeting, the finalized Monograph is published.

79.    In assessing an agent, the IARC Working Group reviews the following information: (a) human, experimental, and mechanistic data; (b) all pertinent epidemiological studies and cancer bioassays; and (c) representative mechanistic data.  The studies must be publicly available and have sufficient detail for meaningful review, and reviewers cannot be associated with the underlying study.

---

[21] World Health Org., *IARC Monographs on the Evaluation of Carcinogenic Risks to Humans: Preamble* (2006), available at http://monographs.iarc.fr/ENG/Preamble/CurrentPreamble.pdf.

FILED DATE: 3/15/2021 11:55 AM   2021L002820

80.     In March 2015, IARC reassessed glyphosate.  The summary published in *The Lancet Oncology* reported that glyphosate is a Group 2A agent and probably carcinogenic in humans.

81.     On July 29, 2015, IARC issued its Monograph for glyphosate, Monograph Volume 112.  For Volume 112, a Working Group of 17 experts from 11 countries met at IARC from March 3–10, 2015 to assess the carcinogenicity of certain herbicides, including glyphosate. The March meeting culminated a nearly one-year review and preparation by the IARC Secretariat and the Working Group, including a comprehensive review of the latest available scientific evidence.  According to published procedures, the Working Group considered "reports that have been published or accepted for publication in the openly available scientific literature" as well as "data from governmental reports that are publicly available."

82.     The studies considered the following exposure groups: (1) occupational exposure of farmers and tree nursery workers in the United States, forestry workers in Canada and Finland and municipal weed-control workers in the United Kingdom; and (2) para-occupational exposure in farming families.

83.     Glyphosate was identified as the second-most used household herbicide in the United States for weed control between 2001 and 2007 and the most heavily used herbicide in the world in 2012.

84.     Exposure pathways are identified as air (especially during spraying), water, and food.  Community exposure to glyphosate is widespread and found in soil, air, surface water, and groundwater, as well as in food.

FILED DATE: 3/15/2021 11:55 AM   2021L002820

85.     The assessment of the IARC Working Group identified several case control studies of occupational exposure in the United States, Canada, and Sweden.  These studies show a human health concern from agricultural and other work-related exposure to glyphosate.

86.     The IARC Working Group found an increased risk between exposure to glyphosate and NHL and several subtypes of NHL, and the increased risk persisted after adjustment for other pesticides.

87.     The IARC Working Group also found that glyphosate caused DNA and chromosomal damage in human cells.  One study in community residents reported increases in blood markers of chromosomal damage (micronuclei) after glyphosate formulations were sprayed.

88.     In male CD-1 mice, glyphosate induced a positive trend in the incidence of a rare tumor: renal tubule carcinoma.  A second study reported a positive trend for hemangiosarcoma in male mice.  Glyphosate increased pancreatic islet-cell adenoma in male rats in two studies.  A glyphosate formulation promoted skin tumors in an initiation-promotion study in mice.

89.     The IARC Working Group also noted that glyphosate has been detected in the urine of agricultural workers, indicating absorption.   Soil microbes degrade glyphosate to aminomethylphosphoric acid (AMPA).   Blood AMPA detection after exposure suggests intestinal microbial metabolism in humans.

90.     The IARC Working Group further found that glyphosate and glyphosate formulations induced DNA and chromosomal damage in mammals, and in human and animal cells in utero.

FILED DATE: 3/15/2021 11:55 AM   2021L002820

91.     The IARC Working Group also noted genotoxic, hormonal, and enzymatic effects in mammals exposed to glyphosate.[22]  Essentially, glyphosate inhibits the biosynthesis of aromatic amino acids, which leads to several metabolic disturbances, including the inhibition of protein and secondary product biosynthesis and general metabolic disruption.

92.     The IARC Working Group also reviewed an Agricultural Health Study, consisting of a prospective cohort of 57,311 licensed pesticide applicators in Iowa and North Carolina.[23] While this study differed from others in that it was based on a self-administered questionnaire, the results support an association between glyphosate exposure and multiple myeloma, hairy cell leukemia (HCL), and chronic lymphocytic leukemia (CLL), in addition to several other cancers.

### Other Earlier Findings About Glyphosate's Dangers to Human Health

93.     The EPA has a technical fact sheet, as part of its Drinking Water and Health, National Primary Drinking Water Regulations publication, relating to glyphosate.  This technical fact sheet predates IARC's March 20, 2015 evaluation.  The fact sheet describes the release patterns for glyphosate as follows:

**Release Patterns**

Glyphosate is released to the environment in its use as a herbicide for controlling woody and herbaceous weeds on forestry, right-of-way, cropped and non-cropped sites. These sites may be around water and in wetlands.

It may also be released to the environment during its manufacture, formulation, transport, storage, disposal and cleanup, and from spills.  Since glyphosate is not a listed chemical in the Toxics Release Inventory, data on releases during its manufacture and handling are not available.

---

[22] Guyton et al., *Carcinogenicity of Tetrachlorvinphos, Parathion, Malathion, Diazinon & Glyphosate, supra* at 77.

[23] Anneclare J. De Roos et al., *Cancer Incidence Among Glyphosate-Exposed Pesticide Applicators in the Agricultural Health Study*, 113 Envt'l Health Perspectives 49–54 (2005), *available at* http://www.ncbi.nlm.nih.gov/pmc/articles/PMC1253709/pdf/ehp0113-000049.pdf.

FILED DATE: 3/15/2021 11:55 AM   2021L002820

> Occupational workers and home gardeners may be exposed to glyphosate by inhalation and dermal contact during spraying, mixing, and cleanup. They may also be exposed by touching soil and plants to which glyphosate was applied. Occupational exposure may also occur during glyphosate's manufacture, transport storage, and disposal.[24]

94.     In 1995, the Northwest Coalition for Alternatives to Pesticides reported that in California, the state with the most comprehensive program for reporting of pesticide-caused illness, glyphosate was the third most commonly reported cause of pesticide illness among agricultural workers.[25]

### The Toxicity of Other Ingredients in Roundup®

95.     In addition to the toxicity of the active ingredient, glyphosate, several studies support the hypothesis that the glyphosate-based formulation in Defendant's Roundup® products is more dangerous and toxic than glyphosate alone. Indeed, as early as 1991, available evidence demonstrated that glyphosate formulations were significantly more toxic than glyphosate alone.[26]

96.     In 2002, a study by Julie Marc, entitled "Pesticide Roundup Provokes Cell Division Dysfunction at the Level of CDK1/Cyclin B Activation," revealed that Roundup® causes delays in the cell cycles of sea urchins but that the same concentrations of glyphosate alone were ineffective and did not alter cell cycles.[27]

---

[24] U.S. Envtl. Prot. Agency, *Technical Factsheet on: Glyphosate*, *supra.*

[25] Caroline Cox, *Glyphosate, Part 2: Human Exposure and Ecological Effects*, 15 J. PESTICIDE REFORM 4 (1995); W.S. Peas et al., *Preventing pesticide-related illness in California agriculture: Strategies and priorities. Environmental Health Policy Program Report*, Univ. of Cal. School of Public Health, Calif. Policy Seminar (1993).

[26] Martinez, T.T. and K. Brown, *Oral and pulmonary toxicology of the surfactant used in Roundup herbicide*, PROC. WEST. PHARMACOL. SOC. 34:43-46 (1991).

[27] Julie Marc, et al., *Pesticide Roundup Provokes Cell Division Dysfunction at the Level of CDK1/Cyclin B Activation*, 15 CHEM. RES. TOXICOL. 326–331 (2002), *available at* http://pubs.acs.org/doi/full/10.1021/tx015543g.

FILED DATE: 3/15/2021 11:55 AM   2021L002820

97.     A 2004 study by Marc and others, entitled "Glyphosate-based pesticides affect cell cycle regulation," demonstrated a molecular link between glyphosate-based products and cell cycle dysregulation. The researchers noted, "cell-cycle dysregulation is a hallmark of tumor cells and human cancer.  Failure in the cell-cycle checkpoints leads genomic instability and subsequent development of cancers from the initial affected cell."  Further, "[s]ince cell cycle disorders such as cancer result from dysfunction of a unique cell, it was of interest to evaluate the threshold dose of glyphosate affecting the cells."[28]

98.     In 2005, a study by Francisco Peixoto, entitled "Comparative effects of the Roundup and glyphosate on mitochondrial oxidative phosphorylation," demonstrated that Roundup®'s effects on rat liver mitochondria are far more toxic than equal concentrations of glyphosate alone.  The Peixoto study further suggested that the harmful effects of Roundup® on mitochondrial bioenergetics could not be exclusively attributed to glyphosate but could be the result of other chemicals, such as the surfactant POEA, or in the alternative, due to a potential synergic effect between glyphosate and other ingredients in the Roundup® formulation.[29]

99.     In 2009, Nora Benachour and Gilles-Eric Seralini published a study examining the effects of Roundup® and glyphosate on human umbilical, embryonic, and placental cells.  The study tested dilution levels of Roundup® and glyphosate that were far below agricultural recommendations, corresponding with low levels of residue in food.  The researchers ultimately concluded that supposed "inert" ingredients, and possibly POEA, alter human cell permeability

---

[28] Julie Marc, et al., *Glyphosate-based pesticides affect cell cycle regulation*, 96 BIOLOGY OF THE CELL          245,          245-249          (2004),          *available          at* http://onlinelibrary.wiley.com/doi/10.1016/j.biolcel.2003.11.010/epdf.

[29] Francisco Peixoto, *Comparative effects of the Roundup and glyphosate on mitochondrial oxidative phosphorylation*, 61 CHEMOSPHERE 1115, 1122 (2005), *available at* https://www.researchgate.net/publication/7504567_Comparative_effects_of_the_Roundup_and_glyphos ate_on_mitochondrial_oxidative_phosphorylation.

