# EXHIBIT A

# DOCKET SHEET

Query    Reports    Utilities    Help    Log Out

PTRCK3,R16

# U.S. District Court
# Eastern District of Missouri (St. Louis)
# CIVIL DOCKET FOR CASE #: 4:20-cv-01508-RLW

Frederick et al v. Monsanto Company
Assigned to: District Judge Ronnie L. White
Case in other court: Circuit Court, St. Louis County, Missouri,
       20SL-CC04791
Cause: 28:1332 Diversity-(Citizenship)

Date Filed: 10/19/2020
Jury Demand: Defendant
Nature of Suit: 365 Personal Inj. Prod.
Liability
Jurisdiction: Diversity

**Plaintiff**

**John Frederick**                                       represented by   **Irving J. Jacobs**
KIRKENDALL DWYER LLP
605 W. 47th Street
Suite 208
Kansas City, MO 64112
913-981-2524
Fax: 913-347-0019
Email: jjacobs@kirkendalldwyer.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Lynn Tierney**                                         represented by   **Irving J. Jacobs**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Paul Paulson**                                         represented by   **Irving J. Jacobs**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Mollie Norman**                                        represented by   **Irving J. Jacobs**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Jim Flatt**                                            represented by   **Irving J. Jacobs**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Jill Estes**

represented by **Irving J. Jacobs**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Melody Burbage**

represented by **Irving J. Jacobs**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Laura Branham**

represented by **Irving J. Jacobs**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Darryl Stanger**

represented by **Irving J. Jacobs**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Robert Vanbuhler**

represented by **Irving J. Jacobs**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Kenneth McGill**

represented by **Irving J. Jacobs**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Jennifer Roling**

represented by **Irving J. Jacobs**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Jody Jacobs**

represented by **Irving J. Jacobs**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Lisa Willhite**

represented by **Irving J. Jacobs**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Randall Crewz**                                       represented by   **Irving J. Jacobs**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**John Lahaye Jr.**                                     represented by   **Irving J. Jacobs**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Gerald Brown**                                        represented by   **Irving J. Jacobs**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Michael Muzechuk**                                    represented by   **Irving J. Jacobs**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Marjorie Hunter**                                     represented by   **Irving J. Jacobs**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Matthew Long**                                        represented by   **Irving J. Jacobs**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Karen Poling**                                        represented by   **Irving J. Jacobs**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Andrew Gilbert**                                      represented by   **Irving J. Jacobs**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Terry Frerman**                                       represented by   **Irving J. Jacobs**
(See above for address)

*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Leigh Oliver**                                represented by   **Irving J. Jacobs**
                                                                (See above for address)
                                                                *LEAD ATTORNEY*
                                                                *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Raquel Davis**                               represented by   **Irving J. Jacobs**
                                                                (See above for address)
                                                                *LEAD ATTORNEY*
                                                                *ATTORNEY TO BE NOTICED*

**Plaintiff**

**James Garrity**                              represented by   **Irving J. Jacobs**
                                                                (See above for address)
                                                                *LEAD ATTORNEY*
                                                                *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Kenneth James**                              represented by   **Irving J. Jacobs**
                                                                (See above for address)
                                                                *LEAD ATTORNEY*
                                                                *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Thomas Moore**                               represented by   **Irving J. Jacobs**
                                                                (See above for address)
                                                                *LEAD ATTORNEY*
                                                                *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Richard Sivley**                             represented by   **Irving J. Jacobs**
                                                                (See above for address)
                                                                *LEAD ATTORNEY*
                                                                *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Anthony King**                               represented by   **Irving J. Jacobs**
                                                                (See above for address)
                                                                *LEAD ATTORNEY*
                                                                *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Robert Moberg**                              represented by   **Irving J. Jacobs**
                                                                (See above for address)
                                                                *LEAD ATTORNEY*
                                                                *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Gregory Johnson**

represented by **Irving J. Jacobs**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

<u>**Plaintiff**</u>

**Diane Shiley**

represented by **Irving J. Jacobs**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

<u>**Plaintiff**</u>

**Cecelia Rogers**

represented by **Irving J. Jacobs**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

<u>**Plaintiff**</u>

**Jonni Masella**

represented by **Irving J. Jacobs**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

<u>**Plaintiff**</u>

**Sherry Hohl**

represented by **Irving J. Jacobs**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

<u>**Plaintiff**</u>

**Cynthia Crady**

represented by **Irving J. Jacobs**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

<u>**Plaintiff**</u>

**Joella Gonterman**

represented by **Irving J. Jacobs**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

<u>**Plaintiff**</u>

**Robin Smith**

represented by **Irving J. Jacobs**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

<u>**Plaintiff**</u>

**Wanda Yobert**

represented by **Irving J. Jacobs**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

Leona Barnes                              represented by **Irving J. Jacobs**
                                          (See above for address)
                                          *LEAD ATTORNEY*
                                          *ATTORNEY TO BE NOTICED*

**Plaintiff**

William Cline                             represented by **Irving J. Jacobs**
                                          (See above for address)
                                          *LEAD ATTORNEY*
                                          *ATTORNEY TO BE NOTICED*

**Plaintiff**

Nancy Ford                                represented by **Irving J. Jacobs**
                                          (See above for address)
                                          *LEAD ATTORNEY*
                                          *ATTORNEY TO BE NOTICED*

**Plaintiff**

Mary Hunt                                 represented by **Irving J. Jacobs**
                                          (See above for address)
                                          *LEAD ATTORNEY*
                                          *ATTORNEY TO BE NOTICED*

**Plaintiff**

Frank Taylor                              represented by **Irving J. Jacobs**
                                          (See above for address)
                                          *LEAD ATTORNEY*
                                          *ATTORNEY TO BE NOTICED*

**Plaintiff**

Jason Burton                              represented by **Irving J. Jacobs**
                                          (See above for address)
                                          *LEAD ATTORNEY*
                                          *ATTORNEY TO BE NOTICED*

**Plaintiff**

Eleanore Mongin                           represented by **Irving J. Jacobs**
                                          (See above for address)
                                          *LEAD ATTORNEY*
                                          *ATTORNEY TO BE NOTICED*

**Plaintiff**

Norma Pearson                             represented by **Irving J. Jacobs**
                                          (See above for address)
                                          *LEAD ATTORNEY*
                                          *ATTORNEY TO BE NOTICED*

**Plaintiff**

Aaron Lyons                               represented by **Irving J. Jacobs**
                                          (See above for address)

*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Brenda Odum**                                    represented by   **Irving J. Jacobs**
                                                   (See above for address)
                                                   *LEAD ATTORNEY*
                                                   *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Carol Conrad**                                   represented by   **Irving J. Jacobs**
                                                   (See above for address)
                                                   *LEAD ATTORNEY*
                                                   *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Paula Gomez**                                    represented by   **Irving J. Jacobs**
                                                   (See above for address)
                                                   *LEAD ATTORNEY*
                                                   *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Tony Ross**                                      represented by   **Irving J. Jacobs**
                                                   (See above for address)
                                                   *LEAD ATTORNEY*
                                                   *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Bonnie Lynn**                                    represented by   **Irving J. Jacobs**
                                                   (See above for address)
                                                   *LEAD ATTORNEY*
                                                   *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Sandra Draper**                                  represented by   **Irving J. Jacobs**
                                                   (See above for address)
                                                   *LEAD ATTORNEY*
                                                   *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Jack Ashwood**                                   represented by   **Irving J. Jacobs**
                                                   (See above for address)
                                                   *LEAD ATTORNEY*
                                                   *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Ruth Jones**                                     represented by   **Irving J. Jacobs**
                                                   (See above for address)
                                                   *LEAD ATTORNEY*
                                                   *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Kay Clark**                                     represented by  **Irving J. Jacobs**
                                                                 (See above for address)
                                                                 *LEAD ATTORNEY*
                                                                 *ATTORNEY TO BE NOTICED*


**Plaintiff**

**Marilyn Davis**                                 represented by  **Irving J. Jacobs**
                                                                 (See above for address)
                                                                 *LEAD ATTORNEY*
                                                                 *ATTORNEY TO BE NOTICED*


**Plaintiff**

**Dorothy Inman**                                 represented by  **Irving J. Jacobs**
                                                                 (See above for address)
                                                                 *LEAD ATTORNEY*
                                                                 *ATTORNEY TO BE NOTICED*


**Plaintiff**

**Sandra All**                                    represented by  **Irving J. Jacobs**
                                                                 (See above for address)
                                                                 *LEAD ATTORNEY*
                                                                 *ATTORNEY TO BE NOTICED*


**Plaintiff**

**Mark Hogue**                                    represented by  **Irving J. Jacobs**
                                                                 (See above for address)
                                                                 *LEAD ATTORNEY*
                                                                 *ATTORNEY TO BE NOTICED*


**Plaintiff**

**Tunja Whitley**                                 represented by  **Irving J. Jacobs**
*individually and on behalf of Marques*                          (See above for address)
*Whitley*                                                        *LEAD ATTORNEY*
                                                                 *ATTORNEY TO BE NOTICED*


**Plaintiff**

**Lynn Button**                                   represented by  **Irving J. Jacobs**
*individually and on behalf of Rush Button*                      (See above for address)
                                                                 *LEAD ATTORNEY*
                                                                 *ATTORNEY TO BE NOTICED*


**Plaintiff**

**Tanya Naumenko**                                represented by  **Irving J. Jacobs**
*individually and on behalf of George*                           (See above for address)
*Anderson*                                                       *LEAD ATTORNEY*
                                                                 *ATTORNEY TO BE NOTICED*


**Plaintiff**

**Linda Stine**                                   represented by  **Irving J. Jacobs**
*individually and on behalf of James Stine*                      (See above for address)
                                                                 *LEAD ATTORNEY*
                                                                 *ATTORNEY TO BE NOTICED*

**Plaintiff**

**John D'ambrosio**                                represented by **Irving J. Jacobs**
*individually and on behalf of Michael*                            (See above for address)
*D'ambrosio*                                                       *LEAD ATTORNEY*
                                                                   *ATTORNEY TO BE NOTICED*


**Plaintiff**

**Geraldine Reed**                                 represented by **Irving J. Jacobs**
*individually and on behalf of Lillian Arthur*                     (See above for address)
                                                                   *LEAD ATTORNEY*
                                                                   *ATTORNEY TO BE NOTICED*


**Plaintiff**

**Lisa Rainer**                                    represented by **Irving J. Jacobs**
*individually and on behalf of John Rainer*                        (See above for address)
                                                                   *LEAD ATTORNEY*
                                                                   *ATTORNEY TO BE NOTICED*


**Plaintiff**

**John Quintana**                                  represented by **Irving J. Jacobs**
*individually and on behalf of Fernando*                           (See above for address)
*Quintana*                                                         *LEAD ATTORNEY*
                                                                   *ATTORNEY TO BE NOTICED*


**Plaintiff**

**Christine Briere**                               represented by **Irving J. Jacobs**
*individually and on behalf of Sandra*                             (See above for address)
*Mcewan*                                                           *LEAD ATTORNEY*
                                                                   *ATTORNEY TO BE NOTICED*


**Plaintiff**

**Nellie Brooks**                                  represented by **Irving J. Jacobs**
*individually and on behalf of James Brooks*                       (See above for address)
                                                                   *LEAD ATTORNEY*
                                                                   *ATTORNEY TO BE NOTICED*


**Plaintiff**

**Marcia Brown**                                   represented by **Irving J. Jacobs**
*individually and on behalf of Wesley Brown*                       (See above for address)
                                                                   *LEAD ATTORNEY*
                                                                   *ATTORNEY TO BE NOTICED*


**Plaintiff**

**Bill Hoover**                                    represented by **Irving J. Jacobs**
*individually and on behalf of Joseph Hoover*                      (See above for address)
                                                                   *LEAD ATTORNEY*
                                                                   *ATTORNEY TO BE NOTICED*


**Plaintiff**

**Gail Novak**                                     represented by **Irving J. Jacobs**
*individually and on behalf of Niles Novak*                        (See above for address)

*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Carroll Jernigan**                          represented by   **Irving J. Jacobs**
*individually and on behalf of Constance*                     (See above for address)
*Jernigan*                                                    *LEAD ATTORNEY*
                                                              *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Dennis Green**                              represented by   **Irving J. Jacobs**
*individually and on behalf of Sally Green*                   (See above for address)
                                                              *LEAD ATTORNEY*
                                                              *ATTORNEY TO BE NOTICED*

**Plaintiff**

**John Powers**                               represented by   **Irving J. Jacobs**
*individually and on behalf of Alberta*                       (See above for address)
*Powers*                                                      *LEAD ATTORNEY*
                                                              *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Virginia Whitaker**                         represented by   **Irving J. Jacobs**
*individually and on behalf of Derrek*                        (See above for address)
*Whitaker*                                                    *LEAD ATTORNEY*
                                                              *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Maureen Woltmann**                          represented by   **Irving J. Jacobs**
*individually and on behalf of Edward*                        (See above for address)
*Woltmann*                                                    *LEAD ATTORNEY*
                                                              *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Katherine Smith**                           represented by   **Irving J. Jacobs**
*individually and on behalf of Craig Smith*                   (See above for address)
                                                              *LEAD ATTORNEY*
                                                              *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Angela Biersteker**                         represented by   **Irving J. Jacobs**
*individually and on behalf of Jon*                           (See above for address)
*Bierstekter*                                                 *LEAD ATTORNEY*
                                                              *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Judy Perkowski**                            represented by   **Irving J. Jacobs**
*individually and on behalf of Edward*                        (See above for address)
*Perkowski*                                                   *LEAD ATTORNEY*
                                                              *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Doris Martinez**
*individually and on behalf of Modesto*
*Rodriguez*

represented by   **Irving J. Jacobs**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Pernecia Hull**
*individually and on behalf of Jimmy Hull*

represented by   **Irving J. Jacobs**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Mary Vail**
*individually and on behalf of Elvis Vail*

represented by   **Irving J. Jacobs**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Ida White**
*individually and on behalf of William White*

represented by   **Irving J. Jacobs**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Marilyn Smith**
*individually and on behalf of Merle Smith*

represented by   **Irving J. Jacobs**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Peggy Potter**
*individually and on behalf of Robert Potter*

represented by   **Irving J. Jacobs**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Monsanto Company**, MO

represented by   **Erik L. Hansell**
HUSCH BLACKWELL LLP - St Louis
190 Carondelet Plaza
Suite 600
St. Louis, MO 63105
314-480-1500
Fax: 314-480-1505
Email: erik.hansell@huschblackwell.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 10/19/2020 | 1 | NOTICE OF REMOVAL from Circuit Court of St. Louis County, MO, case number 20SL- |

| | | CC04791, with receipt number AMOEDC-8223971, in the amount of $400 Jury Demand,, filed by Monsanto Company. (Attachments: # 1 Exhibit A - State Court File, # 2 Exhibit B, # 3 Civil Cover Sheet, # 4 Original Filing Form)(Hansell, Erik) (Entered: 10/19/2020) |
|---|---|---|
| 10/19/2020 | 2 | NOTICE OF FILING NOTICE OF REMOVAL filed by Defendant Monsanto Company Sent To: Plaintiff (Hansell, Erik) (Entered: 10/19/2020) |
| 10/19/2020 | 3 | DISCLOSURE OF ORGANIZATIONAL INTERESTS CERTIFICATE by Defendant Monsanto Company. Parent companies: Bayer AG, Subsidiaries: None, Publicly held company: Bayer AG,. (Hansell, Erik) (Entered: 10/19/2020) |
| 10/19/2020 | 4 | ANSWER to Complaint by Monsanto Company.(Hansell, Erik) (Entered: 10/19/2020) |
| 10/19/2020 | 5 | Petition (Removal/Transfer) Received From: Circuit Court, St. Louis County, Missouri, filed by Diane Shiley, Gregory Johnson, Tunja Whitley, Karen Poling, Christine Briere, Melody Burbage, Maureen Woltmann, James Garrity, Michael Muzechuk, Nellie Brooks, John Lahaye Jr., Mary Hunt, Sandra Draper, Doris Martinez, Kenneth James, Bill Hoover, Ruth Jones, Sandra All, Matthew Long, Peggy Potter, Robert Vanbuhler, Robert Moberg, Jonni Masella, Kenneth McGill, John Powers, Norma Pearson, Ida White, Dennis Green, Richard Sivley, Tanya Naumenko, Brenda Odum, Robin Smith, Lynn Button, Jennifer Roling, Kay Clark, Leona Barnes, Randall Crewz, Katherine Smith, Paula Gomez, Dorothy Inman, Jack Ashwood, Frank Taylor, Linda Stine, Marcia Brown, Mary Vail, Carroll Jernigan, Marjorie Hunter, Mark Hogue, Bonnie Lynn, John D'ambrosio, John Quintana, Geraldine Reed, Lynn Tierney, Gerald Brown, John Frederick, Marilyn Smith, Anthony King, Angela Biersteker, Raquel Davis, Thomas Moore, Wanda Yobert, Gail Novak, Judy Perkowski, Lisa Willhite, Lisa Rainer, Marilyn Davis, Aaron Lyons, Leigh Oliver, Tony Ross, Virginia Whitaker, Andrew Gilbert, William Cline, Jason Burton, Terry Frerman, Jody Jacobs, Jill Estes, Pernecia Hull, Sherry Hohl, Paul Paulson, Darryl Stanger, Carol Conrad, Eleanore Mongin, Joella Gonterman, Laura Branham, Mollie Norman, Cecelia Rogers, Cynthia Crady, Nancy Ford, Jim Flatt.(BAK) (Entered: 10/19/2020) |
| 10/19/2020 | | Case Opening Notification: Judge Assigned: U.S. District Judge Ronnie L. White. (BAK) (Entered: 10/19/2020) |
| 10/22/2020 | 6 | NOTICE OF FILING NOTICE OF REMOVAL filed by Defendant Monsanto Company Sent To: State Court - Executed (Hansell, Erik) (Entered: 10/22/2020) |
| 04/09/2021 | 7 | RULE 16 ORDER: This case is assigned to Track: Preliminary Track 3 (Complex) [SEE ORDER FOR COMPLETE DETAILS] (Joint Scheduling Plan due by 5/13/2021. Rule 16 Conference set for 5/21/2021 10:00 AM in Telephone Conference in Chambers before District Judge Ronnie L. White.) Signed by District Judge Ronnie L. White on 4/9/2021. (TMT) (Entered: 04/09/2021) |
| 04/16/2021 | 8 | NOTICE Filing of Notice of Tag-Along Action With Judicial Panel on Multidistrict Litigation: by Plaintiffs Sandra All, Jack Ashwood, Leona Barnes, Angela Biersteker, Laura Branham, Christine Briere, Nellie Brooks, Gerald Brown, Marcia Brown, Melody Burbage, Jason Burton, Lynn Button, Kay Clark, William Cline, Carol Conrad, Cynthia Crady, Randall Crewz, John D'ambrosio, Marilyn Davis, Raquel Davis, Sandra Draper, Jill Estes, Jim Flatt, Nancy Ford, John Frederick, Terry Frerman, James Garrity, Andrew Gilbert, Paula Gomez, Joella Gonterman, Dennis Green, Mark Hogue, Sherry Hohl, Bill Hoover, Pernecia Hull, Mary Hunt, Marjorie Hunter, Dorothy Inman, Jody Jacobs, Kenneth James, Carroll Jernigan, Gregory Johnson, Ruth Jones, Anthony King, John Lahaye Jr., Matthew Long, Bonnie Lynn, Aaron Lyons, Doris Martinez, Jonni Masella, Kenneth McGill, Robert Moberg, Eleanore Mongin, Thomas Moore, Michael Muzechuk, Tanya Naumenko, Mollie Norman, Gail Novak, Brenda Odum, Leigh Oliver, Paul Paulson, Norma Pearson, Judy Perkowski, Karen Poling, Peggy Potter, John Powers, John Quintana, Lisa Rainer, Geraldine Reed, Cecelia Rogers, Jennifer Roling, Tony Ross, Diane Shiley, Richard Sivley, |

Katherine Smith, Marilyn Smith, Robin Smith, Darryl Stanger, Linda Stine, Frank Taylor, Lynn Tierney, Mary Vail, Robert Vanbuhler, Virginia Whitaker, Ida White, Tunja Whitley, Lisa Willhite, Maureen Woltmann, Wanda Yobert (Jacobs, Irving) (Entered: 04/16/2021)

| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 04/16/2021 14:55:34 | | | |
| **PACER Login:** | fletchtrammell | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 4:20-cv-01508-RLW |
| **Billable Pages:** | 13 | **Cost:** | 1.30 |

# COMPLAINT

Electronically Filed - St Louis County - September 14, 2020 - 12:50 PM

# IN THE CIRCUIT COURT OF THE COUNTY OF ST. LOUIS
## STATE OF MISSOURI

JOHN FREDERICK, LYNN TIERNEY, PAUL PAULSON, MOLLIE NORMAN, JIM FLATT, JILL ESTES, MELODY BURBAGE, LAURA BRANHAM, DARRYL STANGER, ROBERT VANBUHLER, KENNETH MCGILL, JENNIFER ROLING, JODY JACOBS, LISA WILLHITE, RANDALL CREWZ, JOHN LAHAYE JR., GERALD BROWN, MICHAEL MUZECHUK, MARJORIE HUNTER, MATTHEW LONG, KAREN POLING, ANDREW GILBERT, TERRY FRERMAN, LEIGH OLIVER, RAQUEL DAVIS, JAMES GARRITY, KENNETH JAMES, THOMAS MOORE, RICHARD SIVLEY, ANTHONY KING, ROBERT MOBERG, GREGORY JOHNSON, DIANE SHILEY, CECELIA ROGERS, JONNI MASELLA, SHERRY HOHL, CYNTHIA CRADY, JOELLA GONTERMAN, ROBIN SMITH, WANDA YOBERT, LEONA BARNES, WILLIAM CLINE, NANCY FORD, MARY HUNT, FRANK TAYLOR, JASON BURTON, ELEANORE MONGIN, NORMA PEARSON, AARON LYONS, BRENDA ODUM, CAROL CONRAD, PAULA GOMEZ, TONY ROSS, BONNIE LYNN, SANDRA DRAPER, JACK ASHWOOD, RUTH JONES, KAY CLARK, MARILYN DAVIS, DOROTHY INMAN, SANDRA ALL, MARK HOGUE, TUNJA WHITLEY, individually and on behalf of, MARQUES WHITLEY, LYNN BUTTON, individually and on behalf of, RUSH BUTTON, TANYA NAUMENKO, individually and on behalf of, GEORGE ANDERSON, LINDA STINE, individually and on behalf of, JAMES STINE, JOHN D'AMBROSIO, individually and on behalf of, MICHAEL D'AMBROSIO, GERALDINE REED, individually and on behalf of, LILLIAN ARTHUR, LISA RAINER, individually and on behalf of, JOHN RAINER, JOHN QUINTANA, individually and on behalf of, FERNANDO QUINTANA, CHRISTINE BRIERE, individually and on behalf of, SANDRA MCEWAN, NELLIE BROOKS, individually and

Case No.:

Division:

**JURY TRIAL DEMANDED**

Electronically Filed - St Louis County - September 14, 2020 - 12:50 PM

on behalf of, JAMES BROOKS, MARCIA
BROWN, individually and on behalf of, WESLEY
BROWN, BILL HOOVER, individually and on
behalf of, JOSEPH HOOVER, GAIL NOVAK,
individually and on behalf of, NILES NOVAK,
CARROLL JERNIGAN, individually and on
behalf of, CONSTANCE JERNIGAN, DENNIS
GREEN, individually and on behalf of, SALLY
GREEN, JOHN POWERS, individually and on
behalf of, ALBERTA POWERS, VIRGINIA
WHITAKER, individually and on behalf of,
DERREK WHITAKER, MAUREEN
WOLTMANN, individually and on behalf of,
EDWARD WOLTMANN, KATHERINE SMITH,
individually and on behalf of, CRAIG SMITH,
JOHN POWERS, individually and on behalf of,
ALBERTA POWERS, ANGELA BIERSTEKER,
individually and on behalf of, JON
BIERSTEKTER, JUDY PERKOWSKI,
individually and on behalf of, EDWARD
PERKOWSKI, DORIS MARTINEZ, individually
and on behalf of, MODESTO RODRIGUEZ,
PERNECIA HULL, individually and on behalf of,
JIMMY HULL, MARY VAIL, individually and on
behalf of, ELVIS VAIL, IDA WHITE,
individually and on behalf of, WILLIAM WHITE,
MARILYN SMITH, individually and on behalf of,
MERLE SMITH, PEGGY POTTER, individually
and on behalf of, ROBERT POTTER

       Plaintiffs,

v.

MONSANTO COMPANY
Serve: Registered Agent
      CSC of St. Louis County, Inc.
      MC – CSC1
      9666 Olive Blvd., Suite 690
      St. Louis, MO 63132-3026

       Defendant.

Electronically Filed - St Louis County - September 14, 2020 - 12:50 PM

## PETITION

COME NOW Plaintiffs, by and through their undersigned counsel, and for their causes of action against Defendant Monsanto Company, alleging the following upon information and belief (including investigation made by and through Plaintiffs' counsel), except those allegations that pertain to Plaintiffs, which are based on personal knowledge:

## INTRODUCTION

Plaintiffs bring this cause of action against Defendant pursuant to Rule 52.05(a) of the Missouri Rules of Civil Procedure, as their claims arise out of the same series of transactions and occurrences, and their claims involve common questions of law and/or fact. All claims in this action are a direct and proximate result of Defendants' negligent, willful, and wrongful conduct in connection with the design, development, manufacture, testing, packaging, promoting, marketing, distribution, and/or sale of the products as Roundup®, which was conducted without regard to individual Plaintiff differences. All Plaintiffs in this action seek recovery for damages as a result of developing Non-Hodgkin's Lymphoma ("NHL"), which was directly and proximately caused by such wrongful conduct by Defendant, the unreasonably dangerous and defective nature of Roundup®, and its active ingredient, glyphosate, and the attendant effects of developing NHL. No Plaintiff knew of an association between exposure to Roundup® and the increased risk of developing NHL until well after the International Agency for Research on Cancer ("IARC"), an agency of the World Health Organization ("WHO"), first published its evaluation of glyphosate. All of the claims involve common questions of law and fact and share legal and medical issues that arise out of all of the Plaintiffs' exposures to Roundup®.

Electronically Filed - St Louis County - September 14, 2020 - 12:50 PM

## THE PARTIES

### PLAINTIFFS

### John Frederick

1.      Plaintiff John Frederick is a citizen of the State of Kentucky and was born on October 7, 1955.  Plaintiff resides in the City of Cadiz, County of Trigg.

2.      Plaintiff was exposed to Roundup® in the Cities of Woodbine and Wichita, both located in the State of Kansas from 1989 until 1994 while spraying Roundup® commercially. Plaintiff sprayed Roundup® yearly from March through June on a weekly basis.

3.      In April of 2011, Plaintiff was diagnosed with NHL in Nashville, Tennessee at Nashville VA Medical Center and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

4.      As a direct and proximate result of these injuries, Plaintiff has incurred and will incur medical expenses in the future and has endured and will endure pain and suffering and loss of enjoyment of life, and Plaintiff has otherwise been damaged in a personal and pecuniary nature.

5.      During the entire time that Plaintiff was exposed to Roundup®, Plaintiff did not know that exposure to Roundup® was injurious to Plaintiff's health or the health of others.

### Lynn Tierney

6.      Plaintiff Lynn Tierney is a citizen of the State of Idaho and was born on July 9, 1953.  Plaintiff resides in the City of Boise, County of Ada.

Electronically Filed - St Louis County - September 14, 2020 - 12:50 PM

7.      Plaintiff was exposed to Roundup® in Boise, Idaho from 2015 until 2017 while spraying Roundup® residentially.  Plaintiff sprayed Roundup® yearly from March to September on a weekly basis.

8.      In May of 2016, Plaintiff was diagnosed with NHL in Boise, Idaho by Dr. William Kreisle at St. Luke's Mountains States Tumor Institute and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion n, distribution, marketing, and sale of Roundup®.

9.      As a direct and proximate result of these injuries, Plaintiff has incurred and will incur medical expenses in the future and has endured and will endure pain and suffering and loss of enjoyment of life, and Plaintiff has otherwise been damaged in a personal and pecuniary nature.

10.      During the entire time that Plaintiff was exposed to Roundup®, Plaintiff did not know that exposure to Roundup® was injurious to Plaintiff's health or the health of others.

**Paul Paulson**

11.      Plaintiff Paul Paulson is a citizen of the State of Montana and was born on November 19, 1962.  Plaintiff resides in the City of Westby, County of Sheridan.

12.      Plaintiff was exposed to Roundup® in Raymond, Montana from 1996 until 2013 while spraying Roundup® residentially and commercially.  Plaintiff sprayed Roundup® yearly from April through October on a bi-weekly basis.

13.      In February of 2017, Plaintiff was diagnosed with NHL in Plentywood, Montana by Dr. Kirk Stoner at Sheridan Memorial Hospital and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and

Electronically Filed - St Louis County - September 14, 2020 - 12:50 PM

Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

14.     As a direct and proximate result of these injuries, Plaintiff has incurred and will incur medical expenses in the future and has endured and will endure pain and suffering and loss of enjoyment of life, and Plaintiff has otherwise been damaged in a personal and pecuniary nature.

15.     During the entire time that Plaintiff was exposed to Roundup®, Plaintiff did not know that exposure to Roundup® was injurious to Plaintiff's health or the health of others.

**Mollie Norman**

16.     Plaintiff Mollie Norman is a citizen of the State of Kentucky and was born on June 27, 1978.  Plaintiff resides in the City of Nicholasville, Jessamine.

17.     Plaintiff was exposed to Roundup® in the Cities of Lexington and Lebanon, both in the State of Kentucky from 2013 until 2016 while spraying Roundup® residentially.   Plaintiff sprayed Roundup® yearly from May to September on a monthly basis.

18.     In February of 2016, Plaintiff was diagnosed with NHL in Lexington, Kentucky by Dr. Nicholas Schaub at Baptist Health and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

19.     As a direct and proximate result of these injuries, Plaintiff has incurred and will incur medical expenses in the future and has endured and will endure pain and suffering and loss of enjoyment of life, and Plaintiff has otherwise been damaged in a personal and pecuniary nature.

