# Exhibit A

# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA
## MIAMI DIVISION

NANCY C. SALAS,

        Plaintiff,

     v.

MONSANTO COMPANY; BAYER
CORPORATION; BAYER AG; ANDREW
JACK CONROY; HOME DEPOT USA,
INC.; KLI SHELL LUMBER &
HARDWARE, LLC; and ORLANDO
VALDES,

        Defendants.

Case No._____

## DEFENDANT MONSANTO COMPANY'S NOTICE OF REMOVAL

     Pursuant to 28 U.S.C. §§ 1332, 1441, and 1446 (and any other applicable laws), defendant Monsanto Company ("Monsanto") hereby gives notice of removal of this action, captioned *Nancy C. Salas v. Monsanto Company, et al.*, bearing Case Number 2021-000615-CA-01, from the Circuit Court of the Eleventh Judicial Circuit in and for Miami-Dade County, Florida to this Court.[1]  Pursuant to 28 U.S.C. § 1446(a), Monsanto provides the following statement of grounds for removal.

## INTRODUCTION

    1.    In this products liability lawsuit, Plaintiff Nancy Salas sues Monsanto (and other defendants) for injuries allegedly caused by Monsanto's Roundup®-branded herbicides, which have glyphosate as their active ingredient.  For decades, farmers have used glyphosate-based

---

[1] The Complaint named two other defendants – Transform SR Development LLC d/b/a Kmart and Jose Luis Martinez Alvarez.  Plaintiff voluntarily dismissed those defendants on February 17, 2021, so they are no longer part of this lawsuit and therefore are not included in the caption of this Notice of Removal.

herbicides to increase crop yields, and home-owners, landscaping companies, and local government agencies have used these herbicides for highly effective weed control. Glyphosate is one of the most thoroughly studied herbicides in the world, and glyphosate-based herbicides have received regulatory approval in more than 160 countries. Since 1974, when Monsanto first introduced a Roundup®-branded herbicide to the marketplace, the United States Environmental Protection Agency repeatedly has concluded that glyphosate does not cause cancer – including as recently as January 2020. Nevertheless, Plaintiff alleges that she developed cancer – specifically, non-Hodgkin's lymphoma ("NHL") – caused by exposure to Monsanto's Roundup®-branded, glyphosate-based herbicides.

2. As the Eleventh Circuit has stated repeatedly, "[t]he removal process was created by Congress to protect defendants. Congress did not extend such protection with one hand, and with the other give plaintiffs a bag of tricks to overcome it." *Legg v. Wyeth*, 428 F.3d 1317, 1325 (11th Cir. 2005) (quotation marks omitted); *see Pretka v. Kolter City Plaza II, Inc.*, 608 F.3d 744, 766 (11th Cir. 2010 (quoting *Legg*, 428 F.3d at 1325)). Recognizing what the "Supreme Court long ago admonished," the Eleventh Circuit also has explained that "'the Federal courts should not sanction devices intended to prevent a removal to a Federal court where one has that right, and should be equally vigilant to protect the right to proceed in the Federal court.'" *Legg*, 428 F.3d at 1325 (quoting *Wecker v. Nat'l Enameling & Stamping Co.*, 204 U.S. 176, 186 (1907)).

3. In this case, Plaintiff (a Florida citizen) fraudulently joined Florida defendants – Andrew Jack Conroy, KLI Shell Lumber & Hardware, LLC ("KLI Shell"), and Orlando Valdes – in an attempt to deprive Monsanto of its important right to remove this lawsuit to federal court. As discussed in more detail below, those three defendants never had any control over, any

involvement with, or any connection whatsoever to the Roundup®-branded herbicides that allegedly caused Plaintiff's injuries.

4.      When the citizenships of those Florida defendants are disregarded as required by the "fraudulent joinder" doctrine, this Court has subject matter jurisdiction based on diversity of citizenship.  Plaintiff is a Florida citizen, and the other defendants are not Florida citizens for purposes of federal diversity jurisdiction.  Thus, complete diversity of citizenship exists here as required by 28 U.S.C. § 1332.  The jurisdictional-amount-in-controversy requirement is also satisfied because Plaintiff seeks damages for cancer (NHL) allegedly caused by exposure to Monsanto's Roundup®-branded, glyphosate-based herbicides.

## BACKGROUND AND PROCEDURAL HISTORY

5.      In January 2021, Plaintiff filed a Complaint in the Circuit Court of the Eleventh Judicial Circuit in and for Miami-Dade County, Florida against Monsanto and other defendants. *See Salas v. Monsanto Company, et al.*, Case No. 2021-000615-CA-01 (the "State Court Action").

6.      Pursuant to 28 U.S.C. § 1446(a), true and correct copies of the Summons and Complaint (and other pleadings) served in the State Court Action are attached collectively as **Exhibit 1**.  Plaintiff seeks damages for NHL allegedly caused by exposure to Monsanto's Roundup®-branded, glyphosate-based herbicides. *See, e.g.*, Complaint ¶¶ 1, 4, 135-40, 145-51.

7.      In February 2021, Monsanto removed the State Court Action to this Court based on 28 U.S.C. § 1452 because: (a) the Complaint asserted claims against Transform SR Development LLC d/b/a Kmart and Jose Luis Martinez-Alvarez; (b) those claims were precluded by prior federal bankruptcy proceedings; (c) the inclusion of those claims meant that the State Court Action was a civil proceeding arising in or related to a case under title 11 of the United

States Code (*i.e.*, the United States Bankruptcy Code); and (d) removal was proper based on 28 U.S.C. § 1452 because 28 U.S.C. § 1334(b) gave this Court subject matter jurisdiction over the State Court Action.

8.      To avoid litigating this lawsuit in this Court, Plaintiff immediately dismissed Transform SR Development LLC d/b/a Kmart and Jose Luis Martinez-Alvarez, *see* Notice of Voluntary Dismissal (attached as **Exhibit 2**), and filed a motion to remand this lawsuit to Florida state court.   Monsanto did not oppose that motion, so this Court granted the motion and remanded this lawsuit.

### BASIS FOR REMOVAL – DIVERSITY JURISDICTION

**I.      Complete Diversity Of Citizenship Exists In This Lawsuit.**

9.      Based on the Complaint, Plaintiff is, and was at the time the State Court Action was filed, a resident and citizen of the State of Florida.  Complaint ¶¶ 2, 134-35.

10.      Monsanto is, and was at the time the State Court Action was filed, a corporation incorporated under the laws of the State of Delaware, with its principal place of business in the State of Missouri.  Complaint ¶ 4.  Thus, Monsanto is deemed to be a citizen of Delaware and Missouri, for purposes of federal diversity jurisdiction.

11.      Bayer Corporation is, and was at the time the State Court Action was filed, a corporation incorporated under the laws of the State of Indiana, with its principal place of business in the State of New Jersey.  Consent to Removal by Defendant Bayer Corporation (attached as **Exhibit 3**).  Thus, Bayer Corporation is deemed to be a citizen of Indiana and New Jersey, for purposes of federal diversity jurisdiction.

12.      Bayer AG is, and was at the time the State Court Action was filed, a German stock company with its principal place of business in Germany.  *See* Complaint ¶ 5.  Thus, Bayer

AG is deemed to be a citizen of Germany – *i.e.*, a foreign citizen – for purposes of federal diversity jurisdiction.

13.     Home Depot USA, Inc. ("Home Depot") is, and was at the time the State Court Action was filed, a corporation incorporated under the laws of the State of Delaware, with its principal place of business in the State of Georgia.   Complaint ¶ 7.   Thus, Home Depot is deemed to be a citizen of Delaware and Georgia, for purposes of federal diversity jurisdiction.

14.     As discussed below, the citizenships of the other defendants (Mr. Conroy, KLI Shell, and Mr. Valdes) must be disregarded because Plaintiff fraudulently joined those non-diverse defendants.

15.     Although the general rule is that complete diversity of citizenship is required for a federal court to have diversity-based subject matter jurisdiction, when a plaintiff has fraudulently joined a non-diverse defendant, "the district court must ignore the presence of the non-diverse defendant and deny any motion to remand the matter back to state court."   *Jackson v. Bank of America, N.A.*, 578 F. App'x 856, 858 (11th Cir. 2014) (quotation marks omitted); *see also De Varona v. Discount Auto Parts, LLC*, 860 F. Supp. 2d 1344, 1346 (S.D. Fla. 2012) ("In determining whether diversity jurisdiction exists, courts must disregard the citizenship of fraudulently joined parties.").   Fraudulent joinder also renders the so-called "forum defendant rule" inapplicable because that statutory provision applies only to "properly joined" defendants. 28 U.S.C. § 1441(b).

16.     One way to establish fraudulent joinder is for the removing defendant to show that there is not "any reasonable possibility" that the plaintiff has a cause of action against the non-diverse defendant, *Legg*, 428 F.3d at 1324, and "[t]he potential for legal liability must be reasonable, not merely theoretical," *id*. at 1325 n.5 (quotation marks omitted); *see Jackson*, 578

F. App'x at 859 (citing *Legg*, 428 F.3d at 1324-25 n.5); *De Varona*, 860 F. Supp. 2d at 1346 ("A defendant is fraudulently joined where there is no 'reasonable basis' for a claim against it." (citing, *inter alia*, *Legg*, 428 F.3d at 1325 n.5)).

**A.  Plaintiff Fraudulently Joined Mr. Conroy.**

17.     In this case, Plaintiff sued Mr. Conroy in the hope that adding claims against that Florida defendant would prevent removal due to lack of diversity jurisdiction and/or due to the forum defendant rule.  Although the Complaint includes several causes of action, it asserts only certain claims against Mr. Conroy: Count I (Strict Products Liability) – including design defect, manufacturing defect, and failure to warn – and Count II (Negligence).

18.     Plaintiff alleges that, "[a]t all times material, Defendant Andrew Jack Conroy was employed by Monsanto as its industrial, turf and ornamental (ITO) herbicide Representative for the Eastern United States, including Florida."  Complaint ¶ 6.  She also contends that Mr. Conroy "is an IT&O Account Representative for Monsanto, responsible for sales and marketing to distributors, retailers, and users of Roundup and other glyphosate-containing products in Florida" and that "Mr. Conroy engaged in the marketing, promotion and sale of these products, aware of their carcinogenic or potentially carcinogenic properties, but failed to inform any of his sales targets of such danger."  *Id.* ¶ 125.  Claiming that Roundup®-branded herbicides are defective products, Plaintiff alleges that the defects in those products "were present when Monsanto and Mr. Conroy placed them into the stream of commerce" and that Roundup®-branded herbicides "reached the intended consumers, handlers, users and other persons coming into contact and exposed with these products in Florida, including Plaintiff, without substantial change in their condition as designed, manufactured, sold, distributed[,] labeled, and marketed by Monsanto and Mr. Conroy."  *Id.* ¶ 147.

19.     The Complaint alleges that Plaintiff used Roundup®-branded herbicides at her residences from approximately 2004 to 2014.  Complaint ¶¶ 135, 138.  She allegedly purchased those products from the following stores: (a) Home Depot stores in Miami, Florida; (b) a Kmart store in Key Largo, Florida; and (c) a KLI Shell Lumber & Hardware, LLC store located on Overseas Highway in Key Largo, Florida (the "KLI Shell Overseas Highway Store").  *Id*. ¶¶ 7, 8, 10, 126, 128, 131, 136, 200, 208, 231, 239, 262, 270.  Plaintiff does ***not*** allege that Mr. Conroy worked at any of those stores; sold any Roundup®-branded herbicides directly to her; or recommended that she purchase or use Roundup®-branded herbicides.  Indeed, Plaintiff does not allege that she ever had any conversations or other communications with Mr. Conroy.

20.     Plaintiff fraudulently joined Mr. Conroy because, as discussed below, there is "no reasonable possibility," *Legg*, 428 F.3d at 1324, that she can establish a cause of action against him.

21.     There are three markets for which Monsanto has created and designed Roundup®-branded herbicides: (a) the agricultural market; (b) the residential-lawn-and-garden market; and (c) the industrial, turf, and ornamental ("IT&O") market.  Declaration of Andrew Jack Conroy ¶ 3 ("Conroy Declaration") (attached as **Exhibit 4**).  Agricultural Roundup®-branded herbicides have been designed for, and are sold (via distributors) to, farmers and other agricultural workers to eliminate weeds that adversely affect crops.  *Id*.  Residential-lawn-and-garden Roundup®-branded herbicides have been designed for, and are sold to, home-owners to eliminate weeds in their yards, driveways, and other parts of their residential properties.  *Id*.  Those herbicides are sold at hardware stores and major retail stores, like Home Depot stores.  *Id*.  IT&O Roundup®-branded herbicides have been designed for, and are sold (via distributors) to, companies – for example, large landscaping businesses, companies that own or operate golf courses, railroad

companies, and other companies – and government agencies to eliminate weeds in or near, for example, roads, golf courses, railroad tracks, or rights-of-way.  *Id*.

22.    Mr. Conroy has never had any role in or involvement with designing, manufacturing, packaging, assembling, creating, or obtaining regulatory approval for any kind of Roundup®-branded herbicide.  Conroy Declaration ¶ 4.  Moreover, Mr. Conroy has never had any role in or involvement with determining what language should be included in labelling, or what warnings should be provided, for any kind of Roundup®-branded herbicide.  *Id*.  He also has never had any role in or involvement with developing advertisements or commercials for any kind of Roundup®-branded herbicides or developing the content of any such advertisements or commercials.  *Id*.

23.    Although Mr. Conroy's job duties have involved two categories of Roundup®-branded herbicides – agricultural herbicides and/or IT&O herbicides – his job duties have never involved residential-lawn-and-garden Roundup®-branded herbicides.  Conroy Declaration ¶¶ 5-6.  Thus, Mr. Conroy has never had any role with or involvement in promoting, marketing, or selling residential-lawn-and-garden Roundup®-branded herbicides.  *Id*. ¶ 6.

24.    Mr. Conroy has never had any control over – or any connection whatsoever to – the Roundup®-branded herbicides that allegedly caused Plaintiff's injuries.  Conroy Declaration ¶ 8.  Mr. Conroy has never worked at a Home Depot store, or a Kmart store, or the KLI Shell Overseas Highway Store.  *Id*.  He has never spoken to or otherwise communicated with Home Depot USA, Inc. or any Home Depot store about Roundup®-branded herbicides.  *Id*.  Mr. Conroy also has never spoken to or otherwise communicated with any Kmart store about Roundup®-branded herbicides.  *Id*.  He has never spoken to or otherwise communicated with the KLI Shell Overseas Highway Store about Roundup®-branded herbicides.  *Id*.

25.     Finally, Mr. Conroy has never had any role with or involvement in the chain of distribution by which Roundup®-branded herbicides get from the point of manufacture to the point of sale to customers at Home Depot stores, Kmart stores, or the KLI Shell Overseas Highway Store.  Conroy Declaration ¶ 9.

26.     In these circumstances, Plaintiff clearly does not have any viable claims against Mr. Conroy under Florida law.  Identifying the product that allegedly caused a plaintiff's injury as ***the named defendant's*** product is an essential element of the plaintiff's claims.  *See, e.g.*, *Liggett Grp. Inc. v. Engle*, 853 So. 2d 434, 466 n.46 (Fla. Ct. App. 2003) ("It is aphoristic that a plaintiff cannot prevail on claims for negligence, breach of warranty or strict liability, unless the plaintiff establishes that the product which allegedly caused the plaintiff's injury was manufactured or sold by the defendant"), *approved in part and quashed in part on other grounds sub nom. Engle v. Liggett Grp., Inc.* (Fla. 2006); *Levine v. Wyeth, Inc.*, 684 F. Supp. 2d 1338, 1345 (M.D. Fla. 2010) ("It is well established under Florida law and elsewhere that identification of the product that caused the harm as the one sold or manufactured by the defendant is an essential element of traditional tort law."); *Devore v. Howmedica Osteonics Corp.*, 658 F. Supp. 2d 1372, 1378, 1379 (M.D. Fla. 2009) (stating that "a plaintiff must establish that it has properly identified the defendant as actually being within the distributive chain of the product which caused injury"; stating that, if the plaintiff does not prove that the defendant was ever in physical possession of the product, the plaintiff "must still establish that [the defendant] possessed some element of control over the allegedly defective product" (quotation marks omitted)).

27.     Here, Mr. Conroy was not involved in any way whatsoever in the chain of distribution that led to Plaintiff allegedly buying (from the stores identified in the Complaint) the Roundup®-branded herbicides that allegedly caused her injuries, and he did not recommend that

she buy or use those products.   In other words, the herbicides at issue here were not Mr. Conroy's products.  Mr. Conroy had no connection to, or control over, those products, and he did not do anything (or fail to do anything that he was required to do) that caused Plaintiff's alleged injuries.  Therefore, Mr. Conroy cannot be held strictly liable to Plaintiff, and he owed no duty to her, so he also cannot be held liable to her on a negligence claim.  *See Devore*, 658 F. Supp. 2d at 1376-79 (ruling that distributor was fraudulently joined under Florida law in personal injury lawsuit); *Fowler v. Wyeth*, No. 3:04-CV-83/MCR, 2004 WL 3704897, at *4 & n.7 (N.D. Fla. May 14, 2004) (ruling that defendant-company's sales representatives were fraudulently joined under Florida law in personal injury lawsuit); *Kearney v. Wyeth*, No. 6:03-cv-288-Orl-31KRS, 2003 WL 25548422 (M.D. Fla. May 9, 2003) (ruling that defendant-company's sales representative was fraudulently joined under Florida law in personal injury lawsuit); *Campana v. American Home Prods. Corp.*, No. 1:99cv250 MMP, 2000 WL 35547714, at *3-4 (N.D. Fla. Mar. 7, 2000) (same); *see also Legg*, 428 F.3d at 1323-24 (ruling that defendant-company's sales representative was fraudulently joined under Alabama law, based on his "sworn statement that he never promoted or sold" the product that allegedly caused plaintiff's injuries).

28.     In sum, it is clear that Plaintiff does not have any viable claims against Mr. Conroy within the meaning of the fraudulent joinder standard discussed above.  Accordingly, this Court should disregard his Mr. Conroy's citizenship when determining whether this removal is proper and whether the Court has subject matter jurisdiction over this lawsuit based on diversity of citizenship.

### B.  Plaintiff Fraudulently Joined KLI Shell and Mr. Valdes.

29.     Plaintiff sued two other Florida defendants – KLI Shell and Mr. Valdes – in the hope of preventing Monsanto from removing his case to this Court.  The Complaint asserts

claims against KLI Shell for strict liability (Count IX), negligence (Count X), and breach of implied warranties (Count XI).  Plaintiff alleges that Mr. Valdes, "[a]t all times material," was employed by KLI Shell as its owner and CEO, Complaint ¶ 9, and that she purchased Roundup®-branded herbicides from Mr. Valdes at the KLI Shell Overseas Highway store, *see id.* ¶ 239. The Complaint asserts one claim – negligence (Count X) – against Mr. Valdes.  The claims against KLI Shell and Mr. Valdes are based on the allegation that Plaintiff used Roundup®-branded herbicides at her residences from approximately 2004 to 2014, *id.* ¶¶ 135, 138, after purchasing those products from certain stores, including the KLI Shell Overseas Highway Store, *id.* ¶¶ 8, 128, 136, 239.

30.     However, Plaintiff fraudulently joined KLI Shell and Mr. Valdes because, as discussed below, there is "no reasonable possibility," *Legg*, 428 F.3d at 1324, that she can establish a cause of action against either of those defendants.

31.     The allegations regarding KLI Shell and Mr. Valdes clearly are not, and cannot be, correct.  Declaration of Orlando Valdes ¶ 3 ("Valdes Declaration") (attached as **Exhibit 5**). Before March 2017, KLI Shell did not have any ownership interest in – and did not have any role in managing, running, or operating – the store located at 102265 Overseas Highway, Key Largo, Florida (the "Overseas Highway Store").  *Id.* ¶ 4.  Before March 2017, Mr. Valdes did not work at – and did not have any role in managing, running, or operating – the Overseas Highway Store. *Id.*  Before March 2017, Mr. Valdes did not have any ownership interest in: (a) the Overseas Highway Store; or (b) in any company with an ownership interest in that store.  *Id.*

32.     In March 2017, KLI Shell acquired the Overseas Highway Store through an asset purchase agreement with the company that owned the store ("the Seller").  Valdes Declaration ¶ 5.  Mr. Valdes was involved in that asset purchase in his capacity as Chief Executive Officer of

KLI Shell.  *Id*.  The closing date of that asset purchase (March 24, 2017) was long after Plaintiff

allegedly stopped using Roundup®-branded herbicides in 2014.  *Id*.

33.     If Plaintiff purchased any Roundup®-branded herbicides from the Overseas

Highway Store before the closing date of that asset purchase transaction, KLI Shell did not

assume or otherwise become responsible for any actual or potential liabilities related to her

purchases of those products; any such actual or potential liabilities remained with the Seller.

Valdes Declaration ¶ 6.  When KLI Shell acquired the Overseas Highway Store through that

asset purchase transaction, the Seller and KLI Shell agreed that KLI Shell did not assume or

otherwise become responsible for any of the Seller's obligations or liabilities arising out of,

based upon or resulting from any actions, suits, claims or proceedings, whether in law or equity,

pending or threatened, based upon any transactions or occurrences or acts or omissions of the

Seller or its agents, representatives, employees or shareholder on or prior to the closing date.  *Id*.

The Seller and KLI Shell also agreed that KLI Shell did not assume or otherwise become

responsible for any of the Seller's obligations or liabilities for any civil liability (including

punitive damages, if any) imposed upon the Seller on account of any fraudulent, criminal,

intentional, willful or negligent acts or omissions of the Seller or its agents, representatives,

employees, or shareholder.  *Id*.

34.      In his personal capacity, Mr. Valdes did not assume or otherwise become

responsible for any of the Seller's obligations or actual or potential liabilities.   Valdes

Declaration ¶ 7.

35.     Thus, KLI Shell and Mr. Valdes never had any control over – or any connection

whatsoever to – the Roundup®-branded herbicides that allegedly caused Plaintiff's injuries.

Valdes Declaration ¶ 8.

36.     More generally, KLI Shell and Mr. Valdes have never had any role in or involvement with designing, manufacturing, packaging, assembling, creating, or obtaining regulatory approval for any kind of Roundup®-branded herbicide.  Valdes Declaration ¶ 9.  KLI Shell and Mr. Valdes have never had any role in or involvement with determining what language should be included in labelling, or what warnings should be provided, for any kind of Roundup®-branded herbicide.  *Id.*  KLI Shell and Mr. Valdes have never had any role in or involvement with developing advertisements or commercials for any kind of Roundup®-branded herbicides or determining the content of any such advertisements or commercials.  *Id.*

37.     In these circumstances, Plaintiff clearly does not have any viable claims against KLI Shell or Mr. Valdes under Florida law.  KLI Shell did not start selling Roundup®-branded herbicides at the KLI Shell Overseas Highway Store until long after Plaintiff stopped using those products, so she could not have purchased those products from KLI Shell or Mr. Valdes.  The products that allegedly caused Plaintiff's injuries were not KLI Shell's products or Mr. Valdes' products.  KLI Shell and Mr. Valdes had no control over, and no connection to, those products.  Moreover, KLI Shell and Mr. Valdes did not do anything (or fail to do anything that they were required to do) that caused Plaintiff's alleged injuries.  Thus, it is clear that Plaintiff has no viable claims against either of those defendants, *see supra* Paragraphs 26-27 (citing cases), within the meaning of the fraudulent joinder standard discussed above.

38.     Therefore, this Court should disregard KLI Shell's citizenship and Mr. Valdes' citizenship when determining whether this removal is proper and whether the Court has subject matter jurisdiction over this lawsuit based on diversity of citizenship.

39.     Disregarding those two fraudulently joined defendants – and disregarding Mr. Conroy (also fraudulently joined) – means that there is complete diversity of citizenship and that

the forum defendant rule does not apply because the remaining defendants are not Florida citizens.

## II.     The Jurisdictional-Amount-In-Controversy Requirement Is Satisfied Here.

40.     The Complaint seeks damages based on the allegation that Monsanto's Roundup®-branded herbicides caused Plaintiff's cancer (NHL).  Therefore, it is plausible from the face of the Complaint that Plaintiff seeks damages in excess of $75,000, exclusive of interest and costs, which satisfies the jurisdictional amount-in-controversy requirement.  28 U.S.C. § 1332(a); *see Dart Cherokee Basin Operating Co. v. Owens*, 574 U.S. 81, 89 (2014) ("[A] defendant's notice of removal need include only a plausible allegation that the amount in controversy exceeds the jurisdictional threshold.").  In fact, other lawsuits seeking damages for NHL allegedly caused by glyphosate-based herbicides have been filed against Monsanto in other federal courts asserting jurisdiction under Section 1332(a) and alleging damages in excess of $75,000, exclusive of interest and costs.

41.     In sum, this Court has original subject matter jurisdiction over this action based on Section 1332(a) because there is complete diversity of citizenship between Plaintiff and all defendants (disregarding the citizenship of any fraudulently joined defendant) and because the amount in controversy exceeds $75,000, exclusive of interest and costs.[2]

---

[2] Monsanto's prior removal of the State Court Action and this Court's subsequent remand order do not preclude Monsanto from filing this Notice of Removal.  That removal was triggered by two defendants not at issue here (Transform SR Development LLC d/b/a Kmart and Jose Luis Martinez-Alvarez) and was based on 28 U.S.C. §§ 1334(b), 1452 and federal bankruptcy proceedings that precluded claims against those two defendants – and the remand order was based on Plaintiff's voluntary dismissals of those two defendants.  *See supra* note 1 & paragraph 8.  However, this removal is based on **different factual bases** involving **different defendants** (Mr. Conroy, KLI Shell, and Mr. Valdes), a **different legal theory** (fraudulent joinder), and **different statutes** (28 U.S.C. §§ §§ 1332, 1441).  Thus, the prior removal and remand of the State Court Action do not preclude Monsanto from filing this Notice of Removal.  *See, e.g.*, *S.W.S. Erectors, Inc. v. Infax, Inc.*, 72 F.3d 489, 492-93 (5th Cir. 1996) (holding that, after remand from

## **PROCEDURAL REQUIREMENTS**

42.     The Circuit Court of the Eleventh Judicial Circuit in and for Miami-Dade County,

Florida is located within the United States District Court for the Southern District of Florida.

Therefore, removal to this Court satisfies the venue requirements of 28 U.S.C. § 1446(a).

43.     This Notice of Removal is timely.  When the State Court Action was commenced,

the "case stated by the initial pleading [was] not removable," 28 U.S.C § 1446(b)(3), because the

Complaint included claims against several Florida defendants.  Thus, based on the face of the

Complaint, this lawsuit was not removable due to lack of diversity of citizenship and due to the

forum defendant rule, 28 U.S.C. § 1441(b)(2).  The Conroy Declaration (dated March 27, 2021)

and the Valdes Declaration (dated March 29, 2021), are the "other paper[s] from which it may

first be ascertained that [this] case is one which is or has become removable."  § 1446(b)(3).

This Notice of Removal is timely because Monsanto is filing it within 30 days of March 27,

2021.

44.     Home Depot consents to this removal.  Consent to Removal by Defendant Home

Depot USA, Inc. (attached as **Exhibit 6**).

45.     Consent to removal by Bayer Corporation is not required because Florida courts

lack personal jurisdiction over Bayer Corporation for the claims asserted in this lawsuit, Consent

to Removal by Defendant Bayer Corporation (Ex. 3), so Bayer Corporation has not been

"properly joined," 28 U.S.C. § 1446(b)(2)(A).   Nevertheless, to the extent that Bayer

---

federal court to state court, a defendant is precluded from removing again on the same ground
addressed in the prior removal notice but is allowed to file another removal notice based on a
different factual basis); *Dudley v. Eli Lilly and Co.*, 778 F.3d 909, 913-14 n.2 (11th Cir. 2014)
(quoting with approval, *inter alia*, *S.W.S. Erectors,* 72 F.3d at 493); *Watson v. Carnival Corp.*,
436 F. App'x 954, 955-56 (11th Cir. 2011) (same); *Ruiz v. Carnival Corp.*, No. 11-23170-Civ.,
2012 WL 626222, at *1 (S.D. Fla. Feb. 24, 2012) (quoting and/or citing with approval, *inter alia*,
*S.W.S. Erectors,* 72 F.3d at 492; *Watson*, 436 F. App'x at 956).

Corporation's consent may be deemed required, Bayer Corporation consents to this removal. Consent to Removal by Defendant Bayer Corporation.

46.     Consent to removal by Bayer AG is not required because that defendant has not been served in the State Court Action, so that defendant has not been "properly . . . served." § 1446(b)(2)(A).  Bayer AG's consent to removal also is not required because Bayer AG has not been "properly joined."  *Id*.  Courts in Florida lack personal jurisdiction over Bayer AG for the claims asserted against it in this case.  Moreover, this lawsuit does not assert any viable claims against Bayer AG because: (a) any alleged exposure to Roundup®-branded herbicides at issue in this case ended in approximately 2014, Complaint ¶¶ 135, 138; (b) the transaction that resulted in Monsanto becoming an indirect, wholly-owned subsidiary of Bayer AG occurred much later (in 2018); and (c) Bayer AG did not assume any of Monsanto's liabilities for personal injury claims arising out of alleged exposure to Roundup®-branded herbicides.

47.     Mr. Conroy's consent to removal is not required because Plaintiff fraudulently Mr. Conroy, so he has not been "properly joined."  § 1446(b)(2)(A).

48.     KLI Shell's consent to removal is not required because Plaintiff fraudulently KLI Shell, so that defendant has not been "properly joined."  § 1446(b)(2)(A).

49.     Mr. Valdes' consent to removal is not required because Plaintiff fraudulently Mr. Valdes, so he has not been "properly joined."  § 1446(b)(2)(A).

50.     The written notice required by 28 U.S.C. § 1446(d) will be promptly filed in the Circuit Court of the Eleventh Judicial Circuit in and for Miami-Dade County, Florida and will be promptly served on Plaintiff.

51.     Monsanto does not waive any defenses and expressly reserves its right to raise any and all defenses in subsequent proceedings.

52.     If any question arises as to the propriety of this removal, Monsanto requests the opportunity to present written and oral argument in support of removal.

**CONCLUSION**

For the foregoing reasons, Monsanto removes this lawsuit to the Court pursuant to 28 U.S.C. §§ 1332, 1441, and 1446 (and any other applicable laws).


Dated: March 30, 2021                              Respectfully submitted,

                                                   **McDERMOTT WILL & EMERY LLP**

                                                   */s/ Anthony N. Upshaw*
                                                   ANTHONY N. UPSHAW
                                                   Florida Bar No.: 861091
                                                   aupshaw@mwe.com
                                                   MELISSA R. ALVAREZ
                                                   Florida Bar No.: 820091
                                                   malvarez@mwe.com
                                                   333 SE 2nd Avenue, Suite 4500
                                                   Miami, FL 33131
                                                   Tel:  (305) 329-4431
                                                   Fax: (305) 675-8031
                                                   ***Counsel for Defendant***
                                                   ***Monsanto Company***




**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this **30th day of March, 2021,** a true and correct copy of the foregoing was electronically filed with the Clerk of the Court using the CM/ECF system.

                                                   */s/  Anthony N. Upshaw*

# Exhibit 1

Filing # 119454356 E-Filed 01/12/2021 10:39:35 AM

IN THE CIRCUIT COURT OF THE
ELEVENTH JUDICIAL CIRCUIT IN AND
FOR MIAMI-DADE COUNTY, FLORIDA

GENERAL JURISDICTION DIVISION

CASE NO.

NANCY C. SALAS,
a Florida Resident,

      Plaintiff,

vs.

MONSANTO COMPANY, a foreign
corporation; BAYER CORPORATION, a
foreign corporation; BAYER AG, a foreign
corporation; ANDREW JACK CONROY, a
Florida resident; HOME DEPOT U.S.A, INC.,
a foreign corporation; KLI SHELL LUMBER
& HARDWARE, LLC, a Florida company;
ORLANDO VALDES, a Florida resident;
TRANSFORM SR DEVELOPMENT LLC
d/b/a KMART, a foreign company; and JOSE
LUIS MARTINEZ-ALVAREZ, a Florida
resident.

      Defendants.

_____/

Received: 1/25/21 @ 11:00A
Served: 1/25/21 @ 12:20P

Richard Kolodgy, CPS #204
Second Judicial Circuit

## SUMMONS

THE STATE OF FLORIDA:

To Each Sheriff of the State:

      YOU ARE COMMANDED to serve this Summons and a copy of the Complaint or Petition
in this action on defendant:

MONSANTO COMPANY

By Serving Registered Agent:
Corporation Service Company
1201 Hays Street
Tallahassee, FL 32301

Each defendant is required to serve written defenses to the Complaint or Petition on

Steven C. Marks, Esq.

Kristina M. Infante, Esq.
Podhurst Orseck, P.A.
One SE Third Avenue, Suite 2300
Miami, Florida 33131

within twenty (20) days after service of this Summons on that Defendant, exclusive of the day of service, and to file the original of the defenses with the Clerk of this Court either before service on Attorneys for Plaintiff(s) or immediately thereafter. If a defendant fails to do so, a default will be entered against that Defendant for the relief demanded in the Complaint or Petition.

WITNESS my hand and the seal of this Court on _____1/12/2021_____ , 2021.

Harvey Ruvin, Clerk of the Circuit Court
for Miami-Dade County, Florida

By:_____
Deputy Clerk

STEVEN C. MARKS
KRISTINA M. INFANTE
PODHURST ORSECK, P.A.
Attorneys for Plaintiff
One SE Third Avenue, Suite 2300
Miami, Florida 33131
Phone: (305) 358-2800

Filing # 119405216 E-Filed 01/11/2021 02:54:10 PM

IN THE CIRCUIT COURT OF THE
ELEVENTH JUDICIAL CIRCUIT IN AND
FOR MIAMI-DADE COUNTY, FLORIDA

GENERAL JURISDICTION DIVISION

CASE NO.    **2021-000615-CA-01**

NANCY C. SALAS,
a Florida Resident,

     Plaintiff,

vs.

MONSANTO COMPANY, a foreign
corporation; BAYER CORPORATION, a
foreign corporation; BAYER AG, a foreign
corporation; ANDREW JACK CONROY, a
Florida resident; HOME DEPOT U.S.A, INC.,
a foreign corporation; KLI SHELL LUMBER
& HARDWARE, LLC, a Florida company;
ORLANDO VALDES, a Florida resident;
TRANSFORM SR DEVELOPMENT LLC
d/b/a KMART, a foreign company; and JOSE
LUIS MARTINEZ-ALVAREZ, a Florida
resident.

     Defendants.

_____/

## COMPLAINT FOR PERSONAL INJURIES

     Plaintiff, Nancy C. Salas, brings this action against Defendants Monsanto Company, Bayer

AG, and Bayer Corporation (collectively, "Monsanto"); Andrew Jack Conroy; Home Depot

U.S.A., Inc.; KLI Shell Lumber & Hardware, LLC; Orlando Valdes; Transform SR Developments

LLC d/b/a Kmart; and Jose Luis Martinez-Alvarez, and alleges as follows:

### INTRODUCTION

     1.    This is a civil action for damages suffered by Plaintiff as a direct and proximate

result of Defendants' negligent and wrongful conduct in connection with the design, development,

manufacture, testing, packaging, warning, promoting, marketing, advertising, distribution, labeling, and/or sale of glyphosate-containing products.

## PARTIES

2.      At all times material, Plaintiff Nancy C. Salas was a resident of Monroe County, Florida and Miami-Dade County, Florida.

3.      "Roundup" refers to all formulations of Defendants' Roundup products, including, but not limited to, Roundup Concentrate Poison Ivy and Tough Brush Killer 1, Roundup Custom Herbicide, Roundup D-Pak herbicide, Roundup Dry Concentrate, Roundup Export Herbicide, Roundup Fence & Hard Edger 1, Roundup Garden Foam Weed & Grass Killer, Roundup Grass and Weed Killer, Roundup Herbicide, Roundup Original 2k herbicide, Roundup Original II Herbicide, Roundup Pro Concentrate, Roundup Prodry Herbicide, Roundup Promax, Roundup Quik Stik Grass and Weed Killer, Roundup Quikpro Herbicide, Roundup Rainfast Concentrate Weed & Grass Killer, Roundup Rainfast Super Concentrate Weed & Grass Killer, Roundup Ready-to-Use Extended Control Weed & Grass Killer 1 Plus Weed Preventer, Roundup Readyto-Use Weed & Grass Killer, Roundup Ready-to-Use Weed and Grass Killer 2, Roundup Ultra Dry, Roundup Ultra Herbicide, Roundup Ultramax, Roundup VM Herbicide, Roundup Weed & Grass Killer Concentrate, Roundup Weed & Grass Killer Concentrate Plus, Roundup Weed & Grass killer Ready-to-Use Plus, Roundup Weed & Grass Killer Super Concentrate, Roundup Weed & Grass Killer1 Ready-to-Use, Roundup WSD Water Soluble Dry Herbicide Deploy Dry Herbicide, RangerPro Herbicide, AquaMaster, or any other formulation of containing the active ingredient glyphosate.

4.      At all times material, Defendant Monsanto Company (hereinafter "Monsanto") was a corporation organized under the laws of the State of Delaware with its principal place of business

in St. Louis, Missouri. Monsanto was the entity that discovered the herbicidal properties of glyphosate and manufactured Roundup, which contains the active ingredient glyphosate, as well as other "inert" ingredients.

5.      At all times material, Defendant Bayer AG was a corporation organized under the laws of Germany with its principal place of business in Leverkusen, Germany. At all times material, Defendant Bayer Corporation was the American subsidiary of Bayer AG. Bayer Corporation was organized under the laws of the state of Delaware with its principal place of business in Pittsburgh, Pennsylvania. On June 7, 2018, Bayer announced that it had successfully completed its acquisition of Monsanto. For purposes of this complaint, Bayer AG, Bayer Corporation, and the Monsanto Company will be collectively referred to as "Monsanto."

6.      At all times material, Defendant Andrew Jack Conroy was employed by Monsanto as its industrial, turf and ornamental (ITO) herbicide Representative for the Eastern United States, including Florida. Defendant Andrew Jack Conroy is a resident of Polk County, Florida.

7.      At all times material, Defendant Home Depot USA, Inc. (hereinafter "Home Depot") was and is a corporation organized under the laws of the State of Delaware with its principal place of business in Atlanta, Georgia. Defendant Home Depot sold and distributed Monsanto products, including Roundup, within Florida including Miami-Dade County. Plaintiff bought Roundup products at the Home Depot stores located at 11905 SW 152nd Street, Miami, FL 33177, at 33001 S Dixie Hwy, Florida City, FL 33034, and at 11305 SW 40th Street, Miami, FL 33165.

8.      At all times material, Defendant KLI Shell Lumber & Hardware, LLC (hereinafter "KLI Shell Lumber") was and is a corporation organized under the laws of the State of Florida with its principal place of business in Key Largo, Florida. Defendant KLI Shell Lumber sold and

distributed Monsanto products, including Roundup, within Monroe County, Florida. Plaintiff bought Roundup products at the KLI Shell Lumber store located at 102265 Overseas Highway, Key Largo, Florida 33037.

9.     At all times material, Defendant Orlando Valdes was employed by Defendant KLI Shell Lumber as its owner and CEO. Defendant Orlando Valdes is a resident of Miami-Dade County, Florida.

10.     At all times material, Defendant Transform SR Development LLC was and is a corporation organized under the laws of the State of Illinois with its principal place of business in Hoffman Estates, Illinois. Transform SR Development is authorized to do business in Florida and has its registered agent at CT Corporation System, 1200 South Pine Island Road, Plantation, Florida 33324. Transform SR Development does business in Florida under the brand and trade name Kmart. For the purposes of this Complaint, this Defendant shall be referred to as "Transform SR Development d/b/a Kmart". Transform SR Development d/b/a Kmart sold and distributed Monsanto products, including Roundup, within Monroe County, Florida. Plaintiff bought Roundup products at the Transform SR Development d/b/a Kmart store #9614 located at 101499 Overseas Hwy, Key Largo, Florida 33037.

11.     At all times material, Defendant Jose Luis Martinez-Alvarez was employed by Defendant Transform SR Development d/b/a Kmart as the store manager at the Kmart store #9614 located at 101499 Overseas Hwy, Key Largo, Florida 33037. Upon information, Mr. Martinez-Alvarez has managed that store location for the last eleven years. Defendant Jose Luis Martinez-Alvarez is a resident of Miami-Dade County, Florida.

## JURISDICTIONAL ALLEGATIONS

12.    This is an action for damages in excess of Thirty Thousand Dollars ($30,000.00),
exclusive of costs, interest and attorneys' fees, and is therefore within the jurisdictional limits of
this Court.

13.    Defendant Monsanto has been authorized to do business in the State of Florida and
was transacting or conducting business in the State of Florida, and has derived substantial revenue
from goods and products, including Roundup, used in the State of Florida.  At all times relevant
to this Complaint, Monsanto was the entity that discovered the herbicidal properties of glyphosate
and the manufacturer of Roundup.

14.    Defendant Monsanto also consented to jurisdiction by registering to do business in
Florida. Defendant Monsanto's Registered Agent is Corporation Service Company, 1201 Hays
Street, Tallahassee, FL 32301-2525.

15.    Defendant Bayer Corporation has been authorized to do business in the State of
Florida and at all relevant times was transacting or conducting business in the State of Florida, and
has derived substantial revenue from goods and products, including Roundup, used in the State of
Florida.

16.    Defendant Bayer Corporation also consented to jurisdiction by registering to do
business in Florida. Defendant Bayer's Registered Agent is Corporation Service Company, 1201
Hays Street, Tallahassee, FL 32301.

17.    Defendant Andrew Jack Conroy is a resident of Polk County, Florida.

18.    Defendant Home Depot has been authorized to do business in the State of Florida
and at all relevant times was transacting or conducting business in the State of Florida and has
derived substantial revenue from goods and products sold and used in the State of Florida.  At all

times relevant to this Complaint, Defendant Home Depot sold and distributed Monsanto products, including Roundup, within Miami-Dade County, Florida.

19.    Defendant Home Depot also consented to jurisdiction by registering to do business in Florida. Defendant Home Depot's Registered Agent is Corporation Service Company, 1201 Hays Street, Tallahassee, FL 32301-2525.

20.    Defendant KLI Shell Lumber & Hardware, LLC is a Florida corporation which has been authorized to do business in the State of Florida and at all relevant times was transacting or conducting business in the State of Florida and has derived substantial revenue from goods and products sold and used in the State of Florida.  At all times relevant to this Complaint, Defendant KLI Shell Lumber sold and distributed Monsanto products, including Roundup, within Monroe County, Florida.

21.    Defendant KLI Shell Lumber also consented to jurisdiction by registering to do business in Florida. Defendant KLI Shell Lumber's Registered Agent is Orlando Valdes, 2733 SW 27th Avenue, Miami, Florida 33133.

22.    Defendant Orlando Valdes is a resident of Miami-Dade County, Florida.

23.    Defendant Transform SR Development LLC was and is authorized to do business in the State of Florida and was transacting or conducting business in the State of Florida and has derived substantial revenue from goods or services sold in the State of Florida.  Furthermore, Transform SR Development has consented to jurisdiction by registering to do business in Florida. Transform SR Development's Registered Agent is CT Corporation System, 1200 South Pine Island Road, Plantation, Florida 33324.

24.    Defendant Jose Luis Martinez-Alvarez is a resident of Miami-Dade County, Florida.

6

25.   In addition to the allegations stated above, this Court has personal jurisdiction over all of the Defendants pursuant to Florida Statutes § 48.193(1)(a)(1), (2), and (6).  Among other things, Plaintiff's claims arise out of Defendants' operating, conducting, engaging in, or carrying on a business or business venture in this state or having an office or agency in this state, committing a tortious act in this state, and causing injury to life and property in this state arising out of Defendants' acts and omissions outside this state. At or about the time of such injuries, the products, materials, or things, that were processed, serviced, or manufactured by Defendants anywhere, were used or consumed within this state in the ordinary course of commerce, trade, or use.

26.   Venue is proper in Miami-Dade County pursuant to Florida Statutes § 47.011 because, among other things, Plaintiff's cause of action accrued in Miami-Dade County and at least one Defendant resides in Miami-Dade County

## GENERAL ALLEGATIONS APPLICABLE TO ALL COUNTS

27.   Glyphosate is the active ingredient in Roundup.

28.   Glyphosate is a non-selective herbicide, meaning it kills indiscriminately based only on whether a given organism produces a specific enzyme known as EPSP synthase.

29.   Plants treated with glyphosate translocate the systemic herbicide to their roots, shoot regions, and fruit, where it interferes with the plant's ability to form aromatic amino acids for protein synthesis. Treated plants generally die within two to three days.  Because plants absorb glyphosate, it cannot be completely removed by washing or peeling produce or by milling, baking, or brewing grains.

30.   In addition to the active ingredient glyphosate, Roundup formulations, as well as other glyphosate-based product formulations such as Rodeo and Aqua Star, also contain adjuvants

and/or other chemicals, which are considered "inert" and therefore protected as "trade secrets" in manufacturing. Growing evidence suggests that these adjuvants and additional components of Roundup formulations are not, in fact, inert and are toxic in their own right.

31.     The herbicidal properties of glyphosate were discovered in 1970 by Monsanto chemist John Franz.  The first glyphosate-based herbicide was introduced to the market in the mid-1970s under the brand name Roundup.  From the outset, Monsanto marketed Roundup as a "safe" general-purpose herbicide for widespread commercial and consumer use. It still markets Roundup as safe today.

32.     Today, glyphosate products are among the world's most widely used herbicides. Glyphosate-based products are registered in more than 130 countries and are approved for weed control in more than 100 crops.

33.     Since the mid-1970s, Roundup, and later other glyphosate-based products, have been used across the world by people who have not had knowledge of the dangers their use poses.

34.     Since Monsanto first introduced Roundup, it touted glyphosate as a technological breakthrough: it could kill almost every weed without causing harm either to people or to the environment. Monsanto assured the public that Roundup was harmless to humans and continues to assure the public that it is safe despite evidence to the contrary. Monsanto fails to disclose and actively conceals information demonstrating that its products are harmful to human health.

### Registration of Herbicides under Federal Law

35.     The manufacture, formulation, and distribution of herbicides, such as Roundup, are regulated under the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA" or "Act"), 7 U.S.C. § 136 et seq.  FIFRA requires that all pesticides be registered with the Environmental

Protection Agency ("EPA" or "Agency") prior to their distribution, sale, or use, except as described by the Act. 7 U.S.C. § 136a(a).

36.     The EPA requires as part of the registration process, among other things, a variety of tests to evaluate the potential for exposure to pesticides, toxicity to people and other potential non-target organisms, and other adverse effects on the environment. Registration by the EPA, however, is not an assurance or finding of safety.  The determination the Agency must make in registering or re-registering a product is not that the product is "safe," but rather that use of the product in accordance with its label directions "will not generally cause unreasonable adverse effects on the environment." 7 U.S.C. § 136a(c)(5)(D).

37.     FIFRA defines "unreasonable adverse effects on the environment" to mean "any unreasonable risk to man or the environment, taking into account the economic, social, and environmental costs and benefits of the use of any pesticide." 7 U.S.C. § 136(bb).  FIFRA thus requires the EPA to make a risk/benefit analysis in determining whether a registration should be granted or a pesticide allowed to continue to be sold in commerce.

38.     The EPA registered Roundup for distribution, sale, and manufacture in the United States and the state of Florida.

39.     FIFRA generally requires that the registrant, Monsanto in the case of Roundup, conducts the health and safety testing of pesticide products. The EPA has protocols governing the conduct of tests required for registration and the laboratory practices that must be followed in conducting these tests.  The data produced by the registrant must be submitted to the EPA for review and evaluation.  The government is not required, nor is it able, however, to perform the product tests that are required of the manufacturer.

40.   Based on early studies showing that glyphosate could cause cancer in laboratory animals, the EPA originally classified glyphosate as possibly carcinogenic to humans (Group C) in 1985.  After pressure from Monsanto, including contrary studies it provided to the EPA, the EPA changed its classification to evidence of non-carcinogenicity in humans (Group E) in 1991. In so classifying glyphosate, however, the EPA made clear that the designation did not mean the chemical does not cause cancer: "It should be emphasized, however, that designation of an agent in Group E is based on the available evidence at the time of evaluation and should not be interpreted as a definitive conclusion that the agent will not be a carcinogen under any circumstances."[1]

41.   On two occasions, the EPA found that the laboratories hired by Monsanto to test the toxicity of its Roundup products for registration purposes committed fraud.

42.   In the first instance, Monsanto, in seeking initial registration of Roundup by the EPA, hired Industrial Bio-Test Laboratories ("IBT") to perform and evaluate pesticide toxicology studies relating to Roundup.[2] IBT performed about 30 tests on glyphosate and glyphosate-containing products, including nine of the 15 residue studies needed to register Roundup.

43.   In 1976, the United States Food and Drug Administration ("FDA") performed an inspection of IBT that revealed discrepancies between the raw data and the final report relating to the toxicological impacts of glyphosate. The EPA subsequently audited IBT; it too found the toxicology studies conducted for the Roundup herbicide to be invalid.[3] An EPA reviewer stated,

---

[1] U.S. Envtl. Prot. Agency, Memorandum, Subject: SECOND Peer Review of Glyphosate 1 (1991), available at https://archive.org/details/SecondPeerReviewOfGlyphosateEPAOct301991.
[2] Monsanto, Backgrounder, Testing Fraud: IBT and Craven Laboratories (Sep. 2, 2015), available at https://monsanto.com/app/uploads/2017/06/ibt_craven_bkg.pdf.
[3] U.S. Envtl. Prot. Agency, Summary of the IBT Review Program Office of Pesticide Programs (1983), available at
https://nepis.epa.gov/Exe/ZyNET.exe/91014ULV.TXT?ZyActionD=ZyDocument&Client=EPA&Index=1981+Thru+1985&Docs=&Query=&Time=&EndTime=&SearchMethod=1&TocRestrict=n&Toc=&TocEntry=&QField=&QF

after finding "routine falsification of data" at IBT, that it was "hard to believe the scientific integrity of the studies when they said they took specimens of the uterus from male rabbits."[4]

44.    Three top executives of IBT were convicted of fraud in 1983.

45.    In the second incident of data falsification, Monsanto hired Craven Laboratories in 1991 to perform pesticide and herbicide studies, including for Roundup. In that same year, the owner of Craven Laboratories and three of its employees were indicted, and later convicted, of fraudulent laboratory practices in the testing of pesticides and herbicides.[5]

46.    Despite the falsity of the tests that underlie its registration, within a few years of its launch, Monsanto was marketing Roundup in over one hundred countries.

### The Importance of Roundup to Monsanto's Market Dominance Profits

47.    The success of Roundup was key to Monsanto's continued reputation and dominance in the marketplace. Largely due to the success of Roundup sales, Monsanto's agriculture division was out-performing its chemicals division's operating income, and that gap increased yearly. But with its patent for glyphosate expiring in the United States in the year 2000, Monsanto needed a strategy to maintain its Roundup market dominance and to ward off impending competition.

48.    In response, Monsanto began the development and sale of genetically-engineered Roundup Ready seeds in 1996. Since Roundup Ready crops are resistant to glyphosate, farmers

---

ieldYear=&QFieldMonth=&QFieldDay=&IntQFieldOp=0&ExtQFieldOp=0&XmlQuery=&File=D%3A%5Czyfiles%5CIndex%20Data%5C81thru85%5CTxt%5C00000022%5C91014ULV.txt&User=ANONYMOUS&Password=anonymous&SortMethod=h%7C-&MaximumDocuments=1&FuzzyDegree=0&ImageQuality=r75g8/r75g8/x150y150g16/i425&Display=hpfr&DefSeekPage=x&SearchBack=ZyActionL&Back=ZyActionS&BackDesc=Results%20page&MaximumPages=1&ZyEntry=1&SeekPage=x&ZyPURL.

[4] Marie-Monique Robin, The World According to Monsanto: Pollution, Corruption and the Control of the World's Food Supply (2011) (citing U.S. Envtl. Prot. Agency, Data Validation, Memo from K. Locke, Toxicology Branch, to R. Taylor, Registration Branch. Washington, D.C (August 9, 1978)).

[5] Monsanto, Backgrounder, Testing Fraud: IBT and Craven Laboratories, supra note 2.

can spray Roundup onto their fields during the growing season without banning the crop. This allowed Monsanto to expand its market for Roundup even further; by 2000, Monsanto's biotechnology seeds were planted on more than 80 million acres worldwide and nearly 70% of American soybeans were planted from Roundup Ready seeds. It also secured Monsanto's dominant share of the glyphosate/Roundup market through a marketing strategy that coupled proprietary Roundup Ready seeds with continued sales of its Roundup herbicide.

49.     Through a three-pronged strategy of increased production, decreased prices and by coupling with Roundup Ready seeds, Roundup became Monsanto's most profitable product. In 2000, Roundup accounted for almost $2.8 billion in sales, outselling other herbicides by a margin of five to one, and accounting for close to half of Monsanto's revenue. Today, glyphosate remains one of the world's largest herbicides by sales volume.

### Monsanto's Knowledge About the Toxicity of Roundup

50.     Since Roundup was introduced to the market, Monsanto has made broad claims through its advertising and promotional materials that its products are safe, non-toxic, and rigorously tested. But, in reality, the company hardly tested the real-world toxicity of its products, actively avoided pursuing studies which might show unwelcome results, and ghostwrote studies of supposedly independent scientists.

51.     The first valid chronic oncogenicity study on glyphosate was submitted to the EPA in 1983 (the Bio/dynamic mouse study). It showed an increase in renal tubular adenomas in the male mice that Monsanto claimed was not treatment-related. The EPA disagreed and classified glyphosate as a "possible human oncogen" in 1985.

52.     Monsanto challenged the EPA's determination through multiple avenues, for years, leading to an EPA request for Monsanto to do a new and better study. A Scientific Advisory Panel

convened by the EPA to provide guidance in resolving the controversy over the 1983 Bio/dynamic study called for a repeat study. The EPA adopted the SAP's advice and required a repeat mouse 7study in its 1986 Registration Standard document on glyphosate. Monsanto refused to conduct it and, upon information and belief, has not done so to this day.

53.   The 1986 glyphosate Registration Standard document issued by the EPA required Monsanto to add several commonsense worker-safety provisions onto Roundup product labels (e.g., wear gloves, chemical resistant shoes, and goggles or a face shield when applying Roundup; discard clothes that are drenched; wash clothes separately from other laundry). Monsanto refused to add the majority of these provisions to their product labels.

54.   Monsanto has refused since the mid-1980s to conduct the studies needed to resolve uncertainty over the oncogenicity of Roundup, including studies specifically requested by the EPA. The failure of Monsanto to invest in new and better science, such as the more powerful mouse cancer replacement study requested by the EPA in 1986, has perpetuated scientific uncertainty and undermined the EPA's ability to understand and quantify the health risks of Roundup.

55.   Dr. Donna Farmer, a senior Monsanto scientist, wrote the following to a Monsanto communications professional: "You cannot say that Roundup is not a carcinogen...we have not done the necessary testing on the formulation to make that statement. The testing of the formulations are not anywhere near the level of the [testing on] the active ingredient."

The terms glyphosate and Roundup cannot be used interchangeably nor can you use "Roundup" for all glyphosate-based herbicides any more.  For example you cannot say that Roundup is not a carcinogen...we have not done the necessary testing on the formulation to make that statement.  The testing on the formulations are not anywhere near the level of the active ingredient. We can make that statement about glyphosate and can infer that there is no reason to believe that Roundup would cause cancer.

56.     In the same email, Dr. Farmer warned that Monsanto "cannot support the statement" that Roundup produces "'no adverse effects whatsoever on flora, or fauna or on the human body.'" This is because, as Dr. Farmer explained, "[a]dverse effects are seen on flora (glyphosate is meant to kill vegetation), adverse effects on fauna – in studies with laboratory animals – even death is seen (LD50 studies for example) and in humans – mild reversible eye and skin irritation are seen with normal use and death can occur in suicide attempts."

> We cannot support the statement about "no adverse effects whatsoever on flora, or fauna or on the human body". Adverse effects are seen on flora (glyphosate is meant to kill vegetation), adverse effects on fauna – in studies with laboratory animals – even death is seen (LD50 studies for example) and in humans – mild reversible eye and skin irritation are seen with normal use and death can occur in suicide attempts. Therefore we advise using the phrase...."When Roundup herbicides are used according to label directions, no unreasonable adverse effects to people, wildlife, and the environment are expected."

57.     In addition to the active ingredient glyphosate, surfactants are added to Roundup products to speed up the movement of glyphosate through weed leaf surfaces, and then into the cells of weeds. Roundup surfactants act roughly the same way when Roundup comes into contact with human skin. In other words, the formulation penetrates human skin, making Roundup markedly more toxic to exposed humans than glyphosate alone.

58.     For decades, there have been multiple studies showing that formulated Roundup is more toxic than pure, 100% technical glyphosate. Most of the surfactants in Roundup-brand herbicides are even more toxic, ounce for ounce, than glyphosate. Plus, pure glyphosate does not move as readily through the skin or into cells, whereas Roundup does.

59.     Despite knowledge of the differences in toxicity and risks arising from exposures to formulated Roundup in contrast to pure glyphosate, Monsanto has not carried out critical, long-term cancer feeding studies with Roundup. Nor has anyone else.

60.     Monsanto has refused to conduct state-of-the-art genotoxicity assays in mammals and in human populations exposed to formulated Roundup.

61.     In 1999, Monsanto hired Dr. James Parry, a world-renowned genotoxicity expert, to advise the company on what steps it should take to better understand and respond to public literature studies reporting evidence of a genotoxic response following exposures to glyphosate and/or a glyphosate-based herbicide. Dr. Parry identified several deficiencies in the available data on glyphosate. For one, he explained there is "[n]o adequate in vitro clastogenicity data available for glyphosate formulations." He thus recommended that Monsanto "provide comprehensive in vitro cytogenetic data on glyphosate formulations." He also concluded, "[m]y overall view is that if the reported genotoxicity of glyphosate and glyphosate formulations can be shown to be due to the production of oxidative damage then a case could be made that any genetic damage would be thresholded . . . it may be necessary to consider the possibility of susceptible groups within the human population."

62.     In total, Dr. Parry provided Monsanto 11 specific recommendations for further genotoxicity research. Monsanto refused to conduct new studies in 9 of the 11 areas. In a September 1999 email, Monsanto's chief of regulatory science, William Heydens, wrote to his Monsanto colleagues after reading Dr. Parry's report on glyphosate. In his correspondence, Heydens stated: "We want to find/develop someone who is comfortable with the genetox profile of glyphosate/Roundup and who can be influential with regulators and Scientific Outreach operations when genetox issues arise. My read is that Parry is not currently such a person, and it would take quite some time and $$$/studies to get him there. We simply aren't going to do the studies Parry suggests."

> However, let's step back and look at what we are really trying to achieve here. We want to find/develop someone who is comfortable with the genetox profile of glyphosate/Roundup and who can be influential with regulators and Scientific Outreach operations when genetox issues arise. My read is that Parry is not currently such a person, and it would take quite some time and $$$/studies to get him there. We simply aren't going to do the studies Parry suggests. Mark, do you think Parry can become a strong advocate without doing this work Parry? If not, we should *seriously* start looking for one or more other individuals to work with. Even if we think we can eventually bring Parry around closer to where we need him, we should be currently looking for a second/back-up genetox. supporter. We have not made much progress and are currently very vulnerable in this area. We have time to fix that, but only if we make this a high priority now.

63.     In another email the same month, Monsanto executive Stephen Wratten said he was "disappointed in the Parry report," asking "[h]as he ever worked with industry before on this sort of project?" Later in the same email, Wratten intoned that the Parry report is not useful for Monsanto: "I do not see that he has stuck his neck out on anything at all controversial, and therefore, there is little value in the write-up as written that could be useful. Hope it didn't cost much...."

> Overall, I guess we have his recommendation of studies that could be used to strengthen the database on p. 4., but that is about it. I do not see that he has stuck his neck out on anything at all controversial, and therefore, there is little value in the write-up as written that could be useful. Hope it didn't cost much. Perhaps this is too harsh, and I don't know what your proposal to him was, but I guess I would expect more than this of a Professor.

64.     Later on, in the same email chain, Monsanto toxicologist Donna Farmer discussed the fallout from Dr. Parry's report on glyphosate with her colleagues. She wrote: "right now the only person I think that can dig us out of this 'genetox hole' is the Good Dr. Kier... I am concerned about leaving Perry [sic] out there with this as the final project/his final impressions . . . ."

> One option...I agree we need someone else to interface with Perry...right now the only person I think that can dig us out of this "genotox hole" is the Good Dr. Kier....
>
> other option....I am concerned about leaving Perry out there with this as the final project/his final impressions.................if you remember his first report...he was looking for work for a graduate student (I wonder if this evaluation was his or someone else's?)
>
> Maybe you, Bill, Larry, Steve and I can get together to figure out where and how we go from here...Steve's opinion of the report was pretty clear....he also suggested as an option to drop Perry.

65.     In correspondence, Monsanto personnel expressed reluctance to conduct studies on glyphosate. Roundup formulations, or surfactant ingredients, suggesting Monsanto was concerned about the results it would find if it did the tests. In a September 1999 email, for example, Stephen Wratten criticized the Parry report by noting that "of course" Monsanto knew there was no data to support points it wanted to make relating to Roundup's genotoxicity, and Monsanto scientists "didn't need [Dr. Parry] to tell [them] that." What Monsanto wanted Dr. Parry to do (instead of suggesting additional independent and rigorous testing) was to argue *against* the reliability of independent studies that were bad for Monsanto's bottom line:

> 8.  Of course we know there were no data of the type listed in points 2, 3, and 4 on p. 3.  We didn't need him to tell us that.  The key point is whether the conclusions of Bolognesi, and Rank can be discounted on the basis of the strength and number of studies at hand, or whether their experiments need to be repeated independently to credibly refute the findings.  Of course we knew that the latter would be the most convincing approach, but we need him to make any arguments that can be made on the data we have.

66.     In another email from 1999, Dr. Farmer resisted the suggestion that the company do additional studies on the genotoxicity of Roundup, including formulations or other surfactant ingredients:

> It is too premature to discuss conducting any studies. I will not support doing any studies on glyphosate, formulations or other surfactant ingredients at this time with the limited information we have on the situation. As Bill indicated below we have a ton of data .....that was submitted and reviewed.

67.     Other internal correspondence demonstrates that some of Monsanto's executives were concerned about the safety of Roundup and results that would be obtained if Roundup were rigorously tested according to Parry's recommendations. One Monsanto scientist wrote in 2001: "If someone came to me and said they wanted to test Roundup I know how I would react – with serious concern."

68.    Comments made by other Monsanto executives indicate their awareness that glyphosate becomes toxic when mixed with other ingredients. Thus, the formulated product—Roundup—is more toxic than its active ingredient. In 2002, William Heydens and Donna Farmer discussed various studies observing adverse effects by the formulated Roundup product. Specifically. Farmer acknowledged: "[t]he interest point is glyphosate all basically had no effect the formulated product did – does this point us to the coformulants – sufactants? [sic]" Heydens also admitted, after discussing with Monsanto consultant John DeSesso, that "we are in pretty good shape with glyphosate but vulnerable with surfactants. . . . What I've been hearing from you is that this continues to be the case with these studies – Glyphosate is OK but the formulated product (and thus the surfactant) does the damage."

> Your last comment hits exactly where I am coming from. We discussed the situation with Wolson and DeSesso and concluded, not surprisingly, that we are in pretty good shape with glyphosate but vulnerable with surfactants. What I've been hearing from you is that this continues to be the case with these studies - Glyphosate is OK but the formulated product (and thus the surfactant) does the damage.

69.    Despite Monsanto's longstanding awareness of the danger of the formulated product, and the damage caused by the addition to Roundup of the surfactants in particular, Monsanto's website continues to advertise, to this day, that "Glyphosate-based herbicides, including Roundup-brand formulated products with surfactants, all have a long history of safe use and do not pose any unreasonable risk to human health when used according to label directions."[6]

---

[6] *See* Monsanto's webpage "What is a surfactant?," available at. It is available at https://monsanto.com/products/safety-information/what-is-a-surfactant/.



70.     Rather than conduct the more sophisticated genotoxicity studies recommended by Dr. Parry and others, Monsanto instead commissioned members of its third-party network of glyphosate-friendly scientists to write and publish articles arguing that evidence of genotoxicity in public literature studies is the result of flawed study designs, excessive dose levels, inappropriate routes of administration, overt toxicity, or other technical problems. Many of these reviews were ghost-written by Monsanto scientists not listed among the co-authors.

71.     Monsanto made heavy use of supposedly independent scientists in its "Scientific Outreach" and PR campaigns in support of the safety of glyphosate and Roundup-brand herbicides. In some instances, such individuals were appointed to an ad hoc, or standing advisory committee or panel. In other cases, they simply worked on a fee-for-service basis on a defined task. Many of these glyphosate-friendly experts had once worked for Monsanto. Many have authored or co-authored papers commissioned and paid for by Monsanto. Most of these papers contained passages ghost-written by Monsanto scientists, and some were largely ghost-written by Monsanto. "Ghost-writing" refers to contributions to a written document by a person not listed as the author, or among the co-authors of the document. The practice is considered to be serious ethical misconduct.

72.    As far back as 1999, Monsanto was operating behind the scenes to influence the science and bolster the public perception of the safety of glyphosate and Roundup. William Heydens, the Monsanto executive who spearheaded Monsanto's manipulation of the scientific literature via ghostwriting, wrote in a May 1999 email that Monsanto's plan for scientific outreach planning involved maintaining a cohort of "outside scientific experts who are influential at driving science, regulators, public opinion, etc. We would have they [sic] people directly or indirectly/behind-the-scenes work on our behalf."

> 2) outside scientific experts who are influential at driving science, regulators, public opinion, etc. We would have they people directly or indirectly/behind-the-scenes work on our behalf.
>
> 3) Presentations/publications in the scientific literature. Get our data out there so it can be referenced and used to counter-balance the negative stuff. In some cases, we may want to publish specific work in certain world areas to help out in that region. We may use our experts as authors (eg. the CanTox project in which you were fortunate enough to participate).

73.    Heydens succinctly summarized Monsanto's goal: to encourage "people to get up and shout Glyphosate is Non-toxic."

74.    The more formal statement of the "Overall purpose" of Monsanto's "Glyphosate Scientific Outreach Plan" (SO Plan) appears at the beginning of a June 1999 document: "Ensure that Monsanto's glyphosate-containing herbicides are widely viewed throughout the scientific community as posing no threat to human health or the environment. This support [from third-party network experts] will be used to favorably influence current and future possible challenges in the regulatory and public arena."

75.    The unconditional statement in the above-quoted paragraph—"no threat to human health or the environment"—stands in sharp contrast to the more nuanced statements by scientists Monsanto itself commissioned to review the genotoxicity or oncogenicity literature, or by the EPA. No scientist has been willing to say that Roundup poses no threat to human health. For example, Kier and Kirkland, two Monsanto-commissioned scientists, concluded in a 2013 review of

20

glyphosate genotoxicity that "Glyphosate and typical [glyphosate-based herbicides] do not appear to present significant genotoxic risk under normal conditions of human or environmental exposures." The scientists do not rule out the possibility of *some* genotoxic risk from exposures to glyphosate-based herbicides under normal conditions, nor the possibility of *significant* genotoxic risk in the event of unusually high glyphosate-based herbicide exposure episodes.

76.     Over the years, Monsanto systematically attacked scientists whose research threatened their profits. For example, in an April 2001 email, Heydens warned his colleagues that "[d]ata generated by academics has always been a major concern for us in the defense of our products."

| Message | |
|---|---|
| From: | HEYDENS, WILLIAM F [FND/1000] [/O=MONSANTO/OU=NA-1000-01/CN=RECIPIENTS/CN=230737] |
| Sent: | 4/10/2001 6:09:25 PM |
| To: | JACOBS, ERIK [AG/5040] [erik.jacobs@monsanto.com]; MARTENS, MARK A [AG/5040] [mark.a.martens@monsanto.com]; MCKENNA, RUTH M [AG/5040] [ruth.m.mckenna@monsanto.com]; VAN BOSSUYT, ALFRED [AG/5035] [alfred.van.bossuyt@monsanto.com] |
| Subject: | RE: Propachlor sample request |

All,

Please don't do anything until we discuss this.  Data generated by academics has always been a major concern for us in the defense of our products.

77.     In an email from October 2008, Dean Nasser, a Monsanto employee, sent his colleagues a study showing the link between glyphosate and non-Hodgkin's lymphoma:

---Original Message---
**From:** Nasser Dean ███████████████
**Sent:** Tuesday, October 14, 2008 11:33 AM
**To:** Scott Kohne ; Karen Cain ; FARMER, DONNA R [AG/1000]; GOUGH, GEORGE N [AG/1230]; ████████
**Cc:** McAllister, Ray
**Subject:** Study Shows Herbicides Increase Risk of Non-Hodgkin's Lymphoma - Beyond Pesticides, October 14

**Study Shows Herbicides Increase Risk of Non-Hodgkin's Lymphoma**

**(Beyond Pesticides, October 14, 2008)**

78.    Dr. Farmer responded: "We have been aware of this paper for awhile and knew it would only be a matter of time before the activists pick it up… how do we combat this?"

Nassar,

Thank you for forwarding this. We have been aware of this paper for awhile and knew it would only be a matter of time before the activists pick it up. I have some epi experts reviewing it. As soon as I have that review we will pull together a backgrounder to use in response.

Here is their bottom line...how do we combat this?

Avoid carcinogenic herbicides in foods by supporting organic agriculture, and on lawns by using non-toxic land care strategies that rely on soil health, not toxic herbicides.

79.    In 2012, Monsanto executives discussed their efforts to retract a paper written by Professor Seralini in the journal Food and Chemical Toxicology, which pertained to the biological plausibility of glyphosate as a human carcinogen—a conclusion adverse to Monsanto's commercial agenda. Specifically, Monsanto executives galvanized scientists to send letters to the magazine's Editor-in-Chief seeking retraction of the Seralini study. In correspondence from September 2012, Monsanto employee Dr. Goldstein stated: "I was uncomfortable even letting shareholders know we are aware of this LTE…it implies we had something to do with it-otherwise how do we have knowledge of it? I could add 'Aware of multiple letters to editor including one signed by 25 scientists from 14 countries' if you both think this is OK." He added that he was being asked "to keep internal correspondence down on this subject."

Considered doing this already- but I was uncomfortable even letting shareholders know we are aware of this LTE.... It implies we had something to do with it- otherwise how do we have knowledge of it?

I could add "Aware of multiple letters to editor including one signed by 25 scientists from 14 countries" if you both think this is OK.

We are being asked to keep internal correspondence down on this subject.

80.    In response, Eric Sachs said: "We are 'connected' but did not write the letter or encourage anyone to sign it."

81.    In a document outlining the "Business Goals" of Monsanto employee David Saltmiras for the fiscal year 2013, Dr. Saltmiras wrote: "Throughout the late 2012 Seralini rat cancer publication and media campaign, I leveraged my relationship the Editor of Chief of the publishing journal, Food and Chemical Toxicology and was the single point of contact between Monsanto and the Journal." Moreover, Dr. Saltmiras acknowledged that he "[s]uccessfully facilitated numerous third party expert letters to the editor which were subsequently published, reflecting the numerous significant deficiencies, poor study design, biased reporting and selective statistics employed by Seralini."

82.    In multiple other letters and correspondence, Monsanto has expressed its intent to attack independent scientists who raised concerns about the toxicity of its products.

83.    In late 2014, the International Agency for Research on Cancer (IARC) announced that it was recommending dozens of pesticides for evaluation, including glyphosate. When the IARC review was announced, Monsanto's Donna Farmer wrote to former employee, John Acquavella, in an email dated September 18, 2014: "Just wanted to let you that what we have long been concerned about has happened. [sic] Glyphosate is on for an IARC review in March 2015." Farmer then wrote: "Glyphosate had been listed as a medium priority for 2015-2016 but clearly something happened and it got *moved* up to ultra priority."

84.    Monsanto not only anticipated the carcinogenic classification for glyphosate and glyphosate-based formulations, but pro-actively sought to combat the expected result by engaging supposed third-party academics who acted on Monsanto's behalf as purportedly "independent"

experts in signing onto Monsanto ghostwritten reports which were then published in leading toxicology journals and in the media.

85.    In an email dated February 19, 2015, one month prior to the release of the IARC report on glyphosate, Monsanto executive William Heydens proposed that the company "ghost-write" sections of a paper on Roundup's toxicity. In the email, Heydens wrote that they would "add Greim and Kier or Kirkland to have their names on the publication, but we would be keeping the cost down by us doing the writing and they would just edit & sign their names so to speak." Heydens also wrote that this is how Monsanto had "handled" an earlier paper on glyphosate's safety.

86.    As discussed more fully in the following section, the IARC released its findings in March 2015. The report classified Roundup as "probably carcinogenic." After the release of the IARC report, Monsanto set to work on a campaign to influence the press and public perception regarding the safety of its products. Again, the campaign involved ghostwriting drafts of articles that would appear in respected news magazines. In an email dated March 12, 2015, Eric Sachs of Monsanto asked Henry Miller, a Forbes contributor and fellow of the Stanford Hoover Institute, to write about the IARC "process and controversial decision" to classify Roundup as probably carcinogenic. Mr. Miller responded that he would be willing to assist Monsanto if he "could start from a high-quality draft." In response, Monsanto informed Mr. Miller that Monsanto already had "a draft nearly done" that it would send to Mr. Miller by tomorrow.

From: "ERIC S SACHS [AG/1000]" ◄ ▮▮▮▮▮▮▮▮▮ ►
To: "Henry Miller" ◄ ▮▮▮▮▮ @ ▮▮▮▮▮▮
Sent: Tuesday, March 17, 2015 10:23:03 AM
Subject: RE: IARC Outcomes, Process, and Response

We have a draft nearly done and will send to you by tomorrow.

Eric

87.   In another email dated May 11, 2015 and entitled "RE: Post-IARC Activities to Support Glyphosate," Heydens wrote that Monsanto would ghost-write a manuscript refuting the animal data cited by the IARC, noting that the manuscript "would be more powerful if authored by non-Monsanto scientists (e.g., Kirkland, Kier, Williams, Greim, and maybe Keith Solomon)":

Publication on Animal Data Cited by IARC
- It was noted that this is only other idea that could be done prior to IARC Monograph publication
- Manuscript to be initiated by MON as ghost writers
- It was noted this would be more powerful if authored by non-Monsanto scientists (e.g., Kirkland, Kier, Williams, Greim and maybe Keith Solomon)
- Decide within 1-2 weeks if we will recommend going forward with this

88.   After the IARC report came out, Monsanto also organized an ostensibly independent "Expert Panel" for the purpose of conducting an evaluation of the IARC data. But the Expert Panel was anything but an independent collection of neutral scientists rendering an opinion on the toxicity of glyphosate. The conclusions of the Expert Panel were substantially edited and/or authored by Monsanto's own executives.

89.   The question of the ethical permissibility of ghostwriting arose when, in the course of assigning authorship, a member of the Expert Panel and former Monsanto employee, John Acquavella, was excluded from a poster planned for a 2015 Society for Risk Analysis meeting. In

response, Heydens wrote in an email to Acquavella dated November 3, 2015: "I thought we discussed previously that it was decided by our management that we would not be able to use you or Larry [Kier] as Panelists/authors because of your prior employment at Monsanto . . . ." Acquavella responded: "I didn't realize that Bill. Also, I don't think that will be okay with my panelists. We call that ghost writing and it is unethical." In another email to Heydens in the same chain, Acquavella wrote: "I can't be part of deceptive authorship on a presentation or publication. Please note the ICJME guidelines below that everyone goes by to determine what is honest/ethical regarding authorship."

You guys know me. I can't be part of deceptive authorship on a presentation or publication. Please note the ICJME guidelines below that everyone goes by to determine what is honest/ethical regarding authorship.

90.     These concerns did not stop Monsanto from continuing to influence and author reviews on the safety of glyphosate, while advertising the work as independent. In July 2016, the journal Critical Reviews in Toxicology published "A review of the carcinogenic potential of glyphosate by four independent expert panels and comparison to the IARC assessment." Sixteen scientists signed their names to the published work, declaring to readers that their conclusions were free of Monsanto's intervention. Underscoring the supposed independence of the work, the declaration of interest section of the published review stated: "Neither any Monsanto company employees nor any attorneys reviewed any of the Expert Panel's manuscripts prior to submission to the journal." This was false. Internal Monsanto documents reveal that Heydens not only reviewed the manuscripts but had a hand in drafting and editing them. The finished papers were aimed directly at discrediting IARC's classification. In one internal email, Heydens told the

organizer of the panel: "I have gone through the entire document and indicated what I think should stay, what can go, and in a couple spots I did a little editing."

| From: | HEYDENS, WILLIAM F [AG/1000] [/O=MONSANTO/OU=NA-1000-01/CN=RECIPIENTS/CN=230737] |
|---|---|
| Sent: | 2/9/2016 11:43:08 PM |
| To: | Ashley Roberts Intertek ▮▮▮▮▮▮▮ |
| Subject: | RE: summary article |
| Attachments: | Summary Manuscript Draft 2 0 Feb 5 2016_jfa_wfh.docx |

Ashley,

OK, I have gone through the entire document and indicated what I think should stay, what can go, and in a couple spots I did a little editing. I took a crack at adding a little text on page 10 to address John's comments about toxicologists' use of Hill's criteria – see what you think; it made sense to me, but I'm not sure if it will to others - please feel free to further modify and/or run by Gary.

After you have looked through this, let's discuss.

91.     Internal Monsanto documents show that Heydens even argued over statements that he wanted included but that John Acquavella deemed "inflammatory" and "not necessary" criticisms of the IARC. Heydens' edits to draft documents contradicted Acquavella, even though Heydens was not supposed to have even reviewed the papers. Heydens went so far as to state: "I would ignore John's comment" and "I don't see a reason for deleting the text that John did below."

92.     The scientific literature is littered with ghostwritten papers declaring Roundup and glyphosate to be safe. Through its ghostwriting campaigns, Monsanto sought to hide or discredit independent research showing that its products are hazardous to human health. All the while, Monsanto advertised its products as completely safe and non-toxic to an unsuspecting public.

**False Representations Regarding the Safety of Roundup**

93.     In 1996, the New York Attorney General ("NYAG") filed a lawsuit against Monsanto based on its false and misleading advertising of Roundup products. Specifically, the

lawsuit challenged Monsanto's general representations that its spray-on glyphosate-based herbicides, including Roundup, were "safer than table salt" and "practically non-toxic" to mammals, birds, and fish. Among the representations the NY AG found deceptive and misleading about the human and environmental safety of glyphosate and/or Roundup are the following:

a. "Remember that environmentally friendly Roundup herbicide is biodegradable. It won't build up in the soil so you can use Roundup with confidence along customers' driveways, sidewalks and fences..."

b. "And remember that Roundup is biodegradable and won't build up in the soil. That will give you the environmental confidence you need to use Roundup everywhere you've got weed, brush, edging or trimming problem."

c. "Roundup biodegrades into naturally occurring elements."

d. "Remember that versatile Roundup herbicide stays where you put it. That means there's no washing or leaching to harm customers' shrubs or other desirable vegetation."

e. "This non-residual herbicide will not wash or leach in the soil. It... stays where you apply it."

f. "You can apply Accord with...confidence because it will stay where you put it...it bonds tightly to soil particles, preventing leaching. Then, soon after application, soil microorganisms biodegrade Accord into natural products."

g. "Glyphosate is less toxic to rats than table salt following acute oral ingestion."

h. "Glyphosate's safety margin is much greater than required. It has over a 1,000-fold safety margin in food and over a 700-fold safety margin for workers who manufacture it or use it."

i. "You can feel good about using herbicides by Monsanto. They carry a toxicity category rating of 'practically non-toxic' as it pertains to mammals, birds and fish."

j. "Roundup can be used where kids and pets will play and breaks down into natural material." This ad depicts a person with his head in the

ground and a pet dog standing in an area which has been treated with Roundup.[7]

94.     On November 19, 1996, Monsanto entered into an Assurance of Discontinuance with NYAG, in which Monsanto agreed, among other things, "to cease and desist from publishing or broadcasting any advertisements [in New York] that represent, directly or by implication" that:

    a.  its glyphosate-containing pesticide products or any component thereof are safe, non-toxic, harmless or free from risk.

    b.  its glyphosate-containing pesticide products or any component thereof manufactured, formulated, distributed or sold by Monsanto are biodegradable

    c.  its glyphosate-containing pesticide products or any component thereof stay where they are applied under all circumstances and will not move through the environment by any means.

    d.  its glyphosate-containing pesticide products or any component thereof are "good" for the environment or are "known for their environmental characteristics."

    e.  glyphosate-containing pesticide products or any component thereof are safer or less toxic than common consumer products other than herbicides

    f.  its glyphosate-containing products or any component thereof might be classified as "practically non-toxic."

95.     Monsanto did not alter its advertising in the same manner in any state other than New York, and on information and belief it still has not done so today.


**IARC Classification of Glyphosate**

96.     On March 15, 2015, the International Agency for Research on Cancer ("IARC"), an agency of the World Health Organization ("WHO"), issued an evaluation of several herbicides,

---

[7] Attorney General of the State of New York, In the Matter of Monsanto Company, Assurance of Discontinuance Pursuant to Executive Law § 63(15) (Nov. 1996).

including glyphosate. That evaluation was based, in part, on studies of exposure to glyphosate in several countries around the world, and it traces the health implications from exposure to glyphosate since 2001. The summary published in The Lancet Oncology reported that glyphosate is a Group 2A agent and probably carcinogenic in humans.

97.     On July 29, 2015, IARC issued the formal monograph relating to glyphosate. In that monograph, the IARC Working Group provides a thorough review of the numerous studies and dates relating to glyphosate exposure in humans.

98.     The IARC process for the classification of glyphosate followed IARC's stringent procedures for the evaluation of a chemical agent. Evaluations are performed by panels of international experts, selected based on their expertise and the absence of actual or apparent conflicts of interest.

99.     In preparing its Monograph, a Working Group of 17 experts from 11 countries met at IARC from March 3-10, 2015 to assess the carcinogenicity of certain herbicides, including glyphosate.

100.     The March meeting culminated a nearly one-year review and preparation by the IARC Secretariat and the Working Group, including a comprehensive review of the latest available scientific evidence.

101.     Glyphosate was identified as the second-most used household herbicide in the United States for weed control between 2001 and 2007 and the most heavily used herbicide in the world in 2012.

102.     Exposure pathways are identified as air (especially during spraying), water, and food. Community exposure to glyphosate is widespread and found in soil, air, surface water, and groundwater, as well as in food.

103.    The assessment of the IARC Working Group identified several case control studies of occupational exposure in the United States, Canada, and Sweden.  These studies show a human health concern from agricultural and other work-related exposure to glyphosate.

104.    The IARC Working Group found an increased risk between exposure to glyphosate and non-Hodgkin lymphoma and several subtypes of non-Hodgkin lymphoma, and the increased risk persisted after adjustment for other pesticides.

105.    The IARC Working Group also found that glyphosate caused DNA and chromosomal damage in human cells.  One study in community residents reported increases in blood markers of chromosomal damage (micronuclei) after glyphosate formulations were sprayed.

106.    In male CD-I mice, glyphosate induced a positive trend in the incidence of a rare tumor: renal tubule carcinoma. A second study reported a positive trend for haemangiosarcoma in male mice. Glyphosate increased pancreatic islet-cell adenoma in male rats in two studies. A glyphosate formulation promoted skin tumors in an initiation-promotion study in mice.

107.    The IARC Working Group also noted that glyphosate has been detected in the urine of agricultural workers, indicating absorption. Soil microbes degrade glyphosate to aminomethylphosphoric acid (AMPA).  Blood AMPA detection after exposure suggests intestinal microbial metabolism in humans.

108.    In addition, the IARC Working Group found that glyphosate and glyphosate formulations induced DNA and chromosomal damage in mammals, and in human and animal cells in utero.

109.    The IARC Working Group also noted genotoxic, hormonal, and enzymatic effects in mammals exposed to glyphosate. Essentially, glyphosate inhibits the biosynthesis of aromatic

amino acids, which leads to several metabolic disturbances, including the inhibition of protein and secondary product biosynthesis and general metabolic disruption.

110.   Additionally, the IARC Working Group reviewed an Agricultural Health Study, consisting of a prospective cohort of 57,311 licensed pesticide applicators in Iowa and North Carolina. While this study differed from others in that it was based on a self-administered questionnaire, the results support an association between glyphosate exposure and multiple myeloma, hairy cell leukemia (HCL), and chronic lymphocytic leukemia (CLL), in addition to several other cancers.

111.   The IARC evaluation confirms that glyphosate is toxic to humans.

112.   Nevertheless, Monsanto since it began selling Roundup has represented it as safe to humans and the environment. Monsanto has repeatedly proclaimed and continues to proclaim that glyphosate-based herbicides, including Roundup, create no unreasonable risk to human health or to the environment.

113.   In a document titled "Glyphosate/Roundup in the News, Safety Information" issued on March 27, 2017, Monsanto disputes the findings of the IARC and states the following: "All labeled uses of glyphosate are safe for human health and supported by one of the most extensive worldwide human health databases ever compiled on a pesticide."[8]

114.   Dow and Albaugh, who manufacture the aquatic glyphosate-based products Rodeo and Aqua Star respectively, also continue to sell their products containing glyphosate, thereby assuring the public that their products are not hazardous to human health or to the environment.

### The EPA's Review of Glyphosate

---

[8] Monsanto, *Glyphosate/Roundup In the News, Safety Information,*
http://www.monsantoito.com/docs/Glyphosate_IT_O_Briefing.pdf, at 1 (March 27, 2015).

115.    On September 12, 2016, the EPA's Office of Pesticides Program ("OPP") submitted a report, titled "Glyphosate Issue Paper: Evaluation of Carcinogenic Potential," wherein it issued a "proposed conclusion" that glyphosate is "'not likely to be carcinogenic to humans' at doses relevant to human health risk assessment."[9]

116.    The report is based upon a review of industry-sponsored articles and studies. The OPP acknowledged that it rejected all studies that considered Roundup—the formulated product— instead of studies that isolated glyphosate because "[g]lyphosate formulations contain various components other than glyphosate and it has been hypothesized these components are more toxic than glyphosate alone."[10]

117.    Thus, the OPP notes in the report that dozens of studies considered by IARC were not reviewed by the OPP because the OPP's "evaluation focused on studies on the active ingredient glyphosate" and "additional research could also be performed to determine whether formulation components, such as surfactants, influence the toxicity of glyphosate formulations."[11]

118.    From December 13 to 16, 2016, the EPA held FIFRA Scientific Advisory Panel ("SAP") meetings to consider issues raised by the OPP's evaluation of glyphosate.  Again, OPP only allowed the SAP to consider studies of glyphosate alone, and not any study of the formulated product. In its Charge to the FIFRA SAP, the OPP noted that "[a]lthough there are studies available on glyphosate-based pesticide formulations, the agency is soliciting advice from the FIFRA

---

[9] *See* EPA's Office of Pesticide Programs, Glyphosate Issue Paper; Evaluation of Carcinogenic Potential (Sept. 12, 2016), available at https://www.epa.gov/sites/production/files/2016-09/documents/glyphosate_issue_paper_evaluation_of_carcinogenic_potential.pdf.
[10] *Id.*
[11] *Id.*

33

Scientific Advisory Panel (SAP) on this evaluation of human carcinogenic potential for the active ingredient glyphosate only at this time."[12]

119.   The OPP draft assessment does not actually consider how glyphosate, in conjunction with other chemicals, affects not only carcinogenicity but other physical injuries and illnesses.

### Other Studies on the Toxicity of Glyphosate

120.   In 2013, a study published in the scientific journal *Entropy* found that contrary to the current widely-held misconception that glyphosate is relatively harmless to humans, the available evidence shows that glyphosate may be the most important factor in the development of multiple chronic diseases and conditions such as inflammatory bowel disease, anorexia nervosa, obesity, diabetes, heart disease, depression, autism, infertility, cancer and Alzheimer's disease. By interfering with the biochemistry of bacteria in our gastrointestinal tract, consumption of glyphosate depletes essential amino acids and predisposes humans to a host of chronic health problems.[13]

121.   In 2016, the Ramazzini Institute, along with Bologna University, the Italian National Health Institute, George Washington State University and the Icahn School of Medicine, launched the Global Glyphosate Study as a pilot study. It was a single-dose study on the health effects of glyphosate-based herbicides on Sprague Dawley rats, which had been dosed with the U.S. EPA-determined safe limit of 1.75 micrograms per kilo of body weight. The results published in May 2018 showed that glyphosate-based herbicides—at doses deemed safe and over a relatively

---

[12] EPA OPP, Glyphosate: Evaluation of Carcinogenic Potential, Charge to the FIFRA SAP for the October 18-21, 2016 Meeting, available at, https://www.epa.gov/sites/production/files/2016-11/documents/glyphosate_sap_charge_questions_-final.pdf.

[13] Anthony Samsel and Stephanie Seneff, *Glyphosate's Suppression of Cytochrome P450 Enzymes and Amino Acid Biosynthesis by the Gut Microbiome: Pathways to Modern Diseases*, ENTROPY, 2013 at 15.

short exposure time—can alter certain important biological parameters. markers chiefly relating to sexual development, genotoxicity, and alteration of the intestinal microbiome. In sum, the scientists involved concluded that the results show that glyphosate poses a significant public health concern.

122.    Several other studies have demonstrated that exposure to low doses of glyphosate can have detrimental health effects on humans and animals.[14]

123.    In addition to the toxicity of the active ingredient, glyphosate, several studies support the hypothesis that glyphosate-based formulations in Roundup and other products are more dangerous and toxic that glyphosate alone.

124.    Several countries around the world have instituted bans on the sale of Roundup and other glyphosate-containing herbicides, both before and after the IARC first announced its assessment for glyphosate in March 2015.

125.    Defendant Andrew Jack Conroy is an IT&O Account Representative for Monsanto, responsible for sales and marketing to distributors, retailers, and users of Roundup and other glyphosate-containing products in Florida. Mr. Conroy engaged in the marketing, promotion and sale of these products, aware of their carcinogenic or potentially carcinogenic properties, but failed to inform any of his sales targets of such danger.

---

[14] John P. Myers, et al., Concerns over use of glyphosate-based herbicides and risks associated with exposures:    a    consensus    statement,    15    Environ.    Health    9    (2016),    available    at https://ehjournal.biomedcentral.com/articles/10.1186/s12940-016-0117-0; *see also* Gilles-Eric Seralini, et al, Republished study: long-term toxicity of a Roundup herbicide and a Roundup tolerant genetically modified maize, 26 Environ. Sci. Europe 14 (2014), available at http://enveurope.springeropen.com/articles/10.1186/s12302-014-0014-5; A.L. Benedetti, et al., The effects of sub-chronic exposure of Wistar rats to the herbicide Glyphosate-Biocarb, 153(2) Toxicol. Lett. 227-32 (2004), available at http://www.ncbi.nlm.nih.gov/pubmed/15451553; K. Larsen, et al., Effects of Sublethal Exposure to a Glyphosate-Based Herbicide Formulation on Metabolic Activities of Different Xenobiotic-Metabolizing    Enzymes    in    Rats,    33(4)    Int.    J.    Toxicol.    307-18    (Jul.    2014),    available    at http://www.ncbi.nlm.nih.gov/pubmed/24985121; Robin Mesnage, et al., Transcriptome profile analysis reflects rat liver and kidney damage following chronic ultra-low dose Roundup exposure, 14 Environ. Health 70 (2015), available at http://www.ncbi.nlm.nih.gov/pmc/articles/PMC4549093.

126.    Defendant Home Depot was at all relevant times, engaged in the retail and sale of Roundup products manufactured by Monsanto throughout Miami-Dade County, Florida. Plaintiff purchased Roundup products for use at her residences at the Home Depot stores set forth above.

127.    Defendant Home Depot had superior knowledge compared to Roundup users and consumers, including regarding the carcinogenic properties of the product, yet failed to accompany its sales and/or marketing of Roundup with any warnings or precautions for that grave danger.

128.    Defendant KLI Shell Lumber was at all relevant times, engaged in the retail and sale of Roundup products manufactured by Monsanto throughout Monroe County, Florida. Plaintiff purchased Roundup products for use at her residences at the KLI Shell Lumber store set forth above.

129.    Defendant KLI Shell Lumber had superior knowledge compared to Roundup users and consumers, including regarding the carcinogenic properties of the product, yet failed to accompany its sales and/or marketing of Roundup with any warnings or precautions for that grave danger.

130.    Defendant Orlando Valdes is the owner and CEO of the KLI Shell Lumber retail store in Key Largo, Florida, and is responsible for and/or has substantial control over the sales and marketing to users of Roundup and other glyphosate-containing products in Florida. Mr. Valdes engaged in the marketing, promotion and/or sale of these products, aware of their carcinogenic or potentially carcinogenic properties, but failed to inform any of his sales targets of such danger.

131.    Defendant Transform SR Development d/b/a Kmart was at all relevant times, engaged in the retail and sale of Roundup products manufactured by Monsanto. Plaintiff purchased Roundup products for use at her residences at the Transform SR Development d/b/a Kmart store set forth above.

132. Defendant Transform SR Development d/b/a Kmart had superior knowledge compared to Roundup users and consumers, including regarding the carcinogenic properties of the product, yet failed to accompany its sales and/or marketing of Roundup with any warnings or precautions for that grave danger.

133. Defendant Jose Luis Martinez-Alvarez is the manager of the Transform SR Development d/b/a Kmart retail store in Key Largo, Florida, and is responsible for and/or has substantial control over the sales and marketing to users of Roundup and other glyphosate-containing products in Florida. Mr. Martinez-Alvarez engaged in the marketing, promotion and/or sale of these products, aware of their carcinogenic or potentially carcinogenic properties, but failed to inform any of his sales targets of such danger.

**Plaintiff's Exposure to Roundup**

134. Plaintiff Nancy C. Salas has been a Florida resident since childhood.

135. Ms. Salas used Roundup products at her residences in Key Largo, Florida, and Miami, Florida, from approximately 2004 through 2014.

136. Ms. Salas purchased Roundup herbicide at Home Depot, KLI Shell Lumber, and Transform SR Developments d/b/a Kmart at the aforementioned store locations.

137. Ms. Salas would spray Roundup year-round to control the weeds on her properties. Ms. Salas used both the premixed and the concentrated varieties of Roundup. She mixed the Roundup herself into the container and used a handheld sprayer. Additionally, she also used the premixed Roundup bottles that have an attached spray nozzle.

138. Ms. Salas stopped spraying Roundup in approximately 2014.

139. In June of 2020 Ms. Salas began to feel ill and underwent various diagnostic tests.

140.   In July of 2020 Ms. Salas was diagnosed with Stage IV non-Hodgkin's lymphoma.
She immediately began aggressive chemotherapy treatments.

141.   During the entire time that Plaintiff was exposed to Roundup, she did not know that
exposure to Roundup was injurious to her health or to the health of others.

### COUNT I
### STRICT PRODUCTS LIABILITY
**(Against Monsanto and Andrew Jack Conroy)**

142.   Plaintiff incorporates by reference each and every allegation set forth in the
preceding paragraphs as if fully stated herein.

143.   This is a cause of action for strict products liability, including design defect,
manufacturing defect, and failure to warn.

144.   **Product:** Monsanto and Mr. Conroy designed, developed, manufactured,
marketed, tested, assembled, labeled, distributed, sold, advertised, promoted, and placed into the
stream of commerce Roundup products, which are defective and unreasonably dangerous, and to
which Plaintiff was exposed. Monsanto and Mr. Conroy knew or reasonably should have foreseen
that the ultimate users, consumers, and persons exposed to Roundup products could not properly
inspect for defects or dangers and that the detection of such defects or dangers could be beyond
the capabilities of such persons.

145.   **Defects:** Roundup products as researched, tested, developed, designed, licensed,
manufactured, packaged, labeled, distributed, sold, and marketed were defective and unreasonably
dangerous. At the time Roundup left Defendants' control and was placed in the stream of
commerce, Roundup had been manufactured defectively and designed defectively because it was
in a condition that was unreasonably dangerous to the users and persons in the vicinity of the
product; Roundup had been designed defectively because it failed to perform as safely as an

ordinary consumer would expect when used as intended or when used in a manner reasonably foreseeable by the manufacturer; Roundup had been designed defectively because the risk of danger in its design and formulation outweighed its benefits, and because there were alternative, safer designs and formulations that were feasible; and Roundup was defective because the foreseeable risks of harm from Roundup could have been reduced or avoided by providing reasonable instructions or warnings, yet no such instructions or warnings were given. Specifically, Roundup was defective and unreasonably dangerous when placed in the stream of commerce for one or more of the following reasons:

    a.    It was defective in design and formulation and dangerous to an extent beyond that which an ordinary consumer would contemplate;

    b.    It was unreasonably dangerous in that it was hazardous and posed a grave risk of serious illness when used in a reasonably anticipated manner;

    c.    It was otherwise designed in a way that exposed persons to unnecessary and unreasonable risks, including by failing to provide adequate safeguards to protect persons exposed to foreseeable injuries;

    d.    Defendants failed to adequately test, investigate, and/or study Roundup products, including both its active ingredient glyphosate and any other ingredients, to ensure their safety;

    e.    Exposure to Roundup products presents a risk of harmful side effects that outweigh any potential utility stemming from use;

    f.    Defendants knew or should have known at the time of marketing Roundup products that exposure to Roundup products could result in severe injuries and illness;

    g.    Defendants did not conduct adequate post-marketing surveillance of its Roundup products;

    h.    Defendants could have employed safer alternative designs and formulations;

    i.    Defendants failed to use due care in the manufacturing and formulation of Roundup products;

j.    Defendants failed to use due care in warning of the risks associated with the use of and exposure to Roundup products;

k.    Defendants failed to use due care in minimizing the dangers to users, consumers, and persons exposed to Roundup products, and to those who would foreseeably use or be harmed by Roundup products;

l.    Defendants failed to provide adequate warnings or instructions concerning the dangerous characteristics of Roundup and/or the full and complete risks of exposure to Roundup and glyphosate-containing products.

m.    Defendants failed to adequately label, market, and promote Roundup products to ensure that such products did not cause persons exposed to them to suffer from unreasonable and dangerous risks;

n.    Defendants failed to give appropriate warnings about other risks of which Monsanto knew or should have known are involved in the reasonably foreseeable use of Roundup products.

146.    The defects described above rendered Roundup unreasonably dangerous by making it dangerous to an extent beyond that which would be contemplated by the ordinary consumer with the knowledge common to the community as to its characteristics.

147.    The defects in Roundup products were present when Monsanto and Mr. Conroy placed them into the stream of commerce. Roundup products reached the intended consumers, handlers, users and other persons coming into contact and exposed with these products in Florida, including Plaintiff, without substantial change in their condition as designed, manufactured, sold, distributed labeled, and marketed by Monsanto and Mr. Conroy.

148.    At all times material, Roundup products were being used in a manner intended by Monsanto and Mr. Conroy, and in a manner that was reasonably foreseeable by them as involving a substantial danger not readily apparent.

149.    It was foreseeable that Plaintiff would be exposed to Roundup products.

150.   **Causation**: As a direct and proximate result of the defects in Roundup products, Plaintiff was exposed to glyphosate and other ingredients in Roundup products, causing or substantially contributing to Plaintiff's injuries. But for the defects in Roundup products, Plaintiff's injuries would not have occurred.

151.   **Damages**: Plaintiff has been damaged and claims all damages to which she is entitled, including, as applicable law may provide, but not limited to:

    a.  bodily injury resulting in pain and suffering, disability and/or disfigurement;

    b.  mental anguish;

    c.  loss of capacity for enjoyment of life;

    d.  loss of earnings and/or loss of ability to earn money;

    e.  expensive hospitalization, medical treatment and/or care which losses are either permanent or will continue; and/or

    f.  all damages available under applicable law.

WHEREFORE, the Plaintiff, Nancy Salas, demands judgement against Defendants Monsanto and Andrew Jack Conroy for compensatory damages, costs, and such other relief this Court deems appropriate.

## COUNT II
### NEGLIGENCE
**(Against Monsanto and Andrew Jack Conroy)**

152.   Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

153.   This is a cause of action for negligence, including design defect, manufacturing defect, and failure to warn.

154.   **Duty**: Monsanto and Mr. Conroy had a duty to use reasonable care in the design, research, development, testing, assembly, packaging, manufacture, labeling, marketing, advertisement, promotion, sale, and distribution of its Roundup products in order to avoid persons exposed to Roundup products to unnecessary and unreasonable risks.

155.   Monsanto and Mr. Conroy's duty of care included providing accurate, true, and correct warnings concerning the potential adverse effects of exposure to Roundup products.

156.   **Breach**: Monsanto and Mr. Conroy breached that duty by acting in a way that a reasonably careful manufacturer, designer, advertiser, marketer, promotor, and distributor would not act under like circumstances and by failing to take actions that a reasonably careful manufacturer, designer, advertiser, marketer, promotor and distributor would take under like circumstances.   Specifically, Defendants breached their duty of care in one or more of the following ways:

    a.  By manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing Roundup products without thorough and adequate pre- and post-market testing;

    b.  By manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing Roundup products while negligently and/or intentionally concealing and failing to disclose the results of trials, tests, and studies of exposure to glyphosate and other ingredients in Roundup products, and consequently the risk of serious harm associated with human use and exposure to Roundup;

    c.  By failing to undertake sufficient studies and conduct necessary tests to determine whether or not Roundup products and glyphosate-containing products were safe for their intended use;

    d.  By failing to use reasonable and prudent care in the design, research, manufacture, and development of Roundup products so as to avoid the risk of harm associated with exposure to Roundup and/or glyphosate as an herbicide;

    e.  By failing to design and manufacture Roundup products so as to ensure they were at least as safe and effective as other herbicides on the market;

f.  By failing to provide adequate instructions, guidelines, and safety precautions to those persons who Defendants could reasonably foresee would use and/or be exposed to its Roundup products;

g.  By failing to disclose to consumers and the general public, including Plaintiff, that the product's risk of harm was unreasonable and that there were safer and effective alternative herbicides available;

h.  By failing to give appropriate warnings about other risks of which Defendants knew or should have known are involved in the reasonably foreseeable use of and/or exposure to Roundup products;

i.  By systemically suppressing or downplaying contrary evidence about the risks, incidence, and/or prevalence of the side effects of Roundup and glyphosate-containing products;

j.  By representing that its Roundup products were safe for their intended use when, in fact, Defendants knew or should have known that the products were not safe for their intended purpose;

k.  By declining to make or propose any changes to Roundup products' labeling or other promotional materials that would alert consumers and the general public of the risks of Roundup, glyphosate, and any other ingredients in Roundup products;

l.  By advertising, marketing, and recommending the use of Roundup products, while concealing and/or failing to disclose or warn of the dangers known by Defendants to be associated with or caused by the use of or exposure to Roundup, glyphosate, and any other ingredients in Roundup products;

m.  By continuing to disseminate information to its consumers, which indicate or imply that Roundup products are not unsafe for use;

n.  By continuing the manufacture and sale of its products with the knowledge that the products were unreasonably unsafe and dangerous.

157.   Monsanto and Mr. Conroy knew or reasonably should have foreseen that individuals such as Plaintiff would suffer injuries as a result of their failure to exercise reasonable care in the manufacturing, marketing, labeling, distribution, and sale of Roundup products.

158.   **Causation**: As a direct and proximate result of the negligence of Monsanto and Mr. Conroy, Roundup products caused Plaintiff's injuries. Defendant's negligence caused or

substantially contributed to causing Plaintiff to suffer economic and non-economic damages. But for their negligence, these injuries, damages, and losses would not have occurred.

159.   **Damages:** Plaintiff has been damaged and claims all damages to which she is entitled, including, as applicable law may provide, but not limited to:

    a.   bodily injury resulting in pain and suffering, disability and/or disfigurement;

    b.   mental anguish;

    c.   loss of capacity for enjoyment of life;

    d.   loss of earnings and/or loss of ability to earn money;

    e.   expensive hospitalization, medical treatment and/or care which losses are either permanent or will continue; and/or

    f.   all damages available under applicable law.

WHEREFORE, the Plaintiff, Nancy Salas, demands judgement against Defendants Monsanto and Andrew Jack Conroy for compensatory damages, costs, and such other relief this Court deems appropriate.

<u>COUNT III</u>
**BREACH OF EXPRESS WARRANTIES**
**(Against Monsanto Company)**

160.   Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

161.   At all relevant times, Defendant Monsanto engaged in the business of testing, developing, designing, formulating, manufacturing, marketing, selling, distributing, and promoting its Roundup products, which are defective and unreasonably dangers to users and consumers, including Plaintiff, thereby placing Roundup products into the stream of commerce. These actions were under the ultimate control and supervision of Defendant.

44

162.   Roundup products were expected to reach and did in fact reach consumers and users, including Plaintiff, without substantial change in the condition in which they were manufactured and sold by Defendant Monsanto.

163.   Before the time that Plaintiff was exposed to Roundup products, Defendant expressly warranted to its consumers and users, including Plaintiff, that its Roundup products were of merchantable quality and safe and fit for the use for which they were intended and were not unreasonably dangerous for their intended purpose, specifically, as horticultural herbicides.

164.   Defendant Monsanto, through its advertising and promotional materials, expressly warranted that Roundup products were safe for their intended use and were not unreasonable dangerous for their intended purpose.

165.   Defendant Monsanto, however, failed to disclose that Roundup products have dangerous propensities when used as intended and that the use of and/or exposure to Roundup and glyphosate-containing products carries an increased risk of developing severe injuries, including Plaintiff's injuries.

166.   The representations, as set forth above, contained or constituted affirmations of fact or promises made by the seller to the buyer which related to the goods and became part of the basis of the bargain creating an express warranty that the goods shall conform to the affirmations of fact or promises.

167.   Defendant Monsanto breached its express warranties, and Roundup did not conform to the representations made by Monsanto, in that Roundup products were not safe for their intended use.

168.   Plaintiff reasonably relied to her detriment on Defendant Monsanto's express warranties.

169.    As a proximate result of Defendant's wrongful acts and omissions in placing its defective Roundup products into the stream of commerce and failing to warn Plaintiff of the increases risk of NHL associated with the use of and/or exposure to Roundup products as described herein, Plaintiff has suffered and continues to suffer severe physical and emotional injuries. Plaintiff has been damaged and claims all damages to which she is entitled, including, as applicable law may provide, but not limited to:

   a.   bodily injury resulting in pain and suffering, disability and/or disfigurement;

   b.   mental anguish;

   c.   loss of capacity for enjoyment of life;

   d.   loss of earnings and/or loss of ability to earn money;

   e.   expensive hospitalization, medical treatment and/or care which losses are either permanent or will continue; and/or

   f.   all damages available under applicable law.

WHEREFORE, the Plaintiff, Nancy Salas, demands judgement against Defendant Monsanto Company for compensatory damages, costs, and such other relief this Court deems appropriate.

## COUNT IV
### FRAUDULENT MISREPRESENTATION
### (Against Monsanto Company)

170.    Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

171.    This is a cause of action for fraudulent misrepresentation under Florida common law.

172.   Defendant Monsanto is the manufacturer, designer, distributor, seller or supplier of Roundup and, while engaged in the course of such business, made representations about material facts to Plaintiff regarding the character and/or quality of Roundup for guidance in her decision to select Roundup for use.

173.   Monsanto had a duty to disclose material information about the serious health effects of its products to consumers such as Plaintiff. Monsanto intentionally failed to disclose this information for the purpose of inducing consumers, including Plaintiff, to purchase Monsanto's dangerous products.

174.   Specifically, Monsanto's advertisements and promotions, regarding Roundup, during the time when Plaintiff purchased and applied Roundup products from April 2001 to February 2012, made material misrepresentations to the effect that Roundup was safe and non-toxic, which Monsanto knew to be false, for the purpose of inducing consumers, such as Plaintiff, to purchase said product. Monsanto further misrepresented that its products were just as safe, just as effective or more effective, than other weed control products on the market.

175.   Monsanto's representations regarding the character or quality of Roundup were untrue. In addition, Monsanto fraudulently suppressed material information regarding the safety of Roundup, including the dangers known by Monsanto to be associated with or caused by the use of or exposure to Roundup products and glyphosate.

176.   Monsanto had actual knowledge based on the results of trials, tests, and studies of exposure to glyphosate, of the risk of serious harm associated with human use of and exposure to Roundup.

177.   Moreover, Monsanto purposely failed to conduct trials, tests, and studies of the risks associated with the full Roundup formulation—rather than merely the active ingredient

glyphosate—because it knew that these tests were likely to reveal that Roundup was unsafe and toxic to humans.

178.    Despite this knowledge, Monsanto intentionally misrepresented or omitted this information in its product labeling, promotions and advertisements. Instead, Monsanto labeled, promoted, and advertised its products as safe and effective when it knew such statements to be false or when it knew that it did not know the truth of such statements in order to avoid losses and sustain profits in its sale of Roundup products to consumers, including Plaintiff.

179.    In supplying the false information, Monsanto failed to exercise reasonable care or competence in obtaining or communicating information to its intended recipients, including Plaintiff.

180.    Plaintiff relied to her detriment upon Monsanto's misrepresentations and/or omissions in its labeling, advertisements, and promotions concerning the serious risks posed by the product. Plaintiff relied upon Monsanto's representations that Roundup was safe for use and that Monsanto's labeling, advertisements, and promotions fully described all known risks of the product.

181.    Monsanto is estopped from relying on any statute of limitations defenses because Monsanto actively concealed the defects from consumers. Instead of revealing the defects, Monsanto continued to represent its products as safe for their intended use.

182.    As a direct and proximate result of Monsanto's negligent misrepresentations, Plaintiff has been damaged and claims all damages to which she is entitled, including, as applicable law may provide, but not limited to:

    a.  bodily injury resulting in pain and suffering, disability and/or disfigurement;

    b.  mental anguish;

 c. loss of capacity for enjoyment of life;

 d. loss of earnings and/or loss of ability to earn money;

 e. expensive hospitalization, medical treatment and/or care which losses are either permanent or will continue; and/or

 f. all damages available under applicable law.

WHEREFORE, the Plaintiff, Nancy Salas, demands judgement against Defendant Monsanto Company for compensatory damages, costs, and such other relief this Court deems appropriate.

**COUNT V**
**NEGLIGENT MISREPRESENTATION**
**(Against Monsanto Company)**

183. Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

184. This is a cause of action for negligent misrepresentation under Florida common law.

185. Defendant Monsanto is the manufacturer, designer, distributor, seller or supplier of Roundup and, while engaged in the course of such business, made representations about material facts to Plaintiff regarding the character and/or quality of Roundup for guidance in his decision to select Roundup for use.

186. Monsanto had a duty to disclose material information about the serious health effects of its products to consumers such as Plaintiff. Monsanto negligently failed to disclose this information for the purpose of inducing consumers, including Plaintiff, to purchase Monsanto's dangerous products.

187.   Specifically, Monsanto's advertisements and promotions regarding Roundup, during the time when Plaintiff purchased and applied Roundup products from April 2001 to February 2012, made material misrepresentations to the effect that Roundup was safe and non-toxic, which Monsanto should have known to be false, for the purpose of inducing consumers, such as Plaintiff, to purchase said product. Monsanto further misrepresented that its products were just as safe, just as effective or more effective, than other weed control products on the market.

188.   Monsanto's representations regarding the character or quality of Roundup were untrue.

189.   Monsanto negligently suppressed material information regarding the safety of Roundup, including the dangers known by Monsanto to be associated with or caused by the use of or exposure to Roundup products and glyphosate.

190.   Based on the results of trials, tests, and studies of exposure to glyphosate, Monsanto should have known or could have reasonably discovered the risk of serious harm associated with human use of and exposure to Roundup.

191.   Monsanto purposely and/or negligently failed to conduct trials, tests, and studies of the risks associated with the full Roundup formulation—rather than merely the active ingredient glyphosate—because it knew that these tests were likely to reveal that Roundup was unsafe and toxic to humans and/or because it wanted to avoid discovering whether Roundup was unsafe or toxic to humans.

192.   As a result, Monsanto negligently misrepresented or omitted this information in its product labeling, promotions and advertisements. Instead, Monsanto labeled, promoted, and advertised its products as safe and effective when it should have known such statements to be false

or when it should have known that it did not know the truth of such statements in order to avoid losses and sustain profits in its sale of Roundup products to consumers, including Plaintiff.

193.    In supplying the false information, Monsanto failed to exercise reasonable care or competence in obtaining or communicating information to its intended recipients, including Plaintiff.

194.    Plaintiff justifiably relied to her detriment upon Monsanto's misrepresentations and/or omissions in its labeling, advertisements, and promotions concerning the serious risks posed by the product. Plaintiff justifiably relied upon Monsanto's representations that Roundup was safe for use and that Monsanto's labeling, advertisements, and promotions fully described all known risks of the product.

195.    Plaintiff could not have reasonably discovered or known of the risks of serious injury associated with Roundup products or glyphosate.

196.    Monsanto is estopped from relying on any statute of limitations defenses because Monsanto actively concealed the defects from consumers. Instead of revealing the defects, Monsanto continued to represent its products as safe for their intended use.

197.    As a direct and proximate result of Monsanto's negligent misrepresentations, Plaintiff has been damaged and claims all damages to which she is entitled, including, as applicable law may provide, but not limited to:

      a.  bodily injury resulting in pain and suffering, disability and/or disfigurement;

      b.  mental anguish;

      c.  loss of capacity for enjoyment of life;

      d.  loss of earnings and/or loss of ability to earn money;

e. expensive hospitalization, medical treatment and/or care which losses are either permanent or will continue; and/or

f. all damages available under applicable law.

WHEREFORE, the Plaintiff, Nancy Salas, demands judgement against Defendant Monsanto Company for compensatory damages, costs, and such other relief this Court deems appropriate.

## COUNT VI
## STRICT LIABILITY
### (Against Home Depot U.S.A, Inc.)

198. Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

199. Defendant Home Depot engaged in the business of selling and distributing glyphosate-based products, including Roundup, to the public for application throughout Miami-Dade County.

200. Plaintiff purchased Roundup products from Home Depot at the specific store addresses listed above, for use at her residences.

201. **Product**: Defendant Home Depot directly placed glyphosate-based herbicides, including Roundup products, on the market (by selling them) for use throughout Miami-Dade County with knowledge that they would be used and applied without inspection for defects and dangers. Defendant knew or should have known that ultimate users and consumers, such as Plaintiff, would not and could not properly inspect these products for defects and dangerous conditions, and that detection of such defects and dangers would be beyond the capabilities of such persons.

202.   **Defects**: Glyphosate-based herbicides, such as Roundup, were defective and unreasonably dangerous when sold by Defendant Home Depot because they failed to perform as safely as an ordinary consumer would expect when used as intended or used in a reasonably foreseeable manner, because the risk of danger in their design outweighed any benefits, and because there were alternative, safer designs that were both technologically and economically feasible.  Specifically, glyphosate-based herbicides, including Roundup products, sold for use throughout Miami-Dade County were defective and unreasonably dangerous for one or more of the following reasons:

    a.   They contain chemicals and ingredients that expose individuals coming into contact with them to unnecessary and unreasonable risks;

    b.   They failed to provide warnings that would alert users and persons exposed to their dangerous conditions;

    c.   They failed to provide users and persons exposed with reasonable safety in the event of foreseeable uses.

    d.   They have a propensity to interact in the body of a person exposed to them in such a way as to cause serious harm;

203.   These defects were present when Defendant Home Depot sold Roundup products to Plaintiff for application at her residences resulting in Plaintiff's exposure to such products.  The defects were expected to and did reach Plaintiff without substantial change affecting their condition.

204.   **Causation**: As a direct and proximate result of the defects in Roundup products sold to Plaintiff, Plaintiff was exposed to unreasonably dangerous chemicals and ingredients. But for the defects in the Roundup products sold to Plaintiff, Plaintiff's injuries would not have occurred.

205.   **Damages:** Plaintiff has been damaged and claims all damages to which she is entitled, including, as applicable law may provide, but not limited to:

    a.   bodily injury resulting in pain and suffering, disability and/or disfigurement;

    b.   mental anguish;

    c.   loss of capacity for enjoyment of life;

    d.   loss of earnings and/or loss of ability to earn money;

    e.   expensive hospitalization, medical treatment and/or care which losses are either permanent or will continue; and/or

    f.   all damages available under applicable law.

WHEREFORE, the Plaintiff, Nancy Salas, demands judgement against Defendant Home Depot U.S.A., Inc. for compensatory damages, costs, and such other relief this Court deems appropriate.

**COUNT VII**
**NEGLIGENCE**
**(Against Home Depot U.S.A., Inc.)**

206.   Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

207.   Defendant Home Depot engaged in the business of selling and distributing Roundup products.

208.   Plaintiff purchased Roundup products from Home Depot at the specific store addresses listed above, for use at her residences from approximately 2004 through 2014.

209.   Defendant Home Depot knew or should have known that Roundup products purchased by Plaintiff were unreasonably dangerous and unsafe, and created a foreseeable and unreasonable risk to persons that were exposed to such products, such as Plaintiff.

210.    **Duty**: Defendant Home Depot had a duty to use reasonable care in the marketing, distribution, and sale of Roundup products purchased by Plaintiff. They had a duty to sell Roundup products in a reasonably safe condition so as not to present a danger to individuals who would be exposed to them, such as Plaintiff.

211.    **Breach**: Defendant Home Depot breached that duty both by not acting in a way that a reasonably careful marketer, distributor, and seller of glyphosate-based herbicides, including Roundup products, would act under like circumstances and by failing to take actions that a reasonably careful marketer, distributor, and seller of glyphosate-based herbicides, including Roundup, would take under like circumstances. Home Depot failed to ensure that the glyphosate-based herbicides it sold to Plaintiff for use at her residences were reasonably safe. Specifically, Home Depot breached that duty in one or more of the following ways by marketing, distributing, and selling glyphosate-based herbicides, including Roundup, that:

    a. Have a propensity to be unreasonably dangerous, hazardous, and unsafe when exposed to them;

    b. Failed to provide adequate instructions, guidelines, warnings, and/or safety precautions regarding the risk of foreseeable exposures, ultimately harming persons, such as Plaintiff, who Home Depot could reasonably foresee would be exposed to such products as a result of its sales and distribution;

    c. Failed to disclose that the product's risk of harm was unreasonable and that there were safer and effective alternative herbicides available;

    d. Failed to give appropriate warnings regarding other foreseeable risks that would result when exposed to such products;

212.    Home Depot breached their duty of care by failing to adequately investigate and ensure that the glyphosate-based herbicides, including Roundup products, that they sold to Plaintiff were reasonably safe for their intended use.

213.   Home Depot failed to warn purchasers of glyphosate-based products, including Roundup, that reasonably foreseeable exposure to such products were unsafe, ultimately harming persons, such as Plaintiff, who Home Depot could reasonably foresee would be exposed to such products as a result of their sales and distribution.

214.   **Causation**: As a direct and proximate result of the negligence of Defendant Home Depot Plaintiff was harmed. Home Depot's negligence caused or substantially contributed to causing Plaintiff to suffer economic and non-economic damages. But for Home Depot's negligence, Plaintiff's injuries, damages, and losses would not have occurred.

215.   **Damages**: Plaintiff has been damaged and claims all damages to which she is entitled, including, as applicable law may provide, but not limited to:

   a.   bodily injury resulting in pain and suffering, disability and/or disfigurement;

   b.   mental anguish;

   c.   loss of capacity for enjoyment of life;

   d.   loss of earnings and/or loss of ability to earn money;

   e.   expensive hospitalization, medical treatment and/or care which losses are either permanent or will continue; and/or

   f.   all damages available under applicable law.

WHEREFORE, the Plaintiff, Nancy Salas, demands judgement against Defendant Home Depot U.S.A., Inc. for compensatory damages, costs, and such other relief this Court deems appropriate.

**COUNT VIII**
**BREACH OF IMPLIED WARRANTIES**
**(Against Home Depot U.S.A, Inc.)**

216.   Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

217.   At all times relevant to this litigation, Defendant Home Depot engaged in the business of selling and distributing Roundup products, which are defective and unreasonably dangerous to consumers, including Plaintiff, thereby placing Roundup products into the stream of commerce. These actions were under the ultimate control and supervision of the Defendant.

218.   Defendant Home Depot sold the defective Roundup products to Plaintiff that she applied at her residences.

219.   Before the time that Plaintiff was exposed to the use of Roundup products, Defendant Home Depot impliedly warranted to consumers, including Plaintiff, that Roundup products were of merchantable quality, safe, and fit for the use for which they were intended; specifically, as horticultural herbicides.

220.   Defendant Home Depot, however, failed to disclose that Roundup has dangerous propensities when used as intended and that the use of and/or exposure to Roundup and glyphosate-containing products carries an increased risk of developing severe injuries, including Plaintiff's injuries.

221.   Plaintiff reasonably relied upon the skill, superior knowledge, and judgment of Defendant Home Depot and upon their implied warranties that the Roundup products were of merchantable quality and fit for their intended purpose or use.

222.   The Roundup products purchased by Plaintiff from Defendant Home Depot were expected to reach and did in fact reach consumers and users, including Plaintiff, without substantial change in the condition in which they were manufactured and sold.

223. Defendants Home Depot intended that Roundup products be used in the manner in which Plaintiff was exposed to them and Defendant impliedly warranted each product to be of merchantable quality, safe, and fit for this use.

224. In reliance upon Defendant Home Depot's implied warranty, Plaintiff used or was exposed to Roundup in the foreseeable manner intended, recommended, promoted and/or marketed by Defendant.

225. Plaintiff could not have reasonably discovered or known of the risks of serious injury associated with Roundup or glyphosate.

226. Defendant Home Depot breached their implied warranty to Plaintiff in that Roundup products were not of merchantable quality, safe, or fit for their intended use. Roundup has dangerous propensities when used as intended and can cause serious injuries, including those injuries complained of herein.

227. The harm caused by Roundup products far outweighed their benefit, rendering the products more dangerous than an ordinary consumer or user would expect and more dangerous than alternative products.

228. As a direct and proximate result of Defendant Home Depot's breaches of implied warranties, Plaintiff has suffered and continues to suffer severe physical and emotional injuries. Plaintiff has been damaged and claims all damages to which she is entitled, including, as applicable law may provide, but not limited to:

      a.  bodily injury resulting in pain and suffering, disability and/or disfigurement;

      b.  mental anguish;

      c.  loss of capacity for enjoyment of life;

      d.  loss of earnings and/or loss of ability to earn money;

   e.  expensive hospitalization, medical treatment and/or care which losses are either

      permanent or will continue; and/or

   f.  all damages available under applicable law.

WHEREFORE, the Plaintiff, Nancy Salas, demands judgement against Defendant Home

Depot U.S.A., Inc. for compensatory damages, costs, and such other relief this Court deems

appropriate.

## COUNT IX
## STRICT LIABILITY
### (Against KLI Shell Lumber & Hardware, LLC)

229.  Plaintiff incorporates by reference each and every allegation set forth in the

preceding paragraphs as if fully stated herein.

230.  Defendant KLI Shell Lumber engaged in the business of selling and distributing

glyphosate-based products, including Roundup, to the public for application and use.

231.  Plaintiff purchased Roundup products from KLI Shell Lumber at the specific store

address listed above, for use at her residences.

232.  **Product**: Defendant KLI Shell Lumber directly placed glyphosate-based

herbicides, including Roundup products, on the market (by selling them) for use by customers with

knowledge that they would be used and applied without inspection for defects and dangers.

Defendant knew or should have known that ultimate users and consumers, such as Plaintiff, would

not and could not properly inspect these products for defects and dangerous conditions, and that

detection of such defects and dangers would be beyond the capabilities of such persons.

233.  **Defects**: Glyphosate-based herbicides, such as Roundup, were defective and

unreasonably dangerous when sold by Defendant KLI Shell Lumber because they failed to perform

as safely as an ordinary consumer would expect when used as intended or used in a reasonably

foreseeable manner, because the risk of danger in their design outweighed any benefits, and because there were alternative, safer designs that were both technologically and economically feasible. Specifically, glyphosate-based herbicides, including Roundup products, sold for use throughout Monroe County were defective and unreasonably dangerous for one or more of the following reasons:

    a. They contain chemicals and ingredients that expose individuals coming into contact with them to unnecessary and unreasonable risks;

    b. They failed to provide warnings that would alert users and persons exposed to their dangerous conditions;

    c. They failed to provide users and persons exposed with reasonable safety in the event of foreseeable uses.

    d. They have a propensity to interact in the body of a person exposed to them in such a way as to cause serious harm;

234. These defects were present when Defendant KLI Shell Lumber sold Roundup products to Plaintiff for application at her residences resulting in Plaintiff's exposure to such products. The defects were expected to and did reach Plaintiff without substantial change affecting their condition.

235. **Causation**: As a direct and proximate result of the defects in Roundup products sold to Plaintiff, Plaintiff was exposed to unreasonably dangerous chemicals and ingredients. But for the defects in the Roundup products sold to Plaintiff, Plaintiff's injuries would not have occurred.

236. **Damages**: Plaintiff has been damaged and claims all damages to which she is entitled, including, as applicable law may provide, but not limited to:

    a. bodily injury resulting in pain and suffering, disability and/or disfigurement;

    b. mental anguish;

    c.  loss of capacity for enjoyment of life;

    d.  loss of earnings and/or loss of ability to earn money;

    e.  expensive hospitalization, medical treatment and/or care which losses are either

        permanent or will continue; and/or

    f.  all damages available under applicable law.

WHEREFORE, the Plaintiff, Nancy Salas, demands judgement against Defendant KLI Shell Lumber & Hardware, LLC for compensatory damages, costs, and such other relief this Court deems appropriate.

## COUNT X
### NEGLIGENCE
**(Against KLI Shell Lumber & Hardware, LLC and Orlando Valdes)**

237.    Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

238.    Defendants KLI Shell Lumber and Orlando Valdes engaged in the business of selling and distributing Roundup products.

239.    Plaintiff purchased Roundup products from KLI Shell Lumber and Mr. Valdes at the specific store address listed above, for use at her residences.

240.    Defendants KLI Shell Lumber and Mr. Valdes knew or reasonably should have known that Roundup products purchased by Plaintiff were unreasonably dangerous and unsafe, and created a foreseeable and unreasonable risk to persons that were exposed to such products, such as Plaintiff.

241.    **Duty**: Defendants KLI Shell Lumber and Mr. Valdes had a duty to use reasonable care in the marketing, distribution, and sale of Roundup products purchased by Plaintiff. They

had a duty to sell Roundup products in a reasonably safe condition so as not to present a danger to individuals who would be exposed to them, such as Plaintiff.

242.    **Breach**: Defendants KLI Shell Lumber and Mr. Valdes breached that duty both by acting in a way that a reasonably careful marketer, distributor, and seller of glyphosate-based herbicides , including Roundup products, would not act under like circumstances and by failing to take actions that a reasonably careful marketer, distributor, and seller of glyphosate-based herbicides, including Roundup, would take under like circumstances.  KLI Shell Lumber and Mr. Valdes failed to ensure that the glyphosate-based herbicides it sold to Plaintiff for use at her residences were reasonably safe.  Specifically, KLI Shell Lumber and Mr. Valdes breached that duty in one or more of the following ways by marketing, distributing, and selling glyphosate-based herbicides, including Roundup, that:

   a.  Have a propensity to be unreasonably dangerous, hazardous, and unsafe when exposed to them;

   b.  Failed to provide adequate instructions, guidelines, warnings, and/or safety precautions regarding the risk of foreseeable exposures, ultimately harming persons, such as Plaintiff, who KLI Shell Lumber and Mr. Valdes could reasonably foresee would be exposed to such products as a result of its sales and distribution;

   c.  Failed to disclose that the product's risk of harm was unreasonable and that there were safer and effective alternative herbicides available;

   d.  Failed to give appropriate warnings regarding other foreseeable risks that would result when exposed to such products;

243.    KLI Shell Lumber and Mr. Valdes breached their duty of care by failing to adequately investigate and ensure that the glyphosate-based herbicides, including Roundup products, that they sold to Plaintiff were reasonably safe for their intended use.

244.   KLI Shell Lumber and Mr. Valdes failed to warn purchasers of glyphosate-based products, including Roundup, that reasonably foreseeable exposure to such products were unsafe, ultimately harming persons, such as Plaintiff, who KLI Shell Lumber and Mr. Valdes could reasonably foresee would be exposed to such products as a result of their sales and distribution.

245.   **Causation**: As a direct and proximate result of the negligence of Defendants KLI Shell Lumber and Mr. Valdes. Plaintiff was harmed. KLI Shell Lumber and Mr. Valdes' negligence caused or substantially contributed to causing Plaintiff to suffer economic and non-economic damages. But for KLI Shell Lumber and Mr. Valdes' negligence, Plaintiff's injuries, damages, and losses would not have occurred.

246.   **Damages**: Plaintiff has been damaged and claims all damages to which she is entitled, including, as applicable law may provide, but not limited to:

    a.  bodily injury resulting in pain and suffering, disability and/or disfigurement;

    b.  mental anguish;

    c.  loss of capacity for enjoyment of life;

    d.  loss of earnings and/or loss of ability to earn money;

    e.  expensive hospitalization, medical treatment and/or care which losses are either permanent or will continue; and/or

    f.  all damages available under applicable law.

WHEREFORE, the Plaintiff, Nancy Salas, demands judgement against Defendants KLI Shell Lumber & Hardware, LLC and Orlando Valdes for compensatory damages, costs, and such other relief this Court deems appropriate.

**COUNT XI**
**BREACH OF IMPLIED WARRANTIES**
**(Against KLI Shell Lumber & Hardware, LLC)**

247.   Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

248.   At all times relevant to this litigation, Defendant KLI Shell Lumber engaged in the business of selling and distributing Roundup products, which are defective and unreasonably dangerous to consumers, including Plaintiff, thereby placing Roundup products into the stream of commerce. These actions were under the ultimate control and supervision of the Defendant.

249.   Defendant KLI Shell Lumber sold the defective Roundup products to Plaintiff that she applied at her residences.

250.   Before the time that Plaintiff was exposed to the use of Roundup products, Defendant KLI Shell Lumber impliedly warranted to consumers, including Plaintiff, that Roundup products were of merchantable quality, safe, and fit for the use for which they were intended; specifically, as horticultural herbicides.

251.   Defendant KLI Shell Lumber, however, failed to disclose that Roundup has dangerous propensities when used as intended and that the use of and/or exposure to Roundup and glyphosate-containing products carries an increased risk of developing severe injuries, including Plaintiff's injuries.

252.   Plaintiff reasonably relied upon the skill, superior knowledge and judgment of Defendant KLI Shell Lumber and upon their implied warranties that the Roundup products were of merchantable quality and fit for their intended purpose or use.

253.   The Roundup products purchased by Plaintiff from Defendant KLI Shell Lumber were expected to reach and did in fact reach consumers and users, including Plaintiff, without substantial change in the condition in which they were manufactured and sold.

254.     Defendants KLI Shell Lumber intended that Roundup products be used in the manner in which Plaintiff was exposed to them and Defendant impliedly warranted each product to be of merchantable quality, safe, and fit for this use.

255.     In reliance upon Defendant KLI Shell Lumber's implied warranty, Plaintiff used or was exposed to Roundup in the foreseeable manner intended, recommended, promoted and/or marketed by Defendant.

256.     Plaintiff could not have reasonably discovered or known of the risks of serious injury associated with Roundup or glyphosate.

257.     Defendant KLI Shell Lumber breached their implied warranty to Plaintiff in that Roundup products were not of merchantable quality, safe, or fit for their intended use. Roundup has dangerous propensities when used as intended and can cause serious injuries, including those injuries complained of herein.

258.     The harm caused by Roundup products far outweighed their benefit, rendering the products more dangerous than an ordinary consumer or user would expect and more dangerous than alternative products.

259.     As a direct and proximate result of Defendant KLI Shell Lumber's breaches of implied warranties, Plaintiff has suffered and continues to suffer severe physical and emotional injuries. Plaintiff has been damaged and claims all damages to which she is entitled, including, as applicable law may provide, but not limited to:

     a.  bodily injury resulting in pain and suffering, disability and/or disfigurement;

     b.  mental anguish;

     c.  loss of capacity for enjoyment of life;

     d.  loss of earnings and/or loss of ability to earn money;

    e.   expensive hospitalization, medical treatment and/or care which losses are either

permanent or will continue; and/or

    f.   all damages available under applicable law.

WHEREFORE, the Plaintiff, Nancy Salas, demands judgement against Defendant KLI

Shell Lumber & Hardware, LLC for compensatory damages, costs, and such other relief this Court

deems appropriate.

**COUNT XII**
**STRICT LIABILITY**
**(Against Transform SR Development LLC d/b/a Kmart)**

    260.   Plaintiff incorporates by reference each and every allegation set forth in the

preceding paragraphs as if fully stated herein.

    261.   Defendant Transform SR Development d/b/a Kmart engaged in the business of

selling and distributing glyphosate-based products, including Roundup, to the public for

application and use.

    262.   Plaintiff purchased Roundup products from Transform SR Development d/b/a

Kmart at the specific store address listed above, for use at her residences.

    263.   **Product:** Defendant Transform SR Development d/b/a Kmart directly placed

glyphosate-based herbicides, including Roundup products, on the market (by selling them) for use

with knowledge that they would be used and applied without inspection for defects and dangers.

Defendant knew or should have known that ultimate users and consumers, such as Plaintiff, would

not and could not properly inspect these products for defects and dangerous conditions, and that

detection of such defects and dangers would be beyond the capabilities of such persons.

    264.   **Defects:** Glyphosate-based herbicides, such as Roundup, were defective and

unreasonably dangerous when sold by Defendant Transform SR Development d/b/a Kmart

because they failed to perform as safely as an ordinary consumer would expect when used as intended or used in a reasonably foreseeable manner, because the risk of danger in their design outweighed any benefits, and because there were alternative, safer designs that were both technologically and economically feasible. Specifically, glyphosate-based herbicides, including Roundup products, sold for use by Defendant were defective and unreasonably dangerous for one or more of the following reasons:

    a. They contain chemicals and ingredients that expose individuals coming into contact with them to unnecessary and unreasonable risks;

    b. They failed to provide warnings that would alert users and persons exposed to their dangerous conditions;

    c. They failed to provide users and persons exposed with reasonable safety in the event of foreseeable uses.

    d. They have a propensity to interact in the body of a person exposed to them in such a way as to cause serious harm;

265. These defects were present when Defendant Transform SR Development d/b/a Kmart sold Roundup products to Plaintiff for application at her residences resulting in Plaintiff's exposure to such products. The defects were expected to and did reach Plaintiff without substantial change affecting their condition.

266. **Causation**: As a direct and proximate result of the defects in Roundup products sold to Plaintiff, Plaintiff was exposed to unreasonably dangerous chemicals and ingredients. But for the defects in the Roundup products sold to Plaintiff, Plaintiff's injuries would not have occurred.

267. **Damages**: Plaintiff has been damaged and claims all damages to which she is entitled, including, as applicable law may provide, but not limited to:

    a. bodily injury resulting in pain and suffering, disability and/or disfigurement;

    b.  mental anguish;

    c.  loss of capacity for enjoyment of life;

    d.  loss of earnings and/or loss of ability to earn money;

    e.  expensive hospitalization, medical treatment and/or care which losses are either permanent or will continue; and/or

    f.  all damages available under applicable law.

WHEREFORE, the Plaintiff, Nancy Salas, demands judgement against Defendant Transform SR Development LLC d/b/a Kmart for compensatory damages, costs, and such other relief this Court deems appropriate.

**COUNT XIII**
**NEGLIGENCE**
**(Against Transform SR Development LLC d/b/a Kmart and Jose Luis Martinez-Alvarez)**

268.  Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

269.  Defendants Transform SR Development d/b/a Kmart and Jose Luis Martinez-Alvarez engaged in the business of selling and distributing Roundup products.

270.  Plaintiff purchased Roundup products from Transform SR Development d/b/a Kmart and Mr. Martinez-Alvarez at the specific store address listed above, for use at her residences.

271.  Defendants Transform SR Development d/b/a Kmart and Mr. Martinez-Alvarez knew or should have known that Roundup products purchased by Plaintiff were unreasonably dangerous and unsafe, and created a foreseeable and unreasonable risk to persons that were exposed to such products, such as Plaintiff.

272.   **Duty**: Defendants Transform SR Development d/b/a Kmart and Mr. Martinez-Alvarez had a duty to use reasonable care in the marketing, distribution, and sale of Roundup products purchased by Plaintiff. They had a duty to sell Roundup products in a reasonably safe condition so as not to present a danger to individuals who would be exposed to them, such as Plaintiff.

273.   **Breach**: Defendants Transform SR Development d/b/a Kmart and Mr. Martinez-Alvarez breached that duty both by acting in a way that a reasonably careful marketer, distributor, and seller of glyphosate-based herbicides , including Roundup products, would not act under like circumstances and by failing to take actions that a reasonably careful marketer, distributor, and seller of glyphosate-based herbicides, including Roundup, would take under like circumstances. Transform SR Development d/b/a Kmart and Mr. Martinez-Alvarez failed to ensure that the glyphosate-based herbicides it sold to Plaintiff for use at her residences were reasonably safe. Specifically, Transform SR Development d/b/a Kmart and Mr. Martinez-Alvarez breached that duty in one or more of the following ways by marketing, distributing, and selling glyphosate-based herbicides, including Roundup, that:

   a. Have a propensity to be unreasonably dangerous, hazardous, and unsafe when exposed to them;

   b. Failed to provide adequate instructions, guidelines, warnings, and/or safety precautions regarding the risk of foreseeable exposures, ultimately harming persons, such as Plaintiff, who Transform SR Development d/b/a Kmart and Mr. Martinez-Alvarez could reasonably foresee would be exposed to such products as a result of its sales and distribution;

   c. Failed to disclose that the product's risk of harm was unreasonable and that there were safer and effective alternative herbicides available;

   d. Failed to give appropriate warnings regarding other foreseeable risks that would result when exposed to such products;

69

274.   Transform SR Development d/b/a Kmart and Mr. Martinez-Alvarez breached their duty of care by failing to adequately investigate and ensure that the glyphosate-based herbicides, including Roundup products, that they sold to Plaintiff were reasonably safe for their intended use.

275.   Transform SR Development d/b/a Kmart and Mr. Martinez-Alvarez failed to warn purchasers of glyphosate-based products, including Roundup, that reasonably foreseeable exposure to such products were unsafe, ultimately harming persons, such as Plaintiff, who Transform SR Development d/b/a Kmart and Mr. Martinez-Alvarez could reasonably foresee would be exposed to such products as a result of their sales and distribution.

276.   **Causation**: As a direct and proximate result of the negligence of Defendants Transform SR Development d/b/a Kmart and Mr. Martinez-Alvarez, Plaintiff was harmed. Transform SR Development d/b/a Kmart and Mr. Martinez-Alvarez's negligence caused or substantially contributed to causing Plaintiff to suffer economic and non-economic damages. But for Transform SR Development d/b/a Kmart and Mr. Martinez-Alvarez's negligence, Plaintiff's injuries, damages, and losses would not have occurred.

277.   **Damages**: Plaintiff has been damaged and claims all damages to which she is entitled, including, as applicable law may provide, but not limited to:

   a.   bodily injury resulting in pain and suffering, disability and/or disfigurement;

   b.   mental anguish;

   c.   loss of capacity for enjoyment of life;

   d.   loss of earnings and/or loss of ability to earn money;

   e.   expensive hospitalization, medical treatment and/or care which losses are either permanent or will continue; and/or

   f.   all damages available under applicable law.

WHEREFORE, the Plaintiff, Nancy Salas, demands judgement against Defendants Transform SR Development LLC d/b/a Kmart and Jose Luis Martinez-Alvarez for compensatory damages, costs, and such other relief this Court deems appropriate.

## COUNT XIV
## BREACH OF IMPLIED WARRANTIES
### (Against Transform SR Development LLC d/b/a Kmart)

278.    Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

279.    At all times relevant to this litigation, Defendant Transform SR Development d/b/a Kmart engaged in the business of selling and distributing Roundup products, which are defective and unreasonably dangerous to consumers, including Plaintiff, thereby placing Roundup products into the stream of commerce. These actions were under the ultimate control and supervision of the Defendant.

280.    Defendant Transform SR Development d/b/a Kmart sold the defective Roundup products to Plaintiff that she applied at her residences.

281.    Before the time that Plaintiff was exposed to the use of Roundup products, Defendant Transform SR Development d/b/a Kmart impliedly warranted to consumers, including Plaintiff, that Roundup products were of merchantable quality and safe and fit for the use for which they were intended; specifically, as horticultural herbicides.

282.    Defendant Transform SR Development d/b/a Kmart, however, failed to disclose that Roundup has dangerous propensities when used as intended and that the use of and/or exposure to Roundup and glyphosate-containing products carries an increased risk of developing severe injuries, including Plaintiff's injuries.

71

283.   Plaintiff reasonably relied upon the skill, superior knowledge and judgment of Defendant Transform SR Development d/b/a Kmart and upon their implied warranties that the Roundup products were of merchantable quality and fit for their intended purpose or use.

284.   The Roundup products purchased by Plaintiff from Defendant Transform SR Development d/b/a Kmart were expected to reach and did in fact reach consumers and users, including Plaintiff, without substantial change in the condition in which they were manufactured and sold.

285.   Defendants Transform SR Development d/b/a Kmart intended that Roundup products be used in the manner in which Plaintiff was exposed to them and Defendant impliedly warranted each product to be of merchantable quality, safe, and fit for this use.

286.   In reliance upon Defendant Transform SR Development d/b/a Kmart's implied warranty, Plaintiff used or was exposed to Roundup in the foreseeable manner intended, recommended, promoted and/or marketed by Defendant.

287.   Plaintiff could not have reasonably discovered or known of the risks of serious injury associated with Roundup or glyphosate.

288.   Defendant Transform SR Development d/b/a Kmart breached their implied warranty to Plaintiff in that Roundup products were not of merchantable quality, safe, or fit for their intended use. Roundup has dangerous propensities when used as intended and can cause serious injuries, including those injuries complained of herein.

289.   The harm caused by Roundup products far outweighed their benefit, rendering the products more dangerous than an ordinary consumer or user would expect and more dangerous than alternative products.

290.    As a direct and proximate result of Defendant Transform SR Development d/b/a Kmart's breaches of implied warranties, Plaintiff has suffered and continues to suffer severe physical and emotional injuries.  Plaintiff has been damaged and claims all damages to which she is entitled, including, as applicable law may provide, but not limited to:

    a.  bodily injury resulting in pain and suffering, disability and/or disfigurement;

    b.  mental anguish;

    c.  loss of capacity for enjoyment of life;

    d.  loss of earnings and/or loss of ability to earn money;

    e.  expensive hospitalization, medical treatment and/or care which losses are either permanent or will continue; and/or

    f.  all damages available under applicable law.

WHEREFORE, the Plaintiff, Nancy Salas, demands judgement against Defendant Transform SR Development LLC d/b/a Kmart for compensatory damages, costs, and such other relief this Court deems appropriate.


Dated: January 11, 2021                    Respectfully submitted,

                                           **PODHURST ORSECK, P.A.**
                                           Counsel for Plaintiff
                                           One Southeast 3rd Avenue, Suite 2300
                                           Miami, Florida 33131
                                           (305) 358-2800 / Fax (305) 358-2382


                                           By: _/s/ Steven C. Marks_
                                               STEVEN C. MARKS
                                               Fla. Bar No. 516414
                                               smarks@podhurst.com
                                               KRISTINA M. INFANTE
                                               Fla. Bar No. 112557

kinfante@podhurst.com
PABLO ROJAS
Fla. Bar No. 1022427
projas@podhurst.com

## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA
## MIAMI DIVISION

|  |  |
|---|---|
| NANCY C. SALAS, | |
|       Plaintiff, | |
| v. | Case No. _____ |
| MONSANTO COMPANY; BAYER CORPORATION; BAYER AG; ANDREW JACK CONROY; HOME DEPOT USA, INC.; KLI SHELL LUMBER & HARDWARE, LLC; ORLANDO VALDES; TRANSFORM SR DEVELOPMENT LLC d/b/a KMART; and JOSE LUIS MARTINEZ-ALVAREZ, | |
|       Defendants. | |

## MONSANTO COMPANY'S ANSWER TO PLAINTIFF'S COMPLAINT

Defendant Monsanto Company ("Monsanto"), by and through its counsel, respectfully responds by generally denying all allegations contained in plaintiff's Complaint, except as set forth below. As defined in the Complaint and as used in this Answer, Monsanto refers to Monsanto Company, a United States based company incorporated in Delaware, and not to other Monsanto-affiliated companies. Monsanto denies – and objects to – allegations by plaintiff that purport to lump Monsanto together with other defendants. Monsanto responds to this Complaint only on behalf of Monsanto and not on behalf of any other defendant. Silence as to any allegations shall constitute a denial.

1.     Monsanto denies the allegations in paragraph 1.

2.     Monsanto lacks information or knowledge sufficient to form a belief as to the truth of the allegations in paragraph 2 and therefore denies those allegations.

3.     The allegations in paragraph 3 comprise attorney characterizations and are accordingly denied.  Monsanto states that the Roundup®-branded products identified by plaintiff have a variety of separate and distinct uses and formulations.

4.     In response to the allegations in the first sentence of paragraph 4, Monsanto admits that it is a Delaware corporation with its headquarters and principal place of business in St. Louis County, Missouri.  In response to the allegations in the second sentence of paragraph 4, Monsanto admits that it was the entity that discovered the herbicidal properties of glyphosate and that Monsanto has manufactured Roundup®-branded products that have glyphosate as the active ingredient, but notes that Monsanto has not been the only manufacturer of glyphosate-based herbicides.

5.     Monsanto denies – and objects to – allegations in the last sentence of paragraph 5 that purport to lump Monsanto together with other defendants.  The remaining allegations in paragraph 5 are directed at defendants other than Monsanto, so no response from Monsanto is required for these allegations.

6.     Monsanto admits that, at certain times, Andrew Jack Conroy was employed by Monsanto as alleged in the first sentence of paragraph 6.  The allegation in the last sentence of paragraph 6 is directed at a defendant other than Monsanto, so no response from Monsanto is required for that allegations.

7.     The allegations in paragraph 7 are directed at a defendant other than Monsanto, so no response from Monsanto is required for these allegations.

8.     The allegations in paragraph 8 are directed at a defendant other than Monsanto, so no response from Monsanto is required for these allegations.

9.      The allegations in paragraph 9 are directed at a defendant other than Monsanto, so no response from Monsanto is required for these allegations.

10.      The allegations in paragraph 10 are directed at a defendant other than Monsanto, so no response from Monsanto is required for these allegations.

11.      The allegations in paragraph 11 are directed at a defendant other than Monsanto, so no response from Monsanto is required for these allegations.

12.      The allegations in paragraph 12 set forth conclusions of law for which no response is required.

13.      In response to the allegations in the first sentence of paragraph 13, Monsanto admits that it is authorized to do business in Florida.  The remaining allegations in the first sentence of paragraph 13 are vague and conclusory and comprise attorney characterizations and are accordingly denied.  In response to the second sentence of paragraph 13, Monsanto admits that it was the entity that discovered the herbicidal properties of glyphosate and that Monsanto manufactured Roundup®-branded products that have glyphosate as the active ingredient, but notes that Monsanto has not been the only manufacturer of glyphosate-based herbicides.

14.       The allegations in paragraph 14 set forth conclusions of law for which no response is required. To the extent that a response is deemed required, Monsanto denies the allegations in paragraph 14.

15.      The allegations in paragraph 15 are directed at a defendant other than Monsanto, so no response from Monsanto is required for these allegations.

16.      The allegations in paragraph 16 are directed at a defendant other than Monsanto, so no response from Monsanto is required for these allegations.

17.     The allegations in paragraph 17 are directed at a defendant other than Monsanto, so no response from Monsanto is required for these allegations.

18.     The allegations in paragraph 18 are directed at a defendant other than Monsanto, so no response from Monsanto is required for these allegations.

19.     The allegations in paragraph 19 are directed at a defendant other than Monsanto, so no response from Monsanto is required for these allegations.

20.     The allegations in paragraph 20 are directed at a defendant other than Monsanto, so no response from Monsanto is required for these allegations.

21.     The allegations in paragraph 21 are directed at a defendant other than Monsanto, so no response from Monsanto is required for these allegations.

22.     The allegations in paragraph 22 are directed at a defendant other than Monsanto, so no response from Monsanto is required for these allegations.

23.     The allegations in paragraph 23 are directed at a defendant other than Monsanto, so no response from Monsanto is required for these allegations.

24.     The allegations in paragraph 24 are directed at a defendant other than Monsanto, so no response from Monsanto is required for these allegations.

25.     The allegations in paragraph 25 set forth conclusions of law for which no response is required. To the extent that a response is deemed required, Monsanto denies the allegations in paragraph 25.

26.     The allegations in paragraph 26 set forth conclusions of law for which no response is required.

27.     Monsanto admits the allegations in paragraph 27.

28.     In response to the allegations in paragraph 28, Monsanto admits that glyphosate's mode of action is targeting EPSP synthase.  The remaining allegations in paragraph 28 comprise attorney characterizations and are accordingly denied.

29.     Monsanto admits the allegations in the first sentence of paragraph 29.  Monsanto denies the allegations in the second sentence of paragraph 29 because the impact of glyphosate on treated plants varies depending upon the amount of glyphosate applied and the type of plant. Monsanto denies the allegations in the third sentence of paragraph 29 to the extent that they suggest that glyphosate is present in any plants at anything other than *de minimis* amounts well within regulatory safety levels, as determined by the United States Environmental Protection Agency ("EPA").

30.     In response to the allegations in paragraph 30, Monsanto admits that certain Roundup®-branded herbicides contain POEA and adjuvants, that EPA has classified surfactants and adjuvants as inert, and that the specific surfactants and adjuvants used in Roundup®-branded herbicides – like those in other manufacturers' herbicide products – are protected by EPA as "trade secrets."  Monsanto notes that EPA has determined that the surfactants used in Roundup®-branded herbicides do not pose an unreasonable risk to human health.  Monsanto denies the remaining allegations in paragraph 30.

31.     Monsanto admits the allegations in the first two sentences of paragraph 31 and admits that it has marketed Roundup®-branded products in accord with EPA's regulatory determinations under Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA").  Monsanto denies the remaining allegations in paragraph 31.

32.     In response to the allegations in the first sentence of paragraph 32, Monsanto admits that glyphosate is one of the world's most widely used herbicides today, but notes that

Monsanto has not been the only manufacturer of glyphosate-based herbicides.  Monsanto admits the remaining allegations in paragraph 32.

33.     Monsanto denies the allegations in paragraph 33.

34.     In response to the allegations in paragraph 34, Monsanto admits that glyphosate repeatedly has been found to be safe to humans and the environment by regulators in the United States and around the world and further admits that it has labeled glyphosate products as approved by regulatory bodies consistent with those findings.  Monsanto also admits that the EPA repeatedly has concluded pursuant to the FIFRA that glyphosate-based herbicides create no unreasonable risk to human health or to the environment when used in accordance with the label.  To the extent that paragraph 34 alleges that Monsanto has labeled glyphosate-based or Roundup®-branded herbicides in any manner different or in addition to such regulatory approval, Monsanto denies such allegations.  Monsanto denies the allegations in the final sentence of paragraph 34.

35.     The allegations in paragraph 35 set forth conclusions of law for which no response is required.  To the extent that a response is deemed required, Monsanto admits the allegations in paragraph 35.

36.     In response to the allegations in paragraph 36, Monsanto admits that EPA requires registrants of herbicides to submit extensive data in support of the human health and environmental safety of their products and further admits that EPA will not register or approve the labeling of herbicides that do not satisfy the requirements set forth in FIFRA.  The remaining allegations in paragraph 36 set forth conclusions of law for which no response is required.

37.     The allegations in paragraph 37 set forth conclusions of law for which no response is required.

38.     In response to the allegations in paragraph 38, Monsanto admits that Roundup®-branded products are registered by EPA for manufacture, sale, and distribution in the United States, including in Florida.

39.     In response to the allegations in paragraph 39, Monsanto admits that EPA requires registrants of herbicides to submit extensive data in support of the human health and environmental safety of their products and further admits that EPA will not register or approve the labeling of herbicides that do not satisfy the requirements set forth in FIFRA.  Monsanto states that the term "the product tests" in the final sentence of paragraph 39 is vague and ambiguous, and Monsanto therefore denies the same.  The remaining allegations in paragraph 39 set forth conclusions of law for which no response is required.

40.     In response to the allegations in paragraph 40, Monsanto admits that an EPA review committee classified glyphosate as Class C in 1985 based on limited data and that EPA changed its classification of glyphosate to Group E based upon a full evaluation of the scientific evidence, including but not limited to three animal carcinogenicity studies.  Monsanto admits that plaintiff has accurately quoted from one passage in an EPA document in 1991 with respect to the designation of an agent as Group E, but states that EPA repeatedly has concluded that glyphosate does not pose any cancer risk to humans.  For example, Monsanto states that:  (a) in September 2016, EPA's Office of Pesticide Programs ("OPP") issued a 227-page evaluation of glyphosate's carcinogenic potential, concluding that "[t]he strongest support is for [the descriptor] 'not likely to be carcinogenic to humans' at doses relevant to human health risk assessment"[1]; and (b) at the same time, EPA posted an October 2015 final report by its standing

---

[1] EPA's Office of Pesticide Programs, *Glyphosate Issue Paper: Evaluation of Carcinogenic Potential* at 141 (Sept. 12, 2016) ("EPA OPP Report"), https://www.regulations.gov/document?D=EPA-HQ-OPP-2016-0385-0094.  The EPA OPP Report was prepared in

Cancer Assessment Review Committee ("CARC"), in which CARC endorsed EPA's existing classification of glyphosate as "Not Likely to be Carcinogenic to Humans."[2]  Monsanto further states that, in December 2017, EPA's OPP issued a detailed, lengthy revised evaluation of glyphosate's carcinogenic potential that reiterated the conclusion that "[t]he strongest support is for [the descriptor] 'not likely to be carcinogenic to humans'."[3]  In addition to the conclusions in the two EPA OPP reports and the EPA CARC Final Report discussed above, specific findings of safety include:

- "In June 1991, EPA classified glyphosate as a Group E [carcinogen]—one that shows evidence of non-carcinogenicity for humans—based on the lack of convincing evidence of carcinogenicity in adequate studies."  EPA, *Glyphosate: Reregistration Eligibility Decision (RED) Facts*, 2 (Sept. 1993), http://archive.epa.gov/pesticides/reregistration/web/pdf/0178fact.pdf.

- "No evidence of carcinogenicity."  Glyphosate; Pesticide Tolerances, 67 Fed. Reg. 60,934, 60,943 (Sept. 27, 2002) (to be codified at 40 C.F.R. pt. 180).

- "Glyphosate has no carcinogenic potential."  Glyphosate; Pesticide Tolerance, 69 Fed. Reg. 65,081, 65,086 (Nov. 10, 2004) (to be codified at 40 C.F.R. pt. 180).

- "There is [an] extensive database available on glyphosate, which indicate[s] that glyphosate is not mutagenic, not a carcinogen, and not a developmental or reproductive toxicant."  Glyphosate; Pesticide Tolerances, 73 Fed. Reg. 73,586, 73,589 (Dec. 3, 2008) (to be codified at 40 C.F.R. pt. 180).

- "EPA has concluded that glyphosate does not pose a cancer risk to humans."  Glyphosate; Pesticide Tolerances, 78 Fed. Reg. 25,396, 25,398 (May 1, 2013) (to be codified at 40 C.F.R. pt. 180).

---

anticipation of an EPA Scientific Advisory Panel meeting on glyphosate's carcinogenic potential.

[2] Cancer Assessment Review Committee, Health Effects Division, Office of Pesticide Programs, U.S. Environmental Protection Agency, *Cancer Assessment Document – Evaluation of the Carcinogenic Potential of Glyphosate* at 10, 77 (Final Report, Oct. 1, 2015) ("EPA CARC Final Report"), https://www.regulations.gov/document?D=EPA-HQ-OPP-2016-0385-0014.

[3] EPA's Office of Pesticide Programs, *Revised Glyphosate Issue Paper: Evaluation of Carcinogenic Potential* at 143, 144 (Dec. 12, 2017), https://www.regulations.gov/document?D=EPA-HQ-OPP-2016-0385-0528.

- "In 2014, EPA reviewed over 55 epidemiological studies conducted on the possible cancer and non-cancer effects of [g]lyphosate.  Our review concluded that this body of research does not provide evidence to show that [g]lyphosate causes cancer and does not warrant any change in the EPA's cancer classification for [g]lyphosate." *Agriculture Biotechnology:  A Look at Federal Regulation and Stakeholder Perspectives:  Hearing Before the S. Comm. on Agr., Nutrition, & Forestry*, 114th Cong. (2015) (statement of Dr. William Jordan, Deputy Director of EPA's Office of Pesticide Programs), http://www.ag.senate.gov/templates/watch.cfm?id=74793e67-5056-a055-64af-0e55900753b4, at time stamp 55:05-56:20.

Monsanto denies the remaining allegations in paragraph 40.

41.     In response to the allegations in paragraph 41, Monsanto admits that it – along with a large number of other companies and governmental agencies – was defrauded by two chemical testing laboratories, and that Monsanto had hired both of these laboratories to conduct testing on glyphosate.  Monsanto states that only one of these laboratories was hired to conduct toxicity tests of glyphosate.  Monsanto denies that EPA's registration of glyphosate or any glyphosate-based herbicides is based upon any invalid Industrial Bio-Test ("IBT") studies.  To the extent that the allegations in paragraph 41 are intended to suggest that Monsanto was anything other than a victim of this fraud, such allegations are denied.

42.     In response to the allegations in paragraph 42, Monsanto admits that IBT Laboratories was hired to conduct toxicity studies in connection with the registration of a Roundup®-branded product.  Monsanto denies that EPA's regulatory approval of such product is based upon any fraudulent or false IBT studies.

43.     Monsanto denies the allegations in paragraph 43 to the extent they suggest that EPA performed an inspection of IBT Laboratories solely or specifically in connection with studies conducted on glyphosate.  Monsanto admits that EPA performed an audit of IBT Laboratories to investigate that laboratory's fraudulent and/or improper testing procedures in connection with services provided to a broad number of private and governmental entities and that this inspection included a review of studies IBT conducted on glyphosate.  Monsanto was

one of several pesticide manufacturers who had used IBT test results.  The audit found some toxicology studies conducted with the original Roundup® herbicide to be invalid.  As a result, Monsanto repeated all required studies in accordance with applicable EPA testing guidelines.  Monsanto denies that EPA's registration of glyphosate or any glyphosate-based herbicides is based upon any invalid IBT studies.  To the extent that the allegations in paragraph 43 are intended to suggest that Monsanto was anything other than a victim of this fraud, such allegations also are denied.

44.     In response to the allegations in paragraph 44, Monsanto admits that three IBT employees were convicted of the charge of fraud, but Monsanto denies that any of the individuals were convicted based upon studies conducted on glyphosate or glyphosate-based herbicides.

45.     In response to the allegations in paragraph 45, Monsanto admits that it – along with numerous other private companies – hired Craven Laboratories as an independent laboratory to conduct residue studies for Monsanto agricultural products.  Monsanto further admits that it was defrauded by Craven Laboratories and that, as a result, Monsanto repeated the studies conducted at Craven Laboratories at a substantial cost.  To the extent that the allegations in paragraph 45 are intended to suggest that Monsanto was anything other than a victim of this fraud, Monsanto denies those allegations.

46.     Monsanto denies the allegations in paragraph 46.

47.     In response to the allegations in paragraph 47, Monsanto admits that Roundup®-branded products are highly valued by customers because of their efficacy and safety.  Monsanto also admits that the patent for glyphosate expired in the United States in 2000.  The remaining

allegations in paragraph 47 are vague and conclusory and comprise attorney characterizations, and are accordingly denied.

48.    In response to the allegations in paragraph 48, Monsanto admits that, following the development of Roundup® Ready seeds, it began to sell them in the 1990s and that such seeds are now widely used by farmers in the United States and worldwide.  Monsanto lacks information or knowledge sufficient to form a belief as to the accuracy of the specific numbers cited in paragraph 48 and accordingly denies those allegations.  The remaining allegations in paragraph 48 are vague and conclusory and comprise attorney characterizations, and are accordingly denied.

49.    In response to the allegations in paragraph 49, Monsanto admits that glyphosate is one of the world's largest herbicides by sales volume, but Monsanto denies any suggestion that it is the only company that has sold glyphosate or glyphosate-based herbicides.  Monsanto lacks information or knowledge sufficient to form a belief as to the accuracy of the specific numbers cited in paragraph 49 and accordingly denies the same.  The remaining allegations in paragraph 49 are vague and conclusory and comprise attorney characterizations, and are accordingly denied.

50.    In response to the allegations in the first sentence of paragraph 50, Monsanto admits that glyphosate repeatedly has been found to be safe to humans and the environment by regulators in the United States and around the world and further admits that it has labeled glyphosate products as approved by regulatory bodies consistent with those findings.  Monsanto also admits that the EPA repeatedly has concluded pursuant to FIFRA that glyphosate-based herbicides create no unreasonable risk to human health or to the environment when used in accordance with the label.  To the extent that the first sentence of paragraph 50 alleges that

Monsanto has labeled glyphosate-based or Roundup®-branded herbicides in any manner different or in addition to such regulatory approval, Monsanto denies such allegations.  Monsanto denies the allegations in the second sentence of paragraph 50.

51.     In response to the allegations in paragraph 51, Monsanto denies that the animal carcinogenicity studies of glyphosate in the aggregate provide evidence of a positive trend for or increase in any of the identified tumors.  Monsanto admits that an EPA review committee classified glyphosate as Class C in 1985 based on limited data and that EPA changed its classification of glyphosate to Group E based upon a full evaluation of the scientific evidence, including but not limited to three animal carcinogenicity studies.  Monsanto further states that regulatory agencies around the world have reviewed the same animal studies and concluded that they do not provide evidence that glyphosate can cause cancer.

52.     Monsanto denies the allegations in paragraph 52.

53.     Monsanto denies the allegations in paragraph 53.  All labeling of Roundup®-branded products has been and remains EPA-approved and in compliance with all federal requirements under FIFRA.

54.     Monsanto denies the allegations in paragraph 54.

55.     The allegations in paragraph 55 take statements out of context; are vague, misleading, incomplete, and conclusory; and/or comprise attorney characterizations – and are accordingly denied.

56.     The allegations in paragraph 56 take statements out of context; are vague, misleading, incomplete, and conclusory; and/or comprise attorney characterizations – and are accordingly denied.

57.     Monsanto denies the allegations in paragraph 57.

58.     Monsanto states that the term "toxic" as used in paragraph 58 is vague and ambiguous to the extent it is intended to suggest any evidence of carcinogenicity.  Monsanto denies the allegations in paragraph 58.

59.     Monsanto denies the allegations in paragraph 59.

60.     Monsanto denies the allegations in paragraph 60.

61.     The allegations in paragraph 61 take statements out of context; are vague, misleading, incomplete, and conclusory; and/or comprise attorney characterizations – and are accordingly denied.

62.     The allegations in paragraph 62 take statements out of context; are vague, misleading, incomplete, and conclusory; and/or comprise attorney characterizations – and are accordingly denied.

63.     The allegations in paragraph 63 take statements out of context; are vague, misleading, incomplete, and conclusory; and/or comprise attorney characterizations – and are accordingly denied.

64.     The allegations in paragraph 64 take statements out of context; are vague, misleading, incomplete, and conclusory; and/or comprise attorney characterizations – and are accordingly denied.

65.     The allegations in paragraph 65 take statements out of context; are vague, misleading, incomplete, and conclusory; and/or comprise attorney characterizations – and are accordingly denied.

66.     The allegations in paragraph 66 take statements out of context; are vague, misleading, incomplete, and conclusory; and/or comprise attorney characterizations – and are accordingly denied.

67.     The allegations in paragraph 67 take statements out of context; are vague, misleading, incomplete, and conclusory; and/or comprise attorney characterizations – and are accordingly denied.

68.     The allegations in paragraph 68 take statements out of context; are vague, misleading, incomplete, and conclusory; and/or comprise attorney characterizations – and are accordingly denied.

69.     Monsanto denies the allegations in paragraph 69.

70.     Monsanto denies the allegations in paragraph 70.

71.     Monsanto denies the allegations in paragraph 71.

72.     The allegations in paragraph 72 take statements out of context; are vague, misleading, incomplete, and conclusory; and/or comprise attorney characterizations – and are accordingly denied.

73.     The allegations in paragraph 73 take statements out of context; are vague, misleading, incomplete, and conclusory; and/or comprise attorney characterizations – and are accordingly denied.

74.     The allegations in paragraph 74 take statements out of context; are vague, misleading, incomplete, and conclusory; and/or comprise attorney characterizations – and are accordingly denied.

75.     The allegations in paragraph 75 take statements out of context; are vague, misleading, incomplete, and conclusory; and/or comprise attorney characterizations – and are accordingly denied.

76.     Monsanto denies the allegations in the first sentence of paragraph 76.   The remaining allegations in paragraph 76 take statements out of context; are vague, misleading,

incomplete, and conclusory; and/or comprise attorney characterizations – and are accordingly denied.

77.     The allegations in paragraph 77 take statements out of context; are vague, misleading, incomplete, and conclusory; and/or comprise attorney characterizations – and are accordingly denied.

78.     The allegations in paragraph 78 take statements out of context; are vague, misleading, incomplete, and conclusory; and/or comprise attorney characterizations – and are accordingly denied.

79.     The allegations in paragraph 79 take statements out of context; are vague, misleading, incomplete, and conclusory; and/or comprise attorney characterizations – and are accordingly denied.

80.     The allegations in paragraph 80 take statements out of context; are vague, misleading, incomplete, and conclusory; and/or comprise attorney characterizations – and are accordingly denied.

81.     The allegations in paragraph 81 take statements out of context; are vague, misleading, incomplete, and conclusory; and/or comprise attorney characterizations – and are accordingly denied.

82.     Monsanto denies the allegations in paragraph 82.

83.     The allegations in paragraph 83 take statements out of context; are vague, misleading, incomplete, and conclusory; and/or comprise attorney characterizations – and are accordingly denied.

84.     Monsanto denies the allegations in paragraph 84.

85.     The allegations in paragraph 85 take statements out of context; are vague, misleading, incomplete, and conclusory; and/or comprise attorney characterizations – and are accordingly denied.

86.     In response to the allegations in the first and second sentence of paragraph 86, Monsanto admits that the International Agency for Research on Cancer ("IARC") released its assessment of glyphosate (Group 2A) in March 2015.  The remaining allegations in paragraph 86 take statements out of context; are vague, misleading, incomplete, and conclusory; and/or comprise attorney characterizations – and are accordingly denied.

87.     The allegations in paragraph 87 take statements out of context; are vague, misleading, incomplete, and conclusory; and/or comprise attorney characterizations – and are accordingly denied.

88.     In response to the allegations in the first sentence of paragraph 88, Monsanto admits that it convened a panel of independent experts to analyze and evaluate the scientific issues addressed by IARC's glyphosate monograph.  Monsanto denies the remaining allegations in paragraph 88.

89.     The allegations in paragraph 89 take statements out of context; are vague, misleading, incomplete, and conclusory; and/or comprise attorney characterizations – and are accordingly denied.

90.     The allegations in paragraph 90 take statements out of context; are vague, misleading, incomplete, and conclusory; and/or comprise attorney characterizations – and are accordingly denied.

91.     The allegations in paragraph 91 take statements out of context; are vague, misleading, incomplete, and conclusory; and/or comprise attorney characterizations – and are accordingly denied.

92.     Monsanto denies the allegations in paragraph 92.

93.     In response to the allegations in paragraph 93, Monsanto admits that the New York Attorney General filed a lawsuit against Monsanto in 1996 alleging false and misleading advertising of Roundup®-branded products.  This lawsuit was subsequently resolved without any admission of wrongdoing by Monsanto.  Monsanto states that none of the New York Attorney General's allegations related in any way to a purported or alleged risk of cancer.  To the extent the subparts purport to quote a document, the document speaks for itself and thus does not require any further answer.  The remaining allegations in paragraph 93 are vague and conclusory and comprise attorney characterizations, and are accordingly denied.

94.     In response to the allegations in paragraph 94, Monsanto admits it entered into an assurance of discontinuance with the New York Attorney General.  The assurance speaks for itself and thus does not require any further answer.  The remaining allegations in paragraph 94 are vague and conclusory and comprise attorney characterizations, and are accordingly denied.

95.     Monsanto denies the allegations in paragraph 95.

96.     Monsanto admits the allegations in the first sentence of paragraph 96.  Monsanto denies the allegations in the second sentence of paragraph 96 to the extent they suggest that the IARC based its evaluation on a complete or accurate assessment of the scientific research regarding glyphosate.

97.     Monsanto admits the allegations in the first sentence of paragraph 97.  Monsanto denies the allegations in the second sentence of paragraph 97.

98.    In response to the allegations in paragraph 98, Monsanto denies that IARC follows stringent procedures for the evaluation of a chemical agent.  Monsanto lacks information or knowledge sufficient to form a belief as to the accuracy of the specific numbers cited in paragraph 98, which are not limited as of any specified date, and accordingly denies the same.

99.    In response to the allegations in paragraph 99, Monsanto admits that IARC issued its monograph for glyphosate on July 29, 2015 and that a draft of the monograph was prepared by a "working group" of individuals selected by IARC who met over a one week period in March 2015 to consider glyphosate along with a number of other substances.  Monsanto denies the allegation that all members of the working group are "experts."  Monsanto denies that the working group's findings reflected a comprehensive review of the latest available scientific evidence.  Monsanto also denies that the working group considered all information available in the scientific literature and all data from government reports that are publicly available.  Monsanto denies the remaining allegations in paragraph 99.

100.    In response to the allegations in paragraph 100, Monsanto admits that IARC issued its monograph for glyphosate on July 29, 2015 and that a draft of the monograph was prepared by a "working group" of individuals selected by IARC who met over a one week period in March 2015 to consider glyphosate along with a number of other substances.  Monsanto denies that the working group or anyone at IARC conducted a one-year review of the scientific evidence related to glyphosate or that the working group's findings reflected a comprehensive review of the latest available scientific evidence.  Monsanto also denies that the working group considered all information available in the scientific literature and all data from government reports that are publicly available.  Monsanto denies the remaining allegations in paragraph 100.

101.    The allegations in paragraph 101 are vague and conclusory.  To the extent they purport to characterize statements made in the IARC monograph for glyphosate, the statements in that document speak for themselves, but Monsanto lacks information or knowledge sufficient to form a belief as to the accuracy of the source of said information and accordingly denies the allegations.

102.    In response to the allegations in paragraph 102, to the extent the allegations purport to characterize statements made in the IARC monograph for glyphosate, the statements in that document speak for themselves, but to the extent that this paragraph means that more than *de minimis* amounts of exposure are present, the allegations in paragraph 102 are denied.

103.    In response to the allegations in paragraph 103, Monsanto admits that the IARC working group identified a number of case control studies of populations with exposures to glyphosate, but Monsanto denies that any of these studies provide any evidence of a human health concern from such exposures.

104.    Monsanto denies the allegations in paragraph 104.  The IARC working group concluded that there was only limited evidence of carcinogenicity in epidemiologic studies, which, per IARC's guidelines, means that the working group could not rule out chance, bias or confounding so as to reach any conclusion of an increased risk.

105.    In response to the allegations in paragraph 105, Monsanto admits that the working group cited to a study that it concluded provided evidence of chromosomal damage in community residents reported to be exposed to glyphosate, but Monsanto denies that the study supports such a conclusion or that the authors of the study reached such a conclusion.

106.    In response to the allegations in paragraph 106, Monsanto admits that the IARC working group purported to make these findings, but denies that the animal carcinogenicity

studies of glyphosate in the aggregate provide evidence of a positive trend for or increase in any of the identified tumors.  Monsanto further states that regulatory agencies around the world have reviewed the same animal studies and concluded that they do not provide evidence that glyphosate can cause cancer.  Monsanto denies the remaining allegations in paragraph 106.

107.    In response to the allegations in paragraph 107, Monsanto admits that the IARC working group purported to make these findings but denies that the cited studies provide any reliable basis for a finding that any meaningful levels of glyphosate or AMPA is present or persists in human blood or urine.  Monsanto denies the remaining allegations in paragraph 107.

108.    In response to the allegations in paragraph 108, Monsanto admits that the IARC working group interpreted a selected number of experimental studies as evidence that glyphosate can cause genotoxicity, but Monsanto denies that the working group reliably considered the full body of scientific data on such alleged genotoxic endpoints and denies that the working group reliably interpreted the studies that it selected for consideration.  Regulators around the world repeatedly have concluded that glyphosate is not genotoxic.  Monsanto denies the remaining allegations in paragraph 108.

109.    In response to the allegations in paragraph 109, Monsanto admits that the IARC working group purported to find such effects, but denies that there is any reliable scientific basis for such conclusion.  Monsanto denies the remaining allegations in paragraph 109.

110.    In response to the allegations in paragraph 110, Monsanto admits that the working group reviewed the findings of an Agricultural Health Study ("AHS") published in 2005, but denies that the working group characterized that study as supporting an association between glyphosate and the specified cancers.  The AHS cohort study did not find a positive association

between glyphosate and any type of cancer.  Monsanto denies all other allegations in paragraph 110.

111.    Monsanto denies the allegations in paragraph 111.

112.    In response to the allegations in paragraph 112, Monsanto admits that glyphosate repeatedly has been found to be safe to humans and the environment by regulators in the United States and around the world and further admits that it has labeled glyphosate products as approved by regulatory bodies consistent with those findings.  Monsanto also admits that the EPA repeatedly has concluded pursuant to FIFRA that glyphosate-based herbicides create no unreasonable risk to human health or to the environment when used in accordance with the label. To the extent that paragraph 112 alleges that Monsanto has labeled glyphosate or Roundup®-branded herbicides in any manner different or in addition to such regulatory approval, Monsanto denies such allegations.

113.    In response to the allegations in paragraph 113, Monsanto states that the cited report speaks for itself and does not require a response.

114.    The allegations in paragraph 114 do not require a response from Monsanto because these allegations relate to other companies, not Monsanto.

115.    In response to the allegations in paragraph 115, Monsanto states that the cited report speaks for itself and does not require a response. The remaining allegations in paragraph 115 are vague, incomplete, and conclusory and/or comprise attorney characterizations – and are accordingly denied.

116.    In response to the allegations in paragraph 116, Monsanto states that the cited report speaks for itself and does not require a response. The remaining allegations in paragraph

116 are vague, incomplete, and conclusory and/or comprise attorney characterizations – and are accordingly denied.

117.     In response to the allegations in paragraph 117, Monsanto states that the cited report speaks for itself and does not require a response. The remaining allegations in paragraph 117 are vague, incomplete, and conclusory and/or comprise attorney characterizations – and are accordingly denied.

118.     In response to the allegations in the first sentence of paragraph 118, Monsanto admits that EPA held a FIFRA Scientific Advisory Panel ("SAP") from December 13-16, 2016. In response to the allegations in the sentence of paragraph 118, Monsanto states that the cited report speaks for itself and does not require a response. The remaining allegations in paragraph 118 are vague, incomplete, and conclusory and/or comprise attorney characterizations – and are accordingly denied.

119.     In response to the allegations in paragraph 119, Monsanto denies that the OPP Report is a "draft assessment."  The allegations in paragraph 119 are vague and conclusory and comprise attorney characterizations and are accordingly denied.

120.     In response to the allegations in paragraph 120, Monsanto states that the cited publication speaks for itself and does not require a response.  To the extent that the allegations in paragraph 120 characterize the publication, Monsanto denies those allegations.

121.     In response to the allegations in paragraph 121, Monsanto states that the cited publication speaks for itself and does not require a response.  To the extent that the allegations in paragraph 121 characterize the publication, Monsanto denies those allegations.

122.     Monsanto denies the allegations in paragraph 122.

123.     Monsanto denies the allegations in paragraph 123.

124.     In response to the allegations in paragraph 124, Monsanto admits that the IARC working group's classification of glyphosate as a Class 2A carcinogen has resulted in ongoing discussions and/or restrictions in certain countries regarding the sale and/or use of glyphosate-based herbicides, but denies that there is any scientific basis for the concerns raised by the improper IARC classification.  Monsanto denies the remaining allegations in paragraph 124.

125.     Monsanto denies the allegations in the first sentence of paragraph 125.  In response to the allegations in the last sentence of paragraph 125, Monsanto denies that Roundup®-branded products have "carcinogenic or potentially carcinogenic properties."  The remaining allegations in the last sentence of paragraph 125 are directed at a defendant other than Monsanto, so no response from Monsanto is required for these allegations.

126.     The allegations in the first sentence of paragraph 126 are directed at a defendant other than Monsanto, so no response from Monsanto is required for these allegations.  Monsanto lacks information or knowledge sufficient to form a belief as to the truth of the allegations in the last sentence of paragraph 126 and therefore denies those allegations.

127.     In response to the allegations in paragraph 127, Monsanto denies that Roundup®-branded products have "carcinogenic properties" and that those products pose a "grave danger."  The remaining allegations in paragraph 127 are directed at a defendant other than Monsanto, so no response from Monsanto is required for these allegations.

128.     The allegations in the first sentence of paragraph 128 are directed at a defendant other than Monsanto, so no response from Monsanto is required for these allegations.  Monsanto lacks information or knowledge sufficient to form a belief as to the truth of the allegations in the last sentence of paragraph 128 and therefore denies those allegations.

129.     In response to the allegations in paragraph 129, Monsanto denies that Roundup®-branded products have "carcinogenic properties" and that those products pose a "grave danger." The remaining allegations in paragraph 129 are directed at a defendant other than Monsanto, so no response from Monsanto is required for these allegations.

130.     In response to the allegations in paragraph 130, Monsanto denies that Roundup®-branded products have "carcinogenic or potentially carcinogenic properties" and that those products pose a "danger."   The remaining allegations in paragraph 130 are directed at a defendant other than Monsanto, so no response from Monsanto is required for these allegations.

131.     The allegations in the first sentence of paragraph 131 are directed at a defendant other than Monsanto, so no response from Monsanto is required for these allegations.  Monsanto lacks information or knowledge sufficient to form a belief as to the truth of the allegations in the last sentence of paragraph 131 and therefore denies those allegations.

132.     In response to the allegations in paragraph 132, Monsanto denies that Roundup®-branded products have "carcinogenic properties" and that those products pose a "grave danger." The remaining allegations in paragraph 132 are directed at a defendant other than Monsanto, so no response from Monsanto is required for these allegations.

133.     In response to the allegations in paragraph 133, Monsanto denies that Roundup®-branded products have "carcinogenic or potentially carcinogenic properties" and that those products pose a "danger."   The remaining allegations in paragraph 133 are directed at a defendant other than Monsanto, so no response from Monsanto is required for these allegations.

134.     Monsanto lacks information or knowledge sufficient to form a belief as to the truth of the allegations in paragraph 134 and therefore denies those allegations.

135.     Monsanto lacks information or knowledge sufficient to form a belief as to the truth of the allegations in paragraph 135 and therefore denies those allegations.

136.     Monsanto lacks information or knowledge sufficient to form a belief as to the truth of the allegations in paragraph 136 and therefore denies those allegations.

137.     Monsanto lacks information or knowledge sufficient to form a belief as to the truth of the allegations in paragraph 137 and therefore denies those allegations.

138.     Monsanto lacks information or knowledge sufficient to form a belief as to the truth of the allegations in paragraph 138 and therefore denies those allegations.

139.     Monsanto lacks information or knowledge sufficient to form a belief as to the truth of the allegations in paragraph 139 and therefore denies those allegations.

140.     Monsanto lacks information or knowledge sufficient to form a belief as to the truth of the allegations in paragraph 140 and therefore denies those allegations.

141.     In response to the allegations in paragraph 141, Monsanto denies that any exposure to Roundup®-branded products can cause non-Hodgkin's lymphoma ("NHL") and/or other serious illnesses and therefore denies those allegations.  Monsanto states, however, that the scientific studies upon which IARC purported to base its evaluation of glyphosate were all publicly available before March 2015.  Monsanto lacks information or knowledge sufficient to form a belief as to the truth of the remaining allegations in paragraph 141 and therefore denies those allegations.

142.     Monsanto incorporates by reference its responses to paragraphs 1 through 141 in response to paragraph 142 of plaintiff's Complaint.

143.     In response to the allegations in paragraph 143, Monsanto admits that plaintiff purports to bring a claim for strict products liability, but Monsanto denies any liability as to that claim.

144.     In response to the allegations in paragraph 144, Monsanto lacks information or knowledge sufficient to form a belief as to the truth of the allegation that plaintiff used Roundup®-branded products and therefore denies that allegation.   Monsanto denies the remaining allegations in paragraph 144.

145.     Monsanto denies the allegations in paragraph 145 and each of its subparts.

146.     Monsanto denies the allegations in paragraph 146.

147.     In response to the allegations in paragraph 147, Monsanto lacks information or knowledge sufficient to form a belief as to the truth of the allegation that plaintiff used Roundup®-branded products and therefore denies that allegation. Monsanto denies the remaining allegations in paragraph 147.

148.     Monsanto denies the allegations in paragraph 148.

149.     The allegation in paragraph 149 sets forth a conclusion of law for which no response is required.

150.     Monsanto denies the allegations in paragraph 150.

151.     Monsanto denies the allegations in paragraph 151.

In response to the "WHEREFORE" paragraph following paragraph 151, Monsanto demands that judgment be entered in his favor and against plaintiff and that plaintiff's Complaint be dismissed, with prejudice, and that Monsanto be awarded costs of suit and reasonable attorney's fees as allowed by law and such further and additional relief as this Court may deem just and proper.

152.    Monsanto incorporates by reference its responses to paragraphs 1 through 151 in response to paragraph 152 of plaintiff's Complaint.

153.    In response to the allegations in paragraph 153, Monsanto admits that plaintiff purports to bring an action for negligence, but Monsanto denies any liability as to that claim.

154.    The allegations in paragraph 154 set forth conclusions of law for which no response is required.

155.    The allegations in paragraph 155 set forth conclusions of law for which no response is required.

156.    Monsanto denies the allegations in paragraph 156, including each of its subparts.

157.    Monsanto denies the allegations in paragraph 157.

158.    Monsanto denies the allegations in paragraph 158.

159.    Monsanto denies the allegations in paragraph 159.

In response to the "WHEREFORE" paragraph following paragraph 159, Monsanto demands that judgment be entered in his favor and against plaintiff and that plaintiff's Complaint be dismissed, with prejudice, and that Monsanto be awarded costs of suit and reasonable attorney's fees as allowed by law and such further and additional relief as this Court may deem just and proper.

160.    Monsanto incorporates by reference its responses to paragraphs 1 through 159 in response to paragraph 160 of plaintiff's Complaint.

161.    Monsanto denies the allegations in paragraph 161.  Additionally, the last sentence in paragraph 161 sets forth a conclusion of law for which no response is required.

162.    Monsanto lacks information or knowledge sufficient to form a belief as to the truth of the allegations in paragraph 162 and therefore denies those allegations.

163.      Monsanto lacks information or knowledge sufficient to form a belief as to the truth of the allegations in paragraph 163 regarding plaintiff's claimed use of or exposure to Roundup®-branded products and therefore denies those allegations. The remaining allegations in paragraph 163 set forth conclusions of law for which no response is required.

164.      In response to the allegations in paragraph 164, Monsanto admits that it has sold glyphosate-based herbicides in accordance with their EPA-approved labeling.  Monsanto further states that paragraph 164 sets forth conclusions of law for which no response is required. Monsanto denies the remaining allegations in paragraph 164.

165.      Monsanto denies the allegations in paragraph 165.

166.      The allegations in paragraph 166 set forth conclusions of law for which no response is required.

167.      Monsanto denies the allegations in paragraph 167.

168.      The allegations in paragraph 168 set forth conclusions of law for which no response is required.

169.      Monsanto denies the allegations in paragraph 169.

In response to the "WHEREFORE" paragraph following paragraph 169, Monsanto demands that judgment be entered in his favor and against plaintiff and that plaintiff's Complaint be dismissed, with prejudice, and that Monsanto be awarded costs of suit and reasonable attorney's fees as allowed by law and such further and additional relief as this Court may deem just and proper.

170.      Monsanto incorporates by reference its responses to paragraphs 1 through 169 in response to paragraph 170 of plaintiff's Complaint.

171.     In response to the allegations in paragraph 171, Monsanto admits that plaintiff purports to bring a claim for fraudulent misrepresentation, but Monsanto denies any liability as to that claim.

172.     In response to the allegations in paragraph 172, Monsanto admits that it has sold glyphosate-based herbicides in accordance with their EPA-approved labeling.  Monsanto denies the remaining allegations in paragraph 172.  Monsanto further states that paragraph 172 sets forth conclusions of law for which no response is required.

173.     Monsanto denies the allegations in paragraph 173.

174.     Monsanto denies the allegations in paragraph 174.

175.     Monsanto denies the allegations in paragraph 175.

176.     Monsanto denies the allegations in paragraph 176.

177.     Monsanto denies the allegations in paragraph 177.

178.     Monsanto denies the allegations in paragraph 178.

179.     Monsanto denies the allegations in paragraph 179.

180.     Monsanto lacks information or knowledge sufficient to form a belief as to the truth of the allegations in paragraph 180 regarding plaintiff's reliance and therefore denies those allegations.  Monsanto denies the remaining allegations in paragraph 180.

181.     Monsanto denies the allegations in paragraph 181.

182.     Monsanto denies the allegations in paragraph 182 and each of its subparts.

In response to the "WHEREFORE" paragraph following paragraph 182, Monsanto demands that judgment be entered in his favor and against plaintiff and that plaintiff's Complaint be dismissed, with prejudice, and that Monsanto be awarded costs of suit and reasonable

attorney's fees as allowed by law and such further and additional relief as this Court may deem just and proper.

183.     Monsanto incorporates by reference its responses to paragraphs 1 through 182 in response to paragraph 183 of plaintiff's Complaint.

184.     In response to the allegations in paragraph 184, Monsanto admits that plaintiff purports to bring a claim for negligent misrepresentation, but Monsanto denies any liability as to that claim.

185.     In response to the allegations in paragraph 185, Monsanto admits that it has sold glyphosate-based herbicides in accordance with their EPA-approved labeling.  Monsanto denies the remaining allegations in paragraph 185.  Monsanto further states that paragraph 185 sets forth conclusions of law for which no response is required.

186.     Monsanto denies the allegations in paragraph 186.

187.     Monsanto denies the allegations in paragraph 187.

188.     Monsanto denies the allegations in paragraph 188.

189.     Monsanto denies the allegations in paragraph 189.

190.     Monsanto denies the allegations in paragraph 190.

191.     Monsanto denies the allegations in paragraph 191.

192.     Monsanto denies the allegations in paragraph 192.

193.     Monsanto denies the allegations in paragraph 193.

194.     Monsanto lacks information or knowledge sufficient to form a belief as to the truth of the allegations in paragraph 194 regarding plaintiff's reliance and therefore denies those allegations.  Monsanto denies the remaining allegations in paragraph 194.

195.     Monsanto denies the allegations in paragraph 195.

196.    Monsanto denies the allegations in paragraph 196.

197.    Monsanto denies the allegations in paragraph 197 and each of its subparts.

In response to the "WHEREFORE" paragraph following paragraph 197, Monsanto demands that judgment be entered in his favor and against plaintiff and that plaintiff's Complaint be dismissed, with prejudice, and that Monsanto be awarded costs of suit and reasonable attorney's fees as allowed by law and such further and additional relief as this Court may deem just and proper.

198.-290.    Monsanto makes no answer to Counts VI-XIV of plaintiff's Complaint because they are not directed at Monsanto and seek no recovery from Monsanto.  To the extent that responses from Monsanto are deemed required, Monsanto denies: (a) that glyphosate or Roundup®-branded products can cause NHL and other serious illnesses; (b) that glyphosate or Roundup®-branded products caused plaintiff's cancer; (c) that Roundup®-branded products are defective or lack adequate warnings; (d) that Monsanto was negligent, is strictly liable, breached any warranties, or engaged in negligent misrepresentation, fraudulent misrepresentation, or any tortious conduct; and (e) that Monsanto is liable to plaintiff based on any allegations in Counts VI-XIV.

Every allegation in the Complaint that is not specifically and expressly admitted in this Answer is hereby specifically and expressly denied.

## SEPARATE AND AFFIRMATIVE DEFENSES

1.    The Complaint, in whole or part, fails to state a claim or cause of action against Monsanto upon which relief can be granted.

2.    Plaintiff's claims are improperly joined and should be severed.

3.      Plaintiff's claims against Monsanto are barred because plaintiff cannot proffer any scientifically reliable evidence that the products at issue were defective or unreasonably dangerous.

4.      Any alleged negligent or culpable conduct of Monsanto, none being admitted, was so insubstantial as to be insufficient to be a proximate or substantial contributing cause of plaintiff's alleged injuries.

5.      Plaintiff's claims against Monsanto are barred, in whole or in part, because the products at issue were designed, manufactured, marketed and labeled with proper warnings, information, cautions and instructions, in accordance with the state of the art and the state of scientific and technological knowledge.

6.      Plaintiff's claims against Monsanto are barred, in whole or in part, because the products at issue were not defective or unreasonably dangerous in that they complied with, at all relevant times, all applicable government safety standards.

7.      Any claims based on allegations that Monsanto misled, defrauded, made misrepresentations to, or withheld information from U.S. EPA are preempted by federal law. *See, e.g.*, *Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341 (2001); *Nathan Kimmel, Inc. v. Dowelanco*, 275 F.3d 1199 (9th Cir. 2002).

8.      Plaintiff's claims against Monsanto are preempted, in whole or in part, by applicable federal law relating to the design, testing, producing, manufacturing, labeling, distributing, modeling, processing, and supply of Roundup®-branded products and/or glyphosate-containing products.

9.      Plaintiff's claims against Monsanto are preempted, in whole or in part, because of U.S. EPA findings and/or because of U.S. EPA-approved product labeling.

10.     Plaintiff's claims against Monsanto are barred, in whole or in part, by the doctrine of primary jurisdiction, including by the authority delegated by Congress to the U.S. EPA.

11.     Plaintiff's claims against Monsanto are barred, in whole or in part, because plaintiff's injuries, if any, were the result of conduct of plaintiff, independent third parties, and/or events that were extraordinary under the circumstances, not foreseeable in the normal course of events, and/or independent, intervening and superseding causes of the alleged injuries, including but not limited to plaintiff's pre-existing medical conditions.

12.     The doctrines contained in Restatement (Second) of Torts § 402A, comments j and k, bar plaintiff's claims against Monsanto in whole or in part.

13.     Applicable statutes of limitations and/or repose bar plaintiff's claims against Monsanto in whole or in part.

14.     Plaintiff's misuse or abnormal use of the product or failure to follow instructions bar plaintiff's claims against Monsanto in whole or in part.

15.     If plaintiff suffered injuries or damages as alleged, which is denied, such injuries or damages resulted from:  (a) acts or omissions of persons or entities for which Monsanto is neither liable nor responsible or, in the alternative, Monsanto is entitled to an assessment of the relative degree of fault of all such persons and entities; or (b) resulted from diseases and/or causes that are not related or connected with any product sold, distributed, or manufactured by Monsanto.  Such acts or omissions on the part of others or diseases or causes constitute an independent, intervening and sole proximate cause of plaintiff's alleged injuries or damages.

16.     Monsanto had no legal relationship or privity with plaintiff and owed no duty to her by which liability could be attributed to it.

17.     Plaintiff's claims are preempted or otherwise barred in whole or in part by the Freedom of Speech Clause of the First Amendment of the U.S. Constitution.

18.     Monsanto made no warranties of any kind or any representations of any nature whatsoever to plaintiff.  If any such warranties were made, which Monsanto specifically denies, then plaintiff failed to give notice of any breach thereof.

19.     Plaintiff's claims against Monsanto are barred in whole or in part by plaintiff's contributory/comparative negligence.

20.     Plaintiff's claims against Monsanto are barred in whole or in part by plaintiff's failure to mitigate damages.

21.     Plaintiff's claims against Monsanto are barred in whole or in part by the sophisticated user doctrine.

22.     To the extent that plaintiff recovered payments for plaintiff's alleged injuries from any collateral source(s) or other source(s), plaintiff's recovery in this lawsuit, if any, shall be reduced to the extent allowed by applicable law, including as allowed for under Fla. Stat. § 768.76.

23.     If plaintiff has been injured or damaged, no injuries or damages being admitted, such injuries or damages were not caused by a Monsanto product.

24.     Plaintiff's claims against Monsanto are barred or limited to the extent that plaintiff asserts claims that are governed by the laws of a state that does not recognize, or limits, such claims.

25.     Plaintiff's claims against Monsanto are barred to the extent that plaintiff seek relief under the laws of states that do not govern plaintiff's claims.

26.     Plaintiff's claims against Monsanto are barred, in whole or in part, by application of Fla. Stat. § 768.1256.

27.     In accordance with Fla. Stat. § 768.1257, plaintiff's claims against Monsanto are barred, in whole or in part, because the products at issue were designed, manufactured, marketed and labeled with proper warnings, information, cautions and instructions, in accordance with the state of the art and the state of scientific and technological knowledge.

28.     Plaintiff has failed to allege fraud with sufficient particularity.

29.     Plaintiff's medical condition was caused directly, solely, and proximately by medical conditions, sensitivities, and idiosyncrasies peculiar to her, and which were unknown, unknowable, or not reasonably foreseeable to Monsanto.

30.     The number of different agents to which plaintiff was exposed and the lack of definitive evidence as to the amount of actual exposure to each agent makes it impossible to determine, to a requisite degree of legal certainty, the alleged causal connection, if any, between plaintiff's injuries and said agents.

31.     Plaintiff's injuries, if any, were caused, in whole or in part, by the acts or omissions of persons other than Monsanto, whether individual, corporate, associate, or otherwise, whether named or unnamed in the Complaint, and for whose conduct Monsanto is not liable.  Monsanto is not liable for damages proximately caused by non-parties, pursuant to *Fabre v. Marin*, 623 So.2d 1182 (Fla. 1993), including any other product used by plaintiff that was not manufactured, sold, or distributed by Monsanto.

32.     Monsanto hereby gives notice that it intends to rely upon such other defenses as may become available or apparent during the course of discovery and thus reserves its right to amend this Answer to assert such defenses.

**WHEREFORE**, Defendant Monsanto demands judgment in its favor and against plaintiff, dismissing plaintiff's Complaint with prejudice, together with the costs of suit and such other relief as the Court deems equitable and just.

Respectfully submitted,

**McDERMOTT WILL & EMERY LLP**

*/s/ Melissa R. Alvarez*
ANTHONY N. UPSHAW
Florida Bar No.: 861091
aupshaw@mwe.com
MELISSA R. ALVAREZ
Florida Bar No.: 820091
malvarez@mwe.com
333 SE 2nd Avenue, Suite 4500
Miami, FL 33131
Tel:  (305) 329-4431
Fax: (305) 675-8031
*Counsel for Defendant*
*Monsanto Company*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this **16th day of February, 2021,** a true and correct copy of the foregoing was electronically filed with the Clerk of the Court using the CM/ECF system.

*/s/ Melissa R. Alvarez*

## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA
## MIAMI DIVISION

| | |
|---|---|
| NANCY C. SALAS, | |
| Plaintiff, | |
| v. | Case No. 1:21-cv-20648-PCH |
| MONSANTO COMPANY, et al., | |
| Defendants. | |

### ANDREW JACK CONROY'S ANSWER TO PLAINTIFF'S COMPLAINT

Defendant Andrew Jack Conroy, by and through his counsel, respectfully responds by generally denying all allegations contained in plaintiff's Complaint, except as set forth below. Mr. Conroy denies – and objects to – allegations by plaintiff that purport to lump Mr. Conroy together with other defendants.  Mr. Conroy responds to this Complaint only on his own behalf and not on behalf of any other defendant.  Silence as to any allegations shall constitute a denial.

1.      Mr. Conroy denies the allegations in paragraph 1.

2.      Mr. Conroy lacks information or knowledge sufficient to form a belief as to the truth of the allegations in paragraph 2 and therefore denies those allegations.

3.      The allegations in paragraph 3 comprise attorney characterizations and are accordingly denied.   Mr. Conroy states that the Roundup®-branded products identified by plaintiff have a variety of separate and distinct uses and formulations.

4.      The allegations in paragraph 4 are directed at a defendant other than Mr. Conroy, so no response from Mr. Conroy is required for these allegations.

5.      The allegations in paragraph 5 are directed at a defendant other than Mr. Conroy, so no response from Mr. Conroy is required for these allegations.

6.      Mr. Conroy admits that, at certain times, he was employed by Monsanto as alleged in the first sentence of paragraph 6.  Mr. Conroy admits the allegation in the second sentence of paragraph 6.

7.      The allegations in paragraph 7 are directed at a defendant other than Mr. Conroy, so no response from Mr. Conroy is required for these allegations.

8.      The allegations in paragraph 8 are directed at a defendant other than Mr. Conroy, so no response from Mr. Conroy is required for these allegations.

9.      The allegations in paragraph 9 are directed at defendants other than Mr. Conroy, so no response from Mr. Conroy is required for these allegations.

10.     The allegations in paragraph 10 are directed at a defendant other than Mr. Conroy, so no response from Mr. Conroy is required for these allegations.

11.     The allegations in paragraph 11 are directed at defendants other than Mr. Conroy, so no response from Mr. Conroy is required for these allegations.

12.     The allegations in paragraph 12 set forth conclusions of law for which no response is required.

13.     The allegations in paragraph 13 are directed at a defendant other than Mr. Conroy, so no response from Mr. Conroy is required for these allegations.

14.      The allegations in paragraph 14 are directed at a defendant other than Mr. Conroy, so no response from Mr. Conroy is required for these allegations.

15.     The allegations in paragraph 15 are directed at a defendant other than Mr. Conroy, so no response from Mr. Conroy is required for these allegations.

16.     The allegations in paragraph 16 are directed at a defendant other than Mr. Conroy, so no response from Mr. Conroy is required for these allegations.

17.     Mr. Conroy admits the allegations in paragraph 17.

18.     The allegations in paragraph 18 are directed at a defendant other than Mr. Conroy, so no response from Mr. Conroy is required for these allegations.

19.     The allegations in paragraph 19 are directed at a defendant other than Mr. Conroy, so no response from Mr. Conroy is required for these allegations.

20.     The allegations in paragraph 20 are directed at a defendant other than Mr. Conroy, so no response from Mr. Conroy is required for these allegations.

21.     The allegations in paragraph 21 are directed at a defendant other than Mr. Conroy, so no response from Mr. Conroy is required for these allegations.

22.     The allegations in paragraph 22 are directed at a defendant other than Mr. Conroy, so no response from Mr. Conroy is required for these allegations.

23.     The allegations in paragraph 23 are directed at a defendant other than Mr. Conroy, so no response from Mr. Conroy is required for these allegations.

24.     The allegations in paragraph 24 are directed at a defendant other than Mr. Conroy, so no response from Mr. Conroy is required for these allegations.

25.     The allegations in paragraph 25 set forth conclusions of law for which no response is required.  To the extent that a response is deemed required, Mr. Conroy denies the allegations in paragraph 25.

26.     The allegations in paragraph 26 set forth conclusions of law for which no response is required.

27.     Mr. Conroy admits the allegations in paragraph 27.

28.     Mr. Conroy lacks information or knowledge sufficient to form a belief as to the truth of the allegations in paragraph 28 and therefore denies those allegations.

29.     Mr. Conroy lacks information or knowledge sufficient to form a belief as to the truth of the allegations in paragraph 29 and therefore denies those allegations.

30.     Mr. Conroy lacks information or knowledge sufficient to form a belief as to the truth of the allegations in the first sentence of paragraph 30 and therefore denies those allegations.  Mr. Conroy denies the allegations in the final sentence of paragraph 30.

31.     The allegations in paragraph 31 are directed at a defendant other than Mr. Conroy, so no response from Mr. Conroy is required for these allegations.

32.     Mr. Conroy lacks information or knowledge sufficient to form a belief as to the truth of the allegations in paragraph 32 and therefore denies those allegations.

33.     Mr. Conroy denies the allegations in paragraph 33.

34.     The allegations in paragraph 34 are directed at a defendant other than Mr. Conroy, so no response from Mr. Conroy is required for these allegations.

35.     The allegations in paragraph 35 set forth conclusions of law for which no response is required.

36.     The allegations in paragraph 36 set forth conclusions of law for which no response is required.

37.     The allegations in paragraph 37 set forth conclusions of law for which no response is required.

38.     In response to the allegations in paragraph 38, Mr. Conroy admits that Roundup®-branded products are registered by the United States Environmental Protection Agency ("EPA") for manufacture, sale, and distribution in the United States.

39.     The allegations in paragraph 39 are directed at a defendant other than Mr. Conroy or set forth conclusions of law, so no response from Mr. Conroy is required for these allegations.

40.     The allegations in the second sentence of paragraph 40 are directed at a defendant other than Mr. Conroy, so no response from Mr. Conroy is required for these allegations.  Mr. Conroy lacks information or knowledge sufficient to form a belief as to the truth of the remaining allegations in paragraph 40 and therefore denies those allegations.

41.     The allegations in paragraph 41 are directed at a defendant other than Mr. Conroy, so no response from Mr. Conroy is required for these allegations.

42.     The allegations in paragraph 42 are directed at a defendant other than Mr. Conroy, so no response from Mr. Conroy is required for these allegations.

43.     The allegations in paragraph 43 are directed at a defendant other than Mr. Conroy, so no response from Mr. Conroy is required for these allegations.

44.     The allegations in paragraph 44 are directed at a defendant other than Mr. Conroy, so no response from Mr. Conroy is required for these allegations.

45.     The allegations in the first sentence of paragraph 45 are directed at a defendant other than Mr. Conroy, so no response from Mr. Conroy is required for these allegations.   Mr. Conroy lacks information or knowledge sufficient to form a belief as to the truth of the remaining allegations in paragraph 45 and therefore denies those allegations.

46.     The allegations in paragraph 46 are directed at a defendant other than Mr. Conroy, so no response from Mr. Conroy is required for these allegations.

47.     The allegations in paragraph 47 are directed at a defendant other than Mr. Conroy, so no response from Mr. Conroy is required for these allegations.

48.     The allegations in paragraph 48 are directed at a defendant other than Mr. Conroy, so no response from Mr. Conroy is required for these allegations.

49.     The allegations in paragraph 49 are directed at a defendant other than Mr. Conroy, so no response from Mr. Conroy is required for these allegations.

50.     The allegations in paragraph 50 are directed at a defendant other than Mr. Conroy, so no response from Mr. Conroy is required for these allegations.

51.     The allegations in paragraph 51 are directed at a defendant other than Mr. Conroy, so no response from Mr. Conroy is required for these allegations.

52.     The allegations in paragraph 52 are directed at a defendant other than Mr. Conroy, so no response from Mr. Conroy is required for these allegations.

53.     The allegations in paragraph 53 are directed at a defendant other than Mr. Conroy, so no response from Mr. Conroy is required for these allegations.

54.     The allegations in paragraph 54 are directed at a defendant other than Mr. Conroy, so no response from Mr. Conroy is required for these allegations.

55.     The allegations in paragraph 55 are directed at a defendant other than Mr. Conroy, so no response from Mr. Conroy is required for these allegations.

56.     The allegations in paragraph 56 are directed at a defendant other than Mr. Conroy, so no response from Mr. Conroy is required for these allegations.

57.      In response to the allegations in paragraph 57, Mr. Conroy denies that glyphosate or Roundup®-branded products are toxic.  Mr. Conroy lacks information or knowledge sufficient to form a belief as to the truth of the remaining allegations in paragraph 57 and therefore denies those allegations.

58.     Mr. Conroy states that the term "toxic" as used in paragraph 58 is vague and ambiguous to the extent it is intended to suggest any evidence of carcinogenicity.  Mr. Conroy denies the allegations in paragraph 58.

59.      The allegations in paragraph 59 are directed at a defendant other than Mr. Conroy, so no response from Mr. Conroy is required for these allegations.

60.      The allegations in paragraph 60 are directed at a defendant other than Mr. Conroy, so no response from Mr. Conroy is required for these allegations.

61.      The allegations in paragraph 61 are directed at a defendant other than Mr. Conroy, so no response from Mr. Conroy is required for these allegations.

62.      The allegations in paragraph 62 are directed at a defendant other than Mr. Conroy, so no response from Mr. Conroy is required for these allegations.

63.      The allegations in paragraph 63 are directed at a defendant other than Mr. Conroy, so no response from Mr. Conroy is required for these allegations.

64.      The allegations in paragraph 64 are directed at a defendant other than Mr. Conroy, so no response from Mr. Conroy is required for these allegations.

65.      The allegations in paragraph 65 are directed at a defendant other than Mr. Conroy, so no response from Mr. Conroy is required for these allegations.

66.      The allegations in paragraph 66 are directed at a defendant other than Mr. Conroy, so no response from Mr. Conroy is required for these allegations.

67.      The allegations in paragraph 67 are directed at a defendant other than Mr. Conroy, so no response from Mr. Conroy is required for these allegations.

68.      The allegations in paragraph 68 are directed at a defendant other than Mr. Conroy, so no response from Mr. Conroy is required for these allegations.

69.      The allegations in paragraph 69 are directed at a defendant other than Mr. Conroy, so no response from Mr. Conroy is required for these allegations.

70.     The allegations in paragraph 70 are directed at a defendant other than Mr. Conroy, so no response from Mr. Conroy is required for these allegations.

71.     The allegations in paragraph 71 are directed at a defendant other than Mr. Conroy, so no response from Mr. Conroy is required for these allegations.

72.     The allegations in paragraph 72 are directed at a defendant other than Mr. Conroy, so no response from Mr. Conroy is required for these allegations.

73.     The allegations in paragraph 73 are directed at a defendant other than Mr. Conroy, so no response from Mr. Conroy is required for these allegations.

74.     The allegations in paragraph 74 are directed at a defendant other than Mr. Conroy, so no response from Mr. Conroy is required for these allegations.

75.     The allegations in paragraph 75 are directed at a defendant other than Mr. Conroy, so no response from Mr. Conroy is required for these allegations.

76.     The allegations in paragraph 76 are directed at a defendant other than Mr. Conroy, so no response from Mr. Conroy is required for these allegations.

77.     The allegations in paragraph 77 are directed at a defendant other than Mr. Conroy, so no response from Mr. Conroy is required for these allegations.

78.     The allegations in paragraph 78 are directed at a defendant other than Mr. Conroy, so no response from Mr. Conroy is required for these allegations.

79.     The allegations in paragraph 79 are directed at a defendant other than Mr. Conroy, so no response from Mr. Conroy is required for these allegations.

80.     The allegations in paragraph 80 are directed at a defendant other than Mr. Conroy, so no response from Mr. Conroy is required for these allegations.

81.     The allegations in paragraph 81 are directed at a defendant other than Mr. Conroy, so no response from Mr. Conroy is required for these allegations.

82.     The allegations in paragraph 82 are directed at a defendant other than Mr. Conroy, so no response from Mr. Conroy is required for these allegations.

83.     The allegations in paragraph 83 are directed at a defendant other than Mr. Conroy, so no response from Mr. Conroy is required for these allegations.

84.     The allegations in paragraph 84 are directed at a defendant other than Mr. Conroy, so no response from Mr. Conroy is required for these allegations.

85.     The allegations in paragraph 85 are directed at a defendant other than Mr. Conroy, so no response from Mr. Conroy is required for these allegations.

86.     In response to the allegations in the first and second sentences of paragraph 86, Mr. Conroy admits that in March 2015 IARC classified glyphosate as a class 2A carcinogen.  In response to the remaining allegations in the first and second sentences of paragraph 86, Mr. Conroy states that the document speaks for itself and does not require a response.  The remaining allegations in paragraph 86 are directed at a defendant other than Mr. Conroy, so no response from Mr. Conroy is required for these allegations

87.     The allegations in paragraph 87 are directed at a defendant other than Mr. Conroy, so no response from Mr. Conroy is required for these allegations.

88.     The allegations in paragraph 88 are directed at a defendant other than Mr. Conroy, so no response from Mr. Conroy is required for these allegations.

89.     The allegations in paragraph 89 are directed at a defendant other than Mr. Conroy, so no response from Mr. Conroy is required for these allegations.

90.     The allegations in paragraph 90 are directed at a defendant other than Mr. Conroy, so no response from Mr. Conroy is required for these allegations.

91.     The allegations in paragraph 91 are directed at a defendant other than Mr. Conroy, so no response from Mr. Conroy is required for these allegations.

92.     The allegations in paragraph 92 are directed at a defendant other than Mr. Conroy, so no response from Mr. Conroy is required for these allegations.

93.     The allegations in paragraph 93 are directed at a defendant other than Mr. Conroy, so no response from Mr. Conroy is required for these allegations.

94.     The allegations in paragraph 94 are directed at a defendant other than Mr. Conroy, so no response from Mr. Conroy is required for these allegations.

95.     The allegations in paragraph 95 are directed at a defendant other than Mr. Conroy, so no response from Mr. Conroy is required for these allegations.

96.     In response to the allegations in paragraph 96, Mr. Conroy admits that in March 2015 IARC classified glyphosate as a class 2A carcinogen.  In response to the remaining allegations in paragraph 96, Mr. Conroy states that the document speaks for itself and does not require a response.  Mr. Conroy lacks information or knowledge sufficient to form a belief as to the truth of any remaining allegations in paragraph 96 and therefore denies those allegations.

97.     In response to the allegations in paragraph 97, Mr. Conroy admits that the full IARC Monograph regarding glyphosate was published on July 29, 2015 and that the Monograph purported to classify glyphosate as a class 2A carcinogen.  In response to the remaining allegations in paragraph 97, Mr. Conroy states that the document speaks for itself and does not require a response.  To the extent that a response is deemed required, Mr. Conroy lacks

information or knowledge sufficient to form a belief as to the truth of the remaining allegations in paragraph 97 and therefore denies those allegations.

98.     Mr. Conroy lacks information or knowledge sufficient to form a belief as to the truth of the allegations in paragraph 98 and therefore denies those allegations.

99.     Mr. Conroy lacks information or knowledge sufficient to form a belief as to the truth of the allegations in paragraph 99 and therefore denies those allegations.

100.    Mr. Conroy lacks information or knowledge sufficient to form a belief as to the truth of the allegations in paragraph 100 and therefore denies those allegations.

101.    In response to the allegations in paragraph 101, Mr. Conroy states that the document speaks for itself and does not require a response.

102.    In response to the allegations in paragraph 102, Mr. Conroy states that the document speaks for itself and does not require a response.

103.    In response to the allegations in paragraph 103, Mr. Conroy states that the document speaks for itself and does not require a response.

104.    In response to the allegations in paragraph 104, Mr. Conroy states that the document speaks for itself and does not require a response.

105.    In response to the allegations in paragraph 105, Mr. Conroy states that the document speaks for itself and does not require a response.

106.    In response to the allegations in paragraph 106, Mr. Conroy states that the document speaks for itself and does not require a response.

107.    In response to the allegations in the first sentence of paragraph 107, Mr. Conroy states that the document speaks for itself and does not require a response.  Mr. Conroy lacks

information or knowledge sufficient to form a belief as to the truth of the remaining allegations in paragraph 107 and therefore denies those allegations.

108.    In response to the allegations in paragraph 108, Mr. Conroy states that the document speaks for itself and does not require a response.

109.    In response to the allegations in the first sentence of paragraph 109, Mr. Conroy states that the document speaks for itself and does not require a response.  Mr. Conroy lacks information or knowledge sufficient to form a belief as to the truth of the remaining allegations in paragraph 109 and therefore denies those allegations.

110.    In response to the allegations in paragraph 110, Mr. Conroy states that the document speaks for itself and does not require a response.

111.    Mr. Conroy denies the allegations in paragraph 111.

112.    The allegations in paragraph 112 are directed at a defendant other than Mr. Conroy, so no response from Mr. Conroy is required for these allegations.

113.    The allegations in paragraph 113 are directed at a defendant other than Mr. Conroy, so no response from Mr. Conroy is required for these allegations.

114.    The allegations in paragraph 114 do not require a response from Mr. Conroy because these allegations relate to other companies, not Mr. Conroy.

115.    In response to the allegations in paragraph 115, Mr. Conroy states that the document speaks for itself and does not require a response.

116.    In response to the allegations in the last sentence of paragraph 116, Mr. Conroy states that the document speaks for itself and does not require a response.  Mr. Conroy lacks information or knowledge sufficient to form a belief as to the truth of the remaining allegations in paragraph 116 and therefore denies those allegations.

117.     In response to the allegations in paragraph 117, Mr. Conroy states that the document speaks for itself and does not require a response.

118.     In response to the allegations in the last sentence of paragraph 118, Mr. Conroy states that the document speaks for itself and does not require a response.  Mr. Conroy lacks information or knowledge sufficient to form a belief as to the truth of the remaining allegations in paragraph 118 and therefore denies those allegations.

119.     In response to the allegations in paragraph 119, Mr. Conroy states that the document speaks for itself and does not require a response.

120.     Mr. Conroy lacks information or knowledge sufficient to form a belief as to the truth of the allegations in paragraph 120 and therefore denies those allegations.

121.     Mr. Conroy lacks information or knowledge sufficient to form a belief as to the truth of the allegations in paragraph 121 and therefore denies those allegations.

122.     Mr. Conroy lacks information or knowledge sufficient to form a belief as to the truth of the allegations in paragraph 122 and therefore denies those allegations.

123.     Mr. Conroy lacks information or knowledge sufficient to form a belief as to the truth of the allegations in paragraph 123 and therefore denies those allegations.

124.     In response to the allegations in paragraph 124, Mr. Conroy denies that glyphosate-containing products are dangerous and that they can cause non-Hodgkin's lymphoma ("NHL") and other serious illnesses.  Mr. Conroy lacks information or knowledge sufficient to form a belief as to the truth of the remaining allegations in paragraph 124 and therefore denies those allegations.

125.     Mr. Conroy denies the allegations in paragraph 125.

126.     The allegations in paragraph 126 are directed at defendants other than Mr. Conroy, so no response from Mr. Conroy is required for these allegations.

127.     In response to the allegations in paragraph 127, Mr. Conroy denies that Roundup®-branded products have "carcinogenic properties" and that those products pose a "grave danger."  The remaining allegations in paragraph 127 are directed at a defendant other than Mr. Conroy, so no response from Mr. Conroy is required for these allegations.

128.     The allegations in paragraph 128 are directed at defendants other than Mr. Conroy, so no response from Mr. Conroy is required for these allegations.

129.     In response to the allegations in paragraph 129, Mr. Conroy denies that Roundup®-branded products have "carcinogenic properties" and that those products pose a "grave danger."  The remaining allegations in paragraph 129 are directed at a defendant other than Mr. Conroy, so no response from Mr. Conroy is required for these allegations.

130.     In response to the allegations in paragraph 130, Mr. Conroy denies that Roundup®-branded products have "carcinogenic or potentially carcinogenic properties" and that those products pose a "danger."  The remaining allegations in paragraph 130 are directed at a defendant other than Mr. Conroy, so no response from Mr. Conroy is required for these allegations.

131.     The allegations in paragraph 131 are directed at defendants other than Mr. Conroy, so no response from Mr. Conroy is required for these allegations.

132.     In response to the allegations in paragraph 132, Mr. Conroy denies that Roundup®-branded products have "carcinogenic properties" and that those products pose a "grave danger."  The remaining allegations in paragraph 132 are directed at a defendant other than Mr. Conroy, so no response from Mr. Conroy is required for these allegations.

133.    In response to the allegations in paragraph 133, Mr. Conroy denies that Roundup®-branded products have "carcinogenic or potentially carcinogenic properties" and that those products pose a "danger."  The remaining allegations in paragraph 133 are directed at a defendant other than Mr. Conroy, so no response from Mr. Conroy is required for these allegations.

134.    Mr. Conroy lacks information or knowledge sufficient to form a belief as to the truth of the allegations in paragraph 134 and therefore denies those allegations.

135.    Mr. Conroy lacks information or knowledge sufficient to form a belief as to the truth of the allegations in paragraph 135 and therefore denies those allegations.

136.    Mr. Conroy lacks information or knowledge sufficient to form a belief as to the truth of the allegations in paragraph 136 and therefore denies those allegations.

137.    Mr. Conroy lacks information or knowledge sufficient to form a belief as to the truth of the allegations in paragraph 137 and therefore denies those allegations.

138.    Mr. Conroy lacks information or knowledge sufficient to form a belief as to the truth of the allegations in paragraph 138 and therefore denies those allegations.

139.    Mr. Conroy lacks information or knowledge sufficient to form a belief as to the truth of the allegations in paragraph 139 and therefore denies those allegations.

140.    Mr. Conroy lacks information or knowledge sufficient to form a belief as to the truth of the allegations in paragraph 140 and therefore denies those allegations.

141.    Mr. Conroy denies that any exposure to Roundup®-branded products can cause NHL and/or other serious illnesses and therefore denies those allegations in paragraph 141.  Mr. Conroy lacks information or knowledge sufficient to form a belief as to the truth of the remaining allegations in paragraph 141 and therefore denies those allegations.

142.     Mr. Conroy incorporates by reference his responses to paragraphs 1 through 141 in response to paragraph 142 of plaintiff's Complaint.

143.     In response to the allegations in paragraph 143, Mr. Conroy admits that plaintiff purports to bring an action for strict products liability but denies any liability as to those claims.

144.     In response to the allegations in paragraph 144, Mr. Conroy lacks information or knowledge sufficient to form a belief as to the truth of the allegation that plaintiff used Roundup®-branded products and therefore denies that allegation.   Mr. Conroy denies the remaining allegations in paragraph 144.

145.     Mr. Conroy denies the allegations in paragraph 145 and each of its subparts.

146.     Mr. Conroy denies the allegations in paragraph 146.

147.     In response to the allegations in paragraph 147, Mr. Conroy lacks information or knowledge sufficient to form a belief as to the truth of the allegation that plaintiff used Roundup®-branded products and therefore denies that allegation. Mr. Conroy denies the remaining allegations in paragraph 147.

148.     Mr. Conroy denies the allegations in paragraph 148.

149.     The allegation in paragraph 149 sets forth a conclusion of law for which no response is required.

150.     Mr. Conroy denies the allegations in paragraph 150.

151.     Mr. Conroy denies the allegations in paragraph 151.

In response to the "WHEREFORE" paragraph following paragraph 151, Mr. Conroy demands that judgment be entered in his favor and against plaintiff and that plaintiff's Complaint be dismissed, with prejudice, and that Mr. Conroy be awarded costs of suit and reasonable

attorney's fees as allowed by law and such further and additional relief as this Court may deem just and proper.

152.    Mr. Conroy incorporates by reference his responses to paragraphs 1 through 151 in response to paragraph 152 of plaintiff's Complaint.

153.    In response to the allegations in paragraph 153, Mr. Conroy admits that plaintiff purports to bring an action for negligence but denies any liability as to those claims.

154.    The allegations in paragraph 154 set forth conclusions of law for which no response is required.

155.    The allegations in paragraph 155 set forth conclusions of law for which no response is required.

156.    Mr. Conroy denies the allegations in paragraph 156, including each of its subparts.

157.    Mr. Conroy denies the allegations in paragraph 157.

158.    Mr. Conroy denies the allegations in paragraph 158.

159.    Mr. Conroy denies the allegations in paragraph 159.

In response to the "WHEREFORE" paragraph following paragraph 159, Mr. Conroy demands that judgment be entered in his favor and against plaintiff and that plaintiff's Complaint be dismissed, with prejudice, and that Mr. Conroy be awarded costs of suit and reasonable attorney's fees as allowed by law and such further and additional relief as this Court may deem just and proper.

160.-290.    Mr. Conroy makes no answer to Counts III-XIV of plaintiff's Complaint because they are not directed at Mr. Conroy and seek no recovery from Mr. Conroy.  To the extent that responses from Mr. Conroy are deemed required, Mr. Conroy denies:   (a) that

glyphosate or Roundup®-branded products can cause NHL and other serious illnesses; (b) that glyphosate or Roundup®-branded products caused plaintiff's cancer; (c) that Roundup®-branded products are defective or lack adequate warnings; (d) that Mr. Conroy was negligent, is strictly liable, breached any warranties, or engaged in any other tortious conduct; and (e) that Mr. Conroy is liable to plaintiff based on any allegations in Counts III-XIV.

Every allegation in the Complaint that is not specifically and expressly admitted in this Answer is hereby specifically and expressly denied.

## SEPARATE AND AFFIRMATIVE DEFENSES

1.     The Complaint, in whole or part, fails to state a claim or cause of action against Mr. Conroy upon which relief can be granted.

2.     Plaintiff's claims are improperly joined and should be severed.

3.     Plaintiff's claims against Mr. Conroy are barred because plaintiff cannot proffer any scientifically reliable evidence that the products at issue were defective or unreasonably dangerous.

4.     Plaintiff's claims against Mr. Conroy are barred because Mr. Conroy never had any role in the chain of distribution for the Roundup®-branded herbicides that allegedly caused plaintiff's injuries and never had any control over, any involvement with, or any connection whatsoever to those herbicide products.

5.     Any alleged negligent or culpable conduct of Mr. Conroy, none being admitted, was so insubstantial as to be insufficient to be a proximate or substantial contributing cause of plaintiff's alleged injuries.

6.     Plaintiff's claims against Mr. Conroy are barred, in whole or in part, because the products at issue were designed, manufactured, marketed and labeled with proper warnings,

information, cautions and instructions, in accordance with the state of the art and the state of scientific and technological knowledge.

7.     Plaintiff's claims against Mr. Conroy are barred, in whole or in part, because the products at issue were not defective or unreasonably dangerous in that they complied with, at all relevant times, all applicable government safety standards.

8.     Plaintiff's claims against Mr. Conroy are preempted, in whole or in part, by applicable federal law relating to the design, testing, producing, manufacturing, labeling, distributing, modeling, processing, and supply of Roundup®-branded products and/or glyphosate-containing products.

9.     Plaintiff's claims against Mr. Conroy are preempted, in whole or in part, because of U.S. EPA findings that glyphosate does not cause cancer in humans and/or because of U.S. EPA-approved product labeling.

10.     Plaintiff's claims against Mr. Conroy are barred, in whole or in part, by the doctrine of primary jurisdiction, including by the authority delegated by Congress to the U.S. EPA.

11.     Plaintiff's claims against Mr. Conroy are barred, in whole or in part, because plaintiff's injuries, if any, were the result of conduct of plaintiff, independent third parties, and/or events that were extraordinary under the circumstances, not foreseeable in the normal course of events, and/or independent, intervening and superseding causes of the alleged injuries, including but not limited to plaintiff's pre-existing medical conditions.

12.     The doctrines contained in Restatement (Second) of Torts § 402A, comments j and k, bar plaintiff's claims against Mr. Conroy in whole or in part.

13.     Applicable statutes of limitations and/or repose bar plaintiff's claims against Mr. Conroy in whole or in part.

14.     Plaintiff's misuse or abnormal use of the product or failure to follow instructions bar plaintiff's claims against Mr. Conroy in whole or in part.

15.     If plaintiff suffered injuries or damages as alleged, which is denied, such injuries or damages resulted from:  (a) acts or omissions of persons or entities for which Mr. Conroy is neither liable nor responsible or, in the alternative, Mr. Conroy is entitled to an assessment of the relative degree of fault of all such persons and entities; or (b) resulted from diseases and/or causes that are not related or connected with any product sold, distributed, or manufactured by Mr. Conroy.  Such acts or omissions on the part of others or diseases or causes constitute an independent, intervening and sole proximate cause of plaintiff's alleged injuries or damages.

16.     Mr. Conroy had no legal relationship or privity with plaintiff and owed no duty to her by which liability could be attributed to him.

17.     Plaintiff's claims are preempted or otherwise barred in whole or in part by the Freedom of Speech Clause of the First Amendment of the U.S. Constitution.

18.     Plaintiff's claims against Mr. Conroy are barred in whole or in part by plaintiff's contributory/comparative negligence.

19.     Plaintiff's claims against Mr. Conroy are barred in whole or in part by plaintiff's failure to mitigate damages.

20.     Plaintiff's claims against Mr. Conroy are barred in whole or in part by the sophisticated user doctrine.

21.     To the extent that plaintiff recovered payments for plaintiff's alleged injuries from any collateral source(s) or other source(s), plaintiff's recovery in this lawsuit, if any, shall be

reduced to the extent allowed by applicable law, including as allowed for under Fla. Stat. § 768.76.

22.     If plaintiff has been injured or damaged, no injuries or damages being admitted, such injuries or damages were not caused by a product distributed, marketed, or sold by Mr. Conroy.

23.     Plaintiff's claims against Mr. Conroy are barred or limited to the extent that plaintiff asserts claims that are governed by the laws of a state that does not recognize, or limits, such claims.

24.     Plaintiff's claims against Mr. Conroy are barred to the extent that plaintiff seeks relief under the laws of states that do not govern plaintiff's claims.

25.     Plaintiff's claims against Mr. Conroy are barred, in whole or in part, by application of Fla. Stat. § 768.1256.

26.     Plaintiff's medical condition was caused directly, solely, and proximately by medical conditions, sensitivities, and idiosyncrasies peculiar to her, and which were unknown, unknowable, or not reasonably foreseeable to Mr. Conroy.

27.     The number of different agents to which plaintiff was exposed and the lack of definitive evidence as to the amount of actual exposure to each agent makes it impossible to determine, to a requisite degree of legal certainty, the alleged causal connection, if any, between plaintiff's injuries and said agents.

28.     Plaintiff's injuries, if any, were caused, in whole or in part, by the acts or omissions of persons other than Mr. Conroy, whether individual, corporate, associate, or otherwise, whether named or unnamed in the Complaint, and for whose conduct Mr. Conroy is not liable.  Mr. Conroy is not liable for damages proximately caused by non-parties, pursuant to

*Fabre v. Marin*, 623 So.2d 1182 (Fla. 1993), including any other product used by plaintiff that was not manufactured, sold, or distributed by Mr. Conroy.

29.     Mr. Conroy hereby gives notice that he intends to rely upon such other defenses as may become available or apparent during the course of discovery and thus reserves its right to amend this Answer to assert such defenses.

**WHEREFORE**, Defendant Mr. Conroy demands judgment in his favor and against plaintiff, dismissing plaintiff's Complaint with prejudice, together with the costs of suit and such other relief as the Court deems equitable and just.

Dated:  February 23, 2021                    Respectfully submitted,

                                             **McDERMOTT WILL & EMERY LLP**

                                             */s/ Melissa R. Alvarez*
                                             ANTHONY N. UPSHAW
                                             Florida Bar No.: 861091
                                             aupshaw@mwe.com
                                             MELISSA R. ALVAREZ
                                             Florida Bar No.: 820091
                                             malvarez@mwe.com
                                             333 SE 2nd Avenue, Suite 4500
                                             Miami, FL 33131
                                             Tel:  (305) 329-4431
                                             Fax: (305) 675-8031
                                             *Counsel for Defendant*
                                             *Andrew Jack Conroy*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this **23rd day of February, 2021,** a true and correct copy of the foregoing was electronically filed with the Clerk of the Court using the CM/ECF system.

                                             */s/  Melissa R. Alvarez*

# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA
## MIAMI DIVISION

NANCY C. SALAS,

       Plaintiff,

   v.

MONSANTO COMPANY, *et al.*,

       Defendants.

Case No. 1:21-cv-20648-PCH

## BAYER CORPORATION'S ANSWER TO PLAINTIFF'S COMPLAINT

Defendant Bayer Corporation, by and through its counsel, respectfully responds by generally denying all allegations contained in plaintiff's Complaint, except as set forth below. Bayer Corporation denies – and objects to – allegations by plaintiff that purport to lump Bayer Corporation together with other defendants. Bayer Corporation responds to this Complaint only on behalf of Bayer Corporation and not on behalf of any other defendant. Silence as to any allegations shall constitute a denial.

1.     Bayer Corporation denies the allegations in paragraph 1.

2.     Bayer Corporation lacks information or knowledge sufficient to form a belief as to the truth of the allegations in paragraph 2 and therefore denies those allegations.

3.     Bayer Corporation denies the allegations in paragraph 3.

4.     The allegations in paragraph 4 are directed at a defendant other than Bayer Corporation, so no response from Bayer Corporation is required for these allegations.

5.     The allegations in the first sentence of paragraph 5 do not require a response from Bayer Corporation because these allegations relate to a company other than Bayer Corporation. In response to the allegations in the second sentence of paragraph 5, Bayer Corporation admits

that it is an indirect subsidiary of Bayer AG.  Bayer Corporation denies the allegations in the third sentence of paragraph 5.  To the extent that the allegations in the fourth sentences of paragraph 5 are directed at Bayer Corporation, Bayer Corporation denies those allegations.  In response to the allegations in the last sentence of paragraph 5, Bayer Corporation denies – and objects to – allegations by plaintiff that purport to lump Bayer Corporation together with other defendants.  Bayer Corporation responds to this Complaint only on behalf of Bayer Corporation and not on behalf of any other defendant.

6.      The allegations in paragraph 6 are directed at a defendant other than Bayer Corporation, so no response from Bayer Corporation is required for these allegations.

7.      The allegations in paragraph 7 are directed at a defendant other than Bayer Corporation, so no response from Bayer Corporation is required for these allegations.

8.      The allegations in paragraph 8 are directed at a defendant other than Bayer Corporation, so no response from Bayer Corporation is required for these allegations.

9.      The allegations in paragraph 9 are directed at defendants other than Bayer Corporation, so no response from Bayer Corporation is required for these allegations.

10.      The allegations in paragraph 10 are directed at a defendant other than Bayer Corporation, so no response from Bayer Corporation is required for these allegations.

11.      The allegations in paragraph 11 are directed at defendants other than Bayer Corporation, so no response from Bayer Corporation is required for these allegations.

12.      The allegations in paragraph 12 set forth conclusions of law for which no response is required.

13.      The allegations in paragraph 13 are directed at a defendant other than Bayer Corporation, so no response from Bayer Corporation is required for these allegations.

14.     The allegations in paragraph 14 are directed at a defendant other than Bayer Corporation, so no response from Bayer Corporation is required for these allegations.

15.     The allegations in paragraph 15 set forth conclusions of law for which no response is required.

16.     The allegations in paragraph 16 set forth conclusions of law for which no response is required.  To the extent that a response is deemed required, Bayer Corporation denies that it has consented to Florida courts asserting personal jurisdiction over Bayer Corporation.

17.     The allegations in paragraph 17 are directed at a defendant other than Bayer Corporation, so no response from Bayer Corporation is required for these allegations.

18.     The allegations in paragraph 18 are directed at a defendant other than Bayer Corporation, so no response from Bayer Corporation is required for these allegations.

19.     The allegations in paragraph 19 are directed at a defendant other than Bayer Corporation, so no response from Bayer Corporation is required for these allegations.

20.     The allegations in paragraph 20 are directed at a defendant other than Bayer Corporation, so no response from Bayer Corporation is required for these allegations.

21.     The allegations in paragraph 21 are directed at a defendant other than Bayer Corporation, so no response from Bayer Corporation is required for these allegations.

22.     The allegations in paragraph 22 are directed at a defendant other than Bayer Corporation, so no response from Bayer Corporation is required for these allegations.

23.     The allegations in paragraph 23 are directed at a defendant other than Bayer Corporation, so no response from Bayer Corporation is required for these allegations.

24.     The allegations in paragraph 24 are directed at a defendant other than Bayer Corporation, so no response from Bayer Corporation is required for these allegations.

25.      The allegations in paragraph 25 set forth conclusions of law for which no response is required.  To the extent that a response is deemed required, Bayer Corporation denies the allegations in paragraph 25.

26.      The allegations in paragraph 26 set forth conclusions of law for which no response is required.

27.      Bayer Corporation admits the allegations in paragraph 27.

28.      Bayer Corporation lacks information or knowledge sufficient to form a belief as to the truth of the allegations in paragraph 28 and therefore denies those allegations.

29.      Bayer Corporation lacks information or knowledge sufficient to form a belief as to the truth of the allegations in paragraph 29 and therefore denies those allegations.

30.      Bayer Corporation states that the term "toxic" as used in paragraph 30 is vague and ambiguous to the extent it is intended to suggest any evidence of carcinogenicity.  Bayer Corporation otherwise lacks information or knowledge sufficient to form a belief as to the truth of the allegations in paragraph 30 and therefore denies those allegations.

31.      The allegations in paragraph 31 are directed at a defendant other than Bayer Corporation, so no response from Bayer Corporation is required for these allegations.

32.      Bayer Corporation lacks information or knowledge sufficient to form a belief as to the truth of the allegations in paragraph 32 and therefore denies those allegations.

33.      Bayer Corporation denies the allegations in paragraph 33.

34.      As to plaintiff's allegations directed to Monsanto in paragraph 34, Bayer Corporation refers plaintiff to Monsanto's answer, which denies all liability or wrongdoing whatsoever.  In response to the allegations in paragraph 34, Bayer Corporation denies that glyphosate exposure causes cancer.  Bayer Corporation otherwise lacks information or

knowledge sufficient to form a belief as to the truth of the allegations in paragraph 34 and therefore denies those allegations.

35.     The allegations in paragraph 35 set forth conclusions of law for which no response is required.

36.     Bayer Corporation lacks information or knowledge sufficient to form a belief as to the truth of the allegations in the first sentence of paragraph 36 and therefore denies those allegations.  The remaining allegations in paragraph 36 set forth conclusions of law for which no response is required.

37.     The allegations in paragraph 37 set forth conclusions of law for which no response is required.

38.     Bayer Corporation lacks information or knowledge sufficient to form a belief as to the truth of the allegations in paragraph 38 and therefore denies those allegations.

39.     The allegations in paragraph 39 set forth conclusions of law for which no response is required.  To the extent that a response is deemed required, Bayer Corporation lacks information or knowledge sufficient to form a belief as to the truth of the allegations in paragraph 39 and therefore denies those allegations.

40.     As to plaintiff's allegations directed to Monsanto in paragraph 40, Bayer Corporation refers plaintiff to Monsanto's answer, which denies all liability or wrongdoing whatsoever.  Bayer Corporation otherwise lacks information or knowledge sufficient to form a belief as to the truth of the allegations in paragraph 40 and therefore denies those allegations.

41.     The allegations in paragraph 41 are directed at a defendant other than Bayer Corporation, so no response from Bayer Corporation is required for these allegations.

42.     The allegations in paragraph 42 are directed at a defendant other than Bayer Corporation, so no response from Bayer Corporation is required for these allegations.

43.     Bayer Corporation lacks information or knowledge sufficient to form a belief as to the truth of the allegations in paragraph 43 and therefore denies those allegations.

44.     Bayer Corporation lacks information or knowledge sufficient to form a belief as to the truth of the allegations in paragraph 44 and therefore denies those allegations.

45.     The allegations in paragraph 45 are directed at a defendant other than Bayer Corporation, so no response from Bayer Corporation is required for these allegations.  To the extent that a response is deemed required, Bayer Corporation lacks information or knowledge sufficient to form a belief as to the truth of the allegations in paragraph 45 and therefore denies those allegations.

46.     The allegations in paragraph 46 are directed at a defendant other than Bayer Corporation, so no response from Bayer Corporation is required for these allegations.

47.     The allegations in paragraph 47 are directed at a defendant other than Bayer Corporation, so no response from Bayer Corporation is required for these allegations.

48.     The allegations in paragraph 48 are directed at a defendant other than Bayer Corporation, so no response from Bayer Corporation is required for these allegations.

49.     Bayer Corporation lacks information or knowledge sufficient to form a belief as to the truth of the allegations in last sentence of paragraph 49.  The remaining allegations in paragraph 49 are directed at a defendant other than Bayer Corporation, so no response from Bayer Corporation is required for these allegations.

50.      The allegations in paragraph 50 are directed at a defendant other than Bayer Corporation, so no response from Bayer Corporation is required for these allegations.

51.     The allegations in paragraph 51 are directed at a defendant other than Bayer Corporation, so no response from Bayer Corporation is required for these allegations.

52.     The allegations in paragraph 52 are directed at a defendant other than Bayer Corporation, so no response from Bayer Corporation is required for these allegations.

53.     The allegations in paragraph 53 are directed at a defendant other than Bayer Corporation, so no response from Bayer Corporation is required for these allegations.

54.     The allegations in paragraph 54 are directed at a defendant other than Bayer Corporation, so no response from Bayer Corporation is required for these allegations.

55.     The allegations in paragraph 55 are directed at a defendant other than Bayer Corporation, so no response from Bayer Corporation is required for these allegations.

56.     The allegations in paragraph 56 are directed at a defendant other than Bayer Corporation, so no response from Bayer Corporation is required for these allegations.

57.     Bayer Corporation states that the term "toxic" as used in paragraph 57 is vague and ambiguous to the extent it is intended to suggest any evidence of carcinogenicity.  Bayer Corporation otherwise lacks information or knowledge sufficient to form a belief as to the truth of the allegations in paragraph 57 and therefore denies those allegations.

58.     Bayer Corporation states that the term "toxic" as used in paragraph 58 is vague and ambiguous to the extent it is intended to suggest any evidence of carcinogenicity.  Bayer Corporation otherwise lacks information or knowledge sufficient to form a belief as to the truth of the allegations in paragraph 58 and therefore denies those allegations.

59.     The allegations in paragraph 59 are directed at a defendant other than Bayer Corporation, so no response from Bayer Corporation is required for these allegations.

60.     The allegations in paragraph 60 are directed at a defendant other than Bayer Corporation, so no response from Bayer Corporation is required for these allegations.

61.     The allegations in paragraph 61 are directed at a defendant other than Bayer Corporation, so no response from Bayer Corporation is required for these allegations.

62.     The allegations in paragraph 62 are directed at a defendant other than Bayer Corporation, so no response from Bayer Corporation is required for these allegations.

63.     The allegations in paragraph 63 are directed at a defendant other than Bayer Corporation, so no response from Bayer Corporation is required for these allegations.

64.     The allegations in paragraph 64 are directed at a defendant other than Bayer Corporation, so no response from Bayer Corporation is required for these allegations.

65.     The allegations in paragraph 65 are directed at a defendant other than Bayer Corporation, so no response from Bayer Corporation is required for these allegations.

66.     The allegations in paragraph 66 are directed at a defendant other than Bayer Corporation, so no response from Bayer Corporation is required for these allegations.

67.     The allegations in paragraph 67 are directed at a defendant other than Bayer Corporation, so no response from Bayer Corporation is required for these allegations.

68.     The allegations in paragraph 68 are directed at a defendant other than Bayer Corporation, so no response from Bayer Corporation is required for these allegations.

69.     As to plaintiff's allegations directed to Monsanto in paragraph 69, Bayer Corporation refers plaintiff to Monsanto's answer, which denies all liability or wrongdoing whatsoever.  Bayer Corporation denies that glyphosate or Roundup®-branded products are dangerous when used in accordance with the label.  Bayer Corporation otherwise lacks

information or knowledge sufficient to form a belief as to the truth of the allegations in paragraph 69 and therefore denies those allegations.

70.     The allegations in paragraph 70 are directed at a defendant other than Bayer Corporation, so no response from Bayer Corporation is required for these allegations.

71.     The allegations in paragraph 71 are directed at a defendant other than Bayer Corporation, so no response from Bayer Corporation is required for these allegations.

72.     The allegations in paragraph 72 are directed at a defendant other than Bayer Corporation, so no response from Bayer Corporation is required for these allegations.

73.     The allegations in paragraph 73 are directed at a defendant other than Bayer Corporation, so no response from Bayer Corporation is required for these allegations.

74.     The allegations in paragraph 74 are directed at a defendant other than Bayer Corporation, so no response from Bayer Corporation is required for these allegations.

75.     The allegations in paragraph 75 are directed at a defendant other than Bayer Corporation, so no response from Bayer Corporation is required for these allegations.

76.     The allegations in paragraph 76 are directed at a defendant other than Bayer Corporation, so no response from Bayer Corporation is required for these allegations.

77.     The allegations in paragraph 77 are directed at a defendant other than Bayer Corporation, so no response from Bayer Corporation is required for these allegations.

78.     The allegations in paragraph 78 are directed at a defendant other than Bayer Corporation, so no response from Bayer Corporation is required for these allegations.

79.     The allegations in paragraph 79 are directed at a defendant other than Bayer Corporation, so no response from Bayer Corporation is required for these allegations.

80.     The allegations in paragraph 80 are directed at a defendant other than Bayer Corporation, so no response from Bayer Corporation is required for these allegations.

81.     The allegations in paragraph 81 are directed at a defendant other than Bayer Corporation, so no response from Bayer Corporation is required for these allegations.

82.     The allegations in paragraph 82 are directed at a defendant other than Bayer Corporation, so no response from Bayer Corporation is required for these allegations.

83.     Bayer Corporation lacks information or knowledge sufficient to form a belief as to the truth of the allegations in paragraph 83 and therefore denies those allegations.  The remaining allegations in paragraph 83 are directed at a defendant other than Bayer Corporation, so no response from Bayer Corporation is required for these allegations.

84.     The allegations in paragraph 84 are directed at a defendant other than Bayer Corporation, so no response from Bayer Corporation is required for these allegations.

85.     The allegations in paragraph 85 are directed at a defendant other than Bayer Corporation, so no response from Bayer Corporation is required for these allegations.

86.     In response to the allegations in paragraph 86, Bayer Corporation admits that in March 2015 the International Agency for Research on Cancer ("IARC") classified glyphosate as a class 2A carcinogen.  The remaining allegations in paragraph 86 are directed at a defendant other than Bayer Corporation, so no response from Bayer Corporation is required for these allegations.

87.     The allegations in paragraph 87 are directed at a defendant other than Bayer Corporation, so no response from Bayer Corporation is required for these allegations.

88.     The allegations in paragraph 88 are directed at a defendant other than Bayer Corporation, so no response from Bayer Corporation is required for these allegations.

89.     The allegations in paragraph 89 are directed at a defendant other than Bayer Corporation, so no response from Bayer Corporation is required for these allegations.

90.     The allegations in paragraph 90 are directed at a defendant other than Bayer Corporation, so no response from Bayer Corporation is required for these allegations.

91.     The allegations in paragraph 91 are directed at a defendant other than Bayer Corporation, so no response from Bayer Corporation is required for these allegations.

92.     As to plaintiff's allegations directed to Monsanto in paragraph 92, Bayer Corporation refers plaintiff to Monsanto's answer, which denies all liability or wrongdoing whatsoever.  Bayer Corporation otherwise lacks information or knowledge sufficient to form a belief as to the truth of the allegations in paragraph 92 and therefore denies those allegations.

93.     As to plaintiff's allegations directed to Monsanto in paragraph 93, Bayer Corporation refers plaintiff to Monsanto's answer, which denies all liability or wrongdoing whatsoever.  Bayer Corporation otherwise lacks information or knowledge sufficient to form a belief as to the truth of the allegations in paragraph 93 and therefore denies those allegations.

94.     As to plaintiff's allegations directed to Monsanto in paragraph 94, Bayer Corporation refers plaintiff to Monsanto's answer, which denies all liability or wrongdoing whatsoever.  Bayer Corporation otherwise lacks information or knowledge sufficient to form a belief as to the truth of the allegations in paragraph 94 and therefore denies those allegations.

95.     As to plaintiff's allegations directed to Monsanto in paragraph 95, Bayer Corporation refers plaintiff to Monsanto's answer, which denies all liability or wrongdoing whatsoever.  Bayer Corporation otherwise lacks information or knowledge sufficient to form a belief as to the truth of the allegations in paragraph 95 and therefore denies those allegations.

96.     In response to the allegations in paragraph 96, Bayer Corporation admits that in March 2015, IARC classified glyphosate under Group 2A.  Bayer Corporation lacks information or knowledge sufficient to form a belief as to the truth of the remaining allegations in paragraph 96 and therefore denies those allegations.

97.     In response to the allegations in paragraph 97, Bayer Corporation admits that the full IARC Monograph regarding glyphosate was published on July 29, 2015.  Bayer Corporation lacks information or knowledge sufficient to form a belief as to the truth of the remaining allegations in paragraph 97 and therefore denies those allegations.

98.     Bayer Corporation lacks information or knowledge sufficient to form a belief as to the truth of the allegations in paragraph 98 and therefore denies those allegations.

99.     Bayer Corporation lacks information or knowledge sufficient to form a belief as to the truth of the allegations in paragraph 99 and therefore denies those allegations.

100.     Bayer Corporation lacks information or knowledge sufficient to form a belief as to the truth of the allegations in paragraph 100 and therefore denies those allegations.

101.     Bayer Corporation lacks information or knowledge sufficient to form a belief as to the truth of the allegations in paragraph 101 and therefore denies those allegations.

102.     Bayer Corporation lacks information or knowledge sufficient to form a belief as to the truth of the allegations in paragraph 102 and therefore denies those allegations.

103.     Bayer Corporation lacks information or knowledge sufficient to form a belief as to the truth of the allegations in paragraph 103 and therefore denies those allegations.

104.     In response to the allegations in paragraph 104, Bayer Corporation denies that glyphosate exposure causes cancer.  Bayer Corporation otherwise lacks information or

knowledge sufficient to form a belief as to the truth of the allegations in paragraph 104 and therefore denies those allegations.

105.   In response to the allegations in paragraph 105, Bayer Corporation denies that glyphosate exposure causes DNA and chromosomal damage.  Bayer Corporation otherwise lacks information or knowledge sufficient to form a belief as to the truth of the allegations in paragraph 105 and therefore denies those allegations.

106.   In response to the allegations in paragraph 106, Bayer Corporation denies that glyphosate exposure causes cancer.  Bayer Corporation otherwise lacks information or knowledge sufficient to form a belief as to the truth of the allegations in paragraph 106 and therefore denies those allegations.

107.   Bayer Corporation lacks information or knowledge sufficient to form a belief as to the truth of the allegations in paragraph 107 and therefore denies those allegations.

108.   In response to the allegations in paragraph 108, Bayer Corporation denies that glyphosate exposure causes DNA and chromosomal damage.  Bayer Corporation lacks information or knowledge sufficient to form a belief as to the truth of the remaining allegations in paragraph 108 and therefore denies those allegations.

109.   Bayer Corporation lacks information or knowledge sufficient to form a belief as to the truth of the allegations in paragraph 109 and therefore denies those allegations.

110.   In response to the allegations in paragraph 110, Bayer Corporation denies that glyphosate exposure causes cancer.  Bayer Corporation lacks information or knowledge sufficient to form a belief as to the truth of the remaining allegations in paragraph 110 and therefore denies those allegations.

111.   Bayer Corporation denies the allegations in paragraph 111.

112.    The allegations in paragraph 112 are directed at a defendant other than Bayer Corporation, so no response from Bayer Corporation is required for these allegations.

113.    The allegations in paragraph 113 are directed at a defendant other than Bayer Corporation, so no response from Bayer Corporation is required for these allegations.

114.    The allegations in paragraph 114 do not require a response from Bayer Corporation because these allegations relate to other companies, not Bayer Corporation.

115.    Bayer Corporation lacks information or knowledge sufficient to form a belief as to the truth of the allegations in paragraph 115 and therefore denies those allegations.

116.    Bayer Corporation lacks information or knowledge sufficient to form a belief as to the truth of the allegations in paragraph 116 and therefore denies those allegations.

117.    Bayer Corporation lacks information or knowledge sufficient to form a belief as to the truth of the allegations in paragraph 117 and therefore denies those allegations.

118.    Bayer Corporation lacks information or knowledge sufficient to form a belief as to the truth of the allegations in paragraph 118 and therefore denies those allegations.

119.    Bayer Corporation lacks information or knowledge sufficient to form a belief as to the truth of the allegations in paragraph 119 and therefore denies those allegations.

120.    Bayer Corporation lacks information or knowledge sufficient to form a belief as to the truth of the allegations in paragraph 120 and therefore denies those allegations.

121.    Bayer Corporation lacks information or knowledge sufficient to form a belief as to the truth of the allegations in paragraph 121 and therefore denies those allegations.

122.    Bayer Corporation lacks information or knowledge sufficient to form a belief as to the truth of the allegations in paragraph 122 and therefore denies those allegations.

123.    Bayer Corporation lacks information or knowledge sufficient to form a belief as to the truth of the allegations in paragraph 123 and therefore denies those allegations.

124.    Bayer Corporation lacks information or knowledge sufficient to form a belief as to the truth of the allegations in paragraph 124 and therefore denies those allegations.

125.    In response to the allegations in the last sentence of paragraph 125, Bayer Corporation denies that Roundup®-branded products have "carcinogenic or potentially carcinogenic properties." The remaining allegations in paragraph 125 are directed at defendants other than Bayer Corporation, so no response from Bayer Corporation is required for these allegations.

126.    The allegations in paragraph 126 are directed at defendants other than Bayer Corporation, so no response from Bayer Corporation is required for these allegations.

127.    In response to the allegations in paragraph 127, Bayer Corporation denies that Roundup®-branded products have "carcinogenic properties" and that those products pose a "grave danger." The remaining allegations in paragraph 127 are directed at a defendant other than Bayer Corporation, so no response from Bayer Corporation is required for these allegations.

128.    The allegations in paragraph 128 are directed at defendants other than Bayer Corporation, so no response from Bayer Corporation is required for these allegations.

129.    In response to the allegations in paragraph 129, Bayer Corporation denies that Roundup®-branded products have "carcinogenic properties" and that those products pose a "grave danger." The remaining allegations in paragraph 129 are directed at a defendant other than Bayer Corporation, so no response from Bayer Corporation is required for these allegations.

130.    In response to the allegations in paragraph 130, Bayer Corporation denies that Roundup®-branded products have "carcinogenic or potentially carcinogenic properties" and that

those products pose a "danger."  The remaining allegations in paragraph 130 are directed at a defendant other than Bayer Corporation, so no response from Bayer Corporation is required for these allegations.

131.    The allegations in paragraph 131 are directed at defendants other than Bayer Corporation, so no response from Bayer Corporation is required for these allegations.

132.    In response to the allegations in paragraph 132, Bayer Corporation denies that Roundup®-branded products have "carcinogenic properties" and that those products pose a "grave danger."  The remaining allegations in paragraph 132 are directed at a defendant other than Bayer Corporation, so no response from Bayer Corporation is required for these allegations.

133.    In response to the allegations in paragraph 133, Bayer Corporation denies that Roundup®-branded products have "carcinogenic or potentially carcinogenic properties" and that those products pose a "danger."  The remaining allegations in paragraph 133 are directed at a defendant other than Bayer Corporation, so no response from Bayer Corporation is required for these allegations.

134.    Bayer Corporation lacks information or knowledge sufficient to form a belief as to the truth of the allegations in paragraph 134 and therefore denies those allegations.

135.    Bayer Corporation lacks information or knowledge sufficient to form a belief as to the truth of the allegations in paragraph 135 and therefore denies those allegations.

136.    Bayer Corporation lacks information or knowledge sufficient to form a belief as to the truth of the allegations in paragraph 136 and therefore denies those allegations.

137.    Bayer Corporation lacks information or knowledge sufficient to form a belief as to the truth of the allegations in paragraph 137 and therefore denies those allegations.

138.     Bayer Corporation lacks information or knowledge sufficient to form a belief as to the truth of the allegations in paragraph 138 and therefore denies those allegations.

139.     Bayer Corporation lacks information or knowledge sufficient to form a belief as to the truth of the allegations in paragraph 139 and therefore denies those allegations.

140.     Bayer Corporation lacks information or knowledge sufficient to form a belief as to the truth of the allegations in paragraph 140 and therefore denies those allegations.

141.     Bayer Corporation denies that any exposure to glyphosate-based herbicides or Roundup®-branded products can cause non-Hodgkin's lymphoma ("NHL") or other serious illnesses.  Bayer Corporation otherwise lacks information or knowledge sufficient to form a belief as to the truth of the allegations in paragraph 141 and therefore denies those allegations.

142.     Bayer Corporation incorporates by reference its responses to paragraphs 1 through 141 in response to paragraph 142 of plaintiff's Complaint.  Bayer Corporation denies – and objects to – allegations by plaintiff that purport to lump Bayer Corporation together with other defendants.

143.     In response to the allegations in paragraph 143, Bayer Corporation admits that plaintiff purports to bring a claim for strict products liability, but Bayer Corporation denies any liability as to that claim.

144.     As to plaintiff's allegations directed to Monsanto in paragraph 144, Bayer Corporation refers plaintiff to Monsanto's answer, which denies all liability or wrongdoing whatsoever.  Bayer Corporation lacks information or knowledge sufficient to form a belief as to the truth of the allegations in paragraph 144 regarding plaintiff's exposure and therefore denies those allegations.  To the extent that any remaining allegations in paragraph 144 are directed at Bayer Corporation, Bayer Corporation denies those allegations.

145.    As to plaintiff's allegations directed to Monsanto in paragraph 145, Bayer Corporation refers plaintiff to Monsanto's answer, which denies all liability or wrongdoing whatsoever.  To the extent that any remaining allegations in paragraph 145 are directed at Bayer Corporation, Bayer Corporation denies those allegations.

146.    Bayer Corporation denies the allegations in paragraph 146.

147.    As to plaintiff's allegations directed to Monsanto in paragraph 147, Bayer Corporation refers plaintiff to Monsanto's answer, which denies all liability or wrongdoing whatsoever.  Bayer Corporation lacks information or knowledge sufficient to form a belief as to the truth of the allegations that plaintiff used Roundup®-branded products and therefore denies that allegation.   To the extent that any remaining allegations in paragraph 147 involve Roundup®-branded products, Bayer Corporation denies those allegations.  To the extent that any remaining allegations in paragraph 147 are directed at Bayer Corporation, Bayer Corporation denies those allegations.

148.    As to plaintiff's allegations directed to Monsanto in paragraph 148, Bayer Corporation refers plaintiff to Monsanto's answer, which denies all liability or wrongdoing whatsoever.  To the extent that any remaining allegations in paragraph 148 involve Roundup®-branded products, Bayer Corporation denies those allegations.  To the extent that any remaining allegations in paragraph 148 are directed at Bayer Corporation, Bayer Corporation denies those allegations.

149.    The allegation in paragraph 149 sets forth a conclusion of law for which no response is required.

150.    Bayer Corporation denies the allegations in paragraph 150.

151.    Bayer Corporation denies the allegations in paragraph 151.

In response to the "WHEREFORE" paragraph following paragraph 151, Bayer Corporation demands that judgment be entered in its favor and against plaintiff and that plaintiff's Complaint be dismissed, with prejudice, and that Bayer Corporation be awarded costs of suit and reasonable attorney's fees as allowed by law and such further and additional relief as this Court may deem just and proper.

152.    Bayer Corporation incorporates by reference its responses to paragraphs 1 through 151 in response to paragraph 152 of plaintiff's Complaint.  Bayer Corporation denies – and objects to – allegations by plaintiff that purport to lump Bayer Corporation together with other defendants.

153.    In response to the allegations in paragraph 153, Bayer Corporation admits that plaintiff purports to bring an action for negligence, but Bayer Corporation denies any liability as to those claims.

154.    To the extent that the allegations in paragraph 154 are directed at Bayer Corporation, Bayer Corporation denies those allegations.

155.    To the extent that the allegations in paragraph 155 are directed at Bayer Corporation, Bayer Corporation denies those allegations.

156.    As to plaintiff's allegations directed to Monsanto in paragraph 156, Bayer Corporation refers plaintiff to Monsanto's answer, which denies all liability or wrongdoing whatsoever.  To the extent that any remaining allegations in paragraph 156 are directed at Bayer Corporation, Bayer Corporation denies those allegations.

157.    As to plaintiff's allegations directed to Monsanto in paragraph 157, Bayer Corporation refers plaintiff to Monsanto's answer, which denies all liability or wrongdoing whatsoever.  To the extent that any remaining allegations in paragraph 157 involve Roundup®-

branded products, Bayer Corporation denies those allegations.  To the extent that any remaining allegations in paragraph 157 are directed at Bayer Corporation, Bayer Corporation denies those allegations.

158.    As to plaintiff's allegations directed to Monsanto in paragraph 158, Bayer Corporation refers plaintiff to Monsanto's answer, which denies all liability or wrongdoing whatsoever.  To the extent that any remaining allegations in paragraph 158 involve Roundup®-branded products, Bayer Corporation denies those allegations.  To the extent that any remaining allegations in paragraph 158 are directed at Bayer Corporation, Bayer Corporation denies those allegations.

159.    Bayer Corporation denies the allegations in paragraph 159.

In response to the "WHEREFORE" paragraph following paragraph 159, Bayer Corporation demands that judgment be entered in its favor and against plaintiff and that plaintiff's Complaint be dismissed, with prejudice, and that Bayer Corporation be awarded costs of suit and reasonable attorney's fees as allowed by law and such further and additional relief as this Court may deem just and proper.

160.    Bayer Corporation incorporates by reference its responses to paragraphs 1 through 159 in response to paragraph 160 of plaintiff's Complaint.  Bayer Corporation denies – and objects to – allegations by plaintiff that purport to lump Bayer Corporation together with other defendants.

161.    As to plaintiff's allegations directed to Monsanto in paragraph 161, Bayer Corporation refers plaintiff to Monsanto's answer, which denies all liability or wrongdoing whatsoever.  To the extent that any remaining allegations in paragraph 161 involve Roundup®-branded products, Bayer Corporation denies those allegations.  To the extent that any remaining

allegations in paragraph 161 are directed at Bayer Corporation, Bayer Corporation denies those allegations.

162.    Bayer Corporation lacks information or knowledge sufficient to form a belief as to the truth of the allegations in paragraph 162 regarding plaintiff's claimed use of and exposure to Roundup®-branded products and therefore denies those allegations.  To the extent that any remaining allegations in paragraph 162 are directed at Bayer Corporation, Bayer Corporation denies those allegations.

163.    Bayer Corporation lacks information or knowledge sufficient to form a belief as to the truth of the allegations in paragraph 163 regarding plaintiff's claimed use of or exposure to Roundup®-branded products and therefore denies those allegations.  To the extent that any remaining allegations in paragraph 163 are directed at Bayer Corporation, Bayer Corporation denies those allegations.

164.    To the extent that any allegations in paragraph 164 are directed at Bayer Corporation, Bayer Corporation denies those allegations.

165.     As to plaintiff's allegations directed to Monsanto in paragraph 165, Bayer Corporation refers plaintiff to Monsanto's answer, which denies all liability or wrongdoing whatsoever.  To the extent that any remaining allegations in paragraph 165 involve Roundup®-branded products, Bayer Corporation denies those allegations.  To the extent that any remaining allegations in paragraph 165 are directed at Bayer Corporation, Bayer Corporation denies those allegations.

166.    The allegations in paragraph 166 set forth conclusions of law for which no response is required.  To the extent that a response is required, Bayer Corporation states that, to

the extent that any allegations in paragraph 166 are directed at Bayer Corporation, Bayer Corporation denies those allegations.

167.    As to plaintiff's allegations directed to Monsanto in paragraph 167, Bayer Corporation refers plaintiff to Monsanto's answer, which denies all liability or wrongdoing whatsoever.  To the extent that any remaining allegations in paragraph 167 involve Roundup®-branded products, Bayer Corporation denies those allegations.  To the extent that any remaining allegations in paragraph 167 are directed at Bayer Corporation, Bayer Corporation denies those allegations.

168.    To the extent that any allegations in paragraph 168 are directed at Bayer Corporation, Bayer Corporation denies those allegations.

169.    As to plaintiff's allegations directed to Monsanto in paragraph 169, Bayer Corporation refers plaintiff to Monsanto's answer, which denies all liability or wrongdoing whatsoever.  To the extent that any remaining allegations in paragraph 169 involve Roundup®-branded products, Bayer Corporation denies those allegations.  To the extent that any remaining allegations in paragraph 169 are directed at Bayer Corporation, Bayer Corporation denies those allegations.

In response to the "WHEREFORE" paragraph following paragraph 169, Bayer Corporation demands that judgment be entered in its favor and against plaintiff and that plaintiff's Complaint be dismissed, with prejudice, and that Bayer Corporation be awarded costs of suit and reasonable attorney's fees as allowed by law and such further and additional relief as this Court may deem just and proper.

170.    Bayer Corporation incorporates by reference its responses to paragraphs 1 through 169 in response to paragraph 170 of plaintiff's Complaint.  Bayer Corporation denies – and

objects to – allegations by plaintiff that purport to lump Bayer Corporation together with other defendants.

171.    In response to the allegations in paragraph 171, Bayer Corporation admits that plaintiff purports to bring a claim for fraudulent misrepresentation, but Bayer Corporation denies any liability as to that claim.

172.    To the extent that any allegations in paragraph 172 are directed at Bayer Corporation, Bayer Corporation denies those allegations.

173.    As to plaintiff's allegations directed to Monsanto in paragraph 173, Bayer Corporation refers plaintiff to Monsanto's answer, which denies all liability or wrongdoing whatsoever.  To the extent that any remaining allegations in paragraph 173 involve Roundup®-branded products, Bayer Corporation denies those allegations.  To the extent that any remaining allegations in paragraph 173 are directed at Bayer Corporation, Bayer Corporation denies those allegations.

174.    Bayer Corporation lacks information or knowledge sufficient to form a belief as to the truth of the allegations in paragraph 174 regarding plaintiff's claimed use of or exposure to Roundup®-branded products and therefore denies those allegations.  As to plaintiff's allegations directed to Monsanto in paragraph 174, Bayer Corporation refers plaintiff to Monsanto's answer, which denies all liability or wrongdoing whatsoever.  To the extent that any remaining allegations in paragraph 174 involve Roundup®-branded products, Bayer Corporation denies those allegations.  To the extent that any remaining allegations in paragraph 174 are directed at Bayer Corporation, Bayer Corporation denies those allegations.

175.    As to plaintiff's allegations directed to Monsanto in paragraph 175, Bayer Corporation refers plaintiff to Monsanto's answer, which denies all liability or wrongdoing

whatsoever.  To the extent that any remaining allegations in paragraph 175 involve Roundup®-branded products, Bayer Corporation denies those allegations.  To the extent that any remaining allegations in paragraph 175 are directed at Bayer Corporation, Bayer Corporation denies those allegations.

176.    As to plaintiff's allegations directed to Monsanto in paragraph 176, Bayer Corporation refers plaintiff to Monsanto's answer, which denies all liability or wrongdoing whatsoever.  To the extent that any remaining allegations in paragraph 176 involve Roundup®-branded products, Bayer Corporation denies those allegations.  To the extent that any remaining allegations in paragraph 176 are directed at Bayer Corporation, Bayer Corporation denies those allegations.

177.    As to plaintiff's allegations directed to Monsanto in paragraph 177, Bayer Corporation refers plaintiff to Monsanto's answer, which denies all liability or wrongdoing whatsoever.  To the extent that any remaining allegations in paragraph 177 involve Roundup®-branded products, Bayer Corporation denies those allegations.  To the extent that any remaining allegations in paragraph 177 are directed at Bayer Corporation, Bayer Corporation denies those allegations.

178.    As to plaintiff's allegations directed to Monsanto in paragraph 178, Bayer Corporation refers plaintiff to Monsanto's answer, which denies all liability or wrongdoing whatsoever.  To the extent that any remaining allegations in paragraph 178 involve Roundup®-branded products, Bayer Corporation denies those allegations.  To the extent that any remaining allegations in paragraph 178 are directed at Bayer Corporation, Bayer Corporation denies those allegations.

179.    As to plaintiff's allegations directed to Monsanto in paragraph 179, Bayer Corporation refers plaintiff to Monsanto's answer, which denies all liability or wrongdoing whatsoever.  To the extent that any remaining allegations in paragraph 179 involve Roundup®-branded products, Bayer Corporation denies those allegations.  To the extent that any remaining allegations in paragraph 179 are directed at Bayer Corporation, Bayer Corporation denies those allegations.

180.    As to plaintiff's allegations directed to Monsanto in paragraph 180, Bayer Corporation refers plaintiff to Monsanto's answer, which denies all liability or wrongdoing whatsoever.  Bayer Corporation lacks information or knowledge sufficient to form a belief as to the truth of the allegations in paragraph 180 regarding plaintiff's reliance and therefore denies those allegations.   To the extent that any remaining allegations in paragraph 180 involve Roundup®-branded products, Bayer Corporation denies those allegations.  To the extent that any remaining allegations in paragraph 180 are directed at Bayer Corporation, Bayer Corporation denies those allegations.

181.    As to plaintiff's allegations directed to Monsanto in paragraph 181, Bayer Corporation refers plaintiff to Monsanto's answer, which denies all liability or wrongdoing whatsoever.  To the extent that any remaining allegations in paragraph 181 are directed at Bayer Corporation, Bayer Corporation denies those allegations.

182.    As to plaintiff's allegations directed to Monsanto in paragraph 182, Bayer Corporation refers plaintiff to Monsanto's answer, which denies all liability or wrongdoing whatsoever.  To the extent that any remaining allegations in paragraph 182 are directed at Bayer Corporation, Bayer Corporation denies those allegations.

In response to the "WHEREFORE" paragraph following paragraph 182, Bayer Corporation demands that judgment be entered in its favor and against plaintiff and that plaintiff's Complaint be dismissed, with prejudice, and that Bayer Corporation be awarded costs of suit and reasonable attorney's fees as allowed by law and such further and additional relief as this Court may deem just and proper.

183.   Bayer Corporation incorporates by reference its responses to paragraphs 1 through 182 in response to paragraph 183 of plaintiff's Complaint.  Bayer Corporation denies – and objects to – allegations by plaintiff that purport to lump Bayer Corporation together with other defendants.

184.   In response to the allegations in paragraph 184, Bayer Corporation admits that plaintiff purports to bring a claim for negligent misrepresentation, but Bayer Corporation denies any liability as to that claim.

185.   To the extent that any allegations in paragraph 185 are directed at Bayer Corporation, Bayer Corporation denies those allegations.

186.   As to plaintiff's allegations directed to Monsanto in paragraph 186, Bayer Corporation refers plaintiff to Monsanto's answer, which denies all liability or wrongdoing whatsoever.  To the extent that any remaining allegations in paragraph 186 involve Roundup®-branded products, Bayer Corporation denies those allegations.  To the extent that any remaining allegations in paragraph 186 are directed at Bayer Corporation, Bayer Corporation denies those allegations.

187.   Bayer Corporation lacks information or knowledge sufficient to form a belief as to the truth of the allegations in paragraph 187 regarding plaintiff's claimed use of or exposure to Roundup®-branded products and therefore denies those allegations.  As to plaintiff's allegations

directed to Monsanto in paragraph 187, Bayer Corporation refers plaintiff to Monsanto's answer, which denies all liability or wrongdoing whatsoever. To the extent that any remaining allegations in paragraph 187 involve Roundup®-branded products, Bayer Corporation denies those allegations. To the extent that any remaining allegations in paragraph 187 are directed at Bayer Corporation, Bayer Corporation denies those allegations.

188. As to plaintiff's allegations directed to Monsanto in paragraph 188, Bayer Corporation refers plaintiff to Monsanto's answer, which denies all liability or wrongdoing whatsoever. To the extent that any remaining allegations in paragraph 188 are directed at Bayer Corporation, Bayer Corporation denies those allegations.

189. As to plaintiff's allegations directed to Monsanto in paragraph 189, Bayer Corporation refers plaintiff to Monsanto's answer, which denies all liability or wrongdoing whatsoever. To the extent that any remaining allegations in paragraph 189 involve Roundup®-branded products, Bayer Corporation denies those allegations. To the extent that any remaining allegations in paragraph 189 are directed at Bayer Corporation, Bayer Corporation denies those allegations.

190. As to plaintiff's allegations directed to Monsanto in paragraph 190, Bayer Corporation refers plaintiff to Monsanto's answer, which denies all liability or wrongdoing whatsoever. To the extent that any remaining allegations in paragraph 190 involve Roundup®-branded products, Bayer Corporation denies those allegations. To the extent that any remaining allegations in paragraph 190 are directed at Bayer Corporation, Bayer Corporation denies those allegations.

191. As to plaintiff's allegations directed to Monsanto in paragraph 191, Bayer Corporation refers plaintiff to Monsanto's answer, which denies all liability or wrongdoing

whatsoever.  To the extent that any remaining allegations in paragraph 191 involve Roundup®-branded products, Bayer Corporation denies those allegations.  To the extent that any remaining allegations in paragraph 191 are directed at Bayer Corporation, Bayer Corporation denies those allegations.

192.    As to plaintiff's allegations directed to Monsanto in paragraph 192, Bayer Corporation refers plaintiff to Monsanto's answer, which denies all liability or wrongdoing whatsoever.  To the extent that any remaining allegations in paragraph 192 involve Roundup®-branded products, Bayer Corporation denies those allegations.  To the extent that any remaining allegations in paragraph 192 are directed at Bayer Corporation, Bayer Corporation denies those allegations.

193.    As to plaintiff's allegations directed to Monsanto in paragraph 193, Bayer Corporation refers plaintiff to Monsanto's answer, which denies all liability or wrongdoing whatsoever.  To the extent that any remaining allegations in paragraph 193 involve Roundup®-branded products, Bayer Corporation denies those allegations.  To the extent that any remaining allegations in paragraph 193 are directed at Bayer Corporation, Bayer Corporation denies those allegations.

194.    As to plaintiff's allegations directed to Monsanto in paragraph 194, Bayer Corporation refers plaintiff to Monsanto's answer, which denies all liability or wrongdoing whatsoever.  Bayer Corporation lacks information or knowledge sufficient to form a belief as to the truth of the allegations in paragraph 194 regarding plaintiff's reliance and therefore denies those allegations.   To the extent that any remaining allegations in paragraph 194 involve Roundup®-branded products, Bayer Corporation denies those allegations.  To the extent that any

remaining allegations in paragraph 194 are directed at Bayer Corporation, Bayer Corporation denies those allegations.

195.    In response to the allegations in paragraph 195, Bayer Corporation denies that there is any risk of serious injury associated with the as-directed use of and/or exposure to Roundup®-branded products and/or glyphosate.   Bayer Corporation lacks information or knowledge sufficient to form a belief as to the truth of the allegations in paragraph 195 regarding plaintiff's knowledge about Roundup®-branded products and therefore denies the remaining allegations in paragraph 195.

196.    As to plaintiff's allegations directed to Monsanto in paragraph 196, Bayer Corporation refers plaintiff to Monsanto's answer, which denies all liability or wrongdoing whatsoever.  To the extent that any remaining allegations in paragraph 196 involve Roundup®-branded products, Bayer Corporation denies those allegations.  To the extent that any remaining allegations in paragraph 196 are directed at Bayer Corporation, Bayer Corporation denies those allegations.

197.    As to plaintiff's allegations directed to Monsanto in paragraph 197, Bayer Corporation refers plaintiff to Monsanto's answer, which denies all liability or wrongdoing whatsoever.  To the extent that any remaining allegations in paragraph 197 are directed at Bayer Corporation, Bayer Corporation denies those allegations.

In response to the "WHEREFORE" paragraph following paragraph 197, Bayer Corporation demands that judgment be entered in its favor and against plaintiff and that plaintiff's Complaint be dismissed, with prejudice, and that Bayer Corporation be awarded costs of suit and reasonable attorney's fees as allowed by law and such further and additional relief as this Court may deem just and proper.

198.-290.     Bayer Corporation makes no answer to Counts VI-XIV of plaintiff's Complaint because they are not directed at Bayer Corporation and seek no recovery from Bayer Corporation.  To the extent that responses from Bayer Corporation are deemed required, Bayer Corporation denies: (a) that glyphosate or Roundup®-branded products can cause NHL and other serious illnesses; (b) that glyphosate or Roundup®-branded products caused plaintiff's cancer; (c) that Roundup®-branded products are defective or lack adequate warnings; (d) that Bayer Corporation was negligent, is strictly liable, breached any warranties, or engaged in any other tortious conduct; and (e) that Bayer Corporation is liable to plaintiff based on any allegations in Counts VI-XIV.

Every allegation in the Complaint that is not specifically and expressly admitted in this Answer is hereby specifically and expressly denied.

## SEPARATE AND AFFIRMATIVE DEFENSES

1.     The Complaint, in whole or part, fails to state a claim or cause of action against Bayer Corporation upon which relief can be granted.

2.     Plaintiff's claims against Bayer Corporation are barred for lack of personal jurisdiction.

3.     Plaintiff's claims are improperly joined and should be severed.

4.     Plaintiff's claims against Bayer Corporation are barred because Bayer Corporation never manufactured, distributed, marketed, or sold Roundup®-branded products.

5.     Plaintiff's claims against Bayer Corporation are barred because plaintiff cannot proffer any scientifically reliable evidence that the products at issue were defective or unreasonably dangerous.

6.      Any alleged negligent or culpable conduct of Bayer Corporation, none being admitted, was so insubstantial as to be insufficient to be a proximate or substantial contributing cause of plaintiff's alleged injuries.

7.      Plaintiff's claims against Bayer Corporation are barred, in whole or in part, because the products at issue were designed, manufactured, marketed and labeled with proper warnings, information, cautions and instructions, in accordance with the state of the art and the state of scientific and technological knowledge.

8.      Plaintiff's claims against Bayer Corporation are barred, in whole or in part, because the products at issue were not defective or unreasonably dangerous in that they complied with, at all relevant times, all applicable government safety standards.

9.      Any claims based on allegations that Bayer Corporation misled, defrauded, made misrepresentations to, or withheld information from, the United States Environmental Protection Agency ("EPA") are preempted by federal law.  *See, e.g.*, *Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341 (2001); *Nathan Kimmel, Inc. v. Dowelanco*, 275 F.3d 1199 (9th Cir. 2002).

10.     Plaintiff's claims against Bayer Corporation are preempted, in whole or in part, by applicable federal law relating to the design, testing, producing, manufacturing, labeling, distributing, modeling, processing, and supply of Roundup®-branded products and/or glyphosate-containing products.

11.     Plaintiff's claims against Bayer Corporation are preempted, in whole or in part, because of U.S. EPA findings that glyphosate does not cause cancer in humans and/or because of U.S. EPA-approved product labeling.

12.     Plaintiff's claims against Bayer Corporation are barred, in whole or in part, by the doctrine of primary jurisdiction, including by the authority delegated by Congress to the U.S. EPA.

13.     Plaintiff's claims against Bayer Corporation are barred, in whole or in part, because plaintiff's injuries, if any, were the result of conduct of plaintiff, independent third parties, and/or events that were extraordinary under the circumstances, not foreseeable in the normal course of events, and/or independent, intervening and superseding causes of the alleged injuries, including but not limited to plaintiff's pre-existing medical conditions.

14.     The doctrines contained in Restatement (Second) of Torts § 402A, comments j and k, bar plaintiff's claims against Bayer Corporation in whole or in part.

15.     Applicable statutes of limitations and/or repose bar plaintiff's claims against Bayer Corporation in whole or in part.

16.     Plaintiff's misuse or abnormal use of the product or failure to follow instructions bar plaintiff's claims against Bayer Corporation in whole or in part.

17.     If plaintiff suffered injuries or damages as alleged, which is denied, such injuries or damages resulted from:  (a) acts or omissions of persons or entities for which Bayer Corporation is neither liable nor responsible or, in the alternative, Bayer Corporation is entitled to an assessment of the relative degree of fault of all such persons and entities; or (b) resulted from diseases and/or causes that are not related or connected with any product sold, distributed, or manufactured by Bayer Corporation.  Such acts or omissions on the part of others or diseases or causes constitute an independent, intervening and sole proximate cause of plaintiff's alleged injuries or damages.

18.     Bayer Corporation had no legal relationship or privity with plaintiff and owed no duty to her by which liability could be attributed to it.

19.     Plaintiff's claims are preempted or otherwise barred in whole or in part by the Freedom of Speech Clause of the First Amendment of the U.S. Constitution.

20.     Bayer Corporation made no warranties of any kind or any representations of any nature whatsoever to plaintiff.  If any such warranties were made, which Bayer Corporation specifically denies, then plaintiff failed to give notice of any breach thereof.

21.     Plaintiff's claims against Bayer Corporation are barred in whole or in part by plaintiff's contributory/comparative negligence.

22.     Plaintiff's claims against Bayer Corporation are barred in whole or in part by plaintiff's failure to mitigate damages.

23.     Plaintiff's claims against Bayer Corporation are barred in whole or in part by the sophisticated user doctrine.

24.     To the extent that plaintiff recovered payments for plaintiff's alleged injuries from any collateral source(s) or other source(s), plaintiff's recovery in this lawsuit, if any, shall be reduced to the extent allowed by applicable law, including as allowed for under Fla. Stat. § 768.76.

25.     If plaintiff has been injured or damaged, no injuries or damages being admitted, such injuries or damages were not caused by a Bayer Corporation product.

26.     Plaintiff's claims against Bayer Corporation are barred or limited to the extent that plaintiff asserts claims that are governed by the laws of a state that does not recognize, or limits, such claims.

27.     Plaintiff's claims against Bayer Corporation are barred to the extent that plaintiff seek relief under the laws of states that do not govern plaintiff's claims.

28.     Plaintiff's claims against Bayer Corporation are barred, in whole or in part, by application of Fla. Stat. § 768.1256.

29.     In accordance with Fla. Stat. § 768.1257, plaintiff's claims against Bayer Corporation are barred, in whole or in part, because the products at issue were designed, manufactured, marketed and labeled with proper warnings, information, cautions and instructions, in accordance with the state of the art and the state of scientific and technological knowledge.

30.     Plaintiff has failed to allege fraud with sufficient particularity.

31.     Plaintiff's medical condition was caused directly, solely, and proximately by medical conditions, sensitivities, and idiosyncrasies peculiar to her, and which were unknown, unknowable, or not reasonably foreseeable to Bayer Corporation.

32.     The number of different agents to which plaintiff was exposed and the lack of definitive evidence as to the amount of actual exposure to each agent makes it impossible to determine, to a requisite degree of legal certainty, the alleged causal connection, if any, between plaintiff's injuries and said agents.

33.     Plaintiff's injuries, if any, were caused, in whole or in part, by the acts or omissions of persons other than Bayer Corporation, whether individual, corporate, associate, or otherwise, whether named or unnamed in the Complaint, and for whose conduct Bayer Corporation is not liable.  Bayer Corporation is not liable for damages proximately caused by non-parties, pursuant to *Fabre v. Marin*, 623 So.2d 1182 (Fla. 1993), including any other product used by plaintiff that was not manufactured, sold, or distributed by Bayer Corporation.

34.     Bayer Corporation hereby gives notice that it intends to rely upon such other defenses as may become available or apparent during the course of discovery and thus reserves its right to amend this Answer to assert such defenses.

**WHEREFORE**, Defendant Bayer Corporation demands judgment in its favor and against plaintiff, dismissing plaintiff's Complaint with prejudice, together with the costs of suit and such other relief as the Court deems equitable and just.

Dated:  February 23, 2021                              Respectfully submitted,

**McDERMOTT WILL & EMERY LLP**

*/s/ Melissa R. Alvarez*
ANTHONY N. UPSHAW
Florida Bar No.: 861091
aupshaw@mwe.com
MELISSA R. ALVAREZ
Florida Bar No.: 820091
malvarez@mwe.com
333 SE 2nd Avenue, Suite 4500
Miami, FL 33131
Tel:  (305) 329-4431
Fax: (305) 675-8031
***Counsel for Defendant***
***Bayer Corporation***

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this **23rd day of February, 2021,** a true and correct copy of the foregoing was electronically filed with the Clerk of the Court using the CM/ECF system.

*/s/  Melissa R. Alvarez*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA
### MIAMI DIVISION

NANCY C. SALAS,
a Florida resident,

      Plaintiff,

v.

MONSANTO COMPANY, a foreign
corporation; BAYER CORPORATION, a
foreign corporation; BAYER AG, a foreign
corporation; ANDREW JACK CONROY, a
Florida resident; HOME DEPOT U.S.A., INC.,
a foreign corporation; KLI SHELL LUMBER
& HARDWARE, LLC, a Florida company;
ORLANDO VALDES, a Florida resident;
TRANSFORM SR DEVELOPMENT LLC
d/b/a KMART, a foreign company; and JOSE
LUIS MARTINEZ-ALVAREZ, a Florida
resident.

      Defendants.

Case No. 1:21-cv-20648-PCH

## HOME DEPOT U.S.A., INC.'S ANSWER AND AFFIRMATIVE DEFENSES
## TO PLAINTIFF'S COMPLAINT

Defendant Home Depot U.S.A., Inc. ("Home Depot") submits its Answer and Affirmative

Defenses to Plaintiff's Complaint ("Complaint"), respectfully showing as follows:

1.      Home Depot denies the allegations in Paragraph 1 of the Complaint.

2.      Paragraph 2 of the Complaint contains allegations that are not directed toward Home

Depot, and therefore no response from Home Depot is required. To the extent a response is deemed

required, Home Depot states that it lacks sufficient information or knowledge to form a belief as to

the truth of the allegations in Paragraph 2, and therefore denies those allegations.

3.      Home Depot lacks sufficient information or knowledge to form a belief as to the truth of the allegations in Paragraph 3 of the Complaint, and therefore denies those allegations.

4.      Paragraph 4 of the Complaint contains allegations that are not directed toward Home Depot, and therefore no response from Home Depot is required. To the extent a response is deemed required, Home Depot states that it lacks sufficient information or knowledge to form a belief as to the truth of the allegations in Paragraph 4, and therefore denies those allegations.

5.      Paragraph 5 of the Complaint contains allegations that are not directed toward Home Depot, and therefore no response from Home Depot is required. To the extent a response is deemed required, Home Depot states that it lacks sufficient information or knowledge to form a belief as to the truth of the allegations in Paragraph 5, and therefore denies those allegations.

6.      Paragraph 6 of the Complaint contains allegations that are not directed toward Home Depot, and therefore no response from Home Depot is required. To the extent a response is deemed required, Home Depot states that it lacks sufficient information or knowledge to form a belief as to the truth of the allegations in Paragraph 6, and therefore denies those allegations.

7.      Home Depot admits that it is incorporated under the laws of the State of Delaware and maintains its principal place of business in Cobb County, Georgia. Home Depot further admits that it has sold certain Roundup products in Florida, including Miami-Dade County. Home Depot lacks sufficient information or knowledge to form a belief as to the truth of the remaining allegations in Paragraph 7 of the Complaint, and therefore denies those allegations.

8.      Paragraph 8 of the Complaint contains allegations that are not directed toward Home Depot, and therefore no response from Home Depot is required. To the extent a response is deemed required, Home Depot states that it lacks sufficient information or knowledge to form a belief as to the truth of the allegations in Paragraph 8, and therefore denies those allegations.

9.      Paragraph 9 of the Complaint contains allegations that are not directed toward Home Depot, and therefore no response from Home Depot is required. To the extent a response is deemed required, Home Depot states that it lacks sufficient information or knowledge to form a belief as to the truth of the allegations in Paragraph 9, and therefore denies those allegations.

10.      Paragraph 10 of the Complaint contains allegations that are not directed toward Home Depot, and therefore no response from Home Depot is required. To the extent a response is deemed required, Home Depot states that it lacks sufficient information or knowledge to form a belief as to the truth of the allegations in Paragraph 10, and therefore denies those allegations.

11.      Paragraph 11 of the Complaint contains allegations that are not directed toward Home Depot, and therefore no response from Home Depot is required. To the extent a response is deemed required, Home Depot states that it lacks sufficient information or knowledge to form a belief as to the truth of the allegations in Paragraph 11, and therefore denies those allegations.

12.      Paragraph 12 of the Complaint contains allegations that set forth legal conclusions, and therefore no response from Home Depot is required. To the extent a response is deemed required, Home Depot states that it lacks sufficient information or knowledge to form a belief as to the truth of the allegations in Paragraph 12 of the Complaint, and therefore denies those allegations.

13.      Paragraph 13 of the Complaint contains allegations that are not directed toward Home Depot, and therefore no response from Home Depot is required. To the extent a response is deemed required, Home Depot states that it lacks sufficient information or knowledge to form a belief as to the truth of the allegations in Paragraph 13, and therefore denies those allegations.

14.      Paragraph 14 of the Complaint contains allegations that are not directed toward Home Depot, and therefore no response from Home Depot is required. To the extent a response is

deemed required, Home Depot states that it lacks sufficient information or knowledge to form a belief as to the truth of the allegations in Paragraph 14, and therefore denies those allegations.

15.    Paragraph 15 of the Complaint contains allegations that are not directed toward Home Depot, and therefore no response from Home Depot is required. To the extent a response is deemed required, Home Depot states that it lacks sufficient information or knowledge to form a belief as to the truth of the allegations in Paragraph 15, and therefore denies those allegations.

16.    Paragraph 16 of the Complaint contains allegations that are not directed toward Home Depot, and therefore no response from Home Depot is required. To the extent a response is deemed required, Home Depot states that it lacks sufficient information or knowledge to form a belief as to the truth of the allegations in Paragraph 16, and therefore denies those allegations.

17.    Paragraph 17 of the Complaint contains allegations that are not directed toward Home Depot, and therefore no response from Home Depot is required. To the extent a response is deemed required, Home Depot states that it lacks sufficient information or knowledge to form a belief as to the truth of the allegations in Paragraph 17, and therefore denies those allegations.

18.    Home Depot admits that it is authorized to do business in Florida and does conduct business in Florida. Home Depot further admits that it has sold certain Roundup products in Miami-Dade County, Florida. Home Depot lacks sufficient information or knowledge to form a belief as to the truth of the remaining allegations in Paragraph 18 of the Complaint, and therefore denies those allegations.

19.    Home Depot admits that its registered agent is Corporation Service Company, 1201 Hays Street, Tallahassee, Florida 32301. The remaining allegations of Paragraph 19 of the Complaint set forth legal conclusions, and therefore no response from Home Depot is required. To the extent a response is deemed required, Home Depot states that it lacks sufficient information or

knowledge to form a belief as to the truth of the allegations in Paragraph 19, and therefore denies those allegations.

20.     Paragraph 20 of the Complaint contains allegations that are not directed toward Home Depot, and therefore no response from Home Depot is required. To the extent a response is deemed required, Home Depot states that it lacks sufficient information or knowledge to form a belief as to the truth of the allegations in Paragraph 20, and therefore denies those allegations.

21.     Paragraph 21 of the Complaint contains allegations that are not directed toward Home Depot, and therefore no response from Home Depot is required. To the extent a response is deemed required, Home Depot states that it lacks sufficient information or knowledge to form a belief as to the truth of the allegations in Paragraph 21, and therefore denies those allegations.

22.     Paragraph 22 of the Complaint contains allegations that are not directed toward Home Depot, and therefore no response from Home Depot is required. To the extent a response is deemed required, Home Depot states that it lacks sufficient information or knowledge to form a belief as to the truth of the allegations in Paragraph 22, and therefore denies those allegations.

23.     Paragraph 23 of the Complaint contains allegations that are not directed toward Home Depot, and therefore no response from Home Depot is required. To the extent a response is deemed required, Home Depot states that it lacks sufficient information or knowledge to form a belief as to the truth of the allegations in Paragraph 23, and therefore denies those allegations.

24.     Paragraph 24 of the Complaint contains allegations that are not directed toward Home Depot, and therefore no response from Home Depot is required. To the extent a response is deemed required, Home Depot states that it lacks sufficient information or knowledge to form a belief as to the truth of the allegations in Paragraph 24, and therefore denies those allegations.

25.     Paragraph 25 of the Complaint contains allegations that are not directed toward Home Depot and/or contain legal conclusions, and therefore no response from Home Depot is required. To the extent a response is deemed required, Home Depot lacks sufficient information or knowledge to form a belief as to the truth of the remaining allegations in Paragraph 25, and therefore denies those allegations.

26.     Paragraph 26 of the Complaint contains allegations that are not directed toward Home Depot, and therefore no response from Home Depot is required. To the extent a response is deemed required, Home Depot states that it lacks sufficient information or knowledge to form a belief as to the truth of the allegations in Paragraph 26, and therefore denies those allegations.

27.     Home Depot lacks sufficient information or knowledge to form a belief as to the truth of the allegations in Paragraph 27 of the Complaint, and therefore denies those allegations.

28.     Home Depot lacks sufficient information or knowledge to form a belief as to the truth of the allegations in Paragraph 28 of the Complaint, and therefore denies those allegations.

29.     Home Depot lacks sufficient information or knowledge to form a belief as to the truth of the allegations in Paragraph 29 of the Complaint, and therefore denies those allegations.

30.     Home Depot lacks sufficient information or knowledge to form a belief as to the truth of the allegations in Paragraph 30 of the Complaint, and therefore denies those allegations.

31.     To the extent Paragraph 31 of the Complaint contains allegations that are not directed toward Home Depot, no response from Home Depot is required. To the extent a response is deemed required, Home Depot lacks sufficient information or knowledge to form a belief as to the truth of the allegations in Paragraph 31, and therefore denies those allegations.

32.     Home Depot lacks sufficient information or knowledge to form a belief as to the truth of the allegations in Paragraph 32 of the Complaint, and therefore denies those allegations.

33.     Home Depot lacks sufficient information or knowledge to form a belief as to the truth of the allegations in Paragraph 33 of the Complaint, and therefore denies those allegations.

34.     Paragraph 34 of the Complaint contains allegations that are not directed toward Home Depot, and therefore no response from Home Depot is required. To the extent a response is deemed required, Home Depot states that it lacks sufficient information or knowledge to form a belief as to the truth of the allegations in Paragraph 34, and therefore denies those allegations.

35.     Paragraph 35 of the Complaint contains allegations that are not directed toward Home Depot and/or contain legal conclusions, and therefore no response from Home Depot is required. To the extent a response is deemed required, Home Depot states that the statutes referenced in Paragraph 35 speak for themselves, and denies any allegations in Paragraph 35 inconsistent therewith. Home Depot lacks sufficient information or knowledge to form a belief as to the truth of the remaining allegations in Paragraph 35, and therefore denies those allegations.

36.     Paragraph 36 of the Complaint contains allegations that are not directed toward Home Depot and/or contain legal conclusions, and therefore no response from Home Depot is required. To the extent a response is deemed required, Home Depot states that the statutes referenced in Paragraph 36 speak for themselves, and denies any allegations in Paragraph 36 inconsistent therewith. Home Depot lacks sufficient information or knowledge to form a belief as to the truth of the remaining allegations in Paragraph 36, and therefore denies those allegations.

37.     Paragraph 37 of the Complaint contains allegations that are not directed toward Home Depot and/or contain legal conclusions, and therefore no response from Home Depot is required. To the extent a response is deemed required, Home Depot states that the statutes referenced in Paragraph 37 speak for themselves, and denies any allegations in Paragraph 37

inconsistent therewith. Home Depot lacks sufficient information or knowledge to form a belief as to the truth of the remaining allegations in Paragraph 37, and therefore denies those allegations.

38.     Paragraph 38 of the Complaint contains allegations that are not directed toward Home Depot, and therefore no response from Home Depot is required. To the extent a response is deemed required, Home Depot states that it lacks sufficient information or knowledge to form a belief as to the truth of the allegations in Paragraph 38, and therefore denies those allegations.

39.     Paragraph 39 of the Complaint contains allegations that are not directed toward Home Depot and/or contain legal conclusions, and therefore no response from Home Depot is required. To the extent a response is deemed required, Home Depot states that the statutes referenced in Paragraph 39 speak for themselves, and denies any allegations in Paragraph 39 inconsistent therewith. Home Depot lacks sufficient information or knowledge to form a belief as to the truth of the remaining allegations in Paragraph 39, and therefore denies those allegations.

40.     Paragraph 40 of the Complaint contains allegations that are not directed toward Home Depot, and therefore no response from Home Depot is required. To the extent a response is deemed required, Home Depot states that the documents referenced in Paragraph 40 speak for themselves, and denies any allegations in Paragraph 40 inconsistent therewith. Home Depot lacks sufficient information or knowledge to form a belief as to the truth of the remaining allegations in Paragraph 40, and therefore denies those allegations.

41.     Paragraph 41 of the Complaint contains allegations that are not directed toward Home Depot and/or contain legal conclusions, and therefore no response from Home Depot is required. To the extent a response is deemed required, Home Depot states that it lacks sufficient information or knowledge to form a belief as to the truth of the allegations in Paragraph 41, and therefore denies those allegations.

42.     Paragraph 42 of the Complaint contains allegations that are not directed toward Home Depot, and therefore no response from Home Depot is required. To the extent a response is deemed required, Home Depot states that it lacks sufficient information or knowledge to form a belief as to the truth of the allegations in Paragraph 42, and therefore denies those allegations.

43.     Paragraph 43 of the Complaint contains allegations that are not directed toward Home Depot, and therefore no response from Home Depot is required. To the extent a response is deemed required, Home Depot states that it lacks sufficient information or knowledge to form a belief as to the truth of the allegations in Paragraph 43, and therefore denies those allegations.

44.     Paragraph 44 of the Complaint contains allegations that are not directed toward Home Depot, and therefore no response from Home Depot is required. To the extent a response is deemed required, Home Depot states that it lacks sufficient information or knowledge to form a belief as to the truth of the allegations in Paragraph 44, and therefore denies those allegations.

45.     Paragraph 45 of the Complaint contains allegations that are not directed toward Home Depot, and therefore no response from Home Depot is required. To the extent a response is deemed required, Home Depot states that it lacks sufficient information or knowledge to form a belief as to the truth of the allegations in Paragraph 45, and therefore denies those allegations.

46.     Paragraph 46 of the Complaint contains allegations that are not directed toward Home Depot, and therefore no response from Home Depot is required. To the extent a response is deemed required, Home Depot states that it lacks sufficient information or knowledge to form a belief as to the truth of the allegations in Paragraph 46, and therefore denies those allegations.

47.     Paragraph 47 of the Complaint contains allegations that are not directed toward Home Depot, and therefore no response from Home Depot is required. To the extent a response is

deemed required, Home Depot states that it lacks sufficient information or knowledge to form a belief as to the truth of the allegations in Paragraph 47, and therefore denies those allegations.

48.     Paragraph 48 of the Complaint contains allegations that are not directed toward Home Depot, and therefore no response from Home Depot is required. To the extent a response is deemed required, Home Depot states that it lacks sufficient information or knowledge to form a belief as to the truth of the allegations in Paragraph 48, and therefore denies those allegations.

49.     Paragraph 49 of the Complaint contains allegations that are not directed toward Home Depot, and therefore no response from Home Depot is required. To the extent a response is deemed required, Home Depot states that it lacks sufficient information or knowledge to form a belief as to the truth of the allegations in Paragraph 49, and therefore denies those allegations.

50.     Paragraph 50 of the Complaint contains allegations that are not directed toward Home Depot, and therefore no response from Home Depot is required. To the extent a response is deemed required, Home Depot states that it lacks sufficient information or knowledge to form a belief as to the truth of the allegations in Paragraph 50, and therefore denies those allegations.

51.     Paragraph 51 of the Complaint contains allegations that are not directed toward Home Depot, and therefore no response from Home Depot is required. To the extent a response is deemed required, Home Depot states that the documents referenced in Paragraph 51 speak for themselves, and denies any allegations in Paragraph 51 inconsistent therewith. Home Depot lacks sufficient information or knowledge to form a belief as to the truth of the remaining allegations in Paragraph 51, and therefore denies those allegations.

52.     Paragraph 52 of the Complaint contains allegations that are not directed toward Home Depot, and therefore no response from Home Depot is required. To the extent a response is

deemed required, Home Depot states that it lacks sufficient information or knowledge to form a belief as to the truth of the allegations in Paragraph 52, and therefore denies those allegations.

53.     Paragraph 53 of the Complaint contains allegations that are not directed toward Home Depot, and therefore no response from Home Depot is required. To the extent a response is deemed required, Home Depot states that the documents referenced in Paragraph 53 speak for themselves, and denies any allegations in Paragraph 53 inconsistent therewith. Home Depot lacks sufficient information or knowledge to form a belief as to the truth of the remaining allegations in Paragraph 53, and therefore denies those allegations.

54.     Paragraph 54 of the Complaint contains allegations that are not directed toward Home Depot, and therefore no response from Home Depot is required. To the extent a response is deemed required, Home Depot states that it lacks sufficient information or knowledge to form a belief as to the truth of the allegations in Paragraph 54, and therefore denies those allegations.

55.     Paragraph 55 of the Complaint contains allegations that are not directed toward Home Depot, and therefore no response from Home Depot is required. To the extent a response is deemed required, Home Depot states that the documents referenced in Paragraph 55 speak for themselves, and denies any allegations in Paragraph 55 inconsistent therewith. Home Depot lacks sufficient information or knowledge to form a belief as to the truth of the remaining allegations in Paragraph 55, and therefore denies those allegations.

56.     Paragraph 56 of the Complaint contains allegations that are not directed toward Home Depot, and therefore no response from Home Depot is required. To the extent a response is deemed required, Home Depot states that the documents referenced in Paragraph 56 speak for themselves, and denies any allegations in Paragraph 56 inconsistent therewith. Home Depot lacks

sufficient information or knowledge to form a belief as to the truth of the remaining allegations in Paragraph 56, and therefore denies those allegations.

57.     Paragraph 57 of the Complaint contains allegations that are not directed toward Home Depot, and therefore no response from Home Depot is required. To the extent a response is deemed required, Home Depot states that it lacks sufficient information or knowledge to form a belief as to the truth of the allegations in Paragraph 57, and therefore denies those allegations.

58.     Paragraph 58 of the Complaint contains allegations that are not directed toward Home Depot, and therefore no response from Home Depot is required. To the extent a response is deemed required, Home Depot states that it lacks sufficient information or knowledge to form a belief as to the truth of the allegations in Paragraph 58, and therefore denies those allegations.

59.     Paragraph 59 of the Complaint contains allegations that are not directed toward Home Depot, and therefore no response from Home Depot is required. To the extent a response is deemed required, Home Depot states that it lacks sufficient information or knowledge to form a belief as to the truth of the allegations in Paragraph 59, and therefore denies those allegations.

60.     Paragraph 60 of the Complaint contains allegations that are not directed toward Home Depot, and therefore no response from Home Depot is required. To the extent a response is deemed required, Home Depot states that it lacks sufficient information or knowledge to form a belief as to the truth of the allegations in Paragraph 60, and therefore denies those allegations.

61.     Paragraph 61 of the Complaint contains allegations that are not directed toward Home Depot, and therefore no response from Home Depot is required. To the extent a response is deemed required, Home Depot states that the documents referenced in Paragraph 61 speak for themselves, and denies any allegations in Paragraph 61 inconsistent therewith. Home Depot lacks

sufficient information or knowledge to form a belief as to the truth of the remaining allegations in Paragraph 61, and therefore denies those allegations.

62.     Paragraph 62 of the Complaint contains allegations that are not directed toward Home Depot, and therefore no response from Home Depot is required. To the extent a response is deemed required, Home Depot states that the documents referenced in Paragraph 62 speak for themselves, and denies any allegations in Paragraph 62 inconsistent therewith. Home Depot lacks sufficient information or knowledge to form a belief as to the truth of the remaining allegations in Paragraph 62, and therefore denies those allegations.

63.     Paragraph 63 of the Complaint contains allegations that are not directed toward Home Depot, and therefore no response from Home Depot is required. To the extent a response is deemed required, Home Depot states that the documents referenced in Paragraph 63 speak for themselves, and denies any allegations in Paragraph 63 inconsistent therewith. Home Depot lacks sufficient information or knowledge to form a belief as to the truth of the remaining allegations in Paragraph 63, and therefore denies those allegations.

64.     Paragraph 64 of the Complaint contains allegations that are not directed toward Home Depot, and therefore no response from Home Depot is required. To the extent a response is deemed required, Home Depot states that the documents referenced in Paragraph 64 speak for themselves, and denies any allegations in Paragraph 64 inconsistent therewith. Home Depot lacks sufficient information or knowledge to form a belief as to the truth of the remaining allegations in Paragraph 64, and therefore denies those allegations.

65.     Paragraph 65 of the Complaint contains allegations that are not directed toward Home Depot, and therefore no response from Home Depot is required. To the extent a response is deemed required, Home Depot states that the documents referenced in Paragraph 65 speak for

themselves, and denies any allegations in Paragraph 65 inconsistent therewith. Home Depot lacks

sufficient information or knowledge to form a belief as to the truth of the remaining allegations in

Paragraph 65, and therefore denies those allegations.

66.     Paragraph 66 of the Complaint contains allegations that are not directed toward

Home Depot, and therefore no response from Home Depot is required. To the extent a response is

deemed required, Home Depot states that the documents referenced in Paragraph 66 speak for

themselves, and denies any allegations in Paragraph 66 inconsistent therewith. Home Depot lacks

sufficient information or knowledge to form a belief as to the truth of the remaining allegations in

Paragraph 66, and therefore denies those allegations.

67.     Paragraph 67 of the Complaint contains allegations that are not directed toward

Home Depot, and therefore no response from Home Depot is required. To the extent a response is

deemed required, Home Depot states that the documents referenced in Paragraph 67 speak for

themselves, and denies any allegations in Paragraph 67 inconsistent therewith. Home Depot lacks

sufficient information or knowledge to form a belief as to the truth of the remaining allegations in

Paragraph 67, and therefore denies those allegations.

68.     Paragraph 68 of the Complaint contains allegations that are not directed toward

Home Depot, and therefore no response from Home Depot is required. To the extent a response is

deemed required, Home Depot states that the documents referenced in Paragraph 68 speak for

themselves, and denies any allegations in Paragraph 68 inconsistent therewith. Home Depot lacks

sufficient information or knowledge to form a belief as to the truth of the remaining allegations in

Paragraph 68, and therefore denies those allegations.

69.     Paragraph 69 of the Complaint contains allegations that are not directed toward Home Depot, and therefore no response from Home Depot is required. To the extent a response is deemed required, Home Depot states that the documents referenced in Paragraph 69 speak for themselves, and denies any allegations in Paragraph 69 inconsistent therewith. Home Depot lacks sufficient information or knowledge to form a belief as to the truth of the remaining allegations in Paragraph 69, and therefore denies those allegations.

70.     Paragraph 70 of the Complaint contains allegations that are not directed toward Home Depot, and therefore no response from Home Depot is required. To the extent a response is deemed required, Home Depot states that the documents referenced in Paragraph 70 speak for themselves, and denies any allegations in Paragraph 70 inconsistent therewith. Home Depot lacks sufficient information or knowledge to form a belief as to the truth of the remaining allegations in Paragraph 70, and therefore denies those allegations.

71.     Paragraph 71 of the Complaint contains allegations that are not directed toward Home Depot, and therefore no response from Home Depot is required. To the extent a response is deemed required, Home Depot states that it lacks sufficient information or knowledge to form a belief as to the truth of the allegations in Paragraph 71, and therefore denies those allegations.

72.     Paragraph 72 of the Complaint contains allegations that are not directed toward Home Depot, and therefore no response from Home Depot is required. To the extent a response is deemed required, Home Depot states that the documents referenced in Paragraph 72 speak for themselves, and denies any allegations in Paragraph 72 inconsistent therewith. Home Depot lacks sufficient information or knowledge to form a belief as to the truth of the remaining allegations in Paragraph 72, and therefore denies those allegations.

73.     Paragraph 73 of the Complaint contains allegations that are not directed toward Home Depot, and therefore no response from Home Depot is required. To the extent a response is deemed required, Home Depot states that the documents referenced in Paragraph 73 speak for themselves, and denies any allegations in Paragraph 73 inconsistent therewith. Home Depot lacks sufficient information or knowledge to form a belief as to the truth of the remaining allegations in Paragraph 73, and therefore denies those allegations.

74.     Paragraph 74 of the Complaint contains allegations that are not directed toward Home Depot, and therefore no response from Home Depot is required. To the extent a response is deemed required, Home Depot states that the documents referenced in Paragraph 74 speak for themselves, and denies any allegations in Paragraph 74 inconsistent therewith. Home Depot lacks sufficient information or knowledge to form a belief as to the truth of the remaining allegations in Paragraph 74, and therefore denies those allegations.

75.     Paragraph 75 of the Complaint contains allegations that are not directed toward Home Depot, and therefore no response from Home Depot is required. To the extent a response is deemed required, Home Depot states that the documents referenced in Paragraph 75 speak for themselves, and denies any allegations in Paragraph 75 inconsistent therewith. Home Depot lacks sufficient information or knowledge to form a belief as to the truth of the remaining allegations in Paragraph 75, and therefore denies those allegations.

76.     Paragraph 76 of the Complaint contains allegations that are not directed toward Home Depot, and therefore no response from Home Depot is required. To the extent a response is deemed required, Home Depot states that the documents referenced in Paragraph 76 speak for themselves, and denies any allegations in Paragraph 76 inconsistent therewith. Home Depot lacks

sufficient information or knowledge to form a belief as to the truth of the remaining allegations in Paragraph 76, and therefore denies those allegations.

77.    Paragraph 77 of the Complaint contains allegations that are not directed toward Home Depot, and therefore no response from Home Depot is required. To the extent a response is deemed required, Home Depot states that the documents referenced in Paragraph 77 speak for themselves, and denies any allegations in Paragraph 77 inconsistent therewith. Home Depot lacks sufficient information or knowledge to form a belief as to the truth of the remaining allegations in Paragraph 77, and therefore denies those allegations.

78.    Paragraph 78 of the Complaint contains allegations that are not directed toward Home Depot, and therefore no response from Home Depot is required. To the extent a response is deemed required, Home Depot states that the documents referenced in Paragraph 78 speak for themselves, and denies any allegations in Paragraph 78 inconsistent therewith. Home Depot lacks sufficient information or knowledge to form a belief as to the truth of the remaining allegations in Paragraph 78, and therefore denies those allegations.

79.    Paragraph 79 of the Complaint contains allegations that are not directed toward Home Depot, and therefore no response from Home Depot is required. To the extent a response is deemed required, Home Depot states that the documents referenced in Paragraph 79 speak for themselves, and denies any allegations in Paragraph 79 inconsistent therewith. Home Depot lacks sufficient information or knowledge to form a belief as to the truth of the remaining allegations in Paragraph 79, and therefore denies those allegations.

80.    Paragraph 80 of the Complaint contains allegations that are not directed toward Home Depot, and therefore no response from Home Depot is required. To the extent a response is deemed required, Home Depot states that the documents referenced in Paragraph 80 speak for

themselves, and denies any allegations in Paragraph 80 inconsistent therewith. Home Depot lacks

sufficient information or knowledge to form a belief as to the truth of the remaining allegations in

Paragraph 80, and therefore denies those allegations.

81.     Paragraph 81 of the Complaint contains allegations that are not directed toward

Home Depot, and therefore no response from Home Depot is required. To the extent a response is

deemed required, Home Depot states that the documents referenced in Paragraph 81 speak for

themselves, and denies any allegations in Paragraph 81 inconsistent therewith. Home Depot lacks

sufficient information or knowledge to form a belief as to the truth of the remaining allegations in

Paragraph 81, and therefore denies those allegations.

82.     Paragraph 82 of the Complaint contains allegations that are not directed toward

Home Depot, and therefore no response from Home Depot is required. To the extent a response is

deemed required, Home Depot states that the documents referenced in Paragraph 82 speak for

themselves, and denies any allegations in Paragraph 82 inconsistent therewith. Home Depot lacks

sufficient information or knowledge to form a belief as to the truth of the remaining allegations in

Paragraph 82, and therefore denies those allegations.

83.     Paragraph 83 of the Complaint contains allegations that are not directed toward

Home Depot, and therefore no response from Home Depot is required. To the extent a response is

deemed required, Home Depot states that the documents referenced in Paragraph 83 speak for

themselves, and denies any allegations in Paragraph 83 inconsistent therewith. Home Depot lacks

sufficient information or knowledge to form a belief as to the truth of the remaining allegations in

Paragraph 83, and therefore denies those allegations.

84.     Paragraph 84 of the Complaint contains allegations that are not directed toward

Home Depot, and therefore no response from Home Depot is required. To the extent a response is

deemed required, Home Depot states that it lacks sufficient information or knowledge to form a belief as to the truth of the allegations in Paragraph 84, and therefore denies those allegations.

85.     Paragraph 85 of the Complaint contains allegations that are not directed toward Home Depot, and therefore no response from Home Depot is required. To the extent a response is deemed required, Home Depot states that the documents referenced in Paragraph 85 speak for themselves, and denies any allegations in Paragraph 85 inconsistent therewith. Home Depot lacks sufficient information or knowledge to form a belief as to the truth of the remaining allegations in Paragraph 85, and therefore denies those allegations.

86.     Paragraph 86 of the Complaint contains allegations that are not directed toward Home Depot, and therefore no response from Home Depot is required. To the extent a response is deemed required, Home Depot states that the documents referenced in Paragraph 86 speak for themselves, and denies any allegations in Paragraph 86 inconsistent therewith. Home Depot lacks sufficient information or knowledge to form a belief as to the truth of the remaining allegations in Paragraph 86, and therefore denies those allegations.

87.     Paragraph 87 of the Complaint contains allegations that are not directed toward Home Depot, and therefore no response from Home Depot is required. To the extent a response is deemed required, Home Depot states that the documents referenced in Paragraph 87 speak for themselves, and denies any allegations in Paragraph 87 inconsistent therewith. Home Depot lacks sufficient information or knowledge to form a belief as to the truth of the remaining allegations in Paragraph 87, and therefore denies those allegations.

88.     Paragraph 88 of the Complaint contains allegations that are not directed toward Home Depot, and therefore no response from Home Depot is required. To the extent a response is

deemed required, Home Depot states that it lacks sufficient information or knowledge to form a belief as to the truth of the allegations in Paragraph 88, and therefore denies those allegations.

89.     Paragraph 89 of the Complaint contains allegations that are not directed toward Home Depot, and therefore no response from Home Depot is required. To the extent a response is deemed required, Home Depot states that the documents referenced in Paragraph 89 speak for themselves, and denies any allegations in Paragraph 89 inconsistent therewith. Home Depot lacks sufficient information or knowledge to form a belief as to the truth of the remaining allegations in Paragraph 89, and therefore denies those allegations.

90.     Paragraph 90 of the Complaint contains allegations that are not directed toward Home Depot, and therefore no response from Home Depot is required. To the extent a response is deemed required, Home Depot states that the documents referenced in Paragraph 90 speak for themselves, and denies any allegations in Paragraph 90 inconsistent therewith. Home Depot lacks sufficient information or knowledge to form a belief as to the truth of the remaining allegations in Paragraph 90, and therefore denies those allegations.

91.     Paragraph 91 of the Complaint contains allegations that are not directed toward Home Depot, and therefore no response from Home Depot is required. To the extent a response is deemed required, Home Depot states that the documents referenced in Paragraph 91 speak for themselves, and denies any allegations in Paragraph 91 inconsistent therewith. Home Depot lacks sufficient information or knowledge to form a belief as to the truth of the remaining allegations in Paragraph 91, and therefore denies those allegations.

92.     Paragraph 92 of the Complaint contains allegations that are not directed toward Home Depot, and therefore no response from Home Depot is required. To the extent a response is

deemed required, Home Depot states that it lacks sufficient information or knowledge to form a

belief as to the truth of the allegations in Paragraph 92, and therefore denies those allegations.

93.   Paragraph 93 of the Complaint contains allegations that are not directed toward

Home Depot, and therefore no response from Home Depot is required. To the extent a response is

deemed required, Home Depot states that the legal filings referenced in Paragraph 93, including all

subparts thereto, speak for themselves, and denies any allegations in Paragraph 93, including all

subparts thereto, inconsistent therewith. Home Depot lacks sufficient information or knowledge to

form a belief as to the truth of the remaining allegations in Paragraph 93, including all subparts

thereto, and therefore denies those allegations.

94.   Paragraph 94 of the Complaint contains allegations that are not directed toward

Home Depot, and therefore no response from Home Depot is required. To the extent a response is

deemed required, Home Depot states that the documents referenced in Paragraph 94, including all

subparts thereto, speak for themselves, and denies any allegations in Paragraph 94, including all

subparts thereto, inconsistent therewith. Home Depot lacks sufficient information or knowledge to

form a belief as to the truth of the remaining allegations in Paragraph 94, including all subparts

thereto, and therefore denies those allegations.

95.   Paragraph 95 of the Complaint contains allegations that are not directed toward

Home Depot, and therefore no response from Home Depot is required. To the extent a response is

deemed required, Home Depot states that it lacks sufficient information or knowledge to form a

belief as to the truth of the allegations in Paragraph 95, and therefore denies those allegations.

96.   Paragraph 96 of the Complaint contains allegations that are not directed toward

Home Depot, and therefore no response from Home Depot is required. To the extent a response is

deemed required, Home Depot states that the documents referenced in Paragraph 96 speak for

Case MDL No. 2741   Document 2285-4   Filed 04/27/21   Page 210 of 260

Case 1:21-cv-20843-RKMX DDoocumeenntt110-1EnEtneterdeodnoFnLSFDLSDocDkoetck0e2t/3002//32001/22021 PaPgaeg2e1021510o5f54
224

themselves, and denies any allegations in Paragraph 96 inconsistent therewith. Home Depot lacks

sufficient information or knowledge to form a belief as to the truth of the remaining allegations in

Paragraph 96, and therefore denies those allegations.

97.    Paragraph 97 of the Complaint contains allegations that are not directed toward

Home Depot, and therefore no response from Home Depot is required. To the extent a response is

deemed required, Home Depot states that the documents referenced in Paragraph 97 speak for

themselves, and denies any allegations in Paragraph 97 inconsistent therewith. Home Depot lacks

sufficient information or knowledge to form a belief as to the truth of the remaining allegations in

Paragraph 97, and therefore denies those allegations.

98.    Paragraph 98 of the Complaint contains allegations that are not directed toward

Home Depot, and therefore no response from Home Depot is required. To the extent a response is

deemed required, Home Depot states that the documents referenced in Paragraph 98 speak for

themselves, and denies any allegations in Paragraph 98 inconsistent therewith. Home Depot lacks

sufficient information or knowledge to form a belief as to the truth of the remaining allegations in

Paragraph 98, and therefore denies those allegations.

99.    Paragraph 99 of the Complaint contains allegations that are not directed toward

Home Depot, and therefore no response from Home Depot is required. To the extent a response is

deemed required, Home Depot states that the documents referenced in Paragraph 99 speak for

themselves, and denies any allegations in Paragraph 99 inconsistent therewith. Home Depot lacks

sufficient information or knowledge to form a belief as to the truth of the remaining allegations in

Paragraph 99, and therefore denies those allegations.

100.    Paragraph 100 of the Complaint contains allegations that are not directed toward

Home Depot, and therefore no response from Home Depot is required. To the extent a response is

deemed required, Home Depot states that the documents referenced in Paragraph 100 speak for themselves, and denies any allegations in Paragraph 100 inconsistent therewith. Home Depot lacks sufficient information or knowledge to form a belief as to the truth of the remaining allegations in Paragraph 100, and therefore denies those allegations.

101.    Paragraph 101 of the Complaint contains allegations that are not directed toward Home Depot, and therefore no response from Home Depot is required. To the extent a response is deemed required, Home Depot states that the documents referenced in Paragraph 101 speak for themselves, and denies any allegations in Paragraph 101 inconsistent therewith. Home Depot lacks sufficient information or knowledge to form a belief as to the truth of the remaining allegations in Paragraph 101, and therefore denies those allegations.

102.    Paragraph 102 of the Complaint contains allegations that are not directed toward Home Depot, and therefore no response from Home Depot is required. To the extent a response is deemed required, Home Depot states that the documents referenced in Paragraph 102 speak for themselves, and denies any allegations in Paragraph 102 inconsistent therewith. Home Depot lacks sufficient information or knowledge to form a belief as to the truth of the remaining allegations in Paragraph 102, and therefore denies those allegations.

103.    Paragraph 103 of the Complaint contains allegations that are not directed toward Home Depot, and therefore no response from Home Depot is required. To the extent a response is deemed required, Home Depot states that the documents referenced in Paragraph 103 speak for themselves, and denies any allegations in Paragraph 103 inconsistent therewith. Home Depot lacks sufficient information or knowledge to form a belief as to the truth of the remaining allegations in Paragraph 103, and therefore denies those allegations.

104.    Paragraph 104 of the Complaint contains allegations that are not directed toward Home Depot, and therefore no response from Home Depot is required. To the extent a response is deemed required, Home Depot states that the documents referenced in Paragraph 104 speak for themselves, and denies any allegations in Paragraph 104 inconsistent therewith. Home Depot lacks sufficient information or knowledge to form a belief as to the truth of the remaining allegations in Paragraph 104, and therefore denies those allegations.

105.    Paragraph 105 of the Complaint contains allegations that are not directed toward Home Depot, and therefore no response from Home Depot is required. To the extent a response is deemed required, Home Depot states that the documents referenced in Paragraph 105 speak for themselves, and denies any allegations in Paragraph 105 inconsistent therewith. Home Depot lacks sufficient information or knowledge to form a belief as to the truth of the remaining allegations in Paragraph 105, and therefore denies those allegations.

106.    Paragraph 106 of the Complaint contains allegations that are not directed toward Home Depot, and therefore no response from Home Depot is required. To the extent a response is deemed required, Home Depot states that the documents referenced in Paragraph 106 speak for themselves, and denies any allegations in Paragraph 106 inconsistent therewith. Home Depot lacks sufficient information or knowledge to form a belief as to the truth of the remaining allegations in Paragraph 106, and therefore denies those allegations.

107.    Paragraph 107 of the Complaint contains allegations that are not directed toward Home Depot, and therefore no response from Home Depot is required. To the extent a response is deemed required, Home Depot states that the documents referenced in Paragraph 107 speak for themselves, and denies any allegations in Paragraph 107 inconsistent therewith. Home Depot lacks

sufficient information or knowledge to form a belief as to the truth of the remaining allegations in Paragraph 107, and therefore denies those allegations.

108.    Paragraph 108 of the Complaint contains allegations that are not directed toward Home Depot, and therefore no response from Home Depot is required. To the extent a response is deemed required, Home Depot states that the documents referenced in Paragraph 108 speak for themselves, and denies any allegations in Paragraph 108 inconsistent therewith. Home Depot lacks sufficient information or knowledge to form a belief as to the truth of the remaining allegations in Paragraph 108, and therefore denies those allegations.

109.    Paragraph 109 of the Complaint contains allegations that are not directed toward Home Depot, and therefore no response from Home Depot is required. To the extent a response is deemed required, Home Depot states that the documents referenced in Paragraph 109 speak for themselves, and denies any allegations in Paragraph 109 inconsistent therewith. Home Depot lacks sufficient information or knowledge to form a belief as to the truth of the remaining allegations in Paragraph 109, and therefore denies those allegations.

110.    Paragraph 110 of the Complaint contains allegations that are not directed toward Home Depot, and therefore no response from Home Depot is required. To the extent a response is deemed required, Home Depot states that the documents referenced in Paragraph 110 speak for themselves, and denies any allegations in Paragraph 110 inconsistent therewith. Home Depot lacks sufficient information or knowledge to form a belief as to the truth of the remaining allegations in Paragraph 110, and therefore denies those allegations.

111.    Paragraph 111 of the Complaint contains allegations that are not directed toward Home Depot, and therefore no response from Home Depot is required. To the extent a response is deemed required, Home Depot states that the documents referenced in Paragraph 111 speak for

themselves, and denies any allegations in Paragraph 111 inconsistent therewith. Home Depot lacks

sufficient information or knowledge to form a belief as to the truth of the remaining allegations in

Paragraph 111, and therefore denies those allegations.

112.    Paragraph 112 of the Complaint contains allegations that are not directed toward

Home Depot, and therefore no response from Home Depot is required. To the extent a response is

deemed required, Home Depot states that it lacks sufficient information or knowledge to form a

belief as to the truth of the allegations in Paragraph 112, and therefore denies those allegations.

113.    Paragraph 113 of the Complaint contains allegations that are not directed toward

Home Depot, and therefore no response from Home Depot is required. To the extent a response is

deemed required, Home Depot states that the documents referenced in Paragraph 113 speak for

themselves, and denies any allegations in Paragraph 113 inconsistent therewith. Home Depot lacks

sufficient information or knowledge to form a belief as to the truth of the remaining allegations in

Paragraph 113, and therefore denies those allegations.

114.    Paragraph 114 of the Complaint contains allegations that are not directed toward

Home Depot, and therefore no response from Home Depot is required. To the extent a response is

deemed required, Home Depot states that it lacks sufficient information or knowledge to form a

belief as to the truth of the allegations in Paragraph 114, and therefore denies those allegations.

115.    Paragraph 115 of the Complaint contains allegations that are not directed toward

Home Depot, and therefore no response from Home Depot is required. To the extent a response is

deemed required, Home Depot states that the documents referenced in Paragraph 115 speak for

themselves, and denies any allegations in Paragraph 115 inconsistent therewith. Home Depot lacks

sufficient information or knowledge to form a belief as to the truth of the remaining allegations in

Paragraph 115, and therefore denies those allegations.

116.     Paragraph 116 of the Complaint contains allegations that are not directed toward Home Depot, and therefore no response from Home Depot is required. To the extent a response is deemed required, Home Depot states that the documents referenced in Paragraph 116 speak for themselves, and denies any allegations in Paragraph 116 inconsistent therewith. Home Depot lacks sufficient information or knowledge to form a belief as to the truth of the remaining allegations in Paragraph 116, and therefore denies those allegations.

117.     Paragraph 117 of the Complaint contains allegations that are not directed toward Home Depot, and therefore no response from Home Depot is required. To the extent a response is deemed required, Home Depot states that the documents referenced in Paragraph 117 speak for themselves, and denies any allegations in Paragraph 117 inconsistent therewith. Home Depot lacks sufficient information or knowledge to form a belief as to the truth of the remaining allegations in Paragraph 117, and therefore denies those allegations.

118.     Paragraph 118 of the Complaint contains allegations that are not directed toward Home Depot, and therefore no response from Home Depot is required. To the extent a response is deemed required, Home Depot states that the documents referenced in Paragraph 118 speak for themselves, and denies any allegations in Paragraph 118 inconsistent therewith. Home Depot lacks sufficient information or knowledge to form a belief as to the truth of the remaining allegations in Paragraph 118, and therefore denies those allegations.

119.     Paragraph 119 of the Complaint contains allegations that are not directed toward Home Depot, and therefore no response from Home Depot is required. To the extent a response is deemed required, Home Depot states that the documents referenced in Paragraph 119 speak for themselves, and denies any allegations in Paragraph 119 inconsistent therewith. Home Depot lacks

sufficient information or knowledge to form a belief as to the truth of the remaining allegations in Paragraph 119, and therefore denies those allegations.

120.    Paragraph 120 of the Complaint contains allegations that are not directed toward Home Depot, and therefore no response from Home Depot is required. To the extent a response is deemed required, Home Depot states that the documents referenced in Paragraph 120 speak for themselves, and denies any allegations in Paragraph 120 inconsistent therewith. Home Depot lacks sufficient information or knowledge to form a belief as to the truth of the remaining allegations in Paragraph 120, and therefore denies those allegations.

121.    Paragraph 121 of the Complaint contains allegations that are not directed toward Home Depot, and therefore no response from Home Depot is required. To the extent a response is deemed required, Home Depot states that the documents referenced in Paragraph 121 speak for themselves, and denies any allegations in Paragraph 121 inconsistent therewith. Home Depot lacks sufficient information or knowledge to form a belief as to the truth of the remaining allegations in Paragraph 121, and therefore denies those allegations.

122.    Paragraph 122 of the Complaint contains allegations that are not directed toward Home Depot, and therefore no response from Home Depot is required. To the extent a response is deemed required, Home Depot states that the documents referenced in Paragraph 122 speak for themselves, and denies any allegations in Paragraph 122 inconsistent therewith. Home Depot lacks sufficient information or knowledge to form a belief as to the truth of the remaining allegations in Paragraph 122, and therefore denies those allegations.

123.    Paragraph 123 of the Complaint contains allegations that are not directed toward Home Depot, and therefore no response from Home Depot is required. To the extent a response is deemed required, Home Depot states that the documents referenced in Paragraph 123 speak for

themselves, and denies any allegations in Paragraph 123 inconsistent therewith. Home Depot lacks

sufficient information or knowledge to form a belief as to the truth of the remaining allegations in

Paragraph 123, and therefore denies those allegations.

124.    Paragraph 124 of the Complaint contains allegations that are not directed toward

Home Depot, and therefore no response from Home Depot is required. To the extent a response is

deemed required, Home Depot states that it lacks sufficient information or knowledge to form a

belief as to the truth of the allegations in Paragraph 124, and therefore denies those allegations.

125.    Paragraph 125 of the Complaint contains allegations that are not directed toward

Home Depot, and therefore no response from Home Depot is required. To the extent a response is

deemed required, Home Depot states that it lacks sufficient information or knowledge to form a

belief as to the truth of the allegations in Paragraph 125, and therefore denies those allegations.

126.    Home Depot admits that it has sold certain Roundup products in Miami-Dade

County, Florida. Home Depot lacks sufficient information or knowledge to form a belief as to the

truth of the remaining allegations in Paragraph 126 of the Complaint, and therefore denies those

allegations.

127.    Home Depot denies the allegations in Paragraph 127 of the Complaint.

128.    Paragraph 128 of the Complaint contains allegations that are not directed toward

Home Depot, and therefore no response from Home Depot is required. To the extent a response is

deemed required, Home Depot states that it lacks sufficient information or knowledge to form a

belief as to the truth of the allegations in Paragraph 128, and therefore denies those allegations.

129.    Paragraph 129 of the Complaint contains allegations that are not directed toward

Home Depot, and therefore no response from Home Depot is required. To the extent a response is

deemed required, Home Depot states that it lacks sufficient information or knowledge to form a belief as to the truth of the allegations in Paragraph 129, and therefore denies those allegations.

130.    Paragraph 130 of the Complaint contains allegations that are not directed toward Home Depot, and therefore no response from Home Depot is required. To the extent a response is deemed required, Home Depot states that it lacks sufficient information or knowledge to form a belief as to the truth of the allegations in Paragraph 130, and therefore denies those allegations.

131.    Paragraph 131 of the Complaint contains allegations that are not directed toward Home Depot, and therefore no response from Home Depot is required. To the extent a response is deemed required, Home Depot states that it lacks sufficient information or knowledge to form a belief as to the truth of the allegations in Paragraph 131, and therefore denies those allegations.

132.    Paragraph 132 of the Complaint contains allegations that are not directed toward Home Depot, and therefore no response from Home Depot is required. To the extent a response is deemed required, Home Depot states that it lacks sufficient information or knowledge to form a belief as to the truth of the allegations in Paragraph 132, and therefore denies those allegations.

133.    Paragraph 133 of the Complaint contains allegations that are not directed toward Home Depot, and therefore no response from Home Depot is required. To the extent a response is deemed required, Home Depot states that it lacks sufficient information or knowledge to form a belief as to the truth of the allegations in Paragraph 133, and therefore denies those allegations.

134.    Paragraph 134 of the Complaint contains allegations that are not directed toward Home Depot, and therefore no response from Home Depot is required. To the extent a response is deemed required, Home Depot states that it lacks sufficient information or knowledge to form a belief as to the truth of the allegations in Paragraph 134, and therefore denies those allegations.

135.     Paragraph 135 of the Complaint contains allegations that are not directed toward Home Depot, and therefore no response from Home Depot is required. To the extent a response is deemed required, Home Depot states that it lacks sufficient information or knowledge to form a belief as to the truth of the allegations in Paragraph 135, and therefore denies those allegations.

136.     Paragraph 136 of the Complaint contains allegations that are not directed toward Home Depot, and therefore no response from Home Depot is required. To the extent a response is deemed required, Home Depot states that it lacks sufficient information or knowledge to form a belief as to the truth of the allegations in Paragraph 136, and therefore denies those allegations.

137.     Paragraph 137 of the Complaint contains allegations that are not directed toward Home Depot, and therefore no response from Home Depot is required. To the extent a response is deemed required, Home Depot states that it lacks sufficient information or knowledge to form a belief as to the truth of the allegations in Paragraph 137, and therefore denies those allegations.

138.     Paragraph 138 of the Complaint contains allegations that are not directed toward Home Depot, and therefore no response from Home Depot is required. To the extent a response is deemed required, Home Depot states that it lacks sufficient information or knowledge to form a belief as to the truth of the allegations in Paragraph 138, and therefore denies those allegations.

139.     Paragraph 139 of the Complaint contains allegations that are not directed toward Home Depot, and therefore no response from Home Depot is required. To the extent a response is deemed required, Home Depot states that it lacks sufficient information or knowledge to form a belief as to the truth of the allegations in Paragraph 139, and therefore denies those allegations.

140.     Paragraph 140 of the Complaint contains allegations that are not directed toward Home Depot, and therefore no response from Home Depot is required. To the extent a response is

deemed required, Home Depot states that it lacks sufficient information or knowledge to form a belief as to the truth of the allegations in Paragraph 140, and therefore denies those allegations.

141.    Paragraph 141 of the Complaint contains allegations that are not directed toward Home Depot, and therefore no response from Home Depot is required. To the extent a response is deemed required, Home Depot states that it lacks sufficient information or knowledge to form a belief as to the truth of the allegations in Paragraph 141, and therefore denies those allegations.

142.    Home Depot hereby incorporates its previous responses above as if set forth fully herein.

143-151.     To the extent Paragraphs 143 to 151 of the Complaint, including all subparts thereto and the unnumbered paragraph of the Complaint following Paragraph 151 and beginning "WHEREFORE" (the *ad damnum* clause), contain allegations that are not directed toward Home Depot and/or contain legal conclusions, no response from Home Depot is required. To the extent a response is deemed required, Home Depot states that it lacks sufficient information or knowledge to form a belief as to the truth of the allegations in Paragraphs 143 to 151, including all subparts thereto and the unnumbered paragraph of the Complaint following Paragraph 151 and beginning "WHEREFORE" (the *ad damnum* clause), and therefore denies those allegations.

152.    Home Depot hereby incorporates its previous responses above as if set forth fully herein.

153-159.     To the extent Paragraphs 153 to 159 of the Complaint, including all subparts thereto and the unnumbered paragraph of the Complaint following Paragraph 159 and beginning "WHEREFORE" (the *ad damnum* clause), contain allegations that are not directed toward Home Depot and/or contain legal conclusions, no response from Home Depot is required. To the extent a response is deemed required, Home Depot states that it lacks sufficient information or knowledge

to form a belief as to the truth of the allegations in Paragraphs 153 to 159, including all subparts thereto and the unnumbered paragraph of the Complaint following Paragraph 159 and beginning "WHEREFORE" (the *ad damnum* clause), and therefore denies those allegations.

160.   Home Depot hereby incorporates its previous responses above as if set forth fully herein.

161-169.   To the extent Paragraphs 161 to 169 of the Complaint, including all subparts thereto and the unnumbered paragraph of the Complaint following Paragraph 169 and beginning "WHEREFORE" (the *ad damnum* clause), contain allegations that are not directed toward Home Depot and/or contain legal conclusions, no response from Home Depot is required. To the extent a response is deemed required, Home Depot states that it lacks sufficient information or knowledge to form a belief as to the truth of the allegations in Paragraphs 161 to 169, including all subparts thereto and the unnumbered paragraph of the Complaint following Paragraph 169 and beginning "WHEREFORE" (the *ad damnum* clause), and therefore denies those allegations.

170.   Home Depot hereby incorporates its previous responses above as if set forth fully herein.

171-182.   To the extent Paragraphs 171 to 182 of the Complaint, including all subparts thereto and the unnumbered paragraph of the Complaint following Paragraph 182 and beginning "WHEREFORE" (the *ad damnum* clause), contain allegations that are not directed toward Home Depot and/or contain legal conclusions, no response from Home Depot is required. To the extent a response is deemed required, Home Depot states that it lacks sufficient information or knowledge to form a belief as to the truth of the allegations in Paragraphs 171 to 182, including all subparts thereto and the unnumbered paragraph of the Complaint following Paragraph 182 and beginning "WHEREFORE" (the *ad damnum* clause), and therefore denies those allegations.

183.   Home Depot hereby incorporates its previous responses above as if set forth fully herein.

184-197.       To the extent Paragraphs 184 to 197 of the Complaint, including all subparts thereto and the unnumbered paragraph of the Complaint following Paragraph 197 and beginning "WHEREFORE" (the *ad damnum* clause), contain allegations that are not directed toward Home Depot and/or contain legal conclusions, no response from Home Depot is required. To the extent a response is deemed required, Home Depot states that it lacks sufficient information or knowledge to form a belief as to the truth of the allegations in Paragraphs 184 to 197, including all subparts thereto and the unnumbered paragraph of the Complaint following Paragraph 197 and beginning "WHEREFORE" (the *ad damnum* clause), and therefore denies those allegations.

198.   Home Depot hereby incorporates its previous responses above as if set forth fully herein.

199.   Home Depot admits that it has sold certain Roundup products in Miami-Dade County, Florida. Home Depot states that it lacks sufficient information or knowledge to form a belief as to the truth of the remaining allegations in Paragraph 199, and therefore denies those allegations.

200.   Home Depot lacks sufficient information or knowledge to form a belief as to the truth of the allegations in Paragraph 200, and therefore denies those allegations.

201.   To the extent Paragraph 201 of the Complaint contains allegations that set forth legal conclusions, no response from Home Depot is required. To the extent a response is deemed required, Home Depot admits that it has sold certain Roundup products in Miami-Dade County, Florida. Home Depot denies the remaining allegations in Paragraph 201.

202.    To the extent Paragraph 202 of the Complaint, including all subparts thereto, contains allegations that are not directed toward Home Depot and/or contain legal conclusions, no response from Home Depot is required. To the extent a response is deemed required, Home Depot denies the allegations in Paragraph 202 of the Complaint.

203.    To the extent Paragraph 203 of the Complaint contains allegations that are not directed toward Home Depot and/or contain legal conclusions, no response from Home Depot is required. To the extent a response is deemed required, Home Depot denies the allegations in Paragraph 203 of the Complaint.

204.    To the extent Paragraph 204 of the Complaint contains allegations that are not directed toward Home Depot and/or contain legal conclusions, no response from Home Depot is required. To the extent a response is deemed required, Home Depot denies the allegations in Paragraph 204 of the Complaint.

205.    To the extent Paragraph 205 of the Complaint, including all subparts thereto and the unnumbered paragraph of the Complaint following Paragraph 205 and beginning "WHEREFORE" (the *ad damnum* clause), contains allegations that set forth legal conclusions, no response from Home Depot is required. To the extent a response is deemed required, Home Depot denies the allegations in Paragraph 205, including all subparts thereto and the unnumbered paragraph of the Complaint following Paragraph 205 and beginning "WHEREFORE" (the *ad damnum* clause).

206.    Home Depot hereby incorporates its previous responses above as if set forth fully herein.

207.    Home Depot admits that it has sold certain Roundup products. Home Depot states that it lacks sufficient information or knowledge to form a belief as to the truth of the remaining allegations in Paragraph 207, and therefore denies those allegations.

208.    Home Depot lacks sufficient information or knowledge to form a belief as to the truth of the allegations in Paragraph 208, and therefore denies those allegations.

209.    To the extent Paragraph 209 of the Complaint contains allegations that set forth legal conclusions, no response from Home Depot is required. To the extent a response is deemed required, Home Depot denies the allegations in Paragraph 209.

210.    To the extent Paragraph 210 of the Complaint contains allegations that set forth legal conclusions, no response from Home Depot is required. To the extent a response is deemed required, Home Depot states that it lacks sufficient information or knowledge to form a belief as to the truth of the allegations in Paragraph 210, and therefore denies those allegations.

211.    To the extent Paragraph 211 of the Complaint, including all subparts thereto, contains allegations that set forth legal conclusions, no response from Home Depot is required. To the extent a response is deemed required, Home Depot denies the allegations in Paragraph 211, including all subparts thereto.

212.    To the extent Paragraph 212 of the Complaint contains allegations that set forth legal conclusions, no response from Home Depot is required. To the extent a response is deemed required, Home Depot denies the allegations in Paragraph 212.

213.    To the extent Paragraph 213 of the Complaint contains allegations that set forth legal conclusions, no response from Home Depot is required. To the extent a response is deemed required, Home Depot denies the allegations in Paragraph 213.

214.    To the extent Paragraph 214 of the Complaint contains allegations that set forth legal conclusions, no response from Home Depot is required. To the extent a response is deemed required, Home Depot denies the allegations in Paragraph 214.

215.    To the extent Paragraph 215 of the Complaint, including all subparts thereto and the unnumbered paragraph of the Complaint following Paragraph 215 and beginning "WHEREFORE" (the *ad damnum* clause), contains allegations that set forth legal conclusions, no response from Home Depot is required. To the extent a response is deemed required, Home Depot denies the allegations in Paragraph 215, including all subparts thereto and the unnumbered paragraph of the Complaint following Paragraph 215 and beginning "WHEREFORE" (the *ad damnum* clause).

216.    Home Depot hereby incorporates its previous responses above as if set forth fully herein.

217.    Home Depot admits that it has sold certain Roundup products. Home Depot denies the remaining allegations in Paragraph 217 of the Complaint as stated.

218.    To the extent Paragraph 218 of the Complaint contains allegations that are not directed toward Home Depot and/or contain legal conclusions, no response from Home Depot is required. To the extent a response is deemed required, Home Depot denies the allegations in Paragraph 218 of the Complaint.

219.    To the extent Paragraph 219 of the Complaint contains allegations that set forth legal conclusions, no response from Home Depot is required. To the extent a response is deemed required, Home Depot states that it lacks sufficient information or knowledge to form a belief as to the truth of the allegations in Paragraph 219, and therefore denies those allegations.

220.     To the extent Paragraph 220 of the Complaint contains allegations that set forth legal conclusions, no response from Home Depot is required. To the extent a response is deemed required, Home Depot denies the allegations in Paragraph 220.

221.     To the extent Paragraph 221 of the Complaint contains allegations that are not directed toward Home Depot and/or contain legal conclusions, no response from Home Depot is required. To the extent a response is deemed required, Home Depot states that it lacks sufficient information or knowledge to form a belief as to the truth of the allegations in Paragraph 221, and therefore denies those allegations.

222.     To the extent Paragraph 222 of the Complaint contains allegations that are not directed toward Home Depot and/or contain legal conclusions, no response from Home Depot is required. To the extent a response is deemed required, Home Depot states that it lacks sufficient information or knowledge to form a belief as to the truth of the allegations in Paragraph 222, and therefore denies those allegations.

223.     To the extent Paragraph 223 of the Complaint contains allegations that set forth legal conclusions, no response from Home Depot is required. To the extent a response is deemed required, Home Depot states that it lacks sufficient information or knowledge to form a belief as to the truth of the allegations in Paragraph 223, and therefore denies those allegations.

224.     To the extent Paragraph 224 of the Complaint contains allegations that are not directed toward Home Depot and/or contain legal conclusions, no response from Home Depot is required. To the extent a response is deemed required, Home Depot states that it lacks sufficient information or knowledge to form a belief as to the truth of the allegations in Paragraph 224, and therefore denies those allegations.

225.    To the extent Paragraph 225 of the Complaint contains allegations that are not directed toward Home Depot and/or contain legal conclusions, no response from Home Depot is required. To the extent a response is deemed required, Home Depot states that it lacks sufficient information or knowledge to form a belief as to the truth of the allegations in Paragraph 225, and therefore denies those allegations.

226.    To the extent Paragraph 226 of the Complaint contains allegations that set forth legal conclusions, no response from Home Depot is required. To the extent a response is deemed required, Home Depot denies the allegations in Paragraph 226.

227.    To the extent Paragraph 227 of the Complaint contains allegations that are not directed toward Home Depot and/or contain legal conclusions, no response from Home Depot is required. To the extent a response is deemed required, Home Depot denies the allegations in Paragraph 227 of the Complaint.

228.    To the extent Paragraph 228 of the Complaint, including all subparts thereto and the unnumbered paragraph of the Complaint following Paragraph 228 and beginning "WHEREFORE" (the *ad damnum* clause), contains allegations that set forth legal conclusions, no response from Home Depot is required. To the extent a response is deemed required, Home Depot denies the allegations in Paragraph 228, including all subparts thereto and the unnumbered paragraph of the Complaint following Paragraph 228 and beginning "WHEREFORE" (the *ad damnum* clause).

229.    Home Depot hereby incorporates its previous responses above as if set forth fully herein.

230-236.      To the extent Paragraphs 230 to 236 of the Complaint, including all subparts thereto and the unnumbered paragraph of the Complaint following Paragraph 236 and beginning

"WHEREFORE" (the *ad damnum* clause), contain allegations that are not directed toward Home
Depot and/or contain legal conclusions, no response from Home Depot is required. To the extent
a response is deemed required, Home Depot states that it lacks sufficient information or knowledge
to form a belief as to the truth of the allegations in Paragraphs 230 to 236, including all subparts
thereto and the unnumbered paragraph of the Complaint following Paragraph 236 and beginning
"WHEREFORE" (the *ad damnum* clause), and therefore denies those allegations.

237.    Home Depot hereby incorporates its previous responses above as if set forth fully
herein.

238-246.      To the extent Paragraphs 238 to 246 of the Complaint, including all subparts
thereto and the unnumbered paragraph of the Complaint following Paragraph 246 and beginning
"WHEREFORE" (the *ad damnum* clause), contain allegations that are not directed toward Home
Depot and/or contain legal conclusions, no response from Home Depot is required. To the extent
a response is deemed required, Home Depot states that it lacks sufficient information or knowledge
to form a belief as to the truth of the allegations in Paragraphs 238 to 246, including all subparts
thereto and the unnumbered paragraph of the Complaint following Paragraph 246 and beginning
"WHEREFORE" (the *ad damnum* clause), and therefore denies those allegations.

247.    Home Depot hereby incorporates its previous responses above as if set forth fully
herein.

248-259.      To the extent Paragraphs 248 to 259 of the Complaint, including all subparts
thereto and the unnumbered paragraph of the Complaint following Paragraph 259 and beginning
"WHEREFORE" (the *ad damnum* clause), contain allegations that are not directed toward Home
Depot and/or contain legal conclusions, no response from Home Depot is required. To the extent
a response is deemed required, Home Depot states that it lacks sufficient information or knowledge

Case MDL No. 2741   Document 2285-4   Filed 04/27/21   Page 229 of 260

Case 1:21-cv-20848-RKMX DDooccuummeenntt1 0-1EnEtneterdeodnoFnLSFDLSDDoDcoketk0e2t/2308/3200/2210211PaPgaeg4e2 1o2f 1524

224

to form a belief as to the truth of the allegations in Paragraphs 248 to 259, including all subparts thereto and the unnumbered paragraph of the Complaint following Paragraph 259 and beginning "WHEREFORE" (the *ad damnum* clause), and therefore denies those allegations.

260.    Home Depot hereby incorporates its previous responses above as if set forth fully herein.

261-267.       To the extent Paragraphs 261 to 267 of the Complaint, including all subparts thereto and the unnumbered paragraph of the Complaint following Paragraph 267 and beginning "WHEREFORE" (the *ad damnum* clause), contain allegations that are not directed toward Home Depot and/or contain legal conclusions, no response from Home Depot is required. To the extent a response is deemed required, Home Depot states that it lacks sufficient information or knowledge to form a belief as to the truth of the allegations in Paragraphs 261 to 267, including all subparts thereto and the unnumbered paragraph of the Complaint following Paragraph 267 and beginning "WHEREFORE" (the *ad damnum* clause), and therefore denies those allegations.

268.    Home Depot hereby incorporates its previous responses above as if set forth fully herein.

269-277.       To the extent Paragraphs 269 to 277 of the Complaint, including all subparts thereto and the unnumbered paragraph of the Complaint following Paragraph 277 and beginning "WHEREFORE" (the *ad damnum* clause), contain allegations that are not directed toward Home Depot and/or contain legal conclusions, no response from Home Depot is required. To the extent a response is deemed required, Home Depot states that it lacks sufficient information or knowledge to form a belief as to the truth of the allegations in Paragraphs 269 to 277, including all subparts thereto and the unnumbered paragraph of the Complaint following Paragraph 277 and beginning "WHEREFORE" (the *ad damnum* clause), and therefore denies those allegations.

278.     Home Depot hereby incorporates its previous responses above as if set forth fully herein.

279-290.          To the extent Paragraphs 279 to 290 of the Complaint, including all subparts thereto and the unnumbered paragraph of the Complaint following Paragraph 290 and beginning "WHEREFORE" (the *ad damnum* clause), contain allegations that are not directed toward Home Depot and/or contain legal conclusions, no response from Home Depot is required. To the extent a response is deemed required, Home Depot states that it lacks sufficient information or knowledge to form a belief as to the truth of the allegations in Paragraphs 279 to 290, including all subparts thereto and the unnumbered paragraph of the Complaint following Paragraph 290 and beginning "WHEREFORE" (the *ad damnum* clause), and therefore denies those allegations.

Home Depot denies that Plaintiff is entitled to any of the relief set forth herein.

Home Depot denies any allegations in the Complaint not specifically admitted herein.

## **DEFENSES**

Discovery and investigation may reveal that any one or more of the following defenses are available to Home Depot in this matter, and therefore Home Depot asserts these defenses to preserve them. Upon completion of discovery, and if the facts warrant, Home Depot may withdraw any of these defenses as may be appropriate. Home Depot reserves the right to amend its Answer to assert additional defenses, cross-claims, counterclaims, and other claims and defenses as discovery and investigation proceeds. Further answering and by way of additional defense, Home Depot states as follows:

1.     The Complaint fails to state a claim upon which relief may be granted against Home Depot.

2.     Venue may be improper.

3.     Venue is or may be inconvenient for some or all of Plaintiff's claims.

4.      This Court may lack personal jurisdiction and subject matter jurisdiction over Home Depot as to each and every cause of action alleged in the Complaint.

5.      Plaintiff has unreasonably delayed in bringing this action to the prejudice of Home Depot. Plaintiff's claims are barred, in whole or in part, by the applicable statute of limitations, by the doctrine of laches, and/or by Florida's statute of repose pursuant to Section 95.031(2), or is otherwise untimely.

6.      The Complaint arises from a misjoinder of named parties whereby Plaintiff lacks capacity to sue for those claims set forth therein. Such misjoinder will result in prejudice to Home Depot.

7.      Plaintiff failed to join necessary and indispensable parties whereby in the interest of justice and fairness the action cannot proceed in the absence of the parties that should have been joined.

8.      Home Depot's conduct was not the cause in fact or the proximate cause of any of the losses alleged by Plaintiff.

9.      Plaintiff was herself careless and negligent in and about the matters alleged in the Complaint, and that this carelessness and negligence on Plaintiff's part contributed as a proximate cause to the happening of the incident, the injuries, and loss and damage complained of, and any recovery by Plaintiff should be reduced or eliminated based upon comparative fault.

10.     If Plaintiff was injured or damaged, which injuries and damages are denied, the injuries and any damages were the result of intervening or superseding acts, events, factors, occurrences, or conditions which were in no way caused by Home Depot and for which Home Depot is not liable.

11. The sole proximate cause of the injuries and damages, if any, allegedly suffered by the Plaintiff was the negligence and fault of persons or entities other than Home Depot, for whose acts or omissions Home Depot is not legally or otherwise responsible. Home Depot is not liable for damages proximately caused by non-parties. *See Fabre v. Marin*, 623 So. 2d 1182 (Fla. 1993).

12. To the extent that Plaintiff has sustained damage, which Home Depot denies, relating to the design, manufacture, fabrication, assembly, or wholesale of the subject product, Home Depot did not design, manufacture, fabricate, assemble, or wholesale the subject product.

13. Plaintiff's claims are barred, in whole or in part, because the products sold by Home Depot conformed with available technological, medical, scientific and industrial state-of-the-art at all material times. *See* Fla. Stat. § 768.1257.

14. The methods and procedures employed in manufacturing, assembling, packaging, distributing, supplying, and selling the products and/or services complied with all industry standards, federal, state, and local regulations, and applicable states of the art in the industry at all times mentioned herein.

15. Plaintiff has waived and/or is estopped from alleging the matters set forth in her Complaint.

16. Plaintiff's Complaint, and each cause of action therein, is barred by the doctrines of res judicata and collateral estoppel.

17. Plaintiff had full knowledge of all the risks, dangerousness, and hazards, if any, and nevertheless voluntarily and with full appreciation of the amount of danger involved in her actions and the magnitude of risk involved, assumed the risk of damages to herself.

18.     Prior to the commencement of this action, Home Depot duly performed, satisfied, and discharged all of its respective duties and obligations arising out of any and all agreements, representations, or contracts made by it.

19.     Plaintiff's claims against Home Depot are barred in whole or in part because Home Depot had no actual or constructive knowledge of the subject products' alleged defects.

20.     The Complaint and each cause of action therein is barred by waiver.

21.     If Plaintiff sustained injuries attributable to the use of any product sold by Home Depot, which allegations Home Depot expressly denies, the injuries were caused in whole or in part by the unreasonable, unforeseeable, and inappropriate purpose and/or improper use which was made of the product.

22.     Plaintiff's action is barred, in whole or in part, because the products manufactured by others and sold by Home Depot were manufactured in accordance with local, state, and federal statutes, regulations, and governmental specifications and standards, and said governmental entities had actual or constructive knowledge with regard to the alleged hazards of the products. Said products are accordingly not defective or unreasonably dangerous. *See* Fla. Stat. § 768.1256.

23.     At all times and places mentioned in the Complaint, Plaintiff failed to mitigate her damages. The damages claimed by Plaintiff could have been mitigated by due diligence on her part or by one acting under similar circumstances. Any recovery by Plaintiff should be reduced or eliminated due to her failure to mitigate her damages.

24.     At all times material hereto, Home Depot's products were reasonably fit for their intended purposes and were not defective or unreasonably dangerous.

25.     There was and is no unreasonable risk associated with the products allegedly sold by Home Depot.

26.     Plaintiff is not the real party in interest, and lacks standing to bring the claims set forth therein.

27.     The subject products/services/work identified in the Complaint were misused, modified, altered, and/or subjected to certain treatment by Plaintiff and/or other unknown individuals or entities which substantially changed the performance, application characteristics, composition, and formulation of the subject products after they left Home Depot's custody and control.

28.     The damages complained of in the Complaint were caused in whole or in part by the misuse and abuse of the product.

29.     The injuries and damages sustained by Plaintiff, if any, were solely and legally caused by the modification, alteration, or change of the product referred to in the Complaint and said modification, alteration, or change was performed by persons or entities other than Home Depot and without Home Depot's knowledge or consent.

30.     Plaintiff is barred from recovery by reason of her unclean hands.

31.     Plaintiff's claims against Home Depot are barred to the extent that Plaintiff seeks relief under the laws of states that do not govern Plaintiff's claims.

32.     If Home Depot is found liable for any injury and damage to Plaintiff, then said liability for non-economic damages to Plaintiff must be limited to Home Depot's proportionate share of fault, if any, pursuant to Florida law.

33.     Plaintiff's claims against Home Depot are barred, in whole or in part, because the products at issue were designed, manufactured, marketed, and labeled with proper warnings,

information, cautions, and instructions, in accordance with the state of the art and the state of scientific and technological knowledge.

34.    Home Depot's products were sold to buyers who were sophisticated and knowledgeable about their proper use, and/or were otherwise classified as learned intermediaries.

35.    Plaintiff's claims against Home Depot are barred in whole or in part by the sophisticated user doctrine.

36.    If Plaintiff used or was exposed to products sold by Home Depot, then Plaintiff was negligent in failing to take proper safety precautions, in failing to use proper techniques and methods in the use of the products, and in otherwise failing to exercise due care and caution.

37.    Plaintiff has failed to allege sufficient facts identifying the product(s) that caused her alleged injuries.

38.    If Plaintiff has been injured or damaged, no injury or damages being admitted, such injuries or damages were not caused by a Home Depot product.

39.    Plaintiff's claims against Home Depot are barred, in whole or in part, because Plaintiff's injuries, if any, were the result of conduct of Plaintiff, independent third parties, and/or events that were extraordinary under the circumstances, not foreseeable in the normal course of events, and/or independent, intervening, and superseding causes of the alleged injuries, including but not limited to Plaintiff's pre-existing medical conditions.

40.    Plaintiff's claims are barred, in whole or in part, because Home Depot did not owe any legal duty to Plaintiff, and/or if Home Depot owed any legal duty to her, Home Depot did not breach that duty.

41.     Although Home Depot denies that Plaintiff is entitled to recover any damages, any recovery for any injuries or damages alleged by Plaintiff is limited by Fla. Stat. §§ 768.16 through 768.26.

42.     Home Depot is not a joint tortfeasor with any other party herein and, accordingly, Home Depot may not be jointly and severally liable with other Defendants.

43.     Any exposure of Plaintiff to products sold by Home Depot, which exposure Home Depot expressly denies, was so minimal as to be insufficient to establish to a reasonable degree of probability that the product caused Plaintiff's claimed injuries and illness.

44.     At all times, Home Depot acted in good faith and with a reasonable belief in the lawfulness of its conduct.

45.     Plaintiff's claims against Home Depot are barred because Plaintiff cannot proffer any scientifically reliable evidence that the products at issue were defective or unreasonably dangerous.

46.     If any information regarding the alleged health hazards of exposure to glyphosate was in Home Depot's possession, such information was communicated to and in the possession of various organizations, entities, and governmental agencies that are charged with the responsibility of disseminating such information to Plaintiff.

47.     The claims in Plaintiff's Complaint are expressly or impliedly preempted by federal laws, regulations, and/or policies governing the specific product(s) or manufacturing processes alleged by Plaintiff to have resulted in Plaintiff's damages.

48.     Plaintiff's claims against Home Depot are preempted, in whole or in part, by applicable federal law relating to the design, testing, producing, manufacturing, labeling,

distributing, modeling, processing, and supply of Roundup-branded products and/or glyphosate-containing products.

49.    Plaintiff's claims against Home Depot are preempted, in whole or in part, because of findings by the United States Environmental Protection Agency ("EPA") and/or because of EPA-approved product labeling.

50.    Plaintiff's claims against Home Depot are barred, in whole or in part, by the doctrine of primary jurisdiction, including by the authority delegated by Congress to the EPA.

51.    Plaintiff's damages, if any, should be reduced by the amount of her reduced life expectancy, from sources and causes unrelated to Plaintiff's alleged exposures, if any, to products sold by Home Depot.

52.    Any product in question was manufactured in conformity with the specifications established by the United States government and any alleged defect in the product was the result of deficiencies in such specifications which are unknown to Home Depot, and which deficiencies would be an intervening and superseding cause of any alleged injuries, losses, or damages to Plaintiff.

53.    Plaintiff's claims are barred in whole or in part because the products sold by Home Depot are not dangerous to an extent beyond that contemplated by the ordinary consumer.

54.    The number of different products to which Plaintiff was exposed and the lack of definitive evidence as to the amount of actual exposure to each product makes it impossible to determine, to a requisite degree of legal certainty, the alleged causal connection, if any, between her injuries and said products.

55.    Plaintiff may not recover on the claims pled in the Complaint because the damages sought are too speculative and remote.

56.     The doctrines contained in Restatement (Second) of Torts § 402A, comments i, j, and k, bar Plaintiff's claims against Home Depot in whole or in part, and Home Depot affirmatively pleads all defenses that are or may become available to Home Depot under Restatement (Second) of Torts § 402A and the comments thereto.

57.     If Plaintiff suffered injury or damages as alleged, which Home Depot denies, such injury or damages resulted from: (a) acts or omissions of persons or entities for which Home Depot is neither liable nor responsible or, in the alternative, Home Depot is entitled to an assessment of the relative degree of fault of all such persons and entities; or (b) resulted from diseases and/or causes that are not related or connected with any product sold, distributed, or manufactured by Home Depot. Such acts or omissions on the part of others or diseases or causes constitute an independent, intervening, and sole proximate cause of Plaintiff's alleged injury or damages.

58.     Home Depot had no legal relationship or privity with Plaintiff and owed no duty to Plaintiff by which liability could be attributed to Home Depot.

59.     Plaintiff's claims against Home Depot are preempted or otherwise barred in whole or in part by the Freedom of Speech Clause of the First Amendment of the U.S. Constitution.

60.     To the extent that Plaintiff is relying upon a theory of market share liability to support Plaintiff's strict liability claim, this count should be dismissed because the theory of market share liability does not apply.

61.     Certain of Plaintiff's claims are barred, in whole or in part, if in this or other tribunals Plaintiff has brought actions and/or has received compensation, judgments, or awards on some or all claims asserted herein.

62.     Plaintiff has released, settled, entered into an accord and satisfaction, or otherwise compromised certain of Plaintiff's claims herein and, accordingly, those claims are barred.

Alternatively, if Plaintiff, in the future, accepts compensation in partial settlement of those claims, Home Depot is entitled to a set-off.

63.     Home Depot is entitled to set-off, should any damages be awarded against it, in the amount of damages or settlement amounts recovered by Plaintiff from other parties or entities.

64.     To the extent that Plaintiff recovered payments for her alleged injuries from any collateral source(s) or other source(s), including write-offs of medical expenses, Plaintiff's recovery in this lawsuit, if any, shall be reduced to the extent allowed by applicable law.

65.     Home Depot had no notice, or inadequate notice, of any dangerous conditions that may or may not have existed at the time of the losses alleged by Plaintiff, such that any preventative measures could have been taken.

66.     Certain of Plaintiff's claims are barred by Plaintiff's failure to comply with applicable requirements of state law with respect to those claims including, without limitation, pre-suit notice requirements.

67.     Certain of Plaintiff's claims are barred by the economic loss rule.

68.     Certain of Plaintiff's claims are barred because Home Depot did not make any misrepresentations and/or because Plaintiff was not deceived by Home Depot.

69.     Certain of Plaintiff's claims are barred because any representations that may have been made by Home Depot were based on information supplied to Home Depot by others, which Home Depot reasonably believed to be true.

70.     Certain of Plaintiff's claims are barred, in whole or in part, to the extent that any alleged misstatements were non-actionable opinions and/or puffery.

71.     Home Depot made no warranties of any kind or any representations of any nature whatsoever to Plaintiff. If any such warranties were made, which Home Depot specifically denies, then Plaintiff failed to give timely and proper notice of any breach thereof.

72.     Certain of Plaintiff's claims are barred, in whole or in part, to the extent that the statements alleged to have been made by Home Depot never became part of the bargain, and that the warranty alleged to have existed did not therefore exist.

73.     Service as to Home Depot may have been improper.

74.     Home Depot alleges that Plaintiff's damages, if any, were caused or contributed to by Plaintiff's failure to comply with the written and oral instructions relating to the use of the subject product, and that Plaintiff's recovery, if any, should therefore be diminished or barred in accordance with applicable law.

75.     Plaintiff's claims are barred because Plaintiff, either intentionally or negligently, failed to preserve the primary evidence relevant to this litigation, thus failing to afford Home Depot an opportunity to inspect such evidence, thereby severely prejudicing Home Depot. Plaintiff is therefore barred from introducing secondary or lesser evidence, and any recovery should be diminished accordingly.

76.     Some or all of Plaintiff's claims fail because certain of Plaintiff's allegations are directed to "Defendant" or "Defendants" without specifying to which defendant they are referring.

77.     Home Depot incorporates and reserves all other affirmative defenses available under Florida law pending further investigation and discovery.

78.     Home Depot hereby adopts by reference any and all Defenses raised by any other Defendant in this cause.

79.     Home Depot reserves the right to amend its Answer and Affirmative Defenses if appropriate after full investigation and discovery.

WHEREFORE, Home Depot prays that the Complaint and each and every Count therein be dismissed with prejudice, that Plaintiff take nothing, that Plaintiff be denied any relief whatsoever, that Home Depot be granted judgment against Plaintiff as to each and every count of the Complaint and recover from Plaintiff Home Depot's reasonable attorneys' fees and expenses and all costs of this action, and that this Court grant Home Depot such other and further relief as this Court deems just and proper.

DATED: February 23, 2021.

LUKS, SANTANIELLO, PETRILLO & COHEN
Attorneys for Defendant
150 WEST FLAGER STREET, SUITE 2600
MIAMI, FL 33130
Telephone:305-377-8900
Facsimile:  305-377-8901

By: /s/ Kelly Kesner
      KELLY L. KESNER
      Florida Bar No.: 936731
      KKesner@insurancedefense.net

## CERTIFICATE OF SERVICE

WE HEREBY CERTIFY that a true and correct copy of the foregoing has been furnished, to all counsel via the Florida CM/ECF Portal on this 23rd day of February, 2021.

LUKS, SANTANIELLO, PETRILLO & COHEN
Attorneys for Defendant
150 WEST FLAGER STREET, SUITE 2600
MIAMI, FL 33130
Telephone:305-377-8900
Facsimile:  305-377-8901

By: /s/ Kelly Kesner                          
KELLY L. KESNER
Florida Bar No.: 936731
KKesner@insurancedefense.net

# Exhibit 2

## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA
## MIAMI DIVISION

### CASE NO.: 1:21-cv-20648-PCH

NANCY C. SALAS,

    Plaintiff,

vs.

MONSANTO COMPANY; BAYER
CORPORATION; BAYER AG; ANDREW
JACK CONROY; HOME DEPOT U.S.A, INC.;
KLI SHELL LUMBER & HARDWARE, LLC;
ORLANDO VALDES; TRANSFORM SR
DEVELOPMENT LLC d/b/a KMART; and
JOSE LUIS MARTINEZ-ALVAREZ,

    Defendants.

_____/

### NOTICE OF VOLUNTARY DISMISSAL WITHOUT PREJUDICE

Plaintiff, Nancy C. Salas, by and through undersigned counsel and pursuant to Fed.R.Civ.P.

41(a)(1)(A)(I), hereby files this Notice of Voluntary Dismissal Without Prejudice, voluntarily

dismissing her claims as set forth in the subject Complaint against defendants Transform SR

Development LLC d/b/a Kmart and Jose Luis Martinez-Alvarez.  Each party is to bear their own

attorneys' fees and costs.

Dated: February 17, 2021

                                   Respectfully submitted,

                                   **PODHURST ORSECK, P.A.**
                                   Counsel for Plaintiff
                                   One Southeast 3rd Avenue, Suite 2300
                                   Miami, Florida 33131
                                   (305) 358-2800 / Fax (305) 358-2382

                                   By: _/s/ Steven C. Marks_____

STEVEN C. MARKS
Fla. Bar No. 516414
smarks@podhurst.com
KRISTINA M. INFANTE
Fla. Bar No. 112557
kinfante@podhurst.com
PABLO ROJAS
Fla. Bar No. 1022427
projas@podhurst.com


## <u>CERTIFICATE OF SERVICE</u>

WE HEREBY CERTIFY that on this <u>17</u>th day of February, 2021, a true and correct copy of

the foregoing was served via ECF which will furnish an electronic copy to all counsel of record.


By:  */s/ Steven C. Marks*_____

# Exhibit 3

## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA

NANCY C. SALAS,

        Plaintiff,

    v.

MONSANTO COMPANY, *et al.*,

        Defendants.

Case No. _____

### CONSENT TO REMOVAL BY DEFENDANT BAYER CORPORATION

Consent to removal by Bayer Corporation is not required because there is no personal jurisdiction over Bayer Corporation in this case, so Bayer Corporation has not been "properly joined."  28 U.S.C. § 1446(b)(2)(A).  However, in the event that consent is deemed required, Bayer Corporation hereby consents to Monsanto Company's removal of this lawsuit from Florida state court to this Court.

Bayer Corporation does not waive – and reserves the right to assert – any and all defenses in future proceedings, including but not limited to lack of personal jurisdiction.

Dated: March 30, 2021

Respectfully submitted,

**McDERMOTT WILL & EMERY LLP**

*/s/ Anthony N. Upshaw*
ANTHONY N. UPSHAW
Florida Bar No.: 861091
aupshaw@mwe.com
MELISSA R. ALVAREZ
Florida Bar No.: 820091
malvarez@mwe.com
333 SE 2nd Avenue, Suite 4500
Miami, FL 33131
Tel:  (305) 329-4431
Fax: (305) 675-8031
*Counsel for Defendant Bayer Corporation*

# Exhibit 4

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

NANCY C. SALAS,

      Plaintiff,

    v.

MONSANTO COMPANY, *et al.*,

      Defendants.

Case No. _____

## DECLARATION OF ANDREW JACK CONROY

I, Andrew Jack Conroy, declare as follows:

1.    I am over the age of eighteen.  If I were called to testify, I could and would competently testify to the statements set forth in this declaration.  This declaration is based on my personal knowledge and my review of the Complaint filed by Nancy Salas in the lawsuit that she filed against various defendants, including Monsanto Company ("Monsanto") and me.  I submit this declaration in support of Monsanto's Notice of Removal.

2.    I am employed by Bayer CropScience LP as Area Sales Manager, Vegetation Management.  I have held that position since April 2019.  Previously, I was employed (for approximately 18 months) by a joint venture between Monsanto and another company.  Before my employment by that joint venture, I was employed by Monsanto for more than 20 years.

3.    During my work at Monsanto, the joint venture, and Bayer CropScience LP, I acquired substantial knowledge about Monsanto's Roundup®-branded herbicides, which have glyphosate as their active ingredient, and the different markets for which Monsanto created and designed Roundup®-branded herbicides.  There are three markets for which Monsanto has created and designed Roundup®-branded herbicides: (a) the agricultural market; (b) the residential-lawn-and-garden market; and (c) the industrial, turf, and ornamental ("IT&O") market.  Agricultural

Roundup®-branded herbicides have been designed for, and are sold (via distributors) to, farmers and other agricultural workers to eliminate weeds that adversely affect crops. Residential-lawn-and-garden Roundup®-branded herbicides have been designed for, and are sold to, home-owners to eliminate weeds in their yards, drive-ways, and other parts of their residential properties. Those herbicides are sold at hardware stores and major retail stores, like Home Depot stores. IT&O Roundup®-branded herbicides have been designed for, and are sold (via distributors) to, companies – for example, large landscaping companies, companies that own or operate golf courses, railroad companies, and other businesses – and government agencies to eliminate weeds in or near, for example, roads, golf courses, railroad tracks, or rights-of-way.

4.     I have never had any role in or involvement with designing, manufacturing, packaging, assembling, creating, or obtaining regulatory approval for any kind of Roundup®-branded herbicide. I have never had any role in or involvement with determining what language should be included in labelling, or what warnings should be provided, for any kind of Roundup®-branded herbicide. I have never had any role in or involvement with developing advertisements or commercials for any kind of Roundup®-branded herbicides or developing the content of any such advertisements or commercials.

5.     At various times during my employment discussed above in Paragraph 3, my job duties have involved two categories of Roundup®-branded herbicides – agricultural herbicides and/or IT&O herbicides. I have discussed those herbicides with, and otherwise provided information about those herbicides to, farmers who buy and/or use agricultural Roundup®-branded herbicides and professionals who buy and/or use IT&O Roundup®-branded herbicides.

6.     My job duties have never involved residential-lawn-and-garden Roundup®-branded herbicides. I have never had any role with or involvement in promoting, marketing, or selling

2

residential-lawn-and-garden Roundup®-branded herbicides.

7.     In her Complaint, Ms. Salas alleges that she used Roundup®-branded herbicides at her residences and that she bought those herbicides at: (a) Home Depot stores in Miami, Florida; (b) a Kmart store in Key Largo, Florida; and (c) a KLI Shell Lumber & Hardware, LLC store located on Overseas Highway in Key Largo, Florida (the "KLI Shell Overseas Highway Store"). The Complaint alleges that Ms. Salas' injuries were caused by her use of Roundup®-branded herbicides.

8.     I have never had any control over – or any connection whatsoever to – the Roundup®-branded herbicides that allegedly caused Ms. Salas' injuries.  I have never worked at a Home Depot store, or a Kmart store, or the KLI Shell Overseas Highway Store.  I have never spoken to or otherwise communicated with Home Depot USA, Inc. or any Home Depot store about Roundup®-branded herbicides.  I have never spoken to or otherwise communicated with any Kmart store about Roundup®-branded herbicides.  I have never spoken to or otherwise communicated with the KLI Shell Overseas Highway Store about Roundup®-branded herbicides.

9.     I have never had any role with or involvement in the chain of distribution by which Roundup®-branded herbicides get from the point of manufacture to the point of sale to customers at Home Depot stores, Kmart stores, or the KLI Shell Overseas Highway Store.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on March 27, 2021 at _Winter HAven_ , Florida

_____
Andrew Jack Conroy

3

# Exhibit 5

**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF FLORIDA**

NANCY C. SALAS,

        Plaintiff,

  v.

MONSANTO COMPANY, *et al.*,

        Defendants.

Case No._____

**DECLARATION OF ORLANDO VALDES**

I, Orlando Valdes, declare as follows:

1.     I am over the age of eighteen.  If I were called to testify, I could and would competently testify to the statements set forth in this declaration.  This declaration is based on my personal knowledge and my review of the Complaint filed by Nancy Salas in the personal injury lawsuit that she filed against several defendants, including KLI Shell Lumber & Hardware, LLC ("KLI Shell") and me.  I am KLI Shell's Chief Executive Officer.  I submit this declaration in support of Monsanto Company's Notice of Removal.

2.     In her Complaint, Ms. Salas alleges that she used Roundup®-branded herbicides from approximately 2004 to 2014 and that she purchased those products from certain stores, including KLI Shell's store located at 102265 Overseas Highway, Key Largo, Florida.  The Complaint also alleges that, "[a]t all times material," I was employed by KLI Shell as its owner and CEO.  Based on those allegations, the Complaint alleges that KLI Shell and I are liable to Ms. Salas for injuries that she claims were caused by her use of Roundup®-branded herbicides.

3.     As discussed below, those allegations regarding KLI Shell and me clearly are not, and cannot be, correct.

4.      Before March 2017, KLI Shell did not have any ownership interest in – and did not have any role in managing, running, or operating – the store located at 102265 Overseas Highway, Key Largo, Florida (the "Overseas Highway Store").  Before March 2017, I did not work at – and did not have any role in managing, running, or operating – the Overseas Highway Store.  Before March 2017, I did not have any ownership interest in: (a) the Overseas Highway Store; or (b) in any company with an ownership interest in that store.

5.      In March 2017, KLI Shell acquired the Overseas Highway Store through an asset purchase agreement with the company that owned the store ("the Seller").  I was involved in that asset purchase in my capacity as Chief Executive Officer of KLI Shell.  The closing date of that asset purchase (March 24, 2017) was long after Ms. Salas allegedly stopped using Roundup®-branded herbicides in 2014.

6.      If Ms. Salas purchased any Roundup®-branded herbicides from the Overseas Highway Store before the closing date of that asset purchase transaction, KLI Shell did not assume or otherwise become responsible for any actual or potential liabilities related to her purchases of those products; any such actual or potential liabilities remained with the Seller.  When KLI Shell acquired the Overseas Highway Store through that asset purchase transaction, the Seller and KLI Shell agreed that KLI Shell did not assume or otherwise become responsible for any of the Seller's obligations or liabilities arising out of, based upon or resulting from any actions, suits, claims or proceedings, whether in law or equity, pending or threatened, based upon any transactions or occurrences or acts or omissions of the Seller or its agents, representatives, employees or shareholder on or prior to the closing date.  The Seller and KLI Shell also agreed that KLI Shell did not assume or otherwise become responsible for any of the Seller's obligations or liabilities for any civil liability (including punitive damages, if any) imposed upon the Seller on account of

any fraudulent, criminal, intentional, willful or negligent acts or omissions of the Seller or its agents, representatives, employees, or shareholder.

7.    In my personal capacity, I did not assume or otherwise become responsible for any of the Seller's obligations or actual or potential liabilities.

8.    Thus, KLI Shell and I have never had any control over – or any connection whatsoever to – the Roundup®-branded herbicides that allegedly caused Ms. Salas' injuries.

9.    KLI Shell and I have never had any role in or involvement with designing, manufacturing, packaging, assembling, creating, or obtaining regulatory approval for any kind of Roundup®-branded herbicide.  KLI Shell and I have never had any role in or involvement with determining what language should be included in labelling, or what warnings should be provided, for any kind of Roundup®-branded herbicide.  KLI Shell and I have never had any role in or involvement with developing advertisements or commercials for any kind of Roundup®-branded herbicides or determining the content of any such advertisements or commercials.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on March **29**, 2021 at _____*Miami*_____, Florida


_Orlando J. Valdes_
Orlando Valdes

3

# Exhibit 6

## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA

NANCY C. SALAS,

       Plaintiff,

    v.

MONSANTO COMPANY, *et al.*,

       Defendants.

Case No._____

## <u>CONSENT TO REMOVAL BY DEFENDANT HOME DEPOT U.S.A., INC.</u>

Defendant Home Depot U.S.A., Inc. ("Home Depot") hereby consents to Monsanto Company's removal of this lawsuit from Florida state court to the United States District Court for the Southern District of Florida.  Home Depot does not waive – and reserves the right to assert – any and all defenses in this and in any future proceedings.

Dated: March 29, 2021.

LUKS, SANTANIELLO, PETRILLO & COHEN
Attorneys for Defendant
150 W. Flagler Street
Suite 2600
Miami, FL 33130
Telephone:  (305) 377-8900
Facsimile:  (305) 377-8901

*/s/ Kelly L. Kesner*

By:_____
DANIEL J. SANTANIELLO
Florida Bar No.: 860948
Kelly L Kesner
Florida Bar No.:  936731
LUKSMIA-Pleadings@LS-Law.com

JS 44 (Rev. 10/20/ FLSD Revised 03/12/2021)

## CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as re uired by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1 74, is re uired for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.   **NOTICE: Attorneys MUST Indicate All Re-filed Cases Below.**

**I. (a) PLAINTIFFS**
Nancy C. Salas

**DEFENDANTS**
Monsanto Company, et al.

**(b)** County of Residence of First Listed Plaintiff

County of Residence of First Listed Defendant

NOTE:    IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys
Steven C. Marks, PODHURST ORSECK, P.A., One Southeast 3rd Ave

Attorneys
Anthony N. Upshaw, McDERMOTT WILL & EMERY, LLP, 333 S

**(d)** Check County Where Action Arose:   ☒ MIAMI-DADE  ☐ MONROE  ☐ BROWARD  ☐ PALM BEACH  ☐ MARTIN  ☐ ST. LUCIE  ☐ INDIAN RIVER  ☐ OKEECHOBEE  ☐ HIGHLANDS

| II. BASIS OF JURISDICTION | III. CITIZENSHIP OF PRINCIPAL PARTIES |
|---|---|

**II. BASIS OF JURISDICTION**

☐ 1  U.S. Government Plaintiff
☐ 3  Federal uestion

☐ 2  U.S. Government Defendant
☒ 4  Diversity

**III. CITIZENSHIP OF PRINCIPAL PARTIES**

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☐ 1 | Incorporated Principal Place of Business in This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated Principal Place of Business In Another State | ☒ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3  Foreign Nation | | ☐ 6 | ☐ 6 |

**IV. NATURE OF SUIT**   Click here for: Nature of Suit Code Descriptions

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** — **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - Product Liability | ☐ 6 0 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 ui Tam (31 USC 372 (a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 367 Health Care/ | | | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & | Pharmaceutical | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | Slander | Personal Injury | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Product Liability | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted | Liability | ☐ 368 Asbestos Personal | ☐ 835 Patent Abbreviated New Drug Application | ☐ 460 Deportation |
|  | ☐ 340 Marine | Injury Product Liability | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and |
| Student Loans | ☐ 345 Marine Product | | ☐ 880 Defend Trade Secrets Act of 2016 | Corrupt Organizations |
| (Excl. Veterans) | Liability | **LABOR** | **SOCIAL SECURITY** | ☐ 480 Consumer Credit (15 USC 1681 or 16 2) |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (13 5ff) | ☐ 485 Telephone Consumer Protection Act (TCPA) |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 720 Labor/Mgmt. Relations | ☐ 862 Black Lung ( 23) | ☐ 4 0 Cable/Sat TV |
| ☐ 1 0 Other Contract | ☐ 360 Other Personal | ☐ 740 Railway Labor Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 1 5 Contract Product Liability | Injury | ☐ 751 Family and Medical | ☐ 864 SSID Title VI | ☐ 8 0 Other Statutory Actions |
| ☐ 1 6 Franchise | ☐ 362 Personal Injury - Med. Malpractice | Leave Act | ☐ 865 RSI (405(g)) | ☐ 8 1 Agricultural Acts |
|  | | ☐ 7 0 Other Labor Litigation | | ☐ 8 3 Environmental Matters |
| **REAL PROPERTY** | **CIVIL RIGHTS** | ☐ 7 1 Empl. Ret. Inc. Security Act | **FEDERAL TAX SUITS** | ☐ 8 5 Freedom of Information Act |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **PRISONER PETITIONS** | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 8 6 Arbitration |
| ☐ 220 Foreclosure | ☐ 441 Voting | **Habeas Corpus:** | ☐ 871 IRS Third Party 26 USC 760 | ☐ 8 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 463 Alien Detainee | | ☐ 50 Constitutionality of State |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 510 Motions to Vacate Sentence | | Statutes |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | **Other:** | **IMMIGRATION** | |
| ☐ 2 0 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | ☐ 530 General | ☐ 462 Naturalization Application | |
|  | ☐ 448 Education | ☐ 535 Death Penalty | ☐ 465 Other Immigration Actions | |
|  | | ☐ 540 Mandamus & Other | | |
|  | | ☐ 550 Civil Rights | | |
|  | | ☐ 555 Prison Condition | | |
|  | | ☐ 560 Civil Detainee | | |
|  | | ☐ Conditions of Confinement | | |

**V. ORIGIN**
☐ 1 Original Proceeding  ☐ 2 Removed from State Court  ☐ 3 Re-filed (See VI below)  ☐ 4 Reinstated or Reopened  ☐ 5 Transferred from another district  ☐ 6 Multidistrict Litigation Transfer  ☐ 7 Appeal to District Judge from Magistrate Judgment  ☐ 8 Multidistrict Litigation Direct File  Remanded from Appellate Court

**VI. RELATED/ RE-FILED CASE(S)**
(See instructions): a) Re-filed Case ☐YES ☐NO   b) Related Cases ☒YES ☐NO   1:21-cv-20648-PCH /
JUDGE: Paul C. Huck/Kathleen M. Williams   DOCKET NUMBER: 1:20-cv-243 2-KMW

**VII. CAUSE OF ACTION**
Cite the U.S. Civil Statute under which you are filing and Write a Brief Statement of Cause (*Do not cite jurisdictional statutes unless diversity*):
28 U.S.C. sections 1332, 1441 and 1446; Product liability/personal injury for exposure to herbicide
LENGTH OF TRIAL via _____ days estimated (for both sides to try entire case)

**VIII. REQUESTED IN COMPLAINT:**
☐ CHECK IF THIS IS A **CLASS ACTION** UNDER F.R.C.P. 23   **DEMAND $**   CHECK YES only if demanded in complaint:
JURY DEMAND:  ☐ Yes  ☒ No

ABOVE INFORMATION IS TRUE & CORRECT TO THE BEST OF MY KNOWLEDGE
DATE
03/30/2021

SIGNATURE OF ATTORNEY OF RECORD
/s/ Anthony N. Upshaw

FOR OFFICE USE ONLY : RECEIPT #         AMOUNT         IFP         JUDGE         MAG JUDGE

**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

NANCY C. SALAS,

          Plaintiff,

v.

MONSANTO COMPANY; BAYER
CORPORATION; BAYER AG; ANDREW
JACK CONROY; HOME DEPOT USA,
INC.; KLI SHELL LUMBER &
HARDWARE, LLC; and ORLANDO
VALDES,

          Defendants.

Case No._____

### MONSANTO COMPANY'S CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Civil Procedure 7.1, Defendant Monsanto Company

("Monsanto") makes the following disclosures:

    1.    Monsanto is an indirect, wholly-owned subsidiary of Bayer AG.

    2.    Bayer AG is a publicly held corporation.

Dated:  March 30, 2021

Respectfully submitted,

**McDERMOTT WILL & EMERY LLP**

*/s/ Anthony N. Upshaw*
ANTHONY N. UPSHAW
Florida Bar No.: 861091
aupshaw@mwe.com
MELISSA R. ALVAREZ
Florida Bar No.: 820091
malvarez@mwe.com
333 SE 2nd Avenue, Suite 4500
Miami, FL 33131
Tel:  (305) 329-4431/Fax: (305) 675-8031
***Counsel for Defendant***
***Monsanto Company***

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this **30th day of March, 2021,** a true and correct copy of the

foregoing was electronically filed with the Clerk of the Court using the CM/ECF system.

*/s/  Anthony N. Upshaw*