STD

# U.S. District Court
## DISTRICT OF ARIZONA (Tucson Division)
## CIVIL DOCKET FOR CASE #: 4:21-cv-00155-JCH

Gilliland et al v. Monsanto Company
Assigned to: Judge John C Hinderaker
Cause: 28:1332 Diversity-Product Liability

Date Filed: 04/08/2021
Jury Demand: Plaintiff
Nature of Suit: 365 Personal Injury: Prod. Liability
Jurisdiction: Diversity

**Plaintiff**

**Michael Gilliland**                    represented by    **Frank Verderame**
Plattner Verderame PC
316 E Flower St.
Phoenix, AZ 85012
602-266-2002
Fax: 602-266-6908
Email: fverderame@pvazlaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Nicholas Anthony Verderame**
Plattner Verderame PC
316 E Flower St.
Phoenix, AZ 85012
602-266-2002
Fax: 602-266-6908
Email: nverderame@pvazlaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Dana Gilliland**                    represented by    **Frank Verderame**
*wife*                                                   (See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Nicholas Anthony Verderame**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Monsanto Company**

| Date Filed | # | Docket Text |
|---|---|---|

| 04/08/2021 | 1 | COMPLAINT. Filing fee received: $ 402.00, receipt number 0970-19339672 filed by Michael Gilliland, Dana Gilliland. (Verderame, Nicholas) (Attachments: # 1 Civil Cover Sheet)(MYE) (Entered: 04/08/2021) |
|---|---|---|
| 04/08/2021 | 2 | SUMMONS Submitted by Michael Gilliland, Dana Gilliland. (Verderame, Nicholas) (MYE) (Entered: 04/08/2021) |
| 04/08/2021 | 3 | Filing fee paid, receipt number 0970-19339672. This case has been assigned to the Honorable John C Hinderaker. All future pleadings or documents should bear the correct case number: CV-21-155-TUC-JCH. Notice of Availability of Magistrate Judge to Exercise Jurisdiction form attached. (MYE) (Entered: 04/08/2021) |
| 04/08/2021 | 4 | NOTICE TO FILER OF DEFICIENCY re: 1 Complaint filed by Dana Gilliland, Michael Gilliland. Document not in compliance with LRCiv 7.1(a)(3) - Party names must be capitalized using proper upper and lower case type. *No further action is required*. This is a TEXT ENTRY ONLY. There is no PDF document associated with this entry. (MYE) (Entered: 04/08/2021) |
| 04/08/2021 | 5 | NOTICE TO FILER OF DEFICIENCY re: [1-1] Civil Cover Sheet filed by Dana Gilliland, Michael Gilliland. Pursuant to the Electronic Case Filing Administrative Policies and Procedures Manual Section II(B), attorneys are required to submit the automated Civil Cover Sheet when filing a new case. *FOLLOW-UP ACTION REQUIRED:* Please refile corrected document. Deficiency must be corrected within one business day of this notice. This is a TEXT ENTRY ONLY. There is no PDF document associated with this entry. (MYE) (Entered: 04/08/2021) |
| 04/08/2021 | 6 | NOTICE TO FILER OF DEFICIENCY re: 2 Summons Submitted filed by Dana Gilliland, Michael Gilliland. *FOLLOW-UP ACTION REQUIRED:* Please refile corrected document (AO 440 Summons form). Deficiency must be corrected within one business day of this notice. This is a TEXT ENTRY ONLY. There is no PDF document associated with this entry. (MYE) (Entered: 04/08/2021) |
| 04/09/2021 | 7 | Additional Attachments to Main Document re: 1 Complaint by Plaintiffs Dana Gilliland, Michael Gilliland. (Verderame, Nicholas) (Entered: 04/09/2021) |
| 04/09/2021 | 8 | SUMMONS Submitted by Dana Gilliland, Michael Gilliland. (Verderame, Nicholas) (Entered: 04/09/2021) |
| 04/12/2021 | 9 | Summons Issued as to Monsanto Company. (SCA). *** IMPORTANT: When printing the summons, select "Document and stamps" or "Document and comments" for the seal to appear on the document. (Entered: 04/12/2021) |
| 04/13/2021 | 10 | NOTICE TO FILER OF DEFICIENCY re: 7 Additional Attachments to Main Document filed by Dana Gilliland, Michael Gilliland. Pursuant to the Electronic Case Filing Administrative Policies and Procedures Manual Section II(B), attorneys are required to submit the automated Civil Cover Sheet when filing a new case. *FOLLOW-UP ACTION REQUIRED:* Please refile corrected document. Deficiency must be corrected within one business day of this notice. This is a TEXT ENTRY ONLY. There is no PDF document associated with this entry. (SCA) (Entered: 04/14/2021) |
| 04/14/2021 | 11 | *Additional Attachments to Main Document re: 10 Notice of Deficiency (Text Only) *Automated Civil Cover Sheet* by Plaintiffs Dana Gilliland, Michael Gilliland. (Attachments: # 1 Civil Cover Sheet Automated Civil Cover Sheet)(Verderame, Nicholas) *Modified to remove link to doc 10 and add link to doc 1 on 4/19/2021 (SCA). (Entered: 04/14/2021) |

### PACER Service Center

| Transaction Receipt | | | |
|---|---|---|---|
| 05/04/2021 06:22:34 | | | |
| **PACER Login:** | sh0019sh:2634072:0 | **Client Code:** | 31943.356965 rhb |
| **Description:** | Docket Report | **Search Criteria:** | 4:21-cv-00155-JCH |
| **Billable Pages:** | 2 | **Cost:** | 0.20 |

Frank Verderame, State Bar No. 007519
Nicholas A. Verderame, State Bar No. 030683
**PLATTNER VERDERAME PC**
316 East Flower Street
Phoenix, AZ 85012
Telephone: 602-266-2002
E-mail: nverderame@pvazlaw.com
Attorneys for Plaintiffs

# UNITED STATES DISCTRICT COURT

# DISTRICT OF ARIZONA

MICHAEL GILLILAND and )
DANA GILLILAND, his wife, )
       Plaintiffs, )
     v. )     Case No.: _____
               )
MONSANTO COMPANY, )
       Defendant. )

## COMPLAINT AND DEMAND FOR JURY TRIAL

    **COME NOW**, Plaintiffs, MICHAEL GILLILAND and DANA GILLILAND, by and through the undersigned counsel, hereby sue Defendant, MONSANTO COMPANY (hereinafter referred to as "MONSANTO") and allege as follows:

### I.    INTRODUCTION

    1.    Plaintiffs bring this cause of action for the significant damages sustained by MICHAEL GILLILAND as a result of using Roundup®, an unreasonably dangerous and defective product. More specifically, Plaintiffs' claims involve the MONSANTO's negligent and wrongful conduct in connection with the design, development,

1

manufacture, testing, packaging, promoting, marketing, distribution, supply and/or sale of the herbicide Roundup® containing the active ingredient glyphosate (hereinafter referred to as "Roundup").[1]

2.     Roundup is defective, dangerous to human health, unfit and unsuitable to be marketed, distributed and sold in commerce, and lacked proper warnings and directions as to the dangers associated with its use.

3.     As a direct and proximate result of MICHAEL GILLILAND's exposure to Roundup, he developed non-Hodgkin's lymphoma.  Plaintiff, DANA GILLILAND, his wife, has also suffered a significant loss of consortium as a result of her husband's diagnosis, treatments and ongoing injuries.

---

[1] "Roundup" refers to all formulations of Roundup® products, including, but not limited to, Roundup® Concentrate Poison Ivy and Tough Brush Killer 1, Roundup® Custom Herbicide, Roundup® D-Pak herbicide, Roundup® Dry Concentrate, Roundup® Export Herbicide, Roundup® Fence & Hard Edger 1, Roundup® Garden Foam Weed & Grass Killer, Roundup® Grass and Weed Killer, Roundup® Herbicide, Roundup® Original 2k herbicide, Roundup® Original II Herbicide, Roundup® Pro Concentrate, Roundup® Prodry Herbicide, Roundup® Promax, Roundup® Quik Stik Grass and Weed Killer, Roundup® Quikpro Herbicide, Roundup® Rainfast Concentrate Weed & Grass Killer, Roundup® Rainfast Super Concentrate Weed & Grass Killer, Roundup® Ready-to-Use Extended Control Weed & Grass Killer 1 Plus Weed Preventer, Roundup® Ready-to-Use Weed & Grass Killer, Roundup® Ready-to-Use Weed and Grass Killer 2, Roundup® Ultra Dry, Roundup® Ultra Herbicide, Roundup® Ultramax, Roundup® VM Herbicide, Roundup® Weed & Grass Killer Concentrate, Roundup® Weed & Grass Killer Concentrate Plus, Roundup® Weed & Grass killer Ready-to-Use Plus, Roundup® Weed & Grass Killer Super Concentrate, Roundup® Weed & Grass Killer1 Ready-to-Use, Roundup® WSD Water Soluble Dry Herbicide Deploy Dry Herbicide, or any other formulation containing the active ingredient glyphosate.

