# United States District Court
## District of Massachusetts (Boston)
## CIVIL DOCKET FOR CASE #: 1:21-cv-10284-LTS

Medugno et al v. Monsanto Company
Assigned to: District Judge Leo T. Sorokin
Cause: 28:1332 Diversity-Personal Injury

Date Filed: 02/19/2021
Jury Demand: Plaintiff
Nature of Suit: 365 Personal Inj. Prod. Liability
Jurisdiction: Diversity

**Plaintiff**

**Henry Medugno**                    represented by    **David C. Strouss**
Thornton Law Firm LLP
One Lincoln Street, 25th Flr.
100 Summer Street
Boston, MA 02111
617-720-1333
Fax: 617-720-2445
Email: dstrouss@tenlaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Marlene Medugno**                  represented by    **David C. Strouss**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Monsanto Company**

| Date Filed | # | Docket Text |
|---|---|---|
| 02/19/2021 | 1 | COMPLAINT against All Defendants Filing fee: $ 402, receipt number 0101-8643678 (Fee Status: Filing Fee paid), filed by Henry Medugno, Marlene Medugno. (Attachments: # 1 Civil Cover Sheet, # 2 Category Form)(Strouss, David) (Entered: 02/19/2021) |
| 02/19/2021 | 2 | ELECTRONIC NOTICE of Case Assignment. District Judge Leo T. Sorokin assigned to case. If the trial Judge issues an Order of Reference of any matter in this case to a Magistrate Judge, the matter will be transmitted to Magistrate Judge M. Page Kelley. (Finn, Mary) (Entered: 02/19/2021) |
| 02/19/2021 | 3 | Summons Issued as to Monsanto Company. **Counsel receiving this notice electronically should download this summons, complete one for each** |

| | | |
|---|---|---|
| | | **defendant and serve it in accordance with Fed.R.Civ.P. 4 and LR 4.1. Summons will be mailed to plaintiff(s) not receiving notice electronically for completion of service.** (Baker, Casey) (Entered: 02/19/2021) |
| 02/22/2021 | 4 | Set Deadlines: Proof Service due by 5/20/2021. (Simeone, Maria) (Entered: 02/22/2021) |
| 04/23/2021 | 5 | AMENDED COMPLAINT against All Defendants, filed by Henry Medugno, Marlene Medugno. (Attachments: # 1 Exhibit 1 - Demand Letter, # 2 Exhibit 2 - Response to Demand Letter)(Strouss, David) (Entered: 04/23/2021) |
| 05/03/2021 | 6 | SUMMONS Returned Executed Monsanto Company served on 5/3/2021, answer due 5/24/2021. (Strouss, David) (Entered: 05/03/2021) |

| PACER Service Center | | |
|---|---|---|
| **Transaction Receipt** | | |
| 05/06/2021 10:59:52 | | |
| **PACER Login:** | sh0019sh:2634072:0 | **Client Code:** 31943.356965 |
| **Description:** | Docket Report | **Search Criteria:** 1:21-cv-10284-LTS |
| **Billable Pages:** | 1 | **Cost:** 0.10 |



# Notice of Service of Process

**null / ALL**
**Transmittal Number: 23143534**
**Date Processed: 05/03/2021**

**Primary Contact:**   Anne Troupis (Monsanto)
Bayer U.S. LLC
800 N Lindbergh Blvd
Saint Louis, MO 63167-1000

| | |
|---|---|
| **Entity:** | Monsanto Company |
| | Entity ID Number  2282193 |
| **Entity Served:** | Monsanto Company |
| **Title of Action:** | Medugno, Henry  vs. Monsanto Company |
| **Matter Name/ID:** | Medugno, Henry - Roundup Claim  (IARC) (Glyphosate) (11029919) |
| **Document(s) Type:** | Summons/Complaint |
| **Nature of Action:** | Product Liability |
| **Court/Agency:** | U.S. District Court, MA |
| **Case/Reference No:** | 1:21-cv-10284-LTS |
| **Jurisdiction Served:** | Massachusetts |
| **Date Served on CSC:** | 05/03/2021 |
| **Answer or Appearance Due:** | 21 Days |
| **Originally Served On:** | CSC |
| **How Served:** | Personal Service |
| Sender Information: | David C. Strouss |
| | 617-720-1333 |

Information contained on this transmittal form is for record keeping, notification and forwarding the attached document(s). It does not constitute a legal opinion. The recipient is responsible for interpreting the documents and taking appropriate action.

**To avoid potential delay, please do not send your response to CSC**

251 Little Falls Drive, Wilmington, Delaware 19808-1674   (888) 690-2882   |   sop@cscglobal.com

# UNITED STATES DISTRICT COURT
for the
## DISTRICT OF MASSACHUSETTS

---

**HENRY MEDUGNO, ET AL.**

---

*Plaintiff*

v.

Civil Action No.: **1:21−CV−10284−LTS**

---

**MONSANTO COMPANY**

---

*Defendant*

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*

Monsanto Company c/o/ Corporation Service Company
84 State Street
Boston, MA 02109
A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) −−− or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) −−− you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure. The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:

David C. Strouss/Evan Hoffman/Jasmine M. Howard
**THORNTON LAW FIRM LLP**
One Lincoln St., 13th Fl., State Street Financial Center, Boston, MA 02111

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.



**ROBERT M. FARRELL**

---

*CLERK OF COURT*

/s/ − **Casey Baker**

---

*Signature of Clerk or Deputy Clerk*

ISSUED ON 2021−02−19 12:58:36, Clerk USDC DMA

*Civil Cover Sheet, Complaint & 1st Amended Complaint

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| HENRY MEDUGNO and MARLENE MEDUGNO,      Plaintiffs, <br><br> v. <br><br> MONSANTO COMPANY,      Defendant. | Case No.: <br><br> **<u>JURY TRIAL DEMANDED</u>** |

## **<u>COMPLAINT</u>**

The Plaintiffs, Henry Medugno and Marlene Medugno, bring this Complaint for damages against Defendant, Monsanto Company ("Monsanto"), and allege as follows:

### **<u>NATURE OF THE CASE</u>**

1.      This case arises out of Monsanto's wrongful conduct in connection with the design, development, manufacture, testing, packaging, promoting, marketing, advertising, distribution, labeling, and sale of the herbicide Roundup, containing the active ingredient glyphosate. Glyphosate has been found to be carcinogenic, linked to causing various forms of cancer, and in particular, non-Hodgkin's Lymphoma. As such, Roundup is dangerous to human health and unfit to be marketed and sold in commerce, particularly without proper warnings and directions as to the dangers associated with its use. Plaintiff Henry Medugno, who had extensive exposure to Roundup, was diagnosed with mantle cell lymphoma, a type of non-Hodgkin's lymphoma, and he and his wife, Marlene Medugno, bring this action for the injuries and losses they have incurred.

## JURISDICTION AND VENUE

2.     This court has personal jurisdiction over Monsanto under 28 U.S.C. § 1391(c) because Monsanto transacts business in the Commonwealth of Massachusetts and is a corporation doing business within the Commonwealth of Massachusetts. Monsanto knows that its Roundup products are and were sold throughout Massachusetts, and, more specifically, caused Roundup to be sold to the Plaintiffs in Massachusetts. In addition, Monsanto maintains sufficient contacts with the Commonwealth of Massachusetts such that this Court's exercise of personal jurisdiction over it does not offend traditional notions of fair play and substantial justice.

3.     Monsanto advertises and sells goods, specifically Roundup, throughout Massachusetts. It derived substantial revenue from goods and products used in Massachusetts. It expected its acts to have consequences within Massachusetts and derived substantial revenue from interstate commerce. Specific to this case, Monsanto engaged in the business of developing, manufacturing, testing, packaging, marketing, distributing, labeling, and selling Roundup. Monsanto purposefully availed itself of the privilege of conducting activities within Massachusetts, thus invoking the benefits and protections of its laws.

4.     This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1332 because there is complete diversity of citizenship between the Plaintiffs and the Defendant. Monsanto is a citizen of Delaware (where it is incorporated) and Missouri (where it has its principal place of business). The Plaintiff is a citizen of the Commonwealth of Massachusetts, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

5.     Venue is proper in this District under 28 U.S.C. §1391(b0(2) because the Plaintiff was exposed to Roundup in this District.

6.      The Court also has supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

## PARTIES

7.      The Plaintiffs, Henry Medugno and Marlene Medugno, are natural persons and at all relevant times were residents and citizens of Revere, Massachusetts. The Plaintiffs bring this action for personal injuries sustained from exposure to Roundup, and its active ingredient glyphosate and the surfactant POEA. As a direct and proximate result of being exposed to Roundup, the Plaintiff, Henry Medugno, developed Mantle Cell Lymphoma, as well as other health problems as a result of developing NHL.

8.      Monsanto is a Delaware corporation, and it is listed as Massachusetts Secretary of State Business ID No. 356754, in "active" status, with a principle place of business in St. Louis, Missouri.

## FACTUAL ALLEGATIONS

9.      At all relevant times, Monsanto designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed the commercial herbicide Roundup.

10.     "Roundup" refers to all formulations of Monsanto's Roundup products, including, but not limited to, Roundup Concentrate Poison Ivy and Tough Brush Killer 1, Roundup Custom Herbicide, Roundup D-Pak Herbicide, Roundup Dry Concentrate, Roundup Export Herbicide, Roundup Fence & Hard Edger 1, Roundup Garden Foam Weed & Grass Killer, Roundup Grass and Week Killer, Roundup Herbicide, Roundup Original 2k Herbicide, Roundup Original II Herbicide, Roundup Pro Concentrate, Roundup Prodry Herbicide, Roundup Promas, Roundup Quik Stik Grass and Weed Killer, Roundup Quikpro Herbicide, Roundup Rainfast Concentrate Weed & Grass Killer, Roundup Rainfast Super Concentrate Weed & Grass Killer, Roundup Ready-to-Use Extended Control Weed & Grass Killer 1 Plus Weed Preventer, Roundup Ready-

to-Use Weed & Grass Killer, Roundup Ready-to-Use Weed and Grass Killer 2, Roundup Ultra

Dry, Roundup Ultra Herbicide, Roundup Ultramax, Roundup VM Herbicide, Roundup Weed &

Grass Killer Concentrate, Roundup Weed & Grass Killer Concentrate Plus, Roundup Weed &

Grass Killer Ready-to-Use Plus, Roundup Weed & Grass Killer Super Concentrate, Roundup

Weed & Grass Killer 1 Ready-to-Use, Roundup WSD Water Soluble Dry Herbicide Deploy Dry

Herbicide, or any other formulation containing the active ingredient glyphosate.

11.     Monsanto is a multinational agricultural biotechnology corporation based in St.

Louis, Missouri.  It is the world's leading producer of glyphosate.

12.     Monsanto discovered the herbicidal properties of glyphosate during the 1970's

and developed it as a broad-spectrum herbicide used to kill weeds and grasses known to compete

with commercial crops grown around the globe.

13.     Glyphosate is a "non-selective" herbicide, meaning it kills indiscriminately based

only on whether a given organism produces a specific enzyme, 5-enolpyruvylshikimic acid-3-

phospate synthase, known as EPSP synthase.

14.     Glyphosate inhibits the enzyme 5-enolpyruvylshikimic acid-3 phosphate synthase

that interferes with the shikimic pathway in plants, resulting in the accumulation of shikimic acid

in plant tissue and ultimately plant death.

15.     Sprayed as a liquid, plants absorb glyphosate directly through their leaves, stems,

and roots; and detectable quantities accumulate in the plant tissues.

16.     Each year, approximately 250 million pounds of glyphosate are sprayed on crops,

commercial nurseries, suburban lawns, parks, and golf courses.  This increase in use has been

driven largely by the proliferation of "Roundup Ready" crops, which have been genetically

engineered to resist the activity of glyphosate.

4

17.     Monsanto is responsible for the development, manufacture, marketing, sale, and distribution of Roundup Ready seeds. By 2009, Monsanto was the world's leading producer of Roundup ready seeds. In 2010, roughly 70% of corn and cotton and 90% of soybean fields in the United States were grown with Roundup Ready seeds.

18.     Roundup was introduced in 1974 and is today one of the world's most widely-used herbicides. Monsanto's glyphosate products are registered in more than 130 countries and are approved for weed control in more than 100 crops. No other herbicide active ingredient compares in terms of number of uses.[1]

19.     In all this time, farmers have used Roundup unaware it is a carcinogen.

## REGISTRATION OF HERBICIDES UNDER FEDERAL LAW

20.     The manufacture, formulation, and distribution of herbicides, such as Roundup, are regulated under the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA"), 7 U.S.C. § 136 *et seq*. FIFRA requires that all pesticides be registered with the Environmental Protection Agency ("EPA") prior to their distribution, sale, or use, except as described by FIFRA 7 U.S.C. § 136a(a).

21.     The EPA requires a variety of tests as part of the registration process to evaluate the potential for exposure to pesticides, toxicity to people and other potential non-target organisms, and other adverse effects on the environment. Registration by the EPA, however, is not an assurance or finding of safety. The determination the EPA makes in registering or re-registering a product is not that the product is "safe," but rather that use of the product in accordance with its label directions "will not generally cause unreasonable adverse effects on the environment." 7 U.S.C. § 136(a)(c)(5)(D).

---

[1] *Backgrounder*, History of Monsanto's Glyphosate Herbicides, June 2005, available at www.monsanto.com/products/documents/glyphosate-background-materials/back_ground.pdf

22.     FIFRA defines "unreasonable adverse effects on the environment" to mean "any unreasonable risk to man or the environment, taking into account the economic, social, and environmental costs and benefits of the use of any pesticide." 7 U.S.C. § 136(bb).  FIFRA thus requires the EPA to make a risk/benefit analysis in determining whether a registration should be granted or allowed to continue to be sold in commerce.

23.     The EPA and the Commonwealth of Massachusetts registered Roundup for distribution, sale, and manufacture in the United States and the Commonwealth of Massachusetts.

24.     FIFRA generally requires that the registrant, here Monsanto, conduct health and safety testing of pesticide products.  The government is not required, nor is it able, to perform the product tests that are required of the manufacturer.

25.     Each pesticide product distributed, sold, or manufactured is evaluated at the time the product is initially registered.  The data necessary for registration of a pesticide has changed over time.  The EPA is now in the process of re-evaluating all pesticides through a Congressionally-mandated process called "re-registration." 7 U.S.C. § 136a-1.  To re-evaluate these pesticides, the EPA demands the completion of additional tests and the submission of data for the EPA's review and evaluation.

### MONSANTO'S FALSE REPRESENTATIONS REGARDING THE SAFETY OF ROUNDUP

26.     In 1996, the New York Attorney General ("NYAG") filed a lawsuit against Monsanto based on its false and misleading advertising of Roundup products.  Specifically, the lawsuit challenged Monsanto's general representations that its spray-on glyphosate-based herbicides, including Roundup, were "safer than table salt" and "practically non-toxic" to

mammals, birds, and fish.  Among the representations the NYAG found deceptive and

misleading about the human and environmental safety of Roundup are the following:

    a.    Remember that environmentally friendly Roundup herbicide is biodegradable.  It won't build up in the soil so you can use Roundup with confidence along customers' driveways, sidewalks and fences.

    b.    And remember that Roundup is biodegradable and won't build up in the soil.  That will give you the environmental confidence you need to use Roundup everywhere you've got a weed, brush, edging or trimming problem.

    c.    Roundup biodegrades into naturally occurring elements.

    d.    Remember that versatile Roundup herbicide stays where you put it.  That means there's no washing or leaching to harm customers' shrubs or other desirable vegetation.

    e.    This non-residual herbicide will not wash or leach in the soil.  It … stays where you apply it.

    f.    You can apply Accord with "confidence because it will stay where you put it" it bonds tightly to soil particles, preventing leaching.  Then, soon after application, soil microorganisms biodegrade Accord into natural products.

    g.    Glyphosate is less toxic to rats than table salt following acute oral ingestion.

    h.    Glyphosate's safety margin is much greater than required.  It has over a 1,000-fold safety margin in food and over a 700-fold safety margin for workers who manufacture it or use it.

    i.    You can feel good about using herbicides by Monsanto.  They carry a toxicity category rating of 'practically non-toxic' as it pertains to mammals, birds and fish.

    j.    "Roundup can be used where kids and pets will play and breaks down into natural material."  This ad depicts a person with his head in the ground and a pet dog standing in an area which has been treated with Roundup.[2]

---

[2] Attorney General of the State of New York, In the Matter of Monsanto Company, Assurance of Discontinuance Pursuant to Executive Law § 63(15)(Nov. 1996).

27.     On November 19, 1996, Monsanto entered into an Assurance of Discontinuance
with the NYAG, in which Monsanto agreed, among other things, "to cease and desist from
publishing or broadcasting any advertisements [in New York] that represent, directly or by
implication" that:

a.      its glyphosate-containing pesticide products or any component thereof are
        safe, non-toxic, harmless or free from risk;

b.      its glyphosate-containing pesticide products or any component thereof
        manufactured, formulated, distributed or sold by Monsanto are
        biodegradable;

c.      its glyphosate-containing pesticide products or any component thereof stay
        where they are applied under all circumstances and will not move through
        the environment by any means;

d.      its glyphosate-containing pesticide products or any component thereof are
        "good" for the environment or are "known for their environmental
        characteristics;"

e.      glyphosate-containing pesticide products or any component thereof are
        safer or less toxic than common consumer products other than herbicides;
        and

f.      its glyphosate-containing products or any component thereof might be
        classified as "practically non-toxic."

28.     Monsanto did not alter its advertising in the same manner in any state other than
New York, and on information and belief still has not done so today.

29.     In 2009, France's highest court ruled that Monsanto had not told the truth about
the safety of Roundup and affirmed an earlier judgment that Monsanto had falsely advertised its
herbicide Roundup as "biodegradable" and that it "left the soil clean."[3]

---

[3] *Monsanto Guilty in 'False Ad' Row*, BBC, Oct. 15, 2009, *available at*
http://news.bbc.co.uk/2/hi/europe/8308903.stm.

## EVIDENCE OF CARCINOGENICITY IN ROUNDUP

30.     As early as the 1980's Monsanto was aware of glyphosate's carcinogenic properties.

31.     On March 4, 1985, a group of the EPA's Toxicology Branch published a memorandum classifying glyphosate as a Category C oncogene.[4]  Category C oncogenes are possible human carcinogens with limited evidence of carcinogenicity.

