A TRUE COPY I CERTIFY

James W. McCormack, Clerk

By: Brady Hibbs D.C. on
**May 13, 2021**
For the United States District Court
Eastern District of Arkansas

FILED
2021 MAY -3 PM 1: 12
TERRY HAWKINS
CIRCUIT CLERK
CRITTENDEN COUNTY
D.C.
A.S.

## IN THE CIRCUIT COURT OF CRITTENDEN COUNTY, ARKANSAS
## CIVIL DIVISION

**MARK A. PIRANI, as the Executor**
**of the estate of JON PEPPI PIRANI**                                  **PLAINTIFF**


**V.**                          CASE NO. CV-21-274


**MONSANTO COMPANY**                                          **DEFENDANT**


### COMPLAINT

Plaintiff Mark A. Pirani, Executor of the estate of Jon Peppi Pirani, by and through his

counsel, and for his Complaint against Monsanto Company, respectfully states the following:


### INTRODUCTION

All claims in this action are a direct and proximate result of Monsanto Company's

("Monsanto" or "Defendant") negligent, willful, and wrongful conduct in connection with the

design, development, manufacture, testing, packaging, promoting, marketing, distribution, and/or

sale of products such as Roundup®. Plaintiff Mark A. Pirani ("Plaintiff Pirani") brings this action

and seeks recovery in his capacity as the Executor of the estate of Jon Peppi Pirani. Decedent Jon

Peppi Pirani ("Decedent Pirani") suffered damages as a result of developing Non-Hodgkin's

Lymphoma ("NHL"), which was directly and proximately caused by such wrongful conduct by

Monsanto, the unreasonably dangerous and defective nature of Roundup®, and its active

ingredient, glyphosate, and the attendant effects of developing NHL. Decedent Pirani did not know

of an association between exposure to Roundup® and the increased risk of developing NHL until

well after the International Agency for Research on Cancer ("IARC"), an agency of the World

Health Organization ("WHO"), first published its evaluation of glyphosate.


EXHIBIT
1

## PARTIES

1.     Plaintiff Mark A. Pirani is an Arkansas resident residing in Crittenden County, Arkansas. Plaintiff Pirani brings this action in his capacity as the Executor of the estate of Jon Peppi Pirani. Decedent Pirani was an Arkansas resident residing in Crittenden County, Arkansas.

2.     Decedent Pirani was first exposed to Roundup® in approximately 1977 in Crittenden County, Arkansas when he applied Roundup® during the operation of his farming business. While farming, Decedent Pirani sprayed Roundup® on a regular basis. Decedent Pirani followed all safety and precautionary warnings during the course of use. His usage continued until approximately July 2020.

3.     On or about May 11, 2020, Decedent Pirani was diagnosed with NHL in Bartlett, Tennessee from Dr. Michael J. Woodbury, M.D. He proceeded to undergo chemotherapy and radiation. He subsequently suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Monsanto's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

4.     On or about February 24, 2021, Decedent Pirani died in Shelby County, Tennessee. Decedent's injury was a direct and proximate result of his exposure to Roundup® and subsequent NHL diagnosis.

5.     As a direct and proximate result of these injuries, Plaintiff Pirani and Decedent Pirani incurred damages which include, but are not limited to, loss of life; permanent injury; medical expenses; pain, suffering, and mental anguish; loss of earning and earning capacity; loss of companionship; loss of enjoyment of life; and Decedent Pirani was otherwise damaged in a personal and/or pecuniary nature.

2

6.      During the entire time that Decedent Pirani was exposed to Roundup®, he did not know that exposure to Roundup® was injurious to his health or the health of others.

7.      Monsanto is a foreign corporation registered to do business in the State of Arkansas with its principal place of business in St. Louis, Missouri. At all times material to this Complaint, Monsanto engaged in the business of designing, developing, manufacturing, testing, packaging, marketing, distributing, labeling, and/or selling Roundup® in Arkansas, including Crittenden County.

## JURISDICTION AND VENUE

8.      Jurisdiction is proper in this Court pursuant to, *inter alia*, Ark. Code Ann. § 16-13-201(a) and Ark. Const. amend. LXXX, § 6(A).

9.      This Court has personal jurisdiction over Monsanto because it conducts business in Arkansas and has sufficient minimum contacts with the State of Arkansas by way of advertising, marketing, selling, leasing, distributing and offering to sell, leasing, and distributing its Roundup® products to Arkansas residents, including the Roundup® that was the source of Decedent Pirani's injuries and subject of this Complaint.

10.     Venue is proper in this Court pursuant to, *inter alia*, Ark. Code Ann. § 16-60-101.

## FACTUAL ALLEGATIONS

11.     In 1970, Monsanto discovered the herbicidal properties of glyphosate and began marketing it in products in 1974 under the brand name Roundup®. Roundup® is a non-selective herbicide used to kill weeds that commonly compete with the growing of crops. By 2001, glyphosate had become the most-used active ingredient in American agriculture with 85–90

3

millions of pounds used annually. That number grew to 185 million pounds by 2007. As of 2013, glyphosate was the world's most widely used herbicide.[1]

12.     Monsanto is a multinational agricultural biotechnology corporation based in St. Louis, Missouri, and incorporated in Delaware. It is the world's leading producer of glyphosate. As of 2009, Monsanto was the world's leading producer of seeds, accounting for 27% of the world seed market.[2] The majority of these seeds are of the Roundup® Ready® brand. The stated advantage of Roundup® Ready® crops is that they substantially improve a farmer's ability to control weeds, since glyphosate can be sprayed in the fields during the growing season without harming its crops. In 2010, an estimated 70% of corn and cotton, and 90% of soybean fields in the United States were Roundup® Ready®.[3]

13.     Monsanto's glyphosate products are registered in 130 countries and approved for use on over 100 different crops.[4] They are ubiquitous in the environment. Numerous studies confirm that glyphosate is found in rivers, streams, and groundwater in agricultural areas where

[1] Arthur Grube et al., U.S. Envtl. Prot. Agency, *Pesticides Industry Sales and Usage, 2006-2007 Market Estimates* 14 (2011), *available at* Pesticides Industry Sales and Usage 2006 and 2007 Market Estimates | Pesticides | US EPA.

[2] ETC Group, *Who Will Control the Green Economy?* 22 (2011), *available at* Who Will Control the Green Economy? | ETC Group.

[3] William Neuman & Andrew Pollack, *Farmers Cope With Roundup-Resistant Weeds*, N.Y. TIMES, May 3, 2010, *available at* http://www.nytimes.com/2010/05/04/business/energy-environment/04weed.html?pagewan.

[4] Monsanto, *Backgrounder-History of Monsanto's Glyphosate Herbicides* (Sep. 2, 2015), *available at* https://www.monsanto.com/app/uploads/2017/06/back_history.pdf.

4

Roundup® is used.[5] It has been found in food,[6] in the urine of agricultural workers,[7] and even in the urine of urban dwellers who are not in direct contact with glyphosate.[8]

14.     On March 20, 2015, the International Agency for Research on Cancer ("IARC"), an agency of the World Health Organization ("WHO"), issued an evaluation of several herbicides, including glyphosate. That evaluation was based, in part, on studies of exposures to glyphosate in several countries around the world, and it traces the health implications from exposure to glyphosate since 2001.

