scientific reports, and publications, and, if it is employed, historical control data "should be from studies in the same timeframe, for the same exact animal strain, preferably from the same laboratory or the same supplier and preferably reviewed by the same pathologist." BfR's use of historical control data violated these precautions: "only a single study used the same mouse strain as the historical controls, but was reported more than 10 years after the historical control dataset was developed." Further deviating from sound scientific practices, the data used by the BfR came from studies in seven different laboratories. The scientists concluded:

> BfR reported seven positive mouse studies with three studies showing increases in renal tumors, two with positive findings for hemangiosarcomas, and two with positive findings for malignant lymphomas. BfR additionally reported two positive findings for tumors in rats. Eliminating the inappropriate use of historical data, the unequivocal conclusion is that these are not negative studies, but in fact document the carcinogenicity of glyphosate in laboratory animals.[63]

111.    The letter also critiqued the EFSA report's lack of transparency and the opacity surrounding the data cited in the report: "citations for almost all of the references, even those from the open scientific literature, have been redacted from the document" and "there are no authors or contributors listed for either document, a requirement for publication in virtually all scientific journals." Because BfR relied on unpublished, confidential industry-provided studies, it is "impossible for any scientist not associated with BfR to review this conclusion with scientific confidence."[64]

112.    On March 3, 2016, the letter was published in the Journal of Epidemiology & Community Health.[65]

---

[63] *Id.*

[64] *Id.*

[65] Christopher J. Portier, et al., *Differences in the carcinogenic evaluation of glyphosate between the International Agency for Research on Cancer (IARC) and the European Food Safety Authority (EFSA)*, JOURNAL OF EPIDEMIOLOGY &CMTY. HEALTH, Mar. 3, 2016, *available at* https://jech.bmj.com/content/70/8/741.

33

***Statement of Concern Regarding Glyphosate-Based Herbicides***

113. On February 17, 2016, a consensus statement published in the journal *Environmental Health*, entitled "Concerns over use of glyphosate-based herbicides and risks associated with exposures: a consensus statement," assessed the safety of glyphosate-based herbicides (GBHs).[66] The paper's "focus is on the unanticipated effects arising from the worldwide increase in use of GBHs, coupled with recent discoveries about the toxicity and human health risks stemming from use of GBHs."[67] The researchers drew seven factual conclusions about GBHs:

       a.    GBHs are the most heavily applied herbicide in the world and usage continues to rise;

       b.    Worldwide, GBHs often contaminate drinking water sources, precipitation, and air, especially in agricultural regions;

       c.    The half-life of glyphosate in water and soil is longer than previously recognized;

       d.    Glyphosate and its metabolites are widely present in the global soybean supply;

       e.    Human exposures to GBHs are rising;

       f.    Glyphosate is now authoritatively classified as a probable human carcinogen; and

       g.    Regulatory estimates of tolerable daily intakes for glyphosate in the United States and European Union are based on outdated science.[68]

114. The researchers noted that GBH use has increased approximately 100-fold since the 1970s. Further, far from posing a limited hazard to vertebrates, as previously

---

[66] John P. Myers, et al, *Concerns over use of glyphosate-based herbicides and risks associated with exposures: a consensus statement,* Environmental Health (2016), *available* at Concerns over use of glyphosate-based herbicides and risks associated with exposures: a consensus statement | Environmental Health | Full Text (biomedcentral.com).
[67] *Id.*
[68] *Id.*

believed, two decades of evidence demonstrated that "several vertebrate pathways are likely targets of action, including hepatorenal damage, effects on nutrient balance through glyphosate chelating action and endocrine disruption."[69]

115.    The paper attributes uncertainties in current assessments of glyphosate formulations to the fact that "[t]he full list of chemicals in most commercial GBHs is protected as 'commercial business information,' despite the universally accepted relevance of such information to scientists hoping to conduct an accurate risk assessment of these herbicide formulations." Further, the researchers argue, "[t]he distinction in regulatory review and decision processes between 'active' and 'inert' ingredients has no toxicological justification, given increasing evidence that several so-called 'inert' adjuvants are toxic in its own right."[70]

116.    Among various implications, the researchers conclude that "existing toxicological data and risk assessments are not sufficient to infer that GBHs, as currently used, are safe." Further, "GBH-product formulations are more potent, or toxic, than glyphosate alone to a wide array of non-target organisms including mammals, aquatic insects, and fish." Accordingly, "risk assessments of GBHs that are based on studies quantifying the impacts of glyphosate alone underestimate both toxicity and exposure, and thus risk." The paper concludes that this "shortcoming has repeatedly led regulators to set inappropriately high exposure thresholds."[71]

117.    The researchers also critique the current practice of regulators who largely rely on "unpublished, non-peer reviewed data generated by the registrants" but ignore "published

---

[69] *Id.*
[70] *Id.*
[71] *Id.*

35

research because it often uses standards and procedures to assess quality that are different from those codified in regulatory agency data requirements, which largely focus on avoiding fraud." In the researchers' view, "[s]cientists independent of the registrants should conduct regulatory tests of GBHs that include glyphosate alone, as well as GBH-product formulations."[72]

118.    The researchers also call for greater inclusion of GBHs in government-led toxicology testing programs:

> [A] fresh and independent examination of GBH toxicity should be undertaken, and . . . this re-examination be accompanied by systematic efforts by relevant agencies to monitor GBH levels in people and in the food supply, none of which are occurring today. The U.S. National Toxicology Program should prioritize a thorough toxicological assessment of the multiple pathways now identified as potentially vulnerable to GBHs.[73]

120.    The researchers suggest that, in order to fill the gap created by an absence of government funds to support research on GBHs, regulators could adopt a system through which manufacturers fund the registration process and the necessary testing:

> "[W]e recommend that a system be put in place through which manufacturers of GBHs provide funds to the appropriate regulatory body as part of routine registration actions and fees. Such funds should then be transferred to appropriate government research institutes, or to an agency experienced in the award of competitive grants. In either case, funds would be made available to independent scientists to conduct the appropriate long-term (minimum 2 years) safety studies in recognized animal model systems. A thorough and modern assessment of GBH toxicity will encompass potential endocrine disruption, impacts on the gut microbiome, carcinogenicity, and multigenerational effects looking at reproductive capability and frequency of birth defects."[74]

---

[72] *Id.*
[73] *Id.*
[74] *Id.*

121.     Despite these stated concerns, Monsanto, to date, has failed to test its formulated Roundup® products.

### *European Union Vote on Glyphosate Renewal*

122.     The license for glyphosate in the European Union (EU) was set to expire on June 30, 2016.

123.     Without an extension of the license, Monsanto's Roundup® and other glyphosate-based herbicides faced a general phase out in EU markets.[75]

124.     In the months leading up to the license expiration date, protracted meetings and votes among national experts from the 28 EU Member States failed to produce agreement on an extension.

