Query    Reports    Utilities    Help    Log Out

# U.S. District Court
## Eastern District of Missouri (St. Louis)
## CIVIL DOCKET FOR CASE #: 4:21-cv-00579-NAB

Yenzer et al v. Monsanto Company                    Date Filed: 05/19/2021
Assigned to: Magistrate Judge Nannette A. Baker     Jury Demand: Plaintiff
Demand: $75,000                                     Nature of Suit: 365 Personal Inj. Prod.
Cause: 28:1332 Diversity-Product Liability          Liability
                                                    Jurisdiction: Diversity

**Plaintiff**

**Karis Yenzer**                  represented by   **Christopher P. Welsh**
*Individually and as the Special*                  WELSH AND WELSH PC LLO
*Administrator for the Estate Douglas*             9290 W. Dodge Rd.
*W. Yenzer*                                         Suite 204
                                                   Omaha, NE 68114
                                                   (402) 384-8160
                                                   Fax: (402) 384-8211
                                                   Email: cwelsh@welsh-law.com
                                                   *LEAD ATTORNEY*
                                                   *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Estate of Douglas W. Yenzer**   represented by   **Christopher P. Welsh**
                                                   (See above for address)
                                                   *LEAD ATTORNEY*
                                                   *ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Monsanto Company**

| Date Filed | # | Docket Text |
|---|---|---|
| 05/19/2021 | 1 | COMPLAINT against defendant Monsanto Company in the amount of $402 Jury Demand,, filed by Karis Yenzer, Estate of Douglas W. Yenzer. (Attachments: # 1 Civil Cover Sheet, # 2 Original Filing Form, # 3 Summons)(Welsh, Christopher) (Entered: 05/19/2021) |
| 05/19/2021 | 2 | NOTICE OF PROCESS SERVER by Plaintiffs Estate of Douglas W. Yenzer, Karis Yenzer Process Server: HPS Process Service & Investigations (Welsh, Christopher) (Entered: 05/19/2021) |
|  |  |  |

| 05/19/2021 | | Case Opening Notification: 1 Summons(es) issued. The summons was emailed to Attorney Christopher P. Welsh. All parties must file the Notice Regarding Magistrate Judge Jurisdiction Form consenting to or opting out of the Magistrate Judge jurisdiction. Click here for the instructions. and all non-governmental organizational parties (corporations, limited liability companies, limited liability partnerships) must file Disclosure of Organizational Interests Certificate (moed-0001.pdf). Judge Assigned: Honorable Nannette A. Baker. (JKL) (Entered: 05/19/2021) |
| --- | --- | --- |
| 05/19/2021 | 3 | Pursuant to Local Rule 2.08, the assigned/referred magistrate judge is designated and authorized by the court to exercise full authority in this assigned/referred action or matter under 28 U.S.C. Sec. 636 and 18 U.S.C Sec. 3401, including any case budgeting matters. (Potter, Jacob) (Entered: 05/19/2021) |
| 05/19/2021 | | Judge Baker enters a Standing Order in all of her cases as follows: See Order for details https://www.moed.uscourts.gov/judge/nannette-baker (CBL) (Entered: 05/20/2021) |

| PACER Service Center | | |
| --- | --- | --- |
| **Transaction Receipt** | | |
| 06/02/2021 11:38:20 | | |
| **PACER Login:** | sh0019sh | **Client Code:** | 31943.356965 |
| **Description:** | Docket Report | **Search Criteria:** | 4:21-cv-00579-NAB |
| **Billable Pages:** | 2 | **Cost:** | 0.20 |

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI, EASTERN DIVISION

| | | |
|---|---|---|
| KARIS YENZER, Individually and as the | ) | CASE NO. 4:21-cv-579 |
| Special Administrator for the ESTATE OF | ) | |
| DOUGLAS W. YENZER, the surviving spouse | ) | |
| of Douglas W. Yenzer, on behalf of herself and | ) | |
| all legal heirs of Douglas W. Yenzer, | ) | |
| | ) | |
| Plaintiffs, | ) | **COMPLAINT and** |
| | ) | **JURY DEMAND** |
| vs. | ) | |
| | ) | |
| MONSANTO COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |

Plaintiffs, Karis Yenzer, Individually and as the Special Administrator for the Estate of Douglas W. Yenzer, surviving spouse of Douglas W. Yenzer, and behalf of herself and all legal heirs of Douglas W. Yenzer, and for their causes of action and claims for relief against the Defendant, Monsanto Company, allege and state that at all time material herein:

## NATURE OF THE CASE

1.      This is an action for damages suffered by the decedent, Douglas W. Yenzer (hereafter "Decedent" or "Douglas"), as a direct and proximate result of Defendant's negligent and wrongful conduct in connection with the design, development, manufacture, testing, packaging, promoting, marketing, advertising, distribution, labeling, and/or sale of the herbicide Roundup®, containing the active ingredient glyphosate. Plaintiff, Douglas W. Yenzer, as the surviving spouse of Decedent, is making a claim for loss of consortium as well as making a claim on behalf of the Estate of Douglas W. Yenzer on behalf of herself and all legal heirs of the Decedent.

2.      Plaintiffs maintains that Roundup® and/or glyphosate is defective, dangerous to human health, unfit and unsuitable to be marketed and sold in commerce and lacked proper warnings and directions as to the dangers associated with its use.

3.  Decedent was repeatedly exposed to Roundup® while using it for residential purposes as an herbicide on his property in Nebraska, his son's property in Nebraska, and his son's property in Missouri from approximately 1977 through 2020.

4.  Decedent was diagnosed with non-Hodgkin's Lymphoma in August of 2020. Since his diagnosis, Decedent suffered a litany of serious medical issues related to his cancer and the treatment of his cancer and ultimately died on October 20, 2020 due to complications related to high grade lymphoma.

5.  Decedent's injuries and subsequent death, like those striking thousands of similarly situated victims across the country, were avoidable.

## PARTIES, JURISDICTION and VENUE

6.  Plaintiff Karis Yenzer (hereafter "Karis"), is a natural person and is currently a citizen and resident of Bellevue, Sarpy County, Nebraska, and was the lawfully wedded spouse of Douglas W. Yenzer.

7.  Decedent, Douglas W. Yenzer, was born on August 15, 1948, passed away on October 12, 2020, and was the lawfully wedded spouse of the Plaintiff, Karis Yenzer.

8.  Plaintiff Karis is the duly appointed, constituted and qualified Special Administrator of the Estate of Douglas W. Yenzer, having been so appointed by the County Court of Sarpy County, Nebraska, on April 26, 2021. A copy of the Letters of Special Administrator is attached hereto marked as **Exhibit "A"**, and incorporated herein by reference.

9.  Plaintiff Karis brings this action individually and as the Special Administrator for the Estate of Douglas W. Yenzer and behalf of herself and all legal heirs of Douglas W. Yenzer.

10. Plaintiffs bring this action for injuries sustained by exposure to Roundup® ("Roundup") containing the active ingredient glyphosate and the surfactant POEA. As a direct

and proximate result of being exposed to Roundup, Decedent developed non-Hodgkin's Lymphoma.

11. "Roundup" refers to all formulations of Defendant's roundup products, including, but not limited to, Roundup Concentrate Poison Ivy and Tough Brush Killer 1, Roundup Custom Herbicide, Roundup D-Pak herbicide, Roundup Dry Concentrate, Roundup Export Herbicide, Roundup Fence & Hard Edger 1, Roundup Garden Foam Weed & Grass Killer, Roundup Grass and Weed Killer, Roundup Herbicide, Roundup Original 2k herbicide, Roundup Original II Herbicide, Roundup Pro Concentrate, Roundup Pro Dry Herbicide, Roundup Promax, Roundup Quik Stik Grass and Weed Killer, Roundup Quikpro Herbicide, Roundup Rainfast Concentrate Weed & Grass Killer, Roundup Rainfast Super Concentrate Weed & Grass Killer, Roundup Ready-to-Use Extended Control Weed & Grass Killer 1 Plus Weed Preventer, Roundup Ready-to-Use Weed & Grass Killer, Roundup Ready-to-Use Weed and Grass Killer 2, Roundup Ultra Dry, Roundup Ultra Herbicide, Roundup Ultramax, Roundup VM Herbicide, Roundup Weed & Grass Killer Concentrate, Roundup Weed & Grass Killer Concentrate Plus, Roundup Weed & Grass killer Ready-to-Use Plus, Roundup Weed & Grass Killer Super Concentrate, Roundup Weed & Grass Killer1 Ready-to-Use, Roundup WSD Water Soluble Dry Herbicide Deploy Dry Herbicide, or any other formulation of containing the active ingredient glyphosate.

12. Defendant MONSANTO COMPANY ("Monsanto" or "Defendant") is a Delaware corporation with a principle place of business located in St. Louis, Missouri.

13. At all times relevant to this complaint, Defendant was the entity that discovered the herbicidal properties of glyphosate and the manufacturer of Roundup

14. Defendant advertises and sells goods, specifically Roundup, in the State of Missouri.

15.     Defendant transacted and conducted business within the State of Missouri that relates to the allegations in this Complaint.

16.     Defendant derived substantial revenue from goods and products used in the State of Missouri, including Roundup.

17.     Defendant expected or should have expected its acts to have consequences within the State of Missouri, and derived substantial revenue from interstate commerce related to Roundup.

18.     Defendant regularly and persistently engaged in the business of designing, developing, manufacturing, testing, packaging, marketing, distributing, labeling, and/or selling Roundup for use by consumers, including those within the State of Missouri.

19.     Defendant is authorized to do business in the State of Missouri and derives substantial income from doing business in this state.

20.     Defendant purposefully availed itself of the privilege of conducting activities within the State of Missouri, thus invoking the benefits and protections of its laws.

21.     In addition, Defendant Monsanto maintains sufficient contacts with the State of Missouri such that this Court's exercise of personal jurisdiction over it does not offend traditional notions of fair play and substantial justice.

22.     Defendant did act to design, sell, advertise, manufacture and/or distribute Roundup, with full knowledge of its dangerous and defective nature.

23.     This Court has jurisdiction over Defendant and this action pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship between Plaintiffs and Defendant. Defendant is either incorporated and/or has the principal place of business outside of the state in which the Plaintiff resides.

4

24.     The amount in controversy between Plaintiffs and Defendant exceeds $75,000.00, exclusive of interest and cost.

25.     The Court also has supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

26.     Venue of this action properly lies within this district  pursuant to 28 U.S.C. § 1391, as it is the judicial district in which a substantial part of the events or omissions giving rise to the claim occurred and in which Defendant Monsanto does business relating to the allegations contained herein.

## FACTS COMMON TO ALL COUNTS

27.     Defendant was in the business of, and did, design, research, manufacture, test, advertise, promote, market, sell, and distribute the commercial herbicide Roundup.

28.     Monsanto is a multinational agricultural biotechnology corporation based in St. Louis, Missouri. It is the world's leading producer of glyphosate.

29.     Defendant discovered the herbicidal properties of glyphosate during the 1970's and subsequently began to design, research, manufacture, sell and distribute glyphosate based "Roundup" as a broad spectrum herbicide.

30.     Glyphosate is the active ingredient in Roundup.

31.     Glyphosate is a broad-spectrum herbicide used to kill weeds and grasses known to compete with commercial crops grown around the globe.

