# U.S. District Court
# Western District of Louisiana (Lafayette)
# CIVIL DOCKET FOR CASE #: 6:21-cv-01252-RRS-CBW

Pellerin et al v. Monsanto Co
Assigned to: Judge Robert R Summerhays
Referred to: Magistrate Judge Carol B Whitehurst
Case in other court: USDC, Northern District of California,
                3:16-md-2741
Cause: 28:1332 Diversity-Product Liability

Date Filed: 05/11/2021
Jury Demand: Plaintiff
Nature of Suit: 365 Personal Inj. Prod. Liability
Jurisdiction: Diversity

**Plaintiff**

**Gilbert P Pellerin, Sr**   represented by   **Kenneth W DeJean**
Law Offices of Kenneth W DeJean
P O Box 4325
Lafayette, LA 70502
337-235-5294
Fax: 337-235-1095
Email: kwdejean@kwdejean.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Adam Russell Credeur**
Law Offices of Kenneth W DeJean
P O Box 4325
Lafayette, LA 70502
337-235-5294
Fax: 337-235-1095
Email: adam@kwdejean.com
*ATTORNEY TO BE NOTICED*

**Natalie Marie DeJean**
Law Offices of Kenneth W DeJean
P O Box 4325
Lafayette, LA 70502
337-235-5294
Fax: 337-235-1095
Email: natalie@kwdejean.com
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Deborah S Pellerin**   represented by   **Kenneth W DeJean**
(See above for address)
*LEAD ATTORNEY*

*ATTORNEY TO BE NOTICED*

**Adam Russell Credeur**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Natalie Marie DeJean**
(See above for address)
*ATTORNEY TO BE NOTICED*

V.

**<u>Defendant</u>**

**Monsanto Co**

| Date Filed | # | Docket Text |
|---|---|---|
| 05/11/2021 | 1 | COMPLAINT against Monsanto Co with Jury Demand (Filing fee $402, receipt number ALAWDC-4669351) filed by Gilbert P Pellerin, Sr, Deborah S Pellerin. (Attachments: # 1 Civil cover sheet)(Attorney Kenneth W DeJean added to party Deborah S Pellerin(pty:pla), Gilbert P Pellerin, Sr(pty:pla))(aty,DeJean, Kenneth) Modified on 5/11/2021 to modify docket text (Miletello, A). (Entered: 05/11/2021) |
| 05/11/2021 | | CASE Assigned to Judge Robert R Summerhays and Magistrate Judge Carol B Whitehurst. (crt,Miletello, A) (Entered: 05/11/2021) |
| 05/11/2021 | 2 | SUMMONS ISSUED as to Monsanto Co. (crt,Miletello, A) (Entered: 05/11/2021) |

| **PACER Service Center** | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 06/04/2021 09:23:23 | | | |
| **PACER Login:** | sh0019sh | **Client Code:** | 31943.356965 |
| **Description:** | Docket Report | **Search Criteria:** | 6:21-cv-01252-RRS-CBW |
| **Billable Pages:** | 2 | **Cost:** | 0.20 |

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE DIVISION

GILBERT P. PELLERIN, SR. and                    CIVIL ACTION NO.:
DEBORAH S. PELLERIN
                                                JUDGE:

v.
                                                MAGISTRATE JUDGE:

MONSANTO COMPANY                                JURY TRIAL DEMANDED

---

**ORIGINAL COMPLAINT**

---

## I.      NATURE OF THE CASE

1.      This is an action for damages suffered by Plaintiffs as a direct and proximate result of Defendant's negligent and wrongful conduct in connection with the design, development, manufacture, testing, packaging, promoting, marketing, advertising, distribution, labeling, and/or sale of the herbicide Roundup®, containing the active ingredient glyphosate.

2.      Plaintiffs maintain that Roundup® and/or glyphosate is defective, dangerous to human health, unfit and unsuitable to be marketed and sold in commerce and lacked proper warnings and directions as to the dangers associated with its use.

3. Plaintiffs' injuries, like those striking thousands of similarly situated victims across the country, were avoidable.

## II.      THE PARTIES

4.      Plaintiffs, GILBERT P. PELLERIN, SR. and DEBORAH S. PELLERIN, are citizens and residents of the city of Scott, Lafayette Parish, Louisiana. Plaintiff, Gilbert P. Pellerin, Sr. purchased and used Roundup and/or other Monsanto glyphosate-containing products ("Roundup") from approximately 1975 through approximately 2020, primarily in the state of

Louisiana, but also occasionally in Texas and Mississippi, and was diagnosed with Non-Hodgkin's Lymphoma in Louisiana in or around June 2014.

5.  "Roundup" refers to all formulations of Defendant's Roundup products, including, but not limited to, Roundup Concentrate Poison Ivy and Tough Brush Killer 1, Roundup Custom Herbicide, Roundup D-Pak herbicide, Roundup Dry Concentrate, Roundup Export Herbicide, Roundup Fence & Hard Edger 1, Roundup Garden Foam Weed & Grass Killer, Roundup Grass and Weed Killer, Roundup Herbicide, Roundup Original 2k herbicide, Roundup Original II Herbicide, Roundup Pro Concentrate, Roundup Prodry Herbicide, Roundup Promax, Roundup Quik Stik Grass and Weed Killer, Roundup Quikpro Herbicide, Roundup Rainfast Concentrate Weed & Grass Killer, Roundup Rainfast Super Concentrate Weed & Grass Killer, Roundup Ready-to-Use Extended Control Weed & Grass Killer 1 Plus Weed Preventer, Roundup Ready-to-Use Weed & Grass Killer, Roundup Ready-to-Use Weed and Grass Killer 2, Roundup Ultra Dry, Roundup Ultra Herbicide, Roundup Ultramax, Roundup VM Herbicide, Roundup Weed & Grass Killer Concentrate, Roundup Weed & Grass Killer Concentrate Plus, Roundup Weed & Grass Killer Ready-to-Use Plus, Roundup Weed & Grass Killer Super Concentrate, Roundup Weed & Grass Killer 1 Ready-to-Use, Roundup WSD Water Soluble Dry Herbicide Deploy Dry Herbicide, or any other formulation of containing the active ingredient glyphosate.

6.  Defendant, MONSANTO COMPANY, is a Delaware corporation with its headquarters and principal place of business in St. Louis, Missouri and is licensed to do and does business in the State of Louisiana.

7.  Defendant MONSANTO COMPANY is collectively referred to as "Monsanto" or "Defendant."

8.     At all times relevant to this complaint, Monsanto was the entity that discovered the herbicidal properties of glyphosate and the manufacturer of Roundup.

9.     Defendant advertises and sells goods, specifically Roundup, in the State of Louisiana.

10.     Defendant derived substantial revenue from goods and products used in the State of Louisiana.

11.     Defendant expected or should have expected its acts to have consequences within the State of Louisiana, and derived substantial revenue from interstate commerce.

12.     Defendant engaged in the business of designing, developing, manufacturing, testing, packaging, marketing, distributing, labeling, and/or selling Roundup.

13.     Defendant is authorized to do business in Louisiana and derives substantial income from doing business in this state.

14.     Upon information and belief, Defendant purposefully availed itself of the privilege of conducting activities with the State of Louisiana, thus invoking the benefits and protections of its laws.

15.     Upon information and belief, Defendant did design, sell, advertise, manufacture and/or distribute Roundup, with full knowledge of its dangerous and defective nature.

16.     The expiration of any applicable statute of limitations is equitably tolled by reason of Monsanto's fraudulent misrepresentations and fraudulent concealment, detailed more fully below.

### III.     BACKGROUND

17.     In 1970, Defendant Monsanto Company, Inc. discovered the herbicidal properties of glyphosate and began marketing it in products in 1974 under the brand name Roundup®. Roundup is a non-selective herbicide used to kill weeds that commonly compete with the

3

growing of crops. By 2001, glyphosate had become the most-used active ingredient in American agriculture with 85–90 millions of pounds used annually. That number grew to 185 million pounds by 2007. As of 2013, glyphosate was the world's most widely used herbicide.

18.    Monsanto is a multinational agricultural biotechnology corporation based in St. Louis, Missouri. It is the world's leading producer of glyphosate. As of 2009, Monsanto was the world's leading producer of seeds, accounting for 27% of the world seed market. The majority of these seeds are of the Roundup Ready® brand. The stated advantage of Roundup Ready® crops is that they substantially improve a farmer's ability to control weeds, since glyphosate can be sprayed in the fields during the growing season without harming their crops. In 2010, an estimated 70% of corn and cotton, and 90% of soybean fields in the United States were Roundup Ready®.

19.    Monsanto's glyphosate products are registered in 130 countries and approved for use on over 100 different crops. They are ubiquitous in the environment. Numerous studies confirm that glyphosate is found in rivers, streams, and groundwater in agricultural areas where Roundup® is used. It has been found in food, in the urine of agricultural workers, and even in the urine of urban dwellers who are not in direct contact with glyphosate.

20.    On March 20, 2015, the International Agency for Research on Cancer ("IARC"), an agency of the World Health Organization ("WHO"), issued an evaluation of several herbicides, including glyphosate. That evaluation was based, in part, on studies of exposures to glyphosate in several countries around the world, and it traces the health implications from exposure to glyphosate since 2001.

21.    On July 29, 2015, IARC issued the formal monograph relating to glyphosate. In that monograph, the IARC Working Group provides a thorough review of the numerous studies and data relating to glyphosate exposure in humans.

22.     The IARC Working Group classified glyphosate as a Group 2A herbicide, which means that it is probably carcinogenic to humans. The IARC Working Group concluded that the cancers most associated with glyphosate exposure are Non-Hodgkin's lymphoma and other haematopoietic cancers, including lymphocytic lymphoma/chronic lymphocytic leukemia, B-cell lymphoma, and multiple myeloma.

