GILBERT

# United States District Court
## Northern District of Illinois - CM/ECF LIVE, Ver 6.3.3 (Chicago)
### CIVIL DOCKET FOR CASE #: 1:21-cv-02754

Fleischhauer et al v. Monsanto Company
Assigned to: Honorable Manish S. Shah
Demand: $9,999,000
Case in other court: Northern Dist. of California - San Francisco, 16-MD-02741
Cause: 28:1332 Diversity-Product Liability

Date Filed: 05/20/2021
Jury Demand: Plaintiff
Nature of Suit: 365 Personal Inj. Prod. Liability
Jurisdiction: Diversity

**Plaintiff**

**Dieter Fleischhauer**                  represented by   **Carolyn S. Daley**
                                                          Power Rogers, LLP
                                                          70 W. Madison St.
                                                          55th Floor
                                                          Chicago, IL 60602
                                                          (312) 236-9381
                                                          Email: cdaley@prslaw.com
                                                          *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Susan Lynn Fleischhauer**              represented by   **Carolyn S. Daley**
                                                          (See above for address)
                                                          *ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Monsanto Company**

| Date Filed | # | Docket Text |
|---|---|---|
| 05/20/2021 | 1 | COMPLAINT filed by DIETER FLEISCHHAUER, SUSAN LYNN FLEISCHHAUER; Jury Demand. Filing fee $ 402, receipt number 0752-18272040. (Attachments: # 1 Civil Cover Sheet)(Daley, Carolyn) (Entered: 05/20/2021) |
| 05/21/2021 | | CASE ASSIGNED to the Honorable Manish S. Shah. Designated as Magistrate Judge the Honorable Jeffrey T. Gilbert. Case assignment: Random assignment. (ng, ) (Entered: 05/21/2021) |
| 06/17/2021 | | SUMMONS Issued as to Defendant Monsanto Company (mxo, ) (Entered: 06/17/2021) |

| | | |
|---|---|---|
| 07/08/2021 | 2 | MINUTE entry before the Honorable Manish S. Shah: By 7/22/21, the parties shall file a joint initial status report. A template for the Initial Status Report, setting forth the information required, may be found at http://www.ilnd.uscourts.gov/Judges.aspx by clicking on Judge Shah's name and then again on the link entitled 'Initial Status Conferences.' Notices mailed. (psm, ) (Entered: 07/08/2021) |

| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 07/13/2021 16:49:57 | | | |
| **PACER Login:** | sh0019sh:2634072:0 | **Client Code:** | 31943.356965 |
| **Description:** | Docket Report | **Search Criteria:** | 1:21-cv-02754 |
| **Billable Pages:** | 1 | **Cost:** | 0.10 |



**null / ALL**
**Transmittal Number: 23383063**
**Date Processed: 06/22/2021**

# Notice of Service of Process

| | |
|---|---|
| **Primary Contact:** | Anne Troupis (Monsanto)<br>Bayer U.S. LLC<br>800 N Lindbergh Blvd<br>Saint Louis, MO 63167-1000 |

| | |
|---|---|
| **Entity:** | Monsanto Company<br>Entity ID Number  2282193 |
| **Entity Served:** | Monsanto Company |
| **Title of Action:** | Dieter Fleischhauer vs. Monsanto Company |
| **Matter Name/ID:** | Dieter Fleischhauer vs. Monsanto Company (11337676) |
| **Document(s) Type:** | Summons/Complaint |
| **Nature of Action:** | Product Liability |
| **Court/Agency:** | U.S. District Court Northern District, IL |
| **Case/Reference No:** | 1:21-cv-02754 |
| **Jurisdiction Served:** | Illinois |
| **Date Served on CSC:** | 06/21/2021 |
| **Answer or Appearance Due:** | 21 Days |
| **Originally Served On:** | CSC |
| **How Served:** | Personal Service |
| Sender Information: | Devon C. Bruce<br>312-236-9381 |

Information contained on this transmittal form is for record keeping, notification and forwarding the attached document(s). It does not constitute a legal opinion. The recipient is responsible for interpreting the documents and taking appropriate action.

**To avoid potential delay, please do not send your response to CSC**

251 Little Falls Drive, Wilmington, Delaware 19808-1674   (888) 690-2882   |   sop@cscglobal.com

AO 440  (Rev. 05/00) Summons in a Civil Action

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS

### SUMMONS IN A CIVIL CASE

DIETER FLEISCHHAUER and SUSAN LYNN
FLEISCHHAUER

| | |
|---|---|
| | CASE NUMBER:  1:21-CV-02754 |
| V. | ASSIGNED JUDGE:  MANISH S. SHAH |
| MONSANTO COMPANY | DESIGNATED MAGISTRATE JUDGE:  JEFFREY T. GILBERT |

TO: (Name and address of Defendant)

MONSANTO COMPANY
C/O REGISTERED AGENT
CORPORATION SERVICE COMPANY
801 ADLAI STEVENSON DRIVE
SPRINGFIELD, IL 62703

**YOU ARE HEREBY SUMMONED** and required to serve upon PLAINTIFF'S ATTORNEY (name and address)

CAROLYN S. DALEY
POWER ROGERS, LLP
70 W. MADISON, 55TH FLOOR
CHICAGO, IL 60602
CDALEY@POWERROGERS.COM - KPLATT@POWERROGERS.COM

an answer to the complaint which is herewith served upon you,     ___21___ days after service of this
summons upon you, exclusive of the day of service.  If you fail to do so, judgment by default will be taken against you for
the relief demanded in the complaint.  You must also file your answer with the Clerk of this Court within a reasonable
period of time after service.

THOMAS G. BRUTON, CLERK

*Miroslava Osorio*

(By) DEPUTY CLERK

June 17, 2021

DATE

AO 440  (Rev. 05/00)  Summons in a Civil Action

## RETURN OF SERVICE

| | DATE |
|---|---|
| Service of the Summons and complaint was made by me[1] | |

| NAME OF SERVER *(PRINT)* | TITLE |
|---|---|

*Check one box below to indicate appropriate method of service*

☐  Served personally upon the defendant.  Place where served: _____

_____

☐  Left copies thereof at the defendant's dwelling house or usual place of abode with a person of suitable age and discretion then residing therein.

   Name of person with whom the summons and complaint were left: _____

☐  Returned unexecuted: _____

_____

_____

☐  Other (specify): _____

_____

_____

## STATEMENT OF SERVICE FEES

| TRAVEL | SERVICES | TOTAL |
|---|---|---|

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Return of Service and Statement of Service Fees is true and correct.

Executed on _____        _____
                    Date              *Signature of Server*

                                      _____
                                      *Address of Server*

(1) As to who may serve a summons see Rule 4 of the Federal Rules of Civil Procedure.

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS

DIETER FLEISCHHAUER and SUSAN
LYNN FLEISCHHAUER,

                  Plaintiffs,

    vs.

MONSANTO COMPANY,

                  Defendant.

Case No.:

**JURY TRIAL DEMANDED**

Plaintiff DIETER FLEISCHHAUER ("Plaintiff"), and Plaintiff SUSAN LYNN FLEISCHHAUER, by and through their undersigned counsel, brings this Complaint for damages against Defendant Monsanto Company ("Defendant" or "Monsanto"), and alleges the following:

### NATURE OF THE CASE

1. This is an action for damages suffered by Plaintiff as a direct and proximate result of Defendant's negligent and wrongful conduct in connection with the design, development, manufacture, testing, packaging, promoting, marketing, advertising, distribution, labeling, and/or sale of the herbicide Roundup®, containing the active ingredient glyphosate.

2. Plaintiff maintains that Roundup® and/or glyphosate is defective, dangerous to human health, unfit and unsuitable to be marketed and sold in commerce, and lacked proper warnings and directions as to the dangers associated with its use.

