Query   Reports   Utilities   Help   Log Out

ACCO,(AFMx),DISCOVERY,MANADR

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA (Western Division - Los Angeles)
# CIVIL DOCKET FOR CASE #: 2:21-cv-05524-DSF-AFM

| | |
|---|---|
| Anousheh Sabouri et al v. Monsanto Corporation et al | Date Filed: 07/07/2021 |
| Assigned to: Judge Dale S. Fischer | Jury Demand: Plaintiff |
| Referred to: Magistrate Judge Alexander F. MacKinnon | Nature of Suit: 245 Tort Product Liability |
| Cause: 28:1332 Diversity-Product Liability | Jurisdiction: Diversity |

**Plaintiff**

**Anousheh Sabouri**
*an individual and successor in interest to decedent Mike Esfahanian*

represented by **Katherine Katy Melik-Stepanyan**
Law Offices of Haytham Faraj
8605 Santa Monica Boulevard Suite 44953
West Hollywood, CA 90069
323-463-9200
Fax: 202-280-1039
Email: katie@farajlaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Haytham Faraj**
Law Offices of Haytham Faraj
8605 Santa Monica Boulevard Suite 44953
West Hollywood, CA 90069
323-463-9200
Fax: 202-280-1039
Email: haytham@farajlaw.com
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**E. S.**
*an minor and successor in interest to decedent Mike Esfahanian, by and through her Guardian Ad Litem, Anousheh Sabouri*

represented by **Katherine Katy Melik-Stepanyan**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Haytham Faraj**
(See above for address)
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Monsanto Corporation**
*a corporation*

**Defendant**

**Does**
*1 through 100, Inclusive*

| Date Filed | # | Docket Text |
|---|---|---|
| 07/07/2021 | 1 | First PETITION for Appointment of Anousheh Sabouri as Guardian ad Litem for S. E. filed by Plaintiff Anousheh Sabouri. (Attorney Katherine Katy Melik-Stepanyan added to party Anousheh Sabouri(pty:pla)) (Melik-Stepanyan, Katherine) (Entered: 07/07/2021) |
| 07/07/2021 | 2 | CIVIL COVER SHEET filed by Plaintiffs Sofia Esfahanian, Anousheh Sabouri. (Melik-Stepanyan, Katherine) (Entered: 07/07/2021) |
| 07/08/2021 | 3 | NOTICE OF DEFICIENCIES in Attorney Case Opening RE: First PETITION for Appointment of Anousheh Sabouri as Guardian ad Litem for S. E. 1 . The following error(s) was found: You have attempted to open this case electronically but have failed to upload successfully the required PDF version of any initiating document, such as a complaint or notice of removal. You must file an initiating document within two business days of this notice or the docket for this case number will be closed. A case-initiating document was submitted without payment of the full filing fee. Within two business days of this notice, counsel must pay the filing fee or file a request to proceed in forma pauperis;otherwise, the docket for this case number will be closed and no further filings will be permitted under this case number. The filing fee may be paid online by docketing the event Pay Filing Fee. (et) (Entered: 07/08/2021) |
| 07/08/2021 | 4 | COMPLAINT with filing fee previously paid ($402.00 paid on 07/07/2021, receipt number 31591890), ACACDC-31591890, filed by Plaintiff Sofia Esfahanian, Anousheh Sabouri. (Attorney Katherine Katy Melik-Stepanyan added to party Sofia Esfahanian(pty:pla))(Melik-Stepanyan, Katherine) Modified on 7/8/2021 (ghap). (Entered: 07/08/2021) |
| 07/08/2021 | 5 | NOTICE OF DEFICIENCIES in Attorney Case Opening RE: Complaint (Attorney Civil Case Opening), 4 . The following error(s) was found: It appears the name of an individual known to be a minor is contained in documents filed with the Court. Fed R Civ P 5.2(a) requires that a minor's initials (as opposed to a minor's spell-out name) be used on documents filed with this Court, unless the Court orders otherwise. You are not required to take any action in response to this notice unless the Court so directs. (ghap) (Entered: 07/08/2021) |
| 07/08/2021 | 6 | NOTICE OF DEFICIENCIES in Attorney Case Opening RE: Complaint (Attorney Civil Case Opening), 4 . The following error(s) was found: No Notice of Interested Parties has been filed. A Notice of Interested Parties must be filed |

| | | with every partys first appearance. See Local Rule 7.1-1. Counsel must file a Notice of Interested Parties immediately. Failure to do so may be addressed by judicial action, including sanctions. See Local Rule 83-7. (ghap) (Entered: 07/08/2021) |
|---|---|---|
| 07/08/2021 | 7 | NOTICE OF ASSIGNMENT to District Judge Dale S. Fischer and Magistrate Judge Gail J. Standish. (ghap) (Entered: 07/08/2021) |
| 07/08/2021 | 8 | NOTICE TO PARTIES OF COURT-DIRECTED ADR PROGRAM filed. (ghap) (Entered: 07/08/2021) |
| 07/08/2021 | 9 | STANDING ORDER FOR CASES ASSIGNED TO JUDGE DALE S. FISCHER upon filing of the complaint by Judge Dale S. Fischer. If a party would be entitled to attorneys fees, counsel are referred to the Order Re Fees found on Court's website under Judge Fischer's Procedures and Schedules contained in the Judge's Requirements tab. Read all Orders carefully. They govern this case and differ in some respects from the Local Rules. COUNSEL ARE ORDERED TO PROVIDE A MANDATORY CHAMBERS COPY OF THE COMPLAINT, NOTICE OF REMOVAL, AND ANY OTHER INITIATING DOCUMENTS. (dd) (Entered: 07/08/2021) |
| 07/08/2021 | 10 | Notice to Counsel Re Consent to Proceed Before a United States Magistrate Judge. (ghap) (Entered: 07/08/2021) |
| 07/08/2021 | 11 | NOTICE of Interested Parties filed by Plaintiffs All Plaintiffs, identifying Monsanto. (Melik-Stepanyan, Katherine) (Entered: 07/08/2021) |
| 07/08/2021 | 12 | Request for Clerk to Issue Summons on Complaint (Attorney Civil Case Opening), 4 filed by Plaintiff E. S., Anousheh Sabouri. (Melik-Stepanyan, Katherine) (Entered: 07/08/2021) |
| 07/08/2021 | 13 | 21 DAY Summons Issued re Complaint (Attorney Civil Case Opening) 4 as to Defendant Monsanto Corporation. (jp) (Entered: 07/08/2021) |
| 07/09/2021 | 14 | NOTICE OF LODGING filed *Proposed Order* re First PETITION for Appointment of Anousheh Sabouri as Guardian ad Litem for S. E. 1 (Attachments: # 1 Proposed Order Order Appointing GAL)(Melik-Stepanyan, Katherine) (Entered: 07/09/2021) |
| 07/12/2021 | 15 | ORDER RETURNING CASE FOR REASSIGNMENT UPON RECUSAL by Magistrate Judge Gail J. Standish. ORDER case returned to the Clerk for random reassignment Discovery pursuant to General Order 05-07. Case randomly reassigned from Magistrate Judge Gail J. Standish to Magistrate Judge Alexander F. MacKinnon for all further proceedings. The case number will now reflect the initials of the transferee Judge 2:21-cv-05524 DSF(AFMx). (rn) (Entered: 07/12/2021) |
| 07/19/2021 | 16 | TEXT ONLY ENTRY (IN CHAMBERS) ORDER by Judge Dale S. Fischer. The Petition of Anousheh Sabouri to serve as guardian ad litem for the minor co-plaintiff 1 is denied, as there is an obvious conflict of interest. A petition naming a non-conflicted proposed guardian should be filed no later than August 16, 2021. THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY. (dd) TEXT ONLY ENTRY (Entered: 07/19/2021) |

| 07/20/2021 | 17 | Amended PETITION for Appointment of Shirin Sabouri as Guardian ad Litem for S. E. filed by Plaintiff E. S.. (Attachments: # 1 Proposed Order) (Melik-Stepanyan, Katherine) (Entered: 07/20/2021) |
|---|---|---|

<table>
<tr><td colspan="4" align="center"><strong>PACER Service Center</strong></td></tr>
<tr><td colspan="4" align="center"><strong>Transaction Receipt</strong></td></tr>
<tr><td colspan="4" align="center">07/22/2021 07:23:56</td></tr>
<tr><td><strong>PACER Login:</strong></td><td>sh0019sh</td><td><strong>Client Code:</strong></td><td>31943.356965</td></tr>
<tr><td><strong>Description:</strong></td><td>Docket Report</td><td><strong>Search Criteria:</strong></td><td>2:21-cv-05524-DSF-AFM End date: 7/22/2021</td></tr>
<tr><td><strong>Billable Pages:</strong></td><td>4</td><td><strong>Cost:</strong></td><td>0.40</td></tr>
</table>

Haytham Faraj, Esq. (SBN 291416)
Katherine K. Melik-Stepanyan, Esq. (SBN 315015)
**THE LAW OFFICES OF HAYTHAM FARAJ**
8605 Santa Monica Blvd., Suite 44953
West Hollywood, California 90069-4109
Telephone:   (323) 463-9200
Facsimile:    (202) 280-1039
Email:          service@farajlaw.com

Attorneys for Plaintiffs, ANOUSHEH SABOURI
and S. E., a minor by and through
her GAL, ANOUSHEH SABOURI

# UNITED STATES DISTRICT COURT

# FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ANOUSHEH SABOURI, an individual and successor in interest to decedent Mike Esfahanian; S. E., a minor and successor in interest to decedent Mike Esfahanian, by and through her Guardian Ad Litem, ANOUSHEH SABOURI,<br><br>        Plaintiff,<br><br>    v.<br><br>MONSANTO COMPANY, a corporation;<br>and DOES 1 through 100, Inclusive,<br><br>       Defendants. | CASE NO.: 2-21-cv-05524 DSF<br><br>**COMPLAINT FOR DAMAGES:**<br><br>**1. STRICT PRODUCTS LIABILITY - DESIGN DEFECT;**<br>**2. STRICT PRODUCTS LIABILITY – FAILURE TO WARN;**<br>**3. NEGLIGENCE;**<br>**4. BREACH OF EXPRESS WARRANTIES;**<br>**5. BREACH OF IMPLIED WARRANTIES;**<br>**6. FRAUD;**<br>**7. WRONGFUL DEATH; AND**<br>**8. EXEMPLARY DAMAGES.**<br><br>**\*\*DEMAND FOR JURY TRIAL\*\*** |

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

COME NOW Plaintiffs, ANOUSHEH SABOURI, an individual and successor in interest to decedent Mike Esfahanian; S. E., a minor and successor in interest to decedent Mike Esfahanian, by and through her Guardian Ad Litem, ANOUSHEH SABOURI (collectively hereinafter "Plaintiffs"), who for causes of action against the Defendants, MONSANTO COMPANY, a corporation (hereinafter "Monsanto") and DOES 1 through 100, Inclusive, and each of them (collectively hereinafter "DEFENDANTS") complain and allege the following causes of action:

## SUMMARY

1.      This case arises out of Monsanto's wrongful conduct in connection with the design, development, manufacture, testing, packaging, promoting, marketing, advertising, distribution, labeling, and sale of the herbicide Roundup, containing the active ingredient glyphosate.  Glyphosate has been found to be carcinogenic, linked to causing various forms of cancer, and in particular multiple myeloma.  As such, Roundup is dangerous to human health and unfit to be marketed and sold in commerce, particularly without proper warnings and directions as to the dangers associated with its use.

2.      On information and belief, Decedent MIKE ESFAHANIAN (herein referred to as "DECEDENT"), who was exposed to Roundup extensively while using Roundup residentially for his personal use, was diagnosed with multiple

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

myeloma in April 2018 and died as a result of his cancer in February 2019.

Plaintiff ANOUSHEH SABOURI, is the surviving spouse of Decedent and Plaintiff S. E., a minor, is the surviving daughter of decedent.

