**Query**   **Reports**   **Utilities**   **Help**   **Log Out**

# U.S. District Court
## Southern District of California (San Diego)
### CIVIL DOCKET FOR CASE #: 3:21-cv-01336-TWR-BLM

Sparkman v. Monsanto Company et al          Date Filed: 07/26/2021
Assigned to: Judge Todd W. Robinson          Jury Demand: Plaintiff
Referred to: Magistrate Judge Barbara Lynn Major          Nature of Suit: 365 Personal Inj. Prod.
Cause: 28:1332pl Diversity-Product Liability          Liability
                                              Jurisdiction: Diversity

**Plaintiff**

**Gisela Sparkman**                      represented by   **John H. Gomez**
*an Individual and on behalf of The*                      Gomez Trial Attorneys
*Estate of George Sparkman, deceased*                     655 West Broadway
                                                          Suite 1700
                                                          San Diego, CA 92101
                                                          (619)237-3490
                                                          Fax: (619)237-3496
                                                          Email: john@thegomezfirm.com
                                                          *LEAD ATTORNEY*
                                                          *ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Monsanto Company**

**Defendant**

**Does 1-50**

| Date Filed | # | Docket Text |
|---|---|---|
| 07/26/2021 | 1 | COMPLAINT with Jury Demand against Monsanto Company; Does 1-50 ( Filing fee $ 402 receipt number ACASDC-15965443.), filed by Gisela Sparkman. (Attachments: # 1 Civil Cover Sheet)<br><br>The new case number is 3:21-cv-1336-TWR-BLM. Judge Todd W. Robinson and Magistrate Judge Barbara Lynn Major are assigned to the case. (Gomez, John) (fth) (rmc). (Entered: 07/27/2021) |
| 07/27/2021 | 2 | Summons Issued.<br>**Counsel receiving this notice electronically should print this summons and** |

| | | **serve it in accordance with Rule 4, Fed.R.Civ.P and LR 4.1.** (fth) (rmc). (Entered: 07/27/2021) |
|---|---|---|

<table>
<tr><td colspan="4" align="center"><strong>PACER Service Center</strong></td></tr>
<tr><td colspan="4" align="center"><strong>Transaction Receipt</strong></td></tr>
<tr><td colspan="4" align="center">08/09/2021 07:34:52</td></tr>
<tr><td><strong>PACER Login:</strong></td><td>sh0019sh</td><td><strong>Client Code:</strong></td><td>31943.356965</td></tr>
<tr><td><strong>Description:</strong></td><td>Docket Report</td><td><strong>Search Criteria:</strong></td><td>3:21-cv-01336-TWR-BLM</td></tr>
<tr><td><strong>Billable Pages:</strong></td><td>1</td><td><strong>Cost:</strong></td><td>0.10</td></tr>
</table>



**null / ALL**
**Transmittal Number: 23551593**
**Date Processed: 07/29/2021**

# Notice of Service of Process

| | |
|---|---|
| **Primary Contact:** | Anne Troupis (Monsanto)<br>Bayer U.S. LLC<br>800 N Lindbergh Blvd<br>Saint Louis, MO 63167-1000 |

| | |
|---|---|
| **Entity:** | Monsanto Company<br>Entity ID Number  2282193 |
| **Entity Served:** | Monsanto Company |
| **Title of Action:** | Sparkman, Gisela  vs. Monsanto Company |
| **Matter Name/ID:** | Sparkman, Gisela  vs. Monsanto Company (11440140) |
| **Document(s) Type:** | Summons/Complaint |
| **Nature of Action:** | Product Liability |
| **Court/Agency:** | U.S. District Court Southern District, CA |
| **Case/Reference No:** | '21CV1336 TWR BLM |
| **Jurisdiction Served:** | California |
| **Date Served on CSC:** | 07/28/2021 |
| **Answer or Appearance Due:** | 21 Days |
| **Originally Served On:** | CSC |
| **How Served:** | Personal Service |
| Sender Information: | John H. Gomez<br>619-237-3490 |

Information contained on this transmittal form is for record keeping, notification and forwarding the attached document(s). It does not constitute a legal opinion. The recipient is responsible for interpreting the documents and taking appropriate action.

**To avoid potential delay, please do not send your response to CSC**

251 Little Falls Drive, Wilmington, Delaware 19808-1674   (888) 690-2882   |   sop@cscglobal.com

AO 441    Summons in a Civil Action

# United States District Court
## SOUTHERN DISTRICT OF CALIFORNIA

Gisela Sparkman, an Individual and on behalf of The
Estate of George Sparkman, deceased

*Plaintiff*

Civil Action No.  21cv1336-TWR-BLM

**V.**

Monsanto Company; Does 1-50

*Defendant*

## SUMMONS IN A CIVIL ACTION

To:  *(Defendant's name and address)*

MONSANTO COMPANY
2710 GATEWAY OAKS DRIVE SUITE 150N
SACRAMENTO CA  95833

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) - or 60 days
if you are the United States or a United States agency, or an office or employee of the United States described
in Fed. R. Civ. P. 12(a)(2) or (3) - You must serve on the plaintiff an answer to the attached complaint or a
motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the
plaintiff or plaintiff's attorney, whose name and address are:

John H. Gomez
655 West Broadway, Suite 1700
San Diego, CA 92101
(619)237-3490

If you fail to respond, judgment by default will be entered against you for the relief demanded in the
complaint.  You also must file your answer or motion with the court.

Date:      7/27/21



John Morrill
*CLERK OF COURT*

S/                        T. Hernandez

*Signature of Clerk or Deputy Clerk*

AO 441    Summons in a Civil Action                                                                                           (Page 2)

**Civil Action No.** 21cv1336-TWR-BLM                      Date Issued: _____ 7/27/21 _____

<h1 align="center">PROOF OF SERVICE</h1>
*(This section should not be filed with the court unless required by Fed. R. Civ. P. 4(l))*

This summons for *(name of individual and title, if any)* _____

was received by me on *(date)* _____.

    ☐ I personally served the summons on the individual at *(place)* _____

_____ on *(date)* _____; or

    ☐ I left the summons at the individual's residence or place of abode with *(name)* _____

_____, a person of suitable age and discretion who resides there,

on *(date)* _____, and mailed a copy to the individual's last known address; or

    ☐ I served the summons on *(name of the individual)* _____, who is

designated by law to accept service of process on behalf of *(name of organization)* _____

_____ on *(date)* _____; or

    ☐ I returned the summons unexecuted because _____; or

    ☐ Other *(specify)*:


My fees are $ _____ for travel and $ _____ for services, for a total of $ _____.

I declare under penalty of perjury that this information is true.

Date: _____            _____
                                                      *Server's Signature*

                                                      _____
                                                      *Printed name and title*

                                                      _____
                                                      *Server's address*

NOTICE OF RIGHT TO CONSENT TO TRIAL BY A UNITED STATES MAGISTRATE JUDGE

IN ACCORDANCE WITH THE PROVISION OF 28 USC 636(C) YOU ARE HEREBY NOTIFIED THAT A U.S. MAGISTRATE JUDGE OF THIS DISTRICT MAY, UPON CONSENT OF ALL PARTIES, CONDUCT ANY OR ALL PROCEEDINGS, INCLUDING A JURY OR NON-JURY TRIAL, AND ORDER THE ENTRY OF A FINAL JUDGMENT.

YOU SHOULD BE AWARE THAT YOUR DECISION TO CONSENT OR NOT CONSENT IS ENTIRELY VOLUNTARY AND SHOULD BE COMMUNICATED SOLELY TO THE CLERK OF COURT.  ONLY IF ALL PARTIES CONSENT WILL THE JUDGE OR MAGISTRATE JUDGE WHOM THE CASE HAS BEEN ASSIGNED BE INFORMED OF YOUR DECISION.

JUDGMENTS OF THE U.S. MAGISTRATE JUDGES ARE APPEALABLE TO THE U.S. COURT OF APPEALS IN ACCORDANCE WITH THIS STATUTE AND THE FEDERAL RULES OF APPELLATE PROCEDURE.

1

**GOMEZ TRIAL ATTORNEYS**
John H. Gomez (SBN 171485)
2
*john@gomeztrialattorneys.com*
Jessica T. Sizemore (SBN 280000)
3
*jessica@gomeztrialattorneys.com*
655 West Broadway, Suite 1700
4
San Diego, California 92101
5
Telephone:  (619) 237-3490
Facsimile:  (619) 237-3496
6

7
Attorneys for Plaintiffs

8

9
**UNITED STATES DISTRICT COURT**

10
**SOUTHERN DISTRICT OF CALIFORNIA**

11
GISELA SPARKMAN, an Individual and on       )   Case No.   **'21 CV 1336 TWR BLM**
behalf of THE ESTATE OF GEORGE              )
12
SPARKMAN, deceased,                         )
                                            )   **COMPLAINT**
13
                                            )
                     Plaintiffs,            )
14                                          )   **JURY TRIAL DEMANDED**
v.                                          )
15                                          )
MONSANTO COMPANY and DOES 1-50              )
16                                          )
                     Defendants.            )
17                                          )
                                            )
18                                          )
                                            )
19

20
**COMPLAINT**

21
　　　　Plaintiffs, GISELA SPARKMAN, an Individual and on behalf of THE ESTATE OF GEORGE

22
SPARKMAN, deceased ("Plaintiffs"), by and through their undersigned attorneys, hereby brings this

23
Complaint for damages against Defendants Monsanto Company and John Does 1-50, and alleges the

24
following:

25
///

26
///

27
///

28
///

## NATURE OF THE CASE

1.     This is an action for damages suffered by Plaintiffs as a direct and proximate result of Defendants' negligent and wrongful conduct in connection with the design, development, manufacture, testing, packaging, promoting, marketing, advertising, distribution, labeling, and/or sale of the herbicide Roundup®, containing the active ingredient glyphosate.

