# EXHIBIT 4

## IN THE IOWA DISTRICT COURT IN AND FOR WEBSTER COUNTY

| | |
|---|---|
| **BRIAN WEBB,** | 3:20-cv-03032-LRR-KEM |
| **Plaintiff,** | |
| **v.** | **Case No.** |
| **MONSANTO COMPANY; VALERO ENERGY CORPORATION; HOME DEPOT U.S.A., INC.; LOWE'S HOME CENTERS, LLC; MYCENAEAN SHIELD, LLC; CHIEF ETHANOL FUELS, INC.; CARGILL, INC.; VALERO RENEWABLE FUELS COMPANY, LLC; PINE LAKE CORN PROCESSORS, L.L.C.,** | **PETITION AT LAW AND DEMAND FOR JURY TRIAL** |
| **Defendants.** | |

COMES NOW Plaintiff BRIAN WEBB and hereby brings this action against Defendants Monsanto Company, Valero Energy Corporation, Home Depot U.S.A., Inc., Lowe's Home Centers, LLC, Mycenaean Shield, LLC, Chief Ethanol Fuels, Inc., Cargill, Inc., Valero Renewable Fuels Company, LLC, and Pine Lake Corn Processors, L.L.C., as follows:

### INTRODUCTION

Plaintiff brings this cause of action against Defendants for injuries and/or death sustained as a result of using Defendant Monsanto Company's ("Monsanto") unreasonably dangerous and defective product, Roundup® and various Roundup containing by-products, including Round Up Ready Corn, Corn Stover, and Ready Corn Mash, while a Contractor Millwright at various other Defendants' properties. More specifically, Plaintiff's claims involve Defendant's negligent, willful, and wrongful conduct in connection with the design, development, manufacture, testing, packaging, promoting, marketing, distribution, and/or sale of Roundup® and/or other Monsanto glyphosate-containing products ("Roundup" or "Roundup®"). As a direct and proximate result of their exposure to Roundup® and its reactive ingredient, glyphosate, Plaintiff developed non-

1

Hodgkin's Lymphoma.

## THE PARTIES, JURISDICTION, AND VENUE

### Plaintiff

1.      Plaintiff Brian Webb is a resident of Omaha, Nebraska. As a Contractor Millwright, Mr. Webb was exposed to Round Up Ready Corn, Corn Stover, and Ready Corn Mash, from 2008-2018 at various facilities in and around Iowa, and was subsequently diagnosed with non-Hodgkin's Lymphoma in 2016.

### Defendants

2.      Upon information and belief, Defendant, Monsanto Company ("Monsanto") is a multinational agricultural biotechnology corporation based in St. Louis, Missouri, and incorporated in Delaware. Monsanto may be served with process via its registered agent, Corporation Service Company, 505 5th Avenue, Des Moines, Iowa 50309.

3.      Defendant Valero Energy Corporation is incorporated in Delaware and maintains its principle place of business in Delaware. It may be served with process via Iowa's long-arm statute by both serving (1) the Iowa Secretary of State and (2) its registered agent, The Corporation Trust Company, Corporation Trust Center, 1209 Orange St., Wilmington, Delaware 19801.

4.      Defendant HOME DEPOT U.S.A., INC., is a foreign corporation that, at all relevant times, was and is doing business in the state of South Carolina. It is incorporated in the state of Delaware and maintains its principle place of business in Georgia. It may be served with process via its registered agent at 1703 Laurel Street, Columbia, South Carolina 29201.

5.      Defendant LOWE'S HOME CENTERS, LLC is a foreign corporation that, at all relevant times, was and is doing business in the state of South Carolina. It is incorporated in the state of North Carolina and maintains its principle place of business in North Carolina. It may be

served with process via its registered agent at 1703 Laurel Street, Columbia, South Carolina 29201.

6.      Defendant Mycenaean Shield, LLC is incorporated in Delaware and maintains its principle place of business in Illinois. It may be served with process via It may be served with process via Iowa's long-arm statute by both serving (1) the Iowa Secretary of State and (2) its registered agent, Mark Tibbetts at 5959 S. Harlem Ave, Chicago, Illinois 60638.

7.      Defendant Chief Ethanol Fuels, Inc. is incorporated in Delaware and maintains its principle place of business in Nebraska. It may be served with process via Iowa's long-arm statute by both serving (1) the Iowa Secretary of State and (2) its registered agent, Barbara Saladen at 3942 West Old Highway 30, P.O. Box 2078, Grand Island, Nebraska 68802.

8.      Defendant Cargill, Inc. is incorporated in Delaware and maintains its principle place of business in Minnesota. It may be served with process via its registered agent, CT Corporation Systems, at 400 E Court Ave, Des Moines, Iowa 50309.

9.      Valero Renewable Fuels Company, LLC is incorporated in the State of Texas and maintains its principle place of business in Texas. It may be served with process via its registered agent, CT Corporation Systems, at 400 E Court Ave, Des Moines, Iowa 50309.

10.      Pine Lake Corn Processors, L.L.C. is incorporated in Iowa and maintains its principle place of business in Iowa. It may be served with process via its registered agent, William E. Hanigan, at 215 10th Street, Suite 1300, Des Moines, Iowa 50309.

11.      Each defendant either maintains a principle place of business within the State of Iowa or maintains sufficient contacts with the State of Iowa such that this Court's exercise of personal jurisdiction over it does not offend traditional notions of fair play and substantial justice.

12.      Venue is proper within this County because the events giving rise to this action happened in or are closely related to this County.

## NATURE OF THE ACTION

13.     In 1970, Defendant Monsanto Company discovered the herbicidal properties of glyphosate and began marketing it in products in 1974 under the brand name Roundup. Roundup is a non-selective herbicide used to kill weeds that commonly compete with the growing of crops. By 2001, glyphosate had become the most-used active ingredient in American agriculture with 85–90 millions of pounds used annually. That number grew to 185 million pounds by 2007. As of 2013, glyphosate was the world's most widely used herbicide.

14.     Monsanto is a multinational agricultural biotechnology corporation based in St. Louis, Missouri. It is the world's leading producer of glyphosate. As of 2009, Monsanto was the world's leading producer of seeds, accounting for 27% of the world seed market. The majority of these seeds are of the Roundup Ready® brand. The stated advantage of Roundup Ready® crops is that they substantially improve a farmer's ability to control weeds, since glyphosate can be sprayed in the fields during the growing season without harming their crops. In 2010, an estimated 70% of corn and cotton, and 90% of soybean fields in the United States were Roundup Ready®.

15.     Monsanto's glyphosate products are registered in 130 countries and approved for use on over 100 different crops. They are ubiquitous in the environment. Numerous studies confirm that glyphosate is found in rivers, streams, and groundwater in agricultural areas where Roundup® is used. It has been found in food, in the urine of agricultural workers, and even in the urine of urban dwellers who are not in direct contact with glyphosate.

16.     On March 20, 2015, the International Agency for Research on Cancer ("IARC"), an agency of the World Health Organization ("WHO"), issued an evaluation of several herbicides, including glyphosate. That evaluation was based, in part, on studies of exposures to glyphosate in several countries around the world, and it traces the health implications from exposure to

E-FILED  2019 DEC 20 4:26 PM WEBSTER - CLERK OF DISTRICT COURT

glyphosate since 2001.

17.     On July 29, 2015, IARC issued the formal monograph relating to glyphosate. In that monograph, the IARC Working Group provides a thorough review of the numerous studies and data relating to glyphosate exposure in humans.

18.     The IARC Working Group classified glyphosate as a Group 2A herbicide, which means that it is probably carcinogenic to humans. The IARC Working Group concluded that the cancers most associated with glyphosate exposure are non-Hodgkin lymphoma and other hematopoietic cancers, including lymphocytic lymphoma/chronic lymphocytic leukemia, B-cell lymphoma, and multiple myeloma.

19.     The IARC evaluation is significant. It confirms that glyphosate is toxic to humans.

20.     Nevertheless, Monsanto, since it began selling Roundup®, has represented it as safe to humans and the environment. Indeed, Monsanto has repeatedly proclaimed and continues to proclaim to the world, and particularly to United States consumers, that glyphosate-based herbicides, including Roundup®, create no unreasonable risks to human health or to the environment.

## **FACTS**

17.     At all times relevant to this complaint, Monsanto was the entity that discovered the herbicidal properties of glyphosate and the manufacturer of Roundup®, which contains the active ingredient glyphosate and the surfactant POEA, as well as adjuvants and other "inert" ingredients. Glyphosate is a broad spectrum, non-selective herbicide used in a wide variety of herbicidal products around the world.

18.     Glyphosate is a broad-spectrum, non-selective herbicide used in a wide variety of herbicidal products around the world.

E-FILED  2019 DEC 20 4:26 PM WEBSTER - CLERK OF DISTRICT COURT

19.     Plants treated with glyphosate translocate the systemic herbicide to their roots, shoot regions and fruit, where it interferes with the plant's ability to form aromatic amino acids necessary for protein synthesis. Treated plants generally die within two to three days. Because plants absorb glyphosate, it cannot be completely removed by washing or peeling produce or by milling, baking, or brewing grains.

20.     For nearly 40 years, farms across the world have used Roundup® without knowing of the dangers its use poses. That is because when Monsanto first introduced Roundup®, it touted glyphosate as a technological breakthrough: it could kill almost every weed without causing harm either to people or to the environment. Of course, history has shown that not to be true. According to the WHO, the main chemical ingredient of Roundup®—glyphosate—is a probable cause of cancer. Those most at risk are farm workers and other individuals with workplace exposure to Roundup®, such as workers in garden centers, nurseries, and landscapers. Agricultural workers are, once again, victims of corporate greed. Monsanto assured the public that Roundup® was harmless. In order to prove this, Monsanto championed falsified data and attacked legitimate studies that revealed its dangers. Monsanto led a prolonged campaign of misinformation to convince government agencies, farmers, and the general population that Roundup® was safe.

### *The Discovery of Glyphosate and Development of Roundup®*

20.     The herbicidal properties of glyphosate were discovered in 1970 by Monsanto chemist John Franz. The first glyphosate-based herbicide was introduced to the market in the mid-1970s under the brand name Roundup®. From the outset, Monsanto marketed Roundup® as a "safe" general-purpose herbicide for widespread commercial and consumer use; Monsanto still markets Roundup® as safe today.

