# EXHIBIT 9

### E. The Release Required of Those Who Accept Any Payments Is Wildly Overbroad.

Class action releases comport with notice when they relate to the claims made on behalf of the class. *Hansberry v. Lee*, 311 U.S. 32, 40 (1940). Here, that claim is that Roundup can cause NHL and, given that class members are only being represented with respect to NHL, that personal injury should be the limit of what is released. *See, e.g.*, *Taylor v. Sturgell*, 553 U.S. 880 (2008) holding there is no "virtual representation" exception to general rule against nonparty claim preclusion, abrogating *Kourtis v. Cameron*, 419 F.3d 989 (9th Cir. 2005).

However, the scope of the mandated release (Exhibit 6) required to be signed by any individual claimant who receives money, including those who get the paltry $5000 accelerated payment, is far broader than most plaintiffs are required to sign after contentious and well-represented litigation. *See* Settlement Agreement, Exhibit 6, Dkt. 12531-2, pp. 192-208. First, while the settlement offers no possible compensation for anything other than NHL, paragraph 8 is so broad that it not only releases any possible tort claim but also any possible contract claims against Monsanto. Paragraph 11 then waives all possible future claims, including an express waiver of California Civil Code Section 1542. Paragraph 12 releases all claims under California's Section 17200 and any comparable law in any other state. In paragraphs 20 and 21 claimants agree to indemnify and hold Monsanto harmless from any possible liens, including agreeing to reimbursement provisions for Monsanto, such as attorneys' fees, with the indemnity to be "construed as broadly as possible."

As if this was not comprehensive enough, every individual release also includes a mandatory non-disparagement clause:

> 27. I will not directly or indirectly make any negative or disparaging statements against Defendant or the Released Persons maligning, ridiculing, defaming, or

> otherwise speaking ill of them, their products or their business affairs, practices, policies, standards, or reputation…

See Settlement Agreement Exhibit 6, Dkt. 12531-2, p. 202 of 266.

While there are many reasons that this may benefit Monsanto, such a provision buried within a class action settlement is quite shocking and unheard of. Essentially, Monsanto is requiring any class member who accepts any money from ever speaking ill about them, particularly to the press. And given the request that the Court approve the release as part of the settlement, and Monsanto presumably only requested it in order to enforce it, Monsanto will likely use this Court's imprimatur to impose silence on unwitting settling class members. That settlement proponents have gone along with this draconian hammer for the mere pittance the proposed settlement offers the class members is equally shocking.

### F. The Mirage of "Free" Legal Representation Presents More Problems Than It Solves.

A key settlement feature trumpeted by the proponents of the settlement is the "Legal Services Program," which would create a team of in-house settlement lawyers to "afford free legal advice" to the class members. *See* Settlement Agreement, § 11.3(a), Dkt. 12531-2, p. 60 of 266. But these lawyers are mistakenly described as "free" when they are actually prepaid from a legal settlement fund which should otherwise go to the injured and needy class members. And in practice, they are likely to do little more than steer claimants deeper down the rabbit hole of the pittances offered in the inadequate proposed settlement. This is because they cannot truly give reasoned advice regarding the prospects of opting out, because they are *barred* by the settlement from "represent[ing]" anyone who opts out of the settlement or who otherwise brings a tort claim against Monsanto." *Id.* at § 11.3(c), p. 61 of 266. Thus, these lawyers, purportedly in place to "advise" Roundup victims in assessing whether to participate in the settlement (or to opt out and