# United States District Court
## District of Massachusetts (Boston)
## CIVIL DOCKET FOR CASE #: 1:21-cv-11375-RGS

Andrews v. Monsanto Company

Assigned to: Judge Richard G. Stearns

Demand: $3,260,000

Cause: 28:1332 Diversity-Product Liability

Date Filed: 08/20/2021

Jury Demand: Plaintiff

Nature of Suit: 365 Personal Inj. Prod. Liability

Jurisdiction: Diversity

**Plaintiff**

**Robert Andrews**                    represented by    **Richard K. Latimer**
Room 205
222 Main Street
Falmouth, MA 02540
508-548-7006
Fax: 508-548-7008
Email: rklaw@meganet.net
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Monsanto Company**

| Date Filed | # | Docket Text |
|---|---|---|
| 08/20/2021 | 1 | COMPLAINT against Monsanto Company Filing fee: $ 402, receipt number 0101-8913402 (Fee Status: Filing Fee paid), filed by Robert Andrews. (Attachments: # 1 Civil Cover Sheet Civil Cover Sheet, # 2 Category Sheet) (Latimer, Richard) (Entered: 08/20/2021) |
| 08/23/2021 | 2 | ELECTRONIC NOTICE of Case Assignment. Judge Richard G. Stearns assigned to case. If the trial Judge issues an Order of Reference of any matter in this case to a Magistrate Judge, the matter will be transmitted to Magistrate Judge M. Page Kelley. (Finn, Mary) (Entered: 08/23/2021) |
| 08/23/2021 | 3 | Summons Issued as to Monsanto Company. **Counsel receiving this notice electronically should download this summons, complete one for each defendant and serve it in accordance with Fed.R.Civ.P. 4 and LR 4.1. Summons will be mailed to plaintiff(s) not receiving notice electronically for completion of service.** (McManus, Caetlin) (Entered: 08/23/2021) |

| **PACER Service Center** |
|---|
| **Transaction Receipt** |

| 09/16/2021 16:25:02 | | | |
|---|---|---|---|
| **PACER Login:** | sh0019sh:2634072:0 | **Client Code:** | 31943.356965 |
| **Description:** | Docket Report | **Search Criteria:** | 1:21-cv-11375-RGS |
| **Billable Pages:** | 1 | **Cost:** | 0.10 |



**null / ALL**
**Transmittal Number: 23776336**
**Date Processed: 09/16/2021**

# Notice of Service of Process

| | |
|---|---|
| **Primary Contact:** | Anne Troupis (Monsanto)<br>Bayer U.S. LLC<br>800 N Lindbergh Blvd<br>Saint Louis, MO 63167-1000 |

| | |
|---|---|
| **Entity:** | Monsanto Company<br>Entity ID Number  2282193 |
| **Entity Served:** | Monsanto Company |
| **Title of Action:** | Andrews, Robert  vs. Monsanto Company |
| **Matter Name/ID:** | Andrews, Robert  vs. Monsanto Company (11564443) |
| **Document(s) Type:** | Summons/Complaint |
| **Nature of Action:** | Product Liability |
| **Court/Agency:** | U.S. District Court, MA |
| **Case/Reference No:** | 1:21-CV-11375-RGS |
| **Jurisdiction Served:** | Massachusetts |
| **Date Served on CSC:** | 09/15/2021 |
| **Answer or Appearance Due:** | 21 Days |
| **Originally Served On:** | CSC |
| **How Served:** | Personal Service |
| Sender Information: | Richard K. Latimer<br>508-548-7006 |

Information contained on this transmittal form is for record keeping, notification and forwarding the attached document(s). It does not constitute a legal opinion. The recipient is responsible for interpreting the documents and taking appropriate action.

**To avoid potential delay, please do not send your response to CSC**

251 Little Falls Drive, Wilmington, Delaware 19808-1674   (888) 690-2882   |   sop@cscglobal.com

# UNITED STATES DISTRICT COURT
#### for the
## DISTRICT OF MASSACHUSETTS

**ROBERT ANDREWS**

*Plaintiff*

v.

**MONSANTO COMPANY**

*Defendant*

Civil Action No.:
**1:21–CV–11375–RGS**

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*

Monsanto Company
800 N. Lindbergh Blvd.
St. Louis, MO 63167

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) —— or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) —— you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure. The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:

Richard K. Latimer
222 Main Street, Suite 204
Falmouth, MA  02540

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

**ROBERT M. FARRELL**

*CLERK OF COURT*

/s/ — Caetlin McManus

*Signature of Clerk or Deputy Clerk*



ISSUED ON 2021–08–23 09:16:22, Clerk USDC DMA

Civil Action No.: **1:21−CV−11375−RGS**

**PROOF OF SERVICE**

***(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))***

This summons for (name of individual and title, if any) _____

was received by me on (date)_____.

☐ I personally served the summons on the individual at (place)_____

_____ on (date)_____ ; or

☐ I left the summons at the individual's residence or usual place of abode with (name)_____

_____, a person of suitable age and discretion who resides there,

on (date) _____ , and mailed a copy to the individual's last known address; or

☐ I served the summons on (name of individual)_____ , who is

designated by law to accept service of process on behalf of (name of organization)_____

_____ on (date) _____; or

☐ I returned the summons unexecuted because_____ ; or

☑ Other (specify) : I served the summons upon Corporation Service Company, as Registered Agent
for Monsanto Company, at 84 State Street, Boston, MA 02109, by hand delivery
on (date) _____

My fees are $ _____ for travel and $_____ for services, for a total of $_____.

I declare under penalty of perjury that this information is true.

_____
Date

_____
*Server's Signature*

_____
*Printed name and title*

_____
*Server's Address*

Additional information regarding attempted service, etc:

## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ROBERT ANDREWS,<br>          Plaintiff<br><br>vs.<br><br>MONSANTO COMPANY,<br>          Defendant | )<br>)<br>)<br>)<br>)     **Civil Action No**<br>)<br>)<br>)<br>) |

## <u>COMPLAINT & JURY DEMAND</u>

The Plaintiff, Robert Andrews, files this Complaint demanding damages against the Monsanto Company, and he alleges the following:

### A.  <u>Parties</u>

1.      The Plaintiff, Robert Andrews, is an adult individual, age 58, who resides in the Town of Plympton, Plymouth County, Massachusetts.

2.      The Defendant Monsanto Company, hereinafter referred to as Monsanto, is a citizen of Delaware, where it is incorporated, and Saint Louis, Missouri, where it has a principal place of business.

### B.  <u>Jurisdiction & Venue</u>

3.      Federal jurisdiction over this action lies in the District of Massachusetts, based on complete diversity of citizenship under 28 U.S.C. § 1391(c), where the Defendant Monsanto is a citizen of the State of Delaware, and the value of Plaintiff's damages from using Monsanto's product, as described below and incurred in Massachusetts, greatly exceeds $75,000.00.

4.      Monsanto is a foreign corporation regularly doing business in Massachusetts, and it is registered as such with the Massachusetts Secretary of State, Entity No. 000722386, in "active" status, with a principal place of business in St. Louis, Missouri, and a registered agent located in the City of Boston, Massachusetts.

5.     Monsanto knows that its products are and at all times mentioned below were sold throughout Massachusetts, and it had knowingly caused its product, through marketing and distribution, to be sold to residents of Massachusetts such as the Plaintiff.

6.     By reason of knowingly marketing and distributing its products in the Commonwealth, Monsanto has at all times mentioned below maintained sufficient contacts with Massachusetts such that the Court's exercise of personal jurisdiction in this action does not offend traditional principles of fair play and substantial justice.

7.     The United States District Court, District of Massachusetts, also has supplemental jurisdiction over this action pursuant to 28 U.S.C. §1367.

8.     Venue lies in the United States District Court of Massachusetts, at Boston, where the Plaintiff is, and at all times mentioned below has been, a resident of the Town of Plympton, Plymouth County, Massachusetts.

### C.     Timeliness of Complaint

9.     The Plaintiff, Robert Andrews, had at all times mentioned below relied on Monsanto's advertising and marketing of its Roundup Weed Killer, while using it as directed in his landscaping business, and he had no way of knowing, through the exercise of reasonable diligence, about the risk of serious illness associated with the use of and exposure to Roundup, nor about its causal effect on his illness, until he first learned of such risks on or about August 1, 2019, through broadcast media.

10.     Plaintiff did not and could not have discovered through the exercise of reasonable diligence, within the period of any applicable statute of limitations, the causal nexus between his use of Roundup weed killer and the diagnosis of his illness.

11.     Plaintiff did not discover, nor did he know of any facts that would cause a reasonable person to suspect the risks associated with exposure to roundup within the period of any applicable

statute of limitations, nor would a reasonable person in his position, trusting in Monsanto's goodwill and relying on Monsanto's marketing of the product, have discovered through reasonable and diligent investigation that the toxic chemicals in Roundup were carcinogenic.

12.     By reason of the matters stated in Paragraphs 1 through 11, above, all applicable statutes of limitations have been tolled by operation of the discovery rule with respect to Plaintiffs' claims, and all applicable statutes of limitations have also been tolled by Monsanto's knowing and active fraudulent concealment and denial of the carcinogenic toxicity of Glyphosate, as stated below.

