AOR

# U.S. District Court
## Southern District of Florida (Miami)
## CIVIL DOCKET FOR CASE #: 1:21-cv-23191-BB

Komarmy et al v. Monsanto Company          Date Filed: 09/02/2021
Assigned to: Judge Beth Bloom              Jury Demand: Plaintiff
Cause: 28:1332 Diversity-Product Liability  Nature of Suit: 365 Personal Inj. Prod. Liability
                                           Jurisdiction: Diversity

**Plaintiff**

**Argentina Komarmy**          represented by    **Mark Jurgen Heise**
                                                Heise Suarez Melville
                                                1600 Ponce De Leon Boulevard
                                                Suite 1205
                                                Coral Gables, FL 33134
                                                305-800-4476
                                                Email: mheise@hsmpa.com
                                                *LEAD ATTORNEY*
                                                *ATTORNEY TO BE NOTICED*

                                                **Luis Eduardo Suarez**
                                                Heise Suarez Melville PA
                                                1600 Ponce de Leon Boulevard
                                                Suite 1205
                                                Coral Gables, FL 33134
                                                3058004476
                                                Email: lsuarez@hsmpa.com
                                                *ATTORNEY TO BE NOTICED*

                                                **Patricia Melville**
                                                Heise Suarez Melville, P.A.
                                                1600 Ponce de Leon Blvd
                                                Suite 1205
                                                Coral Gables, FL 33134
                                                305-800-4476
                                                Email: pmelville@hsmpa.com
                                                *ATTORNEY TO BE NOTICED*

                                                **Bradford Rothwell Sohn**
                                                The Brad Sohn Law Firm PLLC
                                                1600 Ponce De Leon Boulevard
                                                Suite 1205

Miami, FL 33134
786-708-9750
Fax: 305-397-0650
Email: brad@bradsohnlaw.com
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**The Estate of Joseph Komarmy**    represented by    **Mark Jurgen Heise**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Luis Eduardo Suarez**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Patricia Melville**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Bradford Rothwell Sohn**
(See above for address)
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Monsanto Company**

| Date Filed | # | Docket Text |
|---|---|---|
| 09/02/2021 | 1 | COMPLAINT against Monsanto Company. Filing fees $ 402.00 receipt number AFLSDC-14982564, filed by Argentina Komarmy, The Estate of Joseph Komarmy. (Attachments: # 1 Civil Cover Sheet)(Sohn, Bradford) (Entered: 09/02/2021) |
| 09/02/2021 | 2 | Clerks Notice of Judge Assignment to Judge Beth Bloom. Pursuant to 28 USC 636(c), the parties are hereby notified that the U.S. Magistrate Judge Alicia M. Otazo-Reyes is available to handle any or all proceedings in this case. If agreed, parties should complete and file the Consent form found on our website. It is not necessary to file a document indicating lack of consent. Pro se (NON-PRISONER) litigants may receive Notices of Electronic Filings (NEFS) via email after filing a Consent by Pro Se Litigant (NON-PRISONER) to Receive Notices of Electronic Filing. The consent form is available under the forms section of our website. (pes) (Entered: 09/03/2021) |

| 09/03/2021 | 3 | NOTICE of Filing Proposed Summons(es) by Argentina Komarmy, The Estate of Joseph Komarmy (Attachments: # 1 Summon(s)) (Sohn, Bradford) (Entered: 09/03/2021) |
| 09/03/2021 | 4 | Summons Issued as to Monsanto Company. (amb) (Entered: 09/03/2021) |
| 09/03/2021 | 5 | ORDER REQUIRING SCHEDULING REPORT AND CERTIFICATES OF INTERESTED PARTIES Signed by Judge Beth Bloom on 9/3/2021. *See attached document for full details.* (ail) (Entered: 09/03/2021) |

| PACER Service Center | | |
|---|---|---|
| **Transaction Receipt** | | |
| 09/21/2021 11:40:43 | | |
| **PACER Login:** sh0019sh | **Client Code:** 31943.356965 |
| **Description:** Docket Report | **Search Criteria:** 1:21-cv-23191-BB |
| **Billable Pages:** 2 | **Cost:** 0.20 |

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

CASE NO. 1:21-cv-23191

ARGENTINA KOMARMY, Individually and on Behalf of the Estate of
JOSEPH KOMARMY, a Florida Resident,

      Plaintiff,

vs.

MONSANTO COMPANY, a foreign
corporation.

      Defendant.
_____/

## COMPLAINT FOR DAMAGES

Plaintiff Argentina Komarmy brings this action, on behalf of her husband Plaintiff Joseph Komarmy, against Defendant Monsanto Company ("Monsanto") and alleges as follows:

1.      This is a civil action for damages suffered by Joseph Komarmy and his long-time wife, Argentina Komarmy, as a direct and proximate result of Defendant Monsanto's negligent and wrongful conduct in connection with the design, development, manufacture, testing, packaging, warning, promoting, marketing, advertising, distribution, labeling, and/or sale of glyphosate-containing products.

## PARTIES, JURISDICTION, AND VENUE

2.      At all times material, Joseph Komarmy was a resident of Miami-Dade County, Florida.

3.      At all times material, Argentina Komarmy was the spouse of Joseph Komarmy and is bringing this action as the authorized representative of his Estate and is his sole beneficiary under the Florida Wrongful Death Act.

4.     "Roundup" refers to all formulations of Defendant's Roundup products, including, but not limited to, Roundup Concentrate Poison Ivy and Tough Brush Killer 1, Roundup Custom Herbicide, Roundup D-Pak herbicide, Roundup Dry Concentrate, Roundup Export Herbicide, Roundup Fence & Hard Edger 1, Roundup Garden Foam Weed & Grass Killer, Roundup Grass and Weed Killer, Roundup Herbicide, Roundup Original 2k herbicide, Roundup Original II Herbicide, Roundup Pro Concentrate, Roundup Prodry Herbicide, Roundup Promax, Roundup Quik Stik Grass and Weed Killer, Roundup Quikpro Herbicide, Roundup Rainfast Concentrate Weed & Grass Killer, Roundup Rainfast Super Concentrate Weed & Grass Killer, Roundup Ready-to-Use Extended Control Weed & Grass Killer 1 Plus Weed Preventer, Roundup Ready-to-Use Weed & Grass Killer, Roundup Ready-to-Use Weed and Grass Killer 2, Roundup Ultra Dry, Roundup Ultra Herbicide, Roundup Ultramax, Roundup VM Herbicide, Roundup Weed & Grass Killer Concentrate, Roundup Weed & Grass Killer Concentrate Plus, Roundup Weed & Grass killer Ready-to-Use Plus, Roundup Weed & Grass Killer Super Concentrate, Roundup Weed & Grass Killer 1 Ready-to-Use, Roundup WSD Water Soluble Dry Herbicide Deploy Dry Herbicide, RangerPro Herbicide, AquaMaster, or any other formulation of containing the active ingredient glyphosate.

5.     At all times material, Joseph Komarmy, was exposed to, had contact with, ingested and/or otherwise used Roundup products that were designed, manufactured, sold, distributed, and/or supplied by the Defendant individually or through their predecessors or subsidiaries.

6.     Joseph Komarmy was exposed to the Defendant's Roundup products in the intended manner, without significant change in the products' condition.

7.      As a direct and proximate result of Joseph Komarmy's exposure to, contact with, ingestion and/or use of Roundup products, he was diagnosed with non-Hodgkin's mantle cell lymphoma on or about November 2019 and died on May 8, 2021.

8.      At all times material, Defendant Monsanto Company ("Monsanto") was and is a corporation organized under the laws of the State of Delaware with its principal place of business in St. Louis, Missouri.  Monsanto was the entity that discovered the herbicidal properties of glyphosate and manufactured Roundup, which contains the active ingredient glyphosate, as well as other "inert" ingredients.

9.      This court has jurisdiction over Defendant Monsanto and this action pursuant to 28 U.S.C. §1332 because there is complete diversity of citizenship between Plaintiff Joseph Komarmy and Defendant Monsanto.

10.     The amount in controversy exceeds $75,000 exclusive of costs, interest and attorneys' fees, and is therefore within the jurisdictional limits of this Court.

11.     The Court also has supplemental jurisdiction pursuant to 28 U.S.C. §1367.

12.     Venue is proper within this district pursuant to 28 U.S.C. §1391, in that Defendant Monsanto conducts business in this district and is subject to personal jurisdiction in this district. Defendant Monsanto has been authorized to do business in the State of Florida and at all relevant times was transacting or conducting business in the State of Florida, and has derived substantial revenue from goods and products, including Roundup, used in the State of Florida. A substantial part of the acts and/or omissions giving rise to these claims occurred within this district.

## **GENERAL ALLEGATIONS APPLICABLE TO ALL COUNTS**

13.     Glyphosate is the active ingredient in Roundup.

14. Glyphosate is a non-selective herbicide, meaning it kills indiscriminately based only on whether a given organism produces a specific enzyme known as EPSP synthase.

15. Plants treated with glyphosate translocate the systemic herbicide to their roots, shoot regions, and fruit, where it interferes with the plant's ability to form aromatic amino acids for protein synthesis. Treated plants generally die within two to three days. Because plants absorb glyphosate, it cannot be completely removed by washing or peeling produce or by milling, baking, or brewing grains.

16. In addition to the active ingredient glyphosate, Roundup formulations, as well as other glyphosate-based product formulations such as Rodeo and Aqua Star, also contain certain adjuvants and/or other chemicals, which are considered "inert" and therefore protected as "trade secrets" in manufacturing. Growing evidence suggests that these adjuvants and additional components of Roundup formulations are not, in fact, inert and are toxic in their own right.

17. The herbicidal properties of glyphosate were discovered in 1970 by Monsanto chemist John Franz. The first glyphosate-based herbicide was introduced to the market in the mid-l970s under the brand name Roundup. From the outset, Monsanto marketed Roundup as a "safe" general-purpose herbicide for widespread commercial and consumer use. It still markets Roundup as safe today.

18. Today, glyphosate products are among the world's most widely used herbicides. Glyphosate-based products are registered in more than 130 countries and are approved for weed control in more than 100 crops.

19. Since the mid-1970s, Roundup, and later other glyphosate-based products, have been used across the world by people who have not had knowledge of the dangers their use poses.

