Query    Reports    Utilities    Help    Log Out

CIVIL

# U.S. District Court
## Eastern District of California - Live System (Sacramento)
## CIVIL DOCKET FOR CASE #: 2:21-cv-01824-KJM-CKD

Kirby v. Monsanto Company
Assigned to: Chief District Judge Kimberly J. Mueller
Referred to: Magistrate Judge Carolyn K. Delaney
Cause: 28:1332 Diversity-Product Liability

Date Filed: 10/01/2021
Jury Demand: Plaintiff
Nature of Suit: 365 Personal Inj. Prod.
Liability
Jurisdiction: Diversity

**Plaintiff**

**Robert Kirby**                              represented by    **Jennifer R Scullion**
Seeger Weiss LLP
55 Challenger Road
Ste 6th Floor
Ridgefield Park, NJ 07660
973-639-9100
Email: jscullion@seegerweiss.com
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Monsanto Company**

| Date Filed | # | Docket Text |
|---|---|---|
| 10/01/2021 | 1 | COMPLAINT against Monsanto Company by Robert Kirby. Attorney Scullion, Jennifer R added. (Filing fee $ 402, receipt number ACAEDC-9851096) (Attachments: # 1 Civil Cover Sheet)(Scullion, Jennifer) (Entered: 10/01/2021) |
| 10/01/2021 | 2 | SUMMONS ISSUED as to *Monsanto Company* with answer to complaint due within *21* days. Attorney *Jennifer R Scullion* *Seeger Weiss LLP* *55 Challenger Road, 6th Floor* *Ridgefield Park, NJ 07660*. (Kaminski, H) (Entered: 10/01/2021) |
| 10/01/2021 | 3 | CIVIL NEW CASE DOCUMENTS ISSUED; Initial Scheduling Conference set for 2/10/2022 at 02:30 PM in Courtroom 3 (KJM) before Chief District Judge Kimberly J. Mueller. (Attachments: # 1 Standing Order, # 2 Consent Form, # 3 VDRP) (Kaminski, H) (Entered: 10/01/2021) |

| PACER Service Center | | |
|---|---|---|
| **Transaction Receipt** | | |
| 10/11/2021 07:47:54 | | |
| **PACER Login:** | sh0019sh | **Client Code:** | 31943.356965 |
| **Description:** | Docket Report | **Search Criteria:** | 2:21-cv-01824-KJM-CKD |
| **Billable Pages:** | 1 | **Cost:** | 0.10 |



**null / ALL**
**Transmittal Number: 23877408**
**Date Processed: 10/06/2021**

# Notice of Service of Process

| | |
|---|---|
| **Primary Contact:** | Anne Troupis (Monsanto)<br>Bayer U.S. LLC<br>800 N Lindbergh Blvd<br>Saint Louis, MO 63167-1000 |

| | |
|---|---|
| **Entity:** | Monsanto Company<br>Entity ID Number  2282193 |
| **Entity Served:** | Monsanto Company |
| **Title of Action:** | Kirby, Robert  vs. Monsanto Company |
| **Matter Name/ID:** | Kirby, Robert  vs. Monsanto Company (11619762) |
| **Document(s) Type:** | Summons/Complaint |
| **Nature of Action:** | Product Liability |
| **Court/Agency:** | U.S. District Court Eastern District, CA |
| **Case/Reference No:** | 2:21-cv-01824-KJM-CKD |
| **Jurisdiction Served:** | Missouri |
| **Date Served on CSC:** | 10/05/2021 |
| **Answer or Appearance Due:** | 21 Days |
| **Originally Served On:** | CSC |
| **How Served:** | Personal Service |
| Sender Information: | Jennifer Scullion<br>973-639-9100 |

Information contained on this transmittal form is for record keeping, notification and forwarding the attached document(s). It does not constitute a legal opinion. The recipient is responsible for interpreting the documents and taking appropriate action.

**To avoid potential delay, please do not send your response to CSC**

251 Little Falls Drive, Wilmington, Delaware 19808-1674   (888) 690-2882   |   sop@cscglobal.com

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

Robert Kirby ,

vs.

Monsanto Company ,

**CASE NO: 2:21−CV−01824−KJM−CKD**

**SUMMONS IN A CIVIL CASE**

TO:  **Monsanto Company**

Defendant's Address:   Monsanto Company
c/o CSC Layers Incorporating Service Company
221 Bolivar Street
Jefferson City, MO 65101

**YOU ARE HEREBY SUMMONED** and required to serve on:

> **Jennifer R Scullion**
> **Seeger Weiss LLP**
> **55 Challenger Road, 6th Floor**
> **Ridgefield Park, NJ 07660**

an answer to the complaint which is served on you with this summons, **within 21 days after service of this summons on you,** exclusive of the day of service. If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint. Any answer that you serve on the parties to this action must be filed with the Clerk of this Court within a reasonable period of time after service.

**KEITH HOLLAND**
_____
CLERK

/s/  **H. Kaminski**
_____
(By) DEPUTY CLERK



**ISSUED ON 2021−10−01 14:59:07**
**CLERK, USDC EDCA**

Case 2:21-cv-01824-KJM-CKD   Document 2   Filed 10/01/21   Page 2 of 2

## RETURN OF SERVICE

| Service of the Summons and complaint was made by me(1) | DATE |
|---|---|
| NAME OF SERVER *(PRINT)* | TITLE |

*Check one box below to indicate appropriate method of service*

☐ Served personally upon the defendant. Place where served: _____

_____

☐ Left copies thereof at the defendant's dwelling house or usual place of bode with a person of suitable age and discretion then residing therein.

☐ Name of person with whom the summons and complaint were left:_____

☐ Returned unexecuted:_____

_____

_____

☐ Other (specify) :_____

_____

_____

## STATEMENT OF SERVICE FEES

| TRAVEL | SERVICES | TOTAL |
|---|---|---|

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Return of Service and Statement of Service Fees is true and correct.

Executed on _____          _____
                        Date                              *Signature of Server*

                                                    _____
                                                    *Address of Server*

1   Jennifer Scullion, CA Bar 183476
    **SEEGER WEISS LLP**
2   55 Challenger Road, 6th Fl.
    Ridgefield Park, NJ 07660
3   Tel: 973-639-9100
4   jscullion@seegerweiss.com

5   *Attorney for Plaintiff*

6   [Additional Attorneys Listed on Last Page]

7               UNITED STATES DISTRICT COURT

8               EASTERN DISTRICT OF CALIFORNIA

9

10  ROBERT KIRBY,                          No. _____

11              Plaintiff,          **COMPLAINT AND DEMAND**
                                    **FOR JURY TRIAL**
12       v.

13  MONSANTO COMPANY,

14              Defendant.

15

16                          **COMPLAINT**

17       Plaintiff Robert Kirby ("Plaintiff"), by and through his attorneys, respectfully submits the

18  following Complaint and Demand for Jury Trial against Monsanto Company ("Monsanto" or

19  "Defendant"), and alleges the following:

20                     **JURISDICTION AND VENUE**

21       1.      The Court has jurisdiction over Defendant pursuant to 28 U.S.C. § 1332 because

22  there is complete diversity of citizenship between Plaintiff and Defendant. Defendant is either

23  incorporated and/or has its principal place of business outside of the state in which Plaintiff resides.

24       2.      The amount in controversy exceeds $75,000.00, exclusive of interests and costs.

25       3.      There is complete diversity of citizenship between Plaintiff and Defendant. Plaintiff

26  is a resident and citizen of the State of California.

27

28

                                    1

4.     Defendant maintains sufficient contacts with the State of California such that this Court may exercise personal jurisdiction over Defendant.

