**Query    Reports    Utilities    Help    Log Out**

CONSENTPENDING

# U.S. District Court
## United States District Court - District of New Mexico (Las Cruces)
## CIVIL DOCKET FOR CASE #: 2:21-cv-00994-GBW-SMV

Renteria v. Monsanto Company et al                    Date Filed: 10/13/2021
Assigned to: Magistrate Judge Gregory B. Wormuth        Jury Demand: Plaintiff
Referred to: Magistrate Judge Stephan M. Vidmar         Nature of Suit: 365 Personal Inj. Prod.
Case in other court: First Judicial District Court, 20cv180    Liability
Cause: 28:1441 Petition for Removal- Personal Injury    Jurisdiction: Diversity

**Plaintiff**

**Marita Renteria**                    represented by    **Feliz A Rael**
                                                         505 Marquette NW, suite 1300
                                                         Albuquerque, NM 87102
                                                         505-610-5991
                                                         Fax: 505-938-2301
                                                         Email: frael@swcp.com
                                                         *ATTORNEY TO BE NOTICED*


V.

**Defendant**

**Monsanto Company**                    represented by    **Alex Cameron Walker**
                                                         Modrall, Sperling, Roehl, Harris &
                                                         Sisk, P.A.
                                                         500 Fourth St NW
                                                         Suite 1000
                                                         Albuquerque, NM 87102
                                                         505-848-1861
                                                         Fax: 505-848-1882
                                                         Email: awalker@modrall.com
                                                         *ATTORNEY TO BE NOTICED*

**Defendant**

**SIDCO Corporation**                    represented by    **Kenneth L. Beal**
                                                         Bridgforth & Beal
                                                         PO Box 725
                                                         Las Cruces, NM 88004
                                                         (505) 526-5511
                                                         Fax: 505-526-8635
                                                         Email: klbealoffice@gmail.com
                                                         *ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 10/13/2021 | 1 | NOTICE OF REMOVAL by Monsanto Company from First Judicial District Court, case number D-101-CV-2020-00180. ( Filing Fee - Online Payment), filed by Monsanto Company. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Civil Cover Sheet)(Walker, Alex) (Entered: 10/13/2021) |
| 10/13/2021 | | Filing and Administrative Fees Received: $ 402 receipt number ANMDC-7938276 re 1 Notice of Removal, filed by Monsanto Company (Payment made via Pay.gov)(Walker, Alex) (Entered: 10/13/2021) |
| 10/13/2021 | 2 | Corporate Disclosure Statement by Monsanto Company identifying Corporate Parent Bayer AG for Monsanto Company. (Walker, Alex) (Entered: 10/13/2021) |
| 10/13/2021 | 3 | NOTICE by Monsanto Company *of Multidistrict Litigation* (Walker, Alex) (Entered: 10/13/2021) |
| 10/13/2021 | | Office code correction. Case office code has been changed from 1 (Albuquerque) to 2 (Las Cruces). (dr) (Entered: 10/13/2021) |
| 10/13/2021 | | United States Magistrate Judge Gregory B. Wormuth and United States Magistrate Judge Stephan M. Vidmar assigned. (dr) (Entered: 10/13/2021) |
| 10/13/2021 | 4 | PLEASE TAKE NOTICE that this case has been randomly assigned to United States Magistrate Judge Gregory B. Wormuth to conduct dispositive proceedings in this matter, including motions and trial. Appeal from a judgment entered by a Magistrate Judge will be to the United States Court of Appeals for the Tenth Circuit. **It is the responsibility of the case filer to serve a copy of this Notice upon all parties with the summons and complaint.** *Consent is strictly voluntary, and a party is free to withhold consent without adverse consequences. Should a party choose to consent, notice should be made no later than 21 days after entry of the Order setting the Rule 16 Initial Scheduling Conference.* For e-filers, visit our Web site at www.nmd.uscourts.gov for more information and instructions. [THIS IS A TEXT-ONLY ENTRY. THERE ARE NO DOCUMENTS ATTACHED.] (dr) (Entered: 10/13/2021) |

| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 10/14/2021 07:54:36 | | | |
| **PACER Login:** | sh0019sh | **Client Code:** | 31943.356965 |
| **Description:** | Docket Report | **Search Criteria:** | 2:21-cv-00994-GBW-SMV |
| **Billable Pages:** | 2 | **Cost:** | 0.20 |

FILED  1st JUDICIAL DISTRICT COURT
Santa Fe County
9/13/2021 3:12 PM
KATHLEEN VIGIL CLERK OF THE COURT
Liliana Villalobos

