Query   Reports   Utilities   Help   Log Out

JURYDEMAND

# U.S. District Court
# United States District Court for the Western District of Washington (Seattle)
# CIVIL DOCKET FOR CASE #: 2:21-cv-01340-JLR

Martin v. Monsanto Company et al                    Date Filed: 09/30/2021
Assigned to: Judge James L. Robart                  Jury Demand: Plaintiff
Cause: 28:1332 Diversity-Product Liability          Nature of Suit: 365 Personal Inj. Prod.
                                                    Liability
                                                    Jurisdiction: Federal Question

**Plaintiff**

**Brian Martin**                      represented by  **Brian Martin**
                                                      1129 SUNSET CLIFFS BLVD
                                                      SAN DIEGO, CA 92107
                                                      985-801-9188
                                                      PRO SE

V.

**Defendant**

**Monsanto Company**

**Defendant**

**Bayer Corporation**

| Date Filed | # | Docket Text |
|---|---|---|
| 09/30/2021 | 1 | COMPLAINT against defendant(s) Bayer Corporation, Monsanto Company with JURY DEMAND (Summons to be issued) (Receipt # SEA105470), filed by Brian Martin. (Attachments: # 1 Civil Cover Sheet, # 2 Summons, # 3 Email transmittal)(CDA) (Entered: 10/01/2021) |
| 10/01/2021 | 3 | LETTER to Filer re case number and Judge assignment. (CDA) Modified on 10/1/2021 cc plaintiff via US Mail (CDA). (Entered: 10/01/2021) |
| 10/01/2021 | 4 | Summons Electronically Issued as to defendant Monsanto Company (CDA) Modified on 10/1/2021 cc plaintiff via US Mail (CDA). (Entered: 10/01/2021) |
| 10/01/2021 | 5 | **Notice of Filing Deficiency** re 1 Complaint. ***Action Required*** Notice of Pendency of Other Action. See attached letter for more information and instructions. (CDA)cc plaintiff via US Mail (Entered: 10/01/2021) |
| | | |

| 10/15/2021 | 6 | NOTICE of Pendency of Other Action in Northern District of California, case number(s) in other court MDL 2741; filed by Plaintiff Brian Martin. (LH) (Entered: 10/15/2021) |

| **PACER Service Center** | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 10/21/2021 07:28:14 | | | |
| **PACER Login:** | sh0019sh | **Client Code:** | 31943.356965 |
| **Description:** | Docket Report | **Search Criteria:** | 2:21-cv-01340-JLR |
| **Billable Pages:** | 1 | **Cost:** | 0.10 |

Brian Martin
1129 Sunset Cliffs Blvd
San Diego, California 92107
985/801-9188

Pro Se Plaintiff

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON – SEATTLE DIVISION

BRIAN MARTIN,

          Plaintiff,

   v.

MONSANTO COMPANY and BAYER
CORPORATION,

          Defendants.

Case No. 2:21-cv-1340 JLR

**COMPLAINT**

Plaintiff Brian Martin ("Plaintiff" or "Mr. Martin") alleges as follows:

1.     Plaintiff is currently a resident of Fairfax County, Virginia. Mr. Martin, who is 54 years old, was exposed to defendant's product, Roundup®, while he resided in the states of Washington, Louisiana and Virginia. Roundup® contains the active ingredient glyphosate and the surfactant polyoxyethylene tallow amine (POEA). In October 2018, while in Washington, Mr. Martin developed and was diagnosed with non-Hodgkin's Lymphoma (NHL) as a direct and proximate result of his exposure to Roundup.

2.     Upon information and belief, Defendant Monsanto Company ("Monsanto") is, and at all times herein mentioned was, a Delaware corporation with its principal place of business in St.

1.

1  Louis, Missouri.  Monsanto is a multinational agricultural biotechnology corporation that
2  manufactures Roundup.  Upon information and belief, Bayer Corporation ("Bayer") is an Indiana
3  corporation with its principal place of business in New Jersey.  Bayer formally acquired Monsanto in
4  2018, and Bayer continues to sell Roundup.  All references herein to Monsanto include both
5  Monsanto and Bayer.

