Query    Reports    Utilities    Help    Log Out

4months

# U.S. District Court
## Northern District of Georgia (Atlanta)
### CIVIL DOCKET FOR CASE #: 1:21-cv-04266-ELR

Darty v. Monsanto Company
Assigned to: Judge Eleanor L. Ross
Cause: 28:1332 Diversity-Product Liability

Date Filed: 10/12/2021
Jury Demand: Plaintiff
Nature of Suit: 367 Personal Injury:
Health Care/Pharmaceutical Personal
Injury Product Liability
Jurisdiction: Diversity

**Plaintiff**

**Helga Darty**
*Executrix for the Estate of Ben Richard Darty*

represented by **Andrew J. Shamis**
Shamis & Gentile, P.A.
Suite 705
14 NE 1st Avenue
Miami, FL 33132
305-479-2299
Fax: 786-623-0915
Email: ashamis@shamisgentile.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Monsanto Company**

| Date Filed | # | Docket Text |
|---|---|---|
| 10/12/2021 | 1 | COMPLAINT with Jury Demand filed by Helga Darty. (Filing fee $402, receipt number AGANDC-11320408) (Attachments: # 1 Civil Cover Sheet)(tcc) Please visit our website at http://www.gand.uscourts.gov/commonly-used-forms to obtain Pretrial Instructions and Pretrial Associated Forms which includes the Consent To Proceed Before U.S. Magistrate form. (Entered: 10/13/2021) |
| 10/12/2021 | 2 | Electronic Summons Issued as to Monsanto Company. (tcc) (Entered: 10/13/2021) |
| 10/18/2021 | 3 | NOTICE FROM THE COURT: INSTRUCTIONS FOR CIVIL CASES ASSIGNED TO THE HONORABLE ELEANOR L. ROSS. (mlb) (Entered: 10/18/2021) |

| PACER Service Center | | |
|---|---|---|
| **Transaction Receipt** | | |
| 10/26/2021 10:49:00 | | |
| **PACER Login:** | sh0019sh | **Client Code:** | 31943.356965 |
| **Description:** | Docket Report | **Search Criteria:** | 1:21-cv-04266-ELR |
| **Billable Pages:** | 1 | **Cost:** | 0.10 |

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA

| | |
|---|---|
| HELGA DARTY, EXECUTRIX FOR THE ESTATE OF BEN RICHARD DARTY, | **JURY TRIAL DEMANDED** |
| Plaintiff, | Case No. _____ |
| V. | **COMPLAINT** |
| MONSANTO COMPANY, | |
| Defendant. | |

### COMPLAINT

COMES NOW Plaintiff Helga Darty, Executrix for the Estate of Ben Richard Darty (hereinafter, the "Plaintiff") against Defendant Monsanto Company ("Monsanto"), alleging the following upon information and belief, except those allegations that pertain to Plaintiff based on personal knowledge:

### INTRODUCTION

In 1970, Defendant Monsanto Company discovered the herbicidal properties of glyphosate and began marketing it in products in 1974 under the brand name Roundup®. Roundup® is a non-selective herbicide used to kill weeds that commonly compete with the growing of crops. By 2001, glyphosate had become the most-used active ingredient in American agriculture with 85-90 million pounds used annually. That number grew to 185 million pounds by 2007. As of 2013, glyphosate was the world's most widely used herbicide Monsanto's Roundup® is a prevalent and yet highly dangerous product. Although it has long been marketed as an entirely safe herbicide whose main benefit is that it can be indiscriminately sprayed on fields planted with Monsanto's "Roundup Ready" seeds, we now know that using Roundup® and its active ingredient, glyphosate, in this way causes cancer— including Non-Hodgkin's Lymphoma ("NHL"), Hodgkin's Lymphoma, Lymphoma, Multiple Myeloma and/or Leukemia. Bellwether plaintiffs have already litigated and

1

prevailed on precisely such claims. Plaintiff did not know of any association between exposure to Roundup® and an increased risk of developing these listed above, even well after the International Agency for Research on Cancer ("IARC"), an agency of the World Health Organization, first published its evaluation of glyphosate. That is because Monsanto has waged a campaign of misinformation espousing the safety of Roundup® even as it knew there was evidence to the contrary.

On July 29, 2015, the IARC issued the formal monograph relating to glyphosate. In that monograph, the IARC Working Group provides a thorough review of the numerous studies and data relating to glyphosate exposure in humans. The IARC Working Group classified glyphosate as a Group 2A herbicide, which means that it is probably carcinogenic to humans. The IARC Working Group concluded that the cancers most associated with glyphosate exposure are non-Hodgkin lymphoma and other haematopoietic cancers, including lymphocytic lymphoma/chronic lymphocytic leukemia, B-cell lymphoma, and multiple myeloma. The IARC evaluation is significant. It confirms what has been believed for years: that glyphosate is toxic to humans. Nevertheless, Monsanto, since it began selling Roundup®, has represented it as safe to humans and the environment. Indeed, Monsanto has repeatedly proclaimed and continues to proclaim to the world, and particularly to United States consumers, that glyphosate-based herbicides, including Roundup®, create no unreasonable risks to human health or to the environment.

I.      **THE PARTIES**

**PLAINTIFF**

1.      At all relevant times, Plaintiff was a citizen of Georgia. Plaintiff was born on March 5, 1941 and died from complications from non-Hodgkin Lymphoma on August 22, 2021. The Plaintiff's estate submits to the jurisdiction of this Court and alleges the Venue is proper.

2.      Plaintiff  was exposed to Roundup® in Henry County, Georgia when he applied

Roundup® on a weekly basis from approximately 1987 to April 2020 on his 7-acre property.

3.     In or around May 2020, Plaintiff was diagnosed with non-Hodgkin Lymphoma ("NHL") at the Veterans Administration Hospital in Decatur, Georgia, and suffered the effects—including premature death—as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendants' wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

4.     Plaintiff is informed and believe and based thereon allege that as a direct and proximate result of Plaintiffs exposure to Roundup® and/or other Monsanto and/or Monsanto glyphosate-containing products (hereinafter, "Roundup®"), supplied, marketed, and/or distributed by Defendants herein, Plaintiff suffered significant harm, conscious pain and suffering, physical injury and bodily impairment including, but not limited to non-Hodgkin Lymphoma, and death.

