**Query    Reports    Utilities    Help    Log Out**

# U.S. District Court [LIVE AREA]
# Middle District of Georgia (Albany)
# CIVIL DOCKET FOR CASE #: 1:21-cv-00161-LAG

RAGAN v. MONSANTO COMPANY                      Date Filed: 09/10/2021
Assigned to: US DISTRICT JUDGE LESLIE ABRAMS     Jury Demand: Plaintiff
GARDNER                                        Nature of Suit: 365 Personal Inj. Prod.
Cause: 28:1332 Diversity-Product Liability       Liability
                                               Jurisdiction: Diversity

**Plaintiff**

**DORIS RAGAN**                    represented by  **ASHLEIGH RUTH MADISON**
                                                   1703 ABERCORN ST
                                                   SAVANNAH, GA 31401
                                                   912-662-6612
                                                   Fax: 877-417-2943
                                                   Email: southeastlaw@gmail.com
                                                   *ATTORNEY TO BE NOTICED*

V.

**Defendant**

**MONSANTO COMPANY**

| Date Filed | # | Docket Text |
|------------|---|-------------|
| 09/10/2021 | 1 | **COMPLAINT** against All Plaintiffs Fee paid: Receipt # AGAMDC-3893971, $402 filed by DORIS RAGAN (Attachments: # 1 Civil Cover Sheet)(MADISON, ASHLEIGH) (Entered: 09/10/2021) |
| 09/13/2021 |   | Notice of Deficiency (related document(s): 1 Complaint filed by DORIS RAGAN ); Document must be converted into text-searchable PDF format and re-filed using the event COMPLAINT IFP. The PACER login ID and password used to electronically file a document constitutes the Participants electronic signature for all purposes under the Federal Rules. All electronically filed documents must include a signature block and must set forth the filers name, address, telephone number and e-mail address. The name on the document and the name associated with the participants login ID must be the same. When refiling document, please ensure your signature block complies with the requirements.(mdm) (Entered: 09/13/2021) |
| 09/14/2021 | 2 | AMENDED 1 Complaint against DORIS RAGAN by DORIS RAGAN (MADISON, ASHLEIGH) (Entered: 09/14/2021) |

| 10/08/2021 | 3 | USM285 Process Receipt and Return UNEXECUTED for MONSANTO COMPANY. (MADISON, ASHLEIGH) (Entered: 10/08/2021) |
|---|---|---|
| 10/12/2021 | | Notice of Deficiency (related document(s): 3 USM285 Process Receipt and Return filed by DORIS RAGAN ) - Other: Per Page 8 of the Administrative Procedures for Electronic Filing, when initiating a new civil proceeding, if a participant chooses service by summons, a standard Summons in a Civil Action should be prepared and made an attachment to the complaint or other initiating document. The clerk will thereafter, issue the summons and e-file the issued summons which will be received electronically via the NEF. Federal Rule of Civil Procedure 4 requires that service be perfected within 90 days of filing the case. If a summons is requested subsequent to the filing of the complaint or other initiating document, the participant should complete an online summons form and e- mail it to the appropriate division as indicated below. The summons will then be issued and e-filed by the clerk. (mdm) (Entered: 10/12/2021) |
| 10/13/2021 | 4 | Summons Issued as to MONSANTO COMPANY. (mdm) (Entered: 10/13/2021) |

| **PACER Service Center** | | |
|---|---|---|
| **Transaction Receipt** | | |
| 10/29/2021 13:49:16 | | |
| **PACER Login:** sh0019sh | **Client Code:** | 31943.356965 |
| **Description:** Docket Report | **Search Criteria:** | 1:21-cv-00161-LAG |
| **Billable Pages:** 1 | **Cost:** | 0.10 |



**null / ALL**
**Transmittal Number: 23950750**
**Date Processed: 10/21/2021**

# Notice of Service of Process

| | |
|---|---|
| **Primary Contact:** | Anne Troupis (Monsanto)<br>Bayer U.S. LLC<br>800 N Lindbergh Blvd<br>Saint Louis, MO 63167-1000 |

| | |
|---|---|
| **Entity:** | Monsanto Company<br>Entity ID Number  2282193 |
| **Entity Served:** | Monsanto Company |
| **Title of Action:** | Ragan, Doris vs. Monsanto Company |
| **Matter Name/ID:** | Ragan, Doris vs. Monsanto Company (11666642) |
| **Document(s) Type:** | Summons/Complaint |
| **Nature of Action:** | Product Liability |
| **Court/Agency:** | U.S. District Court Middle District, GA |
| **Case/Reference No:** | 1:21-cv-00161-LAG |
| **Jurisdiction Served:** | Georgia |
| **Date Served on CSC:** | 10/20/2021 |
| **Answer or Appearance Due:** | 21 Days |
| **Originally Served On:** | CSC |
| **How Served:** | Personal Service |
| Sender Information: | Southeast Law, LLC<br>912-662-6612 |

Information contained on this transmittal form is for record keeping, notification and forwarding the attached document(s). It does not constitute a legal opinion. The recipient is responsible for interpreting the documents and taking appropriate action.

**To avoid potential delay, please do not send your response to CSC**

251 Little Falls Drive, Wilmington, Delaware 19808-1674   (888) 690-2882   |   sop@cscglobal.com

AO 440 (Rev. 06/12) Summons in a Civil Action

# UNITED STATES DISTRICT COURT
for the

| | |
|---|---|
| DORIS RAGAN | ) |
| | ) |
| | ) |
| | ) |
| _____ | ) |
| *Plaintiff(s)* | ) |
| v. | ) Civil Action No. 1:21-CV-00161-LAG |
| MONSANTO COMPANY | ) |
| | ) |
| | ) |
| | ) |
| _____ | ) |
| *Defendant(s)* | ) |

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)* Monsanto Company
c/o Registered Agent, Corporation Service Company
40 Technology Parkway South, Suite 300
Norcross, Georgia 30092

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure. The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are: Ashleigh R. Madison, Esq.
Southeast Law LLC
1703 Abercorn Street
Savannah, Georgia 31401
912.662.6612
southeastlaw@gmail.com

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

CLERK OF COURT

Date: __10/13/2021__

_s/ M. Danielle Morrow_
*Signature of Clerk or Deputy Clerk*

IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF GEORGIA
ALBANY DIVISION

| | | |
|---|---|---|
| DORIS RAGAN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. _____ |
| | ) | |
| MONSANTO COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |

## COMPLAINT

**COMES NOW,** Plaintiff Doris Ragan, in the above-styled action, and files her Complaint against Defendant Monsanto Company and show the Court the following:

### I.   PARTIES, JURISDICTION AND VENUE

1.   Plaintiff files this suit for damages asserting claims against Defendant Monsanto Company ("Monsanto").

2.   Plaintiff is a citizen and resident of Mitchell County, Georgia.

3.   Defendant is a Delaware corporation with its headquarters and principal place of business in St. Louis, Missouri. Defendant is registered to do business in Georgia as a foreign profit corporation. Defendant's registered agent name is Corporation Service Company, and can be served with process at 40 Technology Parkway South, Suite 300, Norcross, Georgia 30092.

