# EXHIBIT 2

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

| | |
|---|---|
| MARITA RENTERIA,<br><br>      Plaintiff,<br><br>   v.<br><br>MONSANTO COMPANY and SIDCO<br>CORPORATION,<br><br>      Defendants. | Case No. 1:21-cv-00994 |

### DEFENDANT MONSANTO COMPANY'S NOTICE OF REMOVAL

Pursuant to 28 U.S.C. §§ 1332, 1441, and 1446 (and any other applicable laws), defendant Monsanto Company ("Monsanto") hereby gives notice of removal of this lawsuit, captioned *Marita Renteria v. Monsanto Co., et al.*, No. D-101-CV-2020-00180, from the First Judicial District Court for the County of Santa Fe, New Mexico, to this Court.   Pursuant to 28 U.S.C. § 1446(a), Monsanto provides the following statement of grounds for removal.

### INTRODUCTION

1.       In this products liability lawsuit, Plaintiff Marita Renteria has sued Monsanto for injuries allegedly caused by Monsanto's Roundup®-branded herbicides, which have glyphosate as their active ingredient.   For decades, farmers have used glyphosate-based herbicides to increase crop yields, and home-owners, landscaping companies, and local government agencies have used these herbicides for highly effective weed control.   Glyphosate is one of the most thoroughly studied herbicides in the world, and glyphosate-based herbicides have received regulatory approval in more than 160 countries.   Since 1974, when Monsanto first introduced a Roundup®-branded herbicide to the marketplace, the United States Environmental Protection Agency ("EPA") repeatedly has concluded – including as recently as January 2020 – that glyphosate does

not cause cancer.  Nevertheless, Plaintiff alleges that she developed cancer – specifically, non-Hodgkin's lymphoma ("NHL") – caused by exposure to Monsanto's glyphosate-based herbicides.

2.      This is one of many lawsuits that have been filed in state and federal courts across the country against Monsanto involving Roundup®-branded herbicides.  A multidistrict litigation proceeding is pending in the United States District Court for the Northern District of California ("the MDL Court"), before the Honorable Vince G. Chhabria, pursuant to 28 U.S.C. § 1407.  *See In re Roundup Prods. Liab. Litig.*, No. 3:16-md-02741-VC (N.D. Cal.); *In re Roundup Prods. Liab. Litig.*, MDL No. 2741, 214 F. Supp. 3d 1346 (J.P.M.L. 2016).  Monsanto intends to seek transfer of this lawsuit to the MDL Court and will provide prompt notice to the Judicial Panel on Multidistrict Litigation ("JPML") of this lawsuit pursuant to the procedure for "tag along" cases set forth in the JPML's Rules and Procedures.

3.      Plaintiff is a New Mexico citizen and therefore of diverse citizenship from Monsanto.  Plaintiff tried to avoid complete diversity and defeat Monsanto's right to remove by joining a New Mexico corporation – Sidco Corporation ("Sidco") – as a defendant.  In her initial Complaint, Plaintiff asserted common law claims against Sidco and alleged that she was exposed to Roundup®-branded herbicides while applying them as a Sidco farm hand.  However, on September 13, 2021, Plaintiff filed a First Amended Complaint that significantly narrowed her case against Sidco and changed her exposure theory to allege only bystander exposure.  Moreover, Plaintiff disclosed (in her Plaintiff Fact Sheet) that she is alleging that she was exposed to Roundup®-branded herbicides while her father and brother sprayed those herbicides on family farms, which means that this lawsuit against Sidco is in fact being brought ***against her own family***. And most notably, Plaintiff has narrowed her claim against Sidco to a single count of strict liability, which is available under New Mexico law only against suppliers of allegedly defective products.

4.      Plaintiff's removal-prevention strategy fails because Plaintiff does not have a viable strict liability claim against Sidco, so that defendant is fraudulently joined.  Under New Mexico law, Sidco cannot be held for Plaintiff's strict liability claim because Sidco was an end-user – ***not*** a supplier – of Roundup®-branded herbicides, given that Sidco did not sell or otherwise place those products in the stream of commerce.

5.      As discussed in more detail below, this Court has subject matter jurisdiction and this removal is proper based on complete diversity of citizenship because Plaintiff fraudulently joined Sidco, which means that the presence of that New Mexico defendant must be disregarded when the Court evaluates the issue of diversity jurisdiction and the propriety of removal notwithstanding the presence of that defendant.

## BACKGROUND AND PROCEDURAL HISTORY

6.      In January 2020, Plaintiff commenced this lawsuit by filing a complaint in the First Judicial District Court for the County of Santa Fe, New Mexico, captioned *Marita Renteria v. Monsanto Co., et al.*, No. D-101-CV-2020-00180 (the "State Court Action").  In accordance with 28 U.S.C. § 1446(a) and Local Civil Rule 81.1, copies of the docket sheet and other records for the State Court Action from the state court's files (including all process, pleadings, and orders served upon Monsanto) are attached collectively as Exhibit 1.

7.      The initial Complaint asserted various product liability claims and sought damages for NHL allegedly caused by Monsanto's Roundup®-branded herbicides.  That pleading also asserted claims against Sidco and another defendant – AGCO Corporation ("AGCO") – that allegedly has its principal place of business in New Mexico (and therefore is deemed to be a citizen of New Mexico for purposes of federal diversity jurisdiction).  In May 2020, Plaintiff voluntarily dismissed AGCO.  Stipulation Of Dismissal Without Prejudice Of All Claims Against Defendant

AGCO Corporation (included in Exhibit 1); State Court Action Docket Sheet (included in Exhibit 1).

8.     On September 13, 2021, Plaintiff filed an amended complaint that makes clear, for the first time, that she is asserting only a "strict products liability" claim against Sidco. *See* First Am. Compl. ¶¶ 66-71 (included in Exhibit 1).

## BASIS FOR REMOVAL – DIVERSITY JURISDICTION

**I.   Substantive Requirements For Removal Are Satisfied.**

9.     Although complete diversity of citizenship usually is required for a federal court to have diversity jurisdiction, a defendant is permitted to remove a case from state court to federal court absent complete diversity if the plaintiff has fraudulently joined a non-diverse party to defeat federal subject matter jurisdiction. *See, e.g.*, *Brazell v. Waite*, 525 F. App'x 878, 881 (10th Cir. 2013) (discussing fraudulent joinder arguments); *Aguayo v. AMCO Ins. Co.*, 59 F. Supp. 3d 1225, 1256 (D.N.M. 2014) (citing cases).  One way for a removing defendant to establish fraudulent joinder is to demonstrate "inability of the plaintiff to establish a cause of action against the non-diverse party in state court." *Dutcher v. Matheson*, 733 F.3d 980, 988 (10th Cir. 2013) (quotation marks omitted); *see Brazell*, 525 F. App'x at 881 (stating that "the removing party must show that the plaintiff has no cause of action against the fraudulently joined defendant").  When a plaintiff has fraudulently joined a non-diverse defendant, the district court disregards that defendant for removal purposes. *See, e.g.*, *Brazell*, 525 F. App'x at 881.  Fraudulent joinder also renders the so-called "forum defendant rule" inapplicable because that statutory provision applies only to "properly joined" defendants.  28 U.S.C. § 1441(b)(2); *see Brazell*, 525 F. App'x at 884; *Aguayo*, 59 F. Supp. 3d at 1257.  Moreover, when a defendant removes a lawsuit based on a fraudulent joinder argument, the district court is not limited to the allegations in the complaint but is permitted

to look beyond – *i.e.*, pierce – the pleadings and consider the entire record to determine whether the non-diverse defendant has been fraudulently joined.  *See Dodd v. Fawcett Pubs., Inc.*, 329 F.2d 82, 85 (10th Cir. 1964); *Brazell*, 525 F. App'x at 881; *Aguayo*, 59 F. Supp. 3d at 1250-51 (citing *Dodd*, 329 F.2d at 85).

10.      In this case, Plaintiff sued Sidco in the hope that adding claims against that New Mexico defendant would prevent removal due to lack of diversity jurisdiction and/or due to the forum defendant rule.  However, as discussed below, Sidco has been fraudulently joined.

11.      Plaintiff is, and was at the time the State Court Action was filed, a resident and citizen of the State of New Mexico.  Compl. ¶ 1; First Am. Compl. ¶ 1; Plaintiff Fact Sheet at 1-3 (excerpts attached as Exhibit 2).

12.      As correctly alleged by Plaintiff, Monsanto is, and was at the time the State Court Action was filed, a corporation organized under the laws of the State of Delaware with its principal place of business in the State of Missouri.  Compl. ¶ 2; First Am. Compl. ¶ 2.  Accordingly, Monsanto is deemed to be a citizen of Delaware and Missouri for purposes of federal diversity jurisdiction.

13.      Sidco is, and was at the time the State Court Action was filed, a corporation organized under the laws of the State of New Mexico with its principal place of business in New Mexico.  Compl. ¶ 3; First Am. Compl. ¶ 3.  Accordingly, Sidco is deemed to be a citizen of New Mexico for purposes of federal diversity jurisdiction.

14.      Therefore, if Plaintiff fraudulently joined Sidco: (a) there is complete diversity of citizenship because the Court must disregard Sidco; and (b) the forum defendant rule does not preclude removal.

15.     Plaintiff now asserts only one claim against Sidco – "strict products liability," First Am. Compl., Count 2 – and alleges that Sidco was "a supplier" of the "defective" product (Roundup®-branded herbicides) to which she was exposed, *id*. ¶¶ 67, 70.  However, as a matter of well-established New Mexico law, that claim against Sidco is not viable within the meaning of the fraudulent joinder standard discussed above, *see supra* Paragraph 9, because Sidco was not a **supplier** of Roundup®-branded herbicides – *i.e.*, Sidco did not sell or otherwise place the allegedly defective product in the stream of commerce.  Thus, Plaintiff's claim against Sidco lacks an essential element of a strict liability claim under New Mexico law.  *See, e.g.*, *Livingston v. Begay*, 652 P.2d 734, 738-39 (N.M. 1982) (holding that strict liability for allegedly defective heater could not be extended to defendants that did not sell the heater, were not in the "chain of distribution," and did not place the heater in the "stream of commerce"); *Arenivas v. Cont'l Oil Co.*, 692 P.2d 31, 33-34 (N.M. Ct. App. 1983) (holding that strict liability for allegedly defective oil pumping unit did not apply to defendant that did not sell or lease the unit or place it into the stream of commerce); *Snelling v. Tribal Vapors*, No. Civ 19-0686 JB/GJF, 2021 WL 1227836, at *29 (D.N.M. Mar. 31, 2021) ("[A] party who does not sell or otherwise place an allegedly defective product in the stream of commerce may not be strictly liable for any alleged harm the product caused, and, thus, may not be jointly and severally liable for harm the product causes under New Mexico's strict products liability law." (citing *Livingston*, 652 P.2d at 739)).

16.     The record is now clear that Sidco was merely an end-user of Roundup®-branded herbicides on its properties, *see* First Am. Compl. ¶ 56 ("In the course of her work for Sidco, Plaintiff was exposed to significant levels of Roundup.") (included in Exhibit 1); Plaintiff Fact Sheet at 10 (alleging that Plaintiff's exposure to Roundup®-branded herbicides occurred on "family farms" when her "father and brother sprayed weeds with Roundup within a few feet of

where [Plaintiff] was working") (Exhibit 2), and Plaintiff does not allege that Sidco sold Roundup®-branded herbicides or otherwise placed them in the stream of commerce. Thus, Plaintiff does not have a viable strict liability claim against Sidco. *See supra* Paragraph 15.

17.     For the foregoing reasons, the Court should conclude that Plaintiff fraudulently joined Sidco and, therefore, should disregard the citizenship of that defendant when assessing whether this lawsuit has been properly removed.

$$* \qquad * \qquad * \qquad *$$

18.     The First Amended Complaint seeks compensatory and punitive damages based on allegations that Monsanto's Roundup®-branded herbicides caused Plaintiff to develop cancer (NHL). Therefore, it is plausible from the face of that pleading hat Plaintiff seeks damages in excess of $75,000, exclusive of interest and costs, which satisfies the jurisdictional amount-in-controversy requirement. 28 U.S.C. § 1332(a); *see Dart Cherokee Basin Operating Co. v. Owens*, 574 U.S. 81, 89 (2014) ("[A] defendant's notice of removal need include only a plausible allegation that the amount in controversy exceeds the jurisdictional threshold."); *see also Ross v. First Family Fin. Servs., Inc.*, No. 2:01CV218-P-B, 2002 WL 31059582, at *8 (N.D. Miss. Aug. 29, 2002) ("[U]nspecified claims for punitive damage sufficiently serve to bring the amount in controversy over the requisite jurisdictional threshold set out in 28 U.S.C. § 1332."). In fact, other lawsuits seeking damages for NHL allegedly caused by Roundup®-branded herbicides have been filed against Monsanto in various federal courts asserting jurisdiction under Section 1332(a) and alleging damages in excess of $75,000, exclusive of interest and costs.

19.     Thus, this Court has original subject matter jurisdiction over Plaintiff's claims based on Section 1332(a) because there is complete diversity of citizenship between Plaintiff and

Monsanto (disregarding the citizenship of the fraudulently joined defendant Sidco) and because the amount in controversy exceeds $75,000, exclusive of interest and costs.

**II. Procedural Requirements For Removal Are Satisfied.**

20.     The First Judicial District Court for the County of Santa Fe, New Mexico is located within the District of New Mexico.   Therefore, removal to this Court satisfies the venue requirements of 28 U.S.C. § 1446(a).

21.     This Notice of Removal is timely.  When the State Court Action was commenced, the "case stated by the initial pleading [was] not removable," 28 U.S.C. § 1446(b)(3), because the Complaint included claims against two New Mexico defendants.  Thus, based on the face of the Complaint, this lawsuit was not removable due to lack of diversity of citizenship and due to the forum defendant rule, 28 U.S.C. § 1441(b)(2).  The First Amended Complaint, which was filed on September 13, 2021, was the "amended pleading . . . from which it may first be ascertained that [this] case is one which is or has become removable."  § 1446(b)(3).  This Notice of Removal is timely under Section 1446(b)(3) because Monsanto is filing the Notice of Removal within 30 days of September 13, 2021.

22.     Consent to removal is not required from Sidco because it has not been "properly joined," 28 U.S.C. § 1446(b)(2)(A).

23.     Although this removal notice is being filed more than one year after the State Court Action was commenced, this removal is not barred by the one-year limitation on removals addressed in 28 U.S.C. § 1446(c)(1) because Plaintiff "has acted in bad faith in order to prevent a defendant [*i.e.*, Monsanto] from removing the action," § 1446(c)(1).  As this Court has stated when construing the Section 1446(c)(1) bad-faith exception, "defendants may remove a case on fraudulent joinder grounds even after it has been pending in state court for more than one year."

*Aguayo*, 59 F. Supp. 3d at 1256.  This "Court interprets the bad-faith exception to apply to plaintiffs who keep a removal-spoiling party in the case past the one-year mark for the purpose of defeating removal." *Id*. at 1263.  To determine whether the bad-faith exception applies, "the Court looks to whether the plaintiff actively litigated against the removal-spoiling defendant in state court: asserting valid claims, taking discovery, negotiating settlement, seeking default judgments if the defendant does not answer the complaint, et cetera." *Id*.; *see e.g.*, *Massey v. 21st Century Centennial Ins. Co.*, No. 2:17-cv-01922, 2017 WL 3261419, at *4-6 (S.D. W. Va. July 31, 2017) (relying on *Aguayo*, making Section 1446(c)(1) bad-faith finding, and denying remand motion because, *inter alia*, plaintiff did not actively litigate her case against removal-spoiling defendant in state court); *Forth v. Diversey Corp.*, No 13-CV-808-A, 2013 WL 6096528, at *3 (W.D.N.Y. Nov. 20, 2013) (making Section 1446(c)(1) bad-faith finding and denying remand motion because, *inter alia*, plaintiffs did not obtain any discovery from removal-spoiling defendant in state court).

24.    Based on the standards discussed in the preceding paragraph and the record in this case, the Court should conclude that Plaintiff has acted in bad faith to prevent Monsanto from removing this lawsuit by keeping Sidco – the removal-spoiling defendant – in this case past the one-year mark without actively litigating against Sidco and fraudulently joining that defendant. As discussed above, Plaintiff's First Amended Complaint asserts only one claim against Sidco ("strict products liability"), but that claim clearly is not valid as a matter of New Mexico law.  *See supra* Paragraphs 15-16.  A comparison of the change in allegations regarding Plaintiff's exposure to Roundup®-branded herbicides in the initial Complaint and the First Amended Complaint further reinforces the conclusion that Plaintiff has acted in bad faith to prevent removal by initially making false allegations against Sidco that were not corrected until after the Section 1446(c)(1) one-year

removal deadline.[1]  Plaintiff also has taken no action to prosecute this lawsuit against Sidco.  She

did not seek a default judgment, even though the State Court Action had been filed more than 20

months before – and Sidco had entered its appearance more than 18 months before – Sidco filed a

response to the Complaint.[2]  Plaintiff also has not issued any written discovery requests to Sidco

and has not issued any notices to take depositions of Sidco (or its employees).

25.     Although Section 1446(c)(1) does not require Monsanto to establish a motive for

Plaintiff's bad faith conduct, Plaintiff disclosed information in the Plaintiff Fact Sheet that explains

why she consistently has failed to engage in active litigation as to Sidco – her exposure to

Roundup®-branded herbicides allegedly occurred on "family farms" when her "father and brother

sprayed weeds with Roundup within a few feet of where [Plaintiff] was working."  Plaintiff Fact

---

[1] Plaintiff initially made the following allegations regarding her use of and exposure to Roundup®-branded herbicides: "Sidco Corporation hired [Plaintiff] as a Farm Hand in Las Cruces, New Mexico.  As a Farm Hand, [Plaintiff] was exposed to Roundup at significant levels. Part of [Plaintiff's] duties included carrying a 5-gallon backpack of Roundup and spraying the poison with a hand sprayer.  On other properties, [Plaintiff] would drive a tractor with a 20-gallon sprayer attached to the end. . . .  For six years, [Plaintiff] performed these duties with little to no protective equipment."  Compl. ¶¶ 92-94 (included in Exhibit 1).  However, those allegations are not in the First Amended Complaint.  Instead, Plaintiff now alleges mere bystander exposure: "As a girl and young woman, Plaintiff worked for Sidco.  In the course of her work for Sidco, Plaintiff was exposed to significant levels of Roundup."  First Am. Compl.  ¶ 56 (included in Exhibit 1); *see* Plaintiff Fact Sheet at 10 (alleging bystander exposure to Roundup®-branded herbicides) (Exhibit 2).

[2] The State Court Action was commenced when Plaintiff filed the Complaint on January 24, 2020.  State Court Action Docket Sheet (included in Exhibit 1).  After the Summons and Complaint were served on Sidco, Sidco entered its appearance on March 10, 2020.  *Id.*  However, more than 18 months passed before Sidco filed a response to the Complaint – on September 27, 2021.  *Id.* According to the docket sheet, Plaintiff did not file a motion for a default judgment in response to Sidco's extraordinarily lengthy delay in filing a response to the Complaint.  *Id.*  In addition, although Plaintiff's First Amended Complaint was filed on September 13, 2021, Sidco subsequently filed – for reasons that are unclear – a response to the initial Complaint, *see* Defendant Sidco Corporation's Response to Original Complaint (included in Exhibit 1), and has not filed a response to the First Amended Complaint, *see* State Court Action Docket Sheet.

Sheet at 10 (Exhibit 2).  In other words, Sidco is Plaintiff's family business.[3]  Thus, by joining Sidco as a defendant and keeping Sidco in this lawsuit, Plaintiff is, in effect, suing her own family. However, by limiting her claim to the single, non-viable count of strict liability, Plaintiff has made certain that Sidco cannot be held liable in this case.

26.     In sum, Plaintiff has acted in bad faith within the meaning of Section 1446(c)(1) by keeping Sidco in the State Court Action as a defendant past the one-year deadline for the purpose of preventing Monsanto from removing this case to federal court – and Plaintiff has not actively litigated against Sidco because she does not intend to seek to recover a judgment against her family's business.

27.     The written notice required by 28 U.S.C. § 1446(d) will be promptly filed in the First Judicial District Court for the County of Santa Fe, New Mexico and will be promptly served on Plaintiff.

28.     Monsanto does not waive any defenses and expressly reserves its right to raise any and all defenses in subsequent proceedings.

29.     If any question arises as to the propriety of this removal, Monsanto requests the opportunity to present written and oral argument in support of removal.

---

[3] Plaintiff's father's name was Laurel Lindbeck, Plaintiff Fact Sheet at 4 (Exhibit 2) and Plaintiff has used "Lindbeck" as a last name, *id*. at 1, presumably as her maiden name.  One of Plaintiff's brothers is named Lloyd Lindbeck and Plaintiff's mother is named Marinell Lindbeck.  Obituary of Lyonel Lindbeck, (attached as Exhibit 3), https://www.legacy.com/us/obituaries/lcsun-news/name/lt-col-lyonel-lindbeck-obituary?pid=114373205 (last visited Oct. 13, 2021).  According to publicly available records from the New Mexico Secretary of State (attached as Exhibit 4), Lloyd Lindbeck is the President and Director of Sidco.  Sidco's Articles of Incorporation (attached as Exhibit 5) show that Sidco was incorporated in 1974 by Plaintiff's father (Laurel Lindbeck) and mother (Marinell Lindbeck).

## CONCLUSION

30.     For the foregoing reasons, Monsanto removes this lawsuit to this Court pursuant to

28 U.S.C. §§ 1332, 1441, and 1446 (and any other applicable laws).


Dated: October 13, 2021

                                        Respectfully submitted,

                                        MODRALL, SPERLING, ROEHL, HARRIS
                                            & SISK, P.A.

                                        By:  /s/ Alex Walker
                                            Alex C. Walker
                                            Post Office Box 2168
                                            Albuquerque, NM 87103-2168
                                            Telephone: (505) 848-1800
                                            Facsimile: (505) 848-9710
                                            awalker@modrall.com

                                        *Attorneys for Defendant Monsanto Company*


WE HEREBY CERTIFY that on the
13th day of July, 2021, we filed the
foregoing electronically through the
CM/ECF system and served the
following counsel via electronic mail:

    Anthony K. Bruster
    Christopher Johnson
    John C. Hull
    BRUSTER PLLC
    680 N. Carroll Ave., Suite 110
    Southlake, TX 76092
    Telephone: (817) 601-9564
    akbruster@brusterpllc.com
    cjohnson@brusterpllc.com
    jhull@brusterpllc.com

Darren P. McDowell
Matthew R. McCarley
Danae N. Benton
FEARS NACHAWATI LAW FIRM
5473 Blair Road
Dallas, TX 75231
Telephone: (214) 890-0711
dmcdowell@fnlawfirm.com
mccarley@fnlawfirm.com
dbenton@fnlawfirm.com

Feliz A. Rael
THE LAW OFFICE OF FELIZ A. RAEL
505 Marquette NW, Ste. 1300
Albuquerque, NM 87102
Telephone: (505) 610-5991
frael@swcp.com

*Attorneys for Plaintiff*

Kenneth L. Beal
KENNETH L. BEAL, P.C.
P.O. Box 725
Las Cruces, NM 88004
Telephone: (575) 526-5511
klbealoffice@gmail.com

*Attorney for Defendant SIDCO Corporation*

MODRALL, SPERLING, ROEHL, HARRIS
    & SISK, P.A.

By: */s/ Alex Walker*
    Alex C. Walker

*W4186973.DOCX*

13

https://securecourtcaseaccess.nmcourts.gov/CaseDetail.aspx?CaseID=8225215

Skip to Main Content  Logout  My Account  Search Menu  Search Refine Search  Back                    Location : All Courts    Images

# REGISTER OF ACTIONS
### CASE No. D-101-CV-2020-00180

| | | |
|---|---|---|
| **Marita Renteria v. Monsanto Company, et. al.** | § § § § § § § | Case Type: **Tort Malpractice, Product Liability** |
| | | Date Filed: **01/17/2020** |
| | | Location: |
| | | Judicial Officer: **Ellenwood, Kathleen McGarry** |

---

### RELATED CASE INFORMATION

**Related Cases**
    D-132-CV-2003-00042 (See For Background)
    D-202-CV-2019-03137 (See For Background)
    D-202-CV-2019-05076 (See For Background)
    D-307-CV-2020-00022 (See For Background)

---

### PARTY INFORMATION

|  |  | **Attorneys** |
|---|---|---|
| **Defendant** | **Monsanto Company** | **Alex Cameron Walker** |
| | | *Retained* |
| | | 505-848-1800(W) |
| | C/O Corp. Service Co. | |
| | 123 East Marcy Street, Suite 101 | ~~Alex Cameron Walker~~ |
| | Santa Fe, NM 87501 | *~~Retained~~* |
| | | ~~505-848-1800(W)~~ |
| | | |
| | | Bayard Roberts, IV |
| | | *Retained* |
| | | 505-848-1800(W) |
| | | |
| | | ~~Timothy C. Holm~~ |
| | | *~~Retained~~* |
| | | ~~505-848-1800(W)~~ |
| | | |
| **Defendant** | **Sidco Corporation** | **Kenneth L. Beal** |
| | C/O Lloyd Lindbeck | *Retained* |
| | 2725 Terrance Arc | 575-526-5511(W) |
| | Las Cruces, NM 88011 | |
| | | |
| **Plaintiff** | **Renteria, Marita** | **Danae N. Benton** |
| | | *Retained* |
| | | 214-890-0711(W) |
| | | |
| | | Anthony K. Bruster |
| | | *Retained* |
| | | 817-601-9564(W) |
| | | |
| | | ~~Darren Patrick McDowell~~ |
| | | *~~Retained~~* |
| | | ~~214-276-7600(W)~~ |
| | | |
| | | Feliz Angelica Rael |
| | | *Retained* |
| | | 505-610-5991(W) |

---

### EVENTS & ORDERS OF THE COURT

| | **DISPOSITIONS** |
|---|---|
| 05/05/2020 | **Dismiss/Decided By Dispositive Motion/Dismiss by Judge/Party** (Judicial Officer: Wilson, Matthew Justin) |
| | Comment (Stipulation of Dismissal Without Prejudice of All Claims Against Defendant AGCO Corporation) |

| **OTHER EVENTS AND HEARINGS** |

EXHIBIT 1

| Date | Type | Description |
|---|---|---|
| 01/17/2020 | **Cause Of Actions** | Product Liability (Count I: Strict Liability; Design Defect) |
| | Action Type | Action |
| 01/17/2020 | **Cause Of Actions** | Product Liability (Count IV: Negligence) |
| | Action Type | Action |
| 01/17/2020 | **Cause Of Actions** | Product Liability (Count II: Strict Liability; Failure to Warn) |
| | Action Type | Action |
| 01/17/2020 | **Cause Of Actions** | Product Liability (Count III: Negligence; Failure to Warn) |
| | Action Type | Action |
| 01/17/2020 | **Cause Of Actions** | Product Liability (Count V: Breach of Express Warranty) |
| | Action Type | Action |
| 01/17/2020 | **Cause Of Actions** | Product Liability (Count VI: Breach of Implied Warranty of Merchantability) |
| | Action Type | Action |
| 01/17/2020 | **Cause Of Actions** | Trade Practices Act (Count VII: Unfair and Deceptive Trade Practices) |
| | Action Type | Action |
| 01/17/2020 | **Cause Of Actions** | Misrepresentation, Fraud (Count VIII: Fraud) |
| | Action Type | Action |
| 01/17/2020 | **OPN: COMPLAINT** | |
| | *Plaintiff's Original Complaint* | |
| 01/17/2020 | **JURY DEMAND 6 PERSON** | |
| | *Jury Demand* | |
| 01/24/2020 | **Summons** | |
| | AGCO Corporation | Unserved |
| 01/24/2020 | **Summons** | |
| | Monsanto Company | Unserved |
| 01/24/2020 | **Summons** | |
| | Sidco Corporation | Unserved |
| 03/02/2020 | **RETURN OF SERVICE** | |
| | *Certificate of Serice of Process by Mail or Commercial Carrier - AGCO* | |
| 03/02/2020 | **RETURN OF SERVICE** | |
| | *Certificate of Service of Process by Mail or Commercial Carrier - Monsanto* | |
| 03/02/2020 | **RETURN OF SERVICE** | |
| | *Certificate of Service of Process by Mail or Commerical Carrier - SIDCO* | |
| 03/10/2020 | **ENTRY OF APPEARANCE** | |
| | *Entry of Appearance* | |
| 03/23/2020 | **AFFIDAVIT** | |
| | *Affidavit of Non Admitted Lawyer - McDowell* | |
| 03/23/2020 | **AFFIDAVIT** | |
| | *Affidavit of Non Admitted Lawyer - Przybysz* | |
| 04/08/2020 | **ANSWER** | |
| | *Monsanto Company's Answer to Plaintiff's Complaint* | |
| 04/08/2020 | **Jury Additional 6 / Total 12 (EF) $150** | |
| | *Jury Demand* | |
| 05/05/2020 | **Dismissal of Party, Not of Case** | |
| | *Stipulation of Dismissal Without Prejudice of All Claims Against Defendant AGCO Corporation* | |
| 07/15/2020 | **JDG: NOTICE OF JUDGE ASSIGNMENT** (Judicial Officer: Ellenwood, Kathleen McGarry ) | |

*Effective July 15, 2020, a mass reassignment of cases will occur pursuant to NMSC Rule 23-109, the Chief Judge Rule. Judge Kathleen McGarry Ellenwood, Division X of the First Judicial District Court will maintain a docket consisting of Civil Cases and State Habeas cases, both civil and criminal. Since this is a newly created position, the civil docket will be created with a percentage of cases from the civil cases pending in Divisions I, II, VI and IX. Pursuant to Supreme Court Order No. 20-8500-025, "In the Matter of the Safe and Effective Administration of the New Mexico Judiciary During the Covid-19 Public Health Emergency," Emergency Court Protocol No. 3 (E), "the temporary suspension of the exercise of peremptory excusals shall remain in place," therefore no peremptory excusal of Judge McGarry Ellenwood will take place. Notice by Bar Bulletin Posting-- No Pleading Required.*

| Date | Type | Description |
|---|---|---|
| 07/31/2020 | **WITHDRAWAL/ ENTRY/ SUBSTITUTION OF COUNSEL** | |
| | *Notice of Withdrawl and Substitution of Counsel Enter Alex Walker* | |
| 08/13/2020 | **REQUEST FOR HEARING/ SETTING** | |
| | *Request for Scheduling Conference* | |
| 08/13/2020 | **NTC: HEARING (SCHEDULING CONFERENCE)** | |
| | *Notice of Hearing Matter: Scheduling Conference September 8, 2020 at 11:15 am* | |
| 08/20/2020 | **NTC: OF FILING** | |
| | *Notice of Filing Affidavit of Non-Admitted Lawyer (Brett S. Covington)* | |
| 09/04/2020 | **MTN: TO VACATE** | |
| | *Joint Motion to Vacate Scheduling Conference* | |
| 09/04/2020 | **ORD: VACATING HEARING** | |
| | *Order Granting Joint Moint to Vacate Scheduling Conference* | |
| 09/08/2020 | *CANCELED* **SCHEDULING CONFERENCE** (11:15 AM) (Judicial Officer Ellenwood, Kathleen McGarry) | |
| | *Stipulated to Cancel* | |
| 01/15/2021 | **ENTRY OF APPEARANCE** | |
| | *Noitce of Appearance* | |
| 06/14/2021 | **ORD: ORDER** | |
| | *Confidentiality and Protective Order* | |
| 06/14/2021 | **ORD: STIPULATED** | |
| | *Joint Stipulation and Order Governing Protocol For Discovery Of Electronically Stored Information* | |
| 06/14/2021 | **ORD: ORDER** | |
| | *Order Governing Privilege Logs* | |
| 06/14/2021 | **NTC: HEARING (SCHEDULING CONFERENCE)** | |
| | *Notice Of Rule 16 Scheduling Conference; Hearing is set for Monday, August 30, 2021 at 8:30 a.m.* | |
| 06/23/2021 | **AFFIDAVIT** | |
| | *Affidavit of Non-Admitted Lawyer* | |
| 06/23/2021 | **ENTRY OF APPEARANCE** | |
| | *Entry of Appearance* | |
| 08/30/2021 | **SCHEDULING CONFERENCE** (8:30 AM) (Judicial Officer Ellenwood, Kathleen McGarry) | |
| | Parties Present | |

EXHIBIT 1

| | Result: Held | | | |
|---|---|---|---|---|
| 09/13/2021 | **AMENDED COMPLAINT** | | | |
| | *Plaintiff's First Amended Complaint* | | | |
| 09/14/2021 | **Cause Of Actions** | Product Liability (Count 1- Strict Products Liability(Claim for Relief from Monsanto)) | | |
| | Action Type | Action | | |
| 09/14/2021 | **Cause Of Actions** | Product Liability (Count 2 - Strict Products Liability (Claim For Relief from Sidco)) | | |
| | Action Type | Action | | |
| 09/14/2021 | **Cause Of Actions** | Other (Count 3 - Negligence (Claim for Relief from Monsanto)) | | |
| | Action Type | Action | | |
| 09/14/2021 | **Cause Of Actions** | Breach of Warranty (Count 4 - Breach of Warranty (Claim for Relief from Monsanto)) | | |
| | Action Type | Action | | |
| 09/20/2021 | **CERTIFICATE OF SERVICE** | | | |
| | *Certificate of Service* | | | |
| 09/20/2021 | **CERTIFICATE OF SERVICE** | | | |
| | *Certificate of Service* | | | |
| 09/21/2021 | **ORD: SCHEDULING/PRETRIAL ORDER** | | | |
| | *Rule 1-016(B) Scheduling Order Jury* | | | |
| 09/23/2021 | **WITHDRAWAL/ ENTRY/ SUBSTITUTION OF COUNSEL** | | | |
| | *Entry of Appearance* | | | |
| 09/27/2021 | **ANSWER** | | | |
| | *Monsato Companys Answer to Plaintiffs First Amended Complaint* | | | |
| 09/27/2021 | **RESPONSE** | | | |
| | *Defendant SIDCO Corporation's Response to Original Complaint* | | | |
| 01/11/2022 | **STATUS CONFERENCE** (8:30 AM) (Judicial Officer Ellenwood, Kathleen McGarry) | | | |
| 04/24/2023 | **PRE-TRIAL CONFERENCE** (8:00 AM) (Judicial Officer Ellenwood, Kathleen McGarry) | | | |
| 05/24/2023 | **JURY SELECTION HEARING** (8:30 AM) (Judicial Officer Ellenwood, Kathleen McGarry) | | | |

---

**FINANCIAL INFORMATION**

| | **Defendant** Monsanto Company | | | |
|---|---|---|---|---|
| | Total Financial Assessment | | | 150.00 |
| | Total Payments and Credits | | | 150.00 |
| | **Balance Due as of 10/13/2021** | | | **0.00** |
| 04/08/2020 | Transaction Assessment | | | 150.00 |
| 04/08/2020 | File & Serve Payment | Receipt # SFED-2020-2857 | Monsanto Company | (150.00) |

| | **Plaintiff** Renteria, Marita | | | |
|---|---|---|---|---|
| | Total Financial Assessment | | | 282.00 |
| | Total Payments and Credits | | | 282.00 |
| | **Balance Due as of 10/13/2021** | | | **0.00** |
| 01/23/2020 | Transaction Assessment | | | 282.00 |
| 01/23/2020 | File & Serve Payment | Receipt # SFED-2020-636 | Renteria, Marita | (282.00) |

EXHIBIT 1

FILED  1st JUDICIAL DISTRICT COURT
Santa Fe County
1/17/2020 1:48 PM
KATHLEEN VIGIL CLERK OF THE COURT
Leticia Cunningham

**STATE OF NEW MEXICO**
**COUNTY OF SANTA FE**
**FIRST JUDICIAL DISTRICT**

**MARITA RENTERIA**
    **Plaintiff,**

v.                                                      **Cause No.**   D-101-CV-2020-00180

**MONSANTO COMPANY; SIDCO**                **JURY TRIAL DEMANDED**
**CORPORATION; AGCO CORPORATION**
**Defendant.**

## ORIGINAL COMPLAINT

COMES NOW Plaintiff MARITA RENTERIA and hereby brings this action against

Defendants Monsanto Company, Sidco Corporation, and AGCO Corporation, and would show the

Court as follows:

## INTRODUCTION

Plaintiff brings this cause of action against Defendants for injuries sustained as a result of

using Defendant Monsanto Company's ("Monsanto") unreasonably dangerous and defective

product, Roundup®. More specifically, Plaintiff's claims involve Defendant's negligent, willful,

and wrongful conduct in connection with the design, development, manufacture, testing,

packaging, promoting, marketing, distribution, and/or sale of Roundup® and/or other Monsanto

glyphosate-containing products ("Roundup" or "Roundup®"). As a direct and proximate result of

her exposure to Roundup® and its reactive ingredient, glyphosate, Plaintiff developed non-

Hodgkin's Lymphoma.

## THE PARTIES, JURISDICTION, AND VENUE

### Plaintiff

1.     Plaintiff Marita Renteria is a resident of Las Cruces, New Mexico. Ms. Renteria

was exposed to Roundup employed as a Farm Hand with Sidco Corporation and was subsequently

1

EXHIBIT 1

diagnosed with non-Hodgkin's Lymphoma in 1995.

## Defendants

2.      Upon information and belief, Defendant, Monsanto Company ("Monsanto") is a multinational agricultural biotechnology corporation based in St. Louis, Missouri, and incorporated in Delaware. Monstanto may be served with process via its registered agent, Corporation Service Company, 123 East Marcy Street, Suite 101, Santa Fe, New Mexico 87501.

3.      Defendant Sidco Corporation is incorporated in New Mexico and maintains its principle place of business in New Mexico. It may be served with process via its registered agent, Lloyd Lindbeck at 2725 Terrance Arc, Las Cruces, New Mexico 88011.

4.      Defendant AGCO Corporation is incorporated in the Delaware and maintains its principle place of business in Santa Fe, New Mexico. It may be served with process via its registered agent Corporation Service Company at 123 East Marcy Street, Suite 101, Santa Fe, New Mexico 87501.

5.      Each defendant either maintains a principle place of business within the State of New Mexico or maintains sufficient contacts with the State of Iowa such that this Court's exercise of personal jurisdiction over it does not offend traditional notions of fair play and substantial justice.

6.      Venue is proper within this County because the events giving rise to this action happened in or are closely related to this County.

## NATURE OF THE ACTION

7.      In 1970, Defendant Monsanto Company discovered the herbicidal properties of glyphosate and began marketing it in products in 1974 under the brand name Roundup®. Roundup® is a non-selective herbicide used to kill weeds that commonly compete with the

EXHIBIT 1

growing of crops. By 2001, glyphosate had become the most-used active ingredient in American agriculture with 85–90 millions of pounds used annually. That number grew to 185 million pounds by 2007. As of 2013, glyphosate was the world's most widely used herbicide.

8.    Monsanto is a multinational agricultural biotechnology corporation based in St. Louis, Missouri. It is the world's leading producer of glyphosate. As of 2009, Monsanto was the world's leading producer of seeds, accounting for 27% of the world seed market. The majority of these seeds are of the Roundup Ready® brand. The stated advantage of Roundup Ready® crops is that they substantially improve a farmer's ability to control weeds, since glyphosate can be sprayed in the fields during the growing season without harming their crops. In 2010, an estimated 70% of corn and cotton, and 90% of soybean fields in the United States were Roundup Ready®.

9.    Monsanto's glyphosate products are registered in 130 countries and approved for use on over 100 different crops. They are ubiquitous in the environment. Numerous studies confirm that glyphosate is found in rivers, streams, and groundwater in agricultural areas where Roundup® is used. It has been found in food, in the urine of agricultural workers, and even in the urine of urban dwellers who are not in direct contact with glyphosate.

10.    On March 20, 2015, the International Agency for Research on Cancer ("IARC"), an agency of the World Health Organization ("WHO"), issued an evaluation of several herbicides, including glyphosate. That evaluation was based, in part, on studies of exposures to glyphosate in several countries around the world, and it traces the health implications from exposure to glyphosate since 2001.

11.    On July 29, 2015, IARC issued the formal monograph relating to glyphosate. In that monograph, the IARC Working Group provides a thorough review of the numerous studies and data relating to glyphosate exposure in humans.

EXHIBIT 1

12.     The IARC Working Group classified glyphosate as a Group 2A herbicide, which means that it is probably carcinogenic to humans. The IARC Working Group concluded that the cancers most associated with glyphosate exposure are non-Hodgkin lymphoma and other hematopoietic cancers, including lymphocytic lymphoma/chronic lymphocytic leukemia, B-cell lymphoma, and multiple myeloma.

13.     The IARC evaluation is significant. It confirms that glyphosate is toxic to humans.

14.     Nevertheless, Monsanto, since it began selling Roundup®, has represented it as safe to humans and the environment. Indeed, Monsanto has repeatedly proclaimed and continues to proclaim to the world, and particularly to United States consumers, that glyphosate-based herbicides, including Roundup®, create no unreasonable risks to human health or to the environment.

**FACTS**

17.     At all times relevant to this complaint, Monsanto was the entity that discovered the herbicidal properties of glyphosate and the manufacturer of Roundup®, which contains the active ingredient glyphosate and the surfactant POEA, as well as adjuvants and other "inert" ingredients. Glyphosate is a broad spectrum, non-selective herbicide used in a wide variety of herbicidal products around the world.

18.     Glyphosate is a broad-spectrum, non-selective herbicide used in a wide variety of herbicidal products around the world.

19.     Plants treated with glyphosate translocate the systemic herbicide to their roots, shoot regions and fruit, where it interferes with the plant's ability to form aromatic amino acids necessary for protein synthesis. Treated plants generally die within two to three days. Because plants absorb glyphosate, it cannot be completely removed by washing or peeling produce or by

4

EXHIBIT 1

milling, baking, or brewing grains.

20.     For nearly 40 years, farms across the world have used Roundup® without knowing of the dangers its use poses. That is because when Monsanto first introduced Roundup®, it touted glyphosate as a technological breakthrough: it could kill almost every weed without causing harm either to people or to the environment. Of course, history has shown that not to be true. According to the WHO, the main chemical ingredient of Roundup®—glyphosate—is a probable cause of cancer. Those most at risk are farm workers and other individuals with workplace exposure to Roundup®, such as workers in garden centers, nurseries, and landscapers. Agricultural workers are, once again, victims of corporate greed. Monsanto assured the public that Roundup® was harmless. In order to prove this, Monsanto championed falsified data and attacked legitimate studies that revealed its dangers. Monsanto led a prolonged campaign of misinformation to convince government agencies, farmers, and the general population that Roundup® was safe.

### The Discovery of Glyphosate and Development of Roundup®

20.     The herbicidal properties of glyphosate were discovered in 1970 by Monsanto chemist John Franz. The first glyphosate-based herbicide was introduced to the market in the mid-1970s under the brand name Roundup®. From the outset, Monsanto marketed Roundup® as a "safe" general-purpose herbicide for widespread commercial and consumer use; Monsanto still markets Roundup® as safe today.

### Registration of Herbicides under Federal Law

21.     The manufacture, formulation and distribution of herbicides, such as Roundup®, are regulated under the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA" or "Act"), 7 U.S.C. § 136 et seq. FIFRA requires that all pesticides be registered with the Environmental Protection Agency ("EPA" or "Agency") prior to their distribution, sale, or use, except as

EXHIBIT 1

described by the Act. 7 U.S.C. § 136a(a).

22.     Because pesticides are toxic to plants, animals, and humans, at least to some degree, the EPA requires as part of the registration process, among other things, a variety of tests to evaluate the potential for exposure to pesticides, toxicity to people and other potential non-target organisms, and other adverse effects on the environment. Registration by the EPA, however, is not an assurance or finding of safety. The determination the Agency must make in registering or re-registering a product is not that the product is "safe," but rather that use of the product in accordance with its label directions "will not generally cause unreasonable adverse effects on the environment." 7 U.S.C. § 136a(c)(5)(D).

23.     FIFRA defines "unreasonable adverse effects on the environment" to mean "any unreasonable risk to man or the environment, taking into account the economic, social, and environmental costs and benefits of the use of any pesticide." 7 U.S.C. § 136(bb). FIFRA thus requires EPA to make a risk/benefit analysis in determining whether a registration should be granted or allowed to continue to be sold in commerce.

24.     The EPA registered Roundup® for distribution, sale, and manufacture in the United States and, specifically, the State of Missouri.

25.     FIFRA generally requires that the registrant, Monsanto in the case of Roundup®, conducts the health and safety testing of pesticide products. The EPA has protocols governing the conduct of tests required for registration and the laboratory practices that must be followed in conducting these tests. The data produced by the registrant must be submitted to the EPA for review and evaluation. The government is not required, nor is it able, however, to perform the product tests that are required of the manufacturer.

26.     The evaluation of each pesticide product distributed, sold, or manufactured is

EXHIBIT 1

completed at the time the product is initially registered. The data necessary for registration of a pesticide has changed over time. The EPA is now in the process of re-evaluating all pesticide products through a Congressionally-mandated process called "re-registration." 7 U.S.C. § 136a-1. In order to reevaluate these pesticides, the EPA is demanding the completion of additional tests and the submission of data for the EPA's review and evaluation.

27.     In the case of glyphosate, and therefore Roundup®, the EPA had planned on releasing its preliminary risk assessment —in relation to the re-registration process—no later than July 2015. The EPA completed its review of glyphosate in early 2015, but it delayed releasing the risk assessment pending further review in light of the WHO's health-related findings.

### *Scientific Fraud Underlying the Marketing and Sale of Glyphosate/Roundup*

28.     Based on early studies that glyphosate could cause cancer in laboratory animals, the EPA originally classified glyphosate as possibly carcinogenic to humans (Group C) in 1985. After pressure from Monsanto, including contrary studies it provided to the EPA, the EPA changed its classification to evidence of non-carcinogenicity in humans (Group E) in 1991. In so classifying glyphosate, however, the EPA made clear that the designation did not mean the chemical does not cause cancer: "It should be emphasized, however, that designation of an agent in Group E is based on the available evidence at the time of evaluation and should not be interpreted as a definitive conclusion that the agent will not be a carcinogen under any circumstances."

29.     On two occasions, the EPA found that the laboratories hired by Monsanto to test the toxicity of its Roundup® products for registration purposes committed fraud.

30.     In the first instance, Monsanto, in seeking initial registration of Roundup® by EPA, hired Industrial Bio-Test Laboratories ("IBT") to perform and evaluate pesticide toxicology studies relating to Roundup®. IBT performed about 30 tests on glyphosate and glyphosate-

EXHIBIT 1

containing products, including nine of the 15 residue studies needed to register Roundup®.

31.    In 1976, the United States Food and Drug Administration ("FDA") performed an inspection of Industrial Bio-Test Industries ("IBT") that revealed discrepancies between the raw data and the final report relating to the toxicological impacts of glyphosate. The EPA subsequently audited IBT; it too found the toxicology studies conducted for the Roundup® herbicide to be invalid. An EPA reviewer stated, after finding "routine falsification of data" at IBT, that it was "hard to believe the scientific integrity of the studies when they said they took specimens of the uterus from male rabbits."

32.    Three top executives of IBT were convicted of fraud in 1983.

33.    In the second incident of data falsification, Monsanto hired Craven Laboratories in 1991 to perform pesticide and herbicide studies, including for Roundup®. In that same year, the owner of Craven Laboratories and three of its employees were indicted, and later convicted, of fraudulent laboratory practices in the testing of pesticides and herbicides.

34.    Despite the falsity of the tests that underlie its registration, within a few years of its launch, Monsanto was marketing Roundup® in 115 countries.

### The Importance of Roundup® to Monsanto's Market Dominance Profits

35.    The success of Roundup® was key to Monsanto's continued reputation and dominance in the marketplace. Largely due to the success of Roundup® sales, Monsanto's agriculture division was out-performing its chemicals division's operating income, and that gap increased yearly. But with its patent for glyphosate expiring in the United States in the year 2000, Monsanto needed a strategy to maintain its Roundup® market dominance and to ward off impending competition.

36.    In response, Monsanto began the development and sale of genetically engineered

EXHIBIT 1

Roundup Ready® seeds in 1996. Since Roundup Ready® crops are resistant to glyphosate; farmers can spray Roundup® onto their fields during the growing season without harming the crop. This allowed Monsanto to expand its market for Roundup® even further; by 2000, Monsanto's biotechnology seeds were planted on more than 80 million acres worldwide and nearly 70% of American soybeans were planted from Roundup Ready® seeds. It also secured Monsanto's dominant share of the glyphosate/Roundup® market through a marketing strategy that coupled proprietary Roundup Ready® seeds with continued sales of its Roundup® herbicide.

37.    Through a three-pronged strategy of increased production, decreased prices, and by coupling with Roundup Ready® seeds, Roundup® became Monsanto's most profitable product. In 2000, Roundup® accounted for almost $2.8 billion in sales, outselling other herbicides by a margin of five to one, and accounting for close to half of Monsanto's revenue. Today, glyphosate remains one of the world's largest herbicides by sales volume.

### Monsanto has known for decades that it falsely advertises the safety of Roundup®

38.    In 1996, the New York Attorney General ("NYAG") filed a lawsuit against Monsanto based on its false and misleading advertising of Roundup ® products. Specifically, the lawsuit challenged Monsanto's general representations that its spray-on glyphosate-based herbicides, including Roundup®, were "safer than table salt" and "practically non-toxic" to mammals, birds, and fish. Among the representations the NYAG found deceptive and misleading about the human and environmental safety of Roundup® are the following:

      a)  Remember that environmentally friendly Roundup herbicide is biodegradable. It won't build up in the soil so you can use Roundup with confidence along customers' driveways, sidewalks and fences.

      b)  And remember that Roundup is biodegradable and won't build up in the

EXHIBIT 1

soil. That will give you the environmental confidence you need to use Roundup everywhere you've got a weed, brush, edging or trimming problem.

c) Roundup biodegrades into naturally occurring elements.

d) Remember that versatile Roundup herbicide stays where you put it. That means there's no washing or leaching to harm customers' shrubs or other desirable vegetation.

e) This non-residual herbicide will not wash or leach in the soil. It ... stays where you apply it.

f) You can apply Accord (another glyphosate-containing Monsanto herbicide) with "confidence because it will stay where you put it" it bonds tightly to soil particles, preventing leaching. Then, soon after application, soil microorganisms biodegrade Accord into natural products.

g) Glyphosate is less toxic to rats than table salt following acute oral ingestion.

h) Glyphosate's safety margin is much greater than required. It has over a 1,000-fold safety margin in food and over a 700-fold safety margin for workers who manufacture it or use it.

i) You can feel good about using herbicides by Monsanto. They carry a toxicity category rating of 'practically non-toxic' as it pertains to mammals, birds and fish.

j) "Roundup can be used where kids and pets will play and breaks down

<div align="center">10</div>

EXHIBIT 1

into natural material." This ad depicts a person with his head in the ground and a pet dog standing in an area which has been treated with Roundup.

39.      On November 19, 1996, Monsanto entered into an Assurance of Discontinuance with NYAG, in which Monsanto agreed, among other things, "to cease and desist from publishing or broadcasting any advertisements [in New York] that represent, directly or by implication" that:

   a)  its glyphosate-containing pesticide products or any component thereof are safe, non-toxic, harmless or free from risk.

   b)  its glyphosate-containing pesticide products or any component thereof manufactured, formulated, distributed or sold by Monsanto are biodegradable.

   c)  its glyphosate-containing pesticide products or any component thereof stay where they are applied under all circumstances and will not move through the environment by any means.

   d)  its glyphosate-containing pesticide products or any component thereof are "good" for the environment or are "known for their environmental characteristics."

   e)  glyphosate-containing pesticide products or any component thereof are safer or less toxic than common consumer products other than herbicides;

   f)  its glyphosate-containing products or any component thereof might be classified as "practically non-toxic."

40.      Monsanto did not alter its advertising in the same manner in any state other than

EXHIBIT 1

New York, and on information and belief still has not done so today.

41.   In 2009, France's highest court ruled that Monsanto had not told the truth about the safety of Roundup®. The French court affirmed an earlier judgement that Monsanto had falsely advertised its herbicide Roundup® as "biodegradable" and that it "left the soil clean."

### Classifications and Assessments of Glyphosate

42.   The IARC process for the classification of glyphosate followed the stringent procedures for the evaluation of a chemical agent. Over time, the IARC Monograph program has reviewed 980 agents. Of those reviewed, it has determined 116 agents to be Group 1 (Known Human Carcinogens); 73 agents to be Group 2A (Probable Human Carcinogens); 287 agents to be Group 2B (Possible Human Carcinogens); 503 agents to be Group 3 (Not Classified); and one agent to be Probably Not Carcinogenic.

43.   The established procedure for IARC Monograph evaluations is described in the IARC Programme's Preamble. Evaluations are performed by panels of international experts, selected on the basis of their expertise and the absence of actual or apparent conflicts of interest.

44.   One year before the Monograph meeting, the meeting is announced and there is a call both for data and for experts. Eight months before the Monograph meeting, the Working Group membership is selected and the sections of the Monograph are developed by the Working Group members. One month prior to the Monograph meeting, the call for data is closed and the various draft sections are distributed among Working Group members for review and comment. Finally, at the Monograph meeting, the Working Group finalizes review of all literature, evaluates the evidence in each category, and completes the overall evaluation. Within two weeks after the Monograph meeting, the summary of the Working Group findings is published in Lancet Oncology, and within a year after the meeting, the final Monograph is finalized and published.

EXHIBIT 1

45.    In assessing an agent, the IARC Working Group reviews the following information:

    a)  human, experimental, and mechanistic data;

    b)  all pertinent epidemiological studies and cancer bioassays; and

    c)  representative mechanistic data. The studies must be publicly available and have sufficient detail for meaningful review, and reviewers cannot be associated with the underlying study.

46.    In March 2015, IARC reassessed glyphosate. The summary published in The Lancet Oncology reported that glyphosate is a Group 2A agent and probably carcinogenic in humans.

47.    On July 29, 2015, IARC issued its Monograph for glyphosate, Monograph 112. For Volume 112, the volume that assessed glyphosate, a Working Group of 17 experts from 11 countries met at IARC from March 3–10, 2015, to assess the carcinogenicity of certain herbicides, including glyphosate. The March meeting culminated nearly a one-year review and preparation by the IARC Secretariat and the Working Group, including a comprehensive review of the latest available scientific evidence. According to published procedures, the Working Group considered "reports that have been published or accepted for publication in the openly available scientific literature" as well as "data from governmental reports that are publicly available."

48.    The studies considered the following exposure groups: occupational exposure of farmers and tree nursery workers in the United States, forestry workers in Canada and Finland, and municipal weed-control workers in the United Kingdom; and para-occupational exposure in farming families.

EXHIBIT 1

49.     Glyphosate was identified as the second-most used household herbicide in the United States for weed control between 2001 and 2007 and the most heavily used herbicide in the world in 2012.

50.     Exposure pathways are identified as air (especially during spraying), water, and food. Community exposure to glyphosate is widespread and found in soil, air, surface water, and groundwater, as well as in food.

51.     The assessment of the IARC Working Group identified several case control studies of occupational exposure in the United States, Canada, and Sweden. These studies show a human health concern from agricultural and other work-related exposure to glyphosate.

52.     The IARC Working Group found an increased risk between exposure to glyphosate and non-Hodgkin lymphoma ("NHL") and several subtypes of NHL, and the increased risk persisted after adjustment for other pesticides.

53.     The IARC Working Group also found that glyphosate caused DNA and chromosomal damage in human cells. One study in community residents reported increases in blood markers of chromosomal damage (micronuclei) after glyphosate formulations were sprayed.

54.     In male CD-1 mice, glyphosate induced a positive trend in the incidence of a rare tumor, renal tubule carcinoma. A second study reported a positive trend for haemangiosarcoma in male mice. Glyphosate increased pancreatic islet-cell adenoma in male rats in two studies. A glyphosate formulation promoted skin tumors in an initiation-promotion study in mice.

55.     The IARC Working Group also noted that glyphosate has been detected in the urine of agricultural workers, indicating absorption. Soil microbes degrade glyphosate to aminomethylphosphoric acid (AMPA). Blood AMPA detection after exposure suggests intestinal microbial metabolism in humans.

14

EXHIBIT 1

56.     The IARC Working Group further found that glyphosate and glyphosate formulations induced DNA and chromosomal damage in mammals, and in human and animal cells in utero.

57.     The IARC Working Group also noted genotoxic, hormonal, and enzymatic effects in mammals exposed to glyphosate. Essentially, glyphosate inhibits the biosynthesis of aromatic amino acids, which leads to several metabolic disturbances, including the inhibition of protein and secondary product biosynthesis and general metabolic disruption.

58.     The IARC Working Group also reviewed an Agricultural Health Study, consisting of a prospective cohort of 57,311 licensed pesticide applicators in Iowa and North Carolina. While this study differed from others in that it was based on a self-administered questionnaire, the results support an association between glyphosate exposure and Multiple Myeloma, Hairy Cell Leukemia (HCL), and Chronic Lymphocytic Leukemia (CLL), in addition to several other cancers.

### Other Earlier Findings About Glyphosate's Dangers to Human Health

59.     The EPA has a technical fact sheet, as part of its Drinking Water and Health, National Primary Drinking Water Regulations publication, relating to glyphosate. This technical fact sheet predates the IARC March 20, 2015, evaluation. The fact sheet describes the release patterns for glyphosate as follows:

### Release Patterns

60.     Glyphosate is released to the environment in its use as an herbicide for controlling woody and herbaceous weeds on forestry, right-of-way, cropped and non-cropped sites. These sites may be around water and in wetlands. It may also be released to the environment during its manufacture, formulation, transport, storage, disposal, and cleanup, and from spills. Since glyphosate is not a listed chemical in the Toxics Release Inventory, data on releases during its

EXHIBIT 1

manufacture and handling are not available. Occupational workers and home gardeners may be exposed to glyphosate by inhalation and dermal contact during spraying, mixing, and cleanup. They may also be exposed by touching soil and plants to which glyphosate was applied. Occupational exposure may also occur during glyphosate's manufacture, transport storage, and disposal.

61.     In 1995, the Northwest Coalition for Alternatives to Pesticides reported that in California, the state with the most comprehensive program for reporting of pesticide-caused illness, glyphosate was the third most commonly-reported cause of pesticide illness among agricultural workers.

### *Recent Worldwide Bans on Roundup®/Glyphosate*

62.     Several countries around the world have instituted bans on the sale of Roundup® and other glyphosate-containing herbicides, both before and since IARC first announced its assessment for glyphosate in March 2015, and more countries undoubtedly will follow suit as the dangers of the use of Roundup® are more widely known. The Netherlands issued a ban on all glyphosate-based herbicides in April 2014, including Roundup®, which took effect by the end of 2015. In issuing the ban, the Dutch Parliament member who introduced the successful legislation stated: "Agricultural pesticides in user-friendly packaging are sold in abundance to private persons. In garden centers, Roundup® is promoted as harmless, but unsuspecting customers have no idea what the risks of this product are. Especially children are sensitive to toxic substances and should therefore not be exposed to it."

63.     The Brazilian Public Prosecutor in the Federal District requested that the Brazilian Justice Department suspend the use of glyphosate.

64.     France banned the private sale of Roundup® and glyphosate following the IARC

16

EXHIBIT 1

assessment for Glyphosate.

65.     Bermuda banned both the private and commercial sale of glyphosates, including Roundup®. The Bermuda government explained its ban as follows: "Following a recent scientific study carried out by a leading cancer agency, the importation of weed spray 'Roundup' has been suspended."

66.     The Sri Lankan government banned the private and commercial use of glyphosates, particularly out of concern that glyphosate has been linked to fatal kidney disease in agricultural workers.

67.     The government of Colombia announced its ban on using Roundup® and glyphosate to destroy illegal plantations of coca, the raw ingredient for cocaine, because of the WHO's finding that glyphosate is probably carcinogenic.

### Proposition 65 Listing

68.     On September 4, 2015, California's Office of Environmental Health Hazard Assessment ("OEHHA") published a notice of intent to include glyphosate on the state's list of known carcinogens under Proposition 65. 18 California's Safe Drinking Water and Toxic Enforcement Act of 1986 (informally known as "Proposition 65"), requires the state to maintain and, at least, once a year, revise and republish a list of chemicals "known to the State of California to cause cancer or reproductive toxicity." The OEHHA determined that glyphosate met the criteria for the listing mechanism under the Labor Code following IARC's assessment of the chemical.

69.     The listing process under the Labor Code is essentially automatic. The list known carcinogens, at a minimum, must include substances identified by reference in Labor Code §6382(b)(1). That section of the Labor Code identifies "[s]ubstances listed as human or animal carcinogens by the International Agency for Research on Cancer (IARC)." IARC's classification

EXHIBIT 1

of glyphosate as a Group 2A chemical ("probably carcinogenic to humans") therefore triggered the listing.

70.    A business that deploys a listed chemical in its products must provide "clear and reasonable warnings" to the public prior to exposure to the chemical. To be clear and reasonable, a warning must "(1) clearly communicate that the chemical is known to cause cancer, and/or birth defects or other reproductive harm; and (2) effectively reach the person before exposure." The law also prohibits the discharge of listed chemicals into drinking water.

71.    Monsanto disputed the listing decision and, in January 2016, filed a lawsuit against OEHHA and the agency's acting director, Lauren Zeise, in California state court, seeking declaratory and injunctive relief to prevent OEHHA from listing glyphosate.

72.    Monsanto alleged that OEHHA's exclusive reliance on the IARC decision signified that "OEHHA effectively elevated the determination of an ad hoc committee of an unelected, foreign body, which answers to no United States official (let alone any California state official), over the conclusions of its own scientific experts." Monsanto further alleged that the Labor Code listing mechanism presented various constitutional violations because it "effectively empowers an unelected, undemocratic, unaccountable, and foreign body to make laws applicable in California." Among other things, Monsanto argued that Proposition 65's requirement to provide a "clear and reasonable warning" to consumers that the chemical is a known carcinogen would damage its reputation and violate its First Amendment rights.

### EFSA Report on Glyphosate

73.    On November 12, 2015, the European Food Safety Authority (EFSA), the European Union's primary agency for food safety, reported on its evaluation of the Renewal Assessment Report (RAR) on glyphosate. The Rapporteur Member State assigned to glyphosate,

EXHIBIT 1

the German Federal Institute for Risk Assessment (BfR), had produced the RAR as part of the renewal process for glyphosate in the EU.

74.    Based on a review of the RAR, which included data from industry submitted unpublished studies, EFSA sent its own report ("Conclusion") to the European Commission, finding that "glyphosate is unlikely to pose a carcinogenic hazard to humans and the evidence does not support classification with regard to its carcinogenic potential according to Regulation (EC) No 1272/2008." EFSA therefore disagreed with IARC: glyphosate was not genotoxic and did not present a carcinogenic threat to humans.

75.    In explaining why its results departed from IARC's conclusion, EFSA drew a distinction between the EU and IARC approaches to the study and classification of chemicals. Although IARC examined "both glyphosate – an active substance – and glyphosate-based formulations, grouping all formulations regardless of their composition," EFSA explained that it considered only glyphosate and that its assessment focuses on "each individual chemical, and each marketed mixture separately." IARC, on the other hand, "assesses generic agents, including groups of related chemicals, as well as occupational or environmental exposure, and cultural or behavioural practices." EFSA accorded greater weight to studies conducted with glyphosate alone than studies of formulated products.

76.    EFSA went further and noted: [A]though some studies suggest that certain glyphosate-based formulations may be genotoxic (i.e. damaging to DNA), others that look solely at the active substance glyphosate do not show this effect. It is likely, therefore, that *the genotoxic effects observed in some glyphosate-based formulations are related to the other constituents or "co-formulants"*. Similarly, certain glyphosate-based formulations display higher toxicity than that of the active ingredient, presumably because of the presence of co- formulants. In its

19

EXHIBIT 1

assessment, ***EFSA proposes that the toxicity of each pesticide formulation and in particular its genotoxic potential should be further considered and addressed by*** *Member State authorities while they reassess uses of glyphosate-based formulations in* their own territories. (Emphasis added)

77.     Notwithstanding its conclusion, EFSA did set exposure levels for Specifically, EFSA proposed an acceptable daily intake (ADI) of 0.5 mg/kg of body day; an acute reference dose (ARfD) of 0.5 mg/kg of body weight; and an acceptable exposure level (AOEL) of 0.1 mg/kg bw per day.

### *Leading Scientists Dispute EFSA's Conclusion*

78.     On November 27, 2015, 96 independent academic and governmental scientists from around the world submitted an open letter to the EU health commissioner, Vytenis Andriukaitis, the scientists expressed their strong concerns and urged the commissioner to disregard the "flawed" EFSA report, arguing that "the BfR decision is not credible because it is not supported by the evidence and it was not reached in an open and transparent manner."

79.     Signatories to the letter included Dr. Christopher J. Portier, Ph.D., and other renowned international experts in the field, some of whom were part of the IARC Working Group assigned to glyphosate.

80.     In an exhaustive and careful examination, the scientists scrutinized EFSA's conclusions and outlined why the IARC Working Group decision was "by far the more credible": The IARC WG decision was reached relying on open and transparent procedures by independent scientists who completed thorough conflict-of-interest statements and were not affiliated or financially supported in any way by the chemical manufacturing industry. It is fully referenced and depends entirely on reports published in the open, peer-reviewed biomedical literature. It is part of

EXHIBIT 1

a long tradition of deeply researched and highly credible reports on the carcinogenicity of hundreds of chemicals issued over the past four decades by IARC and used today by international agencies and regulatory bodies around the world as a basis for risk assessment, regulation and public health policy.

81.     With respect to human data, the scientists pointed out that EFSA agreed with IARC that there was "*limited evidence* of carcinogenicity" for non-Hodgkin lymphoma but EFSA nonetheless dismissed an association between glyphosate exposure and carcinogenicity. IARC applies three levels of evidence in its analyses of human data, including sufficient evidence and limited evidence. EFSA's ultimate conclusion that "there was no unequivocal evidence for a clear been established. However, the scientists argued, "[l]egitimate public health concerns arise when 'causality is credible,' i.e., when there is *limited evidence*."

82.     Among its many other deficiencies, EFSA's conclusions regarding animal carcinogenicity data were "scientifically unacceptable," particularly in BfR's use of historical control data and in its trend analysis. Indeed, BfR's analysis directly contradicted the Organisation for Economic Co-operation and Development ("OECD") testing guidelines while citing and purporting to follow those same guidelines. For instance, the EFSA report dismisses observed trends in tumor incidence "because there are no individual treatment groups that are significantly different from controls and because the maximum observed response is reportedly within the range of the historical control data." However, according to the scientists, concurrent controls are recommended over historical controls in all guidelines, scientific reports, and publications, and, if it is employed, historical control data "should be from studies in the same timeframe, for the same exact animal strain, preferably from the same laboratory or the same supplier and preferably reviewed by the same pathologist." BfR's use of historical control data violated these precautions:

EXHIBIT 1

"only a single study used the same mouse strain as the historical controls, but was reported more than 10 years after the historical control dataset was developed." Further deviating from sound scientific practices, the data used by the BfR came from studies in seven different laboratories. The scientists concluded:

> BfR reported seven positive mouse studies with three studies showing increases in renal tumors, two with positive findings for hemangiosarcomas, and two with positive findings for malignant lymphomas. BfR additionally reported two positive findings for tumors in rats. Eliminating the inappropriate use of historical data, the unequivocal conclusion is that these are not negative studies, but in fact document the carcinogenicity of glyphosate in laboratory animals.

83.     The letter also critiqued the EFSA report's lack of transparency and the opacity surrounding the data cited in the report: "citations for almost all of the references, even those from the open scientific literature, have been redacted from the document" and "there are no authors or contributors listed for either document, a requirement for publication in virtually all scientific journals." Because BfR relied on unpublished, confidential industry provided studies, it is "impossible for any scientist not associated with BfR to review this conclusion with scientific confidence."

84.     On March 3, 2016, the letter was published in the Journal of Epidemiology & Community Health.

85.     On February 17, 2016, a consensus statement published in the journal Environmental Health, entitled "Concerns over use of glyphosate-based herbicides and risks associated with exposures: a consensus statement," assessed the safety of glyphosate-based herbicides (GBHs). The paper's "focus is on the unanticipated effects arising from the worldwide increase in use of GBHs, coupled with recent discoveries about the toxicity and human health risks stemming from use of GBHs." The researchers drew seven factual conclusions about GBHs:

A.     GBHs are the most heavily applied herbicide in the world and usage continues

EXHIBIT 1

to rise;

B.    Worldwide, GBHs often contaminate drinking water sources, precipitation, and air, especially in agricultural regions;

C.    The half-life of glyphosate in water and soil is longer than previously recognized;

D.    Glyphosate and its metabolites are widely present in the global soybean supply;

E.    Human exposures to GBHs are rising;

F.    Glyphosate is now authoritatively classified as a probable human carcinogen; and

G.    Regulatory estimates of tolerable daily intakes for glyphosate in the United States and European Union are based on outdated science.

86.    The researchers noted that GBH use has increased approximately 100-fold since the 1970s. Furthermore, far from posing a limited hazard to vertebrates, as previously believed, two decades of evidence demonstrated that "several vertebrate pathways are likely targets of action, including hepatorenal damage, effects on nutrient balance through glyphosate chelating action and endocrine disruption."

87.    The paper attributed uncertainties in current assessments of glyphosate formulations to the fact that "[t]he full list of chemicals in most commercial GBHs is protected as 'commercial business information,' despite the universally accepted relevance of such information to scientists hoping to conduct an accurate risk assessment of these herbicide formulations." Further, the researchers argue, "[t]he distinction in regulatory review and decision processes between 'active' and 'inert' ingredients has no toxicological justification, given increasing evidence that several so-called 'inert' adjuvants are toxic in their own right."

88.    Among various implications, the researchers conclude that "existing toxicological data and risk assessments are not sufficient to infer that GBHs, as currently used, are

23

EXHIBIT 1

safe." Further, "GBH-product formulations are more potent, or toxic, than glyphosate alone to a wide array of non-target organisms including mammals, aquatic insects, and fish." Accordingly, "risk assessments of GBHs that are based on studies quantifying the impacts of glyphosate alone underestimate both toxicity and exposure, and thus risk." The paper concludes that this "shortcoming has repeatedly led regulators to set inappropriately high exposure thresholds."

89.     The researchers also critique the current practice of regulators who largely rely on rely on "unpublished, non-peer reviewed data generated by the registrants" but ignore "published "published research because it often uses standards and procedures to assess quality that are

are different from those codified in regulatory agency data requirements, which largely focus on avoiding fraud." In the researchers' view, "[s]cientists independent of the registrants should conduct regulatory tests of GBHs that include glyphosate alone, as well as GBH product formulations."

90.     The researchers also call for greater inclusion of GBHs in government-led toxicology testing programs:

> [A] fresh and independent examination of GBH toxicity should be undertaken, and . . . this re-examination be accompanied by systematic efforts by relevant agencies to monitor GBH levels in people and in the food supply, none of which are occurring today. The U.S. National Toxicology Program should prioritize a thorough toxicological assessment of the multiple pathways now identified as potentially vulnerable of GBHs.

91.     The researchers suggest that, in order to fill the gap created by an absence of government funds to support research on GBHs, regulators could adopt a system through which manufacturers fund the registration process and the necessary testing:

> "[W]e recommend that a system be put in place through which manufacturers of GBHs provide funds to the appropriate regulatory body as part or routine registration actions and fees. Such funds should then be transferred to appropriate government research institutes, or to an agency experienced in the award of competitive grants. In either case, funds would

EXHIBIT 1

be made available to independent scientists to conduct the appropriate long-term (minimum 2 years) safety studies in recognized animal model systems. A thorough and modern assessment of GBH toxicity will encompass potential endocrine disruption impacts on the gut microbiome, carcinogenicity, and multigenerational effects looking at reproductive capabilities and frequency of birth defects."

***Plaintiff's Exposure to Roundup®***

92.     Sidco Corporation hired Marita Renteria as a Farm Hand in Las Cruces, New Mexico. As a Farm Hand, Ms. Renteria was exposed to Roundup at significant levels.

93.     Part of Ms. Renteria's duties included carrying a 5-gallon backpack of Roundup and spraying the poison with a hand sprayer. On other properties, Ms. Renteria would drive a tractor with a 20-gallon sprayer attached to the end. The Roundup Sidco Corporation supplied to their Farm Hands was purchased from AGCO Corporation.

94.     For six years, Ms. Renteria performed these duties with little to no protective equipment.

95.     Ms. Renteria developed NHL in 1995 and underwent a number of significant, painful treatments.

## DISCOVERY RULE

96.     Plaintiff hereby pleads and invokes the "discovery rule" if necessary. Plaintiff will show that after reasonably exercising due diligence, she did not learn the nature of the cause of her cancer or that such cancer was chemically-related until less than the time periods provided by the relevant statutes of limitations. Plaintiff also specifically invokes the federally required commencement date as set forth in 42 U.S.C. § 9658.

97.     Plaintiff had no way of knowing about the risk of serious illness associated with the use of and/or exposure to Roundup® and glyphosate. The earliest date one could have learned of the link would have been after IARC released its formal assessment of glyphosate in July 2015.

EXHIBIT 1

This is the quintessential case for tolling.

98.     Within the time period of any applicable statutes of limitations, Plaintiff could not have discovered, through the exercise of reasonable diligence, that exposure to Roundup® and glyphosate is injurious to human health.

99.     Plaintiff did not discover, and did not know of facts that would cause a reasonable person to suspect, the risks associated with the use of and/or exposure to Roundup® and glyphosate; nor would a reasonable and diligent investigation by them have disclosed that Roundup® and glyphosate would cause Mr. Gingerich's illness.

100.    For these reasons, all applicable statutes of limitations have been tolled by operation of the discovery rule with respect to Plaintiff' claim.

**Fraudulent Concealment Tolling**

101.    All applicable statutes of limitations have also been tolled by Monsanto's knowing and active fraudulent concealment and denial of the facts alleged herein throughout the time period relevant to this action.

102.    Instead of disclosing critical safety information about Roundup® and glyphosate, Monsanto has consistently and falsely represented the safety of its Roundup® products.

**Estoppel**

103.    Monsanto was under a continuous duty to disclose to consumers, users and other person coming into contact with its products, including Plaintiff, accurate safety information concerning its products and the risks associated with the use of and/or exposure to Roundup® and glyphosate.

104.    Instead, Monsanto knowingly, affirmatively, and actively concealed safety

EXHIBIT 1

information concerning Roundup® and glyphosate and the serious risks associated with the use of and/or exposure to its products.

105.    Based on the foregoing, Monsanto is estopped from relying on any statutes of limitations in defense of this action.

## CLAIMS

### COUNT I
### STRICT LIABILITY
### (DESIGN DEFECT)

106.    Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

107.    Plaintiff brings this strict liability claim against Monsanto for defective design.

108.    At all times relevant to this litigation, Monsanto engaged in the business of testing, developing, manufacturing, selling, distributing, and Monsanto engaged in the marketing, packaging design, and promotion of Roundup® products, which are defective and unreasonably dangerous to consumers, including Plaintiff, thereby placing Roundup® products into the stream of commerce. These actions were under the ultimate control and supervision of Monsanto. At all times relevant to this litigation, Monsanto designed, researched, developed, manufactured, produced, tested, assembled, labeled, advertised, promoted, marketed, sold, and distributed the Roundup® products used by Plaintiff, as described above.

109.    At all times relevant to this litigation, Roundup® products were manufactured, designed, and labeled in an unsafe, defective, and inherently dangerous manner that was dangerous for use by or exposure to the public, and, in particular, Plaintiff.

110.    At all times relevant to this litigation, Roundup® products reached the intended consumers, handlers, and users or other persons coming into contact with these products in

EXHIBIT 1

Missouri and throughout the United States, including Plaintiff, without substantial change in their condition as designed, manufactured, sold, distributed, labeled, and marketed by Monsanto.

111.    Roundup® products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold, and marketed by Monsanto were defective in design and formulation in that when they left the hands of the manufacturers and/or suppliers, they were unreasonably dangerous and dangerous to an extent beyond that which an ordinary consumer would contemplate.

112.    Roundup® products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold, and marketed by Monsanto were defective in design and formulation in that when they left the hands of the manufacturers and/or suppliers, the foreseeable risks exceeded the alleged benefits associated with their design and formulation.

113.    At all times relevant to this action, Monsanto knew or had reason to know that Roundup® products were defective and were inherently dangerous and unsafe when used in the manner instructed and provided by Monsanto. Therefore, at all times relevant to this litigation, Roundup® products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold, and marketed by Monsanto were defective in design and formulation, in one or more of the following ways:

a)  When placed in the stream of commerce, Roundup® products were defective in design and formulation, and, consequently, dangerous to an extent beyond that which an ordinary consumer would contemplate.

b)  When placed in the stream of commerce, Roundup® products were unreasonably dangerous in that they were hazardous and posed a

EXHIBIT 1

grave risk of cancer and other serious illnesses when used in a reasonably anticipated manner.

c) When placed in the stream of commerce, Roundup® products contained unreasonably dangerous design defects and were not reasonably safe when used in a reasonably anticipated or intended manner.

d) Monsanto did not sufficiently test, investigate, or study Roundup® products and, specifically, the active ingredient glyphosate.

e) Exposure to Roundup® and glyphosate-containing products presents a risk of harmful side effects that outweigh any potential utility stemming from the use of the herbicide.

f) At the time of marketing its Roundup® products, Roundup® was defective in that exposure to Roundup® and specifically, its active ingredient glyphosate, could result in cancer and other severe illnesses and injuries and/or death.

g) Monsanto did not conduct adequate post-marketing surveillance of its Roundup® products.

h) Monsanto could have employed safer alternative designs and formulations.

114.   Plaintiff was exposed to Roundup® products in the course of her work-related use, as described above, without knowledge of their dangerous characteristics.

115.   At all times relevant to this litigation, Plaintiff used and/or was exposed to the use of Roundup® products in an intended or reasonably foreseeable manner without knowledge of

29

EXHIBIT 1

their dangerous characteristics.

116.    Plaintiff could not have reasonably discovered the defects and risks associated with Roundup® or glyphosate-containing products before or at the time of exposure.

117.    The harm caused by Roundup® products far outweighed their benefit, rendering these products dangerous to an extent beyond that which an ordinary consumer would contemplate. Roundup® products were and are more dangerous than alternative products and Monsanto could have designed Roundup® products (including their packaging and sales aids) to make them less dangerous. Indeed, at the time that Monsanto designed Roundup® products, the state of the industry's scientific knowledge was such that a less risky design or formulation was attainable.

118.    At the time Roundup® products left Monsanto's control, there was a practical, technically feasible and safer alternative design that would have prevented the harm without substantially impairing the reasonably anticipated or intended function of those herbicides.

119.    Monsanto's defective design of Roundup® products was willful, wanton, fraudulent, malicious, and conducted with reckless disregard for the health and safety of users of the Roundup® products, including Plaintiff herein.

120.    Therefore, as a result of the unreasonably dangerous condition of its Roundup® products, Monsanto is strictly liable to Plaintiff.

121.    The defects in Roundup® products caused or contributed to cause Plaintiff' grave injuries and/or death, and, but for Monsanto's misconduct and omissions, Plaintiff would not have sustained their injuries and/or death.

122.    Monsanto's conduct, as described above, was reckless. Monsanto risked the lives of consumers and users of its products, including Plaintiff, with knowledge of the safety problems associated with Roundup® and glyphosate-containing products, and suppressed this knowledge

EXHIBIT 1

from the general public. Monsanto made conscious decisions not to redesign, warn, or inform the unsuspecting public. Monsanto's reckless conduct warrants an award of aggravated damages.

123.    As a direct and proximate result of Monsanto placing defective Roundup® products into the stream of commerce, Plaintiff has suffered and continue to suffer grave injuries and/or death, and have endured physical pain and discomfort, as well as economic hardship, including considerable financial expenses for medical care and treatment.

<div align="center">

**COUNT II**
**STRICT LIABILITY**
**(FAILURE TO WARN)**

</div>

124.    Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

125.    Plaintiff brings this strict liability claim against Monsanto for failure to warn.

126.    At all times relevant to this litigation, Monsanto engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting Roundup® products, which are defective and unreasonably dangerous to consumers, including Plaintiff, because they do not contain adequate warnings or instructions concerning the dangerous characteristics of Roundup® and, specifically, the active ingredient glyphosate. These actions were under the ultimate control and supervision of Monsanto.

127.    Monsanto researched, developed, designed, tested, manufactured, inspected, labeled, distributed, marketed, promoted, sold, and otherwise released into the stream of commerce Roundup® products, and in the course of same, directly advertised or marketed the products to consumers and end users, including Plaintiff, and therefore had a duty to warn of the risks associated with the use of Roundup® and glyphosate-containing products.

128.    At all times relevant to this litigation, Monsanto had a duty to properly test, develop,

EXHIBIT 1

design, manufacture, inspect, package, label, market, promote, sell, distribute, maintain supply, provide proper warnings, and take such steps as necessary to ensure that Roundup® products did not cause users and consumers to suffer from unreasonable and dangerous risks. Monsanto had a continuing duty to warn Plaintiff of the dangers associated with Roundup® use and exposure. Monsanto, as manufacturer, seller, promoter, marketer, or distributor of chemical herbicides is held to the knowledge of an expert in the field.

129.    At the time of manufacture, Monsanto could have provided the warnings or instructions regarding the full and complete risks of Roundup® and glyphosate-containing products because it knew or should have known of the unreasonable risks of harm associated with the use of and/or exposure to such products.

130.    At all times relevant to this litigation, Monsanto failed to investigate, study, test, or promote the safety or to minimize the dangers to users and consumers of its product and to those who would foreseeably use or be harmed by these herbicides, including Plaintiff.

131.    Despite the fact that Monsanto knew or should have known that Roundup® posed a grave risk of harm, it failed to exercise reasonable care to warn of the dangerous risks associated with use and exposure. The dangerous propensities of these products and the carcinogenic characteristics of glyphosate, as described above, were known to Monsanto, or scientifically knowable to Monsanto through appropriate research and testing by known methods, at the time it distributed, marketed, promoted, supplied, or sold the product, and not known to end users and consumers, such as Plaintiff.

132.    These products created significant risks of serious bodily harm to consumers, as alleged herein, and Monsanto failed to adequately warn consumers and reasonably foreseeable users of the risks of exposure to its products. Monsanto has wrongfully concealed information

EXHIBIT 1

concerning the dangerous nature of Roundup® and its active ingredient glyphosate, and further made false and/or misleading statements concerning the safety of Roundup® and glyphosate.

133.   At all times relevant to this litigation, Roundup® products reached the intended consumers, handlers, and users or other persons coming into contact with these products in Missouri and throughout the United States, including Plaintiff, without substantial change in their condition as designed, manufactured, sold, distributed, labeled, promoted, and marketed by Monsanto.

134.   Plaintiff were exposed to Roundup® products in the course of their personal and/or work-related use of Roundup®, without knowledge of its dangerous characteristics.

135.   At all times relevant to this litigation, Plaintiff used and/or were exposed to the use of Roundup® products in their intended or reasonably foreseeable manner without knowledge of their dangerous characteristics.

136.   Plaintiff could not have reasonably discovered the defects and risks associated with Roundup® or glyphosate-containing products prior to or at the time of Plaintiff' exposure. Plaintiff relied upon the skill, superior knowledge, and judgment of Monsanto.

137.   These products were defective because the minimal warnings disseminated with Roundup® products were inadequate, and they failed to communicate adequate information on the dangers and safe use/exposure and failed to communicate warnings and instructions that were appropriate and adequate to render the products safe for their ordinary, intended, and reasonably foreseeable uses, including agricultural and landscaping applications.

138.   The information that Monsanto did provide or communicate failed to contain relevant warnings, hazards, and precautions that would have enabled consumers such as Plaintiff to utilize the products safely and with adequate protection. Instead, Monsanto disseminated

EXHIBIT 1

information that was inaccurate, false, and misleading and which failed to communicate accurately or adequately the comparative severity, duration, and extent of the risk of injuries and/or death with use of and/or exposure to Roundup® and glyphosate; continued to aggressively promote the efficacy of its products, even after it knew or should have known of the unreasonable risks from use or exposure; and concealed, downplayed, or otherwise suppressed, through aggressive marketing and promotion, any information or research about the risks and dangers of exposure to Roundup® and glyphosate.

139.    To this day, Monsanto has failed to adequately and accurately warn of the true risks of Plaintiff' injuries and/or death associated with the use of and exposure to Roundup® and its active ingredient glyphosate, a probable carcinogen.

140.    As a result of their inadequate warnings, Roundup® products were defective and unreasonably dangerous when they left the possession and/or control of Monsanto, were distributed, marketed, and promoted by Monsanto, and used by Plaintiff in their personal and/or work-related use.

141.    Monsanto is liable to Plaintiff for injuries caused by its negligent or willful failure, as described above, to provide adequate warnings or other clinically relevant information and data regarding the appropriate use of these products and the risks associated with the use of or exposure to Roundup® and glyphosate.

142.    The defects in Roundup® products caused or contributed to cause Plaintiff's injuries, and, but for this misconduct and omissions, Plaintiff would not have sustained their injuries and/or death. To this day, Monsanto has failed to adequately and accurately warn of the true risks of Plaintiff's injuries and/or death associated with the use of and exposure to Roundup® and its active ingredient glyphosate, a probable carcinogen.

EXHIBIT 1

a) As a result of their inadequate warnings, Roundup® products were defective and unreasonably dangerous when they left the possession and/or control of Monsanto, were distributed, marketed, and promoted by Monsanto, and used by Plaintiff in their personal and/or work-related use.

b) Monsanto is liable to Plaintiff for injuries and/or death caused by its negligent or willful failure, as described above, to provide adequate warnings or other clinically relevant information and data regarding the appropriate use of these products and the risks associated with the use of or exposure to Roundup® and glyphosate.

c) The defects in Roundup® products caused or contributed to cause Plaintiff' injuries and/or death, and, but for this misconduct and omissions, Plaintiff would not have sustained their injuries and/or death.

d) Had Monsanto provided adequate warnings and instructions and properly disclosed and disseminated the risks associated with Roundup® products, Plaintiff could have avoided the risk of developing injuries and/or death as alleged herein.

e) As a direct and proximate result of Monsanto placing defective Roundup® products into the stream of commerce, Plaintiff have suffered severe injuries and/or death and have endured physical pain and discomfort, as well as economic hardship, including considerable financial expenses for medical care and treatment.

35

EXHIBIT 1

## COUNT III
## NEGLIGENCE
## FAILURE TO WARN

143.    Plaintiff incorporates by reference all other paragraphs of this Complaint as if fully set forth herein, and further allege:

144.    Plaintiff bring this negligence claim against Defendant for failure to warn.

145.    At all times relevant to this litigation, Defendant engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting Roundup® products, which are defective and unreasonably dangerous to consumers, including Plaintiff, because they do not contain adequate warnings or instructions concerning the dangerous characteristics of Roundup® and specifically, the active ingredient glyphosate. These actions were under the ultimate control and supervision of Defendant.

146.    Defendant researched, developed, designed, tested, manufactured, inspected, labeled, distributed, marketed, promoted, sold, and otherwise released into the stream of commerce its Roundup® products, and in the course of same, directly advertised or marketed the products to consumers and end users, including Plaintiff, and Defendant therefore had a duty to warn of the risks associated with the reasonably foreseeable uses (and misuses) of Roundup® and glyphosate-containing products and a duty to instruct on the proper, safe use of these products.

147.    At all times relevant to this litigation, Defendant had a duty to properly test, develop, design, manufacture, inspect, package, label, market, promote, sell, distribute, maintain supply, provide proper warnings, and take such steps as necessary to ensure that its Roundup® products did not cause users and consumers to suffer from unreasonable and dangerous risks. Defendant had a continuing duty to instruct on the proper, safe use of these products. Defendant, as manufacturer, seller, or distributor of chemical herbicides, is held to the knowledge of an expert in the field.

36

EXHIBIT 1

148.    At the time of manufacture, Defendant could have provided warnings or instructions regarding the full and complete risks of Roundup® and glyphosate containing products because it knew or should have known of the unreasonable risks of harm associated with the use of and/or exposure to these products.

149.    At all times relevant to this litigation, Defendant failed to investigate, study, test, or promote the safety of its Roundup® products. Defendant also failed to minimize the dangers to users and consumer of its Roundup® products and to those who would foreseeably use or be harmed by Defendant's herbicides, including Plaintiff.

150.    Despite the fact that Defendant knew or should have known that Roundup® products posed a grave risk of harm, it failed to warn of the dangerous risks associated with their use and exposure. The dangerous propensities of its products and the carcinogenic characteristics of glyphosate, as described above, were known to Defendant, or scientifically knowable to Defendant through appropriate research and testing by known methods, at the time it distributed, supplied, or sold the product, and not known to end users and consumers, such as Plaintiff.

151.    Defendant knew or should have known that its Roundup® and glyphosate containing products created significant risks of serious bodily harm to consumers, as alleged herein, and Defendant failed to adequately warn consumers and reasonably foreseeable users of the risks of exposure to these products. Defendant has wrongfully concealed information concerning the dangerous nature of Roundup® and its active ingredient glyphosate, and further made false and/or misleading statements concerning the safety of Roundup® and glyphosate.

152.    At all times relevant to this litigation, Defendant's Roundup® products reached the intended consumers, handlers, and users or other persons coming into contact with these products throughout the United States, including Plaintiff, without substantial change in their condition as

EXHIBIT 1

designed, manufactured, sold, distributed, labeled, and marketed by Defendant.

153.   At all times relevant to this litigation, Plaintiff used and/or was exposed to the use of Defendant's Roundup® products in their intended or reasonably foreseeable manner without knowledge of their dangerous characteristics.

154.   Plaintiff could not have reasonably discovered the defects and risks associated with Roundup® or glyphosate-containing products before or at the time of Plaintiff's exposure. Plaintiff relied upon the skill, superior knowledge, and judgment of Defendant.

155.   Defendant knew or should have known that the minimal warnings disseminated with its Roundup® products were inadequate, but it failed to communicate adequate information on the dangers and safe use/exposure and failed to communicate warnings and instructions that were appropriate and adequate to render the products safe for their ordinary, intended, and reasonably foreseeable uses, including agricultural and horticultural applications.

156.   The information that Defendant did provide or communicate failed to contain relevant warnings, hazards, and precautions that would have enabled agricultural workers, horticultural workers and/or at-home users to utilize the products safely and with adequate protection. Instead, Defendant disseminated information that was inaccurate, false, and misleading and which failed to communicate accurately or adequately the comparative severity, duration, and extent of the risk of injuries associated with use of and/or exposure of Roundup® and glyphosate; continued to aggressively promote the efficacy of its products, even after it knew or should have known of the unreasonable risks from use or exposure; an concealed, downplayed, or otherwise suppressed, through aggressive marketing and promotion, any information or research about the risks and dangers of exposure to Roundup® and glyphosate.

157.   To this day, Defendant has failed to adequately and accurately warn of the true

EXHIBIT 1

risks of Plaintiff's injuries associated with the use of and exposure to Roundup® and its active ingredient glyphosate, a probable carcinogen.

158.    As a result of their inadequate warnings, Defendant's Roundup® products were defective and unreasonably dangerous when they left the possession and/or control of Defendant, were distributed by Defendant, and used by Plaintiff.

159.    Defendant is liable to Plaintiff for injuries caused by its failure, as described above, to provide adequate warnings or other clinically relevant information and data regarding the appropriate use of its Roundup® products and the risks associated with the use of or exposure to Roundup® and glyphosate.

160.    The defects in Defendant's Roundup® products were substantial and contributing factors in causing Plaintiff's injuries, and, but for Defendant's misconduct and omissions, Plaintiff would not have sustained her injuries.

161.    Had Defendant provided adequate warnings and instructions and properly disclosed and disseminated the risks associated with its Roundup® products, Plaintiff could have avoided the risk of developing injuries as alleged herein and Plaintiff could have obtained alternative herbicides.

162.    As a direct and proximate result of Defendant placing its defective Roundup® products into the stream of commerce, Plaintiff has suffered and continues to suffer severe injuries, and has endured physical pain and discomfort, as well as economic hardship, including considerable financial expenses for medical care and treatment. Plaintiff will continue to incur these expenses in the future.

## COUNT IV
## NEGLIGENCE

163.    Plaintiff incorporates by reference each and every allegation set forth in the

39

EXHIBIT 1

preceding paragraphs as if fully stated herein.

164.    Monsanto, directly or indirectly, caused Roundup® products to be sold, distributed, packaged, labeled, marketed, promoted, and/or used by Plaintiff.

165.    At all times relevant to this litigation, Monsanto had a duty to exercise reasonable care in the design, research, manufacture, marketing, advertisement, supply, promotion, packaging, sale, and distribution of Roundup® products, including the duty to take all reasonable steps necessary to manufacture, promote, and/or sell a product that was not unreasonably dangerous to consumers and users of the product.

166.    At all times relevant to this litigation, Monsanto had a duty to exercise reasonable care in the marketing, advertisement, and sale of the Roundup® products. Monsanto's duty of care owed to consumers and the general public included providing accurate, true, and correct information concerning the risks of using Roundup® and appropriate, complete, and accurate warnings concerning the potential adverse effects of exposure to Roundup®, and, in particular, its active ingredient glyphosate.

167.    At all times relevant to this litigation, Monsanto knew or, in the exercise of reasonable care, should have known of the hazards and dangers of Roundup® and specifically, the carcinogenic properties of the chemical glyphosate.

168.    Accordingly, at all times relevant to this litigation, Monsanto knew or, in the exercise of reasonable care, should have known that use of or exposure to its Roundup® products could cause or be associated with Plaintiff' injuries and/or death and thus created a dangerous and unreasonable risk of injury to the users of these products, including Plaintiff.

169.    Monsanto also knew or, in the exercise of reasonable care, should have known that users and consumers of Roundup® were unaware of the risks and the magnitude of the risks

EXHIBIT 1

associated with use of and/or exposure to Roundup® and glyphosate-containing products.

170.    As such, Monsanto breached the duty of reasonable care and failed to exercise ordinary care in the design, research, development, manufacture, testing, marketing, supply, promotion, advertisement, packaging, sale, and distribution of its Roundup® products, in that Monsanto manufactured, marketed, promoted, and sold defective herbicides containing the chemical glyphosate, knew or had reason to know of the defects inherent in these products, knew or had reason to know that a user's or consumer's exposure to the products created a significant risk of harm and unreasonably dangerous side effects, and failed to prevent or adequately warn of these risks and injuries and/or death.

171.    Despite an ability and means to investigate, study, and test these products and to provide adequate warnings, Monsanto has failed to do so. Indeed, Monsanto has wrongfully concealed information and has further made false and/or misleading statements concerning the safety and/or exposure to Roundup® and glyphosate.

172.    Monsanto was negligent in the following respects:

a)   Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing its Roundup® products without thorough and adequate pre- and post-market testing;

b)   Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing Roundup® while negligently and/or intentionally concealing and failing to disclose the results of trials, tests, and studies of exposure to glyphosate, and, consequently, the risk of serious harm associated with human use of

EXHIBIT 1

and exposure to Roundup®;

c) Failing to undertake sufficient studies and conduct necessary tests to determine whether or not Roundup® products and glyphosate-containing products were safe for their intended use in agriculture and horticulture;

d) Failing to use reasonable and prudent care in the design, research, manufacture, and development of Roundup® products so as to avoid the risk of serious harm associated with the prevalent use of Roundup®/glyphosate as an herbicide;

e) Failing to design and manufacture Roundup® products so as to ensure they were at least as safe and effective as other herbicides on the market;

f) Failing to provide adequate instructions, guidelines, and safety precautions to those persons who Monsanto could reasonably foresee would use and be exposed to its Roundup® products;

g) Failing to disclose to Plaintiff, users/consumers, and the general public that use of and exposure to Roundup® presented severe risks of cancer and other grave illnesses;

h) Failing to warn Plaintiff, users/consumers, and the general public that the product's risk of harm was unreasonable and that there were safer and effective alternative herbicides available to Plaintiff and other consumers;

i) Systematically suppressing or downplaying contrary evidence about

EXHIBIT 1

the risks, incidence, and prevalence of the side effects of Roundup®

and glyphosate-containing products;

j)  Representing that its Roundup® products were safe for their

intended use when, in fact, Monsanto knew or should have known

that the products were not safe for their intended purpose;

k)  Declining to make or propose any changes to Roundup® products'

labeling or other promotional materials that would alert the

consumers and the general public of the risks of Roundup® and

glyphosate;

l)  Advertising, marketing, and recommending the use of the

Roundup® products, while concealing and failing to disclose or

warn of the dangers known by Monsanto to be associated with or

caused by the use of or exposure to Roundup® and glyphosate;

m)  Continuing to disseminate information to its consumers, which

indicate or imply that Monsanto's Roundup® products are not

unsafe for use in the agricultural and horticultural industries; and

n)  Continuing the manufacture and sale of its products with the

knowledge that the products were unreasonably unsafe and

dangerous.

173.   Monsanto knew and/or should have known that it was foreseeable that consumers

such as Plaintiff would suffer injuries and/or death as a result of Monsanto's failure to exercise

ordinary care in the manufacturing, marketing, promotion, labeling, distribution, and sale of

Roundup®.

43

EXHIBIT 1

174.    Plaintiff did not know the nature and extent of the injuries and/or death that could result from the intended use of and/or exposure to Roundup® or its active ingredient glyphosate.

175.    Monsanto's negligence was the proximate cause of the injuries and/or death, harm, and economic losses that Plaintiff suffered, as described herein.

176.    Monsanto's conduct, as described above, was reckless. Monsanto regularly risked the lives of consumers and users of its products, including Plaintiff, with full knowledge of the dangers of these products. Monsanto has made conscious decisions not to redesign, re-label, warn, or inform the unsuspecting public, including Plaintiff. Monsanto's reckless conduct therefore warrants an award of aggravated or punitive damages.

177.    As a proximate result of Monsanto's wrongful acts and omissions in placing defective Roundup® products into the stream of commerce without adequate warnings of the hazardous and carcinogenic nature of glyphosate, Plaintiff have suffered severe and permanent physical and emotional injuries. Plaintiff have endured pain and suffering and has suffered economic losses (including significant expenses for medical care and treatment) in an amount to be determined.

## COUNT V
## BREACH OF EXPRESS WARRANTY

178.    Plaintiff re-alleges the preceding paragraphs as if fully set forth herein.

179.    At all times relevant to this litigation, Defendant engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting its Roundup® products, which are defective and unreasonably dangerous to consumers, including Plaintiff, thereby placing Roundup® products into the stream of commerce. These actions were under the ultimate control and supervision of Defendant, and their Roundup® products were expected to, and did, reach Plaintiff without any substantial change in their condition.

EXHIBIT 1

180.    At all times relevant to this litigation, Defendant expressly represented and warranted to the purchasers of its Roundup® products, by and through statements made by Defendant in labels, publications, package insert, and other written materials intended for consumers and the general public, that its Roundup® products were safe to human health and the environment, effective, fit, and proper for their intended use. Defendant advertised, labeled, marketed, and promoted Roundup® products, representing the quality to consumers and the public in such a way as to induce their purchase or use, thereby making an express warranty that its Roundup® products would conform to the representations.

181.    These express representations included incomplete warnings and instructions that purport, but fail, to include the complete array of risks associated with use of and/or exposure to Roundup® and glyphosate.  Defendant knew or should have known that the risks expressly included in Roundup® warnings and labels did not and do not accurately and adequately set forth the risks of developing the serious injuries complained of herein. Nevertheless, Defendant expressly represented that its Roundup® products were safe  and effective, that they were safe and effective for use by individuals such as Plaintiff, and/or that they were safe and effective as agricultural  herbicides.

182.    The representations about Roundup®, as set forth herein, contained or constituted affirmations of fact or promises made by the seller to the buyer, which related to the goods and became part of the basis of the bargain, creating an express warranty that the goods would conform to the representations.

183.    Defendant placed its Roundup® products into the stream of commerce for sale and recommended their use to consumers and the public without adequately warning of the true risks of developing the injuries associated with the use of and exposure to Roundup® and its

45

EXHIBIT 1

active ingredient glyphosate.

184.    Defendant breached these warranties because, among other things, its Roundup® products were defective, dangerous, unfit for use, did not contain labels representing the true and adequate nature of the risk associated with their use, and were not merchantable or safe for their intended, ordinary, and foreseeable use and purpose. Specifically, Defendant breached the warranties in the following ways:

      a.   Defendant represented through its labeling, advertising, and marketing materials that its Roundup® products were safe, and fraudulently withheld and concealed information about the risks of serious injury associated with use of and/or exposure to Roundup® and glyphosate by expressly limiting the risks associated with use and/or exposure within its warnings and labels; and

      b.   Defendant represented that its Roundup® products were safe for use and fraudulently concealed information that demonstrated that glyphosate, the active ingredient in Roundup®, had carcinogenic properties, and that its Roundup® products, therefore, were not safer than alternatives available on the market.

185.    Defendant has sole access to material facts concerning the nature of risks associated with its Roundup® products as expressly stated within its warnings and labels, and Defendant knew that consumers and users such as Plaintiff could not have reasonably discovered that the risks expressly included in Roundup® warnings and labels were inadequate and inaccurate.

186.    Plaintiff had no knowledge of the falsity or incompleteness of Defendant's statements and representations concerning Roundup®, and she relied to her detriment on these statements and representations.

187.    Plaintiff used and/or was exposed to the use of Roundup® as researched, developed, designed, tested, formulated, manufactured, inspected, labeled, distributed, packaged, marketed, promoted, sold, or otherwise released into the stream of commerce by

EXHIBIT 1

Defendant.

188.     Had the warning and labels for Roundup® products accurately and adequately set forth the true risks associated with the use of such products, including Plaintiff's injuries, rather than expressly excluding such information and warranting that the products were safe for their intended use, Plaintiff could have avoided the injuries complained of herein.

189.     As a direct and proximate result of Defendant's wrongful acts and omissions, Plaintiff developed NHL and suffered injuries that are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life, as well as economic hardship, including financial expenses for medical care and treatment.

## COUNT VI
## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY

190.     Plaintiff incorporate by reference all other paragraphs of this Complaint as if fully set forth herein, and further allege:

191.     Upon information and belief, at all times relevant to this litigation, Defendant engaged in the business of testing, developing, designing, formulating, manufacturing, marketing, selling, distributing, and promoting its Roundup® products, which are defective and unreasonably dangerous to users and consumers, including Plaintiff, thereby placing Roundup® products into the stream of commerce.

192.     These actions were under the ultimate control and supervision of Defendant.

193.     Before the time that Plaintiff was exposed to the use of the aforementioned Roundup® products, Defendant impliedly warranted to its consumers and users, including Plaintiff, that its Roundup® products were of merchantable quality and safe and fit for the use for which they were intended; specifically, as horticultural herbicides.

194.     Defendant, however, failed to disclose that Roundup® has dangerous

47

EXHIBIT 1

propensities when used as intended and that the use of and/or exposure to Roundup® and glyphosate containing products carries an increased risk of developing severe injuries, including Plaintiff's injuries.

195.     Upon information and belief, Plaintiff reasonably relied upon the skill, superior knowledge and judgment of Defendant and upon its implied warranties that the Roundup® products were of merchantable quality and fit for their intended purpose or use.

196.     The Roundup® products were expected to reach and did in fact reach consumers and users, including Plaintiff, without substantial change in the condition in which they were manufactured and sold by Defendant. At all times relevant to this litigation, Defendant was aware that consumers and users of its products, including Plaintiff, would use Roundup® products as marketed by Defendant, which is to say that Plaintiff were the foreseeable users of Roundup®.

197.     Defendant intended that its Roundup® products be used in the manner in which Plaintiff in fact used them and Defendant impliedly warranted each product to be of merchantable quality, safe, and fit for this use, despite the fact that Roundup® was not adequately tested or researched.

198.     In reliance upon Defendant's implied warranty, Plaintiff used Roundup® as instructed and labeled and in the foreseeable manner intended, recommended, promoted and marketed by Defendant.

199.     Plaintiff could not have reasonably discovered or known of the risks of serious injury associated with Roundup® or glyphosate.

200.     Defendant breached its implied warranty to Plaintiff in that its Roundup® products were not of merchantable quality, safe, or fit for their intended use, or adequately tested. Roundup® has dangerous propensities when used as intended and can cause serious injuries,

EXHIBIT 1

including those injuries complained of herein.

201.     The harm caused by Defendant's Roundup® products far outweighed their benefit, rendering the products more dangerous than an ordinary consumer or user would expect and more dangerous than alternative products.

202.     As a direct and proximate result of Defendant's wrongful acts and omissions Plaintiff has suffered severe and permanent physical and emotional injuries. Plaintiff has endured pain and suffering, has suffered economic loss (including significant expenses for medical care and treatment) and will continue to incur these expenses in the future.

<u>COUNT VII UNFAIR AND DECEPTIVE</u>
<u>TRADE PRACTICES</u>

203.     Plaintiff re-alleges the preceding paragraphs as if fully set forth herein.

204.     Upon information and belief, by reason of its conduct as alleged herein, Defendant violated the provisions of Iowa Consumer Frauds Act, Iowa Code § 714H.1, *et. seq* ("the Act") by inducing Plaintiff to use Roundup® through the use of false and/or misleading advertising, representations and statements.

205.     By engaging in the conduct described herein, Defendants violated the Act by, among other things:

> a.    engaging in unfair or deceptive trade practices as defined in this statute by making false and misleading oral and written statements that had the capacity, tendency, or effect of deceiving or misleading consumers.
>
> b.    engaging in unfair or deceptive trade practices as defined in this statute by making representations that its products had an approval, characteristic, ingredient, use or benefit which they did not have, including but not limited to statements concerning the health consequences of the use of Roundup®.
>
> c.    engaging in unfair or deceptive trade practices as defined in this statute by failing to state material facts, the omission of which deceived or tended to deceive, including but not limited to facts relating to the health consequences of the use of Roundup®.

49

EXHIBIT 1

d.   engaging in unfair or deceptive trade practices as defined in this statute through deception, fraud, misrepresentation and knowing concealment, suppression and omission of material facts with the intent that consumers rely upon the same in connection with the use and continued use of Roundup®.

206.   As a direct and proximate result of Defendant's violations of the Act, Plaintiff developed NHL and suffered injuries that are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life, as well as economic hardship, including financial expenses for medical care and treatment.

## COUNT VIII
## FRAUD

207.   Plaintiff incorporate by reference each preceding and succeeding paragraph as though set forth fully at length herein.

208.   Monsanto has defrauded the agricultural and gardening communities in general and Plaintiff in particular by misrepresenting the true safety of Roundup® and by failing to disclose known risks of cancer.

209.   Monsanto misrepresented and/or failed to disclose, inter alia, that: glyphosate and its major metabolite aminomethylphosphonic acid ("AMPA") could cause cancer; glyphosate and AMPA are known to be genotoxic in humans and laboratory animals because exposure is known to cause DNA strand breaks (a precursor to cancer); glyphosate and AMPA are known to induce oxidative stress in humans and laboratory animals (a precursor to cancer); glyphosate and AMPA interfere with the aromatic amino acids within the human gut, leading to downstream health conditions including cancer; exposure to glyphosate and AMPA is causally associated with NHL; and the laboratory tests attesting to the safety of glyphosate were flawed and/or fraudulent.

210.   Due to these misrepresentations and omissions, at all times relevant to this litigation, Roundup® was misbranded under 7 U.S.C. § 136(g) and its distribution within the State

EXHIBIT 1

of Iowa and around the United States was a violation of 7 U.S.C. § 136(j) and 40 C.F.R. §156.10(a)(5).

211.    When Plaintiff used Roundup® from approximately 1995 through to approximately 2019, neither the labeling on the product nor Monsanto's general promotion warned or disclosed the true safety risks of Roundup® or that the product could cause cancer, as described above. Since the true risk information was known to Monsanto and was not reasonably knowable to reasonable consumers, Plaintiff was unaware of these material facts and/or omissions prior to using the product.

212.    Plaintiff relied on Monsanto's misrepresentations and/or material omissions regarding the safety of Roundup® and its active ingredient glyphosate in deciding whether to use the product. Plaintiff did not know, nor could she reasonably have known, of the misrepresentations and/or material omissions by Monsanto concerning Roundup® and its active ingredient glyphosate.

213.    The misrepresentations and/or material omissions that form the basis of this fraud claim is not limited to statements made on the Roundup® labeling, as defined under federal law, but also involve Monsanto's representations and omissions made as part of its promotion and marketing of Roundup®, including on the internet, television, in print advertisements, etc. Nothing prevented Monsanto from disclosing the truth about the risks associated with Roundup® in its promotional efforts outside of the labeling context, using the forms of media and promotion Monsanto traditionally used to promote the product's efficacy and benefits.

214.    When Monsanto made the misrepresentations and/or omissions as alleged in this pleading, it did so with the intent of defrauding and deceiving the public in general and with the intent of inducing the public to purchase and use Roundup®.

EXHIBIT 1

215.    Monsanto made these misrepresentations and/or material omissions with malicious, fraudulent, and/or oppressive intent toward Plaintiff and the public generally. Monsanto's conduct was willful, wanton, and/or reckless. Monsanto deliberately manufactured, produced, marketed, sold, distributed, merchandized, packaged, promoted and advertised the dangerous and defective herbicide Roundup®. This constitutes an utter, wanton, and conscious disregard of the rights and safety of a large segment of the public including Plaintiff, and by reason thereof, Monsanto, is liable for reckless, willful, and wanton acts and omissions which evidence a total and conscious disregard for the safety of Plaintiff and others which proximately caused the injuries as set forth herein.

216.    Plaintiff suffered grave injuries as a proximate result of Monsanto's fraudulent and deceitful conduct, advertisements, and representations.

## PUNITIVE DAMAGES ALLEGATIONS

217.    Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

218.    Defendants' conduct as alleged herein was done with oppression, fraud, and malice. Monsanto was fully aware of Roundup®'s safety risks. Nonetheless, Monsanto deliberately crafted its label, marketing, and promotion to mislead farmers and consumers.

219.    This was not done by accident or through some justifiable negligence. Rather, Monsanto knew that it could turn a profit by convincing the agricultural industry and the general population that Roundup® was harmless to humans, and that full disclosure of Roundup®'s true risks would limit the amount of money Monsanto would make selling Roundup® in the State of Iowa. This was accomplished not only through its misleading, deceptive, fraudulent and unfair labeling, but also through a comprehensive scheme of selective fraudulent research and testing, misleading advertising, and deceptive omissions as more fully alleged throughout this pleading.

EXHIBIT 1

Plaintiff was robbed of his right to make an informed decision about whether to use an herbicide, knowing the full risks attendant to that use. Such conduct was done with conscious disregard of Plaintiff's rights.

220.    There is no indication that Monsanto will stop its deceptive, unfair, fraudulent, misleading and unlawful marketing practices unless it is punished and deterred. Accordingly, Plaintiff requests punitive damages against Monsanto for the harms caused to Plaintiff.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in favor of Plaintiff and against Defendant as set forth above, that Plaintiff be awarded compensatory and punitive damages, interest, costs and attorney's fees, and for such other and further relief as the Court may deem just.

## JURY DEMAND

221.    PLAINTIFF DEMANDS A TRIAL BY JURY ON ALL COUNTS.

Dated: December 23, 2019

Respectfully submitted by:

Feliz A. Rael
Attorney at Law
505 Marquette NW, Ste. 1300
Albuquerque, NM 87102
Tel: 505-610-5991
Fax:  505-938-2301

and

EXHIBIT 1

**FEARS NACHAWATI LAW FIRM**

Darren P. McDowell*
Texas Bar No. 24025520
dmcdowell@fnlawfirm.com
**FEARS | NACHAWATI, PLLC**
5473 Blair Road
Dallas, TX 75231
Tel. (214) 890-0711
Fax (214) 890-0712


Matthew R. McCarley*
Texas Bar No. 24041426
mccarley@fnlawfirm.com
**FEARS | NACHAWATI, PLLC**
5473 Blair Road
Dallas, TX 75231
Tel. (214) 890-0711
Fax (214) 890-0712


Jonathan P. Novak*
Maryland Bar No. 20282
jnovak@fnlawfirm.com
**FEARS | NACHAWATI, PLLC**
5473 Blair Road
Dallas, TX 75231
Tel. (214) 890-0711
Fax (214) 890-0712

*To be admitted pro hac vice


*Attorneys for Plaintiff*

EXHIBIT 1

FILED  1st JUDICIAL DISTRICT COURT
Santa Fe County
1/17/2020 1:48 PM
KATHLEEN VIGIL CLERK OF THE COURT
Leticia Cunningham

STATE OF NEW MEXICO
COUNTY OF SANTA FE
FIRST JUDICIAL DISTRICT

MARITA RENTERIA
          Plaintiff,

vs.                                               No. _____
                                         D-101-CV-2020-00180

MONSANTO COMPANY; SIDCO
CORPORATION; AGCO CORPORATION
          Defendants.

## JURY DEMAND

Plaintiff, through her attorneys, hereby demands a jury of six for trial and hereby tenders

the appropriate fee.


                              Respectfully submitted by:


                              Feliz A. Rael
                              Attorney at Law
                              505 Marquette NW, Ste. 1300
                              Albuquerque, NM 87102
                              Tel: 505-610-5991
                              Fax: 505-938-2301

                              -and-

                              **FEARS NACHAWATI LAW FIRM**

                              Darren P. McDowell*
                              Texas Bar No. 24025520
                              dmcdowell@fnlawfirm.com
                              **FEARS | NACHAWATI, PLLC**
                              5473 Blair Road
                              Dallas, TX 75231
                              Tel. (214) 890-0711
                              Fax (214) 890-0712

1

EXHIBIT 1

Matthew R. McCarley*
Texas Bar No. 24041426
mccarley@fnlawfirm.com
**FEARS | NACHAWATI, PLLC**
5473 Blair Road
Dallas, TX 75231
Tel. (214) 890-0711
Fax (214) 890-0712


Jonathan P. Novak*
Maryland Bar No. 20282
jnovak@fnlawfirm.com
**FEARS | NACHAWATI, PLLC**
5473 Blair Road
Dallas, TX 75231
Tel. (214) 890-0711
Fax (214) 890-0712


*To be admitted pro hac vice*


*Attorneys for Plaintiff*

EXHIBIT 1

FILED  1st JUDICIAL DISTRICT COURT
Santa Fe County
3/2/2020 4:43 PM
KATHLEEN VIGIL CLERK OF THE COURT
Jill Nohl

STATE OF NEW MEXICO
COUNTY OF SANTA FE
FIRST JUDICIAL DISTRICT


MARITA RENTERIA
        Plaintiff,

v.                                                                No. D-101-CV-2020-00180


MONSANTO COMPANY;
SIDCO CORPORATION;
AGCO CORPORATION
        Defendants.


## CERTIFICATE OF SERVICE OF PROCESS
## BY MAIL OR COMMERCIAL CARRIER SERVICE

Plaintiff, through her counsel, states that Defendant AGCO Corporation was served with a copy of the Complaint and Summons in this matter by delivery via United States Postal Service, via Certified Mail, Return Receipt Requested on February 21, 2020, via its registered agent, Corporation Service Company, 123 East Marcy Street, Suite 101, Santa Fe, New Mexico 87501, proof of which is attached hereto as Exhibit 1.   Upon information and belief, "L. Soto" was authorized to accept this delivery on Defendant's behalf.



Respectfully submitted by:


Feliz A. Rael
Attorney at Law
505 Marquette NW, Ste. 1300
Albuquerque, NM 87102
Tel: 505-610-5991
Fax:  505-938-2301


and

EXHIBIT 1

**FEARS NACHAWATI LAW FIRM**

Darren P. McDowell
Eric Przybysz
**FEARS | NACHAWATI, PLLC**
5473 Blair Road
Dallas, TX 75231
Tel. (214) 890-0711
Fax (214) 890-0712

*Attorneys for Plaintiff*

EXHIBIT 1

**U.S. Postal Service™**
**CERTIFIED MAIL™ RECEIPT**
(Domestic Mail Only; No Insurance Coverage Provided)

For delivery information visit our website at www.usps.com®

SANTA FE, NM 87501

| | |
|---|---|
| Postage | $ |
| Certified Fee | $2.85 |
| | $0.00 |
| Return Receipt Fee (Endorsement Required) | $0.00 |
| Restricted Delivery Fee (Endorsement Required) | $0.00 |
| Total Postage & Fees | $2.40 |

01/31/2020

Sent To  AGCO Corporation
Street, Apt. No.; or PO Box No.  123 East Marcy St. Ste 101
City, State, ZIP+4  Santa Fe, NM 87501

7013 2250 0002 0382 3475

PS Form 3800, August 2006              See Reverse for Instructions

---

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

AGCO Corporation
C/o Corp. Service Co.
123 East Marcy st #101
Santa Fe, NM 87501

9590 9402 2004 6123 0876 98

2. Article Number (Transfer from service label)
7013 2250 0002 0382 3475

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X _____   ☐ Agent
                     ☐ Addressee

B. Received by (Printed Name)   C. Date of Delivery
L. Soto                         2-21-2020

D. Is delivery address different from item 1?   ☐ Yes
   If YES, enter delivery address below:         ☐ No

3. Service Type
☐ Adult Signature
☐ Adult Signature Restricted Delivery
☐ Certified Mail®
☐ Certified Mail Restricted Delivery
☐ Collect on Delivery
☐ Collect on Delivery Restricted Delivery
☐ Insured Mail
☐ Insured Mail Restricted Delivery

☐ Priority Mail Express®
☐ Registered Mail™
☐ Registered Mail Restricted Delivery
☐ Return Receipt for Merchandise
☐ Signature Confirmation™
☐ Signature Confirmation Restricted Delivery

PS Form 3811, July 2015 PSN 7530-02-000-9053          Domestic Return Receipt

Exhibit 1

EXHIBIT 1

FILED  1st JUDICIAL DISTRICT COURT
Santa Fe County
3/2/2020 4:43 PM
KATHLEEN VIGIL CLERK OF THE COURT
Jill Nohl

STATE OF NEW MEXICO
COUNTY OF SANTA FE
FIRST JUDICIAL DISTRICT

MARITA RENTERIA
          Plaintiff,

v.                                                            No. D-101-CV-2020-00180

MONSANTO COMPANY;
SIDCO CORPORATION;
AGCO CORPORATION
          Defendants.

## CERTIFICATE OF SERVICE OF PROCESS
## BY MAIL OR COMMERCIAL CARRIER SERVICE

Plaintiff, through her counsel, states that Defendant Monsanto Company was served with

a copy of the Complaint and Summons in this matter by delivery via United States Postal Service,

via Certified Mail, Return Receipt Requested on February 7, 2020, via its registered agent,

Corporation Service Company, 123 East Marcy Street, Suite 101, Santa Fe, New Mexico 87501,

proof of which is attached hereto as Exhibit 1.   Upon information and belief, "L. Soto" was

authorized to accept this delivery on Defendant's behalf.

Respectfully submitted by:

Feliz A. Rael
Attorney at Law
505 Marquette NW, Ste. 1300
Albuquerque, NM 87102
Tel: 505-610-5991
Fax:  505-938-2301

and

EXHIBIT 1

**FEARS NACHAWATI LAW FIRM**

Darren P. McDowell
Eric Przybysz
**FEARS | NACHAWATI, PLLC**
5473 Blair Road
Dallas, TX 75231
Tel. (214) 890-0711
Fax (214) 890-0712

*Attorneys for Plaintiff*

EXHIBIT 1

**U.S. Postal Service™**

**CERTIFIED MAIL™ RECEIPT**

*(Domestic Mail Only; No Insurance Coverage Provided)*

For delivery information visit our website at www.usps.com®

SANTA FE, NM 87501

| | |
|---|---|
| Postage | $2.85 |
| Certified Fee | $0.00 |
| Return Receipt Fee (Endorsement Required) | $0.00 |
| Restricted Delivery Fee (Endorsement Required) | $0.00 |
| Total Postage & Fees | $ $8.40 |

Postmark Here

Sent To: *Monsanto Company C/o Corp Ser*

Street, Apt. No.; or PO Box No. *123 East Marcy St #101*

City, State, ZIP+4 *Santa Fe, NM 87501*

PS Form 3800, August 2006     See Reverse for Instructions

7013 2250 0002 0382 3482

---

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

*Monsanto Company*
*C/O Corp Service Co*
*123 East Marcy St #101*
*Santa Fe, NM 87501*

9590 9402 2004 6123 0876 81

2. Article Number *(Transfer from service label)*

7013 2250 0002 0382 3482

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature

X _____  ☐ Agent   ☐ Addressee

B. Received by *(Printed Name)*   C. Date of Delivery

L. Sote                            2-7-2020

D. Is delivery address different from item 1?  ☐ Yes
   If YES, enter delivery address below:      ☐ No

3. Service Type
   - ☐ Adult Signature
   - ☐ Adult Signature Restricted Delivery
   - ☐ Certified Mail®
   - ☐ Certified Mail Restricted Delivery
   - ☐ Collect on Delivery
   - ☐ Collect on Delivery Restricted Delivery
   - ☐ Insured Mail
   - ☐ Insured Mail Restricted Delivery
   - ☐ Priority Mail Express®
   - ☐ Registered Mail™
   - ☐ Registered Mail Restricted Delivery
   - ☐ Return Receipt for Merchandise
   - ☐ Signature Confirmation™
   - ☐ Signature Confirmation Restricted Delivery

PS Form 3811, July 2015 PSN 7530-02-000-9053     Domestic Return Receipt

Exhibit 1

EXHIBIT 1

FILED  1st JUDICIAL DISTRICT COURT
Santa Fe County
3/2/2020 4:43 PM
KATHLEEN VIGIL CLERK OF THE COURT
Jill Nohl

STATE OF NEW MEXICO
COUNTY OF SANTA FE
FIRST JUDICIAL DISTRICT

MARITA RENTERIA
        Plaintiff,

v.                    No. D-101-CV-2020-00180

MONSANTO COMPANY;
SIDCO CORPORATION;
AGCO CORPORATION
        Defendants.

## CERTIFICATE OF SERVICE OF PROCESS
## BY MAIL OR COMMERCIAL CARRIER SERVICE

      Plaintiff, through her counsel, states that Defendant SIDCO Corporation was served with

a copy of the Complaint and Summons in this matter by delivery via United States Postal Service,

via Certified Mail, Return Receipt Requested on February 3, 2020, via its registered agent, Lloyd

Lindbeck, 2725 Terrance Arc, Las Cruces, New Mexico 88011, proof of which is attached hereto

as Exhibit 1.   Upon information and belief, "G. Santos" was authorized to accept this delivery on

Defendant's behalf.

                    Respectfully submitted by:

                    Feliz A. Rael
                    Attorney at Law
                    505 Marquette NW, Ste. 1300
                    Albuquerque, NM 87102
                    Tel: 505-610-5991
                    Fax:  505-938-2301

                    and

**EXHIBIT 1**

**FEARS NACHAWATI LAW FIRM**

Darren P. McDowell
Eric Przybysz
**FEARS | NACHAWATI, PLLC**
5473 Blair Road
Dallas, TX 75231
Tel. (214) 890-0711
Fax (214) 890-0712

*Attorneys for Plaintiff*

2

EXHIBIT 1

**U.S. Postal Service™**
**CERTIFIED MAIL™ RECEIPT**
*(Domestic Mail Only; No Insurance Coverage Provided)*

For delivery information visit our website at www.usps.com

LAS CRUCES, NM 88011

| | |
|---|---|
| Postage | $2.85 | 0101 |
| Certified Fee | $0.00 | 5 |
| Return Receipt Fee (Endorsement Required) | $0.00 | |
| Restricted Delivery Fee (Endorsement Required) | $0.00 | |
| Total Postage & Fees | $ | $8.40 |

Postmark Here   01/31/2020

Sent To: *Sidco Corp. C/o Lloyd Lindbeck*
Street, Apt. No.: or PO Box No. *2725 Terrance Ave*
City, State, ZIP+4: *Las Cruces, NM 88011*

PS Form 3800, August 2006          See Reverse for Instructions

7013 2250 0002 0382 3499

---

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

*Sidco Corp
c/o Lloyd Lindbeck
2725 Terrance Ave
Las Cruces, NM
88011*

9590 9402 2004 6128 0877 04

2. Article Number (Transfer from service label)
7013 2250 0002 0382 3499

PS Form 3811, July 2015 PSN 7530-02-000-9053

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X _____   ☐ Agent
                 ☐ Addressee

B. Received by (Printed Name)   C. Date of Delivery
*Gary Santos*                    *2-3-20*

D. Is delivery address different from Item 1?   ☐ Yes
If YES, enter delivery address below:          ☐ No

3. Service Type
☐ Adult Signature
☐ Adult Signature Restricted Delivery
☐ Certified Mail®
☐ Certified Mail Restricted Delivery
☐ Collect on Delivery
☐ Collect on Delivery Restricted Delivery
☐ Insured Mail
☐ Insured Mail Restricted Delivery

☐ Priority Mail Express®
☐ Registered Mail™
☐ Registered Mail Restricted Delivery
☐ Return Receipt for Merchandise
☐ Signature Confirmation™
☐ Signature Confirmation Restricted Delivery

Domestic Return Receipt

*Rendering Service of Process*

**Exhibit 1**          EXHIBIT 1

FILED  1st JUDICIAL DISTRICT COURT
Santa Fe County
3/10/2020 10:35 AM
KATHLEEN VIGIL CLERK OF THE COURT
Desiree Brooks

**STATE OF NEW MEXICO**
**COUNTY OF SANTA FE**
**FIRST JUDICIAL DISTRICT COURT**

**MARITA RENTERIA,**
                    **Plaintiff,**

**v.**
                                                    **D-101-CV-2020-00180**

**MONSANTO COMPANY; SIDCO**
**CORPORATION; AGCO CORPORATION,**
                    **Defendant.**

<u>**ENTRY OF APPEARANCE**</u>

COMES NOW, Kenneth L. Beal of Kenneth L. Beal, P.C. and hereby enters his appearance on behalf of Defendant, Sidco Corporation and requests that further pleadings and correspondence be submitted to the office of Kenneth L. Beal at P.O. Box 725 Las Cruces NM.

Kenneth L. Beal
Attorney for Defendent
P.O. Box 725
Las Cruces NM 88004
575-526-5511
klbealoffice@gmail.com

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of the foregoing Entry of Appearance was emailed to Plaintiff's attorney of record via odyssey file and serve on this the 10 day of March, 2020 .

Amanda M. Beal

EXHIBIT 1

FILED  1st JUDICIAL DISTRICT COURT
Santa Fe County
3/23/2020 2:04 PM
KATHLEEN VIGIL CLERK OF THE COURT
Maureen Naranjo

STATE OF NEW MEXICO
___SANTA FE___ COUNTY
___FIRST___ JUDICIAL DISTRICT

Marita Renteria
_____,

No. ___D-101-CV-2020-00180___

v. Monsanto Company; Sidco
Corporation; AGCO Corporation
_____.

## AFFIDAVIT OF NON-ADMITTED LAWYER

STATE OF ___TEXAS___ )
                        )
COUNTY OF ___DALLAS___ )

___DARREN MCDOWELL___, (Non-admitted Lawyer) the affiant herein, having been
duly sworn, states upon oath:

1. Affiant is admitted to practice law and is in good standing to practice law in
   ___Texas, USA___ (state, territory, country).

2. Affiant has complied with Rule 24-106 NMRA.

3. Affiant has associated with ___Feliz Angelica Rael___, counsel licensed to practice
   law in good standing in New Mexico.

___DARREN MCDOWELL___, Affiant, being first duly sworn, states upon oath, that all of
the representations in this affidavit are true as far as affiant knows or is informed, and
that such affidavit is true, accurate and complete to the best of affiant's knowledge and
belief.

DATED: ___March 9___, 2020.

_____
Affiant

SUBSCRIBED AND SWORN TO before me this ___9___ day of ___March___, 2020

_____
NOTARY PUBLIC

My commission expires:

DESIREE TAYLOR
Notary Public, State of Texas
Comm. Expires 02-26-2022
Notary ID 12966769-9

**EXHIBIT 1**

FILED 1st JUDICIAL DISTRICT COURT
Santa Fe County
3/23/2020 2:04 PM
KATHLEEN VIGIL CLERK OF THE COURT
Maureen Naranjo

STATE OF NEW MEXICO
SANTA FE      COUNTY
  FIRST      JUDICIAL DISTRICT

Marita Renteria

No. D-101-CV-2020-00180

v. Monsanto Company; Sidco
Corporation; AGCO Corporation

## AFFIDAVIT OF NON-ADMITTED LAWYER

STATE OF   TEXAS              )
                             )
COUNTY OF   DALLAS            )

Eric Przybysz            , (Non-admitted Lawyer) the affiant herein, having been
duly sworn, states upon oath:

1. Affiant is admitted to practice law and is in good standing to practice law in
   Texas, USA              (state, territory, country).

2. Affiant has complied with Rule 24-106 NMRA.

3. Affiant has associated with  Feliz Angelica Rael        , counsel licensed to practice
   law in good standing in New Mexico.

      ERIC PRZYBYSZ    Affiant, being first duly sworn, states upon oath, that all of
the representations in this affidavit are true as far as affiant knows or is informed, and
that such affidavit is true, accurate and complete to the best of affiant's knowledge and
belief.

DATED:  March 9              , 20 20 .

                                          _____
                                                  Affiant

SUBSCRIBED AND SWORN TO before me this  9  day of March, 2020

                                          _____
                                                  NOTARY PUBLIC

My commission expires:

DESIREE TAYLOR
Notary Public, State of Texas
Comm. Expires 02-26-2022
Notary ID 12966769-9

EXHIBIT 1

FILED  1st JUDICIAL DISTRICT COURT
Santa Fe County
4/8/2020 1:56 PM
KATHLEEN VIGIL CLERK OF THE COURT
Tamara Snee

STATE OF NEW MEXICO
COUNTY OF SANTA FE
FIRST JUDICIAL DISTRICT

MARITA RENTERIA,

    Plaintiffs,

v.                                                                No. D-101-CV-2020-00180

MONSANTO COMPANY; SIDCO CORPORATION; and
AGCO CORPORATION,

    Defendants.

## MONSANTO COMPANY'S ANSWER TO PLAINTIFF'S COMPLAINT

Defendant Monsanto Company ("Monsanto"), by and through its counsel, respectfully

responds by generally denying all allegations contained in plaintiff's Complaint ("Complaint"),

except as set forth below.  As defined in the Complaint and as used in this Answer, Monsanto

refers to Monsanto Company, a United States based company incorporated in Delaware, and not

to other Monsanto-affiliated companies.  Monsanto denies – and objects to – allegations by

plaintiff that purport to lump Monsanto together with other defendants.  Monsanto responds to

this Complaint only on behalf of Monsanto and not on behalf of any other defendant.  Silence as

to any allegations shall constitute a denial.

In response to the allegations in the first unnumbered paragraph under the section titled

"INTRODUCTION" on page 1 of the Complaint, Monsanto denies that any exposure to

Roundup®-branded products can cause non-Hodgkin's lymphoma ("NHL") and/or other serious

illnesses.  Monsanto denies the remaining allegations in the section titled "INTRODUCTION."

1.       Monsanto lacks information or knowledge sufficient to form a belief as to the

truth of the allegations in paragraph 1 and therefore denies those allegations.

- 1 -

EXHIBIT 1

2.      In response to the allegations in the first sentence of paragraph 2, Monsanto admits that its headquarters and principal place of business are in St. Louis County, Missouri, and that it is incorporated in Delaware.  Monsanto admits that it and its affiliated companies have operations and offices in countries around the world.  The allegations in the second sentence of paragraph 2 set forth conclusions of law for which no response is required.

3.      The allegations in paragraph 3 are directed at a defendant other than Monsanto, so no response from Monsanto is required for these allegations.

4.      The allegations in paragraph 4 are directed at a defendant other than Monsanto, so no response from Monsanto is required for these allegations.

5.      In response to the allegations in paragraph 5, Monsanto denies that its principal place of business is located in New Mexico.  The remaining allegations in paragraph 5 set forth conclusions of law for which no response is required.

6.      Monsanto lacks information or knowledge sufficient to form a belief as to the truth of the allegations in paragraph 6 regarding where the events giving rise to this action occurred and therefore denies those allegations.  The remaining allegations in paragraph 6 set forth conclusions of law for which no response is required.

7.      Monsanto admits the allegations in the first and second sentences of paragraph 7.  Monsanto also admits that glyphosate was one of the world's most widely used herbicides in 2013, but notes that Monsanto was and is not the only manufacturer of glyphosate-based herbicides.  Monsanto lacks information or knowledge sufficient to form a belief as to the accuracy of the specific numbers and statistics cited in the remaining sentences of paragraph 7 and therefore denies those allegations.

EXHIBIT 1

8.      In response to the allegations in paragraph 8, Monsanto admits that its principal place of business is in St. Louis County, Missouri and that it is incorporated in Delaware. Monsanto admits that it and affiliated companies have operations and offices in countries around the world.  Monsanto admits that it is a producer of glyphosate-based herbicides but lacks sufficient information regarding the business of other glyphosate producers to admit or deny the allegation as written in the second sentence of paragraph 8.  Monsanto admits that it is the leading producer of seeds that contain the Roundup Ready® trait and that use of crops with the Roundup Ready® trait substantially improves a farmer's ability to control weeds.  Monsanto lacks information or knowledge sufficient to form a belief as to the accuracy of the specific numbers and statistics provided in the remaining sentences of paragraph 8 and therefore denies those allegations.

9.      In response to the allegations in paragraph 9, Monsanto admits that its glyphosate products are registered in at least 130 countries and approved for use on over 100 different crops. Monsanto admits that certain studies have reported that glyphosate is found at *de minimis* levels significantly below regulatory safety limits in various locations and media.  Monsanto denies the remaining allegations in paragraph 9.

10.     Monsanto admits the allegations in the first sentence of paragraph 10.  Monsanto denies the allegations in the second sentence of paragraph 10 to the extent they suggest that the IARC based its evaluation on a complete or accurate assessment of the scientific research regarding glyphosate.

11.     Monsanto admits the allegations in the first sentence of paragraph 11.  Monsanto denies the allegations in the second sentence of paragraph 11.

EXHIBIT 1

12.     In response to the allegations in paragraph 12, Monsanto admits that the IARC working group classified glyphosate under Group 2A.  Monsanto denies the remaining allegations in paragraph 12.

13.     Monsanto denies the allegations in paragraph 13.

14.     In response to the allegations in paragraph 14, Monsanto admits that glyphosate repeatedly has been found to be safe to humans and the environment by regulators in the United States and around the world and further admits that it has labeled glyphosate products as approved by regulatory bodies consistent with those findings.  Monsanto also admits that the United States Environmental Protection Agency ("EPA") repeatedly has concluded pursuant to the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA") that glyphosate-based herbicides create no unreasonable risk to human health or to the environment when used in accordance with the label.  To the extent that paragraph 14 alleges that Monsanto has labeled glyphosate or Roundup®-branded herbicides in any manner different or in addition to such regulatory approval, Monsanto denies such allegations.

* * *

There are no paragraphs numbered "15" and "16" in the Complaint, and therefore no response is required.

* * *

17.     In response to the allegations in the first sentence of paragraph 17, Monsanto admits that it discovered the herbicidal properties of glyphosate; that it has manufactured Roundup®-branded herbicides; that certain Roundup®-branded herbicides contain POEA and adjuvants; that EPA has classified surfactants and adjuvants as inert; and that glyphosate is an herbicide that is used to kill invasive plants and weeds.  Monsanto notes that EPA has

EXHIBIT 1

determined that the surfactants used in Roundup®-branded herbicides do not pose an unreasonable risk to human health. Monsanto denies the remaining allegations in the first sentence of paragraph 17. In response to the allegations in the second sentence of paragraph 17, Monsanto admits that glyphosate is an herbicide that is used to kill invasive plants and weeds. Monsanto states that the remaining allegations in the second sentence of paragraph 17 are vague and ambiguous and that it lacks information or knowledge sufficient to form a belief as to the truth of the remaining allegations in the second sentence of paragraph 17 and therefore denies those allegations.

18.    In response to the allegations in paragraph 18, Monsanto admits that glyphosate is an herbicide that is used to kill invasive plants and weeds. The remaining allegations in paragraph 18 are vague and ambiguous and Monsanto lacks information or knowledge sufficient to form a belief as to the truth of the remaining allegations in paragraph 18 and therefore denies those allegations.

19.    Monsanto admits the allegations in the first sentence of paragraph 19. Monsanto denies the allegations in the second sentence of paragraph 19 because the impact of glyphosate on treated plants varies depending upon the amount of glyphosate applied and the type of plant. Monsanto denies the allegations in the third sentence of paragraph 19 to the extent that they suggest that glyphosate is present in any plants at anything other than *de minimis* amounts well within regulatory safety levels, as determined by EPA.

20.    In response to the allegations in the first-numbered paragraph 20, Monsanto admits that farmers have safely used Roundup®-branded products since the 1970s. Monsanto denies the remaining allegations in the first-numbered paragraph 20.

EXHIBIT 1

20.     Monsanto admits the allegations in the first two sentences of the second-numbered paragraph 20 and admits that at all relevant times it has marketed Roundup®-branded products in accord with EPA's regulatory determinations under FIFRA.  Monsanto denies the remaining allegations in the second-numbered paragraph 20.

21.     Monsanto admits the allegations in paragraph 21.

22.     In response to the allegations in paragraph 22, Monsanto admits that EPA requires registrants of herbicides to submit extensive data in support of the human health and environmental safety of their products and further admits that EPA will not register or approve the labeling of herbicides that do not satisfy the requirements set forth in FIFRA.  The remaining allegations in paragraph 22 set forth conclusions of law for which no response is required.

23.     The allegations in paragraph 23 set forth conclusions of law for which no response is required.

24.     In response to the allegations in paragraph 24, Monsanto admits that Roundup®-branded products are registered by EPA for manufacture, sale, and distribution in the United States, including in Missouri.

25.     In response to the allegations in paragraph 25, Monsanto admits that EPA requires registrants of herbicides to submit extensive data in support of the human health and environmental safety of their products and further admits that EPA will not register or approve the labeling of herbicides that do not satisfy the requirements set forth in FIFRA.  Monsanto states that the term "the product tests" in the final sentence of paragraph 25 is vague and ambiguous, and Monsanto therefore denies the same.  The remaining allegations in paragraph 25 set forth conclusions of law for which no response is required.

EXHIBIT 1

26.     Monsanto denies the allegations in paragraph 26 to the extent they suggest that EPA only evaluates the safety of pesticide products on the date of their initial registration. Monsanto admits that EPA is in the process of conducting regulatory review of various pesticide products, but Monsanto lacks information or knowledge sufficient to form a belief as to the truth of the allegations in paragraph 26 regarding such pesticide products generally.  The remaining allegations in paragraph 26 set forth conclusions of law for which no response is required.

27.     In response to the allegations in paragraph 27, Monsanto admits that EPA has undertaken a regulatory review of glyphosate and further admits that EPA has not released its final findings.  Monsanto states, however, that:  (a) in September 2016, EPA's Office of Pesticide Programs ("OPP") issued a 227-page evaluation of glyphosate's carcinogenic potential, concluding that "[t]he strongest support is for [the descriptor] 'not likely to be carcinogenic to humans' at doses relevant to human health risk assessment"[1]; and (b) at the same time, EPA posted an October 2015 final report by its standing Cancer Assessment Review Committee ("CARC"), in which CARC endorsed EPA's existing classification of glyphosate as "Not Likely to be Carcinogenic to Humans."[2]  Monsanto further states that, in December 2017, EPA's OPP issued a detailed, lengthy revised evaluation of glyphosate's carcinogenic potential that reiterated the conclusion that "[t]he strongest support is for [the descriptor] 'not likely to be carcinogenic to

---

[1] EPA's Office of Pesticide Programs, *Glyphosate Issue Paper: Evaluation of Carcinogenic Potential* at 141 (Sept. 12, 2016) ("EPA OPP Report"), https://www.regulations.gov/document?D=EPA-HQ-OPP-2016-0385-0094.  The EPA OPP Report was prepared in anticipation of an EPA Scientific Advisory Panel meeting on glyphosate's carcinogenic potential.

[2] Cancer Assessment Review Committee, Health Effects Division, Office of Pesticide Programs, U.S. Environmental Protection Agency, *Cancer Assessment Document – Evaluation of the Carcinogenic Potential of Glyphosate* at 10, 77 (Final Report, Oct. 1, 2015) ("EPA CARC Final Report"), https://www.regulations.gov/document?D=EPA-HQ-OPP-2016-0385-0014.

EXHIBIT 1

humans'."[3]  Monsanto lacks information or knowledge sufficient to form a belief as to the truth

of the remaining allegations in paragraph 27 and therefore denies those allegations.

28.     In response to the allegations in paragraph 28, Monsanto admits that an EPA

review committee classified glyphosate as Class C in 1985 based on limited data and that EPA

changed its classification of glyphosate to Group E based upon a full evaluation of the scientific

evidence, including but not limited to three animal carcinogenicity studies.  Monsanto admits

that plaintiffs have accurately quoted from one passage in an EPA document in 1991 with respect

to the designation of an agent as Group E, but states that EPA repeatedly has concluded that

glyphosate does not pose any cancer risk to humans.  In addition to the conclusions in the two

EPA OPP reports and the EPA CARC Final Report discussed above, specific findings of safety

include:

- "In June 1991, EPA classified glyphosate as a Group E [carcinogen] – one that shows evidence of non-carcinogenicity for humans – based on the lack of convincing evidence of carcinogenicity in adequate studies."  EPA, *Glyphosate: Reregistration Eligibility Decision (RED) Facts*, 2 (Sept. 1993), http://archive.epa.gov/pesticides/reregistration/web/pdf/0178fact.pdf.

- "No evidence of carcinogenicity."  Glyphosate; Pesticide Tolerances, 67 Fed. Reg. 60,934, 60,943 (Sept. 27, 2002) (to be codified at 40 C.F.R. pt. 180).

- "Glyphosate has no carcinogenic potential."  Glyphosate; Pesticide Tolerance, 69 Fed. Reg. 65,081, 65,086 (Nov. 10, 2004) (to be codified at 40 C.F.R. pt. 180).

- "There is [an] extensive database available on glyphosate, which indicate[s] that glyphosate is not mutagenic, not a carcinogen, and not a developmental or reproductive toxicant."  Glyphosate; Pesticide Tolerances, 73 Fed. Reg. 73,586, 73,589 (Dec. 3, 2008) (to be codified at 40 C.F.R. pt. 180).

---

[3] EPA's Office of Pesticide Programs, *Revised Glyphosate Issue Paper: Evaluation of Carcinogenic Potential* at 143, 144 (Dec. 12, 2017), https://www.regulations.gov/document?D=EPA-HQ-OPP-2016-0385-0528.

EXHIBIT 1

- "EPA has concluded that glyphosate does not pose a cancer risk to humans."
  Glyphosate; Pesticide Tolerances, 78 Fed. Reg. 25,396, 25,398 (May 1, 2013) (to be
  codified at 40 C.F.R. pt. 180).

- "In 2014, EPA reviewed over 55 epidemiological studies conducted on the possible
  cancer and non-cancer effects of [g]lyphosate. Our review concluded that this body
  of research does not provide evidence to show that [g]lyphosate causes cancer and
  does not warrant any change in the EPA's cancer classification for [g]lyphosate."
  *Agriculture Biotechnology: A Look at Federal Regulation and Stakeholder
  Perspectives: Hearing Before the S. Comm. on Agr., Nutrition, & Forestry*, 114th
  Cong. (2015) (statement of Dr. William Jordan, Deputy Director of EPA's Office of
  Pesticide Programs), http://www.ag.senate.gov/templates/watch.cfm?id=74793e67-
  5056-a055-64af-0e55900753b4, at time stamp 55:05 – 56:20 ("EPA 2015 Desk
  Statement").

Monsanto denies the remaining allegations in paragraph 28.

29.     In response to the allegations in paragraph 29, Monsanto admits that it – along

with a large number of other companies and governmental agencies – was defrauded by two

chemical testing laboratories, and that Monsanto had hired both of these laboratories to conduct

testing on glyphosate. Monsanto states that only one of these laboratories was hired to conduct

toxicity tests of glyphosate. Monsanto denies that EPA's registration of glyphosate or any

glyphosate-based herbicides is based upon any invalid IBT studies. To the extent that the

allegations in paragraph 29 are intended to suggest that Monsanto was anything other than a

victim of this fraud, such allegations are denied.

30.     In response to the allegations in paragraph 30, Monsanto admits that Industrial

Bio-Test ("IBT") Laboratories was hired to conduct toxicity studies in connection with the

registration of a Roundup®-branded product. Monsanto denies that EPA's regulatory approval of

such product is based upon any fraudulent or false IBT studies.

31.     Monsanto denies the allegations in paragraph 31 to the extent they suggest that

EPA performed an inspection of IBT Laboratories solely or specifically in connection with

studies conducted on glyphosate. Monsanto admits that EPA performed an audit of IBT

EXHIBIT 1

Laboratories to investigate that laboratory's fraudulent and/or improper testing procedures in connection with services provided to a broad number of private and governmental entities and that this inspection included a review of studies IBT conducted on glyphosate.  Monsanto was one of several pesticide manufacturers who had used IBT test results.  The audit found some toxicology studies conducted with the original Roundup® herbicide to be invalid.  As a result, Monsanto repeated all required studies in accordance with applicable EPA testing guidelines.  Monsanto denies that EPA's registration of glyphosate or any glyphosate-based herbicides is based upon any invalid IBT studies.  To the extent that the allegations in paragraph 31 are intended to suggest that Monsanto was anything other than a victim of this fraud, such allegations also are denied.

32.     In response to the allegations in paragraph 32, Monsanto admits that three IBT employees were convicted of the charge of fraud, but Monsanto denies that any of the individuals were convicted based upon studies conducted on glyphosate or glyphosate-based herbicides.

33.     In response to the allegations in paragraph 33, Monsanto admits that it – along with numerous other private companies – hired Craven Laboratories as an independent laboratory to conduct residue studies for Monsanto agricultural products.  Monsanto further admits that it was defrauded by Craven Laboratories and that, as a result, Monsanto repeated the studies conducted at Craven Laboratories at a substantial cost.  To the extent that the allegations in paragraph 33 are intended to suggest that Monsanto was anything other than a victim of this fraud, Monsanto denies those allegations.

34.     Monsanto denies the allegations in paragraph 34.

EXHIBIT 1

35.     In response to the allegations in paragraph 35, Monsanto admits that Roundup®-branded products are highly valued by its customers because of their efficacy and safety. Monsanto also admits that the patent for glyphosate expired in the United States in 2000.  The remaining allegations in paragraph 35 are vague and conclusory and comprise attorney characterizations, and are accordingly denied.

36.     In response to the allegations in paragraph 36, Monsanto admits that, following the development of Roundup® Ready seeds, it began to sell them in the 1990s and that such seeds are now widely used by farmers in the United States and worldwide.  Monsanto lacks information or knowledge sufficient to form a belief as to the accuracy of the specific numbers cited in paragraph 36 and accordingly denies those allegations.  The remaining allegations in paragraph 36 are vague and conclusory and comprise attorney characterizations, and are accordingly denied.

37.     In response to the allegations in paragraph 37, Monsanto admits that glyphosate is one of the world's largest herbicides by sales volume, but Monsanto denies any suggestion that it is the only company that sells glyphosate or glyphosate-based herbicides.  Monsanto lacks information or knowledge sufficient to form a belief as to the accuracy of the specific numbers cited in paragraph 37 and accordingly denies the same.  The remaining allegations in paragraph 37 are vague and conclusory and comprise attorney characterizations, and are accordingly denied.

38.     In response to the allegations in paragraph 38, Monsanto admits that the New York Attorney General filed a lawsuit against Monsanto in 1996 alleging false and misleading advertising of Roundup®-branded products.  This lawsuit was subsequently resolved without any admission of wrongdoing by Monsanto.  Monsanto states that none of the New York Attorney

EXHIBIT 1

General's allegations related in any way to a purported or alleged risk of cancer.  To the extent

the subparts purport to quote a document, the document speaks for itself and thus does not

require any further answer.  The remaining allegations in paragraph 38 are vague and conclusory

and comprise attorney characterizations, and are accordingly denied.

39.    In response to the allegations in paragraph 39, Monsanto admits it entered into an

assurance of discontinuance with the New York Attorney General.  The assurance speaks for

itself and thus does not require any further answer.  The remaining allegations in paragraph 39

are vague and conclusory and comprise attorney characterizations, and are accordingly denied.

40.    Monsanto denies the allegations in paragraph 40.

41.    In response to the allegations in paragraph 41, Monsanto admits that the French

court ruled that Monsanto had falsely advertised its herbicide Roundup® as "biodegradable" and

that it "left the soil clean," but denies the allegations to the extent they suggest that this ruling

was in any way related to plaintiffs' claim here that glyphosate can cause cancer.  Monsanto

denies the remaining allegations in paragraph 41.

42.    In response to the allegations in paragraph 42, Monsanto denies that IARC

follows stringent procedures for the evaluation of a chemical agent.  Monsanto lacks information

or knowledge sufficient to form a belief as to the accuracy of the specific numbers cited in

paragraph 42, which are not limited as of any specified date, and accordingly denies the same.

43.    In response to the allegations in paragraph 43, Monsanto admits that IARC sets

forth in its Preamble the procedures that it claims to follow in its carcinogenicity evaluations.

Monsanto denies the remaining allegations in paragraph 43.

44.    In response to the allegations in paragraph 44, Monsanto denies any suggestion

that IARC reviewed the full body of scientific research in conducting its evaluation of glyphosate

EXHIBIT 1

or that it reliably reviewed the studies that it cited in its glyphosate monograph. Monsanto lacks information or knowledge sufficient to form a belief as to the truth of the remaining allegations in paragraph 44 and therefore denies those allegations.

45.     In response to the allegations in paragraph 45, Monsanto denies any suggestion that IARC reviewed the full body of scientific research in conducting its evaluation of glyphosate or that it reliably reviewed the studies that it cited in its glyphosate monograph. Monsanto lacks information or knowledge sufficient to form a belief as to the truth of the remaining allegations in paragraph 45 and therefore denies those allegations.

46.     Monsanto denies the allegations in paragraph 46 to the extent that they suggest that IARC had previously assessed glyphosate. Monsanto admits that IARC classified glyphosate as a Group 2A agent in March 2015.

47.     In response to the allegations in paragraph 47, Monsanto admits that IARC issued its monograph for glyphosate, Monograph 112, on July 29, 2015 and that a draft of the monograph was prepared by a "working group" of individuals selected by IARC who met over a one week period in March 2015 to consider glyphosate along with a number of other substances. Monsanto denies the allegation that all members of the working group are "experts." Monsanto denies that the working group or anyone at IARC conducted a one-year review of the scientific evidence related to glyphosate or that the working group's findings reflected a comprehensive review of the latest available scientific evidence. Monsanto also denies that the working group considered all information available in the scientific literature and all data from government reports that are publicly available. Monsanto denies the remaining allegations in paragraph 47.

48.     In response to the allegations in paragraph 48, Monsanto denies that the IARC working group considered all of the data in the numerous studies that have been conducted

EXHIBIT 1

looking at the safety of glyphosate and glyphosate-containing herbicides in human populations or

that it reliably considered the studies that it purports to have reviewed, which frequently reach

conclusions directly contrary to those espoused by the IARC working group.  To the extent the

allegations purport to characterize statements made in the IARC monograph for glyphosate, the

statements in that document stand for themselves, but Monsanto lacks information or knowledge

sufficient to form a belief as to the accuracy of the source of said information and accordingly

denies the allegations.

49.     The allegations in paragraph 49 are vague and conclusory.  To the extent they

purport to characterize statements made in the IARC monograph for glyphosate, the statements

in that document stand for themselves, but Monsanto lacks information or knowledge sufficient

to form a belief as to the accuracy of the source of said information and accordingly denies the

allegations.

50.     In response to the allegations in paragraph 50, to the extent the allegations purport

to characterize statements made in the IARC monograph for glyphosate, the statements in that

document stand for themselves, but to the extent that this paragraph means that more than *de

minimis* amounts of exposure are present, the allegations in paragraph 50 are denied.

51.     In response to the allegations in paragraph 51, Monsanto admits that the IARC

working group identified a number of case control studies of populations with exposures to

glyphosate, but Monsanto denies that any of these studies provide any evidence of a human

health concern from such exposures.

52.     Monsanto denies the allegations in paragraph 52.  The IARC working group

concluded that there was only limited evidence of carcinogenicity in epidemiologic studies,

EXHIBIT 1

which, per IARC's guidelines, means that the working group could not rule out chance, bias or confounding so as to reach any conclusion of an increased risk.

53.     In response to the allegations in paragraph 53, Monsanto admits that the working group cited to a study that it concluded provided evidence of chromosomal damage in community residents reported to be exposed to glyphosate, but Monsanto denies that the study supports such a conclusion or that the authors of the study reached such a conclusion.

54.     In response to the allegations in paragraph 54, Monsanto admits that the IARC working group purported to make these findings, but denies that the animal carcinogenicity studies of glyphosate in the aggregate provide evidence of a positive trend for or increase in any of the identified tumors.  Monsanto further states that regulatory agencies around the world have reviewed the same animal studies and concluded that they do not provide evidence that glyphosate can cause cancer.  Monsanto denies the remaining allegations in paragraph 54.

55.     In response to the allegations in paragraph 55, Monsanto admits that the IARC working group purported to make these findings but denies that the cited studies provide any reliable basis for a finding that any meaningful levels of glyphosate or AMPA is present or persists in human blood or urine.  Monsanto denies the remaining allegations in paragraph 55.

56.     In response to the allegations in paragraph 56, Monsanto admits that the IARC working group interpreted a selected number of experimental studies as evidence that glyphosate can cause genotoxicity, but Monsanto denies that the working group reliably considered the full body of scientific data on such alleged genotoxic endpoints and denies that the working group reliably interpreted the studies that it selected for consideration.  Regulators around the world repeatedly have concluded that glyphosate is not genotoxic.  Monsanto denies the remaining allegations in paragraph 56.

EXHIBIT 1

57.     In response to the allegations in paragraph 57, Monsanto admits that the IARC working group purported to find such effects, but denies that there is any reliable scientific basis for such conclusion.  Monsanto denies the remaining allegations in paragraph 57.

58.     In response to the allegations in paragraph 58, Monsanto admits that the working group reviewed the findings of an Agricultural Health Study ("AHS") published in 2005, but denies that the working group characterized that study as supporting an association between glyphosate and the specified cancers.  The AHS cohort study did not find a positive association between glyphosate and any type of cancer.  Monsanto denies all other allegations in paragraph 58.

59.     In response to the allegations in paragraph 59, Monsanto admits that EPA has a technical fact sheet, as part of its Drinking Water and Health, National Primary Drinking Water Regulations, relating to glyphosate that predates the IARC March 20, 2015 evaluation, which should be read in context of EPA's precautionary regulatory mandate and EPA's consistent finding that glyphosate does not pose any cancer risk to humans.

60.     In response to the allegations in paragraph 60, Monsanto admits that the Complaint accurately quotes from the identified document, which should be read in context of EPA's precautionary regulatory mandate and EPA's consistent finding that glyphosate does not pose any cancer risk to humans.

61.     In response to the allegations in paragraph 61, Monsanto admits that the Northwest Coalition for Alternatives to Pesticides made the identified claims, but denies that the Coalition provides any reliable basis for any conclusions regarding potential health risks from glyphosate.  Monsanto notes that a federal district court has characterized this same publication

EXHIBIT 1

as an "advocacy piece[] published in [a] non-peer-reviewed journal." *See Arias v. DynCorp*, 928

F. Supp. 2d 10, 24 (D.D.C. 2013).

62.     In response to the allegations in paragraph 62, Monsanto admits that the IARC

working group's classification of glyphosate as a Class 2A carcinogen has resulted in ongoing

discussions and/or restrictions in certain countries regarding the sale and/or use of glyphosate-

based herbicides, including the Netherlands, but denies that there is any scientific basis for the

concerns raised by the improper IARC classification.  Monsanto denies the remaining allegations

in paragraph 62.

63.     In response to the allegations in paragraph 63, Monsanto admits that the IARC

working group classification led an individual government attorney in Brazil to write a letter to

the Brazilian regulatory authorities requesting a reevaluation of glyphosate.  Monsanto denies the

remaining allegations in paragraph 63.

64.     Monsanto admits that, in France, the sale to and use by amateurs (*i.e.*, non-

professionals) of all pesticides (with certain exceptions for biocontrol pesticides) are prohibited

as of January 1, 2019, with certain exceptions.  Monsanto denies the remaining allegations in

paragraph 64.

65.     In response to the allegations in paragraph 65, Monsanto admits that some

employees of Bermuda's government announced an intention to suspend the importation of

glyphosate-based herbicides, but lacks information sufficient to form a belief as to the truth of

the allegations about whether this suspension took effect and accordingly denies the same.

Monsanto denies the remaining allegations in paragraph 65.

66.     In response to the allegations in paragraph 66, Monsanto admits that the IARC

monograph appears to be the alleged basis for the Sri Lankan government's actions, including

EXHIBIT 1

the allegation that glyphosate can cause kidney disease. Monsanto further states that the allegations regarding kidney disease found in Sri Lanka are unrelated to plaintiffs' allegations regarding claimed carcinogenicity. Monsanto denies the remaining allegations in paragraph 66.

67.     In response to the allegations in paragraph 67, Monsanto denies the alleged basis for Colombia's suspension of aerial spraying of glyphosate. Colombia's attorney general has explained that the ban on aerial spraying of illicit coca plantations was a concession to the FARC ("Fuerzas Armadas Revolucionarias de Colombia"), and had nothing to do with alleged safety concerns. As of April 2016, the government of Colombia has resumed manual application of glyphosate on illicit coca crops. A federal district court in the United States excluded plaintiffs' expert testimony purporting to link these same aerial eradication operations with cancer as scientifically unreliable. *See Arias v. DynCorp*, 928 F. Supp. 2d 10 (D.D.C. 2013). Monsanto denies the remaining allegations in paragraph 67.

68.     In response to the allegations in paragraph 68, Monsanto admits that the California Office of Environmental Health Hazard Assessment ("OEHHA") decided that it was required to add glyphosate to California's Proposition 65 list of chemicals in a process that OEHHA itself considers "ministerial" and "automatic" without any role for consideration of the weight or quality of the evidence considered by IARC. Monsanto further states that this decision was not based upon any independent scientific analysis of glyphosate but instead was in response to a provision of a California ballot proposition triggering such action based solely upon the IARC classification, and indeed was contrary to OEHHA's own conclusion in 2007, based upon its own independent evaluation of the same scientific evidence, that glyphosate is "unlikely to

EXHIBIT 1

pose a cancer hazard to humans."[4]  Monsanto contends that OEHHA's decision that it was

required to list glyphosate violates the United States Constitution and the California Constitution.

On February 26, 2018, a federal district court enjoined California from requiring Proposition 65

warning labels for glyphosate as unconstitutional.  The remaining allegations in paragraph 68 set

forth conclusions of law for which no response is required.  To the extent that a response is

deemed required, Monsanto denies the allegations in paragraph 68.

69.     The allegations in paragraph 69 set forth conclusions of law for which no

response is required.

70.     The allegations in paragraph 70 set forth conclusions of law for which no

response is required.  Nevertheless, Monsanto notes that, under Proposition 65, the mere

presence of a listed substance in a consumer product does not require a warning.  Instead, a

warning need only be provided if the exposure to the listed substance, for the average user of the

product, exceeds the level at which cancer would be hypothesized to occur, based on

extrapolation from animal studies, in one person in 100,000 persons exposed over a 70-year

lifetime.

71.     In response to the allegations in paragraph 71, Monsanto admits that it has

brought a lawsuit challenging OEHHA's notice of intent to include glyphosate on its Proposition

65 list.

72.     In response to the allegations in paragraph 72, Monsanto admits that plaintiff

accurately quotes from Monsanto's Complaint in the referenced lawsuit, and states that

Monsanto's Complaint in that lawsuit speaks for itself.  Monsanto further admits that its lawsuit

---

[4] OEHHA, *Public Health Goal for Glyphosate in Drinking Water* (June 2007),
https://oehha.ca.gov/media/downloads/water/chemicals/phg/glyphg062907.pdf.

EXHIBIT 1

cites to OEHHA's 2007 determination based upon its own independent evaluation of the scientific evidence that glyphosate is "unlikely to pose a cancer hazard to humans."[5]  The remaining allegations in paragraph 72 comprise attorney characterizations and are accordingly denied.

73.     In response to the allegations in paragraph 73, Monsanto admits that, on November 12, 2015, the European Food Safety Authority ("EFSA") issued its Renewal Assessment Report (RAR) on glyphosate, in which it concluded that "glyphosate is unlikely to pose a carcinogenic hazard to humans."[6]  Monsanto further admits that this conclusion affirmed a similar finding by the German Federal Institute for Risk Management (BfR).  Monsanto admits that the European scientists who reached these determinations were acting independently of Monsanto and were acting to protect the public.

74.     Monsanto admits the allegations in paragraph 74.

75.     In response to the allegations in paragraph 75, Monsanto states that the cited document speaks for itself and does not require a response.  Monsanto denies the allegations in paragraph 75 to the extent that they purport to set forth all of the distinctions identified by EFSA between its evaluation and the evaluation of the IARC working group.  Monsanto states that in the same document cited by plaintiffs, EFSA states that, in contrast to IARC, "the EU peer review concluded that no significant increase in tumour incidence could be observed in any of the treated groups of animals in the nine long term rat studies considered" and explains that "[a]s well as reviewing a larger number of studies [than IARC], EFSA for example considered that

---

[5] OEHHA, *Public Health Goal for Glyphosate in Drinking Water* (June 2007), https://oehha.ca.gov/media/downloads/water/chemicals/phg/glyphg062907.pdf.

[6] *See* EFSA, *Glyphosate:  EFSA updates toxicological profile*, http://www.efsa.europa.eu/en/press/news/151112.

EXHIBIT 1

carcinogenic effects observed at high doses were unreliable as they could be related to general

toxicity."[7]  To the extent that paragraph 75 characterizes the meaning of the cited studies,

Monsanto denies the remaining allegations in paragraph 75.

76.    In response to the allegations in paragraph 76, Monsanto states that the cited

document speaks for itself and does not require a response.

77.    In response to the allegations in paragraph 77, Monsanto admits that EFSA set

acceptable exposure thresholds for glyphosate that are orders of magnitude higher than those

which occur in the ordinary use of glyphosate-based herbicides.  Monsanto denies that these

exposure thresholds are based upon any alleged risk of carcinogenicity.

78.    In response to the allegations in paragraph 78, Monsanto admits that certain

individuals, including Dr. Christopher Portier, sent the letter identified in paragraph 78

(hereinafter, "the Portier letter").  Monsanto denies that Dr. Portier or the other signatories to his

letter are "independent" and "renowned international experts in the field."  Monsanto states that

Dr. Portier has been disclosed as an expert witness retained by plaintiffs' counsel in the

glyphosate cancer litigation against Monsanto and that Monsanto lacks information or

knowledge sufficient to form a belief as to whether the other signatories were aware, before they

signed the Portier letter, that Dr. Portier was working as a retained expert for plaintiffs' counsel.

Monsanto otherwise admits that this letter urged the EU Health Commissioner to disregard the

scientific findings reached by EFSA and by the BfR.

79.    In response to the allegations in paragraph 79, Monsanto admits that Dr. Portier

sent the letter identified in paragraph 79.  Monsanto denies that Dr. Portier or the other

_____

[7] EFSA, *EFSA Explains Risk Assessment Glyphosate*, http://www.efsa.europa.eu/sites/default
/files/corporate_publications/files/efsaexplainsglyphosate151112en.pdf.

EXHIBIT 1

signatories to his letter are "renowned international experts in the field."  Monsanto admits that

certain members of the IARC working group assigned to glyphosate signed on to the Portier

letter, but states that Monsanto lacks information or knowledge sufficient to form a belief as to

whether those individuals or the other signatories were aware at the time that Dr. Portier was

working as a retained expert for plaintiffs' counsel.

80.    In response to the allegations in paragraph 80, Monsanto states that the cited

Portier letter speaks for itself and does not require a response.  Monsanto further admits that Dr.

Portier – who has been disclosed as an expert witness retained by plaintiffs' counsel in the

glyphosate cancer litigation against Monsanto – seeks in his letter to challenge the scientific

conclusions reached by EFSA in support of its finding that "glyphosate is unlikely to pose a

carcinogenic hazard to humans."[8]  To the extent that paragraph 80 characterizes the meaning of

the cited document or of EFSA's evaluation of glyphosate, Monsanto denies the remaining

allegations in paragraph 80.

81.    In response to the allegations in paragraph 81, Monsanto admits that IARC

concluded that the human epidemiologic data provides only "limited evidence of

carcinogenicity," which IARC defines as meaning that "chance, bias, or confounding could not

be ruled out with reasonable confidence."[9]  Monsanto further admits that Dr. Portier – who has

been disclosed as an expert witness retained by plaintiffs' counsel in the glyphosate cancer

litigation against Monsanto – seeks in his letter to challenge the scientific conclusions reached by

EFSA in support of its finding that "glyphosate is unlikely to pose a carcinogenic hazard to

---

[8] See EFSA, *Glyphosate:  EFSA updates toxicological profile*, http://www.efsa.europa.eu/en
/press/news/151112.

[9]http://publications.iarc.fr/_publications/media/download/4566/1f986e57ea2ddd9830fec223aeab
c740d0bb2eca.pdf.

EXHIBIT 1

humans."[10]  In response to the remaining allegations in paragraph 81, Monsanto states that the cited Portier letter speaks for itself and does not require a response.  To the extent that paragraph 81 characterizes the meaning of the cited document or of EFSA's evaluation of glyphosate, Monsanto denies the remaining allegations in paragraph 81.

82.     In response to the allegations in paragraph 82, Monsanto states that the cited Portier letter speaks for itself and does not require a response.  Monsanto further admits that Dr. Portier – who has been disclosed as an expert witness retained by plaintiffs' counsel in the glyphosate cancer litigation against Monsanto – seeks in his letter to challenge the scientific conclusions reached by EFSA in support of its finding that "glyphosate is unlikely to pose a carcinogenic hazard to humans."[11]  To the extent that paragraph 82 characterizes the meaning of the cited document or of EFSA's and BfR's evaluation of glyphosate, Monsanto denies the remaining allegations in paragraph 82.

83.     In response to the allegations in paragraph 83, Monsanto states that the cited Portier letter speaks for itself and does not require a response.  Monsanto further admits that Dr. Portier – who has been disclosed as an expert witness retained by plaintiffs' counsel in the glyphosate cancer litigation against Monsanto – seeks in his letter to challenge the scientific conclusions reached by EFSA in support of its finding that "glyphosate is unlikely to pose a carcinogenic hazard to humans."[12]  To the extent that paragraph 83 characterizes the meaning of

---

[10] *See* EFSA, *Glyphosate: EFSA updates toxicological profile*, http://www.efsa.europa.eu /en/press/news/151112.

[11] *See* EFSA, *Glyphosate: EFSA updates toxicological profile*, http://www.efsa.europa.eu /en/press/news/151112.

[12] *See* EFSA, *Glyphosate: EFSA updates toxicological profile*, http://www.efsa.europa.eu /en/press/news/151112.

EXHIBIT 1

the cited document or of EFSA's and BfR's evaluation of glyphosate, Monsanto denies the remaining allegations in paragraph 83.

84.     Monsanto admits the allegations in paragraph 84.

85.     In response to the allegations in paragraph 85, Monsanto states that the cited document speaks for itself and does not require a response.  Monsanto denies that the self-labeled "consensus statement" represents the view of any consensus of scientific opinion.  To the extent that paragraph 85 characterizes the scientific evidence regarding the safety of glyphosate-based herbicides, Monsanto denies the remaining allegations in paragraph 85.

86.     In response to the allegations in paragraph 86, Monsanto states that the cited document speaks for itself and does not require a response.  Monsanto denies that the self-labeled "consensus statement" represents the view of any consensus of scientific opinion.  To the extent that paragraph 86 characterizes the scientific evidence regarding the safety of glyphosate-based herbicides, Monsanto denies the remaining allegations in paragraph 86.

87.     In response to the allegations in paragraph 87, Monsanto states that the cited document speaks for itself and does not require a response.  Monsanto denies that the self-labeled "consensus statement" represents the view of any consensus of scientific opinion.  To the extent that paragraph 87 characterizes the scientific evidence regarding the safety of glyphosate-based herbicides, Monsanto denies the remaining allegations in paragraph 87.

88.     In response to the allegations in paragraph 88, Monsanto states that the cited document speaks for itself and does not require a response.  Monsanto denies that the self-labeled "consensus statement" represents the view of any consensus of scientific opinion.  To the extent that paragraph 88 characterizes the scientific evidence regarding the safety of glyphosate-based herbicides, Monsanto denies the remaining allegations in paragraph 88.

EXHIBIT 1

89.     In response to the allegations in paragraph 89, Monsanto states that the cited document speaks for itself and does not require a response.  Monsanto denies that the self-labeled "consensus statement" represents the view of any consensus of scientific opinion.  To the extent that paragraph 89 characterizes the scientific evidence regarding the safety of glyphosate-based herbicides, Monsanto denies the remaining allegations in paragraph 89.

90.     In response to the allegations in paragraph 90, Monsanto states that the cited document speaks for itself and does not require a response.  Monsanto denies that the self-labeled "consensus statement" represents the view of any consensus of scientific opinion.  To the extent that paragraph 90 characterizes the scientific evidence regarding the safety of glyphosate-based herbicides, Monsanto denies the remaining allegations in paragraph 90.

91.     In response to the allegations in paragraph 91, Monsanto states that the cited document speaks for itself and does not require a response.  Monsanto denies that the self-labeled "consensus statement" represents the view of any consensus of scientific opinion.  To the extent that paragraph 91 characterizes the scientific evidence regarding the safety of glyphosate-based herbicides, Monsanto denies the remaining allegations in paragraph 91.

92.     Monsanto lacks information or knowledge sufficient to form a belief as to the truth of the allegations in paragraph 92 and therefore denies those allegations.

93.     Monsanto lacks information or knowledge sufficient to form a belief as to the truth of the allegations in paragraph 93 and therefore denies those allegations.

94.     Monsanto lacks information or knowledge sufficient to form a belief as to the truth of the allegations in paragraph 94 and therefore denies those allegations.

95.     Monsanto lacks information or knowledge sufficient to form a belief as to the truth of the allegations in paragraph 95 and therefore denies those allegations.

EXHIBIT 1

96.     The allegations in the first sentence of paragraph 96, set forth conclusions of law for which no response is required.  To the extent a response is deemed required, Monsanto denies that plaintiff is entitled to invoke the discovery rule.  In response to the second sentence of paragraph 96, Monsanto denies that any exposure to Roundup®-branded products can cause NHL and/or other serious illnesses and states that the scientific studies upon which the IARC purported to base its evaluation of glyphosate were all publicly available before March 2015. The allegations in the final sentence of paragraph 96 set forth conclusions of law for which no response is required.  To the extent a response is deemed required, Monsanto denies the allegations in the last sentence of paragraph 96.

97.     In response to the allegations in paragraph 97, Monsanto denies that there is any risk of serious illness associated with the use of and/or exposure to Roundup®-branded products and glyphosate and denies that Roundup®-branded products or glyphosate are injurious to human health.  Monsanto states, however, that the scientific studies upon which IARC purported to base its classification were all publicly available before March 2015.  The final sentence of paragraph 97 sets forth a conclusion of law for which no response is required.

98.     In response to the allegations in paragraph 98, Monsanto denies that exposure to Roundup®-branded products and glyphosate is injurious to human health.  Monsanto states, however, that the scientific studies upon which IARC purported to base its cancer classification for glyphosate were all publicly available before March 2015.  The remaining allegations in paragraph 98 set forth conclusions of law for which no response is required.

99.     In response to the allegations in paragraph 99, Monsanto denies that there is any risk of NHL and/or other serious illness associated with the use of and/or exposure to Roundup®-branded products and glyphosate.  Monsanto states, however, that the scientific studies upon

EXHIBIT 1

which IARC purported to base its cancer classification for glyphosate were all publicly available before March 2015.  Monsanto lacks information or knowledge sufficient to form a belief as to the truth of the remaining allegations in paragraph 99 and therefore denies those allegations.

100.    The allegations in paragraph 100 set forth conclusions of law for which no response is required.  To the extent that a response is deemed required, Monsanto denies the allegations in paragraph 100. Monsanto states that the scientific studies upon which IARC purported to base its cancer classification for glyphosate were all publicly available before March 2015.

101.    Monsanto denies the allegations in paragraph 101.

102.    Monsanto denies the allegations in paragraph 102.

103.    The allegations in paragraph 103 set forth conclusions of law for which no response is required.

104.    Monsanto denies the allegations in paragraph 104.

105.    The allegations in paragraph 105 set forth conclusions of law for which no response is required.  To the extent that a response is required, Monsanto denies the allegations in paragraph 105. Monsanto states that the scientific studies upon which IARC purported to base its cancer classification for glyphosate were all publicly available before March 2015.

106.    Monsanto incorporates by reference its responses to paragraphs 1 through 105 in response to paragraph 106 of plaintiff's Complaint.

107.    In response to the allegations in paragraph 107, Monsanto admits that plaintiff purports to bring a claim for strict liability design defect, but denies any liability as to that claim.

108.    In response to the allegations in paragraph 108, Monsanto lacks information or knowledge sufficient to form a belief as to the truth of the allegation that plaintiff used

EXHIBIT 1

Roundup®-branded products and therefore denies that allegation.  Monsanto denies the

remaining allegations in paragraph 108.

109.    Monsanto denies the allegations in paragraph 109.

110.    Monsanto lacks information or knowledge sufficient to form a belief as to the

truth of the allegations in paragraph 110 and therefore denies those allegations.

111.    Monsanto denies the allegations in paragraph 111.

112.    Monsanto denies the allegations in paragraph 112.

113.    Monsanto denies the allegations in paragraph 113, including each of its subparts.

114.    Monsanto lacks information or knowledge sufficient to form a belief as to the

truth of the allegations in paragraph 114 concerning plaintiff's claimed use of Roundup®-branded

products and therefore denies those allegations.  Monsanto denies the remaining allegations in

paragraph 114, including that Roundup® branded products have "dangerous characteristics."

115.    Monsanto lacks information or knowledge sufficient to form a belief as to the

truth of the allegations in paragraph 115 concerning plaintiff's claimed use of Roundup®-branded

products and therefore denies those allegations.  Monsanto denies the remaining allegations in

paragraph 115, including that Roundup®-branded products have "dangerous characteristics."

116.    Monsanto denies the allegations in paragraph 116.

117.    Monsanto denies the allegations in paragraph 117.

118.    Monsanto denies the allegations in paragraph 118.

119.    Monsanto denies the allegations in paragraph 119.

120.    Monsanto denies the allegations in paragraph 120.

121.    Monsanto denies the allegations in paragraph 121.

122.    Monsanto denies the allegations in paragraph 122.

EXHIBIT 1

123.   Monsanto denies the allegations in paragraph 123.

124.   Monsanto incorporates by reference its responses to paragraphs 1 through 123 in response to paragraph 124 of plaintiff's Complaint.

125.   In response to the allegations in paragraph 125, Monsanto admits that plaintiff purports to bring a claim for strict liability failure to warn, but denies any liability as to that claim.

126.   Monsanto denies the allegations in paragraph 126.

127.   In response to the allegations in paragraph 127, Monsanto lacks information or knowledge sufficient to form a belief as to the truth of the allegation that plaintiff or other entities identified purchased or used Roundup®-branded products and therefore denies that allegation.  The allegations in paragraph 127 also set forth conclusions of law for which no response is required.  Monsanto denies the remaining allegations in paragraph 127.

128.   The allegations in paragraph 128 set forth conclusions of law for which no response is required.

129.   Monsanto denies the allegations in paragraph 129.  All labeling of Roundup®-branded products has been and remains EPA-approved and in compliance with all federal requirements under FIFRA.

130.   Monsanto denies the allegations in paragraph 130.

131.   Monsanto denies the allegations in paragraph 131.

132.   Monsanto denies the allegations in paragraph 132.

133.   Monsanto lacks information or knowledge sufficient to form a belief as to the truth of the allegations in paragraph 133 and therefore denies those allegations.

EXHIBIT 1

134.    Monsanto lacks information or knowledge sufficient to form a belief as to the truth of the allegations in paragraph 134 concerning plaintiff's alleged use of Roundup®-branded products and therefore denies those allegations.  Monsanto denies the remaining allegations in paragraph 134, including that Roundup®-branded products have "dangerous characteristics."

135.    Monsanto lacks information or knowledge sufficient to form a belief as to the truth of the allegations in paragraph 135 concerning plaintiff's alleged use and exposure to Roundup®-branded products and therefore denies those allegations.  Monsanto denies the remaining allegations in paragraph 135, including that Roundup®-branded products have "dangerous characteristics."

136.    Monsanto denies the allegations in paragraph 136.

137.    Monsanto denies the allegations in paragraph 137.

138.    Monsanto denies the allegations in paragraph 138.

139.    Monsanto denies the allegations in paragraph 139.

140.    Monsanto denies the allegations in paragraph 140.

141.    Monsanto denies the allegations in paragraph 141.

142.    Monsanto denies the allegations in paragraph 142, including each of its subparts.

143.    Monsanto incorporates by reference its responses to paragraphs 1 through 142 in response to paragraph 143 of plaintiff's Complaint.

144.    In response to the allegations in paragraph 144, Monsanto admits that plaintiff purports to bring claims for negligence failure to warn, but denies any liability as to that claim.

145.    Monsanto denies the allegations in paragraph 145.

146.    Monsanto lacks information or knowledge sufficient to form a belief as to the truth of the allegations in paragraph 146 that plaintiff or other persons or entities purchased

EXHIBIT 1

Roundup®-branded products and therefore denies those allegations.  The allegations in paragraph 146 also set forth conclusions of law for which no response is required.  Monsanto denies the remaining allegations in paragraph 146.

147.    The allegations in paragraph 147 set forth conclusions of law for which no response is required.

148.    Monsanto denies the allegations in paragraph 148.  All labeling of Roundup®-branded products has been and remains EPA-approved and in compliance with all federal requirements under FIFRA.

149.    Monsanto denies the allegations in paragraph 149.

150.    Monsanto denies the allegations in paragraph 150.

151.    Monsanto denies the allegations in paragraph 151.

152.    Monsanto lacks information or knowledge sufficient to form a belief as to the truth of the allegations in paragraph 152 and therefore denies those allegations.

153.    Monsanto lacks information or knowledge sufficient to form a belief as to the truth of the allegations in paragraph 153 concerning plaintiff's claimed use of and exposure to Roundup®-branded products and therefore denies those allegations.  Monsanto denies the remaining allegations in paragraph 153, including that Roundup®-branded products have "dangerous characteristics."

154.    Monsanto lacks information or knowledge sufficient to form a belief as to the truth of the allegations in the second sentence of paragraph 154 and therefore denies those allegations.  Monsanto denies the remaining allegations in paragraph 154.

155.    Monsanto denies the allegations in paragraph 155.

156.    Monsanto denies the allegations in paragraph 156.

EXHIBIT 1

157.    Monsanto denies the allegations in paragraph 157.

158.    Monsanto denies the allegations in paragraph 158.

159.    Monsanto denies the allegations in paragraph 159.

160.    Monsanto denies the allegations in paragraph 160.

161.    Monsanto denies the allegations in paragraph 161.

162.    Monsanto denies the allegations in paragraph 162.

163.    Monsanto incorporates by reference its responses to paragraphs 1 through 162 in response to paragraph 163 of plaintiff's Complaint.

164.    Monsanto lacks information or knowledge sufficient to form a belief as to the truth of the allegations in paragraph 164 regarding the specific products allegedly used by plaintiff or any advertising or marketing allegedly seen or considered by plaintiff and therefore denies the allegations in paragraph 164.

165.    The allegations in paragraph 165 set forth conclusions of law for which no response is required.

166.    The allegations in paragraph 166 set forth conclusions of law for which no response is required.

167.    Monsanto denies the allegations in paragraph 167.

168.    Monsanto denies the allegations in paragraph 168.

169.    Monsanto denies the allegations in paragraph 169.  All labeling of Roundup®-branded products has been and remains EPA-approved and in compliance with all federal requirements under FIFRA.

170.    Monsanto denies the allegations in paragraph 170.

171.    Monsanto denies the allegations in paragraph 171.

EXHIBIT 1

172.     Monsanto denies the allegations in paragraph 172, including each of its subparts.

173.     Monsanto denies the allegations in paragraph 173.

174.     Monsanto lacks information or knowledge sufficient to form a belief as to the truth of the allegations in paragraph 174 regarding plaintiff's knowledge and therefore Monsanto denies those allegations.  Monsanto denies the remaining allegations in paragraph 174, including that intended use and/or exposure to Roundup®-branded products causes any injuries.

175.     Monsanto denies the allegations in paragraph 175.

176.     Monsanto denies the allegations in paragraph 176.

177.     Monsanto denies the allegations in paragraph 177.  All labeling of Roundup®-branded products has been and remains EPA-approved and in compliance with all federal requirements under FIFRA.

178.     Monsanto incorporates by reference its responses to paragraphs 1 through 177 in response to paragraph 178 of plaintiff's Complaint.

179.     Monsanto denies the allegations in paragraph 179.

180.     In response to the allegations in paragraph 180, Monsanto admits that it has sold glyphosate-based herbicides in accordance with their EPA-approved labeling.  Monsanto further states that paragraph 180 sets forth conclusions of law for which no response is required.  Monsanto denies the remaining allegations in paragraph 180.

181.     Monsanto denies the allegations in the first and second sentences of paragraph 181.  All labeling of Roundup®-branded products has been and remains EPA-approved and in compliance with all federal requirements under FIFRA.  Monsanto states that the final sentence of paragraph 181 sets forth conclusions of law for which no response is required.

EXHIBIT 1

182.    The allegations in paragraph 182 set forth conclusions of law for which no response is required.

183.    Monsanto denies the allegations in paragraph 183.

184.    Monsanto denies the allegations in paragraph 184 and each of its subparts.

185.    Monsanto denies the allegations in paragraph 185.

186.    Monsanto lacks information or knowledge sufficient to form a belief as to the truth of the allegations in paragraph 186 regarding plaintiff's knowledge and therefore denies those allegations.  Monsanto denies the remaining allegations in paragraph 186.

187.    Monsanto lacks information or knowledge sufficient to form a belief as to the truth of the allegations in paragraph 187 and therefore denies those allegations.

188.    Monsanto denies the allegations in paragraph 188.

189.    Monsanto denies the allegations in paragraph 189.

190.    Monsanto incorporates by reference its responses to paragraphs 1 through 189 in response to paragraph 190 of plaintiff's Complaint.

191.    Monsanto denies the allegations in paragraph 191.

192.    Monsanto denies the allegations in paragraph 192.

193.    Monsanto lacks information or knowledge sufficient to form a belief as to the truth of the allegations in paragraph 193 concerning plaintiff's claimed use of and exposure to Roundup®-branded products and therefore denies those allegations.  The remaining allegations in paragraph 193 set forth conclusions of law for which no response is required.

194.    Monsanto denies the allegations in paragraph 194.  All labeling of Roundup®-branded products has been and remains EPA-approved and in compliance with all federal requirements under FIFRA.

EXHIBIT 1

195.     Monsanto lacks information or knowledge sufficient to form a belief as to the truth of the allegations in paragraph 195 regarding plaintiff's reliance and therefore denies those allegations.  The remaining allegations in paragraph 195 set forth conclusions of law for which no response is required.

196.     Monsanto lacks information or knowledge sufficient to form a belief as to the truth of the allegations in paragraph 196 concerning plaintiff's claimed use of or exposure to Roundup®-branded products and therefore denies those allegations.  The remaining allegations in paragraph 196 set forth conclusions of law for which no response is required.

197.     Monsanto lacks information or knowledge sufficient to form a belief as to the truth of the allegations in paragraph 197 concerning plaintiff's claimed use of or exposure to Roundup®-branded products and therefore denies those allegations.  The allegation in paragraph 197 regarding Monsanto's implied warranties sets forth conclusions of law for which no response is required.  Monsanto denies the remaining allegations in paragraph 197.

198.     Monsanto lacks information or knowledge sufficient to form a belief as to the truth of the allegations in paragraph 198 concerning plaintiff's reliance or plaintiff's claimed use of any Roundup®-branded product and therefore denies those allegations.  The remaining allegations in paragraph 198 set forth conclusions of law for which no response is required.

199.     Monsanto denies that there is any risk of serious injury associated with or linked to the as-directed use of and/or exposure to Roundup®-branded products and/or glyphosate. Monsanto lacks information or knowledge sufficient to form a belief as to the truth of the allegations in paragraph 199 concerning plaintiff's knowledge about Roundup®-branded products and therefore denies the remaining allegations in paragraph 199.

200.     Monsanto denies the allegations in paragraph 200.

EXHIBIT 1

201.    Monsanto denies the allegations in paragraph 201.

202.    Monsanto denies the allegations in paragraph 202.

203.    Monsanto incorporates by reference its responses to paragraphs 1 through 202 in response to paragraph 203 of plaintiff's Complaint.

204.    Monsanto denies the allegations in paragraph 204 and denies that the Iowa Consumer Frauds Act applies to this case.

205.    Monsanto denies the allegations in paragraph 205 and each of its subparts.

206.    Monsanto denies the allegations in paragraph 206.

207.    Monsanto incorporates by reference its responses to paragraph 1 through paragraph 206 in response to paragraph 207 of plaintiff's Complaint.

208.    Monsanto denies the allegations in paragraph 208.

209.    Monsanto denies the allegations in paragraph 209.  All labeling of Roundup®-branded products has been and remains EPA-approved and in compliance with all federal requirements under FIFRA.

210.    Monsanto denies the allegations in paragraph 210.  All labeling of Roundup®-branded products has been and remains EPA-approved and in compliance with all federal requirements under FIFRA.

211.    Monsanto lacks information or knowledge sufficient to form a belief as to the truth of the allegations in paragraph 211 regarding plaintiff's claimed use of Roundup®-branded products and plaintiff's knowledge or reliance and therefore denies those allegations.  Monsanto denies that any exposure to glyphosate-based herbicides or Roundup®-branded products can cause cancer or other serious illnesses.  All labeling of Roundup®-branded products has been and remains EPA-approved and in compliance with all federal requirements under FIFRA.

EXHIBIT 1

Monsanto states, however, that the scientific studies upon which IARC purported to base its evaluation of glyphosate were all publicly available before March 2015.  Monsanto denies the remaining allegations in paragraph 211.

212.    Monsanto lacks information or knowledge sufficient to form a belief as to the truth of the allegations in paragraph 212 regarding plaintiff's knowledge or reliance and therefore denies those allegations.  Monsanto denies the remaining allegations in paragraph 212. In addition, Monsanto states that the scientific studies upon which IARC purported to base its evaluation of glyphosate were all publicly available before March 2015.

213.    Monsanto denies the allegations in paragraph 213.

214.    Monsanto denies the allegations in paragraph 214.

215.    Monsanto denies the allegations in paragraph 215.

216.    Monsanto denies the allegations in paragraph 216.

217.    Monsanto incorporates by reference its responses to paragraph 1 through paragraph 216 in response to paragraph 217 of plaintiff's Complaint.

218.    Monsanto denies the allegations in paragraph 218.

219.    Monsanto denies the allegations in paragraph 219.

220.    Monsanto denies the allegations in paragraph 220.

In response to the allegations in the section entitled "PRAYER FOR RELIEF," Monsanto denies that plaintiff is entitled to the relief sought therein, including any judgment for any damages, interest, costs, or any other relief whatsoever.

221.    The allegations in paragraph 221 set forth conclusions of law for which no response is required.

EXHIBIT 1

Every allegation in the Complaint that is not specifically and expressly admitted in this Answer is hereby specifically and expressly denied.

## SEPARATE AND AFFIRMATIVE DEFENSES

1.      The Complaint, in whole or part, fails to state a claim or cause of action against Monsanto upon which relief can be granted.

2.      Plaintiff's claims against Monsanto are barred because plaintiff cannot proffer any scientifically reliable evidence that the products at issue were defective or unreasonably dangerous.

3.      Any alleged negligent or culpable conduct of Monsanto, none being admitted, was so insubstantial as to be insufficient to be a proximate or substantial contributing cause of plaintiff's alleged injuries.

4.      Plaintiff's claims against Monsanto are barred, in whole or in part, because the products at issue were designed, manufactured, marketed and labeled with proper warnings, information, cautions and instructions, in accordance with the state of the art and the state of scientific and technological knowledge.

5.      Plaintiff's claims against Monsanto are barred, in whole or in part, because the products at issue were not defective or unreasonably dangerous in that they complied with, at all relevant times, all applicable government safety standards.

6.      Plaintiff's claims against Monsanto are preempted, in whole or in part, by applicable federal law relating to the design, testing, producing, manufacturing, labeling, distributing, modeling, processing, and supply of Roundup®-branded products and/or glyphosate-containing products.

7.      Plaintiff's claims against Monsanto are preempted, in whole or in part, because of

EXHIBIT 1

U.S. EPA findings that glyphosate does not cause cancer in humans and/or because of U.S. EPA-approved product labeling.

8.      Plaintiff's claims against Monsanto are barred, in whole or in part, by the doctrine of primary jurisdiction, including by the authority delegated by Congress to the U.S. EPA.

9.      Plaintiff's claims against Monsanto are barred, in whole or in part, because plaintiff's injuries, if any, were the result of conduct of plaintiff, independent third parties and/or events that were extraordinary under the circumstances, not foreseeable in the normal course of events, and/or independent, intervening and superseding causes of the alleged injuries, including but not limited to plaintiff's pre-existing medical conditions.

10.     The doctrines contained in Restatement (Second) of Torts § 402A, comments j and k, bar plaintiff's claims against Monsanto in whole or in part.

11.     Applicable statutes of limitations and/or repose bar plaintiff's claims against Monsanto in whole or in part.

12.     Plaintiff's misuse or abnormal use of the product or failure to follow instructions bar plaintiff's claims against Monsanto in whole or in part.

13.     If plaintiff suffered injuries or damages as alleged, which is denied, such injuries or damages resulted from acts or omissions of persons or entities for which Monsanto is neither liable nor responsible or resulted from diseases and/or causes that are not related or connected with any product sold, distributed, or manufactured by Monsanto.  Such acts or omissions on the part of others or diseases or causes constitute an independent, intervening and sole proximate cause of plaintiff's alleged injuries or damages.

14.     Monsanto had no legal relationship or privity with plaintiff and owed no duty to her by which liability could be attributed to it.

EXHIBIT 1

15.     Monsanto made no warranties of any kind or any representations of any nature whatsoever to plaintiff.  If any such warranties were made, which Monsanto specifically denies, then plaintiff failed to give notice of any breach thereof.

16.     Plaintiff's claims against Monsanto are preempted or otherwise barred in whole or in part by the Freedom of Speech Clause of the First Amendment of the U.S. Constitution.

17.     Plaintiff's claims against Monsanto for punitive and aggravated damages are barred because such an award would violate Monsanto's due process, equal protection and other rights under the United States Constitution, the New Mexico Constitution, and/or other applicable state constitutions.

18.     Plaintiff's claims against Monsanto for punitive and aggravated damages are barred because plaintiff has failed to allege conduct warranting imposition of punitive and aggravated damages under New Mexico law and/or other applicable state laws.

19.     Plaintiff's claims against Monsanto for punitive and aggravated damages are barred and/or limited by operation of state and/or federal law.

20.     Plaintiff's causes of action against Monsanto are barred in whole or in part by plaintiff's own failure to mitigate damages.

21.     Plaintiff's causes of action against Monsanto are barred in whole or in part by the sophisticated user doctrine.

22.     To the extent that plaintiff recovered payments for his alleged injuries from any collateral source(s) or other source(s), plaintiff's recovery from Monsanto in this lawsuit, if any, shall be reduced to the extent allowed by applicable law.

23.     If plaintiff has been injured or damaged, no injury or damages being admitted, such injuries were not caused by a Monsanto product.

EXHIBIT 1

24.     Plaintiff's claims against Monsanto are barred or limited to the extent that plaintiff asserts claims that are governed by the laws of a state that does not recognize, or limits such claims.

25.     Plaintiff's claims against Monsanto are barred to the extent that plaintiff seeks relief under the laws of states that do not govern plaintiff's claims.

26.     Plaintiff's claims against Monsanto are barred in whole or in part by plaintiff's own contributory/comparative negligence.

27.     Plaintiff has failed to allege fraud with sufficient particularity.

28.     Any claims based on allegations that Monsanto misled, defrauded, made misrepresentations to, or withheld information from U.S. EPA are preempted by federal law. *See, e.g.*, *Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341 (2001); *Nathan Kimmel, Inc. v. Dowelanco*, 275 F.3d 1199 (9th Cir. 2002).

29.     The Iowa Consumer Frauds Act does not apply to this case.

30.     Monsanto hereby gives notice that it intends to rely upon such other defenses as may become available or apparent during the course of discovery and thus reserves its right to amend this Answer to assert such defenses.

**WHEREFORE**, Defendant Monsanto demands judgment in its favor and against plaintiff, dismissing plaintiff's Complaint with prejudice, together with the costs of suit and such other relief as the Court deems equitable and just.

## JURY TRIAL DEMAND

Monsanto demands a jury trial on all issues so triable.

EXHIBIT 1

Dated: April 8, 2020                     Respectfully submitted,

                                         MODRALL, SPERLING, ROEHL, HARRIS
                                             & SISK, P.A.


                                         By:____/s/Timothy C. Holm_____
                                             Timothy C. Holm
                                             *Attorneys for Defendant Monsanto Company*
                                             P. O. Box 2168
                                             Albuquerque, NM 87103-2168
                                             Telephone (505) 848-1800
                                             Fax (505) 848-9710
                                             tch@modrall.com


WE HEREBY CERTIFY that a true
and correct copy of the foregoing
was submitted through the Court's
Electronic Filing System for filing
and service to all counsel of record
this 8th day of April, 2020.

MODRALL, SPERLING, ROEHL, HARRIS
    & SISK, P.A.

By: ___/s/ Timothy C. Holm_____
        Timothy C. Holm


*W3730399.DOCX*

- 42 -

EXHIBIT 1

FILED  1st JUDICIAL DISTRICT COURT
Santa Fe County
4/8/2020 2:19 PM
KATHLEEN VIGIL CLERK OF THE COURT
Tamara Snee

STATE OF NEW MEXICO
COUNTY OF SANTA FE
FIRST JUDICIAL DISTRICT COURT


MARITA RENTERIA,

     Plaintiff

v.                                 No. D-101-CV-2020-00180

MONSANTO COMPANY; SIDCO CORPORATION;
and AGCO CORPORATION,

     Defendants.


### JURY DEMAND

     COMES NOW, Defendant Monsanto Company, by and through its attorneys of record,

Modrall, Sperling, Roehl, Harris & Sisk, P.A. (Timothy C. Holm), and hereby demands trial by

jury of an additional six (6) jurors for a total of twelve (12) jurors in the above entitled and

numbered cause on all legal issues so triable. With this request, Defendant herewith tenders to

the Clerk of Court the sum of $150.00. On or about January 17, 2020, Plaintiff demanded a six

person jury and, upon information and belief, tendered the related fee of $150.00.

                    Respectfully submitted,

                    MODRALL, SPERLING, ROEHL, HARRIS
                     & SISK, P.A.


                    By:____*/s/Timothy C. Holm*_____
                       Timothy C. Holm
                       *Attorneys for Defendant Monsanto Company*
                       P. O. Box 2168
                       Albuquerque, NM 87103-2168
                       Telephone (505) 848-1800
                       Fax (505) 848-9710
                       tch@modrall.com


EXHIBIT 1

WE HEREBY CERTIFY that a true and correct copy of the foregoing was submitted through the Court's Electronic Filing System for filing and service to all counsel of record this 8th day of April, 2020.

MODRALL, SPERLING, ROEHL, HARRIS
    & SISK, P.A.

By:    */s/ Timothy C. Holm*
      Timothy C. Holm

*W3730143.DOCX*

EXHIBIT 1

FILED  1st JUDICIAL DISTRICT COURT
Santa Fe County
5/5/2020 8:52 AM
KATHLEEN VIGIL CLERK OF THE COURT
Tamara Snee

STATE OF NEW MEXICO
COUNTY OF SANTA FE
FIRST JUDICIAL DISTRICT COURT

MARITA RENTERIA,

       Plaintiff,

vs.                                     Case No. D-101-CV-2020-00180

MONSANTO COMPANY; SIDCO
CORPORATION; AGCO CORPORATION,

       Defendants.

## STIPULATION OF DISMISSAL WITHOUT PREJUDICE OF
## ALL CLAIMS AGAINST DEFENDANT AGCO CORPORATION

Plaintiff, by and through her undersigned attorney, and Defendant AGCO Corporation,

by and through their undersigned attorneys and, pursuant to New Mexico Rule of Civil

Procedure 1-041(A), hereby stipulate to the dismissal of all claims against Defendant AGCO

Corporation, without prejudice.  This lawsuit shall proceed against the other Defendants named

in the Complaint and is not opposed by any Defendant. All parties are to bear their own costs and

fees.

Respectfully Submitted,

BUTT THORNTON & BAEHR PC

*/s/ Monica R. Garcia*
Monica R. Garcia
*Attorneys for Defendant*
*AGCO Corporation*
P.O. Box 3170
Albuquerque, NM  87190
(505) 884-0777
mrgarca@btblaw.com

AND

EXHIBIT 1

*/s/ Approved as to Form by*

Darren P. McDowell
Texas Bar No. 24025520
Fears Nachawati Law Firm
5473 Blair Road
Dallas Ta, 75231
Phone: 214-890-0711
Fax: 214-890-0712
dmcdowell@fnlawfirm.com

and

Feliz A. Rael
505 Marquette NW, Ste. 1300
Albuquerque, NM 87102
Phone: 505-610-5991
Fax: 505-938-2301
frael@swcp.com

*Attorneys for Plaintiffs*


APPROVED BY:

*Via email 5/1/20*

Kenneth L. Beal
Kenneth L. Beal, P.C.
PO Box 725
Las Cruces, NM 88004
575-526-5511
klbealoffice@gmail.com
*Attorneys for Sidco Corporation*


*Via email 4/23/20*

Timothy Holm
Modrall, Sperling, Roehl, Harris & Sisk, P.A.
Po Box 2168
Albuquerque, NM 87103
505-848-1800
tch@modrall.com
*Attorneys for Monsanto Company*

EXHIBIT 1

FILED  1st JUDICIAL DISTRICT COURT
Santa Fe County
7/31/2020 4:17 PM
KATHLEEN VIGIL CLERK OF THE COURT
Leticia Cunningham

STATE OF NEW MEXICO
COUNTY OF SANTA FE
FIRST JUDICIAL DISTRICT COURT

MARITA RENTERIA,

     Plaintiff

v.                                             No. D-101-CV-2020-00180

MONSANTO COMPANY; SIDCO CORPORATION;
and AGCO CORPORATION,

     Defendants.

## NOTICE OF WITHDRAWAL AND SUBSTITUTION OF COUNSEL

     Defendant Monsanto Company hereby gives notice that Timothy C. Holm withdraws his appearance.  Modrall, Sperling, Roehl, Harris & Sisk, P.A. will continue as Defendants' counsel of record.  Attorney Alex C. Walker of Modrall, Sperling, Roehl, Harris & Sisk, P.A. hereby enters his appearance on behalf of Defendant Monsanto Company in substitution of Attorney Timothy C. Holm.

                    Respectfully submitted,

                    MODRALL, SPERLING, ROEHL, HARRIS
                      & SISK, P.A.

                    By:  */s/ Alex Walker*
                       Alex C. Walker
                       *Attorneys for Defendant Monsanto Company*
                       P. O. Box 2168
                       Albuquerque, NM 87103-2168
                       Telephone (505) 848-1800
                       Fax (505) 848-9710
                       awalker@modrall.com

EXHIBIT 1

WE HEREBY CERTIFY that a true and correct copy of the foregoing was submitted through the Court's Electronic Filing System for filing and service to all counsel of record this 31st day of July, 2020.

MODRALL, SPERLING, ROEHL, HARRIS
    & SISK, P.A.

By: __/s/ Alex Walker_____
    Alex C. Walker

*W3801786.DOCX*

2

EXHIBIT 1

FILED  1st JUDICIAL DISTRICT COURT
Santa Fe County
8/13/2020 2:37 PM
KATHLEEN VIGIL CLERK OF THE COURT
Bernadette Hernandez

STATE OF NEW MEXICO
COUNTY OF SANTA FE
FIRST JUDICIAL DISTRICT

MARITA RENTERIA
        Plaintiff,
v.                             No. D-101-CV-2020-00180

MONSANTO COMPANY; and
SIDCO CORPORATION;
        Defendants.

<u>REQUEST FOR HEARING</u>
<u>FOR RULE 1-016 SCHEDULING CONFERENCE</u>

1.     Assigned Judge:     The Honorable Kathleen McGarry Ellenwood

2.     Type of Case:      Negligence

3.     Jury:   XXXXX   Non-Jury:

4.     Dates of hearings presently set:    None

5.     Specific matter(s) to be heard upon this request:    Scheduling Conference.

6.     Estimated total time required:    10 minutes

7.    Attach separate sheet listing names, address, and telephone numbers of all counsel and parties pro se entitled to notice.

Respectfully submitted by:

Feliz A. Rael
Attorney at Law
505 Marquette NW, Ste. 1300
Albuquerque, NM 87102
Tel: 505-610-5991
Fax:  505-938-2301

EXHIBIT 1

and

**FEARS NACHAWATI LAW FIRM**

Darren P. McDowell
Eric Przybysz
**FEARS | NACHAWATI, PLLC**
5473 Blair Road
Dallas, TX 75231
Tel. (214) 890-0711
Fax (214) 890-0712

*Attorneys for Plaintiff*

<u>Certificate of Service</u>

I certify that I served a true and correct copy of this document to counsel of record indicated below via the Court's file and serve system on August 13, 2020.

Kenneth L. Beal
Kenneth L. Beal, P.C.
PO Box 725
Las Cruces, NM 88004
575-526-5511
klbealoffice@gmail.com
*Attorneys for Sidco Corporation*

Alex C. Walker
Modrall, Sperling, Roehl, Harris & Sisk, P.A.
Po Box 2168
Albuquerque, NM 87103
505-848-1800
awalker@modrall.com
*Attorneys for Monsanto Company*

_____
Feliz A. Rael

EXHIBIT 1

PARTIES ENTITLED TO NOTICE:

Feliz A. Rael
Attorney at Law
505 Marquette NW, Ste. 1300
Albuquerque, NM 87102
Tel: 505-610-5991 Fax:  505-938-2301
Frael@swcp.com

and

Darren P. McDowell
Eric Przybysz
FEARS | NACHAWATI, PLLC
5473 Blair Road
Dallas, TX 75231
Tel. (214) 890-0711 Fax (214) 890-0712

*Attorneys for Plaintiff*


Kenneth L. Beal
Kenneth L. Beal, P.C.
PO Box 725
Las Cruces, NM 88004
575-526-5511
klbealoffice@gmail.com

*Attorneys for Sidco Corporation*

Alex C. Walker
Modrall, Sperling, Roehl, Harris & Sisk, P.A.
Po Box 2168
Albuquerque, NM 87103
505-848-1800
awalker@modrall.com

*Attorneys for Monsanto Company*

EXHIBIT 1

**STATE OF NEW MEXICO**
**COUNTY OF SANTA FE**
**FIRST JUDICIAL DISTRICT COURT**

FILED  1st JUDICIAL DISTRICT COURT
Santa Fe County
8/13/2020 4:13 PM
KATHLEEN VIGIL CLERK OF THE COURT
Francine Lobato

**MARITA RENTERIA,**

            **Plaintiff(s),**

**vs.**                                                        **No. D-101-CV-2020-00180**
                                                               **Judge McGarry Ellenwood**

**MONSANTO COMPANY; and**
**SIDCO CORPORATION,**

            **Defendant(s).**

## NOTICE OF HEARING

        NOTICE IS HEREBY GIVEN that a hearing in this case has been set as follows:

| | |
|---|---|
| Date of hearing: | September 8, 2020 |
| Time of hearing: | 11:15 am |
| Place of hearing: | First Judicial District Court |
| | 225 Montezuma Ave. |
| | Santa Fe, New Mexico 87501 |

            **All of Division X's hearings will be held by Google Meet:**

            **Join with Google Meet:**
            https://meet.google.com/wof-cofz-tuq
            **Join by phone:**
            (US) + 1-563-503-5060 PIN: 818 230 380#

| | |
|---|---|
| Matter(s) to be heard: | ***Scheduling Conference*** |
| Length of hearing: | 30 minutes |
| Judicial Officer: | **Judge Kathleen McGarry Ellenwood** |

**\* Please READ the attached instructions for Case Scheduling Status Report and information regarding telephonic appearance for this hearing should it proceed.**

**\*\*NOTE\*\* Due to the high volume of cases in this Division, this Court does not accommodate notices of dates of unavailability. Attorneys are to meet and confer and send proposed dates of availability to this Court in conjunction with sending the motions packages and request for hearings.**

**\*\*\*NOTE\*\* Parties are to assume all hearing proceedings are on FTR. If the parties**

EXHIBIT 1

**request transcripts, they should make arrangements in advance to provide their own Court Reporter.**

_Kathy Chanler_
Kathy Chanler
Administrative Assistant

## <u>**CERTIFICATE OF SERVICE**</u>

I, the undersigned, hereby certify that copies of this order were e-served on the date of acceptance for e-filing to counsel who registered for e-service as required by the rules and mailed to pro se parties, if any to:

Feliz Rael
Darren McDowell
Eriz Przybysz
Kenneth Beal
Alex Walker

_Kathy Chanler_
Kathy Chanler
Administrative Assistant

EXHIBIT 1

## Instructions for Case Scheduling Conference

Judge Kathleen McGarry Ellenwood has adopted a case management process which includes an early case scheduling conference with the Court. The goal of the case management process is to put in place a schedule designed to achieve resolution of the case in as timely and inexpensive a manner as possible given the issues in the case. Most civil cases are resolved through settlement; therefore, one goal of the case management process is to schedule an early settlement conference, usually within four to six months of the date the answer is filed. Prior to the early settlement conference, discovery should be targeted toward those matters which are necessary to discuss early settlement of the case. If early settlement is not achieved, the case will proceed through additional discovery as necessary for trial.

In anticipation of the case scheduling conference, counsel is directed to meet and confer on the following issues:

**1. Ready for Trial Date**

In most cases, the court anticipates that cases will be ready for trial approximately 12 to 18 months after the answer is filed. Simpler cases may be ready earlier and complex cases may require additional time. In preparation for the Case Scheduling Conference, counsel must discuss a Ready for Trial Date. If counsel agrees upon a Ready for Trial Date, the court will set the matter on the first trial docket after the Ready for Trial Date. If counsel does not agree on a Ready for Trial Date, the court will set the case for trial at the Scheduling Conference. **Because the trial date will be established either by agreement of counsel or after consideration by the court at the case scheduling conference, counsel should assume that the trial will <u>not</u> be continued.**

**2. Estimated Length of Trial**

Counsel should make an effort to estimate the number of trial days needed for the trial of the case.

**3. Discovery Necessary for Early Settlement Conference**

Counsel should confer to determine what specific discovery is essential so that the parties can engage in good faith settlement discussions at the earliest possible date. Limited written discovery and targeted depositions are encouraged, focused on the issues necessary for good faith settlement discussions. If early settlement is not successful, the time remaining until the scheduled trial may be used for discovery for trial. Counsel should **not** expect that the trial date will be rescheduled if early settlement is not successful.

**4. Early Settlement Conference Deadline**
In most cases, the court anticipates that a case should be ready for early settlement

3

EXHIBIT 1

conference within four to six months after the answer is filed. Counsel will be required to file a report with the court on the outcome of the early settlement conference.

**5. Alternative Dispute Resolution Process**

The Court will order some form of alternative dispute resolution process for early settlement conference. The Court reserves the right to order additional settlement conferences if deemed appropriate. Counsel may agree or request one of the following options for ADR:

1) Agreement for referral to a specific settlement referee or mediator; or

3) Some other form of ADR to fully explore settlement prior to trial.

Counsel must meet and confer on the matters listed above in advance of the Case Scheduling Conference. Pro se parties are also required to meet and confer. **At least three (3) business days prior to the Case Scheduling Conference, counsel must file a Case Scheduling Status Report following the format attached.** Counsel must file the Case Scheduling Status Report even if agreement is not reached as to some matters. Counsel shall also provide a copy of the Case Scheduling Status Report to sfeddiv10proposedtxt@nmcourts.gov. Counsel may modify the Case Scheduling Status Report if there are other matters to be addressed at the conference.

**If counsel reach agreement as to all matters on the case scheduling status report and file the report at least three days prior to the case scheduling conference, the case scheduling conference will be vacated and the court will issue a scheduling order consistent with the dates agreed to by the parties.**

If counsel disagrees as to any matters in the Case Scheduling Status Report, the Scheduling Conference will proceed as scheduled.

**NOTICE FROM THE COURT REGARDING TELEPHONIC APPEARANCES:**

**Until the current operating guidelines for the New Mexico Courts that have been put in place concerning the Coronavirus are modified, parties and attorneys are to appear telephonically for all hearings. Parties and attorneys may appear telephonically by calling 1-563-503-5060 and entering pin number 818230380# or by video at meet.google.com/wof-cofz-tuq (which may be subject to change). As changes are being made frequently, please visit the court website firstdistrictcourt.nmcourts.gov the day before your hearing. Once at the court website, click on District Court Judges and scroll down to Judge Kathleen McGarry Ellenwood, Division X, then click on View Calendar for up to date information on how to appear telephonically.**

**Please call or join at the time of your hearing. (If the previous hearing is still in session, please mute your phone until your case is ready to be called. If you are unable to mute your phone, the Judge may have to mute it for you. Please do not hang up, remain on the line and once the Judge is ready to call your case you will need to unmute your phone or use the instructions given to you by the Judge if he muted the phone for you).**

EXHIBIT 1

STATE OF NEW MEXICO
COUNTY OF
FIRST DISTRICT COURT

_____,

      **Plaintiff,**

**v.**                     **No.** _____

_____,

      **Defendants.**

## <u>CASE SCHEDULING STATUS REPORT</u>

Counsel having conferred on the matters as directed by the Court in the Instructions for

Case Scheduling Conference reports to the Court as follows:

This case is a [  ] Jury Trial   or   [  ] Non-Jury Trial

**1.**    **Ready for Trial Date**

      [  ]   Agreement Reached _____(mm/dd/yr)

      [  ]   Agreed, Ready for Trial

      [  ]   No Agreement Reached

**2.**    **Estimated Length of Trial**

      _____ Trial Days

**3.**    **Discovery Necessary for Early Settlement Conference**

      [  ]   Agreement Reached

      [  ]   Agreed Discovery   _____

      [  ]   Written Discovery   _____

      [  ]   Depositions:   _____

5

EXHIBIT 1

[ ]   Other Discovery:   _____

[ ]   No Agreement Reached

**4.**   **Early Settlement Conference Deadline**

    [ ]   Agreed Early Settlement Deadline _____(mm/dd/yr)

    [ ]   No Agreement Reached

**5.**   **ADR Process**

Date Complaint Filed: _____

Type of Case:

    [ ]   Civil Rights
    [ ]   Commercial / Business
    [ ]   Contract / Debt and Money Due
    [ ]   Construction
    [ ]   Domestic Matters
    [ ]   Employment / Labor
    [ ]   Estates, Wills, Trusts, Probate
    [ ]   Natural Resources
    [ ]   Real Estate
    [ ]   Tort Auto
    [ ]   Tort Malpractice, Product Liability
    [ ]   Tort Other

[ ]   Parties have agreed to the appointment of their own settlement referee or mediator

    Name of settlement referee or mediator: _____

[ ]   Other ADR procedure agreed to by the parties as described below:

    _____

[ ]   No Agreement Reached

**5.**   **Other Matters:** _____

_____

6

EXHIBIT 1

Respectfully submitted,


_____
Attorney Name, Address, and all contact
Information, including fax and email.
*Attorneys for Plaintiff*



_____
Attorney Name, Address, and all contact
Information, including fax and email.
*Attorneys for Defendant*

EXHIBIT 1

FILED  1st JUDICIAL DISTRICT COURT
Santa Fe County
8/20/2020 3:52 PM
KATHLEEN VIGIL CLERK OF THE COURT
Breanna Aguilar

STATE OF NEW MEXICO
COUNTY OF SANTA FE
FIRST JUDICIAL DISTRICT COURT

MARITA RENTERIA,

     Plaintiff,

v.                                           No. D-101-CV-2020-00180

MONSANTO COMPANY; SIDCO CORPORATION;
and AGCO CORPORATION,

     Defendants.

## <u>NOTICE OF FILING AFFIDAVIT OF NON-ADMITTED LAWYER</u>

     Pursuant to Rules 1-089.1 and 24-106 NMRA, the Affidavit of Brett S. Covington, who is not admitted to practice law in the State of New Mexico, is attached as Exhibit A for the purpose of admitting him in the above styled case as counsel for Defendant Monsanto Company.

                   MODRALL, SPERLING, ROEHL, HARRIS
                     & SISK, P.A.

             By: * /s/ Alex Walker*
                   Alex C. Walker
                   *Attorneys for Defendant Monsanto Company*
                   P. O. Box 2168
                   Albuquerque, NM 87103-2168
                   Telephone (505) 848-1800
                   Fax (505) 848-9710
                   awalker@modrall.com

EXHIBIT 1

WE HEREBY CERTIFY that a true and correct copy of the foregoing was submitted through the Court's Electronic Filing System for filing and service to all counsel of record this <u>20th</u> day of August, 2020.

MODRALL, SPERLING, ROEHL, HARRIS & SISK, P.A.

By:  <u>/s/ Alex Walker</u>
      Alex C. Walker

*W3812210.DOC*

2

EXHIBIT 1

STATE OF NEW MEXICO
COUNTY OF SANTA FE
FIRST JUDICIAL DISTRICT COURT

MARITA RENTERIA,

    Plaintiff

v.

No. D-101-CV-2020-00180

MONSANTO COMPANY; SIDCO CORPORATION;
and AGCO CORPORATION,

    Defendants.

## AFFIDAVIT OF NON-ADMITTED LAWYER BRETT S. COVINGTON

STATE OF District of Columbia )
    CITY
COUNTY OF Washington )

BRETT S. COVINGTON, the affiant herein, states under penalty of perjury:

1. Affiant is admitted to practice law and is in good standing to practice law in New York
and the District of Columbia (admitted in 2010 and 2012, respectively).

2. Affiant has complied with Rule 24-106 NMRA.

3. Affiant has associated with Alex C. Walker, counsel licensed to practice law in good
standing in New Mexico.

Pursuant to New Mexico Supreme Court General Rule 23-115, Brett S. Covington,
Affiant, states under penalty of perjury of the laws of New Mexico, that all of the representations
in this affidavit are true as far as Affiant knows or is informed, and that such affidavit is true,
accurate and complete to the best of Affiant's knowledge and belief.

DATED: August 20, 2020.

AFFIANT BRETT S. COVINGTON

District of Columbia
Signed and sworn to (or affirmed) before me on
August 20, 2020 by Brett S. Covington
    Date    Name(s) of individual(s) making statement

Signature of Notarial Officer
Notary Public
Title of Office
My commission expires: April 30, 2025

CARLA R. CHEATHAM
NOTARY PUBLIC DISTRICT OF COLUMBIA
My Commission Expires April 30, 2025

EXHIBIT A    EXHIBIT 1

FILED 1st JUDICIAL DISTRICT COURT
Santa Fe County
9/4/2020 2:25 PM
KATHLEEN VIGIL CLERK OF THE COURT
Desiree Brooks

STATE OF NEW MEXICO
COUNTY OF SANTA FE
FIRST JUDICIAL DISTRICT COURT

MARITA RENTERIA,

     Plaintiff,

v.                                       No. D-101-CV-2020-00180

MONSANTO COMPANY; SIDCO CORPORATION;
and AGCO CORPORATION,

     Defendants.

## JOINT MOTION TO VACATE SCHEDULING CONFERENCE

Plaintiff Marita Renteria and Defendant Monsanto Company ("Monsanto"), through their undersigned counsel of record, hereby move the Court to vacate the Scheduling Conference set for September 8, 2020, and state the following in support:

1.     A Scheduling Conference is currently set for September 8, 2020, at 11:15 a.m.

2.     Counsel for Plaintiff and Monsanto are currently discussing potential resolution of this lawsuit. As a result, the parties agree that it would be most efficient for both the Court's and parties' time and resources to vacate the September 8th conference, as this will provide the parties additional time to continue their discussion regarding potential resolution of this lawsuit. Should the parties need a Scheduling Conference in the future, they will promptly notify this Court and seek such conference. In addition to vacating the September 8th Scheduling Conference, the parties also seek to vacate the requirement for submitting a Case Scheduling Status Report by September 4, 2020.

**WHEREFORE**, the parties respectfully request this Court to vacate the Scheduling Conference set for September 8, 2020 (as well as the requirement for submitting a Case Scheduling

EXHIBIT 1

Status Report by September 4, 2020) and reset any such conference, if necessary, at the future

request of the parties.

MODRALL, SPERLING, ROEHL, HARRIS
    & SISK, P.A.

By:  /s/ Alex Walker
    Alex C. Walker
    P. O. Box 2168
    Albuquerque, NM 87103-2168
    Telephone (505) 848-1800
    Fax (505) 848-9710
    awalker@modrall.com

HOLLINGSWOTH LLP
    Brett S. Covington (admitted *pro hac vice*)
    1350 I Street, N.W.
    Washington, DC 20005
    Telephone (202) 898-5800
    bcovington@hollingsworthllp.com

    *Attorneys for Defendant Monsanto Company*

By:  /s/ Feliz A. Rael
    Feliz A. Rael
    Attorney at Law
    505 Marquette NW, Ste. 1300
    Albuquerque, NM 87102
    Telephone (505) 610-5991
    Fax (505) 938-2301

and

FEARS NACHAWATI LAW FIRM
    Darren P. McDowell
    Eric Przybysz
    5473 Blair Road
    Dallas, TX 75231
    Telephone (214) 890-0711
    Fax (214) 890-0712

    *Attorneys for Plaintiff*

EXHIBIT 1

WE HEREBY CERTIFY that a true and correct copy of the foregoing was submitted through the Court's Electronic Filing System for filing and service to all counsel of record this 4th day of September, 2020.

MODRALL, SPERLING, ROEHL, HARRIS
    & SISK, P.A.

By:   /s/ Alex Walker
    Alex C. Walker

EXHIBIT 1

FILED  1st JUDICIAL DISTRICT COURT
Santa Fe County
9/4/2020 4:39 PM
KATHLEEN VIGIL CLERK OF THE COURT
Jill Nohl

STATE OF NEW MEXICO
COUNTY OF SANTA FE
FIRST JUDICIAL DISTRICT COURT

MARITA RENTERIA,

     Plaintiff,

v.                                                              No. D-101-CV-2020-00180

MONSANTO COMPANY; SIDCO CORPORATION;
and AGCO CORPORATION,

     Defendants.

## ORDER GRANTING JOINT MOTION TO
## VACATE SCHEDULING CONFERENCE

     **THIS MATTER** having come before the Court on the *Joint Motion to Vacate*

*Scheduling Conference*,

     **THE COURT FINDS** the Motion is well-taken and should be granted.

     **IT IS THEREFORE ORDERED** that the Scheduling Conference on September 8, 2020

is vacated and will be reset, only if necessary, at the future request of the parties.  The Court also

vacates the requirement for submitting a Case Scheduling Status Report by September 4, 2020.


_____
**JUDGE MCGARRY ELLENWOOD**

EXHIBIT 1

Approved by:


MODRALL, SPERLING, ROEHL, HARRIS
  & SISK, P.A.

By:  /s/ Alex Walker
    Alex C. Walker
    P. O. Box 2168
    Albuquerque, NM 87103-2168
    Telephone (505) 848-1800
    Fax (505) 848-9710
    awalker@modrall.com

HOLLINGSWOTH LLP
    Brett S. Covington (admitted *pro hac vice*)
    1350 I Street, N.W.
    Washington, DC 20005
    Telephone (202) 898-5800
    bcovington@hollingsworthllp.com

*Attorneys for Monsanto Company*

By:  /s/ Feliz A. Rael
    Feliz A. Rael
    Attorney at Law
    505 Marquette NW, Ste. 1300
    Albuquerque, NM 87102
    Telephone (505) 610-5991
    Fax (505) 938-2301

and

FEARS NACHAWATI LAW FIRM
    Darren P. McDowell
    Eric Przybysz
    5473 Blair Road
    Dallas, TX 75231
    Telephone (214) 890-0711
    Fax (214) 890-0712

*Attorneys for Plaintiff*

EXHIBIT 1

Kenneth L. Beal
Kenneth L. Beal, P.C.
PO Box 725
Las Cruces, NM 88004
Telephone (575) 526-5511

*Attorneys for Sidco Corporation*

EXHIBIT 1

FILED  1st JUDICIAL DISTRICT COURT
Santa Fe County
1/15/2021 2:03 PM
KATHLEEN VIGIL CLERK OF THE COURT
Marina Sisneros

**STATE OF NEW MEXICO**
**COUNTY OF SANTA FE**
**FIRST JUDICAL DISTRICT**

**MARITA RENTERIA,**
    *Plaintiff,*

v.                                                    **No. D-101-CV-2020-00180**

**MONSANTO COMPANY; SIDCO**
**CORPORATION;**
**and AGCO CORPORATION,**
    *Defendants.*

## NOTICE OF APPEARANCE

COMES NOW Marita Renteria, Plaintiff, by undersigned counsel, and requests

the Court and the parties to take notice as follows:

1.      Anthony Bruster and Chris Johnson from the law firm Bruster, PLLC have been

retained by Plaintiff to appear and act as co-counsel for her along with her current attorneys

listed below.

2.      Contact information for Mr. Bruster and Mr. Johnson is as follows:

> Anthony Bruster
> New Mexico Bar No. 20283
> Email: akbruster@brusterpllc.com
> Christopher Johnson
> New Mexico Bar No. 153605
> Email: cjohnson@brusterpllc.com
> BRUSTER PLLC
> 680 N. Carroll Ave., Suite 110
> Southlake, Texas 76092
> Telephone: (817) 601-9564
> Facsimile: (817) 796-2929

3.      Plaintiff respectfully asks that the service list be updated accordingly.

WHEREFORE, premises considered, Marita Renteria, Plaintiff, respectfully requests

that the Court and the parties take notice of this appearance of co-counsel.

1

**EXHIBIT 1**

DATED: January 15, 2021

Respectfully submitted,

_/s/ Anthony K. Bruster_

**Anthony Bruster**
New Mexico Bar No. 20283
**Christopher Johnson**
New Mexico Bar No. 153605
**BRUSTER PLLC**
680 N. Carroll Ave., Suite 110
Southlake, Texas 76092
Telephone:  (817) 601-9564
Facsimile:  (817) 796-2929
Email: akbruster@brusterpllc.com
          cjohnson@brusterpllc.com

Feliz A. Real
Attorney at Law
505 Marquette NW, Suite 1300
Albuquerque, NM
Telephone:  (505) 610-5991
Facsimile:  (505) 938-2301

Darren P. McDowell*
Texas Bar No. 24025520
Matthew R. McCarley*
Texas Bar No. 24041426
Jonathan P. Novak*
Maryland Bar No. 20282
**FEARS | NACHAWATI, PLLC**
5473 Blair Road
Dallas, TX 75231
Tel. (214) 890-0711
Fax (214) 890-0712
Email: dmcdowell@fnlawfirm.com
Email: mccarley@fnlawfirm.com
Email: jnovak@fnlawfirm.com

*To be admitted pro hac vice*
*Attorneys for Plaintiff*

2

EXHIBIT 1

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of the foregoing pleading was filed electronically through the OdysseyFile/Serve System, which caused the parties or counsel to be served by electronic means, as more fully reflected on the Notice of Electronic Filing on this 15th day of January 2021.


**By:** _/s/ Anthony K. Bruster_
**Anthony Bruster**

3

EXHIBIT 1

FILED  1st JUDICIAL DISTRICT COURT
Santa Fe County
6/14/2021 12:11 PM
KATHLEEN VIGIL CLERK OF THE COURT
Corinne Onate

STATE OF NEW MEXICO
COUNTY OF SANTA FE
FIRST JUDICIAL DISTRICT COURT

No. D-101-CV-2020-00180

MARITA RENTERIA,
    Plaintiff,
v.

MONSANTO COMPANY; and
SIDCO CORPORATION,
    Defendants.

## <u>CONFIDENTIALITY AND PROTECTIVE ORDER</u>

It is hereby **ORDERED** and **ADJUDGED**, that:

1.     This Protective and Confidentiality Order ("Protective Order") governing the disclosure of confidential, proprietary, and other protected or privileged information by any Party to this action is hereby entered.

2.     For purposes of this Protective Order, any Party may designate as "Confidential Material" any information regarded as confidential by the Party that is contained in any document, written discovery response, testimony, or other material produced or provided by that Party or its representative(s) to any other Party, whether provided voluntarily, pursuant to formal discovery procedures, or otherwise. Nonetheless, the Parties acknowledge that this Order does not confer blanket protections on all disclosures or responses to discovery and that the protection it affords from public disclosure and use extends only to the information or items that are entitled to confidential treatment under the applicable legal principles.

3.     Any Party may designate a document as Confidential Material by stamping it "Confidential," or "Subject to Protective Order." All pages of any document that bear such a legend are subject to this Protective Order. The Party shall affix the stamp in such a manner so as not to obscure the text of the document.

4.     Due to the complexity of this action, which is estimated to involve millions of pages of documents, and to facilitate the flow of discovery material, at the time of initial production, the

EXHIBIT 1

xc:records/jam

producing party may designate an entire document as "Confidential" if it believes in good faith that any part of the document is confidential or if the document falls within a category of documents that the designating party believes is likely to contain a large volume of Confidential material.

5.      After review, the receiving party may request that the producing party identify for specific documents (no more than 500 documents in a 30 day period) what parts of those documents are confidential. The challenge process described below in paragraph 16 may then be used to resolve any disputes as to those designations. If it comes to the designating party's attention that information or items that it designated for protection do not qualify for protection, that designating party must promptly notify all other Parties that it is withdrawing its mistaken designation.

6.      To the extent that information stored or recorded in the form of electronic or magnetic media (including information, files, databases, or programs stored on any digital or analog machine-readable device, computers, Internet sites, discs, networks, or tapes) ("Computerized Material") is produced by any Party in such form, the producing Party may designate such materials as Confidential by marking the container in which the media is produced "Confidential." For electronically stored information produced in native format, designation of documents as "Confidential" may be made in a produced metadata field or in the file name. Whenever any Party receives Computerized Material or documents produced in native format that have been designated as Confidential, if such Party reduces such material to hardcopy form, that Party shall mark the hardcopy form with the "Confidential" designation.

7.      If responses to interrogatories, requests for admission, or other written responses to discovery quote, summarize, or contain Confidential Material, the Parties may designate them as Confidential Material by marking the face of any such response with one of the legends set forth in paragraph (3) above and indicating the page and line references of the material that are to be subject to this Protective Order.

2

EXHIBIT 1

8.      A Party may designate the transcript of any deposition in this action or any portion thereof, including exhibits thereto, as Confidential Material by either so advising the court reporter and the Parties on the record during the taking of the deposition or within thirty (30) days after receipt of the deposition transcript by written designation served upon the Parties. If all or any portion of a deposition is designated as being subject to this Protective Order, the court reporter and any Parties possessing any transcripts shall label the cover page of each transcript or copy thereof to state that the deposition includes Confidential Material, and shall label as Confidential each of the pages of the transcript or exhibits that contain Confidential Material.

9.      Any production of any confidential or proprietary material will not result in or be construed as a waiver, in whole or in part, of (a) the producing Party's claims of confidentiality either as to the specific information disclosed or more generally as to the subject matter of the information disclosed, or (b) the party's right to later designate the material as Confidential pursuant to this Protective Order. In the event that a Party produces any Confidential Material without attaching one of the legends described in paragraph (3) above, the Party may subsequently designate the material as Confidential at any time by forwarding to the opposing Party copies of the material bearing one of the legends required by paragraph (3) and requesting that the opposing Party destroy all prior copies of the Confidential Material. Upon receipt of such a request, the opposing Party shall destroy all copies of the Confidential Material as originally produced and replace them with copies bearing the appropriate confidentiality legend.

10.      Written and oral communications between or among counsel for the Parties that refer to or discuss Confidential Material automatically shall be subject to this Protective Order.

11.      Confidential Material shall be treated by the Parties and their counsel as being confidential and private. Any copy made of Confidential Material shall have the same status as the original. The disclosure and use of Confidential Material shall be confined to the permissible disclosures and uses set forth below. Confidential Material shall be used (if otherwise relevant and admissible) solely for the litigation of this action, including any appeals, and for any other action brought by or on behalf of a former user of Monsanto glyphosate-containing products alleging

3

EXHIBIT 1

injuries or other damages therefrom, so long as all parties are bound by and subject to another judicially approved protective and confidentiality order that is identical to or the substantial equivalent to this order and has been agreed to by Monsanto. In addition, before Confidential Material is shared with parties to other lawsuits or used for other lawsuits brought by or on behalf of a former user of Monsanto glyphosate-containing products alleging injuries or damages therefrom, the parties to the other action(s) also must have entered into an ESI protocol, protocol governing privilege logs, and protocol or agreement regarding the search and culling of data, including keyword search terms, or alternatively only to the extent that Monsanto has consented in writing. Confidential Material shall not be used for any other purpose without separate written agreement of the Party that produced the Confidential Information. All other disclosure and use of Confidential Material during the pendency of this action or after its termination are hereby prohibited. Nothing in this Protective Order, however, precludes Monsanto Company from making disclosures to government authorities to the extent that it is required to disclose Confidential Material by law.

12.     Confidential Material may be disclosed only to the following persons and only insofar as it is reasonably necessary to the effective prosecution of the Parties' claims and defenses:

a.      Parties, their representatives, in-house counsel and regular employees who are actively engaged in or actively overseeing this action, or are involved in complying with any Monsanto Company legal obligations to provide information to governmental authorities;

b.      Counsel of record in this action, including their associated attorneys, paralegal and secretarial personnel, and other support staff;

c.      Experts and consultants (including their employees) who are retained by a Party to assist in this action;

d.      Third-party contractors and their employees who are retained by one or more Parties to provide litigation-support or copy services in connection with this action;

e.      Witnesses or prospective witnesses in this action;

4

EXHIBIT 1

f.      Court reporters and other persons involved in recording deposition testimony in this action;

g.      Named plaintiffs in other actions brought by or on behalf of a former user of Monsanto glyphosate-containing products alleging injuries or other damages therefrom and their counsel of record, including paralegal, clerical, secretarial and other staff employed or retained by such other plaintiffs' counsel of record if the conditions of Paragraph 11 above have been met;

h.      Court personnel of this Court, or, if on appeal, of a court with appellate jurisdiction; and

i.      Jurors in this action.

Counsel for each Party disclosing Confidential Material in accordance with this paragraph shall (i) advise each person to whom such disclosure is made (except Court personnel, jurors, and government authorities) of the terms of this Protective Order and of the obligation of each such person to comply with those terms and (ii) provide a copy of this Protective Order to each such person. Prior to the disclosure of any Confidential Information to any person identified in subparagraphs c, d, e, f and g above, such person shall sign an Acknowledgment, in the form attached hereto, acknowledging that he or she has read this Protective Order and shall abide by its terms. Counsel shall maintain a list of persons to whom confidential materials are disclosed (excluding jurors, Court personnel, and government authorities). Upon learning of any disclosure of Confidential Material to any person not authorized by this paragraph to receive Confidential Material, the Party who so learns shall immediately (i) inform in writing the Party from which the Confidential Material was originally received of such disclosure, including to whom the material was disclosed, and (ii) take all necessary steps to retrieve as soon as possible each and every copy of all Confidential Material from the unauthorized person and any person to whom the unauthorized person disclosed the Confidential Material.

13.     Disclosure of Confidential Material in accordance with this Protective Order shall not effect, nor shall it be deemed to effect a waiver of the attorney-client privilege, the work-

EXHIBIT 1

product immunity, or any other privilege or immunity from disclosure to which such Confidential Material may be entitled, whether in this action or in any other action or as to any non-party.

14.     To the extent not otherwise addressed in this Order, any use of confidential or protected material in filings with the Court, at any hearing, or at trial shall be governed by a separate agreement or order.

15.     Each Party agrees that in the event it is served by a non-party with a subpoena or request for production of Confidential Material originally received from another party, it will give sufficient notice to allow that Party a reasonable opportunity to intervene to oppose such production. The notice shall include a description of the material sought, the date and location for compliance with the subpoena or request, the identity of the requester of the Confidential Material, the docket number of the matter where requested, and all other information reasonably necessary to intervene and oppose such production.

16.     CHALLENGING CONFIDENTIALITY DESIGNATIONS

16.1.     Timing of Challenges. Any Party or Non-Party may challenge a designation of confidentiality at any time. Unless a prompt challenge to a Designating Party's confidentiality designation is necessary to avoid foreseeable, substantial unfairness, unnecessary economic burdens, or a significant disruption or delay of the litigation, a Party does not waive its right to challenge a confidentiality designation by electing not to mount a challenge promptly after the original designation is disclosed.

16.2.     Meet and Confer. The Challenging Party shall initiate the dispute resolution process by providing written notice of each designation it is challenging and describing the basis for each challenge. No more than 500 documents shall be submitted to the challenge process in a 30-day period. To avoid ambiguity as to whether a challenge has been made, the written notice must recite that the challenge to confidentiality is being made in accordance with this specific paragraph of the Protective Order. The parties shall attempt to resolve each challenge in good faith and must begin the process by conferring directly (in voice to voice dialogue; other forms of communication are not sufficient) within 14 days of the date of service of notice. In conferring, the Challenging

EXHIBIT 1

Party must explain the basis for its belief that the confidentiality designation was not proper and must give the Designating Party an opportunity to review the designated material, to reconsider the circumstances, and, if no change in designation is offered, to explain the basis for the chosen designation. During the meet and confer process, the Designating Party must state the bases for its objections to each challenge on a document by document basis. A Challenging Party may proceed to the next stage of the challenge process only if it has engaged in this meet and confer process first or establishes that the Designating Party is unwilling to participate in the meet and confer process in a timely manner.

16.3.    Judicial Intervention. If the Parties cannot resolve a challenge without court intervention, the Challenging Party shall serve upon the Designating Party a "Notice of Improper Confidential Designation" ("Notice"). The Notice shall list the challenged documents by Bates label (or other identifying label if no Bates label). The Designating Party shall file a "Motion to Maintain Confidentiality" within fourteen (14) calendar days of the Notice, explaining why the documents should or should not be de-designated and, if applicable, why the documents are not reasonably likely to be used for any litigation purpose. Failure by the Designating Party to make such a Motion within 14 days of the Notice shall automatically waive the confidentiality designation for each challenged designation. The Challenging Party will then have seven (7) calendar days to file a Response. There shall be no Reply absent leave of Court. Either party may lodge the challenged documents with chambers bearing the confidentiality legend, which shall not be filed in connection with the confidentiality challenge. The Parties may stipulate in writing to allow additional time for the Designating Party to make such a Motion to Maintain Confidentiality or the Designating Party may move the Court for additional time. The burden of persuasion as to whether information is confidential shall be on the Designating Party. If the challenged documents could not reasonably be used for any litigation purpose, the Court will grant the Motion to Maintain Confidentiality without prejudice to a new objection by the Challenging Party at a later date. Unless the Designating Party has waived the confidentiality designation by failing to file a Motion to Maintain Confidentiality as described above, all parties shall continue to afford the material in

EXHIBIT 1

question the level of protection to which it is entitled under the Producing Party's designation until the Court rules on the challenge.

17.     The production by any Party in the course of discovery in these proceedings of a document subject to a claim of privilege, work product, protection from disclosure under federal or state law, or other statutory or court-ordered confidentiality, will not result in a waiver of any of the foregoing protections, whether in these or any other proceedings, for the produced document or any other withheld document covering the same or similar subject matter. Upon notice of such disclosure, all originals and copies thereof, shall be returned to the producing Party within twenty (20) business days of receipt of such notice and the receiving party shall not use such information for any purpose until further Order of the Court. Such returned material shall be deleted from any litigation-support or other database. All notes or other work product reflecting the contents of such disclosed materials shall be destroyed, and receiving counsel shall certify in writing to the producing party's counsel compliance with this paragraph. In the event of disagreement, until such time as the disagreement is resolved, the receiving Party will return the document and will not review or use the document or its contents. If the specific content of the protected document is discussed in a deposition prior to the time of discovery or notification of the inadvertent disclosure, the Parties agree that such testimony may not be used for any purpose until the dispute is resolved by agreement of the Parties or by Court order. The party to whom any produced document was returned shall retain the returned materials until the end of the case, including any appeals. Within fifteen (15) business days after notice of the disclosure, the producing Party shall provide a log that describes the basis for the claim that the material is privileged or otherwise protected from disclosure. After receipt of such a privilege log, any Party may dispute a claim of privilege or protection, however, prior to any submission to the Court for an in camera review, the Party disputing a claim of privilege or protection shall provide in writing the identification of the documents for which it questions the claim of privilege or protection and the reasons (including legal support) for its assertion that the documents are not privileged or protected. Within fifteen (15) business days, the Party seeking to support the claim of privilege or protection shall provide

EXHIBIT 1

a written response supporting the claim of privilege or protection (including legal support). The Parties will then meet and confer in good faith as to the claims of privilege or protection. If agreement cannot be met after ten (10) business days, any party may thereafter lodge the challenged documents bearing the confidentiality legend with chambers for an *in camera* determination as to privilege or protection, which shall not be filed in connection with the challenge. The burden of persuasion in any such challenge proceeding shall be on the party asserting privilege or protection.

18.     This paragraph does not apply to a Motion to Maintain Confidentiality, which confidentiality challenges shall be governed by paragraph 16.  When possible, the parties should confer in advance of court filings about whether documents previously designated confidential truly need that designation.  If the Parties do not confer or cannot reach agreement in advance of a court filing as to whether certain document(s) designated confidential may be filed in the public record, then the Filing Party should: file a slip sheet with its electronic filing in place of the document(s), include a complete copy of the designated document(s) with the confidentiality legend in the Court's chambers copy, and bring a complete copy of the designated document(s) with the confidentiality legend to the hearing.[1] Following the hearing, and depending on the Court's assessment of which documents are relevant to the motion and in need of further protection, the Court may order that the document(s) be filed in the public record or enter such other further order as appropriate.  Where exhibits to court filings are needed, the Parties shall act in good faith to file only the pages necessary for its argument unless the Court requests additional material.

19.     Upon the final determination, including any appeals related thereto, of this action, the producing Party will send a letter to the receiving Party, stating that the lawsuit has concluded and requesting that all Confidential Material be returned or destroyed. If, at that time, the producing Party has entered an agreement permitting use of the Confidential Materials in another action, the producing Party may wait until resolution of that action to send the letter. Within thirty (30) days

---

[1] This slipsheet approach includes for example where a transcript remains confidential because the 30-day confidentiality designation period has not yet run.

EXHIBIT 1

after receipt of that letter, all attorneys in possession of Confidential Material shall return all Confidential Material to the disclosing Party or, alternatively, shall immediately destroy all such material. All counsel of record shall, within forty-five days of this final determination, certify that all Confidential Material, including any such material disclosed to any other entity, has been returned or destroyed. The sole exception to the requirements described above is that information that has been incorporated into attorney work product or other privileged documents need not be returned or destroyed. Such information shall be retained by the person to whom the information was produced, and shall be treated as Confidential Material in accordance with this Order.

20.     This Protective Order shall not enlarge or affect the proper scope of discovery in this or any other lawsuit, nor shall this Protective Order imply that material designated (or not designated) as Confidential Material under the terms of this Protective Order is properly discoverable, relevant, or admissible in this or any other lawsuit.

21.     Each Party shall retain all rights and remedies available to it under the law for the enforcement of this order against anyone who violates it.

22.     The restrictions of this Protective Order shall continue to apply after this action is finally determined and the Court shall retain jurisdiction for all purposes in connection therewith. All persons receiving or given access to Confidential Material in accordance with the terms of this Protective Order consent to the continuing jurisdiction of the Court for the purposes of enforcing this Protective Order and remedying any violations thereof.

23.     If a Party concludes that certain documents require special or additional protections beyond the protections of this Order such as a designation of "Confidential – Attorneys' Eyes Only," the Parties will meet and confer about those documents at that time and present the issue to the Court if no agreement can be reached. In the event of any designation such as "Confidential – Attorneys' Eyes Only," then, unless otherwise agreed in writing by the parties, the burden shall be upon the Designating Party to obtain an Order of the Court providing for protections beyond or in addition to those set forth herein and, absent any such Order, then beginning on the twenty-first

10

EXHIBIT 1

day following the original "Confidential – Attorneys' Eyes Only" and at all times thereafter, designated materials shall receive no protections beyond those set forth herein.

     24.    In the event of any conflict between any other provision in this Order and this paragraph, this paragraph shall control.  The following materials shall not be designated as Confidential Material and shall not be subject to the terms of this Order:

    (a) any unredacted trial or hearing exhibits admitted into evidence or appearing in the public record in Johnson, Pilliod, Hardeman, or MDL;

    (b) the testimony in open court, at trial or any hearing, of any witness in Johnson, Pilliod, Hardeman, or MDL.

**IT IS SO ORDERED.**

Date:  June 12, 2021

Kathleen McGarry Ellenwood
District Court Judge, Division X

## CERTIFICATE OF SERVICE

  This document was e-filed and served, on the date of acceptance, to all parties that are on the service contact list. It is the submitting attorney's responsibility to effect service upon any party that is not on the service contact list by filing proof of such service, i.e., a Certificate of Mailing.

**Anthony Bruster**
**Feliz Rael**
**Alex Walker**
**Kenneth Beal**

Administrative Assistant

11

EXHIBIT 1

**EXHIBIT A**
**ACKNOWLEDGMENT AND AGREEMENT TO BE BOUND**

I, _____ [print or type full name], of _____

_____ [print or type full address], declare under

penalty of perjury that I have read in its entirety and understand the Protective and Confidentiality

Order that was issued by the State of New Mexico First Judicial District Court in and for Santa Fe

County on _____ [date] in *Renteria v. Monsanto Co., et al.*, Civil Action No. D-

101-CV-2020-00180.  I agree to comply with and to be bound by all the terms of this Protective

and Confidentiality Order, and I understand and acknowledge that failure to so comply could

expose me to sanctions and punishment in the nature of contempt.  I solemnly promise that I will

not disclose in any manner any information or item that is subject to this Protective and

Confidentiality Order to any person or entity except in strict compliance with the provisions of this

Order.

I further agree to submit to the jurisdiction of the State of New Mexico First Judicial

District Court in and for Santa Fe County for the purpose of enforcing the terms of this Protective

and Confidentiality Order, even if such enforcement proceedings occur after termination of this

action.

I hereby appoint _____ [print or type full name] of

_____ [print or type full address

and telephone number] as my New Mexico agent for service of process in connection with this

action or any proceedings related to enforcement of this Stipulated Protective Order.


Date: _____

City and State where sworn and signed: _____

Printed name: _____

Signature: _____

EXHIBIT 1

FILED  1st JUDICIAL DISTRICT COURT
Santa Fe County
6/14/2021 12:11 PM
KATHLEEN VIGIL CLERK OF THE COURT
Corinne Onate

STATE OF NEW MEXICO
COUNTY OF SANTA FE
FIRST JUDICIAL DISTRICT COURT

No. D-101-CV-2020-00180

MARITA RENTERIA,
     Plaintiff,
v.

MONSANTO COMPANY;
and SIDCO CORPORATION,
     Defendants.

### JOINT STIPULATION AND ORDER GOVERNING PROTOCOL
### FOR DISCOVERY OF ELECTRONICALLY STORED INFORMATION

For good cause shown, the Court hereby adopts and enters as an Order of this Court the parties' proposed Stipulation and Order Governing Protocol for Discovery of Electronically Stored Information as follows:

**WHEREAS**, counsel for Plaintiff and Defendant (collectively, the "Parties," and each, a "Party") have met and conferred regarding discovery of electronically stored information ("ESI") of the Parties;

**WHEREAS**, the Parties have reached agreement on certain of the issues discussed regarding such discovery;

**WHEREAS**, the Parties have entered into this Stipulation and Order Governing Protocol for Discovery of Electronically Stored Information ("Order") to facilitate the just and speedy conduct of discovery involving ESI and to promote, to the fullest extent possible, the resolution of disputes regarding the discovery of ESI without Court intervention;

**IT IS HEREBY ORDERED** that:

**I.**     **All Parties are bound by and subject to the terms of this Order.**

**II.**    **Production Format of Defendant's Electronically Stored Information**

1

EXHIBIT 1

**A.    Definitions**

1.    "Document" means paper documents or electronically stored information (ESI) existing in any medium from which information can be obtained or translated into reasonably usable form.

2.    "Native File(s)" means ESI in the file type for (or of) the application in which such ESI is normally created, viewed and/or modified.

3.    "Metadata" means: (i) information embedded in a Native File that is not ordinarily viewable or printable from the application that generated, edited, or modified such Native File; and (ii) information generated automatically by the operation of a computer or other information technology system when a Native File is created, modified, transmitted, deleted or otherwise manipulated by a user of such system.

4.    "Static Image(s)" means a representation of ESI produced by converting a Native File into a standard image format capable of being viewed and printed on standard computer systems. A Tagged Image File Format (TIFF) image is an example of a Static Image.

5.    "Load/Unitization file" means a set of paper-scanned images or electronically processed files and indicates where individual pages or files belong together as documents, including attachments, and where each document begins and ends. A Load/Unitization file will also contain data relevant to the individual documents, such as Metadata, coded data, and OCR or Extracted Text.

EXHIBIT 1

6.      "OCR" means the optical character recognition file which is created by software used in conjunction with a scanner that is capable of reading text-based documents and making such documents searchable using appropriate software.

7.      "Extracted Text" means the text extracted from a Native File and includes all header, footer and document body information.

8.      Parties will use reasonable, best efforts to comply with the terms of this production format.  In the event a party determines that it cannot materially comply with any requirement herein, they will disclose their inability to comply and parties will meet and confer regarding resolution of the identified issue.

## B.      Format of Production

### 1.      Paper Documents

Paper documents, including spreadsheets maintained in paper form, will be produced as TIFF images (consistent with the specifications in Section II.B.2.a.).  The production will include the appropriate Load/Unitization files which will, at a minimum, contain the following fields (described in detail in Section II. B. 2. (e.) infra.):

a.      Beginning Production Number (ProdBeg),

b.      Ending Production Number (ProdEnd),

c.      Beginning Attachment Production Number (BegAttach),

d.      End Attachment Production Number (EndAttach),

e.      Custodian/Source,

f.      Confidentiality,

EXHIBIT 1

g.      Document Type,

h.      Page Counts, and

i.      OCR.TXT file.

In scanning paper documents, if a document is more than one page, to the extent reasonably possible, the unitization of the document and any attachments or affixed notes should be maintained as it existed when collected by the producing party.  The parties may unitize their documents using either physical unitization (i.e., based on physical binding or organizational elements present with the original paper documents like staples, clips and binder inserts) or logical unitization (i.e., a manual review of the paper to determine what logically constitutes a document like page numbers or headers).  The parties will meet and confer to resolve any related issues.

2.  **ESI**

a.      All TIFF-formatted documents will be single page, Group 4 TIFF at 300 x 300 dpi resolution and 8.5 x 11 inch page size, except for documents that in the producing party's reasonable judgment require a different resolution or page size. The requesting party retains the right to request a TIFF image in a higher resolution or larger page size if necessary to render the image legible or understandable. If a color image is produced in black and white, the receiving party may request the producing party to produce the original, color image. After receiving such a request for color production, the parties will meet and confer on a reasonable and cost-effective means of providing the requested documents. To the extent possible, the original orientation shall be maintained (e.g.,

4

EXHIBIT 1

portrait-to-portrait and landscape-to-landscape). Such files will be grouped in folders of no more than 1,000 TIFF files each unless necessary to prevent files from splitting across a folder.

b.  In the absence of agreement of the parties or order of Court, a Static Image will be provided in TIFF format (.TIF files). The image file names shall match the Bates number assigned to the image. All documents are to be provided with multi-page searchable OCR or Extracted Text files, as described in paragraph (c).

c.  **Text Files**.  Full extracted text will be provided in the format of a single *.txt file for each file (e.g., not one *.txt file per *.tif image). Where ESI contains text that has been redacted under assertion of privilege or other protection from disclosure, the redacted *.tif image will be OCR'd and file-level OCR text will be provided in lieu of extracted text.  Searchable text will be produced as file-level multi-page UTF-8 text files with the text file named to match the beginning production number of the file. The full path of the text file must be provided in the *.dat data load file.

d.  There will be two Load/Unitization files accompanying all productions.  One will be the Image load file and the other will be the Metadata load file.  The specifics of these files are detailed in (i) and (ii) below:

EXHIBIT 1

**(i)**   <u>**Image Load File**</u>

- Every Document referenced in a production image load file shall have all corresponding images, text, and data logically grouped together in a directory structure with a common key to properly load the data.

- Documents shall be produced in only one image load file throughout the productions, unless that document is noted as being a replacement document in the Replacement field of the data load file.

- The name of the image load file shall mirror the name of the delivery volume, and should have an .lfp, .opt or .dii* extension (e.g., ABC001.lfp). The volume names shall be consecutive (i.e., ABC001, ABC002, et. seq.)   *If .dii file is produced, the accompanying metadata load file shall be separate from the .dii file and not contained within the .dii file.*

- The load file shall contain one row per Tiff image.

- Every image in the delivery volume shall be contained in the image load file.

- The image key shall be named the same as the Bates number of the page. Load files shall not span across media (e.g., CDs, DVDs, Hard Drives, etc.), i.e., a separate volume shall be created for each piece of media delivered.

EXHIBIT 1

(ii)     **Metadata Load File**

- The metadata load file shall use the following delimiters:

  - Column Delimiter: Pipe – | (ASCII 124)

  - Text Qualifier: Caret – ^ (ASCII 94)

  - New line: Registered sign - ® (ASCII 174)

- Data for documents shall be produced in only one data load file throughout the productions, unless that document is noted as being a replacement document in the Replacement field of the data load file.

- The first record shall contain the field names in the order of the data set forth in (B. 2. e.). Metadata fields that are not applicable to a document shall be filled with a NULL value along with fields that were not able to be obtained due to a processing error or corrupt file.

- All date fields shall be produced in "mm/dd/yyyy hh:mm:ss AM" format.

- A carriage-return line-feed shall be used to indicate the start of the next record.

- Load files shall not span across media (e.g., CDs, DVDs, Hard Drives, etc.); a separate volume shall be created for each piece of media delivered.

EXHIBIT 1

- The name of the metadata load file shall mirror the name of the delivery volume, and shall have a .dat, .csv or .txt extension (i.e., ABC001.dat).

- The volume names shall be consecutive for each produced source. (i.e., ABC001, ABC002, et. seq.).

e. Except as set forth herein, ESI will be produced to the requesting party as Static Images together with a Load/Unitization file that will contain the Metadata fields described below on the document level, except as set forth in section (B.) (2.) (l.) infra. The following fields associated with each electronic document including the body of the document, will be produced in the appropriate Load/Unitization file.

| | Field | Summation Field (Florida) | Definition | Doc Type | Source: Load File (L) or Metadata (M) |
|---|---|---|---|---|---|
| 1 | SOURCE | SOURCE | Name of party producing the document | All | L |
| 2 | CUSTODIAN | CUSTODIAN | Name of person or data source (non-human) from where documents/ files are produced. **Where redundant names occur, individuals should be distinguished by an initial which is kept constant throughout productions (e.g., Smith, John A. and Smith, John B.) | All | M or L |
| 3 | CUSTODIAN ID | CUSTODIAN ID | Each CUSTODIAN from #2 above will be assigned a unique numeric identifier that will be maintained throughout productions. | All | M or L |

8

EXHIBIT 1

| | Field | Summation Field (Florida) | Definition | Doc Type | Source: Load File (L) or Metadata (M) |
|---|---|---|---|---|---|
| 4 | BEGBATES | BEGDOC# | Beginning Bates Number (production number) | All | L |
| 5 | ENDBATES | ENDDOC# | End Bates Number (production number) | All | L |
| 6 | PGCOUNT | PGCOUNT | Number of pages in the document | All | L |
| 7 | FILESIZE | FILESIZE | File Size | All | M |
| 8 | APPLICAT | APPLICAT | Commonly associated application for the specified file type.  (See 2 (l) below). | All | M |
| 9 | FILEPATH | FILEPATH (for Edocs) FOLDER (for emails) | File source path for all electronically collected documents and emails, which includes location, folder name, file name, and file source extension. | All | M |
| 10 | NATIVEFILELINK | DOCLINK | For documents provided in native format only | All | L |
| 11 | TEXTPATH | LOGFILE        or FULLTEXT | File path for OCR or Extracted Text files per paragraph (d) above | All | L |
| 12 | MSGID | MSGID | Email system identifier assigned by the host email system. Value extracted from parent message during processing | Email | M |
| 13 | FROM | FROM | Sender | Email | M |
| 14 | TO | TO | Recipient | Email | M |
| 15 | CC | CC | Additional Recipients | Email | M |
| 16 | BCC | BCC | Blind Additional Recipients | Email | M |
| 17 | SUBJECT | SUBJECT | Subject line of email | Email | M |
| 18 | PARENTBATES | PARENTID | BeginBates number for the parent email of a family (will not be populated for documents that are not part of a family) | Email | L |
| 19 | ATTACHBATES | ATTACHID | Bates number from the first page of each attachment | Email | L |
| 20 | BEGATTACH | (will  be  provided  from ATTRANGE) | First Bates number of family range (i.e. Bates number of the first page of the parent email) | Email | L |

9

EXHIBIT 1

| | Field | Summation Field (Florida) | Definition | Doc Type | Source: Load File (L) or Metadata (M) |
|---|---|---|---|---|---|
| 21 | ENDATTACH | (will be provided from ATTRANGE) | Last Bates number of family range (i.e., Bates number of the last page of the last attachment) | Email | L |
| 22 | ATTACHCOUNT | ATTACHMENT COUNT | Number of attachments to an email | Email | L |
| 23 | ATTACHNAME | ATTACHMENT LIST | Name of each individual attachment | Email | M |
| 24 | DATESENT (mm/dd/yyyy hh:mm:ss AM) | DATESENT | Date Sent | Email | M |
| 25 | DATERCVD (mm/dd/yyyy hh:mm:ss AM) | DATERCVD | Date Received | Email | M |
| 26 | EMAILDATSORT (mm/dd/yyyy hh:mm:ss AM) | DATESENT | Sent Date of the parent email (physically top email in a chain, i.e. immediate/direct parent email) | Email | L |
| 27 | READ/UNREAD | | Whether the Outlook item was read or unread at the time of collection. Values provided will be "Yes" for read, "No" for unread, and a null value where the read/unread flag value is unavailable. | Email | M |
| 28 | Email Outlook Type | Email Outlook Type | Type of Outlook item, e.g. email, calendar item, contact, note, task | Email | M |
| 29 | HASHVALUE | MD5 HASH | MD5 Hash Value for Edocs | Edocs | M |
| 30 | TITLE | DOCTITLE | Title provided by user within the document | Edocs | M |
| 31 | AUTHOR | AUTHOR | Creator of a document | Edocs | M |
| 32 | DATECRTD (mm/dd/yyyy hh:mm:ss AM) | DATECRTD | Creation Date | Edocs | M |
| 33 | MODIFIED BY | LAST EDITED BY | Person who has modified a document | Edocs | M |
| 34 | LASTMODD (mm/dd/yyyy hh:mm:ss AM) | LASTMODD (mm/dd/yyyy hh:mm:ss AM) | Last Modified Date | Edocs | M |

10

EXHIBIT 1

| | Field | Summation Field (Florida) | Definition | Doc Type | Source: Load File (L) or Metadata (M) |
|---|---|---|---|---|---|
| 35 | DocumentType | DocumentType | Descriptor for the type of document: "**E-document**" for electronic documents not attached to emails; "**Emails**" for all emails; "**E-attachments**" for files that were attachments to emails; and "**Physicals**" for hard copy physical documents that have been scanned and converted to an electronic image. | All | M |
| 36 | Importance | Importance | High Importance – indicates Priority in Email message. | Email | M |
| 37 | Redacted | Redacted | Descriptor for documents that have been redacted.  "Yes" for redacted documents; "No" for unredacted documents. | All | M |
| 38 | ProdVol | ProdVol | Name of media that data was produced on.  Wave 001 – Hard Drive | All | M |
| 39 | Confidentiality | Confidentiality | Indicates if the document has been designated as "Confidential" pursuant to any applicable Protective Order.  "Yes" for Confidential documents; "No" for documents that are not so designated. | All | M |
| 40 | Color | Color | Flag to indicate that document contains color.  Values provided will be "Yes" for color, "No" for no color, | All | M |
| 41 | FILENAME | @C FILENAME | Original filename at the point of collection, without extension of native file | All | M |
| 42 | FILEEXTENSION | @C FILEEXT | File extension of native file | All | M |

11

EXHIBIT 1

This list of fields does not create any obligation to create or manually code fields that are not automatically generated by the processing of the ESI; that do not exist as part of the original Metadata of the document; or that would be burdensome or costly to obtain. The parties retain the right to move the Court for the production of additional electronic metadata fields should ongoing discovery reveal the need for such Metadata.  The designation of a document as a "Protected Document" pursuant to the Protective Order of Confidentiality shall include the metadata produced for that document.

    f.    **Bates Numbering**:  All images must be assigned a Bates/control number that shall always: (1) be unique across the entire document production, (2) maintain a constant length (zero/0-padded) across the entire production, (3) contain no special characters or embedded spaces, and (4) be sequential within a given document.  If a Bates number or set of Bates numbers is skipped in a production, and not otherwise identified on a privilege log, the producing party will disclose the Bates numbers or ranges in a cover letter accompanying the production.  Production Bates numbers shall be endorsed on the lower right corner and shall not obscure any portion of the original file.  Confidentiality designations, if any, shall be endorsed on the lower left corner of applicable images and shall not obscure any portion of the original file.

    g.    When processing ESI, **GMT** should be selected as the time zone. To the extent that a party has already processed ESI using a different

EXHIBIT 1

time zone, the producing party will note the time zone used in its processing.

h.    Documents with dynamic fields for file names, dates, and times will be processed to show the field code (*e.g.*, "[FILENAME]" or "[AUTODATE]"), rather than the values for such fields existing at the time the file is processed.

i.    When the Static Image is produced, the producing party shall make reasonable attempts to maintain and not modify the original Native File and its metadata.

j.    The parties will meet and confer regarding collection and production of ESI stored in databases and other structured data under the custody and control of the parties.

k.    Electronic file collection will be "De-NISTed", removing commercially available operating system and application files contained on the current NIST file list. Identification of NIST list matches will be through MD5 Hash values.

l.    User-generated files that have been collected that cannot be produced and/or imaged because of technical issues should be identified as exception files and included on a log that lists all metadata set forth in paragraph 2(e) except that the metadata for the APPLICAT field will be obtained from binary encoding from the file, and reason for exception: for example, corruption, unavailable password protection, proprietary software, or other technical issues.

13

EXHIBIT 1

The producing party shall provide a copy of this log with its production. If the receiving party requests production of any files listed on the exception log, the parties will meet and confer, including on any reasonable and cost-effective means of providing the requested data.

m.   "Duplicate ESI" means files that are exact duplicates based on the files' MD5 or SHA-1 hash value.  The producing party need only produce a single copy of responsive Duplicate ESI.  De-duplication shall not break apart families and shall be performed at a family level.   Defendants will globally (e.g., both within a particular custodian's file and across all custodian/databases) de-duplicate identical ESI as follows:

(1)   Electronic Files:  Electronic files will be de-duplicated based upon calculated MD5 Hash values for binary file content.  File contents only will be used for MD5 Hash value calculation and will not include operating system metadata (filename, file dates) values.

(2)   Messaging Files:  Messaging files will be de-duplicated based upon MD5 Hash values for the message family, including parent object and attachments.  The following fields will be used to create the unique value for each message:  To; From; CC; BCC; Date Sent; Subject; Body; and, MD5 Hash values for all attachments, in attachment order.  Messaging materials

14

EXHIBIT 1

will be de-duplicated at a family level, including message and attachment(s).

(3) Log Files:  For the existing file collection containing fully processed duplicate files and messages, duplicate documents will be listed in a de-duplication log including the same agreed production format meta-data structure and data delivery criteria as for the "master" production documents.  Moving forward, as collected electronic materials are globally de-duplicated during system intake using the above guidelines, defendants will produce logs containing the meta-data field values for de-duplicated files.  As document production begins for additional custodians and during rolling productions for existing custodians, an updated de-duplication log shall be produced for each production.  The metadata provided will be an accurate representation of the data existing for the documents at the time of collection.

n.    **Parent-Child Relationship.** Parent-child relationships (e.g., the associations between emails and their attachments) shall be preserved.  Email and other ESI attachments will be produced as independent files immediately following the parent or email or ESI records.  Parent-child relationships will be identified in the data load file pursuant to paragraph II. B. 2. e.

EXHIBIT 1

o.   **Email Threading.**  Email threads are email communications that contain prior or lesser-included email communications that may also exist separately in a Party's electronic files.  A most inclusive email thread is one that contains all of the prior or lesser-included e-mails, including attachments, for that branch of the email thread.  The Producing Party shall produce the most inclusive email thread and all prior or lesser included email threads that were collected and identified as responsive and not privileged.

p.   **Embedded Objects**:  Objects embedded in Microsoft Word and .RTF will be extracted as separate documents and produced as attachments to the document.

q.   **Compressed files**.  Compression file types (i.e., .CAB, .GZ, .TAR. .Z, .ZIP) shall be decompressed in a reiterative manner to ensure that a zip within a zip is decompressed into the lowest possible compression resulting in individual folders and/or files.

r.   **Replacement files**:   Any documents that are replaced in later productions shall be clearly designated as such, by appending a "-R" to the production prefix and by a letter accompanying the production clearly designating such documents as replacements.

s.   **Native Files**.  The parties acknowledge that production in TIFF and load file format may be inadequate for certain types of ESI (e.g. spreadsheets). The following files shall be produced in native format (except for redacted documents):

16

EXHIBIT 1

i.  All audio files and video files shall be produced in native format with the source file path provided.

ii.  Electronic spreadsheet (e.g., Excel), electronic presentations (e.g., PowerPoint), desktop databases (e.g., Access), and audio/video multimedia files shall be produced in native format whenever possible. The production of the electronic spreadsheets shall include hidden rows, columns and worksheets. Native Excel files will be redacted by overwriting the data contained in a particular cell, row, column or tab with the term "REDACTED." If the production party deems it necessary to produce redacted Excel (or other spreadsheet formats) in any format other than Native, the parties should meet and confer before such a production is made.

iii.  Electronic presentations (e.g. PowerPoint). The production of the electronic presentation files shall include comments, hidden slides, speaker notes, notes and similar data. To the extent native files are produced without an accompanying rendering of TIFF images, a slip sheet will be produced in TIFF format to facilitate Bates and confidentiality stamping. If documents requested in native format require redactions, the parties will produce TIFF images for those documents. Confidentiality of documents produced in native will be noted in the File Name along with the Bates number and in a

EXHIBIT 1

metadata field.  If a dispute arises with respect to the provision, the parties agree to meet and confer in an effort to resolve their differences.   Should the producing party collect Statistical Analysis System, the parties shall meet and confer regarding production format prior to production.

iv.  Word Processing Files. Word processing files including limitation Microsoft Word files (*.doc and *.docx), with tracked changes and comments showing. Such word files will be produced in native format.

t.  **Emails:** Emails will be produced with the CC and BCC line displayed.

u.  **Word Processing Files.** Word processing files, including without limitation Microsoft Word files (*.doc and *.docx), will be produced with tracked changes and comments showing.   Supplemental requests for native format and color copies will be governed by Section II. B. 2. a, above.

v.  Any native files that are produced shall be produced with the source file path provided, as well as all extracted text and applicable metadata fields set forth in Section II. B. 2. e.

w.  The parties shall exchange production samples as follows: (1) standard production from each source (physical, email, electronic document, native, etc.) which fully exercises the metadata fields set forth above; (2) replacement production; (3) clawback.

EXHIBIT 1

x.   **Redacted Document Log**.  The producing party will provide a log identifying by bates/production number each document that contains a redaction and the reason for the redaction.  In addition, if the redaction is based on attorney-client privilege or the work-product doctrine, the document also will be addressed on the privilege log and comply with any order entered governing the privilege log.

y.   **Privilege Log**.  Privilege logs shall be produced in PDF format, and shall be accompanied by an Excel copy of the log.  The PDF copy will be the official privilege log of record. The privilege log also shall comply with any order entered governing the privilege log.

z.   **Suppressed Metadata Log.**  The producing party will provide a log identifying by bates/production number each document that contains metadata field values subject to Privacy or Privilege exceptions.  Suppressed field values will be replaced in whole with a "REDACTED" placeholder value.  The log will provide the document BEGBATES value, field name suppressed and the suppression reason.

aa.  **Foreign Language Documents.** All documents shall be produced in their original language.  If two documents are substantially identical except that they are in different languages, they shall not be treated as exact duplicates. Nothing in this agreement shall

19

EXHIBIT 1

require a producing party to prepare a translation or certify the translation that they possess.

**C.      Objections to Production of ESI**

1.      Nothing in this agreement waives a party's right to object to production of ESI that is not reasonably accessible because of undue burden or cost.  The identification of documents pursuant to this ESI Protocol need not include searches of ESI from sources that are not reasonably accessible because of undue burden or cost.  Such sources that are not reasonably accessible include, but are not limited to: (a) deleted, fragmented or slack data; (b) random access, cache or other ephemeral data; (c) ESI contained on "Backup Systems" (*e.g.*, systems that periodically store electronic information on tape or comparable media to permit recovery of the information in the event of a system failure); (d) on-line data access data such as temporary internet files or cookies; and (e) ESI that cannot be directly opened by its native application due to conversion to a different format for backup or archival purposes.

2.      If asserting an objection based on paragraph II(C)(1), the responding party will inform the requesting party of the electronic information it is willing to produce, the nature and location of the information claimed to not be reasonably accessible, the reason(s) why the requested production would impose an undue burden or is unreasonably costly, and afford the requesting party an opportunity to propose an alternative means of compliance with the request, including payment of all or part of the costs of retrieving the

EXHIBIT 1

information.  If an agreement cannot be reached as to the producing party's objection to production, the parties shall seek judicial assistance.

**D.      Continuing Obligations**

1. To expedite discovery of relevant electronic evidence and reduce costs, the parties' computer experts will informally cooperate and discuss procedures or protocols to facilitate identification, retrieval and production of computerized information. This responsibility shall be continuing, unless otherwise ordered by the Court.

2. The inadvertent production of any materials constituting or containing attorney-client privileged information or attorney work product shall not waive any claim of privilege. If a receiving party disclosed the document(s) or information contained in the document(s) before being notified of its inadvertent production, the receiving party shall take reasonable steps to retrieve that information until the privilege claim has been resolved.

3. The parties will work with one another in good faith to resolve any issues, disputes or objections that arise in connection with electronic discovery issues before raising such matters with the court.  Issues shall be raised promptly in writing, and the parties shall have good faith discussions to attempt to resolve the matter.  The parties will use their best efforts to raise any objections or other requests related to a production within ninety (90) days of receipt of that production.  In any event, the parties must raise any objections or other issues sufficiently in advance of the close of discovery to permit good faith negotiations to resolve the matter and briefing of any

EXHIBIT 1

related motion such that the court has a reasonable time to rule thereon prior to the close of discovery.

**III.    Encryption.**  To maximize the security of information in transit, any media on which documents are produced may be encrypted by the producing Party. In such cases, the producing Party shall transmit the encryption key or password to the requesting Party, under separate cover, contemporaneously with sending the encrypted media.

**IV.    Other Agreements.**  Other orders have been proposed to the Court, may have already been entered, or will be entered in the future that supplement, complement, or otherwise impact application of this Order and/or discovery in this case.  For example, the parties note that this Order does not govern the content of privilege logs except as noted and a protective and confidentiality order is contemplated.  This Order also does not address the scope of discovery, timing and order of discovery, and the procedure for search and culling of documents to be reviewed.

**V.    Reservation.**  Each party reserves the right to object to production of documents in the format described herein to the extent that production in such format is impracticable or unreasonably burdensome or expensive.

 Date:  June 12, 2021

Kathleen McGarry Ellenwood
District Court Judge, Division X

## CERTIFICATE OF SERVICE

   This document was e-filed and served, on the date of acceptance, to all parties that are on the service contact list. It is the submitting attorney's responsibility to effect service upon any party that is not on the service contact list by filing proof of such service, i.e., a Certificate of Mailing.

**Anthony Bruster**
**Feliz Rael**
**Alex Walker**
**Kenneth Beal**

Jmontoya
Administrative Assistant

22

EXHIBIT 1

FILED  1st JUDICIAL DISTRICT COURT
Santa Fe County
6/14/2021 12:11 PM
KATHLEEN VIGIL CLERK OF THE COURT
Corinne Onate

STATE OF NEW MEXICO
COUNTY OF SANTA FE
FIRST JUDICIAL DISTRICT COURT

No. D-101-CV-2020-00180

MARITA RENTERIA,
      Plaintiff,
v.

MONSANTO COMPANY;
and SIDCO CORPORATION,
      Defendants.

## **ORDER GOVERNING PRIVILEGE LOGS**

For good cause shown, the Court hereby orders as follows:

A.     **Asserting Privilege or Protection.**  A party who withholds or redacts documents or information contained within a document on the grounds of attorney-client privilege and/or work product protection, or any other asserted privilege, shall provide:

     1.    A listing of such documents in electronic spreadsheet format providing the following objective metadata fields ("objective metadata" does not include substantive content from, or a subjective description of, the document being withheld or redacted) where available:

          a.    the Bates number of the document (or unique document identifier);

          b.    the nature of the privilege asserted ("attorney-client privilege" or "attorney work product");

          c.    the name(s) of the author(s) of the document (if known or knowable) (for email chains, because metadata only captures the author(s) of the most recent email in the chain, all emails in the same chain will be listed together in the log and the emails within

1

EXHIBIT 1

the chain to which privilege is asserted will state "attorney-client privilege" or "attorney work product");

d.    the name(s) of the recipient(s) of the document, including anyone who was sent the document as a "CC" or a "BCC" (if known or knowable) (for email chains, because metadata only captures the recipients of the most recent email in the chain, all emails in the same chain will be listed together in the log and the emails within the chain to which privilege is asserted will state "attorney-client privilege" or "attorney work product");

e.    the document type, including, for example, whether the document is an email, paper file, a spreadsheet, or other descriptive identifier of the document type; and

f.    the date the document was created (if known or knowable), sent (if applicable), and last modified (if applicable).

2.    The names of the individuals who are identified prior to providing the privilege log as being attorneys will be highlighted on the log; if the withholding/redacting party discovers that names of other attorneys on the log were not highlighted, the withholding/redacting party will notify the other parties and shall provide a replacement log.  In addition to the preceding paragraph, the withholding/redacting party will also include the following information in its privilege log entries (provided the party remains willing to meet and confer further on specific documents after production of this privilege log):

EXHIBIT 1

| Document Type | From and to whom | Content |
|---|---|---|
| Email | from attorney to client | conveying legal advice |
| Email Attach. | from client to attorney | requesting legal advice |
| Memorandum | between attorneys | discussing legal advice |
| Letter | between clients | discussing litigation |
| Other Document | between client and attorney | prepared in anticipation of/for litigation |

3.      As an alternative to the categories in the preceding paragraph, or where they do not apply, the withholding/redacting party may provide alternate individualized descriptions for such documents.

B.      **Challenging Asserted Privilege and Protection.**  After receipt of such a privilege log, any Party may dispute a claim of privilege or protection, however, prior to any submission to the Court for an *in camera* review, the Party disputing a claim of privilege or protection shall provide in writing the identification of the documents for which it questions the claim of privilege or protection.  Within thirty (30) days, the Party making the claim of privilege or protection shall provide a written response supporting the claim of privilege or protection (including legal support).  The Parties will then meet and confer in good faith as to the claims of privilege or protection.  If agreement is not reached within fifteen (15) days of the meet and confer, the withholding/redacting party shall, within eighteen (18) days of receiving written Notice from the Challenging Party that the meet and confer has concluded and of which documents remain in dispute, lodge the challenged documents bearing the confidentiality legend with chambers for an *in camera* determination as to privilege or protection, which shall not be filed in connection with the challenge.  If/when challenges are presented to the Court, the parties' positions on those documents will be affirmed by counsel pursuant to Rule 1-011 NMRA.  If a party believes the circumstances require different timing or procedure, they shall meet and confer

EXHIBIT 1

on alternatives to resolving any disputes and if unable to agree may present the issue to the Court.

      **C.**     **Time for Providing Privilege Log.**  The producing party shall provide the information required by paragraph "A" to the receiving party within 30 days of withholding or redacting the related documents.

      **D.**     **Burden of Proof and Legal Standard for Privilege.**  Nothing herein alters or changes the burden of proof or legal standard for establishing any privilege.

Date:  June 12, 2021

Kathleen McGarry Ellenwood
District Court Judge, Division X

## CERTIFICATE OF SERVICE

   This document was e-filed and served, on the date of acceptance, to all parties that are on the service contact list. It is the submitting attorney's responsibility to effect service upon any party that is not on the service contact list by filing proof of such service, i.e., a Certificate of Mailing.

**Anthony Bruster**
**Feliz Rael**
**Alex Walker**
**Kenneth Beal**

Administrative Assistant

4

EXHIBIT 1

FILED  1st JUDICIAL DISTRICT COURT
Santa Fe County
6/14/2021 2:16 PM
KATHLEEN VIGIL CLERK OF THE COURT
Edith Suarez-Munoz

**STATE OF NEW MEXICO**
**SANTA FE COUNTY**
**FIRST JUDICIAL DISTRICT COURT**

**No: D-101-CV-2020-00180**

**MARITA RENTERIA,**
 **V.**

**MONSANTO COMPANY, et. al.**

## NOTICE OF RULE 16 SCHEDULING CONFERENCE

NOTICE IS HEREBY GIVEN that a hearing in this case has been set before the **Honorable Kathleen McGarry Ellenwood**, as follows:

| | |
|---|---|
| Date of Hearing: | **Monday, August 30, 2021 at 8:30 AM** |
| Place of Hearing: | All Division X hearings are conducted by Google Meets. **(Remote Access)**  The Court prefers counsel and parties to participate by video at: **http://meet.google.com/wof-cofz-tuq** |
| | If it is not possible to participate by video, you may call: **1(563) 503-5060** and enter the **PIN: 818 230 380#** |
| Matter to be Heard: | Rule 16 Scheduling Conference |
| Comments: | **Please note that if the parties confer on trial and scheduling order dates, they may access and plug dates in a proposed scheduling order, which can be found under Division 10 of the First Judicial District Court, then submit the same to sfeddiv10proposedtxt@nmcourts.com for review and entry. If the parties are in agreement and wish to vacate the scheduling conference please advise the Court at your earliest convenience so that we may offer that timeslot to another matter.** |
| Length of Hearing: | 20 Minutes |

KATHLEEN VIGIL
CLERK OF THE DISTRICT COURT

### CERTIFICATE OF SERVICE

I, the undersigned, hereby certify that on the **date of acceptance,** I mailed and/or electronically served a true and correct copy of the foregoing document to the parties listed below:

**Anthony Bruster**              **Darren P. McDowell**
**Feliz Rael**                       **Brett S. Convington**
**Alex Walker**
**Kenneth Beal**

By: _Jmontoya_ _____

EXHIBIT 1

FILED  1st JUDICIAL DISTRICT COURT
Santa Fe County
6/23/2021 8:20 AM
KATHLEEN VIGIL CLERK OF THE COURT
Edith Suarez-Munoz

**STATE OF NEW MEXICO**
**COUNTY OF SANTA FE**
**FIRST JUDICIAL DISTRICT**

MARITA RENTERIA,

        Plaintiff,

vs.                                    Cause No. D-101-CV-2020-00180
                                       Judge: Kathleen McGarry Ellenwood
MONSANTO COMPANY and
SIDCO CORPORATION,

        Defendants.

## AFFIDAVIT OF NON-ADMITTED LAWYER

STATE OF TEXAS      §
                           §
COUNTY OF GREGG  §

    John C. Hull, the affiant herein ("Affiant"), having been duly sworn, states upon oath:

    1.    Affiant is admitted to practice law and is in good standing to practice law in Texas, Oklahoma and Arkansas.

    2.    Affiant has complied with Rule 24-106 NMRA.

    3.    Affiant is associated with Anthony Bruster, Esq., Bruster PLLC, and Feliz Rael, Esq., counsel licensed to practice law in good standing in New Mexico.

    4.    John C. Hull, Affiant, being first duly sworn, states on oath, that all of the representations in this affidavit are true as far as Affiant knows or is informed, and that such affidavit is true, accurate and complete to the best of Affiant's knowledge and belief.

    DATED:  June 16, 2021

                               John C. Hull

**AFFIDAVIT OF NON-ADMITTED LAWYER**

Page 1 of 2

**EXHIBIT 1**

SWORN to me on Wednesday, June 16, 2021 by John C. Hull.

JOCELYN FLEMING
My Notary ID # 130811996
Expires September 7, 2024

Notary Public

FILED  1st JUDICIAL DISTRICT COURT
Santa Fe County
6/23/2021 8:20 AM
KATHLEEN VIGIL CLERK OF THE COURT
Edith Suarez-Munoz

**STATE OF NEW MEXICO**
**COUNTY OF SANTA FE**
**FIRST JUDICAL DISTRICT**

**MARITA RENTERIA,**
    *Plaintiff,*

v.
                    **No. D-101-CV-2020-00180**
                    **Judge:  Kathleen McGarry Ellenwood**

**MONSANTO COMPANY; SIDCO**
**CORPORATION;**
**and AGCO CORPORATION,**
    *Defendants.*

## ENTRY OF APPEARANCE

    **John C. Hull** from the law firm of Bruster PLLC, enters his appearance in this

matter as additional counsel on behalf of Plaintiff, Marita Renteria in connection with the

above-captioned matter. Plaintiff respectfully asks that the service list be updated

accordingly.

                Respectfully submitted,

                **By:** */s/ Anthony K. Bruster*
                **Anthony Bruster**
                New Mexico Bar No. 20283
                **Christopher R. Johnson**
                New Mexico Bar No. 153605
                **John C. Hull**
                Pro Hac Vice

                **BRUSTER PLLC**
                680 N. Carroll Ave., Suite 110
                Southlake, Texas 76092
                Telephone:  (817) 601-9564
                Facsimile:  (817) 796-2929
                Email: akbruster@brusterpllc.com
                      cjohnson@brusterpllc.com
                      jhull@brusterpllc.com

EXHIBIT 1

Feliz A. Real
Attorney at Law
505 Marquette NW, Suite 1300
Albuquerque, NM
Telephone: (505) 610-5991
Facsimile: (505) 938-2301

Darren P. McDowell*
Texas Bar No. 24025520
Matthew R. McCarley*
Texas Bar No. 24041426
Jonathan P. Novak*
Maryland Bar No. 20282
**FEARS | NACHAWATI, PLLC**
5473 Blair Road
Dallas, TX 75231
Tel. (214) 890-0711
Fax (214) 890-0712
Email: dmcdowell@fnlawfirm.com
Email: mccarley@fnlawfirm.com
Email: jnovak@fnlawfirm.com

*To be admitted pro hac vice*
*Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 23rd day of June 2021 the foregoing document was filed

electronically, which caused the following parties or counsel to be served by electronic means, as

more fully reflected in the Notice of Electronic Filing as follows:

**By:** */s/ Anthony K. Bruster*
Anthony K. Bruster

EXHIBIT 1

FILED  1st JUDICIAL DISTRICT COURT
Santa Fe County
9/13/2021 3:12 PM
KATHLEEN VIGIL CLERK OF THE COURT
Liliana Villalobos

**STATE OF NEW MEXICO**
**COUNTY OF SANTA FE**
**FIRST JUDICIAL DISTRICT**

**MARITA RENTERIA,**          **Case No. D-101-CV-2020-00180**
    **Plaintiff,**          **Judge: Kathleen McGarry Ellenwood**

**v.**

**MONSANTO COMPANY and**          **JURY TRIAL DEMANDED**
**SIDCO CORPORTATION,**
    **Defendants.**

## PLAINTIFF'S FIRST AMENDED COMPLAINT

COMES NOW Plaintiff, MARITA RENTERIA ("Plaintiff"), and for her First Amended

Complaint seeking relief from Defendants Monsanto Company ("Monsanto") and Sidco

Corporation ("Sidco") states:

## INTRODUCTION

Plaintiff brings this cause of action against Defendants for injuries sustained as a result of

using Defendant Monsanto's unreasonably dangerous and defective product, Roundup®. More

specifically, Plaintiff's claims involve Defendant Monsanto's negligent, willful, and wrongful

conduct in connection with the design, development, manufacture, testing, packaging, promoting,

marketing, distribution, and/or sale of Roundup® and/or other Monsanto glyphosate-containing

products ("Roundup" or "Roundup®") and Defendant Sidco's wrongful conduct in supplying the

Roundup® to which Plaintiff was exposed. As a direct and proximate result of her exposure to

Roundup® and its reactive ingredient, glyphosate, Plaintiff developed non-Hodgkin's Lymphoma

("NHL").

## PARTIES

1.  Plaintiff is an individual resident of Las Cruces, New Mexico.

Plaintiff's First Amended Complaint          - 1 -

EXHIBIT 1

2.   Defendant Monsanto is a Delaware corporation with its principal office located in St. Louis, Missouri.  Defendant Monsanto has appeared herein through its counsel of record, Alex C. Walker, Modrall, Sperling, Roehl, Harris & Sisk, P.A., P.O. Box. 2168, Albuquerque, New Mexico 87103-2168.

3.   Defendant Sidco is a New Mexico corporation and maintains its principal place of business in New Mexico.  Defendant Sidco has appeared herein through its counsel of record, Kenneth L. Beal, Kenneth L. Beal, P.C., P.O. Box 725, Las Cruces, New Mexico 88004.

## JURISDICTION AND VENUE

4.   This Court has subject matter jurisdiction over this matter.  This is a claim by a resident of the state of New Mexico against a foreign Defendant doing business in New Mexico and a domestic corporation with its principal place of business in New Mexico.  The tortious conduct giving rise to Plaintiff's injuries and the claims asserted herein occurred both inside and outside of New Mexico, with the injuries sustained by Plaintiff in New Mexico, while a New Mexico resident.

5.   Venue is proper in Santa Fe County pursuant to N.M. Stat. Ann. § 38-3-1(F).

## FACTUAL ALLEGATIONS

6.   Monsanto is a multinational agricultural biotechnology corporation based in St. Louis, Missouri.

7.   In 1970, Monsanto chemist, John Franz, discovered the herbicidal properties of glyphosate.  Thereafter, Monsanto designed and tested glyphosate-based formulas for use as an herbicide.  By the mid-1970s, Monsanto began designing, testing, developing, manufacturing, marketing, distributing, and selling glyphosate-based formulations under the brand name Roundup®.

8.   As used herein, "Roundup" refers to all formulations of the Roundup family of products

Plaintiff's First Amended Complaint          - 2 -

EXHIBIT 1

including, without being limited to: Roundup Concentrate Poison Ivy and Tough Brush Killer 1, Roundup Custom Herbicide, Roundup D-Pak herbicide, Roundup Dry Concentrate, Roundup Export Herbicide, Roundup Fence & Hard Edger 1, Roundup Garden Foam Weed & Grass Killer, Roundup Grass and Weed Killer, Roundup Herbicide, Roundup Original 2k herbicide, Roundup Original II Herbicide, Roundup Pro Concentrate, Roundup Prodry Herbicide, Roundup Promax, Roundup Quik Stik Grass and Weed Killer, Roundup Quikpro Herbicide, Roundup Rainfast Concentrate Weed & Grass Killer, Roundup Rainfast Super Concentrate Weed & Grass Killer, Roundup Ready-to-Use Extended Control Weed & Grass Killer 1 Plus Weed Preventer, Roundup Ready-to-Use Weed & Grass Killer, Roundup Ready-to-Use Weed and Grass Killer 2, Roundup Ultra Dry, Roundup Ultra Herbicide, Roundup Ultramax, Roundup VM Herbicide, Roundup Weed & Grass Killer Concentrate, Roundup Weed & Grass Killer Concentrate Plus, Roundup Weed & Grass Killer Ready-to-Use Plus, Roundup Weed & Grass Killer Super Concentrate, Roundup Weed & Grass Killer1 Ready-to-Use, Roundup WSD Water Soluble Dry Herbicide Deploy Dry Herbicide, or any other herbicide formulation containing the active ingredient glyphosate.

9. Roundup is a glyphosate-based formulation, which is a product that contains glyphosate and other ingredients that make the product more effective and/or last longer. Roundup contains glyphosate, water, and other ingredients called other ingredients called "surfactants."

10. At all relevant times, Monsanto designed, tested, developed, manufactured, marketed, distributed, and sold the Roundup used by Plaintiff.

11. Monsanto is the world's leading producer of glyphosate. As of 2009, Monsanto was the world's leading producer of seeds, accounting for 27% of the world seed market. The majority of these seeds are of the Roundup Ready brand. The stated advantage of Roundup Ready crops is that they substantially improve a farmer's ability to control weeds, since glyphosate can be sprayed

EXHIBIT 1

in the fields during the growing season without harming their crops. In 2010, an estimated 70% of corn and cotton, and 90% of soybean fields in the United States were Roundup Ready. Monsanto's glyphosate-based formulations are registered in 130 countries and approved for use on over 100 different crops and are ubiquitous in the environment. Numerous studies confirm that glyphosate is found in rivers, streams, and groundwater in agricultural areas where Roundup is used. It has been found in food, in the urine of agricultural workers, and even in the urine of urban dwellers who are not in direct contact with glyphosate.

12. Monsanto has never tested Roundup to determine whether it is carcinogenic. Indeed, in 2009, as evidence of the carcinogenic properties of Roundup mounted, Monsanto toxicologist Donna Farmer admonished Monsanto employees that "you cannot say that Roundup does not cause cancer … [because Monsanto has] not done carcinogenicity studies with 'Roundup.'"

13. Nevertheless, others have studied the carcinogenic properties of glyphosate and Roundup and have concluded that Roundup can and does cause NHL in humans exposed to the product.

14. Federal regulation of pesticides, including Roundup, is exercised by and under the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA"), 7 U.S.C. § 136 *et seq.* Though commonly referred to as an herbicide, Roundup is defined as a "pesticide" under 7 U.S.C. § 136(t), (u).

15. Among other things, FIFRA requires manufactures of pesticides to register their products with the Environmental Protection Agency ("EPA"). In the registration process, the EPA relies entirely on the applicant to prove that their labels comply with FIFRA. Accordingly, the "EPA does not independently test, study, or otherwise set particular composition standards for the pesticides." *Jeffers v. Wal-Mart Stores, Inc.*, 171 F. Supp. 2d 617, 623 (S.D. W. Va. 2001). "An

Plaintiff's First Amended Complaint          - 4 -

EXHIBIT 1

applicant who wishes to obtain registration for its own pesticide product is responsible for submitting or citing to all of the information and data that are required to support the application." *EPA Pesticide Registration Manual Ch.1*, Overview of Requirements for Pesticide Registration.

16. FIFRA expressly provides that "[i]n no event shall registration of an article be construed as a defense for the commission of any offense under this subchapter."  7 U.S.C. § 136a(f)(2).  Rather, registration of a pesticide is merely "*prima facie* evidence that the pesticide, its labeling and packaging comply with the registration provisions of the subchapter."  *Id.*

17. A pesticide is "misbranded" under FIFRA if its label contains a statement that is "false or misleading in any particular," does not contain adequate instructions for use, or omits necessary warnings or cautionary statements.  It is unlawful under the statute to sell a pesticide that is registered but misbranded.

18. FIFRA does not create a private right of actions for consumers harmed by the sale of a misbranded pesticide but allows for private actions under state tort law to enforce duties that are "equivalent to, and fully consistent with FIFRA's misbranding provisions."  *Bates v. Dow Agrosciences*, 544 U.S. 431, 447 (2005).

19. Starting in 1974 and continuing through the present date, the EPA has registered various glyphosate-based formulations as pesticides.

20. Monsanto has been aware of glyphosate's carcinogenic properties since at least 1985. On March 5, 1985, a group of the Toxicology Branch of the Environmental Protection Agency ("EPS") published a memorandum classifying glyphosate as a Category C oncogene.  Category C oncogene are possible human carcinogens with limited evidence of carcinogenicity.

21. After pressure from Monsanto, including contrary studies it provided to the EPA, the EPA changed its classification to evidence of non-carcinogenicity in humans (Group E) in 1991.

Plaintiff's First Amended Complaint        - 5 -

EXHIBIT 1

In so classifying glyphosate, however, the EPA made clear that the designation did not mean the chemical does not cause cancer: "It should be emphasized, however, that designation of an agent in Group E is based on the available evidence at the time of evaluation and should not be interpreted as a definitive conclusion that the agent will not be a carcinogen under any circumstances."

22. On two occasions, the EPA found that the laboratories hired by Monsanto to test the toxicity of Roundup for registration purposes committed fraud.  In the first instance, Monsanto, in seeking initial EPA registration of Roundup, hired Industrial Bio-Test Laboratories ("IBT") to perform and evaluate pesticide toxicology studies relating to Roundup. IBT performed about thirty (30) tests on glyphosate and glyphosate-containing products, including nine (9) of the fifteen (15) residue studies needed to register Roundup. In 1976, the United States Food and Drug Administration ("FDA") performed an inspection of IBT that revealed discrepancies between the raw data and the final report relating to the toxicological impacts of glyphosate. The EPA subsequently audited IBT; it too found the toxicology studies conducted for Roundup to be invalid. An EPA reviewer stated, after finding "routine falsification of data" at IBT, that it was "hard to believe the scientific integrity of the studies when they said they took specimens of the uterus from male rabbits." Three top executives of IBT were convicted of fraud in 1983.

23. In the second incident of data falsification, Monsanto hired Craven Laboratories in 1991 to perform pesticide and herbicide studies, including for Roundup.  In that same year, the owner of Craven Laboratories and three (3) of its employees were indicted, and later convicted, of fraudulent laboratory practices in the testing of pesticides and herbicides. Despite the falsity of the tests that underlie its registration, within a few years of its launch, Monsanto was marketing Roundup in 115 countries.

Plaintiff's First Amended Complaint          - 6 -

EXHIBIT 1

24. Rather than act to determine whether Roundup was causing cancer, and thereby destroying and taking the lives of humans, Monsanto has sought to mislead the public and regulators about the risks to human health posed by Roundup.

25. The success of Roundup was key to Monsanto's continued reputation and dominance in the marketplace. Largely due to the success of Roundup sales, Monsanto's agriculture division was out-performing its chemicals division's operating income, and that gap increased yearly. But with its patent for glyphosate expiring in the United States in the year 2000, Monsanto needed a strategy to maintain its Roundup market dominance and to ward off impending competition. In response, Monsanto began the development and sale of genetically engineered Roundup Ready seeds in 1996. Since Roundup Ready crops are resistant to glyphosate, farmers can spray Roundup onto their fields during the growing season without harming the crop. This allowed Monsanto to expand its market for Roundup even further; by 2000, Monsanto's biotechnology seeds were planted on more than 80 million acres worldwide and nearly 70% of American soybeans were planted from Roundup Ready seeds. It also secured Monsanto's dominant share of the glyphosate/Roundup market through a marketing strategy that coupled proprietary Roundup Ready seeds with continued sales of its Roundup herbicide.

26. Through a three-pronged strategy of increased production, decreased prices, and by coupling with Roundup Ready seeds, Roundup became Monsanto's most profitable product. In 2000, Roundup accounted for almost $2.8 billion in sales, outselling other herbicides by a margin of five to one, and accounting for close to half of Monsanto's revenue.

27. Glyphosate was identified as the second-most used household herbicide in the United States for weed control between 2001 and 2007 and the most heavily used herbicide in the world in 2012.

Plaintiff's First Amended Complaint          - 7 -

EXHIBIT 1

28. Today, glyphosate-based formulations continue to be the world's largest herbicides by sales volume.

29. Monsanto has consistently and historically marketed and sold Roundup using false, deceptive, and misleading representations including that Roundup is "safer than table salt" and "practically non-toxic."

30. In 1996, the New York Attorney General ("NYAG") filed a lawsuit against Monsanto based on its false and misleading advertising of Roundup products.  Specifically, the lawsuit challenged Monsanto's representations that its spray-on glyphosate-based formulations were "safer than table salt" and "practically non-toxic to mammals, birds, and fish."  Among the representations the NYAG alleged were deceptive and misleading were:

     a.  Remember that environmentally friendly Roundup herbicide is biodegradable.  It won't build up in the soil so you can use Roundup with confidence along customers' driveways, sidewalks and fences.

     b.  And remember that Roundup is biodegradable and won't build up in the soil.  That will give you the environmental confidence you need to use Roundup everywhere you've got a weed, bush, edging or trimming problem.

     c.  Roundup biodegrades into naturally occurring elements.

     d.  Remember that versatile Roundup herbicide stays where you put it. That means there's no washing or leaching to harm customers' shrubs or other desirable vegetation.

     e.  This non-residual herbicide will not wash or leach in the soil. It ... stays where you apply it.

Plaintiff's First Amended Complaint     - 8 -

EXHIBIT 1

f.   You can apply Accord[1] with "confidence because it will stay where you put it" it bonds tightly to soil particles, preventing leaching. Then, soon after application, soil microorganisms biodegrade Accord into natural products.

g.   Glyphosate is less toxic to rats than table salt following acute oral ingestion. Glyphosate's safety margin is much greater than required. It has over a 1,000-fold safety margin in food and over a 700-fold safety margin for workers who manufacture it or use it.

h.   You can feel good about using herbicides by Monsanto. They carry a toxicity category rating of 'practically non-toxic' as it pertains to mammals, birds and fish. "Roundup can be used where kids and pets will play and breaks down into natural materials."  (This ad depicts a person with his head in the ground and a pet dog standing in an area which has been treated with Roundup).

31. On November 19, 1996, Monsanto entered into an Assurance of Discontinuance with the NYAG, in which Monsanto agreed, among other things, "to cease and desist from publishing or broadcasting any advertisements [in New York] that represent, directly or by implication" that:

a.   its glyphosate-containing pesticide products or any component thereof are safe, non-toxic, harmless or free from risk;

b.   its glyphosate-containing pesticide products or any component thereof manufactured, formulated, distributed or sold by Monsanto are biodegradable;

c.   its glyphosate-containing pesticide products or any component thereof stay where they are applied under all circumstances and will not move through the environment by any means;

---

[1] Accord is another glyphosate-containing Monsanto herbicide.

Plaintiff's First Amended Complaint          - 9 -

EXHIBIT 1

d.  its glyphosate-containing pesticide products or any component thereof are "good" for the environment or are "known for their environmental characteristics;"

e.  its glyphosate-containing pesticide products or any component thereof are safer or less toxic than common consumer products other than herbicides; or

f.  its glyphosate-containing products or any component thereof might be classified as "practically non-toxic."

32. Monsanto did not alter its advertising in the same manner in any state other than New York, and on information and belief still has not done so.

33. In 2009, France's highest court ruled that Monsanto had not told the truth about the safety of Roundup.  The French court affirmed an earlier judgement that Monsanto had falsely advertised its herbicide Roundup as "biodegradable" and that it "left the soil clean."

34. The International Agency for Research on Cancer ("IARC") is the specialized agency of the World Health Organization which conducts and coordinates research into the causes of cancer.

35. On March 24, 2015, after its cumulative review of human, animal, and DNA studies, many of which had been in Monsanto's possession since as early as 1985, the IARC working group studying glyphosate concluded that the glyphosate in Roundup is a Class 2A "probable carcinogen."  A full IARC Monograph on the issue was published on July 29, 2015.  The IARC Working Group found that exposure to glyphosate increases the risk that a person will develop NHL and that the increased risk exists even when controlled for other pesticides.

36. The IARC process for the classification of glyphosate followed the stringent procedures for the evaluation of a chemical agent. Over time, the IARC Monograph program has reviewed 980 agents. Of those reviewed, it has determined 116 agents to be Group 1 (Known Human

EXHIBIT 1

Carcinogens); 73 agents to be Group 2A (Probable Human Carcinogens); 287 agents to be Group 2B (Possible Human Carcinogens); 503 agents to be Group 3 (Not Classified); and one agent to be Probably Not Carcinogenic

37. The established procedure for IARC Monograph evaluations is described in the IARC Programme's Preamble.  Evaluations are performed by panels of international experts, selected on the basis of their expertise and the absence of actual or apparent conflicts of interest.

38. One year before the Monograph meeting, the meeting is announced and there is a call both for data and for experts. Eight months before the Monograph meeting, the Working Group membership is selected and the sections of the Monograph are developed by the Working Group members. One month prior to the Monograph meeting, the call for data is closed and the various draft sections are distributed among Working Group members for review and comment. Finally, at the Monograph meeting, the Working Group finalizes review of all literature, evaluates the evidence in each category, and completes the overall evaluation. Within two weeks after the Monograph meeting, the summary of the Working Group findings is published in Lancet Oncology, and within a year after the meeting, the final Monograph is finalized and published.

39. In March 2015, the IARC reassessed glyphosate. The summary published in The Lancet Oncology reported that glyphosate is a Group 2A agent and probably carcinogenic in humans.

40. On July 29, 2015, the IARC issued its Monograph for glyphosate, Monograph 112. For Volume 112, the volume that assessed glyphosate, a Working Group of 17 experts from 11 countries met at IARC from March 3–10, 2015, to assess the carcinogenicity of certain herbicides, including glyphosate. The March meeting culminated nearly a one-year review and preparation by the IARC Secretariat and the Working Group, including a comprehensive review of the latest

EXHIBIT 1

available scientific evidence. According to published procedures, the Working Group considered "reports that have been published or accepted for publication in the openly available scientific literature" as well as "data from governmental reports that are publicly available."

41. The IARC Working Group found an increased risk between exposure to glyphosate and NHL and several subtypes of NHL, and the increased risk persisted after adjustment for other pesticides. The IARC Working Group also found that glyphosate caused DNA and chromosomal damage in human cells. One study in community residents reported increases in blood markers of chromosomal damage (micronuclei) after glyphosate formulations were sprayed.

42. In male CD-1 mice, glyphosate induced a positive trend in the incidence of a rare tumor, renal tubule carcinoma. A second study reported a positive trend for haemangiosarcoma in male mice. Glyphosate increased pancreatic islet-cell adenoma in male rats in two studies. A glyphosate formulation promoted skin tumors in an initiation-promotion study in mice.

43. The IARC Working Group also noted that glyphosate has been detected in the urine of agricultural workers, indicating absorption. Soil microbes degrade glyphosate to aminomethylphosphoric acid (AMPA). Blood AMPA detection after exposure suggests intestinal microbial metabolism in humans.

44. Several countries around the world have instituted bans on the sale of Roundup and other glyphosate-containing herbicides, both before and since the IARC first announced its assessment for glyphosate in March 2015, and more countries undoubtedly will follow suit as the dangers of the use of Roundup are more widely known.

45. The Netherlands issued a ban on all glyphosate-based herbicides in April 2014, including Roundup, which took effect by the end of 2015. In issuing the ban, the Dutch Parliament member who introduced the successful legislation stated: "Agricultural pesticides in user-friendly

Plaintiff's First Amended Complaint          - 12 -

EXHIBIT 1

packaging are sold in abundance to private persons. In garden centers, Roundup is promoted as harmless, but unsuspecting customers have no idea what the risks of this product are. Especially children are sensitive to toxic substances and should therefore not be exposed to it."

46. The Brazilian Public Prosecutor in the Federal District requested that the Brazilian Justice Department suspend the use of glyphosate.

47. France banned the private sale of Roundup and glyphosate following the IARC assessment.

48. Bermuda banned both the private and commercial sale of glyphosates, including Roundup. The Bermuda government explained its ban as follows: "Following a recent scientific study carried out by a leading cancer agency, the importation of weed spray 'Roundup' has been suspended."

49. The Sri Lankan government banned the private and commercial use of glyphosates, particularly out of concern that glyphosate has been linked to fatal kidney disease in agricultural workers.

50. The government of Colombia announced its ban on using Roundup and glyphosate to destroy illegal plantations of coca, the raw ingredient for cocaine, because of the WHO's finding that glyphosate is probably carcinogenic.

51. On September 4, 2015, California's Office of Environmental Health Hazard Assessment ("OEHHA") published a notice of intent to include glyphosate on the state's list of known carcinogens under Proposition 65.   California's Safe Drinking Water and Toxic Enforcement Act of 1986 (informally known as "Proposition 65"), requires the state to maintain and, at least once a year, revise and republish a list of chemicals "known to the State of California

EXHIBIT 1

to cause cancer or reproductive toxicity." The OEHHA determined that glyphosate met the criteria for the listing mechanism under the Labor Code following the IARC's assessment of the chemical.

52. The listing process under the Labor Code is essentially automatic. The list known carcinogens, at a minimum, must include substances identified by reference in Labor Code §6382(b)(1). That section of the Labor Code identifies "[s]ubstances listed as human or animal carcinogens by the International Agency for Research on Cancer (IARC)." The IARC's classification of glyphosate as a Group 2A chemical ("probably carcinogenic to humans") therefore triggered the listing.

53. A business that deploys a listed chemical in its products must provide "clear and reasonable warnings" to the public prior to exposure to the chemical. To be clear and reasonable, a warning must "(1) clearly communicate that the chemical is known to cause cancer, and/or birth defects or other reproductive harm; and (2) effectively reach the person before exposure." The law also prohibits the discharge of listed chemicals into drinking water.

54. Monsanto disputed the listing decision and, in January 2016, filed a lawsuit against OEHHA and the agency's acting director, Lauren Zeise, in California state court, seeking declaratory and injunctive relief to prevent OEHHA from listing glyphosate.

55. Monsanto alleged that OEHHA's exclusive reliance on the IARC decision signified that "OEHHA effectively elevated the determination of an ad hoc committee of an unelected, foreign body, which answers to no United States official (let alone any California state official), over the conclusions of its own scientific experts." Monsanto further alleged that the Labor Code listing mechanism presented various constitutional violations because it "effectively empowers an unelected, undemocratic, unaccountable, and foreign body to make laws applicable in California." Among other things, Monsanto argued that Proposition 65's requirement to provide a "clear and

EXHIBIT 1

reasonable warning" to consumers that the chemical is a known carcinogen would damage its reputation and violate its First Amendment rights.

56. As a girl and young woman, Plaintiff worked for Sidco.  In the course of her work for Sidco, Plaintiff was exposed to significant levels of Roundup.

57. Plaintiff developed NHL in 1995.  Plaintiff's NHL was caused by her exposure to Roundup.

58. The Roundup to which Plaintiff was exposed, and which caused her NHL, was misbranded under FIFRA.

### CLAIMS FOR RELIEF
### Count 1 – Strict Products Liability
### (Claim for Relief from Monsanto)

59. Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

60. Monsanto is the manufacturer of the Roundup to which Plaintiff was exposed.

61. Monsanto is liable to Plaintiff for strict product liability because:

   a.  Roundup presents an unreasonable risk of injury, and

   b.  Monsanto failed to provide an adequate warning of the health and safety risks associated with the use of Roundup.

62. The Roundup to which Plaintiff was exposed caused her NHL.

63. The Roundup to which Plaintiff was exposed was defective because the use of Roundup presented an unreasonable risk of injury (*i.e.,* a risk of injury which a reasonably prudent person having full knowledge of the risk would find unacceptable) to the user and all those in the proximity when the Roundup was used.  Said defective condition of Roundup was a cause of Plaintiff's damages.

EXHIBIT 1

64. Roundup is misbranded under FIFRA.  Monsanto did not provide an adequate warning that exposure to Roundup can cause cancer and said failure to warn was a cause of Plaintiff's damages.

65. Monsanto is strictly liable for all damages to Plaintiff caused by the defective condition of Roundup and/or Monsanto's failure to warn.

## Count 2 – Strict Products Liability
### (Claim for Relief from Sidco)

66. Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

67. Sidco is a supplier of the Roundup to which Plaintiff was exposed.

68. Sidco is liable to Plaintiff for strict product liability because:

   a.   Roundup presents an unreasonable risk of injury, and

   b.   Sidco failed to provide an adequate warning of the health and safety risks associated with the use of Roundup.

69. The Roundup to which Plaintiff was exposed caused her NHL.

70. The Roundup to which Plaintiff was exposed was defective because the use of said Roundup presented an unreasonable risk of injury (*i.e.,* a risk of injury which a reasonably prudent person having full knowledge of the risk would find unacceptable) to the user and all those in the proximity when the Roundup was used.  Said defective condition of Roundup was a cause of Plaintiff's damages.

71. Sidco is strictly liable for all damages to Plaintiff caused by the defective condition of Roundup.

## Count 3 – Negligence
### (Claim for Relief from Monsanto)

72. Plaintiff incorporates by reference each and every allegation set forth in the preceding

Plaintiff's First Amended Complaint        - 16 -

EXHIBIT 1

paragraphs as if fully stated herein.

73. As the manufacturer of Roundup, Monsanto has a duty to use ordinary care in formulating and designing the product; making the product; inspecting/testing the product; and packaging the product.

74. Monsanto breached one or more of these duties by:

    a.  failing adequately and reasonably to investigate, study, and test the safety of Roundup;

    b.  failing to disclose the information in its possession or of which it was aware which showed the health risks posed by Roundup;

    c.  suppressing and downplaying information which shows the dangerous characteristics of Roundup;

    d.  concealing information concerning the health risks posed by exposure to Roundup;

    e.  using false and misleading practices in marketing Roundup;

    f.  misbranding Roundup under FIFRA;

    g.  acting with crass indifference to the dangers posed by Roundup;

    h.  attacking the evidence that Roundup is carcinogenic and the people who raised concerns;

    i.  focusing on public relations and manipulating regulators rather than following the science concerning Roundup and its effects on public health; and

    j.  failing to provide adequate warnings concerning the health risks posed by exposure to Roundup.

75. Each such breach proximately caused Plaintiff's damages.

76. Monsanto is liable for all Plaintiff's damages caused by such breaches.

Plaintiff's First Amended Complaint    - 17 -

EXHIBIT 1

**Count 4 – Breach of Warranty**
**(Claim for Relief from Monsanto)**

77. Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

78. Monsanto's affirmations and promises concerning Roundup created express warranties under N.M. Stat. Ann. § 55-2-313 and an implied warranty of merchantability under N.M. Stat. Ann. § 55-2-314.

79. Under N.M. Stat. Ann. § 55-2-318, Plaintiff is a third-party beneficiary of such warranties.

80. Specifically, Monsanto has breached express and implied warranties concerning Roundup by selling Roundup when it was not reasonably safe for its intended use and did not conform to the representations Monsanto made concerning the risks to the health and safety of consumers exposed to Roundup.

81. Monsanto has breached these warranties and under N.M. Stat. Ann. § 55-2-715(2)(b) is liable for all Plaintiff's damages caused by the such breaches.

## <u>DAMAGES</u>

82. Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

83. Plaintiff seeks recovery of all damages caused by her exposure to Roundup including:

    a.   past and future medical expenses,

    b.   past and future physical pain and suffering,

    c.   past and future mental pain and suffering, and

    d.   past and future loss of enjoyment of life.

EXHIBIT 1

## PUNITIVE DAMAGES

84. Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

85. Monsanto is a company focused on attacking or undermining the people who raise concerns about Roundup's carcinogenic properties, to the exclusion of being an objective arbiter of Roundup's safety. *Hardeman v. Monsanto Co. (In re Roundup Prods. Liab. Litig.)*, 385 F. Supp. 3d 1042, 1047 (N.D. Cal. 2019).

86. For decades Monsanto has acted with crass indifference to the dangers posed by Roundup.  Rather than try to learn if its product was causing cancer, Monsanto attacked the evidence that Roundup is carcinogenic and the people who raised concerns.  When it comes to the carcinogenic properties or Roundup, Monsanto focuses on public relations and manipulating regulators rather than following the science and public health.

87. The evidence at trial will show that Monsanto has been and remains a company addicted to profits from the sale of Roundup and associated products such as seeds for Roundup Ready crops and callously indifferent to the rights of consumers and the threats posed to consumers, including Plaintiff.

88. Monsanto's conduct has been and remains malicious, willful, reckless, and/or wanton.

89. Accordingly, in addition to her actual damages, Plaintiff seeks an award of punitive damages from Monsanto in an amount determined by the jury and allowed by law.

## DISCOVERY RULE; FRAUDULENT CONCEALMENT; EQUITABLE ESTOPPEL

90. Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

91. To the extent that either Defendant pleads or relies on any statute of limitations as a

EXHIBIT 1

defense to any of the claims for relief pleaded herein, Plaintiff pleads that under the discovery rule her causes of action did not accrue until the date on which her cause of action was discovered or should have been discovered with the exercise of reasonable diligence and that her claims are not barred by limitations under this rule.

92. Additionally, and in the alternative, to the extent that either Defendant pleads or relies on any statute of limitations as a defense to any of the claims for relief pleaded herein, Plaintiff pleads that any statute of limitations is tolled due to Monsanto's fraudulent concealment and that her claims are not barred by limitations as tolled.

93. Additionally, and in the alternative, to the extent that Monsanto pleads or relies on any statute of limitations as a defense to any of the claims for relief pleaded herein, Plaintiff pleads that under equitable estoppel, Monsanto is estopped from pleading or relying on any statute of limitations.

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in her favor against Defendant as set forth above, that Plaintiff be awarded compensatory and punitive damages, interest, costs and attorney's fees, and for such other and further relief as the Court may deem just.

## JURY DEMAND

Plaintiff demands a trial by jury on all counts.

EXHIBIT 1

Dated: September 13, 2021      Respectfully submitted,


By: */s/ Anthony K. Bruster*
Anthony K. Bruster
New Mexico Bar No. 20283
Christopher Johnson
New Mexico Bar No. 153605
John C. Hull*
Texas Bar No. 24050791
**BRUSTER PLLC**
680 N. Carroll Ave., Suite 110
Southlake, Texas 76092
Telephone:  (817) 601-9564
Facsimile:   (817) 796-2929
Email: akbruster@brusterpllc.com
      cjohnson@brusterpllc.com
      jhull@brusterpllc.com



Darren P. McDowell*
Texas Bar No. 24025520
Matthew R. McCarley*
Texas Bar No. 24041426
**FEARS NACHAWATI LAW FIRM**
5473 Blair Road
Dallas, Texas 75231
Telephone:  (214) 890-0711
Facsimile:  (214) 890-0712
Email: dmcdowell@fnlawfirm.com
      mccarley@fnlawfirm.com

Feliz A. Rael
Attorney at Law
505 Marquette NM, Ste. 1300
Albuquerque, New Mexico 87102
Telephone:  (505) 610-5991
Facsimile:  (505) 938-2301
Email: frael@swcp.com


*To be admitted pro hac vice*

*Attorneys for Plaintiffs*


Plaintiff's First Amended Complaint     - 21 -

EXHIBIT 1

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing pleading was filed electronically through the OdysseyFile/Serve System, which caused the following parties or counsel to be served by electronic means, as more fully reflected on the Notice of Electronic Filing on this 13th day of September 2021.

Alex C. Walker
awalker@modrall.com

Bayard Roberts
broberts@modrall.com

Brett S. Covington
bcovington@hollingsworthllp.com

*Attorneys for Monsanto Company*


Kenneth L. Beal
klbealoffice@gmail.com

*Attorneys for Sidco Corporation[2]*

                                        **By:** */s/ Anthony K. Bruster*
                                              **Anthony Bruster**

---

This Proposed Amended Scheduling Order is jointly submitted by counsel for Plaintiff Renteria and Defendant Monsanto Company.  Input was also sought from counsel for Defendant Sidco Corporation, but no response was provided.  Counsel for Monsanto and Plaintiff are in agreement with the terms of the Proposed Amended Scheduling Order.

Plaintiff's First Amended Complaint         - 22 -

EXHIBIT 1

FILED  1st JUDICIAL DISTRICT COURT
Santa Fe County
9/20/2021 4:16 PM
KATHLEEN VIGIL CLERK OF THE COURT
Gloria Landin

**STATE OF NEW MEXICO**
**COUNTY OF SANTA FE**
**FIRST JUDICIAL DISTRICT**

MARITA RENTERIA,

        Plaintiff,

v.                                                    Cause No.:   D-101-CV-2020-00180

MONSANTO COMPANY and
SIDCO CORPORATION,

        Defendants.

### <u>CERTIFICATER OF SERVICE</u>

     I do hereby certify that on September 20, 2021, Plaintiff's First Requests for Production to Defendant Monsanto Company were sent by electronic mail to counsel for Monsanto Company listed below together with a copy of this Certificate of Service.


Alex C. Walker
MODRALL, SPERLING, ROEHL, HARRIS & SISK, P.A.,
P.O. Box 2168
Albuquerque, New Mexico 87103-2168
acw@modrall.com

Brett S. Covington
HOLLINGSWORTH LLP
1350 I Street, N.W.
Washington, DC 20005
bcovington@hollingsworthllp.com

1

EXHIBIT 1

DATED:  September 20, 2021.                    Respectfully submitted,


 /s/ Anthony K. Bruster
**Anthony Bruster**
New Mexico Bar No. 20283
**Christopher Johnson**
New Mexico Bar No. 153605

**BRUSTER PLLC**
680 N. Carroll Ave., Suite 110
Southlake, Texas 76092
Telephone: (817) 601-9564
Facsimile: (817) 796-2929
Email: akbruster@brusterpllc.com
          cjohnson@brusterpllc.com

Feliz A. Real
Attorney at Law
505 Marquette NW, Suite 1300
Albuquerque, NM
Telephone:  (505) 610-5991
Facsimile:   (505) 938-2301

Darren P. McDowell*
Texas Bar No. 24025520
Matthew R. McCarley*
Texas Bar No. 24041426
Jonathan P. Novak*
Maryland Bar No. 20282
**FEARS | NACHAWATI, PLLC**
5473 Blair Road
Dallas, TX 75231
Telephone:  (214) 890-0711
Facsimile:  (214) 890-0712
Email: dmcdowell@fnlawfirm.com
Email: mccarley@fnlawfirm.com
Email: jnovak@fnlawfirm.com

*To be admitted pro hac vice*
*Attorneys for Plaintiff*

2

EXHIBIT 1

FILED  1st JUDICIAL DISTRICT COURT
Santa Fe County
9/20/2021 4:16 PM
KATHLEEN VIGIL CLERK OF THE COURT
Gloria Landin

**STATE OF NEW MEXICO**
**COUNTY OF SANTA FE**
**FIRST JUDICIAL DISTRICT**

MARITA RENTERIA,

        Plaintiff,

v.                                 Cause No.:   D-101-CV-2020-00180

MONSANTO COMPANY and
SIDCO CORPORATION,

        Defendants.

### <u>CERTIFICATER OF SERVICE</u>

      I do hereby certify that on September 20, 2021, Plaintiff's First Set of Interrogatories to Defendant Monsanto Company were sent by electronic mail to counsel for Monsanto Company listed below together with a copy of this Certificate of Service.


Alex C. Walker
MODRALL, SPERLING, ROEHL, HARRIS & SISK, P.A.,
P.O. Box 2168
Albuquerque, New Mexico 87103-2168
acw@modrall.com

Brett S. Covington
HOLLINGSWORTH LLP
1350 I Street, N.W.
Washington, DC 20005
bcovington@hollingsworthllp.com

1

EXHIBIT 1

DATED:  September 20, 2021.                    Respectfully submitted,

 /s/ Anthony K. Bruster
**Anthony Bruster**
New Mexico Bar No. 20283
**Christopher Johnson**
New Mexico Bar No. 153605

**BRUSTER PLLC**
680 N. Carroll Ave., Suite 110
Southlake, Texas 76092
Telephone: (817) 601-9564
Facsimile: (817) 796-2929
Email: akbruster@brusterpllc.com
          cjohnson@brusterpllc.com

Feliz A. Real
Attorney at Law
505 Marquette NW, Suite 1300
Albuquerque, NM
Telephone:  (505) 610-5991
Facsimile:   (505) 938-2301

Darren P. McDowell*
Texas Bar No. 24025520
Matthew R. McCarley*
Texas Bar No. 24041426
Jonathan P. Novak*
Maryland Bar No. 20282
**FEARS | NACHAWATI, PLLC**
5473 Blair Road
Dallas, TX 75231
Telephone:  (214) 890-0711
Facsimile:  (214) 890-0712
Email: dmcdowell@fnlawfirm.com
Email: mccarley@fnlawfirm.com
Email: jnovak@fnlawfirm.com

*To be admitted pro hac vice
Attorneys for Plaintiff

2

EXHIBIT 1

FILED  1st JUDICIAL DISTRICT COURT
Santa Fe County
9/21/2021 11:02 AM
KATHLEEN VIGIL CLERK OF THE COURT
Breanna Aguilar

**STATE OF NEW MEXICO**
**COUNTY OF SANTA FE**
**FIRST JUDICIAL DISTRICT COURT**

**MARITA RENTERIA,**

      **Plaintiff,**

**v.**                                                        **No. D-101-CV-2020-00180**

**MONSANTO COMPANY; and**
**SIDCO CORPORATION,**

      **Defendants.**

## RULE 1-016(B) SCHEDULING ORDER
## JURY

      This is a complex product liability lawsuit involving a plaintiff (Marita Renteria) who alleges that Monsanto's Roundup®-branded herbicides caused her to develop non-Hodgkin's lymphoma ("NHL"), a type of cancer.  This raises, among other things, issues of both general causation (*i.e.*, whether Roundup® products are generally capable of causing NHL) and specific causation (*i.e.*, whether Roundup® products specifically caused Ms. Renteria's NHL).  In addition to suing Monsanto, the manufacturer of Roundup® products, Ms. Renteria has sued Sidco Corporation ("Sidco"), her former employer where she alleges to have applied those herbicides. Given the complexity of this product liability lawsuit, the Court herewith establishes the following schedule governing this case pursuant to Rule 1-016(B) NMRA:

      **1. MEDIATION/SETTLEMENT CONFERENCE DEADLINE. Unless the parties agree otherwise,** they shall conduct a mediation or settlement conference on or before **September 10, 2022.** Counsel shall complete the discovery necessary for good faith settlement discussions in advance of the mediation or settlement conference. Counsel may make their own arrangements for a private mediator or settlement facilitator. Within **seven business days** of the mediation or

EXHIBIT 1

settlement conference, counsel or the mediator/settlement facilitator shall file a Certificate of Compliance to report on the outcome of the settlement conference. All individuals with final settlement authority shall attend the settlement conference.

Unless otherwise agreed to or unless otherwise ordered by the Court, the Settlement Facilitator's or Mediator's fee shall be paid by the parties in equal shares. The following persons shall attend the settlement conference, either in person or telephonically: each party of record including parties represented by counsel; each counsel of record who will be trying the case; for each party, the person or persons with complete authority to settle the case.  Persons who do not reside or maintain a business office in New Mexico may attend the settlement conference telephonically or through video; all other persons shall attend the settlement conference in person unless different arrangements are established by the settlement referee or mediator with the approval of the court; in any event, all individuals with full settlement authority shall attend the settlement conference.

**2. JOINDER OF PARTIES.**  Any additional parties must be joined within **30 days** from entry of this Amended Scheduling Order, unless otherwise ordered by the Court.  If additional parties are joined, such joinder must occur in a timely manner such that the Mediation/Settlement Conference deadline and trial setting are not affected.

**3. AMENDMENT OF PLEADINGS.**  The deadline to amend pleadings is **July 29, 2022**. Thereafter, amendments to the pleadings shall not be permitted, unless otherwise ordered by the Court.

**4. MOTIONS.**  All motions addressed to the pleadings, *i.e.* **motions brought under Rule 1-012(B), (D), (E) or (F) NMRA,** shall not be filed, unless otherwise permitted by rule or as a result of an amendment pursuant to Section 3 hereof.

2

EXHIBIT 1

**Motions for Summary Judgment pursuant to Rule 1-056 NMRA and Motions in Limine** (including any motions to exclude expert testimony) shall be filed no later than **September 9, 2022**, unless otherwise ordered by the Court.  Responses to these motions shall be filed no later than **30 days** after service of the motion.  Reply briefs shall be filed no later than **14 days** after service of the Responses.

In connection with any Motions for Summary Judgment or Motions in Limine (including motions to exclude expert testimony), the maximum page lengths shall be 75 pages for the Motion, 75 pages for the Response, and 40 pages for the Reply.

**5. DISCOVERY.**  The deadline to complete fact discovery (including taking fact witness depositions) is **March 31, 2022**, unless otherwise ordered by the Court.  Written discovery requests shall be served at least 30 days prior to March 31, 2022.  The time to conduct expert discovery, including depositions of any expert witnesses, begins on the first day after fact discovery closes (**April 1, 2022**) and ends on **July 8, 2022**, unless otherwise ordered by the Court.

**6. PROCEDURAL ORDERS.**  To promote the orderly, just, speedy, and inexpensive determination of this action, the Court entered the following three procedural orders on June 14, 2021: (1) Protective and Confidentiality Order, (2) Order Governing Privilege Logs, and (3) Stipulation and Order Governing Protocol for Discovery of Electronically Stored Information.

**7. PLAINTIFF FACT SHEET AND AUTHORIZATIONS.**  To help streamline fact discovery, Ms. Renteria completed a Plaintiff Fact Sheet and executed releases for various types of records (including but not limited to medical and employment records).  Monsanto has agreed that it will not serve interrogatories that are duplicative of the questions covered in the Plaintiff Fact Sheet.  Monsanto has further agreed that it will not propound requests for production of documents to Plaintiff that seek documents which Monsanto will be able to obtain pursuant to the

EXHIBIT 1

signed document releases from Plaintiff.  The parties will meet and confer as to the need for additional interrogatories, and Plaintiff reserves the right to seek further interrogatories from the Court to the extent the parties are unable to agree.

 **8. INITIAL PRODUCTION OF DOCUMENTS BY MONSANTO**.   Defendant Monsanto has produced to Plaintiff all documents that it produced in the following matters, as well as the transcripts of all depositions of current/former Monsanto employees taken during discovery in each of the following: the multidistrict litigation in the U.S. District Court for the Northern District of California, *In re: Roundup Prods. Liab. Litig.*, Case No. 3:16-md-02741-VC (N.D. Cal.); *Hardeman v. Monsanto Co.*, Case No. 3:16-cv-00525-VC (N.D. Cal.); *Johnson v. Monsanto Co.*, Case No. CGC-16-550128 in the Superior Court of the State of California for San Francisco County; and *Pilliod v. Monsanto, Co.*, Case No. RG17862702 in the Superior Court of the State of California for Alameda County.[1]

 **9. WITNESSES.**  The parties shall file a list of all non-expert witnesses expected to testify at trial on or before **February 25, 2022.**

 The parties shall file a list of expert witnesses expected to testify at trial on or before the dates set forth below:

 Plaintiff expert witnesses: **April 1, 2022**

 Defense expert witnesses: **May 2, 2022**

 Rebuttal experts:  **June 17, 2022**

 At the time the expert witnesses are identified, the party presenting the expert witness shall provide to all other parties the following: 1) a current curriculum vitae of the expert; and 2) a

---

[1] Plaintiff does not waive the right to seek the production of deposition transcripts of other individuals and/or entities taken in the aforementioned matters or any other matters involving Monsanto's Roundup®-branded herbicides.

EXHIBIT 1

written report detailing all opinions the witness will express and the basis and reasons for them, including the facts or data considered by the witness in forming the witness' opinion(s).

No later than seven days after the latest date designated for disclosure of expert witnesses herein, all counsel who are expected to participate at trial shall conduct a telephonic conference for the purpose of scheduling all depositions yet to be scheduled in this matter.

**10. EXHIBITS.**  The parties shall file a list of all exhibits expected to be submitted at trial no later than **six weeks before trial. The parties shall provide four (4) binders with all trial exhibits to the Court on the day of trial**. **Counsel for the parties shall be responsible for collecting and maintaining their respective exhibits pending any appeal.  The Court shall not be responsible for maintaining offered or admitted exhibits.**

**11.  DEPOSITION  DESIGNATIONS.**   The parties shall submit page and line designations of all depositions that each party intends to present at trial **eight weeks** before trial. Any objections and/or counter-designations to the parties' original designations are to be filed **five weeks before trial.  Objections to counter-designations shall be filed four weeks before trial. If counsel cannot agree on the deposition designations, the proponent of the deposition shall submit to the Court the deposition with page and lines indicated and the objections <u>seven days</u> before the Docket Call with the deposition designation highlighted.**

**A Status Hearing will be held on January 11, 2022 at 8:30 a.m.**

**12. PRE-TRIAL CONFERENCE.**  The pre-trial conference mandated by Rule 1-016(C) NMRA shall be held on a trailing docket on **<u>April 24, 2023</u>, at <u>9:00 a.m.</u>** at the **Judge Steve Herrera Judicial Complex, 225 Montezuma Avenue, Santa Fe, New Mexico**.  Trial counsel must attend the pre-trial conference.

EXHIBIT 1

**13. PRE-TRIAL ORDER.** Plaintiff's counsel shall prepare their portion of the Pre-Trial Order and submit it to opposing counsel no later than **four weeks before trial.** Defendants' counsel shall submit their portion of the Pre-Trial Order no later than three weeks before trial. The parties will submit their final Pre-Trial Order to the Court no later than one week before the pre-trial conference**.**

**14. JURY QUESTIONNAIRES. General Jury Questionnaires** are not usually available until **two (2)** weeks prior to the Jury Selection.

**Special Jury Questionnaires must be approved by the Court.** The following timeline is used by Jury Services for Special Questionnaires, therefore the parties need to factor in the timeline when requesting Court approval of a Special Questionnaire:

- Ten (10) weeks in advance of jury selection, counsel will submit their **approved** supplemental jury questionnaire packets to Jury Services together with outgoing and return postage.

- Nine (9) weeks in advance of jury selection, jury services will send the supplemental jury questionnaire to the jury pool.

- Responses from the jury pool are due within four (4) weeks from service.

- Three (3) weeks in advance of jury selection, jury services will provide completed supplemental jury questionnaires to counsel.

- Two (2) weeks in advance of jury selection, the Court will hold a hearing to address any issues relating to the completed supplemental jury questionnaires.

**15. JURY INSTRUCTIONS.** Jury instructions shall be filed and presented to the Court in three packets. One packet shall consist of those instructions which are stipulated to by the

EXHIBIT 1

parties.  A second packet shall consist of the Plaintiff's additional proposed instructions.  The third

packet shall consist of the Defendants' additional proposed instructions.

Each jury instruction submitted shall indicate the UJI source for such instruction. In

connection with any modification(s) sought from UJI language, counsel shall indicate in bold

typeface on each such instruction any and all proposed modification(s) from New Mexico uniform

jury instructions. In addition, the legal authority for any proposed modification shall be set forth

at the conclusion of each proposed jury instruction.

All proposed jury instructions shall be filed on or before **two weeks before trial.**

**16. TRIAL/DOCKET CALL.**  Trial of this matter is set for a trailing docket **(WHICH
WILL START ON A WEDNESDAY)**, May 24, 2023 AT 8:30 A.M., **at the Judge Steve Herrera
Judicial Complex, 225 Montezuma Avenue, Santa Fe, New Mexico**.  At that time, attorneys
and parties must appear for case scheduling and jury selection.  **Because the trial date has been
set either by agreement of counsel or by the Court at the Scheduling Conference, the trial
date will not be continued except in truly exceptional circumstances.**  The Court will attempt
to work around scheduling conflicts within the trial docket; however, counsel should arrange to
have co-counsel or substitute counsel available to try the case if such conflicts cannot be resolved.

Counsel shall contact Brenda Casias prior to the Pre-Trial Conference to discuss court
reporter services.   If either party wishes to have overnight transcripts, please make prior
arrangements with Brenda Casias at 455-8211.

Honorable Kathleen McGarry Ellenwood
District Court Judge, Division X

7

EXHIBIT 1

**AS CHANGES ARE BEING MADE FREQUENTLY, PLEASE VISIT THE COURT WEBSITE,** **click on District Court Judges and scroll down to Judge Kathleen McGarry Ellenwood, Division X, then click on View Calendar for the up to date information on how to appear**

EXHIBIT 1

(**Remote Access**)  All Division X hearings are conducted by Google Meet.  The Court prefers counsel and parties to participate by video at:  meet.google.com/wof-cofz-tuq

If it is not possible to participate by video, you may by calling:  1-563-503-5060 and entering PIN: 818 230 380#

     (**Motion Package**)  Division X follows LR1-201 as it relates to Motions.  The Court prefers the motion package SHALL be submitted in both electronic and hard copy formats.  The hard copies shall be submitted as follows:  with three hole punch on the left side, NOT in binders, but either rubber banded or fastened with binder clips.


Approved by:
BRUSTER PLLC

By: _/s/ Anthony K. Bruster_____
    Anthony K. Bruster
    John C. Hull
    680 N. Carroll Ave., Suite 110
    Southlake, Texas 76092
    Telephone (817) 601-9564
    Fax (817) 796-2929
    akbruster@brusterpllc.com
    jhull@brusterpllc.com

and

    Feliz A. Rael
    Attorney at Law
    505 Marquette NW, Ste. 1300
    Albuquerque, NM 87102
    Telephone (505) 610-5991
    Fax (505) 938-2301
    frael@swcp.com

and

FEARS NACHAWATI LAW FIRM
    Darren P. McDowell
    Danae Benton
    5473 Blair Road
    Dallas, TX 75231
    Telephone (214) 890-0711
    Fax (214) 890-0712
    dmcdowell@fnlawfirm.com
    dbenton@fnlawfirm.com

EXHIBIT 1

*Attorneys for Plaintiff*

MODRALL, SPERLING, ROEHL, HARRIS

  & SISK, P.A.

By: _/s/ Alex C. Walker_____
    Alex C. Walker
    Bayard Roberts
    P.O. Box 2168
    Albuquerque, NM 87103-2168
    Telephone (505) 848-1800
    Fax (505) 848-9710
    awalker@modrall.com
    broberts@modrall.com

HOLLINGSWOTH LLP
    Brett S. Covington (admitted *pro hac vice*)
    1350 I Street, N.W.
    Washington, DC 20005
    Telephone (202) 898-5800
    bcovington@hollingsworthllp.com

*Attorneys for Monsanto Company*

KENNETH L. BEAL, P.C.

By: _[no response received]_
    Kenneth L. Beal
    P.O. Box 725
    Las Cruces, NM 88004
    Telephone (575) 526-5511
    klbealoffice@gmail.com

*Attorneys for Sidco Corporation[2]*

---

This Proposed Amended Scheduling Order is jointly submitted by counsel for Plaintiff Renteria and Defendant Monsanto Company.  Input was also sought from counsel for Defendant Sidco Corporation, but no response was provided.  Counsel for Monsanto and Plaintiff are in agreement with the terms of the Proposed Amended Scheduling Order.

EXHIBIT 1

FILED  1st JUDICIAL DISTRICT COURT
Santa Fe County
9/23/2021 2:38 PM
KATHLEEN VIGIL CLERK OF THE COURT
Edith Suarez-Munoz

**STATE OF NEW MEXICO**
**COUNTY OF SANTA FE**
**FIRST JUDICIAL DISTRICT**

**MARITA RENTERIA,**
    *Plaintiff,*

v.                               **Cause No.: D-101-CV-2020-00180**
                                     **Judge: Kathleen McGarry**

**Ellenwood**

**MONSANTO COMPANY; SIDCO**
**CORPORATION; and**
**AGCO CORPORATION,**
    *Defendants.*

## ENTRY OF APPEARANCE

Danae N. Benton from Fears Nachawati Law Firm enters her appearance in this matter as

additional counsel replacing Jonathan P. Novak, Matthew R. McCarley and Darren P. McDowell

on behalf of Plaintiff, Marita Renteria in connection with the above-captioned matter. Plaintiff

respectfully asks that the service list be updated accordingly.

Respectfully submitted,

By: _____
Danae N. Benton
*Pro Hac Vice*
Texas Bar No. 24080422
**FEARS | NACHAWATI, PLLC**
5473 Blair Road
Dallas, TX 75231
Tel. (214) 890-0711
Fax (214) 890-0712
Email: dbenton@fnlawfirm.com

EXHIBIT 1

## <u>CERTIFICARE OF SERVICE</u>

**I HEREBY CERTIFY** that on the 23rd day of September 2021 the forgoing document was filed electronically, which caused the following parties or counsel to be served by electronic means, as more fully reflected in the Notice of Electronic Filing as follows:

**By:** _____

Danae N. Benton

EXHIBIT 1

FILED  1st JUDICIAL DISTRICT COURT
Santa Fe County
9/27/2021 9:45 AM
KATHLEEN VIGIL CLERK OF THE COURT
Marina Sisneros

STATE OF NEW MEXICO
COUNTY OF SANTA FE
FIRST JUDICIAL DISTRICT

MARITA RENTERIA,

     Plaintiff,

v.                                                                    No. D-101-CV-2020-00180

MONSANTO COMPANY and
SIDCO CORPORATION,

     Defendants.

## MONSANTO COMPANY'S ANSWER
## TO PLAINTIFF'S FIRST AMENDED COMPLAINT

Defendant Monsanto Company ("Monsanto"), by and through its counsel, respectfully responds by generally denying all allegations contained in plaintiff's First Amended Complaint ("Complaint"), except as set forth below.  As defined in the Complaint and as used in this Answer, "Monsanto" refers to Monsanto Company, a United States based company incorporated in Delaware, and not to other Monsanto-affiliated companies.  Monsanto denies – and objects to – allegations by plaintiff that purport to lump Monsanto together with other defendants. Monsanto responds to this Complaint only on behalf of Monsanto and not on behalf of any other defendant.  Silence as to any allegations shall constitute a denial.

In response to the allegations in the first unnumbered paragraph under the section titled "INTRODUCTION" on page 1 of the Complaint, Monsanto denies that any exposure to Roundup®-branded products can cause non-Hodgkin's lymphoma ("NHL") and/or other serious illnesses.  Monsanto denies the remaining allegations in the section titled "INTRODUCTION."

1.     Monsanto lacks information or knowledge sufficient to form a belief as to the truth of the allegations in paragraph 1 and therefore denies those allegations.

EXHIBIT 1

2.      In response to the allegations in the first sentence of paragraph 2, Monsanto admits that its headquarters and principal place of business are in St. Louis County, Missouri, and that it is incorporated in Delaware.  The allegations in the second sentence of paragraph 2 set forth conclusions of law for which no response is required.

3.      The allegations in paragraph 3 are directed at a defendant other than Monsanto, so no response from Monsanto is required for these allegations.

4.      In response to the allegations in paragraph 4, Monsanto denies that it committed any tortious conduct. The remaining allegations in paragraph 4 set forth conclusions of law for which no response is required.

5.      The allegations in paragraph 5 set forth conclusions of law for which no response is required.

6.      In response to the allegations in paragraph 6, Monsanto admits that its headquarters and principal place of business are in St. Louis County, Missouri and that it and its affiliated companies have operations and offices in countries around the world

7.      Monsanto admits the allegations in paragraph 7.

8.      The allegations in paragraph 8 comprise attorney characterizations and are accordingly denied. Monsanto states that the Roundup®-branded products identified by plaintiff have a variety of separate and distinct uses and formulations.

9.      In response to the allegations in paragraph 9, Monsanto admits that certain Roundup®-branded products have glyphosate as the active ingredient. The remaining allegations in paragraph 9 are vague and conclusory and comprise attorney characterizations, and are accordingly denied.

EXHIBIT 1

10.     Monsanto lacks information or knowledge sufficient to form a belief as to the truth of the allegations in paragraph 10 and therefore denies those allegations.

11.     In responses to the allegations in the first sentence of paragraph 11, Monsanto admits that it has been a producer of glyphosate-based herbicides but lacks sufficient information regarding the business of other glyphosate producers to admit or deny the allegation as written in the first sentence of paragraph 11. In response to the allegations in the second, third, and fourth, sentences of paragraph 11, Monsanto admits that it has been the leading producer of seeds that contain the Roundup Ready® trait and that use of crops with the Roundup Ready® trait substantially improves a farmer's ability to control weeds.  Monsanto lacks information or knowledge sufficient to form a belief as to the accuracy of the specific numbers and statistics provided in the fifth sentences of paragraph 11 and therefore denies those allegations.   In response to the allegations in the sixth sentence of paragraph 11, Monsanto admits that its glyphosate products are registered in at least 130 countries and approved for use on over 100 different crops.  In response to the remaining allegations in paragraph 11, Monsanto admits that certain studies have reported that glyphosate is found at *de minimis* levels significantly below regulatory safety limits in various locations and media.  Monsanto otherwise denies the remaining allegations in paragraph 11.

12.     Monsanto denies the allegations in the first sentence of paragraph 12.  The remaining allegations in paragraph 12 take statements out of context, are vague, incomplete, and conclusory, and/or comprise attorney characterizations — and are accordingly denied.

13.     In response to the allegations in paragraph 13, Monsanto states that the unidentified, referenced purported studies speak for themselves and do not require a response. To

EXHIBIT 1

the extent that paragraph 13 characterizes the meaning of the unidentified, referenced purported studies, Monsanto denies the remaining allegations in paragraph 13.

14.     The allegations in paragraph 14 set forth conclusions of law for which no response is required.

15.     The allegations in paragraph 15 set forth conclusions of law for which no response is required.

16.     The allegations in paragraph 16 set forth conclusions of law for which no response is required.

17.     The allegations in paragraph 17 set forth conclusions of law for which no response is required.

18.     The allegations in paragraph 18 set forth conclusions of law for which no response is required.

19.     Monsanto admits the allegations in paragraph 19.

20.     Monsanto denies that glyphosate has "carcinogenic properties" and therefore denies the allegations in the first sentence of paragraph 20.  In response to the remaining allegations in paragraph 20, Monsanto admits that an EPA review committee classified glyphosate as Class C in 1985 based on limited data and that EPA changed its classification of glyphosate to Group E based upon a full evaluation of the scientific evidence, including but not limited to three animal carcinogenicity studies.

21.     In response to the allegations in paragraph 21, Monsanto admits that plaintiff has accurately quoted from one passage in an EPA document in 1991 with respect to the designation of an agent as Group E, but states that EPA repeatedly has concluded that glyphosate does not

EXHIBIT 1

pose any cancer risk to humans.  In addition to the conclusions in the two EPA OPP reports and

the EPA CARC Final Report discussed above, specific findings of safety include:

- "In June 1991, EPA classified glyphosate as a Group E [carcinogen] – one that shows evidence of non-carcinogenicity for humans – based on the lack of convincing evidence of carcinogenicity in adequate studies."  EPA, *Glyphosate: Reregistration Eligibility Decision (RED) Facts*, 2 (Sept. 1993), http://archive.epa.gov/pesticides/reregistration/web/pdf/0178fact.pdf.

- "No evidence of carcinogenicity."  Glyphosate; Pesticide Tolerances, 67 Fed. Reg. 60,934, 60,943 (Sept. 27, 2002) (to be codified at 40 C.F.R. pt. 180).

- "Glyphosate has no carcinogenic potential."  Glyphosate; Pesticide Tolerance, 69 Fed. Reg. 65,081, 65,086 (Nov. 10, 2004) (to be codified at 40 C.F.R. pt. 180).

- "There is [an] extensive database available on glyphosate, which indicate[s] that glyphosate is not mutagenic, not a carcinogen, and not a developmental or reproductive toxicant."  Glyphosate; Pesticide Tolerances, 73 Fed. Reg. 73,586, 73,589 (Dec. 3, 2008) (to be codified at 40 C.F.R. pt. 180).

- "EPA has concluded that glyphosate does not pose a cancer risk to humans."  Glyphosate; Pesticide Tolerances, 78 Fed. Reg. 25,396, 25,398 (May 1, 2013) (to be codified at 40 C.F.R. pt. 180).

- "In 2014, EPA reviewed over 55 epidemiological studies conducted on the possible cancer and non-cancer effects of [g]lyphosate.  Our review concluded that this body of research does not provide evidence to show that [g]lyphosate causes cancer and does not warrant any change in the EPA's cancer classification for [g]lyphosate."  *Agriculture Biotechnology: A Look at Federal Regulation and Stakeholder Perspectives:  Hearing Before the S. Comm. on Agr., Nutrition, & Forestry*, 114th Cong. (2015) (statement of Dr. William Jordan, Deputy Director of EPA's Office of Pesticide Programs), http://www.ag.senate.gov/templates/watch.cfm?id=74793e67-5056-a055-64af-0e55900753b4, at time stamp 55:05 – 56:20 ("EPA 2015 Desk Statement").

Monsanto denies the remaining allegations in paragraph 21.

22.     In response to the allegations in paragraph 22, Monsanto admits that it – along

with a large number of other companies and governmental agencies – was defrauded by two

chemical testing laboratories, including Industrial Bio-Test ("IBT") Laboratories, and that

Monsanto had hired both of these laboratories to conduct testing on glyphosate.  Monsanto

further admits that IBT was hired to conduct toxicity studies in connection with the registration

EXHIBIT 1

of a Roundup®-branded product, that EPA performed an audit of IBT Laboratories to investigate that laboratory's fraudulent and/or improper testing procedures in connection with services provided to a broad number of private and governmental entities, and that this inspection included a review of studies IBT conducted on glyphosate.  Monsanto was one of several pesticide manufacturers who had used IBT test results.  The audit found some toxicology studies conducted with the original Roundup® herbicide to be invalid.  As a result, Monsanto repeated all required studies in accordance with applicable EPA testing guidelines. Monsanto denies that EPA's registration of glyphosate or any glyphosate-based herbicides is based upon any invalid IBT studies. Monsanto further admits that three IBT employees were convicted of the charge of fraud, but Monsanto denies that any of the individuals were convicted based upon studies conducted on glyphosate or glyphosate-based herbicides. To the extent that the allegations in paragraph 22 are intended to suggest that Monsanto was anything other than a victim of this fraud, such allegations are denied.

23.     Monsanto denies the allegations in the last sentence of paragraph 23. In response to the remaining allegations in paragraph 23, Monsanto admits that it – along with numerous other private companies – hired Craven Laboratories as an independent laboratory to conduct residue studies for Monsanto agricultural products.  Monsanto further admits that it was defrauded by Craven Laboratories and that, as a result, Monsanto repeated the studies conducted at Craven Laboratories at a substantial cost.  To the extent that the remaining allegations in paragraph 23 are intended to suggest that Monsanto was anything other than a victim of this fraud, Monsanto denies those allegations.

24.     Monsanto denies the allegations in paragraph 24.

EXHIBIT 1

25.      In response to the allegations in paragraph 25, Monsanto admits that Roundup®-branded products are highly valued by its customers because of their efficacy and safety, that, following the development of Roundup® Ready seeds, it began to sell them in the 1990s, that such seeds are now widely used by farmers in the United States and worldwide, and Monsanto also that the patent for glyphosate expired in the United States in 2000.  Monsanto lacks information or knowledge sufficient to form a belief as to the accuracy of the specific numbers cited in paragraph 25 and accordingly denies those allegations.  The remaining allegations in paragraph 25 are vague and conclusory and comprise attorney characterizations, and are accordingly denied.

26.      In response to the allegations in paragraph 26, Monsanto admits that glyphosate is one of the world's largest herbicides by sales volume, but Monsanto denies any suggestion that it is the only company that sells glyphosate or glyphosate-based herbicides.  Monsanto lacks information or knowledge sufficient to form a belief as to the accuracy of the specific numbers cited in paragraph 26 and accordingly denies the same.  The remaining allegations in paragraph 26 are vague and conclusory and comprise attorney characterizations, and are accordingly denied.

27.      Monsanto lacks information or knowledge sufficient to form a belief as to the truth of the allegations in paragraph 27 and therefore denies those allegations.

28.      Monsanto lacks information or knowledge sufficient to form a belief as to the truth of the allegations in paragraph 28 and therefore denies those allegations.

29.      Monsanto denies the allegations in paragraph 29.

30.      In response to the allegations in paragraph 30, Monsanto admits that the New York Attorney General filed a lawsuit against Monsanto in 1996 alleging false and misleading

EXHIBIT 1

advertising of Roundup®-branded products.  This lawsuit was subsequently resolved without any admission of wrongdoing by Monsanto.  Monsanto states that none of the New York Attorney General's allegations related in any way to a purported or alleged risk of cancer.  To the extent the subparts purport to quote a document, the document speaks for itself and thus does not require any further answer.  The remaining allegations in paragraph 30 are vague and conclusory and comprise attorney characterizations, and are accordingly denied.

31.     In response to the allegations in paragraph 31, Monsanto admits it entered into an assurance of discontinuance with the New York Attorney General.  The assurance speaks for itself and thus does not require any further answer.  The remaining allegations in paragraph 31 are vague and conclusory and comprise attorney characterizations, and are accordingly denied.

32.     Monsanto denies the allegations in paragraph 32.

33.     In response to the allegations in paragraph 33, Monsanto admits that the French court ruled that Monsanto had falsely advertised its herbicide Roundup® as "biodegradable" and that it "left the soil clean," but denies the allegations to the extent they suggest that this ruling was in any way related to plaintiff's claim here that glyphosate can cause cancer.  Monsanto denies the remaining allegations in paragraph 33.

34.     In response to the allegations in paragraph 34, Monsanto admits that the International Agency for Research on Cancer ("IARC") is a subgroup of the World Health Organization ("WHO") of the United Nations. Monsanto lacks information or knowledge sufficient to form a belief as to the truth of the remaining allegations in paragraph 34 and therefore denies those allegations.

35.     In response to the allegations in paragraph 35, Monsanto admits that in March 2015 IARC classified glyphosate as a class 2A carcinogen. Monsanto specifically denies that

EXHIBIT 1

IARC's evaluation of human, animal or genotoxic evidence was "cumulative." The remaining allegations in paragraph 35 are vague and conclusory and comprise attorney characterizations and are accordingly denied.

36.     In response to the allegations in paragraph 36, Monsanto denies that IARC follows stringent procedures for the evaluation of a chemical agent.  Monsanto lacks information or knowledge sufficient to form a belief as to the accuracy of the specific numbers cited in paragraph 36, which are not limited as of any specified date, and accordingly denies the same.

37.     In response to the allegations in paragraph 37, Monsanto admits that IARC sets forth in its Preamble the procedures that it claims to follow in its carcinogenicity evaluations. Monsanto denies the remaining allegations in paragraph 37.

38.     In response to the allegations in paragraph 38, Monsanto denies any suggestion that IARC reviewed the full body of scientific research in conducting its evaluation of glyphosate or that it reliably reviewed the studies that it cited in its glyphosate monograph.  Monsanto lacks information or knowledge sufficient to form a belief as to the truth of the remaining allegations in paragraph 38 and therefore denies those allegations.

39.     Monsanto denies the allegations in paragraph 39 to the extent that they suggest that IARC had previously assessed glyphosate.   Monsanto admits that IARC classified glyphosate as a Group 2A agent in March 2015.

40.     In response to the allegations in paragraph 40, Monsanto admits that IARC issued its monograph for glyphosate, Monograph 112, on July 29, 2015 and that a draft of the monograph was prepared by a "working group" of individuals selected by IARC who met over a one week period in March 2015 to consider glyphosate along with a number of other substances. Monsanto denies the allegation that all members of the working group are "experts."  Monsanto

EXHIBIT 1

denies that the working group or anyone at IARC conducted a one-year review of the scientific evidence related to glyphosate or that the working group's findings reflected a comprehensive review of the latest available scientific evidence.  Monsanto also denies that the working group considered all information available in the scientific literature and all data from government reports that are publicly available.  Monsanto denies the remaining allegations in paragraph 40.

41.    Monsanto denies the allegations in the first sentence of paragraph 41.  The IARC working group concluded that there was only limited evidence of carcinogenicity in epidemiologic studies, which, per IARC's guidelines, means that the working group could not rule out chance, bias or confounding so as to reach any conclusion of an increased risk. In response to the remaining allegations in paragraph 41, Monsanto admits that the working group cited to a study that it concluded provided evidence of chromosomal damage in community residents reported to be exposed to glyphosate, but Monsanto denies that the study supports such a conclusion or that the authors of the study reached such a conclusion.

42.    In response to the allegations in paragraph 42, Monsanto admits that the IARC working group purported to make these findings, but denies that the animal carcinogenicity studies of glyphosate in the aggregate provide evidence of a positive trend for or increase in any of the identified tumors.  Monsanto further states that regulatory agencies around the world have reviewed the same animal studies and concluded that they do not provide evidence that glyphosate can cause cancer.  Monsanto denies the remaining allegations in paragraph 42.

43.    In response to the allegations in paragraph 43, Monsanto admits that the IARC working group purported to make these findings but denies that the cited studies provide any reliable basis for a finding that any meaningful levels of glyphosate or AMPA is present or persists in human blood or urine.  Monsanto denies the remaining allegations in paragraph 43.

EXHIBIT 1

44.     In response to the allegations in paragraph 44, Monsanto admits that the IARC working group's classification of glyphosate as a Class 2A carcinogen has resulted in ongoing discussions and/or restrictions in certain countries regarding the sale and/or use of glyphosate-based herbicides, but denies that there is any scientific basis for the concerns raised by the improper IARC classification.  Monsanto denies the remaining allegations in paragraph 44.

45.     The allegations in paragraph 45 set forth conclusions of law for which no response is required.

46.     In response to the allegations in paragraph 46, Monsanto admits that the IARC working group classification led an individual government attorney in Brazil to write a letter to the Brazilian regulatory authorities requesting a reevaluation of glyphosate.  Monsanto denies the remaining allegations in paragraph 46.

47.     Monsanto admits that, in France, the sale to and use by amateurs (i.e., non-professionals) of all pesticides (with certain exceptions for biocontrol pesticides) are prohibited as of January 1, 2019, with certain exceptions.  Monsanto denies the remaining allegations in paragraph 47.

48.     In response to the allegations in paragraph 48, Monsanto admits that some employees of Bermuda's government announced an intention to suspend the importation of glyphosate-based herbicides, but lacks information sufficient to form a belief as to the truth of the allegations about whether this suspension took effect and accordingly denies the same. Monsanto denies the remaining allegations in paragraph 48.

49.     In response to the allegations in paragraph 49, Monsanto admits that the IARC monograph appears to be the alleged basis for the Sri Lankan government's actions, including the allegation that glyphosate can cause kidney disease.   Monsanto further states that the

11

EXHIBIT 1

allegations regarding kidney disease found in Sri Lanka are unrelated to plaintiff's allegations regarding claimed carcinogenicity.  Monsanto denies the remaining allegations in paragraph 49.

50.     In response to the allegations in paragraph 50, Monsanto denies the alleged basis for Colombia's suspension of aerial spraying of glyphosate.  Colombia's attorney general has explained that the ban on aerial spraying of illicit coca plantations was a concession to the FARC ("Fuerzas Armadas Revolucionarias de Colombia"), and had nothing to do with alleged safety concerns.  As of April 2016, the government of Colombia has resumed manual application of glyphosate on illicit coca crops.  A federal district court in the United States excluded plaintiffs' expert testimony purporting to link these same aerial eradication operations with cancer as scientifically unreliable.  *See Arias v. DynCorp*, 928 F. Supp. 2d 10 (D.D.C. 2013).  Monsanto denies the remaining allegations in paragraph 50.

51.     In response to the allegations in paragraph 51, Monsanto admits that the California Office of Environmental Health Hazard Assessment ("OEHHA") decided that it was required to add glyphosate to California's Proposition 65 list of chemicals in a process that OEHHA itself considers "ministerial" and "automatic" without any role for consideration of the weight or quality of the evidence considered by IARC.  Monsanto further states that this decision was not based upon any independent scientific analysis of glyphosate but instead was in response to a provision of a California ballot proposition triggering such action based solely upon the IARC classification, and indeed was contrary to OEHHA's own conclusion in 2007, based upon its own independent evaluation of the same scientific evidence, that glyphosate is "unlikely to pose a cancer hazard to humans."[1]  Monsanto contends that OEHHA's decision that it was required to list glyphosate violates the United States Constitution and the California Constitution.

---

[1]  OEHHA, *Public Health Goal for Glyphosate in Drinking Water* (June 2007), https://oehha.ca.gov/media/downloads/water/chemicals/phg/glyphg062907.pdf.

12

EXHIBIT 1

On February 26, 2018, a federal district court enjoined California from requiring Proposition 65 warning labels for glyphosate as unconstitutional.  The remaining allegations in paragraph 51 set forth conclusions of law for which no response is required.  To the extent that a response is deemed required, Monsanto denies the allegations in paragraph 51.

52.     The allegations in paragraph 52 set forth conclusions of law for which no response is required.

53.     The allegations in paragraph 53 set forth conclusions of law for which no response is required.  Nevertheless, Monsanto notes that, under Proposition 65, the mere presence of a listed substance in a consumer product does not require a warning.  Instead, a warning need only be provided if the exposure to the listed substance, for the average user of the product, exceeds the level at which cancer would be hypothesized to occur, based on extrapolation from animal studies, in one person in 100,000 persons exposed over a 70-year lifetime.

54.     In response to the allegations in paragraph 54, Monsanto admits that it has brought a lawsuit challenging OEHHA's notice of intent to include glyphosate on its Proposition 65 list.

55.     In response to the allegations in paragraph 55, Monsanto admits that plaintiff accurately quotes from Monsanto's Complaint in the referenced lawsuit, and states that Monsanto's Complaint in that lawsuit speaks for itself.  Monsanto further admits that its lawsuit cites to OEHHA's 2007 determination based upon its own independent evaluation of the scientific evidence that glyphosate is "unlikely to pose a cancer hazard to humans."[2]   The

---

[2]   OEHHA, *Public Health Goal for Glyphosate in Drinking Water* (June 2007), https://oehha.ca.gov/media/downloads/water/chemicals/phg/glyphg062907.pdf.

EXHIBIT 1

remaining allegations in paragraph 55 comprise attorney characterizations and are accordingly denied.

56.     Monsanto lacks information or knowledge sufficient to form a belief as to the truth of the allegations in paragraph 56 and therefore denies those allegations.

57.     Monsanto lacks information or knowledge sufficient to form a belief as to the truth of the allegations in the first sentence of paragraph 57 and therefore denies those allegations.  Monsanto denies the remaining allegations in paragraph 57.

58.     Monsanto denies the allegations in paragraph 58.

59.     Monsanto incorporates by reference its responses to paragraphs 1 through 58 in response to paragraph 59 of plaintiff's Complaint.

60.     Monsanto lacks information or knowledge sufficient to form a belief as to the truth of the allegations in paragraph 60 and therefore denies those allegations.

61.     Monsanto denies the allegations in paragraph 61, including each of its subparts.

62.     Monsanto denies the allegations in paragraph 62.

63.     Monsanto denies the allegations in paragraph 63.

64.     Monsanto denies the allegations in paragraph 64.  All labeling of Roundup®-branded products has been and remains EPA-approved and in compliance with all federal requirements under FIFRA.

65.     Monsanto denies the allegations in paragraph 65.

66 – 71.     The allegations in paragraphs 66 through 71 are directed at a defendant other than Monsanto and support a claim that is not asserted against Monsanto, so no response from Monsanto is required for these allegations.  To the extent that responses may be deemed required, Monsanto:  (a) denies any and all allegations regarding defective design, failure to

EXHIBIT 1

warn, negligence, breach of express or implied warranties or other misconduct; (b) denies that Monsanto is liable to plaintiff based on a strict liability theory, negligence theory, breach of express or implied warranty theory, or any other legal theory; (c) denies that Roundup®-branded products cause cancer or are defective; and (d) denies that Roundup®-branded products caused plaintiff's cancer.

72.     Monsanto incorporates by reference its responses to paragraphs 1 through 71 in response to paragraph 72 of plaintiff's Complaint.

73.     The allegations in paragraph 73 set forth conclusions of law for which no response is required.

74.     Monsanto denies the allegations in paragraph 74, including each of its subparts.

75.     Monsanto denies the allegations in paragraph 75.

76.     Monsanto denies the allegations in paragraph 76.

77.     Monsanto incorporates by reference its responses to paragraphs 1 through 76 in response to paragraph 77 of plaintiff's Complaint.

78.     The allegations in paragraph 78 set forth conclusions of law for which no response is required. To the extent a response is deemed required, Monsanto denies the allegations in paragraph 78.

79.     The allegations in paragraph 79 set forth conclusions of law for which no response is required.

80.     Monsanto denies the allegations in paragraph 80.

81.     Monsanto denies the allegations in paragraph 81.

82.     Monsanto incorporates by reference its responses to paragraphs 1 through 81 in response to paragraph 82 of plaintiff's Complaint.

EXHIBIT 1

83.     In response to the allegations in paragraph 83, Monsanto admits that plaintiff seeks the recovery described therein but denies that Roundup®-branded products caused plaintiff any injury and denies that plaintiff is entitled to any recovery.

84.     Monsanto incorporates by reference its responses to paragraphs 1 through 83 in response to paragraph 84 of plaintiff's Complaint.

85.     Monsanto denies the allegations in paragraph 85.

86.     Monsanto denies the allegations in paragraph 86.

87.     Monsanto denies the allegations in paragraph 87.

88.     Monsanto denies the allegations in paragraph 88.

89.     In response to the allegations in paragraph 89, Monsanto admits that plaintiff seeks an award of punitive damages but denies that she is entitled to any such award.

90.     Monsanto incorporates by reference its responses to paragraph 1 through paragraph 89 in response to paragraph 90 of plaintiff's Complaint.

91.     The allegations in paragraph 91 set forth conclusions of law for which no response is required. To the extent a response is deemed required, Monsanto denies the allegations in paragraph 91.

92.     The allegations in paragraph 92 set forth conclusions of law for which no response is required. To the extent a response is deemed required, Monsanto denies the allegations in paragraph 92.

93.     The allegations in paragraph 93 set forth conclusions of law for which no response is required. To the extent a response is deemed required, Monsanto denies the allegations in paragraph 93.

EXHIBIT 1

In response to the "WHEREFORE" paragraph following paragraph 93, Monsanto denies that plaintiff is entitled to the relief sought therein, including any judgment for any damages, interest, costs, or any other relief whatsoever.

Every allegation in the Complaint that is not specifically and expressly admitted in this Answer is hereby specifically and expressly denied.

## SEPARATE AND AFFIRMATIVE DEFENSES

1.     The Complaint, in whole or part, fails to state a claim or cause of action against Monsanto upon which relief can be granted.

2.     Plaintiff's claims against Monsanto are barred because plaintiff cannot proffer any scientifically reliable evidence that the products at issue were defective or unreasonably dangerous.

3.     Any alleged negligent or culpable conduct of Monsanto, none being admitted, was so insubstantial as to be insufficient to be a proximate or substantial contributing cause of plaintiff's alleged injuries.

4.     Plaintiff's claims against Monsanto are barred, in whole or in part, because the products at issue were designed, manufactured, marketed and labeled with proper warnings, information, cautions and instructions, in accordance with the state of the art and the state of scientific and technological knowledge.

5.     Plaintiff's claims against Monsanto are barred, in whole or in part, because the products at issue were not defective or unreasonably dangerous in that they complied with, at all relevant times, all applicable government safety standards.

6.     Plaintiff's claims against Monsanto are preempted, in whole or in part, by applicable federal law relating to the design, testing, producing, manufacturing, labeling,

EXHIBIT 1

distributing, modeling, processing, and supply of Roundup®-branded products and/or glyphosate-containing products.

7.      Plaintiff's claims against Monsanto are preempted, in whole or in part, because of U.S. EPA findings that glyphosate does not cause cancer in humans and/or because of U.S. EPA-approved product labeling.

8.      Plaintiff's claims against Monsanto are barred, in whole or in part, by the doctrine of primary jurisdiction, including by the authority delegated by Congress to the U.S. EPA.

9.      Plaintiff's claims against Monsanto are barred, in whole or in part, because plaintiff's injuries, if any, were the result of conduct of plaintiff, independent third parties and/or events that were extraordinary under the circumstances, not foreseeable in the normal course of events, and/or independent, intervening and superseding causes of the alleged injuries, including but not limited to plaintiff's pre-existing medical conditions.

10.     The doctrines contained in Restatement (Second) of Torts § 402A, comments j and k, bar plaintiff's claims against Monsanto in whole or in part.

11.     Applicable statutes of limitations and/or repose bar plaintiff's claims against Monsanto in whole or in part.

12.     Plaintiff's misuse or abnormal use of the product or failure to follow instructions bar plaintiff's claims against Monsanto in whole or in part.

13.     If plaintiff suffered injuries or damages as alleged, which is denied, such injuries or damages resulted from acts or omissions of persons or entities for which Monsanto is neither liable nor responsible or resulted from diseases and/or causes that are not related or connected with any product sold, distributed, or manufactured by Monsanto.  Such acts or omissions on the

18

EXHIBIT 1

part of others or diseases or causes constitute an independent, intervening and sole proximate cause of plaintiff's alleged injuries or damages.

14.     Monsanto had no legal relationship or privity with plaintiff and owed no duty to her by which liability could be attributed to it.

15.     Monsanto made no warranties of any kind or any representations of any nature whatsoever to plaintiff.  If any such warranties were made, which Monsanto specifically denies, then plaintiff failed to give notice of any breach thereof.

16.     Plaintiff's claims against Monsanto are preempted or otherwise barred in whole or in part by the Freedom of Speech Clause of the First Amendment of the U.S. Constitution.

17.     Plaintiff's claims against Monsanto for punitive and aggravated damages are barred because such an award would violate Monsanto's due process, equal protection and other rights under the United States Constitution, the New Mexico Constitution, and/or other applicable state constitutions.

18.     Plaintiff's claims against Monsanto for punitive and aggravated damages are barred because plaintiff has failed to allege conduct warranting imposition of punitive and aggravated damages under New Mexico law and/or other applicable state laws.

19.     Plaintiff's claims against Monsanto for punitive and aggravated damages are barred and/or limited by operation of state and/or federal law.

20.     Plaintiff's causes of action against Monsanto are barred in whole or in part by plaintiff's own failure to mitigate damages.

21.     Plaintiff's causes of action against Monsanto are barred in whole or in part by the sophisticated user doctrine.

EXHIBIT 1

22.     To the extent that plaintiff recovered payments for her alleged injuries from any collateral source(s) or other source(s), plaintiff's recovery from Monsanto in this lawsuit, if any, shall be reduced to the extent allowed by applicable law.

23.     If plaintiff has been injured or damaged, no injury or damages being admitted, such injuries were not caused by a Monsanto product.

24.     Plaintiff's claims against Monsanto are barred or limited to the extent that plaintiff asserts claims that are governed by the laws of a state that does not recognize, or limits such claims.

25.     Plaintiff's claims against Monsanto are barred to the extent that plaintiff seeks relief under the laws of states that do not govern plaintiff's claims.

26.     Plaintiff's claims against Monsanto are barred in whole or in part by plaintiff's own contributory/comparative negligence.

27.     Plaintiff has failed to allege fraud with sufficient particularity.

28.     Any claims based on allegations that Monsanto misled, defrauded, made misrepresentations to, or withheld information from U.S. EPA are preempted by federal law. *See, e.g.*, *Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341 (2001); *Nathan Kimmel, Inc. v. Dowelanco*, 275 F.3d 1199 (9th Cir. 2002).

29.     Monsanto hereby gives notice that it intends to rely upon such other defenses as may become available or apparent during the course of discovery and thus reserves its right to amend this Answer to assert such defenses.

**WHEREFORE**, Defendant Monsanto demands judgment in its favor and against plaintiff, dismissing plaintiff's First Amended Complaint with prejudice, together with the costs of suit and such other relief as the Court deems equitable and just.

EXHIBIT 1

## JURY TRIAL DEMAND

Monsanto demands a jury trial on all issues so triable.

Dated: September 27, 2021

Respectfully submitted,

MODRALL, SPERLING, ROEHL, HARRIS
   & SISK, P.A.

By:    */s/ Alex C. Walker*
    Alex C. Walker
    Bayard Roberts
    P.O. Box 2168
    Albuquerque, NM 87103-2168
    Telephone (505) 848-1800
    Fax (505) 848-9710
    awalker@modrall.com
    broberts@modrall.com

HOLLINGSWOTH LLP
    Brett S. Covington (admitted *pro hac vice*)
    1350 I Street, N.W.
    Washington, DC 20005
    Telephone (202) 898-5800
    bcovington@hollingsworthllp.com

*Attorneys for Defendant Monsanto Company*

WE HEREBY CERTIFY that a true and correct copy of the foregoing was submitted through the Court's Electronic Filing System for filing and service to all counsel of record this 27th day of September, 2021.

MODRALL, SPERLING, ROEHL, HARRIS
   & SISK, P.A.

By:    */s/ Alex C. Walker*
    Alex C. Walker

*W4173843.DOCX*

EXHIBIT 1

FILED  1st JUDICIAL DISTRICT COURT
Santa Fe County
9/27/2021 2:22 PM
KATHLEEN VIGIL CLERK OF THE COURT
Faith Griego

**STATE OF NEW MEXICO**
**COUNTY OF SANTA FE**
**FIRST JUDICIAL DISTRICT**

**MARITA RENTERIA**
      **Plaintiff,**

**v.**
                               **No. D-101-CV-2020-00180**
                               **Judge McGarry Ellenwood**

**MONSANTO COMPANY; and**
**SIDCO CORPORATION,**
      **Defendant(s)**

## DEFENDANT SIDCO CORPORATION'S
## RESPONSE TO ORIGINAL COMPLAINT

**COMES NOW,** Defendant, SIDCO CORPORATION, by and through its attorney of record Kenneth L. Beal, of KENNETH L. BEAL, P.C., and responds to Plaintiff's complaint as follows:

### THE PARTIES, JURISDICTION, AND VENUE

1.     Admits the allegations regarding Jurisdiction and that Plaintiff was diagnosed with non-Hodgkin's Lymphoma, but Defendant, SIDCO Corporation is unable to form a belief as to the voracity of the remaining allegation contained in paragraph 1; therefore, denies the same.

2.     The allegations contained in paragraph 2 do not apply to this defendant; therefore, there is insufficient information to form a belief as to the voracity of the allegation.

3.     Admits the allegations contained in paragraph 3.

1

EXHIBIT 1

4.   The allegations contained in paragraph 4 do not apply to this defendant; therefore, there is insufficient information to form a belief as to the voracity of the allegation

5.   Admits the allegations contained in paragraph 5 as it applies to this defendant, SIDCO Corporation.

6.   Admits the allegations contained in paragraph 6.

## NATURE OF THE ACTION

7.   The allegations contained in paragraphs 7 – 14 of the Complaint do not apply to this defendant; therefore, there is insufficient information to form a belief as to the voracity of the allegation.

## FACTS

8.   The allegations contained in paragraphs 15 - 91 do not apply to this defendant; therefore, there is insufficient information to form a belief as to the voracity of the allegation.

9.   In response to paragraph 92, defendant SIDCO Corporation admits that Plaintiff worked in the field for SIDCO Corporation and that SIDCO Corporation used Roundup for weed control.

10.   In response to paragraph 93, defendant SIDCO Corporation has insufficient information to verify what equipment was utilized.

2

EXHIBIT 1

11.    In response to paragraph 94, upon information and belief, all personnel which worked for SIDCO Corporation, followed the same practices used in the community.

12.    Admits the allegations contained in paragraph 95.


## DISCOVERY RULE

13.    The allegations contained in paragraphs 96 and 97 do not apply to this defendant; therefore, there is insufficient information to form a belief as to the voracity of the allegation.

14.    Admits the allegations contained in paragraphs 98 and 99.

15.    The allegations contained in paragraphs 100 - 105 do not apply to this defendant; therefore, there is insufficient information to form a belief as to the voracity of the allegation.


## <u>CLAIMS</u>

### COUNT 1

16.    In response to the allegation contained in paragraph 106 of the complaint:  Defendant, SIDCO Corporation, incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

17.    The allegations contained in paragraphs 107 - 113 do not apply to this defendant; therefore, there is insufficient information to form a belief as to the voracity of the allegation.

3

EXHIBIT 1

18.   Defendant, SIDCO Corporation, firmly asserts that allegations in paragraphs 114 – 116 apply equally to Plaintiff and this Defendant.

19.   The allegations contained in paragraphs 117 - 123 do not apply to this defendant; therefore, there is insufficient information to form a belief as to the voracity of the allegation.

### COUNT II

20.   In response to the allegation contained in paragraph 124 of the complaint:  Defendant, SIDCO Corporation, incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

21.   The allegations contained in paragraphs 125 – 142 do not apply to this defendant; therefore, there is insufficient information to form a belief as to the voracity of the allegation.

### COUNT III

22.   In response to the allegation contained in paragraph 143 of the complaint:  Defendant, SIDCO Corporation, incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

23.   The allegations contained in paragraphs 144 – 162 do not apply to this defendant; therefore, there is insufficient information to form a belief as to the voracity of the allegation.

4

EXHIBIT 1

## COUNT IV

24.    In response to the allegation contained in paragraph 163 of the complaint:  Defendant, SIDCO Corporation, incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

25.    The allegations contained in paragraphs 164 – 177 do not apply to this defendant; therefore, there is insufficient information to form a belief as to the voracity of the allegation.

## COUNT V

26.    In response to the allegation contained in paragraph 178 of the complaint:  Defendant, SIDCO Corporation, incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

27.    The allegations contained in paragraphs 179 - 189 do not apply to this defendant; therefore, there is insufficient information to form a belief as to the voracity of the allegation.

## COUNT VI

28.    In response to the allegation contained in paragraph 190 of the complaint:  Defendant, SIDCO Corporation, incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

EXHIBIT 1

29.     The allegations contained in paragraphs 191 - 202 do not apply to this defendant; therefore, there is insufficient information to form a belief as to the voracity of the allegation.


**COUNT VII**

30.     In response to the allegation contained in paragraph 203 of the complaint:  Defendant, SIDCO Corporation, incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.


31.     The allegations contained in paragraphs 204 - 206 do not apply to this defendant; therefore, there is insufficient information to form a belief as to the voracity of the allegation.


**COUNT VIII**

32.     In response to the allegation contained in paragraph 207 of the complaint:  Defendant, SIDCO Corporation, incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.


33.     The allegations contained in paragraphs 208 - 216 do not apply to this defendant; therefore, there is insufficient information to form a belief as to the voracity of the allegation.

6

EXHIBIT 1

**PUNITIVE DAMAGES ALLEGATIONS**

34.    In response to the allegation contained in paragraph 217 of the complaint:  Defendant, SIDCO Corporation, incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

35.    The allegations contained in paragraphs 218 – 220 do not apply to this defendant; therefore, there is insufficient information to form a belief as to the voracity of the allegation.

**SEPARATE AND AFFIRMATIVE DEFENSES**

**EQUITABLE ESTOPPEL**

36.    This Defendant did not have any level of expertise or access to information which was greater than that of the Plaintiff, or in excess of that which was made readily accessible to the public in regard to the product commonly known as Roundup.

**WHEREFORE,** Defendant, SIDCO Corporation, having fully responded to the allegations in the Complaint, prays this Court enter its Order denying any relief and directs Plaintiff to go hence with her costs and fees, and such other and further relief as this Court deems just and equitable under the circumstances.

7

EXHIBIT 1

Respectfully Submitted:

KENNETH L. BEAL, P.C.

/s/ *Kenneth L. Beal*
Kenneth L. Beal
Attorney for Defendant SIDCO Corporation
715 E. Idaho Ave, Suite 4-B
Las Cruces, NM 88001
(575) 526-5511


## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing **DEFENDANT SIDCO CORPORATION'S RESPONSE TO ORIGINAL COMPLAINT** was electronically filed through the Odyssey File / Serve System which caused the parties or counsel to be served by electronic means, as more fully reflected on the Notice of Electronic Filing on this 27th day of September 2021.


/s/ *Donna Beal*
Donna Beal

EXHIBIT 1

9

EXHIBIT 1

DocuSign Envelope ID: C090533C9-6D45-4564-897E-D73F680D08F5

**STATE OF NEW MEXICO**
**COUNTY OF SANTA FE**
**FIRST JUDICIAL DISTRICT**

MARITA RENTERIA,

      Plaintiff,

v.                                                     Cause No.:   D-101-CV-2020-00180

MONSANTO COMPANY and
SIDCO CORPORATION,

      Defendants.

## PLAINTIFF FACT SHEET

### I       REPRESENTATIVE CAPACITY

A. If you are completing this Fact Sheet on behalf of someone else (*e.g.*, a deceased person, an incapacitated person, or a minor), please complete the following:

1. Your Name

2. Your Home Address

3. What is your relationship to the person upon whose behalf you have completed this Fact Sheet? (*e.g.* parent, guardian, Estate Administrator)

### II       PERSONAL INFORMATION

A. Name:  Marita Renteria

Other names by which you have been known (from prior marriages or otherwise, if any):   In addition to Renteria, I have used the last names Lindbeck, Evans, Linbeck-Melton, and Rich.

B. Sex:  Female

C. Social Security Number: ████████

D. Date and Place of Birth: ████████, in Las Cruces, NM

1

EXHIBIT 2

DocuSign Envelope ID: C090533C9-6D45-4564-897E-D73F580D08F5

E.  For each different city where you have lived for the past forty (40) years, provide the following information:

| City and State<br><br>Include Country, if Outside the United States | Approximate Dates You Lived There<br><br>Month Year to Month Year |
|---|---|
| Las Cruces, NM | Prior to 1988 and since 1992 |
| El Centro, CA | 1988 |
| San Diego, CA | 1989-1992 |

F.  Please complete the chart below detailing your entire employment history.  If there were periods of retirement, unemployment, or student status, include those as well.

| No | Employer | City State | Approximate Dates of Employment | Occupation or Job Title | Duties |
|---|---|---|---|---|---|
| 1 | Defendant Sidco | Las Cruces, NM | 1982 – 1988 | Laborer | Manual labor on family farm |
| 2 | Multiple restaurants | El Centro, CA, San Diego, CA, & Las Cruces, NM | 1988 – 1992; 1997 – 2002 | Restaurant server | Restaurant server |
| 3 | Las Cruces Sun-News | Las Cruces, NM | 1993 | Data entry | Data entry |
| 4 | New Mexico State University & Las Cruces Public Schools | Las Cruces, NM | 2004 - 2007 | Student and substitute teacher | Student and substitute teacher |
| 5 | Las Cruces Public Schools | Las Cruces, NM | 2007 – 2014 | Teacher | Second and third grade teacher |

EXHIBIT 2

DocuSign Envelope ID: C090530C9-6D45-4554-897E-D73F680D08F5

| 6 | Heart for the World Church | Las Cruces, NM | 2014 – 2016 | Assistant to the director of children's ministry | Teach and minister to children |
| 7 | Las Cruces Public Schools | Las Cruces, NM | 2016 – 2019 | Teacher | Teach fourth and fifth grade |
| 8. | Time off to care for mother | Las Cruces, NM | 2019 | | |
| 9. | VIP Kid | Las Cruces, NM | 2020-2021 | Teacher | Teach ESL on-line |

G. Workplace Checklist: Have you ever worked in any of the occupations or workplaces listed below?  If so, please check "yes" and then list the number(s) in the chart in section II(F) above that corresponds to that occupation.

| Industry | Yes | No | No  in Ch  rt in P  rt II F |
|---|---|---|---|
| Car Mechanic | | X | |
| Cleaning/Maid Service | | X | |
| Electrician | | X | |
| Farming/Agricultural | X | | 1 |
| Fuel/Oil Products | | X | |
| Hairdressing | | X | |
| Handled Fission Products | | X | |
| Handled Jet Propellant | | X | |
| Handled Solvents | | X | |
| Horticultural | X | | 1 |
| Hospitals and Clinics | | X | |

EXHIBIT 2

DocuSign Envelope ID: C0905309-6D45-4564-897E-D73F980D09F5

| | | | |
|---|---|---|---|
| Landscaping | X | | 1 |
| Metal Working (including sheet metal) | | X | |
| Painting | | X | |
| Pest Exterminator | | X | |
| Pesticide[1] Use | X | | 1 |
| Petroleum Refinery/Petrochemical | | X | |
| Rubber Factory | | X | |
| Schoolteacher | X | | 4, 5, 7, & 9 |
| Textile | | X | |
| Waste Management | | X | |
| Woodworking | | X | |
| X-radiation or Gamma-radiation (regular exposure) | | X | |

## III    FAMILY INFORMATION

A.  For any grandparent, parent, sibling, or child who has been diagnosed with any type of cancer (including but not limited to non-Hodgkin's lymphoma), plasma cell disease(s), endocrine disease(s), cardiovascular; disease, auto-immune disorder(s), chromosomal abnormalities, chronic immunodeficiency (such as HIV), inflammatory diseases, diabetes, or has died (from any underlying medical condition or cause), please provide the following information:

| Name | Relationship | Approximate Birth Year | History of Medical Conditions in Part III A | Date and Cause of Death if applicable |
|---|---|---|---|---|
| Laurel Lindbeck | Father | 1911 | bladder cancer | 1993 - stroke |

---

[1] As defined in 7 U.S.C. § 136(u)

4

EXHIBIT 2

DocuSign Envelope ID: C09053C9-6D45-4564-897E-D73FB80D09E5

C. Please complete the chart below to detail your exposure to Roundup® and other glyphosate-based products.  Use as many rows as necessary to describe different periods of usage.

| Dates of Use | Product Name | Frequency of Exposure | Use | Type of Use (check all that apply): | Reason or Use | Location of Exposure City and State |
|---|---|---|---|---|---|---|
| Example 1980-1985 | Example Roundup® Grass and Weed Killer | Example once per year | Example I sprayed Roundup® in my yard using a hand sprayer. | Residential: IT&O: Agricultural: X | Example To control weeds on my personal property. | Example Oakland, CA |
| 1976 - 1988 | Roundup | Once per week during the summer. | My father and brother sprayed weeds with Roundup within a few feet of where I was working | Residential: IT&O: Agricultural: X | To control weed on the family farms. | Las Cruces, NM. |

D. Describe any precautions you took while using these products (examples: wearing gloves, a mask, or protective gear).

I was dressed for manual labor but did not take any precautions specifically related to Roundup exposure.

E. For the products identified in the chart above, do you have receipts, proof of purchase, or store of purchase for each product you claim to have used?

---

[2] Residential includes using the product on your lawn, garden, or place of residence.  Industrial, Turf, and Ornamental ("IT&O") includes using the product in areas such as golf courses, nurseries, roadsides, or for turf management or landscaping.  Agricultural includes using the product to assist with farming or harvesting crops.

EXHIBIT 2

DocuSign Envelope ID: C090553C9-6D45-4F54-897E-D73FD80D09F5

D.  If you are claiming loss of income due to injuries allegedly caused by Roundup® products or other glyphosate-based herbicides, complete the tax records release.  In addition, please sign and complete the social security income release for the past 30 years.  (Ex. D)

E.  Release of records received from/sent to the U.S. Department of Agriculture, if applicable. (Ex. E).

## DECLARATION

I declare under penalty of perjury that all of the information provided in this Plaintiff Fact Sheet is true and correct to the best of my knowledge, information, and belief , and that I have supplied all the documents requested in Part IX of this Declaration, to the extent that such documents are in my possession, custody, or control, or in the possession of my lawyers.

_DocuSigned by:_

*Marita Renteria*

—10E5AD29A52B4CF...————————————

Marita Renteria

7/13/2021

————————————————————

Date

13

EXHIBIT 2

# Lt. Col. Lyonel R. Lindbeck



Send Flowers

➤ **Share**

**FUNERAL HOME**

La Paz - Graham's Funeral Home - Las Cruces

555 West Amador

Las Cruces, NM

**L**t. Col. Lyonel R. Lindbeck, age 59, entered eternal rest on Sunday, July 20. He is survived by his wife, Dolores, his mother Marinell Lindbeck, a brother, Lloyd Lindbeck, a sister, Marita Lindbeck-Melton and many others who loved and respected him. Also surviving are sisters Ladeen Ring, Lavonne Taylor, Lynda Davis and Marlene Steinweg. Preceded in death by his father, Laurel Lindbeck, brother Lonnie and brother Lauren.

Funeral arrangements are pending with Getz Funeral Home, but a candlelight memorial will be held on Friday, August 1st at 6:00 p.m. at the Radium Springs Family Worship Center, 12555 Desert Edge Road.

Published by Las Cruces Sun-News on Jul. 30, 2008.

10/12/21, 9:46 AM Lt. Col. Lyonel Lindbeck Obituary (2021) - Las Cruces, NM - Las Cruces Sun News

**To plant trees in memory, please visit the Sympathy Store.**

## MEMORIAL EVENTS

To offer your sympathy during this difficult time, you can now have memorial trees planted in a National Forest in memory of your loved one.

 **Plant Memorial Trees**

Funeral services provided by:

**La Paz - Graham's Funeral Home - Las Cruces**

 **Call**    🌐 **Website**

## MAKE A DONATION



Search for a nonprofit organization

OR

Get Inspired

powered by 💜 **Pledge**

Case MDL No. 2741   Document 2525-4   Filed 11/01/21   Page 275 of 284

10/12/21, 9:46 AM          Case 1:21-cv-00994   Document 1-3   Lt-Col Lyonel Lindbeck Obituary (2008) - Las Cruces, NM - Las Cruces Sun News   Filed 10/13/21   Page 3 of 5

## MEMORIES & CONDOLENCES

| Add a Message |
|:---:|

**From**

Your Name

**Your Message**

Offer sympathy or share a memory...

🖼 **Add a Photo**

[Not sure what to say?](Not sure what to say?)

**7 Entries**

I was so sad to hear of the passing of Ron Lindbeck, too soon to leave this world. Our prayers go out to Ron's family during this difficult time. God bless you.

**Jan Bailey**                                                        August 1, 2008

Uncle Ron was my a good friend. I enjoyed visiting him last september and I am glad I got the chance. He will be missed.

**Ryan Lindbeck**                                                        July 31, 2008

EXHIBIT 3

Col. Lindbeck,

Sir, I would just like to say thank you for your years of dedicated service and sacrifice for our Country when you served in the USAF-especially during the Vietnam War. And to your family and loved ones, I wish to extend my deepest sympathy.

**Mike Casey**
July 30, 2008

My thoughts and prayers are with the family during this difficult time. Ron was an intelligent, kind, gentle soul and will be missed greatly.
Susan (Lindbeck) Hopkins

**Susan Hopkins**
July 30, 2008

I have memories of Ronnie that will last forever. I recall running up and down ditchbanks and playing in the fields in Las Cruces. We will miss him, yet know in our hearts that we will soon be together again where we will be free to gambol about like children again. My love to the family, because you are my family, too.

**Belva Lewis**
July 30, 2008

I went to SVA with Ronnie. He was a good guy.
May God be near in your time of sorrow.

**Marianne Harris Storfjell**
July 30, 2008

My heart goes out to you at this time and in the days ahead.

**lawrence madrid**
July 30, 2008

EXHIBIT 3

Showing 1 - 7 of 7 results

Contact Us

FAQ

Do Not Sell My Personal Information

Privacy Policy

Terms of Use

Legacy®

©2021 Legacy.com All rights reserved.

EXHIBIT 3



Corporations and Business Services
New Mexico Secretary of State

## Search Information

Home

**Entity Details**

Business ID#: **798751**
Status: **Active**
Entity Name: **SIDCO CORPORATION**
Standing: **Good Standing**
DBA Name: **Not Applicable**

**Entity Type and State of Domicile**

Entity Type: **Domestic Profit Corporation**
State of Incorporation: **New Mexico**
Benefit Corporation: **No**
Statute Law Code: **53-11-1 to 53-18-12**

**Formation Dates**

**Reporting Information**

**Period of Existence and Purpose and Character of Affairs**

**Outstanding Items**

**Reports:**

No Pending Reports.

**Registered Agent:**

No Records Found.

**License:**

No Records Found.

**Contact Information**

Mailing Address: **2725 TERRACE ARC, Las Cruces, NM 88011**
Principal Place of Business in New Mexico: **2725 TERRACE ARC, Las Cruces, NM 88011**
Secondary Principal Place of Business in New Mexico:
Principal Office Outside of New Mexico: **Not Applicable**
Registered Office in State of Incorporation:
Principal Place of Business in Domestic State/ Country: **Not Applicable**
Principal Office Location in NM: **Not Applicable**

**Registered Agent Information**

Name: **LLOYD LINDBECK**
Geographical Location Address:
Physical Address: **2725 TERRACE ARC, LAS CRUCES, NM 88011**
Mailing Address: **NONE**
Date of Appointment: **04/24/2012**
Effective Date of Resignation:

**Director Information**

| Title | Name | Address |
|---|---|---|
| Director | LLOYD LINDBECK | 2725 TERRACE ARC, Las Cruces, NM 88011 - 5078 |

**Officer Information**

| Title | Name | Address |
|---|---|---|
| President | LLOYD LINDBECK | 2725 TERRACE ARC, Las Cruces, NM 88011 - 5078 |

**Organizer Information**

**Not Applicable**

**Incorporator Information**

No Records to View.

**Trustee Information**

**Not Applicable**

**Filing History**

**License History**

Back | Entity Name History | Return to Search

EXHIBIT 4





# STATE OF NEW MEXICO

### CERTIFICATE OF INCORPORATION

#### OF

SIDCO Corporation

(79,875)

The State Corporation Commission certifies that duplicate originals of the Articles of Incorporation attached hereto, duly signed pursuant to the provisions of the Business Corporation Act, have been received by it and are found to conform to law.

Accordingly, by virtue of the authority vested in it by law, the State Corporation Commission issues this Certificate of Incorporation, and attaches hereto a duplicate original of Articles of Incorporation.

*In Testimony Whereof, the State Corporation Commission of the State of New Mexico has caused this certificate to be signed by its Chairman and the seal of said Commission to be affixed at the City of Santa Fe on this* 21st *day of* MARCH, 1974

*Attest:*

ALBERT P. BENAVIDES,    Director

JOHN ABRAHAM,    Chairman

EXHIBIT 5

FILED IN OFFICE OF
STATE CORPORATION COMMISSION
OF NEW MEXICO

ARTICLES OF INCORPORATION   MAR 21 1974

1.   The name of the corporation will be SIDCO Corporation.

2.   The period of duration shall be perpetual.

3.   The purposes for which the corporation is organized is
farming; buy, sell and improve real estate; land clearing and
development; operating resort areas; development, selling, buying
and maintenance and repair of farm leveling machinery.

4.   The aggregate number of shares, which are without par
value, is one thousand (1,000).

5.   The corporation will not commence business until con-
sideration of the value of at least one thousand dollars ($1,000)
has been received for the issuance of shares.

6.   The address of the registered agent is SIDCO Corporation,
P. O. Box 72, Radium Springs, New Mexico  88054.

7.   The name of the individual registered agent at the above
address is Mr. Laurel Byron Lindbeck.

8.   There are four members of the initial board of directors.
The names and addresses are as follows:

    a.   Laurel Byron Lindbeck, P. O. Box 72, Radium Springs,
New Mexico  88054.

    b.   Ruth Marinell Lindbeck, P. O. Box 72, Radium Springs,
New Mexico  88054.

    c.   Lyonel Ronald Lindbeck, P. O. Box 72, Radium Springs,
New Mexico  88054.

    d.   Lonnie Byron Lindbeck, P. O. Box 72, Radium Springs,
New Mexico  88054.

9.   The name and address of each incorporator is:   Laurel
Byron Lindbeck, P. O. Box 72, Radium Springs, New Mexico 88054;

FILED

MAR 21 1974

ST. CORP. COMM.
CORP. FR. TAX DEPT.

EXHIBIT 5



1  and Ruth Marinell Lindbeck, P. O. Box 72, Radium Springs, New
2  Mexico  88054.
3      DATED ᵗMarch  1ˢᵗ                        , 1974.
4
5
6                                 _L-B Lindbeck_
                                 Laurel Byron Lindbeck
7
8                                 _Ruth Marinell Lindbeck_
9                                 Ruth Marinell Lindbeck
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28
29
30
31
32                          -2-

EXHIBIT 5

JS 44   (Rev. 04/21)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court.  This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.   *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

MARITA RENTERIA

**(b)** County of Residence of First Listed Plaintiff   Dona Ana
*(EXCEPT IN U.S. PLAINTIFF CASES)*

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*

See attachment

## DEFENDANTS

MONSANTO COMPANY and SIDCO CORPORATION

County of Residence of First Listed Defendant
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF
THE TRACT OF LAND INVOLVED.

Attorneys *(If Known)*

See attachment

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

| | | | |
|---|---|---|---|
| ☐ 1 | U.S. Government Plaintiff | ☐ 3 | Federal Question *(U.S. Government Not a Party)* |
| ☐ 2 | U.S. Government Defendant | ☒ 4 | Diversity *(Indicate Citizenship of Parties in Item III)* |

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)*                                    *and One Box for Defendant)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☒ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY**　**PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane　☒ 365 Personal Injury - | ☐ 690 Other | ☐ 423 Withdrawal | ☐ 376 Qui Tam (31 USC |
| ☐ 130 Miller Act | ☐ 315 Airplane Product　　　Product Liability | | 　28 USC 157 | 　3729(a)) |
| ☐ 140 Negotiable Instrument | 　　Liability　☐ 367 Health Care/ | | **INTELLECTUAL** | ☐ 400 State Reapportionment |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel &　　　Pharmaceutical | | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| 　& Enforcement of Judgment | 　　Slander　　　Personal Injury | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers'　　　Product Liability | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted | 　　Liability　☐ 368 Asbestos Personal | | ☐ 835 Patent - Abbreviated | ☐ 460 Deportation |
| 　Student Loans | ☐ 340 Marine　　　Injury Product | | 　　New Drug Application | ☐ 470 Racketeer Influenced and |
| 　(Excludes Veterans) | ☐ 345 Marine Product　　　Liability | | ☐ 840 Trademark | 　Corrupt Organizations |
| ☐ 153 Recovery of Overpayment | 　　Liability　**PERSONAL PROPERTY** | **LABOR** | ☐ 880 Defend Trade Secrets | ☐ 480 Consumer Credit |
| 　of Veteran's Benefits | ☐ 350 Motor Vehicle　☐ 370 Other Fraud | ☐ 710 Fair Labor Standards | 　Act of 2016 | 　(15 USC 1681 or 1692) |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle　☐ 371 Truth in Lending | 　Act | | ☐ 485 Telephone Consumer |
| ☐ 190 Other Contract | 　　Product Liability　☐ 380 Other Personal | ☐ 720 Labor/Management | **SOCIAL SECURITY** | 　Protection Act |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal　　　Property Damage | 　Relations | ☐ 861 HIA (1395ff) | ☐ 490 Cable/Sat TV |
| ☐ 196 Franchise | 　　Injury　☐ 385 Property Damage | ☐ 740 Railway Labor Act | ☐ 862 Black Lung (923) | ☐ 850 Securities/Commodities/ |
| | ☐ 362 Personal Injury -　　　Product Liability | ☐ 751 Family and Medical | ☐ 863 DIWC/DIWW (405(g)) | 　Exchange |
| | 　　Medical Malpractice | 　Leave Act | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS**　**PRISONER PETITIONS** | ☐ 790 Other Labor Litigation | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights　**Habeas Corpus:** | ☐ 791 Employee Retirement | | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 441 Voting　☐ 463 Alien Detainee | 　Income Security Act | **FEDERAL TAX SUITS** | ☐ 895 Freedom of Information |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment　☐ 510 Motions to Vacate | | ☐ 870 Taxes (U.S. Plaintiff | 　Act |
| ☐ 240 Torts to Land | ☐ 443 Housing/　　　Sentence | | 　or Defendant) | ☐ 896 Arbitration |
| ☐ 245 Tort Product Liability | 　　Accommodations　☐ 530 General | | ☐ 871 IRS—Third Party | ☐ 899 Administrative Procedure |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities -　☐ 535 Death Penalty | **IMMIGRATION** | 　26 USC 7609 | 　Act/Review or Appeal of |
| | 　　Employment　**Other:** | ☐ 462 Naturalization Application | | 　Agency Decision |
| | ☐ 446 Amer. w/Disabilities -　☐ 540 Mandamus & Other | ☐ 465 Other Immigration | | ☐ 950 Constitutionality of |
| | 　　Other　☐ 550 Civil Rights | 　Actions | | 　State Statutes |
| | ☐ 448 Education　☐ 555 Prison Condition | | | |
| | 　☐ 560 Civil Detainee - | | | |
| | 　　　Conditions of | | | |
| | 　　　Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

| | | | | | | |
|---|---|---|---|---|---|---|
| ☐ 1 Original Proceeding | ☒ 2 Removed from State Court | ☐ 3 Remanded from Appellate Court | ☐ 4 Reinstated or Reopened | ☐ 5 Transferred from Another District *(specify)* | ☐ 6 Multidistrict Litigation - Transfer | ☐ 8 Multidistrict Litigation - Direct File |

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
28 U.S.C. §§ 1332, 1441, and 1446
Brief description of cause:
Product liability suit for injuries allegedly caused by Monsanto's Roundup®-branded herbicides, which have glyphosate as their active ingredient

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION
UNDER RULE 23, F.R.Cv.P.

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:　☒ Yes　☐ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*
JUDGE   Kathleen McGarry Ellenwood

DOCKET NUMBER   D-101-CV-2020-00180

DATE
October 13, 2021

SIGNATURE OF ATTORNEY OF RECORD
/s/ Alex C. Walker

**FOR OFFICE USE ONLY**

RECEIPT #　　　AMOUNT　　　APPLYING IFP　　　JUDGE　　　MAG. JUDGE

JS 44 Reverse (Rev. 04/21)

## INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court.  This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.  Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed.  The attorney filing a case should complete the form as follows:

I.(a)   **Plaintiffs-Defendants.**  Enter names (last, first, middle initial) of plaintiff and defendant.  If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

   (b)   **County of Residence.**  For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing.  In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing.  (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

   (c)   **Attorneys.**  Enter the firm name, address, telephone number, and attorney of record.  If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

II.      **Jurisdiction.**  The basis of jurisdiction is set forth under Rule 8(a), F.R.Cv.P., which requires that jurisdictions be shown in pleadings.  Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.
        United States plaintiff.  (1) Jurisdiction based on 28 U.S.C. 1345 and 1348.  Suits by agencies and officers of the United States are included here.
        United States defendant.  (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.
        Federal question.  (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.
        Diversity of citizenship.  (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states.  When Box 4 is checked, the citizenship of the different parties must be checked.  (See Section III below; **NOTE: federal question actions take precedence over diversity cases.**)

III.     **Residence (citizenship) of Principal Parties.**  This section of the JS 44 is to be completed if diversity of citizenship was indicated above.  Mark this section for each principal party.

IV.      **Nature of Suit.**  Place an "X" in the appropriate box.  If there are multiple nature of suit codes associated with the case, pick the nature of suit code that is most applicable.  Click here for: Nature of Suit Code Descriptions.

V.       **Origin.**  Place an "X" in one of the seven boxes.
        Original Proceedings.  (1) Cases which originate in the United States district courts.
        Removed from State Court.  (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441.
        Remanded from Appellate Court.  (3) Check this box for cases remanded to the district court for further action.  Use the date of remand as the filing date.
        Reinstated or Reopened.  (4) Check this box for cases reinstated or reopened in the district court.  Use the reopening date as the filing date.
        Transferred from Another District.  (5) For cases transferred under 28 U.S.C. Section 1404(a).  Do not use this for within district transfers or multidistrict litigation transfers.
        Multidistrict Litigation – Transfer.  (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407.
        Multidistrict Litigation – Direct File.  (8) Check this box when a multidistrict case is filed in the same district as the Master MDL docket.
        **PLEASE NOTE THAT THERE IS NOT AN ORIGIN CODE 7.**  Origin Code 7 was used for historical records and is no longer relevant due to changes in statute.

VI.      **Cause of Action.**  Report the civil statute directly related to the cause of action and give a brief description of the cause.  **Do not cite jurisdictional statutes unless diversity.**  Example: U.S. Civil Statute: 47 USC 553 Brief Description: Unauthorized reception of cable service.

VII.     **Requested in Complaint.**  Class Action.  Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.
        Demand.  In this space enter the actual dollar amount being demanded or indicate other demand, such as a preliminary injunction.
        Jury Demand.  Check the appropriate box to indicate whether or not a jury is being demanded.

VIII.    **Related Cases.**  This section of the JS 44 is used to reference related pending cases, if any.  If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature.**  Date and sign the civil cover sheet.

ATTACHMENT to Civil Cover Sheet

Attorneys for Plaintiff:

Anthony K. Bruster
Christopher Johnson
John C. Hull
BRUSTER PLLC
680 N. Carroll Ave., Suite 110
Southlake, TX 76092
Telephone: (817) 601-9564
akbruster@brusterpllc.com
cjohnson@brusterpllc.com
jhull@brusterpllc.com

Darren P. McDowell
Matthew R. McCarley
Danae N. Benton
FEARS NACHAWATI LAW FIRM
5473 Blair Road
Dallas, TX 75231
Telephone: (214) 890-0711
dmcdowell@fnlawfirm.com
mccarley@fnlawfirm.com
dbenton@fnlawfirm.com

Feliz A. Rael
THE LAW OFFICE OF FELIZ A. RAEL
505 Marquette NM, Ste. 1300
Albuquerque, NM 87102
Telephone: (505) 610-5991
frael@swcp.com

Attorney for Defendant Monsanto Company:

Alex C. Walker
MODRALL, SPERLING, ROEHL, HARRIS
    & SISK, P.A.
P.O. Box 2168
Albuquerque, NM 87103-2168
Telephone: (505) 848-1800
awalker@modrall.com

Attorney for Defendant SIDCO Corporation:

Kenneth L. Beal
KENNETH L. BEAL, P.C.
P.O. Box 725
Las Cruces, NM 88004
Telephone: (575) 526-5511
klbealoffice@gmail.com

1