# EXHIBIT 3

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

| | |
|---|---|
| MARITA RENTERIA, | |
| Plaintiff, | |
| v. | Case No. 2:21-cv-00994 |
| MONSANTO COMPANY and SIDCO CORPORATION, | |
| Defendants. | |

### PLAINTIFF MARITA RENTERIA'S MOTION TO REMAND

Pursuant to 28 U.S.C. 1447, plaintiff Marita Renteria ("Renteria") files this Motion to Remand this case to the First Judicial District Court for the County of Santa Fe, New Mexico.

1. Pursuant to D.N.M.LR-Civ 7.1(a), Counsel for Renteria conferred with counsel for Monsanto who advised that this Motion is opposed.

2. Renteria moves the Court for an order remanding this case to the First Judicial District Court for the County of Santa Fe, New Mexico.

3. This Motion is supported by the Declaration of Anthony Bruster attached hereto as Exhibit A together with the following numbered Exhibits attached to the Declaration. Reference to the "MDL" in the Description column are to *In re Roundup Prods. Liab. Litig.*, No. MDL No. 2741 (N.D. Cal.). References to the "State Court Action" are to *Renteria v. Monsanto Co., et al.*; Case No D-101-CV-2020-00180 in the First Judicial District, Santa Fe County, New Mexico.

| Exhibit: | Date: | Description: |
|---|---|---|
| 1 | 10/04/2016 | Transfer Order (MDL ECF 1) |
| 2 | 06/07/2018 | "Bayer closes Monsanto acquisition" |
| 3 | 07/10/2018 | Pretrial Order No. 45: Summary Judgment and *Daubert* Motions (MDL ECF 1596) |
| 4 | 01/17/2020 | Original Complaint filed in State Court Action. |
| 5 | 05/05/2020 | Stipulation of Dismissal Without Prejudice of All Claims Against Defendant AGCO Corporation filed in State Court Action |
| 6 | 06/24/2020 | "Bayer announces agreements to resolve major legacy Monsanto litigation" |
| 7 | 08/13/2020 | Request for Hearing for Rule 1-016 Scheduling Conference filed in State Court Action |
| 8 | 08/13/2020 | Notice of Hearing filed in State Court Action |
| 9 | 09/04/2020 | Joint Motion to Vacate Scheduling Conference filed in State Court Action |
| 10 | 09/04/2020 | Order Granting Joint Motion to Vacate Scheduling Conference filed in State Court Action |
| 11 | 06/22/2021 | Pretrial Order No. 236: Granting in Part and Denying in Part Motion to Establish Holdback Percentage (MDL ECF 13192) |
| 12 | 09/13/2021 | Plaintiff's First Amended Complaint filed in State Court Action |
| 13 | 10/13/2021 | Docket Sheet from State Court Action (from Notice of Removal) |
| 14 | 10/15/2021 | Excerpts from the Judicial Council of California Civil Case Coordination Proceedings (JCCP) Log (printed on 10/15/2020) |

4.  The grounds for the relief requested are:

    a.  The Notice of Removal is untimely under 28 U.S.C. 28 U.S.C. § 1446(b)(1).

b. The Notice of Removal is untimely under 28 U.S.C. 28 U.S.C. § 1446(c)(1) and the bad faith exception does not apply.

c. The Court lacks subject matter jurisdiction over this case. Sidco Corporation, one of the defendants, was not fraudulently joined and is a citizen of the state of New Mexico. Thus, the case lacks "complete diversity" and there is no diversity jurisdiction under 28 U.S.C. § 1332. "On its face, § 1441(b) requires a district court to determine whether it has 'original jurisdiction' over the case at bar. Thus, an inquiry into the propriety of removal under § 1441(b) necessarily incorporates an inquiry into subject matter jurisdiction." *Dalrymple v. Grand River Dam Auth.*, 145 F.3d 1180, 1185 (10th Cir. 1998). "In other words, removal requires complete diversity between plaintiff and the defendants." *Nat'l Inspection & Repairs, Inc. v. George S. May Int'l Co.*, 202 F. Supp. 2d 1238, 1241 (D. Kan. 2002).

5. Additionally, pursuant to 28 U.S.C. § 1447(c), Marita Renteria requests an award of attorney fees incurred as a result of the removal.

6. The Brief in Support of Plaintiff Marita Renteria's Motion to Remand is being filed and served contemporaneously with this Motion.

Wherefore, Marita Renteria prays for an order remanding this case to state court, for an award of attorney fees incurred as a result of the removal, and for all other just relief.

Dated: October 22, 2021                    Respectfully submitted,

                                           **By:** */s/ Feliz Angelica Rael*
                                              **Feliz Angelica Rael**
                                              New Mexico Bar No. 14698

                                           **Attorney at Law**
                                           1201 Lomas Blvd. NM, Ste. C
                                           Albuquerque, NM 87102
                                           frael@swcp.com
                                           Tel: 505-610-5991
                                           Fax: 505-302-2074

                                           Anthony K. Bruster
                                           New Mexico Bar No. 20283
                                           akbruster@brusterpllc.com

                                           **BRUSTER, PLLC**
                                           680 N. Carroll Ave., Suite 110
                                           Southlake, Texas 76092
                                           Telephone:  (817) 601-9564
                                           Facsimile:   (817) 796-2929
                                           Email: akbruster@brusterpllc.com

                                           Darren P. McDowell
                                           Texas Bar No. 24025520
                                           Email:  dmcdowell@fnlawfirm.com

                                           **FEARS | NACHAWATI, PLLC**
                                           5473 Blair Road
                                           Dallas, TX 75231
                                           Tel. (214) 890-0711
                                           Fax (214) 890-0712

                                           *Attorneys for Plaintiff*


WE HEREBY CERTIFY that on October 22,
2021, we filed the foregoing electronically
through the CM/ECF system and served the
following counsel via electronic mail:
     Alex C. Walker
     MODRALL, SPERLING, ROEHL,
     HARRIS & SISK, P.A.
     awalker@modrall.com

# EXHIBIT

# A

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**

MARITA RENTERIA,

        Plaintiff,

v.

        Case No. 2:21-cv-00994

MONSANTO COMPANY and SIDCO
CORPORATION,

        Defendants.

**DECLARATION OF ANTHON         BRUSTER**

I, Anthony K. Bruster, declare:

        I am one of the attorneys for Plaintiff Marita Renteria in the referenced case.

1. I understand that this Declaration is being submitted in connection with and in support of Plaintiff Marita Renteria's Motion to Remand which is being filed in the referenced case.

2. As used herein, the "MDL" refers to *In re Roundup Prods. Liab. Litig.*, No. MDL No. 2741 (N.D. Cal.), and the "State Court Action" refers to *Renteria v. Monsanto Co., et al.*; Case No D-101-CV-2020-00180 in the First Judicial District, Santa Fe County, New Mexico.

3. In the course of representing Marita Renteria in this case, along with representing other clients bringing similar claims against Monsanto, I have monitored and familiarized myself with many of the procedural details of the trials and appeals of *ohnson v. Monsanto* (Case No. CGC-16-550128 in the Superior Court, San Francisco County, California), *ardeman v. Monsanto* (Case No. 3:16-cv-00525 (N.D.Cal.)), and *Pilliod v. Monsanto* (Case No. RG17862702 in the Superior Court of Alameda County, California). In *ohnson*: opening statements for the trial began on July 9, 2018, verdict

for plaintiff was returned on August 10, 2018, and judgment was entered on August 23, 2018. In *ardeman*: opening statements for the trial began on February 25, 2019, verdict for plaintiffs on Phase 1 of the bifurcated trial was returned on March 19, 2019, verdict for plaintiffs on Phase 2 of the bifurcated trial was returned on March 27, 2019, and the trial court entered judgment on May 3, 2019, which was amended on July 17, 2019. *In Pilliod*: opening statements for the trial began on March 28, 2019, verdict for plaintiffs was returned on May 13, 2019, and the trial court entered judgment on May 20, 2019.

4. Following *Pilliod*, no Roundup cases were tried until September of 2021, when trial of *Clar  v. Monsanto Co.* (Case No. 20STCV46616 in the Superior Court of Los Angeles County, California) began.  The *Clar* trial was bifurcated, with Phase 1 calling on the jury to decide whether the plaintiff's exposure to Roundup was a substantial factor in causing his cancer.  On or about October 5, 2021, the jury returned a verdict for Monsanto on Phase 1.

5. Attached to this Declaration are true and correct copies of the following Exhibits:

| Exhibit: | Date: | Description: |
|---|---|---|
| 1 | 10/04/2016 | Transfer Order (MDL ECF 1) |
| 2 | 06/07/2018 | "Bayer closes Monsanto acquisition" |
| 3 | 07/10/2018 | Pretrial Order No. 45: Summary Judgment and *Daubert* Motions (MDL ECF 1596) |
| 4 | 01/17/2020 | Original Complaint filed in State Court Action. |
| 5 | 05/05/2020 | Stipulation of Dismissal Without Prejudice of All Claims Against Defendant AGCO Corporation filed in State Court Action |

| 6 | 06/24/2020 | "Bayer announces agreements to resolve major legacy Monsanto litigation" |
| 7 | 08/13/2020 | Request for Hearing for Rule 1-016 Scheduling Conference filed in State Court Action |
| 8 | 08/13/2020 | Notice of Hearing filed in State Court Action |
| 9 | 09/04/2020 | Joint Motion to Vacate Scheduling Conference filed in State Court Action |
| 10 | 09/04/2020 | Order Granting Joint Motion to Vacate Scheduling Conference filed in State Court Action |
| 11 | 06/22/2021 | Pretrial Order No. 236: Granting in Part and Denying in Part Motion to Establish Holdback Percentage (MDL ECF 13192) |
| 12 | 09/13/2021 | Plaintiff's First Amended Complaint filed in State Court Action |
| 13 | 10/13/2021 | Docket Sheet from State Court Action (from Notice of Removal) |
| 14 | 10/15/2021 | Excerpts from the Judicial Council of California Civil Case Coordination Proceedings (JCCP) Log (printed on 10/15/2020) |

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on October 22, 2021.

_/s/ Anthony   .   ruster_
Anthony K. Bruster

3

# EXHIBIT
# 1

# UNITED STATES JUDICIAL PANEL
### on
# MULTIDISTRICT LITIGATION

**IN RE: ROUNDUP PRODUCTS
LIABILITY LITIGATION**                                   MDL No. 2741

## TRANSFER ORDER

**Before the Panel:** Plaintiffs in the *Giglio* and *Hardeman* actions listed on Schedule A move under 28 U.S.C. § 1407 to centralize pretrial proceedings in this litigation in the Southern District of Illinois. This litigation consists of twenty-one actions pending in fourteen districts, as listed on Schedule A. The actions allege that Roundup, a widely used glyphosate-based herbicide manufactured by Monsanto Company, can cause non-Hodgkin's lymphoma and that Monsanto failed to warn consumers and regulators about the alleged risks of Roundup. Since the filing of the motion, the parties have notified the Panel of another sixteen related actions pending in twelve districts.[1]

All responding plaintiffs support centralization, but suggest different transferee districts. Plaintiffs in three actions and a potential tag-along action support centralization in the Southern District of Illinois. Plaintiffs in another three actions propose centralization in the Central District of California. Plaintiffs in one action suggest centralization in the Southern District of Illinois, the Central District of California, or the Eastern District of California. Plaintiffs in five actions suggest instead centralization in the District of Hawaii. Plaintiff in one action does not oppose the Southern District of Illinois, but suggests that the Eastern District of Louisiana is a more appropriate transferee district. Finally, plaintiff in one potential tag-along action suggests centralization in the Northern District of Illinois. Various plaintiffs alternatively support the Central District of California, the District of Hawaii, or the Southern District of Illinois.

Defendant Monsanto Company opposes centralization. Should the Panel centralize this litigation over Monsanto's objections, it alternatively proposes centralization in the Northern District of California, the Southern District of California, or the Southern District of Florida. Monsanto's primary arguments against centralization are that: (1) individualized facts concerning each plaintiff's case, such as the nature of plaintiff's exposure, the formulation of Roundup to which plaintiff was exposed, and the specific type of non-Hodgkins' lymphoma plaintiff developed, will predominate over common factual issues; and (2) informal coordination and cooperation among the involved parties and courts are preferable to centralization. We are not persuaded by either argument.

There undoubtedly are some individualized factual issues presented by these actions, but they do not negate the efficiencies to be gained by centralization. Regardless of the particular formulation

---

[1] These and any other related actions are potential tag-along actions. *See* Panel Rules 1.1(h), 7.1, and 7.2.

-2-

of Roundup at issue (all of which employ glyphosate as the active ingredient), or the nature of plaintiff's exposure to glyphosate, all the actions entail an overarching query—whether glyphosate causes non-Hodgkin's lymphoma in persons exposed to it while using Roundup. Monsanto itself implicitly acknowledges the predominance of this common question as it has moved in a number of the underlying actions to bifurcate discovery to address general causation issues before plaintiff-specific ones. In any event, almost all personal injury litigation involves plaintiff-specific questions of causation and damages. Those differences are not an impediment to centralization when common questions of fact are multiple and complex, as they are here. *See In re Xarelto (Rivaroxaban) Prods. Liab. Litig.*, 65 F. Supp. 3d 1402, 1404 (J.P.M.L. 2014). When discovery and other pretrial proceedings related to the common issues have been completed, the transferee judge may suggest Section 1407 remand of the actions to their transferor courts for more individual discovery and trial, if necessary. *See In re Darvocet, Darvon & Propoxyphene Prods. Liab. Litig.*, 780 F. Supp. 2d 1379, 1381 (J.P.M.L. 2011).

Turning to Monsanto's second argument, we conclude that informal coordination among the involved courts and counsel is not practicable in this instance. Including the potential tag-along actions, there are now thirty-seven actions pending in twenty-one districts. More than ten different law firms represent plaintiffs in these actions, which are spread across the country. Even if no additional actions are filed, the present number of cases, districts, and involved counsel, as well as the complexity of the issues presented, warrants centralization.

On the basis of the papers filed and hearing session held, we find that these actions involve common questions of fact, and that centralization in the Northern District of California will serve the convenience of the parties and witnesses and promote the just and efficient conduct of this litigation. These actions share common factual questions arising out of allegations that Monsanto's Roundup herbicide, particularly its active ingredient, glyphosate, causes non-Hodgkin's lymphoma. Plaintiffs each allege that they or their decedents developed non-Hodgkin's lymphoma after using Roundup over the course of several or more years. Plaintiffs also allege that the use of glyphosate in conjunction with other ingredients, in particular the surfactant polyethoxylated tallow amine (POEA), renders Roundup even more toxic than glyphosate on its own. Issues concerning general causation, the background science, and regulatory history will be common to all actions. Centralization will eliminate duplicative discovery; prevent inconsistent pretrial rulings (including with respect to discovery, privilege, and *Daubert* motion practice); and conserve the resources of the parties, their counsel, and the judiciary.

We select the Northern District of California as the appropriate transferee district for this litigation. Two of the earliest-filed and most procedurally advanced actions are pending in this district. The Northern District of California is both convenient and easily accessible for all parties, and we are convinced that the district has the necessary judicial resources and expertise to efficiently manage this litigation. Furthermore, centralization in this district allows us to assign this litigation to the Honorable Vince Chhabria, a skilled jurist who has not yet had the opportunity to preside over an MDL.

-3-

IT IS THEREFORE ORDERED that the actions listed on Schedule A and pending outside the Northern District of California are transferred to the Northern District of California and, with the consent of that court, assigned to the Honorable Vince Chhabria for coordinated or consolidated pretrial proceedings.

PANEL ON MULTIDISTRICT LITIGATION

_____
                    Sarah S. Vance
                         Chair

Marjorie O. Rendell          Charles R. Breyer
Lewis A. Kaplan              Ellen Segal Huvelle
R. David Proctor             Catherine D. Perry

IN RE: ROUNDUP PRODUCTS
LIABILITY LITIGATION                                            MDL No. 2741

## SCHEDULE A

Central District of California

MCCALL v. MONSANTO COMPANY, C.A. No. 2:16-01609
HERNANDEZ, ET AL. v. MONSANTO COMPANY, C.A. No. 2:16-01988
JOHANSING v. MONSANTO COMPANY, C.A. No. 2:16-05035
SANDERS, ET AL. v. MONSANTO COMPANY, C.A. No. 5:16-00726

Eastern District of California

MENDOZA v. MONSANTO COMPANY, C.A. No. 1:16-00406

Northern District of California

HARDEMAN v. MONSANTO COMPANY, ET AL., C.A. No. 3:16-00525
STEVICK, ET AL. v. MONSANTO COMPANY, C.A. No. 3:16-02341

Southern District of California

GIGLIO v. MONSANTO COMPANY, ET AL., C.A. No. 3:15-02279

Southern District of Florida

RUIZ, ET AL. v. MONSANTO COMPANY, C.A. No. 9:16-80539

District of Hawaii

SHEPPARD, ET AL. v. MONSANTO COMPANY, C.A. No. 1:16-00043
JOHNSON v. MONSANTO COMPANY, C.A. No. 1:16-00075

Northern District of Illinois

GIBBS v. MONSANTO COMPANY, C.A. No. 1:16-07588

Southern District of Illinois

BRIDGEMAN v. MONSANTO COMPANY, C.A. No. 3:16-00812
HARRIS v. MONSANTO COMPANY, ET AL., C.A. No. 3:16-00823
PATTERSON v. MONSANTO COMPANY, C.A. No. 3:16-00825

-A2-

Western District of Kentucky

MEANS v. MONSANTO COMPANY, C.A. No. 5:16-00112

Eastern District of Louisiana

WORK v. RAGAN AND MASSEY, INC., ET AL., C.A. No. 2:16-07491

District of Massachusetts

SCHEFFER v. MONSANTO COMPANY, C.A. No. 1:16-11489

Northern District of Mississippi

COUEY v. MONSANTO COMPANY, C.A. No. 4:16-00149

District of Nebraska

DOMINA, ET AL. v. MONSANTO COMPANY, C.A. No. 4:16-03074

Western District of Wisconsin

PORATH v. MONSANTO COMPANY, C.A. No. 3:16-00518

# EXHIBIT 2



# News Release

Bayer AG
Communications and
Public Affairs
51368 Leverkusen
Germany
Tel. +49 214 30-1
www.news.bayer.com

## Bayer closes Monsanto acquisition

**Leverkusen, June 7, 2018** – Bayer successfully completed the acquisition of Monsanto on Thursday. Shares in the U.S. company will no longer be traded on the New York Stock Exchange, with Bayer now the sole owner of Monsanto Company. Monsanto shareholders are being paid 128 U.S. dollars per share. J.P. Morgan assisted Bayer with processing the purchase price payment for the largest acquisition in the company's history. According to the conditional approval from the United States Department of Justice, the integration of Monsanto into Bayer can take place as soon as the divestments to BASF have been completed. This integration process is expected to commence in approximately two months.

"Today is a great day: for our customers – farmers around the world whom we will be able to help secure and improve their harvests even better; for our shareholders, because this transaction has the potential to create significant value; and for consumers and broader society, because we will be even better placed to help the world's farmers grow more healthy and affordable food in a sustainable manner. As a leading innovation engine in agriculture, we offer employees around the world attractive jobs and development opportunities," said Werner Baumann, Chairman of the Bayer Board of Management. "Our sustainability targets are as important to us as our financial targets. We aim to live up to the heightened responsibility that a leadership position in agriculture entails and to deepen our dialogue with society."

"Today's closing represents an important milestone toward the vision of creating a leading agricultural company, supporting growers in their efforts to be more productive and sustainable for the benefit of our planet and consumers," said Hugh Grant, outgoing Chairman and CEO of Monsanto. "I am proud of the path we have paved as Monsanto and look forward to the combined company helping move modern agriculture forward."

Liam Condon, member of the Bayer Board of Management, will lead the combined Crop Science Division when the integration commences. Until that time, Monsanto will operate independently from Bayer.

Contacts:

*Bayer:*

**Christian Hartel, phone +49 214 3047686**

Email: christian.hartel@bayer.com

**Tino Andresen, phone +49 214 3066048**

Email: tino.andresen@bayer.com

*Monsanto:*

**Sara Miller, phone +1 314-694-5824**

Email: sara.e.miller@monsanto.com

**Christi Dixon, phone +1 314-694-1092**

Email: christi.m.dixon@monsanto.com

Find more information at www.bayer.com.

tia                (2018-0183E)

**Cautionary Statements Regarding Forward-Looking Information**

Certain statements contained in this communication may constitute "forward-looking statements". Actual results could differ materially from those projected or forecast in the forward-looking statements. The factors that could cause actual results to differ materially include the following: the risk that the parties may be unable to achieve expected synergies and operating efficiencies in the merger within the expected time-frames (or at all) and to successfully integrate Monsanto Company's ("Monsanto") operations into those of Bayer Aktiengesellschaft ("Bayer"); such integration may be more difficult time-consuming or costly than expected; revenues following the transaction may be lower than expected; operating costs, customer loss and business disruption (including difficulties in maintaining relationships with employees, customers, clients or suppliers) may be greater or more significant than expected following the transaction; the retention of certain key employees at Monsanto; the parties' ability to meet expectations regarding the accounting and tax treatments of the merger; the impact of refinancing of the loans taken out for the transaction; the impact of indebtedness incurred by Bayer in connection with the transaction and the potential impact on the rating of indebtedness of Bayer; the effects of the business combination of Bayer and Monsanto, including the combined company's future financial condition, operating results, strategy and plans; other factors detailed in Monsanto's Annual Report on Form 10-K filed with the U.S. Securities and Exchange Commission (the "SEC") for the fiscal year ended August 31, 2017 and Monsanto's other filings with the SEC, which are available at http://www.sec.gov and on Monsanto's website at www.monsanto.com; and other factors discussed in Bayer's public reports which are available on the Bayer website at www.bayer.com. Bayer assumes no obligation to update the information in this communication, except as otherwise required by law. Readers are cautioned not to place undue reliance on these forward-looking statements that speak only as of the date hereof.

# EXHIBIT
# 3

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: ROUNDUP PRODUCTS LIABILITY LITIGATION | MDL No. 2741 |
| | Case No. 16-md-02741-VC |
| | **PRETRIAL ORDER NO. 45: SUMMARY JUDGMENT AND *DAUBERT* MOTIONS** |
| This document relates to: ALL ACTIONS | Re: Dkt. Nos. 545, 647 |

The question at this early phase in the proceedings – the "general causation" phase – is whether a reasonable jury could conclude that glyphosate, a commonly used herbicide, can cause Non-Hodgkin's Lymphoma ("NHL") at exposure levels people realistically may have experienced. If the answer is yes, the case moves to the next phase, which addresses whether each particular plaintiff's NHL was caused by glyphosate. If the answer is no, none of the plaintiffs' cases may proceed. And the answer must be no unless the plaintiffs can present at least one reliable expert opinion in support of their position.

There are two significant problems with the plaintiffs' presentation, which combine to make this a very close question. First, the plaintiffs (along with some of their experts) rely heavily on the decision by the International Agency for Research on Cancer ("IARC") to classify glyphosate as "probably carcinogenic to humans." This classification is not as helpful to the plaintiffs as it might initially seem. To render a verdict for a plaintiff in a civil trial, a jury must

conclude, applying the "preponderance of the evidence" standard, that the plaintiff's NHL was more likely than not caused by exposure to glyphosate. And at this general causation phase, the question is whether a reasonable jury could conclude by a preponderance of the evidence that glyphosate can cause NHL at exposure levels people realistically could have experienced. The IARC inquiry is different in kind – it is a public health assessment, not a civil trial. Public health assessments generally involve two steps: (1) an effort to identify *hazards*; and (2) an evaluation of the *risk* that the hazard poses at particular exposure levels. The first step essentially asks whether a substance is cause for concern, while the second step asks how concerned we should be. As IARC takes pains to point out, its decision that a substance is "probably carcinogenic to humans" is a hazard assessment – merely the first step in determining whether the substance currently presents a meaningful risk to human health. IARC leaves the second step – risk assessment – to other public health entities. Moreover, even with its hazard assessment, IARC makes clear that although it uses the word "probably," it does not intend for that word to have any quantitative significance. Therefore, the public health inquiry does not map nicely onto the inquiry required by civil litigation. And the hazard assessment IARC undertakes is too limited and too abstract to fully serve the plaintiffs' purposes here. A substance could be cause for concern, such that it can and should trigger preventive public health measures and further study, even when it is not so clearly dangerous as to allow a verdict in favor of a plaintiff.

The second problem with the plaintiffs' presentation is that the evidence of a causal link between glyphosate exposure and NHL in the human population seems rather weak. Some epidemiological studies suggest that glyphosate exposure is slightly or moderately associated with increased odds of developing NHL. Other studies, including the largest and most recent, suggest there is no link at all. All the studies leave certain questions unanswered, and every study has its flaws. The evidence, viewed in its totality, seems too equivocal to support any firm conclusion that glyphosate causes NHL. This calls into question the credibility of some of the plaintiffs' experts, who have confidently identified a causal link.

However, the question at this phase is not whether the plaintiffs' experts are right. The

question is whether they have offered opinions that would be admissible at a jury trial.  And the case law – particularly Ninth Circuit case law – emphasizes that a trial judge should not exclude an expert opinion merely because he thinks it's shaky, or because he thinks the jury will have cause to question the expert's credibility.  So long as an opinion is premised on reliable scientific principles, it should not be excluded by the trial judge; instead the weaknesses in an unpersuasive expert opinion can be exposed at trial, through cross-examination or testimony by opposing experts.

The three expert opinions most helpful to the plaintiffs at this phase in the proceedings were offered by Dr. Christopher Portier, Dr. Beate Ritz, and Dr. Dennis Weisenburger.  A jury may well reject these opinions at trial, finding the opinions too results-driven or concluding that the evidence behind those opinions is too weak.  But applying the standard set forth in the case law for admission of expert testimony, the Court cannot go so far as to say these experts have served up the kind of junk science that requires exclusion from trial.  And the testimony of these three experts is directly on topic, because they (in contrast to some other experts) went beyond the inquiry conducted by IARC, offering independent and relatively comprehensive opinions that the epidemiological and other evidence demonstrates glyphosate causes NHL in some people who are exposed to it.  Accordingly, their opinions are admissible, which means the plaintiffs have presented enough evidence to defeat Monsanto's summary judgment motion.  These proceedings thus move on to the next phase, which will involve an attempt by individual plaintiffs to present enough evidence to warrant a jury trial on whether glyphosate caused the NHL they developed.  Given how close the question is at the general causation phase, the plaintiffs appear to face a daunting challenge at the next phase.  But it is a challenge they are entitled to undertake.

This ruling is organized as follows: Section I provides background information relevant to these lawsuits.  Section II describes the legal standard that applies to the admissibility of expert testimony, and explains why the IARC classification is insufficient to get the plaintiffs over the general causation hurdle.  Section III provides an overview of the important

epidemiological studies, highlighting the strengths and weaknesses of those studies and explaining why Monsanto's criticisms of the studies more helpful to the plaintiffs are not fatal to the plaintiffs' case. Section IV introduces the evidence addressing the carcinogenic effects of glyphosate on rodents. Section V briefly discusses evidence on the effects of glyphosate at the cellular level. Section VI examines each of the plaintiffs' experts' opinions, and analyzes whether those opinions synthesize all this evidence reliably enough to be admissible at trial. Finally, Section VII addresses the plaintiffs' motion to exclude some of Monsanto's experts.

## I.     BACKGROUND

Glyphosate is the active ingredient in Roundup, an herbicide manufactured by Monsanto. Roundup became commercially available in 1974, and glyphosate-based herbicides are now widely used across the United States and much of the world, on large-scale farms and in backyards. The U.S. Environmental Protection Agency does not currently consider glyphosate likely to cause cancer.[1]

In 2015, IARC, which is the specialized cancer agency of the World Health Organization, convened a "working group" to assess whether several pesticides, including glyphosate, can cause cancer. Since 1971, IARC has regularly convened working groups to evaluate whether chemicals or other environmental factors are capable of causing cancer in humans. These working groups compile "Monographs" that examine the available scientific evidence and then come to conclusions about the carcinogenic potential of these different agents. The working group examining glyphosate concluded that the pesticide is "probably carcinogenic to humans," a designation whose meaning will be discussed later in this ruling.[2]

IARC's designation addressed cancer in general, but the working group's report paid

---

[1] *See* U.S. Environmental Protection Agency Office of Pesticide Programs, *Revised Glyphosate Issue Paper: Evaluation of Carcinogenic Potential* 12-13, 143-44 (Dec. 12, 2017) [Daubert Ex. 873].
[2] IARC, *Some Organophosphate Insecticides and Herbicides: Volume 112*, at 398 (2015) [Daubert Ex. 1030] ("Monograph").

particular attention to human studies concerning a particular cancer, NHL, in reaching its conclusion.  NHL is a cancer that affects lymphocytes, a type of white blood cell that is part of the immune system.  Farmers have long had an elevated risk of NHL, even before glyphosate went on the market.[3]

After IARC classified glyphosate as a probable carcinogen, a wave of lawsuits followed. These lawsuits, which now number in the hundreds, were dispersed among state and federal courts across the country, but the claims against Monsanto raised similar issues.  In particular, a central question in all these cases is whether Monsanto's glyphosate-based herbicides can cause NHL.

The Judicial Panel on Multidistrict Litigation, a panel of judges empowered to coordinate proceedings in federal cases where doing so "will be for the convenience of parties and witnesses and will promote the just and efficient conduct" of the cases, determined that coordination in these cases was warranted.  28 U.S.C. § 1407(a).  The Panel therefore created this Multidistrict Litigation to centralize management of all the federal cases, and assigned to this Court all pretrial proceedings in the Multidistrict Litigation.  As is common in such proceedings, the Court appointed a group of plaintiffs' counsel to serve as leaders and to represent all the plaintiffs' interests.  Dkt. No. 62.  Many additional cases have since been transferred to this district as part of the Multidistrict Litigation, and more than 400 cases are now pending.

The Court decided to bifurcate the pretrial proceedings.  Dkt. No. 25.  The motions at issue here arise during the first phase, which addresses "general causation."  As noted, the question at the general causation phase is whether glyphosate is capable of causing NHL at exposure levels humans might have experienced.  The second phase will involve, among other things, the issue of "specific causation."  The specific causation inquiry focuses on whether individual plaintiffs' exposure to glyphosate-based herbicides caused the NHL they developed.

---

[3] *See* Kenneth P. Cantor et al., *Pesticides and Other Agricultural Risk Factors for Non-Hodgkin's Lymphoma Among Men in Iowa and Minnesota*, 52 Cancer Research 2447, 2448 (1992).

## II.    THE *DAUBERT* STANDARD AND THE GENERAL CAUSATION INQUIRY

To carry their burden during this phase of the litigation, the plaintiffs must put forward admissible evidence supporting their claim that glyphosate is capable of causing NHL at exposure levels humans might have experienced.  If the plaintiffs cannot provide admissible evidence supporting this proposition – and enough admissible evidence to allow a reasonable jury to find in favor of the plaintiffs on this question – Monsanto is entitled to summary judgment in all the cases.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986).

The evidence at issue here is expert witness testimony.  The plaintiffs have retained six experts they contend will provide opinions that satisfy the plaintiffs' burden at the general causation phase.  These experts are: Dr. Beate Ritz, Dr. Christopher Portier, Dr. Alfred Neugut, Dr. Charles Jameson, Dr. Dennis Weisenburger, and Dr. Chadhi Nabhan.  Broadly speaking, each of these experts reviewed the available scientific evidence and concluded that glyphosate is capable of causing NHL in humans.  Monsanto has moved to exclude the plaintiffs' experts and has put forward seven retained experts of its own, each of whom provides a contrary view of the science.  Before ruling on these motions, the Court held seven days of hearings to assess the testimony of many of these experts.  Pursuant to the Cameras in the Courtroom pilot project, these hearings were video recorded.  The recordings are publicly available on the U.S. Courts website.[4]

### A.  Legal Standard

Experts may not automatically testify before a jury.  First, the district court must act as a "gatekeeper" and screen the experts' testimony under the standards set by the Federal Rules of Evidence and the Supreme Court's decision in *Daubert v. Merrell Dow Pharmaceuticals, Inc.* (*Daubert I*), 509 U.S. 579 (1993).  Federal Rule of Evidence 702, which governs this inquiry, provides that expert opinion testimony is admissible if: (1) the witness is qualified to testify about the topics she intends to address; (2) the expert's specialized knowledge will help the jury

---

[4] *In re Roundup Products Liability Litigation*, U.S. Courts, http://www.uscourts.gov/cameras-courts/re-roundup-products-liability-litigation [https://perma.cc/YHJ8-Y7YP].

"to understand the evidence or to determine a fact in issue"; (3) "the testimony is based on sufficient facts or data"; (4) "the testimony is the product of reliable principles and methods"; and (5) "the expert has reliably applied the principles and methods to the facts of the case."  The burden is on the plaintiffs to establish the admissibility of their experts' testimony.  *See Building Industry Association of Washington v. Washington State Building Code Council*, 683 F.3d 1144, 1154 (9th Cir. 2012).

To be qualified, the expert must have sufficient "knowledge, skill, experience, training, or education" to offer the opinion.  Fed. R. Evid. 702.  So long as the expert's testimony is "within the reasonable confines of his subject area," a lack of particularized expertise generally goes to the weight of the testimony, not its admissibility.  *D.F. ex rel. Amador v. Sikorsky Aircraft Corp.*, No. cv-00331-GPC-KSC, 2017 WL 4922814, at *14 (S.D. Cal. Oct. 30, 2017) (quoting *Avila v. Willits Environmental Remediation Trust*, 633 F.3d 828, 839 (9th Cir. 2011) and citing *United States v. Garcia*, 7 F.3d 885, 889-90 (9th Cir. 1993)); *see also Hopkins v. Dow Corning Corp.*, 33 F.3d 1116, 1124 (9th Cir. 1994).

Aside from the qualification requirement, there are two questions at the heart of the admissibility determination: whether the testimony is relevant and whether it is reliable.  *See City of Pomona v. SQM North America Corp.*, 750 F.3d 1036, 1043 (9th Cir. 2014).  "Expert opinion testimony is relevant if the knowledge underlying it has a valid connection to the pertinent inquiry."  *Id.* at 1044 (citation omitted).  In other words, the expert testimony must "fit" the question the jury must answer.  *Daubert v. Merrell Dow Pharmaceuticals, Inc.* (*Daubert II*), 43 F.3d 1311, 1321 n.17 (9th Cir. 1995).  This bar is cleared where the evidence "logically advances a material aspect of the proposing party's case."  *Messick v. Novartis Pharmaceuticals Corp.*, 747 F.3d 1193, 1196 (9th Cir. 2014) (citation omitted).

Expert evidence "is reliable if the knowledge underlying it has a reliable basis in the knowledge and experience of the relevant discipline."  *City of Pomona*, 750 F.3d at 1044 (citation omitted).  In deciding whether to permit an expert to testify, courts face the difficult task of "determin[ing] whether the analysis undergirding the experts' testimony falls within the range of accepted standards governing how scientists conduct their research and reach their

conclusions." *Daubert II*, 43 F.3d at 1317.  Among the factors courts consider in making this

determination are (1) whether the expert's theory or method is generally accepted in the scientific

community; (2) whether the expert's methodology can be or has been tested; (3) the known or

potential error rate of the technique; and (4) whether the method has been subjected to peer

review and publication.  *Id.* at 1316 (citing *Daubert I*, 509 U.S. at 593-94).  Courts should also

consider whether the expert's testimony springs from research independent of the litigation.  *Id.*

at 1317.  If not, the expert should point to other evidence that the testimony has a reliable basis,

like peer-reviewed studies or a reputable source showing that the expert "followed the scientific

method, as it is practiced by (at least) a recognized minority of scientists in their field." *Id.* at

1317-19.  These factors are not a mandatory or inflexible checklist, and the Court has broad

discretion to determine which factors are most informative in assessing reliability in the context

of a given case.  *See Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141-42 (1999); *United

States v. Alatorre*, 222 F.3d 1098, 1102 (9th Cir. 2000).

The focus of the reliability inquiry is on the principles and methodology an expert uses in

forming her opinions rather than the expert's conclusions.  But in conducting the reliability

analysis, the Court must also consider whether, for a given conclusion, "there is simply too great

an analytical gap between the data and the opinion proffered." *General Electric Co. v. Joiner*,

522 U.S. 136, 146 (1997).  In short, both unsound methods and unjustified extrapolations from

existing data can require the Court to exclude an expert.

The Ninth Circuit has placed great emphasis on *Daubert*'s admonition that a district court

should conduct this analysis "with a 'liberal thrust' favoring admission." *Messick*, 747 F.3d at

1196 (quoting *Daubert I*, 509 U.S. at 588).  Accordingly, the Ninth Circuit has emphasized that

the gatekeeping function is meant to "screen the jury from unreliable nonsense opinions, but not

to exclude opinions merely because they are impeachable." *Alaska Rent-A-Car, Inc. v. Avis

Budget Group, Inc*., 738 F.3d 960, 969 (9th Cir. 2013).  That is because "[v]igorous cross-

examination, presentation of contrary evidence, and careful instruction on the burden of proof

are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert

I*, 509 U.S. at 596; *see, e.g., Murray v. Southern Route Maritime SA*, 870 F.3d 915, 925 (9th Cir.

Case MDL No. 2741   Document 2525-5   Filed 11/01/21   Page 28 of 279
Case 3:16-md-02741-VC  Document 2525-5  Filed 10/22/21 Page 30 of 69
Case 2:21-cv-00092-TBW-SMV  Document 2525-4 Filed 10/22/21 Page 1 of 69

2017); *Wendell v. GlaxoSmithKline LLC*, 858 F.3d 1227, 1237 (9th Cir. 2017).  This emphasis has resulted in slightly more room for deference to experts in close cases than might be appropriate in some other Circuits.  *Compare Wendell*, 858 F.3d at 1233-38, *and City of Pomona*, 750 F.3d at 1043-49, *with In re Zoloft (Sertraline Hydrochloride) Products Liability Litigation*, 858 F.3d 787, 800 (3d Cir. 2017), *and McClain v. Metabolife International, Inc.*, 401 F.3d 1233, 1244-45 (11th Cir. 2005).  This is a difference that could matter in close cases.

###### B.  The Relevance of the IARC Classification

Although much of this ruling concerns itself with the reliability prong of the *Daubert* analysis, relevance is also important here.  It's not sufficient for the plaintiffs to present evidence that glyphosate could cause NHL if humans were exposed to glyphosate at the kinds of massive doses, administered in the kinds of ways, that laboratory animals alone have experienced.  A "general causation" phase that focused on this question would be a waste of time – it would be too far afield from the ultimate question whether any of the plaintiffs in these cases got NHL from glyphosate.  That is why, to defeat Monsanto's summary judgment motion on the issue of general causation, it is not enough for the plaintiffs merely to present evidence that glyphosate is capable of causing cancer in the abstract.

By the same token, however, the inquiry at the general causation phase is not whether glyphosate gave NHL to any of the particular plaintiffs who brought these lawsuits, and the plaintiffs need not establish any particular level of exposure.  It's enough in this litigation, at this stage, for the plaintiffs to show that glyphosate can cause NHL when people are exposed to the highest dose people might plausibly experience.  *See In re Hanford Nuclear Reservation Litigation*, 292 F.3d 1124, 1133 (9th Cir. 2002).  Picture, for instance, a professional gardener who has applied Roundup without using protective equipment several times per week, many hours per day, for decades.

The distinction between glyphosate's capacity to cause NHL at any hypothetical dose and its capacity to cause NHL at a human-relevant dose is important here, in light of the plaintiffs' heavy reliance on IARC's classification of glyphosate.  Throughout much of this case, the

plaintiffs seem to have operated under the assumption that they can clear the general causation hurdle simply by showing that IARC's decision to designate glyphosate a probable human carcinogen is scientifically sound. Accordingly, they have put forward some expert opinions that largely parrot IARC's analysis and conclusions. But whether glyphosate is "probably carcinogenic to humans" as IARC defines that phrase is not what's directly at issue here.

IARC engages in a standardized inquiry that it describes in detail in the Preamble to the Monograph addressing glyphosate. In short, IARC seeks to identify cancer hazards. The organization explains the "important" distinction between hazard identification and risk assessment, stating that "[a] cancer 'hazard' is an agent that is capable of causing cancer under some circumstances, while a cancer 'risk' is an estimate of the carcinogenic effects expected from exposure to a cancer hazard." Monograph at 10. As a result, the Monograph explains, the IARC classification process is only the "first step in carcinogen risk assessment," because the Monographs "identify cancer hazards even when risks are very low at current exposure levels, because new uses or unforeseen exposures could engender risks that are significantly higher." *Id.* Putting this definition into practice, Dr. Portier (one of the plaintiffs' experts) wrote a letter urging the EPA to "declare glyphosate a probable human carcinogen and go on to do a risk assessment to determine if human exposure is sufficient to warrant concern." Expert Report of Dr. Portier, App. Doc. 2 at 4, Wagstaff Decl. ISO Pls.' Opp'n to Def.'s Mot. for Summ. J. & Daubert Mot. ("Pls.' Opp'n") Ex. 5 [Dkt. No. 648-5 at 151].

To make its hazard assessment, an IARC working group looks first at studies in humans and then at studies in animals and at other available data, including studies on the mechanisms by which a particular agent affects organisms at the cellular level. The working group determines, "using standard terms," the strength of the evidence for carcinogenicity in both humans and animals. Monograph at 27. Here, IARC concluded that there is "limited" evidence in humans that glyphosate causes cancer, meaning that "[a] positive association has been observed between exposure to the agent and cancer for which a causal interpretation is considered . . . to be credible, but chance, bias or confounding could not be ruled out with

reasonable confidence." *Id.* at 27, 398.  IARC further concluded there was "sufficient" evidence of carcinogenicity in experimental animals, that is, that "a causal relationship has been established between [glyphosate] and an increased incidence of malignant neoplasms or of an appropriate combination of benign and malignant neoplasms" in animal studies.  *Id.* at 28, 398.[5] The label IARC settled upon for glyphosate, "probably carcinogenic to humans," automatically follows from these evaluations.  A substance is deemed a probable carcinogen, also known as a "Group 2A" agent, where IARC concludes the evidence in humans is limited and evidence in animals is sufficient.  *Id.* at 30.[6]  A Group 2A classification can also be made when the working group concludes there is "inadequate" evidence – that is, not even limited evidence – that the agent causes cancer in humans but sufficient evidence that it does so in animals, where there is also strong evidence that it causes cancer in animals by a mechanism that operates in humans. *Id.*  For comparison, a "Group 2B" classification of "possibly carcinogenic to humans" usually follows where the working group concludes there is "limited evidence of carcinogenicity in humans" and "less than sufficient evidence of carcinogenicity in experimental animals," or alternatively, where there is "inadequate evidence of carcinogenicity in humans" but "sufficient evidence of carcinogenicity in experimental animals." *Id.*[7]

        All this is to say that IARC conducts its inquiry at a higher level of generality than what the Court must do here.  Although IARC's assessment is not entirely divorced from real-world exposure levels, IARC sorts agents into different categories based on a fairly rigid formula that seeks to identify whether an agent is capable of causing cancer "under some circumstances."  *Id.*

---

[5] Neoplasms are tumors.  *Id.* at 10.
[6] IARC also notes that, "[e]xceptionally, an agent may be classified in this category solely on the basis of limited evidence of carcinogenicity in humans," if the agent clearly belongs, based on mechanistic evidence, to a class of agents some of which already have been classified as carcinogenic or probably carcinogenic to humans.  *Id.*
[7] A Group 2B classification can also in some instances follow where there is "inadequate evidence of carcinogenicity in humans and less than sufficient evidence of carcinogenicity in experimental animals together with supporting evidence from mechanistic and other relevant data."  *Id.*  "[S]trong evidence from mechanistic and other relevant data" can also support classification in this category.  *Id.*

at 10.  Here, although there is no need to specify precisely the circumstances under which each plaintiff was exposed to glyphosate, only evidence supporting the conclusion that glyphosate causes NHL in doses within the realistic realm of actual human exposure can get the plaintiffs past summary judgment.  It's worth acknowledging that, even at the end of this ruling, precisely what the range of actual human exposure is will remain vague, a product of bifurcated proceedings where the hundreds of individual plaintiffs' experiences remain on the periphery for now.  But it's enough at this point to say that IARC's hazard assessment considers the evidence for a different purpose, and without the attention to the effects of current human exposure the Court must pay here.  Moreover, it is not enough for the evidence in this case to go merely to the causal relationship between glyphosate and cancer in general; it must go to the relationship between glyphosate and NHL in particular.  Perhaps most importantly, the question in a court case at this stage is whether a reasonable jury could conclude by a preponderance of the evidence that glyphosate can cause NHL at human-relevant doses – that is, whether a jury could conclude it is "more likely than not" that glyphosate can cause NHL in the human population.  IARC's use of the word "probably" has "no quantitative significance."  *Id.*  The inquiry in this case therefore fits neatly into neither the hazard identification nor the risk assessment boxes as IARC defines them.

As a result, expert opinions that simply parrot IARC's analysis and conclusions are somewhat off topic and are unduly limited, rendering them insufficient to satisfy the plaintiffs' burden at the general causation phase.  A "hazard assessment," as IARC and other public health bodies define that inquiry, is not what the jury needs to conduct when deciding whether glyphosate actually causes NHL in people at past or current exposure levels.  An expert who recites IARC's conclusions and analysis therefore may be offering a sound scientific opinion, but not an opinion that speaks squarely to the issue the jury must decide.  And in addition to the fact that such opinions are not enough to get the plaintiffs past the general causation hurdle, there is a significant possibility that, if there ever is a jury trial (that is, if any plaintiff can get past summary judgment on the issue of specific causation), expert opinions that go no further than

IARC's analysis will be excluded.  An expert opinion of this sort may not "fit" the general causation inquiry closely enough to be helpful to the jury in the way Rule 702 requires; it may serve primarily to confuse the jury, causing the trial to devolve into an abstract discussion about the differences between what public health organizations do and what juries do.  In any event, for current purposes, the point is that to the extent the plaintiffs have offered opinions from experts who merely reiterate the IARC analysis, those opinions do not allow the plaintiffs to avoid summary judgment.  Beyond that, the relevance and admissibility of these opinions at any eventual trial can be addressed as these cases develop.

### III.   EPIDEMIOLOGY

Epidemiology is "the field of public health and medicine that studies the incidence, distribution, and etiology of disease in human populations."[8]  As the parties acknowledge, epidemiology is central to the general causation inquiry, and where such evidence exists, it must be addressed by the experts.  *See Norris v. Baxter Healthcare Corp.*, 397 F.3d 878, 882 (10th Cir. 2005); Def.'s Daubert & Summ. J. Mot. 10 [Dkt. No. 545] ("Def.'s Mot."); Pls.' Opp'n 19-20 [Dkt. No. 647]; *cf. Milward v. Acuity Specialty Products Group, Inc.*, 639 F.3d 11, 24 (1st Cir. 2011)  None of the plaintiffs' experts base their opinions exclusively on the epidemiology research, but all discuss it to varying degrees.

### A.  The Bradford Hill Criteria

Epidemiology studies examine whether an association exists between an agent like glyphosate and an outcome like NHL.  Whether that agent *causes* the outcome, however, cannot be proven by epidemiological studies alone; an evaluation of causation requires epidemiologists to exercise judgment about the import of those studies and to consider them in context.  Once epidemiologists have concluded from the studies that there is an association between an agent and an outcome, they often assess causation through a framework called the "Bradford Hill

---

[8] Michael D. Green et al., *Reference Guide on Epidemiology*, *in* Reference Manual on Scientific Evidence 551, 551 (3d ed. 2011) ("Reference Manual").

criteria."  These criteria are named for Sir Austin Bradford Hill, who wrote a 1965 article that
articulated nine "viewpoints" now generally accepted to be relevant to assessing causation.
Broadly, these factors are: (1) the strength of the association; (2) consistency; (3) specificity; (4)
temporality; (5) biological gradient or dose response; (6) biological plausibility; (7) coherence
with other scientific knowledge; (8) experimental evidence; and (9) analogy.[9]  Both parties'
experts considered these criteria, which are introduced here to frame the discussion that follows,
and they will be explained in more detail in Section VI.

### B.  Case-Control Studies and Meta-Analyses

The first step in assessing causation is determining whether an association exists between
exposure to glyphosate and NHL.  In concluding that studies have shown such an association, the
plaintiffs' experts emphasize case-control studies.  A case-control study is one of two primary
types of observational epidemiological studies.  This kind of study starts with a group of people
who have the disease of interest (the "cases"), selects a similar population of people without the
disease (the "controls"), and then compares the groups on the basis of past exposure to the
chemical the investigators are studying.  In contrast, a cohort study, the other primary type of
observational epidemiological study, selects a study population without the disease of interest,
sorts that population into exposed and unexposed groups, and then measures the incidence of
disease in the exposed and unexposed groups after observing them for a period of time.
Frequently touted benefits of case-control studies are their comparatively low cost and ability to
identify associations relevant to rare diseases.  *See, e.g.*, Reference Manual at 556-60; Expert
Report of Dr. Mucci 12, Hollingsworth Decl. ISO Def.'s Mot. Ex. 18 [Dkt. No. 546-18] ("Mucci
Report"); Expert Report of Dr. Ritz 13, Wagstaff Decl. ISO Pls.' Opp'n Ex. 3 [Dkt. No. 648-3]
("Ritz Report").

Case-control studies report an odds ratio as the measure of association between the

---

[9] Austin Bradford Hill, *The Environment and Disease: Association or Causation?*, 58
Proceedings of the Royal Society of Medicine 295 (1965), Wagstaff Decl. ISO Pls.' Opp'n Ex. 47
[Dkt. No. 649-17] ("Bradford Hill").

variables the investigators are studying.  "In a case-control study, the odds ratio is the ratio of the odds that a case (one with the disease) was exposed to the odds that a control (one without the disease) was exposed."  Reference Manual at 568.  An odds ratio greater than 1.0 indicates an association, as it suggests those with the disease are more likely to have been exposed to the substance of interest.

Odds ratios are typically reported with confidence intervals that seek to capture the likely effects of random error.  A 95% confidence interval, the standard interval, is a range that would capture the actual odds ratio 95% of the time if the study were conducted repeatedly.  Generally, larger sample sizes produce narrower confidence intervals.  When the lower bound of the 95% confidence interval exceeds 1.0, the results of the study are considered to show an association that is "statistically significant" at the .05 level.  *Id*. at 580-81.  The purpose of assessing statistical significance is to determine how likely it is that an observed odds ratio is merely due to chance, rather than indicative of a true association.  The line delineating what constitutes a statistically significant result is necessarily somewhat arbitrary, and the experts dispute how much weight to give studies reporting odds ratios above 1.0 that are not statistically significant at the .05 level.  Although there may be a causal association even in the absence of statistically significant results, statistical significance remains a useful metric for determining whether the results of a given study likely show a real association.  *In re Zoloft*, 858 F.3d at 793.

When assessing whether an epidemiological study can form a reliable basis for an expert's opinion, a court must determine whether the study adequately considered confounding variables and possible sources of bias.  *In re Abilify (Aripiprazole) Products Liability Litigation*, 299 F. Supp. 3d 1291, 1322-23 (N.D. Fla. 2018).  Confounding arises where a factor not accounted for by the study wholly or partially explains an apparent association between the agent under study and the outcome.  A factor is a confounder where it is independently related to both the exposure and the disease of interest.  Failure to control for true confounding variables can

skew the results of a study, producing an observed association where none exists or an observed association that is stronger or weaker than the actual association.[10]   Reliable epidemiological studies should account for confounders where they are identified, although "failure to control for every conceivable potential confounder does not necessarily render the results of an epidemiological study unreliable." *In re Abilify*, 299 F. Supp. 3d at 1322.  One way to account for confounders is through study design; for instance, matching controls to cases by age would ameliorate concerns about confounding resulting from the age of study participants. Confounders can also be addressed during data analysis, using methods like stratification or multivariable analysis, so long as information about potential confounders was obtained during the study. *See* Reference Manual at 591-97.  One important possible source of confounding in the studies relevant here is exposure to other pesticides.

Bias occurs where the results of a study are subject to systematic – in other words, non-random – error.  Study design, data collection, and data analysis can all give rise to bias. *Id.* at 583.  Most relevant in this case is the possibility of information bias resulting from inaccurate information about study participants' exposure to glyphosate.  One type of information bias, recall bias, occurs where people with a disease (the "cases" in a case-control study) are differently able to recall past exposures than are people who never get sick; generally, the assumption is that the cases will recall greater levels of exposure, as those who become ill are more likely to ruminate about the possible causes of their disease. *See id.* at 585-86.

Concerns about recall bias and about study accuracy more generally may be heightened where studies rely on proxy respondents.  Proxy respondents or surrogates, often spouses or next of kin, are used when the study participants themselves are not available, typically because they have died or are too ill to participate.  Proxy respondents are generally considered less reliable than the study participants themselves.  Mucci Report 20-21.

---

[10] *See* Kenneth J. Rothman et al., *Modern Epidemiology* 129-34 (3d ed. 2008) ("Rothman").

With this background in mind, the following is an overview of the some of the most important and frequently discussed case-control studies.

One key publication is a pooled analysis of three separate case-control studies conducted by the National Cancer Institute in the Midwestern United States between 1979 and 1986. In a pooled analysis, the study authors combine the raw, participant-level data from earlier studies and then analyze these data as one combined dataset. *See* Ritz Report 6; Mucci Report 25. Pooling allows for uniform analysis of the data in the underlying studies and increases the statistical power of the earlier, smaller studies. The experts identify this study as "De Roos (2003)," by the lead author's last name and its year of publication.[11]

De Roos (2003) aggregated the data from the three studies and analyzed the effects of 47 different pesticides on the incidence of NHL. *Id.* at 1. The authors sought to isolate the effect of each pesticide by controlling for the use of all 46 other pesticides, in addition to age and study site, in their models assessing association. *Id.* at 2. The authors reported results using both a more conventional logistic regression model and a more conservative hierarchical regression model that took into account values estimating the prior distributions of the other pesticides. *Id.* Using the logistic regression model, the odds ratio for those exposed to glyphosate was 2.1, with a 95% confidence interval of 1.1 to 4.0.[12] Using the hierarchical regression model, the odds ratio was 1.6 (0.9, 2.8), no longer a statistically significant result. *Id.* at 5. Thirty-six of the cases and 61 of the controls in this analysis were exposed to glyphosate. *Id.* The study authors considered proxy responses. *Id.* at 4.

Another study discussed at length by the experts focused on a population-based case-control study in Canada. They refer to this study as "McDuffie (2001)."[13] NHL diagnoses in

---

[11] A.J. De Roos et al., *Integrative Assessment of Multiple Pesticides as Risk Factors for Non-Hodgkin's Lymphoma Among Men*, 60 Occupational & Environmental Medicine 1 (2003), Wagstaff Decl. ISO Pls.' Opp'n Ex. 55 [Dkt. No. 652-9].

[12] Going forward, the 95% confidence interval will be reported in the following format: odds ratio (lower bound, upper bound).

[13] Helen H. McDuffie et al., *Non-Hodgkin's Lymphoma and Specific Pesticide Exposures in*

this study occurred between 1991 and 1994, and 51 cases and 133 controls were exposed to glyphosate. *Id.* at 1158. Proxy respondents were not used. *Id.* at 1156. This study reported an overall odds ratio for glyphosate of 1.2 (0.83, 1.74). This estimate was adjusted for medical variables associated with NHL outcomes (like a positive family history of cancer or past cancer), age, and province of residence, but not for use of other pesticides. *Id.* at 1158. The study also sought to capture an estimate of NHL risk that reflected frequency of exposure to glyphosate. It reported that when glyphosate was used between zero and two days per year, the odds ratio was 1.00 (0.63, 1.57). When glyphosate was used more than two days per year, the odds ratio was 2.12 (1.20, 3.73). These estimates likewise appear not to have been adjusted for use of other pesticides. *Id.* at 1161.

The North American Pooled Project ("NAPP") aggregated the data from the three case-control studies included in De Roos (2003) and the Canadian data from McDuffie (2001). The results of this pooled analysis have not been published in a peer-reviewed journal, but the parties highlighted results presented in an abstract and two slide decks prepared for conferences. The more recent analysis is presented in a slide deck for an August 2015 presentation, although this slide deck, like the other NAPP materials, does not detail the methods used by the study authors.[14] These slides presented an overall odds ratio for glyphosate use of 1.13 (0.84, 1.51), when adjusted for use of three other pesticides and several other potential confounders. *Id.* at 10. When proxy respondents were removed from the data, the odds ratio dropped to 0.95 (0.69, 1.32). *Id.* at 26. The odds ratios reported for subjects who reported using glyphosate for seven lifetime days or fewer were lower than those who reported use for more than seven days, but none of these odds ratios were statistically significant. For subjects who reported using

---

*Men: Cross-Canada Study of Pesticides and Health*, 10 Cancer Epidemiology, Biomarkers & Prevention 1155 (2001), Wagstaff Decl. ISO Pls.' Opp'n Ex. 60 [Dkt. No. 652-14].
[14] Manisha Pahwa et al., An Evaluation of Glyphosate Use and the Risk of Non-Hodgkin Lymphoma Major Histological Sub-Types in the North American Pooled Project (Aug. 31, 2015) [Daubert Ex. 1278].

glyphosate for less than or equal to two days per year, without proxy respondents, the odds ratio was 0.66 (0.39, 1.12), and with proxy respondents it was 0.74 (0.46, 1.19).  The greater-than-two-days-per-year odds ratio without proxy respondents was 1.77 (0.99, 3.17), and when proxy respondents were included, the result was 1.73 (1.02, 2.94).  *Id.*  Monsanto argues that the NAPP study, although still unpublished, should supersede the earlier De Roos (2003) and McDuffie (2001) studies, as it is a more recent and complete analysis.

A further publication, "Eriksson (2008)," addresses the results of a Swedish population-based case-control study, with NHL cases collected between 1999 and 2002.[15]  There were 29 glyphosate-exposed cases and 18 controls included in this study.  *Id.* at 1659.  Proxy respondents were not used.  *Id.* at 1660.  The authors analyzed the data using a multivariate model controlling for six other pesticides, age, sex, and year of diagnosis or enrollment, and reported a non-statistically significant odds ratio of 1.51 (0.77, 2.94) for glyphosate.  *Id.* at 1661.  This study also reported a more detailed set of numbers unadjusted for use of other pesticides.  The overall odds ratio for glyphosate was 2.02 (1.10, 3.71).  Breaking this down, the unadjusted results showed statistically significant associations for glyphosate and NHL for those who were exposed to glyphosate for greater than ten days – 2.36 (1.04, 5.37), versus 1.69 (0.70, 4.07) for those exposed for less than ten days.  *Id.* at 1659.  For those who developed cancer more than ten years after exposure to glyphosate, the odds ratio was 2.26 (1.16, 4.40), compared to 1.11 (0.24, 5.08) for those who developed cancer less than ten years after exposure.  *Id.* at 1658-59.  One possible cause for concern in this study is the authors' choice of the control group for the univariate analysis, that is, the analysis not adjusted for use of other pesticides.  *See* Mar. 5, 2018 Tr. [Ritz] 34-35 [Dkt. No. 1172]; Mucci Report 53.  The authors used as the control group for this part of the analysis people who were not exposed to any of the pesticides included in the study.

---

[15] Mikael Eriksson et al., *Pesticide Exposure as Risk Factor for Non-Hodgkin Lymphoma Including Histopathological Subgroup Analysis*, 123 International Journal of Cancer 1657 (2008), Wagstaff Decl. ISO Pls.' Opp'n Ex. 54 [Dkt. No. 652-8].

Eriksson (2008) at 1658.[16]

      The plaintiffs also emphasize meta-analyses of the available epidemiological studies. Meta-analysis combines the results of several studies, giving them different weights that take into account, for instance, the size of the study population.  Reference Manual at 607.  Unlike a pooled analysis, which uses the underlying raw data, meta-analysis uses the reported summary statistics from the earlier studies.  *See* Ritz Report 6; Mucci Report 24.  The value of a meta-analysis, like the value of a pooled analysis, depends upon the quality of the underlying studies, and meta-analyses can be uninformative when the studies included in the analysis are very different from one another.  Although these meta-analyses take into account one cohort study, which will be discussed shortly, they are introduced here since the bulk of the included studies are case-control studies.

      Three meta-analyses of the data on glyphosate and NHL have been discussed during these proceedings.  The first was published in 2014 by Schinasi and Leon, but this analysis did not use the odds ratios from some of the underlying studies that were most fully adjusted for confounders.[17]  The IARC working group updated Schinasi and Leon's meta-analysis to use the more fully adjusted numbers and reported a meta-risk-ratio of 1.3 (1.03, 1.65).  Monograph at 350.[18]  A later published meta-analysis, by Chang and Delzell in 2016, likewise took into

---

[16] Dr. Ritz sought to offer an opinion that, had the study authors used a more appropriate comparison group, the results would not have changed materially.  *See* Apr. 4, 2018 Tr. [Ritz] 22-27 [Dkt. No. 1352]; *see also* Def.'s Apr. 9, 2018 Supp. Br. 5 [Dkt. No. 1354] (objecting to this opinion).  In light of her own tentativeness about her adjustment and the absence of any detailed explanation of her method in her reports or her live testimony, Dr. Ritz's opinion regarding how the Eriksson results would change after altering the control group is not admissible.

[17] Leah Schinasi & Maria E. Leon, *Non-Hodgkin Lymphoma and Occupational Exposure to Agricultural Pesticide Chemical Groups and Active Ingredients: A Systematic Review and Meta-Analysis*, 11 International Journal of Environmental Research & Public Health 4449 (2014), Wagstaff Decl. ISO Pls.' Opp'n Ex. 67 [Dkt. No. 653-7] ("Schinasi & Leon (2014)").

[18] The risk ratio or relative risk, which is used to assess whether an association exists in cohort studies, is the ratio of the risk of disease among people exposed to those who are unexposed.  For relatively rare diseases, the odds ratio approximates the relative risk and, as with an odds ratio, a number above 1.0 indicates an association between the exposure and the disease.  Reference Manual at 625, 627.

account the most fully adjusted results from the earlier studies, and reported a meta-risk-ratio of 1.3 (1.0, 1.6).[19]   Chang & Delzell (2016) also conducted sensitivity analyses that swapped out the hierarchical regression in De Roos (2003) for the logistic regression and replaced McDuffie (2001) with a 2011 analysis of the Canadian data.  *See id.* at 416.  The results for the four models they tested were very similar, all falling between 1.3 (1.0, 1.6) and 1.4 (1.0, 1.8).  *Id.*

    Monsanto and its experts raise concerns about basing a causation assessment on the case-control studies and meta-analyses.  For instance, Monsanto's epidemiology experts highlighted concerns about recall bias.  Mucci Report 36; Expert Report of Dr. Rider 3, Wagstaff Decl. ISO Pls.' Opp'n Ex. 116 [Dkt. No. 656-11] ("Rider Report").  The plaintiffs' experts acknowledged that recall bias is a potential concern in case-control studies, but disputed that it is a major issue here.  Ritz Report 7-8; Revised Expert Report of Dr. Portier 7, 18, Hollingsworth Decl. ISO Def.'s Mot. Ex. 8 [Dkt. No. 546-8] ("Portier Report").  The plaintiffs' experts explained that, at the time the cases were assessed, the participants had no reason to suspect that glyphosate exposure could cause cancer, and therefore they were unlikely to have over-reported their exposure.  Apr. 4, 2018 Tr. [Ritz] 51-53.  To demonstrate that participants didn't generally over-report glyphosate use when these studies were conducted, they pointed out that epidemiology studies on the whole observed associations only between glyphosate and NHL, and not between glyphosate and the other cancers about which participants were asked.  If participants were predisposed to think that glyphosate caused cancer and exhibited recall bias as a result, they explained, one would expect to see associations reported for glyphosate and other cancers.  *Id.* at 50-51; *see also* Mar. 5, 2018 Tr. [Weisenburger] 192-93 [Dkt. No. 1172]; March 9, 2018 Tr. [Mucci] 945-46 [Dkt. No. 1186].  The plaintiffs' experts also pointed to studies that sought to validate self-reports of pesticide exposure and that found similar recall accuracy between cases

---

[19] Ellen T. Chang & Elizabeth Delzell, *Systematic Review and Meta-Analysis of Glyphosate Exposure and Risk of Lymphohematopoietic Cancers*, 51 Journal of Environmental Science & Health 402 (2016), Wagstaff Decl. ISO Pls.' Opp'n Ex. 68 [Dkt. No. 653-8] ("Chang & Delzell (2016)").

and controls.  Ritz Report 19; Portier Report 8, 11; Mar. 5, 2018 Tr. [Weisenburger] 182-83.

Ultimately, in response to these points, one of Monsanto's epidemiology experts conceded at the

*Daubert* hearing that she was "not quite as worried about recall bias in the context of this body of

literature," except in the McDuffie (2001) study.  Mar. 9, 2018 Tr. [Mucci] 946.  On the whole,

concerns about recall bias in these studies do not demand that a reliable expert opinion

meaningfully discount the body of case-control studies when assessing causation.

      Monsanto's experts also attacked the plaintiffs' experts' reliance on case-control studies

they contend reflect inadequate latency periods, that is, periods between exposure and diagnosis.

*See* Mucci Report 7, 36-40, 49, 69; Rider Report 32-33, 35, 38-39, 45-46.  Specifically,

Monsanto pointed to the case-control studies conducted in Kansas and Iowa/Minnesota, which

are included in the pooled analyses reported in De Roos (2003) and the NAPP.  The Kansas

cases were identified between 1979 and 1981 and the Iowa/Minnesota cases between 1980 and

1983.  De Roos (2003) at 1-2.  Monsanto and its experts argued that these studies focused on

people diagnosed with NHL too soon after glyphosate was put on the market in 1974 to capture

cases caused by glyphosate, as cancer typically takes many years to develop.  The plaintiffs'

experts recognized that inadequate latency periods could be cause for concern, and at least

implicitly acknowledge that latency could be an issue with the studies that generated many of the

numbers that are most helpful to the plaintiffs.  *See* Ritz Report 17 ("Although a short latency

period does not completely exclude the possibility of exposure-disease relationships in cancer, a

longer latency period increases confidence in results due to increased biological plausibility[,]

i.e.[,] typically we would generally expect a 5-10 year minimum latency between exposure and

disease onset for blood system related cancers.");  *id.* at 18-19 (acknowledging that the

Iowa/Minnesota study had what "is considered an inadequate latency period");  Mar. 6, 2018 Tr.

[Weisenburger] 267-70 [Dkt. No. 1175];  Portier Report 5 ("Because the latency period for

cancers can be long (years), evaluation of studies should consider whether the exposure occurred

sufficiently long ago to be associated with cancer development.");  Apr. 6, 2018 Tr. [Portier] 142,

148-53 [Dkt. No. 1353].

Although the latency concern is legitimate, three of the plaintiffs' experts, Drs. Ritz, Portier, and Weisenburger, explained that this concern was mitigated to a degree by steps taken by some study authors.  One reason a study might show an association between glyphosate and NHL shortly after glyphosate was put on the market is confounding; if one of the pesticides that was frequently used before glyphosate came on the market causes NHL, those who later switched to glyphosate might simply be manifesting the NHL triggered by those other pesticides.  However, in some of the studies, the authors adjusted for other pesticides.  The plaintiffs' experts explained that, although it is always possible that an observed association is the result of confounding for which the authors did not account, the adjustment for many other pesticides used by De Roos (2003), in particular, made it significantly less likely that a pesticide other than glyphosate explained the observed association.  If the studies accounted for likely confounders, they explained, there is little reason to discount the studies, notwithstanding the relatively short latency periods they captured.  *See* Mar. 6, 2018 Tr. [Weisenburger] 282-83; Apr. 4, 2018 Tr. [Ritz] 15-18, 30-31; Apr. 6, 2018 Tr. [Portier] 149-53.

The plaintiffs' experts also sought to downplay the latency concern in other ways.  Dr. Ritz asserted that, in a case-control study, an association observed after a short latency period might be something of an alarm bell, as those cases might reflect outcomes in people who experienced heavy exposures or who developed particularly aggressive cancers.  Apr. 4, 2018 Tr. [Ritz] 9-11.  As a result, Dr. Ritz argued, one might expect to see an even stronger association had the studies allowed for longer latency periods.  *Id.*; *see also* Apr. 6, 2018 Tr. [Portier] 154.  Dr. Ritz also hypothesized that quicker onset of NHL in case-control studies might reflect the older average age of case-control study participants versus participants enrolled in the cohort study discussed below.[20]

---

[20] For the most part, Dr. Ritz introduced her views on latency in her original expert report and discussed them at her deposition.  *See* Wagstaff Decl. ISO Pls.' Opp'n Ex. 58 [Dkt. No. 652-12] (discussing latency in the context of the De Roos (2003) study).  To the extent she strayed into new territory regarding latency in the epidemiological studies during the second round of *Daubert* hearings – as is arguably the case with her opinion that the older average age of participants in case-control studies might have some explanatory power – the Court is persuaded

Overall, the latency concern raised by Monsanto is a legitimate one that makes a causal account of the American case-control studies, in particular, more difficult to swallow.  But, at least for the studies that adjust for other pesticide exposures, the relatively short period between glyphosate exposure and cancer development is not a concern so significant as to disqualify an expert who gives significant weight to the case-control studies in rendering a causation opinion.

Monsanto also argues that reliance on some of the case-control studies is inappropriate because they did not adequately account for the important possible confounder of exposure to other pesticides.  Some glyphosate users, like farmers and landscapers, are likely exposed to many pesticides, and these other pesticides may also be associated with elevated incidences of NHL.  As discussed, the case-control studies adjusted for possible confounders to different degrees, and when study authors provided both unadjusted and adjusted numbers, the odds ratios adjusted for use of other pesticides were closer to 1.0, and often not statistically significant.  *See, e.g.*, Eriksson (2008) at 1659, 1661.  The possibility of confounding arising from exposure to other pesticides is a serious consideration and one that must be accounted for in a reliable expert report assessing the epidemiology evidence.

### C.  Cohort Study

Instead of the case-control studies, Monsanto's experts focus on the results of the Agricultural Health Study (AHS), a cohort study.  Recall that cohort studies, unlike case-control studies, select participants without the disease of interest and follow them for a period of time to see what diseases develop in the exposed and unexposed cohorts.  Advantages of such studies include that they can conclusively establish the temporal relationship between exposure to a chemical and a disease, and that they avoid the possibility of recall bias by selecting participants before they develop the disease.  *See* Reference Manual at 557-58; Supplemental Expert Report

---

that exclusion is not warranted, as Dr. Ritz's testimony was responsive to the Court's questions, and Monsanto will have an adequate opportunity between now and trial to refine its cross-examination on this point.  *But see id.* at 187-89 (discussing the relationship between age and latency generally).  The Court reaches the same conclusion regarding Dr. Portier's illustration of the different latency concerns associated with case-control and cohort studies.  *See* Apr. 6, 2018 Tr. [Portier] 34-40.

of Dr. Ritz 3, Wagstaff Decl. ISO Pls.' Supp. Br. Ex. 7 [Dkt. No. 1136-7] ("Ritz Supp. Report").

The AHS is a cohort study of more than 57,000 licensed pesticide applicators from Iowa and

North Carolina.[21]  The study participants were first surveyed between 1993 and 1997, and were

at that time asked about their use of 50 pesticides, including glyphosate.  *Id*. at 2.  Participants

were asked not only about years of use and days of use per year, but also about other features of

their pesticide application that could affect the intensity of their exposure, including use of

personal protective equipment and application method.  *Id*.  Sixty-three percent of the

participants completed a follow-up telephone interview approximately five years later.  *Id*.  That

survey asked about the participants' pesticide use during the most recent year in which they

farmed.  *Id*.  Cancer outcomes for members of the cohort were determined through cancer

registries.  *Id*.

        When the initial round of expert reports in this case was prepared, the most recent

published study addressing the relationship between glyphosate and NHL as observed in the

AHS was a 2005 study, whose lead author was again De Roos.[22]  The De Roos (2005) study was

published before data from the follow-up surveys were analyzed.  It reported no statistically

significant association between glyphosate use and NHL, considering 92 total observed cases of

NHL – a fully adjusted odds ratio of 1.1 (0.7-1.9) for ever having used glyphosate, with no

evidence of higher rates of disease with more days of exposure.  *Id.* at 51-52.  The meta-analyses

mentioned previously – Schinasi & Leon (2014), Chang & Delzell (2016), and IARC's meta-

analysis – incorporated this study.[23]

---

[21] Gabriella Andreotti et al., *Glyphosate Use and Cancer Incidence in the Agricultural Health Study*, 110 Journal of the National Cancer Institute 1 (2018), Wagstaff Decl. ISO Pls.' Supp. Br. Ex. 1 at 1-2 [Dkt. No. 1136-1] ("Andreotti (2018)").
[22] *See* Anneclaire J. De Roos et al., *Cancer Incidence Among Glyphosate-Exposed Pesticide Applicators in the Agricultural Health Study*, 113 Environmental Health Perspectives 49 (2005), Wagstaff Decl. ISO Pls.' Opp'n Ex. 72 [Dkt. No. 653-12] ("De Roos (2005)").
[23] Several of the experts discussed an unpublished reanalysis of the AHS data during the first round of expert reports, "Alvanja (2013)."  Chang and Delzell, authors of the 2016 meta-analysis, prepared an unpublished "technical memorandum" revisiting their meta-analysis, replacing the AHS (2005) data with data from Alvanja (2013) and incorporating the unpublished

A few months before the *Daubert* hearing, an update of the De Roos (2005) study was published in the *Journal of the National Cancer Institute*. This update, which is known as "Andreotti (2018)," included data gathered using the follow-up telephone interviews and considered 575 individuals who developed NHL. Andreotti (2018) at 5. Like the 2005 study, Andreotti (2018) reported no association between glyphosate use and NHL. *Id.* at 4-5. The study broke the cohort into quartiles based on how intensively the study participants had used glyphosate, using a formula that included number of days of use, lifetime years of use, use of protective equipment, and other factors to determine the "intensity-weighted lifetime days of use" for each participant. The results ranged from rate ratios of 0.83 (0.59, 1.18) for the lowest quartile, to 0.88 (0.65, 1.19) for the third-highest quartile. *Id.* The study also reported results that took into account different possible latency periods, and these results likewise showed no statistically significant association. *Id.* at 6. At the Court's request, the parties submitted supplemental briefs addressing the import of this newly-published study. Dkt. No. 761. All of the plaintiffs' experts submitted supplemental reports addressing the study, and Monsanto's epidemiology experts did the same.

The plaintiffs' experts identified concerns with this study. First among these is the risk of exposure misclassification. Dr. Ritz highlighted potential problems with both the way pesticide exposure was assessed during the initial survey and the way the follow-up survey was conducted. *See* Ritz Supp. Report 2-7. Inaccurate exposure assessments were likely during the initial survey, she argued, because the initial data were obtained from people applying for pesticide applicator licenses who were asked on the spot to recall their use of many pesticides over the past several decades. They did not have an opportunity to check their records or otherwise verify their answers. *Id.* at 2-3.

---

NAPP data into their sensitivity analyses. Wagstaff Decl. ISO Pls.' Opp'n Ex. 56 [Dkt. No. 652-10]. Data from these unpublished studies were provided by Monsanto. The primary meta-risk ratio reported in this memorandum for ever having used glyphosate was 1.2 (0.91-1.6). *Id.* at 5.

Dr. Ritz also highlighted problems with the questionnaire's inquiry about the use of personal protective equipment, noting that the survey asked only about the use of protective equipment generally, not about the use of such equipment when applying glyphosate.  Because the intensity-weighted results for each pesticide relied on the same generic response regarding protective gear, participants were likely classified into incorrect exposure groups.  Mar. 5, 2018 Tr. [Ritz] 72-76.  For example, if a farmer had in mind the protective gear he used for his most toxic pesticides when he answered the question, even if he used no protective gear when applying glyphosate, he would be placed in a lower exposure group for the intensity-weighted analysis of glyphosate.  Another consideration noted by Dr. Ritz is that, because study participants were in the process of applying for their pesticide applicator licenses, they may have felt an incentive to portray themselves in their responses as using protective gear properly even if they did not actually do so.  *Id.* at 74-75.

The plaintiffs' experts also contend there is a particular risk of misclassification where glyphosate is concerned (compared to other pesticides studied in the AHS), because use patterns changed so dramatically in the mid-1990s.  Ritz Supp. Report 5.  Glyphosate use greatly increased during that period with the introduction of glyphosate-resistant genetically engineered crops.  Dr. Ritz elaborated on this concern at some length, arguing that the change in glyphosate use patterns was not adequately captured by the follow-up study for two main reasons.  First, the follow-up survey asked only about pesticide use during the last year of farming prior to the interview, rather than asking about all the intervening years.  *Id.* at 6.  Second, the study authors imputed the exposures of the approximately thirty-seven percent of participants who did not respond to the follow-up survey using a mathematical model.  That imputation, the plaintiffs' experts argued, is also susceptible to error.  *Id.* at 6-7; Supplemental Expert Report of Dr. Portier 2-4, Wagstaff Decl. ISO Pls.' Supp. Br. Ex. 22 [Dkt. No. 1136-22] ("Portier Supp. Report").[24]

---

[24] During his second round of *Daubert* testimony, Dr. Portier presented a series of hypothetical examples seeking to explain the risk of exposure misclassification associated with the imputation

They highlighted a published paper evaluating the AHS imputation method that reported the

model underestimated glyphosate exposure when tested against a sample of those who had

responded to the survey.[25]  According to Dr. Portier, use of this imputation method likely

resulted in differential exposure misclassification.  Apr. 6, 2018 Tr. [Portier] 49-50, 56-57.

Moreover, Dr. Portier contended, the differences in the total percentage of people exposed could

have masked a misclassification of much larger magnitude, had the imputation model also

misclassified some of the exposed people as unexposed.  Apr. 6, 2018 Tr. [Portier] 53-56.  In

addition, the model assumed that non-response to the follow-up survey was random, leaving

open the possibility that non-responders were meaningfully different from those who responded

to the survey.  *See* Heltshe (2012) at 8.

Monsanto's experts mounted a strong defense of this study, pointing out that it considered

by far the largest number of NHL cases across a broad range of exposures and for the longest

period of time.  Supplemental Expert Report of Dr. Mucci 6, Hollingsworth Decl. ISO Def.'s

Supp. Br. Ex. 7 [Dkt. No. 1137-8] ("Mucci Supp. Report"); Supplemental Expert Report of Dr.

Rider 6, 9, Hollingsworth Decl. ISO Def.'s Supp. Br. Ex. 8 [Dkt. No. 1137-9] ("Rider Supp.

---

method in the most recent AHS study.  Apr. 6, 2018 Tr. [Portier] 51-57.  These examples were
not included in his supplemental expert report.  However, Dr. Portier explained in his
supplemental report that the imputation method could have resulted in differential exposure
misclassification and pointed to the 2012 study from which he obtained the numbers he used in
his *Daubert* presentation.  Portier Supp. Report 3.  Under ordinary pretrial circumstances, it
would be a closer question whether to exclude these new hypotheticals; there would be an
argument that Monsanto lacked sufficient time to prepare to address them before the jury trial.
However, in the context of these MDL proceedings, the Court concludes they need not be
excluded.  *Cf. In re Seroquel Products Liability Litigation*, No. 6:06-md-1769-Orl-22DAB, 2009
WL 3806435, at *13 (M.D. Fla. June 23, 2009).  For one, Monsanto will have adequate time to
prepare further cross-examination relevant to these charts between now and the next phase of the
proceedings.  For another, although the charts themselves reflected additional analysis, that
analysis elaborated on Dr. Portier's previously disclosed opinions.

[25] *See* Apr. 6, 2018 Tr. [Portier] 49-50, 56-57; Sonya L. Heltshe et al., *Using Multiple Imputation
To Assign Pesticide Use for Non-Responders in the Follow-Up Questionnaire in the Agricultural
Health Study*, 22 Journal of Exposure Science & Environmental Epidemiology 1, 11, 18 (2012),
Wagstaff Decl. ISO Pls.' Supp. Br. Ex. 31 [Dkt. No. 1136-31] ("Heltshe (2012)") (showing an
observed prevalence of glyphosate exposure of 52.73%, compared to an imputed prevalence of
45.42% in a holdout dataset used to test the accuracy of the model).

Report").  In addition, Monsanto argues, the results are appropriately controlled for confounding by lifestyle factors and other pesticides.  Mucci Supp. Report 7.  To rebut the critiques of the plaintiffs' experts, Monsanto's experts highlighted the sensitivity analyses used by the study authors, as well as the efforts taken to validate the imputation method used to estimate the missing responses and to demonstrate that selection bias with respect to those who completed the follow-up interview was not a serious concern.  *Id.* at 3-7; Rider Supp. Report 4, 10; Mar. 9, 2018 Tr. [Mucci] 905-09.  In short, Monsanto's experts reasonably consider the most recent AHS publication to be the most powerful evidence regarding the relationship between glyphosate and NHL.  Because this study shows no association, Monsanto argues, there is no basis for finding a causal relationship.

\*   \*   \*

The upshot of all this is that the epidemiology evidence is open to different interpretations, and the potential flaws in the data from the case-control studies and meta-analyses are not overwhelmingly greater than the potential flaws in the data from the AHS study. An expert operating "within the range of accepted standards governing how scientists conduct their research and reach their conclusions" could thus place less weight on the AHS study, and could conclude that the analyses of the case-control studies support an association between glyphosate exposure and NHL, even if this is not necessarily the best interpretation of the evidence.  *Daubert II*, 43 F.3d at 1317.  As a result, an expert who places more weight on the case-control studies than the AHS study cannot be excluded as categorically unreliable for doing so.

## IV.    LABORATORY ANIMAL CANCER STUDIES

In addition to the epidemiological evidence, the plaintiffs seek to support their general causation arguments with opinions addressing studies of cancer in rodents.

Monsanto objects to the plaintiffs' experts' reliance on these studies to support their causation opinions, arguing that any opinions based upon these data fail the relevance or "fit" requirement of the *Daubert* inquiry.  In effect, Monsanto argues that for opinions addressing this

evidence to be admissible, the plaintiffs must show that it is appropriate to extrapolate directly
from increased incidences of particular rodent tumors to an increased incidence of NHL in
humans at human-relevant exposure levels.  That is not necessary.  It's true that, where animal
studies provide the best available evidence of causation, the experts seeking to rely upon such
evidence must explain why the results in animals are relevant to humans.  *See Domingo ex rel.
Domingo v. T.K.*, 289 F.3d 600, 606 (9th Cir. 2002); *In re Silicone Gel Breast Implants Products
Liability Litigation*, 318 F. Supp. 2d 879, 891 (C.D. Cal. 2004) ("Animal studies are not
generally admissible where contrary epidemiological evidence in humans exists.").  But the
parties don't face that scenario here.

It is sufficient for purposes of the Rule 702 relevance inquiry that the evidence "logically
advance[] a material aspect of the proposing party's case."  *Daubert II*, 43 F.3d at 1315.
Demonstrating that a chemical is carcinogenic in rodents would logically advance the plaintiffs'
argument that glyphosate is capable of causing NHL in humans, because it is pertinent to, at
least, the biological plausibility criterion that is part of the Bradford Hill analysis.  *See*, *e.g.*, Mar.
7, 2018 Tr. [Jameson] 429 ("This is a premise that is generally accepted in the scientific
community, that if an agent causes a[] cancer in animals, that it's biologically plausible to be a
human carcinogen.") [Dkt. No. 1181].  Rodent cancer studies are routinely conducted to learn
information that is useful in assessing whether substances cause cancer in humans.[26]  So, while
the rodent studies would not be sufficient on their own to satisfy the plaintiffs' burden (at least in
this case), the rodent studies nevertheless "speak[] clearly and directly to an issue in dispute in
the case," and they will not mislead the jury when properly contextualized.  *Daubert II*, 43 F.3d
at 1321 n.17.

For these reasons, although IARC's overall conclusion that glyphosate is a "probable
human carcinogen" is not squarely relevant to the general causation question in this case, IARC's

---

[26] *See* Bernard D. Goldstein & Mary Sue Henifin, *Reference Guide on Toxicology*, *in* Reference
Manual on Scientific Evidence 633, 637 (3d ed. 2011) ("[T]he toxic responses in laboratory
animals are useful predictors of toxic responses in humans."); *see also In re Silicone Gel
Implants Products Liability Litigation*, 318 F. Supp. 2d at 890.

narrower conclusion about carcinogenicity in lab animals is quite relevant.  If there is sufficient evidence that glyphosate causes cancer in animals, as IARC concluded, that would support the plaintiffs' case.  And IARC's analysis itself suggests that such a conclusion is within the mainstream of scientific views regarding how to interpret the available animal cancer studies. *See* Reference Manual at 564 n.46.

As with the epidemiological studies, the parties' experts generally agree about which underlying animal studies are worthy of close consideration.  The studies at issue are cancer bioassays that assess the development of tumors (both benign and malignant) in rodent subjects after chronic exposure to different doses of glyphosate over most of their lifetimes.  *See, e.g.*, *id.* at 640-41, 644-45; Expert Report of Dr. Rosol 3, Wagstaff Decl. ISO Pls.' Opp'n Ex. 97 [Dkt. No. 655-7 at 124] ("Rosol Report"); Expert Report of Dr. Jameson 19, Wagstaff Decl ISO Pls.' Opp'n Ex. 6 [Dkt. No. 648-6] ("Jameson Report").  Included in these studies is a control group subject to the same conditions – regarding food, light exposure, or exercise, for example – as the experimental group in every respect except for exposure to the chemical of interest.  *See* Reference Manual at 640.  The rodents in these long-term studies are typically exposed to doses that are significantly higher, relative to body mass, than what humans realistically would experience, as the goal is to maximize the studies' ability to detect the chemical's capacity to cause cancer.  *Id.* at 644-45.

In contrast to the epidemiology studies, much of the data on experimental animals were not presented in studies published in peer reviewed journals.  Instead, the data tend to come from studies submitted by manufacturers to regulatory agencies.  To the extent the data underlying these studies are public, the data are generally considered by IARC, and they were considered by the experts in this case.  *See* Monograph at 12; Apr. 6, 2018 Tr. [Portier] 186.  One source of much of the data for the experts here was a supplement to a review article published in 2015, which included tumor incidence tables from many of the regulatory submissions.[27]

_____

[27] Helmut Greim et al., *Evaluation of Carcinogenic Potential of the Herbicide Glyphosate, Drawing on Tumor Incidence Data from Fourteen Chronic/Carcinogenicity Rodent Studies*, 45

As with the epidemiology, the experts also broadly agreed on the method to be employed in evaluating animal toxicology studies.  They conducted literature reviews and assessed study quality, excluding those studies about which inadequate information was available or that had serious methodological problems.  Although there is some disagreement at the margins, the experts focused primarily on seven rat studies and five mouse studies.  *See* Jameson Report 28-29; Portier Report 50; Rosol Report 9-19; Expert Report of Dr. Foster 13-25, Wagstaff Decl. ISO Pls.' Opp'n Ex. 37 [Dkt. No. 649-7] ("Foster Report").  Then, broadly speaking – although the details differ – the experts assessed the tumors that arose in the studies for statistical and biological significance.  Relevant to the first aspect of this analysis is both whether there was a statistically significant increase in tumor development in a particular dose group, as compared to the control group, and whether the numbers of tumors that developed in the treated groups showed a statistically significant trend as the dosage of glyphosate increased.[28]  The experts also agreed that data from concurrent controls – the rodents in the control group of the same study – were most important.  But they acknowledged that the rate of tumor incidence in historical control groups – control groups used in previous, similar studies – was relevant as an indicator of

---

Critical Reviews in Toxicology 185, 185 (2015) ("Greim (2015)").  Although IARC reviewed Greim (2015), it was unable to evaluate in detail several of the studies considered by the experts here. Mar. 7, 2018 Tr. [Jameson] 455-56; Monograph at 354.

[28] *See* U.S. Environmental Protection Agency, *Guidelines for Carcinogen Risk Assessment* 2-19 (2005), https://www.epa.gov/sites/production/files/2013-09/documents/cancer_guidelines_final_3-25-05.pdf [https://perma.cc/G878-YJLC] ("EPA, Guidelines for Carcinogen Risk Assessment").  The EPA Guidelines go on to explain:

> Trend tests and pairwise comparison tests are the recommended tests for determining whether chance, rather than a treatment-related effect, is a plausible explanation for an apparent increase in tumor incidence. A trend test such as the Cochran-Armitage test (Snedecor and Cochran, 1967) asks whether the results in all dose groups together increase as dose increases. A pairwise comparison test such as the Fisher exact test (Fisher, 1950) asks whether an incidence in one dose group is increased over that of the control group. By convention, for both tests a statistically significant comparison is one for which $p$ is less than 0.05 that the increased incidence is due to chance. Significance in either kind of test is sufficient to reject the hypothesis that chance accounts for the result.

*Id.*

how many spontaneous tumors could be expected.  The experts disagreed, however, about how and to what extent to consider historical control information.  A further important consideration in assessing whether a chemical causes cancer in rodents is whether particular tumor findings were replicated across gender, subtype, species, or study.  Monsanto does not dispute the reliability of this method on the whole, instead critiquing specific aspects the plaintiffs' experts' application.  These critiques will be discussed in Section VI.

## V.   MECHANISTIC DATA

The final category of evidence the plaintiffs seek to put before the jury addresses possible mechanisms at the cellular level by which glyphosate could cause cancer.  The plaintiffs identify two possible mechanisms they contend are supported by the scientific literature: genotoxicity and oxidative stress.

Monsanto again disputes the relevance of this body of literature, arguing that the objectives of studies at the cellular level are far afield from the question of general causation.  However, for much the same reason that the experts' opinions on the rodent studies are relevant, the plaintiffs' experts' opinions regarding the mechanistic evidence are also relevant: the mechanistic evidence pertains to biological plausibility.  Evidence that glyphosate causes damage to the genetic material in cells (genotoxicity) or an imbalance between the production of reactive oxygen species and antioxidant defenses in a cell (oxidative stress) supports the plaintiffs' argument that it is biologically plausible that glyphosate acts as a carcinogen.  *See In re Denture Cream Products Liability Litigation*, 795 F. Supp. 2d 1345, 1356 (S.D. Fla. 2011) ("When mechanistic evidence is present it can greatly strengthen a causal inference, but when it is absent it does not necessarily undermine the inference." (citation and alteration omitted)).  This is not a scenario where the plaintiffs are relying on mechanistic studies alone to justify their experts' causal inferences; mechanistic evidence "may supplement the more substantial evidence of general causation in this case."  *In re Abilify*, 299 F. Supp. 3d at 1399.

Monsanto further argues that any opinion that relies upon two human studies – which the parties refer to as "Paz-y-Miño (2007)" and "Bolognesi (2009)" – must be excluded because the methodologies of those studies are so flawed that any opinion based on them is necessarily

33

unreliable.[29]  These studies considered possible genotoxic effects of glyphosate in people

following aerial spraying in Colombia and Ecuador.  They are "in vivo" studies of cells in whole,

living organisms, as opposed to "in vitro" studies of cells outside their normal biological

contexts.

Studies are not admissible simply because they are published.  *See In re Viagra Products*

*Liability Litigation*, 658 F. Supp. 2d 936, 945 (D. Minn. 2009).  The two human in vivo studies

Monsanto targets have flaws, some of which are acknowledged by the study authors themselves.

*See* Bolognesi (2009) at 995 (acknowledging the possibility of misclassification of exposures and

"the need to use better procedures to estimate the exposure").  For instance, there was a delay

between glyphosate exposure and the genotoxicity assessment in Paz-y-Miño (2007), and some

of the study participants showed symptoms suggesting acute illness.  *See* Paz-y-Miño (2007) at

457.  But none of these flaws is so glaring that an expert who relies on the studies in assessing all

the evidence going to whether glyphosate has a genotoxic effect, as the plaintiffs' experts and

IARC did, is necessarily unreliable.

## VI.    CONCLUSIONS REGARDING THE PLAINTIFFS' EXPERTS

The parties' experts offer contrasting takes on how to assess the evidence discussed in the

three preceding sections.  It is a given that there will be disagreement among reasonable

scientists about which evidence to emphasize in cases where the evidence does not point

unequivocally toward a particular conclusion.  *See, e.g.*, *Milward*, 639 F.3d at 18.  The question

here is whether the plaintiffs' experts' analysis of these studies "falls within the range of accepted

standards governing how scientists conduct their research and reach their conclusions."  *Daubert*

*II*, 43 F.3d at 1317.

Although the plaintiffs' experts specialize in various scientific disciplines, they all engage

---

[29] César Paz-y-Miño et al., *Evaluation of DNA Damage in an Ecuadorian Population Exposed to Glyphosate*, 30 Genetics & Molecular Biology 456 (2007), Wagstaff Decl. ISO Pls.' Opp'n Ex. 109 [Dkt. No. 656-4] ("Paz-y-Miño (2007)"); C. Bolognesi et al., *Biomonitoring of Genotoxic Risk in Agricultural Workers from Five Colombian Regions: Association to Occupational Exposure to Glyphosate*, 72 Journal of Toxicology & Environmental Health 986 (2009), Wagstaff Decl. ISO Pls.' Opp'n Ex. 110 [Dkt. No. 656-5] ("Bolognesi (2009)").

in some version of a Bradford Hill analysis (perhaps with the exception of Dr. Jameson, as discussed below).  Recall that the Bradford Hill approach to assessing whether an association is causal takes into account: strength of association, consistency across studies, specificity of the association, temporality, dose response, biological plausibility, coherence, experimental evidence, and analogous compounds.

As mentioned in Section III, the Bradford Hill criteria are generally associated with epidemiology, and a reliable assessment that an association between glyphosate and NHL exists in the epidemiological literature is a prerequisite to application of the criteria.  *See* Reference Manual at 597.  As a practical matter, however, application of these criteria requires an expert to consider more than the epidemiology literature.  In particular, by inquiring about biological plausibility and coherence with other knowledge, the Bradford Hill framework asks experts to survey all the available evidence that might support or disprove causation.  A broad survey of the available evidence is neither unusual in expert testimony nor necessarily inappropriate.  *See, e.g.*, *Milward*, 639 F.3d at 19-20; *In re Neurontin Marketing, Sales Practices & Products Liability Litigation*, 612 F. Supp. 2d 116, 158-59 (D. Mass. 2009).  However, this feature of the Bradford Hill methodology poses some challenges for a reviewing court, as the sweep of an expert's opinion is likely to be quite broad, the inquiry involves the exercise of subjective judgment, and an expert may opine on matters outside of her core area of expertise.

To the extent the *Daubert* question is whether consideration of the Bradford Hill factors is a reliable method for determining causation as a general matter, the answer is yes.  *See, e.g.*, *Wendell*, 858 F.3d at 1235 n.4; *In re Zoloft*, 858 F.3d at 795-97.  Although it is not the sort of scientific process that is amenable to objective testing, or that has a known or potential error rate, none of the experts dispute that this method of evaluating scientific evidence is generally accepted in the field of epidemiology.  *See Daubert II*, 43 F.3d at 1316; *Lust By & Through Lust v. Merrell Dow Pharmaceuticals, Inc.*, 89 F.3d 594, 597 (9th Cir. 1996) (noting that "testing and rate of error . . . do not apply, however, when the expert has not done original research, but rather has surveyed available literature and drawn conclusions that differ from those presented by the scientists who performed the original work").  What matters more in this case is whether the way

the experts assessed each of the Bradford Hill factors is reliable in light of the underlying evidence.  The experts must also show that the analytical leaps required to reach their ultimate conclusions regarding glyphosate's ability to cause NHL in humans are supportable, in light of the evidence on which they relied.  *See Joiner*, 522 U.S. at 146.

### A.  Dr. Portier

Dr. Portier is a biostatistician whose graduate research focused on the design of rodent studies and who, among other things, worked for much of his career at the Center for Disease Control's National Center for Environmental Health and at the National Institutes of Health's National Institute of Environmental Health Sciences.  Mar. 7, 2018 Tr. [Portier] 540-41; Portier Report 1-3.  Although Dr. Portier's PhD is in biostatistics and his primary focus is on toxicology and mechanistic studies, he has reviewed epidemiology studies throughout his career and has published in the field.  Apr. 6, 2018 Tr. [Portier] 13-14, 16-21.  Accordingly, although epidemiology is not his core area, he is qualified to examine the epidemiology literature to see whether an association exists and, if so, to engage in a Bradford Hill analysis.

Dr. Portier conducted a literature review of the epidemiological evidence and, as to the epidemiological evidence alone, agreed with IARC's conclusion that the evidence supported a credible causal interpretation but could not definitively rule out chance, bias, or confounding. *See* Portier Report 6; Mar. 8, 2018 Tr. [Portier] 618-19; Apr. 6, 2018 Tr. [Portier] 78-79.  As an initial matter, Monsanto makes a non-frivolous argument that Dr. Portier's description of what the epidemiology evidence shows – a description that several of the plaintiffs' experts shared – entitles it to summary judgment.  However, the better conclusion is that the plaintiffs' experts need not derive their causation conclusion exclusively from that body of evidence.  If other bodies of knowledge tend to bolster a causal interpretation of studies that could not alone establish causation, an expert need not be excluded based on an opinion that the epidemiology evidence alone is limited in the way Dr. Portier describes.

Although Dr. Portier agreed with IARC's assessment, his expert report did not simply reiterate IARC's conclusions.  In analyzing the epidemiology evidence, Dr. Portier emphasized numbers adjusted for use of other pesticides, particularly those from the Chang & Delzell (2016)

36

and IARC meta-analyses and the De Roos (2003) study. He considered the possible roles that chance, confounding, small sample sizes, and recall bias might have played in explaining the observed results. *See, e.g.*, Portier Report 11. He also explained that he discounted the Andreotti (2018) study in light of possible exposure misclassification arising from the study design, the dramatic increase in glyphosate use over the course of the AHS, and the authors' imputation of exposures for the sizable portion of the cohort that did not respond to the follow-up survey. Portier Supp. Report 3-4.

As noted, reliably identifying an association between NHL and glyphosate is a necessary predicate to reliable application of the Bradford Hill criteria. *See* Bradford Hill at 295; *In re Lipitor (Atorvastatin Calcium) Marketing, Sales Practices & Product Liability Litigation (No. II)*, 892 F.3d 624, 640 (4th Cir. 2018). Dr. Portier does not in his report first pause to establish an association. Even though Dr. Portier did not structure his report in this way, however, it is clear that he identified an association between glyphosate and NHL. What primarily persuaded Dr. Portier that an association existed was the consistency of the observed associations across different case-control studies. Portier Report 15. He acknowledged that, using the most highly adjusted numbers, the increases in NHL observed with exposure to glyphosate were "modest" – generally under 2.0 – and were not always statistically significant. *Id.* at 15, 19. But he concluded it was unlikely that so many studies would report results above 1.0, whether statistically significant or not, if there was no true association. *Id.* at 14-16. This is thus not a scenario where an expert attempted to deploy the Bradford Hill "guidelines to support the existence of causation in the absence of any epidemiologic studies finding an association," given how Dr. Portier interprets the studies. *In re Lipitor*, 892 F.3d at 640 (citations omitted).

Dr. Portier conducted his Bradford Hill analysis as follows: He concluded that the epidemiology studies addressed exposures occurring prior to disease onset, and therefore that the temporality criterion – the only non-discretionary Bradford Hill factor – was satisfied. Portier Report 75. As to the strength of the observed association, Dr. Portier acknowledged that the

observed odds ratios showed a "moderate" association, and that it was therefore "conceivable they are individually due to either chance or bias." *Id.* at 18. [30]  Although the magnitude of the observed association in each individual study was not especially large, another Bradford Hill criterion, consistency, allayed his concerns about chance and bias, leading him ultimately to conclude that the case-control studies "demonstrate a significant strength of association." *Id.* at 19.  His opinion that the consistency criterion provided strong support for causation emphasized the Chang & Delzell (2016) meta-analysis, which showed little heterogeneity between studies and remained stable after sensitivity analyses. *Id.* at 15-17.  He also considered possible sources of bias or confounding that might explain the consistency but noted, among other things, that several of the studies controlled for other pesticides without erasing the observed association. *Id.* at 17-18.  Dr. Portier further concluded, based on two case-control studies and the AHS, that dose response, or biological gradient, was demonstrated to a moderate degree by the epidemiological studies. *Id.* at 74-75.  Dose response – which refers to whether there is an increased risk of contracting a disease associated with higher levels of exposure to the agent – is strong but not necessary evidence of a causal relationship.  Reference Manual at 603.

Dr. Portier further concluded that the biological plausibility criterion "very strong[ly]" supported causation.  Portier Report 77.  He focused much of his report on this point, analyzing both the rodent carcinogenicity studies and the studies addressing possible cellular mechanisms of action in conjunction with this factor. *Id.* at 19-74.  He again relied on this evidence, along with studies showing absorption and excretion of glyphosate by exposed humans, in support of Bradford Hill's "coherence" criterion, which asks whether a causal interpretation of the association conflicts with other information known about the disease. *Id.* at 75-76.  He

---

[30] Monsanto argues that the plaintiffs must be able to show a statistically significant odds ratio of greater than 2.0 to survive summary judgment at the general causation stage.  Controlling case law does not support that proposition.  *See In re Hanford Nuclear Reservation Litigation*, 292 F.3d at 1137; *see also In re Bextra & Celebrex Marketing Sales Practices & Product Liability Litigation*, 524 F. Supp. 2d 1166, 1172-73 (N.D. Cal. 2007) (explaining that a relative risk of greater than 1.0 is relevant to general causation, while a relative risk of 2.0 can be probative of specific causation).

concluded this criterion strongly supported a causal assessment.  *Id.* at 77.

Because there are causes of NHL aside from glyphosate, Dr. Portier concluded "[t]here is little support for specificity."  *Id.* at 75; *see also id.* at 77 (stating that specificity is "[n]ot needed"); Apr. 6, 2018 Tr. [Portier] 75 (stating that specificity "doesn't add to the causation argument").  He did not rely on the criteria considering analogous compounds and evidence from human experimental studies in reaching his causation opinion, citing his lack of information about the former and a lack of data altogether as to the latter.  Portier Report 76-78.

With respect to Dr. Portier's epidemiology-related conclusions – both his finding of an association between glyphosate exposure and NHL and his application of the Bradford Hill factors that turn on the epidemiology studies – it is not difficult to conclude that much of his analysis is sufficiently reliable to be admissible.  For example, as discussed more fully in Section III, it was reasonable for Dr. Portier to rely more heavily on the case-control studies than the AHS.  To briefly recap, there is a legitimate concern about exposure misclassification in the AHS.  With respect to the case-control studies, Dr. Portier addressed the most significant concern – the possibility that pesticides other than glyphosate caused the observed cases of NHL – by focusing on data adjusted for potential confounding by various other pesticides.  *See In re Abilify*, 299 F. Supp. 3d at 1322-23.  Monsanto's other critiques of the case-control studies, like the possible presence of recall bias or the short period between glyphosate exposure and diagnosis in some of the studies, are not significant enough to require an expert categorically to weight them less heavily than the AHS.  And having reasonably decided to rely heavily on the case-control studies, Dr. Portier's conclusion that a true association exists between glyphosate and NHL, as well as his conclusion that the Bradford Hill "consistency" criterion was satisfied, was not an unreasonable logical leap.

On the other hand, some of Dr. Portier's epidemiology-related conclusions follow less clearly from the studies – particularly those relating to strength of association and dose response.  Regarding the former, it seems like a stretch to conclude, as Dr. Portier seems to have done, that the association between glyphosate use and NHL is strong.  *See* Apr. 6, 2018 Tr. [Portier] 68.

Even if one completely discounted the AHS (which Dr. Portier claims not to have done), virtually all the adjusted odds ratios from the case-control studies are below 2.0, and many of them are not statistically significant. As discussed in Section III, data may well be informative even in the absence of statistical significance, but one would expect a more cautious assessment regarding the strength of association in light of these numbers, particularly when one remembers that the case-control studies have vulnerabilities of their own. And when the AHS is given some weight (as Dr. Portier apparently agrees it should), the overall picture from the data becomes fuzzier still.

With respect to dose response, it's true that some of the data from the case-control studies support Dr. Portier's conclusion, but other data do not, as he acknowledged. Eriksson (2008) reported a higher odds ratio – 2.36 (1.04, 5.37) – for those who used glyphosate for greater than ten days than for those who used it for ten or fewer days – 1.69 (0.70, 4.07). McDuffie (2001) reported odds ratios of 1.0 (0.63, 1.57) for those who used glyphosate between zero and two days per year, and of 2.12 (1.2, 3.73) for those who used it for greater than two days per year. Dr. Portier also concluded that the rodent carcinogenicity studies demonstrated a dose response. Yet neither of the published AHS studies, which used much more detailed exposure metrics, demonstrated a dose response. *See* Portier Report 74-75; Apr. 6, 2018 Tr. [Portier] 140. Although the better conclusion might be that these data are inconclusive, Dr. Portier's assessment that the biological gradient criterion is moderately supportive of a causal association does not constitute an unsupported scientific leap. *See Joiner*, 522 U.S. at 146.

More broadly, Dr. Portier's epidemiology-related conclusions, even tempered as they are by the recognition that the epidemiology evidence alone does not show causation, are far from unassailable. There is one large cohort study (the AHS), with results recently published in a well-regarded scientific journal, suggesting no association between glyphosate use and NHL. There is a series of case-control studies arguably suggesting an association, but a fairly weak one. There are limited data indicating that the association strengthens with greater exposure to glyphosate, but also data to the contrary. And there are legitimate concerns about the reliability

of the data from all the studies.  Under these circumstances, all one might expect an expert to

conclude is that glyphosate exposure is cause for concern, but not that glyphosate is likely

causing NHL at realistic human exposure levels.

But, as noted at the beginning of this ruling, the *Daubert* inquiry does not require (or

even allow) a district court to exclude an expert's opinion merely because the court is not

persuaded that the expert's read of the evidence is the best one.  *See, e.g.*, *City of Pomona*, 750

F.3d at 1044 ("The district court is not tasked with deciding whether the expert is right or wrong,

just whether his testimony has substance such that it would be helpful to a jury." (citation and

alteration omitted)); *Quiet Technology DC-8, Inc. v. Hurel-Dubois UK Ltd.*, 326 F.3d 1333, 1341

(11th Cir. 2003) ("[I]t is not the role of the district court to make ultimate conclusions as to the

persuasiveness of the proffered evidence."); *Daubert II*, 43 F.3d at 1318 ("[T]he test under

*Daubert* is not the correctness of the expert's conclusions but the soundness of his

methodology."); *In re TMI Litigation*, 193 F.3d 613, 665 (3d Cir. 1999), *amended*, 199 F.3d 158

(3d Cir. 2000) (explaining that plaintiffs "do not have to demonstrate to the judge by a

preponderance of the evidence that the assessments of their experts are correct, they only have to

demonstrate by a preponderance of evidence that their opinions are reliable" (citation omitted)).

It bears repeating that applying the Bradford Hill criteria involves a certain amount of

subjectivity, and experts often will disagree when doing so.  The job of the district court is

merely to ensure that the expert's methods are not so far outside the realm of reasonable scientific

practice that his testimony would be unhelpful or misleading to a jury.  *See Messick*, 747 F.3d at

1199.  The Court must also assure itself that the expert's conclusions are not based upon

unreasonable extrapolations from the existing data.  *See Joiner*, 522 U.S. at 146.  Monsanto can

cross-examine Dr. Portier on the apparent weaknesses in his analysis, and there is little reason to

think that a jury will not understand those weaknesses.  But the aspects of his opinion based upon

the epidemiology evidence have a sufficiently reliable basis in the methods of that discipline for

the jury to consider his testimony about that evidence, including his assessments of the strength,

consistency, and dose-response Bradford Hill criteria.  *See Messick*, 747 F.3d at 1197.

Dr. Portier's testimony regarding the contested Bradford Hill factors that do not depend primarily upon epidemiology evidence – namely, biological plausibility and coherence – is also admissible, with one exception.

Dr. Portier first supported his biological plausibility conclusion with a determination that sufficient evidence shows that glyphosate causes cancer in two strains of rats and one strain of mice. Portier Report 52. One of Monsanto's major critiques of this portion of his analysis concerns his decision to use a pooling method to analyze together the results of the various rodent carcinogenicity studies. Dr. Portier's expert report combined the results of similar studies, treating the resulting data as "one big bioassay," then analyzed the results using a Cochran-Armitage trend test. Mar. 7, 2018 Tr. [Portier] 579. In response to critiques from one of Monsanto's experts, he then conducted an additional analysis using logistic regression, which he contended provided similar results. *Id.* at 579-80. He also conducted sensitivity analyses in conjunction with his pooling that sought to isolate the effects of studies that, for instance, had a very high rate of tumor incidence in the control and all dose groups. *Id.* at 577-84.

Although some version of Dr. Portier's pooled approach may well gain traction as a means of evaluating the results of multiple rodent studies, it fares poorly under the traditional *Daubert* criteria. His pooling approach is not subject to objective testing, and it appears to have no identifiable error rate. Although neither of these shortcomings itself requires exclusion, Dr. Portier's method also has not gained general acceptance in the scientific community, nor does it appear to have been subjected to peer review and publication. *See Estate of Barabin v. AstenJohnson, Inc.*, 740 F.3d 457, 463 (9th Cir. 2014).

Dr. Portier seemed to acknowledge that his approach was novel, but argued it was still a reliable way to assess multiple animal studies. Mar. 8, 2018 Tr. [Portier] 638 [Dkt. No. 1183]; Portier Report 21 ("Methods for the combined analysis of multiple animal cancer bioassays are not available in the scientific literature."). Dr. Portier later pointed to two studies by another scientist that he contended used a similar pooling analysis. Mar. 8, 2018 Tr. [Portier] 635. But it appears that the pooling used in these studies combined male and female rodents from the same study, or that the authors displayed results from studies of different lengths in a single figure to

model a dose-response curve, rather than combining rodents from multiple separate studies to determine whether given tumor findings were significant in the way that Dr. Portier does.[31]  As evidence that Dr. Portier's method has gained acceptance, the plaintiffs pointed to comments by members of the EPA's Science Advisory Panel indicating that pooling the studies here would be appropriate.  However, although some members of the panel evidently found Dr. Portier's proposed approach promising, the report of the panel meeting says only that some "[p]anelists recommend that EPA adopt a pooled analysis approach for combining multiple studies."  Wagstaff Decl. ISO Pls.' Opp'n Ex. 10 at 59 [Dkt. No. 648-10].  The report continues, "[a]dopting a pooled analysis approach should include the development of full guidelines for how to conduct and evaluate these analyses," suggesting that the details of what might constitute a reliable way to conduct a pooled analysis remained to be determined.  *Id.*; *see also* Mar. 8, 2018 Tr. [Portier] 638.

That Dr. Portier has staked his reputation on his pooling analysis in regulatory submissions in addition to doing so in this litigation suggests that this litigation isn't the only force behind this portion of his analysis.  But Dr. Portier's pooling method has evolved as he has received feedback from his peers, and his regulatory submissions reflected a somewhat different analysis than the one he presents here.  Mar. 8, 2018 Tr. [Portier] 626-35.  Further, during cross-examination, Dr. Portier acknowledged an error in his expert report, in which he neglected to present one of his pooled sensitivity analyses of thyroid C-cell tumors in male rats, making it appear that he had not consistently applied his method to all the relevant studies.  Mar. 8, 2018 Tr. [Portier] 665-66.  All this suggests that Dr. Portier's pooling is a good faith work in progress, but does not yet constitute "the scientific method, as it is practiced by (at least) a recognized minority of scientists in their field."  *Daubert II*, 43 F.3d at 1319.  The proper place to refine his

---

[31] *See* Michael L. Dourson et al., *Update: Mode of Action (MOA) for Liver Tumors Induced by Oral Exposure to 1,4-dioxane*, 88 Regulatory Toxicology & Pharmacology 45, 46-50 (2017), Wagstaff Decl. ISO Pls.' Opp'n, Ex. 104 [Dkt Nos. 655-14]; Michael Dourson et al., *Mode of Action Analysis for Liver Tumors from Oral 1,4-dioxane Exposures and Evidence-Based Dose Response Assessment*, 68 Regulatory Toxicology & Pharmacology 387, 391, 394 (2014), Wagstaff Decl. ISO Pls.' Opp'n Ex. 105 [Dkt. No. 655-15]; Mar. 8, 2018 Tr. [Portier] 635-36.

pooling approach is not in front the jury.

The question thus becomes whether Dr. Portier's opinion as to the animal studies "nonetheless rests on good grounds." *Karlo v. Pittsburgh Glass Works, LLC*, 849 F.3d 61, 83 (3d Cir. 2017). Although it is a somewhat close call, it appears that Dr. Portier's other analyses and conclusions are separable from his pooling. Dr. Portier acknowledged that the pooling was "part of [his] analysis and evaluation," but he sought to make clear that his conclusions were not dependent upon it. Mar. 8, 2018 Tr. [Portier] 640. He explained, "The pooled analysis is just a tool for me to better understand the strength of the evidence across multiple studies. Like a meta-analysis or the pooled analysis in epidemiology. Not having it doesn't change the core meaning of the data. And so my opinion of the animal carcinogenicity data wouldn't change just because I couldn't use the pooled analysis." Apr. 6, 2018 Tr. [Portier] 181. Indeed, a significant portion of his rebuttal report was dedicated to disputing one of Monsanto's expert's interpretations of the individual studies. *See* Rebuttal Report of Dr. Portier 12-24, Wagstaff Decl. ISO Pls.' Opp'n Ex. 96 [Dkt. No. 655-6].

Without pooling, the remainder of his analysis evinces relatively minor disagreements with the other toxicology experts on how to interpret the studies, and his positions in these debates do not depart from the realm of reasonable science. Monsanto criticized the way Dr. Portier addressed the possibility that random chance could explain the statistically significant tumor findings he identified, given the large number of possible tumor sites analyzed. *See* Mar. 8, 2018 Tr. [Portier] 682-89. In addition to disputing the method he used to account for the role of chance, Monsanto highlighted that the total number of tumor sites included in this portion of his initial report was higher than the number included in his rebuttal report. At the *Daubert* hearing, however, Dr. Portier explained the discrepancy, citing his decision to depart from his original reliance on the tumor site counts in a comment provided by another scientist to the EPA. *Id.* at 683-89. Dr. Portier provided a reasonable explanation, and to the extent Monsanto seeks to argue that this change makes his opinion less credible, it is free to do so. *See Primiano v. Cook*, 598 F.3d 558, 566 (9th Cir. 2010) ("Where the foundation is sufficient, the litigant is entitled to have the jury decide upon the experts' credibility, rather than the judge." (internal quotation

marks, citation, and alteration omitted)).

Monsanto also accused Dr. Portier of engaging in "p-hacking," manipulation of data to obtain statistically significant results. Monsanto used Dr. Portier's treatment of renal tumors observed in a 1983 mouse bioassay as an example of this alleged methodological flaw. *See* Def.'s Mot. 25-26. Monsanto cites his prior analyses of these data in regulatory submissions, noting that his approach has evolved over time. Yet, although Monsanto takes issue with his use of a measure that takes into account historical controls, it does not provide any reason why use of his other measures, the Cochran-Armitage trend and Fisher exact tests, is an unreliable way to evaluate these data. *See* EPA, Guidelines for Carcinogen Risk Assessment at 2-19; *see also* Expert Report of Dr. Corcoran 8, Wagstaff Decl. ISO Pls.' Opp'n Ex. 102 [Dkt. No. 655-12] ("Corcoran Report"). As to his incorporation of historical control data for tumors he deemed rare, Monsanto has legitimate critiques of the way he calculated his statistic. But it is within the realm of reasonable toxicological practice to consider historical control data in some fashion, and Monsanto has not demonstrated that another approach to historical controls is the only reliable one.[32] Indeed, there are reasons one might expect a reliable expert to use caution when dismissing tumor findings simply because they fall within the range of tumors observed in historical controls. *See, e.g.*, EPA, Guidelines for Carcinogen Risk Assessment at 2-20 to 2-21. Again, Monsanto may highlight discrepancies between Dr. Portier's past approaches and the analysis he presents in this case, and may emphasize what it perceives to be flaws in Dr. Portier's use of historical controls. But the concerns about the opinion he presents here are not sufficient to render his opinion inadmissible.

Monsanto points out that not even Drs. Jameson and Portier, the two plaintiffs' experts who focused at length on the animal studies, could agree on how to analyze the studies and suggests this is evidence of unreliability. Def.'s Mot. 22 n.31. But, by that score, Monsanto's

---

[32] *See, e.g.*, Foster Report 11, 16 n.2 (evaluating tumor findings in comparison to the range of historical controls rather than the mean); Rosol Report 5-6; Charlotte Keenan et al., *Best Practices for Use of Historical Control Data of Proliferative Rodent Lesions*, 31 Toxicologic Pathology 679, 690 (2009), Wagstaff Decl. ISO Pls.' Opp'n Ex. 108 [Dkt. No. 656-3].

experts would also be unreliable, as they reached somewhat different conclusions regarding some of the studies, too. *Compare, e.g.*, Rosol Report 17 (noting in the Stout and Ruecker study a statistically significant increase by pair-wise comparison for pancreatic islet cell adenomas in low-dose males, but concluding the tumors were not treatment related); *id.* at 17-18 (reporting no compound related or biologically relevant changes in any treatment group in the Wood 2009 study); *with* Foster Report 16 (noting non-statistically significant neoplastic changes in pancreatic islet cells in the Stout and Ruecker study); *id.* at 18 (noting in the Wood 2009 study a statistically significant trend for mammary gland adenocarcinomas, and for adenomas and adenocarcinomas combined for the highest dose group in the same study, but concluding the tumors were not compound-related).  The Court may not "t[ake] sides on questions that are currently the focus of extensive scientific research and debate – and on which reasonable scientists can clearly disagree." *Milward*, 639 F.3d at 22.

In sum, with the exception of his pooled analysis, Dr. Portier's assessment of the animal carcinogenicity data is admissible.  Some of the statistical tests he applied to the data within the expert reports submitted in conjunction with this case are essentially unchallenged.  Monsanto disputes the way he incorporated data on historical controls into his analysis and how he sought to address concerns that his observed statistically significant results could be due to chance.  But seeking to account for these factors comports with good scientific practice, and Monsanto has not shown that Dr. Portier has taken a scientifically unacceptable, as opposed to a debatable, approach.

Dr. Portier's second opinion supporting his conclusion that it is biologically plausible that glyphosate causes cancer in humans concerns the mechanistic evidence.  As discussed in Section V, his reliance on the human in vivo studies does not disqualify his expert opinion.  Dr. Portier acknowledged that some of the results he considered were not statistically significant.  *See, e.g.*, Portier Report 56.  He also considered a later Paz-y-Miño study, published in 2011, that showed no effect, which Monsanto cites in disputing the plaintiffs' reliance on the other two human in

46

vivo studies. *Id.* at 55-56.[33]  Dr. Portier additionally took into account myriad other mechanistic evidence, effectively unchallenged by Monsanto in its motion, including a published meta-analysis of in vivo assays that found a statistically significant positive mean response.  Portier Report 68-69.  Dr. Portier explained that he weighted these studies heavily, as they demonstrate DNA damage in living organisms with intact DNA repair mechanisms, making them more probative of potential DNA damage in humans than in vitro studies.  *Id.* at 69.

Monsanto also argues that Dr. Portier's chart summarizing the study results is unreliable, contending he inappropriately added up the positive studies.  Def.'s Mot. 35.  But Dr. Portier expressly cautioned against relying too heavily on the table Monsanto disputes, noting that it was simply a summary tool.  Portier Report 65 (explaining that the table "does not address the subtlety needed to interpret any one study," but instead "summarizes these studies in a simple framework that allows all of the experimental data to be seen in one glance"); *cf.* Expert Report of Dr. Jay Goodman 31, Wagstaff Decl. ISO Pls.' Opp'n Ex. 38 [Dkt. No. 649-8] ("Goodman Report") ("While there were occasional positives, some of which might have occurred by chance, among the very numerous tests for genotoxicity, these are far outweighed by the overwhelmingly negative results.").

In short, Monsanto's attacks on Dr. Portier's analysis of the mechanistic data probe his application of the scientific method, but do not demonstrate that the principles and methodology he applied in analyzing these data were not grounded in science.  *See Wendell*, 858 F.3d at 1232.

Stepping back and applying the *Daubert* factors not already accounted for to Dr. Portier's Bradford Hill analysis: Dr. Portier has not sought to publish his conclusions regarding glyphosate and NHL in a peer-reviewed journal.  However, the studies underlying his opinion were in large part published in peer-reviewed journals.  *See Daubert II*, 43 F.3d at 1318; *cf. Metabolife International, Inc. v. Wornick*, 264 F.3d 832, 845 (9th Cir. 2001) (concluding that experts who

---

[33]*See* César Paz-y-Miño et al., *Baseline Determination in Social, Health, and Genetic Areas in Communities Affected by Glyphosate Aerial Spraying on the Northeastern Ecuadorian Border*, 26 Reviews on Environmental Health 45 (2011), Wagstaff Decl. ISO Pls.' Mot. Ex. 111 [Dkt. No. 656-6]; Def.'s Mot. 33 n.66.

"explain[ed] the methodology of risk assessment and how the data found in peer-reviewed articles and adverse incident reports was used" in their declarations "facially complied with *Daubert II*'s verification requirement for evidence prepared in anticipation of litigation").  In addition, Dr. Portier has become, in the wake of his participation in the IARC Monograph process, something of an advocate for increased regulatory attention to glyphosate, suggesting his position is not one he has taken solely for purposes of this litigation, even if much of his public commentary occurred after he was retained by counsel for the plaintiffs.  *See, e.g.*, Expert Report of Dr. Portier, App. Docs. 1-2, Wagstaff Decl. ISO Pls.' Opp'n Ex. 5; *Daubert II*, 43 F.3d at 1316-18; Mar. 8, 2018 Tr. [Portier] 626-27.  Although these factors do not strongly favor admission, neither do they counsel significantly against it.

*        *        *

On the whole, Dr. Portier has adequately demonstrated that his opinion regarding general causation is sufficiently "within the range of accepted standards governing how scientists conduct their research and reach their conclusions" to proceed to a jury should any of the plaintiffs get past summary judgment at the next phase.  *Daubert II*, 43 F.3d at 1317.  He may present his full Bradford Hill analysis, but may not support his biological plausibility conclusion with the application of his pooling method.  Turning from methods to conclusions, perhaps Dr. Portier has read too much into the evidence in certain areas – particularly in the important area of epidemiology.  This could cause a jury to reject his conclusions, but it does not warrant keeping his opinion from a jury altogether.  Thus, although it's a close question, Dr. Portier's opinion does not involve any logical leaps so great and so lacking in support as to render them inadmissible.  *Joiner*, 522 U.S. at 146.

**B.  Dr. Ritz**

Dr. Ritz is an epidemiology professor at the University of California, Los Angeles.  She has a PhD in epidemiology, as well as an MD, and her primary research interests include the health effects of environmental and occupational exposures.  Ritz Report 1.  Monsanto does not dispute that she is qualified to offer an opinion addressing the epidemiology evidence at issue here.

Like Dr. Portier, Dr. Ritz first conducted a literature search to identify the relevant epidemiology evidence, assessed the quality of each pertinent study, and used her judgment to determine how the results of these studies fit together.  *Id.* at 8-9, 14-23.  She concluded that "[t]he epidemiologic studies as a whole support an increased risk of NHL with exposure to glyphosate or glyphosate based formulations." *Id.* at 25.

She also engaged in a Bradford Hill analysis.  Dr. Ritz concluded that the strength criterion was "partially met," in light of the results of the meta-analyses that showed a "weak to moderate size association." *Id.* at 23.  She further concluded that the dose-response criterion was met, gesturing toward the same two studies with higher odds ratios for greater exposures as Dr. Portier.  *Id.*  In assessing consistency, she noted briefly that positive associations were observed in different populations, places, and time periods.  *Id.* at 24.  She briefly concluded that the temporality criterion was met and, like Dr. Portier, acknowledged there was no supportive human experimental evidence.  *Id.* at 24-25.

Dr. Ritz took a somewhat different tack than Dr. Portier with respect to the specificity, biological plausibility, and coherence criteria.  Unlike Dr. Portier, who focused on whether NHL was an outcome associated exclusively with glyphosate exposure, Dr. Ritz asked the inverse question, inquiring whether glyphosate exposure resulted in a specific cancer outcome. Approaching the factor this way, she concluded that the criterion was met – increased incidences of NHL were observed, but not of other cancers – although she acknowledged that it was difficult to assess this criterion.  *Id.* at 24; Apr. 4, 2018 Tr. [Ritz] 53-54.[34]  She found coherence not to be a relevant factor, as she considered it to overlap with the question whether there was any experimental evidence in humans to consider, and did not address whether any analogous compounds provided information relevant to the causation inquiry here.  Ritz Report 25.  Finally,

---

[34] The Bradford Hill article seems to countenance both these experts' interpretations of the criterion, noting that "[o]ne-to-one relationships" between exposures and diseases are rare. Bradford Hill at 297; *see also* Rothman at 27 ("The criterion of specificity has two variants.  One is that a cause leads to a single effect, not multiple effects.  The other is that an effect has one cause, not multiple causes.").

to support her conclusion that a causal relationship between glyphosate and NHL is biologically plausible, Dr. Ritz in her report relied on the mechanistic evidence.  As to the mechanistic evidence, she provided a cursory summary of studies on human absorption of glyphosate and studies she concludes demonstrate oxidative stress and genotoxicity.  *Id.* at 24-25; Mar. 5, 2018 Tr. [Ritz] 86-88.  Ultimately, she concluded "to a reasonable degree of scientific certainty," that glyphosate and glyphosate-based formulations like Roundup cause NHL.  Ritz Report 25.

Although Drs. Ritz and Portier generally offered similar opinions regarding the epidemiology evidence, one significant difference is Dr. Ritz's greater emphasis on numbers unadjusted for use of other pesticides.  Although she acknowledged the importance of considering results that accounted for confounding variables, Dr. Ritz's analysis emphasized some numbers that did not make this adjustment.  *See, e.g.*, *id.* at 14, 16.  Monsanto attacks her opinion on this ground and argues that, once one focuses on the most fully adjusted numbers from the case-control studies, the results of these studies (combined with the AHS cohort study on which Monsanto relies) cannot justify a conclusion that there is a meaningful association between glyphosate and NHL.  This critique of Dr. Ritz is a valid one, and exclusive consideration of numbers unadjusted for other pesticides, when adjusted numbers are available, would be disqualifying.  Failing to take account of likely confounders by presenting and relying upon only unadjusted (or minimally adjusted) estimates is a serious methodological concern.  *See Nelson v. Tennessee Gas Pipeline Co.*, 243 F.3d 244, 253 (6th Cir. 2001).  This is illustrated by the IARC Monograph, which focused on numbers from epidemiological studies that were adjusted for other pesticides, explaining that "there is high potential for confounding by use of multiple pesticides."  Monograph at 50; *see also id.* at 331.  Accordingly, the misleading "Forest plot" from Dr. Ritz's report – which highlighted numbers unadjusted for other pesticides and, moreover, reported the number of cases in the individual studies without taking into account how many of these individuals were exposed to glyphosate – may not be presented to a jury.  *See* Ritz Report 14.  And frankly, this portion of her presentation calls her objectivity and credibility into question.

However, although Dr. Ritz did not focus heavily on the adjusted numbers in her reports,

she did consider them.  Two of the meta-analyses of the case-control studies used the fully adjusted estimates, and both regressions performed in De Roos (2003) adjusted for use of many other pesticides.  Ritz Report 16, 19.  She cited the numbers from the meta-analyses first and foremost in her causation analysis.  *See id.* at 23.[35]  Further, during the hearings, Dr. Ritz professed that, even if she were limited to considering only the numbers adjusted for other pesticides, her conclusion would not change.  *See* Apr. 4, 2018 Tr. [Ritz] 37-42, 92.  By way of explanation, Dr. Ritz, like Dr. Portier, pointed to the consistency of the observed associations in case-control studies, which were primarily above 1.0 even if some were not statistically significant.  *See id.* at 39-40.  As discussed in Section III, Dr. Ritz critiqued the methodology of the AHS study, the most significant study that does not support her conclusion, and those critiques raise valid concerns.  Further, although Dr. Ritz's conclusions do not predate this litigation, there is some evidence that her critiques of the AHS do.  *See* Ritz Supp. Report 8.  Although it is again a close question, Dr. Ritz's conclusions regarding the epidemiology evidence are admissible.  While her analysis is subject to challenge – something Monsanto's cross-examination during the *Daubert* hearing made plain – her opinion does not rise to the level of an "unreliable nonsense opinion[]."  *City of Pomona*, 750 F.3d at 1044 (citation omitted).

Dr. Ritz's assessment of the Bradford Hill "strength" criterion as "partially met" based on the "weak to moderate size association" reported in the meta-analyses requires less of a logical leap than does Dr. Portier's assessment.  Ritz Report 23.  Her conclusion regarding dose response is based on the "effect estimates for longer or more extensive use" between 2 and 3 – presumably, the greater-than-two-days-per-year odds ratio in the McDuffie (2001) study and the greater-than-ten-days odds ratio in Eriksson (2008).  *Id.*  She does not explain how the contrary results of the AHS impacted her dose-response analysis, but, in light of the two published studies suggesting a biological gradient and the negligible weight she gave to the AHS overall in reaching her epidemiology opinions, her conclusion regarding dose response is admissible, even

---

[35] Because Dr. Ritz did consider the adjusted numbers, the Court declines Monsanto's invitation to exclude any opinion based on the adjusted numbers.  *See* Def.'s Apr. 9, 2018 Supp. Br. 3-5.

if it is questionable.

Dr. Ritz's opinion regarding biological plausibility is quite brief, and consists in effect of a series of citations to studies on human absorption of glyphosate and possible genotoxic and cytotoxic effects on humans and in rodents. *See id.* at 24-25. There is little to her analysis of this criterion, and she has not established that she would be qualified to offer an opinion addressing the toxicology evidence in any detail. However, to the extent she simply opines that, as an epidemiologist engaging in a Bradford Hill analysis, a review of the published mechanistic literature suggested it was biologically plausible that glyphosate could cause NHL in humans, that limited conclusion is admissible. *Cf.* Rothman at 28-29.

With her Bradford Hill analysis cabined in this way, Dr. Ritz's opinion that glyphosate causes NHL, and has caused NHL in those who have used it in the manner studied, is admissible. Mar. 5, 2018 Tr. [Ritz] 96; Ritz Supp. Report 10. Dr. Ritz's opinion, like Dr. Portier's, goes to the ultimate general causation question and therefore is sufficient to support a denial of summary judgment; it does not simply rehash IARC's analysis. Also like Dr. Portier – and perhaps to a greater extent – there is ample room to challenge both her methods and her conclusions. But, as discussed, the purpose of Rule 702 and the *Daubert* inquiry is not to "exclude opinions merely because they are impeachable." *City of Pomona*, 750 F.3d at 1044 (citation omitted).

### C. Dr. Weisenburger

Dr. Weisenburger, a physician and pathologist who has focused for much of his career on NHL, also engaged in a Bradford Hill analysis in his expert report. He has significant experience in epidemiology and was a co-author of De Roos (2003), one of the key case-control studies for the plaintiffs. *See* Mar. 5, 2018 Tr. [Weisenburger] 169-70; Expert Report of Dr. Weisenburger 1-2, Wagstaff Decl. ISO Pls.' Opp'n Ex. 8 [Dkt. No. 648-8] ("Weisenburger Report"). Monsanto does not dispute that he is qualified to opine on the epidemiology evidence. *See* Def.'s Mot. 11 n.16.

In his expert report, Dr. Weisenburger offered an epidemiology opinion that was relatively brief. He considered the same core set of studies, reporting both the adjusted and

unadjusted odds ratios from these studies. Although he did not include the hierarchical regression in De Roos (2003) in his summary chart, he otherwise considered the full picture presented by the published epidemiology studies and concluded, first, that an association existed between NHL and glyphosate use. He explained that neither methodological critiques of the case-control studies nor the results of the AHS were sufficient to persuade him that the association he detected in the case-control studies was spurious. Weisenburger Report 6. When confronted with the data from the Andreotti (2018) update to the AHS, he discounted the study on the basis of nondifferential exposure misclassification, making many of the same arguments in support of this point as the experts above, as well as what he characterized as an insufficient follow-up period. Supplemental Report of Dr. Weisenburger 1-2, Wagstaff Decl. ISO Pls.' Supp. Br. Ex. 16 [Dkt. No. 1136-16] ("Weisenburger Supp. Report").

Monsanto contends Dr. Weisenburger's opinion is unreliable because it relied upon the univariate analysis in Eriksson (2008). Although Dr. Weisenburger did not provide a particularly nuanced analysis of that study in his report, he did include the results of the multivariate analysis in his report, and he frankly acknowledged the benefits of adjusting for potential confounders in that study during his testimony. Weisenburger Report 5; Mar. 6, 2018 Tr. [Weisenburger] 234-37. However, he disputed the inclusion of one of the variables in the study authors' model (arsenic), and did not say, as Monsanto implies, that he found the particular multivariate analysis included in Eriksson (2008), which included that disputed adjustment, to be more reliable. *See* Mar. 6, 2018 Tr. [Weisenburger] 237; Def.'s June 22, 2018 Br. 4. Monsanto also attacks Dr. Weisenburger's failure to mention the NAPP data in his expert report, even though he is an author of that study. Dr. Weisenburger explained that he elected to include published studies in his expert report, a defensible choice. Mar. 6, 2018 Tr. [Weisenburger] 251. And he was willing and able to discuss the NAPP during the *Daubert* hearings, acknowledging the wisdom of certain adjustments made in the NAPP study and that some of the odds ratios became statistically insignificant after these adjustments. He also emphasized that the odds ratio for higher-intensity exposure remained statistically significant. *Id.* at 218-21, 253-55, 257-63.

Thus, Dr. Weisenburger's treatment of the Eriksson (2008) and NAPP data is not a reason to deem his epidemiology opinion unreliable.

Dr. Weisenburger's handling of latency gives the Court the most pause. In his initial report, he faulted the first AHS study, De Roos (2005), for its inadequate follow-up period. In doing so, he acknowledged neither that the AHS inquired about exposures occurring prior to the start of the study nor that the case-control studies included in De Roos (2003) could be subject to the same criticism. *See* Weisenburger Report 5. He continued to fault the AHS for inadequate follow-up periods even after publication of the Andreotti (2018) update. Weisenburger Supp. Report 3. And Dr. Weisenburger repeatedly suggested, including in materials prepared outside of this litigation, that glyphosate-induced NHL was likely to have a long average latency period, on the order of 20 or more years. Weisenburger Report 5; Def.'s June 22, 2018 Supp. Br. Ex. 1 [Dkt. No. 1539-1]. Dr. Weisenburger sought to explain why it might be appropriate to discount negative cohort studies on the basis of latency but not positive case-control studies, but his justification was not entirely satisfying. *See* Mar. 6, 2018 Tr. [Weisenburger] 278-84.

Although Dr. Weisenburger's discussion of this issue during his *Daubert* testimony did not answer every question it raised, he ultimately persuaded the Court that he could testify reliably about the latency issue. He admitted during the *Daubert* hearing that the case-control studies could also be critiqued for having a short latency period. Mar. 5, 2018 Tr. [Weisenburger] 190; Mar. 6, 2018 Tr. [Weisenburger] 282-83. And he continued to acknowledge evidence suggesting that it likely takes many years, on average, for NHL to develop as a result of glyphosate exposure. *See* Mar. 6, 2018 Tr. [Weisenburger] 245-47, 268-69. While acknowledging these concerns, however, Dr. Weisenburger explained that the adjustments for other pesticides made by De Roos (2003) and the NAPP study would ameliorate the latency concern to a degree; as noted, one possible explanation for elevated odds ratios so soon after glyphosate's introduction would have been use of other pesticides, but these adjustments took account of that possible confounder. *Id.* at 282-83. So, although there is tension between Dr. Weisenburger's view that, on average, it likely takes more than a decade for

NHL to develop as a result of glyphosate exposure and the heavy weight he gives the case-control studies that could only account for a few years, he provided a scientifically plausible reason for continuing to credit the studies that adjusted for other pesticides.

Turning to the remainder of Dr. Weisenburger's opinion, the Court likewise finds no basis for excluding it. Dr. Weisenburger provided a brief rundown of the positive tumor findings identified by IARC, Greim (2015), and the EPA and concluded these findings provide sufficient evidence of carcinogenicity in experimental animals. Weisenburger Report 6-8. He also reviewed the mechanistic evidence and found that these studies supported IARC's conclusion that glyphosate and glyphosate-based herbicides are genotoxic. *Id.* at 8-9. He further opined that certain mechanistic studies indicated that low-dose exposures can have significant biological effects. *Id.* at 10.

Dr. Weisenburger's Bradford Hill analysis is admissible in light of his interpretation of the epidemiology studies. He concluded the temporality requirement was met. As to the strength of the association, he highlighted the odds ratios above 2.0 observed for certain subsets of the case-control study data, taking into account whether these results were statistically significant. *Id.* at 10-11. He focused on the same two case-control studies that sought to capture dose response as the experts above, and found elevated odds ratios to be adequately replicated across case-control studies conducted by different researchers in different regions. Regarding biological plausibility, he emphasized the studies demonstrating genotoxic effects and the occurrence of lymphoma in mice in some of the animal experiments. *Id.* at 11. Like Dr. Ritz, he concluded the specificity criterion supported causation, as the only disease associated with glyphosate exposure was NHL. Unlike the experts previously discussed, he concluded that glyphosate fell within a class of chemicals others of which have been implicated in causing NHL. *Id.* at 12. In addition, Dr. Weisenburger considered other possible explanations for the observed results and, among other things, concluded that "confounding due to the use of other pesticides does not fully explain the increased risk estimates for glyphosate" in light of the results in some studies that controlled for use of other pesticides. *Id.* None of these conclusions

55

offends *Daubert*'s requirements.

Of note, one feature of Dr. Weisenburger's opinion is particularly helpful to the plaintiffs. Unlike Dr. Ritz and Dr. Portier, who elaborated on what the evidence showed as to real-world exposure levels almost as an afterthought, Dr. Weisenburger's opinions were presented in these terms from the beginning. In his original report, he addressed whether glyphosate or glyphosate-based formulations like Roundup cause "NHL in humans exposed to these chemicals in the workplace or environment." Weisenburger Report 2, 12. In addressing this question, he considered the epidemiological studies as well as studies he determined showed biological effects at relatively low doses. *See id.* at 10. Thus, Dr. Weisenburger's testimony goes directly to the general causation question, and likewise assists the plaintiffs in surviving Monsanto's summary judgment motion.

### D.  Dr. Neugut

Another of the plaintiffs' experts who focused on epidemiology, although eminently qualified and refreshingly candid, has not provided admissible testimony.

Dr. Neugut, like the experts discussed above, evaluated each of the key epidemiology studies before engaging in a Bradford Hill analysis that took into account all available data across disciplines. *See* Expert Report of Dr. Neugut 11-17, 20-23, Wagstaff Decl. ISO Pls.' Opp'n Ex. 4 [Dkt. No. 648-4] ("Neugut Report"). His supplemental report offered many of the same critiques of the AHS that Dr. Ritz offered. *See* Supplemental Report of Dr. Neugut 6-12, Wagstaff Decl. ISO Pls.' Supp. Br. Ex. 15 [Dkt. No. 1136-15]. The reports themselves are of high quality.

However, Dr. Neugut's testimony at the *Daubert* hearing was of much lower quality. There were several inconsistencies between his deposition testimony and his testimony at the hearing (significant ones – not just the usual molehills of which lawyers often make mountains). He often seemed unfamiliar with key aspects of the material that purportedly formed the basis of his opinion. He sometimes answered questions in a cavalier fashion, apparently without giving much thought to whether he really knew the answer. And he often needed help from the

plaintiffs' lawyers in answering questions.  Although the written transcript of Dr. Neugut's testimony reflects these problems to some extent, they were far more apparent in the courtroom (and in the video recording of the hearing).  To give a few examples:

- Dr. Neugut sought to characterize IARC's assessment of glyphosate as something other than a hazard assessment, even though the Preamble is quite clear about what the Monographs seek to do.  Mar. 6, 2018 Tr. [Neugut] 296; Monograph at 10.

- Dr. Neugut opined that an IARC conclusion that an agent is a probable carcinogen means, as a practical matter, that the group reached this conclusion with 70-90% certainty, although IARC disclaims any numeric probability associated with its classifications.  Mar. 6, 2018 Tr. [Neugut] 301, 356-57; Monograph at 30 ("The terms probably carcinogenic and possibly carcinogenic have no quantitative significance and are used simply as descriptors of different levels of evidence of human carcinogenicity, with probably carcinogenic signifying a higher level of evidence than possibly carcinogenic." (emphasis omitted)).

- In his deposition, Dr. Neugut agreed with Monsanto's counsel that no statistically significant, pesticide-adjusted odds ratio in the published literature supported an association between glyphosate and NHL.  Hollingsworth Decl. ISO Def.'s Mot. Ex. 3 158-59 [Dkt. No 546-3].  That was an erroneous statement about a critical issue in the case.  Neugut later sought to correct that deposition testimony to take account of De Roos (2003), which reported a statistically significant association in the logistic regression model adjusted for other pesticides.  Hollingsworth Decl. ISO Def.'s Reply Ex. 4 [Dkt. No. 681-5]; De Roos (2003) at 5.

- In the slide presentation during Dr. Neugut's *Daubert* testimony, ostensibly prepared by Dr. Neugut himself, there was a slide describing McDuffie (2001). Dr. Neugut was not familiar with all the assertions about McDuffie (2001) that were contained in his own slide.  *See* Mar. 6, 2018 Tr. [Neugut] 330.

- He relied on a certain odds ratio from a 2002 Swedish case-control study whose

lead author was Lennart Hardell but demonstrated during his testimony that he did not know much about it. Among other things, he did not know whether and to what extent Hardell considered proxy respondents, and required help from the plaintiffs' lawyer to answer this question. *See id.* at 334-40.

▪ In response to a question by the Court about the logistic regression and the hierarchical regression in DeRoos (2003), Dr. Neugut first stated that logistic regression was more "legitimate" and that hierarchical regression modeling "is a fancy-schmancy, sophisticated thing you do to look cool." *Id.* at 341. The Court responded, "so can you now try and explain the difference between the two, to me?" After a period of fumbling in which it became apparent that Dr. Neugut couldn't explain the difference between the two, counsel for the plaintiff stepped in to point Dr. Neugut to the portion of the study that explained it. Dr. Neugut stated that he didn't know what it meant. *Id.* at 341-42.

▪ It appeared from his deposition testimony and his testimony at the *Daubert* hearing that Dr. Neugut reached his opinion that glyphosate causes NHL after reading only the IARC Monograph, and before reviewing the individual studies. *Id.* at 353-55. He also seemed to suggest that even IARC's finding of limited evidence of carcinogenicity in humans, without any review of the underlying studies, would have sufficed for him to reach the conclusion he reached in his report. *Id.* at 355-58.

▪ At his deposition, Dr. Neugut stated that the epidemiology evidence alone was not sufficient to show causation. During the *Daubert* hearing, Dr. Neugut stated he was revisiting that conclusion, even though the only evidence that could have justified a change in his analysis was the Andreotti (2018) study, which showed no association between glyphosate and NHL. *Id.* at 368-69; *cf. Domingo ex rel. Domingo*, 289 F.3d at 607.

Each problem with Dr. Neugut's testimony is not sufficient, on its own, to justify exclusion. Reliable experts sometimes make mistakes. They sometimes need to refer to the

written materials during their testimony, to refresh their recollection about an issue or perhaps to consider a point raised by counsel for the first time on cross-examination. Even a few instances of misstating the details or failing to recall some aspect of a particular study would not be enough to exclude a witness. But in combination, the problems with Dr. Neugut's testimony lead the Court to conclude that his opinion is not sufficiently reliable to be admissible. *See Department of Toxic Substances Control v. Technichem, Inc.*, No. 12-CV-05845-VC, 2016 WL 1029463, at *1 (N.D. Cal. Mar. 15, 2016) (noting that "[k]ey factual errors" undermine the reliability of an expert's testimony).

### E. Dr. Jameson

Dr. Jameson, a chemist and environmental toxicologist who specializes in cancer, engaged in an IARC-style hazard assessment of glyphosate as it relates to NHL, with a focus on the rodent carcinogenicity studies. *See* Jameson Report 1, 9-11, 19-29. Dr. Jameson has more than forty years of toxicology experience, and has worked for the National Cancer Institute and National Institute of Environmental Health Sciences. Mar. 7, 2018 Tr. [Jameson] 403. He was for many years responsible for the preparation of the Report on Carcinogens, a congressionally mandated public health report listing agents known or reasonably anticipated to cause cancer in humans. Jameson Report 2-3. He has also been a member of several IARC working groups, including the working group that assessed glyphosate as the chair of the experimental animal subgroup. Mar. 7, 2018 Tr. [Jameson] 404.

With respect to his opinion regarding the epidemiological evidence and its bearing on the general causation question, Dr. Jameson is hamstrung by his decision to conduct an IARC-style analysis. Dr. Jameson first summarizes the relevant IARC report at length. Jameson Report 4-8. He then engages in a "hazard based assessment of glyphosate and/or glyphosate-based formulations[] that . . . is the same as defined and characterized by IARC." *Id.* at 9. Dr. Jameson concludes that the human evidence is "limited" in the sense IARC used the term; that there is "sufficient" evidence that glyphosate causes certain tumors in experimental animals; and that there is strong evidence that glyphosate is genotoxic and induces oxidative stress, the two

possible cancer-causing mechanisms also identified by IARC.  *Id.* at 19, 29, 30-31.  Ultimately, he opines "to a reasonable degree of scientific certainty that glyphosate and glyphosate-based formulations are probable human carcinogens," and that "glyphosate and glyphosate-based formulations cause NHL in humans."  *Id.* at 31-32.  IARC does not explicitly reach Dr. Jameson's second conclusion but, having characterized his inquiry throughout the report as parallel to IARC's, there is no basis for reading Dr. Jameson's statements regarding glyphosate's ability to cause NHL in humans to mean anything more than that glyphosate is an NHL "hazard" in the sense IARC defines that term.  *See id.* at 9; Mar. 7, 2018 Tr. [Jameson] at 412, 418-19. That conclusion, reached using the methods IARC used, is one that meets *Daubert*'s reliability requirement, but it does not itself allow the plaintiffs to survive summary judgment and, as discussed in Section II, may not be admissible in this case at all, because it involves too different an inquiry from the one a jury would be required to undertake.

Apparently realizing their mistake before Dr. Jameson's appearance at the *Daubert* hearing, counsel for the plaintiffs sought to elicit an opinion from Dr. Jameson during the hearing that went beyond the one presented in his report – specifically, an opinion that "exposure to glyphosate not only can cause [NHL], but it is currently doing so, at current exposure levels today."  *Id.* at 405.  Dr. Jameson's analysis of the human evidence is not sufficient to support his additional conclusion that glyphosate "is currently" causing NHL "at current exposure levels today."  Dr. Jameson's primary focus and meaningful independent analysis concerned the animal toxicology studies, and his analysis was not crafted to support a conclusion that glyphosate is causing NHL in humans at current exposure levels.  *See id.* at 455-57.  As a result, "there is simply too great an analytical gap between" his analysis, which effectively duplicates IARC's as to human studies but goes further as to the animal studies, and his new conclusion regarding glyphosate's effects on humans at current exposure levels.  *Joiner*, 522 U.S. at 146; *see also Domingo ex rel. Domingo*, 289 F.3d at 606-07.

Obviously, none of this is the fault of Dr. Jameson – he is a scientist who should not be expected to identify, on his own, the difference between an IARC-style hazard assessment and

the evidentiary standard that governs civil lawsuits. But the apparent failure of plaintiffs' counsel to explain this difference to him, and to elicit an opinion from him that goes beyond a hazard assessment, means that his testimony is insufficient to get the plaintiffs over the general causation hurdle.

Although Dr. Jameson's overall hazard-assessment conclusion may end up not being admissible, he will be permitted to offer testimony (if a case makes it to trial) on the narrower topic of the animal cancer studies. As Dr. Jameson stated repeatedly during the *Daubert* hearing, the purpose of conducting studies in laboratory animals like the ones at issue here is to determine whether a substance causes cancer in animals. *See, e.g.*, Mar. 7, 2018 Tr. [Jameson] 475. As mentioned in Section IV, whether a substance does so is relevant to the general causation inquiry.

Monsanto attacks Dr. Jameson for not adequately addressing what it deems an absence of replicated tumor findings across different experiments, and for relying too heavily on statistical significance, rather than conducting a fuller assessment of biological significance. *See* Def.'s Mot. 30-31, 31 n.51; Def.'s Reply 29-30. Dr. Jameson did consider replication, agreeing that repeated findings of the same tumors across sexes, studies, or species would strengthen his conclusion that a particular chemical caused tumor development. Mar. 7, 2018 Tr. [Jameson] 449-52, 495. Further, Dr. Jameson concluded that four of the tumors of interest were repeated across studies. *Id.* at 449-52. Monsanto disagrees with his interpretation of those studies, and pointed out that his conclusions differ in many cases from those of the study authors. But Monsanto's disagreements with how Dr. Jameson weighted different considerations in arriving at his conclusions are fodder for cross-examination, not grounds for exclusion. *See Karlo*, 849 F.3d at 83 ("The question of whether a study's results were properly calculated or interpreted ordinarily goes to the weight of the evidence, not to its admissibility." (citation omitted)).

### F. Dr. Nabhan

Dr. Nabhan is a hematologist and medical oncologist who specializes "in the diagnosis and management of patients with all types of lymphoma." Expert Report of Dr. Nabhan 1,

Wagstaff Decl. ISO Pls.' Opp'n Ex. 7 [Dkt. No. 648-7].  Although he stated that he routinely

reviews epidemiology and toxicology studies as part of his clinical practice, he did not dispute

that his primary focus is on clinical work.  Mar. 9, 2018 Tr. [Nabhan] 805 ("I'm a clinician, I'm

not an epidemiologist or a statistician, but we're on the front line with patients."); *id.* at 818

("Again, I'm not an epidemiologist . . . .").  He summarized many relevant studies, but offered

little in the way of critical analysis of these studies.  *See id.* at 820 ("[F]rom a clinician's view,

we don't really sit down and re-analyze and re-perform a peer-review process for every single

paper that has been published. . . . My job as a clinician is not to peer-review the entire literature

again.").  Instead, he deferred to the opinions of other experts, and to IARC in particular, in

arriving at his conclusions.  *See id.* at 820-22, 850; *see also id.* at 822 ("So as a clinician, I will

look [at] these epidemiology studies, then I look at bodies such as the IARC, I look at the

history, and it's hard to argue, with all of the data that the IARC looked at and with the history,

so I tend to obviously believe the data that came out of IARC."); *id.* at 837 ("I didn't review this

particular evidence, but if the IARC says this particular aspect of the mechanism of action is

weak, then it's weak."); *id.* at 844 (agreeing that he "rel[ied] heavily on IARC for [his] opinion").

"[M]edical doctors do not need to be epidemiologists in order to testify regarding

epidemiological studies," so long as the expert is qualified by training or experience to interpret

these studies and his opinions would be helpful to the jury.  *In re Mirena IUD Products Liability

Litigation*, 169 F. Supp. 3d 396, 426 (S.D.N.Y. 2016); *see also In re Abilify*, 299 F. Supp. 3d at

1349.  The primary problem for the plaintiffs, however, is Dr. Nabhan's uncritical reliance on

IARC's conclusions.  During the *Daubert* hearing, Dr. Nabhan all but admitted that he reached

his conclusion regarding glyphosate upon reading the IARC report, and that contrary new

evidence was unlikely to shake his faith in IARC's conclusion.  *See* Mar. 9, 2018 Tr. [Nabhan]

850 ("Q. At this point, nothing would [] shake your conviction.  A. At this point, the IARC report

is very convincing.").  The deference to IARC that Dr. Nabhan demonstrated during the *Daubert*

hearing may well be appropriate clinical practice but, under these circumstances, it is not a

reliable way to reach a general causation opinion.  Dr. Nabhan's report also did not demonstrate

that he engaged in his own objective analysis of the epidemiologic literature.  Although he

summarized the relevant studies, he said little about how or whether they addressed possible bias or confounding, for instance.  *See* Nabhan Report 11-16.

During the *Daubert* hearing, Dr. Nabhan also suggested that his opinion regarding whether glyphosate was causing NHL at present-day exposure levels was informed by his clinical practice.  *See* Mar. 9, 2018 Tr. [Nabhan] 805-07.  He suggested that a subset of NHL patients developed their NHL as a result of glyphosate exposure, and that he recommends curtailing glyphosate use for patients with NHL, treating it as a "modifiable risk factor."  *Id.* at 810-11, 826-27.  Dr. Nabhan may well be able to offer an opinion that glyphosate was responsible for causing a particular patient's NHL, based on that patient's clinical presentation and history, during the specific causation phase of this litigation.  And it may well be good medical advice to tell a patient to curtail glyphosate exposure.  However, because Dr. Nabhan has not provided a reliable basis for concluding that glyphosate can cause NHL as a general matter, Monsanto's motion to exclude his testimony is granted.

## VII.   THE PLAINTIFFS' *DAUBERT* MOTION

In addition to defending their own experts, the plaintiffs seek to exclude certain of Monsanto's experts.  These challenges are addressed in the sections that follow.

### A.  Dr. Rosol

The plaintiffs seek to exclude Dr. Rosol, a veterinary pathologist, because he considered certain documents available only in a "glyphosate reading room" in Brussels that has since been shuttered.  *See* Rosol Report 9, 13-18.  They do not object to his general methodology or conclusions aside from this critique.  *See* Mar. 8, 2018 Tr. [Rosol] 731 ("We're actually not really even challenging your conclusions or your methodology too much.").

Dr. Rosol elaborated on what the reading room entailed during cross-examination at the *Daubert* hearing.  He testified that the reading room allowed researchers to sign up for up to four half-day sessions during the weeks it was open, and the researchers could use one of approximately ten old, monochrome computers to review the data from the studies.  *Id.* at 732-36.  On the one hand, he testified that he took approximately 50 pages of handwritten notes during his time in the reading room, and he references the material he reviewed in the reading

room repeatedly in his report.  *See id.*; Rosol Report 13-18.  On the other hand, he testified that the "Reading Room pathology reports," apparently the only material not accessible through the publicly available Greim (2015) study supplements, "did not influence [his] interpretation" and were not necessary to support his conclusions.  *Id.* at 735.

So long as neither the Court nor the plaintiffs' experts have access to the data available only in the reading room, Dr. Rosol will be precluded from referencing this material in rendering his opinion.  However, because he testified that his opinion would stand absent that material, and his opinion is otherwise admissible, his opinion will not otherwise be excluded.

### B.  Dr. Goodman

Dr. Goodman, a toxicologist, seeks to offer an opinion that glyphosate and glyphosate-based formulations "should be regarded as non-genotoxic materials," and that, although they "might be capable of causing oxidative stress under certain experimental conditions, . . . it is not appropriate to use this observation to support a contention that these materials are capable of causing cancer."  Goodman Report 3-4.

The plaintiffs challenge the admissibility of Dr. Goodman's testimony on two grounds. First, they argue his opinions discounting two human in vivo studies, Bolognesi (2009) and Paz-y-Miño (2007), are inadmissible because his critiques of the studies are too speculative and contain errors.  Some of Dr. Goodman's critiques are less than persuasive bases for discounting the studies – for instance, his concern that more than one person might have analyzed the slides in Paz-y-Miño (2007), which might have introduced subjectivity into the data analysis.  *See id.* at 13.  Others are very reasonable, like his observations that other factors might have explained the DNA damage in light of the period that elapsed between the aerial glyphosate spraying and the time when the blood samples were taken, and that study participants appeared to exhibit symptoms of acute illness.  *See* Paz-y-Miño (2007) at 457 (noting the physical symptoms reported by participants and that blood samples were gathered between two weeks and two months after the aerial spraying of glyphosate).  Regarding the Bolognesi (2009) study, Dr. Goodman emphasized that the indicator of genotoxicity was highest in a region where glyphosate was not aerially sprayed (although where people were still exposed to pesticides,

including glyphosate).  Goodman Report 15-17; Bolognesi (2009) at 995.  Although the plaintiffs ascribe a different meaning to this aspect of the Bolognesi study, Dr. Goodman's observation is neither incorrect nor irrelevant, in light of the study's focus on the effects of aerial spraying and its extremely limited conclusions.  *See* Bolognesi (2009) at 994-95.  The plaintiffs' motion to exclude Dr. Goodman's critiques of the human in vivo studies is therefore denied.

The plaintiffs also mount a broader attack on Dr. Goodman's methodology as results-oriented.  Dr. Goodman's methodology emphasized studies conducted on mammals or mammalian cells and those that use the four basic tests used by international agencies for registration or approval of chemicals.  Goodman Report 10-11.  He dismisses several of the studies as unable to rule out cytotoxicity as the cause of the results observed.  *See, e.g.*, *id.* at 23, 26-27, 29-30.  Although he reaches different conclusions about what the weight of the mechanistic evidence shows, his analysis is not so flawed or one-sided that his opinions need be excluded.

### C.  Dr. Foster

The plaintiffs further seek to exclude the testimony of Dr. Foster, who is also a toxicologist.  They contend he is not qualified to offer an opinion on the rodent studies, because his focus is on reproductive toxicology.  Notwithstanding Dr. Foster's focus on reproductive toxicology, he is qualified to opine on the rodent carcinogenicity data at issue here.  *See D.F. ex rel. Amador*, 2017 WL 4922814, at *14.  He is a trained in toxicology, served as the one-time acting director of an environmental toxicology program at Health Canada, and has published at least a few peer-reviewed articles on cancer in rodents.  Wagstaff Decl. ISO Pls.' Opp'n Ex. 122 at 118-23 [Dkt. No. 656-17 at 32-33].

The plaintiffs additionally argue that Dr. Foster's opinion is unreliable.  Among the alleged flaws they identify are his comparisons across studies the plaintiffs consider insufficiently similar.  For example, they point to his comparison of the results concerning interstitial testicular tumors in the Lankas (1981) study with those in the Atkinson and Suresh studies, noting that, in the latter two studies, not all the low-dose animals were fully examined.  Pls.' Opp'n 67-68.  The plaintiffs also argue that he inappropriately dismissed certain tumors

because no tumor progression was observed or, in the case of the Knezevich and Hogan study, because of alleged weight loss in the high-dose group of mice. *Id.* at 68-69.

Dr. Foster, like the plaintiffs' experts, conducted a literature review and evaluated the quality of each of the studies. Unlike the plaintiffs' experts, he explained away the statistically significant tumor findings, pointing to a lack of reproducibility between studies, an abnormally low number of tumors in certain control groups, lack of dose response, decreased survival of certain control animals (which would result in older treated animals, and thus likely more spontaneous tumors), and evidence of systemic toxicity in one high-dose group. *See* Foster Report 27. As discussed above, different interpretations of these studies are not necessarily evidence of unreliability, and Dr. Foster's interpretations of the same core studies evaluated by the plaintiffs are sufficiently grounded in scientific principles to be admissible. The plaintiffs may raise their concerns via cross-examination.

### D. Drs. Rider and Mucci

Monsanto proffered two epidemiology experts, Drs. Rider and Mucci. The plaintiffs object to their opinions because they relied heavily and, the plaintiffs argue, uncritically on the various iterations of the AHS study. As discussed above, the AHS study, like the case-control studies, is open to valid critiques. Like the plaintiffs' experts who focused on epidemiology, Drs. Rider and Mucci assessed the strengths and weaknesses of the relevant epidemiology studies, but weighed the studies differently and reached different conclusions. Dr. Rider briefly acknowledged the possibility of exposure misclassification in the AHS study, but concluded that, in light of the observed odds ratios below 1.0, it would not have obscured any positive association. Rider Supp. Report 3-4. She also explained why she was not concerned about the imputation method used by the AHS study authors, citing methodological and sensitivity analyses. *Id.* at 4-5. Dr. Mucci likewise acknowledged the possibility of nondifferential misclassification of glyphosate exposure and explained how the authors of the Andreotti (2018) study assuaged any concerns she might have about the imputation method. Mucci Report 33, 35; Mucci Supp. Report 2-4, 7; Mar. 9, 2018 Tr. [Mucci] 905 ("[W]e should be, as epidemiologists, concerned with the fact that there is 37 percent missing data. We do want to rule out that there

are not biases that are systematic as a result of this missing data.").  Both experts offered rebuttals to the plaintiffs' concerns.  *See* Mucci Supp. Report 7-10; Rider Supp. Report 8-11; Mar. 9, 2018 Tr. [Mucci] 863-919.  As suggested earlier, the disputes between the experts evaluating these epidemiology studies are reasonable disputes.  Dr. Mucci and Dr. Rider used sufficiently reliable methods to reach conclusions about the epidemiology evidence that require no unduly great leap from their analyses.  The plaintiffs' *Daubert* motion to exclude their testimony is therefore denied.

### E.  Dr. Corcoran

Dr. Corcoran, a biostatistician, critiques Dr. Portier's statistical analysis of the rodent carcinogenicity studies.  The plaintiffs argue only that Dr. Corcoran is not qualified to offer an opinion on the data at issue here, because his research has focused on dementia and other aging-related diseases.  As proof, they point to an exchange in which he purportedly did not know the difference between primary and secondary tumors, the latter of which the plaintiffs contend should be excluded from tumor counts in animal bioassays.  Pls.' Opp'n 56 n.165; Pls.' Reply 12.  That Dr. Corcoran's research has not focused on cancer or animal bioassays does not require his exclusion.  *See Avila*, 633 F.3d at 839.  As a trained biostatistician, he is qualified to offer a critique of Dr. Portier's statistical analysis, and the plaintiffs are free to dispute his treatment of secondary tumors through Dr. Portier's testimony and during cross-examination.  The motion to exclude Dr. Corcoran is denied.

### VIII.   CONCLUSION

It's a close question whether to admit the expert opinions of Dr. Portier, Dr. Ritz, and Dr. Weisenburger that glyphosate can cause NHL at human-relevant doses.  Therefore, it's a close question whether to grant or deny Monsanto's motion for summary judgment.  But the Court concludes that the opinions of these experts, while shaky, are admissible.  They have surveyed the significant body of epidemiological literature relevant to this question; identified at least a few statistically significant elevated odds ratios from case-control studies and meta-analyses; identified what they deem to be a pattern of odds ratios above 1.0 from the case-control studies, even if not all are statistically significant; emphasized that studies of glyphosate have focused on

many different types of cancer but found a link only between glyphosate and NHL; given

legitimate reasons to question the results of the primary study on which Monsanto relies; and

concluded, in light of all the available evidence, that a causal interpretation is appropriate.  Their

opinions may be bolstered by Dr. Jameson's narrower opinions regarding glyphosate's ability to

cause cancer in animals.  Therefore, the plaintiffs have presented evidence from which a

reasonable jury could conclude that glyphosate can cause NHL at human-relevant doses.

Monsanto's motion for summary judgment is denied.


       **IT IS SO ORDERED.**

Dated: July 10, 2018

       _____

       VINCE CHHABRIA
       United States District Judge

# EXHIBIT
# 4

FILED  1st JUDICIAL DISTRICT COURT
Santa Fe County
1/17/2020 1:48 PM
KATHLEEN VIGIL CLERK OF THE COURT
Leticia Cunningham

**STATE OF NEW MEXICO**
**COUNTY OF SANTA FE**
**FIRST JUDICIAL DISTRICT**

| | |
|---|---|
| **MARITA RENTERIA** | |
| **Plaintiff,** | |
| **v.** | **Cause No.**   D-101-CV-2020-00180 |
| **MONSANTO COMPANY; SIDCO** | **JURY TRIAL DEMANDED** |
| **CORPORATION; AGCO CORPORATION** | |
| **Defendant.** | |

## ORIGINAL COMPLAINT

COMES NOW Plaintiff MARITA RENTERIA and hereby brings this action against Defendants Monsanto Company, Sidco Corporation, and AGCO Corporation, and would show the Court as follows:

## INTRODUCTION

Plaintiff brings this cause of action against Defendants for injuries sustained as a result of using Defendant Monsanto Company's ("Monsanto") unreasonably dangerous and defective product, Roundup®. More specifically, Plaintiff's claims involve Defendant's negligent, willful, and wrongful conduct in connection with the design, development, manufacture, testing, packaging, promoting, marketing, distribution, and/or sale of Roundup® and/or other Monsanto glyphosate-containing products ("Roundup" or "Roundup®"). As a direct and proximate result of her exposure to Roundup® and its reactive ingredient, glyphosate, Plaintiff developed non-Hodgkin's Lymphoma.

## THE PARTIES, JURISDICTION, AND VENUE

### Plaintiff

1.      Plaintiff Marita Renteria is a resident of Las Cruces, New Mexico. Ms. Renteria was exposed to Roundup employed as a Farm Hand with Sidco Corporation and was subsequently

1

diagnosed with non-Hodgkin's Lymphoma in 1995.

## Defendants

2.      Upon information and belief, Defendant, Monsanto Company ("Monsanto") is a multinational agricultural biotechnology corporation based in St. Louis, Missouri, and incorporated in Delaware. Monstanto may be served with process via its registered agent, Corporation Service Company, 123 East Marcy Street, Suite 101, Santa Fe, New Mexico 87501.

3.      Defendant Sidco Corporation is incorporated in New Mexico and maintains its principle place of business in New Mexico. It may be served with process via its registered agent, Lloyd Lindbeck at 2725 Terrance Arc, Las Cruces, New Mexico 88011.

4.      Defendant AGCO Corporation is incorporated in the Delaware and maintains its principle place of business in Santa Fe, New Mexico. It may be served with process via its registered agent Corporation Service Company at 123 East Marcy Street, Suite 101, Santa Fe, New Mexico 87501.

5.      Each defendant either maintains a principle place of business within the State of New Mexico or maintains sufficient contacts with the State of Iowa such that this Court's exercise of personal jurisdiction over it does not offend traditional notions of fair play and substantial justice.

6.      Venue is proper within this County because the events giving rise to this action happened in or are closely related to this County.

## NATURE OF THE ACTION

7.      In 1970, Defendant Monsanto Company discovered the herbicidal properties of glyphosate and began marketing it in products in 1974 under the brand name Roundup®. Roundup® is a non-selective herbicide used to kill weeds that commonly compete with the

growing of crops. By 2001, glyphosate had become the most-used active ingredient in American agriculture with 85–90 millions of pounds used annually. That number grew to 185 million pounds by 2007. As of 2013, glyphosate was the world's most widely used herbicide.

8.      Monsanto is a multinational agricultural biotechnology corporation based in St. Louis, Missouri. It is the world's leading producer of glyphosate. As of 2009, Monsanto was the world's leading producer of seeds, accounting for 27% of the world seed market. The majority of these seeds are of the Roundup Ready® brand. The stated advantage of Roundup Ready® crops is that they substantially improve a farmer's ability to control weeds, since glyphosate can be sprayed in the fields during the growing season without harming their crops. In 2010, an estimated 70% of corn and cotton, and 90% of soybean fields in the United States were Roundup Ready®.

9.      Monsanto's glyphosate products are registered in 130 countries and approved for use on over 100 different crops. They are ubiquitous in the environment. Numerous studies confirm that glyphosate is found in rivers, streams, and groundwater in agricultural areas where Roundup® is used. It has been found in food, in the urine of agricultural workers, and even in the urine of urban dwellers who are not in direct contact with glyphosate.

10.      On March 20, 2015, the International Agency for Research on Cancer ("IARC"), an agency of the World Health Organization ("WHO"), issued an evaluation of several herbicides, including glyphosate. That evaluation was based, in part, on studies of exposures to glyphosate in several countries around the world, and it traces the health implications from exposure to glyphosate since 2001.

11.      On July 29, 2015, IARC issued the formal monograph relating to glyphosate. In that monograph, the IARC Working Group provides a thorough review of the numerous studies and data relating to glyphosate exposure in humans.

3

12.     The IARC Working Group classified glyphosate as a Group 2A herbicide, which means that it is probably carcinogenic to humans. The IARC Working Group concluded that the cancers most associated with glyphosate exposure are non-Hodgkin lymphoma and other hematopoietic cancers, including lymphocytic lymphoma/chronic lymphocytic leukemia, B-cell lymphoma, and multiple myeloma.

13.     The IARC evaluation is significant. It confirms that glyphosate is toxic to humans.

14.     Nevertheless, Monsanto, since it began selling Roundup®, has represented it as safe to humans and the environment. Indeed, Monsanto has repeatedly proclaimed and continues to proclaim to the world, and particularly to United States consumers, that glyphosate-based herbicides, including Roundup®, create no unreasonable risks to human health or to the environment.

## FACTS

17.     At all times relevant to this complaint, Monsanto was the entity that discovered the herbicidal properties of glyphosate and the manufacturer of Roundup®, which contains the active ingredient glyphosate and the surfactant POEA, as well as adjuvants and other "inert" ingredients. Glyphosate is a broad spectrum, non-selective herbicide used in a wide variety of herbicidal products around the world.

18.     Glyphosate is a broad-spectrum, non-selective herbicide used in a wide variety of herbicidal products around the world.

19.     Plants treated with glyphosate translocate the systemic herbicide to their roots, shoot regions and fruit, where it interferes with the plant's ability to form aromatic amino acids necessary for protein synthesis. Treated plants generally die within two to three days. Because plants absorb glyphosate, it cannot be completely removed by washing or peeling produce or by

milling, baking, or brewing grains.

20.     For nearly 40 years, farms across the world have used Roundup® without knowing of the dangers its use poses. That is because when Monsanto first introduced Roundup®, it touted glyphosate as a technological breakthrough: it could kill almost every weed without causing harm either to people or to the environment. Of course, history has shown that not to be true. According to the WHO, the main chemical ingredient of Roundup®—glyphosate—is a probable cause of cancer. Those most at risk are farm workers and other individuals with workplace exposure to Roundup®, such as workers in garden centers, nurseries, and landscapers. Agricultural workers are, once again, victims of corporate greed. Monsanto assured the public that Roundup® was harmless. In order to prove this, Monsanto championed falsified data and attacked legitimate studies that revealed its dangers. Monsanto led a prolonged campaign of misinformation to convince government agencies, farmers, and the general population that Roundup® was safe.

### *The Discovery of Glyphosate and Development of Roundup®*

20.     The herbicidal properties of glyphosate were discovered in 1970 by Monsanto chemist John Franz. The first glyphosate-based herbicide was introduced to the market in the mid-1970s under the brand name Roundup®. From the outset, Monsanto marketed Roundup® as a "safe" general-purpose herbicide for widespread commercial and consumer use; Monsanto still markets Roundup® as safe today.

### *Registration of Herbicides under Federal Law*

21.     The manufacture, formulation and distribution of herbicides, such as Roundup®, are regulated under the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA" or "Act"), 7 U.S.C. § 136 et seq. FIFRA requires that all pesticides be registered with the Environmental Protection Agency ("EPA" or "Agency") prior to their distribution, sale, or use, except as

described by the Act. 7 U.S.C. § 136a(a).

22.     Because pesticides are toxic to plants, animals, and humans, at least to some degree, the EPA requires as part of the registration process, among other things, a variety of tests to evaluate the potential for exposure to pesticides, toxicity to people and other potential non-target organisms, and other adverse effects on the environment. Registration by the EPA, however, is not an assurance or finding of safety. The determination the Agency must make in registering or re-registering a product is not that the product is "safe," but rather that use of the product in accordance with its label directions "will not generally cause unreasonable adverse effects on the environment." 7 U.S.C. § 136a(c)(5)(D).

23.     FIFRA defines "unreasonable adverse effects on the environment" to mean "any unreasonable risk to man or the environment, taking into account the economic, social, and environmental costs and benefits of the use of any pesticide." 7 U.S.C. § 136(bb). FIFRA thus requires EPA to make a risk/benefit analysis in determining whether a registration should be granted or allowed to continue to be sold in commerce.

24.     The EPA registered Roundup® for distribution, sale, and manufacture in the United States and, specifically, the State of Missouri.

25.     FIFRA generally requires that the registrant, Monsanto in the case of Roundup®, conducts the health and safety testing of pesticide products. The EPA has protocols governing the conduct of tests required for registration and the laboratory practices that must be followed in conducting these tests. The data produced by the registrant must be submitted to the EPA for review and evaluation. The government is not required, nor is it able, however, to perform the product tests that are required of the manufacturer.

26.     The evaluation of each pesticide product distributed, sold, or manufactured is

completed at the time the product is initially registered. The data necessary for registration of a pesticide has changed over time. The EPA is now in the process of re-evaluating all pesticide products through a Congressionally-mandated process called "re-registration." 7 U.S.C. § 136a-1. In order to reevaluate these pesticides, the EPA is demanding the completion of additional tests and the submission of data for the EPA's review and evaluation.

27.     In the case of glyphosate, and therefore Roundup®, the EPA had planned on releasing its preliminary risk assessment —in relation to the re-registration process—no later than July 2015. The EPA completed its review of glyphosate in early 2015, but it delayed releasing the risk assessment pending further review in light of the WHO's health-related findings.

### *Scientific Fraud Underlying the Marketing and Sale of Glyphosate/Roundup*

28.     Based on early studies that glyphosate could cause cancer in laboratory animals, the EPA originally classified glyphosate as possibly carcinogenic to humans (Group C) in 1985. After pressure from Monsanto, including contrary studies it provided to the EPA, the EPA changed its classification to evidence of non-carcinogenicity in humans (Group E) in 1991. In so classifying glyphosate, however, the EPA made clear that the designation did not mean the chemical does not cause cancer: "It should be emphasized, however, that designation of an agent in Group E is based on the available evidence at the time of evaluation and should not be interpreted as a definitive conclusion that the agent will not be a carcinogen under any circumstances."

29.     On two occasions, the EPA found that the laboratories hired by Monsanto to test the toxicity of its Roundup® products for registration purposes committed fraud.

30.     In the first instance, Monsanto, in seeking initial registration of Roundup® by EPA, hired Industrial Bio-Test Laboratories ("IBT") to perform and evaluate pesticide toxicology studies relating to Roundup®. IBT performed about 30 tests on glyphosate and glyphosate-

containing products, including nine of the 15 residue studies needed to register Roundup®.

31.     In 1976, the United States Food and Drug Administration ("FDA") performed an inspection of Industrial Bio-Test Industries ("IBT") that revealed discrepancies between the raw data and the final report relating to the toxicological impacts of glyphosate. The EPA subsequently audited IBT; it too found the toxicology studies conducted for the Roundup® herbicide to be invalid. An EPA reviewer stated, after finding "routine falsification of data" at IBT, that it was "hard to believe the scientific integrity of the studies when they said they took specimens of the uterus from male rabbits."

32.     Three top executives of IBT were convicted of fraud in 1983.

33.     In the second incident of data falsification, Monsanto hired Craven Laboratories in 1991 to perform pesticide and herbicide studies, including for Roundup®. In that same year, the owner of Craven Laboratories and three of its employees were indicted, and later convicted, of fraudulent laboratory practices in the testing of pesticides and herbicides.

34.     Despite the falsity of the tests that underlie its registration, within a few years of its launch, Monsanto was marketing Roundup® in 115 countries.

### The Importance of Roundup® to Monsanto's Market Dominance Profits

35.     The success of Roundup® was key to Monsanto's continued reputation and dominance in the marketplace. Largely due to the success of Roundup® sales, Monsanto's agriculture division was out-performing its chemicals division's operating income, and that gap increased yearly. But with its patent for glyphosate expiring in the United States in the year 2000, Monsanto needed a strategy to maintain its Roundup® market dominance and to ward off impending competition.

36.     In response, Monsanto began the development and sale of genetically engineered

Roundup Ready® seeds in 1996. Since Roundup Ready® crops are resistant to glyphosate; farmers can spray Roundup® onto their fields during the growing season without harming the crop. This allowed Monsanto to expand its market for Roundup® even further; by 2000, Monsanto's biotechnology seeds were planted on more than 80 million acres worldwide and nearly 70% of American soybeans were planted from Roundup Ready® seeds. It also secured Monsanto's dominant share of the glyphosate/Roundup® market through a marketing strategy that coupled proprietary Roundup Ready® seeds with continued sales of its Roundup® herbicide.

37.     Through a three-pronged strategy of increased production, decreased prices, and by coupling with Roundup Ready® seeds, Roundup® became Monsanto's most profitable product. In 2000, Roundup® accounted for almost $2.8 billion in sales, outselling other herbicides by a margin of five to one, and accounting for close to half of Monsanto's revenue. Today, glyphosate remains one of the world's largest herbicides by sales volume.

### *Monsanto has known for decades that it falsely advertises the safety of Roundup®*

38.     In 1996, the New York Attorney General ("NYAG") filed a lawsuit against Monsanto based on its false and misleading advertising of Roundup ® products. Specifically, the lawsuit challenged Monsanto's general representations that its spray-on glyphosate-based herbicides, including Roundup®, were "safer than table salt" and "practically non-toxic" to mammals, birds, and fish. Among the representations the NYAG found deceptive and misleading about the human and environmental safety of Roundup® are the following:

> a)  Remember that environmentally friendly Roundup herbicide is biodegradable. It won't build up in the soil so you can use Roundup with confidence along customers' driveways, sidewalks and fences.
>
> b)  And remember that Roundup is biodegradable and won't build up in the

soil. That will give you the environmental confidence you need to use Roundup everywhere you've got a weed, brush, edging or trimming problem.

c) Roundup biodegrades into naturally occurring elements.

d) Remember that versatile Roundup herbicide stays where you put it. That means there's no washing or leaching to harm customers' shrubs or other desirable vegetation.

e) This non-residual herbicide will not wash or leach in the soil. It ... stays where you apply it.

f) You can apply Accord (another glyphosate-containing Monsanto herbicide) with "confidence because it will stay where you put it" it bonds tightly to soil particles, preventing leaching. Then, soon after application, soil microorganisms biodegrade Accord into natural products.

g) Glyphosate is less toxic to rats than table salt following acute oral ingestion.

h) Glyphosate's safety margin is much greater than required. It has over a 1,000-fold safety margin in food and over a 700-fold safety margin for workers who manufacture it or use it.

i) You can feel good about using herbicides by Monsanto. They carry a toxicity category rating of 'practically non-toxic' as it pertains to mammals, birds and fish.

j) "Roundup can be used where kids and pets will play and breaks down

10

into natural material." This ad depicts a person with his head in the ground and a pet dog standing in an area which has been treated with Roundup.

39.      On November 19, 1996, Monsanto entered into an Assurance of Discontinuance with NYAG, in which Monsanto agreed, among other things, "to cease and desist from publishing or broadcasting any advertisements [in New York] that represent, directly or by implication" that:

a)  its glyphosate-containing pesticide products or any component thereof are safe, non-toxic, harmless or free from risk.

b)  its glyphosate-containing pesticide products or any component thereof manufactured, formulated, distributed or sold by Monsanto are biodegradable.

c)  its glyphosate-containing pesticide products or any component thereof stay where they are applied under all circumstances and will not move through the environment by any means.

d)  its glyphosate-containing pesticide products or any component thereof are "good" for the environment or are "known for their environmental characteristics."

e)  glyphosate-containing pesticide products or any component thereof are safer or less toxic than common consumer products other than herbicides;

f)  its glyphosate-containing products or any component thereof might be classified as "practically non-toxic."

40.      Monsanto did not alter its advertising in the same manner in any state other than

11

New York, and on information and belief still has not done so today.

41.     In 2009, France's highest court ruled that Monsanto had not told the truth about the safety of Roundup®. The French court affirmed an earlier judgement that Monsanto had falsely advertised its herbicide Roundup® as "biodegradable" and that it "left the soil clean."

### Classifications and Assessments of Glyphosate

42.     The IARC process for the classification of glyphosate followed the stringent procedures for the evaluation of a chemical agent. Over time, the IARC Monograph program has reviewed 980 agents. Of those reviewed, it has determined 116 agents to be Group 1 (Known Human Carcinogens); 73 agents to be Group 2A (Probable Human Carcinogens); 287 agents to be Group 2B (Possible Human Carcinogens); 503 agents to be Group 3 (Not Classified); and one agent to be Probably Not Carcinogenic.

43.     The established procedure for IARC Monograph evaluations is described in the IARC Programme's Preamble. Evaluations are performed by panels of international experts, selected on the basis of their expertise and the absence of actual or apparent conflicts of interest.

44.     One year before the Monograph meeting, the meeting is announced and there is a call both for data and for experts. Eight months before the Monograph meeting, the Working Group membership is selected and the sections of the Monograph are developed by the Working Group members. One month prior to the Monograph meeting, the call for data is closed and the various draft sections are distributed among Working Group members for review and comment. Finally, at the Monograph meeting, the Working Group finalizes review of all literature, evaluates the evidence in each category, and completes the overall evaluation. Within two weeks after the Monograph meeting, the summary of the Working Group findings is published in Lancet Oncology, and within a year after the meeting, the final Monograph is finalized and published.

45.     In assessing an agent, the IARC Working Group reviews the following information:

    a)  human, experimental, and mechanistic data;

    b)  all pertinent epidemiological studies and cancer bioassays; and

    c)  representative mechanistic data. The studies must be publicly available and have sufficient detail for meaningful review, and reviewers cannot be associated with the underlying study.

46.     In March 2015, IARC reassessed glyphosate. The summary published in The Lancet Oncology reported that glyphosate is a Group 2A agent and probably carcinogenic in humans.

47.     On July 29, 2015, IARC issued its Monograph for glyphosate, Monograph 112. For Volume 112, the volume that assessed glyphosate, a Working Group of 17 experts from 11 countries met at IARC from March 3–10, 2015, to assess the carcinogenicity of certain herbicides, including glyphosate. The March meeting culminated nearly a one-year review and preparation by the IARC Secretariat and the Working Group, including a comprehensive review of the latest available scientific evidence. According to published procedures, the Working Group considered "reports that have been published or accepted for publication in the openly available scientific literature" as well as "data from governmental reports that are publicly available."

48.     The studies considered the following exposure groups: occupational exposure of farmers and tree nursery workers in the United States, forestry workers in Canada and Finland, and municipal weed-control workers in the United Kingdom; and para-occupational exposure in farming families.

13

49.     Glyphosate was identified as the second-most used household herbicide in the United States for weed control between 2001 and 2007 and the most heavily used herbicide in the world in 2012.

50.     Exposure pathways are identified as air (especially during spraying), water, and food. Community exposure to glyphosate is widespread and found in soil, air, surface water, and groundwater, as well as in food.

51.     The assessment of the IARC Working Group identified several case control studies of occupational exposure in the United States, Canada, and Sweden. These studies show a human health concern from agricultural and other work-related exposure to glyphosate.

52.     The IARC Working Group found an increased risk between exposure to glyphosate and non-Hodgkin lymphoma ("NHL") and several subtypes of NHL, and the increased risk persisted after adjustment for other pesticides.

53.     The IARC Working Group also found that glyphosate caused DNA and chromosomal damage in human cells. One study in community residents reported increases in blood markers of chromosomal damage (micronuclei) after glyphosate formulations were sprayed.

54.     In male CD-1 mice, glyphosate induced a positive trend in the incidence of a rare tumor, renal tubule carcinoma. A second study reported a positive trend for haemangiosarcoma in male mice. Glyphosate increased pancreatic islet-cell adenoma in male rats in two studies. A glyphosate formulation promoted skin tumors in an initiation-promotion study in mice.

55.     The IARC Working Group also noted that glyphosate has been detected in the urine of agricultural workers, indicating absorption. Soil microbes degrade glyphosate to aminomethylphosphoric acid (AMPA). Blood AMPA detection after exposure suggests intestinal microbial metabolism in humans.

14

56.     The IARC Working Group further found that glyphosate and glyphosate formulations induced DNA and chromosomal damage in mammals, and in human and animal cells in utero.

57.     The IARC Working Group also noted genotoxic, hormonal, and enzymatic effects in mammals exposed to glyphosate. Essentially, glyphosate inhibits the biosynthesis of aromatic amino acids, which leads to several metabolic disturbances, including the inhibition of protein and secondary product biosynthesis and general metabolic disruption.

58.     The IARC Working Group also reviewed an Agricultural Health Study, consisting of a prospective cohort of 57,311 licensed pesticide applicators in Iowa and North Carolina. While this study differed from others in that it was based on a self-administered questionnaire, the results support an association between glyphosate exposure and Multiple Myeloma, Hairy Cell Leukemia (HCL), and Chronic Lymphocytic Leukemia (CLL), in addition to several other cancers.

*Other Earlier Findings About Glyphosate's Dangers to Human Health*

59.     The EPA has a technical fact sheet, as part of its Drinking Water and Health, National Primary Drinking Water Regulations publication, relating to glyphosate. This technical fact sheet predates the IARC March 20, 2015, evaluation. The fact sheet describes the release patterns for glyphosate as follows:

*Release Patterns*

60.     Glyphosate is released to the environment in its use as an herbicide for controlling woody and herbaceous weeds on forestry, right-of-way, cropped and non-cropped sites. These sites may be around water and in wetlands. It may also be released to the environment during its manufacture, formulation, transport, storage, disposal, and cleanup, and from spills. Since glyphosate is not a listed chemical in the Toxics Release Inventory, data on releases during its

manufacture and handling are not available. Occupational workers and home gardeners may be exposed to glyphosate by inhalation and dermal contact during spraying, mixing, and cleanup. They may also be exposed by touching soil and plants to which glyphosate was applied. Occupational exposure may also occur during glyphosate's manufacture, transport storage, and disposal.

61.    In 1995, the Northwest Coalition for Alternatives to Pesticides reported that in California, the state with the most comprehensive program for reporting of pesticide-caused illness, glyphosate was the third most commonly-reported cause of pesticide illness among agricultural workers.

### *Recent Worldwide Bans on Roundup®/Glyphosate*

62.    Several countries around the world have instituted bans on the sale of Roundup® and other glyphosate-containing herbicides, both before and since IARC first announced its assessment for glyphosate in March 2015, and more countries undoubtedly will follow suit as the dangers of the use of Roundup® are more widely known. The Netherlands issued a ban on all glyphosate-based herbicides in April 2014, including Roundup®, which took effect by the end of 2015. In issuing the ban, the Dutch Parliament member who introduced the successful legislation stated: "Agricultural pesticides in user-friendly packaging are sold in abundance to private persons. In garden centers, Roundup® is promoted as harmless, but unsuspecting customers have no idea what the risks of this product are. Especially children are sensitive to toxic substances and should therefore not be exposed to it."

63.    The Brazilian Public Prosecutor in the Federal District requested that the Brazilian Justice Department suspend the use of glyphosate.

64.    France banned the private sale of Roundup® and glyphosate following the IARC

assessment for Glyphosate.

65.     Bermuda banned both the private and commercial sale of glyphosates, including Roundup®. The Bermuda government explained its ban as follows: "Following a recent scientific study carried out by a leading cancer agency, the importation of weed spray 'Roundup' has been suspended."

66.     The Sri Lankan government banned the private and commercial use of glyphosates, particularly out of concern that glyphosate has been linked to fatal kidney disease in agricultural workers.

67.     The government of Colombia announced its ban on using Roundup® and glyphosate to destroy illegal plantations of coca, the raw ingredient for cocaine, because of the WHO's finding that glyphosate is probably carcinogenic.

### Proposition 65 Listing

68.     On September 4, 2015, California's Office of Environmental Health Hazard Assessment ("OEHHA") published a notice of intent to include glyphosate on the state's list of known carcinogens under Proposition 65. 18 California's Safe Drinking Water and Toxic Enforcement Act of 1986 (informally known as "Proposition 65"), requires the state to maintain and, at least, once a year, revise and republish a list of chemicals "known to the State of California to cause cancer or reproductive toxicity." The OEHHA determined that glyphosate met the criteria for the listing mechanism under the Labor Code following IARC's assessment of the chemical.

69.     The listing process under the Labor Code is essentially automatic. The list known carcinogens, at a minimum, must include substances identified by reference in Labor Code §6382(b)(1). That section of the Labor Code identifies "[s]ubstances listed as human or animal carcinogens by the International Agency for Research on Cancer (IARC)." IARC's classification

of glyphosate as a Group 2A chemical ("probably carcinogenic to humans") therefore triggered the listing.

70.     A business that deploys a listed chemical in its products must provide "clear and reasonable warnings" to the public prior to exposure to the chemical. To be clear and reasonable, a warning must "(1) clearly communicate that the chemical is known to cause cancer, and/or birth defects or other reproductive harm; and (2) effectively reach the person before exposure." The law also prohibits the discharge of listed chemicals into drinking water.

71.     Monsanto disputed the listing decision and, in January 2016, filed a lawsuit against OEHHA and the agency's acting director, Lauren Zeise, in California state court, seeking declaratory and injunctive relief to prevent OEHHA from listing glyphosate.

72.     Monsanto alleged that OEHHA's exclusive reliance on the IARC decision signified that "OEHHA effectively elevated the determination of an ad hoc committee of an unelected, foreign body, which answers to no United States official (let alone any California state official), over the conclusions of its own scientific experts." Monsanto further alleged that the Labor Code listing mechanism presented various constitutional violations because it "effectively empowers an unelected, undemocratic, unaccountable, and foreign body to make laws applicable in California." Among other things, Monsanto argued that Proposition 65's requirement to provide a "clear and reasonable warning" to consumers that the chemical is a known carcinogen would damage its reputation and violate its First Amendment rights.

### EFSA Report on Glyphosate

73.     On November 12, 2015, the European Food Safety Authority (EFSA), the European Union's primary agency for food safety, reported on its evaluation of the Renewal Assessment Report (RAR) on glyphosate. The Rapporteur Member State assigned to glyphosate,

the German Federal Institute for Risk Assessment (BfR), had produced the RAR as part of the renewal process for glyphosate in the EU.

74.     Based on a review of the RAR, which included data from industry submitted unpublished studies, EFSA sent its own report ("Conclusion") to the European Commission, finding that "glyphosate is unlikely to pose a carcinogenic hazard to humans and the evidence does not support classification with regard to its carcinogenic potential according to Regulation (EC) No 1272/2008." EFSA therefore disagreed with IARC: glyphosate was not genotoxic and did not present a carcinogenic threat to humans.

75.     In explaining why its results departed from IARC's conclusion, EFSA drew a distinction between the EU and IARC approaches to the study and classification of chemicals. Although IARC examined "both glyphosate – an active substance – and glyphosate-based formulations, grouping all formulations regardless of their composition," EFSA explained that it considered only glyphosate and that its assessment focuses on "each individual chemical, and each marketed mixture separately." IARC, on the other hand, "assesses generic agents, including groups of related chemicals, as well as occupational or environmental exposure, and cultural or behavioural practices." EFSA accorded greater weight to studies conducted with glyphosate alone than studies of formulated products.

76.     EFSA went further and noted: [A]though some studies suggest that certain glyphosate-based formulations may be genotoxic (i.e. damaging to DNA), others that look solely at the active substance glyphosate do not show this effect. It is likely, therefore, that *the genotoxic effects observed in some glyphosate-based formulations are related to the other constituents or "co-formulants"*. Similarly, certain glyphosate-based formulations display higher toxicity than that of the active ingredient, presumably because of the presence of co- formulants. In its

assessment, ***EFSA proposes that the toxicity of each pesticide formulation and in particular its
genotoxic potential should be further considered and addressed by*** *Member State authorities
while they reassess uses of glyphosate-based formulations in* their own territories. (Emphasis
added)

77.      Notwithstanding its conclusion, EFSA did set exposure levels for Specifically,
EFSA proposed an acceptable daily intake (ADI) of 0.5 mg/kg of body day; an acute reference
dose (ARfD) of 0.5 mg/kg of body weight; and an acceptable exposure level (AOEL) of 0.1 mg/kg
bw per day.

### Leading Scientists Dispute EFSA's Conclusion

78.      On November 27, 2015, 96 independent academic and governmental scientists
from around the world submitted an open letter to the EU health commissioner, Vytenis
Andriukaitis, the scientists expressed their strong concerns and urged the commissioner to
disregard the "flawed" EFSA report, arguing that "the BfR decision is not credible because it is
not supported by the evidence and it was not reached in an open and transparent manner."

79.      Signatories to the letter included Dr. Christopher J. Portier, Ph.D., and other
renowned international experts in the field, some of whom were part of the IARC Working Group
assigned to glyphosate.

80.      In an exhaustive and careful examination, the scientists scrutinized EFSA's
conclusions and outlined why the IARC Working Group decision was "by far the more credible":
The IARC WG decision was reached relying on open and transparent procedures by independent
scientists who completed thorough conflict-of-interest statements and were not affiliated or
financially supported in any way by the chemical manufacturing industry. It is fully referenced and
depends entirely on reports published in the open, peer-reviewed biomedical literature. It is part of

a long tradition of deeply researched and highly credible reports on the carcinogenicity of hundreds of chemicals issued over the past four decades by IARC and used today by international agencies and regulatory bodies around the world as a basis for risk assessment, regulation and public health policy.

81.     With respect to human data, the scientists pointed out that EFSA agreed with IARC that there was "*limited evidence* of carcinogenicity" for non-Hodgkin lymphoma but EFSA nonetheless dismissed an association between glyphosate exposure and carcinogenicity. IARC applies three levels of evidence in its analyses of human data, including sufficient evidence and limited evidence. EFSA's ultimate conclusion that "there was no unequivocal evidence for a clear been established. However, the scientists argued, "[l]egitimate public health concerns arise when 'causality is credible,' i.e., when there is *limited evidence*."

82.     Among its many other deficiencies, EFSA's conclusions regarding animal carcinogenicity data were "scientifically unacceptable," particularly in BfR's use of historical control data and in its trend analysis. Indeed, BfR's analysis directly contradicted the Organisation for Economic Co-operation and Development ("OECD") testing guidelines while citing and purporting to follow those same guidelines. For instance, the EFSA report dismisses observed trends in tumor incidence "because there are no individual treatment groups that are significantly different from controls and because the maximum observed response is reportedly within the range of the historical control data." However, according to the scientists, concurrent controls are recommended over historical controls in all guidelines, scientific reports, and publications, and, if it is employed, historical control data "should be from studies in the same timeframe, for the same exact animal strain, preferably from the same laboratory or the same supplier and preferably reviewed by the same pathologist." BfR's use of historical control data violated these precautions:

"only a single study used the same mouse strain as the historical controls, but was reported more than 10 years after the historical control dataset was developed." Further deviating from sound scientific practices, the data used by the BfR came from studies in seven different laboratories. The scientists concluded:

> BfR reported seven positive mouse studies with three studies showing increases in renal tumors, two with positive findings for hemangiosarcomas, and two with positive findings for malignant lymphomas. BfR additionally reported two positive findings for tumors in rats. Eliminating the inappropriate use of historical data, the unequivocal conclusion is that these are not negative studies, but in fact document the carcinogenicity of glyphosate in laboratory animals.

83.     The letter also critiqued the EFSA report's lack of transparency and the opacity surrounding the data cited in the report: "citations for almost all of the references, even those from the open scientific literature, have been redacted from the document" and "there are no authors or contributors listed for either document, a requirement for publication in virtually all scientific journals." Because BfR relied on unpublished, confidential industry provided studies, it is "impossible for any scientist not associated with BfR to review this conclusion with scientific confidence."

84.     On March 3, 2016, the letter was published in the Journal of Epidemiology & Community Health.

85.     On February 17, 2016, a consensus statement published in the journal Environmental Health, entitled "Concerns over use of glyphosate-based herbicides and risks associated with exposures: a consensus statement," assessed the safety of glyphosate-based herbicides (GBHs). The paper's "focus is on the unanticipated effects arising from the worldwide increase in use of GBHs, coupled with recent discoveries about the toxicity and human health risks stemming from use of GBHs." The researchers drew seven factual conclusions about GBHs:

A.     GBHs are the most heavily applied herbicide in the world and usage continues

to rise;

B.   Worldwide, GBHs often contaminate drinking water sources, precipitation, and air, especially in agricultural regions;

C.   The half-life of glyphosate in water and soil is longer than previously recognized;

D.   Glyphosate and its metabolites are widely present in the global soybean supply;

E.   Human exposures to GBHs are rising;

F.   Glyphosate is now authoritatively classified as a probable human carcinogen; and

G.   Regulatory estimates of tolerable daily intakes for glyphosate in the United States and European Union are based on outdated science.

86.     The researchers noted that GBH use has increased approximately 100-fold since the 1970s. Furthermore, far from posing a limited hazard to vertebrates, as previously believed, two decades of evidence demonstrated that "several vertebrate pathways are likely targets of action, including hepatorenal damage, effects on nutrient balance through glyphosate chelating action and endocrine disruption."

87.     The paper attributed uncertainties in current assessments of glyphosate formulations to the fact that "[t]he full list of chemicals in most commercial GBHs is protected as 'commercial business information,' despite the universally accepted relevance of such information to scientists hoping to conduct an accurate risk assessment of these herbicide formulations." Further, the researchers argue, "[t]he distinction in regulatory review and decision processes between 'active' and 'inert' ingredients has no toxicological justification, given increasing evidence that several so-called 'inert' adjuvants are toxic in their own right."

88.     Among various implications, the researchers conclude that "existing toxicological data and risk assessments are not sufficient to infer that GBHs, as currently used, are

safe." Further, "GBH-product formulations are more potent, or toxic, than glyphosate alone to a wide array of non-target organisms including mammals, aquatic insects, and fish." Accordingly, "risk assessments of GBHs that are based on studies quantifying the impacts of glyphosate alone underestimate both toxicity and exposure, and thus risk." The paper concludes that this "shortcoming has repeatedly led regulators to set inappropriately high exposure thresholds."

89.     The researchers also critique the current practice of regulators who largely rely on rely on "unpublished, non-peer reviewed data generated by the registrants" but ignore "published "published research because it often uses standards and procedures to assess quality that are

are different from those codified in regulatory agency data requirements, which largely focus on avoiding fraud." In the researchers' view, "[s]cientists independent of the registrants should conduct regulatory tests of GBHs that include glyphosate alone, as well as GBH product formulations."

90.     The researchers also call for greater inclusion of GBHs in government-led toxicology testing programs:

> [A] fresh and independent examination of GBH toxicity should be undertaken, and . . . this re-examination be accompanied by systematic efforts by relevant agencies to monitor GBH levels in people and in the food supply, none of which are occurring today. The U.S. National Toxicology Program should prioritize a thorough toxicological assessment of the multiple pathways now identified as potentially vulnerable of GBHs.

91.     The researchers suggest that, in order to fill the gap created by an absence of government funds to support research on GBHs, regulators could adopt a system through which manufacturers fund the registration process and the necessary testing:

> "[W]e recommend that a system be put in place through which manufacturers of GBHs provide funds to the appropriate regulatory body as part or routine registration actions and fees. Such funds should then be transferred to appropriate government research institutes, or to an agency experienced in the award of competitive grants. In either case, funds would

be made available to independent scientists to conduct the appropriate long-term (minimum 2 years) safety studies in recognized animal model systems. A thorough and modern assessment of GBH toxicity will encompass potential endocrine disruption impacts on the gut microbiome, carcinogenicity, and multigenerational effects looking at reproductive capabilities and frequency of birth defects."

***Plaintiff's Exposure to Roundup®***

92.     Sidco Corporation hired Marita Renteria as a Farm Hand in Las Cruces, New Mexico. As a Farm Hand, Ms. Renteria was exposed to Roundup at significant levels.

93.     Part of Ms. Renteria's duties included carrying a 5-gallon backpack of Roundup and spraying the poison with a hand sprayer. On other properties, Ms. Renteria would drive a tractor with a 20-gallon sprayer attached to the end. The Roundup Sidco Corporation supplied to their Farm Hands was purchased from AGCO Corporation.

94.     For six years, Ms. Renteria performed these duties with little to no protective equipment.

95.     Ms. Renteria developed NHL in 1995 and underwent a number of significant, painful treatments.

## **DISCOVERY RULE**

96.     Plaintiff hereby pleads and invokes the "discovery rule" if necessary. Plaintiff will show that after reasonably exercising due diligence, she did not learn the nature of the cause of her cancer or that such cancer was chemically-related until less than the time periods provided by the relevant statutes of limitations. Plaintiff also specifically invokes the federally required commencement date as set forth in 42 U.S.C. § 9658.

97.     Plaintiff had no way of knowing about the risk of serious illness associated with the use of and/or exposure to Roundup® and glyphosate. The earliest date one could have learned of the link would have been after IARC released its formal assessment of glyphosate in July 2015.

This is the quintessential case for tolling.

98.     Within the time period of any applicable statutes of limitations, Plaintiff could not have discovered, through the exercise of reasonable diligence, that exposure to Roundup® and glyphosate is injurious to human health.

99.     Plaintiff did not discover, and did not know of facts that would cause a reasonable person to suspect, the risks associated with the use of and/or exposure to Roundup® and glyphosate; nor would a reasonable and diligent investigation by them have disclosed that Roundup® and glyphosate would cause Mr. Gingerich's illness.

100.    For these reasons, all applicable statutes of limitations have been tolled by operation of the discovery rule with respect to Plaintiff' claim.

### Fraudulent Concealment Tolling

101.    All applicable statutes of limitations have also been tolled by Monsanto's knowing and active fraudulent concealment and denial of the facts alleged herein throughout the time period relevant to this action.

102.    Instead of disclosing critical safety information about Roundup® and glyphosate, Monsanto has consistently and falsely represented the safety of its Roundup® products.

### Estoppel

103.    Monsanto was under a continuous duty to disclose to consumers, users and other person coming into contact with its products, including Plaintiff, accurate safety information concerning its products and the risks associated with the use of and/or exposure to Roundup® and glyphosate.

104.    Instead, Monsanto knowingly, affirmatively, and actively concealed safety

information concerning Roundup® and glyphosate and the serious risks associated with the use of and/or exposure to its products.

105.     Based on the foregoing, Monsanto is estopped from relying on any statutes of limitations in defense of this action.

## CLAIMS

### COUNT I
### STRICT LIABILITY
### (DESIGN DEFECT)

106.     Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

107.     Plaintiff brings this strict liability claim against Monsanto for defective design.

108.     At all times relevant to this litigation, Monsanto engaged in the business of testing, developing, manufacturing, selling, distributing, and Monsanto engaged in the marketing, packaging design, and promotion of Roundup® products, which are defective and unreasonably dangerous to consumers, including Plaintiff, thereby placing Roundup® products into the stream of commerce. These actions were under the ultimate control and supervision of Monsanto. At all times relevant to this litigation, Monsanto designed, researched, developed, manufactured, produced, tested, assembled, labeled, advertised, promoted, marketed, sold, and distributed the Roundup® products used by Plaintiff, as described above.

109.     At all times relevant to this litigation, Roundup® products were manufactured, designed, and labeled in an unsafe, defective, and inherently dangerous manner that was dangerous for use by or exposure to the public, and, in particular, Plaintiff.

110.     At all times relevant to this litigation, Roundup® products reached the intended consumers, handlers, and users or other persons coming into contact with these products in

Missouri and throughout the United States, including Plaintiff, without substantial change in their condition as designed, manufactured, sold, distributed, labeled, and marketed by Monsanto.

111.   Roundup® products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold, and marketed by Monsanto were defective in design and formulation in that when they left the hands of the manufacturers and/or suppliers, they were unreasonably dangerous and dangerous to an extent beyond that which an ordinary consumer would contemplate.

112.   Roundup® products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold, and marketed by Monsanto were defective in design and formulation in that when they left the hands of the manufacturers and/or suppliers, the foreseeable risks exceeded the alleged benefits associated with their design and formulation.

113.   At all times relevant to this action, Monsanto knew or had reason to know that Roundup® products were defective and were inherently dangerous and unsafe when used in the manner instructed and provided by Monsanto. Therefore, at all times relevant to this litigation, Roundup® products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold, and marketed by Monsanto were defective in design and formulation, in one or more of the following ways:

  a)  When placed in the stream of commerce, Roundup® products were defective in design and formulation, and, consequently, dangerous to an extent beyond that which an ordinary consumer would contemplate.

  b)  When placed in the stream of commerce, Roundup® products were unreasonably dangerous in that they were hazardous and posed a

grave risk of cancer and other serious illnesses when used in a reasonably anticipated manner.

c)  When placed in the stream of commerce, Roundup® products contained unreasonably dangerous design defects and were not reasonably safe when used in a reasonably anticipated or intended manner.

d)  Monsanto did not sufficiently test, investigate, or study Roundup® products and, specifically, the active ingredient glyphosate.

e)  Exposure to Roundup® and glyphosate-containing products presents a risk of harmful side effects that outweigh any potential utility stemming from the use of the herbicide.

f)  At the time of marketing its Roundup® products, Roundup® was defective in that exposure to Roundup® and specifically, its active ingredient glyphosate, could result in cancer and other severe illnesses and injuries and/or death.

g)  Monsanto did not conduct adequate post-marketing surveillance of its Roundup® products.

h)  Monsanto could have employed safer alternative designs and formulations.

114.    Plaintiff was exposed to Roundup® products in the course of her work-related use, as described above, without knowledge of their dangerous characteristics.

115.    At all times relevant to this litigation, Plaintiff used and/or was exposed to the use of Roundup® products in an intended or reasonably foreseeable manner without knowledge of

their dangerous characteristics.

116.   Plaintiff could not have reasonably discovered the defects and risks associated with Roundup® or glyphosate-containing products before or at the time of exposure.

117.   The harm caused by Roundup® products far outweighed their benefit, rendering these products dangerous to an extent beyond that which an ordinary consumer would contemplate. Roundup® products were and are more dangerous than alternative products and Monsanto could have designed Roundup® products (including their packaging and sales aids) to make them less dangerous. Indeed, at the time that Monsanto designed Roundup® products, the state of the industry's scientific knowledge was such that a less risky design or formulation was attainable.

118.   At the time Roundup® products left Monsanto's control, there was a practical, technically feasible and safer alternative design that would have prevented the harm without substantially impairing the reasonably anticipated or intended function of those herbicides.

119.   Monsanto's defective design of Roundup® products was willful, wanton, fraudulent, malicious, and conducted with reckless disregard for the health and safety of users of the Roundup® products, including Plaintiff herein.

120.   Therefore, as a result of the unreasonably dangerous condition of its Roundup® products, Monsanto is strictly liable to Plaintiff.

121.   The defects in Roundup® products caused or contributed to cause Plaintiff' grave injuries and/or death, and, but for Monsanto's misconduct and omissions, Plaintiff would not have sustained their injuries and/or death.

122.   Monsanto's conduct, as described above, was reckless. Monsanto risked the lives of consumers and users of its products, including Plaintiff, with knowledge of the safety problems associated with Roundup® and glyphosate-containing products, and suppressed this knowledge

from the general public. Monsanto made conscious decisions not to redesign, warn, or inform the unsuspecting public. Monsanto's reckless conduct warrants an award of aggravated damages.

123.     As a direct and proximate result of Monsanto placing defective Roundup® products into the stream of commerce, Plaintiff has suffered and continue to suffer grave injuries and/or death, and have endured physical pain and discomfort, as well as economic hardship, including considerable financial expenses for medical care and treatment.

**COUNT II**
**STRICT LIABILITY**
**(FAILURE TO WARN)**

124.     Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

125.     Plaintiff brings this strict liability claim against Monsanto for failure to warn.

126.     At all times relevant to this litigation, Monsanto engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting Roundup® products, which are defective and unreasonably dangerous to consumers, including Plaintiff, because they do not contain adequate warnings or instructions concerning the dangerous characteristics of Roundup® and, specifically, the active ingredient glyphosate. These actions were under the ultimate control and supervision of Monsanto.

127.     Monsanto researched, developed, designed, tested, manufactured, inspected, labeled, distributed, marketed, promoted, sold, and otherwise released into the stream of commerce Roundup® products, and in the course of same, directly advertised or marketed the products to consumers and end users, including Plaintiff, and therefore had a duty to warn of the risks associated with the use of Roundup® and glyphosate-containing products.

128.     At all times relevant to this litigation, Monsanto had a duty to properly test, develop,

design, manufacture, inspect, package, label, market, promote, sell, distribute, maintain supply, provide proper warnings, and take such steps as necessary to ensure that Roundup® products did not cause users and consumers to suffer from unreasonable and dangerous risks. Monsanto had a continuing duty to warn Plaintiff of the dangers associated with Roundup® use and exposure. Monsanto, as manufacturer, seller, promoter, marketer, or distributor of chemical herbicides is held to the knowledge of an expert in the field.

129.    At the time of manufacture, Monsanto could have provided the warnings or instructions regarding the full and complete risks of Roundup® and glyphosate-containing products because it knew or should have known of the unreasonable risks of harm associated with the use of and/or exposure to such products.

130.    At all times relevant to this litigation, Monsanto failed to investigate, study, test, or promote the safety or to minimize the dangers to users and consumers of its product and to those who would foreseeably use or be harmed by these herbicides, including Plaintiff.

131.    Despite the fact that Monsanto knew or should have known that Roundup® posed a grave risk of harm, it failed to exercise reasonable care to warn of the dangerous risks associated with use and exposure. The dangerous propensities of these products and the carcinogenic characteristics of glyphosate, as described above, were known to Monsanto, or scientifically knowable to Monsanto through appropriate research and testing by known methods, at the time it distributed, marketed, promoted, supplied, or sold the product, and not known to end users and consumers, such as Plaintiff.

132.    These products created significant risks of serious bodily harm to consumers, as alleged herein, and Monsanto failed to adequately warn consumers and reasonably foreseeable users of the risks of exposure to its products. Monsanto has wrongfully concealed information

concerning the dangerous nature of Roundup® and its active ingredient glyphosate, and further made false and/or misleading statements concerning the safety of Roundup® and glyphosate.

133.    At all times relevant to this litigation, Roundup® products reached the intended consumers, handlers, and users or other persons coming into contact with these products in Missouri and throughout the United States, including Plaintiff, without substantial change in their condition as designed, manufactured, sold, distributed, labeled, promoted, and marketed by Monsanto.

134.    Plaintiff were exposed to Roundup® products in the course of their personal and/or work-related use of Roundup®, without knowledge of its dangerous characteristics.

135.    At all times relevant to this litigation, Plaintiff used and/or were exposed to the use of Roundup® products in their intended or reasonably foreseeable manner without knowledge of their dangerous characteristics.

136.    Plaintiff could not have reasonably discovered the defects and risks associated with Roundup® or glyphosate-containing products prior to or at the time of Plaintiff' exposure. Plaintiff relied upon the skill, superior knowledge, and judgment of Monsanto.

137.    These products were defective because the minimal warnings disseminated with Roundup® products were inadequate, and they failed to communicate adequate information on the dangers and safe use/exposure and failed to communicate warnings and instructions that were appropriate and adequate to render the products safe for their ordinary, intended, and reasonably foreseeable uses, including agricultural and landscaping applications.

138.    The information that Monsanto did provide or communicate failed to contain relevant warnings, hazards, and precautions that would have enabled consumers such as Plaintiff to utilize the products safely and with adequate protection. Instead, Monsanto disseminated

information that was inaccurate, false, and misleading and which failed to communicate accurately or adequately the comparative severity, duration, and extent of the risk of injuries and/or death with use of and/or exposure to Roundup® and glyphosate; continued to aggressively promote the efficacy of its products, even after it knew or should have known of the unreasonable risks from use or exposure; and concealed, downplayed, or otherwise suppressed, through aggressive marketing and promotion, any information or research about the risks and dangers of exposure to Roundup® and glyphosate.

139.    To this day, Monsanto has failed to adequately and accurately warn of the true risks of Plaintiff' injuries and/or death associated with the use of and exposure to Roundup® and its active ingredient glyphosate, a probable carcinogen.

140.    As a result of their inadequate warnings, Roundup® products were defective and unreasonably dangerous when they left the possession and/or control of Monsanto, were distributed, marketed, and promoted by Monsanto, and used by Plaintiff in their personal and/or work-related use.

141.    Monsanto is liable to Plaintiff for injuries caused by its negligent or willful failure, as described above, to provide adequate warnings or other clinically relevant information and data regarding the appropriate use of these products and the risks associated with the use of or exposure to Roundup® and glyphosate.

142.    The defects in Roundup® products caused or contributed to cause Plaintiff's injuries, and, but for this misconduct and omissions, Plaintiff would not have sustained their injuries and/or death. To this day, Monsanto has failed to adequately and accurately warn of the true risks of Plaintiff's injuries and/or death associated with the use of and exposure to Roundup® and its active ingredient glyphosate, a probable carcinogen.

a) As a result of their inadequate warnings, Roundup® products were defective and unreasonably dangerous when they left the possession and/or control of Monsanto, were distributed, marketed, and promoted by Monsanto, and used by Plaintiff in their personal and/or work-related use.

b) Monsanto is liable to Plaintiff for injuries and/or death caused by its negligent or willful failure, as described above, to provide adequate warnings or other clinically relevant information and data regarding the appropriate use of these products and the risks associated with the use of or exposure to Roundup® and glyphosate.

c) The defects in Roundup® products caused or contributed to cause Plaintiff' injuries and/or death, and, but for this misconduct and omissions, Plaintiff would not have sustained their injuries and/or death.

d) Had Monsanto provided adequate warnings and instructions and properly disclosed and disseminated the risks associated with Roundup® products, Plaintiff could have avoided the risk of developing injuries and/or death as alleged herein.

e) As a direct and proximate result of Monsanto placing defective Roundup® products into the stream of commerce, Plaintiff have suffered severe injuries and/or death and have endured physical pain and discomfort, as well as economic hardship, including considerable financial expenses for medical care and treatment.

**COUNT III**
**NEGLIGENCE**
**FAILURE TO WARN**

143.     Plaintiff incorporates by reference all other paragraphs of this Complaint as if fully set forth herein, and further allege:

144.     Plaintiff bring this negligence claim against Defendant for failure to warn.

145.     At all times relevant to this litigation, Defendant engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting Roundup® products, which are defective and unreasonably dangerous to consumers, including Plaintiff, because they do not contain adequate warnings or instructions concerning the dangerous characteristics of Roundup® and specifically, the active ingredient glyphosate. These actions were under the ultimate control and supervision of Defendant.

146.     Defendant researched, developed, designed, tested, manufactured, inspected, labeled, distributed, marketed, promoted, sold, and otherwise released into the stream of commerce its Roundup® products, and in the course of same, directly advertised or marketed the products to consumers and end users, including Plaintiff, and Defendant therefore had a duty to warn of the risks associated with the reasonably foreseeable uses (and misuses) of Roundup® and glyphosate-containing products and a duty to instruct on the proper, safe use of these products.

147.     At all times relevant to this litigation, Defendant had a duty to properly test, develop, design, manufacture, inspect, package, label, market, promote, sell, distribute, maintain supply, provide proper warnings, and take such steps as necessary to ensure that its Roundup® products did not cause users and consumers to suffer from unreasonable and dangerous risks. Defendant had a continuing duty to instruct on the proper, safe use of these products. Defendant, as manufacturer, seller, or distributor of chemical herbicides, is held to the knowledge of an expert in the field.

36

148.    At the time of manufacture, Defendant could have provided warnings or instructions regarding the full and complete risks of Roundup® and glyphosate containing products because it knew or should have known of the unreasonable risks of harm associated with the use of and/or exposure to these products.

149.    At all times relevant to this litigation, Defendant failed to investigate, study, test, or promote the safety of its Roundup® products. Defendant also failed to minimize the dangers to users and consumer of its Roundup® products and to those who would foreseeably use or be harmed by Defendant's herbicides, including Plaintiff.

150.    Despite the fact that Defendant knew or should have known that Roundup® products posed a grave risk of harm, it failed to warn of the dangerous risks associated with their use and exposure. The dangerous propensities of its products and the carcinogenic characteristics of glyphosate, as described above, were known to Defendant, or scientifically knowable to Defendant through appropriate research and testing by known methods, at the time it distributed, supplied, or sold the product, and not known to end users and consumers, such as Plaintiff.

151.    Defendant knew or should have known that its Roundup® and glyphosate containing products created significant risks of serious bodily harm to consumers, as alleged herein, and Defendant failed to adequately warn consumers and reasonably foreseeable users of the risks of exposure to these products. Defendant has wrongfully concealed information concerning the dangerous nature of Roundup® and its active ingredient glyphosate, and further made false and/or misleading statements concerning the safety of Roundup® and glyphosate.

152.    At all times relevant to this litigation, Defendant's Roundup® products reached the intended consumers, handlers, and users or other persons coming into contact with these products throughout the United States, including Plaintiff, without substantial change in their condition as

designed, manufactured, sold, distributed, labeled, and marketed by Defendant.

153.    At all times relevant to this litigation, Plaintiff used and/or was exposed to the use of Defendant's Roundup® products in their intended or reasonably foreseeable manner without knowledge of their dangerous characteristics.

154.    Plaintiff could not have reasonably discovered the defects and risks associated with Roundup® or glyphosate-containing products before or at the time of Plaintiff's exposure. Plaintiff relied upon the skill, superior knowledge, and judgment of Defendant.

155.    Defendant knew or should have known that the minimal warnings disseminated with its Roundup® products were inadequate, but it failed to communicate adequate information on the dangers and safe use/exposure and failed to communicate warnings and instructions that were appropriate and adequate to render the products safe for their ordinary, intended, and reasonably foreseeable uses, including agricultural and horticultural applications.

156.    The information that Defendant did provide or communicate failed to contain relevant warnings, hazards, and precautions that would have enabled agricultural workers, horticultural workers and/or at-home users to utilize the products safely and with adequate protection. Instead, Defendant disseminated information that was inaccurate, false, and misleading and which failed to communicate accurately or adequately the comparative severity, duration, and extent of the risk of injuries associated with use of and/or exposure of Roundup® and glyphosate; continued to aggressively promote the efficacy of its products, even after it knew or should have known of the unreasonable risks from use or exposure; an concealed, downplayed, or otherwise suppressed, through aggressive marketing and promotion, any information or research about the risks and dangers of exposure to Roundup® and glyphosate.

157.    To this day, Defendant has failed to adequately and accurately warn of the true

risks of Plaintiff's injuries associated with the use of and exposure to Roundup® and its active ingredient glyphosate, a probable carcinogen.

158.     As a result of their inadequate warnings, Defendant's Roundup® products were defective and unreasonably dangerous when they left the possession and/or control of Defendant, were distributed by Defendant, and used by Plaintiff.

159.     Defendant is liable to Plaintiff for injuries caused by its failure, as described above, to provide adequate warnings or other clinically relevant information and data regarding the appropriate use of its Roundup® products and the risks associated with the use of or exposure to Roundup® and glyphosate.

160.     The defects in Defendant's Roundup® products were substantial and contributing factors in causing Plaintiff's injuries, and, but for Defendant's misconduct and omissions, Plaintiff would not have sustained her injuries.

161.     Had Defendant provided adequate warnings and instructions and properly disclosed and disseminated the risks associated with its Roundup® products, Plaintiff could have avoided the risk of developing injuries as alleged herein and Plaintiff could have obtained alternative herbicides.

162.     As a direct and proximate result of Defendant placing its defective Roundup® products into the stream of commerce, Plaintiff has suffered and continues to suffer severe injuries, and has endured physical pain and discomfort, as well as economic hardship, including considerable financial expenses for medical care and treatment. Plaintiff will continue to incur these expenses in the future.

**COUNT IV**
**NEGLIGENCE**

163.     Plaintiff incorporates by reference each and every allegation set forth in the

preceding paragraphs as if fully stated herein.

164.    Monsanto, directly or indirectly, caused Roundup® products to be sold, distributed, packaged, labeled, marketed, promoted, and/or used by Plaintiff.

165.    At all times relevant to this litigation, Monsanto had a duty to exercise reasonable care in the design, research, manufacture, marketing, advertisement, supply, promotion, packaging, sale, and distribution of Roundup® products, including the duty to take all reasonable steps necessary to manufacture, promote, and/or sell a product that was not unreasonably dangerous to consumers and users of the product.

166.    At all times relevant to this litigation, Monsanto had a duty to exercise reasonable care in the marketing, advertisement, and sale of the Roundup® products. Monsanto's duty of care owed to consumers and the general public included providing accurate, true, and correct information concerning the risks of using Roundup® and appropriate, complete, and accurate warnings concerning the potential adverse effects of exposure to Roundup®, and, in particular, its active ingredient glyphosate.

167.    At all times relevant to this litigation, Monsanto knew or, in the exercise of reasonable care, should have known of the hazards and dangers of Roundup® and specifically, the carcinogenic properties of the chemical glyphosate.

168.    Accordingly, at all times relevant to this litigation, Monsanto knew or, in the exercise of reasonable care, should have known that use of or exposure to its Roundup® products could cause or be associated with Plaintiff' injuries and/or death and thus created a dangerous and unreasonable risk of injury to the users of these products, including Plaintiff.

169.    Monsanto also knew or, in the exercise of reasonable care, should have known that users and consumers of Roundup® were unaware of the risks and the magnitude of the risks

associated with use of and/or exposure to Roundup® and glyphosate-containing products.

170.   As such, Monsanto breached the duty of reasonable care and failed to exercise ordinary care in the design, research, development, manufacture, testing, marketing, supply, promotion, advertisement, packaging, sale, and distribution of its Roundup® products, in that Monsanto manufactured, marketed, promoted, and sold defective herbicides containing the chemical glyphosate, knew or had reason to know of the defects inherent in these products, knew or had reason to know that a user's or consumer's exposure to the products created a significant risk of harm and unreasonably dangerous side effects, and failed to prevent or adequately warn of these risks and injuries and/or death.

171.   Despite an ability and means to investigate, study, and test these products and to provide adequate warnings, Monsanto has failed to do so. Indeed, Monsanto has wrongfully concealed information and has further made false and/or misleading statements concerning the safety and/or exposure to Roundup® and glyphosate.

172.   Monsanto was negligent in the following respects:

a)   Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing its Roundup® products without thorough and adequate pre- and post-market testing;

b)   Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing Roundup® while negligently and/or intentionally concealing and failing to disclose the results of trials, tests, and studies of exposure to glyphosate, and, consequently, the risk of serious harm associated with human use of

41

and exposure to Roundup®;

c)  Failing to undertake sufficient studies and conduct necessary tests
to determine whether or not Roundup® products and glyphosate-
containing products were safe for their intended use in agriculture
and horticulture;

d)  Failing to use reasonable and prudent care in the design, research,
manufacture, and development of Roundup® products so as to avoid
the risk of serious harm associated with the prevalent use of
Roundup®/glyphosate as an herbicide;

e)  Failing to design and manufacture Roundup® products so as to
ensure they were at least as safe and effective as other herbicides on
the market;

f)  Failing to provide adequate instructions, guidelines, and safety
precautions to those persons who Monsanto could reasonably
foresee would use and be exposed to its Roundup® products;

g)  Failing to disclose to Plaintiff, users/consumers, and the general
public that use of and exposure to Roundup® presented severe risks
of cancer and other grave illnesses;

h)  Failing to warn Plaintiff, users/consumers, and the general public
that the product's risk of harm was unreasonable and that there were
safer and effective alternative herbicides available to Plaintiff and
other consumers;

i)  Systematically suppressing or downplaying contrary evidence about

42

the risks, incidence, and prevalence of the side effects of Roundup®
and glyphosate-containing products;

j) Representing that its Roundup® products were safe for their
intended use when, in fact, Monsanto knew or should have known
that the products were not safe for their intended purpose;

k) Declining to make or propose any changes to Roundup® products'
labeling or other promotional materials that would alert the
consumers and the general public of the risks of Roundup® and
glyphosate;

l) Advertising, marketing, and recommending the use of the
Roundup® products, while concealing and failing to disclose or
warn of the dangers known by Monsanto to be associated with or
caused by the use of or exposure to Roundup® and glyphosate;

m) Continuing to disseminate information to its consumers, which
indicate or imply that Monsanto's Roundup® products are not
unsafe for use in the agricultural and horticultural industries; and

n) Continuing the manufacture and sale of its products with the
knowledge that the products were unreasonably unsafe and
dangerous.

173.    Monsanto knew and/or should have known that it was foreseeable that consumers
such as Plaintiff would suffer injuries and/or death as a result of Monsanto's failure to exercise
ordinary care in the manufacturing, marketing, promotion, labeling, distribution, and sale of
Roundup®.

174.   Plaintiff did not know the nature and extent of the injuries and/or death that could result from the intended use of and/or exposure to Roundup® or its active ingredient glyphosate.

175.   Monsanto's negligence was the proximate cause of the injuries and/or death, harm, and economic losses that Plaintiff suffered, as described herein.

176.   Monsanto's conduct, as described above, was reckless. Monsanto regularly risked the lives of consumers and users of its products, including Plaintiff, with full knowledge of the dangers of these products. Monsanto has made conscious decisions not to redesign, re-label, warn, or inform the unsuspecting public, including Plaintiff. Monsanto's reckless conduct therefore warrants an award of aggravated or punitive damages.

177.   As a proximate result of Monsanto's wrongful acts and omissions in placing defective Roundup® products into the stream of commerce without adequate warnings of the hazardous and carcinogenic nature of glyphosate, Plaintiff have suffered severe and permanent physical and emotional injuries. Plaintiff have endured pain and suffering and has suffered economic losses (including significant expenses for medical care and treatment) in an amount to be determined.

## COUNT V
## BREACH OF EXPRESS WARRANTY

178.   Plaintiff re-alleges the preceding paragraphs as if fully set forth herein.

179.   At all times relevant to this litigation, Defendant engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting its Roundup® products, which are defective and unreasonably dangerous to consumers, including Plaintiff, thereby placing Roundup® products into the stream of commerce. These actions were under the ultimate control and supervision of Defendant, and their Roundup® products were expected to, and did, reach Plaintiff without any substantial change in their condition.

44

180.    At all times relevant to this litigation, Defendant expressly represented and warranted to the purchasers of its Roundup® products, by and through statements made by Defendant in labels, publications, package insert, and other written materials intended for consumers and the general public, that its Roundup® products were safe to human health and the environment, effective, fit, and proper for their intended use. Defendant advertised, labeled, marketed, and promoted Roundup® products, representing the quality to consumers and the public in such a way as to induce their purchase or use, thereby making an express warranty that its Roundup® products would conform to the representations.

181.    These express representations included incomplete warnings and instructions that purport, but fail, to include the complete array of risks associated with use of and/or exposure to Roundup® and glyphosate.  Defendant knew or should have known that the risks expressly included in Roundup® warnings and labels did not and do not accurately and adequately set forth the risks of developing the serious injuries complained of herein. Nevertheless, Defendant expressly represented that its Roundup® products were safe  and effective, that they were safe and effective for use by individuals such as Plaintiff, and/or that they were safe and effective as agricultural  herbicides.

182.    The representations about Roundup®, as set forth herein, contained or constituted affirmations of fact or promises made by the seller to the buyer, which related to the goods and became part of the basis of the bargain, creating an express warranty that the goods would conform to the representations.

183.    Defendant placed its Roundup® products into the stream of commerce for sale and recommended their use to consumers and the public without adequately warning of the true risks of developing the injuries associated with the use of and exposure to Roundup® and its

45

active ingredient glyphosate.

184.    Defendant breached these warranties because, among other things, its Roundup® products were defective, dangerous, unfit for use, did not contain labels representing the true and adequate nature of the risk associated with their use, and were not merchantable or safe for their intended, ordinary, and foreseeable use and purpose. Specifically, Defendant breached the warranties in the following ways:

> a.   Defendant represented through its labeling, advertising, and marketing materials that its Roundup® products were safe, and fraudulently withheld and concealed information about the risks of serious injury associated with use of and/or exposure to Roundup® and glyphosate by expressly limiting the risks associated with use and/or exposure within its warnings and labels; and

> b.   Defendant represented that its Roundup® products were safe for use and fraudulently concealed information that demonstrated that glyphosate, the active ingredient in Roundup®, had carcinogenic properties, and that its Roundup® products, therefore, were not safer than alternatives available on the market.

185.    Defendant has sole access to material facts concerning the nature of risks associated with its Roundup® products as expressly stated within its warnings and labels, and Defendant knew that consumers and users such as Plaintiff could not have reasonably discovered that the risks expressly included in Roundup® warnings and labels were inadequate and inaccurate.

186.    Plaintiff had no knowledge of the falsity or incompleteness of Defendant's statements and representations concerning Roundup®, and she relied to her detriment on these statements and representations.

187.    Plaintiff used and/or was exposed to the use of Roundup® as researched, developed, designed, tested, formulated, manufactured, inspected, labeled, distributed, packaged, marketed, promoted, sold, or otherwise released into the stream of commerce by

Defendant.

188.      Had the warning and labels for Roundup® products accurately and adequately set forth the true risks associated with the use of such products, including Plaintiff's injuries, rather than expressly excluding such information and warranting that the products were safe for their intended use, Plaintiff could have avoided the injuries complained of herein.

189.      As a direct and proximate result of Defendant's wrongful acts and omissions, Plaintiff developed NHL and suffered injuries that are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life, as well as economic hardship, including financial expenses for medical care and treatment.

## COUNT VI
## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY

190.      Plaintiff incorporate by reference all other paragraphs of this Complaint as if fully set forth herein, and further allege:

191.      Upon information and belief, at all times relevant to this litigation, Defendant engaged in the business of testing, developing, designing, formulating, manufacturing, marketing, selling, distributing, and promoting its Roundup® products, which are defective and unreasonably dangerous to users and consumers, including Plaintiff, thereby placing Roundup® products into the stream of commerce.

192.      These actions were under the ultimate control and supervision of Defendant.

193.      Before the time that Plaintiff was exposed to the use of the aforementioned Roundup® products, Defendant impliedly warranted to its consumers and users, including Plaintiff, that its Roundup® products were of merchantable quality and safe and fit for the use for which they were intended; specifically, as horticultural herbicides.

194.      Defendant, however, failed to disclose that Roundup® has dangerous

propensities when used as intended and that the use of and/or exposure to Roundup® and glyphosate containing products carries an increased risk of developing severe injuries, including Plaintiff's injuries.

195.    Upon information and belief, Plaintiff reasonably relied upon the skill, superior knowledge and judgment of Defendant and upon its implied warranties that the Roundup® products were of merchantable quality and fit for their intended purpose or use.

196.    The Roundup® products were expected to reach and did in fact reach consumers and users, including Plaintiff, without substantial change in the condition in which they were manufactured and sold by Defendant. At all times relevant to this litigation, Defendant was aware that consumers and users of its products, including Plaintiff, would use Roundup® products as marketed by Defendant, which is to say that Plaintiff were the foreseeable users of Roundup®.

197.    Defendant intended that its Roundup® products be used in the manner in which Plaintiff in fact used them and Defendant impliedly warranted each product to be of merchantable quality, safe, and fit for this use, despite the fact that Roundup® was not adequately tested or researched.

198.    In reliance upon Defendant's implied warranty, Plaintiff used Roundup® as instructed and labeled and in the foreseeable manner intended, recommended, promoted and marketed by Defendant.

199.    Plaintiff could not have reasonably discovered or known of the risks of serious injury associated with Roundup® or glyphosate.

200.    Defendant breached its implied warranty to Plaintiff in that its Roundup® products were not of merchantable quality, safe, or fit for their intended use, or adequately tested. Roundup® has dangerous propensities when used as intended and can cause serious injuries,

including those injuries complained of herein.

201.    The harm caused by Defendant's Roundup® products far outweighed their benefit, rendering the products more dangerous than an ordinary consumer or user would expect and more dangerous than alternative products.

202.    As a direct and proximate result of Defendant's wrongful acts and omissions Plaintiff has suffered severe and permanent physical and emotional injuries. Plaintiff has endured pain and suffering, has suffered economic loss (including significant expenses for medical care and treatment) and will continue to incur these expenses in the future.

<u>COUNT VII UNFAIR AND DECEPTIVE
TRADE PRACTICES</u>

203.    Plaintiff re-alleges the preceding paragraphs as if fully set forth herein.

204.    Upon information and belief, by reason of its conduct as alleged herein, Defendant violated the provisions of Iowa Consumer Frauds Act, Iowa Code § 714H.1, *et. seq* ("the Act") by inducing Plaintiff to use Roundup® through the use of false and/or misleading advertising, representations and statements.

205.    By engaging in the conduct described herein, Defendants violated the Act by, among other things:

> a.    engaging in unfair or deceptive trade practices as defined in this statute by making false and misleading oral and written statements that had the capacity, tendency, or effect of deceiving or misleading consumers.
>
> b.    engaging in unfair or deceptive trade practices as defined in this statute by making representations that its products had an approval, characteristic, ingredient, use or benefit which they did not have, including but not limited to statements concerning the health consequences of the use of Roundup®.
>
> c.    engaging in unfair or deceptive trade practices as defined in this statute by failing to state material facts, the omission of which deceived or tended to deceive, including but not limited to facts relating to the health consequences of the use of Roundup®.

d. engaging in unfair or deceptive trade practices as defined in this statute through deception, fraud, misrepresentation and knowing concealment, suppression and omission of material facts with the intent that consumers rely upon the same in connection with the use and continued use of Roundup®.

206.    As a direct and proximate result of Defendant's violations of the Act, Plaintiff developed NHL and suffered injuries that are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life, as well as economic hardship, including financial expenses for medical care and treatment.

**COUNT VIII**
**FRAUD**

207.    Plaintiff incorporate by reference each preceding and succeeding paragraph as though set forth fully at length herein.

208.    Monsanto has defrauded the agricultural and gardening communities in general and Plaintiff in particular by misrepresenting the true safety of Roundup® and by failing to disclose known risks of cancer.

209.    Monsanto misrepresented and/or failed to disclose, inter alia, that: glyphosate and its major metabolite aminomethylphosphonic acid ("AMPA") could cause cancer; glyphosate and AMPA are known to be genotoxic in humans and laboratory animals because exposure is known to cause DNA strand breaks (a precursor to cancer); glyphosate and AMPA are known to induce oxidative stress in humans and laboratory animals (a precursor to cancer); glyphosate and AMPA interfere with the aromatic amino acids within the human gut, leading to downstream health conditions including cancer; exposure to glyphosate and AMPA is causally associated with NHL; and the laboratory tests attesting to the safety of glyphosate were flawed and/or fraudulent.

210.    Due to these misrepresentations and omissions, at all times relevant to this litigation, Roundup® was misbranded under 7 U.S.C. § 136(g) and its distribution within the State

of Iowa and around the United States was a violation of 7 U.S.C. § 136(j) and 40 C.F.R. §156.10(a)(5).

211.    When Plaintiff used Roundup® from approximately 1995 through to approximately 2019, neither the labeling on the product nor Monsanto's general promotion warned or disclosed the true safety risks of Roundup® or that the product could cause cancer, as described above. Since the true risk information was known to Monsanto and was not reasonably knowable to reasonable consumers, Plaintiff was unaware of these material facts and/or omissions prior to using the product.

212.    Plaintiff relied on Monsanto's misrepresentations and/or material omissions regarding the safety of Roundup® and its active ingredient glyphosate in deciding whether to use the product. Plaintiff did not know, nor could she reasonably have known, of the misrepresentations and/or material omissions by Monsanto concerning Roundup® and its active ingredient glyphosate.

213.    The misrepresentations and/or material omissions that form the basis of this fraud claim is not limited to statements made on the Roundup® labeling, as defined under federal law, but also involve Monsanto's representations and omissions made as part of its promotion and marketing of Roundup®, including on the internet, television, in print advertisements, etc. Nothing prevented Monsanto from disclosing the truth about the risks associated with Roundup® in its promotional efforts outside of the labeling context, using the forms of media and promotion Monsanto traditionally used to promote the product's efficacy and benefits.

214.    When Monsanto made the misrepresentations and/or omissions as alleged in this pleading, it did so with the intent of defrauding and deceiving the public in general and with the intent of inducing the public to purchase and use Roundup®.

215.    Monsanto made these misrepresentations and/or material omissions with malicious, fraudulent, and/or oppressive intent toward Plaintiff and the public generally. Monsanto's conduct was willful, wanton, and/or reckless. Monsanto deliberately manufactured, produced, marketed, sold, distributed, merchandized, packaged, promoted and advertised the dangerous and defective herbicide Roundup®. This constitutes an utter, wanton, and conscious disregard of the rights and safety of a large segment of the public including Plaintiff, and by reason thereof, Monsanto, is liable for reckless, willful, and wanton acts and omissions which evidence a total and conscious disregard for the safety of Plaintiff and others which proximately caused the injuries as set forth herein.

216.    Plaintiff suffered grave injuries as a proximate result of Monsanto's fraudulent and deceitful conduct, advertisements, and representations.

## PUNITIVE DAMAGES ALLEGATIONS

217.    Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

218.    Defendants' conduct as alleged herein was done with oppression, fraud, and malice. Monsanto was fully aware of Roundup®'s safety risks. Nonetheless, Monsanto deliberately crafted its label, marketing, and promotion to mislead farmers and consumers.

219.    This was not done by accident or through some justifiable negligence. Rather, Monsanto knew that it could turn a profit by convincing the agricultural industry and the general population that Roundup® was harmless to humans, and that full disclosure of Roundup®'s true risks would limit the amount of money Monsanto would make selling Roundup® in the State of Iowa. This was accomplished not only through its misleading, deceptive, fraudulent and unfair labeling, but also through a comprehensive scheme of selective fraudulent research and testing, misleading advertising, and deceptive omissions as more fully alleged throughout this pleading.

Plaintiff was robbed of his right to make an informed decision about whether to use an herbicide, knowing the full risks attendant to that use. Such conduct was done with conscious disregard of Plaintiff's rights.

220.    There is no indication that Monsanto will stop its deceptive, unfair, fraudulent, misleading and unlawful marketing practices unless it is punished and deterred. Accordingly, Plaintiff requests punitive damages against Monsanto for the harms caused to Plaintiff.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in favor of Plaintiff and against Defendant as set forth above, that Plaintiff be awarded compensatory and punitive damages, interest, costs and attorney's fees, and for such other and further relief as the Court may deem just.

### JURY DEMAND

221.    PLAINTIFF DEMANDS A TRIAL BY JURY ON ALL COUNTS.

Dated: December 23, 2019

Respectfully submitted by:

Feliz A. Rael
Attorney at Law
505 Marquette NW, Ste. 1300
Albuquerque, NM 87102
Tel: 505-610-5991
Fax:  505-938-2301

and

**FEARS NACHAWATI LAW FIRM**

Darren P. McDowell*
Texas Bar No. 24025520
dmcdowell@fnlawfirm.com
**FEARS | NACHAWATI, PLLC**
5473 Blair Road
Dallas, TX 75231
Tel. (214) 890-0711
Fax (214) 890-0712


Matthew R. McCarley*
Texas Bar No. 24041426
mccarley@fnlawfirm.com
**FEARS | NACHAWATI, PLLC**
5473 Blair Road
Dallas, TX 75231
Tel. (214) 890-0711
Fax (214) 890-0712


Jonathan P. Novak*
Maryland Bar No. 20282
jnovak@fnlawfirm.com
**FEARS | NACHAWATI, PLLC**
5473 Blair Road
Dallas, TX 75231
Tel. (214) 890-0711
Fax (214) 890-0712

*To be admitted pro hac vice*


*Attorneys for Plaintiff*

# EXHIBIT
# 5

FILED 1st JUDICIAL DISTRICT COURT
Santa Fe County
5/5/2020 8:52 AM
KATHLEEN VIGIL CLERK OF THE COURT
Tamara Snee

STATE OF NEW MEXICO
COUNTY OF SANTA FE
FIRST JUDICIAL DISTRICT COURT

MARITA RENTERIA,

     Plaintiff,

vs.                                             Case No. D-101-CV-2020-00180

MONSANTO COMPANY; SIDCO
CORPORATION; AGCO CORPORATION,

     Defendants.

## STIPULATION OF DISMISSAL WITHOUT PREJUDICE OF
## ALL CLAIMS AGAINST DEFENDANT AGCO CORPORATION

Plaintiff, by and through her undersigned attorney, and Defendant AGCO Corporation,

by and through their undersigned attorneys and, pursuant to New Mexico Rule of Civil

Procedure 1-041(A), hereby stipulate to the dismissal of all claims against Defendant AGCO

Corporation, without prejudice.  This lawsuit shall proceed against the other Defendants named

in the Complaint and is not opposed by any Defendant. All parties are to bear their own costs and

fees.

Respectfully Submitted,

BUTT THORNTON & BAEHR PC

/s/ Monica R. Garcia
Monica R. Garcia
*Attorneys for Defendant*
*AGCO Corporation*
P.O. Box 3170
Albuquerque, NM  87190
(505) 884-0777
mrgarca@btblaw.com

AND

*/s/ Approved as to Form by*
Darren P. McDowell
Texas Bar No. 24025520
Fears Nachawati Law Firm
5473 Blair Road
Dallas Ta. 75231
Phone: 214-890-0711
Fax: 214-890-0712
dmcdowell@fnlawfirm.com

and

Feliz A. Rael
505 Marquette NW, Ste. 1300
Albuquerque, NM 87102
Phone: 505-610-5991
Fax: 505-938-2301
frael@swcp.com

*Attorneys for Plaintiffs*


APPROVED BY:

*Via email 5/1/20*
Kenneth L. Beal
Kenneth L. Beal, P.C.
PO Box 725
Las Cruces, NM 88004
575-526-5511
klbealoffice@gmail.com
*Attorneys for Sidco Corporation*


*Via email 4/23/20*
Timothy Holm
Modrall, Sperling, Roehl, Harris & Sisk, P.A.
Po Box 2168
Albuquerque, NM 87103
505-848-1800
tch@modrall.com
*Attorneys for Monsanto Company*

# EXHIBIT
# 6

10/14/21, 10:19 AM                Bayer announces agreements to resolve major legacy Monsanto litigation | Bayer News



*IIIIII Science for a **better life***

## Global

Home    Media    **News**

### Wednesday - June 24, 2020

# Bayer announces agreements to resolve major legacy Monsanto litigation

**Company will make a total payment of $10.1 billion to $10.9 billion (EUR 9.1 billion to EUR 9.8 billion) to resolve current and address potential future Roundup™ litigation / Company also resolves dicamba drift litigation for payment of up to $400 million and most PCB water litigation exposure for payment of approximately $820 million / Funding sourced from free cash flow and Animal Health divestment / Bayer is well positioned to deliver science-based solutions to meet global health, nutrition needs**

**Leverkusen, June 24, 2020** – Bayer announced today a series of agreements that will substantially resolve major outstanding Monsanto litigation, including U.S. Roundup™ product liability litigation, dicamba drift litigation and PCB water litigation. The main feature is the U.S. Roundup™ resolution that will bring closure to approximately 75% of the current Roundup™ litigation involving approximately 125,000 filed and unfiled claims overall. The resolved claims include all plaintiff law firms leading the Roundup™ federal multi-district litigation (MDL) or the California bellwether cases, and those representing approximately 95% of the cases currently set for trial, and establish key values and parameters to guide the resolution of the remainder of the claims as negotiations advance. resolution also puts in place a mechanism to resolve potential future claims ciently. The company will make a payment of $8.8 billion to $9.6 billion to

10/14/21, 10:19 AM                Bayer announces agreements to resolve major legacy Monsanto litigation | Bayer News

resolve the current Roundup™ litigation, including an allowance expected to cover unresolved claims, and $1.25 billion to support a separate class agreement to address potential future litigation. The Roundup™ class agreement will be subject to approval by Judge Vince Chhabria of the U.S. District Court for the Northern District of California. The resolutions were approved unanimously by Bayer's Board of Management and Supervisory Board with input from its Special Litigation Committee. The agreements contain no admission of liability or wrongdoing.

"First and foremost, the Roundup™ settlement is the right action at the right time for Bayer to bring a long period of uncertainty to an end," said Werner Baumann, Chief Executive Officer of Bayer. "It resolves most current claims and puts in place a clear mechanism to manage risks of potential future litigation. It is financially reasonable when viewed against the significant financial risks of continued, multi-year litigation and the related impacts to our reputation and to our business. The decision to resolve the Roundup™ litigation enables us to focus fully on the critical supply of healthcare and food. It will also return the conversation about the safety and utility of glyphosate-based herbicides to the scientific and regulatory arena and to the full body of science."

"The Roundup™ agreements are designed as a constructive and reasonable resolution to a unique litigation," said Kenneth R. Feinberg, court-appointed mediator for the settlement talks. "The separate, independent settlements of the current claims are unique and a tribute to Bayer. The significant progress made to date – which exceeds the initial participation rates of other claims resolution proceedings – provides a robust framework that will enable the parties to bring closure to the current Roundup™ litigation in due course."

**Resolution of Roundup™ litigation**

The multi-step Roundup™ resolution includes several elements. The agreements will resolve the vast majority of the current litigation in U.S. federal and state courts, including both plaintiffs with filed cases and parties who have retained counsel but not yet filed their claims in court. Those participating in the settlement will be required to dismiss their cases or agree not to file. The range of

10/14/21, 10:19 AM
Bayer announces agreements to resolve major legacy Monsanto litigation | Bayer - News

$8.8 billion to $9.6 billion covers both the agreements already signed and those that are still under negotiation. It also reflects the fact that the number of claimants who are eligible to receive compensation under these agreements won't be known until the claims process is well underway. The claims still subject to negotiation largely consist of cases generated by TV advertising and for which plaintiffs' law firms have provided little or no information on the medical condition of their clients, and/or cases held by law firms with small inventories.

The three cases that have gone to trial – Johnson, Hardeman and Pilliod – will continue through the appeals process and are not covered by the settlement. It is important for the company to continue these cases as the appeals will provide legal guidance going forward. In an appellate court filing, the U.S. government expressed its specific support for the company's preemption arguments, asserting that state law warning claims in the Roundup™ litigation conflict with U.S. federal law, requiring no cancer warning, and must be dismissed. Just this week, a federal judge in California found that the weight of scientific evidence does not support the state's Proposition 65 cancer warning requirement for glyphosate-based herbicides -- a ruling that reinforces the very arguments the company has made at trial.

Potential future cases will be governed by a class agreement which is subject to court approval. The agreement includes the establishment of a class of potential future plaintiffs and the creation of an independent Class Science Panel. The Class Science Panel will determine whether Roundup™ can cause non-Hodgkin's lymphoma (NHL), and if so, at what minimum exposure levels. The materials considered by the Class Science Panel that Bayer has permission to disclose or are in the public domain will be posted on a public website. Both the class and company will be bound by the Class Science Panel's determination on this question of general causation, taking this decision out of the jury trial setting and putting it back in the hands of expert scientists. If the Class Science Panel determines that a causal connection between Roundup™ and NHL is not established, class members will be barred from claiming otherwise in any future litigation against the company. The Class Science Panel's determination is expected to take several years. Class members will not be permitted to proceed with Roundup™ claims prior to the Class Science Panel's determination, and

10/14/21, 10:19 AM        Bayer announces agreements to resolve major legacy Monsanto litigation | Bayer News

cannot seek punitive damages. The agreed funding is capped at $1.25 billion and will support research into treatment of NHL, NHL diagnostic programs in underserved areas, and assistance payments to class members who develop NHL before the Class Science Panel's determination and are eligible on a need basis for assistance during that period.

The company said that before deciding to settle, it considered the alternative course of continuing to litigate Roundup™ cases. In the company's risk assessment, potential negative outcomes of further litigation, including more advertising and growing numbers of plaintiffs, upwards of twenty trials per year and uncertain jury outcomes, and associated reputational and business impacts, likely would substantially exceed the settlement and related costs.

"Taking account of various options, I am convinced this plan provides a comprehensive, reasonable solution to the complex, contested issues presented by this litigation," said attorney John Beisner, a consultant to Bayer's Supervisory Board and a mass tort expert who leads Skadden, Arps, Slate, Meagher & Flom LLP's Mass Torts, Insurance and Consumer Litigation Practice Group.

"Supported by our external advisor John Beisner and the Litigation Committee, the Supervisory Board has closely followed the Roundup™ litigation, as well as the dicamba and PCB litigation, and has provided counsel to the Board of Management on these matters. The Supervisory Board unanimously agrees with our Board of Management that all three settlements are in the best interest of the company and our stakeholders," said Norbert Winkeljohann, Chairman of Bayer's Supervisory Board.

Baumann added: "Our company is grounded in the well-being of our customers. As a science-based company committed to improving people's health, we have great sympathy for anyone who suffers from disease, and we understand their search for answers. At the same time, the extensive body of science indicates that Roundup™ does not cause cancer, and therefore, is not responsible for the illnesses alleged in this litigation. We stand strongly behind our glyphosate-based ___bicides, which are among the most rigorously studied products of their kind, ___ four decades of science support their safety and that they are not

10/14/21, 10:19 AM

carcinogenic." Indeed, in its Interim Registration Review Decision, issued in January, the U.S. Environmental Protection Agency (EPA) accurately concluded that it "did not identify any human health risks from exposure to glyphosate."

Customers, including farmers and other professional users who depend on glyphosate-based herbicides for their livelihoods, will see no change in the availability of Roundup™ products under the Roundup™ agreements announced today. Meanwhile, Bayer remains committed to offering customers more choices and announced last year an investment of approximately EUR 5 billion over a ten-year period to develop additional methods to manage weeds as part of an integrated approach to sustainable agriculture.

**Resolution of dicamba litigation**

Bayer also announced a mass tort agreement to settle the previously disclosed dicamba drift litigation involving alleged damage to crops. The company will pay up to a total of $400 million to resolve the multi-district litigation pending in the U.S. District Court for the Eastern District of Missouri and claims for the 2015-2020 crop years. Claimants will be required to provide proof of damage to crop yields and evidence that it was due to dicamba in order to collect. The company expects a contribution from its co-defendant, BASF, towards this settlement.

The only dicamba drift case to go to trial – Bader Farms – is not included in this resolution. The company believes the verdict in Bader Farms is inconsistent with the evidence and the law and will continue to pursue post-trial motions and an appeal, if necessary.

Bayer stands strongly behind the safety and utility of its XtendiMax™ herbicide with VaporGrip™ technology and continues to enhance training and education efforts to help ensure growers use these products successfully. The company is settling the pending dicamba drift cases to be able to focus on the needs of its customers.

**Resolution of PCB litigation**

10/14/21, 10:19 AM   Case 2:21-cv-00994-GBW-SMV   Document 5-7   Filed 10/22/21   Page 6 of 11
Bayer announces agreements to resolve major legacy Monsanto litigation | Bayer News

Bayer also announced a series of agreements that resolve cases representing most of the company's exposure to PCB water litigation. Monsanto legally manufactured PCBs until ceasing their production in 1977. One agreement establishes a class that includes all local governments with EPA permits involving water discharges impaired by PCBs. Bayer will pay a total of approximately $650 million to the class, which will be subject to court approval.

At the same time, the company has entered into separate agreements with the Attorneys-General of New Mexico, Washington, and the District of Columbia to resolve similar PCB claims. For these agreements, which are separate from the class, Bayer will make payments that together total approximately $170 million.

**Funding sourced from free cash flow and Animal Health divestment**

Cash payments related to the settlements are expected to start in 2020. Bayer currently assumes that the potential cash outflow will not exceed $5 billion in 2020 and $5 billion in 2021; the remaining balance would be paid in 2022 or thereafter. In order to finance these payments which are subject to tax treatment, Bayer can make use of existing surplus liquidity, future free cash flows, the proceeds from the Animal Health divestment, and additional bond issuances, which will provide flexibility in managing the settlement payments as well as upcoming debt maturities.

Based on publications by the rating agencies and the company's communication with them, Bayer expects to keep investment grade credit ratings. With its strong underlying business, the company intends to keep its dividend policy. At the same time, deleveraging the balance sheet remains a high priority.

**Bayer: Well positioned for the future**

"As we work to put this major litigation behind us, Bayer can set a course for the future and tackle the global challenges we face in both health and nutrition – not only today as we confront the COVID-19 pandemic, but also long-term, as we ...k to improve quality of life for a growing and aging population of an estimated ...billion people by 2050," said Baumann. "More than 100,000 people put their

Case MDL No. 2741   Document 2525-5   Filed 11/01/21   Page 153 of 279
10/14/21, 10:19 AM   Case 2:21-cv-00994-GBW-SMV   Document 5-7   Filed 10/22/21   Page 9 of 11
Bayer announces agreements to resolve major legacy Monsanto litigation | Bayer - News

energies into making our vision of 'Health for all, Hunger for none' come true with medicines and agricultural products. We believe that science and innovation will be critical to the future, just as they have been for Bayer in serving customers and patients over nearly 160 years. We are committed to addressing these challenges in a responsible manner, both to help meet the UN's sustainable development goals, and maintain the transparency and constructive engagement with stakeholders that is essential to sustain public trust in our products and in our company."

**About Bayer**

Bayer is a global enterprise with core competencies in the life science fields of health care and nutrition. Its products and services are designed to benefit people by supporting efforts to overcome the major challenges presented by a growing and aging global population. At the same time, the Group aims to increase its earning power and create value through innovation and growth. Bayer is committed to the principles of sustainable development, and the Bayer brand stands for trust, reliability and quality throughout the world. In fiscal 2019, the Group employed around 104,000 people and had sales of 43.5 billion euros. Capital expenditures amounted to 2.9 billion euros, R&D expenses to 5.3 billion euros. For more information, go to **www.bayer.com**.

_Notes to editors:_

_The following resources are available online **www.bayer.com/settlements**_
_// Speeches for the Investor Conference Call_
_// Links to the conference calls (recordings will also be available there shortly after the calls)_
_// Further information on glyphosate_

_TV editors can download the latest Bayer footage free of charge at **www.tv-footage.bayer.com/**_

d more information at: **www.bayer.com**

10/14/21, 10:19 AM                    Bayer announces agreements to resolve major legacy Monsanto litigation | Bayer News

**Forward-Looking Statements**

This release may contain forward-looking statements based on current assumptions and forecasts made by Bayer management. Various known and unknown risks, uncertainties and other factors could lead to material differences between the actual future results, financial situation, development or performance of the company and the estimates given here. These factors include those discussed in Bayer's public reports which are available on the Bayer website at **www.bayer.com**. The company assumes no liability whatsoever to update these forward-looking statements or to conform them to future events or developments.

### Download Center

## 0 file(s) collected

***VIEW DOWNLOAD CENTER***

### Download

News Release

Download PDF

Download RTF

Add PDF (83 KB) to Download Center

Add RTF (180 KB) to Download Center

### Investor Conference Call

Speeches

### Contact



10/14/21, 10:19 AM
Bayer announces agreements to resolve major legacy Monsanto litigation | Bayer News



**Christopher Loder**

Global Media Relations

Phone +1 201 3964325

E-Mail



**Christian Hartel**

Head of Corporate Media Relations

Phone +49 214 30-47686

E-Mail



**Tino Andresen**

Corporate Media Relations

Phone +49 214 30-66048

E-Mail



Copyright © Bayer AG

Last updated: August 1, 2021



# EXHIBIT
# 7

STATE OF NEW MEXICO
COUNTY OF SANTA FE
FIRST JUDICIAL DISTRICT

FILED  1st JUDICIAL DISTRICT COURT
Santa Fe County
8/13/2020 2:37 PM
KATHLEEN VIGIL CLERK OF THE COURT
Bernadette Hernandez

MARITA RENTERIA
          Plaintiff,

v.                                        No. D-101-CV-2020-00180


MONSANTO COMPANY; and
SIDCO CORPORATION;
          Defendants.


## REQUEST FOR HEARING
## FOR RULE 1-016 SCHEDULING CONFERENCE

1.    Assigned Judge:      The Honorable Kathleen McGarry Ellenwood

2.    Type of Case:        Negligence

3.    Jury:   XXXXX     Non-Jury:

4.    Dates of hearings presently set:     None

5.    Specific matter(s) to be heard upon this request:     Scheduling Conference.

6.    Estimated total time required:     10 minutes

7.    Attach separate sheet listing names, address, and telephone numbers of all counsel and parties pro se entitled to notice.


Respectfully submitted by:


Feliz A. Rael
Attorney at Law
505 Marquette NW, Ste. 1300
Albuquerque, NM 87102
Tel: 505-610-5991
Fax:  505-938-2301

and

**FEARS NACHAWATI LAW FIRM**

Darren P. McDowell
Eric Przybysz
**FEARS | NACHAWATI, PLLC**
5473 Blair Road
Dallas, TX 75231
Tel. (214) 890-0711
Fax (214) 890-0712

*Attorneys for Plaintiff*

<u>Certificate of Service</u>

I certify that I served a true and correct copy of this document to counsel of record indicated below via the Court's file and serve system on August 13, 2020.

Kenneth L. Beal
Kenneth L. Beal, P.C.
PO Box 725
Las Cruces, NM 88004
575-526-5511
klbealoffice@gmail.com
*Attorneys for Sidco Corporation*

Alex C. Walker
Modrall, Sperling, Roehl, Harris & Sisk, P.A.
Po Box 2168
Albuquerque, NM 87103
505-848-1800
awalker@modrall.com
*Attorneys for Monsanto Company*

_____
Feliz A. Rael

2

PARTIES ENTITLED TO NOTICE:

Feliz A. Rael
Attorney at Law
505 Marquette NW, Ste. 1300
Albuquerque, NM 87102
Tel: 505-610-5991 Fax:  505-938-2301
Frael@swcp.com

and

Darren P. McDowell
Eric Przybysz
FEARS | NACHAWATI, PLLC
5473 Blair Road
Dallas, TX 75231
Tel. (214) 890-0711 Fax (214) 890-0712

*Attorneys for Plaintiff*


Kenneth L. Beal
Kenneth L. Beal, P.C.
PO Box 725
Las Cruces, NM 88004
575-526-5511
klbealoffice@gmail.com

*Attorneys for Sidco Corporation*

Alex C. Walker
Modrall, Sperling, Roehl, Harris & Sisk, P.A.
Po Box 2168
Albuquerque, NM 87103
505-848-1800
awalker@modrall.com

*Attorneys for Monsanto Company*

# EXHIBIT
# 8

**STATE OF NEW MEXICO**
**COUNTY OF SANTA FE**
**FIRST JUDICIAL DISTRICT COURT**

FILED  1st JUDICIAL DISTRICT COURT
Santa Fe County
8/13/2020 4:13 PM
KATHLEEN VIGIL CLERK OF THE COURT
Francine Lobato

**MARITA RENTERIA,**

                    **Plaintiff(s),**

**vs.**                                                    **No. D-101-CV-2020-00180**
                                                          **Judge McGarry Ellenwood**

**MONSANTO COMPANY; and**
**SIDCO CORPORATION,**

                    **Defendant(s).**

<u>**NOTICE OF HEARING**</u>

        NOTICE IS HEREBY GIVEN that a hearing in this case has been set as follows:

| | |
|---|---|
| Date of hearing: | September 8, 2020 |
| Time of hearing: | 11:15 am |
| Place of hearing: | First Judicial District Court |
| | 225 Montezuma Ave. |
| | Santa Fe, New Mexico 87501 |

<u>**All of Division X's hearings will be held by Google Meet:**</u>

<u>**Join with Google Meet:**</u>
https://meet.google.com/wof-cofz-tuq
<u>**Join by phone:**</u>
(US) + 1-563-503-5060 PIN: 818 230 380#

| | |
|---|---|
| Matter(s) to be heard: | ***Scheduling Conference*** |
| Length of hearing: | 30 minutes |
| Judicial Officer: | **Judge Kathleen McGarry Ellenwood** |

**\* Please READ the attached instructions for Case Scheduling Status Report and information regarding telephonic appearance for this hearing should it proceed.**

**\*\*NOTE\*\* Due to the high volume of cases in this Division, this Court does not accommodate notices of dates of unavailability. Attorneys are to meet and confer and send proposed dates of availability to this Court in conjunction with sending the motions packages and request for hearings.**

**\*\*\*NOTE\*\* Parties are to assume all hearing proceedings are on FTR. If the parties**

request transcripts, they should make arrangements in advance to provide their own Court Reporter.

_____
Kathy Chanler
Administrative Assistant


## CERTIFICATE OF SERVICE

I, the undersigned, hereby certify that copies of this order were e-served on the date of acceptance for e-filing to counsel who registered for e-service as required by the rules and mailed to pro se parties, if any to:
Feliz Rael
Darren McDowell
Eriz Przybysz
Kenneth Beal
Alex Walker

_____
Kathy Chanler
Administrative Assistant

2

## Instructions for Case Scheduling Conference

Judge Kathleen McGarry Ellenwood has adopted a case management process which includes an early case scheduling conference with the Court. The goal of the case management process is to put in place a schedule designed to achieve resolution of the case in as timely and inexpensive a manner as possible given the issues in the case. Most civil cases are resolved through settlement; therefore, one goal of the case management process is to schedule an early settlement conference, usually within four to six months of the date the answer is filed. Prior to the early settlement conference, discovery should be targeted toward those matters which are necessary to discuss early settlement of the case. If early settlement is not achieved, the case will proceed through additional discovery as necessary for trial.

In anticipation of the case scheduling conference, counsel is directed to meet and confer on the following issues:

**1. Ready for Trial Date**

In most cases, the court anticipates that cases will be ready for trial approximately 12 to 18 months after the answer is filed. Simpler cases may be ready earlier and complex cases may require additional time. In preparation for the Case Scheduling Conference, counsel must discuss a Ready for Trial Date. If counsel agrees upon a Ready for Trial Date, the court will set the matter on the first trial docket after the Ready for Trial Date. If counsel does not agree on a Ready for Trial Date, the court will set the case for trial at the Scheduling Conference. **Because the trial date will be established either by agreement of counsel or after consideration by the court at the case scheduling conference, counsel should assume that the trial will <u>not</u> be continued.**

**2. Estimated Length of Trial**

Counsel should make an effort to estimate the number of trial days needed for the trial of the case.

**3. Discovery Necessary for Early Settlement Conference**

Counsel should confer to determine what specific discovery is essential so that the parties can engage in good faith settlement discussions at the earliest possible date. Limited written discovery and targeted depositions are encouraged, focused on the issues necessary for good faith settlement discussions. If early settlement is not successful, the time remaining until the scheduled trial may be used for discovery for trial. Counsel should **not** expect that the trial date will be rescheduled if early settlement is not successful.

**4. Early Settlement Conference Deadline**
In most cases, the court anticipates that a case should be ready for early settlement

conference within four to six months after the answer is filed. Counsel will be required to file a report with the court on the outcome of the early settlement conference.

**5. Alternative Dispute Resolution Process**

The Court will order some form of alternative dispute resolution process for early settlement conference. The Court reserves the right to order additional settlement conferences if deemed appropriate. Counsel may agree or request one of the following options for ADR:

1) Agreement for referral to a specific settlement referee or mediator; or

3) Some other form of ADR to fully explore settlement prior to trial.

Counsel must meet and confer on the matters listed above in advance of the Case Scheduling Conference. Pro se parties are also required to meet and confer. **At least three (3) business days prior to the Case Scheduling Conference, counsel must file a Case Scheduling Status Report following the format attached.** Counsel must file the Case Scheduling Status Report even if agreement is not reached as to some matters. Counsel shall also provide a copy of the Case Scheduling Status Report to sfeddiv10proposedtxt@nmcourts.gov. Counsel may modify the Case Scheduling Status Report if there are other matters to be addressed at the conference.

**If counsel reach agreement as to all matters on the case scheduling status report and file the report at least three days prior to the case scheduling conference, the case scheduling conference will be vacated and the court will issue a scheduling order consistent with the dates agreed to by the parties.**

If counsel disagrees as to any matters in the Case Scheduling Status Report, the Scheduling Conference will proceed as scheduled.

**NOTICE FROM THE COURT REGARDING TELEPHONIC APPEARANCES:**
       **Until the current operating guidelines for the New Mexico Courts that have been put in place concerning the Coronavirus are modified, parties and attorneys are to appear telephonically for all hearings. Parties and attorneys may appear telephonically by calling 1-563-503-5060 and entering pin number 818230380# or by video at meet.google.com/wof-cofz-tuq (which may be subject to change). As changes are being made frequently, please visit the court website firstdistrictcourt.nmcourts.gov the day before your hearing. Once at the court website, click on District Court Judges and scroll down to Judge Kathleen McGarry Ellenwood, Division X, then click on View Calendar for up to date information on how to appear telephonically.**
       **Please call or join at the time of your hearing. (If the previous hearing is still in session, please mute your phone until your case is ready to be called. If you are unable to mute your phone, the Judge may have to mute it for you. Please do not hang up, remain on the line and once the Judge is ready to call your case you will need to unmute your phone or use the instructions given to you by the Judge if he muted the phone for you).**

4

STATE OF NEW MEXICO
COUNTY OF
FIRST DISTRICT COURT

_____ ,

       **Plaintiff,**

**v.**                            **No.** _____

_____ ,

       **Defendants.**

## <u>CASE SCHEDULING STATUS REPORT</u>

Counsel having conferred on the matters as directed by the Court in the Instructions for

Case Scheduling Conference reports to the Court as follows:

This case is a [  ] Jury Trial    or    [  ] Non-Jury Trial

**1.**      **Ready for Trial Date**

        [  ]    Agreement Reached _____(mm/dd/yr)

        [  ]    Agreed, Ready for Trial

        [  ]    No Agreement Reached

**2.**      **Estimated Length of Trial**

        _____ Trial Days

**3.**      **Discovery Necessary for Early Settlement Conference**

        [  ]    Agreement Reached

        [  ]    Agreed Discovery    _____

        [  ]    Written Discovery    _____

        [  ]    Depositions:    _____

[ ]   Other Discovery: _____

[ ]   No Agreement Reached

**4.**   **Early Settlement Conference Deadline**

    [ ]   Agreed Early Settlement Deadline _____(mm/dd/yr)

    [ ]   No Agreement Reached

**5.**   **ADR Process**

Date Complaint Filed: _____

Type of Case:

    [ ]   Civil Rights
    [ ]   Commercial / Business
    [ ]   Contract / Debt and Money Due
    [ ]   Construction
    [ ]   Domestic Matters
    [ ]   Employment / Labor
    [ ]   Estates, Wills, Trusts, Probate
    [ ]   Natural Resources
    [ ]   Real Estate
    [ ]   Tort Auto
    [ ]   Tort Malpractice, Product Liability
    [ ]   Tort Other

[ ]   Parties have agreed to the appointment of their own settlement referee or mediator

    Name of settlement referee or mediator: _____

[ ]   Other ADR procedure agreed to by the parties as described below:

_____

[ ]   No Agreement Reached

**5.**   **Other Matters:** _____

_____

6

EXHIBIT 1

Respectfully submitted,

_____
Attorney Name, Address, and all contact
Information, including fax and email.
*Attorneys for Plaintiff*

_____
Attorney Name, Address, and all contact
Information, including fax and email.
*Attorneys for Defendant*

# EXHIBIT
# 9

STATE OF NEW MEXICO
COUNTY OF SANTA FE
FIRST JUDICIAL DISTRICT COURT

MARITA RENTERIA,

     Plaintiff,

v.                                 No. D-101-CV-2020-00180

MONSANTO COMPANY; SIDCO CORPORATION;
and AGCO CORPORATION,

     Defendants.

---

     Plaintiff Marita Renteria and Defendant Monsanto Company ( Monsanto ), through their undersigned counsel of record, hereby move the Court to vacate the Scheduling Conference set for September 8, 2020, and state the following in support:

     1.     A Scheduling Conference is currently set for September 8, 2020, at 11:15 a.m.

     2.     Counsel for Plaintiff and Monsanto are currently discussing potential resolution of this lawsuit.  As a result, the parties agree that it would be most efficient for both the Court s and parties  time and resources to vacate the September 8th conference, as this will provide the parties additional time to continue their discussion regarding potential resolution of this lawsuit.  Should the parties need a Scheduling Conference in the future, they will promptly notify this Court and seek such conference.  In addition to vacating the September 8th Scheduling Conference, the parties also seek to vacate the requirement for submitting a Case Scheduling Status Report by September 4, 2020.

     , the parties respectfully request this Court to vacate the Scheduling Conference set for September 8, 2020 (as well as the requirement for submitting a Case Scheduling

Status Report by September 4, 2020) and reset any such conference, if necessary, at the future request of the parties.

MODRALL, SPERLING, ROEHL, HARRIS
& SISK, P.A.

By: /s/ Alex Walker
Alex C. Walker
P. O. Box 2168
Albuquerque, NM 87103-2168
Telephone (505) 848-1800
Fax (505) 848-9710
awalker@modrall.com

HOLLINGSWOTH LLP
Brett S. Covington (admitted *pro hac vice*)
1350 I Street, N.W.
Washington, DC 20005
Telephone (202) 898-5800
bcovington@hollingsworthllp.com

*Attorneys for Defendant Monsanto Company*

By: /s/ Feliz A. Rael
Feliz A. Rael
Attorney at Law
505 Marquette NW, Ste. 1300
Albuquerque, NM 87102
Telephone (505) 610-5991
Fax (505) 938-2301

and

FEARS NACHAWATI LAW FIRM
Darren P. McDowell
Eric Przybysz
5473 Blair Road
Dallas, TX 75231
Telephone (214) 890-0711
Fax (214) 890-0712

*Attorneys for Plaintiff*

WE HEREBY CERTIFY that a true and correct copy of the foregoing was submitted through the Court s Electronic Filing System for filing and service to all counsel of record this 4th day of September, 2020.

MODRALL, SPERLING, ROEHL, HARRIS
    & SISK, P.A.

By:   */s/ Alex Walker*
    Alex C. Walker

# EXHIBIT
# 10

FILED  1st JUDICIAL DISTRICT COURT
Santa Fe County
9/4/2020 4:39 PM
KATHLEEN VIGIL CLERK OF THE COURT
Jill Nohl

STATE OF NEW MEXICO
COUNTY OF SANTA FE
FIRST JUDICIAL DISTRICT COURT

MARITA RENTERIA,

     Plaintiff,

v.                                                                    No. D-101-CV-2020-00180

MONSANTO COMPANY; SIDCO CORPORATION;
and AGCO CORPORATION,

     Defendants.

## ORDER GRANTING JOINT MOTION TO
## VACATE SCHEDULING CONFERENCE

     **THIS MATTER** having come before the Court on the *Joint Motion to Vacate*

*Scheduling Conference*,

     **THE COURT FINDS** the Motion is well-taken and should be granted.

     **IT IS THEREFORE ORDERED** that the Scheduling Conference on September 8, 2020

is vacated and will be reset, only if necessary, at the future request of the parties.  The Court also

vacates the requirement for submitting a Case Scheduling Status Report by September 4, 2020.


                                   _____
                                **JUDGE MCGARRY ELLENWOOD**

Approved by:


MODRALL, SPERLING, ROEHL, HARRIS
  & SISK, P.A.

By:  _/s/ Alex Walker_____
    Alex C. Walker
    P. O. Box 2168
    Albuquerque, NM 87103-2168
    Telephone (505) 848-1800
    Fax (505) 848-9710
    awalker@modrall.com

HOLLINGSWOTH LLP
    Brett S. Covington (admitted *pro hac vice*)
    1350 I Street, N.W.
    Washington, DC 20005
    Telephone (202) 898-5800
    bcovington@hollingsworthllp.com

*Attorneys for Monsanto Company*

By:  _/s/ Feliz A. Rael_____
    Feliz A. Rael
    Attorney at Law
    505 Marquette NW, Ste. 1300
    Albuquerque, NM 87102
    Telephone (505) 610-5991
    Fax (505) 938-2301

and

FEARS NACHAWATI LAW FIRM
    Darren P. McDowell
    Eric Przybysz
    5473 Blair Road
    Dallas, TX 75231
    Telephone (214) 890-0711
    Fax (214) 890-0712

*Attorneys for Plaintiff*

Kenneth L. Beal
Kenneth L. Beal, P.C.
PO Box 725
Las Cruces, NM 88004
Telephone (575) 526-5511

*Attorneys for Sidco Corporation*

# EXHIBIT
# 11

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: ROUNDUP PRODUCTS LIABILITY LITIGATION | MDL No. 2741 |
| | Case No. 16-md-02741-VC |
| This document relates to: | **PRETRIAL ORDER NO. 236: GRANTING IN PART AND DENYING IN PART MOTION TO ESTABLISH A HOLDBACK PERCENTAGE** |
| *ALL CASES* | Re: Dkt. No. 12394 |

Lead counsel in this MDL has asked the Court to order that, whenever anyone in the country recovers money from Monsanto based on allegations that its Roundup product caused their cancer, 8.25% of their recovery be held back and placed into a fund to compensate lawyers who took the lead in litigating against Monsanto. Lead counsel's motion does not merely seek to tax the recoveries of plaintiffs in this MDL; it also seeks to tax the recoveries of state court plaintiffs, and the recoveries of people who settled with Monsanto before filing any lawsuit at all. The motion does not merely seek to compensate lawyers who performed "common benefit work" in this MDL; it also seeks to compensate lawyers for doing work in state courts.

The motion is largely denied. The fact that counsel is even requesting such a far-reaching order—a request that has some support from past MDL practice—suggests that courts and attorneys need clearer guidance regarding attorney compensation in mass litigation, at least outside the class action context. The Civil Rules Advisory Committee should consider crafting a rule that brings some semblance of order and predictability to an MDL attorney compensation system that seems to have gotten totally out of control.

# I.  BACKGROUND

In 2015, the International Agency for Research on Cancer (IARC) classified glyphosate as "probably carcinogenic to humans." IARC's conclusion stemmed from scientific studies that found an association between glyphosate exposure and a particular type of cancer: non-Hodgkin lymphoma (NHL). Glyphosate is the active ingredient in Roundup, the popular weedkiller manufactured and sold by Monsanto.

The IARC classification inspired a wave of lawsuits against Monsanto by plaintiffs with NHL, in federal and state courts across the country. As of today—roughly five years later—a few thousand cases have landed in federal court. In state courts, there are tens of thousands of cases. Many more potential cases wait in the wings, with people hiring lawyers but trying to settle before filing a lawsuit. Public reports filed by Bayer (which acquired Monsanto after the IARC classification) state that well over a hundred thousand cases have either been filed or are in the works.

When multiple similar cases are filed in federal courts throughout the country, those cases are sometimes transferred to a single federal judge for pretrial purposes. The transfer decision is made by the Judicial Panel on Multidistrict Litigation. When the panel decides that all cases of a particular type should be transferred to a single judge, lawyers describe it as the creation of an "MDL" (for multidistrict litigation). Relatively soon after IARC announced its glyphosate classification, the panel decided to create an MDL for federal Roundup cases and ordered that all such cases be transferred to the Northern District of California, and specifically to the undersigned judge.

Most of the state court cases are in Missouri, where Monsanto is headquartered. The California state courts have the second-highest number of Roundup cases. The judiciaries in those states have taken similar measures to group the cases together, with individual judges being assigned large chunks of cases.

Because all the cases in a federal MDL present similar or identical issues, the MDL judge's pretrial decisions—whether they involve case management or substantive legal

2

analysis—will typically impact all the plaintiffs. But the MDL judge cannot manage or adjudicate the cases effectively if the lawyers from every case have an active role. Accordingly, an MDL judge's first order of business is often to decide which lawyers will take the lead in managing and litigating the cases. This is an important decision because the performance of those lawyers, and the strategic decisions they make, often affect the outcome for the entire group of plaintiffs. For lawyers, leading an MDL is a major responsibility and a major risk. Lead lawyers invest a lot of time and money into managing and litigating the MDL. And if they lose, there is no way to recover their investment from the attorneys and plaintiffs who sat back and watched.

In this MDL, it was not difficult to decide which lawyers should take the lead because only one group came forward, presenting themselves as a slate. There were eight lawyers in total, all from different firms. The Court adopted the slate as proposed. The lawyers assigned themselves various titles, but for the purposes of this discussion it suffices to refer to them all as "lead counsel." Upon being appointed, these lawyers became responsible for managing the MDL on the plaintiffs' side, conducting discovery, communicating with other plaintiffs' lawyers who have cases in the MDL, determining the substantive legal positions to be taken, litigating those positions, and engaging in settlement discussions.

Shortly after being appointed, lead counsel filed a motion to establish a "common benefit fund." Common benefit funds are often created in MDLs so that if lead counsel succeeds in a way that benefits all the plaintiffs, they can be compensated from the fund. A certain percentage is held back from the recoveries of plaintiffs and placed in the fund. Then, towards the close of the MDL, lead counsel typically makes a showing to the Court related to the value of their work and the amount they believe they're owed from the fund.

It bears emphasis that these MDL common benefit funds are not necessarily for the compensation of lead counsel alone. Any counsel who (in coordination with lead counsel) ends up performing "common benefit work" can typically make a claim for compensation. The judge, often with the assistance of a court-appointed "special master," assesses the various claims for

compensation and decides how the money should be distributed. Furthermore, the requirement

that the defendant hold back a percentage of a plaintiff's recovery does not necessarily preclude

that plaintiff or their lawyer from ultimately getting it, or a portion of it. The money is simply

"held back" to make sure that any lawyer who performed work on behalf of all plaintiffs is fairly

compensated.

From the description so far, one might assume that lead counsel's common benefit fund

motion sought a holdback from any plaintiff *within the MDL* who obtained a settlement or

judgment from Monsanto. But the range of people lead counsel sought to affect through the

proposed holdback was far broader. And to be candid, this Court did not adequately scrutinize

lead counsel's proposal—the motion was unopposed at the time, and the Court was not very

familiar with the nuances of MDL proceedings. Thus, the Court signed (with just one change)

the proposed order submitted by lead counsel. The order requires Monsanto to hold back a

percentage of a settlement or judgment from any of the following people who obtain a recovery:

- Any plaintiff in the MDL.

- Any person not in the MDL who recovers from Monsanto, if their lawyer also happened
  to separately represent a client in the MDL. This includes someone who filed suit in state
  court and obtained a judgment or settlement. And it includes someone who settled before
  filing any lawsuit at all.

- Any person not in the MDL who recovers from Monsanto, if their lawyer has signed an
  agreement with MDL lead counsel to be subject to the holdback order in exchange for
  access to "MDL work product." Again, this includes someone who filed suit in state court
  and obtained a judgment or settlement, and it includes someone who settled before filing
  any lawsuit.

Pretrial Order No. 12: Common Benefit Fund Order, *In re Roundup*, No. 16-md-2741 (N.D. Cal.

Feb. 22, 2017), ECF No. 161.

The one change to the proposed order involved the percentage of the recovery to be held

back. Although lead counsel proposed that it be 7% of the gross amount recovered in a

settlement or judgment, Monsanto argued that it was premature to set a percentage so early, before the Court could begin to conduct a meaningful assessment of the value of the work performed by lead counsel and others on behalf of other plaintiffs. The Court accepted Monsanto's suggestion. The result was an order that laid the groundwork for the creation of a common benefit fund and specified who would be subject to it, but that left for another day a decision about the amount to be held back.

Thus began the litigation. Lead counsel's first big responsibility was to litigate the question of "general causation," which involved presenting expert testimony and legal argument about whether a reasonable jury could conclude that Roundup is capable of causing NHL at exposure levels that people currently experience. If the plaintiffs were to lose on that threshold question, every single case in the MDL would be dismissed. This phase necessitated a tremendous amount of fact discovery and expert discovery. Each side hired numerous experts, and many of those experts testified at an evidentiary hearing that lasted over a week. Most of the attorney work on the plaintiffs' side was performed by people from the lead counsel group (or people from their firms). Ultimately, the Court concluded that several of the expert opinions put forward by the plaintiffs were admissible, which meant that Monsanto's motion for summary judgment on the issue of general causation was denied.

Next, the parties and the Court identified three cases in the MDL that would serve as "bellwethers"—cases to be tried in the hope of educating both sides about their prospects in future cases, which in turn could facilitate settlement. Additional discovery took place, primarily focused on specific causation—that is, whether a reasonable jury could conclude that Roundup caused the NHL of the bellwether plaintiffs. The Court again heard extensive testimony from the experts on specific causation. Monsanto sought summary judgment in all three cases, arguing that no reasonable jury could conclude that Roundup caused NHL for these three particular plaintiffs. Monsanto also made a legal argument that affected all cases in the MDL: it contended that the plaintiffs' claims—which were based on California law—were preempted by federal law. The Court denied Monsanto's motion.

Meanwhile, a plaintiff in California state court, Dewayne Johnson, managed to get his case tried on an expedited basis. This was the first trial ever about whether Roundup caused someone's NHL. Johnson was represented by attorneys from the MDL's lead counsel group. A jury found in his favor, awarding him $289 million in compensatory and punitive damages. The trial court reduced both compensatory and punitive damages, and the court of appeal reduced those damages even further, leaving a total recovery of more than $20.5 million.

The following year, the first of the three federal bellwether cases went to trial in this Court. The plaintiff was Edwin Hardeman. One of the two lawyers who stood up at trial was a member of the lead counsel group; the other was not. The jury awarded Hardeman roughly $5 million in compensatory damages and $75 million in punitive damages. This Court reduced the punitive damages award to $20 million, leaving Hardeman with a total award of roughly $25 million.

In the aftermath of this trial, the Court determined that pressing ahead immediately with the other two bellwether trials would not be the best way to manage the MDL. Monsanto had suffered resounding defeats in two trials, and a third trial was set to proceed in California state court in the coming months. Thus, Monsanto and its opponents would soon have the benefit of three bellwethers. Furthermore, the *Hardeman* trial was structured in a manner that could not have been more fair to Monsanto. Among other things, the trial was bifurcated between a causation phase and a damages phase. This meant that the jury was asked to render a verdict on the scientific evidence relating to causation before it was presented with a good deal of damning evidence against Monsanto—evidence which suggested that Monsanto never seemed to care whether its product harms people. The fact that the jury found causation despite this trial structure, and the fact that the jury decided to award $80 million despite the fact that Hardeman had recovered from his NHL, suggested that Monsanto's prospects in future trials were exceedingly dim and that there would not be much more to learn from another trial. The Court thus vacated the trial date for the next federal bellwether and began focusing on pretrial proceedings for the remaining cases in the MDL, so that those cases could be transferred back to

their "home districts" for trial. The Court also appointed renowned mediator Ken Feinberg to preside over settlement negotiations between Monsanto and the plaintiffs.

The next trial in California state court took place shortly thereafter. The plaintiffs were a husband and wife named Alva and Alberta Pilliod. Lead counsel from the MDL was involved in the trial. It was not bifurcated. The trial went even worse for Monsanto than the first two—the jury awarded each plaintiff $1 billion in punitive damages, to go along with $55 million in compensatory damages. The trial court ultimately reduced the total award to roughly $87 million.

Back in federal court, the parties and the Court continued to move the MDL cases through the pretrial stage. Settlement negotiations continued as well. Ultimately, in June 2020, Bayer issued a press release announcing "agreements to resolve major legacy Monsanto litigation," including and especially the Roundup litigation. The press release stated that Bayer would "make a total payment of $10.1 billion to $10.9 billion . . . to resolve current and address potential future Roundup litigation."

From this press release, people might have assumed that Bayer had agreed to establish a fund that would compensate all plaintiffs (and future plaintiffs) who could make some type of threshold showing that they used Roundup and developed NHL. People might also have assumed that a deal was squarely in place. But in reality, there was there was no global settlement, and no plan for a global settlement fund. It's not even clear whether Bayer had formally reached settlements with anyone up to that point. Instead, Bayer was in the process of negotiating agreements with individual law firms—agreements to settle what people in the MDL world often refer to as a firm's "inventory" of cases.

From the June 2020 press release until now (a year later), Bayer has been working to finalize settlements with law firms. This includes settlement of cases in the federal MDL, cases in state court, and prospective cases for which no suit has been filed. But no money has yet changed hands. This may be partly due to the fact that a holdback percentage for the common benefit fund has not yet been set.

So now, lead counsel has filed a motion to establish the percentage. The motion differs in two key ways from what lead counsel requested at the beginning of the MDL. First, lead counsel asks that the holdback percentage be 8.25% of the total amount of each recovery, rather than 7%. The motion posits that 8% would represent attorneys' fees and be used to compensate attorneys who did common benefit work, while .25% would represent litigation costs and be used to compensate plaintiffs who incurred such costs to the benefit of everyone.

Second, lead counsel asks that the holdback order apply even more broadly than previously requested. They now ask the Court to issue an order requiring that, whenever anyone with NHL anywhere in the country obtains a recovery from Monsanto based on their use of Roundup, Monsanto hold back 8.25% of their total recovery and contribute it to this common benefit fund. This includes plaintiffs in the federal MDL, plaintiffs in state court, and people who haven't yet filed lawsuits but are negotiating deals with Monsanto. Any such person would be subject to the holdback order regardless of whether their lawyer was involved in the MDL or used MDL work product. While the original motion was unopposed, the new motion has drawn multiple objections from lawyers who have settled, or are in the process of settling, their cases. The objections are not limited to this recent attempt to expand the scope of the holdback order; they are targeted at several aspects of the original order as well.

## II.  THE SOURCE AND SCOPE OF A DISTRICT COURT'S POWER TO CREATE, AND ORDER PAYMENTS INTO, A COMMON BENEFIT FUND.

The breathtaking nature of lead counsel's request, along with the many objections filed in response to it, have prompted the Court to go back and ask: what is the source of a district court's power to create and require contributions to a common benefit fund, and how far does that power reach? It's helpful to break up the discussion into the following categories of people for whom lead counsel requests a holdback:

- Any plaintiff in the MDL who recovers from Monsanto following a settlement or judgment.

- People outside the MDL who recover from Monsanto following a settlement or

judgment, if their attorney happens to also represent a client in the MDL. This could include people who filed lawsuits in state court, or people who settled before filing any lawsuit.

- People who recover from Monsanto (whether in a state court lawsuit or before filing any lawsuit), if their attorney signed an agreement with lead counsel in the MDL to be bound by a holdback order in exchange for access to MDL work product.

- All other people who have recovered, or will soon recover, from Monsanto, regardless of any connection to the MDL.

**A.      Plaintiffs In The MDL**

There is not much disagreement about whether a district court has the power to create a common benefit fund in the MDL and order holdbacks from the recoveries of MDL plaintiffs. There is, however, some ambiguity as to where that power comes from. Identifying the source of the power is important because it is relevant to the question of how far that power can reach.

**1. The MDL Statute.** The first place one might look is the statute that created MDLs in the first place: 28 U.S.C. § 1407. But section 1407 merely creates the Judicial Panel on Multidistrict Litigation and authorizes the panel to transfer similar cases from around the country to a single federal judge for pretrial purposes. It is a procedural statute—not one that expands the substantive powers of the district court assigned to handle the cases. *In re Genetically Modified Rice Litigation*, 764 F.3d 864 (8th Cir. 2014) (citing *In re Showa Denko K.K. L–Tryptophan Products Liability Litigation–II*, 953 F.2d 162, 165 (4th Cir. 1992)). Accordingly, if a district court has the power to require that a percentage of recoveries be deposited into a common benefit fund in an MDL, that power must exist independently of section 1407. Which means, incidentally, that although this ruling speaks in terms of the power of an MDL court, the same concepts apply outside the MDL context (for example, if one district judge happens to be handling dozens of related cases filed within the same district).

**2. The Common Fund Doctrine.** One doctrine commonly invoked to support the creation of common benefit funds in MDLs is the "common fund" doctrine. This doctrine stems

from cases holding that district courts may, in rare circumstances, invoke their equitable power to award attorneys' fees to successful plaintiffs. Indeed, the proposed order signed by this Court at the outset of the MDL cited this line of cases. On reflection, despite the superficial similarity based on the name of the doctrine, the common fund cases are a questionable source of support for creating and requiring contributions to a fund in a situation like this.

The default rule in the United States is that each side pays its own attorneys' fees, regardless of who ultimately wins the case. Sometimes Congress will adopt a statute authorizing federal courts to award fees to the winning side in a particular type of case, or in a particular type of situation. But absent a statute, courts have historically only been permitted to require the payment of attorneys' fees in three circumstances: (i) when a party has acted in bad faith; (ii) when a party has willfully disobeyed a court order; or (iii) when the "common fund" exception applies. *Alyeska Pipeline Service Co. v. Wilderness Society*, 421 U.S. 240, 259 (1975).

The common fund exception recognizes that a plaintiff who litigates and recovers a specific piece of property or pot of money—one that benefits a discrete group of people in addition to themselves—is entitled to reasonable attorneys' fees from that recovery. The common fund line of cases typically involve a plaintiff recovering or preserving some money or property—for example, a trust—which can be loosely understood as a "fund." A similarly situated group of people typically has an interest in that fund, and the judgment obtained by the plaintiff paves the way for each person to realize that interest. In such circumstances, the Supreme Court has held that the prevailing plaintiff may seek, and the district court may order, reimbursement of attorneys' fees and litigation costs from the fund produced by the plaintiff's litigation. Such reimbursement works to spread the plaintiff's fees and costs proportionately among those who benefited from the lawsuit, preventing the plaintiff from shouldering the entire cost of litigating alone. The authority to affect the rights of people who are not parties to the case comes from the equitable jurisdiction that the district court exercises over the fund, by way of the litigation. *See, e.g.*, *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980); *see also Trustees v. Greenough*, 105 U.S. 527 (1882); *Central Railroad & Banking Co. v. Pettus*, 113 U.S. 116

(1885).

One helpful example is *Sprague v. Ticonic National Bank*, 307 U.S. 161 (1939). In that case, Lottie Sprague made a bank deposit that was backed by certain earmarked bonds. Fourteen other deposits with that bank were backed by the same bonds. The bank went into receivership, putting these deposits in jeopardy. Sprague sued and successfully imposed a lien on the bond proceeds. The consequence for Sprague was that the bank would be precluded from distributing the bond proceeds to unsecured creditors before satisfying its obligation to her. Similarly, her successful lawsuit established a claim from the same bond proceeds for the fourteen other depositors. In light of these circumstances, the Supreme Court held that the district court had the power to award Sprague reimbursement of her attorney's fees and litigation expenses from the bond proceeds: it was a situation in which the plaintiff effectively "produced" a fund through the successful result she achieved, and the fund was "for all practical purposes created for the benefit of others." *Id.* at 167.

This line of cases clearly justifies a fee award for common benefit work by MDL lawyers in one circumstance: when the MDL results in a settlement where the defendant establishes a fund for paying claims made by similarly situated people. *Cf. Boeing Co. v. Van Gemert*, 444 U.S. 472 (1980). With that type of global settlement, the lawyers (and their clients) have invested time and money to secure a fund for the benefit of the group, and the district court has the power to require that a portion of any payment from that fund be earmarked for the compensation of the lawyers who did the work that led to its creation. (Or, as typically happens, the court can make it simpler and compensate the lawyers by awarding them money directly from the fund.) Of course, questions could arise about whether the attorneys who did the common benefit work (or their clients) would get an unfair windfall from common fund payments. But as discussed later in this ruling, that is a matter of discretion; it seems clear that, pursuant to the common fund doctrine, an MDL court has the power to order such payments if discretion warrants it.

It seems like a stretch, however, to apply the common fund doctrine to the type of arrangement contemplated in this case (and in many other MDLs). Lead counsel has not asked

this Court to reimburse them from some fund or property interest that was preserved or established as a result of a victory against, or settlement with, Monsanto. Rather, lead counsel asked the Court to *create* a fund at the outset—before any judgment was entered and before liability was established—and to require contributions from individual recoveries down the line, whenever they were reached. Exercising equitable jurisdiction over a fund ultimately secured by litigation to reimburse the plaintiff who secured it seems quite different from creating a fund at the beginning of litigation and requiring contributions to that fund from individual recoveries in anticipation of the MDL lawyers needing to be reimbursed.

The distinction between these two concepts is highlighted by *Grupo Mexicano de Desarrollo S.A. v. Alliance Bond Fund, Inc.*, a Supreme Court case involving a somewhat analogous situation. 527 U.S. 308 (1999). There, the Court held that, although a district court has equitable authority to impose a lien on the defendant's funds or property after judgment is entered to ensure that the judgment can be effectuated, a district court lacks the equitable authority to enjoin a defendant from disposing of assets while the case is still pending—even if it's likely that the plaintiff will prevail, and even if there's a serious risk that the assets will disappear. Relatedly, the Court emphasized in *Grupo Mexicano* that district courts cannot exercise their equitable powers beyond situations where courts have historically invoked them, even if some of the same principles apply to the new situation. As noted, preemptively creating a common benefit fund and requiring holdbacks seems quite different from the historical practice of awarding fees from a fund secured by a successful plaintiff in the litigation.[1]

The link courts often draw between the traditional common fund cases and the type of

---

[1] In a couple of decisions from the 1970s applying the common fund exception, the Supreme Court held that a fee award was appropriate even in situations where it was debatable whether the judgment had established or preserved an actual fund or property interest. *Hall v. Cole*, 412 U.S. 1, 9 (1973); *Mills v. Electric Auto-Lite Company*, 307 U.S. 161, 167 (1939). Regardless, even the fee awards in *Hall* and *Mills* were different from what lead counsel seeks here: in those cases, a plaintiff incurred attorneys' fees obtaining a judgment against the defendant, a class of people benefited from that judgment, and the defendant was ordered to reimburse the plaintiff's fees. Also unlike this case, reimbursement from the defendant's treasury acted to proportionally spread the plaintiff's fees among those who benefited from the litigation.

12

arrangement proposed here is that, in both contexts, there are concerns about free riding. Those concerns arise when people sit back and watch one plaintiff work hard (and spend hard) to obtain a favorable result, only to swoop in and benefit from that result in the end. *See, e.g.*, *In re General Motors LLC Ignition Switch Litigation*, 477 F. Supp. 3d 170, 180-82 (S.D.N.Y. 2020). It's true that free rider concerns exist in both contexts. But free riding occurs all across our legal system. The presence of free riding, and the desire to address it, is not itself a source of judicial power. The power of a court to address free riding concerns—just like the power of a court to address any concern—must actually come from somewhere. As it relates to the type of holdback order contemplated in this MDL, that power does not seem to come from the common fund doctrine.

Speaking of the free rider problem, it's worth noting another difference between the traditional common fund cases and the type of arrangement that lead counsel has proposed here. The common fund doctrine was created against the backdrop of the rule that winning plaintiffs typically must pay their own attorneys' fees. Thus, if not for the common fund exception, if a plaintiff stepped up to secure a fund without being compensated by the other beneficiaries of the ruling, those beneficiaries would be unjustly enriched at the expense of the plaintiff. The plaintiff had to pay their attorneys; the other beneficiaries did not. Thus, the common fund exception is largely about making sure that the plaintiff is reimbursed for fees. *Cf. United States v. Tobias*, 935 F.2d 666, 668 (4th Cir. 1991) ("Generally, a fund claimant who is represented by counsel . . . is deemed not to have taken a 'free ride' on the efforts of another's counsel."). With the arrangement proposed by lead counsel here, it does not appear that any actual plaintiffs would recoup any attorneys' fees as a result of common benefit work their lawyers performed. As far as the Court can tell, regardless of whether a holdback is ordered in this MDL, plaintiffs whose lawyers performed common benefit work will see the same contingency fee extracted from their recovery pursuant to their contracts with their lawyers. Thus, the proposed common benefit fund and holdback order will do nothing to ease the financial pain that any plaintiff will feel when their lawyer takes a percentage (typically 40%) of the recovery. Rather, it is the lawyers who will

receive additional money, over and above the 40% of their clients' recoveries. That's not to say it's categorically inappropriate for lawyers who do common benefit work to get paid more than the contingency fee they negotiated with their own clients—more on that later. But it further highlights the degree to which this type of arrangement differs from the traditional common fund cases.

Notwithstanding all this, an old Ninth Circuit case arguably requires a district court to treat a holdback order of this type as authorized by the common fund doctrine. In *Vincent v. Hughes Air West, Inc.*, 557 F.2d 759 (9th Cir. 1977), the Court considered (among other important things discussed later in this ruling) whether an MDL court had the authority to create a fund and order a holdback from the recoveries of MDL plaintiffs. The Court ultimately concluded that there was no meaningful difference between a plaintiff securing a fund at the end of a case (like in *Sprague*) and a court creating a fund and then using its existence to justify a holdback from individual recoveries. Rejecting the argument that conflating these two concepts is "bootstrapping of the rankest order in that an attorney and the court create by compulsion a fund which in turn they use to trigger application of the common fund doctrine," the court concluded that, "[t]aking a broader view . . . lead counsel helped 'create' a fund consisting of the various settlements negotiated in the [MDL]." *Id.* at 770-71. *Vincent*'s conclusion on this issue may have been indirectly invalidated by the Supreme Court's reasoning in *Grupo Mexicano*. But for purposes of this ruling, this Court will assume that the common fund doctrine gives it the authority to require a holdback for recoveries—at least when the recoveries are obtained by plaintiffs in the MDL itself.

**3. The district court's inherent authority to manage its docket.** Perhaps, in light of *Vincent*, there is no need for further discussion of the power to order holdbacks from the recoveries of plaintiffs in an MDL. But because *Vincent*'s reasoning on this issue is arguably undermined by subsequent Supreme Court precedent, it seems worth exploring the matter further. Moreover, as discussed in the next section, understanding the true source of this power helps elucidate how far a holdback order can reach.

14

District courts may exercise power in furtherance of the efficient and speedy resolution of cases. This authority, the Supreme Court has explained, is "governed not by rule or statute but by the control necessarily vested in courts to manage their own affairs . . . ." *Link v. Wabash R.R. Co.*, 370 U.S. 626, 630-31 (1962). "It has long been understood that certain implied powers must necessarily result to our Courts of justice from the nature of their institution, powers which cannot be dispensed with in a Court, because they are necessary to the exercise of all others." *Chambers v. NASCO, Inc.*, 501 U.S. 32, 43 (1991) (citing *United States v. Hudson*, 7 Cranch 32, 34 (1812)).

The Fifth Circuit—in a case decided the same year that the Ninth Circuit decided *Vincent*—relied primarily on this concept in concluding that a district court has the authority to require, for any plaintiff in the MDL who might settle with the defendants, a holdback to compensate attorneys who did common benefit work. *In re Air Crash Disaster at Florida Everglades*, 549 F.2d 1006 (5th Cir. 1977). As the Fifth Circuit noted, district courts handling a mass of related cases have the power to appoint lead counsel to manage the litigation. That power is rooted in a district court's inherent authority to efficiently manage the cases on its docket because, without lead counsel, hundreds of diligent lawyers would lobby the court for attention, leaving it unable to manage and adjudicate the related cases, not to mention the rest of its docket. *See id.* at 1012-15; *see also Vincent*, 557 F.2d at 773-75. It follows, the Fifth Circuit Court explained, that a district court can order additional compensation for lead counsel (beyond whatever contingency fee they receive from their own clients) based on the work they do for the collective whole. *In re Air Crash Disaster*, 549 F.2d at 1106.[2]

---

[2] The Fifth Circuit went on to assert that its conclusion was bolstered by the common fund doctrine. *Id.* at 1017-18. It opined, just like the Ninth Circuit in *Vincent*, that there's no meaningful difference from the standpoint of equitable authority between: (i) awarding attorneys' fees to the prevailing plaintiff from a defendant's fund over which a court has jurisdiction as a result of the judgment; and (ii) ordering the establishment of a fund at the outset of the case and ordering that people who settle with the defendant in the future must pay a portion of their recovery into it. *In re Air Crash Disaster*, 549 F.2d at 1018. As discussed earlier with respect to *Vincent*, this aspect of the Fifth Circuit's opinion is dubious and may have been undermined by the Supreme Court's subsequent ruling in *Grupo Mexicano*.

15

In terms of finding the right source of authority for holdbacks, the inherent managerial authority is a much better fit than the common fund doctrine—at least when it comes to holdbacks for plaintiffs who are actually part of the MDL. As Judge Furman nicely put it, "A subset of plaintiffs' lawyers do the lion's share of the work, but that work accrues to the benefit of all plaintiffs. If those other plaintiffs were not required to pay any costs of that work, high-quality legal work would be under-incentivized and, ultimately, under-produced." *In re General Motors*, 477 F. Supp. at 174. Mass tort cases are difficult enough to manage and adjudicate when the common benefit work is being done by good lawyers; the cases would be impossible to manage if good lawyers lacked sufficient incentive to step up.

It's probably wrong to say—as the Fifth Circuit and others have—that lead MDL counsel would essentially be doing volunteer work absent a common benefit fund and a holdback order. *In re Air Crash Disaster*, 549 F.2d at 1016. After all, once you've been appointed lead counsel and have taken control of the MDL, you and your clients will typically have much greater bargaining power compared to other plaintiffs. So you can often expect to obtain a more lucrative settlement for your clients (and by extension, for yourself) than the lawyers who are waiting on the sidelines and not bringing bellwether cases to trial. The differential between what you recover and what the free riders recover may already be adequate compensation for the common benefit work that you did. But it remains safe to assume that if a district court lacked the ability to ensure that lead counsel can receive compensation from the other plaintiffs in the MDL when the situation warrants it, good counsel would be hard to find in at least some cases. Good counsel may not want to gamble that their recoveries will be so much greater as to justify doing a large amount of common benefit work.

Accordingly, when a district court is handling an MDL or some other group of related cases, it has the authority to compensate common benefit work by redistributing attorneys' fees in those cases, to the extent necessary to ensure effective management and adjudication of the litigation.

**B.      A Person With No Case In The MDL Who Recovers From The Defendant And Whose Attorney Happens To Represent Someone In The MDL.**

The next question is whether the Court has the authority to require holdbacks from the recoveries of people who are not plaintiffs in the MDL but who happened to hire a lawyer with a client in the MDL. This could include someone who filed a lawsuit in state court and recovered from Monsanto following a judgment or settlement, and it could include someone who filed no lawsuit and settled out of court. The answer is that a district court cannot exert authority over the recovery of a person with so tenuous a connection to the MDL. Neither the common fund doctrine nor the district court's inherent power to control its docket justifies an order affecting the recovery of a nonparty merely because they happened to hire a lawyer with a client in the MDL.

As discussed earlier, the connection between the common fund doctrine and the type of holdback order contemplated here is tenuous at best. If it's tenable at all, it's because one similarity persists among many differences: the transaction takes place within the case itself. In the common fund cases, the district court is awarding money from a fund that is part of the case to a plaintiff who is part of the case. If the holdback order were extended to the recoveries of parties in state court or parties with no case at all, any plausible support from the common fund doctrine disappears entirely—the court is exercising authority over disputes that are not before it and over property that is not before it, without any clear limit on the court's reach. *Cf. Alyeska Pipeline*, 421 U.S. at 264 n. 39 ("In this Court's common-fund and common-benefit decisions, the classes of beneficiaries were small in number and easily identifiable.").

To return to the Supreme Court's common fund decision in *Sprague* as an example, imagine if one of the other depositors had sued the bank in state court and then reached a settlement while Ms. Sprague's case was still pending. Imagine further that the bank paid the state court plaintiff with money from its general fund, not from the proceeds of the earmarked bonds. Now imagine what would have happened if Ms. Sprague asked the district court to order a portion of the settlement amount withheld and placed into a fund to potentially reimburse her

for the fees she was in the process of incurring—just in case she was ultimately successful in her own lawsuit. It seems likely that the Court would have reached a different conclusion about the power of the district court in a situation like that.

If one understands the power to order holdbacks as coming from the inherent docket management authority, it becomes even more obvious that a district court lacks the authority to apply holdbacks to a dispute outside the MDL merely because the plaintiff in that dispute happened to hire a lawyer who represents a plaintiff within the MDL. Under this doctrine, district courts merely have the power to manage "their" dockets, and the purpose of this power is "the efficient and expedient resolution of cases." *Dietz v. Bouldin*, 136 S. Ct. 1885, 1892-93 (2016); *see also United States v. Moussaoui*, 483 F.3d 220, 237 (4th Cir. 2007) (explaining that the cases involving the inherent managerial power of a district court "stand for the proposition that a court has the inherent authority to control various aspects of the cases *before that court* so that they can 'protect their proceedings and judgments in the course of discharging their traditional responsibilities.'" (emphasis in original) (quoting *Degen v. United States,* 517 U.S. 820, 823 (1996))). It's one thing to require holdbacks in your own cases for the purpose of ensuring those cases are litigated and adjudicated properly; it's quite another to insist that you need to manage your docket by issuing orders affecting disputes that are not before you. *See Degen,* 517 U.S. at 823-24 ("Principles of deference counsel restraint in resorting to inherent power, and require its use to be a reasonable response to the problems and needs that provoke it.").

Perhaps these are some of the reasons why the Eighth Circuit, in *Genetically Modified Rice Litigation*, 764 F.3d 864 (8th Cir. 2014), tersely affirmed a ruling by an MDL court that it lacked the authority to order holdbacks from state court plaintiffs' recoveries. Lead counsel argued that the authority came from the fact that the court would be ordering the *defendant* in the MDL to withhold the money, rather than ordering the state court plaintiff to relinquish it. But the Eighth Circuit rejected this as a distinction without a difference:

> But state-court cases, related or not, are not before the district court.

> The state-court plaintiffs at issue neither agreed to be part of the federal MDL nor participated in the MDL Settlement Agreement. Even if the state plaintiffs' *attorneys* participated in the MDL, the district court overseeing the MDL does not have authority over separate disputes between state-court *plaintiffs* and [the defendant].

*Id.* at 874. The Court acknowledged the possibility that the lawyers for the state court plaintiffs had benefitted from lead MDL counsel's work but noted that "equity is insufficient to overcome limitations on federal jurisdiction." *Id.*

The same logic applies to disputes where the claimant has not filed a lawsuit in any court. This is underscored by the Ninth Circuit's opinion in *Vincent*, along with a similar opinion filed one year earlier: *Hartland v. Alaska Airlines*, 544 F.2d 992 (9th Cir. 1976). Both these cases stemmed from MDLs created following plane crashes, with the families of the deceased suing the airline. In *Hartland*, an MDL court insisted on a holdback from the recovery of one person who had sued the airline in state court, and one person who had not sued the airline at all. The Ninth Circuit issued a writ of mandamus to correct this "usurpation of power" by the district court, ordering that the money be returned to both people. *Hartland*, 544 F.2d at 1001. In *Vincent*, an MDL court similarly required a holdback from the recovery of someone who had never filed suit, and that person appealed. The Ninth Circuit held that the appeal was controlled by *Hartland*, and that although an MDL court has the power to order holdbacks from the recoveries of plaintiffs before it, it lacks the power to order holdbacks from the recoveries of claimants not before it. *Vincent*, 557 F.2d at 765-66.

To be sure, it's not immediately apparent whether the people who won their appeals in *Hartland* and *Vincent* had hired lawyers who also happened to represent clients in the MDL.[3] But there is no reason to think that the presence of so tenuous a connection between those nonparties and the MDL proceedings would have changed the Ninth Circuit's views about the "usurpation of power" that the district courts had committed. The fundamental problem with lead counsel's argument is that they are thinking too much in terms of the lawyers, and not enough in terms of

---

[3] That seems likely as to *Hartland*, because the claimant who filed a state court lawsuit against the airline had also filed a separate action against the United States that became part of the MDL. *Hartland*, 544 F.2d at 997-98. Presumably she was using the same lawyer for both cases.

the clients. The lawyers may think of the recoveries as "their" recoveries—recoveries that come from their "inventory." But that "inventory" consists of people, and each person has their own case against the defendant. Authority over a person's case (and a person's recovery) cannot be created simply because that person's lawyer happens to have another case before the district court.

Incidentally, *Hartland* and *Vincent*, as well as the Eighth Circuit's ruling in *Genetically Modified Rice*, vaguely conclude that the MDL courts lacked "jurisdiction." And it appears they may have been speaking in terms of "subject matter jurisdiction." *Hartland*, 544 F.2d at 1001 (stating that the MDL court "had not even a semblance of jurisdiction—original, ancillary or pendent—to order anything or anybody, and least of all to compel lawyers who were not parties to the action to pay $3,250 into a fund"); *Vincent*, 557 F.2d at 765-66 (relying on *Hartland* and cautioning that "[i]f parties to a suit cannot confer subject-matter jurisdiction on a federal court by agreement, certainly 'nonparties,' people who have never been made parties to a suit anywhere, cannot confer such jurisdiction . . . ."); *In re Genetically Modified Rice Litigation*, 764 F.3d at 874 (affirming the district court's holding that it lacked "jurisdiction" based, in part, on *Hartland*). But it's not clear that this is precisely the right way to think about it. Imagine that a federal case is proceeding down the hall in Judge Breyer's courtroom. Imagine further that Chief Judge Seeborg does not like what he's seeing and decides to issue an order in the case. There is subject matter jurisdiction in the case—it belongs in federal district court. There is jurisdiction "in the sense of addressing the power of the courts to entertain cases concerned with a certain subject." *Sosa v. Alvarez-Machain*, 542 U.S. 692, 714 (2004). It's just that Chief Judge Seeborg lacks any authority over the case (no matter how badly the parties might prefer otherwise). It is in this more general sense that jurisdiction is lacking.[4]

---

[4] In a recent opinion on whether MDL courts have the power to order holdbacks from the recoveries of nonparties whose attorneys happened to have clients in the MDL, Judge Furman gives good reasons why it's not actually a question of subject matter jurisdiction. *In re General Motors*, 477 F. Supp. 3d at 187-88. From there, he concludes that district courts indeed have the power to order holdbacks from the recoveries of nonparties (and then declines to exercise his discretion to do so for state court plaintiffs based on comity concerns). *Id.* at 188-191. But as the

Lead counsel makes several arguments in response to all this, but they are mostly policy arguments rather than arguments about the scope of a district court's power. For example, lead counsel notes that the common benefit work performed in the MDL paved the way for plaintiffs with state court cases (and for claimants who have not yet filed cases) to receive settlements from Monsanto. That's true, but as discussed, it does not matter for purposes of assessing the scope of an MDL court's authority to reach nonparties. In any event, while much of the pretrial work was done in the MDL, and while much of that work laid the groundwork for the three trials, ultimately it was the three jury verdicts that brought Monsanto to the table, and two of those were not even in federal court. It seems strange to assert that a federal district court should issue an order affecting the recoveries of nonparties based on common benefit work that was performed in state court. Especially when, as Judge Furman has noted, there's nothing to prevent the lawyers who did common benefit work in the state courts from seeking a redistribution of compensation from the judges presiding over the state court cases. *In re General Motors*, 477 F. Supp. 3d at 180.

Relatedly, lead counsel observes that if a lawyer has a client in the MDL, that lawyer will have access to "common benefit work" performed in the MDL—for example, the transcripts of expert depositions, or documents produced by the defendant. If a lawyer in the MDL also represents a client in state court, presumably that client will benefit from the lawyer's access to this MDL work product. It's not clear why that would present a policy concern in most instances—in our system, lawyers regularly pick up where other lawyers left off, benefitting from the good work of their predecessors. So if a lawyer with access to an expert deposition becomes better prepared to deal with the expert testimony in a separate case, what's the problem

---

Breyer-Seeborg example shows, even if the holdbacks are not a question of subject matter jurisdiction, it does not follow that district courts have authority to do require them—there are other limitations on the "jurisdiction" (in the more generic sense of the term) of a district judge. Judge Furman's ruling cites a district courts' inherent managerial authority as the source of power for a holdback. But it focuses on the policy reasons in support of extending holdbacks to nonparties—in particular, free riding concerns. As already discussed, the presence of free rider problems does not itself permit a district court to expand its power so dramatically beyond where it would otherwise reach.

with that? Moreover, if the transcript of that deposition is on the docket, as much of the expert materials are in this MDL, then by definition it's available for use by anyone, and lead counsel has no right whatsoever to impose a tax on its use. In any event, to the extent lead counsel has a genuine interest in preventing nonparties from benefitting from confidential MDL work product, it can ask the MDL court to issue an order preventing MDL attorneys from using confidential MDL work product in other cases without the consent of lead counsel. Perhaps even an order requiring payment of a fee for its use outside the MDL context. But the possibility that an MDL attorney will use MDL work product to the benefit of a client outside the MDL is not a basis for a federal district court to assert jurisdiction over the recovery of a party not before it.

Lead counsel also notes that Monsanto's "inventory settlements" with law firms were brokered by Ken Feinberg, the special master appointed by this Court. Those law firms, lead counsel correctly observes, represented plaintiffs in the MDL along with state court plaintiffs and people who had not yet filed suit. But the appointment of a special master is not a thread that can connect all these cases for jurisdictional purposes. The Court appointed Feinberg simply to mediate cases in the MDL; it was Monsanto and the law firms who wisely decided to hire him to broker deals in the other cases. Indeed, it's not clear how a district court could have the authority to appoint someone to mediate disputes that reside outside its jurisdiction.

Next, lead counsel argues that MDL courts can use their inherent power to regulate the conduct of attorneys to require all attorneys in the MDL to contribute a portion of their contingency fees (from all their clients' recoveries) to a common benefit fund. But the power to regulate attorney conduct typically involves sanctions and other disciplinary measures, and it can only be exercised to control courts' "own proceedings." *Chambers v. NASCO, Inc.*, 501 U.S. 32 (1991); *United States v. Williams*, 504 U.S. 36, 50 (1992); *United States v. Wunsch,* 84 F.3d 1110, 1115 (9th Cir. 1996); *Wharton v. Calderon*, 127 F.3d 1201, 1207 (9th Cir. 1997) ("As broad as the scope of the inherent power of a federal court may be, it does not encompass the protective order at issue here. It cannot be justified as a sanction, as an attorney disciplinary measure, or as necessary to control the courtroom or proceedings pending before the court."

(citations omitted)); *see also* 30 *Moore's Federal Practice*, § 807.01 (Matthew Bender 3d Ed.). It would stretch the power beyond recognition to say that it authorizes MDL courts to order appearing attorneys to contribute from their contingency fees from non-MDL recoveries to compensate lead counsel.

Finally, lead counsel argues that broad holdback orders have become a regular occurrence in MDLs, citing various pretrial orders. It's true that district courts often adopt orders requiring holdbacks from recoveries of plaintiffs outside the MDL—and in particular from the recoveries of plaintiffs who hired an attorney with an MDL case. *In re Juul Labs Inc.*, No. 19-md-02913 (N.D. Cal. May 27, 2020); *In re Bair Hugger Forced Air Warming Devices*, No. 15-md-2666 (D. Minn. May 24, 2016); *In re Ethicon Inc.*, No. 15-md-2652 (D. Kan. May 2, 2016); *In re Cook Medical Inc.*, No. 14-ml-2570 (S.D. Ind. Mar. 16, 2016); *In re Testosterone Replacement Therapy*, No. 14-cv-1748 (N.D. Ill. Nov. 25, 2014); *In re Toyota Motor Corp.*, No. 10-ml-2151 (S.D. Cal. June 9, 2013); *In re Nuvaring*, No. 08-md-1964 (E.D. Mo. Dec. 9, 2011); *In re Yasmin & Yaz*, No. 09-md-2100 (S.D. Ill. Mar. 25, 2010). Perhaps the prevalence of these orders suggests that this Court is wrong about the limits of a district court's authority. But perhaps instead it's a sign that we are too quick to assume that MDL courts can do whatever they want. Few of those holdback orders meaningfully consider the power of a district court to issue them. Instead, they seem similar to the common fund order this Court adopted uncritically in this case: orders based on language proposed by lead counsel, which engendered little or no opposition and were adopted at the outset of an MDL.

**C.    Claimants Outside The MDL Who Are Represented By A Lawyer Who Signed A Participation Agreement.**

The next category consists of people whose lawyers signed an agreement with lead counsel to be bound by this Court's holdback order in exchange for access to MDL work product. This agreement is described in the holdback order as the "participation agreement."

As discussed in the preceding subsection, the Eighth Circuit and the Ninth Circuit may have considered a district court's authority to order holdbacks from the recoveries of nonparties

23

to be an issue of subject matter jurisdiction. *In re Genetically Modified Rice Litigation*, 764 F.3d at 874; *Vincent*, 557 F.2d at 765-66; *Hartland*, 544 F.2d at 1001. If that's the right way to interpret those cases, district courts in those circuits lack the power to require a holdback from nonparties whose lawyers signed an agreement that they would be bound by a holdback order, because parties cannot agree to confer subject matter jurisdiction where none exists.

As explained in the preceding section and by Judge Furman in *General Motors*, it's probably not an issue of subject matter jurisdiction. But it's still questionable whether a district court has authority (that is, "jurisdiction" in the more generic sense) over the recovery of someone whose lawyer signs a participation agreement. On the one hand, the Third Circuit has held, in an unpublished opinion, that a district court might be able to enforce that agreement through ancillary jurisdiction. *See In re Avandia Marketing, Sales Practices & Product Liability Litigation*, 617 F. App'x 136, 141-44 (3d Cir. 2015). According to the Third Circuit, an MDL court's power to appoint lead counsel allows it to issue pretrial orders governing lead counsel's compensation, and because an MDL court can incorporate into its pretrial order an agreement permitting lead counsel to trade MDL work product for a contribution into a common benefit fund, it can then exercise ancillary jurisdiction to enforce the agreement and require a contribution. On the other hand, it seems strange to exercise power over a nonparty's recovery from a state court judgment or settlement when the same purpose could be achieved through action that is far less intrusive: authorizing lead counsel to directly charge a lawyer who wishes to use confidential MDL work product, and then allowing that lawyer to decide, with their client and without involvement of a federal court, who should shoulder that cost. After all, to the extent this is in furtherance of the district court's efforts to manage the MDL cases, the court must take pains not to extend its inherent managerial authority beyond its reach. *See Degen*, 517 U.S. at 829 ("[Inherent power] is limited by the necessity giving rise to its exercise."); *United States v. Moussaoui*, 483 F.3d 220, 237 (4th Cir. 2007).[5]

---

[5] Presumably, even if it were an issue of subject matter jurisdiction, a district court would not exceed its power by authorizing lead counsel to charge non-MDL lawyers a fee for the use of

In any event, there is no need in this ruling to take a position on whether an MDL court has the authority to require a holdback from a nonparty's recovery as a result of a lawyer participation agreement. As discussed in Section III, even if the Court had the authority to do so here, it would decline to exercise that authority.

**D.      People With No Connection At All To The MDL**

By now it should be obvious how badly lead counsel overreached when they asked the Court to tax every Roundup-related recovery by anyone in the country, regardless of any connection to the MDL. *Vincent*, 557 F.2d at 765-66; *Hartland*, 544 F.2d at 1001; *see also In re Showa Denko*, 953 F.2d at 166 ("The order thus compels contributions from plaintiffs in state or federal litigation who are not before the court and by claimants who have chosen not to litigate but to compromise their claims outside of the court . . . Claimants who have not sued and plaintiffs in state and untransferred federal cases have not voluntarily entered the litigation before the district court nor have they been brought in by process. The district court simply has no power to extend the obligations of its order to them."). That lead counsel was even willing to make such a request is perhaps reflective of a more widespread problem in the MDL world—a pervasive assumption that MDL courts have the power (or should have the power) to solve every problem or imperfection imaginable relating to mass tort litigation. One example of this—the example most relevant to this ruling—relates to the free rider issue. What began as a healthy concern about the free rider problem seems to have evolved into an obsession. From reading lead counsel's papers, you begin to get the feeling that any lawyer who secures for their client a quick settlement from Monsanto has committed some great injustice that must be rectified at all costs. Poor lead counsel does all the hard work killing the prey, only to see the "TV lawyers" and other vultures swoop in and pick at the remains.

This issue needs to be put in perspective. Yes, district courts must be able to redistribute

---

confidential MDL work product, and then those lawyers could, if consistent with their arrangements with their own clients, pass the cost on to the clients. It's not clear whether such an order is necessary or desirable, but there's no reason to think a district court would lack the power to do it.

attorney compensation when the situation warrants it. And in an MDL, the situation will often

warrant it—to a degree. But there is nothing inherently wrong with lawyers (and by extension

their clients) benefitting from the work of other lawyers without paying them. That happens all

the time in our legal system. Against this backdrop, the idea of a lawyer in the MDL getting

better results for a state court client as a result of access to "MDL work product" seems

unremarkable—hardly an event that district courts should reach to the outer limit of their powers

(or beyond) to address. And yes, it might strike some as unseemly that many lawyers obtain

clients as a result of mass TV advertisements and do little other work to settle their cases. But

perhaps that ad was the only thing that caused those clients to seek redress for an actual injury.

There is no need to redistribute attorney compensation in mass tort litigation based on value

judgments, or based on the assumption that any "benefit" lawyers and clients receive through the

efforts of hard-working attorneys must be taxed. Rather, the concern is simpler: that lawyers

doing common benefit work be compensated adequately for that work. They should be

compensated enough to make the work worth doing—to make sure that the difference between

taking the lead and sitting on the sidelines is meaningful enough to prevent the good lawyers

from running to the sidelines.

With this in mind, the next question is whether the Court should exercise what limited

power it does have to redistribute attorney compensation in this MDL.

### III. WHETHER THE COURT SHOULD EXERCISE ITS DISCRETION TO REQUIRE HOLDBACKS IN THIS MDL.

Given the discussion in Section II, the only plausible candidates for a holdback order are

plaintiffs in the MDL who will recover from Monsanto, and possibly nonparties whose lawyers

signed the participation agreement. But in the interest of thoroughness, this section will also

address whether the Court would, if its power were broader, order a holdback for the other

people who lead counsel propose to tax.

**A.      The Recoveries Of MDL Plaintiffs**

One could imagine an argument that there should be no holdback at all for this MDL. The

argument would go something like this: Yes, the lead lawyers invested a great deal of time and money in these cases, but now they're likely making so much from settling their own "inventories" that they can each afford to buy their own island. Yes, much of the "common benefit work" was done in connection with general causation, which directly impacted all plaintiffs in the MDL, but what really opened the floodgates for settlement were the three jury verdicts, two of which took place in state court, not the MDL. And yes, lead counsel's hard work helped lay the groundwork for other lawyers in the MDL to get settlements for their clients, but the settlements obtained by those lawyers were likely far lower than the settlements obtained by lead counsel for their "inventories," thus diminishing the need to address the free rider problem. No doubt that the distribution of attorney compensation in this MDL is imperfect, but perfection can almost never be achieved in the area of attorney compensation—that would be a game of whack-a-mole. And there's no indication that the distribution is so out of whack as to justify the effort and time involved in holding back money from people's recoveries and figuring out how to redistribute it.

Tempting as it may be to adopt that argument (particularly after watching lead counsel argue to expand an already overbroad holdback order), the Court is convinced that a holdback is justified for recoveries obtained by plaintiffs in the MDL. This is so for several reasons. Perhaps most importantly, it's worth reiterating that ordering a holdback does not necessarily mean that more money will be distributed to lead counsel. Rather, a portion of each MDL plaintiff's recovery will be placed into a fund, and then Special Master Feinberg will prepare a recommendation to the Court for how that money should be distributed. Perhaps some of the lawyers who performed valuable common benefit work are *not* part of the lead counsel group, and perhaps the compensation they stand to receive from their own clients' recoveries is not so great. Or perhaps some lawyers from the lead counsel group will be able to make a case for additional compensation despite the money they already stand to receive. But perhaps all or most of the money will be sent back to the people who were subject to the holdback, in which case

delay would be the only real consequence.[6]

Relatedly, there is a reliance interest at play here. After all, the Court signed lead counsel's proposed order at the outset of the MDL, thereby creating an expectation that a common benefit fund would be created. Lawyers who did common benefit work (whether they were part of the lead counsel group or not) did so on the expectation that they would have the opportunity to make a case for extra compensation—beyond what they stood to receive from their own clients' recoveries. Thus, even in the face of doubt about whether any redistribution of attorney compensation is really necessary in this MDL, it's worth going through the trouble and expense of analyzing the issue carefully. This is so even if the Court ultimately concludes that all MDL plaintiffs should simply get their money back from the fund.

Finally, the common benefit work performed in the MDL indeed conferred a significant benefit on MDL plaintiffs and their lawyers. The work on general causation, on summary judgment in the bellwethers, and on the *Hardeman* trial helped pave the way for substantial settlements for other MDL plaintiffs, and thus for substantial contingency fee recoveries by the lawyers representing them. Thus, it's worth double checking to make sure that the lawyers in the MDL who performed common benefit work are adequately compensated in relation to the lawyers who did not.

In terms of the percentage of an MDL plaintiff's recovery that will be held back, there is a certain arbitrariness to lead counsel's request for 8.25%. The request assumes (contrary to the discussion in this ruling) that even if the attorneys who did common benefit work have already been compensated obscenely compared to the free riders—they should automatically be entitled

---

[6] It is, of course, much easier to sort this out before money starts changing hands. Fortunately, money has not yet started changing hands, but we're on the precipice of that. On reflection, the Court should have addressed the holdback issue earlier in the litigation. As noted in Section I, Monsanto argued that it was premature to set a holdback percentage at the outset. That argument may or may not have been correct. But at some point—likely after the ruling on general causation—it would have been advisable for the Court to revisit the holdback issue, setting both the scope and the percentage of the holdback, to ensure that the parties could conduct settlement discussions against a more predictable backdrop. If the Civil Rules Advisory Committee tackles the issue of attorney compensation in mass litigation, one issue potentially worth addressing is the timing of holdback orders.

to more because those who benefitted from their work should be taxed no matter what. That is neither necessary nor desirable. Their request also assumes that they should be compensated for work performed in state court, which, as previously discussed, is not appropriate. On the other hand, when lead counsel proposed 8.25% (and when they originally proposed 7%) they assumed that the order would extend far beyond plaintiffs in the MDL, which is not happening. It appears, based on the Court's general understanding of settlement amounts discussed in the filings in this case and in public reports, that an 8% holdback is likely more than adequate to make any necessary redistribution of attorney compensation. And it would not be surprising to see all plaintiffs receive all or part of that money back.

To be clear, the required holdback is 8% of a plaintiff's gross recovery, but it is ordered to come out of the portion of the recovery designated for attorney compensation. It would be a violation of this order for any attorney of a plaintiff in this MDL to reduce a plaintiff's net recovery on the basis of this ruling. When attorneys make claims for compensation from the fund, it must be based only on work performed in the MDL; state court work cannot be compensated. As previously mentioned, to the extent lead MDL counsel did common benefit work in state court, they can seek redistribution of attorney compensation there. To adequately assess whether attorney compensation should be redistributed, the Court will likely need to be informed by the Special Master of the amounts attorneys have already recovered—those who performed common benefit work and those who did not. And all counsel in the MDL should be aware that, even if they performed no common benefit work, they may have a strong claim to ultimately recover the amount withheld from their clients' recovery, based on an argument that lead counsel's relative compensation is already so high that no further redistribution is warranted.

As previously noted, lead counsel proposed that an additional .25% of each plaintiff's gross recovery be taken from the plaintiff's share, for the purpose of redistributing litigation costs. However, lead counsel has made virtually no effort to show that this is necessary. In passing, lead counsel has stated that their clients' litigation expenses amounted to $20 million.

But that appears to be for all their clients, not just the ones involved this MDL. And it is not obvious why lead counsel's MDL clients, who are already no doubt being compensated more handsomely than the typical MDL plaintiff, need to be reimbursed for those litigation costs. Accordingly, this request is denied without prejudice to making a stronger showing, within 21 days of this ruling, that a redistribution of litigation expenses is necessary. It is ordered that no money shall change hands in any settlement in this MDL until the deadline has passed to file a renewed motion for a holdback of costs or until any such motion is resolved, whichever is later.[7]

**B.      The Recoveries Of Non-Parties Whose Attorneys Signed A Participation Agreement**

Assuming for argument's sake that the Court has the power to order a holdback from the recoveries of nonparties whose attorneys signed the participation agreement, it would not do so here, for two reasons.

First, the participation agreement contemplates that the nonparty clients will be subject to this Court's holdback order in exchange for giving their attorneys access to MDL work product. As noted earlier, much of the MDL work product—for example, expert reports and expert deposition transcripts—was rightly placed on the docket and thus was available to any member of the public for free. It would not be appropriate to take money from anyone's recovery based on access to that information. Moreover, to the extent that attorneys for nonparties received access to MDL work product that was actually confidential, it's doubtful that access to that work product is what truly advanced the ball for those attorneys and their clients. Lead counsel themselves imply that there was little difference, from the standpoint of reaching meaningful

---

[7] The Court has a particular concern for Edwin Hardeman. If Hardeman, based on his representation agreement with his counsel, is on the hook for all the litigation costs associated with his trial, he could be in danger of an unfair result compared to the other MDL plaintiffs as it relates to costs. If Hardeman's $25 million verdict is ultimately upheld on appeal, there is presumably nothing to worry about. But if the Supreme Court were to reverse the Ninth Circuit and conclude that his claims are preempted, and if that would result in Hardeman himself (rather than his lawyers) being on the hook for the litigation expenses incurred in his trial and in discovery that was specific to his case, that could be terribly unfair: all other plaintiffs (or almost all other plaintiffs) will have received a settlement, and Hardeman, as the MDL plaintiff who put the most on the line, would be left with nothing except a substantial bill for litigation costs that served only to benefit those who obtained a settlement.

settlements, between firms that did and did not receive confidential MDL work product. They

admit that "only a few non-leadership firms have requested access to the document depository."

Plaintiffs' Co-Lead Counsel's Reply at 14, *In re Roundup*, No. 16-md-2741 (N.D. Cal. Feb. 18,

2021), ECF No. 12615. Nevertheless, "most law firms were able to resolve their Roundup cases

without hiring any experts, without accessing or reviewing discovery documents, without taking

any depositions, and really without doing any pre-settlement work at all." Plaintiffs' Co-Lead

Counsel's Motion at 9, *In re Roundup*, No. 16-md-2741 (N.D. Cal. Jan. 11, 2021), ECF No.

12394. What truly advanced the ball for attorneys who settled their cases without doing much

work—as lead counsel repeatedly trumpet in their papers—was the three jury verdicts and the

work that led up to them. There is little reason to believe, at least on this record, that access to

confidential work product increased anyone's settlement value.

Second, as lead counsel candidly explained at the hearing on this motion, there was no

real correlation between the lawyers who signed the participation agreement and the lawyers

who received access to the work product from the MDL. *See* Transcript of Oral Argument at 9,

*In re Roundup*, No. 16-md-2741 (N.D. Cal. Mar. 8, 2021), ECF No. 12737. Things were moving

so fast in the MDL, and lead counsel was working so hard, that they understandably did not take

the time to ensure sure that attorneys who requested access to MDL work product signed the

agreement.

Under these circumstances, it would not be reasonable to require a holdback from the

recoveries of non-parties whose attorneys happened to sign the participation agreement,

particularly where the authority to impose this requirement is questionable in the first place.

**C.      The Recoveries of All Other People**

Even if the Court had the power to order holdbacks from the recoveries of all other

people who would be affected by lead counsel's motion, it would not do so. This is so for many

of the reasons already discussed in this ruling—reasons that are as relevant to the Court's

exercise of its discretion as they are to an assessment of the Court's power. For example, it's

likely that the lawyers who did common benefit work in the MDL have already been handsomely

compensated, such that if a redistribution is warranted at all, it can likely be accomplished with a fund created from the recoveries of MDL plaintiffs. From the standpoint of exercising the Court's inherent managerial power, there is a much weaker nexus between nonparties and the MDL, and courts should exercise caution before extending that power broadly (even when they have it). And much of the overall common benefit work was performed outside the MDL—in particular, the two state court jury verdicts.

But there are further reasons not to extend the holdback order beyond recoveries of plaintiffs in the MDL. This is especially true as it relates to state court plaintiffs. Recall that lead counsel has asked the Court to impose a holdback on the *recoveries* of state court plaintiffs—not just from settlements, but from judgments. One wonders if this would be constitutional, but in any event it raises serious comity concerns, as explained by Judge Furman in *General Motors*. 477 F. Supp. 3d at 180. Moreover, it will be challenging enough to police the holdback requirements and adjudicate the potential redistribution of attorney compensation for plaintiffs in this MDL. Including cases that are not before this Court would make the task that much taller.

## IV. CONCLUSION

For all these reasons, lead counsel's motion to establish a holdback percentage is granted in part and denied in part. Monsanto must hold back 8% of the gross amount of any recovery it pays an MDL plaintiff and place that money into the common benefit fund. The attorneys for the MDL plaintiffs are ordered that this 8% must come from the attorney fee portion of the recovery, not their clients' portion. The request for a holdback from the recoveries of people who are not plaintiffs in the MDL is denied. The Court lacks the power to order holdbacks from the recoveries of most or all of those people. And even if the Court had the power, it would decline to exercise it in light of the specific facts relating to this MDL. The request for a .25% holdback to potentially redistribute the burden of litigation costs is denied without prejudice to filing a renewed motion within 21 days of this ruling.

32

**IT IS SO ORDERED.**

Dated: June 22, 2021

_____

VINCE CHHABRIA
United States District Judge

# EXHIBIT
# 12

FILED  1st JUDICIAL DISTRICT COURT
Santa Fe County
9/13/2021 3:12 PM
KATHLEEN VIGIL CLERK OF THE COURT
Liliana Villalobos

**STATE OF NEW MEXICO**
**COUNTY OF SANTA FE**
**FIRST JUDICIAL DISTRICT**


**MARITA RENTERIA,**          **Case No. D-101-CV-2020-00180**
    **Plaintiff,**          **Judge: Kathleen McGarry Ellenwood**

**v.**

**MONSANTO COMPANY and**          **JURY TRIAL DEMANDED**
**SIDCO CORPORTATION,**
    **Defendants.**


## PLAINTIFF'S FIRST AMENDED COMPLAINT

COMES NOW Plaintiff, MARITA RENTERIA ("Plaintiff"), and for her First Amended

Complaint seeking relief from Defendants Monsanto Company ("Monsanto") and Sidco

Corporation ("Sidco") states:


## INTRODUCTION

Plaintiff brings this cause of action against Defendants for injuries sustained as a result of

using Defendant Monsanto's unreasonably dangerous and defective product, Roundup®. More

specifically, Plaintiff's claims involve Defendant Monsanto's negligent, willful, and wrongful

conduct in connection with the design, development, manufacture, testing, packaging, promoting,

marketing, distribution, and/or sale of Roundup® and/or other Monsanto glyphosate-containing

products ("Roundup" or "Roundup®") and Defendant Sidco's wrongful conduct in supplying the

Roundup® to which Plaintiff was exposed. As a direct and proximate result of her exposure to

Roundup® and its reactive ingredient, glyphosate, Plaintiff developed non-Hodgkin's Lymphoma

("NHL").


## PARTIES

1.  Plaintiff is an individual resident of Las Cruces, New Mexico.


Plaintiff's First Amended Complaint          - 1 -

2.   Defendant Monsanto is a Delaware corporation with its principal office located in St. Louis, Missouri.  Defendant Monsanto has appeared herein through its counsel of record, Alex C. Walker, Modrall, Sperling, Roehl, Harris & Sisk, P.A., P.O. Box. 2168, Albuquerque, New Mexico 87103-2168.

3.   Defendant Sidco is a New Mexico corporation and maintains its principal place of business in New Mexico.  Defendant Sidco has appeared herein through its counsel of record, Kenneth L. Beal, Kenneth L. Beal, P.C., P.O. Box 725, Las Cruces, New Mexico 88004.

## JURISDICTION AND VENUE

4.   This Court has subject matter jurisdiction over this matter.  This is a claim by a resident of the state of New Mexico against a foreign Defendant doing business in New Mexico and a domestic corporation with its principal place of business in New Mexico.  The tortious conduct giving rise to Plaintiff's injuries and the claims asserted herein occurred both inside and outside of New Mexico, with the injuries sustained by Plaintiff in New Mexico, while a New Mexico resident.

5.   Venue is proper in Santa Fe County pursuant to N.M. Stat. Ann. § 38-3-1(F).

## FACTUAL ALLEGATIONS

6.   Monsanto is a multinational agricultural biotechnology corporation based in St. Louis, Missouri.

7.   In 1970, Monsanto chemist, John Franz, discovered the herbicidal properties of glyphosate.  Thereafter, Monsanto designed and tested glyphosate-based formulas for use as an herbicide.  By the mid-1970s, Monsanto began designing, testing, developing, manufacturing, marketing, distributing, and selling glyphosate-based formulations under the brand name Roundup®.

8.   As used herein, "Roundup" refers to all formulations of the Roundup family of products

Plaintiff's First Amended Complaint          - 2 -

including, without being limited to: Roundup Concentrate Poison Ivy and Tough Brush Killer 1, Roundup Custom Herbicide, Roundup D-Pak herbicide, Roundup Dry Concentrate, Roundup Export Herbicide, Roundup Fence & Hard Edger 1, Roundup Garden Foam Weed & Grass Killer, Roundup Grass and Weed Killer, Roundup Herbicide, Roundup Original 2k herbicide, Roundup Original II Herbicide, Roundup Pro Concentrate, Roundup Prodry Herbicide, Roundup Promax, Roundup Quik Stik Grass and Weed Killer, Roundup Quikpro Herbicide, Roundup Rainfast Concentrate Weed & Grass Killer, Roundup Rainfast Super Concentrate Weed & Grass Killer, Roundup Ready-to-Use Extended Control Weed & Grass Killer 1 Plus Weed Preventer, Roundup Ready-to-Use Weed & Grass Killer, Roundup Ready-to-Use Weed and Grass Killer 2, Roundup Ultra Dry, Roundup Ultra Herbicide, Roundup Ultramax, Roundup VM Herbicide, Roundup Weed & Grass Killer Concentrate, Roundup Weed & Grass Killer Concentrate Plus, Roundup Weed & Grass Killer Ready-to-Use Plus, Roundup Weed & Grass Killer Super Concentrate, Roundup Weed & Grass Killer1 Ready-to-Use, Roundup WSD Water Soluble Dry Herbicide Deploy Dry Herbicide, or any other herbicide formulation containing the active ingredient glyphosate.

9. Roundup is a glyphosate-based formulation, which is a product that contains glyphosate and other ingredients that make the product more effective and/or last longer.  Roundup contains glyphosate, water, and other ingredients called other ingredients called "surfactants."

10. At all relevant times, Monsanto designed, tested, developed, manufactured, marketed, distributed, and sold the Roundup used by Plaintiff.

11. Monsanto is the world's leading producer of glyphosate.  As of 2009, Monsanto was the world's leading producer of seeds, accounting for 27% of the world seed market.  The majority of these seeds are of the Roundup Ready brand.  The stated advantage of Roundup Ready crops is that they substantially improve a farmer's ability to control weeds, since glyphosate can be sprayed

in the fields during the growing season without harming their crops. In 2010, an estimated 70% of corn and cotton, and 90% of soybean fields in the United States were Roundup Ready. Monsanto's glyphosate-based formulations are registered in 130 countries and approved for use on over 100 different crops and are ubiquitous in the environment. Numerous studies confirm that glyphosate is found in rivers, streams, and groundwater in agricultural areas where Roundup is used. It has been found in food, in the urine of agricultural workers, and even in the urine of urban dwellers who are not in direct contact with glyphosate.

12. Monsanto has never tested Roundup to determine whether it is carcinogenic. Indeed, in 2009, as evidence of the carcinogenic properties of Roundup mounted, Monsanto toxicologist Donna Farmer admonished Monsanto employees that "you cannot say that Roundup does not cause cancer … [because Monsanto has] not done carcinogenicity studies with 'Roundup.'"

13. Nevertheless, others have studied the carcinogenic properties of glyphosate and Roundup and have concluded that Roundup can and does cause NHL in humans exposed to the product.

14. Federal regulation of pesticides, including Roundup, is exercised by and under the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA"), 7 U.S.C. § 136 *et seq.* Though commonly referred to as an herbicide, Roundup is defined as a "pesticide" under 7 U.S.C. § 136(t), (u).

15. Among other things, FIFRA requires manufactures of pesticides to register their products with the Environmental Protection Agency ("EPA"). In the registration process, the EPA relies entirely on the applicant to prove that their labels comply with FIFRA. Accordingly, the "EPA does not independently test, study, or otherwise set particular composition standards for the pesticides." *Jeffers v. Wal-Mart Stores, Inc.*, 171 F. Supp. 2d 617, 623 (S.D. W. Va. 2001). "An

applicant who wishes to obtain registration for its own pesticide product is responsible for submitting or citing to all of the information and data that are required to support the application." *EPA Pesticide Registration Manual Ch.1*, Overview of Requirements for Pesticide Registration.

16. FIFRA expressly provides that "[i]n no event shall registration of an article be construed as a defense for the commission of any offense under this subchapter."  7 U.S.C. § 136a(f)(2).  Rather, registration of a pesticide is merely "*prima facie* evidence that the pesticide, its labeling and packaging comply with the registration provisions of the subchapter." *Id.*

17. A pesticide is "misbranded" under FIFRA if its label contains a statement that is "false or misleading in any particular," does not contain adequate instructions for use, or omits necessary warnings or cautionary statements.  It is unlawful under the statute to sell a pesticide that is registered but misbranded.

18. FIFRA does not create a private right of actions for consumers harmed by the sale of a misbranded pesticide but allows for private actions under state tort law to enforce duties that are "equivalent to, and fully consistent with FIFRA's misbranding provisions." *Bates v. Dow Agrosciences*, 544 U.S. 431, 447 (2005).

19. Starting in 1974 and continuing through the present date, the EPA has registered various glyphosate-based formulations as pesticides.

20. Monsanto has been aware of glyphosate's carcinogenic properties since at least 1985.  On March 5, 1985, a group of the Toxicology Branch of the Environmental Protection Agency ("EPS") published a memorandum classifying glyphosate as a Category C oncogene.  Category C oncogene are possible human carcinogens with limited evidence of carcinogenicity.

21. After pressure from Monsanto, including contrary studies it provided to the EPA, the EPA changed its classification to evidence of non-carcinogenicity in humans (Group E) in 1991.

In so classifying glyphosate, however, the EPA made clear that the designation did not mean the chemical does not cause cancer: "It should be emphasized, however, that designation of an agent in Group E is based on the available evidence at the time of evaluation and should not be interpreted as a definitive conclusion that the agent will not be a carcinogen under any circumstances."

22. On two occasions, the EPA found that the laboratories hired by Monsanto to test the toxicity of Roundup for registration purposes committed fraud.  In the first instance, Monsanto, in seeking initial EPA registration of Roundup, hired Industrial Bio-Test Laboratories ("IBT") to perform and evaluate pesticide toxicology studies relating to Roundup. IBT performed about thirty (30) tests on glyphosate and glyphosate-containing products, including nine (9) of the fifteen (15) residue studies needed to register Roundup. In 1976, the United States Food and Drug Administration ("FDA") performed an inspection of IBT that revealed discrepancies between the raw data and the final report relating to the toxicological impacts of glyphosate. The EPA subsequently audited IBT; it too found the toxicology studies conducted for Roundup to be invalid. An EPA reviewer stated, after finding "routine falsification of data" at IBT, that it was "hard to believe the scientific integrity of the studies when they said they took specimens of the uterus from male rabbits." Three top executives of IBT were convicted of fraud in 1983.

23. In the second incident of data falsification, Monsanto hired Craven Laboratories in 1991 to perform pesticide and herbicide studies, including for Roundup.  In that same year, the owner of Craven Laboratories and three (3) of its employees were indicted, and later convicted, of fraudulent laboratory practices in the testing of pesticides and herbicides. Despite the falsity of the tests that underlie its registration, within a few years of its launch, Monsanto was marketing Roundup in 115 countries.

Plaintiff's First Amended Complaint         - 6 -

24. Rather than act to determine whether Roundup was causing cancer, and thereby destroying and taking the lives of humans, Monsanto has sought to mislead the public and regulators about the risks to human health posed by Roundup.

25. The success of Roundup was key to Monsanto's continued reputation and dominance in the marketplace. Largely due to the success of Roundup sales, Monsanto's agriculture division was out-performing its chemicals division's operating income, and that gap increased yearly. But with its patent for glyphosate expiring in the United States in the year 2000, Monsanto needed a strategy to maintain its Roundup market dominance and to ward off impending competition. In response, Monsanto began the development and sale of genetically engineered Roundup Ready seeds in 1996. Since Roundup Ready crops are resistant to glyphosate, farmers can spray Roundup onto their fields during the growing season without harming the crop. This allowed Monsanto to expand its market for Roundup even further; by 2000, Monsanto's biotechnology seeds were planted on more than 80 million acres worldwide and nearly 70% of American soybeans were planted from Roundup Ready seeds. It also secured Monsanto's dominant share of the glyphosate/Roundup market through a marketing strategy that coupled proprietary Roundup Ready seeds with continued sales of its Roundup herbicide.

26. Through a three-pronged strategy of increased production, decreased prices, and by coupling with Roundup Ready seeds, Roundup became Monsanto's most profitable product. In 2000, Roundup accounted for almost $2.8 billion in sales, outselling other herbicides by a margin of five to one, and accounting for close to half of Monsanto's revenue.

27. Glyphosate was identified as the second-most used household herbicide in the United States for weed control between 2001 and 2007 and the most heavily used herbicide in the world in 2012.

Plaintiff's First Amended Complaint          - 7 -

28. Today, glyphosate-based formulations continue to be the world's largest herbicides by sales volume.

29. Monsanto has consistently and historically marketed and sold Roundup using false, deceptive, and misleading representations including that Roundup is "safer than table salt" and "practically non-toxic."

30. In 1996, the New York Attorney General ("NYAG") filed a lawsuit against Monsanto based on its false and misleading advertising of Roundup products.  Specifically, the lawsuit challenged Monsanto's representations that its spray-on glyphosate-based formulations were "safer than table salt" and "practically non-toxic to mammals, birds, and fish."   Among the representations the NYAG alleged were deceptive and misleading were:

     a.  Remember that environmentally friendly Roundup herbicide is biodegradable.  It won't build up in the soil so you can use Roundup with confidence along customers' driveways, sidewalks and fences.

     b.  And remember that Roundup is biodegradable and won't build up in the soil.  That will give you the environmental confidence you need to use Roundup everywhere you've got a weed, bush, edging or trimming problem.

     c.  Roundup biodegrades into naturally occurring elements.

     d.  Remember that versatile Roundup herbicide stays where you put it. That means there's no washing or leaching to harm customers' shrubs or other desirable vegetation.

     e.  This non-residual herbicide will not wash or leach in the soil. It ... stays where you apply it.

f.   You can apply Accord[1] with "confidence because it will stay where you put it" it bonds tightly to soil particles, preventing leaching. Then, soon after application, soil microorganisms biodegrade Accord into natural products.

g.   Glyphosate is less toxic to rats than table salt following acute oral ingestion. Glyphosate's safety margin is much greater than required. It has over a 1,000-fold safety margin in food and over a 700-fold safety margin for workers who manufacture it or use it.

h.   You can feel good about using herbicides by Monsanto. They carry a toxicity category rating of 'practically non-toxic' as it pertains to mammals, birds and fish. "Roundup can be used where kids and pets will play and breaks down into natural materials."  (This ad depicts a person with his head in the ground and a pet dog standing in an area which has been treated with Roundup).

31. On November 19, 1996, Monsanto entered into an Assurance of Discontinuance with the NYAG, in which Monsanto agreed, among other things, "to cease and desist from publishing or broadcasting any advertisements [in New York] that represent, directly or by implication" that:

a.   its glyphosate-containing pesticide products or any component thereof are safe, non-toxic, harmless or free from risk;

b.   its glyphosate-containing pesticide products or any component thereof manufactured, formulated, distributed or sold by Monsanto are biodegradable;

c.   its glyphosate-containing pesticide products or any component thereof stay where they are applied under all circumstances and will not move through the environment by any means;

_____

[1] Accord is another glyphosate-containing Monsanto herbicide.

Plaintiff's First Amended Complaint          - 9 -

d.   its glyphosate-containing pesticide products or any component thereof are "good"

for the environment or are "known for their environmental characteristics;"

e.   its glyphosate-containing pesticide products or any component thereof are safer or

less toxic than common consumer products other than herbicides; or

f.   its glyphosate-containing products or any component thereof might be classified as

"practically non-toxic."

32. Monsanto did not alter its advertising in the same manner in any state other than New

York, and on information and belief still has not done so.

33. In 2009, France's highest court ruled that Monsanto had not told the truth about the

safety of Roundup.  The French court affirmed an earlier judgement that Monsanto had falsely

advertised its herbicide Roundup as "biodegradable" and that it "left the soil clean."

34. The International Agency for Research on Cancer ("IARC") is the specialized agency

of the World Health Organization which conducts and coordinates research into the causes of

cancer.

35. On March 24, 2015, after its cumulative review of human, animal, and DNA studies,

many of which had been in Monsanto's possession since as early as 1985, the IARC working group

studying glyphosate concluded that the glyphosate in Roundup is a Class 2A "probable

carcinogen."  A full IARC Monograph on the issue was published on July 29, 2015.  The IARC

Working Group found that exposure to glyphosate increases the risk that a person will develop

NHL and that the increased risk exists even when controlled for other pesticides.

36. The IARC process for the classification of glyphosate followed the stringent procedures

for the evaluation of a chemical agent. Over time, the IARC Monograph program has reviewed

980 agents. Of those reviewed, it has determined 116 agents to be Group 1 (Known Human

Carcinogens); 73 agents to be Group 2A (Probable Human Carcinogens); 287 agents to be Group 2B (Possible Human Carcinogens); 503 agents to be Group 3 (Not Classified); and one agent to be Probably Not Carcinogenic

37. The established procedure for IARC Monograph evaluations is described in the IARC Programme's Preamble.  Evaluations are performed by panels of international experts, selected on the basis of their expertise and the absence of actual or apparent conflicts of interest.

38. One year before the Monograph meeting, the meeting is announced and there is a call both for data and for experts. Eight months before the Monograph meeting, the Working Group membership is selected and the sections of the Monograph are developed by the Working Group members. One month prior to the Monograph meeting, the call for data is closed and the various draft sections are distributed among Working Group members for review and comment. Finally, at the Monograph meeting, the Working Group finalizes review of all literature, evaluates the evidence in each category, and completes the overall evaluation. Within two weeks after the Monograph meeting, the summary of the Working Group findings is published in Lancet Oncology, and within a year after the meeting, the final Monograph is finalized and published.

39. In March 2015, the IARC reassessed glyphosate. The summary published in The Lancet Oncology reported that glyphosate is a Group 2A agent and probably carcinogenic in humans.

40. On July 29, 2015, the IARC issued its Monograph for glyphosate, Monograph 112. For Volume 112, the volume that assessed glyphosate, a Working Group of 17 experts from 11 countries met at IARC from March 3–10, 2015, to assess the carcinogenicity of certain herbicides, including glyphosate. The March meeting culminated nearly a one-year review and preparation by the IARC Secretariat and the Working Group, including a comprehensive review of the latest

available scientific evidence. According to published procedures, the Working Group considered "reports that have been published or accepted for publication in the openly available scientific literature" as well as "data from governmental reports that are publicly available."

41. The IARC Working Group found an increased risk between exposure to glyphosate and NHL and several subtypes of NHL, and the increased risk persisted after adjustment for other pesticides. The IARC Working Group also found that glyphosate caused DNA and chromosomal damage in human cells. One study in community residents reported increases in blood markers of chromosomal damage (micronuclei) after glyphosate formulations were sprayed.

42. In male CD-1 mice, glyphosate induced a positive trend in the incidence of a rare tumor, renal tubule carcinoma. A second study reported a positive trend for haemangiosarcoma in male mice. Glyphosate increased pancreatic islet-cell adenoma in male rats in two studies. A glyphosate formulation promoted skin tumors in an initiation-promotion study in mice.

43. The IARC Working Group also noted that glyphosate has been detected in the urine of agricultural workers, indicating absorption. Soil microbes degrade glyphosate to aminomethylphosphoric acid (AMPA). Blood AMPA detection after exposure suggests intestinal microbial metabolism in humans.

44. Several countries around the world have instituted bans on the sale of Roundup and other glyphosate-containing herbicides, both before and since the IARC first announced its assessment for glyphosate in March 2015, and more countries undoubtedly will follow suit as the dangers of the use of Roundup are more widely known.

45. The Netherlands issued a ban on all glyphosate-based herbicides in April 2014, including Roundup, which took effect by the end of 2015. In issuing the ban, the Dutch Parliament member who introduced the successful legislation stated: "Agricultural pesticides in user-friendly

packaging are sold in abundance to private persons. In garden centers, Roundup is promoted as harmless, but unsuspecting customers have no idea what the risks of this product are. Especially children are sensitive to toxic substances and should therefore not be exposed to it."

46. The Brazilian Public Prosecutor in the Federal District requested that the Brazilian Justice Department suspend the use of glyphosate.

47. France banned the private sale of Roundup and glyphosate following the IARC assessment.

48. Bermuda banned both the private and commercial sale of glyphosates, including Roundup. The Bermuda government explained its ban as follows: "Following a recent scientific study carried out by a leading cancer agency, the importation of weed spray 'Roundup' has been suspended."

49. The Sri Lankan government banned the private and commercial use of glyphosates, particularly out of concern that glyphosate has been linked to fatal kidney disease in agricultural workers.

50. The government of Colombia announced its ban on using Roundup and glyphosate to destroy illegal plantations of coca, the raw ingredient for cocaine, because of the WHO's finding that glyphosate is probably carcinogenic.

51. On September 4, 2015, California's Office of Environmental Health Hazard Assessment ("OEHHA") published a notice of intent to include glyphosate on the state's list of known carcinogens under Proposition 65.  California's Safe Drinking Water and Toxic Enforcement Act of 1986 (informally known as "Proposition 65"), requires the state to maintain and, at least once a year, revise and republish a list of chemicals "known to the State of California

to cause cancer or reproductive toxicity." The OEHHA determined that glyphosate met the criteria for the listing mechanism under the Labor Code following the IARC's assessment of the chemical.

52. The listing process under the Labor Code is essentially automatic. The list known carcinogens, at a minimum, must include substances identified by reference in Labor Code §6382(b)(1). That section of the Labor Code identifies "[s]ubstances listed as human or animal carcinogens by the International Agency for Research on Cancer (IARC)." The IARC's classification of glyphosate as a Group 2A chemical ("probably carcinogenic to humans") therefore triggered the listing.

53. A business that deploys a listed chemical in its products must provide "clear and reasonable warnings" to the public prior to exposure to the chemical. To be clear and reasonable, a warning must "(1) clearly communicate that the chemical is known to cause cancer, and/or birth defects or other reproductive harm; and (2) effectively reach the person before exposure." The law also prohibits the discharge of listed chemicals into drinking water.

54. Monsanto disputed the listing decision and, in January 2016, filed a lawsuit against OEHHA and the agency's acting director, Lauren Zeise, in California state court, seeking declaratory and injunctive relief to prevent OEHHA from listing glyphosate.

55. Monsanto alleged that OEHHA's exclusive reliance on the IARC decision signified that "OEHHA effectively elevated the determination of an ad hoc committee of an unelected, foreign body, which answers to no United States official (let alone any California state official), over the conclusions of its own scientific experts." Monsanto further alleged that the Labor Code listing mechanism presented various constitutional violations because it "effectively empowers an unelected, undemocratic, unaccountable, and foreign body to make laws applicable in California." Among other things, Monsanto argued that Proposition 65's requirement to provide a "clear and

reasonable warning" to consumers that the chemical is a known carcinogen would damage its reputation and violate its First Amendment rights.

56. As a girl and young woman, Plaintiff worked for Sidco.  In the course of her work for Sidco, Plaintiff was exposed to significant levels of Roundup.

57. Plaintiff developed NHL in 1995.  Plaintiff's NHL was caused by her exposure to Roundup.

58. The Roundup to which Plaintiff was exposed, and which caused her NHL, was misbranded under FIFRA.

## CLAIMS FOR RELIEF
### Count 1 – Strict Products Liability
### (Claim for Relief from Monsanto)

59. Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

60. Monsanto is the manufacturer of the Roundup to which Plaintiff was exposed.

61. Monsanto is liable to Plaintiff for strict product liability because:

   a.  Roundup presents an unreasonable risk of injury, and

   b.  Monsanto failed to provide an adequate warning of the health and safety risks associated with the use of Roundup.

62. The Roundup to which Plaintiff was exposed caused her NHL.

63. The Roundup to which Plaintiff was exposed was defective because the use of Roundup presented an unreasonable risk of injury (*i.e.,* a risk of injury which a reasonably prudent person having full knowledge of the risk would find unacceptable) to the user and all those in the proximity when the Roundup was used.  Said defective condition of Roundup was a cause of Plaintiff's damages.

64. Roundup is misbranded under FIFRA.  Monsanto did not provide an adequate warning that exposure to Roundup can cause cancer and said failure to warn was a cause of Plaintiff's damages.

65. Monsanto is strictly liable for all damages to Plaintiff caused by the defective condition of Roundup and/or Monsanto's failure to warn.

## Count 2 – Strict Products Liability
### (Claim for Relief from Sidco)

66. Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

67. Sidco is a supplier of the Roundup to which Plaintiff was exposed.

68. Sidco is liable to Plaintiff for strict product liability because:

    a.  Roundup presents an unreasonable risk of injury, and

    b.  Sidco failed to provide an adequate warning of the health and safety risks associated with the use of Roundup.

69. The Roundup to which Plaintiff was exposed caused her NHL.

70. The Roundup to which Plaintiff was exposed was defective because the use of said Roundup presented an unreasonable risk of injury (*i.e.,* a risk of injury which a reasonably prudent person having full knowledge of the risk would find unacceptable) to the user and all those in the proximity when the Roundup was used.  Said defective condition of Roundup was a cause of Plaintiff's damages.

71. Sidco is strictly liable for all damages to Plaintiff caused by the defective condition of Roundup.

## Count 3 – Negligence
### (Claim for Relief from Monsanto)

72. Plaintiff incorporates by reference each and every allegation set forth in the preceding

paragraphs as if fully stated herein.

73. As the manufacturer of Roundup, Monsanto has a duty to use ordinary care in formulating and designing the product; making the product; inspecting/testing the product; and packaging the product.

74. Monsanto breached one or more of these duties by:

   a. failing adequately and reasonably to investigate, study, and test the safety of Roundup;

   b. failing to disclose the information in its possession or of which it was aware which showed the health risks posed by Roundup;

   c. suppressing and downplaying information which shows the dangerous characteristics of Roundup;

   d. concealing information concerning the health risks posed by exposure to Roundup;

   e. using false and misleading practices in marketing Roundup;

   f. misbranding Roundup under FIFRA;

   g. acting with crass indifference to the dangers posed by Roundup;

   h. attacking the evidence that Roundup is carcinogenic and the people who raised concerns;

   i. focusing on public relations and manipulating regulators rather than following the science concerning Roundup and its effects on public health; and

   j. failing to provide adequate warnings concerning the health risks posed by exposure to Roundup.

75. Each such breach proximately caused Plaintiff's damages.

76. Monsanto is liable for all Plaintiff's damages caused by such breaches.

Plaintiff's First Amended Complaint        - 17 -

**Count 4 – Breach of Warranty**
**(Claim for Relief from Monsanto)**

77. Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

78. Monsanto's affirmations and promises concerning Roundup created express warranties under N.M. Stat. Ann. § 55-2-313 and an implied warranty of merchantability under N.M. Stat. Ann. § 55-2-314.

79. Under N.M. Stat. Ann. § 55-2-318, Plaintiff is a third-party beneficiary of such warranties.

80. Specifically, Monsanto has breached express and implied warranties concerning Roundup by selling Roundup when it was not reasonably safe for its intended use and did not conform to the representations Monsanto made concerning the risks to the health and safety of consumers exposed to Roundup.

81. Monsanto has breached these warranties and under N.M. Stat. Ann. § 55-2-715(2)(b) is liable for all Plaintiff's damages caused by the such breaches.

## <u>DAMAGES</u>

82. Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

83. Plaintiff seeks recovery of all damages caused by her exposure to Roundup including:

    a.  past and future medical expenses,

    b.  past and future physical pain and suffering,

    c.  past and future mental pain and suffering, and

    d.  past and future loss of enjoyment of life.

## PUNITIVE DAMAGES

84. Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

85. Monsanto is a company focused on attacking or undermining the people who raise concerns about Roundup's carcinogenic properties, to the exclusion of being an objective arbiter of Roundup's safety. *Hardeman v. Monsanto Co. (In re Roundup Prods. Liab. Litig.)*, 385 F. Supp. 3d 1042, 1047 (N.D. Cal. 2019).

86. For decades Monsanto has acted with crass indifference to the dangers posed by Roundup.  Rather than try to learn if its product was causing cancer, Monsanto attacked the evidence that Roundup is carcinogenic and the people who raised concerns.  When it comes to the carcinogenic properties or Roundup, Monsanto focuses on public relations and manipulating regulators rather than following the science and public health.

87. The evidence at trial will show that Monsanto has been and remains a company addicted to profits from the sale of Roundup and associated products such as seeds for Roundup Ready crops and callously indifferent to the rights of consumers and the threats posed to consumers, including Plaintiff.

88. Monsanto's conduct has been and remains malicious, willful, reckless, and/or wanton.

89. Accordingly, in addition to her actual damages, Plaintiff seeks an award of punitive damages from Monsanto in an amount determined by the jury and allowed by law.

## DISCOVERY RULE; FRAUDULENT CONCEALMENT; EQUITABLE ESTOPPEL

90. Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

91. To the extent that either Defendant pleads or relies on any statute of limitations as a

defense to any of the claims for relief pleaded herein, Plaintiff pleads that under the discovery rule her causes of action did not accrue until the date on which her cause of action was discovered or should have been discovered with the exercise of reasonable diligence and that her claims are not barred by limitations under this rule.

92. Additionally, and in the alternative, to the extent that either Defendant pleads or relies on any statute of limitations as a defense to any of the claims for relief pleaded herein, Plaintiff pleads that any statute of limitations is tolled due to Monsanto's fraudulent concealment and that her claims are not barred by limitations as tolled.

93. Additionally, and in the alternative, to the extent that Monsanto pleads or relies on any statute of limitations as a defense to any of the claims for relief pleaded herein, Plaintiff pleads that under equitable estoppel, Monsanto is estopped from pleading or relying on any statute of limitations.

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in her favor against Defendant as set forth above, that Plaintiff be awarded compensatory and punitive damages, interest, costs and attorney's fees, and for such other and further relief as the Court may deem just.

## JURY DEMAND

Plaintiff demands a trial by jury on all counts.

Dated: September 13, 2021                    Respectfully submitted,


By: _/s/ Anthony K. Bruster_
Anthony K. Bruster
New Mexico Bar No. 20283
Christopher Johnson
New Mexico Bar No. 153605
John C. Hull*
Texas Bar No. 24050791
**BRUSTER PLLC**
680 N. Carroll Ave., Suite 110
Southlake, Texas 76092
Telephone:  (817) 601-9564
Facsimile:  (817) 796-2929
Email: akbruster@brusterpllc.com
            cjohnson@brusterpllc.com
            jhull@brusterpllc.com



Darren P. McDowell*
Texas Bar No. 24025520
Matthew R. McCarley*
Texas Bar No. 24041426
**FEARS NACHAWATI LAW FIRM**
5473 Blair Road
Dallas, Texas 75231
Telephone:  (214) 890-0711
Facsimile:  (214) 890-0712
Email: dmcdowell@fnlawfirm.com
            mccarley@fnlawfirm.com

Feliz A. Rael
Attorney at Law
505 Marquette NM, Ste. 1300
Albuquerque, New Mexico 87102
Telephone:  (505) 610-5991
Facsimile:  (505) 938-2301
Email: frael@swcp.com


*To be admitted pro hac vice*

*Attorneys for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of the foregoing pleading was filed electronically through the OdysseyFile/Serve System, which caused the following parties or counsel to be served by electronic means, as more fully reflected on the Notice of Electronic Filing on this 13th day of September 2021.

Alex C. Walker
awalker@modrall.com

Bayard Roberts
broberts@modrall.com

Brett S. Covington
bcovington@hollingsworthllp.com

*Attorneys for Monsanto Company*


Kenneth L. Beal
klbealoffice@gmail.com

*Attorneys for Sidco Corporation*[2]

**By:** */s/ Anthony K. Bruster*
 **Anthony Bruster**

---

This Proposed Amended Scheduling Order is jointly submitted by counsel for Plaintiff Renteria and Defendant Monsanto Company.  Input was also sought from counsel for Defendant Sidco Corporation, but no response was provided.  Counsel for Monsanto and Plaintiff are in agreement with the terms of the Proposed Amended Scheduling Order.

EXHIBIT
13

Skip to Main Content Logout My Account Search Menu Search Refine Search  Back                    Location : All Courts   Images

# REGISTER OF ACTIONS
## CASE No. D-101-CV-2020-00180

| | | |
|---|---|---|
| **Marita Renteria v. Monsanto Company, et. al.** | §<br>§<br>§<br>§<br>§<br>§ | Case Type: **Tort Malpractice, Product Liability**<br>Date Filed: **01/17/2020**<br>Location:<br>Judicial Officer: **Ellenwood, Kathleen McGarry** |

---

### RELATED CASE INFORMATION

**Related Cases**
D-132-CV-2003-00042 (See For Background)
D-202-CV-2019-03137 (See For Background)
D-202-CV-2019-05076 (See For Background)
D-307-CV-2020-00022 (See For Background)

---

### PARTY INFORMATION

|  |  | Attorneys |
|---|---|---|
| **Defendant** | **Monsanto Company** | **Alex Cameron Walker**<br>*Retained*<br>505-848-1800(W) |
| | C/O Corp. Service Co.<br>123 East Marcy Street, Suite 101<br>Santa Fe, NM 87501 | ~~Alex Cameron Walker~~<br>~~*Retained*~~<br>~~505-848-1800(W)~~ |
| | | Bayard Roberts, IV<br>*Retained*<br>505-848-1800(W) |
| | | ~~Timothy C. Holm~~<br>~~*Retained*~~<br>~~505-848-1800(W)~~ |
| **Defendant** | **Sidco Corporation**<br>C/O Lloyd Lindbeck<br>2725 Terrance Arc<br>Las Cruces, NM 88011 | **Kenneth L. Beal**<br>*Retained*<br>575-526-5511(W) |
| **Plaintiff** | **Renteria, Marita** | **Danae N. Benton**<br>*Retained*<br>214-890-0711(W) |
| | | Anthony K. Bruster<br>*Retained*<br>817-601-9564(W) |
| | | ~~Darren Patrick McDowell~~<br>~~*Retained*~~<br>~~214-276-7680(W)~~ |
| | | Feliz Angelica Rael<br>*Retained*<br>505-610-5991(W) |

---

### EVENTS & ORDERS OF THE COURT

| | **DISPOSITIONS** |
|---|---|
| 05/05/2020 | **Dismiss/Decided By Dispositive Motion/Dismiss by Judge/Party** (Judicial Officer: Wilson, Matthew Justin)<br>Comment (Stipulation of Dismissal Without Prejudice of All Claims Against Defendant AGCO Corporation) |

| **OTHER EVENTS AND HEARINGS** |
|---|

| | | | |
|---|---|---|---|
| 01/17/2020 | **Cause Of Actions** | Product Liability (Count I: Strict Liability; Design Defect) | |
| | Action Type | Action | |
| 01/17/2020 | **Cause Of Actions** | Product Liability (Count IV: Negligence) | |
| | Action Type | Action | |
| 01/17/2020 | **Cause Of Actions** | Product Liability (Count II: Strict Liability; Failure to Warn) | |
| | Action Type | Action | |
| 01/17/2020 | **Cause Of Actions** | Product Liability (Count III: Negligence; Failure to Warn) | |
| | Action Type | Action | |
| 01/17/2020 | **Cause Of Actions** | Product Liability (Count V: Breach of Express Warranty) | |
| | Action Type | Action | |
| 01/17/2020 | **Cause Of Actions** | Product Liability (Count VI: Breach of Implied Warranty of Merchantability) | |
| | Action Type | Action | |
| 01/17/2020 | **Cause Of Actions** | Trade Practices Act (Count VII: Unfair and Deceptive Trade Practices) | |
| | Action Type | Action | |
| 01/17/2020 | **Cause Of Actions** | Misrepresentation, Fraud (Count VIII: Fraud) | |
| | Action Type | Action | |

01/17/2020 **OPN: COMPLAINT**
*Plaintiff's Original Complaint*

01/17/2020 **JURY DEMAND 6 PERSON**
*Jury Demand*

| | | | |
|---|---|---|---|
| 01/24/2020 | **Summons** | | |
| | AGCO Corporation | Unserved | |
| 01/24/2020 | **Summons** | | |
| | Monsanto Company | Unserved | |
| 01/24/2020 | **Summons** | | |
| | Sidco Corporation | Unserved | |

03/02/2020 **RETURN OF SERVICE**
*Certificate of Serice of Process by Mail or Commercial Carrier - AGCO*

03/02/2020 **RETURN OF SERVICE**
*Certificate of Service of Process by Mail or Commercial Carrier - Monsanto*

03/02/2020 **RETURN OF SERVICE**
*Certificate of Service of Process by Mail or Commerical Carrier - SIDCO*

03/10/2020 **ENTRY OF APPEARANCE**
*Entry of Appearance*

03/23/2020 **AFFIDAVIT**
*Affidavit of Non Admitted Lawyer - McDowell*

03/23/2020 **AFFIDAVIT**
*Affidavit of Non Admitted Lawyer - Przybysz*

04/08/2020 **ANSWER**
*Monsanto Company's Answer to Plaintiff's Complaint*

04/08/2020 **Jury Additional 6 / Total 12 (EF) $150**
*Jury Demand*

05/05/2020 **Dismissal of Party, Not of Case**
*Stipulation of Dismissal Without Prejudice of All Claims Against Defendant AGCO Corporation*

07/15/2020 **JDG: NOTICE OF JUDGE ASSIGNMENT** (Judicial Officer: Ellenwood, Kathleen McGarry )
*Effective July 15, 2020, a mass reassignment of cases will occur pursuant to NMSC Rule 23-109, the Chief Judge Rule. Judge Kathleen McGarry Ellenwood, Division X of the First Judicial District Court will maintain a docket consisting of Civil Cases and State Habeas cases, both civil and criminal. Since this is a newly created position, the civil docket will be created with a percentage of cases from the civil cases pending in Divisions I, II, VI and IX. Pursuant to Supreme Court Order No. 20-8500-025, "In the Matter of the Safe and Effective Administration of the New Mexico Judiciary During the Covid-19 Public Health Emergency," Emergency Court Protocol No. 3 (E), "the temporary suspension of the exercise of peremptory excusals shall remain in place," therefore no peremptory excusal of Judge McGarry Ellenwood will take place. Notice by Bar Bulletin Posting-- No Pleading Required.*

07/31/2020 **WITHDRAWAL/ ENTRY/ SUBSTITUTION OF COUNSEL**
*Notice of Withdrawl and Substitution of Counsel Enter Alex Walker*

08/13/2020 **REQUEST FOR HEARING/ SETTING**
*Request for Scheduling Conference*

08/13/2020 **NTC: HEARING (SCHEDULING CONFERENCE)**
*Notice of Hearing Matter: Scheduling Conference September 8, 2020 at 11:15 am*

08/20/2020 **NTC: OF FILING**
*Notice of Filing Affidavit of Non-Admitted Lawyer (Brett S. Covington)*

09/04/2020 **MTN: TO VACATE**
*Joint Motion to Vacate Scheduling Conference*

09/04/2020 **ORD: VACATING HEARING**
*Order Granting Joint Moint to Vacate Scheduling Conference*

09/08/2020 *CANCELED* **SCHEDULING CONFERENCE** (11:15 AM) (Judicial Officer Ellenwood, Kathleen McGarry)
*Stipulated to Cancel*

01/15/2021 **ENTRY OF APPEARANCE**
*Noitce of Appearance*

06/14/2021 **ORD: ORDER**
*Confidentiality and Protective Order*

06/14/2021 **ORD: STIPULATED**
*Joint Stipulation and Order Governing Protocol For Discovery Of Electronically Stored Information*

06/14/2021 **ORD: ORDER**
*Order Governing Privilege Logs*

06/14/2021 **NTC: HEARING (SCHEDULING CONFERENCE)**
*Notice Of Rule 16 Scheduling Conference; Hearing is set for Monday, August 30, 2021 at 8:30 a.m.*

06/23/2021 **AFFIDAVIT**
*Affidavit of Non-Admitted Lawyer*

06/23/2021 **ENTRY OF APPEARANCE**
*Entry of Appearance*

08/30/2021 **SCHEDULING CONFERENCE** (8:30 AM) (Judicial Officer Ellenwood, Kathleen McGarry)
**Parties Present**

Result: Held
| | | |
|---|---|---|
| 09/13/2021 | **AMENDED COMPLAINT** | |
| | *Plaintiff's First Amended Complaint* | |
| 09/14/2021 | **Cause Of Actions** | Product Liability (Count 1- Strict Products Liability(Claim for Relief from Monsanto)) |
| | Action Type | Action |
| 09/14/2021 | **Cause Of Actions** | Product Liability (Count 2 - Strict Products Liability (Claim For Relief from Sidco)) |
| | Action Type | Action |
| 09/14/2021 | **Cause Of Actions** | Other (Count 3 - Negligence (Claim for Relief from Monsanto)) |
| | Action Type | Action |
| 09/14/2021 | **Cause Of Actions** | Breach of Warranty (Count 4 - Breach of Warranty (Claim for Relief from Monsanto)) |
| | Action Type | Action |
| 09/20/2021 | **CERTIFICATE OF SERVICE** | |
| | *Certificate of Service* | |
| 09/20/2021 | **CERTIFICATE OF SERVICE** | |
| | *Certificate of Service* | |
| 09/21/2021 | **ORD: SCHEDULING/PRETRIAL ORDER** | |
| | *Rule 1-016(B) Scheduling Order Jury* | |
| 09/23/2021 | **WITHDRAWAL/ ENTRY/ SUBSTITUTION OF COUNSEL** | |
| | *Entry of Appearance* | |
| 09/27/2021 | **ANSWER** | |
| | *Monsato Companys Answer to Plaintiffs First Amended Complaint* | |
| 09/27/2021 | **RESPONSE** | |
| | *Defendant SIDCO Corporation's Response to Original Complaint* | |
| 01/11/2022 | **STATUS CONFERENCE** (8:30 AM) (Judicial Officer Ellenwood, Kathleen McGarry) | |
| 04/24/2023 | **PRE-TRIAL CONFERENCE** (8:00 AM) (Judicial Officer Ellenwood, Kathleen McGarry) | |
| 05/24/2023 | **JURY SELECTION HEARING** (8:30 AM) (Judicial Officer Ellenwood, Kathleen McGarry) | |

---

**FINANCIAL INFORMATION**

| | | | | |
|---|---|---|---|---|
| | **Defendant** Monsanto Company | | | |
| | Total Financial Assessment | | | 150.00 |
| | Total Payments and Credits | | | 150.00 |
| | **Balance Due as of 10/13/2021** | | | **0.00** |
| 04/08/2020 | Transaction Assessment | | | 150.00 |
| 04/08/2020 | File & Serve Payment | Receipt # SFED-2020-2857 | Monsanto Company | (150.00) |

| | | | | |
|---|---|---|---|---|
| | **Plaintiff** Renteria, Marita | | | |
| | Total Financial Assessment | | | 282.00 |
| | Total Payments and Credits | | | 282.00 |
| | **Balance Due as of 10/13/2021** | | | **0.00** |
| 01/23/2020 | Transaction Assessment | | | 282.00 |
| 01/23/2020 | File & Serve Payment | Receipt # SFED-2020-636 | Renteria, Marita | (282.00) |

# EXHIBIT
# 14

JUDICIAL COUNCIL OF CALIFORNIA
CIVIL CASE COORDINATION PROCEEDING (JCCP) LOG

| JCCP No. | Date Judicial Council Received Petition | JC Special Title Case Name (Subject to Change While Under Review) | County Designated For Motion Hearing | Motion Judge Assignment | Date CMJ Order Mailed | County Designated for Coordination Proceeding | Trial Judge Assignment | Date CTJ Order Mailed | Disposition of Case (Contact Court For Current Up-to-Date Information) | Superior Court Case Numbers |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | 4/3/20 @ 11:30 a.m to 8/7/20 @ 11:30 a.m., Dept C-65, the Hon. Ronald F. Frazier presiding. | |
| | | | | | | | | | 5/29/20 Received Notice of Rescheduled Civil Case Management Conference: fr. 4/3/2020 @ 11 a.m. to 8/7/20/20 @ 11:30 a.m., Dept. C-65, the Hon. Ronald F. Frazier presiding. | |
| | | | | | | | | | 8/19/21 Received Notice of Status Conference - Civil: 9/3/21 @ 11:31 a.m., Dept. C-65, Hon. Ronald F. Frazier presiding | |
| 4953 | 10/17/17 | Roundup Products Cases | Alameda | Hon. Ioana Petrou assigned as coordination motion judge by Hon. Wynne Carvill, acting Presiding Judge of the Superior | 11/8/17 | Alameda | Hon. Ioana Petrou assigned as coordination trial judge – 1/26/18 | 1/17/18 | 1/27/17 Received Order Assigning Coordination Motion Judge – Hon. Ioana Petrou, of Superior Court of Alameda County – | Alameda RG17853420 RG17854000 RG17855094 RG17876143 RG17852375 RG17862702 RG17872423 |

JUDICIAL COUNCIL OF CALIFORNIA
CIVIL CASE COORDINATION PROCEEDING (JCCP) LOG

| JCCP No. | Date Judicial Council Received Petition | JC Special Title Case Name (Subject to Change While Under Review) | County Designated For Motion Hearing | Motion Judge Assignment | Date CMJ Order Mailed | County Designated for Coordination Proceeding | Trial Judge Assignment | Date CTJ Order Mailed | Disposition of Case (Contact Court For Current Up-to-Date Information) | Superior Court Case Numbers |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Court of Alameda County. | | | Hon. Winifred Smith, assigned as coordination trial judge by Hon. Stephen Pulido, Chief Supervising Judge – Civil Law – 12/10/18. | | Dept. 15 – assigned as coordination motion judge by Hon. Wynne Carvill, Acting Presiding Judge of Superior Court of Alameda County. <br><br> 11/30/17 Received Notice of Potential Add-On Cases: Aguero v. Monsanto Co., et al., SFSC, Case No. CGC-17-562696; Allen v. Monsanto Company, eet al., SFSC, Case No CGC-17-562697, Baron v. Monsanto Co., et al., SFSC, Case No. CGC-17-562698; Barton v. Monsanto Co., et al., SFSC, Case No. CGC-17-562699, Bedolla v. Monsanto Co., et al., SFSC, Case No. CGC-17-562700; Blackwelder v. | RG17875095 <br> RG17873193 <br> RG17872413 <br> RG17876678 <br> RG17876283 <br> RG17876148 <br> RG17876229 <br> ADD-ON (7/8/19) <br> Alameda <br> RG19019910 <br> ADD-ON (12/13/19) <br> Alameda <br> ADD-ON (1/14/20) <br> Alameda <br> RG19046041 <br> HG19035934 <br> ADD-ON (2/4/20) <br> Alameda <br> RG20053221 <br> ADD-ON (7/12/21) <br> Alameda <br> RG21088549 <br> RG21095653 <br> ADD-ON (4/6/18) <br> Contra Costa <br> MSC17-02338 <br> ADD-ON 4/16/18) <br> Los Angeles <br> BC669972 <br> ADD-ON (3/11/19) <br> LASC <br> 18STCV03557 |

JUDICIAL COUNCIL OF CALIFORNIA
CIVIL CASE COORDINATION PROCEEDING (JCCP) LOG

| JCCP No. | Date Judicial Council Received Petition | JC Special Title Case Name (Subject to Change While Under Review) | County Designated For Motion Hearing | Motion Judge Assignment | Date CMJ Order Mailed | County Designated for Coordination Proceeding | Trial Judge Assignment | Date CTJ Order Mailed | Disposition of Case (Contact Court For Current Up-to-Date Information) | Superior Court Case Numbers |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | Monsanto Co., et al., SFSC, Case No. CGC-17-562701; Carender v Monsanto Co., et al., SFSC, Case No. CGC-17-562702, etc.<br><br>12/7/17 Received Plaintiffs' Response in Support of Petition for Coordination.<br><br>12/14/17 Received Notice of Potential Add-On Cases: Aiton, et al. v. Monsanto Company, et al., Case No. CGC-17-563100, SFSC.<br><br>1/8/18 Received court order granting petition for coordination by Hon. Ioana Petrou of Superior Court of Alameda County. | 18STCV09579<br>ADD-ON (4/16/18)<br>Madera<br>MCV07844<br>ADD-ON (4/16/18)<br>Placer<br>SCV-0040863<br>Riverside<br>RIC160/0639<br>ADD-ON (4/16/18)<br>Riverside<br>RIC160/0639<br>ADD-ON (8/19/19)<br>Riverside<br>RIC-1923189<br>Sacramento<br>34-2019-00262698<br>ADD-ON (10/25/19)<br>San Bernardino<br>CIVDS1925789<br>ADD-ON (10/2/19)<br>San Diego<br>37-2019-0039221<br>ADD-ON (2/14/20)<br>San Diego<br>37-2019-00051471<br>ADD-ON (4/16/18)<br>San Francisco<br>CGC-17-563104<br>CGC-17-563100<br>CGC-17-563101 |

JUDICIAL COUNCIL OF CALIFORNIA
CIVIL CASE COORDINATION PROCEEDING (JCCP) LOG

| JCCP No. | Date Judicial Council Received Petition | JC Special Title Case Name (Subject to Change While Under Review) | County Designated For Motion Hearing | Motion Judge Assignment | Date CMJ Order Mailed | County Designated for Coordination Proceeding | Trial Judge Assignment | Date CTJ Order Mailed | Disposition of Case (Contact Court For Current Up-to-Date Information) | Superior Court Case Numbers |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | 1/25/19 Received Notice of Submission of Petition for Coordination of Add-On Case: Hall, et al. v. Monsanto Co., et al., Superior Court of San Diego County, Case No., 37-2018-00028342 <br><br> 3/4/19 Received Monsanto Co.'s Additional Written Materials in Support of Petition for Coordination of Add-On Case: Hall v. Monsanto Co., Superior Court of San Diego County, Case No. 37-2018-00028342 <br><br> 3/11/19 Received Notice of Add-On Case: Ataide, et al v. Monsanto Co., et al., Superior Court | CGC-17-563102 <br> CGC-17-563104 <br> CGC-17-563105 <br> CGC-18-564200 <br> CGC-18-565070 <br> CGC-17-565071 <br> CGC-18-565068 <br> CGC-18-565067 <br> CGC-18-565066 <br> **ADD-ON (5/31/19)** San Francisco <br> CGC-19-575104 <br> **ADD-ON (7/26/18)** SFSC <br> CGC-18-567677 <br> **ADD-ON (8/28/18)** SFSC <br> CGC-18-568424 <br> CGC-18-568425 <br> CGC-18-568620 <br> **ADD-ON (9/7/18)** SFSC <br> CGC-18-568620 <br> CGC-18-568425 <br> CGC-18-568424 <br> **ADD-ON (2/7/19)** SFSC <br> CGC-18-571047 <br> CGC-18-571282 <br> **ADD-ON (2/26/19)** SFSC <br> CGC-18-571668 |

JUDICIAL COUNCIL OF CALIFORNIA
CIVIL CASE COORDINATION PROCEEDING (JCCP) LOG

| JCCP No. | Date Judicial Council Received Petition | JC Special Title Case Name (Subject to Change While Under Review) | County Designated For Motion Hearing | Motion Judge Assignment | Date CMJ Order Mailed | County Designated for Coordination Proceeding | Trial Judge Assignment | Date CTJ Order Mailed | Disposition of Case (Contact Court For Current Up-to-Date Information) | Superior Court Case Numbers |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | of San Francisco County, Case No. CGC-18-571282.<br><br>3/12/19 Received Defendants' Notice of Potential Add-On Case: Baker v. Monsanto Company, et al., Superior Court of Madera County, Case No. MCV076844<br><br>6/10/19 Received Notice of Addition of Case to Coordination: Celaya, et al. v. Monsanto Co., et al., Superior Court of San Francisco County, Case No. CGC-19-575104<br><br>8/9/19 Received Request to Coordination Add-On Case: Sharaby, et al. v. Monsanto | CGC-18-571705<br>CGC-18-571983<br>ADD-ON (3/5/19)<br>SFSC<br>CGC-19-573058<br>ADD-ON (3/14/19)<br>SFSC<br>CGC-18-571642<br>CGC-18-571002<br>CGC-19-572706<br>ADD-ON (5/6/19)<br>SFSC<br>CGC-19-573409<br>CGC-18-572289<br>ADD-ON (5/31/19)<br>SFSC<br>CGC-19-575104<br>ADD-ON (8/26/19)<br>SFSC<br>CGC-19-575736<br>ADD-ON (10/8/19)<br>SFSC<br>CGC-19-577393<br>CGC-19-578828<br>ADD-ON (10/23/19)<br>SFSC<br>CGC-19-578721<br>CGC-19-578868<br>CGC-19-578663<br>CGC-19-578620<br>CGC-19-578625<br>CGC-19-578869 |

JUDICIAL COUNCIL OF CALIFORNIA
CIVIL CASE COORDINATION PROCEEDING (JCCP) LOG

| JCCP No. | Date Judicial Council Received Petition | JC Special Title Case Name (Subject to Change While Under Review) | County Designated For Motion Hearing | Motion Judge Assignment | Date CMJ Order Mailed | County Designated for Coordination Proceeding | Trial Judge Assignment | Date CTJ Order Mailed | Disposition of Case (Contact Court For Current Up-to-Date Information) | Superior Court Case Numbers |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | Co., et al., Superior Court of San Francisco County, Case No. CGC-19-577177. Peterson, Et al. v Monsanto Co., et al., Superior Court of San Francisco County, Case No. CGC-19-577180.

8/21/19 Received Notice of Entry of Order Granting Addition of Cotton v. Monsanto Co., et al., Superior Court of Riverside County, Case No. RIC1903180.

9/12/19 Received Stipulation Regarding [Proposed] Order: Addition of Warren, Knowles and Routher to JCCP | CGC-19-578816
CGC-19-578667
CGC-19-578619
CGC-19-578624
CGC-19-578710
CGC-19-578623
CGC-19-578668
CGC-19-578670
CGC-19-578671
CGC-19-578621
CGC-19-578720
CGC-19-578626
CGC-19-578662
CGC-19-578761
CGC-19-578759
CGC-19-578664
CGC-19-578665
CGC-19-578622
CGC-19-578755
CGC-19-578712
CGC-19-578713
CGC-19-578722
CGC-19-578752
CGC-19-578669
CGC-19-578629
CGC-19-578661
**ADD-ON (10/25/19)** SFSC
CGC-19-578592
CGC-19-788802
CGC-19-578791
CGC-19-578789 |

JUDICIAL COUNCIL OF CALIFORNIA
CIVIL CASE COORDINATION PROCEEDING (JCCP) LOG

| JCCP No. | Date Judicial Council Received Petition | JC Special Title Case Name (Subject to Change While Under Review) | County Designated For Motion Hearing | Motion Judge Assignment | Date CMJ Order Mailed | County Designated for Coordination Proceeding | Trial Judge Assignment | Date CTJ Order Mailed | Disposition of Case (Contact Court For Current Up-to-Date Information) | Superior Court Case Numbers |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | 9/27/19 Received Notice of Petition and Petition for Coordination/ Add-On Case with Roundup Product Cases; Memorandum of Points and Authorities in Support Thereof: Berliant, et al. v. Monsanto Co., et al., Superior Court of Marin County, Case No. CIV1903556. 10/3/19 Received Notice of Potential Add-On and Petition for Coordination of Add-On to JCCP 4953: Police v. Monsanto Company, et al., Superior Court of Shasta County, Case No. 193317; Kelly v. Monsanto Company, et al.. | CGC-19-578808 CGC-19-578798 CGC-19-578799 CGC-19-578797 CGC-19-578795 CGC-19-578793 ADD-ON (11/8/19) SFSC CGC-19-579734 ADD-ON (11/21/19) SFSC CGC-19-579377 CGC-19-579374 CGC-19-580382 ADD-ON (1/2/2020) SFSC CGC-19-579677 CGC-19-578757 CGC-19-577335 CGC-19-578716 CGC-19-581134 CGC-19-578753 CGC-19-578715 CGC-19-576576 CGC-19-578750 CGC-19-578715 CGC-19-578763 ADD-ON (1/9/2020) SFSC CGC-19-578801 CGC-19-578803 CGC-19-578806 |

JUDICIAL COUNCIL OF CALIFORNIA
CIVIL CASE COORDINATION PROCEEDING (JCCP) LOG

| JCCP No. | Date Judicial Council Received Petition | JC Special Title Case Name (Subject to Change While Under Review) | County Designated For Motion Hearing | Motion Judge Assignment | Date CMJ Order Mailed | County Designated for Coordination Proceeding | Trial Judge Assignment | Date CTJ Order Mailed | Disposition of Case (Contact Court For Current Up-to-Date Information) | Superior Court Case Numbers |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | Superior Court of San Francisco County, Case No. CGC-19-577393.<br><br>10/7/19<br>Received stipulation re. Proposed Order: Addition of McCauley v. Monsanto Company, et al., Superior Court of San Francisco County, Case No CGC-19-578828<br><br>10/10/19<br>SFSC<br>Received Notice of Termination of Case & transfer to Riverside court; Modification of Stay: Cotton v. Monsanto Company, Inc., Superior Court of Riverside County, Case No. RIC1903180.<br><br>10/11/19 | CGC-19-578813<br>CGC-19-578796<br>CGC-19-578810<br>CGC-19-578788<br>**ADD-ON 2/26/20)**<br>SFSC<br>CGC-19-579185<br>CGC-19-579187<br>CGC-19-579182<br>CGC-19-579411<br>CGC-19-579415<br>CGC-19-579414<br>CGC-19-579413<br>CGC-19-580656<br>CGC-19-580657<br>CGC-19-580675<br>**ADD-ON (5/6/20)**<br>SFSC<br>CGC-19-580825<br>**ADD-ON (6/17/20)**<br>SFSC<br>CGC-20-584195<br>CGC-20-582163<br>CGC-20-584446<br>CGC-20-8643<br>**ADD-ON (9/24/20)**<br>CGC-19-584468<br>**ADD-ON (12/17/20)**<br>SFSC<br>CGC-20-585996<br>**ADD-ON (7/12/21)**<br>SFSC |

JUDICIAL COUNCIL OF CALIFORNIA
CIVIL CASE COORDINATION PROCEEDING (JCCP) LOG

| JCCP No. | Date Judicial Council Received Petition | JC Special Title Case Name (Subject to Change While Under Review) | County Designated For Motion Hearing | Motion Judge Assignment | Date CMJ Order Mailed | County Designated for Coordination Proceeding | Trial Judge Assignment | Date CTJ Order Mailed | Disposition of Case (Contact Court For Current Up-to-Date Information) | Superior Court Case Numbers |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | Received Notice of Submission of Petition for Coordination of Add-On Case: Martinez v. Monsanto Co, et al., Superior Court of Santa Clara County, Case No. 19CV355309.

1/8/20
Received Notice of Potential Add-On Cases: Lombano v. Monsanto Co., et al., SFSC, Case No. CGC-19-578801; Rodrigues v. Monsanto Co., et al., SFSC, Case No. CGC-19-578803; Duncan v. Monsanto Co., et al., SFSWC, Case No. CGC-19-578806; Lee v. Monsanto Co., et al., SFSC, Case No. 19-578813; Smith v. Monsanto Co., et | CGC-20-582451
**Santa Barbara**
17CV02577
**ADD-ON (4/16/18)**
Santa Barbara
17CV02577
**ADD-ON (10/18/19)**
Santa Clara
19-CV-349193
**ADD-ON (10/2/190)**
Ventura
56-2019-00531209
**ADD-ON (6/11/19)**
Yolo
PO19-1019 |

JUDICIAL COUNCIL OF CALIFORNIA
CIVIL CASE COORDINATION PROCEEDING (JCCP) LOG

| JCCP No. | Date Judicial Council Received Petition | JC Special Title Case Name (Subject to Change While Under Review) | County Designated For Motion Hearing | Motion Judge Assignment | Date CMJ Order Mailed | County Designated for Coordination Proceeding | Trial Judge Assignment | Date CTJ Order Mailed | Disposition of Case (Contact Court For Current Up-to-Date Information) | Superior Court Case Numbers |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | al., SFSC, Case No. CGC-19-578796; Kalayta v. Monsanto Co., et al., SFSC, Case No. CGC-19-578810; Wilcoxen v. Monsanto Co., et al., SFSC, Case No. CGC-19-578788<br><br>2/13/20 Received Request to Coordinate Add-On Case; MPA ISO; Decl ISO Adame v. Monsanto Co., et al., Superior Court of San Francisco County, Case nO. CGC-20-582451<br><br>6/19/20 Received NOS of Petition for Coordination of Add-On Case: Yates v. Monsanto Co., et al., Superior Court of San Francisco County, | |

JUDICIAL COUNCIL OF CALIFORNIA
CIVIL CASE COORDINATION PROCEEDING (JCCP) LOG

| JCCP No. | Date Judicial Council Received Petition | JC Special Title Case Name (Subject to Change While Under Review) | County Designated For Motion Hearing | Motion Judge Assignment | Date CMJ Order Mailed | County Designated for Coordination Proceeding | Trial Judge Assignment | Date CTJ Order Mailed | Disposition of Case (Contact Court For Current Up-to-Date Information) | Superior Court Case Numbers |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | Case No. CGC-20-584190.<br><br>Received Notice of Submission of Petition to Coordinate Add-On Cases : CGC-20-584826; CGC-20-584824; STK-CV-UPI-2020-0006280; CGC-20-585766; CGC-20-585600; CGC-20-585698; CGC-20-585699; CGC-20-585764; CGC-20-585714; CGC-20-585761; CGC-20-585697; CGCC-20-585765; CGC-20-585762; CGC-20-585601; CGC-20-585866<br><br>11/23/20<br>Received Notice of Petition and Petition for Coordination of Add-On Cases with Roundup Product Cases; MPA ISO. | |

JUDICIAL COUNCIL OF CALIFORNIA
CIVIL CASE COORDINATION PROCEEDING (JCCP) LOG

| JCCP No. | Date Judicial Council Received Petition | JC Special Title Case Name (Subject to Change While Under Review) | County Designated For Motion Hearing | Motion Judge Assignment | Date CMJ Order Mailed | County Designated for Coordination Proceeding | Trial Judge Assignment | Date CTJ Order Mailed | Disposition of Case (Contact Court For Current Up-to-Date Information) | Superior Court Case Numbers |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | Acain v. Monsanto Co., et al., LASC, Case No. 19STCV36039; Carmichael v. Monsanto Co., et al., LASC, Case No. 20STCV31015; Flores v. Monsanto Co., et al., LASC, Case No. 19STCV36057; Mizel v. Monsanto Col et al., LASC, Case No. 20STCV23899. 12/2/20 Received notice of Potential Add-On and Petition to Coordination Add Add Cases to JCCP 4953 : Villescas v. Monsanto Co., et al., SFSC, Case No. CGC-20-587156; Love v. Monsanto Co., et al., SFSC, Case No. CGC-20-587526; Miller v. Monsanto Co., et | |

JUDICIAL COUNCIL OF CALIFORNIA
CIVIL CASE COORDINATION PROCEEDING (JCCP) LOG

| JCCP No. | Date Judicial Council Received Petition | JC Special Title Case Name (Subject to Change While Under Review) | County Designated For Motion Hearing | Motion Judge Assignment | Date CMJ Order Mailed | County Designated for Coordination Proceeding | Trial Judge Assignment | Date CTJ Order Mailed | Disposition of Case (Contact Court For Current Up-to-Date Information) | Superior Court Case Numbers |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | al., SFSC, Case No. CGC-20-587445; Denham v. Monsanto Co., et al., SFSC, Case No. CGC-20-586214<br><br>12/10/20<br>Received Notice of Potential Add-On and Petition to Coordinate Add-On: Villecas v. Monsanto Co., etal., SFSC, Case No. CGC-20-587156.<br><br>12/16/20<br>Received Notice of Petition and Petition for Coordination of Add-On Case with Coordination Proceedings; MPA ISO  Perez v. Monsanto Company, et al., Superior Court of Madera County, Case No. MCV084020. | |

JUDICIAL COUNCIL OF CALIFORNIA
CIVIL CASE COORDINATION PROCEEDING (JCCP) LOG

| JCCP No. | Date Judicial Council Received Petition | JC Special Title Case Name (Subject to Change While Under Review) | County Designated For Motion Hearing | Motion Judge Assignment | Date CMJ Order Mailed | County Designated for Coordination Proceeding | Trial Judge Assignment | Date CTJ Order Mailed | Disposition of Case (Contact Court For Current Up-to-Date Information) | Superior Court Case Numbers |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | 1/7/21 Received Notice of Addition of Case to Coordination Proceeding. Call v. Monsanto Co., et al., Superior Court of San Francisco County, Case No. CGC-20-585996. 1/26/21 Received Notice of Potential Add-On an dPetition to Coordinate Add-On Cases: Arline v. Monsanto Co., et al., Superior Court of San Francisco County, Case No. CGC-21-588701; Ceniceros v. Monsanto Co., et al., SFSC, Case No. CGC-21-588736; Highman v. Monsanto Co., et al., SFSC, Case No. CGC-20-588722; Lynch-Trettel v. Monsanto Co., eta | |

JUDICIAL COUNCIL OF CALIFORNIA
CIVIL CASE COORDINATION PROCEEDING (JCCP) LOG

| JCCP No. | Date Judicial Council Received Petition | JC Special Title Case Name (Subject to Change While Under Review) | County Designated For Motion Hearing | Motion Judge Assignment | Date CMJ Order Mailed | County Designated for Coordination Proceeding | Trial Judge Assignment | Date CTJ Order Mailed | Disposition of Case (Contact Court For Current Up-to-Date Information) | Superior Court Case Numbers |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | I., SFSC, Case No. CGC-20-588737; Moorhead v. Monsanto Co., et al., SFSC, Case o, CGC-21-588800; Nunley v. Monsanto Co., et al., Superior Court of Alameda County, Case No. RG21085444; Oswald v. Monsanto Co., et al., SFSC, Case No. CGC-21-588697; Clark v. Monsanto Co., et al., LASC, Case NO. 20STCV46616<br><br>2/8/21 Received Notice of Potential Ad-On and Petition to Coordinate Add-On Cases  Affine v. Monsanto Co., et al., SFSC, Case No. CGC-21-588701; Ceniceros v. Monsanto Col, et al., SFSC, Case No. | |

JUDICIAL COUNCIL OF CALIFORNIA
CIVIL CASE COORDINATION PROCEEDING (JCCP) LOG

| JCCP No. | Date Judicial Council Received Petition | JC Special Title Case Name (Subject to Change While Under Review) | County Designated For Motion Hearing | Motion Judge Assignment | Date CMJ Order Mailed | County Designated for Coordination Proceeding | Trial Judge Assignment | Date CTJ Order Mailed | Disposition of Case (Contact Court For Current Up-to-Date Information) | Superior Court Case Numbers |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | CGC-21-588736; Highman v. Monsanto Co., et al., SFSC, Case No. CGC-20-588722; Lynch-Trettel v. Monsanto Co., et al., SFSC, Case No. CGC-21-588737; Moorhead v. Monsanto Co., et al., SFSC, Case No. CGC-21-588800; Nunley v. Monsanto Co., et al., Superior Court of Alameda County, Case No. RG21085444, Oswald v. Monsanto Co., et al., SFSC, Case No. CGC-21-588697; Clark v. Monsanto Co., et al., LASC, Case No 20STCV466i6.<br><br>3/30/21 Received Notice of Petition and Petition for Coordination of Add-On Cases; | |

JUDICIAL COUNCIL OF CALIFORNIA
CIVIL CASE COORDINATION PROCEEDING (JCCP) LOG

| JCCP No. | Date Judicial Council Received Petition | JC Special Title Case Name (Subject to Change While Under Review) | County Designated For Motion Hearing | Motion Judge Assignment | Date CMJ Order Mailed | County Designated for Coordination Proceeding | Trial Judge Assignment | Date CTJ Order Mailed | Disposition of Case (Contact Court For Current Up-to-Date Information) | Superior Court Case Numbers |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | MPA ISO Thereof: Centeno, et al. v. Monsanto Co., et al., Superior Court of Alameda County, Case No. RG21089549; Delaney v. Monsanto Co., et al., SFSC, Case No. CGC-21-588945; Lopez v. Monsanto Co., et al., SFSC, Case No. CGC-20-583404; Mullins v. Monsanto Co., et al., SFSC, Case No. CGC-20-583407;Romero v. the BNSF Railway Co., et al., Superior Copurt of Fresno County, Case No. 21CECG00013; Saleh v. Monsanto Co., et al., LASC, Case No. 20STCV20229; Spencer v. Monsanto Co., et al., Superior Court of Santa Clara County, Case No. | |

JUDICIAL COUNCIL OF CALIFORNIA
CIVIL CASE COORDINATION PROCEEDING (JCCP) LOG

| JCCP No. | Date Judicial Council Received Petition | JC Special Title Case Name (Subject to Change While Under Review) | County Designated For Motion Hearing | Motion Judge Assignment | Date CMJ Order Mailed | County Designated for Coordination Proceeding | Trial Judge Assignment | Date CTJ Order Mailed | Disposition of Case (Contact Court For Current Up-to-Date Information) | Superior Court Case Numbers |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | 2:1CV376397; Trivett, et al. v. Bayer AG dba Bayer, et al., Superior Court of Sacramento County, Case No. 34-2020-00286233; Wetzel, et al. v. Monsanto Co., et al., SFSC, Case No CGC-20-585067.<br><br>4/1/21 Received Notice of Petition and Petition for Coordination of Add-On Cases: Burks v. Monsanto Co, et al., Superior Court of Monterey County, Case No. 21CV000577; Colmenero v. Monsanto Co., et al., Superior Court of Stanislaus County, Case No. CV-21-001113; Garff V. Monsanto Co., et al., Superior Court of Contra | |

JUDICIAL COUNCIL OF CALIFORNIA
CIVIL CASE COORDINATION PROCEEDING (JCCP) LOG

| JCCP No. | Date Judicial Council Received Petition | JC Special Title Case Name (Subject to Change While Under Review) | County Designated For Motion Hearing | Motion Judge Assignment | Date CMJ Order Mailed | County Designated for Coordination Proceeding | Trial Judge Assignment | Date CTJ Order Mailed | Disposition of Case (Contact Court For Current Court Up-to-Date Information) | Superior Court Case Numbers |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | Costa County, Case No. MSC21-00382; Gaukel v. Monsanto Co., et al., Superior Court of Riverside County, CVRI2100637; Goldstein v. Monsanto Co., et al., Superior Cout of Ventura County, Case No. 56-2021-00550765; Harris v. Monsanto Co., et al., SFSC, Case No. CGC-21-589182; Kross v. Monsanto Co., et al., SFSC, Cse No. CGC-21-589183; Marin v. Monsanto Co., et al., Superior Court of Santa Clara County, Case No. 21CV375996; Nash v. Monsanto Cp., et al., Superior Court of San Diego County, Case No. 37-2021-00011270; Oxford v. Monsanto Co., et al., Superior | |

JUDICIAL COUNCIL OF CALIFORNIA
CIVIL CASE COORDINATION PROCEEDING (JCCP) LOG

| JCCP No. | Date Judicial Council Received Petition | JC Special Title Case Name (Subject to Change While Under Review) | County Designated For Motion Hearing | Motion Judge Assignment | Date CMJ Order Mailed | County Designated for Coordination Proceeding | Trial Judge Assignment | Date CTJ Order Mailed | Disposition of Case (Contact Court For Current Up-to-Date Information) | Superior Court Case Numbers |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | Court of Stanislaus County, Case No. CV-21-000759. Poloni v. Monsanto Co., et al. Superior Court of Contra Costa County, Case No. MSC21-00472; Sezen v. Monsanto Co., et al. SFSC, Case No CGC-21-589185. Smith v. Monsanto Co., et al., SFSC, Case No. CGC-21-588914; Weinstein v. Monsanto Co., et al., Superior Court of Placer County Case No. S-CV-0046423.

4/7/21 Received Notice of Opposition to Monsanto Co.'s Petition for Coordination of Add-On cases Romer v. The BNSF Railway Co., et al., Superior | |

JUDICIAL COUNCIL OF CALIFORNIA
CIVIL CASE COORDINATION PROCEEDING (JCCP) LOG

| JCCP No. | Date Judicial Council Received Petition | JC Special Title Case Name (Subject to Change While Under Review) | County Designated For Motion Hearing | Motion Judge Assignment | Date CMJ Order Mailed | County Designated for Coordination Proceeding | Trial Judge Assignment | Date CTJ Order Mailed | Disposition of Case (Contact Court For Current Up-to-Date Information) | Superior Court Case Numbers |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | Court of Fresno County, Case No. 21CECG00013<br><br>4/22/21 Received MPA ISO Opposition to Monsanto Company Petition for Coordination of Add-On Cases (Romero v. The BNSF Railway Company, Superior Court of Fresno County, Case No. 21CECG00013 – by BNSF Railway Company.<br><br>4/22/21 Received Memorandum in Support of Notice of Opposition to Monsanto Petition for Coordination of Add-On Cases - by Plaintiff Jony Romero. Romero v. The BNSF Railway Company , Superior | |

JUDICIAL COUNCIL OF CALIFORNIA
CIVIL CASE COORDINATION PROCEEDING (JCCP) LOG

| JCCP No. | Date Judicial Council Received Petition | JC Special Title Case Name (Subject to Change While Under Review) | County Designated For Motion Hearing | Motion Judge Assignment | Date CMJ Order Mailed | County Designated for Coordination Proceeding | Trial Judge Assignment | Date CTJ Order Mailed | Disposition of Case (Contact Court For Current Up-to-Date Information) | Superior Court Case Numbers |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | Court of Fresno County, Case No. 21CECG0013 | |
| | | | | | | | | | 7/19/21 Received Notice of Addition of Case to JCCP 4953 and Stay of Case: Adame v. Monsanto Company, et al., Superior Court of San Francisco County, Case No. CGC-20-582451. | |
| | | | | | | | | | 9/2/21 Received Notice of Further Case Management Conference: 10/14/21 @ 2:30 p.m., Dept. 1, Hon. Sunil R. Kulkami presiding. | |
| | | | | | | | | | 9/2/21 Received Order of Remand (37-2019-00033645 to San Diego Superior Court Johnson v. | |

JUDICIAL COUNCIL OF CALIFORNIA
CIVIL CASE COORDINATION PROCEEDING (JCCP) LOG

| JCCP No. | Date Judicial Council Received Petition | JC Special Title Case Name (Subject to Change While Under Review) | County Designated For Motion Hearing | Motion Judge Assignment | Date CMJ Order Mailed | County Designated for Coordination Proceeding | Trial Judge Assignment | Date CTJ Order Mailed | Disposition of Case (Contact Court For Current Up-to-Date Information) | Superior Court Case Numbers |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | Monsanto, Superior Court of San Diego County) | |
| 4952 | 10/13/17 | The Ritz-Carlton Wage and Hour Cases | Los Angeles | Hon. Carolyn B. Kuhl assigned as coordination motion judge, unless otherwise designated by Hon. Daniel J. Buckley, PJ of LASC. | 11/8/17 | Orange | Hon. Randall J. Sherman assigned as coordination trial judge by Hon. Charles Margines, PJ of Superior Court of Orange County. | 4/1/18 | Coordination Motion hearing – 12/19/17 @ 11 a.m., Dept. 309, LASC, Central Civil West<br><br>10/27/17 Received Opposition to Petitioner's Application for Stay and Request for Hearing by counsel for defendant.<br><br>12/6/17 Received Notice of the Ritz-Carlton Hotel Company, LLC's Opposition to Petition for Coordination<br><br>12/11/17 Received Petitioners' Reply in Support of Petition for | **Los Angeles** BC615299 **Riverside** RIC1718434 |

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

MARITA RENTERIA,

         Plaintiff,

v.

MONSANTO COMPANY and SIDCO
CORPORATION,

         Defendants.

Case No. 2:21-cv-00994

**BRIEF IN SUPPORT OF PLAINTIFF MARITA RENTERIA'S MOTION TO REMAND**

Plaintiff Marita Renteria files this Brief in Support of her Motion to Remand.

## I.     HISTORY OF THE CASE

"Glyphosate is the active ingredient in Roundup, an herbicide manufactured by Monsanto."

Ex. 3[1] p. 4.   In 2015, the International Agency for Research on Cancer ("IARC") classified

glyphosate as "probably carcinogenic to humans."   Following the IARC's finding of a probable

link between glyphosate and cancer, over one hundred thousand cases were filed against Monsanto

by individuals who had or had recovered from non-Hodgkin Lymphoma ("NHL").   These

plaintiffs all claimed that their NHL was caused by exposure to Roundup.   Most of these cases are

in Missouri state court, where Monsanto is headquartered and "a few thousand cases have landed

in federal court."   Ex. 11 p. 2.

On October 4, 2016, the United States Judicial Panel on Multidistrict Litigation, acting

under 28 U.S.C. § 1407, transferred all of the Roundup products liability cases pending in the

United States District Courts in which the plaintiff claimed that exposure to Roundup caused his

---

[1] References to "Ex." herein are to the Exhibits attached to the Bruster Declaration which is Exhibit
A to Plaintiff Marita Renteria's Motion to Remand.

or her NHL to the United States District Court for the Northern District of California for coordinated or consolidated pretrial proceedings, thus commencing *In re: Roundup Products Liability Litigation*, MDL No. 2741 (N.D. Cal.)  (the "MDL").  Ex. 1 *passim*.

There are also a large number of these cases pending in California state court.  Under a California statute similar to 28 U.S.C. § 1407, complex cases can be consolidated and coordinated for pretrial proceedings in what are known as Judicial Council Coordination Proceedings ("JCCP").  *See* Cal. Civ. Proc. Code § 404.  A JCCP was established for Roundup cases on October 17, 2017, and remains pending.  Ex. 14.

In the midst of this mass, toxic-tort litigation, Bayer AG ("Bayer") acquired Monsanto, and its liabilities in the Roundup cases, in a transaction which was completed on June 7, 2018.  Ex. 2.

The history of Roundup litigation across the country,[2] including the MDL and all of the cases in state courts, is complex, but a few points are relevant here.  First, on October 6, 2017, Monsanto filed "Monsanto Company's *Daubert* and Summary Judgment Motion on Based on Failure of General Causation Proof."  MDL ECF Doc. No. 545.  On July 10, 2018 the MDL Court ruled on Monsanto's Motion and found sufficient evidence of general causation for the cases to go to trial.  Ex. 3 *passim*.  Second, on July 9, 2018, opening statements began in San Francisco Superior Court in the first Roundup jury trial, *Johnson v. Monsanto Co.*, Cause No. 16-550128.  Ex. A ¶ 3; Ex. 11 p. 6; *Johnson v. Monsanto Co.*, 52 Cal. App. 5th 434 (2020).  The *Johnson* trial was followed in March of 2019 by trial in federal court, before the MDL judge, of the *Hardeman v. Monsanto Co.* case. Ex. A ¶ 3; Ex. 11 p. 6.  A few days after final verdict was returned in Hardeman, trial the *Pilliod* case began in California state court.  Ex. A ¶ 3; Ex. 11 p. 7; *Pilliod v.*

---

[2] A more comprehensive history is set forth in Ex. 11 pp. 5-7.

*Monsanto Co.*, 67 Cal. App. 5th 591, 607 (2021). All three of these trials resulted in multi-million-dollar judgements against Monsanto which included substantial awards of punitive damages.

In the aftermath of *Hardeman*, the MDL judge vacated settings for the next federal court bellwether cases and appointed Ken Feinberg to act as a mediator between Monsanto and the plaintiffs in the MDL. Ex. 11 pp. 6-7, 22. By the agreement of Monsanto and the lead plaintiffs' firms in the MDL, Mr. Feinberg's role was expanded to include an attempt to settle all of the over one hundred thousand Roundup cases. Ex. 11 pp. 22. From mid-2019 through September of 2021, no more Roundup cases went to trial as the parties focused their efforts on the settlement negotiations led by Mr. Feinberg. Ex. A ¶ 4.[3]

The case at bar was filed during this two-year hiatus in active litigation of the Roundup cases. The plaintiff in this case, Marita Renteria ("Renteria"), is a citizen of New Mexico who was exposed to Roundup, developed NHL, and claims that her NHL was caused by her exposure to Roundup. Renteria filed her Original Complaint in this case on January 1, 2020, in the First Judicial District Court, County of Santa Fe, State of New Mexico (the "State Court"). In her Original Complaint, Renteria named Monsanto, Sidco Corporation ("Sidco"), and AGCO Corporation ("AGCO") as defendants. Both Sidco and ARGO are citizens of New Mexico for purposes of 28 U.S.C. § 1441. Notice of Removal ¶¶ 3 & 7; Ex. 4, ¶¶ 3-4.

In Plaintiff's Original Complaint filed in State Court, the only cause of action pleaded against Sidco was in Count VII where she alleged that "Defendants violated the Act," which is defined as "Iowa Consumer Frauds Act, Iowa Code § 714H.1, et seq." Ex. 4 ¶¶ 204-205. The only

---

[3] In September and October of 2021, the *Clark v. Monsanto Co.* (Case No. 20STCV46616 in the Superior Court of Los Angeles County, California) was tried. The *Clark* trial was bifurcated, with Phase 1 calling on the jury to decide whether the plaintiff's exposure to Roundup was a substantial factor in causing his cancer. On or about October 5, 2021, the jury returned a verdict for Monsanto on Phase 1. Ex. A ¶ 4.

other possible reference to Sidco in any claim for relief in the Original Complaint is the Punitive

Damage section in which she alleges "Defendants' conduct as alleged herein was done with

oppression, fraud, and malice," and then summarizes alleged actions by Monsanto justifying an

award of punitive damages.  Ex. 4 ¶¶ 217-220.  The prayer does not seek any relief from Sidco.

Ex. p. 53.

On May 5, 2020, Renteria filed a Stipulation of Dismissal Without Prejudice of All Claims

against Defendant AGCO Corporation, Ex. 5, thereby leaving Monsanto and Sidco as the only

Defendants to this action.  Thus, from May 5, 2020, through September 13, 2021 (the date upon

which Renteria filed her First Amended Complaint in state court), the only New Mexico defendant

in this case was Sidco and the only claim pleaded against it was under the Iowa Consumer Frauds

Act.

On June 24, 2020, just over one year after Mr. Feinberg began his work as mediator, Bayer

announced "a series of agreements that will substantially resolve major outstanding Monsanto

litigation, including U.S. Roundup$^{TM}$ product liability litigation …. The main feature is the U.S.

Roundup$^{TM}$ resolution that will bring closure to approximately 75% of the current Roundup$^{TM}$

litigation involving approximately 125,000 filed and unfiled claims overall."  Ex. 6.  For the next

year, Bayer's focus was on actually accomplishing what it had announced in June of 2020 that it

had already accomplished.  Ex. 11 p. 7.  The reason for this unusual ordering of events –

announcement of a settlement followed by settlement negotiations – is that Bayer's announcement

heralded much less than met the eye.  Indeed, as the MDL judge put it

> From this press release, people might have assumed that Bayer had agreed to
> establish a fund that would compensate all plaintiffs (and future plaintiffs) who
> could make some type of threshold showing that they used Roundup and developed
> NHL.  People might also have assumed that a deal was squarely in place. But in
> reality, there was no global settlement, and no plan for a global settlement fund. It's
> not even clear whether Bayer had formally reached settlements with anyone up to

that point. Instead, Bayer was in the process of negotiating agreements with individual law firms.

Ex. 11 p. 7.

Through July of 2020, Monsanto was working to settle over one hundred thousand cases, including this one, and it seemed, to Renteria at least, that settlement was imminent.  Therefore, neither Monsanto nor Renteria filed anything with the state court or conducted any discovery in this case from May 5, 2020, through August 13, 2020.

On August 13, 2020, Renteria took the first step under New Mexico practice toward actively litigating this case by filing her Request for Hearing for a Rule 1-016 Scheduling Conference.  Ex. 7.  On the same day Renteria filed her Request, the state court issued a Notice of Hearing for a Scheduling Conference by which the Scheduling conference was set for September 8, 2020.  Ex. 8.  Counsel were directed to come to the scheduling conference having met and conferred on a proposed trial date, the estimated length of trial, the discovery which is "essential so that the parties can engage in good faith settlement discussions at the earliest possible date," an early settlement conference deadline, and an appropriate form of alternative dispute resolution process.  Ex. 8.

On September 4, 2020, Monsanto and Renteria filed a joint Motion to Vacate Scheduling Conference in the State Court Action which included the following representation to the court:

> Counsel for Plaintiff and Monsanto are currently discussing potential resolution of this lawsuit.  As a result, the parties agree that it would be most efficient for both the Court's and the parties' time and resources to vacate the September 8th conference, as this will provide the parties additional time to continue their discussions regarding potential resolution of this lawsuit.  Should the parties need a Scheduling Conference in the future, they will promptly notify this Court and seek such conference.  In addition to vacating the September 8th Scheduling Conference, the parties also seek to vacate the requirement for submitting a Case Scheduling Status Report by September 4, 2020.

Ex. 9 at ¶ 2.  The Joint Motion to Vacate was granted on the same day it was filed.  Ex. 10.

5

Again, nothing more happened in the case until January 15, 2021 when attorneys from Bruster PLLC filed their Notice of Appearance for Renteria.  Ex. 13.  From that time to the present, the parties have worked together and with the state court to finalize certain procedural orders (entered June 14, 2021) and a Rule 1-016(B) Scheduling Order – Jury (entered September 1, 2021). Consistent with the September 13, 2021, Scheduling Order, Renteria filed Plaintiff's First Amended Complaint on September 13, 2021.  Ex. 12.  Indeed, this case was just getting off the ground with the commencement of discovery when Monsanto filed the Notice of Removal.

As detailed below, the Notice of Removal was filed improvidently and Plaintiff's Motion to Remand must be granted.

## II.    ARGUMENTS AND AUTHORITIES

### A.  Sidco Was Not Fraudulently Joined.

Fraudulent joined is neither presumed nor easily established.  "The defendant seeking removal bears a heavy burden of proving fraudulent joinder, and all factual and legal issues must be resolved in favor of the plaintiff."  *Dutcher v. Matheson*, 733 F.3d 980, 988 (10th Cir. 2013). "The party asserting fraudulent joinder bears the burden of proof.  To justify removal based on diversity jurisdiction, a defendant must plead a claim of fraudulent joinder with particularity and prove the claim with certainty."  *Bio-Tec Envtl., Ltd. Liab. Co. v. Adams*, 792 F. Supp. 2d 1208, 1214 (D.N.M. 2011) (citations and internal quotation marks omitted).

This Court uses "the following standard for [analyzing claims of] fraudulent joinder: whether the defendant has demonstrated that there is no possibility that the plaintiff will obtain a judgment against an in-state defendant." *Bellman v. NXP Semiconductors USA, Inc.*, 248 F. Supp. 3d 1081, 1116 (D.N.M. 2017).  "To prove their allegation of fraudulent joinder the removing parties must demonstrate that there is no possibility that plaintiff would be able to establish a cause

of action against the joined party in state court.  In evaluating fraudulent joinder claims, we must initially resolve all disputed questions of fact and all ambiguities in the controlling law in favor of the non-removing party. [The court then determines] whether that party has any possibility of recovering against the party whose joinder is questioned."  *McDaniel v. Loya*, 304 F.R.D. 617, 628 (D.N.M. 2015) (cleaned up) (quoting *Montano v. Allstate Indemnity Co.*, 211 F.3d 1278 (alteration in original) [published in full-text format at 2000 U.S. App. LEXIS 6852]).

Monsanto's claim of fraudulent joinder rests entirely on the premise that Sidco is not a "supplier" of Monsanto and therefore cannot be liable under a strict products liability claim. Notice of Removal ¶¶ 4 and 15.  No definition of "supplier" is included under the New Mexico Uniform Jury Instructions for products liability cases.  "The omission is intentional.  *Stang v. Hertz Corp.*, [83 N.M. 730, 497 P.2d 732 (1972)] suggests a wide scope of application for strict liability in tort and the law, with respect to persons liable under this theory, is in a state of development.  It is felt that any definition of this term might restrict future application of the doctrine where this is not warranted by the principles of *Stang v. Hertz Corp., supra.*"  N.M. Unif. Jury Instructions (1997) Chapter 14, Introduction (citations omitted).

When it applies, the New Mexico Workers' Compensation Act ("NMWCA") is the exclusive remedy for workers injured in the course of his or her employment.  NMSA § 52-1-9. But the NMWCA does not apply to Renteria's claims against Sidco because Sidco, her employer, did not, at the time of the Renteria was exposed to Roundup, comply with the insurance provisions of the NMWCA.  NMSA § 52-1-9(B).

No New Mexico case has addressed the unique legal question posed in this case: When the NMWCA does not apply, can an employee who is harmed in the scope of his or her employment

by exposure to a defective product supplied by his or her employer sue his or her employer for strict products liability?

It is crucial to note that in this case Renteria cannot plausibly maintain a negligence action against Sidco because Sidco is not the manufacturer of Roundup and the evidence here will establish, as the evidence admitted in the *Hardeman* trial established, that Monsanto denied the link between Roundup and NHL, hid what it knew, and undermined all efforts to establish the link. As noted by the MDL judge in awarding judgment for the plaintiff in *Hardeman*:

> Monsanto's behavior betrayed a lack of concern about the risk that its product might be carcinogenic. Despite years of colorable claims in the scientific community that Roundup causes NHL, Monsanto presented minimal evidence suggesting that it was interested in getting to the bottom of those claims. While Monsanto repeatedly intones that it stands by the safety of its product, the evidence at trial painted the picture of ***a company focused on attacking or undermining the people who raised concerns, to the exclusion of being an objective arbiter of Roundup's safety***. For example, while the jury was shown emails of Monsanto employees crassly attempting to combat, undermine or explain away challenges to Roundup's safety, not once was it shown an email suggesting that Monsanto officials were actively committed to conducting an objective assessment of its product.

*Hardeman v. Monsanto Co. (In re Roundup Prods. Liab. Litig.*), 385 F. Supp. 3d 1042, 1047 (N.D. Cal. 2019) (emphasis added) (citations omitted).

In this unique situation, where an employer, who does not carry workers' compensation insurance, cannot possibly be negligent because of ignorance resulting from a fraud perpetrated by the manufacturer of a product, Renteria has a good-faith argument for the extension of "supplier" status, and hence strict product liability, to her employer who supplied Roundup to her and instructed her to use it. Renteria is making a good-faith request that New Mexico courts extend application of settled New Mexico law to a situation which has never before been addressed. Renteria's argument is based on applying well established policy consideration to facts materially different from those presented in any prior New Mexico case. As such, Renteria's claim against

Sidco is not one which can be ignored under a fraudulent joinder analysis. "A claim which can be

dismissed only after an intricate analysis of state law is not so wholly insubstantial and frivolous

that it may be disregarded for purposes of diversity jurisdiction." *Tennell v. Amazon.com Servs.*,

Civil Action No. 19-cv-02889-CMA-KLM, 2020 U.S. Dist. LEXIS 32611, at *6 (D. Colo. Feb.

26, 2020); *Black Iron, Ltd. Liab. Co. v. Helm-Pac.,* No. 2:16-cv-00873-JNP-DBP, 2017 U.S. Dist.

LEXIS 93163, at *10 (D. Utah June 16, 2017).

A District Court in the Seventh Circuit faced a similar situation in *Guyant v. Johnson &*

*Johnson, Inc.*, No. 1:03-CV-0015- DFH, 2003 U.S. Dist. LEXIS 6747 (S.D. Ind. Apr. 21, 2003)

where the plaintiff sued two diversity-defeating defendants for fraud.  The defendant argued that

those claims were subject to the Indiana Medical Malpractice Act and, as such, could not be filed

because "a plaintiff may not file a medical malpractice action in state court against a covered health

care provider until after the claim has been presented to a medical review panel and the panel

issues an opinion."  *Id.*, at *5.   The Plaintiff argued that the fraud claims pleaded against the

diversity-destroying defendants "fell outside the coverage of the Medical Malpractice Act so that

the case must be remanded for lack of complete diversity."  *Id.*, at *5.   In remanding the case, the

court noted:

> The plaintiffs' argument may or may not convince the state courts, but that is not
> the standard here. This court could agree with defendants on the application of
> Indiana's Medical Malpractice Act to the alleged fraudulent pricing scheme only
> by undertaking "an intricate analysis of state law."  See *Batoff,* 977 F.2d at 853 (if
> "intricate analysis of state law" is needed to dismiss claim, the claim may not be
> disregarded for purposes of diversity jurisdiction and fraudulent joinder).  Although
> the Indiana state courts may ultimately conclude that the Medical Malpractice Act
> applies   to plaintiffs' fraud   claim, plaintiffs have    reasonable   and good
> faith arguments available to them.  Accordingly, their joinder of [the non-diverse
> defendants] Dr. Stack and IIMC as defendants was not "fraudulent." Complete
> diversity is destroyed by their presence, and plaintiffs' motion for remand to the
> Marion Superior Court is hereby granted.

*Id.*, at * 11-12.

9

Finding the balance between the policies underlying the NMWCA and those advanced by New Mexico product liability law is precisely the kind of "intricate analysis of state law" discussed in the cases cited above. This Court should not, as Monsanto suggests, base a finding of fraudulent joinder on any such analysis and in the absence of any such analysis, Monsanto cannot prove fraudulent joinder.

### B.  The Notice of Removal is Untimely under 28 U.S.C. 28 U.S.C. § 1446(b).

Monsanto claims its Notice of Removal was timely under 28 U.S.C. § 1446(b)(1) because the case was not removable under the Original Complaint and only became removable after Renteria filed her First Amended Complaint. "[I]f the case stated by the initial pleading is not removable, a notice of removal may be filed within 30 days after receipt by the defendant, through service or otherwise, of a copy of an amended pleading, motion, order or other paper from which it may first be ascertained that the case is one which is or has become removable." 28 U.S.C. § 1446(b)(3).

Monsanto's claim is incorrect and the Notice of Removal was not timely under 28 U.S.C. § 1446(b) because if this case ever was removable, it became removable on May 5, 2020, (when Renteria dismissed AGCO), and not September 13, 2021 (when Renteria filed Plaintiff's First Amended Complaint).

The only cause of action pleaded against Sidco in the Original Complaint is in ¶¶ 203 – 206, where a claim is pleaded under the Iowa Private Right of Actions for Consumer Frauds Act. That Act creates a cause of action against persons who engage in "unfair practice deception, fraud, false pretense, or false promise, or the misrepresentation, concealment, suppression, or omission of a material fact … in connection with the advertisement, sale, or lease of consumer merchandise." Iowa Code § 714H.3. This case has nothing to do with Iowa and Iowa law does not apply. This

pleading was a clerical error, but the result of this clerical error was that until September 13, 2021, under Renteria's pleadings "there [was] no possibility of recovery by the plaintiff against an in-state defendant, which stated differently means that there [was] no reasonable basis for the district court to predict that the plaintiff might be able to recover against an in-state defendant." *Salinas v. Goodyear Tire & Rubber Co*., No. 1:16-CV-01283-WPJ-KBM, 2017 U.S. Dist. LEXIS 8459, at \*4 (D.N.M. Jan. 18, 2017) (citations omitted).  The First Amended Complaint corrected this error and, as is shown above, pleads a valid – or at least colorable – claim against Sidco.  As such, if this case ever was removable, it became removable on May 5, 2020 when AGCO was dismissed.

In ¶ 16 of the Notice of Removal, Monsanto states "[t]he Record is now clear that Sidco was merely an end-user of Roundup-branded herbicides on its properties," suggesting that the record was not clear on that point until Renteria filed the First Amended Complaint. Not true. The fact that Sidco did not sell Roundup, but rather purchased it for use in Sidco's operations has always been clear.  In her Original Complaint, Renteria pleaded:

> 1.     Plaintiff Marita Renteria is a resident of Las Cruces New Mexico.  Ms. Renteria was exposed to Roundup employed (sic) as a Farm Hand with Sidco Corporation and was subsequently diagnosed with non-Hodgkin's Lymphoma in 1995.

> . . .

> 92.    Sidco Corporation hired Marita Renteria as a Farm Hand in Las Cruces, New Mexico.  As a Farm Hand, Ms. Renteria was exposed to Roundup at significant levels.

> 93.    Part of Ms. Renteria's duties included carrying a 5-gallon backpack of Roundup and spraying the poison with a hand sprayer.  On other properties, Ms. Renteria would drive a tractor with a 20-gallon sprayer attached to the end.  The Roundup Sidco Corporation supplied to their Farm Hands was purchased from AGCO Corporation.

> 94.    For six years, Ms. Renteria performed these duties with little to no protective equipment.

11

Ex. 4 ¶¶ 1, 92-94.  Indeed, the only places the word "Sidco" appears in the Original Complaint is in the style, in the paragraph immediately below the style in ¶¶ 1 and 3 where Renteria and Sidco are identified, and ¶¶ 92-93.  Renteria's allegation has always been that Sidco purchased Roundup from AGCO and that Renteria was exposed to Roundup while she was an employee of Sidco.

Monsanto's entire argument for removal is based on the proposition that Renteria's "claim against Sidco is not viable … because Sidco was not a ***supplier*** of Roundup® branded herbicides – i.e., Sidco did not sell or otherwise place allegedly defective products in the stream of commerce."  Notice of Removal ¶ 15 (emphasis in the original).  As is shown in Part II.A. above, Monsanto's position is incorrect under New Mexico law, but even if Monsanto were correct on this point, Sidco's relationship to Renteria and the Roundup she claims caused her NHL was clear from the day this case was commenced, it is indefensible for Monsanto to claim otherwise, and Plaintiff's First Amended Complaint did *nothing* to change that fact.

Renteria has now pleaded a viable claim against Sidco, but if the Court concludes otherwise, then the "amended pleading, motion, order or other paper from which it may first be ascertained that the case is one which is or has become removable" was the May 5, 2020, Stipulation of Dismissal and not the September 13, 2021, First Amended Complaint.  As such, the Notice of Removal is untimely under 28 U.S.C. § 1446(b)(1).

**C.  The Notice of Removal is Untimely under 28 U.S.C. § 1446(c)(1).**

Likewise, Monsanto's excuse for failing to comply with the one-year requirement under 28 U.S.C. § 1446(c)(1) lacks merit.  "A case may not be removed under subsection (b)(3) on the basis of jurisdiction conferred by section 1332 [28 USCS § 1332] more than 1 year after commencement of the action, unless the district court finds that the plaintiff has acted in bad faith in order to prevent a defendant from removing the action."  28 U.S.C.S. § 1446(c)(1).

It is undisputed that the Notice of Removal was filed more than one year after this case was commenced. Monsanto's only excuse for missing the deadline is the claim that Renteria acted in bad-faith in order to prevent Monsanto from removing this case. Monsanto's argument lacks merit for two reasons.

First, Monsanto's sole argument is that the bad faith exception is established by Renteria's failure to actively litigate against Sidco. Notice of Removal ¶¶ 23-26. As detailed in Part I above, however, no party engaged in any active litigation in this case prior to January of 2021. Indeed, Renteria took the customary steps to commence active litigation on August 13, 2020 by requesting a scheduling conference. Ex. 7. After counsel for Renteria and counsel for Monsanto conferred, however, Renteria and Monsanto filed a Joint Motion to Vacate Scheduling Conference because they were "currently discussing resolution of this lawsuit." Ex. 9 ¶ 2. It is somewhat astounding that Monsanto's parent corporation would announce to the world a global settlement of Roundup cases on June 24, 2020, Monsanto would ask the State Court to defer active litigation on August 8, 2020, so that it could attempt to negotiate a settlement, and then Monsanto would accuse Renteria of bad-faith for failing to do the very thing Monsanto asked her not to do.

This case is one of over one hundred thousand similar cases against Monsanto. That fact informs the "active litigation" analysis. The level of activity reasonably to be expected of a plaintiff in a one-off case is not a reasonable expectation in a mass, toxic-tort case of this magnitude. Both Bayer's curious approach to settlement and the Joint Motion to Vacate Scheduling Conference speak to this fact, a fact ignored by Monsanto. The usual active litigation analysis simply does not fit this case. In the context of the Roundup cases as a whole, Renteria is, if anything, somewhat ahead of the pack in pushing her case to resolution.

Moreover, in all of the cases cited my Monsanto which analyze the bad faith exception under 28 U.S.C.S. § 1446(c)(1), the plaintiff actively litigated against one defendant, but not another.  That differential in the activity focused on one defendant as opposed the lack of any activity focused on another was found to be evidence of bad faith in naming the party against which no discovery, motion practice, etc. was directed.  In this case, Renteria did not actively litigate against Monsanto or Sidco and the legitimate reasons for that fact are shown above, but to reiterate: (1) this case is one of over one hundred thousand cases asserting the same basic, toxic tort claim against the same defendant, (2) this case was filed in the time period after *Pilliod* and Bayer's settlement announcement during which there was no, or virtually no, active litigation of any of those case across the country, (3) the pause in active litigation was requested by Monsanto and benefitted it more than any one of the plaintiffs or the plaintiffs as a group, and (4) Monsanto affirmatively requested the state court to postpone active litigation to try to settle this case along with all of the others.  These undisputed facts show that if the lack of active litigation in this case is evidence of the bad faith of any party, it is Monsanto that has acted in bad faith.

Second, Monsanto does not point to any specific impediment it faced to removing this case at any time from May 5, 2020 through August 13, 2021, and indeed it cannot do so. Certainly, Monsanto does not link Renteria's alleged failure to actively litigate to an impediment to removal. All of the cases applying the bad-faith exception under 28 U.S.C.S. § 1446(c)(1) involve situations in which the plaintiff named a non-diverse defendant, waited at least one year, and then dismissed the non-diverse defendant.  Such was the case in *Aguayo v. AMCO Ins. Co.*, 59 F. Supp. 3d 1225 (D.N.M. 2014), where the plaintiffs originally filed a personal injury suit in state court against three, in-state defendants.  *Id.* at 1231.  Plaintiffs then amended their pleading to add a claim against an out of state defendant, AMCO.  *Id.*  Exactly one year after naming AMCO, plaintiffs

dismissed two of the three in-state defendants and then six days before trial dismissed the final in-state defendant. *Id.* *Aguayo* was not removed until after the last non-diverse defendant was dismissed. *Id.* Such was also the case in the other two cases cited by Monsanto, both of which presented situations in which the plaintiff dismissed the in-state defendant after the one-year time period had run, thereby creating complete diversity, but doing so only after the deadline under 28 U.S.C.S. § 1446(c)(1) had run. *See Massey v. 21st Century Centennial Ins. Co.*, No. 2:17-cv-01922, 2017 U.S. Dist. LEXIS 119431, at *1-2 (S.D. W. Va. July 31, 2017) ("On March 16, 2017, the West Virginia state court entered a partial dismissal order dismissing Tully as a Defendant due to settlement. The dismissal eliminated the only instate defendant from the suit and created complete diversity of citizenship among the parties."); *Forth v. Diversey Corp.*, Case No. 1:13-CV-00808 Magistrate's Report and Recommendation (ECF Doc. 19) at pp. 3 and 5 (W.D.N.Y. Nov. 20, 2013) (The nondiverse defendant, chemical Distributors, was dismissed on July 30, 2013, and the notice of removal was filed on August 6, 2013. "[I]n delaying the dismissal of Chemical Distributors from this action, plaintiffs 'acted in bad faith in order to prevent … defendant[s] from removing the action.'").

        That typical fact pattern – removal *after* the plaintiff voluntarily dismisses the last non-diverse defendant – is not present in this case. In the above cited cases, the removing defendant could point to a specific act by the plaintiff which prevented removal until more than one year after the case was commenced; specifically, dismissal of the last non-diverse defendant. That did not happen here, a material fact which Monsanto chooses to ignore. The logic of the fraudulent removal doctrine is that under some circumstances a case can be removed while a non-diverse defendant is a party. Indeed, that is what Monsanto did here. The logic of the bad faith exception to the deadline under 28 U.S.C. § 1446(c)(1) is that a specific thing done by the plaintiff, typically

naming a non-diverse defendant and not dismissing that defendant until after the year from commencement has run, "prevent[s] a defendant from removing the action."  None of the cases cited by Monsanto involve situations in which the doctrines are applied together or where the defendant cannot point to anything that the plaintiff did "in order to prevent [Monsanto] from removing the action."

### D.  There is No Diversity Jurisdiction under 28 U.S.C. § 1332.

Following removal, "the first order of business should be to determine whether the case is properly in the court's jurisdiction." *Kimbrell v. Hall-Kimbrell Envtl. Servs., Inc.*, Case No. 90-4162-R, 1990 U.S. Dist. LEXIS 16419, at *2 (D. Kan. Nov. 19, 1990).  "On its face, § 1441(b) requires a district court to determine whether it has 'original jurisdiction' over the case at bar.  Thus, an inquiry into the propriety of removal under § 1441(b) necessarily incorporates an inquiry into subject matter jurisdiction." *Dalrymple v. Grand River Dam Auth.*, 145 F.3d 1180, 1185 (10th Cir. 1998).  "In other words, removal requires complete diversity between plaintiff and the defendants." *Nat'l Inspection & Repairs, Inc. v. George S. May Int'l Co.*, 202 F. Supp. 2d 1238, 1241 (D. Kan. 2002).

Renteria agrees that the amount in controversy in this case meets the jurisdictional amount in controversy requirements, but the Court nevertheless lacks subject matter jurisdiction because there is not complete diversity of citizenship.  Diversity jurisdiction under 28 U.S.C. § 1332 requires complete diversity between all plaintiffs and all defendants. *Lincoln Prop. Co. v. Roche*, 546 U.S. 81, 83, 126 S. Ct. 606, 610 (2005).

Monsanto does not contest that Sidco is a New Mexico citizen for diversity jurisdiction purposes.  Rather, Monsanto's only argument is that Sidco was fraudulently joined and may be ignored.  As is shown in Part II.A. above, Monsanto's jurisdictional argument is based on a flawed

16

fraudulent joinder argument.  Monsanto does not claim that diversity jurisdiction exists for any reason other than its argument that Sidco was fraudulently joined.  Sidco was not fraudulently joined, however, and as such there is no complete diversity of the parties and no federal jurisdiction.

### III.    CONCLUSION

For the foregoing reasons, Plaintiff's Motion to Remand should be granted.

Wherefore, Marita Renteria respectfully prays that her Motion to Remand be granted and for all other just relief.

Dated: October 22, 2021                    Respectfully submitted,

                                           **By:** */s/ Feliz Angelica Rael*
                                                 **Feliz Angelica Rael**
                                                  New Mexico Bar No. 14698

                                           **Attorney at Law**
                                           1201 Lomas Blvd. NM, Ste. C
                                           Albuquerque, NM 87102
                                           frael@swcp.com
                                           Tel: 505-610-5991
                                           Fax: 505-302-2074

                                           Anthony K. Bruster
                                           New Mexico Bar No. 20283
                                           akbruster@brusterpllc.com

                                           **BRUSTER, PLLC**
                                           680 N. Carroll Ave., Suite 110
                                           Southlake, Texas 76092
                                           Telephone:  (817) 601-9564
                                           Facsimile:   (817) 796-2929
                                           Email: akbruster@brusterpllc.com

                                           Darren P. McDowell
                                           Texas Bar No. 24025520
                                           Email:  dmcdowell@fnlawfirm.com

                                           **FEARS | NACHAWATI, PLLC**
                                           5473 Blair Road
                                           Dallas, TX 75231
                                           Tel. (214) 890-0711
                                           Fax (214) 890-0712

                                           *Attorneys for Plaintiff*

WE HEREBY CERTIFY that on October 22,
2021, we filed the foregoing electronically
through the CM/ECF system and served the
following counsel via electronic mail:
    Alex C. Walker
    MODRALL,  SPERLING,  ROEHL,
    HARRIS & SISK, P.A.
    awalker@modrall.com