Query   Reports   Utilities   Help   Log Out

ACCO,MJDAP

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA (Western Division - Los Angeles)
# CIVIL DOCKET FOR CASE #: 2:21-cv-08619-MRW

Sadie Hunter v. Monsanto Company et al
Assigned to: Magistrate Judge Michael R. Wilner
Cause: 28:1332 Diversity-Product Liability

Date Filed: 11/01/2021
Jury Demand: Plaintiff
Nature of Suit: 365 Personal Inj. Prod. Liability
Jurisdiction: Diversity

**Plaintiff**

**Sadie Hunter**
*an individual*

represented by **Boris Treyzon**
Abir Cohen Treyzon Salo LLP
16001 Ventura Boulevard Suite 200
Encino, CA 91436
424-288-4367
Fax: 424-288-4368
Email: btreyzon@actslaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Joseph Robert Finnerty**
Abir Cohen Treyzon Salo LLP
16001 Ventura Boulevard Suite 200
Encino, CA 91436
424-288-4367
Fax: 424-288-4368
*ATTORNEY TO BE NOTICED*

**Michael P Kelly**
Abir Cohen Treyzon Salo LLP
16001 Ventura Boulevard Suite 200
Encino, CA 91436
424-288-4367
Fax: 424-288-4368
Email: mkelly@actslaw.com
*ATTORNEY TO BE NOTICED*

**Robert William Finnerty**
Abir Cohen Treyzon Salo LLP
16001 Ventura Boulevard Suite 200
Encino, CA 91436
424-288-4367

Fax: 424-288-4368
Email: rfinnerty@actslaw.com
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Monsanto Company**

**Defendant**

**Bayer Corporation**

**Defendant**

**Does**
*1 through 300, inclusive*

| Date Filed | # | Docket Text |
|---|---|---|
| 11/01/2021 | 1 | COMPLAINT Receipt No: ACACDC-32252409 - Fee: $402, filed by Plaintiff Sadie Hunter. (Attorney Boris Treyzon added to party Sadie Hunter(pty:pla)) (Treyzon, Boris) (Entered: 11/01/2021) |
| 11/01/2021 | 2 | CIVIL COVER SHEET filed by Plaintiff Sadie Hunter. (Treyzon, Boris) (Entered: 11/01/2021) |
| 11/01/2021 | 3 | Request for Clerk to Issue Summons on Complaint (Attorney Civil Case Opening) 1 filed by Plaintiff Sadie Hunter. (Treyzon, Boris) (Entered: 11/01/2021) |
| 11/01/2021 | 4 | Request for Clerk to Issue Summons on Complaint (Attorney Civil Case Opening) 1 filed by Plaintiff Sadie Hunter. (Treyzon, Boris) (Entered: 11/01/2021) |
| 11/03/2021 | 5 | NOTICE TO COUNSEL re Magistrate Judge Direct Assignment Program. This case has been randomly assigned to Magistrate Judge Michael R. Wilner. (Attachments: # 1 CV-11C) (lh) (Entered: 11/03/2021) |
| 11/03/2021 | 6 | NOTICE OF DEFICIENCIES in Request to Issue Summons RE: Summons Request 3 , Summons Request 4 . The following error(s) was found: The date and signature line must be left blank. The summons cannot be issued until this defect has been corrected. Please correct the defect and re-file your request. (lh) (Entered: 11/03/2021) |
| 11/03/2021 | 7 | NOTICE OF DEFICIENCIES in Attorney Case Opening. The following error(s) was found: No Notice of Interested Parties has been filed. A Notice of Interested Parties must be filed with every partys first appearance. See Local Rule 7.1-1. Counsel must file a Notice of Interested Parties immediately. Failure to do so may be addressed by judicial action, including sanctions. See Local Rule 83-7. (lh) (Entered: 11/03/2021) |
| 11/03/2021 | 8 | |

| | | |
|---|---|---|
| | | NOTICE of Interested Parties filed by Plaintiff Sadie Hunter, identifying Monsanto Company; Bayer Corporation. (Treyzon, Boris) (Entered: 11/03/2021) |
| 11/03/2021 | 9 | Request for Clerk to Issue Summons on Complaint (Attorney Civil Case Opening) 1 filed by Plaintiff Sadie Hunter. (Treyzon, Boris) (Entered: 11/03/2021) |
| 11/03/2021 | 10 | Request for Clerk to Issue Summons on Complaint (Attorney Civil Case Opening) 1 filed by Plaintiff Sadie Hunter. (Treyzon, Boris) (Entered: 11/03/2021) |
| 11/04/2021 | 11 | 21 DAY Summons Issued as to Defendant Bayer Corporation. Re Complaint (Attorney Civil Case Opening) 1 (vm) (Entered: 11/04/2021) |
| 11/04/2021 | 12 | 21 DAY Summons Issued as to Defendant Monsanto Company. Re Complaint (Attorney Civil Case Opening) 1 (vm) (Entered: 11/04/2021) |
| 11/22/2021 | 13 | MINUTE (IN CHAMBERS) ORDER RE: STATUS REPORT ON SERVICE OF PROCESS IN CIVIL ACTION by Magistrate Judge Michael R. Wilner. Plaintiff may discharge this order by filing a statement (not to exceed 3 pages) plus proof of service of process by or before December 13, 2021. (See Minute Order for further details) (vm) (Entered: 11/22/2021) |
| 12/01/2021 | 14 | PROOF OF SERVICE Executed by Plaintiff Sadie Hunter, upon Defendant Bayer Corporation served on 11/22/2021, answer due 12/13/2021. Service of the Summons and Complaint were executed upon CSC Lawyers Incorporating Service, Inc. - Service Agent for Bayer Corporation in compliance with Federal Rules of Civil Procedure by personal service.Original Summons returned. (Treyzon, Boris) (Entered: 12/01/2021) |
| 12/02/2021 | 15 | MINUTE (IN CHAMBERS) ORDER RE: PROOF OF SERVICE by Magistrate Judge Michael R. Wilner. The Court reviewed Plaintiffs proof of service. (Docket # 14.) The previous order is DISCHARGED with no further consequence. (vm) (Entered: 12/02/2021) |
| 12/02/2021 | 16 | REMINDER NOTICE re Magistrate Judge Direct Assignment Program. Each party must file form CV-11C within the consent deadlines pursuant to L.R. 73-2. Additionally, the parties are directed to L.R. 73-2.2 Proof of Service. In any case in which only a magistrate judge is initially assigned, plaintiff must file a proof of service within 10 days of service of the summons and complaint as to each defendant. (vm) (Entered: 12/02/2021) |
| 12/02/2021 | 17 | PROOF OF SERVICE Executed by Plaintiff Sadie Hunter, upon Defendant Monsanto Company served on 11/22/2021, answer due 12/13/2021. Service of the Summons and Complaint were executed upon CSC Lawyers Incorporating Service, Inc. - Service Agent for Monsanto Company in compliance with Federal Rules of Civil Procedure by personal service.Original Summons returned. (Treyzon, Boris) (Entered: 12/02/2021) |

**PACER Service Center**

| Transaction Receipt | | | |
|---|---|---|---|
| 12/03/2021 06:20:58 | | | |
| **PACER Login:** | sh0019sh | **Client Code:** | 31943.356965 |
| **Description:** | Docket Report | **Search Criteria:** | 2:21-cv-08619-MRW End date: 12/3/2021 |
| **Billable Pages:** | 3 | **Cost:** | 0.30 |



**null / ALL**
**Transmittal Number: 24106854**
**Date Processed: 11/23/2021**

# Notice of Service of Process

| | |
|---|---|
| **Primary Contact:** | Romaine Fulton<br>Bayer Corporation<br>100 Bayer Blvd<br>Whippany, NJ 07981-1544 |
| **Electronic copy provided to:** | Avery Stemmler<br>Christine Letts |

| | |
|---|---|
| **Entity:** | Bayer Corporation<br>Entity ID Number  2486849 |
| **Entity Served:** | Bayer Corporation |
| **Title of Action:** | Sadie Hunter vs. Monsanto Company |
| **Matter Name/ID:** | Sadie Hunter vs. Monsanto Company (11758702) |
| **Document(s) Type:** | Summons/Complaint |
| **Nature of Action:** | Product Liability |
| **Court/Agency:** | U.S. District Court Central District, CA |
| **Case/Reference No:** | 2:21-cv-08619-MRW |
| **Jurisdiction Served:** | California |
| **Date Served on CSC:** | 11/22/2021 |
| **Answer or Appearance Due:** | 21 Days |
| **Originally Served On:** | CSC |
| **How Served:** | Personal Service |
| Sender Information: | Abir Cohen Treyzon Salo, LLP<br>424-288-4367 |

Information contained on this transmittal form is for record keeping, notification and forwarding the attached document(s). It does not constitute a legal opinion. The recipient is responsible for interpreting the documents and taking appropriate action.

**To avoid potential delay, please do not send your response to CSC**

251 Little Falls Drive, Wilmington, Delaware 19808-1674   (888) 690-2882   |   sop@cscglobal.com

AO 440 (Rev. 06/12)  Summons in a Civil Action

# UNITED STATES DISTRICT COURT
for the

Central District of California

| | |
|---|---|
| SADIE HUNTER, an individual | ) |
| | ) |
| | ) |
| | ) |
| _Plaintiff(s)_ | ) |
| v. | ) |
| | ) Civil Action No.  2:21-cv-08619 MRW |
| MONSANTO COMPANY; BAYER CORPORATION; | ) |
| DOES 1 through 300, inclusive | ) |
| | ) |
| | ) |
| _Defendant(s)_ | ) |

## SUMMONS IN A CIVIL ACTION

To: _(Defendant's name and address)_   BAYER CORPORATION
CORPORATION SERVICE COMPANY WHICH WILL DO BUSINESS IN CALIFORNIA
AS CSC - LAWYERS INCORPORATING SERVICE (C1592199)
251 LITTLE FALLS DRIVE
WILMINGTON DE 19808

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:   Robert W. Finnerty, Esq. (SBN 119775)
Boris Treyzon, Esq. (188893)
Michael P. Kelly, Esq. (311045)
ABIR COHEN TREYZON SALO, LLP
16001 Encino Blvd., Suite 200
Encino, CA 91436

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

CLERK OF COURT

Date:  November 4, 2021                                _Veronica Piper_
                                                     _Signature of Clerk or Deputy Clerk_

AO 440 (Rev. 06/12)  Summons in a Civil Action (Page 2)

Civil Action No.  2:21-cv-08619

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

❑ I personally served the summons on the individual at *(place)* _____

_____ on *(date)* _____ ; or

❑ I left the summons at the individual's residence or usual place of abode with *(name)* _____

_____ , a person of suitable age and discretion who resides there,

on *(date)* _____ , and mailed a copy to the individual's last known address; or

❑ I served the summons on *(name of individual)* _____ , who is

designated by law to accept service of process on behalf of *(name of organization)* _____

_____ on *(date)* _____ ; or

❑ I returned the summons unexecuted because _____ ; or

❑ Other *(specify):*


My fees are $ _____ for travel and $ _____ for services, for a total of $ ___0.00___ .


I declare under penalty of perjury that this information is true.


Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc:

AO 440 (Rev. 06/12) Summons in a Civil Action

# UNITED STATES DISTRICT COURT

for the

Central District of California

| | |
|---|---|
| SADIE HUNTER, an individual | ) |
| | ) |
| | ) |
| | ) |
| *Plaintiff(s)* | ) |
| v. | ) Civil Action No. 2:21-cv-08619 |
| | ) |
| MONSANTO COMPANY; BAYER CORPORATION; | ) |
| DOES 1 through 300, inclusive | ) |
| | ) |
| | ) |
| *Defendant(s)* | ) |

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*   BAYER CORPORATION
CORPORATION SERVICE COMPANY WHICH WILL DO BUSINESS IN CALIFORNIA
AS CSC - LAWYERS INCORPORATING SERVICE (C1592199)
251 LITTLE FALLS DRIVE
WILMINGTON DE 19808

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure. The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:    Robert W. Finnerty, Esq. (SBN 119775)
Boris Treyzon, Esq. (188893)
Michael P. Kelly, Esq. (311045)
ABIR COHEN TREYZON SALO, LLP
16001 Encino Blvd., Suite 200
Encino, CA 91436

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

*CLERK OF COURT*

Date: _____         _____

*Signature of Clerk or Deputy Clerk*

AO 440 (Rev. 06/12)  Summons in a Civil Action (Page 2)

Civil Action No.  2:21-cv-08619

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

❑ I personally served the summons on the individual at *(place)*

_____ on *(date)* _____ ; or

❑ I left the summons at the individual's residence or usual place of abode with *(name)* _____

_____ , a person of suitable age and discretion who resides there,

on *(date)* _____ , and mailed a copy to the individual's last known address; or

❑ I served the summons on *(name of individual)* _____ , who is

designated by law to accept service of process on behalf of *(name of organization)* _____

on *(date)* _____ ; or

❑ I returned the summons unexecuted because _____ ; or

❑ Other *(specify):*


My fees are $ _____ for travel and $ _____ for services, for a total of $    0.00    .


I declare under penalty of perjury that this information is true.


Date: _____                    _____
                                                        *Server's signature*

                                                        _____
                                                        *Printed name and title*



                                                        _____
                                                        *Server's address*

Additional information regarding attempted service, etc:

**ABIR COHEN TREYZON SALO, LLP**
Boris Treyzon, Esq. (SBN: 188893)
*btreyzon@actslaw.com*
Robert W. Finnerty, Esq. (SBN: 119775)
*rfinnerty@actslaw.com*
Joseph R. Finnerty, Esq. (SBN 298678)
*jfinnerty@actslaw.com*
Michael P. Kelly (SBN 311045)
*mkelly@actslaw.com*
16001 Ventura Blvd., Suite 200
Encino, California 91436
T: (424) 288-4367 F: (424) 288-4368

Attorneys for Plaintiff Sadie Hunter

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SADIE HUNTER, an individual;<br><br>Plaintiff,<br><br>v.<br><br>MONSANTO COMPANY; BAYER CORPORATION; DOES 1 through 300, inclusive;<br><br>Defendants. | Case No.<br><br>**PLAINTIFF'S COMPLAINT FOR DAMAGES**<br><br>**DEMAND FOR JURY TRIAL** |

COMES NOW Plaintiff, Sadie Hunter ("Plaintiff"), by and through her undersigned attorneys, hereby brings this Complaint for damages against

1

Defendants Monsanto Company, Bayer Corporation, and John Does 1-300, and alleges the following:

## INTRODUCTION

1.      This is an action for damages suffered by Plaintiff as a direct and proximate result of Defendants' negligent and wrongful conduct in connection with the design, development, manufacture, testing, packaging, promoting, marketing, advertising, distribution, labeling, and/or sale of the herbicide Roundup®, containing the active ingredient glyphosate.

2.      Plaintiff maintains the Roundup® and/or glyphosate is defective, dangerous to human health, unfit and unsuitable to be marked and sold in commerce, and lacked proper warnings and directions as to the dangers associated with its use.

3.      Plaintiff's injuries, like those striking thousands of similarly situated victims across the country, were avoidable.

## JURISDICTION AND VENUE

4.      This Court has jurisdiction over Defendants and this action pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship between Plaintiff and Defendants. Defendants are all either incorporated and/or have their principal place of business outside of the state in which the Plaintiff resides.

5.      The amount in controversy between Plaintiff and Defendants exceeds $75,000, exclusive of interest and cost.

6.      The Court also has supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

7.      Venue is proper within this district pursuant to 28 U.S.C. § 1391 in that Defendants conduct business here and are subject to personal jurisdiction in this district. Furthermore, Defendants sell, market, and/or distribute Roundup® within the District of California.

1

## **PARTIES**

2   8. Plaintiff, Sadie Hunter, ("Plaintiff") is a natural person and at all

3 relevant times a resident and citizen of Madison, Tennessee. Plaintiff brings this

4 action for personal injuries sustained by exposure to Roundup® ("Roundup")

5 containing the active ingredient glyphosate and the surfactant POEA. As a direct

6 and proximate result of being exposed to Roundup, Plaintiff developed non-

7 Hodgkin's Lymphoma.

8   9. "Roundup" refers to all formulations of Defendants' roundup products,

9 including, but not limited to, Roundup Concentrate Poison Ivy and Tough Brush

10 Killer 1, Roundup Custom Herbicide, Roundup D-Pak herbicide, Roundup Dry

11 Concentrate, Roundup Export Herbicide, Roundup Fence & Hard Edger 1,

12 Roundup Garden Foam Weed & Grass Killer, Roundup Grass and Weed Killer,

13 Roundup Herbicide, Roundup Original 2k herbicide, Roundup Original II

14 Herbicide, Roundup Pro Concentrate, Roundup Prodry Herbicide, Roundup

15 Promax, Roundup Quik Stik Grass and Weed Killer, Roundup Quikpro Herbicide,

16 Roundup Rainfast Concentrate Weed & Grass Killer, Roundup Rainfast Super

17 Concentrate Weed & Grass Killer, Roundup Ready-to-Use Extended Control Weed

18 & Grass Killer 1 Plus Weed Preventer, Roundup Ready-to-Use Weed & Grass

19 Killer, Roundup Ready-to-Use Weed and Grass Killer 2, Roundup Ultra Dry,

20 Roundup Ultra Herbicide, Roundup Ultramax, Roundup VM Herbicide, Roundup

21 Weed & Grass Killer Concentrate, Roundup Weed & Grass Killer Concentrate Plus,

22 Roundup Weed & Grass killer Ready-to-Use Plus, Roundup Weed & Grass Killer

23 Super Concentrate, Roundup Weed & Grass Killer1 Ready-to-Use, Roundup WSD

24 Water Soluble Dry Herbicide Deploy Dry Herbicide, or any other formulation of

25 containing the active ingredient glyphosate.

26   10. Defendant MONSANTO COMPANY is a Delaware corporation,

27 Calif. Secretary of State Entity No. C2362863, in "active" status, with a principle

28 place of business in St. Louis, Missouri.

PLAINTIFF'S COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

11.    Defendant BAYER CORPORATION is an Indiana Corporation, California Secretary of State Entity No. C1593546, in "active" status, with a principal place of business in New Jersey.

12.    Upon best information and belief, Defendants DOES 1-300 are subsidiaries, partners, alter-egos or other entities that were involved in the design, development, manufacture, testing, packaging, promoting, marketing, advertising, distribution, labeling, and/or sale of the herbicide Roundup, containing the active ingredient glyphosate. The identities of DOES 1-300 are unknown to Plaintiff at this time. Plaintiff will move the Court to specifically name JOHN DOES 1-300 as their identities becomes known to Plaintiff through discovery.

13.    Defendant MONSANTO COMPANY, BAYER CORPORATION, and JOHN DOES 1-300 are collectively referred to as "Monsanto Defendants" or "Defendants."

14.    Defendants advertise and sell goods, specifically Roundup, in California, Tennessee, and Ohio.

15.    Defendants transacted and conducted business within the States of California, Tennessee, and Ohio that relates to the allegations in this Complaint.

16.    Defendants derived substantial revenue from goods and products used in the States of California, Tennessee, and Ohio.

17.    Defendants expected or should have expected their acts to have consequences within the States of California, Tennessee, and Ohio and derived substantial revenue from interstate commerce.

18.    Defendants engaged in the business of designing, developing, manufacturing, testing, packaging, marketing, distributing, labeling, and/or selling Roundup.

19.    Defendants are authorized to do business in California and derive substantial income from doing business in this states.

20.    Upon information and belief, Defendants purposefully availed

4

themselves of the privilege of conducting activities with the State of California, thus invoking the benefits and protections of its laws.

21.    Upon information and belief, Defendants did act together to design, sell, advertise, manufacture and/or distribute Roundup, with full knowledge of its dangerous and defective nature.

## FACTUAL ALLEGATIONS

22.    At all relevant times, Defendants were in the business of, and did, design, research, manufacture, test, advertise, promote, market, sell, distribute, and/or have acquired and are responsible for Defendants who have designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed the commercial herbicide Roundup.

23.    Monsanto is a multinational agricultural biotechnology corporation based in St. Louis, Missouri. It is the world's leading producer of glyphosate.

24.    Defendants discovered the herbicidal properties of glyphosate during the 1970's and subsequently began to design, research, manufacture, sell and distribute glyphosate based "Roundup" as a broad spectrum herbicide.

25.    Glyphosate is the active ingredient in Roundup.

26.    Glyphosate is a broad-spectrum herbicide used to kill weeds and grasses known to compete with commercial crops grown around the globe.

27.    Glyphosate is a "non-selective" herbicide, meaning it kills indiscriminately based only on whether a given organism produces a specific enzyme, 5-enolpyruvylshikimic acid-3-phosphate synthase, known as EPSP synthase.

28.    Glyphosate inhibits the enzyme 5-enolpyruvylshikimic acid-3-phosphate synthase that interferes with the shikimic pathway in plants, resulting in the accumulation of shikimic acid in plant tissue and ultimately plant death.

29.    Sprayed as a liquid, plants absorb glyphosate directly through their leaves, stems, and roots, and detectable quantities accumulate in the plant tissues.

5

30.     Defendants are intimately involved in the development, design, manufacture, marketing, sale, and/or distribution of genetically modified ("GMO") crops, many of which are marketed as being resistant to Roundup i.e., "Roundup Ready®." As of 2009, Defendants were the world's leading producer of seeds designed to be Roundup Ready®. In 2010, an estimated 70% of corn and cotton, and 90% of soybean fields in the United States contained Roundup Ready® seeds.

31.     Each year, approximately 250 million pounds of glyphosate are sprayed on crops, commercial nurseries, suburban lawns, parks, and golf courses. This increase in use has been driven largely by the proliferation of genetically engineered crops, crops specifically tailored to resist the activity of glyphosate.

32.     The original Roundup, containing the active ingredient glyphosate, was introduced in 1974. Today, glyphosate products are among the world's most widely used herbicides. Defendants' glyphosate products are registered in more than 130 countries and are approved for weed control in more than 100 crops. No other herbicide active ingredient compares in terms of number of approved uses.[1]

33.     For nearly 40 years, farmers and agriculture businesses, like Plaintiff's, across the globe have used Roundup, unaware of its carcinogenic properties.

**REGISTRATION OF HERBICIDES UNDER FEDERAL LAW**

34.     The manufacture, formulation and distribution of herbicides, such as Roundup, are regulated under the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA"), 7. U.S.C. § 136 et seq. FIFRA requires that all pesticides be registered with the Environmental Protection Agency ("EPA) prior to their distribution, sale, or use, except as described by FIFRA 7 U.S.C. 136a(a).

