JURY

# U.S. District Court
## District of South Carolina (Florence)
## CIVIL DOCKET FOR CASE #: 4:21-cv-04040-MDL

Graham v. Monsanto Company                    Date Filed: 12/14/2021
Assigned to: Unassigned - MDL                 Jury Demand: Plaintiff
Cause: 28:1332 Diversity-Personal Injury      Nature of Suit: 365 Personal Inj. Prod.
                                              Liability
                                              Jurisdiction: Diversity

**Plaintiff**

**Larry Graham, Jr**                represented by   **Blake Garrett Abbott**
                                                     Anastopoulo Law Firm LLC
                                                     32 Ann Street
                                                     Unit B
                                                     Charleston, SC 29403
                                                     843-614-8888
                                                     Email: blake@akimlawfirm.com
                                                     *LEAD ATTORNEY*
                                                     *ATTORNEY TO BE NOTICED*

                                                     **Eric Poulin**
                                                     Anastopoulo Law Firm LLC
                                                     32 Ann Street
                                                     Charleston, SC 29403
                                                     843-614-8888
                                                     Fax: 843-494-5536
                                                     Email: eric@akimlawfirm.com
                                                     *LEAD ATTORNEY*
                                                     *ATTORNEY TO BE NOTICED*

                                                     **Roy T Willey , IV**
                                                     Anastopoulo Law Firm LLC
                                                     32 Ann Street
                                                     Unit B
                                                     Charleston, SC 29403
                                                     843-614-8888
                                                     Email: roy@akimlawfirm.com
                                                     *LEAD ATTORNEY*
                                                     *ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Monsanto Company**

| Date Filed | # | Docket Text |
|---|---|---|
| 12/14/2021 | 1 | COMPLAINT against Monsanto Company ( Filing fee $ 402 receipt number ASCDC-10236102.), filed by Larry Graham, Jr. Service due by 3/14/2022.(prou, ) (Entered: 12/15/2021) |
| 12/15/2021 | 3 | Local Rule 26.01 Answers to Interrogatories by Larry Graham, Jr.(prou, ) (Entered: 12/15/2021) |
| 12/15/2021 | 4 | Summons Issued as to Monsanto Company. (prou, ) (Entered: 12/15/2021) |

A TRUE COPY
ATTEST: ROBIN L. BLUME, CLERK

BY: _Penelope W. Roulston_

DEPUTY CLERK

## UNITED STATES DISTRICT COURT
## DISTRICT OF SOUTH CAROLINA
## FLORENCE DIVISION

| | |
|---|---|
| LARRY GRAHAM JR., | |
| Plaintiff, | |
| V. | CIVIL ACTION NO. _____ |
| MONSANTO COMPANY, | |
| Defendant. | **COMPLAINT**<br>**(JURY TRIAL DEMANDED)** |

### COMPLAINT

Plaintiff Larry Graham Jr., by and through his attorneys, respectfully submit the following Complaint and Jury Demand against Monsanto Company ("Defendant" or "Monsanto"), and alleges the following:

### INTRODUCTION

1.      This products liability and negligence complaint is brought by Plaintiff, a South Carolina resident diagnosed with non-Hodgkin's lymphoma ("NHL") in March of 2019 due to multinational, agrigiant Monsanto's knowing and willful dissemination of carcinogenic products throughout the stream of commerce. Plaintiff used Roundup®/glyphosate distributed by Monsanto monthly in an agricultural setting from 1981 to 2005. Years of long-term use and exposure to

1

Roundup®/glyphosate distributed by Monsanto caused Plaintiff to develop NHL and seek months of intensive, costly medical intervention.

## NATURE OF THE ACTION

2.      This action seeks to recover damages for the injuries sustained by Plaintiff as the direct and proximate result of the wrongful conduct and negligence of the Defendant in connection with the design, development, manufacture, testing, packaging, promoting, marketing, advertising, distributing, labeling, and selling of the herbicide Roundup®, containing the active ingredient glyphosate.

3.      Plaintiff maintains that Roundup® and/or glyphosate is defective, dangerous to human health, unfit and unsustainable to be marketed and sold in commerce and lacked proper warnings and directions as to the dangers associated with its use.

## JURISDICTION AND VENUE

4.      This Court has subject-matter jurisdiction over this action under 28 U.S.C. § 1332 because there is complete diversity of the plaintiff and the defendant and the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

5.      Defendant maintains sufficient contacts with the South Carolina such that this Court's exercise of personal jurisdiction over it does not offend traditional notions of fair play and substantial justice.

6.      Venue is proper in this District pursuant to 28 U.S.C.§ 1391 (b)(2), because Defendant marketed, advertised, and distributed the dangerous products in this District. Defendant does substantial business in South Carolina and within the District; and at all times relevant hereto, Defendant developed, manufactured, promoted, marketed, distributed, warranted, and sold

Roundup® in interstate commerce. Further, Defendant, as a corporate entity, is deemed to reside in any judicial district in which it is subject to personal jurisdiction.

## PARTIES

7.    Plaintiff Larry Graham Jr. is a competent individual over the age of 18, a resident and citizen of South Carolina, and hereby submits to the jurisdiction of the Court and alleges that venue in this Court is proper.

8.    Defendant is a Delaware corporation with its headquarters and principal place of business in St. Louis, Missouri. At all times relevant to this complaint, Monsanto was the entity that discovered the herbicidal properties of glysophate and the manufacturer of Roundup®.

9.    Plaintiff is informed and believes, and based thereon alleges, that in committing the acts alleged herein, each and every managing agent, agent, representative and/or employee of the collective Defendant was working within the course and scope of said agency, representation and/or employment with the knowledge, consent, ratification, and authorization of the Defendant and its directors, officers and/or managing agents.

## FACTUAL ALLEGATIONS

10.    Glyphosate is a broad-spectrum, non-selective herbicide used in a variety of herbicidal products around the world.

11.    Plants treated with glyphosate translocate the systemic herbicide to their roots, shoot regions and fruit, where it interferes with the plant's ability to form aromatic amino acids.

