TRIAL-OMAHA

# U.S. District Court
## District of Nebraska (8 Omaha)
## CIVIL DOCKET FOR CASE #: 8:21-cv-00469-JMG-MDN
## Internal Use Only

Jobman et al v. Monsanto Company
Assigned to: Judge John M. Gerrard
Referred to: Magistrate Judge Michael D. Nelson
Case in other court: District Court of Dawson County, Nebraska,
      CI 21-00410
Cause: 28:1332 Diversity-Product Liability

Date Filed: 12/16/2021
Jury Demand: Plaintiff
Nature of Suit: 365 Personal Inj. Prod.
Liability
Jurisdiction: Diversity

**Plaintiff**

**Jeffrey T. Jobman**
*Husband*

    represented by    **David A. Domina**
DOMINA LAW GROUP
2425 South 144th Street
Omaha, NE 68144-3267
(402) 493-4100
Fax: (402) 493-9782
Email: ddomina@dominalaw.com
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Christy L. Jobman**
*Wife*

    represented by    **David A. Domina**
(See above for address)
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Monsanto Company**
*a Missouri Corporation*

    represented by    **Michael K. Huffer**
CASSEM, TIERNEY LAW FIRM
9290 West Dodge Road
Suite 302
Omaha, NE 68114-3320
(402) 390-0300
Fax: (402) 390-9676
Email: mhuffer@ctagd.com
*ATTORNEY TO BE NOTICED*

**Ronald F. Krause**
CASSEM, TIERNEY LAW FIRM
9290 West Dodge Road
Suite 302
Omaha, NE 68114-3320
(402) 390-0300

Fax: (402) 390-9676
Email: rkrause@ctagd.com
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 12/16/2021 | 1 | NOTICE OF REMOVAL against All Plaintiffs from District Court of Dawson County, Nebraska, Case number CI 21-410 ( Filing fee $ 402, receipt number ANEDC-4538769) with attached state court pleadings, by Attorney Michael K. Huffer on behalf of Monsanto Company (Attachments: # 1 Exhibit 1)(Huffer, Michael) (Entered: 12/16/2021) |
| 12/16/2021 | 2 | NOTICE of *Request for Location of Trial* by Attorney Michael K. Huffer on behalf of Defendant Monsanto Company (Huffer, Michael) (Entered: 12/16/2021) |
| 12/16/2021 | 3 | UNOPPOSED MOTION to Stay by Attorney Michael K. Huffer on behalf of Defendant Monsanto Company.(Huffer, Michael) (Entered: 12/16/2021) |
| 12/16/2021 | 4 | TEXT NOTICE OF JUDGES ASSIGNED: Judge John M. Gerrard and Magistrate Judge Michael D. Nelson assigned. In accordance with 28 U.S.C. 636(c)(2), the parties are notified that, if all parties consent, a magistrate judge may conduct a civil action or proceeding, including a jury or nonjury trial, subject to the courts rules and policies governing the assignment of judges in civil cases. See Fed. R. Civ. P. 73; NEGenR 1.4. (LRM) (Entered: 12/16/2021) |
| 12/16/2021 | | (Court only) ***Set TRIAL-OMAHA Flag (LRM) (Entered: 12/16/2021) |

## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| JEFFREY T. JOBMAN & CHRISTY L. JOBMAN, Husband & Wife, | ) )  ) | CASE NO. _____ |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| MONSANTO COMPANY, | ) ) | |
| Defendant. | ) | |

## DEFENDANT MONSANTO COMPANY'S NOTICE OF REMOVAL

Pursuant to 28 U.S.C. §§ 1332, 1441, and 1446, Defendant Monsanto Company ("Monsanto"), hereby gives notice of removal of this action, captioned *Jeffrey T. Jobman, et al. v. Monsanto Company,* bearing Case Number D18CI210000410, from the District Court of Dawson County, Nebraska to the United States District Court for the District of Nebraska. Pursuant to 28 U.S.C. § 1446(a), Monsanto provides the following statement of grounds for removal.

## Introduction

1.     In this products liability lawsuit, Plaintiffs Jeffrey and Christy Jobman sue Monsanto for injuries allegedly caused by Monsanto's Roundup®-branded herbicides, which have glyphosate as their active ingredient. For decades, farmers have used glyphosate-based herbicides to increase crop yields, and home-owners, landscaping companies, and local government agencies have used these herbicides for highly effective weed control. Glyphosate is one of the most thoroughly studied herbicides in the world, and glyphosate-based herbicides have received regulatory approval in more than 160 countries. Since 1974, when Monsanto first introduced a Roundup®-branded herbicide to the marketplace, the United States Environmental Protection Agency repeatedly has concluded that glyphosate does not cause cancer. Nevertheless, Plaintiffs

allege that Mr. Jobman developed cancer — specifically, non-Hodgkin's lymphoma ("NHL") — caused by exposure to Monsanto glyphosate-based herbicides.

2.      This is one of many lawsuits that have been filed against Monsanto involving Roundup®-branded herbicides. A multidistrict litigation proceeding is pending in the United States District Court for the Northern District of California, before the Honorable Vince G. Chhabria, pursuant to 28 U.S.C. § 1407. *See In re Roundup Prods. Liab. Litig.*, No. 3:16-md-02741-VC (N.D. Cal.); *In re Roundup Prods. Liab. Litig.*, MDL No. 2741, 214 F. Supp. 3d 1346 (J.P.M.L. 2016).

3.      As discussed in more detail below, Monsanto removes this lawsuit because this Court has subject matter jurisdiction based on diversity of citizenship. Plaintiffs are citizens of Nebraska. For purposes of diversity jurisdiction, Monsanto is deemed to be a citizen of Missouri (where its principal place of business is located) and Delaware (Monsanto's state of incorporation). Accordingly, complete diversity of citizenship exists in this case as required by 28 U.S.C. § 1332. The statutory amount-in-controversy requirement is also satisfied because Plaintiffs seek damages for cancer allegedly caused by exposure to Monsanto's Roundup®-branded herbicides.

## Background and Procedural History

4.      In November 2021, Plaintiffs commenced this lawsuit in the District Court of Dawson County, Nebraska by filing a complaint, captioned *Jeffery T. Jobman, et al. v. Monsanto Company,* Case Number D18CI210000410 (the "State Court Action").

5.      Pursuant to 28 U.S.C. § 1446(a), true and correct copies of the Summons and Complaint served upon Monsanto in the State Court Action (and other filings available from the state court's files) are attached collectively as **Exhibit 1.**

6.      Plaintiffs seek damages for NHL allegedly caused by exposure to Monsanto's glyphosate-based herbicides. *See* Complaint ¶¶ 1-7, 78, 93, 121, 126-128.

## Basis For Removal — Diversity Jurisdiction

7.      Plaintiffs are, and were at the time the State Court Action was filed, residents and citizens of the State of Nebraska. *See* Complaint ¶¶ 3, 8, 64, 67, 69, 127.

8.      Monsanto is, and was at the time the State Court Action was filed, a corporation incorporated under the laws of the State of Delaware, with its principal place of business in the State of Missouri. Thus, Monsanto is deemed to be a citizen of Missouri and Delaware, for purposes of federal diversity jurisdiction.

9.      The Complaint seeks compensatory and punitive damages based on the allegations that Monsanto's Roundup®-branded herbicides caused Mr. Jobman to develop cancer (NHL). Therefore, it is plausible from the face of the Complaint that Plaintiffs seek damages in excess of $75,000, exclusive of interest and costs, which satisfies the jurisdictional amount-in-controversy requirement. 28 U.S.C. § 1332(a); *see Dart Cherokee Basin Operating Co. v. Owens*, 574 U.S. 81, 89 (2014) ("[A] defendant's notice of removal need include only a plausible allegation that the amount in controversy exceeds the jurisdictional threshold."). Indeed, Plaintiffs' request for punitive damages, Complaint, pp. 37–38, "makes it virtually impossible to say that the claim is for less than the jurisdictional amount." *Woodward v. Newcourt Commercial Finance Corp.,* 60 F. Supp. 2d 530, 532 (D.S.C. 1999); *see also Ross v. First Family Fin. Servs., Inc.,* No. 2:01CV218-P-B, 2002 WL 31059582, at *8 (N.D. Miss. Aug. 29, 2002) ("[U]nspecified claims for punitive damage sufficiently serve to bring the amount in controversy over the requisite jurisdictional threshold set out in 28 U.S.C. § 1332."). In fact, numerous other lawsuits seeking damages for cancer allegedly caused by Roundup®-branded herbicides have been filed against Monsanto in other federal courts asserting jurisdiction under §1332(a) and alleging damages in excess of $75,000, exclusive of interest and costs.

10.     In sum, this Court has original subject matter jurisdiction over this action based on § 1332(a) because there is complete diversity of citizenship and the amount in controversy exceeds $75,000, exclusive of costs and interest.

## Procedural Requirements

11.     The District Court of Dawson County, Nebraska is located within the District of Nebraska. Therefore, removal to this Court satisfies the venue requirement of 28 U.S.C. § 1446(a).

12.     Monsanto received notice of process on November 17, 2021. This Notice of Removal is timely, in accordance with 28 U.S.C. § 1446(b)(1), because it is being filed within 30 days of November 17, 2021.

13.     The written notice required by 28 U.S.C. § 1446(d) will be promptly filed in the District Court of Dawson County, Nebraska and will be promptly served on Plaintiffs.

14.     Monsanto does not waive any defenses and expressly reserves its right to raise any and all defenses in subsequent proceedings.

15.     If any question arises as to the propriety of this removal, Monsanto requests the opportunity to present written and oral argument in support of removal.

## Conclusion

For the foregoing reasons, Monsanto removes this lawsuit to this Court pursuant to 28 U.S.C. §§ 1332, 1441, and 1446 (and any other applicable laws).

Dated:  December 16, 2021.

MONSANTO COMPANY, Defendant.

By: /s/ Michael K. Huffer
    Michael K. Huffer – 18087
    Ronald F. Krause - 15980
    CASSEM TIERNEY ADAMS
      GOTCH & DOUGLAS
    9290 West Dodge Road, Suite 302
    Omaha, Nebraska 68114-3320
    Tel. (402) 390-0300
    mhuffer@ctagd.com
    rkrause@ctagd.com

# EXHIBIT 1

Filed in Dawson District Court
*** EFILED ***
Case Number: D18CI210000410
Transaction ID: 0015075934
Filing Date: 11/19/2021 02:01:48 PM CST

## SERVICE RETURN

```
DAWSON COUNTY DISTRICT COURT
Dawson County Courthouse
700 N. Washington St., Room E
Lexington          NE 68850
```

To:

Case ID: CI 21    410 Jeffrey T Jobman v. Monsanto Company

Received this Summons on _____,_____. I hereby certify that on

_____, _____ at _____ o'clock ___M. I served copies of the Summons
upon the party:

_____

by _____

_____

_____

as required by Nebraska state law.

