# U.S. District Court
# Alabama Middle District (Montgomery)
# CIVIL DOCKET FOR CASE #: 2:21-cv-00827-JTA
# Internal Use Only

Harwick v. Monsanto Company

Assigned to: Honorable Judge Jerusha T. Adams

Case in other court: Circuit Court of Elmore County, Alabama, 29-CV-21-900230.00

Cause: 28:1332 Diversity-Product Liability

Date Filed: 12/20/2021
Jury Demand: Plaintiff
Nature of Suit: 365 Personal Inj. Prod. Liability
Jurisdiction: Diversity

**Plaintiff**

**James Harwick**         represented by   **Ernest Clayton Hornsby**
Morris Haynes Law Firm
131 Main St
P O Box 1660
Alexander City, AL 35010
256-329-2000
Fax: 256-329-2015
Email: chornsby@mhhlaw.net
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
**Bar Status: Active**

V.

**Defendant**

**Monsanto Company**         represented by   **Halron Waites Turner**
*a corporation*
Turner, Onderdonk, Kimbrough, Howell, Huggins & Bradley, PA
Post Office Drawer 1389
Chatom, AL 36518
251-847-2237
Fax: 251-847-3115
Email: hwt@tokh.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
**Bar Status: Fees Due**

ATTEST: A True Copy
Certified to December 21, 2021
Clerk, U.S. District Court,
Middle District of Alabama
BY: /s/ Amber Maddox

| Date Filed | # | Docket Text |
| --- | --- | --- |

| | | |
|---|---|---|
| 12/20/2021 | 1 | NOTICE OF REMOVAL by Monsanto Company from Circuit Court of Elmore County, case number 29-CV-2021-900230.00. (Filing fee $402.00 receipt number 4602065510) (Attachments: # 1 Exhibit A, # 2 State Court Complaint, # 3 State Court Docket Sheet, # 4 Notice of Filing to State Court, # 5 Civil Cover Sheet, # 6 Receipt)(am, ) (Entered: 12/21/2021) |
| 12/20/2021 | | COMPLAINT against Monsanto Company, filed by James Harwick. (NO PDF - See doc 1 )(am, ) (Entered: 12/21/2021) |
| 12/20/2021 | | DEMAND for Trial by Jury by James Harwick. (NO PDF - See doc 1 ) (am, ) (Entered: 12/21/2021) |
| 12/20/2021 | | NOTICE of Filing of Removal to State Court by Monsanto Company. (NO PDF - See doc 1 ) (am, ) (Entered: 12/21/2021) |
| 12/20/2021 | 2 | Conflict Disclosure Statement by Monsanto Company. (am, ) (Entered: 12/21/2021) |
| 12/21/2021 | 3 | NOTICE of Assignment to Magistrate Judge sent to counsel for James Harwick, Monsanto Company. (am, ) (Entered: 12/21/2021) |

IN THE UNITED STATES DISTRICT COURT FOR
THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

2021 DEC 20 A 10: 26

JAMES HARWICK,

    Plaintiff,

v.

MONSANTO COMPANY; *et al.*,

    Defendants.

DEBRA P. HACKETT, CLK
U.S. DISTRICT COURT
MIDDLE DISTRICT ALA

)
)
)
)
)
)
)
)
)
)
)
)

Case Number: 2:21-cv-827 .

### DEFENDANT MONSANTO COMPANY'S NOTICE OF REMOVAL

Pursuant to 28 U.S.C. §§ 1332, 1441, and 1446, Defendant Monsanto Company ("Monsanto"), hereby gives notice of removal of this action, captioned *James Harwick v. Monsanto Company, et al.*, bearing Case Number 29-CV-2021-900230.00, from the Circuit Court of Elmore County, Alabama to the United States District Court for the Middle District of Alabama. Pursuant to 28 U.S.C. § 1446(a), Monsanto provides the following statement of grounds for removal.

### Introduction

1.    In this products liability lawsuit, Plaintiff James Harwick sues Monsanto for injuries allegedly caused by Monsanto's Roundup®-branded herbicides, which have glyphosate as their active ingredient. For decades, farmers have used glyphosate-based herbicides to increase crop yields, and home-owners, landscaping companies, and local government agencies have used these herbicides for highly effective weed control. Glyphosate is one of the most thoroughly studied herbicides in the world, and glyphosate-based herbicides have received regulatory approval in more than 160 countries. Since 1974, when Monsanto first introduced a Roundup®-

branded herbicide to the marketplace, the United States Environmental Protection Agency repeatedly has concluded that glyphosate does not cause cancer. Nevertheless, Plaintiff alleges that he developed cancer — specifically, Hairy Cell Leukemia — caused by exposure to Monsanto glyphosate-based herbicides.

2.      This is one of many lawsuits that have been filed against Monsanto involving Roundup®-branded herbicides. A multidistrict litigation proceeding is pending in the United States District Court for the Northern District of California, before the Honorable Vince G. Chhabria, pursuant to 28 U.S.C. § 1407. *See In re Roundup Prods. Liab. Litig.*, No. 3:16-md-02741-VC (N.D. Cal.); *In re Roundup Prods. Liab. Litig.*, MDL No. 2741, 214 F. Supp. 3d 1346 (J.P.M.L. 2016).

3.      As discussed in more detail below, Monsanto removes this lawsuit because this Court has subject matter jurisdiction based on diversity of citizenship. Plaintiff is a citizen of Georgia. *See* Complaint ¶ 1. For purposes of diversity jurisdiction, Monsanto is deemed to be a citizen of Missouri (where its principal place of business is located) and Delaware (Monsanto's state of incorporation). *See id.*, ¶ 2. Accordingly, complete diversity of citizenship exists in this case as required by 28 U.S.C. § 1332. The statutory amount-in-controversy requirement is also satisfied because Plaintiff seeks damages for cancer allegedly caused by exposure to Monsanto's Roundup®-branded herbicides.

**<ins>Background and Procedural History</ins>**

4.      In November 2021, Plaintiff commenced this lawsuit in the Circuit Court of Elmore County, Alabama by filing a complaint, captioned *James Harwick v. Monsanto Company, et al.*, Case Number 29-CV-2021-900230.00 (the "State Court Action").

2

5.      Pursuant to 28 U.S.C. § 1446(a), true and correct copies of the Summons and Complaint served upon Monsanto in the State Court Action (and other filings available from the state court's files) are attached collectively as **Exhibit 1.**

6.      Plaintiff seeks compensatory and punitive damages for cancer allegedly caused by exposure to Monsanto's glyphosate-based herbicides. *See, e.g.*, Complaint ¶¶ 32-36, 66, 101, 126, 136.

### Basis For Removal — Diversity Jurisdiction

7.      Plaintiff is, and was at the time the State Court Action was filed, a citizen of the State of Georgia. *See id.*, ¶ 1.

8.      Monsanto is, and was at the time the State Court Action was filed, a corporation incorporated under the laws of the State of Delaware, with its principal place of business in the State of Missouri. *See id.*, ¶ 2. Thus, Monsanto is deemed to be a citizen of Missouri and Delaware, for purposes of federal diversity jurisdiction.

9.      The citizenship of all "Fictitious Defendants" named in the Complaint (also known as "John Doe" defendants) must be disregarded when determining whether this lawsuit is removable based on Section 1332(a). See 28 U.S.C. § 1441(b)(1).

10.     The Complaint seeks compensatory and punitive damages based on the allegations that Monsanto's Roundup®-branded herbicides caused Mr. Harwick to develop cancer. Therefore, it is plausible from the face of the Complaint that Plaintiff seeks damages in excess of $75,000, exclusive of interest and costs, which satisfies the jurisdictional amount-in-controversy requirement. 28 U.S.C. § 1332(a); *see Dart Cherokee Basin Operating Co. v. Owens*, 574 U.S. 81, 89 (2014) ("[A] defendant's notice of removal need include only a plausible allegation that the amount in controversy exceeds the jurisdictional threshold."). Indeed, Plaintiff's request for

punitive damages, Complaint, ¶¶ 135-136, "makes it virtually impossible to say that the claim is for less than the jurisdictional amount." *Woodward v. Newcourt Commercial Finance Corp.*, 60 F. Supp. 2d 530, 532 (D.S.C. 1999); *see also Ross v. First Family Fin. Servs., Inc.*, No. 2:01CV218-P-B, 2002 WL 31059582, at *8 (N.D. Miss. Aug. 29, 2002) ("[U]nspecified claims for punitive damage sufficiently serve to bring the amount in controversy over the requisite jurisdictional threshold set out in 28 U.S.C. § 1332."). In fact, numerous other lawsuits seeking damages for cancer allegedly caused by Roundup®-branded herbicides have been filed against Monsanto in other federal courts asserting jurisdiction under §1332(a) and alleging damages in excess of $75,000, exclusive of interest and costs.

11.     In sum, this Court has original subject matter jurisdiction over this action based on § 1332(a) because there is complete diversity of citizenship and the amount in controversy exceeds $75,000, exclusive of costs and interest.

## Procedural Requirements

12.     The Circuit Court of Elmore County, Alabama is located within the Middle District of Alabama. Therefore, removal to this Court satisfies the venue requirement of 28 U.S.C. § 1446(a).

13.     Monsanto received notice of process on November 22, 2021. This Notice of Removal is timely, in accordance with 28 U.S.C. § 1446(b)(1), because it is being filed within 30 days of November 22, 2021.

14.     The written notice required by 28 U.S.C. § 1446(d) will be promptly filed in the Circuit Court of Elmore County, Alabama and will be promptly served on Plaintiff.

15.     Monsanto does not waive any defenses and expressly reserves its right to raise any and all defenses in subsequent proceedings.

16.     If any question arises as to the propriety of this removal, Monsanto requests the opportunity to present written and oral argument in support of removal.

## Conclusion

For the foregoing reasons, Monsanto removes this lawsuit to this Court pursuant to 28 U.S.C. §§ 1332, 1441, and 1446 (and any other applicable laws).

Dated:  December 20, 2021

Respectfully submitted,

HALRON W. TURNER (ASB-9339-T62H)
Turner, Onderdonk, Kimbrough,
  Howell, Huggins & Bradley, PA
13212 West Central Avenue
Post Office Drawer 1389
Chatom, Alabama 36518
Telephone:  (251) 847-2237
Facsimile:  (251) 847-3115
Email:  hwt@tokh.com

**Attorneys for Defendant**
**MONSANTO COMPANY**

## CERTIFICATE OF SERVICE

I hereby certify that on December 20, 2021, I conventionally filed the foregoing document with the Clerk of the Court, and I further certify that, on the same date, I served a copy of the forgoing document on all counsel of record, as listed below, either by electronic mail or by U.S. first-class mail, addressed as shown below.

HALRON W. TURNER
Counsel for Defendant

5

**Counsel of Record**:

E. Clayton Hornsby Jr., Esq.
Morris Haynes, LLC
131 Main Street
Post Office Box 1660 (35011)
Alexander City, Alabama 35010
Telephone:  (256) 329-2000
Facsimile:  (256) 329-2015
Email:  chornsby@mhhlaw.net

**Attorneys for Plaintiff**

# Exhibit 1 to Defendant Monsanto Company's Notice of Removal



## CSC

# Notice of Service of Process

null / ALL
**Transmittal Number: 24108560**
**Date Processed: 11/23/2021**

| | |
|---|---|
| Primary Contact: | Anne Troupis (Monsanto)<br>Bayer U.S. LLC<br>800 N Lindbergh Blvd<br>Saint Louis, MO 63167-1000 |

| | |
|---|---|
| **Entity:** | Monsanto Company Corporation<br>Entity ID Number  2282193 |
| **Entity Served:** | Monsanto Company Corporation |
| **Title of Action:** | Harwick, James  vs. Monsanto Company |
| **Matter Name/ID:** | Harwick, James  vs. Monsanto Company (11759635) |
| **Document(s) Type:** | Summons/Complaint |
| **Nature of Action:** | Product Liability |
| **Court/Agency:** | Elmore County Circuit Court, AL |
| **Case/Reference No:** | 29-CV-2021-900230.00 |
| **Jurisdiction Served:** | Alabama |
| **Date Served on CSC:** | 11/22/2021 |
| **Answer or Appearance Due:** | 30 Days |
| **Originally Served On:** | CSC |
| **How Served:** | Certified Mail |
| **Sender Information:** | Morris, Haynes, LLC.<br>256-329-2000 |

Information contained on this transmittal form is for record keeping, notification and forwarding the attached document(s). It does not constitute a legal opinion. The recipient is responsible for interpreting the documents and taking appropriate action.

**To avoid potential delay, please do not send your response to CSC**

251 Little Falls Drive, Wilmington, Delaware 19808-1674   (888) 690-2882  |  sop@cscglobal.com



AlaFile E-Notice

29-CV-2021-900230.00

To: MONSANTO COMPANY CORPORATION
641 SOUTH LAWRENCE STREET
MONTGOMERY, AL, 36104

---

# NOTICE OF ELECTRONIC FILING

---

IN THE CIRCUIT COURT OF ELMORE COUNTY, ALABAMA

JAMES HARWICK V. MONSANTO COMPANY CORPORATION ET AL
29-CV-2021-900230.00

The following complaint was FILED on 11/19/2021 4:26:24 PM

Notice Date:     11/19/2021 4:26:24 PM

MICHAEL DOZIER
CIRCUIT COURT CLERK
ELMORE COUNTY, ALABAMA
ELMORE COUNTY JUDICIAL CENTER
P.O. BOX 310
WETUMPKA, AL, 36092

334-514-3116
michael.dozier@alacourt.gov

| State of Alabama<br>Unified Judicial System<br>Form C-34  Rev. 4/2017 | **SUMMONS**<br>**- CIVIL -** | **Court Case Number**<br>29-CV-2021-900230.00 |
| --- | --- | --- |

**IN THE CIRCUIT COURT OF ELMORE COUNTY, ALABAMA**
**JAMES HARWICK V. MONSANTO COMPANY CORPORATION ET AL**

**NOTICE TO:** MONSANTO COMPANY CORPORATION, 641 SOUTH LAWRENCE STREET, MONTGOMERY, AL 36104
_____
*(Name and Address of Defendant)*

THE COMPLAINT OR OTHER DOCUMENT WHICH IS ATTACHED TO THIS SUMMONS IS IMPORTANT, AND YOU MUST TAKE IMMEDIATE ACTION TO PROTECT YOUR RIGHTS. YOU OR YOUR ATTORNEY ARE REQUIRED TO FILE THE ORIGINAL OF YOUR WRITTEN ANSWER, EITHER ADMITTING OR DENYING EACH ALLEGATION IN THE COMPLAINT OR OTHER DOCUMENT, WITH THE CLERK OF THIS COURT. A COPY OF YOUR ANSWER MUST BE MAILED OR HAND DELIVERED BY YOU OR YOUR ATTORNEY TO THE PLAINTIFF(S) OR ATTORNEY(S) OF THE PLAINTIFF(S), ERNEST CLAYTON HORNSBY JR.
_____
*[Name(s) of Attorney(s)]*

WHOSE ADDRESS(ES) IS/ARE: 131 Main Street, Alexander City, AL 35010
_____
*[Address(es) of Plaintiff(s) or Attorney(s)]*

THE ANSWER MUST BE MAILED OR DELIVERED WITHIN 30 DAYS AFTER THIS SUMMONS AND COMPLAINT OR OTHER DOCUMENT WERE SERVED ON YOU OR A JUDGMENT BY DEFAULT MAY BE RENDERED AGAINST YOU FOR THE MONEY OR OTHER THINGS DEMANDED IN THE COMPLAINT OR OTHER DOCUMENT.

**TO ANY SHERIFF OR ANY PERSON AUTHORIZED BY THE ALABAMA RULES OF CIVIL PROCEDURE TO SERVE PROCESS:**

☐ You are hereby commanded to serve this Summons and a copy of the Complaint or other document in this action upon the above-named Defendant.

