Query    Reports    Utilities    Help    Log Out

Cat08,Greenberg

# U.S. District Court
## Northern District of Ohio (Cleveland)
## CIVIL DOCKET FOR CASE #: 1:21-cv-02326-JG

| | |
|---|---|
| Terrell v. Monsanto Company, Inc. | Date Filed: 12/10/2021 |
| Assigned to: Judge James S. Gwin | Jury Demand: Plaintiff |
| Demand: $75,000 | Nature of Suit: 365 Personal Inj. Prod. |
| Cause: 28:1332 Diversity-Product Liability | Liability |
| | Jurisdiction: Diversity |

**Plaintiff**

**Fannie Terrell**
*Individually and as Administratrix of
the Estate of David M. Terrell*

represented by **Steven M. Goldberg**
Law Office of Steven M. Goldberg
Ste. 12
31300 Solon Road
Solon, OH 44139
440-519-9900
Fax: 887-464-4652
Email: steven@smglegal.com
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Monsanto Company, Inc.**

| Date Filed | # | Docket Text |
|---|---|---|
| 12/10/2021 | 1 | **Complaint** with jury demand against Monsanto Company, Inc. Filing fee paid $ 402, Receipt number BOHNDC-11175062. Filed by Fannie Terrell. (Attachments: # 1 Civil Cover Sheet, # 2 Summons - Monsanto Company, Inc.) (Goldberg, Steven) (Entered: 12/10/2021) |
| 12/10/2021 | | Request to Clerk for refund of erroneous or duplicate on-line filing fee payment. Reason for refund request: Duplicate charge made due to computer error. Receipt #: AOHNDC-11175062, filed by Fannie M Terrell. (Goldberg, Steven) (Entered: 12/10/2021) |
| 12/10/2021 | | Judge James S. Gwin assigned to case. (L,MI) (Entered: 12/10/2021) |
| 12/10/2021 | | Random Assignment of Magistrate Judge pursuant to Local Rule 3.1. In the event of a referral, case will be assigned to Magistrate Judge Jonathan D. Greenberg. (L,MI) (Entered: 12/10/2021) |

| 12/10/2021 | 2 | Original Summons and Magistrate Consent Form issued to counsel for service upon Monsanto Company, Inc. (Attachments: # 1 Magistrate Consent Form). (L,MI) (Entered: 12/10/2021) |
|---|---|---|

| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 01/25/2022 11:07:34 | | | |
| **PACER Login:** | sh0019sh | **Client Code:** | 31943.356965 |
| **Description:** | Docket Report | **Search Criteria:** | 1:21-cv-02326-JG |
| **Billable Pages:** | 1 | **Cost:** | 0.10 |

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | | |
|---|---|---|
| **FANNIE TERRELL, INDIVIDUALLY AND AS ADMINISTRATRIX OF THE ESTATE OF DAVID M. TERRELL** | ) ) ) | Civil Action No.:_____ |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **COMPLAINT AND JURY DEMAND** |
| | ) | (Tag-Along Action) |
| **MONSANTO COMPANY, INC.** | ) | |
| | ) | |
| Defendant. | ) | |

Plaintiff, Fannie M. Terrell ("Plaintiff"), Individually and as the Personal Representative of the Heirs and Estate of David M. Terrell ("Plaintiff's Decedent" or "the Estate"), by and through her undersigned counsel, hereby brings this Complaint for damages against Defendant Monsanto Company, and alleges the following:

### <u>NATURE OF THE CASE</u>

1.      The causes of actions and claims for damages alleged in this Complaint on behalf of Fannie M. Terrell, Individually and as the Personal Representative of the Heirs and Estate of David M. Terrell, Deceased, are brought pursuant to the authority granted by the Ohio Survival Statute, Ohio R.C. § 2305.21, and the Wrongful Death Statue, Ohio R.C. § 2125, *et seq*. and the other laws of the State of Ohio authorizing the maintenance of such actions, and seek recovery for damages arising as a direct and proximate result of Defendant's negligent and wrongful conduct in connection with the design, development, manufacture, testing, packaging, promoting, marketing, advertising, distribution, labeling, and/or sale of the herbicide Roundup®, containing the active ingredient glyphosate.

2.      Plaintiff maintains that Roundup® and/or glyphosate is defective, dangerous to

human health, unfit and unsuitable to be marketed and sold in commerce, and lacked proper warnings and directions as to the dangers associated with its use.

3.      The injuries sustained by Plaintiff's Decedent and Plaintiff's Decedent's Heirs, like those striking thousands of similarly situated victims across the country, were avoidable.

## THE PARTIES, JURISDICTION, AND VENUE

4.      Plaintiff, Fannie M. Terrell, is a natural person and is currently a citizen and resident of Cleveland, Cuyahoga County, Ohio and is the duly appointed fiduciary and Personal Representative of the Heirs and Estate of her late husband, David M. Terrell.

5.      Pursuant to the Ohio Survival Statute, Ohio R.C. § 2305.21, Plaintiff brings this action for the pre-death injuries sustained by Plaintiff's Decedent's exposure to Roundup® ("Roundup") containing the active ingredient glyphosate and the surfactant POEA.  As a direct and proximate result of being exposed to Roundup, Plaintiff developed non-Hodgkin's Lymphoma.  Plaintiff also brings claims pursuant to the Wrongful Death Statue, Ohio R.C. § 2125, *et seq*. on behalf of the beneficiaries of Plaintiff's Decedent's Estate.

6.      "Roundup" refers to all formulations of Defendant's roundup products, including, but not limited to, Roundup Concentrate Poison Ivy and Tough Brush Killer 1, Roundup Custom Herbicide, Roundup D-Pak herbicide, Roundup Dry Concentrate, Roundup Export Herbicide, Roundup Fence & Hard Edger 1, Roundup Garden Foam Weed & Grass Killer, Roundup Grass and Weed Killer, Roundup Herbicide, Roundup Original 2k herbicide, Roundup Original II Herbicide, Roundup Pro Concentrate, Roundup Pro Dry Herbicide, Roundup Promax, Roundup Quik Stik Grass and Weed Killer, Roundup Quikpro Herbicide, Roundup Rainfast Concentrate Weed & Grass Killer, Roundup Rainfast Super Concentrate Weed & Grass Killer, Roundup

2

Ready-to-Use Extended Control Weed & Grass Killer 1 Plus Weed Preventer, Roundup Ready-to- Use Weed & Grass Killer, Roundup Ready-to-Use Weed and Grass Killer 2, Roundup Ultra Dry, Roundup Ultra Herbicide, Roundup Ultramax, Roundup VM Herbicide, Roundup Weed & Grass Killer Concentrate, Roundup Weed & Grass Killer Concentrate Plus, Roundup Weed & Grass killer Ready-to-Use Plus, Roundup Weed & Grass Killer Super Concentrate, Roundup Weed & Grass Killer1 Ready-to-Use, Roundup WSD Water Soluble Dry Herbicide Deploy Dry Herbicide, or any other formulation of containing the active ingredient glyphosate.

7.     Defendant MONSANTO COMPANY ("Monsanto" or "Defendant") is a Delaware corporation, with a principle place of business in St. Louis, Missouri.  Defendant Monsanto is registered to transact business in Ohio with the Ohio Secretary of State, and its appointed agent for service of process is Corporation Service Company, 50 West Broad Street, Suite 1330, Columbus, Ohio 43215.

8.     Defendant advertises and sells goods, specifically Roundup, in the State of Ohio.

9.     Defendant transacted and conducted business within the State of Ohio that relates to the allegations in this Complaint.

10.     Defendant derived substantial revenue from goods and products used in the State of Ohio, including Roundup.

11.     Defendant expected or should have expected its acts to have consequences within the State of Ohio, and derived substantial revenue from interstate commerce related to Roundup.