FILED DATE: 3/15/2021 11:55 AM   2021L002820

and amplify toxicity of glyphosate alone. The researchers further suggested that assessments of glyphosate toxicity should account for the presence of adjuvants or additional chemicals used in the formulation of the complete pesticide. The study confirmed that the adjuvants present in Roundup® are not, in fact, inert and that Roundup® is potentially far more toxic than its active ingredient glyphosate alone.[30]

100.    The results of these studies were at all times available to Defendant.

101.    Monsanto's chief toxicologist Donna Farmer has admitted that she cannot say that Roundup® does not cause cancer because Monsanto has not performed carcinogenicity studies with the formulated product Roundup®, the very product that caused Plaintiff's NHL.[31]  Indeed, she further admitted that in the 35 years that Monsanto has marketed Roundup® to the public, Monsanto has conducted no chronic carcinogenicity studies on the formulated Roundup® product merely because EPA did not require that such a study be performed for registration of glyphosate.[32]

102.    Defendant thus knew or should have known that Roundup® is more toxic than glyphosate alone and that safety studies of Roundup®, Roundup's adjuvants and "inert" ingredients, and/or the surfactant POEA were necessary to protect Plaintiff from Roundup®.

103.    Despite its knowledge that Roundup® is considerably more dangerous than glyphosate alone, Monsanto continued to promote Roundup® as safe.

---

[30] Nora Benachour, et al., *Glyphosate Formulations Induce Apoptosis and Necrosis in Human Umbilical, Embryonic, and Placental Cells*, 22 CHEM. RES. TOXICOL. 97-105 (2008), *available at* http://big.assets.huffingtonpost.com/france.pdf.

[31] *See* Plaintiff's Submission in Response to Pretrial Order No. 8, Ex. 7, *In re: Roundup Products Liability Litigation*, MDL No. 2741 (N.D. Cal., Mar. 14, 2017), ECF No. 187-7.

[32] *See id.*

### The EPA's Review of Glyphosate

104.    In April 2016, personnel within the EPA's Office of Pesticides Program (OPP) leaked and posted on the internet a draft report on glyphosate carcinogenicity, entitled Cancer Assessment Review Committee (CARC) report, dated October 2015.   The EPA removed the documents by May 2, 2016, within days of initially posting it online.   An EPA spokesperson subsequently issued a statement on the agency's glyphosate review:

> Glyphosate documents were inadvertently posted to the Agency's docket.  These documents have now been taken down because our assessment is not final.  EPA has not completed our cancer review. We will look at the work of other governments as well as work by HHS's Agricultural Health Study as we move to make a decision on glyphosate.  Our assessment will be peer reviewed and completed by end of 2016.[33]

105.    On September 12, 2016, EPA's OPP submitted a report on the carcinogenic potential of glyphosate, wherein it issued a "proposed conclusion" that glyphosate is "'not likely to be carcinogenic to humans' at doses relevant to human health risk assessment."[34]   There are no authors listed on this issue paper, which reiterates and adopts the conclusions of the October 2015 leaked assessment.   The issue paper is based upon a review of industry-sponsored articles and studies.   The OPP acknowledged that it rejected all studies that considered Roundup®—the formulated product—instead of studies that isolated glyphosate because "[g]lyphosate

---

[33] Carey Gillam, *What Is Going On With Glyphosate? EPA's Odd Handling of Controversial Chemical*, HUFFINGTON POST, May 2, 2016, *available at* http://www.huffingtonpost.com/carey-gillam/what-is-going-on-with-gly_b_9825326.html;   *see also* P.J. Huffstutter, *EPA takes offline report that says glyphosate not likely carcinogenic*, REUTERS, May 2, 2016, available at http://www.reuters.com/article/us-usa-glyphosate-epa-idUSKCN0XU01K.

[34] See EPA's Office of Pesticide Programs, Glyphosate Issue Paper: Evaluation of Carcinogenic Potential (Sept. 12, 2016), *available at* https://www.epa.gov/sites/production/files/2016-09/documents/glyphosate_issue_paper_evaluation_of_carcincogenic_potential.pdf.

FILED DATE: 3/15/2021 11:55 AM   2021L002820

FILED DATE: 3/15/2021 11:55 AM   2021L002820

formulations contain various components other than glyphosate and it has been hypothesized these components are more toxic than glyphosate alone."[35]

106.     Thus, the OPP notes dozens of studies considered by IARC were not reviewed by the OPP because the OPP's "evaluation focused on studies on the active ingredient glyphosate" and "additional research could also be performed to determine whether formulation components, such as surfactants, influence the toxicity of glyphosate formulations."[36]

107.     From December 13 to 16, 2016, the EPA held FIFRA Scientific Advisory Panel ("SAP") meetings to consider issues raised by the OPP's evaluation of glyphosate.  Again, OPP only allowed the SAP to consider studies of glyphosate alone, and not any study of the formulated product.  In its Charge to the FIFRA SAP, the OPP noted that "[a]lthough there are studies available on glyphosate-based pesticide formulations, the agency is soliciting advice from the FIFRA Scientific Advisory Panel (SAP) on this evaluation of human carcinogenic potential for the active ingredient glyphosate only at this time."[37]

108.     The OPP draft assessment therefore does not actually consider the product at issue in this litigation or, more importantly, how glyphosate, in conjunction with surfactants and other chemicals, affects carcinogenicity.

109.     On March 16, 2017, the final SAP meeting minutes and report were released, revealing disagreement and lack of consensus among the scientists on whether there was a positive association between *glyphosate* exposure and NHL.[38]

---

[35] *Id.*

[36] *Id.*

[37] EPA OPP, Glyphosate: Evaluation of Carcinogenic Potential, Charge to the FIFRA SAP for the October 18-21, 2016 Meeting, available at, https://www.epa.gov/sites/production/files/2016-11/documents/glyphosate_sap_charge_questions_-final.pdf.

[38] FIFRA Scientific Advisory Panel Meeting Minutes and Final Report No. 2017-01, A Set of Scientific Issues Being Considered by the Environmental Protection Agency Regarding: EPA's

FILED DATE: 3/15/2021 11:55 AM   2021L002820

*Monsanto's Industry Ties*

110.   Recently unsealed documents in the federal Roundup® MDL litigation reveal the extent to which Monsanto has been able to leverage its contacts within the EPA to protect glyphosate and Roundup® from scrutiny and review.

111.   Internal Monsanto documents, including email communications, demonstrate that Jess Rowland, former Deputy Division Director, Health Effects Division of the EPA's OPP, and formerly the chair of the CARC (the same committee that inadvertently leaked the EPA's glyphosate report in April 2016), repeatedly and directly intervened on Monsanto's behalf. These same documents reveal that Monsanto was secure in the knowledge that it had allies within the EPA.

112.   To begin, in the months following IARC's initial March 2015 announcement that it had classified glyphosate as a probable carcinogen, Monsanto turned its attention to the EPA's review of glyphosate. In one April 27, 2015 email, Monsanto official Bill Heydens wrote to colleagues to suggest "approaching EPA and…. ask if there is anything that would help them defend the situation?" His colleague Dan Jenkins responded: "I think you and I could get on the phone w Jess Rowland and discuss this pretty openly. He'll give us straight talk."[39]

113.   The following day, Mr. Jenkins spoke to Mr. Rowland by telephone and then relayed the substance of the conversation for his colleagues in an April 28, 2015 email. Specifically, he reported back that with respect to the CARC investigation, Mr. Rowland had stated: "We have enough to sustain our conclusions. Don't need gene tox or epi . . . . I am the

---

Evaluation    of    the    Carcinogenic    Potential    of    Glyphosate,    *available    at* https://www.epa.gov/sites/production/files/2017-03/documents/december_13-16_2016_final_report_03162017.pdf.

[39] *See* Plaintiff' Motion to Compel the Deposition of Jess Rowland, Ex. D, In re: Roundup Products Liability Litigation, MDL No. 2741 (N.D. Cal., Mar. 14, 2017), ECF No. 189-4.

FILED DATE: 3/15/2021 11:55 AM   2021L002820

chair of the CARC and my folks are running this process for glyphosate in reg review. I have called a CARC meeting in June."[40] Thus, even though the ostensible purpose of the CARC review was to evaluate the exhaustive IARC assessment on glyphosate, and even though the full IARC monograph on glyphosate would not be completed until July 2015, Mr. Rowland had already formed his conclusion months earlier—in April 2015.

114. Mr. Rowland also intervened to halt another agency's review of glyphosate. When the Agency for Toxic Substances and Disease Registry (ATSDR), a federal public health agency of the U.S. Department of Health and Human Services, announced in February 2015 that it planned to publish a toxicological review of glyphosate, it was Mr. Rowland who helped Monsanto stop the ATSDR's investigation. In the same April 28, 2015, email discussed above, Mr. Jenkins explained that Mr. Rowland wanted to help Monsanto stop an investigation concerning the carcinogenicity of glyphosate being conducted by ATSDR.[41] Since ATSDR is not controlled by the EPA, according to Mr. Jenkins, Mr. Rowland had bragged: "If I can kill this I should get a medal."[42] Jenkins cautioned, however, that Monsanto should not "get your hopes up, I doubt EPA and Jess can kill this; but it's good to know they are going to actually make the effort now to coordinate due to our pressing and their shared concern that ATSDR is consistent in its conclusions with the EPA."[43] The ATSDR never published its toxicological profile of glyphosate.