20.     During the entire time that Plaintiff was exposed to Roundup®, Plaintiff did not know that exposure to Roundup® was injurious to Plaintiff's health or the health of others.

Electronically Filed - St Louis County - September 14, 2020 - 12:50 PM

**Jim Flatt**

21.     Plaintiff Jim Flatt is a citizen of the State of Tennessee and was born on October 5, 1958.  Plaintiff resides in the City of Sparta, County of White.

22.     Plaintiff was exposed to Roundup® in Sparta, Tennessee from 1976 until 2001 while spraying Roundup® residentially.  Plaintiff sprayed Roundup® yearly from March through October on a monthly basis.

23.     In July of 2002, Plaintiff was diagnosed with NHL in Nashville, Tennessee by Dr. Adetola Kassim at Vanderbilt University Medical Center and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

24.     As a direct and proximate result of these injuries, Plaintiff has incurred and will incur medical expenses in the future and has endured and will endure pain and suffering and loss of enjoyment of life, and Plaintiff has otherwise been damaged in a personal and pecuniary nature.

25.     During the entire time that Plaintiff was exposed to Roundup®, Plaintiff did not know that exposure to Roundup® was injurious to Plaintiff's health or the health of others.

**Jill Estes**

26.     Plaintiff Jill Estes is a citizen of the State of Kentucky and was born on May 19, 1969.  Plaintiff resides in the City of Owensboro, County of Daviess.

27.     Plaintiff was exposed to Roundup® in Utica, Kentucky from 1988 until 1998 while spraying Roundup® residentially and commercially.  Plaintiff sprayed Roundup® yearly from March to October on a daily to weekly basis.

Electronically Filed - St Louis County - September 14, 2020 - 12:50 PM

28.     In 2007, Plaintiff was diagnosed with NHL in Owensboro, Kentucky by Dr. George Gilliam at Owensboro Health and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

29.     As a direct and proximate result of these injuries, Plaintiff has incurred and will incur medical expenses in the future and has endured and will endure pain and suffering and loss of enjoyment of life, and Plaintiff has otherwise been damaged in a personal and pecuniary nature.

30.     During the entire time that Plaintiff was exposed to Roundup®, Plaintiff did not know that exposure to Roundup® was injurious to Plaintiff's health or the health of others.

### Melody Burbage

31.     Plaintiff Melody Burbage is a citizen of the State of South Carolina and was born on February 24, 1960.  Plaintiff resides in the City of Charleston, County of Charleston.

32.     Plaintiff was exposed to Roundup® in the cities of Sturgis, Morganfield, and Henderson, all located in the state of Kentucky from 1991 until 2017 while spraying Roundup® residentially and commercially.  Plaintiff sprayed Roundup® yearly from May to September on a weekly basis.

33.     In March of 2017, Plaintiff was diagnosed with NHL in Newburgh, Indiana by Dr. Vivian Cook at Oncology Hematology Associates of Southwest Indiana and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

Electronically Filed - St Louis County - September 14, 2020 - 12:50 PM

34.    As a direct and proximate result of these injuries, Plaintiff has incurred and will incur medical expenses in the future and has endured and will endure pain and suffering and loss of enjoyment of life, and Plaintiff has otherwise been damaged in a personal and pecuniary nature.

35.    During the entire time that Plaintiff was exposed to Roundup®, Plaintiff did not know that exposure to Roundup® was injurious to Plaintiff's health or the health of others.

### Laura Branham

36.    Plaintiff Laura Branham is a citizen of the State of Ohio and was born on July 13, 1967.  Plaintiff resides in the City of Lancaster, County of Fairfield.

37.    Plaintiff was exposed to Roundup® in the Cities of Chillicothe and Lancaster, both located in the State of Ohio from 1976 until 1985 and 2002 until 2014 while spraying Roundup® commercially and residentially.  Plaintiff sprayed Roundup® yearly from April to October on a monthly basis.

38.    In January of 2018, Plaintiff was diagnosed with NHL in Columbus, Ohio Dr. Chris Karas at OhioHealth and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

39.    As a direct and proximate result of these injuries, Plaintiff has incurred and will incur medical expenses in the future and has endured and will endure pain and suffering and loss of enjoyment of life, and Plaintiff has otherwise been damaged in a personal and pecuniary nature.

40.    During the entire time that Plaintiff was exposed to Roundup®, Plaintiff did not know that exposure to Roundup® was injurious to Plaintiff's health or the health of others.

### Darryl Stanger

41.     Plaintiff Darryl Stanger is a citizen of the State of Washington and was born on February 1, 1943. Plaintiff resides in the City of Omak, County of Okanogan.

42.     Plaintiff was exposed to Roundup® in Omak, Washington from 1976 until 2017 while spraying Roundup® residentially.   Plaintiff sprayed Roundup® yearly from March to September on a bi-weekly basis.

43.     In January of 2017, Plaintiff was diagnosed with NHL in Spokane, Washington by Dr. Melvyn Feliciano at WSH Sacred Heart Medical Center and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

44.     As a direct and proximate result of these injuries, Plaintiff has incurred and will incur medical expenses in the future and has endured and will endure pain and suffering and loss of enjoyment of life, and Plaintiff has otherwise been damaged in a personal and pecuniary nature.

45.     During the entire time that Plaintiff was exposed to Roundup®, Plaintiff did not know that exposure to Roundup® was injurious to Plaintiff's health or the health of others.

**Robert Vanbuhler**

46.     Plaintiff Robert Vanbuhler is a citizen of the State of South Carolina and was born on September 20, 1977.  Plaintiff resides in the City of Simpsonville, County of Greenvill.

47.     Plaintiff was exposed to Roundup® in Maulden, South Carolina and Clearwater, Florida from 1989 until 2018 while spraying Roundup® commercially and while working in a factory when Roundup was stored and spilled.  Plaintiff was expose to Roundup® yearly on a weekly basis.

Electronically Filed - St Louis County - September 14, 2020 - 12:50 PM

Electronically Filed - St Louis County - September 14, 2020 - 12:50 PM

48.     In September of 2017, Plaintiff was diagnosed with NHL in Greenville, South Carolina by Dr. Lester Salwen at Castroenterology and Liver Center and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

49.     As a direct and proximate result of these injuries, Plaintiff has incurred and will incur medical expenses in the future and has endured and will endure pain and suffering and loss of enjoyment of life, and Plaintiff has otherwise been damaged in a personal and pecuniary nature.

50.     During the entire time that Plaintiff was exposed to Roundup®, Plaintiff did not know that exposure to Roundup® was injurious to Plaintiff's health or the health of others.

**Kenneth McGill**

51.     Plaintiff Kenneth McGill is a citizen of the State of Kansas and was born on October 15, 1955.  Plaintiff resides in the City of Clearwater, County of Sedgwick.

52.     Plaintiff was exposed to Roundup® in the Cities of Warsaw and Ava, both in the State of Missouri, and the City of LaCygne, in the State of Kansas, from 1996 until 2008 while spraying Roundup® residentially.  Plaintiff sprayed Roundup® yearly every three months.

53.     In January of 2008, Plaintiff was diagnosed with NHL in Wichita, Kansas by Dr. Martha Householder at The Dermatology Clinic and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

Electronically Filed - St. Louis County - September 14, 2020 - 12:50 PM

54.     As a direct and proximate result of these injuries, Plaintiff has incurred and will incur medical expenses in the future and has endured and will endure pain and suffering and loss of enjoyment of life, and Plaintiff has otherwise been damaged in a personal and pecuniary nature.

55.     During the entire time that Plaintiff was exposed to Roundup®, Plaintiff did not know that exposure to Roundup® was injurious to Plaintiff's health or the health of others.

### Jennifer Roling

56.     Plaintiff Jennifer Roling is a citizen of the State of Iowa and was born on December 12, 1980.  Plaintiff resides in the City of Remsen, County of Plymouth.

57.     Plaintiff was exposed to Roundup® in the Cities of Remsen and Granville, both in the State of Iowa from 2010 until 2012.

58.     In January of 2011, Plaintiff was diagnosed with NHL in St. Lincoln, Nebraska at CHI Health St. Elizabeth and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

59.     As a direct and proximate result of these injuries, Plaintiff has incurred and will incur medical expenses in the future and has endured and will endure pain and suffering and loss of enjoyment of life, and Plaintiff has otherwise been damaged in a personal and pecuniary nature.

60.     During the entire time that Plaintiff was exposed to Roundup®, Plaintiff did not know that exposure to Roundup® was injurious to Plaintiff's health or the health of others.

### Jody Jacobs

61.     Plaintiff Jody Jacobs is a citizen of the State of Georgia and was born on July 8, 1958.  Plaintiff resides in the City of Fort Oglethorpe, County of Catoosa.

62.     Plaintiff was exposed to Roundup® in Chattanooga, Tennessee and Ringo, Georgia from 1997 until 2015 while spraying Roundup® residentially.  Plaintiff sprayed Roundup® every three months throughout the year.

63.     In December of 2017, Plaintiff was diagnosed with NHL in Chattanooga, Tennessee by Dr. John McCravey at Erlanger Cancer Center and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

64.     As a direct and proximate result of these injuries, Plaintiff has incurred and will incur medical expenses in the future and has endured and will endure pain and suffering and loss of enjoyment of life, and Plaintiff has otherwise been damaged in a personal and pecuniary nature.

65.     During the entire time that Plaintiff was exposed to Roundup®, Plaintiff did not know that exposure to Roundup® was injurious to Plaintiff's health or the health of others.

### Lisa Willhite

66.     Plaintiff Lisa Willhite is a citizen of the State of Kentucky and was born on January 06, 1963.  Plaintiff resides in the City of Eminence, County of Henry.

67.     Plaintiff was exposed to Roundup® in Eminence, Kentucky from 1988 until 2008 while spraying Roundup® on a family farm and residentially.  Plaintiff sprayed Roundup® yearly from March to October on a monthly basis.

68.     On or about March 1, 1997, Plaintiff was diagnosed with NHL in Shelbyville, Kentucky by Dr. Don Stevens at Norton Cancer Insitute suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and

Electronically Filed - St Louis County - September 14, 2020 - 12:50 PM

Electronically Filed - St Louis County - September 14, 2020 - 12:50 PM

Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

69.     As a direct and proximate result of these injuries, Plaintiff has incurred and will incur medical expenses in the future and has endured and will endure pain and suffering and loss of enjoyment of life, and Plaintiff has otherwise been damaged in a personal and pecuniary nature.

70.     During the entire time that Plaintiff was exposed to Roundup®, Plaintiff did not know that exposure to Roundup® was injurious to Plaintiff's health or the health of others.

**Randall Crewz**

71.     Plaintiff Randall Crewz is a citizen of the State of Illinois and was born on May 30, 1966.  Plaintiff resides in the City of Ingleside, County of Lake.

72.     Plaintiff was exposed to Roundup® in Hodgensville, Kentucky from 1976 until 1982 while spraying Roundup® residentially.  Plaintiff sprayed Roundup® yearly from April to September on a monthly basis.

73.     In November of 1982, Plaintiff was diagnosed with NHL in Louisville, Kentucky by Dr. Patel at Norton Children's Hospital and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

74.     As a direct and proximate result of these injuries, Plaintiff has incurred and will incur medical expenses in the future and has endured and will endure pain and suffering and loss of enjoyment of life, and Plaintiff has otherwise been damaged in a personal and pecuniary nature.

75.     During the entire time that Plaintiff was exposed to Roundup®, Plaintiff did not know that exposure to Roundup® was injurious to Plaintiff's health or the health of others.

Electronically Filed - St Louis County - September 14, 2020 - 12:50 PM

**John Lahaye Jr.**

76.      Plaintiff John Lahaye Jr. is a citizen of the State of Louisiana and was born on October 11, 1951.  Plaintiff resides in the City of Lafayette, Parish of Lafayette.

77.      Plaintiff was exposed to Roundup® in the Cities of Ville Platte and Vidrine, both in the State of Louisiana from 1978 until 2016 while spraying Roundup® commercially.  Plaintiff sprayed Roundup® twice a year during the spring.

78.      In December of 2010, Plaintiff was diagnosed with NHL in Oakdale, Louisiana by Dr. Gregory Savoy at  Oakdale Community Hospital and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

79.      As a direct and proximate result of these injuries, Plaintiff has incurred and will incur medical expenses in the future and has endured and will endure pain and suffering and loss of enjoyment of life, and Plaintiff has otherwise been damaged in a personal and pecuniary nature.

80.      During the entire time that Plaintiff was exposed to Roundup®, Plaintiff did not know that exposure to Roundup® was injurious to Plaintiff's health or the health of others.

**Gerald Brown**

81.      Plaintiff Gerald Brown is a citizen of the State of Tennessee and was born on August 15, 1941.  Plaintiff resides in the City of Del Rio, County of Cocke.

82.      Plaintiff was exposed to Roundup® in Del Rio, Tennessee from 2014 until 2017 while spraying Roundup® residentially.  Plaintiff sprayed Roundup® yearly from May to September on a almost daily basis.

15

Electronically Filed - St. Louis County - September 14, 2020 - 12:50 PM

83.     In December of 2017, Plaintiff was diagnosed with NHL in Johnson City, Tennessee by Dr. Brian Villanueva at James H. Quillen VAMC and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

84.     As a direct and proximate result of these injuries, Plaintiff has incurred and will incur medical expenses in the future and has endured and will endure pain and suffering and loss of enjoyment of life, and Plaintiff has otherwise been damaged in a personal and pecuniary nature.

85.     During the entire time that Plaintiff was exposed to Roundup®, Plaintiff did not know that exposure to Roundup® was injurious to Plaintiff's health or the health of others.

### Michael Muzechuk

86.     Plaintiff Michael Muzechuk is a citizen of the State of Ohio and was born on March 27, 1960.  Plaintiff resides in the City New Philadelphia, County of Tuscarawas.

87.     Plaintiff was exposed to Roundup® in New Philadelphia, Ohio from 2003 until 2007 while spraying Roundup® residentially and commercially.   Plaintiff sprayed Roundup® yearly from June to September on a weekly basis.

88.     In December of 2007, Plaintiff was diagnosed with NHL in Dover, Ohio by Dr. Michael McCombs and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

Electronically Filed - St Louis County - September 14, 2020 - 12:50 PM

89.     As a direct and proximate result of these injuries, Plaintiff has incurred and will incur medical expenses in the future and has endured and will endure pain and suffering and loss of enjoyment of life, and Plaintiff has otherwise been damaged in a personal and pecuniary nature.

90.     During the entire time that Plaintiff was exposed to Roundup®, Plaintiff did not know that exposure to Roundup® was injurious to Plaintiff's health or the health of others.

### Marjorie Hunter

91.     Plaintiff Marjorie Hunter is a citizen of the State of Alabama and was born on April 11, 1961.  Plaintiff resides in the City of Graysville, County of Jefferson.

92.     Plaintiff was exposed to Roundup® in Bradford, Tennessee; Waynesboro, Mississippi; Forrest City, Arkansas; Cordova, Alabama; and San Bernadino, California from 1987 until 2014 while spraying Roundup® residentially.   Plaintiff sprayed Roundup® yearly from November March on a monthly basis and from June to September on a weekly basis.

93.     In October of 2010, Plaintiff was diagnosed with NHL in Alabaster, Alabama by Dr. David Halversen at Central Alabama Hematology & Oncology and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

94.     As a direct and proximate result of these injuries, Plaintiff has incurred and will incur medical expenses in the future and has endured and will endure pain and suffering and loss of enjoyment of life, and Plaintiff has otherwise been damaged in a personal and pecuniary nature.

95.     During the entire time that Plaintiff was exposed to Roundup®, Plaintiff did not know that exposure to Roundup® was injurious to Plaintiff's health or the health of others.

Electronically Filed - St Louis County - September 14, 2020 - 12:50 PM

**Matthew Long**

96.     Plaintiff Matthew Long is a citizen of the State of Texas and was born on December 1, 1983.  Plaintiff resides in the City of Houston, County of Harris.

97.     Plaintiff was exposed to Roundup® in and Blanchard, Oklahoma and Houston, Texas from 1993 until 2008 and 2014 until 2017, while spraying Roundup® residentially.  Plaintiff sprayed Roundup® yearly from June to September on a monthly basis.

98.     In June of 2019, Plaintiff was diagnosed with NHL in Houston, Texas by Dr. Aden Rios at Mem and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

99.     As a direct and proximate result of these injuries, Plaintiff has incurred and will incur medical expenses in the future and has endured and will endure pain and suffering and loss of enjoyment of life, and Plaintiff has otherwise been damaged in a personal and pecuniary nature.

100.     During the entire time that Plaintiff was exposed to Roundup®, Plaintiff did not know that exposure to Roundup® was injurious to Plaintiff's health or the health of others.

**Karen Poling**

101.     Plaintiff Karen Poling is a citizen of the State of New Jersey and was born on June 03, 1947.  Plaintiff resides in the City of Cherry Hill, County of Cherry Hill.

102.     Plaintiff was exposed to Roundup® in Marlton, New Jersey from 2004 until 2005 while spraying Roundup® residentially.  Plaintiff sprayed Roundup® yearly from April to October on a monthly basis.

Electronically Filed - St Louis County - September 14, 2020 - 12:50 PM

103.    In January of 2018, Plaintiff was diagnosed with NHL in Philadelphia, Pennsylvania by Dr. Nestor Esnaola at Fox Chase Cancer Center and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

104.    As a direct and proximate result of these injuries, Plaintiff has incurred and will incur medical expenses in the future and has endured and will endure pain and suffering and loss of enjoyment of life, and Plaintiff has otherwise been damaged in a personal and pecuniary nature.

105.    During the entire time that Plaintiff was exposed to Roundup®, Plaintiff did not know that exposure to Roundup® was injurious to Plaintiff's health or the health of others.

### Andrew Gilbert

106.    Plaintiff Andrew Gilbert is a citizen of the State of Texas and was born on June 26, 1963.  Plaintiff resides in the City of Conroe, County of Montgomery.

107.    Plaintiff was exposed to Roundup® in various farms in Florida, and in the Cities of Mt. Vernon and Bowling Green, both located in the State of Kentucky, from 1970's until 2019 while spraying Roundup® residentially and commercially.  Plaintiff sprayed Roundup® yearly in the months of March, June, and September on a daily basis.

108.    In January of 2006, Plaintiff was diagnosed with NHL in Galveston, Texas, at UTMB Health John Sealy Hospital, and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

Electronically Filed - St Louis County - September 14, 2020 - 12:50 PM

109.     As a direct and proximate result of these injuries, Plaintiff has incurred and will incur medical expenses in the future and has endured and will endure pain and suffering and loss of enjoyment of life, and Plaintiff has otherwise been damaged in a personal and pecuniary nature.

110.     During the entire time that Plaintiff was exposed to Roundup®, Plaintiff did not know that exposure to Roundup® was injurious to Plaintiff's health or the health of others.

### Terry Frerman

111.     Plaintiff Terry Frerman is a citizen of the State of Indiana and was born on August 27, 1946.  Plaintiff resides in the City of Clarksville, County of Clark.

112.     Plaintiff was exposed to Roundup® in Clarksville, Indiana from 1998 until 2018 while spraying Roundup® residentially.  Plaintiff sprayed Roundup® yearly from March through October on a monthly basis.

113.     In November of 2017, Plaintiff was diagnosed with NHL in Jefferson, Indiana by Dr. Elisabeth von Bun, and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

114.     As a direct and proximate result of these injuries, Plaintiff has incurred and will incur medical expenses in the future and has endured and will endure pain and suffering and loss of enjoyment of life, and Plaintiff has otherwise been damaged in a personal and pecuniary nature.

115.     During the entire time that Plaintiff was exposed to Roundup®, Plaintiff did not know that exposure to Roundup® was injurious to Plaintiff's health or the health of others.

**Leigh Oliver**

116.    Plaintiff Leigh Oliver is a citizen of the State of Oregon and was born on January 26, 1958.  Plaintiff resides in the City of Eugene, County of Lane.

117.    Plaintiff was exposed to Roundup® in Hood River, Oregon from 1966 until 2015 while spraying Roundup® residentially and commercially.  Plaintiff sprayed Roundup® yearly throughout the year on a weekly basis.

118.    In February of 2018, Plaintiff was diagnosed with NHL in Springfield, Oregon, by Dr. Christopher Yasenchak at Willamette Valley Cancer Institute and Research Center, and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

119.    As a direct and proximate result of these injuries, Plaintiff has incurred and will incur medical expenses in the future and has endured and will endure pain and suffering and loss of enjoyment of life, and Plaintiff has otherwise been damaged in a personal and pecuniary nature.

120.    During the entire time that Plaintiff was exposed to Roundup®, Plaintiff did not know that exposure to Roundup® was injurious to Plaintiff's health or the health of others.

**Raquel Davis**

121.    Plaintiff Raquel Davis is a citizen of the State of Iowa and was born on May 27, 1978.  Plaintiff resides in the City of Brooklyn, County of Poweshiek.

122.    Plaintiff was exposed to Roundup® in Brooklyn, Iowa in 2017 while spraying Roundup® residentially.  Plaintiff sprayed Roundup® yearly from April through September on a semi-weekly basis.

Electronically Filed - St Louis County - September 14, 2020 - 12:50 PM

123.    In January of 2018, Plaintiff was diagnosed with NHL in Iowa City, Iowa, by Dr. Agustin Aguilar at University of Iowa Hospitals & Clinics and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

124.    As a direct and proximate result of these injuries, Plaintiff has incurred and will incur medical expenses in the future and has endured and will endure pain and suffering and loss of enjoyment of life, and Plaintiff has otherwise been damaged in a personal and pecuniary nature.

125.    During the entire time that Plaintiff was exposed to Roundup®, Plaintiff did not know that exposure to Roundup® was injurious to Plaintiff's health or the health of others.

**James Garrity**

126.    Plaintiff James Garrity is a citizen of the State of South Carolina and was born on July 9, 1948. Plaintiff resides in the City of Murrells Inlet, County of Georgetown.

127.    Plaintiff was exposed to Roundup® in the Cities of Murrells Inlet and Orangeburg, both located in the State of South Carolina and the City of Mathew, located in the State of North Carolina, from 1978 to 2003, and again from 2013 to 2015, while spraying Roundup® residentially. Plaintiff sprayed Roundup® yearly from March to September on a bi-weekly basis.

128.    In February of 2018, Plaintiff was diagnosed with NHL in Murrells Inlet, South Carolina at Tidelands Waccamaw Community Hospital, and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

129.    As a direct and proximate result of these injuries, Plaintiff has incurred and will incur medical expenses in the future and has endured and will endure pain and suffering and loss of enjoyment of life, and Plaintiff has otherwise been damaged in a personal and pecuniary nature.

130.    During the entire time that Plaintiff was exposed to Roundup®, Plaintiff did not know that exposure to Roundup® was injurious to Plaintiff's health or the health of others.

### Kenneth James

131.    Plaintiff Kenneth James is a citizen of the State of Texas and was born on August 22, 1943.  Plaintiff resides in the City of Houston, County of Harris.

132.    Plaintiff was exposed to Roundup® in the Greater Houston area of Texas from 1976 until 2018 while spraying Roundup® residentially.  Plaintiff sprayed Roundup® yearly throughout the year on a semi-weekly basis.

133.    In January of 2018, Plaintiff was diagnosed with NHL in Houston, Texas by Dr. Gregory Kaufman at The University of Texas MD Anderson Cancer Center, and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

134.    As a direct and proximate result of these injuries, Plaintiff has incurred and will incur medical expenses in the future and has endured and will endure pain and suffering and loss of enjoyment of life, and Plaintiff has otherwise been damaged in a personal and pecuniary nature.

135.    During the entire time that Plaintiff was exposed to Roundup®, Plaintiff did not know that exposure to Roundup® was injurious to Plaintiff's health or the health of others.

### Thomas Moore

Electronically Filed - St Louis County - September 14, 2020 - 12:50 PM

136.    Plaintiff Thomas Moore is a citizen of the State of Maryland and was born on January 18, 1952.  Plaintiff resides in the City of Westminster, County of Carroll.

137.    Plaintiff was exposed to Roundup® in Silver Spring, Maryland from 1998 until 2013 while spraying Roundup® commercially.  Plaintiff sprayed Roundup® yearly from May to September on a semi-weekly basis.

138.    In January of 2017, Plaintiff was diagnosed with NHL in Westminster, Maryland by Dr. Keith O'Reilly at Carroll Hospital and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

139.    As a direct and proximate result of these injuries, Plaintiff has incurred and will incur medical expenses in the future and has endured and will endure pain and suffering and loss of enjoyment of life, and Plaintiff has otherwise been damaged in a personal and pecuniary nature.

140.    During the entire time that Plaintiff was exposed to Roundup®, Plaintiff did not know that exposure to Roundup® was injurious to Plaintiff's health or the health of others.

### Richard Sivley

141.    Plaintiff Richard Sivley is a citizen of the State of Alabama and was born on January 23, 1957.  Plaintiff resides in the City of Grant, County of Marshall.

142.    Plaintiff was exposed to Roundup® in Grant, Alabama from 2010 to 2018 while spraying Roundup® residentially and commercially.  Plaintiff sprayed Roundup® yearly from throughout the year on a weekly basis.

143.    In December of 2017, Plaintiff was diagnosed with NHL in Albertville, Alabama by Dr. Jonathan Storey at Marshall Cancer Care Center, and suffered the effects attendant thereto,

Electronically Filed - St. Louis County - September 14, 2020 - 12:50 PM

Electronically Filed - St Louis County - September 14, 2020 - 12:50 PM

as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup®
and Defendant's wrongful and negligent conduct in the research, development, testing,
manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

144.    As a direct and proximate result of these injuries, Plaintiff has incurred and will
incur medical expenses in the future and has endured and will endure pain and suffering and loss
of enjoyment of life, and Plaintiff has otherwise been damaged in a personal and pecuniary nature.

145.    During the entire time that Plaintiff was exposed to Roundup®, Plaintiff did not
know that exposure to Roundup® was injurious to Plaintiff's health or the health of others.

### Anthony King

146.    Plaintiff Anthony King is a citizen of the State of Florida and was born on March
19, 1953.  Plaintiff resides in the City of Boca Raton, County of Palm Beach.

147.    Plaintiff was exposed to Roundup® in the Cities of Parkland, Oakland, Ft.
Lauderdale, and Coral Spring, all located in the State of Florida, from 1976 to 2019 while spraying
Roundup® residentially and commercially.  Plaintiff sprayed Roundup® yearly throughout the year
on a weekly basis.

148.    In February of 2016, Plaintiff was diagnosed with NHL in Pompano Beach, Florida
at Broward Health North, and suffered the effects attendant thereto, as a direct and proximate result
of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and
negligent conduct in the research, development, testing, manufacture, production, promotion,
distribution, marketing, and sale of Roundup®.

149.    As a direct and proximate result of these injuries, Plaintiff has incurred and will
incur medical expenses in the future and has endured and will endure pain and suffering and loss
of enjoyment of life, and Plaintiff has otherwise been damaged in a personal and pecuniary nature.

150.    During the entire time that Plaintiff was exposed to Roundup®, Plaintiff did not know that exposure to Roundup® was injurious to Plaintiff's health or the health of others.

**Robert Moberg**

151.    Plaintiff Robert Moberg is a citizen of the State of Illinois and was born on March 31, 1968.  Plaintiff resides in the City of Lee, County of DeKalb.

152.    Plaintiff was exposed to Roundup® in the Cities of Rochelle, Aurora, and Sycamore, all located in the State of Illinois, from 1999 to 20013 while spraying Roundup® residentially and commercially.  Plaintiff sprayed Roundup® yearly from April to September on a semi-weekly basis.

153.    In February of 2018, Plaintiff was diagnosed with NHL in Chicago, at Rush University Medical Center, and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

154.    As a direct and proximate result of these injuries, Plaintiff has incurred and will incur medical expenses in the future and has endured and will endure pain and suffering and loss of enjoyment of life, and Plaintiff has otherwise been damaged in a personal and pecuniary nature.

155.    During the entire time that Plaintiff was exposed to Roundup®, Plaintiff did not know that exposure to Roundup® was injurious to Plaintiff's health or the health of others.

**Gregory Johnson**

156.    Plaintiff Gregory Johnson is a citizen of the State of South Carolina and was born on October 31, 1972.  Plaintiff resides in the City of Salters, County of Williamsburg.

Electronically Filed - St Louis County - September 14, 2020 - 12:50 PM

Electronically Filed - St Louis County - September 14, 2020 - 12:50 PM

157.    Plaintiff was exposed to Roundup® in King Street, South Carolina from 2002 to 2017 while spraying Roundup® residentially.  Plaintiff sprayed Roundup® yearly from March to September on a weekly basis.

158.    In February of 2017, Plaintiff was diagnosed with NHL in Florence, South Carolina at McLeod Regional Medical Center and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

159.    As a direct and proximate result of these injuries, Plaintiff has incurred and will incur medical expenses in the future and has endured and will endure pain and suffering and loss of enjoyment of life, and Plaintiff has otherwise been damaged in a personal and pecuniary nature.

160.    During the entire time that Plaintiff was exposed to Roundup®, Plaintiff did not know that exposure to Roundup® was injurious to Plaintiff's health or the health of others.

**Diane Shiley**

161.    Plaintiff Diane Shiley is a citizen of the State of Ohio and was born on November 1, 1951.  Plaintiff resides in the City of Newton Falls, County of Trumbull.

162.    Plaintiff was exposed to Roundup® in Newton Falls, Ohio from approximately 1985 until 2012 while spraying Roundup® residentially.  Plaintiff sprayed Roundup® yearly from March to October on a weekly basis.

163.    In February of 2018, Plaintiff was diagnosed with NHL in Youngstown, Ohio at Mercy Hospital, and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and

Electronically Filed - St Louis County - September 14, 2020 - 12:50 PM

negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

164.    As a direct and proximate result of these injuries, Plaintiff has incurred and will incur medical expenses in the future and has endured and will endure pain and suffering and loss of enjoyment of life, and Plaintiff has otherwise been damaged in a personal and pecuniary nature.

165.    During the entire time that Plaintiff was exposed to Roundup®, Plaintiff did not know that exposure to Roundup® was injurious to Plaintiff's health or the health of others.