## II. THE PARTIES

### A. Plaintiffs

4. Plaintiff, MICHAEL GILLILAND, has been a resident of Pima County, Arizona since 1954, and is otherwise *sui juris.*

5. At all times material, MICHAEL GILLILAND was exposed to, ingested, inhaled, had dermal contact with, or otherwise was exposed to Roundup products that were designed, manufactured, sold, distributed, and/or supplied by the Defendant.

6. More specifically, between approximately 1985 and 2014, MICHAEL GILLILAND worked with and/or used Roundup products for personal purposes at his family residence located in Pima County, Arizona.

7. At all times material, MICHAEL GILLILAND worked with and/or used Roundup products in the intended manner, without significant change in the products' condition and, being unaware of the dangerous properties of glyphosate contained in Roundup products, relied on Defendant's instructions as to the proper methods of handling the products.

8. As a direct and proximate result of MICHAEL GILLILAND's exposure to, ingestion, inhalation, contact with and/or use of Roundup products, he was diagnosed with non-Hodgkin's lymphoma on or about December 2015.

9. As a result of his non-Hodgkin's lymphoma, MICHAEL GILLILAND has suffered serious physical injury, resulting pain and suffering, and mental anguish. He has undergone extensive and debilitating chemotherapy treatment. In addition, he must

3

continually undergo medical monitoring. His injuries are permanent and continuing in nature.

10.     Plaintiff DANA GILLILAND, has been a resident of Pima County, Arizona since 1974, and is otherwise *sui juris*.

11.     At all times material, DANA GILLILAND was and is the wife of MICHAEL GILLILAND and has suffered loss of her husband's consortium.

**B.     Defendant**

12.     At all times material, Defendant, MONSANTO COMPANY, was and is a for-profit corporation organized and existing under the laws of the State of Delaware, having its principal place of business located at 800 North Lindbergh Blvd., St. Louis, Missouri 63167.

13.     MONSANTO, at all times material, was authorized to conduct and is conducting business throughout the State of Arizona, including, but not limited to, conducting business in Arizona.

14.     At all times material, MONSANTO has had and continues to have substantial and not isolated contacts with Arizona and is subject to the jurisdiction of Arizona.

15.     At all times material, MONSANTO was the entity that discovered the herbicidal properties of glyphosate and is the manufacturer of Roundup products containing glyphosate as the active ingredient.

4

16.     At all times material, and while committing the acts alleged herein, each and every managing agent, agent, representative and/ or employee of Defendant MONSANTO was working within the course and scope of said agency, representation and/or employment with the knowledge, consent, ratification, and authorization of the Defendant and its directors, officers and/or managing agents.

### III.     JURISDICTION AND VENUE

17.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 because the amount in controversy exceeds $75,000, exclusive of interest and costs, and because there is complete diversity of citizenship between Plaintiffs and Defendant. Plaintiff at all times material, was a citizen of Arizona. Defendant, MONSANTO, is a citizen of Delaware (where it is incorporated) and Missouri (where it has its principal place of business).

18.     The Court also has supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

19.     This Court has personal jurisdiction over the Defendant because at all times material, MONSANTO was and is authorized and licensed to conduct business in Arizona, maintains and carries on systematic and continuous contacts in the judicial district, regularly transacts business within this judicial district, and regularly and purposefully avails itself of the benefits of this judicial district and expected or should have expected that its acts would have consequences in Arizona because MONSANTO designed, manufactured, sold, distributed, and/or supplied Roundup products throughout the United States, including Arizona, which Defendant knew or should have known

5

contained glyphosate, and which MICHAEL GILLILAND purchased, used and/or was exposed to in his life, causing his non-Hodgkin's lymphoma and subsequent death. Defendant's affiliations with Arizona are so continuous and systematic as to render them essentially at home in Arizona.

20.     Additionally, MONSANTO caused tortious injury by acts and omissions in this judicial district and caused tortious injury in this district by acts and omissions outside this district while regularly doing and soliciting business, engaging in a persistent course of conduct, and deriving substantial revenue from goods used or consumed and services rendered in this judicial district.

21.     Venue is proper in United States District Court for the District of Arizona pursuant to 28 U.S.C § 1391(b)(2) and (3) because substantial parts of the events giving rise to the claim occurred in Arizona and the Defendant is subject to personal jurisdiction in this district.

## IV.     <u>NATURE OF THE ACTION</u>

22.     At all times material, MONSANTO was and is in the business of, and does, design, research, manufacture, test, advertise, promote, market, sell and/or distribute the commercial herbicide Roundup.

23.     MONSANTO is a multinational agricultural biotechnology corporation based in St. Louis, Missouri. It is the world's leading producer of glyphosate.

6

24.     MONSANTO discovered the herbicidal properties of glyphosate during the 1970's and subsequently began to design, research, manufacture, sell and distribute glyphosate-based Roundup as a broad-spectrum herbicide.

25.     Glyphosate is the active ingredient in Roundup.

26.     Glyphosate is a broad-spectrum herbicide used to kill weeds and grasses known to compete with crops grown around the globe.

27.     The original Roundup, containing the active ingredient glyphosate, was introduced in 1974.  Today, glyphosate products are among the world's most widely used herbicides.  MONSANTO's glyphosate products are registered in 130 countries and approved for weed control on more than 100 different crops.

28.     From the outset, MONSANTO marketed Roundup as a "safe" general-purpose herbicide for widespread commercial and consumer use; MONSANTO still markets Roundup as safe today.

29.     On March 24, 2015, the International Agency for Research on Cancer ("IARC"), an agency of the World Health Organization ("WHO"), issued an evaluation of several herbicides, including glyphosate. That evaluation was based, in part, on studies of exposures to glyphosate in several countries around the world, and it traces the health implications from exposure to glyphosate since 2001.

30.     Based on its cumulative review of human, animal, and DNA studies for more than one (1) year, many of which have been in MONSANTO's possession since as early as 1985, the IARC's working group published its conclusion that the glyphosate

7

contained in MONSANTO's Roundup herbicide, is a Class 2A "probable carcinogen" as demonstrated by the mechanistic evidence of carcinogenicity in humans and sufficient evidence of carcinogenicity in animals.

31.     The IARC's full Monograph was published on July 29, 2015 and established glyphosate as a class 2A *probable* carcinogen to humans. According to the authors, glyphosate demonstrated sufficient mechanistic evidence (genotoxicity and oxidative stress) to warrant a 2A classification based on evidence of carcinogenicity in humans and animals.

32.     The IARC Working Group found an increased risk between exposure to glyphosate and non-Hodgkin's lymphoma ("NHL") and several subtypes of NHL.

33.     The IARC evaluation is significant. It confirms that glyphosate is toxic to humans.

34.     For nearly 40 years, consumers, farmers, and the public have used Roundup unaware of its carcinogenic properties.

## V.     FACTS RELEVANT TO ALL CAUSES OF ACTION

### A.     Plaintiff's Use and Exposure to Roundup®

35.     Between approximately 1985 and 2014, MICHAEL GILLILAND worked with and/or used Roundup products on a regular basis for personal purposes at his family residence located in Pima County, Arizona.

8

36.     At all times material, MICHAEL GILLILAND followed all safety and precautionary warnings during the course of his use of Roundup. He was directly involved in using, handling and spraying Roundup products at his residences.

37.     At all times material, MICHAEL GILLILAND used Roundup products that were manufactured, designed, sold, distributed and/or supplied by MONSANTO.

38.     Defendant never warned MICHAEL GILLILAND as to the actual and potential danger or risks of using Roundup products, never provided him with any written materials about the danger or risk of using Roundup products, and never advised him that he could contract non-Hodgkin's lymphoma as a result of using Roundup products.

39.     As a direct and proximate result of MICHAEL GILLILAND's use of and exposure to Roundup products, he contracted non-Hodgkin's lymphoma. MICHAEL GILLILAND was diagnosed on or about December 2015.

40.     It was not until on or after October 2020, that Plaintiffs MICHAEL GILLILAND and DANA GILLILAND first discovered that using Roundup products containing glyphosate can result in non-Hodgkin's lymphoma after seeing various news stories and television advertisements relating to the actual and potential dangers of Roundup.