32.     In 1986, the EPA issued a Registration Standard for glyphosate (NTIS PB87-103214).  The Registration standard required additional phytotoxicity, environmental fate, toxicology, product chemistry, and residue chemistry studies.  All of the data required was submitted and reviewed and/or waived.[5]

33.     In October 1991, the EPA published a Memorandum entitled "Second Peer Review of Glyphosate."  The memorandum changed glyphosate's classification to Group E (evidence of non-carcinogenicity for humans).  Two peer review committee members did not concur with the conclusions of the committee and one member refused to sign.[6]

34.     In addition to the toxicity of the active molecule, many studies support the hypothesis that glyphosate formulations found in Monsanto's Roundup products are more dangerous and toxic than glyphosate alone.[7]  As early as 1991, evidence existed demonstrating that glyphosate formulations were significantly more toxic than glyphosate alone.

---

[4] Consensus Review of Glyphosate, Casewell No. 661A.  March 4, 1985.  United States Environmental Protection Agency.
[5] http://www.epa.gov/oppsrrd1/reregistration/REDs/factsheets/0178fact.pdf.
[6] U.S. EPA, *Memorandum, Subject:  SECOND Peer Review of Glyphosate* 1 (1191), *available at* http://www.epa.gov/pesticides/chem_search/cleared_reviews/csr_PC-103601_30-Oct-91_265.pdf
[7] See Martinez, et al. *Oral and pulmonary toxicology of the surfactant used in Roundup herbicide,* PROC. WEST. PHARMACOL. SOC. 34:43-46 (1991); Nora Benachour, et al., *Glyphosate Formulations Induce Apoptosis and Necrosis in Human Umbilical, Embryotic, and Placental Cells,* 22 CHEM. RES. TOXICOL. 97-105 (2009), *available at* http://big.assets.huffington.com/france.pdf; Gasnier et al. 2010, Francisco Peixoto, *Comparative effects of the Roundup and glyphosate on mitochondrial oxidative phosphorylation,* 61 CHEMOSPHERE 1115, 1122 (2005), *available at*

35.     In 2002, Julie Marc published a study entitled "Pesticide Roundup Provokes Cell Division Dysfunction at the Level of CDK1/Cyclin B Activation."[8] The study found that Monsanto's Roundup caused delays in the cell cycles of sea urchins, while the same concentrations of glyphosate alone proved ineffective and did not alter cell cycles.

36.     In 2004, Julie Marc published a study entitled "Glyphosate-based pesticides affect cell cycle regulation." The study demonstrated a molecular link between glyphosate-based products and cell cycle dysregulation.[9]

37.     The study noted that "cell-cycle dysregulation is a hallmark of tumor cells and human cancer. Failure in the cell-cycle checkpoints leads to genomic instability and subsequent development of cancers from the initial affected cell." Further, "[s]ince cell cycle disorders such as cancer result from dysfunction of unique cell, it was of interest to evaluate the threshold dose of glyphosate affecting cells."[10]

38.     In 2005, Francisco Peixoto published a study showing that Roundup's effects on rat liver mitochondria are much more toxic and harmful than the same concentrations of glyphosate alone.

39.     The Peixoto study suggested that the harmful effects of Roundup on mitochondrial bioenergetics could not be exclusively attributed to glyphosate and could be the result of other chemicals, namely the surfactant POEA, or alternatively due to the possible synergy between glyphosate and Roundup formulation products.

---

https://www.researchgate.net/publication/7504567_Comparative_effects_of_the_Roundup_and_glyphosate_on_mitochondrial_oxidative_phosphorylation; March 2004.

[8] Julie Marc, et al., *Pesticide Roundup Provokes Cell Division Dysfunction at the Level of CDK1/Cyclin B Activation*, 15 CHEM. RES. TOXICOL. 326-331 (2002), *available at* http://pubs.acs.org/doi/full/10.1021/tx015543g.

[9] Julie Marc, et al., *Glyphosate-based pesticides affect cell cycle regulation*, 96 BILIOGY OF THE CELLS 245, 245-249 (2004), *available at* http://onlinelibrary.wiley.com/doi/10.1016/j.biolcel.2003.11.010/epdf.

[10] Molinari, 2000; Stewart et al., 2003.

40.     In 2009, Nora Benachour and Gilles-Eric Seralini published a study of the effects of Roundup and glyphosate on human umbilical, embryonic, and placental cells.

41.     The study used dilution levels of Roundup and glyphosate far below agricultural recommendations, corresponding with low levels of residues in food.  The study concluded that supposed "inert" ingredients, and possibly POEA, change human cell permeability and amplify toxicity of glyphosate alone.  The study further suggested that determinations of glyphosate toxicity should take into account the presence of adjuvants, or those chemicals used in the formulation of the complete pesticide.  The study confirmed that the adjuvants in Roundup are not inert and that Roundup is always more toxic than its active ingredient glyphosate.

42.     The results of these studies were confirmed in peer-reviewed studies that were known to Monsanto.

43.     Monsanto knew or should have known that Roundup is more toxic than glyphosate alone and that safety studies on Roundup, Roundup's adjuvants and "inert" ingredients, and/or the surfactant POEA were necessary to protect the Plaintiff from Roundup.

44.     Monsanto knew or should have known that tests limited to Roundup's active ingredient glyphosate were insufficient to prove the safety of Roundup.

45.     Monsanto failed to appropriately and adequately test Roundup, Roundup's adjuvants and "inert" ingredients, and/or the surfactant POEA to protect the Plaintiff from Roundup.

46.     Rather than performing appropriate tests, Monsanto relied on flawed industry-supported studies designed to protect Monsanto's economic interests rather than the Plaintiffs and the consuming public.

47.     Despite its knowledge that Roundup was considerably more dangerous than glyphosate alone, Monsanto continued to promote Roundup as safe.

## IARC CLASSIFICATION OF GLYPHOSATE

48.     The International Agency for Research on Cancer ("IARC") is the specialized intergovernmental agency that the World Health Organization ("WHO") of the United Nations tasked with conducting and coordinating research into the causes of cancer.

49.     An IARC Advisory Group to Recommend Priorities for IARC Monographs during 2015-2019 met in April 2014.  Though nominations for the review were solicited, a substance must meet two criteria to be eligible for review by the IARC Monographs:  there must already be some evidence of carcinogenicity of the substance, and there must be evidence that humans are exposed to the substance.

50.     IARC set glyphosate for review in 2015-2016.  IARC uses five criteria for determining priority in reviewing chemicals.  The substance must have a potential for direct impact on public health; scientific literature to support suspicion of carcinogenicity; evidence of significant human exposure; high public interest and/or potential to bring clarity to a controversial area and/or reduce public anxiety or concern; and related agents similar to one given high priority by the above considerations.  Data reviewed is sourced preferably from publicly accessible, peer-reviewed data.

51.     On March 24, 2015, after its cumulative review of human, animal, and DNA studies for more than one (1) year, many of which have been in Monsanto's possession since as early as 1985, the IARC's working group published its conclusion that the glyphosate contained in Monsanto's Roundup herbicide, is a Class 2A "probable carcinogen" as demonstrated by the

mechanistic evidence of carcinogenicity in humans and sufficient evidence of carcinogenicity in animals.

52.     The IARC's full Monograph was published on July 29, 2015, and established glyphosate as a class 2A probable carcinogen to humans.  According to the authors, glyphosate demonstrated sufficient mechanistic evidence (genotoxicity and oxidative stress) to warrant a 2A classification based on evidence of carcinogenicity in humans and animals.

53.     The IARC Working Group found an increased risk between exposure to glyphosate and non-Hodgkin's Lymphoma ("NHL") and several subtypes of NHL, and the increased risk continued after adjustment for other pesticides.

54.     The IARC also found that glyphosate caused DNA and chromosomal damage in human cells.

## EARLIER EVIDENCE OF THE DANGERS OF GLYPHOSATE

55.     Despite the new classification by the IARC, Monsanto has had ample evidence of glyphosate and Roundup's genotoxic properties for decades.

56.     Genotoxicity refers to chemical agents capable of damaging the DNA within a cell through genetic mutations, which is a process that is believed to lead to cancer.

57.     In 1997, Chris Clements published "Genotoxicity of select herbicides in Rana catesbeiana tadpoles using the alkaline single-cell gel DNA electrophoresis (comet) assay."

58.     The study found that tadpoles exposed to roundup showed significant DNA damage when compared with unexposed control animals.

59.     Both human and animal studies have shown that glyphosate and glyphosate-base formulations such as Roundup can induce oxidative stress.

13

60.     Oxidative stress and associated chronic inflammation are believed to be involved in carcinogenesis.

61.     The IARC Monograph notes that "[s]trong evidence exists that glyphosate, AMPA and glyphosate-based formulations can induce oxidative stress."

62.     In 2006, César Paz-y-Miño published a study examining DNA damage in human subjects exposed to glyphosate.

63.     The study produced evidence of chromosomal damage in blood cells showing significantly greater damage after exposure to glyphosate than before in the same individuals, suggesting that the glyphosate formulation used during aerial spraying had a genotoxic effect on exposed individuals.

64.     The IARC Monograph reflects the volume of evidence of glyphosate pesticides' genotoxicity noting "[t]he evidence for genotoxicity caused by glyphosate-based formulations is strong."

65.     Despite knowledge to the contrary, Monsanto denies that Roundup is genotoxic.

66.     In addition to glyphosate and Roundup's genotoxic properties, Monsanto has long been aware of glyphosate's carcinogenic properties.

67.     Glyphosate and Roundup in particular have long been associated with carcinogenicity and the development of numerous forms of cancer, including, but not limited to, NHL, Hodgkin's Lymphoma, Multiple Myeloma, and soft tissue sarcoma.

68.     Monsanto has known of this association since the mid-1980's and numerous human and animal studies evidence the carcinogenicity of glyphosate and/or Roundup.

69.     In 1985, the EPA studied the effects of glyphosate in mice finding a dose related response in male mice linked to renal tubal adenomas, a rare tumor. The study concluded the glyphosate was oncogenic.

70.     In 2003, Lennart Hardell and Mikael Eriksson published the results of two case controlled studies on pesticides as a risk factor for NHL and hairy cell leukemia.

71.     The study concluded that glyphosate had the most significant relationship to NHL among all herbicide studies with an increased odds ratio of 3.11.

72.     In 2003, AJ De Roos published a study examining the pooled data of mid-western farmers, examining pesticides and herbicides as risk factors for NHL.

73.     The study, which controlled for potential confounders, found a relationship between increased NHL incidence and glyphosate.

74.     In 2008, Mikael Eriksson published a population based case-control study of exposure to various pesticides as a risk factor for NHL.

75.     This strengthened previous associations between glyphosate and NHL.

76.     In spite of this knowledge, Monsanto continued to issue broad and sweeping statements suggesting that Roundup was, and is, safer than ordinary household items such as table salt, despite a lack of scientific support for the accuracy and validity of these statements and, in fact, voluminous evidence to the contrary.

77.     On information and belief, these statements and representations have been made with the intent of inducing Plaintiff, the agricultural community, and the public at large to purchase, and increase the use of, Roundup for Monsanto's pecuniary gain, and in fact did induce the Plaintiff to use Roundup.

15

78.     Monsanto made these statements with complete disregard and reckless indifference to the safety of the Plaintiff and the general public.

79.     Notwithstanding Monsanto's representations, scientific evidence has established a clear association between glyphosate and genotoxicity, inflammation, and an increased risk of many cancers, including, but not limited to, NHL, Multiple Myeloma, and soft tissue sarcoma.

80.     Monsanto knew or should have known that glyphosate is associated with an increased risk of developing cancer, including, but not limited to, NHL, Multiple Myeloma, and soft tissue sarcomas.

81.     Monsanto failed to appropriately and adequately inform and warn the Plaintiff of the serious and dangerous risks associated with the use of and exposure to glyphosate and/or Roundup, including, but not limited to, the risk of developing NHL, as well as other severe and personal injuries, which are permanent and/or long-lasting in nature, cause significant physical pain and mental anguish, diminished enjoyment of life, and the need for medical treatment, monitoring, and/or medications.

82.     Despite the IARC's classification of glyphosate as a class 2A probable carcinogen, Monsanto continues to maintain that glyphosate and/or Roundup is safe, non-carcinogenic, non-genotoxic, and falsely warrant to users and the general public that independent experts and regulatory agencies agree that there is no evidence of carcinogenicity or genotoxicity in glyphosate and Roundup.

83.     Monsanto has claimed and continues to claim that Roundup is safe, non-carcinogenic, and non-genotoxic.

84.     Monsanto claims on its website that "[r]egulatory authorities and independent experts around the world have reviewed numerous long-term/carcinogenicity and genotoxicity

16

studies and agree that there is no evidence that glyphosate, the active ingredient in Roundup brand herbicides and other glyphosate-based herbicides, causes cancer, even at very high doses, and that it is not genotoxic."[11]

85.     Ironically, the primary source for this statement is a 1986 report by the WHO, the same organization that now considers glyphosate to be a probable carcinogen.

86.     Glyphosate, and Monsanto's Roundup products in particular, have long been associated with serious side effects and many regulatory agencies around the globe have banned or are currently banning the use of glyphosate herbicide products.

87.     Monsanto's statements proclaiming the safety of Roundup and disregarding its dangers misled the Plaintiff.

88.     Despite Monsanto's knowledge that Roundup was associated with an elevated risk of developing cancer, Monsanto's promotional campaigns focused on Roundup's purported "safety profile."

89.     Monsanto's failure to adequately warn the Plaintiff, resulted in (1) the Plaintiff, Henry Medugno, being exposed to glyphosate instead of using another acceptable and safe method of controlling unwanted weeds and pests; and (2) scientists and physicians failing to warn and instruct consumers about the risk of cancer, including NHL, and other injuries associated with Roundup.

90.     Monsanto failed to seek modification of the labeling of roundup to include relevant information regarding the risks and dangers associated with Roundup exposure.

91.     Monsanto's failure to appropriately warn and inform the EPA has resulted in inadequate warnings in safety information presented directly to users and consumers.

---

[11] *Backgrounder* – Glyphosate: No Evidence of Carcinogenicity, updated November 2014, available at www.monsanto.com/glyphosate/documents/no-evidence-of-carcinogenicity.pdf

92.     Monsanto's failure to appropriately warn and inform the EPA has resulted in the absence of warning or caution statements that are adequate to protect health and the environment.

93.     Monsanto's failure to appropriately warn and inform the EPA has resulted in the directions for use that are not adequate to protect health and the environment.

94.     By reason of the foregoing acts and omissions, the Plaintiffs seek compensatory damages as a result of the Plaintiff's exposure to Roundup, which caused or was a substantial contributing factor in causing the Plaintiff to suffer from cancer, specifically NHL, and the Plaintiffs suffered severe and personal injuries that are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life.

95.     By reason of the foregoing, the Plaintiff is severely and permanently injured.

96.     By reason of the foregoing acts and omissions, the Plaintiffs have endured and continues to suffer, emotional and mental anguish, medical expenses, and other economic and non-economic damages, as a result of Monsanto's actions and inactions.

## PLAINTIFF'S EXPOSURE TO ROUNDUP

97.     The Plaintiff, Henry Medugno, is a Massachusetts resident who used Roundup on his property from approximately 1994 to 2019.

98.     The Plaintiff, Henry Medugno, was first diagnosed with mantle cell lymphoma, a non-Hodgkin's lymphoma in 2011. The development of Plaintiff's NHL, and subsequent health problems, was proximately and actually caused by exposure to Monsanto's Roundup products.

99.     The Plaintiff has incurred significant economic and non-economic damages resulting from his injuries.

100.    During the period of Plaintiff's exposure to Roundup, he did not know that exposure to Roundup was injurious to his health or the health of others.

101.    The Plaintiff first learned that Roundup caused NHL in 2019 after seeing a television advertisement regarding the correlation between the two.

<div align="center">

### TOLLING OF APPLICABLE STATUTE OF LIMITATIONS
### DISCOVERY RULE TOLLING

</div>

102.    The Plaintiff had no way of knowing about the risk of serious illness associated with the use of and/or exposure to Roundup and glyphosate until 2019. This is the quintessential case for tolling.

103.    Within the time period of any applicable statutes of limitations, the Plaintiff could not have discovered, through the exercise of reasonable diligence, that exposure to Roundup and glyphosate is injurious to human health.

104.    The Plaintiff did not discover, and did not know the facts that would cause a reasonable person to suspect, the risks associated with the use of and/or exposure to Roundup and glyphosate; nor would a reasonable and diligent investigation by them have disclosed that Roundup and glyphosate would cause their cancers.

105.    For these reasons, all applicable statute of limitations have been tolled by operation of the discovery rule with respect to the Plaintiff's claims

<div align="center">

### FRAUDULENT CONCEALMENT TOLLING

</div>

106.    All applicable statutes of limitations have also been tolled by Monsanto's knowing and active fraudulent concealment and denial of the facts alleged herein throughout the time period relevant to this action.

107.    Instead of disclosing critical safety information about Roundup and glyphosate, Monsanto has consistently and falsely represented the safety of its Roundup products.

<div align="center">19</div>

## ESTOPPEL

108.   Monsanto was under a continuous duty to disclose to consumers, users, and other persons coming into contact with its products, including the Plaintiff, accurate safety information concerning its products and the risks associated with the use of and/or exposure to Roundup and glyphosate.

109.   Instead, Monsanto knowingly, affirmatively, and actively concealed safety information concerning Roundup and glyphosate and the serious risks associated with the use of and/or exposure to its products.

110.   Based on the foregoing, Monsanto is estopped from relying on any statutes of limitations in defense of this action.

## COUNT I – NEGLIGENCE

111.   The Plaintiffs re-alleges each paragraph above as if fully set forth herein.

112.   Defendant is in the business of designing, manufacturing, selling, marketing, packaging, selling, and/or distributing products used in the agricultural industry. The products used by the Plaintiff and to which the Plaintiff was exposed to were designed, produced, manufactured, marketed, sold and/or otherwise put into the stream of commerce by the Defendant, and were used for their intended purpose.

113.   Defendant Monsanto had a duty to exercise reasonable care in the designing, researching, testing, manufacturing, marketing, supplying, promoting, packaging, sale, and/or distribution of Roundup into the stream of commerce, including a duty to assure that the product would not cause users to suffer unreasonable, dangerous side effects.