15.     On July 29, 2015, the IARC issued a formal monograph relating to glyphosate. In that monograph, the IARC Working Group provides a thorough review of the numerous studies and data relating to glyphosate exposure in humans.

16.     The IARC Working Group classified glyphosate as a Group 2A herbicide, which means that it is probably carcinogenic to humans. The IARC Working Group concluded that the cancers most associated with glyphosate exposure are Non-Hodgkin's lymphoma and other haematopoietic cancers, including lymphocytic lymphoma/chronic lymphocytic leukemia, B-cell lymphoma, and multiple myeloma.[9]

---

[5] *See* U.S. Geological Survey, *USGS Technical Announcement: Widely Used Herbicide Commonly Found in Rain and Streams in the Mississippi River Basin* (2011), *available at* https://www.usgs.gov/news/widely-used-herbicide-commonly-found-rain-and-streams-mississippi-river-basin; *see also* U.S. Envtl. Prot. Agency, *Technical Factsheet on: Glyphosate. available at* https://www.epa.gov/ingredients-used-pesticide-products/glyphosate.

[6] Thomas Bohn et al., *Compositional Differences in Soybeans on the Market: Glyphosate Accumulates in Roundup Ready GM Soybeans,* 153 FOOD CHEMISTRY 207 (2013), *available at* http://www.sciencedirect.com/science/article/pii/S0308814613019201.

[7] John F. Acquavella et al., *Glyphosate Biomonitoring for Farmers and Their Families: Results from the Farm Family Exposure Study, 112(3)* ENVTL. HEALTH PERSPECTIVES 321 (2004), *available at* http://www.ncbi.nlm.nih.gov/pmc/articles/PMC1241861/; Kathryn Z. Guyton et al., *Carcinogenicity of Tetrachlorvinphos, Parathion, Malathion, Diazinon & Glyphosate,* 112 IARC Monographs 76, section 5.4 (2015), *available at* https://www.ftc.gov/system/files/documents/public_comments/2016/11/00854-130441.pdf.

[8] Dirk Brandli& Sandra Reinacher, *Herbicides found in Human Urine,* 1 ITHAKA JOURNAL 270 (2012), *available at* http://ithaka-journal.net/drunkversionen/e052012-herbicides-urine.pdf.

[9] *See* Guyton et al., *Carcinogenicity of Tetrachlorvinphos, Parathion, Malathion, Diazinon & Glyphosate, supra.*

17. The IARC evaluation is significant. It confirms what has been believed for years: that glyphosate is toxic to humans.

18. Nevertheless, Monsanto, since it began selling Roundup®, has represented it as safe to humans and the environment. Indeed, Monsanto has repeatedly proclaimed and continues to proclaim to the world, and particularly to United States consumers, that glyphosate-based herbicides, including Roundup®, create no unreasonable risks to human health or to the environment.

## FACTS

19. Glyphosate is a broad-spectrum, non-selective herbicide used in a wide variety of herbicidal products around the world.

20. Plants treated with glyphosate translocate the systemic herbicide to its roots, shoot regions, and fruit, where it interferes with the plant's ability to form aromatic amino acids necessary for protein synthesis. Treated plants generally die within two to three days. Because plants absorb glyphosate, it cannot be completely removed by washing or peeling produce or by milling, baking, or brewing grains.

21. For nearly 40 years, farms across the world have used Roundup® without knowing of the dangers its use poses. That is because when Monsanto first introduced Roundup®, it touted glyphosate as a technological breakthrough: it could kill almost every weed without causing harm either to people or to the environment. Of course, history has shown that not to be true. According to the WHO, the main chemical ingredient of Roundup®—glyphosate—is a probable cause of cancer. Those most at risk are farm workers and other individuals with workplace exposure to Roundup®, such as workers in garden centers, nurseries, and landscapers. Monsanto assured the public that Roundup® was harmless. In order to prove this, Monsanto championed falsified data

6

and attacked legitimate studies that revealed the dangers of Roundup®. Monsanto led a prolonged campaign of misinformation to convince government agencies, farmers, and the general population that Roundup® is safe.

### *The Discovery of Glyphosate and Development of Roundup®*

22.     The herbicidal properties of glyphosate were discovered in 1970 by Monsanto chemist John Franz. The first glyphosate-based herbicide was introduced to the market in the mid-1970s under the brand name Roundup®.[10] From the outset, Monsanto marketed Roundup® as a "safe" general-purpose herbicide for widespread commercial and consumer use. It still markets Roundup® as safe today.[11]

23.     In addition to the active ingredient glyphosate, Roundup® formulations also contain adjuvants and other chemicals, such as the surfactant POEA, which are considered "inert" and therefore protected as "trade secrets" in manufacturing. Growing evidence suggests that these adjuvants and additional components of Roundup® formulations are not, in fact, inert and are toxic in their own right.

### *Registration of Herbicides under Federal Law*

24.     The manufacture, formulation and distribution of herbicides, such as Roundup®, are regulated under the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA" or "Act"), 7 U.S.C. § 136 et seq. FIFRA requires that all pesticides be registered with the Environmental

---

[10] Monsanto, *Backgrounder, History of Monsanto's Glyphosate Herbicide* (Sep. 2, 2015), Backgrounder: History of Monsanto's Glyphosate Herbicides.

[11] Monsanto, *What is Glyphosate?* (Sep. 2, 2015), http://www.monsanto.com/sitecollectiondoeuments/glyphosate-safety-health.pdf.

7

Protection Agency ("EPA" or "Agency") prior to its distribution, sale, or use, except as described by the Act. 7 U.S.C. § 136a(a).

25.     Because pesticides are toxic to plants, animals, and humans, at least to some degree, the EPA requires as part of the registration process, among other things, a variety of tests to evaluate the potential for exposure to pesticides, toxicity to people and other potential non-target organisms, and other adverse effects on the environment. Registration by the EPA, however, is not an assurance or finding of safety. When registering or reregistering a product, the EPA does not determine whether the product is "safe," but rather that use of the product in accordance with its label directions "will not generally cause unreasonable adverse effects on the environment." 7 U.S.C. § 136a(c)(5)(D).

26.     FIFRA defines "unreasonable adverse effects on the environment" to mean "any unreasonable risk to man or the environment, taking into account the economic, social, and environmental costs and benefits of the use of any pesticide." 7 U.S.C. § 136(bb). FIFRA thus requires the EPA to make a risk/benefit analysis in determining whether a registration should be granted or allowed to continue to be sold in commerce.

27.     The EPA and the State of Arkansas registered Roundup® for distribution, sale, and manufacture in the United States and the State of Arkansas.

28.     FIFRA generally requires that the registrant, Monsanto in the case of Roundup®, conducts the health and safety testing of pesticide products. The EPA has protocols governing the conduct of tests required for registration and the laboratory practices that must be followed in conducting these tests. The data produced by the registrant must be submitted to the EPA for review and evaluation. The government is not required, nor is it able, however, to perform the product tests that are required of the manufacturer.

8

29.     The evaluation of each pesticide product distributed, sold, or manufactured is completed at the time the product is initially registered. The data necessary for registration of a pesticide has changed over time. The EPA is now in the process of re-evaluating all pesticide products through a Congressionally-mandated process called "re-registration." 7 U.S.C. § 136a-1. In order to re-evaluate these pesticides, the EPA is demanding the completion of additional tests and the submission of data for the EPA's review and evaluation.