125.     On June 29, 2016, the EU Commission extended the European license for glyphosate for 18 months to allow the European Chemical Agency (ECHA) to rule on the safety of the chemical, which was expected by the end of 2017.[76]

126.     On July 11, 2016, the EU voted in favor of a proposal to restrict the conditions of use of glyphosate in the EU, including a ban on common co-formulant POE-tallowamine (POEA) from all glyphosate-based herbicides, including Roundup®.[77]

127.     In March 2017, ECHA's Committee for Risk Assessment (RAC) concluded that the available scientific evidence did not meet the criteria to classify glyphosate as a carcinogen.[78]

---

[75] Philip Blenkinsop, Alissa de Carbonnel& Barbara Lewis European, *Commission to extend glyphosate license for 18 months,* REUTERS, June 28, 2016, *available at* European Commission to extend glyphosate license for 18 months | Reuters.

[76] Arthur Neslen, *Controversial chemical in Roundup weedkiller escapes immediate ban,* THE GUARDIAN, June 29, 2016, *available at* Controversial chemical in Roundup weedkiller escapes immediate ban | Monsanto | The Guardian.

[77] SarantisMichalopoulos, *EU agrees ban on glyphosate co-formulant,* EuRAcTIv, July 11, 2016, *available at* https://www.euractiv.com/section/agriculture-food/news/eu-agrees-ban-on-glyphosate-co-formulant/.

[78] ECHA, March 2017, *available at* https://echa.europa.eu/-/glyphosate-not-classified-as-a-carcinogen-by-echa.

128.    With the glyphosate license set to again expire on December 15, 2017, and after months of indecision among EU member states, on November 27, 2017, the EU voted to extend the glyphosate license for five more years.[79] Of the 28 EU members, 18 countries voted in favor of a European Commission proposal to extend the glyphosate license, nine countries voted against, and one country abstained.[80]

## CLAIMS

### TOLLING APPLICABLE STATUTE OF LIMITATIONS

#### *Discovery Rule Tolling*

129.    Plaintiff Pirani incorporates by reference all preceding paragraphs as if fully set forth herein.

130.    Decedent Pirani suffered an illness that has a latency period and does not arise until years after exposure. Decedent Pirani had no way of knowing about the risks of serious illness associated with the use of and/or exposure to Roundup® and glyphosate until he was made aware that his NHL could be caused by his use of and/or exposure to Roundup®. Consequently, the discovery rule applies to these cases, and the statute of limitations has been tolled until at least the day that Decedent Pirani knew or had reason to know that his NHL was linked to his use of and/or exposure to Roundup®.

131.    Within the time period of any applicable statutes of limitations, Decedent Pirani could not have discovered, through the exercise of reasonable diligence, that exposure to Roundup® and glyphosate is injurious to human health.

---

[79] *See* Philip Blenkinsop, *Germany swings EU vote in favor of weed-killer glyphosate,* Reuters, Nov. 27, 2017, https://www.reuters.com/article/us-eu-health-glyphosate/germany-swings-eu-vote-in-favor-of-weed-killer-glyphosate-idUSKBN1DR1SG.

[80] *See id.*

132.   Decedent Pirani did not discover, and did not know of facts that would cause a reasonable person to suspect, the risks associated with the use of and/or exposure to Roundup® and glyphosate; nor would a reasonable and diligent investigation by him have disclosed that Roundup® and glyphosate would cause his NHL.

133.   For these reasons, all applicable statutes of limitations have been tolled by operation of the discovery rule with respect to Plaintiff Pirani's claims.

### Fraudulent Concealment

134.   Furthermore, the running of the statute of limitations has been equitably tolled due to Defendant's fraudulent concealment and conduct, as alleged above. Through its affirmative misrepresentations and omissions, Defendant actively concealed from Decedent Pirani the true risks associated with use of or exposure to Roundup®.

135.   As a result of Defendant's actions, Decedent Pirani was unaware, and could not reasonably know or have learned through reasonable diligence, that Decedent Pirani had been exposed to the risks alleged herein and that those risks were the direct and proximate result of Defendant's acts and omissions.

136.   Defendant is estopped from relying on any statute of limitations because of its concealment of the truth regarding the safety of Roundup®. Defendant was under a duty to disclose the true character, quality, and nature of Roundup® because this was non-public information over which it continues to have exclusive control. Defendant knew that this information was not available to Decedent Pirani, his medical providers, and/or his health facilities, yet it failed to disclose the information to the public.

137.   Defendant had the ability to and did spend enormous amounts of money in furtherance of its purposes of marketing and promoting a profitable product, notwithstanding the

known or reasonably knowable risks. Decedent Pirani and medical professionals could not have afforded to and could not have possibly conducted studies to determine the nature, extent and identity of related health risks, and they were forced to rely on Defendant's representations.

### *Estoppel*

138.    Monsanto was under a continuous duty to disclose to consumers, users and other persons coming into contact with its products, including Decedent Pirani, accurate safety information concerning its products and the risks associated with the use of and/or exposure to Roundup® and glyphosate.

139.    Instead, Monsanto knowingly, affirmatively, and actively concealed safety information concerning Roundup® and glyphosate and the serious risks associated with the use of and/or exposure to its products.

140.    Based on the foregoing, Monsanto is estopped from relying on any statutes of limitations in defense of this action.

### LIMITATION ON ALLEGATIONS

141.    Plaintiff Pirani incorporates by reference each allegation set forth in preceding paragraphs as if fully stated herein.