32.     Glyphosate is a "non-selective" herbicide, meaning it kills indiscriminately based only on whether a given organism produces a specific enzyme, 5-enolpyruvylshikimic acid-3-phosphate synthase, known as EPSP synthase.

33.     Glyphosate inhibits the enzyme 5-enolpyruvylshikimic acid-3-phosphate synthase that interferes with the shikimic pathway in plants, resulting in the accumulation of shikimic acid in plant tissue and ultimately plant death.

34.     Sprayed as a liquid, plants absorb glyphosate directly through their leaves, stems, and roots, and detectable quantities accumulate in the plant tissues.

35.     Each year, approximately 250 million pounds of glyphosate are sprayed on crops, commercial nurseries, suburban lawns, parks, and golf courses. This increase in use has been driven largely by the proliferation of genetically engineered crops, crops specifically tailored to resist the activity of glyphosate.

36.     Defendant is intimately involved in the development, design, manufacture, marketing, sale, and/or distribution of genetically modified ("GMO") crops, many of which are marketed as being resistant to Roundup *i.e.,* "Roundup Ready®." As of 2009, Defendant was the world's leading producer of seeds designed to be Roundup Ready®. In 2010, an estimated 70% of corn and cotton, and 90% of soybean fields in the United States contained Roundup Ready® seeds.

37.     The original Roundup, containing the active ingredient glyphosate, was introduced in 1974. Today, glyphosate products are among the most widely used herbicides in the world.[1]

38.     For nearly 40 years, consumers, farmers, and the public have used Roundup, unaware of its carcinogenic properties.

### REGISTRATION OF HERBICIDES UNDER FEDERAL LAW

39.     The manufacture, formulation and distribution of herbicides, such as Roundup, are regulated under the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA"), 7. U.S.C. § 136 *et seq*. FIFRA requires that all pesticides be registered with the Environmental Protection

---

[1] *Backgrounder*, History of Monsanto's Glyphosate Herbicides, June 2005.

Agency ("EPA) prior to their distribution, sale, or use, except as described by FIFRA 7 U.S.C. 136a(a).

40.     The EPA requires as part of the registration process, among other requirements, a variety of tests to evaluate the potential for exposure to pesticides, toxicity to people and other potential non-target organisms, and other adverse effects on the environment. Registration by the EPA, however, is not an assurance or finding of safety. The determination the EPA makes in registering or re-registering a product is not that the product is "safe," but rather that use of the product in accordance with its label directions "will not generally cause unreasonable adverse effects on the environment." *See* 7 U.S.C. § 136(a)(c)(5)(D).

41.     FIFRA defines "unreasonable adverse effects on the environment" to mean "any unreasonable risk to man or the environment, taking into account the economic, social, and environmental costs and benefits of the use of any pesticide." 7 U.S.C. § 136(bb). FIFRA thus requires the EPA to make a risk/benefit analysis in determining whether a registration should be granted or allowed to continue to be sold in commerce.

42.     The EPA and the States of Missouri and Iowa registered Roundup for distribution, sale, and manufacture in the United States and the States of Missouri and Iowa.

43.     FIFRA generally requires that the registrant, Monsanto, conduct health and safety testing of pesticide products. The government is not required, nor is it able, to perform the product tests that are required of the manufacturer.

44.     The evaluation of each pesticide product distributed, sold, or manufactured is completed at the time the product is initially registered. The data necessary for registration of a pesticide has changed over time. The EPA is now in the process of re-evaluating all pesticide products through a Congressionally-mandated process called "re-registration." 7 U.S.C. § 136a-1.

In order to reevaluate these pesticides, the EPA demands the completion of additional tests and the submission of data for the EPA's review and evaluation.

45.     In the case of glyphosate and Roundup, the EPA had planned on releasing its preliminary risk assessment – in relation to the registration process – no later than July 2015. The EPA completed its review of glyphosate in early 2015, but delayed releasing the assessment pending further review in light of the World Health Organization's findings.

## MONSANTO'S FALSE REPRESENTATIONS
## REGARDING THE SAFETY OF ROUNDUP®

46.     In 1996, the New York Attorney General ("NYAG") filed a lawsuit against Monsanto based on its false and misleading advertising of Roundup products. Specifically, the lawsuit challenged Monsanto's general representations that its spray-on glyphosate-based herbicides, including Roundup, were "safer **than table salt"** and "practically **non-toxic"** to mammals, birds, and fish. Among the representations the NYAG found deceptive and misleading about the human and environmental safety of Roundup are the following:

    a.  Remember that environmentally friendly Roundup herbicide is biodegradable. It won't build up in the soil so you can use Roundup with confidence along customers' driveways, sidewalks and fences ...

    b.  And remember that Roundup is biodegradable and won't build up in the soil. That will give you the environmental confidence you need to use Roundup everywhere you've got a weed, brush, edging or trimming problem.

    c.  Roundup biodegrades into naturally occurring elements.

    d.  Remember that versatile Roundup herbicide stays where you put it. That means there's no washing or leaching to harm customers' shrubs or other desirable vegetation.

    e.  This non-residual herbicide will not wash or leach in the soil. It ... stays where you apply it.

    f.   You can apply Accord with "confidence because it will stay where you put it" it bonds tightly to soil particles, preventing leaching. Then, soon after application, soil microorganisms biodegrade Accord into natural products.

    g.   Glyphosate is less toxic to rats than table salt following acute oral ingestion.

    h.   Glyphosate's safety margin is much greater than required. It has over a 1,000-fold safety margin in food and over a 700-fold safety margin for workers who manufacture it or use it.

    i.   You can feel good about using herbicides by Monsanto. They carry a toxicity category rating of 'practically non-toxic' as it pertains to mammals, birds and fish.

    j.   "Roundup can be used where kids and pets will play and breaks down into natural material." This ad depicts a person with his head in the ground and a pet dog standing in an area which has been treated with Roundup [2]

47.    On November 19, 1996, Monsanto entered into an Assurance of Discontinuance with NYAG, in which Monsanto agreed, among other things, "to cease and desist from publishing or broadcasting any advertisements [in New York] that represent, directly or by implication" that:

    a.   its glyphosate-containing pesticide products or any component thereof are safe, non-toxic, harmless or free from risk.

                  ***

    b.   its glyphosate-containing pesticide products or any component thereof manufactured, formulated, distributed or sold by Monsanto are biodegradable

                  ***

    c.   its glyphosate-containing pesticide products or any component thereof stay where they are applied under all circumstances and will not move through the environment by any means.

                  ***

    d.   its glyphosate-containing pesticide products or any component thereof are "good" for the environment or are "known for their environmental characteristics."

                  ***

---

[2] Attorney General of the State of New York, In the Matter of Monsanto Company, Assurance of Discontinuance Pursuant to Executive Law § 63(15) (Nov. 1996).

e.  glyphosate-containing pesticide products or any component thereof are safer or less toxic than common consumer products other than herbicides;

***

f.  its glyphosate-containing products or any component thereof might be classified as "practically non-toxic.

48.  Monsanto did not alter its advertising in the same manner in any state other than New York, and on information and belief still has not done so today.

49.  In 2009, France's highest court ruled that Monsanto had not told the truth about the safety of Roundup. The French court affirmed an earlier judgment that Monsanto had falsely advertised its herbicide Roundup as "biodegradable" and that it "left the soil clean."[3]

## EVIDENCE OF CARCINOGENICITY IN ROUNDUP

50.  As early as the 1980's Monsanto was aware of glyphosate's carcinogenic properties.

51.  On March 4, 1985, a group of the Environmental Protection Agency's ("EPA") Toxicology Branch published a memorandum classifying glyphosate as a Category C oncogene.[4] Category C oncogenes are possible human carcinogens with limited evidence of carcinogenicity.

52.  In 1986, the EPA issued a Registration Standard for glyphosate (NTIS PB87-103214). The Registration standard required additional phytotoxicity, environmental fate, toxicology, product chemistry, and residue chemistry studies. All of the data required was submitted and reviewed and/or waived.[5]

---

[3] *Monsanto Guilty in 'False Ad' Row,* BBC, Oct. 15, 2009, *available at* http://news.bbc.co.uk/2/hi/europe/8308903.stm.
[4] Consensus Review of Glyphosate, Casewell No. 661A. March 4, 1985. United States Environmental Protection Agency.
[5] http://www.epa.gov/oppsrrd1/reregistration/REDs/factsheets/0178fact.pdf

53.     In October 1991 the EPA published a Memorandum entitled "Second Peer Review of Glyphosate." The memorandum changed glyphosate's classification to Group E (evidence of non-carcinogenicity for humans). Two peer review committee members did not concur with the conclusions of the committee and one member refused to sign.[6]

54.     In addition to the toxicity of the active molecule, many studies support the hypothesis that glyphosate formulations found in Defendant's Roundup products are more dangerous and toxic than glyphosate alone.[7] As early as 1991 evidence existed demonstrating that glyphosate formulations were significantly more toxic than glyphosate alone.[8]

55.     In 2002, Julie Marc published a study entitled "Pesticide Roundup Provokes Cell Division Dysfunction at the Level of CDK1/Cyclin B Activation."

56.     The study found that Defendant's Roundup caused delays in the cell cycles of sea urchins, while the same concentrations of glyphosate alone proved ineffective and did not alter cell cycles.

57.     In 2004, Julie Marc published a study entitled "Glyphosate-based pesticides affect cell cycle regulation." The study demonstrated a molecular link between glyphosate-based products and cell cycle dysregulation.

58.     The study noted that "cell-cycle dysregulation is a hallmark of tumor cells and human cancer. Failure in the cell-cycle checkpoints leads to genomic instability and subsequent development of cancers from the initial affected cell." Further, "[s]ince cell cycle disorders such

---

[6] Second Peer Review of Glyphosate, CAS No. 1071-83-6. October 30, 1881. United States Environmental Protection Agency.
[7] Martinez et al. 2007; Benachour 2009; Gasnier et al. 2010; Peixoto 2005; Marc 2004
[8] Martinez et al 1991

as cancer result from dysfunction of unique cell, it was of interest to evaluate the threshold dose of glyphosate affecting cells."[9]

59.     In 2005, Francisco Peixoto published a study showing that Roundup's effects on rat liver mitochondria are much more toxic and harmful than the same concentrations of glyphosate alone.

60.     The Peixoto study suggested that the harmful effects of Roundup on mitochondrial bioenergetics could not be exclusively attributed to glyphosate and could be the result of other chemicals, namely the surfactant POEA, or alternatively due to the possible synergy between glyphosate and Roundup formulation products.

61.     In 2009, Nora Benachour and Gilles-Eric Seralini published a study examining the effects of Roundup and glyphosate on human umbilical, embryonic, and placental cells.

62.     The study used dilution levels of Roundup and glyphosate far below agricultural recommendations, corresponding with low levels of residues in food. The study concluded that supposed "inert" ingredients, and possibly POEA, change human cell permeability and amplify toxicity of glyphosate alone. The study further suggested that determinations of glyphosate toxicity should take into account the presence of adjuvants, or those chemicals used in the formulation of the complete pesticide. The study confirmed that the adjuvants in Roundup are not inert and that Roundup is always more toxic than its active ingredient glyphosate.

63.     The results of these studies were confirmed in recently published peer-reviewed studies and were at all times available and/or known to Defendant.