23.     The IARC evaluation is significant. It confirms what has been believed for years: that glyphosate is toxic to humans.

24.     Nevertheless, Monsanto, since it began selling Roundup, has represented it as safe to humans and the environment. Indeed, Monsanto and has repeatedly proclaimed and continues to proclaim to the world, and particularly to United States consumers, that glyphosate-based herbicides, including Roundup, create no unreasonable risks to human health or to the environment.

### IV.     JURISDICTION AND VENUE

25.     This Court has subject matter jurisdiction over Defendant pursuant to 28 U.S.C. § 1332 because Plaintiffs, Gilbert P. Pellerin, Sr. and Deborah S. Pellerin, are citizens of a different state from Defendant Monsanto's states of citizenship.

26.     The amount in controversy between Plaintiffs and Defendant exceeds $75,000, exclusive of interest and cost.

27.     Venue is proper within this district pursuant to 28 U.S.C. § 1391 in that Defendant conducts business here and is subject to personal jurisdiction in this district. Plaintiff, Gilbert P. Pellerin, Sr. purchased, used and was exposed to Roundup and glyphosate in this judicial district and his injuries and damages, including the development of Non-Hodgkin's Lymphoma, occurred within this judicial district. Furthermore, Defendant sells, markets, and/or distributes

Roundup within Louisiana. Also, a substantial part of the acts and/or omissions giving rise to these claims occurred within this District.

## V.     **FACTS**

28.    Glyphosate is a broad-spectrum, non-selective herbicide used in a wide variety of herbicidal products around the world.

29.    Plants treated with glyphosate translocate the systemic herbicide to their roots, shoot regions and fruit, where it interferes with the plant's ability to form aromatic amino acids necessary for protein synthesis. Treated plants generally die within two to three days. Because plants absorb glyphosate, it cannot be completely removed by washing or peeling produce or by milling, baking, or brewing grains.

30.    For nearly 40 years, farms across the world have used Roundup without knowing of the dangers its use poses. That is because when Monsanto first introduced Roundup, it touted glyphosate as a technological breakthrough: it could kill almost every weed without causing harm either to people or to the environment. Of course, history has shown that not to be true. According to the World Health Organization ("WHO"), the main chemical ingredient of Roundup—glyphosate—is a probable cause of cancer. Those most at risk are farm workers and other individuals with workplace exposure to Roundup, such as workers in garden centers, nurseries, and landscapers. Monsanto assured the public that Roundup was harmless. In order to prove this, Monsanto championed falsified data and attacked legitimate studies that revealed its dangers. Monsanto led a prolonged campaign of misinformation to convince government agencies, farmers and the general population that Roundup was safe.

### The Discovery of Glyphosate and Development of Roundup®

31.     The herbicidal properties of glyphosate were discovered in 1970 by Monsanto chemist John Franz. The first glyphosate-based herbicide was introduced to the market in the mid- 1970s under the brand name Roundup. From the outset, Monsanto marketed Roundup as a "safe" general-purpose herbicide for widespread commercial and consumer use. Monsanto still markets Roundup as safe today.

### Registration of Herbicides under Federal Law

32.     The manufacture, formulation and distribution of herbicides, such as Roundup, are regulated under the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA" or "Act"), 7 U.S.C. § 136 et seq. FIFRA requires that all pesticides be registered with the Environmental Protection Agency ("EPA" or "Agency") prior to their distribution, sale, or use, except as described by the Act. 7 U.S.C. § 136a(a).

33.     Because pesticides are toxic to plants, animals, and humans, at least to some degree, the EPA requires as part of the registration process, among other things, a variety of tests to evaluate the potential for exposure to pesticides, toxicity to people and other potential non-target organisms, and other adverse effects on the environment. Registration by the EPA, however, is not an assurance or finding of safety. The determination the Agency must make in registering or reregistering a product is not that the product is "safe," but rather that use of the product in accordance with its label directions "will not generally cause unreasonable adverse effects on the environment." 7 U.S.C. § 136a(c)(5)(D).

34.     FIFRA defines "unreasonable adverse effects on the environment" to mean "any unreasonable risk to man or the environment, taking into account the economic, social, and environmental costs and benefits of the use of any pesticide." 7 U.S.C. § 136(bb). FIFRA thus

requires EPA to make a risk/benefit analysis in determining whether a registration should be granted or allowed to continue to be sold in commerce.

35.     The EPA registered Roundup® for distribution, sale, and manufacture in the United States.

36.     FIFRA generally requires that the registrant, Monsanto in the case of Roundup, conducts the health and safety testing of pesticide products. The EPA has protocols governing the conduct of tests required for registration and the laboratory practices that must be followed in conducting these tests. The data produced by the registrant must be submitted to the EPA for review and evaluation. The government is not required, nor is it able, however, to perform the product tests that are required of the manufacturer.

37.     The evaluation of each pesticide product distributed, sold, or manufactured is completed at the time the product is initially registered. The data necessary for registration of a pesticide has changed over time. The EPA is now in the process of re-evaluating all pesticide products through a Congressionally-mandated process called "re-registration." 7 U.S.C. § 136a-1. In order to re-evaluate these pesticides, the EPA is demanding the completion of additional tests and the submission of data for the EPA's review and evaluation.

38.     In the case of glyphosate, and therefore Roundup, the EPA had planned on releasing its preliminary risk assessment —in relation to the re-registration process—no later than July 2015. The EPA completed its review of glyphosate in early 2015, but it delayed releasing the risk assessment pending further review in light of the WHO's health-related findings.

**Scientific Fraud Underlying the Marketing and Sale of Glyphosate/Roundup**

39.     Based on early studies that glyphosate could cause cancer in laboratory animals, the EPA originally classified glyphosate as possibly carcinogenic to humans (Group C) in 1985. After

pressure from Monsanto, including contrary studies it provided to the EPA, the EPA changed its classification to evidence of non-carcinogenicity in humans (Group E) in 1991. In so classifying glyphosate, however, the EPA made clear that the designation did not mean the chemical does not cause cancer: "It should be emphasized, however, that designation of an agent in Group E is based on the available evidence at the time of evaluation and should not be interpreted as a definitive conclusion that the agent will not be a carcinogen under any circumstances."

40.     On two occasions, the EPA found that the laboratories hired by Monsanto to test the toxicity of its Roundup products for registration purposes committed fraud.

41.     In the first instance, Monsanto, in seeking initial registration of Roundup by EPA, hired Industrial Bio-Test Laboratories ("IBT") to perform and evaluate pesticide toxicology studies relating to Roundup. IBT performed about 30 tests on glyphosate and glyphosate-containing products, including nine of the 15 residue studies needed to register Roundup.

42.     In 1976, the United States Food and Drug Administration ("FDA") performed an inspection of Industrial Bio-Test Industries ("IBT") that revealed discrepancies between the raw data and the final report relating to the toxicological impacts of glyphosate. The EPA subsequently audited IBT; it too found the toxicology studies conducted for the Roundup herbicide to be invalid. An EPA reviewer stated, after finding "routine falsification of data" at IBT, that it was "hard to believe the scientific integrity of the studies when they said they took specimens of the uterus from male rabbits."

43.     Three top executives of IBT were convicted of fraud in 1983.

44.     In the second incident of data falsification, Monsanto hired Craven Laboratories in 1991 to perform pesticide and herbicide studies, including for Roundup. In that same year, the owner

of Craven Laboratories and three of its employees were indicted, and later convicted, of fraudulent laboratory practices in the testing of pesticides and herbicides.

45.     Despite the falsity of the tests that underlie its registration, within a few years of its launch, Monsanto was marketing Roundup in 115 countries.

46.     Multiple studies have been ghostwritten in part and/or published by Monsanto through companies such as Intertek and Exponent, Inc. from 2000-present which minimize any safety concerns about the use of glyphosate; are used to convince regulators to allow the sale of Roundup and are used to convince customers to use Roundup. Such studies include but are not limited to Williams (2000); Williams (2012); Kier & Kirkland (2013); Kier (2015); Bus (2016); Chang (2016); and the Intertek Expert Panel Manuscripts. All of these studies have been submitted to and relied upon the public and the EPA in assessing the safety of glyphosate. Through these means Monsanto has fraudulently represented that independent scientists have concluded that Glyphosate is safe. In fact, these independent experts have been paid by Monsanto and have failed to disclose the significant role Monsanto had in creating the manuscripts. Monsanto has further ghostwritten editorials for scientists such as Robert Tarone and Henry Miller to advocate for the safety of glyphosate in Newspapers and Magazines. Monsanto has also ghostwritten letters by supposed independent scientists submitted to regulatory agencies who are reviewing the safety of glyphosate.

47.     Monsanto has also violated federal regulations in holding secret ex parte meetings and conversations with certain EPA employees to collude in a strategy to re-register glyphosate and to quash investigations into the carcinogenicity of glyphosate by other federal agencies such as the Agency for Toxic Substances and Disease Registry. Monsanto's close connection with the EPA arises in part from its offering of lucrative consulting positions to retiring EPA officials.

48.     In March 2015, The Joint Glyphosate Task Force at Monsanto's behest issued a press release sharply criticizing IARC, stating that IARC's conclusion was "baffling" and falsely claiming that "IARC did not consider any new or unique research findings when making its decision. It appears that only by deciding to exclude certain available scientific information and by adopting a different approach to interpreting the studies was this possible."