3. Plaintiff's injuries, like those striking thousands of similarly situated victims across the country, were avoidable.

### JURISDICTION AND VENUE

4. This Court has jurisdiction over Defendant and this action pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship between Plaintiff and Defendant.

Defendant is incorporated in, and/or maintains its principal place of business outside of the state in which the Plaintiff reside.

5.    The amount in controversy exceeds $75,000, exclusive of interest and cost.

6.    The Court also has supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

7.    Venue is proper within this district pursuant to 28 U.S.C. § 1391 in that Defendant conducts business here and is subject to personal jurisdiction in this district. Furthermore, Defendant sells, markets, and/or distributes Roundup within the Central District of Illinois. Also, a substantial part of the acts and/or omissions giving rise to these claims occurred within this district.

## PARTIES

8.    Plaintiff is over the age of eighteen and is a resident and citizen of Cook County, Illinois.

9.    Plaintiff Susan Lynn Fleischhauer is over the age of eighteen and is a resident and citizen of Cook County, Illinois.

10.   At all times material to this Complaint, Plaintiff and Plaintiff Susan Lynn Fleischhauer were married and lawfully wedded husband and wife residing in the State of Illinois.

11.   Plaintiff brings this action for injuries he sustained by exposure to Roundup containing the active ingredient glyphosate and the surfactant POEA.  As a direct and proximate result of being exposed to Roundup, Plaintiff developed non-Hodgkin's lymphoma ("NHL").

12.   Plaintiff Susan Lynn Fleischhauer brings this action for the loss of consortium, society, companionship, and conjugal relations with her husband Dieter Fleischhauer.

13.   "Roundup" refers to all formulations of Defendant's Roundup products, including, but not limited to, Roundup Concentrate Poison Ivy and Tough Brush Killer 1, Roundup Custom Herbicide, Roundup D-Pak herbicide, Roundup Dry Concentrate, Roundup Export Herbicide, Roundup Fence & Hard Edger 1, Roundup Garden Foam Weed & Grass Killer, Roundup Grass and Weed Killer, Roundup Herbicide, Roundup Original 2k herbicide, Roundup Original II Herbicide, Roundup Pro Concentrate, Roundup

2

Prodry Herbicide, Roundup Promax, Roundup Quik Stik Grass and Weed Killer, Roundup Quikpro Herbicide, Roundup Rainfast Concentrate Weed & Grass Killer, Roundup Rainfast Super Concentrate Weed & Grass Killer, Roundup Ready-to-Use Extended Control Weed & Grass Killer 1 Plus Weed Preventer, Roundup Ready-to-Use Weed & Grass Killer, Roundup Ready-to-Use Weed and Grass Killer 2, Roundup Ultra Dry, Roundup Ultra Herbicide, Roundup Ultramax, Roundup VM Herbicide, Roundup Weed & Grass Killer Concentrate, Roundup Weed & Grass Killer Concentrate Plus, Roundup Weed & Grass killer Ready-to-Use Plus, Roundup Weed & Grass Killer Super Concentrate, Roundup Weed & Grass Killer1 Ready-to-Use, Roundup WSD Water Soluble Dry Herbicide Deploy Dry Herbicide, or any other formulation of containing the active ingredient glyphosate.

14. Defendant Monsanto is incorporated in the state of Delaware, with a principal place of business in St. Louis, Missouri.

15. Defendant advertises and sells goods, specifically Roundup, throughout the United States, including in Illinois.

16. Defendant transacted and conducted business within the State of Illinois that relates to the allegations in this Complaint.

17. Defendant derived substantial revenue from goods and products used in the State of Illinois.

18. Defendant expected or should have expected its acts to have consequences within the State of Illinois, and derived substantial revenue from interstate commerce.

19. Defendant engaged in the business of designing, developing, manufacturing, testing, packaging, marketing, distributing, labeling, and/or selling Roundup.

20. Defendant is authorized to do business in the State of Illinois and derive substantial income from doing business in this state.

21. Defendant purposefully availed itself of the privilege of conducting activities with the State of Illinois, thus invoking the benefits and protections of its laws.

22.    Defendant designed, sold, advertised, manufactured and/or distributed Roundup, with
       full knowledge of its dangerous and defective nature.

## FACTUAL ALLEGATIONS

23.    At all relevant times, Defendant was in the business of, and did, design, research,
       manufacture, test, advertise, promote, market, sell and distribute the commercial
       herbicide Roundup.

24.    Monsanto is a multinational agricultural biotechnology corporation based in St. Louis,
       Missouri.  It is the world's leading producer of glyphosate.

25.    Defendant discovered the herbicidal properties of glyphosate during the 1970s and
       subsequently began to design, research, manufacture, sell and distribute glyphosate-
       based Roundup as a broad spectrum herbicide.

26.    Glyphosate is the active ingredient in Roundup.

27.    Glyphosate is a broad-spectrum herbicide used to kill weeds and grasses known to
       compete with commercial crops grown around the globe.

28.    Glyphosate is a "non-selective" herbicide, meaning it kills indiscriminately based only
       on whether a given organism produces a specific enzyme, 5-enolpyruvylshikimic acid-3-
       phosphate synthase, known as EPSP synthase.

29.    Glyphosate inhibits the enzyme 5-enolpyruvylshikimic acid-3-phosphate synthase that
       interferes with the shikimic pathway in plants, resulting in the accumulation of shikimic
       acid in plant tissue and ultimately plant death.

30.    Sprayed as a liquid, plants absorb glyphosate directly through their leaves, stems, and
       roots, and detectable quantities accumulate in the plant tissues.

31.    The original Roundup, containing the active ingredient glyphosate, was introduced in
       1974.  Today, glyphosate products are among the world's most widely used herbicides.

32.    Defendant is intimately involved in the development, design, manufacture, marketing,
       sale, and/or distribution of genetically modified ("GMO") crops, many of which are
       marketed as being resistant to Roundup i.e., Roundup Ready®.  As of 2009, Defendant
       was the world's leading producer of seeds designed to be Roundup Ready.  In 2010, an

4

estimated 70% of corn and cotton, and 90% of soybean fields in the United States contained Roundup Ready seeds.

33.   Each year approximately 250 million pounds of glyphosate are sprayed on crops, commercial nurseries, suburban lawns, parks, and golf courses. This increase in use has been driven largely by the proliferation of genetically engineered crops, crops specifically tailored to resist the activity of glyphosate.

34.   For nearly 40 years, consumers, farmers, and the general public, including Plaintiff, have used Roundup, unaware of its carcinogenic properties.

## REGISTRATION OF HERBICIDES UNDER FEDERAL LAW

35.   The manufacture, formulation and distribution of herbicides, such as Roundup, are regulated under the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA"), 7. U.S.C. § 136 et seq.  FIFRA requires that all pesticides be registered with the Environmental Protection Agency ("EPA") prior to their distribution, sale, or use, except as described by FIFRA 7 U.S.C. § 136a(a).

36.   The EPA requires as part of the registration process, among other requirements, a variety of tests to evaluate the potential for exposure to pesticides, toxicity to people and other potential non-target organisms, and other adverse effects on the environment. Registration by the EPA, however, is not an assurance or finding of safety.  The determination the EPA makes in registering or re-registering a product is not that the product is "safe," but rather that use of the product in accordance with its label directions "will not generally cause unreasonable adverse effects on the environment." 7 U.S.C. § 136(a)(c)(5)(D).

37.   FIFRA defines "unreasonable adverse effects on the environment" to mean "any unreasonable risk to man or the environment, taking into account the economic, social, and environmental costs and benefits of the use of any pesticide." 7 U.S.C. § 136(bb). FIFRA thus requires the EPA to make a risk/benefit analysis in determining whether a registration should be granted or allowed to continue to be sold in commerce.