## STATEMENT OF THE CASE

3.      In 1970, Defendant Monsanto Company discovered the herbicidal properties of glyphosate and began marketing it in products in 1974 under the brand name Roundup®. Roundup® is a non-selective herbicide used to kill weeds that commonly compete with the growing of crops. By 2001, glyphosate had become the most-used active ingredient in American agriculture with 85-90 millions of pounds used annually. That number grew to 185 million pounds by 2007. As of 2013, glyphosate was the world's most widely used herbicide.

4.      Monsanto is a multinational agricultural biotechnology corporation based in St. Louis, Missouri. It is the world's leading producer of glyphosate. As of 2009, Monsanto was the world's leading producer of seeds, accounting for 27% of the world seed market. The majority of these seeds are of the Roundup Ready® brand. The stated advantage of Roundup Ready® crops is that they substantially improve a farmer's ability to control weeds, since glyphosate can be sprayed in the fields during the growing season without harming their crops. In 2010, an estimated 70% of corn and cotton, and 90% of soybean fields in the United States were Roundup Ready®.

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

5.      Monsanto's glyphosate products are registered in 130 countries and approved for use on over 100 different crops. They are ubiquitous in the environment. Numerous studies confirm that glyphosate is found in rivers, streams, and groundwater in agricultural areas where Roundup® is used. It has been found in food, in the urine of agricultural  workers, and even in the urine of urban dwellers who are not in direct contact with glyphosate.

6.      On March 20, 2015, the International Agency for Research on Cancer ("IARC"), an agency of the World Health Organization ("WHO"), issued an evaluation of several herbicides, including glyphosate. That evaluation was based, in part, on studies of exposures to glyphosate in several countries around the world, and it traces the health implications from exposure to glyphosate since 2001.

7.      On July 29, 2015, the IARC issued the formal monograph relating to glyphosate. In that monograph, the IARC Working Group provides a thorough review of the numerous studies and data relating to glyphosate exposure in humans.

8.      The IARC Working Group classified glyphosate as a Group 2A herbicide, which means that it is probably carcinogenic to humans. The IARC Working Group concluded that the cancers most associated with glyphosate exposure are non-Hodgkin lymphoma and other hematopoietic cancers, including multiple myeloma.

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

7.     The IARC evaluation is significant. It confirms what has been
believed for years: that glyphosate is toxic to humans. Nevertheless, Monsanto,
since it began selling Roundup®, has represented it as safe to humans and the
environment. Indeed, Monsanto has repeatedly proclaimed and continues to
proclaim to the world, and particularly to United States consumers, that
glyphosate-based herbicides, including Roundup®, create no unreasonable risks to
human health or to the environment.

## THE PARTIES

8.     At all times relevant and mentioned herein, Plaintiff ANOUSHEH
SABOURI, is the surviving spouse of Decedent and Plaintiff S. E., a minor, is the
surviving daughter of Decedent. Plaintiffs were, and are now, residents of the City
of Topanga, County of Los Angeles, California. Pursuant to the operation of *Code
of Civil Procedure* section 377.60, Plaintiffs are the heirs, successors in interest and
persons lawfully entitled to assert a cause of action of the wrongful death of
Decedent. No other persons have any claim, right or interest in the cause of action
for wrongful death that is superior to the claims by the Plaintiffs.

9.     As a result of decedent MIKE ESFAHANIAN'S exposure to
Roundup® and/or other Monsanto and/or Monsanto glyphosate containing products
in the state of California from approximately the mid-1990s to around 2018,
Decedent was diagnosed with multiple myeloma, which ultimately resulted

5

in his untimely death on February 9, 2019. The conduct of defendants was a substantial factor and proximate cause of the serious personal injuries and death sustained by plaintiffs' Decedent, MIKE ESFAHANIAN.

10.    Plaintiffs are informed and believe and based thereon allege that as a direct and proximate result of Decedent's use of Roundup® and/or other Monsanto and/or Monsanto glyphosate-containing products ("Roundup"), supplied, marketed, and/or distributed by defendants herein, decedent suffered significant harm, conscious pain and suffering, physical injury and bodily impairment including, but not limited to, multiple myeloma and other cancers, other permanent physical deficits, permanent bodily impairment and other injury sequelae. Decedent's injuries required medical intervention to address the adverse physical effects and damage caused by decedent's use of Roundup® and/or other Monsanto glyphosate-containing products ("Roundup"). These injuries ultimately resulted in Decedent's untimely death.

11.    As a direct and proximate result of the wrongful conduct, acts, omissions, fraudulent concealments, fraudulent misrepresentations, and fraudulent business practices by Defendants and DOES 1 through 100, inclusive, Decedent used and/or was exposed to Roundup® and was diagnosed with serious health injuries including to multiple myeloma and/or other cancers.

12.    As a further direct and proximate result of defects in Roundup® and the wrongful conduct, acts, omissions, and fraudulent misrepresentations of

6

Defendants, Decedent suffered severe mental and physical pain and have and will sustain permanent injuries and emotional distress, along with economic loss due to medical expenses and living-related expenses as a result of lifestyle changes.

13.    As a further direct and proximate result of defects in Roundup® and the wrongful conduct, acts, omissions, and fraudulent misrepresentations of Defendants, Decedent required medical intervention in efforts to maintain and/or save Decedent.

14.    Plaintiffs are individuals who suffered damages as a result of injuries resulting from Decedent's use and/or exposure to Roundup® and are authorized to bring an action for the causes of actions alleged herein including, but not limited to, injuries and damages sustained by Plaintiffs resulting from Decedent's use of Roundup®. Said injuries and damages sustained by Plaintiffs were caused or substantially contributed to by the wrongful conduct of Defendants and DOES 1 through 100, inclusive.

15.    The product warnings for Roundup® in effect during the time period Decedent used and/or was exposed to Roundup® were vague, incomplete or otherwise inadequate, both substantively and graphically, to alert consumers to the severe health risks associated with Roundup® use and/or exposure.

16.    The Defendants and DOES 1 through 100, and each of them, inclusive, did not provide adequate warnings to consumers including Decedent and

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

the general public about the increased risk of the serious adverse events described

herein.

17.     Had decedent and/or plaintiffs been adequately warned by the

Defendants and DOES I through 100, and each of them, inclusive, of the potential

life-threatening side effects of Roundup®, Decedent would not have purchased,

used, or been exposed to Roundup®.

18.     By reason of the foregoing, Decedent developed serious and

dangerous side effects including multiple myeloma and other cancers, related

injury sequelae, physical pain and suffering, mental anguish, loss of enjoyment of

life, and death. By reason of the foregoing, Plaintiffs suffered damages and losses,

as alleged herein. Plaintiffs' general and special damages exceed the jurisdictional

limits of this Court.

## DEFENDANTS

19.     Plaintiffs are informed and believe, and thereupon allege, that

defendant Monsanto Company (hereinafter "Monsanto" or "defendant Monsanto"),

is, and at all times relevant was, a Delaware corporation, with its headquarters in

St. Louis, Missouri and multiple principal places of business throughout the world,

including in St. Louis, Missouri, Oxnard, California, Woodland, and, at all relevant

times to this complaint, San Ramon, California. At all times relevant to this

complaint, Monsanto was the entity that discovered the herbicidal properties of

glyphosate and manufactured Roundup®. Monsanto has regularly transacted and

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

conducted business within the State of California and has derived substantial

revenue from goods and products, including Roundup®, used in the State of

California and employs sales representatives in the State of California.

Specifically, Monsanto operated a residential products division known as the

Solaris Group of Monsanto Company (hereinafter "Solaris Group"), headquartered

in San Ramon, California. Moreover, upon information and belief, Solaris Group

manufactured, registered, distributed, marketed, advertised, and sold Roundup®

products to California consumers. At all relevant times, Monsanto has conducted

testing, research, and analyses on its Roundup® and other glyphosate-based

formulations within California and manufactured said products in California,

utilizing principal laboratories and manufacturing sites throughout the State of

California in locations such as San Ramon, Oxnard and Woodland. Monsanto

expected or should have expected its acts to have consequences within the State of

California because it derived substantial revenue from interstate commerce and

invoked the benefits and protection of the State of California's laws.

20.     Plaintiffs are informed and believe, and based thereon allege, that in

committing the acts alleged herein, each and every managing agent, agent,

representative and/or employee of the Defendants was working within the course

and scope of said agency, representation and/or employment with the knowledge,

consent, ratification, and authorization of the Defendants and their directors,

officers and/or managing agents.

21.     The true names and/or capacities, whether individual, corporate, partnership, associate, governmental, or otherwise, of Defendant DOES 1 through 100, inclusive, and each of them, are unknown to Plaintiffs at this time, who therefore sue said Defendants by such fictitious names. Plaintiffs are informed and believe, and thereon allege, that each Defendant designated herein as a DOE caused injuries and damages proximately thereby to Plaintiffs as hereinafter alleged; and that each DOE Defendant is liable to the Plaintiffs for the acts and omissions alleged herein below, and the resulting injuries to Plaintiffs, and damages sustained by the Plaintiffs. Plaintiffs will amend this Complaint to allege the true names and capacities of said DOE Defendants when the same are ascertained.

22.     Plaintiffs are informed and believe, and thereon allege, that at all times herein mentioned, each of the named Defendants and each of the DOE Defendants was the agent, servant, employee and/or joint venturer of the other co-Defendants and other DOE Defendants, and each of them, and at all said times, each named Defendant and each DOE Defendant was acting in the full course, scope and authority of said agency, service, employment and/or joint venture.

23.     Plaintiffs are informed and believe and allege that at all times mentioned herein, Defendants and DOES 1 through 100, inclusive, and each of them, were also known as, formerly known as and/or were the successors and/or predecessors in interest/business/product line/or a portion thereof, assigns, a

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

parent, a subsidiary (wholly or partially owned by, or the whole or partial owner),

affiliate, partner, co-venturer, merged company, alter egos, agents, equitable

trustees and/or fiduciaries of and/or were members in an entity or entities engaged

in the funding, researching, studying, manufacturing, fabricating, designing,

developing, labeling, assembling, distributing, supplying, leasing, buying, offering

for sale, selling, inspecting, servicing, contracting others for marketing, warranting,

rebranding, manufacturing for others, packaging and advertising of Roundup®

and/or other Montano glyphosate-containing products. Defendants and DOES 1

through 100, inclusive, and each of them, are liable for the acts, omissions and

tortious conduct of their successors and/or predecessors in

interest/business/product line/or a portion thereof, assigns, parents, subsidiaries,

affiliates, partners, co-venturers, merged companies, alter egos, agents, equitable

trustees, fiduciaries and/or their alternate entities in that Defendants and DOES 1

through 100, inclusive, and each of them, enjoy the goodwill originally attached to

each such alternate entity, acquired the assets or product line (or portion thereof),

and in that there has been a virtual destruction of Plaintiffs' remedy against each

such alternate entity, and that each such Defendant has the ability to assume the

risk spreading role of each such alternate entity.

24.     Plaintiffs are informed and believe, and thereon allege, that at all

times herein mentioned, Defendants and DOES 1 through 100, inclusive, and each

of them, were and are corporations organized and existing under the laws of the

11

State of California or the laws of some state or foreign jurisdiction; that each of the said Defendants and DOE Defendants were and are authorized to do and are doing business in the State of California and regularly conducted business in California, including in Los Angeles County.

25.   Upon information and belief, at all relevant times, Defendants and DOES 1 through 100, and each of them, inclusive, were engaged in the business of researching, developing, designing, licensing, manufacturing, distributing, labeling, selling, marketing, and/or introducing into interstate commerce and into the State of California, including in Los Angeles County, either directly or indirectly through third parties or related entities, Roundup® and/or other Monstano glyphosate-containing products.

26.   At all relevant times, Defendants and DOES 1 through 100, inclusive, and each of them, conducted regular and sustained business and engaged in substantial commerce and business activity in the State of California, which included but was not limited to selling, marketing and distributing Roundup® and/or other Monstano glyphosate-containing products in the State of California, including Los Angeles County. Specifically, Decedent purchased all of its Roundup® products for residential use from retailers in Los Angeles County.