2.     Plaintiffs maintain that Roundup® and/or glyphosate is defective, dangerous to human health, unfit and unsuitable to be marketed and sold in commerce, and lacked proper warnings and directions as to the dangers associated with its use.

3.     Plaintiffs' injuries, like those striking thousands of similarly situated victims across the country, were avoidable.

## JURISDICTION AND VENUE

4.     This Court has jurisdiction over Defendants and this action pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship between Plaintiffs and Defendants. Defendants are all either incorporated and/or have their principal place of business outside of the state in which the Plaintiffs reside.

5.     The amount in controversy between Plaintiffs and Defendants exceeds $75,000, exclusive of interest and cost.

6.     The Court also has supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

7.     Venue is proper within this district pursuant to 28 U.S.C. § 1391 in that Defendants conduct business here and are subject to personal jurisdiction in this district. Furthermore, Defendants sell, market, and/or distribute Roundup® within the District of California. Also, a substantial part of the acts and/or omissions giving rise to these claims occurred within this district.

## PARTIES

8.     Plaintiff, Gisela Sparkman, is a natural person and at all relevant times a resident and citizen of San Diego County, California. Plaintiff's deceased husband, George J. Sparkman ("Decedent"), was at all times relevant hereto a natural person and citizen of San Diego County, California.  Plaintiffs bring this action for personal injuries sustained by exposure to Roundup® ("Roundup") containing the active ingredient glyphosate and the surfactant POEA. As a direct and

1  proximate result of being exposed to Roundup, Decedent George Sparkman developed non-Hodgkin's
2  Lymphoma.

3      9.    "Roundup" refers to all formulations of Defendants' roundup products, including, but
4  not limited to, Roundup Concentrate Poison Ivy and Tough Brush Killer 1, Roundup Custom
5  Herbicide, Roundup D-Pak herbicide, Roundup Dry Concentrate, Roundup Export Herbicide,
6  Roundup Fence & Hard Edger 1, Roundup Garden Foam Weed & Grass Killer, Roundup Grass and
7  Weed Killer, Roundup Herbicide, Roundup Original 2k herbicide, Roundup Original II Herbicide,
8  Roundup Pro Concentrate, Roundup Prodry Herbicide, Roundup Promax, Roundup Quik Stik Grass
9  and Weed Killer, Roundup Quikpro Herbicide, Roundup Rainfast Concentrate Weed & Grass Killer,
10  Roundup Rainfast Super Concentrate Weed & Grass Killer, Roundup Ready-to-Use Extended Control
11  Weed & Grass Killer 1 Plus Weed Preventer, Roundup Ready-to-Use Weed & Grass Killer, Roundup
12  Ready-to-Use Weed and Grass Killer 2, Roundup Ultra Dry, Roundup Ultra Herbicide, Roundup
13  Ultramax, Roundup VM Herbicide, Roundup Weed & Grass Killer Concentrate, Roundup Weed &
14  Grass Killer Concentrate Plus, Roundup Weed & Grass killer Ready-to-Use Plus, Roundup Weed &
15  Grass Killer Super Concentrate, Roundup Weed & Grass Killer1 Ready-to-Use, Roundup WSD Water
16  Soluble Dry Herbicide Deploy Dry Herbicide, or any other formulation of containing the active
17  ingredient glyphosate.

18      10.    Defendant MONSANTO COMPANY is a Delaware corporation, Calif. Secretary of
19  State Entity No. C2362863, in "active" status, with a principle place of business in St. Louis,
20  Missouri.

21      11.    Upon best information and belief, Defendants JOHN DOES 1-50 are subsidiaries,
22  partners, or other entities that were involved in the design, development, manufacture, testing,
23  packaging, promoting, marketing, advertising, distribution, labeling, and/or sale of the herbicide
24  Roundup, containing the active ingredient glyphosate. The identities of JOHN DOES 1-50 are
25  unknown to Plaintiff at this time. Plaintiff will move the Court to specifically name JOHN DOES 1-50
26  as their identities becomes known to Plaintiff through discovery.

27      12.    Defendant MONSANTO COMPANY and JOHN DOES 1-50 are collectively referred
28  to as "Monsanto Defendants" or "Defendants."

---

PLAINTIFFS' COMPLAINT & JURY       -3-
DEMAND

1      13.    Defendants advertise and sell goods, specifically Roundup, in San Diego County,

2 California.

3      14.    Defendants transacted and conducted business within the State of California that relates

4 to the allegations in this Complaint.

5      15.    Defendants derived substantial revenue from goods and products used in the State of

6 California.

7      16.    Defendants expected or should have expected their acts to have consequences within the

8 State of California, and derived substantial revenue from interstate commerce.

9      17.    Defendants engaged in the business of designing, developing, manufacturing, testing,

10 packaging, marketing, distributing, labeling, and/or selling Roundup.

11      18.    Defendants are authorized to do business in California and derive substantial income

12 from doing business in this state.

13      19.    Upon information and belief, Defendants purposefully availed themselves of the

14 privilege of conducting activities with the State of California, thus invoking the benefits and

15 protections of its laws.

16      20.    Upon information and belief, Defendants did act together to design, sell, advertise,

17 manufacture and/or distribute Roundup, with full knowledge of its dangerous and defective nature.

18                    **FACTUAL ALLEGATIONS**

19      21.    At all relevant times, Defendants were in the business of, and did, design, research,

20 manufacture, test, advertise, promote, market, sell, distribute, and/or have acquired and are responsible

21 for Defendants who have designed, researched, manufactured, tested, advertised, promoted, marketed,

22 sold, and distributed the commercial herbicide Roundup.

23      22.    Monsanto is a multinational agricultural biotechnology corporation based in St. Louis,

24 Missouri. It is the world's leading producer of glyphosate.

25      23.    Defendants discovered the herbicidal properties of glyphosate during the 1970's and

26 subsequently began to design, research, manufacture, sell and distribute glyphosate based "Roundup"

27 as a broad spectrum herbicide.

28      24.    Glyphosate is the active ingredient in Roundup.

1      25.    Glyphosate is a broad-spectrum herbicide used to kill weeds and grasses known to

2 compete with commercial crops grown around the globe.

3      26.    Glyphosate is a "non-selective" herbicide, meaning it kills indiscriminately based only

4 on whether a given organism produces a specific enzyme, 5-enolpyruvylshikimic acid-3-phosphate

5 synthase, known as EPSP synthase.

6      27.    Glyphosate inhibits the enzyme 5-enolpyruvylshikimic acid-3-phosphate synthase that

7 interferes with the shikimic pathway in plants, resulting in the accumulation of shikimic acid in plant

8 tissue and ultimately plant death.

9      28.    Sprayed as a liquid, plants absorb glyphosate directly through their leaves, stems, and

10 roots, and detectable quantities accumulate in the plant tissues.

11      29.    Each year, approximately 250 million pounds of glyphosate are sprayed on crops,

12 commercial nurseries, suburban lawns, parks, and golf courses. This increase in use has been driven

13 largely by the proliferation of genetically engineered crops, crops specifically tailored to resist the

14 activity of glyphosate.

15      30.    Defendants are intimately involved in the development, design, manufacture,

16 marketing, sale, and/or distribution of genetically modified ("GMO") crops, many of which are

17 marketed as being resistant to Roundup i.e., "Roundup Ready®." As of 2009, Defendants were the

18 world's leading producer of seeds designed to be Roundup Ready®. In 2010, an estimated 70% of corn

19 and cotton, and 90% of soybean fields in the United States contained Roundup Ready® seeds.

20      31.    The original Roundup, containing the active ingredient glyphosate, was introduced in

21 1974. Today, glyphosate products are among the world's most widely used herbicides. Monsanto's

22 glyphosate products are registered in more than 130 countries and are approved for weed control in

23 more than 100 crops. No other herbicide active ingredient compares in terms of number of approved

24 uses.[1]

25      32.    For nearly 40 years, farmers across the globe have used Roundup, unaware of its

26 carcinogenic properties.

27 ///

28

---

[1] *2 Backgrounder*, History of Monsanto's Glyphosate Herbicides, June 2005.