E-FILED  2019 DEC 20 4:26 PM WEBSTER - CLERK OF DISTRICT COURT

*Registration of Herbicides under Federal Law*

21.     The manufacture, formulation and distribution of herbicides, such as Roundup®, are regulated under the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA" or "Act"), 7 U.S.C. § 136 et seq. FIFRA requires that all pesticides be registered with the Environmental Protection Agency ("EPA" or "Agency") prior to their distribution, sale, or use, except as described by the Act. 7 U.S.C. § 136a(a).

22.     Because pesticides are toxic to plants, animals, and humans, at least to some degree, the EPA requires as part of the registration process, among other things, a variety of tests to evaluate the potential for exposure to pesticides, toxicity to people and other potential non-target organisms, and other adverse effects on the environment. Registration by the EPA, however, is not an assurance or finding of safety. The determination the Agency must make in registering or re-registering a product is not that the product is "safe," but rather that use of the product in accordance with its label directions "will not generally cause unreasonable adverse effects on the environment." 7 U.S.C. § 136a(c)(5)(D).

23.     FIFRA defines "unreasonable adverse effects on the environment" to mean "any unreasonable risk to man or the environment, taking into account the economic, social, and environmental costs and benefits of the use of any pesticide." 7 U.S.C. § 136(bb). FIFRA thus requires EPA to make a risk/benefit analysis in determining whether a registration should be granted or allowed to continue to be sold in commerce.

24.     The EPA registered Roundup® for distribution, sale, and manufacture in the United States and, specifically, the State of Missouri.

25.     FIFRA generally requires that the registrant, Monsanto in the case of Roundup®, conducts the health and safety testing of pesticide products. The EPA has protocols governing the

conduct of tests required for registration and the laboratory practices that must be followed in conducting these tests. The data produced by the registrant must be submitted to the EPA for review and evaluation. The government is not required, nor is it able, however, to perform the product tests that are required of the manufacturer.

26.     The evaluation of each pesticide product distributed, sold, or manufactured is completed at the time the product is initially registered. The data necessary for registration of a pesticide has changed over time. The EPA is now in the process of re-evaluating all pesticide products through a Congressionally-mandated process called "re-registration." 7 U.S.C. § 136a-1. In order to reevaluate these pesticides, the EPA is demanding the completion of additional tests and the submission of data for the EPA's review and evaluation.

27.     In the case of glyphosate, and therefore Roundup®, the EPA had planned on releasing its preliminary risk assessment —in relation to the re-registration process—no later than July 2015. The EPA completed its review of glyphosate in early 2015, but it delayed releasing the risk assessment pending further review in light of the WHO's health-related findings.

### *Scientific Fraud Underlying the Marketing and Sale of Glyphosate/Roundup*

28.     Based on early studies that glyphosate could cause cancer in laboratory animals, the EPA originally classified glyphosate as possibly carcinogenic to humans (Group C) in 1985. After pressure from Monsanto, including contrary studies it provided to the EPA, the EPA changed its classification to evidence of non-carcinogenicity in humans (Group E) in 1991. In so classifying glyphosate, however, the EPA made clear that the designation did not mean the chemical does not cause cancer: "It should be emphasized, however, that designation of an agent in Group E is based on the available evidence at the time of evaluation and should not be interpreted as a definitive conclusion that the agent will not be a carcinogen under any circumstances."

E-FILED  2019 DEC 20 4:26 PM WEBSTER - CLERK OF DISTRICT COURT

29.     On two occasions, the EPA found that the laboratories hired by Monsanto to test the toxicity of its Roundup® products for registration purposes committed fraud.

30.     In the first instance, Monsanto, in seeking initial registration of Roundup® by EPA, hired Industrial Bio-Test Laboratories ("IBT") to perform and evaluate pesticide toxicology studies relating to Roundup®. IBT performed about 30 tests on glyphosate and glyphosate-containing products, including nine of the 15 residue studies needed to register Roundup®.

31.     In 1976, the United States Food and Drug Administration ("FDA") performed an inspection of Industrial Bio-Test Industries ("IBT") that revealed discrepancies between the raw data and the final report relating to the toxicological impacts of glyphosate. The EPA subsequently audited IBT; it too found the toxicology studies conducted for the Roundup® herbicide to be invalid. An EPA reviewer stated, after finding "routine falsification of data" at IBT, that it was "hard to believe the scientific integrity of the studies when they said they took specimens of the uterus from male rabbits."

32.     Three top executives of IBT were convicted of fraud in 1983.

33.     In the second incident of data falsification, Monsanto hired Craven Laboratories in 1991 to perform pesticide and herbicide studies, including for Roundup®. In that same year, the owner of Craven Laboratories and three of its employees were indicted, and later convicted, of fraudulent laboratory practices in the testing of pesticides and herbicides.

34.     Despite the falsity of the tests that underlie its registration, within a few years of its launch, Monsanto was marketing Roundup® in 115 countries.

### *The Importance of Roundup® to Monsanto's Market Dominance Profits*

35.     The success of Roundup® was key to Monsanto's continued reputation and dominance in the marketplace. Largely due to the success of Roundup® sales, Monsanto's

agriculture division was out-performing its chemicals division's operating income, and that gap increased yearly. But with its patent for glyphosate expiring in the United States in the year 2000, Monsanto needed a strategy to maintain its Roundup® market dominance and to ward off impending competition.

36.     In response, Monsanto began the development and sale of genetically engineered Roundup Ready® seeds in 1996. Since Roundup Ready® crops are resistant to glyphosate; farmers can spray Roundup® onto their fields during the growing season without harming the crop. This allowed Monsanto to expand its market for Roundup® even further; by 2000, Monsanto's biotechnology seeds were planted on more than 80 million acres worldwide and nearly 70% of American soybeans were planted from Roundup Ready® seeds. It also secured Monsanto's dominant share of the glyphosate/Roundup® market through a marketing strategy that coupled proprietary Roundup Ready® seeds with continued sales of its Roundup® herbicide.

37.     Through a three-pronged strategy of increased production, decreased prices, and by coupling with Roundup Ready® seeds, Roundup® became Monsanto's most profitable product. In 2000, Roundup® accounted for almost $2.8 billion in sales, outselling other herbicides by a margin of five to one, and accounting for close to half of Monsanto's revenue. Today, glyphosate remains one of the world's largest herbicides by sales volume.

***Monsanto has known for decades that it falsely advertises the safety of Roundup®***

38.     In 1996, the New York Attorney General ("NYAG") filed a lawsuit against Monsanto based on its false and misleading advertising of Roundup ® products. Specifically, the lawsuit challenged Monsanto's general representations that its spray-on glyphosate-based herbicides, including Roundup®, were "safer than table salt" and "practically non-toxic" to mammals, birds, and fish. Among the representations the NYAG found deceptive and misleading

E-FILED  2019 DEC 20 4:26 PM WEBSTER - CLERK OF DISTRICT COURT

about the human and environmental safety of Roundup® are the following:

a) Remember that environmentally friendly Roundup herbicide is biodegradable. It won't build up in the soil so you can use Roundup with confidence along customers' driveways, sidewalks and fences.

b) And remember that Roundup is biodegradable and won't build up in the soil. That will give you the environmental confidence you need to use Roundup everywhere you've got a weed, brush, edging or trimming problem.

c) Roundup biodegrades into naturally occurring elements.

d) Remember that versatile Roundup herbicide stays where you put it. That means there's no washing or leaching to harm customers' shrubs or other desirable vegetation.

e) This non-residual herbicide will not wash or leach in the soil. It ... stays where you apply it.

f) You can apply Accord (another glyphosate-containing Monsanto herbicide) with "confidence because it will stay where you put it" it bonds tightly to soil particles, preventing leaching. Then, soon after application, soil microorganisms biodegrade Accord into natural products.

g) Glyphosate is less toxic to rats than table salt following acute oral ingestion.

h) Glyphosate's safety margin is much greater than required. It has over a 1,000-fold safety margin in food and over a 700-fold safety margin for

workers who manufacture it or use it.

i) You can feel good about using herbicides by Monsanto. They carry a toxicity category rating of 'practically non-toxic' as it pertains to mammals, birds and fish.

j) "Roundup can be used where kids and pets will play and breaks down into natural material." This ad depicts a person with his head in the ground and a pet dog standing in an area which has been treated with Roundup.

39.     On November 19, 1996, Monsanto entered into an Assurance of Discontinuance with NYAG, in which Monsanto agreed, among other things, "to cease and desist from publishing or broadcasting any advertisements [in New York] that represent, directly or by implication" that:

a) its glyphosate-containing pesticide products or any component thereof are safe, non-toxic, harmless or free from risk.

b) its glyphosate-containing pesticide products or any component thereof manufactured, formulated, distributed or sold by Monsanto are biodegradable.

c) its glyphosate-containing pesticide products or any component thereof stay where they are applied under all circumstances and will not move through the environment by any means.

d) its glyphosate-containing pesticide products or any component thereof are "good" for the environment or are "known for their environmental characteristics."

e) glyphosate-containing pesticide products or any component thereof are

12

safer or less toxic than common consumer products other than herbicides;

f)   its glyphosate-containing products or any component thereof might be classified as "practically non-toxic."

40.   Monsanto did not alter its advertising in the same manner in any state other than New York, and on information and belief still has not done so today.

41.   In 2009, France's highest court ruled that Monsanto had not told the truth about the safety of Roundup®. The French court affirmed an earlier judgement that Monsanto had falsely advertised its herbicide Roundup® as "biodegradable" and that it "left the soil clean."

### Classifications and Assessments of Glyphosate

42.   The IARC process for the classification of glyphosate followed the stringent procedures for the evaluation of a chemical agent. Over time, the IARC Monograph program has reviewed 980 agents. Of those reviewed, it has determined 116 agents to be Group 1 (Known Human Carcinogens); 73 agents to be Group 2A (Probable Human Carcinogens); 287 agents to be Group 2B (Possible Human Carcinogens); 503 agents to be Group 3 (Not Classified); and one agent to be Probably Not Carcinogenic.

43.   The established procedure for IARC Monograph evaluations is described in the IARC Programme's Preamble. Evaluations are performed by panels of international experts, selected on the basis of their expertise and the absence of actual or apparent conflicts of interest.

44.   One year before the Monograph meeting, the meeting is announced and there is a call both for data and for experts. Eight months before the Monograph meeting, the Working Group membership is selected, and the sections of the Monograph are developed by the Working Group members. One month prior to the Monograph meeting, the call for data is closed and the various

draft sections are distributed among Working Group members for review and comment. Finally, at the Monograph meeting, the Working Group finalizes review of all literature, evaluates the evidence in each category, and completes the overall evaluation. Within two weeks after the Monograph meeting, the summary of the Working Group findings is published in Lancet Oncology, and within a year after the meeting, the final Monograph is finalized and published.