### D.     Statement Of Facts

13.     In 1970, the Defendant Monsanto Company discovered the herbicidal properties of glyphosate and began marketing it in products in 1974 under the trademarked brand name Roundup, as a non-selective herbicide used to kill weeds and other unwanted vegetation. By 2001, glyphosate had become the most-used active ingredient in herbicides used by American landscapers, arborists and farmers, with 85–90 millions of pounds used annually. That number grew to 185 million pounds by 2007. As of 2013, glyphosate was the world's most widely used herbicide, and Monsanto is the world's leading producer of glyphosate with its  products registered in 130 countries including the United States.

### 1.     Monsanto's Fraudulent & Deceptive Marketing of Roundup

14.     Monsanto has at all times relevant advertised and marketed Roundup as a safe, non-toxic herbicide, with ads making representations such as:

Roundup biodegrades into naturally occurring elements;

Glyphosate is less toxic to rats than table salt following acute oral ingestion;

Glyphosate's safety margin is much greater than required. It has over a 1,000-fold safety margin in food and over a 700-fold safety margin for workers who manufacture it or use it;

You can feel good about using herbicides by Monsanto. They carry a toxicity category rating of 'practically non-toxic' as it pertains to mammals, birds and fish; and

3

> Roundup can be used where kids and pets will play and breaks down into natural material (depicting a man and a dog on the ground in an area where Roundup had recently been applied).

15.     Such claims and others made by Monsanto in its advertising and marketing of Roundup were knowingly deceptive and/or false, and were intended to induce professional landscapers and arborists like the Plaintiff to use Roundup in their businesses, those most likely to purchase and use Roundup on a regular daily basis and thereby incur the highest level of exposure to glyphosate and its toxic effects.

16.     Monsanto's advertising and marketing of Roundup has at all times been directed to landscape and arborist professionals with claims such as:

> Remember that environmentally friendly Roundup herbicide is biodegradable. It won't build up in the soil so you can use Roundup with confidence along *customers*' driveways, sidewalks and fences; and

> Remember that versatile Roundup herbicide stays where you put it. That means there's no washing or leaching to harm *customers*' shrubs or other desirable vegetation.

(Emphases are added).

17.     Knowing and with reason to know of glyphosate's toxicity, Monsanto has consistently and falsely represented the safety of its Roundup products and, through its misrepresentations and material omissions, actively concealed from purchasers and users of the product, including the Plaintiff Robert Andrews, the true risks associated with Roundup and glyphosate.

### (a)     Monsanto's Knowledge of Glyphosate's Toxicity

18.     In November 1996, Monsanto entered into an Assurance of Discontinuance with the New York Attorney General in which it agreed, *inter alia*, "to cease and desist from publishing or broadcasting any advertisements [in New York] that represent, directly or by implication" that:

> its glyphosate-containing pesticide products or any component thereof are safe, non-toxic, harmless or free from risk;

4

Glyphosate-containing pesticide products or any component thereof are safer or less toxic than common consumer products other than herbicides; and

its glyphosate-containing products or any component thereof might be classified as "practically non-toxic."

These terms were agreed to as recorded in a document titled Attorney General of the State of New York, In the Matter of Monsanto Company, Assurance of Discontinuance Pursuant to Executive Law § 63(15) (Nov. 1996).

19.     Monsanto did not thereafter alter its advertising or marketing as to the alleged safety of Roundup in Massachusetts or in any state other than New York, and it continued to represent Roundup as safe to consumers in Massachusetts, including the Plaintiff Robert Andrews, intending that such representations be relied upon for the purchase and use of Roundup.

20.     In March, 2015, the International Agency for Research on Cancer (IARC), an agency of the World Health Organization (WHO), issued an evaluation of several herbicides, including glyphosate. That evaluation was based, in part, on studies of exposures to glyphosate in several countries around the world, and it traces the health implications from exposure to glyphosate since 2001.

21.     IARC's working group based its evaluation, determining after a one-year comprehensive review of human, animal and DNA studies, that glyphosate, as contained in Monsanto's Roundup herbicide, is a Class 2A "probable carcinogen."

22.     The IARC Working Group classified glyphosate as a Group 2A herbicide, which means that it is probably carcinogenic to humans. The IARC Working Group concluded that the cancers most associated with glyphosate exposure are non-Hodgkin lymphoma and other haematopoietic cancers, including lymphocytic lymphoma/chronic lymphocytic leukemia, B-cell lymphoma, and multiple myeloma. The IARC evaluation confirms that glyphosate is toxic to humans.

23. The IARC's classification of glyphosate as a possible carcinogen was based on and/or consistent with peer reviewed research from academic, governmental and other non-industry sources, of which Monsanto knew and should have known, going back to the 1980s.

### (i) Epidemiological Studies

24. Monsanto knew of, and should have known of surveys conducted between 2003 and 2008 demonstrating a higher incidence of certain cancers, including among farmers and others with prolonged exposure to glyphosate and Roundup's glyphosate formula, both as against the use of other herbicides and against the incidence among control groups surveyed.

25. In 1999, Swedish scientists Lennart Hardell and Mikael Eriksson determined that non-Hodgkin's lymphoma (NHL) is linked to exposure to a range of pesticides and herbicides, including glyphosate. Their peer-reviewed research found an increased incidence of hepatocellular carcinoma, leukemia, and lymphoma in one study on mice, and in culture of human lymphocytes, concluding that, glyphosate deserves further epidemiologic studies. "A Case Control Study of Non-Hodgkin Lymphoma and Exposure to Pesticides," Cancer, Vol. 85, Issue 6, pp. 1353-1360 (March 15, 1999).

26. In 2002, Hardell and Eriksson published the results of two case controlled studies of pesticides as a risk factor of Non-Hodgkins Lymphoma (NHL) and hairy-cell leukemia, finding that glyphosate had the highest correlation with NHL among all herbicide studies. "Exposure to Pesticides as Risk Factor for Non-Hodgkin's Lymphoma and Hairy Cell Leukemia: Pooled Analysis of Two Swedish Case-control Studies," Journal Leukemia & Lymphoma, Vol. 43, Issue 5, pp. 1043-1049 (2002).

27. In 2003, A.J. De Roos, et al., published results of a study examining the pooled data of midwestern farmers, focusing on pesticides and herbicides as potential risk factors for NHL, controlled for potential confounders, which found a relationship between increased NHL incidence

6

and glyphosate. They referred to a 1990 study across a large region of Canada by Wigle, *et al.,* Nat'l Cancer Inst., Vol. 82, pp. 575-582 (1990), finding increased risk of NHL associated with glyphosate use that increased by the number of days used per year and other findings which provided impetus for further investigation into the potential health effects of glyphosate. "Assessment of Multiple Pesticides as Risk Factors for Non-Hodgkin's Lymphoma Among Men." Occupational & Environmental Medicine, Vol. 60, Issue 9 (2003).

28.     In 2008, Eriksson, Hardell, *et al.,* published a population based case-control study of exposure to various pesticides as a risk factor for Non-Hodgkins Lymphoma (NHL), consistent with previous studies finding an association between glyphosate and NHL. "Pesticide Exposure as Risk factor for Non-Hodgkin Lymphoma Including Histopathological Subgroup Analysis," International Journal of Cancer, Vol. 123, Issue 7, pp. 1657-1663 (Oct., 2008).

### (ii)     Mechanistic Biochemical Studies

29.     Several independent peer reviewed biochemical studies reported findings that the specific glyphosate formulations found in Roundup products, including the surfactant polyoxyethylene amine (POEA), making Roundup more dangerous and toxic than glyphosate alone, including Martinez, et al. "Oral and Pulmonary Toxicology of the Surfactant Used in Roundup herbicide," Proceedings of the Western Pharmacology Society, Vol. 34, 43-46 (1991).

30.     In 1997, Chris Clements published a study finding that tadpoles exposed to Roundup showed significant DNA damage when compared with unexposed control animals. "Genotoxicity of Select Herbicides in Rana Catesbeiana Tadpoles Using the Alkaline Single-Cell Gel DNA Electrophoresis (Comet) Assay."

31.     In 2002, Julie Marc, *et al.* published a study demonstrating that Monsanto's Roundup caused delays in the cell cycles of sea urchins, while the same concentrations of glysophate alone proved ineffective and did not alter cell cycles. "Pesticide Roundup Provokes Cell

7

Division Dysfunction at the Level of CDK1/Cyclin B Activation," 15 *Chemical Research in Toxicology*, 326-331 (2002).

32.     In 2004, Julie Marc, *et al.,* published a study demonstrating a molecular link between glyphosate- based products and cell cycle dysregulation, finding that "cell-cycle dysregulation is a hallmark of tumor cells and human cancer, where failure in the cell-cycle checkpoints leads to genomic instability and subsequent development of cancers from the initial affected cell" and, further, where "cell cycle disorders such as cancer result from dysfunction of unique cell" it was important to evaluate the threshold dose of glyphosate affecting cells. "Glyphosate-based pesticides affect cell cycle regulation," Biology of the Cell, Vol. 9, Issue 3 (2004).