20.     Since Monsanto first introduced Roundup, it touted glyphosate as a technological breakthrough: it could kill almost every weed without causing harm either to people or to the environment. Monsanto assured the public that Roundup was harmless to humans and continues to assure the public that it is safe despite evidence to the contrary. Monsanto fails to disclose and actively conceals information demonstrating that its products are harmful to human health.

### Registration of Herbicides under Federal Law

21.     The manufacture, formulation, and distribution of herbicides, such as Roundup, are regulated under the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA" or "Act"), 7 U.S.C. § 136 et seq.  FIFRA requires that all pesticides be registered with the Environmental Protection Agency ("EPA" or " Agency") prior to their distribution, sale, or use, except as described by the Act. 7 U.S.C. § 136a(a).

22.     The EPA requires as part of the registration process, among other things, a variety of tests to evaluate the potential for exposure to pesticides, toxicity to people and other potential non-target organisms, and other adverse effects on the environment. Registration by the EPA, however, is not an assurance or finding of safety. The determination the Agency must make in registering or re-registering a product is not that the product is "safe," but rather that use of the product in accordance with its label directions "will not generally cause unreasonable adverse effects on the environment." 7 U.S.C. § 136a(c)(5)(D).

23.     FIFRA defines "unreasonable adverse effects on the environment" to mean "any unreasonable risk to man or the environment, taking into account the economic, social, and environmental costs and benefits of the use of any pesticide." 7 U.S.C. § 136(bb). FIFRA thus requires the EPA to make a risk/benefit analysis in determining whether a registration should be granted, or a pesticide allowed to continue to be sold in commerce.

5

24.     The EPA registered Roundup for distribution, sale, and manufacture in the United States and the state of Florida.

25.     FIFRA generally requires that the registrant, Monsanto in the case of Roundup, conducts the health and safety testing of pesticide products. The EPA has protocols governing the conduct of tests required for registration and the laboratory practices that must be followed in conducting these tests. The data produced by the registrant must be submitted to the EPA for review and evaluation. The government is not required, nor is it able, however, to perform the product tests that are required of the manufacturer.

26.     Based on early studies showing that glyphosate could cause cancer in laboratory animals, the EPA originally classified glyphosate as possibly carcinogenic to humans (Group C) in 1985. After pressure from Monsanto, including contrary studies it provided to the EPA, the EPA changed its classification to evidence of non-carcinogenicity in humans (Group E) in 1991. In so classifying glyphosate, however, the EPA made clear that the designation did not mean the chemical does not cause cancer: "It should be emphasized, however, that designation of an agent in Group E is based on the available evidence at the time of evaluation and should not be interpreted as a definitive conclusion that the agent will not be a carcinogen under any circumstances."[1]

27.     On two occasions, the EPA found that the laboratories hired by Monsanto to test the toxicity of its Roundup products for registration purposes committed fraud.

28.     In the first instance, Monsanto, in seeking initial registration of Roundup by the EPA, hired Industrial Bio-Test Laboratories ("IBT") to perform and evaluate pesticide toxicology

---

[1] U.S. Envtl. Prot. Agency, Memorandum, Subject: SECOND Peer Review of Glyphosate 1 (1991), available at https://archive.org/details/SecondPeerReviewOfGlyphosateEPAOct301991.

6

studies relating to Roundup.[2] IBT performed about 30 tests on glyphosate and glyphosate-containing products, including nine of the 15 residue studies needed to register Roundup.

29. In 1976, the United States Food and Drug Administration ("FDA") performed an inspection of IBT that revealed discrepancies between the raw data and the final report relating to the toxicological impacts of glyphosate. The EPA subsequently audited IBT; it too found the toxicology studies conducted for the Roundup herbicide to be invalid.[3] An EPA reviewer stated, after finding "routine falsification of data" at IBT, that it was "hard to believe the scientific integrity of the studies when they said they took specimens of the uterus from male rabbits."[4]

30. Three top executives of IBT were convicted of fraud in 1983.

31. In the second incident of data falsification, Monsanto hired Craven Laboratories in 1991 to perform pesticide and herbicide studies, including for Roundup. In that same year, the owner of Craven Laboratories and three of its employees were indicted, and later convicted, of fraudulent laboratory practices in the testing of pesticides and herbicides.[5]

32. Despite the falsity of the tests that underlie its registration, within a few years of its launch, Monsanto was marketing Roundup in over one hundred countries.

---

[2] Monsanto, Backgrounder, Testing Fraud: IBT and Craven Laboratories (Sep. 2, 2015), available at https://monsanto.com/app/uploads/2017/06/ibt_craven_bkg.pdf.

[3] U.S. Envtl. Prot. Agency, Summary of the IBT Review Program Office of Pesticide Programs (1983), available at https://nepis.epa.gov/Exe/ZyNETexe/91014ULVTXT?ZyActionD=ZyDocument&Client=EPA&Index=l98l+Thru+1985&Docs=&Query=&Time=&EndTime=&SearchMethod=1&TocRestrict=n&Toc=&TocEntry=&QField=&QFieldYear=&QFieldMonth=&QFieldDay=&IntQFieldOp=0&ExtQFieldOp=0&XmlQuery=&File=D%3A%5Czyfiles%20Data%5C8lthru85%5CTxt%5C00000022%5C9l0l4ULV.txt&User=ANONYMOUS&Password=anonymous&SortMethod=h%7C-&MaximumDocuments=1&FuzzyDegree=0&ImageQuality=r75g8/r75g8/xl50y150gl6/i425&Display=hpfr&DefSeekPage=x&SearchBack=ZyActionL&Back=ZyActionS&BackDesc=Results%20page&MaximumPages=l&ZyEntry=l&SeekPage=x&ZyPURL.

[4] Marie-Monique Robin, The World According to Monsanto: Pollution, Corruption and the Control of the World's Food Supply (2011) (citing U.S. Envtl. Prot. Agency, Data Validation, Memo from K. Locke, Toxicology Branch, to R. Taylor, Registration Branch. Washington, D.C (August 9, 1978)).

[5] Monsanto, Backgrounder, Testing Fraud: IBT and Craven Laboratories, supra note 2.

### The Importance of Roundup to Monsanto's Market Dominance Profits

33.     The success of Roundup was key to Monsanto's continued reputation and dominance in the marketplace. Largely due to the success of Roundup sales, Monsanto's agriculture division was outperforming its chemicals division's operating income, and that gap increased yearly. But with its patent for glyphosate expiring in the United States in the year 2000, Monsanto needed a strategy to maintain its Roundup market dominance and to ward off impending competition.

34.     In response, Monsanto began the development and sale of genetically engineered Roundup Ready seeds in 1996. Since Roundup Ready crops are resistant to glyphosate, farmers can spray Roundup onto their fields during the growing season without banning the crop. This allowed Monsanto to expand its market for Roundup even further; by 2000, Monsanto's biotechnology seeds were planted on more than 80 million acres worldwide and nearly 70% of American soybeans were planted from Roundup Ready seeds. It also secured Monsanto's dominant share of the glyphosate/Roundup market through a marketing strategy that coupled proprietary Roundup Ready seeds with continued sales of its Roundup herbicide.

35.     Through a three-pronged strategy of increased production, decreased prices and by coupling with Roundup Ready seeds, Roundup became Monsanto's most profitable product. In 2000, Roundup accounted for almost $2.8 billion in sales, outselling other herbicides by a margin of five to one, and accounting for close to half of Monsanto's revenue. Today, glyphosate remains one of the world's largest herbicides by sales volume.

### Monsanto's Knowledge About the Toxicity of Roundup

36.     Since Roundup was introduced to the market, Monsanto has made broad claims through its advertising and promotional materials that its products are safe, non-toxic, and

rigorously tested. But, in reality, the company hardly tested the real-world toxicity of its products, actively avoided pursuing studies which might show unwelcome results, and ghostwrote studies of supposedly independent scientists.

37. The first valid chronic oncogenicity study on glyphosate was submitted to the EPA in 1983 (the Bio/dynamic mouse study). It showed an increase in renal tubular adenomas in the male mice that Monsanto claimed was not treatment related. The EPA disagreed and classified glyphosate as a "possible human oncogen" in 1985.

38. Monsanto challenged the EPA's determination through multiple avenues, for years, leading to an EPA request for Monsanto to do a new and better study. A Scientific Advisory Panel convened by the EPA to provide guidance in resolving the controversy over the 1983 Bio/dynamic study called for a repeat study. The EPA adopted the SAP's advice and required a repeat mouse study in its 1986 Registration Standard document on glyphosate. Monsanto refused to conduct it and, upon information and belief, has not done so to this day.

39. The 1986 glyphosate Registration Standard document issued by the EPA required Monsanto to add several commonsense worker-safety provisions onto Roundup product labels (e.g., wear gloves, chemical resistant shoes, and goggles or a face shield when applying Roundup; discard clothes that are drenched; wash clothes separately from other laundry). Monsanto refused to add the majority of these provisions to their product labels.

40. Monsanto has refused since the mid-1980s to conduct the studies needed to resolve uncertainty over the carcinogenicity of Roundup, including studies specifically requested by the EPA. The failure of Monsanto to invest in new and better science, such as the more powerful mouse cancer replacement study requested by the EPA in 1986, has perpetuated scientific

uncertainty and undermined the EPA's ability to understand and quantify the health risks of Roundup.

41.    Dr. Donna Farmer, a senior Monsanto scientist, wrote the following to a Monsanto communications professional: "You cannot say that Roundup is not a carcinogen... we have not done the necessary testing on the formulation to make that statement. The testing of the formulations are not anywhere near the level of the [testing on] the active ingredient."

> The terms glyphosate and Roundup cannot be used interchangeably nor can you use "Roundup" for all glyphosate-based herbicides any more. For example you cannot say that Roundup is not a carcinogen...we have not done the necessary testing on the formulation to make that statement. The testing on the formulations are not anywhere near the level of the active ingredient. We can make that statement about glyphosate and can infer that there is no reason to believe that Roundup would cause cancer.