5.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because Defendant marketed, advertised, and distributed Roundup® in this District; Plaintiff resides in this District; Plaintiff's harms, losses, and damages occurred in this District; Defendant does substantial business in the State of California and within the District; and at all times relevant hereto, Defendant developed, manufactured, promoted, marketed, distributed, warranted, and sold Roundup® in interstate commerce. Further, Defendant, as a corporate entity, is deemed to reside in any judicial district in which it is subject to personal jurisdiction.

## NATURE OF THE ACTION

6.     This action seeks to recover damages for the injuries sustained by Plaintiff as the direct and proximate result of the wrongful conduct and negligence of the Defendant in connection with the design, development, manufacture, testing, packaging, promotion, marketing, advertising, distribution, labelling, and sale of the herbicide Roundup®, containing the active ingredient glyphosate.

7.     As set forth below, Roundup® and/or glyphosate is defective, dangerous to human health, unfit and unsustainable to be marketed and sold in commerce, and lacked proper warnings and directions as to the dangers associated with its use.

8.     Plaintiff's injuries, like those afflicting thousands of similarly situated victims across the country, were unavoidable.

## PARTIES

9.     Plaintiff Robert Kirby is a citizen of California and resides in Manteca. Plaintiff brings this action for personal injuries sustained by his exposure to Roundup® ("Roundup"), which contained the active ingredient glyphosate and the surfactant polyethoxylated tallow amine ("POEA"). As a direct and proximate result of his exposure to Roundup, Plaintiff developed CD 10-Positive High Grade B-Cell Lymphoma.

10.     Defendant Monsanto Company is a Delaware corporation in "active" status with a principal place of business in St. Louis, Missouri.

2

11.     At all times relevant to this complaint, Monsanto was the entity that discovered the herbicidal properties of glyphosate and the manufacturer of Roundup, which contains the active ingredient glyphosate and the surfactant POEA, as well as adjuvants and other "inert" ingredients. "Roundup," as used herein, refers to all formulations of Defendant's Roundup products that contain the active ingredient glyphosate.

**FACTUAL ALLEGATIONS**

12.     At all relevant times, Defendant was in the business of, and did, design, research, manufacture, test, advertise, promote, market, sell, distribute, and/or has acquired and is responsible for the commercial herbicide Roundup.

13.     Monsanto is a multinational agricultural biotechnology corporation based in St. Louis, Missouri. It is the world's largest producer of glyphosate.

14.     Defendant discovered the herbicidal properties of glyphosate during the 1970s and subsequently began to design, research, manufacture, sell, and distribute glyphosate-based Roundup as a broad-spectrum herbicide.

15.     Glyphosate is the active ingredient in Roundup.

16.     Glyphosate is a broad spectrum herbicide used to kill weeds and grasses known to compete with commercial crops grown around the globe.

17.     Glyphosate is a "non-selective" herbicide, meaning it kills indiscriminately, based only on whether a given organism produces a specific enzyme, 5-enolpyruvylshikimic acid-3-phosphate synthase, known as EPSP synthase.

18.     Glyphosate inhibits the enzyme 5-enolpyruvylshikimic acid-3-phosphate synthase that interferes with the shikimic pathway in plants, resulting in the accumulation of shikimic acid in plant tissue and ultimately plant death.

19.     Sprayed as a liquid, plants absorb glyphosate directly through their leaves, stems, and roots, and detectable quantities accumulate in plant tissues.

20.     Each year, approximately 250 million pounds of glyphosate are sprayed on crops, commercial nurseries, suburban lawns, parks, and golf courses. This increase in use has been driven

3

1  largely by the proliferation of genetically engineered crops, crops specifically tailored to resist the

2  activity of glyphosate.

3     21.     Defendant is intimately involved in the development, design, manufacture,

4  marketing, sale, and/or distribution of genetically modified ("GMO") crops, many of which are

5  marketed as being resistant to Roundup, i.e., "Roundup Ready®." As of 2009, Defendant was the

6  world's leading producer of seeds designed to be Roundup Ready®. In 2010, an estimated 70% of

7  corn and cotton, and 90% of soybean fields in the United States contained Roundup Ready® seeds.

8     22.     The original Roundup, containing the active ingredient glyphosate, was introduced

9  in 1974. Today, glyphosate products are among the world's most widely used herbicides. For nearly

10  40 years, consumers, farmers, and the public have used Roundup, unaware of its carcinogenic

11  properties.

12  **REGISTRATION OF HERBICIDES UNDER FEDERAL LAW**

13     23.     The manufacture, formulation and distribution of herbicides, such as Roundup, are

14  regulated under the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA"), 7 U.S.C. § 136

15  et seq. FIFRA requires that all pesticides be registered with the Environmental Protection Agency

16  ("EPA") prior to their distribution, sale, or use, except as described by FIFRA, 7 U.S.C. § 136a(a).

17     24.     The EPA requires as part of the registration process, among other requirements, a

18  variety of tests to evaluate the potential for exposure to pesticides, toxicity to people and other

19  potential non-target organisms, and other adverse effects on the environment. Registration by the

20  EPA, however, is not an assurance or finding of safety. The determination the EPA makes in

21  registering of re-registering a product is not that the product is "safe," but rather that the use of the

22  product in accordance with its label directions "will not generally cause unreasonable adverse

23  effects on the environment." 7 U.S.C. § 136(a)(c)(5)(D).

24     25.     FIFRA defines "unreasonable adverse effects on the environment" to mean "any

25  unreasonable risk to man or the environment, taking into account the economic, social, and

26  environmental costs and benefits of the use of any pesticide." 7 U.S.C. § 136(b)(b). FIFRA thus

27  requires the EPA to make a risk/benefit analysis in determining whether a registration should be

28  granted or allowed to continue to be sold in commerce.

4

26.     The EPA and the State of California registered Roundup for distribution, sale, and manufacture in the United States and in the State of California.

27.     FIFRA generally requires that the registrant, Monsanto, conduct health and safety testing of pesticide products. The government is not required, nor is it able, to perform the product tests that are required of the manufacturer.

28.     The evaluation of each pesticide product distributed, sold, or manufactured is completed at the time the product is initially registered. The data necessary for registration of a pesticide has changed over time. The EPA is now in the process of re-evaluating all pesticide products through a Congressionally-mandated process called "re-registration." 7 U.S.C. § 136a-1. In order to reevaluate these pesticides, the EPA demands the completion of additional tests and the submission of data for the EPA's review and evaluation.

29.     In the case of glyphosate and Roundup, the EPA had planned on releasing its preliminary risk assessment—in relation to the registration process—no later than July 2015. The EPA completed its review of glyphosate in early 2015, but delayed releasing the assessment pending further review in light of the World Health Organization's March 24, 2015 finding that glyphosate is a "probable carcinogen" as demonstrated by the mechanistic evidence of carcinogenicity in humans and sufficient evidence of carcinogenicity in animals.

### MONSANTO'S FALSE REPRESENTATIONS REGARDING THE SAFETY OF ROUNDUP

30.     In 1996, the New York Attorney General ("NYAG") filed a lawsuit against Monsanto based on its false and misleading advertising of Roundup products. Specifically, the lawsuit challenged Monsanto's general representations that its spray-on glyphosate-based herbicides, including Roundup, were "safer than table salt" and "practically non-toxic" to mammals, birds, and fish. Among the representations the NYAG found deceptive and misleading about the human and environmental safety of Roundup are the following:

      a.   Remember that environmentally friendly Roundup herbicide is biodegradable. It won't build up in the soil so you can use Roundup with confidence along customer's driveways, sidewalks, and fences.