**STATE OF NEW MEXICO**
**COUNTY OF SANTA FE**
**FIRST JUDICIAL DISTRICT**

**MARITA RENTERIA,**           **Case No. D-101-CV-2020-00180**
    **Plaintiff,**            **Judge: Kathleen McGarry Ellenwood**

**v.**

**MONSANTO COMPANY and**        **JURY TRIAL DEMANDED**
**SIDCO CORPORTATION,**
    **Defendants.**

## PLAINTIFF'S FIRST AMENDED COMPLAINT

COMES NOW Plaintiff, MARITA RENTERIA ("Plaintiff"), and for her First Amended Complaint seeking relief from Defendants Monsanto Company ("Monsanto") and Sidco Corporation ("Sidco") states:

## INTRODUCTION

Plaintiff brings this cause of action against Defendants for injuries sustained as a result of using Defendant Monsanto's unreasonably dangerous and defective product, Roundup®. More specifically, Plaintiff's claims involve Defendant Monsanto's negligent, willful, and wrongful conduct in connection with the design, development, manufacture, testing, packaging, promoting, marketing, distribution, and/or sale of Roundup® and/or other Monsanto glyphosate-containing products ("Roundup" or "Roundup®") and Defendant Sidco's wrongful conduct in supplying the Roundup® to which Plaintiff was exposed. As a direct and proximate result of her exposure to Roundup® and its reactive ingredient, glyphosate, Plaintiff developed non-Hodgkin's Lymphoma ("NHL").

## PARTIES

1.  Plaintiff is an individual resident of Las Cruces, New Mexico.

Plaintiff's First Amended Complaint          - 1 -

2.   Defendant Monsanto is a Delaware corporation with its principal office located in St. Louis, Missouri.  Defendant Monsanto has appeared herein through its counsel of record, Alex C. Walker, Modrall, Sperling, Roehl, Harris & Sisk, P.A., P.O. Box. 2168, Albuquerque, New Mexico 87103-2168.

3.   Defendant Sidco is a New Mexico corporation and maintains its principal place of business in New Mexico.  Defendant Sidco has appeared herein through its counsel of record, Kenneth L. Beal, Kenneth L. Beal, P.C., P.O. Box 725, Las Cruces, New Mexico 88004.

## JURISDICTION AND VENUE

4.   This Court has subject matter jurisdiction over this matter.  This is a claim by a resident of the state of New Mexico against a foreign Defendant doing business in New Mexico and a domestic corporation with its principal place of business in New Mexico.  The tortious conduct giving rise to Plaintiff's injuries and the claims asserted herein occurred both inside and outside of New Mexico, with the injuries sustained by Plaintiff in New Mexico, while a New Mexico resident.

5.   Venue is proper in Santa Fe County pursuant to N.M. Stat. Ann. § 38-3-1(F).

## FACTUAL ALLEGATIONS

6.   Monsanto is a multinational agricultural biotechnology corporation based in St. Louis, Missouri.

7.   In 1970, Monsanto chemist, John Franz, discovered the herbicidal properties of glyphosate.  Thereafter, Monsanto designed and tested glyphosate-based formulas for use as an herbicide.  By the mid-1970s, Monsanto began designing, testing, developing, manufacturing, marketing, distributing, and selling glyphosate-based formulations under the brand name Roundup®.

8.   As used herein, "Roundup" refers to all formulations of the Roundup family of products

Plaintiff's First Amended Complaint                     - 2 -

including, without being limited to: Roundup Concentrate Poison Ivy and Tough Brush Killer 1, Roundup Custom Herbicide, Roundup D-Pak herbicide, Roundup Dry Concentrate, Roundup Export Herbicide, Roundup Fence & Hard Edger 1, Roundup Garden Foam Weed & Grass Killer, Roundup Grass and Weed Killer, Roundup Herbicide, Roundup Original 2k herbicide, Roundup Original II Herbicide, Roundup Pro Concentrate, Roundup Prodry Herbicide, Roundup Promax, Roundup Quik Stik Grass and Weed Killer, Roundup Quikpro Herbicide, Roundup Rainfast Concentrate Weed & Grass Killer, Roundup Rainfast Super Concentrate Weed & Grass Killer, Roundup Ready-to-Use Extended Control Weed & Grass Killer 1 Plus Weed Preventer, Roundup Ready-to-Use Weed & Grass Killer, Roundup Ready-to-Use Weed and Grass Killer 2, Roundup Ultra Dry, Roundup Ultra Herbicide, Roundup Ultramax, Roundup VM Herbicide, Roundup Weed & Grass Killer Concentrate, Roundup Weed & Grass Killer Concentrate Plus, Roundup Weed & Grass Killer Ready-to-Use Plus, Roundup Weed & Grass Killer Super Concentrate, Roundup Weed & Grass Killer1 Ready-to-Use, Roundup WSD Water Soluble Dry Herbicide Deploy Dry Herbicide, or any other herbicide formulation containing the active ingredient glyphosate.