6      3.      The district court has subject matter jurisdiction over this matter pursuant to 28
7  U.S.C. § 1332. Defendants are incorporated in Delaware and Indiana and have their principal places
8  of business in Missouri and New Jersey, and Plaintiff resides in Virginia.  There is complete
9  diversity of citizenship between the parties.  The amount in controversy requirement is also satisfied;
10  Mr. Martin is currently suffering stage 3B non-Hodgkin's Lymphoma, a fatal disease, caused by his
11  exposure to Monsanto's product, Roundup.  As a result, Mr. Martin has endured pain and suffering
12  and emotional distress, and has required and will require extensive medical treatment for his
13  terminal condition, and damages easily exceed $75,000.

14      4.      This court has personal jurisdiction over Defendant under F.R.C.P 4(k) and Wash.
15  Rev. Code § 4.28.185 because Monsanto has minimum contacts with the State of Washington; in
16  particular: (1) the cause of action against Defendants arises from their contacts in the State,
17  specifically, committing the tortious act of manufacturing and selling a defective product (Roundup)
18  to Mr. Martin in this State; (2) Defendants do business in the State of Washington and sells Roundup
19  to consumers in this State (including Plaintiff); and (3) the assertion of personal jurisdiction over
20  Defendanst in Washington is fair and reasonable.  Monsanto is also licensed to do business in the
21  State of Washington and derives substantial revenue from doing business in this State.

22      5.      Venue is proper in this court under 28 U.S.C. § 1391(b)(2) because a substantial part
23  of the events or omissions giving rise to the claim occurred in Snohomish County in the state of
24  Washington, in which Mr. Martin purchased and used Monsanto's Roundup products and in which
25  he was diagnosed with terminal NHL.

26      6.      Glyphosate is the main active ingredient in the commercial herbicide Roundup.
27  Roundup also contains a surfactant, POEA, which enhances the absorption of the herbicide through
28  the waxy surface of a plant. The surfactant also enhances the absorption of the herbicide through

2.

1    skin.  The European Union voted to ban POEA in 2016, based on a determination that herbicides

2    containing POEA exhibited substantially higher toxicity than glyphosate alone.

3          7.    Monsanto manufactures Roundup and is the world's leading producer of glyphosate.

4    Monsanto discovered the herbicidal properties of glyphosate during the 1970's and subsequently

5    began to design, research, manufacture, sell and distribute glyphosate-based Roundup as a broad-

6    spectrum herbicide. Monsanto began selling glyphosate-based Roundup products in 1974.

7          8.    At all relevant times described herein, Monsanto designed, researched, manufactured,

8    tested, advertised, promoted, marketed, sold, and distributed the commercial herbicide Roundup. As

9    used in this Complaint, "Roundup" refers to all formulations of Monsanto's Roundup products,

10   including, but not limited to, Roundup Concentrate Poison Ivy and Tough  Killer 1, Roundup

11   Custom Herbicide, Roundup D-Pak herbicide, Roundup Dry Concentrate, Roundup Export

12   Herbicide, Roundup Fence & Hard Edger 1, Roundup Garden Foam Weed & Grass Killer, Roundup

13   Grass and Weed Killer, Roundup Herbicide, Roundup Original 2k herbicide, Roundup Original II

14   Herbicide, Roundup Pro Concentrate, Roundup Prodry Herbicide, Roundup Promax, Roundup Quik

15   Stik Grass and Weed Killer, Roundup Quikpro Herbicide, Roundup Rainfast Concentrate Weed &

16   Grass Killer, Roundup Rainfast Super Concentrate Weed & Grass Killer, Roundup Ready-to-Use

17   Extended Control Weed & Grass Killer 1 Plus Weed Preventer, Roundup Ready-to-Use Weed &

18   Grass Killer, Roundup Ready-to Use Weed and Grass Killer 2, Roundup Ultra Dry, Roundup Ultra

19   Herbicide, Roundup Ultramax, Roundup VM Herbicide, Roundup Weed & Grass Killer

20   Concentrate, Roundup Weed & Grass Killer Super Concentrate, Roundup Weed & Grass Killer1

21   Ready-to-Use, Roundup WSD Water Soluble Dry Herbicide Deploy Dry Herbicide, or any other

22   formulation of Roundup containing the active ingredient glyphosate.