5.     As a direct and proximate result of the wrongful conduct, acts, omissions, fraudulent concealments, fraudulent misrepresentations, and fraudulent business practices by Defendants, Plaintiff used and/or was exposed to Roundup® and was diagnosed with non-Hodgkin lymphoma.

6.     As a further direct and proximate result of defects in Roundup® and the wrongful conduct, acts, omissions, and fraudulent misrepresentations of Defendants, Plaintiff suffered severe mental and physical pain and has and will sustain permanent injuries and emotional distress, along with economic loss due to medical expenses and living-related expenses as a result of lifestyle changes.  As a further direct and proximate result of defects in Roundup® and the wrongful conduct, acts, omissions, and fraudulent misrepresentations of Defendants, Plaintiff required medical intervention in efforts to maintain and/or save Plaintiff's life, which failed to save Plaintiff from premature death.

7.    The product warnings for Roundup® in effect during the time period Plaintiff used and/or was exposed to Roundup® were vague, incomplete, or otherwise inadequate, both substantively and graphically, to alert consumers to the severe health risks associated with Roundup® use and/or exposure.

8.    The Defendants did not provide adequate warnings to consumers including Plaintiff and the general public about the increased risk of the serious adverse events described herein.

### DEFENDANT

9.    Defendant Monsanto Company is a Delaware corporation with its headquarters and principal place of business in St. Louis, Missouri.

10.    At all times relevant to this petition, Monsanto was the entity that discovered herbicidal properties of glyphosate and the manufacturer of Roundup®.

11.    In September 2016, Monsanto was acquired by Bayer, a German chemicals conglomerate.

## II.    JURISDICTION AND VENUE

11.    At all relevant times, Monsanto, a wholly owned subsidiary of Bayer Aktiengesellschaft ("Bayer AG"), has had its principal place of business in St. Louis, Missouri

5.    At all relevant times, Monsanto was in the business of researching, designing, formulating, compounding, testing, manufacturing, producing, processing, assembling, inspecting, distributing, labeling, and packaging and Monsanto was in the business of marketing, promoting, and/or advertising Roundup® products in Georgia. As such, there is specific jurisdiction as well.

6.    Defendants have purposefully availed themselves of the benefits and the protections of the laws within the State of Georgia. Monsanto has had sufficient contact such that the exercise of

jurisdiction would be consistent with the traditional notions of fair play and substantial justice.

## III.     SUBJECT-MATTER JURISDICTION

7.     At all relevant times, Plaintiff Ben Richard Darty was a legal resident of Henry County, Georgia.

8.     Bayer AG is incorporated in the Federal Republic of Germany with its principal place of business in Leverkusen, Germany.

9.     Monsanto Co. is a wholly owned subsidiary of Bayer AG, and has its principal place of business in St. Louis, Missouri.[1]

10.     The court has subject matter jurisdiction under 28 U.S.C. §1332(a)(1). Monsanto is a citizen of Missouri under 28 U.S.C. §1332(c)(1). Plaintiff is a Georgia resident. The parties therefore have complete diversity of citizenship. *Lincoln Property Co. v. Roche*, 546 U.S. 81, 89 (2005).

11.     Plaintiff's requested relief also meets the $75,000 amount-in-controversy requirement of 28 U.S.C. §1332. When there is a "suit for declaratory or injunctive relief, the amount in controversy is the value to the plaintiff of the right that is in issue." *Usery v. Anadarko Petroleum Corp.*, 606 F.3d 1017, 1018 (8th Cir. 2010). Under this standard, the measurement of value is the "actual value of the object of the suit." *Id.* As Monsanto sells millions of dollars of Roundup® products nationwide, the requested injunction meets the amount- in-controversy requirement of 28 U.S.C. §1332.

## IV.     FACTS

12.     In 1970, Monsanto discovered the herbicidal properties of glyphosate and began marketing it in products in 1974 under the brand name Roundup®. Roundup® is a non-selective

---

[1] *See, e.g.*, https://www.investor.bayer.de/en/bayer-group/ueberblick/subsidiaries/.

herbicide used to kill weeds that commonly compete with the growing of crops. By 2001, glyphosate had become the most-used active ingredient in American agriculture with 85–90 millions of pounds used annually. That number grew to 185 million pounds by 2007. As of 2013, glyphosate was the world's most widely used herbicide.

13.     Monsanto is a multinational agricultural biotechnology corporation based in St. Louis, Missouri. It is the world's leading producer of glyphosate. But as of 2009, Monsanto was *also* the world's leading producer of seeds, accounting for 27% of the world seed market.

14.     The majority of these seeds are Monsanto's Roundup Ready® brand. Such seeds have been genetically modified to resist the effects of glyphosate. This permits farmers to indiscriminately spray their fields with huge amounts of glyphosate to control weeds without endangering the growing crops. In 2010, an estimated 70% of corn and cotton, and 90% of soybean fields in the United States were Roundup Ready®.

15.     Monsanto's glyphosate products are registered in 130 countries and approved for use on over 100 different crops. They are ubiquitous in the environment. Numerous studies confirm that glyphosate is found in rivers, streams, and groundwater in agricultural areas where Roundup® is used. It has been found in food, in the urine of agricultural workers, and even in the urine of urban dwellers who are not in direct contact with glyphosate.

16.     On March 20, 2015, the International Agency for Research on Cancer ("IARC"), an agency of the World Health Organization ("WHO"), issued an evaluation of several herbicides, including glyphosate. That evaluation was based, in part, on studies of exposures to glyphosate in several countries around the world, and it traces the health implications from exposure to glyphosate since 2001. The IARC Working Group classified glyphosate as a Group 2A herbicide, which means that it is probably carcinogenic to humans. The IARC Working Group concluded that the cancers most associated with glyphosate exposure are non-Hodgkin lymphoma and other

6

hematopoietic cancers, including lymphocytic lymphoma/chronic lymphocytic leukemia, B-cell lymphoma, and multiple myeloma.