4.   At all times relevant to this complaint, Monsanto was the entity that discovered the herbicidal properties of glyphosate and the manufacturer of Roundup®.

5.   Federal diversity jurisdiction in this Court is proper under 28 U.S.C. § 1332 because Plaintiff is a citizen of a different state from Monsanto's states of

citizenship, and the aggregate amount in controversy exceeds $75,000, exclusive of interest and costs.

6.  This Court has personal jurisdiction over Monsanto under O.C.G.A. § 9-10-91, because Monsanto knows or should have known that its Roundup® products are sold throughout the State of Georgia.

7.  In addition, Monsanto maintains sufficient contacts with the State of Georgia such that this Court's exercise of personal jurisdiction over it does not offend traditional notions of fair play and substantial justice.

8.  Venue is proper within this District under 28 U.S.C. § 1391 because Monsanto, as a corporate entity, is deemed to reside in any judicial district in which it is subject to personal jurisdiction.

## II.   FACTUAL ALLEGATIONS

9.  Plaintiff renews and reaffirms each and every allegation set forth in paragraphs above.

10. Glyphosate is a broad-spectrum, non-selective herbicide used in a wide variety of herbicidal products around the world.

11. Plants treated with glyphosate translocate the systemic herbicide to their roots, shoot regions, and fruit, where it interferes with the plant's ability to form aromatic amino acids necessary for protein synthesis. Treated plants generally die within two to three days. Because plants absorb glyphosate, it cannot be completely removed by washing or peeling produce or by milling, baking, or brewing grains.

12. For nearly 40 years, homeowners across the world have used Roundup® without

2

knowing of the dangers its use poses. That is because when Monsanto first introduced Roundup®, it marketed glyphosate as a technological breakthrough; it could kill almost every weed without causing harm either to people or to the environment. Of course, history has shown that not to be true. According to the WHO, the main chemical ingredient of Roundup®-glyphosate—is a probable cause of cancer. Those most at risk are individuals that are exposed to Roundup® with direct application to their lawns. Monsanto assured the public that Roundup® was harmless. In order to prove this, Monsanto championed falsified data and attacked legitimate studies that revealed its dangers. Monsanto led a prolonged campaign of misinformation to convince government agencies, farmers and the general population that Roundup® was safe.

### *The Discovery of Glyphosate and Development of Roundup®*

13.   The herbicidal properties of glyphosate were discovered in 1970 by Monsanto chemist John Franz. The first glyphosate-based herbicide was introduced to the market in the mid-1970s under the brand name Roundup®. From the outset, Monsanto marketed Roundup® as a "safe" general-purpose herbicide for widespread commercial and consumer use. It still markets Roundup® as safe today.

### *Registration of Herbicides under Federal Law*

14.   The manufacture, formulation and distribution of herbicides, such as Roundup®, are regulated under the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA or "ACT"), 7 U.S.C. § 136 *et seq.* FIFRA requires that all pesticides be registered with the Environmental Protection Agency ("EPA" or "Agency") prior

to their distribution, sale, use, except as described by the Act. 7 U.S.C. §136a(a).

15. Because pesticides are toxic to plants, animals, and humans, at least to some degree, the EPA requires as part of the registration process, among other things, a variety of tests to evaluate the potential for exposure to pesticides, toxicity to people and other potential non-target organisms, and other adverse effects on the environment. Registration by the EPA, however, is not an assurance or finding of safety. The determination the Agency must make in registering or re-registering a product is not that the product is "safe," but rather that use of the product in accordance with its label directions "will not generally cause unreasonable adverse effects on the environment." 7 U.S.C. §136a(c)(5)(D).

16. FIFRA defines "unreasonable adverse effects on the environment" to mean "any unreasonable risk to man or the environment, taking into account the economic, social, and environmental costs and benefits of the use of any pesticide." 7 U.S.C. §136(bb). FIFRA thus requires EPA to make a risk/benefit analysis in determining whether a registration should be granted or allowed to continue to be sold in commerce.

17. The EPA and the State of Georgia registered Roundup® for distribution, sale, and manufacture in the United States and the State of Georgia.

18. FIFRA generally requires that the registrant, Monsanto in the case of Roundup®, conduct the health and safety testing of pesticide products. The EPA has protocols governing the conduct of tests required for registration and the laboratory practices that must be followed in conducting these tests. The data produced by the registrant must be submitted to the EPA for review and evaluation. The

4

government is not required, nor is it able, however, to perform the product tests that are required of the manufacturer.

19. The evaluation of each pesticide product distributed, sold, or manufactured is completed at the time the product is initially registered. The data necessary for registration of a pesticide has changed over time. The EPA is now in the process of re-evaluating all pesticide products through a Congressionally-mandated process called "re-registration." 7 U.S.C. §136a-1. In order to reevaluate these pesticides, the EPA is demanding the completion of additional tests and the submission of data for the EPA's review and evaluation.

20. In the case of glyphosate, and therefore Roundup®, the EPA had planned on releasing its preliminary risk assessment – in relation to the reregistration process – no later than July 2015. The EPA completed its review of glyphosate in early 2015, but it delayed releasing the risk assessment pending further review in light of the WHO's health-related findings.

*Scientific Fraud Underlying the Marketing and Sale of Glyphosate/Roundup®*

21. Based on early studies that glyphosate could cause cancer in laboratory animals, the EPA orginally classified glyphosate as *possibly carcinogenic to humans* (Group C) in 1985. After pressure from Monsanto, including contrary studies it provided to the EPA, the EPA changed its classification to *evidence of non-carcinogenicity in humans* (Group E) in 1991. In so classifying glyphosate, however, the EPA made clear that the designation did not mean the chemical does not cause cancer: "It should be emphasized, however, that designation of an agent in Group E is based on the available evidence at the time of evaluation and should

5

not be interpreted as a definitive conclusion that the agent will not be a carcinogen under any circumstances."

22. On two occasions, the EPA found that the laboratories hired by Monsanto to test the toxicity of its Roundup® products for registration purposes committed fraud.

23. In the first instance, Monsanto, in seeking initial registration of Roundup® by EPA, hired Industrial Bio-Test Laboratories ("IBT") to perform and evaluate pesticide toxicology studies relating to Roundup®. IBT performed about 30 tests on glyphosate and glyphosate-containing products, including nine of the 15 residue studies needed to register Roundup®.

24. In 1976, the United States Food and Drug Administration ("FDA") performed an inspection of Industrial Bio-Test Industries ("IBT") that revealed discrepancies between the raw data and the final report relating to the toxicological impacts of glyphosate. The EPA subsequently audited IBT; it too found the toxicology studies conducted for the Roundup® herbicide to be invalid. An EPA reviewer stated, after finding "routine falsification of data" at IBT, that it was "hard to believe the scientific integrity of the studies when they said they took specimens of the uterus from male rabbits."

25. Three top executives of IBT were convicted of fraud in 1983.

26. In the second incident of data falsification, Monsanto hired Craven Laboratories in 1991 to perform pesticide and herbicide studies, including for Roundup®. In that same year, the owner of Craven Laboratories and three of its employees were indicted, and later convicted, of fraudulent laboratory practices in the testing of pesticides and herbicides.