35.     The EPA requires as part of the registration process, among other requirements, a variety of tests to evaluate the potential for exposure to pesticides, toxicity to people and other potential non-target organisms, and other adverse

---

[1] *Backgrounder*, History of Monsanto's Glyphosate Herbicides, June 2005.

PLAINTIFF'S COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

1   effects on the environment. Registration by the EPA, however, is not an assurance
2   or finding of safety. The determination the EPA makes in registering or re-
3   registering a product is not that the product is "safe," but rather that use of the
4   product in accordance with its label directions "will not generally cause
5   unreasonable adverse effects on the environment." 7 U.S.C. § 136(a)(c)(5)(D).

6       36.    FIFRA defines "unreasonable adverse effects on the environment" to
7   mean "any unreasonable risk to man or the environment, taking into account the
8   economic, social, and environmental costs and benefits of the use of any
9   pesticide." 7 U.S.C. § 136(bb). FIFRA thus requires the EPA to make a
10   risk/benefit analysis in determining whether a registration should be granted or
11   allowed to continue to be sold in commerce.

12       37.    The EPA and the State of California registered Roundup for
13   distribution, sale, and manufacture in the United States and the State of California.

14       38.    FIFRA generally requires that the registrant, Monsanto, conduct
15   health and safety testing of pesticide products. The government is not required,
16   nor is it able, to perform the product tests that are required of the manufacturer.

17       39.    The evaluation of each pesticide product distributed, sold, or
18   manufactured is completed at the time the product is initially registered. The data
19   necessary for registration of a pesticide has changed over time. The EPA is now in
20   the process of re-evaluating all pesticide products through a Congressionally
21   mandated process called "re-registration." 7 U.S.C. § 136a-1. In order to
22   reevaluate these pesticides, the EPA demands the completion of additional tests
23   and the submission of data for the EPA's review and evaluation.

24       40.    In the case of glyphosate and Roundup, the EPA had planned on
25   releasing its preliminary risk assessment – in relation to the registration process –
26   no later than July 2015. The EPA completed its review of glyphosate in early 2015
27   but delayed releasing the assessment pending further review in light of the World
28   Health Organization's findings.

## DEFENDANTS' FALSE REPRESENTATIONS REGARDING THE SAFETY OF ROUNDUP®

41.     In 1996, the New York Attorney General ("NYAG") filed a lawsuit against Monsanto based on its false and misleading advertising of Roundup products. Specifically, the lawsuit challenged Monsanto's general representations that its spray-on glyphosate-based herbicides, including Roundup, were "safer than table salt" and "practically non-toxic" to mammals, birds, and fish. Among the representations the NYAG found deceptive and misleading about the human and environmental safety of Roundup are the following:

(a) Remember that environmentally friendly Roundup herbicide is biodegradable. It won't build up in the soil so you can use Roundup with confidence along customers' driveways, sidewalks and fences ...

(b) And remember that Roundup is biodegradable and won't build up in the soil. That will give you the environmental confidence you need to use Roundup everywhere you've got a weed, brush, edging or trimming problem.

(c) Roundup biodegrades into naturally occurring elements.

(d) Remember that versatile Roundup herbicide stays where you put it. That means there's no washing or leaching to harm customers' shrubs or other desirable vegetation.

(e) This non-residual herbicide will not wash or leach in the soil. It ... stays where you apply it.

(f) You can apply Accord with "confidence because it will stay where you put it" it bonds tightly to soil particles, preventing leaching. Then, soon after application, soil microorganisms biodegrade Accord into natural products.

(g) Glyphosate is less toxic to rats than table salt following acute oral ingestion.

(h) Glyphosate's safety margin is much greater than required. It has over a 1,000-fold safety margin in food and over a 700-fold safety margin for workers who manufacture it or use it.

(i) You can feel good about using herbicides by Monsanto. They carry a toxicity category rating of 'practically non-toxic' as it pertains to mammals, birds and fish.

(j) "Roundup can be used where kids and pets will play and breaks down into natural material." This ad depicts a person with his head in the ground and a pet dog standing in an area which has been treated with Roundup.[2]

42.   On November 19, 1996, Monsanto entered into an Assurance of Discontinuance with NYAG, in which Monsanto agreed, among other things, "to cease and desist from publishing or broadcasting any advertisements [in New York] that represent, directly or by implication" that:

(a) its glyphosate-containing pesticide products or any component thereof are safe, non-toxic, harmless or free from risk;

(b) its glyphosate-containing pesticide products or any component thereof manufactured, formulated, distributed or sold by Monsanto are biodegradable;

(c) its glyphosate-containing pesticide products or any component thereof stay where they are applied under all circumstances and will not move through the environment by any means;

(d) its glyphosate-containing pesticide products or any component thereof are "good" for the environment or are "known for their environmental characteristics;"

---

[2] Attorney General of the State of New York, In the Matter of Monsanto Company, Assurance of Discontinuance Pursuant to Executive Law § 63(15) (Nov. 1996).

PLAINTIFF'S COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

1         (e) glyphosate-containing pesticide products or any component thereof are

2              safer or less toxic than common consumer products other than

3              herbicides;

4         (f) its glyphosate-containing products or any component thereof might be

5              classified as "practically non-toxic."

6       43.    Monsanto did not alter its advertising in the same manner in any state

7 other than New York, and on information and belief still has not done so today.

8       44.    In 2009, France's highest court ruled that Monsanto had not told the

9 truth about the safety of Roundup. The French court affirmed an earlier judgment

10 that Monsanto had falsely advertised its herbicide Roundup as "biodegradable"

11 and that it "left the soil clean."[3]

12               **EVIDENCE OF CARCINOGENICITY IN ROUNDUP**

13       45.    As early as the 1980's Monsanto was aware of glyphosate's

14 carcinogenic properties.

15       46.    On March 4, 1985, a group of the Environmental Protection

16 Agency's ("EPA") Toxicology Branch published a memorandum classifying

17 glyphosate as a Category C oncogene[4]. Category C oncogenes are possible human

18 carcinogens with limited evidence of carcinogenicity.

19       47.    In 1986, the EPA issued a Registration Standard for glyphosate

20 (NTIS PB87-103214). The Registration standard required additional

21 phytotoxicity, environmental fate, toxicology, product chemistry, and residue

22 chemistry studies. All of the data required was submitted and reviewed and/or

23 waived[5].

24       48.    In October 1991, the EPA published a Memorandum entitled

25

26 [3] Monsanto Guilty in 'False Ad' Row, BBC, Oct. 15, 2009, available at
http://news.bbc.co.uk/2/hi/europe/8308903.stm.

27 [4] Consensus Review of Glyphosate, Casewell No. 661A. March 4, 1985. United States Environmental Protection
Agency.

28 [5] http://www.epa.gov/oppsrrd1/reregistration/REDs/factsheets/0178fact.pdf

PLAINTIFF'S COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

1    "Second Peer Review of Glyphosate." The memorandum changed glyphosate's

2    classification to Group E (evidence of non-carcinogenicity for humans). Two peer

3    review committee members did not concur with the conclusions of the committee

4    and one member refused to sign.[6]

5        49.    In addition to the toxicity of the active molecule, many studies

6    support the hypothesis that glyphosate formulations found in Defendants'

7    Roundup products are more dangerous and toxic than glyphosate alone.[7] As early

8    as 1991, evidence existed demonstrating that glyphosate formulations were

9    significantly more toxic than glyphosate alone. [8]

10       50.    In 2002, Julie Marc published a study entitled "Pesticide Roundup

11   Provokes Cell Division Dysfunction at the Level of CDK1/Cyclin B Activation."

12       51.    The study found that Defendants' Roundup caused delays in the cell

13   cycles of sea urchins, while the same concentrations of glyphosate alone proved

14   ineffective and did not alter cell cycles.

15       52.    In 2004, Julie Marc published a study entitled "Glyphosate-based

16   pesticides affect cell cycle regulation." The study demonstrated a molecular link

17   between glyphosate-based products and cell cycle dysregulation.

18       53.    The study noted that "cell-cycle dysregulation is a hallmark of tumor

19   cells and human cancer. Failure in the cell-cycle checkpoints leads to genomic

20   instability and subsequent development of cancers from the initial affected cell."

21   Further, "[s]ince cell cycle disorders such as cancer result from dysfunction of

22   unique cell, it was of interest to evaluate the threshold dose of glyphosate affecting

23   cells."[9]

24       54.    In 2005, Francisco Peixoto published a study showing that

25   Roundup's effects on rat liver mitochondria are much more toxic and harmful than

26   _____

27   [6] Second Peer Review of Glyphosate, CAS No. 1071-83-6. October 30, 1881. United States Environmental
     Protection Agency.
     [7] Martinez et al. 2007; Benachour 2009; Gasnier et al. 2010; Peixoto 2005; Marc 2004

28   [8] Martinez et al 1991
     [9] (Molinari, 2000; Stewart et al., 2003)

PLAINTIFF'S COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

the same concentrations of glyphosate alone.

55.     The Peixoto study suggested that the harmful effects of Roundup on mitochondrial bioenergetics could not be exclusively attributed to glyphosate and could be the result of other chemicals, namely the surfactant POEA, or alternatively due to the possible synergy between glyphosate and Roundup formulation products.

56.     In 2009, Nora Benachour and Gilles-Eric Seralini published a study examining the effects of Roundup and glyphosate on human umbilical, embryonic, and placental cells.

57.     The study used dilution levels of Roundup and glyphosate far below agricultural recommendations, corresponding with low levels of residues in food. The study concluded that supposed "inert" ingredients, and possibly POEA, change human cell permeability and amplify toxicity of glyphosate alone. The study further suggested that determinations of glyphosate toxicity should take into account the presence of adjuvants, or those chemicals used in the formulation of the complete pesticide. The study confirmed that the adjuvants in Roundup are not inert and that Roundup is always more toxic than its active ingredient glyphosate.

58.     The results of these studies were confirmed in recently published peer-reviewed studies and were at all times available and/or known to Defendants.

59.     Defendants knew or should have known that Roundup is more toxic than glyphosate alone and that safety studies on Roundup, Roundup's adjuvants and "inert" ingredients, and/or the surfactant POEA were necessary to protect Plaintiff from Roundup.

60.     Defendants knew or should have known that tests limited to Roundup's active ingredient glyphosate were insufficient to prove the safety of Roundup.

61.     Defendants failed to appropriately and adequately test Roundup, Roundup's adjuvants and "inert" ingredients, and/or the surfactant POEA to

1    protect Plaintiff from Roundup.

2        62.    Rather than performing appropriate tests, Defendants relied upon

3    flawed industry supported studies designed to protect Defendants' economic

4    interests rather than Plaintiff and the consuming public.

5        63.    Despite their knowledge that Roundup was considerably more

6    dangerous than glyphosate alone, Defendants continued to promote Roundup as

7    safe.

8                    **IARC CLASSIFICATION OF GLYPHOSATE**

9        64.    The International Agency for Research on Cancer ("IARC") is the

10   specialized intergovernmental cancer agency the World Health Organization

11   ("WHO") of the United Nations tasked with conducting and coordinating research

12   into the causes of cancer.

13       65.    An IARC Advisory Group to Recommend Priorities for IARC

14   Monographs during 2015–2019 met in April 2014. Though nominations for the

15   review were solicited, a substance must meet two criteria to be eligible for review

16   by the IARC Monographs: there must already be some evidence of

17   carcinogenicity of the substance, and there must be evidence that humans are

18   exposed to the substance.