12.    For nearly 40 years, people across the world have used Roundup® without knowing of the dangers its use poses. That is because when Monsanto first introduced Roundup®, it touted glyphosate as a technological breakthrough: it could kill almost every weed without causing harm either to people or to the environment. Of course, history has shown that not to be true. According

to the WHO, the main chemical ingredient of Roundup®, glyphosate, is a probable cause of cancer. Those most at risk are farm workers and other individuals with workplace exposure to Roundup®, such as workers in garden centers, nurseries, and landscapers. Agricultural workers are, once again, victims of corporate greed.

13.     Monsanto assured the public that Roundup® was harmless. In order to prove this, Monsanto championed falsified data and attacked legitimate studies that revealed its dangers. Monsanto led a prolonged campaign of misinformation to convince governmental agencies, farmers, and the general population that Roundup® was safe.

*The Discovery of Glyphosate and Development of Roundup®*

14.     The herbicidal properties of glyphosate were discovery in 1970 by Monsanto chemist, John Franz. The first glyphosate-based herbicide was introduced to the market in the mid-1970s under the brand name Roundup®. From the outset, Monsanto marketed Roundup® as a "safe" general-purpose herbicide for widespread commercial and consumer use. It still markets Roundup® as safe today.

*Registration of Herbicides under Federal Law*

15.     The manufacture, formulation, and distribution of herbicides, such as Roundup®, are regulated under the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA" or "Act"), 7 U.S.C. § 136, et seq. FIFRA requires that all pesticides be registered with the Environmental Protection Agency ("EPA" or "Agency") prior to their distribution, sale, or use, except as described by the Act. 7 U.S.C. § 136a(a).

16.     Because pesticides are toxic to plants, animals, and humans, at least to some extent, the EPA requires as part of the registration process, among other things, a variety of tests to evaluate

the potential for exposure to pesticides, toxicity to people and other potential non-target organisms, and other adverse effects on the environment. Registration by the EPA, however, is not an assurance or finding of safety. The determination the Agency must make in registering or re-registering a product is not that the product is "safe," but rather that use of the product in accordance with its label directions "will not generally cause unreasonable adverse effects on the environment." 7 U.S.C. § 136a(c)(5)(D).

17.    FIFRA defines "unreasonable adverse effects on the environment" to mean "any unreasonable risk to man or the environment, taking into account the economic, social, and environmental costs and benefits of the use of any pesticide." 7 U.S.C. § 136(bb). FIFRA thus requires EPA to make a risk/benefit analysis in determining whether a registration should be granted or allowed to continue to be sold in commerce.

18.    The EPA and the State of South Carolina registered Roundup® for distribution, sale, and manufacture in the United States and the State of South Carolina.

19.    FIFRA generally requires that the registrant, Monsanto in the case of Roundup®, conducts the health and safety testing of pesticide products. The EPA has protocols governing the conduct of tests required for registration and the laboratory practices that must be followed in conducting these tests. The data produced by the registrant must be submitted to the EPA for review and evaluation. The government is not required, nor is it able, however, to perform the product tests that are required of the manufacturer.

### *Scientific Fraud Underlying the Marketing and Sale of Glyphosate/Roundup*

20.    Based on early studies that glyphosate could cause cancer in laboratory animals, the EPA originally classified glyphosate as *possibly carcinogenic to humans* (Group C) in 1985. After pressure from Monsanto, including contrary studies it provided to the EPA, the EPA changed its

classification to *evidence of non-carcinogenicity in humans* (Group E) in 1991. In so classifying

glyphosate, however, the EPA made clear that the designation did not mean the chemical does not

cause cancer: "It should be emphasized, however, that designation of an agent in Group E is based

on the available evidence at the time of evaluation and should not be interpreted as a definitive

conclusion that the agent will not be a carcinogen under any circumstances."

21.     On two occasions, the EPA found that the laboratories hired by Monsanto to test the

toxicity of its Roundup® products for registration purposes committed fraud.

22.     In the first instance, Monsanto, in seeking initial registration of Roundup® by EPA, hired

Industrial Bio-Test Laboratories ("IBT") to perform and evaluate pesticide toxicology studies

relating to Roundup®. IBT performed about 30 tests on glyphosate and glyphosate-containing

products, including nine of the 15 residue studies needed to register Roundup®.

23.     In 1976, the United States Food and Drug Administration ("FDA") performed an

inspection of IBT that revealed discrepancies between the raw data and the final report relating to

the toxicological impacts of glyphosate. The EPA subsequently audited IBT; it too found the

toxicology studies conducted for the Roundup® herbicide to be invalid. An EPA reviewer states,

after finding "routine falsification of data" at IBT, that it was "hard to believe the scientific

integrity of the studies when they said they took specimens of the uterus from male rabbits."

24.     Three top executives of IBT were convicted of fraud in 1983.

25.     In the second incident of data falsification, Monsanto hired Craven Laboratories in 1991

to perform pesticide and herbicide studies, including for Roundup®. In that same year, the owner

of Craven Laboratories and three of its employees were indicted, and later convicted, of fraudulent

laboratory practices in the testing of pesticides and herbicides.

26.    Despite the falsity of the tests that underlie its registration, within a few years of its launch, Monsanto was marketing Roundup® in 115 countries.

### *The Importance of Roundup® to Monsanto's Market Dominance Profits*

27.    The success of Roundup® was key to Monsanto's continued reputation and dominance in the marketplace. Largely due to the success of Roundup® sales, Monsanto's agriculture division was out-performing its chemicals division's operating income, and that gap increased yearly. But with its patent for glyphosate expiring in the United States in the year 2000, Monsanto needed a strategy to maintain its Roundup® market dominance and to ward off impending competition.

28.    In response, Monsanto began the development and sale of genetically engineered Roundup Ready® seeds in 1996. Since Roundup Ready® crops are resistant to glyphosate, farmers can spray Roundup® onto their fields during the growing season without harming the crop. This allowed Monsanto to expand its market for Roundup® even further; by 2000, Monsanto's biotechnology seeds were planted on more than 80 million acres worldwide and nearly 70% of American soybeans were planted from Roundup Ready® seeds. It also secured Monsanto's dominant share of the glyphosate/Roundup® market through a marketing strategy that coupled proprietary Roundup Ready® seeds with continued sales of its Roundup® herbicide.