Service and return      $ _____

Copy                      _____

Mileage _____ miles       _____

   TOTAL               $ _____

Date: _____    BY: _____
                                      (Sheriff or authorized person)

## CERTIFIED MAIL
## PROOF OF SERVICE

Copies of the Summons were mailed by certified mail,
TO THE PARTY: _____ Monsanto Company _____

At the following address: __CSC-Lawyers IncorporatimgService Company__

_____ Suite 1900, 233 South 13th Street _____

_____ Lincoln, NE 68508-0000 _____

on the ___15___ day of __November_____ __2021___, as required by Nebraska state law.

                         _____ David A. Domina _____

Postage $ __8.56_____   Attorney for: __Plaintiffs_____

The return receipt for mailing to the party was signed on __November 19___ __2021___.

```
To: Monsanto Company            From: David A Domina
    CSC - Lawyers Incorp Service Co    2425 S. 144th St.
    233 South 13th Street, Suite 1900  Omaha, NE 68144
    Lincoln, NE 68508
```

## ATTACH RETURN RECEIPT & RETURN TO COURT



**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Monsanto Company
CSC-LAWYERS INCORPORATING SERVICE
COMPANY
SUITE 1900
233 SOUTH 13TH STREET
LINCOLN, NE 68508-0000

9590 9402 6985 1225 5924 95

2. Article Number (Transfer from service label)

7021 0950 0001 2260 9912

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature

X Anthony M Rager  ☐ Agent  ☐ Addressee

B. Received by (Printed Name)    C. Date of Delivery

D. Is delivery address different from item 1?  ☐ Yes
If YES, enter delivery address below:  ☐ No

NOV 17 2021  LINCOLN USPS

3. Service Type
☐ Adult Signature
☐ Adult Signature Restricted Delivery
☐ Certified Mail®
☐ Certified Mail Restricted Delivery
☐ Collect on Delivery
☐ Collect on Delivery Restricted Delivery
☐ Insured Mail
☐ Insured Mail Restricted Delivery (over $500)

☐ Priority Mail Express®
☐ Registered Mail™
☐ Registered Mail Restricted Delivery
☐ Signature Confirmation™
☐ Signature Confirmation Restricted Delivery

PS Form 3811, July 2020 PSN 7530-02-000-9053    Domestic Return Receipt



**U.S. Postal Service™**
**CERTIFIED MAIL® RECEIPT**
*Domestic Mail Only*

For delivery information, visit our website at www.usps.com®.

OFFICIAL USE

Certified Mail Fee
$  3.75

Extra Services & Fees (check box, add fee as appropriate)
☐ Return Receipt (hardcopy)       $  3.05
☐ Return Receipt (electronic)      $
☐ Certified Mail Restricted Delivery  $
☐ Adult Signature Required         $
☐ Adult Signature Restricted Delivery $

Postage
$  1.76

Total Postage and Fees
$  8.56

Sent To

Monsanto Company
CSC-LAWYERS INCORPORATING SERVICE
COMPANY
SUITE 1900
233 SOUTH 13TH STREET
LINCOLN, NE 68508-0000

Street and Apt. No., or PO Box No.

City, State, ZIP+4®

BOYSTOWN POST OFFICE 6889 NOV 17 2021 Postmark Here

PS Form 3800, April 2015 PSN 7530-02-000-9047    See Reverse for Instructions

# Certificate of Service

I hereby certify that on Friday, November 19, 2021 I provided a true and correct copy of the Return-Summons/Alias Summons to the following:

Monsanto Company service method: No Service

Signature: /s/ Domina,David,A (Bar Number: 11043)

| Image ID:<br>D00050119D18 | **SUMMONS** | Doc. No.      50119 |

IN THE DISTRICT COURT OF Dawson COUNTY, NEBRASKA
Dawson County Courthouse
700 N. Washington St., Room E
Lexington          NE 68850

Jeffrey T Jobman v. Monsanto Company

Case ID: CI 21      410

TO:  Monsanto Company

**FILED BY**

Clerk of the Dawson District Court
11/15/2021

You have been sued by the following plaintiff(s):

Jeffrey T Jobman                    Christy L Jobman

Plaintiff's Attorney:   David A Domina
Address:                2425 S. 144th St.
                        Omaha, NE 68144

Telephone:              (402) 493-4100

A copy of the complaint/petition is attached. To defend this lawsuit, an
appropriate response must be served on the parties and filed with the office of
the clerk of the court within 30 days of service of the complaint/petition. If
you fail to respond, the court may enter judgment for the relief demanded in the
complaint/petition.

Date: NOVEMBER 15, 2021      BY THE COURT: _Becky Boryca_

Clerk

PLAINTIFF'S DIRECTIONS FOR SERVICE OF SUMMONS AND A COPY OF THE
COMPLAINT/PETITION ON:

Monsanto Company
CSC - Lawyers Incorp Service Co
233 South 13th Street, Suite 1900
Lincoln, NE 68508

Method of service:  Certified Mail

You are directed to make such service within ten days after the date of issue,
and file with the court clerk proof of service within ten days after the signed
receipt is received or is available electronically, whichever occurs first.

| SERVICE RETURN | Doc. No. 50119 |
|---|---|

DAWSON COUNTY DISTRICT COURT
Dawson County Courthouse
700 N. Washington St., Room E
Lexington          NE 68850

To:
Case ID: CI 21    410 Jeffrey T Jobman v. Monsanto Company

Received this Summons on _____,_____. I hereby certify that on

_____, _____ at _____ o'clock ___M. I served copies of the Summons

upon the party:

_____

by _____

_____

_____

as required by Nebraska state law.

Service and return      $ _____

Copy                         _____

Mileage _____miles      _____

   TOTAL                $ _____

Date: _____      BY: _____
                                               (Sheriff or authorized person)

# CERTIFIED MAIL
# PROOF OF SERVICE

Copies of the Summons were mailed by certified mail,
TO THE PARTY: _____

At the following address: _____

_____

_____

on the _____ day of _____ _____, as required by Nebraska state law.

                                        _____

Postage $ _____      Attorney for: _____

The return receipt for mailing to the party was signed on _____,_____.

To: Monsanto Company                    From: David A Domina
    CSC - Lawyers Incorp Service Co           2425 S. 144th St.
    233 South 13th Street, Suite 1900         Omaha, NE 68144
    Lincoln, NE 68508

**ATTACH RETURN RECEIPT & RETURN TO COURT**

Filed in Dawson District Court
*** EFILED ***
Case Number: D18CI210000410
Transaction ID: 0014712834
Filing Date: 11/15/2021 11:40:00 AM CST

## District Court, Dawson County, Nebraska

| | |
|---|---|
| Jeffrey T. Jobman & Christy L. Jobman, Husband & Wife, | Case No.: CI 21-___ |
| **Plaintiffs,** | |
| v. | **Praecipe for Summons** |
| Monsanto Company, a Missouri Corporation, | |
| **Defendant.** | |

TO:    Clerk of the District Court

Pursuant to *Neb Rev Stat* §§ 25- 505.01 *et seq*., please issue a Summons directed to the following:

Monsanto Company
CSC-LAWYERS INCORPORATING SERVICE COMPANY
SUITE 1900
233 SOUTH 13TH STREET
LINCOLN, NE 68508-0000

Plaintiff elects to make service of process by certified mail.

November 15, 2021.

Jeffrey T. Jobman & Christy L.
Jobman, Plaintiffs,

By:  /s/ *David A. Domina*
David A. Domina 11043NE
Domina Law Group pc llo
2425 South 144th St.
Omaha NE 68144-3267
402 493 4100
ddomina@dominalaw.com

Plaintiffs' Lawyers

10O6688

Filed in Dawson District Court
*** EFILED ***
Case Number: D18CI210000410
Transaction ID: 0014712834
Filing Date: 11/15/2021 11:40:00 AM CST

## District Court, Dawson County, Nebraska

| | |
|---|---|
| Jeffrey T. Jobman & Christy L. Jobman, Husband & Wife, | Case No.: CI 21-___ |
| **Plaintiffs,** | |
| v. | **Plaintiff's Complaint & Jury Demand** |
| Monsanto Company, a Missouri Corporation, | **Trial Location Designation** |
| **Defendant.** | |

## Overview

1.      Jeffrey T. Jobman, date of birth 1968, sues Monsanto Company for his personal injuries, consisting of diffuse large B-cell non-Hodgkin's lymphoma – Central Nervous System (Solid Tumor Situs) caused by his reliance upon the false assurances of Monsanto, Monsanto's failure to warn, and its unsafe, negligent, and intentionally wrongful disregard for human safety in the design, formulation, testing, manufacturing, advertising, promotion, and distribution of its Roundup® herbicide.  For decades, including throughout the time that Mr. Jobman used Roundup®, Monsanto promoted it as harmless to human beings. In some representations, Roundup® was described as being a product as safe as table salt, and even as "safe enough to drink."

2.      Despite Monsanto's representations, Roundup® is dangerous to human health. Roundup®'s primary ingredient is glyphosate, a carcinogen. Monsanto formulates its glyphosate to create Roundup® with surfactants and other elements that multiply the aggressive carcinogen quality of its product. Monsanto failed to warn consumers about what it knew and perpetuated the false representation of its products dangers even though it knew or had reason to know of them. When confronted with the facts, Monsanto persistently denied that its product was harmful and denied specifically that it causes non-Hodgkin's lymphoma. Monsanto continues, to the date of this filing to market its Roundup® herbicide as safe, and without warnings or precautions to foreseeable users.

1

3.     Mr. Jobman used Roundup® concentrate, mixed for personal use, and used Roundup® concentrate mixed for crop use on corn and soybean crops. His usage and exposures were as follows:

| • Years/Location/Type | Frequency | Duration/ Tot Exp | Total |
|---|---|---|---|
| 1982-1988 Dawson County, Nebraska Roundup® concentrate mixed around building site | 10 applications/yr x 7 yrs | 1.5 hrs ea. 70 exp | 15 hrs / yr x 7 yrs = 105 hrs |
| 1989-1996 Dawson County, Nebraska Roundup® concentrate mixed around building site | 10 applications x 7 yrs | 1.5 hrs ea. 70 exp | 15 hrs / yr x 7 yrs = 105 hrs |
| 1997-2020 (14 yrs) Dawson County, Nebraska Roundup® concentrate mixed around building site | 10 applications x 24 yrs | 1.5 hrs ea. 240 exp | 15 hrs / yr x 24 yrs – 360hrs |
| 1996-2020 (15 yrs) Dawson County, Nebraska Roundup® concentrate mixed on soybeans Av 450 acres | 2-3 day / yr av 2.5 days. Yr x 25 yrs | 10 hrs / day 75 exp | 25 hrs / yr x 25 yrs = 625 hrs |
| 1998 – 2020 Dawson County, Nebraska Roundup® concentrate on corn Av 1400 acres | 7 days per yr av x 23 yrs | 10 hrs /day 161 exp | 70 hrs /yr x 23 yrs = 1,610 hrs |
| **Totals** | **Exposures:** **616** | | **Hours** **2,805** |

Uses:          Agricultural; crops and farmstead
Types:         Roundup Concentrate; RoundupPro®; ProMax
Purchased:   Gothenburg NE, Country Partners Coop and Farmacy Chemical LLC
Not included: Work time in close struck by Roundup spray or mist;  unaccountable
                    exposures due to ubiquity of Roundup in farm community.