☑ Service by certified mail of this Summons is initiated upon the written request of JAMES HARWICK
pursuant to the Alabama Rules of the Civil Procedure.                          *[Name(s)]*

| 11/19/2021 | /s/ MICHAEL DOZIER | By: |
| --- | --- | --- |
| *(Date)* | *(Signature of Clerk)* | *(Name)* |

☑ Certified Mail is hereby requested.          /s/ ERNEST CLAYTON HORNSBY JR.
_____
*(Plaintiff's/Attorney's Signature)*

## RETURN ON SERVICE

☐ Return receipt of certified mail received in this office on _____
*(Date)*

☐ I certify that I personally delivered a copy of this Summons and Complaint or other document to _____

_____ in _____ County,
*(Name of Person Served)*                              *(Name of County)*

Alabama on _____.
*(Date)*

_____          _____
*(Type of Process Server)*                              *(Address of Server)*

_____          _____
*(Server's Signature)*                              *(Phone Number of Server)*

_____
*(Server's Printed Name)*

DOCUMENT 1

ELECTRONICALLY FILED
11/19/2021 4:26 PM
29-CV-2021-900230.00
CIRCUIT COURT OF
ELMORE COUNTY, ALABAMA
MICHAEL DOZIER, CLERK

| State of Alabama | **COVER SHEET** | Ca: |
| Unified Judicial System | **CIRCUIT COURT - CIVIL CASE** | 2! |
| Form ARCiv-93    Rev. 9/18 | (Not For Domestic Relations Cases) | Date of Filing:    Judge Code: |
| | | 11/19/2021 |

## GENERAL INFORMATION

### IN THE CIRCUIT COURT OF ELMORE COUNTY, ALABAMA
### JAMES HARWICK v. MONSANTO COMPANY CORPORATION ET AL

**First Plaintiff:** ☐ Business  ☑ Individual       **First Defendant:** ☑ Business  ☐ Individual
☐ Government ☐ Other                              ☐ Government ☐ Other

**NATURE OF SUIT:** Select primary cause of action, by checking box (check only one) that best characterizes your action:

**TORTS: PERSONAL INJURY**

☐ WDEA - Wrongful Death
☐ TONG - Negligence: General
☐ TOMV - Negligence: Motor Vehicle
☐ TOWA - Wantonness
☑ TOPL - Product Liability/AEMLD
☐ TOMM - Malpractice-Medical
☐ TOLM - Malpractice-Legal
☐ TOOM - Malpractice-Other
☐ TBFM - Fraud/Bad Faith/Misrepresentation
☐ TOXX - Other: _____

**TORTS: PERSONAL INJURY**

☐ TOPE - Personal Property
☐ TORE - Real Properly

**OTHER CIVIL FILINGS**

☐ ABAN - Abandoned Automobile
☐ ACCT - Account & Nonmortgage
☐ APAA - Administrative Agency Appeal
☐ ADPA - Administrative Procedure Act
☐ ANPS - Adults in Need of Protective Service

**OTHER CIVIL FILINGS  (cont'd)**

☐ MSXX - Birth/Death Certificate Modification/Bond Forfeiture Appeal/
Enforcement of Agency Subpoena/Petition to Preserve
☐ CVRT - Civil Rights
☐ COND - Condemnation/Eminent Domain/Right-of-Way
☐ CTMP - Contempt of Court
☐ CONT - Contract/Ejectment/Writ of Seizure
☐ TOCN - Conversion
☐ EQND - Equity Non-Damages Actions/Declaratory Judgment/
Injunction Election Contest/Quiet Title/Sale For Division
☐ CVUD - Eviction Appeal/Unlawful Detainer
☐ FORJ - Foreign Judgment
☐ FORF - Fruits of Crime Forfeiture
☐ MSHC - Habeas Corpus/Extraordinary Writ/Mandamus/Prohibition
☐ PFAB - Protection From Abuse
☐ EPFA - Elder Protection From Abuse
☐ QTLB - Quiet Title Land Bank
☐ FELA - Railroad/Seaman (FELA)
☐ RPRO - Real Property
☐ WTEG - Will/Trust/Estate/Guardianship/Conservatorship
☐ COMP - Workers' Compensation
☐ CVXX - Miscellaneous Circuit Civil Case

**ORIGIN:**  F ☑ INITIAL FILING      A ☐ APPEAL FROM         O ☐ OTHER
DISTRICT COURT

R ☐ REMANDED         T ☐ TRANSFERRED FROM
OTHER CIRCUIT COURT

**HAS JURY TRIAL BEEN DEMANDED?** ☑ YES ☐ NO     Note: Checking "Yes" does not constitute a demand for a
jury trial. (See Rules 38 and 39, Ala.R.Civ.P, for procedure)

**RELIEF REQUESTED:**      ☑ MONETARY AWARD REQUESTED  ☐ NO MONETARY AWARD REQUESTED

| **ATTORNEY CODE:** | | |
| HOR021 | 11/19/2021 4:26:19 PM | /s/ ERNEST CLAYTON HORNSBY J |
| | Date | Signature of Attorney/Party filing this form |

**MEDIATION REQUESTED:**      ☐ YES ☑ NO ☐ UNDECIDED

**Election to Proceed under the Alabama Rules for Expedited Civil Actions:**      ☐ YES ☐ NO

DOCUMENT 2



ELECTRONICALLY FILED
11/19/2021 4:26 PM
29-CV-2021-900230.00
CIRCUIT COURT OF
ELMORE COUNTY, ALABAMA
MICHAEL DOZIER, CLERK

## IN THE CIRCUIT COURT OF ELMORE COUNTY, ALABAMA

| | |
|---|---|
| James Harwick           ) | |
|                    ) | |
| **Plaintiff,**      ) | |
|                    ) | **Case Action No:** |
| **v.**                  ) | |
|                    ) | **JURY TRIAL DEMANDED** |

**MONSANTO COMPANY, a corporation;**  )
**Fictitious Party Defendant "A" being that**  )
**legal entity that is a successor in interest to**  )
**Monsanto; Fictitious Party Defendant "B"**  )
**being the correctly named legal entity that**  )
**is responsible for the wrongs alleged in**  )
**the complaint**  )
  )
        **Defendants.**  )

---

## COMPLAINT

---

Plaintiff James Harwick, by and through counsel, complains as follows:

### <u>INTRODUCTION PARTIES</u>

1.    Plaintiff is a Georgia citizen over the age of nineteen.

2.    Defendant Monsanto Company is a Delaware corporation with its headquarters and principal place of business in St. Louis, Missouri. Monsanto was the entity that discovered the herbicidal properties of glyphosate and the manufacturer of Roundup®, which contains the active ingredient glyphosate and the surfactant POEA, as well as adjuvants and other "inert" ingredients.

3.    Fictitious Party Defendant "A" being that legal entity that is the legal successor in interest to the defendant Monsanto Company;

DOCUMENT 2

## JURISDICTION AND VENUE

4.     Fictitious Party Defendant "B" being that legal entity that is the correctly named legal entity that is responsible for the wrongs complained of hereinafter in this complaint.

5.     This Court has jurisdiction over this matter as Plaintiff's purchase of and exposure to the subject Roundup® products took place in Elmore County, Alabama.

6.     Defendant Monsanto Company ("Monsanto") maintains sufficient contacts with the State of Alabama that this Court's exercise of personal jurisdiction over it does not offend traditional notions of fair play and substantial justice.

7.     Venue is proper within this Court because the purchase of and exposure to the Roundup® complained of herein took place in Elmore County, Alabama.

8.     Glyphosate is a broad-spectrum, non-selective herbicide used in a wide variety of herbicidal products around the world.

9.     Plants treated with glyphosate translocate the systemic herbicide to their roots, shoot regions, and fruit, where it interferes with the plant's ability to form aromatic amino acids necessary for protein synthesis. Treated plants generally die within two to three days. Because plants absorb glyphosate, it cannot be completely removed by washing or peeling produce or by milling, baking or brewing grains.

10.     When Monsanto first introduced Roundup® it touted glyphosate as a technological breakthrough: it could kill almost every weed without causing harm

either to people or to the environment.

11.    The herbicidal properties of glyphosate were discovered by Monsanto in approximately 1970. The first glyphosate-based herbicide was introduced to the market in the mid-1970s under the brand name Roundup®. Monsanto marketed it as a "safe" general purpose herbicide for widespread commercial and consumer use. It still markets it as safe today.

12.    In addition to the active ingredient glyphosate, Roundup® formulations also contain adjuvants and other chemicals, such as the POEA, which are considered "inert" and therefore protected as "trade secrets" in manufacturing. Growing evidence suggests that these adjuvants and additional components of Roundup® formulations are not, in fact, inert and are toxic in their own right.

13.    The manufacture, formulation and distribution of herbicides such as Roundup®, are regulated under the FIFRA, 7 U.S.C. 136 et seq. FIFRA requires that all pesticides be registered with the EPA prior to their distribution, sale or use except as described by the FIFRA.

14.    Because pesticides are toxic to plants, animals and humans, at least to some degree, the EPA requires as part of the registration process, among other things, a variety of tests to evaluate the potential exposure to pesticides, toxicity to people and other potential non-target organisms and other adverse effects on the environment. Registration by the EPA, however is not an assurance or finding of safety.

15.    Based on early studies showing that glyphosate could cause cancer in lab

animals, the EPA originally classified glyphosate as possibly carcinogenic to humans in 1985. After pressure from Monsanto, including contrary studies it provided to the EPA, the EPA changed its classification to evidence of non-carcinogenicity in humans in 1991. In so classifying glyphosate, however, the EPA made clear that the designation did not mean the chemical does not cause cancer: "It should be emphasized, however, that designation of an agent in Group E is based on the available evidence at the time of evaluation and should not be interpreted as a definitive conclusion that the agent will not be a carcinogen under any circumstances.

16.     On two occasions, the EPA found that the labs hired by Monsanto to test the toxicity of Roundup® products for registration purposes committed fraud.

17.     In the first instance, Monsanto hired Industrial Bio-Test Laboratories (IBT) to perform and evaluate pesticide toxicology studies relating to Roundup®. IBT performed about 30 tests on glyphosate and glyphosate-containing products, including nine of the 15 residue studies needed to register Roundup®.

18.     In 1976, the FDA performed an inspection of IBT that revealed discrepancies between the raw data and the final report relating to the toxicological impacts of glyphosate. The EPA subsequently audited IBT; it too found the toxicology studies conducted for the Roundup® herbicide to be invalid. An EPA reviewer stated, after finding "routine falsification of data" at IBT, that it was "hard to believe the scientific integrity of the studies when they said they took specimens of the uterus

from male rabbits."

19.     Three top executives of IBT were convicted of fraud in 1983.

20.     In the second incident of data falsification, Monsanto hired Craven Labs in 1991 to perform pesticide and herbicide studies including for Roundup®. In that same year, the owner of Craven Labs and three of its employees were indicated, and later convicted, of fraudulent laboratory practices in the testing of pesticides and herbicides.

21.     Despite the falsity of the tests that underlie its registration, within a few years of its launch, Monsanto was marketing Roundup® in 115 countries.

22.     The success of Roundup® was key to Monsanto's continued reputation and dominance in the marketplace. Largely due to the success of Roundup® sales, Monsanto's agriculture division was out-performing its chemicals division's operating income, and that gap increased yearly. But with its patent for glyphosate expiring in the United States in the year 2000, Monsanto needed a strategy to maintain its Roundup® market dominance and to ward off impending competition.

23.     In response, Monsanto began the development and sale of genetically engineered Roundup Ready® seeds in 1996. Since Roundup Ready® crops are resistant to glyphosate, farmers can spray Roundup® onto their fields during the growing season without harming the crop. This allowed Monsanto to expand its market for Roundup even further, by 2000, Monsanto's biotechnology seeds were planted on more than 80 million acres worldwide and nearly 70 percent of American

soybeans were planted from Roundup Ready® seeds. It also secured Monsanto's dominant share of the glyphosate/Roundup® market thought a marketing strategy that coupled proprietary Roundup Ready® seeds with continued sales of its Roundup® herbicide.

24.    Through a three-pronged strategy of increasing production, decreasing prices, and by coupling with Roundup Ready® seeds, Roundup® became Monsanto's most profitable product. In 2000, it accounted for $2.8 billion in sales, outselling other herbicides by a margin of five to one. Today, glyphosate remains one of the world's largest herbicides by sales volume.

25.    In 1996, the New York Attorney General filed a lawsuit against Monsanto based on its false and misleading advertising of Roundup® products. Some of the comments upon which the suit was based included: "safer than table salt", "practically non-toxic", "environmentally friendly", "stays where you apply it", "safety margin is much greater than required.", "you can feel good about using herbicides by Monsanto", and "can be used where kids and pets play".

26.    On November 19, 1996, Monsanto entered into an Assurance of Discontinuance with the New York Attorney General in which Monsanto agreed, among other things, to stop publishing advertisements in New York that represent directly or by implication that the product was safe, non-toxic, harmless and risk-free.

27.    Monsanto did not alter its advertising in the same manner in any state other

DOCUMENT 2

than New York, and on information and believe, it still has not done so today.

28.    In 2009, France's highest court ruled that Monsanto had not told the truth about the safety of Roundup®. The French court affirmed an earlier judgment that

29.    In addition to the toxicity of the active ingredient glyphosate several studies support the theory that the glyphosate-based formulation in Roundup® products is more dangerous and toxic than glyphosate alone. Indeed, as early as 1991, available evidence demonstrated that glyphosate formulations were significantly more toxic than glyphosate alone.

30.    Results of studies conducted in 2002 and 2004 by Julie Marc, and studies by Francisco Pexoto, Benachour, and Seralini all confirmed that the adjuvants present in Roundup® are not in fact inert and that Roundup® is potentially far more toxic than its active ingredient glyphosate alone. Results of these studies were at all times available to Defendants. Defendants thus knew or should have known that Roundup® is more toxic than glyphosate alone and that safety studies of Roundup®, Roundup's adjuvants and "inert" ingredients and/or the surfactant POEA were necessary to protect Plaintiff from Roundup®.

31.    Several countries have instituted bans on the sale of Roundup® and other glyphosate-containing herbicides.

32.    Plaintiff is fifty-four years old. From 2000 to 2019 Plaintiff lived in Tallassee, Alabama which is in Elmore County. During the months of April through November he would regularly use Roundup in his yard in the grass and in his flower beds to

kill weeds.

33.    Plaintiff would buy the Roundup from the local Walmart or other local stores and mix it according to the instructions and use at this home in Elmore County.

34.    Defendant promoted the sale and distribution of its Roundup product and concealed the fact that it was a true carcinogenic.

35.    Because Plaintiff did not know that Roundup® was injurious to his health and/or to the health of others Plaintiff did not wear any protective gear while mixing or applying Roundup® and used the Roundup® in the manner recommended by the Defendants. Defendant Monsanto did not recommend that such be worn with knowledge of the fact the product caused cancer of the type now debilitating the Plaintiff's life. Defendants possessed far superior knowledge to that of Plaintiff and despite their knowledge did not reveal the true facts to the Plaintiff. Defendant was financially rewarded by the selling of the Roundup product and had a vested interest in it being sold without warning of its hazardous components.

36.    On or about late November, 2019 Plaintiff was diagnosed with Hairy Cell Leukemia.

37.    During the entire time that Plaintiff was exposed to Roundup® he did not know that exposure was injurious to his health or the health of others.

38.    Plaintiff had no way of knowing about the risk of serious illness associated with the use of and/or exposure to Roundup® and glyphosate until well after IARC released its formal assessment of glyphosate in July 2015. This is the quintessential

case for tolling.

39.     Within the time period of any applicable statute of limitations, Plaintiff could not have discovered, through the exercise of reasonable diligence, that exposure to Roundup® and glyphosate is injurious to human health.

40.     Plaintiff did not discover, and did not know of facts that would cause a reasonable person to suspect the risks associated with the use of and/or exposure to Roundup® and glyphosate; nor would a reasonable and diligent investigation by him have disclosed that Roundup® and glyphosate would cause his illness.

41.     For these reasons, all applicable statutes of limitations have been told by operation of the discovery rule with respect to Plaintiff's claims.

42.     All applicable statutes of limitations have also been told by the Defendant's knowing and active fraudulent concealment and denial of the facts alleged herein throughout the time period relevant to this action.

43.     Instead of disclosing critical safety information about Roundup® and glyphosate, the Defendant has consistently and falsely represented the safety of their Roundup® products.

44.     Defendant was under a continuous duty to disclose to consumers, users and other persons coming into contact with its products, including Plaintiff, accurate safety information concerning its products and the risks associated with the use of and/or exposure to Roundup® and glyphosate.

45.     Instead, the Defendant knowingly, affirmatively, and actively concealed

safety information concerning Roundup® and glyphosate and the serious risks associated with the use of and/or exposure to its products.

46.    Based on the foregoing, the Defendant are estopped from relying on any statutes of limitations in defense of this action. The Defendants had advanced levels of education on the product, worked to conceal the carcinogenic nature of the Roundup product and to promote it above others despite alternatives being available in order to effectuate a financial gain. All to the detriment of Plaintiff. The Defendant knew or reasonably should have known, because of its knowledge and information, that the Roundup sold would cause injury to and/or death to a large number of consumers, including Plaintiff. The Defendant has been educated in and aware of the carcinogenic nature of Roundup for many years, thus giving it superior knowledge of these. Defendant knew consumers, such as Plaintiff, would likely contract Hairy Cell Leukemia and similar cancers.

47.    The Defendant knew that their actions would result in the continued use of the product and enhanced sales of the product that would likely result in harm to the Plaintiff and others that use the product. The Defendant had an intent to keep from the public the carcinogenic nature of Roundup, as well as the intent to keep from the general public the extreme hazard of Roundup. The Defendant worked with knowledge in such a way to control and manipulate the sales of the Roundup product and to quieten any concern about its carcinogenic nature.

48.    Plaintiff has suffered and continues to suffer tremendous physical pain as a

result of his cancer and suffered and continues to suffer mental anguish and emotional distress as a result of his cancer.

49.    Defendant had an opportunity to inspect the Roundup that is superior to Plaintiff. Moreover, Defendant had more knowledge of the product that is superior to that of the Plaintiff. The Defendant concealed information about risks of Roundup and aggressively marketed the herbicide as safe for humans and the environment. The Defendant championed falsified data while attacking legitimate research linking Roundup to cancer. Defendant made a conscious decision not to redesign or withdraw from the market Roundup so that it was less dangerous to humans and the environment. Defendant knew or should have known that Roundup caused cancer but failed to adequately warn. Defendant also failed to adequately monitor Roundup after bringing it to the market.

50.    Defendant undertook a concerted effort to disguise the information they had concerning Roundup being a carcinogenic, the actions they undertook were done negligently, wantonly and with reckless disregard for the lives and safety of the public and with knowledge that serious injury and death would likely result from continued use of Roundup by the public including Plaintiff.

## FIRST CAUSE OF ACTION
### (Product Liability)

51.    Plaintiff adopts all preceding paragraphs of this Complaint as if fully set forth herein.

52.    Plaintiff brings this product liability claim against Defendant.

53.     Defendant engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing and promoting Roundup® products, which are defective and unreasonably dangerous to consumers and users and other persons coming into contact with them, including the Plaintiff, thereby placing Roundup® products in the stream of commerce. These actions were under the ultimate control and supervision of Defendant. Defendant designed, researched, developed, formulated, manufactured, produced, tested, assembled, mixed, labeled, sold, promoted, marketed, advertised, and distributed the Roundup® products used by Plaintiff and/or to which Plaintiff was exposed, as described above.