12.     Defendant regularly and persistently engaged in the business of designing, developing, manufacturing, testing, packaging, marketing, distributing, labeling, and/or selling Roundup for use by consumers, including those within the State of Ohio.

13.    Defendant is authorized to do business in the State of Ohio and derives substantial income from doing business in this state.

14.    Defendant purposefully availed itself of the privilege of conducting activities with the State of Ohio, thus invoking the benefits and protections of its laws.

15.    At all times relevant herein, Defendant Monsanto conducted substantial business in Ohio and purposely availed itself of the privilege of doing business in Ohio by knowingly marketing, distributing, selling and shipping products, including Roundup, into Ohio for sale to consumers in this state.  Further, this action arises from Defendant Monsanto's conduct directed toward Ohio, arises from a tort committed in whole or in part within Ohio, relates to Defendant Monsanto's regular and persistent manufacture, design, supply and sale of Roundup, and resulted in injuries in Ohio.  Therefore, as to Defendant Monsanto, specific personal jurisdiction is proper under one or more provisions of Ohio R.C. § 2307.382, as well as the Due Process Clauses of the Fifth and Fourteenth Amendments to the Constitution of the United States of America.

16.    Defendant did act to design, sell, advertise, manufacture and/or distribute Roundup, with full knowledge of its dangerous and defective nature.

17.    This Court has jurisdiction over Defendant and this action pursuant to 28 U.S.C. §1332 because there is complete diversity of citizenship between Plaintiff and Defendant. Defendant is either incorporated and/or has the principal place of business outside of the state in which the Plaintiff resides.

18.    The amount in controversy between Plaintiff and Defendant exceeds $75,000, exclusive of interest and cost.

19.    The Court also has supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

4

20.     Venue of this action properly lies in the Northern District of Ohio, pursuant to 28 U.S.C. § 1391(a), and within the Division, as it is the judicial district and division in which a substantial part of the events or omissions giving rise to the claim occurred, in which Defendant Monsanto does business relating to the allegations contained herein, and wherein Plaintiff resides.

21.     Currently an action is pending before Judge Vince Chhabria, *In Re Roundup Products Liability Litigation*, MDL No. 2741, N.D. Cal. Case No. 16-md-02741-VC.  MDL No. 2741 contains similar factual issues rendering Plaintiff's claims appropriate for Tag-Along treatment under Rule 7.1 of the Rules of Procedure of the United States Judicial Panel on Multidistrict Litigation and 28 U.S.C. Section 1407.

## FACTUAL ALLEGATIONS

22.     At all relevant times, Defendant was in the business of, and did, design, research, manufacture, test, advertise, promote, market, sell, and/or distribute the commercial herbicide Roundup.

23.     Monsanto is a multinational agricultural biotechnology corporation based in St. Louis, Missouri.  It is the world's leading producer of glyphosate.

24.     Defendant discovered the herbicidal properties of glyphosate during the 1970's and subsequently began to design, research, manufacture, sell and distribute glyphosate based "Roundup" as a broad spectrum herbicide.

25.     Glyphosate is the active ingredient in Roundup.

26.     Glyphosate is a broad-spectrum herbicide used to kill weeds and grasses known to compete with commercial crops grown around the globe.

27.     Glyphosate is a "non-selective" herbicide, meaning it kills indiscriminately based

only on whether a given organism produces a specific enzyme, 5-enolpyruvylshikimic acid-3-phosphate synthase, known as EPSP synthase.

28.     Glyphosate inhibits the enzyme 5-enolpyruvylshikimic acid-3-phosphate synthase that interferes with the shikimic pathway in plants, resulting in the accumulation of shikimic acid in plant tissue and ultimately plant death.

29.     Sprayed as a liquid, plants absorb glyphosate directly through their leaves, stems, and roots, and detectable quantities accumulate in the plant tissues.

30.     Each year, approximately 250 million pounds of glyphosate are sprayed on crops, commercial nurseries, suburban lawns, parks, and golf courses.  This increase in use has been driven largely by the proliferation of genetically engineered crops, crops specifically tailored to resist the activity of glyphosate.

31.     Defendant is intimately involved in the development, design, manufacture, marketing, sale, and/or distribution of genetically modified ("GMO") crops, many of which are marketed as being resistant to Roundup i.e., "Roundup Ready®." As of 2009, Defendant was the world's leading producer of seeds designed to be Roundup Ready®.  In 2010, an estimated 70% of corn and cotton, and 90% of soybean fields in the United States contained Roundup Ready® seeds.

32.     The original Roundup, containing the active ingredient glyphosate, was introduced in 1974.  Today, glyphosate products are among the most widely used herbicides in the world.[1]

33.     For nearly 40 years, consumers, farmers, and the public have used Roundup, unaware of its carcinogenic properties.

---

[1] *Backgrounder*, History of Monsanto's Glyphosate Herbicides, June 2005.

## REGISTRATION OF HERBICIDES UNDER FEDERAL LAW

34.    The manufacture, formulation and distribution of herbicides, such as Roundup, are regulated under the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA"), 7. U.S.C. § 136 *et seq*. FIFRA requires that all pesticides be registered with the Environmental Protection Agency ("EPA) prior to their distribution, sale, or use, except as described by FIFRA 7 U.S.C. 136a(a).

35.    The EPA requires as part of the registration process, among other requirements, a variety of tests to evaluate the potential for exposure to pesticides, toxicity to people and other potential non-target organisms, and other adverse effects on the environment.  Registration by the EPA, however, is not an assurance or finding of safety.  The determination the EPA makes in registering or re-registering a product is not that the product is "safe," but rather that use of the product in accordance with its label directions "will not generally cause unreasonable adverse effects on the environment." See 7 U.S.C. § 136(a)(c)(5)(D).

36.    FIFRA defines "unreasonable adverse effects on the environment" to mean "any unreasonable risk to man or the environment, taking into account the economic, social, and environmental costs and benefits of the use of any pesticide." 7 U.S.C. § 136(bb).  FIFRA thus requires the EPA to make a risk/benefit analysis in determining whether a registration should be granted or allowed to continue to be sold in commerce.

37.    The EPA and the State of Ohio registered Roundup for distribution, sale, and manufacture in the United States and the State of Ohio.

38.    FIFRA generally requires that the registrant, Monsanto, conduct health and safety testing of pesticide products.  The government is not required, nor is it able, to perform the product

7

tests that are required of the manufacturer.

39.     The evaluation of each pesticide product distributed, sold, or manufactured is completed at the time the product is initially registered.  The data necessary for registration of a pesticide has changed over time.  The EPA is now in the process of re-evaluating all pesticide products through a Congressionally-mandated process called "re-registration." 7 U.S.C. § 136a-1. In order to reevaluate these pesticides, the EPA demands the completion of additional tests and the submission of data for the EPA's review and evaluation.

40.     In the case of glyphosate and Roundup, the EPA had planned on releasing its preliminary risk assessment – in relation to the registration process – no later than July 2015.  The EPA completed its review of glyphosate in early 2015, but delayed releasing the assessment pending further review in light of the World Health Organization's findings.