115. Further, the released documents reveal Monsanto's confidence that its allies within the EPA would continue to support glyphosate. In an internal memo on glyphosate, Monsanto executives wrote: "We know, *but cannot say*, that EPA's Office of Pesticide Program scientists

---

[40] *Id.*

[41] *See id.*

[42] *Id.*

[43] *Id.*

strongly feel that glyphosate does not cause cancer and have defended their written determination internally for months."[44]   Notably, when Mr. Rowland attended the IARC glyphosate meetings as an observed for the EPA, internal communications indicate Monsanto was not displeased with his attendance since, "we all know Jess."[45]

### Recent Worldwide Bans on Roundup®/Glyphosate

116.   Several countries around the world have instituted bans on the sale of Roundup® and other glyphosate-containing herbicides, both before and since IARC first announced its assessment for glyphosate in March 2015, and more countries undoubtedly will follow suit as the dangers of the use of Roundup® become more widely known.   The Netherlands issued a ban on all glyphosate-based herbicides in April 2014, including Roundup®, which will take effect by the end of 2015.   In issuing the ban, the Dutch Parliament member who introduced the successful legislation stated: "Agricultural pesticides in user-friendly packaging are sold in abundance to private persons.   In garden centers, Roundup® is promoted as harmless, but unsuspecting customers have no idea what the risks of this product are.   Especially children are sensitive to toxic substances and should therefore not be exposed to it."[46]

117.   The Brazilian Public Prosecutor in the Federal District requested that the Brazilian Justice Department suspend the use of glyphosate.[47]

---

[44] *See* Plaintiff's Motion to Compel the Deposition of Jess Rowland, Ex. E, In re: Roundup Products Liability Litigation, MDL No. 2741 (N.D. Cal., Mar. 14, 2017), ECF No. 189-5 (emphasis original).

[45] *See* Plaintiff's Motion to Compel the Deposition of Jess Rowland, Ex. G, *In re: Roundup Products Liability Litigation*, MDL No. 2741 (N.D. Cal., Mar. 14, 2017), ECF No. 189-7.

[46] *Holland's Parliament Bans Glyphosate Herbicides*, The Real Agenda, April 14, 2014, *available at* http://real-agenda.com/hollands-parliament-bans-glyphosate-herbicides/.

[47] Christina Sarich, *Brazil's Public Prosecutor Wants to Ban Monsanto's Chemicals Following Recent Glyphosate-Cancer Link*, GLOBAL RESEARCH, May 14, 2015, *available at* http://www.globalresearch.ca/brazils-public-prosecutor-wants-to-ban-monsantos-chemicals-following-recent-glyphosate-cancer-link/5449440; *see* Ministério Público Federal, *MPF/DF reforça pedido para que glifosato seja banido do mercado nacional*, April, 14, 2015, *available at*

FILED DATE: 3/15/2021 11:55 AM   2021L002820

FILED DATE: 3/15/2021 11:55 AM   2021L002820

118.    France banned the private sale of Roundup® and glyphosate following the IARC assessment for Glyphosate.[48]

119.    Bermuda banned both the private and commercial sale of glyphosates, including Roundup®. The Bermuda government explained its ban as follows: "Following a recent scientific study carried out by a leading cancer agency, the importation of weed spray 'Roundup' has been suspended."[49]

120.    The Sri Lankan government banned the private and commercial use of glyphosate, particularly out of concern that glyphosate has been linked to fatal kidney disease in agricultural workers.[50]

121.    The government of Colombia announced its ban on using Roundup® and glyphosate to destroy illegal plantations of coca, the raw ingredient for cocaine, because of the WHO's finding that glyphosate is probably carcinogenic.[51]

### EFSA Report on Glyphosate

122.    On November 12, 2015, the European Food Safety Authority (EFSA), the European Union's primary agency for food safety, reported on its evaluation of the Renewal Assessment

---

http://noticias.pgr.mpf.mp.br/noticias/noticias-do-site/copy_of_meio-ambiente-e-patrimonio-cultural/mpf-df-reforca-pedido-para-que-glifosato-seja-banido-do-mercado-nacional.

[48] Zoe Schlanger, *France Bans Sales of Monsanto's Roundup in Garden Centers, 3 Months After U.N. Calls it 'Probable Carcinogen'*, NEWSWEEK, June 15, 2015, *available at* http://www.newsweek.com/france-bans-sale-monsantos-roundup-garden-centers-after-un-names-it-probable-343311.

[49] *Health Minister: Importation of Roundup Weed Spray Suspended,* Today in Bermuda, May, 11 2015, *available at* http://www.todayinbermuda.com/news/health/item/1471-health-minister-importation-of-roundup-weed-spray-suspended.

[50] *Sri Lanka's New President Puts Immediate Ban on Glyphosate Herbicides*, Sustainable Pulse, May 25, 2015, *available at* http://sustainablepulse.com/2015/05/25/sri-lankas-new-president-puts-immediate-ban-on-glyphosate-herbicides/#.VeduYk3bKAw.

[51] *Columbia to ban coca spraying herbicide glyphosate*, BBC, May 10, 2015, *available at* http://www.bbc.com/news/world-latin-america-32677411.

FILED DATE: 3/15/2021 11:55 AM   2021L002820

Report (RAR) on glyphosate.[52]  The Rapporteur Member State assigned to glyphosate, the German Federal Institute for Risk Assessment (BfR), had produced the RAR as part of the renewal process for glyphosate in the EU.

123.    BfR sent its draft RAR to EFSA and the RAR underwent a peer review process by EFSA, other member states, and industry groups.  As part of the on-going peer review of Germany's reevaluation of glyphosate, EFSA had also received a second mandate from the European Commission to consider IARC's findings regarding the potential carcinogenicity of glyphosate and glyphosate-containing products.

124.    Based on a review of the RAR, which included data from industry-submitted unpublished studies, EFSA sent its own report ("Conclusion") to the European Commission, finding that "glyphosate is unlikely to pose a carcinogenic hazard to humans and the evidence does not support classification with regard to its carcinogenic potential according to Regulation (EC) No 1272/2008."[53]  EFSA therefore disagreed with IARC: glyphosate was not genotoxic and did not present a carcinogenic threat to humans.

125.    In explaining why its results departed from IARC's conclusion, EFSA drew a distinction between the EU and IARC approaches to the study and classification of chemicals.[54]  Although IARC examined "both glyphosate—an active substance—and glyphosate-based formulations, grouping all formulations regardless of their composition," EFSA explained that it considered only glyphosate and that its assessment focuses on "each individual chemical, and each

---

[52] European Food Safety Auth., Conclusion on the peer review of the pesticide risk assessment of the active substance glyphosate, *available at* http://www.efsa.europa.eu/sites/default/files/scientific_output/files/main_documents/4302.pdf.

[53] *Id.*

[54] EFSA Fact Sheet: Glyphosate, EFSA http://www.efsa.europa.eu/sites/default/files/corporate_publications/files/efsaexplainsglyphosate151112 en.pdf.

FILED DATE: 3/15/2021 11:55 AM   2021L002820

marketed mixture separately."[55]   IARC, on the other hand, "assesses generic agents, including groups of related chemicals, as well as occupational or environmental exposure, and cultural or behavioural practices."[56]   EFSA accorded greater weight to studies conducted with glyphosate alone than studies of formulated products.[57]

126.   EFSA went further and noted:

> [A]lthough some studies suggest that certain glyphosate-based formulations may be genotoxic (i.e. damaging to DNA), others that look solely at the active substance glyphosate do not show this effect. It is likely, therefore, that *the genotoxic effects observed in some glyphosate-based formulations are related to the other constituents or "co-formulants."*  Similarly, certain glyphosate-based formulations display higher toxicity than that of the active ingredient, presumably because of the presence of co-formulants.  In its assessment, *EFSA proposes that the toxicity of each pesticide formulation and in particular its genotoxic potential should be further considered and addressed by Member State authorities while they re-assess uses of glyphosate-based formulations in their own territories.*[58]

127.   Notwithstanding its conclusion, EFSA did set exposure levels for glyphosate. Specifically, EFSA proposed an acceptable daily intake (ADI) of 0.5 mg/kg of body weight per day; an acute reference dose (ARfD) of 0.5 mg/kg of body weight; and an acceptable operator exposure level (AOEL) of 0.1 mg/kg bw per day.[59]

### *Leading Scientists Dispute EFSA's Conclusion*

128.   On November 27, 2015, 96 independent academic and governmental scientists from around the world submitted an open letter to the EU health commissioner, Vytenis

---

[55] *Id.*

[56] *Id.*

[57] *Id.*

[58] *Id.* (emphasis added).

[59] European Food Safety Auth., Conclusion on the peer review of the pesticide risk assessment of the active substance glyphosate, *supra.*

FILED DATE: 3/15/2021 11:55 AM   2021L002820

Andriukaitis.[60]   The scientists expressed their strong concerns and urged the commissioner to disregard the "flawed" EFSA report, arguing that "the BfR decision is not credible because it is not supported by the evidence and it was not reached in an open and transparent manner."[61]

129.   Signatories to the letter included Dr. Christopher J. Portier, Ph.D., and other renowned international experts in the field, some of whom were part of the IARC Working Group assigned to glyphosate.