**Cecelia Rogers**

166.    Plaintiff Cecelia Rogers is a citizen of the State of Georgia and was born on February 2, 1936.  Plaintiff resides in the City of Dalton, County of Whitfield.

167.    Plaintiff was exposed to Roundup® in Winter Springs, Florida from 1986 to 2016 while spraying Roundup® residentially.  Plaintiff sprayed Roundup® yearly throughout the year on a monthly basis.

168.    In April of 2014, Plaintiff was diagnosed with NHL in Orlando, Florida at Florida Hospital Orlando and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

169.    As a direct and proximate result of these injuries, Plaintiff has incurred and will incur medical expenses in the future and has endured and will endure pain and suffering and loss of enjoyment of life, and Plaintiff has otherwise been damaged in a personal and pecuniary nature.

170.    During the entire time that Plaintiff was exposed to Roundup®, Plaintiff did not know that exposure to Roundup® was injurious to Plaintiff's health or the health of others.

Electronically Filed - St Louis County - September 14, 2020 - 12:50 PM

**Jonni Masella**

171.    Plaintiff Jonni Masella is a citizen of the State of New York and was born on July 9, 1948.  Plaintiff resides in the City of New York, County of New York.

172.    Plaintiff was exposed to Roundup® in Manassas, Virginia from 2003 to 2012 while spraying Roundup® residentially.  Plaintiff sprayed Roundup® yearly from June to September on a daily basis, and from October to May on a monthly basis.

173.    In July of 2007, Plaintiff was diagnosed with NHL in New York, New York by Dr. Raymond Pastore at New York Presbyterian Hospital and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

174.    As a direct and proximate result of these injuries, Plaintiff has incurred and will incur medical expenses in the future and has endured and will endure pain and suffering and loss of enjoyment of life, and Plaintiff has otherwise been damaged in a personal and pecuniary nature.

175.    During the entire time that Plaintiff was exposed to Roundup®, Plaintiff did not know that exposure to Roundup® was injurious to Plaintiff's health or the health of others.

**Sherry Hohl**

176.    Plaintiff Sherry Hohl is a citizen of the State of North Carolina, and was born on July 29, 1950.  Plaintiff resides in the City of Belhaven, County of Beaufort.

177.    Plaintiff was exposed to Roundup® in the Cities of Seagrove and Winston-Salem, both located in the State of North Carolina, from 1990 until 2017 while spraying Roundup® residentially and commercially.  Plaintiff sprayed Roundup® yearly throughout the year on a semi-weekly basis.

Electronically Filed - St Louis County - September 14, 2020 - 12:50 PM

178.    In January of 2017, Plaintiff was diagnosed with NHL in Pinehurst, North Carolina by Dr. Fabian Alzamora at Randolph Health, and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

179.    As a direct and proximate result of these injuries, Plaintiff has incurred and will incur medical expenses in the future and has endured and will endure pain and suffering and loss of enjoyment of life, and Plaintiff has otherwise been damaged in a personal and pecuniary nature.

180.    During the entire time that Plaintiff was exposed to Roundup®, Plaintiff did not know that exposure to Roundup® was injurious to Plaintiff's health or the health of others.

### Cynthia Crady

181.    Plaintiff Cynthia Crady is a citizen of the State of Iowa and was born on August 29, 1955.  Plaintiff resides in the City of Monroe, County of Jasper.

182.    Plaintiff was exposed to Roundup® in Monroe, Iowa from 1982 utnil 2018 while spraying Roundup® residentially.  Plaintiff sprayed Roundup® yearly from April to October on a monthly basis.

183.    In February of 2018, Plaintiff was diagnosed with NHL in Clive, Iowa by Dr. Angela Sandre at Mercy Cancer Center - West Lakes, and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

184.    As a direct and proximate result of these injuries, Plaintiff has incurred and will incur medical expenses in the future and has endured and will endure pain and suffering and loss of enjoyment of life, and Plaintiff has otherwise been damaged in a personal and pecuniary nature.

185.    During the entire time that Plaintiff was exposed to Roundup®, Plaintiff did not know that exposure to Roundup® was injurious to Plaintiff's health or the health of others.

**Joella Gonterman**

186.    Plaintiff Joella Gonterman is a citizen of the State of Kentucky and was born on July 8, 1948.  Plaintiff resides in the City of Louisville, County of Jefferson.

187.    Plaintiff was exposed to Roundup® in Louisville, Kentucky from 1984 through 2007 while spraying Roundup® residentially.  Plaintiff sprayed Roundup® yearly from April to September on a bi-weekly basis.

188.    In August of 2010, Plaintiff was diagnosed with NHL in Louisville, Kentucky by Dr. Michael Kommar, and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

189.    As a direct and proximate result of these injuries, Plaintiff has incurred and will incur medical expenses in the future and has endured and will endure pain and suffering and loss of enjoyment of life, and Plaintiff has otherwise been damaged in a personal and pecuniary nature.

190.    During the entire time that Plaintiff was exposed to Roundup®, Plaintiff did not know that exposure to Roundup® was injurious to Plaintiff's health or the health of others.

**Robin Smith**

Electronically Filed - St Louis County - September 14, 2020 - 12:50 PM

Electronically Filed - St Louis County - September 14, 2020 - 12:50 PM

191.     Plaintiff Robin Smith is a citizen of the State of West Virginia and was born on February 10, 1957.  Plaintiff resides in the City of Beckley, County of Raleigh.

192.     Plaintiff was exposed to Roundup® in Beckley, West Virginia from 1989 until 2000 while spraying Roundup® residentially.  Plaintiff sprayed Roundup® yearly from April to October on a weekly basis.

193.     In February of 2018, Plaintiff was diagnosed with NHL in Beckley, West Virginia at Raleigh General Hospital and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

194.     As a direct and proximate result of these injuries, Plaintiff has incurred and will incur medical expenses in the future and has endured and will endure pain and suffering and loss of enjoyment of life, and Plaintiff has otherwise been damaged in a personal and pecuniary nature.

195.     During the entire time that Plaintiff was exposed to Roundup®, Plaintiff did not know that exposure to Roundup® was injurious to Plaintiff's health or the health of others.

### Wanda Yobert

196.     Plaintiff Wanda Yobert is a citizen of the State of Georgia and was born on April 4, 1968.  Plaintiff resides in the City of Thomson, County of McDuffie.

197.     Plaintiff was exposed to Roundup® in Thomson, Georgia from 2017 through 2018 while spraying Roundup® residentially.  Plaintiff sprayed Roundup® yearly from June to July on a monthly basis.

198.     In February of 2018, Plaintiff was diagnosed with NHL in Augusta, Georgia by Dr. Anu Batra, and suffered the effects attendant thereto, as a direct and proximate result of the

Electronically Filed - St Louis County - September 14, 2020 - 12:50 PM

unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

199.     As a direct and proximate result of these injuries, Plaintiff has incurred and will incur medical expenses in the future and has endured and will endure pain and suffering and loss of enjoyment of life, and Plaintiff has otherwise been damaged in a personal and pecuniary nature.

200.     During the entire time that Plaintiff was exposed to Roundup®, Plaintiff did not know that exposure to Roundup® was injurious to Plaintiff's health or the health of others.

### Leona Barnes

201.     Plaintiff Leona Barnes is a citizen of the State of Kentucky and was born on February 8, 1940.  Plaintiff resides in the City of Frankfort, County of Franklin.

202.     Plaintiff was exposed to Roundup® in Franklin, Kentucky from approximately 2000 until 2018 while spraying Roundup® residentially.  Plaintiff sprayed Roundup® yearly from April through October on a weekly basis.

203.     In January of 2019, Plaintiff was diagnosed with NHL in Frankfort, Kentucky by Dr. Brian Chouce at Frankfort Regional Medical Center, and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

204.     As a direct and proximate result of these injuries, Plaintiff has incurred and will incur medical expenses in the future and has endured and will endure pain and suffering and loss of enjoyment of life, and Plaintiff has otherwise been damaged in a personal and pecuniary nature.

Electronically Filed - St Louis County - September 14, 2020 - 12:50 PM

205.    During the entire time that Plaintiff was exposed to Roundup®, Plaintiff did not know that exposure to Roundup® was injurious to Plaintiff's health or the health of others.

### William Cline

206.    Plaintiff William Cline is a citizen of the State of Georgia and was born on July 18, 1948.  Plaintiff resides in the City of Dalton, County of Whitfield.

207.    Plaintiff was exposed to Roundup® in Dalton, Georgia from 1976 until 2017 while spraying Roundup® residentially and commercially.   Plaintiff sprayed Roundup® yearly from March to October on a semi-weekly basis.

208.    In February of 2018, Plaintiff was diagnosed with NHL in Dalton, Georgia at NW Georgia Hematology, and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

209.    As a direct and proximate result of these injuries, Plaintiff has incurred and will incur medical expenses in the future and has endured and will endure pain and suffering and loss of enjoyment of life, and Plaintiff has otherwise been damaged in a personal and pecuniary nature.

210.    During the entire time that Plaintiff was exposed to Roundup®, Plaintiff did not know that exposure to Roundup® was injurious to Plaintiff's health or the health of others.

### Nancy Ford

211.    Plaintiff Nancy Ford is a citizen of the State of Florida and was born on May 2, 1940.  Plaintiff resides in the City of Sarasota, County of Sarasota.

212.    Plaintiff was exposed to Roundup® in Cities of Okeechobee and Sarasota, both located in the State of Florida, from 1981 until 2011 while spraying Roundup® residentially and commercially.  Plaintiff sprayed Roundup® yearly throughout the year on a weekly basis.

213.    In January of 2016, Plaintiff was diagnosed with NHL in Sarasota, Florida at Florida Cancer Specialists and Research Institute: Sarasota Downtown, and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

214.    As a direct and proximate result of these injuries, Plaintiff has incurred and will incur medical expenses in the future and has endured and will endure pain and suffering and loss of enjoyment of life, and Plaintiff has otherwise been damaged in a personal and pecuniary nature.

215.    During the entire time that Plaintiff was exposed to Roundup®, Plaintiff did not know that exposure to Roundup® was injurious to Plaintiff's health or the health of others.

**Mary Hunt**

216.    Plaintiff Mary Hunt is a citizen of the State of North Carolina and was born on August 7, 1952.  Plaintiff resides in the City of Lumberton, County of Robeson.

217.    Plaintiff was exposed to Roundup® in Lumberton, North Carolina from 2011 through 2018 while spraying Roundup® residentially.  Plaintiff sprayed Roundup® yearly from March to November on a every other day basis.

218.    In April of 2018, Plaintiff was diagnosed with NHL in Lumberton, North Carolina at Gibson Cancer Center and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and

negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

219.    As a direct and proximate result of these injuries, Plaintiff has incurred and will incur medical expenses in the future and has endured and will endure pain and suffering and loss of enjoyment of life, and Plaintiff has otherwise been damaged in a personal and pecuniary nature.

220.    During the entire time that Plaintiff was exposed to Roundup®, Plaintiff did not know that exposure to Roundup® was injurious to Plaintiff's health or the health of others.

**Frank Taylor**

221.    Plaintiff Frank Taylor is a citizen of the State of Ohio and was born on March 6, 1954.  Plaintiff resides in the City of Little Hocking, County of Washington.

222.    Plaintiff was exposed to Roundup® in Little Hocking, Ohio from 1999 until 2013 while spraying Roundup® residentially.  Plaintiff sprayed Roundup® yearly from May to September on a monthly basis.

223.    In March of 2017, Plaintiff was diagnosed with NHL in Marietta, Ohio by Dr. Kelli Cawley at Mariella Memorial Hospital and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

224.    As a direct and proximate result of these injuries, Plaintiff has incurred and will incur medical expenses in the future and has endured and will endure pain and suffering and loss of enjoyment of life, and Plaintiff has otherwise been damaged in a personal and pecuniary nature.

225.    During the entire time that Plaintiff was exposed to Roundup®, Plaintiff did not know that exposure to Roundup® was injurious to Plaintiff's health or the health of others.

Electronically Filed - St Louis County - September 14, 2020 - 12:50 PM

Electronically Filed - St Louis County - September 14, 2020 - 12:50 PM

**Jason Burton**

226.    Plaintiff Jason Burton is a citizen of the State of South Carolina and was born on February 29, 1976.  Plaintiff resides in the City of Laurens, County of Luarens.

227.    Plaintiff was exposed to Roundup® in Laurens, South Carolina from 2005 until 2013 while spraying Roundup® commercially.  Plaintiff sprayed Roundup® yearly throughout the year on a semi-weekly basis.

228.    In February of 2017, Plaintiff was diagnosed with NHL in Greenwood, South Carolina by Dr. Venkata Pokuri, and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

229.    As a direct and proximate result of these injuries, Plaintiff has incurred and will incur medical expenses in the future and has endured and will endure pain and suffering and loss of enjoyment of life, and Plaintiff has otherwise been damaged in a personal and pecuniary nature.

230.    During the entire time that Plaintiff was exposed to Roundup®, Plaintiff did not know that exposure to Roundup® was injurious to Plaintiff's health or the health of others.

**Eleanore Mongin**

231.    Plaintiff Eleanore Monginis a citizen of the State of Wisconsin and was born on November 9, 1950.  Plaintiff resides in the City of Coleman, County of Marinette.

232.    Plaintiff was exposed to Roundup® in Coleman, Wisconsin from 20005 until 2014 while spraying Roundup® residentially.  Plaintiff sprayed Roundup® yearly from June to September on a bi-weekly basis.

Electronically Filed - St Louis County - September 14, 2020 - 12:50 PM

233.    In January of 2017, Plaintiff was diagnosed with NHL in Green Bay, Wisconsin by Dr. Sigurdur Bodvarsson at Green Bay Oncology and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

234.    As a direct and proximate result of these injuries, Plaintiff has incurred and will incur medical expenses in the future and has endured and will endure pain and suffering and loss of enjoyment of life, and Plaintiff has otherwise been damaged in a personal and pecuniary nature.

235.    During the entire time that Plaintiff was exposed to Roundup®, Plaintiff did not know that exposure to Roundup® was injurious to Plaintiff's health or the health of others.

### Norma Pearson

236.    Plaintiff Norma Pearson is a citizen of the State of Iowa and was born on January 31, 1952. Plaintiff resides in the City of Fremont, County of Mahaska.

237.    Plaintiff was exposed to Roundup® in Fremont, Iowa from approximately 1985 until 2018 while spraying Roundup® residentially.  Plaintiff sprayed Roundup® from March to September on a twice-yearly basis.

238.    In February of 2018, Plaintiff was diagnosed with NHL in Des Moines at Iowa Methodist Hospital and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

239.    As a direct and proximate result of these injuries, Plaintiff has incurred and will incur medical expenses in the future and has endured and will endure pain and suffering and loss of enjoyment of life, and Plaintiff has otherwise been damaged in a personal and pecuniary nature.

240.    During the entire time that Plaintiff was exposed to Roundup®, Plaintiff did not know that exposure to Roundup® was injurious to Plaintiff's health or the health of others.

**Aaron Lyons**

241.    Plaintiff Aaron Lyons is a citizen of the State of Ohio and was born on July 16, 1982.  Plaintiff resides in the City of Mantua, County of Portage.

242.    Plaintiff was exposed to Roundup® in Mantua, Ohio from 1998 through 2018 while spraying Roundup® residentially.  Plaintiff sprayed Roundup® yearly from May to September on a weekly basis.

243.    In July of 2017, Plaintiff was diagnosed with NHL in Chardon, Ohio by Dr. Judah Friedman, and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

244.    As a direct and proximate result of these injuries, Plaintiff has incurred and will incur medical expenses in the future and has endured and will endure pain and suffering and loss of enjoyment of life, and Plaintiff has otherwise been damaged in a personal and pecuniary nature.

245.    During the entire time that Plaintiff was exposed to Roundup®, Plaintiff did not know that exposure to Roundup® was injurious to Plaintiff's health or the health of others.

**Brenda Odum**

246.     Plaintiff Brenda Odum is a citizen of the State of Tennessee and was born on October 7, 1955.  Plaintiff resides in the City of Athens, County of McMinn.

247.     Plaintiff was exposed to Roundup® in Athens, Tennessee from approximately 1980 until 2015 while spraying Roundup® residentially.  Plaintiff sprayed Roundup® bi-weekly for approximately seven months out of the year.

248.     In July of 2015, Plaintiff was diagnosed with NHL in Cleveland, Tennessee at Tennessee Oncology – Cleveland and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

249.     As a direct and proximate result of these injuries, Plaintiff has incurred and will incur medical expenses in the future and has endured and will endure pain and suffering and loss of enjoyment of life, and Plaintiff has otherwise been damaged in a personal and pecuniary nature.

250.     During the entire time that Plaintiff was exposed to Roundup®, Plaintiff did not know that exposure to Roundup® was injurious to Plaintiff's health or the health of others.

### Carol Conrad

251.     Plaintiff Carol Conrad is a citizen of the State of Tennessee and was born on April 18, 1958.  Plaintiff resides in the City of Brighton, County of Tipton.

252.     Plaintiff was exposed to Roundup® in Brighton, Tennessee from approximately 1985 until 2011 while spraying Roundup® residentially.  Plaintiff sprayed Roundup® daily basis for approximately six months out of the year.

253.     In February of 2011, Plaintiff was diagnosed with NHL in Brighton, Tennessee at West Cancer Center and suffered the effects attendant thereto, as a direct and proximate result of

Electronically Filed - St Louis County - September 14, 2020 - 12:50 PM

the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

254.    As a direct and proximate result of these injuries, Plaintiff has incurred and will incur medical expenses in the future and has endured and will endure pain and suffering and loss of enjoyment of life, and Plaintiff has otherwise been damaged in a personal and pecuniary nature.

255.    During the entire time that Plaintiff was exposed to Roundup®, Plaintiff did not know that exposure to Roundup® was injurious to Plaintiff's health or the health of others.

### Paula Gomez

256.    Plaintiff Paula Gomez is a citizen of the State of Kentucky and was born on November 8, 1962.  Plaintiff resides in the City of Warsaw, County of Gallatin.

257.    Plaintiff was exposed to Roundup® in Warsaw, Kentucky from approximately 2000 to 2009 while Plaintiff's husband sprayed Roundup® residentially.  Plaintiff's husband sprayed Roundup® every two months throughout the year.

258.    On or about January 1, 2009, Plaintiff was diagnosed with NHL in Edgewood, Kentucky at St. Elizabeth Physicians: Medical Oncology Northern Kentucky and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

259.    As a direct and proximate result of these injuries, Plaintiff has incurred and will incur medical expenses in the future and has endured and will endure pain and suffering and loss of enjoyment of life, and Plaintiff has otherwise been damaged in a personal and pecuniary nature.

Case: MDL No. 2741   Document 2278-30   Filed: 04/20/21   Page: 58 of 156 #: 330
Electronically Filed - St Louis County - September 14, 2020 - 12:50 PM

260.    During the entire time that Plaintiff was exposed to Roundup®, Plaintiff did not know that exposure to Roundup® was injurious to Plaintiff's health or the health of others.

**Tony Ross**

261.    Plaintiff Tony Ross is a citizen of the State of Tennessee and was born on April 17, 1951.  Plaintiff resides in the City of Bean Station, County of Grainger.

262.    Plaintiff was exposed to Roundup® in Bean Station, Tennessee from approximately 2012 until 2016 while spraying Roundup® residentially.  Plaintiff sprayed Roundup® yearly from June to September on a weekly basis.

263.    In November of 2001, Plaintiff was diagnosed with NHL in Nashville, Tennessee by Dr. John Zic at Vanderbilt Hematology Clinic and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

264.    As a direct and proximate result of these injuries, Plaintiff has incurred and will incur medical expenses in the future and has endured and will endure pain and suffering and loss of enjoyment of life, and Plaintiff has otherwise been damaged in a personal and pecuniary nature.

265.    During the entire time that Plaintiff was exposed to Roundup®, Plaintiff did not know that exposure to Roundup® was injurious to Plaintiff's health or the health of others.

**Bonnie Lynn**

266.    Plaintiff Bonnie Lynn is a citizen of the State of Virginia and was born on January 8, 1943.  Plaintiff resides in the City of Glade Spring, County of Washington.

Electronically Filed - St Louis County - September 14, 2020 - 12:50 PM

267.     Plaintiff was exposed to Roundup® in Gallatin, Tennessee from approximately 1995 until 2001 while spraying Roundup® residentially.  Plaintiff sprayed Roundup® yearly from April to September on a bi-weekly basis.

268.     In November of 2001, Plaintiff was diagnosed with NHL in Nashville, Tennessee by Dr. John Zic at Vanderbilt Hematology Clinic and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

269.     As a direct and proximate result of these injuries, Plaintiff has incurred and will incur medical expenses in the future and has endured and will endure pain and suffering and loss of enjoyment of life, and Plaintiff has otherwise been damaged in a personal and pecuniary nature.

270.     During the entire time that Plaintiff was exposed to Roundup®, Plaintiff did not know that exposure to Roundup® was injurious to Plaintiff's health or the health of others.

### Sandra Draper

271.     Plaintiff Sandra Draper is a citizen of the State of Florida, and was born on September 19, 1948.  Plaintiff resides in the City of Spring Hill, County of Hernando.

272.     Plaintiff was exposed to Roundup® in Pasadena, Maryland from 2005-2012 while spraying Roundup® residentially.  Plaintiff sprayed Roundup® yearly from March to October on a weekly basis.

273.     In February of 2016, Plaintiff was diagnosed with NHL in Tampa, Florida by Dr. Julio Chavez at Moffitt Cancer Center and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's

Electronically Filed - St Louis County - September 14, 2020 - 12:50 PM

wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

274.   As a direct and proximate result of these injuries, Plaintiff has incurred and will incur medical expenses in the future and has endured and will endure pain and suffering and loss of enjoyment of life, and Plaintiff has otherwise been damaged in a personal and pecuniary nature.

275.   During the entire time that Plaintiff was exposed to Roundup®, Plaintiff did not know that exposure to Roundup® was injurious to Plaintiff's health or the health of others.

### Jack Ashwood

276.   Plaintiff Jack Ashwood is a citizen of the State of Georgia, and was born on November 13, 1959. Plaintiff resides in the City of Cartersville, County of Bartow.

277.   Plaintiff was exposed to Roundup® in the Cities of Marietta and White, both in the State of Georgia, from 2005 through 2016 while spraying Roundup® residentially and commercially. Plaintiff sprayed Roundup® yearly from throughout the year on a weekly basis.

278.   In February of 2018, Plaintiff was diagnosed with NHL in Cartersville, Georgia at Northwest Georgia Oncology Center and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

279.   As a direct and proximate result of these injuries, Plaintiff has incurred and will incur medical expenses in the future and has endured and will endure pain and suffering and loss of enjoyment of life, and Plaintiff has otherwise been damaged in a personal and pecuniary nature.

280.   During the entire time that Plaintiff was exposed to Roundup®, Plaintiff did not know that exposure to Roundup® was injurious to Plaintiff's health or the health of others.

Electronically Filed - St Louis County - September 14, 2020 - 12:50 PM

**Ruth Jones**

281.    Plaintiff Ruth Jones is a citizen of the State of Pennsylvania and was born on August 18.1934.  Plaintiff resides in the City of Norristown, County of Montgomery.

282.    Plaintiff was exposed to Roundup® in the Cities of Norristown and Philadelphia, both located in the State of Philadelphia, and the City of Windsor, located in the State of North Carolina, from 1975 until 1986 while spraying Roundup® residentially.   Plaintiff sprayed Roundup® yearly from March to October on a weekly basis.

283.    In or about 1987, Plaintiff was diagnosed with NHL in Philadelphia, Pennsylvania by Dr. John Mikuta at Hospital of the University of Pennsylvania and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

284.    As a direct and proximate result of these injuries, Plaintiff has incurred and will incur medical expenses in the future and has endured and will endure pain and suffering and loss of enjoyment of life, and Plaintiff has otherwise been damaged in a personal and pecuniary nature.

285.    During the entire time that Plaintiff was exposed to Roundup®, Plaintiff did not know that exposure to Roundup® was injurious to Plaintiff's health or the health of others.

**Kay Clark**

286.    Plaintiff Kay Clark is a citizen of the State of Tennessee and was born on February 29, 1952.  Plaintiff resides in the City of Smyrna, County of Rutherford.

287.    Plaintiff was exposed to Roundup® in Smyrna, Tennessee from 1995 until 2008 while spraying Roundup® residentially.   Plaintiff sprayed Roundup® yearly from May to September on a bi-weekly basis.

Electronically Filed - St Louis County - September 14, 2020 - 12:50 PM

288.     In November of 2000, Plaintiff was diagnosed with NHL in Nashville, Tennessee by Dr. John Greer at Vanderbilt University Medical Center and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

289.     As a direct and proximate result of these injuries, Plaintiff has incurred and will incur medical expenses in the future and has endured and will endure pain and suffering and loss of enjoyment of life, and Plaintiff has otherwise been damaged in a personal and pecuniary nature.

290.     During the entire time that Plaintiff was exposed to Roundup®, Plaintiff did not know that exposure to Roundup® was injurious to Plaintiff's health or the health of others.

### Marilyn Davis

291.     Plaintiff Marylin Davis is a citizen of the State of Wisconsin and was born on May 5, 2949.  Plaintiff resides in the City of Delafield, County of Waukesha..

292.     Plaintiff was exposed to Roundup® in Delafield, Wisconsin from 1983 until 2016 while spraying Roundup® residentially.  Plaintiff sprayed Roundup® yearly from April until August on a monthly basis.

293.     In February 13, 2017, Plaintiff was diagnosed with NHL in Summit, Wisconsin by Dr. Adam Siegel at Vince Lombardi Cancer Clinic and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

Electronically Filed - St Louis County - September 14, 2020 - 12:50 PM

294.     As a direct and proximate result of these injuries, Plaintiff has incurred and will incur medical expenses in the future and has endured and will endure pain and suffering and loss of enjoyment of life, and Plaintiff has otherwise been damaged in a personal and pecuniary nature.

295.     During the entire time that Plaintiff was exposed to Roundup®, Plaintiff did not know that exposure to Roundup® was injurious to Plaintiff's health or the health of others.

**Dorothy Inman**

296.     Plaintiff Dorothy Inman is a citizen of the State of Tennessee and was born on July 13, 1935.  Plaintiff resides in the City of Linden, County of Perry.

297.     Plaintiff was exposed to Roundup® in Romford, Connecticut and Linden, Tennessee from 1976 until 1989 while spraying Roundup® residentially.   Plaintiff sprayed Roundup® yearly throughout the year on a weekly basis.

298.     In May of 2007, Plaintiff was diagnosed with NHL in Rutland, Vermont by Dr. Allan Eisemann at Rutland Regional Medical Center and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

299.     As a direct and proximate result of these injuries, Plaintiff has incurred and will incur medical expenses in the future and has endured and will endure pain and suffering and loss of enjoyment of life, and Plaintiff has otherwise been damaged in a personal and pecuniary nature.

300.     During the entire time that Plaintiff was exposed to Roundup®, Plaintiff did not know that exposure to Roundup® was injurious to Plaintiff's health or the health of others.

**Sandra All**

301.    Plaintiff Sandra All is a citizen of the State of Illinois, and was born on December 26, 1949.  Plaintiff resides in the City of Evanton, County of Cook.

302.    Plaintiff was exposed to Roundup® in Columbus, Ohio from 2007 through 2016 while spraying Roundup® residentially.  Plaintiff sprayed Roundup® yearly from May to October on a bi-weekly basis.

303.    In February of 2018, Plaintiff was diagnosed with NHL in Chicago, Illinois by Dr. Justin Kline at University of Chicago Hospitals and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

304.    As a direct and proximate result of these injuries, Plaintiff has incurred and will incur medical expenses in the future and has endured and will endure pain and suffering and loss of enjoyment of life, and Plaintiff has otherwise been damaged in a personal and pecuniary nature.

305.    During the entire time that Plaintiff was exposed to Roundup®, Plaintiff did not know that exposure to Roundup® was injurious to Plaintiff's health or the health of others.

### Mark Hogue

306.    Plaintiff Mark Hogue is a citizen of the State of Texas and was born on July 5, 1958.  Plaintiff resides in the City of Austin, County of Travis.

307.    Plaintiff was exposed to Roundup® in Pfuellgerville, Texas from 1985 until 2018 while spraying Roundup® residentially and commercially.  Plaintiff sprayed Roundup® yearly throughout the year on a daily basis.

308.    In March of 2018, Plaintiff was diagnosed with NHL in Austin, Texas by Dr. Brian Skimkus at Austin Cancer Center and suffered the effects attendant thereto, as a direct and

Electronically Filed - St Louis County - September 14, 2020 - 12:50 PM

proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

309.    As a direct and proximate result of these injuries, Plaintiff has incurred and will incur medical expenses in the future and has endured and will endure pain and suffering and loss of enjoyment of life, and Plaintiff has otherwise been damaged in a personal and pecuniary nature.

310.    During the entire time that Plaintiff was exposed to Roundup®, Plaintiff did not know that exposure to Roundup® was injurious to Plaintiff's health or the health of others.

**Tunja Whitley, individually and on behalf of, Marques Whitley**

311.    Plaintiff Tunja Whitley is an adult whose principal place of residence is the City of Memphis, County of Shelby, State of Tennessee, who brings this action in her capacity as the surviving heir of Marques Whitley.  Marques Whitley died on February 22, 1991, in Memphis, Tennessee, County of Shelby.  Plaintiff is pursuing this action due to the personal injury and resultant death suffered by Marques Whitley in her representative capacity as surviving heir. Marques Whitley's injury was the direct and proximate result of his exposure to Roundup® and subsequent NHL diagnosis.

312.    Marques Whitley was exposed to Roundup® in Memphis, Tennessee, from 2000 through 2008 while spraying Roundup® residentially and commercially. Marques Whitley was exposed to Roundup® yearly from March to November on a twice weekly basis.

313.    In June of 2009, Marques Whitley was diagnosed with NHL in Memphis, Tennessee at Methodist University Hospital, and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and

Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

314.   As a direct and proximate result of these injuries, Plaintiff Tunja Whitley, as survivor on the behalf of Marques Whitley, incurred medical expenses and endured pain and suffering and loss of enjoyment of life, and Plaintiff Tunja Whitley as representative of Marques Whitley has otherwise been damaged in a personal and pecuniary nature.