**B.      The Discovery of Glyphosate and Development of Roundup®**

9

41.     The herbicidal properties of glyphosate were discovered in 1970 by MONSANTO chemist John Franz. The first glyphosate-based herbicide was introduced to the market in the mid- 1970s under the brand name Roundup.

42.     Glyphosate is a "non-selective" herbicide, meaning it kills indiscriminately based only on whether a given organism produces a specific enzyme, 5-enolpyruvylshikimic acid-3-phosphate synthase, known as EPSP synthase.

43.     Glyphosate, among other things, inhibits the enzyme 5-enolpyruvylshikimic acid-3-phosphate synthase that interferes with the shikimic pathway in plants, resulting in the accumulation of shikimic acid in plant tissue and ultimately plant death.

44.     Sprayed as a liquid, plants absorb glyphosate directly through their leaves, stems, and roots, and detectable quantities accumulate in the plant tissues.

45.     Each year, approximately 250 million pounds of glyphosate are sprayed on crops, commercial nurseries, suburban lawns, parks, and golf courses.  This increase use has been driven largely by the proliferation of genetically engineered crops, crops specifically tailored to resist the activity of glyphosate.

46.     MONSANTO is intimately involved in the development, design, manufacture, marketing, sale, and/or distribution of genetically modified ("GMO") crops, many of which are marketed as being resistant to Roundup *i.e.*, "Roundup Ready®." As of 2009, MONSANTO was the world's leading producer of seeds, accounting for 27% of the world seed market, designed to be Roundup Ready®.   In

10

2010, an estimated 70% of corn and cotton, and 90% of soybean fields in the United States contained Roundup Ready® seeds.

47.     Glyphosate is ubiquitous in the environment. Numerous studies confirm that glyphosate is found in rivers, streams, and groundwater in agricultural areas where Roundup is used. It has been found in food, in the urine of agricultural workers, and even in the urine of urban dwellers who are not in direct contact with glyphosate.

48.     Nevertheless, MONSANTO, since it began selling Roundup, has represented it as safe to humans and the environment. Indeed, MONSANTO has repeatedly proclaimed and continues to proclaim to the world, and particularly to United States consumers, that glyphosate-based herbicides, including Roundup, create no unreasonable risks to human health or to the environment.

**C.     Registration of Herbicides under Federal Law**

49.     The manufacture, formulation and distribution of herbicides, such as Roundup, are regulated under the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA" or "Act"), 7 U.S.C. § 136 et seq. FIFRA requires that all pesticides be registered with the Environmental Protection Agency ("EPA" or "Agency") prior to their distribution, sale, or use, except as described by the Act. 7 U.S.C. § 136a(a).

50.     Because pesticides are toxic to plants, animals, and humans, at least to some degree, the EPA requires as part of the registration process, among other things, a variety of tests to evaluate the potential for exposure to pesticides, toxicity to people and other potential non-target organisms, and other adverse effects on the environment.

11

Registration by the EPA, however, is not an assurance or finding of safety. The determination the Agency must make in registering or re- registering a product is not that the product is "safe," but rather that use of the product in accordance with its label directions "will not generally cause unreasonable adverse effects on the environment." 7 U.S.C. § 136a(c)(5)(D).

51. FIFRA defines "unreasonable adverse effects on the environment" to mean "any unreasonable risk to man or the environment, taking into account the economic, social, and environmental costs and benefits of the use of any pesticide." 7 U.S.C. § 136(bb). FIFRA thus requires EPA to make a risk/benefit analysis in determining whether a registration should be granted or allowed to continue to be sold in commerce.

52. The EPA registered Roundup for distribution, sale, and manufacture in the United States, including, Arizona.

53. FIFRA generally requires that the registrant, MONSANTO, conduct health and safety testing of pesticide products. The EPA has protocols governing the conduct of tests required for registration and the laboratory practices that must be followed in conducting these tests. The data produced by the registrant must be submitted to the EPA for review and evaluation. The government is not required, nor is it able, however, to perform the product tests that are required of the manufacturer.

54. The evaluation of each pesticide product distributed, sold, or manufactured is completed at the time the product is initially registered. The data

12

necessary for registration of a pesticide has changed over time. The EPA is now in the process of re-evaluating all pesticide products through a Congressionally-mandated process called "re-registration." 7 U.S.C. § 136a-1. In order to reevaluate these pesticides, the EPA is demanding the completion of additional tests and the submission of data for the EPA's review and evaluation.

55.     In the case of glyphosate and Roundup, the EPA had planned on releasing its preliminary risk assessment —in relation to the registration process—no later than July 2015. The EPA completed its review of glyphosate in early 2015, but it delayed releasing the risk assessment pending further review in light of the WHO's health-related findings.

**D.     The Importance of Roundup® to MONSANTO's Market Dominance Profits**

56.     The success of Roundup was key to MONSANTO's continued reputation and dominance in the marketplace.

57.     Largely due to the success of Roundup sales, MONSANTO's agriculture division was out-performing its chemicals division's operating income, and that gap increased yearly. But with its patent for glyphosate expiring in the United States in the year 2000, MONSANTO needed a strategy to maintain its Roundup market dominance and to ward off impending competition.

58.     In response, MONSANTO began the development and sale of genetically engineered Roundup Ready® seeds in 1996. Since Roundup Ready® crops are resistant

13

to glyphosate; farmers can spray Roundup onto their fields during the growing season without harming the crop. This allowed MONSANTO to expand its market for Roundup even further; by 2000, MONSANTO's biotechnology seeds were planted on more than 80 million acres worldwide and nearly 70% of American soybeans were planted from Roundup Ready® seeds. It also secured MONSANTO's dominant share of the glyphosate market through a marketing strategy that coupled proprietary Roundup Ready® seeds with continued sales of its Roundup herbicide.

59. Through a three-pronged strategy of increased production, decreased prices, and by coupling with Roundup Ready® seeds, Roundup became MONSANTO's most profitable product. In 2000, Roundup accounted for almost $2.8 billion in sales, outselling other herbicides by a margin of five to one, and accounting for close to half of MONSANTO's revenue.

**E.      MONSANTO's False Representations Regarding the Safety of Roundup®**

60. In 1996, the New York Attorney General ("NYAG") filed a lawsuit against MONSANTO based on its false and misleading advertising of Roundup products. Specifically, the lawsuit challenged MONSANTO's general representations that its spray-on glyphosate-based herbicides, including Roundup, were "safer than table salt" and "practically non-toxic" to mammals, birds, and fish. Among the representations the NYAG found deceptive and misleading about the human and environmental safety of Roundup are the following:

a.      Remember that environmentally friendly Roundup herbicide is

14

biodegradable. It won't build up in the soil so you can use Roundup with confidence along customers' driveways, sidewalks and fences.

b. And remember that Roundup is biodegradable and won't build up in the soil. That will give you the environmental confidence you need to use Roundup everywhere you've got a weed, brush, edging or trimming problem.

c. Roundup biodegrades into naturally occurring elements.

d. Remember that versatile Roundup herbicide stays where you put it. That means there's no washing or leaching to harm customers' shrubs or other desirable vegetation.

e. This non-residual herbicide will not wash or leach in the soil. It ... stays where you apply it.

f. You can apply Accord (another glyphosate-containing MONSANTO herbicide) with "confidence because it will stay where you put it" it bonds tightly to soil particles, preventing leaching. Then, soon after application, soil microorganisms biodegrade Accord into natural products.

g. Glyphosate is less toxic to rats than table salt following acute oral ingestion.

h. Glyphosate's safety margin is much greater than required. It has over a 1,000-fold safety margin in food and over a 700-fold safety margin for workers who manufacture it or use it.

i. You can feel good about using herbicides by MONSANTO. They carry a toxicity category rating of 'practically non-toxic' as it pertains to mammals, birds and fish.

j. "Roundup can be used where kids and pets will play and breaks down into natural material." This ad depicts a person with his head in the ground and a pet dog standing in an area which has been treated with Roundup.

61. On November 19, 1996, MONSANTO entered into an Assurance of Discontinuance with NYAG, in which MONSANTO agreed, among other things, "to

15

cease and desist from publishing or broadcasting any advertisements [in New York] that represent, directly or by implication" that:

    a.    its glyphosate-containing pesticide products or any component thereof are safe, non-toxic, harmless or free from risk;

    b.    its glyphosate-containing pesticide products or any component thereof manufactured, formulated, distributed or sold by MONSANTO are biodegradable;

    c.    its glyphosate-containing pesticide products or any component thereof stay where they are applied under all circumstances and will not move through the environment by any means.;

    d.    its glyphosate-containing pesticide products or any component thereof are "good" for the environment or are "known for their environmental characteristics";

    e.    glyphosate-containing pesticide products or any component thereof are safer or less toxic than common consumer products other than herbicides; and

    f.    its glyphosate-containing products or any component thereof might be classified as "practically non-toxic."