114.   Monsanto failed to exercise reasonable care in the designing, researching, testing, manufacturing, marketing, supplying, promoting, packaging, sale, testing, quality assurance, quality control, and/or distribution of Roundup into interstate commerce in that Monsanto knew or should have known that using Roundup created a high risk of unreasonable, dangerous side effects,

20

including, but not limited to, the development of NHL, as well as other severe and personal injuries that are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life, as well as need for lifelong medical treatment, monitoring, and/or medications.

115.    The negligence by Defendant, its agents, servants, and/or employees, included but was not limited to the following act and/or omissions:

a.    Manufacturing, producing, promoting, formulating, creating, and/or designing Roundup without thoroughly testing it;

b.    Failing to test Roundup and/or failing to adequately, sufficiently, and properly test Roundup;

c.    Not conducting sufficient testing programs to determine whether or not Roundup was safe for use; in that Monsanto knew or should have known that Roundup was unsafe and unfit for use by reason of the dangers to its users;

d.    Not conducting sufficient testing programs and studies to determine Roundup's carcinogenic properties even after Monsanto had knowledge that Roundup is, was, or could be carcinogenic;

e.    Failing to conduct sufficient testing programs to determine the safety of "inert" ingredients and/or adjuvants contained within roundup, and the propensity of these ingredients to render Roundup toxic, increase the toxicity of Roundup, whether these ingredients are carcinogenic, magnify the carcinogenic properties of Roundup, and whether or not "inert" ingredients and/or adjuvants were safe for use;

f.    Negligently failing to adequately and correctly warn the Plaintiff, the public, the medical and agricultural professions, and the EPA of the dangers of Roundup;

g.    Negligently failing to petition the EPA to strengthen the warnings associated with Roundup;

h.    Failing to provide adequate cautions and warnings to protect the health of users, handlers, applicators, and persons who would reasonably and foreseeably come into contact with roundup;

i.    Negligently marketing, advertising, and recommending the use of Roundup without sufficient knowledge as to its dangerous propensities;

j.    Negligently representing that Roundup was safe for use for its intended purpose, and/or that Roundup was safer than ordinary and common items such as table salt, when, in fact, it was unsafe;

k.    Negligently representing that Roundup had equivalent safety and efficacy as other forms of herbicides;

l.    Negligently designing Roundup in a manner that was dangerous to its users;

m.    Negligently manufacturing Roundup in a manner that was dangerous to its users;

n.    Negligently producing Roundup in a manner that was dangerous to its users;

o.    Negligently formulating Roundup in a manner that was dangerous to its users;

p.    Concealing information from the Plaintiffs while knowing that Roundup was unsafe, dangerous, and/or non-conforming with EPA regulations;

q.    Improperly concealing and/or misrepresenting information from the Plaintiff, scientific and medical professionals, and/or the EPA, concerning the severity of risks and dangers of Roundup compared to other forms of herbicides; and

r.    Negligently selling Roundup with a false and misleading label.

116.    Monsanto under-reported, underestimated, and downplayed the serious dangers of Roundup.

117.    Monsanto negligently and deceptively compared the safety risks and/or dangers of roundup with common everyday foods such as table salt, and other forms of herbicides.

118.    Monsanto was negligent and/or violated Massachusetts law in the designing, researching, supplying, manufacturing, promoting, packaging, distributing, testing, advertising, warning, marketing, and selling of Roundup in that it:

a.    Failed to use ordinary care in designing and manufacturing Roundup so as to avoid the aforementioned risks to individuals when Roundup was used as an herbicide;

b.   Failed to accompany its product with proper and/or accurate warnings regarding all possible adverse side effects associated with the use of Roundup;

c.   Failed to accompany its product with proper warnings regarding all possible adverse side effects concerning the failure and/or malfunction of Roundup;

d.   Failed to accompany its product with accurate warnings regarding the risks of all possible adverse side effects concerning Roundup;

e.   Failed to warn the Plaintiff of the severity and duration of such adverse effects, as the warnings given did not accurately reflect the symptoms, or severity of the side effects including, but not limited to, the development of NHL;

f.   Failed to conduct adequate testing, clinical testing and post-marketing surveillance to determine the safety of Roundup;

g.   Failed to conduct adequate testing, clinical testing, and post-marketing surveillance to determine the safety of Roundup's "inert" ingredients and/or adjuvants;

h.   Negligently misrepresented the evidence of Roundup's genotoxicity and carcinogenicity; and

i.   Was otherwise careless and/or negligent.

119.   Despite the fact that Monsanto knew or should have known that Roundup caused, or could cause, unreasonably dangerous side effects, Defendant continues to market, manufacture, distribute, and/or sell Roundup to consumers, including the Plaintiff.

120.   Defendant knew or should have known that consumers such as the Plaintiff would foreseeably suffer injury as a result of Monsanto's failure to exercise ordinary care.

121.   Defendant's violations of law and/or negligence were the proximate cause of the Plaintiff's injuries, harm and economic loss, which the Plaintiff suffered and will continue to suffer.

23

122.    As a result of the foregoing acts and omissions, the Plaintiff suffered life-threatening NHL, and severe personal injuries, which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life, as well as financial expenses for hospitalization and medical care.

WHEREFORE, the Plaintiff, Henry Medugno, respectfully requests that this Court enter judgment in the Plaintiff's favor for damages, together with interest, costs herein incurred, attorneys' fees and all relief as this Court deems just and proper.

## COUNT II – BREACH OF EXPRESS AND IMPLIED WARRANTIES

123.    The Plaintiff re-alleges each paragraph above as if fully stated herein.

124.    At all times relevant to this litigation, Monsanto engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting its Roundup products, which are defective and unreasonably dangerous to consumers, including the Plaintiff, thereby placing Roundup products into the stream of commerce.  These actions were under Defendant's ultimate control and supervision.

125.    At all times relevant to this litigation, Monsanto were engaged in the business of marketing, selling, distributing, and promoting Roundup products, which are defective and unreasonably dangerous to consumers, including the Plaintiff, thereby placing Roundup products into the stream of commerce.

126.    Plaintiff, Henry Medugno, was a person whom Monsanto could reasonably have expected to use, consume or be affected by Defendant's products within the meaning of Massachusetts General Laws c. 106, §2-318.

127.    At all relevant times, Monsanto expressly and impliedly represented and warranted to the purchasers of its Roundup products, by and through statements made in labels,

24

publications, package inserts, and other written materials intended for consumers and the general public, that its Roundup products were safe to human health and the environment, effective, fit, safe, and proper for their ordinary and particular purpose for which they were manufactured, sold, supplied or distributed. Defendant advertised, labeled, marketed, and promoted Roundup products, representing the quality to consumers and the public so as to induce their purchase or use, thereby making an express and implied warranty that Roundup products would conform to the representations.

128.    These express and implied representations include incomplete warnings and instructions that purport, but fail, to include the complete array or risks associated with use of and/or exposure to Roundup and glyphosate. Monsanto knew and/or should have known that the risks expressly included in Roundup warnings and labels did not and do not accurately or adequately set forth the risks of developing the serious injuries complained of herein. Nevertheless, Defendant expressly and impliedly represented that its Roundup products were safe and effective, including for use as agricultural herbicides.

129.    The representations about Roundup, as set forth herein, contained or constituted affirmations of fact or promises made by the seller to the buyer, which related to the goods and became part of the basis of the bargain, creating an express and implied warranty that the goods would conform to the representations.

130.    Monsanto placed Roundup products into the stream of commerce for sale and recommended their use to consumers and the public without adequately warning of the true risks of developing the injuries associated with the use of and exposure to Roundup and its active ingredient glyphosate.

131.   Defendant breached these warranties because, among other things, its Roundup

products were defective, dangerous, unfit for use, did not contain labels representing the true and

adequate nature of the risks associated with their use, and were not merchantable or safe for their

intended, ordinary, and foreseeable use and purpose.  Specifically, Defendant breached the

warranties in the following ways;

      a.    Monsanto represented through its labeling, advertising, and marketing
            materials that its Roundup products were safe, and fraudulently withheld
            and concealed information about the risks of serious injury associated with
            the use of and/or exposure to Roundup and glyphosate by expressly
            limiting the risks associated with use and/or exposure within its warnings
            and labels; and

      b.    Monsanto represented that its Roundup products were safe for use and
            fraudulently concealed information demonstrating that glyphosate, the
            active ingredient in Roundup, had carcinogenic properties, and that its
            Roundup products, therefore, were not safer than alternatives available on
            the market.

132.   Monsanto had sole access to material facts concerning the nature of the risks

associated with its Roundup products as expressly stated within its warnings and labels, and

knew that consumers and users such as the Plaintiff could not have reasonably discovered that

the risks expressly included in Roundup warnings and labels were inadequate and inaccurate.

133.   The Plaintiff had no knowledge of the falsity or incompleteness of Defendant's

statements and representations concerning Roundup.

134.   The Plaintiff used and/or was exposed to the use of Roundup as researched,

developed, designed, tested, formulated, manufactured, inspected, labeled, distributed, packaged,

marketed, promoted, sold, or otherwise released into the stream of commerce by Defendant.

135.   Had the warnings and labels for Roundup products accurately and adequately set

forth the true risks associated with the use of such products, including the Plaintiff's injuries,

rather than expressly excluding such information and warranting that the products were safe for their intended use, the Plaintiff could have avoided the injuries complained of herein.

136.    As a direct and proximate result of Defendant Monsanto's wrongful acts and omissions, the Plaintiffs have suffered severe injuries.  The Plaintiff has endured pain and suffering, has suffered economic losses (including significant expenses for medical care and treatment), and will continue to incur these expenses in the future.

WHEREFORE, the Plaintiff Henry Medugno, respectfully requests that this Court enter judgment in the Plaintiff's favor for damages, together with interest, costs herein incurred, attorneys' fees, and all such other and further relief as this Court deems just and proper.

## COUNT III - LOSS OF CONSORTIUM

137.    The Plaintiffs re-allege the paragraphs above as if fully stated herein.

138.    The Plaintiff, Marlene Medugno, is the wife of Henry Medugno and at all pertinent times was the wife of Henry Medugno.

139.    As a direct and proximate result of the breach of duty and wrongdoing of the defendants and the resultant injury to Henry Medugno as more particularly described in Counts I through II, the plaintiff, Marlene Medugno, suffered a loss of her right to consortium with her husband and the loss of her husband's services, society and companionship, and has suffered great mental anguish.

WHEREFORE, the Plaintiff, Marlene Medugno, demands compensatory damages, plus interest and costs.  The Plaintiff also demands a jury trial on the issues contained herein.

## DEMAND FOR JURY TRIAL

The Plaintiffs hereby demand trial by jury as to all issues.

DATED:  February 19, 2020

<div style="margin-left:50%">

The Plaintiffs,
By their Attorneys,


_/s/David C. Strouss_
David C. Strouss, BBO# 546253
Evan R. Hoffman, BBO# 678975
Jasmine M. Howard, BBO# 698130
**THORNTON LAW FIRM, LLP**
One Lincoln Street, 13th Floor
State Street Financial Center
Boston, MA  02111
(617) 720-1333  FAX (617) 720-1333
dstrouss@tenlaw.com
ehoffman@tenlaw.com
jhoward@tenlaw.com

</div>

JS 44 (Rev. 10/20)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

| I. (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| HENRY MEDUGNO and MARLENE MEDUGNO | MONSANTO COMPANY |

**(b)** County of Residence of First Listed Plaintiff    Suffolk
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF
THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*

David C. Strouss, Esq., Thornton Law Firm LLP
1 Lincoln St., 13th Fl., Boston, MA 02111 (617) 720-1333

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- [ ] 1 U.S. Government Plaintiff
- [ ] 2 U.S. Government Defendant
- [ ] 3 Federal Question *(U.S. Government Not a Party)*
- [x] 4 Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)*                                       *and One Box for Defendant)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | [x] 1 | [ ] 1 | Incorporated *or* Principal Place of Business In This State | [ ] 4 | [ ] 4 |
| Citizen of Another State | [ ] 2 | [ ] 2 | Incorporated *and* Principal Place of Business In Another State | [ ] 5 | [x] 5 |
| Citizen or Subject of a Foreign Country | [ ] 3 | [ ] 3 | Foreign Nation | [ ] 6 | [ ] 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| [ ] 110 Insurance | **PERSONAL INJURY** / **PERSONAL INJURY** | [ ] 625 Drug Related Seizure of Property 21 USC 881 | [ ] 422 Appeal 28 USC 158 | [ ] 375 False Claims Act |
| [ ] 120 Marine | [ ] 310 Airplane  [x] 365 Personal Injury - | [ ] 690 Other | [ ] 423 Withdrawal 28 USC 157 | [ ] 376 Qui Tam (31 USC 3729(a)) |
| [ ] 130 Miller Act | [ ] 315 Airplane Product  Product Liability | | | [ ] 400 State Reapportionment |
| [ ] 140 Negotiable Instrument | Liability  [ ] 367 Health Care/ | | **PROPERTY RIGHTS** | [ ] 410 Antitrust |
| [ ] 150 Recovery of Overpayment | [ ] 320 Assault, Libel &  Pharmaceutical | | [ ] 820 Copyrights | [ ] 430 Banks and Banking |
| & Enforcement of Judgment | Slander  Personal Injury | | [ ] 830 Patent | [ ] 450 Commerce |
| [ ] 151 Medicare Act | [ ] 330 Federal Employers'  Product Liability | | [ ] 835 Patent - Abbreviated | [ ] 460 Deportation |
| [ ] 152 Recovery of Defaulted | Liability  [ ] 368 Asbestos Personal | | New Drug Application | [ ] 470 Racketeer Influenced and |
| Student Loans | [ ] 340 Marine  Injury Product | | [ ] 840 Trademark | Corrupt Organizations |
| (Excludes Veterans) | [ ] 345 Marine Product  Liability | | [ ] 880 Defend Trade Secrets | [ ] 480 Consumer Credit |
| [ ] 153 Recovery of Overpayment | Liability  **PERSONAL PROPERTY** | | Act of 2016 | (15 USC 1681 or 1692) |
| of Veteran's Benefits | [ ] 350 Motor Vehicle  [ ] 370 Other Fraud | **LABOR** | | [ ] 485 Telephone Consumer |
| [ ] 160 Stockholders' Suits | [ ] 355 Motor Vehicle  [ ] 371 Truth in Lending | [ ] 710 Fair Labor Standards | | Protection Act |
| [ ] 190 Other Contract | Product Liability  [ ] 380 Other Personal | Act | **SOCIAL SECURITY** | [ ] 490 Cable/Sat TV |
| [ ] 195 Contract Product Liability | [ ] 360 Other Personal  Property Damage | [ ] 720 Labor/Management | [ ] 861 HIA (1395ff) | [ ] 850 Securities/Commodities/ |
| [ ] 196 Franchise | Injury  [ ] 385 Property Damage | Relations | [ ] 862 Black Lung (923) | Exchange |
| | [ ] 362 Personal Injury -  Product Liability | [ ] 740 Railway Labor Act | [ ] 863 DIWC/DIWW (405(g)) | [ ] 890 Other Statutory Actions |
| | Medical Malpractice | [ ] 751 Family and Medical | [ ] 864 SSID Title XVI | [ ] 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** / **PRISONER PETITIONS** | Leave Act | [ ] 865 RSI (405(g)) | [ ] 893 Environmental Matters |
| [ ] 210 Land Condemnation | [ ] 440 Other Civil Rights  **Habeas Corpus:** | [ ] 790 Other Labor Litigation | | [ ] 895 Freedom of Information |
| [ ] 220 Foreclosure | [ ] 441 Voting  [ ] 463 Alien Detainee | [ ] 791 Employee Retirement | **FEDERAL TAX SUITS** | Act |
| [ ] 230 Rent Lease & Ejectment | [ ] 442 Employment  [ ] 510 Motions to Vacate | Income Security Act | [ ] 870 Taxes (U.S. Plaintiff | [ ] 896 Arbitration |
| [ ] 240 Torts to Land | [ ] 443 Housing/  Sentence | | or Defendant) | [ ] 899 Administrative Procedure |
| [ ] 245 Tort Product Liability | Accommodations  [ ] 530 General | | [ ] 871 IRS—Third Party | Act/Review or Appeal of |
| [ ] 290 All Other Real Property | [ ] 445 Amer. w/Disabilities -  [ ] 535 Death Penalty | **IMMIGRATION** | 26 USC 7609 | Agency Decision |
| | Employment  **Other:** | [ ] 462 Naturalization Application | | [ ] 950 Constitutionality of |
| | [ ] 446 Amer. w/Disabilities -  [ ] 540 Mandamus & Other | [ ] 465 Other Immigration | | State Statutes |
| | Other  [ ] 550 Civil Rights | Actions | | |
| | [ ] 448 Education  [ ] 555 Prison Condition | | | |
| | [ ] 560 Civil Detainee -  | | | |
| | Conditions of  | | | |
| | Confinement  | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

- [x] 1 Original Proceeding
- [ ] 2 Removed from State Court
- [ ] 3 Remanded from Appellate Court
- [ ] 4 Reinstated or Reopened
- [ ] 5 Transferred from Another District *(specify)*
- [ ] 6 Multidistrict Litigation - Transfer
- [ ] 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
28 USC 1332
Brief description of cause:

## VII. REQUESTED IN COMPLAINT:

- [ ] CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:  [x] Yes   [ ] No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*     JUDGE _____     DOCKET NUMBER _____

DATE
02/19/2021

SIGNATURE OF ATTORNEY OF RECORD
/s/ David C. Strouss

**FOR OFFICE USE ONLY**

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

1. **Title of case (name of first party on each side only)** Henry Medugno v. Monsanto Company

2. **Category in which the case belongs based upon the numbered nature of suit code listed on the civil cover sheet.   (See local rule 40.1(a)(1)).**

   ☐   **I.**   160, 400, 410, 441, 535, 830*, 835*, 850, 880, 891, 893, R.23, REGARDLESS OF NATURE OF SUIT.

   ☐   **II.**   110, 130, 190, 196, 370, 375, 376, 440, 442, 443, 445, 446, 448, 470, 751, 820*, 840*, 895, 896, 899.