30.     In the case of glyphosate, and therefore Roundup®, the EPA had planned on releasing its preliminary risk assessment —in relation to the re-registration process—no later than July 2015. The EPA completed its review of glyphosate in early 2015, but it delayed releasing the risk assessment pending further review in light of the WHO's health-related findings.

### *Scientific Fraud Underlying the Marketing and Sale of Glyphosate/ Roundup®*

31.     Based on early studies showing that glyphosate could cause cancer in laboratory animals, the EPA originally classified glyphosate as *possibly carcinogenic to humans* (Group C) in 1985. After pressure from Monsanto, including contrary studies it provided to the EPA, the EPA changed its classification to *evidence of non-carcinogenicity in humans* (Group E) in 1991. In so classifying glyphosate, however, the EPA made clear that the designation did not mean the chemical does not cause cancer: "It should be emphasized, however, that designation of an agent in Group E is based on the available evidence at the time of evaluation and should not be interpreted as a definitive conclusion that the agent will not be a carcinogen under any circumstances."[12]

---

[12] U.S. Envtl. Prot. Agency, *Memorandum, Subject: SECOND Peer Review of Glyphosate* 1 (1991), *available at* https://archive.org/details/SecondPeerReviewOfGlyphosateEPAOct301991.

32.     On two occasions, the EPA found that the laboratories hired by Monsanto, to test the toxicity of its Roundup® products for registration purposes, committed fraud.

33.     In the first instance, Monsanto, in seeking initial registration of Roundup® by the EPA, hired Industrial Bio-Test Laboratories ("IBT") to perform and evaluate pesticide toxicology studies relating to Roundup®.[13] IBT performed about 30 tests on glyphosate and glyphosate-containing products, including nine of the 15 residue studies needed to register Roundup®.

34.     In 1976, the United States Food and Drug Administration ("FDA") performed an inspection of IBT that revealed discrepancies between the raw data and the final report relating to the toxicological impacts of glyphosate. The EPA subsequently audited IBT; it found the toxicology studies conducted for the Roundup® herbicide to be invalid.[14] An EPA reviewer stated, after finding "routine falsification of data" at IBT, that it was "hard to believe the scientific integrity of the studies when they said they took specimens of the uterus from male rabbits."[15]

35.     Three top executives of IBT were convicted of fraud in 1983.

36.     In the second incident of data falsification, Monsanto hired Craven Laboratories, in 1991, to perform pesticide and herbicide studies, including for Roundup®. In that same year, the owner of Craven Laboratories and three of its employees were indicted, and later convicted, of fraudulent laboratory practices in the testing of pesticides and herbicides.[16]

---

[13] Monsanto, *Backgrounder, Testing Fraud: IBT and Craven Laboratories* (Sep. 2, 2015), Backgrounder: Testing Fraud: IBT and Craven Laboratories (monsanto.com).

[14] U.S. Envtl. Prot. Agency, *Summary of the IBT Review Program Office of Pesticide Programs* (1983), *available at* https://nepis.epa.gov/Exe/ZyPURL.cgi?Dockey=91014ULV.TXT.

[15] Marie-Monique Robin, *The World According to Monsanto: Pollution, Corruption and the Control of the World's Food Supply* (2011) (citing U.S. Envtl. Prot. Agency, *Data Validation, Memo from K Locke, Toxicology Branch, to R. Taylor, Registration Branch. Washington, D.C.* (August 9, 1978)).

[16] Monsanto, *Backgrounder, Testing Fraud: IBT and Craven Laboratories, supra.*

37. Despite the falsity of the tests that underlie its registration, within a few years of its launch, Monsanto was marketing Roundup® in 115 countries

*The Importance of Roundup® to Monsanto's Market Dominance Profits*

38. The success of Roundup® was key to Monsanto's continued reputation and dominance in the marketplace. Largely due to the success of Roundup® sales, Monsanto's agriculture division was outperforming its chemicals division's operating income, and that gap increased yearly. However, with its patent for glyphosate expiring in the United States in the year 2000, Monsanto needed a strategy to maintain its Roundup® market dominance and to ward off impending competition.

39. In response, Monsanto began the development and sale of genetically engineered Roundup® Ready® seeds in 1996. Since Roundup® Ready® crops are resistant to glyphosate, farmers can spray Roundup® onto its fields during the growing season without harming the crop. This allowed Monsanto to expand its market for Roundup® even further. By 2000, Monsanto's biotechnology seeds were planted on more than 80 million acres worldwide and nearly 70% of American soybeans were planted from Roundup® Ready® seeds. It also secured Monsanto's dominant share of the glyphosate/Roundup® market through a marketing strategy that coupled proprietary Roundup® Ready® seeds with continued sales of its Roundup® herbicide.

40. Through a three-pronged strategy of increasing production, decreasing prices, and by coupling with Roundup® Ready® seeds, Roundup® became Monsanto's most profitable product. In 2000, Roundup® accounted for almost $2.8 billion in sales, outselling other herbicides

11

by a margin of five to one, and accounting for close to half of Monsanto's revenue.[17] Today, glyphosate remains one of the world's largest herbicides by sales volume.

***Monsanto has Known for Decades that it Falsely Advertises the Safety of Roundup®***

41.    In 1996, the New York Attorney General ("NYAG") filed a lawsuit against Monsanto based on its false and misleading advertising of Roundup® products. Specifically, the lawsuit challenged Monsanto's general representations that its spray-on glyphosate-based herbicides, including Roundup®, were "safer than table salt" and "practically non-toxic" to mammals, birds, and fish. Among the representations the NYAG found deceptive and misleading about the human and environmental safety of glyphosate and/or Roundup® are the following:

   a.  "Remember that environmentally friendly Roundup® herbicide is biodegradable. It won't build up in the soil so you can use Roundup® with confidence along customers' driveways, sidewalks and fences ..."

   b.  "And remember that Roundup® is biodegradable and won't build up in the soil. That will give you the environmental confidence you need to use Roundup® everywhere you've got a weed, brush, edging or trimming problem."

   c.  "Roundup® biodegrades into naturally occurring elements."

   d.  "Remember that versatile Roundup® herbicide stays where you put it. That means there's no washing or leaching to harm customers' shrubs or other desirable vegetation."

   e.  "This non-residual herbicide will not wash or leach in the soil. It ... stays where you apply it."