142.    The allegations in this pleading are made pursuant to Arkansas law. To the extent Arkansas law imposes a duty or obligation on Defendant that exceeds those required by federal law, Plaintiff Pirani does not assert such claims. All claims asserted herein run parallel to federal law, *i.e.,* the Defendant's violations of Arkansas law were also violations of federal law. Had Defendant honestly complied with Arkansas law, it would also have complied with federal law.

143. Additionally, Plaintiff Pirani's claims do not seek to enforce federal law. These claims are brought under Arkansas law, notwithstanding that such claims run parallel to federal law.

144. As alleged herein, Defendant violated U.S.C. § 136j and 40 C.F.R. § 156.10(a)(5) by distributing Roundup®, which was misbranded pursuant to 7 U.S.C. § 136(g). Federal law specifically prohibits the distribution of a misbranded herbicide.

## COUNT I: STRICT LIABILITY (DESIGN DEFECT)

145. Plaintiff Pirani incorporates by reference each allegation set forth in preceding paragraphs as if fully stated herein. Plaintiff Pirani brings this strict liability claim against Defendant for defective design.

146. At all relevant times, Defendant engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting Roundup® products, which are defective and unreasonably dangerous to consumers, including Decedent Pirani, thereby placing Roundup® products into the stream of commerce. These actions were under the ultimate control and supervision of Defendant. At all relevant times, Defendant designed, researched, developed, manufactured, produced, tested, assembled, labeled, advertised, promoted, marketed, sold, and distributed the Roundup® products used by Decedent Pirani, as described herein.

147. At all relevant times, Defendant's Roundup® products were manufactured, designed, and labeled in an unsafe, defective, and inherently dangerous manner that was dangerous for use by or exposure to the public, including Decedent Pirani.

148. At all relevant times, Defendant's Roundup® products reached the intended consumers, handlers, and users or other persons coming into contact with these products in Arkansas and throughout the United States, including Decedent Pirani, without substantial

41

change in its condition as designed, manufactured, sold, distributed, labeled, and marketed by Defendant. At all relevant times, Defendant registered, researched, manufactured, distributed, marketed, and sold Roundup® and other glyphosate-based formulations within Arkansas and aimed at Arkansas consumers and industrial market.

149. Defendant's Roundup® products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold, and marketed by Defendant, were defective in design and formulation in that, when it left the hands of Defendant's manufacturers and/or suppliers, the foreseeable risks exceeded the alleged benefits associated with its design and formulation.

151. At all relevant times, Defendant knew or had reason to know that Roundup® products were defective and were inherently dangerous and unsafe when used in the manner instructed and provided by Defendant.

152. Therefore, at all relevant times, Defendant's Roundup® products, as researched, tested, developed, designed, registered, licensed, manufactured, packaged, labeled, distributed, sold, and marketed by Defendant were defective in design and formulation, in one or more of the following ways:

> a. when placed in the stream of commerce, Defendant's Roundup® products were defective in design and formulation, and, consequently, dangerous to an extent beyond that which an ordinary consumer would expect;
>
> b. when placed in the stream of commerce, Defendant's Roundup® products were unreasonably dangerous in that they were hazardous and

42

posed a grave risk of cancer and other serious illnesses when used in a reasonably anticipated manner;

c. when placed in the stream of commerce, Defendant's Roundup® products contained unreasonably dangerous design defects and were not reasonably safe when used in a reasonably anticipated or intended manner;

d. Defendant did not sufficiently test, investigate, or study its Roundup® products and, specifically, the active ingredient glyphosate;

e. Defendant failed to test, investigate, or study its formulated Roundup® products.

f. exposure to Roundup® and glyphosate-containing products presents a risk of harmful side effects that outweighs any potential utility stemming from the use of the herbicide;

g. Defendant knew or should have known at the time of marketing its Roundup® products that exposure to Roundup® and specifically, its active ingredient glyphosate, could result in cancer and other severe illnesses and injuries;

h. Defendant did not conduct adequate post-marketing surveillance of its Roundup® products; and

i. Defendant could have employed safer alternative designs and formulations.

153. At all times relevant to this litigation, Decedent Pirani used and/or was exposed to the use of Defendant's Roundup® products in an intended or reasonably foreseeable manner without knowledge of Roundup®'s dangerous characteristics.

154. Decedent Pirani could not reasonably have discovered the defects and risks associated with Roundup® or glyphosate-containing products before or at the time of exposure due to the Defendant's suppression of scientific information linking glyphosate to cancer.

155. The harm caused by Defendant's Roundup® products far outweighed its benefit, rendering Defendant's product dangerous to an extent beyond that which an ordinary consumer would contemplate. Defendant's Roundup® products were and are more dangerous than alternative products, and Defendant could have designed Roundup® products to make them less dangerous. Indeed, at the time Defendant designed Roundup® products, the state of the industry's scientific knowledge was such that a less risky design or formulation was attainable.

156. At the time Roundup® products left Defendant's control, there was a practical, technically feasible and safer alternative design that would have prevented the harm without substantially impairing the reasonably anticipated or intended function of Defendant's herbicides.

157. Defendant's defective design of Roundup® products was willful, wanton, fraudulent, malicious, and conducted with reckless disregard for the health and safety of users of the Roundup® products, including Decedent Pirani.

158. Therefore, as a result of the unreasonably dangerous condition of its Roundup® products, Defendant is strictly liable.

159. The defects in Defendant's Roundup® products were substantial and contributing factors in causing Decedent Pirani's injuries, and, but for Defendant's misconduct and omissions, Decedent Pirani would not have sustained injuries.

160. Defendant's conduct, as described above, was reckless. Defendant risked the lives of consumers and users of its products, including Decedent Pirani, with knowledge of the safety problems associated with Roundup® and glyphosate-containing products, and suppressed this

44

knowledge from the general public. Defendant made conscious decisions not to redesign, warn or inform the unsuspecting public. Defendant's reckless conduct warrants an award of punitive damages.

161.    As a proximate result of Defendant placing its defective Roundup® products into the stream of commerce, as alleged herein, there was a measurable and significant interval of time during which Decedent Pirani suffered great mental anguish and other personal injury and damages all as set forth above.