---

[9] (Molinari, 2000; Stewart et al., 2003)

64. Defendant knew or should have known that Roundup is more toxic than glyphosate alone and that safety studies on Roundup, Roundup's adjuvants and "inert" ingredients, and/or the surfactant POEA were necessary to protect Decedent from Roundup.

65. Defendant knew or should have known that tests limited to Roundup's active ingredient glyphosate were insufficient to prove the safety of Roundup.

66. Defendant failed to appropriately and adequately test Roundup, Roundup's adjuvants and "inert" ingredients, and/or the surfactant POEA to protect Decedent from Roundup.

67. Rather than performing appropriate tests, Defendant relied upon flawed industry-supported studies designed to protect Defendant's economic interests rather than the Plaintiffs, Decedent and the consuming public.

68. Despite its knowledge that Roundup was considerably more dangerous than glyphosate alone, Defendant continued to promote Roundup as safe.

## IARC CLASSIFICATION OF GLYPHOSATE

69. The International Agency for Research on Cancer ("IARC") is the specialized intergovernmental cancer agency the World Health Organization ("WHO") of the United Nations tasked with conducting and coordinating research into the causes of cancer.

70. An IARC Advisory Group to Recommend Priorities for IARC Monographs during 2015–2019 met in April 2014. Though nominations for the review were solicited, a substance must meet two criteria to be eligible for review by the IARC Monographs: there must already be some evidence of carcinogenicity of the substance, and there must be evidence that humans are exposed to the substance.

71. IARC set glyphosate for review in 2015-2016. IARC uses five criteria for determining priority in reviewing chemicals. The substance must have a potential for direct impact

on public health; scientific literature to support suspicion of carcinogenicity; evidence of significant human exposure; high public interest and/or potential to bring clarity to a controversial area and/or reduce public anxiety or concern; related agents similar to one given high priority by the above considerations. Data reviewed is sourced preferably from publicly accessible, peer-reviewed data.

72.     On March 24, 2015, after its cumulative review of human, animal, and DNA studies for more than one (1) year, many of which have been in Defendant's possession since as early as 1985, the IARC's working group published its conclusion that the glyphosate contained in Defendant's Roundup herbicide, is a Class 2A "probable carcinogen" as demonstrated by the mechanistic evidence of carcinogenicity in humans and sufficient evidence of carcinogenicity in animals.

73.     The IARC's full Monograph was published on July 29, 2015 and established glyphosate as a class 2A *probable* carcinogen to humans. According to the authors glyphosate demonstrated sufficient mechanistic evidence (genotoxicity and oxidative stress) to warrant a 2A classification based on evidence of carcinogenicity in humans and animals.

74.     The IARC Working Group found an increased risk between exposure to glyphosate and non-Hodgkin's lymphoma ("NHL") and several subtypes of NHL, and the increased risk continued after adjustment for other pesticides.

75.     The IARC also found that glyphosate caused DNA and chromosomal damage in human cells.

## EARLIER EVIDENCE OF GLYPHOSATE'S DANGER

76.     Despite the new classification by the IARC, Defendant has had ample evidence of glyphosate and Roundup's genotoxic properties for decades.

77.     Genotoxicity refers to chemical agents that are capable of damaging the DNA within a cell through genetic mutations, which is a process that is believed to lead to cancer.

78.     In 1997, Chris Clements published "Genotoxicity of select herbicides in *Rana catesbeiana* tadpoles using the alkaline single-cell gel DNA electrophoresis (comet) assay."

79.     The study found that tadpoles exposed to Roundup showed significant DNA damage when compared with unexposed control animals.

80.     Both human and animal studies have shown that glyphosate and glyphosate-based formulations such as Roundup can induce oxidative stress.

81.     Oxidative stress and associated chronic inflammation are believed to be involved in carcinogenesis.

82.     The IARC Monograph notes that "[s]trong evidence exists that glyphosate, AMPA and glyphosate-based formulations can induce oxidative stress."

83.     In 2006 César Paz-y-Miño published a study examining DNA damage in human subjects exposed to glyphosate.

84.     The study produced evidence of chromosomal damage in blood cells showing significantly greater damage after exposure to glyphosate than before in the same individuals, suggesting that the glyphosate formulation used during aerial spraying had a genotoxic effect on exposed individuals.

85.     The IARC Monograph reflects the volume of evidence of glyphosate pesticides' genotoxicity noting "[t]he evidence for genotoxicity caused by glyphosate-based formulations is strong."

86. Despite knowledge to the contrary, Defendant maintains that there is no evidence that Roundup is genotoxic, that regulatory authorities and independent experts are in agreement that Roundup is not genotoxic, and that there is no evidence that Roundup is genotoxic.

87. In addition to glyphosate and Roundup's genotoxic properties, Defendant has long been aware of glyphosate's carcinogenic properties.

88. Glyphosate and Roundup in particular have long been associated with carcinogenicity and the development of numerous forms of cancer, including, but not limited to, non-Hodgkin's lymphoma, Hodgkin's lymphoma, multiple myeloma, and soft tissue sarcoma.

89. Defendant has known of this association since the early to mid-1980s and numerous human and animal studies have evidenced the carcinogenicity of glyphosate and/or Roundup.

90. In 1985 the EPA studied the effects of glyphosate in mice finding a dose related response in male mice linked to renal tubal adenomas, a rare tumor. The study concluded the glyphosate was oncogenic.

91. In 2003 Lennart Hardell and Mikael Eriksson published the results of two case controlled studies on pesticides as a risk factor for NHL and hairy cell leukemia.

92. The study concluded that glyphosate had the most significant relationship to NHL among all herbicides studies with an increased odds ratio of 3.11.

93. In 2003 AJ De Roos published a study examining the pooled data of mid-western farmers, examining pesticides and herbicides as risk factors for NHL.

94. The study, which controlled for potential confounders, found a relationship between increased NHL incidence and glyphosate.

95. In 2008 Mikael Eriksson published a study a population-based case-control study of exposure to various pesticides as a risk factor for NHL.

96.     This strengthened previous associations between glyphosate and NHL.

97.     In spite of this knowledge, Defendant continued to issue broad and sweeping statements suggesting that Roundup was, and is, safer than ordinary household items such as table salt, despite a lack of scientific support for the accuracy and validity of these statements and, in fact, voluminous evidence to the contrary.

98.     Upon information and belief, these statements and representations have been made with the intent of inducing Decedent, the agricultural community, and the public at large to purchase, and increase the use of, Defendant's Roundup for Defendant's pecuniary gain, and in fact did induce Decedent to use Roundup.

99.     Defendant made these statements with complete disregard and reckless indifference to the safety of the Decedent and of the general public.

100.    Notwithstanding Defendant's representations, scientific evidence has established a clear association between glyphosate and genotoxicity, inflammation, and an increased risk of many cancers, including, but not limited to, NHL, Multiple Myeloma, and soft tissue sarcoma.

101.    Defendant knew or should have known that glyphosate is associated with an increased risk of developing cancer, including, but not limited to, NHL, Multiple Myeloma, and soft tissue sarcomas.

102.    Defendant failed to appropriately and adequately inform and warn Decedent of the serious and dangerous risks associated with the use of and exposure to glyphosate and/or Roundup, including, but not limited to, the risk of developing NHL, as well as other severe and personal injuries, which are permanent and/or long-lasting in nature, cause significant physical pain and mental anguish, diminished enjoyment of life, and the need for medical treatment, monitoring and/or medications.

103.     Despite the IARC's classification of glyphosate as a class 2A probable carcinogen, Defendant continues to maintain that glyphosate and/or Roundup is safe, non-carcinogenic, non-genotoxic, and falsely warrant to users and the general public that independent experts and regulatory agencies agree that there is no evidence of carcinogenicity or genotoxicity in glyphosate and Roundup.

104.     Defendant has claimed and continue to claim that Roundup is safe, non-carcinogenic, and non-genotoxic. These misrepresentations are consistent with Defendant cavalier approach to investigating and ensuring the safety of its products, the safety of the public at large, and the safety of the Plaintiffs.

## SCIENTIFIC FRAUD UNDERLYING THE SAFETY DETERMINATIONS OF GLYPHOSATE

105.     After the EPA's 1985 classification of glyphosate as possibly carcinogenic to humans (Group C), Monsanto exerted pressure upon the EPA to change its classification.

106.     This culminated in the EPA's reclassification of glyphosate to Group E, which was based upon evidence of non-carcinogenicity in humans.

107.     In so classifying, the EPA stated that "[i]t should be emphasized, however, that designation of an agent in Group E is based on the available evidence at the time of evaluation and should not be interpreted as a definitive conclusion that the agent will not be a carcinogen under any circumstances."

108.     On two occasions, the EPA found that laboratories hired by Monsanto to test the toxicity of its Roundup products for registration purposes committed scientific fraud.

109.     In the first instance, Monsanto hired Industrial Bio-Test Laboratories ("IBT") to perform and evaluate pesticide toxicology studies relating to Roundup. IBT performed

approximately 30 tests on glyphosate and glyphosate-containing products, including 11 of the 19 chronic toxicology studies needed to register Roundup with the EPA.

110.    In 1976, the Food and Drug Administration ("FDA") performed an inspection of IBT and discovered discrepancies between the raw data and the final report relating to toxicological impacts of glyphosate. The EPA subsequently audited IBT and determined that the toxicology studies conducted for Roundup were invalid. An EPA reviewer stated, after finding "routine falsification of data" at IBT, that it was "hard to believe the scientific integrity of the studies when they said they took specimens of the uterus from male rabbits."

111.    Three top executives of IBT were convicted of fraud in 1983.

112.    In the second incident, Monsanto hired Craven Laboratories ("Craven") in 1990 to perform pesticide and herbicide studies, including several studies on Roundup.

113.    In March of 1991, the EPA announced that it was investigating Craven for "allegedly falsifying test data used by chemical firms to win EPA approval of pesticides."

114.    The investigation lead to the indictments of the laboratory owner and a handful of employees

## MONSANTO'S CONTINUING DISREGARD FOR THE SAFETY OF PLAINTIFFS AND THE PUBLIC

115.    Monsanto claims on its website that "[r]egulatory authorities and independent experts around the world have reviewed numerous long-term/carcinogenicity and genotoxicity studies and agree that there is no evidence that glyphosate, the active ingredient in Roundup brand herbicides and other glyphosate-based herbicides, causes cancer, even at very high doses, and that it is not genotoxic".[10]

---

[10] Backgrounder - Glyphosate: No Evidence of Carcinogenicity. Updated November 2014. (downloaded October 9, 2015)

116. Ironically, the primary source for this statement is a 1986 report by the WHO, the same organization that now considers glyphosate to be a probable carcinogen.

117. Glyphosate, and Defendant's Roundup products in particular, have long been associated with serious side effects and many regulatory agencies around the globe have banned or are currently banning the use of glyphosate herbicide products.

118. Defendant's statements proclaiming the safety of Roundup and disregarding its dangers misled the Plaintiffs.

119. Despite Defendant's knowledge that Roundup was associated with an elevated risk of developing cancer, Defendant's promotional campaigns focused on Roundup's purported "safety profile."