49.     Beginning in 2011, the Federal Institute for Risk Assessment (BfR) in Germany began preparing a study on the safety of glyphosate. Through the Glyphosate Task Force, Defendant was able to co-opt this study becoming the sole providers of data and ultimately wrote the report which was rubber-stamped by the BfR. The Glyphosate Task Force was solely responsible for preparing and submitting summary of studies relied upon by the by the BfR. Defendant has used this report, which it wrote, to falsely proclaim the safety of glyphosate.

50.     In October 2015, the Defendant, as a member of the Joint Glyphosate Task Force, wrote to the state of California to try to stop California from warning the public about the carcinogenicity of glyphosate arguing that the IARC classification is mistaken. In January of 2016 Monsanto filed a lawsuit to stop California from warning the public about the carcinogenicity of glyphosate.

**The Importance of Roundup® to Monsanto's Market Dominance Profits**

51.     The success of Roundup was key to Monsanto's continued reputation and dominance in the marketplace. Largely due to the success of Roundup sales, Monsanto's agriculture division was outperforming its chemicals division's operating income, and that gap increased yearly. But with its patent for glyphosate expiring in the United States in the year 2000, Monsanto needed a strategy to maintain its Roundup market dominance and to ward off impending competition.

52.     In response, Monsanto began the development and sale of genetically engineered Roundup Ready seeds in 1996. Since Roundup Ready crops are resistant to glyphosate; farmers can spray Roundup onto their fields during the growing season without harming the crop. This allowed Monsanto to expand its market for Roundup even further; by 2000, Monsanto's biotechnology seeds were planted on more than 80 million acres worldwide and nearly 70% of American soybeans were planted from Roundup Ready seeds. It also secured Monsanto's dominant share of the glyphosate/Roundup market through a marketing strategy that coupled proprietary Roundup Ready seeds with continued sales of its Roundup herbicide.

53.     Through a three-pronged strategy of increased production, decreased prices and by coupling with Roundup Ready seeds, Roundup became Monsanto's most profitable product. In 2000, Roundup accounted for almost $2.8 billion in sales, outselling other herbicides by a margin of five to one, and accounting for close to half of Monsanto's revenue. Today, glyphosate remains one of the world's largest herbicides by sales volume.

**Monsanto has known for decades that it falsely advertises the safety of Roundup®.**

54.     In 1996, the New York Attorney General ("NYAG") filed a lawsuit against Monsanto based on its false and misleading advertising of Roundup products. Specifically, the lawsuit challenged Monsanto's general representations that its spray-on glyphosate-based herbicides, including Roundup, were "safer than table salt" and "practically non-toxic" to mammals, birds, and fish. Among the representations the NYAG found deceptive and misleading about the human and environmental safety of Roundup are the following:

   a.      Remember that environmentally friendly Roundup herbicide is biodegradable. It won't build up in the soil, so you can use Roundup with confidence along customers' driveways, sidewalks and fences ...

b.      And remember that Roundup is biodegradable and won't build up in the soil. That will give you the environmental confidence you need to use Roundup everywhere you've got a weed, brush, edging or trimming problem.

c.      Roundup biodegrades into naturally occurring elements.

d.      Remember that versatile Roundup herbicide stays where you put it. That means there's no washing or leaching to harm customers' shrubs or other desirable vegetation.

e.      This non-residual herbicide will not wash or leach in the soil. It ... stays where you apply it.

f.      You can apply Accord with "confidence because it will stay where you put it" it bonds tightly to soil particles, preventing leaching. Then, soon after application, soil microorganisms biodegrade Accord into natural products.

g.      Glyphosate is less toxic to rats than table salt following acute oral ingestion.

h.      Glyphosate's safety margin is much greater than required. It has over a 1,000-fold safety margin in food and over a 700-fold safety margin for workers who manufacture it or use it.

i.      You can feel good about using herbicides by Monsanto. They carry a toxicity category rating of 'practically non-toxic' as it pertains to mammals, birds and fish.

j.      "Roundup can be used where kids and pets will play and breaks down into natural material." This ad depicts a person with his head in the ground and a pet dog standing in an area which has been treated with Roundup.

55.   On November 19, 1996, Monsanto entered into an Assurance of Discontinuance with NYAG, in which Monsanto agreed, among other things, "to cease and desist from publishing or broadcasting any advertisements [in New York] that represent, directly or by implication" that:

a.      Its glyphosate-containing pesticide products or any component thereof are safe, non-toxic, harmless or free from risk.

b.      Its glyphosate-containing pesticide products or any component thereof manufactured, formulated, distributed or sold by Monsanto are biodegradable.

c.      Its glyphosate-containing pesticide products or any component thereof stay where they are applied under all circumstances and will not move through the environment by any means.

  d.  Its glyphosate-containing pesticide products or any component thereof are "good" for the environment or are "known for their environmental characteristics."

  e.  Glyphosate-containing pesticide products or any component thereof are safer or less toxic than common consumer products other than herbicides;

  f.  Its glyphosate-containing products or any component thereof might be classified as "practically non-toxic."

56. Monsanto did not alter its advertising in the same manner in any state other than New York, and on information and belief still has not done so today.

57. In 2009, France's highest court ruled that Monsanto had not told the truth about the safety of Roundup. The French court affirmed an earlier judgment that Monsanto had falsely advertised its herbicide Roundup as "biodegradable" and that it "left the soil clean."

### Classifications and Assessments of Glyphosate

58. The IARC process for the classification of glyphosate followed the stringent procedures for the evaluation of a chemical agent. Over time, the IARC Monograph program has reviewed 980 agents. Of those reviewed, it has determined 116 agents to be Group 1 (Known Human Carcinogens); 73 agents to be Group 2A (Probable Human Carcinogens); 287 agents to be Group 2B (Possible Human Carcinogens); 503 agents to be Group 3 (Not Classified); and one agent to be Probably Not Carcinogenic.

59. The established procedure for IARC Monograph evaluations is described in the IARC Programme's Preamble. Evaluations are performed by panels of international experts, selected on the basis of their expertise and the absence of actual or apparent conflicts of interest.

60. One year before the Monograph meeting, the meeting is announced and there is a call both for data and for experts. Eight months before the Monograph meeting, the Working Group membership is selected, and the sections of the Monograph are developed by the Working Group members. One month prior to the Monograph meeting, the call for data is closed and the various

draft sections are distributed among Working Group members for review and comment. Finally, at the Monograph meeting, the Working Group finalizes review of all literature, evaluates the evidence in each category, and completes the overall evaluation. Within two weeks after the Monograph meeting, the summary of the Working Group findings are published in Lancet Oncology, and within a year after the meeting, the final Monograph is finalized and published.

61.     In assessing an agent, the IARC Working Group reviews the following information:

        a.      Human, experimental, and mechanistic data;

        b.      All pertinent epidemiological studies and cancer bioassays; and

        c.      Representative mechanistic data. The studies must be publicly available and have sufficient detail for meaningful review, and reviewers cannot be associated with the underlying study.

62.     In March 2015, IARC reassessed glyphosate. The summary published in The Lancet Oncology reported that glyphosate is a Group 2A agent and probably carcinogenic in humans.

63.     On July 29, 2015, IARC issued its Monograph for glyphosate, Monograph 112. For Volume 112, the volume that assessed glyphosate, a Working Group of 17 experts from 11 countries met at IARC from March 3–10, 2015, to assess the carcinogenicity of certain herbicides, including glyphosate. The March meeting culminated nearly a one-year review and preparation by the IARC Secretariat and the Working Group, including a comprehensive review of the latest available scientific evidence. According to published procedures, the Working Group considered "reports that have been published or accepted for publication in the openly available scientific literature" as well as "data from governmental reports that are publicly available."

64.     The studies considered the following exposure groups: occupational exposure of farmers and tree nursery workers in the United States, forestry workers in Canada and Finland and

municipal weed-control workers in the United Kingdom; and para-occupational exposure in farming families.

65.     Glyphosate was identified as the second-most used household herbicide in the United States for weed control between 2001 and 2007 and the most heavily used herbicide in the world in 2012.

66.     Exposure pathways are identified as air (especially during spraying), water, and food. Community exposure to glyphosate is widespread and found in soil, air, surface water, and groundwater, as well as in food.

67.     The assessment of the IARC Working Group identified several case control studies of occupational exposure in the United States, Canada, and Sweden. These studies show a human health concern from agricultural and other work-related exposure to glyphosate.

68.     The IARC Working Group found an increased risk between exposure to glyphosate and Non-Hodgkin's lymphoma ("NHL") and several subtypes of NHL, and the increased risk persisted after adjustment for other pesticides.

69.     The IARC Working Group also found that glyphosate caused DNA and chromosomal damage in human cells. One study in community residents reported increases in blood markers of chromosomal damage (micronuclei) after glyphosate formulations were sprayed.

70.     In male CD-1 mice, glyphosate induced a positive trend in the incidence of a rare tumor, renal tubule carcinoma. A second study reported a positive trend for haemangiosarcoma in male mice. Glyphosate increased pancreatic islet-cell adenoma in male rats in two studies. A glyphosate formulation promoted skin tumors in an initiation-promotion study in mice.

71.     The IARC Working Group also noted that glyphosate has been detected in the urine of agricultural workers, indicating absorption. Soil microbes degrade glyphosate to

aminomethylphosphoric acid (AMPA). Blood AMPA detection after exposure suggests intestinal microbial metabolism in humans.

72.     The IARC Working Group further found that glyphosate and glyphosate formulations induced DNA and chromosomal damage in mammals, and in human and animal cells in utero.

73.     The IARC Working Group also noted genotoxic, hormonal, and enzymatic effects in mammals exposed to glyphosate. Essentially, glyphosate inhibits the biosynthesis of aromatic amino acids, which leads to several metabolic disturbances, including the inhibition of protein and secondary product biosynthesis and general metabolic disruption.