38.   The EPA and the State of Illinois registered Roundup for distribution, sale, and manufacture in the United States and the State of Illinois.

39.   FIFRA generally requires that the registrant, Monsanto, conduct health and safety testing of pesticide products. The government is not required, nor is it able, to perform the product tests that are required of the manufacturer.

40.   The evaluation of each pesticide product distributed, sold, or manufactured is completed at the time the product is initially registered. The data necessary for registration of a pesticide has changed over time. The EPA is now in the process of re-evaluating all pesticide products through a Congressionally-mandated process called "re-registration." 7 U.S.C. § 136a-1. In order to reevaluate these pesticides, the EPA demands the completion of additional tests and the submission of data for the EPA's review and evaluation.

41.   In the case of glyphosate and Roundup, the EPA had planned on releasing its preliminary risk assessment—in relation to the registration process—no later than July 2015. The EPA completed its review of glyphosate in early 2015, but delayed releasing the assessment pending further review in light of the World Health Organization's findings.

**MONSANTO'S FALSE REPRESENTATIONS
REGARDING THE SAFETY OF ROUNDUP**

42.   In 1996, the New York Attorney General ("NYAG") filed a lawsuit against Monsanto based on its false and misleading advertising of Roundup products. Specifically, the lawsuit challenged Monsanto's general representations that its spray-on glyphosate-based herbicides, including Roundup, were "safer than table salt" and "practically non-toxic" to mammals, birds, and fish. Among the representations the NYAG found deceptive and misleading about the human and environmental safety of Roundup are the following:

      a) Remember that environmentally friendly Roundup herbicide is biodegradable. It won't build up in the soil so you can use Roundup with confidence along customers' driveways, sidewalks and fences ...

b) And remember that Roundup is biodegradable and won't build up in the soil. That will give you the environmental confidence you need to use Roundup everywhere you've got a weed, brush, edging or trimming problem.

c) Roundup biodegrades into naturally occurring elements.

d) Remember that versatile Roundup herbicide stays where you put it. That means there's no washing or leaching to harm customers' shrubs or other desirable vegetation.

e) This non-residual herbicide will not wash or leach in the soil.  It ... stays where you apply it.

f) You can apply Accord with "confidence because it will stay where you put it" it bonds tightly to soil particles, preventing leaching.  Then, soon after application, soil microorganisms biodegrade into natural products.

g) Glyphosate is less toxic to rats than table salt following acute oral ingestion.

h) h) Glyphosate's safety margin is much greater than required.  It has over a 1,000-fold safety margin in food and over a 700-fold safety margin for workers who manufacture it or use it.

i) You can feel good about using herbicides by Monsanto.  They carry a toxicity category rating of 'practically non-toxic' as it pertains to mammals, birds and fish.

j) "Roundup can be used where kids and pets will play and breaks down into natural material."  This ad depicts a person with his head in the ground and a pet dog standing in an area which has been treated with Roundup.[1]

43.    On November 19, 1996, Monsanto entered into an Assurance of Discontinuance with

NYAG, in which Monsanto agreed, among other things, "to cease and desist from

publishing or broadcasting any advertisements [in New York] that represent, directly or

by implication" that:

a) its glyphosate-containing pesticide products or any component thereof are safe, non-toxic, harmless or free from risk.

***

_____

[1] Attorney General of the State of New York, In the Matter of Monsanto Company, Assurance of Discontinuance Pursuant to Executive Law § 63(15) (Nov. 1996).

7

b) its glyphosate-containing pesticide products or any component thereof manufactured, formulated, distributed or sold by Monsanto are biodegradable

\*\*\*

c) its glyphosate-containing pesticide products or any component thereof stay where they are applied under all circumstances and will not move through the environment by any means.

\*\*\*

d) its glyphosate-containing pesticide products or any component thereof are "good" for the environment or are "known for their environmental characteristics."

\*\*\*

e) glyphosate-containing pesticide products or any component thereof are safer or less toxic than common consumer products other than herbicides;

f) its glyphosate-containing products or any component thereof might be classified as "practically non-toxic."

44. Monsanto did not alter its advertising in the same manner in any state other than New York, and on information and belief still has not done so today.

45. In 2009, France's highest court ruled that Monsanto had not told the truth about the safety of Roundup. The French court affirmed an earlier judgment that Monsanto had falsely advertised its herbicide Roundup as "biodegradable" and that it "left the soil clean."[2]

## EVIDENCE OF CARCINOGENICITY IN ROUNDUP

46. As early as the 1980s Monsanto was aware of glyphosate's carcinogenic properties.

47. On March 4, 1985, a group of the Environmental Protection Agency's ("EPA") Toxicology Branch published a memorandum classifying glyphosate as a Category C oncogene.[3] Category C oncogenes are possible human carcinogens with limited evidence of carcinogenicity.

---

[2] *Monsanto Guilty in 'False Ad' Row,* BBC, Oct. 15, 2009, *available at* http://news.bbc.co.uk/2/hi/europe/8308903.stm.
[3] Consensus Review of Glyphosate, Casewell No. 661A. March 4, 1985. United States Environmental Protection Agency.

48.     In 1986, the EPA issued a Registration Standard for glyphosate (NTIS PB87-103214).
        The Registration standard required additional phytotoxicity, environmental fate,
        toxicology, product chemistry, and residue chemistry studies.  All of the data required
        was submitted and reviewed and/or waived.

49.     In October 1991, the EPA published a Memorandum entitled "Second Peer Review of
        Glyphosate."  The memorandum changed glyphosate's classification to Group E
        (evidence of non-carcinogenicity for humans).  Two peer review committee members
        did not concur with the conclusions of the committee and one member refused to sign.[4]

50.     In addition to the toxicity of the active molecule, many studies support the hypothesis
        that glyphosate formulations found in Defendant's Roundup products are more
        dangerous and toxic than glyphosate alone.[5]  As early as 1991 evidence existed
        demonstrating that glyphosate formulations were significantly more toxic than
        glyphosate alone.[6]

51.     In 2002, Julie Marc published a study entitled "Pesticide Roundup Provokes Cell
        Division Dysfunction at the Level of CDK1/Cyclin B Activation."

52.     The study found that Roundup caused delays in the cell cycles of sea urchins, while the
        same concentrations of glyphosate alone proved ineffective and did not alter cell cycles.

53.     In 2004, Julie Marc published a study entitled "Glyphosate-based pesticides affect cell
        cycle regulation."  The study demonstrated a molecular link between glyphosate-based
        products and cell cycle dysregulation.

54.     The study noted that "cell-cycle dysregulation is a hallmark of tumor cells and human
        cancer.  Failure in the cell-cycle checkpoints leads to genomic instability and subsequent
        development of cancers from the initial affected cell."  Further, "[s]ince cell cycle

---

[4] Second Peer Review of Glyphosate, CAS No. 1071-83-6. October 30, 1881. United States
Environmental Protection Agency.
[5] Martinez et al. 2007; Benachour 2009; Gasnier et al. 2010; Peixoto 2005; Marc 2004.
[6] Martinez et al 1991.

disorders such as cancer result from dysfunction of unique cell, it was of interest to evaluate the threshold dose of glyphosate affecting cells."[7]

55.    In 2005, Francisco Peixoto published a study showing that Roundup's effects on rat liver mitochondria are much more toxic and harmful than the same concentrations of glyphosate alone.

56.    The Peixoto study suggested that the harmful effects of Roundup on mitochondrial bioenergetics could not be exclusively attributed to glyphosate and could be the result of other chemicals, namely the surfactant POEA, or alternatively due to the possible synergy between glyphosate and Roundup formulation products.

57.    In 2009, Nora Benachour and Gilles-Eric Seralini published a study examining the effects of Roundup and glyphosate on human umbilical, embryonic, and placental cells.