27.   At all relevant times, Defendants and DOES 1 through 100, inclusive, and each of them, expected or should have expected that their acts would have consequences within the United States of America including the State of

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

California, including Los Angeles County, and said Defendants derived and derive substantial revenue therefrom.

## AGENCY

28.    Each of the Defendants named in this Complaint, including each of the DOE Defendants, is, and at all relevant times herein mentioned was, the co-conspirator of each other Defendant in connection with the wrongful conduct described herein, and, therefore, each Defendant is jointly and severally liable to Plaintiffs for the damages sustained as a proximate result of each other Defendant.

29.    Each Defendant entered into an express or implied agreement, understanding, and/or concert of action with each of the other Defendants to commit the wrongs herein alleged.  These affirmative wrongful acts included, but were not limited to, the conspiracy to defraud, deceive, and hide the dangers of glyphosate from the public, beginning in 1976, through Defendants' routine falsification of data for toxicity studies needed to register Roundup®. In 1976, the United States Food and Drug Administration ("FDA") performed an inspection of Industrial Bio-Test Industries ("IBT") that revealed discrepancies between the raw data and the final report relating to the toxicological impacts of glyphosate. The EPA subsequently audited IBT; it too found the toxicology studies conducted for the Roundup® herbicide to be invalid. An EPA reviewer stated, after finding "routine falsification of data" at IBT, that it was "hard to believe the scientific integrity of the studies when they said they took specimens of the uterus from male

_____13_____

rabbits."

30.    The conspiracy was furthered in 1991 when Defendant Monsanto hired Craven Laboratories in 1991 to perform pesticide and herbicide studies, including for Roundup®. In that same year, the owner of Craven Laboratories and three of its employees were indicted, and later convicted, of fraudulent laboratory practices in the testing of pesticides and herbicides.

31.    The conspiracy was furthered through 2000 through present with publication of studies through companies such as Intertek and Exponent, Inc., which minimize any safety concerns about the use of glyphosate

32.    The conspiracy was furthered when Monsanto held secret ex parte meetings and conversations with certain EPA employees to collude in a strategy to re-register glyphosate and to quash investigations into the carcinogenicity of glyphosate by other federal agencies such as the Agency for Toxic Substances and Disease Registry. In March 2015, The Joint Glyphosate Task Force, at Monsanto's behest, issued a press release sharply criticizing IARC, stating that IARC's conclusion was "baffling" and falsely claiming that "IARC did not consider any new or unique research findings when making its decision. It appears that only by deciding to exclude certain available scientific information and by adopting a different approach to interpreting the studies was this possible."

33.    The conspiracy was furthered in 2011when Defendants co-opted studies which falsely proclaimed the safety of glyphosate. In October 2015, the

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

Defendants, as members of the Joint Glyphosate Task Force, wrote to the state of California to try to stop California from warning the public about the carcinogenicity of glyphosate, arguing that the IARC classification was mistaken. In January of 2016, Monsanto filed a lawsuit to stop California from warning the public about the carcinogenicity of glyphosate.

34.     Plaintiffs are further informed and believe and thereon allege that at all times herein alleged, each of the Defendants, including, but not limited to DOES 1 through 100, was the agent, servant, partner, aider and abettor, co-conspirator, alter ego, and/or joint venturer of the other herein and were at all times operating and acting within the purpose and scope of said agency, service, employment, partnership, conspiracy, alter ego, and/or joint venture and rendered substantial assistance and encouragement to the other Defendants, knowing that their conduct constituted a breach of duty owed to Plaintiffs.

35.     Plaintiffs are informed and believe, and thereon allege, that there exists, and at all times herein alleged, there existed, a unity of interest in ownership between each of the aforesaid Defendants, including DOES 1 through 100, such that any individuality and separateness between these Defendants has ceased and these Defendants each are the alter-ego of the others and exerted control over those Defendants. Adherence to the fiction of the separate existence of each of these Defendants as an entity distinct from the others will permit an abuse of the corporate privilege and would sanction fraud and would promote injustice.

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

36.     Each of these acts and failures to act is alleged against each defendant whether acting individually, jointly, or severally. Each of the defendants or their alter egos agreed and conspired with the others in the commission of these acts or failures to act.

37.     Defendants, and each of them, committed these acts alleged herein maliciously, fraudulently, and oppressively, and with the wrongful intention of injuring Plaintiffs, and acted with an improper and evil motive amounting to malice or despicable conduct. Alternatively, Defendants' wrongful conduct was carried out with a conscious disregard for Plaintiffs' rights.

38.     Defendants' conduct warrants the assessment of punitive damages in an amount sufficient to punish Defendants and deter others from engaging in similar conduct.

39.     Each of these acts and failures to act are alleged against each Defendant whether acting individually, jointly, or severally. Each of the Defendants or their alter egos agreed and conspired with the others in the commission of these acts or failures to act.

## JURISDICTION AND VENUE

40.     This Court has jurisdiction over Defendants and this action pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship between Plaintiffs and Defendants. Defendants are all either incorporated and/or have their principal place of business outside of the state in which the Plaintiffs reside.

41.     The amount in controversy between Plaintiffs and Defendants exceeds $75,000, exclusive of interest and cost.

42.     The Court also has supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

43.     Venue is proper within this district pursuant to 28 U.S.C. § 1391 in that Defendants conduct business here and are subject to personal jurisdiction in this district. Furthermore, Defendants sell, market, and/or distribute Roundup ® within the Central District of California. Also, a substantial part of the acts and/or omissions giving rise to these claims occurred within this district.

## FACTUAL ALLEGATIONS

44.     Glyphosate is a broad-spectrum, non-selective herbicide used in a wide variety of herbicidal products around the world.

45.     Plants treated with glyphosate translocate the systemic herbicide to their roots, shoot regions and fruit, where it interferes with the plant's ability to form aromatic amino acids necessary for protein synthesis. Treated plants generally die within two to three days. Because plants absorb glyphosate, it cannot be completely removed by washing or peeling produce or by milling, baking, or brewing grains.

46.     For nearly 40 years, farms across the world have used Roundup® without knowing of the dangers its use poses.

47.     That is because when Monstano first introduced Roundup®, it touted

_____17_____

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

glyphosate as a technological breakthrough: it could kill almost every weed without causing harm either to people or to the environment. Of course, history has shown that not to be true. According to the WHO, the main chemical ingredient of Roundup®--glyphosate--is a probable cause of cancer. Those most at risk are farm workers and other individuals with workplace exposure to Roundup®, such as workers in garden centers, nurseries, and landscapers. Agricultural workers are, once again, victims of corporate greed. Monstano assured the public that Roundup® was harmless. In order to prove this, Monstano championed falsified data and attacked legitimate studies that revealed its dangers. Monstano led a prolonged campaign of misinformation to convince government agencies, farmers and the general population that Roundup® was safe.

### *The Discovery of Glyphosate and Development of Roundup®*

48.     The herbicidal properties of glyphosate were discovered in 1970 by Monstano chemist John Franz. The first glyphosate-based herbicide was introduced to the market in the mid-1970s under the brand name Roundup®. From the outset, Monstano marketed Roundup® as a "safe" general-purpose herbicide for widespread commercial and consumer use. Monstano still markets Roundup® as safe today.

### *Registration of Herbicides under Federal Law*

49.     The manufacture, formulation and distribution of herbicides, such as Roundup®, are regulated under the Federal Insecticide, Fungicide, and

18

Rodenticide Act ("FIFRA" or "Act"), 7 U.S.C. § 136 *et seq.* FIFRA requires that all herbicides be registered with the Environmental Protection Agency ("EPA" or "Agency") prior to their distribution, sale, or use, except as described by the Act. 7 U.S.C. § 136a (a).

50.     Because herbicides are toxic to plants, animals, and humans, at least to some degree, the EPA requires as part of the registration process, among other things, a variety of tests to evaluate the potential for exposure to herbicides, toxicity to people and other potential non-target organisms, and other adverse effects on the environment. Registration by the EPA, however, is not an assurance or finding of safety. The determination the Agency must make in registering or re-registering a product is not that the product is "safe," but rather that use of the product in accordance with its label directions "will not generally cause unreasonable adverse effects on the environment." 7 U.S.C. § 136a(c) (5) (D).

51.     FIFRA defines "unreasonable adverse effects on the environment" to mean "any unreasonable risk to man or the environment, taking into account the economic, social, and environmental costs and benefits of the use of any pesticide." 7 U.S.C. § 136(bb). FIFRA thus 5 requires EPA to make a risk/benefit analysis in determining whether a registration of a product should be granted or allowed so that the product may continue to be sold in commerce.

52.     The EPA registered Roundup® for distribution, sale, and manufacture in the United States including the State of California. The EPA's decision to

register Roundup, however, was based on studies on the active chemical, glyphosate, and not the formulated Roundup product which contains a cocktail of other ingredients such as surfactants, adjuvants, and inert compounds, all of which, as discussed in greater detail below, contribute to the health risks associated with Roundup exposure.[1]

53.     FIFRA generally requires the registrant, Monsanto in the case of Roundup®, to conduct health and safety testing of herbicide products. The EPA has protocols governing the conduct of tests required for registration and the laboratory practices that must be followed in conducting these tests. The data produced by the registrant must be submitted to the EPA for review and evaluation. The government is not required, nor is it able, however, to perform the product tests that are required of the manufacturer.

54.     The evaluation of each herbicide product distributed, sold, or manufactured is completed at the time the product is initially registered. The data necessary for registration of an herbicide has changed over time. The EPA is now in the process of re-evaluating all herbicide products through a Congressionally mandated process called "re-registration." 7 U.S.C. § 136a-I. In order to reevaluate these herbicides, the EPA is demanding the completion of additional tests and the submission of data for the EPA's review and evaluation.

---

[1] Surfactants are compounds which contribute to the even and effective spread of glyphosate across the surface of a leaf and increase the rate of penetration through the plant. It has been shown that surfactants also greatly increase the amount and rate of Roundup® absorbed by human skin.

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

55.     In the case of glyphosate, and therefore Roundup®, the EPA had planned on releasing its preliminary risk assessment -in relation to the re-registration process-no later than July 2015. The EPA completed its review of glyphosate in early 2015, but it delayed releasing the risk assessment pending further review in light of the WHO's health-related findings. "On September 12, 2016, the EPA's office of Pesticide Programs released an interim report, titled "Glyphosate Issue Paper: Evaluation of Carcinogenic Potential," ("2016 Issue Paper"") detailing the agency's review of a small portion of the existing literature on Roundup. The 2016 Issue Paper contains a review of studies submitted to the agency by Monsanto, as well as the general independent scientific literature on glyphosate carcinogenicity.

56.     Immediately following the publication of the 2016 Issue Paper, the FIFRA Scientific Advisory Panel ("SAP") issued a report which reviewed the EPA's 2016 Issue Paper, and the conclusions therein. The SAP strongly criticized the EPA's conclusions and questioned the scientific approach of the agency, noting that that agency had failed to follow its own guidelines.

*Scientific Fraud Underlying the Marketing and Sale of Glyphosate/Roundup®*

57.     Based on early studies that glyphosate could cause cancer in laboratory animals, the EPA originally classified glyphosate as *possibly*

21

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

*carcinogenic to humans* (Group C) in 1985. After pressure from Monsanto, including contrary studies it provided to the EPA, in 1991 the EPA changed its classification to *evidence of non-carcinogenicity in humans* (Group E). In so classifying glyphosate, however, the EPA made clear that the designation did not mean the chemical does not cause cancer: "It should be emphasized, however, that designation of an agent in Group E is based on the available evidence at the time of evaluation and should not be interpreted as a definitive conclusion that the agent will not be a carcinogen under any circumstances.

58.    On two occasions, the EPA found that the laboratories hired by Monsanto to test the toxicity of its Roundup® products for registration purposes committed fraud.