PLAINTIFFS' COMPLAINT & JURY        -5-
DEMAND

## REGISTRATION OF HERBICIDES UNDER FEDERAL LAW

33.     The manufacture, formulation and distribution of herbicides, such as Roundup, are regulated under the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA"), 7. U.S.C. § 136 *et seq.* FIFRA requires that all pesticides be registered with the Environmental Protection Agency ("EPA") prior to their distribution, sale, or use, except as described by FIFRA 7 U.S.C. 136a(a).

34.     The EPA requires as part of the registration process, among other requirements, a variety of tests to evaluate the potential for exposure to pesticides, toxicity to people and other potential non-target organisms, and other adverse effects on the environment. Registration by the EPA, however, is not an assurance or finding of safety. The determination the EPA makes in registering or re-registering a product is not that the product is "safe," but rather that use of the product in accordance with its label directions "will not generally cause unreasonable adverse effects on the environment." 7 U.S.C. § 136(a)(c)(5)(D).

35.     FIFRA defines "unreasonable adverse effects on the environment" to mean "any unreasonable risk to man or the environment, taking into account the economic, social, and environmental costs and benefits of the use of any pesticide." 7 U.S.C. § 136(bb). FIFRA thus requires the EPA to make a risk/benefit analysis in determining whether a registration should be granted or allowed to continue to be sold in commerce.

36.     The EPA and the State of California registered Roundup for distribution, sale, and manufacture in the United States and the State of California.

37.     FIFRA generally requires that the registrant, Monsanto, conduct health and safety testing of pesticide products. The government is not required, nor is it able, to perform the product tests that are required of the manufacturer.

38.     The evaluation of each pesticide product distributed, sold, or manufactured is completed at the time the product is initially registered. The data necessary for registration of a pesticide has changed over time. The EPA is now in the process of re-evaluating all pesticide products through a Congressionally-mandated process called "re-registration." 7 U.S.C. § 136a-1. In order to reevaluate these pesticides, the EPA demands the completion of additional tests and the submission of data for the EPA's review and evaluation.

39.     In the case of glyphosate and Roundup, the EPA had planned on releasing its preliminary risk assessment – in relation to the registration process – no later than July 2015. The EPA completed its review of glyphosate in early 2015, but delayed releasing the assessment pending further review in light of the World Health Organization's findings.

**MONSANTO'S FALSE REPRESENTATIONS REGARDING THE SAFETY OF ROUNDUP®**

40.     In 1996, the New York Attorney General ("NYAG") filed a lawsuit against Monsanto based on its false and misleading advertising of Roundup products. Specifically, the lawsuit challenged Monsanto's general representations that its spray-on glyphosate-based herbicides, including Roundup, were "safer **than table salt**" and "practically **non-toxic**" to mammals, birds, and fish. Among the representations the NYAG found deceptive and misleading about the human and environmental safety of Roundup are the following:

        a.) Remember that environmentally friendly Roundup herbicide is biodegradable. It won't build up in the soil so you can use Roundup with confidence along customers' driveways, sidewalks and fences ...

        b.) And remember that Roundup is biodegradable and won't build up in the soil. That will give you the environmental confidence you need to use Roundup everywhere you've got a weed, brush, edging or trimming problem.

        c.) Roundup biodegrades into naturally occurring elements.

        d.) Remember that versatile Roundup herbicide stays where you put it. That means there's no washing or leaching to harm customers' shrubs or other desirable vegetation.

        e.) This non-residual herbicide will not wash or leach in the soil. It ... stays where you apply it.

        f.) You can apply Accord with " confidence because it will stay where you put it" it bonds tightly to soil particles, preventing leaching. Then, soon after application, soil microorganisms biodegrade Accord into natural products.

        g.) Glyphosate is less toxic to rats than table salt following acute oral ingestion.

        h.) Glyphosate's safety margin is much greater than required. It has over a 1,000-fold safety margin in food and over a 700-fold safety margin for

1  workers who manufacture it or use it.

2  i.) You can feel good about using herbicides by Monsanto. They carry a
toxicity category rating of 'practically non-toxic' as it pertains to
3  mammals, birds and fish.

4  j.) "Roundup can be used where kids and pets will play and breaks down
into natural material." This ad depicts a person with his head in the
5  ground and a pet dog standing in an area which has been treated with
6  Roundup.[2]

7  41.   On November 19, 1996, Monsanto entered into an Assurance of Discontinuance with

8  NYAG, in which Monsanto agreed, among other things, "to cease and desist from publishing or

9  broadcasting any advertisements [in New York] that represent, directly or by implication" that:

10  a.) its glyphosate-containing pesticide products or any component thereof
are safe, non-toxic, harmless or free from risk.

11

12  ***

13  b.) its glyphosate-containing pesticide products or any component thereof
manufactured, formulated, distributed or sold by Monsanto are
14  biodegradable

15  ***

16  c.) its glyphosate-containing pesticide products or any component thereof
stay where they are applied under all circumstances and will not move
17  through the environment by any means.

18  ***

19

20  d.) its glyphosate-containing pesticide products or any component thereof
are "good" for the environment or are "known for their environmental
21  characteristics."

22  ***

23  e.) glyphosate-containing pesticide products or any component thereof are
safer or less toxic than common consumer products other than
24  herbicides;

25
f.) its glyphosate-containing products or any component thereof might be
26  classified as "practically non-toxic.

27

28  [2] Attorney General of the State of New York, In the Matter of Monsanto Company, Assurance of Discontinuance Pursuant
to Executive Law § 63(15) (Nov. 1996).

PLAINTIFFS' COMPLAINT & JURY               -8-
DEMAND

1

2      42.     Monsanto did not alter its advertising in the same manner in any state other than New

3  York, and on information and belief still has not done so today.

4      43.     In 2009, France's highest court ruled that Monsanto had not told the truth about the

5  safety of Roundup. The French court affirmed an earlier judgment that Monsanto had falsely

6  advertised its herbicide Roundup as "biodegradable" and that it "left the soil clean."[3]

7                            **EVIDENCE OF CARCINOGENICITY IN ROUNDUP**

8      44.     As early as the 1980's Monsanto was aware of glyphosate's carcinogenic properties.

9      45.     On March 4, 1985, a group of the Environmental Protection Agency's ("EPA")

10  Toxicology Branch published a memorandum classifying glyphosate as a Category C oncogene.[4]

11  Category C oncogenes are possible human carcinogens with limited evidence of carcinogenicity.

12      46.     In 1986, the EPA issued a Registration Standard for glyphosate (NTIS PB87-103214).

13  The Registration standard required additional phytotoxicity, environmental fate, toxicology, product

14  chemistry, and residue chemistry studies. All of the data required was submitted and reviewed and/or

15  waived.[5]

16      47.     In October 1991 the EPA published a Memorandum entitled "Second Peer Review of

17  Glyphosate." The memorandum changed glyphosate's classification to Group E (evidence of non-

18  carcinogenicity for humans). Two peer review committee members did not concur with the

19  conclusions of the committee and one member refused to sign.[6]

20      48.     In addition to the toxicity of the active molecule, many studies support the hypothesis

21  that glyphosate formulations found in Defendants' Roundup products are more dangerous and toxic

22  than glyphosate alone.[7]  As early as 1991 evidence existed demonstrating that glyphosate formulations

23  were significantly more toxic than glyphosate alone.[8]

24      49.     In 2002, Julie Marc published a study entitled "Pesticide Roundup Provokes Cell

25

---

[3] *Monsanto Guilty in 'False Ad' Row,* BBC, Oct. 15, 2009, *available at* http://news.bbc.co.uk/2/hi/europe/8308903.stm.
[4] Consensus Review of Glyphosate, Casewell No. 661A. March 4, 1985. United States Environmental Protection Agency.
[5] http://www.epa.gov/oppsrrd1/reregistration/REDs/factsheets/0178fact.pdf
[6] Second Peer Review of Glyphosate, CAS No. 1071-83-6. October 30, 1881. United States Environmental Protection Agency.
[7] Martinez et al. 2007; Benachour 2009; Gasnier et al. 2010; Peixoto 2005; Marc 2004
[8] Martinez et al 1991.

1  Division Dysfunction at the Level of CDK1/Cyclin B Activation."

2       50.     The study found that Defendants' Roundup caused delays in the cell cycles of sea
3  urchins, while the same concentrations of glyphosate alone proved ineffective and did not alter cell
4  cycles.

5       51.     In 2004, Julie Marc published a study entitled "Glyphosate-based pesticides affect cell
6  cycle regulation." The study demonstrated a molecular link between glyphosate-based products and
7  cell cycle dysregulation.

8       52.     The study noted that "cell-cycle dysregulation is a hallmark of tumor cells and human
9  cancer. Failure in the cell-cycle checkpoints leads to genomic instability and subsequent development
10 of cancers from the initial affected cell." Further, "[s]ince cell cycle disorders such as cancer result
11 from dysfunction of unique cell, it was of interest to evaluate the threshold dose of glyphosate
12 affecting cells."[9]

13      53.     In 2005, Francisco Peixoto published a study showing that Roundup's effects on rat
14 liver mitochondria are much more toxic and harmful than the same concentrations of glyphosate alone.