45.     In assessing an agent, the IARC Working Group reviews the following information:

a)   human, experimental, and mechanistic data;

b)   all pertinent epidemiological studies and cancer bioassays; and

c)    representative mechanistic data. The studies must be publicly available and have sufficient detail for meaningful review, and reviewers cannot be associated with the underlying study.

46.     In March 2015, IARC reassessed glyphosate. The summary published in The Lancet Oncology reported that glyphosate is a Group 2A agent and probably carcinogenic in humans.

47.     On July 29, 2015, IARC issued its Monograph for glyphosate, Monograph 112. For Volume 112, the volume that assessed glyphosate, a Working Group of 17 experts from 11 countries met at IARC from March 3–10, 2015, to assess the carcinogenicity of certain herbicides, including glyphosate. The March meeting culminated nearly a one-year review and preparation by the IARC Secretariat and the Working Group, including a comprehensive review of the latest available scientific evidence. According to published procedures, the Working Group considered "reports that have been published or accepted for publication in the openly available scientific

literature" as well as "data from governmental reports that are publicly available."

48.   The studies considered the following exposure groups: occupational exposure of farmers and tree nursery workers in the United States, forestry workers in Canada and Finland, and municipal weed-control workers in the United Kingdom; and para-occupational exposure in farming families.

49.   Glyphosate was identified as the second-most used household herbicide in the United States for weed control between 2001 and 2007 and the most heavily used herbicide in the world in 2012.

50.   Exposure pathways are identified as air (especially during spraying), water, and food. Community exposure to glyphosate is widespread and found in soil, air, surface water, and groundwater, as well as in food.

51.   The assessment of the IARC Working Group identified several case control studies of occupational exposure in the United States, Canada, and Sweden. These studies show a human health concern from agricultural and other work-related exposure to glyphosate.

52.   The IARC Working Group found an increased risk between exposure to glyphosate and non-Hodgkin lymphoma ("NHL") and several subtypes of NHL, and the increased risk persisted after adjustment for other pesticides.

53.   The IARC Working Group also found that glyphosate caused DNA and chromosomal damage in human cells. One study in community residents reported increases in blood markers of chromosomal damage (micronuclei) after glyphosate formulations were sprayed.

54.   In male CD-1 mice, glyphosate induced a positive trend in the incidence of a rare tumor, renal tubule carcinoma. A second study reported a positive trend for haemangiosarcoma in male mice. Glyphosate increased pancreatic islet-cell adenoma in male rats in two studies. A

glyphosate formulation promoted skin tumors in an initiation-promotion study in mice.

55.    The IARC Working Group also noted that glyphosate has been detected in the urine of agricultural workers, indicating absorption. Soil microbes degrade glyphosate to aminomethylphosphoric acid (AMPA). Blood AMPA detection after exposure suggests intestinal microbial metabolism in humans.

56.    The IARC Working Group further found that glyphosate and glyphosate formulations induced DNA and chromosomal damage in mammals, and in human and animal cells in utero.

57.    The IARC Working Group also noted genotoxic, hormonal, and enzymatic effects in mammals exposed to glyphosate. Essentially, glyphosate inhibits the biosynthesis of aromatic amino acids, which leads to several metabolic disturbances, including the inhibition of protein and secondary product biosynthesis and general metabolic disruption.

58.    The IARC Working Group also reviewed an Agricultural Health Study, consisting of a prospective cohort of 57,311 licensed pesticide applicators in Iowa and North Carolina. While this study differed from others in that it was based on a self-administered questionnaire, the results support an association between glyphosate exposure and Multiple Myeloma, Hairy Cell Leukemia (HCL), and Chronic Lymphocytic Leukemia (CLL), in addition to several other cancers.

### *Other Earlier Findings About Glyphosate's Dangers to Human Health*

59.    The EPA has a technical fact sheet, as part of its Drinking Water and Health, National Primary Drinking Water Regulations publication, relating to glyphosate. This technical fact sheet predates the IARC March 20, 2015, evaluation. The fact sheet describes the release patterns for glyphosate as follows:

### *Release Patterns*

16

E-FILED  2019 DEC 20 4:26 PM WEBSTER - CLERK OF DISTRICT COURT

60.     Glyphosate is released to the environment in its use as an herbicide for controlling woody and herbaceous weeds on forestry, right-of-way, cropped and non-cropped sites. These sites may be around water and in wetlands. It may also be released to the environment during its manufacture, formulation, transport, storage, disposal, and cleanup, and from spills. Since glyphosate is not a listed chemical in the Toxics Release Inventory, data on releases during its manufacture and handling are not available. Occupational workers and home gardeners may be exposed to glyphosate by inhalation and dermal contact during spraying, mixing, and cleanup. They may also be exposed by touching soil and plants to which glyphosate was  applied. Occupational exposure may also occur during glyphosate's manufacture, transport storage, and disposal.

61.     In 1995, the Northwest Coalition for Alternatives to Pesticides reported that in California, the state with the most comprehensive program for reporting of pesticide-caused illness, glyphosate was the third most commonly-reported cause of pesticide illness among agricultural workers.

### Recent Worldwide Bans on Roundup®/Glyphosate

62.     Several countries around the world have instituted bans on the sale of Roundup® and other glyphosate-containing herbicides, both before and since IARC first announced its assessment for glyphosate in March 2015, and more countries undoubtedly will follow suit as the dangers of the use of Roundup® are more widely known. The Netherlands issued a ban on all glyphosate-based herbicides in April 2014, including Roundup®, which took effect by the end of 2015. In issuing the ban, the Dutch Parliament member who introduced the successful legislation stated: "Agricultural pesticides in user-friendly packaging are sold in abundance to private persons. In garden centers, Roundup® is promoted as harmless, but unsuspecting customers have no idea

what the risks of this product are. Especially children are sensitive to toxic substances and should therefore not be exposed to it."

63.     The Brazilian Public Prosecutor in the Federal District requested that the Brazilian Justice Department suspend the use of glyphosate.

64.     France banned the private sale of Roundup® and glyphosate following the IARC assessment for Glyphosate.

65.     Bermuda banned both the private and commercial sale of glyphosates, including Roundup®. The Bermuda government explained its ban as follows: "Following a recent scientific study carried out by a leading cancer agency, the importation of weed spray 'Roundup' has been suspended."

66.     The Sri Lankan government banned the private and commercial use of glyphosates, particularly out of concern that glyphosate has been linked to fatal kidney disease in agricultural workers.

67.     The government of Colombia announced its ban on using Roundup® and glyphosate to destroy illegal plantations of coca, the raw ingredient for cocaine, because of the WHO's finding that glyphosate is probably carcinogenic.

### *Proposition 65 Listing*

68.     On September 4, 2015, California's Office of Environmental Health Hazard Assessment ("OEHHA") published a notice of intent to include glyphosate on the state's list of known carcinogens under Proposition 65. 18 California's Safe Drinking Water and Toxic Enforcement Act of 1986 (informally known as "Proposition 65"), requires the state to maintain and, at least, once a year, revise and republish a list of chemicals "known to the State of California to cause cancer or reproductive toxicity." The OEHHA determined that glyphosate met the criteria

for the listing mechanism under the Labor Code following IARC's assessment of the chemical.

69.    The listing process under the Labor Code is essentially automatic. The list known carcinogens, at a minimum, must include substances identified by reference in Labor Code §6382(b)(1). That section of the Labor Code identifies "[s]ubstances listed as human or animal carcinogens by the International Agency for Research on Cancer (IARC)." IARC's classification of glyphosate as a Group 2A chemical ("probably carcinogenic to humans") therefore triggered the listing.

70.    A business that deploys a listed chemical in its products must provide "clear and reasonable warnings" to the public prior to exposure to the chemical. To be clear and reasonable, a warning must "(1) clearly communicate that the chemical is known to cause cancer, and/or birth defects or other reproductive harm; and (2) effectively reach the person before exposure." The law also prohibits the discharge of listed chemicals into drinking water.

71.    Monsanto disputed the listing decision and, in January 2016, filed a lawsuit against OEHHA and the agency's acting director, Lauren Zeise, in California state court, seeking declaratory and injunctive relief to prevent OEHHA from listing glyphosate.

72.    Monsanto alleged that OEHHA's exclusive reliance on the IARC decision signified that "OEHHA effectively elevated the determination of an ad hoc committee of an unelected, foreign body, which answers to no United States official (let alone any California state official), over the conclusions of its own scientific experts." Monsanto further alleged that the Labor Code listing mechanism presented various constitutional violations because it "effectively empowers an unelected, undemocratic, unaccountable, and foreign body to make laws applicable in California." Among other things, Monsanto argued that Proposition 65's requirement to provide a "clear and reasonable warning" to consumers that the chemical is a known carcinogen would

damage its reputation and violate its First Amendment rights.

### *EFSA Report on Glyphosate*

73.      On November 12, 2015, the European Food Safety Authority (EFSA), the European Union's primary agency for food safety, reported on its evaluation of the Renewal Assessment Report (RAR) on glyphosate. The Rapporteur Member State assigned to glyphosate, the German Federal Institute for Risk Assessment (BfR), had produced the RAR as part of the renewal process for glyphosate in the EU.

74.      Based on a review of the RAR, which included data from industry submitted unpublished studies, EFSA sent its own report ("Conclusion") to the European Commission, finding that "glyphosate is unlikely to pose a carcinogenic hazard to humans and the evidence does not support classification with regard to its carcinogenic potential according to Regulation (EC) No 1272/2008." EFSA therefore disagreed with IARC: glyphosate was not genotoxic and did not present a carcinogenic threat to humans.

75.      In explaining why its results departed from IARC's conclusion, EFSA drew a distinction between the EU and IARC approaches to the study and classification of chemicals. Although IARC examined "both glyphosate – an active substance – and glyphosate-based formulations, grouping all formulations regardless of their composition," EFSA explained that it considered only glyphosate and that its assessment focuses on "each individual chemical, and each marketed mixture separately." IARC, on the other hand, "assesses generic agents, including groups of related chemicals, as well as occupational or environmental exposure, and cultural or behavioural practices." EFSA accorded greater weight to studies conducted with glyphosate alone than studies of formulated products.