33.     Monsanto's labeling for Roundup weed killer lists active ingredients as 2% glyphosate, isopropylamine, and 2% pelargonic acid and related fatty acids, with unspecified "other ingredients" listed at 96%. One of the unspecified "other ingredients" is polyoxyethylene amine (POEA), a surfactant mixture that is included in Roundup to enhance uptake of the active ingredient  glyphosate across the waxy layers and membranes of plants.

34.     In 2005, Francisco Peixoto published a study showing that Roundup's effects on rat liver mitochondria are much more toxic and harmful than the same concentrations of glyphosate alone, indicating that the harmful effects of Roundup on mitochondrial bioenergetics could not be exclusively attributed to glyphosate and could be the result of other chemicals, namely the surfactant POEA, or alternatively due to the possible synergy between glyphosate and Roundup formulation products. "Comparative Effects of the Roundup and Glyphosate on Mitochondrial Oxidative Phosphorylation," 61 Chemosphere, 1115, 1122 (2005).

35.     In 2009, Nora Benachour and Gilles-Éric Séralini published a biochemical study of the effects of Roundup on human umbilical, embryonic, and placental cells, using a concentration below agricultural levels, similar to the low levels or residues found in food crops, finding that

8

purportedly inert ingredients in Roundup, such as POEA, increase human cell permeability and thereby amplify the toxicity of glyphosate alone. "Glyphosate Formulations Induce Apoptosis and Necrosis in Human Umbilical, Embryotic, and Placental Cells," 22 Chemical Research in Toxicology, 97-105 (2009).

36.     The study recommended that determinations of glyphosate toxicity must take into account the presence of adjuvants, the chemicals used in formulation of the complete pesticide, where the adjuvants in Roundup are not inert, causing it to be more toxic than glyphosate alone.

### (b)   Monsanto's Failure to Warn and Fraudulent Marketing of Roundup

37.     Monsanto knew and should have known, beginning as early as the 1990s, of the independent, peer reviewed epidemiological studies associating glyphosate with increased levels of cancer and the mechanistic biochemical testing demonstrating the toxic effects of glyphosate on both human and animal tissue.

38.     Based on such actual and imputed knowledge, Monsanto had a duty of reasonable care to warn purchasers of Roundup of its potentially carcinogenic properties, by labelling, by printed product information included with packaging and by disclaimers in its advertising and marketing in magazines, on television, on radio and through other media.

39.     Despite the substantial scientific evidence that glyphosate is carcinogenic, Monsanto failed to warn purchasers of Roundup of such risk in its labeling, packaging, product literature and media marketing.

40.     Instead of reformulating Roundup or placing warnings of the cancer risk prominently on product labels and on packaging, Monsanto engaged in a decades long campaign to protect the brand, with little or no regard for public health and safety, through marketing that denied glyphosate is carcinogenic, manipulation of public media to discredit research finding glyphosate to be carcinogenic, disparaging independent and academic researchers who found glyphosate

9

and/or Roundup's glyphosate formula to be carcinogenic, lobbying regulatory agencies, including the U.S. Environmental Protection Agency (EPA) to stifle or reject independent research finding Roundup's glyphosate formula to be carcinogenic, lobbying EPA reviewers to reject findings by other agencies including the IARC and WHO that glyphosate is a carcinogen and disparaging those agencies in public media, paying industry friendly researchers to generate fraudulent scientific research finding that glyphosate is not carcinogenic, authoring "research" favorable to Roundup and paying purportedly independent researchers to edit and sign, and making payments to purportedly independent members of a scientific review board during a  periodic EPA re-registration of Roundup products in 2015.

### (c)   Monsanto's Continued False Marketing Based On Roundup's Safety

41.    Instead of warning purchasers and users of Roundup's toxicity, Monsanto continued to issue broad and sweeping statements suggesting that Roundup was, and is, safer than ordinary household items such as table salt, despite a paucity of impartial scientific support for the accuracy and validity of those claims and contrary to the great weight of independent epidemiological studies and mechanistic biochemical research.

42.    Monsanto's continued marketing claims as to Roundup's safety were made with both the knowledge of its falsity and the intent of inducing the general public, and the agricultural community and landscapers/arborists like the Plaintiff. to purchase and use Roundup and thereby maintain the value of its patents on glyphosate, the goodwill it had generated for the Roundup brand and profits.

### (i)   Monsanto's Solicitation Of Fraudulent Research As To Glyphosate's Safety

43.    The formulation, manufacture, distribution and sale of herbicides, such as Roundup, are regulated under the Federal Insecticide, Fungicide, and Rodenticide Act (FIFRA), 7 U.S.C. §136 *et seq.*, which requires that pesticides be registered with the United States Environmental Protection Agency  (EPA) prior to distribution, sale, or use, in the interest of public health and safety

44.     The registration of herbicides under FIFRA involves a variety of tests, as required by the EPA, to evaluate a product's potential for harm to humans and other non-target organisms through exposure to the product, and for other adverse effects on the environment. The EPA does not conduct such health and safety testing, nor does Massachusetts or any other state in which the product is registered, but instead relies on product testing required of the manufacturer.

45.     Registration by the EPA is not an assurance or finding of safety, nor does the EPA determine that a product is safe. Registration means only that use of the product in accordance with the product's labeling "will not generally cause unreasonable adverse effects on the environment." 7 U.S.C. §136(a)(c)(5)(D). That determination is based on the product testing performed for and submitted for review by the applicant.

46.     EPA review and approval is not based solely on evaluation of the health and environmental risks indicated for use of a pesticide or herbicide product, but also includes a cost-benefit analysis as to "unreasonable risks" taking account of the "*economic*, social and environmental costs and benefits" of its use when making a determination whether a product should be allowed to enter or continue in the stream of interstate commerce. 7 U.S.C. §136(bb), emphasis supplied.

47.     Monsanto registered and introduced Roundup herbicide as "MON 2139" in 1974, which contained the active ingredient glyphosate, as the isopropylamine salt, water and the surfactant POEA. Based on the EPA approval, Monsanto subsequently registered Roundup herbicide with the Commonwealth of Massachusetts Department of Agriculture, Pesticide Board Sub-committee, for distribution and sale locally, pursuant to M.G.L. c.132B.

48.     The required testing procured by Monsanto for registration with the EPA included a study performed by Industrial Bio-Tech Laboratories (IBT) which purported to perform 30 or so tests on glyphosate and glyphosate formulated products, including 11 of the 19 chronic toxicology studies required for registration with the EPA.

11

49.     In 1976 the United States Food & Drug Administration (FDA) reviewed the testing done

by IBT and discovered significant discrepancies between the raw data relating to the  toxicology

of glyphosate and the final report, finding that the reported results were invalid.  An EPA reviewer

also found "routine falsification" of data by IBT, questioning the scientific integrity of the studies

performed for Monsanto, and three top IBT executives were convicted of fraud in1983.

50.     In 1985, after an EPA review had classified glyphosate as being possibly carcinogenic to

humans (Group C) Monsanto exerted pressure on  EPA officials to change its classification, which

resulted in the EPA's reclassification of glyphosate to Group E, meaning "evidence of non-

carcinogenicity in humans." At that time, the EPA stated that  "[i]t should be emphasized, however,

that designation of an agent in Group E is based on the available evidence at the time of evaluation

and should not be interpreted as a definitive conclusion that the agent will not be a carcinogen

under any circumstances."

51.     As a 1993 EPA re-registration was approaching, Monsanto hired Craven Laboratories

(Craven) in 1990 to perform pesticide and herbicide studies, including several studies on Roundup.

In March,1991, the EPA announced an investigation of Craven for "allegedly falsifying test data

used by chemical firms to win EPA approval of pesticides," which led to indictments of the

laboratory owner and several employees.

52.     Despite such scientific fraud by Monsanto, the EPA renewed its registration of its

glyphosate products under the statutory cost/benefit analysis, after reviewing other studies,

finding that continued use of glyphosate, in accordance with label directions, would "not

pose *unreasonable* risks or adverse effects to humans or the environment." Emphasis is added.

53.     Label directions for Roundup sold at retail only include warnings to avoid contact with the

eyes and not to allow runoff containing Roundup to enter storm drains, thus acknowledging that

using Roundup does involve some risk to human and environmental safety, while failing to

warn of its far more dangerous carcinogenic potential through misleading indirection and
omission of the product's known carcinogenic risks.

54.     That deceptive purpose is confirmed in a March 24, 2015, strategic memo titled, "IARC
FOLLOW UP- Demonstrate Safety of Glyphosate," which recommends, *inter alia*: "General
Safety of Glyphosate - explanation of the types of assessments done beyond carcinogenicity and
how 'safe' glyphosate is. *Only potential issue is reversible eye and skin irritation* of formulations.
(Donna Farmer working on this)," emphasis added.

55.     In 2015, the EPA began a process of re-evaluating all pesticides through a Congressionally-
mandated "re-registration," under 7 U.S.C. § 136a-l.  To re-evaluate these pesticides, the EPA
required completion of additional tests and submission of data for agency review and evaluation.

56.     The EPA had planned to release its preliminary risk assessment of glyphosate and
Roundup no later than July 2015, but delayed releasing its completed review, pending
further review, based on findings by the World Health Organization (WHO) that glyphosate
is a "probable carcinogen" as demonstrated by mechanistic biochemical evidence of
carcinogenicity in humans and animals.