42.    In the same email, Dr. Farmer warned that Monsanto "cannot support the statement" that Roundup produces "'no adverse effects whatsoever on flora, or fauna or on the human body." This is because, as Dr. Farmer explained, "[a]dverse effects are seen on flora (glyphosate is meant to kill vegetation), adverse effects on fauna - in studies with laboratory animals - even death is seen (LD50 studies for example) and in humans - mild reversible eye and skin irritation are seen with normal use and death can occur in suicide attempts."

> We cannot support the statement about "no adverse effects whatsoever on flora, or fauna or on the human body". Adverse effects are seen on flora (glyphosate is meant to kill vegetation), adverse effects on fauna - in studies with laboratory animals - even death is seen (LD50 studies for example) and in humans - mild reversible eye and skin irritation are seen with normal use and death can occur in suicide attempts. Therefore we advise using the phrase...."When Roundup herbicides are used according to label directions, no unreasonable adverse effects to people, wildlife, and the environment are expected."

43.    In addition to the active ingredient glyphosate, surfactants are added to Roundup products to speed up the movement of glyphosate through weed leaf surfaces, and then into the cells of weeds. Roundup surfactants act roughly the same way when Roundup comes into contact

with human skin. In other words, the formulation penetrates human skin, making Roundup markedly more toxic to exposed humans than glyphosate alone.

44.    For decades, there have been multiple studies showing that formulated Roundup is more toxic than pure, 100% technical glyphosate. Most of the surfactants in Roundup-brand herbicides are even more toxic, ounce for ounce, than glyphosate. Plus, pure glyphosate does not move as readily through the skin or into cells, whereas Roundup does.

45.    Despite knowledge of the differences in toxicity and risks arising from exposures to formulated Roundup in contrast to pure glyphosate, Monsanto has not carried out critical, long-term cancer feeding studies with Roundup. Nor has anyone else.

46.    Monsanto has refused to conduct state-of-the-art genotoxicity assays in mammals and in human populations exposed to formulated Roundup.

47.    In 1999, Monsanto hired Dr. James Parry, a world-renowned genotoxicity expert, to advise the company on what steps it should take to better understand and respond to public literature studies reporting evidence of a genotoxic response following exposures to glyphosate and/or a glyphosate-based herbicide. Dr. Parry identified several deficiencies in the available data on glyphosate. For one, he explained there is "[n]o adequate in vitro clastogenicity data available for glyphosate formulations." He thus recommended that Monsanto "provide comprehensive in vitro cytogenetic data on glyphosate formulations." He also concluded, "[m]y overall view is that if the reported genotoxicity of glyphosate and glyphosate formulations can be shown to be due to the production of oxidative damage then a case could be made that any genetic damage would be thresholded ... it may be necessary to consider the possibility of susceptible groups within the human population."

48.     In total, Dr. Parry provided Monsanto eleven (11) specific recommendations for further genotoxicity research. Monsanto refused to conduct new studies in nine (9) of the eleven (11) areas. In a September 1999 email, Monsanto's chief of regulatory science, William Heydens, wrote to his Monsanto colleagues after reading Dr. Parry's report on glyphosate. In his correspondence, Heydens stated: "We want to find/develop someone who is comfortable with the genetox profile of glyphosate/Roundup and who can be influential with regulators and Scientific Outreach operations when genetox issues arise. My read is that Parry is not currently such a person, and it would take quite some time and $$$/studies to get him there. We simply aren't going to do the studies Parry suggests."

However, let's step back and look at what we are really trying to achieve here. We want to find/develop someone who is comfortable with the genetox profile of glyphosate/Roundup and who can be influential with regulators and Scientific Outreach operations when genetox. issues arise. My read is that Parry is not currently such a person, and it would take quite some time and $$$/studies to get him there. We simply aren't going to do the studies Parry suggests. Mark, do you think Parry can become a strong advocate without doing this work Parry? If not, we should *seriously* start looking for one or more other individuals to work with. Even if we think we can eventually bring Parry around closer to where we need him, we should be currently looking for a second/back-up genetox. supporter. We have not made much progress and are currently very vulnerable in this area. We have time to fix that, but only if we make this a high priority now.

49.     In another email the same month, Monsanto executive Stephen Wratten said he was "disappointed in the Parry report," asking "[h]as he ever worked with industry before on this sort of project?" Later in the same email, Wratten intoned that the Parry report is not useful for Monsanto: "I do not see that he has stuck his neck out on anything at all controversial, and therefore, there is little value in the write-up as written that could be useful. Hope it didn't cost much…."

Overall, I guess we have his recommendation of studies that could be used to strengthen the database on p. 4. , but that is about it. I do not see that he has stuck his neck out on anything at all controversial, and therefore, there is little value in the write-up as written that could be useful. Hope it didn't cost much. Perhaps this is too harsh, and I don't know what your proposal to him was, but I guess I would expect more than this of a Professor.

50.     Later on, in the same email chain, Monsanto toxicologist Donna Farmer discussed

the fallout from Dr. Parry's report on glyphosate with her colleagues. She wrote: "right now the

only person I think that can dig us out of this 'genetox hole' is the Good Dr. Kier…I am concerned

about leaving Perry [sic] out there with this as the final project/his final impressions…."

> One option…I agree we need someone else to interface with Perry… right now the only person I think that
> can dig us out of this "genetox hole" is the Good Dr. Kier…
>
> other option….I am concerned about leaving Perry out there with this as the final project/his final
> impressions…………….if you remember his first report…he was looking for work for a graduate student (I
> wonder if this evaluation was his or someone else's?)
>
> Maybe you, Bill, Larry, Steve and I can get together to figure out where and how we go from here. Steve's
> opinion of the report was pretty clear…he also suggested as an option to drop Perry.

51.     In correspondence, Monsanto personnel expressed reluctance to conduct studies on

glyphosate, Roundup formulations, or surfactant ingredients, suggesting Monsanto was concerned

about the results it would find it if did the tests. In a September 1999 email, for example, Stephen

Wratten criticized the Parry report by noting that "of course" Monsanto knew there was no data to

support points it wanted to make relating to Roundup's genotoxicity, and Monsanto scientists

"didn't need [Dr. Parry] to tell [them] that." What Monsanto wanted Dr. Parry to do (instead of

suggesting additional independent and rigorous testing) was to argue against the reliability of

independent studies that were bad for Monsanto's bottom line:

> 8. Of course we know there were no data of the type listed in points 2, 3, and 4 on p. 3. We didn't need him
> to tell us that. The key point is whether the conclusions of Bolognesi, and Rank can be discounted on the
> basis of the strength and number of studies at hand, or whether their experiments need to be repeated
> independently to credibly refute the findings. Of course we knew that the latter would be the most convincing
> approach, but we need him to make any arguments that can be made on the data we have.

52.     In another email from 1999, Dr. Farmer resisted the suggestion that the company

do additional studies on the genotoxicity of Roundup, including formulations or other surfactant

ingredients:

It is too premature to discuss conducting any studies. I will not support doing any studies on glyphosate,
formulations or other surfactant ingredients at this time with the limited information we have on the situation.
As Bill indicated below we have a ton of data .....that was submitted and reviewed.

53.     Other internal correspondence demonstrates that some of Monsanto's executives
were concerned about the safety of Roundup and results that would be obtained if Roundup were
rigorously tested according to Parry's recommendations. One Monsanto scientist wrote in 2001:
"If someone came to me and said they wanted to test Roundup I know how I would react - with
serious concern."

54.     Comments made by other Monsanto executives indicate their awareness that
glyphosate becomes toxic when mixed with other ingredients. Thus, the formulated product-
Roundup-is more toxic than its active ingredient. In 2002, William Heydens and Donna Farmer
discussed various studies observing adverse effects by the formulated Roundup product.
Specifically, Farmer acknowledged: "[t]he interest point is glyphosate all basically had no effect
the formulated product did - does this point us to the coformulants - sufactants? [sic]" Heydens
also admitted, after discussing with Monsanto consultant John DeSesso, that "we are in pretty good
shape with glyphosate but vulnerable with surfactants What I've been hearing from you is that this
continues to be the case with these studies - Glyphosate is OK but the formulated product (and
thus the surfactant) does the damage."

Your last comment hits exactly where I am coming from.  We discussed the situation with Holson and
DeSesso and concluded, not surprisingly, that we are in pretty good shape with glyphosate but vulnerable
with surfactants.  What I've been hearing from you is that this continues to be the case with these
studies - Glyphosate is OK but the formulated product (and thus the surfactant) does the damage.

55.     Despite Monsanto's longstanding awareness of the danger of the formulated
product, and the damage caused by the addition to Roundup of the surfactants in particular,
Monsanto's website continues to advertise, to this day, that "Glyphosate-based herbicides,

including Roundup-brand formulated products with surfactants, all have a long history of safe use and do not pose any unreasonable risk to human health when used according to label directions."[6]



56.     Rather than conduct the more sophisticated genotoxicity studies recommended by Dr. Parry and others, Monsanto instead commissioned members of its third-party network of glyphosate-friendly scientists to write and publish articles arguing that evidence of genotoxicity in public literature studies is the result of flawed study designs, excessive dose levels, inappropriate routes of administration, overt toxicity, or other technical problems. Many of these reviews were ghost-written by Monsanto scientists not listed among the co-authors.

57.     Monsanto made heavy use of supposedly independent scientists in its "Scientific Outreach" and PR campaigns in support of the safety of glyphosate and Roundup-brand herbicides. In some instances, such individuals were appointed to an ad hoc, or standing advisory committee or panel. In other cases, they simply worked on a fee-for-service basis on a defined task. Many of these glyphosate-friendly experts had once worked for Monsanto. Many have authored or co-authored papers commissioned and paid for by Monsanto. Most of these papers contained passages

---

[6] *See* Monsanto's webpage "What is a surfactant?," available at https://monsanto.com/products /safety-information/what-is-a-surfactant/.

ghost-written by Monsanto scientists, and some were largely ghost-written by Monsanto. "Ghost-writing" refers to contributions to a written document by a person not listed as the author, or among the co-authors of the document. The practice is considered to be serious ethical misconduct.

58.     As far back as 1999, Monsanto was operating behind the scenes to influence the science and bolster the public perception of the safety of glyphosate and Roundup. William Heydens, the Monsanto executive who spearheaded Monsanto's manipulation of the scientific literature via ghostwriting, wrote in a May 1999 email that Monsanto's plan for scientific outreach planning involved maintaining a cohort of "outside scientific experts who are influential at driving science, regulators, public opinion, etc. We would have they [sic] people directly or indirectly /behind-the-scenes work on our behalf."