5

b. And remember that Roundup is biodegradable and won't build up in the soil. That will give you the environmental confidence you need to use Roundup everywhere you've got weed, brush, edging, or trimming problems.

c. Roundup biodegraded into naturally occurring elements.

d. Remember that versatile Roundup herbicide stays where you put it. That means there's no washing or leaching to harm customer's shrubs or other desirable vegetation.

e. This non-residual herbicide will not wash or leach into the soil. It . . . stays where you put it.

f. You can apply Roundup with "confidence because it will stay where you put it," it bonds tightly to soil particles, preventing leaching. Then, soon after application, soil microorganisms biodegrade Roundup into natural products.

g. Glyphosate is less toxic to rats than table salt following acute oral ingestion.

h. Glyphosate's safety margin is much greater than required. It has over 1,000-fold safety margin in food and over a 700-fold safety margin for workers who manufacture it or use it.

i. You can feel good about using herbicides by Monsanto. They carry a toxicity category rating of 'practically non-toxic' as it pertains to mammals, birds, and fish.

j. "Roundup can be used where kids and pets will play and breaks down into natural material." This advertisement depicts a person with his head in the ground and a pet dog standing in an area that has been treated with Roundup.[1]

31. On November 19, 1996, Monsanto entered into an Assurance of Discontinuance with NYAG, in which Monsanto agreed, among other things, "to cease and desist from publishing or broadcasting any advertisements [in New York] that represent, directly or by implication" that:

a. its glyphosate-containing pesticide products or any component thereof are safe, non-toxic, harmless, or free of risk;

---

[1] Attorney General of the State of New York, In the Matter of Monsanto Company, Assurance of Discontinuance Pursuant to Executive Laws § 63(15) (Nov. 1996).

    b.  its glyphosate-containing pesticide products or any component thereof manufactured, formulated, distributed or sold by Monsanto are biodegradable;

    c.  its glyphosate-containing pesticide products or any component thereof stays where they are applied under all circumstances and will not move through the environment by any means;

    d.  its glyphosate-containing pesticide products or any component thereof are "good" for the environment or are "known for their environmental characteristics;"

    e.  its glyphosate-containing pesticide products or any component thereof are safer or less toxic than common consumer products other than herbicides;

    f.  its glyphosate-containing pesticide products or any component thereof might be classified as "practically non-toxic."

32.    Monsanto did not alter its advertising in the same manner in any state other than New York, and on information and belief, its representations did not change through at least 2015.

33.    In 2009, France's highest court ruled that Monsanto had not told the truth about the safety of Roundup. The French court affirmed an earlier judgment that Monsanto had falsely advertised its herbicide Roundup as "biodegradable" and that it "left the soil clean."[2]

## EVIDENCE OF CARCINOGENICITY IN ROUNDUP

34.    As early as the 1980s, Monsanto was aware of glyphosate's carcinogenic properties.

35.    On March 4, 1985, a group of the EPA's Toxicology Branch published a memorandum classifying glyphosate as a Category C oncogene. Category C oncogenes are possible human carcinogens with limited evidence of carcinogenicity.

36.    In 1986, the EPA issued a Registration Standard for glyphosate (NTIS PB87-103214). The Registration standard required additional phytotoxicity, environmental fate, toxicology, product chemistry, and residue chemistry studies. All of the data required was submitted and reviewed and/or waived.

---

[2]  Monsanto Guilty in 'False Ad' Row, BBC, Oct. 15, 2009, available at http://news.bbc.co.uk/2/hi/europe/8308903.stm (last visited Aug. 26, 2021).

37. In October 1991, the EPA published a memorandum entitled, "Second Peer Review of Glyphosate." The memorandum changed glyphosate's classification to Group E (evidence of non-carcinogenicity for humans). Two peer review committee members did not concur with the conclusions of the committee and one member refused to sign.

38. In addition to the toxicity of the active molecule, many studies support the hypothesis that glyphosate formulations found in Roundup products are more dangerous and toxic than glyphosate alone. As early as 1991, evidence existed demonstrating that glyphosate formulations were significantly more toxic than glyphosate alone.

39. In 2002, Julie Marc published a study entitled, "Pesticide Roundup Provokes Cell Division Dysfunction at the Level of CDK1/Cyclin B Activation."

40. The study found that Roundup caused delays in the cell cycles of sea urchin, while the same concentrations of glyphosate alone proved ineffective and did not alter cell cycles.

41. In 2004, Julie Marc published a study entitled, "Glyphosate-based pesticides affect cell cycle regulation." The study demonstrated a molecular link between glyphosate-based products and cell cycle dysregulation.

42. The study noted that "cell-cycle dysregulation is a hallmark of tumor cells and human cancer. Failure in the cell-cycle checkpoints leads to genomic instability and subsequent development of cancers from the initial affected cell." Further, "[s]ince cell cycle disorders such as cancer result from dysfunction of unique cells, it was of interest to evaluate the threshold dose of glyphosate affecting cells."

43. In 2005, Francisco Peixoto published a study showing that Roundup's effects on rat liver mitochondria are much more toxic and harmful than the same concentrations of glyphosate alone.

44. The Peixoto study suggested that the harmful effects of Roundup on mitochondrial bioenergetics could not be exclusively attributed to glyphosate and could be the result of other chemicals, namely the surfactant POEA, or alternatively due to the possible synergy between glyphosate and Roundup formulation products.

45.     In 2009, Nora Benachour and Gilles-Eric Seralini published a study examining the effects of Roundup and glyphosate on human umbilical, embryonic, and placental cells.

46.     The study used dilution levels of Roundup and glyphosate far below agricultural recommendations, corresponding with low levels of residues in food. The study concluded that supposed "inert" ingredients, and possibly POEA, change human cell permeability and amplify toxicity of glyphosate alone. The study further suggested that determinations of glyphosate toxicity should take into account the presence of adjuvants, or those chemicals used in the formulation of the complete pesticide. The study confirmed that the adjuvants in Roundup are not inert and that Roundup is always more toxic than its active ingredient glyphosate.

47.     The results of these studies were confirmed in recently published peer-reviewed studies and were at all times available and/or know to Defendant.

48.     Defendant knew or should have known that Roundup is more toxic than glyphosate alone and that safety studies on Roundup, Roundup's adjuvants and "inert" ingredients, and/or the surfactant POEA, were necessary to protect Plaintiff from Roundup.

49.     Defendant knew or should have known that tests limited to Roundup's active ingredient glyphosate were insufficient to prove the safety of Roundup.

50.     Defendant failed to appropriately and adequately test Roundup, Roundup's adjuvants and "inert" ingredients, and/or the surfactant POEA, to protect Plaintiff from Roundup.

51.     Rather than performing appropriate tests, Defendant relied upon flawed industry-supported studies designed to protect its economic interests rather than Plaintiff and the consuming public.

52.     Despite its knowledge that Roundup was considerably more dangerous than glyphosate alone, Defendant continued to promote Roundup as safe.

**IARC CLASSIFICATION OF GLYPHOSATE**

53.     The International Agency for Research on Cancer ("IARC") is the specialized intergovernmental cancer agency that the World Health Organization ("WHO") of the United Nations tasked with conducting and coordinating research into the causes of cancer.

54.   An IARC Advisory Group to Recommend Priorities for IARC Monographs during 2015-2019 met in April 2014. Though nominations for the review were solicited, a substance must meet two criteria to be eligible for review by the IARC Monographs: there must already be some evidence of carcinogenicity of the substance, and there must be evidence that humans are exposed to the substance.

55.   IARC set glyphosate for review in 2015-2016. IARC uses five criteria for determining priority in reviewing chemicals. The substance must have a potential for direct impact on public health; scientific literature to support suspicion of carcinogenicity; evidence of significant human exposure; high public interest and/or potential to bring clarity to a controversial area and/or reduce public anxiety or concern; related agents similar to one given high priority by the above considerations. Data reviewed is sourced preferably from publicly accessible, peer-reviewed data.