9. Roundup is a glyphosate-based formulation, which is a product that contains glyphosate and other ingredients that make the product more effective and/or last longer. Roundup contains glyphosate, water, and other ingredients called other ingredients called "surfactants."

10. At all relevant times, Monsanto designed, tested, developed, manufactured, marketed, distributed, and sold the Roundup used by Plaintiff.

11. Monsanto is the world's leading producer of glyphosate. As of 2009, Monsanto was the world's leading producer of seeds, accounting for 27% of the world seed market. The majority of these seeds are of the Roundup Ready brand. The stated advantage of Roundup Ready crops is that they substantially improve a farmer's ability to control weeds, since glyphosate can be sprayed

in the fields during the growing season without harming their crops. In 2010, an estimated 70% of corn and cotton, and 90% of soybean fields in the United States were Roundup Ready.  Monsanto's glyphosate-based formulations are registered in 130 countries and approved for use on over 100 different crops and are ubiquitous in the environment.  Numerous studies confirm that glyphosate is found in rivers, streams, and groundwater in agricultural areas where Roundup is used.  It has been found in food, in the urine of agricultural workers, and even in the urine of urban dwellers who are not in direct contact with glyphosate.

12. Monsanto has never tested Roundup to determine whether it is carcinogenic.  Indeed, in 2009, as evidence of the carcinogenic properties of Roundup mounted, Monsanto toxicologist Donna Farmer admonished Monsanto employees that "you cannot say that Roundup does not cause cancer … [because Monsanto has] not done carcinogenicity studies with 'Roundup.'"

13. Nevertheless, others have studied the carcinogenic properties of glyphosate and Roundup and have concluded that Roundup can and does cause NHL in humans exposed to the product.

14. Federal regulation of pesticides, including Roundup, is exercised by and under the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA"), 7 U.S.C. § 136 *et seq.*  Though commonly referred to as an herbicide, Roundup is defined as a "pesticide" under 7 U.S.C. § 136(t), (u).

15. Among other things, FIFRA requires manufactures of pesticides to register their products with the Environmental Protection Agency ("EPA").  In the registration process, the EPA relies entirely on the applicant to prove that their labels comply with FIFRA. Accordingly, the "EPA does not independently test, study, or otherwise set particular composition standards for the pesticides." *Jeffers v. Wal-Mart Stores, Inc.*, 171 F. Supp. 2d 617, 623 (S.D. W. Va. 2001).  "An

applicant who wishes to obtain registration for its own pesticide product is responsible for submitting or citing to all of the information and data that are required to support the application." *EPA Pesticide Registration Manual Ch.1*, Overview of Requirements for Pesticide Registration.

16. FIFRA expressly provides that "[i]n no event shall registration of an article be construed as a defense for the commission of any offense under this subchapter." 7 U.S.C. § 136a(f)(2). Rather, registration of a pesticide is merely "*prima facie* evidence that the pesticide, its labeling and packaging comply with the registration provisions of the subchapter." *Id.*

17. A pesticide is "misbranded" under FIFRA if its label contains a statement that is "false or misleading in any particular," does not contain adequate instructions for use, or omits necessary warnings or cautionary statements. It is unlawful under the statute to sell a pesticide that is registered but misbranded.

18. FIFRA does not create a private right of actions for consumers harmed by the sale of a misbranded pesticide but allows for private actions under state tort law to enforce duties that are "equivalent to, and fully consistent with FIFRA's misbranding provisions." *Bates v. Dow Agrosciences*, 544 U.S. 431, 447 (2005).

19. Starting in 1974 and continuing through the present date, the EPA has registered various glyphosate-based formulations as pesticides.

20. Monsanto has been aware of glyphosate's carcinogenic properties since at least 1985. On March 5, 1985, a group of the Toxicology Branch of the Environmental Protection Agency ("EPS") published a memorandum classifying glyphosate as a Category C oncogene. Category C oncogene are possible human carcinogens with limited evidence of carcinogenicity.

21. After pressure from Monsanto, including contrary studies it provided to the EPA, the EPA changed its classification to evidence of non-carcinogenicity in humans (Group E) in 1991.

Plaintiff's First Amended Complaint        - 5 -

In so classifying glyphosate, however, the EPA made clear that the designation did not mean the chemical does not cause cancer: "It should be emphasized, however, that designation of an agent in Group E is based on the available evidence at the time of evaluation and should not be interpreted as a definitive conclusion that the agent will not be a carcinogen under any circumstances."