23         9.    Glyphosate is a broad-spectrum herbicide used to kill weeds and grasses. It works by

24   targeting an enzyme that is essential to plant growth.  Glyphosate kills any plant that produces the

25   enzyme, 5-enolpyruvylshikimic acid-3-phosphate synthase ("EPSP synthase"). Glyphosate inhibits

26   EPSP synthase and thereby interferes with the shikimic pathway in plants, resulting in the

27   accumulation of shikimic acid in plant tissue.  The accumulation of shikimic acid ultimately kills the

28   plant.

COMPLAINT

1      10.    Glyphosate-based products are currently among the world's most widely used

2   herbicides. Globally, both commercial and non-commercial users spray about 250 million pounds of

3   glyphosate on plants annually.

4      11.    The Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA"), 7. U.S.C. § 136

5   et seq., regulates herbicides such as Roundup. FIFRA requires herbicides to be registered with the

6   Environmental Protection Agency ("EPA") prior to their distribution, sale, or use. As part of the

7   registration process, the EPA requires that herbicides be tested to evaluate their potential for toxicity

8   to people and other non-target organisms, and other adverse effects on the environment. EPA

9   registration of a product signifies that, if used in accordance with its label directions, the product

10  "will not generally cause unreasonable adverse effects on the environment." 7 U.S.C. §

11  136(a)(c)(5)(D). FIFRA defines "unreasonable adverse effects on the environment" as "any

12  unreasonable risk to man or the environment, considering the economic, social, and environmental

13  costs and benefits of the use of any pesticide." 7 U.S.C. § 136(bb). The EPA has registered

14  Roundup for manufacture, sale, and distribution throughout the United States.

15     12.    Under FIFRA, pesticide manufacturers like Monsanto must test their own products

16  before seeking registration with the EPA. The EPA evaluates the safety of the product based on the

17  data provided by the company.

18     13.    In 2015, the International Agency for Research on Cancer (IARC), part of the World

19  Health Organization (WHO), issued a monograph in which it classified glyphosate as a Level 2A

20  probable human carcinogen. The IARC monograph evaluation process is based on a review of all

21  publicly available and pertinent studies, by independent experts, free from vested interests. Its

22  classification system is recognized and used as a reference throughout the world.

23     14.    Based on approximately a thousand separate scientific, in March 2015 the IARC

24  Working Group classified glyphosate as "probably carcinogenic to humans" (Group 2A). This

25  conclusion was based on evidence of cancer in humans (from real-world exposures) and evidence of

26  cancer in experimental animals (from studies based on lab experiments). IARC also found strong

27  evidence that glyphosate causes genotoxicity, both for "pure" glyphosate and for glyphosate

28

4.

1  formulations. Genotoxicity refers to chemical agents that are capable of damaging the DNA within a
2  cell through genetic mutations, a process that is believed to lead to cancer.

3      15.    Both human and animal studies have shown that glyphosate and glyphosate-based
4  formulations such as Roundup can also induce oxidative stress. Oxidative stress and associated
5  chronic inflammation are also believed to be involved in carcinogenesis. The IARC Monograph
6  concluded that strong evidence exists that glyphosate, AMPA and glyphosate-based formulations
7  can induce oxidative stress."

8      16.    The IARC Working Group further conducted an objective statistical analysis of the
9  results of all available studies on glyphosate and non-Hodgkin lymphoma. The data from these
10  studies show a statistically significant association between NHL and exposure to glyphosate.