17. Nevertheless, Monsanto has consistently represented that Roundup® is safe for humans and the environment. Indeed, Monsanto has repeatedly proclaimed and continues to proclaim to the world, and particularly to United States consumers, that glyphosate-based herbicides, including Roundup®, create no unreasonable risks to humans or the environment.

18. For nearly 40 years, farms across the world have used Roundup® without knowing of the dangers its use poses. Those most at risk are farm workers and other individuals with workplace exposure to Roundup®, such as workers in garden centers, nurseries, and landscapers.

19. These and other agricultural workers are, once again, victims of corporate greed. Monsanto assured the public that Roundup® was harmless. In order to prove this, Monsanto championed falsified data and attacked legitimate studies that revealed Roundup®'s dangers. Monsanto led a prolonged campaign of misinformation to convince government agencies, farmers, and the general population that Roundup® was safe. And this disinformation campaign had a disproportionate effect on Black farmers, who have become particularly dependent on Monsanto's seeds and herbicides for the reasons discussed above.

### Scientific Fraud Underlying the Marketing and Sale of Glyphosate/Roundup®

20. Based on early studies showing that glyphosate could cause cancer in laboratory animals, the EPA originally classified glyphosate as possibly carcinogenic to humans (Group C) in 1985. After pressure from Monsanto, the EPA changed its classification to evidence of non-carcinogenicity in humans (Group E) in 1991. In so classifying glyphosate, however, the EPA made clear that the designation did not mean the chemical does not cause cancer: "It should be emphasized, however, that designation of an agent in Group E is based on the available evidence at the time of evaluation and should not be interpreted as a definitive conclusion that the agent will

not be a carcinogen under any circumstances."

21.     On two occasions, the EPA found that the laboratories hired by Monsanto to test the toxicity of its Roundup® products for registration purposes committed fraud.

22.     In the first instance, Monsanto, in seeking initial registration of Roundup® by EPA, hired Industrial Bio-Test Laboratories ("IBT") to perform and evaluate pesticide toxicology studies relating to Roundup®. IBT performed about 30 tests on glyphosate and glyphosate- containing products, including nine of the 15 residue studies needed to register Roundup®.

23.     In 1976, the United States Food and Drug Administration ("FDA") performed an inspection of IBT that revealed discrepancies between the raw data and the final report relating to the toxicological impacts of glyphosate. The EPA subsequently audited IBT; it too found the toxicology studies conducted for the Roundup® herbicide to be invalid. An EPA reviewer stated, after finding "routine falsification of data" at IBT, that it was "hard to believe the scientific integrity of the studies when they said they took specimens of the uterus from male rabbits."

24.     Three top executives of IBT were convicted of fraud in 1983.

25.     In the second incident of data falsification, Monsanto hired Craven Laboratories in 1991 to perform pesticide and herbicide studies, including for Roundup®. In that same year, the owner of Craven Laboratories and three of its employees were indicted, and later convicted, of fraudulent laboratory practices in the testing of pesticides and herbicides.

26.     Despite the falsity of the tests that underlie its registration, within a few years of its launch, Monsanto was marketing Roundup® in 115 countries.

**Monsanto has Known for Decades that it Falsely Advertises the Safety of Roundup®**

27.     In 1996, the New York Attorney General ("NYAG") filed a lawsuit against Monsanto based on its false and misleading advertising of Roundup® products. Specifically, the

lawsuit challenged Monsanto's general representations that its spray-on glyphosate-based herbicides, including Roundup®, were "safer than table salt" and "practically non-toxic" to mammals, birds, and fish. Among the representations the NYAG found deceptive and misleading about the human and environmental safety of Roundup® are the following:

a)  Environmentally friendly Roundup herbicide is biodegradable. It won't build up in the soil so you can use Roundup with confidence along customers' driveways, sidewalks and fences ...

b)  Roundup is biodegradable and won't build up in the soil. That will give you the environmental confidence you need to use Roundup everywhere you've got a weed, brush, edging or trimming problem.

c)  Roundup biodegrades into naturally occurring elements.

d)  Versatile Roundup herbicide stays where you put it. That means there's no washing or leaching to harm customers' shrubs or other desirable vegetation.

e)  This non-residual herbicide will not wash or leach in the soil. It ... stays where you apply it.

f)  You can apply Accord with "confidence because it will stay where you put it" it bonds tightly to soil particles, preventing leaching. Then, soon after application, soil microorganisms biodegrade Accord into natural products.

g)  Glyphosate is less toxic to rats than table salt following acute oral ingestion.

h)  Glyphosate's safety margin is much greater than required. It has over a 1,000-fold safety margin in food and over a 700-fold safety margin for workers who manufacture it or use it.

i)  You can feel good about using herbicides by Monsanto. They carry a toxicity category rating of "practically non-toxic" as it pertains to mammals, birds and fish.

9

j) Roundup can be used where kids and pets will play and breaks down into natural material.

28.     On November 19, 1996, Monsanto entered into an Assurance of Discontinuance with NYAG, in which Monsanto agreed, among other things, "to cease and desist from publishing or broadcasting any advertisements [in New York] that represent, directly or by implication" that:

a) its glyphosate-containing pesticide products or any component thereof are safe, non-toxic, harmless or free from risk.

b) its glyphosate-containing pesticide products or any component thereof manufactured, formulated, distributed or sold by Monsanto are biodegradable ***

c) its glyphosate-containing pesticide products or any component thereof stay where they are applied under all circumstances and will not move through the environment by any means. ***

d) its glyphosate-containing pesticide products or any component thereof are "good" for the environment or are "known for their environmental characteristics." * * *

e) glyphosate-containing pesticide products or any component thereof are safer or less toxic than common consumer products other than herbicides;

f) its glyphosate-containing products or any component thereof might be classified as "practically non-toxic."

29.     Monsanto did not alter its advertising in the same manner in any state other than New York, and on information and belief still has not done so today.