27.    Despite the falsity of the tests that underlie its registration, within a few years of is
       launch, Monsanto was marketing Roundup® in 115 countries.

       ***The Importance of Roundup® to Monsanto's Market Dominance Profits***

28.    The success of Roundup® was key to Monsanto's continued reputation and
       dominance in the marketplace. Largely due to the success of Roundup® sales,
       Monsanto's agriculture division was out performing its chemicals division's
       operating income, and that gap increased yearly. But with its patent for glyphosate
       expiring in the United States in the year 2000, Monsanto needed a strategy to
       maintain its Roundup® market dominance and to ward off impending
       competition.

29.    In response, Monsanto began the development and sale of genetically engineered
       Roundup Ready® seeds in 1996. Since Roundup Ready® crops are resistant to
       glyphosate; farmers can spray Roundup® onto their fields during the growing
       season without harming the crop. This allowed Monsanto to expand its market for
       Roundup® even further, by 2000, Monsanto's biotechnology seeds were planted
       on more than 80 million acres worldwide and nearly 70% of American soybeans
       were planted from Roundup Ready® seeds. It also secured Monsanto's dominant
       share of the glyphosate/Roundup® market through a marketing strategy that
       coupled proprietary Roundup Ready® seeds with continued sales of its
       Roundup® herbicide.

30.    Through a three-pronged strategy of increased production, decreased prices and
       by coupling with Roundup Ready® seeds, Roundup® became Monsanto's most
       profitable product. In 2000, Roundup® accounted for almost $2.8 billion in sales,

outselling other herbicides by a margin of five to one, and accounting for close to half of Monsanto's revenue. Today, glyphosate remains one of the world's largest herbicides by sales volume.

*Monsanto has known for decades that it falsely advertises the safety of Roundup®*

31.   In 1996, the New York Attorney General ("NYAG") filed a lawsuit against Monsanto based on its false and misleading advertising of Roundup® products. Specifically, the lawsuit challenged Monsanto's general representations that its spray-on glyphosate-based herbicides, including Roundup®, were **"safer than table salt"** and **"practically non-toxic"** to mammals, birds and fish. Among the representations the NYAG found deceptive and misleading about the human and environmental safety of Roundup® are the following:

a) Remember that environmentally friendly Roundup herbicide is biodegradable. It won't build up in the soil so you can use Roundup with confidence along customers' driveways, sidewalks and fences...

b) And remember that Roundup is biodegradable and won't build up in the soil. That will give you the environmental confidence you need to use Roundup everywhere you've got a weed, brush, edging or trimming problem.

c) Roundup biodegrades into naturally occurring elements.

d) Remember that versatile Roundup herbicide stays where you put it. That means there's no washing or leaching to harm customers' shrubs or other desirable vegetation.

e) This non-residual herbicide will not wash or leach in the soil. It ... stays where you apply it.

8

f) You can apply Accord with "confidence because it will stay where you put it" it bonds tightly to soil particles, preventing leaching. Then, soon after application, soil microorganisms biodegrade Accord into natural products.

g) Glyphosate is less toxic to rats than table salt following acute oral ingestion.

h) Glyphosate's safety margin is much greater than required. It has over a 1,000-fold safety margin in food and over a 700-fold safety margin for workers who manufacture or use it.

i) You can feel good about using herbicides by Monsanto. They carry a toxicity category rating of 'practically non-toxic' as it pertains to mammals, birds and fish.

j) "Roundup can be used where kids and pets will play and breaks down into natural material." This ad depicts a person with his head in the ground and a pet dog standing in an area which has been treated with Roundup.

32.   On November 19,1996, Monsanto entered into an Assurance of Discontinuance with NYAG, in which Monsanto agreed, among other things, "to cease and desist from publishing or broadcasting and advertisements [in New York] that represent, directly or by implication" that:

a) Its glyphosate-containing pesticide products or any component thereof are safe, non-toxic, harmless or free from risk.

b) Its glyphosate-containing pesticide products or any component thereof manufactured, formulated, distributed or sold by Monsanto are biodegradable.

c) Its glyphosate-containing pesticide products or any component thereof stay where they are applied under all circumstances and will not move through the environment by any means.

9

d) Its glyphosate-containing pesticide products or any component thereof are "good" for the environment or are "known for their environmental characteristics."

e) Glyphosate-containing pesticide products or any component thereof are safer or less toxic than common consumer products other than herbicides;

f) Its glyphosate-containing products or any component thereof might be classified as "practically non-toxic."

33. Monsanto did not alter its advertising in the same manner in any state other than New York, and on information and belief still has not done so today.

34. In 2009, France's highest court ruled that Monsanto had not told the truth about the safety of Roundup®. The French court affirmed an earlier judgment that Monsanto had falsely advertised its herbicide Roundup® as "biodegradable" and that it "left the soil clean."

### *Classifications and Assessments of Glyphosate*

35. The International Agency for Research on Cancer's (IARC) process for the classification of glyphosate followed the stringent procedures for the evaluation of a chemical agent. Over time, the IARC Monograph program has reviewed 980 agents. Of those reviewed, it has determined 116 agents to be Group 1 (Known Human Carcinogens); 73 agents to be Group 2A (Probable Human Carcinogens); 287 agents to Group 2B (Possible Human Carcinogens); 503 agents to be Group 3 (Not Classified); and one agent to be Probably Not Carcinogenic.

36. The established procedure for IARC Monograph evaluations is described in the IARC Programme's Preamble. Evaluations are performed by panels of

international experts, selected on the basis of their expertise and the absence of actual or apparent conflicts of interest.

37. One year before the Monograph meeting, the meeting is announced and there is a call both for data and for experts. Eight months before the Monograph meeting, the Working Group membership is selected and the sections of the Monograph are developed by the Working Groups members. One month prior to the Monograph meeting, the call for data is closed and the various draft sections are distributed among Working Group members for review and comment. Finally, at the Monograph meeting, the Working Group finalizes review of all literature, evaluates the evidence in each category, and completes the overall evaluation. Within two weeks after the Monograph meeting, the summary of the Working Group findings are published in Lancet Oncology, and within a year after the meeting, the final Monograph is finalized and published.

38. In assessing an agent, the IARC Working Group reviews the following information: (a) human, experimental, and mechanistic data; (b) all pertinent epidemiological studies and cancer bioassays; and (c) representative mechanistic data. The studies must be publicly available and have sufficient detail for meaningful review, and reviewers cannot be associated with the underlying study.

39. In March 2015, IARC reassessed glyphosate. The summary published in *The Lancet Oncology* reported that glyphosate is a Group 2A agent and probably carcinogenic in humans.

40. On July 29, 2015, IARC issued at Monograph for glyphosate, Monograph 112. For Volume 112, the volume that assessed glyphosate, a Working Group of 17

experts from 11 countries met at IARC from March 3-10, 2015, to assess the carcinogenicity of certain herbicides, including glyphosate. The March meeting culminated nearly a one-year review and preparation by the IARC Secretariat and Working Group, including a comprehensive review of the latest available scientific evidence. According to published procedures, the Working Group considered "reports that have been published or accepted for publication in the openly available scientific literature" as well as "data from governmental reports that are publicly available."