19       66.    IARC set glyphosate for review in 2015-2016. IARC uses five

20   criteria for determining priority in reviewing chemicals. The substance must have

21   a potential for direct impact on public health; scientific literature to support

22   suspicion of carcinogenicity; evidence of significant human exposure; high public

23   interest and/or potential to bring clarity to a controversial area and/or reduce

24   public anxiety or concern; related agents similar to one given high priority by the

25   above considerations. Data reviewed is sourced preferably from publicly

26   accessible, peer-reviewed data.

27       67.    On March 24, 2015, after its cumulative review of human, animal,

28   and DNA studies for more than one (1) year, many of which have been in

---

13

PLAINTIFF'S COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

1    Defendants' possession since as early as 1985, the IARC's working group

2    published its conclusion that the glyphosate contained in Defendants' Roundup

3    herbicide, is a Class 2A "probable carcinogen" as demonstrated by the

4    mechanistic evidence of carcinogenicity in humans and sufficient evidence of

5    carcinogenicity in animals.

6        68.    The IARC's full Monograph was published on July 29, 2015 and

7    established glyphosate as a class 2A probable carcinogen to humans. According to

8    the authors glyphosate demonstrated sufficient mechanistic evidence (genotoxicity

9    and oxidative stress) to warrant a 2A classification based on evidence of

10   carcinogenicity in humans and animals.

11       69.    The IARC Working Group found an increased risk between

12   exposure to glyphosate and non-Hodgkin's lymphoma ("NHL") and several

13   subtypes of NHL, and the increased risk continued after adjustment for other

14   pesticides.

15       70.    The IARC also found that glyphosate caused DNA and chromosomal

16   damage in human cells.

17       71.    Despite the new classification by the IARC, Defendants have had

18   ample evidence of glyphosate and Roundup's genotoxic properties for decades.

19       72.    Genotoxicity refers to chemical agents that are capable of damaging

20   the DNA within a cell through genetic mutations, which is a process that is

21   believed to lead to cancer.

22       73.    In 1997, Chris Clements published "Genotoxicity of select

23   herbicides in Rana catesbeiana tadpoles using the alkaline single-cell gel DNA

24   electrophoresis (comet) assay."

25       74.    The study found that tadpoles exposed to Roundup showed

26   significant DNA damage when compared with unexposed control animals.

27       75.    Both human and animal studies have shown that glyphosate and

28   glyphosate-based formulations such as Roundup can induce oxidative stress.

PLAINTIFF'S COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

76.     Oxidative stress and associated chronic inflammation are believed to be involved in carcinogenesis.

77.     The IARC Monograph notes that "[s]trong evidence exists that glyphosate, AMPA and glyphosate-based formulations can induce oxidative stress."

78.     In 2006, César Paz-y-Miño published a study examining DNA damage in human subjects exposed to glyphosate.

79.     The study produced evidence of chromosomal damage in blood cells showing significantly greater damage after exposure to glyphosate than before in the same individuals, suggesting that the glyphosate formulation used during aerial spraying had a genotoxic effect on exposed individuals.

80.     The IARC Monograph reflects the volume of evidence of glyphosate pesticides' genotoxicity noting "[t]he evidence for genotoxicity caused by glyphosate-based formulations is strong."

81.     Despite knowledge to the contrary, Defendants maintain that there is no evidence that Roundup is genotoxic, and that regulatory authorities and independent experts are in agreement that Roundup is not genotoxic.

82.     In addition to glyphosate and Roundup's genotoxic properties, Defendants have long been aware of glyphosate's carcinogenic properties.

83.     Glyphosate and Roundup in particular have long been associated with carcinogenicity and the development of numerous forms of cancer, including, but not limited to, non-Hodgkin's lymphoma, Hodgkin's lymphoma, multiple myeloma, and soft tissue sarcoma.

84.     Defendants have known of this association since the early to mid-1980s and numerous human and animal studies have evidenced the carcinogenicity of glyphosate and/or Roundup.

85.     In 1985, the EPA studied the effects of glyphosate in mice finding a dose related response in male mice linked to renal tubal adenomas, a rare tumor.

The study concluded the glyphosate was oncogenic.

86.     In 2003, Lennart Hardell and Mikael Eriksson published the results of two case controlled studies on pesticides as a risk factor for NHL and hairy cell leukemia.

87.     The study concluded that glyphosate had the most significant relationship to NHL among all herbicides studies with an increased odds ratio of 3.11.

88.     In 2003 AJ De Roos published a study examining the pooled data of mid-western farmers, examining pesticides and herbicides as risk factors for NHL.

89.     The study, which controlled for potential confounders, found a relationship between increased NHL incidence and glyphosate.

90.     In 2008 Mikael Eriksson published a population based case-control study of exposure to various pesticides as a risk factor for NHL.

91.     This strengthened previous associations between glyphosate and NHL.

92.     In spite of this knowledge, Defendants continued to issue broad and sweeping statements suggesting that Roundup was, and is, safer than ordinary household items such as table salt, despite a lack of scientific support for the accuracy and validity of these statements and, in fact, voluminous evidence to the contrary.

93.     Upon information and belief, these statements and representations have been made with the intent of inducing Plaintiff, the agricultural community, and the public at large to purchase, and increase the use of, Defendants' Roundup for Defendants' pecuniary gain, and in fact did induce Plaintiff to use Roundup.

94.     Defendants made these statements with complete disregard and reckless indifference to the safety of Plaintiff and the general public.

95.     Notwithstanding Defendants' representations, scientific evidence has established a clear association between glyphosate and genotoxicity,

PLAINTIFF'S COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

1  inflammation, and an increased risk of many cancers, including, but not limited to,

2  NHL, Multiple Myeloma, and soft tissue sarcoma.

3      96.    Defendants knew or should have known that glyphosate is associated

4  with an increased risk of developing cancer, including, but not limited to, NHL,

5  Multiple Myeloma, and soft tissue sarcomas.

6      97.    Defendants failed to appropriately and adequately inform and warn

7  Plaintiff of the serious and dangerous risks associated with the use of and

8  exposure to glyphosate and/or Roundup, including, but not limited to, the risk of

9  developing NHL, as well as other severe and personal injuries, which are

10  permanent and/or long-lasting in nature, cause significant physical pain and

11  mental anguish, diminished enjoyment of life, and the need for medical treatment,

12  monitoring and/or medications.

13      98.    Despite the IARC's classification of glyphosate as a class 2A

14  probable carcinogen, Defendants continue to maintain that glyphosate and/or

15  Roundup is safe, non-carcinogenic, non-genotoxic, and falsely warrant to users

16  and the general public that independent experts and regulatory agencies agree that

17  there is no evidence of carcinogenicity or genotoxicity in glyphosate and

18  Roundup.

19      99.    Defendants have claimed and continue to claim that Roundup is safe,

20  non-carcinogenic, and non-genotoxic.

21      100.    Monsanto claims on its website that "[r]egulatory authorities and

22  independent experts around the world have reviewed numerous long-

23  term/carcinogenicity and genotoxicity studies and agree that there is no evidence

24  that glyphosate, the active ingredient in Roundup brand herbicides and other

25  glyphosate-based herbicides, causes cancer, even at very high doses, and that it is

26  not genotoxic".[10]

27  _____

28  [10]Backgrounder - Glyphosate: No Evidence of Carcinogenicity. Updated November 2014. (downloaded October 9 2015)

PLAINTIFF'S COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

101.   Ironically, the primary source for this statement is a 1986 report by the WHO, the same organization that now considers glyphosate to be a probable carcinogen.

102.   Glyphosate, and Defendants' Roundup products in particular, have long been associated with serious side effects and many regulatory agencies around the globe have banned or are currently banning the use of glyphosate herbicide products.

103.   Defendants' statements proclaiming the safety of Roundup and disregarding its dangers misled Plaintiff.

104.   Despite Defendants' knowledge that Roundup was associated with an elevated risk of developing cancer, Defendants' promotional campaigns focused on Roundup's purported "safety profile."

105.   Defendants' failure to adequately warn Plaintiff resulted in (1) Plaintiff using and being exposed to glyphosate instead of using another acceptable and safe method of controlling unwanted weeds and pests; and (2) scientists and physicians failing to warn and instruct consumers about the risk of cancer, including NHL, and other injuries associated with Roundup.

106.   Defendants failed to seek modification of the labeling of Roundup to include relevant information regarding the risks and dangers associated with Roundup exposure.

107.   The failure of Defendants to appropriately warn and inform the EPA has resulted in inadequate warnings in safety information presented directly to users and consumers.

108.   The failure of Defendants to appropriately warn and inform the EPA has resulted in the absence of warning or caution statements that are adequate to protect health and the environment.

109.   The failure of Defendants to appropriately warn and inform the EPA has resulted in the directions for use that are not adequate to protect health and the

PLAINTIFF'S COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

1   environment.

2       110.   By reason of the foregoing acts and omissions, Plaintiff seeks

3   compensatory damages   as a result of Plaintiff's use of, and exposure to, Roundup

4   which caused or was a substantial   contributing factor in causing Plaintiff to

5   suffer from cancer, specifically NHL, and Plaintiff suffered severe and personal

6   injuries which are permanent and lasting in nature, physical pain and mental

7   anguish, including diminished enjoyment of life.

8       111.   By reason of the foregoing, Plaintiff is severely and permanently

9   injured.

10       112.   By reason of the foregoing acts and omissions, Plaintiff has endured

11   and continues to suffer, emotional and mental anguish, medical expenses, and

12   other economic and non-economic damages, as a result of the actions and

13   inactions of the Defendants.

14              **PLAINTIFF'S EXPOSURE TO ROUNDUP**

15       113.   Plaintiff was a part owner of a lawn maintenance company in

16   Nashville, Tennessee.

17       114.   Plaintiff used Roundup beginning in the 1970's to control weeds on

18   the properties she had contracts for. Plaintiff used the product on a monthly,

19   sometimes weekly basis, depending on the business volume at any given time.

20   Plaintiff also stored industrial strength Roundup in the basement of her home until

21   her company was large enough to expand to a commercial warehouse.

22       115.   In or around 1979, Plaintiff moved to Ohio where she continued to

23   use the same Roundup product used in her lawn maintenance business in and

24   around her property. Plaintiff lived in Ohio and regularly used Roundup for

25   approximately ten (10) years. In or around 1990, Plaintiff moved back to

26   Tennessee where she continued us Roundup consistently for decades.

27       116.   For many years, Plaintiff sprayed Roundup on a regular basis.

28   Plaintiff followed all safety and precautionary warnings during the course of her

1    use.

2       117.   Between the 1970's through 2020, Plaintiff used Roundup regularly

3    in her lawn maintenance business and in and around her home, located in both

4    Ohio and Tennessee.

5       118.   Plaintiff was subsequently diagnosed with Non-Hodgkin Lymphoma

6    in March of 2020.

7       119.   As a result of her injury, Plaintiff has incurred significant economic

8    and non-economic damages.

9            **EQUITABLE TOLLING OF APPLICABLE STATUTE OF**

10                              **LIMITATIONS**.

11      120.   Plaintiff incorporates by reference all prior paragraphs of this

12   Complaint as if fully set forth herein.

13      121.   The running of any statute of limitations has been tolled by reason of

14   Defendants' fraudulent concealment. Defendants, through their affirmative

15   misrepresentations and omissions, actively concealed from Plaintiff the true risks

16   associated with Roundup and glyphosate. Indeed, even as of today, Defendants

17   continue to represent to the public that there is no evidence glyphosate causes

18   cancer.