29.    Through a three-pronged strategy of increased production, decreased prices and by coupling with Roundup Ready® seeds, Roundup® became Monsanto's most profitable product. In 2000, Roundup® accounted for almost $2.8 billion in sales, outselling other herbicides by a margin of five to one, and accounting for close to half of Monsanto's revenue. Today, glyphosate remains one of the world's largest herbicides by sales volume.

### *Monsanto has known for decades that it falsely advertises the safety of Roundup®*

30.     In 1996, the New York Attorney General ("NYAG") filed a lawsuit against Monsanto
based on its false and misleading advertising of Roundup® products. Specifically, the lawsuit
challenged Monsanto's general reputations that its spray-on glyphosate-based herbicides,
including Roundup®, were "**safer than table salt**" and "**practically non-toxic**" to mammals,
birds, and fish. Among the representations the NYAG found deceptive and misleading about the
human and environmental safety of Roundup® are the following:

a.  Remember that environmentally friendly Roundup herbicide is biodegradable. It
    won't build up in the soil so you can use Roundup with confidence along
    customers' driveways, sidewalks and fences…

b.  And remember that Roundup is biodegradable and won't build up in the soil. That
    will give you the environmental confidence you need to use Roundup everywhere
    you've got a weed, brush, edging or trimming problem.

c.  Roundup biodegrades into naturally occurring elements.

d.  Remember that versatile Roundup herbicide stays where you put it. That means
    there's no washing or leaching to harm customers' shrubs or other desirable
    vegetation.

e.  This non-residual herbicide will not wash or leach into the soil. It . . . stays where
    you apply it.

f.  You can apply Accord with "confidence because it will stay where you put it" it
    bonds tightly to soil particles, preventing leaching. Then, soon after application,
    soil microorganisms biodegrade Accord into natural products.

g.  Glyphosate is less toxic to rats than table salt following acute oral ingestion.

8

h. Glyphosate's safety margin is much greater than required. It has over a 1,000-fold safety margin in food and over a 700-fold safety margin for workers who manufacture it or use it.

i. You can feel good about using herbicides by Monsanto. They carry a toxicity category rating of 'practically non-toxic' as it pertains to mammals, birds and fish.

j. "Roundup can be used where kids and pets will play and breaks down into natural material." This ad depicts a person with his head in the ground and a pet dog standing in an area which has been treated with Roundup.

31.    On November 19, 1996, Monsanto entered into an Assurance of Discontinuance with NYAG, in which Monsanto agreed, among other things, "to cease and desist from publishing or broadcasting any advertisements [in New York] that represent, directly or by implication" that:

a. Its glyphosate-containing pesticide products or any component thereof are safe, non-toxic, harmless or free from risk.

b. Its glyphosate-containing pesticide products or any component thereof manufactured, formulated, distributed or sold by Monsanto are biodegradable.

c. Its glyphosate-containing pesticide products or any component thereof stay where they are applied under all circumstances and will not move through the environment by any means.

d. Its glyphosate-containing pesticide products or any component thereof are "good" for the environment or are "known for their environmental characteristics."

e. Glyphosate-containing pesticide products or any component thereof are safer or less toxic than common consumer products other than herbicides;

      f.   Its glyphosate-containing products or any component thereof might be classified as

"practically non-toxic."

32.    Monsanto did not alter its advertising in the same manner in any state other than New York,

and on information and belief still has not done so today.

33.    In 2009, France's highest court ruled that Monsanto had not told the truth about the safety

of Roundup®. The French court affirmed an earlier judgment that Monsanto had falsely advertised

its herbicide Roundup® as "biodegradable" and that it "left the soil clean."

### *Classifications and Assessments of Glyphosate*

34. The IARC process for the classification of glyphosate followed the stringent procedures for

the evaluation of a chemical agent. Over time, the IARC Monograph program has reviewed

980 agents. Of those reviewed, it has determined 116 agents to be Group 1 (Known Human

Carcinogens); 73 agents to be Group 2A (Probable Human Carcinogens); 287 agents to be Group

2B (Possible Human Carcinogens); 503 agents to be Group 3 (Not Classified); and one agent to

be Probably Not Carcinogenic.

35.    The established procedure for IARC Monograph evaluations is described in the IARC

Programme's Preamble. Evaluations are performed by panels of international experts, selected on

the basis of their expertise and the absence of actual or apparent conflicts of interest.

36.    One year before the Monograph meeting, the meeting is announced and there is a call both

for data and for experts. Eight months before the Monograph meeting, the Working Group

membership is selected and the sections of the Monograph are developed by the Working Group

members. One month prior to the Monograph meeting, the call for data is closed and the various

draft sections are distributed among Working Group members for review and comment. Finally,

at the Monograph meeting, the Working Group finalizes review of all literature, evaluates the

evidence in each category, and completes the overall evaluation. Within two weeks after the Monograph meeting, the summary of the Working Group are published in Lancet Oncology, and within a year after the meeting, the final Monograph is finalized and published.

37.     In assessing an agent, the IARC Working Group reviews the following information: (a) human, experimental, and mechanistic data; (b) all pertinent epidemiological studies and cancer bioassays; and (c) representative mechanistic data. The studies must be publicly available and have sufficient detail for meaningful review, and reviewers cannot be associated with the underlying study.

38.     In March, 2015, IARC reassessed glyphosate. The summary published in *The Lancet Oncology* reported that glyphosate is a Group 2A agent and probably carcinogenic to humans.

39.     On July 29, 2015, IARC issued its Monograph for glyphosate, Monograph 112. For Volume 112, the volume that assessed glyphosate, a Working Group of 17 experts from 11 countries met at IARC from March 3-10, 2015, to assess the carcinogenicity of certain herbicides, including glyphosate. The March meeting culminated nearly a one-year review and preparation by the IARC Secretariat and the Working Group, including a comprehensive review of the latest available scientific evidence. According to published procedures, the Working Group considered "reports that have been published or accepted for publication in the openly available scientific literature" as well as "data from governmental reports that are publicly available."