4.     After Roundup® had firmly established itself as the weed killer of choice, from time-to-time Mr. Jobman used generic glyphosate but did so strictly in reliance upon Roundup®'s safety assurances and general acceptance and promotion by Monsanto.

5.     Mr. Jobman was diagnosed with diffuse large B-cell non-Hodgkin's lymphoma presenting in his central nervous system with a tumor partially removed during

2

10O5344

a craniotomy April 2, 2021. The diagnosis was confirmed by the Mayo Clinic and subsequently by the University of Nebraska Medical Center. Mr. Jobman has been in continuous treatment since diagnosis and is undergoing autologous stem cell transplantation as this Complaint is filed.

6.      If Mr. Jobman had known, or been warned by Monsanto, he would not have used it, or suffered exposures to it. At all relevant times, Plaintiff used Roundup® in accord with its label directions. The label did not caution about personal protective equipment or other precautions and gave no indications of any health risks associated with the product. Monsanto continues to deny the carcinogenic properties of Roundup®. As of March 2020, it continued to expressly state on its Australian website, www.roundup.com.au that:

> **Do I need to wear protective clothing when using Roundup products?**
> You are not required to use any protective clothing when using Roundup, although we do recommend that when using any lawn & garden products that you wear closed shoes, protective glasses, dust mask, and gloves, where appropriate. Don't forget a hat and sunscreen![1]

Plaintiff used the product in accord with the label.

7.      Plaintiff seeks a money judgment for his general and special damages. Plaintiff's spouse, Christy L. Jobman, joins him and asserts her consortium claim. For simplicity throughout this Complaint, except where necessary to refer to Mrs. Jobman's consortium claim "Plaintiff" refers to Mr. Jobman but only for ease of reference and not to exclude Mrs. Jobman's claim.

### Jurisdiction, Venue

8.      The District Court has subject matter jurisdiction under its general jurisdictional grant, *Neb Rev Stat* § 24-302. Venue is proper in Dawson County, Nebraska where Plaintiff resides, Defendant has a presence and sells its product, and Defendant caused tortious injury to the Plaintiff. In the event this case is removed by Defendant to the

---

[1] https://www.roundup.com.au/faqs/do-i-need-to-wear-protective-clothing-when-using-roundup-products

10O5344

United States District Court for the District of Nebraska, trial by jury is demanded and trial in Omaha, Nebraska is requested. If this occurs, the Court is informed that this case is related to an order issued by the United States judicial panel on Multi-District Litigation on October 4, 2016 creating MDL #2741. This Court has personal jurisdiction over Defendant because Defendant contracted to sell and deliver goods and services in Dawson County, Nebraska, maintains a presence here, and caused tortious injury to the Plaintiff here. *Neb Rev Stat* § 25-536.

**Facts Concerning Mr. Jobman,
Glyphosate, Roundup® & Monsanto**

9.      Plaintiff, born in 1968, enjoyed good health, and had no predispositions, family history, or medical history that suggested he had any propensity to develop non-Hodgins Lymphoma ("NHL").

10.     Plaintiff's Roundup® usage is as summarized in ¶ 3 above. Plaintiff was not warned. Roundup® was sold as safe and not posing lethal dangers to human users. Roundup® is formulated with glyphosate as a principal ingredient. Indeed, as late as 2021, Monsanto was continuing to tout and sell the product as safe.

11.     Glyphosate is a broad-spectrum, non-selective herbicide used in Monsanto's Roundup®. Glyphosate disrupts a plant's ability to form certain amino acids necessary for protein synthesis. Generally, it kills targeted plants within two to three days. Before they die, target and nontarget plants absorb Roundup® and glyphosate. The absorbed substance cannot be removed by washing, peeling, or even by milling, baking or brewing.

12.     Herbicidal properties of glyphosate were discovered in 1970 by a Monsanto chemist. The first glyphosate-based herbicide was introduced by Monsanto in the mid-1970s under the brand name Roundup®. Roundup® was not truthfully portrayed though Monsanto did, or should have, known the truth at the outset about the dangers of its product. It gave no warnings in the beginning, or thereafter. Despite known and mounting evidence of the dangers of Roundup® Monsanto did not change its formulation, marketing or disclosure practices. Monsanto's awareness of health risks, and its decision to conceal those risks dates back to at least the 1980s and has been continuous since then.

13.     Roundup® reached the marketplace in 1976. It became the most commonly used weed killer in the State of Nebraska, the United States, and the world. Since then, Monsanto promoted use of its Roundup® products containing glyphosate, touting it as a remarkable technological breakthrough that could kill weeds without causing harm to people or the environment. In 1996, Monsanto introduced soybean seed with traits that made it tolerant of Roundup®, and in 1998 it produced seed corn with traits that made it tolerant of Roundup®. These events caused a sweeping change in agriculture and rapidly made it a virtual impossibility to raise corn or soybeans in Nebraska unless Monsanto's Roundup-tolerant soybean and corn hybrid seeds were used.

14.     Monsanto knew, for all or substantially all of those forty (40) years that its reassuring statements about Roundup®'s impact on human health were false. But, internally at Monsanto, Roundup® was so popular, and had so much potential and profit potential for Monsanto that the company falsified data, sponsored, promoted, developed and distributed false studies masquerading as science, and vilified accurate studies all for the purpose of masking Monsanto's knowledge and Roundup®'s dangers from the unsuspecting public. The Plaintiff is a victim of this deception.

15.     In the United States, Monsanto paid massive political campaign contributions, spent huge sums for "government relations," and expended large amounts of money on universities to influence and purchase their research and for university endorsements to disguise dangers of Roundup®.

16.     On an ongoing basis, Monsanto engages in specific acts and omissions designed to conceal its awareness of   carcinogenic properties of Roundup®. It has done so for decades. By doing so, it makes it impossible for members of the general public and consumers and users of the product like Plaintiff to learn of Roundup®'s cancer risks.

17.     Monsanto engaged in these acts, and others, to conceal the link between Roundup® or its glyphosate product, and non-Hodgkin's lymphoma:

      17.1  Since the 1970s. Monsanto consciously and deliberately elected against performing research studies and evaluations of its product because the

5

10O5344

risks of conducting the experiments indicated by the work of others was viewed as posing too great a risk of outcomes adverse to the health claims.

17.2 May 26, 1999. William F. Heydens of Roundup® emailed an internal group called about a global scientific outreach council meeting for the purpose of communicating an internal plan at Monsanto to network its people to shut down persons who were early at advancing a claim that Roundup® and its glyphosate component are carcinogenic in order to get "people to get up and shout Glyphosate is Non-Toxic."

17.3 By 1999, Monsanto had a report from a scientist it engaged, Dr. James Parry detailing scientific findings of cancer risks associated with glyphosate and Roundup®. Monsanto severed its arrangements with Dr. Parry, stopped funding his research, and embarked upon a decades long effort to debunk the results of his work.

17.4 2004. Monsanto had toxicologist Dr. Donna Farmer prepared a "2004 product safety center-toxicology goals" internal document at Monsanto. The document details her successes in 2004 at suppressing medical information adverse to Roundup® and suggesting that it had carcinogenic properties or posed other hazards. She detailed a plan for continuing to do so. The plan was adopted and executed over ensuing years.

17.5 2011. Then and thereafter until at least 2016, Monsanto's scientists engaged in efforts to rebuff and suppress European scientific papers establishing dermal absorption rates for glyphosate into the human skin, and thereby explaining the pathway of Monsanto's glyphosate to the human blood arteries and veins, and the blood system where it tended to cause cancer, and particularly non-Hodgkin's lymphoma.

17.6 January 2013. Monsanto engaged in ghost writing papers posing as documents generated by objective, independent research scientists. However, Monsanto had compromised the authors of several of these

6

papers, including David Saltmiras, but concealed its disqualifying business arrangements with them. It continued a course of conduct and pattern of concealing this information.

17.7    2013 through 2019. Monsanto developed internal communications channels and methodologies with public officials and federal employees responsible for reviewing products like Roundup® and evaluating their safety.

17.8    Over Decades. Monsanto developed relationships with many of these persons, compromising them to make incomplete and Monsanto-friendly decisions notwithstanding contrary scientific evidence.

17.9    Over Decades. Monsanto manipulated and falsified the outcomes of research and efforts to submit information about Roundup® to federal regulators, thereby concealing its risks.

17.10   Between 2011 and 2015. In this timeframe, Monsanto's chief toxicologist alerted Monsanto colleagues that the company could not claim glyphosate poses no risks as a carcinogen because the company had not performed the research necessary to reach a conclusion in that regard. A recommendation against conducting the research followed, and the research was never undertaken by Monsanto. Nonetheless, Monsanto promoted the product as safe.

17.11   March 2016. In or about then, Monsanto figures communicated with one another and developed a "Red Flag" campaign with a Dublin-based PR and lobbying firm to influence public officials and opinion to believe that Roundup® was safe.

17.12   2016-Present. Monsanto continues to deny the existence of a cause-and-effect relationship making a its Monsanto Roundup® herbicide products substantial factors in bringing about the occurrence of non-Hodgkin's lymphoma in the body of innocent persons including Plaintiff.

7

10O5344

17.13   As late as July 18, 2020 Monsanto's owner published this statement on its Bayer.com website with worldwide reach:

> As part of our continued commitment to our customers around the world and driven by our desire to continue providing them with the tools they need for their operations, Bayer announced today a series of agreements to substantially resolve major outstanding legacy Monsanto litigation, including the U.S. Roundup™ product liability litigation, the dicamba drift litigation and most of the company's PCB water litigation.

> These agreements are not a contradiction to our belief in the safety of our products. On the contrary, now, more than ever, we continue to proudly stand behind their safety and utility. The decision to resolve these cases was driven by our desire to bring greater certainty about the availability of our products to customers and to return our focus to our important work at hand-developing additional agricultural innovations to help growers around the world. We are committed to providing the innovative seeds & traits, crop protection and services our customers need to continue doing their jobs every day. To that end, we remain committed to the safety, access and availability of our Roundup™ and XtendiMax™ products, today and in the future.