54.     Defendant's Roundup® products were manufactured, designed, and labeled in an unsafe, defective, and inherently dangerous manner that was dangerous for use by or exposure to the public, and in particular, the Plaintiff.

55.     Defendant's Roundup products reached the intended consumers, handlers, and users or other persons coming into contact with these products in Alabama and throughout the United States, including Plaintiff without substantial change in their condition as designed, manufactured, sold, distributed, labeled, and marketed by Defendant.

56.     Defendant's Roundup products, as researched, tested, developed, designed, licensed, formulated, manufactured, packaged, labeled, distributed, sold and marketed by Defendant was defective in design and formulation in that when they left the hands of the Defendant's manufacturers and/or suppliers and/or distributors

they were unreasonably dangerous and dangerous to an extent beyond that which an ordinary consumer would contemplate.

57. Defendants Roundup® products as researched, tested, developed, designed, licensed, formulated, manufactured, packaged, labeled, distributed, sold and marketed by Defendant was defective in that when they left the hands of the Defendant's manufacturers and/or suppliers, the foreseeable risks associated with these products' reasonably foreseeable uses exceeded the alleged benefits associated with their design and formulation.

58. Therefore, at all relevant times, Defendant's Roundup® products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold, and marketed by Defendant was defective in design and formulation in one or more of the following ways:

a. When placed in the stream of commerce, Defendant's Roundup® products were defective in design and formulation and consequently dangerous to an extent beyond that which an ordinary consumer would contemplate;

b. When placed in the stream of commerce, Defendant's Roundup® products were unreasonably dangerous in that they were hazardous and posed a grave risk of cancer and other serious illnesses when used in a reasonably anticipated manner.

c. When placed in the stream of commerce, Defendant's Roundup® products contained unreasonably dangerous design defects and were not reasonably safe when used in a reasonably anticipated or intended manner;

d. Defendant did not sufficiently test, investigate or study the Roundup products and specifically the active ingredient glyphosate.

e. Exposure to Roundup® and glyphosate-containing products presents a risk of harmful side effects that outweighs any potential utility stemming from the use of the herbicide.

f. Defendant's working in concert together all knew or should have known at the time of marketing, selling, distributing, supplying, and promoting the Roundup® products that exposure to Roundup® and specifically, its active ingredient glyphosate could result in cancer and other severe illnesses and injuries.

g. Defendant did not conduct adequate post-marketing surveillance of its Roundup products.

h. Defendant could have employed safer alternative designs and formulations;

i. Defendants failed to provide, encourage, suggest or recommend the use of protective gear when using this dangerous product – a product the Defendants all knew was carcinogenic;

j. Defendants all failed to deliver important product information to Plaintiff;

59.     Plaintiff used and/or was exposed to the use of Defendant's Roundup® products in an intended or reasonably foreseeable manner without knowledge of their dangerous characteristics.

60.     Plaintiff could not have reasonably discovered the defects and risks associated with Roundup® or glyphosate-containing products before or at the time of exposure.

61.    The harm caused by Defendant's Roundup® products far outweighed their benefit, rendering Defendant's products dangerous to an extent beyond that which an ordinary consumer would contemplate. Defendant's Roundup® products were and are more dangerous than alternative products and the Defendant could have designed its Roundup® products to make them less dangerous. Indeed, at the time that Defendant designed its Roundup® products the state of the industry's scientific knowledge was such that a less risky design or formulation was attainable.

62.    At the time Roundup® products left Defendant's control, there was a practical, technically feasible, and safer alternative design that would have prevented the harm without substantially impairing the reasonably anticipated or intended function of Defendant's herbicides.

63.    Defendants' defective design of Roundup® amounts to willful, wanton and/or reckless conduct by Defendant.

64.    Therefore, as a result of the unreasonably dangerous condition of their Roundup® products the Defendant is liable to Plaintiff.

65.    The defects in Defendant's products were substantial and contributing factors in causing Plaintiff's grave injuries, and, but for Defendants' misconduct and omissions, Plaintiff would not have sustained his injuries.

66.    As a direct and proximate result of Defendants placing their defective Roundup® products into the stream of commerce, Plaintiff has suffered and continues to suffer grave injuries, and has endured pain and discomfort, financial

hardship, emotional distress, worry, anxiety, and stress. Plaintiff will continue to incur these damages in the future.

## SECOND CAUSE OF ACTION
### (Failure to Warn)

67.     Plaintiff adopts all preceding paragraphs of this Complaint as if fully set forth herein.

68.     Plaintiff brings this products liability claim against the Defendant for failure to warn.

69.     At all times relevant to this litigation, Defendant engaged in the business for testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting Roundup® products, which are defective and unreasonably dangerous to consumers, including Plaintiff, because they do not contain adequate warnings or instructions concerning the dangerous characteristics of Roundup® and specifically, the active ingredient glyphosate. These actions were under the ultimate control and supervision of the Defendant. The Defendant had greater knowledge than that of the Plaintiff. Defendant promoted the sale and distribution of the subject product while it knew or should have known of the carcinogenic nature of the Roundup. Defendant concealed it was a true carcinogenic. Defendant failed to deliver important product information to Plaintiff.

70.     Defendant researched, developed, designed, tested, manufactured, inspected, labeled, distributed, marketed, promoted, sold, and otherwise released into the stream of commerce their Roundup® products, and in the course of same, directly

advertised or marketed the products to consumers and end users, including Plaintiff, and the Defendant therefore had a duty to warn of the risks associated with the reasonably foreseeable uses (and misuses) of Roundup® and glyphosate-containing products.

71.    At all times relevant to this litigation, the Defendant had a duty to properly test, develop, design, manufacture, inspect, package, label, market, promote, sell, distribute, maintain supply, provide proper warnings, and take such steps as necessary to ensure that their Roundup® products did not cause users and consumers to suffer from unreasonable and dangerous risks. Defendant had a continuing duty to warn Plaintiff of the dangers associated with Roundup® use and exposure. Defendant, as manufacturer, seller, or distributor of chemical herbicides, is held to the knowledge of an expert in the field.

72.    At the time of manufacture, Defendant could have provided warnings or instructions regarding the full and complete risks of Roundup® and glyphosate-containing products because they knew or should have known of the unreasonable risks of harm associated with the use of and/or exposure to these products.

73.    At all times relevant to this litigation, Defendant failed to investigate, study, test, or promote the safety or to minimize the dangers to users and consumers of the Roundup® products and to those who would foreseeably use or be harmed by Defendant's herbicides, including Plaintiff.

74.    Despite the fact that Defendant knew or should have known that Roundup®

products posed a grave risk of harm, it failed to warn of the dangerous risks associated with their use and exposure. The dangerous propensities of their products and the carcinogenic characteristics of glyphosate, as described above, were known to Defendants, or scientifically knowable to the Defendant through appropriate research and testing by known methods, at the time it distributed, supplied, or sold the product, and not known to end users and consumers, such as Plaintiff.

75.     Defendant knew or should have known that Roundup® and glyphosate-containing products created significant risks of seriously bodily harm to consumers, as alleged herein, and Defendant failed to adequately warn consumers and reasonably foreseeable users of the risks of exposure to these products. Defendant has wrongfully concealed information concerning the dangerous nature of Roundup and its active ingredient glyphosate, and further made false and/or misleading statements concerning the safety of Roundup® and glyphosate.

76.     At all times relevant to this litigation, Defendant's Roundup® products reached the intended consumers, handlers, and users or other persons coming into contact with these products throughout the United States, including Plaintiff, without substantial change in their condition as designed, manufactured, sold, distributed, labeled, and marketed by the Defendant.

77.     At all times relevant to this litigation, Plaintiff used and/or was exposed to the use of Defendant's Roundup® products in their intended or reasonably foreseeable manner without knowledge of their dangerous characteristics.

78.     Plaintiff could not have reasonable discovered the defects and risks associated with Roundup® or glyphosate-containing products before or at the time of Plaintiff's exposure. Plaintiff relied upon the skill, superior knowledge, and judgment of Defendant.

79.     Defendant knew or should have known that the minimal warnings disseminated with their Roundup® products were inadequate, but they failed to communicate adequate information on the dangers and safe use/exposure and failed to communicate warnings and instructions that were appropriate and adequate to render the products safe for their ordinary, intended, and reasonably foreseeable uses. The Defendant did not display or sell the product in such a way to notify the Plaintiff as the customer that the Roundup was a hazardous substance.

80.     The information that Defendant did provide or communicate failed to contain relevant warnings, hazards, and precautions that would have enabled at-home users such as Plaintiff to utilize the products safely and with adequate protection. Instead, Defendant disseminated information that was inaccurate, false, and misleading and which failed to communicate accurately or adequately the comparative severity, duration, and extent of the risk of injuries associated with use of and/or exposure to Roundup® and glyphosate; continued to aggressively promote the efficacy of their products, even after they knew or should have known of the unreasonable risks from use or exposure; and concealed, downplayed, or otherwise suppressed, through aggressive marketing and promotion; any information or research about the risks and

dangers of exposure to Roundup® and glyphosate. To this day, Defendant has failed to adequately and accurately warn of the true risks of Plaintiff's injuries associated with the use of and exposure to Roundup® and its active ingredient glyphosate, a probable carcinogen.

81.    As a result of their inadequate warnings, Defendant's Roundup® products were defective and unreasonable dangerous when they left their possession and/or control of the Defendant, were distributed by the Defendant, and used by Plaintiff.

82.    Defendant is liable to Plaintiff for injuries caused by their failure, as described above, to provide adequate warnings or other clinically relevant information and data regarding the appropriate use of Roundup® products and the risks associated with the use of or exposure to Roundup® and glyphosate.

83.    The defects in Roundup® products were substantial and contributing factors in causing Plaintiff's injuries, and, but for Defendant's misconduct and omissions, Plaintiff would not have sustained his injuries.

84.    Had Defendant provided adequate warnings and instructions and properly disclosed and disseminated the risks associated with Roundup® products, Plaintiff could have avoided the risk of developing injuries as alleged herein and could have obtained alternative herbicides.

85.    As a direct and proximate result of Defendant placing the defective Roundup® products into the stream of commerce, Plaintiff has suffered and continues to suffer severe injuries, and has endured physical pain and discomfit, as

well as economic hardship, including considerable financial expenses for medical care and treatment. Plaintiff will continue to incur these expenses in the future.

## THIRD CAUSE OF ACTION
### (Negligence)

86.   Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

87.   Defendant, directly or indirectly, caused Roundup® products to be sold, distributed, packaged, labeled, marketed, promoted, and/or used by Plaintiff.

88.   At all times relevant to this litigation, Defendant had a duty to exercise reasonable care in the design, research, manufacture, marketing, advertisement, supply, promotion, packaging, sale, and distribution of Roundup® products, including the duty to take all reasonable steps necessary to manufacture, promote, and/or sell a product that was not unreasonably dangerous to consumers, users, and other persons coming into contact with the product.

89.   At all times relevant to this litigation, Defendant had a duty to exercise reasonable care in the marketing, advertisement, and sale of Roundup® products. Defendant's duty of care owed to consumers and the general public included providing accurate, true, and correct information concerning the risks of using Roundup® and appropriate, complete, and accurate warnings concerning the potential adverse effects of exposure to Roundup® and, in particular, its active ingredient glyphosate.

90.   At all times relevant to this litigation, Defendant knew or, in the exercise of

reasonable care, should have known of the hazards and dangers of Roundup® and specifically, the carcinogenic properties of the chemical glyphosate.

91.     Accordingly, at all times relevant to this litigation, Defendant knew or, in the exercise of reasonable care, should have known that use of or exposure to Roundup® products could cause Plaintiff's injuries and thus created a dangerous and unreasonable risk of injury to the users of these products, including Plaintiff.

92.     The Defendant knew or, in the exercise of reasonable care, should have known that Roundup® is more toxic than glyphosate alone and that safety studies on Roundup®, Roundup®'s adjuvants, and "inert" ingredients, and/or the surfactant POEA were necessary to protect Plaintiff from Roundup®.

93.     Defendant knew or, in the exercise of reasonable care, should have known that tests limited to Roundup®'s active ingredient glyphosate were insufficient to prove the safety of Roundup®.

94.     Defendant also knew, or in the exercise of reasonable care, should have known that users and consumers of Roundup® were unaware of the risks and the magnitude of the risks associated with the use of and/or exposure to Roundup® and glyphosate-containing products.

95.     As such, Defendant breached their duty of reasonable care and failed to exercise ordinary care in the design, research, development, manufacture, testing, marketing, supply, promotion, advertisement, packaging, sale, and distribution of their Roundup® products, in that Defendant's manufactured and produced defective

herbicides containing the chemical glyphosate, knew or had reason to know of the defects inherent in their products, knew or had reason to know that a user's or consumer's exposure to the products created a significant risk of harm and unreasonable dangerous side effects, and failed to prevent or adequately warn of these risks and injuries.

96.     Defendant failed to appropriately and adequately test Roundup®, Roundup®'s adjuvants and "inert" ingredients, and/or the surfactant POEA to protect Plaintiff from Roundup®.

97.     Despite their ability and means to investigate, study, and test their products and to provide adequate warnings, Defendant has failed to do so. Indeed, Defendant has wrongfully concealed information and have further made false and/or misleading statements concerning the safety and/or exposure to Roundup® and glyphosate.

98.     Defendant's negligence included:

a. Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing their Roundup® products without thorough and adequate pre- and post-market testing;

b. Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing Roundup® while negligently and/or intentionally concealing and failing to disclose the results of trials, tests, and studies of exposure to glyphosate, and, consequently, the risk of serious harm associated with human use of and exposure to Roundup®;

c. Failing to undertake sufficient studies and conduct necessary tests to determine whether or not Roundup® products and glyphosate-containing products were safe for their intended use in agriculture, horticulture, and at-home use;

d. Failing to undertake sufficient studies and conduct necessary tests to determine the safety of "inert" ingredients and/or adjuvants contained within Roundup®, and the propensity of these ingredients to render Roundup® toxic, increase the toxicity of Roundup®, whether these ingredients are carcinogenic, magnify the carcinogenic properties of Roundup®, and whether or not "inert" ingredients and/or adjuvants were safe for use;

e. Failing to use reasonable and prudent care in the design, research, manufacture, formulation, and development of Roundup® products so as to avoid the risk of serious harm associated with the prevalent use of Roundup®/ glyphosate as an herbicide;

f. Failing to design and manufacture Roundup® products so as to ensure they were at least as safe and effective as other herbicides on the market;

g. Failing to provide adequate instructions, guidelines, and safety precautions to those persons who Defendants could reasonably foresee would use and/or be exposed to Roundup® products;

h. Failing to disclose to Plaintiff, users, consumers, and the general public that the use of and exposure to Roundup® presented severe risks of cancer and other grave illnesses;

i.  Failing to warn Plaintiff, users, consumers, and the general public that the product's risk of harm was unreasonable and that there were safer and effective alternative herbicides available to Plaintiff and other users or consumers;

j.  Systematically suppressing or downplaying contrary evidence about the risks, incidence, and prevalence of the side effects of Roundup® and glyphosate-containing products;

k.  Representing that their Roundup® products were safe for their intended use when, in fact, Defendants knew or should have known that the products were not safe for their intended use;

l.  Declining to make or propose any changes to Roundup® products' labeling or other promotional material that would alert the consumers and the general public of the risks of Roundup® and glyphosate;

m. Advertising, marketing, and recommending the use of Roundup® products, while concealing and failing to disclose or warn the dangers known by Defendants to be associated with or caused by the use of or exposure to Roundup® and glyphosate;

n.  Continuing to disseminate information to their consumers, which indicate or imply that Defendants Roundup® products are not unsafe for use in the agricultural, horticultural industries, and/or home use; and

o.  Continuing the manufacture and sale of their products with the knowledge that the products were unreasonably unsafe and dangerous.

99.    Defendant knew and/or should have known that it was foreseeable that consumers and/or users, such as Plaintiff, would suffer injuries as a result of Defendants' failure to exercise ordinary care in the manufacturing, marketing, labeling, distribution, and sale of Roundup®.

100.    Plaintiff did not know the nature and extent of the injuries that could result from the intended use or and/or exposure to Roundup® or its active ingredient glyphosate.

100.    Defendant's negligence was the proximate cause of the injuries, harm, and economic losses that Plaintiff suffered, and will continue to suffer, as described herein.

101.    Defendant's conduct, as described above, was reckless. Defendant regularly risks the lives of consumers and users of their products, including Plaintiff, with full knowledge of the dangers of their products. Defendant has made conscious decisions not to redesign, relabel, warn, or inform the unsuspecting public, including Plaintiff. Defendant's reckless conduct therefore warrants an award of punitive damages.

102.    As a proximate result of Defendant's wrongful acts and omissions in placing defective Roundup® products into the stream of commerce without adequate warnings of the hazardous and carcinogenic nature of glyphosate, Plaintiff has suffered and continues to suffer severe and permanent physical and emotional injuries. Plaintiff has endured pain and suffering, has suffered economic losses (including significant expenses for medical care and treatment) and will continue to

incur these expenses in the future.

## FOURTH CAUSE OF ACTION
### (Breach of Express Warranty)

103.    Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

104.    Roundup® which was designed, tested, manufactured, distributed, promoted and sold by Defendant, was expected to, and did, reach Plaintiff without any substantial change in its condition.

105.    Defendant, through their advertising and promotional materials, expressly warranted that Roundup® was safe for its intended use and was not unreasonably dangerous for its intended purpose.