41.     In 1996, the New York Attorney General ("NYAG") filed a lawsuit against Monsanto based on its false and misleading advertising of Roundup products.  Specifically, the lawsuit challenged Monsanto's general representations that its spray-on glyphosate-based herbicides, including Roundup, were "safer than table salt" and "practically non-toxic" to mammals, birds, and fish.  Among the representations the NYAG found deceptive and misleading about the human and environmental safety of Roundup are the following:

      a.  Remember that environmentally friendly Roundup herbicide is biodegradable.  It won't build up in the soil so you can use Roundup with confidence along customers' driveways, sidewalks and fences;

      b.  And remember that Roundup is biodegradable and won't build up in the soil.  That will give you the environmental confidence you need to use Roundup everywhere you've got a weed, brush, edging or trimming problem;

      c.  Roundup biodegrades into naturally occurring elements;

> d. Remember that versatile Roundup herbicide stays where you put it. That means there's no washing or leaching to harm customers' shrubs or other desirable vegetation;
>
> e. This non-residual herbicide will not wash or leach in the soil. It ... stays where you apply it;
>
> f. You can apply Accord with "confidence because it will stay where you put it" it bonds tightly to soil particles, preventing leaching. Then, soon after application, soil microorganisms biodegrade Accord into natural products;
>
> g. Glyphosate is less toxic to rats than table salt following acute oral ingestion;
>
> h. Glyphosate's safety margin is much greater than required. It has over a 1,000-fold safety margin in food and over a 700-fold safety margin for workers who manufacture it or use it;
>
> i. You can feel good about using herbicides by Monsanto. They carry a toxicity category rating of 'practically non-toxic' as it pertains to mammals, birds and fish; and
>
> j. "Roundup can be used where kids and pets will play and breaks down into natural material." This ad depicts a person with his head in the ground and a pet dog standing in an area which has been treated with Roundup.[2]

42. On November 19, 1996, Monsanto entered into an Assurance of Discontinuance with NYAG, in which Monsanto agreed, among other things, "to cease and desist from publishing or broadcasting any advertisements [in New York] that represent, directly or by implication" that:

> a. Its glyphosate-containing pesticide products or any component thereof are safe, non-toxic, harmless or free from risk;
>
> b. Its glyphosate-containing pesticide products or any component thereof manufactured, formulated, distributed or sold by Monsanto are biodegradable;
>
> c. Its glyphosate-containing pesticide products or any component thereof stay where they are applied under all circumstances and will not move through the environment by any means;
>
> d. Its glyphosate-containing pesticide products or any component

---

[2] Attorney General of the State of New York, In the Matter of Monsanto Company, Assurance of Discontinuance Pursuant to Executive Law § 63(15) (Nov. 1996).

9

thereof are "good" for the environment or are "known for their
environmental characteristics;"

    e. Glyphosate-containing pesticide products or any component
thereof are safer or less toxic than common consumer products
other than herbicides; and

    f. Its glyphosate-containing products or any component thereof
might be classified as "practically non-toxic."

43.    Monsanto did not alter its advertising in the same manner in any state other than New York, and on information and belief still has not done so today.

44.    In 2009, France's highest court ruled that Monsanto had not told the truth about the safety of Roundup. The French court affirmed an earlier judgment that Monsanto had falsely advertised its herbicide Roundup as "biodegradable" and that it "left the soil clean."[3]

## EVIDENCE OF CARCINEGENICITY IN ROUNDUP

45.    As early as the 1980's Monsanto was aware of glyphosate's carcinogenic properties.

46.    On March 4, 1985, a group of the Environmental Protection Agency's ("EPA") Toxicology Branch published a memorandum classifying glyphosate as a Category C oncogene.[4] Category C oncogenes are possible human carcinogens with limited evidence of carcinogenicity.

47.    In 1986, the EPA issued a Registration Standard for glyphosate (NTIS PB87-103214). The Registration standard required additional phytotoxicity, environmental fate, toxicology, product chemistry, and residue chemistry studies. All of the data required was submitted and reviewed and/or waived.[5]

---

[3] *Monsanto Guilty in 'False Ad' Row*, BBC, Oct. 15, 2009, *available at*
http://news.bbc.co.uk/2/hi/europe/8308903.stm.

[4] Consensus Review of Glyphosate, Casewell No. 661A. March 4, 1985. United States Environmental Protection Agency.

[5] http://www.epa.gov/oppsrrd1/reregistration/REDs/factsheets/0178fact.pdf

48.    In October 1991 the EPA published a Memorandum entitled "Second Peer Review of Glyphosate." The memorandum changed glyphosate's classification to Group E (evidence of non-carcinogenicity for humans).  Two peer review committee members did not concur with the conclusions of the committee and one member refused to sign.[6]

49.    In addition to the toxicity of the active molecule, many studies support the hypothesis that glyphosate formulations found in Defendant's Roundup products are more dangerous and toxic than glyphosate alone.[7] As early as 1991 evidence existed demonstrating that glyphosate formulations were significantly more toxic than glyphosate alone.[8]

50.    In 2002, Julie Marc published a study entitled "Pesticide Roundup Provokes Cell Division Dysfunction at the Level of CDK1/Cyclin B Activation."

51.    The study found that Defendant's Roundup caused delays in the cell cycles of sea urchins, while the same concentrations of glyphosate alone proved ineffective and did not alter cell cycles.

52.    In 2004, Julie Marc published a study entitled "Glyphosate-based pesticides affect cell cycle regulation." The study demonstrated a molecular link between glyphosate-based products and cell cycle dysregulation.

53.    The study noted that "cell-cycle dysregulation is a hallmark of tumor cells and human cancer.  Failure in the cell-cycle checkpoints leads to genomic instability and subsequent development of cancers from the initial affected cell." Further, "[s]ince cell cycle disorders such as cancer result from dysfunction of unique cell, it was of interest to evaluate the threshold dose

---

[6] Second Peer Review of Glyphosate, CAS No. 1071-83-6. October 30, 1881. United States Environmental Protection Agency.
[7] Martinez et al., 2007; Benachour, 2009; Gasnier et al., 2010; Peixoto, 2005; Marc, 2004.
[8] Martinez et al., 1991.

of glyphosate affecting cells."[9]

54.      In 2005, Francisco Peixoto published a study showing that Roundup's effects on rat liver mitochondria are much more toxic and harmful than the same concentrations of glyphosate alone.

55.      The Peixoto study suggested that the harmful effects of Roundup on mitochondrial bioenergetics could not be exclusively attributed to glyphosate and could be the result of other chemicals, namely the surfactant POEA, or alternatively due to the possible synergy between glyphosate and Roundup formulation products.

56.      In 2009, Nora Benachour and Gilles-Eric Seralini published a study examining the effects of Roundup and glyphosate on human umbilical, embryonic, and placental cells.

57.      The study used dilution levels of Roundup and glyphosate far below agricultural recommendations, corresponding with low levels of residues in food.  The study concluded that supposed "inert" ingredients, and possibly POEA, change human cell permeability and amplify toxicity of glyphosate alone.  The study further suggested that determinations of glyphosate toxicity should take into account the presence of adjuvants, or those chemicals used in the formulation of the complete pesticide.  The study confirmed that the adjuvants in Roundup are not inert and that Roundup is always more toxic than its active ingredient glyphosate.

58.      The results of these studies were confirmed in recently published peer-reviewed studies and were at all times available and/or known to Defendant.

59.      Defendant knew or should have known that Roundup is more toxic than glyphosate alone and that safety studies on Roundup, Roundup's adjuvants and "inert" ingredients, and/or the

---

[9] Molinari, 2000; Stewart et al., 2003.

surfactant POEA were necessary to protect Plaintiff from Roundup.

60.     Defendant knew or should have known that tests limited to Roundup's active ingredient glyphosate were insufficient to prove the safety of Roundup.

61.     Defendant failed to appropriately and adequately test Roundup, Roundup's adjuvants and "inert" ingredients, and/or the surfactant POEA to protect Plaintiff from Roundup.

62.     Rather than performing appropriate tests, Defendant relied upon flawed industry-supported studies designed to protect Defendant's economic interests rather than the Plaintiff and the consuming public.

63.     Despite its knowledge that Roundup was considerably more dangerous than glyphosate alone, Defendant continued to promote Roundup as safe.

## IARC CLASSIFICATION OF GLYPHOSATE

64.     The International Agency for Research on Cancer ("IARC") is the specialized intergovernmental cancer agency the World Health Organization ("WHO") of the United Nations tasked with conducting and coordinating research into the causes of cancer.