130.   In an exhaustive and careful examination, the scientists scrutinized EFSA's conclusions and outlined why the IARC Working Group decision was "by far the more credible":

> The IARC WG decision was reached relying on open and transparent procedures by independent scientists who completed thorough conflict-of-interest statements and were not affiliated or financially supported in any way by the chemical manufacturing industry. It is fully referenced and depends entirely on reports published in the open, peer-reviewed biomedical literature. It is part of a long tradition of deeply researched and highly credible reports on the carcinogenicity of hundreds of chemicals issued over the past four decades by IARC and used today by international agencies and regulatory bodies around the world as a basis for risk assessment, regulation and public health policy.[62]

131.   With respect to human data, the scientists pointed out that EFSA agreed with IARC that there was "*limited evidence* of carcinogenicity" for NHL, but EFSA nonetheless dismissed an association between glyphosate exposure and carcinogenicity.   IARC applies three levels of evidence in its analyses of human data, including sufficient evidence and limited evidence. EFSA's ultimate conclusion that "there was no unequivocal evidence for a clear and strong

---

[60] Letter from Christopher J. Portier et al. to Commission Vytenis Andriukaitis, Open letter: Review of the Carcinogenicity of Glyphosate by EFSA and BfR (Nov. 27, 2015), http://www.zeit.de/wissen/umwelt/2015-11/glyphosat-offener-brief.pdf; http://www.theguardian.com/environment/2016/jan/13/eu-scientists-in-row-over-safety-of-glyphosate-weedkiller.

[61] *Id.*

[62] *Id.*

FILED DATE: 3/15/2021 11:55 AM   2021L002820

association of NHL with glyphosate" was misleading because it was tantamount to IARC's highest level of evidence: "sufficient evidence," which means that a causal relationship has been established. However, the scientists argued, "[l]egitimate public health concerns arise when 'causality is credible,' i.e., when there is *limited evidence*." [63]

132.    Among its many other deficiencies, EFSA's conclusions regarding animal carcinogenicity data were "scientifically unacceptable," particularly in BfR's use of historical control data and in its trend analysis. Indeed, BfR's analysis directly contradicted the Organisation for Economic Co-operation and Development ("OECD") testing guidelines while citing and purporting to follow those same guidelines. For instance, the EFSA report dismisses observed trends in tumor incidence "because there are no individual treatment groups that are significantly different from controls and because the maximum observed response is reportedly within the range of the historical control data." However, according to the scientists, concurrent controls are recommended over historical controls in all guidelines, scientific reports, and publications, and, if it is employed, historical control data "should be from studies in the same timeframe, for the same exact animal strain, preferably from the same laboratory or the same supplier and preferably reviewed by the same pathologist." BfR's use of historical control data violated these precautions: "only a single study used the same mouse strain as the historical controls, but was reported more than 10 years after the historical control dataset was developed." Further deviating from sound scientific practices, the data used by the BfR came from studies in seven different laboratories. The scientists concluded:

> BfR reported seven positive mouse studies with three studies showing increases in renal tumors, two with positive findings for hemangiosarcomas, and two with positive findings for malignant lymphomas. BfR additionally reported two positive findings for

---

[63] *Id.*

FILED DATE: 3/15/2021 11:55 AM   2021L002820

tumors in rats.  Eliminating the inappropriate use of historical data, the unequivocal conclusion is that these are not negative studies, but in fact document the carcinogenicity of glyphosate in laboratory animals.[64]

133.    The letter also critiqued the EFSA report's lack of transparency and the opacity surrounding the data cited in the report: "citations for almost all of the references, even those from the open scientific literature, have been redacted from the document" and "there are no authors or contributors listed for either document, a requirement for publication in virtually all scientific journals."  Because BfR relied on unpublished, confidential industry-provided studies, it is "impossible for any scientist not associated with BfR to review this conclusion with scientific confidence."[65]

134.    On March 3, 2016, the letter was published in the Journal of Epidemiology & Community Health.[66]

### Statement of Concern Regarding Glyphosate-Based Herbicides

135.    On February 17, 2016, a consensus statement published in the journal *Environmental Health*, entitled "Concerns over use of glyphosate-based herbicides and risks associated with exposures: a consensus statement," assessed the safety of glyphosate-based herbicides (GBHs).[67]  The paper's "focus is on the unanticipated effects arising from the worldwide increase in use of GBHs, coupled with recent discoveries about the toxicity and human

---

[64] *Id.*

[65] *Id.*

[66] Christopher J. Portier, et al., *Differences in the carcinogenic evaluation of glyphosate between the International Agency for Research on Cancer (IARC) and the European Food Safety Authority (EFSA)*, JOURNAL OF EPIDEMIOLOGY & CMTY. HEALTH, Mar. 3, 2016, *available at* http://jech.bmj.com/content/early/2016/03/03/jech-2015-207005.full.

[67] John P. Myers, et al, *Concerns over use of glyphosate-based herbicides and risks associated with exposures: a consensus statement*, Environmental Health (2016), *available at* http://ehjournal.biomedcentral.com/articles/10.1186/s12940-016-0117-0.

FILED DATE: 3/15/2021 11:55 AM   2021L002820

health risks stemming from use of GBHs."[68]  The researchers drew seven factual conclusions about

GBHs:

> 1.  GBHs are the most heavily applied herbicide in the world and usage continues to rise;
>
> 2.  Worldwide, GBHs often contaminate drinking water sources, precipitation, and air, especially in agricultural regions;
>
> 3.  The half-life of glyphosate in water and soil is longer than previously recognized;
>
> 4.  Glyphosate and its metabolites are widely present in the global soybean supply;
>
> 5.  Human exposures to GBHs are rising;
>
> 6.  Glyphosate is now authoritatively classified as a probable human carcinogen; and
>
> 7.  Regulatory estimates of tolerable daily intakes for glyphosate in the United States and European Union are based on outdated science.[69]

136.   The researchers noted that GBH use has increased approximately 100-fold since

the 1970s.  Further, far from posing a limited hazard to vertebrates, as previously believed, two

decades of evidence demonstrated that "several vertebrate pathways are likely targets of action,

including hepatorenal damage, effects on nutrient balance through glyphosate chelating action and

endocrine disruption."[70]

137.   The paper attributes uncertainties in current assessments of glyphosate

formulations to the fact that "[t]he full list of chemicals in most commercial GBHs is protected as

---

[68] *Id.*

[69] *Id.*

[70] *Id.*

FILED DATE: 3/15/2021 11:55 AM   2021L002820

'commercial business information,' despite the universally accepted relevance of such information to scientists hoping to conduct an accurate risk assessment of these herbicide formulations." Further, the researchers argue, "[t]he distinction in regulatory review and decision processes between 'active' and 'inert' ingredients has no toxicological justification, given increasing evidence that several so-called 'inert' adjuvants are toxic in their own right."[71]

138.   Among various implications, the researchers conclude, "existing toxicological data and risk assessments are not sufficient to infer that GBHs, as currently used, are safe." Further, "GBH-product formulations are more potent, or toxic, than glyphosate alone to a wide array of non-target organisms including mammals, aquatic insects, and fish." Accordingly, "risk assessments of GBHs that are based on studies quantifying the impacts of glyphosate alone underestimate both toxicity and exposure, and thus risk." The paper concludes that this "shortcoming has repeatedly led regulators to set inappropriately high exposure thresholds."[72]

139.   The researchers also critique the current practice of regulators who largely rely on "unpublished, non-peer reviewed data generated by the registrants" but ignore "published research because it often uses standards and procedures to assess quality that are different from those codified in regulatory agency data requirements, which largely focus on avoiding fraud." In the researchers' view, "[s]cientists independent of the registrants should conduct regulatory tests of GBHs that include glyphosate alone, as well as GBH-product formulations."[73]

140.   The researchers also call for greater inclusion of GBHs in government-led toxicology testing programs:

---

[71] *Id.*

[72] *Id.*

[73] *Id.*

FILED DATE: 3/15/2021 11:55 AM   2021L002820

> [A] fresh and independent examination of GBH toxicity should be undertaken, and . . . this re-examination be accompanied by systematic efforts by relevant agencies to monitor GBH levels in people and in the food supply, none of which are occurring today. The U.S. National Toxicology Program should prioritize a thorough toxicological assessment of the multiple pathways now identified as potentially vulnerable to GBHs.[74]

141.   The researchers suggest that, in order to fill the gap created by an absence of government funds to support research on GBHs, regulators could adopt a system through which manufacturers fund the registration process and the necessary testing:

> "[W]e recommend that a system be put in place through which manufacturers of GBHs provide funds to the appropriate regulatory body as part of routine registration actions and fees. Such funds should then be transferred to appropriate government research institutes, or to an agency experienced in the award of competitive grants. In either case, funds would be made available to independent scientists to conduct the appropriate long-term (minimum 2 years) safety studies in recognized animal model systems. A thorough and modern assessment of GBH toxicity will encompass potential endocrine disruption, impacts on the gut microbiome, carcinogenicity, and multigenerational effects looking at reproductive capability and frequency of birth defects."[75]

142.   Despite these stated concerns, Monsanto, to date, has failed to test its formulated Roundup® products.

### *European Union Vote on Glyphosate Renewal*

143.   The license for glyphosate in the European Union (EU) was set to expire on June 30, 2016.

---

[74] *Id.*

[75] *Id.*

FILED DATE: 3/15/2021 11:55 AM   2021L002820

144.    Without an extension of the license, Monsanto's Roundup® and other glyphosate-based herbicides faced a general phase out in EU markets.[76]

145.    In the months, leading up to the license expiration date, protracted meetings, and votes among national experts from the 28 EU Member States failed to produce agreement on an extension.

146.    On June 29, 2016, the EU Commission extended the European license for glyphosate for 18 months to allow the European Chemical Agency (ECHA) to rule on the safety of the chemical, which was expected by the end of 2017.[77]

147.    On July 11, 2016, the EU voted in favor of a proposal to restrict the conditions of use of glyphosate in the EU, including a ban on common co-formulant POE-tallowamine (POEA) from all glyphosate-based herbicides, including Roundup®.[78]

148.    In March 2017, ECHA's Committee for Risk Assessment (RAC) concluded that the available scientific evidence did not meet the criteria to classify glyphosate as a carcinogen.[79]

149.    With the glyphosate license set to again expire on December 15, 2017, and after months of indecision among EU member states, on November 27, 2017, the EU voted to extend

---

[76] Philip Blenkinsop, Alissa de Carbonnel & Barbara Lewis European, *Commission to extend glyphosate license for 18 months*, REUTERS, June 28, 2016, *available at* http://www.reuters.com/article/us-health-eu-glyphosate-idUSKCN0ZE25B.