315.   During the entire time that Marques Whitley was exposed to Roundup®, he did not know that exposure to Roundup® was injurious to his health or the health of others.

**Lynn Button, individually and on behalf of, Rush Button**

316.   Plaintiff Lynn Button is an adult whose principal place of residence is the City of Orangeburg, County of Orangeburg, State of South Carolina, who brings this action in her capacity as the surviving heir of Rush Button.  Rush Button died on May13, 2020, in Orangeburg, South Carolina, County of Orangeburg.  Plaintiff is pursuing this action due to the personal injury and resultant death suffered by Rush Button in her representative capacity as surviving heir.  Rush Button's injury was the direct and proximate result of his exposure to Roundup® and subsequent NHL diagnosis.

317.   Plaintiff was exposed to Roundup® in the Cities of Saint Matthews and Creston, both located in the State of South Carolina from 1976 until 1990 while spraying Roundup® commercially.  Plaintiff sprayed Roundup® yearly from May to September on a monthly basis.

318.   In July of 1991, Plaintiff was diagnosed with NHL in Orangeburg, South Carolina by Dr. Robert Smoke at The Regional Medical Center, and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup®

Electronically Filed - St Louis County - September 14, 2020 - 12:50 PM

Electronically Filed - St Louis County - September 14, 2020 - 12:50 PM

and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

319.    As a direct and proximate result of these injuries, Plaintiff Lynn Button, as survivor on the behalf of Rush Button, incurred medical expenses and endured pain and suffering and loss of enjoyment of life, and Plaintiff Lynn Button as representative of Rush Button has otherwise been damaged in a personal and pecuniary nature.

320.    During the entire time that Rush Button was exposed to Roundup®, he did not know that exposure to Roundup® was injurious to his health or the health of others.

### Tanya Naumenko, individually and on behalf of, George Anderson

321.    Plaintiff Tanya Naumenko is an adult whose principal place of residence is the City of Middle Township, County of Cape May, State of New Jersey, who brings this action in her capacity as the surviving heir of George Anderson. George Anderson died on January 16, 2018, in Middle Township, County of Cape May, State of New Jersey. Plaintiff is pursuing this action due to the personal injury and resultant death suffered by George Anderson in her representative capacity as surviving heir. George Anderson's injury was the direct and proximate result of his exposure to Roundup® and subsequent NHL diagnosis.

322.    George Anderson was exposed to Roundup® in the Cities of Middle Township and North Whilewood, both in the State of New Jersey and the City of Westland, in the State of Michigan, from 1990 through 2014 while spraying Roundup® residentially. George Anderson was exposed to Roundup® yearly from May to August on a monthly basis.

323.    On or about July of 2016, George Anderson was diagnosed with NHL in Camden, New Jersey at Cooper University Hospital, and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and

Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

324.    As a direct and proximate result of these injuries, Plaintiff Tanya Naumenko, as survivor on the behalf of George Anderson, incurred medical expenses and endured pain and suffering and loss of enjoyment of life, and Plaintiff Tanya Naumenko as representative of George Anderson has otherwise been damaged in a personal and pecuniary nature.

325.    During the entire time that George Anderson was exposed to Roundup®, he did not know that exposure to Roundup® was injurious to his health or the health of others.

### Linda Stine, individually and on behalf of, James Smith

326.    Plaintiff Linda Stine is an adult whose principal place of residence is the City of Michie, County of McNairy, State of Tennessee, who brings this action in her capacity as the surviving heir of James Stine.  James Stine died on April 29, 2015, in Michie, Tennessee, County of McNairy.  Plaintiff is pursuing this action due to the personal injury and resultant death suffered by James Stine in her representative capacity as surviving heir.  James Stine's injury was the direct and proximate result of his exposure to Roundup® and subsequent NHL diagnosis.

327.    James Stine was exposed to Roundup® in Michie, Tennessee and West Kenosha, Wisconsin, from 1974 through 2013 while spraying Roundup® residentially and commercially. James Stine sprayed Roundup® every year from March through October, on a daily basis.

328.    On or about January 1, 2015, James Stine was diagnosed with NHL in Corinth, Mississippi by Dr. J. Robert Davis, and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

329.    As a direct and proximate result of these injuries, Plaintiff Linda Stine, as survivor on the behalf of James Stine, incurred medical expenses and endured pain and suffering and loss of enjoyment of life, and Plaintiff Linda Stine as representative of James Stine has otherwise been damaged in a personal and pecuniary nature.

330.    During the entire time that James Stine was exposed to Roundup®, he did not know that exposure to Roundup® was injurious to his health or the health of others.

**John D'Ambrosio, individually and on behalf of, Michael D'Ambrosio**

331.    Plaintiff John D'Ambrosio is an adult whose principal place of residence is the City of Norristown, County of Montgomery, State of Pennsylvania, who brings this action in his capacity as the surviving heir of Marriott D'Ambrosio.  Marriott D'Ambrosio died on January 20. 2018, in Norristown, Pennsylvania, County of Montgoemry.  Plaintiff is pursuing this action due to the personal injury and resultant death suffered by Marriott D'Ambrosio in his representative capacity as surviving heir.  Marriott D'Ambrosio's injury was the direct and proximate result of his exposure to Roundup® and subsequent NHL diagnosis.

332.    Marriott D'Ambrosio was exposed to Roundup® in Norrisville, Pennsylvania, from 1980 until 2008 while spraying Roundup® residentially. Marriott D'Ambrosio was exposed to Roundup® yearly from March to September on a weekly basis.

333.    On or about 2001, Marriott D'Ambrosio was diagnosed with NHL in Philadelphia, Pennsylvania at Penn Medicine University City, and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

334.    As a direct and proximate result of these injuries, Plaintiff John D'Ambrosio, as survivor on the behalf of Marriott D'Ambrosio, incurred medical expenses and endured pain and suffering and loss of enjoyment of life, and Plaintiff John D'Ambrosio as representative of Marriott D'Ambrosio has otherwise been damaged in a personal and pecuniary nature.

335.    During the entire time that Marriott D'Ambrosio was exposed to Roundup®, he did not know that exposure to Roundup® was injurious to his health or the health of others.

**Geraldine Reed, individually and on behalf of, Lillian Arthur**

336.    Plaintiff Geraldine Reed is an adult whose principal place of residence is the City of Huntington, County of Cabell, State of West Virginia, who brings this action in her capacity as the surviving heir of Lillian Arthur.  Lillian Arthur died on July 20, 2016, in Ashland, Kentucky, County of Boyd.  Plaintiff is pursuing this action due to the personal injury and resultant death suffered by Lillian Arthur in her representative capacity as surviving heir.  Lillian Arthur's injury was the direct and proximate result of his exposure to Roundup® and subsequent NHL diagnosis.

337.    Lillian Arthur was exposed to Roundup® in Coalgrove, Ohio from 1995 through 2015 while spraying Roundup® residentially. Lillian Arthur was exposed to Roundup® yearly from March to October on a weekly basis.

338.    On or about June of 2016, Lillian Arthur was diagnosed with NHL in Ashland, Kenucky by Dr. Lisa Baker at King's Daughters Hospital, and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

339.    As a direct and proximate result of these injuries, Plaintiff Geraldine Reed, as survivor on the behalf of Lillian Arthur, incurred medical expenses and endured pain and suffering

and loss of enjoyment of life, and Plaintiff Geraldine Reed as representative of Lillian Arthur has otherwise been damaged in a personal and pecuniary nature.

340.     During the entire time that Lillian Arthur was exposed to Roundup®, he did not know that exposure to Roundup® was injurious to his health or the health of others.

### Lisa Rainer, individually and on behalf of, Michael Fife

341.     Plaintiff Lisa Rainer is an adult whose principal place of residence is the City of Williamsburg, County of Wayne, State of Indiana, who brings this action in her capacity as the surviving heir of John Rainer.  John Rainer died on January 27, 2018, in Williamsburg, Indiana, County of Wayne.  Plaintiff is pursuing this action due to the personal injury and resultant death suffered by John Rainer in her representative capacity as surviving heir.  John Rainer's injury was the direct and proximate result of his exposure to Roundup® and subsequent NHL diagnosis.

342.     John Rainer was exposed to Roundup® in Williamsburg, Indiana, from 1999 to 2017while spraying Roundup® residentially. John Rainer was exposed to Roundup® yearly from April to October on a bi-weekly basis.

343.     On or about April 14, 2017, John Rainer was diagnosed with NHL in Richmond, Indiana, by Dr. Jeevan Sekhar at Reid Health Physicians Associates, and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

344.     As a direct and proximate result of these injuries, Plaintiff Lisa Rainer, as survivor on the behalf of John Rainer, incurred medical expenses and endured pain and suffering and loss

Electronically Filed - St Louis County - September 14, 2020 - 12:50 PM

of enjoyment of life, and Plaintiff Lisa Rainer as representative of John Rainer has otherwise been damaged in a personal and pecuniary nature.

345.     During the entire time that John Rainer was exposed to Roundup®, he did not know that exposure to Roundup® was injurious to his health or the health of others.

### John Quintana, individually and on behalf of, Fernando Quintana

346.     Plaintiff John Quintana is an adult whose principal place of residence is the City of Tucson, County of Pima, State of Arizona, who brings this action in his capacity as the surviving heir of Fernando Quintana. Fernando Quintana died on February 6, 2018, in Tucson, Arizona, County of Pima. Plaintiff is pursuing this action due to the personal injury and resultant death suffered by Fernando Quintana in his representative capacity as surviving heir. Fernando Quintana's injury was the direct and proximate result of his exposure to Roundup® and subsequent NHL diagnosis.

347.     Fernando Quintana was exposed to Roundup® in Tucson, Arizona, from approximately 2000 through 2016 while spraying Roundup® residentially. Fernando Quintana was exposed to Roundup® throughout the year every three months.

348.     On or about March of 2017, Fernando Quintana was diagnosed with NHL in Tucson, Arizona, at Carondelet St. Joseph's Hospital, and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

349.     As a direct and proximate result of these injuries, Plaintiff John Quintana, as survivor on the behalf of John Quintana, incurred medical expenses and endured pain and suffering

and loss of enjoyment of life, and Plaintiff Fernando Quintana as representative of Fernando Quintana has otherwise been damaged in a personal and pecuniary nature.

350.    During the entire time that Fernando Quintana was exposed to Roundup®, he did not know that exposure to Roundup® was injurious to his health or the health of others.

### Christine Briere, individually and on behalf of, Sandra McEwan

351.    Plaintiff Christine Briere is an adult whose principal place of residence is the City of Bristol, County of Hartford, State of Conneticutt, who brings this action in her capacity as the surviving heir of Sandra McEwan.  Sandra McEwan died on April 11, 2000, in Charlotte, North Carolina, County of Mecklenburg.  Plaintiff is pursuing this action due to the personal injury and resultant death suffered by Sandra McEwan in her representative capacity as surviving heir. Sandra McEwan's injury was the direct and proximate result of his exposure to Roundup® and subsequent NHL diagnosis.

352.    Sandra McEwan was exposed to Roundup® in Woodbridge, Connecticut; Albamarie, North Caroline; and Northport, Florida, from the 1980's through 2000, while spraying Roundup® residentially.  Sandra McEwan was exposed to Roundup® yearly from May to September on a weekly basis.

353.    On or about July of 1997, Sandra McEwan was diagnosed with NHL in Port Charlotte, Florida, at Bayfront Health Port Charlotte, and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

354.    As a direct and proximate result of these injuries, Plaintiff Christine Briere, as survivor on the behalf of Sandra McEwan, incurred medical expenses and endured pain and

Electronically Filed - St Louis County - September 14, 2020 - 12:50 PM

suffering and loss of enjoyment of life, and Plaintiff Christine Briere as representative of Sandra McEwan has otherwise been damaged in a personal and pecuniary nature.

355. During the entire time that Sandra McEwan was exposed to Roundup®, he did not know that exposure to Roundup® was injurious to his health or the health of others.

### Nellie Brooks, individually and on behalf of, James Brooks

356. Plaintiff Nellie Brooks is an adult whose principal place of residence is the City of Gray, Parish of Terrebonne, State of Louisiana, who brings this action in her capacity as the surviving heir of James Brooks. James Brooks died on April 20, 2015, in Gray, Louisiana, Parish of Terrebonne. Plaintiff is pursuing this action due to the personal injury and resultant death suffered by James Brooks in her representative capacity as surviving heir. James Brooks's injury was the direct and proximate result of his exposure to Roundup® and subsequent NHL diagnosis.

357. James Brooks was exposed to Roundup® in the Cities of New Orleans and Homer, both in the State of Louisiana, from the 1970's through 2015 while spraying Roundup® residentially and commercially. James Brooks was exposed to Roundup® yearly on a daily basis.

358. In 2013, James Brooks was diagnosed with NHL in New Orleans, Louisiana, at the Veterans Affairs Hospital, and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®

359. As a direct and proximate result of these injuries, Plaintiff Nellie Brooks, as survivor on the behalf of James Brooks, incurred medical expenses and endured pain and suffering and loss of enjoyment of life, and Plaintiff Nellie Brooks as representative of James Brooks has otherwise been damaged in a personal and pecuniary nature.

Electronically Filed - St Louis County - September 14, 2020 - 12:50 PM

360.    During the entire time that James Brooks was exposed to Roundup®, he did not know that exposure to Roundup® was injurious to his health or the health of others.

**Marcia Brown, individually and on behalf of, Wesley Brown**

361.    Plaintiff Marcia Brown is an adult whose principal place of residence is the City of Falconer, County of Chautauqua, State of New York, who brings this action in her capacity as the surviving heir of Wesley Brown.  Wesley Brown died on January 21, 2018, in Falconer, New York, County of Chautauqua.  Plaintiff is pursuing this action due to the personal injury and resultant death suffered by Wesley Brown in her representative capacity as surviving heir.  Wesley Brown's injury was the direct and proximate result of his exposure to Roundup® and subsequent NHL diagnosis.

362.    Wesley Brown was exposed to Roundup® in the Cities of Falconer and Jamestown, both located in the State of New York, from 1985 through 2017 while spraying Roundup® commercially. Wesley Brown was exposed to Roundup® yearly from May through September on a daily basis.

363.    In 2016, Wesley Brown was diagnosed with NHL in Jamestown, New York at UPMC Chautauqua and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

364.    As a direct and proximate result of these injuries, Plaintiff Marcia Brown, as survivor on the behalf of Wesley Brown, incurred medical expenses and endured pain and suffering and loss of enjoyment of life, and Plaintiff Marcia Brown as representative of Wesley Brown has otherwise been damaged in a personal and pecuniary nature.

Electronically Filed - St Louis County - September 14, 2020 - 12:50 PM

365.    During the entire time that Wesley Brown was exposed to Roundup®, he did not know that exposure to Roundup® was injurious to his health or the health of others.

**Bill Hoover, individually and on behalf of, Joseph Hoover**

366.    Plaintiff Bill Hoover is an adult whose principal place of residence is the City of Dawsonville, County of Dawson, State of Georgia, who brings this action in his capacity as the surviving heir of Joseph Hoover.  Joseph Hoover died on December 4, 2019, in Cumming, Georgia, County of Forsyth.  Plaintiff is pursuing this action due to the personal injury and resultant death suffered by Joseph Hoover in his representative capacity as surviving heir.  Joseph Hoover's injury was the direct and proximate result of his exposure to Roundup® and subsequent NHL diagnosis.

367.    Plaintiff was exposed to Roundup® in the Cities of Dawsonville, Mcntyre, Irwintin, and Gordon, all located in the State of Georgia, from 1976 to 2017 while spraying Roundup® residentially and commercially.  Plaintiff sprayed Roundup® yearly from March to November on a weekly basis.

368.    In January of 2018, Plaintiff was diagnosed with NHL in Cumming, Georgia by at Northside Hospital, and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

369.    As a direct and proximate result of these injuries, Plaintiff Bill Hoover, as survivor on the behalf of Joseph Hoover, incurred medical expenses and endured pain and suffering and loss of enjoyment of life, and Plaintiff Bill Hoover as representative of Joseph Hoover has otherwise been damaged in a personal and pecuniary nature.

Electronically Filed - St Louis County - September 14, 2020 - 12:50 PM

370.    During the entire time that Joseph Hoover was exposed to Roundup®, he did not know that exposure to Roundup® was injurious to his health or the health of others.

**Gail Novak, individually and on behalf of, Niles Novak**

371.    Plaintiff Gail Novak is an adult whose principal place of residence is the City of Sewell, County of Gloucester, State of New Jersey, who brings this action in her capacity as the surviving heir of Niles Novak.  Niles Novak died on March 17, 2020, in Mantua Township, New Jersey, County of Gloucester.  Plaintiff is pursuing this action due to the personal injury and resultant death suffered by Niles Novak in her representative capacity as surviving heir.  Niles Novak's injury was the direct and proximate result of his exposure to Roundup® and subsequent NHL diagnosis.

372.    Niles Novak was exposed to Roundup® in the Cities of Washington Township, Turnresville, Seoul, and Manchua Township, all located in the State of New Jersey, and the City of Philadelphia, located in the State of Pennsylvania, from 1978 through 2019 while spraying Roundup® residentially and commercially. Niles Novak was exposed to Roundup® yearly from May to September on a semi-weekly basis.

373.    On or about February of 2018, Niles Novak was diagnosed with NHL in Camden, New Jersey at Cooper University Health Care, and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

374.    As a direct and proximate result of these injuries, Plaintiff Gail Novak, as survivor on the behalf of Niles Novak, incurred medical expenses and endured pain and suffering and loss

Electronically Filed - St Louis County - September 14, 2020 - 12:50 PM

of enjoyment of life, and Plaintiff Gail Novak as representative of Niles Novak has otherwise been damaged in a personal and pecuniary nature.

375.     During the entire time that Niles Novak was exposed to Roundup®, he did not know that exposure to Roundup® was injurious to his health or the health of others.

### Carroll Jernigan, individually and on behalf of, Constance Jernigan

376.     Plaintiff Carroll Jernigan is an adult whose principal place of residence is the City of Loudon, County of Loudon, State of Tennessee, who brings this action in his capacity as the surviving heir of Constance Jernigan. Constance Jernigan died on December 10, 2008, in Loudon, Tennessee, County of Loudon.  Plaintiff is pursuing this action due to the personal injury and resultant death suffered by Constance Jernigan in his representative capacity as surviving heir. Constance Jernigan's injury was the direct and proximate result of his exposure to Roundup® and subsequent NHL diagnosis.

377.     Constance Jernigan was exposed to Roundup® in Lenoir City, Tennessee, from 1993 through 2008 while spraying Roundup® residentially and commercially. Constance Jernigan was exposed to Roundup® yearly from March to November on a weekly basis.

378.     On or about May 5, 2008, Constance Jernigan was diagnosed with NHL in Knoxville, Tennessee by Dr. James Vinson at Baptist Hospital of East Tennessee, and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

379.     As a direct and proximate result of these injuries, Plaintiff Carroll Jernigan, as survivor on the behalf of Constance Jernigan, incurred medical expenses and endured pain and

Electronically Filed - St Louis County - September 14, 2020 - 12:50 PM

Electronically Filed - St Louis County - September 14, 2020 - 12:50 PM

suffering and loss of enjoyment of life, and Plaintiff Carroll Jernigan as representative of Constance Jernigan has otherwise been damaged in a personal and pecuniary nature.

380.    During the entire time that Constance Jernigan was exposed to Roundup®, he did not know that exposure to Roundup® was injurious to his health or the health of others.

### Dennis Green, individually and on behalf of, Sally Green

381.    Plaintiff Dennis Green is an adult whose principal place of residence is the City of Louisburg, County of Franklin, State of North Carolina, who brings this action in his capacity as the surviving heir of Sally Green.  Sally Green died on February 24, 2018, in Willow Spring, North Carolina, County of Wake.  Plaintiff is pursuing this action due to the personal injury and resultant death suffered by Sally Green in his representative capacity as surviving heir.  Sally Green's injury was the direct and proximate result of his exposure to Roundup® and subsequent NHL diagnosis.

382.    Sally Green was exposed to Roundup® in Willow Springs, North Carolina, from 1999 until 2018 while spraying Roundup® residentially. Sally Green was exposed to Roundup® yearly throughout the year on a weekly basis.

383.    On or about January of 2017, Sally Green was diagnosed with NHL in Raleigh, North Carolina at UNC REX Cancer Care, and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

384.    As a direct and proximate result of these injuries, Plaintiff Dennis Green, as survivor on the behalf of Sally Green, incurred medical expenses and endured pain and suffering and loss of enjoyment of life, and Plaintiff Dennis Green as representative of Sally Green has otherwise been damaged in a personal and pecuniary nature.

Electronically Filed - St Louis County - September 14, 2020 - 12:50 PM

385.     During the entire time that Sally Green was exposed to Roundup®, he did not know that exposure to Roundup® was injurious to his health or the health of others.

### John Powers, individually and on behalf of, Alberta Powers

386.     Plaintiff John Powers is an adult whose principal place of residence is the City of Soddy-Daisy, County of Hamilton, State of Tennessee, who brings this action in his capacity as the surviving heir of Alberta Powers.  Alberta Powers died on November 22, 2018, in Soddy-Daisy, Tennessee, County of Hamilton.  Plaintiff is pursuing this action due to the personal injury and resultant death suffered by Alberta Powers in his representative capacity as surviving heir. Alberta Powers's injury was the direct and proximate result of his exposure to Roundup® and subsequent NHL diagnosis.

387.     Alberta Powers was exposed to Roundup® in Soddy-Daisy, Tennessee, while spraying Roundup® residentially and commercially. Alberta Powers was exposed to Roundup® yearly from May to September on a weekly basis.

388.     On or about January of 2003, Alberta Powers was diagnosed with NHL in Chattanooga, Tennessee, by Dr. Edward Arrowsmit, and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

389.     As a direct and proximate result of these injuries, Plaintiff John Powers, as survivor on the behalf of Alberta Powers, incurred medical expenses and endured pain and suffering and loss of enjoyment of life, and Plaintiff John Powers as representative of Alberta Powers has otherwise been damaged in a personal and pecuniary nature.

390.     During the entire time that Alberta Powers was exposed to Roundup®, he did not know that exposure to Roundup® was injurious to his health or the health of others.

**Virginia Whitaker, individually and on behalf of, Derrek Whitaker**

391.     Plaintiff Virginia Whitaker is an adult whose principal place of residence is the City of Durham, County of Durham, State of North Carolina who brings this action in her capacity as the surviving heir of Derrek Whitaker.  Derrek Whitaker died on February 8, 2018, in Durham, North Carolina, County of Durham.  Plaintiff is pursuing this action due to the personal injury and resultant death suffered by Derrek Whitaker in her representative capacity as surviving heir. Derrek Whitaker's injury was the direct and proximate result of his exposure to Roundup® and subsequent NHL diagnosis.

392.     Derrek Whitaker was exposed to Roundup® in Durham, North Carolina, from 2011 through 2018 while spraying Roundup® residentially. Derrek Whitaker was exposed to Roundup® yearly throughout the year on a weekly basis.

393.     On or about January 25, 2018, Derrek Whitaker was diagnosed with NHL in Durham, North Carolina at Durham VA Health Care System, and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

394.     As a direct and proximate result of these injuries, Plaintiff Virginia Whitaker, as survivor on the behalf of Derrek Whitaker, incurred medical expenses and endured pain and suffering and loss of enjoyment of life, and Plaintiff Virginia Whitaker as representative of Derrek Whitaker has otherwise been damaged in a personal and pecuniary nature.

Electronically Filed - St. Louis County - September 14, 2020 - 12:50 PM

Electronically Filed - St Louis County - September 14, 2020 - 12:50 PM

395.    During the entire time that Derrek Whitaker was exposed to Roundup®, he did not know that exposure to Roundup® was injurious to his health or the health of others.

**Maureen Woltmann, individually and on behalf of, Edward Woltmann**

396.    Plaintiff Maureen Woltmann is an adult whose principal place of residence is the City of Reedy, County of Roane, State of West Virginia, who brings this action in her capacity as the surviving heir of Edward Woltmann.  Edward Woltmann died on February 10, 2018, in Charleston, West Virginia, County of Kanawha.  Plaintiff is pursuing this action due to the personal injury and resultant death suffered by Edward Woltmann in her representative capacity as surviving heir.  Edward Woltmann's injury was the direct and proximate result of his exposure to Roundup® and subsequent NHL diagnosis.

397.    Edward Woltmann was exposed to Roundup® in the Cities of Northfield and Mayslanding, both in the State of New Jersey, from 1974 through 2005 while spraying Roundup® residentially and commercially. Edward Woltmann was exposed to Roundup® yearly from May to September on a weekly basis.

398.    On or about February 1, 2001, Edward Woltmann was diagnosed with NHL in Pleasantville, New Jersey by Dr. Nazha at Nazha Cancer Center, and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

399.    As a direct and proximate result of these injuries, Plaintiff Maureen Woltmann, as survivor on the behalf of Edward Woltmann, incurred medical expenses and endured pain and suffering and loss of enjoyment of life, and Plaintiff Maureen Woltmann as representative of Edward Woltmann has otherwise been damaged in a personal and pecuniary nature.

400.     During the entire time that Edward Woltmann was exposed to Roundup®, he did not know that exposure to Roundup® was injurious to his health or the health of others.

**Katherine Smith, individually and on behalf of, Craig Smith**

401.     Plaintiff Katherine Smith is an adult whose principal place of residence is the City of Alpharetta, County of Fulton, State of Georgia, who brings this action in her capacity as the surviving heir of Craig Smith.  Craig Smith died on February 11, 2018, in Atlanta, Georgia, County of Fulton.  Plaintiff is pursuing this action due to the personal injury and resultant death suffered by Craig Smith in her representative capacity as surviving heir.  Craig Smith's injury was the direct and proximate result of his exposure to Roundup® and subsequent NHL diagnosis.

402.     Craig Smith was exposed to Roundup® in Woodstock, Georgia, from 1986 through 1992 while spraying Roundup® residentially and commercially. Craig Smith was exposed to Roundup® yearly from March to October on a semi-weekly basis.

403.     On or about September 1, 1992, Craig Smith was diagnosed with NHL in Roswell, Georgia by Dr. James Armitage at University of Nebraska Medical Center, and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

404.     As a direct and proximate result of these injuries, Plaintiff Katherine Smith, as survivor on the behalf of Craig Smith, incurred medical expenses and endured pain and suffering and loss of enjoyment of life, and Plaintiff Katherine Smith as representative of Craig Smith has otherwise been damaged in a personal and pecuniary nature.

405.    During the entire time that Craig Smith was exposed to Roundup®, he did not know that exposure to Roundup® was injurious to his health or the health of others.

**John Powers, individually and on behalf of, Alberta Powers**

406.    Plaintiff John Powers is an adult whose principal place of residence is the City of Soddy-Daisy, County of Hamilton, State of Tennessee, who brings this action in his capacity as the surviving heir of Alberta Powers.  Alberta Powers died on November 22, 2018, in Soddy-Daisy, Tennessee, County of Hamilton.  Plaintiff is pursuing this action due to the personal injury and resultant death suffered by Alberta Powers in his representative capacity as surviving heir. Alberta Powers' injury was the direct and proximate result of his exposure to Roundup® and subsequent NHL diagnosis.

407.    Alberta Powers was exposed to Roundup® in Soddy-Daisy, Tennessee, from 2000 through 2003 while spraying Roundup® residentially. Alberta Powers was exposed to Roundup® yearly from May to September on a monthly basis.

408.    On or about January 1, 2003, Alberta Powers was diagnosed with NHL Chattanooga, Tennessee by Dr. Edward Arrowsmith, and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

409.    As a direct and proximate result of these injuries, Plaintiff John Powers, as survivor on the behalf of Alberta Powers, incurred medical expenses and endured pain and suffering and loss of enjoyment of life, and Plaintiff John Powers as representative of Alberta Powers has otherwise been damaged in a personal and pecuniary nature.

Electronically Filed - St Louis County - September 14, 2020 - 12:50 PM

Electronically Filed - St Louis County - September 14, 2020 - 12:50 PM

410.    During the entire time that Alberta Powers was exposed to Roundup®, he did not know that exposure to Roundup® was injurious to his health or the health of others.

**Angela Biersteker, individually and on behalf of, Jon Biersteker**

411.    Plaintiff Angela Biersteker is an adult whose principal place of residence is the City of Suffolk, State of Virginia, who brings this action in her capacity as the surviving heir of Jon Biersteker.  Jon Biersteker died on February 1, 2019, in Suffolk, Virginia.  Plaintiff is pursuing this action due to the personal injury and resultant death suffered by Jon Biersteker in her representative capacity as surviving heir.  Jon Biersteker 's injury was the direct and proximate result of his exposure to Roundup® and subsequent NHL diagnosis.

412.    Jon Biersteker was exposed to Roundup® in Suffolk, Virginia, from 2002 through 2018 while spraying Roundup® residentially. Jon Biersteker was exposed to Roundup® yearly from April to October on a bi-weekly basis.

413.    On or about February 5, 2018, Jon Biersteker was diagnosed with NHL in Suffolk, Virginia by Dr. Eric Feliberti, and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

414.    As a direct and proximate result of these injuries, Plaintiff Angela Biersteker, as survivor on the behalf of Jon Biersteker, incurred medical expenses and endured pain and suffering and loss of enjoyment of life, and Plaintiff Angela Biersteker as representative of Jon Biersteker has otherwise been damaged in a personal and pecuniary nature.

415.    During the entire time that Jon Biersteker was exposed to Roundup®, he did not know that exposure to Roundup® was injurious to his health or the health of others.

**Judy Perkowski, individually and on behalf of, Edward Perkowski**

416.    Plaintiff Judy Perkowski is an adult whose principal place of residence is the City of Wayland, County of Steuben, State of New York, who brings this action in her capacity as the surviving heir of Edward Perkowski.  Edward Perkowski died on February 25, 2018, in Wayland, New York, County of Steuben.  Plaintiff is pursuing this action due to the personal injury and resultant death suffered by Edward Perkowski in her representative capacity as surviving heir. Edward Perkowski's injury was the direct and proximate result of his exposure to Roundup® and subsequent NHL diagnosis.