62. MONSANTO did not alter its advertising in the same manner in any state other than New York, and on information and belief still has not done so today.

63. In 2009, France's highest court ruled that MONSANTO had not told the truth about the safety of Roundup. The French court affirmed an earlier judgement that MONSANTO had falsely advertised its herbicide Roundup as "biodegradable" and that it "left the soil clean."

**F.    Classifications and Assessments of Glyphosate**

64. The IARC process for the classification of glyphosate followed the stringent procedures for the evaluation of a chemical agent. Over time, the IARC

16

Monograph program has reviewed 980 agents. Of those reviewed, it has determined 116 agents to be Group 1 (Known Human Carcinogens); 73 agents to be Group 2A (Probable Human Carcinogens); 287 agents to be Group 2B (Possible Human Carcinogens); 503 agents to be Group 3 (Not Classified); and one agent to be Probably Not Carcinogenic.

65.     The established procedure for IARC Monograph evaluations is described in the IARC Programme's Preamble. Evaluations are performed by panels of international experts, selected on the basis of their expertise and the absence of actual or apparent conflicts of interest.

66.     One year before the Monograph meeting, the meeting is announced and there is a call both for data and for experts. Eight months before the Monograph meeting, the Working Group membership is selected and the sections of the Monograph are developed by the Working Group members. One month prior to the Monograph meeting, the call for data is closed and the various draft sections are distributed among Working Group members for review and comment. Finally, at the Monograph meeting, the Working Group finalizes review of all literature, evaluates the evidence in each category, and completes the overall evaluation. Within two weeks after the Monograph meeting, the summary of the Working Group findings is published in Lancet Oncology, and within a year after the meeting, the final Monograph is finalized and published.

67.     In assessing an agent, the IARC Working Group reviews the following information:

          a.       human, experimental, and mechanistic data;

17

b.    all pertinent epidemiological studies and cancer bioassays; and

c.    representative mechanistic data. The studies must be publicly available and have sufficient detail for meaningful review, and reviewers cannot be associated with the underlying study.

68.    In March 2015, IARC reassessed glyphosate. The summary published in The Lancet Oncology reported that glyphosate is a Group 2A agent and probably carcinogenic in humans.

69.    On July 29, 2015, IARC issued its Monograph for glyphosate, Monograph 112. For Volume 112, the volume that assessed glyphosate, a Working Group of 17 experts from 11 countries met at IARC from March 3–10, 2015, to assess the carcinogenicity of certain herbicides, including glyphosate. The March meeting culminated nearly a one-year review and preparation by the IARC Secretariat and the Working Group, including a comprehensive review of the latest available scientific evidence. According to published procedures, the Working Group considered "reports that have been published or accepted for publication in the openly available scientific literature" as well as "data from governmental reports that are publicly available."

70.    The studies considered the following exposure groups: occupational exposure of farmers and tree nursery workers in the United States, forestry workers in Canada and Finland, and municipal weed-control workers in the United Kingdom; and para-occupational exposure in farming families.

18

71.     Glyphosate was identified as the second-most used household herbicide in the United States for weed control between 2001 and 2007 and the most heavily used herbicide in the world in 2012.

72.     Exposure pathways are identified as air (especially during spraying), water, and food. Community exposure to glyphosate is widespread and found in soil, air, surface water, and groundwater, as well as in food.

73.     The assessment of the IARC Working Group identified several case control studies of occupational exposure in the United States, Canada, and Sweden. These studies show a human health concern from agricultural and other work-related exposure to glyphosate.

74.     The IARC Working Group found an increased risk between exposure to glyphosate and non-Hodgkin lymphoma ("NHL") and several subtypes of NHL, and the increased risk persisted after adjustment for other pesticides.

75.     The IARC Working Group also found that glyphosate caused DNA and chromosomal damage in human cells. One study in community residents reported increases in blood markers of chromosomal damage (micronuclei) after glyphosate formulations were sprayed.

76.     In male CD-1 mice, glyphosate induced a positive trend in the incidence of a rare tumor, renal tubule carcinoma. A second study reported a positive trend for hemangiosarcoma in male mice. Glyphosate increased pancreatic islet-cell adenoma in

19

male rats in two studies. A glyphosate formulation promoted skin tumors in an initiation-promotion study in mice.

77.     The IARC Working Group also noted that glyphosate has been detected in the urine of agricultural workers, indicating absorption. Soil microbes degrade glyphosate to aminomethylphosphoric acid (AMPA). Blood AMPA detection after exposure suggests intestinal microbial metabolism in humans.

78.     The IARC Working Group further found that glyphosate and glyphosate formulations induced DNA and chromosomal damage in mammals, and in human and animal cells in utero.

79.     The IARC Working Group also noted genotoxic, hormonal, and enzymatic effects in mammals exposed to glyphosate. Essentially, glyphosate inhibits the biosynthesis of aromatic amino acids, which leads to several metabolic disturbances, including the inhibition of protein and secondary product biosynthesis and general metabolic disruption.

80.     The IARC Working Group also reviewed an Agricultural Health Study, consisting of a prospective cohort of 57,311 licensed pesticide applicators in Iowa and North Carolina. While this study differed from others in that it was based on a self-administered questionnaire, the results support an association between glyphosate exposure and Multiple Myeloma, Hairy Cell Leukemia (HCL), and Chronic Lymphocytic Leukemia (CLL), in addition to several other cancers.

**G.      Other Earlier Findings about Glyphosate's Dangers to Human Health and Release Patterns**

20

81.     The EPA has a technical fact sheet, as part of its Drinking Water and Health, National Primary Drinking Water Regulations publication, relating to glyphosate. This technical fact sheet predates the IARC March 20, 2015, evaluation. The fact sheet describes the release patterns for glyphosate as follows:

*Release Patterns*

82.     Glyphosate is released to the environment in its use as an herbicide for controlling woody and herbaceous weeds on forestry, right-of-way, cropped and non-cropped sites. These sites may be around water and in wetlands. It may also be released to the environment during its manufacture, formulation, transport, storage, disposal, and cleanup, and from spills. Since glyphosate is not a listed chemical in the Toxics Release Inventory, data on releases during its manufacture and handling are not available. Occupational workers and home gardeners may be exposed to glyphosate by inhalation and dermal contact during spraying, mixing, and cleanup. They may also be exposed by touching soil and plants to which glyphosate was  applied. Occupational exposure may also occur during glyphosate's manufacture, transport storage, and disposal.

83.     In 1995, the Northwest Coalition for Alternatives to Pesticides reported that in California, the state with the most comprehensive program for reporting of pesticide-caused illness, glyphosate was the third most commonly-reported cause of pesticide illness among agricultural workers.

**H.     Recent Worldwide Bans on Glyphosate/Roundup®**

21

84.     Several countries around the world have instituted bans on the sale of Roundup and other glyphosate-containing herbicides, both before and since IARC first announced its assessment for glyphosate in March 2015, and more countries undoubtedly will follow suit as the dangers of the use of Roundup are more widely known. The Netherlands issued a ban on all glyphosate-based herbicides in April 2014, including Roundup, which took effect by the end of 2015. In issuing the ban, the Dutch Parliament member who introduced the successful legislation stated: "Agricultural pesticides in user-friendly packaging are sold in abundance to private persons. In garden centers, Roundup is promoted as harmless, but unsuspecting customers have no idea what the risks of this product are. Especially children are sensitive to toxic substances and should therefore not be exposed to it."

85.     The Brazilian Public Prosecutor in the Federal District requested that the Brazilian Justice Department suspend the use of glyphosate.

86.     France banned the private sale of Roundup and glyphosate following the IARC assessment for Glyphosate.

87.     Bermuda banned both the private and commercial sale of glyphosates, including Roundup. The Bermuda government explained its ban as follows: "Following a recent scientific study carried out by a leading cancer agency, the importation of weed spray 'Roundup' has been suspended."

22

88.     The Sri Lankan government banned the private and commercial use of glyphosates, particularly out of concern that glyphosate has been linked to fatal kidney disease in agricultural workers.

89.     The government of Colombia announced its ban on using Roundup and glyphosate to destroy illegal plantations of coca, the raw ingredient for cocaine, because of the WHO's finding that glyphosate is probably carcinogenic.

90.     Despite numerous scientific findings from around the world demonstrating the highly-carcinogenic nature of Roundup and its main active ingredient, glyphosate, MONSANTO knowingly and willfully misrepresented Roundup as safe to humans and the environment.  MONSANTO repeatedly claimed to the world and, particularly to United States consumers, that its Roundup products pose no unreasonable risks to human health or to the environment.