   ☑   **III.**   120, 140, 150, 151, 152, 153, 195, 210, 220, 230, 240, 245, 290, 310, 315, 320, 330, 340, 345, 350, 355, 360, 362, 365, 367, 368, 371, 380, 385, 422, 423, 430, 450, 460, 462, 463, 465, 480, 485, 490, 510, 530, 540, 550, 555, 560, 625, 690, 710, 720, 740, 790, 791, 861-865, 870, 871, 890, 950.

   *Also complete AO 120 or AO 121. for patent, trademark or copyright cases.

3. **Title and number, if any, of related cases.  (See local rule 40.1(g)).  If more than one prior related case has been filed in this district please indicate the title and number of the first filed case in this court.**

4. **Has a prior action between the same parties and based on the same claim ever been filed in this court?**
   YES ☐   NO ☑

5. **Does the complaint in this case question the constitutionality of an act of congress affecting the public interest?   (See 28 USC §2403)**
   YES ☐   NO ☑

   **If so, is the U.S.A. or an officer, agent or employee of the U.S. a party?**
   YES ☐   NO ☐

6. **Is this case required to be heard and determined by a district court of three judges pursuant to title 28 USC §2284?**
   YES ☐   NO ☑

7. **Do all of the parties  in this action, excluding governmental agencies of the United States and the Commonwealth of Massachusetts ("governmental agencies"),  residing in Massachusetts reside in the same division? -  (See Local Rule 40.1(d)).**
   YES ☐   NO ☑

   **A.**   **If yes, in which division do all of the non-governmental parties reside?**
   Eastern Division ☑      Central Division ☐      Western Division ☐

   **B.**   **If no, in which division do the majority of the plaintiffs or the only parties, excluding governmental agencies, residing in Massachusetts reside?**
   Eastern Division ☑      Central Division ☐      Western Division ☐

8. **If filing a Notice of Removal - are there any motions pending in the state court requiring the attention of this Court?  (If yes, submit a separate sheet identifying the motions)**
   YES ☐   NO ☐

**(PLEASE TYPE OR PRINT)**
**ATTORNEY'S NAME** David C. Strouss, Esq.

**ADDRESS** Thornton Law Firm LLP, One Lincoln St., 13th Fl., State Street Financial Center, Boston, MA 02111

**TELEPHONE NO.** (617) 720-1333

**(CategoryForm11-2020.wpd )**

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| HENRY MEDUGNO and<br>MARLENE MEDUGNO<br><br>    Plaintiffs,<br><br>v.<br><br>MONSANTO COMPANY,<br><br>    Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

Case No.: 21-10284

**JURY TRIAL DEMANDED**

## FIRST AMENDED COMPLAINT

The Plaintiffs, Henry Medugno and Marlene Medugno, bring this Complaint for damages against Defendant, Monsanto Company ("Monsanto"), and allege as follows:

### NATURE OF THE CASE

1.      This case arises out of Monsanto's wrongful conduct in connection with the design, development, manufacture, testing, packaging, promoting, marketing, advertising, distribution, labeling, and sale of the herbicide Roundup, containing the active ingredient glyphosate.  Glyphosate has been found to be carcinogenic, linked to causing various forms of cancer, and in particular, non-Hodgkin's Lymphoma.  As such, Roundup is dangerous to human health and unfit to be marketed and sold in commerce, particularly without proper warnings and directions as to the dangers associated with its use.  Plaintiff Henry Medugno, who had extensive exposure to Roundup, was diagnosed with mantle cell lymphoma, a type of non-Hodgkin's lymphoma, and he and his wife, Marlene Medugno, bring this action for the injuries and losses they have incurred.

1

## JURISDICTION AND VENUE

2.      This court has personal jurisdiction over Monsanto under 28 U.S.C. § 1391(c) because Monsanto transacts business in the Commonwealth of Massachusetts and is a corporation doing business within the Commonwealth of Massachusetts. Monsanto knows that its Roundup products are and were sold throughout Massachusetts, and, more specifically, caused Roundup to be sold to the Plaintiffs in Massachusetts. In addition, Monsanto maintains sufficient contacts with the Commonwealth of Massachusetts such that this Court's exercise of personal jurisdiction over it does not offend traditional notions of fair play and substantial justice.

3.      Monsanto advertises and sells goods, specifically Roundup, throughout Massachusetts. It derived substantial revenue from goods and products used in Massachusetts. It expected its acts to have consequences within Massachusetts and derived substantial revenue from interstate commerce. Specific to this case, Monsanto engaged in the business of developing, manufacturing, testing, packaging, marketing, distributing, labeling, and selling Roundup. Monsanto purposefully availed itself of the privilege of conducting activities within Massachusetts, thus invoking the benefits and protections of its laws.

4.      This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1332 because there is complete diversity of citizenship between the Plaintiffs and the Defendant. Monsanto is a citizen of Delaware (where it is incorporated) and Missouri (where it has its principal place of business). The Plaintiff is a citizen of the Commonwealth of Massachusetts, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

5.      Venue is proper in this District under 28 U.S.C. §1391(b0(2) because the Plaintiff was exposed to Roundup in this District.

2

6.      The Court also has supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

## PARTIES

7.      The Plaintiffs, Henry Medugno and Marlene Medugno, are natural persons and at all relevant times were residents and citizens of Revere, Massachusetts. The Plaintiffs bring this action for personal injuries sustained from exposure to Roundup, and its active ingredient glyphosate and the surfactant POEA. As a direct and proximate result of being exposed to Roundup, the Plaintiff, Henry Medugno, developed Mantle Cell Lymphoma, as well as other health problems as a result of developing NHL.

8.      Monsanto is a Delaware corporation, and it is listed as Massachusetts Secretary of State Business ID No. 356754, in "active" status, with a principle place of business in St. Louis, Missouri.

## FACTUAL ALLEGATIONS

9.      At all relevant times, Monsanto designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed the commercial herbicide Roundup.

10.     "Roundup" refers to all formulations of Monsanto's Roundup products, including, but not limited to, Roundup Concentrate Poison Ivy and Tough Brush Killer 1, Roundup Custom Herbicide, Roundup D-Pak Herbicide, Roundup Dry Concentrate, Roundup Export Herbicide, Roundup Fence & Hard Edger 1, Roundup Garden Foam Weed & Grass Killer, Roundup Grass and Week Killer, Roundup Herbicide, Roundup Original 2k Herbicide, Roundup Original II Herbicide, Roundup Pro Concentrate, Roundup Prodry Herbicide, Roundup Promas, Roundup Quik Stik Grass and Weed Killer, Roundup Quikpro Herbicide, Roundup Rainfast Concentrate Weed & Grass Killer, Roundup Rainfast Super Concentrate Weed & Grass Killer, Roundup Ready-to-Use Extended Control Weed & Grass Killer 1 Plus Weed Preventer, Roundup Ready-

3

to-Use Weed & Grass Killer, Roundup Ready-to-Use Weed and Grass Killer 2, Roundup Ultra

Dry, Roundup Ultra Herbicide, Roundup Ultramax, Roundup VM Herbicide, Roundup Weed &

Grass Killer Concentrate, Roundup Weed & Grass Killer Concentrate Plus, Roundup Weed &

Grass Killer Ready-to-Use Plus, Roundup Weed & Grass Killer Super Concentrate, Roundup

Weed & Grass Killer 1 Ready-to-Use, Roundup WSD Water Soluble Dry Herbicide Deploy Dry

Herbicide, or any other formulation containing the active ingredient glyphosate.

11.     Monsanto is a multinational agricultural biotechnology corporation based in St.

Louis, Missouri.  It is the world's leading producer of glyphosate.

12.     Monsanto discovered the herbicidal properties of glyphosate during the 1970's

and developed it as a broad-spectrum herbicide used to kill weeds and grasses known to compete

with commercial crops grown around the globe.

13.     Glyphosate is a "non-selective" herbicide, meaning it kills indiscriminately based

only on whether a given organism produces a specific enzyme, 5-enolpyruvylshikimic acid-3-

phospate synthase, known as EPSP synthase.

14.     Glyphosate inhibits the enzyme 5-enolpyruvylshikimic acid-3 phosphate synthase

that interferes with the shikimic pathway in plants, resulting in the accumulation of shikimic acid

in plant tissue and ultimately plant death.

15.     Sprayed as a liquid, plants absorb glyphosate directly through their leaves, stems,

and roots; and detectable quantities accumulate in the plant tissues.

16.     Each year, approximately 250 million pounds of glyphosate are sprayed on crops,

commercial nurseries, suburban lawns, parks, and golf courses.  This increase in use has been

driven largely by the proliferation of "Roundup Ready" crops, which have been genetically

engineered to resist the activity of glyphosate.

17.     Monsanto is responsible for the development, manufacture, marketing, sale, and distribution of Roundup Ready seeds.  By 2009, Monsanto was the world's leading producer of Roundup ready seeds.  In 2010, roughly 70% of corn and cotton and 90% of soybean fields in the United States were grown with Roundup Ready seeds.

18.     Roundup was introduced in 1974 and is today one of the world's most widely-used herbicides.  Monsanto's glyphosate products are registered in more than 130 countries and are approved for weed control in more than 100 crops.  No other herbicide active ingredient compares in terms of number of uses.[1]

19.     In all this time, farmers have used Roundup unaware it is a carcinogen.

## REGISTRATION OF HERBICIDES UNDER FEDERAL LAW

20.     The manufacture, formulation, and distribution of herbicides, such as Roundup, are regulated under the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA"), 7 U.S.C. § 136 *et seq.*  FIFRA requires that all pesticides be registered with the Environmental Protection Agency ("EPA") prior to their distribution, sale, or use, except as described by FIFRA 7 U.S.C. § 136a(a).

21.     The EPA requires a variety of tests as part of the registration process to evaluate the potential for exposure to pesticides, toxicity to people and other potential non-target organisms, and other adverse effects on the environment.  Registration by the EPA, however, is not an assurance or finding of safety.  The determination the EPA makes in registering or re-registering a product is not that the product is "safe," but rather that use of the product in accordance with its label directions "will not generally cause unreasonable adverse effects on the environment."  7 U.S.C. § 136(a)(c)(5)(D).

---

[1] *Backgrounder,* History of Monsanto's Glyphosate Herbicides, June 2005, available at www.monsanto.com/products/documents/glyphosate-background-materials/back_ground.pdf

22.     FIFRA defines "unreasonable adverse effects on the environment" to mean "any unreasonable risk to man or the environment, taking into account the economic, social, and environmental costs and benefits of the use of any pesticide." 7 U.S.C. § 136(bb).  FIFRA thus requires the EPA to make a risk/benefit analysis in determining whether a registration should be granted or allowed to continue to be sold in commerce.

23.     The EPA and the Commonwealth of Massachusetts registered Roundup for distribution, sale, and manufacture in the United States and the Commonwealth of Massachusetts.

24.     FIFRA generally requires that the registrant, here Monsanto, conduct health and safety testing of pesticide products.  The government is not required, nor is it able, to perform the product tests that are required of the manufacturer.

25.     Each pesticide product distributed, sold, or manufactured is evaluated at the time the product is initially registered.  The data necessary for registration of a pesticide has changed over time.  The EPA is now in the process of re-evaluating all pesticides through a Congressionally-mandated process called "re-registration." 7 U.S.C. § 136a-1.  To re-evaluate these pesticides, the EPA demands the completion of additional tests and the submission of data for the EPA's review and evaluation.

## MONSANTO'S FALSE REPRESENTATIONS REGARDING THE SAFETY OF ROUNDUP

26.     In 1996, the New York Attorney General ("NYAG") filed a lawsuit against Monsanto based on its false and misleading advertising of Roundup products.  Specifically, the lawsuit challenged Monsanto's general representations that its spray-on glyphosate-based herbicides, including Roundup, were "safer than table salt" and "practically non-toxic" to

mammals, birds, and fish.  Among the representations the NYAG found deceptive and

misleading about the human and environmental safety of Roundup are the following:

    a.    Remember that environmentally friendly Roundup herbicide is biodegradable.  It won't build up in the soil so you can use Roundup with confidence along customers' driveways, sidewalks and fences.

    b.    And remember that Roundup is biodegradable and won't build up in the soil.  That will give you the environmental confidence you need to use Roundup everywhere you've got a weed, brush, edging or trimming problem.

    c.    Roundup biodegrades into naturally occurring elements.

    d.    Remember that versatile Roundup herbicide stays where you put it.  That means there's no washing or leaching to harm customers' shrubs or other desirable vegetation.

    e.    This non-residual herbicide will not wash or leach in the soil.  It ... stays where you apply it.

    f.    You can apply Accord with "confidence because it will stay where you put it" it bonds tightly to soil particles, preventing leaching.  Then, soon after application, soil microorganisms biodegrade Accord into natural products.

    g.    Glyphosate is less toxic to rats than table salt following acute oral ingestion.

    h.    Glyphosate's safety margin is much greater than required.  It has over a 1,000-fold safety margin in food and over a 700-fold safety margin for workers who manufacture it or use it.

    i.    You can feel good about using herbicides by Monsanto.  They carry a toxicity category rating of 'practically non-toxic' as it pertains to mammals, birds and fish.

    j.    "Roundup can be used where kids and pets will play and breaks down into natural material."  This ad depicts a person with his head in the ground and a pet dog standing in an area which has been treated with Roundup.[2]

---

[2] Attorney General of the State of New York, In the Matter of Monsanto Company, Assurance of Discontinuance Pursuant to Executive Law § 63(15)(Nov. 1996).

27.     On November 19, 1996, Monsanto entered into an Assurance of Discontinuance with the NYAG, in which Monsanto agreed, among other things, "to cease and desist from publishing or broadcasting any advertisements [in New York] that represent, directly or by implication" that:

      a.    its glyphosate-containing pesticide products or any component thereof are safe, non-toxic, harmless or free from risk;

      b.    its glyphosate-containing pesticide products or any component thereof manufactured, formulated, distributed or sold by Monsanto are biodegradable;

      c.    its glyphosate-containing pesticide products or any component thereof stay where they are applied under all circumstances and will not move through the environment by any means;

      d.    its glyphosate-containing pesticide products or any component thereof are "good" for the environment or are "known for their environmental characteristics;"

      e.    glyphosate-containing pesticide products or any component thereof are safer or less toxic than common consumer products other than herbicides; and

      f.    its glyphosate-containing products or any component thereof might be classified as "practically non-toxic."

28.     Monsanto did not alter its advertising in the same manner in any state other than New York, and on information and belief still has not done so today.

29.     In 2009, France's highest court ruled that Monsanto had not told the truth about the safety of Roundup and affirmed an earlier judgment that Monsanto had falsely advertised its herbicide Roundup as "biodegradable" and that it "left the soil clean."[3]

---

[3] *Monsanto Guilty in 'False Ad' Row,* BBC, Oct. 15, 2009, *available at* http://news.bbc.co.uk/2/hi/europe/8308903.stm.

8

## EVIDENCE OF CARCINOGENICITY IN ROUNDUP

30.     As early as the 1980's Monsanto was aware of glyphosate's carcinogenic properties.

31.     On March 4, 1985, a group of the EPA's Toxicology Branch published a memorandum classifying glyphosate as a Category C oncogene.[4]  Category C oncogenes are possible human carcinogens with limited evidence of carcinogenicity.

32.     In 1986, the EPA issued a Registration Standard for glyphosate (NTIS PB87-103214).  The Registration standard required additional phytotoxicity, environmental fate, toxicology, product chemistry, and residue chemistry studies.  All of the data required was submitted and reviewed and/or waived.[5]

33.     In October 1991, the EPA published a Memorandum entitled "Second Peer Review of Glyphosate."  The memorandum changed glyphosate's classification to Group E (evidence of non-carcinogenicity for humans).  Two peer review committee members did not concur with the conclusions of the committee and one member refused to sign.[6]

34.     In addition to the toxicity of the active molecule, many studies support the hypothesis that glyphosate formulations found in Monsanto's Roundup products are more dangerous and toxic than glyphosate alone.[7]  As early as 1991, evidence existed demonstrating that glyphosate formulations were significantly more toxic than glyphosate alone.

---

[4] Consensus Review of Glyphosate, Casewell No. 661A.  March 4, 1985.  United States Environmental Protection Agency.
[5] http://www.epa.gov/oppsrrd1/reregistration/REDs/factsheets/0178fact.pdf.
[6] U.S. EPA, *Memorandum, Subject:  SECOND Peer Review of Glyphosate* 1 (1191), *available at* http://www.epa.gov/pesticides/chem_search/cleared_reviews/csr_PC-103601_30-Oct-91_265.pdf
[7] See Martinez, et al. *Oral and pulmonary toxicology of the surfactant used in Roundup herbicide,* PROC. WEST. PHARMACOL. SOC. 34:43-46 (1991); Nora Benachour, et al., *Glyphosate Formulations Induce Apoptosis and Necrosis in Human Umbilical, Embryotic, and Placental Cells, 22 CHEM. RES. TOXICOL. 97-105 (2009), available at http://big.assets.huffington.com/france.pdf; Gasnier et al. 2010, Francisco Peixoto, Comparative effects of the Roundup and glyphosate on mitochondrial oxidative phosphorylation,* 61 CHEMOSPHERE 1115, 1122 (2005), *available at*

9

35.     In 2002, Julie Marc published a study entitled "Pesticide Roundup Provokes Cell Division Dysfunction at the Level of CDK1/Cyclin B Activation."[8]  The study found that Monsanto's Roundup caused delays in the cell cycles of sea urchins, while the same concentrations of glyphosate alone proved ineffective and did not alter cell cycles.

36.     In 2004, Julie Marc published a study entitled "Glyphosate-based pesticides affect cell cycle regulation."  The study demonstrated a molecular link between glyphosate-based products and cell cycle dysregulation.[9]

37.     The study noted that "cell-cycle dysregulation is a hallmark of tumor cells and human cancer.  Failure in the cell-cycle checkpoints leads to genomic instability and subsequent development of cancers from the initial affected cell."  Further, "[s]ince cell cycle disorders such as cancer result from dysfunction of unique cell, it was of interest to evaluate the threshold dose of glyphosate affecting cells."[10]

38.     In 2005, Francisco Peixoto published a study showing that Roundup's effects on rat liver mitochondria are much more toxic and harmful than the same concentrations of glyphosate alone.

39.     The Peixoto study suggested that the harmful effects of Roundup on mitochondrial bioenergetics could not be exclusively attributed to glyphosate and could be the result of other chemicals, namely the surfactant POEA, or alternatively due to the possible synergy between glyphosate and Roundup formulation products.