---

[17] David Barboza, *The Power of Roundup; A Weed Killer Is A Block for Monsanto to Build On,* N.Y. TIMES, Aug. 2, 2001, *available at* http://www.nytimes.com/2001/08/02/business/the-power-of-roundup-a-weed-killer-is-a-block-for-monsanto-to-build-on.html.

f.  "You can apply Accord with 'confidence because it will stay where you put it' it bonds tightly to soil particles, preventing leaching. Then, soon after application, soil microorganisms biodegrade Accord into natural products."

g.  "Glyphosate is less toxic to rats than table salt following acute oral ingestion."

h.  "Glyphosate's safety margin is much greater than required. It has over a 1,000-fold safety margin in food and over a 700-fold safety margin for workers who manufacture it or use it."

i.  "You can feel good about using herbicides by Monsanto. They carry a toxicity category rating of 'practically non-toxic' as it pertains to mammals, birds and fish."

j.  "Roundup® can be used where kids and pets will play and breaks down into natural material." This ad depicts a person with his head in the ground and a pet dog standing in an area which has been treated with Roundup®.[18]

42.  On November 19, 1996, Monsanto entered into an Assurance of Discontinuance with NYAG, in which Monsanto agreed, among other things, "to cease and desist from publishing or broadcasting any advertisements [in New York] that represent, directly or by implication" that:

a.  its glyphosate-containing pesticide products or any component thereof are safe, non-toxic, harmless or free from risk;

b.  its glyphosate-containing pesticide products or any component thereof manufactured, formulated, distributed or sold by Monsanto are biodegradable;

---

[18] Attorney General of the State of New York, In the Matter of Monsanto Company, Assurance of Discontinuance Pursuant to Executive Law § 63 (15) (Nov. 1996).

c. its glyphosate-containing pesticide products or any component thereof stay where they are applied under all circumstances and will not move through the environment by any means;

d. its glyphosate-containing pesticide products or any component thereof are "good" for the environment or are "known for its environmental characteristics";

e. glyphosate-containing pesticide products or any component thereof are safer or less toxic than common consumer products other than herbicides;

f. its glyphosate-containing products or any component thereof might be classified as "practically non-toxic."

43. Monsanto did not alter its advertising in the same manner in any state other than New York, and on information and belief still has not done so today.

44. In 2009, France's highest court ruled that Monsanto had not told the truth about the safety of Roundup®. The French court affirmed an earlier judgment that Monsanto had falsely advertised its herbicide Roundup® as "biodegradable" and that it "left the soil clean."[19]

*Classifications and Assessments of Glyphosate*

45. The IARC process for the classification of glyphosate followed the stringent procedures for the evaluation of a chemical agent. Over time, the IARC Monograph program has reviewed 980 agents. Of those reviewed, it has determined 116 agents to be Group 1 (Known Human Carcin-ogens); 73 agents to be Group 2A (Probable Human Carcinogens); 287 agents to be Group 2B (Possible Human Carcinogens); 503 agents to be Group 3 (Not Classified); and one agent to be Probably Not Carcinogenic.

---

[19] *Monsanto Guilty in 'False Ad' Row.* BBC, Oct. 15, 2009, *available at* http://news.bbc.co.uk/2/hi/europe/8308903.stm.

46.     The established procedure for IARC Monograph evaluations is described in the IARC Programme's Preamble.[20] Evaluations are performed by panels of international experts, selected on the basis of its expertise and the absence of actual or apparent conflicts of interest.

47.     One year before the Monograph meeting, the meeting is announced and there is a call both for data and for experts. Eight months before the Monograph meeting, the Working Group membership is selected, and the sections of the Monograph are developed by the Working Group members. One month prior to the Monograph meeting, the call for data is closed and the various draft sections are distributed among Working Group members for review and comment. Finally, at the Monograph meeting, the Working Group finalizes review of all literature, evaluates the evidence in each category, and completes the overall evaluation. Within two weeks after the Monograph meeting, the summary of the Working Group findings are published in Lancet Oncology, and within a year after the meeting, the final Monograph is finalized and published.

48.     In assessing an agent, the IARC Working Group reviews the following information: human, experimental, and mechanistic data; all pertinent epidemiological studies and cancer bioassays; and representative mechanistic data. The studies must be publicly available and have sufficient detail for meaningful review, and reviewers cannot be associated with the underlying study.

49.     In March 2015, IARC reassessed glyphosate. The summary published in The Lancet Oncology reported that glyphosate is a Group 2A agent and probably carcinogenic in humans.

50.     On July 29, 2015, IARC issued its Monograph for glyphosate, Monograph 112. For Volume 112, the volume that assessed glyphosate, a Working Group of 17 experts from 11

---

[20] World Health Org., *IARC Monographs on the Evaluation of Carcinogenic Risks to Humans: Preamble* (2006), *available at* https://monographs.iarc.who.int/wp-content/uploads/2018/06/mono97-4.pdf.

countries met at IARC from March 3–10, 2015, to assess the carcinogenicity of certain herbicides, including glyphosate. The March meeting culminated nearly a one-year review and preparation by the IARC Secretariat and the Working Group, including a comprehensive review of the latest available scientific evidence. According to published procedures, the Working Group considered "reports that have been published or accepted for publication in the openly available scientific literature" as well as "data from governmental reports that are publicly available."

51.     The studies considered the following exposure groups: occupational exposure of farmers and tree nursery workers in the United States, forestry workers in Canada and Finland and municipal weed-control workers in the United Kingdom; and para-occupational exposure in farming families.

52.     Glyphosate was identified as the second-most used household herbicide in the United States for weed control between 2001 and 2007 and the most heavily used herbicide in the world in 2012.

53.     Exposure pathways are identified as air (especially during spraying), water, and food. Community exposure to glyphosate is widespread and found in soil, air, surface water, and groundwater, as well as in food.

54.     The assessment of the IARC Working Group identified several case control studies of occupational exposure in the United States, Canada, and Sweden. These studies show a human health concern from agricultural and other work-related exposure to glyphosate.

55.     The IARC Working Group found an increased risk between exposure to glyphosate and Non-Hodgkin's lymphoma and several subtypes of NHL, and the increased risk persisted after adjustment for other pesticides.

16

56.     The IARC Working Group also found that glyphosate caused DNA and chromosomal dam-áge in human cells. One study in community residents reported increases in blood markers of chromosomal damage (micronuclei) after glyphosate formulations were sprayed.

57.     In male CD-1 mice, glyphosate induced a positive trend in the incidence of a rare tumor, renal tubule carcinoma. A second study reported a positive trend for haemangiosarcoma in male mice. Glyphosate increased pancreatic islet-cell adenoma in male rats in two studies. A glyphosate formulation promoted skin tumors in an initiation-promotion study in mice.

58.     The IARC Working Group also noted that glyphosate has been detected in the urine of agricultural workers, indicating absorption. Soil microbes degrade glyphosate to aminomethylphosphoric acid (AMPA). Blood AMPA detection after exposure suggests intestinal microbial metabolism in humans.

59.     The IARC Working Group further found that glyphosate and glyphosate formulations induced DNA and chromosomal damage in mammals, and in human and animal cells in utero.

60.     The IARC Working Group also noted genotoxic, hormonal, and enzymatic effects in mammals exposed to glyphosate.[21] Essentially, glyphosate inhibits the biosynthesis of aromatic amino acids, which leads to several metabolic disturbances, including the inhibition of protein and secondary product biosynthesis and general metabolic disruption.

61.     The IARC Working Group also reviewed an Agricultural Health Study, consisting of a prospective cohort of 57,311 licensed pesticide applicators in Iowa and North Carolina.[22] While this study differed from others in that it was based on a self-administered questionnaire, the

---

[21] Guyton et al., *Carcinogenicity of Tetrachlorvinphos, Parathion, Malathion, Diazinon & Glyphosate, supra* at 77.
[22] Anneclare J. De Roos et *al., Cancer Incidence Among Glyphosate-Exposed Pesticide Applicators in the Agricultural Health Study,* 113 Envt'l Health Perspectives 49-54 (2005), *available at* https://www.ncbi.nlm.nih.gov/pmc/articles/pmid/15626647/.

results support an association between glyphosate exposure and Multiple Myeloma, Hairy Cell

Leukemia (HCL), and Chronic Lymphocytic Leukemia (CLL), in addition to several other cancers.