162.    As a proximate result of the Defendant placing its defective Roundup® products into the stream of commerce, as alleged herein, Decedent Pirani sustained loss of income, loss of earning capacity and/or property damage.

163.    WHEREFORE, Plaintiff Pirani respectfully requests this Court to enter judgment in Plaintiff Pirani's favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all such other and further relief for an amount in excessive of the jurisdictional minimum for diversity of citizenship in Federal Court.

## COUNT II: STRICT LIABILITY (FAILURE TO WARN)

164.    Plaintiff Pirani incorporates by reference each allegation set forth in preceding paragraphs as if fully stated herein.

165.    Plaintiff Pirani brings this strict liability claim against Defendant for failure to warn.

166.    At all relevant times, Defendant engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting Roundup® products which are defective and unreasonably dangerous to consumers, including Decedent Pirani, because they do not contain adequate warnings or instructions concerning the dangerous

characteristics of Roundup® and specifically, the active ingredient glyphosate. These actions were under the ultimate control and supervision of Defendant. At all relevant times, Defendant registered, researched, manufactured, distributed, marketed and sold Roundup® and other glyphosate-based formulations within Arkansas and aimed at Arkansas consumers and industrial market.

167. Defendant researched, developed, designed, tested, manufactured, inspected, labeled, distributed, marketed, promoted, sold, and otherwise released into the stream of commerce its Roundup® products, and in the course of same, directly advertised or marketed the products to consumers and end users, including Decedent Pirani, and therefore had a duty to warn of the risks associated with the use of Roundup® and glyphosate-containing products.

168. At all relevant times, Defendant had a duty to properly test, develop, design, manufacture, inspect, package, label, market, promote, sell, distribute, maintain, supply, provide proper warnings, and take such steps as necessary to ensure its Roundup® products did not cause users and consumers to suffer from unreasonable and dangerous risks. Defendant had a continuing duty to warn Decedent Pirani of dangers associated with Roundup® use and exposure. Defendant, as manufacturer, seller, or distributor of chemical herbicides, is held to the knowledge of an expert in the field.

169. At the time of manufacture, Defendant could have provided the warnings or instructions regarding the full and complete risks of Roundup® and glyphosate-containing products because it knew or should have known of the unreasonable risks of harm associated with the use of and/or exposure to such products.

170. At all relevant times, Defendant failed and deliberately refused to investigate, study, test, or promote the safety or to minimize the dangers to users and consumers of its product

and to those who would foreseeably use or be harmed by Defendant's herbicides, including Plaintiff.

171. Despite the fact that Defendant knew or should have known that Roundup® posed a grave risk of harm, it failed to exercise reasonable care to warn of the dangerous risks associated with use and exposure. The dangerous propensities of its products and the carcinogenic characteristics of glyphosate, as described above, were known to Defendant, or scientifically knowable to Defendant through appropriate research and testing by known methods, at the time it distributed, supplied or sold the product, and were not known to end users and consumers, such as Decedent Pirani.

172. Defendant knew or should have known that its products created significant risks of serious bodily harm to consumers, as alleged herein, and Defendant failed to adequately warn consumers, *i.e.,* the reasonably foreseeable users, of the risks of exposure to its products. Defendant have wrongfully concealed information concerning the dangerous nature of Roundup® and its active ingredient glyphosate and, further, have made false and/or misleading statements concerning the safety of Roundup® products and glyphosate.

173. At all relevant times, Defendant's Roundup® products reached the intended consumers, handlers, and users or other persons coming into contact with these products in Arkansas and throughout the United States, including Decedent Pirani, without substantial change in its condition as designed, manufactured, sold, distributed, labeled, and marketed by Defendant.

174. Decedent Pirani was exposed to Defendant's Roundup® products without knowledge of its dangerous characteristics.

47

175.   At all relevant times, Decedent Pirani used and/or was exposed to the use of Defendant's Roundup® products while using them for its intended or reasonably foreseeable purposes, without knowledge of its dangerous characteristics.

176.   Decedent Pirani could not have reasonably discovered the defects and risks associated with Roundup® or glyphosate-containing products prior to or at the time of Decedent Pirani's exposure. Decedent Pirani relied upon the skill, superior knowledge, and judgment of Defendant to know about and disclose serious health risks associated with using Defendant's products.

177.   Defendant knew or should have known that the minimal warnings disseminated with its Roundup® products were inadequate, failed to communicate adequate information on the dangers and safe use/exposure, and failed to communicate warnings and instructions that were appropriate and adequate to render the products safe for its ordinary, intended and reasonably foreseeable uses, including agricultural and horticultural applications.

178.   The information that Defendant did provide or communicate failed to contain relevant warnings, hazards, and precautions that would have enabled consumers such as Decedent Pirani to utilize the products safely and with adequate protection. Instead, Defendant disseminated information that was inaccurate, false and misleading, and which failed to communicate accurately or adequately the comparative severity, duration, and extent of the risk of injuries with use of and/or exposure to Roundup® and glyphosate; continued to aggressively promote the efficacy of its products, even after it knew or should have known of the unreasonable risks from use or exposure; and concealed, downplayed, or otherwise suppressed, through aggressive marketing and promotion, any information or research about the risks and dangers of exposure to Roundup® and glyphosate.

179. This alleged failure to warn is not limited to the information contained on Roundup® labeling. Defendant was able, in accord with federal law, to comply with Arkansas law by disclosing the known risks associated with Roundup® through other non-labeling mediums, *i.e.*, promotion, advertisements, public service announcements, and/or public information sources. However, Defendant did not disclose these known risks through any medium.

180. To this day, Defendant has failed to adequately and accurately warn of the risks of cancer associated with the use of and exposure to Roundup® and its active ingredient glyphosate.

181. As a result of its inadequate warnings, Defendant's Roundup® products were defective and unreasonably dangerous when they left the possession and/or control of Defendant, were distributed by Defendant, and used by Decedent Pirani.

182. Defendant is liable to Plaintiff Pirani for injuries Decedent Pirani suffered that were caused by Defendant's negligent or willful failure, as described above, to provide adequate warnings or other clinically relevant information and data regarding the appropriate use of its products and the risks associated with the use of or exposure to Roundup® and glyphosate.