120. Defendant's failure to adequately warn Decedent resulted in (1) Decedent using and being exposed to glyphosate instead of using another acceptable and safe method of controlling unwanted weeds and pests; and (2) scientists and physicians failing to warn and instruct consumers about the risk of cancer, including NHL, and other injuries associated with Roundup.

121. Defendant failed to seek modification of the labeling of Roundup to include relevant information regarding the risks and dangers associated with Roundup exposure.

122. The failure of Defendant to appropriately warn and inform the EPA has resulted in inadequate warnings in safety information presented directly to users and consumers.

123. The failure of Defendant to appropriately warn and inform the EPA has resulted in the absence of warning or caution statements that are adequate to protect health and the environment.

124. The failure of Defendant to appropriately warn and inform the EPA has resulted in the directions for use that are not adequate to protect health and the environment.

125.     By reason of the foregoing acts and omissions, Plaintiffs seeks compensatory damages as a result of Decedent's use of, and exposure to, Roundup which caused or was a substantial contributing factor in causing Decedent to suffer from cancer, specifically NHL, and Decedent suffered severe and personal injuries which were permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life, and subsequent death.

126.     By reason of the foregoing, Decedent was severely and permanently injured and subsequently died as a result of complications related to high grade lymphoma.

127.     By reason of the foregoing acts and omissions, Decedent endured and, in some categories continued to suffer, emotional and mental anguish, medical expenses, and other economic and non-economic damages, as a result of the actions and inactions of the Defendant up to his untimely death.

128.     By reason of the foregoing acts and omission and as a direct and proximate result of the injuries sustained by Decedent, Plaintiff Karis was and will be denied her lawful consortium and the conjugal benefits of her marital relationship including, without limitation, loss of support and society.

## PLAINTIFF'S EXPOSURE TO ROUNDUP

129.     Plaintiffs incorporate by reference all prior paragraphs of this Complaint as if fully set forth herein.

130.     For many years, Decedent regularly used Roundup on his residential property and on his sons' properties for residential purposes.

131.     Specifically, Decedent first began to use Roundup from approximately 1977 through 2020 for residential purposes and would spray the product at regular intervals for

residential purposes to control weeds on his lawn, garden and/or yard at his place of residence as well as on his sons' lawns.

132. Decedent developed NHL and was first diagnosed by his physician in August of 2020. Decedent has sought and continued to seek treatment for his NHL, including chemotherapy up until his untimely death.

133. Decedent's exposure to Roundup products designed, formulated, supplied and distributed by Defendant Monsanto was a direct and proximate cause of his developing NHL. As a result of his illness, Decedent incurred physical injury, significant economic and non-economic damages, subsequent death, and Plaintiff Karis was and will be denied her lawful consortium and the conjugal benefits of her marital relationship including, without limitation, loss of support and society.

## TOLLING OF ANY APPLICABLE STATUTES OF LIMITATIONS

134. Plaintiffs incorporates by reference all prior paragraphs of this Complaint as if fully set forth herein.

135. Plaintiffs and Decedent had no way of knowing about the risk of serious illness associated with the use of and/or exposure to Roundup and glyphosate during the entire time he was using the product.

136. Within the time period of any applicable statute of limitations, if any, Plaintiffs and Decedent could not have discovered, through the exercise of reasonable diligence, that exposure to Roundup, an herbicide, and the chemicals contained therein, including, glyphosate was hazardous, toxic and injurious to human health.

137. Plaintiffs and Decedent did not discover, and did not know of facts that would cause a reasonable person to suspect, the risks associated with the use of and/or exposure to Roundup

and glyphosate; nor would a reasonable and diligent investigation by Plaintiffs have disclosed that Roundup herbicide and the glyphosate contained therein would have caused his illness.

138.    For these reasons, any applicable statute of limitations has been tolled by operation of the discovery rule with respect to Plaintiffs' claims.

139.    The running of any statute of limitations, if any, has also been tolled by reason of Monsanto's knowing and active fraudulent concealment, actual misrepresentation and denial of the facts alleged herein through the time period relevant to this action. Defendant, through its affirmative misrepresentations and omissions, actively concealed from Plaintiffs and Decedent the true risks associated with Roundup and glyphosate.

140.    Instead of disclosing critical safety information about Roundup and glyphosate, Monsanto has consistently and falsely represented the safety of its Roundup products.

141.    At all relevant times, Defendant has maintained that Roundup is safe, non-toxic, and non-carcinogenic.

142.    Indeed, even as of July 2016, Defendant continued to represent to the public that "Regulatory authorities and independent experts around the world have reviewed numerous long-term/carcinogenicity and genotoxicity studies and *agree* that there is *no evidence* that glyphosate, the active ingredient in Roundup brand herbicides and other glyphosate-based herbicides, causes cancer, even at very high doses, and that it is not genotoxic." (emphasis added)[11]

143.    As a result of Defendant's actions, Plaintiffs and Decedent were unaware, and could not reasonably known or have learned through reasonable diligence that Roundup and/or glyphosate contact, exposed Decedent to the risks alleged herein and that those risks were the direct and proximate result of Defendant's acts and omissions.

---

[11] Backgrounder - Glyphosate: No Evidence of Carcinogenicity. Updated November 2014. (downloaded October 9, 2015)

144.     Furthermore, Defendant is estopped from relying on any statute of limitations because of its fraudulent concealment of the true character, quality and nature of Roundup. Defendant was under a duty to disclose the true character, quality, and nature of Roundup because this was non-public information over which Defendant had and continues to have exclusive control, and because Defendant knew that this information was not available to Plaintiffs and Decedent or to distributors of Roundup and such concealment contributed to Plaintiffs' harm. In addition, Defendant is estopped from relying on any statute of limitations because of its intentional concealment of these facts.

145.     Plaintiffs and Decedent had no knowledge that Defendant was engaged in the wrongdoing alleged herein. Because of the fraudulent acts of concealment of wrongdoing by Defendant, Plaintiffs and Decedent could not have reasonably discovered the wrongdoing at any time prior. Also, the economics of this fraud should be considered. Defendant had the ability to and did spend enormous amounts of money in furtherance of its purpose of marketing, promoting and/or distributing a profitable herbicide, notwithstanding the known or reasonably known risks. Plaintiffs, Decedent and medical professionals could not have afforded and could not have possibly conducted studies to determine the nature, extent, and identity of related health risks, and were forced to rely on only the Defendant's representation. Accordingly, Defendant is precluded by both the discovery rule and the doctrine of fraudulent concealment from relying upon any statutes of limitations.

## FIRST CLAIM FOR RELIEF
## NEGLIGENCE

146.     Plaintiffs repeat, reiterate, and re-allege each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

147.     Defendant, directly or indirectly, caused Roundup products to be sold, distributed, packaged, labeled, marketed, and/or promoted.

148.     Defendant, directly or indirectly, caused Roundup products to be purchased and/or used by the Decedent.

149.     At all times relevant to this litigation, Defendant had a duty to exercise reasonable care in the design, research, manufacture, marketing, advertisement, supply, promotion, packaging, sale, and distribution of its Roundup products, including the duty to take all reasonable steps necessary to manufacture, promote, and/or sell a product that was not unreasonably dangerous to consumers, users, and other persons coming into contact with the product.

150.     At all times relevant to this litigation, Defendant had a duty to exercise reasonable care in the marketing, advertising, and sale of its Roundup products. Defendant's duty of care owed to consumer and the general public included providing accurate, true, and correct information concerning the risks of using Roundup and appropriate, complete, and accurate warnings concerning the potential adverse effects of exposure to Roundup and, in particular, its active ingredient glyphosate.

151.     At all times relevant to this litigation, Defendant knew or, in the exercise of reasonable care, should have known of the hazards and dangers of Roundup and specifically, the carcinogenic properties of the chemical glyphosate.

152.     Accordingly, at all times relevant to this litigation, Defendant knew or, in the exercise of reasonable care, should have known that use or exposure to its Roundup products could cause Decedent's injuries and thus, created a dangerous and unreasonable risk of injury to the users of these products, including Decedent.

153.    Defendant knew or, in the exercise of reasonable care, should have known that Roundup is more toxic than glyphosate alone and that safety studies on Roundup, Roundup's adjuvants and "inert" ingredients, and/or the surfactant POEA were necessary to protect Decedent from Roundup.

154.    Defendant knew or, in the exercise of reasonable care, should have known that tests limited to Roundup's active ingredient glyphosate were insufficient to prove the safety of Roundup.

155.    Defendant also knew or, in the exercise of reasonable care, should have known that users and consumers of Roundup were unaware of the risks and the magnitude of the risks associated with the use of and/or exposure to Roundup and glyphosate-containing products.

156.    As such, Defendant breached its duty of reasonable care and failed to exercise ordinary care in the design, research, development, manufacture, testing, marketing, supply, promotion, advertisement, packaging, sale, and distribution of its Roundup products, in that Defendant manufactured and produced defective herbicides containing the chemical glyphosate, knew or had reason to know of the defects inherent in its products, knew or had reason to know that a user's or consumer's exposure to the products created a significant risk of harm and unreasonably dangerous side effects, and failed to prevent or adequately warn of these risks and injuries.

157.    Defendant failed to appropriately and adequately test Roundup, Roundup adjuvants and "inert" ingredients, and/or the surfactant POEA to protect Plaintiffs from Roundup.

158.    Despite the ability and means to investigate, study, and test its products and to provide adequate warnings, Defendant has failed to do so. Indeed, Defendant has wrongfully

concealed information and has further made false and/or misleading statements concerning the

safety and/or exposure to Roundup and glyphosate.

159.     The negligence by the Defendant, its agents, servants, and/or employees, included

but was not limited to the following acts and/or omissions:

   a. Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing its Roundup products without thorough and adequate pre- and post-market testing;

   b. Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing Roundup while negligently and/or intentionally concealing and failing to disclose the results of trials, tests and studies of exposure to glyphosate, and, consequently, the risk of serious harm associated with human use of and exposure to Roundup;

   c. Failing to undertake sufficient studies and conduct necessary tests to determine whether or not Roundup products and glyphosate-containing products were safe for their intended use in agriculture, horticulture, and at-home use;

   d. Failing to undertake sufficient studies and conduct necessary tests to determine the safety of "inert" ingredients and/or adjuvants contained within Roundup®, and the propensity of these ingredients to render Roundup toxic, increase the toxicity of Roundup, whether these ingredients are carcinogenic, magnify the carcinogenic properties of Roundup, and whether or not "inert" ingredients and/or adjuvants were safe for use;

   e. Failing to use reasonable and prudent care in the design, research, manufacture, formulation, and development of Roundup products so as to avoid the risk of serious harm associated with the prevalent use of Roundup/glyphosate as a herbicide;

   f. Failing to design and manufacture Roundup products so as to ensure they were at least as safe and effective as other herbicides on the market;

   g. Failing to provide adequate instructions, guidelines, and safety precautions to those persons who Defendant could reasonably foresee would use and/or be exposed to its Roundup products;

   h. Failing to disclose to Plaintiffs, Decedent, users, consumers, and the general public that the use of and exposure to Roundup presented severe risks of cancer and other grave illnesses;

   i. Failing to warn Plaintiffs, Decedent, users, consumers, and the general public

that the products' risk of harm was unreasonable and that there were safer and effective alternative herbicides available to Plaintiffs and Decedent and other users or consumers;

j.  Systemically suppressing or downplaying contrary evidence about the risks, incidence, and prevalence of the side effects of Roundup® and glyphosate-containing products;

k.  Representing that its Roundup products were safe for their intended use when in fact, Defendant knew or should have known that the products were not safe for their intended use;

l.  Declining to make or propose any changes to Roundup products' labeling or other promotional materials that would alert the consumers and the general public of the risk of Roundup and glyphosate;

m.  Advertising, marketing, and recommending the use of Roundup® products, whole concealing and failing to disclose or warn of the dangers known by defendant to be associated with or caused by the use of and exposure to Roundup and glyphosate;

n.  Continuing to disseminate information to its consumers, which indicate or imply that Defendant's Roundup products are not unsafe for use in the agricultural, horticultural industries, and/or home use; and

o.  Continuing the manufacture and sale of its products with the knowledge that the products were unreasonably unsafe and dangerous.