74.     The IARC Working Group also reviewed an Agricultural Health Study, consisting of a prospective cohort of 57,311 licensed pesticide applicators in Iowa and North Carolina. While this study differed from others in that it was based on a self-administered questionnaire, the results support an association between glyphosate exposure and Multiple Myeloma, Hairy Cell Leukemia (HCL), and Chronic Lymphocytic Leukemia (CLL), in addition to several other cancers.

**Other Earlier Findings About Glyphosate's Dangers to Human Health**

75.     Despite the new classification by the IARC, Defendant previously had ample evidence of glyphosate and Roundup's genotoxic properties for decades.

76.     Genotoxicity refers to chemical agents that are capable of damaging the DNA within a cell through genetic mutations, which is a process that is believed to lead to cancer.

77.     In 1997, Chris Clements published "Genotoxicity of select herbicides in Rana catesbeiana tadpoles using the alkaline single-cell gel DNA electrophoresis (comet) assay."

78.     The study found that tadpoles exposed to Roundup showed significant DNA damage when compared with unexposed control animals.

17

79.     Both human and animal studies have shown that glyphosate and glyphosate-based formulations such as Roundup can induce oxidative stress.

80.     Oxidative stress and associated chronic inflammation are believed to be involved in carcinogenesis.

81.     The IARC Monograph notes that "[s]trong evidence exists that glyphosate, AMPA and glyphosate-based formulations can induce oxidative stress."

82.     In 2006 César Paz-y-Miño published a study examining DNA damage in human subjects exposed to glyphosate.

83.     The study produced evidence of chromosomal damage in blood cells showing significantly greater damage after exposure to glyphosate than before in the same individuals, suggesting that the glyphosate formulation used during aerial spraying had a genotoxic effect on exposed individuals.

84.     The IARC Monograph reflects the volume of evidence of glyphosate pesticides' genotoxicity noting "[t]he evidence for genotoxicity caused by glyphosate-based formulations is strong."

85.     Despite knowledge to the contrary, Defendant maintains that there is no evidence that Roundup is genotoxic, that regulatory authorities and independent experts are in agreement that Roundup is not genotoxic, and that there is no evidence that Roundup is genotoxic.

86.     In addition to glyphosate and Roundup's genotoxic properties, Defendant has long been aware of glyphosate's carcinogenic properties.

87.     Glyphosate and Roundup in particular have long been associated with carcinogenicity and the development of numerous forms of cancer, including, but not limited to, Non-Hodgkin's lymphoma, Hodgkin's lymphoma, multiple myeloma, and soft tissue sarcoma.

88.     Defendant has known of this association since the early to mid-1980s and numerous human and animal studies have evidenced the carcinogenicity of glyphosate and/or Roundup.

89.     In 1985, the EPA studied the effects of glyphosate in mice finding a dose related response in male mice linked to renal tubal adenomas, a rare tumor. The study concluded the glyphosate was oncogenic.

90.     In 2003, Lennart Hardell and Mikael Eriksson published the results of two case-controlled studies on pesticides as a risk factor for NHL and hairy cell leukemia.

91.     The study concluded that glyphosate had the most significant relationship to NHL among all herbicides studies with an increased odds ratio of 3.11.

92.     In 2003, AJ De Roos published a study examining the pooled data of mid-western farmers, examining pesticides and herbicides as risk factors for NHL.

93.     The study, which controlled for potential confounders, found a relationship between increased NHL incidence and glyphosate.

94.     In 2008 Mikael Eriksson published a population-based case-control study of exposure to various pesticides as a risk factor for NHL.

95.     This strengthened previous associations between glyphosate and NHL.

96.     In spite of this knowledge, Defendant continued to issue broad and sweeping statements suggesting that Roundup was, and is, safer than ordinary household items such as table salt, despite a lack of scientific support for the accuracy and validity of these statements and, in fact, voluminous evidence to the contrary.

97.     Upon information and belief, these statements and representations have been made with the intent of inducing Plaintiff, Gilbert P. Pellerin, Sr., the agricultural community, and the

public at large to purchase and increase the use of Defendant's Roundup for Defendant's pecuniary gain, and in fact, did induce Plaintiff, Gilbert P. Pellerin, Sr., to use Roundup.

98.     Defendant made these statements with complete disregard and reckless indifference to the safety of Plaintiff, Gilbert P. Pellerin, Sr., and the general public.

99.     Notwithstanding Defendant's representations, scientific evidence has established a clear association between glyphosate and genotoxicity, inflammation, and an increased risk of many cancers, including, but not limited to, NHL, Multiple Myeloma, and soft tissue sarcoma.

100.     Defendant knew or should have known that glyphosate is associated with an increased risk of developing cancer, including, but not limited to, NHL, Multiple Myeloma, and soft tissue sarcomas.

101.     Defendant failed to appropriately and adequately inform and warn Plaintiff, Gilbert P. Pellerin, Sr., of the serious and dangerous risks associated with the use of and exposure to glyphosate and/or Roundup, including, but not limited to, the risk of developing NHL, as well as other severe and personal injuries, which are permanent and/or long-lasting in nature, cause significant physical pain and mental anguish, diminished enjoyment of life, and the need for medical treatment, monitoring and/or medications.

102.     Despite the IARC's classification of glyphosate as a class 2A probable carcinogen, Defendant continues to maintain that glyphosate and/or Roundup is safe, non-carcinogenic, nongenotoxic, and falsely warrant to users and the general public that independent experts and regulatory agencies agree that there is no evidence of carcinogenicity or genotoxicity in glyphosate and Roundup.

103.     Defendant has claimed and continues to claim that Roundup is safe, noncarcinogenic, and non-genotoxic. These misrepresentations are consistent with Defendant's cavalier approach to

investigating and ensuring the safety of its products, the safety of the public at large, and the safety of Plaintiff, Gilbert P. Pellerin, Sr.

## Release Patterns

104.    Glyphosate is released to the environment in its use as a herbicide for controlling woody and herbaceous weeds on forestry, right-of-way, cropped and non-cropped sites. These sites may be around water and in wetlands. It may also be released to the environment during its manufacture, formulation, transport, storage, disposal and cleanup, and from spills. Since glyphosate is not a listed chemical in the Toxics Release Inventory, data on releases during its manufacture and handling are not available. Occupational workers and home gardeners may be exposed to glyphosate by inhalation and dermal contact during spraying, mixing, and cleanup. They may also be exposed by touching soil and plants to which glyphosate was applied. Occupational exposure may also occur during glyphosate's manufacture, transport storage, and disposal.

105.    In 1995, the Northwest Coalition for Alternatives to Pesticides reported that in California, the state with the most comprehensive program for reporting of pesticide-caused illness, glyphosate was the third most commonly reported cause of pesticide illness among agricultural workers.

## Recent Worldwide Bans on Roundup®/Glyphosate

106.    Several countries around the world have instituted bans on the sale of Roundup and other glyphosate-containing herbicides, both before and since IARC first announced its assessment for glyphosate in March 2015, and more countries undoubtedly will follow suit in light of the as the dangers of the use of Roundup are more widely known. The Netherlands issued a ban on all glyphosate-based herbicides in April 2014, including Roundup, which takes effect by the end of

2015. In issuing the ban, the Dutch Parliament member who introduced the successful legislation stated: "Agricultural pesticides in user-friendly packaging are sold in abundance to private persons. In garden centers, Roundup is promoted as harmless, but unsuspecting customers have no idea what the risks of this product are. Especially children are sensitive to toxic substances and should therefore not be exposed to it."

107.    The Brazilian Public Prosecutor in the Federal District requested that the Brazilian Justice Department suspend the use of glyphosate.

108.    France banned the private sale of Roundup and glyphosate following the IARC assessment for Glyphosate.

109.    Bermuda banned both the private and commercial sale of glyphosates, including Roundup. The Bermuda government explained its ban as follows: "Following a recent scientific study carried out by a leading cancer agency, the importation of weed spray 'Roundup' has been suspended."

110.    The Sri Lankan government banned the private and commercial use of glyphosates, particularly out of concern that Glyphosate has been linked to fatal kidney disease in agricultural workers.

111.    The government of Columbia announced its ban on using Roundup and glyphosate to destroy illegal plantations of coca, the raw ingredient for cocaine, because of the WHO's finding that glyphosate is probably carcinogenic.

## VI.    PLAINTIFF'S EXPOSURE TO ROUNDUP

112.    Plaintiff, Gilbert P. Pellerin, Sr. used Roundup beginning approximately in 1975 and continued to use the product until 2020.

113.    For years, Gilbert P. Pellerin, Sr. sprayed Roundup on a regular basis.

114.    Plaintiff, Gilbert P. Pellerin, Sr., was subsequently diagnosed with a form of Non-Hodgkin's lymphoma in or around June 2014. The development of Gilbert P. Pellerin, Sr.'s Non-Hodgkin's lymphoma was proximately and actually caused by exposure to Defendant's Roundup products.

115.    As a result of these injuries, Plaintiff, Gilbert P. Pellerin, Sr., has incurred significant economic and noneconomic damages.

## VII.    TOLLING OF THE STATUTE OF LIMITATIONS

### Discovery Rule Tolling

116.    Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

117.    Plaintiff, Gilbert P. Pellerin, Sr., has suffered an illness that has a latency period and does not arise until years after exposure. Plaintiff had no way of knowing about the risks of serious illness associated with the use of and/or exposure to Roundup® and glyphosate until he was made aware that his NHL could be caused by his use of and/or exposure to Roundup®. Consequently, the discovery rule applies to this case, and the statute of limitations has been tolled until the day that Plaintiff knew or had reason to know that his NHL was linked to his use of and/or exposure to Roundup®.