58.    The study used dilution levels of Roundup and glyphosate far below agricultural recommendations, corresponding with low levels of residues in food. The study concluded that supposed "inert" ingredients, and possibly POEA, change human cell permeability and amplify toxicity of glyphosate alone. The study further suggested that determinations of glyphosate toxicity should take into account the presence of adjuvants, or those chemicals used in the formulation of the complete pesticide. The study confirmed that the adjuvants in Roundup are not inert and that Roundup is always more toxic than its active ingredient glyphosate.

59.    The results of these studies were confirmed in recently published peer-reviewed studies and were at all times available and/or known to Defendant.

60.    Defendant knew or should have known that Roundup is more toxic than glyphosate alone and that safety studies on Roundup, Roundup's adjuvants and "inert" ingredients, and/or the surfactant POEA were necessary to protect Plaintiff from Roundup.

61.    Defendant knew or should have known that tests limited to Roundup's active ingredient glyphosate were insufficient to prove the safety of Roundup.

---

[7] Molinari, 2000; Stewart et al., 2003.

62. Defendant failed to appropriately and adequately test Roundup, Roundup's adjuvants
and "inert" ingredients, and/or the surfactant POEA to protect Plaintiff from Roundup.

63. Rather than performing appropriate tests, Defendant relied upon flawed industry-
supported studies designed to protect Defendant's economic interests rather than
Plaintiff and the consuming public.

64. Despite possessing knowledge that Roundup was considerably more dangerous than
glyphosate alone, Defendant continued to promote Roundup as safe.

### IARC CLASSIFICATION OF GLYPHOSATE

65. The International Agency for Research on Cancer ("IARC") is the specialized
intergovernmental cancer agency the World Health Organization ("WHO") of the
United Nations tasked with conducting and coordinating research into the causes of
cancer.

66. An IARC Advisory Group to Recommend Priorities for IARC Monographs during
2015–2019 met in April 2014. Though nominations for the review were solicited, a
substance must meet two criteria to be eligible for review by the IARC Monographs:
there must already be some evidence of carcinogenicity of the substance, and there must
be evidence that humans are exposed to the substance.

67. IARC set glyphosate for review in 2015-2016. IARC uses five criteria for determining
priority in reviewing chemicals. The substance must have a potential for direct impact
on public health; scientific literature to support suspicion of carcinogenicity; evidence of
significant human exposure; high public interest and/or potential to bring clarity to a
controversial area and/or reduce public anxiety or concern; related agents similar to one
given high priority by the above considerations. Data reviewed is sourced preferably
from publicly accessible, peer-reviewed data.

68. On March 24, 2015, after its cumulative review of human, animal, and DNA studies for
more than one (1) year, many of which have been in Defendant's possession since as
early as 1985, the IARC's working group published its conclusion that the glyphosate
contained in Defendant's Roundup herbicide, is a Class 2A "probable carcinogen" as

11

demonstrated by the mechanistic evidence of carcinogenicity in humans and sufficient evidence of carcinogenicity in animals.

69.   The IARC's full Monograph was published on July 29, 2015 and established glyphosate as a class 2A probable carcinogen to humans.  According to the authors glyphosate demonstrated sufficient mechanistic evidence (genotoxicity and oxidative stress) to warrant a 2A classification based on evidence of carcinogenicity in humans and animals.

70.   The IARC Working Group found an increased risk between exposure to glyphosate and NHL and several subtypes of NHL, and the increased risk continued after adjustment for other pesticides.

71.   The IARC also found that glyphosate caused DNA and chromosomal damage in human cells.

### EARLIER EVIDENCE OF GLYPHOSATE'S DANGER

72.   Despite the new classification by the IARC, Defendant has had ample evidence of glyphosate and Roundup's genotoxic properties for decades.

73.   Genotoxicity refers to chemical agents that are capable of damaging the DNA within a cell through genetic mutations, which is a process that is believed to lead to cancer.

74.   In 1997, Chris Clements published "Genotoxicity of select herbicides in Rana catesbeiana tadpoles using the alkaline single-cell gel DNA electrophoresis (comet) assay."

75.   The study found that tadpoles exposed to Roundup showed significant DNA damage when compared with unexposed control animals.

76.   Both human and animal studies have shown that glyphosate and glyphosate-based formulations such as Roundup can induce oxidative stress.

77.   Oxidative stress and associated chronic inflammation are believed to be involved in carcinogenesis.

78.   The IARC Monograph notes that "[s]trong evidence exists that glyphosate, AMPA and glyphosate-based formulations can induce oxidative stress."

79.     In 2006 César Paz-y-Miño published a study examining DNA damage in human
        subjects exposed to glyphosate.

80.     The study produced evidence of chromosomal damage in blood cells showing
        significantly greater damage after exposure to glyphosate than before in the same
        individuals, suggesting that the glyphosate formulation used during aerial spraying had a
        genotoxic effect on exposed individuals.

81.     The IARC Monograph reflects the volume of evidence of glyphosate pesticides'
        genotoxicity noting "[t]he evidence for genotoxicity caused by glyphosate-based
        formulations is strong."

82.     Despite knowledge to the contrary, Defendant maintains that there is no evidence that
        Roundup is genotoxic, that regulatory authorities and independent experts are in
        agreement that Roundup is not genotoxic, and that there is no evidence that Roundup is
        genotoxic.

83.     In addition to glyphosate and Roundup's genotoxic properties, Defendant has long been
        aware of glyphosate's carcinogenic properties.

84.     Glyphosate and Roundup in particular have long been associated with carcinogenicity
        and the development of numerous forms of cancer, including, but not limited to, NHL,
        Hodgkin's lymphoma, multiple myeloma, and soft tissue sarcoma.

85.     Defendant has known of this association since the early to mid-1980s and numerous
        human and animal studies have evidenced the carcinogenicity of glyphosate and/or
        Roundup.

86.     In 1985 the EPA studied the effects of glyphosate in mice finding a dose related
        response in male mice linked to renal tubal adenomas, a rare tumor. The study
        concluded the glyphosate was oncogenic.

87.     In 2003 Lennart Hardell and Mikael Eriksson published the results of two case
        controlled studies on pesticides as a risk factor for NHL and hairy cell leukemia.

88.     The study concluded that glyphosate had the most significant relationship to NHL
        among all herbicides studies with an increased odds ratio of 3.11.

13

89.     In 2003 AJ De Roos published a study examining the pooled data of mid-western
        farmers, examining pesticides and herbicides as risk factors for NHL.

90.     The study, which controlled for potential confounders, found a relationship between
        increased NHL incidence and glyphosate.

91.     In 2008 Mikael Eriksson published a study a population based case-control study of
        exposure to various pesticides as a risk factor for NHL.

92.     This strengthened previous associations between glyphosate and NHL.

93.     In spite of this knowledge, Defendant continued to issue broad and sweeping statements
        suggesting that Roundup was, and is, safer than ordinary household items such as table
        salt, despite a lack of scientific support for the accuracy and validity of these statements
        and, in fact, voluminous evidence to the contrary.

94.     Upon information and belief, these statements and representations have been made with
        the intent of inducing Plaintiff and the public at large to purchase, and increase the use
        of, Roundup for Defendant's pecuniary gain, and in fact did induce Plaintiff to use
        Roundup.

95.     Defendant made these statements with complete disregard and reckless indifference to
        the safety of Plaintiff and the general public.

96.     Notwithstanding Defendant's representations, scientific evidence has established a clear
        association between glyphosate and genotoxicity, inflammation, and an increased risk of
        many cancers, including, but not limited to, NHL, multiple myeloma, and soft tissue
        sarcoma.

97.     Defendant knew or should have known that glyphosate is associated with an increased
        risk of developing cancer, including, but not limited to, NHL, multiple myeloma, and
        soft tissue sarcomas.