59.    In the first instance, Monsanto, in seeking initial registration of Roundup® by EPA, hired Industrial Bio-Test Laboratories ("IBT") to perform and evaluate herbicide toxicology studies relating to Roundup®. IBT performed about 30 tests on glyphosate and glyphosate-containing products, including nine of the 15 residue studies needed to register Roundup®.

60.    In 1976, the United States Food and Drug Administration ("FDA") performed an inspection of Industrial Bio-Test Industries ("IBT") that revealed discrepancies between the raw data and the final report relating to the toxicological impacts of glyphosate. The EPA subsequently audited IBT; it too found the toxicology studies conducted for the Roundup® herbicide to be invalid. An EPA

22

reviewer stated, after finding "routine falsification of data" at IBT, that it was "hard to believe the scientific integrity of the studies when they said they took specimens of the uterus from male rabbits."

61.     Three top executives of IBT were convicted of fraud in 1983.

62.     In the second incident of data falsification, Monsanto hired Craven Laboratories in 1991 to perform pesticide and herbicide studies, including for Roundup®. In that same year, the owner of Craven Laboratories and three of its employees were indicted, and later convicted, of fraudulent laboratory practices in the testing of pesticides and herbicides.

63.     Despite the falsity of the tests that underlie its registration, within a few years of its launch, Monsanto was marketing Roundup® in 115 countries.

64.     Multiple studies have been ghostwritten in part and/or published by Monsanto through companies such as Intertek and Exponent, Inc., from 2000 through the present which minimize any safety concerns about the use of glyphosate. The studies are used to convince regulators to allow the sale of Roundup® and customers to use Roundup®. Such studies include, but are not limited to Williams (2000); Williams (2012); Kier & Kirkland (2013); Kier (2015); Bus (2016); Chang (2016); and the Intertek Expert Panel Manuscripts. All of these studies have been submitted to and relied upon by the public and the EPA in assessing the safety of glyphosate. Through these means, Monsanto has fraudulently represented that independent scientists have concluded that

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

Glyphosate is safe. In fact, Monsanto paid these so-called "independent experts," and Monsanto failed to disclose the significant role Monsanto had in creating the manuscripts produced by the "independent" experts. Further, Monsanto has ghostwritten editorials to advocate for the safety of glyphosate in newspapers and magazines for scientists such as Robert Tarone and Henry Miller. Monsanto has also ghostwritten letters by supposedly independent scientists which have been submitted to regulatory agencies who are reviewing the safety of glyphosate.

65.     Monsanto has also violated federal regulations in holding secret ex parte meetings and conversations with certain EPA employees to collude in a strategy to re-register glyphosate and to quash investigations into the carcinogenicity of glyphosate by other federal agencies such as the Agency for Toxic Substances and Disease Registry. Monsanto's close connection with the EPA arises in part from its offering of lucrative consulting gigs to retiring EPA officials. In March 2015, The Joint Glyphosate Task Force, at Monsanto's behest, issued a press release sharply criticizing IARC, stating that IARC's conclusion was "baffling" and falsely claiming that "IARC did not consider any new or unique research findings when making its decision. It appears that only by deciding to exclude certain available scientific information and by adopting a different approach to interpreting the studies was this possible."

66.     Beginning in 2011, the Federal Institute for Risk Assessment (BfR) in Germany began preparing a study on the safety of glyphosate. Through the

Glyphosate Task Force, Defendants were able to co-opt this study, becoming the sole providers of data and ultimately writing the report, which was rubber-stamped by the BfR. The Glyphosate Task Force was solely responsible for preparing and submitting a summary of studies relied upon by the BfR. Defendants have used this self-serving report (which they, in fact, wrote) to falsely proclaim the safety of glyphosate. In October 2015, the Defendants, as members of the Joint Glyphosate Task Force, wrote to the state of California to try to stop California from warning the public about the carcinogenicity of glyphosate, arguing that the IARC classification was mistaken. In January of 2016, Monsanto filed a lawsuit to stop California from warning the public about the carcinogenicity of glyphosate.

### *The Importance of Roundup® to Monsanto's Market Dominance Profits*

67.    The success of Roundup® was key to Monsanto's continued reputation and dominance in the marketplace. Largely due to the success of Roundup® sales, Monsanto's agriculture division was outperforming its chemicals division's operating income, and that gap increased  yearly. But with its patent for glyphosate expiring in the United States in the year 2000, Monsanto needed a strategy to maintain its Roundup® market dominance and to ward off impending competition.

68.    In response, Monsanto began the development and sale of genetically engineered

69.    Roundup Ready® seeds in 1996. Since Roundup Ready® crops are

resistant to glyphosate, farmers can spray Roundup® onto their fields during the growing season without harming the crop. This allowed Monsanto to expand its market for Roundup® even further. By 2000, Monsanto's biotechnology seeds were planted on more than 80 million acres worldwide, and nearly 70% of American soybeans were planted from Roundup Ready® seeds. It also secured Monsanto's dominant share of the glyphosate/Roundup® market through a marketing strategy that coupled proprietary Roundup Ready® seeds with continued sales of its Roundup® herbicide

70.     Through a three-pronged strategy of increased production, decreased prices, and by coupling Roundup Ready® seeds with Roundup® herbicide, Roundup® became Monsanto's most profitable product. In 2000, Roundup® accounted for almost $2.8 billion in sales, outselling other herbicides by a margin of five to one and accounting for close to half of Monsanto's revenue. Today, glyphosate remains one of the world's largest herbicides by sales volume.

*Monsanto has known for decades that it falsely advertises the safety of Roundup®.*

71.     In 1996, the New York Attorney General ("NYAG") filed a lawsuit againstMonsanto based on its false and misleading advertising of Roundup ® products. Specifically, the lawsuit challenged Monsanto's general representations that its spray-on glyphosate-based herbicides, including

---

26

Roundup®, were "safer than table salt" and "practically non-toxic" to mammals, birds, and fish. Among the representations the NYAG found deceptive and misleading about the human and environmental safety of Roundup® are the following:

a. Remember that environmentally friendly Roundup® herbicide is biodegradable. It won't build up in the soil so you can use Roundup® with confidence along customers' driveways, sidewalks and fences...

b. And remember that Roundup® is biodegradable and won't build up in the soil. That will give you the environmental confidence you need to use Roundup® everywhere you've got a weed, brush, edging or trimming problem.

c. Roundup® biodegrades into naturally occurring elements.

d. Remember that versatile Roundup® herbicide stays where you put it. That means there's no washing or leaching to harm customers' shrubs or other desirable vegetation.

e. This non-residual herbicide will not wash or leach in the soil. It ... stays where you apply it.

f. You can apply Accord (glyphosate-containing herbicide) with "confidence because it will stay where you put it;" it bonds tightly to soil particles, preventing leaching. Then, soon after application, soil microorganisms biodegrade Accord into natural products.

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

g.  Glyphosate is less toxic to rats than table salt following acute oral ingestion.

h.  Glyphosate's safety margin is much greater than required. It has over a 1,000-fold safety margin in food and over a 700-fold safety margin for workers who manufacture or use it.

i.  You can feel good about using herbicides by Monsanto. They carry a toxicity category rating of 'practically non-toxic' as it pertains to mammals, birds and fish.

j.  "Roundup can be used where kids and pets will play and breaks down into natural material." This ad depicts a person with his head in the ground and a pet dog standing in an area which has been treated with Roundup.

72.     On November 19, 1 996, Monsanto entered into an Assurance of Discontinuance with NYAG, in which Monsanto agreed, among other things, "to cease and desist from publishing or broadcasting any advertisements [in New York] that represent, directly or by implication" that:

a.  its glyphosate-containing herbicide products or any component thereof are safe, non-toxic, harmless or free from risk. * * *

b.  its glyphosate-containing herbicide products or any component thereof manufactured, formulated, distributed or sold by Monsanto are biodegradable * * *

_____28_____

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

     c.  its glyphosate-containing herbicide products or any component thereof stay where they are applied under all circumstances and will not move through the environment by any means.

     d.  its glyphosate-containing herbicide products or any component thereof are "good" for the environment or are "known for their environmental characteristics." * * *

     e.  glyphosate-containing herbicide products or any component thereof are safer or less toxic than common consumer products other than herbicides;

     f.  its glyphosate-containing products or any component thereof might be classified as "practically non-toxic."

73.    Monsanto did not alter its advertising in the same manner in any state other than New York, and, on information and belief, still has not done so today.

74.    In 2009, France's highest court ruled that Monsanto had not told the truth about the safety of Roundup®. The French court affirmed an earlier judgement that Monsanto had falsely advertised its herbicide Roundup® as "biodegradable" and that it "left the soil clean."

***Classifications and Assessments of Glyphosate***

75.    The IARC process for the classification of glyphosate followed the stringent procedures for the evaluation of a chemical agent. Over time, the IARC Monograph program has reviewed 980 agents. Of those reviewed, it has

29

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

determined 116 agents to be Group I (Known Human Carcinogens); 73 agents to be Group 2A (Probable Human Carcinogens); 287 agents to be Group 2B (Possible Human Carcinogens); 503 agents to be Group 3 (Not Classified); and one agent to be Probably Not Carcinogenic.

76.     The established procedure for IARC Monograph evaluations is described in the IARC Programme's Preamble. Evaluations are performed by panels of international experts, selected on the basis of their expertise and the absence of actual or apparent conflicts of interest.

77.     One year before the Monograph meeting, the meeting is announced and there is a call both for data and for experts. Eight months before the Monograph meeting, the Working Group membership is selected, and the sections of the Monograph are developed by the Working Group members. One month prior to the Monograph meeting, the call for data is closed, and the various draft sections are distributed among Working Group members for review and comment. Finally, at the Monograph meeting, the Working Group finalizes review of all literature, evaluates the evidence in each category, and completes the overall evaluation. Within two weeks after the Monograph meeting, the summary of the Working Group findings is published in Lancet Oncology, and within a year after the meeting, the final Monograph is finalized and published.

78.     In assessing a chemical agent, the IARC Working Group reviews the following information:

(a) human, experimental, and mechanistic data;

(b) all pertinent epidemiological studies and cancer bioassays; and

(c) representative mechanistic data.

The studies must be publicly available and have sufficient detail for meaningful review, and reviewers cannot be associated with the underlying study.

79.     In March of 2015, IARC reassessed glyphosate. The summary published in The Lancet Oncology reported that glyphosate is a Group 2A agent, that is, glyphosate is probably carcinogenic in humans.

80.     On July 29, 2015, IARC issued its Monograph for glyphosate, Monograph 112. For Volume 112, the volume that assessed glyphosate, a Working Group of 17 experts from II countries met at IARC from March 3-10, 2015, to assess the carcinogenicity of certain herbicides, including glyphosate. The March meeting culminated nearly a one-year review and preparation by the IARC Secretariat and the Working Group, including a comprehensive review of the latest available scientific evidence. According to published procedures, the Working Group considered "reports that have been published or accepted for publication in the openly available scientific literature" as well as "data from governmental reports that are publicly available."

81.     The studies considered the following exposure groups: occupational exposure of farmers and tree nursery workers in the United States, forestry workers in Canada and Finland and municipal weed-control workers in the United

_____31_____

Kingdom; and para-occupational exposure in farming families.

82.     Glyphosate was identified as the second-most used household herbicide in the United States for weed control between 2001 and 2007 and the most heavily used herbicide in the world in 2012.

83.     Exposure pathways are identified as air (especially during spraying), water, and food. Community exposure to glyphosate is widespread and found in soil, air, surface water, and groundwater, as well as in food.

84.     The assessment of the IARC Working Group identified several case control studies of occupational exposure in the United States, Canada, and Sweden. These studies show a human health concern from agricultural and other work-related exposure to glyphosate.

85.     The IARC Working Group found an increased risk between exposure to glyphosate and non-Hodgkin lymphoma ("NHL") and several subtypes of NHL, and the increased risk persisted after adjustment for other pesticides.