15      54.     The Peixoto study suggested that the harmful effects of Roundup on mitochondrial
16 bioenergetics could not be exclusively attributed to glyphosate and could be the result of other
17 chemicals, namely the surfactant POEA, or alternatively due to the possible synergy between
18 glyphosate and Roundup formulation products.

19      55.     In 2009, Nora Benachour and Gilles-Eric Seralini published a study examining the
20 effects of Roundup and glyphosate on human umbilical, embryonic, and placental cells.

21      56.     The study used dilution levels of Roundup and glyphosate far below agricultural
22 recommendations, corresponding with low levels of residues in food. The study concluded that
23 supposed "inert" ingredients, and possibly POEA, change human cell permeability and amplify
24 toxicity of glyphosate alone. The study further suggested that determinations of glyphosate toxicity
25 should take into account the presence of adjuvants, or those chemicals used in the formulation of the
26 complete pesticide. The study confirmed that the adjuvants in Roundup are not inert and that Roundup
27 is always more toxic than its active ingredient glyphosate.

28  _____
[9] (Molinari, 2000; Stewart et al., 2003)

PLAINTIFFS' COMPLAINT & JURY          -10-
DEMAND

57.     The results of these studies were confirmed in recently published peer-reviewed studies and were at all times available and/or known to Defendants.

58.     Defendants knew or should have known that Roundup is more toxic than glyphosate alone and that safety studies on Roundup, Roundup's adjuvants and "inert" ingredients, and/or the surfactant POEA were necessary to protect Plaintiff from Roundup.

59.     Defendants knew or should have known that tests limited to Roundup's active ingredient glyphosate were insufficient to prove the safety of Roundup.

60.     Defendants failed to appropriately and adequately test Roundup, Roundup's adjuvants and "inert" ingredients, and/or the surfactant POEA to protect Plaintiff from Roundup.

61.     Rather than performing appropriate tests, Defendants relied upon flawed industry-supported studies designed to protect Defendants' economic interests rather than Plaintiff and the consuming public.

62.     Despite their knowledge that Roundup was considerably more dangerous than glyphosate alone, Defendants continued to promote Roundup as safe.

## IARC CLASSIFICATION OF GLYPHOSATE

63.     The International Agency for Research on Cancer ("IARC") is the specialized intergovernmental cancer agency the World Health Organization ("WHO") of the United Nations tasked with conducting and coordinating research into the causes of cancer.

64.     An IARC Advisory Group to Recommend Priorities for IARC Monographs during 2015–2019 met in April 2014. Though nominations for the review were solicited, a substance must meet two criteria to be eligible for review by the IARC Monographs: there must already be some evidence of carcinogenicity of the substance, and there must be evidence that humans are exposed to the substance.

65.     IARC set glyphosate for review in 2015-2016. IARC uses five criteria for determining priority in reviewing chemicals. The substance must have a potential for direct impact on public health;

PLAINTIFFS' COMPLAINT & JURY          -11-
DEMAND

1   scientific literature to support suspicion of carcinogenicity; evidence of significant human exposure;

2   high public interest and/or potential to bring clarity to a controversial area and/or reduce public anxiety

3   or concern; related agents similar to one given high priority by the above considerations. Data

4   reviewed is sourced preferably from publicly accessible, peer-reviewed data.

5           66.     On March 24, 2015, after its cumulative review of human, animal, and DNA studies for

6   more than one (1) year, many of which have been in Defendants' possession since as early as 1985, the

7   IARC's working group published its conclusion that the glyphosate contained in Defendants' Roundup

8   herbicide, is a Class 2A "probable carcinogen" as demonstrated by the mechanistic evidence of

9   carcinogenicity in humans and sufficient evidence of carcinogenicity in animals.

10

11          67.     The IARC's full Monograph was published on July 29, 2015 and established glyphosate

12  as a class 2A probable carcinogen to humans. According to the authors glyphosate demonstrated

13  sufficient mechanistic evidence (genotoxicity and oxidative stress) to warrant a 2A classification based

14  on evidence of carcinogenicity in humans and animals.

15
16          68.     The IARC Working Group found an increased risk between exposure to glyphosate and

17  non-Hodgkin's lymphoma ("NHL") and several subtypes of NHL, and the increased risk continued

18  after adjustment for other pesticides.

19          69.     The IARC also found that glyphosate caused DNA and chromosomal damage in human

20  cells.

21
                              **EARLIER EVIDENCE OF GLYPHOSATE'S DANGER**
22
            70.     Despite the new classification by the IARC, Defendants have had ample evidence of
23
24  glyphosate and Roundup's genotoxic properties for decades.

25          71.     Genotoxicity refers to chemical agents that are capable of damaging the DNA within a

26  cell through genetic mutations, which is a process that is believed to lead to cancer.

27          72.     In 1997, Chris Clements published "Genotoxicity of select herbicides in *Rana*

28  *catesbeiana* tadpoles using the alkaline single-cell gel DNA electrophoresis (comet) assay."

PLAINTIFFS' COMPLAINT & JURY                    -12-
DEMAND

73.     The study found that tadpoles exposed to Roundup showed significant DNA damage when compared with unexposed control animals.

74.     Both human and animal studies have shown that glyphosate and glyphosate-based formulations such as Roundup can induce oxidative stress.

75.     Oxidative stress and associated chronic inflammation are believed to be involved in carcinogenesis.

76.     The IARC Monograph notes that "[s]trong evidence exists that glyphosate, AMPA and glyphosate-based formulations can induce oxidative stress."

77.     In 2006 César Paz-y-Miño published a study examining DNA damage in human subjects exposed to glyphosate.

78.     The study produced evidence of chromosomal damage in blood cells showing significantly greater damage after exposure to glyphosate than before in the same individuals, suggesting that the glyphosate formulation used during aerial spraying had a genotoxic effect on exposed individuals.

79.     The IARC Monograph reflects the volume of evidence of glyphosate pesticides' genotoxicity noting "[t]he evidence for genotoxicity caused by glyphosate-based formulations is strong."

80.     Despite knowledge to the contrary, Defendants maintain that there is no evidence that Roundup is genotoxic, that regulatory authorities and independent experts are in agreement that Roundup is not genotoxic, and that there is no evidence that Roundup is genotoxic.

81.     In addition to glyphosate and Roundup's genotoxic properties, Defendants have long been aware of glyphosate's carcinogenic properties.

82.     Glyphosate and Roundup in particular have long been associated with carcinogenicity and the development of numerous forms of cancer, including, but not limited to, non-Hodgkin's lymphoma, Hodgkin's lymphoma, multiple myeloma, and soft tissue sarcoma.

83.     Defendants have known of this association since the early to mid-1980s and numerous human and animal studies have evidenced the carcinogenicity of glyphosate and/or Roundup.

84.    In 1985 the EPA studied the effects of glyphosate in mice finding a dose related response in male mice linked to renal tubal adenomas, a rare tumor. The study concluded the glyphosate was oncogenic.

85.    In 2003 Lennart Hardell and Mikael Eriksson published the results of two case controlled studies on pesticides as a risk factor for NHL and hairy cell leukemia.

86.    The study concluded that glyphosate had the most significant relationship to NHL among all herbicides studies with an increased odds ratio of 3.11.

87.    In 2003 AJ De Roos published a study examining the pooled data of mid-western farmers, examining pesticides and herbicides as risk factors for NHL.

88.    The study, which controlled for potential confounders, found a relationship between increased NHL incidence and glyphosate.

89.    In 2008 Mikael Eriksson published a study a population based case-control study of exposure to various pesticides as a risk factor for NHL.

90. This strengthened previous associations between glyphosate and NHL.

91.    In spite of this knowledge, Defendants continued to issue broad and sweeping statements suggesting that Roundup was, and is, safer than ordinary household items such as table salt, despite a lack of scientific support for the accuracy and validity of these statements and, in fact, voluminous evidence to the contrary.

92.    Upon information and belief, these statements and representations have been made with the intent of inducing Plaintiff, the agricultural community, and the public at large to purchase, and increase the use of, Defendants' Roundup for Defendants' pecuniary gain, and in fact did induce Plaintiff to use Roundup.

93.    Defendants made these statements with complete disregard and reckless indifference to the safety of Plaintiff and the general public.

94.    Notwithstanding Defendants' representations, scientific evidence has established a clear association between glyphosate and genotoxicity, inflammation, and an increased risk of many cancers, including, but not limited to, NHL, Multiple Myeloma, and soft tissue sarcoma.

PLAINTIFFS' COMPLAINT & JURY          -14-
DEMAND

1

2       95.    Defendants knew or should have known that glyphosate is associated with an increased

3 risk of developing cancer, including, but not limited to, NHL, Multiple Myeloma, and soft tissue

4 sarcomas.

5       96.    Defendants failed to appropriately and adequately inform and warn Plaintiff of the

6 serious and dangerous risks associated with the use of and exposure to glyphosate and/or Roundup,

7 including, but not limited to, the risk of developing NHL, as well as other severe and personal injuries,

8 which are permanent and/or long-lasting in nature, cause significant physical pain and mental anguish,

9 diminished enjoyment of life, and the need for medical treatment, monitoring and/or medications.