76.      EFSA went further and noted: [A]though some studies suggest that certain

glyphosate-based formulations may be genotoxic (i.e. damaging to DNA), others that look solely at the active substance glyphosate do not show this effect. It is likely, therefore, that *the genotoxic effects observed in some glyphosate-based formulations are related to the other constituents or "co-formulants"*. Similarly, certain glyphosate-based formulations display higher toxicity than that of the active ingredient, presumably because of the presence of co- formulants. In its assessment, *EFSA proposes that the toxicity of each pesticide formulation and in particular its genotoxic potential should be further considered and addressed by* Member State authorities while they reassess uses of glyphosate-based formulations in their own territories. (Emphasis added)

77.     Notwithstanding its conclusion, EFSA did set exposure levels for Specifically, EFSA proposed an acceptable daily intake (ADI) of 0.5 mg/kg of body day; an acute reference dose (ARfD) of 0.5 mg/kg of body weight; and an acceptable exposure level (AOEL) of 0.1 mg/kg bw per day.

### *Leading Scientists Dispute EFSA's Conclusion*

78.     On November 27, 2015, 96 independent academic and governmental scientists from around the world submitted an open letter to the EU health commissioner, Vytenis Andriukaitis, the scientists expressed their strong concerns and urged the commissioner to disregard the "flawed" EFSA report, arguing that "the BfR decision is not credible because it is not supported by the evidence and it was not reached in an open and transparent manner."

79.     Signatories to the letter included Dr. Christopher J. Portier, Ph.D., and other renowned international experts in the field, some of whom were part of the IARC Working Group assigned to glyphosate.

80.     In an exhaustive and careful examination, the scientists scrutinized EFSA's

conclusions and outlined why the IARC Working Group decision was "by far the more credible": The IARC WG decision was reached relying on open and transparent procedures by independent scientists who completed thorough conflict-of-interest statements and were not affiliated or financially supported in any way by the chemical manufacturing industry. It is fully referenced and depends entirely on reports published in the open, peer-reviewed biomedical literature. It is part of a long tradition of deeply researched and highly credible reports on the carcinogenicity of hundreds of chemicals issued over the past four decades by IARC and used today by international agencies and regulatory bodies around the world as a basis for risk assessment, regulation and public health policy.

81.     With respect to human data, the scientists pointed out that EFSA agreed with IARC that there was "*limited evidence* of carcinogenicity" for non-Hodgkin lymphoma but EFSA nonetheless dismissed an association between glyphosate exposure and carcinogenicity. IARC applies three levels of evidence in its analyses of human data, including sufficient evidence and limited evidence. EFSA's ultimate conclusion that "there was no unequivocal evidence for a clear been established. However, the scientists argued, "[l]egitimate public health concerns arise when 'causality is credible,' i.e., when there is *limited evidence*."

82.     Among its many other deficiencies, EFSA's conclusions regarding animal carcinogenicity data were "scientifically unacceptable," particularly in BfR's use of historical control data and in its trend analysis. Indeed, BfR's analysis directly contradicted the Organisation for Economic Co-operation and Development ("OECD") testing guidelines while citing and purporting to follow those same guidelines. For instance, the EFSA report dismisses observed trends in tumor incidence "because there are no individual treatment groups that are significantly different from controls and because the maximum observed response is reportedly within the range

of the historical control data." However, according to the scientists, concurrent controls are recommended over historical controls in all guidelines, scientific reports, and publications, and, if it is employed, historical control data "should be from studies in the same timeframe, for the same exact animal strain, preferably from the same laboratory or the same supplier and preferably reviewed by the same pathologist." BfR's use of historical control data violated these precautions: "only a single study used the same mouse strain as the historical controls, but was reported more than 10 years after the historical control dataset was developed." Further deviating from sound scientific practices, the data used by the BfR came from studies in seven different laboratories. The scientists concluded:

> BfR reported seven positive mouse studies with three studies showing increases in renal tumors, two with positive findings for hemangiosarcomas, and two with positive findings for malignant lymphomas. BfR additionally reported two positive findings for tumors in rats. Eliminating the inappropriate use of historical data, the unequivocal conclusion is that these are not negative studies, but in fact document the carcinogenicity of glyphosate in laboratory animals.

83.     The letter also critiqued the EFSA report's lack of transparency and the opacity surrounding the data cited in the report: "citations for almost all of the references, even those from the open scientific literature, have been redacted from the document" and "there are no authors or contributors listed for either document, a requirement for publication in virtually all scientific journals." Because BfR relied on unpublished, confidential industry provided studies, it is "impossible for any scientist not associated with BfR to review this conclusion with scientific confidence."

84.     On March 3, 2016, the letter was published in the Journal of Epidemiology & Community Health.

85.     On February 17, 2016, a consensus statement published in the journal Environmental Health, entitled "Concerns over use of glyphosate-based herbicides and risks

associated with exposures: a consensus statement," assessed the safety of glyphosate-based herbicides (GBHs). The paper's "focus is on the unanticipated effects arising from the worldwide increase in use of GBHs, coupled with recent discoveries about the toxicity and human health risks stemming from use of GBHs." The researchers drew seven factual conclusions about GBHs:

A.   GBHs are the most heavily applied herbicide in the world and usage continues to rise;

B.   Worldwide, GBHs often contaminate drinking water sources, precipitation, and air, especially in agricultural regions;

C.   The half-life of glyphosate in water and soil is longer than previously recognized;

D.   Glyphosate and its metabolites are widely present in the global soybean supply;

E.   Human exposures to GBHs are rising;

F.   Glyphosate is now authoritatively classified as a probable human carcinogen; and

G.   Regulatory estimates of tolerable daily intakes for glyphosate in the United States and European Union are based on outdated science.

86.     The researchers noted that GBH use has increased approximately 100-fold since the 1970s. Furthermore, far from posing a limited hazard to vertebrates, as previously believed, two decades of evidence demonstrated that "several vertebrate pathways are likely targets of action, including hepatorenal damage, effects on nutrient balance through glyphosate chelating action and endocrine disruption."

87.     The paper attributed uncertainties in current assessments of glyphosate formulations to the fact that "[t]he full list of chemicals in most commercial GBHs is protected as 'commercial business information,' despite the universally accepted relevance of such information to scientists hoping to conduct an accurate risk assessment of these herbicide formulations." Further, the researchers argue, "[t]he distinction in regulatory review and decision processes

24

between 'active' and 'inert' ingredients has no toxicological justification, given increasing evidence that several so-called 'inert' adjuvants are toxic in their own right."

88.     Among various implications, the researchers conclude that "existing toxicological data and risk assessments are not sufficient to infer that GBHs, as currently used, are safe." Further, "GBH-product formulations are more potent, or toxic, than glyphosate alone to a wide array of non-target organisms including mammals, aquatic insects, and fish." Accordingly, "risk assessments of GBHs that are based on studies quantifying the impacts of glyphosate alone underestimate both toxicity and exposure, and thus risk." The paper concludes that this "shortcoming has repeatedly led regulators to set inappropriately high exposure thresholds."

89.     The researchers also critique the current practice of regulators who largely rely on "unpublished, non-peer reviewed data generated by the registrants" but ignore "published research because it often uses standards and procedures to assess quality that are different from those codified in regulatory agency data requirements, which largely focus on avoiding fraud." In the researchers' view, "[s]cientists independent of the registrants should conduct regulatory tests of GBHs that include glyphosate alone, as well as GBH product formulations."

90.     The researchers also call for greater inclusion of GBHs in government-led toxicology testing programs:[A] fresh and independent examination of GBH toxicity should be undertaken, and . . . this re-examination be accompanied by systematic efforts by relevant agencies to monitor GBH levels in people and in the food supply, none of which are occurring today. The U.S. National Toxicology Program should prioritize a thorough toxicological assessment of the multiple pathways now identified as potentially vulnerable of GBHs.

91.     The researchers suggest that, in order to fill the gap created by an absence of government funds to support research on GBHs, regulators could adopt a system through which

25

manufacturers fund the registration process and the necessary testing:

> "[W]e recommend that a system be put in place through which manufacturers of GBHs provide funds to the appropriate regulatory body as part or routine registration actions and fees. Such funds should then be transferred to appropriate government research institutes, or to an agency experienced in the award of competitive grants. In either case, funds would be made available to independent scientists to conduct the appropriate long-term (minimum 2 years) safety studies in recognized animal model systems. A thorough and modern assessment of GBH toxicity will encompass potential endocrine disruption impacts on the gut microbiome, carcinogenicity, and multigenerational effects looking at reproductive capabilities and frequency of birth defects."

### Plaintiff's Exposure to Roundup®

98.     From approximately 2008 to 2018, Mr. Webb worked as a Contractor Millwright for a variety of facilities. As a Contractor Millwright, Mr. Webb had a variety of job duties including, but not limited to, new installation, maintenance, and repair of facility equipment and machinery, including but not limited to conveyer systems, rotating valves, and pumps.

99.     The conveyor systems, valves, and pumps Mr. Webb repaired and maintained conveyed Round Up Ready Corn and Corn Stover from storage silos into hammer mills where the Round Up Ready Corn and Corn Stover was ground into a corn meal. The corn meal was then conveyed to slurry tanks for conversion to a wet mixture called mash. From there, the corn mash was pumped into fermentation tanks and then conveyed to distillation columns where the mash was separated for further processing and conversion and then conveyed to the final ethanol production and to final distillers' grain production and used for livestock feed.

100.    The conversion of the Round Up Ready Corn Mash to make livestock feed utilizes a centrifuge to make a wet cake. The wet cake resembled a steaming, bright yellow sawdust that Mr. Webb cold ball up in his hand.

101.    The repair and maintenance work he performed on the conveyer systems, valves and pumps frequently caused Mr. Webb to be covered in the Round Up Ready Corn and Corn

Stover crop dust, corn meal, corn mash and corn wet cake. These Round Up Ready Corn by-products would stick onto his clothes and hair and would coat the inside of his nose. This occurred on a regular and frequent basis from approximately 2008 to 2018.

102.    Mr. Webb worked for facilities owned and operated by  Icon Industrial, Weitz Industrial, Hayes Mechanical, Cargill Corn Milling Ethanol Plants, Pine Lake Corn Processors, Valero Fuel Plants, Chief Ethanol; and Monsanto Corn Seed Processing Plant. Mr. Webb worked as a Contractor Millwright in a variety of states, including Iowa, Nebraska, Texas, Minnesota, Kansas, Indiana, Wisconsin, and Ohio. Specifically, Mr. Webb worked at Cargill Corn Milling Ethanol Plants in Fort Dodge and Eddyville, Iowa; Pine Lake Corn Processors in Steamboat Rock, Iowa; Valero Fuel Plants in Clarks Hill, Lafayette, Linden, and Mt. Vernon, Indiana; and Chief Ethanol in Hastings, Nebraska; and the Monsanto Corn Seed Processing Plant in Grinnell, Iowa, among others.