57.     In the years preceding the 2015 EPA re-registration, Monsanto had repeatedly interceded
with researchers asking that they alter findings indicating Roundup's carcinogenicity and/or sign
off on research papers ghostwritten for them by Monsanto staff, with knowledge that the Roundup
formulation with POEA as a surfactant was considered more carcinogenic than glyphosate alone.

58.     In 1999, Monsanto retained James Parry, Ph.D., a highly respected genetic toxicologist
to review research as to Roundup's potential toxicity, who conducted his review under a signed
confidentiality agreement.  Dr. Parry concluded on his evaluation of four studies finding that
glyphosate is capable of producing genotoxicity both in vivo and in vitro by a mechanism based
upon the production of oxidative damage.

13

59.     On 08/31/1999, Monsanto employee Steven J. Wratten e-mailed several colleagues questioning whether Dr. Parry had ever worked with industry on this sort of project before, complaining that it would be "hard to circulate this around to anyone as supporting information" and "I do not see that he has stuck his neck out on anything at all controversial, and therefore, there is little value in the write-up as written that could be useful. Hope it didn't cost much. Perhaps this is too harsh, and I don't know what your proposal to him was, but I guess I would expect more than this of a Professor."

60.     In an e-mail of 09/02/1999, Monsanto Senior Toxicologist Donna Farmer, Ph. D, replied, expressing concern about Dr. Parry's report, not about its implications for public health and safety, but only for the brand, saying: "One option.. .1 agree we need someone else to interface with Perry (sic) ... right now the only person I think that can dig us out of this 'genotox hole' is the Good Dr. Kier...."

61.     On or about 09/16/1999, then Monsanto Regulatory Product Safety Assessment Lead William Heydens sent an e-mail to Monsanto colleagues about the Parry report on glyphosate. Heydens wrote: "We want to find/develop someone who is comfortable with the genetox profile of glyphosate/Roundup and who can be influential with regulators and Scientific Outreach operations when genetox issues arise. My read is that Parry is not currently such a person, and it would take quite some time and $$$/studies to get him there. We simply aren't going to do the studies Parry suggests."

62.     Before and after the March 2015 IARC finding of possible carcinogenic toxicity, internal corporate documents show that Monsanto asked scientists to co-sign safety studies focusing on glyphosate prepared by its own in-house researchers. In a 02/19/2015 e-mail from William Heyden to Dr. Donna Farmer, Heyden suggested cutting costs by ghost-writing research papers for consultants to sign, stating: "[a]n option would be to add Greim and Kier or Kirkland to have

14

their names on the publication, but we would be keeping the cost down by us doing the writing and they would just edit & sign their names so to speak.  Recall that is how we handled Williams Kroes & Munro, 2000."

63.      On or about 08/19/2008, Monsanto toxicologist Charles Healy, M.D., e-mailed colleagues Donna Farmer, Ph.D. and David Saltimiras, Ph. D., asking them to provide a peer review of a study he had been commissioned to review, saying: "you two would be the reviewers in fact and I would then collate your comments and be the reviewer of record." Dr. Healy was violating basic standards of the peer review process by asking his Monsanto colleagues to review a study observing the cytotoxic effects of glyphosate in which they all had vested interests.

64.      On or about 11/18/2010, Monsanto toxicologist Donna Farmer, Ph. D., informed colleague John DeSesso that she "added a section in genotox from the Gasnier study …see a attached a critique we did that I took that from. Am working on a section for gasiner (sic) in the mechanistic section. Also we cut and pasted in summaries of the POEA surfactant studies." The attachment was a draft of the Williams et. al. study with significant edits by Dr. Farmer demonstrating Monsanto's policy of covert manipulation of available scientific data on glyphosate, where researchers reading this published and peer-reviewed article would be unaware that the data was furnished by a biased contributor  with a strong financial interest in the study's conclusion as to glyphosate's alleged safety.

65.      On 02/23/2015, Monsanto public relations executive Eric Sachs e-mailed Dr. Henry Miller, a Forbes contributor and Stanford Hoover Institute fellow, soliciting him to write a column favorable to glyphosate, saying: "Are you interested in writing a column on this topic? Ideally, your article would precede the IARC decision. Why not set the table with the weight of

scientific evidence before IARC convenes? Then, regardless of what they do, your article will set the stage for a science-based response."

66.     Mr. Sachs then informed his Monsanto colleagues: "Henry agreed to author an article on Forbes.com. John will work with a team internally to provide a draft and Henry will edit/add to make it his own."  This appears to be what Mr. Wratten expected of professors who were hired by Monsanto to conduct product safety reviews of Roundup.

67.     On or about 3/14/2017 Monsanto's Crop Protection Regulatory Affairs Lead  Christophe Gustin e-mailed colleagues reporting how he co-wrote a manuscript on glyphosate genotoxicity literature with Larry Kier, a purportedly independent Monsanto consultant who was paid "9k$ (approved by the board)," i.e. $9,000.00.  The email also details how adding British scientist David Kirkland to the study would "add credibility," for an additional "£14,000 (pounds Stirling)," which he characterized as a "fair investment."

68.     Between 08/06/2015 and 08/14/2015, Monsanto toxicologist Donna Farmer, Ph.D., e-mailed colleagues about paying members of the purportedly independent EPA Expert Panel reviewing Roundup for re-registration.  She wrote: "We have another consulting doing the same thing that John Acquavella is doing for the epidemiology area... Larry Kier is facilitating the gentox area of the expert, panel. We have had a contract with Larry Kier before. How do we get this set up for Larry so that he too can be paid."

### (ii)     Monsanto's Suppression Of and Political  & Media Attacks On Research and Findings Evidencing Glyphosate's Carcinogenic Risks

69.     In an e-mail on 4/10/2001, Monsanto Regulatory Product Safety Assessment Lead William Heydens expressed concern over Dr. James Parry's request to evaluate Propachlor, an herbicide that Monsanto holds the patent on.  Monsanto's Toxicology Director, Europe/Africa Mark Martens suggested that one of the advantages of letting Parry test Propachlor is it would

"keep prof Parry happy which will make him a good proponent of glyphosate." Heydens

disagreed, saying: "Please don't do anything until we discuss this. *Data generated by academics*

*has always been a major concern for us in the defense of our products.*" Emphasis is added.

70.    In e-mail correspondence between 03/29/2002 and 04/02/2002 among several Monsanto

personnel regarding a Monsanto study on the dermal absorption of the formulated Roundup

product as precipitated by the surfactant (TNO Study), Dr. Heydens expressed concerns with

continuing such studies: "My primary concern is with the glyphosate in terms of the potential for

this work to blow Roundup risk evaluations (getting a much higher dermal penetration than

we've ever seen before)."

71.    The results of the TNO study show "in vitro dermal penetration of glyphosate [with

surfactant] through rat skin [to be] between 5 and 10%," but lower than 1.5% "in the absence of

surfactants[.]" This scientific data  relates to the effects of the formulated product, i.e.

Roundup, versus the effects of glyphosate alone, and it directly contradicts Monsanto's

marketing claims that Roundup has a low absorption rate and breaks down quickly, with

no harm to users and others exposed to the product.

72.    As the result of lobbying by Monsanto employees during the 2015 re-registration process,

the EPA examined only glyphosate, and expressly excluded studies that used the formulation, the

substance Plaintiffs' actually used in the product being re-registered, causing the EPA analysis to

be improperly and deceptively limited. The TNO study was never provided to the EPA or to

European regulatory officials.

73.    In an April 2002 e-mail exchange between Monsanto's Product Safety Assessment Strategy

Lead William Heydens, Ph. D., and Senior Toxicologist Donna Farmer, Ph.D., the issue of POEA

was discussed and strategized.  Dr. Farmer stated that: "[t]he interest point is glyphosate all

17

basicially [sic] had no effect the formulated product did – does this point us to the coformulants – sufactants? [sic]" Dr. Heydens responds, after discussing with Monsanto consultant John Desesso, that "we are in pretty good shape with glyphosate but vulnerable with surfactants. . . What I've been hearing from you is that this continues to be the case with these studies – Glyphosate is OK but the formulated product (and thus the surfactant) does the damage."

74.     In a November 2003 e-mail exchange between Dr. Farmer and Sekhar Natarajan, Chairman of Monsanto India, Ltd., discussing the potential adverse effects of the formulated Roundup product, Dr. Farmer stated: "you cannot say that Roundup is not a carcinogen…we have not done the necessary testing on the formulation to make that statement."

75.     Monsanto had always marketed Roundup as being safe based on the way glyphosate was postulated to work, as laid out in public relations campaigns and industry friendly published research, based on a singular mechanism called the shikimate pathway through which glyphosate attacked a plant enzyme called 5-enolpyruvylshikimate-3-phosphate synthase (EPSPS) which killed the targeted plants.  Since EPSPS is not found in humans or animals, Monsanto promoted Roundup as safe, claiming it was impossible for the active ingredient, glyphosate, to damage human or animal tissue.

76.     Being aware after 2002 that Roundup's formulation, the product design combining glyphosate with POEA, was potentially carcinogenic, Monsanto continued to market Roundup based on the purported safety of glyphosate alone, as the active ingredient, and it continued to rely on research finding glyphosate alone to be non-carcinogenic with little or no toxicity to humans and animals.  Such marketing was inherently and intentionally deceptive.