59.     Heydens succinctly summarized Monsanto's goal: to encourage "people to get up and shout Glyphosate is Non-toxic."

60.     The more formal statement of the "Overall purpose" of Monsanto's "Glyphosate Scientific Outreach Plan" (SO Plan) appears at the beginning of a June 1999 document: "Ensure that Monsanto's glyphosate-containing herbicides are widely viewed throughout the scientific community as posing no threat to human health or the environment. This support [from third-party network experts] will be used to favorably influence current and future possible challenges in the regulatory and public arena."

61.     The unconditional statement in the above-quoted paragraph-"no threat to human health or the environment"- stands in sharp contrast to the more nuanced statements by scientists

Monsanto itself commissioned to review the genotoxicity or oncogenicity literature, or by the EPA. No scientist has been willing to say that Roundup poses no threat to human health. For example, Kier and Kirkland, two Monsanto-commissioned scientists, concluded in a 2013 review of glyphosate genotoxicity that "Glyphosate and typical [glyphosate-based herbicides] do not appear to present significant genotoxic risk under normal conditions of human or environmental exposures." The scientists do not rule out the possibility of some genotoxic risk from exposures to glyphosate-based herbicides under normal conditions, nor the possibility of significant genotoxic risk in the event of unusually high glyphosate-based herbicide exposure episodes.

62.     Over the years, Monsanto systematically attacked scientists whose research threatened their profits. For example, in an April 2001 email, Heydens warned his colleagues that "[d]ata generated by academics has always been a major concern for us in the defense of our products."

| Message | |
|---|---|
| From: | HEYDENS, WILLIAM F [FND/1000] [/O=MONSANTO/OU=NA-1000-01/CN=RECIPIENTS/CN=230737] |
| Sent: | 4/10/2001 6:09:25 PM |
| To: | JACOBS, ERIK [AG/5040] [erik.jacobs@monsanto.com]; MARTENS, MARK A [AG/5040] [mark.a.martens@monsanto.com]; MCKENNA, RUTH M [AG/5040] [ruth.m.mckenna@monsanto.com]; VAN BOSSUYT, ALFRED [AG/5035] [alfred.van.bossuyt@monsanto.com] |
| Subject: | RE: Propachlor sample request |

All,

Please don't do anything until we discuss this. Data generated by academics has always been a major concern for us in the defense of our products.

63.     In an email from October 2008, Dean Nasser, a Monsanto employee, sent his colleagues a study showing the link between glyphosate and non-Hodgkin's lymphoma:



64.     Dr. Farmer responded: "We have been aware of this paper for awhile and knew it would only be a matter of time before the activists pick it up … how do we combat this?"

> Nassar,
>
> Thank you for forwarding this. We have been aware of this paper for awhile and knew it would only be a matter of time before the activists pick it up. I have some epi experts reviewing it. As soon as I have that review we will pull together a backgrounder to use in response.
>
> Here is their bottom line…how do we combat this?
>
> Avoid carcinogenic herbicides in foods by supporting organic agriculture, and on lawns by using non-toxic land care strategies that rely on soil health, not toxic herbicides.

65.     In 2012, Monsanto executives discussed their efforts to retract a paper written by Professor Seralini in the journal Food and Chemical Toxicology, which pertained to the biological plausibility of glyphosate as a human carcinogen-a conclusion adverse to Monsanto's commercial agenda. Specifically, Monsanto executives galvanized scientists to send letters to the magazine's Editor-in-Chief seeking retraction of the Seralini study. In correspondence from September 2012, Monsanto employee Dr. Goldstein stated: "I was uncomfortable even letting shareholders know we are aware of this LTE.. .it implies we had something to do with it-otherwise how do we have knowledge of it? I could add 'Aware of multiple letters to editor including one signed by 25

18

scientists from 14 countries' if you both think this is OK." He added that he was being asked "to keep internal correspondence down on this subject."

> Considered doing this already- but I was uncomfortable even letting shareholders know we are aware of this LTE.... It implies we had something to do with it- otherwise how do we have knowledge of it?
>
> I could add "Aware of multiple letters to editor including one signed by 25 scientists from 14 countries" if you both think this is OK.
>
> We are being asked to keep internal correspondence down on this subject.

66.     In response, Eric Sachs said: "We are 'connected' but did not write the letter or encourage anyone to sign it."

67.     In a document outlining the "Business Goals" of Monsanto employee David Saltmiras for the fiscal year 2013, Dr. Saltmiras wrote: "Throughout the late 2012 Seralini rat cancer publication and media campaign, I leveraged my relationship the Editor of Chief of the publishing journal, Food and Chemical Toxicology and was the single point of contact between Monsanto and the Journal." Moreover, Dr. Saltmiras acknowledged that he "[s]uccessfully facilitated numerous third-party expert letters to the editor which were subsequently published, reflecting the numerous significant deficiencies, poor study design, biased reporting and selective statistics employed by Seralini."

68.     In multiple other letters and correspondence, Monsanto has expressed its intent to attack independent scientists who raised concerns about the toxicity of its products.

69.     In late 2014, the International Agency for Research on Cancer (IARC) announced that it was recommending dozens of pesticides for evaluation, including glyphosate. When the IARC review was announced, Monsanto's Donna Farmer wrote to former employee, John Acquavella, in an email dated September 18, 2014: "Just wanted to let you that what we have long

19

been concerned about has happened. [sic] Glyphosate is on for an IARC review in March 2015." Farmer then wrote: "Glyphosate had been listed as a medium priority for 2015-2016 but clearly something happened and it got moved up to ultra priority."

70.     Monsanto not only anticipated the carcinogenic classification for glyphosate and glyphosate-based formulations, but proactively sought to combat the expected result by engaging supposed third-party academics who acted on Monsanto's behalf as purportedly "independent" experts in signing onto Monsanto ghostwritten reports which were then published in leading toxicology journals and in the media.

71.     In an email dated February 19, 2015, one month prior to the release of the IARC report on glyphosate, Monsanto executive William Heydens proposed that the company "ghost-write" sections of a paper on Roundup's toxicity. In the email, Heydens wrote that they would "add Greim and Kier or Kirkland to have their names on the publication, but we would be keeping the cost down by us doing the writing and they would just edit & sign their names so to speak." Heydens also wrote that this is how Monsanto had "handled" an earlier paper on glyphosate's safety.

72.     As discussed more fully in the following section, the IARC released its findings in March 2015. The report classified Roundup as "probably carcinogenic." After the release of the IARC report, Monsanto set to work on a campaign to influence the press and public perception regarding the safety of its products. Again, the campaign involved ghostwriting drafts of articles that would appear in respected news magazines. In an email dated March 12, 2015, Eric Sachs of Monsanto asked Henry Miller, a Forbes contributor and fellow of the Stanford Hoover Institute, to write about the IARC "process and controversial decision" to classify Roundup as probably carcinogenic. Mr. Miller responded that he would be willing to assist Monsanto if he "could start

from a high-quality draft." In response, Monsanto informed Mr. Miller that Monsanto already had "a draft nearly done" that it would send to Mr. Miller by tomorrow.



73.    In another email dated May 11, 2015 and entitled "RE: Post-IARC Activities to Support Glyphosate," Heydens wrote that Monsanto would ghost-write a manuscript refuting the animal data cited by the IARC, noting that the manuscript "would be more powerful if authored by non-Monsanto scientists (e.g., Kirkland, Kier, Williams, Greim, and maybe Keith Solomon)":



74.    After the IARC report came out, Monsanto also organized an ostensibly independent "Expert Panel" for the purpose of conducting an evaluation of the IARC data. But the Expert Panel was anything but an independent collection of neutral scientists rendering an opinion on the toxicity of glyphosate. The conclusions of the Expert Panel were substantially edited and/or authored by Monsanto's own executives.

75.     The question of the ethical permissibility of ghostwriting arose when, in the course of assigning authorship, a member of the Expert Panel and former Monsanto employee, John Acquavella, was excluded from a poster planned for a 2015 Society for Risk Analysis meeting.  In response, Heydens wrote in an email to Acquavella dated November 3, 2015: "I thought we discussed previously that it was decided by our management that we would not be able to use you or Larry [Kier] as Panelists/ authors because of your prior employment at Monsanto…." Acquavella responded: "I didn't realize that Bill.  Also, I don't think that will be okay with my panelists.  We call that ghost writing and it is unethical."  In another email to Heydens in the same chain, Acquavella wrote: "I can't be part of deceptive authorship on a presentation or publication.  Please note the ICJME guidelines below that everyone goes by to determine what is honest/ ethical regarding authorship."

You guys know me. I can't be a part of deceptive authorship on a presentation or publication. Please note the ICJME guidelines below that everyone goes by to determine what is honest/ethical regarding authorship.

76.     These concerns did not stop Monsanto from continuing to influence and author reviews on the safety of glyphosate, while advertising the work as independent. In July 2016, the journal Critical Reviews in Toxicology published "A review of the carcinogenic potential of glyphosate by four independent expert panels and comparison to the IARC assessment." Sixteen scientists signed their names to the published work, declaring to readers that their conclusions were free of Monsanto's intervention. Underscoring the supposed independence of the work, the declaration of interest section of the published review stated: "Neither any Monsanto company employees nor any attorneys reviewed any of the Expert Panel's manuscripts prior to submission to the journal." This was false. Internal Monsanto documents reveal that Heydens not only

reviewed the manuscripts but had a hand in drafting and editing them. The finished papers were aimed directly at discrediting IARC's classification. In one internal email, Heydens told the organizer of the panel: "I have gone through the entire document and indicated what I think should stay, what can go, and in a couple spots I did a little editing."

| From: | HEYDENS, WILLIAM F [AG/1000] [/O=MONSANTO/OU=NA-1000-01/CN=RECIPIENTS/CN=230737] |
|---|---|
| Sent: | 2/9/2016 11:43:08 PM |
| To: | Ashley Roberts Intertek |
| Subject: | RE: summary article |
| Attachments: | Summary Manuscript Draft 2 0 Feb 5 2016_jfa_wfh.docx |

Ashley,

OK, I have gone through the entire document and indicated what I think should stay, what can go, and in a couple spots I did a little editing. I took a crack at adding a little text on page 10 to address John's comments about toxicologists' use of Hill's criteria – see what you think; it made sense to me, but I'm not sure if it will to others - please feel free to further modify and/or run by Gary.