56.   On March 24, 2015, after its cumulative review of human, animal, and DNA studies for more than one (1) year, many of which have been in Defendant's possession since as early as 1985, the IARC's working group published its conclusion that the glyphosate contained in Roundup herbicide is a Class 2A "probable carcinogen," as demonstrated by the mechanistic evidence of carcinogenicity in humans and sufficient evidence of carcinogenicity in animals.

57.   The IARC's full Monograph was published on July 29, 2015 and established glyphosate as a class 2A probable carcinogen to humans. According to the authors, glyphosate demonstrated sufficient mechanistic evidence (genotoxicity and oxidative stress) to warrant a 2A classification based on evidence of carcinogenicity in humans and animals.

58.   The IARC Working Group found an increased risk between exposure to glyphosate and non-Hodgkin's lymphoma ("NHL") and several subtypes of NHL, and the increased risk continued after adjustment for other pesticides.

59.   The IARC also found that glyphosate caused DNA and chromosomal damage in human cells.

**EARLIER EVIDENCE OF GLYPHOSATE'S DANGER**

60.   Despite the new classification by the IARC, Defendant has had ample evidence of glyphosate and Roundup's genotoxic properties for decades.

10

61.     Genotoxicity refers to chemical agents that are capable of damaging the DNA within a cell through genetic mutations, which is a process that is believed to lead to cancer.

62.     In 1997, Chris Clements published "Genotoxicity of select herbicides in Rana catesbeiana tadpoles using the alkaline single-cell gel DNA electrophoresis (comet) assay."

63.     The study found that tadpoles exposed to Roundup showed significant DNA damage when compared with unexposed control animals.

64.     Both human and animal studies have shown that glyphosate and glyphosate-based formulations such as Roundup can induce oxidative stress.

65.     Oxidative stress and associated chronic inflammation are believed to be involved in carcinogenesis.

66.     The IARC Monograph notes that "[s]trong evidence exists that glyphosate, AMPA and glyphosate-based formulations can induce oxidative stress."

67.     In 2006, Cesar Paz-y-Mino published a study examining DNA damage in human subjects exposed to glyphosate.

68.     The study produced evidence of chromosomal damage in blood cells showing significantly greater damage after exposure to glyphosate than before in the same individuals, suggesting that the glyphosate formulation used during aerial spraying had a genotoxic effect on exposed individuals.

69.     The IARC Monograph reflects the volume of evidence of glyphosate pesticides' genotoxicity, noting "[t]he evidence for genotoxicity caused by glyphosate-based formulations is strong."

70.     Despite knowledge to the contrary, Defendant maintains that there is no evidence that Roundup is genotoxic, that regulatory authorities and independent experts are in agreement that Roundup is not genotoxic, and that there is no evidence that Roundup is genotoxic.

71.     In addition to glyphosate and Roundup's genotoxic properties, Defendant has long been aware of glyphosate's carcinogenic properties.

72.    Glyphosate and Roundup in particular have long been associated with carcinogenicity and the development of numerous forms of cancer, including, but not limited to, non-Hodgkin's lymphoma, Hodgkin's lymphoma, multiple myeloma, and soft tissue sarcoma.

73.    Defendant has known of this association since the early to mid-1980s and numerous human and animal studies have evidenced the carcinogenicity of glyphosate and/or Roundup.

74.    In 1985, the EPA studied the effects of glyphosate in mice, finding a dose related response in male mice linked to renal tubal adenomas, a rare tumor. The study concluded that glyphosate was oncogenic.

75.    In 2003, Lennart Hardell and Mikael Eriksson published the results of two case controlled studies on pesticides as a risk factor for NHL and hairy cell leukemia.

76.    The study concluded that glyphosate had the most significant relationship to NHL among all herbicides studied, with an increased odds ratio of 3.11.

77.    In 2003, AJ De Roos published a study examining the pooled data of midwestern farmers, examining pesticides and herbicides as risk factors for NHL.

78.    The study, which controlled for potential confounders, found a relationship between increased NHL incidence and glyphosate.

79.    In 2008, Mikael Eriksson published a population based case-control study of exposure to various pesticides as a risk factor for NHL.

80.    This strengthened previous associations between glyphosate and NHL.

81.    In spite of this knowledge, Defendant continued to issue broad and sweeping statements suggesting that Roundup was, and is, safer than ordinary household items such as table salt, despite a lack of scientific support for the accuracy and validity of these statements and, in fact, voluminous evidence to the contrary.

82.    Upon information and belief, these statements and representations have been made with the intent of inducing Plaintiff, the agricultural community, and the public at large to purchase and increase the use of Roundup for Defendant's pecuniary gain.

83.    Defendant made these statements with complete disregard and reckless indifference to the safety of Plaintiff and the general public.

84.     Notwithstanding Defendant's representations, scientific evidence has established a clear association between glyphosate and genotoxicity, inflammation, and an increased risk of many cancers, including but not limited to NHL, multiple myeloma, and soft tissue sarcoma.

85.     Defendant knew or should have known that glyphosate is associated with an increased risk of developing cancer, including but not limited to NHL, multiple myeloma, and soft tissue sarcoma.

86.     Defendant failed to appropriately and adequately inform and warn Plaintiff of the serious and dangerous risks associated with the use of and exposure to glyphosate and/or Roundup, including, but not limited to, the risk of developing NHL, as well as other severe and personal injuries, which are permanent and/or long-lasting in nature, cause significant physical pain and mental anguish, diminished enjoyment of life, and the need for medical treatment, monitoring and/or medications.

87.     Despite the IARC's classification of glyphosate as a class 2A probable carcinogen, Defendant continues to maintain that glyphosate and/or Roundup is safe, non-carcinogenic, non-genotoxic, and to falsely warrant to users and the general public that independent experts and regulatory agencies agree that there is no evidence of carcinogenicity or genotoxicity in glyphosate and Roundup.

88.     Defendant has claimed and continues to claim that Roundup is safe, non-carcinogenic, and non-genotoxic. These misrepresentations are consistent with Defendant's cavalier approach to investigating and ensuring the safety of its products, the safety of the public at large, and the safety of Plaintiff.

## SCIENTIFIC FRAUD UNDERLYING THE SAFETY DETERMINATION OF
## GLYPHOSATE

89.     After the EPA's 1985 classification of glyphosate as possibly carcinogenic to humans (Group C), Monsanto exerted pressure upon the EPA to change its classification.

90.     This culminated in the EPA's reclassification of glyphosate to Group E, which was based upon evidence of non-carcinogenicity in humans.

91.     In so classifying, the EPA stated that "[i]t should be emphasized, however, that designation of an agent in Group E is based on the available evidence at the time of evaluation and should not be interpreted as a definitive conclusion that the agent will not be a carcinogen under any circumstances."

92.     On two occasions, the EPA found that laboratories hired by Monsanto to test the toxicity of its Roundup products for registration purposes committed scientific fraud.

93.     In the first instance, Monsanto hired Industrial Bio-Test Laboratories ("IBT") to perform and evaluate pesticide toxicology studies relating to Roundup. IBT performed approximately 30 tests on glyphosate and glyphosate-containing products, including 11 of the 19 chronic toxicology studies needed to register Roundup with the EPA.

94.     In 1976, the FDA performed an inspection of IBT and discovered discrepancies between the raw data and the final report relating to toxicological impacts of glyphosate. The EPA subsequently audited IBT and determined that the toxicology studies conducted for Roundup were invalid. An EPA reviewer stated, after finding "routine falsification of data" at IBT, that it was "hard to believe the scientific integrity of the studies when they said they took specimens of the uterus from male rabbits."

95.     Three top executives of IBT were convicted of fraud in 1983.

96.     In the second incident, Monsanto hired Craven Laboratories ("Craven") in 1990 to perform pesticide and herbicide studies, including several studies on Roundup.

97.     In March of 1991, the EPA announced that it was investigating Craven for "allegedly falsifying test data used by chemical firms to win EPA approval of pesticides."