22. On two occasions, the EPA found that the laboratories hired by Monsanto to test the toxicity of Roundup for registration purposes committed fraud. In the first instance, Monsanto, in seeking initial EPA registration of Roundup, hired Industrial Bio-Test Laboratories ("IBT") to perform and evaluate pesticide toxicology studies relating to Roundup. IBT performed about thirty (30) tests on glyphosate and glyphosate-containing products, including nine (9) of the fifteen (15) residue studies needed to register Roundup. In 1976, the United States Food and Drug Administration ("FDA") performed an inspection of IBT that revealed discrepancies between the raw data and the final report relating to the toxicological impacts of glyphosate. The EPA subsequently audited IBT; it too found the toxicology studies conducted for Roundup to be invalid. An EPA reviewer stated, after finding "routine falsification of data" at IBT, that it was "hard to believe the scientific integrity of the studies when they said they took specimens of the uterus from male rabbits." Three top executives of IBT were convicted of fraud in 1983.

23. In the second incident of data falsification, Monsanto hired Craven Laboratories in 1991 to perform pesticide and herbicide studies, including for Roundup. In that same year, the owner of Craven Laboratories and three (3) of its employees were indicted, and later convicted, of fraudulent laboratory practices in the testing of pesticides and herbicides. Despite the falsity of the tests that underlie its registration, within a few years of its launch, Monsanto was marketing Roundup in 115 countries.

Plaintiff's First Amended Complaint          - 6 -

24. Rather than act to determine whether Roundup was causing cancer, and thereby destroying and taking the lives of humans, Monsanto has sought to mislead the public and regulators about the risks to human health posed by Roundup.

25. The success of Roundup was key to Monsanto's continued reputation and dominance in the marketplace. Largely due to the success of Roundup sales, Monsanto's agriculture division was out-performing its chemicals division's operating income, and that gap increased yearly. But with its patent for glyphosate expiring in the United States in the year 2000, Monsanto needed a strategy to maintain its Roundup market dominance and to ward off impending competition. In response, Monsanto began the development and sale of genetically engineered Roundup Ready seeds in 1996. Since Roundup Ready crops are resistant to glyphosate, farmers can spray Roundup onto their fields during the growing season without harming the crop. This allowed Monsanto to expand its market for Roundup even further; by 2000, Monsanto's biotechnology seeds were planted on more than 80 million acres worldwide and nearly 70% of American soybeans were planted from Roundup Ready seeds. It also secured Monsanto's dominant share of the glyphosate/Roundup market through a marketing strategy that coupled proprietary Roundup Ready seeds with continued sales of its Roundup herbicide.

26. Through a three-pronged strategy of increased production, decreased prices, and by coupling with Roundup Ready seeds, Roundup became Monsanto's most profitable product. In 2000, Roundup accounted for almost $2.8 billion in sales, outselling other herbicides by a margin of five to one, and accounting for close to half of Monsanto's revenue.

27. Glyphosate was identified as the second-most used household herbicide in the United States for weed control between 2001 and 2007 and the most heavily used herbicide in the world in 2012.

Plaintiff's First Amended Complaint          - 7 -

28. Today, glyphosate-based formulations continue to be the world's largest herbicides by sales volume.

29. Monsanto has consistently and historically marketed and sold Roundup using false, deceptive, and misleading representations including that Roundup is "safer than table salt" and "practically non-toxic."

30. In 1996, the New York Attorney General ("NYAG") filed a lawsuit against Monsanto based on its false and misleading advertising of Roundup products.  Specifically, the lawsuit challenged Monsanto's representations that its spray-on glyphosate-based formulations were "safer than table salt" and "practically non-toxic to mammals, birds, and fish."  Among the representations the NYAG alleged were deceptive and misleading were:

    a. Remember that environmentally friendly Roundup herbicide is biodegradable.  It won't build up in the soil so you can use Roundup with confidence along customers' driveways, sidewalks and fences.

    b. And remember that Roundup is biodegradable and won't build up in the soil.  That will give you the environmental confidence you need to use Roundup everywhere you've got a weed, bush, edging or trimming problem.

    c. Roundup biodegrades into naturally occurring elements.

    d. Remember that versatile Roundup herbicide stays where you put it. That means there's no washing or leaching to harm customers' shrubs or other desirable vegetation.

    e. This non-residual herbicide will not wash or leach in the soil. It ... stays where you apply it.