11     17.    Monsanto has been aware of glyphosate's carcinogenic properties since the 1980s. In
12  1985, the EPA studied the effects of glyphosate in animals and found a dose-related response in
13  male mice linked to renal tubal adenomas, a rare tumor. On March 4, 1985, the EPA's Toxicology
14  Branch published a memo classifying glyphosate as a Category C oncogene; i.e., a possible human
15  carcinogen with evidence of carcinogenicity. In 1986, the EPA issued a Registration Standard for
16  glyphosate (NTIS PB87-103214) that required Monsanto to submit additional glyphosate studies re
17  phytotoxicity, environmental fate, toxicology, product chemistry, and residue chemistry to the EPA.
18  All of these studies and events were contemporaneously known to Monsanto.

19     18.    Studies conducted throughout the 1990s and 2000s continued to demonstrate
20  glyphosate's carcinogenic properties. For example, in 2003 two case-controlled studies concluded
21  that glyphosate had the most significant relationship to NHL among all herbicides studied, with an
22  increased odds ratio of 3.11. Similarly, in 2003, AJ De Roos published a study that examined the
23  pooled data of midwestern farmers, and even after controlling for potential cofounders, concluded
24  that there was a demonstrable relationship between increased NHL incidence and glyphosate.
25  Further, in 2006, César Paz-y-Miño published a study examining DNA damage in human subjects
26  exposed to glyphosate and demonstrated evidence of chromosomal damage in blood cells and that
27  showed significantly greater damage after exposure to glyphosate than before in the same

28

individuals, suggesting that the glyphosate formulation used during aerial spraying had a genotoxic effect on exposed individuals.

19.     Monsanto either knew or should have known about all of the published studies and materials described above.

20.     Further, at least since the 1990s, it has been known by both Monsanto and the scientific community that the surfactant POEA used by Monanto in Roundup made that product even more carcinogenic and genotoxic than glyphosate alone.  For example, in 2002, Julie Marc published a study entitled "Pesticide Roundup Provokes Cell Division Dysfunction at the Level of CDK1/Cyclin B Activation" that found that Roundup caused delays in the cell cycles of sea urchins, even though the same concentrations of glyphosate alone did not alter cell cycles.  Similarly, in 2004, Julie Marc published a study that demonstrated a molecular link between glyphosate-based products and cell cycle dysregulation, which (as the study noted) is a hallmark of tumor cells and human cancer. Further, in 2005, Francisco Peixoto published a study showing that Roundup's effects on rat liver mitochondria are more toxic and harmful than the same concentrations of glyphosate alone.  Moreover, in 2009, Nora Benachour and Gilles-Eric Seralini published a study examining the effects of even diluted levels of Roundup and glyphosate on human umbilical, embryonic, and placental cells, and concluded that even the supposed "inert" ingredients of Roundup altered human cell permeability and amplified the toxicity of glyphosate alone.

21.     The results of these studies have been repeatedly confirmed, and at all relevant times herein, Monsanto knew or should have known of these results.

22.     Despite its knowledge to the contrary, at all relevant times herein, Monsanto has false maintained and represented to the public that Roundup is not genotoxic, that regulatory authorities and independent experts agree Roundup is not genotoxic, and that there is no evidence that Roundup is genotoxic.

23.     Monsanto has known, or should have known, of glyphosate's carcinogenic properties for many years. Glyphosate and Roundup have long been associated with carcinogenicity and the development of numerous forms of cancer, including, but not limited to, the type of non-Hodgkin's

lymphoma (NHL) with which Mr. Martin was diagnosed – at the exceptionally early age of 52 – as a result of his exposure to Roundup.

24. At all relevant times, Monsanto knew or should have known that Roundup is more toxic than glyphosate alone, and Monsanto knew or should have known that studies limited to Roundup's active ingredient glyphosate were insufficient to prove the safety of Roundup. Monsanto knew or should have known that tests on Roundup needed to include Roundup's adjuvants and "inert" ingredients, and/or the surfactant POEA, to accurately determine the safety of Roundup. Monsanto failed to appropriately and adequately test Roundup, Roundup's adjuvants and "inert" ingredients, and the surfactant POEA, to protect Mr. Martin and the consuming public from Roundup.