30.     In 2009, France's highest court ruled that Monsanto had not told the truth about the safety of Roundup®. The French court affirmed an earlier judgement that Monsanto had falsely advertised its herbicide Roundup® as "biodegradable" and that it "left the soil clean."

31.     In 2018, Dewayne Johnson—a black public-school groundskeeper tasked with

regularly using Roundup® as part of his job—became the first person to take Monsanto to trial before a jury on allegations that Roundup® caused his non-Hodgkin lymphoma.[2] A unanimous jury agreed, handing down a verdict in Johnson's favor and awarding him $289 million in compensatory and punitive damages. *Id.* The jury found that Roundup® products are a "substantial danger" to people and the company failed to warn consumers of the risks, and that Monsanto had acted with "malice or oppression" in its conduct.[3] On cross-appeal, the court affirmed that there was "abundant—and certainly substantial—evidence" to support the jury's finding "that glyphosate, together with the other ingredients in Roundup products, caused" Johnson's "cancer."[4]The court also concluded that there was "substantial evidence" to support the jury's finding "that Monsanto acted with a willful and conscious disregard of others' safety." *Id.* Although the court ultimately reduced the compensatory and punitive damages awards, they still amounted to over $20.5 million for Johnson. *Id.*

32.     In 2019, another jury ruled in favor of Edwin Hardeman on similar claims against Monsanto for causing his non-Hodgkin lymphoma—the first case of its kind in federal court.[5] The jury awarded Hardeman $80 million in damages—which included about $75 million in punitive damages for Monsanto's conduct—after unanimously finding that Roundup® was a "substantial factor" in causing his Hardeman's cancer. The jury unanimously ruled that Roundup® is "defective," lacked sufficient cancer warnings, and that Monsanto was negligent in failing to warn Hardeman of the NHL risk.[6] Classifications and Assessments of Glyphosate

33.     The IARC process for the classification of glyphosate followed the stringent

---

[2] Sam Levin, *The Man Who Beat Monsanto: "They Have to Pay for Not Being Honest"*, The Guardian (Sep. 26, 2028), https://www.theguardian.com/business/2018/sep/25/monsanto-dewayne-johnson-cancer-verdict
[3] *See* Verdict Form, *Johnson v. Monsanto*, No. CGC-160559128 (Cal. Super. Ct., Cty. of S.F., Aug. 10 2018), *available at* https://www.baumhedlundlaw.com/pdf/monsanto-documents/johnson-trial/Johnson-vs-Monsanto-Verdict-Form.pdf.
[4] *Johnson v. Monsanto Co.*, -- Cal. Rptr. 3d --, 2020 WL 4782728 (Cal. Ct. App. Aug. 18, 2020) (also denying the petitions for rehearing).
[5] Sam Levin, *The Family That Took On Monsanto: "They Should've Been With Us in the Chemo Ward"*, The Guardian (Apr. 10, 2019), https://www.theguardian.com/business/2019/apr/10/edwin-hardeman-monsanto-trial-interview
[6] Sam Levin, *Monsanto Found Liable for California Man's Cancer and Ordered to Pay $80m In Damages*, The Guardian (Mar. 27, 2019), https://www.theguardian.com/business/2019/mar/27/monsanto-trial-verdict-cancer-jury

procedures for the evaluation of a chemical agent.  Over time, the IARC Monograph program has reviewed 980 agents. Of those reviewed, it has determined 116 agents to be Group 1 (Known Human Carcinogens); 73 agents to be Group 2A (Probable Human Carcinogens); 287 agents to be Group 2B (Possible Human Carcinogens); 503 agents to be Group 3 (Not Classified); and one agent to be Probably Not Carcinogenic. These evaluations are performed by panels of international experts, selected on the basis of their expertise and the absence of actual or apparent conflicts of interest.

34.     One year before the Monograph meeting, the meeting is announced and there is a call both for data and for experts. Eight months before the Monograph meeting, the Working Group membership is selected, and the sections of the Monograph are developed by the Working Group members. One month prior to the Monograph meeting, the call for data is closed and the various draft sections are distributed among Working Group members for review and comment. Finally, at the Monograph meeting, the Working Group finalizes review of all literature, evaluates the evidence in each category, and completes the overall evaluation. Within two weeks after the Monograph meeting, the summary of the Working Group findings is published in Lancet Oncology, and within a year after the meeting, the final Monograph is finalized and published.

35.     In March 2015, IARC reassessed glyphosate. The summary published in The Lancet Oncology reported that glyphosate is a Group 2A agent and probably carcinogenic in humans.

36.     On July 29, 2015, IARC issued its Monograph for glyphosate, Monograph 112. It relied on publicly available studies involving the following exposure groups: farmers and tree nursery workers occupationally exposed in the United States, forestry workers in Canada and Finland, and municipal weed-control workers in the United Kingdom; and para-occupational exposure in farming families.

37.     The IARC Working Group found an increased risk between exposure to glyphosate and non-Hodgkin lymphoma and several subtypes of NHL, and the increased risk persisted after

12

adjustment for other pesticides.

38.     The IARC Working Group also found that glyphosate caused DNA and chromosomal damage in human cells. One study in community residents reported increases in blood markers of chromosomal damage (micronuclei) after glyphosate formulations were sprayed.

39.     In male CD-1 mice, glyphosate induced a positive trend in the incidence of a rare tumor, renal tubule carcinoma. A second study reported a positive trend for haemangiosarcoma in male mice. Glyphosate increased pancreatic islet-cell adenoma in male rats in two studies. A glyphosate formulation promoted skin tumors in an initiation-promotion study in mice.

40.     The IARC Working Group also noted that glyphosate has been detected in the urine of agricultural workers, indicating absorption. Soil microbes degrade glyphosate to aminomethylphosphoric acid ("AMPA"). Blood AMPA detection after exposure suggests intestinal microbial metabolism in humans.

41.     The IARC Working Group further found that glyphosate and glyphosate formulations induced DNA and chromosomal damage in mammals, and in human and animal cells in utero.