41.   The studies considered the following exposure groups: occupational exposure of farmers and tree nursery workers in the United States, forestry workers in Canada and Finlan and municipal weed-control workers in the United Kingdom; and para-occupational exposure in farming families.

42.   Glyphosate was identified as the second-most used household herbicide in the United States for weed control between 2001 and 2007 and the most heavily used herbicide in the world in 2012.

43.   Exposure pathways are identified as air (especially during spraying), water, and food. Community exposure to glyphosate is widespread and found in soil, air, surface water, and groundwater, as well as in food.

44.   The assessment of the IARC Working group identified several case control studies of occupational exposure in the United States, Canada, and Sweden. These studies show a human health concern from agricultural and other work-related exposure to glyphosate.

45.   The IARC Working Group found an increased risk between exposure to

glyphosate and non-Hodgkin lymphoma ("NHL") and several subtypes of NHL, and the increased risk persisted after adjustment for other pesticides.

46.    The IARC Working Group also found that glyphosate caused DNA and chromosomal damage in human cells. One study in community residents reported increases in blood markers of chromosomal damage (micronuclei) after glyphosate formulations were sprayed.

47.    In male CD-1 mice, glyphosate induced a positive trend in the incidence of a rare tumor, renal tubule carcinoma. A second study reported a positive trend for haemangiosarcoma in male mice. Glyhposate increased pancreatic islet-call adenoma in male rats in two studies. A glyphosate formulation promoted skin tumors in an initiation-promotion study in mice.

48.    The IARC Working Group also noted that glyphosate has been detected in the urine of agricultural workers, indicating absorption. Soil microbes degrade glyphosate to aminomethlyphosphoric acid (AMPA). Blood AMPA detection after exposure suggests intestinal microbial metabolism in humans.

49.    The IARC Working Group further found that glyphosate and glyphosate formulations induced DNA and chromosomal damage in mammals, and in human and animal cells in utero.

50.    The IARC Working Group also noted genotoxic, hormonal, and enzymatic effects in mammals exposed to glyphosate. Essentially, glyphosate inhibits the biosynthesis of aromatic amino acids, which leads to several metabolic disturbances, including the inhibition of protein and secondary product biosynthesis and general metabolic disruption.

51.    The IARC Working Group also reviewed an Agricultural Health Study, consisting
       of a prospective cohort of 57,311 licensed pesticide applicators in Iowa and North
       Carolina. While this study differed from others in that it was based on a self-
       administered questionnaire, the results support an association between glyphosate
       exposure and Multiple Myeloma, Hairy Cell Leukemia (HCL), and Chronic
       Lymphocytic Leukemia (CLL), in addition to several other cancers.

       ***Other Earlier Findings About Glyphosate's Dangers to Human Health***

52.    The EPA has a technical fact sheet, as part of its Drinking Water and Health,
       National Primary Drinking Water Regulations publication, relating to glyphosate.
       This technical fact sheet predates the IARC March 20, 2015, evaluation. The fact
       sheet describes the release patterns for glyphosate as follows:

       **Release Patterns**

       Glyphosate is released to the environment in its use as an herbicide for controlling
       woody and herbaceous weeds on forestry, right-of-way and cropped sites. These
       sites may be around water and in wetlands. It may also be released to the
       environment during its manufacture, formulation, transport, storage, and disposal.

53.    In 1995, the Northwest Coalition for Alternatives to Pesticides reported that in
       California, the state with the most comprehensive program for reporting of
       pesticide-caused illness, glyphosate was the third most commonly-reported cause
       of pesticide illness among agricultural workers.

14

*Recent Worldwide Bans on Roundup®/Glyphosate*

54. Several countries around the world have instituted bans on the sale of Roundup® and other glyphosate-containing herbicides, both before and since IARC first announced its assessment for glyphosate in March 2015, and more countries undoubtedly will follow suit in light of the dangers of Roundup® being more widely known. The Netherlands issued a ban on all glyphosate-based herbicides in April 2014, including Roundup® which took effect by the end of 2015. In issuing the ban, the Dutch Parliament member who introduced the successful legislation stated: "Agricultural pesticides in user-friendly packaging are sold in abundance to private persons. In garden centers, Roundup ® is promoted as harmless, but unsuspecting customers have no idea what the risks of this product are. Especially children are sensitive to toxic substances and should therefor not be exposed to it."

55. The Brazilian Public Prosecutor in the Federal District requested that the Brazilian Justice Department suspend the use of glyphosate.

56. France banned the private sale of Roundup® and glyphosate following the IARC assessment for Glyphosate.

57. Bermuda banned both the private and commercial sale of glyphosates, including Roundup®. The Bermuda government explained its ban as follows: "Following a recent scientific study carried out by a leading cancer agency, the importation of weed spray 'Roundup' has been suspended."

58. The Sri Lankan government banned the private and commercial use of glyphosates, particularly out of concern that Glyphosate has been linked to fatal

kidney disease in agricultural workers.

59.   The government of Columbia announced its ban on using Roundup® and glyphosate to destroy illegal plantation of coca, the raw ingredient for cocaine, because of the WHO's finding that glyphosate is probably carcinogenic.

### *Plaintiff's Exposure to Roundup®*

60.   Beginning in the 1970s and continuing until approximately 2018, Plaintiff regularly used and applied Roundup® in controlling weeds and grass in her yard as well as in assisting her husband in agricultural operations.

61.   Plaintiff was diagnosed with follicular lymphoma, a cancer related to and a sub-type of non-Hodgkin lymphoma ("NHL"), following over forty-five (45) years of Roundup® exposure.

62.   As a result of exposure to Roundup®, Plaintiff was harmed.

### III.   CAUSES OF ACTION

### *First Cause of Action – Strict Liability (Design Defect)*

63.   Plaintiff renews and reaffirms each and every allegation set forth above.

64.   Plaintiff brings this strict liability claim against Defendant for defective design.

65.   At all times relevant to this litigation, Defendant engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting Roundup® products, which are defective and unreasonably dangerous to consumers, including Plaintiff's decedent, thereby placing Roundup® products into the stream of commerce. These actions were under the ultimate control and supervision of Defendant. At all times relevant to this litigation, Defendant designed, researched, developed, manufactured, produced,

16

tested, assembled, labeled, advertised, promoted, marketed, sold and distributed
the Roundup® products used by Plaintiff, as described above.

66. At all times relevant to this litigation, Defendant's Roundup® products were
manufactured, designed, and labeled in an unsafe, defective, and inherently
dangerous manner that was dangerous for use by or exposure to the public, and, in
particular, Plaintiff.

67. At all times relevant to this litigation, Defendant's Roundup® products reached
the intended consumers, handlers, and users or other persons coming into contact
with these products in New York and throughout the United States, including
Plaintiff, without substantial change in their condition as designed, manufactured,
sold, distributed, labeled, and marketed by Defendant.

68. Defendant's Roundup® products, as researched, tested, developed, designed,
licensed, manufactured, packaged, labeled, distributed, sold, and marketed by
Defendant were defective in design and formulation in that when they left the
hands of the Defendant's manufacturers and/or suppliers, they were unreasonably
dangerous and dangerous to an extent beyond that which an ordinary consumer
would contemplate.