19      122.   As a result of Defendants' actions, Plaintiff was unaware, and could

20   not reasonably know or have learned through reasonable diligence that Roundup

21   and/or glyphosate contact, exposed Plaintiff to the risks alleged herein and that

22   those risks were the direct and proximate result of Defendants' acts and omissions.

23      123.   Furthermore, Defendants are estopped from relying on any statute of

24   limitations defense because of their fraudulent concealment of the true character,

25   quality and nature of Roundup. Defendants were under a duty to disclose the true

26   character, quality, and nature of Roundup because this was non-public information

27   over which Defendants had and continue to have exclusive control, and because

28   Defendants knew that this information was not available to Plaintiff or to

---

20

PLAINTIFF'S COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

1    distributors of Roundup. In addition, Defendants are estopped from relying on any

2    statute of limitations defense because of their intentional concealment of these

3    facts.

4        124.   Plaintiff had no knowledge that Defendants were engaged in the

5    wrongdoing alleged herein. Because of the fraudulent acts of concealment of

6    wrongdoing by Defendants, Plaintiff could not have reasonably discovered the

7    wrongdoing at any time prior. Also, the economics of this fraud should be

8    considered. Defendants had the ability to and did spend enormous amounts of

9    money in furtherance of their purpose of marketing, promoting and/or distributing

10   a profitable herbicide, notwithstanding the known or reasonably known risks.

11   Plaintiff and medical professionals could not have afforded and could not have

12   possibly conducted studies to determine the true nature, extent, and identity of

13   related health risks, and were forced to rely on only the Defendants'

14   representations as a result. Accordingly, Defendants are precluded by the

15   discovery rule and/or the doctrine of fraudulent concealment from relying upon

16   any statute of limitations as a defense.

17                      **FIRST CAUSE OF ACTION**

18                          **(NEGLIGENCE)**

19       125.   Plaintiff repeats, reiterates, and re-alleges each and every allegation

20   of this Complaint contained in each of the foregoing paragraphs inclusive, with

21   the same force and effect as if more fully set forth herein.

22       126.   Defendants had a duty to exercise reasonable care in the designing,

23   researching, testing, manufacturing, marketing, supplying, promoting, packaging,

24   sale, and/or distribution of Roundup into the stream of commerce, including a duty

25   to assure that the product would not cause users to suffer unreasonable, dangerous

26   side effects.

27       127.   Defendants failed to exercise ordinary care in the designing,

28   researching, testing, manufacturing, marketing, supplying, promoting, packaging,

PLAINTIFF'S COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

1 sale, testing, quality assurance, quality control, and/or distribution of Roundup

2 into interstate commerce in that Defendants knew or should have known that using

3 Roundup created a high risk of unreasonable, dangerous side effects, including,

4 but not limited to, the development of NHL, as well as other severe and personal

5 injuries which are permanent and lasting in nature, physical pain and mental

6 anguish, including diminished enjoyment of life, as well as need for lifelong

7 medical treatment, monitoring, and/or medications.

8     128.   The negligence by the Defendants, their agents, servants, and/or

9 employees, included but was not limited to the following acts and/or omissions:

10     (a) Manufacturing, producing, promoting, formulating, creating, and/or

11         designing Roundup without thoroughly testing it;

12     (b) Failing to test Roundup and/or failing to adequately, sufficiently, and

13         properly test Roundup;

14     (c) Not conducting sufficient testing programs to determine whether or not

15         Roundup was safe for use; in that Defendants herein knew or should have

16         known that Roundup was unsafe and unfit for use by reason of the dangers

17         to its users;

18     (d) Not conducting sufficient testing programs and studies to determine

19         Roundup's carcinogenic properties even after Defendants had knowledge

20         that Roundup is, was, or could be carcinogenic;

21     (e) Failing to conduct sufficient testing programs to determine the safety of

22         "inert" ingredients and/or adjuvants contained within Roundup, and the

23         propensity of these ingredients to render Roundup toxic, increase the

24         toxicity of Roundup, whether these ingredients are carcinogenic, magnify

25         the carcinogenic properties of Roundup, and whether or not "inert"

26         ingredients and/or adjuvants were safe for use;

27     (f) Negligently failing to adequately and correctly warn the Plaintiff, the

28         public, the medical and agricultural professions, and the EPA of the

dangers of Roundup;

(g) Negligently failing to petition the EPA to strength the warnings associated with Roundup;

(h) Failing to provide adequate cautions and warnings to protect the health of users, handlers, applicators, and persons who would reasonably and foreseeably come into contact with Roundup;

(i) Negligently marketing, advertising, and recommending the use of Roundup without sufficient knowledge as to its dangerous propensities;

(j) Negligently representing that Roundup was safe for use for its intended purpose, and/or that Roundup was safer than ordinary and common items such as table salt, when, in fact, it was unsafe;

(k) Negligently representing that Roundup had equivalent safety and efficacy as other forms of herbicides;

(l) Negligently designing Roundup in a manner, which was dangerous to its users;

(m) Negligently manufacturing Roundup in a manner, which was dangerous to its users;

(n) Negligently producing Roundup in a manner, which was dangerous to its users;

(o) Negligently formulating Roundup in a manner, which was dangerous to its users;

(p) Concealing information from the Plaintiff while knowing that Roundup was unsafe, dangerous, and/or non-conforming with EPA regulations; and

(q) Improperly concealing and/or misrepresenting information from the Plaintiff, scientific and medical professionals, and/or the EPA, concerning the severity of risks and dangers of Roundup compared to other forms of herbicides.

(r) Negligently selling Roundup with a false and misleading label.

PLAINTIFF'S COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

129.   Defendants under-reported, underestimated, and downplayed the serious dangers of Roundup.

130.   Defendants negligently and deceptively compared the safety risks and/or dangers of Roundup with common everyday foods such as table salt, and other forms of herbicides.

131.   Defendants were negligent and/or violated California law in the designing, researching, supplying, manufacturing, promoting, packaging, distributing, testing, advertising, warning, marketing, and selling of Roundup in that they:

(a) Failed to use ordinary care in designing and manufacturing Roundup so as to avoid the aforementioned risks to individuals when Roundup was used as an herbicide;

(b) Failed to accompany their product with proper and/or accurate warnings regarding all possible adverse side effects associated with the use of Roundup;

(c) Failed to accompany their product with proper warnings regarding all possible adverse side effects concerning the failure and/or malfunction of Roundup;

(d) Failed to accompany their product with accurate warnings regarding the risks of all possible adverse side effects concerning Roundup;

(e) Failed to warn Plaintiff of the severity and duration of such adverse effects, as the warnings given did not accurately reflect the symptoms, or severity of the side effects including, but not limited to, the development of NHL;

(f) Failed to conduct adequate testing, clinical testing and post-marketing surveillance to determine the safety of Roundup;

(g) Failed to conduct adequate testing, clinical testing, and post-marketing surveillance to determine the safety of Roundup's "inert" ingredients and/or adjuvants;

PLAINTIFF'S COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

(h) Negligently misrepresented the evidence of Roundup's genotoxicity and carcinogenicity;

(i) Were otherwise careless and/or negligent.

132.   Despite the fact that Defendants knew or should have known that Roundup caused, or could cause, unreasonably dangerous side effects, Defendants continued and continue to market, manufacture, distribute, and/or sell Roundup to consumers, including the Plaintiff.

133.   Defendants knew or should have known that consumers such as the Plaintiff would foreseeably suffer injury as a result of Defendants' failure to exercise ordinary care, as set forth above.

134.   Defendants' violations of law and/or negligence were the proximate cause of Plaintiff's injuries, harm and economic loss, which Plaintiff suffered and/or will continue to suffer.

135.   As a result of the foregoing acts and omissions, the Plaintiff suffered from serious and dangerous side effects including, but not limited to, NHL, as well as other severe and personal injuries which are permanent and lasting in nature, physical pain and mental anguish, diminished enjoyment of life, and financial expenses for hospitalization and medical care. Further, Plaintiff suffered life-threatening NHL, and severe personal injuries, which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life.

136.   WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in   Plaintiff's favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all relief as this Court deems just and proper. Additionally, Plaintiff demands a jury trial on all issues contained herein.

## SECOND CAUSE OF ACTION (STRICT PRODUCTS LIABILITY – DESIGN DEFECT)

137.   Plaintiff repeats, reiterates and, re-alleges each and every allegation

25

1  of this Complaint contained in each of the foregoing paragraphs inclusive, with

2  the same force and effect as if more fully set forth herein.

3       138.   At all times herein mentioned, the Defendants designed, researched,

4  manufactured, tested, advertised, promoted, sold, distributed, and/or have acquired

5  the Defendants who have designed, researched, tested, advertised, promoted,

6  marketed, sold, and distributed Roundup as hereinabove described that was used

7  by the Plaintiff.

8       139.   Defendants' Roundup was expected to and did reach the usual

9  consumers, handlers, and persons coming into contact with said product without

10  substantial change in the condition in which it was produced, manufactured, sold,

11  distributed, and marketed by the Defendants.

12       140.   At those times, Roundup was in an unsafe, defective, and inherently

13  dangerous condition, which was dangerous to users, and in particular, the Plaintiff

14  herein.

15       141.   The Roundup designed, researched, manufactured, tested, advertised,

16  promoted, marketed, sold, and distributed by Defendants was defective in design

17  or formulation in that, when it left the hands of the manufacturer and/or suppliers,

18  the foreseeable risks exceeded the benefits associated with the design or

19  formulation of Roundup.

20       142.   The Roundup designed, researched, manufactured, tested, advertised,

21  promoted, marketed, sold, and distributed by Defendants was defective in design

22  and/or formulation, in that, when it left the hands of the Defendants manufacturers

23  and/or suppliers, it was unreasonably dangerous, unreasonably dangerous in

24  normal use, and it was more dangerous than an ordinary consumer would expect.

25       143.   At all times herein mentioned, Roundup was in a defective condition

26  and unsafe, and Defendants knew or had reason to know that said product was

27  defective and unsafe, especially when used in the form and manner as provided by

28  the Defendants. In particular, Defendants' Roundup was defective in the following

PLAINTIFF'S COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

ways:

 (a) When placed in the stream of commerce, Defendants' Roundup Products
were defective in design and formulation and, consequently, dangerous to
an extent beyond that which an ordinary consumer would anticipate.

 (b) When placed in the stream of commerce, Defendants' Roundup products
were unreasonably dangerous in that they were hazardous and posed a grave
risk of cancer and other serious illnesses when used in a reasonably
anticipated manner.

 (c) When placed in the stream of commerce, Defendants' Roundup products
contained unreasonably dangerous design defects and were not reasonably
safe when used in a reasonably anticipated manner.

 (d) Defendants did not sufficiently test, investigate, or study its Roundup
products.

 (e) Exposure to Roundup presents a risk of harmful side effects that outweigh
any potential utility stemming from the use of the herbicide.

 (f) Defendants new or should have known at the time of marketing its
Roundup products that exposure to Roundup could result in cancer and
other severe illnesses and injuries.

 (g) Defendants did not conduct adequate post-marketing surveillance of its
Roundup products.

144. Defendants knew, or should have known, that at all times herein
mentioned its Roundup was in a defective condition, and was and is inherently
dangerous and unsafe.

145. Plaintiff was exposed to Defendants' Roundup in the course of her
employment and in her every day use, as described above, without knowledge of
Roundup's dangerous characteristics.