40.     The studies considered the following exposure groups: occupational exposure of farmers and tree nursery workers in the United States, forestry workers in Canada and Finland and municipal weed-control workers in the United Kingdom; and para-occupational exposure in farming families.

41.    Glyphosate was identified as the second-most used household herbicide in the United States for weed control between 2001 and 2007 and the most heavily used herbicide in the world in 2012.

42.    Exposure pathways are identified as air (especially during spraying), water, and food. Community exposure to glyphosate is widespread and found in soil, air, surface water, and groundwater, as well as in food.

43.    The assessment of the IARC Working Group identified several case control studies of occupational exposure in the United States, Canada, and Sweden. These studies show a human health concern from agricultural and other work-related exposure to glyphosate.

44.    The IARC Working Group found an increased risk between exposure to glyphosate and non-Hodgkin lymphoma ("NHL") and several subtypes of NHL, and the increased risk persisted after adjustment for other pesticides.

45.    The IARC Working Group also found that glyphosate cause DNA and chromosomal damage in human cells. One study in community residents reported increases in blood markers of chromosomal damage (micronuclei) after glyphosate formulations were sprayed.

46.    In male CD-1 mice, glyphosate induced a positive trend in the incidence of a rare tumor, renal tubule carcinoma. A second study reported a positive trend for haemangiosarcoma in male mice. Glyphosate increased pancreatic islet-cell adenoma in male rats in two studies. A glyphosate formulation promoted skin tumors in an initiation-promotion study in mice.

47.    The IARC Working Group also noted that glyphosate has been detected in the urine of agricultural workers, indicating absorption. Soil microbes degrade glyphosate to aminomethylphosphoric acid (AMPA). Blood AMPA detection after exposure suggests intestinal microbial metabolism in humans.

48.    The IARC Working Group further found that glyphosate and glyphosate formulations induced DNA and chromosomal damage in mammals, and in human and animal cells in utero.

49.    The IARC Working Group also noted genotoxic, hormonal, and enzymatic effects in mammals exposed to glyphosate. Essentially, glyphosate inhibits the biosynthesis of aromatic amino acids, which leads to several metabolic disturbances, including the inhibition of protein and secondary product biosynthesis and general metabolic disruption.

50.    The IARC Working Group also reviewed an Agricultural Health Study, consisting of a prospective cohort of 57,311 licensed pesticide applicators in Iowa and North Carolina. while this study differed from others in that it was based on a self-administered questionnaire, the results support an association between glyphosate exposure and Multiple Myeloma, Hairy Cell Leukemia (HCL), and Chronic Lymphocytic Leukemia (CLL), in addition to several other cancers.

### Other Earlier Findings About Glyphosate's Dangers to Human Health

51.    The EPA has a technical fact sheet, as part of its Drinking Water and Health, National Primary Drinking Water Regulations publication, relating to glyphosate. This technical fact sheet predates the IARC March 20, 2015, evaluation. The fact sheet describes the release patterns for glyphosate as follows:

### Release Patterns

52.    Glyphosate is released to the environment in its use as a herbicide for controlling woody and herbaceous weeds on forestry, right-of-way, cropped and non-cropped sites. These sites may be around water and in wetlands.

53.    It may also be released to the environment during its manufacture, formulation, transport, storage, disposal and cleanup, and from spills. Since glyphosate is not a listed chemical in the Toxics Release Inventory, data on releases during its manufacture and handling are not available.

54.    Occupational workers and home gardeners may be exposed to glyphosate by inhalation and dermal contact during spraying, mixing, and cleanup. They may also be exposed by touching soil and plants to which glyphosate was applied. Occupational exposure may also occur during glyphosate's manufacture, transport, storage, and disposal.

### *Recent Worldwide Bans on Roundup®/Glyphosate*

55.    Several countries around the world have instituted bans on the sale of Roundup® and other glyphosate-containing herbicides, both before and since IARC first announced its assessment for glyphosate in March 2015, and more countries undoubtedly will follow suit in light of this as the dangers of the use of Roundup® are more widely known. The Netherlands issued a ban on all glyphosate-based herbicides in April 2014, including Roundup®, which was to take effect by the end of 2015. In issuing the ban, the Dutch Parliament member who introduced the successful legislation stated: "Agricultural pesticides in user-friendly packaging are sold in abundance to private persons. In garden centers, Roundup® is promoted as harmless, but unsuspecting customers have no idea what the risks of this product are. Especially children are sensitive to toxic substances and should therefore not be exposed to it."

56.    The Brazilian Public Prosecutor in the Federal District requested that the Brazilian Justice Department suspend the use of glyphosate.

57.    France banned the private sale of Roundup® and glyphosate following the IARC assessment for glyphosate.

58.    Bermuda banned both the private and commercial sale of glyphosates, including Roundup®. The Bermuda government explained its ban as follows: "Following a recent scientific study carried out by a leading cancer agency, the importation of weed spray 'Roundup' has been suspended."

59.    The Sri Lankan government banned the private and commercial use of glyphosates, particularly out of concern that Glyphosate has been linked to fatal kidney disease in agricultural workers.

60.    The government of Colombia announced its ban on using Roundup® and glyphosate to destroy illegal plantations of coca, the raw ingredient for cocaine, because of the WHO's finding that glyphosate is probably carcinogenic.

### *Plaintiff's Exposure to Roundup®*

61.    From 1981 to 1998, Plaintiff was employed by Florence County where his responsibilities included direct application of Roundup®, among other Monsanto glyphosate products, around the property's fence lines.

62.    From 1998 to 2005, Plaintiff was employed by the Florence Housing Authority where his responsibilities included direct application of Roundup®, among other Monsanto glyphosate products.

63.    At all relevant times, from 1981 through 2005, Plaintiff purchased, and used Roundup® in South Carolina.

64.    Plaintiff was diagnosed with non-Hodgkin's lymphoma in March of 2019, at the age of 59.

65.    Plaintiff first became aware of the probable carcinogenic properties of Glyphosate and its probable link to his non-Hodgkin's lymphoma in 2019.