**Liam Condon**, President of the Crop Science Division and Member of the Bayer AG Board of Management

**Brett Begemann**, Chief Operating Officer and Member of the Executive Leadership Team[2]

The website statements continue with this:

> The problem is that juries in all of the trial settings to date have been presented with a very narrow slice of the science by plaintiffs' lawyers, and much of it is not reliable because of small samples or studies confounded by

---

[2]  https://www.cropscience.bayer.com/customer-updates   (visited 7.18.2020).

exposure to other chemicals. This is unlikely to change under the evidentiary rulings by trial courts to date and is emblematic of the types of difficulties faced by defendants dealing with medical causation issues under the U.S. mass tort legal system.[3]

18.     In January 2021, and continuing to May 2021, Monsanto published claims that its Roundup® is safe and "do[es] not cause cancer". [4]

19.     In 2015, the World Health Organization's International Agency for Research of Cancer (IARC), announced in 2015 that its  work by  premier scientists established that glyphosate and Roundup® are probable carcinogens. Public notice started slowly thereafter. Since then, other studies have also revealed this fact, and evidence of the cancerous nature of the substance continues to grow. It is now established by objective scientific research that glyphosate and Roundup® cause NHL. Roundup® caused the NHL of Plaintiff. This is why the Plaintiff now sues Monsanto.

20.     In the United States, the manufacture, formulation, and distribution of certain chemicals, including herbicides and specifically including Roundup® is regulated under federal law by 7 USC §§ 136 et. seq. The statute is known the *Federal Insecticide, Fungicide and Rodenticide Act* ("FIFRA").

21.     Under FIFRA, all pesticides must be registered with the Environmental Protection Agency before they may be distributed, sold, or used. This is because they are toxic to plants, animals, and humans. The EPA, as a part of the registration process, requires that products be tested and evaluated, pass those tests, and that the results of the tests be submitted to the EPA for assessment.  Even after assessment by the EPA, its decision is not an assurance of safety or government endorsement. EPA approval for marketing is not a regulatory decision about safety.

22.     The EPA does not deem products "safe," but only that use of the product in accordance with its label directions "will not generally cause unreasonable adverse effects on the environment."  7 USC § 136a(c)(5)(D).

---

[3] *Id.*
[4] https://www.bayer.com/en/glyphosate/glyphosate-roundup

23.     FIFRA defines "unreasonable adverse effects on the environment" to mean "any unreasonable risk to man or the environment, taking into account the economic, social, and environmental costs and benefits of the use of any pesticide." 7 USC § 136(bb). FIFRA thus requires EPA to conduct a risk/benefit analysis in determining whether a registration should be granted or allowed to continue to be sold in commerce.

24.     FIFRA generally requires that the registrant, Monsanto in the case of Roundup®, conduct the health and safety testing of pesticide products in accord with approved protocols. The data produced by the registrant must be submitted to the EPA for review and evaluation.

25.     Each product submitted to the EPA for evaluation undergoes initial registration. Singular registration is not an all-encompassing, all-times, and non-changing event. Data necessary to achieve registration has changed from time to time. Re-registration is required by 7 USC § 136a-1. This requires additional tests and submissions. In Monsanto's case, it undertook those additional tests and performed them. The tests were falsified[5] and the laboratories that conducted them for Monsanto were caught and punished.[6] Still, Monsanto concealed these events and used Roundup® profits to obscure and conceal adverse information with its marketing campaigns. It did so successfully for many years.

26.     In April 2016, the EPA posted a risk assessment of glyphosate on its website and then immediately retracted it. The EPA subsequently indicated that the posting was

---

[5]  U.S. EPA. Communications and Public Affairs. 1991. Note to correspondents. Washington, D.C. (March 1. );. U.S. EPA. Communications, Education, And Public Affairs. 1994. Press advisory. Craven Laboratories, owner, and 14 employees sentenced for falsifying pesticide tests. Washington, D.C. (March 4.); U.S. EPA. Communications and Public Affairs. 1991. Press advisory. EPA lists crops associated with pesticides for which residue and environmental fate studies were allegedly manipulated. Washington, D.C. (March 29.); U.S. Dept. of Justice. United States Attorney. Western District of Texas. 1992. Texas laboratory, its president, 3 employees indicted on 20 felony counts in connection with pesticide testing. Austin, TX. (September 29.)

[6]  For example, U.S. Congress. House of Representatives. Committee on Government Operations. 1984. Problems plague the Environmental Protection Agency's pesticide registration activities. House Report 98-1147. Washington, D.C.: U.S. Government Printing Office; False data, Journal of Pesticide Reform, Volume 15, Number 3, Fall 1995. Northwest Coalition for Alternatives to Pesticides, Eugene, OR. Glyphosate, Part 1: Toxicology, by Caroline Cox

10O5344

inadvertent, that the document posted was not the EPA's final assessment or even a preliminary one, and that the EPA intended to issue a final report by the end of 2016.

**Scientific Falsehoods Re: Marketing and Sale of Roundup®.**

27.     Monsanto manipulated "scientific" data to market its Roundup® products using many of the tactics it perfected with dioxin[7], Pydraul 150[8] and PCBs.[9]

28.     At least as early as 1985, studies existed demonstrating that the glyphosate component of Roundup® was believed to be an agent that caused cancer in laboratory animals and that it was possibly carcinogenic to humans. Monsanto flexed its political and government relations muscles, provided studies to the EPA, and the EPA changed its classification of the substance. When it did so in 1991, the EPA classified the glyphosate component of Roundup® as yielding evidence of non-carcinogenicity in humans. The EPA announcement, however, emphasized that the designation of Roundup® or glyphosate in what it called Group E, i.e., non-carcinogenicity in humans, was "based on the available evidence at the time of evaluation and should not be interrupted as a definitive conclusion that the agent will not be a carcinogen…." Monsanto, however, continued to sell its Roundup® products as safe, noncarcinogenic, and without warnings. It also aggressively denied any health hazard associated with the use of Roundup® products.

29.     The EPA, itself, however found that Monsanto, and laboratories it employed, manipulated tests of toxicity, misrepresented them, and affirmatively committed fraud. Monsanto's laboratories used for this purpose in committing these wrongful acts included Industrial Bio-Test Laboratories. The studies falsified included at least thirty (30) test runs

---

[7] The name dioxin refers to a group of highly toxic chemicals linked to heart disease, liver disease, human reproductive disorders, and developmental problems. Even in small amounts, dioxin persists in the environment and accumulates in the body. In 1997 the International Agency for Research on Cancer, classified dioxin as a substance that causes cancer in humans. In 2001 the U.S. government listed the chemical as a "known human carcinogen."

[8] Pydraul 150 was a lethal hydraulic for submarines manufactured and sold by Monsanto as safe for humans at the same time the company concealed that it knew the product was too toxic for use in submarines.

[9] PCBs were versatile and fire-resistant, and became accepted in lubricants, hydraulic fluids, and sealants. But PCBs are toxic. A member of a family of chemicals that mimic hormones, PCBs have been linked to damage in the liver and in the neurological, immune, endocrine, and reproductive systems. The Environmental Protection Agency (E.P.A.) and the Agency for Toxic Substances and Disease Registry, part of the Department of Health and Human Services, now classify PCBs as "probable carcinogens."

on glyphosate and products containing it including residue studies required by the EPA to register Roundup® for sale.

30.     The U.S. Food and Drug Administration discovered in an inspection of Industrial Bio-Test Laboratories (IBT), significant discrepancies between raw data and final reports. This led to an EPA audit of IBT and a determination that its toxicology studies on Roundup® were invalid. The EPA found the firm engaged in routine falsification of data making it "hard to believe the scientific integrity of the studies when they said they took specimens from the uterus of male rabbits."  Three (3) senior executives of IBT were convicted of criminal fraud.[10]

31.     Separately, Monsanto engaged Craven Laboratories to preform tests, including studies of Roundup®. During the same year that they were engaged by Monsanto, Craven Laboratories had three (3) of its employees were indicted and convicted of fraudulent laboratory testing practices involving pesticides and herbicides.[11]   While Monsanto denies that the laboratories acted at its direction, it did not disavow the results until it was forced to occur by the Federal Government through the prosecutions noted above. Monsanto has not explained why it did fail to publicly disavow the occurrences and make its customers and the public aware of the testing results immediately. It continues to market Roundup® and continues, even on its website, to contend glyphosate is safe. It has made no new disclosures or warnings but marches on with its statements, undaunted by rejection from science, courts, juries and hundreds of national and local governments.[12]

32.     Monsanto dominates and controls the market. Its RoundupReady® seed, which became so dominant in row crop production, and production of many small grains and alfalfa, that farmers across the United States were forced to use Roundup® and RoundupReady® seed. Mr. Jobman found himself in this inescapable dilemma.

---

[10]  Id.

[11]  Id.

[12]  R. Raman, the impact of Genetically Modified (GM) crops in modern agriculture: A review, 8, Biotechnology and Agriculture and the Food Chain, No. 4 (2017) available at
https://www.tandfonline.com/doi/full/10.1080/21645698.2017.1413522 Also see, Ashley Hutchinson et al.,
"Roundup® Ready":  the first widely used genetically modified crop, the environment and society portal
http://www.environmentandsociety.org/tools/keywords/roundup-ready-first-widely-used-genetically-modified-crop

33.     Monsanto did not refrain from disclosing what it knew or should have known about Roundup®. It is believed to have continued to perpetuate its conscious, deliberate disregard for the truth about Roundup® because the product was a key ingredient to Monsanto's dominance in the marketplace, its dramatically expanding market share, and its assumption of a position of influence, power and authority in the industry that was essentially unparalleled.

34.     Monsanto became so dominant in the marketplace that its product crowded out competitors, and it became virtually impossible in many markets to find or secure herbicides that were compatible with seeds and grasses that were not Monsanto products containing glyphosate marketed under the Roundup® label. Mr. Jobman and many others, faced this circumstance.[13]

35.     As a result of Roundup® sales, Monsanto's primary corporate focus shifted to its agricultural division because it outperformed the chemicals division in revenues and income by dramatic margins and with rapid growth.

36.     Monsanto developed genetically modified seeds which it called and labeled as "Roundup® Ready."  Defendant recognized its potential to secure even more market gains with control over seed for crops that could be made resistant to Roundup®. These were seeds resistant to glyphosate and permitted farmers to use Roundup® on their fields during the growing season without harming the crop. This effort permitted Monsanto to expand the market for Roundup® to the nation's farmers and to use the income from those sales to further dominate the domestic market for commercial uses and residential uses akin to the uses experienced by Mr. Jobman.