106.    Defendant breached their express warranties in that Roundup® was not safe for its intended use in light of the unreasonably high risk of cancer associated with its use, including the risk of NHL.

107.    Plaintiff reasonably relied to his detriment on Defendant's express warranties.

108.    As a proximate result of Defendant's wrongful acts and omissions in placing its defective Roundup® products into the stream of commerce, Plaintiff has suffered and continues to suffer severe and permanent physical and emotional injuries. Plaintiff has endured pain and suffered, has suffered economical losses (including significant expenses for medical care and treatment) and will continue to incur these expenses in the future.

DOCUMENT 2

## FIFTH CAUSE OF ACTION
### (Breach of Implied Warranty)

109.   Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

110.   Roundup® which was designed, tested, manufactured, distributed, promoted and sold by Defendant, was expected to, and did, reach Plaintiff without any substantial change in condition.

111.   At the time Defendant manufactured, marketed, sold, and distributed Roundup® the Defendant knew of the use for which Roundup® was intended and impliedly warranted, through their advertising and promotional materials, that Roundup® was of merchantable quality, fitness, and safe for the use for which it was intended.

112.   Plaintiff reasonably relied upon the skill and judgment of the Defendant as to whether Roundup® was of merchantable quality and safe for its intended use and upon Defendants' implied warranty as to such matters.

113.   Contrary to the implied warranty, Defendants' product Roundup® was not of merchantable quality of safe for its intended use because it was unreasonably dangerous as described herein.

114.   As a proximate result of Defendant's wrongful acts and omissions in placing their defective Roundup® products into the stream of commerce, Plaintiff has suffered and continues to suffer severe and permanent physical and emotional injuries. Plaintiff has endured pain and suffering, has suffered economic loses

(including significant expenses for medical care and treatment) and will continue to incur these expenses in the future.

## SIXTH CAUSE OF ACTION
### Negligent Misrepresentation and/or Fraud

115.   Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraph as if fully stated herein.

116.   Defendant is the manufacturer, designer, distributor, seller or supplier of Roundup® and, while engaged in the course of such business, made representations to Plaintiff regarding the character and/or quality of for guidance in his decision to select Roundup® for use.

117.   Defendant had a duty to disclose material information about serious health effects to consumers such as Plaintiff. Defendant intentionally failed to disclose this information for the purpose of inducing consumers, including Plaintiff, to purchase Defendants' dangerous products.

118.   Specifically, Defendant's advertisement regarding Roundup made material misrepresentations to the effect that Roundup® was a safe, which misrepresentations Defendant knew to be false, for the purpose of fraudulently including consumers, such as Plaintiff to purchase said product. Defendant further misrepresented that their products were just as safe, and just as effective or more effective, than other weed control products on the market.

119.   Defendant's representations regarding the character of quality of Roundup® were untrue.

120.    In addition, Defendant fraudulently suppressed material information regarding the safety of Roundup®, including the dangers known by Defendant to be associated with or caused by the use of or exposure to Roundup® and glyphosate.

121.    Defendants had actual knowledge based on the results of trials, tests, and studies of exposure to glyphosate, of the risk of serious harm associated with human use of and exposure to Roundup®.

122.    Defendants negligently and/or intentionally misrepresented or omitted this information in their product labeling, promotions, and advertisements and instead labeled, promoted, and advertised their products as safe and effective in order to avoid losses and sustain profits in their sales to consumer.

123.    In supplying the false information, Defendant failed to exercise reasonable care or competence in obtaining or communicating information to their intended recipients, including Plaintiff.

124.    Plaintiff reasonably relied to his detriment upon Defendant's misrepresentations and/or omissions in their labeling, advertisements, and promotions concerning the serious risks posed by the product. Plaintiff reasonably relied upon Defendant's representations to him that Roundup was safe for use and that Defendant's labeling, advertisements, and promotions fully described all known risks of the product.

125.    Defendant is estopped from relying on any statute of limitations defenses because Defendant actively concealed the defects from consumers, such as Plaintiff.

Instead of revealing the defects, Defendant continued to represent their product as safe for its intended use.

126. As a direct and proximate result of Plaintiff's use of Roundup® as manufactured, designed, sold, supplied, and introduced into the stream of commerce by Defendant, Plaintiff suffered personal injury, non-economic damages, and will continue to suffer such harm and damages in the future.

## SEVENTH CAUSE OF ACTION
### Unfair and Deceptive Trade Practices

127. Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

128. By reason of their conduct as alleged herein, Defendant violated the provisions of the Code of Alabama by inducing the Plaintiff to use Roundup® through the use of false and/or misleading, advertising, representations, and statements.

129. By engaging in the conduct described herein, Defendant violated Code of Alabama by, among other things:

a. Engaging in unfair or deceptive trade practices as defined in this statute by making false and misleading oral and written statements that had the capacity, tendency, or effect of deceiving or misleading consumers.

b. Engaging in unfair or deceptive trade practices as defined in this statute by making representations that their products had an approval, characteristics, ingredient, use or benefit which they did not have, including but not limited to

statements concerning the health consequences of the use of Roundup®.

c.     Engaging in unfair or deceptive trade practices as defined in this statute by failing to state material facts the omission of which deceived or tended to deceive, including but not limited to facts related to the health consequences of the use of Roundup®.

d.     Engaging in unfair or deceptive trade practices as defined in this statute through deception, fraud, misrepresentation and knowing concealment, suppression and mission of material facts with the intent that consumers rely upon the same in connection with the use.

## TENTH CAUSE OF ACTION WANTONNESS

130.   Plaintiff adopts all preceding paragraphs of this Complaint as if fully set forth herein.

131.   Defendant consciously decided to design, manufacture, distribute, market and sell the product while knowing that injuries similar to those suffered by Plaintiff would likely result from the use of the Roundup.

132.   Defendant wantonly failed to address the risk in a timely manner.

133.   Defendant wantonly disregarded their knowledge and proceeded with manufacturing, selling, marketing, and distributing the dangerous product with the knowledge that it contained a carcinogenic and severe injury and death were likely.

134.   As a result of the Defendant's wanton conduct, Plaintiff suffers from Hairy Cell Leukemia

## PUNITIVE DAMAGES

135.   The conduct of Defendant described above was fraudulent, malicious, and willful or wanton in that it demonstrated a conscious and intentional disregard of and indifference to the safety of others, including Plaintiff, which Defendant knew or should have known was likely to result in serious injury or death to members of the consuming public, including Plaintiff. The Defendant worked in concert with each other to effectuate their global purpose of economic gain.

136.  As a direct and proximate result of the intentional, willful, and wanton misconduct of the Defendant, Plaintiff was caused to suffer NHL, as well as the damages alleged herein. Plaintiff is entitled to recover punitive damages as a result of Defendants concerted and combined conduct.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff prays that the Court enter judgement in his favor and against the Defendant, awarding as follows:

a. Compensatory damages in in excess of the jurisdictional amount, including, but not limited to pain, suffering, emotional distress, loss of enjoyment of life, and other non-economic damages in an amount to be determined at trial of this action;

b. Medical expenses and other economic damages in an amount to be determined at trial of this action;

c. Punitive damages;

   d. Costs including reasonable attorneys' fees, court costs, and other litigation expenses;

   e. Any other relief the Court may deem just and proper.

## **JURY DEMAND**

101.   Plaintiff hereby demands a trial by jury on all issues.

Done this 19th day of November, 2021

MORRIS, HAYNES, LLC.
131 Main Street
Alexander City, Alabama 35010
(O): 256-329-2000


/s/ Clay Hornsby
CLAY HORNSBY, ESQ. (HOR021)

| State of Alabama<br>Unified Judicial System<br>Form C-34 Rev. 4/2017 | **SUMMONS**<br>**- CIVIL -** | **Court Case Number**<br>**29-CV-2021-900230.00** |
|---|---|---|

### IN THE CIRCUIT COURT OF ELMORE COUNTY, ALABAMA
### JAMES HARWICK V. MONSANTO COMPANY CORPORATION ET AL

**NOTICE TO:** MONSANTO COMPANY CORPORATION, 841 SOUTH LAWRENCE STREET, MONTGOMERY, AL 36104

*(Name and Address of Defendant)*

THE COMPLAINT OR OTHER DOCUMENT WHICH IS ATTACHED TO THIS SUMMONS IS IMPORTANT, AND YOU MUST TAKE IMMEDIATE ACTION TO PROTECT YOUR RIGHTS. YOU OR YOUR ATTORNEY ARE REQUIRED TO FILE THE ORIGINAL OF YOUR WRITTEN ANSWER, EITHER ADMITTING OR DENYING EACH ALLEGATION IN THE COMPLAINT OR OTHER DOCUMENT, WITH THE CLERK OF THIS COURT. A COPY OF YOUR ANSWER MUST BE MAILED OR HAND DELIVERED BY YOU OR YOUR ATTORNEY TO THE PLAINTIFF(S) OR ATTORNEY(S) OF THE PLAINTIFF(S),
ERNEST CLAYTON HORNSBY JR.

*[Name(s) of Attorney(s)]*

WHOSE ADDRESS(ES) IS/ARE: 131 Main Street, Alexander City, AL 35010

*[Address(es) of Plaintiff(s) or Attorney(s)]*

THE ANSWER MUST BE MAILED OR DELIVERED WITHIN 30 DAYS AFTER THIS SUMMONS AND COMPLAINT OR OTHER DOCUMENT WERE SERVED ON YOU OR A JUDGMENT BY DEFAULT MAY BE RENDERED AGAINST YOU FOR THE MONEY OR OTHER THINGS DEMANDED IN THE COMPLAINT OR OTHER DOCUMENT.

**TO ANY SHERIFF OR ANY PERSON AUTHORIZED BY THE ALABAMA RULES OF CIVIL PROCEDURE TO SERVE PROCESS:**

☐ You are hereby commanded to serve this Summons and a copy of the Complaint or other document in this action upon the above-named Defendant.

☑ Service by certified mail of this Summons is initiated upon the written request of JAMES HARWICK
pursuant to the Alabama Rules of the Civil Procedure.

*[Name(s)]*

| 11/19/2021 | /s/ MICHAEL DOZIER | By: |
|---|---|---|
| *(Date)* | *(Signature of Clerk)* | *(Name)* |

☑ Certified Mail is hereby requested.     /s/ ERNEST CLAYTON HORNSBY JR.

*(Plaintiff's/Attorney's Signature)*

### RETURN ON SERVICE

☐ Return receipt of certified mail received in this office on _____

*(Date)*

☐ I certify that I personally delivered a copy of this Summons and Complaint or other document to _____

_____ in _____ County,

*(Name of Person Served)*        *(Name of County)*

Alabama on _____

*(Date)*

_____        _____

*(Type of Process Server)*       *(Server's Signature)*       *(Address of Server)*

_____        _____

*(Server's Printed Name)*       *(Phone Number of Server)*

### 29-CV-2021-900230.00
JAMES HARWICK V. MONSANTO COMPANY CORPORATION ET AL

| C001 - JAMES HARWICK | v. | D001 - MONSANTO COMPANY CORPORATION |
|---|---|---|
| *(Plaintiff)* | | *(Defendant)* |



# SERVICE RETURN COPY

CERTIFIED MAIL



Morris Haynes

*Attorneys at Law*

PO BOX 1660 ■ ALEXANDER CITY, AL 35011-1660



7020 2450 0002 1601 7869



FIRST-CLASS

$ 009.16⁰
NOV 19 2021
MAILED FROM ZIP CODE 35010

Monsanto Company Corporation
641 South Lawrence Street
Montgomery, AL 36104

DOCUMENT 2

ELECTRONICALLY FILED
11/19/2021 4:26 PM
29-CV-2021-900230.00
CIRCUIT COURT OF
ELMORE COUNTY, ALABAMA
MICHAEL DOZIER, CLERK



# IN THE CIRCUIT COURT OF ELMORE COUNTY, ALABAMA

| | |
|---|---|
| James Harwick )<br><br>Plaintiff, )<br><br>v. )<br><br>MONSANTO COMPANY, a corporation; )<br>Fictitious Party Defendant "A" being that )<br>legal entity that is a successor in interest to )<br>Monsanto; Fictitious Party Defendant "B" )<br>being the correctly named legal entity that )<br>is responsible for the wrongs alleged in )<br>the complaint )<br><br>Defendants. ) | Case Action No:<br><br>**JURY TRIAL DEMANDED** |

---

## COMPLAINT

---

Plaintiff James Harwick, by and through counsel, complains as follows:

## INTRODUCTION PARTIES

1.      Plaintiff is a Georgia citizen over the age of nineteen.

2.      Defendant Monsanto Company is a Delaware corporation with its headquarters
and principal place of business in St. Louis, Missouri. Monsanto was the entity that
discovered the herbicidal properties of glyphosate and the manufacturer of
Roundup®, which contains the active ingredient glyphosate and the surfactant POEA,
as well as adjuvants and other "inert" ingredients.

3.      Fictitious Party Defendant "A" being that legal entity that is the legal
successor in interest to the defendant Monsanto Company;

## JURISDICTION AND VENUE

4.      Fictitious Party Defendant "B" being that legal entity that is the correctly named legal entity that is responsible for the wrongs complained of hereinafter in this complaint.

5.      This Court has jurisdiction over this matter as Plaintiff's purchase of and exposure to the subject Roundup® products took place in Elmore County, Alabama.

6.      Defendant Monsanto Company ("Monsanto") maintains sufficient contacts with the State of Alabama that this Court's exercise of personal jurisdiction over it does not offend traditional notions of fair play and substantial justice.

7.      Venue is proper within this Court because the purchase of and exposure to the Roundup® complained of herein took place in Elmore County, Alabama.

8.      Glyphosate is a broad-spectrum, non-selective herbicide used in a wide variety of herbicidal products around the world.

9.      Plants treated with glyphosate translocate the systemic herbicide to their roots, shoot regions, and fruit, where it interferes with the plant's ability to form aromatic amino acids necessary for protein synthesis. Treated plants generally die within two to three days. Because plants absorb glyphosate, it cannot be completely removed by washing or peeling produce or by milling, baking or brewing grains.

10.     When Monsanto first introduced Roundup® it touted glyphosate as a technological breakthrough: it could kill almost every weed without causing harm

either to people or to the environment.

11.    The herbicidal properties of glyphosate were discovered by Monsanto in approximately 1970. The first glyphosate-based herbicide was introduced to the market in the mid-1970s under the brand name Roundup®. Monsanto marketed it as a "safe" general purpose herbicide for widespread commercial and consumer use. It still markets it as safe today.

12.    In addition to the active ingredient glyphosate, Roundup® formulations also contain adjuvants and other chemicals, such as the POEA, which are considered "inert" and therefore protected as "trade secrets" in manufacturing. Growing evidence suggests that these adjuvants and additional components of Roundup® formulations are not, in fact, inert and are toxic in their own right.

13.    The manufacture, formulation and distribution of herbicides such as Roundup®, are regulated under the FIFRA, 7 U.S.C. 136 et seq. FIFRA requires that all pesticides be registered with the EPA prior to their distribution, sale or use except as described by the FIFRA.

14.    Because pesticides are toxic to plants, animals and humans, at least to some degree, the EPA requires as part of the registration process, among other things, a variety of tests to evaluate the potential exposure to pesticides, toxicity to people and other potential non-target organisms and other adverse effects on the environment. Registration by the EPA, however is not an assurance or finding of safety.

15.    Based on early studies showing that glyphosate could cause cancer in lab

animals, the EPA originally classified glyphosate as possibly carcinogenic to humans in 1985. After pressure from Monsanto, including contrary studies it provided to the EPA, the EPA changed its classification to evidence of non-carcinogenicity in humans in 1991. In so classifying glyphosate, however, the EPA made clear that the designation did not mean the chemical does not cause cancer: "It should be emphasized, however, that designation of an agent in Group E is based on the available evidence at the time of evaluation and should not be interpreted as a definitive conclusion that the agent will not be a carcinogen under any circumstances.

16.     On two occasions, the EPA found that the labs hired by Monsanto to test the toxicity of Roundup® products for registration purposes committed fraud.

17.     In the first instance, Monsanto hired Industrial Bio-Test Laboratories (IBT) to perform and evaluate pesticide toxicology studies relating to Roundup®. IBT performed about 30 tests on glyphosate and glyphosate-containing products, including nine of the 15 residue studies needed to register Roundup®.

18.     In 1976, the FDA performed an inspection of IBT that revealed discrepancies between the raw data and the final report relating to the toxicological impacts of glyphosate. The EPA subsequently audited IBT; it too found the toxicology studies conducted for the Roundup® herbicide to be invalid. An EPA reviewer stated, after finding "routine falsification of data" at IBT, that it was "hard to believe the scientific integrity of the studies when they said they took specimens of the uterus

from male rabbits."

19.     Three top executives of IBT were convicted of fraud in 1983.

20.     In the second incident of data falsification, Monsanto hired Craven Labs in 1991 to perform pesticide and herbicide studies including for Roundup®. In that same year, the owner of Craven Labs and three of its employees were indicated, and later convicted, of fraudulent laboratory practices in the testing of pesticides and herbicides.

21.     Despite the falsity of the tests that underlie its registration, within a few years of its launch, Monsanto was marketing Roundup® in 115 countries.

22.     The success of Roundup® was key to Monsanto's continued reputation and dominance in the marketplace. Largely due to the success of Roundup® sales, Monsanto's agriculture division was out-performing its chemicals division's operating income, and that gap increased yearly. But with its patent for glyphosate expiring in the United States in the year 2000, Monsanto needed a strategy to maintain its Roundup® market dominance and to ward off impending competition.