65.     An IARC Advisory Group to Recommend Priorities for IARC Monographs during 2015–2019 met in April 2014.  Though nominations for the review were solicited, a substance must meet two criteria to be eligible for review by the IARC Monographs: there must already be some evidence of carcinogenicity of the substance, and there must be evidence that humans are exposed to the substance.

66.     IARC set glyphosate for review in 2015-2016.  IARC uses five criteria for determining priority in reviewing chemicals.  The substance must have a potential for direct impact on public health; scientific literature to support suspicion of carcinogenicity; evidence of

significant human exposure; high public interest and/or potential to bring clarity to a controversial area and/or reduce public anxiety or concern; related agents similar to one given high priority by the above considerations. Data reviewed is sourced preferably from publicly accessible, peer-reviewed data.

67. On March 24, 2015, after its cumulative review of human, animal, and DNA studies for more than one (1) year, many of which have been in Defendant's possession since as early as 1985, the IARC's working group published its conclusion that the glyphosate contained in Defendant's Roundup herbicide, is a Class 2A "probable carcinogen" as demonstrated by the mechanistic evidence of carcinogenicity in humans and sufficient evidence of carcinogenicity in animals.

68. The IARC's full Monograph was published on July 29, 2015 and established glyphosate as a class 2A probable carcinogen to humans. According to the authors glyphosate demonstrated sufficient mechanistic evidence (genotoxicity and oxidative stress) to warrant a 2A classification based on evidence of carcinogenicity in humans and animals.

69. The IARC Working Group found an increased risk between exposure to glyphosate and non-Hodgkin's lymphoma ("NHL") and several subtypes of NHL, and the increased risk continued after adjustment for other pesticides.

70. The IARC also found that glyphosate caused DNA and chromosomal damage in human cells.

## EARLIER EVIDENCE OF GLYPHOSATE'S DANGER

71. Despite the new classification by the IARC, Defendant has had ample evidence of glyphosate and Roundup's genotoxic properties for decades.

14

72.     Genotoxicity refers to chemical agents that are capable of damaging the DNA within a cell through genetic mutations, which is a process that is believed to lead to cancer.

73.     In 1997, Chris Clements published "Genotoxicity of select herbicides in Rana catesbeiana tadpoles using the alkaline single-cell gel DNA electrophoresis (comet) assay."

74.     The study found that tadpoles exposed to Roundup showed significant DNA damage when compared with unexposed control animals.

75.     Both human and animal studies have shown that glyphosate and glyphosate-based formulations such as Roundup can induce oxidative stress.

76.     Oxidative stress and associated chronic inflammation are believed to be involved in carcinogenesis.

77.     The IARC Monograph notes that "[s]trong evidence exists that glyphosate, AMPA and glyphosate-based formulations can induce oxidative stress."

78.     In 2006, César Paz-y-Miño published a study examining DNA damage in human subjects exposed to glyphosate.

79.     The study produced evidence of chromosomal damage in blood cells showing significantly greater damage after exposure to glyphosate than before in the same individuals, suggesting that the glyphosate formulation used during aerial spraying had a genotoxic effect on exposed individuals.

80.     The IARC Monograph reflects the volume of evidence of glyphosate pesticides' genotoxicity noting "[t]he evidence for genotoxicity caused by glyphosate-based formulations is strong."

81.     Despite knowledge to the contrary, Defendant maintains that there is no evidence

15

that Roundup is genotoxic, that regulatory authorities and independent experts are in agreement that Roundup is not genotoxic, and that there is no evidence that Roundup is genotoxic.

82.     In addition to glyphosate and Roundup's genotoxic properties, Defendant has long been aware of glyphosate's carcinogenic properties.

83.     Glyphosate and Roundup in particular have long been associated with carcinogenicity and the development of numerous forms of cancer, including, but not limited to, non-Hodgkin's lymphoma, Hodgkin's lymphoma, multiple myeloma, and soft tissue sarcoma.

84.     Defendant has known of this association since the early to mid-1980s and numerous human and animal studies have evidenced the carcinogenicity of glyphosate and/or Roundup.

85.     In 1985, the EPA studied the effects of glyphosate in mice finding a dose related response in male mice linked to renal tubal adenomas, a rare tumor.  The study concluded the glyphosate was oncogenic.

86.     In 2003, Lennart Hardell and Mikael Eriksson published the results of two case controlled studies on pesticides as a risk factor for NHL and hairy cell leukemia.

87.     The study concluded that glyphosate had the most significant relationship to NHL among all herbicides studies with an increased odds ratio of 3.11.

88.     In 2003, A.J. De Roos published a study examining the pooled data of mid-western farmers, examining pesticides and herbicides as risk factors for NHL.

89.     The study, which controlled for potential confounders, found a relationship between increased NHL incidence and glyphosate.

90.     In 2008, Mikael Eriksson published a study a population based case-control study of exposure to various pesticides as a risk factor for NHL.

16

91.     This strengthened previous associations between glyphosate and NHL.

92.     In spite of this knowledge, Defendant continued to issue broad and sweeping statements suggesting that Roundup was, and is, safer than ordinary household items such as table salt, despite a lack of scientific support for the accuracy and validity of these statements and, in fact, voluminous evidence to the contrary.

93.     Upon information and belief, these statements and representations have been made with the intent of inducing Plaintiff, the agricultural community, and the public at large to purchase, and increase the use of, Defendant's Roundup for Defendant's pecuniary gain, and in fact did induce Plaintiff to use Roundup.

94.     Defendant made these statements with complete disregard and reckless indifference to the safety of the Plaintiff and of the general public.

95.     Notwithstanding Defendant's representations, scientific evidence has established a clear association between glyphosate and genotoxicity, inflammation, and an increased risk of many cancers, including, but not limited to, NHL, Multiple Myeloma, and soft tissue sarcoma.

96.     Defendant knew or should have known that glyphosate is associated with an increased risk of developing cancer, including, but not limited to, NHL, Multiple Myeloma, and soft tissue sarcomas.

97.     Defendant failed to appropriately and adequately inform and warn Plaintiff of the serious and dangerous risks associated with the use of and exposure to glyphosate and/or Roundup, including, but not limited to, the risk of developing NHL, as well as other severe and personal injuries, which are permanent and/or long-lasting in nature, cause significant physical pain and mental anguish, diminished enjoyment of life, and the need for medical treatment, monitoring

17

and/or medications.

98.     Despite the IARC's classification of glyphosate as a class 2A probable carcinogen, Defendant continues to maintain that glyphosate and/or Roundup is safe, non-carcinogenic, non-genotoxic, and falsely warrant to users and the general public that independent experts and regulatory agencies agree that there is no evidence of carcinogenicity or genotoxicity in glyphosate and Roundup.

99.     Defendant has claimed and continue to claim that Roundup is safe, non-carcinogenic, and non-genotoxic.  These misrepresentations are consistent with Defendant cavalier approach to investigating and ensuring the safety of its products, the safety of the public at large, and the safety of the Plaintiff.

100.    Monsanto claims on its website that "[r]egulatory authorities and independent experts around the world have reviewed numerous long-term/carcinogenicity and genotoxicity studies and agree that there is no evidence that glyphosate, the active ingredient in Roundup brand herbicides and other glyphosate-based herbicides, causes cancer, even at very high doses, and that it is not genotoxic."[10]

101.    Ironically, the primary source for this statement is a 1986 report by the WHO, the same organization that now considers glyphosate to be a probable carcinogen.

102.    Glyphosate and Defendant's Roundup products in particular, have long been associated with serious side effects and many regulatory agencies around the globe have banned or are currently banning the use of glyphosate herbicide products.

103.    Defendant's statements proclaiming the safety of Roundup and disregarding its

---

[10] *Backgrounder – Glyphosate: No Evidence of Carcinogenicity.* Updated November 2014. (Downloaded October 9 2015).

dangers misled the Plaintiff's Decedent.