[77] Arthur Neslen, *Controversial chemical in Roundup weedkiller escapes immediate ban*, THE GUARDIAN, June 29, 2016, *available at* https://www.theguardian.com/business/2016/jun/29/controversial-chemical-roundup-weedkiller-escapes-immediate-ban

[78] Sarantis Michalopoulos, *EU agrees ban on glyphosate co-formulant*, EURACTIV, July 11, 2016, *available at* http://www.euractiv.com/section/agriculture-food/news/eu-agrees-ban-on-glyphosate-co-formulant/?nl_ref=16562829

[79] https://echa.europa.eu/-/glyphosate-not-classified-as-a-carcinogen-by-echa.

FILED DATE: 3/15/2021 11:55 AM    2021L002820

the glyphosate license for five more years.[80]  Of the 28 EU members, 18 countries voted in favor

of a European Commission proposal to extend the glyphosate license, 9 countries voted against,

and 1 country abstained.[81]

## TOLLING OF THE STATUTE OF LIMITATIONS

### *Discovery Rule Tolling*

150.    Plaintiff incorporates by reference all preceding paragraphs as if fully set forth

herein.

151.    Plaintiff has suffered an illness that has a latency period and does not arise until

years after exposure.  Plaintiff had no way of knowing about the risks of serious illness

associated with the use of and/or exposure to Roundup® and glyphosate until they were made

aware that their NHL could be caused by their use of and/or exposure to Roundup®.

Consequently, the discovery rule applies to these cases, and the statute of limitations has been

tolled until the day that Plaintiff knew or had reason to know that Plaintiff's NHL was linked to

their use of and/or exposure to Roundup®.

152.    Within the time period of any applicable statutes of limitations, Plaintiff could not

have discovered, through the exercise of reasonable diligence, that exposure to Roundup® and

glyphosate is injurious to human health.

153.    Plaintiff did not discover, and did not know of facts that would cause a reasonable

person to suspect, the risks associated with the use of and/or exposure to Roundup® and

---

[80] *See* Philip Blenkinsop, *Germany swings EU vote in favor of weed-killer glyphosate*, Reuters, Nov. 27, 2017, https://www.reuters.com/article/us-eu-health-glyphosate/germany-swings-eu-vote-in-favor-of-weed-killer-glyphosate-idUSKBN1DR1SG

[81] *See id.*

glyphosate; nor would a reasonable and diligent investigation by them have disclosed that Roundup® and glyphosate would cause their NHL.

154.    For these reasons, all applicable statutes of limitations have been tolled by operation of the discovery rule with respect to Plaintiff's claims.

### *Fraudulent Concealment*

155.    Furthermore, the running of the statute of limitations has been equitably tolled by reason of Defendants' fraudulent concealment and conduct, as alleged above.  Through its affirmative misrepresentations and omissions, Defendants actively concealed from Plaintiff the true risks associated with use of or exposure to Roundup®.

156.    Furthermore, the running of the statute of limitations has been equitably tolled by reason of Defendants' fraudulent concealment and conduct, as alleged above.  Through its affirmative misrepresentations and omissions, Defendants actively concealed from Plaintiff the true risks associated with use of or exposure to Roundup®.

157.    As a result of Defendants' actions, Plaintiff was unaware, and could not reasonably know or have learned through reasonable diligence, that Plaintiff had been exposed to the risks alleged herein and that those risks were the direct and proximate result of Defendant's acts and omissions.

158.    Defendants are estopped from relying on any statute of limitations because of its concealment of the truth regarding the safety of Roundup®.  Defendants were under a duty to disclose the true character, quality and nature of Roundup® because this was non-public information over which it continues to have exclusive control.  Defendants knew that this information was not available to Plaintiff, his medical providers and/or their health facilities, yet it failed to disclose the information to the public.

FILED DATE: 3/15/2021 11:55 AM   2021L002820

FILED DATE: 3/15/2021 11:55 AM   2021L002820

159.    Defendants had the ability to and did spend enormous amounts of money in furtherance of its purposes of marketing and promoting a profitable product, notwithstanding the known or reasonably knowable risks.  Plaintiff and medical professionals could not have afforded to and could not have possibly conducted studies to determine the nature, extent and identity of related health risks, and they were forced to rely on Defendants' representations.

### *Estoppel*

160.    Defendant Monsanto was under a continuous duty to disclose to consumers, users and other persons coming into contact with its products, including Plaintiff, accurate safety information concerning its products and the risks associated with the use of and/or exposure to Roundup® and glyphosate.

161.    Instead, defendants knowingly, affirmatively, and actively concealed safety information concerning Roundup® and glyphosate and the serious risks associated with the use of and/or exposure to its products.

162.    Based on the foregoing, Defendants are estopped from relying on any statutes of limitations in defense of this action.

### COUNT ONE – STRICT LIABILITY (DESIGN DEFECT) (Against All Defendants)

163.    Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

164.    Plaintiff bring these strict liability claims against Defendants for design defect.

165.    Marcia Moreno developed NHL which caused him *inter alia* pain, suffering, disability, disfigurement, and loss of normal life as a result of using Monsanto's Roundup products.

FILED DATE: 3/15/2021 11:55 AM 2021L002820

166.    At all relevant times, Defendants sold and distributed surfactant materials to be used in the Roundup® formula used by Plaintiff, and/or to which the Plaintiff was exposed, as described above.

167.    At all relevant times, Defendants engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting Roundup® products, which are defective and unreasonably dangerous to consumers, users, and other persons coming into contact with them, including Plaintiff, thereby placing Roundup® products into the stream of commerce. These actions were under the ultimate control and supervision of Defendants.

168.    At all times relevant to this litigation, Defendants designed, researched, developed, formulated, manufactured, produced, tested, assembled, labeled, advertised, promoted, marketed, sold, and distributed the Roundup® products used by Plaintiff, and/or to which the Plaintiff was exposed, as described above.

169.    At all times relevant to this litigation, Defendants' Roundup® products were manufactured, designed, and labeled in an unsafe, defective, and inherently dangerous manner that was dangerous for use by or exposure to the public, and, in particular, Plaintiff.

170.    At all times relevant to this litigation, Defendants' Roundup® products reached the intended consumers, handlers, and users or other persons coming into contact with these products in Illinois and throughout the United States, including Plaintiff, without substantial change in their condition as designed, manufactured, sold, distributed, labeled, and marketed by Defendants.

171.    Defendants' Roundup® products, as researched, tested, developed, designed, licensed, formulated, manufactured, packaged, labeled, distributed, sold, and marketed by Defendants, were defectively manufactured and designed by Defendants in that when they left the hands of the Defendants' manufacturers and/or suppliers, they were unreasonably dangerous

because they were not as safe as an ordinary consumer would expect when used in an intended or reasonably foreseeable manner.

172.    Defendants' Roundup® products, as researched, tested, developed, designed, licensed, formulated, manufactured, packaged, labeled, distributed, sold, and marketed by Defendants, were defective in manufacture, design, and formulation in that when they left the hands of Defendant's manufacturers and/or suppliers, the foreseeable risks associated with these products' reasonably foreseeable uses exceeded the alleged benefits associated with their design and formulation.

173.    At all relevant times, Defendants' Roundup® products created significant risks to the health and safety of consumers and others who were exposed to the products that far outweigh the risks posed by other products on the market used for the same or similar purpose.

174.    Therefore, at all relevant times to this litigation, Defendants' Roundup® products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold and marketed by Defendants, were defective in design and formulation, in one or more of the following ways:

    a.    When placed in the stream of commerce, Defendants' Roundup® products were defective in design and formulation, and, consequently, dangerous to an extent beyond that which an ordinary consumer would expect.

    b.    When placed in the stream of commerce, Defendants' Roundup® products were unreasonably dangerous in that they were hazardous and posed a grave risk of cancer and other serious illnesses when used in a reasonably anticipated manner.

FILED DATE: 3/15/2021 11:55 AM   2021L002820

c.     When placed in the stream of commerce, Defendants' Roundup® products contained unreasonably dangerous design defects and were not reasonably safe when used in a reasonably anticipated or intended manner.

d.     Defendants did not sufficiently test, investigate, or study the Roundup® products and, specifically, the active ingredient glyphosate.

e.     Defendants failed to test, investigate, or study the formulated Roundup® products.

f.     Exposure to Roundup® and glyphosate-containing products presents a risk of harmful side effects that outweighs any potential utility stemming from the use of the herbicide.

g.     Defendants knew or should have known at the time of marketing its Roundup® products that exposure to Roundup® and specifically, its active ingredient glyphosate, could result in cancer and other severe illnesses and injuries.

h.     Defendants did not conduct adequate post-marketing surveillance of Roundup® products.

i.     Defendants could have employed safer alternative designs and formulations.

175.    At all times relevant to this litigation, Plaintiff used and/or was exposed to Defendants' Roundup® products in an intended or reasonably foreseeable manner without knowledge of their dangerous characteristics.

176.    Plaintiff could not have reasonably discovered the defects and risks associated with Roundup® or glyphosate-containing products before or at the time of exposure.

FILED DATE: 3/15/2021 11:55 AM   2021L002820

177.    The harm caused by Defendants' Roundup® products far outweighed their benefit, rendering Defendant's products dangerous to an extent beyond that which an ordinary consumer would contemplate.   Defendants' Roundup® products were and are more dangerous than alternative products and Defendants could have designed the various Roundup® products to make them less dangerous.  Indeed, at the time that Defendants designed the Roundup® products, the state of the industry's scientific knowledge was such that a less risky design or formulation was attainable.