417.    Edward Perkowski was exposed to Roundup® in the Cities of Wayland and Cohocton, both located in the State of New York, from 1976 while spraying Roundup® commercially. Edward Perkowski was exposed to Roundup® yearly from May to October on a weekly basis.

418.    On or about September of 2014, Edward Perkowski was diagnosed with NHL in Wayland, New York by Dr. Daniel Curtin, and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

419.    As a direct and proximate result of these injuries, Plaintiff Judy Perkowski, as survivor on the behalf of Edward Perkowski, incurred medical expenses and endured pain and suffering and loss of enjoyment of life, and Plaintiff Judy Perkowski as representative of Edward Perkowski has otherwise been damaged in a personal and pecuniary nature.

420.    During the entire time that Edward Perkowski was exposed to Roundup®, he did not know that exposure to Roundup® was injurious to his health or the health of others.

**Doris Martinez, individually and on behalf of, Modesto Aponte**

421.    Plaintiff Doris Martinez is an adult whose principal place of residence is the City of Orlando, County of Orange, State of Florida, who brings this action in her capacity as the surviving heir of Modesto Aponte.  Modesto Aponte died on February 2, 2017, in Orlando, Florida, County of Orange.  Plaintiff is pursuing this action due to the personal injury and resultant death suffered by Modesto Aponte in her representative capacity as surviving heir.  Modesto Aponte's injury was the direct and proximate result of his exposure to Roundup® and subsequent NHL diagnosis.

422.    Modesto Aponte was exposed to Roundup® in Orlando, Florida, from 1985 until 2017 while spraying Roundup® residentially and commercially. Modesto Aponte was exposed to Roundup® yearly throughout the year on a bi-weekly basis.

423.    In or about March of 2016, Modesto Aponte was diagnosed with NHL in Orlando, Florida, at Florida Hospital East Orlando Medical Plaza, and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

424.    As a direct and proximate result of these injuries, Plaintiff Doris Martinez, as survivor on the behalf of Modesto Aponte, incurred medical expenses and endured pain and suffering and loss of enjoyment of life, and Plaintiff Doris Martinez as representative of Modesto Aponte has otherwise been damaged in a personal and pecuniary nature.

425.    During the entire time that Modesto Aponte was exposed to Roundup®, he did not know that exposure to Roundup® was injurious to his health or the health of others.

Electronically Filed - St Louis County - September 14, 2020 - 12:50 PM

**Pernecia Hull, individually and on behalf of, Michael Fife**

426.     Plaintiff Pernecia Hull is an adult whose principal place of residence is the City of Lubbock, County of Lubbock, State of Texas, who brings this action in her capacity as the surviving heir of Jimmy Hull.  Jimmy Hull died on January 20, 2019, in Lubbock, Texas, County of Lubbock.  Plaintiff is pursuing this action due to the personal injury and resultant death suffered by Jimmy Hull in her representative capacity as surviving heir.  Jimmy Hull's injury was the direct and proximate result of his exposure to Roundup® and subsequent NHL diagnosis.

427.     Jimmy Hull was exposed to Roundup® in Lubbock, Texas, from 1999 through 2012 while spraying Roundup® commercially. Jimmy Hull was exposed to Roundup® yearly from throughout the year on a weekly basis.

428.     On or about February 1, 2018, Jimmy Hull was diagnosed with NHL in Lubbock, Texas by Dr. Jehanzeb Riaz at Covenant Health, and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

429.     As a direct and proximate result of these injuries, Plaintiff Pernecia Hull, as survivor on the behalf of Jimmy Hull, incurred medical expenses and endured pain and suffering and loss of enjoyment of life, and Plaintiff Pernecia Hull as representative of Jimmy Hull has otherwise been damaged in a personal and pecuniary nature.

430.     During the entire time that Jimmy Hull was exposed to Roundup®, he did not know that exposure to Roundup® was injurious to his health or the health of others.

Electronically Filed - St Louis County - September 14, 2020 - 12:50 PM

Electronically Filed - St Louis County - September 14, 2020 - 12:50 PM

**Mary Vail, individually and on behalf of, Elvis Vail**

431.     Plaintiff Mary Vail is an adult whose principal place of residence is the City of Shelbyville, County of Shelby, State of Texas, who brings this action in her capacity as the surviving heir of Elvis Vail.  Elvis Vail died on March 24, 2018, in Shelbyville, Texas, County of Shelby.  Plaintiff is pursuing this action due to the personal injury and resultant death suffered by Elvis Vail in her representative capacity as surviving heir.  Elvis Vail's injury was the direct and proximate result of his exposure to Roundup® and subsequent NHL diagnosis.

432.     Elvis Vail was exposed to Roundup® in Shelbyville, Texas, from 2007 through 2017, while spraying Roundup® residentially. Elvis Vail was exposed to Roundup® yearly from April to September on a weekly basis.

433.     In or about February 1, 2018, Elvis Vail was diagnosed with NHL in Center, Texas, by Dr. Mark Cline at Cline Family Medicine, and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

434.     As a direct and proximate result of these injuries, Plaintiff Mary Vail, as survivor on the behalf of Elvis Vail, incurred medical expenses and endured pain and suffering and loss of enjoyment of life, and Plaintiff Mary Vail as representative of Elvis Vail has otherwise been damaged in a personal and pecuniary nature.

435.     During the entire time that Elvis Vail was exposed to Roundup®, he did not know that exposure to Roundup® was injurious to his health or the health of others.

Electronically Filed - St Louis County - September 14, 2020 - 12:50 PM

**Ida White, individually and on behalf of, William White**

436.    Plaintiff Ida White is an adult whose principal place of residence is the City of Greenwood, County of Clark, State of Wisconsin, who brings this action in her capacity as the surviving heir of William White.  William White died on March 1, 2017, in Mead, Wisconsin, County of Clark. Plaintiff is pursuing this action due to the personal injury and resultant death suffered by William White in her representative capacity as surviving heir William White's injury was the direct and proximate result of his exposure to Roundup® and subsequent NHL diagnosis.

437.    William White was exposed to Roundup® in the Cities of Thorpe, Greenwood, and Stanley, all located within the State of Wisconsin, from approximately 1980 through 1988 while spraying Roundup® commercially. William White was exposed to Roundup® yearly from April to June on a daily basis.

438.    In or about June 21, 1999, William White was diagnosed with NHL in Marshfield, Wisconsin by Dr. William Hocking, and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

439.    As a direct and proximate result of these injuries, Plaintiff Ida White, as survivor on the behalf of William White, incurred medical expenses and endured pain and suffering and loss of enjoyment of life, and Plaintiff Ida White as representative of William White has otherwise been damaged in a personal and pecuniary nature.

440.    During the entire time that William White was exposed to Roundup®, he did not know that exposure to Roundup® was injurious to his health or the health of others.

**Marilyn Smith, individually and on behalf of, Marle Smith**

441.    Plaintiff Marilyn Smith is an adult whose principal place of residence is the City of Lincoln, County of Lancaster, State of Nebraska, who brings this action in her capacity as the surviving heir of Marle Smith.  Marle Smith died on March 1, 2018, in Lincoln, Nebraska, County of Lancaster. Plaintiff is pursuing this action due to the personal injury and resultant death suffered by Marle Smith in her representative capacity as surviving heir.  Marle Smith's injury was the direct and proximate result of his exposure to Roundup® and subsequent NHL diagnosis.

442.    Marle Smith was exposed to Roundup® in the Cities of Lincoln, Scottsbluff, Gering, and Chadron, all located in the State of Nebraska, from 1974 through 2017 while spraying Roundup® residentially. Marle Smith was exposed to Roundup® yearly from April to November on a bi-weekly basis.

443.    In or about June 2017, Marle Smith was diagnosed with NHL in Lincoln, Nebraska by Dr. Nathan Green at Southeast Nebraska Cancer Center, and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

444.    As a direct and proximate result of these injuries, Plaintiff Marilyn Smith as survivor on the behalf of Marle Smith, incurred medical expenses and endured pain and suffering and loss of enjoyment of life, and Plaintiff Marilyn Smith as representative of Marle Smith has otherwise been damaged in a personal and pecuniary nature.

445.    During the entire time that Marle Smith was exposed to Roundup®, he did not know that exposure to Roundup® was injurious to his health or the health of others.

Electronically Filed - St Louis County - September 14, 2020 - 12:50 PM

Electronically Filed - St Louis County - September 14, 2020 - 12:50 PM

**Peggy Potter, individually and on behalf of, Robert Potter**

446.    Plaintiff Peggy Potter is an adult whose principal place of residence is the City of Winton, County of Merced, State of California, who brings this action in her capacity as the surviving heir of Robert Potter.  Robert Potter died on January 28, 2018, in Winton, California, County of Merced. Plaintiff is pursuing this action due to the personal injury and resultant death suffered by Robert Potter in her representative capacity as surviving heir.  Robert Potter's injury was the direct and proximate result of his exposure to Roundup® and subsequent NHL diagnosis.

447.    Robert Potter was exposed to Roundup® in Winton, California, from 2002 through 2017 while spraying Roundup® residentially and commercially. Robert Potter was exposed to Roundup® yearly throughout the year on a monthly basis.

448.    In or about November of 2017, Robert Potter was diagnosed with NHL in Merced, California at Mercy UC Davis Cancer Center, and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

449.    As a direct and proximate result of these injuries, Plaintiff Peggy Potter, as survivor on the behalf of Robert Potter, incurred medical expenses and endured pain and suffering and loss of enjoyment of life, and Plaintiff Peggy Potter as representative of Robert Potter has otherwise been damaged in a personal and pecuniary nature.

450.    During the entire time that Robert Potter was exposed to Roundup®, he did not know that exposure to Roundup® was injurious to his health or the health of others.

Electronically Filed - St. Louis County - September 14, 2020 - 12:50 PM

**DEFENDANT**

**MONSANTO**

451.     Defendant Monsanto is a Delaware corporation with its headquarters and principal place of business in St. Louis, Missouri.   At all relevant times, Monsanto also regularly conducted, transacted, and solicited business in St. Louis, Missouri, as well as in all States of the United States. Monsanto's world headquarters are located at 800 Lindbergh Boulevard in St. Louis County, Missouri.

452.     At all times relevant to this complaint, Monsanto was the entity that discovered the herbicidal properties of glyphosate and the manufacturer of Roundup®, which contains the active ingredient glyphosate and the surfactant POEA, as well as adjuvants and other "inert" ingredients. On information and belief, important scientific, manufacturing, marketing, sales, and other business decisions regarding Roundup® were made from and in the State of Missouri.

453.     At all times relevant to this complaint, Monsanto was engaged in the business of manufacturing, marketing, testing, promoting, selling, and/or distributing Roundup® in the State of Missouri.

454.     At all relevant times, Monsanto had, and continues to have, regular and systematic contact with and conducts business in and from the State of Missouri, such that it has purposefully availed itself of the laws of the State and expects to both sue and be sued in Missouri.   In the alternative, Monsanto's presence in the State of Missouri satisfies the due process requirements for Missouri courts to exercise jurisdiction over it.   In the alternative, Monsanto's domicile in the State of Missouri satisfies the due process requirements for Missouri courts to exercise jurisdiction over it.   In the alternative, Monsanto has consented to the exercise of jurisdiction over it by Missouri courts by registering to and conducting business from the State of Missouri.

Electronically Filed - St Louis County - September 14, 2020 - 12:50 PM

## JOINDER AND VENUE

455.    At all times relevant hereto, Monsanto was in the business of researching, designing, formulating, compounding, testing, manufacturing, producing, processing, assembling, inspecting, distributing, labeling, and packaging and Monsanto was in the business of marketing, promoting, and/or advertising Roundup® products in the State of Missouri and the County of St. Louis.

456.    At all times relevant hereto, Monsanto was a Delaware corporation with its headquarters and principal place of business in St. Louis County, Missouri, and therefore is a local defendant for purposes of removal.

457.    Venue is proper in St. Louis County under Mo. Rev. Stat. §508.010(5)(1) because this is a tort case in which Plaintiffs were first injured outside of Missouri, and the registered agent for Defendant, Monsanto is located in St. Louis County.

458.    All Plaintiffs herein are properly joined pursuant to Rule 52.05(a) of the Missouri rules of Civil Procedure as their claims all arise out of the same series of transactions or occurrences.  All claims in this action are a direct and proximate result of Defendants' negligent, willful, and wrongful conduct in connection with the design, development, manufacture, testing, packaging, promoting, marketing, distribution, and/or sale of the products as Roundup®, which was conducted without regard to individual Plaintiff differences.  All Plaintiffs in this action seek recovery for damages as a result of developing NHL, which was directly and proximately caused by such wrongful conduct by Defendant, the unreasonably dangerous and defective nature of Roundup®, and its active ingredient, glyphosate, and the attendant effects of developing NHL.  All of the claims involve common questions of law and fact and share legal and medical issues that arise out of all of the Plaintiffs' exposures to Roundup®.

Electronically Filed - St Louis County - September 14, 2020 - 12:50 PM

## ALLEGATIONS COMMON TO ALL COUNTS

459.    In 1970, Defendant Monsanto Company, Inc. ("Monsanto") discovered the herbicidal properties of glyphosate and began marketing it in products in 1974 under the brand name Roundup®.  Roundup® is a non-selective herbicide used to kill weeds that commonly compete with the growing of crops.  In addition to the active ingredient glyphosate, Roundup® contains the surfactant Polyethoxylated tallow amine (POEA) and/or adjuvants and other so-called "inert" ingredients.  In 2001, glyphosate was the most-used pesticide active ingredient in American agriculture with 85–90 million pounds used annually.  That number grew to 185 million pounds in 2007.[1]  As of 2013, glyphosate was the world's most widely used herbicide.

460.    Monsanto is a multinational agricultural biotechnology corporation based in St. Louis, Missouri, and incorporated in Delaware.  It is the world's leading producer of glyphosate. As of 2009, Monsanto was the world's leading producer of seeds, accounting for 27% of the world seed market.[2]  The majority of these seeds are of the Roundup Ready® brand.  The stated advantage of Roundup Ready® crops is that they substantially improve a farmer's ability to control weeds, because glyphosate can be sprayed in the fields during the growing season without harming the crops.  In 2010, an estimated 70% of corn and cotton and 90% of soybean fields in the United States were Roundup Ready®.[3]

461.    Monsanto's glyphosate products are registered in 130 countries and approved for use on over 100 different crops.[4]  They are ubiquitous in the environment.  Numerous studies

---

[1] Arthur Grube et al., U.S. Envtl. Prot. Agency, *Pesticides Industry Sales and Usage, 2006–2007 Market Estimates* 14 (2011), *available at* http://www.epa.gov/pesticides/pestsales/07pestsales/market_estimates2007.pdf.

[2] ETC Group, *Who Will Control the Green Economy?* 22 (2011), *available at* http://www.etcgroup.org/files/publication/pdf_file/ETC_wwctge_4web_Dec2011.pdf.

[3] William Neuman & Andrew Pollack, *Farmers Cope With Roundup-Resistant Weeds*, N.Y. TIMES, May 3, 2010, *available at* http://www.nytimes.com/2010/05/04/business/energy-environment/04weed.html?pagewan.

[4] Monsanto, *Backgrounder-History of Monsanto's Glyphosate Herbicides* (Sep. 2, 2015), http://www.monsanto.com/products/documents/glyphosate-background-materials/back_history.pdf.

Electronically Filed - St Louis County - September 14, 2020 - 12:50 PM

confirm that glyphosate is found in rivers, streams, and groundwater in agricultural areas where Roundup® is used.[5]  It has been found in food,[6] in the urine of agricultural workers,[7] and even in the urine of urban dwellers who are not in direct contact with glyphosate.[8]

462.    On March 20, 2015, the International Agency for Research on Cancer ("IARC"), an agency of the World Health Organization ("WHO"), issued an evaluation of several herbicides, including glyphosate.  That evaluation was based, in part, on studies of exposures to glyphosate in several countries around the world, and it traces the health implications from exposure to glyphosate since 2001.

463.    On July 29, 2015, IARC issued the formal monograph relating to glyphosate.  In that monograph, the IARC Working Group provides a thorough review of the numerous studies and data relating to glyphosate exposure in humans.

464.    The IARC Working Group classified glyphosate as a Group 2A herbicide, which means that it is *probably carcinogenic to humans*.  The IARC Working Group concluded that the cancers most associated with glyphosate exposure are NHL and other haematopoietic cancers, including lymphocytic lymphoma / chronic lymphocytic leukemia, B-cell lymphoma, and multiple myeloma.[9]

---

[5] *See* U.S. Geological Survey, *USGS Technical Announcement: Widely Used Herbicide Commonly Found in Rain and Streams in the Mississippi River Basin* (2011), *available at* http://www.usgs.gov/newsroom/article.asp?ID=2909; *see also* U.S. Envtl. Prot. Agency, *Technical Factsheet on: Glyphosate*, *available at* http://www.epa.gov/safewater/pdfs/factsheets/soc/tech/glyphosa.pdf.

[6] Thomas Bohn et al., *Compositional Differences in Soybeans on the Market: Glyphosate Accumulates in Roundup Ready GM Soybeans*, 153 FOOD CHEMISTRY 207 (2013), *available at* http://www.sciencedirect.com/science/article/pii/S0308814613019201.

[7] John F. Acquavella et al., *Glyphosate Biomonitoring for Farmers and Their Families: Results from the Farm Family Exposure Study*, 112(3) ENVTL. HEALTH PERSPECTIVES 321 (2004), *available at* http://www.ncbi.nlm.nih.gov/pmc/articles/PMC1241861/; Kathryn Z. Guyton et al., *Carcinogenicity of Tetrachlorvinphos, Parathion, Malathion, Diazinon & Glyphosate*, 112 IARC Monographs 76, section 5.4 (2015), *available at* http://dx.doi.org/10.1016/S1470-2045(15)70134-8.

[8] Dirk Brändli & Sandra Reinacher, *Herbicides found in Human Urine*, 1 ITHAKA JOURNAL 270 (2012), *available at* http://www.ithaka-journal.net/druckversionen/e052012-herbicides-urine.pdf.

[9] *See* Guyton et al., *Carcinogenicity of Tetrachlorvinphos, Parathion, Malathion, Diazinon & Glyphosate*, *supra*.

465.     The IARC evaluation is significant.  It confirms what has been believed for years: that glyphosate is toxic to humans.

466.     Nevertheless, Monsanto, since it began selling Roundup®, has represented it as safe to humans and the environment.  Indeed, Monsanto has repeatedly proclaimed and continues to proclaim to the world, and particularly to United States consumers, that glyphosate-based herbicides, including Roundup®, create no unreasonable risks to human health or to the environment.

**FACTS**

467.     Glyphosate is a broad-spectrum, non-selective herbicide used in a wide variety of herbicidal products around the world.

468.     Plants treated with glyphosate translocate the systemic herbicide to their roots, shoot regions, and fruit, where it interferes with the plant's ability to form aromatic amino acids necessary for protein synthesis.  Treated plants generally die within two to three days.  Because plants absorb glyphosate, it cannot be completely removed by washing or peeling produce or by milling, baking, or brewing grains.

469.     For nearly 40 years, farms across the world have used Roundup® without knowing of the dangers its use poses.  That is because when Monsanto first introduced Roundup®, it touted glyphosate as a technological breakthrough: it could kill almost every weed without causing harm either to people or to the environment.  Of course, history has shown that not to be true. According to the WHO, the main chemical ingredient of Roundup®—glyphosate—is a probable cause of cancer.  Those most at risk are farm workers and other individuals with workplace exposure to Roundup®, such as garden center workers, nursery workers, and landscapers. Agricultural workers are, once again, victims of corporate greed.  Monsanto assured the public

Electronically Filed - St Louis County - September 14, 2020 - 12:50 PM

Electronically Filed - St Louis County - September 14, 2020 - 12:50 PM

that Roundup® was harmless.  In order to prove this, Monsanto has championed falsified data and has attacked legitimate studies that revealed Roundup®'s dangers.  Monsanto has led a prolonged campaign of misinformation to convince government agencies, farmers and the general population that Roundup® is safe.

### The Discovery of Glyphosate and Development of Roundup®

470.    The herbicidal properties of glyphosate were discovered in 1970 by Monsanto chemist John Franz. The first glyphosate-based herbicide was introduced to the market in the mid-1970s under the brand name Roundup®.[10]  From the outset, Monsanto marketed Roundup® as a "safe" general-purpose herbicide for widespread commercial and consumer use.  It still markets Roundup® as safe today.[11]

471.    In addition to the active ingredient glyphosate, Roundup® formulations also contain adjuvants and other chemicals, such as the surfactant POEA, which are considered "inert" and therefore protected as "trade secrets" in manufacturing.  Growing evidence suggests that these adjuvants and additional components of Roundup® formulations are not, in fact, inert and are toxic in their own right.

### Registration of Herbicides under Federal Law

472.    The manufacture, formulation, and distribution of herbicides, such as Roundup®, are regulated under the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA" or "Act"), 7 U.S.C. § 136 *et seq.*  FIFRA requires that all pesticides be registered with the Environmental Protection Agency ("EPA" or "Agency") prior to their distribution, sale, or use, except as described by the Act.  7 U.S.C. § 136a(a).

---

[10] Monsanto*, Backgrounder, History of Monsanto's Glyphosate Herbicide* (Sep. 2, 2015), http://www.monsanto.com/products/documents/glyphosate-background-materials/back_history.pdf.

[11] Monsanto, *What is Glyphosate?* (Sep. 2, 2015), http://www.monsanto.com/sitecollectiondocuments/glyphosate-safety-health.pdf.

473.     Because pesticides are toxic to plants, animals, and humans, at least to some degree, the EPA requires as part of the registration process, among other things, a variety of tests to evaluate the potential for exposure to pesticides, toxicity to people and other potential non-target organisms, and other adverse effects on the environment.  Registration by the EPA, however, is not an assurance or finding of safety.  The determination the Agency must make in registering or re-registering a product is not that the product is "safe," but rather that use of the product in accordance with its label directions "will not generally cause unreasonable adverse effects on the environment."  7 U.S.C. § 136a(c)(5)(D).

474.     FIFRA defines "unreasonable adverse effects on the environment" to mean "any unreasonable risk to man or the environment, taking into account the economic, social, and environmental costs and benefits of the use of any pesticide."  7 U.S.C. § 136(bb).  FIFRA thus requires EPA to make a risk/benefit analysis in determining whether a registration should be granted or a pesticide allowed to continue to be sold in commerce.

475.     The EPA and the State of California registered Roundup® for distribution, sale, and manufacture in the United States and the State of California.

476.     FIFRA generally requires that the registrant, Monsanto in the case of Roundup®, conducts the health and safety testing of pesticide products.  The EPA has protocols governing the conduct of tests required for registration and the laboratory practices that must be followed in conducting these tests. The data produced by the registrant must be submitted to the EPA for review and evaluation.  The government is not required, nor is it able, however, to perform the product tests that are required of the manufacturer.

477.     The evaluation of each pesticide product distributed, sold, or manufactured is completed at the time the product is initially registered. The data necessary for registration of a

pesticide has changed over time.  The EPA is now in the process of re-evaluating all pesticide products through a Congressionally-mandated process called "re-registration."  7 U.S.C. § 136a-1.  In order to reevaluate these pesticides, the EPA is demanding the completion of additional tests and the submission of data for the EPA's recent review and evaluation.

478.    In the case of glyphosate, and therefore Roundup®, the EPA had planned on releasing its preliminary risk assessment—in relation to the reregistration process—no later than July 2015.  The EPA completed its review of glyphosate in early 2015, but it delayed releasing the risk assessment pending further review in light of the WHO's health-related findings.

### Scientific Fraud Underlying the Marketing and Sale of Glyphosate/Roundup®

479.    Based on early studies showing that glyphosate could cause cancer in laboratory animals, the EPA originally classified glyphosate as *possibly carcinogenic to humans* (Group C) in 1985.  After pressure from Monsanto, including contrary studies it provided to the EPA, the EPA changed its classification to *evidence of non-carcinogenicity in humans* (Group E) in 1991.  In so classifying glyphosate, however, the EPA made clear that the designation did not mean the chemical does not cause cancer:  "It should be emphasized, however, that designation of an agent in Group E is based on the available evidence at the time of evaluation and should not be interpreted as a definitive conclusion that the agent will not be a carcinogen under any circumstances."[12]

480.    On two occasions, the EPA found that the laboratories hired by Monsanto to test the toxicity of its Roundup® products for registration purposes committed fraud.

481.    In the first instance, Monsanto, in seeking initial registration of Roundup® by the EPA, hired Industrial Bio-Test Laboratories ("IBT") to perform and evaluate pesticide

---

[12]  U.S. Envtl. Prot. Agency, *Memorandum, Subject: SECOND Peer Review of Glyphosate* 1 (1991), *available at* http://www.epa.gov/pesticides/chem_search/cleared_reviews/csr_PC-103601_30-Oct-91_265.pdf.

Electronically Filed - St Louis County - September 14, 2020 - 12:50 PM

toxicology studies relating to Roundup®.[13]  IBT performed about 30 tests on glyphosate and glyphosate-containing products, including nine of the 15 residue studies needed to register Roundup®.

482.    In 1976, the United States Food and Drug Administration ("FDA") performed an inspection of IBT that revealed discrepancies between the raw data and the final report relating to the toxicological impacts of glyphosate.  The EPA subsequently audited IBT; it too found the toxicology studies conducted for the Roundup® herbicide to be invalid.[14]  An EPA reviewer stated, after finding "routine falsification of data" at IBT, that it was "hard to believe the scientific integrity of the studies when they said they took specimens of the uterus from male rabbits."[15]

483.    Three top executives of IBT were convicted of fraud in 1983.

484.    In the second incident of data falsification, Monsanto hired Craven Laboratories in 1991 to perform pesticide and herbicide studies, including for Roundup®.  In that same year, the owner of Craven Laboratories and three of its employees were indicted, and later convicted, of fraudulent laboratory practices in the testing of pesticides and herbicides.[16]

485.    Despite the falsity of the tests that underlie its registration, within a few years of its launch, Monsanto was marketing Roundup® in 115 countries.

---

[13] Monsanto, *Backgrounder, Testing Fraud: IBT and Craven Laboratories* (Sep. 2, 2015), http://www.monsanto.com/products/documents/glyphosate-background-materials/ibt_craven_bkg.pdf.

[14] U.S. Envtl. Prot. Agency, *Summary of the IBT Review Program Office of Pesticide Programs* (1983), *available at* http://nepis.epa.gov/Exe/ZyNET.exe/91014ULV.TXT?ZyActionD=ZyDocument&Client=EPA&Index=1981+Thru+1985&Docs=&Query=&Time=&EndTime=&SearchMethod=1&TocRestrict=n&Toc=&TocEntry=&QField=&QFieldYear=&QFieldMonth=&QFieldDay=&IntQFieldOp=0&ExtQFieldOp=0&XmlQuery=&File=D%3A%5Czyfiles%5CIndex%20Data%5C81thru85%5CTxt%5C00000022%5C91014ULV.txt&User=ANONYMOUS&Password=anonymous&SortMethod=h%7C-&MaximumDocuments=1&FuzzyDegree=0&ImageQuality=r75g8/r75g8/x150y150g16/i425&Display=p%7Cf&DefSeekPage=x&SearchBack=ZyActionL&Back=ZyActionS&BackDesc=Results%20page&MaximumPages=1&ZyEntry=1&SeekPage=x&ZyPURL.

[15] Marie-Monique Robin, *The World According to Monsanto: Pollution, Corruption and the Control of the World's Food Supply* (2011) (citing U.S. Envtl. Prot. Agency, *Data Validation, Memo from K. Locke, Toxicology Branch, to R. Taylor, Registration Branch. Washington, D.C.* (August 9, 1978)).

[16] Monsanto, *Backgrounder, Testing Fraud: IBT and Craven Laboratories*, *supra.*

### *The Importance of Roundup® to Monsanto's Market Dominance Profits*

486.    The success of Roundup® was key to Monsanto's continued reputation and dominance in the marketplace.  Largely due to the success of Roundup® sales, Monsanto's agriculture division was out-performing its chemicals division's operating income, and that gap increased yearly.  But with its patent for glyphosate expiring in the United States in the year 2000, Monsanto needed a strategy to maintain its Roundup® market dominance and to ward off impending competition.

487.    In response, Monsanto began the development and sale of genetically engineered Roundup Ready® seeds in 1996.  Since Roundup Ready® crops are resistant to glyphosate, farmers can spray Roundup® onto their fields during the growing season without harming the crop.  This allowed Monsanto to expand its market for Roundup® even further; by 2000, Monsanto's biotechnology seeds were planted on more than 80 million acres worldwide and nearly 70% of American soybeans were planted from Roundup Ready® seeds.  It also secured Monsanto's dominant share of the glyphosate/Roundup® market through a marketing strategy that coupled proprietary Roundup Ready® seeds with continued sales of its Roundup® herbicide.

488.    Through a three-pronged strategy of increasing production, decreasing prices, and by coupling with Roundup Ready® seeds, Roundup® became Monsanto's most profitable product.  In 2000, Roundup® accounted for almost $2.8 billion in sales, outselling other herbicides by a margin of five to one, and accounting for close to half of Monsanto's revenue.[17] Today, glyphosate remains one of the world's largest herbicides by sales volume.

---

[17] David Barboza, *The Power of Roundup; A Weed Killer Is A Block for Monsanto to Build On*, N.Y. TIMES, Aug. 2, 2001, *available at* http://www.nytimes.com/2001/08/02/business/the-power-of-roundup-a-weed-killer-is-a-block-for-monsanto-to-build-on.html.