## VI.     EQUITABLE TOLLING OF THE APPLICABLE STATUTE OF LIMITATIONS

91.     Plaintiffs hereby plead and invoke the "discovery rule" if necessary. Plaintiff MICHAEL GILLILAND will show that after reasonably exercising due diligence, neither he nor DANA GILLILAND learned the nature of the cause of his cancer or that such cancer was chemically-related until less than the time periods provided by the relevant statutes of limitations. Plaintiffs also specifically invoke the federally required commencement date as set forth in 42 U.S.C. § 9658 (Actions under State law for damages from exposure to hazardous substances).

92.     The running of any statute of limitations has been tolled by reason of the Defendant's fraudulent concealment. Defendant, through its affirmative misrepresentations and omissions, actively concealed from Plaintiffs the true risks associated with Roundup and glyphosate.

93.     At all times material, MONSANTO has maintained that Roundup products are safe, non-toxic, and non-carcinogenic.

94.     Indeed, even as recent as December 2019, MONSANTO continues to represent to the public that "regulatory authorities around the world have comprehensively and routinely reviewed glyphosate and glyphosate-based herbicides for more than 40 years and their conclusions consistently support the safety of glyphosate and glyphosate-based herbicides when used as directed." *See* Figure 1, below.



***



Figure 1. Source: https://www.bayer.com/en/glyphosate/is-glyphosate-safe (last visited Feb. 1, 2021).

95.     As a result of the Defendant's actions, Plaintiffs were unaware, and could not reasonably know or have learned through reasonable diligence that Roundup and/or glyphosate contact, exposed MICHAEL GILLILAND to the risks alleged herein and that those risks were the direct and proximate result of the Defendant's acts and omissions.

96.     Furthermore, the Defendant is estopped from relying on any statute of limitations because of its fraudulent concealment of the true character, quality and nature of Roundup. Defendant was under a duty to disclose the true character, quality, and nature of Roundup because this was non-public information over which Defendant had and continues to have exclusive control, and because Defendant knew that this information was not available to the Plaintiffs or MICHAEL GILLILAND. In addition,

25

Defendant is estopped from relying on any statute of limitations because of its intentional concealment of these facts.

97.     Plaintiffs had no knowledge that Defendant was engaged in the wrongdoing alleged herein. Because of the fraudulent acts of concealment of wrongdoing by the Defendant, Plaintiffs MICHAEL GILLILAND or DANA GILLILAND could not have reasonably discovered the wrongdoing at any time prior.

98.     Also, the economics of this fraud should be considered. Defendant had the ability to and did spend enormous amounts of money in furtherance of its purpose of marketing, promoting and/or distributing a profitable herbicide, notwithstanding the known or reasonably known risks.

99.     Plaintiffs and medical professionals could not have afforded and could not have possibly conducted studies to determine the nature, extent, and identity of related health risks, and were forced to rely on only the Defendant's representations.

100.    Accordingly, Defendant is precluded by the discovery rule and/or the doctrine of fraudulent concealment from relying upon any statute of limitations.

### VII.    CAUSES OF ACTION

### COUNT I
### NEGLIGENCE

Plaintiffs adopt, reallege, and incorporate the allegations in paragraphs 1 through 100 above, and further allege the following:

26

101. Defendant MONSANTO, directly or indirectly, caused Roundup products to be sold, distributed, packaged, designed, labeled, marketed, promoted, and/or used by consumers, including MICHAEL GILLILAND.

102. At all times relevant to this litigation, Defendant MONSANTO, by and through its agents, employees, representatives and/or others over whom it exercised control, including its predecessor(s) and/or subsidiaries, had a duty to exercise reasonable care in the design, research, manufacture, marketing, advertisement, supply, promotion, packaging, sale, and distribution of Roundup products, including the duty to take all reasonable steps necessary to manufacture, promote, and/or sell a product that was not unreasonably dangerous to consumers and users of the product.

103. At all times material, Defendant MONSANTO had a duty to exercise reasonable care in the marketing, advertisement, and sale of the Roundup products. MONSANTO's duty of care owed to consumers and the general public included providing accurate, true, and correct information concerning the risks of using Roundup and appropriate, complete, and accurate warnings concerning the potential adverse effects of exposure to Roundup, and, in particular, its active ingredient glyphosate.

104. At all times relevant to this litigation, Defendant MONSANTO knew or, in the exercise of reasonable care, should have known of the hazards and dangers of Roundup and specifically, the carcinogenic properties of the chemical glyphosate.

105. Accordingly, at all times material, Defendant MONSANTO knew or, in the exercise of reasonable care, should have known that use of or exposure to its

27

Roundup products could cause or be associated with MICHAEL GILLILAND's injuries and thus created a dangerous and unreasonable risk of injury to the users of these products, including to MICHAEL GILLILAND.

106.    Defendant MONSANTO also knew or, in the exercise of reasonable care, should have known that users and consumers of Roundup were unaware of the risks and the magnitude of the risks associated with use of and/or exposure to Roundup and glyphosate-containing products.

107.    As such, Defendant MONSANTO breached the duty of reasonable care and failed to exercise ordinary care in the design, research, development, manufacture, testing, marketing, supply, promotion, advertisement, packaging, sale, and distribution of its Roundup products, in that MONSANTO manufactured, marketed, promoted, and sold defective herbicides containing the chemical glyphosate, knew or had reason to know of the defects inherent in these products, knew or had reason to know that a user's or consumer's exposure to the products created a significant risk of harm and unreasonably dangerous side effects, and failed to prevent or adequately warn of these risks and injuries.

108.    Despite an ability and means to investigate, study, and test these products and to provide adequate warnings, Defendant MONSANTO failed to do so. Indeed, MONSANTO has wrongfully concealed information and has further made false and/or misleading statements concerning the safety and/or exposure to Roundup and glyphosate.

28

109. At all times material, Defendant MONSANTO, by and through its agents, servants, or employees, breached its duty of care and acted in a careless and negligent manner through the following acts of omission or commission:

a. Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing Roundup products without thorough and adequate pre- and post-market testing;

b. Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing Roundup while negligently and/or intentionally concealing and failing to disclose the results of trials, tests, and studies of exposure to glyphosate, and, consequently, the risk of serious harm associated with human use of and exposure to Roundup;

c. Failing to undertake sufficient studies and conduct necessary tests to determine whether or not Roundup products and glyphosate-containing products were safe for their intended use in agriculture and horticulture;

d. Failing to use reasonable and prudent care in the design, research, manufacture, and development of Roundup products so as to avoid the risk of serious harm associated with the prevalent use of Roundup/glyphosate as an herbicide;

e. Failing to design and manufacture Roundup products so as to ensure they were at least as safe and effective as other herbicides on the market;

f. Failing to provide adequate instructions, guidelines, and safety precautions to those persons who Defendant could reasonably foresee would use and be exposed to its Roundup products;

g. Failing to disclose to Plaintiff, users/consumers, and the general public that use of and exposure to Roundup presented severe risks of cancer and other grave illnesses;

29

h. Failing to warn Plaintiff, users/consumers, and the general public that the product's risk of harm was unreasonable and that there were safer and effective alternative herbicides available to Plaintiff and other consumers;

i. Systematically suppressing or downplaying contrary evidence about the risks, incidence, and prevalence of the side effects of Roundup and glyphosate-containing products;

j. Representing that its Roundup products were safe for their intended use when, in fact, Defendant knew or should have known that the products were not safe for their intended purpose;

k. Declining to make or propose any changes to Roundup products' labeling or other promotional materials that would alert the consumers and the general public of the risks of Roundup and glyphosate;

l. Advertising, marketing, and recommending the use of the Roundup products, while concealing and failing to disclose or warn of the dangers known by Defendant to be associated with or caused by the use of or exposure to Roundup and glyphosate;

m. Continuing to disseminate information to its consumers, which indicate or imply that Defendant's Roundup products are not unsafe for use in the agricultural and horticultural industries; and

n. Continuing the manufacture and sale of its products with the knowledge that the products were unreasonably unsafe and dangerous.

110. Defendant MONSANTO knew and/or should have known that it was foreseeable that consumers, such as MICHAEL GILLILAND, would suffer injuries as

30

a result of MONSANTO's failure to exercise ordinary care in the manufacturing, marketing, promotion, labeling, distribution, and sale of Roundup.

111.   MICHAEL GILLILAND did not know the nature and extent of the injuries that could result from the intended use of and/or exposure to Roundup or its active ingredient glyphosate.

112.   Defendant MONSANTO's negligence was the proximate cause of the injuries, harm, and economic losses that MICHAEL GILLILAND suffered, as described herein.