---

https://www.researchgate.net/publication/7504567_Comparative_effects_of_the_Roundup_and_glyphosate_on_mitochondrial_oxidative_phosphorylation; March 2004.

[8] Julie Marc, et al., *Pesticide Roundup Provokes Cell Division Dysfunction at the Level of CDK1/Cyclin B Activation*, 15 CHEM. RES. TOXICOL. 326-331 (2002), *available at* http://pubs.acs.org/doi/full/10.1021/tx015543g.

[9] Julie Marc, et al., *Glyphosate-based pesticides affect cell cycle regulation*, 96 BILIOGY OF THE CELLS 245, 245-249 (2004), *available at* http://onlinelibrary.wiley.com/doi/10.1016/j.biolcel.2003.11.010/epdf.

[10] Molinari, 2000; Stewart et al., 2003.

40.     In 2009, Nora Benachour and Gilles-Eric Seralini published a study of the effects of Roundup and glyphosate on human umbilical, embryonic, and placental cells.

41.     The study used dilution levels of Roundup and glyphosate far below agricultural recommendations, corresponding with low levels of residues in food. The study concluded that supposed "inert" ingredients, and possibly POEA, change human cell permeability and amplify toxicity of glyphosate alone. The study further suggested that determinations of glyphosate toxicity should take into account the presence of adjuvants, or those chemicals used in the formulation of the complete pesticide. The study confirmed that the adjuvants in Roundup are not inert and that Roundup is always more toxic than its active ingredient glyphosate.

42.     The results of these studies were confirmed in peer-reviewed studies that were known to Monsanto.

43.     Monsanto knew or should have known that Roundup is more toxic than glyphosate alone and that safety studies on Roundup, Roundup's adjuvants and "inert" ingredients, and/or the surfactant POEA were necessary to protect the Plaintiff from Roundup.

44.     Monsanto knew or should have known that tests limited to Roundup's active ingredient glyphosate were insufficient to prove the safety of Roundup.

45.     Monsanto failed to appropriately and adequately test Roundup, Roundup's adjuvants and "inert" ingredients, and/or the surfactant POEA to protect the Plaintiff from Roundup.

46.     Rather than performing appropriate tests, Monsanto relied on flawed industry-supported studies designed to protect Monsanto's economic interests rather than the Plaintiffs and the consuming public.

11

47.     Despite its knowledge that Roundup was considerably more dangerous than glyphosate alone, Monsanto continued to promote Roundup as safe.

### IARC CLASSIFICATION OF GLYPHOSATE

48.     The International Agency for Research on Cancer ("IARC") is the specialized intergovernmental agency that the World Health Organization ("WHO") of the United Nations tasked with conducting and coordinating research into the causes of cancer.

49.     An IARC Advisory Group to Recommend Priorities for IARC Monographs during 2015-2019 met in April 2014.  Though nominations for the review were solicited, a substance must meet two criteria to be eligible for review by the IARC Monographs:  there must already be some evidence of carcinogenicity of the substance, and there must be evidence that humans are exposed to the substance.

50.     IARC set glyphosate for review in 2015-2016.  IARC uses five criteria for determining priority in reviewing chemicals.  The substance must have a potential for direct impact on public health; scientific literature to support suspicion of carcinogenicity; evidence of significant human exposure; high public interest and/or potential to bring clarity to a controversial area and/or reduce public anxiety or concern; and related agents similar to one given high priority by the above considerations.  Data reviewed is sourced preferably from publicly accessible, peer-reviewed data.

51.     On March 24, 2015, after its cumulative review of human, animal, and DNA studies for more than one (1) year, many of which have been in Monsanto's possession since as early as 1985, the IARC's working group published its conclusion that the glyphosate contained in Monsanto's Roundup herbicide, is a Class 2A "probable carcinogen" as demonstrated by the

mechanistic evidence of carcinogenicity in humans and sufficient evidence of carcinogenicity in animals.

52.     The IARC's full Monograph was published on July 29, 2015, and established glyphosate as a class 2A probable carcinogen to humans.  According to the authors, glyphosate demonstrated sufficient mechanistic evidence (genotoxicity and oxidative stress) to warrant a 2A classification based on evidence of carcinogenicity in humans and animals.

53.     The IARC Working Group found an increased risk between exposure to glyphosate and non-Hodgkin's Lymphoma ("NHL") and several subtypes of NHL, and the increased risk continued after adjustment for other pesticides.

54.     The IARC also found that glyphosate caused DNA and chromosomal damage in human cells.

## EARLIER EVIDENCE OF THE DANGERS OF GLYPHOSATE

55.     Despite the new classification by the IARC, Monsanto has had ample evidence of glyphosate and Roundup's genotoxic properties for decades.

56.     Genotoxicity refers to chemical agents capable of damaging the DNA within a cell through genetic mutations, which is a process that is believed to lead to cancer.

57.     In 1997, Chris Clements published "Genotoxicity of select herbicides in Rana catesbeiana tadpoles using the alkaline single-cell gel DNA electrophoresis (comet) assay."

58.     The study found that tadpoles exposed to roundup showed significant DNA damage when compared with unexposed control animals.

59.     Both human and animal studies have shown that glyphosate and glyphosate-base formulations such as Roundup can induce oxidative stress.

13

60.     Oxidative stress and associated chronic inflammation are believed to be involved in carcinogenesis.

61.     The IARC Monograph notes that "[s]trong evidence exists that glyphosate, AMPA and glyphosate-based formulations can induce oxidative stress."

62.     In 2006, César Paz-y-Miño published a study examining DNA damage in human subjects exposed to glyphosate.

63.     The study produced evidence of chromosomal damage in blood cells showing significantly greater damage after exposure to glyphosate than before in the same individuals, suggesting that the glyphosate formulation used during aerial spraying had a genotoxic effect on exposed individuals.

64.     The IARC Monograph reflects the volume of evidence of glyphosate pesticides' genotoxicity noting "[t]he evidence for genotoxicity caused by glyphosate-based formulations is strong."

65.     Despite knowledge to the contrary, Monsanto denies that Roundup is genotoxic.

66.     In addition to glyphosate and Roundup's genotoxic properties, Monsanto has long been aware of glyphosate's carcinogenic properties.

67.     Glyphosate and Roundup in particular have long been associated with carcinogenicity and the development of numerous forms of cancer, including, but not limited to, NHL, Hodgkin's Lymphoma, Multiple Myeloma, and soft tissue sarcoma.

68.     Monsanto has known of this association since the mid-1980's and numerous human and animal studies evidence the carcinogenicity of glyphosate and/or Roundup.

14

69.     In 1985, the EPA studied the effects of glyphosate in mice finding a dose related response in male mice linked to renal tubal adenomas, a rare tumor.  The study concluded the glyphosate was oncogenic.

70.     In 2003, Lennart Hardell and Mikael Eriksson published the results of two case controlled studies on pesticides as a risk factor for NHL and hairy cell leukemia.

71.     The study concluded that glyphosate had the most significant relationship to NHL among all herbicide studies with an increased odds ratio of 3.11.

72.     In 2003, AJ De Roos published a study examining the pooled data of mid-western farmers, examining pesticides and herbicides as risk factors for NHL.

73.     The study, which controlled for potential confounders, found a relationship between increased NHL incidence and glyphosate.

74.     In 2008, Mikael Eriksson published a population based case-control study of exposure to various pesticides as a risk factor for NHL.

75.     This strengthened previous associations between glyphosate and NHL.

76.     In spite of this knowledge, Monsanto continued to issue broad and sweeping statements suggesting that Roundup was, and is, safer than ordinary household items such as table salt, despite a lack of scientific support for the accuracy and validity of these statements and, in fact, voluminous evidence to the contrary.

77.     On information and belief, these statements and representations have been made with the intent of inducing Plaintiff, the agricultural community, and the public at large to purchase, and increase the use of, Roundup for Monsanto's pecuniary gain, and in fact did induce the Plaintiff to use Roundup.

78.     Monsanto made these statements with complete disregard and reckless indifference to the safety of the Plaintiff and the general public.

79.     Notwithstanding Monsanto's representations, scientific evidence has established a clear association between glyphosate and genotoxicity, inflammation, and an increased risk of many cancers, including, but not limited to, NHL, Multiple Myeloma, and soft tissue sarcoma.

80.     Monsanto knew or should have known that glyphosate is associated with an increased risk of developing cancer, including, but not limited to, NHL, Multiple Myeloma, and soft tissue sarcomas.

81.     Monsanto failed to appropriately and adequately inform and warn the Plaintiff of the serious and dangerous risks associated with the use of and exposure to glyphosate and/or Roundup, including, but not limited to, the risk of developing NHL, as well as other severe and personal injuries, which are permanent and/or long-lasting in nature, cause significant physical pain and mental anguish, diminished enjoyment of life, and the need for medical treatment, monitoring, and/or medications.

82.     Despite the IARC's classification of glyphosate as a class 2A probable carcinogen, Monsanto continues to maintain that glyphosate and/or Roundup is safe, non-carcinogenic, non-genotoxic, and falsely warrant to users and the general public that independent experts and regulatory agencies agree that there is no evidence of carcinogenicity or genotoxicity in glyphosate and Roundup.

83.     Monsanto has claimed and continues to claim that Roundup is safe, non-carcinogenic, and non-genotoxic.

84.     Monsanto claims on its website that "[r]egulatory authorities and independent experts around the world have reviewed numerous long-term/carcinogenicity and genotoxicity

studies and agree that there is no evidence that glyphosate, the active ingredient in Roundup

brand herbicides and other glyphosate-based herbicides, causes cancer, even at very high doses,

and that it is not genotoxic."[11]

85.     Ironically, the primary source for this statement is a 1986 report by the WHO, the

same organization that now considers glyphosate to be a probable carcinogen.

86.     Glyphosate, and Monsanto's Roundup products in particular, have long been

associated with serious side effects and many regulatory agencies around the globe have banned

or are currently banning the use of glyphosate herbicide products.

87.     Monsanto's statements proclaiming the safety of Roundup and disregarding its

dangers misled the Plaintiff.

88.     Despite Monsanto's knowledge that Roundup was associated with an elevated

risk of developing cancer, Monsanto's promotional campaigns focused on Roundup's purported

"safety profile."

89.     Monsanto's failure to adequately warn the Plaintiff, resulted in (1) the Plaintiff,

Henry Medugno, being exposed to glyphosate instead of using another acceptable and safe

method of controlling unwanted weeds and pests; and (2) scientists and physicians failing to

warn and instruct consumers about the risk of cancer, including NHL, and other injuries

associated with Roundup.

90.     Monsanto failed to seek modification of the labeling of roundup to include

relevant information regarding the risks and dangers associated with Roundup exposure.

91.     Monsanto's failure to appropriately warn and inform the EPA has resulted in

inadequate warnings in safety information presented directly to users and consumers.

---

[11] *Backgrounder* – Glyphosate: No Evidence of Carcinogenicity, updated November 2014, available at
www.monsanto.com/glyphosate/documents/no-evidence-of-carcinogenicity.pdf

92.     Monsanto's failure to appropriately warn and inform the EPA has resulted in the absence of warning or caution statements that are adequate to protect health and the environment.

93.     Monsanto's failure to appropriately warn and inform the EPA has resulted in the directions for use that are not adequate to protect health and the environment.

94.     By reason of the foregoing acts and omissions, the Plaintiffs seek compensatory damages as a result of the Plaintiff's exposure to Roundup, which caused or was a substantial contributing factor in causing the Plaintiff to suffer from cancer, specifically NHL, and the Plaintiffs suffered severe and personal injuries that are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life.

95.     By reason of the foregoing, the Plaintiff is severely and permanently injured.

96.     By reason of the foregoing acts and omissions, the Plaintiffs have endured and continues to suffer, emotional and mental anguish, medical expenses, and other economic and non-economic damages, as a result of Monsanto's actions and inactions.

## PLAINTIFF'S EXPOSURE TO ROUNDUP

97.     The Plaintiff, Henry Medugno, is a Massachusetts resident who used Roundup on his property from approximately 1994 to 2019.

98.     The Plaintiff, Henry Medugno, was first diagnosed with mantle cell lymphoma, a non-Hodgkin's lymphoma in 2011. The development of Plaintiff's NHL, and subsequent health problems, was proximately and actually caused by exposure to Monsanto's Roundup products.

99.     The Plaintiff has incurred significant economic and non-economic damages resulting from his injuries.

100.    During the period of Plaintiff's exposure to Roundup, he did not know that exposure to Roundup was injurious to his health or the health of others.

101.    The Plaintiff first learned that Roundup caused NHL in 2019 after seeing a television advertisement regarding the correlation between the two.

## TOLLING OF APPLICABLE STATUTE OF LIMITATIONS
## DISCOVERY RULE TOLLING

102.    The Plaintiff had no way of knowing about the risk of serious illness associated with the use of and/or exposure to Roundup and glyphosate until 2019. This is the quintessential case for tolling.

103.    Within the time period of any applicable statutes of limitations, the Plaintiff could not have discovered, through the exercise of reasonable diligence, that exposure to Roundup and glyphosate is injurious to human health.

104.    The Plaintiff did not discover, and did not know the facts that would cause a reasonable person to suspect, the risks associated with the use of and/or exposure to Roundup and glyphosate; nor would a reasonable and diligent investigation by them have disclosed that Roundup and glyphosate would cause their cancers.

105.    For these reasons, all applicable statute of limitations have been tolled by operation of the discovery rule with respect to the Plaintiff's claims

## FRAUDULENT CONCEALMENT TOLLING

106.    All applicable statutes of limitations have also been tolled by Monsanto's knowing and active fraudulent concealment and denial of the facts alleged herein throughout the time period relevant to this action.

107.    Instead of disclosing critical safety information about Roundup and glyphosate, Monsanto has consistently and falsely represented the safety of its Roundup products.

19

## ESTOPPEL

108.   Monsanto was under a continuous duty to disclose to consumers, users, and other persons coming into contact with its products, including the Plaintiff, accurate safety information concerning its products and the risks associated with the use of and/or exposure to Roundup and glyphosate.

109.   Instead, Monsanto knowingly, affirmatively, and actively concealed safety information concerning Roundup and glyphosate and the serious risks associated with the use of and/or exposure to its products.

110.   Based on the foregoing, Monsanto is estopped from relying on any statutes of limitations in defense of this action.

## COUNT I – NEGLIGENCE

111.   The Plaintiffs re-alleges each paragraph above as if fully set forth herein.

112.   Defendant is in the business of designing, manufacturing, selling, marketing, packaging, selling, and/or distributing products used in the agricultural industry. The products used by the Plaintiff and to which the Plaintiff was exposed to were designed, produced, manufactured, marketed, sold and/or otherwise put into the stream of commerce by the Defendant, and were used for their intended purpose.

113.   Defendant Monsanto had a duty to exercise reasonable care in the designing, researching, testing, manufacturing, marketing, supplying, promoting, packaging, sale, and/or distribution of Roundup into the stream of commerce, including a duty to assure that the product would not cause users to suffer unreasonable, dangerous side effects.

114.   Monsanto failed to exercise reasonable care in the designing, researching, testing, manufacturing, marketing, supplying, promoting, packaging, sale, testing, quality assurance, quality control, and/or distribution of Roundup into interstate commerce in that Monsanto knew or should have known that using Roundup created a high risk of unreasonable, dangerous side effects,

20

including, but not limited to, the development of NHL, as well as other severe and personal injuries that are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life, as well as need for lifelong medical treatment, monitoring, and/or medications.

115.    The negligence by Defendant, its agents, servants, and/or employees, included but was not limited to the following act and/or omissions:

a.    Manufacturing, producing, promoting, formulating, creating, and/or designing Roundup without thoroughly testing it;

b.    Failing to test Roundup and/or failing to adequately, sufficiently, and properly test Roundup;

c.    Not conducting sufficient testing programs to determine whether or not Roundup was safe for use; in that Monsanto knew or should have known that Roundup was unsafe and unfit for use by reason of the dangers to its users;

d.    Not conducting sufficient testing programs and studies to determine Roundup's carcinogenic properties even after Monsanto had knowledge that Roundup is, was, or could be carcinogenic;

e.    Failing to conduct sufficient testing programs to determine the safety of "inert" ingredients and/or adjuvants contained within roundup, and the propensity of these ingredients to render Roundup toxic, increase the toxicity of Roundup, whether these ingredients are carcinogenic, magnify the carcinogenic properties of Roundup, and whether or not "inert" ingredients and/or adjuvants were safe for use;

f.    Negligently failing to adequately and correctly warn the Plaintiff, the public, the medical and agricultural professions, and the EPA of the dangers of Roundup;

g.    Negligently failing to petition the EPA to strengthen the warnings associated with Roundup;

h.    Failing to provide adequate cautions and warnings to protect the health of users, handlers, applicators, and persons who would reasonably and foreseeably come into contact with roundup;

i.    Negligently marketing, advertising, and recommending the use of Roundup without sufficient knowledge as to its dangerous propensities;

j.    Negligently representing that Roundup was safe for use for its intended purpose, and/or that Roundup was safer than ordinary and common items such as table salt, when, in fact, it was unsafe;

k.    Negligently representing that Roundup had equivalent safety and efficacy as other forms of herbicides;

l.    Negligently designing Roundup in a manner that was dangerous to its users;

m.    Negligently manufacturing Roundup in a manner that was dangerous to its users;

n.    Negligently producing Roundup in a manner that was dangerous to its users;

o.    Negligently formulating Roundup in a manner that was dangerous to its users;

p.    Concealing information from the Plaintiffs while knowing that Roundup was unsafe, dangerous, and/or non-conforming with EPA regulations;

q.    Improperly concealing and/or misrepresenting information from the Plaintiff, scientific and medical professionals, and/or the EPA, concerning the severity of risks and dangers of Roundup compared to other forms of herbicides; and

r.    Negligently selling Roundup with a false and misleading label.

116.    Monsanto under-reported, underestimated, and downplayed the serious dangers of Roundup.

117.    Monsanto negligently and deceptively compared the safety risks and/or dangers of roundup with common everyday foods such as table salt, and other forms of herbicides.