### *Other Earlier Findings About Glyphosate's Dangers to Human Health*

62.     The EPA has a technical fact sheet, as part of its Drinking Water and Health,

National Primary Drinking Water Regulations publication, relating to glyphosate. This technical

fact sheeting predates IARC's March 20, 2015 evaluation. The fact sheet describes the release

patters for glyphosate as follows:

**Release Patterns**

Glyphosate is released to the environment in its use as a herbicide for controlling woody and herbaceous weeds on forestry, right-of-way, cropped and non-cropped sites. These sites may be around water and in wetlands.

It may also be released to the environment during its manufacture, formulation, transport, storage, disposal and cleanup, and from spills. Since glyphosate is not a listed chemical in the Toxics Release Inventory, data on releases during its manufacture and handling are not available.

Occupational workers and home gardeners may be exposed to glyphosate by inhalation and dermal contact during spraying, mixing, and cleanup. They may also be exposed by touching soil and plants to which glyphosate was applied. Occupational exposure may also occur during glyphosate's manufacture, transport storage, and disposal.[23]

63.     In 1995, the Northwest Coalition for Alternatives to Pesticides reported that in

California, the state with the most comprehensive program for reporting of pesticide-caused

---

[23] U.S. Envtl. Prot. Agency, *Technical Factsheet on: Glyphosate, supra.*

illness, glyphosate was the third most commonly-reported cause of pesticide illness among agricultural workers.[24]

### The Toxicity of Other Ingredients in Roundup®

64.     In addition to the toxicity of the active ingredient, glyphosate, several studies support the hypothesis that the glyphosate-based formulation in Defendant's Roundup® products is more dangerous and toxic than glyphosate alone. Indeed, as early as 1991, available evidence demonstrated that glyphosate formulations were significantly more toxic than glyphosate alone.[25]

65.     In 2002, a study by Julie Marc, entitled "Pesticide Roundup® Provokes Cell Division Dysfunction at the Level of CDK1/Cyclin B Activation," revealed that Roundup® causes delays in the cell cycles of sea urchins but that the same concentrations of glyphosate alone were ineffective and did not alter cell cycles.[26]

66.     A 2004 study by Marc and others, entitled "Glyphosate-based pesticides affect cell cycle regulation," demonstrated a molecular link between glyphosate-based products and cell cycle dysregulation. The researchers noted, "cell-cycle dysregulation is a hallmark of tumor cells and human cancer. Failure in the cell-cycle checkpoints leads genomic instability and subsequent development of cancers from the initial affected cell." Further, "[s]ince cell cycle disorders such as cancer result from dysfunction of a unique cell, it was of interest to evaluate the thresh-old dose of glyphosate affecting the cells."[27]

---

[24] Caroline Cox, *Glyphosate, Part 2: Human Exposure and Ecological Effects*, 15 J. PESTICIDE REFORM 4 (1995); W.S. Peas et al., *Preventing pesticide-related illness in California agriculture: Strategies and priorities. Environmental Health Policy Program Report*, Univ. of Cal. School of Public Health, Calif. Policy Seminar (1993).

[25] Martinez, T.T. and K. Brown, *Oral and pulmonary toxicology of the stufactant used in Roundup herbicide*, PROC. WEST. PHARMACOL. Soc. 34:43-46 (1991).

[26] Julie Marc, et al., *Pesticide Roundup Provokes Cell Division Dysfunction at the Level of CDK1/Cyclin B Activation, 15* CHEM. RES. TOXICOL. 326-331 (2002), *available at* https://pubs.acs.org/doi/10.1021/tx015543g.

[27] Julie Marc, et al., *Glyphosate-based pesticides affect cell cycle regulation*, 96 BIOLOGY OF THE CELL 245, 245-249 (2004), *available at* https://onlinelibrary.wiley.com/doi/abs/10.1016/j.biolcel.2003.11.010.

67.     In 2005, a study by Francisco Peixoto, entitled "Comparative effects of the Roundup® and glyphosate on mitochondrial oxidative phosphorylation," demonstrated that Roundup®®'s effects on rat liver mitochondria are far more toxic than equal concentrations of glyphosate alone. The Peixoto study further suggested that the harmful effects of Roundup® on mitochondrial bioenergetics could not be exclusively attributed to glyphosate but could be the result of other chemicals, such as the surfactant POEA, or in the alternative, due to a potential synergic effect between glyphosate and other ingredients in the Roundup® formulation.[28]

68.     In 2009, Nora Benachour and Gilles-Eric Seralini published a study examining the effects of Roundup® and glyphosate on human umbilical, embryonic, and placental cells. The study tested dilution levels of Roundup® and glyphosate that were far below agricultural recommendations, corresponding with low levels of residue in food. The researchers ultimately concluded that supposed "inert" ingredients, and possibly POEA, alter human cell permeability and amplify toxicity of glyphosate alone. The researchers further suggested that assessments of glyphosate toxicity should account for the presence of adjuvants or additional chemicals used in the formulation of the complete pesticide. The study confirmed that the adjuvants present in Roundup® are not, in fact, inert and that Roundup® is potentially far more toxic than its active ingredient glyphosate alone.[29]

69.     The results of these studies were, at all times, available to Defendant.

70.     Monsanto's chief toxicologist Donna Farmer has admitted that she cannot say that Roundup® does not cause cancer because Monsanto has not performed carcinogenicity studies with

---

[28] Francisco Peixoto, *Comparative effects of the Roundup and glyphosate on mitochondrial oxidative Phosphorylation,* 61 CI-IEMOSPHERE 1115, 1122 (2005), *available at* https://www.researchgate.net/publication/7504567_Comparative_effects_of_the_Roundup_and_glyphosate_on_mit ochondrial_oxidative_phosphorylation.

[29] Nora Benachour, et al., *Glyphosate Formulations Induce Apoptosis and Necrosis in Human Umbilical, Embryonic, and Placental Cells.* 22 CHEM. RES. TOXICOL. 97-105 (2008), *available at* https://pubs.acs.org/doi/10.1021/tx800218n.

the formulated product Roundup®, the very product that caused Plaintiff's NHL.[30] Indeed, she

further admitted that in the 35 years that Monsanto has marketed Roundup® to the public, Monsanto

has conducted no chronic carcinogenicity studies on the formulated Roundup® product merely

because EPA did not require that such a study be performed for registration for glyphosate.[31]

71.    Defendant thus knew or should have known that Roundup® is more toxic than

glyphosate alone and that safety studies of Roundup®, Roundup®'s adjuvants and "inert"

ingredients, and/or the surfactant POEA were necessary to protect users from Roundup®.

72.    Despite its knowledge that Roundup® is considerably more dangerous than

glyphosate alone, Defendant continued to promote Roundup® as safe.