183. Had Defendant provided adequate warnings and instructions and properly disclosed and disseminated the risks associated with its Roundup® products, Decedent Pirani could have avoided the risk of developing injuries and could have obtained or used alternative herbicides.

184. As a direct and proximate result of Defendant placing defective Roundup® products into the stream of commerce, Decedent Pirani was injured and sustained pecuniary loss resulting and general damages in a sum which exceeds the jurisdictional minimum for diversity of citizenship in Federal Court.

185.    As a proximate result of Defendant placing defective Roundup® products into the stream of commerce, as alleged herein, there was a measurable and significant interval of time during which Decedent Pirani suffered great mental anguish and other personal injury and damages.

186.    As a proximate result of Defendant placing defective Roundup® products into the stream of commerce, as alleged herein, Decedent Pirani sustained loss of income, loss of earning capacity, and property damage.

187.    WHEREFORE, Plaintiff Pirani respectfully requests this Court to enter judgment in Plaintiff Pirani's favor for compensatory and punitive damages for an amount in excess of the jurisdictional minimum for diversity of citizenship in Federal Court, together with interest, costs herein incurred, attorneys' fees and all such other and further relief as this Court deems just and proper.

## COUNT III: NEGLIGENCE

188.    Plaintiff Pirani incorporates by reference each allegation set forth in preceding paragraphs as if fully stated herein.

189.    Defendant, directly or indirectly, caused Roundup® products to be sold, distributed, packaged, labeled, marketed, promoted, and/or used by Decedent Pirani. At all relevant times, Defendant registered, researched, manufactured, distributed, marketed, and sold Roundup® and other glyphosate-based formulations within Arkansas and aimed at Arkansas consumers and industrial market.

190.    At all relevant times, Defendant had a duty to exercise reasonable care in the design, research, manufacture, marketing, advertisement, supply, promotion, packaging, sale, and distribution of Roundup® products, including the duty to take all reasonable steps necessary to

manufacture, promote, and/or sell a product that was not unreasonably dangerous to consumers and users of the product.

191. At all relevant times, Defendant had a duty to exercise reasonable care in the marketing, advertisement, and sale of the Roundup® products. Defendant's duty of care owed to consumers and the general public included providing accurate, true, and correct information concerning the risks of using Roundup® and appropriate, complete, and accurate warnings concerning the potential adverse effects of exposure to Roundup®, and, in particular, its active ingredient glyphosate.

192. At all relevant times, Defendant knew or, in the exercise of reasonable care, should have known of the hazards and dangers of Roundup® and, specifically, the carcinogenic properties of the chemical glyphosate.

193. Accordingly, at all relevant times, Defendant knew or, in the exercise of reasonable care, should have known that use of or exposure to Roundup® products could cause or be associated with Decedent Pirani's injuries, and thus, create a dangerous and unreasonable risk of injury to the users of these products, including Decedent Pirani.

194. Defendant also knew or, in the exercise of reasonable care, should have known that users and consumers of Roundup® were unaware of the risks and the magnitude of the risks associated with use of and/or exposure to Roundup® and glyphosate-containing products.

195. As such, Defendant breached its duty of reasonable care and failed to exercise ordinary care in the design, research, development, manufacture, testing, marketing, supply, promotion, advertisement, packaging, sale, and distribution of Roundup® products, in that Defendant manufactured and produced defective herbicides containing the chemical glyphosate; knew or had reason to know of the defects inherent in its products; knew or had reason to know that

a user's or consumer's exposure to the products created a significant risk of harm and unreasonably dangerous side effects; and failed to prevent or adequately warn of these risks and injuries. Indeed, Defendant deliberately refused to test Roundup® products because it knew that the chemical posed serious health risks to humans.

196.     Defendant was negligent in its promotion of Roundup®, outside of the labeling context, by failing to disclose material risk information as part of its promotion and marketing of Roundup®, including the Internet, television, print advertisements, etc. Nothing prevented Defendant from being honest in its promotional activities, and, in fact, Defendant had a duty to disclose the truth about the risks associated with Roundup® in its promotional efforts, outside of the context of labeling.

197.     Despite the ability and means to investigate, study, and test the products and to provide adequate warnings, Defendant failed to do so. Indeed, Defendant wrongfully concealed information and further made false and/or misleading statements concerning the safety and/or exposure to Roundup® and glyphosate.

198.   Defendant' negligence included:

a.   Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing Roundup® products without thorough and adequate pre- and post-market testing;

b.   Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing Roundup® while negligently and/or intentionally concealing and failing to disclose the results of trials, tests, and studies of exposure to glyphosate, and, consequently, the risk of serious harm associated with human use of and exposure to Roundup®;

c. Failing to undertake sufficient studies and conduct necessary tests to determine whether or not Roundup® products and glyphosate-containing products were safe for its intended use in agriculture and horticulture;

d. Failing to use reasonable and prudent care in the design, research, manufacture, and development of Roundup® products so as to avoid the risk of serious harm associated with the prevalent use of Roundup®/glyphosate as an herbicide;

e. Failing to design and manufacture Roundup® products so as to ensure they were at least as safe and effective as other herbicides on the market;

f. Failing to provide adequate instructions, guidelines, and safety precautions to those persons Defendant could reasonably foresee would use and be exposed to Roundup® products;

g. Failing to disclose to Decedent Pirani, users/consumers, and the general public that use of and exposure to Roundup® presented severe risks of cancer and other grave illnesses;

h. Failing to warn Decedent Pirani, consumers, and the general public that the product's risk of harm was unreasonable and that there were safer and effective alternative herbicides available to Decedent Pirani and other consumers;

i. Systematically suppressing or downplaying contrary evidence about the risks, incidence, and prevalence of the side effects of Roundup® and glyphosate-containing products;

j. Representing that its Roundup® products were safe for its intended use when, in fact, Defendant knew or should have known the products were not safe for its intended purpose;

k. Declining to make or propose any changes to Roundup® products' labeling or other promotional materials that would alert consumers and the general public of the risks of Roundup® and glyphosate;

53

l. Advertising, marketing, and recommending the use of the Roundup® products, while concealing and failing to disclose or warn of the dangers known (by Defendant) to be associated with or caused by the use of or exposure to Roundup® and glyphosate;

m. Continuing to disseminate information to its consumers, which indicate or imply that Defendant's Roundup® products are not unsafe for use in the agricultural and horticultural industries; and

n. Continuing the manufacture and sale of its products with the knowledge that the products were unreasonably unsafe and dangerous.