160.  Defendant under-reported, underestimated, and downplayed the serious dangers of Roundup.

161.  Defendant negligently and deceptively compared the safety risks and/or dangers of Roundup with common everyday foods such as table salt, and other forms of herbicides.

162.  Defendant was negligent and/or violated applicable law in the designing, researching, supplying, manufacturing, promoting, packaging, distributing, testing, advertising, warning, marketing, and selling of Roundup in that it:

a.  Failed to use ordinary care in designing and manufacturing Roundup so as to avoid the aforementioned risks to individuals when Roundup was used as an herbicide;

b. Failed to accompany its product with proper and/or accurate warnings regarding all possible adverse side effects associated with the use of Roundup;

c. Failed to accompany its product with proper warnings regarding all possible adverse side effects concerning the failure and/or malfunction of Roundup;

d. Failed to accompany its product with accurate warnings regarding the risks of all possible adverse side effects concerning Roundup;

e. Failed to warn Plaintiffs of the severity and duration of such adverse effects, as the warnings given did not accurately reflect the symptoms, or severity of the side effects including, but not limited to, the development of NHL;

f. Failed to conduct adequate testing, clinical testing and post-marketing surveillance to determine the safety of Roundup;

g. Failed to conduct adequate testing, clinical testing, and post-marketing surveillance to determine the safety of Roundup's "inert" ingredients and/or adjuvants;

h. Negligently misrepresented the evidence of Roundup's genotoxicity and carcinogenicity;

i. Were otherwise careless and/or negligent.

163. The Roundup designed, formulated researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed by Defendant was defective in design or formulation in that, when it left the hands of the manufacturer and/or suppliers, the foreseeable risks exceeded the benefits associated with the design or formulation of Roundup.

164. Despite the fact that Defendant knew or should have known that Roundup caused, or could cause, unreasonably dangerous side effects, Defendant continued and continues to market, manufacture, distribute, and/or sell Roundup to consumers, including the Plaintiffs and Decedent.

165. Defendant knew or should have known that consumers such as the Decedent and the Plaintiffs would foreseeably suffer injury as a result of Defendant's failure to exercise ordinary care, as set forth above.

166.    Defendant's violations of law and/or negligence were a proximate cause of Decedent's and Plaintiffs' injuries, harm and economic loss, which Plaintiffs have and will continue to suffer.

167.    Defendant's conduct, as described above, was reckless. Defendant regularly risks the lives of consumers and users of its products, including Decedent and Plaintiffs, with full knowledge of the  dangers of its products. Defendant has made conscious decisions not to redesign, re-label, warn, or inform the unsuspecting public, including Decedent and Plaintiffs. Defendant's reckless conduct therefore warrants an award of punitive damages.

168.    As a proximate result of the foregoing wrongful acts and omissions, Decedent suffered from serious and dangerous side effects including, but not limited to, NHL, as well as other severe and personal injuries which were permanent and lasting in nature, physical pain and mental anguish, diminished enjoyment of life, subsequent death, and financial expenses for hospitalization and medical care. Further, Decedent suffered life-threatening NHL, and severe personal injuries, which were permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life, and subsequent death.

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in Plaintiffs' favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees, and all such other and further relief as this Court deems proper and just. Plaintiffs also demand a jury trial on the issues contained herein.

**SECOND CLAIM FOR RELIEF**
**STRICT LIABILITY FOR DEFECTIVE MANUFACTURE AND DESIGN**

169.    Plaintiffs repeat, reiterate and re-allege each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

170. Plaintiffs bring this strict liability clam against Defendant Monsanto for defective manufacture and design.

171. At all times herein mentioned, the Defendant designed, formulated, researched, manufactured, tested, advertised, promoted, sold, and/or distributed Roundup as hereinabove described that was used by Decedent.

172. Defendant's Roundup was expected to and did reach the usual consumers, handlers, and persons coming into contact with said product without substantial change in the condition in which it was produced, manufactured, sold, distributed, and marketed by the Defendant.

173. At those times, Roundup was in an unsafe, defective, and unreasonably dangerous condition, which was dangerous to users, and in particular, Decedent herein.

174. The Roundup designed, formulated researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed by Defendant were defective in design or formulation in that, when it left the hands of the manufacturer and/or suppliers, the foreseeable risks exceeded the benefits associated with the design or formulation of Roundup.

175. The Roundup designed, formulated, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed by Defendant were defective in design and/or formulation, in that, when it left the hands of the Defendant's manufacturer and/or supplier, it was unreasonably dangerous, unreasonably dangerous in normal use, and it was more dangerous than an ordinary consumer would expect.

176. At all times herein mentioned, Roundup was in a defective condition and unsafe, and Defendant knew or had reason to know that said product was defective and unsafe, especially when used in the form and manner as provided by the Defendant. In particular, Defendant's Roundup was defective in the following ways:

a. When placed in the stream of commerce, Defendant's Roundup products were defective in design and formulation and, consequently, dangerous to an extent beyond that which an ordinary consumer would anticipate.

b. When placed in the stream of commerce, Defendant's Roundup products were unreasonably dangerous in that they were hazardous and posed a grave risk of cancer and other serious illnesses when used in a reasonably anticipated manner.

c. When placed in the stream of commerce, Defendant's Roundup products contained unreasonably dangerous design defects and were not reasonably safe when used in a reasonably anticipated manner.

d. Defendant did not sufficiently test, investigate, or study its Roundup products.

e. Exposure to Roundup presents a risk of harmful side effects that outweigh any potential utility stemming from the use of the herbicide.

f. Defendant knew or should have known at the time of marketing its Roundup products that exposure to Roundup and could result in cancer and other severe illnesses and injuries.

g. Defendant did not conduct adequate post-marketing surveillance of its Roundup products; and

h. In such other particulars as the evidence may show.

177. Defendant knew, or should have known that at all times herein mentioned its Roundup was in a defective condition, and was and is unreasonably dangerous and unsafe.

178. Decedent was exposed to Defendant's Roundup, as described above, without knowledge of Roundup's dangerous characteristics.

179. At the time of Decedent's use of and exposure to Roundup, Roundup was being used for the purposes and in a manner normally intended, as a broad-spectrum herbicide.

180. Defendant, with this knowledge, voluntarily designed its Roundup with a dangerous condition for use by the public, and in particular, the Decedent.

181. Defendant had a duty to create a product that was not unreasonably dangerous for its normal, intended use.

182.    Defendant created a product that was and is unreasonably dangerous for its normal, intended use.

183.    Defendant marketed and promoted a product in such a manner so as to make it unreasonably dangerous and defective as the product downplayed its suspected, probable, and established health risks inherent with its normal, intended use.

184.    The Roundup designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed by Defendant was manufactured defectively in that Roundup left the hands of Defendant in a defective condition and was unreasonably dangerous to its intended users.

185.    The Roundup designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed by Defendant reached its intended users in the same defective and unreasonably dangerous condition in which the Defendant's Roundup was manufactured.

186.    Defendant designed, formulated, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed a defective product, which created an unreasonable risk to the health of consumers and to the Decedent in particular, and Defendant is therefore strictly liable for the injuries sustained by the Decedent and subsequent death.

187.    Decedent and Plaintiffs could not, by the exercise of reasonable care, have discovered Roundup's defects herein mentioned or perceived its danger.

188.    Defendant Monsanto is strictly liable in tort, irrespective of privity, to the Plaintiffs for the manufacturing, design marketing, promoting, distribution, and selling of a defective product, Roundup.

189.    Defendant's defective design and formulation of Roundup amounts to willful, wanton, and/or reckless conduct by Defendant.

190.    Defects in Defendant's Roundup were the cause or a substantial factor in causing Decedent's injuries and subsequent death.

191.    As a result of the foregoing acts and omission, Decedent developed NHL, and suffered severe and personal injuries, which were permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life, subsequent death, and financial expenses for hospitalization and medical care.

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in Plaintiffs' favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees, and all such other and further relief as this Court deems proper and just. Plaintiffs also demand a jury trial on the issues contained herein.

### THIRD CLAIM FOR RELIEF
### STRICT LIABILITY FOR FAILURE TO WARN

192.    Plaintiffs repeat, reiterate, and re-allege each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

193.    Plaintiffs bring this strict liability claim against Defendant Monsanto for failure to warn.

194.    Defendant has engaged in the business of selling, testing, distributing, supplying, manufacturing, marketing, and/or promoting Roundup, and through that conduct has knowingly and intentionally placed Roundup into the stream of commerce with full knowledge that it reaches consumers such as the Decedent who are exposed to it through ordinary and reasonably foreseeable uses.

195.    Defendant did in fact sell, distribute, supply, manufacture, and/or promote Roundup to Decedent. Additionally, Defendant expected the Roundup that it was selling, distributing,

supplying, manufacturing, and/or promoting to reach – and Roundup did in fact reach – consumers, including the Decedent, without any substantial change in the condition of the product from when it was initially distributed by Defendant.

196.    At the time of manufacture, Defendant could have provided the warnings or instructions regarding the full and complete risks of Roundup and glyphosate-containing products because it knew or should have known of the unreasonable risks of harm associated with the use of and/or exposure to such products.

197.    At all times herein mentioned, the aforesaid product was defective and unsafe in manufacture such that it was unreasonably dangerous to the user, and was so at the time it was distributed by Defendant and at the time Decedent was exposed to and/or ingested the product. The defective condition of Roundup was due in part to the fact that it was not accompanied by proper warnings regarding its carcinogenic qualities and possible side effects, including, but not limited to, developing non-Hodgkin's lymphoma as a result of exposure and use.

198.    Roundup did not contain a warning or caution statement, which was necessary and, if complied with, was adequate to protect health those exposed in violation of 7 U.S.C. § 136j(a)(1)(E).

199.    Defendant's failure to include a warning or caution statement which was necessary and, if complied with, was adequate to protect the health of those exposed, violated 7 U.S.C. § 136j(a)(1)(E) as well as the laws of the State of Missouri.

200.    Defendant could have amended the label of Roundup to provide additional warnings.

201.    This defect caused serious injury and subsequent death to the Decedent, who used Roundup in its intended and foreseeable manner.

202. At all times herein mentioned, Defendant had a duty to properly design, formulate, manufacture, compound, test, inspect, package, label, distribute, market, examine, maintain supply, provide proper warnings, and take such steps to assure that the product did not cause users to suffer from unreasonable and dangerous side effects.