118.    Within the time period of any applicable statutes of limitations or prescriptive periods, Plaintiff could not have discovered, through the exercise of reasonable diligence, that exposure to Roundup® and glyphosate is injurious to human health.

119.    Plaintiff, Gilbert P. Pellerin, did not discover and did not know of facts that would cause a reasonable person to suspect, the risks associated with the use of and/or exposure to Roundup® and glyphosate; nor would a reasonable and diligent investigation by him have disclosed that Roundup® and glyphosate would cause his Non-Hodgkin's Lymphoma.

120.    Furthermore, the running of the statute of limitations has been equitably tolled by reason of Defendant's fraudulent concealment and conduct, as alleged above. Through its affirmative misrepresentations and omissions, Defendant actively concealed from Plaintiff the true risks associated with use of or exposure to Roundup®.

121.    As a result of Defendant's actions, Plaintiff was unaware, and could not reasonably know or have learned through reasonable diligence, that Plaintiff had been exposed to the risks alleged herein and that those risks were the direct and proximate result of Defendant's acts and omissions.

122.    Furthermore, Defendant is estopped from relying on any statute of limitations or prescriptive period because of its concealment of the truth regarding the safety of Roundup®. Defendant was under a duty to disclose the true character, quality and nature of Roundup® because this was non-public information over which it continues to have exclusive control. Defendant knew that this information was not available to Plaintiff, yet it failed to disclose the information to the public.

123.    Defendant had the ability to and did spend enormous amounts of money in furtherance of its purposes of marketing and promoting a profitable product, notwithstanding the known or reasonably knowable risks. Plaintiff could not have afforded to and could not have possibly conducted studies to determine the nature, extent and identity of related health risks, and he was forced to rely on Defendant's representations.

124.    For these reasons, all applicable statutes of limitations and prescriptive periods have been tolled by operation of the discovery rule with respect to Plaintiff's claims.

## Estoppel

125.    Monsanto was under a continuous duty to disclose to consumers, users and other persons coming into contact with its products, including Plaintiff, accurate safety information concerning its products and the risks associated with the use of and/or exposure to Roundup® and glyphosate.

126.    Instead, Monsanto knowingly, affirmatively, and actively concealed safety information concerning Roundup® and glyphosate and the serious risks associated with the use of and/or exposure to its products.

127.    Based on the foregoing, Monsanto is estopped from relying on any statutes of limitations in defense of this action.

## VIII.   LIMITATION ON ALLEGATIONS

128.     Plaintiffs incorporate by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

129.    The allegations in this pleading are made pursuant to Louisiana Law. To the extent Louisiana Law imposes a duty or obligation on Monsanto that exceeds those required by federal law, Plaintiff does not assert such claims.

130.    As alleged in this pleading, in addition to violating Louisiana Law, Monsanto violated 7 U.S.C. § 136j and 40 C.F.R. § 156.10(a)(5) by distributing Roundup®, which was misbranded pursuant to 7 U.S.C. § 136(g). Federal law specifically prohibits the distribution of a misbranded herbicide.

## IX.   CLAIMS

## COUNT ONE

## NEGLIGENCE

131.   Plaintiffs incorporate by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

132.   Defendant had a duty to exercise reasonable care in the designing, researching, testing, manufacturing, marketing, supplying, promoting, packaging, sale, and/or distribution of Roundup into the stream of commerce, including a duty to assure that the product would not cause users to suffer unreasonable, dangerous side effects.

133.   Defendant failed to exercise ordinary care in the designing, researching, testing, manufacturing, marketing, supplying, promoting, packaging, sale, testing, quality assurance, quality control, and/or distribution of Roundup into interstate commerce in that Defendant knew or should have known that using Roundup created a high risk of unreasonable, dangerous side effects, including, but not limited to, the development of NHL, as well as other severe and personal injuries which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life, as well as need for lifelong medical treatment, monitoring, and/or medications.

134.   The negligence by the Defendant, its agents, servants, and/or employees, included but was not limited to the following acts and/or omissions:

     a.    Manufacturing, producing, promoting, formulating, creating, and/or designing Roundup without thoroughly testing it;

     b.    Failing to test Roundup and/or failing to adequately, sufficiently, and properly test Roundup;

c.  Not conducting sufficient testing programs to determine whether or not Roundup was safe for use; in that Defendant herein knew or should have known that Roundup was unsafe and unfit for use by reason of the dangers to its users;

d.  Not conducting sufficient testing programs and studies to determine Roundup's carcinogenic properties even after Defendant had knowledge that Roundup is, was, or could be carcinogenic;

e.  Failing to conduct sufficient testing programs to determine the safety of "inert" ingredients and/or adjuvants contained within Roundup, and the propensity of these ingredients to render Roundup toxic, increase the toxicity of Roundup, whether these ingredients are carcinogenic, magnify the carcinogenic properties of Roundup, and whether or not "inert" ingredients and/or adjuvants were safe for use;

f.  Negligently failing to adequately and correctly warn the Plaintiff, the public, the medical and agricultural professions, and the EPA of the dangers of Roundup;

g.  Negligently failing to petition the EPA to strengthen the warnings associated with Roundup;

h.  Failing to provide adequate cautions and warnings to protect the health of users, handlers, applicators, and persons who would reasonably and foreseeably come into contact with Roundup;

i.  Negligently marketing, advertising, and recommending the use of Roundup without sufficient knowledge as to its dangerous propensities;

j.  Negligently representing that Roundup was safe for use for its intended purpose, and/or that Roundup was safer than ordinary and common items such as table salt, when, in fact, it was unsafe;

k.  Negligently representing that Roundup had equivalent safety and efficacy as other forms of herbicides;

l.  Negligently designing Roundup in a manner, which was dangerous to its users;

m.  Negligently manufacturing Roundup in a manner, which was dangerous to its users;

n.  Negligently producing Roundup in a manner, which was dangerous to its users;

o.  Negligently formulating Roundup in a manner, which was dangerous to its users;

p.  Concealing information from the Plaintiff while knowing that Roundup was unsafe, dangerous, and/or non-conforming with EPA regulations; and

27

q. Improperly concealing and/or misrepresenting information from the Plaintiff, scientific and medical professionals, and/or the EPA, concerning the severity of risks and dangers of Roundup compared to other forms of herbicides.

r. Negligently selling Roundup with a false and misleading label.

135. Defendant under-reported, underestimated, and downplayed the serious dangers of Roundup.

136. Defendant negligently and deceptively compared the safety risks and/or dangers of Roundup with common everyday foods such as table salt, and other forms of herbicides.

137. Defendant was negligent and/or violated state law in the designing, researching, supplying, manufacturing, promoting, packaging, distributing, testing, advertising, warning, marketing, and selling of Roundup in that they:

a. Failed to use ordinary care in designing and manufacturing Roundup so as to avoid the aforementioned risks to individuals when Roundup was used as an herbicide;

b. Failed to accompany its product with proper and/or accurate warnings regarding all possible adverse side effects associated with the use of Roundup;

c. Failed to accompany its product with proper warnings regarding all possible adverse side effects concerning the failure and/or malfunction of Roundup;

d. Failed to accompany its product with accurate warnings regarding the risks of all possible adverse side effects concerning Roundup;

e. Failed to warn Plaintiff, Gilbert P. Pellerin, Sr., of the severity and duration of such adverse effects, as the warnings given did not accurately reflect the symptoms, or severity of the side effects including, but not limited to, the development of NHL;

f. Failed to conduct adequate testing, clinical testing and post-marketing surveillance to determine the safety of Roundup;

g. Failed to conduct adequate testing, clinical testing, and post-marketing surveillance to determine the safety of Roundup's "inert" ingredients and/or adjuvants;

       h.     Negligently misrepresented the evidence of Roundup's genotoxicity and carcinogenicity;

       i.     Was otherwise careless and/or negligent.

138.    Despite the fact that Defendant knew or should have known that Roundup caused, or could cause, unreasonably dangerous side effects, Defendant continued and continues to market, manufacture, distribute, and/or sell Roundup to consumers, including Plaintiff, Gilbert P. Pellerin, Sr.

139.    Defendant knew or should have known that consumers such as Plaintiff, Gilbert P. Pellerin, Sr., would foreseeably suffer injury as a result of Defendant's failure to exercise ordinary care, as set forth above.

140.    As a result of the foregoing acts and omissions, Plaintiff, Gilbert P. Pellerin, Sr., suffered from serious and dangerous side effects including, but not limited to, NHL, as well as other severe and personal injuries which are permanent and lasting in nature, physical pain and mental anguish, diminished enjoyment of life, and financial expenses for hospitalization and medical care. Further, Plaintiff, Gilbert P. Pellerin, Sr., suffered life-threatening NHL, and severe personal injuries, which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life.

      WHEREFORE, as a result of the foregoing acts and omissions, Plaintiffs, Gilbert P. Pellerin, Sr. and Deborah S. Pellerin, respectfully request that this Court enter judgment in Plaintiffs' favor for compensatory, general and punitive damages, together with interest, costs herein incurred, attorneys' fees and all such other and further relief as this Court deems just and proper.

## COUNT TWO

### BREACH OF DUTY IN THE MANUFACTURE
### UNDER THE LOUISIANA PRODUCTS LIABILITY ACT (LPLA)

141.    Plaintiffs incorporate by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

142.    Monsanto had a duty to exercise reasonable care in the design, research, manufacture, marketing, testing, advertisement, supply, promotion, packaging, sale, and distribution of Roundup including the duty to take all reasonable steps necessary to manufacture and sell a product that was not defective and unreasonably dangerous to consumers and users of the product.