98.     Defendant failed to appropriately and adequately inform and warn Plaintiff of the
        serious and dangerous risks associated with the use of and exposure to glyphosate and/or
        Roundup, including, but not limited to, the risk of developing NHL, as well as other
        severe and personal injuries, which are permanent and/or long-lasting in nature, cause

14

significant physical pain and mental anguish, diminished enjoyment of life, and the need for medical treatment, monitoring and/or medications.

99.     Despite the IARC's classification of glyphosate as a class 2A probable carcinogen, Defendant continues to maintain that glyphosate and/or Roundup is safe, non-carcinogenic, non-genotoxic, and falsely warrant to users and the general public that independent experts and regulatory agencies agree that there is no evidence of carcinogenicity or genotoxicity in glyphosate and Roundup.

100.    Defendant has claimed and continue to claim that Roundup is safe, non-carcinogenic, and non-genotoxic.

101.    Glyphosate, and Roundup products in particular, have long been associated with serious side effects and many regulatory agencies around the globe have banned or are currently banning the use of glyphosate herbicide products.

102.    Defendant's statements proclaiming the safety of Roundup and disregarding its dangers misled Plaintiff.

103.    Despite Defendant's knowledge that Roundup was associated with an elevated risk of developing cancer, Defendant's promotional campaigns focused on Roundup's purported "safety profile."

104.    Defendant's failure to adequately warn Plaintiff resulted in (1) Plaintiff using and being exposed to glyphosate instead of using another acceptable and safe method of controlling unwanted weeds and pests; and (2) scientists and physicians failing to warn and instruct consumers about the risk of cancer, including NHL, and other injuries associated with Roundup.

105.    Defendant failed to seek modification of the labeling of Roundup to include relevant information regarding the risks and dangers associated with Roundup exposure.

106.    The failure of Defendant to appropriately warn and inform the EPA has resulted in inadequate warnings in safety information presented directly to users and consumers.

107.  The failure of Defendant to appropriately warn and inform the EPA has resulted in the absence of warning or caution statements that are adequate to protect health and the environment.

108.  The failure of Defendant to appropriately warn and inform the EPA has resulted in the directions for use that are not adequate to protect health and the environment.

109.  By reason of the foregoing acts and omissions, Plaintiff seeks compensatory damages as a result of Plaintiff's use of, and exposure to, Roundup which caused or was a substantial contributing factor in causing Plaintiff to suffer from cancer, specifically NHL, and Plaintiff suffered severe and personal injuries which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life.

110.  By reason of the foregoing, Plaintiff was severely and permanently injured.

111.  By reason of the foregoing acts and omissions, Plaintiff has endured and, in some categories continues to suffer, emotional and mental anguish, medical expenses, and other economic and non-economic damages, as a result of the actions and inactions of Defendant.

## PLAINTIFF'S EXPOSURE TO ROUNDUP

112.  For many years, Plaintiff sprayed Roundup on a regular basis.  Plaintiff followed all safety and precautionary warnings during the course of use.

113.  Plaintiff was subsequently diagnosed with NHL in September of 2020.

114.  Plaintiff developed NHL as a result of his exposure to Roundup product.  As a result of his injury, Plaintiff incurred significant economic and non-economic damages.

## EQUITABLE TOLLING OF APPLICABLE STATUTE OF LIMITATIONS

115.  Plaintiff incorporates by reference all prior paragraphs of this Complaint as if fully set forth herein.

116.  The running of any statute of limitations has been tolled by reason of Defendant's fraudulent concealment.  Defendant, through affirmative misrepresentations and

omissions, actively concealed from Plaintiff the true risks associated with Roundup and glyphosate.

117.    At all relevant times, Defendant has maintained that Roundup is safe, non-toxic, and non-carcinogenic.

118.    As a result of Defendant's actions, Plaintiff was unaware, and could not reasonably have known or have learned through reasonable diligence, that Roundup and/or glyphosate contact exposed him to the risks alleged herein and that those risks were the direct and proximate result of Defendant's acts and omissions.

119.    Furthermore, Defendant is estopped from relying on any statute of limitations because of its fraudulent concealment of the true character, quality and nature of Roundup. Defendant was under a duty to disclose the true character, quality, and nature of Roundup because this was non-public information over which Defendant had and continues to have exclusive control, and because Defendant knew that this information was not available to Plaintiff or to distributors of Roundup. In addition, Defendant is estopped from relying on any statute of limitations because of their intentional concealment of these facts.

120.    Plaintiff had no knowledge that Defendant was engaged in the wrongdoing alleged herein. Because of the fraudulent acts of concealment of wrongdoing by Defendant, Plaintiff could not have reasonably discovered the wrongdoing at any time prior. Also, the economics of this fraud should be considered. Defendant had the ability to and did spend enormous amounts of money in furtherance of its purpose of marketing, promoting and/or distributing a profitable herbicide, notwithstanding the known or reasonably known risks. Plaintiff and medical professionals could not have afforded and could not have possibly conducted studies to determine the nature, extent, and identity of related health risks, and were forced to rely on only the Defendant's representations. Accordingly, Defendant is precluded by the discovery rule and/or the doctrine of fraudulent concealment from relying upon any statute of limitations.

## COUNT I
## (NEGLIGENCE)

121.   Plaintiff repeats, reiterates, and re-alleges each and every allegation of this Complaint
contained in each of the foregoing paragraphs inclusive, with the same force and effect
as if more fully set forth herein.

122.   Defendant had a duty to exercise reasonable care in the designing, researching, testing,
manufacturing, marketing, supplying, promoting, packaging, sale, and/or distribution of
Roundup into the stream of commerce, including a duty to assure that the product would
not cause users to suffer unreasonable, dangerous side effects.

123.   Defendant failed to exercise ordinary care in the designing, researching, testing,
manufacturing, marketing, supplying, promoting, packaging, sale, testing, quality
assurance, quality control, and/or distribution of Roundup into interstate commerce in
that Defendant knew or should have known that using Roundup created a high risk of
unreasonable, dangerous side effects, including, but not limited to, the development of
NHL, as well as other severe and personal injuries which are permanent and lasting in
nature, physical pain and mental anguish, including diminished enjoyment of life, as
well as need for lifelong medical treatment, monitoring, and/or medications.

124.   The negligence by Defendant, its agents, servants, and/or employees, included but was
not limited to the following acts and/or omissions:

   a)   Manufacturing, producing, promoting, formulating, creating, and/or
   designing Roundup without thoroughly testing it;

   b)   Failing to test Roundup and/or failing to adequately, sufficiently, and
   properly test Roundup;

   c)   Not conducting sufficient testing programs to determine whether or
   not Roundup was safe for use; in that Defendant knew or should have
   known that Roundup was unsafe and unfit for use by reason of the
   dangers to its users;

   d)   Not conducting sufficient testing programs and studies to determine
   Roundup's carcinogenic properties even after Defendant had
   knowledge that Roundup is, was, or could be carcinogenic;

   e)   Failing to conduct sufficient testing programs to determine the safety
   of "inert" ingredients and/or adjuvants contained within Roundup, and
   the propensity of these ingredients to render Roundup toxic, increase

the toxicity of Roundup, whether these ingredients are carcinogenic, magnify the carcinogenic properties of Roundup, and whether or not "inert" ingredients and/or adjuvants were safe for use;

f) Negligently failing to adequately and correctly warn Plaintiff, the public, the medical and agricultural professions, and the EPA of the dangers of Roundup;

g) Negligently failing to petition the EPA to strength the warnings associated with Roundup;

h) Failing to provide adequate cautions and warnings to protect the health of users, handlers, applicators, and persons who would reasonably and foreseeably come into contact with Roundup;

i) Negligently marketing, advertising, and recommending the use of Roundup without sufficient knowledge as to its dangerous propensities;

j) Negligently representing that Roundup was safe for use for its intended purpose, and/or that Roundup was safer than ordinary and common items such as table salt, when, in fact, it was unsafe;

k) Negligently representing that Roundup had equivalent safety and efficacy as other forms of herbicides;

l) Negligently designing Roundup in a manner, which was dangerous to its users;

m) Negligently manufacturing Roundup in a manner, which was dangerous to its users;

n) Negligently producing Roundup in a manner, which was dangerous to its users;

o) Negligently formulating Roundup in a manner, which was dangerous to its users;

p) Concealing information from Plaintiff while knowing that Roundup was unsafe, dangerous, and/or non-conforming with EPA regulations;

q) Improperly concealing and/or misrepresenting information from Plaintiff, scientific and medical professionals, and/or the EPA, concerning the severity of risks and dangers of Roundup compared to other forms of herbicides; and

r) Negligently selling Roundup with a false and misleading label.