86.     The IARC Working Group also found that glyphosate caused DNA and chromosomal damage in human cells. One study in community residents reported increases in blood markers of chromosomal damage (micronuclei) after glyphosate formulations were sprayed.

87.     In male CD-I mice, glyphosate induced a positive trend in the incidence of a rare tumor, renal tubule carcinoma. A second study reported a positive trend for hemangiosarcoma in male mice. Glyphosate increased pancreatic

islet-cell adenoma in male rats in two studies. A glyphosate formulation promoted skin tumors in an initiation-promotion study in mice.

88.   The IARC Working Group also noted that glyphosate has been detected in the urine of agricultural workers, indicating absorption. Soil microbes degrade glyphosate to aminomethylphosphoric acid (AMPA). Blood AMPA detection after exposure suggests intestinal microbial metabolism in humans.

89.   The IARC Working Group further found that glyphosate and glyphosate formulations induced DNA, oxidative stress, and chromosomal damage in mammals and in human and animal cells in utero.

90.   In addition to DNA damage and oxidative stress, scientists have suggested that Roundup®'s association with various serious health conditions is linked to the effect Roundup® has on the digestive system. Specifically, scientists believe the same mechanism that makes Roundup® toxic to weeds also makes it toxic to the microbes within the human gut and mucous membranes. When humans are exposed to Roundup®, this exposure leads to a chronic inflammatory state in the gut, as well an impaired gut barrier, which can lead to many long-term health effects, including an increased risk of cancer. Monsanto has deliberately refused to conduct tests on this aspect of Roundup®'s mechanism of action.

91.   Many Roundup® products bear a label which either reads: "glyphosate targets an enzyme found in plants but not in people or pets" or "this Roundup formula targets an enzyme in plants but not in people or pets." These

statements are false because it has been established that the human body is host to microorganisms which contain the enzyme Monsanto asserts is not found in humans.

92.    Thus, glyphosate targets microbes within the human body which contain the enzyme affected by glyphosate, leading to a variety of adverse health effects. The IARC Working Group also noted genotoxic, hormonal, and enzymatic effects in mammals exposed to glyphosate. Essentially, glyphosate inhibits the biosynthesis of aromatic amino acids, which leads to several metabolic disturbances, including the inhibition of protein and secondary product biosynthesis and general metabolic disruption.

93.    The IARC Working Group also reviewed an Agricultural Health Study consisting of a prospective cohort of 57,311 licensed pesticide applicators in Iowa and North Carolina. While this study differed from others in that it was based on a self-administered questionnaire, the results support an association between glyphosate exposure and Multiple Myeloma, Hairy Cell Leukemia (HCL), and Chronic Lymphocytic Leukemia (CLL), in addition to several other cancers.

***Other Earlier Findings about Glyphosate's Dangers to Human Health***

94.    The EPA has a technical fact sheet, as part of its Drinking Water and Health, National Primary Drinking Water Regulations publication, relating to glyphosate. This technical fact sheet predates the IARC March 20, 2015, evaluation. The fact sheet describes the release patterns for glyphosate as follows:

34

**Release Patterns**

95.     Glyphosate is released to the environment in its use as an herbicide for controlling woody and herbaceous weeds on forestry, right-of-way, cropped and non-cropped sites. These sites may be around water and in wetlands.

96.     It may also be released to the environment during its manufacture, formulation, transport, storage, disposal and cleanup, and from spills. Since glyphosate is not a listed chemical in the Toxics Release Inventory, data on releases during its manufacture and handling are not available.

97.     Occupational workers and home gardeners may be exposed to glyphosate by inhalation and dermal contact during spraying, mixing, and cleanup. They may also be exposed by touching soil and plants to which glyphosate was applied. Occupational exposure may also occur during glyphosate's manufacture, transport, storage, and disposal.

98.     In 1995, the Northwest Coalition for Alternatives to Pesticides reported that in California, the state with the most comprehensive program for reporting of pesticide-caused illness, glyphosate was the third most commonly-reported cause of pesticide illness among agricultural workers.

***Recent Worldwide Bans on Roundup®/Glyphosate***

99.     Several countries around the world have instituted bans on the sale of Roundup® and other glyphosate-containing herbicides, both before and since IARC first announced its assessment for glyphosate in March 2015, and more

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

countries undoubtedly will follow suit in light of this assessment as the dangers of the use of Roundup® are more widely known. The Netherlands issued a ban on all glyphosate-based herbicides in April 2014, including Roundup®, which takes effect by the end of 2015. In issuing the ban, the Dutch Parliament member who introduced the successful legislation stated: "Agricultural pesticides in user-friendly packaging are sold in abundance to private persons. In garden centers, Roundup® is promoted as harmless, but unsuspecting customers have no idea what the risks of this product are. Especially children are sensitive to toxic substances and should therefore not be exposed to it."

100.   The Brazilian Public Prosecutor in the Federal District requested that the Brazilian Justice Department suspend the use of glyphosate.

101.   France banned the private sale of Roundup® and glyphosate following the IARC assessment for Glyphosate.

102.   Bermuda banned both the private and commercial sale of glyphosates, including Roundup®. The Bermuda government explained its ban as follows: "Following a recent scientific study carried out by a leading cancer agency, the importation of weed spray 'Roundup' has been suspended."

103.   The Sri Lankan government banned the private and commercial use of glyphosates, particularly out of concern that glyphosate has been linked to fatal kidney disease in agricultural workers.

104.   The government of Columbia announced its ban on using Roundup®

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

and glyphosate to destroy illegal plantations of coca, the raw ingredient for

cocaine, because of the WHO's finding that glyphosate is probably carcinogenic.

## EQUITABLE TOLLING OF APPLICABLE STATUTE OF LIMITATIONS

105.   Decedent has suffered an illness that has a latency period and does not

arise until years after exposure. Decedent and plaintiffs had no way of knowing

about the risk of serious illness associated with the use of and/or exposure to

Roundup® and glyphosate until made aware that decedent's illnesses, including

multiple myeloma, could be caused by use and/or exposure to Roundup®. The

discovery rule applies, and the statute of limitations was tolled until the day

plaintiffs knew or had reason to know that decedent's illnesses, including

myeloma, were linked to decedent's use and/or exposure to Roundup®.

106.   Within the time period of any applicable statute of limitations,

plaintiffs could not have discovered through the exercise of reasonable diligence

that exposure to Roundup® and glyphosate is injurious to human health.

107.   Plaintiffs did not discover and did not know of facts that would cause

a reasonable person to suspect the risk associated with the use of and/or exposure

to Roundup® and glyphosate, nor would a reasonable and diligent investigation by

plaintiffs have disclosed that Roundup® and glyphosate would cause decedent's

illnesses.

108.   The expiration of any applicable statute of limitations has been

equitably tolled by reason of Monsanto's fraudulent misrepresentations and

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

fraudulent concealment and fraudulent conduct. Through affirmative misrepresentations and omissions, defendants actively concealed from plaintiffs and decedent the true risks associated with use of and/or exposure to Roundup®.

109.   As a result of defendants' actions, plaintiffs could not reasonably have known or learned through reasonable diligence that decedent had been exposed to the risks alleged herein and that those risks were the direct and proximate result of defendants' acts and omissions.

110.   Defendants are estopped from relying on any statute of limitations because of their concealment of the truth regarding the safety of Roundup®. Defendants had a duty to disclose the true character, quality and nature of Roundup® because this was non-public information over which defendants continue to have exclusive control. Defendants knew that this information was not available to plaintiffs or decedent, decedent's medical providers and/or health facilities, yet defendants failed to disclose the information to the public, including plaintiffs and decedent.

111.   Defendants had the ability to and did spend enormous amounts of money in furtherance of the purposes of marketing and promoting a profitable product, notwithstanding the known or reasonably knowable risks. Plaintiffs, decedent, and medical professionals could not have afforded to and could not have possibly conducted studies to determine the nature, extent, and identity of related health risks and were forced to rely on defendants' representations.

## FIRST CAUSE OF ACTION

### (STRICT PRODUCTS LIABILITY--DESIGN DEFECT by All Plaintiffs as Against Defendant Monsanto Company, and DOES 1 Through 100, Inclusive)

112.   Plaintiffs re-allege and incorporate herein by reference each and every allegation and statement contained in the prior paragraphs.

113.   At all relevant times, defendants designed, developed, tested, manufactured, fabricated, assembled, distributed, bought, sold, inspected, serviced, repaired, maintained, marketed, warranted, supplied, modified, placed, and/or provided Roundup® products, which are defective and unreasonably dangerous to consumers, including decedent, thereby placing Roundup® products into the stream of commerce. These actions were under the ultimate control and supervision of defendants. At all relevant times, defendants designed, researched, developed, manufactured, produced, tested, assembled, labeled, advertised, promoted, marketed, sold, and distributed the Roundup® products used by plaintiffs, as described herein.

114.   At all relevant times, defendants' Roundup® products were manufactured, designed, and labeled in an unsafe, defective, and inherently dangerous manner that was dangerous for use by or exposure to the public, including decedent.

115.   At all relevant times, defendants' Roundup® products were

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

defectively designed, tested, developed, and manufactured when placed on the market by defendants, and was of such a nature that the defects would not be discovered in the normal course of inspection and operation by users thereof. Moreover, Roundup® products failed to provide adequate warnings or instructions concerning the dangerous characteristics of Roundup®. In particular, defendants failed to provide adequate warnings or instructions concerning the Roundup®'s active ingredient, glyphosate.

116. Defendants researched, developed, designed, tested, manufactured, inspected, labeled, distributed, marketed, promoted, sold, and otherwise released into the stream of commerce its Roundup® products, and in the course of same, directly advertised or marketed the products to consumers and end users, including decedent, and therefore had a duty to warn of the risks associated with the use of Roundup® and glyphosate-containing products.

117. At all relevant times, defendants had a duty to properly test, develop, design, manufacture, inspect, package, label, market, promote, sell, distribute, maintain, supply, provide proper warnings, and take such steps as necessary to ensure its Roundup® products did not cause users and consumers to suffer from unreasonable and dangerous risks. Defendants had a continuing duty to warn decedent of dangers associated with Roundup use and exposure. Defendants, as manufacturer, seller, or distributor of chemical herbicides are held to the knowledge of an expert in the field.

118.   At all relevant times, defendants' Roundup® products reached the intended consumers, handlers, and users in California and throughout the United States, including decedent, without substantial change in the condition, as designed, manufactured, sold, distributed, labeled, and marketed by defendants. Defendants registered, researched, manufactured, distributed, marketed, and sold Roundup® and other glyphosate-based formulations within California and aimed at a California consumer and industrial market.

119.   Defendants' Roundup® products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold, and marketed by defendants were defective in design and formulation in that, when they left the hands of defendants' manufacturers and/or suppliers, the foreseeable risks exceeded the alleged benefits associated with their design and formulation.

120.   At all relevant times, defendants knew or had reason to know that Roundup® products were defective and were inherently dangerous and unsafe when used in the manner instructed and provided by defendants.

121.   Therefore, at all relevant times, Defendants' Roundup® products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold and marketed by Defendants were defective in design and formulation, in one or more of the following ways:

  a.   When placed in the stream of commerce, Defendants' Roundup® products were defective in design and formulation, and, consequently,

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

dangerous to an extent beyond that which an ordinary consumer would contemplate;

b.  When placed in the stream of commerce, Defendants' Roundup® products were unreasonably dangerous in that they were hazardous and posed a grave risk of cancer and other serious illnesses when used in a reasonably anticipated manner;

c.  When placed in the stream of commerce, Defendants' Roundup® products contained unreasonably dangerous design defects and were not reasonably safe when used in a reasonably anticipated or intended manner;

d.  Defendants did not sufficiently test, investigate, or study its Roundup® products and, specifically, the active ingredient glyphosate;

e.  Exposure to Roundup® and glyphosate-containing products presents a risk of harmful side effects that outweigh any potential utility stemming from the use of the herbicide;

f.  Defendants knew or should have known at the time of marketing Roundup® products that exposure to Roundup® and specifically, its active ingredient glyphosate, could result in cancer and other severe illnesses and injuries; and

g.  Defendants did not conduct adequate post-marketing surveillance of

42

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

its Roundup® products.