10      97.    Despite the IARC's classification of glyphosate as a class 2A probable carcinogen,

11 Defendants continue to maintain that glyphosate and/or Roundup is safe, non-carcinogenic, non-

12 genotoxic, and falsely warrant to users and the general public that independent experts and regulatory

13 agencies agree that there is no evidence of carcinogenicity or genotoxicity in glyphosate and Roundup.

14      98.    Defendants have claimed and continue to claim that Roundup is safe, non-carcinogenic,

15 and non-genotoxic.

16      99.    Monsanto claims on its website that "[r]egulatory authorities and independent experts

17 around the world have reviewed numerous long-term/carcinogenicity and genotoxicity studies and

18 agree that there is no evidence that glyphosate, the active ingredient in Roundup brand herbicides and

19 other glyphosate-based herbicides, causes cancer, even at very high doses, and that it is not

20 genotoxic".[10]

21      100.   Ironically, the primary source for this statement is a 1986 report by the WHO, the same

22 organization that now considers glyphosate to be a probable carcinogen.

23      101.   Glyphosate, and Defendants' Roundup products in particular, have long been associated

24 with serious side effects and many regulatory agencies around the globe have banned or are currently

25 banning the use of glyphosate herbicide products.

26      102.   Defendants' statements proclaiming the safety of Roundup and disregarding its dangers

27 misled Plaintiff.

28

[10] Backgrounder - Glyphosate: No Evidence of Carcinogenicity. Updated November 2014. (downloaded October 9 2015)

PLAINTIFFS' COMPLAINT & JURY      -15-
DEMAND

1  103.  Despite Defendants' knowledge that Roundup was associated with an elevated risk of

2  developing cancer, Defendants' promotional campaigns focused on Roundup's purported "safety

3  profile."

4  104.  Defendants' failure to adequately warn Decedent resulted in (1) Decedent using and

5  being exposed to glyphosate instead of using another acceptable and safe method of controlling

6  unwanted weeds and pests; and (2) scientists and physicians failing to warn and instruct consumers

7  about the risk of cancer, including NHL, and other injuries associated with Roundup.

8  105.  Defendants failed to seek modification of the labeling of Roundup to include relevant

9  information regarding the risks and dangers associated with Roundup exposure.

10  106.  The failure of Defendants to appropriately warn and inform the EPA has resulted in

11  inadequate warnings in safety information presented directly to users and consumers.

12  107.  The failure of Defendants to appropriately warn and inform the EPA has resulted in the

13  absence of warning or caution statements that are adequate to protect health and the environment.

14  108.  The failure of Defendants to appropriately warn and inform the EPA has resulted in the

15  directions for use that are not adequate to protect health and the environment.

16  109.  By reason of the foregoing acts and omissions, Plaintiffs seek compensatory damages as

17  a result of decedent George Sparkman's use of, and exposure to, Roundup which caused or was a

18  substantial contributing factor in causing decedent George Sparkman to suffer from cancer,

19  specifically NHL, severe and personal injuries, including but not limited to his wrongful death, and

20  Plaintiffs to suffer economic and non-economic damages.

21  110.  By reason of the foregoing, Plaintiffs are severely and permanently injured.

22  111.  By reason of the foregoing acts and omissions, Plaintiffs have endured and, in some

23  categories continue to suffer, emotional and mental anguish, wrongful death, medical expenses, and

24  other economic and non-economic damages, as a result of the actions and inactions of the Defendants.

25  **DECEDENT'S EXPOSURE TO ROUNDUP**

26  112.  Decedent used Roundup to control weeds both during his occupation as a farmer and on

27  his residential property.

28  113.  During Decedent's employment, Decedent sprayed Roundup on a regular basis.

1   Decedent followed all safety and precautionary warnings during the course of use.

2        114.    Decedent was diagnosed with Non-Hodgkin Lymphoma in 2019.

3        115.    As a result of his injury, Decedent George Sparkman died on June 5, 2020 and Plaintiffs

4   have incurred significant economic and non-economic damages.  Plaintiff Gisela Sparkman has

5   suffered the wrongful death of her husband and loss of spousal consortium.

6               **EQUITABLE TOLLING OF APPLICABLE STATUTE OF LIMITATIONS**

7        116.    Plaintiffs incorporate by reference all prior paragraphs of this Complaint as if fully set

8   forth herein.

9        117.    The running of any statute of limitations has been tolled by reason of Defendants'

10  fraudulent concealment. Defendants, through their affirmative misrepresentations and omissions,

11  actively concealed from Plaintiffs the true risks associated with Roundup and glyphosate. Indeed, even

12  as of July 2016, Defendants continue to represent to the public that "*Scientists are in agreement* that

13  there is *no evidence* glyphosate causes cancer." (emphasis added)[11]

14       118.    As a result of Defendants' actions, Plaintiffs were unaware, and could not reasonably

15  know or have learned through reasonable diligence that Roundup and/or glyphosate contact, exposed

16  Decedent to the risks alleged herein and that those risks were the direct and proximate result of

17  Defendants' acts and omissions.

18       119.    Furthermore, Defendants are estopped from relying on any statute of limitations

19  because of their fraudulent concealment of the true character, quality and nature of Roundup.

20  Defendants were under a duty to disclose the true character, quality, and nature of Roundup because

21  this was non-public information over which Defendants had and continue to have exclusive control,

22  and because Defendants knew that this information was not available to Plaintiffs or to distributors of

23  Roundup. In addition, Defendants are estopped from relying on any statute of limitations because of

24  their intentional concealment of these facts.

25       120.    Plaintiffs had no knowledge that Defendants were engaged in the wrongdoing alleged

26  herein. Because of the fraudulent acts of concealment of wrongdoing by Defendants, Plaintiffs could

27  not have reasonably discovered the wrongdoing at any time prior. Also, the economics of this fraud

28  _____
[11] Backgrounder - Glyphosate: No Evidence of Carcinogenicity. Updated November 2014. (downloaded October 9 2015)

PLAINTIFFS' COMPLAINT & JURY              -17-
DEMAND

1  should be considered. Defendants had the ability to and did spend enormous amounts of money in

2  furtherance of their purpose of marketing, promoting and/or distributing a profitable herbicide,

3  notwithstanding the known or reasonably known risks. Plaintiffs and medical professionals could not

4  have afforded and could not have possibly conducted studies to determine the nature, extent, and

5  identity of related health risks, and were forced to rely on only the Defendants' representations.

6  Accordingly, Defendants are precluded by the discovery rule and/or the doctrine of fraudulent

7  concealment from relying upon any statute of limitations.

8                               **FIRST CAUSE OF ACTION**

9                                    **(NEGLIGENCE)**

10       121.   Plaintiffs repeat, reiterate, and re-allege each and every allegation of this Complaint

11  contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully

12  set forth herein.

13       122.   Defendants had a duty to exercise reasonable care in the designing, researching, testing,

14  manufacturing, marketing, supplying, promoting, packaging, sale, and/or distribution of Roundup into

15  the stream of commerce, including a duty to assure that the product would not cause users to suffer

16  unreasonable, dangerous side effects.

17       123.   Defendants failed to exercise ordinary care in the designing, researching, testing,

18  manufacturing, marketing, supplying, promoting, packaging, sale, testing, quality assurance, quality

19  control, and/or distribution of Roundup into interstate commerce in that Defendants knew or should

20  have known that using Roundup created a high risk of unreasonable, dangerous side effects, including,

21  but not limited to, the development of NHL, as well as other severe and personal injuries and damages

22  which were permanent and lasting in nature, causing Decedent's death and causing Plaintiff Gisela

23  Sparkman her own damages resulting from her husband's injuries and death.

24       124.   The negligence by the Defendants, their agents, servants, and/or employees, included

25  but was not limited to the following acts and/or omissions:

26          a.  Manufacturing, producing, promoting, formulating, creating, and/or designing
                Roundup without thoroughly testing it;

27          b.  Failing to test Roundup and/or failing to adequately, sufficiently, and properly test
28              Roundup;

---

PLAINTIFFS' COMPLAINT & JURY          -18-
DEMAND

c. Not conducting sufficient testing programs to determine whether or not Roundup was safe for use; in that Defendants herein knew or should have known that Roundup was unsafe and unfit for use by reason of the dangers to its users;

d. Not conducting sufficient testing programs and studies to determine Roundup's carcinogenic properties even after Defendants had knowledge that Roundup is, was, or could be carcinogenic;

e. Failing to conduct sufficient testing programs to determine the safety of "inert" ingredients and/or adjuvants contained within Roundup, and the propensity of these ingredients to render Roundup toxic, increase the toxicity of Roundup, whether these ingredients are carcinogenic, magnify the carcinogenic properties of Roundup, and whether or not "inert" ingredients and/or adjuvants were safe for use;

f. Negligently failing to adequately and correctly warn the Plaintiff, the public, the medical and agricultural professions, and the EPA of the dangers of Roundup;

g. Negligently failing to petition the EPA to strength the warnings associated with Roundup;

h. Failing to provide adequate cautions and warnings to protect the health of users, handlers, applicators, and persons who would reasonably and foreseeably come into contact with Roundup;

i. Negligently marketing, advertising, and recommending the use of Roundup without sufficient knowledge as to its dangerous propensities;

j. Negligently representing that Roundup was safe for use for its intended purpose, and/or that Roundup was safer than ordinary and common items such as table salt, when, in fact, it was unsafe;

k. Negligently representing that Roundup had equivalent safety and efficacy as other forms of herbicides;

l. Negligently designing Roundup in a manner, which was dangerous to its users;

m. Negligently manufacturing Roundup in a manner, which was dangerous to its users;

n. Negligently producing Roundup in a manner, which was dangerous to its users;

o. Negligently formulating Roundup in a manner, which was dangerous to its users;

p. Concealing information from the Plaintiff while knowing that Roundup was unsafe, dangerous, and/or non-conforming with EPA regulations; and

q. Improperly concealing and/or misrepresenting information from the Plaintiff, scientific and medical professionals, and/or the EPA, concerning the severity of risks and dangers of Roundup compared to other forms of herbicides.

r.  Negligently selling Roundup with a false and misleading label.