103.    Additionally, Mr. Webb used Roundup products residentially for a number of years.

104.    In 2016, Mr. Webb was diagnosed with non-Hodgkin's Lymphoma. He received treatment intermittently from 2016 to 2018. Recently, Mr. Webb's condition has deteriorated greatly with the failure of an experimental treatment plan his physicians prescribed him.

**<u>DISCOVERY RULE</u>**

105.    Plaintiff hereby pleads and invokes the "discovery rule" if necessary. Plaintiff will show that after reasonably exercising due diligence, he did not learn the nature of the cause of his cancer or that such cancer was chemically-related until less than the time periods provided by the relevant statutes of limitations. Plaintiff also specifically invokes the federally required commencement date as set forth in <u>42 U.S.C. § 9658</u>.

106.    Plaintiff had no way of knowing about the risk of serious illness associated with the

use of and/or exposure to Roundup® and glyphosate. The earliest date one could have learned of the link would have been after IARC released its formal assessment of glyphosate in July 2015. This is the quintessential case for tolling.

107.    Within the time period of any applicable statutes of limitations, Plaintiff could not have discovered, through the exercise of reasonable diligence, that exposure to Roundup® and glyphosate is injurious to human health.

108.    Plaintiff did not discover and did not know of facts that would cause a reasonable person to suspect, the risks associated with the use of and/or exposure to Roundup® and glyphosate; nor would a reasonable and diligent investigation by them have disclosed that Roundup® and glyphosate would cause Mr. Webb's illness.

109.    For these reasons, all applicable statutes of limitations have been tolled by operation of the discovery rule with respect to Plaintiff' claim.

### Fraudulent Concealment Tolling

109.    All applicable statutes of limitations have also been tolled by Monsanto's knowing and active fraudulent concealment and denial of the facts alleged herein throughout the time period relevant to this action.

110.    Instead of disclosing critical safety information about Roundup® and glyphosate, Monsanto has consistently and falsely represented the safety of its Roundup® products.

### Estoppel

111.    Monsanto was under a continuous duty to disclose to consumers, users and other person coming into contact with its products, including Plaintiff, accurate safety information concerning its products and the risks associated with the use of and/or exposure to Roundup® and

glyphosate.

112.     Instead, Monsanto knowingly, affirmatively, and actively concealed safety information concerning Roundup® and glyphosate and the serious risks associated with the use of and/or exposure to its products.

113.     Based on the foregoing, Monsanto is estopped from relying on any statutes of limitations in defense of this action.

## CLAIMS

### COUNT I
### STRICT LIABILITY
### (DESIGN DEFECT)

114.     Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

115.     Plaintiff brings this strict liability claim against Monsanto for defective design.

116.     At all times relevant to this litigation, Monsanto engaged in the business of testing, developing, manufacturing, selling, distributing, and Monsanto engaged in the marketing, packaging design, and promotion of Roundup® products, which are defective and unreasonably dangerous to consumers, including Plaintiff, thereby placing Roundup® products into the stream of commerce. These actions were under the ultimate control and supervision of Monsanto. At all times relevant to this litigation, Monsanto designed, researched, developed, manufactured, produced, tested, assembled, labeled, advertised, promoted, marketed, sold, and distributed the Roundup® products used by Plaintiff, as described above.

117.     At all times relevant to this litigation, Roundup® products were manufactured, designed, and labeled in an unsafe, defective, and inherently dangerous manner that was dangerous for use by or exposure to the public, and, in particular, Plaintiff.

118.    At all times relevant to this litigation, Roundup® products reached the intended consumers, handlers, and users or other persons coming into contact with these products in Missouri and throughout the United States, including Plaintiff, without substantial change in their condition as designed, manufactured, sold, distributed, labeled, and marketed by Monsanto.

119.    Roundup® products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold, and marketed by Monsanto were defective in design and formulation in that when they left the hands of the manufacturers and/or suppliers, they were unreasonably dangerous and dangerous to an extent beyond that which an ordinary consumer would contemplate.

120.    Roundup® products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold, and marketed by Monsanto were defective in design and formulation in that when they left the hands of the manufacturers and/or suppliers, the foreseeable risks exceeded the alleged benefits associated with their design and formulation.

121.    At all times relevant to this action, Monsanto knew or had reason to know that Roundup® products were defective and were inherently dangerous and unsafe when used in the manner instructed and provided by Monsanto. Therefore, at all times relevant to this litigation, Roundup® products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold, and marketed by Monsanto were defective in design and formulation, in one or more of the following ways:

a)  When placed in the stream of commerce, Roundup® products were defective in design and formulation, and, consequently, dangerous to an extent beyond that which an ordinary consumer would contemplate.

b)  When placed in the stream of commerce, Roundup® products were unreasonably dangerous in that they were hazardous and posed a grave risk of cancer and other serious illnesses when used in a reasonably anticipated manner.

c)  When placed in the stream of commerce, Roundup® products contained unreasonably dangerous design defects and were not reasonably safe when used in a reasonably anticipated or intended manner.

d)  Monsanto did not sufficiently test, investigate, or study Roundup® products and, specifically, the active ingredient glyphosate.

e)  Exposure to Roundup® and glyphosate-containing products presents a risk of harmful side effects that outweigh any potential utility stemming from the use of the herbicide.

f)  At the time of marketing its Roundup® products, Roundup® was defective in that exposure to Roundup® and specifically, its active ingredient glyphosate, could result in cancer and other severe illnesses and injuries and/or death.

g)  Monsanto did not conduct adequate post-marketing surveillance of its Roundup® products.

h)  Monsanto could have employed safer alternative designs and formulations.

122.  Plaintiff was exposed to Roundup® products in the course of his work-related use, as described above, without knowledge of their dangerous characteristics.

E-FILED  2019 DEC 20 4:26 PM WEBSTER - CLERK OF DISTRICT COURT

123.    At all times relevant to this litigation, Plaintiff used and/or was exposed to the use of Roundup® products in an intended or reasonably foreseeable manner without knowledge of their dangerous characteristics.

124.    Plaintiff could not have reasonably discovered the defects and risks associated with Roundup® or glyphosate-containing products before or at the time of exposure.

125.    The harm caused by Roundup® products far outweighed their benefit, rendering these products dangerous to an extent beyond that which an ordinary consumer would contemplate. Roundup® products were and are more dangerous than alternative products and Monsanto could have designed Roundup® products (including their packaging and sales aids) to make them less dangerous. Indeed, at the time that Monsanto designed Roundup® products, the state of the industry's scientific knowledge was such that a less risky design or formulation was attainable.

126.    At the time Roundup® products left Monsanto's control, there was a practical, technically feasible and safer alternative design that would have prevented the harm without substantially impairing the reasonably anticipated or intended function of those herbicides.

127.    Monsanto's defective design of Roundup® products was willful, wanton, fraudulent, malicious, and conducted with reckless disregard for the health and safety of users of the Roundup® products, including Plaintiff herein.

128.    Therefore, as a result of the unreasonably dangerous condition of its Roundup® products, Monsanto is strictly liable to Plaintiff.

129.    The defects in Roundup® products caused or contributed to cause Plaintiff' grave injuries and/or death, and, but for Monsanto's misconduct and omissions, Plaintiff would not have sustained his injuries and/or death.

130.    Monsanto's conduct, as described above, was reckless. Monsanto risked the lives

of consumers and users of its products, including Plaintiff, with knowledge of the safety problems associated with Roundup® and glyphosate-containing products, and suppressed this knowledge from the general public. Monsanto made conscious decisions not to redesign, warn, or inform the unsuspecting public. Monsanto's reckless conduct warrants an award of aggravated damages.

131.     As a direct and proximate result of Monsanto placing defective Roundup® products into the stream of commerce, Plaintiff has suffered and continue to suffer grave injuries and/or death, and have endured physical pain and discomfort, as well as economic hardship, including considerable financial expenses for medical care and treatment.

## COUNT II
## STRICT LIABILITY
## (FAILURE TO WARN)

132.     Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

133.     Plaintiff brings this strict liability claim against Monsanto for failure to warn.

134.     At all times relevant to this litigation, Monsanto engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting Roundup® products, which are defective and unreasonably dangerous to consumers, including Plaintiff, because they do not contain adequate warnings or instructions concerning the dangerous characteristics of Roundup® and, specifically, the active ingredient glyphosate. These actions were under the ultimate control and supervision of Monsanto.

135.     Monsanto researched, developed, designed, tested, manufactured, inspected, labeled, distributed, marketed, promoted, sold, and otherwise released into the stream of commerce Roundup® products, and in the course of same, directly advertised or marketed the products to consumers and end users, including Plaintiff, and therefore had a duty to warn of the risks

associated with the use of Roundup® and glyphosate-containing products.

136.    At all times relevant to this litigation, Monsanto had a duty to properly test, develop, design, manufacture, inspect, package, label, market, promote, sell, distribute, maintain supply, provide proper warnings, and take such steps as necessary to ensure that Roundup® products did not cause users and consumers to suffer from unreasonable and dangerous risks. Monsanto had a continuing duty to warn Plaintiff of the dangers associated with Roundup® use and exposure. Monsanto, as manufacturer, seller, promoter, marketer, or distributor of chemical herbicides is held to the knowledge of an expert in the field.

137.    At the time of manufacture, Monsanto could have provided the warnings or instructions regarding the full and complete risks of Roundup® and glyphosate-containing products because it knew or should have known of the unreasonable risks of harm associated with the use of and/or exposure to such products.

138.    At all times relevant to this litigation, Monsanto failed to investigate, study, test, or promote the safety or to minimize the dangers to users and consumers of its product and to those who would foreseeably use or be harmed by these herbicides, including Plaintiff.

139.    Despite the fact that Monsanto knew or should have known that Roundup® posed a grave risk of harm, it failed to exercise reasonable care to warn of the dangerous risks associated with use and exposure. The dangerous propensities of these products and the carcinogenic characteristics of glyphosate, as described above, were known to Monsanto, or scientifically knowable to Monsanto through appropriate research and testing by known methods, at the time it distributed, marketed, promoted, supplied, or sold the product, and not known to end users and consumers, such as Plaintiff.

140.    These products created significant risks of serious bodily harm to consumers, as

alleged herein, and Monsanto failed to adequately warn consumers and reasonably foreseeable users of the risks of exposure to its products. Monsanto has wrongfully concealed information concerning the dangerous nature of Roundup® and its active ingredient glyphosate, and further made false and/or misleading statements concerning the safety of Roundup® and glyphosate.