77.     In August 2013, after Professor Gilles-Éric Séralini had a 2012 study published in the journal Food and Chemical Toxicology documenting a causal relation between exposure to glyphosate and cancer in rats, Monsanto toxicologist David Saltimiras, Ph. D., submitted a

18

"Business Performance" report taking credit for facilitating numerous "third party expert letters to the editor" critical of the Séralini study and for having "leveraged my relationship" with the Editor in Chief of the journal as the single point of contact between Monsanto and the journal. As a consequence, the Séralini study was withdrawn from the publication.

78.     Other researchers, meanwhile, were publishing studies indicating that glyphosate itself was in fact harmful to humans, focusing on non-carcinogenic toxic effects of glyphosate. They included Don Huber, Ph.D., professor of plant pathology at Perdue University, environmental scientist Anthony Samsel, Ph.D., of ADL, Cambridge, MA,  biophysicist Stephanie Seneff, Ph.D., of M.I.T. and plant physiologist Thierry Vrain, Ph. D., former  director of biotechnology at the Pacific Agri-Food Research Center in British Columbia.

79.     The focus of these researchers was how glyphosate does not in fact break down in the soil as Monsanto claimed, but in fact remains in plant tissue and is ingested by animals and humans where it interferes with enzymes other than EPSPS, such as those found in the liver for detoxifying ingested substances.   Dr. Vrain's research suggests that this is the real problem with genetically engineered plants which must be made "Roundup ready."  Monsanto's response to these independent academics was to marshal industry friendly researchers to do studies and reviews to discredit their independent findings and impugn their credentials.

80.     Monsanto also pursued that same strategy preceding and during the 2015 EPA re-registration in an effort to discredit the IARC and WHO determinations that glyphosate is carcinogenic.   Monsanto responded to the IARC findings by attacking the IARC and its researchers politically and professionally, with lobbying to strip IARC of its U.S. funding.

81.     As part of that strategy, The American Chemistry Council, an industry organization of which Monsanto is a  member, formed a front group called Campaign for Accuracy in Public Health Research, for the express purposes of discrediting the IARC and reforming the IARC

Monographs Program, which evaluates and determines the carcinogenicity of chemicals, to be more industry oriented.

82.     In an e-mail exchange between 02/18/2009 and 02/22/2009, Monsanto's Global Crop Protection Regulatory Affairs Strategy Lead Richard Garnett, Ph. D. wrote about strategies for getting a favorable regulatory assessment of Roundup saying: "Cannot win the battle on science alone (40% science : 60% politics) – need an experimental front, supported by a critical review of the literature, and a communication campaign to promote the message, with the stated goal that "the regulatory authority must have no doubts" about the safety of glyphosate.

83.     In an e-mail exchange between 03/20/2013 and 03/29/2013, Monsanto's Team Lead, Surfactant Sci and Formulation, Gary Klopf, wrote to one of the two main manufacturers of surfactants, Azko Nobel, pressuring Azko Nobel to take a Prop 65 warning label off its surfactant material safety data sheets, so that Monsanto could avoid placing a Prop 65 warning on Roundup.

84.     Prop 65 refers to a California law, The Safe Drinking Water and Toxic Enforcement Act of 1986, which requires warnings on all consumer products containing compounds that may cause cancer, birth defects or reproductive harm, and Dr. Klopf was expressly soliciting Azko Nobel to violate a California consumer protection law in order to enable Monsanto to violate that law by selling deceptively labeled Roundup products in California.

85.     On or about 02/23/2015, a chart prepared by a "team" of Monsanto employees, led by Jen Listello and including, *inter alia*, Richard Garnett, Bill Heydens and Dan Jenkins, set out action items for before and after the anticipated IARC report that glyphosate is carcinogenic, in a comprehensive effort to discredit the IARC findings and the IARC itself, targeting the scientific community, regulatory agencies, the industry, the media and the general public.

86.     The document, titled "Glyphosate: IARC," stated in an introduction that it was possible the IARC decision "will impact future regulatory decision making" and "could further delay

20

the U.S. EPA review." Among the action items specified in the document were:

Create a blog post reiterating that "gly not carcinogen" *via* tweets";

"Outreach to EPA / IARC participants," to ensure "awareness" of scientific studies favorable to Monsanto;

"Engage with experts to plan for publications and other activities in case IARC classification is unfavorable";

"Outreach to key stakeholders" to "(n)eutralize impact of decision / gain active support"; and

"Outreach to ag media" to ensure Monsanto's point of view in coverage.

87.     An Attachment A was titled "Preparedness and Engagement Plan for IARC Carcinogen Rating of Glyphosate," which included action items for a target audience that included "IARC Panelists and Observers", "Regulators", "Stakeholders" and "Farmer Customers" for stated objectives that included: "Protect the reputation and FTO of Roundup by communicating the safety of glyphosate."

88.     The action items for pre-release of the IARC report set out on Attachment A included specific "Strategies / Tactics" such as:

Amplification of Scientific Studies

• Support the development of three new papers on glyphosate focused on epidemiology and toxicology

• Work with RPSA and Strategic Communications to amplify existing studies and new papers

    o Authors work directly with scientific journals to issue alerts and news releases on new bodies of work

    o RPSA posts blog from first-person viewpoint of Monsanto's David Saltmiras, co-author of one of the glyphosate cancer papers

    o Share resources and content with Monsanto key regions to amplify the message globally

21

89.     Action items for post-release of the IARC report, under the heading "Orchestrate

Outcry with IARC Decision," included:

- Industry conducts robust media/ social media outreach on process and outcome

    o [Sense About Science?] leads industry response and provides
      platform for IARC observers and industry spokesperson

    o CLI and other associations issue press releases

    o Joint Glyphosate Taskforce publishes press release, letter signed
      by leaders of each manufacturer in North America and Europe

    o Push opinion leader letter to key daily newspaper on day of IARC
      ruling with assistance of Potomac Group

- Monsanto responds with strong reactive statement

    o Distribute video and audio responses to IARC decision o Address media
      inquiries with company glyphosate spokesperson

    o Utilize Monsanto channels (web, FB, Twitter, blog, etc) to provide
      Monsanto POV

    o Corporate Engagement team packages industry and Monsanto responses,
      then distributes via email to -20 most influential ag media outlets across
      print, radio and TV

90.     Monsanto employees and agents in fact carried out such action items in a concerted

effort to discredit the IARC prior to the release of a report finding glyphosate to be carcinogenic,

in total disregard of public health and safety, in a strategic effort to protect the Roundup brand

and thereby continue to profit from the sale of a product which it knew and should have known

was carcinogenic.

91.     The IARC's full Monograph was published on July 29, 2015, and established

glyphosate as a class 2A probable carcinogen to humans, finding that that glyphosate caused

DNA and chromosomal damage in human cells,  contrary to Monsanto's marketing pitch that it

was impossible for glyphosate to harm human tissue.  Monsanto's orchestrated "outcry"

continued to disparage and discredit IARC, a publicly funded international research agency

concerned only with public health and safety, while attacking the independent academic

researchers on which the IARC classification was based. Monsanto's "outcry" included efforts to

silence the IARC through political lobbying to get it defunded.

    **(iii)**    **Monsanto's Collusion With EPA Personnel & Stacking Expert Review Panel**

92.    Between 2/11/2013 and 3/10/2016, text messages among Monsanto employees and

lobbyists describe Monsanto's collusion with certain EPA officials in an ongoing effort to get

glyphosate re-registered and, after March 2015, to discredit the IARC finding that glyphosate is a

probable carcinogen, by precluding and/or politically influencing further agency reviews.

93.    These communications included exchanges among and between, *inter alia*, Monsanto

employees Jennifer Listello, Michael Dykes, Tracey Reynolds, Eric Sachs, Ty Vaughan, Phillip

Miller, Jeremy Stump, Tina Bhakta, Dan Jenkins, Amelia Jackson-Gheissari, industry

lobbyists Susan Martino-Catt and Steven Bradbury, former EPA toxicologist Mary Manibusan,

and then EPA Director of Pesticide Program Jack E. Housenger.

94.    This correspondence includes exchanges between Mr. Daniel Jenkins, various Monsanto

employees, and various EPA officials regarding regulatory aspects of glyphosate. In reference to

the United States Department of Agriculture, Mr. Jenkins comments: "might want to tell them

we're going to need their support for glyphosate…We're in for a tough ride[.]" Mr. Jenkins also

comments: "Jess is doing a nice job at EPA," referring to Jess Rowland of the EPA's

Carcinogens group (CARC).

95.    Jennifer Listello asked: "Is there anyone we can get to in EPA?" With regard to IARC,

Mr. Jenkins commented: "Got john to agree to talk about how we might work together on

changing IARC communication[.]" Mr. Jenkins asked Ms. Mary Manibusan (formerly EPA and

co-chair with Jess Rowland on CARC publication): "do you know folks at ATSDR in HHS?"

Ms. Manibusan responded: "Yes. Where specifically…on Tox profiles?" After Mr. Jenkins

confirmed, Ms. Manibusan responded: "I know lots of people. You can count o[n] me."