After you have looked through this, let's discuss.

77. Internal Monsanto documents show that Heydens even argued over statements that he wanted included but that John Acquavella deemed "inflammatory" and "not necessary" criticisms of the IARC. Heydens' edits to draft documents contradicted Acquavella, even though Heydens was not supposed to have even reviewed the papers. Heydens went so far as to state: "I would ignore John's comment" and "I don't see a reason for deleting the text that John did below."

78. The scientific literature is littered with ghostwritten papers declaring Roundup and glyphosate to be safe. Through its ghostwriting campaigns, Monsanto sought to hide or discredit independent research showing that its products are hazardous to human health. All the while, Monsanto advertised its products as completely safe and non-toxic to an unsuspecting public.

**False Representations Regarding the Safety of Roundup**

79. In 1996, the New York Attorney General ("NYAG") filed a lawsuit against Monsanto based on its false and misleading advertising of Roundup products. Specifically, the

lawsuit challenged Monsanto's general representations that its spray-on glyphosate-based herbicides, including Roundup, were "safer than table salt" and "practically non-toxic" to mammals, birds, and fish. Among the representations the NY AG found deceptive and misleading about the human and environmental safety of glyphosate and/or Roundup are the following:

a. "Remember that environmentally friendly Roundup herbicide is biodegradable. It won't build up in the soil so you can use Roundup with confidence along customers' driveways, sidewalks and fences..."

b. "And remember that Roundup is biodegradable and won't build up in the soil. That will give you the environmental confidence you need to use Roundup everywhere you've got weed, brush, edging or trimming problem."

c. "Roundup biodegrades into naturally occurring elements."

d. "Remember that versatile Roundup herbicide stays where you put it. That means there's no washing or leaching to harm customers' shrubs or other desirable vegetation."

e. "This non-residual herbicide will not wash or leach in the soil. It... stays where you apply it."

f. "You can apply Accord with... confidence because it will stay where you put it... it bonds tightly to soil particles, preventing leaching. Then, soon after application, soil microorganisms biodegrade Accord into natural products."

g. "Glyphosate is less toxic to rats than table salt following acute oral ingestion."

h. "Glyphosate's safety margin is much greater than required. It has over a 1,000-fold safety margin in food and over a 700-fold safety margin for workers who manufacture it or use it."

     i.  "You can feel good about using herbicides by Monsanto. They carry a toxicity category rating of 'practically non-toxic' as it pertains to mammals, birds and fish."

     j.  "Roundup can be used where kids and pets will play and breaks down into natural material." This ad depicts a person with his head in the ground and a pet dog standing in an area which has been treated with Roundup.[7]

80.    On November 19, 1996, Monsanto entered into an Assurance of Discontinuance with NYAG, in which Monsanto agreed, among other things, "to cease and desist from publishing or broadcasting any advertisements [in New York] that represent, directly or by implication" that:

     a.  its glyphosate-containing pesticide products or any component thereof are safe, non-toxic, harmless or free from risk.

     b.  its glyphosate-containing pesticide products or any component thereof manufactured, formulated, distributed or sold by Monsanto are biodegradable

     c.  its glyphosate-containing pesticide products or any component thereof stay where they are applied under all circumstances and will not move through the environment by any means.

     d.  its glyphosate-containing pesticide products or any component thereof are "good" for the environment or are "known for their environmental characteristics."

     e.  glyphosate-containing pesticide products or any component thereof are safer or less toxic than common consumer products other than herbicides

---

[7] Attorney General of the State of New York, In the Matter of Monsanto Company, Assurance of Discontinuance Pursuant to Executive Law § 63(15) (Nov. 1996).

      f.   its glyphosate-containing products or any component thereof might be classified as "practically non-toxic."

81.    Monsanto did not alter its advertising in the same manner in any state other than New York, and on information and belief it still has not done so today.

**IARC Classification of Glyphosate**

82.    On March 15, 2015, the International Agency for Research on Cancer ("IARC"), an agency of the World Health Organization ("WHO"), issued an evaluation of several herbicides, including glyphosate. That evaluation was based, in part, on studies of exposure to glyphosate in several countries around the world, and it traces the health implications from exposure to glyphosate since 2001. The summary published in The Lancet Oncology reported that glyphosate is a Group 2A agent and probably carcinogenic in humans.

83.    On July 29, 2015, IARC issued the formal monograph relating to glyphosate. In that monograph, the IARC Working Group provides a thorough review of the numerous studies and dates relating to glyphosate exposure in humans.

84.    The IARC process for the classification of glyphosate followed IARC's stringent procedures for the evaluation of a chemical agent. Evaluations are performed by panels of international experts, selected based on their expertise and the absence of actual or apparent conflicts of interest.

85.    In preparing its Monograph, a Working Group of seventeen (17) experts from eleven (11) countries met at IARC from March 3-10, 2015 to assess the carcinogenicity of certain herbicides, including glyphosate.

86. The March meeting culminated a nearly one-year review and preparation by the IARC Secretariat and the Working Group, including a comprehensive review of the latest available scientific evidence.

87. Glyphosate was identified as the second-most used household herbicide in the United States for weed control between 2001 and 2007 and the most heavily used herbicide in the world in 2012.

88. Exposure pathways are identified as air (especially during spraying), water, and food. Community exposure to glyphosate is widespread and found in soil, air, surface water, and groundwater, as well as in food.

89. The assessment of the IARC Working Group identified several case control studies of occupational exposure in the United States, Canada, and Sweden. These studies show a human health concern from agricultural and other work-related exposure to glyphosate.

90. The IARC Working Group found an increased risk between exposure to glyphosate and non-Hodgkin lymphoma and several subtypes of non-Hodgkin lymphoma, and the increased risk persisted after adjustment for other pesticides.

91. The IARC Working Group also found that glyphosate caused DNA and chromosomal damage in human cells. One study in community residents reported increases in blood markers of chromosomal damage (micronuclei) after glyphosate formulations were sprayed.

92. In male CD-I mice, glyphosate induced a positive trend in the incidence of a rare tumor: renal tubule carcinoma. A second study reported a positive trend for haemangiosarcoma in male mice. Glyphosate increased pancreatic islet-cell adenoma in male rats in two studies. A glyphosate formulation promoted skin tumors in an initiation-promotion study in mice.

93. The IARC Working Group also noted that glyphosate has been detected in the urine of agricultural workers, indicating absorption. Soil microbes degrade glyphosate to aminomethylphosphoric acid (AMPA). Blood AMPA detection after exposure suggests intestinal microbial metabolism in humans.

94. In addition, the IARC Working Group found that glyphosate and glyphosate formulations induced DNA and chromosomal damage in mammals, and in human and animal cells in utero.

95. The IARC Working Group also noted genotoxic, hormonal, and enzymatic effects in mammals exposed to glyphosate. Essentially, glyphosate inhibits the biosynthesis of aromatic amino acids, which leads to several metabolic disturbances, including the inhibition of protein and secondary product biosynthesis and general metabolic disruption.

96. Additionally, the IARC Working Group reviewed an Agricultural Health Study, consisting of a prospective cohort of 57,311 licensed pesticide applicators in Iowa and North Carolina. While this study differed from others in that it was based on a self-administered questionnaire, the results support an association between glyphosate exposure and multiple myeloma, hairy cell leukemia (HCL), and chronic lymphocytic leukemia (CLL), in addition to several other cancers.

97. The IARC evaluation confirms that glyphosate is toxic to humans.

98. Nevertheless, Monsanto since it began selling Roundup has represented it as safe to humans and the environment. Monsanto has repeatedly proclaimed and continues to proclaim that glyphosate-based herbicides, including Roundup, create no unreasonable risk to human health or to the environment.

99.     In a document titled "Glyphosate/Roundup in the News, Safety Information" issued on March 27, 2017, Monsanto disputes the findings of the IARC and states the following: "All labeled uses of glyphosate are safe for human health and supported by one of the most extensive worldwide human health databases ever compiled on a pesticide."[8]

100.    Dow and Albaugh, who manufacture the aquatic glyphosate-based products Rodeo and Aqua Star respectively, also continue to sell their products containing glyphosate, thereby assuring the public that their products are not hazardous to human health or to the environment.

**The EPA's Review of Glyphosate**

101.    On September 12, 2016, the EPA's Office of Pesticides Program ("OPP") submitted a report, titled "Glyphosate Issue Paper: Evaluation of Carcinogenic Potential," wherein it issued a "proposed conclusion" that glyphosate is "'not likely to be carcinogenic to humans' at doses relevant to human health risk assessment."[9]

102.    The report is based upon a review of industry-sponsored articles and studies. The OPP acknowledged that it rejected all studies that considered Roundup-the formulated product-instead of studies that isolated glyphosate because "[g]lyphosate formulations contain various components other than glyphosate and it has been hypothesized these components are more toxic than glyphosate alone."[10]

103.    Thus, the OPP notes in the report that dozens of studies considered by IARC were not reviewed by the OPP because the OPP's "evaluation focused on studies on the active ingredient

---

[8]  Monsanto, *Glyphosate/Roundup In the News, Safety Information*, http://www.monsantoito.com/docs /Glyphosate_IT_0_Briefing.pdf, at 1 (March 27, 2015).

[9] *See* EPA's Office of Pesticide Programs, Glyphosate Issue Paper: Evaluation of Carcinogenic Potential (Sept. 12, 2016), available at https://www.epa.gov /sites/production/files/2016-09/documents/glyphosate_issue_paper_evaluation_of_carcincogenic_potential.pdf.

[10] *Id.*

glyphosate" and "additional research could also be performed to determine whether formulation components, such as surfactants, influence the toxicity of glyphosate formulations."[11]

104.    From December 13 to 16, 2016, the EPA held FIFRA Scientific Advisory Panel ("SAP") meetings to consider issues raised by the OPP's evaluation of glyphosate. Again, OPP only allowed the SAP to consider studies of glyphosate alone, and not any study of the formulated product. In its Charge to the FIFRA SAP, the OPP noted that "[a]lthough there are studies available on glyphosate-based pesticide formulations, the agency is soliciting advice from the FIFRA Scientific Advisory Panel (SAP) on this evaluation of human carcinogenic potential for the active ingredient glyphosate only at this time."[12]

105.    The OPP draft assessment does not actually consider how glyphosate, in conjunction with other chemicals, affects not only carcinogenicity but other physical injuries and illnesses.