98.     The investigation led to the indictments of the laboratory owner and a handful of employees.

**MONSANTO'S CONTINUING DISREGARD FOR THE SAFETY OF PLAINTIFF AND THE PUBLIC**

99.     Monsanto's website recently contained the claim that "[r]egulatory authorities and independent experts around the world have reviewed numerous long-term/carcinogenicity and genotoxicity studies and agree that there is no evidence that glyphosate, the active ingredient in

14

1   Roundup brand herbicides and other glyphosate-based herbicides, causes cancer, even at very high

2   doses, and that it is not genotoxic."[3]

3       100.   Ironically, the primary source for this statement is a 1986 report by the WHO, the

4   same organization that now considers glyphosate to be a probable carcinogen.

5       101.   Glyphosate, and Roundup products in particular, have long been associated with

6   serious side effects and many regulatory agencies around the globe have banned or are currently

7   banning the use of glyphosate herbicide products.

8       102.   Defendant's statements proclaiming the safety of Roundup and disregarding its

9   dangers misled Plaintiff.

10      103.   Despite Defendant's knowledge that Roundup was associated with an elevated risk

11   of developing cancer, Defendant's promotional campaigns focused on Roundup's purported "safety

12   profile."

13      104.   Defendant's failure to adequately warn Plaintiff resulted in (1) Plaintiff using and

14   being exposed to glyphosate instead of using another acceptable and safe method of controlling

15   unwanted weeds and pests; and (2) scientists and physicians failing to warn and instruct consumers

16   about the risks of cancer, including NHL, and other injuries associated with Roundup.

17      105.   Defendant failed to seek modification of the labeling of Roundup to include relevant

18   information regarding the risks and dangers associated with Roundup exposure.

19      106.   The failure of Defendant to appropriately warn and inform the EPA has resulted in

20   inadequate warnings in safety information presented directly to users and consumers.

21      107.   The failure of Defendant to appropriately warn and inform the EPA has resulted in

22   the absence of warning or caution statements that are adequate to protect health and the

23   environment.

24      108.   The failure of Defendant to appropriately warn and inform the EPA has resulted in

25   the directions for use that are not adequate to protect health and the environment.

26

27

28      [3] Backgrounder – Glyphosate: No Evidence of Carcinogenicity. Updated November 2014 (downloaded October 9, 2015).

1      109.    By reason of the foregoing acts and omissions, Plaintiffs seeks compensatory

2   damages as a result of Plaintiff's use of, and exposure to, Roundup, which caused or was a

3   substantial contributing factor in causing Plaintiff to suffer from cancer, specifically chronic

4   lymphocytic leukemia, and Plaintiff suffered severe and personal injuries, which are permanent and

5   lasting in nature, physical pain and mental anguish, including diminished enjoyment of life.

6      110.    By reason of the foregoing, Plaintiff is severely and permanently injured.

7      111.    By reason of the foregoing acts and omissions, Plaintiff has endured and, in some

8   categories continues to suffer, emotional and mental anguish, medical expenses, and other

9   economic and non-economic damages, as a result of the actions and inactions of Defendant.

10                   **PLAINTIFF'S EXPOSURE TO ROUNDUP**

11      112.    Plaintiff Robert Kirby is 65 years old.

12      113.    Plaintiff Kirby was exposed to Roundup primarily in the City of Tracy, California,

13   during his employment from 1982-2003. Plaintiff sprayed Roundup occupationally as a city

14   employee. Typically, Plaintiff sprayed Roundup three times per week during the spring and summer

15   months.

16      114.    On or about May 28, 2019, Plaintiff Kirby was diagnosed with CD 10-Positive High

17   Grade B-Cell Lymphoma with an extremely high proliferation rate.

18      115.    During the entire time that Plaintiff Kirby was exposed to Roundup, he did not know

19   that exposure to Roundup was injurious to his health or the health of others.

20                          **COUNT ONE**

21              **STRICT LIABILITY (DESIGN DEFECT)**

22      116.    Plaintiff incorporates by reference each and every allegation set forth in the

23   preceeding paragraphs as if fully stated herein.

24      117.    Plaintiff brings this strict liability claim against Defendant for defective design.

25      118.    At all times relevant to this litigation, Defendant engaged in the business of testing,

26   developing, designing, manufacturing, marketing, selling, distributing, and promoting Roundup

27   products, which are defective and unreasonably dangerous to consumers and users and other

28   persons coming into contact with them, including Plaintiff, thereby placing Roundup products into

1    the stream of commerce. These actions were under the ultimate control and supervision of

2    Defendant. At all times relevant to this litigation, Defendant designed, researched, developed,

3    formulated, manufactured, produced, tested, assembled, labeled, advertised, promoted, marketed,

4    sold, and distributed the Roundup products used by Plaintiff, and/or to which Plaintiff was exposed,

5    as described above.

6         119.    At all times relevant to this litigation, Defendant's Roundup products were

7    manufactured, designed, and labeled in an unsafe, defective, and inherently dangerous manner that

8    was dangerous for use by or exposure to the public and, in particular, the Plaintiff.

9         120.    At all times relevant to this litigation, Defendant's Roundup products reached the

10   intended consumers, handlers, and users or other persons coming into contact with these products

11   in California and throughout the United States, including Plaintiff, without substantial change in

12   their condition as designed, manufactured, sold, distributed, labeled, and marketed by Defendant.

13        121.    Defendant's Roundup products, as researched, tested, developed, designed,

14   licensed, formulated, manufactured, packaged, labeled, distributed, sold, and marketed by

15   Defendant were defective in design and formulation in that when they left the hands of Defendant's

16   manufacturers and/or suppliers, they were unreasonably dangerous and dangerous to an extent

17   beyond that which an ordinary consumer would contemplate.

18        122.    Defendant's Roundup products, as researched, tested, developed, designed,

19   licensed, formulated, manufactured, packaged, labeled, distributed, sold, and marketed by

20   Defendant were defective in design and formulation in that when they left the hands of Defendant's

21   manufacturers and/or suppliers, the foreseeable risks associated with these products' reasonably

22   foreseeable uses exceeded the alleged benefits associated with their design and formulation.

23        123.    Therefore, at all times relevant to this litigation, Defendant's Roundup products, as

24   researched, tested, developed, designed, licensed, formulated, manufactured, packaged, labeled,

25   distributed, sold, and marketed by Defendant were defective in design and formulation, in one or

26   more of the following ways:

27

28

17

a.   When placed in the stream of commerce, Defendant's Roundup products were defective in design and formulation and, consequently, dangerous to an extent beyond that which an ordinary consumer would contemplate.

b.   When placed in the stream of commerce, Defendant's Roundup products were unreasonably dangerous in that they were hazardous and posed a grave risk of cancer and other serious illnesses when used in a reasonably anticipated manner.

c.   When placed in the stream of commerce, Defendant's Roundup products contained unreasonably dangerous design defects and were not reasonably safe when used in a reasonably anticipated or intended manner.

d.   Defendant did not sufficiently test, investigate, or study its Roundup products and, specifically, the active ingredient glyphosate.

e.   Exposure to Roundup and glyphosate-containing products presents a risk of harmful side effects that outweighs any potential utility stemming from the use of the herbicide.

f.   Defendant knew or should have known at the time of marketing its Roundup products that exposure to Roundup and, specifically, its active ingredient glyphosate, could result in cancer and other severe illnesses and injuries.

g.   Defendant did not conduct adequate post-marketing surveillance of its Roundup products.

h.   Defendant could have employed safer alternative designs and formulations.

124.   At all times relevant to this litigation, Plaintiff used and/or was exposed to the use of Defendant's Roundup products in an intended or reasonably foreseeable manner without knowledge of their dangerous characteristics.

125.   Plaintiff could not have reasonably discovered the defects and risks associated with Roundup or glyphosate-containing products before or at the time of exposure.