Plaintiff's First Amended Complaint      - 8 -

f.  You can apply Accord[1] with "confidence because it will stay where you put it" it bonds tightly to soil particles, preventing leaching. Then, soon after application, soil microorganisms biodegrade Accord into natural products.

g.  Glyphosate is less toxic to rats than table salt following acute oral ingestion. Glyphosate's safety margin is much greater than required. It has over a 1,000-fold safety margin in food and over a 700-fold safety margin for workers who manufacture it or use it.

h.  You can feel good about using herbicides by Monsanto. They carry a toxicity category rating of 'practically non-toxic' as it pertains to mammals, birds and fish. "Roundup can be used where kids and pets will play and breaks down into natural materials."  (This ad depicts a person with his head in the ground and a pet dog standing in an area which has been treated with Roundup).

31. On November 19, 1996, Monsanto entered into an Assurance of Discontinuance with the NYAG, in which Monsanto agreed, among other things, "to cease and desist from publishing or broadcasting any advertisements [in New York] that represent, directly or by implication" that:

a.  its glyphosate-containing pesticide products or any component thereof are safe, non-toxic, harmless or free from risk;

b.  its glyphosate-containing pesticide products or any component thereof manufactured, formulated, distributed or sold by Monsanto are biodegradable;

c.  its glyphosate-containing pesticide products or any component thereof stay where they are applied under all circumstances and will not move through the environment by any means;

---

[1] Accord is another glyphosate-containing Monsanto herbicide.

Plaintiff's First Amended Complaint          - 9 -

    d.  its glyphosate-containing pesticide products or any component thereof are "good" for the environment or are "known for their environmental characteristics;"

    e.  its glyphosate-containing pesticide products or any component thereof are safer or less toxic than common consumer products other than herbicides; or

    f.  its glyphosate-containing products or any component thereof might be classified as "practically non-toxic."

32. Monsanto did not alter its advertising in the same manner in any state other than New York, and on information and belief still has not done so.

33. In 2009, France's highest court ruled that Monsanto had not told the truth about the safety of Roundup.  The French court affirmed an earlier judgement that Monsanto had falsely advertised its herbicide Roundup as "biodegradable" and that it "left the soil clean."

34. The International Agency for Research on Cancer ("IARC") is the specialized agency of the World Health Organization which conducts and coordinates research into the causes of cancer.

35. On March 24, 2015, after its cumulative review of human, animal, and DNA studies, many of which had been in Monsanto's possession since as early as 1985, the IARC working group studying glyphosate concluded that the glyphosate in Roundup is a Class 2A "probable carcinogen."  A full IARC Monograph on the issue was published on July 29, 2015.  The IARC Working Group found that exposure to glyphosate increases the risk that a person will develop NHL and that the increased risk exists even when controlled for other pesticides.

36. The IARC process for the classification of glyphosate followed the stringent procedures for the evaluation of a chemical agent. Over time, the IARC Monograph program has reviewed 980 agents. Of those reviewed, it has determined 116 agents to be Group 1 (Known Human

Carcinogens); 73 agents to be Group 2A (Probable Human Carcinogens); 287 agents to be Group 2B (Possible Human Carcinogens); 503 agents to be Group 3 (Not Classified); and one agent to be Probably Not Carcinogenic

37. The established procedure for IARC Monograph evaluations is described in the IARC Programme's Preamble.  Evaluations are performed by panels of international experts, selected on the basis of their expertise and the absence of actual or apparent conflicts of interest.

38. One year before the Monograph meeting, the meeting is announced and there is a call both for data and for experts. Eight months before the Monograph meeting, the Working Group membership is selected and the sections of the Monograph are developed by the Working Group members. One month prior to the Monograph meeting, the call for data is closed and the various draft sections are distributed among Working Group members for review and comment. Finally, at the Monograph meeting, the Working Group finalizes review of all literature, evaluates the evidence in each category, and completes the overall evaluation. Within two weeks after the Monograph meeting, the summary of the Working Group findings is published in Lancet Oncology, and within a year after the meeting, the final Monograph is finalized and published.

39. In March 2015, the IARC reassessed glyphosate. The summary published in The Lancet Oncology reported that glyphosate is a Group 2A agent and probably carcinogenic in humans.

40. On July 29, 2015, the IARC issued its Monograph for glyphosate, Monograph 112. For Volume 112, the volume that assessed glyphosate, a Working Group of 17 experts from 11 countries met at IARC from March 3–10, 2015, to assess the carcinogenicity of certain herbicides, including glyphosate. The March meeting culminated nearly a one-year review and preparation by the IARC Secretariat and the Working Group, including a comprehensive review of the latest

available scientific evidence. According to published procedures, the Working Group considered "reports that have been published or accepted for publication in the openly available scientific literature" as well as "data from governmental reports that are publicly available."

41. The IARC Working Group found an increased risk between exposure to glyphosate and NHL and several subtypes of NHL, and the increased risk persisted after adjustment for other pesticides. The IARC Working Group also found that glyphosate caused DNA and chromosomal damage in human cells. One study in community residents reported increases in blood markers of chromosomal damage (micronuclei) after glyphosate formulations were sprayed.