25. Despite this knowledge, Monsanto continued to issue broad and sweeping statements falsely representing that Roundup was, and is, safer than ordinary household items such as table salt, despite a lack of scientific support for the accuracy and validity of these statements and, in fact, voluminous evidence to the contrary.

26. Upon information and belief, these statements and representations have been made with the intent of inducing Mr. Martin and the public at large to purchase, and increase their use of, Roundup, to enable Monsanto to profit from those sales. Those representations regarding the safety and non-toxicity of Roundup induced Mr. Martin to buy and to use Roundup.

27. Monsanto made these statements with disregard and reckless indifference to the safety of Mr. Martin and the general public. Contrary to Monsanto's representations, scientific evidence has established a clear association between glyphosate and genotoxicity, inflammation, and an increased risk of many cancers, including, but not limited to, NHL.

28. At all times relevant herein, Monsanto knew or should have known that glyphosate is associated with an increased risk of developing cancer, particularly including the type of NHL that Mr. Martin developed from his use of and exposure to Roundup.

29. Despite the IARC's classification of glyphosate as a class 2A probable carcinogen, Monsanto represented to the public and continues to maintain that glyphosate and Roundup are safe, non-carcinogenic, non-genotoxic, and falsely warrants to users and the general public, including Mr.

7.

1    Martin, that independent experts and regulatory agencies agree that there is no evidence of

2    carcinogenicity or genotoxicity in glyphosate and Roundup.

3        30.    At relevant times herein, Monsanto claimed on its website that "[r]egulatory

4    authorities and independent experts around the world have reviewed numerous long-

5    term/carcinogenicity and genotoxicity studies and agree that there is no evidence that glyphosate, the

6    active ingredient in Roundup brand herbicides and other glyphosate-based herbicides, causes cancer,

7    even at very high doses, and that it is not genotoxic." This is false; indeed, the primary source for

8    this statement is a 1986 report by the WHO, the same organization that now considers glyphosate to

9    be a probable carcinogen.

10       31.    Defendants' statements proclaiming the safety of Roundup and disregarding its

11    dangers misled Mr. Martin. Monsanto's failure to adequately warn Mr. Martin resulted in Mr. Martin

12    using and being exposed to Roundup and glyphosate instead of using another acceptable and safe

13    method of controlling unwanted weeds.

14       32.    At all relevant times herein, Monsanto failed to modify the labeling of Roundup to

15    include relevant information regarding the risks and dangers associated with Roundup exposure.

16    Monsanto's failure to appropriately warn and inform the EPA has resulted in inadequate warnings in

17    safety information presented directly to users and consumers, including Mr. Martin.

18       33.    Mr. Martin used Roundup for many years to control poison oak and weeds on his

19    parents' property in Virginia and on his properties in Washington and Louisiana. Mr. Martin's most

20    systemic use of Roundup occurred while he was living in the State of Washington. Plaintiff moved

21    to Edmonds, Washington, in 2011, Soon after moving to Edmonds, Mr. Martin purchased a

22    backpack for spraying Roundup on this property, which he used multiple times per week, every

23    week, for several years. In 2015, Mr. Martin purchased a house on five acres of land in Snohomish

24    County, Washington and increased his use of Roundup.

25       34.    Mr. Martin chose to purchase and use Roundup, in contrast to other weedkillers or

26    pesticides, because it was advertised by Monsanto as nontoxic and safe. Mr. Martin chose to use

27    Roundup because -- unlike other weedkillers -- Monsanto did not instruct the user to wear gloves or

28

COMPLAINT

1 masks while applying the product, which Mr. Martin interpreted as evidence of Roundup's non-
2 toxicity.