42.     The IARC Working Group also reviewed an Agricultural Health Study, consisting of a prospective cohort of 57,311 licensed pesticide applicators in Iowa and North Carolina. While this study differed from others in that it was based on a self-administered questionnaire, the results support an association between glyphosate exposure and Multiple Myeloma, Hairy Cell Leukemia ("HCL"), and Chronic Lymphocytic Leukemia ("CLL"), in addition to several other cancers.

### Recent Bans in Other Countries

43.     Several countries around the world have instituted bans on the sale of Roundup® and other glyphosate-containing herbicides, both before and since IARC first announced its assessment for glyphosate in March 2015, and more countries undoubtedly will follow. The

13

Netherlands issued a ban on all glyphosate-based herbicides in April 2014, including Roundup®, which took effect by the end of 2015. In issuing the ban, the Dutch Parliament member who introduced the successful legislation stated: "Agricultural pesticides in user-friendly packaging are sold in abundance to private persons. In garden centers, Roundup® is promoted as harmless, but unsuspecting customers have no idea what the risks of this product are. Especially children are sensitive to toxic substances and should therefore not be exposed to it."

44.     The Brazilian Public Prosecutor in the Federal District requested that the Brazilian Justice Department suspend the use of glyphosate.

45.     France banned the private sale of Roundup® and glyphosate following the IARC assessment for Glyphosate.

46.     Bermuda banned both the private and commercial sale of glyphosates, including Roundup®. The Bermuda government explained its ban as follows: "Following a recent scientific study carried out by a leading cancer agency, the importation of weed spray 'Roundup' has been suspended."

47.     The Sri Lankan government banned the private and commercial use of glyphosates, particularly out of concern that glyphosate has been linked to fatal kidney disease in agricultural workers.

48.     The government of Colombia announced its ban on using Roundup® and glyphosate to destroy illegal plantations of coca, the raw ingredient for cocaine, because of the WHO's finding that glyphosate is probably carcinogenic.

49.     All in all, the following countries have now issued outright bans on glyphosate, imposed restrictions, or have issued statements of intention to ban or restrict glyphosate-based herbicides, including Roundup®, over health concerns and the ongoing Roundup cancer litigation: Argentina, Australia, Austria, Bahrain, Belgium, Bermuda, Brazil, Canada, Columbia, Costa Rica,

Czech Republic, Denmark, El Salvador, Fiji, France, German, Greece, India, Italy, Kuwait, Luxembourg, Malawi, Malta, Mexico, Netherlands, New Zealand, Oman, Portugal, Qatar, St. Vincent and the Grenadines, Saudi Arabia, Scotland, Slovenia, Spain, Sri Lanka, Sweden, Switzerland, Thailand, United Arab Emirates, United Kingdom, and Vietnam.[7] Monsanto Fails to Change Its Behavior in the United States.

50.    Even as of July 2020, Defendant continued to represent to the public that "Glyphosate is one of the most studied herbicides in the world – and, like all crop protection products, it is subject to rigorous testing and oversight by regulatory authorities. There is an extensive body of research on glyphosate and glyphosate-based herbicides, including more than 800 scientific studies submitted to U.S., submitted to U.S. or other worldwide regulators in connection with the registration process, that confirm that glyphosate and our glyphosate-based formulated products can be used safely and do not cause cancer."[8]  In fact, Defendant has *increased* its advertising of glyphosate-based products in the wake of all of this evidence.[9] In 2020 alone, Defendant has spent over $8,500,000 to advertise directly to consumers in an attempt to sell them glyphosate-based products.

## V.    CLAIMS

### COUNT I
### STRICT LIABILITY (DESIGN DEFECT)
### (AGAINST MONSANTO)

51.    Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

52.    Plaintiff brings this strict liability claim against Monsanto for defective design.

---

[7] *See* Where Is Glyphosate Banned?, https://www.baumhedlundlaw.com/toxic-tort-law/monsanto-roundup-lawsuit/where-is-glyphosate-banned/ (last visited Aug. 24, 2020).
[8] Bayer Website Common Questions - Is Glyphosate Safe? at https://www.bayer.com/en/is-glyphosate-safe.aspx (last accessed July 23, 2020).
[9] https://www.wsj.com/articles/roundup-sellers-boost-advertising-as-lawsuits-mount-for-weedkiller-11556738038 (last accessed Aug. 19, 2020).

53.     At all times relevant to this litigation, Monsanto engaged in the business of testing, developing, manufacturing, selling, distributing, and Monsanto engaged in the marketing, packaging design, and promotion of Roundup® products, which are defective and unreasonably dangerous to consumers, including Plaintiff, thereby placing Roundup® products into the stream of commerce. These actions were under the ultimate control and supervision of Monsanto. At all times relevant to this litigation, Monsanto designed, researched, developed, manufactured, produced, tested, assembled, labeled, advertised, promoted, marketed, sold, and distributed the Roundup® products used by Plaintiff, as described above.

54.     At all times relevant to this litigation, Roundup® products were manufactured, designed, and labeled in an unsafe, defective, and inherently dangerous manner that was dangerous for use by or exposure to the public, including the Plaintiff.

55.     At all times relevant to this litigation, Roundup® products reached the intended consumers, handlers, and users or other persons coming into contact with these products in Missouri and throughout the United States, including the Plaintiff, without substantial change in their condition as designed, manufactured, sold, distributed, labeled, and marketed by Monsanto.

56.     Roundup® products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold, and marketed by Monsanto were defective in design and formulation in that when they left the hands of the manufacturers and/or suppliers, they were unreasonably dangerous and dangerous to an extent beyond that which an ordinary consumer would contemplate.

57.     Roundup® products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold, and marketed by Monsanto were defective in design and formulation in that when they left the hands of the manufacturers and/or suppliers, the

foreseeable risks exceeded the alleged benefits associated with their design and formulation.

58.     At all times relevant to this action, Monsanto knew or had reason to know that Roundup® products were defective and were inherently dangerous and unsafe when used in the manner instructed and provided by Monsanto.