69. Defendant's Roundup® products, as researched, tested, developed, designed,
licensed, manufactured, packaged, labeled, distributed, sold, and marketed by
Defendant were defective in design and formulation in that when they left the
hands of Defendant's manufacturers and/or suppliers, the foreseeable risks
exceeded the alleged benefits associated with their design and formulation.

70. At all times relevant to this action, Defendant knew or had reason to know that its

17

Roundup® products were defective and were inherently dangerous and unsafe
when used in the manner instructed and provided by Defendant.

71.   Therefore, at all times relevant to this litigation, Defendant's Roundup® products,
as researched, tested, developed, designed, licensed, manufactured, packaged,
labeled, distributed, sold, and marketed by Defendant were defective in design
and formulation, in one or more of the following ways:

a) When placed in the stream of commerce, Defendant's Roundup® products
were defective in design and formulation, and, consequently, dangerous to an
extent beyond that which an ordinary consumer would contemplate.

b) When placed in the stream of commerce, Defendant's Roundup® products
were unreasonably dangerous in that they were hazardous and posed a grave risk
of cancer and other serious illnesses when used in a reasonably anticipated
manner.

c) When placed in the stream of commerce, Defendant's Roundup® products
contained unreasonably dangerous design defects and were not reasonably safe
when used in a reasonably anticipated or intended manner.

d) Defendant did not sufficiently test, investigate, or study its Roundup® products
and, specifically, the active ingredient, glyphosate.

e) Exposure to Roundup® and glyphosate-containing products presents a risk of
harmful side effects that outweigh any potential utility stemming from the use of
the herbicide.

f) Defendant knew or should have known at the time of marketing its Roundup®
products that exposure to Roundup® and specifically, its active ingredient

18

glyphosate, could result in cancer and other severe illnesses and injuries.

g) Defendant did not conduct adequate post-marketing surveillance of its
Roundup® products.

h) Defendant could have employed safer alternative designs and formulations.

72. At all times relevant to this litigation, Plaintiff was exposed to the use of
Defendant's Roundup® products in an intended or reasonably foreseeable manner
without knowledge of their dangerous characteristics.

73. Plaintiff could not have reasonably discovered the defects and risks associated
with Roundup® or glyphosate-containing products before or at the time of
exposure.

74. The harm caused by Defendant's Roundup® products far outweighed their
benefit, rendering Defendant's products dangerous to an extent beyond that which
an ordinary consumer would contemplate. Defendant's Roundup® products were
and are more dangerous than alternative products and Defendant could have
designed its Roundup® products to make them less dangerous. Indeed, at the time
that Defendant designed its Roundup® products, the state of the industry's
scientific knowledge was such that a less risky design or formulation was
attainable.

75. At the time Roundup® products left Defendant's control, there was a practical,
technically feasible and safer alternative design that would have prevented the
harm without substantially impairing the reasonably anticipated or intended
function of Defendant's herbicides.

76. Defendant's defective design of its Roundup® products was willful, wanton,

19

fraudulent, malicious, and conducted with reckless disregard for the health and
safety of users of the Roundup® products, including Plaintiff herein.

77.    Therefore, as a result of the unreasonably dangerous condition of its Roundup®
products, Defendant is strictly liable to Plaintiff.

78.    The defects in Defendant's Roundup® products were substantial and contributing
factors in causing Plaintiff's injury, and, but for Defendant's misconduct and
omissions, Plaintiff would not have been injured.

79.    Defendant's conduct, as described above, was reckless. Defendant risked the lives
of consumers and users of its products, including Plaintiff, with knowledge of the
safety problems associated with Roundup® and glyphosate-containing products,
and suppressed this knowledge from the general public. Defendant made
conscious decisions not to redesign, warn, or inform the unsuspecting public.
Defendant's reckless conduct warrants an award of punitive damages.

80.    As a direct and proximate result of Defendant placing its defective Roundup®
products into the stream of commerce, Plaintiff was injured, and endured physical
pain and discomfort, as well as economic hardship, including considerable
financial expenses for medical care and treatment.

*Second Cause of Action- Strict Liability (Failure to Warn)*

81.    Plaintiff renews and reaffirms each and every allegation set forth above.

82.    Plaintiff brings this strict liability claim against Defendant for failure to warn.

83.    At all times relevant to this litigation, Defendant engaged in the business of
testing, developing, designing, manufacturing, marketing, selling, distributing,
and promoting Roundup® products, which are defective and unreasonably

dangerous to consumers, including Plaintiff, because they do not contain adequate warnings or instructions concerning the dangerous characteristics of Roundup® and specifically, the active ingredient glyphosate. These actions were under the ultimate control and supervision of Defendant.

84.   Defendant researched, developed, designed, tested, manufactured, inspected, labeled, distributed, marketed, promoted, sold, and otherwise released into the stream of commerce its Roundup® products, and in the course of the same, directly advertised or marketed the products to consumers and end users, including Plaintiff, and therefore had a duty to warn of the risks associated with the use of Roundup® and glyphosate-containing products.

85.   At all times relevant to this litigation, Defendant had a duty to properly test, develop, design, manufacture, inspect, package, label, market, promote, sell, distribute, maintain supply, provide proper warnings, and take such steps as necessary to ensure that its Roundup® products did not cause users and consumers to suffer from unreasonable and dangerous risks. Defendant had a continuing duty to warn Plaintiff of the dangers associated with Roundup® use and exposure. Defendant, as manufacturer, seller, or distributor of chemical herbicides is held to the knowledge of an expert in the field.

86.   At the time of manufacture, Defendant could have provided warnings or instructions regarding the full and complete risks of Roundup® and glyphosate-containing products because it knew or should have known of the unreasonable risks of harm associated with the use of and/or exposure to such products.

87.   At all times relevant to this litigation, Defendant failed to investigate, study, test,

or promote the safety or to minimize the dangers to users and consumers of its product and to those who would foreseeably use or be harmed by Defendant's herbicides, including Plaintiff.

88.   Despite the fact that Defendant knew or should have known that Roundup® posed a grave risk of harm, it failed to exercise reasonable care to warn of the dangerous risks associated with the use and exposure. The dangerous propensities of its products and the carcinogenic characteristics of glyphosate, as described above, were known to Defendant, or scientifically knowable to Defendant through appropriate research and testing by known methods at the time it distributed, supplied, or sold the product, and not known to end users and consumers, such as Plaintiff.

89.   Defendant knew or should have known that its products created significant risks of serious bodily harm to consumers, as alleged herein, and Defendant failed to adequately warn consumers and reasonably foreseeable users of the risks of exposure to its products. Defendant has wrongfully concealed information concerning the dangerous nature of Roundup® and its active ingredient glyphosate, and further made false and/or misleading statements concerning the safety of Roundup® and glyphosate.

90.   At all times relevant to this litigation, Defendant's Roundup® products reached the intended consumers, handlers, and users or other persons coming into contact with these products in Georgia and throughout the United States, including Plaintiff, without substantial change in their condition as designed, manufactured, sold, distributed, labeled, and marketed by Defendant.