146. At the time of the Plaintiff's use of and exposure to Roundup,
Roundup was being used for the purposes and in a manner normally intended, as a

1    broad-spectrum herbicide.

2        147.    Defendants with this knowledge voluntarily designed its Roundup

3    with a dangerous condition for use by the public, and in particular the Plaintiff.

4        148.    Defendants had a duty to create a product that was not unreasonably

5    dangerous for its normal, intended use.

6        149.    Defendants created a product that was and is unreasonably dangerous

7    for its normal, intended use.

8        150.    Defendants marketed and promoted a product in such a manner so as

9    to make it inherently defective as the product downplayed its suspected, probable,

10   and established health risks inherent with its normal, intended use.

11       151.    The Roundup designed, researched, manufactured, tested, advertised,

12   promoted, marketed, sold, and distributed by Defendants was manufactured

13   defectively in that Roundup left the hands of Defendants in a defective condition

14   and was unreasonably dangerous to its intended users.

15       152.    The Roundup designed, researched, manufactured, tested, advertised,

16   promoted, marketed, sold, and distributed by Defendants reached their intended

17   users in the same defective and unreasonably dangerous condition in which the

18   Defendants' Roundup was manufactured.

19       153.    Defendants designed, researched, manufactured, tested, advertised,

20   promoted, marketed, sold, and distributed a defective product, which created an

21   unreasonable risk to the health of consumers and to the Plaintiff in particular, and

22   Defendants are therefore strictly liable for the injuries sustained by the Plaintiff.

23       154.    The Plaintiff could not, by the exercise of reasonable care, have

24   discovered Roundup's defects herein mentioned or perceived its danger.

25       155.    By reason of the foregoing, the Defendants have become strictly

26   liable to the Plaintiff for the manufacturing, marketing, promoting, distribution,

27   and selling of a defective product, Roundup.

28       156.    Defendants' defective design, of Roundup amounts to willful,

PLAINTIFF'S COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

1    wanton, and/or reckless conduct by Defendants.

2       157.   Defects in Defendants' Roundup were the cause or a substantial

3    factor in causing Plaintiff's injuries.

4       158.   As a result of the foregoing acts and omission, the Plaintiff developed

5    NHL, and suffered severe and personal injuries, which are permanent and lasting

6    in nature, physical pain and mental anguish, including diminished enjoyment of

7    life, and financial expenses for hospitalization and medical care.

8       159.   WHEREFORE, Plaintiff respectfully requests that this Court enter

9    judgment in Plaintiff's favor for compensatory and punitive damages, together

10   with interest, costs herein incurred, attorneys' fees and all relief as this Court

11   deems just and proper. Additionally, Plaintiff demands a jury trial on all issues

12   contained herein.

13              **THIRD CAUSE OF ACTION**

14      **(STRICT PRODUCTS LIABILITY – FAILURE TO WARN)**

15      160.   Plaintiff repeats, reiterates and, re-alleges each and every allegation

16   of this Complaint contained in each of the foregoing paragraphs inclusive, with

17   the same force and effect as if more fully set forth herein.

18      161.   Defendants have engaged in the business of selling, testing,

19   distributing, supplying, manufacturing, marketing, and/or promoting Roundup,

20   and through that conduct have knowingly and intentionally placed Roundup into

21   the stream of commerce with full knowledge that it reaches consumers such as

22   Plaintiff who are exposed to it through ordinary and reasonably foreseeable uses.

23      162.   Defendants did in fact sell, distribute, supply, manufacture, and/or

24   promote Roundup to Plaintiff. Additionally, Defendants expected the Roundup

25   that they were selling, distributing, supplying, manufacturing, and/or promoting to

26   reach – and Roundup did in fact reach – consumers, including Plaintiff, without

27   any substantial change in the condition of the product from when it was initially

28   distributed by Defendants.

163.   At the time of manufacture, Defendant could have provided the warnings or instructions regarding the full and complete risks of Roundup and glyphosate-containing products because it knew or should have known of the unreasonable risks of harm associated with the use of and/or exposure to such products.

164.   At all times herein mentioned, the aforesaid product was defective and unsafe in manufacture such that it was unreasonably dangerous to the user, and was so at the time it was distributed by Defendants and at the time Plaintiff was exposed to and/or ingested the product. The defective condition of Roundup was due in part to the fact that it was not accompanied by proper warnings regarding its carcinogenic qualities and possible side effects, including, but not limited to, developing non-Hodgkin's lymphoma as a result of exposure and use.

165.   Roundup did not contain a warning or caution statement, which was necessary and, if complied with, was adequate to protect the health of those exposed in violation of 7 U.S.C. § 136j(a)(1)(E).

166.   Defendants' failure to include a warning or caution statement which was necessary and, if complied with, was adequate to protect the health of those exposed, violated 7 U.S.C. § 136j(a)(1)(E) as well as the laws of the State of California.

167.   Defendants could have amended the label of Roundup to provide additional warnings.

168.   This defect caused serious injury to Plaintiff, who used Roundup in its intended and foreseeable manner.

169.   At all times herein mentioned, Defendants had a duty to properly design, manufacture, compound, test, inspect, package, label, distribute, market, examine, maintain supply, provide proper warnings, and take such steps to assure that the product did not cause users to suffer from unreasonable and dangerous side effects.

PLAINTIFF'S COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

170.   Defendants labeled, distributed, and promoted the aforesaid product that it was dangerous and unsafe for the use and purpose for which it was intended.

171.   Defendants failed to warn of the nature and scope of the side effects associated with Roundup, namely its carcinogenic properties and its propensity to cause or serve as a substantial contributing factor in the development of NHL.

172.   Defendants were aware of the probable consequences of the aforesaid conduct. Despite the fact that Defendants knew or should have known that Roundup caused serious injuries, Defendants failed to exercise reasonable care to warn of the dangerous carcinogenic properties and side effect of developing NHL from Roundup exposure, even though these side effects were known or reasonably scientifically knowable at the time of distribution. Defendants willfully and deliberately failed to avoid the consequences associated with their failure to warn, and in doing so, Defendants acted with a conscious disregard for the safety of Plaintiff.

173.   At the time of exposure, Plaintiff could not have reasonably discovered any defect in Roundup prior through the exercise of reasonable care.

174.   Defendants, as the manufacturers and/or distributors of the subject product, are held to the level of knowledge of an expert in the field.

175.   Plaintiff reasonably relied upon the skill, superior knowledge, and judgment of Defendants.

176.   Had Defendants properly disclosed the risks associated with Roundup, Plaintiff would have avoided the risk of NHL by not using Roundup.

177.   The information that Defendants did provide or communicate failed to contain adequate warnings and precautions that would have enabled Plaintiff, and similarly situated individuals, to utilize the product safely and with adequate protection. Instead, Defendants disseminated information that was inaccurate, false, and misleading and which failed to communicate accurately or adequately

PLAINTIFF'S COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

1    the comparative severity, duration, and extent of the risk of injuries associated

2    with use of and/or exposure to Roundup and glyphosate; continued to promote the

3    efficacy of Roundup, even after it knew or should have known of the unreasonable

4    risks from use or exposure; and concealed, downplayed, or otherwise suppressed,

5    through aggressive marketing and promotion, any information or research about

6    the risks and dangers of exposure to Roundup and glyphosate.

7        178.   To this day, Defendants have failed to adequately warn of the true

8    risks of Plaintiff's injuries associated with the use of and exposure to Roundup.

9        179.   As a result of their inadequate warnings, Defendants' Roundup

10   products were defective and unreasonably dangerous when they left the possession

11   and/or control of Defendant, were distributed by Defendant, and used by Plaintiff.

12       180.   As a direct and proximate result of Defendants' actions as alleged

13   herein, and in such other ways to be later shown, the subject product caused

14   Plaintiff to sustain injuries as herein alleged.

15       181.   WHEREFORE, Plaintiff respectfully requests that this Court enter

16   judgment in Plaintiff's favor for compensatory and punitive damages, together

17   with interest, costs herein incurred, attorneys' fees and all relief as this Court

18   deems just and proper. Additionally, Plaintiff demands a jury trial on all issues

19   contained herein.

20               **FOURTH CAUSE OF ACTION**

21          **(BREACH OF IMPLIED WARRANTIES)**

22       182.   Plaintiff repeats, reiterates, and re-alleges each and every allegation

23   of this Complaint contained in each of the foregoing paragraphs inclusive, with

24   the same force and effect all if more fully set forth herein.

25       183.   At all times herein mentioned, the Defendants manufactured,

26   distributed, compounded, recommended, merchandized, advertised, promoted, and

27   sold Roundup and/or have recently acquired the Defendants who have

28   manufactured, compound portrayed, distributed, recommended, merchandized,

advertised, promoted, and sold Roundup, as a broad spectrum herbicide. These actions were under the ultimate control and supervision of Defendants.

184.   At the time Defendants marketed, sold, and distributed Roundup for use by Plaintiff, Defendants knew of Roundup's intended use and impliedly warranted the product to be or merchantable quality and safe and fit for this use.

185.   The Defendants impliedly represented and warranted to Plaintiff and users of Roundup, the agricultural community, and/or the EPA that Roundup was safe and of merchantable quality and fit for the ordinary purpose for which it was to be used.

186.   These representations and warranties were false, misleading, and inaccurate in that Roundup was unsafe, unreasonably dangerous, not of merchantable quality, and defective.

187.   Plaintiff and/or the EPA did rely on said implied warranty of merchantability of fitness for particular use and purpose.

188.   Plaintiff reasonably relied upon the skill and judgment of Defendants as to whether Roundup was of merchantable quality and safe and fit for its intended use.

189.   Roundup was injected into the stream of commerce by the Defendants in a defective, unsafe, and inherently dangerous condition, and the products' materials were expected to and did reach users, handlers, and persons coming into contact with said products without substantial change in the condition in which they were sold.

190.   The Defendants breached the aforesaid implied warranties, as their herbicide Roundup was not fit for its intended purposes and uses.

191.   As a result of the foregoing acts and omissions, Plaintiff suffered from NHL and Plaintiff suffered severe and personal injuries which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life, financial expenses for hospitalization and medical care,

1    including medical expenses and other economic, and non-economic damages.

2        192.   WHEREFORE, Plaintiff respectfully requests that this Court enter

3    judgment in Plaintiff's favor for compensatory and punitive damages, together

4    with interest, costs herein incurred, attorneys' fees and all relief as this Court

5    deems just and proper. Additionally, Plaintiff demands a jury trial on all issues

6    contained herein.

7                            **PRAYER FOR RELIEF**

8        WHEREFORE, Plaintiff SADIE HUNTER prays for damages and other

9    judicial relief against all Defendants as follows:

10       1.    Awarding compensatory damages in excess of the jurisdictional

11             amount, including, but not limited to pain, suffering, emotional

12             distress, loss of enjoyment of life, and other non-economic damages

13             in an amount to be determined at trial of this action;

14       2.    Awarding compensatory damages to Plaintiff for past and future

15             damages, including, but not limited to, Plaintiff's pain and suffering

16             and for severe and permanent personal injuries sustained by the

17             Plaintiff including health care costs and economic loss;

18       3.    Awarding economic damages in the form of medical expenses, out of

19             pocket expenses, lost earnings and other economic damages in an

20             amount to be determine at trial of this action;

21       4.    Punitive and/or exemplary damages for the wanton, willful,

22             fraudulent, and reckless acts of the Defendants who demonstrated a

23             complete disregard and reckless indifference for the safety and

24             welfare of the general public and to the Plaintiff in an amount

25             sufficient to punish Defendants and deter future similar conduct, to

26             the extent allowed by applicable law

27       5.    Pre-judgment interest;

28       6.    Post-judgment interest;

7.  Awarding Plaintiff reasonable attorneys' fees;

8.  Awarding Plaintiff the costs of these proceedings; and

9.  Such other and further relief as this Court deems just and proper.

Dated: October 28, 2021          **ABIR COHEN TREYZON SALO, LLP**


By: /s/ Michael P. Kelly
       Boris Treyzon, Esq.
       Robert W. Finnerty, Esq.
       Michael P. Kelly, Esq.
       Attorneys for Plaintiff

## **DEMAND FOR JURY TRIAL**

Plaintiff hereby respectfully demands a trial by jury as to all causes of action.