### CLAIM ONE
### STRICT LIABILITY (DESIGN DEFECT)

66.    Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

67.    Plaintiff brings this strict liability claim against Defendant for defective design.

68.    At all times relevant to this litigation, Defendant engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting Roundup® products, which are defective and unreasonably dangerous to consumers, including Plaintiff, thereby placing Roundup®/glyphosate products in the stream of commerce. These actions were under the ultimate control and supervision of Defendant. At all times relevant to this litigation, Defendant designed, researched, developed, manufactured, produced, tested, assembled, labeled, advertised, promoted, marketed, sold, and distributed the Roundup®/glyphosate products that Plaintiff was exposed to, as described above.

69.    At all times relevant to this litigation, Defendant's Roundup®/glyphosate products were manufactured, designed, and labeled in an unsafe, defective, and inherently dangerous manner that was dangerous for use by or exposure to the public, and, in particular, the Plaintiff.

70.    At all times relevant to this litigation, Defendant's Roundup®/glyphosate products reached the intended consumers, handlers, and users or other persons coming into contact with these products in South Carolina and throughout the United States, including Plaintiff, without substantial change in their condition as designed, manufactured, sold, distributed, labeled, and marketed by Defendant.

71.    Defendant's Roundup®/glyphosate products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold, and marketed by Defendant were defective in design and formulation in that when they left the hands of the Defendant's manufacturers and/or suppliers, they were unreasonably dangerous and dangerous to an extent beyond that which an ordinary consumer would contemplate.

72.    Defendant's Roundup®/glyphosate products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold, and marketed by Defendant were

defective in design and formulation in that when they left the hands of Defendant's manufacturers and/or suppliers, the foreseeable risks exceeded the alleged benefits associated with their design and formulation.

73.   At all times relevant to this action, Defendant knew or had reason to know that Roundup®/glyphosate products were defective and were inherently dangerous and unsafe when used in the manner instructed and provided by Defendant.

74.   Therefore, at all times relevant to this litigation, Defendant's Roundup®/glyphosate products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold, and marketed by Defendant were defective in design and formulation in one or more of the following ways:

a.   When placed in the stream of commerce, Defendant's Roundup®/glyphosate products were unreasonably dangerous in design and formulation, and, consequently, dangerous to an extent beyond that which an ordinary consumer would contemplate.

b.   When placed in the stream of commerce, Defendant's Roundup®/glyphosate products were unreasonably dangerous in that they were hazardous and posed a grave risk of cancer and other serious illnesses when used in a reasonably anticipated manner.

c.   When placed in the stream of commerce, Defendant's Roundup®/glyphosate products contained unreasonably dangerous design defects and were not reasonably safe when used in a reasonably anticipated or intended manner.

d.   Defendant did not sufficiently test, investigate, or study its Roundup® products and, specifically, the active ingredient glyphosate.

     e.  Exposure to Roundup® and glyphosate-containing products presents a risk of harmful side effects that outweigh any potential utility stemming from the use of herbicide.

     f.  Defendant knew or should have known at the time of marketing its Roundup®/glyphosate products that exposure to Roundup® and specifically, its active ingredient glyphosate, could result in cancer and other severe illnesses and injuries.

     g.  Defendant did not conduct adequate post-marketing surveillance of its Roundup®/glyphosate products.

     h.  Defendant could have employed safer alternative design and formulations.

75.    At all times relevant to this litigation, Plaintiff was exposed to the use of Defendant's Roundup®/glyphosate products in an intended or reasonably foreseeable manner without knowledge of their dangerous characteristics.

76.    Plaintiff could not have reasonably discovered the defects and risks associated with Roundup® or glyphosate-containing products before or at the time of exposure.

77.    The harm caused by Defendant's Roundup®/glyphosate products far outweighed their benefit, rendering Defendant's products dangerous to an extent beyond that which an ordinary consumer would contemplate. Defendant's Roundup®/glyphosate products were and are more dangerous than alternative products and Defendant could have designed its Roundup®/glyphosate products to make them less dangerous. Indeed, at the time that Defendant designed its Roundup®/glyphosate products, the state of the industry's scientific knowledge was such that a less risky design or formulation was attainable.

78.    At the time Roundup®/glyphosate products left Defendant's control, there was a practical, technically feasible and safer alternative design that would have prevented the harm without substantially impairing the reasonably anticipated or intended function of Defendant's herbicides.

79.    Defendant's defective design of its Roundup®/glyphosate products was willful, wanton, fraudulent, malicious, and conducted with reckless disregard for the health and safety of users of the Roundup®/glyphosate products, including the Plaintiff herein.

80.    Therefore, as a result of the unreasonably dangerous condition of its Roundup®/glyphosate products, Defendant is strictly liable to Plaintiff.

81.    The defects in Defendant's Roundup®/glyphosate products were substantial and contributing factors in causing Plaintiff's grave injuries, and, but for Defendant's misconduct and omissions, Plaintiff would not have sustained these injuries.

82.    Defendant's conduct, as described above, was reckless. Defendant risked the lives of consumers and users of its products, including Plaintiff, with knowledge of the safety problems associated with Roundup® and glyphosate-containing products, and suppressed this knowledge from the general public. Defendant made conscious decisions not to redesign, warn, or inform the unsuspecting public. Defendant's reckless conduct warrants an award of punitive damages.

83.    As a direct and proximate result of Defendant placing defective Roundup®/glyphosate products into the stream of commerce, Plaintiff has suffered and continues to suffer grave injuries, and has endured physical pain and discomfort, as well as economic hardship, including considerable financial expenses for medical care and treatment. Plaintiff will continue to incur these expenses in the future.

**CLAIM TWO**

## STRICT LIABIITY (FAILURE TO WARN)

84.    Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

85.    Plaintiff brings this strict liability claim against Defendant for failure to warn.

86.    At all times relevant to this litigation, Defendant engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, promoting, and applying Roundup®/glyphosate products, which are defective and unreasonably dangerous to consumers, including Plaintiff, because they do not contain adequate warnings or instructions concerning the dangerous characteristics of Roundup® and specifically, the active ingredient glyphosate. These actions were under the ultimate control and supervision of Defendant.