37.     Many years before Plaintiff found he had no choice realistically but to use Roundup® due to its market dominance, Monsanto's biotechnology seeds became dominant worldwide. Roundup® was the odds-on, and virtually ubiquitous herbicide with what, through the company's marketing strategy, became a household term synonymous

13

with weed killer or herbicide. Roundup® weed killer, and herbicide, became indistinguishable in the minds of many Americans. The Plaintiff is among these victims.

38.     Proximity to crops and herbicides used on them, including their plant tissue and dust at harvest time exposes the persons who suffer the dust and harvest-based exposure to the risks associated with ingesting the herbicides into their bodies. Plaintiff was so exposed by extensive work at harvest time, did ingest the substance into his body, and had Roundup® and its glyphosate component introduced into his blood as a result.

**Monsanto Falsely Promoted Roundup® as Safe**

39.     Monsanto has been taken to task and promised to discontinue its false statements about Roundup® but failed to keep its word, even after being ordered by a U.S. Court to do so. In 1996, the New York Attorney General ("NYAG") sued Monsanto for false advertising of Roundup® products. The New York case challenged Monsanto's representations that its spray-on glyphosate-based herbicides, including Roundup®, were:

39.1   "Safer than table salt" and "practically non-toxic" to mammals, birds, and fish.

39.2   "Remember that environmentally friendly Roundup® herbicide is biodegradable. It won't build up in the soil so you can use Roundup® with confidence along customers' driveways, sidewalks and fences."

39.3   "And remember that Roundup® is biodegradable and won't build up in the soil. That will give you the environmental confidence you need to use Roundup® everywhere you've got a weed, brush, edging or trimming problem."

39.4   "Roundup® biodegrades into naturally occurring elements." \

39.5   "Remember that versatile Roundup® herbicide stays where you put it. That means there's no washing or leaching to harm customers' shrubs or other desirable vegetation."

39.6   "This non-residual herbicide will not wash or leach in the soil. It … stays where you apply it."

14

10O5344

39.7     You can apply Roundup® with "confidence because it will stay where you put it," it bonds tightly to soil particles, preventing leaching. Then, soon after application, soil microorganisms biodegrade Roundup® into natural products.

39.8     "Glyphosate is less toxic to rats than table salt following acute oral ingestion."

39.9     "Glyphosate's safety margin is much greater than required. It has over a 1,000-fold safety margin in food and over a 700-fold safety margin for workers who manufacture it or use it."

39.10     "You can feel good about using herbicides by Monsanto. They carry a toxicity category rating of 'practically non-toxic' as it pertains to mammals, birds and fish."

39.11     "Roundup® can be used where kids and pets will play and breaks down into natural material." This ad depicts a person with his head in the ground and a pet dog standing in an area that has been treated with Roundup®.

40.     Monsanto either could not, or chose not to, defend these and similar hyperbolic false statements. On November 19, 1996, Monsanto entered into an agreement called an *Assurance of Discontinuance* with the Attorney General of New York.[14] In it, Monsanto agreed, among other things, "to cease and desist from publishing or broadcasting any advertisements [in New York] that represent, directly or by implication" that Monsanto Glyphosate-containing pesticide products or any of them, possessed any of these features, advantages or elements described below. These are assurances made by Monsanto to the Attorney General:

Glyphosate-containing pesticide products or any component thereof of Monsanto:

---

[14] In the matter of Monsanto Company, respondent.
Assurance of Discontinuance pursuant to executive law § 63(15) (Attorney General of the State of New York, Consumer Frauds and Protection Bureau. Environmental Protection. November 1996. Available at https://big.assets.huffingtonpost.com/fraud.pdf.

40.1   Are safe, non- toxic, harmless or free from risk;

40.2   Are biodegradable;

40.3   Will stay where applied and will not move through the environment;

40.4   Are "good" for the environment or are "known for their environmentally friendly characteristics;"

40.5   Are safer or less toxic than consumer products other than herbicides; and,

40.6   Might be classified as "practically non-toxic."

41.     Monsanto double crossed the Attorney General of New York, and the public because it did not alter its advertising in the same manner in any state other than New York and, based on information and belief, still has not done so today. Indeed, Monsanto's bad acts in connection with is crop chemicals business continues with its wrongdoing in ways that produced criminal convictions and admissions of guilt as late as November 2019 in connection with other products.[15]

42.     Monsanto also double crossed and misled the people of the world. In 2009, France's highest court ruled that Monsanto had not told the truth about the safety of Roundup®. The French court affirmed that Monsanto had falsely advertised its herbicide

---

[15]  In 2005, Monsanto was convicted on felony bribery-related charges under the U.S. Foreign Corrupt Practices Act, 15 USC §§78dd-1 and 78m(b). On November 21, 2019, the U.S. Department of Justice announced a settlement in which Monsanto agreed to plead guilty to a misdemeanor count of illegally using the pesticide Penncap-M, a methyl parathion product that was cancelled by the U.S. Environmental Protection Agency (EPA) on July 27, 2010. US Dist Ct Hawaii, CR19-00162. This settlement of several criminal counts by Monsanto followed an investigation by the EPA Criminal Investigation Division. Under the existing stocks provision in the EPA cancellation order, continued use of Penncap-M became unlawful after December 31, 2013. Monsanto admits that its employees knowingly violated this order by using Penncap-M on July 15, 2014, to treat corn seed research crops at Monsanto's Valley Farm research facility in Maui, Hawaii. Monsanto also admits that its employees directed other employees to re-enter the treated site seven days after the July 15, 2014, application, although the re-entry period established for this pesticide prior to its cancellation was 31 days. Monsanto further admits that it stored stocks of Penncap-M after December 31, 2013, when unused stocks of this product became an acute hazardous waste under the Resource Conservation and Recovery Act (RCRA), at several locations in Hawaii without obtaining the required permits. Monsanto agreed to pay a total of $10.2 million in fines and penalties, which includes a maximum fine of $200,000 for illegal use of a cancelled pesticide, $6 million in fines for the hazardous waste violations, and $4 million in community service payments. Monsanto agreed to be sentenced to two years of probation. https://www.justice.gov/usao-cdca/pr/monsanto-agrees-plead-guilty-illegally-spraying-banned-pesticide-maui-facility

Roundup® as "biodegradable" and that it "left the soil clean." Around the world, nations, cities, and counties have banned Roundup® and glyphosate herbicides. Countries with bans include Germany, France, Vietnam, Sri Lanka, Colombia, El Salvador, Saudi Arabia, Kuwait, Qatar, Bahrain, Oman, United Arab Emirates, Argentina and others. Warnings are also required, or other sales curbs are in place, in multiple U.S. States and local governments.

### Assessments of Glyphosate and Roundup®

43. Monsanto concealed what it knew of glyphosate and Roundup® from the scientific community and the world for many years. The International Agency for Research of Cancer ("IARC") is the specialized cancer agency of the World Health Organization, and organization of the United Nations. IARC promotes international collaboration in cancer research, "bringing together skills in epidemiology, laboratory sciences, and biostatistics to identify the causes of cancer[.]" IARC assesses whether chemicals are carcinogenic through its Monograph issuance program and protocol.

44. IARC Monographs identify environmental factors that are carcinogenic hazards to humans. These include chemicals, complex mixtures, occupational exposures, physical agents, biological agents, and lifestyle factors. National health agencies can use this information as scientific support for their actions to prevent exposure to potential carcinogens. Interdisciplinary working groups of expert scientists review the published studies and assess the strength of the available evidence that an agent can cause cancer in humans.

45. The principles, procedures, and scientific criteria that guide the evaluations are described in the Preamble to the IARC Monographs. The preamble is a forty + page expression of one of the most sophisticated scientific processes used in the world to review and evaluate substances for their impact on human health. The procedure requires evaluations to be performed by panels of international experts, selected on the basis of their expertise and the absence of actual or apparent conflicts of interest. The studies considered the various exposure groups, including occupational exposure of farmers and tree nursery

17

workers in the United States, forestry workers in Canada and Finland, municipal weed-control workers in the United Kingdom, and para-occupational exposure in farming families.

46.     In March 2015, IARC reassessed glyphosate. The summary published in The Lancet Oncology journal reported that glyphosate is a Group 2A agent and probably carcinogenic in humans.

47.     The assessment of the IARC Working Group identified several case control studies of occupational exposure in the United States, Canada, and Sweden. These studies showed a human health concern from agricultural and other work-related exposure to glyphosate. The IARC Working Group conducted a systematic review of over 15 studies designed to assess whether there was an association between Roundup® exposure in agricultural workers and Non-Hodgkin Lymphoma (NHL). The researchers reviewed each study, identified the results and assessed each study's strengths and weaknesses. The IARC Working Group concluded that, despite the limited evidence concerning the carcinogenicity of glyphosate in humans, a "positive association has been observed for non-Hodgkin lymphoma."

48.     On July 29, 2015, IARC issued its Monograph for glyphosate, Monograph 112. It was authored with input of 17 experts from 11 countries who met in March 2015, to assess the carcinogenicity of certain herbicides, including glyphosate. Among the members were Lauren Zeise, Ph.D., of the California Environmental Protection Agency, Matthew T. Martin, Ph.D., a scientist with the U.S. Environmental Protection Agency, and Gloria D. Jahnke, D.V.M., D.A.B.T. of the National Institute of Environmental Health Sciences. Mr. Jobman did not learn of this information until much later.

49.     After adherence to its established procedures, the IARC Working Group considered "reports that have been published or accepted for publication in scientific literature" as well as "data from governmental reports that are publicly available."

50.     Glyphosate was the second-most used household herbicide in the United States for weed control between 2001 and 2007 and the most heavily used herbicide in the

18

world in 2012. Exposure pathways are identified as air (especially during spraying), water, and food. Community exposure to glyphosate is widespread and found in soil, air, surface water, and groundwater, as well as in food.

51.     The IARC Working Group found that glyphosate caused DNA and chromosomal damage in human cells. One study in community residents reported increases in blood markers of chromosomal damage (micronuclei) after glyphosate formulations were sprayed. In assessing the genotoxicity of glyphosate (the property of chemical agents that damages the genetic information within a cell causing mutations, which may lead to cancer), the IARC Working Group concluded "[t]here is strong evidence that glyphosate causes genotoxicity."

52.     A   section of the IARC monograph for glyphosate is devoted to exposure to humans; it examines studies of glyphosate exposures in various settings including agricultural ones. The IARC Working Group noted that glyphosate has been detected in urine of agricultural workers, indicating absorption. The IARC Working Group specifically evaluated farm workers in the United States, and found that, within the days following the application of Roundup® to a crop, approximately 60% of farm workers tested positive for glyphosate in the urine. The IARC Working Group noted that soil microbes degrade glyphosate to aminomethylphosphoric acid (AMPA). Blood AMPA detection after exposure suggests intestinal microbial metabolism in humans.