23.     In response, Monsanto began the development and sale of genetically engineered Roundup Ready® seeds in 1996. Since Roundup Ready® crops are resistant to glyphosate, farmers can spray Roundup® onto their fields during the growing season without harming the crop. This allowed Monsanto to expand its market for Roundup even further, by 2000, Monsanto's biotechnology seeds were planted on more than 80 million acres worldwide and nearly 70 percent of American

soybeans were planted from Roundup Ready® seeds. It also secured Monsanto's dominant share of the glyphosate/Roundup® market thought a marketing strategy that coupled proprietary Roundup Ready® seeds with continued sales of its Roundup® herbicide.

24.     Through a three-pronged strategy of increasing production, decreasing prices, and by coupling with Roundup Ready® seeds, Roundup® became Monsanto's most profitable product. In 2000, it accounted for $2.8 billion in sales, outselling other herbicides by a margin of five to one. Today, glyphosate remains one of the world's largest herbicides by sales volume.

25.     In 1996, the New York Attorney General filed a lawsuit against Monsanto based on its false and misleading advertising of Roundup® products. Some of the comments upon which the suit was based included: "safer than table salt", "practically non-toxic", "environmentally friendly", "stays where you apply it", "safety margin is much greater than required.", "you can feel good about using herbicides by Monsanto", and "can be used where kids and pets play".

26.     On November 19, 1996, Monsanto entered into an Assurance of Discontinuance with the New York Attorney General in which Monsanto agreed, among other things, to stop publishing advertisements in New York that represent directly or by implication that the product was safe, non-toxic, harmless and risk-free.

27.     Monsanto did not alter its advertising in the same manner in any state other

than New York, and on information and believe, it still has not done so today.

28.    In 2009, France's highest court ruled that Monsanto had not told the truth about the safety of Roundup®. The French court affirmed an earlier judgment that

29.    In addition to the toxicity of the active ingredient glyphosate several studies support the theory that the glyphosate-based formulation in Roundup® products is more dangerous and toxic than glyphosate alone. Indeed, as early as 1991, available evidence demonstrated that glyphosate formulations were significantly more toxic than glyphosate alone.

30.    Results of studies conducted in 2002 and 2004 by Julie Marc, and studies by Francisco Pexoto, Benachour, and Seralini all confirmed that the adjuvants present in Roundup® are not in fact inert and that Roundup® is potentially far more toxic than its active ingredient glyphosate alone. Results of these studies were at all times available to Defendants. Defendants thus knew or should have known that Roundup® is more toxic than glyphosate alone and that safety studies of Roundup®, Roundup's adjuvants and "inert" ingredients and/or the surfactant POEA were necessary to protect Plaintiff from Roundup®.

31.    Several countries have instituted bans on the sale of Roundup® and other glyphosate-containing herbicides.

32.    Plaintiff is fifty-four years old. From 2000 to 2019 Plaintiff lived in Tallassee, Alabama which is in Elmore County. During the months of April through November he would regularly use Roundup in his yard in the grass and in his flower beds to

kill weeds.

33.     Plaintiff would buy the Roundup from the local Walmart or other local stores

and mix it according to the instructions and use at this home in Elmore County.

34.     Defendant promoted the sale and distribution of its Roundup product and

        concealed the fact that it was a true carcinogenic.

35.     Because Plaintiff did not know that Roundup® was injurious to his health

and/or to the health of others Plaintiff did not wear any protective gear while mixing

or applying Roundup® and used the Roundup® in the manner recommended by the

Defendants. Defendant Monsanto did not recommend that such be worn with

knowledge of the fact the product caused cancer of the type now debilitating the

Plaintiff's life. Defendants possessed far superior knowledge to that of Plaintiff and

despite their knowledge did not reveal the true facts to the Plaintiff. Defendant was

financially rewarded by the selling of the Roundup product and had a vested interest

in it being sold without warning of its hazardous components.

36.     On or about late November, 2019 Plaintiff was diagnosed with Hairy Cell

Leukemia.

37.     During the entire time that Plaintiff was exposed to Roundup® he did not

know that exposure was injurious to his health or the health of others.

38.     Plaintiff had no way of knowing about the risk of serious illness associated

with the use of and/or exposure to Roundup® and glyphosate until well after IARC

released its formal assessment of glyphosate in July 2015. This is the quintessential

case for tolling.

39.    Within the time period of any applicable statute of limitations, Plaintiff could not have discovered, through the exercise of reasonable diligence, that exposure to Roundup® and glyphosate is injurious to human health.

40.    Plaintiff did not discover, and did not know of facts that would cause a reasonable person to suspect the risks associated with the use of and/or exposure to Roundup® and glyphosate; nor would a reasonable and diligent investigation by him have disclosed that Roundup® and glyphosate would cause his illness.

41.    For these reasons, all applicable statutes of limitations have been told by operation of the discovery rule with respect to Plaintiff's claims.

42.    All applicable statutes of limitations have also been told by the Defendant's knowing and active fraudulent concealment and denial of the facts alleged herein throughout the time period relevant to this action.

43.    Instead of disclosing critical safety information about Roundup® and glyphosate, the Defendant has consistently and falsely represented the safety of their Roundup® products.

44.    Defendant was under a continuous duty to disclose to consumers, users and other persons coming into contact with its products, including Plaintiff, accurate safety information concerning its products and the risks associated with the use of and/or exposure to Roundup® and glyphosate.

45.    Instead, the Defendant knowingly, affirmatively, and actively concealed

safety information concerning Roundup® and glyphosate and the serious risks associated with the use of and/or exposure to its products.

46.     Based on the foregoing, the Defendant are estopped from relying on any statutes of limitations in defense of this action. The Defendants had advanced levels of education on the product, worked to conceal the carcinogenic nature of the Roundup product and to promote it above others despite alternatives being available in order to effectuate a financial gain. All to the detriment of Plaintiff. The Defendant knew or reasonably should have known, because of its knowledge and information, that the Roundup sold would cause injury to and/or death to a large number of consumers, including Plaintiff. The Defendant has been educated in and aware of the carcinogenic nature of Roundup for many years, thus giving it superior knowledge of these. Defendant knew consumers, such as Plaintiff, would likely contract Hairy Cell Leukemia and similar cancers.

47.     The Defendant knew that their actions would result in the continued use of the product and enhanced sales of the product that would likely result in harm to the Plaintiff and others that use the product. The Defendant had an intent to keep from the public the carcinogenic nature of Roundup, as well as the intent to keep from the general public the extreme hazard of Roundup. The Defendant worked with knowledge in such a way to control and manipulate the sales of the Roundup product and to quieten any concern about its carcinogenic nature.

48.     Plaintiff has suffered and continues to suffer tremendous physical pain as a

result of his cancer and suffered and continues to suffer mental anguish and emotional distress as a result of his cancer.

49. Defendant had an opportunity to inspect the Roundup that is superior to Plaintiff. Moreover, Defendant had more knowledge of the product that is superior to that of the Plaintiff. The Defendant concealed information about risks of Roundup and aggressively marketed the herbicide as safe for humans and the environment. The Defendant championed falsified data while attacking legitimate research linking Roundup to cancer. Defendant made a conscious decision not to redesign or withdraw from the market Roundup so that it was less dangerous to humans and the environment. Defendant knew or should have known that Roundup caused cancer but failed to adequately warn. Defendant also failed to adequately monitor Roundup after bringing it to the market.

50. Defendant undertook a concerted effort to disguise the information they had concerning Roundup being a carcinogenic, the actions they undertook were done negligently, wantonly and with reckless disregard for the lives and safety of the public and with knowledge that serious injury and death would likely result from continued use of Roundup by the public including Plaintiff.

**FIRST CAUSE OF ACTION**
**(Product Liability)**

51. Plaintiff adopts all preceding paragraphs of this Complaint as if fully set forth herein.

52. Plaintiff brings this product liability claim against Defendant.

53.     Defendant engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing and promoting Roundup® products, which are defective and unreasonably dangerous to consumers and users and other persons coming into contact with them, including the Plaintiff, thereby placing Roundup® products in the stream of commerce. These actions were under the ultimate control and supervision of Defendant. Defendant designed, researched, developed, formulated, manufactured, produced, tested, assembled, mixed, labeled, sold, promoted, marketed, advertised, and distributed the Roundup® products used by Plaintiff and/or to which Plaintiff was exposed, as described above.

54.     Defendant's Roundup® products were manufactured, designed, and labeled in an unsafe, defective, and inherently dangerous manner that was dangerous for use by or exposure to the public, and in particular, the Plaintiff.

55.     Defendant's Roundup products reached the intended consumers, handlers, and users or other persons coming into contact with these products in Alabama and throughout the United States, including Plaintiff without substantial change in their condition as designed, manufactured, sold, distributed, labeled, and marketed by Defendant.

56.     Defendant's Roundup products, as researched, tested, developed, designed, licensed, formulated, manufactured, packaged, labeled, distributed, sold and marketed by Defendant was defective in design and formulation in that when they left the hands of the Defendant's manufacturers and/or suppliers and/or distributors

they were unreasonably dangerous and dangerous to an extent beyond that which an ordinary consumer would contemplate.

57.     Defendants Roundup® products as researched, tested, developed, designed, licensed, formulated, manufactured, packaged, labeled, distributed, sold and marketed by Defendant was defective in that when they left the hands of the Defendant's manufacturers and/or suppliers, the foreseeable risks associated with these products' reasonably foreseeable uses exceeded the alleged benefits associated with their design and formulation.

58.     Therefore, at all relevant times, Defendant's Roundup® products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold, and marketed by Defendant was defective in design and formulation in one or more of the following ways:

a.  When placed in the stream of commerce, Defendant's Roundup® products were defective in design and formulation and consequently dangerous to an extent beyond that which an ordinary consumer would contemplate;

b.  When placed in the stream of commerce, Defendant's Roundup® products were unreasonably dangerous in that they were hazardous and posed a grave risk of cancer and other serious illnesses when used in a reasonably anticipated manner.

c.  When placed in the stream of commerce, Defendant's Roundup® products contained unreasonably dangerous design defects and were not reasonably safe when used in a reasonably anticipated or intended manner;

d. Defendant did not sufficiently test, investigate or study the Roundup products and specifically the active ingredient glyphosate.

e. Exposure to Roundup® and glyphosate-containing products presents a risk of harmful side effects that outweighs any potential utility stemming from the use of the herbicide.

f. Defendant's working in concert together all knew or should have known at the time of marketing, selling, distributing, supplying, and promoting the Roundup® products that exposure to Roundup® and specifically, its active ingredient glyphosate could result in cancer and other severe illnesses and injuries.

g. Defendant did not conduct adequate post-marketing surveillance of its Roundup products.

h. Defendant could have employed safer alternative designs and formulations;

i. Defendants failed to provide, encourage, suggest or recommend the use of protective gear when using this dangerous product – a product the Defendants all knew was carcinogenic;

j. Defendants all failed to deliver important product information to Plaintiff;

59. Plaintiff used and/or was exposed to the use of Defendant's Roundup® products in an intended or reasonably foreseeable manner without knowledge of their dangerous characteristics.

60. Plaintiff could not have reasonably discovered the defects and risks associated with Roundup® or glyphosate-containing products before or at the time of exposure.

61.    The harm caused by Defendant's Roundup® products far outweighed their benefit, rendering Defendant's products dangerous to an extent beyond that which an ordinary consumer would contemplate. Defendant's Roundup® products were and are more dangerous than alternative products and the Defendant could have designed its Roundup® products to make them less dangerous. Indeed, at the time that Defendant designed its Roundup® products the state of the industry's scientific knowledge was such that a less risky design or formulation was attainable.

62.    At the time Roundup® products left Defendant's control, there was a practical, technically feasible, and safer alternative design that would have prevented the harm without substantially impairing the reasonably anticipated or intended function of Defendant's herbicides.

63.    Defendants' defective design of Roundup® amounts to willful, wanton and/or reckless conduct by Defendant.

64.    Therefore, as a result of the unreasonably dangerous condition of their Roundup® products the Defendant is liable to Plaintiff.

65.    The defects in Defendant's products were substantial and contributing factors in causing Plaintiff's grave injuries, and, but for Defendants' misconduct and omissions, Plaintiff would not have sustained his injuries.

66.    As a direct and proximate result of Defendants placing their defective Roundup® products into the stream of commerce, Plaintiff has suffered and continues to suffer grave injuries, and has endured pain and discomfort, financial

hardship, emotional distress, worry, anxiety, and stress. Plaintiff will continue to incur these damages in the future.

## SECOND CAUSE OF ACTION
### (Failure to Warn)

67. Plaintiff adopts all preceding paragraphs of this Complaint as if fully set forth herein.

68. Plaintiff brings this products liability claim against the Defendant for failure to warn.

69. At all times relevant to this litigation, Defendant engaged in the business for testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting Roundup® products, which are defective and unreasonably dangerous to consumers, including Plaintiff, because they do not contain adequate warnings or instructions concerning the dangerous characteristics of Roundup® and specifically, the active ingredient glyphosate. These actions were under the ultimate control and supervision of the Defendant. The Defendant had greater knowledge than that of the Plaintiff. Defendant promoted the sale and distribution of the subject product while it knew or should have known of the carcinogenic nature of the Roundup. Defendant concealed it was a true carcinogenic. Defendant failed to deliver important product information to Plaintiff.

70. Defendant researched, developed, designed, tested, manufactured, inspected, labeled, distributed, marketed, promoted, sold, and otherwise released into the stream of commerce their Roundup® products, and in the course of same, directly

advertised or marketed the products to consumers and end users, including Plaintiff, and the Defendant therefore had a duty to warn of the risks associated with the reasonably foreseeable uses (and misuses) of Roundup® and glyphosate-containing products.

71.     At all times relevant to this litigation, the Defendant had a duty to properly test, develop, design, manufacture, inspect, package, label, market, promote, sell, distribute, maintain supply, provide proper warnings, and take such steps as necessary to ensure that their Roundup® products did not cause users and consumers to suffer from unreasonable and dangerous risks. Defendant had a continuing duty to warn Plaintiff of the dangers associated with Roundup® use and exposure. Defendant, as manufacturer, seller, or distributor of chemical herbicides, is held to the knowledge of an expert in the field.

72.     At the time of manufacture, Defendant could have provided warnings or instructions regarding the full and complete risks of Roundup® and glyphosate-containing products because they knew or should have known of the unreasonable risks of harm associated with the use of and/or exposure to these products.

73.     At all times relevant to this litigation, Defendant failed to investigate, study, test, or promote the safety or to minimize the dangers to users and consumers of the Roundup® products and to those who would foreseeably use or be harmed by Defendant's herbicides, including Plaintiff.

74.     Despite the fact that Defendant knew or should have known that Roundup®

products posed a grave risk of harm, it failed to warn of the dangerous risks associated with their use and exposure. The dangerous propensities of their products and the carcinogenic characteristics of glyphosate, as described above, were known to Defendants, or scientifically knowable to the Defendant through appropriate research and testing by known methods, at the time it distributed, supplied, or sold the product, and not known to end users and consumers, such as Plaintiff.

75.     Defendant knew or should have known that Roundup® and glyphosate-containing products created significant risks of seriously bodily harm to consumers, as alleged herein, and Defendant failed to adequately warn consumers and reasonably foreseeable users of the risks of exposure to these products. Defendant has wrongfully concealed information concerning the dangerous nature of Roundup and its active ingredient glyphosate, and further made false and/or misleading statements concerning the safety of Roundup® and glyphosate.

76.     At all times relevant to this litigation, Defendant's Roundup® products reached the intended consumers, handlers, and users or other persons coming into contact with these products throughout the United States, including Plaintiff, without substantial change in their condition as designed, manufactured, sold, distributed, labeled, and marketed by the Defendant.

77.     At all times relevant to this litigation, Plaintiff used and/or was exposed to the use of Defendant's Roundup® products in their intended or reasonably foreseeable manner without knowledge of their dangerous characteristics.

78.     Plaintiff could not have reasonable discovered the defects and risks associated with Roundup® or glyphosate-containing products before or at the time of Plaintiff's exposure. Plaintiff relied upon the skill, superior knowledge, and judgment of Defendant.

79.     Defendant knew or should have known that the minimal warnings disseminated with their Roundup® products were inadequate, but they failed to communicate adequate information on the dangers and safe use/exposure and failed to communicate warnings and instructions that were appropriate and adequate to render the products safe for their ordinary, intended, and reasonably foreseeable uses. The Defendant did not display or sell the product in such a way to notify the Plaintiff as the customer that the Roundup was a hazardous substance.

80.     The information that Defendant did provide or communicate failed to contain relevant warnings, hazards, and precautions that would have enabled at-home users such as Plaintiff to utilize the products safely and with adequate protection. Instead, Defendant disseminated information that was inaccurate, false, and misleading and which failed to communicate accurately or adequately the comparative severity, duration, and extent of the risk of injuries associated with use of and/or exposure to Roundup® and glyphosate; continued to aggressively promote the efficacy of their products, even after they knew or should have known of the unreasonable risks from use or exposure; and concealed, downplayed, or otherwise suppressed, through aggressive marketing and promotion; any information or research about the risks and

dangers of exposure to Roundup® and glyphosate. To this day, Defendant has failed to adequately and accurately warn of the true risks of Plaintiff's injuries associated with the use of and exposure to Roundup® and its active ingredient glyphosate, a probable carcinogen.

81.    As a result of their inadequate warnings, Defendant's Roundup® products were defective and unreasonable dangerous when they left their possession and/or control of the Defendant, were distributed by the Defendant, and used by Plaintiff.

82.    Defendant is liable to Plaintiff for injuries caused by their failure, as described above, to provide adequate warnings or other clinically relevant information and data regarding the appropriate use of Roundup® products and the risks associated with the use of or exposure to Roundup® and glyphosate.