104.    Despite Defendant's knowledge that Roundup was associated with an elevated risk of developing cancer, Defendant's promotional campaigns focused on Roundup's purported "safety profile."

105.    Defendant's failure to adequately warn the Plaintiff and Plaintiff's Decedent resulted in:

      a.   the Plaintiff's Decedent using and being exposed to glyphosate instead of using another acceptable and safe method of controlling unwanted weeds and pests; and

      b.   Scientists and physicians failing to warn and instruct consumers about the risk of cancer, including NHL, and other injuries associated with Roundup.

106.    Defendant failed to seek modification of the labeling of Roundup to include relevant information regarding the risks and dangers associated with Roundup exposure.

107.    The failure of Defendant to appropriately warn and inform the EPA has resulted in inadequate warnings in safety information presented directly to users and consumers.

108.    The failure of Defendant to appropriately warn and inform the EPA has resulted in the absence of warning or caution statements that are adequate to protect health and the environment.

109.    The failure of Defendant to appropriately warn and inform the EPA has resulted in the directions for use that are not adequate to protect health and the environment.

110.    By reason of the foregoing acts and omissions, Plaintiff seeks compensatory damages as a result of Plaintiff's Decedent's use of, and exposure to, Roundup which caused or was a substantial contributing factor in causing Plaintiff's Decedent to suffer from cancer, specifically diffuse B-cell lymphoma, a form of NHL, and the Estate of David M. Terrell, including his next-of-kin and beneficiaries of the Estate, suffered severe and personal injuries which are

19

permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life.

111. By reason of the foregoing, the Estate of David M. Terrell, including his next-of-kin and beneficiaries of the Estate, are severely and permanently injured.

112. By reason of the foregoing acts and omissions, the Estate of David M. Terrell, including his next-of-kin and beneficiaries of the Estate, have endured and, in some categories continues to suffer, emotional and mental anguish, medical expenses, and other economic and non-economic damages, as a result of the actions and inactions of the Defendant.

## PLAINTIFF'S DECEDENT'S EXPOSURE TO ROUNDUP

113. Plaintiff incorporates by reference all prior paragraphs of this Complaint as if fully set forth herein.

114. For many years, Plaintiff's Decedent was regularly exposed to Roundup residentially.

115. Specifically, Plaintiff's Decedent first started using Roundup in approximately May 2000 in order to kill grass and weeds around his home. Plaintiff's Decedent sprayed Roundup around his home, in his yard, and on the cracks in his driveway, 1 day a week for 20 years, using both pre-mixed and concentrate forms of Roundup. Plaintiff's Decedent sprayed Roundup for up to 45 minutes each time he used it around his home.

116. Plaintiff's Decedent developed Diffuse B-cell Non-Hodgkin's lymphoma on or about January 2021 and he perished from his illness on July 29, 2021.

117. Plaintiff's Decedent's exposure to Roundup products designed, formulated, supplied and distributed by Defendant Monsanto was a direct and proximate cause of his

developing NHL.  As a result of his illness, Plaintiff's Decedent incurred pre-death physical injury, significant economic and non-economic damages, and the Estate of David M. Terrell, including his next-of-kin and beneficiaries of the Estate, have sustained losses from Plaintiff's Decedent's death, including loss of support, loss of services, loss of society, loss of prospective inheritance and mental anguish.

## TOLLING OF ANY APPLICABLE STATUTES OF LIMITATIONS OR REPOSE

118.    Plaintiff incorporates by reference all prior paragraphs of this Complaint as if fully set forth herein.

119.    Neither Plaintiff nor Plaintiff's Decedent had any way of knowing about the risk of serious illness associated with the use of and/or exposure to Roundup® and glyphosate during the entire time he was using the product.

120.    Within the time period of any applicable statutes of limitations or repose, neither the Plaintiff nor Plaintiff's Decedent could not have discovered, through the exercise of reasonable diligence, that exposure to Roundup®, an herbicide, and the chemicals contained therein, including, glyphosate was hazardous, toxic and injurious to human health.

121.    Within the time period of any applicable statutes of limitations or repose, Plaintiffs' Decedent, was neither informed by any competent medical authority, nor through the exercise of reasonable diligence should have known, that his NHL was related to his exposure to Roundup, an herbicide.

122.    Neither Plaintiff nor Plaintiff's Decedent discovered, nor knew of facts that would cause a reasonable person to suspect, the risks associated with the use of and/or exposure to Roundup® and glyphosate; nor would a reasonable and diligent investigation by Plaintiff and

Plaintiff's Decedent have disclosed that Roundup® herbicide and the glyphosate contained therein would have caused his illness.

123.    For these reasons, all applicable statutes of limitations or repose have been tolled by operation of the discovery rule with respect to the claims brought on behalf of Plaintiff's Decedent and Plaintiff's Decedent's beneficiaries.

124.    The running of any statutes of limitations or repose, if any, has also been tolled by reason of Monsanto's knowing and active fraudulent concealment and denial of the facts alleged herein through the time period relevant to this action.  Defendant, through its affirmative misrepresentations and omissions, actively concealed from Plaintiff and Plaintiff's Decedent the true risks associated with Roundup and glyphosate.

125.    Instead of disclosing critical safety information about Roundup® and glyphosate, Monsanto has consistently and falsely represented the safety of its Roundup® products.

126.    At all relevant times, Defendant has maintained that Roundup is safe, non-toxic, and non-carcinogenic.

127.    Indeed, even as of July 2016, Defendant continued to represent to the public that "Regulatory authorities and independent experts around the world have reviewed numerous long-term/carcinogenicity and genotoxicity studies and agree that there is no evidence that glyphosate, the active ingredient in Roundup® brand herbicides and other glyphosate-based herbicides, causes cancer, even at very high doses, and that it is not genotoxic."[11]

128.    As a result of Defendant's actions, Plaintiff and Plaintiff's Decedent were unaware, and could not reasonably known or have learned through reasonable diligence that Roundup and/or

---

[11] *Backgrounder – Glyphosate: No Evidence of Carcinogenicity.* Updated November 2014. (downloaded March 31 2020)

glyphosate contact, exposed Plaintiff's Decedent to the risks alleged herein and that those risks were the direct and proximate result of Defendant's acts and omissions.

129.    Furthermore, Defendant is estopped from relying on any statutes of limitations or repose because of its fraudulent concealment of the true character, quality and nature of Roundup. Defendant was under a duty to disclose the true character, quality, and nature of Roundup because this was non-public information over which Defendant had and continues to have exclusive control, and because Defendant knew that this information was not available to Plaintiff's Decedent or to distributors of Roundup and such concealment contributed to Plaintiff's Decedent's harm.  In addition, Defendant is estopped from relying on any statute of limitations or repose because of its intentional concealment of these facts.

130.    Plaintiff's Decedent had no knowledge that Defendant was engaged in the wrongdoing alleged herein.  Because of the fraudulent acts of concealment of wrongdoing by Defendant, Plaintiff's Decedent could not have reasonably discovered the wrongdoing at any time prior.  Also, the economics of this fraud should be considered.  Defendant had the ability to and did spend enormous amounts of money in furtherance of its purpose of marketing, promoting and/or distributing a profitable herbicide, notwithstanding the known or reasonably known risks. Plaintiffs Decedent and medical professionals could not have afforded and could not have possibly conducted studies to determine the nature, extent, and identity of related health risks, and were forced to rely on only the Defendant's representation.  Accordingly, Defendant is precluded by both the discovery rule and the doctrine of fraudulent concealment from relying upon any statutes of limitations or repose.