178.    Defendants' defective design of Roundup® amounts to willful, wanton, and/or reckless conduct by Defendants.

179.    As a direct and proximate result of the defective design and manufacture of Roundup® products, Plaintiff developed NHL and has been injured catastrophically and have been caused severe and permanent pain, suffering, disability, and impairment, loss of enjoyment of life, loss of care, comfort and economic damages.

180.    Therefore, as a result of the unreasonably dangerous condition of the Roundup® products, Defendants are strictly liable to Plaintiff.

181.    The defects in Defendants' Roundup® products were substantial and contributing factors in causing Plaintiff's grave injuries, and, but for Defendants' misconduct and omissions, Plaintiff would not have sustained his injuries.

182.    As a direct and proximate result of Defendants placing their defective Roundup® products into the stream of commerce, Plaintiff suffered grave injuries, and he endured pain and discomfort, as well as economic hardship, including considerable financial expenses for medical care and treatment.

FILED DATE: 3/15/2021 11:55 AM   2021L002820

WHEREFORE, Plaintiff prays for judgment against Defendants Monsanto, Akzo Nobel Incorporated, Akzo Surface Chemistry LLC, Akzo Nobel Functional Chemicals LLC, Akzo Nobel Chemicals LLC, Nouryan Chemicals LLC, Nouryan Functional Chemicals LLC, and Nouryan Surface Chemicals in a fair and reasonable sum in excess of the jurisdictional amount, together with costs expended herein and such further and other relief as the Court deems just and appropriate.

**COUNT TWO – STRICT LIABILITY (FAILURE TO WARN)(Against All Defendants)**

183.     Plaintiff incorporate by reference every other paragraph of this Complaint as if each were set forth fully and completely herein.

184.     Plaintiff brings this strict liability claim against Defendants for failure to warn.

185.     At all relevant times, Defendants sold and distributed surfactant materials to be used in the Roundup® formula used by Plaintiff, and/or to which the Plaintiff was exposed, as described above.

186.     At all relevant times, Defendants engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting Roundup® products, which are defective and unreasonably dangerous to consumers, including Plaintiff, because they do not contain adequate warnings or instructions concerning the dangerous characteristics of Roundup® and specifically, the active ingredient glyphosate.  These actions were under the ultimate control and supervision of Defendants.

187.     Defendants researched, developed, designed, tested, manufactured, inspected, labeled, distributed, marketed, promoted, sold, and otherwise released into the stream of commerce Roundup® products, and in the course of same, directly advertised or marketed the products to consumers and end users, including Plaintiff, Plaintiff's employers, Plaintiff's co-workers, and

FILED DATE: 3/15/2021 11:55 AM   2021L002820

persons responsible for consumers (such as employers), and Defendants therefore had a duty to warn of the risks associated with the reasonably foreseeable uses (and misuses) of Roundup® and glyphosate-containing products and a duty to instruct on the proper, safe use of these products.

188.    At all times relevant to this litigation, Defendants had a duty to properly test, develop, design, manufacture, inspect, package, label, market, promote, sell, distribute, maintain supply, provide proper warnings, and take such steps as necessary to ensure that Roundup® products did not cause users and consumers to suffer from unreasonable and dangerous risks. Defendants had a continuing duty to warn Plaintiff of the dangers associated with Roundup® use and exposure, and a continuing duty to instruct on the proper, safe use of these products. Defendants, as manufacturers, sellers, or distributors of chemical herbicides, is held to the knowledge of an expert in the field.

189.    At the time of manufacture, Defendants could have provided warnings or instructions regarding the full and complete risks of Roundup® and glyphosate-containing products because it knew or should have known of the unreasonable risks of harm associated with the use of and/or exposure to these products.

190.    At all times relevant to this litigation, Defendants failed to investigate, study, test, or promote the safety of the various Roundup® products. Defendants also failed to minimize the dangers to users and consumers of Roundup® products and to those who would foreseeably use or be harmed by Defendant's herbicides, including Plaintiff.

191.    Despite the fact that Defendants knew or should have known that Roundup® products posed a grave risk of harm, it failed to warn of the dangerous risks associated with their use and exposure.   The dangerous propensities of their products and the carcinogenic characteristics of glyphosate, as described above, were known to Defendants, or scientifically

FILED DATE: 3/15/2021 11:55 AM   2021L002820

knowable to Defendants through appropriate research and testing by known methods, at the time it distributed, supplied, or sold the product, and not known to end users and consumers, such as Plaintiff and his employers.

192.     Defendants knew or should have known that Roundup® and glyphosate-containing products created significant risks of serious bodily harm to consumers, as alleged herein, and Defendants failed to adequately warn consumers and reasonably foreseeable users of the risks of exposure to these products. Defendants have wrongfully concealed information concerning the dangerous nature of Roundup® and its active ingredient glyphosate, and further made false and/or misleading statements concerning the safety of Roundup® and glyphosate.

193.     At all times relevant to this litigation, Defendants' Roundup® products reached the intended consumers, handlers, and users or other persons coming into contact with these products throughout the United States, including Plaintiff, without substantial change in their condition as designed, manufactured, sold, distributed, labeled, and marketed by Defendants.

194.     At all times relevant to this litigation, Plaintiff used and/or was exposed to the use of Defendants' Roundup® products in their intended or reasonably foreseeable manner without knowledge of their dangerous characteristics.

195.     Plaintiff could not have reasonably discovered the defects and risks associated with Roundup® or glyphosate-containing products before or at the time of his exposure. Plaintiff relied upon the skill, superior knowledge, and judgment of Defendants.

196.     Defendants knew or should have known that the minimal warnings disseminated with Roundup® products were inadequate, but it failed to communicate adequate information on the dangers and safe use/exposure and failed to communicate warnings and instructions that were

FILED DATE: 3/15/2021 11:55 AM   2021L002820

appropriate and adequate to render the products safe for their ordinary, intended, and reasonably foreseeable uses, including agricultural and horticultural applications.

197.    The information that Defendants did provide or communicate failed to contain relevant warnings, hazards, and precautions that would have enabled agricultural workers, horticultural workers and/or at-home users such as Plaintiff to utilize the products safely and with adequate protection.  Instead, Defendants disseminated information that was inaccurate, false, and misleading and which failed to communicate accurately or adequately the comparative severity, duration, and extent of the risk of injuries associated with use of and/or exposure to Roundup® and glyphosate; continued to aggressively promote the efficacy of the products, even after it knew or should have known of the unreasonable risks from use or exposure; and concealed, downplayed, or otherwise suppressed, through aggressive marketing and promotion, any information or research about the risks and dangers of exposure to Roundup® and glyphosate.

198.    To this day, Defendants have failed to adequately and accurately warn of the true risks of Plaintiff's injuries associated with the use of and exposure to Roundup® and its active ingredient glyphosate, a probable carcinogen.

199.    To this day, Defendants have failed to test, investigate, or study formulated Roundup® products.

200.    As a result of their inadequate warnings, Defendants' Roundup® products were defective and unreasonably dangerous when they left the possession and/or control of Defendants, were distributed by Defendants, and used by Plaintiff.

201.    Defendants are liable to Plaintiff for injuries caused by their failure, as described above, to provide adequate warnings or other clinically relevant information and data regarding

FILED DATE: 3/15/2021 11:55 AM   2021L002820

the appropriate use of their Roundup® products and the risks associated with the use of or exposure to Roundup® and glyphosate.

202.    The defects in Defendants' Roundup® products were substantial and contributing factors in causing Plaintiff's injuries, and, but for Defendants' misconduct and omissions, he would not have sustained his injuries.

203.    Had Defendants provided adequate warnings and instructions and properly disclosed and disseminated the risks associated with the Roundup® products, Plaintiff could have avoided the risk of developing injuries as alleged herein and Plaintiff and his employers could have obtained alternative herbicides.

As a direct and proximate result of Defendants placing defective Roundup® products into the stream of commerce and failing to warn Plaintiff of the increased risk of NHL associated with the use of and/or exposure to Roundup® products as described herein, Plaintiff has developed NHL and has been injured catastrophically, causing severe and permanent pain, suffering, disability, impairment, loss of enjoyment of life, loss of care, comfort and economic damages, including for medical care and treatment.

WHEREFORE, Plaintiff pray for judgment against Defendants Monsanto, Akzo Nobel Incorporated, Akzo Surface Chemistry LLC, Akzo Nobel Functional Chemicals LLC, Akzo Nobel Chemicals LLC, Nouryan Chemicals LLC, Nouryan Functional Chemicals LLC, and Nouryan Surface Chemicals in a fair and reasonable sum in excess of the jurisdictional amount, together with costs expended herein and such further and other relief as the Court deems just and appropriate.

## COUNT THREE – NEGLIGENCE

204.    Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

205.    At all relevant times, Defendants breached their duty to Plaintiff and were otherwise negligent in marketing, designing, manufacturing, producing, supplying, inspecting, testing, selling and/or distributing Roundup® products, including surfactant materials include in the Roundup® formula.

206.    Defendants, directly or indirectly, caused Roundup® products to be purchased and/or used by Plaintiff.

207.    At all times relevant to this litigation, Defendants had a duty to exercise reasonable care in the design, research, manufacture, marketing, advertisement, supply, promotion, packaging, sale, and distribution of the Roundup® products, including the duty to take all reasonable steps necessary to manufacture, promote, and/or sell a product that was not unreasonably dangerous to consumers, users, and other persons coming into contact with the product.

208.    At all times relevant to this litigation, Defendants had a duty to exercise reasonable care in the marketing, advertisement, and sale of Roundup® products.  Defendants' duty of care owed to consumers and the general public included providing accurate, true, and correct information concerning the risks of using Roundup® and appropriate, complete, and accurate warnings concerning the potential adverse effects of exposure to Roundup® and, in particular, its active ingredient glyphosate.