Electronically Filed - St Louis County - September 14, 2020 - 12:50 PM

*Monsanto has known for decades that it falsely advertises the safety of Roundup®*

489.    In 1996, the New York Attorney General ("NYAG") filed a lawsuit against Monsanto based on its false and misleading advertising of Roundup® products.  Specifically, the lawsuit challenged Monsanto's general representations that its spray-on glyphosate-based herbicides, including Roundup®, were "**safer than table salt**" and "**practically non-toxic**" to mammals, birds, and fish.  Among the representations the NYAG found deceptive and misleading about the human and environmental safety of glyphosate and/or Roundup® are the following:

a)    "Remember that environmentally friendly Roundup herbicide is biodegradable. It won't build up in the soil so you can use Roundup with confidence along customers' driveways, sidewalks and fences ..."

b)    "And remember that Roundup is biodegradable and won't build up in the soil. That will give you the environmental confidence you need to use Roundup everywhere you've got a weed, brush, edging or trimming problem."

c)    "Roundup biodegrades into naturally occurring elements."

d)    "Remember that versatile Roundup herbicide stays where you put it. That means there's no washing or leaching to harm customers' shrubs or other desirable vegetation."

e)    "This non-residual herbicide will not wash or leach in the soil. It ... stays where you apply it."

f)    "You can apply Accord with 'confidence because it will stay where you put it' it bonds tightly to soil particles, preventing leaching. Then, soon after application, soil microorganisms biodegrade Accord into natural products."

g)    "Glyphosate is less toxic to rats than table salt following acute oral ingestion."

h)    "Glyphosate's safety margin is much greater than required. It has over a 1,000-fold safety margin in food and over a 700-fold safety margin for workers who manufacture it or use it."

Electronically Filed - St Louis County - September 14, 2020 - 12:50 PM

    i)      "You can feel good about using herbicides by Monsanto. They carry a toxicity category rating of 'practically non-toxic' as it pertains to mammals, birds and fish."

    j)      "Roundup can be used where kids and pets will play and breaks down into natural material." This ad depicts a person with his head in the ground and a pet dog standing in an area which has been treated with Roundup.[18]

490.    On November 19, 1996, Monsanto entered into an Assurance of Discontinuance with NYAG, in which Monsanto agreed, among other things, "to cease and desist from publishing or broadcasting any advertisements [in New York] that represent, directly or by implication" that:

    a)      its glyphosate-containing pesticide products or any component thereof are safe, non-toxic, harmless or free from risk.

    b)      its glyphosate-containing pesticide products or any component thereof manufactured, formulated, distributed or sold by Monsanto are biodegradable

    c)      its glyphosate-containing pesticide products or any component thereof stay where they are applied under all circumstances and will not move through the environment by any means.

    d)      its glyphosate-containing pesticide products or any component thereof are "good" for the environment or are "known for their environmental characteristics."

    e)      glyphosate-containing pesticide products or any component thereof are safer or less toxic than common consumer products other than herbicides;

    f)      its glyphosate-containing products or any component thereof might be classified as "practically non-toxic."

491.    Monsanto did not alter its advertising in the same manner in any state other than New York, and on information and belief it still has not done so today.

---

[18] Attorney General of the State of New York, In the Matter of Monsanto Company, Assurance of Discontinuance Pursuant to Executive Law § 63(15) (Nov. 1996).

Electronically Filed - St Louis County - September 14, 2020 - 12:50 PM

492.    In 2009, France's highest court ruled that Monsanto had not told the truth about the safety of Roundup®.  The French court affirmed an earlier judgement that Monsanto had falsely advertised its herbicide Roundup® as "biodegradable" and that it "left the soil clean."[19]

### Classifications and Assessments of Glyphosate

493.    The IARC process for the classification of glyphosate followed IARC's stringent procedures for the evaluation of a chemical agent.  Over time, the IARC Monograph program has reviewed 980 agents.  Of those reviewed, it has determined 116 agents to be Group 1 (Known Human Carcinogens); 73 agents to be Group 2A (Probable Human Carcinogens); 287 agents to be Group 2B (Possible Human Carcinogens); 503 agents to be Group 3 (Not Classified); and one agent to be Probably Not Carcinogenic.

494.    The established procedure for IARC Monograph evaluations is described in the IARC Programme's Preamble.[20]  Evaluations are performed by panels of international experts, selected on the basis of their expertise and the absence of actual or apparent conflicts of interest.

495.    One year before the Monograph meeting, the meeting is announced and there is a call both for data and for experts.  Eight months before the Monograph meeting, the Working Group membership is selected and the sections of the Monograph are developed by the Working Group members.  One month prior to the Monograph meeting, the call for data is closed and the various draft sections are distributed among Working Group members for review and comment. Finally, at the Monograph meeting, the Working Group finalizes review of all literature, evaluates the evidence in each category, and completes the overall evaluation.  Within two weeks after the

---

[19] *Monsanto Guilty in 'False Ad' Row*, BBC, Oct. 15, 2009, *available at* http://news.bbc.co.uk/2/hi/europe/8308903.stm.

[20] World Health Org., *IARC Monographs on the Evaluation of Carcinogenic Risks to Humans: Preamble* (2006), available at http://monographs.iarc.fr/ENG/Preamble/CurrentPreamble.pdf.

Monograph meeting, the summary of the Working Group findings are published in *The Lancet Oncology*, and within a year after the meeting, the finalized Monograph is published.

496. In assessing an agent, the IARC Working Group reviews the following information: (a) human, experimental, and mechanistic data; (b) all pertinent epidemiological studies and cancer bioassays; and (c) representative mechanistic data. The studies must be publicly available and have sufficient detail for meaningful review, and reviewers cannot be associated with the underlying study.

497. In March 2015, IARC reassessed glyphosate. The summary published in *The Lancet Oncology* reported that glyphosate is a Group 2A agent and probably carcinogenic in humans.

498. On July 29, 2015, IARC issued its Monograph for glyphosate, Monograph Volume 112. For Volume 112, a Working Group of 17 experts from 11 countries met at IARC from March 3–10, 2015 to assess the carcinogenicity of certain herbicides, including glyphosate. The March meeting culminated a nearly one-year review and preparation by the IARC Secretariat and the Working Group, including a comprehensive review of the latest available scientific evidence. According to published procedures, the Working Group considered "reports that have been published or accepted for publication in the openly available scientific literature" as well as "data from governmental reports that are publicly available."

499. The studies considered the following exposure groups: (1) occupational exposure of farmers and tree nursery workers in the United States, forestry workers in Canada and Finland and municipal weed-control workers in the United Kingdom; and (2) para-occupational exposure in farming families.

Electronically Filed - St Louis County - September 14, 2020 - 12:50 PM

Electronically Filed - St Louis County - September 14, 2020 - 12:50 PM

500.     Glyphosate was identified as the second-most used household herbicide in the United States for weed control between 2001 and 2007 and the most heavily used herbicide in the world in 2012.

501.     Exposure pathways are identified as air (especially during spraying), water, and food.  Community exposure to glyphosate is widespread and found in soil, air, surface water, and groundwater, as well as in food.

502.     The assessment of the IARC Working Group identified several case control studies of occupational exposure in the United States, Canada, and Sweden.  These studies show a human health concern from agricultural and other work-related exposure to glyphosate.

503.     The IARC Working Group found an increased risk between exposure to glyphosate and NHL and several subtypes of NHL, and the increased risk persisted after adjustment for other pesticides.

504.     The IARC Working Group also found that glyphosate caused DNA and chromosomal damage in human cells.  One study in community residents reported increases in blood markers of chromosomal damage (micronuclei) after glyphosate formulations were sprayed.

505.     In male CD-1 mice, glyphosate induced a positive trend in the incidence of a rare tumor: renal tubule carcinoma.   A second study reported a positive trend for hemangiosarcoma in male mice.  Glyphosate increased pancreatic islet-cell adenoma in male rats in two studies.  A glyphosate formulation promoted skin tumors in an initiation-promotion study in mice.

506.     The IARC Working Group also noted that glyphosate has been detected in the urine of agricultural workers, indicating absorption.   Soil microbes degrade glyphosate to aminomethylphosphoric acid (AMPA).  Blood AMPA detection after exposure suggests intestinal microbial metabolism in humans.

507.    The IARC Working Group further found that glyphosate and glyphosate formulations induced DNA and chromosomal damage in mammals, and in human and animal cells in utero.

508.    The IARC Working Group also noted genotoxic, hormonal, and enzymatic effects in mammals exposed to glyphosate.[21]  Essentially, glyphosate inhibits the biosynthesis of aromatic amino acids, which leads to several metabolic disturbances, including the inhibition of protein and secondary product biosynthesis and general metabolic disruption.

509.    The IARC Working Group also reviewed an Agricultural Health Study, consisting of a prospective cohort of 57,311 licensed pesticide applicators in Iowa and North Carolina.[22] While this study differed from others in that it was based on a self-administered questionnaire, the results support an association between glyphosate exposure and multiple myeloma, hairy cell leukemia (HCL), and chronic lymphocytic leukemia (CLL), in addition to several other cancers.

### *Other Earlier Findings About Glyphosate's Dangers to Human Health*

510.    The EPA has a technical fact sheet, as part of its Drinking Water and Health, National Primary Drinking Water Regulations publication, relating to glyphosate.  This technical fact sheet predates IARC's March 20, 2015 evaluation.  The fact sheet describes the release patterns for glyphosate as follows:

### Release Patterns

Glyphosate is released to the environment in its use as a herbicide for controlling woody and herbaceous weeds on forestry, right-of-way, cropped and non-cropped sites. These sites may be around water and in wetlands.

---

[21] Guyton et al., *Carcinogenicity of Tetrachlorvinphos, Parathion, Malathion, Diazinon & Glyphosate*, *supra* at 77.

[22] Anneclare J. De Roos et al., *Cancer Incidence Among Glyphosate-Exposed Pesticide Applicators in the Agricultural Health Study*, 113 Envt'l Health Perspectives 49–54 (2005), *available at* http://www.ncbi.nlm.nih.gov/pmc/articles/PMC1253709/pdf/ehp0113-000049.pdf.

Electronically Filed - St Louis County - September 14, 2020 - 12:50 PM

Electronically Filed - St Louis County - September 14, 2020 - 12:50 PM

It may also be released to the environment during its manufacture, formulation, transport, storage, disposal and cleanup, and from spills. Since glyphosate is not a listed chemical in the Toxics Release Inventory, data on releases during its manufacture and handling are not available.

Occupational workers and home gardeners may be exposed to glyphosate by inhalation and dermal contact during spraying, mixing, and cleanup. They may also be exposed by touching soil and plants to which glyphosate was applied. Occupational exposure may also occur during glyphosate's manufacture, transport storage, and disposal.[23]

511.    In 1995, the Northwest Coalition for Alternatives to Pesticides reported that in California, the state with the most comprehensive program for reporting of pesticide-caused illness, glyphosate was the third most commonly-reported cause of pesticide illness among agricultural workers.[24]

### *The Toxicity of Other Ingredients in Roundup®*

512.    In addition to the toxicity of the active ingredient, glyphosate, several studies support the hypothesis that the glyphosate-based formulation in Defendant's Roundup® products is more dangerous and toxic than glyphosate alone.  Indeed, as early as 1991, available evidence demonstrated that glyphosate formulations were significantly more toxic than glyphosate alone.[25]

513.    In 2002, a study by Julie Marc, entitled "Pesticide Roundup Provokes Cell Division Dysfunction at the Level of CDK1/Cyclin B Activation," revealed that Roundup® causes delays

---

[23] U.S. Envtl. Prot. Agency, *Technical Factsheet on: Glyphosate*, *supra*.

[24] Caroline Cox, *Glyphosate, Part 2: Human Exposure and Ecological Effects*, 15 J. PESTICIDE REFORM 4 (1995); W.S. Peas et al., *Preventing pesticide-related illness in California agriculture: Strategies and priorities. Environmental Health Policy Program Report*, Univ. of Cal. School of Public Health, Calif. Policy Seminar (1993).

[25] Martinez, T.T. and K. Brown, *Oral and pulmonary toxicology of the surfactant used in Roundup herbicide*, PROC. WEST. PHARMACOL. SOC. 34:43-46 (1991).

Electronically Filed - St Louis County - September 14, 2020 - 12:50 PM

in the cell cycles of sea urchins but that the same concentrations of glyphosate alone were ineffective and did not alter cell cycles.[26]

514.    A 2004 study by Marc and others, entitled "Glyphosate-based pesticides affect cell cycle regulation," demonstrated a molecular link between glyphosate-based products and cell cycle dysregulation.  The researchers noted that "cell-cycle dysregulation is a hallmark of tumor cells and human cancer.  Failure in the cell-cycle checkpoints leads genomic instability and subsequent development of cancers from the initial affected cell."  Further, "[s]ince cell cycle disorders such as cancer result from dysfunction of a unique cell, it was of interest to evaluate the threshold dose of glyphosate affecting the cells."[27]

515.    In 2005, a study by Francisco Peixoto, entitled "Comparative effects of the Roundup and glyphosate on mitochondrial oxidative phosphorylation," demonstrated that Roundup®'s effects on rat liver mitochondria are far more toxic than equal concentrations of glyphosate alone.  The Peixoto study further suggested that the harmful effects of Roundup® on mitochondrial bioenergetics could not be exclusively attributed to glyphosate but could be the result of other chemicals, such as the surfactant POEA, or in the alternative, due to a potential synergic effect between glyphosate and other ingredients in the Roundup® formulation.[28]

516.    In 2009, Nora Benachour and Gilles-Eric Seralini published a study examining the effects of Roundup® and glyphosate on human umbilical, embryonic, and placental cells.  The study tested dilution levels of Roundup® and glyphosate that were far below agricultural

---

[26] Julie Marc, et al., *Pesticide Roundup Provokes Cell Division Dysfunction at the Level of CDK1/Cyclin B Activation*, 15 CHEM. RES. TOXICOL. 326–331 (2002), *available at* http://pubs.acs.org/doi/full/10.1021/tx015543g.

[27] Julie Marc, et al., *Glyphosate-based pesticides affect cell cycle regulation*, 96 BIOLOGY OF THE CELL 245, 245-249 (2004), *available at* http://onlinelibrary.wiley.com/doi/10.1016/j.biolcel.2003.11.010/epdf.

[28] Francisco Peixoto, *Comparative effects of the Roundup and glyphosate on mitochondrial oxidative phosphorylation*, 61 CHEMOSPHERE 1115, 1122 (2005), *available at* https://www.researchgate.net/publication/7504567_Comparative_effects_of_the_Roundup_and_glyphosate_on_mitochondrial_oxidative_phosphorylation.

recommendations, corresponding with low levels of residue in food. The researchers ultimately concluded that supposed "inert" ingredients, and possibly POEA, alter human cell permeability and amplify toxicity of glyphosate alone. The researchers further suggested that assessments of glyphosate toxicity should account for the presence of adjuvants or additional chemicals used in the formulation of the complete pesticide. The study confirmed that the adjuvants present in Roundup® are not, in fact, inert and that Roundup® is potentially far more toxic than its active ingredient glyphosate alone.[29]

517. The results of these studies were at all times available to Defendant.

518. Monsanto's chief toxicologist Donna Farmer has admitted that she cannot say that Roundup® does not cause cancer because Monsanto has not performed carcinogenicity studies with the formulated product Roundup®, the very product that caused Plaintiffs' NHL.[30] Indeed, she further admitted that in the 35 years that Monsanto has marketed Roundup® to the public, Monsanto has conducted no chronic carcinogenicity studies on the formulated Roundup® product merely because EPA did not require that such a study be performed for registration of glyphosate.[31]

519. Defendant thus knew or should have known that Roundup® is more toxic than glyphosate alone and that safety studies of Roundup®, Roundup's adjuvants and "inert" ingredients, and/or the surfactant POEA were necessary to protect Plaintiffs from Roundup®.

---

[29] Nora Benachour, et al., *Glyphosate Formulations Induce Apoptosis and Necrosis in Human Umbilical, Embryonic, and Placental Cells*, 22 CHEM. RES. TOXICOL. 97-105 (2008), *available at* http://big.assets.huffingtonpost.com/france.pdf.

[30] *See* Plaintiffs' Submission in Response to Pretrial Order No. 8, Ex. 7, *In re: Roundup Products Liability Litigation*, MDL No. 2741 (N.D. Cal., Mar. 14, 2017), ECF No. 187-7.

[31] *See id*.

Electronically Filed - St Louis County - September 14, 2020 - 12:50 PM

Electronically Filed - St Louis County - September 14, 2020 - 12:50 PM

520.    Despite its knowledge that Roundup® is considerably more dangerous than glyphosate alone, Defendant continued to promote Roundup® as safe.

### The EPA's Review of Glyphosate

521.    In April 2016, personnel within the EPA's Office of Pesticides Program (OPP) leaked and posted on the internet a draft report on glyphosate carcinogenicity, entitled Cancer Assessment Review Committee (CARC) report, dated October 2015.  The EPA removed the documents by May 2, 2016, within days of initially posting it online.  An EPA spokesperson subsequently issued a statement on the agency's glyphosate review:

> Glyphosate documents were inadvertently posted to the Agency's docket. These documents have now been taken down because our assessment is not final. EPA has not completed our cancer review. We will look at the work of other governments as well as work by HHS's Agricultural Health Study as we move to make a decision on glyphosate. Our assessment will be peer reviewed and completed by end of 2016.[32]

522.    On September 12, 2016, EPA's OPP submitted a report on the carcinogenic potential of glyphosate, wherein it issued a "proposed conclusion" that glyphosate is "'not likely to be carcinogenic to humans' at doses relevant to human health risk assessment."[33]   There are no authors listed on this issue paper, which reiterates and adopts the conclusions of the October 2015 leaked assessment.   The issue paper is based upon a review of industry-sponsored articles and studies.   The OPP acknowledged that it rejected all studies that considered Roundup®—the formulated product—instead of studies that isolated glyphosate because "[g]lyphosate

---

[32] Carey Gillam, *What Is Going On With Glyphosate? EPA's Odd Handling of Controversial Chemical*, HUFFINGTON POST, May 2, 2016, *available at* http://www.huffingtonpost.com/carey-gillam/what-is-going-on-with-gly_b_9825326.html; *see also* P.J. Huffstutter, *EPA takes offline report that says glyphosate not likely carcinogenic*, REUTERS, May 2, 2016, available at http://www.reuters.com/article/us-usa-glyphosate-epa-idUSKCN0XU01K.

[33] See EPA's Office of Pesticide Programs, Glyphosate Issue Paper: Evaluation of Carcinogenic Potential (Sept. 12, 2016), *available at* https://www.epa.gov/sites/production/files/2016-09/documents/glyphosate_issue_paper_evaluation_of_carcinogenic_potential.pdf.

formulations contain various components other than glyphosate and it has been hypothesized these components are more toxic than glyphosate alone."[34]

523.    Thus, the OPP notes dozens of studies considered by IARC were not reviewed by the OPP because the OPP's "evaluation focused on studies on the active ingredient glyphosate" and "additional research could also be performed to determine whether formulation components, such as surfactants, influence the toxicity of glyphosate formulations."[35]

524.    From December 13 to 16, 2016, the EPA held FIFRA Scientific Advisory Panel ("SAP") meetings to consider issues raised by the OPP's evaluation of glyphosate.  Again, OPP only allowed the SAP to consider studies of glyphosate alone, and not any study of the formulated product.  In its Charge to the FIFRA SAP, the OPP noted that "[a]lthough there are studies available on glyphosate-based pesticide formulations, the agency is soliciting advice from the FIFRA Scientific Advisory Panel (SAP) on this evaluation of human carcinogenic potential for the active ingredient glyphosate only at this time."[36]

525.    The OPP draft assessment therefore does not actually consider the product at issue in this litigation or, more importantly, how glyphosate, in conjunction with surfactants and other chemicals, affects carcinogenicity.

526.    On March 16, 2017, the final SAP meeting minutes and report were released, revealing disagreement and lack of consensus among the scientists on whether there was a positive association between *glyphosate* exposure and NHL.[37]

---

[34] *Id.*

[35] *Id.*

[36] EPA OPP, Glyphosate: Evaluation of Carcinogenic Potential, Charge to the FIFRA SAP for the October 18-21, 2016 Meeting, available at, https://www.epa.gov/sites/production/files/2016-11/documents/glyphosate_sap_charge_questions_-final.pdf.

[37] FIFRA Scientific Advisory Panel Meeting Minutes and Final Report No. 2017-01, A Set of Scientific Issues Being Considered by the Environmental Protection Agency Regarding: EPA's Evaluation of the Carcinogenic

Electronically Filed - St Louis County - September 14, 2020 - 12:50 PM

Electronically Filed - St Louis County - September 14, 2020 - 12:50 PM

***Monsanto's Industry Ties***

527.    Recently unsealed documents in the federal Roundup® MDL litigation reveal the extent to which Monsanto has been able to leverage its contacts within the EPA to protect glyphosate and Roundup® from scrutiny and review.

528.    Internal Monsanto documents, including email communications, demonstrate that Jess Rowland, former Deputy Division Director, Health Effects Division of the EPA's OPP, and formerly the chair of the CARC (the same committee that inadvertently leaked the EPA's glyphosate report in April 2016), repeatedly and directly intervened on Monsanto's behalf.  These same documents reveal that Monsanto was secure in the knowledge that it had allies within the EPA.

529.    To begin, in the months following IARC's initial March 2015 announcement that it had classified glyphosate as a probable carcinogen, Monsanto turned its attention to the EPA's review of glyphosate.  In one April 27, 2015 email, Monsanto official Bill Heydens wrote to colleagues to suggest "approaching EPA and…. ask if there is anything that would help them defend the situation?"  His colleague Dan Jenkins responded: "I think you and I could get on the phone w Jess Rowland and discuss this pretty openly. He'll give us straight talk."[38]

530.    The following day, Mr. Jenkins spoke to Mr. Rowland by telephone and then relayed the substance of the conversation for his colleagues in an April 28, 2015 email.  Specifically, he reported back that with respect to the CARC investigation, Mr. Rowland had stated:  "We have enough to sustain our conclusions.  Don't need gene tox or epi . . . . I am the

---

Potential of Glyphosate, *available at* https://www.epa.gov/sites/production/files/2017-03/documents/december_13-16_2016_final_report_03162017.pdf.

[38] *See* Plaintiffs' Motion to Compel the Deposition of Jess Rowland, Ex. D, In re: Roundup Products Liability Litigation, MDL No. 2741 (N.D. Cal., Mar. 14, 2017), ECF No. 189-4.

Electronically Filed - St Louis County - September 14, 2020 - 12:50 PM

chair of the CARC and my folks are running this process for glyphosate in reg review. I have called a CARC meeting in June."[39]  Thus, even though the ostensible purpose of the CARC review was to evaluate the exhaustive IARC assessment on glyphosate, and even though the full IARC monograph on glyphosate would not be completed until July 2015, Mr. Rowland had already formed his conclusion months earlier—in April 2015.

531.    Mr. Rowland also intervened to halt another agency's review of glyphosate.  When the Agency for Toxic Substances and Disease Registry (ATSDR), a federal public health agency of the U.S. Department of Health and Human Services, announced in February 2015 that it planned to publish a toxicological review of glyphosate, it was Mr. Rowland who helped Monsanto stop the ATSDR's investigation.  In the same April 28, 2015, email discussed above, Mr. Jenkins explained that Mr. Rowland wanted to help Monsanto stop an investigation concerning the carcinogenicity of glyphosate being conducted by ATSDR.[40]  Since ATSDR is not controlled by the EPA, according to Mr. Jenkins, Mr. Rowland had bragged: "If I can kill this I should get a medal."[41]  Jenkins cautioned, however, that Monsanto should not "get your hopes up, I doubt EPA and Jess can kill this; but it's good to know they are going to actually make the effort now to coordinate due to our pressing and their shared concern that ATSDR is consistent in its conclusions with the EPA."[42]  The ATSDR never published its toxicological profile of glyphosate.

532.    Further, the released documents reveal Monsanto's confidence that its allies within the EPA would continue to support glyphosate.  In an internal memo on glyphosate, Monsanto executives wrote: "We know, *but cannot say*, that EPA's Office of Pesticide Program scientists

---

[39] *Id.*

[40] See id.

[41] Id.

[42] *Id.*

Electronically Filed - St Louis County - September 14, 2020 - 12:50 PM

strongly feel that glyphosate does not cause cancer and have defended their written determination internally for months."[43]  Notably, when Mr. Rowland attended the IARC glyphosate meetings as an observed for the EPA, internal communications indicate Monsanto was not displeased with his attendance since, "we all know Jess."[44]

### *Recent Worldwide Bans on Roundup®/Glyphosate*

533.    Several countries around the world have instituted bans on the sale of Roundup® and other glyphosate-containing herbicides, both before and since IARC first announced its assessment for glyphosate in March 2015, and more countries undoubtedly will follow suit as the dangers of the use of Roundup® become more widely known.   The Netherlands issued a ban on all glyphosate-based herbicides in April 2014, including Roundup®, which will take effect by the end of 2015.  In issuing the ban, the Dutch Parliament member who introduced the successful legislation stated: "Agricultural pesticides in user-friendly packaging are sold in abundance to private persons.   In garden centers, Roundup® is promoted as harmless, but unsuspecting customers have no idea what the risks of this product are.  Especially children are sensitive to toxic substances and should therefore not be exposed to it."[45]

534.    The Brazilian Public Prosecutor in the Federal District requested that the Brazilian Justice Department suspend the use of glyphosate.[46]

---

[43] See Plaintiffs' Motion to Compel the Deposition of Jess Rowland, Ex. E, In re: Roundup Products Liability Litigation, MDL No. 2741 (N.D. Cal., Mar. 14, 2017), ECF No. 189-5 (emphasis original).

[44] *See* Plaintiffs' Motion to Compel the Deposition of Jess Rowland, Ex. G, *In re: Roundup Products Liability Litigation*, MDL No. 2741 (N.D. Cal., Mar. 14, 2017), ECF No. 189-7.

[45] *Holland's Parliament Bans Glyphosate Herbicides*, The Real Agenda, April 14, 2014, *available at* http://real-agenda.com/hollands-parliament-bans-glyphosate-herbicides/.

[46] Christina Sarich, *Brazil's Public Prosecutor Wants to Ban Monsanto's Chemicals Following Recent Glyphosate-Cancer Link*, GLOBAL RESEARCH, May 14, 2015, *available at* http://www.globalresearch.ca/brazils-public-prosecutor-wants-to-ban-monsantos-chemicals-following-recent-glyphosate-cancer-link/5449440; *see* Ministério Público Federal, *MPF/DF reforça pedido para que glifosato seja banido do mercado nacional*, April, 14, 2015, *available at* http://noticias.pgr.mpf.mp.br/noticias/noticias-do-site/copy_of_meio-ambiente-e-patrimonio-cultural/mpf-df-reforca-pedido-para-que-glifosato-seja-banido-do-mercado-nacional.

Electronically Filed - St Louis County - September 14, 2020 - 12:50 PM

535.    France banned the private sale of Roundup® and glyphosate following the IARC assessment for Glyphosate.[47]

536.    Bermuda banned both the private and commercial sale of glyphosates, including Roundup®. The Bermuda government explained its ban as follows: "Following a recent scientific study carried out by a leading cancer agency, the importation of weed spray 'Roundup' has been suspended."[48]

537.    The Sri Lankan government banned the private and commercial use of glyphosate, particularly out of concern that glyphosate has been linked to fatal kidney disease in agricultural workers.[49]

538.    The government of Colombia announced its ban on using Roundup® and glyphosate to destroy illegal plantations of coca, the raw ingredient for cocaine, because of the WHO's finding that glyphosate is probably carcinogenic.[50]

### EFSA Report on Glyphosate

539.    On November 12, 2015, the European Food Safety Authority (EFSA), the European Union's primary agency for food safety, reported on its evaluation of the Renewal Assessment Report (RAR) on glyphosate.[51] The Rapporteur Member State assigned to glyphosate, the German

---

[47] Zoe Schlanger, *France Bans Sales of Monsanto's Roundup in Garden Centers, 3 Months After U.N. Calls it 'Probable Carcinogen'*, NEWSWEEK, June 15, 2015, *available at* http://www.newsweek.com/france-bans-sale-monsantos-roundup-garden-centers-after-un-names-it-probable-343311.

[48] *Health Minister: Importation of Roundup Weed Spray Suspended*, Today in Bermuda, May, 11 2015, *available at* http://www.todayinbermuda.com/news/health/item/1471-health-minister-importation-of-roundup-weed-spray-suspended.

[49] *Sri Lanka's New President Puts Immediate Ban on Glyphosate Herbicides*, Sustainable Pulse, May 25, 2015, *available at* http://sustainablepulse.com/2015/05/25/sri-lankas-new-president-puts-immediate-ban-on-glyphosate-herbicides/#.VeduYk3bKAw.

[50] *Columbia to ban coca spraying herbicide glyphosate*, BBC, May 10, 2015, *available at* http://www.bbc.com/news/world-latin-america-32677411.

[51] European Food Safety Auth., Conclusion on the peer review of the pesticide risk assessment of the active substance glyphosate, *available at* http://www.efsa.europa.eu/sites/default/files/scientific_output/files/main_documents/4302.pdf.

Federal Institute for Risk Assessment (BfR), had produced the RAR as part of the renewal process for glyphosate in the EU.

540.    BfR sent its draft RAR to EFSA and the RAR underwent a peer review process by EFSA, other member states, and industry groups.  As part of the on-going peer review of Germany's reevaluation of glyphosate, EFSA had also received a second mandate from the European Commission to consider IARC's findings regarding the potential carcinogenicity of glyphosate and glyphosate-containing products.

541.    Based on a review of the RAR, which included data from industry-submitted unpublished studies, EFSA sent its own report ("Conclusion") to the European Commission, finding that "glyphosate is unlikely to pose a carcinogenic hazard to humans and the evidence does not support classification with regard to its carcinogenic potential according to Regulation (EC) No 1272/2008."[52]  EFSA therefore disagreed with IARC: glyphosate was not genotoxic and did not present a carcinogenic threat to humans.