113.   Defendant MONSANTO's conduct, as described above, was reckless. MONSANTO regularly risked the lives of consumers and users of its products, including MICHAEL GILLILAND, with full knowledge of the dangers of these products. Defendant MONSANTO has made conscious decisions not to redesign, re-label, warn, or inform the unsuspecting public, including warning MICHAEL GILLILAND.

114.   As a direct and proximate result of Defendant MONSANTO's negligent acts and/or omissions in placing defective Roundup products into the stream of commerce without adequate warnings of the hazardous and carcinogenic nature of glyphosate, MICHAEL GILLILAND contracted non-Hodgkin's lymphoma.

115.   As a direct and proximate result of the Defendant MONSANTO's negligent acts and/or omissions described in this Count, MICHAEL GILLILAND contracted non-Hodgkin's lymphoma and has suffered significant bodily injury and resulting pain and suffering, disability, mental anguish, loss of capacity for the

31

enjoyment of life, embarrassment, inconvenience, expense of hospitalization, medical and nursing care and treatment, loss of earnings, and loss of ability to earn money.

WHEREFORE, Plaintiffs, MICHAEL GILLILAND and DANA GILLILAND, respectfully request that this Court enter judgment in their favor for compensatory and punitive damages, together with interest, costs herein incurred, attorney's fees and all relief as this Court deems just and proper.

**COUNT II**
**STRICT LIABILITY**
**(Design Defect)**

Plaintiffs adopt, reallege, and incorporate the allegations in paragraphs 1 through 100 above, and further allege the following:

116. Plaintiffs bring this strict liability claim against Defendant MONSANTO for defective design.

117. At all times material, Defendant MONSANTO engaged in the business of testing, developing, manufacturing, selling, distributing, marketing, packaging, design, and promotion of Roundup products, which are defective and unreasonably dangerous to consumers, including MICHAEL GILLILAND, thereby placing Roundup products into the stream of commerce. These actions were under the ultimate control and supervision of Defendant MONSANTO. At all times relevant to this litigation, Defendant MONSANTO designed, researched, developed, manufactured, produced, tested, assembled, labeled, advertised, promoted, marketed, sold, and distributed the Roundup products used by MICHAEL GILLILAND, as described above.

118. At all times material, Roundup products were manufactured, designed, and labeled in an unsafe, defective, and inherently dangerous manner that was dangerous for use by or exposure to the public, and, in particular to MICHAEL GILLILAND.

119. At all times relevant to this litigation, Roundup products reached the intended consumers, handlers, and users or other persons coming into contact with these products in Arizona and throughout the United States, including MICHAEL GILLILAND, without substantial change in their condition as designed, manufactured, sold, distributed, labeled, and marketed by Defendant MONSANTO.

120. Roundup products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold, and marketed by Defendant MONSANTO were defective in design and formulation in that when they left the hands of the manufacturers and/or suppliers, they were unreasonably dangerous and dangerous to an extent beyond that which an ordinary consumer would contemplate.

121. Roundup products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold, and marketed by Defendant MONSANTO were defective in design and formulation in that when they left the hands of the manufacturers and/or suppliers, the foreseeable risks exceeded the alleged benefits associated with their design and formulation.

122. At all times relevant to this action, Defendant MONSANTO knew or had reason to know that Roundup products were defective and were inherently dangerous and unsafe when used in the manner instructed and provided by Defendant

33

MONSANTO. Therefore, at all times relevant to this litigation, Roundup products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold, and marketed by Defendant MONSANTO were defective in design and formulation, in one or more of the following ways:

    a.    When placed in the stream of commerce, Roundup products were defective in design and formulation, and, consequently, dangerous to an extent beyond that which an ordinary consumer would contemplate;

    b.    When placed in the stream of commerce, Roundup products were unreasonably dangerous in that they were hazardous and posed a grave risk of cancer and other serious illnesses when used in a reasonably anticipated manner;

    c.    When placed in the stream of commerce, Roundup products contained unreasonably dangerous design defects and were not reasonably safe when used in a reasonably anticipated or intended manner;

    d.    Defendant did not sufficiently test, investigate, or study Roundup products and, specifically, the active ingredient glyphosate;

    e.    Exposure to Roundup and glyphosate-containing products presents a risk of harmful side effects that outweigh any potential utility stemming from the use of the herbicide;

    f.    At the time of marketing its Roundup products, Roundup was defective in that exposure to Roundup and specifically, its active ingredient glyphosate, could result in cancer and other severe illnesses and injuries and/or death;

    g.    Defendant did not conduct adequate post-marketing surveillance of their Roundup products; and

34

h.  Defendant could have employed safer alternative designs and formulations.

123.  MICHAEL GILLILAND was exposed to Roundup products in the course of his personal use, as described above, without knowledge of their dangerous characteristics.

124.  At all times relevant to this litigation, MICHAEL GILLILAND used and/or was exposed to the use of Roundup products in an intended or reasonably foreseeable manner without knowledge of their dangerous characteristics.

125.  MICHAEL GILLILAND could not have reasonably discovered the defects and risks associated with Roundup or glyphosate-containing products before or at the time of exposure.

126.  The harm caused by Roundup products far outweighed their benefit, rendering these products dangerous to an extent beyond that which an ordinary consumer would contemplate. Roundup products were and are more dangerous than alternative products and Defendant MONSANTO could have designed Roundup products (including their packaging and sales aids) to make them less dangerous. Indeed, at the time that Defendant MONSANTO designed Roundup products, the state of the industry's scientific knowledge was such that a less risky design or formulation was attainable.

127.  At the time Roundup products left Defendant MONSANTO's control there was a practical, technically feasible and safer alternative design that would have

35

prevented the harm without substantially impairing the reasonably anticipated or intended function of those herbicides.

128. Defendant MONSANTO's defective design of Roundup products was willful, wanton, fraudulent, malicious, and conducted with reckless disregard for the health and safety of users of the Roundup products, including MICHAEL GILLILAND.

129. Therefore, as a result of the unreasonably dangerous condition of its Roundup products, Defendant MONSANTO is strictly liable to Plaintiffs.

130. The defects in Roundup products caused or contributed to cause MICHAEL GILLILAND's non-Hodgkin's lymphoma, and, but for Defendant MONSANTO's misconduct and omissions, MICHAEL GILLILAND would not have sustained his injuries.

131. Defendant MONSANTO's conduct, as described above, was reckless. Defendant risked the lives of consumers and users of its products, including MICHAEL GILLILAND, with knowledge of the safety problems associated with Roundup and glyphosate-containing products, and suppressed this knowledge from the general public. Defendant MONSANTO made conscious decisions not to redesign, warn, or inform the unsuspecting public.

132. As a direct and proximate result of the Defendant MONSANTO's wrongful acts and/or omissions described in this Count, MICHAEL GILLILAND contracted non-Hodgkin's lymphoma and has suffered significant bodily injury and resulting pain and suffering, disability, mental anguish, loss of capacity for the

36

enjoyment of life, embarrassment, inconvenience, expense of hospitalization, medical and nursing care and treatment, loss of earnings, and loss of ability to earn money.

WHEREFORE, Plaintiffs, MICHAEL GILLILAND and DANA GILLILAND, respectfully request that this Court enter judgment in their favor for compensatory and punitive damages, together with interest, costs herein incurred, attorney's fees and all relief as this Court deems just and proper.

### COUNT III
### STRICT LIABILITY
### (Failure to Warn)

Plaintiffs adopt, reallege, and incorporate the allegations in paragraphs 1 through 100 above, and further allege the following:

133. Plaintiffs bring this strict liability claim against Defendant MONSANTO for failure to warn.

134. At all times material, Defendant MONSANTO engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting Roundup products, which are defective and unreasonably dangerous to consumers, including MICHAEL GILLILAND, because they do not contain adequate warnings or instructions concerning the dangerous characteristics of Roundup and, specifically, the active ingredient glyphosate. These actions were under the ultimate control and supervision of the Defendant.

135. Defendant MONSANTO researched, developed, designed, tested, manufactured, inspected, labeled, distributed, marketed, promoted, sold, and otherwise

released into the stream of commerce Roundup products, and in the course of same, directly advertised or marketed the products to consumers and end users, including MICHAEL GILLILAND, and therefore had a duty to warn of the risks associated with the use of Roundup and glyphosate-containing products.

136.    At all times material, Defendant MONSANTO had a duty to properly test, develop, design, manufacture, inspect, package, label, market, promote, sell, distribute, maintain supply, provide proper warnings, and take such steps as necessary to ensure that Roundup products did not cause users and consumers to suffer from unreasonable and dangerous risks. Defendant MONSANTO had a continuing duty to warn MICHAEL GILLILAND of the dangers associated with Roundup use and exposure. Defendant MONSANTO, as manufacturer, seller, promoter, marketer, or distributor of chemical herbicides is held to the knowledge of an expert in the field.