118.    Monsanto was negligent and/or violated Massachusetts law in the designing, researching, supplying, manufacturing, promoting, packaging, distributing, testing, advertising, warning, marketing, and selling of Roundup in that it:

a.    Failed to use ordinary care in designing and manufacturing Roundup so as to avoid the aforementioned risks to individuals when Roundup was used as an herbicide;

22

b.  Failed to accompany its product with proper and/or accurate warnings regarding all possible adverse side effects associated with the use of Roundup;

c.  Failed to accompany its product with proper warnings regarding all possible adverse side effects concerning the failure and/or malfunction of Roundup;

d.  Failed to accompany its product with accurate warnings regarding the risks of all possible adverse side effects concerning Roundup;

e.  Failed to warn the Plaintiff of the severity and duration of such adverse effects, as the warnings given did not accurately reflect the symptoms, or severity of the side effects including, but not limited to, the development of NHL;

f.  Failed to conduct adequate testing, clinical testing and post-marketing surveillance to determine the safety of Roundup;

g.  Failed to conduct adequate testing, clinical testing, and post-marketing surveillance to determine the safety of Roundup's "inert" ingredients and/or adjuvants;

h.  Negligently misrepresented the evidence of Roundup's genotoxicity and carcinogenicity; and

i.  Was otherwise careless and/or negligent.

119.    Despite the fact that Monsanto knew or should have known that Roundup caused, or could cause, unreasonably dangerous side effects, Defendant continues to market, manufacture, distribute, and/or sell Roundup to consumers, including the Plaintiff.

120.    Defendant knew or should have known that consumers such as the Plaintiff would foreseeably suffer injury as a result of Monsanto's failure to exercise ordinary care.

121.    Defendant's violations of law and/or negligence were the proximate cause of the Plaintiff's injuries, harm and economic loss, which the Plaintiff suffered and will continue to suffer.

122.    As a result of the foregoing acts and omissions, the Plaintiff suffered life-threatening NHL, and severe personal injuries, which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life, as well as financial expenses for hospitalization and medical care.

WHEREFORE, the Plaintiff, Henry Medugno, respectfully requests that this Court enter judgment in the Plaintiff's favor for damages, together with interest, costs herein incurred, attorneys' fees and all relief as this Court deems just and proper.

### COUNT II – BREACH OF EXPRESS AND IMPLIED WARRANTIES

123.    The Plaintiff re-alleges each paragraph above as if fully stated herein.

124.    At all times relevant to this litigation, Monsanto engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting its Roundup products, which are defective and unreasonably dangerous to consumers, including the Plaintiff, thereby placing Roundup products into the stream of commerce.  These actions were under Defendant's ultimate control and supervision.

125.    At all times relevant to this litigation, Monsanto were engaged in the business of marketing, selling, distributing, and promoting Roundup products, which are defective and unreasonably dangerous to consumers, including the Plaintiff, thereby placing Roundup products into the stream of commerce.

126.    Plaintiff, Henry Medugno, was a person whom Monsanto could reasonably have expected to use, consume or be affected by Defendant's products within the meaning of Massachusetts General Laws c. 106, §2-318.

127.    At all relevant times, Monsanto expressly and impliedly represented and warranted to the purchasers of its Roundup products, by and through statements made in labels,

publications, package inserts, and other written materials intended for consumers and the general public, that its Roundup products were safe to human health and the environment, effective, fit, safe, and proper for their ordinary and particular purpose for which they were manufactured, sold, supplied or distributed. Defendant advertised, labeled, marketed, and promoted Roundup products, representing the quality to consumers and the public so as to induce their purchase or use, thereby making an express and implied warranty that Roundup products would conform to the representations.

128.    These express and implied representations include incomplete warnings and instructions that purport, but fail, to include the complete array or risks associated with use of and/or exposure to Roundup and glyphosate.  Monsanto knew and/or should have known that the risks expressly included in Roundup warnings and labels did not and do not accurately or adequately set forth the risks of developing the serious injuries complained of herein. Nevertheless, Defendant expressly and impliedly represented that its Roundup products were safe and effective, including for use as agricultural herbicides.

129.    The representations about Roundup, as set forth herein, contained or constituted affirmations of fact or promises made by the seller to the buyer, which related to the goods and became part of the basis of the bargain, creating an express and implied warranty that the goods would conform to the representations.

130.    Monsanto placed Roundup products into the stream of commerce for sale and recommended their use to consumers and the public without adequately warning of the true risks of developing the injuries associated with the use of and exposure to Roundup and its active ingredient glyphosate.

25

131.   Defendant breached these warranties because, among other things, its Roundup

products were defective, dangerous, unfit for use, did not contain labels representing the true and

adequate nature of the risks associated with their use, and were not merchantable or safe for their

intended, ordinary, and foreseeable use and purpose.   Specifically, Defendant breached the

warranties in the following ways;

     a.   Monsanto represented through its labeling, advertising, and marketing
materials that its Roundup products were safe, and fraudulently withheld
and concealed information about the risks of serious injury associated with
the use of and/or exposure to Roundup and glyphosate by expressly
limiting the risks associated with use and/or exposure within its warnings
and labels; and

     b.   Monsanto represented that its Roundup products were safe for use and
fraudulently concealed information demonstrating that glyphosate, the
active ingredient in Roundup, had carcinogenic properties, and that its
Roundup products, therefore, were not safer than alternatives available on
the market.

132.   Monsanto had sole access to material facts concerning the nature of the risks

associated with its Roundup products as expressly stated within its warnings and labels, and

knew that consumers and users such as the Plaintiff could not have reasonably discovered that

the risks expressly included in Roundup warnings and labels were inadequate and inaccurate.

133.   The Plaintiff had no knowledge of the falsity or incompleteness of Defendant's

statements and representations concerning Roundup.

134.   The Plaintiff used and/or was exposed to the use of Roundup as researched,

developed, designed, tested, formulated, manufactured, inspected, labeled, distributed, packaged,

marketed, promoted, sold, or otherwise released into the stream of commerce by Defendant.

135.   Had the warnings and labels for Roundup products accurately and adequately set

forth the true risks associated with the use of such products, including the Plaintiff's injuries,

rather than expressly excluding such information and warranting that the products were safe for their intended use, the Plaintiff could have avoided the injuries complained of herein.

136.    As a direct and proximate result of Defendant Monsanto's wrongful acts and omissions, the Plaintiffs have suffered severe injuries. The Plaintiff has endured pain and suffering, has suffered economic losses (including significant expenses for medical care and treatment), and will continue to incur these expenses in the future.

WHEREFORE, the Plaintiff Henry Medugno, respectfully requests that this Court enter judgment in the Plaintiff's favor for damages, together with interest, costs herein incurred, attorneys' fees, and all such other and further relief as this Court deems just and proper.

## COUNT III - LOSS OF CONSORTIUM

137.    The Plaintiffs re-allege the paragraphs above as if fully stated herein.

138.    The Plaintiff, Marlene Medugno, is the wife of Henry Medugno and at all pertinent times was the wife of Henry Medugno.

139.    As a direct and proximate result of the breach of duty and wrongdoing of the defendants and the resultant injury to Henry Medugno as more particularly described in Counts I through II, the plaintiff, Marlene Medugno, suffered a loss of her right to consortium with her husband and the loss of her husband's services, society and companionship, and has suffered great mental anguish.

WHEREFORE, the Plaintiff, Marlene Medugno, demands compensatory damages, plus interest and costs. The Plaintiff also demands a jury trial on the issues contained herein.

## COUNT IV - VIOLATION OF M.G.L. c. 93A § 9

140.    Plaintiffs incorporate by reference, as if fully set forth herein each and every allegation as set forth in the preceding paragraphs and further allege as follows:

27

141.    At all times relevant to this complaint, Defendant Monsanto was engaged in trade or commerce.

142.    The acts and conduct of Monsanto alleged in this Complaint, including but not limited to, Counts I and II, constitute unfair or deceptive acts or practices within the meaning of M.G.L. c. 93A, §§ 2 and 3, 940 C.M.R. 3.05(1), and 940 C.M.R. 3.16(1) and (2).

143.    The actions of Monsanto described herein were performed willfully and knowingly.

144.    As a result of the unfair or deceptive acts or practices alleged in this complaint, including but not limited to, Counts I, II and III, the Plaintiffs sustained injuries including, but not limited to the injuries detailed above.

145.    Prior to the filing and service of this Amended Complaint on Defendant Monsanto, on March 2, 2021, the Plaintiff, Henry Medugno, through her attorneys, sent Monsanto a written demand for relief pursuant to M.G.L. c.93A, §9(3), identifying the claimant and reasonably describing the unfair and deceptive acts or practices by the Defendant, and the injuries the Plaintiff suffered as a result. This written demand was sent via certified mail, return receipt requested, and Plaintiff's counsel received signed confirmation of the delivery of the demand letter via certified Mail Receipt. A copy of this demand letter, along with the certified mail receipt, is attached hereto as "Exhibit 1."

146.    Plaintiff has received Monsanto's reply to Plaintiff's written demand for relief, in which Monsanto declined to make a settlement offer. Attached hereto as "Exhibit 2."

147.    The requisite 30 days, pursuant to M.G.L. c.93A §9, has elapsed since service of Plaintiff's demand and Defendant has not provided a satisfactory response.

WHEREFORE, the Plaintiff, Henry Medugno, demands compensatory damages, double or treble damages, attorneys' fees, plus interest and costs.

## DEMAND FOR JURY TRIAL

The Plaintiffs hereby demand trial by jury as to all issues.

DATED:  April 23, 2020

<div style="text-align: right">

The Plaintiffs,
By their Attorneys,


/s/ *David C. Strouss*
David C. Strouss, BBO# 546253
Evan R. Hoffman, BBO# 678975
Jasmine M. Howard, BBO# 698130
**THORNTON LAW FIRM, LLP**
One Lincoln Street, 13th Fl.
State Street Financial Center
Boston, MA  02111
(617) 720-1333  FAX (617) 720-1333
dstrouss@tenlaw.com
ehoffman@tenlaw.com
jhoward@tenlaw.com

</div>



Michael P. Thornton (NH, ME & MA)
David J. McMorris (NY & MA)
David C. Strouss
Andrew E. Wainwright (NY & MA)
Michael A. Lesser
Marilyn T. McGoldrick
Garrett J. Bradley (NY & MA)
Brad J. Mitchell

Andrea Marino Landry
Evan R. Hoffman
Leah M. McMorris
Brian J. Prior (NY & MA)
Guillaume Buell (MA, NY & DC)
Leslie-Anne Taylor
Jasmine M. Howard (MA & NY)

Of Counsel
John T. Burnett (NH & MA)
David Bricker (CA, IL & MA)
Patricia M. Flannery
Melissa A. Reznek (MO & MA)
Christian F. Uehlein (MT, MA & WY)

March 2, 2021

<u>VIA Certified Mail – Return Receipt Requested</u>

To: Brett Begemann, President
  **Monsanto Company**
  800 North Lindbergh Blvd.
  St. Louis, Missouri 63167

Re: Henry Medugno , D.O.B. 06/22/1938
  Roundup (Glyphosate)

Dear Sir:

  This is a written demand for relief pursuant to the Massachusetts Consumer Protection Act, M.G.L.A. c. 93A § 9(3). This law firm represents Henry Medugno. The unfair and deceptive acts or practices of The Monsanto Company (hereinafter referred to as "the Defendant," or "Monsanto") led to Mr. Medugno developing follicular lymphoma, a type of non-Hodgkin lymphoma, due to his use of, and exposure to, Defendant's product, Roundup. Specifically, the Defendant willfully, knowingly, and deceptively, advertised, marketed, promoted, distributed, and sold Roundup, a herbicide containing the active ingredient glyphosate, without adequate and proper warnings concerning health risks, including follicular lymphoma, experienced by Mr. Medugno. Defendant caused the unreasonably dangerous and defective product to enter the channels of trade in direct violation of M.G.L. c. 93A.

  Mr. Medugno's claim arises from the Defendant (1) transacting business in Massachusetts; (2) contracting to supply and/or sell goods in Massachusetts; (3) doing or causing a tortious act to be done in Massachusetts; and/or (4) causing the consequences of a tortious act that occurred within Massachusetts.

  The Defendant has been researching, developing, designing, licensing, manufacturing, distributing, selling, marketing, testing, promoting and/or introducing into interstate commerce, either directly or indirectly through third parties or related entities, the herbicide Roundup at all times relevant hereto, having first formulated Roundup in the 1970's. Glyphosate is a "non-selective" herbicide, meaning it kills indiscriminately based only on whether a given organism produces a specific enzyme, 5-enolpyruvylshikimic acid-3-phospate synthase, known as EPSP synthase. Glyphosate inhibits the enzyme 5-enolpyruvylshikimic acid-3 phosphate synthase that interferes with the shikimic pathway in plants, resulting in the accumulation of shikimic acid in plant tissue and ultimately plant death. Glyphosate is the active ingredient in Roundup. Each year, approximately 250 million pounds of glyphosate are sprayed on crops, commercial nurseries, suburban lawns, parks, and golf courses. No other herbicide active ingredient

compares in terms of number of uses.[1]  For nearly forty years, consumers and the public have used Roundup, unaware of its carcinogenic properties.

Each pesticide product distributed, sold, or manufactured is evaluated at the time the product is initially registered.  The data necessary for registration of a pesticide has changed over time.  The EPA is now in the process of re-evaluating all pesticides through a Congressionally-mandated process called "re-registration."  7 U.S.C. § 136a-1.  To re-evaluate these pesticides, the EPA demands the completion of additional tests and the submission of data for the EPA's review and evaluation. The EPA had planned to release its preliminary risk assessment of glyphosate and Roundup – in relation to the registration process – no later than July 2015.  The EPA completed its review of glyphosate in early 2015 but delayed releasing the assessment pending further review in light of the World Health Organization's findings that glyphosate is a "probable carcinogen" as demonstrated by the mechanistic evidence of carcinogenicity in humans and sufficient evidence of carcinogenicity in animals.

In 1996, the New York Attorney General ("NYAG") filed a lawsuit against Monsanto based on its false and misleading advertising of Roundup products.  Specifically, the lawsuit challenged Monsanto's general representations that its spray-on glyphosate-based herbicides, including Roundup, were "safer than table salt" and "practically non-toxic" to mammals, birds, and fish.  Among the representations the NYAG found deceptive and misleading about the human and environmental safety of Roundup are the following:

     a.     Remember that environmentally friendly Roundup herbicide is biodegradable.  It won't build up in the soil so you can use Roundup with confidence along customers' driveways, sidewalks and fences.

     b.     And remember that Roundup is biodegradable and won't build up in the soil.  That will give you the environmental confidence you need to use Roundup everywhere you've got a weed, brush, edging or trimming problem.

     c.     Roundup biodegrades into naturally occurring elements.

     d.     Remember that versatile Roundup herbicide stays where you put it.  That means there's no washing or leaching to harm customers' shrubs or other desirable vegetation.

     e.     This non-residual herbicide will not wash or leach in the soil.  It … stays where you apply it.

     f.     You can apply Accord with "confidence because it will stay where you put it" it bonds tightly to soil particles, preventing leaching.  Then, soon after application, soil microorganisms biodegrade Accord into natural products.

---

[1] *Backgrounder*, History of Monsanto's Glyphosate Herbicides, June 2005, available at www.monsanto.com/products/documents/glyphosate-background-materials/back_ground.pdf

g.   Glyphosate is less toxic to rats than table salt following acute oral ingestion.

h.   Glyphosate's safety margin is much greater than required.  It has over a 1,000-fold safety margin in food and over a 700-fold safety margin for workers who manufacture it or use it.

i.   You can feel good about using herbicides by Monsanto.  They carry a toxicity category rating of 'practically non-toxic' as it pertains to mammals, birds and fish.

j.   "Roundup can be used where kids and pets will play and breaks down into natural material."  This ad depicts a person with his head in the ground and a pet dog standing in an area which has been treated with Roundup.[2]

On November 19, 1996, Monsanto entered into an Assurance of Discontinuance with the NYAG, in which Monsanto agreed, among other things, "to cease and desist from publishing or broadcasting any advertisements [in New York] that represent, directly or by implication" that:

a.   its glyphosate-containing pesticide products or any component thereof are safe, non-toxic, harmless or free from risk;

b.   its glyphosate-containing pesticide products or any component thereof manufactured, formulated, distributed or sold by Monsanto are biodegradable;

c.   its glyphosate-containing pesticide products or any component thereof stay where they are applied under all circumstances and will not move through the environment by any means;

d.   its glyphosate-containing pesticide products or any component thereof are "good" for the environment or are "known for their environmental characteristics;"

e.   glyphosate-containing pesticide products or any component thereof are safer or less toxic than common consumer products other than herbicides; and

f.   its glyphosate-containing products or any component thereof might be classified as "practically non-toxic."

Monsanto did not alter its advertising in the same manner in any state other than New York, and on information and belief still has not done so today.  In 2009, France's highest court ruled that Monsanto had not told the truth about the safety of Roundup and affirmed an earlier

---

[2] Attorney General of the State of New York, In the Matter of Monsanto Company, Assurance of Discontinuance Pursuant to Executive Law § 63(15)(Nov. 1996).

judgment that Monsanto had falsely advertised its herbicide Roundup as "biodegradable" and that it "left the soil clean."[3]

As early as the 1980's Monsanto was aware of glyphosate's carcinogenic properties. On March 4, 1985, a group of the EPA's Toxicology Branch published a memorandum classifying glyphosate as a Category C oncogene.[4] Category C oncogenes are possible human carcinogens with limited evidence of carcinogenicity. In 1986, the EPA issued a Registration Standard for glyphosate (NTIS PB87-103214). The Registration standard required additional phytotoxicity, environmental fate, toxicology, product chemistry, and residue chemistry studies. All of the data required was submitted and reviewed and/or waived.[5] In October 1991, the EPA published a Memorandum entitled "Second Peer Review of Glyphosate." The memorandum changed glyphosate's classification to Group E (evidence of non-carcinogenicity for humans). Two peer review committee members did not concur with the conclusions of the committee and one member refused to sign.[6] In addition to the toxicity of the active molecule, many studies support the hypothesis that glyphosate formulations found in Monsanto's Roundup products are more dangerous and toxic than glyphosate alone.[7] As early as 1991, evidence existed demonstrating that glyphosate formulations were significantly more toxic than glyphosate alone.