### The EPA's Review of Glyphosate

73.    In April 2016, personnel within the EPA's Office of Pesticides Program (OPP)

leaked and posted on the internet a draft report on glyphosate carcinogenicity, entitled Cancer

Assessment Review Committee (CARC) report, dated October 2015. The EPA removed the

documents by May 2, 2016, within days of initially posting it online. An EPA spokesperson

subsequently issued a statement on the agency's glyphosate review:

> Glyphosate documents were inadvertently posted to the Agency's
> docket. These documents have now been taken down because our
> assessment is not final. EPA has not completed our cancer review.
> We will look at the work of other governments as well as work by
> HHS's Agricultural Health Study as we move to make a decision on
> glyphosate. Our assessment will be peer reviewed and completed by
> end of 2016.[32]

---

[30] See Plaintiffs' Submission in Response to Pretrial Order No. 8, Ex. 7, In re: Roundup Products Liability Litigation, MDL No. 2741 (N.D. Cal., Mar. 14, 2017), ECF No. 187-7.

[31] See id.

[32] Carey Gillam, What Is Going On With Glyphosate? EPA's Odd Handling of Controversial Chemical, HUFFINGTON POST, May 2, 2016, available at https://www.huffpost.com/entry/what-is-going-on-with-gly_b_9825326; see also P.J. Huffstutter, EPA takes offline report that says glyphosate not likely carcinogenic, REUTERS, May 2, 2016, available at EPA takes offline report that says glyphosate not likely carcinogenic | Reuters.

21

74. On September 12, 2016, EPA's OPP submitted a report on the carcinogenic potential of glyphosate, wherein it issued a "proposed conclusion" that glyphosate is "'not likely to be carcinogenic to humans' at doses relevant to human health risk assessment."[33] There are no authors listed on this issue paper, which reiterates and adopts the conclusions of the October 2015 leaked assessment. The issue paper is based upon a review of industry-sponsored articles and studies. The OPP acknowledged that it rejected all studies that considered Roundup®—the formulated product—instead of studies that isolated glyphosate because "[g]lyphosate formulations contain various components other than glyphosate and it has been hypothesized these components are more toxic than glyphosate alone."[34]

75. Thus, the OPP notes dozens of studies considered by IARC were not reviewed by the OPP because the OPP's "evaluation focused on studies on the active ingredient glyphosate" and "additional research could also be performed to determine whether formulation components, such as surfactants, influence the toxicity of glyphosate formulations."[35]

76. From December 13 to 16, 2016, the EPA held FIFRA Scientific Advisory Panel ("SAP") meetings to consider issues raised by the OPP's evaluation of glyphosate. Again, OPP only allowed the SAP to consider studies of glyphosate alone, and not any study of the formulated product. In its Charge to the FIFRA SAP, the OPP noted "[a]lthough there are studies available on glyphosate-based pesticide formulations, the agency is soliciting advice from the FIFRA Scientific Advisory Panel (SAP) on this evaluation of human carcinogenic potential for the active ingredient glyphosate only at this time."[36]

---

[33] *See* EPA's Office of Pesticide Programs, Glyphosate Issue Paper: Evaluation of Carcinogenic Potential (Sept. 12, 2016), *available at* https://www.epa.gov/sites/production/files/2016-09/documents/glyphosate_issue_paper_evaluation_of_carcincogenic_potential.pdf.
[34] *Id.*
[35] *Id.*
[36] EPA OPP, Glyphosate: Evaluation of Carcinogenic Potential, Charge to the FIFRA SAP for the October 18-21, 2016 Meeting, *available at* Charge to the FIFRA SAP for October 18-21, 2016 Meeting (epa.gov).

77.     The OPP draft assessment therefore does not actually consider the product at issue in this litigation or, more importantly, how glyphosate, in conjunction with surfactants and other chemicals, affects carcinogenicity.

78.     On March 16, 2017, the final SAP meeting minutes and report were released, revealing disagreement and lack of consensus among the scientists on whether there was a positive association between glyphosate exposure and NHL. [37]

### *Monsanto's Industry Ties*

79.     Recently unsealed documents in the federal Roundup® MDL litigation reveal the extent to which Monsanto has been able to leverage its contacts within the EPA to protect glyphosate and Roundup® from scrutiny and review.

80.     Internal Monsanto documents, including email communications, demonstrate that Jess Rowland, former Deputy Division Director, Health Effects Division of the EPA's OPP, and formerly the chair of the CARC (the same committee that inadvertently leaked the EPA's glyphosate report in April 2016), repeatedly and directly intervened on Monsanto's behalf. These same documents reveal that Monsanto was secure in the knowledge that it had allies within the EPA.

81.     To begin, in the months following IARC's initial March 2015 announcement that it had classified glyphosate as a probable carcinogen, Monsanto turned its attention to the EPA's review of glyphosate. In one April 27, 2015 email, Monsanto official Bill Heydens wrote to colleagues to suggest "approaching EPA and... ask if there is anything that would help them

---

[37] FIFRA Scientific Advisory Panel Meeting Minutes and Final Report No. 2017-01, A Set of Scientific Issues Being Considered by the Environmental Protection Agency Regarding: EPA's Evaluation of the Carcinogenic Potential of Glyphosate, *available at* https://www.epa.gov/sites/production/files/2017-03/documents/december_13-16_2016_final_report_03162017.pdf.

defend the situation?" His colleague Dan Jenkins responded: "I think you and I could get on the phone w Jess Rowland and discuss this pretty openly. He'll give us straight talk."[38]

82.     The following day, Mr. Jenkins spoke to Mr. Rowland by telephone and then relayed the substance of the conversation for his colleagues in an April 28, 2015 email. Specifically, he reported that with respect to the CARC investigation, Mr. Rowland had stated: "We have enough to sustain our conclusions. Don't need gene tox or epi . . . . I am the chair of the CARC and my folks are running this process for glyphosate in reg review. I have called a CARC meeting in June."[39] Thus, even though the ostensible purpose of the CARC review was to evaluate the exhaustive IARC assessment on glyphosate, and even though the full IARC monograph on glyphosate would not be completed until July 2015, Mr. Rowland had already formed his conclusion months earlier—in April 2015.

83.     Mr. Rowland also intervened to halt another agency's review of glyphosate. When the Agency for Toxic Substances and Disease Registry (ATSDR), a federal public health agency of the U.S. Department of Health and Human Services, announced in February 2015 that it planned to publish a toxicological review of glyphosate, it was Mr. Rowland who helped Monsanto stop the ATSDR's investigation. In the same April 28, 2015, email discussed above, Mr. Jenkins explained that Mr. Rowland wanted to help Monsanto stop an investigation concerning the carcinogenicity of glyphosate being conducted by ATSDR.[40] Since ATSDR is not controlled by the EPA, according to Mr. Jenkins, Mr. Rowland had bragged: "If I can kill this I should get a medal."[41] Jenkins cautioned, however, that Monsanto should not "get your hopes up, I doubt EPA and Jess can kill this; but its

---

[38] *See* Plaintiffs' Motion to Compel the Deposition of Jess Rowland, Ex. D, In re: Roundup Products Liability Litigation, MDL No. 2741 (N.D. Cal., Mar. 14, 2017), ECF No. 189-4.
[39] *Id.*
[40] *See id.*
[41] *Id.*

24

good to know they are going to actually make the effort now to coordinate due to our pressing and its shared concern that ATSDR is consistent in in its conclusions with the EPA."[42] The ATSDR never published its toxicological profile of glyphosate.