199.    Defendant knew and/or should have known that it was foreseeable consumers such as Decedent Pirani would suffer injuries as a result of Defendant's failure to exercise ordinary care in the manufacturing, marketing, labeling, distribution, and sale of Roundup®.

200.    Decedent Pirani did not know the nature and extent of the injuries that could result from the intended use of and/or exposure to Roundup® or its active ingredient glyphosate.

201.    Defendant's negligence was the proximate cause of Decedent Pirani's injuries, i.e., absent Defendant's negligence, Decedent Pirani would not have developed cancer.

202.    Defendant's conduct, as described above, was reckless. Defendant regularly risked the lives of consumers and users of its products, including Decedent Pirani, with full knowledge of the dangers of its products. Defendant made conscious decisions not to redesign, re-label, warn, or inform the unsuspecting public, including Decedent Pirani. Defendant's reckless conduct therefore warrants an award of punitive damages.

203.    As a direct and proximate result of Defendant placing defective Roundup® products into the stream of commerce. Decedent Pirani was injured and sustained pecuniary loss

and general damages in a sum exceeding the jurisdictional minimum for diversity of citizenship in Federal Court.

204.    As a proximate result of Defendant placing defective Roundup® products into the stream of commerce, as alleged herein, there was a measurable and significant interval of time during which Decedent Pirani suffered great mental anguish and other personal injury and damages.

205.    As a proximate result of Defendant placing defective Roundup® products into the stream of commerce, as alleged herein, Decedent Pirani sustained a loss of income, loss of earning capacity, and property damage.

206.    WHEREFORE, Plaintiff Pirani respectfully requests this Court to enter judgment in Plaintiff's favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all such other and further relief which exceeds the minimum jurisdictional limits for diversity of citizenship in Federal Court.

### COUNT IV: FRAUD

207.    Plaintiff Pirani incorporates by reference each allegation set forth in preceding paragraphs as if fully stated herein.

208.    Defendant has defrauded the agricultural community in general and Decedent Pirani in particular by misrepresenting the true safety of its Roundup® and by failing to disclose known risks of cancer.

209.    Defendant misrepresented and/or failed to disclose, *inter alia,* that: glyphosate and its major metabolite aminomethylphosphonic acid (AMPA) could cause cancer; glyphosate and AMPA are known to be genotoxic in humans and laboratory animals because exposure is known to cause DNA strand breaks (a precursor to cancer); glyphosate and AMPA are known to

55

induce oxidative stress in humans and laboratory animals (a precursor to cancer); glyphosate and AMPA interfere with the aromatic amino acids within the human gut, leading to downstream health conditions including cancer; exposure to glyphosate and AMPA is causally associated with non-Hodgkin lymphoma; and the laboratory tests attesting to the safety of glyphosate were flawed and/or fraudulent.

210.   Due to these misrepresentations and omissions, at all times relevant to this litigation, Defendant's Roundup® was misbranded under 7 U.S.C. § 136(g) and its distribution within Arkansas and around the United States was a violation of 7 U.S.C. § 136j and 40 C.F.R. § 156.10(a)(5).

211.   Decedent Pirani relied on the Defendant's misrepresentations and/or material omissions regarding the safety of Roundup® and its active ingredient glyphosate in deciding whether to purchase and/or use the product. Decedent Pirani did not know nor could he reasonably have known of the misrepresentations and/or material omissions by Defendant concerning Roundup® and its active ingredient glyphosate.

212.   The misrepresentations and/or material omissions that form the basis of this fraud claim are not limited to statements made on the Roundup® labeling, as defined under federal law, but also involve Monsanto's representations and omissions made as part of its promotion and marketing of Roundup®, including on the Internet, television, in print advertisements, etc. Nothing prevented Defendant from disclosing the truth about the risks associated with Roundup® in its promotional efforts outside of the labeling context, using the forms of media and promotion Defendant traditionally used to promote the product's efficacy and benefits.

213.   When Defendant made the misrepresentations and/or omissions as alleged in this pleading, it did so with the intent of defrauding and deceiving the public in general and the

agricultural community and with the intent of inducing the public and agricultural community to purchase and use Roundup®.

214.    Defendant made these misrepresentations and/or material omissions with malicious, fraudulent and/or oppressive intent toward Decedent Pirani and the public generally. Defendant's conduct was willful, wanton, and/or reckless. Defendant deliberately recommended, manufactured, produced, marketed, sold, distributed, merchandized, packaged, promoted and advertised the dangerous and defective herbicide Roundup®. This constitutes an utter, wanton, and conscious disregard of the rights and safety of a large segment of the public, and by reason thereof, Defendant is liable for reckless, willful, and wanton acts and omissions which evidence a total and conscious disregard for the safety of Decedent Pirani and others which proximately caused the injuries as set forth herein.

215.    As a proximate result of Defendant's fraudulent and deceitful conduct and representations, Decedent Pirani sustained damages and other losses in an amount in excess of the minimum jurisdictional limits for diversity of citizenship in Federal Court.

216.    As a proximate result of Defendant's fraud, as alleged herein, Decedent Pirani sustained a loss of income, loss of earning capacity, and property damage, including lost income.

217.    WHEREFORE, Plaintiff Pirani respectfully requests that this Court enter judgment in Plaintiff Pirani's favor for compensatory and punitive damages for an amount in excess of the minimum jurisdictional limits for diversity of citizenship in Federal Court, together with interest, costs herein incurred, attorneys' fees and all such other and further relief as this Court deems just and proper.

## COUNT V: BREACH OF EXPRESS WARRANTIES

218.    Plaintiff Pirani incorporates by reference each allegation set forth in preceding paragraphs as if fully stated herein.

57

219. At all relevant times, Defendant engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting Roundup® products, which are defective and unreasonably dangerous to consumers, including Decedent Pirani, thereby placing Roundup® products into the stream of commerce. These actions were under the ultimate control and supervision of Defendant.