203. Defendant labeled, distributed, and promoted the aforesaid product in a manner such that it was dangerous and unsafe for the use and purpose for which it was intended.

204. Defendant failed to warn of the nature and scope of the side effects associated with Roundup, namely its carcinogenic properties and its propensity to cause or serve as a substantial contributing factor in the development of NHL.

205. Defendant was aware of the probable consequences of the aforesaid conduct. Despite the fact that Defendant knew or should have known that Roundup caused serious injuries, Defendant failed to exercise reasonable care to warn of the dangerous carcinogenic properties and side effect of developing NHL from Roundup exposure, even though these side effects were known or reasonably scientifically knowable at the time of distribution. Defendant willfully and deliberately failed to avoid the consequences associated with its failure to warn, and in doing so, Defendant acted with a conscious disregard for the safety of Decedent.

206. At the time of exposure, Plaintiffs and Decedent could not have reasonably discovered any defect in Roundup prior through the exercise of reasonable care.

207. Defendant, as the manufacturer and/or distributor of the subject product, is held to the level of knowledge of an expert in the field.

208. Plaintiffs and Decedent reasonably relied upon the skill, superior knowledge, and judgment of Defendant.

209.    Had Defendant properly disclosed the risks associated with Roundup, Decedent would have avoided the risk of NHL by not using Roundup.

210.    The information that Defendant did provide or communicate failed to contain adequate warnings, instructions and precautions that would have enabled Decedent, and similarly situated individuals, to utilize the product safely and with adequate protection. Instead, Defendant disseminated information that was inaccurate, false, and misleading and which failed to communicate accurately or adequately the comparative severity, duration, and extent of the risk of injuries associated with use of and/or exposure to Roundup and glyphosate; continued to promote the efficacy of Roundup, even after it knew or should have known of the unreasonable risks from use or exposure; and concealed, downplayed, or otherwise suppressed, through aggressive marketing and promotion, any information or research about the risks and dangers of exposure to Roundup and glyphosate.

211.    To this day, Defendant has failed to adequately warn of the true risks of Decedent's injuries and subsequent death associated with the use of and exposure to Roundup.

212.    As a result of its inadequate warnings, Defendant's Roundup products were defective and unreasonably dangerous when they left the possession and/or control of Defendant, were distributed by Defendant, and used by the Decedent.

213.    As a direct and proximate result of Defendant's actions as alleged herein, and in such other ways to be later shown, the subject product caused Decedent to sustain injuries and subsequent death as herein alleged.

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in Plaintiffs' favor for compensatory and punitive damages, together with interest, costs herein incurred,

attorneys' fees, and all such other and further relief as this Court deems proper and just. Plaintiffs also demand a jury trial on the issues contained herein.

**FOURTH CLAIM FOR RELIEF**
**BREACH OF IMPLIED WARRANTIES**

214.   Plaintiffs repeat, reiterate, and re-allege each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect all if more fully set forth herein.

215.   At all times herein mentioned, the Defendant manufactured, distributed, compounded, recommended, merchandized, advertised, promoted, and sold Roundup as a broad spectrum herbicide.  These actions were under the ultimate control and supervision of Defendant.

216.   At the time Defendant marketed, sold, and distributed Roundup for use by Decedent, Defendant knew of Roundup's intended use and impliedly warranted the product to be or merchantable quality and safe and fit for this use.

217.   The Defendant impliedly represented and warranted to Decedent and users of Roundup, the agricultural community, and/or the EPA that Roundup was safe and of merchantable quality and fit for the ordinary purpose for which it was to be used.

218.   These representations and warranties were false, misleading, and inaccurate in that Roundup was unsafe, unreasonably dangerous, not of merchantable quality, not fit for the purpose of safely serving as a broad spectrum herbicide, and defective.

219.   Decedent and/or the EPA did rely on said implied warranty of merchantability of fitness for particular use and purpose.

220.   Decedent reasonably relied upon the skill and judgment of Defendant as to whether Roundup was of merchantable quality and safe and fit for its intended use.

221. Roundup was injected into the stream of commerce by the Defendant in a defective, unsafe, and unreasonably dangerous condition, and the product's materials were expected to and did reach users, handlers, and persons coming into contact with said product without substantial change in the condition in which it was sold.

222. The Defendant breached the aforesaid implied warranties, as its herbicide Roundup was not fit for its intended purposes and uses nor was it merchantable.

223. As a result of the foregoing acts and omissions, Decedent suffered from NHL and Decedent suffered severe and personal injuries which were permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life, subsequent death, financial expenses for hospitalization and medical care, including medical expenses, and other economic and non-economic damages.

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in Plaintiffs' favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees, and all such other and further relief as this Court deems proper and just. Plaintiffs also demand a jury trial on the issues contained herein.

## FIFTH CLAIM FOR RELIEF
## BREACH OF EXPRESS WARRANTY

224. Plaintiffs repeat, reiterate, and re-allege each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect all if more fully set forth herein.

225. Defendant manufactured, distributed, advertised, promoted, and sold Roundup.

226. Defendant intended that its Roundup be used in the manner that Decedent used it, and Defendant expressly warranted that each Roundup product was safe and fit for use by

consumers, that it was of merchantable quality, that its health and side effects were minimal, and that it was adequately tested and fit for its intended use.

227.    Defendant was aware that consumers, including Decedent, would use Roundup products; which is to say that Decedent was a foreseeable user of Defendant's Roundup products.

228.    Decedent purchased Roundup manufactured by Defendant.

229.    Defendant's Roundup products were expected to reach and did reach consumers, including Decedent, without any substantial change in the condition in which it was manufactured and sold by Defendant.

230.    Defendant expressly warranted that Roundup was safe and not dangerous to users.

231.    Defendant expressly represented to Plaintiffs, Decedent, scientists, the agricultural community, and the EPA that Roundup was safe and fit for the purposes intended, that it was of merchantable quality, that it did not produce dangerous side effects in excess of those risks associated with other forms of herbicides, that the side effects it did produce were accurately reflected in the warnings, and that it was adequately tested and fit for its intended use.

232.    Defendant breached various express warranties with respect to Roundup including the following particulars: a) Defendant Monsanto's website expressly states that "[r]egulatory authorities and independent experts around the world have reviewed numerous long term/carcinogenicity and genotoxicity studies and agree that there is no evidence that glyphosate, the active ingredient in Roundup brand herbicides and other glyphosate based herbicides, causes cancer, even at very high doses, and that it is not genotoxic"; b) Defendant has expressly warrantied that Roundup is "safer than table salt" and "practically nontoxic."

233.    Roundup did not conform to these express representations because Roundup was not safe and had, at all relevant times, an increased risk of serious side effects, including non-Hodgkin's Lymphoma, when used according to Defendant's instructions.

234.    Defendant fraudulently concealed information from Plaintiffs and Decedent regarding the true dangers and relative risks of Roundup.

235.    The global scientific community is not, and never was, in agreement that Roundup is non-carcinogenic.

236.    Decedent relied on the express warranties of Defendant herein.

237.    Decedent, Plaintiffs, consumers, and members of the agricultural community relied upon the representation and warranties of Defendant for the use of Roundup in using, purchasing, mixing, handling, applying, and dispensing Roundup.

238.    Defendant breached the aforesaid express warranties, as its product Roundup was defective.

239.    Defendant knew or should have known that, in fact, said representations and warranties were false, misleading, and untrue in that Roundup was not safe and fit for the use intended, and, in fact, produced serious injuries to the users that were not accurately identified and represented by Defendant.

240.    Defendant knew or should have known that, in fact, said warranties were false, misleading, and untrue in that there is evidence that Roundup is toxic, genotoxic, and carcinogenic and that scientists and/or regulatory authorities around the world are not in agreement that Roundup is not carcinogenic or genotoxic and that it is safe.

241.    As a result of the foregoing acts and omissions, Decedent suffered from life threatening non-Hodgkin's Lymphoma and suffered severe and personal injuries, which were

permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life, subsequent death, and extensive financial expenses for hospitalization and medical care.

242.   As a result of the foregoing acts and omissions, Plaintiffs have suffered and incurred damages, including medical expenses and other economic and non-economic damages.

WHEREFORE, Plaintiffs respectfully requests that this Court enter judgment in Plaintiffs' favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees, and all such other and further relief as this Court deems proper and just. Plaintiffs also demand a jury trial on the issues contained herein.

## SIXTH CLAIM FOR RELIEF
## FRAUD, MISREPRESENTATION AND SUPPRESSION

243.   Plaintiffs repeat, reiterate, and re-allege each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect all if more fully set forth herein.

244.   Defendant is the manufacturer, designer, distributor, seller or supplier of Roundup® and, while engaged in the course of such business, made representations to Decedent regarding the character and/or quality of, for guidance in his decision to select Roundup® for use.

245.   Defendant had a duty to disclose material information about serious health effects to consumers such as Decedent. Defendant intentionally failed to disclose this information for the purpose of inducing consumers, including Decedent, to purchase Defendant's dangerous products.

246.   Defendant fraudulently, intentionally, and negligently misrepresented to the public, and to Plaintiffs and Decedent, both directly and by and through the media, the scientific literature and purported "community outreach" programs, the safety of Roundup products, and

fraudulently, intentionally, and negligently concealed, suppressed, or omitted material, adverse information regarding the safety of Roundup.

247.    Defendant's intentional and negligent misrepresentations and omissions regarding the safety of Roundup products were communicated to Decedent directly through ghostwritten articles, editorials, national and regional advertising, marketing and promotion efforts, as well as the Roundup packaging and sales aids.  The safety of Roundup products was also intentionally and/or negligently misrepresented to Decedent and the public with the intent that such misrepresentations would cause Decedent and other potential consumers to purchase and use or continue to purchase and use Roundup products.

248.    Defendant either knew or should have known of the material representations they were making regarding the safety and relative utility of Roundup products.

249.    Defendant fraudulently, intentionally, and negligently made the misrepresentations and/or actively concealed, suppressed, or omitted this material information with the specific desire to induce Decedent, and the consuming public to purchase and use Roundup products.  Defendant fraudulently, intentionally, and negligently, knew or should have known that Decedent and the consuming public would rely on such material misrepresentations and omissions in selecting and applying Roundup products.  Defendant knew or should have known that Decedent would rely on its false representations and omissions.

250.    Defendant made these misrepresentations and actively concealed adverse information including the risk of non-Hodgkin's Lymphoma, at a time when their agents and employees knew or should have known the product had defects, dangers, and characteristics that were other than what was represented to the consuming public.  Specifically, Monsanto's hired advertising firm Osborn & Barr misrepresented and actively concealed, suppressed, and omitted that there had been inadequate testing of the safety and efficacy of Roundup, and that prior studies, research, reports,

and/or testing had been conducted linking the use of the drug with serious health events, including non-Hodgkin's Lymphoma.

251. Despite the fact that Defendant knew or should have known of reports of severe risks, including non-Hodgkin's Lymphoma, with Roundup use and exposure, this information was strategically minimized, understated, or omitted in order to create the impression that the human dangers of Roundup were nonexistent, particularly in light of its purported utility.

252. The fraudulent, intentional and/or negligent material misrepresentations and/or active concealment, suppression, and omissions by Defendant were perpetuated directly and indirectly through the advertisements, packaging, sales aids, furtive public relations efforts, and other marketing and promotional pieces authored, analyzed, created, compiled, designed, drafted, disseminated, distributed, edited, evaluated, marketed, published, and supplied by Osborn & Barr.