143.    Monsanto failed to exercise reasonable care in the design, formulation, manufacture, sale, testing, quality assurance, quality control, labeling, marketing, promotions, and distribution of Roundup because Monsanto knew, or should have known, that exposure to Roundup was linked to Non-Hodgkin's lymphoma, and was therefore not safe for use by consumers.

144.    Monsanto failed to exercise due care in the labeling of Roundup and failed to issue to purchasers and users adequate warnings as to the risk of serious bodily injury, including Non-Hodgkin's lymphoma, resulting from its use.

145.    Monsanto continued to manufacture and market its product despite the knowledge, whether direct or ascertained with reasonable care, that Roundup posed a serious risk of bodily harm to consumers.

146.    Monsanto knew, or should have known, that consumers such as Plaintiff, Gilbert P. Pellerin, Sr., would foreseeably suffer injury as a result of Monsanto's failure to exercise ordinary care. The characteristic of the product that renders it unreasonably dangerous, the glyphosate content, existed at the time the product left the control of Monsanto.

147.    As a direct and proximate consequence of Monsanto's negligence, Plaintiff, Gilbert P. Pellerin, Sr., sustained serious personal injuries and related losses including, but not limited to, the following:

     a.    Plaintiff, Gilbert P. Pellerin, Sr., required and will continue to require healthcare and services;

     b.    Plaintiff, Gilbert P. Pellerin, Sr., incurred and will continue to incur medical and related expenses; and

     c.    Plaintiff, Gilbert P. Pellerin, Sr., suffered and will continue to suffer mental anguish, physical pain and suffering, diminished capacity for the enjoyment of life, a diminished quality of   life, and other losses and damages.

WHEREFORE, as a result of the foregoing acts and omissions, Plaintiffs, Gilbert P. Pellerin, Sr. and Deborah S. Pellerin, respectfully request that this Court enter judgment in Plaintiffs' favor for compensatory, general and punitive damages, together with interest, costs herein incurred, attorneys' fees and all such other and further relief as this Court deems just and proper.

### COUNT THREE

### MANUFACTURING AND DESIGN DEFECT
### UNDER LSA-RS 9:2800.55 AND LSA-RS 9:2800.56

148.    Plaintiffs incorporate by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

149.    Monsanto designed, researched, developed, manufactured, tested, labeled, advertised, promoted, marketed, sold, supplied, and/or distributed Roundup.

150.    Roundup was expected to, and did, reach the intended consumers, handlers, and persons coming in contact with the product with no substantial change in the condition in which the product was designed, produced, manufactured, sold, distributed, labeled, and marketed by Monsanto.

151.    Roundup was manufactured, designed, marketed, labeled and sold in a defective condition, for use by Plaintiff and all other consumers of the product, making the product unreasonably dangerous.

152.    Roundup as designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed by Monsanto was defective in design and formulation in that when it left the hands of the manufacturers, suppliers, and distributors, the foreseeable risks of harm caused by the product exceeded the claimed benefits of the product.

153.    Roundup, as designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed by Monsanto was defective in design and formulation because when it left the hands of Monsanto, the product was unreasonably dangerous and was also more dangerous than expected by the ordinary consumer.

154.    At all times relevant to this action, Monsanto knew and had reason to know that Roundup was inherently defective and unreasonably dangerous as designed, formulated, and manufactured by Monsanto, and when used and administered in the form manufactured and distributed by Monsanto, and in the manner instructed by Monsanto to be used by Plaintiff and other consumers.

155.    Plaintiff, Gilbert P. Pellerin, Sr., used Roundup for the purpose intended by Monsanto, and in a manner normally intended to be used. Monsanto had a duty to design, create, and manufacture products that were reasonably safe and not unreasonably dangerous for their normal, common, and intended use. Monsanto's product was not reasonably fit, suitable, or safe for its anticipated use, and safer, reasonable alternative designs existed and could have been utilized. Reasonably prudent manufacturers would not have placed the product in the stream of commerce with knowledge of these design flaws.

156.    Monsanto designed, developed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed a defective product that created an unreasonable risk of serious harm to the health, safety, and well-being of Plaintiff, Gilbert P. Pellerin, Sr., and other consumers. Monsanto is therefore liable for Gilbert P. Pellerin, Sr.'s injuries and damages sustained proximately caused by Gilbert P. Pellerin, Sr.'s use of the product, as Monsanto's product unreasonably dangerous, and all damage arose from the reasonably anticipated use of the product by Plaintiff, Gilbert P. Pellerin, Sr.

157.    Plaintiff, Gilbert P. Pellerin, Sr., could not, by the exercise of reasonable care, discover the defective condition of Monsanto's product and/or perceive its defective dangers prior to its use.

158.    Roundup was a substantial, proximate, and contributing factor in causing Plaintiff, Gilbert P. Pellerin, Sr.'s injuries.

159.    As a proximate result of Monsanto's acts and omissions and Plaintiff, Gilbert P. Pellerin, Sr.'s use of Monsanto's defective product, Gilbert P. Pellerin, Sr. suffered serious physical injuries and incurred substantial medical costs and expenses to treat and care for her injuries described in this Complaint, including, but not limited to, the following:

a.    Plaintiff, Gilbert P. Pellerin, Sr., required and will continue to require healthcare and services;

b.    Plaintiff, Gilbert P. Pellerin, Sr., incurred and will continue to incur medical and related expenses; and

c.    Plaintiff, Gilbert P. Pellerin, Sr., suffered and will continue to suffer mental anguish, physical pain and suffering, diminished capacity for the enjoyment of life, a diminished quality of life, and other losses and damages.

WHEREFORE, as a result of the foregoing acts and omissions, Plaintiffs, Gilbert P. Pellerin, Sr. and Deborah S. Pellerin, respectfully request that this Court enter judgment in

Plaintiffs' favor for compensatory, general and punitive damages, together with interest, costs herein incurred, attorneys' fees and all such other and further relief as this Court deems just and proper.

## COUNT FOUR

### INADEQUATE WARNING UNDER LSA-RS 9:2800.57

160.   Plaintiffs incorporate by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

161.   Monsanto designed, researched, developed, manufactured, tested, labeled, advertised, promoted, marketed, sold, supplied, and/or distributed Roundup.

162.   Roundup was expected to, and did, reach the intended consumers, handlers, and persons coming in contact with the product with no substantial change in the condition in which the product was designed, produced, manufactured, sold, distributed, labeled, and marketed by Roundup.

163.   Roundup was manufactured, designed, marketed, labeled and sold in a defective condition, for use by Plaintiff and all other consumers of the product, making the product unreasonably dangerous.

164.   Monsanto researched, developed, designed, tested, manufactured, inspected, labeled, distributed, marketed, promoted, sold, and otherwise released into the stream of commerce Roundup and in the course of same, directly advertised or marketed the product to consumers or persons responsible for consumers, and therefore had a duty to warn of the risks associated with the use of its product.

165.   Roundup, as designed, researched, developed, manufactured, tested, advertised, promoted, marketed, sold, labeled, and distributed by Monsanto, was defective due to the

product's inadequate warnings and instructions. Monsanto knew, or should have known, and adequately warned that its product created a risk of serious and dangerous side effects, including but not limited to, Non-Hodgkin's lymphoma.

166. The product was under the exclusive control of Monsanto and was unaccompanied by appropriate and adequate warnings regarding the risk of severe and permanent injuries associated with its use, including, but not limited to, the risk of developing Non-Hodgkin's lymphoma. The warnings given did not accurately reflect the risk, incidence, symptoms, scope or severity of such injuries to the consumer.

167. Notwithstanding Monsanto's knowledge of the defective condition of its product, Monsanto failed to adequately warn the medical community and consumers of the product, including Plaintiff and her healthcare providers, of the dangers and risk of harm associated with the use of Roundup.

168. Monsanto downplayed the serious and dangerous side effects of its product to encourage sales of the product, particularly without the use of protective equipment; consequently, Monsanto placed its profits above its customers' safety.

169. The product was defective when it left the possession of Monsanto in that it contained insufficient warnings to alert Plaintiff, Gilbert P. Pellerin, Sr., to the dangerous risks associated with it, including the risk of Non-Hodgkin's lymphoma.

170. Even though Monsanto knew or should have known of the risks and reactions associated with their product, it still failed to provide warnings that accurately reflected the signs, symptoms, incident, scope, or severity of the risks associated with the product.

171. Plaintiff, Gilbert P. Pellerin, Sr., used Roundup as intended or in a reasonably foreseeable manner.

172.    Monsanto, as a manufacturer of agricultural products, is held to the level of knowledge of an expert in the field and, further, Monsanto had knowledge of the dangerous risks and side effects of its product.

173.    Plaintiff, Gilbert P. Pellerin, Sr., did not have the same knowledge as Monsanto and no adequate warning was communicated to Plaintiff or any other consumers.

174.    Monsanto had a continuing duty to warn consumers, including Plaintiff, Gilbert P. Pellerin, Sr., of the dangers associated with its product, and by negligently and/or wantonly failing to adequately warn of the dangers of the use of its product, Monsanto breached its duty.

175.    Although Monsanto knew, or should have known, of the defective nature of Roundup it continued and continues to design, manufacture, market, and sell its product without providing adequate warnings and instructions concerning the use of its product so as to maximize sales and profits at the expense of the public health and safety, in knowing, conscious, and deliberate disregard of the foreseeable harm caused by Roundup.

176.    As a direct and proximate result of Monsanto's failure to adequately warn or other acts and omissions of Monsanto described herein, Plaintiff, Gilbert P. Pellerin, Sr., suffered severe and permanent injuries, pain, and mental anguish, including diminished enjoyment of life.