125.  Defendant under-reported, underestimated, and downplayed the serious dangers of Roundup.

126.    Defendant negligently and deceptively compared the safety risks and/or dangers of
        Roundup with common everyday foods such as table salt, and other forms of herbicides.

127.    Defendant was negligent and/or violated Illinois law in the designing, researching,
        supplying, manufacturing, promoting, packaging, distributing, testing, advertising,
        warning, marketing, and selling of Roundup in that it:

   a)  Failed to use ordinary care in designing and manufacturing Roundup
       so as to avoid the aforementioned risks to individuals when Roundup
       was used as an herbicide;

   b)  Failed to accompany their product with proper and/or accurate
       warnings regarding all possible adverse side effects associated with the
       use of Roundup;

   c)  Failed to accompany their product with proper warnings regarding all
       possible adverse side effects concerning the failure and/or malfunction
       of Roundup;

   d)  Failed to accompany their product with accurate warnings regarding
       the risks of all possible adverse side effects concerning Roundup;

   e)  Failed to warn Plaintiff of the severity and duration of such adverse
       effects, as the warnings given did not accurately reflect the symptoms,
       or severity of the side effects including, but not limited to, the
       development of NHL;

   f)  Failed to conduct adequate testing, clinical testing and post-marketing
       surveillance to determine the safety of Roundup;

   g)  Failed to conduct adequate testing, clinical testing, and post-marketing
       surveillance to determine the safety of Roundup's "inert" ingredients
       and/or adjuvants;

   h)  Negligently misrepresented the evidence of Roundup's genotoxicity
       and carcinogenicity; and

   i)  Was otherwise careless and/or negligent.

128.    Despite the fact that Defendant knew or should have known that Roundup caused, or
        could cause, unreasonably dangerous side effects, Defendant continued and continue to
        market, manufacture, distribute, and/or sell Roundup to consumers, including to
        Plaintiff.

129.    Defendant knew or should have known that consumers such as Plaintiff would foreseeably suffer injury as a result of Defendant's failure to exercise ordinary care, as set forth above.

130.    Defendant's violations of law and/or negligence were the proximate cause of Plaintiff's injuries, harm and economic loss, which Plaintiff suffered and/or will continue to suffer.

131.    As a result of the foregoing acts and omissions, Plaintiff suffered from serious and dangerous side effects including, but not limited to, NHL, as well as other severe and personal injuries which are permanent and lasting in nature, physical pain and mental anguish, diminished enjoyment of life, and financial expenses for hospitalization and medical care.  Further, Plaintiff suffered life-threatening NHL, and severe personal injuries, which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life.

132.    WHEREFORE, Plaintiff respectfully request that this Court enter judgment in Plaintiff's favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all relief as this Court deems just and proper.

## COUNT II
## (STRICT PRODUCTS LIABILITY—DESIGN DEFECT)

133.   Plaintiff repeats, reiterates and, re-alleges each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

134.   At all times herein mentioned, Defendant designed, researched, manufactured, tested, advertised, promoted, sold, distributed, and/or had acquired the entity who has designed, researched, tested, advertised, promoted, marketed, sold, and distributed Roundup as hereinabove described that was used by Plaintiff.

135.   Defendant's Roundup was expected to and did reach the usual consumers, handlers, and persons coming into contact with said product without substantial change in the condition in which it was produced, manufactured, sold, distributed, and marketed by the Defendant.

136.   At those times, Roundup was in an unsafe, defective, and inherently dangerous condition, which was dangerous to users, and in particular, Plaintiff.

137.   The Roundup designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed by Defendant was defective in design or formulation in that, when it left the hands of the manufacturer and/or suppliers, the foreseeable risks exceeded the benefits associated with the design or formulation of Roundup.

138.   The Roundup designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed by Defendant was defective in design and/or formulation, in that, when it left the hands of the Defendant's manufacturer and/or supplier, it was unreasonably dangerous, unreasonably dangerous in normal use, and it was more dangerous than an ordinary consumer would expect.

139.   At all times herein mentioned, Roundup was in a defective condition and unsafe, and Defendant knew or had reason to know that said product was defective and unsafe, especially when used in the form and manner as provided by Defendant.  In particular, Roundup was defective in the following ways:

22

a) When placed in the stream of commerce, Roundup Products were defective in design and formulation and, consequently, dangerous to an extent beyond that which an ordinary consumer would anticipate.

b) When placed in the stream of commerce, Roundup products were unreasonably dangerous in that they were hazardous and posed a grave risk of cancer and other serious illnesses when used in a reasonably anticipated manner.

c) When placed in the stream of commerce, Roundup products contained unreasonably dangerous design defects and were not reasonably safe when used in a reasonably anticipated manner.

d) Defendant did not sufficiently test, investigate, or study its Roundup products.

e) Exposure to Roundup presents a risk of harmful side effects that outweigh any potential utility stemming from the use of the herbicide.

f) Defendant knew or should have known at the time of marketing its Roundup products that exposure to Roundup and could result in cancer and other severe illnesses and injuries.

g) Defendant did not conduct adequate post-marketing surveillance of its Roundup products.

140.   Defendant knew, or should have known that at all times herein mentioned its Roundup was in a defective condition, and was and is inherently dangerous and unsafe.

141.   Plaintiff was exposed to Roundup, as described above, without knowledge of Roundup's dangerous characteristics.

142.   At the time of Plaintiff's use of and exposure to Roundup, Roundup was being used for the purposes and in a manner normally intended, as a broad-spectrum herbicide.

143.   Defendant with this knowledge voluntarily designed its Roundup with a dangerous condition for use by the public, and in particular Plaintiff.

144.   Defendant had a duty to create a product that was not unreasonably dangerous for its normal, intended use.

145.   Defendant created a product that was and is unreasonably dangerous for its normal, intended use.

146.   Defendant marketed and promoted a product in such a manner so as to make it inherently defective as the product downplayed its suspected, probable, and established health risks inherent with its normal, intended use.

147.   The Roundup designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed by Defendant was manufactured defectively in that Roundup left the hands of Defendant in a defective condition and was unreasonably dangerous to its intended users.

148.   The Roundup designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed by Defendant reached their intended users in the same defective and unreasonably dangerous condition in which the Defendant's Roundup was manufactured.

149.   Defendant designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed a defective product, which created an unreasonable risk to the health of consumers and to Plaintiff in particular, and Defendant is therefore strictly liable for the injuries sustained by Plaintiff.

150.   Plaintiff could not, by the exercise of reasonable care, have discovered Roundup's defects herein mentioned or perceived its danger.

151.   By reason of the foregoing, Defendant has become strictly liable to the Plaintiff for the manufacturing, marketing, promoting, distribution, and selling of a defective product, Roundup.

152.   Defendant's defective design, of Roundup amounts to willful, wanton, and/or reckless conduct by Defendant.

153.   Defects in Defendant's Roundup were the cause or a substantial factor in causing Plaintiff's injuries.

154.   As a result of the foregoing acts and omission, Plaintiff developed NHL, and suffered severe and personal injuries, which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life, and financial expenses for hospitalization and medical care.