122.    Defendants knew, or should have known that at all times herein mentioned its Roundup was in a defective condition, and was and is inherently dangerous and unsafe.

123.    Decedent was exposed to Defendants' Roundup, as described above, without knowledge of Roundup's dangerous characteristics.

124.    At the time of the Decedent's use of and exposure to Roundup, Roundup was being used for the purposes and in a manner normally intended, as a broad-spectrum herbicide.

125.    Defendants with this knowledge voluntarily designed its Roundup with a dangerous condition for use by the public, and in particular the Decedent.

126.    Defendants had a duty to create a product that was not unreasonably dangerous for its normal, intended use.

127.    Defendants created a product that was and is unreasonably dangerous for its normal, intended use.

128.    Defendants marketed and promoted a product in such a manner so as to make it inherently defective as the product downplayed its suspected, probable, and established health risks inherent with its normal, intended use.

129.    The Roundup designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed by Defendants was manufactured defectively in that Roundup left the hands of Defendants in a defective condition

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

and was unreasonably dangerous to its intended users.

130.   The Roundup designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed by Defendants reached their intended users in the same defective and unreasonably dangerous condition in which the Defendants' Roundup was manufactured.

131.   Defendants designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed a defective product, which created an unreasonable risk to the health of consumers and to the Decedent in particular, and Defendants are therefore strictly liable for the injuries sustained by the Decedent.

132.   The Decedent could not, by the exercise of reasonable care, have discovered Roundup's defects herein mentioned or perceived its danger.

133.   By reason of the foregoing, the Defendants have become strictly liable to the Plaintiffs for the manufacturing, marketing, promoting, distribution, and selling of a defective product, Roundup.

134.   Defendants' defective design, of Roundup amounts to willful, wanton, and/or reckless conduct by Defendants.

135.   Defects in Defendants' Roundup were the cause or a substantial factor in causing Plaintiff's injuries.

136.   As a result of the foregoing acts and omission, the Decedent developed multiple myeloma, and suffered severe and personal injuries, which are permanent and lasting in nature, physical pain and mental anguish, including

diminished enjoyment of life, and financial expenses for hospitalization and medical care.

137.    As a result of the foregoing acts and omissions, Plaintiffs, and each of them, have suffered a loss of love, companionship, comfort, affection, society, solace and moral support, all to their respective non-economic damages in a sum within the unlimited jurisdiction of this Court and will be established at trial according to proof.

138.    As a result of the foregoing acts and omissions, Plaintiffs, and each of them, and each of them, have incurred funeral and burial expenses in an amount not yet fully ascertained but according to proof at the time of trial.

139.    WHEREFORE, Plaintiffs respectfully requests this Court to enter judgment in plaintiffs' favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all such other and further relief as this Court deems just and proper.

## SECOND CAUSE OF ACTION

**(STRICT PRODUCTS LIABILITY--FAILURE TO WARN by All Plaintiffs as Against Defendant Monsanto Company, and DOES 1 Through 100, Inclusive)**

140.    Plaintiffs repeat, reiterate and re-allege each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

141.    Defendants have engaged in the business of selling, testing, distributing, supplying, manufacturing, marketing, and/or promoting Roundup, and through that conduct has knowingly and intentionally placed Roundup into the stream of commerce with full knowledge that it reaches consumers such as Decedent who are exposed to it through ordinary and reasonably foreseeable uses.

142.    Defendants did in fact sell, distribute, supply, manufacture, and/or promote Roundup to Plaintiff. Additionally, Defendants expected the Roundup that they were selling, distributing, supplying, manufacturing, and/or promoting to reach--and Roundup did in fact reach--consumers, including Decedent, without any substantial change in the condition of the product from when it was initially distributed by Defendants.

143.    At the time of manufacture, Defendants could have provided the warnings or instructions regarding the full and complete risks of Roundup and glyphosate-containing products because it knew or should have known of the unreasonable risks of harm associated with the use of and/or exposure to such products.

144.    At all times herein mentioned, the aforesaid product was defective and unsafe in manufacture such that it was unreasonably dangerous to the user, and was so at the time it was distributed by Defendants and at the time Decedent was exposed to and/or ingested the product. The defective condition of Roundup was due in part to the fact that it was not accompanied by proper warnings regarding its

carcinogenic qualities and possible side effects, including, but not limited to, developing multiple myeloma as a result of exposure and use.

145.   Roundup did not contain a warning or caution statement, which was necessary and, if complied with, was adequate to protect health those exposed in violation of 7 U.S.C. § 136j(a)(1)(E).

146.   Defendants' failure to include a warning or caution statement which was necessary and, if complied with, was adequate to protect the health of those exposed, violated 7 U.S.C. § 136j(a)(1)(E) as well as the laws of the State of California.

147.   Defendants could have amended the label of Roundup to provide additional warnings.

148.   This defect caused serious injury to Decedent, who used Roundup in its intended and foreseeable manner.

149.   At all times herein mentioned, Defendants had a duty to properly design, manufacture, compound, test, inspect, package, label, distribute, market, examine, maintain supply, provide proper warnings, and take such steps to assure that the product did not cause users to suffer from unreasonable and dangerous side effects.

150.   Defendants labeled, distributed, and promoted the aforesaid product that it was dangerous and unsafe for the use and purpose for which it was intended.

151.   Defendants failed to warn of the nature and scope of the side effects

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

associated with Roundup, namely its carcinogenic properties and its propensity to cause or serve as a substantial contributing factor in the development of multiple myeloma.

152.   Defendants were aware of the probable consequences of the aforesaid conduct. Despite the fact that Defendants knew or should have known that Roundup caused serious injuries, Defendants failed to exercise reasonable care to warn of the dangerous carcinogenic properties and side effect of developing multiple myeloma from Roundup exposure, even though these side effects were known or reasonably scientifically knowable at the time of distribution. Defendants willfully and deliberately failed to avoid the consequences associated with their failure to warn, and in doing so, Defendants acted with a conscious disregard for the safety of Decedent.

153.   At the time of exposure, Decedent could not have reasonably discovered any defect in Roundup prior through the exercise of reasonable care.

154.   Defendants, as the manufacturer and/or distributor of the subject product, is held to the level of knowledge of an expert in the field.

155.   Decedent reasonably relied upon the skill, superior knowledge, and judgment of Defendants.

156.   Had Defendants properly disclosed the risks associated with Roundup, Decedent would have avoided the risk of multiple myeloma by not using Roundup.

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

157.    The information that Defendants did provide or communicate failed to contain adequate warnings and precautions that would have enabled Decedent, and similarly situated individuals, to utilize the product safely and with adequate protection. Instead, Defendants disseminated information that was inaccurate, false, and misleading and which failed to communicate accurately or adequately the comparative severity, duration, and extent of the risk of injuries associated with use of and/or exposure to Roundup and glyphosate; continued to promote the efficacy of Roundup, even after it knew or should have known of the unreasonable risks from use or exposure; and concealed, downplayed, or otherwise suppressed, through aggressive marketing and promotion, any information or research about the risks and dangers of exposure to Roundup and glyphosate.

158.    To this day, Defendants have failed to adequately warn of the true risks of Decedent's injuries associated with the use of and exposure to Roundup.

159.    As a result of their inadequate warnings, Defendants' Roundup products were defective and unreasonably dangerous when they left the possession and/or control of Defendants, were distributed by Defendants, and used by Decedent.

160.    As a direct and proximate result of Defendants' actions as alleged herein, and in such other ways to be later shown, the subject product caused Decedent to sustain injuries as herein alleged.

161.    As a result of the foregoing acts and omissions, Plaintiffs, and each of

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

them, have suffered a loss of love, companionship, comfort, affection, society, solace and moral support, all to their respective non-economic damages in a sum within the unlimited jurisdiction of this Court and will be established at trial according to proof.

162.   As a result of the foregoing acts and omissions, Plaintiffs, and each of them, have incurred funeral and burial expenses in an amount not yet fully ascertained but according to proof at the time of trial.

163.   WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in Plaintiffs' favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all relief as this Court deems just and proper.

## THIRD CAUSE OF ACTION

**(NEGLIGENCE by All Plaintiffs as Against Defendants Monsanto Company, and DOES 1 Through 100, Inclusive)**

164.   Plaintiffs re-allege and incorporate herein by reference each and every allegation and statement contained in the prior paragraphs.

165.   Defendants, directly or indirectly, caused Roundup® products to be sold, distributed, packaged, labeled, marketed, promoted, and/or used by Plaintiffs.

166.   At all relevant times, Defendants had a duty to exercise reasonable care in the design, research, manufacture, marketing, advertisement, supply, promotion, packaging, sale, and distribution of Roundup products, including the

duty to take all reasonable steps necessary to manufacture, promote, and/or sell a product that was not unreasonably dangerous to consumers and users of the product.

167.   At all relevant times, Defendants had a duty to exercise reasonable care in the marketing, advertisement, and sale of the Roundup® products. Defendants' duty of care owed to consumers and the general public included providing accurate, true, and correct information concerning the risks of using Roundup and appropriate, complete, and accurate warnings concerning the potential adverse effects of exposure to Roundup®, and, in particular, its active ingredient glyphosate.

168.   At all relevant times, Defendants knew or, in the exercise of reasonable care, should have known of the hazards and dangers of Roundup® and, specifically, the carcinogenic properties of the chemical glyphosate.

169.   Accordingly, at all relevant times, Defendants knew or, in the exercise of reasonable care, should have known that use of or exposure to Roundup® products could cause or be associated with Plaintiffs' injuries, and thus, create a dangerous and unreasonable risk of injury to the users of these products, including Plaintiffs.

170.   Defendants also knew or, in the exercise of reasonable care, should have known that users and consumers of Roundup® were unaware of the risks and the magnitude of the risks associated with use of and/or exposure to Roundup®

and glyphosate-containing products.

171.   As such, Defendants breached their duty of reasonable care and failed to exercise ordinary care in the design, research, development, manufacture, testing, marketing, supply, promotion, advertisement, packaging, sale, and distribution of Roundup® products, in that Defendants manufactured and produced defective herbicides containing the chemical glyphosate; knew or had reason to know of the defects inherent in its products; knew or had reason to know that a user's or consumer's exposure to the products created a significant risk of harm and unreasonably dangerous side effects; and failed to prevent or adequately warn of these risks and injuries. Indeed, Defendants deliberately refused to test Roundup® products because they knew that the chemical posed serious health risks to humans.

172.   Defendants were negligent in their promotion of Roundup®, outside of the labeling context, by failing to disclose material risk information as part of their promotion and marketing of Roundup, including the Internet, television, print advertisements, etc. Nothing prevented Defendants from being honest in their promotional activities, and, in fact, Defendants had a duty to disclose the truth about the risks associated with Roundup in their promotional efforts, outside of the context of labeling.

173.   Despite their ability and means to investigate, study, and test the products and to provide adequate warnings, Defendants have failed to do so.

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

Indeed, Defendants have wrongfully concealed information and have further made false and/or misleading statements concerning the safety and/or exposure to Roundup and glyphosate.