125.  Defendants under-reported, underestimated, and downplayed the serious dangers of Roundup.

126.  Defendants negligently and deceptively compared the safety risks and/or dangers of Roundup with common everyday foods such as table salt, and other forms of herbicides.

127.  Defendants were negligent and/or violated California law in the designing, researching, supplying, manufacturing, promoting, packaging, distributing, testing, advertising, warning, marketing, and selling of Roundup in that they:

    a.  Failed to use ordinary care in designing and manufacturing Roundup so as to avoid the aforementioned risks to individuals when Roundup was used as an herbicide;

    b.  Failed to accompany their product with proper and/or accurate warnings regarding all possible adverse side effects associated with the use of Roundup;

    c.  Failed to accompany their product with proper warnings regarding all possible adverse side effects concerning the failure and/or malfunction of Roundup;

    d.  Failed to accompany their product with accurate warnings regarding the risks of all possible adverse side effects concerning Roundup;

    e.  Failed to warn Plaintiff of the severity and duration of such adverse effects, as the warnings given did not accurately reflect the symptoms, or severity of the side effects including, but not limited to, the development of NHL;

    f.  Failed to conduct adequate testing, clinical testing and post-marketing surveillance to determine the safety of Roundup;

    g.  Failed to conduct adequate testing, clinical testing, and post-marketing surveillance to determine the safety of Roundup's "inert" ingredients and/or adjuvants;

    h.  Negligently misrepresented the evidence of Roundup's genotoxicity and carcinogenicity;

    i.  Were otherwise careless and/or negligent.

128.  Despite the fact that Defendants knew or should have known that Roundup caused, or could cause, unreasonably dangerous side effects, Defendants continued and continue to market, manufacture, distribute, and/or sell Roundup to consumers, including the Decedent.

129.  Defendants knew or should have known that consumers such as the Decedent would foreseeably suffer injury as a result of Defendants' failure to exercise ordinary care, as set forth above.

1    130.    Defendants' violations of law and/or negligence were the proximate cause of Plaintiffs'

2  injuries, harm, and economic loss, which Plaintiffs suffered and/or will continue to suffer.

3    131.    As a result of the foregoing acts and omissions, the Decedent George Sparkman

4  suffered from serious and dangerous side effects including, but not limited to, NHL, as well as other

5  severe and personal injuries and damages which were permanent and lasting in nature, including but

6  not limited to his wrongful death. Further, Plaintiff Gisela Sparkman suffered the wrongful death of

7  her husband and loss of spousal consortium.

8    132.    WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in

9  Plaintiffs' favor for compensatory and punitive damages, together with interest, costs herein incurred,

10  attorneys' fees and all relief as this Court deems just and proper. Additionally, Plaintiffs demand a jury

11  trial on all issues contained herein.

12                          **SECOND CAUSE OF ACTION**

13                 **(STRICT PRODUCTS LIABILITY – DESIGN DEFECT)**

14    133.    Plaintiffs repeat, reiterate and, re-allege each and every allegation of this Complaint

15  contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully

16  set forth herein.

17    134.    At all times herein mentioned, the Defendants designed, researched, manufactured,

18  tested, advertised, promoted, sold, distributed, and/or have acquired the Defendants who have

19  designed, researched, tested, advertised, promoted, marketed, sold, and distributed Roundup as

20  hereinabove described that was used by the Decedent.

21    135.    Defendants' Roundup was expected to and did reach the usual consumers, handlers, and

22  persons coming into contact with said product without substantial change in the condition in which it

23  was produced, manufactured, sold, distributed, and marketed by the Defendants.

24    136.    At those times, Roundup was in an unsafe, defective, and inherently dangerous

25  condition, which was dangerous to users, and in particular, the Decedent herein.

26    137.    The Roundup designed, researched, manufactured, tested, advertised, promoted,

27  marketed, sold, and distributed by Defendants was defective in design or formulation in that, when it

28  left the hands of the manufacturer and/or suppliers, the foreseeable risks exceeded the benefits

PLAINTIFFS' COMPLAINT & JURY                    -21-
DEMAND

1   associated with the design or formulation of Roundup.

2        138.   The Roundup designed, researched, manufactured, tested, advertised, promoted,

3   marketed, sold, and distributed by Defendants was defective in design and/or formulation, in that,

4   when it left the hands of the Defendants manufacturers and/or suppliers, it was unreasonably

5   dangerous, unreasonably dangerous in normal use, and it was more dangerous than an ordinary

6   consumer would expect.

7        139.   At all times herein mentioned, Roundup was in a defective condition and unsafe, and

8   Defendants knew or had reason to know that said product was defective and unsafe, especially when

9   used in the form and manner as provided by the Defendants. In particular, Defendants' Roundup was

10  defective in the following ways:

11         a.  When placed in the stream of commerce, Defendants' Roundup Products were
12            defective in design and formulation and, consequently, dangerous to an extent
              beyond that which an ordinary consumer would anticipate.
13

14         b.  When placed in the stream of commerce, Defendants' Roundup products were
              unreasonably dangerous in that they were hazardous and posed a grave risk of
15            cancer and other serious illnesses when used in a reasonably anticipated manner.

16         c.  When placed in the stream of commerce, Defendants' Roundup products contained
              unreasonably dangerous design defects and were not reasonably safe when used in a
17            reasonably anticipated manner.

18         d.  Defendants did not sufficiently test, investigate, or study its Roundup products.

19         e.  Exposure to Roundup presents a risk of harmful side effects that outweigh any
              potential utility stemming from the use of the herbicide.
20

21         f.  Defendants new or should have known at the time of marketing its Roundup
              products that exposure to Roundup and could result in cancer and other severe
22            illnesses and injuries.

23         g.  Defendants did not conduct adequate post-marketing surveillance of its Roundup
              products.
24
         140.   Defendants knew, or should have known that at all times herein mentioned its Roundup
25
    was in a defective condition, and was and is inherently dangerous and unsafe.
26
         141.   Decedent was exposed to Defendants' Roundup in the course of his occupational and
27
    residential spraying, as described above, without knowledge of Roundup's dangerous characteristics.
28

1      142.    At the time of the Decedent's use of and exposure to Roundup, Roundup was being
2 used for the purposes and in a manner normally intended, as a broad-spectrum herbicide.

3      143.    Defendants with this knowledge voluntarily designed its Roundup with a dangerous
4 condition for use by the public, and in particular the Decedent.

5      144.    Defendants had a duty to create a product that was not unreasonably dangerous for its
6 normal, intended use.

7      145.    Defendants created a product that was and is unreasonably dangerous for its normal,
8 intended use.

9      146.    Defendants marketed and promoted a product in such a manner so as to make it
10 inherently defective as the product downplayed its suspected, probable, and established health risks
11 inherent with its normal, intended use.

12      147.    The Roundup designed, researched, manufactured, tested, advertised, promoted,
13 marketed, sold, and distributed by Defendants was manufactured defectively in that Roundup left the
14 hands of Defendants in a defective condition and was unreasonably dangerous to its intended users.

15      148.    The Roundup designed, researched, manufactured, tested, advertised, promoted,
16 marketed, sold, and distributed by Defendants reached their intended users in the same defective and
17 unreasonably dangerous condition in which the Defendants' Roundup was manufactured.

18      149.    Defendants designed, researched, manufactured, tested, advertised, promoted, marketed,
19 sold, and distributed a defective product, which created an unreasonable risk to the health of
20 consumers and to the Decedent in particular, and Defendants are therefore strictly liable for the injuries
21 sustained by the Decedent.

22      150.    The Decedent could not, by the exercise of reasonable care, have discovered Roundup's
23 defects herein mentioned or perceived its danger.

24      151.    By reason of the foregoing, the Defendants have become strictly liable to the Plaintiffs
25 for the manufacturing, marketing, promoting, distribution, and selling of a defective product, Roundup.