141.    At all times relevant to this litigation, Roundup® products reached the intended consumers, handlers, and users or other persons coming into contact with these products in Missouri and throughout the United States, including Plaintiff, without substantial change in their condition as designed, manufactured, sold, distributed, labeled, promoted, and marketed by Monsanto.

142.    Plaintiff was exposed to Roundup® products in the course of his personal and/or work-related use of Roundup®, without knowledge of its dangerous characteristics.

143.    At all times relevant to this litigation, Plaintiff used and/or was exposed to the use of Roundup® products in their intended or reasonably foreseeable manner without knowledge of their dangerous characteristics.

144.    Plaintiff could not have reasonably discovered the defects and risks associated with Roundup® or glyphosate-containing products prior to or at the time of Plaintiff's exposure. Plaintiff relied upon the skill, superior knowledge, and judgment of Monsanto.

145.    These products were defective because the minimal warnings disseminated with Roundup® products were inadequate, and they failed to communicate adequate information on the dangers and safe use/exposure and failed to communicate warnings and instructions that were appropriate and adequate to render the products safe for their ordinary, intended, and reasonably foreseeable uses, including agricultural and landscaping applications.

146.    The information that Monsanto did provide or communicate failed to contain

E-FILED  2019 DEC 20 4:26 PM WEBSTER - CLERK OF DISTRICT COURT

relevant warnings, hazards, and precautions that would have enabled consumers such as Plaintiff to utilize the products safely and with adequate protection. Instead, Monsanto disseminated information that was inaccurate, false, and misleading and which failed to communicate accurately or adequately the comparative severity, duration, and extent of the risk of injuries and/or death with use of and/or exposure to Roundup® and glyphosate; continued to aggressively promote the efficacy of its products, even after it knew or should have known of the unreasonable risks from use or exposure; and concealed, downplayed, or otherwise suppressed, through aggressive marketing and promotion, any information or research about the risks and dangers of exposure to Roundup® and glyphosate.

147.    To this day, Monsanto has failed to adequately and accurately warn of the true risks of Plaintiff' injuries and/or death associated with the use of and exposure to Roundup® and its active ingredient glyphosate, a probable carcinogen.

148.    As a result of their inadequate warnings, Roundup® products were defective and unreasonably dangerous when they left the possession and/or control of Monsanto, were distributed, marketed, and promoted by Monsanto, and used by Plaintiff in their personal and/or work-related use.

149.    Monsanto is liable to Plaintiff for injuries caused by its negligent or willful failure, as described above, to provide adequate warnings or other clinically relevant information and data regarding the appropriate use of these products and the risks associated with the use of or exposure to Roundup® and glyphosate.

150.    The defects in Roundup® products caused or contributed to cause Plaintiff's injuries, and, but for this misconduct and omissions, Plaintiff would not have sustained their injuries and/or death. To this day, Monsanto has failed to adequately and accurately warn of the

true risks of Plaintiff's injuries and/or death associated with the use of and exposure to Roundup®
and its active ingredient glyphosate, a probable carcinogen.

    a)  As a result of their inadequate warnings, Roundup® products were defective and unreasonably dangerous when they left the possession and/or control of Monsanto, were distributed, marketed, and promoted by Monsanto, and used by Plaintiff in their personal and/or work-related use.

    b)  Monsanto is liable to Plaintiff for injuries and/or death caused by its negligent or willful failure, as described above, to provide adequate warnings or other clinically relevant information and data regarding the appropriate use of these products and the risks associated with the use of or exposure to Roundup® and glyphosate.

    c)  The defects in Roundup® products caused or contributed to cause Plaintiff' injuries and/or death, and, but for this misconduct and omissions, Plaintiff would not have sustained their injuries and/or death.

    d)  Had Monsanto provided adequate warnings and instructions and properly disclosed and disseminated the risks associated with Roundup® products, Plaintiff could have avoided the risk of developing injuries and/or death as alleged herein.

    e)  As a direct and proximate result of Monsanto placing defective Roundup® products into the stream of commerce, Plaintiff have suffered severe injuries and/or death and have endured physical pain

and discomfort, as well as economic hardship, including considerable financial expenses for medical care and treatment.

**COUNT III**
**NEGLIGENCE**
**FAILURE TO WARN**

151.    Plaintiff incorporates by reference all other paragraphs of this Complaint as if fully set forth herein, and further allege:

152.    Plaintiff bring this negligence claim against Defendant for failure to warn.

153.    At all times relevant to this litigation, Defendant engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting Roundup® products, which are defective and unreasonably dangerous to consumers, including Plaintiff, because they do not contain adequate warnings or instructions concerning the dangerous characteristics of Roundup® and specifically, the active ingredient glyphosate. These actions were under the ultimate control and supervision of Defendant.

154.    Defendant researched, developed, designed, tested, manufactured, inspected, labeled, distributed, marketed, promoted, sold, and otherwise released into the stream of commerce its Roundup® products, and in the course of same, directly advertised or marketed the products to consumers and end users, including Plaintiff, and Defendant therefore had a duty to warn of the risks associated with the reasonably foreseeable uses (and misuses) of Roundup® and glyphosate-containing products and a duty to instruct on the proper, safe use of these products.

155.    At all times relevant to this litigation, Defendant had a duty to properly test, develop, design, manufacture, inspect, package, label, market, promote, sell, distribute, maintain supply, provide proper warnings, and take such steps as necessary to ensure that its Roundup® products did not cause users and consumers to suffer from unreasonable and dangerous risks.

Defendant had a continuing duty to instruct on the proper, safe use of these products. Defendant, as manufacturer, seller, or distributor of chemical herbicides, is held to the knowledge of an expert in the field.

156.   At the time of manufacture, Defendant could have provided warnings or instructions regarding the full and complete risks of Roundup® and glyphosate containing products because it knew or should have known of the unreasonable risks of harm associated with the use of and/or exposure to these products.

157.   At all times relevant to this litigation, Defendant failed to investigate, study, test, or promote the safety of its Roundup® products. Defendant also failed to minimize the dangers to users and consumer of its Roundup® products and to those who would foreseeably use or be harmed by Defendant's herbicides, including Plaintiff.

158.   Despite the fact that Defendant knew or should have known that Roundup® products posed a grave risk of harm, it failed to warn of the dangerous risks associated with their use and exposure. The dangerous propensities of its products and the carcinogenic characteristics of glyphosate, as described above, were known to Defendant, or scientifically knowable to Defendant through appropriate research and testing by known methods, at the time it distributed, supplied, or sold the product, and not known to end users and consumers, such as Plaintiff.

159.   Defendant knew or should have known that its Roundup® and glyphosate containing products created significant risks of serious bodily harm to consumers, as alleged herein, and Defendant failed to adequately warn consumers and reasonably foreseeable users of the risks of exposure to these products. Defendant has wrongfully concealed information concerning the dangerous nature of Roundup® and its active ingredient glyphosate, and further made false and/or misleading statements concerning the safety of Roundup® and glyphosate.

E-FILED  2019 DEC 20 4:26 PM WEBSTER - CLERK OF DISTRICT COURT

160.    At all times relevant to this litigation, Defendant's Roundup® products reached the intended consumers, handlers, and users or other persons coming into contact with these products throughout the United States, including Plaintiff, without substantial change in their condition as designed, manufactured, sold, distributed, labeled, and marketed by Defendant.

161.    At all times relevant to this litigation, Plaintiff used and/or was exposed to the use of Defendant's Roundup® products in their intended or reasonably foreseeable manner without knowledge of their dangerous characteristics.

162.    Plaintiff could not have reasonably discovered the defects and risks associated with Roundup® or glyphosate-containing products before or at the time of Plaintiff's exposure. Plaintiff relied upon the skill, superior knowledge, and judgment of Defendant.

163.    Defendant knew or should have known that the minimal warnings disseminated with its Roundup® products were inadequate, but it failed to communicate adequate information on the dangers and safe use/exposure and failed to communicate warnings and instructions that were appropriate and adequate to render the products safe for their ordinary, intended, and reasonably foreseeable uses, including agricultural and horticultural applications.

164.    The information that Defendant did provide or communicate failed to contain relevant warnings, hazards, and precautions that would have enabled agricultural workers, horticultural workers and/or at-home users to utilize the products safely and with adequate protection. Instead, Defendant disseminated information that was inaccurate, false, and misleading and which failed to communicate accurately or adequately the comparative severity, duration, and extent of the risk of injuries associated with use of and/or exposure of Roundup® and glyphosate; continued to aggressively promote the efficacy of its products, even after it knew or should have known of the unreasonable risks from use or exposure; an concealed, downplayed,

E-FILED  2019 DEC 20 4:26 PM WEBSTER - CLERK OF DISTRICT COURT

or otherwise suppressed, through aggressive marketing and promotion, any information or research about the risks and dangers of exposure to Roundup® and glyphosate.

165.    To this day, Defendant has failed to adequately and accurately warn of the true risks of Plaintiff's injuries associated with the use of and exposure to Roundup® and its active ingredient glyphosate, a probable carcinogen.

166.    As a result of their inadequate warnings, Defendant's Roundup® products were defective and unreasonably dangerous when they left the possession and/or control of Defendant, were distributed by Defendant, and used by Plaintiff.

167.    Defendant is liable to Plaintiff for injuries caused by its failure, as described above, to provide adequate warnings or other clinically relevant information and data regarding the appropriate use of its Roundup® products and the risks associated with the use of or exposure to Roundup® and glyphosate.

168.    The defects in Defendant's Roundup® products were substantial and contributing factors in causing Plaintiff's injuries, and, but for Defendant's misconduct and omissions, Plaintiff would not have sustained his injuries.

169.    Had Defendant provided adequate warnings and instructions and properly disclosed and disseminated the risks associated with its Roundup® products, Plaintiff could have avoided the risk of developing injuries as alleged herein and Plaintiff could have obtained alternative herbicides.

170.    As a direct and proximate result of Defendant placing its defective Roundup® products into the stream of commerce, Plaintiff has suffered and continues to suffer severe injuries, and has endured physical pain and discomfort, as well as economic hardship, including considerable financial expenses for medical care and treatment. Plaintiff will continue to incur

these expenses in the future.

## COUNT IV
## NEGLIGENCE

171.    Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

172.    Monsanto, directly or indirectly, caused Roundup® products to be sold, distributed, packaged, labeled, marketed, promoted, and/or used by Plaintiff.

173.    At all times relevant to this litigation, Monsanto had a duty to exercise reasonable care in the design, research, manufacture, marketing, advertisement, supply, promotion, packaging, sale, and distribution of Roundup® products, including the duty to take all reasonable steps necessary to manufacture, promote, and/or sell a product that was not unreasonably dangerous to consumers and users of the product.