Mr. Jenkins informed her that: "we're trying to do everything we can to keep from having a

domestic IARC occur w this group. may need your help… I'll share some info, you tell me what

you think we might be able to do, who you may know, etc ok?" to which Ms. Manibusan agreed.

96.     Mr. Jenkins also contacted Mr. Ty Vaughn: "I think we need to talk about a political level

EPA strategy and then try to build a consensus plan w Michael on several fronts:  w glyphosate

…we're not in good shape and we need to make a plan[.]"

97.     Following text messaging with Mr. Jack Housenger (EPA), Mr. Jenkins commented:

"Spoke to EPA: is going to conclude that IARC is wrong. So is EFSA….pushed them to make

sure atsdr is aligned, said they would…they're looking into getting a contact for me at cdc re bio

monitoring."

98.     In e-mail exchanges on 04/28/2015 between William Heydens and Dan Jenkins, with

cc. to Jennifer Listello, Mr. Jenkins reported that Jess Rowland of EPA called him "out of the

blue" saying "We have enough to sustain our conclusions. Don't need gene toy: or epi. The only

thing is the cherninova study with the sarcoma in mice-- we have that study now and its

conclusions are irrelevant (bc at limit dose...?). I am the chair of the C:ARC: and my folks are

running this process for glyphosate in reg review. I have called a CARC meeting in June..."

99.     Referring to the HHS Agency for Toxic Substances & Disease Registry (ATSDR), Rowland

asked for "a contact name at ATSDR" which was also reviewing glyphosate, saying that no

coordination was going on and he wanted to establish contact.  Rowland added: "If I can kill this

I should get a medal".

100.    In June 2015, Monsanto employees made a plan, devising a strategy to corrupt the

regulatory review process through "outreach" seeking the EPA's assistance in "clarifying" the

24

WHO findings that glyphosate was carcinogenic. This strategy was outlined in a four page

memorandum, authored by Monsanto employees Donna Farmer, Jim Travis, Brian Lowry &

Michael Dykes. E-mail, 06/05/2015 from Michael D. Dykes to Erick Jacobs, *et al.*

101.    Part of this strategy was purely political, where the Monsanto Washington office had

"conducted significant outreach within the U.S. government to secure its engagement with the

WHO in an effort to obtain that clarification." Monsanto operatives had briefed "key staff at EPA,

USTR, USDA and the State Department as well as members of Congress."

102.    Monsanto was joined by "a small group of value chain stakeholders to underscore the

challenges the confusion of the IARC classification and concomitant media reports have generated

in a short period of time," including the American Farm Bureau Federation, the National Corn

Growers Association and the U.S. Grains Council which all had an economic stake in glyphosate

production and use, including "the need for tools like glyphosate and maintaining trade that is so

critical to America's farm economy" and, tacitly, Monsanto's continued profit taking from

sales of Roundup.

103.    The Monsanto employees were specifically concerned with obtaining "clarification" from

the WHO, through political pressure based on economic concerns, before the release of the

IARC monograph on glyphosate then anticipated for July 2015.

104.    In a series of e-mails in the summer of 2015, Monsanto employees discussed direct

efforts to intercede with EPA employees by putting testing of glyphosate "on hold," and

when the EPA was assembling an Intertek Expert Panel of purportedly independent scientists for

its re-registration of Roundup, Monsanto was negotiating consulting agreements with members of

the panel, including Dr. Larry D. Kier who had frequently consulted for Monsanto in the past.

105.    On or about 08/01/2015, Monsanto agent Michael S. Koch, Ph. D.,  signed a "Project

Amendment Letter" to an August 17, 2015 "Consulting Agreement" with Dr. Larry D. Kier,  under

which Dr. Kier agreed to "(s)upport the genotoxicity and oxidative stress portion of Intertek and support generation of a panel draft manuscript on glyphosate genotoxicity and oxidative stress," for which Monsanto agreed to pay Dr. Kier the sum of $27,400.00 plus expenses. This contractual relationship with Monsanto was not disclosed by Dr. Kier in the published manuscript.

106.    Monsanto also contracted with panel member John Acquavella, Ph. D. who, on an invoice dated August 31, 2015, billed the sum of $20,700 for "consulting hours in August 2015 related to the glyphosate expert epidemiology panel."

107.    Through such corrupt manipulation of the herbicide registration process, Monsanto has been able to continue its false and misleading representations to the world, and particularly to United States purchasers, that glyphosate-based herbicides, including Roundup, create no unreasonable risks to human health or to the environment.

### 2. Plaintiff's Use of Roundup & Exposure to Glyphosate & POEA

108.    The Plaintiff, Robert Andrews, at all times mentioned herein, had been an agricultural worker with occasional acute exposure to Roundup's glyphosate / POEA formula, and then the owner and operator of a business known as Bob's Tree & Landscape in Falmouth, Massachusetts, now sited in the Town of Plympton, with frequent exposure to Roundup's glyphosate / POEA formula, from 1998 through 2015.   He has also used Roundup at his home to control weeds.

109.    As a young man beginning in the 1990s, Plaintiff used Roundup as a volunteer day laborer on his family's cranberry bogs in Plympton which were sprayed with Roundup products for, *inter alia,* phragmites, texas, skunk cabbage, cat tails and other unwanted plants. This work involved day-long use of Roundup during which Plaintiff was exposed to airborne overspray, breathing it in frequently and occasionally getting overspray on his bare skin.

110.    As the owner and operator of Bob's Tree & Landscape, the Plaintiff had at all times between 1998 and 2015, purchased all equipment and materials used in the business, including

26

Roundup and a backpack sprayer for weed control on customer's properties, and he later subcontracted with others for services that included, *inter alia*, tree removal, delimbing and trimming and brush clearing.

111.    Roundup weed killer, as produced and marketed by Monsanto, was among the materials purchased by Plaintiff between from and after 1998 for weed killing and brush clearing on customer's properties, including poison ivy, bittersweet and briars, and it was used by subcontractors hired by Plaintiff for larger jobs after 2008.

112.    Plaintiff was present on most occasions when Roundup was used on a customer's property, whether it was applied by him personally, by a helper or by a contractor, with Plaintiff working in close proximity and handling the contaminated vegetation, occasionally getting it on his bare skin.

113.    A typical job required two applications of Roundup to kill the brush, a week apart, with manual and/or mechanical removal of the contaminated vegetation within a week or so later. This was hands-on physical work involving direct contact while removing the contaminated brush, which Plaintiff performed himself, or with a helper, between 1998 and 2014.

114.    At all times mentioned herein, the Plaintiff reasonably relied on Monsanto's marketing when purchasing and spraying Roundup on customer's properties and when subcontracting for Roundup to be sprayed on customer's properties, including Monsanto's express claims that Roundup was safe for use as directed on customers' properties and it biodegrades into naturally occurring elements.

115.    If Plaintiff been warned of Roundup's toxicity and potential for causing cancer, he would not have used it as he did, or contracted for its use, on his brush clearing jobs

116.    Circa 2006, Plaintiff began to suffer from fatigue, having to reduce his workload and cut back on the tree removal and landscaping jobs he contracted, with a loss of earnings averaging $5,000.00 per week.

27

117.    Plaintiff's fatigue was initially attributed to Lyme Disease in 2006, but in 2010, he was diagnosed with  chronic lymphocytic leukemia.  Plaintiff's Lyme Disease resolved, with negative findings for Borrelia Burgdorferi in blood tested in 2016, while his disabling fatigue has continued unabated.

118.    Circa 2015, Plaintiff began hiring a sub-contractor for his tree work, for which he solicits customers and provides estimates, while he has given up the landscaping work entirely due to fatigue related to his chronic lymphocytic leukemia.

119.    Plaintiff has sustained a loss of earning capacity exceeding $250,000.00 per year due to disability caused by his chronic lymphocytic leukemia, and he has incurred medical bills exceeding $10,000.00 to date for treatment of his chronic lymphocytic leukemia.

120.    Plaintiff's debilitating fatigue, as caused by his chronic lymphocytic leukemia, has caused him to suffer severe depression, anxiety, stress, and frustration with his inability to perform normal everyday life activities, as well as his inability to perform the essential tasks of his occupation, and this has caused a severe loss of happiness and the enjoyment of living.

121.    The proximate cause of Plaintiff's chronic lymphotic leukemia, and its debilitating symptoms, effects and consequences, was his decades-long repeated close exposure to the glyphosate and POEA in Roundup, a risk to purchasers and users of which Monsanto was in fact aware, and should have been aware at all times relevant, but failed to take reasonable action to eliminate or mitigate by product reformulation and/or adequate warnings.

122.    The Plaintiff purchased and/or used Roundup weed killer on his family bog and then in his tree and landscape business, over  a period exceeding twenty-five  years, at all times reasonably relying on Monsanto's false and deceptive marketing and with no knowledge of its toxicity and the risk of cancer.  He first learned of such risk on broadcast media during the week of August 1, 2019.

## COUNT I -  NEGLIGENCE

123.    Monsanto owed a duty to the general public, including the Plaintiff as a foreseeable

purchaser of Roundup weed killer, to exercise reasonable care in the designing, researching,

testing, manufacturing, marketing, supplying, promoting, packaging, sale, and/or distribution of

Roundup into the stream of commerce, including a duty to assure that the product would not cause

users to suffer unreasonable, dangerous toxic effects.