### Other Studies on the Toxicity of Glyphosate

106.    In 2013, a study published in the scientific journal Entropy found that contrary to the current widely held misconception that glyphosate is relatively harmless to humans, the available evidence shows that glyphosate may be the most important factor in the development of multiple chronic diseases and conditions such as inflammatory bowel disease, anorexia nervosa, obesity, diabetes, heart disease, depression, autism, infertility, cancer and Alzheimer's disease. By interfering with the biochemistry of bacteria in our gastrointestinal tract, consumption of

---

[11] *Id.*
[12] EPA OPP, Glyphosate: Evaluation of Carcinogenic Potential, Charge to the FIFRA SAP for the October 18-21, 2016 Meeting, available at, https://www.epa.gov/sites/production/files/2016-11/documents/glyphosate_sap_charge_questions_-final.pdf.

glyphosate depletes essential amino acids and predisposes humans to a host of chronic health problems.[13]

107.    In 2016, the Ramazzini Institute, along with Bologna University, the Italian National Health Institute, George Washington University and the Icahn School of Medicine, launched the Global Glyphosate Study as a pilot study. It was a single-dose study on the health effects of glyphosate-based herbicides on Sprague Dawley rats, which had been dosed with the U.S. EPA-determined safe limit of 1.75 micrograms per kilo of body weight. The results published in May 2018 showed that glyphosate-based herbicides-at doses deemed safe and over a relatively short exposure time-can alter certain important biological parameters, markers chiefly relating to sexual development, genotoxicity, and alteration of the intestinal microbiome. In sum, the scientists involved concluded that the results show that glyphosate poses a significant public health concern.

108.    Several other studies have demonstrated that exposure to low doses of glyphosate can have detrimental health effects on humans and animals.[14]

109.    In addition to the toxicity of the active ingredient, glyphosate, several studies support the hypothesis that glyphosate-based formulations in Roundup and other products are more dangerous and toxic that glyphosate alone.

---

[13] Anthony Samsel and Stephanie Seneff, *Glyphosate's Suppression of Cytochrome P450 Enzymes and Amino Acid Biosynthesis by the Gut Microbiome: Pathways to Modern Diseases*, ENTROPY, 2013 at 15.

[14] John P. Myers, et al., *Concerns over use of glyphosate-based herbicides and risks associated with exposures: a consensus statement*, 15 ENVIRON. HEALTH 9 (2016), available at https://ehjournal.biomedcentral.com/articles /10.1186/s12940-016-0117-0; *see also* Gilles-Eric Seralini, et al, *Republished study: long-term toxicity of a Roundup herbicide and a Roundup tolerant genetically modified maize*, 26 ENVIRON. SCI. EUROPE 14 (2014), available at http://enveurope.springeropen.com/articles/l 0.1186/s12302-014-0014-5; A.L. Benedetti, et al., *The effects of subchronic exposure of Wistar rats to the herbicide Glyphosate-Biocarb*, 153(2) TOXICOL. LETT. 227-32 (2004), available at http://www.ncbi.nlm.nih.gov/pubmed/15451553; K. Larsen, et al., *Effects of Sublethal Exposure to a Glyphosate-Based Herbicide Formulation on Metabolic Activities of Different Xenobiotic- Metabolizing Enzymes in Rats*, 33(4) INT. J. TOXICOL. 307-18 (Jul. 2014), available at http://www.ncbi.nlm.nih.gov/pubmed/2498512 l; Robin Mesnage, et al., *Transcriptome profile analysis reflects rat liver and kidney damage following chronic ultra-low dose Roundup exposure*, 14 ENVIRON. HEALTH 70 (2015), available at http://www.ncbi.nlm.nih.gov/pmc/articles /PMC4549093.

110. Several countries around the world have instituted bans on the sale of Roundup and other glyphosate-containing herbicides, both before and after the IARC first announced its assessment for glyphosate in March 2015.

### Monsanto's Negligent and Fraudulent Acts

111. From the onset, Defendant Monsanto knowingly, willingly and negligently manufactured and sold Roundup in product packaging that is devoid of written safety warnings, thereby keeping consumers unaware of Roundup's carcinogenic effects or the need to take protective measures when applying the product.

112. Despite numerous scientific findings from around the world demonstrating the highly carcinogenic nature of Roundup and its main, active ingredient, glyphosate, Defendant Monsanto knowingly and willfully failed to manufacture and design packaging bearing any warnings concerning the possibility and/ or likelihood of development cancer or other injuries through the use of Roundup or even to exercise safe handling measures as a precaution.

113. Defendant Monsanto knowingly and willfully failed to provide safety and health warnings to consumers concerning the use of Roundup.

114. Defendant Monsanto knowingly and willfully maintained a singular focus: earning billions of dollars in quarterly and annual profits from Roundup sales.

115. Since Monsanto began selling Roundup, it has represented the product as safe to humans and the environment. It repeatedly claimed that glyphosate-based herbicides, including Roundup, pose no unreasonable risks to human health or to the environment.

116. Defendant Monsanto knowingly and willfully prioritized profits over the health and safety of millions of people around the world.

## Plaintiff's Exposure to Roundup

117.    Joseph Komarmy had been a Florida resident since childhood.

118.    Mr. Komarmy used Roundup products at his residence in Miami-Dade County, Florida, beginning in 1983 at the latest through 2019.

119.    Mr. Komarmy would spray Roundup year-round to control the weeds on his property.  Mr. Komarmy followed all safety and precautionary warnings during the course of his use.

120.    Mr. Komarmy stopped spraying Roundup in 2019 once he discovered that the products had links to cancer.

121.    In September of 2019, Mr. Komarmy began to feel ill and underwent various diagnostic tests.

122.    In November of 2019, Mr. Komarmy was diagnosed with non-Hodgkin's mantle cell lymphoma at 72 years old that was caused by exposure to Defendant's Roundup products.  He began chemotherapy treatments quickly afterwards.

123.    During the entire time that Mr. Komarmy was exposed to Roundup, he did not know that its exposure was injurious to his health or to the health of others.

124.    Mr. Komarmy passed away on May 8, 2021, as a direct and proximate result of his nearly four decades-long use of Roundup products.

## COUNT I
## STRICT PRODUCTS LIABILITY (DESIGN DEFECT)

125.    Plaintiff adopts, realleges, and incorporates the allegations in paragraphs 1 through 124 above, and further allege the following:

126.     Plaintiff brings this strict liability claim against Defendant Monsanto for defective design.

127.     At all times material, Defendant Monsanto engaged in the business of testing, developing, manufacturing, selling, distributing, marketing, packaging design, and promoting of Roundup products, which are defective and unreasonably dangerous to consumers, including Joseph Komarmy, thereby placing Roundup products into the stream of commerce.  These actions were under the ultimate control and supervision of Defendant Monsanto. At all times relevant to this litigation, Defendant Monsanto designed, researched, developed, manufactured, produced, tested, assembled, labeled, advertised, promoted, marketed, sold, and distributed the Roundup products used by Joseph Komarmy, as described above.

128.     At all times material, Roundup products were manufactured, designed, and labeled in an unsafe, defective, and inherently dangerous manner that was dangerous for the use by or exposure to the public, and, in particular, Joseph Komarmy.

129.     At all times relevant to this litigation, Roundup products reached the intended consumers, handlers, and users or other persons coming into contact with these products in Florida and throughout the United States, including Joseph Komarmy, without substantial change in their condition as designed, manufactured, sold, distributed, labeled, and marketed by Defendant Monsanto.

130.     Roundup products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold, and marketed by Defendant Monsanto were defective in design and formulation in that when they left the hands of the manufacturers and/or suppliers, they were unreasonably dangerous and dangerous to an extent beyond that which an ordinary consumer would contemplate.

131.    Roundup products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold, and marketed by Defendant Monsanto were defective in design and formulation in that when they left the hands of the manufacturers and/or suppliers, the foreseeable risks exceeded the alleged benefits associated with their design and formulation.

132.    At all times relevant to this action, Defendant Monsanto knew or had reason to know that Roundup products were defective and were inherently dangerous and unsafe when used in the manner instructed and provided by Defendant Monsanto.  Therefore, at all times relevant to this litigation, Roundup produced as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold, and marketed by Defendant Monsanto were defective in design and formulation, in one or more of the following ways:

a.  When placed in the stream of commerce, Roundup products were defective in design and formulation, and consequently, dangerous to an extent beyond that which an ordinary consumer would contemplate;

b.  When placed in the stream of commerce, Roundup products were unreasonably dangerous in that they were hazardous and posed a grave risk of cancer and other serious illnesses when used in a reasonably anticipated manner;

c.  When placed in the stream of commerce, Roundup products contained unreasonably dangerous design defects and were not reasonably safe when used in a reasonably anticipated or intended manner;

d.  Defendant did not sufficiently test, investigate, or study Roundup products and, specifically, the active ingredient glyphosate;

e. Exposure to Roundup and glyphosate-containing products presents a risk of harmful side effects that outweigh any potential utility stemming from the use of the herbicide;

f. At the time of marketing its Roundup products, Roundup was defective in that exposure to Roundup and specifically, its active ingredient glyphosate, could result in cancer and other severe illnesses and injuries and/or death;

g. Defendant did not conduct adequate post-marketing surveillance of their Roundup products; and

h. Defendant could have employed safer alternative designs and formulations.

133. Joseph Komarmy was exposed to Roundup products in the course of his personal use, as described above, without knowledge of their dangerous characteristics.

134. At all times relevant to this litigation, Joseph Komarmy used and/or was exposed to the use of Roundup products in an intended or reasonably foreseeable manner without knowledge of their dangerous characteristics.

135. Joseph Komarmy could not have reasonably discovered the defects and risks associated with Roundup or glyphosate-containing products before or at the time of exposure.