126.   The harm caused by Defendant's Roundup products far outweighed their benefit, rendering Defendant's products dangerous to an extent beyond that which an ordinary consumer would contemplate. Defendant's Roundup products were and are more dangerous than alternative products and Defendant could have designed its Roundup products to make them less dangerous.

18

Indeed, at the time that Defendant designed its Roundup products, the state of the industry's scientific knowledge was such that a less risky design or formulation was attainable.

127.    At the time Roundup products left Defendant's control, there was a practical, technically feasible, and safer alternative design that would have prevented the harm without substantially impairing the reasonably anticipated or intended function of Defendant's Roundup herbicides.

128.    Defendant's defective design of Roundup amounts to willful, wanton, and/or reckless conduct by Defendant.

129.    Therefore, as a result of the unreasonably dangerous condition of its Roundup products, Defendant is strictly liable to Plaintiff.

130.    The defects in Defendant's Roundup products were substantial and contributing factors in causing Plaintiff's grave injuries and, but for Defendant's misconduct and omissions, Plaintiff would not have sustained his injuries.

131.    As a direct and proximate result of Defendant placing its defective Roundup products into the stream of commerce, Plaintiff has suffered and continues to suffer grave injuries, and has endured pain and discomfort, as well as economic hardship, including considerable financial expenses for medical care and treatment. Plaintiff will continue to incur these expenses in the future.

132.    Plaintiff respectfully requests that this Court enter judgment in his favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees, and all such other and further relief as this Court deems just and proper. Plaintiff also demands a jury trial on the issues contained herein.

## COUNT TWO

### STRICT LIABILITY (FAILURE TO WARN)

133.    Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully set forth herein.

134.    Plaintiff brings this strict liability claim against Defendant for failure to warn.

19

135.    At all times relevant to this litigation, Defendant engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting Roundup products, which are defective and unreasonably dangerous to consumers, including Plaintiff, because they do not contain adequate warnings or instructions concerning the dangerous characteristics of Roundup and specifically, the active ingredient glyphosate. These actions were under the ultimate control and supervision of Defendant.

136.    Defendant researched, developed, designed, tested, manufactured, inspected, labeled, distributed, marketed, promoted, sold, and otherwise released into the stream of commerce its Roundup products, and in the course of same, directly advertised or marketed the products to consumers and end users, including Plaintiff, Plaintiff's employers, Plaintiff's co-workers, and persons responsible for consumers (such as employers), and Defendant therefore had a duty to warn of the risks associated with reasonably foreseeable uses (and misuses) of Roundup and glyphosate-containing products.

137.    At all times relevant to this litigation, Defendant had a duty to properly test, develop, design, manufacture, inspect, package, label, market, promote, sell, distribute, maintain supply, provide proper warnings, and take such steps as necessary to ensure that its Roundup products did not cause users and consumers to suffer from unreasonable and dangerous risks. Defendant had a continuing duty to warn Plaintiff of the dangers associated with Roundup use and exposure. Defendant, as manufacturer, seller, or distributor of chemical herbicides, is held to the knowledge of an expert in the field.

138.    At the time of manufacture, Defendant could have provided warnings or instructions regarding the full and complete risks of Roundup and glyphosate-containing products because it knew or should have known of the unreasonable risks of harm associated with the use of and/or exposure to these products.

139.    At all times relevant to this litigation, Defendant failed to investigate, study, test, or promote the safety or to minimize the dangers to users and consumers of its Roundup products and to those who would foreseeably use or be harmed by Defendant's herbicides, including Plaintiff.

140.    Despite the fact that Defendant knew or should have known that Roundup products posed a grave risk of harm, it failed to warn of the dangerous risks associated with their use and exposure. The dangerous propensities of its products and the carcinogenic characteristics of glyphosate, as described herein, were known to Defendant, or scientifically knowable to Defendant through appropriate research and testing by known methods, at the time it distributed, supplied, or sold the product, and not known to end users and consumers, such as Plaintiff's employers.

141.    Defendant knew or should have known that its Roundup and glyphosate-containing products created significant risks of serious bodily harm to consumers, as alleged herein, and Defendant failed to adequately warn consumers and reasonably foreseeable users of the risks of exposure to these products. Defendant has wrongfully concealed information concerning the dangerous nature of Roundup and its active ingredient glyphosate, and further made false and/or misleading statements concerning the safety of Roundup and glyphosate.

142.    At all times relevant to this litigation, Defendant's Roundup products reached the intended consumers, handlers, and users or other persons coming into contact with these products throughout the United States, including Plaintiff, without substantial change in their condition as designed, manufactured, sold, distributed, labeled, and marketed by Defendant.

143.    At all times relevant to this litigation, Plaintiff used and/or was exposed to the use of Roundup products in their intended or reasonably foreseeable manner without knowledge of their dangerous characteristics.

144.    Plaintiff could not have reasonably discovered the defects and risks associated with Roundup or glyphosate-containing products before or at the time of Plaintiff's exposure. Plaintiff relied upon the skill, superior knowledge, and judgment of Defendant.

145.    Defendant knew or should have known that the minimal warnings disseminated with its Roundup products were inadequate, but it failed to communicate adequate information on the dangers and safe use/exposure and failed to communicate warnings and instructions that were appropriate and adequate to render the products safe for their ordinary, intended, and reasonably foreseeable uses, including agricultural and horticultural applications.

146. The information that Defendant did provide or communicate failed to contain relevant warnings, hazards, and precautions that would have enabled agricultural workers, horticultural workers, landscapers, and/or at-home users to utilize the products safely and with adequate protection. Instead, Defendant disseminated information that was inaccurate, false, and misleading, and that failed to communicate accurately or adequately the comparative severity, duration, and extent of the risk of injuries associated with the use of and/or exposure to Roundup and glyphosate; continued to aggressively promote the efficacy of its products, even after it knew or should have known of the unreasonable risks from use or exposure; and concealed, downplayed, or otherwise suppressed, through aggressive marketing and promotion, any information or research about the risks and dangers of exposure to Roundup and glyphosate.

147. The defects in Defendant's Roundup products were substantial and contributing factors in causing Plaintiff's injuries, and, but for Defendant's misconduct and omissions, Plaintiff would not have sustained his injuries.

148. Had Defendant provided adequate warnings and instructions and properly disclosed and disseminated the risks associated with its Roundup products, Plaintiff could have avoided the risk of developing injuries as alleged herein and Plaintiff's employers could have obtained alternate herbicides.

149. As a direct and proximate result of Defendant placing its defective Roundup products into the stream of commerce, Plaintiff has suffered and continues to suffer severe injuries, and has endured physical pain and discomfort, as well as economic hardship, including considerable expenses for medical care and treatment. Plaintiff will continue to incur these expenses in the future.

150. Plaintiff respectfully requests that this Court enter judgment in Plaintiff's favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees, and all such other and further relief as this Court deems just and proper. Plaintiff also demands a jury trial on the issue contained herein.

### COUNT THREE

### NEGLIGENCE

22

151.   Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

152.   Defendant, directly or indirectly, caused Roundup products to be sold, distributed, packaged, labeled, marketed, promoted, and/or used by Plaintiff.

153.   At all times relevant to this litigation, Defendant had a duty to exercise reasonable care in the design, research, manufacture, marketing, advertisement, supply, promotion, packaging, sale, and distribution of its Roundup products, including the duty to take all reasonable steps necessary to manufacture, promote, and/or sell a product that was not unreasonably dangerous to consumers, users, and other persons coming into contact with the product.

154.   At all times relevant to this litigation, Defendant had a duty to exercise reasonable care in the marketing, advertisement, and sale of its Roundup products. Defendant's duty of care owed to consumers and the general public included providing accurate, true, and correct information concerning the risks of using Roundup and appropriate, complete, and accurate warnings concerning the potential adverse effects of exposure to Roundup and, in particular, its active ingredient glyphosate.