42. In male CD-1 mice, glyphosate induced a positive trend in the incidence of a rare tumor, renal tubule carcinoma. A second study reported a positive trend for haemangiosarcoma in male mice. Glyphosate increased pancreatic islet-cell adenoma in male rats in two studies. A glyphosate formulation promoted skin tumors in an initiation-promotion study in mice.

43. The IARC Working Group also noted that glyphosate has been detected in the urine of agricultural workers, indicating absorption. Soil microbes degrade glyphosate to aminomethylphosphoric acid (AMPA). Blood AMPA detection after exposure suggests intestinal microbial metabolism in humans.

44. Several countries around the world have instituted bans on the sale of Roundup and other glyphosate-containing herbicides, both before and since the IARC first announced its assessment for glyphosate in March 2015, and more countries undoubtedly will follow suit as the dangers of the use of Roundup are more widely known.

45. The Netherlands issued a ban on all glyphosate-based herbicides in April 2014, including Roundup, which took effect by the end of 2015. In issuing the ban, the Dutch Parliament member who introduced the successful legislation stated: "Agricultural pesticides in user-friendly

Plaintiff's First Amended Complaint          - 12 -

packaging are sold in abundance to private persons. In garden centers, Roundup is promoted as harmless, but unsuspecting customers have no idea what the risks of this product are. Especially children are sensitive to toxic substances and should therefore not be exposed to it."

46. The Brazilian Public Prosecutor in the Federal District requested that the Brazilian Justice Department suspend the use of glyphosate.

47. France banned the private sale of Roundup and glyphosate following the IARC assessment.

48. Bermuda banned both the private and commercial sale of glyphosates, including Roundup. The Bermuda government explained its ban as follows: "Following a recent scientific study carried out by a leading cancer agency, the importation of weed spray 'Roundup' has been suspended."

49. The Sri Lankan government banned the private and commercial use of glyphosates, particularly out of concern that glyphosate has been linked to fatal kidney disease in agricultural workers.

50. The government of Colombia announced its ban on using Roundup and glyphosate to destroy illegal plantations of coca, the raw ingredient for cocaine, because of the WHO's finding that glyphosate is probably carcinogenic.

51. On September 4, 2015, California's Office of Environmental Health Hazard Assessment ("OEHHA") published a notice of intent to include glyphosate on the state's list of known carcinogens under Proposition 65.   California's Safe Drinking Water and Toxic Enforcement Act of 1986 (informally known as "Proposition 65"), requires the state to maintain and, at least once a year, revise and republish a list of chemicals "known to the State of California

Plaintiff's First Amended Complaint          - 13 -

to cause cancer or reproductive toxicity." The OEHHA determined that glyphosate met the criteria for the listing mechanism under the Labor Code following the IARC's assessment of the chemical.

52. The listing process under the Labor Code is essentially automatic. The list known carcinogens, at a minimum, must include substances identified by reference in Labor Code §6382(b)(1). That section of the Labor Code identifies "[s]ubstances listed as human or animal carcinogens by the International Agency for Research on Cancer (IARC)." The IARC's classification of glyphosate as a Group 2A chemical ("probably carcinogenic to humans") therefore triggered the listing.

53. A business that deploys a listed chemical in its products must provide "clear and reasonable warnings" to the public prior to exposure to the chemical. To be clear and reasonable, a warning must "(1) clearly communicate that the chemical is known to cause cancer, and/or birth defects or other reproductive harm; and (2) effectively reach the person before exposure." The law also prohibits the discharge of listed chemicals into drinking water.

54. Monsanto disputed the listing decision and, in January 2016, filed a lawsuit against OEHHA and the agency's acting director, Lauren Zeise, in California state court, seeking declaratory and injunctive relief to prevent OEHHA from listing glyphosate.

55. Monsanto alleged that OEHHA's exclusive reliance on the IARC decision signified that "OEHHA effectively elevated the determination of an ad hoc committee of an unelected, foreign body, which answers to no United States official (let alone any California state official), over the conclusions of its own scientific experts." Monsanto further alleged that the Labor Code listing mechanism presented various constitutional violations because it "effectively empowers an unelected, undemocratic, unaccountable, and foreign body to make laws applicable in California." Among other things, Monsanto argued that Proposition 65's requirement to provide a "clear and

reasonable warning" to consumers that the chemical is a known carcinogen would damage its reputation and violate its First Amendment rights.

56. As a girl and young woman, Plaintiff worked for Sidco.  In the course of her work for Sidco, Plaintiff was exposed to significant levels of Roundup.