3      35.    Plaintiff was diagnosed with large B-cell Non-Hodgkin Lymphoma (NHL) in October
4 2018, at the age of 51. As a result of his injury, Mr. Martin has incurred significant economic and
5 non-economic damages. Mr. Martin stopped spraying Roundup on his property shortly after his
6 diagnosis, after reading media reports indicating that Roundup and its active ingredient, glyphosate,
7 were associated with NHL.

8 **FIRST CAUSE OF ACTION**
9 Strict Liability (Design Defect)

10      36.    Plaintiff incorporates by reference each of the allegations of the foregoing paragraphs
11 as though fully set forth herein.

12      37.    At all times herein mentioned, Monsanto designed, researched, manufactured, tested,
13 advertised, promoted, sold, and distributed Roundup, which used by Mr. Martin. Pursuant to
14 Washington's Products Liability Act, producers are strictly liable for injuries proximately caused by
15 products that are "not reasonably safe as designed." Wash. Rev. Code Ann. § 7.72.030(1).
16 Monsanto's product, Roundup, was not reasonably safe as designed, and was defectively designed,
17 because a defect existed in Roundup that was unknown to Mr. Martin, which rendered the use of the
18 product unreasonably dangerous and proximately caused Mr. Martin's injuries. *City of Seattle v.*
19 *Monsanto Co.*, 237 F. Supp. 3d 1096, 1107–08 (W.D. Wash. 2017) (citing *Lunsford v. Saberhagen*
20 *Holdings, Inc.*, 106 P.3d 808 (Wash. App. 2005)).

21      38.    Roundup was expected to and did reach Mr. Martin without substantial change in the
22 condition in which it was produced, manufactured, sold, distributed, and marketed by Monsanto. At
23 those times, Roundup was in an unsafe, defective, and inherently dangerous condition, which was
24 dangerous to users, including Mr. Martin.

25      39.    A product is "unreasonably dangerous" if the likelihood that it would harm plaintiff,
26 and the seriousness of that harm, outweighs the burden on the defendant "to design a product that
27 would have prevented those harms" using a feasible alternative design. *Soproni v. Polygon*
28 *Apartment Partners*, 971 P.2d 500, 504 (Wash. 1999); Wash. Rev. Code Ann. § 7.72.030(1)(a). The

9.

1    product designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and

2    distributed by Monsanto, Roundup, was defective in design or formulation, such that the foreseeable

3    harm to Mr. Martin, and the severity of that to him, exceeded the burden on Monsanto to design a

4    safer, feasible alternative product. Monsanto has already committed to replace the current

5    formulation of Roundup used domestically in the United States with "new formulations that rely on

6    alternative active ingredients," removing glyphosate from the product, as of 2023. It was feasible for

7    Monsanto to use an alternative to the surfactant POEA in Roundup products, and the use of POEA

8    by Monsanto in Roundup was unreasonably dangerous.

9         40.    A product is also "unreasonably dangerous" if it is "unsafe to an extent beyond that

10   which would be contemplated by the ordinary consumer." *Soproni v. Polygon Apartment Partners*,

11   971 P.2d 500, 504 (Wash. 1999); Wash. Rev. Code Ann. § 7.72.030(3). Roundup was designed,

12   researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed by Monsanto

13   in a manner that was defective in design and/or formulation, such that it was unreasonably dangerous

14   in normal use, and it was more dangerous than an ordinary consumer, including but not limited to

15   Mr. Martin, would expect.

16        41.    At all times herein mentioned, Roundup was in a defective condition and unsafe, and

17   Monsanto knew or had reason to know that said product was defective and unsafe, especially when

18   used in the form and manner as provided by Monsanto. Roundup was defective, *inter alia*, in the

19   following ways:

20             a. When placed in the stream of commerce, Roundup was defective in design and

21             formulation and, consequently, dangerous to an extent beyond that which an ordinary

22             consumer would anticipate.