59.     Therefore, at all times relevant to this litigation, Roundup® products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold, and marketed by Monsanto were defective in design and formulation, in one or more of the following ways:

a)     When placed in the stream of commerce, Roundup® products were defective in design and formulation, and, consequently, dangerous to an extent beyond that which an ordinary consumer would contemplate.

b)     When placed in the stream of commerce, Roundup® products were unreasonably dangerous in that they were hazardous and posed a grave risk of cancer and other serious illnesses when used in a reasonably anticipated manner.

c)     When placed in the stream of commerce, Roundup® products contained unreasonably dangerous design defects and were not reasonably safe when used in a reasonably anticipated or intended manner.

d)     Monsanto did not sufficiently test, investigate, or study Roundup® products and, specifically, the active ingredient glyphosate.

e)     Exposure to Roundup® and glyphosate-containing products presents a risk of harmful side effects that outweigh any potential utility stemming from the use of the herbicide.

f)     At the time of marketing its Roundup® products, Roundup® was defective in that exposure to Roundup® and specifically, its active ingredient glyphosate, could result in

17

cancer and other severe illnesses and injuries.

g)      Monsanto did not conduct adequate post-marketing surveillance of its Roundup®

products.

h)      Monsanto could have employed safer alternative designs and formulations.

60.     Plaintiff was exposed to Roundup® products without knowledge of its dangerous characteristics.

61.     At all times relevant to this litigation, the Plaintiff used and/or was exposed to the use of Roundup® products in an intended or reasonably foreseeable manner without knowledge of their dangerous characteristics.

62.     Plaintiff could not have reasonably discovered the defects and risks associated with Roundup® or glyphosate-containing products before or at the time of exposure.

63.     The harm caused by Roundup® products far outweighed their benefit, rendering these products dangerous to an extent beyond that which an ordinary consumer would contemplate. Roundup® products were and are more dangerous than alternative products and Monsanto could have designed Roundup® products (including their packaging and sales aids) to make them less dangerous. Indeed, at the time that Monsanto designed Roundup® products, the state of the industry's scientific knowledge was such that a less risky design or formulation was attainable.

64.     At the time Roundup® products left Monsanto's control, there was a practical, technically feasible and safer alternative design that would have prevented the harm without substantially impairing the reasonably anticipated or intended function of those herbicides.

65.     Monsanto's defective design of Roundup® products was willful, wanton, fraudulent, malicious, and conducted with reckless disregard for the health and safety of users of the Roundup® products, including the Plaintiff.

66.     Therefore, as a result of the unreasonably dangerous condition of its Roundup®

products, Monsanto is strictly liable to the Plaintiff.

67.     The defects in Roundup® products caused or contributed to Plaintiff's grave injuries, and, but for Monsanto's misconduct and omissions, Plaintiff would not have sustained his injuries, including premature death.

68.     Monsanto's conduct, as described above, was reckless. Monsanto risked the lives of consumers and users of its products, including Plaintiff, with knowledge of the safety problems associated with Roundup® and glyphosate-containing products, and suppressed this knowledge from the general public. Monsanto made conscious decisions not to redesign, warn, or inform the unsuspecting public.

69.     As a direct and proximate result of Monsanto placing defective Roundup® products into the stream of commerce, Plaintiff suffered grave injuries, and have endured physical pain and discomfort, and premature death.

## COUNT II
## STRICT LIABILITY (FAILURE TO WARN)
## (AGAINST MONSANTO)

70.     Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

71.     Plaintiff brings this strict liability claim against Monsanto for failure to warn.

72.     At all times relevant to this litigation, Monsanto engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting Roundup® products, which are defective and unreasonably dangerous to consumers, including Plaintiff, because they do not contain adequate warnings or instructions concerning the dangerous characteristics of Roundup® and, specifically, the active ingredient glyphosate. These actions were under the ultimate control and supervision of Monsanto.

73.     Monsanto researched, developed, designed, tested, manufactured, inspected, labeled, distributed, marketed, promoted, sold, and otherwise released into the stream of commerce Roundup® products, and in the course of same, directly advertised or marketed the products to consumers and end users, including Plaintiff, and therefore had a duty to warn of the risks associated with the use of Roundup® and glyphosate-containing products.

74.     At all times relevant to this litigation, Monsanto had a duty to properly test, develop, design, manufacture, inspect, package, label, market, promote, sell, distribute, maintain supply, provide proper warnings, and take such steps as necessary to ensure that Roundup® products did not cause users and consumers to suffer from unreasonable and dangerous risks. Monsanto had a continuing duty to warn the Plaintiff of the dangers associated with Roundup® use and exposure. Monsanto, as manufacturer, seller, promoter, marketer, or distributor of chemical herbicides are held to the knowledge of an expert in the field.

75.     At the time of manufacture, Monsanto could have provided the warnings or instructions regarding the full and complete risks of Roundup® and glyphosate-containing products because it knew or should have known of the unreasonable risks of harm associated with the use of and/or exposure to such products.

76.     At all times relevant to this litigation, Monsanto failed to investigate, study, test, or promote the safety or to minimize the dangers to users and consumers of its product and to those who would foreseeably use or be harmed by these herbicides, including the Plaintiff.

77.     Despite the fact that Monsanto knew or should have known that Roundup® posed a grave risk of harm, it failed to exercise reasonable care to warn of the dangerous risks associated with use and exposure. The dangerous propensities of these products and the carcinogenic characteristics of glyphosate, as described above, were known to Monsanto, or scientifically knowable to Monsanto through appropriate research and testing by known methods, at the time it

distributed, marketed, promoted, supplied, or sold the product, and not known to end users and consumers, such as the Plaintiff.

78.     These products created significant risks of serious bodily harm to consumers, as alleged herein, and Monsanto failed to adequately warn consumers reasonably foreseeable users of the risks of exposure to its products. Monsanto has wrongfully concealed information concerning the dangerous nature of Roundup® and its active ingredient glyphosate, and further made false and/or misleading statements concerning the safety of Roundup® and glyphosate.

79.     At all times relevant to this litigation, Roundup® products reached the intended consumers, handlers, and users or other persons coming into contact with these products in Missouri and throughout the United States, including the Plaintiff, without substantial change in their condition as designed, manufactured, sold, distributed, labeled, promoted, and marketed by Monsanto.