91.   Plaintiff was exposed to Defendant's Roundup® products in the course of her
general lawncare and assistance with of agricultural operations, without
knowledge of their dangerous characteristics.

92.   At all times relevant to this litigation, Plaintiff was exposed to the use of
Defendant's Roundup® products in their intended or reasonably foreseeable
manner without knowledge of their dangerous characteristics.

93.   Plaintiff could not have reasonably discovered the defects and risks associated
with Roundup® or glyphosate-containing products prior to or at the time of
Plaintiff's exposure. Plaintiff relied upon the skill, superior knowledge, and
judgment of Defendant.

94.   Defendant knew or should have known that the minimal warnings disseminated
with its Roundup® products were inadequate, but they failed to communicate
adequate information on the dangers and safe use/exposure and failed to
communicate warnings and instructions that were appropriate and adequate to
rend the products safe for their ordinary, intended, and reasonably foreseeable
uses.

95.   The information that Defendant did provide or communicate failed to contain
relevant warnings, hazards, and precautions that would have enabled horticultural
workers to utilize the products safely and with adequate protection. Instead,
Defendant disseminated information that was inaccurate, false, and misleading
and which failed to communicate accurately or adequately the comparative safety,
duration, and extent of the risk of injuries with use of and/or exposure to
Roundup® and glyphosate; continued to aggressively promote the efficacy of its

products, even after it knew or should have known of the unreasonable risks from use or exposure; and concealed, downplayed, or otherwise suppressed, through aggressive marketing and promotion, any information or research about the risks and dangers of exposure to Roundup® and glyphosate.

96.     To this day, Defendant has failed to adequately and accurately warn of the true risks of Plaintiff's injury associated with the use of and exposure to Roundup® and its active ingredient glyphosate, a probable carcinogen.

97.     As a result of their inadequate warnings, Defendant's Roundup® products were defective and unreasonably dangerous when they left the possession and/or control of Defendant, were distributed by Defendant, and Plaintiff was exposed.

98.     Defendant is liable to Plaintiff for Plaintiff's injury caused by its negligent or willful failure, as described above, to provide adequate warnings or other clinically relevant information and data regarding the appropriate use of its products and the risks associated with the use of or exposure to Roundup® and glyphosate.

99.     The defects in Defendant's Roundup® products were substantial and contributing factors in causing Plaintiff's injury, and, but for Defendant's misconduct and omissions, Plaintiff would not have been injured.

100.    Had Defendant provided adequate warnings and instructions and properly disclosed and disseminated the risks associated with its Roundup® products, Plaintiff could have avoided the risk of developing injuries as alleged herein.

101.    As a direct and proximate result of Defendant placing its defective Roundup® products into the stream of commerce, Plaintiff was injured and endured physical

24

pain and discomfort, as well as economic hardship, including considerable financial expenses for medical care and treatment.

### Third Cause of Action- Negligence

102.  Plaintiff renews and reaffirms each and every allegation set forth above.

103.  Defendant, directly or indirectly, caused Roundup® products to be sold, distributed, packaged, labeled, marketed, promoted, used by or exposed to Plaintiff.

104.  At all times relevant to this litigation, Defendant had a duty to exercise reasonable care in the design, research, manufacture, marketing, advertisement, supply, promotion, packaging, sale, and distribution of its Roundup® products, including the duty to take all reasonable steps necessary to manufacture, promote, and/or sell a product that was not unreasonably dangerous to consumers and users of the product.

105.  At all times relevant to this litigation, Defendant had a duty to exercise reasonable care in the marketing, advertisement, and sale of the Roundup® products. Defendant's duty of care owed to consumers and the general public included providing accurate, true, and correct information concerning the risks of using Roundup® and appropriate, complete, and accurate warnings concerning the potential adverse effects of exposure to Roundup®, and, in particular, its active ingredient glyphosate.

106.  At all times relevant to this litigation, Defendant knew or, in the exercise of reasonable care, should have known of the hazards and dangers of Roundup® and specifically, the carcinogenic properties of the chemical glyphosate.

107. Accordingly, at all times relevant to this litigation, Defendant knew or, in the exercise of reasonable care, should have known that use of or exposure to its Roundup® products could cause or be associated with Plaintiff's injury and thus created a dangerous and unreasonable risk of injury to the users of these products, including Plaintiff.

108. Defendant also knew or, in the exercise of reasonable care, should have known that users and consumers of Roundup® were unaware of the risks and the magnitude of the risks associated with the use of and/or exposure to Roundup® and glyphosate-containing products.

109. As such, Defendant breached its duty of reasonable care and failed to exercise ordinary care in the design, research, development, manufacture, testing, marketing, supply, promotion, advertisement, packaging, sales, and distribution of its Roundup® products, in that Defendant manufactured and produced defective herbicides containing the chemical glyphosate, knew or had reason to know of the defects inherent in its products, knew or had reason to know that a user's or consumer's exposure to the products created a significant risk of harm and unreasonably dangerous side effects, and failed to prevent or adequately warn of these risks and injuries.

110. Despite its ability and means to investigate, study, and test its products and to provide adequate warnings, Defendant has failed to do so. Indeed, Defendant has wrongfully concealed information and has further made false and/or misleading statements concerning the safety and/or exposure to Roundup® and glyphosate.

111. Defendant's negligence included:

26

a) Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing its Roundup® products without thorough and adequate pre- and post-market testing.

b) Manufacturing, producing, promoting, formulating, creating, developing, designing, selling and/or distributing Roundup® while negligently and/or intentionally concealing and failing to disclose the results of trials, tests, and studies of exposure to glyphosate, and consequently, the risk of serious harm associated with human use of and exposure to Roundup®.

c) Failing to undertake sufficient studies and conduct necessary tests to determine whether Roundup® products and glyphosate-containing products were safe for their intended use in agriculture and horticulture;

d) Failing to use reasonable and prudent care in the design, research, manufacture, and development of Roundup® products so as to avoid the risk of serious harm associated with the prevalent use of Roundup®/glyphosate as an herbicide;

e) Failing to design and manufacture Roundup® products so as to ensure they were at least as safe and effective as other herbicides on the market;

f) Failing to provide adequate instructions, guidelines, and safety precautions to those persons who Defendant could reasonable foresee would use and be exposed to its Roundup® products.

g) Failing to disclose to Plaintiff, users/consumers, and the general public that use of and exposure to Roundup® presented severe risks of cancer and other grave illnesses;

h) Failing to warn Plaintiff, consumers, and the general public that the product's

risk of harm was unreasonable and that there were safer and effective alternative herbicides available to consumers;

i) Systematically suppressing or downplaying contrary evidence about the risks, incidence, and prevalence of the side effects of Roundup® and glyphosate-containing products;

j) Representing that its Roundup® products were safe for their intended use when, in fact, Defendant knew or should have known that the products were not safe for their intended purpose.

k) Declining to make or propose any changes to Roundup® products' labeling or other promotional materials that would alert the consumers and the general public of the risks of Roundup® and glyphosate;

l) Advertising, marketing, and recommending the use of the Roundup® products, while concealing and failing to disclose or warn of the dangers known by Defendant to be associated with or caused by the use of or exposure to Roundup® and glyphosate.

m) Continuing to disseminate information to its consumers, which indicate or imply that Defendant's Roundup® products are not unsafe; and

n) Continuing the manufacture and sale of its products with the knowledge that the products were unreasonably unsafe and dangerous.