Dated: October 28, 2021          **ABIR COHEN TREYZON SALO, LLP**


By: /s/ Michael P. Kelly
       Boris Treyzon, Esq.
       Robert W. Finnerty, Esq.
       Michael P. Kelly, Esq.
       Attorneys for Plaintiff

PLAINTIFF'S COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

Case 2:21-cv-08619   Document 2   Filed 11/01/21   Page 1 of 3   Page ID #:36

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**
**CIVIL COVER SHEET**

| I. (a) PLAINTIFFS ( Check box if you are representing yourself ☐ ) | DEFENDANTS ( Check box if you are representing yourself ☐ ) |
|---|---|
| Sadie Hunter, an individual | Monsanto Company; Bayer Corporation; Does 1 though 300 |

| (b) County of Residence of First Listed Plaintiff   Davidson, TN *(EXCEPT IN U.S. PLAINTIFF CASES)* | County of Residence of First Listed Defendant   St. Louis, MO *(IN U.S. PLAINTIFF CASES ONLY)* |
|---|---|
| (c) Attorneys (*Firm Name, Address and Telephone Number*) If you are representing yourself, provide the same information. Boris Treyzon, Esq. (SBN 188893) | Michael P. Kelly, Esq. (SBN 311045) ABIR COHEN TREYZON SALO, LLP 16001 Ventura Blvd., Suite 200, Encino, CA 91436 T: (424) 288-4367 | F: (424) 288-4368 | Attorneys (*Firm Name, Address and Telephone Number*) If you are representing yourself, provide the same information. |

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

- ☐ 1. U.S. Government Plaintiff
- ☐ 3. Federal Question (U.S. Government Not a Party)
- ☐ 2. U.S. Government Defendant
- ☒ 4. Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES**-For Diversity Cases Only
(Place an X in one box for plaintiff and one for defendant)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☒ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☒ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. ORIGIN** (Place an X in one box only.)

- ☒ 1. Original Proceeding
- ☐ 2. Removed from State Court
- ☐ 3. Remanded from Appellate Court
- ☐ 4. Reinstated or Reopened
- ☐ 5. Transferred from Another District (Specify)
- ☐ 6. Multidistrict Litigation - Transfer
- ☐ 8. Multidistrict Litigation - Direct File

**V. REQUESTED IN COMPLAINT: JURY DEMAND:** ☒ Yes ☐ No   (Check "Yes" only if demanded in complaint.)

**CLASS ACTION under F.R.Cv.P. 23:** ☐ Yes ☒ No   ☐ **MONEY DEMANDED IN COMPLAINT:** $

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)
28 U.S. Code § 1332; Negligence; Strict Liability - Design Defect; Strict Liability - Failure to Warn; Breach of Implied Warranties

**VII. NATURE OF SUIT** (Place an X in one box only).

| OTHER STATUTES | CONTRACT | REAL PROPERTY CONT. | IMMIGRATION | PRISONER PETITIONS | PROPERTY RIGHTS |
|---|---|---|---|---|---|
| ☐ 375 False Claims Act | ☐ 110 Insurance | ☐ 240 Torts to Land | ☐ 462 Naturalization Application | **Habeas Corpus:** | ☐ 820 Copyrights |
| ☐ 376 Qui Tam (31 USC 3729(a)) | ☐ 120 Marine | ☐ 245 Tort Product Liability | ☐ 465 Other Immigration Actions | ☐ 463 Alien Detainee | ☐ 830 Patent |
| ☐ 400 State Reapportionment | ☐ 130 Miller Act | ☐ 290 All Other Real Property | | ☐ 510 Motions to Vacate Sentence | ☐ 835 Patent - Abbreviated New Drug Application |
| ☐ 410 Antitrust | ☐ 140 Negotiable Instrument | **TORTS** | **TORTS** | ☐ 530 General | ☐ 840 Trademark |
| ☐ 430 Banks and Banking | ☐ 150 Recovery of Overpayment & Enforcement of Judgment | **PERSONAL INJURY** | **PERSONAL PROPERTY** | ☐ 535 Death Penalty | ☐ 880 Defend Trade Secrets Act of 2016 (DTSA) |
| ☐ 450 Commerce/ICC Rates/Etc. | | ☐ 310 Airplane | ☐ 370 Other Fraud | **Other:** | |
| ☐ 460 Deportation | ☐ 151 Medicare Act | ☐ 315 Airplane Product Liability | ☐ 371 Truth in Lending | ☐ 540 Mandamus/Other | **SOCIAL SECURITY** |
| ☐ 470 Racketeer Influenced & Corrupt Org. | ☐ 152 Recovery of Defaulted Student Loan (Excl. Vet.) | ☐ 320 Assault, Libel & Slander | ☐ 380 Other Personal Property Damage | ☐ 550 Civil Rights | ☐ 861 HIA (1395ff) |
| ☐ 480 Consumer Credit | | ☐ 330 Fed. Employers' Liability | ☐ 385 Property Damage Product Liability | ☐ 555 Prison Condition | ☐ 862 Black Lung (923) |
| ☐ 485 Telephone Consumer Protection Act | ☐ 153 Recovery of Overpayment of Vet. Benefits | ☐ 340 Marine | **BANKRUPTCY** | ☐ 560 Civil Detainee Conditions of Confinement | ☐ 863 DIWC/DIWW (405 (g)) |
| ☐ 490 Cable/Sat TV | | ☐ 345 Marine Product Liability | ☐ 422 Appeal 28 USC 158 | **FORFEITURE/PENALTY** | ☐ 864 SSID Title XVI |
| ☐ 850 Securities/Commodities/Exchange | ☐ 160 Stockholders' Suits | ☐ 350 Motor Vehicle | ☐ 423 Withdrawal 28 USC 157 | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 865 RSI (405 (g)) |
| ☐ 890 Other Statutory Actions | ☐ 190 Other Contract | ☐ 355 Motor Vehicle Product Liability | **CIVIL RIGHTS** | ☐ 690 Other | **FEDERAL TAX SUITS** |
| ☐ 891 Agricultural Acts | ☐ 195 Contract Product Liability | ☐ 360 Other Personal Injury | ☐ 440 Other Civil Rights | **LABOR** | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| ☐ 893 Environmental Matters | ☐ 196 Franchise | ☐ 362 Personal Injury-Med Malpractice | ☐ 441 Voting | ☐ 710 Fair Labor Standards Act | ☐ 871 IRS-Third Party 26 USC 7609 |
| ☐ 895 Freedom of Info. Act | **REAL PROPERTY** | ☒ 365 Personal Injury-Product Liability | ☐ 442 Employment | ☐ 720 Labor/Mgmt. Relations | |
| ☐ 896 Arbitration | ☐ 210 Land Condemnation | ☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability | ☐ 443 Housing/ Accommodations | ☐ 740 Railway Labor Act | |
| ☐ 899 Admin. Procedures Act/Review of Appeal of Agency Decision | ☐ 220 Foreclosure | | ☐ 445 American with Disabilities-Employment | ☐ 751 Family and Medical Leave Act | |
| ☐ 950 Constitutionality of State Statutes | ☐ 230 Rent Lease & Ejectment | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 446 American with Disabilities-Other | ☐ 790 Other Labor Litigation | |
| | | | ☐ 448 Education | ☐ 791 Employee Ret. Inc. Security Act | |

| FOR OFFICE USE ONLY: | Case Number: |
|---|---|

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL COVER SHEET**

**VIII. VENUE:** Your answers to the questions below will determine the division of the Court to which this case will be initially assigned. This initial assignment is subject to change, in accordance with the Court's General Orders, upon review by the Court of your Complaint or Notice of Removal.

| QUESTION A: Was this case removed from state court? | STATE CASE WAS PENDING IN THE COUNTY OF: | INITIAL DIVISION IN CACD IS: |
|---|---|---|
| ☐ Yes  ☒ No | ☐ Los Angeles, Ventura, Santa Barbara, or San Luis Obispo | Western |
| If "no," skip to Question B. If "yes," check the box to the right that applies, enter the corresponding division in response to Question E, below, and continue from there. | ☐ Orange | Southern |
| | ☐ Riverside or San Bernardino | Eastern |

| QUESTION B: Is the United States, or one of its agencies or employees, a PLAINTIFF in this action? | B.1. Do 50% or more of the defendants who reside in the district reside in Orange Co.? | ☐ YES. Your case will initially be assigned to the Southern Division. Enter "Southern" in response to Question E, below, and continue from there. |
|---|---|---|
| ☐ Yes  ☒ No | *check one of the boxes to the right* ➡ | ☐ NO. Continue to Question B.2. |
| If "no," skip to Question C. If "yes," answer Question B.1, at right. | B.2. Do 50% or more of the defendants who reside in the district reside in Riverside and/or San Bernardino Counties? (Consider the two counties together.) | ☐ YES. Your case will initially be assigned to the Eastern Division. Enter "Eastern" in response to Question E, below, and continue from there. |
| | *check one of the boxes to the right* ➡ | ☐ NO. Your case will initially be assigned to the Western Division. Enter "Western" in response to Question E, below, and continue from there. |

| QUESTION C: Is the United States, or one of its agencies or employees, a DEFENDANT in this action? | C.1. Do 50% or more of the plaintiffs who reside in the district reside in Orange Co.? | ☐ YES. Your case will initially be assigned to the Southern Division. Enter "Southern" in response to Question E, below, and continue from there. |
|---|---|---|
| ☐ Yes  ☒ No | *check one of the boxes to the right* ➡ | ☐ NO. Continue to Question C.2. |
| If "no," skip to Question D. If "yes," answer Question C.1, at right. | C.2. Do 50% or more of the plaintiffs who reside in the district reside in Riverside and/or San Bernardino Counties? (Consider the two counties together.) | ☐ YES. Your case will initially be assigned to the Eastern Division. Enter "Eastern" in response to Question E, below, and continue from there. |
| | *check one of the boxes to the right* ➡ | ☐ NO. Your case will initially be assigned to the Western Division. Enter "Western" in response to Question E, below, and continue from there. |

| QUESTION D: Location of plaintiffs and defendants? | A. Orange County | B. Riverside or San Bernardino County | C. Los Angeles, Ventura, Santa Barbara, or San Luis Obispo County |
|---|---|---|---|
| Indicate the location(s) in which 50% or more of *plaintiffs who reside in this district* reside. (Check up to two boxes, or leave blank if none of these choices apply.) | ☐ | ☐ | ☐ |
| Indicate the location(s) in which 50% or more of *defendants who reside in this district* reside. (Check up to two boxes, or leave blank if none of these choices apply.) | ☐ | ☐ | ☐ |

| D.1. Is there at least one answer in Column A? | D.2. Is there at least one answer in Column B? |
|---|---|
| ☐ Yes  ☒ No | ☐ Yes  ☒ No |
| If "yes," your case will initially be assigned to the SOUTHERN DIVISION. | If "yes," your case will initially be assigned to the EASTERN DIVISION. |
| Enter "Southern" in response to Question E, below, and continue from there. | Enter "Eastern" in response to Question E, below. |
| If "no," go to question D2 to the right. ➡ | If "no," your case will be assigned to the WESTERN DIVISION. |
| | Enter "Western" in response to Question E, below. ⬇ |

| QUESTION E: Initial Division? | INITIAL DIVISION IN CACD |
|---|---|
| Enter the initial division determined by Question A, B, C, or D above: | |

| QUESTION F: Northern Counties? | | |
|---|---|---|
| Do 50% or more of plaintiffs or defendants in this district reside in Ventura, Santa Barbara, or San Luis Obispo counties? | ☐ Yes | ☒ No |

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL COVER SHEET**

**IX(a). IDENTICAL CASES:** Has this action been previously filed **in this court**?          ☒ NO          ☐ YES

If yes, list case number(s): _____

**IX(b). RELATED CASES:** Is this case related (as defined below) to any civil or criminal case(s) previously filed **in this court**?