87.    Monsanto researched, developed, designed, tested, manufactured, inspected, labeled, distributed, marketed, promoted, sold, and otherwise released into the stream of commerce its Roundup®/glyphosate products, and in the course of the same, directly advertised or marketed the products to consumers and end users, including the Plaintiff, and persons responsible for consumers (such as employers), and therefore had a duty to warn of the risks associated with the use of Roundup® and glyphosate-containing products.

88.    At all times relevant to this litigation, Defendant had a duty to properly test, develop, design, manufacture, inspect, package, label, market, promote, sell, distribute, maintain supply, provide proper warnings, and take such steps as necessary to ensure that Roundup®/glyphosate products did not cause users and consumers to suffer from unreasonable and dangerous risks. Defendant had a continuing duty to warn the Plaintiff of the dangers associated with Roundup®/glyphosate use and exposure. Defendant, as manufacturer, seller, or distributor of chemical herbicides, is held to the knowledge of an expert in the field.

89.    At the time of manufacture, Defendant could have provided the warnings or instructions regarding the full and complete risks of Roundup® and glyphosate-containing products because it knew or should have known of the unreasonable risks of harm associated with the use of and/or exposure to such products.

90.    At all times relevant to this litigation, Defendant failed to investigate, study, test, or promote the safety or to minimize the dangers to users and consumers of this product and to those who would foreseeably use or be harmed by Roundup®/glyphosate, including Plaintiff.

91.    Despite the fact that Defendant knew or should have known that Roundup®/glyphosate posed a grave risk of harm, it failed to exercise reasonable care to warn of the dangerous risks associated with use and exposure. The dangerous propensities of its products and the carcinogenic characteristics of glyphosate, as described above, were known to Defendant, or scientifically knowable to Defendant through appropriate research and testing by known methods, at the time it distributed, supplied, or sole the product, and not known to end users and consumers, such as Plaintiff.

92.    Defendant knew or should have known that these products created significant risks of serious bodily harm to consumers, as alleged herein, and Defendant failed to adequately warn consumers and reasonably foreseeable users of the risks of exposure to its products. Defendant has wrongfully concealed information concerning the dangerous nature of the Roundup® and its active ingredient glyphosate, and further made false and/or misleading statements concerning the safety of Roundup® and glyphosate.

93.    At all times relevant to this litigation, Defendant's Roundup®/glyphosate products reached the intended consumers, handlers, and users or other persons coming into contact with these products in South Carolina and throughout the United States, including Plaintiff, without

substantial change in their condition as designed, manufactured, sold, distributed, labeled, marketed, and sprayed/applied by Defendant.

94.    Plaintiff was exposed to Roundup®/glyphosate products, as described above, without knowledge of their dangerous characteristics.

95.    At all times relevant to this litigation, Plaintiff was exposed to the use of Defendant's Roundup®/glyphosate products in their intended or reasonably foreseeable manner without knowledge of their dangerous characteristics.

96.    Plaintiff could not have reasonably discovered the defects and risks associated with Roundup® or glyphosate-containing products prior to or at the time of Plaintiff's exposure. Plaintiff relied upon the skill, superior knowledge, and judgment of Defendant.

97.    Defendant knew or should have known that the minimal warnings disseminated with or accompanying the application of Roundup®/glyphosate products were inadequate, but they failed to communicate adequate information on the dangers and safe use/exposure and failed to communicate warnings and instructions that were appropriate and adequate to render the products safe for their ordinary, intended and reasonably foreseeable uses, including agricultural and horticultural applications.

98.    The information that Defendant did provide or communicate failed to contain relevant warnings, hazards, and precautions that would have enabled those exposed such as Plaintiff to utilize the products safely and with adequate protection. Instead, Defendant disseminated information that was inaccurate, false, and misleading and which failed to communicate accurately or adequately the comparative severity, duration, and extent of the risk of injuries with use of and/or exposure to Roundup® and glyphosate; continued to aggressively promote the efficacy of its products, even after it knew or should have known of the unreasonable risks from use or

exposure; and concealed, downplayed, or otherwise suppressed, through aggressive marketing and promotion, any information or research about the risks and dangers of exposure to Roundup® and glyphosate.

99.     To this day, Defendant has failed to adequately and accurately warn of the true risks of Plaintiff's injuries associated with the use of and exposure to Roundup® and its active ingredient glyphosate, a probably carcinogen.

100.    As a result of their inadequate warnings, Roundup®/glyphosate products were defective and unreasonably dangerous when they left the possession and/or control of Defendant, were sold or distributed by Defendant, were applied by Defendant, and when Plaintiff became exposed.

101.    Defendant is liable to Plaintiff for injuries caused by negligent or willful failure, as described above, to provide adequate warnings or other clinically relevant information and data regarding the appropriate use of their products and the risks associated with the use of or exposure to Roundup®/glyphosate and glyphosate.

102.    The defects in these Roundup®/glyphosate products were substantial and contributing factors in causing Plaintiff's injuries, and, but for Defendant's misconduct and omissions, Plaintiff would not have sustained these injuries.

103.    Had Defendant provided adequate warnings and instructions and properly disclosed and disseminated the risks associated with Roundup®/glyphosate products and application, Plaintiff could have avoided the risk of developing injuries as alleged herein and the company who employed Plaintiff could have obtained alternative herbicides.

104.    As a direct and proximate result of Defendant placing defective Roundup®/glyphosate products into the stream of commerce and exposing Plaintiff to them, Plaintiff has suffered and

continues to suffer severe injuries, and has endured physical pain and discomfort, as well as economic hardship, including considerable financial expenses for medical care and treatment. Plaintiff will continue to incur these expenses in the future.

## CLAIM THREE
### NEGLIGENCE/GROSS NEGLIGENCE

105.    Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

106.    Defendant, directly or indirectly, caused Roundup®/glyphosate products to be sold, distributed, packaged, labeled, marketed, promoted, and/or used by Plaintiff.