53.     IARC reviewed an Agricultural Health Study, consisting of a prospective cohort of 57,311 licensed pesticide applicators in Iowa and North Carolina. It found that results of this study support an association between glyphosate exposure and Hairy Cell Leukemia (HCL) an NHL subtype, and Chronic Lymphocytic Leukemia (CLL) also an NHL subtype, Multiple Myeloma, a blood cancer similar to NHL, and other cancers.

54.     Scientists published a systematic review and meta-analysis on the relationship between non-Hodgkin lymphoma and occupational exposure to agricultural pesticides, including glyphosate, in the *International Journal of Environmental Research and Public Health* (2014). The study showed a statistically significant association between

19

10O5344

farm workers exposed to Roundup® and non-Hodgkin lymphoma. The study confirmed two earlier studies from 2002 and 2008, published in the journal *Leukemia & Lymphoma* (2002) and the *International Journal on Cancer* (2008).

55.     Recent studies, including the glyphosate residue study published in the *Journal of Environmental & Analytical Toxicology* in 2014, conclude that "chronically ill humans showed significantly higher glyphosate residues in urine than healthy population." Glyphosate has been detected in the blood and urine of agricultural workers, indicating that agricultural use of Roundup® leads to its absorption. Monsanto continues to promote Roundup® as safe. During 2019 Monsanto ran newspaper advertisements, full-page in size, in the *Wall Street Journal* and other widespread magazines, as well as in advertisements and promotions on television, radio, in other media, and multiple languages, across the United States. It did not acknowledge or change its actions after researchers at the University of Washington disclosed, on February 13, 2019, findings and a new study conducted there, including a comprehensive review of existing literature, that exposure to Roundup® increases the risks of certain cancers, including NHL, by more than 40%. The University of Washington studies, entitled *Mutation Research - Fundamental and Molecular Mechanisms of Mutagenesis* (2019) (ISSN:0027-5107, available at https://www.journals.elsevier.com/mutation-research-fundamental-and-molecular-mechanisms-of-mutagenesis).

56.     Scientific research also discloses that carcinogenic properties of Roundup® are magnified by the addition of adjuvants in the Roundup® formulation. Adjuvants are chemicals designed to modify or enhance the effects of other agents. Monsanto includes adjuvants with glyphosate in its Roundup® products; they are designed to increase the effectiveness of the herbicide. But the added adjuvants   greatly increase the carcinogenic properties of Roundup®. Monsanto systematically tested glyphosate without adjuvants. The results are misleading. Yet, Monsanto used those tests and results to tout Roundup® as safe to U.S. federal regulators.

10O5344

57. Plaintiff was first exposed to Roundup® commenced in 1976. His intensive uses commenced when his own farming operations started on a fulltime basis as shown in his chart in ¶ 3.

58. Monsanto's effectively concealed the dangers of Roundup® and glyphosate. Many steps were taken by Monsanto to achieve this objective. Among others they included those alleged above, and:

58.1 Disregarded scientific studies drawing a link between Roundup® and glyphosates herbicides in general, and human illness including blood born cancers and NHL;

58.2 Epidemiologic studies disclosing the link the between Roundup®, glyphosates and blood born cancers including NHL.

58.3 Internal scientific data, warnings and revelations from its own personnel which were quashed by Monsanto internally.

58.4 Influence practiced on politicians and government officials to paralyze, delay, or wholly prevent government action to protect the public from Roundup® and glyphosate.

58.5 A campaign, which continues to present, designed to teach the safety of Roundup® and to deny the scientific evidence linking it to cancers, including NHL, that are lethal to human beings.

58.6 Denial that overwhelming contrary evidence by objective scientific research not financed by Monsanto, discloses that glyphosate causes changes in the human body that produce cancers.

58.7 Affirmative financing activities masked as objective scientific studies, despite the lack of objectivity in the studies, in order to produce skewed results, further masquerading as research. These results were then used by Monsanto to promote, teach, and advance used of its products despite the dangers posed by them.

59. Monsanto also improperly used financial and corruptive influences to:

21

59.1 Influence practiced on politicians and government officials to paralyze, delay, or wholly prevent government action to protect the public from Roundup® and glyphosate.

59.2 Conduct campaigns, which continue to present, designed to teach the safety of Roundup® and to deny the scientific evidence linking it to cancers, including NHL, that are lethal to human beings.

59.3 Assert, despite contrary evidence by objective scientists not financed by Monsanto, that glyphosate causes changes in the human body that produce cancers because of cellular level damage to human tissue.

59.4 Affirmative financing activities masked as objective scientific studies, despite the lack of objectivity in the studies, in order to produce skewed results, further masquerading as research. These results were then used by Monsanto to promote, taught, and advance used of its products despite the dangers posed by them.

60. Monsanto's conduct induced members of the public, including Plaintiff, to rely upon it. Monsanto is by virtue of its conduct equitably estopped to assert certain defenses, including a) contributory fault, b) comparative fault, c) alternate causation, d) the statute of limitations, and e) used of its products without wearing protective equipment. Monsanto's statements inducing reliance and action by users like Plaintiff were false statements of material fact. They were intended to induce reliance and did so. These statements were made when Monsanto knew they were false or at a minimum knew that they were highly controverted and that substantial scientific evidence, denied Monsanto, concluded that a causal connection exists between Roundup® and cancers including NHL.

61. Plaintiff did not discover and did not know of facts that would cause a reasonable person to suspect, the risks associated with the use of and/or exposure to Roundup® and glyphosate, nor would a reasonable and diligent investigation have disclosed that Roundup® and glyphosate would cause Plaintiff's illnesses.

10O5344

62.     Monsanto was under a continuous duty to disclose to consumers, users and other persons coming into contact with its products, including Plaintiff, accurate safety information concerning its products and the risks associated with the use of and/or exposure to Roundup® and glyphosate. Instead, Monsanto knowingly, affirmatively, and actively concealed safety information concerning Roundup® and glyphosate and the risks associated with the use of and/or exposure to its products.

63.     As a proximate result of Monsanto's wrongful acts and omissions in placing its defective Roundup® products into the stream of commerce without adequate warnings of the hazardous and carcinogenic nature of glyphosate, and in breach of its warranties, negligence and strict liability. Plaintiff's non-Hodgkin's lymphoma presented in his brain. His initial treatment was a surgical removal of a portion of the cancerous tissue in his brain. Since then, he has undergone extensive hospitalization and multiple extreme therapies to treat his disease. Hospitalizations have been at Gothenburg Community Hospital, CHI Good Samaritan Hospital in Kearney, the University of Nebraska Medical Center and Nebraska Medicine, Madonna Rehabilitation Hospital, and now, as of the time of this filing, again at UNMC. He suffers the uncertainty of the future, the dramatic risks he knows are posed by his disease, and his own morbidity and potential mortality.

64.     Plaintiff's claims are made under Nebraska law. Nebraska is where Plaintiff's primary use of Roundup® and injuries occurred. In the event Nebraska law imposes a duty or obligation on Monsanto in excess of those required by Federal law, the Plaintiff does not assert the State law claims. On the contrary, all claims asserted by Plaintiff here are claims parallel with Federal law and Federal legal duties. Accordingly, Monsanto violations of Nebraska law, so limited, were also violations of Federal law. If Monsanto had complied with the law, there likely would have been no Federal violations.

65.     Plaintiff does not seek to enforce Federal law. Instead, he invokes the law of Nebraska, but limits his claim to the scope and extent to which Nebraska law is equal to, but not greater than, Federal law in its imposition of duties on Monsanto. Accordingly, Plaintiff claims that Monsanto violated 7 USC § 136, including subparts (g) & (j), and

23

Federal regulations including 40 CFR § 156.10 (a) (5). They did so by distributing Roundup® when it was misbranded contrary to legal requirements. The distribution of a misbranded herbicide is a violation of law and is a tort because it violates Nebraska law when considered in parallel with Federal requirements. These violations are evidence of negligence and support the Plaintiff's claims of strict liability in tort, strict liability for failure to warn, negligence, and breaches of implied warranties and express warranties.

### First Theory: Strict Liability (Design Defect)

66.     All allegations above are renewed here.

67.     Monsanto is strictly liable in tort to them for defective design of its Roundup® products. A substantial part of the activity undertaken by Monsanto as described in this Complaint, putting in the allegations above and below, occurred in the State of Nebraska.

68.     At relevant times, Monsanto was engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting Roundup® products. These products, including the ones used by Plaintiff, were defective and unreasonably dangerous to foreseeable users like Plaintiff and including him. The products were unreasonably dangerous when they were placed by Monsanto into the stream of commerce. Monsanto ultimately controlled and supervised these actions. Monsanto designed, researched, developed, manufactured, produced, tested, assembled, labeled, advertised, promoted, marketed, sold, and distributed the Roundup® products used by Plaintiff as safe when they were not as described above.

69.     On the contrary, Monsanto's Roundup® products were manufactured, designed, and labeled in an unsafe, defective, and inherently dangerous manner that was dangerous for use by or exposure to the public, and, in particular, Plaintiff. These products left Monsanto's immediate control and were placed onto the market and reached intended consumers, handlers, and users coming into contact with these products in Nebraska and throughout the United States, including Plaintiff, without substantial change in their condition as designed, manufactured, sold, distributed, labeled, and marketed.

24

70.     Monsanto's Roundup® products including those to which Plaintiff was exposed were unreasonably dangerous and dangerous to an extent beyond that which an ordinary consumer would contemplate. The risks and dangers of those products exceeded the benefits allegedly associated with them as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold, and marketed by Monsanto. Exposure to Roundup® and glyphosate-containing products presents a risk of harmful side effects that outweigh any potential utility stemming from the use of the herbicide.

71.     Monsanto knew or had reason to know that its Roundup® products were defective and were inherently dangerous and unsafe when used in the manner instructed and provided by Monsanto in one or more of these ways when placed in the stream of commerce:

71.1    Monsanto's Roundup® products were defective in design and formulation, and, consequently, dangerous to an extent beyond that which an ordinary consumer would contemplate.

71.2    Monsanto's Roundup® products were unreasonably dangerous in that they were hazardous and posed a grave risk of cancer and other serious illnesses when used in a reasonably anticipated manner.

71.3    Monsanto did not sufficiently test, investigate, or study its Roundup® products and, specifically, the active ingredient glyphosate alone or with surfactants added by Monsanto.

71.4    Monsanto did not conduct adequate post-marketing surveillance of its Roundup® products.

71.5    Monsanto could have employed safer alternative designs and formulations but did not do so. Safer alternative formulations and safer alternative weed killers were available without glyphosate.

72.     Plaintiff used and/or was exposed to the use of Monsanto's Roundup® products in an intended or reasonably foreseeable manner, i.e., as a consumer, without knowledge of Roundup®'s concealed and suppressed dangerous characteristics. Plaintiff

10O5344

was also exposed to generic glyphosate products which he used solely because of the assurances of Monsanto about Roundup® and glyphosate herbicides.