83.    The defects in Roundup® products were substantial and contributing factors in causing Plaintiff's injuries, and, but for Defendant's misconduct and omissions, Plaintiff would not have sustained his injuries.

84.    Had Defendant provided adequate warnings and instructions and properly disclosed and disseminated the risks associated with Roundup® products, Plaintiff could have avoided the risk of developing injuries as alleged herein and could have obtained alternative herbicides.

85.    As a direct and proximate result of Defendant placing the defective Roundup® products into the stream of commerce, Plaintiff has suffered and continues to suffer severe injuries, and has endured physical pain and discomfit, as

well as economic hardship, including considerable financial expenses for medical care and treatment. Plaintiff will continue to incur these expenses in the future.

## THIRD CAUSE OF ACTION
### (Negligence)

86.    Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

87.    Defendant, directly or indirectly, caused Roundup® products to be sold, distributed, packaged, labeled, marketed, promoted, and/or used by Plaintiff.

88.    At all times relevant to this litigation, Defendant had a duty to exercise reasonable care in the design, research, manufacture, marketing, advertisement, supply, promotion, packaging, sale, and distribution of Roundup® products, including the duty to take all reasonable steps necessary to manufacture, promote, and/or sell a product that was not unreasonably dangerous to consumers, users, and other persons coming into contact with the product.

89.    At all times relevant to this litigation, Defendant had a duty to exercise reasonable care in the marketing, advertisement, and sale of Roundup® products. Defendant's duty of care owed to consumers and the general public included providing accurate, true, and correct information concerning the risks of using Roundup® and appropriate, complete, and accurate warnings concerning the potential adverse effects of exposure to Roundup® and, in particular, its active ingredient glyphosate.

90.    At all times relevant to this litigation, Defendant knew or, in the exercise of

reasonable care, should have known of the hazards and dangers of Roundup® and specifically, the carcinogenic properties of the chemical glyphosate.

91.     Accordingly, at all times relevant to this litigation, Defendant knew or, in the exercise of reasonable care, should have known that use of or exposure to Roundup® products could cause Plaintiff's injuries and thus created a dangerous and unreasonable risk of injury to the users of these products, including Plaintiff.

92.     The Defendant knew or, in the exercise of reasonable care, should have known that Roundup® is more toxic than glyphosate alone and that safety studies on Roundup®, Roundup®'s adjuvants, and "inert" ingredients, and/or the surfactant POEA were necessary to protect Plaintiff from Roundup®.

93.     Defendant knew or, in the exercise of reasonable care, should have known that tests limited to Roundup®'s active ingredient glyphosate were insufficient to prove the safety of Roundup®.

94.     Defendant also knew, or in the exercise of reasonable care, should have known that users and consumers of Roundup® were unaware of the risks and the magnitude of the risks associated with the use of and/or exposure to Roundup® and glyphosate-containing products.

95.     As such, Defendant breached their duty of reasonable care and failed to exercise ordinary care in the design, research, development, manufacture, testing, marketing, supply, promotion, advertisement, packaging, sale, and distribution of their Roundup® products, in that Defendant's manufactured and produced defective

herbicides containing the chemical glyphosate, knew or had reason to know of the defects inherent in their products, knew or had reason to know that a user's or consumer's exposure to the products created a significant risk of harm and unreasonable dangerous side effects, and failed to prevent or adequately warn of these risks and injuries.

96.     Defendant failed to appropriately and adequately test Roundup®, Roundup®'s adjuvants and "inert" ingredients, and/or the surfactant POEA to protect Plaintiff from Roundup®.

97.     Despite their ability and means to investigate, study, and test their products and to provide adequate warnings, Defendant has failed to do so. Indeed, Defendant has wrongfully concealed information and have further made false and/or misleading statements concerning the safety and/or exposure to Roundup® and glyphosate.

98.     Defendant's negligence included:

a. Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing their Roundup® products without thorough and adequate pre- and post-market testing;

b. Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing Roundup® while negligently and/or intentionally concealing and failing to disclose the results of trials, tests, and studies of exposure to glyphosate, and, consequently, the risk of serious harm associated with human use of and exposure to Roundup®;

c. Failing to undertake sufficient studies and conduct necessary tests to determine whether or not Roundup® products and glyphosate-containing products were safe for their intended use in agriculture, horticulture, and at-home use;

d. Failing to undertake sufficient studies and conduct necessary tests to determine the safety of "inert" ingredients and/or adjuvants contained within Roundup®, and the propensity of these ingredients to render Roundup® toxic, increase the toxicity of Roundup®, whether these ingredients are carcinogenic, magnify the carcinogenic properties of Roundup®, and whether or not "inert" ingredients and/or adjuvants were safe for use;

e. Failing to use reasonable and prudent care in the design, research, manufacture, formulation, and development of Roundup® products so as to avoid the risk of serious harm associated with the prevalent use of Roundup®/ glyphosate as an herbicide;

f. Failing to design and manufacture Roundup® products so as to ensure they were at least as safe and effective as other herbicides on the market;

g. Failing to provide adequate instructions, guidelines, and safety precautions to those persons who Defendants could reasonably foresee would use and/or be exposed to Roundup® products;

h. Failing to disclose to Plaintiff, users, consumers, and the general public that the use of and exposure to Roundup® presented severe risks of cancer and other grave illnesses;

i. Failing to warn Plaintiff, users, consumers, and the general public that the product's risk of harm was unreasonable and that there were safer and effective alternative herbicides available to Plaintiff and other users or consumers;

j. Systematically suppressing or downplaying contrary evidence about the risks, incidence, and prevalence of the side effects of Roundup® and glyphosate-containing products;

k. Representing that their Roundup® products were safe for their intended use when, in fact, Defendants knew or should have known that the products were not safe for their intended use;

l. Declining to make or propose any changes to Roundup® products' labeling or other promotional material that would alert the consumers and the general public of the risks of Roundup® and glyphosate;

m. Advertising, marketing, and recommending the use of Roundup® products, while concealing and failing to disclose or warn the dangers known by Defendants to be associated with or caused by the use of or exposure to Roundup® and glyphosate;

n. Continuing to disseminate information to their consumers, which indicate or imply that Defendants Roundup® products are not unsafe for use in the agricultural, horticultural industries, and/or home use; and

o. Continuing the manufacture and sale of their products with the knowledge that the products were unreasonably unsafe and dangerous.

99.    Defendant knew and/or should have known that it was foreseeable that consumers and/or users, such as Plaintiff, would suffer injuries as a result of Defendants' failure to exercise ordinary care in the manufacturing, marketing, labeling, distribution, and sale of Roundup®.

100.    Plaintiff did not know the nature and extent of the injuries that could result from the intended use or and/or exposure to Roundup® or its active ingredient glyphosate.

100.    Defendant's negligence was the proximate cause of the injuries, harm, and economic losses that Plaintiff suffered, and will continue to suffer, as described herein.

101.    Defendant's conduct, as described above, was reckless. Defendant regularly risks the lives of consumers and users of their products, including Plaintiff, with full knowledge of the dangers of their products. Defendant has made conscious decisions not to redesign, relabel, warn, or inform the unsuspecting public, including Plaintiff. Defendant's reckless conduct therefore warrants an award of punitive damages.

102.    As a proximate result of Defendant's wrongful acts and omissions in placing defective Roundup® products into the stream of commerce without adequate warnings of the hazardous and carcinogenic nature of glyphosate, Plaintiff has suffered and continues to suffer severe and permanent physical and emotional injuries. Plaintiff has endured pain and suffering, has suffered economic losses (including significant expenses for medical care and treatment) and will continue to

DOCUMENT 2

incur these expenses in the future.

## FOURTH CAUSE OF ACTION
### (Breach of Express Warranty)

103.　Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

104.　Roundup® which was designed, tested, manufactured, distributed, promoted and sold by Defendant, was expected to, and did, reach Plaintiff without any substantial change in its condition.

105.　Defendant, through their advertising and promotional materials, expressly warranted that Roundup® was safe for its intended use and was not unreasonably dangerous for its intended purpose.

106.　Defendant breached their express warranties in that Roundup® was not safe for its intended use in light of the unreasonably high risk of cancer associated with its use, including the risk of NHL.

107.　Plaintiff reasonably relied to his detriment on Defendant's express warranties.

108.　As a proximate result of Defendant's wrongful acts and omissions in placing its defective Roundup® products into the stream of commerce, Plaintiff has suffered and continues to suffer severe and permanent physical and emotional injuries. Plaintiff has endured pain and suffered, has suffered economical losses (including significant expenses for medical care and treatment) and will continue to incur these expenses in the future.

## FIFTH CAUSE OF ACTION
### (Breach of Implied Warranty)

109.   Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

110.   Roundup® which was designed, tested, manufactured, distributed, promoted and sold by Defendant, was expected to, and did, reach Plaintiff without any substantial change in condition.

111.   At the time Defendant manufactured, marketed, sold, and distributed Roundup® the Defendant knew of the use for which Roundup® was intended and impliedly warranted, through their advertising and promotional materials, that Roundup® was of merchantable quality, fitness, and safe for the use for which it was intended.

112.   Plaintiff reasonably relied upon the skill and judgment of the Defendant as to whether Roundup® was of merchantable quality and safe for its intended use and upon Defendants' implied warranty as to such matters.

113.   Contrary to the implied warranty, Defendants' product Roundup® was not of merchantable quality of safe for its intended use because it was unreasonably dangerous as described herein.

114.   As a proximate result of Defendant's wrongful acts and omissions in placing their defective Roundup® products into the stream of commerce, Plaintiff has suffered and continues to suffer severe and permanent physical and emotional injuries. Plaintiff has endured pain and suffering, has suffered economic loses

(including significant expenses for medical care and treatment) and will continue to incur these expenses in the future.

## SIXTH CAUSE OF ACTION
### Negligent Misrepresentation and/or Fraud

115.  Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraph as if fully stated herein.

116.  Defendant is the manufacturer, designer, distributor, seller or supplier of Roundup® and, while engaged in the course of such business, made representations to Plaintiff regarding the character and/or quality of for guidance in his decision to select Roundup® for use.

117.  Defendant had a duty to disclose material information about serious health effects to consumers such as Plaintiff. Defendant intentionally failed to disclose this information for the purpose of inducing consumers, including Plaintiff, to purchase Defendants' dangerous products.

118.  Specifically, Defendant's advertisement regarding Roundup made material misrepresentations to the effect that Roundup® was a safe, which misrepresentations Defendant knew to be false, for the purpose of fraudulently including consumers, such as Plaintiff to purchase said product. Defendant further misrepresented that their products were just as safe, and just as effective or more effective, than other weed control products on the market.

119.  Defendant's representations regarding the character of quality of Roundup® were untrue.

120.   In addition, Defendant fraudulently suppressed material information regarding the safety of Roundup®, including the dangers known by Defendant to be associated with or caused by the use of or exposure to Roundup® and glyphosate.

121.   Defendants had actual knowledge based on the results of trials, tests, and studies of exposure to glyphosate, of the risk of serious harm associated with human use of and exposure to Roundup®.

122.   Defendants negligently and/or intentionally misrepresented or omitted this information in their product labeling, promotions, and advertisements and instead labeled, promoted, and advertised their products as safe and effective in order to avoid losses and sustain profits in their sales to consumer.

123.   In supplying the false information, Defendant failed to exercise reasonable care or competence in obtaining or communicating information to their intended recipients, including Plaintiff.

124.   Plaintiff reasonably relied to his detriment upon Defendant's misrepresentations and/or omissions in their labeling, advertisements, and promotions concerning the serious risks posed by the product. Plaintiff reasonably relied upon Defendant's representations to him that Roundup was safe for use and that Defendant's labeling, advertisements, and promotions fully described all known risks of the product.

125.   Defendant is estopped from relying on any statute of limitations defenses because Defendant actively concealed the defects from consumers, such as Plaintiff.

Instead of revealing the defects, Defendant continued to represent their product as safe for its intended use.

126.   As a direct and proximate result of Plaintiff's use of Roundup® as manufactured, designed, sold, supplied, and introduced into the stream of commerce by Defendant, Plaintiff suffered personal injury, non-economic damages, and will continue to suffer such harm and damages in the future.

## SEVENTH CAUSE OF ACTION
### Unfair and Deceptive Trade Practices

127.   Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

128.   By reason of their conduct as alleged herein, Defendant violated the provisions of the Code of Alabama by inducing the Plaintiff to use Roundup® through the use of false and/or misleading, advertising, representations, and statements.

129.   By engaging in the conduct described herein, Defendant violated Code of Alabama by, among other things:

a.   Engaging in unfair or deceptive trade practices as defined in this statute by making false and misleading oral and written statements that had the capacity, tendency, or effect of deceiving or misleading consumers.

b.   Engaging in unfair or deceptive trade practices as defined in this statute by making representations that their products had an approval, characteristics, ingredient, use or benefit which they did not have, including but not limited to

DOCUMENT 2

statements concerning the health consequences of the use of Roundup®.

c.       Engaging in unfair or deceptive trade practices as defined in this statute by failing to state material facts the omission of which deceived or tended to deceive, including but not limited to facts related to the health consequences of the use of Roundup®.

d.       Engaging in unfair or deceptive trade practices as defined in this statute through deception, fraud, misrepresentation and knowing concealment, suppression and mission of material facts with the intent that consumers rely upon the same in connection with the use.

## TENTH CAUSE OF ACTION WANTONNESS

130.   Plaintiff adopts all preceding paragraphs of this Complaint as if fully set forth herein.

131.   Defendant consciously decided to design, manufacture, distribute, market and sell the product while knowing that injuries similar to those suffered by Plaintiff would likely result from the use of the Roundup.

132.   Defendant wantonly failed to address the risk in a timely manner.

133.   Defendant wantonly disregarded their knowledge and proceeded with manufacturing, selling, marketing, and distributing the dangerous product with the knowledge that it contained a carcinogenic and severe injury and death were likely.

134.   As a result of the Defendant's wanton conduct, Plaintiff suffers from Hairy Cell Leukemia

DOCUMENT 2

## PUNITIVE DAMAGES

135. The conduct of Defendant described above was fraudulent, malicious, and willful or wanton in that it demonstrated a conscious and intentional disregard of and indifference to the safety of others, including Plaintiff, which Defendant knew or should have known was likely to result in serious injury or death to members of the consuming public, including Plaintiff. The Defendant worked in concert with each other to effectuate their global purpose of economic gain.

136. As a direct and proximate result of the intentional, willful, and wanton misconduct of the Defendant, Plaintiff was caused to suffer NHL, as well as the damages alleged herein. Plaintiff is entitled to recover punitive damages as a result of Defendants concerted and combined conduct.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff prays that the Court enter judgement in his favor and against the Defendant, awarding as follows:

a. Compensatory damages in in excess of the jurisdictional amount, including, but not limited to pain, suffering, emotional distress, loss of enjoyment of life, and other non-economic damages in an amount to be determined at trial of this action;

b. Medical expenses and other economic damages in an amount to be determined at trial of this action;

c. Punitive damages;

d. Costs including reasonable attorneys' fees, court costs, and other litigation expenses;

e. Any other relief the Court may deem just and proper.