## FIRST CAUSE OF ACTION
## WRONGFUL DEATH AND SURVIVAL

23

## DEFECTIVE DESIGN OR FORMULATION – OHIO R.C. § 2307.75

131.    Plaintiff repeats, reiterate and, re-allege each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

132.    This First Cause of Action is brought by Plaintiff against Defendant Monsanto with respect to the defective design and formulation of Roundup, pursuant to Ohio R.C. § 2307.75, seeks recovery for Plaintiff's Decedent's pre-death injuries and damages under Ohio R.C. § 2305.21, and for the wrongful death damages sustained by Plaintiff's Decedent's beneficiaries, pursuant to Ohio R.C. 2125, *et seq.*

133.    At all times relevant, Defendant Monsanto is and was engaged in the business of designing, formulating, producing, creating, constructing, assembling and marketing Roundup, including the Roundup used by Plaintiff's Decedent.

134.    The Roundup designed, formulated researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed by Defendant were defective in design or formulation in that, when it left the hands of the manufacturer and/or suppliers, the foreseeable risks exceeded the benefits associated with the design or formulation of Roundup.

135.    The Roundup designed, formulated, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed by Defendant was defective in design and/or formulation, in that, when it left the hands of the Defendant, it was unreasonably dangerous, unreasonably dangerous in normal use, and it was more dangerous than an ordinary consumer would expect.

136.    The foreseeable risks associated with the design of, and intended uses, of the

24

Subject Roundup exceeded the benefits associated with that design, pursuant to the provisions of Ohio R.C. §§ 2307.75(B) and (C).

137.    As a direct and proximate result of the defective design of the Subject Roundup, Plaintiff's Decedent sustained the injuries described herein.

138.    Defendant Monsanto is liable because the Subject Roundup was designed in a defective manner and was in a defective and unreasonably dangerous condition when it was placed into the stream of commerce.

139.    The defective condition of the Subject Roundup existed at the times it was purchased and/or used by the Plaintiff's Decedent.

140.    The defective condition of the Subject Roundup existed at the time of Plaintiff's Decedent's exposures which form the basis of this action.

141.    From the time the Subject Roundup left the control of Defendant Monsanto until the time of the Plaintiff's Decedent's exposures, it did not undergo any substantial changes or alterations.

142.    Plaintiff's Decedent was unaware of the hazards posed by the Subject Roundup, including but not limited to the risk of developing cancer, and could not have reasonably discovered such risks.

143.    Defendant Monsanto, the manufacturer of Roundup, is liable in tort, irrespective of privity, for manufacturing, designing, assembling, marketing and/or placing a defective and unreasonably dangerous product in the stream of commerce which was a proximate cause of Plaintiff's Decedent's illness, injuries and damages.

144.    At all times herein mentioned, the Defendant designed, formulated, researched,

manufactured, tested, advertised, promoted, sold, distributed Roundup as hereinabove described that was used by the Plaintiff's Decedent.

145.    At all times herein mentioned, Roundup was defective in design, pursuant to Ohio Revised Code § 2307.75, and the foreseeable risks of the Roundup outweighed the benefits associated with its design because, *inter alia*:

  a. When placed in the stream of commerce, Defendant's Roundup products were defective in design and formulation and, consequently, dangerous to an extent beyond that which an ordinary consumer would anticipate;
  b. When placed in the stream of commerce, Defendant's Roundup products were unreasonably dangerous in that they were hazardous and posed a grave risk of cancer and other serious illnesses when used in a reasonably anticipated manner;
  c. When placed in the stream of commerce, Defendant's Roundup products contained unreasonably dangerous design defects and were not reasonably safe when used in a reasonably anticipated manner;
  d. Defendant did not sufficiently test, investigate, or study its Roundup products;
  e. Exposure to Roundup presents a risk of harmful side effects that outweigh any potential utility stemming from the use of the herbicide;
  f. Defendant knew or should have known at the time of marketing its Roundup products that exposure to Roundup and could result in cancer and other severe illnesses and injuries;
  g. Defendant did not conduct adequate post-marketing surveillance of its Roundup products; and
  h. In such other particulars as the evidence may show.

146.    Defendant knew or should have known that at all times herein mentioned its Roundup was in a defective condition, and was and is unreasonably dangerous and unsafe.

147.    Plaintiff's Decedent was exposed to Defendant's Roundup, as described above, without knowledge of Roundup's dangerous characteristics.

148.    At the time of the Plaintiff's Decedent's use of and exposure to Roundup, Roundup was being used for the purposes and in a manner normally intended, as a broad-spectrum herbicide.

149.    Defendant, with this knowledge, voluntarily designed its Roundup with a

26

dangerous condition for use by the public, and in particular the Plaintiff's Decedent.

150.    Defendant had a duty to create a product that was not unreasonably dangerous for its normal, intended use.

151.    Defendant created a product that was and is unreasonably dangerous for its normal, intended use.

152.    Defendant marketed and promoted a product in such a manner so as to make it unreasonably dangerous and defective as the product downplayed its suspected, probable, and established health risks inherent with its normal, intended use.

153.    The Roundup designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed by Defendant was manufactured defectively in that Roundup left the hands of Defendant in a defective condition and was unreasonably dangerous to its intended users.

154.    The Roundup designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed by Defendant reached its intended users in the same defective and unreasonably dangerous condition in which the Defendant's Roundup was manufactured.

155.    Defendant designed, formulated, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed a defective product, which created an unreasonable risk to the health of consumers and to the Plaintiff's Decedent in particular, and Defendant is therefore strictly liable for the injuries sustained by the Plaintiff's Decedent.

156.    The Plaintiff's Decedent could not, by the exercise of reasonable care, have discovered Roundup's defects herein mentioned or perceived its danger.

157.    By reason of the foregoing, Defendant Monsanto is strictly liable in tort,

irrespective of privity, to the Plaintiff for the manufacturing, design marketing, promoting, distribution, and selling of a defective product, Roundup, which harmed his Decedent.

158.    As a direct and proximate result of the defective design of the Subject Roundup, Plaintiff's Decedent suffered "harm," as defined in Ohio R.C. § 2307.71(A)(7), including but not limited to NHL and severe and personal injuries, physical pain and mental anguish, including diminished enjoyment of life, financial expenses for hospitalization and medical care, including medical expenses and other economic, non-economic damages, and death.

159.    As a direct and proximate result of the defective design of the Subject Roundup, Plaintiff's Decedent's beneficiaries have suffered "harm," as defined in Ohio R.C. § 2307.71(A)(7), including but not limited to the following injuries and damages arising out of the untimely death of Plaintiff's Decedent: loss of support, loss of services, loss of society, loss of prospective inheritance and grief and mental anguish.

160.    Defendant's defective design and formulation of Roundup amounts to willful, wanton, and/or reckless conduct by Defendant.

161.    Defects in Defendant's Roundup were the cause or a substantial factor in causing Plaintiff's Decedent's and Plaintiff's Decedent's beneficiaries' injuries.

162.    WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in Plaintiff's favor for compensatory damages for the wrongful death and survival claims brought herein, punitive damages, together with interest, costs herein incurred, attorneys' fees and all relief as this Court deems just and proper.  Additionally, Plaintiff demands a jury trial on all issues contained herein.

## SECOND CAUSE OF ACTION
## WRONGFUL DEATH AND SURVIVAL
## INADEQUATE WARNING OR INSTRUCTION – OHIO R.C. § 2307.76

163.	Plaintiff repeats, reiterates and, re-alleges each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

164.	This Second Cause of Action is brought by Plaintiff against Defendant Monsanto with respect to the inadequate warnings and instructions provided with Roundup, pursuant to Ohio R.C. § 2307.76, seeks recovery for Plaintiff's Decedent's pre-death injuries and damages under Ohio R.C. § 2305.21, and for the wrongful death damages sustained by Plaintiff's Decedent's beneficiaries, pursuant to Ohio R.C. 2125, *et seq*.

165.	Defendant Monsanto, the manufacturer of Roundup, is liable in tort, irrespective of privity, for placing a defective and unreasonably dangerous product in the stream of commerce without adequate or necessary warnings or instructions sufficient to inform foreseeable users and consumers, including Plaintiff's Decedent, of the dangerous conditions and hazards associated with the use of Roundup.