FILED DATE: 3/15/2021 11:55 AM   2021L002820

209.    At all times relevant to this litigation, Defendants knew or, in the exercise of reasonable care, should have known of the hazards and dangers of Roundup® and specifically, the carcinogenic properties of the chemical glyphosate.

210.    Accordingly, at all times relevant to this litigation, Defendants knew or, in the exercise of reasonable care, should have known that use of or exposure to Roundup® products could cause Plaintiff's injuries and thus created a dangerous and unreasonable risk of injury to the users of these products, including Plaintiff.

211.    Defendants knew or, in the exercise of reasonable care, should have known that Roundup® is more toxic than glyphosate alone and that safety studies on Roundup®, Roundup®'s adjuvants and "inert" ingredients, and/or the surfactant POEA were necessary to protect Plaintiff from Roundup®.

212.    Defendants knew or, in the exercise of reasonable care, should have known that tests limited to Roundup®'s active ingredient glyphosate were insufficient to prove the safety of Roundup®.

213.    Defendants also knew or, in the exercise of reasonable care, should have known that users and consumers of Roundup® were unaware of the risks and the magnitude of the risks associated with the use of and/or exposure to Roundup® and glyphosate-containing products.

214.    As such, Defendants breached their duty of reasonable care and failed to exercise ordinary care in the design, research, development, manufacture, testing, marketing, supply, promotion, advertisement, packaging, sale, and distribution of their Roundup® products, in that Defendants manufactured and produced defective herbicides containing the chemical glyphosate, knew or had reason to know of the defects inherent in their products, knew or had reason to know that a user's or consumer's exposure to the products created a significant risk of harm and

FILED DATE: 3/15/2021 11:55 AM   2021L002820

unreasonably dangerous side effects, and failed to prevent or adequately warn of these risks and injuries.

215.    Defendants failed to appropriately and adequately test Roundup®, Roundup®'s adjuvants and "inert" ingredients, and/or the surfactant POEA to protect Plaintiff from Roundup®.

216.    Despite their ability and means to investigate, study, and test the products and to provide adequate warnings, Defendants have failed to do so. Indeed, Defendants have wrongfully concealed information and have further made false and/or misleading statements concerning the safety and/or exposure to Roundup® and glyphosate.

217.    Defendants' negligence included:

a.    Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing Roundup® products without thorough and adequate pre- and post-market testing;

b.    Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing Roundup® while negligently and/or intentionally concealing and failing to disclose the results of trials, tests, and studies of exposure to glyphosate, and, consequently, the risk of serious harm associated with human use of and exposure to Roundup®;

c.    Failing to undertake sufficient studies and conduct necessary tests to determine whether Roundup® products and glyphosate-containing products were safe for their intended use in agriculture, horticulture, and at-home use;

d.    Failing to test, investigate, or study the formulated Roundup® products;

e.    Failing to undertake sufficient studies and conduct necessary tests to determine the safety of "inert" ingredients and/or adjuvants contained within Roundup®,

FILED DATE: 3/15/2021 11:55 AM   2021L002820

and the propensity of these ingredients to render Roundup® toxic, increase the toxicity of Roundup®, whether these ingredients are carcinogenic, magnify the carcinogenic properties of Roundup®, and whether "inert" ingredients and/or adjuvants were safe for use;

f.        Failing to use reasonable and prudent care in the design, research, manufacture, formulation, and development of Roundup® products so as to avoid the risk of serious harm associated with the prevalent use of Roundup®/glyphosate as an herbicide;

g.        Failing to design and manufacture Roundup® products so as to ensure they were at least as safe and effective as other herbicides on the market;

h.        Failing to provide adequate instructions, guidelines, and safety precautions to those persons who Defendants could reasonably foresee would use and/or be exposed to Roundup® products;

i.        Failing to disclose to Plaintiff, users, consumers, and the general public that the use of and exposure to Roundup® presented severe risks of cancer and other grave illnesses;

j.        Failing to warn Plaintiff, users, consumers, and the general public that the product's risk of harm was unreasonable and that there were safer and effective alternative herbicides available to Plaintiff and other users or consumers;

k.        Systematically suppressing or downplaying contrary evidence about the risks, incidence, and prevalence of the side effects of Roundup® and glyphosate-containing products;

FILED DATE: 3/15/2021 11:55 AM   2021L002820

l.        Representing that Roundup® products were safe for their intended use when, in fact, Defendants knew or should have known that the products were not safe for their intended use;

m.        Declining to make or propose any changes to Roundup® products' labeling or other promotional materials that would alert the consumers and the general public of the risks of Roundup® and glyphosate;

n.        Advertising, marketing, and recommending the use of Roundup® products, while concealing and failing to disclose or warn of the dangers known by Defendants to be associated with or caused by the use of or exposure to Roundup® and glyphosate;

o.        Continuing to disseminate information to their consumers, which indicate or imply that Defendants' Roundup® products are not unsafe for use in the agricultural, horticultural industries, and/or home use; and

p.        Continuing the manufacture and sale of the products with the knowledge that the products were unreasonably unsafe and dangerous.

218.    Defendants knew and/or should have known that it was foreseeable that consumers and/or users, such as Plaintiff, would suffer injuries as a result of Defendants' failure to exercise ordinary care in the manufacturing, marketing, labeling, distribution, and sale of Roundup®.

219.    Plaintiff did not know the nature and extent of the injuries that could result from the intended use of and/or exposure to Roundup® or its active ingredient glyphosate.

220.    Defendants' negligence was the proximate cause of the injuries, harm, and economic losses that Plaintiff suffered, and will continue to suffer, as described herein.

221.    Defendants' conduct, as described above, was reckless. Defendants regularly risk the lives of consumers and users of their products, including Plaintiff, with full knowledge of the

dangers of their products.  Defendants have made conscious decisions not to redesign, re-label, warn, or inform the unsuspecting public, including Plaintiff.

222.    As a proximate result of Defendants' wrongful acts and omissions in placing defective Roundup® products into the stream of commerce without adequate warnings of the hazardous and carcinogenic nature of glyphosate, Plaintiff developed NHL and has been injured catastrophically and endured severe and permanent pain, suffering, disability, impairment, loss of enjoyment of life, loss of care, comfort and economic damages, including significant expenses for medical care and treatment.

WHEREFORE, Plaintiff pray for judgment against Defendants Monsanto, Akzo Nobel Incorporated, Akzo Surface Chemistry LLC, Akzo Nobel Functional Chemicals LLC, Akzo Nobel Chemicals LLC, Nouryan Chemicals LLC, Nouryan Functional Chemicals LLC, and Nouryan Surface Chemicals in a fair and reasonable sum in excess of the jurisdictional amount, together with costs expended herein and such further and other relief as the Court deems just and appropriate.

## COUNT FOUR – BREACH OF EXPRESS WARRANTIES
### (810 Ill. Comp. Stat. 5/2-313)

223.    Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

224.    At all relevant times, Defendant Monsanto engaged in the business of testing, developing, designing, formulating, manufacturing, marketing, selling, distributing, and promoting its Roundup® products, which are defective and unreasonably dangerous to users, consumers and those in proximity to users, including Plaintiff, thereby placing Roundup® products into the stream of commerce.  These actions were under the ultimate control and supervision of Defendants.

FILED DATE: 3/15/2021 11:55 AM   2021L002820

FILED DATE: 3/15/2021 11:55 AM   2021L002820

225.    At all relevant times, Defendants Akzo Nobel Incorporated, Akzo Surface Chemistry LLC, Akzo Nobel Functional Chemicals LLC, Akzo Nobel Chemicals LLC, Nouryan Chemicals LLC, Nouryan Functional Chemicals LLC, and Nouryan Surface Chemicals, upon information and belief, engaged in the business of manufacturing and selling surfactant materials, which are defective and unreasonably dangerous to users, consumers, and those in proximity to users, including Plaintiff, thereby placing Roundup® products into the stream of commerce. These actions were under the ultimate control and supervision of Defendants.

226.    Before the time that Plaintiff were exposed to the use of the aforementioned Roundup® products, Defendant expressly warranted to their consumers and users—including Plaintiff and Plaintiff's employers—that its Roundup® products were of merchantable quality and safe and fit for the use for which they were intended; specifically, as horticultural herbicides.

227.    Defendant, however, failed to disclose that Roundup® has dangerous propensities when used as intended and that the use of and/or exposure to Roundup® and glyphosate-containing products carries an increased risk of developing severe injuries, including Plaintiff's injuries.

228.    Defendant further failed to test, investigate, or study formulated Roundup® products.

229.    The representations, as set forth above, contained or constituted affirmations of fact or promises made by the seller to the buyer, which related to the goods and became part of the basis of the bargain creating an express warranty that the goods shall conform to the affirmations of fact or promises.

230.    Roundup® did not conform to the representations made by Defendant as Roundup® was not safe for use by individuals such as Plaintiff.

FILED DATE: 3/15/2021 11:55 AM    2021L002820

231.    At all times relevant to this litigation, Plaintiff used and/or was exposed to the use of Defendant's Roundup® products in their intended or reasonably foreseeable manner without knowledge of their dangerous characteristics.

232.    Neither Plaintiff nor Plaintiff's employers could have reasonably discovered or known of the risks of serious injury associated with Roundup® or glyphosate.