542.    In explaining why its results departed from IARC's conclusion, EFSA drew a distinction between the EU and IARC approaches to the study and classification of chemicals.[53] Although IARC examined "both glyphosate—an active substance—and glyphosate-based formulations, grouping all formulations regardless of their composition," EFSA explained that it considered only glyphosate and that its assessment focuses on "each individual chemical, and each marketed mixture separately."[54]  IARC, on the other hand, "assesses generic agents, including groups of related chemicals, as well as occupational or environmental exposure, and cultural or

---

[52] *Id.*

[53] EFSA Fact Sheet: Glyphosate, EFSA
http://www.efsa.europa.eu/sites/default/files/corporate_publications/files/efsaexplainsglyphosate151112en.pdf.
[54] *Id.*

Electronically Filed - St Louis County - September 14, 2020 - 12:50 PM

Electronically Filed - St Louis County - September 14, 2020 - 12:50 PM

behavioural practices."[55]  EFSA accorded greater weight to studies conducted with glyphosate alone than studies of formulated products.[56]

543.    EFSA went further and noted:

> [A]lthough some studies suggest that certain glyphosate-based formulations may be genotoxic (i.e. damaging to DNA), others that look solely at the active substance glyphosate do not show this effect. It is likely, therefore, that *the genotoxic effects observed in some glyphosate-based formulations are related to the other constituents or "co-formulants"*. Similarly, certain glyphosate-based formulations display higher toxicity than that of the active ingredient, presumably because of the presence of co-formulants. In its assessment, *EFSA proposes that the toxicity of each pesticide formulation and in particular its genotoxic potential should be further considered and addressed by Member State authorities while they re-assess uses of glyphosate-based formulations in their own territories*.[57]

544.    Notwithstanding its conclusion, EFSA did set exposure levels for glyphosate. Specifically, EFSA proposed an acceptable daily intake (ADI) of 0.5 mg/kg of body weight per day; an acute reference dose (ARfD) of 0.5 mg/kg of body weight; and an acceptable operator exposure level (AOEL) of 0.1 mg/kg bw per day.[58]

### *Leading Scientists Dispute EFSA's Conclusion*

545.    On November 27, 2015, 96 independent academic and governmental scientists from around the world submitted an open letter to the EU health commissioner, Vytenis Andriukaitis.[59]  The scientists expressed their strong concerns and urged the commissioner to

---

[55] *Id*.

[56] *Id*.

[57] *Id*.

[58] European Food Safety Auth., Conclusion on the peer review of the pesticide risk assessment of the active substance glyphosate, *supra.*

[59] Letter from Christopher J. Portier et al. to Commission Vytenis Andriukaitis, Open letter: Review of the Carcinogenicity of Glyphosate by EFSA and BfR (Nov. 27, 2015), http://www.zeit.de/wissen/umwelt/2015-11/glyphosat-offener-brief.pdf; http://www.theguardian.com/environment/2016/jan/13/eu-scientists-in-row-over-safety-of-glyphosate-weedkiller.

Electronically Filed - St Louis County - September 14, 2020 - 12:50 PM

disregard the "flawed" EFSA report, arguing that "the BfR decision is not credible because it is not supported by the evidence and it was not reached in an open and transparent manner."[60]

546.    Signatories to the letter included Dr. Christopher J. Portier, Ph.D., and other renowned international experts in the field, some of whom were part of the IARC Working Group assigned to glyphosate.

547.    In an exhaustive and careful examination, the scientists scrutinized EFSA's conclusions and outlined why the IARC Working Group decision was "by far the more credible":

> The IARC WG decision was reached relying on open and transparent procedures by independent scientists who completed thorough conflict-of-interest statements and were not affiliated or financially supported in any way by the chemical manufacturing industry. It is fully referenced and depends entirely on reports published in the open, peer-reviewed biomedical literature. It is part of a long tradition of deeply researched and highly credible reports on the carcinogenicity of hundreds of chemicals issued over the past four decades by IARC and used today by international agencies and regulatory bodies around the world as a basis for risk assessment, regulation and public health policy.[61]

548.    With respect to human data, the scientists pointed out that EFSA agreed with IARC that there was "*limited evidence* of carcinogenicity" for NHL, but EFSA nonetheless dismissed an association between glyphosate exposure and carcinogenicity.  IARC applies three levels of evidence in its analyses of human data, including sufficient evidence and limited evidence. EFSA's ultimate conclusion that "there was no unequivocal evidence for a clear and strong association of NHL with glyphosate" was misleading because it was tantamount to IARC's highest level of evidence: "sufficient evidence," which means that a causal relationship has been

---

[60] *Id.*
[61] *Id.*

Electronically Filed - St Louis County - September 14, 2020 - 12:50 PM

established.  However, the scientists argued, "[l]egitimate public health concerns arise when 'causality is credible,' i.e., when there is *limited evidence*."[62]

549.  Among its many other deficiencies, EFSA's conclusions regarding animal carcinogenicity data were "scientifically unacceptable," particularly in BfR's use of historical control data and in its trend analysis.  Indeed, BfR's analysis directly contradicted the Organisation for Economic Co-operation and Development ("OECD") testing guidelines while citing and purporting to follow those same guidelines.  For instance, the EFSA report dismisses observed trends in tumor incidence "because there are no individual treatment groups that are significantly different from controls and because the maximum observed response is reportedly within the range of the historical control data."  However, according to the scientists, concurrent controls are recommended over historical controls in all guidelines, scientific reports, and publications, and, if it is employed, historical control data "should be from studies in the same timeframe, for the same exact animal strain, preferably from the same laboratory or the same supplier and preferably reviewed by the same pathologist."  BfR's use of historical control data violated these precautions: "only a single study used the same mouse strain as the historical controls, but was reported more than 10 years after the historical control dataset was developed."  Further deviating from sound scientific practices, the data used by the BfR came from studies in seven different laboratories. The scientists concluded:

> BfR reported seven positive mouse studies with three studies showing increases in renal tumors, two with positive findings for hemangiosarcomas, and two with positive findings for malignant lymphomas. BfR additionally reported two positive findings for tumors in rats. Eliminating the inappropriate use of historical data, the unequivocal conclusion is that these are not negative studies, but

---

[62] *Id.*

Electronically Filed - St Louis County - September 14, 2020 - 12:50 PM

in fact document the carcinogenicity of glyphosate in laboratory animals.[63]

550.  The letter also critiqued the EFSA report's lack of transparency and the opacity surrounding the data cited in the report: "citations for almost all of the references, even those from the open scientific literature, have been redacted from the document" and "there are no authors or contributors listed for either document, a requirement for publication in virtually all scientific journals."  Because BfR relied on unpublished, confidential industry-provided studies, it is "impossible for any scientist not associated with BfR to review this conclusion with scientific confidence."[64]

551.  On March 3, 2016, the letter was published in the Journal of Epidemiology & Community Health.[65]

### *Statement of Concern Regarding Glyphosate-Based Herbicides*

552.  On February 17, 2016, a consensus statement published in the journal *Environmental Health*, entitled "Concerns over use of glyphosate-based herbicides and risks associated with exposures: a consensus statement," assessed the safety of glyphosate-based herbicides (GBHs).[66]  The paper's "focus is on the unanticipated effects arising from the worldwide increase in use of GBHs, coupled with recent discoveries about the toxicity and human

---

[63] *Id*.

[64] *Id*.

[65] Christopher J. Portier, et al., *Differences in the carcinogenic evaluation of glyphosate between the International Agency for Research on Cancer (IARC) and the European Food Safety Authority (EFSA)*, JOURNAL OF EPIDEMIOLOGY & CMTY. HEALTH, Mar. 3, 2016, *available at* http://jech.bmj.com/content/early/2016/03/03/jech-2015-207005.full.

[66] John P. Myers, et al, *Concerns over use of glyphosate-based herbicides and risks associated with exposures: a consensus statement*, Environmental Health (2016), *available at* http://ehjournal.biomedcentral.com/articles/10.1186/s12940-016-0117-0.

health risks stemming from use of GBHs."[67]  The researchers drew seven factual conclusions about

GBHs:

1.  GBHs are the most heavily applied herbicide in the world and usage continues to rise;

2.  Worldwide, GBHs often contaminate drinking water sources, precipitation, and air, especially in agricultural regions;

3.  The half-life of glyphosate in water and soil is longer than previously recognized;

4.  Glyphosate and its metabolites are widely present in the global soybean supply;

5.  Human exposures to GBHs are rising;

6.  Glyphosate is now authoritatively classified as a probable human carcinogen; and

7.  Regulatory estimates of tolerable daily intakes for glyphosate in the United States and European Union are based on outdated science.[68]

553.  The researchers noted that GBH use has increased approximately 100-fold since

the 1970s.  Further, far from posing a limited hazard to vertebrates, as previously believed, two

decades of evidence demonstrated that "several vertebrate pathways are likely targets of action,

including hepatorenal damage, effects on nutrient balance through glyphosate chelating action and

endocrine disruption."[69]

554.  The paper attributes uncertainties in current assessments of glyphosate

formulations to the fact that "[t]he full list of chemicals in most commercial GBHs is protected as

'commercial business information,' despite the universally accepted relevance of such information

---

[67] *Id.*

[68] *Id.*

[69] *Id.*

Electronically Filed - St Louis County - September 14, 2020 - 12:50 PM

to scientists hoping to conduct an accurate risk assessment of these herbicide formulations." Further, the researchers argue, "[t]he distinction in regulatory review and decision processes between 'active' and 'inert' ingredients has no toxicological justification, given increasing evidence that several so-called 'inert' adjuvants are toxic in their own right."[70]

555.    Among various implications, the researchers conclude that "existing toxicological data and risk assessments are not sufficient to infer that GBHs, as currently used, are safe." Further, "GBH-product formulations are more potent, or toxic, than glyphosate alone to a wide array of non-target organisms including mammals, aquatic insects, and fish."  Accordingly, "risk assessments of GBHs that are based on studies quantifying the impacts of glyphosate alone underestimate both toxicity and exposure, and thus risk."   The paper concludes that this "shortcoming has repeatedly led regulators to set inappropriately high exposure thresholds."[71]

556.    The researchers also critique the current practice of regulators who largely rely on "unpublished, non-peer reviewed data generated by the registrants" but ignore "published research because it often uses standards and procedures to assess quality that are different from those codified in regulatory agency data requirements, which largely focus on avoiding fraud." In the researchers' view, "[s]cientists independent of the registrants should conduct regulatory tests of GBHs that include glyphosate alone, as well as GBH-product formulations."[72]

557.    The researchers also call for greater inclusion of GBHs in government-led toxicology testing programs:

> [A] fresh and independent examination of GBH toxicity should be undertaken, and . . . this re-examination be accompanied by systematic efforts by relevant agencies to monitor GBH levels in people and in the food supply, none of which are occurring today.

---

[70] *Id.*

[71] *Id.*

[72] *Id.*

The U.S. National Toxicology Program should prioritize a thorough toxicological assessment of the multiple pathways now identified as potentially vulnerable to GBHs.[73]

558.    The researchers suggest that, in order to fill the gap created by an absence of government funds to support research on GBHs, regulators could adopt a system through which manufacturers fund the registration process and the necessary testing:

> "[W]e recommend that a system be put in place through which manufacturers of GBHs provide funds to the appropriate regulatory body as part of routine registration actions and fees. Such funds should then be transferred to appropriate government research institutes, or to an agency experienced in the award of competitive grants. In either case, funds would be made available to independent scientists to conduct the appropriate long-term (minimum 2 years) safety studies in recognized animal model systems. A thorough and modern assessment of GBH toxicity will encompass potential endocrine disruption, impacts on the gut microbiome, carcinogenicity, and multigenerational effects looking at reproductive capability and frequency of birth defects."[74]

559.    Despite these stated concerns, Monsanto, to date, has failed to test its formulated Roundup® products.

### *European Union Vote on Glyphosate Renewal*

560.    The license for glyphosate in the European Union (EU) was set to expire on June 30, 2016.

561.    Without an extension of the license, Monsanto's Roundup® and other glyphosate-based herbicides faced a general phase out in EU markets.[75]

---

[73] *Id*.

[74] *Id*.

[75] Philip Blenkinsop, Alissa de Carbonnel & Barbara Lewis European, *Commission to extend glyphosate license for 18 months*, REUTERS, June 28, 2016, *available at* http://www.reuters.com/article/us-health-eu-glyphosate-idUSKCN0ZE25B.

Electronically Filed - St Louis County - September 14, 2020 - 12:50 PM

Electronically Filed - St Louis County - September 14, 2020 - 12:50 PM

562.    In the months leading up to the license expiration date, protracted meetings and votes among national experts from the 28 EU Member States failed to produce agreement on an extension.

563.    On June 29, 2016, the EU Commission extended the European license for glyphosate for 18 months to allow the European Chemical Agency (ECHA) to rule on the safety of the chemical, which was expected by the end of 2017.[76]

564.    On July 11, 2016, the EU voted in favor of a proposal to restrict the conditions of use of glyphosate in the EU, including a ban on common co-formulant POE-tallowamine (POEA) from all glyphosate-based herbicides, including Roundup®.[77]

565.    In March 2017, ECHA's Committee for Risk Assessment (RAC) concluded that the available scientific evidence did not meet the criteria to classify glyphosate as a carcinogen.[78]

566.    With the glyphosate license set to again expire on December 15, 2017, and after months of indecision among EU member states, on November 27, 2017, the EU voted to extend the glyphosate license for five more years.[79]  Of the 28 EU members, 18 countries voted in favor of a European Commission proposal to extend the glyphosate license, 9 countries voted against, and 1 country abstained.[80]

---

[76] Arthur Neslen, *Controversial chemical in Roundup weedkiller escapes immediate ban*, THE GUARDIAN, June 29, 2016, *available at* https://www.theguardian.com/business/2016/jun/29/controversial-chemical-roundup-weedkiller-escapes-immediate-ban

[77] Sarantis Michalopoulos, *EU agrees ban on glyphosate co-formulant*, EURACTIV, July 11, 2016, *available at* http://www.euractiv.com/section/agriculture-food/news/eu-agrees-ban-on-glyphosate-co-formulant/?nl_ref=16562829

[78] https://echa.europa.eu/-/glyphosate-not-classified-as-a-carcinogen-by-echa.

[79] *See* Philip Blenkinsop, *Germany swings EU vote in favor of weed-killer glyphosate*, Reuters, Nov. 27, 2017, https://www.reuters.com/article/us-eu-health-glyphosate/germany-swings-eu-vote-in-favor-of-weed-killer-glyphosate-idUSKBN1DR1SG

[80] *See id.*

Electronically Filed - St Louis County - September 14, 2020 - 12:50 PM

## TOLLING OF THE STATUTE OF LIMITATIONS

### *Discovery Rule Tolling*

567.     Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

568.     Plaintiffs have suffered an illness that has a latency period and does not arise until years after exposure.  Plaintiffs had no way of knowing about the risks of serious illness associated with the use of and/or exposure to Roundup® and glyphosate until they were made aware that their NHL could be caused by their use of and/or exposure to Roundup®.   Consequently, the discovery rule applies to these cases, and the statute of limitations has been tolled until the day that Plaintiffs knew or had reason to know that their NHL was linked to their use of and/or exposure to Roundup®.

569.     Within the time period of any applicable statutes of limitations, Plaintiffs could not have discovered, through the exercise of reasonable diligence, that exposure to Roundup® and glyphosate is injurious to human health.

570.     Plaintiffs did not discover, and did not know of facts that would cause a reasonable person to suspect, the risks associated with the use of and/or exposure to Roundup® and glyphosate; nor would a reasonable and diligent investigation by them have disclosed that Roundup® and glyphosate would cause their NHL.

571.     For these reasons, all applicable statutes of limitations have been tolled by operation of the discovery rule with respect to Plaintiffs' claims.

### *Fraudulent Concealment*

572.     Furthermore, the running of the statute of limitations has been equitably tolled by reason of Defendant's fraudulent concealment and conduct, as alleged above.   Through its

Electronically Filed - St Louis County - September 14, 2020 - 12:50 PM

affirmative misrepresentations and omissions, Defendant actively concealed from Plaintiffs the true risks associated with use of or exposure to Roundup®.

573.    Furthermore, the running of the statute of limitations has been equitably tolled by reason of Defendant's fraudulent concealment and conduct, as alleged above.  Through its affirmative misrepresentations and omissions, Defendant actively concealed from Plaintiffs the true risks associated with use of or exposure to Roundup®.

574.    As a result of Defendant's actions, Plaintiffs were unaware, and could not reasonably know or have learned through reasonable diligence, that Plaintiffs had been exposed to the risks alleged herein and that those risks were the direct and proximate result of Defendant's acts and omissions.

575.    Defendant is estopped from relying on any statute of limitations because of its concealment of the truth regarding the safety of Roundup®.  Defendant was under a duty to disclose the true character, quality and nature of Roundup® because this was non-public information over which it continues to have exclusive control.  Defendant knew that this information was not available to Plaintiffs, their medical providers and/or their health facilities, yet it failed to disclose the information to the public.

576.    Defendant had the ability to and did spend enormous amounts of money in furtherance of its purposes of marketing and promoting a profitable product, notwithstanding the known or reasonably knowable risks.  Plaintiffs and medical professionals could not have afforded to and could not have possibly conducted studies to determine the nature, extent and identity of related health risks, and they were forced to rely on Defendant's representations.

Electronically Filed - St Louis County - September 14, 2020 - 12:50 PM

*Estoppel*

577.     Monsanto was under a continuous duty to disclose to consumers, users and other persons coming into contact with its products, including Plaintiffs, accurate safety information concerning its products and the risks associated with the use of and/or exposure to Roundup® and glyphosate.

578.     Instead, Monsanto knowingly, affirmatively, and actively concealed safety information concerning Roundup® and glyphosate and the serious risks associated with the use of and/or exposure to its products.

579.     Based on the foregoing, Monsanto is estopped from relying on any statutes of limitations in defense of this action.

## COUNT ONE:  STRICT LIABILITY FOR DEFECTIVE MANUFACTURE AND DESIGN

580.     Plaintiffs incorporate by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

581.     Plaintiffs bring this strict liability claim against Defendant for defective manufacture and design.

582.     At all relevant times, Defendant engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting Roundup® products, which are defective and unreasonably dangerous to consumers, users, and other persons coming into contact with them, including Plaintiffs, thereby placing Roundup® products into the stream of commerce.  These actions were under the ultimate control and supervision of Defendant.

583.     At all times relevant to this litigation, Defendant designed, researched, developed, formulated, manufactured, produced, tested, assembled, labeled, advertised, promoted, marketed,

Electronically Filed - St Louis County - September 14, 2020 - 12:50 PM

sold, and distributed the Roundup® products used by the Plaintiffs, and/or to which the Plaintiffs were exposed, as described above.

584.   At all times relevant to this litigation, Defendant's Roundup® products were manufactured, designed, and labeled in an unsafe, defective, and inherently dangerous manner that was dangerous for use by or exposure to the public, and, in particular, the Plaintiffs.

585.   At all times relevant to this litigation, Defendant's Roundup® products reached the intended consumers, handlers, and users or other persons coming into contact with these products in Missouri and throughout the United States, including Plaintiffs, without substantial change in their condition as designed, manufactured, sold, distributed, labeled, and marketed by Defendant.

586.   Defendant's Roundup® products, as researched, tested, developed, designed, licensed, formulated, manufactured, packaged, labeled, distributed, sold, and marketed by Defendant, were defectively manufactured and designed by Defendant in that when they left the hands of the Defendant's manufacturers and/or suppliers, they were unreasonably dangerous because they were not as safe as an ordinary consumer would expect when used in an intended or reasonably foreseeable manner.

587.   Defendant's Roundup® products, as researched, tested, developed, designed, licensed, formulated, manufactured, packaged, labeled, distributed, sold, and marketed by Defendant, were defective in manufacture, design, and formulation in that when they left the hands of Defendant's manufacturers and/or suppliers, the foreseeable risks associated with these products' reasonably foreseeable uses exceeded the alleged benefits associated with their design and formulation.

588.    At all relevant times, Defendant's Roundup® products created significant risks to the health and safety of consumers and others who were exposed to the products that far outweigh the risks posed by other products on the market used for the same or similar purpose.

589.    Therefore, at all relevant times to this litigation, Defendant's Roundup® products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold and marketed by Defendant, were defective in design and formulation, in one or more of the following ways:

a)      When placed in the stream of commerce, Defendant's Roundup® products were defective in design and formulation, and, consequently, dangerous to an extent beyond that which an ordinary consumer would expect.

b)      When placed in the stream of commerce, Defendant's Roundup® products were unreasonably dangerous in that they were hazardous and posed a grave risk of cancer and other serious illnesses when used in a reasonably anticipated manner.

c)      When placed in the stream of commerce, Defendant's Roundup® products contained unreasonably dangerous design defects and were not reasonably safe when used in a reasonably anticipated or intended manner.

d)      Defendant did not sufficiently test, investigate, or study its Roundup® products and, specifically, the active ingredient glyphosate.

e)      Defendant failed to test, investigate, or study its formulated Roundup® products.

f)      Exposure to Roundup® and glyphosate-containing products presents a risk of harmful side effects that outweighs any potential utility stemming from the use of the herbicide.

g)      Defendant knew or should have known at the time of marketing its Roundup® products that exposure to Roundup® and specifically, its active ingredient glyphosate, could result in cancer and other severe illnesses and injuries.

h)      Defendant did not conduct adequate post-marketing surveillance of its Roundup® products.

i)      Defendant could have employed safer alternative designs and formulations.

Electronically Filed - St Louis County - September 14, 2020 - 12:50 PM

Electronically Filed - St Louis County - September 14, 2020 - 12:50 PM

590.    At all times relevant to this litigation, Plaintiffs used and/or were exposed to Defendant's Roundup® products in an intended or reasonably foreseeable manner without knowledge of their dangerous characteristics.

591.    Plaintiffs could not have reasonably discovered the defects and risks associated with Roundup® or glyphosate-containing products before or at the time of exposure.

592.    The harm caused by Defendant's Roundup® products far outweighed their benefit, rendering Defendant's products dangerous to an extent beyond that which an ordinary consumer would contemplate.   Defendant's Roundup® products were and are more dangerous than alternative products and Defendant could have designed its Roundup® products to make them less dangerous.   Indeed, at the time that Defendant designed its Roundup® products, the state of the industry's scientific knowledge was such that a less risky design or formulation was attainable.

593.    Defendant's defective design of Roundup® amounts to willful, wanton, and/or reckless conduct by Defendant.

594.    As a direct and proximate result of the defective design and manufacture of Roundup® products, Plaintiffs developed NHL and have been injured catastrophically and have been caused severe and permanent pain, suffering, disability, impairment, loss of enjoyment of life, loss of care, comfort and economic damages.

595.    Therefore, as a result of the unreasonably dangerous condition of its Roundup® products, Defendant is strictly liable to Plaintiffs.

596.    The defects in Defendant's Roundup® products were substantial and contributing factors in causing Plaintiffs' grave injuries, and, but for Defendant's misconduct and omissions, Plaintiffs would not have sustained their injuries.

Electronically Filed - St Louis County - September 14, 2020 - 12:50 PM

597.    As a direct and proximate result of Defendant placing its defective Roundup®
products into the stream of commerce, Plaintiffs have suffered and continue to suffer grave
injuries, and they have endured pain and discomfort, as well as economic hardship, including
considerable financial expenses for medical care and treatment.  Plaintiffs will continue to incur
these expenses in the future.

WHEREFORE, Plaintiffs pray for judgment against Defendant Monsanto in a fair and
reasonable sum in excess of $10,000,000.00, together with costs expended herein and such further
and other relief as the Court deems just and appropriate.

### COUNT TWO:  STRICT LIABILITY FOR FAILURE TO WARN

598.    Plaintiffs incorporate by reference each and every other paragraph of this Petition
as if each were set forth fully and completely herein.

599.    Plaintiffs bring this strict liability claim against Defendant for failure to warn.

600.    At all relevant times, Defendant engaged in the business of testing, developing,
designing, manufacturing, marketing, selling, distributing, and promoting Roundup® products,
which are defective and unreasonably dangerous to consumers, including Plaintiffs, because they
do not contain adequate warnings or instructions concerning the dangerous characteristics of
Roundup® and specifically, the active ingredient glyphosate.   These actions were under the
ultimate control and supervision of Defendant.

601.    Defendant researched, developed, designed, tested, manufactured, inspected,
labeled, distributed, marketed, promoted, sold, and otherwise released into the stream of commerce
its Roundup® products, and in the course of same, directly advertised or marketed the products to
consumers and end users, including Plaintiffs, Plaintiffs' employers, Plaintiffs' co-workers, and
persons responsible for consumers (such as employers), and Defendant therefore had a duty to

Electronically Filed - St Louis County - September 14, 2020 - 12:50 PM

warn of the risks associated with the reasonably foreseeable uses (and misuses) of Roundup® and glyphosate-containing products and a duty to instruct on the proper, safe use of these products.

602.    At all times relevant to this litigation, Defendant had a duty to properly test, develop, design, manufacture, inspect, package, label, market, promote, sell, distribute, maintain supply, provide proper warnings, and take such steps as necessary to ensure that its Roundup® products did not cause users and consumers to suffer from unreasonable and dangerous risks. Defendant had a continuing duty to warn Plaintiffs of the dangers associated with Roundup® use and exposure, and a continuing duty to instruct on the proper, safe use of these products. Defendant, as manufacturer, seller, or distributor of chemical herbicides, is held to the knowledge of an expert in the field.

603.    At the time of manufacture, Defendant could have provided warnings or instructions regarding the full and complete risks of Roundup® and glyphosate-containing products because it knew or should have known of the unreasonable risks of harm associated with the use of and/or exposure to these products.

604.    At all times relevant to this litigation, Defendant failed to investigate, study, test, or promote the safety of its Roundup® products.  Defendant also failed to minimize the dangers to users and consumers of its Roundup® products and to those who would foreseeably use or be harmed by Defendant's herbicides, including Plaintiffs.

605.    Despite the fact that Defendant knew or should have known that Roundup® products posed a grave risk of harm, it failed to warn of the dangerous risks associated with their use and exposure.  The dangerous propensities of its products and the carcinogenic characteristics of glyphosate, as described above, were known to Defendant, or scientifically knowable to Defendant through appropriate research and testing by known methods, at the time it distributed,

Electronically Filed - St Louis County - September 14, 2020 - 12:50 PM

supplied, or sold the product, and not known to end users and consumers, such as Plaintiffs and Plaintiffs' employers.

606.    Defendant knew or should have known that its Roundup® and glyphosate-containing products created significant risks of serious bodily harm to consumers, as alleged herein, and Defendant failed to adequately warn consumers and reasonably foreseeable users of the risks of exposure to these products.  Defendant has wrongfully concealed information concerning the dangerous nature of Roundup® and its active ingredient glyphosate, and further made false and/or misleading statements concerning the safety of Roundup® and glyphosate.

607.    At all times relevant to this litigation, Defendant's Roundup® products reached the intended consumers, handlers, and users or other persons coming into contact with these products throughout the United States, including Plaintiffs, without substantial change in their condition as designed, manufactured, sold, distributed, labeled, and marketed by Defendant.

608.    At all times relevant to this litigation, Plaintiffs used and/or were exposed to the use of Defendant's Roundup® products in their intended or reasonably foreseeable manner without knowledge of their dangerous characteristics.

609.    Plaintiffs could not have reasonably discovered the defects and risks associated with Roundup® or glyphosate-containing products before or at the time of Plaintiffs' exposure. Plaintiffs relied upon the skill, superior knowledge, and judgment of Defendant.

610.    Defendant knew or should have known that the minimal warnings disseminated with its Roundup® products were inadequate, but it failed to communicate adequate information on the dangers and safe use/exposure and failed to communicate warnings and instructions that were appropriate and adequate to render the products safe for their ordinary, intended, and reasonably foreseeable uses, including agricultural and horticultural applications.

611.    The information that Defendant did provide or communicate failed to contain relevant warnings, hazards, and precautions that would have enabled agricultural workers, horticultural workers and/or at-home users such as Plaintiffs to utilize the products safely and with adequate protection.  Instead, Defendant disseminated information that was inaccurate, false, and misleading and which failed to communicate accurately or adequately the comparative severity, duration, and extent of the risk of injuries associated with use of and/or exposure to Roundup® and glyphosate; continued to aggressively promote the efficacy of its products, even after it knew or should have known of the unreasonable risks from use or exposure; and concealed, downplayed, or otherwise suppressed, through aggressive marketing and promotion, any information or research about the risks and dangers of exposure to Roundup® and glyphosate.

612.    To this day, Defendant has failed to adequately and accurately warn of the true risks of Plaintiffs' injuries associated with the use of and exposure to Roundup® and its active ingredient glyphosate, a probable carcinogen.

613.    To this day, Defendant has failed to test, investigate, or study its formulated Roundup® products.

614.    As a result of their inadequate warnings, Defendant's Roundup® products were defective and unreasonably dangerous when they left the possession and/or control of Defendant, were distributed by Defendant, and used by Plaintiffs.

615.    Defendant is liable to Plaintiffs for injuries caused by its failure, as described above, to provide adequate warnings or other clinically relevant information and data regarding the appropriate use of its Roundup® products and the risks associated with the use of or exposure to Roundup® and glyphosate.

Electronically Filed - St Louis County - September 14, 2020 - 12:50 PM

Electronically Filed - St Louis County - September 14, 2020 - 12:50 PM

616.    The defects in Defendant's Roundup® products were substantial and contributing factors in causing Plaintiffs' injuries, and, but for Defendant's misconduct and omissions, Plaintiffs would not have sustained their injuries.

617.    Had Defendant provided adequate warnings and instructions and properly disclosed and disseminated the risks associated with its Roundup® products, Plaintiffs could have avoided the risk of developing injuries as alleged herein and Plaintiffs and Plaintiffs' employers could have obtained alternative herbicides.

618.    As a direct and proximate result of Defendant placing its defective Roundup® products into the stream of commerce and failing to warn Plaintiffs of the increased risk of NHL associated with the use of and/or exposure to Roundup® products as described herein, Plaintiffs have developed NHL and have been injured catastrophically and have been caused severe and permanent pain, suffering, disability, impairment, loss of enjoyment of life, loss of care, comfort and economic damages, including for medical care and treatment.  Plaintiffs will continue to incur these expenses in the future.

WHEREFORE, Plaintiffs pray for judgment against Defendant Monsanto in a fair and reasonable sum in excess of $10,000,000.00, together with costs expended herein and such further and other relief as the Court deems just and appropriate.

### COUNT THREE:  VIOLATION OF MISSOURI MERCHANDISING PRACTICE ACT, § 407.020 et seq.

619.    Plaintiffs incorporate by reference each and every other paragraph of this Petition as if each were set forth fully and completely herein.

620.    At all relevant times, Defendant knew or should have known of the unreasonably dangerous and carcinogenic nature of the use of and/or exposure to Roundup®.

Electronically Filed - St Louis County - September 14, 2020 - 12:50 PM

621.    At all relevant times, Defendant, through its labeling, advertisements, public representations and marketing of Roundup®, intentionally used deception, fraud, false pretenses, false promises, misrepresentations and unfair trade practices in order to mislead consumers that Roundup® products are safe for use.