137.    At the time of manufacture, Defendant MONSANTO could have provided the warnings or instructions regarding the full and complete risks of Roundup and glyphosate-containing products because it knew or should have known of the unreasonable risks of harm associated with the use of and/or exposure to such products.

138.    At all times material, Defendant MONSANTO failed to investigate, study, test, or promote the safety or to minimize the dangers to users and consumers of its product and to those who would foreseeably use or be harmed by these herbicides, including MICHAEL GILLILAND.

139.    Despite the fact that Defendant MONSANTO knew or should have known that Roundup posed a grave risk of harm, they failed to exercise reasonable care to warn of the dangerous risks associated with use and exposure. The dangerous propensities of these products and the carcinogenic characteristics of glyphosate, as described above, were known to Defendant MONSANTO or scientifically knowable to Defendant through appropriate research and testing by known methods, at the time they distributed, marketed, promoted, supplied, or sold the product, and not known to end users and consumers, such as MICHAEL GILLILAND.

140.    These products created significant risks of serious bodily harm to consumers, as alleged herein, and Defendant MONSANTO failed to adequately warn consumers and reasonably foreseeable users of the risks of exposure to its products. Defendant MONSANTO has wrongfully concealed information concerning the dangerous nature of Roundup and its active ingredient glyphosate, and further made false and/or misleading statements concerning the safety of Roundup and glyphosate.

141.    At all times material, Roundup products reached the intended consumers, handlers, and users or other persons coming into contact with these products in Arizona and throughout the United States, including MICHAEL GILLILAND, without substantial change in their condition as designed, manufactured, sold, distributed, labeled, promoted, and marketed by Defendant MONSANTO.

142.    MICHAEL GILLILAND was exposed to Roundup products in the course of his personal use of Roundup without knowledge of its dangerous characteristics.

143.   At all times relevant to this litigation, MICHAEL GILLILAND used and/or was exposed to the use of Roundup products in their intended or reasonably foreseeable manner without knowledge of their dangerous characteristics.

144.   MICHAEL GILLILAND nor DANA GILLILAND could have reasonably discovered the defects and risks associated with Roundup or glyphosate-containing products prior to or at the time of MICHAEL GILLILAND's exposure. MICHAEL GILLILAND relied upon the skill, superior knowledge, and judgment of Defendant MONSANTO.

145.   These products were defective because the minimal warnings disseminated with Roundup products were inadequate, and they failed to communicate adequate information on the dangers and safe use/exposure and failed to communicate warnings and instructions that were appropriate and adequate to render the products safe for their ordinary, intended, and reasonably foreseeable uses, including agricultural and landscaping applications.

146.   The information that Defendant MONSANTO did provide or communicate failed to contain relevant warnings, hazards, and precautions that would have enabled consumers such as MICHAEL GILLILAND to utilize the products safely and with adequate protection. Instead, Defendant MONSANTO disseminated information that was inaccurate, false, and misleading and which failed to communicate accurately or adequately the comparative severity, duration, and extent of the risk of injuries with use of and/or exposure to Roundup and glyphosate; continued to

40

aggressively promote the efficacy of its products, even after it knew or should have known of the unreasonable risks from use or exposure; and concealed, downplayed, or otherwise suppressed, through aggressive marketing and promotion, any information or research about the risks and dangers of exposure to Roundup and glyphosate.

147.   To this day, Defendant MONSANTO has failed to adequately and accurately warn of the true risks of MICHAEL GILLILAND's injuries associated with the use of and exposure to Roundup and its active ingredient glyphosate, a probable carcinogen.

148.   As a result of their inadequate warnings, Roundup products were defective and unreasonably dangerous when they left the possession and/or control of Defendant MONSANTO, were distributed, marketed, and promoted by Defendant MONSANTO and used by MICHAEL GILLILAND in his personal use.

149.   Defendant MONSANTO is liable to Plaintiffs for MICHAEL GILLILAND's injuries caused by its negligent or willful failure, as described above, to provide adequate warnings or other clinically relevant information and data regarding the appropriate use of these products and the risks associated with the use of or exposure to Roundup and glyphosate.

150.   The defects in Roundup products caused or contributed to cause MICHAEL GILLILAND's injuries and, but for this misconduct and omissions, MICHAEL GILLILAND would not have sustained his injuries.

41

151. Moreover, had Defendant MONSANTO provided adequate warnings and instructions and properly disclosed and disseminated the risks associated with Roundup products, MICHAEL GILLILAND could have avoided the risk of developing injuries as alleged herein.

152. As a direct and proximate result of Defendant MONSANTO placing defective Roundup products into the stream of commerce and engaging in the acts and/or omissions described in this Count, MICHAEL GILLILAND contracted non-Hodgkin's lymphoma and has suffered significant bodily injury and resulting pain and suffering, disability, mental anguish, loss of capacity for the enjoyment of life, embarrassment, inconvenience, expense of hospitalization, medical and nursing care and treatment, loss of earnings, and loss of ability to earn money.

WHEREFORE, Plaintiffs, MICHAEL GILLILAND and DANA GILLILAND, respectfully request that this Court enter judgment in their favor for compensatory and punitive damages, together with interest, costs herein incurred, attorney's fees and all relief as this Court deems just and proper.

## COUNT IV
## FRAUDULENT CONCEALMENT

Plaintiffs adopt, reallege, and incorporate the allegations in paragraphs 1 through 100 above, and further allege the following:

153. Defendant MONSANTO fraudulently, intentionally, and/or negligently misrepresented to the public, and to Plaintiff MICHAEL GILLILAND both directly and by and through the media, the scientific literature and purported "community outreach"

42

programs, the safety of Roundup products, and/or fraudulently, intentionally, and/or negligently concealed, suppressed, or omitted material, adverse information regarding the safety of Roundup.

154. The intentional and/or negligent misrepresentations and omissions of Defendant MONSANTO regarding the safety of Roundup products were communicated to MICHAEL GILLILAND directly through ghostwritten articles, editorials, national and regional advertising, marketing and promotion efforts, as well as the packaging and sales aids. The safety of Roundup products was also intentionally and/or negligently misrepresented to MICHAEL GILLILAND and the public with the intent that such misrepresentations would cause MICHAEL GILLILAND and other potential consumers to purchase and use or continue to purchase and use Roundup products.

155. Defendant MONSANTO either knew or should have known of the material representations they were making regarding the safety and relative utility of Roundup products.

156. Defendant MONSANTO fraudulently, intentionally, and/or negligently made the misrepresentations and/or actively concealed, suppressed, or omitted this material information with the specific desire to induce MICHAEL GILLILAND, and the consuming public to purchase and use Roundup products. Defendants fraudulently, intentionally, and/or negligently, knew or should have known that MICHAEL GILLILAND and the consuming public would rely on such material misrepresentations and/or omissions in selecting and applying Roundup products. Defendants knew or

43

should have known that MICHAEL GILLILAND would rely on their false representations and omissions.

157. Defendant made these misrepresentations and actively concealed adverse information including the risk of non-Hodgkin's lymphoma, at a time when, their agents and/or employees knew or should have known, the product had defects, dangers, and characteristics that were other than what was represented to the consuming public. Specifically, Defendant MONSANTO misrepresented and actively concealed, suppressed, and omitted that there had been inadequate testing of the safety and efficacy of Roundup and that prior studies, research, reports, and/or testing had been conducted linking the use of the drug with serious health events, including non-Hodgkin's lymphoma.

158. Despite the fact that Defendant MONSANTO knew or should have known of reports of severe risks including non-Hodgkin's lymphoma, with Roundup use and exposure, this information was strategically minimized, understated, or omitted in order to create the impression that the human dangers of Roundup were nonexistent, particularly in light of its purported utility.

159. The fraudulent, intentional and/or negligent material misrepresentations and/or active concealment, suppression, and omissions by Defendant was perpetuated directly and/or indirectly through the advertisements, packaging, sales aids, furtive public relations efforts, and other marketing and promotional pieces authored, analyzed, created, compiled, designed, drafted, disseminated, distributed, edited, evaluated,

44

marketed, published, and supplied by Defendant. If MICHAEL GILLILAND had known the true facts concerning the risks associated with Roundup exposure, he would have used a safer alternative.

160.    MICHAEL GILLILAND's reliance upon the material misrepresentations and omissions was justified, among other reasons, because said misrepresentations and omissions were made by individuals and entities who were in a position to know the true facts concerning Roundup while MICHAEL GILLILAND was not in a position to know the true facts because Defendant overstated the benefits and safety of Roundup and downplayed the risk of lymphoma, thereby inducing MICHAEL GILLILAND to use the herbicide rather than safer alternatives.