In 2002, Julie Marc published a study entitled "Pesticide Roundup Provokes Cell Division Dysfunction at the Level of CDK1/Cyclin B Activation."[8] The study found that Monsanto's Roundup caused delays in the cell cycles of sea urchins, while the same concentrations of glyphosate alone proved ineffective and did not alter cell cycles. In 2004, Julie Marc published a study entitled "Glyphosate-based pesticides affect cell cycle regulation." The study demonstrated a molecular link between glyphosate-based products and cell cycle dysregulation.[9] The study noted that "cell-cycle dysregulation is a hallmark of tumor cells and human cancer. Failure in the cell-cycle checkpoints leads to genomic instability and subsequent development of cancers from the initial affected cell." Further, "[s]ince cell cycle disorders such

[3] *Monsanto Guilty in 'False Ad' Row*, BBC, Oct. 15, 2009, *available at* http://news.bbc.co.uk/2/hi/europe/8308903.stm.

[4] Consensus Review of Glyphosate, Casewell No. 661A. March 4, 1985. United States Environmental Protection Agency.

[5] http://www.epa.gov/oppsrrd1/reregistration/REDs/factsheets/0178fact.pdf.

[6] U.S. EPA, *Memorandum, Subject: SECOND Peer Review of Glyphosate* 1 (1191), *available at* http://www.epa.gov/pesticides/chem_search/cleared_reviews/csr_PC-103601_30-Oct-91_265.pdf

[7] *See* Martinez, et al. *Oral and pulmonary toxicology of the surfactant used in Roundup herbicide*, PROC. WEST. PHARMACOL. SOC. 34:43-46 (1991); Nora Benachour, et al., *Glyphosate Formulations Induce Apoptosis and Necrosis in Human Umbilical, Embryotic, and Placental Cells*, 22 CHEM. RES. TOXICOL. 97-105 (2009), *available at* http://big.assets.huffington.com/france.pdf; Gasnier et al. 2010, Francisco Peixoto, *Comparative effects of the Roundup and glyphosate on mitochondrial oxidative phosphorylation*, 61 CHEMOSPHERE 1115, 1122 (2005), *available at* https://www.researchgate.net/publication/7504567_Comparative_effects_of_the_Roundup_and_glyphosate_on_mit ochondrial_oxidative_phosphorylation; March 2004.

[8] Julie Marc, et al., *Pesticide Roundup Provokes Cell Division Dysfunction at the Level of CDK1/Cyclin B Activation*, 15 CHEM. RES. TOXICOL. 326-331 (2002), *available at* http://pubs.acs.org/doi/full/10.1021/tx015543g.

[9] Julie Marc, et al., *Glyphosate-based pesticides affect cell cycle regulation*, 96 BILIOGY OF THE CELLS 245, 245-249 (2004), *available at* http://onlinelibrary.wiley.com/doi/10.1016/j.biolcel.2003.11.010/epdf.

as cancer result from dysfunction of unique cell, it was of interest to evaluate the threshold dose of glyphosate affecting cells."[10]

In 2005, Francisco Peixoto published a study showing that Roundup's effects on rat liver mitochondria are much more toxic and harmful than the same concentrations of glyphosate alone. The Peixoto study suggested that the harmful effects of Roundup on mitochondrial bioenergetics could not be exclusively attributed to glyphosate and could be the result of other chemicals, namely the surfactant POEA, or alternatively due to the possible synergy between glyphosate and Roundup formulation products. In 2009, Nora Benachour and Gilles-Eric Seralini published a study of the effects of Roundup and glyphosate on human umbilical, embryonic, and placental cells. The study used dilution levels of Roundup and glyphosate far below agricultural recommendations, corresponding with low levels of residues in food. The study concluded that supposed "inert" ingredients, and possibly POEA, change human cell permeability and amplify toxicity of glyphosate alone. The study further suggested that determinations of glyphosate toxicity should take into account the presence of adjuvants, or those chemicals used in the formulation of the complete pesticide. The study confirmed that the adjuvants in Roundup are not inert and that Roundup is always more toxic than its active ingredient glyphosate. The results of these studies were confirmed in peer-reviewed studies that were known to Monsanto.

Monsanto knew or should have known that Roundup is more toxic than glyphosate alone and that safety studies on Roundup, Roundup's adjuvants and "inert" ingredients, and/or the surfactant POEA were necessary to protect the Plaintiff from Roundup. Monsanto knew or should have known that tests limited to Roundup's active ingredient glyphosate were insufficient to prove the safety of Roundup. Monsanto failed to appropriately and adequately test Roundup, Roundup's adjuvants and "inert" ingredients, and/or the surfactant POEA to protect the Plaintiff from Roundup. Rather than performing appropriate tests, Monsanto relied on flawed industry-supported studies designed to protect Monsanto's economic interests rather than the Plaintiff and the consuming public. Despite its knowledge that Roundup was considerably more dangerous than glyphosate alone, Monsanto continued to promote Roundup as safe.

The International Agency for Research on Cancer ("IARC") is the specialized intergovernmental agency that the World Health Organization ("WHO") of the United Nations tasked with conducting and coordinating research into the causes of cancer. An IARC Advisory Group to Recommend Priorities for IARC Monographs during 2015-2019 met in April 2014. Though nominations for the review were solicited, a substance must meet two criteria to be eligible for review by the IARC Monographs: there must already be some evidence of carcinogenicity of the substance, and there must be evidence that humans are exposed to the substance.

IARC set glyphosate for review in 2015-2016. IARC uses five criteria for determining priority in reviewing chemicals. The substance must have a potential for direct impact on public health; scientific literature to support suspicion of carcinogenicity; evidence of significant human exposure; high public interest and/or potential to bring clarity to a controversial area and/or reduce public anxiety or concern; and related agents similar to one given high priority by the

---

[10] Molinari, 2000; Stewart et al., 2003.

above considerations. Data reviewed is sourced preferably from publicly accessible, peer-reviewed data.

On March 24, 2015, after its cumulative review of human, animal, and DNA studies for more than one (1) year, many of which have been in Monsanto's possession since as early as 1985, the IARC's working group published its conclusion that the glyphosate contained in Monsanto's Roundup herbicide, is a Class 2A "probable carcinogen" as demonstrated by the mechanistic evidence of carcinogenicity in humans and sufficient evidence of carcinogenicity in animals.

The IARC's full Monograph was published on July 29, 2015, and established glyphosate as a class 2A probable carcinogen to humans. According to the authors, glyphosate demonstrated sufficient mechanistic evidence (genotoxicity and oxidative stress) to warrant a 2A classification based on evidence of carcinogenicity in humans and animals. The IARC Working Group found an increased risk between exposure to glyphosate and non-Hodgkin's Lymphoma ("NHL") and several subtypes of NHL, and the increased risk continued after adjustment for other pesticides. The IARC also found that glyphosate caused DNA and chromosomal damage in human cells.

Despite the new classification by the IARC, Monsanto has had ample evidence of glyphosate and Roundup's genotoxic properties for decades. Genotoxicity refers to chemical agents capable of damaging the DNA within a cell through genetic mutations, which is a process that is believed to lead to cancer. In 1997, Chris Clements published "Genotoxicity of select herbicides in Rana catesbeiana tadpoles using the alkaline single-cell gel DNA electrophoresis (comet) assay." The study found that tadpoles exposed to roundup showed significant DNA damage when compared with unexposed control animals. Both human and animal studies have shown that glyphosate and glyphosate-base formulations such as Roundup can induce oxidative stress. Oxidative stress and associated chronic inflammation are believed to be involved in carcinogenesis. The IARC Monograph notes that "[s]trong evidence exists that glyphosate, AMPA and glyphosate-based formulations can induce oxidative stress."

In 2006, César Paz-y-Miño published a study examining DNA damage in human subjects exposed to glyphosate. The study produced evidence of chromosomal damage in blood cells showing significantly greater damage after exposure to glyphosate than before in the same individuals, suggesting that the glyphosate formulation used during aerial spraying had a genotoxic effect on exposed individuals. The IARC Monograph reflects the volume of evidence of glyphosate pesticides' genotoxicity noting "[t]he evidence for genotoxicity caused by glyphosate-based formulations is strong."

Despite knowledge to the contrary, Monsanto denies that Roundup is genotoxic, that regulatory authorities and independent experts are in agreement that Roundup is not genotoxic, and that there is no evidence that Roundup is genotoxic. In addition to glyphosate and Roundup's genotoxic properties, Monsanto has long been aware of glyphosate's carcinogenic properties.

Glyphosate and Roundup, in particular, have long been associated with carcinogenicity and the development of numerous forms of cancer, including, but not limited to, NHL, Hodgkin's Lymphoma, Multiple Myeloma, and soft tissue sarcoma. Monsanto has known of this association since the mid-1980's and numerous human and animal studies evidence the carcinogenicity of glyphosate and/or Roundup. In 1985, the EPA studied the effects of glyphosate in mice finding a dose related response in male mice linked to renal tubal adenomas, a rare tumor. The study concluded the glyphosate was oncogenic.

In 2003, Lennart Hardell and Mikael Eriksson published the results of two case controlled studies on pesticides as a risk factor for NHL and hairy cell leukemia. The study concluded that glyphosate had the most significant relationship to NHL among all herbicide studies with an increased odds ratio of 3.11. In 2003, AJ De Roos published a study examining the pooled data of mid-western farmers, examining pesticides and herbicides as risk factors for NHL. The study, which controlled for potential confounders, found a relationship between increased NHL incidence and glyphosate.

In 2008, Mikael Eriksson published a population based case-control study of exposure to various pesticides as a risk factor for NHL. This strengthened previous associations between glyphosate and NHL. Monsanto continued to issue broad and sweeping statements suggesting that Roundup was, and is, safer than ordinary household items such as table salt, despite a lack of scientific support for the accuracy and validity of these statements and, in fact, voluminous evidence to the contrary. Upon information and belief, these statements and representations have been made with the intent of inducing Plaintiff, the agricultural community, and the public at large to purchase, and increase the use of, Roundup for Monsanto's pecuniary gain, and in fact did induce the Plaintiff to use Roundup.

Monsanto made these statements with complete disregard and reckless indifference to the safety of the Plaintiff and the general public. Notwithstanding Monsanto's representations, scientific evidence has established a clear association between glyphosate and genotoxicity, inflammation, and an increased risk of many cancers, including, but not limited to, NHL, Multiple Myeloma, and soft tissue sarcoma. Monsanto knew or should have known that glyphosate is associated with an increased risk of developing cancer, including, but not limited to, NHL, Multiple Myeloma, and soft tissue sarcomas.

Monsanto failed to appropriately and adequately inform and warn the Plaintiff of the serious and dangerous risks associated with the use of and exposure to glyphosate and/or Roundup, including, but not limited to, the risk of developing NHL, as well as other severe and personal injuries, which are permanent and/or long-lasting in nature, cause significant physical pain and mental anguish, diminished enjoyment of life, and the need for medical treatment, monitoring, and/or medications. Despite the IARC's classification of glyphosate as a class 2A probable carcinogen, Monsanto continues to maintain that glyphosate and/or Roundup is safe, non-carcinogenic, non-genotoxic, and falsely warrant to users and the general public that independent experts and regulatory agencies agree that there is no evidence of carcinogenicity or genotoxicity in glyphosate and Roundup.

After the EPA's 1985 classification of glyphosate as possibly carcinogenic to humans (Group C), Monsanto exerted pressure on the EPA to change its classification. This culminated in the EPA's reclassification of glyphosate to Group E, which was based upon evidence of non-carcinogenicity in humans. In so classifying, the EPA stated that "[i]t should be emphasized, however, that designation of an agent in Group E is based on the available evidence at the time of evaluation and should not be interpreted as a definitive conclusion that the agent will not be a carcinogen under any circumstances."

On two occasions, the EPA found that laboratories hired by Monsanto to test the toxicity of its Roundup products for registration purposes committed scientific fraud. In the first instance, Monsanto hired Industrial Bio-Test Laboratories ("IBT") to perform and evaluate pesticide toxicology studies relation to Roundup. IBT performed approximately 30 tests on glyphosate and glyphosate-containing products, including 11 of the 19 chronic toxicology studies needed to register Roundup with the EPA. In 1976, the Food and Drug Administration ("FDA") performed an inspection of IBT and discovered discrepancies between the raw data and the final report relating to the toxicological impacts of glyphosate. The EPA subsequently audited IBT and determined that the toxicology studies conducted for Roundup were invalid. An EPA reviewer stated, after finding "routine falsification of data" at IBT, that it was "hard to believe the scientific integrity of the studies when they said they took specimens of the uterus from male rabbits." Three top executives of IBT were convicted of fraud in 1983.

In the second incident, Monsanto hired Craven Laboratories ("Craven") in 1990 to perform pesticide and herbicide studies, including several studies on Roundup. In March of 1991, the EPA announced that it was investigating Craven for "allegedly falsifying test data used by chemical firms to win EPA approval of pesticides." The investigation lead to the indictments of the laboratory owner and a handful of employees.

Monsanto has claimed and continues to claim that Roundup is safe, non-carcinogenic, and non-genotoxic. Monsanto claims on its website that "[r]egulatory authorities and independent experts around the world have reviewed numerous long-term/carcinogenicity and genotoxicity studies and agree that there is no evidence that glyphosate, the active ingredient in Roundup brand herbicides and other glyphosate-based herbicides, causes cancer, even at very high doses, and that it is not genotoxic."[11] Ironically, the primary source for this statement is a 1986 report by the WHO, the same organization that now considers glyphosate to be a probable carcinogen.

Glyphosate, and Monsanto's Roundup products, in particular, have long been associated with serious side effects and many regulatory agencies around the globe have banned or are currently banning the use of glyphosate herbicide products. Monsanto's statements proclaiming the safety of Roundup and disregarding its dangers misled the Plaintiff. Despite Monsanto's knowledge that Roundup was associated with an elevated risk of developing cancer, Monsanto's promotional campaigns focused on Roundup's purported "safety profile."

---

[11] *Backgrounder – Glyphosate: No Evidence of Carcinogenicity*, updated November 2014, available at www.monsanto.com/glyphosate/documents/no-evidence-of-carcinogenicity.pdf

Monsanto's failure to adequately warn Plaintiff, Henry Medugno , resulted in (1) the Plaintiff using and being exposed to glyphosate instead of using another acceptable and safe method of controlling unwanted weeds and pests; and (2) scientists and physicians failing to warn and instruct consumers about the risk of cancer, including NHL and NHL subtypes, and other injuries associated with Roundup.

Monsanto failed to seek modification of the labeling of roundup to include relevant information regarding the risks and dangers associated with Roundup exposure. Monsanto's failure to appropriately warn and inform the EPA has resulted in inadequate warnings in safety information presented directly to users and consumers. Monsanto's failure to appropriately warn and inform the EPA has resulted in the absence of warning or caution statements that are adequate to protect health and the environment. Monsanto's failure to appropriately warn and inform the EPA has resulted in the directions for use that are not adequate to protect health and the environment.

By reason of the foregoing acts and omissions, Plaintiff, Henry Medugno, seeks compensatory damages as a result of his use of, and exposure to, Roundup, which caused or was a substantial contributing factor in causing the Plaintiff to develop and suffer from cancer, specifically being diagnosed with mantle cell lymphoma, a subtype of non-Hodgkin's lymphoma. The Plaintiff suffered severe and personal injuries that are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life. By reason of the foregoing, the Plaintiff is severely and permanently injured. By reason of the foregoing acts and omissions, the Plaintiff has endured and continues to suffer, emotional and mental anguish, medical expenses, and other economic and non-economic damages, as a result of Monsanto's actions and inactions.

The Plaintiff, Henry Medugno, is a Massachusetts resident who was exposed to Roundup annually for at least 15 years while using the product on his residence. Mr. Medugno was diagnosed with mantle cell lymphoma, a non-Hodgkin's lymphoma in 2011. The development of Plaintiff's lymphomas was proximately and actually caused by exposure to Monsanto's Roundup products. Mr. Medugno has incurred significant economic and non-economic damages resulting from his injuries. During the period of Plaintiff's exposure to Roundup, he did not know that exposure to Roundup was injurious to his health or the health of others. The Plaintiff first learned that Roundup caused NHL in 2019.

A pre-litigation demand is hereby made upon the Defendant for compensatory damages in the amount of $30,000,000.00. This sum is reasonable given Mr. Medugno' age, the immense cost of his medical treatment, his profound pain and suffering, and the terrible likelihood of his disease proving fatal. You have thirty days under M.G.L.A. c. 93A to respond to this demand. Unless you make a reasonable offer of settlement within thirty days from the date of this letter, I intend to seek damages, including treble damages, under M.G.L.A. c. 93A, Sections 2 and 9, as well as attorney's fees and costs. I would remind you that, under Massachusetts law, the requirements of M.G.L.A. c. 93A are met if the demand letter is adequate to describe the basis for the claim, the scope of the injury, and to inform defendants of the "ballpark" of the damages. As Mr.Medugno' claim is substantially the same as the cases Monsanto is currently litigating in the MDL, Defendant should be well aware of both the underlying issues in this case, as well as

the damages. A response claiming insufficient information upon which to make an offer will be deemed a non-offer by the Court.

Very truly yours,

David C. Strouss

DCS/jfs
Cc: Legal Department – Monsanto Company



Martin C. Calhoun
dir 202 898 5867
MCalhoun@hollingsworthllp.com

April 1, 2021

VIA ELECTRONIC MAIL

David Strouss, Esq.
Thornton Law Firm LLP
One Lincoln Street
Boston, MA  02111
dstrouss@tenlaw.com

  Re: Demand Letter re Henry Medugno

Dear Mr. Strouss:

  This letter responds to your letter to Monsanto Company ("Monsanto"), which seeks relief based on the Massachusetts Consumer Protection Act ("MCPA"), Mass. Gen. Laws c.93A. Your letter alleges that exposure to Monsanto's glyphosate-based herbicides ("GBHs"), also known as Roundup®-branded herbicides, caused Henry Medugno to develop non-Hodgkin's lymphoma ("NHL").