84.     Further, the released documents reveal Monsanto's confidence that its allies within the EPA would continue to support glyphosate. In an internal memo on glyphosate, Monsanto executives wrote: "We know, *but cannot say*, that EPA's Office of Pesticide Program scientists strongly feel that glyphosate does not cause cancer and have defended its written determination internally for months."[43] Notably, when Mr. Rowland attended the IARC glyphosate meetings as an observed for the EPA, internal communications indicate Monsanto was not displeased with his attendance since, "we all know Jess."[44]

### *Recent Worldwide Bans on Roundup®/Glyphosate*

85.     Several countries around the world have instituted bans on the sale of Roundup® and other glyphosate-containing herbicides, both before and since IARC first announced its assessment for glyphosate in March 2015, and more countries undoubtedly will follow suit as the dangers of the use of Roundup® become more widely known. The Netherlands issued a ban on all glyphosate-based herbicides in April 2014, including Roundup®, which will take effect by the end of 2015. In issuing the ban, the Dutch Parliament member who introduced the successful legislation stated: "Agricultural pesticides in user-friendly packaging are sold in abundance to private persons. In garden centers, Roundup® is promoted as harmless, but unsuspecting

---

[42] *Id.*

[43] See Plaintiffs' Motion to Compel the Deposition of Jess Rowland, Ex. E, In re: Roundup Products Liability Litigation, MDL No. 2741 (N.D. Cal., Mar. 14, 2017), ECF No. 189-5 (emphasis original).

[44] *See* Plaintiffs' Motion to Compel the Deposition of Jess Rowland, Ex. G, *In re: Roundup Products Liability Litigation,* MDL No. 2741 (N.D. Cal., Mar. 14, 2017), ECF No. 189-7.

customers have no idea what the risks of this product are. Especially children sensitive to toxic substances and should therefore not be exposed to it."[45]

86.     The Brazilian Public Prosecutor in the Federal District requested that the Brazilian Justice Department suspend the use of glyphosate.[46]

87.     France banned the private sale of Roundup® and glyphosate following the IARC assessment for Glyphosate.[47]

88.     Bermuda banned both the private and commercial sale of glyphosates, including Roundup®. The Bermuda government explained its ban as follows: "Following a recent scientific study carried out by a leading cancer agency, the importation of weed spray 'Roundup®' has been suspended."[48]

89.     The Sri Lankan government banned the private and commercial use of glyphosate, particularly out of concern that glyphosate has been linked to fatal kidney disease in agricultural workers.[49]

---

[45] *Holland's Parliament Bans Glyphosate Herbicides*, The Real Agenda, April 14, 2014, *available at* Holland's Parliament Bans Glyphosate Herbicides | Politics | Before It's News.

[46] Christina Sarich, *Brazil's Public Prosecutor Wants to Ban Monsanto's Chemicals Following Recent Glyphosate-Cancer Link*, GLOBAL RESEARCH, May 14, 2015, *available at* http://www.globalresearch.ca/brazils-public-prosecutor-wants-to-ban-monsantos-chemicals-following-recent-glyphosate-cancer-link/5449440;
*See* MinisterioPalico Federal, *MPF:DF reforcapedido para que glifosatosejabanido do mercado national*, April, 14, 2015, *available at* http://noticias.pgr.mpf.mp.br/noticias/noticias-do-site/copyofmeio-ambiente-e-patrimoniocultural/mpf-df-reforca-pedido-para-que-glifosato-seja-banido-do-mercado-nacional.

[47] Zoe Schlanger, *France Bans Sales of Monsanto's Roundup in Garden Centers, 3 Months After U.N. Calls it 'Probable Carcinogen'*, NEWSWEEK, June 15, 2015, *available at* http://www.newsweek.com/france-bans-sale-monsantos-roundup-garden-centers-after-un-names-it-probable-343311.

[48] *Health Minister: Importation of Roundup Weed Spray Suspended* Today in Bermuda, May, 11 2015, *available at* https://bernews.com/2015/05/importation-weed-spray-round-suspended/.

[49] *Sri Lanka's New President Puts Immediate Ban on Glyphosate Herbicides*, Sustainable Pulse, May 25, 2015, *available at* https://sustainablepulse.com/2015/05/25/sri-lankas-new-president-puts-immediate-ban-on-glyphosate-herbicides/.

90.     The government of Columbia announced its ban on using Roundup® and glyphosate to destroy illegal plantations of coca, the raw ingredient for cocaine, because of the WHO's finding that glyphosate is probably carcinogenic.[50]

### *Proposition 65 Listing*

91.     On September 4, 2015, California's Office of Environmental Health Hazard Assessment ("OEHHA") published a notice of intent to include glyphosate on the state's list of known carcinogens under Proposition 65. California's Safe Drinking Water and Toxic Enforcement Act of 1986 (informally known as "Proposition 65"), requires the state to maintain and, at least once a year, revise and republish a list of chemicals "known to the State of California to cause cancer or reproductive toxicity." The OEHHA determined that glyphosate met the criteria for the listing mechanism under the Labor Code following IARC's assessment of the chemical.

92.     The listing process under the Labor Code is essentially automatic. The list of known carcinogens, at a minimum, must include substances identified by reference in Labor Code § 6382(b)(1). That section of the Labor Code identifies "[s]ubstances listed as human or animal carcinogens by the International Agency for Research on Cancer (IARC)." IARC's classification of glyphosate as a Group 2A chemical ("probably carcinogenic to humans") therefore triggered the listings.

93.     A business that deploys a listed chemical in its products must provide "clear and reasonable warnings" to the public prior to exposure to the chemical. To be clear and reasonable, a warning must "(1) clearly communicate that the chemical is known to cause cancer, and/or birth

---

[50] *Columbia to ban coca spraying herbicide glyphosate,* BBC, *May 10,* 2015, *available at* http://www.bbc.cominews/world-latin-america-32677411.

27

defects or other reproductive harm; and (2) effectively reach the person before exposure."[54] The law also prohibits the discharge of listed chemicals into drinking water.

94.     Monsanto disputed the listing decision and, in January 2016, filed a lawsuit against OEHHA and the agency's acting director, Lauren Zeise, in California state court, seeking declaratory and injunctive relief to prevent OEHHA from listing glyphosate.

95.     Monsanto alleged that OEHHA's exclusive reliance on the IARC decision signified that "OEHHA effectively elevated the determination of an ad hoc committee of an unelected, foreign body, which answers to no United States official (let alone any California state official), over the conclusions of its own scientific experts." Monsanto further alleged that the Labor Code listing mechanism presented various constitutional violations because it "effectively empowers an unelected, undemocratic, unaccountable, and foreign body to make laws applicable in California.[57]" Among other things, Monsanto argued that Proposition 65's requirement to provide a clear and reasonable warning" to consumers that the chemical is a known carcinogen would damage its reputation and violate its First Amendment rights.

96.     On January 27, 2017, the Superior Court of California – Fresno issued a tentative ruling granting, among other things, OEHHA's motion for judgment on the pleadings, thus rejecting Monsanto's arguments. On March 10, 2017, the Court issued a final order adopting, in full, the earlier tentative ruling.

97.     On March 28, 2017 OEHHA posted Notice on its website that glyphosate would be added to the list of chemicals known to the state of California to cause cancer for purposes of Proposition 65.