220. Defendant had a duty to exercise reasonable care in the research, development, design, testing, packaging, manufacture, inspection, labeling, distributing, marketing, promotion, sale, and release of Roundup® products, including a duty to:

        a. ensure that its products did not cause the user unreasonably dangerous side effects;

        b. warn of dangerous and potentially fatal side effects; and

        c. disclose adverse material facts, such as the true risks associated with the use of and exposure to Roundup® and glyphosate-containing products, when making representations to consumers and the general public, including Decedent Pirani.

221. As alleged throughout this pleading, the ability of Defendant to properly disclose those risks associated with Roundup® is not limited to representations made on the labeling.

222. At all relevant times, Defendant expressly represented and warranted to the purchasers of its products, by and through statements made by Defendant in labels, publications, package inserts, and other written materials intended for consumers and the general public, that Roundup® products were safe for human health and the environment, effective, fit, and proper for its intended use. Defendant advertised, labeled, marketed, and promoted Roundup® products, representing the quality to consumers and the public in such a way as to induce its purchase or

58

use, thereby making an express warranty that Roundup® products would conform to the representations.

223.     These express representations include incomplete warnings and instructions that purport, but fail, to include the complete array of risks associated with use of and/or exposure to Roundup® and glyphosate. Defendant knew and/or should have known that the risks expressly included in Roundup® warnings and labels did not and do not accurately or adequately set forth the risks of developing the serious injuries complained of herein. Nevertheless, Defendant expressly represented that Roundup® products were safe and effective, that they were safe and effective for use by individuals such as the Decedent Pirani, and/or that they were safe and effective as agricultural herbicides.

224.     The representations about Roundup®, as set forth herein, contained or constituted affirmations of fact or promises made by the seller to the buyer, which related to the goods and became part of the basis of the bargain, creating an express warranty that the goods would conform to the representations.

225.     Defendant placed Roundup® products into the stream of commerce for sale and recommended its use to consumers and the public without adequately warning of the true risks of developing the injuries associated with the use of and exposure to Roundup® and its active ingredient glyphosate.

226.     Defendant breached these warranties because, among other things, Roundup® products were defective, dangerous, and unfit for use, did not contain labels representing the true and adequate nature of the risks associated with its use, and were not merchantable or safe for its intended, ordinary, and foreseeable use and purpose. Specifically, Defendant breached the warranties in the following ways:

59

a.  Defendant represented through its labeling, advertising, and marketing materials that Roundup® products were safe, and fraudulently withheld and concealed information about the risks of serious injury associated with us of and/or exposure to Roundup® and glyphosate by expressly limiting the risks associated with use and/or exposure within its warnings and labels; and

b.  Defendant represented that Roundup® products were safe for use and fraudulently concealed information that demonstrated that glyphosate, the active ingredient in Roundup®, had carcinogenic properties, and that Roundup® products, therefore, were not safer than alternatives available on the market.

227.  Decedent Pirani detrimentally relied on the express warranties and representations of Defendant concerning the safety and/or risk profile of Roundup® in making a decision to purchase the product. Decedent Pirani reasonably relied upon Defendant to disclose known defects, risks, dangers, and side effects of Roundup® and glyphosate. Decedent Pirani would not have purchased or used Roundup® had Defendant properly disclosed the risks associated with the product, either through advertising, labeling, or any other form of disclosure.

228.  Defendant had sole access to material facts concerning the nature of the risks associated with its Roundup® products, as expressly stated within its warnings and labels, and knew that consumers and users such as Decedent Pirani could not have reasonably discovered that the risks expressly included in Roundup® warnings and labels were inadequate and inaccurate.

229. Decedent Pirani had no knowledge of the falsity or incompleteness of Defendant's statements and representations concerning Roundup®.

230. Decedent Pirani used and/or was exposed to Roundup® as researched, developed, designed, tested, manufactured, inspected, labeled, distributed, packaged, marketed, promoted, sold, or otherwise released into the stream of commerce by Defendant.

231. Had the warnings, labels, advertisements, or promotional material for Roundup® products accurately and adequately set forth the true risks associated with the use of such products, including Decedent Pirani's injuries, rather than expressly excluding such information and warranting that the products were safe for its intended use, Decedent Pirani could have avoided the injuries complained of herein.

232. As a direct and proximate result of Defendant's breach of express warranty, Decedent Pirani sustained pecuniary loss and general damages in a sum exceeding the jurisdictional minimum for diversity of citizenship cases in Federal Court.

233. As a proximate result of Defendant's breach of express warranty, as alleged herein, there was a measurable and significant interval of time during which Decedent Pirani suffered great mental anguish and other personal injury and damages.

234. As a proximate result of Defendant's breach of express warranty, as alleged herein, Decedent Pirani sustained a loss of income, loss of earning capacity, and property damage.

235. WHEREFORE, Plaintiff Pirani respectfully requests this Court to enter judgment in Plaintiff Pirani's favor for compensatory and punitive damages for a sum exceeding the minimum jurisdictional limits for diversity of citizenship cases in Federal Court, together with

interest, costs herein incurred, attorneys' fees, and all such other and further relief as this Court deems just and proper.

## COUNT VI: BREACH OF IMPLIED WARRANTIES

236.    Plaintiff Pirani incorporates by reference every allegation set forth in preceding paragraphs as if fully stated herein.

237.    At all relevant times, Defendant engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting Roundup® products, which were and are defective and unreasonably dangerous to consumers, including Plaintiff, thereby placing Roundup® products into the stream of commerce.

238.    Before the time Decedent Pirani was exposed to the aforementioned Roundup® products, Defendant impliedly warranted to its consumers, including Decedent Pirani, that Roundup® products were of merchantable quality and safe and fit for the use for which they were intended; specifically, as agricultural herbicides.

239.    Defendant failed to disclose that Roundup® has dangerous propensities when used as intended and that use of and/or exposure to Roundup® and glyphosate-containing products carries an increased risk of developing severe injuries, including Plaintiff's injuries.

240.    Decedent Pirani was an intended beneficiary of the implied warranties made by Defendant to purchasers of its herbicides.