253. If Decedent had known the true facts concerning the risks associated with Roundup exposure, Decedent would have used a safer alternative.

254. Decedent's reliance upon the material misrepresentations and omissions was justified, among other reasons, because said misrepresentations and omissions were made by individuals and entities who were in a position to know the true facts concerning Roundup. Plaintiffs and Decedent were not in a position to know the true facts because Defendant overstated the benefits and safety of Roundup and downplayed the risk of lymphoma, thereby inducing Decedent to use the herbicide rather than safer alternatives.

255. Defendant is estopped from relying on any statute of limitations defenses because Defendant actively concealed the defects from consumers, such as Plaintiffs and Decedent. Instead of revealing the defects, Defendant continued to represent its product as safe for its intended use.

256.    As a direct and proximate result of Decedent's use of Roundup as manufactured, designed, sold, supplied and introduced into the stream of commerce by Defendant, Decedent suffered personal injury, non-economic damages, and continue to suffer such harm and damages until his untimely death.

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in Plaintiffs' favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees, and all such other and further relief as this Court deems proper and just. Plaintiffs also demand a jury trial on the issues contained herein.

## SEVENTH CLAIM FOR RELIEF
## VIOLATION OF THE CONSUMER FRAUD ACTS

257.    Plaintiffs repeat, reiterate, and re-allege each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect all if more fully set forth herein.

258.    Plaintiffs brings this cause of action pursuant to Missouri's consumer protection statutes, the Missouri Merchandising Practices Act ("MMPA"), Mo. Rev. Stat. 407.025. Defendant fraudulently, intentionally, and negligently misrepresented to the public, and to Plaintiffs, both directly and by and through the media and purported "community outreach" programs, the safety of Roundup products, and fraudulently, intentionally, and negligently concealed, suppressed, or omitted material, adverse information regarding the safety of Roundup. This deception caused injury to Plaintiffs and Decedent in violation of the MMPA, which provide a private right of action by Plaintiffs.

259.    The intentional, negligent, and innocent misrepresentations and omissions of Defendant regarding the safety of Roundup products were communicated to Decedent directly through national and regional advertising, marketing and promotional efforts, as well as the

Roundup packaging and sales aids.  The safety of Roundup products was also intentionally, negligently, and innocently misrepresented to Decedent and the public with the intent that such misrepresentations would cause Decedent and other potential consumers to purchase and use or continue to purchase and use Roundup products.

260.    Defendant either knew or should have known of the material representations it was making regarding the safety and relative utility of Roundup products.

261.    Defendant fraudulently, intentionally, negligently, and innocently made the misrepresentations and actively concealed, suppressed, or omitted this material information with the specific desire to induce Decedent and the consuming public to purchase and use Roundup products.  Defendant fraudulently, intentionally, negligently, and innocently, knew or should have known that Decedent and the consuming public would rely on such material misrepresentations and/or omissions in selecting and applying Roundup products.  Defendant knew or should have known that Decedent would rely on its false representations and omissions.

262.    Defendant made these misrepresentations and actively concealed adverse information including the risk of non-Hodgkin's Lymphoma, at a time when its agents and/or employees knew or should have known the product had defects, dangers, and characteristics that were other than what was represented to the consuming public.   Specifically, Defendant misrepresented and actively concealed, suppressed, and omitted that there had been inadequate testing of the safety and efficacy of Roundup, and that prior studies, research, reports, and/or testing had been conducted linking the use of the drug with serious health events, including non-Hodgkin's Lymphoma.

263.    Despite the fact that Defendant knew or should have known of reports of severe risks including non-Hodgkin's Lymphoma with Roundup use and exposure, this information

46

was strategically minimized, understated, or omitted in order to create the impression that the human dangers of Roundup were nonexistent, particularly in light of its purported utility.

264. The fraudulent, intentional, negligent and/or innocent material misrepresentations and active concealment, suppression, and omissions by Defendant were perpetuated directly and indirectly through the advertisements, packaging, sales aids, furtive public relations efforts, and other marketing and promotional pieces authored, analyzed, created, compiled, designed, drafted, disseminated, distributed, edited, evaluated, marketed, published, and supplied by Defendant.

265. If Decedent had known the true facts concerning the risks associated with Roundup exposure, Decedent would have used a safer alternative.

266. Decedent's reliance upon the material misrepresentations and omissions was justified, among other reasons, because said misrepresentations and omissions were made by individuals and entities who were in a position to know the true facts concerning Roundup. Decedent was not in a position to know the true facts because Defendant overstated the benefits and safety of Roundup and downplayed the risk of lymphoma, thereby inducing Decedent to use the herbicide rather than safer alternatives.

267. Federal law and the EPA do not authorize and specifically prohibit the deceptions, misrepresentations and omissions made by Defendant.

268. As a direct and proximate result of Decedent's use of Roundup as manufactured, designed, sold, supplied and introduced into the stream of commerce by Defendant, Decedent and Plaintiffs suffered personal injury, subsequent death, non-economic damages, and will continue to suffer such harm and damages in the future.

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in Plaintiffs' favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees, and all such other and further relief as this Court deems proper and just. Plaintiffs also demand a jury trial on the issues contained herein.

**EIGHTH CLAIM FOR RELIEF**
**MISSOURI PRODUCTS LIABILITY-DEFECTIVE CONDITION**

269.     Plaintiffs repeat, reiterate, and re-allege each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect all if more fully set forth herein.

270.     Missouri Statute § 537.760 states that a "products liability claim" means a claim or portion of a claim in which Plaintiffs seeks relief in the form of damages on a theory that the defendant is strictly liable for such damages because: (1) the defendant, wherever situated in the chain of commerce, transferred a product in the course of his business; and (2) the product was used in a manner reasonably anticipated; and (3) either or both of the following: (a) the product was then in a defective condition unreasonably dangerous when put to a reasonably anticipated use, and Plaintiffs were damaged as a direct result of such defective condition as existed when the product was sold; or (b) the product was then unreasonably dangerous when put to a reasonably anticipated use without knowledge of its characteristics, and Plaintiffs were damaged as a direct result of the product being sold without an adequate warning.

271.     Defendant designed, researched, manufactured, tested, advertised, promoted, sold, and distributed Roundup as hereinabove described that was used by Decedent.

272.     Defendant's Roundup was expected to and did reach the usual consumers, handlers, and persons coming into contact with said product without substantial change in the

condition in which it was produced, manufactured, sold, distributed, and marketed by Defendant.

273. At those times, Roundup was in an unsafe, defective, and inherently dangerous condition, which was dangerous to users, and in particular, Decedent herein.

274. The Roundup designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed by Defendant was defective in design or formulation in that, when it left the hands of the manufacturer and suppliers, the foreseeable risks exceeded the benefits associated with the design or formulation of Roundup.

275. The Roundup designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed by Defendant was defective in design and/or formulation, in that, when it left the hands of Defendant manufacturers and/or suppliers, it was unreasonably dangerous, unreasonably dangerous in normal use, and it was more dangerous than an ordinary consumer would expect.

276. Roundup was in a defective condition and unsafe, and Defendant knew or had reason to know that said product was defective and unsafe, especially when used in the form and manner as provided by Defendant. In particular, Defendant's Roundup was defective in the following ways:

277. In addition, when Roundup left control of Defendant, there were practical and feasible alternative designs, which would have prevented and/or significantly reduced the risk of Decedent's injury without impairing the reasonably anticipated or intended function of the product. These safer alternative designs were economically and technologically feasible, and would have prevented or significantly reduced the risk of Decedent's injuries without substantially impairing the product's utility.

278.    Defendant knew, or should have known, that its Roundup was in a defective condition, and was and is inherently dangerous and unsafe.

279.    Decedent was exposed to Defendant's Roundup, as described above, without knowledge of Roundup's dangerous characteristics.

280.    At the time of Decedent's use of and exposure to Roundup, Decedent used Roundup for the purposes and in a manner normally intended: as a broad-spectrum herbicide.

281.    Defendant voluntarily designed its Roundup with this knowledge of a dangerous condition for use by the public, and in particular the Decedent.

282.    Defendant had a duty to create a product that was not unreasonably dangerous for its normal, intended use.

283.    Defendant created a product that was and is unreasonably dangerous for its normal, intended use.

284.    Defendant marketed and promoted a product in such a manner so as to make it inherently defective as the product downplayed its suspected, probable, and established health risks inherent with its normal, intended use.

285.    The Roundup designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed by Defendant was manufactured defectively in that Roundup left the hands of Defendant in a defective condition and was unreasonably dangerous to its intended users.

286.    The Roundup designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed by Defendant reached its intended users in the same defective and unreasonably dangerous condition in which Defendant's Roundup was manufactured.

287.    Defendant designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed a defective product, which created an unreasonable risk to the health of consumers and to Decedent in particular, and Defendant is therefore strictly liable for the injuries sustained by Decedent and the Plaintiffs.

288.    Decedent could not, by the exercise of reasonable care, have discovered Roundup's defects herein mentioned or perceived its danger.

289.    By reason of the foregoing, Defendant has become strictly liable to Plaintiffs for the manufacturing, marketing, promoting, distribution, and selling of a defective product, Roundup.

290.    Defendant's defective design of Roundup amounts to willful, wanton, and reckless conduct by Defendant.

291.    Defects in Defendant's Roundup were the cause or a substantial factor in causing Decedent's and Plaintiffs' injuries.

292.    As a direct and proximate result of Decedent's use of Roundup as manufactured, designed, sold, supplied and introduced into the stream of commerce by Defendant, Decedent and Plaintiffs suffered personal injury, subsequent death, non-economic damages, and will continue to suffer such harm and damages in the future.

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in Plaintiffs' favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees, and all such other and further relief as this Court deems proper and just. Plaintiffs also demand a jury trial on the issues contained herein.

## NINETH CLAIM FOR RELIEF
## MISSOURI PRODUCTS LIABILITY – FAILURE TO
## WARN OF UNREASONABLE DANGER

293.    Plaintiffs repeat, reiterate, and re-allege each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect all if more fully set forth herein.

294.    Missouri Statute § 537.760 states that a "products liability claim" means a claim or portion of a claim in which Plaintiff seeks relief in the form of damages on a theory that the defendant is strictly liable for such damages because: (1) the defendant, wherever situated in the chain of commerce, transferred a product in the course of his business; and (2) the product was used in a manner reasonably anticipated; and (3) either or both of the following: (a) the product was then in a defective condition unreasonably dangerous when put to a reasonably anticipated use, and the Plaintiff was damaged as a direct result of such defective condition as existed when the product was sold; or (b) the product was then unreasonably dangerous when put to a reasonably anticipated use without knowledge of its characteristics, and Plaintiff was damaged as a direct result of the product being sold without an adequate warning.

295.    Defendant has engaged in the business of selling, testing, distributing, supplying, manufacturing, marketing, and promoting Roundup, and through that conduct has knowingly and intentionally placed Roundup into the stream of commerce with full knowledge that Roundup reaches consumers such as Decedent who are exposed to it through ordinary and reasonably foreseeable uses

296.    Defendant did in fact sell, distribute, supply, manufacture, and promote Roundup to Decedent. Additionally, Defendant expected the Roundup that it was selling, distributing, supplying, manufacturing, and promoting to reach – and did in fact reach –

consumers, including Decedent, without any substantial change in the condition of the product from when the Roundup was initially distributed by Defendant.