177.    Monsanto's failure to warn extended beyond the product's label and into other media available to Monsanto, including but not limited to advertisements, person-to-person sales calls, medical journal articles, and medical conference presentations.

178.    Roundup, upon information and belief, as manufactured by Monsanto, was further defective due to inadequate post-market warnings or instructions because after Monsanto knew, or should have known, of the risk of serious bodily harm from the use of Roundup, Monsanto

failed to provide adequate warnings to consumers about the product, knowing the product could cause serious injury.

179.    Roundup, upon information and belief, as manufactured and supplied by Monsanto, was unreasonably dangerous because an adequate warning about the product was not been provided if, as at the time the product left Monsanto's control, the product possessed the aforementioned characteristics that may cause damage users such as Plaintiff, Gilbert P. Pellerin, Sr., and Monsanto failed to use reasonable care to provide an adequate warning of such characteristic and its danger to users and handlers of the product.

180.    After Monsanto had started shipping product that had left its control, Monsanto acquired knowledge of characteristics of the product that might cause damage and the danger of such characteristic and is liable for damage caused by a subsequent failure to use reasonable care to provide an adequate warning of such characteristic and its danger to users and handlers of the product since that knowledge of the characteristics and its danger to users was acquired.

181.    A reasonably prudent manufacturer would have warned of these characteristics and its danger to users, and Monsanto's failure to do so renders it liable for all damages caused by its subsequent failure to use reasonable care to provide adequate warning of the danger to Plaintiff, Gilbert P. Pellerin, Sr., and other users of the product.

182.    As a proximate result of Monsanto's acts and omissions and Plaintiff, Gilbert P. Pellerin, Sr.'s use of Roundup, Monsanto's defective product, Gilbert P. Pellerin, Sr. suffered serious physical injuries and incurred substantial medical costs and expenses as set forth in this Complaint, including, but not limited to, the following:

      a.    Plaintiff, Gilbert P. Pellerin, Sr., required and will continue to require healthcare and services;

b.   Plaintiff, Gilbert P. Pellerin, Sr., incurred and will continue to incur medical and related expenses; and

c.   Plaintiff, Gilbert P. Pellerin, Sr., suffered and will continue to suffer mental anguish, physical pain and suffering, diminished capacity for the enjoyment of life, a diminished quality of life, and other losses and damages.

WHEREFORE, as a result of the foregoing acts and omissions, Plaintiffs, Gilbert P. Pellerin, Sr. and Deborah S. Pellerin, respectfully request that this Court enter judgment in Plaintiffs' favor for compensatory, general and punitive damages, together with interest, costs herein incurred, attorneys' fees and all such other and further relief as this Court deems just and proper.

## COUNT FIVE

### BREACH OF EXPRESS WARRANTY UNDER LSA-RS-9:2800.58

183.   Plaintiffs incorporate by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

184.   Monsanto, through its officers, directors, agents, representatives, and written literature and packaging, and written and media advertisements, expressly warranted that Roundup was safe and effective and fit for use by consumers, was of merchantable quality, did not create the risk of or produce dangerous side effects, including, but not limited to, Non-Hodgkin's lymphoma and was adequately tested and fit for its intended use.

185.   Specifically, Monsanto made the representations as set forth above in paragraphs 54 and 55, as well as many others, via advertising, product labels, and information given to the public.

186.   At the time of making such express warranties, Monsanto knew and/or should have known that Roundup did not conform to the express warranties and representations and that, in fact, its product was not safe and had numerous serious side effects, including the possibility of

Non-Hodgkin's lymphoma, of which Monsanto had full knowledge and did not accurately or adequately warn.

187.    Roundup, as manufactured and sold by Monsanto, did not conform to these representations because it caused serious injury, including Non-Hodgkin's lymphoma, to consumers such as Plaintiff, Gilbert P. Pellerin, Sr., when used as directed by the product label.

188.    Monsanto breached its express warranties because its product was and is defective for its intended purpose.

189.    Plaintiff, Gilbert P. Pellerin, Sr., did rely on Monsanto's express warranties regarding the safety and efficacy of their product in purchasing and using the product, and induced Gilbert P. Pellerin, Sr. to use the product, and Gilbert P. Pellerin, Sr.'s damages were proximately caused by the untruthfulness of the express warranty.

190.    As a foreseeable, direct, and proximate result of the breach of the express warranties, Plaintiff, Gilbert P. Pellerin, Sr., suffered severe and permanent personal injuries, harm, and economic loss.

WHEREFORE, as a result of the foregoing acts and omissions, Plaintiffs, Gilbert P. Pellerin, Sr. and Deborah S. Pellerin, respectfully request that this Court enter judgment in Plaintiffs' favor for compensatory, general and punitive damages, together with interest, costs herein incurred, attorneys' fees and all such other and further relief as this Court deems just and proper.

## COUNT SIX

### VIOLATION OF THE UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION LAW

191.    Plaintiffs incorporate by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

192.    Defendant fraudulently, intentionally, negligently, and/or innocently misrepresented to the public, and to Plaintiff, Gilbert P. Pellerin, Sr., both directly and by and through the media and purported "community outreach" programs, the safety of Roundup products, and/or fraudulently, intentionally, negligently and/or innocently concealed, suppressed, or omitted material, adverse information regarding the safety of Roundup. This deception caused injury to Plaintiff, Gilbert P. Pellerin, Sr., in violation of the Louisiana Unfair Trade Practices and Consumer Protection Law, La. R.S. 51:1401 et seq.

193.    The intentional, negligent, and/or innocent misrepresentations and omissions of Defendant regarding the safety of Roundup products were communicated to Plaintiff, Gilbert P. Pellerin, Sr., directly through national and regional advertising, marketing and promotion efforts, as well as the packaging and sales aids. The safety of Roundup products was also intentionally, negligently, and/or innocently misrepresented to Plaintiff, Gilbert P. Pellerin, Sr., and the public with the intent that such misrepresentations would cause Gilbert P. Pellerin, Sr. and other potential consumers to purchase and use or continue to purchase and use Roundup products.

194.    Defendant either knew or should have known of the material representations it was making regarding the safety and relative utility of Roundup products.

195.    Defendant fraudulently, intentionally, negligently, and/or innocently made the misrepresentations and/or actively concealed, suppressed, or omitted this material information with the specific desire to induce Plaintiff, Gilbert P. Pellerin, Sr., and the consuming public to purchase and use Roundup products. Defendant fraudulently, intentionally, negligently, and/or innocently, knew or should have known that Plaintiff, Gilbert P. Pellerin, Sr., and the consuming public would rely on such material misrepresentations and/or omissions in selecting and applying

Roundup products. Defendant knew or should have known that Plaintiff, Gilbert P. Pellerin, Sr., would rely on their false representations and omissions.

196.    Defendant made these misrepresentations and actively concealed adverse information including the risk of Non-Hodgkin's lymphoma, at a time when, their agents and/or employees knew or should have known, the product had defects, dangers, and characteristics that were other than what was represented to the consuming public. Specifically, Defendant misrepresented and actively concealed, suppressed, and omitted that there had been inadequate testing of the safety and efficacy of Roundup, and that prior studies, research, reports, and/or testing had been conducted linking the use of the drug with serious health events, including Non-Hodgkin's lymphoma.

197.    Despite the fact that Defendant knew or should have known of reports of severe risks including Non-Hodgkin's lymphoma, with Roundup use and exposure, this information was strategically minimized, understated, or omitted in order to create the impression that the human dangers of Roundup were nonexistent, particularly in light of its purported utility.

198.    The fraudulent, intentional, negligent and/or innocent material misrepresentations and/or active concealment, suppression, and omissions by Defendant were perpetuated directly and/or indirectly through the advertisements, packaging, sales aids, furtive public relations efforts, and other marketing and promotional pieces authored, analyzed, created, compiled, designed, drafted, disseminated, distributed, edited, evaluated, marketed, published, and supplied by Defendant.

199.    If Plaintiff, Gilbert P. Pellerin, Sr., had known the true facts concerning the risks associated with Roundup exposure, Gilbert P. Pellerin, Sr. would have used a safer alternative.

200.    Gilbert P. Pellerin, Sr.'s reliance upon the material misrepresentations and omissions was justified, among other reasons, because said misrepresentations and omissions were made by

individuals and entities who were in a position to know the true facts concerning Roundup while Plaintiff, Gilbert P. Pellerin, Sr., was not in a position to know the true facts because Defendant overstated the benefits and safety of Roundup and downplayed the risk of lymphoma, thereby inducing Plaintiff, Gilbert P. Pellerin, Sr., to use the herbicide rather than safer alternatives.

201.    Federal law and the EPA do not authorize and specifically prohibit the deceptions, misrepresentations and omissions made by Defendant.

202.    As a direct and proximate result of Defendant's actions and inactions, Plaintiff, Gilbert P. Pellerin, Sr., was exposed to Roundup and suffered and will continue to suffer injuries and damages, as set forth herein.

WHEREFORE, as a result of the foregoing acts and omissions, Plaintiffs, Gilbert P. Pellerin, Sr. and Deborah S. Pellerin, respectfully request that this Court enter judgment in Plaintiffs' favor for compensatory, general and punitive damages, together with interest, costs herein incurred, attorneys' fees and all such other and further relief as this Court deems just and proper.

## COUNT SEVEN

## BREACH OF WARRANTY IN REDHIBITION

203.    Plaintiffs incorporate by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

204.    Roundup® contains a vice or defect which renders it useless or its use so inconvenient that consumers would not have purchased it had they known about the vice or defect.