155.   WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in Plaintiff's favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all relief as this Court deems just and proper.

## COUNT III
## (STRICT PRODUCTS LIABILITY—FAILURE TO WARN)

156.   Plaintiff repeats, reiterates and re-alleges each and every allegation of this Complaint
       contained in each of the foregoing paragraphs inclusive, with the same force and effect
       as if more fully set forth herein.

157.   Defendant has engaged in the business of selling, testing, distributing, supplying,
       manufacturing, marketing, and/or promoting Roundup, and through that conduct has
       knowingly and intentionally placed Roundup into the stream of commerce with full
       knowledge that it reaches consumers such as Plaintiff who are exposed to it through
       ordinary and reasonably foreseeable uses.

158.   Defendant did in fact sell, distribute, supply, manufacture, and/or promote Roundup to
       Plaintiff.  Additionally, Defendant expected the Roundup that they were selling,
       distributing, supplying, manufacturing, and/or promoting to reach—and Roundup did in
       fact reach—consumers, including Plaintiff, without any substantial change in the
       condition of the product from when it was initially distributed by Defendant.

159.   At the time of manufacture, Defendant could have provided the warnings or instructions
       regarding the full and complete risks of Roundup and glyphosate-containing products
       because it knew or should have known of the unreasonable risks of harm associated with
       the use of and/or exposure to such products.

160.   At all times herein mentioned, the aforesaid product was defective and unsafe in
       manufacture such that it was unreasonably dangerous to the user, and was so at the time
       it was distributed by Defendant and at the time Plaintiff was exposed to and/or ingested
       the product. The defective condition of Roundup was due in part to the fact that it was
       not accompanied by proper warnings regarding its carcinogenic qualities and possible
       side effects, including, but not limited to, developing NHL as a result of exposure and
       use.

161.   Roundup did not contain a warning or caution statement, which was necessary and, if
       complied with, was adequate to protect health those exposed in violation of 7 U.S.C.
       § 136j(a)(1)(E).

162.   Defendant's failure to include a warning or caution statement which was necessary and, if complied with, was adequate to protect the health of those exposed, violated 7 U.S.C. § 136j(a)(1)(E) as well as the laws of the State of Illinois.

163.   Defendant could have amended the label of Roundup to provide additional warnings.

164.   This defect caused serious injury to Plaintiff, who used Roundup in its intended and foreseeable manner.

165.   At all times herein mentioned, Defendant had a duty to properly design, manufacture, compound, test, inspect, package, label, distribute, market, examine, maintain supply, provide proper warnings, and take such steps to assure that the product did not cause users to suffer from unreasonable and dangerous side effects.

166.   Defendant labeled, distributed, and promoted the aforesaid product that it was dangerous and unsafe for the use and purpose for which it was intended.

167.   Defendant failed to warn of the nature and scope of the side effects associated with Roundup, namely its carcinogenic properties and its propensity to cause or serve as a substantial contributing factor in the development of NHL.

168.   Defendant was aware of the probable consequences of the aforesaid conduct. Despite the fact that Defendant knew or should have known that Roundup caused serious injuries, Defendant failed to exercise reasonable care to warn of the dangerous carcinogenic properties and side effect of developing NHL from Roundup exposure, even though these side effects were known or reasonably scientifically knowable at the time of distribution.  Defendant willfully and deliberately failed to avoid the consequences associated with their failure to warn, and in doing so, Defendant acted with a conscious disregard for the safety of Plaintiff.

169.   At the time of exposure, Plaintiff could not have reasonably discovered any defect in Roundup prior through the exercise of reasonable care.

170.   Defendant, as the manufacturer and/or distributor of the subject product, is held to the level of knowledge of an expert in the field.

171.   Plaintiff reasonably relied upon the skill, superior knowledge, and judgment of Defendant.

172.   Had Defendant properly disclosed the risks associated with Roundup, Plaintiff would have avoided the risk of NHL by not using Roundup.

173.   The information that Defendant did provide or communicate failed to contain adequate warnings and precautions that would have enabled Plaintiff, and similarly situated individuals, to utilize the product safely and with adequate protection.  Instead, Defendant disseminated information that was inaccurate, false, and misleading and which failed to communicate accurately or adequately the comparative severity, duration, and extent of the risk of injuries associated with use of and/or exposure to Roundup and glyphosate; continued to promote the efficacy of Roundup, even after it knew or should have known of the unreasonable risks from use or exposure; and concealed, downplayed, or otherwise suppressed, through aggressive marketing and promotion, any information or research about the risks and dangers of exposure to Roundup and glyphosate.

174.   To this day, Defendant has failed to adequately warn of the true risks of Plaintiff's injuries associated with the use of and exposure to Roundup.

175.   As a result of their inadequate warnings, Roundup was defective and unreasonably dangerous when it left the possession and/or control of Defendant, were distributed by Defendant, and used by Plaintiff.

176.   As a direct and proximate result of Defendant's actions as alleged herein, and in such other ways to be later shown, the subject product caused Plaintiff to sustain injuries herein alleged.

177.   WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in Plaintiff's favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all relief as this Court deems just and proper.

## COUNT IV

### (BREACH OF IMPLIED WARRANTIES)

178.   Plaintiff repeats, reiterates, and re-alleges each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect all if more fully set forth herein.

179.   At all times herein mentioned, Defendant manufactured, distributed, compounded, recommended, merchandized, advertised, promoted, and sold Roundup and/or has acquired the entity who manufactured, compound portrayed, distributed, recommended, merchandized, advertised, promoted, and sold Roundup, as a broad spectrum herbicide. These actions were under the ultimate control and supervision of Defendant.

180.   At the time Defendant marketed, sold, and distributed Roundup for use by Plaintiff, Defendant knew of Roundup's intended use and impliedly warranted the product to be or merchantable quality and safe and fit for this use.

181.   The Defendant impliedly represented and warranted to Plaintiff and users of Roundup, the agricultural community, and/or the EPA that Roundup was safe and of merchantable quality and fit for the ordinary purpose for which it was to be used.

182.   These representations and warranties were false, misleading, and inaccurate in that Roundup was unsafe, unreasonably dangerous, not of merchantable quality, and defective.

183.   Plaintiff and/or the EPA did rely on said implied warranty of merchantability of fitness for particular use and purpose.

184.   Plaintiff reasonably relied upon the skill and judgment of Defendant as to whether Roundup was of merchantable quality and safe and fit for its intended use.

185.   Roundup was injected into the stream of commerce by Defendant in a defective, unsafe, and inherently dangerous condition, and the products' materials were expected to and did reach users, handlers, and persons coming into contact with said products without substantial change in the condition in which they were sold.

186.    The Defendant breached the aforesaid implied warranties, as their herbicide Roundup
        was not fit for its intended purposes and uses.

187.    As a result of the foregoing acts and omissions, Plaintiff suffered from NHL and
        suffered severe and personal injuries which are permanent and lasting in nature, physical
        pain and mental anguish, including diminished enjoyment of life, financial expenses for
        hospitalization and medical care, including medical expenses and other economic, and
        non-economic damages.

188.    WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in
        Plaintiff's favor for compensatory and punitive damages, together with interest, costs
        herein incurred, attorneys' fees and all relief as this Court deems just and proper.

## COUNT V
## (LOSS OF CONSORTIUM)

189. Plaintiff repeats, reiterates, and re-alleges each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

190. Defendant had a duty to exercise reasonable care in the designing, researching, testing, manufacturing, marketing, supplying, promoting, packaging, sale, and/or distribution of Roundup into the stream of commerce, including a duty to assure that the product would not cause users to suffer unreasonable, dangerous side effects.