174.    Defendants' negligence included:

a.  Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing Roundup® products without thorough and adequate pre- and post-market testing;

b.  Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing Roundup® while negligently and/or intentionally concealing and failing to disclose the results of trials, tests, and studies of exposure to glyphosate, and, consequently, the risk of serious harm associated with human use of and exposure to Roundup;

c.  Failing to undertake sufficient studies and conduct necessary tests to determine whether or not Roundup® products and glyphosate-containing products were safe for their intended use in agriculture and horticulture;

d.  Failing to use reasonable and prudent care in the design, research, manufacture, and development of Roundup® products so as to avoid the risk of serious harm associated with the prevalent use of Roundup/glyphosate as an herbicide;

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

e.  Failing to design and manufacture Roundup® products so as to ensure they were at least as safe and effective as other herbicides on the market;

f.  Failing to provide adequate instructions, guidelines, and safety precautions to those persons Defendants could reasonably foresee would use and be exposed to Roundup® products;

g.  Failing to disclose to Plaintiffs, users/consumers, and the general public that use of and exposure to Roundup® presented severe risks of cancer and other grave illnesses;

h.  Failing to warn Plaintiffs, consumers, and the general public that the product's risk of harm was unreasonable and that there were safer and effective alternative herbicides available to Plaintiffs and other consumers;

i.  Systematically suppressing or downplaying contrary evidence about the risks, incidence, and prevalence of the side effects of Roundup® and glyphosate-containing products;

j.  Representing that their Roundup® products were safe for their intended use when, in fact, Defendants knew or should have known the products were not safe for their intended purpose;

k.  Declining to make or propose any changes to Roundup® products' labeling or other promotional materials that would alert consumers

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

and the general public of the risks of Roundup® and glyphosate;

l.  Advertising, marketing, and recommending the use of the Roundup® products, while concealing and failing to disclose or warn of the dangers known (by Defendants) to be associated with or caused by the use of or exposure to Roundup® and glyphosate;

m.  Continuing to disseminate information to its consumers, which indicate or imply that Defendants' Roundup® products are not unsafe for use in the agricultural and horticultural industries; and

n.  Continuing the manufacture and sale of their products with the knowledge that the products were unreasonably unsafe and dangerous.

175.  Defendants knew and/or should have known that it was foreseeable consumers such as Plaintiffs would suffer injuries as a result of Defendants' failure to exercise ordinary care in the manufacturing, marketing, labeling, distribution, and sale of Roundup®.

176.  Decedent did not know the nature and extent of the injuries that could result from the intended use of and/or exposure to Roundup® or its active ingredient glyphosate.

177.  Defendants' negligence was the proximate cause of decedent's injuries and untimely death, *i.e.,* absent defendants' negligence, decedent would not have developed cancer and plaintiffs' husband and father would still be here today.

178.   Defendants' conduct, as described above, was reckless. Defendants regularly risked the lives of consumers and users of their products, including decedent, with full knowledge of the dangers of their products. Defendants have made conscious decisions not to redesign, re-label, warn, or inform the unsuspecting public, including decedent. Defendants' reckless conduct therefore warrants an award of punitive damages.

179.   As a result of the foregoing acts and omissions, the Decedent suffered from serious and dangerous side effects including, but not limited to, multiple myeloma, as well as other severe and personal injuries which are permanent and lasting in nature, physical pain and mental anguish, diminished enjoyment of life, and financial expenses for hospitalization and medical care. Further, Decedent suffered life-threatening multiple myeloma, and severe personal injuries, which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life.

180.   The conduct of defendants was a substantial factor and proximate cause of the serious personal injuries and death sustained by plaintiffs' decedent, Mike Esfahanian.

181.   Plaintiffs are informed and believe, and thereon alleges, that at all times herein relevant, that the conduct of defendants was a substantial factor in causing plaintiffs' damages as alleged herein.

182.   As a result of the foregoing acts and omissions, Plaintiffs, and each of

them, have suffered a loss of love, companionship, comfort, affection, society, solace and moral support, all to their respective non-economic damages in a sum within the unlimited jurisdiction of this Court and will be established at trial according to proof.

183.   As a result of the foregoing acts and omissions, Plaintiffs, and each of them, and each of them, have incurred funeral and burial expenses in an amount not yet fully ascertained but according to proof at the time of trial.

184.   WHEREFORE, plaintiffs respectfully request this Court to enter judgment in plaintiffs' favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all such other and further relief as this Court deems just and proper.

## **FOURTH CAUSE OF ACTION**

**(BREACH OF EXPRESS WARRANTIES by All Plaintiffs as Against Defendant Monsanto Company, and DOES 1 Through 100, Inclusive)**

185.   Plaintiffs re-allege and incorporate herein by reference each and every allegation and statement contained in the prior paragraphs.

186.   At all relevant times, Defendant Monsanto engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting Roundup® products, which are defective and unreasonably dangerous to consumers, including Plaintiffs, thereby placing Roundup® products into the

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

stream of commerce. These actions were under the ultimate control and supervision of Defendant Monsanto.

187.  Defendant Monsanto had a duty to exercise reasonable care in the research, development, design, testing, packaging, manufacture, inspection, labeling, distributing, marketing, promotion, sale, and release of Roundup® products, including a duty to:

a.    ensure that its products did not cause the user unreasonably dangerous side effects;

b.    warn of dangerous and potentially fatal side effects; and

c.    disclose adverse material facts, such as the true risks associated with the use of and exposure to Roundup® and glyphosate-containing products, when making representations to consumers and the general public, including Plaintiffs.

188.  As alleged throughout this pleading, the ability of Defendant Monsanto to properly disclose those risks associated with Roundup® is not limited to representations made on the labeling.

189.  At all relevant times, Defendant Monsanto expressly represented and warranted to the purchasers of its products, by and through statements made by Defendant Monsanto in labels, publications, package inserts, and other written materials intended for consumers and the general public, that Roundup® products were safe to human health and the environment, effective, fit, and proper for their intended use. Defendant Monsanto advertised, labeled, marketed, and promoted

Roundup® products, representing the quality to consumers and the public in such a way as to induce their purchase or use, thereby making an express warranty that Roundup® products would conform to the representations.

190.  These express representations include incomplete warnings and instructions that purport, but fail, to include the complete array of risks associated with use of and/or exposure to Roundup® and glyphosate. Defendant Monsanto knew and/or should have known that the risks expressly included in Roundup® warnings and labels did not and do not accurately or adequately set forth the risks of developing the serious injuries complained of herein. Nevertheless, Defendant Monsanto expressly represented that Roundup® products were safe and effective, that they were safe and effective for use by individuals such as the Plaintiffs, and/or that they were safe and effective as agricultural herbicides.

191.  The representations about Roundup®, as set forth herein, contained or constituted affirmations of fact or promises made by the seller to the buyer, which related to the goods and became part of the basis of the bargain, creating an express warranty that the goods would conform to the representations.

192.  Defendant Monsanto placed Roundup® products into the stream of commerce for sale and recommended their use to consumers and the public without adequately warning of the true risks of developing the injuries associated with the use of and exposure to Roundup® and its active ingredient glyphosate.

193.  Defendant Monsanto breached these warranties because, among other

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

things, Roundup® products were defective, dangerous, and unfit for use, did not contain labels representing the true and adequate nature of the risks associated with their use, and were not merchantable or safe for their intended, ordinary, and foreseeable use and purpose. Specifically, Defendant Monsanto breached the warranties in the following ways:

a. Defendant Monsanto represented through its labeling, advertising, and marketing materials that Roundup® products were safe, and fraudulently withheld and concealed information about the risks of serious injury associated with use of and/or exposure to Roundup® and glyphosate by expressly limiting the risks associated with use and/or exposure within its warnings and labels; and

b. Defendant Monsanto represented that Roundup® products were safe for use and fraudulently concealed information that demonstrated that glyphosate, the active ingredient in Roundup®, had carcinogenic properties, and that Roundup® products, therefore, were not safer than alternatives available on the market.

194. Decedent detrimentally relied on the express warranties and representations of defendant Monsanto concerning the safety and/or risk profile of Roundup® in making a decision to purchase the product. Decedent reasonably relied upon defendant Monsanto to disclose known defects, risks, dangers, and side effects of Roundup® and glyphosate. Decedent would not have purchased or used

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

Roundup® had defendant Monsanto properly disclosed the risks associated with the product, either through advertising, labeling, or any other form of disclosure.

195.  Defendant Monsanto had sole access to material facts concerning the nature of the risks associated with its Roundup® products, as expressly stated within their warnings and labels, and knew that consumers and users such as decedent could not have reasonably discovered that the risks expressly included in Roundup® warnings and labels were inadequate and inaccurate.

196.  Decedent had no knowledge of the falsity or incompleteness of defendant Monsanto's statements and representations concerning Roundup.

197.  Decedent used and/or was exposed to Roundup® as researched, developed, designed, tested, manufactured, inspected, labeled, distributed, packaged, marketed, promoted, sold, or otherwise released into the stream of commerce by defendant Monsanto.

198.  Had the warnings, labels, advertisements, or promotional material for Roundup® products accurately and adequately set forth the true risks associated with the use of such products, including decedent's injuries, rather than expressly excluding such information and warranting that the products were safe for their intended use, Decedent could have avoided the injuries complained of herein, including his untimely death.

199.  As a direct and proximate result of defendant Monsanto's breach of express warranty, plaintiffs have sustained pecuniary loss and general damages in a

sum exceeding the jurisdictional minimum of this Court.

200.   As a direct and proximate result of the conduct of defendant Monsanto's breach of express warranty, Decedent suffered from serious and dangerous side effects including, but not limited to, multiple myeloma, as well as other severe and personal injuries which are permanent and lasting in nature, physical pain and mental anguish, diminished enjoyment of life, and financial expenses for hospitalization and medical care. Further, Decedent suffered life-threatening multiple myeloma, and severe personal injuries, which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life.

201.   The conduct of defendants was a substantial factor and proximate cause of the. serious personal injuries and death sustained by plaintiffs' decedent, Mike Esfahanian.

202.   Plaintiffs are-informed and believe, and thereon alleges, that at all times herein relevant, that the conduct of defendants was a substantial factor in causing plaintiffs' damages as alleged herein.

203.   As a result of the foregoing acts and omissions, Plaintiffs, and each of them, have suffered a loss of love, companionship, comfort, affection, society, solace and moral support, all to their respective non-economic damages in a sum within the unlimited jurisdiction of this Court and will be established at trial according to proof.

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

204.   As a result of the foregoing acts and omissions, Plaintiffs, and each of them, have incurred funeral and burial expenses in an amount not yet fully ascertained but according to proof at the time of trial.

205.   WHEREFORE, plaintiffs respectfully requests that this Court enter judgment in plaintiffs' favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all such other and further relief as this Court deems just and proper.

## FIFTH CAUSE OF ACTION

**(BREACH OF IMPLIED WARRANTIES by All Plaintiffs as Against Defendant Monsanto Company, and DOES 1 Through 100, Inclusive)**

206.   Plaintiffs re-allege and incorporate herein by reference each and every allegation and statement contained in the prior paragraphs.

207.   At all relevant times, defendant Monsanto engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting Roundup® products, which were and are defective and unreasonably dangerous to consumers, including decedent, thereby placing Roundup® products into the stream of commerce.

208.   Before the time decedent was exposed to the aforementioned Roundup® products, defendant Monsanto impliedly warranted to its consumers, including decedent, that Roundup® products were of merchantable quality and safe and fit for the use for which they were intended; specifically, as agricultural

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

herbicides.

209. But defendant Monsanto failed to disclose that Roundup® has dangerous propensities when used as intended and that use of and/or exposure to Roundup® and glyphosate-containing products carries an increased risk of developing severe injuries, including decedent's injuries.

210. Decedent was an intended beneficiary of the implied warranties made by defendant Monsanto to purchasers of its herbicides.

211. The Roundup® products were expected to reach and did in fact reach consumers and users, including decedent, without substantial change in the condition in which they were manufactured and sold by defendant Monsanto.

212. At all relevant times, defendant Monsanto was aware that consumers and users of its products, including decedent, would use Roundup® products as marketed by defendant Monsanto, which is to say that decedent was a foreseeable user of Roundup®.

213. Defendant Monsanto intended that Roundup® products be used in the manner in which decedent, in fact, used them and which defendant Monsanto impliedly warranted to be of merchantable quality, safe, and fit for this use, despite the fact that Roundup® was not adequately tested or researched.

214. In reliance upon defendant Monsanto's implied warranty, decedent used Roundup® as instructed and labeled and in the foreseeable manner intended, recommended, promoted, and marketed by defendant Monsanto.