26      152.    Defendants' defective design, of Roundup amounts to willful, wanton, and/or reckless
27 conduct by Defendants.

28      153.    Defects in Defendants' Roundup were the cause or a substantial factor in causing

1   Plaintiffs' injuries.

2       154.    As a result of the foregoing acts and omission, the Decedent George Sparkman

3   developed NHL, and suffered severe and personal injuries and damages, including but not limited to

4   his wrongful death. Further, Plaintiff Gisela Sparkman suffered the wrongful death of her husband and

5   loss of spousal consortium.

6       155.    WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in

7   Plaintiffs' favor for compensatory and punitive damages, together with interest, costs herein incurred,

8   attorneys' fees and all relief as this Court deems just and proper. Additionally, Plaintiffs demand a jury

9   trial on all issues contained herein.

10                          **THIRD CAUSE OF ACTION**

11                  **(STRICT PRODUCTS LIABILITY – FAILURE TO WARN)**

12      156.    Plaintiffs repeat, reiterate and re-allege each and every allegation of this Complaint

13   contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully

14   set forth herein.

15      157.    Defendants have engaged in the business of selling, testing, distributing, supplying,

16   manufacturing, marketing, and/or promoting Roundup, and through that conduct have knowingly and

17   intentionally placed Roundup into the stream of commerce with full knowledge that it reaches

18   consumers such as Decedent who are exposed to it through ordinary and reasonably foreseeable uses.

19      158.    Defendants did in fact sell, distribute, supply, manufacture, and/or promote Roundup to

20   Decedent. Additionally, Defendants expected the Roundup that they were selling, distributing,

21   supplying, manufacturing, and/or promoting to reach – and Roundup did in fact reach – consumers,

22   including Decedent, without any substantial change in the condition of the product from when it was

23   initially distributed by Defendants.

24      159.    At the time of manufacture, Defendant could have provided the warnings or instructions

25   regarding the full and complete risks of Roundup and glyphosate-containing products because it knew

26   or should have known of the unreasonable risks of harm associated with the use of and/or exposure to

27   such products.

28      160.    At all times herein mentioned, the aforesaid product was defective and unsafe in

PLAINTIFFS' COMPLAINT & JURY           -24-
DEMAND

1   manufacture such that it was unreasonably dangerous to the user, and was so at the time it was

2   distributed by Defendants and at the time Decedent was exposed to and/or ingested the product. The

3   defective condition of Roundup was due in part to the fact that it was not accompanied by proper

4   warnings regarding its carcinogenic qualities and possible side effects, including, but not limited to,

5   developing non-Hodgkin's lymphoma as a result of exposure and use.

6        161.    Roundup did not contain a warning or caution statement, which was necessary and, if

7   complied with, was adequate to protect health those exposed in violation of 7 U.S.C. § 136j(a)(1)(E).

8        162.    Defendants' failure to include a warning or caution statement which was necessary and,

9   if complied with, was adequate to protect the health of those exposed, violated 7 U.S.C. §

10   136j(a)(1)(E) as well as the laws of the State of California.

11       163.    Defendants could have amended the label of Roundup to provide additional warnings.

12       164.    This defect caused serious injury and death to Decedent, who used Roundup in its

13   intended and foreseeable manner.

14       165.    At all times herein mentioned, Defendants had a duty to properly design, manufacture,

15   compound, test, inspect, package, label, distribute, market, examine, maintain supply, provide proper

16   warnings, and take such steps to assure that the product did not cause users to suffer from unreasonable

17   and dangerous side effects.

18       166.    Defendants labeled, distributed, and promoted the aforesaid product that it was

19   dangerous and unsafe for the use and purpose for which it was intended.

20       167.    Defendants failed to warn of the nature and scope of the side effects associated with

21   Roundup, namely its carcinogenic properties and its propensity to cause or serve as a substantial

22   contributing factor in the development of NHL.

23       168.    Defendants were aware of the probable consequences of the aforesaid conduct. Despite

24   the fact that Defendants knew or should have known that Roundup caused serious injuries, Defendants

25   failed to exercise reasonable care to warn of the dangerous carcinogenic properties and side effect of

26   developing NHL from Roundup exposure, even though these side effects were known or reasonably

27   scientifically knowable at the time of distribution. Defendants willfully and deliberately failed to avoid

28   the consequences associated with their failure to warn, and in doing so, Defendants acted with a

---

PLAINTIFFS' COMPLAINT & JURY            -25-
DEMAND

1  conscious disregard for the safety of Decedent.

2      169.    At the time of exposure, Decedent could not have reasonably discovered any defect in

3  Roundup prior through the exercise of reasonable care.

4      170.    Defendants, as the manufacturers and/or distributors of the subject product, are held to

5  the level of knowledge of an expert in the field.

6      171.    Decedent reasonably relied upon the skill, superior knowledge, and judgment of

7  Defendants.

8      172.    Had Defendants properly disclosed the risks associated with Roundup, Decedent could

9  have avoided the risk of NHL by not using Roundup.

10     173.    The information that Defendants did provide or communicate failed to contain adequate

11 warnings and precautions that would have enabled Decedent, and similarly situated individuals, to

12 utilize the product safely and with adequate protection. Instead, Defendants disseminated information

13 that was inaccurate, false, and misleading and which failed to communicate accurately or adequately

14 the comparative severity, duration, and extent of the risk of injuries associated with use of and/or

15 exposure to Roundup and glyphosate; continued to promote the efficacy of Roundup, even after it

16 knew or should have known of the unreasonable risks from use or exposure; and concealed,

17 downplayed, or otherwise suppressed, through aggressive marketing and promotion, any information

18 or research about the risks and dangers of exposure to Roundup and glyphosate.

19     174.    To this day, Defendants have failed to adequately warn of the true risks of Decedent's

20 injuries associated with the use of and exposure to Roundup.

21     175.    As a result of their inadequate warnings, Defendants' Roundup products were defective

22 and unreasonably dangerous when they left the possession and/or control of Defendant, were

23 distributed by Defendant, and used by Decedent.

24     176.    As a direct and proximate result of Defendants' actions as alleged herein, and in such

25 other ways to be later shown, the subject product caused Plaintiffs to sustain injuries as herein alleged.

26     177.    WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in

27 Plaintiffs' favor for compensatory and punitive damages, together with interest, costs herein incurred,

28 attorneys' fees and all relief as this Court deems just and proper. Additionally, Plaintiffs demand a jury

PLAINTIFFS' COMPLAINT & JURY          -26-
DEMAND

1  trial on all issues contained herein.

2                              **FOURTH CAUSE OF ACTION**

3                            **(BREACH OF IMPLIED WARRANTIES)**

4          178.    Plaintiffs repeat, reiterate, and re-allege each and every allegation of this Complaint

5  contained in each of the foregoing paragraphs inclusive, with the same force and effect all if more fully

6  set forth herein.

7          179.    At all times herein mentioned, the Defendants manufactured, distributed, compounded,

8  recommended, merchandized, advertised, promoted, and sold Roundup and/or have recently acquired

9  the Defendants who have manufactured, compound portrayed, distributed, recommended,

10  merchandized, advertised, promoted, and sold Roundup, as a broad spectrum herbicide. These actions

11  were under the ultimate control and supervision of Defendants.

12          180.    At the time Defendants marketed, sold, and distributed Roundup for use by Decedent,

13  Defendants knew of Roundup's intended use and impliedly warranted the product to be or

14  merchantable quality and safe and fit for this use.

15          181.    The Defendants impliedly represented and warranted to Decedent and users of

16  Roundup, the agricultural community, and/or the EPA that Roundup was safe and of merchantable

17  quality and fit for the ordinary purpose for which it was to be used.

18          182.    These representations and warranties were false, misleading, and inaccurate in that

19  Roundup was unsafe, unreasonably dangerous, not of merchantable quality, and defective.

20          183.    Decedent and/or the EPA did rely on said implied warranty of merchantability of fitness

21  for particular use and purpose.

22          184.    Decedent reasonably relied upon the skill and judgment of Defendants as to whether

23  Roundup was of merchantable quality and safe and fit for its intended use.

24          185.    Roundup was injected into the stream of commerce by the Defendants in a defective,

25  unsafe, and inherently dangerous condition, and the products' materials were expected to and did reach

26  users, handlers, and persons coming into contact with said products without substantial change in the

27  condition in which they were sold.

28          186.    The Defendants breached the aforesaid implied warranties, as their herbicide Roundup

PLAINTIFFS' COMPLAINT & JURY              -27-
DEMAND

1  was not fit for its intended purposes and uses.

2  187.   As a result of the foregoing acts and omissions, Decedent suffered from NHL and

3  severe and personal injuries, including but not limited to his wrongful death.  Plaintiff Gisela

4  Sparkman also suffered the wrongful death of her husband.

5  188.   WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in

6  Plaintiffs' favor for compensatory and punitive damages, together with interest, costs herein incurred,

7  attorneys' fees and all relief as this Court deems just and proper. Additionally, Plaintiffs demand a jury

8  trial on all issues contained herein.