174.    At all times relevant to this litigation, Monsanto had a duty to exercise reasonable care in the marketing, advertisement, and sale of the Roundup® products. Monsanto's duty of care owed to consumers and the general public included providing accurate, true, and correct information concerning the risks of using Roundup® and appropriate, complete, and accurate warnings concerning the potential adverse effects of exposure to Roundup®, and, in particular, its active ingredient glyphosate.

175.    At all times relevant to this litigation, Monsanto knew or, in the exercise of reasonable care, should have known of the hazards and dangers of Roundup® and specifically, the carcinogenic properties of the chemical glyphosate.

176.    Accordingly, at all times relevant to this litigation, Monsanto knew or, in the exercise of reasonable care, should have known that use of or exposure to its Roundup® products could cause or be associated with Plaintiff' injuries and/or death and thus created a dangerous and

42

unreasonable risk of injury to the users of these products, including Plaintiff.

177.    Monsanto also knew or, in the exercise of reasonable care, should have known that users and consumers of Roundup® were unaware of the risks and the magnitude of the risks associated with use of and/or exposure to Roundup® and glyphosate-containing products.

178.    As such, Monsanto breached the duty of reasonable care and failed to exercise ordinary care in the design, research, development, manufacture, testing, marketing, supply, promotion, advertisement, packaging, sale, and distribution of its Roundup® products, in that Monsanto manufactured, marketed, promoted, and sold defective herbicides containing the chemical glyphosate, knew or had reason to know of the defects inherent in these products, knew or had reason to know that a user's or consumer's exposure to the products created a significant risk of harm and unreasonably dangerous side effects, and failed to prevent or adequately warn of these risks and injuries and/or death.

179.    Despite an ability and means to investigate, study, and test these products and to provide adequate warnings, Monsanto has failed to do so. Indeed, Monsanto has wrongfully concealed information and has further made false and/or misleading statements concerning the safety and/or exposure to Roundup® and glyphosate.

180.    Monsanto was negligent in the following respects:

    a)    Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing its Roundup® products without thorough and adequate pre- and post-market testing;

    b)    Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing Roundup® while

negligently and/or intentionally concealing and failing to disclose the results of trials, tests, and studies of exposure to glyphosate, and, consequently, the risk of serious harm associated with human use of and exposure to Roundup®;

c)   Failing to undertake sufficient studies and conduct necessary tests to determine whether or not Roundup® products and glyphosate-containing products were safe for their intended use in agriculture and horticulture;

d)   Failing to use reasonable and prudent care in the design, research, manufacture, and development of Roundup® products so as to avoid the risk of serious harm associated with the prevalent use of Roundup®/glyphosate as an herbicide;

e)   Failing to design and manufacture Roundup® products so as to ensure they were at least as safe and effective as other herbicides on the market;

f)    Failing to provide adequate instructions, guidelines, and safety precautions to those persons who Monsanto could reasonably foresee would use and be exposed to its Roundup® products;

g)   Failing to disclose to Plaintiff, users/consumers, and the general public that use of and exposure to Roundup® presented severe risks of cancer and other grave illnesses;

h)   Failing to warn Plaintiff, users/consumers, and the general public that the product's risk of harm was unreasonable and that there were

44

safer and effective alternative herbicides available to Plaintiff and other consumers;

i) Systematically suppressing or downplaying contrary evidence about the risks, incidence, and prevalence of the side effects of Roundup® and glyphosate-containing products;

j)    Representing that its Roundup® products were safe for their intended use when, in fact, Monsanto knew or should have known that the products were not safe for their intended purpose;

k) Declining to make or propose any changes to Roundup® products' labeling or other promotional materials that would alert the consumers and the general public of the risks of Roundup® and glyphosate;

l)    Advertising, marketing, and recommending the use of the Roundup® products, while concealing and failing to disclose or warn of the dangers known by Monsanto to be associated with or caused by the use of or exposure to Roundup® and glyphosate;

m) Continuing to disseminate information to its consumers, which indicate or imply that Monsanto's Roundup® products are not unsafe for use in the agricultural and horticultural industries; and

n)    Continuing the manufacture and sale of its products with the knowledge that the products were unreasonably unsafe and dangerous.

181.    Monsanto knew and/or should have known that it was foreseeable that consumers

such as Plaintiff would suffer injuries and/or death as a result of Monsanto's failure to exercise ordinary care in the manufacturing, marketing, promotion, labeling, distribution, and sale of Roundup®.

182.    Plaintiff did not know the nature and extent of the injuries and/or death that could result from the intended use of and/or exposure to Roundup® or its active ingredient glyphosate.

183.    Monsanto's negligence was the proximate cause of the injuries and/or death, harm, and economic losses that Plaintiff suffered, as described herein.

184.    Monsanto's conduct, as described above, was reckless. Monsanto regularly risked the lives of consumers and users of its products, including Plaintiff, with full knowledge of the dangers of these products. Monsanto has made conscious decisions not to redesign, re-label, warn, or inform the unsuspecting public, including Plaintiff. Monsanto's reckless conduct therefore warrants an award of aggravated or punitive damages.

185.    As a proximate result of Monsanto's wrongful acts and omissions in placing defective Roundup® products into the stream of commerce without adequate warnings of the hazardous and carcinogenic nature of glyphosate, Plaintiff have suffered severe and permanent physical and emotional injuries. Plaintiff have endured pain and suffering and has suffered economic losses (including significant expenses for medical care and treatment) in an amount to be determined.

## COUNT V
## BREACH OF EXPRESS WARRANTY

188.    Plaintiff re-alleges the preceding paragraphs as if fully set forth herein.

187.    At all times relevant to this litigation, Defendant engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting its Roundup® products, which are defective and unreasonably dangerous to consumers, including

46

Plaintiff, thereby placing Roundup® products into the stream of commerce. These actions were under the ultimate control and supervision of Defendant, and their Roundup® products were expected to, and did, reach Plaintiff without any substantial change in their condition.

188.    At all times relevant to this litigation, Defendant expressly represented and warranted to the purchasers of its Roundup® products, by and through statements made by Defendant in labels, publications, package insert, and other written materials intended for consumers and the general public, that its Roundup® products were safe to human health and the environment, effective, fit, and proper for their intended use. Defendant advertised, labeled, marketed, and promoted Roundup® products, representing the quality to consumers and the public in such a way as to induce their purchase or use, thereby making an express warranty that its Roundup® products would conform to the representations.

189.    These express representations included incomplete warnings and instructions that purport, but fail, to include the complete array of risks associated with use of and/or exposure to Roundup® and glyphosate.  Defendant knew or should have known that the risks expressly included in Roundup® warnings and labels did not and do not accurately and adequately set forth the risks of developing the serious injuries complained of herein. Nevertheless, Defendant expressly represented that its Roundup® products were safe  and effective, that they were safe and effective for use by individuals such as Plaintiff, and/or that they were safe and effective as agricultural  herbicides.

190.    The representations about Roundup®, as set forth herein, contained or constituted affirmations of fact or promises made by the seller to the buyer, which related to the goods and became part of the basis of the bargain, creating an express warranty that the goods would conform to the representations.

191.    Defendant placed its Roundup® products into the stream of commerce for sale and recommended their use to consumers and the public without adequately warning of the true risks of developing the injuries associated with the use of and exposure to Roundup® and its active ingredient glyphosate.

192.    Defendant breached these warranties because, among other things, its Roundup® products were defective, dangerous, unfit for use, did not contain labels representing the true and adequate nature of the risk associated with their use, and were not merchantable or safe for their intended, ordinary, and foreseeable use and purpose. Specifically, Defendant breached the warranties in the following ways:

> a.    Defendant represented through its labeling, advertising, and marketing materials that its Roundup® products were safe, and fraudulently withheld and concealed information about the risks of serious injury associated with use of and/or exposure to Roundup® and glyphosate by expressly limiting the risks associated with use and/or exposure within its warnings and labels; and

> b.    Defendant represented that its Roundup® products were safe for use and fraudulently concealed information that demonstrated that glyphosate, the active ingredient in Roundup®, had carcinogenic properties, and that its Roundup® products, therefore, were not safer than alternatives available on the market.

193.    Defendant has sole access to material facts concerning the nature of risks associated with its Roundup® products as expressly stated within its warnings and labels, and Defendant knew that consumers and users such as Plaintiff could not have reasonably discovered that the risks expressly included in Roundup® warnings and labels were inadequate and inaccurate.

194.    Plaintiff had no knowledge of the falsity or incompleteness of Defendant's statements and representations concerning Roundup®, and he relied to his detriment on these statements and representations.

48

195.     Plaintiff used and/or was exposed to the use of Roundup® as researched, developed, designed, tested, formulated, manufactured, inspected, labeled, distributed, packaged, marketed, promoted, sold, or otherwise released into the stream of commerce by Defendant.

196.     Had the warning and labels for Roundup® products accurately and adequately set forth the true risks associated with the use of such products, including Plaintiff's injuries, rather than expressly excluding such information and warranting that the products were safe for their intended use, Plaintiff could have avoided the injuries complained of herein.

197.     As a direct and proximate result of Defendant's wrongful acts and omissions, Plaintiff developed NHL and suffered injuries that are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life, as well as economic hardship, including financial expenses for medical care and treatment.

## COUNT VI
## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY

198.     Plaintiff incorporates by reference all other paragraphs of this Complaint as if fully set forth herein, and further allege:

199.     Upon information and belief, at all times relevant to this litigation, Defendant engaged in the business of testing, developing, designing, formulating, manufacturing, marketing, selling, distributing, and promoting its Roundup® products, which are defective and unreasonably dangerous to users and consumers, including Plaintiff, thereby placing Roundup® products into the stream of commerce.

200.     These actions were under the ultimate control and supervision of Defendant.

201.     Before the time that Plaintiff was exposed to the use of the aforementioned Roundup® products, Defendant impliedly warranted to its consumers and users, including

Plaintiff, that its Roundup® products were of merchantable quality and safe and fit for the use for which they were intended; specifically, as horticultural herbicides.

202.    Defendant, however, failed to disclose that Roundup® has dangerous propensities when used as intended and that the use of and/or exposure to Roundup® and glyphosate containing products carries an increased risk of developing severe injuries, including Plaintiff's injuries.

203.    Upon information and belief, Plaintiff reasonably relied upon the skill, superior knowledge and judgment of Defendant and upon its implied warranties that the Roundup® products were of merchantable quality and fit for their intended purpose or use.