124.    By reason of the matters stated in Paragraphs 1 through 122 above, which are herein

incorporated by reference, Monsanto breached its duty to exercise reasonable care in the designing,

researching, testing, manufacturing, marketing, supplying, promoting, packaging, sale, and/or

distribution of Roundup into the stream of commerce, by failing to recognize, mitigate and/or

eliminate a known carcinogenic risk created by Roundup's glyphosate/POEA formulation, and

and such breach foreseeably caused Plaintiff to develop chronic lymphocytic leukemia through

prolonged and acute exposure to glyphosate and/or POEA in the performance of his trade.

125.    Monsanto is therefore liable to Plaintiff for its negligence, to compensate Plaintiff in full

for the debilitating effects of his illness, chronic fatigue, severe depression, anxiety, stress, and

frustration, with the inability to perform normal everyday life activities, the inability to perform

the essential tasks of his occupation with ongoing loss of earning capacity of $3,250,000.00 to

date and ongoing reasonable medical expenses of  $10,000.00 to date.

## COUNT II - STRICT LIABILITY / PRODUCT DESIGN DEFECTS

126.    At all times mentioned herein, Monsanto designed, researched, manufactured, tested

advertised, promoted, sold, and distributed Roundup to the general public,  intending and expecting

that it would be purchased and used by agricultural workers and landscape professionals like the

Plaintiff, who would use it as directed without substantial change in the condition in which it

was produced.

127.    By reason of the matters stated in Paragraphs 1 through 122 above, which are herein incorporated by reference, Roundup was at all times mentioned herein in an unsafe, defective and inherently dangerous condition, due to the carcinogenic toxicity of its active ingredient glyphosate and/or its compound glyphosate / POEA formulation, creating a known risk of toxicity to users, including the Plaintiff, and Monsanto knew and/or should have known of such dangerous defect.

128.    Roundup, as designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed by Monsanto was defective in design or formulation such that, when it left the hands of the manufacturer and/or suppliers, the foreseeable risks of its intended, normal use greatly exceeded any benefits associated with the design or formulation of Roundup, and it was more dangerous than an ordinary purchaser or user would reasonably expect.

129.    Plaintiff's chronic leucocytic leukemia was proximately caused by his prolonged and acute exposure to the glyphosate and/or POEA in the Roundup formulation, and Monsanto is therefore strictly liable to Plaintiff for the defective formulation and condition of the Roundup products he purchased, to compensate Plaintiff in full for the debilitating effects of his illness, chronic fatigue, severe depression, anxiety, stress, and frustration, with the inability to perform normal everyday life activities, the inability to perform the essential tasks of his occupation with ongoing loss of earning capacity of $3,250,000.00 to date and ongoing reasonable medical expenses of $10,000.00 to date.

### COUNT III - STRICT LIABILITY / FAILURE TO WARN

130.    At all times herein mentioned, Monsanto designed, researched, manufactured, tested advertised, promoted, sold, and distributed Roundup to the general public,  intending and expecting that it would be purchased and used by agricultural workers and landscape professionals like the Plaintiff, without providing any warning of a known risk of carcinogenic toxicity on its labeling, packaging and advertising for Roundup.

30

131.    By reason of the matters stated in Paragraphs 1 through 122 above, which are herein incorporated by reference, Roundup was at all times mentioned herein in an unsafe, defective and inherently dangerous condition, due to the carcinogenic toxicity of its active ingredient glyphosate and/or its compound glyphosate / POEA formulation, a risk of which the Plaintiff was reasonably unaware at all times when he purchased and used Roundup weed killer as directed in his business.

132.    Monsanto's failure to provide a warning or a caution statement to purchasers and users as to the carcinogenic toxicity of the Roundup glyphosate / POEA formulation, for the protection of purchasers and users like the Plaintiff, was in violation of 7 U.S.C. §136j(a)(1)(E) and the laws of the Commonwealth of Massachusetts.

133.    If suitable warnings had been published by Monsanto, on the labeling, packaging and/or marketing of Roundup, the Plaintiff would not have purchased or used the product as directed and could have chosen to use another product, instead of Roundup, or take precautions in the manner and conditions of his using Roundup.  In the absence of warnings,  Plaintiff reasonably purchased and used Roundup as directed, relying on Monsanto's labeling and marketing of the product as being safe for humans.

134.  Plaintiff's chronic leucocytic leukemia was proximately caused by his prolonged and acute exposure to the glyphosate and/or POEA in the Roundup formulation, and Monsanto is therefore strictly liable to Plaintiff for its failure to warn him of a known risk of carcinogenic toxicity in Roundup products he purchased, to compensate Plaintiff in full for the debilitating effects of his illness, chronic fatigue, severe depression, anxiety, stress, and frustration, with the inability to perform normal everyday life activities, the inability to perform the essential tasks of his occupation with ongoing loss of earning capacity of $3,250,000.00 to date and ongoing reasonable medical expenses of  $10,000.00 to date.

31

## COUNT IV - BREACH OF WARRANTY

135.    At all times mentioned herein, Monsanto advertised, promoted, sold, packaged, labeled and distributed Roundup to the general public, including the Plaintiff, making express warranties that Roundup was safe to human health and the environment, and effective, suitable and appropriate for its intended use as a weed killer, and the Plaintiff reasonably relied on such express warranties when he purchased and/or used Roundup in his business.

136.    By reason of the matters stated in Paragraphs 1 through 122 above, which are herein incorporated by reference, Monsanto's express warranties as to the safety of Roundup, as made through advertisement, promotions, packaging, labeling and sales to purchasers including the Plaintiff, were false and knowingly false, while Monsanto had at all times relevant had knowledge and reason to know of the  carcinogenic toxicity of Roundup's glyphosate / POEA formulation.

137.    Plaintiff at all times mentioned herein reasonably relied on Monsanto's express warranties as to Roundup's safety when he purchased and used Roundup weed  killer as directed in his trade, and had no reason to question Monsanto's express warranties.

138.    Plaintiff's chronic leucocytic leukemia was proximately caused by his prolonged and acute exposure to the glyphosate and/or POEA in the Roundup formulation, and Monsanto is therefore liable to Plaintiff for its breach of the express warranties it made as to Roundup's safety on which Plaintiff relied when he purchased and used Roundup products, to compensate Plaintiff in full for the debilitating effects of his illness, chronic fatigue, severe depression, anxiety, stress, and frustration, with the inability to perform normal everyday life activities, the inability to perform the essential tasks of his occupation with ongoing loss of earning capacity of $3,250,000.00 to date and ongoing reasonable medical expenses of  $10,000.00 to date.

32

## COUNT V - BREACH OF IMPLIED WARRANTY OF MERCHANTIBILITY

139.    At all times mentioned herein, Monsanto impliedly warranted to the general public, including the Plaintiff, that its Roundup products were of merchantable quality and reasonably safe if used as intended and directed, including the use of Roundup weed killer as a horticultural herbicide in agriculture, landscaping and tree work.

140.    By reason of the matters stated in Paragraphs 1 through 122 above, which are herein incorporated by reference, Monsanto's breached the implied warranty of merchantability in its marketing, advertising, distribution and sale of Roundup products to the general public, including the Plaintiff, where Monsanto knew and had reason to know that Roundup was not of merchantable quality and reasonably safe if used as intended and directed, due to the known carcinogenic toxicity of its glyphosate / POEA formulation.

141.    Due to Monsanto's failure and refusal to disclose Roundup's known carcinogenic toxicity to purchasers and  users of the product, the Plaintiff reasonably relied on Monsanto's skill, superior knowledge and judgment and therefore believed that Roundup was safe to use as directed in his business.

142.    Plaintiff's chronic leucocytic leukemia was proximately caused by his prolonged and acute exposure to the glyphosate and/or POEA in the Roundup formulation, and Monsanto is therefore liable to Plaintiff for its breach of the implied warranty of merchantability as to Roundup's safety on which Plaintiff relied when he purchased and used Roundup products, to compensate Plaintiff in full for the debilitating effects of his illness, chronic fatigue, severe depression, anxiety, stress, and frustration, with the inability to perform normal everyday life activities, the inability to perform the essential tasks of his occupation with ongoing loss of earning capacity of $3,250,000.00 to date and ongoing reasonable medical expenses of  $10,000.00 to date.

## COUNT VI - MISREPRESENTATION & FRAUDULENT INDUCEMENT

143.    At all times mentioned herein, Monsanto impliedly warranted to the general public, including the Plaintiff, that its Roundup products were of merchantable quality and reasonably safe if used as intended and directed, including the use of Roundup weed killer as a horticultural herbicide in agriculture, landscaping and tree work.

144.    By reason of the matters stated in Paragraphs 1 through 122 above, which are herein incorporated by reference, Monsanto knew and had reason to know, that its representations were false and deceptive as to the safety of Roundup and its main ingredient glyphosate.

145.    By making such false and deceptive representations as to the safety of Roundup and/or glyphosate, Monsanto intended to deceive consumers, including landscape professionals such as the Plaintiff Robert Andrews, and thereby induce consumers to purchase and use Roundup.