136. The harm caused by Roundup products far outweighed their benefit, rendering these products dangerous to an extent beyond that which an ordinary consumer would contemplate. Roundup products were and are more dangerous than the alternative products that Defendant Monsanto could have designed Roundup products (including their packaging and sales aids) to make them less dangerous. Indeed, at the time that Defendant Monsanto designed Roundup products, the state of the industry's scientific knowledge was such that a less risky design or formulation was attainable.

137.     At the time Roundup products left Defendant Monsanto's control, there was a practical, technically feasible and safer alternative design that would have prevented the harm without substantially impairing the reasonably anticipated or intended function of those herbicides.

138.     Defendant Monsanto's defective design of Roundup products was willful, wanton, fraudulent, malicious, and conducted with reckless disregard for the health and safety of users of the Roundup products, including Plaintiff Joseph Komarmy.

139.     Therefore, as a result of the unreasonably dangerous condition of its Roundup products, Defendant Monsanto is strictly liable to Plaintiff.

140.     The defects in Roundup products caused or contributed to cause Joseph Komarmy's non-Hodgkin's mantle cell lymphoma, and, but for Defendant Monsanto's misconduct and omissions, Joseph Komarmy would not have sustained his injuries.

141.     Defendant Monsanto's conduct, as described above, was reckless. Defendant Monsanto risked the lives of consumers and users of its products, including Joseph Komarmy, with knowledge of the safety problems associated with Roundup and glyphosate-containing products, and suppressed this knowledge from the general public. Defendant Monsanto made conscious decisions not to redesign, warn, or inform the unsuspecting public.

142.     As a direct and proximate result of the Defendant Monsanto placing defective Roundup products into the stream of commerce and engaging in the acts and/or omissions described in this Court, Joseph Komarmy contracted non-Hodgkin's mantle cell lymphoma.

143.     Mr. Komarmy unconditionally loved and supported his wife who now suffers from future loss of support, companionship, protection, and earnings, and from dreadful mental pain and suffering. Mrs. Komarmy has also incurred significant expenses to provide her beloved husband with a proper funeral and burial.

144.    Mrs. Komarmy demands all damages under the Florida Wrongful Death Act including compensatory and punitive damages.

WHEREFORE, Argentina Komarmy, as the representative of the Estate of Joseph Komarmy, prays for judgment against Defendant Monsanto in excess of Seventy-Five Thousand Dollars ($75,000) plus costs, interests and for such other and further relief both at law and in equity to which Plaintiff may show to be justly entitled.

## COUNT II
### STRICT PRODUCTS LIABILITY (FAILURE TO WARN)

145.    Plaintiff adopts, realleges, and incorporates the allegations in paragraphs 1 through 124 above, and further allege the following:

146.    Plaintiff brings this strict liability claim against Defendant Monsanto for failure to warn.

147.    At all times material, Defendant Monsanto engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promotion Roundup products, which are defective and unreasonably dangerous to consumers, including Joseph Komarmy, because they do not contain adequate warnings or instructions concerning the dangerous characteristics of Roundup and, specifically, the active ingredient glyphosate. These actions were under the ultimate control and supervision of the Defendant.

148.    Defendant Monsanto researched, developed, designed, tested, manufactured, inspected, labeled, distributed, marketed, promoted, sold, and otherwise released into the stream of commerce Roundup products, and in the course of same, directly advertised or marketed the products to consumers and end users, including Plaintiff Joseph Komarmy, and therefore had a duty to warn of the risks associated with the use of Roundup and glyphosate-containing products.

149.     At all times material, Defendant Monsanto had a duty to properly test, develop, design, manufacture, inspect, package, label, market, promote, sell, distribute, maintain supply, provide proper warnings, and take such steps as necessary to ensure that Roundup products did not cause users and consumers to suffer from unreasonable and dangerous risks.  Defendant Monsanto as manufacturer, seller, promoter, marketer, or distributer of chemical herbicides is held to the knowledge of an expert in the field.

150.     At the time of manufacture, Defendant Monsanto could have provided the warning or instructions regarding the full and complete risks of Roundup and glyphosate-containing products because it knew or should have known of the unreasonable risks of harm associated with the use of and/or exposure to such products.

151.     At all times material, Defendant Monsanto failed to investigate, study, test, or promote the safety or to minimize the dangers to users and consumers of its product and to those who would foreseeably use or be harmed by these herbicides, including Joseph Komarmy.

152.     Despite the fact that Defendant Monsanto knew or should have known that Roundup posed a grave risk of harm, they failed to exercise reasonable care to warn of the dangerous risks associated with use and exposure.  The dangerous propensities of these products and the carcinogenic characteristics of glyphosate, as described above, were known to Defendant Monsanto, or scientifically knowable to Defendant through appropriate research and testing by known methods, at the time they distributed, marketed, promoted, supplied, or sold the product, and not known to end users and consumers, such as Joseph Komarmy.

153.     These products created significant risks of serious bodily harm to consumers, as alleged herein, and Defendant Monsanto failed to adequately warn consumers and reasonably foreseeable users of the risks of exposure to their products. Defendant Monsanto has wrongfully

concealed information concerning the dangerous nature of Roundup and its active ingredient glyphosate, and further made false and/or misleading statements concerning the safety of Roundup and glyphosate.

154. At all times material, Roundup products reached its intended consumers, handlers, and users or other persons coming into contact with these products in Florida and throughout the United States, including Joseph Komarmy, without substantial change in their condition as designed, manufactured, sold, distributed, labeled, promoted, and marketed by Defendant Monsanto.

155. Joseph Komarmy was exposed to Roundup products in the course of his personal use of Roundup without knowledge of its dangerous characteristics.

156. At all times relevant to this litigation, Joseph Komarmy used and/or was exposed to the use of Roundup products in their intended or reasonably foreseeable manner without knowledge of their dangerous characteristics.

157. Joseph Komarmy could not have reasonably discovered the defects and risks associated with Roundup or glyphosate-containing products prior to or at the time of Joseph Komarmy's exposure. Joseph Komarmy relied upon the skill, superior knowledge, and judgment of Defendant Monsanto.

158. These products were defective because the minimal warnings disseminated with Roundup products were inadequate, and they failed to communicate warnings and instructions that were appropriate and adequate, and they failed to communicate adequate information on the dangers and safe use/exposure and failed to communicate warnings and instructions that were appropriate and adequate to render the products safe for their ordinary, intended, and reasonably foreseeable uses, including agricultural and landscaping applications.

159.    The information that Defendant Monsanto did provide or communicate failed to contain relevant warnings, hazards, and precautions that would have enabled consumers, such as Joseph Komarmy, to utilize the products safely and with adequate protection.  Instead, Defendant Monsanto disseminated information that was inaccurate, false, and misleading and which failed to communicate accurately or adequately the comparative severity, duration, and extent of the risk of injuries and/or death with the use of and/or exposure to Roundup and glyphosate; continued to aggressively promote the efficacy of its products, even after it knew or should have known of the unreasonable risks from use or exposure; and concealed, downplayed, or otherwise suppressed, through aggressive marketing and promotion, any information or research about the risks and dangers of exposure to Roundup and glyphosate.

160.    To this day, Defendant Monsanto has failed to adequately and accurately warn of the true risks of Joseph Komarmy's injuries associated with the use of and exposure to Roundup and its active ingredient glyphosate, a probable carcinogen.

161.    As a result of their inadequate warnings, Roundup products were defective and unreasonably dangerous when they left the possession and/or control of Defendant Monsanto, were distributed, marketed, and promoted by Defendant Monsanto, and used by Joseph Komarmy in his personal use.

162.    Defendant Monsanto is liable to Joseph Komarmy for injuries caused by their negligent or willful failure, as described above, to provide adequate warnings or other clinically relevant information and data regarding the appropriate use of these products and the risks associated with the use of or exposure to Roundup and glyphosate.

163.    The defects in Roundup products caused or contributed to cause Joseph Komarmy's injuries, and, but for this misconduct and omissions, Joseph Komarmy would not have sustained

his injuries. To this day, Defendant Monsanto has failed to adequately and accurately warn of the true risks of Joseph Komarmy's injuries associated with the use and exposure of and exposure to Roundup and its active ingredient glyphosate, a probable carcinogen.

164.    As a result of their inadequate warnings, Roundup products were defective and unreasonably dangerous when they left the possession and/or control of Defendant Monsanto, were distributed, marketed, and promoted by Defendant Monsanto and used by Joseph Komarmy in his personal use.

165.    Defendant Monsanto is liable to Joseph Komarmy for injuries and/or death caused by its negligent or willful failure, as described above, to provide adequate warnings or other clinically relevant information and data regarding the appropriate use of these products and the risks associated with the use or exposure to Roundup and glyphosate.

166.    The defects in Roundup products caused or contributed to cause Joseph Komarmy's injuries, and, but for this misconduct and omissions, Joseph Komarmy would not have sustained his injuries.

167.    Moreover, had Defendant Monsanto provided adequate warnings and instructions and properly disclosed and disseminated the risks associated with Roundup products, Joseph Komarmy could have avoided the risk of developing injuries and/or death as alleged herein.

168.    As a direct and proximate result of the Defendant Monsanto placing defective Roundup products into the stream of commerce and engaging in the acts and/or omissions described in this Court, Joseph Komarmy contracted non-Hodgkin's mantle cell lymphoma.

169.    Mr. Komarmy unconditionally loved and supported his wife who now suffers from future loss of support, companionship, protection, and earnings, and from dreadful mental pain

and suffering. Mrs. Komarmy has also incurred significant expenses to provide her beloved husband with a proper funeral and burial.

170.     Mrs. Komarmy demands all damages under the Florida Wrongful Death Act including compensatory and punitive damages.

WHEREFORE, Argentina Komarmy, as the representative of the Estate of Joseph Komarmy, prays for judgment against Defendant Monsanto in excess of Seventy-Five Thousand Dollars ($75,000) plus costs, interests and for such other and further relief both at law and in equity to which Plaintiff may show to be justly entitled.

## COUNT III
## NEGLIGENCE

171.     Plaintiff adopts, realleges, and incorporates the allegations in paragraphs 1 through 124 above, and further allege the following:

172.     This is a cause of action for negligence, including design defect, manufacturing defect, and failure to warn.

173.     Defendant Monsanto had a duty to use reasonable care in the design, research, development, testing, assembly, packaging, manufacture, labeling, marketing, advertisement, promotion, sale, and distribution of its Roundup products in order to avoid persons exposed to Roundup products to unnecessary and unreasonable risks.