155.   At all times relevant to this litigation, Defendant knew or, in the exercise of reasonable care, should have known, of the hazards and dangers of Roundup and, specifically, the carcinogenic properties of the chemical glyphosate.

156.   Accordingly, at all times relevant to this litigation, Defendant knew or, in the exercise of reasonable care, should have known, that use of or exposure to its Roundup products could cause Plaintiff's injuries and thus created a dangerous and unreasonable risk of injury to the users of these products, including Plaintiff.

157.   Defendant knew or, in the exercise of reasonable care, should have known, that Roundup is more toxic than glyphosate alone and that safety studies on Roundup, Roundup's adjuvants and "inert" ingredients, and/or the surfactant POEA, were necessary to protect Plaintiff from Roundup.

158.   Defendant knew, or in the exercise of reasonable care, should have known that tests limited to Roundup's active ingredient glyphosate were insufficient to prove the safety of Roundup.

159.   Defendant also knew, or in the exercise of reasonable care should have known, that users and consumers of Roundup were unaware of the risks and the magnitude of the risks associated with the use of and/or exposure to Roundup and glyphosate-containing products.

160.   As such, Defendant breached its duty of reasonable care and failed to exercise ordinary care in the design, research, development, manufacture, testing, marketing, supply, promotion, advertisement, packaging, sale, and distribution of its Roundup products, in that Defendant manufactured and produced defective herbicides containing the chemical glyphosate, knew or had reason to know of the defects inherent in its products, knew or had reason to know that a user's or consumer's exposure to the products created a significant risk of harm and unreasonably dangerous side effects, and failed to prevent or adequately warn of these risks and injuries.

161.   Defendant failed to appropriately and adequately test Roundup, Roundup's adjuvants and "inert" ingredients, and/or the surfactant POEA to protect Plaintiff from Roundup.

162.   Despite its ability and means to investigate, study, and test its products and to provide adequate warnings, Defendant failed to do so. Indeed, Defendant has wrongfully concealed information and has further made false and/or misleading statements concerning the safety and/or exposure to Roundup and glyphosate.

163.   Defendant's negligence included:

a. Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing its Roundup products without thorough and adequate pre- and post-market testing;

b. Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing Roundup while negligently and/or intentionally concealing and failing to disclose the results of trials, tests, and studies of exposure to glyphosate, and, consequently, the risk of serious harm associated with human use of and exposure to Roundup;

24

c. Failing to undertake sufficient studies and conduct necessary tests to determine whether or not Roundup products and glyphosate-containing products were safe for their intended use in agriculture, horticulture, and at-home use;

d. Failing to undertake sufficient studies and conduct necessary tests to determine the safety of "inert" ingredients and/or adjuvants contained within Roundup, and the propensity of these ingredients to render Roundup toxic, increase the toxicity of Roundup, whether these ingredients are carcinogenic, magnify the carcinogenic properties of Roundup, and whether or not "inert" ingredients and/or adjuvants were safe for use;

e. Failing to use reasonable and prudent care in the design, research, manufacture, formulation, and development of Roundup products so as to avoid the risk of serious harm associated with the prevalent use of Roundup and glyphosate as an herbicide;

f. Failing to design and manufacture Roundup products so as to ensure they were at least as safe and effective as other herbicides on the market;

g. Failing to provide adequate instructions, guidelines, and safety precautions to those persons who Defendant could reasonably foresee would use and/or be exposed to its Roundup products;

h. Failing to disclose to Plaintiff, users, consumers, and the general public that the use of and exposure to Roundup presented severe risks of cancer and other grave illnesses;

i. Failing to warn Plaintiff, users, consumers, and the general public that the product's risk of harm was unreasonable and that there were safer and effective alternative herbicides available to Plaintiff and other users or consumers;

j. Systematically suppressing or downplaying contrary evidence about the risks, incidence, and prevalence of the side effects of Roundup and glyphosate-containing products;

k. Representing that its Roundup products were safe for their intended use when, in fact, Defendant knew or should have known that the products were not safe for their intended use;

l.   Declining to make or propose any changes to Roundup products' labeling or other promotional materials that would alert the consumers and the general public of the risks of Roundup and glyphosate;

m.   Advertising, marketing, and recommending the use of Roundup products, while concealing and failing to disclose or warn of the dangers known by Defendant to be associated with or caused by the use of or exposure to Roundup and glyphosate;

n.   Continuing to disseminate information to its consumers, which indicated or implied that Defendant's Roundup products were not unsafe for use in the agricultural and horticultural industries, and/or were not unsafe for home use; and

o.   Continuing the manufacture and sale of its products with the knowledge that the products were unreasonably unsafe and dangerous.

164.   Defendant knew and/or should have known that it was foreseeable that consumers and/or users, such as Plaintiff, would suffer injuries as a result of Defendant's failure to exercise ordinary care in the manufacturing, marketing, labeling, distribution, and sale of Roundup.

165.   Plaintiff did not know the nature and extent of the injuries that could result from the intended use of and/or exposure to Roundup and its active ingredient glyphosate.

166.   Defendant's negligence was the proximate cause of the injuries, harm, and economic losses that Plaintiff suffered, and will continue to suffer, as described herein.

167.   Defendant's conduct, as described above, was reckless. Defendant regularly risks the lives of consumers and users of its Roundup products, including Plaintiff, with full knowledge of the dangers of those products. Defendant has made conscious decisions not to redesign, re-label, warn or inform the unsuspecting public, including Plaintiff, of these dangers. Defendant's reckless conduct therefore warrants an award of punitive damages.

168.   As a proximate result of Defendant's wrongful acts and omissions in placing its defective Roundup products into the stream of commerce without adequate warnings of the hazardous and carcinogenic nature of glyphosate, Plaintiff has suffered and continues to suffer severe and permanent physical and emotional injuries. Plaintiff has endured pain and suffering, has

1  suffered economic losses (including significant expenses for medical care and treatment) and will

2  continue to incur these expenses in the future.

3      169.   Plaintiff respectfully requests that this Court enter judgment in his favor for

4  compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees,

5  and all such other and further relief as this Court deems just and proper. Plaintiff also demands a

6  jury trial on the issues contained herein.

7  **JURY TRIAL DEMAND**

8      170.   Plaintiff demands a trial by jury on all of the triable issues within this pleading.

9  **PRAYER FOR RELIEF**

10      171.   WHEREFORE, Plaintiff requests that the Court enter judgment in his favor and

11  against Monsanto, awarding as follows:

12      p.   compensatory damages in an amount to be proven at trial;

13      q.   punitive damages;

14      r.   costs, including reasonable attorneys' fees, court costs, and other litigation

15  expenses; and

16      s.   any other relief the Court may deem just and proper.