57. Plaintiff developed NHL in 1995.  Plaintiff's NHL was caused by her exposure to Roundup.

58. The Roundup to which Plaintiff was exposed, and which caused her NHL, was misbranded under FIFRA.

## CLAIMS FOR RELIEF
### Count 1 – Strict Products Liability
### (Claim for Relief from Monsanto)

59. Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

60. Monsanto is the manufacturer of the Roundup to which Plaintiff was exposed.

61. Monsanto is liable to Plaintiff for strict product liability because:

   a.  Roundup presents an unreasonable risk of injury, and

   b.  Monsanto failed to provide an adequate warning of the health and safety risks associated with the use of Roundup.

62. The Roundup to which Plaintiff was exposed caused her NHL.

63. The Roundup to which Plaintiff was exposed was defective because the use of Roundup presented an unreasonable risk of injury (*i.e.,* a risk of injury which a reasonably prudent person having full knowledge of the risk would find unacceptable) to the user and all those in the proximity when the Roundup was used.  Said defective condition of Roundup was a cause of Plaintiff's damages.

Plaintiff's First Amended Complaint          - 15 -

64. Roundup is misbranded under FIFRA. Monsanto did not provide an adequate warning that exposure to Roundup can cause cancer and said failure to warn was a cause of Plaintiff's damages.

65. Monsanto is strictly liable for all damages to Plaintiff caused by the defective condition of Roundup and/or Monsanto's failure to warn.

## Count 2 – Strict Products Liability
### (Claim for Relief from Sidco)

66. Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

67. Sidco is a supplier of the Roundup to which Plaintiff was exposed.

68. Sidco is liable to Plaintiff for strict product liability because:

    a.   Roundup presents an unreasonable risk of injury, and

    b.   Sidco failed to provide an adequate warning of the health and safety risks associated with the use of Roundup.

69. The Roundup to which Plaintiff was exposed caused her NHL.

70. The Roundup to which Plaintiff was exposed was defective because the use of said Roundup presented an unreasonable risk of injury (*i.e.,* a risk of injury which a reasonably prudent person having full knowledge of the risk would find unacceptable) to the user and all those in the proximity when the Roundup was used. Said defective condition of Roundup was a cause of Plaintiff's damages.

71. Sidco is strictly liable for all damages to Plaintiff caused by the defective condition of Roundup.

## Count 3 – Negligence
### (Claim for Relief from Monsanto)

72. Plaintiff incorporates by reference each and every allegation set forth in the preceding

paragraphs as if fully stated herein.

73. As the manufacturer of Roundup, Monsanto has a duty to use ordinary care in formulating and designing the product; making the product; inspecting/testing the product; and packaging the product.

74. Monsanto breached one or more of these duties by:

    a.  failing adequately and reasonably to investigate, study, and test the safety of Roundup;

    b.  failing to disclose the information in its possession or of which it was aware which showed the health risks posed by Roundup;

    c.  suppressing and downplaying information which shows the dangerous characteristics of Roundup;

    d.  concealing information concerning the health risks posed by exposure to Roundup;

    e.  using false and misleading practices in marketing Roundup;

    f.  misbranding Roundup under FIFRA;

    g.  acting with crass indifference to the dangers posed by Roundup;

    h.  attacking the evidence that Roundup is carcinogenic and the people who raised concerns;

    i.  focusing on public relations and manipulating regulators rather than following the science concerning Roundup and its effects on public health; and

    j.  failing to provide adequate warnings concerning the health risks posed by exposure to Roundup.

75. Each such breach proximately caused Plaintiff's damages.

76. Monsanto is liable for all Plaintiff's damages caused by such breaches.

**Count 4 – Breach of Warranty**
**(Claim for Relief from Monsanto)**

77. Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

78. Monsanto's affirmations and promises concerning Roundup created express warranties under N.M. Stat. Ann. § 55-2-313 and an implied warranty of merchantability under N.M. Stat. Ann. § 55-2-314.

79. Under N.M. Stat. Ann. § 55-2-318, Plaintiff is a third-party beneficiary of such warranties.

80. Specifically, Monsanto has breached express and implied warranties concerning Roundup by selling Roundup when it was not reasonably safe for its intended use and did not conform to the representations Monsanto made concerning the risks to the health and safety of consumers exposed to Roundup.

81. Monsanto has breached these warranties and under N.M. Stat. Ann. § 55-2-715(2)(b) is liable for all Plaintiff's damages caused by the such breaches.

## DAMAGES

82. Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

83. Plaintiff seeks recovery of all damages caused by her exposure to Roundup including:

  a.  past and future medical expenses,

  b.  past and future physical pain and suffering,

  c.  past and future mental pain and suffering, and

  d.  past and future loss of enjoyment of life.