23             b. When placed in the stream of commerce, Roundup was unreasonably dangerous in that it

24             was hazardous and posed a grave risk of cancer and other serious illnesses when used in a

25             reasonably anticipated manner.

26             c. When placed in the stream of commerce, Roundup contained unreasonably dangerous

27             design defects and was not reasonably safe when used in a reasonably anticipated manner.

28             d. Monsanto did not sufficiently test, investigate, or study Roundup.

10.

e. Exposure to Roundup presents a risk of harmful side effects that outweigh any potential utility stemming from its use, or any burden on Monsanto of designing a safer alternative.

f. Monsanto knew or should have known at the time of marketing Roundup that exposure to Roundup and could result in cancer, particularly NHL, and other severe illnesses and injuries.

g. Monsanto did not conduct adequate post-marketing surveillance of Roundup.

42.     Monsanto knew, or should have known, that, at all times mentioned herein, its product Roundup was in a defective condition and was inherently dangerous and unsafe. With this knowledge, Monsanto designed Roundup with a dangerous condition for use by the public, and in particular the Plaintiff.

43.     Mr. Martin was exposed to Roundup without knowledge of its dangerous characteristics. At the time of Mr. Martin's use of and exposure to Roundup, Roundup was being used for the purposes and in a manner normally intended, as a broad-spectrum herbicide.

44.     Monsanto had a duty to create a product that was not unreasonably dangerous for its normal, intended use. Monsanto created a product that was and is unreasonably dangerous for its normal, intended use.

45.     Monsanto marketed and promoted Roundup in such a manner so as to make it inherently defective, as the product downplayed its suspected, probable, and established health risks inherent with its normal, intended use.

46.     Mr. Martin could not, by the exercise of reasonable care, have discovered Roundup's defects herein mentioned or appropriately perceive its danger, particularly given the representations made by Monsanto.

47.     By reason of the foregoing, Monsanto is strictly liable to Mr. Martin for the manufacturing, marketing, promoting, distribution, and selling of a defective product, Roundup, and for the damages proximately caused to Mr. Martin by Monsanto's conduct.

11.

**SECOND CAUSE OF ACTION**

Strict Liability (Failure to Warn)

48.     Plaintiff incorporates by reference each of the allegations of the foregoing paragraphs as though fully set forth herein.

49.     Monsanto has engaged in the business of selling, testing, distributing, supplying, manufacturing, marketing, and/or promoting Roundup, and through that conduct has knowingly and intentionally placed Roundup into the stream of commerce with full knowledge that it reaches consumers such as Mr. Martin who are exposed to it through ordinary and reasonably foreseeable uses. Monsanto did in fact sell, distribute, supply, manufacture, and/or promote Roundup to Mr. Martin. Additionally, Monsanto expected Roundup to reach – and Roundup did in fact reach – consumers, including Mr. Martin, without any substantial change in the condition of the product from when it was initially distributed by Monsanto.

50.     A manufacturer is strictly liable for injuries caused by its failure to adequately warn consumers regarding the dangers of its product. Monsanto is liable if the likelihood that Roundup would harm Plaintiff, and the seriousness of that harm, rendered Monsanto's warnings or instructions regarding the dangers of using Roundup inadequate. *Soproni v. Polygon Apartment Partners*, 971 P.2d 500, 504 (Wash. 1999); Wash. Rev. Code Ann. § 7.72.030(1)(b). At the time of manufacture, Monsanto could have provided the warnings or instructions regarding the full and complete risks of Roundup and glyphosate-containing products, because it knew or should have known of the unreasonable risks of harm associated with the use of and/or exposure to such products. It did not.

51.     Monsanto failed to appropriately and adequately inform and warn Mr. Martin of the serious and dangerous risks associated with the use of and exposure to glyphosate and/or Roundup including, but not limited to, the risk of developing NHL, as well as other severe and personal injuries, which are permanent and/or long-lasting in nature, cause significant physical pain and mental anguish, diminished enjoyment of life, and the need for medical treatment, monitoring and/or medications.

12.