80.     Plaintiff was exposed to Roundup® products in the course of their employment and/or personal use of Roundup, without knowledge of its dangerous characteristics.

81.     At all times relevant to this litigation, the Plaintiff used and/or was exposed to the use of Roundup® products in their intended or reasonably foreseeable manner without knowledge of their dangerous characteristics.

82.     The Plaintiff could not have reasonably discovered the defects and risks associated with Roundup® or glyphosate-containing products prior to or at the time of their exposure. The Plaintiff relied upon the skill, superior knowledge, and judgment of Monsanto.

83.     These products were defective because the minimal warnings disseminated with Roundup® products were inadequate, and they failed to communicate adequate information on the dangers and safe use/exposure and failed to communicate warnings and instructions that were appropriate and adequate to render the products safe for their ordinary, intended, and reasonably

foreseeable uses, including agricultural and landscaping applications.

84. The information that Monsanto did provide or communicate failed to contain relevant warnings, hazards, and precautions that would have enabled consumers such as the Plaintiff to utilize the products safely and with adequate protection. Instead, Monsanto disseminated information that was inaccurate, false, and misleading and which failed to communicate accurately or adequately the comparative severity, duration, and extent of the risk of injuries with use of and/or exposure to Roundup® and glyphosate; continued to aggressively promote the efficacy of its products, even after it knew or should have known of the unreasonable risks from use or exposure; and concealed, downplayed, or otherwise suppressed, through aggressive marketing and promotion, any information or research about the risks and dangers of exposure to Roundup® and glyphosate.

85. To this day, Monsanto has failed to adequately and accurately warn of the true risks of Plaintiff's injuries associated with the use of and exposure to Roundup® and its active ingredient glyphosate, a probable carcinogen.

86. As a result of their inadequate warnings, Roundup® products were defective and unreasonably dangerous when they left the possession and/or control of Monsanto, were distributed, marketed, and promoted by Monsanto, and used by the Plaintiff on his 7-acre property.

87. Monsanto is liable to Plaintiff for injuries caused by its negligent or willful failure, as described above, to provide adequate warnings or other clinically relevant information and data regarding the appropriate use of these products and the risks associated with the use of or exposure to Roundup® and glyphosate.

88. The defects in Roundup® products caused or contributed to cause the Plaintiff's injuries, and, but for this misconduct and omissions, the Plaintiff would not have sustained his injuries.

89. Had Monsanto provided adequate warnings and instructions and properly disclosed

and disseminated the risks associated with Roundup® products, the Plaintiff could have avoided the risk of developing injuries as alleged herein.

90.     As a direct and proximate result of Monsanto placing defective Roundup® products into the stream of commerce, the Plaintiff has suffered severe injuries and have endured physical pain and discomfort, as well as economic hardship, including considerable financial expenses for medical care and treatment.

**COUNT III**
**DECEPTIVE OR UNFAIR TRADE PRACTICES UNDER**
**GA. CODE ANN. § 10-1-370 et seq. and GA. CODE ANN. §**
**10-1-390 et seq.**
**(AGAINST MONSANTO)**

91.     Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

92.     At all relevant times, Defendant knew or should have known of the unreasonably dangerous and carcinogenic nature of the use of and/or exposure to Roundup®.

93.     At all relevant times, Defendant, through its labeling, advertisements, public representations and marketing of Roundup®, intentionally used deception, fraud, false pretenses, false promises, misrepresentations and unfair trade practices in order to mislead consumers that Roundup® products are safe for use.

94.     At all relevant times, Defendant also engaged in the concealment, suppression and/or omission of material facts in connection with the sale and/or advertisement of Roundup® products in trade or commerce. In particular, Defendant failed to disclose to the public that Roundup® is unsafe and poses serious health hazards, particularly Non-Hodgkin's Lymphoma ("NHL"), Hodgkin's Lymphoma, Lymphoma, Multiple Myeloma, and/or Leukemia. Defendant was aware of the hazardous risks posed by Roundup® and yet failed to inform the public of these risks through their advertisements, labeling, or other means available to them. Defendant's failure to state material

facts about Roundup® constitutes a violation of Mo. Rev. Stat. §407.020.

95.     At all relevant times, the Plaintiff was deceived by Defendant's intentional misrepresentations and omissions, including by the orchestrated claims made on or in television commercials, advertising materials, websites, and on product labels and packaging regarding the usage and safety of Roundup®.

96.     At all relevant times, the Plaintiff acted in reasonable reliance upon Defendant's unlawful trade practices, and had the Defendant not engaged in the deceptive conduct described herein, the Plaintiff would not have purchased Roundup® and/or would have protected themselves from exposure to Roundup®.

97.     As a direct and proximate result of Defendant's unlawful trade practices, the Plaintiff developed Non-Hodgkin's Lymphoma ("NHL"), Hodgkin's Lymphoma, Lymphoma, Multiple Myeloma, and/or Leukemia, and have been injured catastrophically and have been caused severe and permanent pain, suffering, disability, impairment, loss of enjoyment of life, loss of care, comfort and economic damages, and premature death.

## COUNT IV
## NEGLIGENCE
## (AGAINST MONSANTO)

98.     The Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

99.     Monsanto, directly or indirectly, caused Roundup® products to be sold, distributed, packaged, labeled, marketed, promoted, and/or used by the Plaintiff.

100.    At all times relevant to this litigation, Monsanto had a duty to exercise reasonable care in the design, research, manufacture, marketing, advertisement, supply, promotion, packaging, sale, and distribution of Roundup® products, including the duty to take all reasonable steps necessary to manufacture, promote, and/or sell a product that was not unreasonably dangerous to

consumers and users of the product.

101.    At all times relevant to this litigation, Monsanto had a duty to exercise reasonable care in the marketing, advertisement, and sale of the Roundup® products. Monsanto's duty of care owed to consumers and the general public included providing accurate, true, and correct information concerning the risks of using Roundup® and appropriate, complete, and accurate warnings concerning the potential adverse effects of exposure to Roundup®, and, in particular, its active ingredient glyphosate.