112. Defendant knew and/or should have known that it was foreseeable that consumers such as Plaintiff would suffer injuries and potentially die as a result of Defendant's failure to exercise ordinary care in the manufacturing, marketing, labeling, distribution, and sale of Roundup®.

113.   Plaintiff did not know the nature and extent of the injuries that could result from
the intended use of and/or exposure to Roundup® or its active ingredient
glyphosate.

114.   Defendant's negligence was the proximate cause of the injuries, harm, and
economic losses that Plaintiff suffered.

115.   Defendant's conduct, as described above, was reckless. Defendant regularly risks
the lives of consumers and users of their products with full knowledge of the
dangers of its products. Defendant has made conscious decisions not to redesign,
re-label, warn, or inform the unsuspecting public, including Plaintiff. Defendant's
reckless conduct therefore warrants an award of punitive damages.

116.   As a proximate result of Defendant's wrongful acts and omissions in placing its
defective Roundup® products into the stream of commerce without adequate
warnings of the hazardous and carcinogenic nature of glyphosate, Plaintiff was
injured. Plaintiff endured pain and suffering, and suffered economic losses
(including significant expenses for medical care and treatment).

*Fourth Cause of Action- Breach of Implied Warranties*

117.   Plaintiff renews and reaffirms each and every allegation set forth above.

118.   At all times relevant to this litigation, Defendant engaged in the business of
testing, developing, designing, manufacturing, marketing, selling, distributing, and
promoting its Roundup® products, which are defective and unreasonably
dangerous to consumers thereby placing Roundup® products into the stream of
commerce. These actions were under the ultimate control and supervision of the
Defendant.

29

119. Before the time that Plaintiff was exposed to the use of the aforementioned Roundup® products, Defendant impliedly warranted to its consumers and those exposed to it – including Plaintiff – that its Roundup® products were of merchantable quality and safe for the use for which they were intended; specifically, as horticultural herbicides.

120. Defendant, however, failed to disclose that Roundup® has dangerous propensities when used as intended and that the use of and/or exposure to Roundup® and glyphosate-containing product carries an increased risk of developing severe injuries, including Plaintiff's injury.

121. Plaintiff reasonably relied upon the skill, superior knowledge and judgment of Defendant and upon its implied warranties that the Roundup® products were of merchantable quality and fit for their intended purpose or use.

122. Upon information and belief, Plaintiff was at all relevant times in privity with Defendant.

123. Plaintiff is the intended third-party beneficiary of implied warranties made by Defendant to the purchasers of its horticultural herbicides, and as such Plaintiff is entitled to assert this claim.

124. The Roundup® products were expected to reach and did in fact reach consumers and users, including Plaintiff, without substantial change in the condition in which they were manufactured and sold by Defendant.

125. At all times relevant to this litigation, Defendant was aware that consumers and users of its products, including Plaintiff, would use Roundup® products as marketed by Defendant, which is to say that Plaintiff was a foreseeable user of

Roundup®.

126.   Defendant intended that its Roundup® products be used in the manner in which
       Plaintiff in fact used them and Defendant impliedly warranted each product to be
       of merchantable quality, safe, and for this use, despite the fact that Roundup®
       was not adequately tested or researched.

127.   In reliance upon Defendant's implied warranty, Plaintiff's exposure to
       Roundup® was in the foreseeable manner intended, recommended, promoted and
       marketed by Defendant.

128.   Plaintiff could not have reasonably discovered or known of the risks of serious
       injury and death associated with Roundup® or glyphosate.

129.   Defendant breached its implied warranty to Plaintiff in that its Roundup®
       products were not of merchantable quality, safe, or fit for their intended use, or
       adequately tested. Roundup® has dangerous propensities when used as intended
       and can cause serious injuries and death.

130.   The harm caused by Defendant's Roundup® products far outweighed their
       benefit, rendering the products more dangerous than an ordinary consumer or user
       would expect and more dangerous than alternative products.

131.   As a direct and proximate result of Defendant's wrongful acts and omissions
       Plaintiff suffered severe and permanent physical and emotional injuries. Plaintiff
       endured pain and suffering, and suffered economic loss (including significant
       expenses for medical care and treatment).

## IV.  DAMAGES

132.   Plaintiff renews and reaffirms each and every allegation set forth above.

31

133.   As a result of the aforesaid acts and/or omissions of Defendant, Plaintiff is

entitled to recover for past and future medical expenses, pain and suffering and

permanent impairment.

WHEREFORE, Plaintiff prays as follows:

(A) That service be perfected upon Defendant as provided by law;

(B) That Plaintiff have judgment against Defendant in an amount to be proven

and as determined by the enlightened conscience of a fair and impartial

jury; and

(C) For such other and further relief as the Court deems just and proper.

This 10th day of September, 2021.

/s/Ashleigh R. Madison
Ashleigh R. Madison
Georgia Bar No.346027

Southeast Law, LLC
1703 Abercorn Street
Savannah, Georgia 31401
912.662.6612

JS 44 (Rev. 04/21)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

| I. (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| | |
| **(b)** County of Residence of First Listed Plaintiff  MITCHELL<br>*(EXCEPT IN U.S. PLAINTIFF CASES)* | County of Residence of First Listed Defendant<br>*(IN U.S. PLAINTIFF CASES ONLY)*<br>NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF<br>THE TRACT OF LAND INVOLVED. |
| **(c)** Attorneys *(Firm Name, Address, and Telephone Number)*<br>Ashleigh R. Madison, Esq.     Southeast Law, LLC.<br>1703 Abercorn Street              Savannah, GA 31401 | Attorneys *(If Known)* |

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

| | | | |
|---|---|---|---|
| ☐ 1 | U.S. Government<br>Plaintiff | ☐ 3 | Federal Question<br>*(U.S. Government Not a Party)* |
| ☐ 2 | U.S. Government<br>Defendant | ☒ 4 | Diversity<br>*(Indicate Citizenship of Parties in Item III)* |