☒ NO          ☐ YES

If yes, list case number(s): _____

**Civil cases** are related when they (check all that apply):

☐   A. Arise from the same or a closely related transaction, happening, or event;

☐   B. Call for determination of the same or substantially related or similar questions of law and fact; or

☐   C. For other reasons would entail substantial duplication of labor if heard by different judges.

Note: That cases may involve the same patent, trademark, or copyright is not, in itself, sufficient to deem cases related.

**A civil forfeiture case and a criminal case** are related when they (check all that apply):

☐   A. Arise from the same or a closely related transaction, happening, or event;

☐   B. Call for determination of the same or substantially related or similar questions of law and fact; or

☐   C. Involve one or more defendants from the criminal case in common and would entail substantial duplication of labor if heard by different judges.

---

**X. SIGNATURE OF ATTORNEY**
**(OR SELF-REPRESENTED LITIGANT):**   /s/ Michael P. Kelly _____   DATE:  11/1/2021 _____

**Notice to Counsel/Parties:** The submission of this Civil Cover Sheet is required by Local Rule 3-1. This Form CV-71 and the information contained herein neither replaces nor supplements the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. For more detailed instructions, see separate instruction sheet (CV-071A).

---

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405 (g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405 (g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405 (g)) |

NAME, ADDRESS, AND TELEPHONE NUMBER OF ATTORNEY(S)
OR OF PARTY APPEARING IN PRO PER
Robert W. Finnerty, Esq. (SBN 119775)
Boris Treyzon, Esq. (188893)
Michael P. Kelly, Esq. (311045)
ABIR COHEN TREYZON SALO, LLP
16001 Encino Blvd., Suite 200
Encino, CA 91436
T: (424) 288-4367
F: (424) 288-4368

ATTORNEY(S) FOR: Plaintiff Sadie Hunter

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| Sadie Hunter, an individual | CASE NUMBER: |
|---|---|
| Plaintiff(s), | 2:21-cv-08619 |
| v. | |
| Monsanto Company, et al. | CERTIFICATION AND NOTICE OF INTERESTED PARTIES (Local Rule 7.1-1) |
| Defendant(s) | |

TO:    THE COURT AND ALL PARTIES OF RECORD:

The undersigned, counsel of record for        Plaintiff Sadie Hunter
or party appearing in pro per, certifies that the following listed party (or parties) may have a pecuniary interest in the outcome of this case.  These representations are made to enable the Court to evaluate possible disqualification or recusal.

(List the names of all such parties and identify their connection and interest. Use additional sheet if necessary.)

| PARTY | CONNECTION / INTEREST |
|---|---|
| Sadie Hunter | Plaintiff |
| Monsanto Company | Defendant |
| Bayer Corporation | Defendant |

November 3, 2021                          /s/ Michael P. Kelly
_____                   _____
Date                                      Signature

Attorney of record for (or name of party appearing in pro per):

Plaintiff Sadie Hunter
_____

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

### NOTICE TO COUNSEL
**(For use in Direct Assignment of Civil Cases to Magistrate Judges Program only)**

***The court has directed that the following rules be specifically called to your attention:***

    I.     Notice of Right to Consent to Disposition of a Civil Case by a United States Magistrate Judge [28 U.S.C. § 636(c) and General Order 12-02].

    II.   Continuing Obligation to Report Related Cases (Local Rule 83-1.3.3)

    III.  Service of Papers and Process (Local Rule 4)

**I.**    **NOTICE OF RIGHT TO CONSENT TO DISPOSITION OF A CIVIL CASE BY A UNITED STATES MAGISTRATE**

*Pursuant to Local Rule 73-2, the initiating party must serve this notice and consent form CV-11C on each party at the time of service of the summons and complaint or other initial pleading.*

       This case has been randomly assigned to Magistrate Judge **Michael R. Wilner** under the Direct Assignment of Civil Cases to Magistrate Judge Program in accordance with General Order 12-02.  The case number on all documents filed with the court must read as follows:

### 2:21–cv–08619–MRW

       The parties are advised that their consent is required if the above assigned magistrate judge is to conduct all further proceedings in the case, including trial and final entry of judgment pursuant to 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73.  Should the parties not consent to proceed before the above assigned magistrate judge, the case will be randomly reassigned to a district judge.  If this occurs, the parties cannot later consent to reassignment of the case to any other magistrate judge.

       **The parties are further advised that they are free to withhold consent without adverse substantive consequences.  If the parties agree to the exercise of jurisdiction by the magistrate judge, the parties shall jointly or separately file a statement of consent setting forth such election.  Except as provided in Local Rule 73-2.4.1.1, for cases originally filed in district court and initially assigned only to a magistrate judge, the statement of consent shall be filed within 42 days after service of the summons and complaint upon that defendant, and within 42 days by plaintiff after service upon the first-served defendant.  If the United States, an agency of the United States, or an officer or employee of the United States is a defendant, the statement of consent shall be filed by the government defendant within 60 days after service of the summons and complaint upon that defendant.**

       **For cases removed from state court and initially assigned only to a magistrate judge, a joint or separate statements of consent shall be filed by plaintiff and all defendants upon whom service has been effected, within 14 days after the notice of removal is filed.**

       Since magistrate judges do not handle felony criminal trials, civil trial dates are not at risk of being preempted by a felony criminal trial, which normally has priority.  Further, in some cases, the magistrate judge may be able to assign an earlier trial date than a district judge.  There may be other advantages or disadvantages which you will want to consider.

Any appeal from a judgment of the magistrate judge shall be taken to the United States Court of Appeals in the same manner as an appeal from any other judgment of the district court in accordance with 28 U.S.C. § 636(c)(3).

If a party has not consented to the exercise of jurisdiction by the magistrate judge within the time required by Local Rule 73-2, the case shall be randomly reassigned to a district judge and a magistrate judge shall be randomly assigned to the case as the discovery judge. (Local Rule 73-2.6)

You may contact the Civil Consent Case Coordinator at (213) 894-1871 or _consentcoordinator@cacd.uscourts.gov_ if you have any questions about the Direct Assignment of Civil Cases to Magistrate Judges Program.

## II.   CONTINUING OBLIGATION TO REPORT RELATED CASES

Parties are under the continuing obligation to promptly advise the Court whenever one or more civil actions or proceedings previously commenced and one or more currently filed appear to be related.

Local Rule 83-1.3.3 states: "It shall be the continuing duty of the attorney in any case promptly to bring to the attention of the Court, by filing a Notice of Related Case(s) pursuant to Local Rule 83-1.3, all facts which in the opinion of the attorney or party appear relevant to a determination whether such action and one or more pending actions should, under the criteria and procedures set forth in Local Rule 83-1.3, be heard by the same judge."

Local Rule 83-1.2.1 states: "It is not permissible to dismiss and thereafter re-file an action for the purpose of obtaining a different judge."

Local Rule 83-1.2.2 provides:  Whenever an action is dismissed by a party or by the Court before judgment and thereafter the same or essentially the same claims, involving the same or essentially the same parties, are alleged in another action, the later-filed action shall be assigned to the judge to whom the first filed action was assigned.  It shall be the duty of every attorney in any such later-filed action to bring those facts to the attention of the Court in the Civil Cover Sheet and by the filing of a Notice of Related Case(s) pursuant to L.R. 83-1.3.

## III.   SERVICE OF PAPERS AND PROCESS

Local Rule 4-2 states: "Except as otherwise provided by order of Court, or when required by the treaties or statutes of the United States, process shall not be presented to a United States Marshal for service." Service of process must be accomplished in accordance with Rule 4 of the Federal Rules of Civil Procedure or in any manner provided by State Law, when applicable.  Service upon the United States, an officer or agency thereof, shall be served pursuant to the provisions of FRCP 4(i).  Service should be promptly made; unreasonable delay may result in dismissal of the action under Local Rule 41 and Rule 4(m) of the Federal Rules of Civil Procedure.  Proof of service or a waiver of service of summons and complaint must be filed with the court.

Clerk, U.S. District Court

November 3, 2021
Date

By  _/s/ Luz Hernandez_
Deputy Clerk

NAME, ADDRESS & TELEPHONE NUMBER OF ATTORNEY(S) OR PRO PER

ATTORNEY(S) FOR:

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | CASE NUMBER: |
|---|---|
| Plaintiff(s) | |
| v. | STATEMENT OF CONSENT TO PROCEED BEFORE A UNITED STATES MAGISTRATE JUDGE (For use in Direct Assignment of Civil Cases to Magistrate Judges Program Only) |
| Defendant(s). | |

### (THIS FORM SHALL BE USED ONLY FOR CASES IN WHICH A MAGISTRATE JUDGE IS INITIALLY ASSIGNED PURSUANT TO LOCAL RULE 73-2.)

In accordance with General Order 12-02 and Local Rule 73-2 the above-captioned civil matter has been randomly assigned to Magistrate Judge _____ . All parties to the above-captioned civil matter are to select one of the following two options and file this document with the Clerk's Office.

☐ The party or parties listed below to the above-captioned civil matter **consent** pursuant to the provisions of 28 U.S.C. § 636(C) and F.R.Civ.P. 73(b), to have the assigned Magistrate Judge conduct all further proceedings in this case, including trial and entry of final judgment.

Any appeal from a judgment of the assigned Magistrate Judge shall be taken to the United States Court of Appeals in the same manner as an appeal from any other judgment of the District Court in accordance with 28 U.S.C. § 636(c)(3).

☐ The party or parties listed below to the above-captioned civil matter **do not consent** to proceed before the assigned Magistrate Judge.

The party or parties listed below acknowledge that they are free to withhold consent without adverse substantive consequences.

| Name of Counsel (OR Party if Pro Per) | Signature and date | Counsel for (Name of Party or Parties) |
|---|---|---|
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |

### NOTICE TO COUNSEL FROM CLERK:

All parties having consented to proceed before the assigned Magistrate Judge, this case will remain assigned to United States Magistrate Judge _____ for all further proceedings.

CV-11C (05/14)      STATEMENT OF CONSENT TO PROCEED BEFORE A UNITED STATES MAGISTRATE JUDGE
(For use in Direct Assignment of Civil Cases to Magistrate Judges Program only)