107.    At all times relevant to this litigation, Defendant had a duty to exercise reasonable care in the design, research, manufacture, marketing, advertisement, supply, promotion, packaging, sale, and distribution of Roundup®/glyphosate products, including the duty to take all reasonable steps necessary to manufacture, promote, and/or sell a product that was not unreasonably dangerous to consumers and users of the product.

108.    At all times relevant to this litigation, Defendant had a duty to exercise reasonable care in the marketing, advertisement, and sale of the Roundup®/glyphosate products. Defendant's duty of care owed to consumers and the general public included providing accurate, true, and accurate information concerning the risks of using Roundup®/glyphosate and appropriate, complete, and accurate warnings concerning the potential adverse effects of exposure to Roundup®/glyphosate, and, in particular, its active ingredient glyphosate.

109.    At all times relevant to this litigation, Defendant knew or, in the exercise of reasonable care, should have known of the hazards and dangers of Roundup®/glyphosate and other herbicides, but specifically, the carcinogenic properties of the chemical glyphosate.

24

110.    Accordingly, at all times relevant to this litigation, Defendant knew or, in the exercise of reasonable care, should have known that use of or exposure to Roundup®/glyphosate products could cause or be associated with Plaintiff's injuries and thus created a dangerous and unreasonable risk of injury to the users of these products, including Plaintiff.

111.    Defendant also knew or, in the exercise of reasonable care, should have known that users and consumers of Roundup®/glyphosate were unaware of the risks and the magnitude of the risks associated with use of and/or exposure to Roundup® and glyphosate-containing products.

112.    As such, Defendant breached its duty of reasonable care and failed to exercise ordinary care in the design, research, development, manufacture, testing, marketing, supply, promotion, advertisement, packaging, sale, and distribution of its Roundup®/glyphosate products, in that Defendant manufactured and produced defective herbicides containing the chemical glyphosate, knew or had reason to know of the defects inherent in its products, knew or had reason to know that a user's or consumer's exposure to the products created a significant risk of harm and unreasonably dangerous side effects, and failed to prevent or adequately warn of these risks and injuries.

113.    Despite ability and means to investigate, study, and test products and to provide adequate warnings, Defendant has failed to do so. Indeed, Defendant wrongfully concealed information and has further made false and/or misleading statements concerning the safety and/or exposure to Roundup® and glyphosate.

114.    Defendant's negligence included:

    a.    Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing Roundup®/glyphosate products without thorough and adequate pre- and post-market testing;

b.      Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing Roundup®/glyphosate while negligently and/or intentionally concealing and failing to disclose the results of trials, tests, and studies of exposure to glyphosate, and, consequently, the risk of serious harm associated with human use of and exposure to Roundup®/glyphosate;

c.      Failing to undertake sufficient studies and conduct necessary tests to determine whether or not Roundup® products and glyphosate-containing products were safe for their intended use in agriculture and horticulture;

d.      Failing to use reasonable and prudent care in the design, research, manufacture, and development of Roundup®/glyphosate products so as to avoid the risk of serious harm associated with the prevalent use of Roundup®/glyphosate as an herbicide;

e.      Failing to design and manufacture Roundup®/glyphosate products so as to ensure they were at least as safe and effective as other herbicides on the market;

f.      Failing to provide adequate instruction, guidelines, and safety precautions to those persons who Defendant could reasonably foresee would use and be exposed to its Roundup®/glyphosate products;

g.      Failing to disclose to Plaintiff, users/consumers, and the general public that use of and exposure to Roundup®/glyphosate presented severe risks of cancer and other grave illnesses;

h.      Failing to warn Plaintiff, consumers, and the general public that the product's risk of harm was unreasonable and that there were safer and effective alternative herbicides available to Plaintiff and other consumers;

i.      Systematically suppressing or downplaying contrary evidence about the risks, incidence, and prevalence of the side effects of Roundup® and glyphosatecontaining products;

j.      Representing that its Roundup®/glyphosate products were safe for their intended use when, in fact, Defendant knew or should have known that the products were not safe for their intended purpose;

k.      Declining to make or propose any changes to Roundup®/glyphosate products' labeling or other promotional materials that would alert the consumers and the general public of the risks of Roundup® and glyphosate;

l.      Advertising, marketing, and recommending the use of the Roundup®/glyphosate products, while concealing and failing to disclose or warn of the dangers known by Defendant to be associated with or caused by the use of or exposure to Roundup® and glyphosate;

m.      Continuing to disseminate information to its consumers, which indicate or imply that Defendant's Roundup®/glyphosate products are not unsafe.

n.      Continuing the manufacture and sale of its products with the knowledge that the products were unreasonably unsafe and dangerous.

115.    Defendant knew and/or should have known that it was foreseeable that consumers such as Plaintiff would suffer injuries as a result of Defendant's failure to exercise ordinary care in the manufacturing, marketing, labeling, distribution, and sale of Roundup®/glyphosate.

116.    Plaintiff did not know the nature and extent of the injuries that could result from the intended use of and/or exposure to Roundup® or its active ingredient glyphosate.

117.    Defendant's negligence was the proximate cause of the injuries, harm, and economic losses that Plaintiff suffered, and will continue to suffer, as described herein.

118.    Defendant's conduct, as described above, was reckless. Defendant regularly risks the lives of consumers and users of their products, including Plaintiff, with full knowledge of the dangers of its product. Defendant made conscious decisions not to redesign, re-label, warn, or inform the unsuspecting public, including Plaintiff. Defendant's reckless conduct therefore warrants an award of punitive damages.

119.    As a proximate result of Defendant's wrongful acts and omissions in placing defective Roundup®/glyphosate products into the stream of commerce without adequate warnings of the hazardous and carcinogenic nature of glyphosate, Plaintiff has suffered and continues to suffer severe and permanent physical and emotional injuries. Plaintiff has endured pain and suffering, has suffered economic losses (including significant expenses for medical care and treatment) and will continue to incur these expenses in the future.

## CLAIM FOUR

### BREACH OF IMPLIED WARRANTIES

120.    Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

121.    At all times relevant to this litigation, Defendant engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting Roundup®/glyphosate products, which are defective and unreasonably dangerous to consumers, including Plaintiff, thereby placing Roundup®/glyphosate products into the stream of commerce. These actions were under the ultimate control and supervision of Defendant.