73. Monsanto's Roundup® products are more dangerous than alternative products. Monsanto could have designed its Roundup® to make them less dangerous. Indeed, at the time Monsanto designed its Roundup® products, the state of the industry's scientific knowledge was such that a less risky design or formulation was attainable.

74. At the time Roundup® products left Monsanto's control, there were practical, feasible, safer alternative designs that would have prevented the harm without substantially impairing the reasonably anticipated or intended function of Monsanto's herbicides.

75. As a result of the unreasonably dangerous condition of its Roundup® products, Monsanto is strictly liable to Plaintiff. The defects in Monsanto's Roundup® products were substantial and contributing factors in causing Plaintiff's injuries and, but for Monsanto's misconduct and omissions, Plaintiff would not have sustained his injuries.

76. Monsanto's defective design of its Roundup® products was willful, wanton, fraudulent, malicious, and conducted with reckless disregard for the health and safety of users of the Roundup® products, including Plaintiff. The conduct was also reckless.

77. As proximate result of Monsanto placing its defective Roundup® products into the stream of commerce, Plaintiff developed Non-Hodgkin's lymphoma and personal injuries which are permanent in nature.

78. As a proximate result of Monsanto placing its defective Roundup® products into the stream of commerce, as alleged, Plaintiff sustained losses of income, loss of earning capacity and other financial damages. These damages are accruing. Leave is requested to amend the Complaint to state the total amount of special damages at the time of the final pretrial conference or at trial.

**Second Theory: Strict Liability (Failure to Warn)**

79. All allegations above are renewed here.

80. Plaintiff contends that Monsanto had a duty to exercise reasonable care to avoid physical harm to Plaintiff by preventing the recognizable and foreseeable harm it

26

would cause by its marketing of its Roundup® products.[16] He contends that Monsanto sold its Roundup® products in a defective condition unreasonably dangerous to consumers, including them. He contends Monsanto was engaged in the business of selling the product which was expected to and did reach him without substantial change in condition from that in which it was sold, and that it was not misused by Plaintiff. The Plaintiff's damages are not subject to the economic loss rule.[17]

81.     Plaintiff respectfully asserts that Monsanto is strictly liable in tort to them for failure to warn of the dangers of its Roundup® products. At all times relevant to this litigation, Monsanto engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting Roundup® products, which are defective and unreasonably dangerous to consumers, including Plaintiff, because they do not contain adequate warnings or instructions concerning the dangerous characteristics of Roundup® and specifically, the active ingredient glyphosate either alone or with adjuvants and surfactants. These actions were under the ultimate control and supervision of Monsanto. It did so from its headquarters in St. Louis Missouri.

82.     Monsanto researched, developed, designed, tested, manufactured, inspected, labeled, distributed, marketed, promoted, sold, and otherwise released into the stream of commerce its Roundup® products. While doing so, Monsanto advertised or marketed Roundup® to consumers including Plaintiff. Monsanto had, but failed to discharge, a duty to warn Plaintiff and the public of risks associated with use of Roundup®.

83.     Monsanto had a duty to reasonably test, develop, design, manufacture, inspect, package, label, market, promote, sell, distribute, maintain, supply, provide proper warnings, and take such steps as necessary to ensure its Roundup® products did not cause users and consumers to suffer from unreasonable and dangerous risks. Monsanto had a continuing duty to warn Plaintiff of dangers associated with Roundup® use and exposure.

---

[16] *Stahlecker v. Ford Motor Co.,* 266 Neb 601, 667 NW2d 244 (2003) Restatement (Third) of Torts: Liability for Physical and Emotional Harm § 7 (2010), and Restatement (Second) of Torts § 402A. Also, *Jay v. Moog Automotive, Inc.*, 264 Neb 875, 652 NW2d 872 (2002)(defective design). Restatement (Second) of Torts § 402A.
[17] See *Lesiak v. Central Valley Ag.,* 283 Neb 103, 808 NW2d 67 (2012).

10O5344

Monsanto, as manufacturer, seller, or distributor of chemical herbicides is held to the knowledge of an expert in the field.

84.    At the time of manufacture, Monsanto could have provided the warnings or instructions regarding the full and complete risks of Roundup® and glyphosate-containing products because it knew or should have known of the unreasonable risks of harm associated with the use of and/or exposure to such products.

85.    Monsanto failed to investigate, study, test, or promote the safety or to minimize the dangers to users and consumers of its product and to those who would foreseeably use or be harmed by Monsanto's herbicides, including Plaintiff.

86.    Despite knowing or having a duty to know, that Roundup® posed a grave risk of harm, Monsanto failed to exercise reasonable care to warn of the dangerous risks associated with use and exposure. Monsanto failed to adequately warn consumers, i.e., the reasonably foreseeable users, of the risks of exposure to its products. Monsanto wrongfully concealed information concerning the dangerous nature of Roundup®\, and further made false and/or misleading statements concerning the safety of Roundup® and glyphosate.

87.    At all times relevant to this litigation, Monsanto's Roundup® reached the intended consumers, handlers, and users or other persons coming into contact with these products, including Plaintiff without substantial change in their condition as designed, manufactured, sold, distributed, labeled, and marketed by Monsanto.

88.    Plaintiff was exposed to Monsanto's Roundup® products in the course of spraying and using the product without knowledge of its dangerous characteristics. Plaintiff used the dangerous product for its intended purpose and without misuse.

89.    Plaintiff could not have reasonably discovered the defects and risks associated with Roundup® or glyphosate-containing products prior to and at the times of exposure. Plaintiff relied upon the skill, superior knowledge, and judgment of Monsanto to know about and disclose serious health risks associated with using the products.

90.    Monsanto knew or should have known that the minimal cautions disseminated with its Roundup® products were inadequate, failed to communicate

28

10O5344

adequate information on the dangers and safe use/exposure, and failed to communicate warnings and instructions that were appropriate and adequate to render the products safe for their ordinary, intended and reasonably foreseeable uses, including agricultural and horticultural applications.

91.     The information Monsanto did impart failed to contain relevant warnings, hazards, and precautions that would have enabled consumers such as Plaintiff to utilize the products safely and with adequate protection. Instead, Monsanto disseminated information that was inaccurate, false and misleading. This misleading information and denial of the danger of glyphosate has been unremitting conduct of Monsanto to the present day.

92.     This alleged failure to warn is not limited to the information contained on Roundup®'s labeling. Monsanto was able, in accord with federal law, to comply with Nebraska law by disclosing the known risks associated with Roundup® through other non-labeling mediums, i.e., promotion, advertisements, public service announcements, and/or public information sources. Monsanto, however, deliberately did not do so.

93.     Monsanto is liable to the Plaintiff for injuries caused by its negligent or willful failure, as described above, to provide adequate as alleged. As a direct and proximate result of Monsanto placing its defective Roundup® products into the stream of commerce, Plaintiff developed non-Hodgkin lymphoma. Plaintiff's treatment is active and ongoing. His disease is not in remission. He suffers great physical and emotional pain and discomfort. His medical care costs have already, within well under a year, reached the $1,000,000 level and are expected to dramatically exceed it. In addition, his economic losses are accruing and are significant. Plaintiff's non-economic damages for his physical injury, and physical and emotional pain and anguish all command general damages as well. He requests general damages.

### Third Theory:  Negligence

94.     All allegations above are renewed here.

10O5344

95. Monsanto owed a duty of reasonable care to all foreseeable users, including the Plaintiff, but it breached that duty is alleged below. The breach proximately caused damages to the Plaintiff.[18]

96. Monsanto, directly or indirectly, caused Roundup® products to be sold, distributed, packaged, labeled, marketed, promoted, and/or used by Plaintiff.

97. Monsanto owed to Plaintiff and the public the duties that follows:

97.1 To exercise reasonable care in the design, research, manufacture, marketing, advertisement, supply, promotion, packaging, sale, and distribution of its Roundup® products. This included the duty to take all reasonable steps necessary to manufacture, promote, and/or sell a product that was not unreasonably dangerous to consumers and users of the product.

97.2 To exercise reasonable care in the marketing, advertisement, and sale of the Roundup® products. Monsanto's duty of care owed to consumers and the general public. This included the duty to provide accurate, true, and correct information concerning the risks of using Roundup® and appropriate, complete, and accurate warnings concerning the potential adverse effects of exposure to Roundup®, and, in particular, its active ingredient glyphosate. Monsanto knew or, in the exercise of reasonable care, should have known of the hazards and dangers of Roundup® and specifically, the carcinogenic properties of the chemical glyphosate and its Roundup® products.

97.3 To warn of the risks.

97.4 To withhold the product from the market.

97.5 To inform Plaintiff of the risks.

97.6 To exercise reasonable care in the marketing and representation of Roundup® to the public.

---

[18] *Deviney v. UPRR,* 280 Neb 450, 786 NW2d 902 (2010).

10O5344

97.7  To refrain from falsifying, withholding or manipulating unfavorable research data, or feigning the favorable research data.

97.8  To label its product with complete disclosures of risks.

98.  Monsanto breached each and all its duties as alleged above. It was negligent in that:

98.1  It negligently designed and formulated its Roundup® products.

98.2  It negligently tested its Roundup® products and negligently failed to continue to test them.

98.3  It negligently mixed and batched its Roundup® products.

98.4  It negligently submitted and withheld information about its Roundup® products for governmental regulatory purposes.

98.5  It negligently failed to supplement its governmental submissions with new information about the dangers of Glyphosate and its Roundup® products.

98.6  It negligently manufactured its Roundup® products.

98.7  It negligently labeled its Roundup® products.

98.8  It negligently marketed its Roundup® products.

98.9  It negligently packaged its Roundup® products.

98.10  It negligently advertised and commercialized its Roundup® products.

98.11  It negligently distributed its Roundup® products and placed them in commerce.

98.12  It continued to negligently advertise and commercialize its Roundup® products after agreeing with the New York Attorney General not to do so.

98.13  It negligently failed to disclose the truth about the risks associated with Roundup® in its promotional efforts, outside of the context of labeling.

31

10O5344

98.14 It negligently disregarded scientific, medical and epidemiological studies and findings about the dangers of Roundup®.

98.15 It negligently caused or permitted its advertising inaccuracies to continue even after it knew exposure to the products created a significant risk of harm and unreasonably dangerous side effects, and it failed to prevent or adequately warn of these risks and injuries.

98.16 It negligently packaged its Roundup® products.

98.17 It negligently failed to provide adequate instructions, guidelines, and safety precautions to reasonable users including.

98.18 It negligently failed to inform Plaintiff and the public of safer alternatives though it knew they existed.

98.19 It negligently failed to disclose that its Roundup® products are probably carcinogens and do cause NHL in a population of foreseeable users including Plaintiff after use of the product.