## **JURY DEMAND**

101.   Plaintiff hereby demands a trial by jury on all issues.

Done this 19th day of November, 2021

MORRIS, HAYNES, LLC.
131 Main Street
Alexander City, Alabama 35010
(O): 256-329-2000


/s/ Clay Hornsby
CLAY HORNSBY, ESQ. (HOR021)

## ALABAMA SJIS CASE DETAIL

**PREPARED FOR: HALRON TURNER**

 alacourt.com

County: **29**　　Case Number: **CV-2021-900230.00**　　Court Action: **REMOVED TO FEDERAL COURT**

Style: **JAMES HARWICK V. MONSANTO COMPANY CORPORATION ET AL**

Real Time

### Case

#### Case Information

| | | | | | | |
|---|---|---|---|---|---|---|
| County: | **29-ELMORE** | Case Number: | **CV-2021-900230.00** | Judge: | **SGR:SIBLEY G. REYNOLDS** | |
| Style: | **JAMES HARWICK V. MONSANTO COMPANY CORPORATION ET AL** | | | | | |
| Filed: | **11/19/2021** | Case Status: | **DISPOSED** | Case Type: | **PRODUCTS LIABILITY** | |
| Trial Type: | **JURY** | Track: | | Appellate Case: | **0** | |
| No of Plaintiffs: | **1** | No of Defendants: | **2** | | | |

#### Damages

| | | | | | |
|---|---|---|---|---|---|
| Damage Amt: | **0.00** | Punitive Damages: | **0.00** | General Damages: | **0.00** |
| No Damages: | | Compensatory Damages: | **0.00** | | |
| Pay To: | | Payment Frequency: | | Cost Paid By: | |

#### Court Action

| | | | | | |
|---|---|---|---|---|---|
| Court Action Code: | **R** | Court Action Desc: | **REMOVED TO FEDERAL COURT** | Court Action Date: | **12/20/2021** |
| Num of Trial days: | **0** | Num of Liens: | **0** | Judgment For: | **DEFENDANT** |
| Dispositon Date of Appeal: | | Disposition Judge: | **SGR:SIBLEY G. REYNOLDS** | Disposition Type: | |
| Revised Judgement Date: | | Minstral: | | Appeal Date: | |
| Date Trial Began but No Verdict (TBNV1): | | | | | |
| Date Trial Began but No Verdict (TBNV2): | | | | | |

#### Comments

Comment 1:

Comment 2:

#### Appeal Information

| | | | |
|---|---|---|---|
| Appeal Date: | | Appeal Case Number: | Appeal Court: |
| Appeal Status: | | Orgin Of Appeal: | |
| Appeal To: | | Appeal To Desc: | LowerCourt Appeal Date: |
| Disposition Date Of Appeal: | | Disposition Type Of Appeal: | |

#### Administrative Information

| | | | |
|---|---|---|---|
| Transfer to Admin Doc Date: | | Transfer Reason: | Transfer Desc: |
| Number of Subponeas: | | Last Update: **12/20/2021** | Updated By: **MET** |

### Parties

#### Party 1 - Plaintiff INDIVIDUAL - HARWICK JAMES

##### Party Information

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Party: | **C001-Plaintiff** | Name: | **HARWICK JAMES** | | | Type: | **I-INDIVIDUAL** |
| Index: | **D MONSANTO COM** | Alt Name: | | Hardship: | **No** | JID: | **SGR** |
| Address 1: | **131 MAIN STREET** | | | Phone: | **(334) 000-0000** | | |

Address 2:

| City: | **ALEXANDER CITY** | State: | **AL** | Zip: | **35010-0000** Country: **US** |
|---|---|---|---|---|---|
| SSN: | **XXX-XX-X999** | DOB: | | Sex: | **M** Race: |

## Court Action

| Court Action: | **R-REMOVED TO FEDERAL COURT** | | Court Action Date: **12/20/2021** |
|---|---|---|---|
| Amount of Judgement: **$0.00** | | Court Action For: **D-DEFENDANT** | Exemptions: |
| Cost Against Party: | **$0.00** | Other Cost: **$0.00** | Date Satisfied: |
| Comment: | | | Arrest Date: |
| Warrant Action Date: | | Warrant Action Status: | Status Description: |

## Service Information

| Issued: | Issued Type: | Reissue: | Reissue Type: |
|---|---|---|---|
| Return: | Return Type: | Return: | Return Type: |
| Served: | Service Type | Service On: | Served By: |
| Answer: | Answer Type: | Notice of No Service: | Notice of No Answer: |

## Attorneys

| Number | Attorney Code | Type of Counsel | Name | Email | Phone |
|---|---|---|---|---|---|
| Attorney 1 | **HOR021** | | **HORNSBY CLAY** | CHORNSBY@MHHLAW.NET | (205) 324-4008 |

### Party 2 - Defendant BUSINESS - MONSANTO COMPANY CORPORATION

## Party Information

| Party: | **D001-Defendant** | Name: | **MONSANTO COMPANY CORPORATION** | | Type: | **B-BUSINESS** |
|---|---|---|---|---|---|---|
| Index: | **C HARWICK JAME** | Alt Name: | | Hardship: **No** | JID: | **SGR** |
| Address 1: | **641 SOUTH LAWRENCE STREET** | | | Phone: **(334) 000-0000** | | |
| Address 2: | | | | | | |
| City: | **MONTGOMERY** | State: | **AL** | Zip: **36104-0000** | Country: | **US** |
| SSN: | **XXX-XX-X999** | DOB: | | Sex: | Race: | |

## Court Action

| Court Action: | **R-REMOVED TO FEDERAL COURT** | | Court Action Date: **12/20/2021** |
|---|---|---|---|
| Amount of Judgement: **$0.00** | | Court Action For: **D-DEFENDANT** | Exemptions: |
| Cost Against Party: | **$0.00** | Other Cost: **$0.00** | Date Satisfied: |
| Comment: | | | Arrest Date: |
| Warrant Action Date: | | Warrant Action Status: | Status Description: |

## Service Information

| Issued: **11/19/2021** | Issued Type: **F-CERTIFIED MAIL BY FIL** | Reissue: | Reissue Type: |
|---|---|---|---|
| Return: | Return Type: | Return: | Return Type: |
| Served: | Service Type | Service On: | Served By: |
| Answer: | Answer Type: | Notice of No Service: | Notice of No Answer: |



## Attorneys

| Number | Attorney Code | Type of Counsel | Name | Email | Phone |
|--------|---------------|-----------------|------|-------|-------|
| Attorney 1 | TUR012 | | TURNER HALRON WAITES | HWT@TOKH.COM | (251) 847-2237 |

## Party 3 - Defendant BUSINESS - MONSANTO COMPANY

### Party Information

| | | | | | | | | |
|--|--|--|--|--|--|--|--|--|
| Party: | D002-Defendant | Name: | **MONSANTO COMPANY** | | | | Type: | **B-BUSINESS** |
| Index: | **C HARWICK JAME** | Alt Name: | | | Hardship: | **No** | JID: | **SGR** |
| Address 1: | **2 NORTH JACKSON ST.** | | | | Phone: | **(334) 000-0000** | | |
| Address 2: | **SUITE 605** | | | | | | | |
| City: | **MONTGOMERY** | State: | **AL** | | Zip: | **36104-0000** | Country: | **US** |
| SSN: | **XXX-XX-X999** | DOB: | | | Sex: | | Race: | |

### Court Action

| | | | |
|--|--|--|--|
| Court Action: | **R-REMOVED TO FEDERAL COURT** | | Court Action Date: **12/20/2021** |
| Amount of Judgement: | **$0.00** | Court Action For: **D-DEFENDANT** | Exemptions: |
| Cost Against Party: | **$0.00** | Other Cost: **$0.00** | Date Satisfied: |
| Comment: | | | Arrest Date: |
| Warrant Action Date: | | Warrant Action Status: | Status Description: |

### Service Information

| | | | | | | |
|--|--|--|--|--|--|--|
| Issued: | **11/19/2021** | Issued Type: | **F-CERTIFIED MAIL BY FIL** | Reissue: | Reissue Type: | |
| Return: | | Return Type: | | Return: | Return Type: | |
| Served: | | Service Type | | Service On: | Served By: | |
| Answer: | | Answer Type: | | Notice of No Service: | Notice of No Answer: | |

### Attorneys

| Number | Attorney Code | Type of Counsel | Name | Email | Phone |
|--------|---------------|-----------------|------|-------|-------|
| Attorney 1 | TUR012 | | TURNER HALRON WAITES | HWT@TOKH.COM | (251) 847-2237 |

## Financial

### Fee Sheet

| Fee Status | Admin Fee | Fee Code | Payor | Payee | Amount Due | Amount Paid | Balance | Amount Hold | Garnish Party |
|------------|-----------|----------|-------|-------|------------|-------------|---------|-------------|---------------|
| ACTIVE | N | CONV | C001 | 000 | $0.00 | $19.36 | $0.00 | $0.00 | 0 |
| ACTIVE | N | CV08 | C001 | 000 | $309.00 | $309.00 | $0.00 | $0.00 | 0 |
| ACTIVE | N | JDMD | C001 | 000 | $100.00 | $100.00 | $0.00 | $0.00 | 0 |
| ACTIVE | N | LOAF | C001 | 000 | $30.00 | $30.00 | $0.00 | $0.00 | 0 |
| ACTIVE | N | VADM | C001 | 000 | $45.00 | $45.00 | $0.00 | $0.00 | 0 |
| | | | | **Total:** | **$484.00** | **$503.36** | **-$19.36** | **$0.00** | |

### Financial History

| Transaction Date | Description | Disbursement Accoun | Transaction Batch | Receipt Number | Amount | From Party | To Party | Money Type | Admin Fee | Reason | Attorney | Operator |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 11/22/2021 | CREDIT | CONV | 2022036 | 3576150 | $19.36 | C001 | 000 | | N | | | MET |
| 11/22/2021 | RECEIPT | CV05 | 2022036 | 3576160 | $309.00 | C001 | 000 | | N | | | MET |
| 11/22/2021 | RECEIPT | JDMD | 2022036 | 3576170 | $100.00 | C001 | 000 | | N | | | MET |
| 11/22/2021 | RECEIPT | LOAF | 2022036 | 3576180 | $30.00 | C001 | 000 | | N | | | MET |
| 11/22/2021 | RECEIPT | VADM | 2022036 | 3576190 | $48.00 | C001 | 000 | | N | | | MET |

## Case Action Summary

| Date: | Time | Code | Comments | Operator |
|---|---|---|---|---|
| 11/19/2021 | 4:25 PM | FILE | FILED THIS DATE: 11/19/2021        (AV01) | AJA |
| 11/19/2021 | 4:25 PM | EORD | E-ORDER FLAG SET TO "Y"        (AV01) | AJA |
| 11/19/2021 | 4:25 PM | ASSJ | ASSIGNED TO JUDGE: SIBLEY G. REYNOLDS        (AV01) | AJA |
| 11/19/2021 | 4:25 PM | SCAN | CASE SCANNED STATUS SET TO: N        (AV01) | AJA |
| 11/19/2021 | 4:25 PM | TDMJ | JURY TRIAL REQUESTED        (AV01) | AJA |
| 11/19/2021 | 4:25 PM | STAT | CASE ASSIGNED STATUS OF: ACTIVE        (AV01) | AJA |
| 11/19/2021 | 4:25 PM | ORIG | ORIGIN: INITIAL FILING        (AV01) | AJA |
| 11/19/2021 | 4:26 PM | C001 | C001 PARTY ADDED: HARWICK JAMES        (AV02) | AJA |
| 11/19/2021 | 4:26 PM | C001 | INDIGENT FLAG SET TO: N        (AV02) | AJA |
| 11/19/2021 | 4:26 PM | C001 | LISTED AS ATTORNEY FOR C001: HORNSBY CLAY  (AV02) | AJA |
| 11/19/2021 | 4:26 PM | C001 | C001 E-ORDER FLAG SET TO "Y"        (AV02) | AJA |
| 11/19/2021 | 4:26 PM | D001 | CERT MAIL-FIL ISSUED: 11/19/2021 TO D001  (AV02) | AJA |
| 11/19/2021 | 4:26 PM | D001 | D001 E-ORDER FLAG SET TO "Y"        (AV02) | AJA |
| 11/19/2021 | 4:26 PM | D001 | D001 PARTY ADDED: MONSANTO COMPANY CORPORATION | AJA |
| 11/19/2021 | 4:26 PM | D001 | INDIGENT FLAG SET TO: N        (AV02) | AJA |
| 11/19/2021 | 4:26 PM | D001 | LISTED AS ATTORNEY FOR D001: PRO SE        (AV02) | AJA |
| 11/19/2021 | 4:26 PM | D002 | D002 E-ORDER FLAG SET TO "Y"        (AV02) | AJA |
| 11/19/2021 | 4:26 PM | D002 | LISTED AS ATTORNEY FOR D002: PRO SE        (AV02) | AJA |
| 11/19/2021 | 4:26 PM | D002 | CERT MAIL-FIL ISSUED: 11/19/2021 TO D002  (AV02) | AJA |
| 11/19/2021 | 4:26 PM | D002 | D002 PARTY ADDED: MONSANTO COMPANY        (AV02) | AJA |
| 11/19/2021 | 4:26 PM | D002 | INDIGENT FLAG SET TO: N        (AV02) | AJA |
| 11/19/2021 | 4:26 PM | ECOMP | COMPLAINT E-FILED. | HOR021 |
| 12/20/2021 | 2:59 PM | EMOT | D001-D002-OTHER - NOTICE OF FILING NOTICE OF REMOVAL FILED. | TUR012 |
| 12/20/2021 | 3:03 PM | D001 | LISTED AS ATTORNEY FOR D001: TURNER HALRON WAITES | AJA |
| 12/20/2021 | 3:03 PM | D002 | LISTED AS ATTORNEY FOR D002: TURNER HALRON WAITES | AJA |
| 12/20/2021 | 3:03 PM | STAT | CASE ASSIGNED STATUS OF: DISPOSED        (AV01) | MET |
| 12/20/2021 | 3:03 PM | DISP | DISPOSED ON: 12/20/2021 BY (RMVL FED COURT) (AV01) | MET |
| 12/20/2021 | 3:03 PM | CACJ | COURT ACTION JUDGE: SIBLEY G. REYNOLDS        (AV01) | MET |
| 12/20/2021 | 3:03 PM | PDIS | C001 DISPOSED BY (RMVL FED COURT) ON 12/20/2021 | MET |
| 12/20/2021 | 3:03 PM | PDIS | D001 DISPOSED BY (RMVL FED COURT) ON 12/20/2021 | MET |
| 12/20/2021 | 3:03 PM | PDIS | D002 DISPOSED BY (RMVL FED COURT) ON 12/20/2021 | MET |
| 12/20/2021 | 3:03 PM | EMOT | D001-D002-OTHER /DOCKETED | MET |

## Images

| Date: | Doc# | Title | Description | Pages |
|---|---|---|---|---|
| 11/19/2021 4:26:24 PM | 1 | CIVIL_COVER_SHEET | CIRCUIT COURT - CIVIL CASE | 1 |
| 11/19/2021 4:26:24 PM | 2 | COMPLAINT | | 34 |
| 11/19/2021 4:26:36 PM | 3 | COMPLAINT - TRANSMITTAL | E-NOTICE TRANSMITTALS | 3 |
| 11/19/2021 4:26:36 PM | 4 | COMPLAINT - SUMMONS | E-NOTICE TRANSMITTALS | 2 |
| 12/20/2021 2:59:42 PM | 5 | MOTION_COVER_SHEET | Motion Cover Sheet | 1 |
| 12/20/2021 2:59:43 PM | 6 | MOTION | Defendant Monsanto Company's Notice of Filing Notice of Removal | 2 |
| 12/20/2021 2:59:43 PM | 7 | ATTACHMENT | Defendant Monsanto Company's Notice of Removal | 8 |
| 12/20/2021 2:59:47 PM | 8 | MOTION - TRANSMITTAL | E-NOTICE TRANSMITTALS | 4 |

**END OF THE REPORT**



# AlaFile E-Notice

29-CV-2021-900230.00
Judge: SIBLEY G. REYNOLDS

To: HALRON WAITES TURNER
hwt@tokh.com

---

# NOTICE OF ELECTRONIC FILING

---

IN THE CIRCUIT COURT OF ELMORE COUNTY, ALABAMA

JAMES HARWICK V. MONSANTO COMPANY CORPORATION ET AL
29-CV-2021-900230.00

The following matter was FILED on 12/20/2021 2:59:43 PM

**D001 MONSANTO COMPANY CORPORATION**
**D002 MONSANTO COMPANY**
NOTICE OF FILING NOTICE OF REMOVAL

[Filer: TURNER HALRON WAITES]

Notice Date:     12/20/2021 2:59:43 PM

MICHAEL DOZIER
CIRCUIT COURT CLERK
ELMORE COUNTY, ALABAMA
ELMORE COUNTY JUDICIAL CENTER
P.O. BOX 310
WETUMPKA, AL, 36092

334-514-3116
michael.dozier@alacourt.gov

ELECTRONICALLY FILED
12/20/2021 2:59 PM
29-CV-2021-900230.00
CIRCUIT COURT OF
ELMORE COUNTY, ALABAMA
MICHAEL DOZIER, CLERK

## STATE OF ALABAMA

Revised 3/5/08

Unified Judicial System

29-ELMORE

☐ District Court    ☑ Circuit Court

Cas

CV2

### CIVIL MOTION COVER SHEET

JAMES HARWICK V. MONSANTO COMPANY
CORPORATION ET AL

*Name of Filing Party:* D001 - MONSANTO COMPANY
CORPORATION
D002 - MONSANTO COMPANY

*Name, Address, and Telephone No. of Attorney or Party. If Not Represented.*

HALRON WAITES TURNER

POST OFFICE DRAWER 1389

CHATOM, AL 36518

*Attorney Bar No.:* TUR012

☐ Oral Arguments Requested

## TYPE OF MOTION

| Motions Requiring Fee | Motions Not Requiring Fee |
|---|---|
| ☐ Default Judgment ($50.00) | ☐ Add Party |
| ☐ Joinder in Other Party's Dispositive Motion (i.e.Summary Judgment, Judgment on the Pleadings, orother Dispositive Motion not pursuant to Rule 12(b)) ($50.00) | ☐ Amend |
| | ☐ Change of Venue/Transfer |
| | ☐ Compel |
| ☐ Judgment on the Pleadings ($50.00) | ☐ Consolidation |
| ☐ Motion to Dismiss, or in the Alternative SummaryJudgment($50.00) | ☐ Continue |
| | ☐ Deposition |
| | ☐ Designate a Mediator |
| ☐ Renewed Dispositive Motion(Summary Judgment,Judgment on the Pleadings, or other DispositiveMotion not pursuant to Rule 12(b)) ($50.00) | ☐ Judgment as a Matter of Law (during Trial) |
| | ☐ Disburse Funds |
| ☐ Summary Judgment pursuant to Rule 56($50.00) | ☐ Extension of Time |
| ☐ Motion to Intervene ($297.00) | ☐ In Limine |
| ☐ Other | ☐ Joinder |
| pursuant to Rule _____ ($50.00) | ☐ More Definite Statement |
| | ☐ Motion to Dismiss pursuant to Rule 12(b) |
| *Motion fees are enumerated in §12-19-71(a). Fees pursuant to Local Act are not included. Please contact the Clerk of the Court regarding applicable local fees. | ☐ New Trial |
| | ☐ Objection of Exemptions Claimed |
| ☐ Local Court Costs $    0 | ☐ Pendente Lite |
| | ☐ Plaintiff's Motion to Dismiss |
| | ☐ Preliminary Injunction |
| | ☐ Protective Order |
| | ☐ Quash |
| | ☐ Release from Stay of Execution |
| | ☐ Sanctions |
| | ☐ Sever |
| | ☐ Special Practice in Alabama |
| | ☐ Stay |
| | ☐ Strike |
| | ☐ Supplement to Pending Motion |
| | ☐ Vacate or Modify |
| | ☐ Withdraw |
| | ☑ Other   Notice of Filing Notice of Removal |
| | pursuant to Rule  28 U.S.C. § 1446(d)   (Subject to Filing Fee) |

| Check here if you have filed  or are filing contemporaneously with this motion an Affidavit of Substantial Hardship or if you are filing on behalf of an agency or department of the State, county, or municipal government. (Pursuant to §6-5-1 Code of Alabama (1975), governmental entities are exempt from prepayment of filing fees) | Date:<br><br>12/20/2021 2:57:18 PM | Signature of Attorney or Party<br>/s/ HALRON WAITES TURNER |
|---|---|---|

*This Cover Sheet must be completed and submitted to the Clerk of Court upon the filing of any motion. Each motion should contain a separate Cover Sheet.