166.	Defendant did in fact sell, distribute, supply, manufacture, and/or promote Roundup to Plaintiff's Decedent.  Additionally, Defendant expected the Roundup that it was selling, distributing, supplying, manufacturing, and/or promoting to reach – and Roundup did in fact reach – consumers, including Plaintiff's Decedent, without any substantial change in the condition of the product from when it was initially distributed by Defendant.

167.	At all times herein mentioned, the aforesaid product was defective and unsafe in manufacture such that it was unreasonably dangerous to the user, and was so at the time it was

distributed by Defendant and at the times Plaintiff's Decedent was exposed to and/or ingested the product. The defective condition of Roundup was due in part to the fact that it was not accompanied by proper warnings regarding its carcinogenic qualities and possible side effects, including, but not limited to, developing non-Hodgkin's lymphoma as a result of exposure and use.

168.    Roundup did not contain a warning or caution statement, which was necessary and, if complied with, was adequate to protect health those exposed in violation of 7 U.S.C. § 136j(a)(1)(E).

169.    Defendant's failure to include a warning or caution statement which was necessary and, if complied with, was adequate to protect the health of those exposed, violated 7 U.S.C. § 136j(a)(1)(E) as well as the laws of the State of Ohio.

170.    Defendant could have amended the label of Roundup to provide additional warnings.

171.    This defect caused serious injury to Plaintiff's Decedent, who used Roundup in its intended and foreseeable manner.

172.    At all times herein mentioned, Defendant had a duty to properly design, formulate, manufacture, compound, test, inspect, package, label, distribute, market, examine, maintain supply, provide proper warnings, and take such steps to assure that the product did not cause users to suffer from unreasonable and dangerous side effects.

173.    Defendant labeled, distributed, and promoted the aforesaid product in a manner such that it was dangerous and unsafe for the use and purpose for which it was intended.

174.    Defendant failed to warn of the nature and scope of the side effects associated with

Roundup, namely its carcinogenic properties and its propensity to cause or serve as a substantial contributing factor in the development of NHL.

175.    Defendant was aware of the probable consequences of the aforesaid conduct. Despite the fact that Defendant knew or should have known that Roundup caused serious injuries, Defendant failed to exercise reasonable care to warn of the dangerous carcinogenic properties and side effect of developing NHL from Roundup exposure, even though these side effects were known or reasonably scientifically knowable at the time of distribution.    Defendant willfully and deliberately failed to avoid the consequences associated with its failure to warn, and in doing so, Defendant acted with a conscious disregard for the safety of Plaintiff's Decedent.

176.    At the time of exposure, Plaintiff's Decedent could not have reasonably discovered any defect in Roundup prior through the exercise of reasonable care.

177.    Defendant, as the manufacturer and/or distributor of the subject product, is held to the level of knowledge of an expert in the field.

178.    Plaintiff's Decedent reasonably relied upon the skill, superior knowledge, and judgment of Defendant.

179.    Had Defendant properly disclosed the risks associated with Roundup, Plaintiff's Decedent would have avoided the risk of NHL by not using Roundup.

180.    The information that Defendant did provide or communicate failed to contain adequate warnings, instructions and precautions that would have enabled Plaintiff's Decedent, and similarly situated individuals, to utilize the product safely and with adequate protection.  Instead, Defendant disseminated information that was inaccurate, false, and misleading and which failed to communicate accurately or adequately the comparative severity, duration, and extent of the risk

31

of injuries associated with use of and/or exposure to Roundup and glyphosate; continued to promote the efficacy of Roundup, even after it knew or should have known of the unreasonable risks from use or exposure; and concealed, downplayed, or otherwise suppressed, through aggressive marketing and promotion, any information or research about the risks and dangers of exposure to Roundup and glyphosate.

181.    To this day, Defendant has failed to adequately warn of the true risks of Plaintiff's Decedent's injuries associated with the use of and exposure to Roundup.

182.    As a result of its inadequate warnings, Defendant's Roundup products were defective and unreasonably dangerous when they left the possession and/or control of Defendant, were distributed by Defendant, and used by Plaintiff's Decedent.

183.    As a direct and proximate result of the inadequate warnings and instructions provided with Subject Roundup, Plaintiff's Decedent suffered "harm," as defined in Ohio R.C. § 2307.71(A)(7), including but not limited to NHL and severe and personal injuries, physical pain and mental anguish, including diminished enjoyment of life, financial expenses for hospitalization and medical care, including medical expenses and other economic, non-economic damages, and death.

184.    As a direct and proximate result of the inadequate warnings and instructions provided with Subject Roundup, Plaintiff's Decedent's beneficiaries have suffered "harm," as defined in Ohio R.C. § 2307.71(A)(7), including but not limited to the following injuries and damages arising out of the untimely death of Plaintiff's Decedent: loss of support, loss of services, loss of society, loss of prospective inheritance and grief and mental anguish.

185.    Defendant's defective design and formulation of Roundup amounts to willful,

wanton, and/or reckless conduct by Defendant.

186.    Defects in Defendant's Roundup were the cause or a substantial factor in causing Plaintiff's Decedent's and Plaintiff's Decedent's beneficiaries' injuries.

187.    WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in Plaintiff's favor for compensatory damages for the wrongful death and survival claims brought herein, punitive damages, together with interest, costs herein incurred, attorneys' fees and all relief as this Court deems just and proper.  Additionally, Plaintiff demands a jury trial on all issues contained herein.

### THIRD CAUSE OF ACTION
### WRONGFUL DEATH AND SURVIVAL
### FAILURE TO CONFORM TO REPRESENTATIONS – OHIO R.C. § 2307.77

188.    Plaintiff repeats, reiterates, and re-alleges each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect all if more fully set forth herein.

189.    This Third Cause of Action is brought by Plaintiff against Defendant Monsanto with respect to the failure of Roundup to conform to representations made about it, pursuant to Ohio R.C. §2307.77, seeks recovery for Plaintiff's Decedent's pre-death injuries and damages under Ohio R.C. § 2305.21, and for the wrongful death damages sustained by Plaintiff's Decedent's beneficiaries, pursuant to Ohio R.C. 2125, *et seq*.

190.    At all times herein mentioned, the Defendant manufactured, distributed, compounded, recommended, merchandized, advertised, promoted, sold and represented Roundup as a broad spectrum herbicide.  These actions were under the ultimate control and supervision of Defendant.

33

191.     At the time Defendant marketed, sold, and distributed Roundup for use by Plaintiff's Decedent, Defendant knew of Roundup's intended use and impliedly warranted and represented the product to be or merchantable quality and safe and fit for this use.

192.     The Defendant impliedly represented and warranted to Plaintiff's Decedent and users of Roundup, the agricultural community, and/or the EPA that Roundup was safe and of merchantable quality and fit for the ordinary purpose for which it was to be used.

193.     These representations and warranties were false, misleading, and inaccurate in that Roundup was unsafe, unreasonably dangerous, not of merchantable quality, not fit for the purpose of safely serving as a broad spectrum herbicide, and defective.

194.     Plaintiff's Decedent and/or the EPA did rely on said implied representations and warranties of merchantability of fitness for particular use and purpose.

195.     Plaintiff's Decedent reasonably relied upon the skill and judgment of Defendant as to whether Roundup was of merchantable quality and safe and fit for its intended use.

196.     Roundup was injected into the stream of commerce by the Defendant in a defective, unsafe, and unreasonably dangerous condition, and the product's materials were expected to and did reach users, handlers, and persons coming into contact with said product without substantial change in the condition in which it was sold.

197.     The Defendant breached the aforesaid implied warranties, as its herbicide Roundup did not conform to Defendant's representations and was not fit for its intended purposes and uses nor was it merchantable.