233.    Defendant's breaches constitute violations of state common laws, including but not limited to, the following statutory provisions as applicable to the Plaintiff in this Complaint:

- Ill. Comp. Stat. Ann. Ch. 810, 5/2-313 (2016);

234.    The breach of the warranty was a substantial factor in bringing about Plaintiff's injuries. As a direct and proximate result of Defendant placing defective Roundup® products into the stream of commerce and failing to warn Plaintiff of the increased risk of NHL associated with the use of and/or exposure to Roundup® products as described herein, Plaintiff developed NHL and was injured catastrophically, including loss of his life, and incurred severe pain, suffering, disability, impairment, loss of enjoyment of life, as well as economic damages, including for medical care and treatment.

235.    The harm caused by Defendants' Roundup® products far outweighed their benefit, rendering the products more dangerous than an ordinary consumer or user would expect and more dangerous than alternative products.

As a direct and proximate result of Defendants' wrongful acts and omissions, Plaintiff suffered severe physical and emotional injuries. Plaintiff has endured pain and suffering, has suffered economic loss, including significant expenses for medical care and treatment. WHEREFORE, Plaintiff pray for judgment against Defendants Monsanto, Akzo Nobel Incorporated, Akzo Surface Chemistry LLC, Akzo Nobel Functional Chemicals LLC, Akzo Nobel

FILED DATE: 3/15/2021 11:55 AM   2021L002820

Chemicals LLC, Nouryan Chemicals LLC, Nouryan Functional Chemicals LLC, and Nouryan Surface Chemicals in a fair and reasonable sum in excess of the jurisdictional amount, together with costs expended herein and such further and other relief as the Court deems just and appropriate.

### COUNT FIVE – BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (810 Ill. Comp. Stat. 5/2-314)

236.    Plaintiff incorporates by reference each of the preceding paragraphs as if fully set forth herein.

237.    At all relevant times, Defendants engaged in the business of testing, developing, designing, formulating, manufacturing, marketing, selling, distributing, and promoting Roundup® products, which are defective and unreasonably dangerous to users, consumers and those in proximity to users, including Plaintiff, thereby placing Roundup® products into the stream of commerce.  These actions were under the ultimate control and supervision of Defendants.

238.    Before the time that Plaintiff was exposed to the use of the aforementioned Roundup® products, Defendants impliedly warranted to their consumers and users—including Plaintiff —that Roundup® products were of merchantable quality and safe and fit for the use for which they were intended; specifically, as horticultural herbicides.

239.    Defendants, however, failed to disclose that Roundup® has dangerous propensities when used as intended and that the use of and/or exposure to Roundup® and glyphosate-containing products carries an increased risk of developing severe injuries, including Plaintiff's injuries.

240.    Defendants further failed to test, investigate, or study formulated Roundup® products.

FILED DATE: 3/15/2021 11:55 AM   2021L002820

241.    Upon information and belief, Plaintiff reasonably relied upon the skill, superior knowledge, and judgment of Defendants and upon their implied warranties that the Roundup® products were of merchantable quality and fit for their intended purpose or use.

242.    Upon information and belief, Plaintiff reasonably relied upon the skill, superior knowledge, and judgment of Defendants and upon their implied warranties that the Roundup® products were of merchantable quality and fit for their intended purpose or use.

243.    The Roundup® products were expected to reach and did in fact reach consumers, users and those in proximity to users, including Plaintiff, without substantial change in the condition in which they were manufactured and sold by Defendants.

244.    At all relevant times, Defendants were aware that consumers, users, and those in proximity of users of their products, including Plaintiff, would use Roundup® products as marketed by Defendants, which is to say that Plaintiff was a foreseeable user of Roundup®.

245.    Defendants intended that Roundup® products be used in the manner in which Plaintiff in fact used or was exposed to them and Defendants impliedly warranted each product to be of merchantable quality, safe, and fit for this use, despite the fact that Roundup® was not adequately tested or researched.

246.    In reliance upon Defendants' implied warranty, Plaintiff used or were in proximity to the use of Roundup® as instructed and labeled and in the foreseeable manner intended, recommended, promoted and marketed by Defendant.

247.    Plaintiff could not have reasonably discovered or known of the risks of serious injury associated with Roundup® or glyphosate.

248.    Defendants breached their implied warranty to Plaintiff in that Roundup® products were not of merchantable quality, safe, or fit for their intended use, or adequately tested.  Roundup®

FILED DATE: 3/15/2021 11:55 AM   2021L002820

has dangerous propensities when used as intended and can cause serious injuries, including those injuries complained of herein.

249.    The harm caused by Defendants' Roundup® products far outweighed their benefit, rendering the products more dangerous than an ordinary consumer or user would expect and more dangerous than alternative products.

250.    As a direct and proximate result of Defendants' wrongful acts and omissions, Plaintiff has suffered severe and permanent physical and emotional injuries. Plaintiff has endured pain and suffering, have suffered economic loss, including significant expenses for medical care and treatment.

WHEREFORE, Plaintiff prays for judgment against Defendants Monsanto Akzo Nobel Incorporated, Akzo Surface Chemistry LLC, Akzo Nobel Functional Chemicals LLC, Akzo Nobel Chemicals LLC, Nouryan Chemicals LLC, Nouryan Functional Chemicals LLC, and Nouryan Surface Chemicals in a fair and reasonable sum in excess of the jurisdictional amount, together with costs expended herein and such further and other relief as the Court deems just and appropriate.

## COUNT SIX – FRAUDULENT CONCEALMENT

251.    Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

252.    Defendants are estopped from asserting a statute of limitations defense because they fraudulently concealed their wrongful conduct from Plaintiff's decedent with the intent that Plaintiff, and other consumers and users of Roundup® would rely on such material representations.

FILED DATE: 3/15/2021 11:55 AM   2021L002820

253.    Defendant Monsanto had actual knowledge that exposure to Roundup® and specifically, its active ingredient glyphosate, could result in cancer and other severe illnesses and injuries.  Monsanto knew or should have known that Roundup® is more toxic than glyphosate alone and that safety studies of Roundup®, Roundup's adjuvants and "inert" ingredients, and/or the surfactant POEA were necessary to protect Plaintiff's decedent from Roundup®.

254.    Defendant Monsanto failed to conduct adequate testing of glyphosate and the Roundup® formulation.

255.    Defendants Akzo Nobel Incorporated, Akzo Surface Chemistry LLC, Akzo Nobel Functional Chemicals LLC, Akzo Nobel Chemicals LLC, Nouryan Chemicals LLC, Nouryan Functional Chemicals LLC, and Nouryan Surface Chemicals, upon information and belief, knew or should have known that Roundup® is more toxic than glyphosate alone and that safety studies of Roundup® were inadequate.

256.    Defendant Monsanto had actual knowledge of its misrepresentations, negligence, breach of warranties, and false, misleading, deceptive, and unconscionable conduct.  Even so, Monsanto perpetuated its wrongful conduct with the intent and fixed purpose of concealing its wrongs from Plaintiff and the public at large.

257.    Despite their knowledge that Roundup® is considerably more dangerous than glyphosate alone, Defendants continued to promote Roundup® as safe.

258.    Plaintiff was unaware of the falsity of these representations, acted in actual and justifiable reliance on such material misrepresentations, and were injured as a direct and proximate result.

259.    Additionally, Monsanto knowingly omitted material information and remained silent regarding said misrepresentations despite the fact that it had a duty to inform Plaintiff and

FILED DATE: 3/15/2021 11:55 AM   2021L002820

the general public of the inaccuracy of said misrepresentations, which omission constitutes a positive misrepresentation of material fact, with the intent that Plaintiff and the public would rely on Monsanto's misrepresentations.

260.     Plaintiff did, in fact, act in actual and justifiable reliance on Monsanto's representations, and Plaintiff was injured as a result.

261.     Monsanto, as the manufacturer of Roundup®, was in a position of superior knowledge and judgment regarding any potential risks associated with its products.

262.     Monsanto committed constructive fraud by breaching one or more legal or equitable duties owed to Plaintiff relating to Roundup®, said breach or breaches constituting fraud because of its propensity to deceive others or constitute an injury to public interests or public policy.

263.     In breaching their respective duties to Plaintiff, Defendants used their position of trust as the manufacturer and/or distributors of Roundup® to increase sales of their products at the expense of informing Plaintiff's decedent that use of or exposure to Roundup® carries the risk of serious illness, such as NHL.

WHEREFORE, Plaintiff respectfully request that this Court enter judgment in Plaintiff's favor for damages, together with interest, costs herein incurred, attorneys' fees, and all such other and further relief as this Court deems just and proper.  Plaintiff also demand a jury trial on the issues contained herein.

## DAMAGES

264.     Plaintiff incorporates by reference every other paragraph of this Complaint as if each were set forth fully and completely herein.

FILED DATE: 3/15/2021 11:55 AM   2021L002820

265.     Defendants knew of the dangerous condition of Roundup® products, including that they posed a danger to their consumers and non-consumers exposed to Roundup® products, including Plaintiff, but chose not to include any warnings or information regarding the dangerous condition of Roundup® products.

266.     Defendants showed complete indifference to or conscious disregard of the safety of Plaintiff by their conduct described herein.  Defendants knew or should have known failure to include a warning for Roundup® products would result in individuals using and/or being exposed to Roundup® products and subsequently developing NHL.

WHEREFORE, Plaintiff prays for judgment against Defendants for:

    a.    Compensatory damages in an amount to be proven at trial;

    b.    Exemplary damages;

    c.    Costs, including reasonable attorneys' fees, court costs, and other litigation expenses; and

    d.    Any other relief the Court may deem just and proper.

WHEREFORE, Plaintiff prays for a judgment for damages against Defendant, jointly and severally, in a fair and reasonable amount in excess of the jurisdictional amount and other relief as the Court deems just and appropriate.

Respectfully submitted,

**COONEY & CONWAY**
120 N. Lasalle Street, Suite 3000
Chicago, Illinois 60602-2415

By:     _/s/ John D. Cooney_____