622.    At all relevant times, Defendant also engaged in the concealment, suppression and/or omission of material facts in connection with the sale and/or advertisement of Roundup® products in trade or commerce.  In particular, Defendant failed to disclose to the public that Roundup® is unsafe and poses serious health hazards, particularly NHL.  Defendant was aware of the hazardous risks posed by Roundup® and yet failed to inform the public of these risks through their advertisements, labeling, or other means available to them.  Defendant's failure to state material facts about Roundup® constitutes a violation of V.A.M.S. § 407.020.

623.    At all relevant times, Plaintiffs were deceived by Defendant's intentional misrepresentations and omissions, including by the orchestrated claims made on or in television commercials, advertising materials, websites, and on product labels and packaging regarding the usage and safety of Roundup®.

624.    At all relevant times, Plaintiffs acted in reasonable reliance upon Defendant's unlawful trade practices, and had the Defendant not engaged in the deceptive conduct described herein, Plaintiffs would not have purchased Roundup® and/or would have protected themselves from exposure to Roundup®.

625.    As a direct and proximate result of Defendant's unlawful trade practices, Plaintiffs developed NHL and have been injured catastrophically and have been caused severe and permanent pain, suffering, disability, impairment, loss of enjoyment of life, loss of care, comfort and economic damages.

Electronically Filed - St Louis County - September 14, 2020 - 12:50 PM

WHEREFORE, Plaintiffs pray for judgment against Defendant in a fair and reasonable sum in excess of $10,000,000.00 together with costs expended herein and such further and other relief as the Court deems just and appropriate.

## COUNT FOUR: NEGLIGENCE

626.    Plaintiffs incorporate by reference each and every other paragraph of this Petition as if each were set forth fully and completely herein.

627.    At all relevant times, Defendant breached its duty to Plaintiffs and were otherwise negligent in marketing, designing, manufacturing, producing, supplying, inspecting, testing, selling and/or distributing Roundup® products.

628.    Defendant, directly or indirectly, caused Roundup® products to be purchased and/or used by Plaintiffs.

629.    At all times relevant to this litigation, Defendant had a duty to exercise reasonable care in the design, research, manufacture, marketing, advertisement, supply, promotion, packaging, sale, and distribution of its Roundup® products, including the duty to take all reasonable steps necessary to manufacture, promote, and/or sell a product that was not unreasonably dangerous to consumers, users, and other persons coming into contact with the product.

630.    At all times relevant to this litigation, Defendant had a duty to exercise reasonable care in the marketing, advertisement, and sale of its Roundup® products. Defendant's duty of care owed to consumers and the general public included providing accurate, true, and correct information concerning the risks of using Roundup® and appropriate, complete, and accurate warnings concerning the potential adverse effects of exposure to Roundup® and, in particular, its active ingredient glyphosate.

Electronically Filed - St Louis County - September 14, 2020 - 12:50 PM

631. At all times relevant to this litigation, Defendant knew or, in the exercise of reasonable care, should have known of the hazards and dangers of Roundup® and specifically, the carcinogenic properties of the chemical glyphosate.

632. Accordingly, at all times relevant to this litigation, Defendant knew or, in the exercise of reasonable care, should have known that use of or exposure to its Roundup® products could cause Plaintiffs' injuries and thus created a dangerous and unreasonable risk of injury to the users of these products, including Plaintiffs.

633. Defendant knew or, in the exercise of reasonable care, should have known that Roundup® is more toxic than glyphosate alone and that safety studies on Roundup®, Roundup®'s adjuvants and "inert" ingredients, and/or the surfactant POEA were necessary to protect Plaintiffs from Roundup®.

634. Defendant knew or, in the exercise of reasonable care, should have known that tests limited to Roundup®'s active ingredient glyphosate were insufficient to prove the safety of Roundup®.

635. Defendant also knew or, in the exercise of reasonable care, should have known that users and consumers of Roundup® were unaware of the risks and the magnitude of the risks associated with the use of and/or exposure to Roundup® and glyphosate-containing products.

636. As such, Defendant breached its duty of reasonable care and failed to exercise ordinary care in the design, research, development, manufacture, testing, marketing, supply, promotion, advertisement, packaging, sale, and distribution of its Roundup® products, in that Defendant manufactured and produced defective herbicides containing the chemical glyphosate, knew or had reason to know of the defects inherent in its products, knew or had reason to know that a user's or consumer's exposure to the products created a significant risk of harm and

unreasonably dangerous side effects, and failed to prevent or adequately warn of these risks and injuries.

637.    Defendant failed to appropriately and adequately test Roundup®, Roundup®'s adjuvants and "inert" ingredients, and/or the surfactant POEA to protect Plaintiffs from Roundup®.

638.    Despite its ability and means to investigate, study, and test its products and to provide adequate warnings, Defendant has failed to do so.  Indeed, Defendant has wrongfully concealed information and has further made false and/or misleading statements concerning the safety and/or exposure to Roundup® and glyphosate.

639.    Defendant's negligence included:

a)    Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing its Roundup® products without thorough and adequate pre- and post-market testing;

b)    Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing Roundup® while negligently and/or intentionally concealing and failing to disclose the results of trials, tests, and studies of exposure to glyphosate, and, consequently, the risk of serious harm associated with human use of and exposure to Roundup®;

c)    Failing to undertake sufficient studies and conduct necessary tests to determine whether or not Roundup® products and glyphosate-containing products were safe for their intended use in agriculture, horticulture, and at-home use;

d)    Failing to test, investigate, or study its formulated Roundup® products;

e)    Failing to undertake sufficient studies and conduct necessary tests to determine the safety of "inert" ingredients and/or adjuvants contained within Roundup®, and the propensity of these ingredients to render Roundup® toxic, increase the toxicity of Roundup®, whether these ingredients are carcinogenic, magnify the carcinogenic properties of Roundup®, and whether or not "inert" ingredients and/or adjuvants were safe for use;

f)    Failing to use reasonable and prudent care in the design, research, manufacture, formulation, and development of Roundup® products so as to avoid the risk of serious harm associated with the prevalent use of Roundup®/glyphosate as an herbicide;

125

Electronically Filed - St Louis County - September 14, 2020 - 12:50 PM

g) Failing to design and manufacture Roundup® products so as to ensure they were at least as safe and effective as other herbicides on the market;

h) Failing to provide adequate instructions, guidelines, and safety precautions to those persons who Defendant could reasonably foresee would use and/or be exposed to its Roundup® products;

i) Failing to disclose to Plaintiffs, users, consumers, and the general public that the use of and exposure to Roundup® presented severe risks of cancer and other grave illnesses;

j) Failing to warn Plaintiffs, users, consumers, and the general public that the product's risk of harm was unreasonable and that there were safer and effective alternative herbicides available to Plaintiffs and other users or consumers;

k) Systematically suppressing or downplaying contrary evidence about the risks, incidence, and prevalence of the side effects of Roundup® and glyphosate-containing products;

l) Representing that its Roundup® products were safe for their intended use when, in fact, Defendant knew or should have known that the products were not safe for their intended use;

m) Declining to make or propose any changes to Roundup® products' labeling or other promotional materials that would alert the consumers and the general public of the risks of Roundup® and glyphosate;

n) Advertising, marketing, and recommending the use of Roundup® products, while concealing and failing to disclose or warn of the dangers known by Defendant to be associated with or caused by the use of or exposure to Roundup® and glyphosate;

o) Continuing to disseminate information to its consumers, which indicate or imply that Defendant's Roundup® products are not unsafe for use in the agricultural, horticultural industries, and/or home use; and

p) Continuing the manufacture and sale of its products with the knowledge that the products were unreasonably unsafe and dangerous.

640. Defendant knew and/or should have known that it was foreseeable that consumers and/or users, such as Plaintiffs, would suffer injuries as a result of Defendant's failure to exercise ordinary care in the manufacturing, marketing, labeling, distribution, and sale of Roundup®.

Electronically Filed - St Louis County - September 14, 2020 - 12:50 PM

641.    Plaintiffs did not know the nature and extent of the injuries that could result from the intended use of and/or exposure to Roundup® or its active ingredient glyphosate.

642.    Defendant's negligence was the proximate cause of the injuries, harm, and economic losses that Plaintiffs suffered, and will continue to suffer, as described herein.

643.    Defendant's conduct, as described above, was reckless.  Defendant regularly risks the lives of consumers and users of its products, including Plaintiffs, with full knowledge of the dangers of its products.  Defendant has made conscious decisions not to redesign, re-label, warn, or inform the unsuspecting public, including Plaintiffs.  Defendant's reckless conduct therefore warrants an award of punitive damages.

644.    As a proximate result of Defendant's wrongful acts and omissions in placing its defective Roundup® products into the stream of commerce without adequate warnings of the hazardous and carcinogenic nature of glyphosate, Plaintiffs developed NHL and have been injured catastrophically and have been caused severe and permanent pain, suffering, disability, impairment, loss of enjoyment of life, loss of care, comfort and economic damages, including significant expenses for medical care and treatment, and will continue to incur these expenses in the future.

WHEREFORE, Plaintiffs pray for judgment against Defendant Monsanto in a fair and reasonable sum in excess of $10,000,000.00, together with costs expended herein and such further and other relief as the Court deems just and appropriate.

## COUNT FIVE:  BREACH OF EXPRESS WARRANTIES

645.    Plaintiffs incorporate by reference each and every other paragraph of this Petition as if each were set forth fully and completely herein.

Electronically Filed - St Louis County - September 14, 2020 - 12:50 PM

646.    At all relevant times, Defendant engaged in the business of testing, developing, designing, formulating, manufacturing, marketing, selling, distributing, and promoting its Roundup® products, which are defective and unreasonably dangerous to users, consumers and those in proximity to users, including Plaintiffs, thereby placing Roundup® products into the stream of commerce.  These actions were under the ultimate control and supervision of Defendant.

647.    Before the time that Plaintiffs were exposed to the use of the aforementioned Roundup® products, Defendant expressly warranted to its consumers and users—including Plaintiffs and Plaintiffs' employers—that its Roundup® products were of merchantable quality and safe and fit for the use for which they were intended; specifically, as horticultural herbicides.

648.    Defendant, however, failed to disclose that Roundup® has dangerous propensities when used as intended and that the use of and/or exposure to Roundup® and glyphosate-containing products carries an increased risk of developing severe injuries, including Plaintiffs' injuries.

649.    Defendant further failed to test, investigate, or study its formulated Roundup® products.

650.     The representations, as set forth above, contained or constituted affirmations of fact or promises made by the seller to the buyer which related to the goods and became part of the basis of the bargain creating an express warranty that the goods shall conform to the affirmations of fact or promises.

651.    Roundup® did not conform to the representations made by Monsanto as Roundup® was not safe for use by individuals such as Plaintiffs.

652.    At all times relevant to this litigation, Plaintiffs used and/or were exposed to the use of Defendant's Roundup® products in their intended or reasonably foreseeable manner without knowledge of their dangerous characteristics.

653. Neither Plaintiffs nor Plaintiffs' employers could have reasonably discovered or known of the risks of serious injury associated with Roundup® or glyphosate.

654. Defendant's breaches constitute violations of state common laws, including but not limited to, the following statutory provisions as applicable to the Plaintiffs in this Petition:

- Ala. Code §§ 7-2-313, 7-2-314 (2017);

- Ariz. Rev. Stat. Ann. § 47-2313 (2016);

- Ark. Code Ann. § 4-2-313 (2016);

- Conn. Gen. Stat. Ann. § 42a-2-313 (effective 2017);

- Fla. Stat. Ann. § 672.313 (2017);

- O.C.G.A. § 11-2-318 (2017);

- Id. Code § 28-2-314(2)(c) (2017).

- Ill. Comp. Stat. Ann. Ch. 810, 5/2-313 (2016);

- Ind. Code Ann. § 26-1-2-313 (2016);

- Iowa Code Ann. § 554.2313 (2016);

- Kans. Stat. Ann. § 84-2-313 (2017); KRS § 355.2-318 (2017); Kan. Stat. Ann. § 60-3302(c) (2017);

- Ky. Rev. Stat. § 355.2-318 (2017);

- La. Rev. Stat. §§ 9:2800.54, 9:2800.58 (2016);

- Md. Code Ann., Com. Law § 2-318 (2017);

- Mich. Comp. Laws Ann. § 440.2313 (2016);

- Miss. Code Ann. § 11-1-63(i)(3) and 75-2-313 (2017);

- Mo. Rev. Stat. Ann. § 400.2-313 (2016);

- Mont. Code Ann. § 30-2-313 (2017);

- Neb. Rev. Stat. U.C.C. § 2-313 et seq. (2017)

- N.J. Rev. Stat. § 56:8-1, et seq. (2013);

- N.Y. U.C.C. Law 2-313, et seq. (2017);

- N.C. Gen. Stat. Ann. § 25-2-313, et seq. (2017);

- Ohio Rev. Code Ann. § 1302.26, et seq. (2016);

- Okla. Stat. tit. 12A, § 2-313 et seq. (2017);

- Or. Rev. Stat. § 72.3130, et seq. (2016);

- 13 Pa. Stat. Ann. § 2313, et seq. (2016);

- Laws of P.R. Ann. § 2701, et seq. (2011);

- S.C. Code. Ann. § 36-2-313, et seq. (2016);

- Tenn. Code Ann. § 47-2-313, et seq. (2016);

- Tex. Bus. & Com. Code Ann. § 2.313, et seq. (2015);

- Va. Code Ann. § 8.2-318, et seq. (2016);

- Wa. Rev. Code § 62A.2-313, et seq. (2016); § 7.72.030(2) (2016);

- W.Va. Code § 46A-6-108, et seq. (2016);

- Wis. Stat. Ann. § 402.313, et seq. (2017).

655.    The breach of the warranty was a substantial factor in bringing about Plaintiffs' injuries.  As a direct and proximate result of Defendant placing its defective Roundup® products into the stream of commerce and failing to warn Plaintiffs of the increased risk of NHL associated with the use of and/or exposure to Roundup® products as described herein, Plaintiffs have developed NHL and have been injured catastrophically and have been caused severe and permanent pain, suffering, disability, impairment, loss of enjoyment of life, loss of care, comfort and economic damages, including for medical care and treatment.

656.     The harm caused by Defendant's Roundup® products far outweighed their benefit, rendering the products more dangerous than an ordinary consumer or user would expect and more dangerous than alternative products.

657.     As a direct and proximate result of Defendant's wrongful acts and omissions Plaintiffs have suffered severe and permanent physical and emotional injuries.  Plaintiffs have endured pain and suffering, have suffered economic loss, including significant expenses for medical care and treatment, and will continue to incur these expenses in the future.

WHEREFORE, Plaintiffs pray for judgment against Defendant Monsanto in a fair and reasonable sum in excess of $10,000,000.00, together with costs expended herein and such further and other relief as the Court deems just and appropriate.

### COUNT SIX:  BREACH OF IMPLIED WARRANTIES

658.     Plaintiffs incorporate by reference each and every other paragraph of this Petition as if each were set forth fully and completely herein.

659.     At all relevant times, Defendant engaged in the business of testing, developing, designing, formulating, manufacturing, marketing, selling, distributing, and promoting its Roundup® products, which are defective and unreasonably dangerous to users, consumers and those in proximity to users, including Plaintiffs, thereby placing Roundup® products into the stream of commerce.  These actions were under the ultimate control and supervision of Defendant.

660.     Before the time that Plaintiffs were exposed to the use of the aforementioned Roundup® products, Defendant impliedly warranted to its consumers and users—including Plaintiffs and Plaintiffs' employers—that its Roundup® products were of merchantable quality and safe and fit for the use for which they were intended; specifically, as horticultural herbicides.

Electronically Filed - St Louis County - September 14, 2020 - 12:50 PM

Electronically Filed - St Louis County - September 14, 2020 - 12:50 PM

661. Defendant, however, failed to disclose that Roundup® has dangerous propensities when used as intended and that the use of and/or exposure to Roundup® and glyphosate-containing products carries an increased risk of developing severe injuries, including Plaintiffs' injuries.

662. Defendant further failed to test, investigate, or study its formulated Roundup® products.

663. Upon information and belief, Plaintiffs and Plaintiffs' employers reasonably relied upon the skill, superior knowledge and judgment of Defendant and upon its implied warranties that the Roundup® products were of merchantable quality and fit for their intended purpose or use.

664. Upon information and belief, Plaintiffs and Plaintiffs' employers reasonably relied upon the skill, superior knowledge and judgment of Defendant and upon its implied warranties that the Roundup® products were of merchantable quality and fit for their intended purpose or use.

665. The Roundup® products were expected to reach and did in fact reach consumers, users and those in proximity to users, including Plaintiffs, without substantial change in the condition in which they were manufactured and sold by Defendant.

666. At all relevant times, Defendant was aware that consumers, users, and those in proximity of users of its products, including Plaintiffs, would use Roundup® products as marketed by Defendant, which is to say that Plaintiffs were the foreseeable users of Roundup®.

667. Defendant intended that its Roundup® products be used in the manner in which Plaintiffs in fact used or were exposed to them and Defendant impliedly warranted each product to be of merchantable quality, safe, and fit for this use, despite the fact that Roundup® was not adequately tested or researched.

Case: MDL No. 2741 Document 2278-30 Filed 04/20/21 Page 149 of 156 PageID #: 421

Electronically Filed - St Louis County - September 14, 2020 - 12:50 PM

668.    In reliance upon Defendant's implied warranty, Plaintiffs used or were in proximity to the use of Roundup® as instructed and labeled and in the foreseeable manner intended, recommended, promoted and marketed by Defendant.

669.    Neither Plaintiffs nor Plaintiffs' employers could have reasonably discovered or known of the risks of serious injury associated with Roundup® or glyphosate.

670.    Defendant breached its implied warranty to Plaintiffs in that its Roundup® products were not of merchantable quality, safe, or fit for their intended use, or adequately tested. Roundup® has dangerous propensities when used as intended and can cause serious injuries, including those injuries complained of herein.

671.    The harm caused by Defendant's Roundup® products far outweighed their benefit, rendering the products more dangerous than an ordinary consumer or user would expect and more dangerous than alternative products.

672.    As a direct and proximate result of Defendant's wrongful acts and omissions Plaintiffs have suffered severe and permanent physical and emotional injuries. Plaintiffs have endured pain and suffering, have suffered economic loss, including significant expenses for medical care and treatment, and will continue to incur these expenses in the future.

WHEREFORE, Plaintiffs pray for judgment against Defendant Monsanto in a fair and reasonable sum in excess of $10,000,000.00, together with costs expended herein and such further and other relief as the Court deems just and appropriate.

### COUNT SEVEN:  WRONGFUL DEATH

**Plaintiffs TUNJA WHITLEY, LYNN BUTTON, TANYA NAUMENKO, LINDA STINE,**

**JOHN D'AMBROSIO, GERALDINE REED, LISA RAINER, JOHN QUINTANA,**

**CHRISTINE BRIERE, NELLIE BROOKS, MARCIA BROWN, BILL HOOVER, GAIL**

Electronically Filed - St Louis County - September 14, 2020 - 12:50 PM

**NOVAK, CARROLL JERNIGAN, DENNIS GREEN, JOHN POWERS, VIRGINIA WHITAKER, MAUREEN WOLTMANN, KATHERINE SMITH, JOHN POWERS, ANGELA BIERSTEKER, JUDY PERKOWSKI, DORIS MARTINEZ, PERNECIA HULL, MARY VAIL, IDA WHITE, MARILYN SMITH**

673.    Plaintiffs incorporate by reference each and every other paragraph of this Petition as if each were set forth fully and completely herein.

674.    As a direct and proximate result of the acts and/or omissions of Defendant, as set forth herein, the Decedent named in this action used and/or was exposed to Roundup®.

675.    Subsequent to such use, Decedent developed NHL, suffered substantial pain and suffering, both physical and emotional in nature, and subsequently died.

676.    Plaintiffs Tunja Whitley, Lynn Button, Tanya Naumenko, Linda Stine, John D'ambrosio, Geraldine Reed, Lisa Rainer, John Quintana, Christine Briere, Nellie Brooks, Marcia Brown, Bill Hoover, Gail Novak, Carroll Jernigan, Dennis Green, John Powers, Virginia Whitaker, Maureen Woltmann, Katherine Smith, John Powers, Angela Biersteker, Judy Perkowski, Doris Martinez, Pernecia Hull, Mary Vail, Ida White, and Marilyn Smith, on behalf of themselves and all of the next of kin of Decedents Marques Whitley, Rush Button, George Anderson, James Stine, Michael D'ambrosio, Lillian Arthur, John Rainer, Fernando Quintana, Sandra Mcewan, James Brooks, Wesley Brown, Joseph Hoover, Niles Novak, Constance Jernigan, Sally Green, Alberta Powers, Derrek Whitaker, Edward Woltmann, Craig Smith, Alberta Powers, Jon Bierstekter, Edward  Perkowski, Modesto Rodriguez, Jimmy Hull, Elvis Vail, William White, and Merle Smith, are entitled to recover damages as Decedents would have if they were living, as a result of acts and/or omissions of Defendant.

Electronically Filed - St Louis County - September 14, 2020 - 12:50 PM

677.   Plaintiffs Tunja Whitley, Lynn Button, Tanya Naumenko, Linda Stine, John D'ambrosio, Geraldine Reed, Lisa Rainer, John Quintana, Christine Briere, Nellie Brooks, Marcia Brown, Bill Hoover, Gail Novak, Carroll Jernigan, Dennis Green, John Powers, Virginia Whitaker, Maureen Woltmann, Katherine Smith, John Powers, Angela Biersteker, Judy Perkowski, Doris Martinez, Pernecia Hull, Mary Vail, Ida White, and Marilyn Smith, on behalf of themselves and all of Decedent's next of kin is also entitled to recover punitive damages and damages for substantial pain and suffering caused to Decedent from the acts and/or omissions of Defendant as fully set forth herein, including without limitations, punitive damages.

678.   As a direct and proximate result of Defendant's conduct, Plaintiffs Tunja Whitley, Lynn Button, Tanya Naumenko, Linda Stine, John D'ambrosio, Geraldine Reed, Lisa Rainer, John Quintana, Christine Briere, Nellie Brooks, Marcia Brown, Bill Hoover, Gail Novak, Carroll Jernigan, Dennis Green, John Powers, Virginia Whitaker, Maureen Woltmann, Katherine Smith, John Powers, Angela Biersteker, Judy Perkowski, Doris Martinez, Pernecia Hull, Mary Vail, Ida White, and Marilyn Smith and Decedents Marques Whitley, Rush Button, George Anderson, James Stine, Michael D'ambrosio, Lillian Arthur, John Rainer, Fernando Quintana, Sandra Mcewan, James Brooks, Wesley Brown, Joseph Hoover, Niles Novak, Constance Jernigan, Sally Green, Alberta Powers, Derrek Whitaker, Edward Woltmann, Craig Smith, Alberta Powers, Jon Bierstekter, Edward Perkowski, Modesto Rodriguez, Jimmy Hull, Elvis Vail, William White, and Merle Smith, have been injured and sustained severe and permanent pain, suffering, disability, impairment, loss of enjoyment of life, loss of care and comfort, and economic damages.

WHEREFORE, the Plaintiff demands judgment against Defendant, and in the alternative, request compensatory damages, punitive damages, together with interest, costs of suit, attorneys' fees, and such further relief as the Court deems equitable and just.

Electronically Filed - St. Louis County - September 14, 2020 - 12:50 PM

## COUNT EIGHT:  FRAUDULENT CONCEALMENT

679.    Plaintiffs incorporate by reference each and every other paragraph of this Petition as if each were set forth fully and completely herein.

680.    Monsanto is estopped from asserting a statute of limitations defense because it fraudulently concealed its wrongful conduct from Plaintiffs with the intent that Plaintiffs, their employers, and other consumers and users of Roundup® would rely on such material representations.

681.    Monsanto had actual knowledge that exposure to Roundup® and specifically, its active ingredient glyphosate, could result in cancer and other severe illnesses and injuries. Monsanto knew or should have known that Roundup® is more toxic than glyphosate alone and that safety studies of Roundup®, Roundup's adjuvants and "inert" ingredients, and/or the surfactant POEA were necessary to protect Plaintiffs from Roundup®.

682.    Monsanto failed to conduct adequate testing of glyphosate and the Roundup® formulation.

683.    Monsanto had actual knowledge of its misrepresentations, negligence, breach of warranties, and false, misleading, deceptive, and unconscionable conduct.  Even so, Monsanto perpetuated its wrongful conduct with the intent and fixed purpose of concealing its wrongs from Plaintiffs and the public at large. Despite its knowledge that Roundup® is considerably more dangerous than glyphosate alone, Defendant continued to promote Roundup® as safe.

684.    Plaintiffs and/or Plaintiffs' employers were unaware of the falsity of these representations, acted in actual and justifiable reliance on such material misrepresentations, and were injured as a direct and proximate result.

685.    Additionally, Monsanto knowingly omitted material information and remained silent regarding said misrepresentations despite the fact that it had a duty to inform Plaintiffs, their employers, and the general public of the inaccuracy of said misrepresentations, which omission constitutes a positive misrepresentation of material fact, with the intent that Plaintiffs and the public would rely on Monsanto's misrepresentations.

686.    Plaintiffs did, in fact, act in actual and justifiable reliance on Monsanto's representations, and Plaintiffs were injured as a result.

687.    Monsanto, as the manufacturer of Roundup®, was in a position of superior knowledge and judgment regarding any potential risks associated with its products.

688.    Monsanto committed constructive fraud by breaching one or more legal or equitable duties owed to Plaintiffs relating to Roundup®, said breach or breaches constituting fraud because of its propensity to deceive others or constitute an injury to public interests or public policy.

689.    In breaching its duties to Plaintiffs, Monsanto used its position of trust as the manufacturer and/or distributor of Roundup® to increase sales of its products at the expense of informing Plaintiffs that use of or exposure to Roundup® carries the risk of serious illness, such as NHL.

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in Plaintiffs' favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees, and all such other and further relief as this Court deems just and proper.  Plaintiffs also demand a jury trial on the issues contained herein.

Electronically Filed - St Louis County - September 14, 2020 - 12:50 PM

Electronically Filed - St Louis County - September 14, 2020 - 12:50 PM

## COUNT NINE:  PUNITIVE DAMAGES

690.    Plaintiffs incorporate by reference each and every other paragraph of this Petition as if each were set forth fully and completely herein.

691.    Defendant has acted willfully, wantonly, maliciously, with an evil motive, and recklessly in one or more of the following ways:

a)    Defendants knew of the unreasonably high risk of NHL posed by the Roundup® products before manufacturing, marketing, distributing and/or selling the Roundup® products, yet purposefully proceeded with such action;

b)    Despite their knowledge of the high risk of NHL associated with use and/or exposure to Roundup® products, Defendant affirmatively minimized this risk through marketing and promotional efforts and product labeling;

c)    Through the actions outlined above, Defendant expressed a reckless indifference to the safety of users of Roundup® products, including Plaintiffs.

692.    Defendant knew of the dangers and risks of Roundup® products, yet it concealed and/or omitted this information from labels and warnings contained on Roundup® products in furtherance of its knowing and willful actions.

693.    These actions were outrageous because of Defendant's evil motive or a reckless indifference to the safety of users of Roundup® products and/or those who became exposed to it.

694.    As a direct and proximate result of the willful, wanton, malicious, evilly motivated and/or reckless conduct of Defendant, the Plaintiffs have sustained damages as set forth above.

WHEREFORE, Plaintiffs pray for a judgment for punitive damages against Defendant, jointly and severally, in a fair and reasonable amount sufficient to punish Defendant and deter it and others from engaging in similar conduct in the future, costs expended herein, and such further and other relief as the Court deems just and appropriate.

Electronically Filed - St Louis County - September 14, 2020 - 12:50 PM

## COUNT TEN:  DAMAGES

695.    Plaintiffs incorporate by reference each and every other paragraph of this Petition as if each were set forth fully and completely herein.

696.    Defendant knew of the dangerous condition of Roundup® products, including that they posed a danger to their consumers and non-consumers exposed to Roundup® products, including Plaintiffs, but chose not to include any warnings or information regarding the dangerous condition of Roundup® products.

697.    Defendant showed complete indifference to or conscious disregard of the safety of Plaintiffs by their conduct described herein.  Defendant knew or should have known failure to include a warning for Roundup® products would result in women using and/or being exposed to Roundup® products and subsequently developing NHL.

698.    Plaintiffs are entitled to exemplary damages to punish Defendant and to deter Defendant and others in similar situations from like conduct.

WHEREFORE, Plaintiffs pray for judgment against Defendant for:

a.    compensatory damages in an amount to be proven at trial;

b.    exemplary damages;

c.    costs, including reasonable attorneys' fees, court costs, and other litigation expenses; and

d.    any other relief the Court may deem just and proper.

Respectfully submitted,
Dated: September 14, 2020

By:    */s/ I. Josh Jacobs*
I. Josh Jacobs
Missouri Bar No. 67723
Kirkendall Dwyer LLP
605 W. 47th Street, Suite 208
Kansas City, MO 64112
P: 913-981-2524

Electronically Filed - St Louis County - September 14, 2020 - 12:50 PM

F: 913-347-0019
jjacobs@kirkendalldwyer.com

By: /s/ *Alexander Dwyer*
Alexander G. Dwyer
Texas Bar No. 24054271
Andrew F. Kirkendall
Texas Bar No. 24050882
Erin M. Wood
Texas Bar No. 24073064
ad@kirkendalldwyer.com
ak@kirkendalldwyer.com
ewood@kirkendalldwyer.com
Kirkendall Dwyer LLP
4343 Sigma Rd, STE 200
Dallas, TX 75244
Tel: 214-271-4027
Fax: 214-253-0629

By: /s/ *Fletcher V. Trammell*
Fletcher V. Trammell, Esq. (SBN: 24042053)
Melissa Binstock Ephron, Esq. (SBN: 24101518)
TRAMMELL, PC
3262 Westheimer Rd., Ste. 423
Houston, TX 77098
Tel: (800) 405-1740
Fax: (800) 532-0992
fletch@trammellpc.com
melissa@trammellpc.com

*Attorneys for Plaintiffs*