161.    As a direct and proximate result of Defendant MONSANTO's actions and inactions, MICHAEL GILLILAND was exposed to Roundup, contracted non-Hodgkin's lymphoma and has suffered significant bodily injury and resulting pain and suffering, disability, mental anguish, loss of capacity for the enjoyment of life, embarrassment, inconvenience, expense of hospitalization, medical and nursing care and treatment, loss of earnings, and loss of ability to earn money.

WHEREFORE, Plaintiffs, MICHAEL GILLILAND and DANA GILLILAND, respectfully request that this Court enter judgment in their favor for compensatory and punitive damages, together with interest, costs herein incurred, attorney's fees and all relief as this Court deems just and proper.

## COUNT V
## BREACH OF EXPRESS WARRANTY

45

Plaintiffs adopt, reallege, and incorporate the allegations in paragraphs 1 through 100 above, and further allege the following:

162. Defendant made several express warranties regarding Roundup.

163. These representations and promises became part of the basis of the bargain between the parties and created a collective "express warranty" that Roundup would conform to Defendant's affirmations and promises.

164. Defendant knew or should have known that Roundup® was susceptible to causing non-Hodgkin's lymphoma for those exposed to Roundup.

165. Defendant has breached the express warranty.

166. Defendant's conduct described in this Complaint constitutes a breach of express warranties under Ariz. Rev. Stat. § 47-2313 (2020).

167. MICHAEL GILLILAND complied with the warranty terms, including application instructions and maintaining residence in his home.

168. As a direct and proximate result of Defendant MONSANTO's breach of express warranty, MICHAEL GILLILAND was exposed to Roundup, contracted non-Hodgkin's lymphoma and has suffered significant bodily injury and resulting pain and suffering, disability, mental anguish, loss of capacity for the enjoyment of life, embarrassment, inconvenience, expense of hospitalization, medical and nursing care and treatment, loss of earnings, and loss of ability to earn money.

WHEREFORE, Plaintiffs, MICHAEL GILLILAND and DANA GILLILAND, respectfully request that this Court enter judgment in their favor for compensatory and

46

punitive damages, together with interest, costs herein incurred, attorney's fees and all relief as this Court deems just and proper.

## COUNT VI
## BREACH OF IMPLIED WARRANTY

Plaintiffs adopt, reallege, and incorporate the allegations in paragraphs 1 through 100 above, and further allege the following:

169.    Defendant is in the business of manufacturing, designing, supplying, marketing, advertising, warranting, and selling Roundup, which has been used as a weed killer. Defendant impliedly warranted to MICHAEL GILLILAND that Roundup was of a certain quality, was free from defects, and was fit for its ordinary purpose.

170.    Roundup was unfit for its ordinary use and was not of merchantable quality, as warranted by Defendant, because it was defective and studies show that it increases the risk of non-Hodgkin's lymphoma. Prior to purchase, MICHAEL GILLILAND could not have readily discovered that the product was not fit for its ordinary purpose and would potentially cause non-Hodgkin's lymphoma.

171.    Roundup was similarly unfit for its particular purpose.

172.    Defendant has not sufficiently disclaimed the implied warranty of merchantability (specifically and conspicuously) or the implied warranty of fitness (in writing and conspicuously). Further, the purported limitations in the warranty, including limiting the "exclusive remedy" to a refund or replacement, are procedurally and substantively unconscionable.

47

173.    Defendant was in privity with MICHAEL GILLILAND by law and/or by fact. First, MICHAEL GILLILAND had sufficient direct dealings with Defendant and/or its authorized dealers, franchisees, representatives, and agents to establish privity of contract. Alternatively, MICHAEL GILLILAND was the intended third-party beneficiary of contracts, including express warranties, amongst Defendant and its dealers, franchisees, representatives and agents; Defendant's advertisements were aimed at MICHAEL GILLILAND, and Defendant's warranties were expressly written for the benefit of MICHAEL GILLILAND as an end user of Roundup. Defendant's authorized dealers, franchisees, representatives, and agents, on the other hand, were not intended to be the ultimate consumers of Roundup and have no rights under the warranty agreements provided by Defendant; these intermediary entities made no changes to Defendant's product, nor made any additions to the warranties issued by Defendant. Further, Defendant is estopped from limiting claims for common law and statutory violations based on a defense of lack of privity.

174.    Defendant's conduct described in this Complaint constitutes a breach of implied warranty under Ariz. Rev. Stat. § 47-2315 et seq. (2020).

175.    Actual and/or constructive notice was duly given to Defendant of the breach of the warranty, and Defendant has failed to cure.

176.    As a direct and proximate result of Defendant MONSANTO's breach of implied warranty, MICHAEL GILLILAND was exposed to Roundup, contracted non-Hodgkin's lymphoma and has suffered significant bodily injury and resulting pain and

48

suffering, disability, mental anguish, loss of capacity for the enjoyment of life, embarrassment, inconvenience, expense of hospitalization, medical and nursing care and treatment, loss of earnings, and loss of ability to earn money.

WHEREFORE, Plaintiffs, MICHAEL GILLILAND and DANA GILLILAND, respectfully request that this Court enter judgment in their favor for compensatory and punitive damages, together with interest, costs herein incurred, attorney's fees and all relief as this Court deems just and proper.

## COUNT VII
## VIOLATION OF ARIZONA CONSUMER FRAUD ACT

Plaintiffs adopt, reallege, and incorporate the allegations in paragraphs 1 through 100 above, and further allege the following:

177.   Defendant has violated the Arizona Consumer Fraud Act by engaging in unfair methods of competition and unfair, deceptive, fraudulent, unconscionable and/or unlawful acts or practices, including without limitation, by defective design and manufacture of Roundup as well as misleading marketing, advertising, selling, and warranting of Roundup to consumers. In connection with these sales, Defendant omitted material information about Roundup that it was legally obligated to disclose. Defendant never informed MICHAEL GILLILAND, at the point of sale or otherwise, that Roundup was linked to non-Hodgkin's lymphoma, and failed to disclose this information in a timely manner.

178.   Among other things, Defendant made numerous deceptive statements regarding Roundup.

49

179.    Through its conduct, Defendant has violated the Arizona Consumer Fraud Act prohibiting unfair act or practice, fraud, false pretense, false promise, misrepresentation, or concealment, suppression or omission of any material fact with intent that others rely on such concealment suppression or omission, in connection with the sale or advertisement of any merchandise whether or not any person has in fact been misled, deceived or damaged, codified in Ariz. Rev. Stat. § 44-1522 et seq. (2020).

180.    As a direct and proximate result of Defendant MONSANTO's violation of Arizona laws, MICHAEL GILLILAND was exposed to Roundup, contracted non-Hodgkin's lymphoma and has suffered significant bodily injury and resulting pain and suffering, disability, mental anguish, loss of capacity for the enjoyment of life, embarrassment, inconvenience, expense of hospitalization, medical and nursing care and treatment, loss of earnings, and loss of ability to earn money.

WHEREFORE, Plaintiffs, MICHAEL GILLILAND and DANA GILLILAND, respectfully request that this Court enter judgment in their favor for compensatory and punitive damages, together with interest, costs herein incurred, attorney's fees and all relief as this Court deems just and proper.

**COUNT VIII**
**LOSS OF CONSORTIUM ON BEHALF OF DANA GILLILAND**

Plaintiffs adopt, reallege, and incorporate the allegations in paragraphs 1 through 100 above, and further allege the following:

181.    As a direct and proximate result of all of the foregoing allegations and injuries, MICHAEL GILLILAND's wife, DANA GILLILAND, has suffered and will

50

continue to suffer from the loss of her husband's services, his support, income, consortium and the care and comfort of his society; and due to the injuries and disabilities suffered by MICHAEL GILLILAND as alleged herein, Plaintiff's spouse has also incurred expenses for medical attention rendered to her husband.

WHEREFORE, Plaintiff, DANA GILLILAND, respectfully requests that this Court enter in her favor for compensatory and punitive damages, together with interest, costs herein incurred, attorney's fees and all relief as this Court deems just and proper.

## VIII.  DEMAND FOR JURY TRIAL

182.    Plaintiffs, MICHAEL GILLILAND and DANA GILLILAND, demand a trial by jury of all issues so triable as a matter of right.

DATED: this 8th day of April, 2021.

PLATTNER VERDERAME, PC

By:  */s/ Nicholas Verderame*
Nicholas A. Verderame
316 E. Flower Street
Phoenix, Arizona 85012
*Attorneys for Plaintiff*

51