  Although Monsanto sympathizes with Mr. Medugno and wishes him the best in his ongoing fight against this disease, Monsanto respectfully declines your settlement demand. After careful consideration, Monsanto denies the allegations of law and fact asserted in your letter.  We understand Mr. Medugno's interest in determining what caused his NHL, but more than forty years of safe use, an extensive body of scientific research, and repeated approvals by the United States Environmental Protection Agency ("EPA") and other regulatory agencies make clear that his medical condition is not causally related to his alleged exposure to GBHs.  For the reasons discussed below, we see no grounds – based on the facts and the science currently known to us, including the limited information provided in your letter – for Monsanto to be held

David Strouss, Esq.
April 1, 2021
Page 2

liable for Mr. Medugno's NHL on any kind of legal claim, whether asserted under the MCPA or any other legal theory.[1]

By way of background, glyphosate, the active ingredient in Roundup®-branded herbicides, is "the most important herbicide" developed in the post-World War II era.[2] GBHs first became commercially available in 1974 when, after years of testing by Monsanto's research scientists, Monsanto introduced Roundup®-branded products.

As documented in numerous scientific analyses, GBHs and glyphosate are not carcinogens and do not cause NHL. Your letter ignores a recent important scientific development regarding this general causation issue – namely, the publication in one of the world's most respected, peer-reviewed oncology journals of powerful new epidemiology data that directly refutes the contention that GBHs cause NHL. *See* G. Andreotti, *et al.*, *Glyphosate Use and Cancer Incidence in the Agricultural Health Study*, 110 Journal of the National Cancer Institute 509 (2019) ("Andreotti JNCI Study"). This study, which was funded by the National Cancer Institute and the National Institute of Environmental Health Sciences, unequivocally concluded that, "[i]n this large, prospective cohort study, no association was apparent between glyphosate and any solid tumors or lymphoid malignancies overall, including NHL and its subtypes." *Id.* at 509; *see also id.* at 515 ("In our study, we observed no associations between glyphosate use and NHL overall or any of its subtypes."). The lack of association between GBH exposure and NHL held true regardless of how the authors analyzed the data: "This lack of association was consistent for both exposure metrics, unlagged and lagged analyses, after further adjustments for pesticides linked to NHL in previous AHS [Agricultural Health Study] analyses, and when we excluded multiple myeloma from the NHL grouping." *Id.* at 515; *see also id.* at 511 ("These findings were unchanged in sensitivity analyses [investigating the possibility of biases], including further adjustments for additional potential confounders, or by exclusion of women and non-whites."). The Andreotti JNCI Study is by far the largest epidemiology study of GBHs and NHL, with data on more exposed NHL cases than all of the other glyphosate epidemiology studies combined. This study includes significantly more years of follow-up after exposure (to allow for latency of NHL development) than any other epidemiology study, extending nearly forty years after glyphosate was introduced to the market. Moreover, aside from earlier studies of the AHS cohort, the Andreotti JNCI Study is the only epidemiology study involving a dose-response analysis of GBH exposure and NHL that accounts for exposure-influencing variables such as applicator use of personal protective equipment. In short, the most powerful, scientifically reliable study of human exposure to GBHs confirms what has been known for many years – that GBHs and glyphosate do not cause NHL.

---

[1] By sending you this response, Monsanto does not concede that your letter satisfies the statutory requirements of the MPCA or that the MCPA applies to any of the claims or allegations asserted in that letter.

[2] Stephen O. Duke & Stephen B. Powles, *Glyphosate: A Once-In-A-Century Herbicide*, 64 Pest Mgmt. Sci. 319, 319 (2008).

David Strouss, Esq.
April 1, 2021
Page 3

One reaches the same conclusion when examining the findings and statements made by the EPA, which has broad authority to regulate all herbicides under the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA"), 7 U.S.C. § 136 *et seq.* For decades, the EPA has found glyphosate to be "one of the most safely-used pesticides in the U.S."[3] and repeatedly has concluded that glyphosate exposure does not cause cancer. For example, the Science Advisor in the EPA's Office of Pesticide Programs presented the following statement to a congressional committee: "Based on the comprehensive analysis of all available data and reviews, the EPA concludes that glyphosate is 'not likely to be carcinogenic to humans.'" Testimony of Anna Lowit, Science Advisor, Office of Pesticide Programs, U.S. Environmental Protection Agency before the House Committee on Science, Space, and Technology (Feb. 6, 2018). Dr. Lowit made clear that this EPA conclusion remains in place even after the EPA considered the 2015 International Agency for Research on Cancer ("IARC") monograph that classified glyphosate as "probably carcinogenic to humans." *Id.* Dr. Lowit addressed "fundamental differences" between the IARC review and the EPA review of glyphosate, including that EPA considered more animal carcinogenicity studies than IARC and that IARC did not consider exposure but "the EPA considers exposure as a critical component of the cancer evaluation." *Id.* Dr. Lowit also pointed out that IARC's conclusion is "inconsistent with the international community, whereas the EPA's conclusion that glyphosate is 'not likely to be carcinogenic to humans' is consistent with other countries and international organizations including: Australia (2013), Canada (2015), Japan (2016), New Zealand (2016), the European Food Safety Authority (EFSA) (2015), Germany (2014), the European Chemicals Agency (ECHA) (2017) and the Joint Food and Agriculture Organization of the United Nations (FAO)/WHO Meeting on Pesticide Residues (JPMR) (2016)." *Id.* Finally, Dr. Lowit stated that the Andreotti JNCI Study results "provide additional strong support for the agency's conclusion that glyphosate is 'not likely to be carcinogenic to humans.'" *Id.* By contrast, the IARC review of glyphosate that was conducted and announced in 2015 did not take into account the important results of the subsequently published Andreotti JNCI Study.

The testimony by Dr. Lowit addressed above is consistent with a series of federal regulatory determinations issued by the EPA over many years in which it consistently has concluded that GBHs and glyphosate do not impose "unreasonable adverse effects on the environment," as defined in FIFRA, 7 U.S.C. § 136(bb), and, in particular, do not pose any risk of cancer:

- In June 1991, EPA "classified glyphosate in Group E (evidence of non-carcinogenicity for humans), based on a lack of convincing evidence of carcinogenicity." EPA, *Reregistration Eligibility Decision Document: Glyphosate*, 14 (Sept. 1993), https://www3.epa.gov/pesticides/chem_search/reg_actions/reregistration/red_PC-417300_1-Sep-93.pdf (discussing 1991 EPA finding).

---

[3] Letter from EPA Assistant Administrator Stephen L. Johnson to Secretary of State Colin Powell (Aug. 19, 2002), https://2009-2017.state.gov/j/inl/rls/rpt/aeicc/13237.htm

David Strouss, Esq.
April 1, 2021
Page 4

- "No evidence of carcinogenicity." Glyphosate; Pesticide Tolerances, 67 Fed. Reg. 60,934, 60,943 (Sept. 27, 2002).

- "Glyphosate has no carcinogenic potential." Glyphosate; Pesticide Tolerance, 69 Fed. Reg. 65,081, 65,086 (Nov. 10, 2004).

- "There is [an] extensive database available on glyphosate, which indicate[s] that glyphosate is not mutagenic, not a carcinogen, and not a developmental or reproductive toxicant." Glyphosate; Pesticide Tolerances, 73 Fed. Reg. 73,586, 73,589 (Dec. 3, 2008).

- "EPA has concluded that glyphosate does not pose a cancer risk to humans." Glyphosate; Pesticide Tolerances, 78 Fed. Reg. 25,396, 25,398 (May 1, 2013).[4]

The EPA regulatory determinations discussed above affirming glyphosate's safety have informed the EPA's FIFRA approval of the labeling of Roundup®-branded herbicides without any cancer warning during periods when Mr. Medugno allegedly used the Roundup®-branded products at issue here.[5]

Moreover, in September 2016, the EPA Office of Pesticide Programs ("OPP") issued a 227-page evaluation of glyphosate's carcinogenic potential, concluding that "[t]he strongest support is for [the descriptor] 'not likely to be carcinogenic to humans' at doses relevant to human health risk assessment."[6]  At the same time, the EPA posted an October 2015 final report by its standing Cancer Assessment Review Committee ("CARC"), in which CARC endorsed the

---

[4] The EPA's 2002 regulatory finding that there was "[n]o evidence of carcinogenicity" for glyphosate, 67 Fed. Reg. at 60,943, was issued following a submission to the EPA from a citizen's group challenging glyphosate's safety, *see id.* at 60,935.  In reaching this finding, the EPA expressly rejected the citizen group's arguments that glyphosate was carcinogenic, pointing to the EPA's own analysis of genotoxicity studies, rodent cancer bioassays, and epidemiologic studies.  *See id.* at 60,935 (discussing genotoxicity data), 60,936 (discussing animal and epidemiologic data).

[5] *See, e.g.*, March 10, 2016 EPA Letter (approving labeling for Roundup®-branded herbicide), https://www3.epa.gov/pesticides/chem_search/ppls/071995-00051-20160310.pdf; March 10, 1992 EPA Letter (approving labeling for Roundup®-branded herbicide), https://www3.epa.gov/pesticides/chem_search/ppls/000524-00452-19920310.pdf.

[6] EPA's Office of Pesticide Programs, *Glyphosate Issue Paper: Evaluation of Carcinogenic Potential* at 141 (Sept. 12, 2016) ("EPA OPP Report"), https://www.regulations.gov/document?D=EPA-HQ-OPP-2016-0385-0094.

David Strouss, Esq.
April 1, 2021
Page 5

EPA's existing classification of glyphosate as "Not Likely to be Carcinogenic to Humans."[7]  In its review of the voluminous scientific evidence demonstrating the safety of glyphosate, the EPA CARC concluded:

- "[E]pidemiological studies in humans showed no association between glyphosate exposure and cancer of the following: oral cavity, esophagus, stomach, colon, rectum, colorectum, lung, pancreas, kidney, bladder, prostate, brain (gliomas), soft-tissue sarcoma, leukemia, or multiple myelomas," and the "epidemiologic literature to date does not support a direct causal association" between glyphosate exposure and non-Hodgkin's lymphoma.  EPA CARC Final Report at 8, 9.

- "[T]here was no evidence of carcinogenicity in the eleven carcinogenicity studies conducted in Sprague Dawley or Wistar rats and CD-1 mice.  There were no treatment-related increases in the occurrence of any tumor type in either sex of either species."  *Id.* at 9.

- "[T]here is no concern for genotoxicity or mutagenicity.  Glyphosate was no[t] mutagenic in bacterial reversion (Ames) assays or *in vitro* mammalian gene mutation assays.  There is no convincing evidence that glyphosate induces micronuclei formation or chromosomal aberrations *in vitro* or *in vivo*."  *Id.*

Furthermore, in December 2017, the EPA's OPP issued a detailed, lengthy revised evaluation of glyphosate's carcinogenic potential that reiterated the conclusion that "[t]he strongest support is for [the descriptor] 'not likely to be carcinogenic to humans.'"[8]

To the extent that you rely on the 2015 IARC "cancer hazard" listing of glyphosate as "probably carcinogenic," that reliance is misplaced.  Although IARC purports to "identify cancer hazards," it acknowledges that it does not evaluate **the risks associated with exposure** and that a substance may be classified as "probably carcinogenic" under its methodology "even when risks are very low with known patterns of use or exposure."[9]  IARC also states that, when IARC

---

[7] *See* Cancer Assessment Review Committee, Health Effects Division, Office of Pesticide Programs, U.S. Environmental Protection Agency, *Cancer Assessment Document – Evaluation of the Carcinogenic Potential of Glyphosate*, at 10, 77 (Final Report, Oct. 1, 2015) ("EPA CARC Final Report").

[8] EPA's Office of Pesticide Programs, *Revised Glyphosate Issue Paper: Evaluation of Carcinogenic Potential* at 143, 144 (Dec. 12, 2017), https://www.epa.gov/sites/production/files/2017-12/documents/revised_glyphosate_issue_paper_evaluation_of_carcinogenic_potential.pdf.

[9] *See* IARC, *IARC Monographs Questions and Answers*, 3 (2015) ("IARC Monographs Q&A"), http://www.iarc.fr/en/media-centre/iarcnews/pdf/Monographs-Q&A.pdf (emphasis in original).

David Strouss, Esq.
April 1, 2021
Page 6

uses the term "probably carcinogenic," it has "no quantitative significance."[10]  For example, IARC does not take into account levels of exposure, methods of exposure, or other factors central to a determination of whether a substance can actually cause cancer in humans under real-world exposure scenarios.[11]

Moreover, in its October 2015 report, the EPA CARC explained that IARC's analysis of the glyphosate science was flawed:  IARC failed to consider key scientific data showing non-carcinogenicity in the select animal studies upon which IARC relied and ignored negative findings in other animal studies that IARC did not consider.  EPA CARC Final Report at 9.  The EPA CARC noted that IARC's "omission of the negative findings from reliable studies may have had a significant bearing on the conclusion drawn for evidence of carcinogenicity in animals."  *Id.*  Likewise, the EPA CARC sharply criticized IARC's cherry-picked and unreliable analysis of genotoxicity studies, stating that "[t]he inclusion of the positive findings from studies with known limitations, the lack of reproducible positive findings and the omission of the negative findings from reliable studies may have had a significant bearing on IARC's conclusion on the genotoxic potential of glyphosate."  *Id.* at 10.

The CARC report mirrors similar findings in 2015-2016 by the European Food Safety Authority ("EFSA"), the Health Canada Pest Management Regulatory Agency, the German Federal Institute for Risk Assessment ("BfR"), and the World Health Organization ("WHO") and United Nations Food and Agricultural Organization – which all rejected the claim that glyphosate causes cancer.[12]  This WHO finding of non-carcinogenicity is of particular relevance because IARC is part of the WHO.

---

[10] IARC, *IARC Monographs on the Evaluation of Carcinogenic Risks to Humans Preamble*, 2 (Jan. 2006), http://monographs.iarc.fr/ENG/Preamble/currenta2objective0706.php.

[11] *See id.*

[12] EFSA, *Conclusion on the Peer Review of the Pesticide Risk Assessment of the Active Substance Glyphosate* at 2, EFSA Journal 2015; 13(11):4302 (published Nov. 12, 2015), http://www.efsa.europa.eu/en/efsajournal/pub/4302; Letter from Bernhard Url, Exec. Director, EFSA, to Prof. Christopher J. Portier, Working Group Participant, IARC at 1 (Jan. 13, 2016), https://www.efsa.europa.eu/sites/default/files/EFSA_response_Prof_Portier.pdf; Summary of the Pest Management Regulatory Agency Proposed Re-evaluation Decision at 15 (PRVD2015-01) (Apr. 13, 2015), http://publications.gc.ca/collections/collection_2015/sc-hc/H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-1-eng.pdf; BfR, *The BfR has finalised its draft report for the re-evaluation of glyphosate* (Apr. 2, 2015), http://www.bfr.bund.de/en/the_bfr_has_finalised_its_draft_report_for_the_re_evaluation_of_gly phosate-188632.html; Food & Agric. Org. of the U.N., World Health Org., Joint FAO/WHO Meeting on Pesticide Residues, Geneva, 9-13 May 2016, Summary Report at 2 (issued May 16, 2016), http://www.who.int/foodsafety/jmprsummary2016.pdf?ua=1.

David Strouss, Esq.
April 1, 2021
Page 7

In April 2019, the EPA again re-affirmed its finding that glyphosate is not a carcinogen, stating: (a) that "[t]he EPA thoroughly assessed risks to humans from exposure to glyphosate from all uses and all routes of exposure and did not identify any risks of concern"; and (b) that the agency "has determined that glyphosate is not likely to be carcinogenic to humans." Glyphosate, Proposed Interim Registration Review Decision at 19 (April 23, 2019), https://www.regulations.gov/document?D=EPA-HQ-OPP-2009-0361-2344.  And, in December 2018 (in a letter to the Australian agency that regulates pesticides and herbicides), the EPA reiterated its long-standing conclusion that "glyphosate is not likely to be carcinogenic to humans."

In August 2019, the EPA formally announced that the agency "will no longer approve product labels claiming glyphosate is known to cause cancer – a false claim that does not meet the labeling requirements of the *Federal Insecticide, Fungicide, and Rodenticide Act* (FIFRA)."[13] This EPA announcement also stated that "[i]t is irresponsible to require labels on products that are inaccurate when EPA knows the product does not pose a cancer risk" and that "[i]t is critical that federal regulatory agencies like EPA relay to consumers accurate, scientific based information about risks that pesticides may pose to them."

Finally, in January 2020, the EPA once again re-affirmed its repeating findings that glyphosate is not a carcinogen: "The agency has determined that there are no risks to human health from the current registered uses of glyphosate and that glyphosate is not likely to be carcinogenic to humans."[14]

General causation – whether glyphosate/GBHs cause NHL in humans – is an essential element of Mr. Medugno's MCPA claim (and the other claims addressed in your letter), so Mr. Medugno would have the burden of presenting scientifically reliable, admissible evidence to prove general causation.  As discussed above, there is no scientifically reliable evidence to prove general causation.  Therefore, we expect that all of Mr. Medugno's claims will fail on that basis. Moreover, even if Mr. Medugno can overcome that general causation hurdle, we expect that the claims will fail for additional reasons, including but not limited to: (a) lack of evidence to prove that Monsanto engaged in deceptive practices when marketing any GBHs to which Mr. Medugno allegedly was exposed; (b) lack of evidence to prove that the labeling for any Monsanto GBHs to which he allegedly was exposed was inadequate; (c) lack of evidence to satisfy Mr. Medugno's burden of proof regarding specific causation (that exposure to Monsanto's GBHs caused his NHL); and/or (d) preemption.

---

[13] August 8, 2019 EPA News Release, https://www.epa.gov/newsreleases/epa-takes-action-provide-accurate-risk-information-consumers-stop-false-labeling.

[14] EPA, Response from the Pesticide Re-evaluation Division (PRD) to Comments on the Glyphosate Proposed Interim Decision at 4; https://www.epa.gov/sites/production/files/2020-01/documents/response-from-prd-comments-glyphosate-proposed-interim-decision.pdf.

David Strouss, Esq.
April 1, 2021
Page 8

     In sum, based on our current knowledge of the relevant facts, the science relating to glyphosate/GBHs and NHL, and the applicable law, we do not perceive any basis for Monsanto to be held liable for Mr. Medugno's claims.  Given that Monsanto is not legally responsible to Mr. Medugno's, Monsanto is under no legal obligation to make a settlement offer at this time. We respectfully decline the request presented in your letter and do not make an offer because facts sufficient to warrant a settlement offer have not yet been discovered.  If you have any other information that you think supports Mr. Medugno's claims and should be considered by us when evaluating those claims, please provide that information to us.

Sincerely,

Martin Calhoun