98.     On November 15, 2017, Monsanto and various agricultural groups, including the National Association of Wheat Growers, the National Corn Growers Association, the Iowa

Soybean Association, and others, filed a complaint against the OEHHA and California's Attorney General in the Eastern District of California seeking, among other things, to enjoin California's application of Prop 65 to glyphosate. On January 3, 2018, Attorneys General in Idaho, Indiana, Iowa, Kansas, Louisiana, Michigan, Missouri, North Dakota, Oklahoma, South Dakota, and Wisconsin filed an amicus brief in support of injunctive relief.

99.     On February 26, 2018, the Eastern District of California denied Monsanto's motion for a preliminary injunction enjoining California from listing glyphosate as a chemical known to the State of California to cause cancer and granted the injunction enjoining California from requiring Monsanto provide a warning label on its products.

### *EFSA Report on Glyphosate*

100.     On November 12, 2015, the European Food Safety Authority (EFSA), the European Union's primary agency for food safety, reported on its evaluation of the Renewal Assessment Report (RAR) on glyphosate.[51] The Rapporteur Member State assigned to glyphosate, the German Federal Institute for Risk Assessment (BfR), had produced the RAR as part of the renewal process for glyphosate in the EU.

101.     BfR sent its draft RAR to EFSA and the RAR underwent a peer review process by EFSA, other member states, and industry groups. As part of the on-going peer review of Germany's reevaluation of glyphosate, EFSA had also received a second mandate from the European Commission to consider IARC's findings regarding the potential carcinogenicity of glyphosate and glyphosate-containing products.

---

[51] European Food Safety Auth., Conclusion on the peer review of the pesticide risk assessment of the active substance glyphosate, *available at*
http://www.efsa.europa.eu/sites/default/files/scientific_output/files/main_documents/4302.pdf.

102.    Based on a review of the RAR, which included data from industry-submitted
unpublished studies, EFSA sent its own report ("Conclusion") to the European Commission,
finding that "glyphosate is unlikely to pose a carcinogenic hazard to humans and the evidence does
not support classification with regard to its carcinogenic potential according to Regulation (EC)
No 1272/2008."[52] EFSA therefore disagreed with IARC: glyphosate was not genotoxic and did
not present a carcinogenic threat to humans.

103.    In explaining why its results departed from IARC's conclusion, EFSA drew a
distinction between the EU and IARC approaches to the study and classification of chemicals.[53]
Although IARC examined "both glyphosate—an active substance—and glyphosate-based
formulations, grouping all formulations regardless of its composition," EFSA explained that it
considered only glyphosate and that its assessment focuses on "each individual chemical, and each
marketed mixture separately."[54] IARC, on the other hand, "assesses generic agents, including
groups of related chemicals, as well as occupational or environmental exposure, and cultural or
behavioural practices."[55] EFSA accorded greater weight to studies conducted with glyphosate
alone than studies of formulated products.[56]

104.    EFSA went further and noted:

> [A]lthough some studies suggest that certain glyphosate-based
> formulations may be genotoxic (i.e. damaging to DNA); others that
> look solely at the active substance glyphosate do not show this
> effect. It is likely, therefore, that *the genotoxic effects observed in
> some glyphosate-based formulations are related to the other
> constituents or "co-formulants."* Similarly, certain glyphosate-
> based formulations display higher toxicity than that of the active
> ingredient, presumably because of the presence of co-formulants. In

---

[52] *Id.*

[53] European Food Safety Auth., Glyphosate, *available at*
https://www.efsa.europa.eu/sites/default/files/corporate_publications/files/efsaexplainsglyphosate151112en.pdf.

[54] *Id.*

[55] *Id.*

[56] *Id.*

> its assessment, *EFSA proposes that the toxicity of each pesticide formulation and in particular its genotoxic potential should be further considered and addressed by Member State authorities while they re-assess uses of glyphosate-based formulations in its own territories.*[57]

105. Notwithstanding its conclusion, EFSA did set exposure levels for glyphosate. Specifically, EFSA proposed an acceptable daily intake (ADI) of 0.5 mg/kg of body weight per day; an acute reference dose (ARfD) of 0.5 mg/kg of body weight; and an acceptable operator exposure level (AOEL) of 0.1 mg/kg bw per day.[58]

### *Leading Scientists Dispute EFSA's Conclusion*

106. On November 27, 2015, 96 independent academic and governmental scientists from around the world submitted an open letter to the EU health commissioner, Vytenis Andriukaitis.[59] The scientists expressed its strong concerns and urged the commissioner to disregard the "flawed" EFSA report, arguing, "the BfR decision is not credible because it is not supported by the evidence and it was not reached in an open and transparent manner."[60]

107. Signatories to the letter included Dr. Christopher J. Portier, Ph.D., and other renowned international experts in the field, some of whom were part of the IARC Working Group assigned to glyphosate.

108. In an exhaustive and careful examination, the scientists scrutinized EFSA's conclusions and outlined why the IARC Working Group decision was "by far the more credible":

> The IARC WG decision was reached relying on open and transparent procedures by independent scientists who completed thorough conflict-of-interest statements and

---

[57] *Id.*

[58] European Food Safety Auth., Conclusion on the peer review of the pesticide risk assessment of the active substance glyphosate, *supra*

[59] Letter from Christopher J. Portier et al. to Commission Vytenis Andriukaitis, Open letter: Review of the Carcinogenicity of Glyphosate by EFSA and BfR (Nov. 27, 2015), https://www.efsa.europa.eu/sites/default/files/Prof_Portier_letter.pdf;

http://www.theguardian.com/environment/2016/jan/13/eu-scientists-in-row-over-safety-of-glyphosate-weedkiller.
[60] *Id.*

were not affiliated or financially supported in any way by the chemical manufacturing industry. It is fully referenced and depends entirely on reports published in the open, peer-reviewed biomedical literature. It is part of a long tradition of deeply researched and highly credible reports on the carcinogenicity of hundreds of chemicals issued over the past four decades by IARC and used today by international agencies and regulatory bodies around the world as a basis for risk assessment, regulation and public health policy.[61]

109. With respect to human data, the scientists pointed out that EFSA agreed with IARC that there was "*limited evidence* of carcinogenicity" for NHL, but EFSA nonetheless dismissed an association between glyphosate exposure and carcinogenicity. IARC applies three levels of evidence in its analyses of human data, including sufficient evidence and limited evidence. EFSA's ultimate conclusion that "there was no unequivocal evidence for a clear and strong association of NHL with glyphosate" was misleading because it was tantamount to IARC's highest level of evidence: "sufficient evidence," which means that a causal relationship has been established. However, the scientists argued, "[l]egitimate public health concerns arise when 'causality is credible,' i.e., when there is *limited evidence*."[62]

110. Among its many other deficiencies, EFSA's conclusions regarding animal carcinogenicity data were "scientifically unacceptable," particularly in BfR's use of historical control data and in its trend analysis. Indeed, BfR's analysis directly contradicted the Organisation for Economic Co-operation and Development ("OECD") testing guidelines while citing and purporting to follow those same guidelines. For instance, the EFSA report dismisses observed trends in tumor incidence "because there are no individual treatment groups that are significantly different from controls and because the maximum observed response is reportedly within the range of the historical control data." However, according to the scientists, concurrent controls are recommended over historical controls in all guidelines,

---

[61] *Id.*
[62] *Id.*

32