241.    The Roundup® products were expected to reach and did in fact reach consumers and users, including Decedent Pirani, without substantial change in the condition in which they were manufactured and sold by Defendant.

242. At all relevant times, Defendant was aware that consumers and users of its products, including Decedent Pirani, would use Roundup® products as marketed by Defendant, which is to say that Decedent Pirani was a foreseeable user of Roundup®.

243. Defendant intended that Roundup® products be used in the manner in which Decedent Pirani, in fact, used them and which Defendant impliedly warranted to be of merchantable quality, safe, and fit for this use, despite the fact that Roundup® was not adequately tested or researched.

244. In reliance upon Defendant's implied warranty, Decedent Pirani used Roundup® as instructed and labeled and in the foreseeable manner intended, recommended, promoted, and marketed by Defendant.

245. Decedent Pirani could not have reasonably discovered or known of the risks of serious injury associated with Roundup® or glyphosate.

246. Defendant breached its implied warranty to Decedent Pirani in that Roundup® products were not of merchantable quality, safe, or fit for its intended use, or adequately tested. Roundup® has dangerous propensities when used as intended and can cause serious injuries, including those injuries complained of herein.

247. The harm caused by Defendant's Roundup® products far outweighed its benefit, rendering the products more dangerous than an ordinary consumer or user would expect and more dangerous than alternative products.

248. As a direct and proximate result of Defendant's breach of implied warranty, Decedent Pirani sustained pecuniary loss and general damages in a sum exceeding the jurisdictional minimum for diversity of citizenship cases in Federal Court.

249.   As a proximate result of the Defendant's breach of implied warranty, as alleged herein, there was a measurable and significant interval of time during which Decedent Pirani suffered great mental anguish and other personal injury and damages.

250.   As a proximate result of Defendant's breach of implied warranty, as alleged herein, Decedent Pirani sustained a loss of income, loss of earning capacity, and property damage.

251.   WHEREFORE, Plaintiff Pirani respectfully requests this Court to enter judgment in Plaintiff Pirani's favor for compensatory and punitive damages for an amount in excess of the minimum jurisdictional limits for diversity of citizenship cases in Federal Court, together with interest, costs herein incurred, attorneys' fees, and all such other and further relief as this Court deems just and proper.

### COUNT VII: WRONGFUL DEATH

252.   Plaintiff Pirani incorporate by reference every other paragraph of this Complaint as if each were set forth herein.

253.   As a direct and proximate result of the acts and/or omissions of Defendant, as set forth herein, Decedent Pirani used and/or was exposed to Roundup®.

254.   Subsequent to such use, Decedent Pirani developed NHL, suffered substantial pain and suffering, both physical and emotional in nature, and subsequently died.

255.   Plaintiff Pirani, as Executor of the estate of Decedent Pirani's estate, is entitled to recover damages as Decedent Pirani would have if he were living, as a result of acts and/or omissions of Defendant.

256.   Plaintiff Pirani, as Executor of the estate of Decedent Pirani's estate, is also entitled to recover punitive damages and damages for substantial pain and suffering caused to Decedent

Pirani from the acts and/or omissions of Defendant as fully set forth herein, including without limitations, punitive damages.

257.     As a direct and proximate result of Defendant's conduct, Plaintiff Pirani and Decedent Pirani have been injured and sustained severe and permanent pain, suffering, disability, impairment, loss of life, loss of enjoyment of life, loss of care and comfort, and economic damages.

258.     WHEREFORE, Plaintiff Pirani demands judgment against Defendant, and in the alternative, request compensatory damages, punitive damages, together with interest, costs of suit, attorneys' fees, and such further relief as the Court deems equitable and just.

## EXEMPLARY DAMAGES ALLEGATIONS

259.     Plaintiff Pirani incorporates by reference each allegation set forth in preceding paragraphs as if fully stated herein.

260.     Defendant's conduct as alleged herein was done with oppression, fraud, and malice. Defendant was fully aware of the safety risks of Roundup®. Nonetheless, Defendant deliberately crafted its label, marketing, and promotion to mislead farmers and consumers.

261.     This was not done by accident or through some justifiable negligence. Rather, Defendant knew that it could turn a profit by convincing the agricultural industry that Roundup® was harmless to humans, and that full disclosure of the true risks of Roundup® would limit the amount of money Defendant would make selling Roundup® in Arkansas. Defendant's objective was accomplished not only through its misleading labeling, but through a comprehensive scheme of selective fraudulent research and testing, misleading advertising, and deceptive omissions as more fully alleged throughout this pleading. Decedent Pirani was denied the right to make an informed decision about whether to purchase, use, or be exposed to an herbicide, knowing the full

65

risks attendant to that use. Such conduct was done with conscious disregard of Decedent Pirani's rights.

262. There is no indication that Defendant will stop its deceptive and unlawful marketing practices unless it is punished and deterred. Accordingly, Plaintiff Pirani requests punitive damages against the Defendant for harms caused to Decedent Pirani.

## JURY TRIAL DEMAND

263. Plaintiff Pirani demands a trial by jury on all of the triable issues within this pleading.

## PRAYER FOR RELIEF

264. WHEREFORE, Plaintiff Pirani requests that the Court enter judgment in Plaintiff Pirani's favor and against the Defendant for:

   a. actual or compensatory damages in such amount in excess of that required for the jurisdictional minimum limits for diversity of citizenship in Federal Court and as provided by applicable law;

   b. exemplary and punitive damages sufficient to punish and deter the Defendant and others from future fraudulent practices;

   c. pre-judgment and post-judgment interest;

   d. costs including reasonable attorneys' fees, court costs, and other litigation expenses; and

   e. any other relief the Court may deem just and proper.

66

Respectfully submitted,

ROSE LAW FIRM,
a Professional Association
120 East Fourth Street
Little Rock, Arkansas 72201
Phone: (501) 375-9131

By: _/s/David S. Mitchell, Jr._
David S. Mitchell, Jr.
Arkansas Bar No. 2010271
_dmitchell@roselawfirm.com_
Nancy A. Smith
Arkansas Bar No. 2020212
nsmith@roselawfirm.com

_Attorneys for Plaintiff Mark A. Pirani, the Executor of the estate of Jon Peppi Pirani_