297.  At the time of manufacture, Defendant could have provided the warnings or instructions regarding the full and complete risks of Roundup and glyphosate-containing products because it knew or should have known of the unreasonable risks of harm associated with the use of and exposure to such products.

298.  At all times herein mentioned, the aforesaid product was defective and unsafe in manufacture such that it was unreasonably dangerous to the user, and was so at the time it was distributed by Defendant and at the time Decedent was exposed to and/or ingested the product. The defective condition of Roundup was due in part to the fact that it was not accompanied by proper warnings regarding its carcinogenic qualities and possible side effects, including, but not limited to, developing non-Hodgkin's Lymphoma as a result of exposure and use.

299.  Roundup did not contain a warning or caution statement, which was necessary and, if complied with, was adequate to protect the health of those exposed in violation of the laws of the state of Missouri.

300.  Defendant's failure to include a warning or caution statement which was necessary and, if complied with, was adequate to protect the health of those exposed, violated the laws of the state of Missouri.

301.  Defendant could have amended the label of Roundup to provide additional warnings.

302.  This defect caused serious injury and subsequent death to Decedent, who used Roundup in its intended and foreseeable manner.

303. At all times herein mentioned, Defendant had a duty to properly design, manufacture, compound, test, inspect, package, label, distribute, market, examine, maintain supply, provide proper warnings, and take such steps to assure that the product did not cause users to suffer from unreasonable and dangerous side effects.

304. Defendant labeled, distributed, and promoted the aforesaid product that was dangerous and unsafe for the use and purpose for which it was intended.

305. Defendant failed to warn of the nature and scope of the side effects associated with Roundup, namely its carcinogenic properties and its propensity to cause or serve as a substantial contributing factor in the development of non-Hodgkin's Lymphoma.

306. Defendant was aware of the probable consequences of the aforesaid conduct. Despite the fact that Defendant knew or should have known that Roundup caused serious injuries, Defendant failed to exercise reasonable care to warn of the dangerous carcinogenic properties and the side effect of developing non-Hodgkin's Lymphoma from Roundup exposure, even though these side effects were known or reasonably scientifically knowable at the time of distribution. Defendant willfully and deliberately failed to avoid the consequences associated with its failure to warn, and in doing so, Defendant acted with a conscious disregard for the safety of the Decedent.

307. At the time of exposure, Decedent could not have reasonably discovered any defect in Roundup through the exercise of reasonable care.

308. Defendant, as the manufacturer and distributor of the subject product, is held to the level of knowledge of an expert in the field.

309. Plaintiffs and Decedent reasonably relied upon the skill, superior knowledge, and judgment of Defendant.

310.   Had Defendant properly disclosed the risks associated with Roundup products, Decedent would have avoided the risk of non-Hodgkin's Lymphoma by not using Roundup products.

311.   The information that Defendant did provide or communicate failed to contain adequate warnings and precautions that would have enabled Decedent, and similarly situated individuals, to utilize the product safely and with adequate protection.  Instead, Defendant disseminated information that was inaccurate, false, and misleading, and which failed to communicate accurately or adequately the comparative severity, duration, and extent of the risk of injuries associated with use of and exposure to Roundup and glyphosate; continued to promote the efficacy of Roundup, even after it knew or should have known of the unreasonable risks from use or exposure; and concealed, downplayed, or otherwise suppressed, through aggressive marketing and promotion, any information or research about the risks and dangers of exposure to Roundup and glyphosate.

312.   To this day, Defendant has failed to adequately warn of the true risks of Decedent's injuries associated with the use of and exposure to Roundup.

313.   As a result of its inadequate warnings, Defendant's Roundup products were defective and unreasonably dangerous when they left the possession and control of Defendant, were distributed by Defendant, and used by the Decedent.

314.   As a direct and proximate result of Decedent's use of Roundup as manufactured, designed, sold, supplied and introduced into the stream of commerce by Defendant, Plaintiffs and Decedent suffered personal injury, subsequent death, non-economic damages, and will continue to suffer such harm and damages in the future.

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in Plaintiffs' favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees, and all such other and further relief as this Court deems proper and just. Plaintiff also demands a jury trial on the issues contained herein.

## TENTH CLAIM FOR RELIEF
## WRONFUL DEATH

315.    Plaintiffs repeat, reiterate, and re-allege each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect all if more fully set forth herein.

316.    Plaintiffs bring this claim on behalf of and for the benefit of Decedent's lawful beneficiaries

317.    Plaintiffs bring this action for wrongful death of Decedent, who used Defendant's product and was injured and died as a result. Decedent was supplied with, and used said products as tested, studied, researched, evaluated, endorsed, designed, formulated, compounded, manufactured, produced, processed, assembled, inspected, distributed, marketed, labeled, promoted, packaged, advertised for sale, prescribed, sold or otherwise placed in the stream of interstate commerce by Defendants.

318.    The injuries and damages of Plaintiffs and Decedent were caused by the wrongful acts, omissions, and fraudulent misrepresentations of Defendants.

319.    As a direct and proximate result of the conduct of the Defendants and the defective nature of Roundup as outlined above, Decedent suffered bodily injury resulting in pain and suffering, disability, disfigurement, mental anguish, loss of capacity of the enjoyment of life, shortened life expectancy, expenses for hospitalization, medical and nursing treatment, funeral expenses and death.

320.     As a direct and proximate cause of the conduct of Defendant, Decedent's beneficiaries have incurred hospital, nursing and medical expenses, and estate administration expenses as a result of Decedent's death. Plaintiffs bring this claim on Decedent's lawful beneficiaries for these damages and for all pecuniary losses under applicable state statutory and/or common laws.

321.     As a direct and proximate cause of the conduct of Defendant and the exposure to and/or ingestion of Defendant's product, Decedent suffered fatal injuries.

322.     As a result of the death of Decedent, Plaintiffs were deprived of love, companionship, comfort, support, affection, society, solace and moral support of Decedent.

323.     Plaintiffs are entitled to recover economic and non-economic damages against all Defendant for wrongful death directly and legally caused by the defects in Defendant's product and the negligent conduct, acts, errors, omissions and intentional and negligent misrepresentations of Defendants, and each of them.

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in Plaintiffs' favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees, and all such other and further relief as this Court deems proper and just. Plaintiff also demands a jury trial on the issues contained herein.

## ELEVENTH CLAIM FOR RELIEF
## SURVIVAL ACTION

324.     Plaintiffs repeat, reiterate, and re-allege each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect all if more fully set forth herein.

325.     As a direct and proximate result of the conduct of Defendant, where appropriate, Decedent, prior to his death, was obligated to spend various sums of money to treat his injuries, which debts have been assumed by the Estate. As a direct and proximate cause of the aforesaid, Decedent endured pain and suffering, mental anguish and impairment of the enjoyment of life, until the date of

his death; and, as a direct and proximate result of the aforesaid, Decedent's lawful beneficiaries suffered a loss of earnings and earning capacity. Plaintiffs brings this claim on behalf of Decedent's estate under applicable state statutory and/or common laws.

326.     As a direct and proximate result of the conduct of Defendant, Decedent and his heirs, until the time of his death, suffered a disintegration and deterioration of the family unit and the relationships existing therein, resulting in enhanced anguish, depression and other symptoms of psychological stress and disorder.

327.     As a direct and proximate result of the aforesaid, and including the observance of the suffering and physical deterioration of Decedent until the date of his death, Plaintiffs have and will continue to suffer permanent and ongoing psychological damage which may require future psychological and medical treatment. Decedent's heirs, Plaintiffs Karis Yenzer, surviving spouse of and as the Special Administrator of the Estate of Douglas W. Yenzer, brings the claim on behalf of the estate for damages under applicable statutory and/or common laws, and in their own right.

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in Plaintiffs' favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees, and all such other and further relief as this Court deems proper and just. Plaintiff also demands a jury trial on the issues contained herein.

## TWELFTH CLAIM FOR RELIEF
## LOSS OF CONSORTIUM

328.     Plaintiffs repeat, reiterate, and re-allege each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect all if more fully set forth herein.

329.     At all times relevant to this action, Plaintiff Karis was and is the lawfully wedded wife of the Decedent.

330.    As a direct and proximate result of the injuries sustained by Decedent, Plaintiff Karis was and will be denied her lawful consortium and the conjugal benefits of her marital relationship including without limitation loss of support and society

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in Plaintiffs' favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees, and all such other and further relief as this Court deems proper and just. Plaintiff also demands a jury trial on the issues contained herein.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in Plaintiffs' favor and against Monsanto, awarding as follows:

A.  Compensatory damages in the form of medical expenses, out-of-pocket expenses, lost earnings, and other economic damages in an amount to be proven at trial;

B.  Compensatory damages for pain and suffering, emotional distress, loss of enjoyment of life, and other non-economic damages in an amount to be determined at trial;

C.  Punitive damages for the wanton, willful, fraudulent, and reckless acts of the Defendant who demonstrated a complete disregard and reckless indifference for the safety and welfare of the general public and to the Plaintiff in an amount sufficient to punish Defendant and deter future similar conduct, to the extent allowable by applicable law;

D.  Pre- and post-judgment interest;

E.  Costs including attorneys' fees, court costs, and other litigation expenses; and

F.  Any other relief that this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand trial by jury as to all issues.

DATED this 19th day of May, 2021.

KARIS YENZER, Individually and as the Special Administrator for the ESTATE OF DOUGLAS W. YENZER, the surviving spouse of Douglas W. Yenzer, on behalf of herself and all legal heirs of Douglas W. Yenzer, Plaintiffs,

By:     /s/ Christopher P. Welsh
       Christopher P. Welsh - MO #52413
       WELSH & WELSH, P.C., L.L.O.
       9290 West Dodge Road
       204 The Mark
       Omaha, NE  68114
       Phone: 402-384-8160
       Fax: 402-384-8211
       cwelsh@welsh-law.com



IN THE COUNTY COURT OF SARPY COUNTY, NEBRASKA

2021 APR 26  A.1 4:46

| | | |
|---|---|---|
| IN THE MATTER OF THE ESTATE OF | ) | No. 21-174 |
| | ) | |
| | ) | |
| Douglas W. Yenzer, | ) | LETTERS OF SPECIAL |
| Deceased | ) | ADMINISTRATOR |
| | ) | |
| | ) | |

THE STATE OF NEBRASKA

KNOW ALL MEN BY THESE PRESENTS:

WHEREAS, on ___April 26___, 2021 Karis Yenzer was appointed and qualified as Special Administrator for the above named decedent by this Court or its Registrar, with all the authority granted by law;

NOW THEREFORE, these Letters are issued as evidence of such appointment and qualifications and authority of Karis Yenzer to do and perform all acts which may be authorized by law.

IN WITNESS WHEREOF, the signature of Registrar of this Court, and the seal of this Court, on ___April 26___, 2021.

( S E A L )


_Michelle Kilgallon_
Signature of Registrar


**EXHIBIT**
**A**

NebDocs January 2015
NCLE Form 303
§§ 30 2444 & 30 2214



000962605C59