205.    Pursuant to Louisiana Civil Code Article 2520, a seller warrants the buyer against redhibitory defects, or vices, in the thing sold. Roundup® products, which were sold and promoted by the Defendant, possesses a redhibitory defect because they are unreasonably

dangerous, as described above, which render Roundup® products useless or so inconvenient that it must be presumed that Plaintiff, Gilbert P. Pellerin, Sr., would not have bought Roundup® products had he known of the defects.

206.    Defendant was aware of the substantial risks associated with Roundup® and its active ingredient glyphosate but failed to fully disclose those risks to Plaintiff, Gilbert P. Pellerin, Sr.

207.    In accordance with Louisiana Civil Code Article 2545, Defendant, as the manufacturer, distributor and seller of Roundup® products, is deemed to be aware of their redhibitory defects.

208.    Had Plaintiff, Gilbert P. Pellerin, Sr., been made aware of the defects contained in Roundup® products, he would not have purchased Roundup®. This characteristic rendered Roundup® products unfit for their intended purposes.

209.    Defendant is liable to Plaintiff, Gilbert P. Pellerin, Sr., under the theory of redhibition as a consequence of the sale to Plaintiff, Gilbert P. Pellerin, Sr., of a product unfit for its intended use.

210.    Plaintiff, Gilbert P. Pellerin, Sr., is entitled to the return of the purchase price paid for Roundup®, including, but not limited to, purchase price, interest on these amounts from the date of purchase, attorneys' fees and costs, pecuniary and non-pecuniary damages, as well as any other legal and equitable relief to which Plaintiff, Gilbert P. Pellerin, Sr., may be entitled.

211.    As a result of the aforementioned breach of obligation by Defendant, Plaintiff, Gilbert P. Pellerin, Sr., suffered and continues to suffer from the following items of damage, all past, present, and future, for which he is entitled to be compensated by Defendant, in an amount which is just and reasonable:

    a.    Medical and related expenses;

    b.    Physical injury and disability;

    c.      Physical pain and suffering;

    d.      Mental anguish and distress;

    e.      Loss of earnings;

    f.      Impairment to earning capacity;

    g.      Loss of enjoyment of life; and

    h.      Other items of damage which may be shown through discovery or at trial.

212.    By reason of the foregoing, Plaintiffs, Gilbert P. Pellerin, Sr. and Deborah S. Pellerin, demand judgment against the Defendant, for damages in a sum in excess of $75,000.00, together with interest, court costs, and all such other and further relief as the Court deems proper.

## COUNT EIGHT

### FRAUD, MISREPRESENTATION, AND SUPPRESSION

213.    Plaintiffs incorporate by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

214.    Defendant fraudulently, intentionally, and/or negligently misrepresented to the public, and to the Plaintiff, both directly and by and through the media, the scientific literature and purported "community outreach" programs, the safety of Roundup products, and/or fraudulently, intentionally, and/or negligently concealed, suppressed, or omitted material, adverse information regarding the safety of Roundup.

215.    The intentional and/or negligent misrepresentations and omissions of Defendant regarding the safety of Roundup products was communicated to Plaintiff, Gilbert P. Pellerin, Sr., directly through ghostwritten articles, editorials, national and regional advertising, marketing and promotion efforts, as well as the packaging and sales aids. The safety of Roundup products was also intentionally and/or negligently misrepresented to Plaintiff, Gilbert P. Pellerin, Sr., and the

public with the intent that such misrepresentations would cause Gilbert P. Pellerin, Sr. and other potential consumers to purchase and use or continue to purchase and use Roundup products.

216.   Defendant either knew or should have known of the material representations it was making regarding the safety and relative utility of Roundup products.

217.   Defendant fraudulently, intentionally, and/or negligently made the misrepresentations and/or actively concealed, suppressed, or omitted this material information with the specific desire to induce Plaintiff, Gilbert P. Pellerin, Sr., and the consuming public to purchase and use Roundup products. Defendant fraudulently, intentionally, and/or negligently, knew or should have known that Plaintiff, Gilbert P. Pellerin, Sr., and the consuming public would rely on such material misrepresentations and/or omissions in selecting and applying Roundup products. Defendant knew or should have known that Plaintiff, Gilbert P. Pellerin, Sr., would rely on their false representations and omissions.

218.   Defendant made these misrepresentations and actively concealed adverse information including the risk of Non-Hodgkin's lymphoma, at a time when, their agents and/or employees knew or should have known, the product had defects, dangers, and characteristics that were other than what was represented to the consuming public.

219.   Despite the fact that Defendant knew or should have known of reports of severe risks including Non-Hodgkin's lymphoma, with Roundup use and exposure, this information was strategically minimized, understated, or omitted in order to create the impression that the human dangers of Roundup were nonexistent, particularly in light of its purported utility.

220.   The fraudulent, intentional and/or negligent material misrepresentations and/or active concealment, suppression, and omissions by Defendant were perpetuated directly and/or indirectly through the advertisements, packaging, sales aids, furtive public relations efforts, and

other marketing and promotional pieces authored, analyzed, created, compiled, designed, drafted, disseminated, distributed, edited, evaluated, marketed, published, and supplied.

221.   If Plaintiff, Gilbert P. Pellerin, Sr., had known the true facts concerning the risks associated with Roundup exposure, Gilbert P. Pellerin, Sr. would have used a safer alternative.

222.   Plaintiff, Gilbert P. Pellerin, Sr.'s reliance upon the material misrepresentations and omissions was justified, among other reasons, because said misrepresentations and omissions were made by individuals and entities who were in a position to know the true facts concerning Roundup while Plaintiff, Gilbert P. Pellerin, Sr., was not in a position to know the true facts because Defendant overstated the benefits and safety of Roundup and downplayed the risk of lymphoma, thereby inducing Plaintiff, Gilbert P. Pellerin, Sr., to use the herbicide rather than safer alternatives.

223.   As a direct and proximate result of Defendant's actions and inactions, Plaintiff, Gilbert P. Pellerin, Sr., was exposed to Roundup and suffered and will continue to suffer injuries and damages, as set forth herein.

WHEREFORE, as a result of the foregoing acts and omissions, Plaintiffs, Gilbert P. Pellerin, Sr. and Deborah S. Pellerin, respectfully request that this Court enter judgment in Plaintiffs' favor for compensatory, general and punitive damages, together with interest, costs herein incurred, attorneys' fees and all such other and further relief as this Court deems just and proper.

## X.   EXEMPLARY DAMAGES ALLEGATIONS

224.   Plaintiffs incorporate by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

225. Monsanto's conduct as alleged herein was done with oppression, fraud, and/or malice. Monsanto was fully aware of Roundup's safety risks. Nonetheless, Monsanto deliberately crafted its label, marketing, and promotion to mislead farmers and consumers.

226. This was not done by accident or through some justifiable negligence. Rather, Monsanto knew that it could turn a profit by convincing the agricultural industry and the general population that Roundup® products were harmless to humans, and that full disclosure of Roundup's true risks would limit the amount of money Monsanto would make selling Roundup products in Louisiana. This was accomplished not only through its misleading labeling, but through a comprehensive scheme of selective fraudulent research and testing, misleading advertising, and deceptive omissions as more fully alleged throughout this pleading. Plaintiff, Gilbert P. Pellerin, Sr., was robbed of his right to make an informed decision about whether to purchase and use an herbicide on his property, knowing the full risks attendant to that use. Such conduct was done with conscious disregard of the rights of Plaintiff, Gilbert P. Pellerin, Sr.

227. There is no indication that Monsanto will stop its deceptive and unlawful marketing practices unless it is punished and deterred. Accordingly, Plaintiffs, Gilbert P. Pellerin, Sr. and Deborah S. Pellerin, request punitive damages against Monsanto for the harms caused to Plaintiffs, Gilbert P. Pellerin, Sr. and Deborah S. Pellerin.

**LOSS OF CONSORTIUM CLAIM OF DEBORAH S. PELLERIN**

228. As a result of the injuries sustained by her husband (Gilbert P. Pellerin, Sr.), Deborah S. Pellerin has suffered loss of consortium with her husband. Therefore, Plaintiff, Deborah S. Pellerin, alleges that she is entitled to damages in a reasonable sum for her loss.

## <u>PRAYER FOR RELIEF AND JURY TRIAL DEMAND</u>

229.    WHEREFORE, Plaintiffs, Gilbert P. Pellerin, Sr. and Deborah S. Pellerin request that the

Court enter judgment in their favor and against Monsanto, awarding Plaintiffs:

       a.    Past, present and future pain and suffering, mental anguish and anxiety, loss of enjoyment of life, residual physical and mental disability;

       b.    Past, present and future medical expenses;

       c.    Past, present and future economic damages, including lost wages and loss of earning capacity;

       d.    All other past, present and future actual or compensatory damages in such amount to be determined at trial and as provided by applicable law;

       e.    Exemplary and punitive damages sufficient to punish and deter Monsanto and others from future fraudulent, deceptive and harmful practices;

       f.    Loss of consortium damages for Plaintiff, Deborah S. Pellerin;

       g.    Pre-judgment and post-judgment interest;

       h.    Costs including reasonable attorneys' fees, court costs, and other litigation expenses; and

       i.    Any other relief the Court may deem just and proper.

230.    Plaintiffs demand a trial by jury on all of the triable issues within this pleading.

Respectfully Submitted,

LAW OFFICES OF KENNETH W. DEJEAN

/s/ Kenneth W. DeJean
Kenneth W. DeJean (No. 4817)
Adam R. Credeur (No. 35095)
Natalie M. DeJean (No. 32423)
417 W. University Avenue (70506)
Post Office Box 4325
Lafayette, LA 70502
Phone: (337) 235-5294
Fax: (337) 235-1095
kwdejean@kwdejean.com
adam@kwdejean.com
natalie@kwdejean.com
COUNSEL FOR PETITIONERS