191. Defendant failed to exercise ordinary care in the designing, researching, testing, manufacturing, marketing, supplying, promoting, packaging, sale, testing, quality assurance, quality control, and/or distribution of Roundup into interstate commerce in that Defendant knew or should have known that using Roundup created a high risk of unreasonable, dangerous side effects, including, but not limited to, the development of NHL, as well as other severe and personal injuries which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life, as well as need for lifelong medical treatment, monitoring, and/or medications.

192. The negligence by Defendant, its agents, servants, and/or employees, included but was not limited to the following acts and/or omissions:

   a) Manufacturing, producing, promoting, formulating, creating, and/or designing Roundup without thoroughly testing it;

   b) Failing to test Roundup and/or failing to adequately, sufficiently, and properly test Roundup;

   c) Not conducting sufficient testing programs to determine whether or not Roundup was safe for use; in that Defendant knew or should have known that Roundup was unsafe and unfit for use by reason of the dangers to its users;

   d) Not conducting sufficient testing programs and studies to determine Roundup's carcinogenic properties even after Defendant had knowledge that Roundup is, was, or could be carcinogenic;

   e) Failing to conduct sufficient testing programs to determine the safety of "inert" ingredients and/or adjuvants contained within Roundup, and the propensity of these ingredients to render Roundup toxic, increase

30

the toxicity of Roundup, whether these ingredients are carcinogenic, magnify the carcinogenic properties of Roundup, and whether or not "inert" ingredients and/or adjuvants were safe for use;

f) Negligently failing to adequately and correctly warn Plaintiff, the public, the medical and agricultural professions, and the EPA of the dangers of Roundup;

g) Negligently failing to petition the EPA to strength the warnings associated with Roundup;

h) Failing to provide adequate cautions and warnings to protect the health of users, handlers, applicators, and persons who would reasonably and foreseeably come into contact with Roundup;

i) Negligently marketing, advertising, and recommending the use of Roundup without sufficient knowledge as to its dangerous propensities;

j) Negligently representing that Roundup was safe for use for its intended purpose, and/or that Roundup was safer than ordinary and common items such as table salt, when, in fact, it was unsafe;

k) Negligently representing that Roundup had equivalent safety and efficacy as other forms of herbicides;

l) Negligently designing Roundup in a manner, which was dangerous to its users;

m) Negligently manufacturing Roundup in a manner, which was dangerous to its users;

n) Negligently producing Roundup in a manner, which was dangerous to its users;

o) Negligently formulating Roundup in a manner, which was dangerous to its users;

p) Concealing information from Plaintiff while knowing that Roundup was unsafe, dangerous, and/or non-conforming with EPA regulations;

q) Improperly concealing and/or misrepresenting information from Plaintiff, scientific and medical professionals, and/or the EPA, concerning the severity of risks and dangers of Roundup compared to other forms of herbicides; and

r) Negligently selling Roundup with a false and misleading label.

193.   Defendant under-reported, underestimated, and downplayed the serious dangers of Roundup.

194.     Defendant negligently and deceptively compared the safety risks and/or dangers of
         Roundup with common everyday foods such as table salt, and other forms of herbicides.

195.     Defendant was negligent and/or violated Illinois law in the designing, researching,
         supplying, manufacturing, promoting, packaging, distributing, testing, advertising,
         warning, marketing, and selling of Roundup in that it:

   a) Failed to use ordinary care in designing and manufacturing Roundup
      so as to avoid the aforementioned risks to individuals when Roundup
      was used as an herbicide;

   b) Failed to accompany their product with proper and/or accurate
      warnings regarding all possible adverse side effects associated with the
      use of Roundup;

   c) Failed to accompany their product with proper warnings regarding all
      possible adverse side effects concerning the failure and/or malfunction
      of Roundup;

   d) Failed to accompany their product with accurate warnings regarding
      the risks of all possible adverse side effects concerning Roundup;

   e) Failed to warn Plaintiff of the severity and duration of such adverse
      effects, as the warnings given did not accurately reflect the symptoms,
      or severity of the side effects including, but not limited to, the
      development of NHL;

   f) Failed to conduct adequate testing, clinical testing and post-marketing
      surveillance to determine the safety of Roundup;

   g) Failed to conduct adequate testing, clinical testing, and post-marketing
      surveillance to determine the safety of Roundup's "inert" ingredients
      and/or adjuvants;

   h) Negligently misrepresented the evidence of Roundup's genotoxicity
      and carcinogenicity; and

   i) Was otherwise careless and/or negligent.

196.     Despite the fact that Defendant knew or should have known that Roundup caused, or
         could cause, unreasonably dangerous side effects, Defendant continued and continue to
         market, manufacture, distribute, and/or sell Roundup to consumers, including to
         Plaintiff.

197.    Defendant knew or should have known that consumers such as Plaintiff would foreseeably suffer injury as a result of Defendant's failure to exercise ordinary care, as set forth above.

198.    Defendant's violations of law and/or negligence were the proximate cause of Plaintiff's injuries, harm and economic loss, which Plaintiff suffered and/or will continue to suffer.

199.    As a result of the foregoing acts and omissions, Plaintiff suffered from serious and dangerous side effects including, but not limited to, NHL, as well as other severe and personal injuries which are permanent and lasting in nature, physical pain and mental anguish, diminished enjoyment of life, and financial expenses for hospitalization and medical care.  Further, Plaintiff suffered life-threatening NHL, and severe personal injuries, which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life.

200.    As a result of the foregoing acts and omissions, Plaintiff Susan Lynn Fleischhauer has suffered the loss of society, companionship, and conjugal relations with her husband, Dieter Fleischhauer.

201.    That at all times material Plaintiff Susan Lynn Fleischhauer was the lawfully wedded wife of Dieter Fleischhauer.

WHEREFORE, Plaintiff Susan Lynn Fleischhauer respectfully request that this Court enter judgment in Plaintiff's favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all relief as this Court deems just and proper.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment against Defendant on each of the above-referenced claims and causes of action and as follows:

1.      Awarding compensatory damages in excess of the jurisdictional amount, including, but not limited to pain, suffering, emotional distress, loss of enjoyment of life, and other non-economic damages in an amount to be determined at trial of this action;

2.      Awarding compensatory damages to Plaintiff for past and future damages, including, but not limited to, Plaintiff's pain and suffering and for severe and permanent personal injuries sustained by Plaintiff including health care costs and economic loss;

3.      Awarding compensatory damages to Plaintiff Susan Lynn Fleischhauer for loss of consortium, loss of society, companionship, and conjugal relations with her husband, Dieter Fleischhauer.

3.      Awarding economic damages in the form of medical expenses, out of pocket expenses, lost earnings and other economic damages in an amount to be determine at trial of this action;

4.      Punitive and/or exemplary damages for the wanton, willful, fraudulent, and reckless acts of the Defendant which demonstrated a complete disregard and reckless indifference for the safety and welfare of the general public and to Plaintiff in an amount sufficient to punish Defendant and deter future similar conduct, to the extent allowed by applicable law;

5.      Pre-judgment interest;

6.      Post-judgment interest;

7.      Awarding Plaintiff reasonable attorneys' fees;

8.      Awarding Plaintiff the costs of these proceedings; and

9.      Such other and further relief as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands trial by jury as to all issues.

34

Dated:  May 20, 2021                    POWER ROGERS LLP

                                        By:_____ */s/ Carolyn S. Daley*_____
                                                Carolyn S. Daley


                                                        Devon C. Bruce
                                                dbruce@powerrogers.com
                                                      Carolyn S. Daley
                                                cdaley@powerrogers.com
                                                    POWER ROGERS LLP
                                        70 W. Madison Street, #5500
                                                    Chicago, IL 60602
                                        Telephone:    (312) 236-9381
                                        Facsimile:    (312) 236-0902

                                                *Attorneys for Plaintiff*