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

215.  Decedent could not have reasonably discovered or known of the risks of serious injury associated with Roundup® or glyphosate.

216.  Defendant Monsanto breached its implied warranty to decedent in that Roundup® products were not of merchantable quality, safe, or fit for their intended use, or adequately tested. Roundup® has dangerous propensities when used as intended and can cause serious injuries, including those injuries complained of herein.

217.  The harm caused by defendant's Roundup® products far outweighed their benefit, rendering the products more dangerous than an ordinary consumer or user would expect and more dangerous than alternative products.

218.   As a direct and proximate result of defendant's breach of implied warranty, the Decedent suffered from serious and dangerous side effects including, but not limited to, multiple myeloma, as well as other severe and personal injuries which are permanent and lasting in nature, physical pain and mental anguish, diminished enjoyment of life, and financial expenses for hospitalization and medical care. Further, Decedent suffered life-threatening multiple myeloma, and severe personal injuries, which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life.

219.  As a direct and proximate result of Defendant's breach of implied warranty, plaintiffs have sustained pecuniary loss and general damages in a sum exceeding the jurisdictional minimum of this Court.

220. The conduct of defendants was a substantial factor and proximate cause of the serious personal injuries and death sustained by plaintiffs' decedent, Mike Esfahanian.

221. Plaintiffs are informed and believe, and thereon alleges, that at all times herein relevant, that the conduct of defendants was a substantial factor in causing plaintiffs' damages as alleged herein.

222. As a result of the negligence of said Defendants, and each of them, Plaintiffs, and each of them, have suffered a loss of love, companionship, comfort, affection, society, solace and moral support, all to their respective non-economic damages in a sum within the unlimited jurisdiction of this Court and will be established at trial according to proof.

223. As a further result of the negligence of said Defendants, and each of them, Plaintiffs, and each of them, have incurred funeral and burial expenses in an amount not yet fully ascertained but according to proof at the time of trial.

224. WHEREFORE, plaintiffs respectfully requests that this Court enter judgment in plaintiffs' favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all such other and further relief as this Court deems just and proper.

## SIXTH CAUSE OF ACTION

**(FRAUD by All Plaintiffs as Against Defendant Monsanto Company, and DOES 1 Through 100, Inclusive)**

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

225.  Plaintiffs re-allege and incorporate herein by reference each and every allegation and statement contained in the prior paragraphs.

226.  Defendant Monsanto has defrauded the agricultural community in general and decedent Plaintiffs in particular by misrepresenting the true safety of its Roundup® and by failing to disclose known risks of cancer.

227.  Defendant Monsanto misrepresented and/or failed to disclose, inter alia, that: glyphosate and its major metabolite aminomethylphosphonic acid (AMPA) could cause cancer; glyphosate and AMPA are known to be genotoxic in humans and laboratory animals because exposure is known to cause DNA strand breaks (a precursor to cancer); glyphosate and AMPA are known to induce oxidative stress in humans and laboratory animals (a precursor to cancer); glyphosate and AMPA interfere with the aromatic amino acids within the human gut, leading to downstream health conditions including cancer; exposure to glyphosate and AMPA is causally associated with multiple myeloma; and the laboratory tests attesting to the safety of glyphosate were flawed and/or fraudulent.

228.  Due to these misrepresentations and omissions, at all times relevant to this litigation, Defendant's Roundup® was misbranded under 7 U.S.C. § 136(g) and its distribution within California and around the United States was a violation of 7 U.S.C. § 136j and 40 C.F.R. § 156.10(a)(5).

229.  Decedent relied on the Defendant's misrepresentations and/or material omissions regarding the safety of Roundup® and its active ingredient glyphosate in

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

deciding whether to purchase and/or use the product. Decedent and/or plaintiffs did not know nor could they reasonably have known of the misrepresentations and/or material omissions by Defendant concerning Roundup® and its active ingredient glyphosate.

230.  The misrepresentations and/or material omissions that form the basis of this fraud claim are not limited to statements made on the Roundup® labeling, as defined under federal law, but also involve Defendant Monsanto's representations and omissions made as part of its promotion and marketing of Roundup®, including on the Internet, television, in print advertisements, etc. Nothing prevented Defendant Monsanto from disclosing the truth about the risks associated with Roundup® in its promotional efforts outside of the labeling context, using the forms of media and promotion Defendant Monsanto traditionally used to promote the product's efficacy and benefits.

231.  When Defendant Monsanto made the misrepresentations and/or omissions as alleged in this pleading, it did so with the intent of defrauding and deceiving the public in general and the agricultural community and with the intent of inducing the public and agricultural community to purchase and use Roundup®.

232.  Defendant Monsanto made these misrepresentations and/or material omissions with malicious, fraudulent and/or oppressive intent toward Plaintiffs and the public generally. Defendant's conduct was willful, wanton, and/or reckless. Defendant deliberately recommended, manufactured, produced, marketed, sold,

distributed, merchandized, packaged, promoted and advertised the dangerous and defective herbicide Roundup®. This constitutes an utter, wanton, and conscious disregard of the rights and safety of a large segment of the public, and by reason thereof, Defendant is liable for reckless, willful, and wanton acts and omissions which evidence a total and conscious disregard for the safety of Plaintiffs and others which proximately caused the injuries as set forth herein.

233.  As a proximate result of defendant Monsanto's fraudulent and deceitful conduct and representations, plaintiffs have sustained damages and other losses in an amount to be proven at trial.

234.   As a direct and proximate result of the conduct of defendants, the Decedent suffered from serious and dangerous side effects including, but not limited to, multiple myeloma, as well as other severe and personal injuries which are permanent and lasting in nature, physical pain and mental anguish, diminished enjoyment of life, and financial expenses for hospitalization and medical care. Further, Decedent suffered life-threatening multiple myeloma, and severe personal injuries, which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life.

235.  The conduct of defendants was a substantial factor and proximate cause of the serious personal injuries and death sustained by plaintiffs' decedent, Mike Esfahanian.

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

236.  Plaintiffs are informed and believe, and thereon alleges, that at all times herein relevant, that the conduct of defendants was a substantial factor in causing plaintiffs' damages as alleged herein.

237.   As a direct and proximate result of the conduct of defendants, and each of them, Plaintiffs, and each of them, have suffered a loss of love, companionship, comfort, affection, society, solace and moral support, all to their respective non-economic damages in a sum within the unlimited jurisdiction of this Court and will be established at trial according to proof.

238.   As a further result of the negligence of said Defendants, and each of them, Plaintiffs, and each of them, have incurred funeral and burial expenses in an amount not yet fully ascertained but according to proof at the time of trial.

239.   WHEREFORE, plaintiffs respectfully requests that this Court enter judgment in plaintiffs' favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all such other and further relief as this Court deems just and proper.

## SEVENTH CAUSE OF ACTION

**(WRONGFUL DEATH by Plaintiffs Against Defendant Monsanto Company, and DOES 1 Through 100, Inclusive)**

240.  Plaintiffs repeat, reiterate, and re-allege each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect all if more fully set forth herein.

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

241.  Plaintiff ANOUSHEH SABOURI, is the surviving spouse of Decedent and Plaintiff S. E., a minor, is the surviving daughter of decedent. Plaintiffs are the Decedent's only heirs and bring herein this wrongful death claim.

242.  Decedent died as a direct and proximate result of Defendants' negligent and wrongful conduct in connection with the design, development, manufacture, testing, packaging, promoting, marketing, advertising, distribution, labeling, and/or sale of the herbicide Roundup, containing the active ingredient glyphosate.

243.  Defendants' wrongful conduct has proximately caused Decedent's heirs to suffer the loss of Decedent's companionship, services, society, marital association, love and consortium.

244.   As a direct and proximate result of the conduct of defendants, and each of them, Plaintiffs, and each of them, have suffered a loss of love, companionship, comfort, affection, society, solace and moral support, all to their respective non-economic damages in a sum within the unlimited jurisdiction of this Court and will be established at trial according to proof.

245.   As a further result of the negligence of said Defendants, and each of them, Plaintiffs, and each of them, have incurred funeral and burial expenses in an amount not yet fully ascertained but according to proof at the time of trial.

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

246.  WHEREFORE, Plaintiffs Anousheh Sabouri and S. E. respectfully request that this Court enter judgment in Plaintiffs' favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all relief as this Court deems just and proper.

## **EIGHTH CAUSE OF ACTION**

### **(EXEMPLARY DAMAGES by Plaintiffs Against Defendant Monsanto Company, and DOES 1 Through 100, Inclusive)**

247.  Plaintiffs incorporate by reference each allegation set forth in preceding paragraphs as if fully stated herein.

248.  Defendants' conduct as alleged herein was done with oppression, fraud, and malice. Defendants were fully aware of the safety risks of Roundup®. Nonetheless, Defendants deliberately crafted their label, marketing, and promotion to mislead farmers and consumers.

249.  This was not done by accident or through some justifiable negligence. Rather, Defendants knew that it could turn a profit by convincing the agricultural industry that Roundup was harmless to humans, and that full disclosure of the true risks of Roundup® would limit the amount of money Defendants would make selling Roundup® in California. Defendants' objection was accomplished not only through its misleading labeling, but through a comprehensive scheme of selective fraudulent research and testing, misleading advertising, and deceptive omissions as more fully alleged throughout this pleading. Plaintiffs were denied the right to

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

make an informed decision about whether to purchase, use, or be exposed to an herbicide, knowing the full risks attendant to that use. Such conduct was done with conscious disregard of Plaintiffs' rights.

250. There is no indication that Defendants will stop their deceptive and unlawful marketing practices unless they are punished and deterred. Accordingly, Plaintiffs request punitive damages against the Defendants for the harms caused to Plaintiffs.

251. The conduct of defendants was a substantial factor and proximate cause of the serious personal injuries and death sustained by plaintiffs' decedent, Mike Esfahanian.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff ANOUSHEH SABOURI and Plaintiff S. E., hereby prays for judgment against Defendants, and each of them, jointly and severally as follows:

1.    Awarding compensatory damages in excess of the jurisdictional amount, including, but not limited to pain, suffering, emotional distress, loss of enjoyment of life, and other non-economic damages in an amount to be determined at trial of this action;

2.    Awarding compensatory damages to Plaintiffs for past and future damages, including, but not limited to, Plaintiffs' pain and suffering and for severe and permanent personal injuries sustained by the Plaintiffs including health care costs

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

1  and economic loss;

2      3.    Awarding economic damages in the form of medical expenses, out of

3  pocket expenses, lost earnings and other economic damages in an amount to be

4  determine at trial of this action;

5

6      4.    Punitive and/or exemplary damages for the wanton, willful, fraudulent,

7  and reckless acts of the Defendants who demonstrated a complete disregard and

8  reckless indifference for the safety and welfare of the general public and to the

9  Plaintiffs in an amount sufficient to punish Defendants and deter future similar

10  conduct, to the extent allowed by applicable law;

11

12      5.    Pre-judgment interest;

13      6.    Post-judgment interest;

14      7.    Awarding Plaintiffs reasonable attorneys' fees;

15

16      8.    Awarding Plaintiffs the costs of these proceedings; and

17      9.    Such other and further relief as this Court deems just and proper.

18

19

20  DATED: July 7, 2021           **THE LAW OFFICES OF HAYTHAM FARAJ**

21

22

23

24                  By:_____

25                  HAYTHAM FARAJ, ESQ.
                Attorneys for Plaintiffs

26

27

28

_____74_____

## **DEMAND FOR JURY TRIAL**

Plaintiff ANOUSHEH SABOURI and Plaintiff S. E. hereby demand a

trial by jury on all of the causes of action.


DATED: July 7, 2021        **THE LAW OFFICES OF HAYTHAM FARAJ**



By: _____
       HAYTHAM FARAJ, ESQ.
       Attorneys for Plaintiffs, ANOUSHEH
       SABOURI and S. E.