9  ### FIFTH CAUSE OF ACTION

10  ### (LOSS OF CONSORTIUM)

11  189.   Plaintiffs incorporate by reference each and every allegation set forth in the preceding

12  paragraphs as if fully stated herein.

13  190.   At all times relevant, Plaintiff Gisela Sparkman was the wife of Decedent George J.

14  Sparkman.

15  191.   As a result of the aforesaid acts or omissions by Defendant, Gisela Sparkman has been

16  deprived of the care, protection, comfort, companionship, services, assistance and society of her

17  husband, George J. Sparkman, all of which has been and will be to Gisela Sparkman's great financial

18  and emotional loss.

19

20  192.   WHEREFORE, Gisela Sparkman respectfully requests that this Court enter judgment in

21  her favor and against Defendant and award her compensatory and punitive damages, together with

22  interest, costs herein incurred, attorneys' fees, and all such other and further relief as this Court deems

23  just and proper. Gisela Sparkman also demands a jury trial on the issues contained herein.

24  ### PRAYER FOR RELIEF

25  WHEREFORE, Plaintiffs demand judgment against the Defendants on each of the above-

26  referenced claims and causes of action and as follows:

27  1.   Awarding compensatory damages in excess of the jurisdictional amount, for the

28  wrongful death of George J. Sparkman, including, but not limited to loss of love, companionship,

---

PLAINTIFFS' COMPLAINT & JURY          -28-
DEMAND

1   comfort, care, assistance, protection, affection, society, and moral support, loss of enjoyment of sexual

2   relations, loss of training and guidance, and other non-economic damages in an amount to be

3   determined at trial of this action;

4       2.      Awarding compensatory damages in excess of the jurisdictional amount, for the

5   wrongful death of George J. Sparkman, including, but not limited to, loss of financial support, loss of

6   gifts and benefits, funeral and burial expenses, household services, and other economic damages in an

7   amount to be determined at the trial of this action;

8       3.      Awarding Plaintiff Gisela Sparkman compensatory damages for the loss of spousal

9   consortium in excess of the jurisdictional amount, in an amount to be determined at trial of this action;

10       4.      Awarding economic damages in the form of medical expenses, out of pocket expenses,

11   lost earnings and other economic damages in an amount to be determine at trial of this action;

12       5.      Punitive and/or exemplary damages for the wanton, willful, fraudulent, and reckless

13   acts of the Defendants who demonstrated a complete disregard and reckless indifference for the safety

14   and welfare of the general public and to the Plaintiff in an amount sufficient to punish Defendants and

15   deter future similar conduct, to the extent allowed by applicable law;

16       6.      Pre-judgment interest;

17       7.      Post-judgment interest;

18       8.      Awarding Plaintiff reasonable attorneys' fees;

19       9.      Awarding Plaintiff the costs of these proceedings; and

20       10.    Such other and further relief as this Court deems just and proper.

21

22

23

24

25

26

27

28

PLAINTIFFS' COMPLAINT & JURY       -29-
DEMAND

1

## DEMAND FOR JURY TRIAL

2

Plaintiff hereby demands trial by jury as to all issues.

3

4  Dated: July 26, 2021                                    Respectfully submitted,

5

6                                                          By: _____

7                                                          John H. Gomez, Esq.
                                                           Jessica T. Sizemore-Wetzel, Esq.
8                                                          **GOMEZ TRIAL ATTORNEYS**
                                                           john@thegomezfirm.com
9                                                          jessica@thegomezfirm.com

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PLAINTIFFS' COMPLAINT & JURY                    -30-
DEMAND

JS 44   (Rev. 06/17)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

| I. (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| GISELA SPARKMAN, an Individual and on behalf of THE ESTATE OF GEORGE SPARKMAN, deceased | MONSANTO COMPANY and DOES 1-50 |

**(b)** County of Residence of First Listed Plaintiff    San Diego
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant   
      *(IN U.S. PLAINTIFF CASES ONLY)*
NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF
         THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
John H. Gomez, Jessica T. Sizemore, Gomez Trial Attorneys
655 West Broadway, Suite 1700, San Diego, CA 92101
(619) 237-3490

Attorneys *(If Known)*

**'21CV1336 TWR BLM**

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- ☐ 1   U.S. Government
Plaintiff
- ☐ 2   U.S. Government
Defendant
- ☐ 3   Federal Question
*(U.S. Government Not a Party)*
- ☒ 4   Diversity
*(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)*          *and One Box for Defendant)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☒ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☒ 365 Personal Injury - Product Liability | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 367 Health Care/ | | | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | Pharmaceutical Personal Injury | | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | Product Liability | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 340 Marine | ☐ 368 Asbestos Personal Injury Product Liability | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ☐ 345 Marine Product Liability | **PERSONAL PROPERTY** | | ☐ 835 Patent - Abbreviated New Drug Application | ☐ 460 Deportation |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | **LABOR** | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 371 Truth in Lending | ☐ 710 Fair Labor Standards Act | **SOCIAL SECURITY** | ☐ 480 Consumer Credit |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 380 Other Personal Property Damage | ☐ 720 Labor/Management Relations | ☐ 861 HIA (1395ff) | ☐ 490 Cable/Sat TV |
| ☐ 195 Contract Product Liability | ☐ 362 Personal Injury - Medical Malpractice | ☐ 385 Property Damage Product Liability | ☐ 740 Railway Labor Act | ☐ 862 Black Lung (923) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 196 Franchise | | | ☐ 751 Family and Medical Leave Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 790 Other Labor Litigation | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | ☐ 791 Employee Retirement Income Security Act | ☐ 865 RSI (405(g)) | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | **FEDERAL TAX SUITS** | ☐ 895 Freedom of Information Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate Sentence | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 896 Arbitration |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 530 General | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 535 Death Penalty | **IMMIGRATION** | | ☐ 950 Constitutionality of State Statutes |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | **Other:** | ☐ 462 Naturalization Application | | |
| | ☐ 448 Education | ☐ 540 Mandamus & Other | ☐ 465 Other Immigration Actions | | |
| | | ☐ 550 Civil Rights | | | |
| | | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

- ☒ 1   Original Proceeding
- ☐ 2   Removed from State Court
- ☐ 3   Remanded from Appellate Court
- ☐ 4   Reinstated or Reopened
- ☐ 5   Transferred from Another District *(specify)*
- ☐ 6   Multidistrict Litigation - Transfer
- ☐ 8   Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
28 U.S.C. Sec 1332
Brief description of cause:
Personal Injury - Product Liability

| VII. REQUESTED IN COMPLAINT: | ☐ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P. | DEMAND $ Exceeds $75,000 | CHECK YES only if demanded in complaint: JURY DEMAND: ☒ Yes ☐ No |
|---|---|---|---|

**VIII. RELATED CASE(S) IF ANY**    *(See instructions):*    JUDGE         DOCKET NUMBER

| DATE | SIGNATURE OF ATTORNEY OF RECORD |
|---|---|
| 07/26/2021 | /s/ John H. Gomez |

**FOR OFFICE USE ONLY**

RECEIPT #      AMOUNT      APPLYING IFP      JUDGE      MAG. JUDGE

## INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

**I.(a)** **Plaintiffs-Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

**(b)** **County of Residence.** For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

**(c)** **Attorneys.** Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

**II.** **Jurisdiction.** The basis of jurisdiction is set forth under Rule 8(a), F.R.Cv.P., which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.
United States plaintiff. (1) Jurisdiction based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States are included here.
United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.
Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.
Diversity of citizenship. (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked. (See Section III below; **NOTE: federal question actions take precedence over diversity cases.**)

**III.** **Residence (citizenship) of Principal Parties.** This section of the JS 44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

**IV.** **Nature of Suit.** Place an "X" in the appropriate box. If there are multiple nature of suit codes associated with the case, pick the nature of suit code that is most applicable. Click here for: Nature of Suit Code Descriptions.

**V.** **Origin.** Place an "X" in one of the seven boxes.
Original Proceedings. (1) Cases which originate in the United States district courts.
Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441. When the petition for removal is granted, check this box.
Remanded from Appellate Court. (3) Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.
Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.
Transferred from Another District. (5) For cases transferred under Title 28 U.S.C. Section 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.
Multidistrict Litigation – Transfer. (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407.
Multidistrict Litigation – Direct File. (8) Check this box when a multidistrict case is filed in the same district as the Master MDL docket.
**PLEASE NOTE THAT THERE IS NOT AN ORIGIN CODE 7.** Origin Code 7 was used for historical records and is no longer relevant due to changes in statute.

**VI.** **Cause of Action.** Report the civil statute directly related to the cause of action and give a brief description of the cause. **Do not cite jurisdictional statutes unless diversity.** Example: U.S. Civil Statute: 47 USC 553 Brief Description: Unauthorized reception of cable service

**VII.** **Requested in Complaint.** Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.
Demand. In this space enter the actual dollar amount being demanded or indicate other demand, such as a preliminary injunction.
Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

**VIII.** **Related Cases.** This section of the JS 44 is used to reference related pending cases, if any. If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature.** Date and sign the civil cover sheet.