204.    The Roundup® products were expected to reach and did in fact reach consumers and users, including Plaintiff, without substantial change in the condition in which they were manufactured and sold by Defendant. At all times relevant to this litigation, Defendant was aware that consumers and users of its products, including Plaintiff, would use Roundup® products as marketed by Defendant, which is to say that Plaintiff were the foreseeable users of Roundup®.

205.    Defendant intended that its Roundup® products be used in the manner in which Plaintiff in fact used them and Defendant impliedly warranted each product to be of merchantable quality, safe, and fit for this use, despite the fact that Roundup® was not adequately tested or researched.

206.    In reliance upon Defendant's implied warranty, Plaintiff used Roundup® as instructed and labeled and in the foreseeable manner intended, recommended, promoted and marketed by Defendant.

207.    Plaintiff could not have reasonably discovered or known of the risks of serious injury associated with Roundup® or glyphosate.

50

208.     Defendant breached its implied warranty to Plaintiff in that its Roundup® products were not of merchantable quality, safe, or fit for their intended use, or adequately tested. Roundup® has dangerous propensities when used as intended and can cause serious injuries, including those injuries complained of herein.

209.     The harm caused by Defendant's Roundup® products far outweighed their benefit, rendering the products more dangerous than an ordinary consumer or user would expect and more dangerous than alternative products.

210.     As a direct and proximate result of Defendant's wrongful acts and omissions Plaintiff has suffered severe and permanent physical and emotional injuries. Plaintiff has endured pain and suffering, has suffered economic loss (including significant expenses for medical care and treatment) and will continue to incur these expenses in the future.

**COUNT VII UNFAIR AND DECEPTIVE
TRADE PRACTICES**

211.     Plaintiff re-alleges the preceding paragraphs as if fully set forth herein. Upon information and belief, by reason of its conduct as alleged herein, Defendant violated the provisions of Iowa Consumer Frauds Act, Iowa Code § 714H.1, *et. seq* ("the Act") by inducing Plaintiff to use Roundup® through the use of false and/or misleading advertising, representations and statements.

212.     By engaging in the conduct described herein, Defendants violated the Act by, among other things:

   a.   engaging in unfair or deceptive trade practices as defined in this statute by making false and misleading oral and written statements that had the capacity, tendency, or effect of deceiving or misleading consumers.

   b.   engaging in unfair or deceptive trade practices as defined in this statute by making representations that its products had an approval, characteristic, ingredient, use or benefit which they did not have, including but not limited

51

to statements concerning the health consequences of the use of Roundup®.

c. engaging in unfair or deceptive trade practices as defined in this statute by failing to state material facts, the omission of which deceived or tended to deceive, including but not limited to facts relating to the health consequences of the use of Roundup®.

d. engaging in unfair or deceptive trade practices as defined in this statute through deception, fraud, misrepresentation and knowing concealment, suppression and omission of material facts with the intent that consumers rely upon the same in connection with the use and continued use of Roundup®.

214.    As a direct and proximate result of Defendant's violations of the Act, Plaintiff developed NHL and suffered injuries that are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life, as well as economic hardship, including financial expenses for medical care and treatment.

## COUNT VIII
## FRAUD

215.    Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

216.    Monsanto has defrauded the agricultural and gardening communities in general and Plaintiff in particular by misrepresenting the true safety of Roundup® and by failing to disclose known risks of cancer.

217.    Monsanto misrepresented and/or failed to disclose, inter alia, that: glyphosate and its major metabolite aminomethylphosphonic acid ("AMPA") could cause cancer; glyphosate and AMPA are known to be genotoxic in humans and laboratory animals because exposure is known to cause DNA strand breaks (a precursor to cancer); glyphosate and AMPA are known to induce oxidative stress in humans and laboratory animals (a precursor to cancer); glyphosate and AMPA interfere with the aromatic amino acids within the human gut, leading to downstream health

conditions including cancer; exposure to glyphosate and AMPA is causally associated with NHL; and the laboratory tests attesting to the safety of glyphosate were flawed and/or fraudulent.

218.    Due to these misrepresentations and omissions, at all times relevant to this litigation, Roundup® was misbranded under 7 U.S.C. § 136(q) and its distribution within the State of Iowa and around the United States was a violation of 7 U.S.C. § 136(j) and 40 C.F.R. §156.10(a)(5).

219.    When Plaintiff used Roundup® from approximately 1995 through to approximately 2019, neither the labeling on the product nor Monsanto's general promotion warned or disclosed the true safety risks of Roundup® or that the product could cause cancer, as described above. Since the true risk information was known to Monsanto and was not reasonably knowable to reasonable consumers, Plaintiff was unaware of these material facts and/or omissions prior to using the product.

220.    Plaintiff relied on Monsanto's misrepresentations and/or material omissions regarding the safety of Roundup® and its active ingredient glyphosate in deciding whether to use the product. Plaintiff did not know, nor could he reasonably have known, of the misrepresentations and/or material omissions by Monsanto concerning Roundup® and its active ingredient glyphosate.

221.    The misrepresentations and/or material omissions that form the basis of this fraud claim is not limited to statements made on the Roundup® labeling, as defined under federal law, but also involve Monsanto's representations and omissions made as part of its promotion and marketing of Roundup®, including on the internet, television, in print advertisements, etc. Nothing prevented Monsanto from disclosing the truth about the risks associated with Roundup® in its promotional efforts outside of the labeling context, using the forms of media and promotion

Monsanto traditionally used to promote the product's efficacy and benefits.

222.    When Monsanto made the misrepresentations and/or omissions as alleged in this pleading, it did so with the intent of defrauding and deceiving the public in general and with the intent of inducing the public to purchase and use Roundup®.

223.    Monsanto made these misrepresentations and/or material omissions with malicious, fraudulent, and/or oppressive intent toward Plaintiff and the public generally. Monsanto's conduct was willful, wanton, and/or reckless. Monsanto deliberately manufactured, produced, marketed, sold, distributed, merchandized, packaged, promoted and advertised the dangerous and defective herbicide Roundup®. This constitutes an utter, wanton, and conscious disregard of the rights and safety of a large segment of the public including Plaintiff, and by reason thereof, Monsanto, is liable for reckless, willful, and wanton acts and omissions which evidence a total and conscious disregard for the safety of Plaintiff and others which proximately caused the injuries as set forth herein.

224.    Plaintiff suffered grave injuries as a proximate result of Monsanto's fraudulent and deceitful conduct, advertisements, and representations.

**COUNT IX**
**PREMESIS LIABILITY**

225.    Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

226.    In Iowa, property owners must exercise reasonable care to ensure the safety of those persons who enter their property.

227.    The Premises Defendants here breached that duty of care in at least the following ways:

        a. Failing to maintain a safe condition on their properties;

b.  Failing to eliminate known or reasonably knowable hazards;

c.  Failing to eliminate known or reasonably knowable unsafe conditions;

d.  Failing to exercise reasonable care in the maintenance of their premises;

e.  Failing to warn of the dangerous condition.

228.    At all relevant times, Mr. Webb was a lawful visitor upon the Premises Defendants'
properties. His injuries as a result of his consistent and concentrated exposure to the various
Roundup Products was foreseeable, especially considering Mr. Webb was specifically there to
handle Roundup contaminated machinery. At all relevant times, Mr. Webb entered the Premises
Defendants' premises in an appropriate time and manner and under appropriate circumstances.
Further, he occupied areas he was expected to occupy.

229.    It would not have been burdensome upon the Premises Defendants or unreasonable
in any way to require them to repair, correct, or warn of the danger presented by the Roundup
products.

230.    Based upon information and belief, the Premises Defendants knew or should have
known of the danger Roundup presented to his property; knew or reasonably should have known
that the victim—Mr. Webb—would not know about the risk, wouldn't realize its dangers, or would
not be able to protect themselves.

231.    The Premises Defendants failed to protect Mr. Webb from a known risk and that
failure directly resulted in Mr. Webb's injuries.

## PUNITIVE DAMAGES ALLEGATIONS

232.    Plaintiff incorporates by reference each preceding and succeeding paragraph as
though set forth fully at length herein.

233.    Defendants' conduct as alleged herein was done with oppression, fraud, and malice.
Monsanto was fully aware of Roundup®'s safety risks. Nonetheless, Monsanto deliberately

55

E-FILED  2019 DEC 20 4:26 PM WEBSTER - CLERK OF DISTRICT COURT

crafted its label, marketing, and promotion to mislead farmers and consumers.

234.    This was not done by accident or through some justifiable negligence. Rather, Monsanto knew that it could turn a profit by convincing the agricultural industry and the general population that Roundup® was harmless to humans, and that full disclosure of Roundup®'s true risks would limit the amount of money Monsanto would make selling Roundup® in the State of Iowa. This was accomplished not only through its misleading, deceptive, fraudulent and unfair labeling, but also through a comprehensive scheme of selective fraudulent research and testing, misleading advertising, and deceptive omissions as more fully alleged throughout this pleading. Plaintiff was robbed of his right to make an informed decision about whether to use an herbicide, knowing the full risks attendant to that use. Such conduct was done with conscious disregard of Plaintiff's rights.

235.    There is no indication that Monsanto will stop its deceptive, unfair, fraudulent, misleading and unlawful marketing practices unless it is punished and deterred. Accordingly, Plaintiff requests punitive damages against Monsanto for the harms caused to Plaintiff.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in favor of Plaintiff and against Defendant as set forth above, that Plaintiff be awarded compensatory and punitive damages, interest, costs and attorney's fees, and for such other and further relief as the Court may deem just.

## JURY DEMAND

236.    PLAINTIFF DEMANDS A TRIAL BY JURY ON ALL COUNTS.

Respectfully submitted,

DUTTON, DANIELS, HINES, KALKHOFF,
COOK & SWANSON, P.L.C.

BY:     */S/ James H. Cook*
         James H. Cook, AT0001622
        3151 Brockway Road
        P.O. Box 810
        Waterloo, IA 50704
        Phone: (319) 234-4471
        Fax: (319) 234-8029
        Email: jcook@duttonfirm.com

        and

        **FEARS NACHAWATI LAW FIRM**

        Darren P. McDowell*, Texas Bar No. 24025520
        Matthew R. McCarley*, Texas Bar No. 24041426
        Jonathan P. Novak*, Maryland Bar No. 20282
        **FEARS | NACHAWATI, PLLC**
        5473 Blair Road
        Dallas, TX 75231
        Tel. (214) 890-0711
        Fax (214) 890-0712
        dmcdowell@fnlawfirm.com
        mccarley@fnlawfirm.com
        jnovak@fnlawfirm.com

        *To be admitted pro hac vice*

        ***Attorneys for Plaintiff***

57