146.    The Plaintiff, Robert Andrews, relying on such false and deceptive representations by Monsanto as to the safety of Roundup and glyphosate, did purchase and/or use Roundup in his agricultural labor, his landscaping business and for herbicidal use at his home, on a regular, sustained basis over a period exceeding seventeen years, as was intended by Monsanto's false and deceptive representations as to the safety of Roundup and/or glyphosate.

147.    Plaintiff's chronic leucocytic leukemia was proximately caused by his prolonged and acute exposure to the glyphosate and/or POEA in the Roundup formulation, and Monsanto is therefore liable to Plaintiff for its breach of the implied warranty of merchantability as to Roundup's safety on which Plaintiff relied when he purchased and used Roundup products, to compensate Plaintiff in full for the debilitating effects of his illness, chronic fatigue, severe depression, anxiety, stress, and frustration, with the inability to perform normal everyday life activities, the inability to perform the essential tasks of his occupation with ongoing loss of earning capacity of $3,250,000.00 to date and ongoing reasonable medical expenses of $10,000.00 to date.

34

## COUNT VII:  BATTERY BY POISON

148.   At all times mentioned herein, Monsanto impliedly warranted to the general public,

including the Plaintiff, that its Roundup products were of merchantable quality and reasonably safe

if used as intended and directed, including the use of Roundup weed killer as a horticultural

herbicide in agriculture, landscaping and tree work.

149.   By reason of the matters stated in Paragraphs 1 through 122 above, which are herein

incorporated by reference, Monsanto knew and had reason to know, that its representations

were false and deceptive as to the safety of Roundup and its main ingredient glyphosate.

150.   The Plaintiff, Robert Andrews, relying on such false and deceptive representations

by Monsanto as to the safety of Roundup and glyphosate, did purchase and/or use Roundup

in his agricultural labor, his landscaping business and for herbicidal use at his home, on a

regular, sustained basis over a period exceeding seventeen years, as was intended by

Monsanto's false and deceptive representations as to the safety of Roundup and/or glyphosate.

151.   By making such false and deceptive representations as to the safety of Roundup and/or

glyphosate, Monsanto intended to deceive consumers, including landscape professionals such as

the Plaintiff Robert Andrews, into purchasing and using Roundup and glyphosate, and Monsanto

did thereby, intentionally or with reckless indifference, commit a battery upon the Plaintiff

through subterfuge, foreseeably causing carcinogenic chemicals to collect on Plaintiff's bare

skin, enter Plaintiff's lungs and then into Plaintiff's blood stream, causing Plaintiff to suffer

chronic leucocytic leukemia by destruction of Plaintiff's white blood cells.

152.  Plaintiff's chronic leucocytic leukemia was proximately caused by his prolonged and acute

exposure to the glyphosate and/or POEA in the Roundup formulation, and Monsanto is therefore

liable to Plaintiff for its breach of the implied warranty of merchantability as to Roundup's safety

on which Plaintiff relied when he purchased and used Roundup products, to compensate Plaintiff

in full for the debilitating effects of his illness, chronic fatigue, severe depression, anxiety, stress, and frustration, with the inability to perform normal everyday life activities, the inability to perform the essential tasks of his occupation with ongoing loss of earning capacity of $3,250,000.00 to date and ongoing reasonable medical expenses of $10,000.00 to date.

**WHEREFORE, the Plaintiff demands Judgment and Relief as follows:**

**First, on Count I,** judgment against the Defendant Monsanto Company, for its negligence in the manufacture, marketing, distribution and sale of Roundup products, with compensatory damages to the Plaintiff including loss of earning capacity in the amount of $3,250,000.00 to date plus future lost earning capacity as may be determined by the jury, reasonable medical expenses of $10,000.00 incurred to date plus future medical expenses as may be determined by the jury, and such compensation as the jury may find reasonable for the debilitating effects of his illness, chronic fatigue, severe depression, anxiety, stress, and frustration, with the inability to perform normal everyday life activities as caused by his prolonged and acute exposures to Roundup's glyphosate / POEA formulation, plus interest and costs of the action;

**Second, on Count II,** judgment against the Defendant Monsanto Company for its dangerous and defective design and formulation of its Roundup products, with compensatory damages to the Plaintiff including loss of earning capacity in the amount of $3,250,000.00 to date plus future lost earning capacity as may be determined by the jury, reasonable medical expenses of $10,000.00 incurred to date plus future medical expenses as may be determined by the jury, and such compensation as the jury may find reasonable for the debilitating effects of his illness, chronic fatigue, severe depression, anxiety, stress, and frustration, with the inability to perform normal everyday life activities as caused by his prolonged and acute exposures to Roundup's glyphosate / POEA formulation, plus interest and costs of the action;

36

**Third, on Count III**, judgment against the Defendant Monsanto Company for its failure to warn through marketing, packaging and labeling of the known carcinogenic toxicity of its Roundup products, with compensatory damages to the Plaintiff including loss of earning capacity in the amount of $3,250,000.00 to date plus future lost earning capacity as may be determined by the jury, reasonable medical expenses of $10,000.00 incurred to date plus future medical expenses as may be determined by the jury, and such compensation as the jury may find reasonable for the debilitating effects of his illness, chronic fatigue, severe depression, anxiety, stress, and frustration, with the inability to perform normal everyday life activities as caused by his prolonged and acute exposures to Roundup's glyphosate / POEA formulation, plus interest and costs of the action;

**Fourth, on Count IV,** judgment against the Defendant Monsanto Company for its breach of express warranties in its marketing, packaging, labeling, distribution and sale as to the safety of its Roundup products, with compensatory damages to the Plaintiff including loss of earning capacity in the amount of $3,250,000.00 to date plus future lost earning capacity as may be determined by the jury, reasonable medical expenses of $10,000.00 incurred to date plus future medical expenses as may be determined by the jury, and such compensation as the jury may find reasonable for the debilitating effects of his illness, chronic fatigue, severe depression, anxiety, stress, and frustration, with the inability to perform normal everyday life activities as caused by his prolonged and acute exposures to Roundup's glyphosate / POEA formulation, plus interest and costs of the action;

**Fifth, on Count V,** judgment against the Defendant Monsanto Company for its breach of its implied warranties of merchantability in the marketing, packaging, labeling, distribution and sale as to the safety of its Roundup products, with compensatory damages to the Plaintiff including loss of earning capacity in the amount of $3,250,000.00 to date plus future lost earning capacity as may be determined by the jury, reasonable medical expenses of $10,000.00 incurred to date plus future

37

medical expenses as may be determined by the jury, and such compensation as the jury may find reasonable for the debilitating effects of his illness, chronic fatigue, severe depression, anxiety, stress, and frustration, with the inability to perform normal everyday life activities as caused by his prolonged and acute exposures to Roundup's glyphosate / POEA formulation, plus interest and costs of the action; and

**Sixth, on Count VI,** judgment against the Defendant Monsanto Company for knowingly making false representations in the marketing, packaging, labeling, distribution and sale as to the of its Roundup products, which induced the Plaintiff to purchase and use Roundup, as intended by Monsanto, with compensatory damages to the Plaintiff including loss of earning capacity in the amount of $3,250,000.00 to date plus future lost earning capacity as may be determined by the jury, reasonable medical expenses of $10,000.00 incurred to date plus future medical expenses as may be determined by the jury, and such compensation as the jury may find reasonable for the debilitating effects of his illness, chronic fatigue, severe depression, anxiety, stress, and frustration, with the inability to perform normal everyday life activities as caused by his prolonged and acute exposures to Roundup's glyphosate / POEA formulation, plus interest and costs of the action; and

**Seventh, on Count VII,** judgment against the Defendant Monsanto Company for battery on the Plaintiff by poison, with knowledge or reckless indifference by making false representations in the marketing, packaging, labeling, distribution and sale of its Roundup products, which foreseeably induced the Plaintiff to purchase and use Roundup, as intended by Monsanto, foreseeably causing Plaintiff to suffer chronic leukocytic leukemia, with compensatory damages to the Plaintiff including loss of earning capacity in the amount of $3,250,000.00 to date plus future lost earning capacity as may be determined by the jury, reasonable medical expenses of $10,000.00 incurred to date plus future medical expenses as may be determined by the jury, and such compensation as the jury may find reasonable for the debilitating effects of his illness, chronic fatigue, severe

depression, anxiety, stress, and frustration, with the inability to perform normal everyday life

activities as caused by his prolonged and acute exposures to Roundup's glyphosate / POEA

formulation, plus interest and costs of the action; and

**Eighth, on the Complaint,** such other relief as the Court may be empowered to grant, based on

the facts alleged herein and the applicable law.

### Demand for Jury Trial

**Plaintiff demands trial by jury as to all issues of fact.**

Dated: 08/20/2019                           For the Plaintiff,

                                            /s/ *Richard K. Latimer*

                                            Richard K. Latimer, BBO #287840
                                            222 Main Street, Suite 204
                                            Falmouth, MA  02540
                                            (508) 548-7006
                                            rklaw@meganet.net

37

**BOB SWEENEY**
**CONSTABLE SERVICES**
**PO BOX 80018**
**STONEHAM MA 02180**

Monsanto
84 State St
BOSTON