174.     Defendant Monsanto's duty of care included providing accurate, true, and correct warnings concerning the potential adverse effects of exposure to Roundup products.

175.     Defendant Monsanto breached that duty by acting in a way that a reasonably careful manufacturer, designer, advertiser, marketer, promotor, and distributor would not act under like circumstances and by failing to take actions that a reasonably careful manufacturer, designer,

advertiser, marketer, promotor and distributor would take under like circumstances. Specifically, Defendant Monsanto breached their duty of care in one or more of the following ways:

a. By manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing Roundup products without thorough and adequate pre- and post-market testing;

b. By manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing Roundup products while negligently and/or intentionally concealing and failing to disclose the results of trials, tests, and studies of exposure to glyphosate and other ingredients in Roundup products, and consequently the risk of serious harm associated with human use and exposure to Roundup;

c. By failing to undertake sufficient studies and conduct necessary tests to determine whether or not Roundup products and glyphosate-containing products were safe for their intended use;

d. By failing to use reasonable and prudent care in the design, research, manufacture, and development of Roundup products so as to avoid the risk of harm associated with exposure to Roundup and/or glyphosate as an herbicide;

e. By failing to design and manufacture Roundup products so as to ensure they were at least as safe and effective as other herbicides on the market;

f. By failing to provide adequate instructions, guidelines, and safety precautions to those persons who Defendant Monsanto could reasonably foresee would use and/or be exposed to its Roundup products;

g.  By failing to disclose to consumers and the general public, including Joseph Komarmy, that the product's risk of harm was unreasonable and that there were safer and effective alternative herbicides available;

h.  By failing to give appropriate warnings about other risks of which Defendant Monsanto knew or should have known are involved in the reasonably foreseeable use of and/or exposure to Roundup products;

i.  By systemically suppressing or downplaying contrary evidence about the risks, incidence, and/or prevalence of the side effects of Roundup and glyphosate-containing products;

j.  By representing that its Roundup products were safe for their intended use when, in fact, Defendant Monsanto knew or should have known that the products were not safe for their intended purpose;

k.  By declining to make or propose any changes to Roundup products' labeling or other promotional materials that would alert consumers and the general public of the risks of Roundup, glyphosate, and any other ingredients in Roundup products ;

l.  By advertising, marketing, and recommending the use of Roundup products, while concealing and/or failing to disclose or warn of the dangers known by Defendant Monsanto to be associated with or caused by the use of or exposure to Roundup, glyphosate, and any other ingredients in Roundup products;

m.  By continuing to disseminate information to its consumers, which indicate or imply that Roundup products are not unsafe for use;

n.  By continuing the manufacture and sale of its products with the knowledge that the products were unreasonably unsafe and dangerous.

176.     Monsanto knew or reasonably should have foreseen that individuals such as Joseph Komarmy would suffer injuries as a result of their failure to exercise reasonable care in the manufacturing, marketing, labeling, distribution, and sale of Roundup products.

177.     As a direct and proximate result of the negligence of Defendant Monsanto, Roundup products caused Joseph Komarmy's injuries. Defendant Monsanto's negligence caused or substantially contributed to causing Joseph Komarmy to suffer economic and non-economic damages. But for their negligence, these injuries, damages, and losses would not have occurred.

178.     As a direct and proximate result of the Defendant Monsanto placing defective Roundup products into the stream of commerce and engaging in the acts and/or omissions described in this Court, Joseph Komarmy contracted non-Hodgkin's mantle cell lymphoma.

179.     Mr. Komarmy unconditionally loved and supported his wife who now suffers from future loss of support, companionship, protection, and earnings, and from dreadful mental pain and suffering. Mrs. Komarmy has also incurred significant expenses to provide her beloved husband with a proper funeral and burial.

180.     Mrs. Komarmy demands all damages under the Florida Wrongful Death Act including compensatory and punitive damages.

WHEREFORE, Argentina Komarmy, as the representative of the Estate of Joseph Komarmy, prays for judgment against Defendant Monsanto in excess of Seventy-Five Thousand Dollars ($75,000) plus costs, interests and for such other and further relief both at law and in equity to which Plaintiff may show to be justly entitled.

### COUNT IV
### BREACH OF EXPRESS WARRANTIES

181.     Plaintiff adopts, realleges, and incorporates the allegations in paragraphs 1 through 124 above, and further allege the following:

182. At all relevant times, Defendant Monsanto engaged in the business of testing, developing, designing, formulating, manufacturing, marketing, selling, distributing, and promoting its Roundup products, which are defective and unreasonably dangers to users and consumers, including Joseph Komarmy, thereby placing Roundup products into the stream of commerce. These actions were under the ultimate control and supervision of Defendant.

183. Roundup products were expected to reach and did in fact reach consumers and users, including Joseph Komarmy, without substantial change in the condition in which they were manufactured and sold by Defendant Monsanto.

184. Before the time that Joseph Komarmy was exposed to Roundup products, Defendant Monsanto expressly warranted to its consumers and users, including Joseph Komarmy, that its Roundup products were of merchantable quality and safe and fit for the use for which they were intended and were not unreasonably dangerous for their intended purpose, specifically, as horticultural herbicides.

185. Defendant Monsanto, through its advertising and promotional materials, expressly warranted that Roundup products were safe for their intended use and were not unreasonable dangerous for their intended purpose.

186. Defendant Monsanto, however, failed to disclose that Roundup products have dangerous propensities when used as intended and that the use of and/or exposure to Roundup and glyphosate-containing products carries an increased risk of developing severe injuries, including Joseph Komarmy's injuries.

187. The representations, as set forth above, contained or constituted affirmations of fact or promises made by the seller to the buyer which related to the goods and became part of the basis

47

of the bargain creating an express warranty that the goods shall conform to the affirmations of fact or promises.

188.    Defendant Monsanto breached its express warranties, and Roundup did not conform to the representations made by Defendant Monsanto, in that Roundup products were not safe for their intended use.

189.    Joseph Komarmy reasonably relied to his detriment on Defendant Monsanto's express warranties.

190.    As a direct and proximate result of Defendant Monsanto placing defective Roundup products into the stream of commerce and engaging in the acts and/or omissions and failing to warn Joseph Komarmy of the increased risks of non-Hodgkin's lymphoma associated with the use of/ and or exposure to Roundup products as described in this Court, Joseph Komarmy contracted non-Hodgkin's mantle cell lymphoma.

191.    Mr. Komarmy unconditionally loved and supported his wife who now suffers from future loss of support, companionship, protection, and earnings, and from dreadful mental pain and suffering. Mrs. Komarmy has also incurred significant expenses to provide her beloved husband with a proper funeral and burial.

192.    Mrs. Komarmy demands all damages under the Florida Wrongful Death Act including compensatory and punitive damages.

WHEREFORE, Argentina Komarmy, on behalf of the Estate of Joseph Komarmy, prays for judgment against Defendant Monsanto, in excess of Seventy-Five Thousand Dollars ($75,000) plus costs, interests and for such other and further relief both at law and in equity to which Plaintiff may show to be justly entitled.

## COUNT V
## SURVIVAL ACTION

193.    Plaintiff adopts, realleges, and incorporates the allegations in paragraphs 1 through 124 above, and further alleges the following:

194.    . As alleged in Counts I through IV above, Joseph Komarmy used Roundup products for nearly four decades and, as a direct and proximate result of this use, he contracted non-Hodgkin's mantle cell lymphoma that was diagnosed in 2019 that led to his death in May 2021.

195.    If Defendant Monsanto claims that Mr. Komarmy's death was caused by something other than his non-Hodgkin's mantle cell lymphoma contracted as a direct and proximate result of his use of Roundup products, then Argentina Komarmy brings this survival action on his behalf.

196.    As a direct and proximate result of Defendant Monsanto's negligence and wrongful conduct described above, Argentina Komarmy is entitled to recover damages on behalf of her husband Joseph Komarmy, from the time of his diagnosis until the date of his passing, for but not limited to:

    a.    bodily injury and resulting in pain and suffering, disability;

    b.    mental anguish;

    c.    loss of capacity for the enjoyment of life;

    d.    embarrassment; inconvenience;

    e.    expense of hospitalization;

    f.    medical and nursing care and treatment;

    g.    loss of earnings;

    h.    loss of ability to earn money and aggravation of a previously existing condition;

i.   and/or all damages available under Florida law.

WHEREFORE, Argentina Komarmy, on behalf of Joseph Komarmy, prays for judgment against Defendant, Monsanto in excess of Seventy-Five Thousand Dollars ($75,000) plus costs, interests and for such other and further relief both at law and in equity to which Plaintiff may show to be justly entitled.

## PRAYER FOR RELIEF

WHEREFORE, Argentina Komarmy, on behalf of Joseph Komarmy, prays for judgment against Defendant, Monsanto in each of the above claims, awarding as follows:

1.  Compensatory damages, in an amount to be proven at trial;
2.  Punitive damages, in an amount to be proven at trial;
3.  Costs including reasonable attorneys' fees, court costs, and other litigation expenses;
4.  Any and all other relief this court deems just and proper.

## JURY TRIAL DEMAND

Plaintiff demands trial by jury on all matters so triable.

Dated: September 2, 2021

Respectfully submitted,

**THE BRAD SOHN LAW FIRM, PLLC**
1600 Ponce De Leon Boulevard
Suite 1205
Coral Gables, Florida 33134
Telephone: (786) 708-9750

By: ___*/s/Brad R. Sohn*_____
        Brad R. Sohn
        Florida Bar No. 98788
        brad@bradsohnlaw.com

**HEISE SUAREZ MELVILLE, P.A.**
1600 Ponce De Leon Boulevard
Suite 1205
Coral Gables, Florida 33134
Telephone (305) 800-4476

By: */s/ Mark J. Heise*_____
        Mark J. Heise
        Florida Bar No. 771090
        mheise@hsmpa.com
        Luis E. Suarez
        Florida Bar No. 390021
        lsuarez@hsmpa.com
        Patricia Melville
        Florida Bar No. 475467
        pmelville@hsmpa.com

*Attorneys for Plaintiff*