17  Dated: October 1, 2021
       Ridgefield Park, NJ

18                    Respectfully submitted,

19                    /s Jennifer Scullion

20                    Jennifer Scullion (CA Bar 183476)
                         SEEGER WEISS LLP

21                    55 Challenger Road
                         Ridgefield Park, NJ 07660

22                    Tel: (973) 639-9100
                         jscullion@seegerweiss.com

23                    James J. Bilsborrow (*pro hac vice* to be

24                    submitted)
                         SEEGER WEISS LLP

25                    55 Challenger Road
                         Ridgefield Park, NJ 07660

26                    Tel: (973) 639-9100
                         jbilsborrow@seegerweiss.com

27                    *Attorneys for Plaintiff*

28

JS 44 (Rev. 10/20)

Case 2:21-cv-01824-KJM-CKD  Document 1-1  Filed 10/01/21  Page 1 of 2

## CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.   *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

### I. (a) PLAINTIFFS
Robert Kirby

**DEFENDANTS**
Monsanto Co.

**(b)** County of Residence of First Listed Plaintiff   San Joaquin
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant _____
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF
THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*

Jennifer Scullion, Seeger Weiss LLP, 55 Challenger Rd.,
Ridgefield Park, NJ 07550, 973-639-9100

Attorneys *(If Known)*

### II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

| | | |
|---|---|---|
| ☐ 1 | U.S. Government Plaintiff | ☐ 3 Federal Question *(U.S. Government Not a Party)* |
| ☐ 2 | U.S. Government Defendant | ☒ 4 Diversity *(Indicate Citizenship of Parties in Item III)* |

### III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)*                          *and One Box for Defendant)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☒ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

### IV. NATURE OF SUIT *(Place an "X" in One Box Only)*
Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment & Enforcement of Judgment<br>☐ 151 Medicare Act<br>☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans)<br>☐ 153 Recovery of Overpayment of Veteran's Benefits<br>☐ 160 Stockholders' Suits<br>☐ 190 Other Contract<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | **PERSONAL INJURY**<br>☐ 310 Airplane<br>☐ 315 Airplane Product Liability<br>☐ 320 Assault, Libel & Slander<br>☐ 330 Federal Employers' Liability<br>☐ 340 Marine<br>☐ 345 Marine Product Liability<br>☐ 350 Motor Vehicle<br>☐ 355 Motor Vehicle Product Liability<br>☐ 360 Other Personal Injury<br>☐ 362 Personal Injury - Medical Malpractice | **PERSONAL INJURY**<br>☒ 365 Personal Injury - Product Liability<br>☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability<br>☐ 368 Asbestos Personal Injury Product Liability<br>**PERSONAL PROPERTY**<br>☐ 370 Other Fraud<br>☐ 371 Truth in Lending<br>☐ 380 Other Personal Property Damage<br>☐ 385 Property Damage Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881<br>☐ 690 Other | ☐ 422 Appeal 28 USC 158<br>☐ 423 Withdrawal 28 USC 157<br>**PROPERTY RIGHTS**<br>☐ 820 Copyrights<br>☐ 830 Patent<br>☐ 835 Patent - Abbreviated New Drug Application<br>☐ 840 Trademark<br>☐ 880 Defend Trade Secrets Act of 2016 | ☐ 375 False Claims Act<br>☐ 376 Qui Tam (31 USC 3729(a))<br>☐ 400 State Reapportionment<br>☐ 410 Antitrust<br>☐ 430 Banks and Banking<br>☐ 450 Commerce<br>☐ 460 Deportation<br>☐ 470 Racketeer Influenced and Corrupt Organizations<br>☐ 480 Consumer Credit (15 USC 1681 or 1692)<br>☐ 485 Telephone Consumer Protection Act<br>☐ 490 Cable/Sat TV |
| **REAL PROPERTY** | **LABOR** | **SOCIAL SECURITY** | | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 210 Land Condemnation<br>☐ 220 Foreclosure<br>☐ 230 Rent Lease & Ejectment<br>☐ 240 Torts to Land<br>☐ 245 Tort Product Liability<br>☐ 290 All Other Real Property | **CIVIL RIGHTS**<br>☐ 440 Other Civil Rights<br>☐ 441 Voting<br>☐ 442 Employment<br>☐ 443 Housing/ Accommodations<br>☐ 445 Amer. w/Disabilities - Employment<br>☐ 446 Amer. w/Disabilities - Other<br>☐ 448 Education | **PRISONER PETITIONS**<br>**Habeas Corpus:**<br>☐ 463 Alien Detainee<br>☐ 510 Motions to Vacate Sentence<br>☐ 530 General<br>☐ 535 Death Penalty<br>**Other:**<br>☐ 540 Mandamus & Other<br>☐ 550 Civil Rights<br>☐ 555 Prison Condition<br>☐ 560 Civil Detainee - Conditions of Confinement | ☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Management Relations<br>☐ 740 Railway Labor Act<br>☐ 751 Family and Medical Leave Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Employee Retirement Income Security Act | ☐ 861 HIA (1395ff)<br>☐ 862 Black Lung (923)<br>☐ 863 DIWC/DIWW (405(g))<br>☐ 864 SSID Title XVI<br>☐ 865 RSI (405(g))<br>**FEDERAL TAX SUITS**<br>☐ 870 Taxes (U.S. Plaintiff or Defendant)<br>☐ 871 IRS—Third Party 26 USC 7609<br>**IMMIGRATION**<br>☐ 462 Naturalization Application<br>☐ 465 Other Immigration Actions | ☐ 890 Other Statutory Actions<br>☐ 891 Agricultural Acts<br>☐ 893 Environmental Matters<br>☐ 895 Freedom of Information Act<br>☐ 896 Arbitration<br>☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision<br>☐ 950 Constitutionality of State Statutes |

### V. ORIGIN *(Place an "X" in One Box Only)*

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| ☒ 1 Original Proceeding | ☐ 2 Removed from State Court | ☐ 3 Remanded from Appellate Court | ☐ 4 Reinstated or Reopened | ☐ 5 Transferred from Another District *(specify)* | ☐ 6 Multidistrict Litigation - Transfer | | ☐ 8 Multidistrict Litigation - Direct File |

### VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
28 USC 1332
Brief description of cause:
Strict Liability - Products Liability

### VII. REQUESTED IN COMPLAINT:
☐ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:   ☒ Yes   ☐ No

### VIII. RELATED CASE(S) IF ANY
*(See instructions):*
JUDGE _____   DOCKET NUMBER _____

DATE
10/1/2021

SIGNATURE OF ATTORNEY OF RECORD
/s/ Jennifer Scullion

**FOR OFFICE USE ONLY**

RECEIPT #_____   AMOUNT_____   APPLYING IFP_____   JUDGE_____   MAG. JUDGE_____

JS 44 Reverse (Rev. 10/20)

**INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44**

Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

I.(a)  **Plaintiffs-Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

(b)  **County of Residence.** For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

(c)  **Attorneys.** Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

II.  **Jurisdiction.** The basis of jurisdiction is set forth under Rule 8(a), F.R.Cv.P., which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.
United States plaintiff. (1) Jurisdiction based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States are included here.
United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.
Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.
Diversity of citizenship. (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked. (See Section III below; **NOTE: federal question actions take precedence over diversity cases.**)

III.  **Residence (citizenship) of Principal Parties.** This section of the JS 44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

IV.  **Nature of Suit.** Place an "X" in the appropriate box. If there are multiple nature of suit codes associated with the case, pick the nature of suit code that is most applicable. Click here for: Nature of Suit Code Descriptions.

V.  **Origin.** Place an "X" in one of the seven boxes.
Original Proceedings. (1) Cases which originate in the United States district courts.
Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441.
Remanded from Appellate Court. (3) Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.
Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.
Transferred from Another District. (5) For cases transferred under Title 28 U.S.C. Section 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.
Multidistrict Litigation – Transfer. (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407.
Multidistrict Litigation – Direct File. (8) Check this box when a multidistrict case is filed in the same district as the Master MDL docket. **PLEASE NOTE THAT THERE IS NOT AN ORIGIN CODE 7.** Origin Code 7 was used for historical records and is no longer relevant due to changes in statute.

VI.  **Cause of Action.** Report the civil statute directly related to the cause of action and give a brief description of the cause. **Do not cite jurisdictional statutes unless diversity.** Example: U.S. Civil Statute: 47 USC 553 Brief Description: Unauthorized reception of cable service.

VII.  **Requested in Complaint.** Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.
Demand. In this space enter the actual dollar amount being demanded or indicate other demand, such as a preliminary injunction.
Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

VIII.  **Related Cases.** This section of the JS 44 is used to reference related pending cases, if any. If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature.** Date and sign the civil cover sheet.