Plaintiff's First Amended Complaint          - 18 -

**PUNITIVE DAMAGES**

84. Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

85. Monsanto is a company focused on attacking or undermining the people who raise concerns about Roundup's carcinogenic properties, to the exclusion of being an objective arbiter of Roundup's safety. *Hardeman v. Monsanto Co. (In re Roundup Prods. Liab. Litig.)*, 385 F. Supp. 3d 1042, 1047 (N.D. Cal. 2019).

86. For decades Monsanto has acted with crass indifference to the dangers posed by Roundup.  Rather than try to learn if its product was causing cancer, Monsanto attacked the evidence that Roundup is carcinogenic and the people who raised concerns.  When it comes to the carcinogenic properties or Roundup, Monsanto focuses on public relations and manipulating regulators rather than following the science and public health.

87. The evidence at trial will show that Monsanto has been and remains a company addicted to profits from the sale of Roundup and associated products such as seeds for Roundup Ready crops and callously indifferent to the rights of consumers and the threats posed to consumers, including Plaintiff.

88. Monsanto's conduct has been and remains malicious, willful, reckless, and/or wanton.

89. Accordingly, in addition to her actual damages, Plaintiff seeks an award of punitive damages from Monsanto in an amount determined by the jury and allowed by law.

**DISCOVERY RULE; FRAUDULENT CONCEALMENT; EQUITABLE ESTOPPEL**

90. Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

91. To the extent that either Defendant pleads or relies on any statute of limitations as a

Plaintiff's First Amended Complaint          - 19 -

defense to any of the claims for relief pleaded herein, Plaintiff pleads that under the discovery rule her causes of action did not accrue until the date on which her cause of action was discovered or should have been discovered with the exercise of reasonable diligence and that her claims are not barred by limitations under this rule.

92. Additionally, and in the alternative, to the extent that either Defendant pleads or relies on any statute of limitations as a defense to any of the claims for relief pleaded herein, Plaintiff pleads that any statute of limitations is tolled due to Monsanto's fraudulent concealment and that her claims are not barred by limitations as tolled.

93. Additionally, and in the alternative, to the extent that Monsanto pleads or relies on any statute of limitations as a defense to any of the claims for relief pleaded herein, Plaintiff pleads that under equitable estoppel, Monsanto is estopped from pleading or relying on any statute of limitations.

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in her favor against Defendant as set forth above, that Plaintiff be awarded compensatory and punitive damages, interest, costs and attorney's fees, and for such other and further relief as the Court may deem just.

## JURY DEMAND

Plaintiff demands a trial by jury on all counts.

Dated: September 13, 2021               Respectfully submitted,


By: /s/ Anthony K. Bruster
Anthony K. Bruster
New Mexico Bar No. 20283
Christopher Johnson
New Mexico Bar No. 153605
John C. Hull*
Texas Bar No. 24050791
**BRUSTER PLLC**
680 N. Carroll Ave., Suite 110
Southlake, Texas 76092
Telephone:  (817) 601-9564
Facsimile:  (817) 796-2929
Email: akbruster@brusterpllc.com
       cjohnson@brusterpllc.com
       jhull@brusterpllc.com


Darren P. McDowell*
Texas Bar No. 24025520
Matthew R. McCarley*
Texas Bar No. 24041426
**FEARS NACHAWATI LAW FIRM**
5473 Blair Road
Dallas, Texas 75231
Telephone:  (214) 890-0711
Facsimile:  (214) 890-0712
Email: dmcdowell@fnlawfirm.com
       mccarley@fnlawfirm.com

Feliz A. Rael
Attorney at Law
505 Marquette NM, Ste. 1300
Albuquerque, New Mexico 87102
Telephone:  (505) 610-5991
Facsimile:  (505) 938-2301
Email: frael@swcp.com


*To be admitted pro hac vice*

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing pleading was filed electronically through the OdysseyFile/Serve System, which caused the following parties or counsel to be served by electronic means, as more fully reflected on the Notice of Electronic Filing on this 13th day of September 2021.

Alex C. Walker
awalker@modrall.com

Bayard Roberts
broberts@modrall.com

Brett S. Covington
bcovington@hollingsworthllp.com

*Attorneys for Monsanto Company*

Kenneth L. Beal
klbealoffice@gmail.com

*Attorneys for Sidco Corporation*[2]

> By: _/s/ Anthony K. Bruster_____
>      **Anthony Bruster**

---

[2] This Proposed Amended Scheduling Order is jointly submitted by counsel for Plaintiff Renteria and Defendant Monsanto Company.  Input was also sought from counsel for Defendant Sidco Corporation, but no response was provided.  Counsel for Monsanto and Plaintiff are in agreement with the terms of the Proposed Amended Scheduling Order.