52.     At all times herein, Roundup was defective and unsafe in manufacture such that it was unreasonably dangerous to the user and was so during the period Mr. Martin was exposed to the product. The defective condition of Roundup was due in part to the fact that it was not accompanied by proper warnings regarding its carcinogenic qualities and possible side effects, including, but not limited to, developing NHL as a result of exposure and use.

53.     Roundup did not contain a warning or caution statement, which was necessary and, if complied with, was adequate to protect health of those exposed, in violation of 7 U.S.C. § 136j(a)(1)(E). Monsanto's failure to include a warning or caution statement which was necessary and, if complied with, was adequate to protect the health of those exposed, violated 7 U.S.C. § 136j(a)(1)(E) as well as the laws of the State of Washington.

54.     Monsanto could have amended the label of Roundup to provide additional warnings, but it did not. This defect caused serious injury to Mr. Martin, who used Roundup in its intended and foreseeable manner.

55.     At all times herein mentioned, Monsanto had a duty to properly design, manufacture, compound, test, inspect, package, label, distribute, market, examine, maintain supply, provide proper warnings, and take such steps to assure that the product did not cause users to suffer from unreasonable and dangerous side effects. Monsanto labeled, distributed, and promoted the aforesaid product in a manner so that it was dangerous and unsafe for the use and purpose for which it was intended.

56.     Monsanto knew or should have known the probable consequences of the aforesaid conduct. Even though Monsanto knew or should have known that Roundup caused serious injuries, Monsanto failed to exercise reasonable care to warn of the dangerous carcinogenic properties and side effect of developing NHL from Roundup exposure, even though these side effects were known or reasonably scientifically knowable at the time of distribution.

57.     Monsanto willfully and deliberately failed to avoid the consequences associated with its failure to warn, and in doing so, Monsanto acted with a conscious disregard for the safety of Plaintiff. At the time of exposure, Plaintiff could not have reasonably discovered any defect in Roundup prior through the exercise of reasonable care.

13.

58.     Monsanto, as the manufacturer of Roundup, is held to the level of knowledge of an expert in the field. Mr. Martin reasonably relied upon the skill, superior knowledge, and judgment of Monsanto. Had Monsanto properly disclosed the risks associated with Roundup, Mr. Martin would have avoided the risk of NHL by not using Roundup.

59.     The information that Monsanto did provide or communicate failed to contain adequate warnings and precautions that would have enabled Mr. Martin to utilize the product safely and with adequate protection. Instead, Monsanto disseminated information that was inaccurate, false, and misleading, and which failed to communicate accurately or adequately the comparative severity, duration, and extent of the risk of injuries associated with use of and/or exposure to Roundup and glyphosate; continued to promote the efficacy of Roundup, even after it knew or should have known of the unreasonable risks from use or exposure; and concealed, downplayed, or otherwise suppressed, through aggressive marketing and promotion, any information or research about the risks and dangers of exposure to Roundup and glyphosate.

60.     To this day, Monsanto has failed to adequately warn of the true risks of Mr. Martin's injuries associated with the use of and exposure to Roundup. As a result of its inadequate warnings, Monsanto's Roundup product was defective and unreasonably dangerous when it left the possession and/or control of Monsanto and was used by Mr. Martin.

61.     As a direct and proximate result of Monsanto's conduct, Mr. Martin contracted a terminal disease, NHL, at the age of 51.  His wife will be a widow, and his children will have no father, as a direct result of Monsanto's conduct.

14.

**PRAYER FOR RELIEF**

Plaintiff accordingly seeks monetary damages against Defendants in an amount to be proven at trial, exemplary and punitive damages, and such further relief as the Court deems proper.

Dated:  September 30, 2021

_____
Brian Martin
Pro Se Plaintiff

15.

COMPLAINT

**JURY DEMAND**


Plaintiff hereby demands a jury trial for all claims and issues so triable.


Dated: September 30, 2021

Brian Martin
Pro Se Plaintiff

16.