102.    At all times relevant to this litigation, Monsanto knew or, in the exercise of reasonable care, should have known of the hazards and dangers of Roundup® and specifically, the carcinogenic properties of the chemical glyphosate.

103.    Accordingly, at all times relevant to this litigation, Monsanto knew or, in the exercise of reasonable care, should have known that use of or exposure to its Roundup® products could cause or be associated with the Plaintiff injuries and thus created a dangerous and unreasonable risk of injury to the users of these products, including the Plaintiff.

104.    Monsanto also knew or, in the exercise of reasonable care, should have known that users and consumers of Roundup® were unaware of the risks and the magnitude of the risks associated with use of and/or exposure to Roundup® and glyphosate-containing products.

105.    As such, Monsanto breached the duty of reasonable care and failed to exercise ordinary care in the design, research, development, manufacture, testing, marketing, supply, promotion, advertisement, packaging, sale, and distribution of its Roundup® products, in that Monsanto manufactured, marketed, promoted, and sold defective herbicides containing the chemical glyphosate, knew or had reason to know of the defects inherent in these products, knew or had reason to know that a user's or consumer's exposure to the products created a significant risk of harm and unreasonably dangerous side effects, and failed to prevent or adequately warn of these

risks and injuries.

106.    Despite an ability and means to investigate, study, and test these products and to provide adequate warnings, Monsanto has failed to do so. Indeed, Monsanto has wrongfully concealed information and has further made false and/or misleading statements concerning the safety and/or exposure to Roundup® and glyphosate.

107.    Monsanto was negligent in the following respects:

a.    Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing its Roundup® products without thorough and adequate pre- and post-market testing;

b.    Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing Roundup® while negligently and/or intentionally concealing and failing to disclose the results of trials, tests, and studies of exposure to glyphosate, and, consequently, the risk of serious harm associated with human use of and exposure to Roundup®;

c.    Failing to undertake sufficient studies and conduct necessary tests to determine whether or not Roundup® products and glyphosate-containing products were safe for their intended use in agriculture and horticulture;

d.    Failing to use reasonable and prudent care in the design, research, manufacture, and development of Roundup® products so as to avoid the risk of serious harm associated with the prevalent use of Roundup®/glyphosate as an herbicide;

e.    Failing to design and manufacture Roundup® products so as to ensure they were at least as safe and effective as other herbicides on the market;

f.    Failing to provide adequate instructions, guidelines, and safety precautions to those persons who Monsanto could reasonably foresee would use and be exposed to its Roundup® products;

26

g.      Failing to disclose to the Plaintiff, users/consumers, and the general public that use of and exposure to Roundup® presented severe risks of cancer and other grave illnesses;

h.      Failing to warn the Plaintiff, consumers, and the general public that the product's risk of harm was unreasonable and that there were safer and effective alternative herbicides available to the Plaintiff and other consumers;

i.      Systematically suppressing or downplaying contrary evidence about the risks, incidence, and prevalence of the side effects of Roundup® and glyphosate-containing products;

j.      Representing that its Roundup® products were safe for their intended use when, in fact, Monsanto knew or should have known that the products were not safe for their intended purpose;

k.      Declining to make or propose any changes to Roundup® products' labeling or other promotional materials that would alert the consumers and the general public of the risks of Roundup® and glyphosate;

l.      Advertising, marketing, and recommending the use of the Roundup® products, while concealing and failing to disclose or warn of the dangers known by Monsanto to be associated with or caused by the use of or exposure to Roundup® and glyphosate;

m.      Continuing to disseminate information to its consumers, which indicate or imply that Monsanto's Roundup® products are not unsafe for use in the agricultural and horticultural industries; and

n.      Continuing the manufacture and sale of its products with the knowledge that the products were unreasonably unsafe and dangerous.

108.      Monsanto knew and/or should have known that it was foreseeable that consumers such as the Plaintiff would suffer injuries as a result of Monsanto's failure to exercise ordinary care

in the manufacturing, marketing, promotion, labeling, distribution, and sale of Roundup®.

109.    The Plaintiff did not know the nature and extent of the injuries that could result from the intended use of and/or exposure to Roundup® or its active ingredient glyphosate.

110.    Monsanto's negligence was the proximate cause of the injuries, harm, and economic losses that the Plaintiff suffered, as described herein.

111.    Monsanto's conduct, as described above, was reckless. Monsanto regularly risked the lives of consumers and users of its products, including the Plaintiff, with full knowledge of the dangers of these products. Monsanto has made conscious decisions not to redesign, re-label, warn, or inform the unsuspecting public, including the Plaintiff. Monsanto's reckless conduct therefore warrants an award of aggravated or punitive damages.

112.    As a proximate result of Monsanto's wrongful acts and omissions in placing defective Roundup® products into the stream of commerce without adequate warnings of the hazardous and carcinogenic nature of glyphosate, the Plaintiff have suffered severe and permanent physical and emotional injuries. The Plaintiff has endured pain and suffering and have suffered economic losses (including significant expenses for medical care and treatment) in an amount to be determined and premature death.

## JURY DEMAND

113.    The Plaintiff hereby demands a trial by jury on all issues so triable.

## PRAYER FOR RELIEF

114.    WHEREFORE, Plaintiff requests the Court to enter Judgment in favor of the Plaintiff against the Defendant for:

a.  Actual or compensatory damages in such amount to be determined at trial and as provide by law;

b.  exemplary and punitive damages sufficient to punish and deter Defendant  and other

from future fraudulent practices;

c. pre-judgement and post-judgement interest;

d. costs including reasonable attorney's fees, court costs, and other litigation; and,

e. any other relief the Court may deem just and proper.

10/12/2021                          Respectfully submitted,


                                    **Shamis & Gentile, P.A.**
                                    /s/ Andrew J. Shamis
                                    Andrew J. Shamis, Esq.
                                    Georgia Bar No. 494196
                                    ashamis@shamisgentile.com
                                    14 NE 1st Avenue, Suite 705
                                    Miami, FL 33132
                                    Telephone: 305-479-2299