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☐ 1 | Incorporated *or* Principal Place<br>of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place<br>of Business In Another State | ☐ 5 | ☒ 5 |
| Citizen or Subject of a<br>Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*
Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment<br>   & Enforcement of Judgment<br>☐ 151 Medicare Act<br>☐ 152 Recovery of Defaulted<br>   Student Loans<br>   (Excludes Veterans)<br>☐ 153 Recovery of Overpayment<br>   of Veteran's Benefits<br>☐ 160 Stockholders' Suits<br>☐ 190 Other Contract<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | **PERSONAL INJURY**<br>☐ 310 Airplane<br>☐ 315 Airplane Product<br>   Liability<br>☐ 320 Assault, Libel &<br>   Slander<br>☐ 330 Federal Employers'<br>   Liability<br>☐ 340 Marine<br>☐ 345 Marine Product<br>   Liability<br>☐ 350 Motor Vehicle<br>☐ 355 Motor Vehicle<br>   Product Liability<br>☐ 360 Other Personal<br>   Injury<br>☐ 362 Personal Injury -<br>   Medical Malpractice | **PERSONAL INJURY**<br>☒ 365 Personal Injury -<br>   Product Liability<br>☐ 367 Health Care/<br>   Pharmaceutical<br>   Personal Injury<br>   Product Liability<br>☐ 368 Asbestos Personal<br>   Injury Product<br>   Liability<br>**PERSONAL PROPERTY**<br>☐ 370 Other Fraud<br>☐ 371 Truth in Lending<br>☐ 380 Other Personal<br>   Property Damage<br>☐ 385 Property Damage<br>   Product Liability | ☐ 625 Drug Related Seizure<br>   of Property 21 USC 881<br>☐ 690 Other<br><br>**LABOR**<br>☐ 710 Fair Labor Standards<br>   Act<br>☐ 720 Labor/Management<br>   Relations<br>☐ 740 Railway Labor Act<br>☐ 751 Family and Medical<br>   Leave Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Employee Retirement<br>   Income Security Act | ☐ 422 Appeal 28 USC 158<br>☐ 423 Withdrawal<br>   28 USC 157<br>**INTELLECTUAL<br>PROPERTY RIGHTS**<br>☐ 820 Copyrights<br>☐ 830 Patent<br>☐ 835 Patent - Abbreviated<br>   New Drug Application<br>☐ 840 Trademark<br>☐ 880 Defend Trade Secrets<br>   Act of 2016<br>**SOCIAL SECURITY**<br>☐ 861 HIA (1395ff)<br>☐ 862 Black Lung (923)<br>☐ 863 DIWC/DIWW (405(g))<br>☐ 864 SSID Title XVI<br>☐ 865 RSI (405(g)) | ☐ 375 False Claims Act<br>☐ 376 Qui Tam (31 USC<br>   3729(a))<br>☐ 400 State Reapportionment<br>☐ 410 Antitrust<br>☐ 430 Banks and Banking<br>☐ 450 Commerce<br>☐ 460 Deportation<br>☐ 470 Racketeer Influenced and<br>   Corrupt Organizations<br>☐ 480 Consumer Credit<br>   (15 USC 1681 or 1692)<br>☐ 485 Telephone Consumer<br>   Protection Act<br>☐ 490 Cable/Sat TV<br>☐ 850 Securities/Commodities/<br>   Exchange<br>☐ 890 Other Statutory Actions<br>☐ 891 Agricultural Acts<br>☐ 893 Environmental Matters |
| **REAL PROPERTY**<br>☐ 210 Land Condemnation<br>☐ 220 Foreclosure<br>☐ 230 Rent Lease & Ejectment<br>☐ 240 Torts to Land<br>☐ 245 Tort Product Liability<br>☐ 290 All Other Real Property | **CIVIL RIGHTS**<br>☐ 440 Other Civil Rights<br>☐ 441 Voting<br>☐ 442 Employment<br>☐ 443 Housing/<br>   Accommodations<br>☐ 445 Amer. w/Disabilities -<br>   Employment<br>☐ 446 Amer. w/Disabilities -<br>   Other<br>☐ 448 Education | **PRISONER PETITIONS**<br>**Habeas Corpus:**<br>☐ 463 Alien Detainee<br>☐ 510 Motions to Vacate<br>   Sentence<br>☐ 530 General<br>☐ 535 Death Penalty<br>**Other:**<br>☐ 540 Mandamus & Other<br>☐ 550 Civil Rights<br>☐ 555 Prison Condition<br>☐ 560 Civil Detainee -<br>   Conditions of<br>   Confinement | **IMMIGRATION**<br>☐ 462 Naturalization Application<br>☐ 465 Other Immigration<br>   Actions | **FEDERAL TAX SUITS**<br>☐ 870 Taxes (U.S. Plaintiff<br>   or Defendant)<br>☐ 871 IRS—Third Party<br>   26 USC 7609 | ☐ 895 Freedom of Information<br>   Act<br>☐ 896 Arbitration<br>☐ 899 Administrative Procedure<br>   Act/Review or Appeal of<br>   Agency Decision<br>☐ 950 Constitutionality of<br>   State Statutes |

## V. ORIGIN *(Place an "X" in One Box Only)*

| | | | | | |
|---|---|---|---|---|---|
| ☒ 1 Original<br>Proceeding | ☐ 2 Removed from<br>State Court | ☐ 3 Remanded from<br>Appellate Court | ☐ 4 Reinstated or<br>Reopened | ☐ 5 Transferred from<br>Another District<br>*(specify)* | ☐ 6 Multidistrict<br>Litigation -<br>Transfer | ☐ 8 Multidistrict<br>Litigation -<br>Direct File |

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
28 USC 1332
Brief description of cause:
PRODUCT LIABILITY

## VII. REQUESTED IN COMPLAINT:
☐ CHECK IF THIS IS A CLASS ACTION
UNDER RULE 23, F.R.Cv.P.

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:   ☒ Yes   ☐ No

## VIII. RELATED CASE(S) IF ANY
*(See instructions)*
JUDGE _____   DOCKET NUMBER _____

DATE  Sept 10, 2021
SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT #_____  AMOUNT_____  APPLYING IFP_____  JUDGE_____  MAG. JUDGE_____

Print Form

SHERIFF'S ENTRY OF SERVICE

Civil Action No. __1:21-CV-00161-LAG__

| | |
|---|---|
| Superior Court ☐ | Magistrate Court ☐ |
| State Court ☐ | Probate Court ☐ |
| Juvenile Court ☐ | |

Date Filed _____

Georgia, _____ COUNTY

Attorney's Address

SOUTHEAST LAW LLC

1703 ABERCORN ST

SAVANNAH, GA 31401

DORIS RAGAN
_____
Plaintiff

VS.

Name and Address of Party to Served

MONSANTO COMPANY

C/O CORP SVC CO 2 SUN CT STE 400

PEACHTREE CORNERS, GA 30092

MONSANTO COMPANY
_____
Defendant

_____
Garnishee

## SHERIFF'S ENTRY OF SERVICE

**PERSONAL**
☐ I have this day served the defendant _____ personally with a copy
of the within action and summons.

**NOTORIOUS**
☐ I have this day served the defendant _____ by leaving a
copy of the action and summons at his most notorious place abode in this County.

Delivered same into hands of _____ described as follows:
age, about _____ years; weight _____ pounds; height _____ feet and _____ inches, domiciled at the residence of
defendant.

**CORPORATION**
☑ Served the defendant _Monsanto Company_ a corporation
by leaving a copy of the within action and summons with _____
In charge of the office and place of doing business of said Corporation in this County.

**TACK & MAIL**
I have this day served the above styled affidavit and summons on the defendant(s) by posting a copy of the same to the door of the premises
designated in said affidavit and on the same day of such posting by depositing a true copy of same in the United States Mail, First Class in an
☐ envelope properly addressed to the defendant(s) at the address shown in said summons, with adequate postage affixed thereon containing notice
to the defendant(s) to answer said summons at the place stated in the summons.

**NON EST**
Diligent search made and defendant _____
☐ not to be found in the jurisdiction of this Court.

This _20_ day of _October_, 20_21_.

_____
DEPUTY