122.    Before the time that Plaintiff was exposed to the use of the aforementioned Roundup®/glyphosate products, Defendant impliedly warranted to consumers and those exposed – including Plaintiff – that Roundup®/glyphosate products were of merchantable quality and safe and fit for the use for which they were intended; specifically, as horticultural herbicides.

123.    Defendant, however, failed to disclose that Roundup®/glyphosate has dangerous propensities when used as intended and that the use of and/or exposure to Roundup® and glyphosate-containing products carries an increased risk of developing severe injuries, including Plaintiff's injuries.

124.    Plaintiff reasonably relied upon the skill, superior knowledge, and judgment of Defendant and upon their implied warranties that the Roundup®/glyphosate products were of merchantable quality and fit for their intended purpose or use.

125.    Upon information and belief, Plaintiff was at all relevant times in privity with Defendant.

126.    Plaintiff is the intended third-party beneficiaries of implied warranties made by Defendant to the purchasers of their horticultural herbicides, and as such Plaintiff is entitled to assert this claim.

123.    The Roundup®/glyphosate products were expected to reach and did in fact reach consumers and users, including Plaintiff, without substantial change in the condition in which they were manufactured and sold by Defendant.

124.    At all times relevant to this litigation, Defendant was aware that consumers and users of their products, including Plaintiff, would use Roundup®/glyphosate products as marketed by Defendant, which is to say that Plaintiff was a foreseeable user of Roundup®/glyphosate.

125.    Defendant intended that Roundup®/glyphosate products be used in the manner in which Plaintiff was exposed to them and Defendant impliedly warranted each product to be of

29

merchantable quality, safe, and fit for this use, despite the fact that Roundup®/glyphosate was not adequately tested or researched.

126.    In reliance upon Defendant's implied warranty, Plaintiff used or was exposed to Roundup®/glyphosate as instructed and labeled and in the foreseeable manner intended, recommended, promoted, and marketed by Defendant.

127.    Plaintiff could not have reasonably discovered or known of the risks of serious injury associated with Roundup® or glyphosate.

128.    Defendant breached its implied warranty to Plaintiff in that Roundup®/glyphosate products were not of merchantable quality, safe, or fit for their intended use, or adequately tested. Roundup®/glyphosate has dangerous propensities when used as intended and can cause serious injuries, including those injuries complained of herein.

129.    The harm caused by Roundup®/glyphosate products far outweighed their benefit, rendering the products more dangerous than an ordinary consumer or user would expect and more dangerous than alternative products.

130.    As a direct and proximate result of Defendant's wrongful acts and omissions, Plaintiff has suffered severe and permanent physical and emotional injuries. Plaintiff has endured pain and suffering, has suffered economic loss (including significant expenses for medical care and treatment) and will continue to incur these expenses in the future.

## **<u>CLAIM FIVE</u>**

### **PUNITIVE DAMAGES**

131.    Plaintiff repeats and reiterates the allegations set forth herein.

132.    At all times material hereto, the Defendant knew or should have known that the subject product was inherently dangerous with respect to its health risks.

133.    At all times material hereto, the Defendant attempted to misrepresent and did misrepresent facts concerning the safety of the subject product.

134.    Defendant's misrepresentations included knowingly withholding material information from the public, including the Plaintiff herein, concerning the safety of the subject product. 135. At all times material hereto, the Defendant knew and recklessly disregarded the fact that human exposure to Roundup®/glyphosate can and does cause health hazards, including non-Hodgkin lymphoma.

136.    Notwithstanding the foregoing, the Defendant continued to aggressively market and apply the subject product without disclosing the aforesaid risks.

137.    Defendant knew of the subject product's defective and unreasonably dangerous nature, as set forth herein, but continued to design, develop, manufacture, market, distribute, sell, and apply it so as to maximize sales and profits at the expense of the health and safety of the public, including the Plaintiff herein, in conscious and/or negligent disregard of the foreseeable harm caused by Roundup®/glyphosate.

138.    The Defendant intentionally concealed and/or recklessly failed to disclose to the public, including the Plaintiff herein, the potentially life-threatening hazards of Roundup®/glyphosate in order to ensure continued and increased sales.

139.    The Defendant's intentional and/or reckless failure to disclose information deprived the Plaintiff of necessary information to enable Plaintiff to weigh the true risks of using or being exposed to the subject product against its benefits.

140.    As a direct and proximate result of the Defendant's conscious and deliberate disregard for the rights and safety of consumers such as the Plaintiff, Plaintiff suffered severe and permanent physical injuries. The Plaintiff has endured substantial pain and suffering and has undergone

extensive medical and surgical procedures. Plaintiff has incurred significant expenses for medical care and treatment, and will continue to incur such expenses in the future. The Plaintiff has lost past earnings and has suffered a loss of earning capacity. The Plaintiff has suffered and will continue to suffer economic loss, and has otherwise been physically, emotionally, and economically injured. The Plaintiff's injuries and damages are permanent and will continue into the future.

141.    The aforesaid conduct of the Defendant was committed with knowing, conscious, and deliberate disregard for the rights and safety of consumers, including the Plaintiff herein, thereby entitling the Plaintiff to punitive damages in an amount appropriate to punish the Defendant and deter it from similar conduct in the future.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests that the Court enter judgment in their favor and against Defendant, awarding as follows:

A.  Compensatory damages in an amount to be proven at trial;

B.  Punitive damages;

C.  Costs including reasonable attorneys' fees, court costs, and other litigation expenses; and,

D.  Any other relief the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands trial by jury as to all issues.

Respectfully submitted,

_s/ Blake G. Abbott_
Blake G. Abbott
   Bar No.: 13354
Eric M. Poulin
   Bar No.: 11251
Roy T. Willey, IV
   Bar No.: 11664
**ANASTOPOULO LAW FIRM, LLC**
 32 Ann Street
Charleston, SC 29418
(843) 614-8888
Email: eric@akimlawfirm.com
      roy@akimlawfirm.com
      blake@akimlawfirm.com

**ATTORNEYS FOR PLAINTIFF**

December 14, 2021