98.20 It negligently withheld information necessary permit an informed user with an option to use something else to make an informed selection.

98.21 It negligently failed to comply with safe practices and standards, including federal regulations governing the design and formulation, testing, continuing testing, disclosure, approval procurement, labeling, advertising, promotion, and distribution of its product and thereby failed to inform both government regulators and foreseeable users, including Plaintiff.

99.     These negligent acts and omissions occurred when and after Monsanto, knew or had reason to know of the defects inherent in its products, and knew or had reason to know that a user's or consumer's exposure to the products created a significant risk of harm and unreasonably dangerous side effects, and failed to prevent or adequately warn of these risks and injuries.

10O5344

100.    Monsanto knew and/or should have known that it was foreseeable consumers such as and including Plaintiff would suffer injuries as a result of Monsanto's failure to exercise ordinary care in the manufacturing, marketing, labeling, distribution, and sale of Roundup®. He could not have known of his injuries until they were diagnosed in 2017.

101.    Monsanto's conduct was negligent. But it was also reckless. Monsanto has made conscious decisions not to redesign, re-label, warn, or inform the unsuspecting public, including Plaintiff. Monsanto's reckless conduct therefore warrants an award of punitive damages.

102.    As a proximate result of Monsanto's negligence, Plaintiff sustained temporary and permanent lost income personal injuries, illness, medical and rehabilitation care and emotional distress. Plaintiff remains in treatment. He also suffered permanent loss of his ability to enjoy life with confidence of good health, and a permanently impaired body.

### Fourth Theory: Implied Warranty

103.    All allegations above are renewed here.

104.    Monsanto engaged in the business of testing developing, designing, manufacturing, marketing, selling, distributing, and promoting its Roundup® products, which are defective and unreasonably dangerous to consumers, including Plaintiff thereby placing Roundup® products into the stream of commerce. These actions were under the ultimate control and supervision of Monsanto. Monsanto impliedly warranted each product to be of merchantable quality, safe, and fit for this use, despite the fact that Roundup® was not adequately tested or researched.

105.    Before Plaintiff was exposed to the aforementioned Roundup® products, Monsanto impliedly warranted to its consumers, including Plaintiff, that its Roundup® products were of merchantable quality and safe and fit for the use for which they were intended; specifically, as agricultural herbicides to kill weeds without harm to humans.

106.    Monsanto failed to disclose that Roundup® has dangerous propensities when used as intended and that use of and/or exposure to Roundup® and glyphosate-containing

products carries an increased risk of developing severe injuries and death, including Plaintiff's cancer. Plaintiff was the intended beneficiary of the implied warranties made by Monsanto to the purchasers of its herbicides as a foreseeable human user. He used the Roundup® products as intended and without alteration.

107.   Plaintiff used at the Roundup® product as Monsanto intended that its Roundup® products. In reliance upon Monsanto's implied warranty, Plaintiff used Roundup® as instructed and labeled and in the foreseeable manner intended, recommended, promoted and marketed by Monsanto.

108.   Plaintiff could not have reasonably discovered or known of the risks of serious injury and death associated with Roundup® or glyphosate.

109.   Monsanto breached its implied warranty to the Plaintiff in that its Roundup® products were not of merchantable quality, safe, or fit for their intended use, or adequately tested. Roundup® has dangerous propensities when used as intended and can cause serious injuries, including those injuries complained of herein.

110.   The harm caused by Monsanto's Roundup® products far outweighed their benefit, rendering the products more dangerous than an ordinary consumer or user would expect and more dangerous than alternative products.

111.   As a direct and proximate result of Monsanto's breach of implied warranty, the Plaintiff sustained a loss of income, loss of earning capacity and property damage.[19]

### Fifth Theory: Breach of Express Warranties

112.   All allegations above are renewed here.

113.   Plaintiff contends Monsanto is liable to him for breach of express warranties. Plaintiff asserts this position because Monsanto made affirmative representations and warranties about its Roundup® products which were material parts the basis of the bargain whereby Plaintiff purchased and used Roundup® products.[20] These affirmative

---

[19] Proof of negligence establishes breach of implied warranty. *Adams v. American Cyanamid Co.*, 1 Neb. App. 337, 498 N.W.2d 577 (1992). *El Fredo Pizza, Inc. v. Roto-Flex Oven Co,* 199 Neb 697, 261 NW2d 358 (1978); *Christensen v. Eastern Nebraska Equip Co.,* 199 Neb 741, 261 NW2d 367 (1978).
[20]  Neb UCC § 2-313 and (b).

34

representations effectively promised a specific result, i.e., that Roundup® products could be used by Plaintiff without personal injury, illness, or cancer caused or induced by the products; Monsanto represented that the products were safe, but knew or should have known, they were not. Plaintiff was a person whom Monsanto might reasonably expect to use, consume and be affected by the Roundup® products.[21]

114. Monsanto has special knowledge skill and expertise germane to herbicides and their design, manufacture testing, and marketing. At all times relevant, Monsanto engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting its Roundup® products, which are defective and unreasonably dangerous to consumers, including Plaintiff, thereby placing Roundup® products into the stream of commerce. These actions were under the ultimate control and supervision of Monsanto.

115. Monsanto expressly represented and warranted matters to Plaintiff and other consumers and users, and through statements made by Monsanto in labels, publications, package inserts, and other written materials that its Roundup® products were:

115.1 Safe to human health and the environment.

115.2 Effective, fit, and proper for their intended use and posed no risks of harm to humans.

115.3 Did not cause unreasonably dangerous side effects.

115.4 Is a product of Monsanto's "safety is a top priority for us" approach to its business.

115.5 Is safe enough to drink.

115.6 Monsanto Roundup® spray-on glyphosate-based herbicides, were "safer than table salt" and "practically non-toxic" to mammals, birds, and fish despite its agreement with the New York Attorney General to the contrary.

115.7 Roundup®'s Glyphosate is good for the environment.

---

[21] Neb UCC § 2-318.

35

10O5344

116.   These representations about Roundup® were affirmations of fact or promises made by Monsanto to the public including Plaintiff. The representations related to the goods and became part of the basis of the bargain, creating an express warranty that the goods would conform to the representations. Monsanto placed its Roundup® products into the stream of commerce for sale and recommended use without adequately warning of the true risks of developing the injuries associated with the use of and exposure to Roundup® and its active ingredient glyphosate.

117.   Monsanto breached these warranties because its affirmations were not true. Its Roundup® products were defective, dangerous, unfit for use, did not contain labels representing the true and adequate nature of the risks associated with their use, and were not merchantable or safe for their intended, ordinary, and foreseeable use and purpose.

118.   Plaintiff detrimentally relied on the express warranties \of Monsanto in the purchase and use of its Roundup® products. When Plaintiff decided to purchase Roundup®, he reasonably relied upon Monsanto to disclose known risks, dangers, and effects of Roundup® and glyphosate. He did not know the representations were false.

119.   As a direct and proximate result of Monsanto's breach of implied warranty, Plaintiff sustained personal injuries and illness, loss of income, loss of earning capacity and financial losses and their consequences, .

### Mr. Jobman's Claims

### Personal Injuries; Economic and Non-Economic Damages

120.   All allegations & theories above are renewed here.

121.   Plaintiff's personal injuries, physical and emotional non-economic damages, permanent impairment, lost earnings and earning capacity, and economic losses were proximately caused by Monsanto's Roundup® herbicide which is the substance that caused Plaintiff to contract non-Hodgkin's lymphoma and brain cancer.

122.   Plaintiff's economic damages include lost earnings; lost earning capacity; medical expenses and medical care costs; transportation and over-the-counter expenses; lost retirement security; and related economic losses.

10O5344

## Second Claim

## Mrs. Jobman's Consortium Claim

123.    All allegations and theories of ¶¶ 1-122 are renewed here and except to the extent that she sustained a spousal injury for loss of consortium and not a personal injury, are incorporated and disserted by Mrs. Jobman.

124.    Mr. and Mrs. Jobman were married in October 2020. Approximately five months before Mr. Jobman was diagnosed with NHL.

125.    Mrs. Jobman has sustained a disruption of her life, business career, and opportunities. She has lost the care, comfort, companionship, support, services, advice, counsel, love, affection and conjugal relations of her husband and asserts her derivative claim for these losses. She is also jointly and severally liable for her husband's medical bills and necessities of life as he is treated and fights for his life. To support him she has disrupted her career and sustained an accruing loss of earnings. The nature and extent of these losses are not yet known.

## Exemplary Damages

126.    All allegations above are renewed here. The Plaintiff is aware that Nebraska law permits the recovery of punitive damages in wrongful death cases but does not do so in personal injury cases. However, Monsanto's willful, wanton, reckless and malicious conduct in pursuit of profit at the expense of human safety and well-being of foreseeable users of its Roundup® products was caused, effectuated, or directed from Missouri.

127.    Accordingly, Plaintiff contends that Missouri law governs the punitive damages aspect of his case. The most significant contacts between Monsanto's products and Plaintiff occurred in Nebraska, making Nebraska law the governing law on compensatory claims. But the reprehensible conduct justifying punitive damages occurred in Missouri and may be policed and prevented only by judicial proceedings against Monsanto inflicting punishment for its wrongdoing in Missouri. Missouri's contact with an interest in this subject is governing. Plaintiff seeks punitive damages against Monsanto under Missouri law for this reason.

37

10O5344

128.    In addition, and in the alternative in the event the Court concludes that Missouri law does not govern the punitive damages aspects of this case, Plaintiff seeks punitive damages under the law of Nebraska and request that the punitive damages recovery, subject to payment of proportionate fees and expenses, be awarded to the common school fund the State of Nebraska.

### Requests for Relief

On the foregoing basis the Plaintiffs request judgment for:

1.    On the First Claim for Mr. Jobman's economic and non-economic damages, costs, and punitive damages.

2.    On Plaintiffs' Second Claim for Mrs. Jobman's economic damages for loss of consortium, disruption of her own life and losses caused by the need to provide care to her husband, and costs.

3.    On both claims Plaintiffs seek punitive damages under Missouri law and to the extent permissible under Nebraska law. They also seek costs.

### Jury Demand & Trial Location Designation

4.    Plaintiffs' respectfully demand trial by jury.

5.    In the event this case is not tried in the Nebraska state court system, trial is requested at Omaha, Nebraska where Plaintiffs' oncologists and medical physicians are located and where the medical evidence concerning Plaintiffs' treatment and care and many of the witnesses required to testify at trial reside.


Jeffrey T. Jobman &
Christy L. Jobman, Plaintiffs,

By:  /s/ *David A. Domina* 11043NE
Domina Law Group pc llo
2425 South 144th St. Omaha NE 68144-3267
402 493 4100
ddomina@dominalaw.com

Plaintiff's Lawyers

38

10O5344