**Motions titled 'Motion to Dismiss' that are not pursuant to Rule 12(b) and are in fact Motions for Summary Judgments are subject to filing fee.

ELECTRONICALLY FILED
12/20/2021 2:59 PM
29-CV-2021-900230.00
CIRCUIT COURT OF
ELMORE COUNTY, ALABAMA
MICHAEL DOZIER, CLERK

IN THE CIRCUIT COURT OF ELMORE COUNTY, ALABAMA

JAMES HARWICK,                    :

        Plaintiff,                :

v.                                :        29-CV-2021-900230-SGR

MONSANTO COMPANY; *et al.*,       :

        Defendants.               :

                            :   :   :

### NOTICE OF FILING NOTICE OF REMOVAL

**PLEASE TAKE NOTICE** that on December 20, 2021, Defendant Monsanto Company, by and through its undersigned counsel, filed the attached Notice of Removal in the United States District Court for the Middle District of Alabama, Northern Division (Montgomery), thereby removing this case to that Court pursuant to 28 U.S.C. §§ 1332, 1441, and 1446. Pursuant to 28 U.S.C. § 1446(d), a true and correct copy of the Notice of Removal is attached hereto. This Court may proceed no further with this action unless or until the case is remanded by the District Court.

1

Dated:   December 20, 2021


                              Respectfully submitted,


                                   /s/ Halron W. Turner
                              HALRON W. TURNER (TUR012)
                              Turner, Onderdonk, Kimbrough,
                                Howell, Huggins & Bradley, PA
                              13212 West Central Avenue
                              Post Office Drawer 1389
                              Chatom, Alabama 36518
                              Telephone:   (251) 847-2237
                              Facsimile:   (251) 847-3115
                              Email:   hwt@tokh.com

                              **Attorneys for Defendant
                              MONSANTO COMPANY**


### CERTIFICATE OF SERVICE

        I hereby certify that on December 20, 2021, I
electronically filed the foregoing document with the Clerk of
the Court utilizing the AlaFile system, which will send
notification of such filing to all registered counsel of record
as listed below.



                                   /s/ Halron W. Turner
                              HALRON W. TURNER
                              Counsel for Defendant


**Counsel of Record:**

E. Clayton Hornsby Jr., Esq. (chornsby@mhhlaw.net)

ELECTRONICALLY FILED
12/20/2021 2:59 PM
29-CV-2021-900230.00
CIRCUIT COURT OF
ELMORE COUNTY, ALABAMA
MICHAEL DOZIER, CLERK

## IN THE UNITED STATES DISTRICT COURT FOR
## THE MIDDLE DISTRICT OF ALABAMA
## NORTHERN DIVISION

JAMES HARWICK,                      )

     Plaintiff,                )

                                )

v.                                )     Case Number: _____

                                )

MONSANTO COMPANY; *et al.*,      )

                                )

     Defendants.           )

                                )

_____ )

## **DEFENDANT MONSANTO COMPANY'S NOTICE OF REMOVAL**

Pursuant to 28 U.S.C. §§ 1332, 1441, and 1446, Defendant Monsanto Company ("Monsanto"), hereby gives notice of removal of this action, captioned *James Harwick v. Monsanto Company, et al.*, bearing Case Number 29-CV-2021-900230.00, from the Circuit Court of Elmore County, Alabama to the United States District Court for the Middle District of Alabama. Pursuant to 28 U.S.C. § 1446(a), Monsanto provides the following statement of grounds for removal.

### **Introduction**

1.     In this products liability lawsuit, Plaintiff James Harwick sues Monsanto for injuries allegedly caused by Monsanto's Roundup®-branded herbicides, which have glyphosate as their active ingredient. For decades, farmers have used glyphosate-based herbicides to increase crop yields, and home-owners, landscaping companies, and local government agencies have used these herbicides for highly effective weed control. Glyphosate is one of the most thoroughly studied herbicides in the world, and glyphosate-based herbicides have received regulatory approval in more than 160 countries. Since 1974, when Monsanto first introduced a Roundup®-

branded herbicide to the marketplace, the United States Environmental Protection Agency repeatedly has concluded that glyphosate does not cause cancer. Nevertheless, Plaintiff alleges that he developed cancer — specifically, Hairy Cell Leukemia — caused by exposure to Monsanto glyphosate-based herbicides.

2.     This is one of many lawsuits that have been filed against Monsanto involving Roundup®-branded herbicides. A multidistrict litigation proceeding is pending in the United States District Court for the Northern District of California, before the Honorable Vince G. Chhabria, pursuant to 28 U.S.C. § 1407. *See In re Roundup Prods. Liab. Litig.*, No. 3:16-md-02741-VC (N.D. Cal.); *In re Roundup Prods. Liab. Litig.*, MDL No. 2741, 214 F. Supp. 3d 1346 (J.P.M.L. 2016).

3.     As discussed in more detail below, Monsanto removes this lawsuit because this Court has subject matter jurisdiction based on diversity of citizenship. Plaintiff is a citizen of Georgia. *See* Complaint ¶ 1. For purposes of diversity jurisdiction, Monsanto is deemed to be a citizen of Missouri (where its principal place of business is located) and Delaware (Monsanto's state of incorporation). *See id.*, ¶ 2. Accordingly, complete diversity of citizenship exists in this case as required by 28 U.S.C. § 1332. The statutory amount-in-controversy requirement is also satisfied because Plaintiff seeks damages for cancer allegedly caused by exposure to Monsanto's Roundup®-branded herbicides.

**<u>Background and Procedural History</u>**

4.     In November 2021, Plaintiff commenced this lawsuit in the Circuit Court of Elmore County, Alabama by filing a complaint, captioned *James Harwick v. Monsanto Company, et al.*, Case Number 29-CV-2021-900230.00 (the "State Court Action").

5.      Pursuant to 28 U.S.C. § 1446(a), true and correct copies of the Summons and Complaint served upon Monsanto in the State Court Action (and other filings available from the state court's files) are attached collectively as **Exhibit 1.**

6.      Plaintiff seeks compensatory and punitive damages for cancer allegedly caused by exposure to Monsanto's glyphosate-based herbicides. *See, e.g.*, Complaint ¶¶ 32-36, 66, 101, 126, 136.

### Basis For Removal — Diversity Jurisdiction

7.      Plaintiff is, and was at the time the State Court Action was filed, a citizen of the State of Georgia. *See id.*, ¶ 1.

8.      Monsanto is, and was at the time the State Court Action was filed, a corporation incorporated under the laws of the State of Delaware, with its principal place of business in the State of Missouri. *See id.*, ¶ 2. Thus, Monsanto is deemed to be a citizen of Missouri and Delaware, for purposes of federal diversity jurisdiction.

9.      The citizenship of all "Fictitious Defendants" named in the Complaint (also known as "John Doe" defendants) must be disregarded when determining whether this lawsuit is removable based on Section 1332(a). See 28 U.S.C. § 1441(b)(1).

10.      The Complaint seeks compensatory and punitive damages based on the allegations that Monsanto's Roundup®-branded herbicides caused Mr. Harwick to develop cancer. Therefore, it is plausible from the face of the Complaint that Plaintiff seeks damages in excess of $75,000, exclusive of interest and costs, which satisfies the jurisdictional amount-in-controversy requirement. 28 U.S.C. § 1332(a); *see Dart Cherokee Basin Operating Co. v. Owens*, 574 U.S. 81, 89 (2014) ("[A] defendant's notice of removal need include only a plausible allegation that the amount in controversy exceeds the jurisdictional threshold."). Indeed, Plaintiff's request for

3

punitive damages, Complaint, ¶¶ 135-136, "makes it virtually impossible to say that the claim is for less than the jurisdictional amount." *Woodward v. Newcourt Commercial Finance Corp.*, 60 F. Supp. 2d 530, 532 (D.S.C. 1999); *see also Ross v. First Family Fin. Servs., Inc.*, No. 2:01CV218-P-B, 2002 WL 31059582, at *8 (N.D. Miss. Aug. 29, 2002) ("[U]nspecified claims for punitive damage sufficiently serve to bring the amount in controversy over the requisite jurisdictional threshold set out in 28 U.S.C. § 1332."). In fact, numerous other lawsuits seeking damages for cancer allegedly caused by Roundup®-branded herbicides have been filed against Monsanto in other federal courts asserting jurisdiction under §1332(a) and alleging damages in excess of $75,000, exclusive of interest and costs.

11.     In sum, this Court has original subject matter jurisdiction over this action based on § 1332(a) because there is complete diversity of citizenship and the amount in controversy exceeds $75,000, exclusive of costs and interest.

### Procedural Requirements

12.     The Circuit Court of Elmore County, Alabama is located within the Middle District of Alabama. Therefore, removal to this Court satisfies the venue requirement of 28 U.S.C. § 1446(a).

13.     Monsanto received notice of process on November 22, 2021. This Notice of Removal is timely, in accordance with 28 U.S.C. § 1446(b)(1), because it is being filed within 30 days of November 22, 2021.

14.     The written notice required by 28 U.S.C. § 1446(d) will be promptly filed in the Circuit Court of Elmore County, Alabama and will be promptly served on Plaintiff.

15.     Monsanto does not waive any defenses and expressly reserves its right to raise any and all defenses in subsequent proceedings.

4

16.     If any question arises as to the propriety of this removal, Monsanto requests the opportunity to present written and oral argument in support of removal.

### Conclusion

For the foregoing reasons, Monsanto removes this lawsuit to this Court pursuant to 28 U.S.C. §§ 1332, 1441, and 1446 (and any other applicable laws).

Dated:  December 20, 2021

Respectfully submitted,

HALRON W. TURNER (ASB-9339-T62H)
Turner, Onderdonk, Kimbrough,
  Howell, Huggins & Bradley, PA
13212 West Central Avenue
Post Office Drawer 1389
Chatom, Alabama 36518
Telephone:  (251) 847-2237
Facsimile:  (251) 847-3115
Email:  hwt@tokh.com

**Attorneys for Defendant**
**MONSANTO COMPANY**

### CERTIFICATE OF SERVICE

I hereby certify that on December 20, 2021, I conventionally filed the foregoing document with the Clerk of the Court, and I further certify that, on the same date, I served a copy of the forgoing document on all counsel of record, as listed below, either by electronic mail or by U.S. first-class mail, addressed as shown below.

HALRON W. TURNER
Counsel for Defendant

5

**Counsel of Record:**

E. Clayton Hornsby Jr., Esq.
Morris Haynes, LLC
131 Main Street
Post Office Box 1660 (35011)
Alexander City, Alabama 35010
Telephone: (256) 329-2000
Facsimile: (256) 329-2015
Email: chornsby@mhhlaw.net

**Attorneys for Plaintiff**

6

JS 44 (Rev. 02/19)

# CIVIL COVER SHEET

CF# 95-003
$402.00

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS
James Harwick

RECEIVED
2021 DEC 20 A
DEBRA P. HACKETT, CLK
U.S. DISTRICT COURT
MIDDLE DISTRICT

**DEFENDANTS**
Monsanto Company

**(b)** County of Residence of First Listed Plaintiff   State of Georgia
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant   State of Missouri
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
E. Clayton Hornsby Jr. of Morris Haynes, LLC, 131 Main Street, Alexander City, AL 35010; Telephone: (256) 329-2000; Email: chornsby@mhhlaw.net

Attorneys *(If Known)*
Halron W. Turner of Turner Onderdonk, 13212 West Central Avenue, P. O. Box 1389, Chatom, AL 36518; Telephone: (251) 847-2237; Email: hwt@tokh.com

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- ☐ 1 U.S. Government Plaintiff
- ☐ 2 U.S. Government Defendant
- ☐ 3 Federal Question *(U.S. Government Not a Party)*
- ☒ 4 Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☒ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☒ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*
Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY**   **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane   ☒ 365 Personal Injury - | ☐ 690 Other | ☐ 423 Withdrawal | ☐ 376 Qui Tam (31 USC |
| ☐ 130 Miller Act | ☐ 315 Airplane Product     Product Liability |  |    28 USC 157 |    3729(a)) |
| ☐ 140 Negotiable Instrument |     Liability   ☐ 367 Health Care/ |  | **PROPERTY RIGHTS** | ☐ 400 State Reapportionment |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel &     Pharmaceutical |  | ☐ 820 Copyrights | ☐ 410 Antitrust |
|     & Enforcement of Judgment |     Slander     Personal Injury |  | ☐ 830 Patent | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers'     Product Liability |  | ☐ 835 Patent - Abbreviated | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted |     Liability   ☐ 368 Asbestos Personal |  |     New Drug Application | ☐ 460 Deportation |
|     Student Loans | ☐ 340 Marine     Injury Product |  | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and |
|     (Excludes Veterans) | ☐ 345 Marine Product     Liability |  | **SOCIAL SECURITY** |     Corrupt Organizations |
| ☐ 153 Recovery of Overpayment |     Liability   **PERSONAL PROPERTY** | **LABOR** | ☐ 861 HIA (1395ff) | ☐ 480 Consumer Credit |
|     of Veteran's Benefits | ☐ 350 Motor Vehicle   ☐ 370 Other Fraud | ☐ 710 Fair Labor Standards | ☐ 862 Black Lung (923) | ☐ 485 Telephone Consumer |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle   ☐ 371 Truth in Lending |     Act | ☐ 863 DIWC/DIWW (405(g)) |     Protection Act |
| ☐ 190 Other Contract |     Product Liability   ☐ 380 Other Personal | ☐ 720 Labor/Management | ☐ 864 SSID Title XVI | ☐ 490 Cable/Sat TV |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal     Property Damage |     Relations | ☐ 865 RSI (405(g)) | ☐ 850 Securities/Commodities/ |
| ☐ 196 Franchise |     Injury   ☐ 385 Property Damage | ☐ 740 Railway Labor Act |  |     Exchange |
|  | ☐ 362 Personal Injury -     Product Liability | ☐ 751 Family and Medical |  | ☐ 890 Other Statutory Actions |
|  |     Medical Malpractice |  |     Leave Act | **FEDERAL TAX SUITS** | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS**   **PRISONER PETITIONS** | ☐ 790 Other Labor Litigation | ☐ 870 Taxes (U.S. Plaintiff | ☐ 893 Environmental Matters |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights   **Habeas Corpus:** | ☐ 791 Employee Retirement |     or Defendant) | ☐ 895 Freedom of Information |
| ☐ 220 Foreclosure | ☐ 441 Voting   ☐ 463 Alien Detainee |     Income Security Act | ☐ 871 IRS—Third Party |     Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment   ☐ 510 Motions to Vacate |  |     26 USC 7609 | ☐ 896 Arbitration |
| ☐ 240 Torts to Land | ☐ 443 Housing/     Sentence |  |  | ☐ 899 Administrative Procedure |
| ☐ 245 Tort Product Liability |     Accommodations   ☐ 530 General |  |  |     Act/Review or Appeal of |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities -   ☐ 535 Death Penalty | **IMMIGRATION** |  |     Agency Decision |
|  |     Employment   **Other:** | ☐ 462 Naturalization Application |  | ☐ 950 Constitutionality of |
|  | ☐ 446 Amer. w/Disabilities -   ☐ 540 Mandamus & Other | ☐ 465 Other Immigration |  |     State Statutes |
|  |     Other   ☐ 550 Civil Rights |     Actions |  |  |
|  | ☐ 448 Education   ☐ 555 Prison Condition |  |  |  |
|  |     ☐ 560 Civil Detainee - |  |  |  |
|  |     Conditions of |  |  |  |
|  |     Confinement |  |  |  |

## V. ORIGIN *(Place an "X" in One Box Only)*

- ☐ 1 Original Proceeding
- ☒ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from Another District *(specify)*
- ☐ 6 Multidistrict Litigation - Transfer
- ☐ 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
28 U.S.C. § 1332
Brief description of cause:
Removal of products liability action where requirements of diversity jurisdiction are met.

## VII. REQUESTED IN COMPLAINT:
☐ CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND: ☒ Yes ☐ No

## VIII. RELATED CASE(S) IF ANY
*(See instructions):*
JUDGE       DOCKET NUMBER

DATE
12/20/2021

SIGNATURE OF ATTORNEY OF RECORD
*Halron L. Turner*

**FOR OFFICE USE ONLY**

RECEIPT #     AMOUNT     APPLYING IFP     JUDGE     MAG. JUDGE

Court Name: U S DISTRICT COURT - AL/M
Division: 2
Receipt Number: 4602065510
Cashier ID: hseymore
Transaction Date: 12/21/2021
Payer Name: TURNER ONDERDONK ET AL
------------------------------------
CIVIL FILING FEE- NON-PRISONER
 For: TURNER ONDERDONK ET AL
 Case/Party: D-ALM-2-21-CV-000827-001
 Amount:        $402.00
------------------------------------
CHECK
 Check/Money Order Num: 95003
 Amt Tendered: $402.00
------------------------------------
 Total Due:      $402.00
 Total Tendered: $402.00
 Change Amt:     $0.00

 2:21-cv-00827

 Harwick v. Monsanto Company