198.     As a direct and proximate result of the failure of Roundup to conform to Defendant's representations and warranties, Plaintiff's Decedent suffered "harm," as defined in

Ohio R.C. § 2307.71(A)(7), including but not limited to NHL and severe and personal injuries, physical pain and mental anguish, including diminished enjoyment of life, financial expenses for hospitalization and medical care, including medical expenses and other economic, non-economic damages, and death.

199.    As a direct and proximate result of the failure of Roundup to conform to Defendant's representations and warranties, Plaintiff's Decedent's beneficiaries have suffered "harm," as defined in Ohio R.C. § 2307.71(A)(7), including but not limited to the following injuries and damages arising out of the untimely death of Plaintiff's Decedent: loss of support, loss of services, loss of society, loss of prospective inheritance and grief and mental anguish.

200.    Defendant's failure to ensure that Roundup conformed to the representations made about it amounts to willful, wanton, and/or reckless conduct by Defendant.

201.    Defects in Defendant's Roundup were the cause or a substantial factor in causing Plaintiff's and Plaintiff's Decedent's injuries.

202.    WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in Plaintiff's favor for compensatory damages for his wrongful death and survival claims, punitive damages, together with interest, costs herein incurred, attorneys' fees and all relief as this Court deems just and proper.  Additionally, Plaintiff demands a jury trial on all issues contained herein.

### FOURTH CAUSE OF ACTION
### WRONGFUL DEATH AND SURVIVAL
### COMPENSATORY DAMAGES

203.    Plaintiff repeats, reiterates, and re-alleges each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect all if more fully set forth herein.

204.  As a direct and proximate result of Defendant's tortious conduct, Plaintiff's Decedent developed NHL and subsequently died as a result of complications from such illness. The conduct of Defendant Monsanto, as alleged hereinabove, was a direct, proximate and producing cause of the damages resulting from the Plaintiff's Decedent's illness and death, and of the following general and special damages including, but not limited to, damages for survival and wrongful death claims, that Plaintiff has sustained both as personal representative of the heirs and estate of Decedent:

a.  All damages allowed under Ohio's Wrongful Death and Survival Act, including without limitation damages to punish Defendants for proximately causing Plaintiff's Decedent's untimely death;
b.  The conscious physical pain and suffering and mental anguish sustained by Plaintiff's Decedent's prior to his death;
c.  The physical impairment suffered by Plaintiff's Decedent's prior to his death;
d.  The disfigurement suffered by Plaintiff's Decedent's prior to his death;
e.  Reasonable and necessary medical expenses incurred by Plaintiff's Decedent's and his estate;
f.  Reasonable funeral and burial expenses incurred by Plaintiff's Decedent's Estate;
g.  Loss of earnings suffered by Plaintiff's Decedent during his lifetime;
h.  Pecuniary loss, including the loss of care, maintenance, services, support, advice counsel, and reasonable contributions of a pecuniary value which Plaintiff, and the Wrongful Death beneficiaries would have received from Plaintiff's Decedent had he lived;
i.  Loss of companionship and society, including the loss of the positive benefits flowing from the love, comfort, companionship, consortium, and society that Plaintiff and Decedent's beneficiaries would have received from Plaintiff's had he lived;
j.  The past and future mental anguish suffered by the Plaintiff and/or any other proper Wrongful Death Act beneficiaries as a consequence of observing the last illnesses and death of the Decedent; and
k.  Reasonable attorney's fees.

205.  Plaintiff seeks all elements of damages, in the past and in the future, permitted under the law from the Defendants including, but not limited to, claims for medical and/or hospitalization care, mental anguish, pain and suffering, personal injuries, torment, loss of

earnings, lost earning capacity, loss of support, loss of companionship, loss of consortium, physical impairment, disfigurement, loss of household services, and all said damages in an amount that Plaintiff would show that she is entitled to at the time of trial.  Finally, Plaintiff asserts a claim for costs of court and pre-judgment and post-judgment interest allowed under Ohio law.

### FIFTH CAUSE OF ACTION
### WRONGFUL DEATH AND SURVIVAL
### PUNITIVE DAMAGES

206.    Plaintiff repeats, reiterates, and re-alleges each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect all if more fully set forth herein.

207.    Defendant Monsanto had a duty to refrain from willful and wanton acts, omissions and/or misconduct which would foreseeably expose Plaintiff's Decedent to an unreasonable risk of harm and injury, including exposure to cancer-causing Roundup.

208.    Upon information and belief, Monsanto breached its duties and committed one or more of the following acts or omission amounting to willful and wanton misconduct, in that they acted with reckless disregard for the health, safety and well-being of the Plaintiff and others similarly situated by:

> a. Having actual knowledge of the defective condition and/or hazards of the Roundup yet acting in a way that contributed to Plaintiff's Decedent's injuries for material gain;
> b. Designing, manufacturing, selling, distributing, marketing, and/or otherwise placing into the stream of commerce the Roundup which posed an unreasonable risk causing NHL in its users and consumers, despite knowledge of the product's dangerous, defective condition;
> c. Failing to provide any adequate warnings or hazard communications to users and consumers purchasing or using Roundup;
> d. Making misrepresentations which indicated that Roundup was reasonably safe for use and/or storage;
> e. Failing to disclose, and/or concealing, information in their respective

possession concerning the risks to users and consumers Roundup would cause NHL and illness; and

f.  In such other particulars as the evidence may show.

209.  Upon information and belief, as a direct and proximate result of one or more of the foregoing willful and wanton acts/and or omissions on the part of the Defendants, Plaintiff's Decedent was exposed to the defective Roundup, which directly and proximately resulted in his contracting NHL, and, subsequently, his death and his injuries and damages described herein.

210.  An award of punitive damages is necessary and appropriate to punish Defendant for its willful, wanton and/or intentional misconduct and/or reckless disregard for the health, safety and well-being of Plaintiff's Decedent and others and to deter said Defendant and others similarly situated from engaging in like misconduct in the future.

**211.**  Plaintiff therefore seeks punitive or exemplary damages in an amount within the discretion of the jury sufficient to deter and punish Defendant.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands judgment against the Defendant on each of the above-referenced claims and causes of action and as follows:

1.  Awarding compensatory damages in excess of the jurisdictional amount, including, but not limited to pain, suffering, emotional distress, loss of enjoyment of life, and other non-economic damages for Plaintiff's Decedent's pre-death injuries an amount to be determined at trial of this action;

2.  Awarding compensatory damages to Plaintiff's Decedent's beneficiaries for, *inter alia*, loss of support, loss of services, loss of society, loss of prospective inheritance and grief and mental anguish;

3.  Awarding economic damages in the form of medical expenses, out of pocket expenses, lost earnings and other economic damages in an amount to be determine at trial of this action;

4.  Punitive and/or exemplary damages for the wanton, willful, fraudulent, and

reckless acts of the Defendant who demonstrated a complete disregard and reckless indifference for the safety and welfare of the general public and to the Plaintiff in an amount sufficient to punish Defendant and deter future similar conduct, to the extent allowed by applicable law;

5.     Pre-judgment interest;

6.     Post-judgment interest;

7.     Awarding Plaintiff reasonable attorneys' fees;

8.     Awarding Plaintiff the costs of these proceedings; and

9.     Such other and further relief as this Court deems just and proper.

Respectfully submitted,
/s/ *Steven M. Goldberg*
Steven M. Goldberg (41344)
**GOLDBERG LEGAL CO., LPA**
Solon Business Campus
31300 Solon Road - Suite 12
Solon, Ohio 44139
P: 440.519.9900
E: steven@goldberglpa.com
*Counsel for Plaintiff*

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands trial by jury as to all issues.

Dated: December 10, 2021

Respectfully submitted,
/s/ *Steven M. Goldberg*
Steven M. Goldberg (41344)
**GOLDBERG LEGAL CO., LPA**