**Query**   **Reports**   **Utilities**   **Help**   **Log Out**

ACCO,(AGRx),DISCOVERY,MANADR

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA (Western Division - Los Angeles)
# CIVIL DOCKET FOR CASE #: 2:22-cv-01033-FLA-AGR

| | |
|---|---|
| Sofia Manukyan v. Monsanto Company et al | Date Filed: 02/15/2022 |
| Assigned to: Judge Fernando L. Aenlle-Rocha | Jury Demand: Both |
| Referred to: Magistrate Judge Alicia G. Rosenberg | Nature of Suit: 365 Personal Inj. Prod. |
| Case in other court: Los Angeles Superior Court, | Liability |
| 22STCV04964 | Jurisdiction: Diversity |
| Cause: 28:1446pl Notice of Removal - Product Liability | |

**Plaintiff**

**Sofia Manukyan**                      represented by   **Areg Allen Sarkissian**
*an individual*                                          Sarkissian Law Group
                                                         Encino Office Park 1
                                                         6345 Balboa Boulevard Suite 114
                                                         Encino, CA 91316
                                                         818-827-5199
                                                         Email: areg@sarkissianlawgroup.com
                                                         *LEAD ATTORNEY*
                                                         *ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Monsanto Company**                    represented by   **Ryan S Killian**
                                                         Shook Hardy and Bacon LLP
                                                         600 Travis Street Suite 3400
                                                         Houston, TX 77002
                                                         713-227-8008
                                                         Fax: 713-227-9508
                                                         Email: rkillian@shb.com
                                                         *LEAD ATTORNEY*
                                                         *ATTORNEY TO BE NOTICED*

**Defendant**

**Does**
*1 through 100, inclusive*

| Date Filed | # | Docket Text |
|---|---|---|
| 02/15/2022 | 1 | |

| | | NOTICE OF REMOVAL from Los Angeles, case number 22STCV04964 Receipt No: ACACDC-32795893 - Fee: $402, filed by Defendant Monsanto Company. (Attachments: # 1 Exhibit Exhibits 1-6) (Attorney Ryan S Killian added to party Monsanto Company(pty:dft))(Killian, Ryan) (Entered: 02/15/2022) |
|---|---|---|
| 02/15/2022 | 2 | CIVIL COVER SHEET filed by Defendant Monsanto Company. (Killian, Ryan) (Entered: 02/15/2022) |
| 02/15/2022 | 3 | CERTIFICATE of Interested Parties filed by Defendant Monsanto Company, identifying Monsanto Company, Bayer AG. (Killian, Ryan) (Entered: 02/15/2022) |
| 02/15/2022 | 4 | CORPORATE DISCLOSURE STATEMENT filed by Defendant Monsanto Company identifying Bayer AG as Corporate Parent. (Killian, Ryan) (Entered: 02/15/2022) |
| 02/15/2022 | 5 | PROOF OF SERVICE filed by Defendant Monsanto Company, re Certificate/Notice of Interested Parties 3 , Notice of Removal (Attorney Civil Case Opening), 1 , Civil Cover Sheet (CV-71) 2 , Corporate Disclosure Statement 4 served on February 15, 2022. (Killian, Ryan) (Entered: 02/15/2022) |
| 02/15/2022 | 6 | NOTICE OF ASSIGNMENT to District Judge Fernando L Aenlle-Rocha and Magistrate Judge Alicia G. Rosenberg. (ghap) (Entered: 02/15/2022) |
| 02/15/2022 | 7 | NOTICE TO PARTIES OF COURT-DIRECTED ADR PROGRAM filed. (ghap) (Entered: 02/15/2022) |
| 02/15/2022 | 8 | Notice to Counsel Re Consent to Proceed Before a United States Magistrate Judge. (ghap) (Entered: 02/15/2022) |
| 02/15/2022 | | CONFORMED FILED COPY OF COMPLAINT against Defendants Does 1 through 100, inclusive, Monsanto Company. Jury Demanded., filed by plaintiff Sofia Manukyan. (FILED IN STATE COURT ON 2/9/2022 SUBMITTED ATTACHED EXHIBIT 1) (ghap) (Entered: 02/15/2022) |
| 02/15/2022 | | NON CONFORM COPY OF ANSWER to Complaint - (Discovery) filed by Defendant Monsanto Company. (SUBMITTED ATTACHED EXHIBIT 5)(ghap) (Entered: 02/15/2022) |

| PACER Service Center | | | |
|---|---|---|---|
| Transaction Receipt | | | |
| 02/16/2022 06:49:37 | | | |
| PACER Login: | sh0019sh | Client Code: | 31943.356965 |
| Description: | Docket Report | Search Criteria: | 2:22-cv-01033-FLA-AGR End date: 2/16/2022 |
| Billable Pages: | 2 | Cost: | 0.20 |

Electronically FILED by Superior Court of California, County of Los Angeles on 02/09/2022 12:23 PM Sherri R. Carter, Executive Officer/Clerk of Court, by N. Alvarez,Deputy Clerk

Case 2:22-cv-01063-TJH Document 1-2 Filed 02/16/22 Page 3 of 31 Page ID #:8

Assigned for all purposes to: Spring Street Courthouse, Judicial Officer: Serena Murillo

Areg A. Sarkissian, Esq. SBN 276797
**SARKISSIAN LAW GROUP**
Encino Office Park 1
6345 Balboa Blvd., Ste. 114
Encino, CA 91316
Tel: 818.827.5199
areg@sarkissianlawgroup.com

Attorney for Plaintiff

## SUPERIOR COURT OF THE STATE OF CALIFORNIA

## FOR THE COUNTY OF LOS ANGELES, STANLEY MOSK COURTHOUSE

| | |
|---|---|
| SOFIA MANUKYAN, an individual, | CASE NO. 22STCV04964 |
| Plaintiff, | COMPLAINT FOR: |
| vs. | 1. NEGLIGENCE; |
| MONSANTO COMPANY, and DOES 1 through 100, inclusive, | 2. STRICT PRODUCTS LIABILITY – DESIGN DEFECT; |
| Defendant. | 3. STRICT PRODUCTS LIABILITY – FAILURE TO WARN; |
| | 4. BREACH OF IMPLIED WARRANTIES; |

///

///

**COMES NOW** Plaintiff and alleges as follows:

1

## NATURE OF THE CASE

2  1. This is an action for damages suffered by Plaintiff as a direct and proximate result of

3  Defendants' negligent and wrongful conduct in connection with the design, development,

4  manufacture, testing, packaging, promoting, marketing, advertising, distribution, labeling,

5  and/or sale of the herbicide Roundup®, containing the active ingredient glyphosate.

6

7  2. Plaintiff maintains that Roundup® and/or glyphosate is defective, dangerous to human

8  health, unfit and unsuitable to be marketed and sold in commerce and lacked proper warnings

9  and directions as to the dangers associated with its use.

10  3. Plaintiff's injuries, like those striking thousands of similarly situated victims across the

11  country, were avoidable.

12

13  ## JURISDICTION AND VENUE

14  4. Plaintiff resides in the real property involved herein, which is located at 14156 Tiara St. Apt

15  1 Van Nuys CA 91401 recognized as the location of Plaintiff's personal injury, situated

16  within the above-captioned judicial district and county.

17

18  5. Venue is proper in this Court as the location of the premises is within the jurisdiction of this

19  court.

20  ## PARTIES

21

22  6. Plaintiff, SOFIA MANUKYAN (Herein "Plaintiff") is a natural person and at all relevant

23  times a resident and citizen of Los Angeles County, California. Plaintiff brings this action

24  for personal injuries sustained by exposure to Roundup® ("Roundup") containing the

25  active ingredient glyphosate and the surfactant POEA. As a direct and proximate result of

26  being exposed to Roundup, Plaintiff developed non-Hodgkin's Lymphoma.

27

28

7. "Roundup" refers to all formulations of Defendants' Roundup products, including, but not limited to, Roundup Concentrate Poison Ivy and Tough Brush Killer 1, Roundup Custom Herbicide, Roundup D-Pak herbicide, Roundup Dry Concentrate, Roundup Export Herbicide, Roundup Fence & Hard Edger 1, Roundup Garden Foam Weed & Grass Killer, Roundup Grass and Weed Killer, Roundup Herbicide, Roundup Original 2k herbicide, Roundup Original II Herbicide, Roundup Pro Concentrate, Roundup Prodry Herbicide, Roundup Promax, Roundup Quik Stik Grass and Weed Killer, Roundup Quikpro Herbicide, Roundup Rainfast Concentrate Weed & Grass Killer, Roundup Rainfast Super Concentrate Weed & Grass Killer, Roundup Ready-to-Use Extended Control Weed & Grass Killer 1 Plus Weed Preventer, Roundup Ready-to-Use Weed & Grass Killer, Roundup Ready-to-Use Weed and Grass Killer 2, Roundup Ultra Dry, Roundup Ultra Herbicide, Roundup Ultramax, Roundup VM Herbicide, Roundup Weed & Grass Killer Concentrate, Roundup Weed & Grass Killer Concentrate Plus, Roundup Weed & Grass killer Ready-to-Use Plus, Roundup Weed & Grass Killer Super Concentrate, Roundup Weed & Grass Killer1 Ready-to-Use, Roundup WSD Water Soluble Dry Herbicide Deploy Dry Herbicide, or any other formulation of containing the active ingredient glyphosate.

8. Defendant, MONSANTO COMPANY (Herein "Defendant") is a Delaware corporation, California Secretary of State Entity No. C2362863, in "active" status, with a principal place of business in St. Louis, Missouri.

9. The true names and capacities of Defendant MONSANTO COMPANY and Does 1-100 inclusive, are unknown to Plaintiff, who therefore sues said Defendant by such fictitious names. Plaintiff is informed and believes and thereon alleges that each Defendant designated herein as a fictitiously named Defendant is in some manner responsible for the events and

happenings herein referred to, either contractually or tortiously, and caused the damage to the Plaintiff as herein alleged. When Plaintiff ascertains the true names and capacities of DOES 1-100, inclusive, it will ask leave of this Court to amend its Complaint by setting forth the same.

10. Defendant MONSANTO COMPANY and DOES 1-100 are collectively referred to as "Defendants."

11. Defendants advertise and sell goods, specifically Roundup, in Los Angeles County, California.

12. Defendants transacted and conducted business within the State of California that relates to the allegations in this Complaint.

13. Defendants derived substantial revenue from goods and products used in the State of California.

14. Defendants expected or should have expected their acts to have consequences within the State of California and derived substantial revenue from interstate commerce.

15. Defendants engaged in the business of designing, developing, manufacturing, testing, packaging, marketing, distributing, labeling, and/or selling Roundup.

16. Defendants are authorized to do business in California and derive substantial income from doing business in this state.

17. Upon information and belief, Defendants purposefully availed themselves of the privilege of conducting activities with the State of California, thus invoking the benefits and protections of its laws.

1  18. Upon information and belief, Defendants did act together to design, sell, advertise,
2      manufacture and/or distribute Roundup, with full knowledge of its dangerous and defective
3      nature.

4                              **FACTUAL ALLEGATIONS**
5
6  19. At all relevant times, Defendants were in the business of, and did, design, research,
7      manufacture, test, advertise, promote, market, sell, distribute, and/or have acquired and are
8      responsible for Defendants who have designed, researched, manufactured, tested,
9      advertised, promoted, marketed, sold, and distributed the commercial herbicide Roundup.
10 20. Monsanto is a multinational agricultural biotechnology corporation based in St. Louis,
11     Missouri. It is the world's leading producer of glyphosate.
12
13 21. Defendants discovered the herbicidal properties of glyphosate during the 1970's and
14     subsequently began to design, research, manufacture, sell and distribute glyphosate based
15     "Roundup" as a broad-spectrum herbicide.
16 22. Glyphosate is the active ingredient in Roundup.
17 23. Glyphosate is a broad-spectrum herbicide used to kill weeds and grasses known to compete
18     with commercial crops grown around the globe.
19 24. Glyphosate is a "non-selective" herbicide, meaning it kills indiscriminately based only on
20     whether a given organism produces a specific enzyme, 5-enolpyruvylshikimic acid-3-
21     phosphate synthase, known as EPSP synthase.
22 25. Glyphosate inhibits the enzyme 5-enolpyruvylshikimic acid-3-phosphate synthase that
23     interferes with the shikimic pathway in plants, resulting in the accumulation of shikimic
24     acid in plant tissue and ultimately plant death.

26. Sprayed as a liquid, plants absorb glyphosate directly through their leaves, stems, and roots, and detectable quantities accumulate in the plant tissues.

27. Each year, approximately 250 million pounds of glyphosate are sprayed on crops, commercial nurseries, suburban lawns, parks, and golf courses. This increase in use has been driven largely by the proliferation of genetically engineered crops, crops specifically tailored to resist the activity of glyphosate.

28. Defendants are intimately involved in the development, design, manufacture, marketing, sale, and/or distribution of genetically modified ("GMO") crops, many of which are marketed as being resistant to Roundup i.e., "Roundup Ready®." As of 2009, Defendants were the world's leading producer of seeds designed to be Roundup Ready®. In 2010, an estimated 70% of corn and cotton, and 90% of soybean fields in the United States contained Roundup Ready® seeds.

29. For nearly 40 years, farms across the world have used Roundup® without knowing of the dangers its use poses. That is because when Monsanto first introduced Roundup®, it touted glyphosate as a technological breakthrough: it could kill almost every weed without causing harm either to people or to the environment. Of course, history has shown that not to be true. According to the WHO, the main chemical ingredient of Roundup®—glyphosate—is a probable cause of cancer. Those most at risk are farm workers and other individuals with workplace exposure to Roundup®, such as workers in garden centers, nurseries, and landscapers. Agricultural workers are, once again, victims of corporate greed.

## REGISTRATION OF HERBICIDES UNDER FEDERAL LAW

30. The manufacture, formulation and distribution of herbicides, such as Roundup, are regulated under the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA"), 7. U.S.C. § 136 *et seq*. FIFRA requires that all pesticides be registered with the Environmental Protection Agency ("EPA) prior to their distribution, sale, or use, except as described by FIFRA 7 U.S.C. 136a(a).

31. The EPA requires as part of the registration process, among other requirements, a variety of tests to evaluate the potential for exposure to pesticides, toxicity to people and other potential non-target organisms, and other adverse effects on the environment. Registration by the EPA, however, is not an assurance or finding of safety. The determination the EPA makes in registering or re-registering a product is not that the product is "safe," but rather that use of the product in accordance with its label directions "will not generally cause unreasonable adverse effects on the environment." 7 U.S.C. § 136(a)(c)(5)(D).

32. FIFRA defines "unreasonable adverse effects on the environment" to mean "any unreasonable risk to man or the environment, taking into account the economic, social, and environmental costs and benefits of the use of any pesticide." 7 U.S.C. § 136(bb). FIFRA thus requires the EPA to make a risk/benefit analysis in determining whether a registration should be granted or allowed to continue to be sold in commerce.

33. The EPA and the State of California registered Roundup for distribution, sale, and manufacture in the United States and the State of California.

34. FIFRA generally requires that the registrant, Monsanto, conduct health and safety testing of pesticide products. The government is not required, nor is it able, to perform the product tests that are required of the manufacturer.

COMPLAINT FOR DAMAGES
- 7 -

35. The evaluation of each pesticide product distributed, sold, or manufactured is completed at the time the product is initially registered. The data necessary for registration of a pesticide has changed over time. The EPA is now in the process of re-evaluating all pesticide products through a Congressionally mandated process called "re-registration." 7 U.S.C. § 136a-1. In order to reevaluate these pesticides, the EPA demands the completion of additional tests and the submission of data for the EPA's review and evaluation.

36. In the case of glyphosate and Roundup, the EPA had planned on releasing its preliminary risk assessment – in relation to the registration process – no later than July 2015. The EPA completed its review of glyphosate in early 2015 but delayed releasing the assessment pending further review in light of the World Health Organization's findings.

## MONSANTO'S FALSE REPRESENTATIONS REGARDING THE SAFETY OF ROUNDUP®

37. In 1996, the New York Attorney General ("NYAG") filed a lawsuit against Monsanto based on its false and misleading advertising of Roundup products. Specifically, the lawsuit challenged Monsanto's general representations that its spray-on glyphosate-based herbicides, including Roundup, were "safer **than table salt**" and "practically **non-toxic**" to mammals, birds, and fish. Among the representations the NYAG found deceptive and misleading about the human and environmental safety of Roundup are the following:

   a. Remember that environmentally friendly Roundup herbicide is biodegradable. It won't build up in the soil so you can use Roundup with confidence along customers' driveways, sidewalks and fences.

b. And remember that Roundup is biodegradable and won't build up in the soil. That will give you the environmental confidence you need to use Roundup everywhere you've got a weed, brush, edging or trimming problem.

c. Roundup biodegrades into naturally occurring elements.

d. Remember that versatile Roundup herbicide stays where you put it. That means there's no washing or leaching to harm customers' shrubs or other desirable vegetation.

e. This non-residual herbicide will not wash or leach in the soil. It ... stays where you apply it.

f. You can apply Accord with "confidence because it will stay where you put it" it bonds tightly to soil particles, preventing leaching. Then, soon after application, soil microorganisms biodegrade Accord into natural products.

g. Glyphosate is less toxic to rats than table salt following acute oral ingestion.

h. Glyphosate's safety margin is much greater than required. It has over a 1,000-fold safety margin in food and over a 700-fold safety margin for workers who manufacture it or use it.

i. "Roundup can be used where kids and pets will play and breaks down into natural material." This ad depicts a person with his head in the ground and a pet dog standing in an area which has been treated with Roundup.

38. On November 19, 1996, Monsanto entered into an Assurance of Discontinuance with NYAG, in which Monsanto agreed, among other things, "to cease and desist from publishing or broadcasting any advertisements [in New York] that represent, directly or by implication.

39. Monsanto did not alter its advertising in the same manner in any state other than New York, and on information and belief still has not done so today.

40. In 2009, France's highest court ruled that Monsanto had not told the truth about the safety of Roundup. The French court affirmed an earlier judgment that Monsanto had falsely advertised its herbicide Roundup as "biodegradable" and that it "left the soil clean."

## EVIDENCE OF CARCINOGENICITY IN ROUNDUP

41. As early as the 1980's Monsanto was aware of glyphosate's carcinogenic properties.

42. On March 4, 1985, a group of the Environmental Protection Agency's ("EPA") Toxicology Branch published a memorandum classifying glyphosate as a Category C oncogene. Category C oncogenes are possible human carcinogens with limited evidence of carcinogenicity.

43. In 1986, the EPA issued a Registration Standard for glyphosate (NTIS PB87-103214). The Registration standard required additional phytotoxicity, environmental fate, toxicology, product chemistry, and residue chemistry studies. All of the data required was submitted and reviewed and/or waived.

44. In October 1991 the EPA published a Memorandum entitled "Second Peer Review of Glyphosate." The memorandum changed glyphosate's classification to Group E (evidence of non-carcinogenicity for humans). Two peer review committee members did not concur with the conclusions of the committee and one member refused to sign.

45. In addition to the toxicity of the active molecule, many studies support the hypothesis that glyphosate formulations found in Defendants' Roundup products are more dangerous and toxic than glyphosate alone. As early as 1991 evidence existed demonstrating that glyphosate formulations were significantly more toxic than glyphosate alone.

46. Defendants knew or should have known that Roundup is more toxic than glyphosate alone and that safety studies on Roundup, Roundup's adjuvants and "inert" ingredients, and/or the surfactant POEA were necessary to protect Plaintiff from Roundup.

47. Defendants knew or should have known that tests limited to Roundup's active ingredient glyphosate were insufficient to prove the safety of Roundup.

48. Defendants failed to appropriately and adequately test Roundup, Roundup's adjuvants and "inert" ingredients, and/or the surfactant POEA to protect Plaintiff from Roundup.

49. Rather than performing appropriate tests, Defendants relied upon flawed industry-supported studies designed to protect Defendants' economic interests rather than Plaintiff and the consuming public.

50. Despite their knowledge that Roundup was considerably more dangerous than glyphosate alone, Defendants continued to promote Roundup as safe.

## IARC CLASSIFICATION OF GLYPHOSATE

51. The International Agency for Research on Cancer ("IARC") is the specialized intergovernmental cancer agency the World Health Organization ("WHO") of the United Nations tasked with conducting and coordinating research into the causes of cancer.

52. An IARC Advisory Group to Recommend Priorities for IARC Monographs during 2015– 2019 met in April 2014. Though nominations for the review were solicited, a substance must meet two criteria to be eligible for review by the IARC Monographs: there must already be some evidence of carcinogenicity of the substance, and there must be evidence that humans are exposed to the substance.

53. IARC set glyphosate for review in 2015-2016. IARC uses five criteria for determining priority in reviewing chemicals. The substance must have a potential for direct impact on

1  public health; scientific literature to support suspicion of carcinogenicity; evidence of

2  significant human exposure; high public interest and/or potential to bring clarity to a

3  controversial area and/or reduce public anxiety or concern; related agents similar to one

4  given high priority by the above considerations. Data reviewed is sourced preferably from

5  publicly accessible, peer-reviewed data.

6  54. On March 24, 2015, after its cumulative review of human, animal, and DNA studies for more

7  than one (1) year, many of which have been in Defendants' possession since as early as 1985,

8  the IARC's working group published its conclusion that the glyphosate contained in

9  

10  Defendants' Roundup herbicide, is a Class 2A "probable carcinogen" as demonstrated by the

11  mechanistic evidence of carcinogenicity in humans and sufficient evidence of carcinogenicity

12  in animals.

13  55. The IARC's full Monograph was published on July 29, 2015, and established glyphosate as a

14  class 2A probable carcinogen to humans. According to the authors glyphosate demonstrated

15  

16  sufficient mechanistic evidence (genotoxicity and oxidative stress) to warrant a 2A

17  classification based on evidence of carcinogenicity in humans and animals.

18  56. The IARC Working Group found an increased risk between exposure to glyphosate and non-

19  Hodgkin's lymphoma ("NHL") and several subtypes of NHL, and the increased risk

20  continued after adjustment for other pesticides.

21  57. The IARC also found that glyphosate caused DNA and chromosomal damage in human cells.

22  

23  ### PLAINTIFF'S EXPOSURE TO ROUNDUP

24  58. Plaintiff used Roundup beginning in the 1990's while gardening and caring for the lawn of

25  her property. This was primarily used to control the weeds on her properties.

26  

27  

28

59. For many years, Plaintiff purchased Roundup from local hardware stores and sprayed Roundup on a regular basis to kill weeds on numerous residential properties. Plaintiff followed all safety and precautionary warnings during the course of use.

60. Plaintiff worked on his primary residence, specifically her yard on a regular basis, therefore consistently being exposed to Roundup.

61. Plaintiff was subsequently diagnosed with stage two large B-cell Non-Hodgkin's Lymphoma on or about early 2014 at the age of 77. This type of lymphoma is a common type of non-Hodgkin's lymphoma and is considered an aggressive cancer.

62. From the years 2014-2016 years, Plaintiff battled Non-Hodgkin's Lymphoma and went through the treatment of chemotherapy at City of Hope Pasadena.

63. Plaintiff went into remission for the first time in 2016. Plaintiff was monitored for possible complications from the chemotherapy and for other types of lymphomas, because a personal history of lymphomas is an increased risk for other lymphomas.

64. During her follow-up at City of Hope in the year 2020, Plaintiff completed a CAT scan and physical exam. It was then noted that her non-Hodgkin's lymphoma re-emerged.

65. Plaintiff is currently in remission. Plaintiff is being monitored for possible complications from the chemotherapy and for other types of lymphomas, because a personal history of lymphomas is an increased risk for other lymphomas.

66. As a result of her injury, Plaintiff has incurred significant economic and non-economic damages.

## FIRST CAUSE OF ACTION
## (NEGLIGENCE)

67. Plaintiff incorporates and re-alleges the allegations of paragraphs 1 through 65 above, as though set forth fully herein

COMPLAINT FOR DAMAGES
- 13 -

68. Defendants had a duty to exercise reasonable care in the designing, researching, testing, manufacturing, marketing, supplying, promoting, packaging, sale, and/or distribution of Roundup into the stream of commerce, including a duty to assure that the product would not cause users to suffer unreasonable, dangerous side effects.

69. Defendants failed to exercise ordinary care in the designing, researching, testing, manufacturing, marketing, supplying, promoting, packaging, sale, testing, quality assurance, quality control, and/or distribution of Roundup into interstate commerce in that Defendants knew or should have known that using Roundup created a high risk of unreasonable, dangerous side effects, including, but not limited to, the development of NHL, as well as other severe and personal injuries which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life, as well as need for lifelong medical treatment, monitoring, and/or medications.

70. The negligence by the Defendants, their agents, servants, and/or employees, included but was not limited to the following acts and/or omissions:

   a. Manufacturing, producing, promoting, formulating, creating, and/or designing Roundup without thoroughly testing it;

   b. Failing to test Roundup and/or failing to adequately, sufficiently, and properly test Roundup;

   c. Not conducting sufficient testing programs to determine whether or not Roundup was safe for use; in that Defendants herein knew or should have known that Roundup was unsafe and unfit for use by reason of the dangers to its users;

d. Not conducting sufficient testing programs and studies to determine Roundup's carcinogenic properties even after Defendants had knowledge that Roundup is, was, or could be carcinogenic;

e. Failing to conduct sufficient testing programs to determine the safety of "inert" ingredients and/or adjuvants contained within Roundup, and the propensity of these ingredients to render Roundup toxic, increase the toxicity of Roundup, whether these ingredients are carcinogenic, magnify the carcinogenic properties of Roundup, and whether or not "inert" ingredients and/or adjuvants were safe for use;

f. Negligently failing to adequately and correctly warn the Plaintiff, the public, the medical and agricultural professions, and the EPA of the dangers of Roundup;

g. Negligently failing to petition the EPA to strength the warnings associated with Roundup;

h. Failing to provide adequate cautions and warnings to protect the health of users, handlers, applicators, and persons who would reasonably and foreseeably come into contact with Roundup;

i. Negligently marketing, advertising, and recommending the use of Roundup without sufficient knowledge as to its dangerous propensities;

j. Negligently representing that Roundup was safe for use for its intended purpose, and/or that Roundup was safer than ordinary and common items such as table salt, when, in fact, it was unsafe;

k. Negligently representing that Roundup had equivalent safety and efficacy as other forms of herbicides;

l. Negligently designing Roundup in a manner, which was dangerous to its users;

m. Negligently manufacturing Roundup in a manner, which was dangerous to its users;

n. Negligently producing Roundup in a manner, which was dangerous to its users;

o. Negligently formulating Roundup in a manner, which was dangerous to its users;

p. Concealing information from the Plaintiff while knowing that Roundup was unsafe, dangerous, and/or non-conforming with EPA regulations; and

q. Improperly concealing and/or misrepresenting information from the Plaintiff, scientific and medical professionals, and/or the EPA, concerning the severity of risks and dangers of Roundup compared to other forms of herbicides.

r. Negligently selling Roundup with a false and misleading label.

71. Defendants under-reported, underestimated, and downplayed the serious dangers of Roundup

72. Defendants negligently and deceptively compared the safety risks and/or dangers of Roundup with common everyday foods such as table salt, and other forms of herbicides.

73. Defendants were negligent and/or violated California law in the designing, researching, supplying, manufacturing, promoting, packaging, distributing, testing, advertising, warning, marketing, and selling of Roundup in that they:

a. Failed to use ordinary care in designing and manufacturing Roundup so as to avoid the aforementioned risks to individuals when Roundup was used as an herbicide;

b. Failed to accompany their product with proper and/or accurate warnings regarding all possible adverse side effects associated with the use of Roundup;

c. Failed to accompany their product with proper warnings regarding all possible adverse side effects concerning the failure and/or malfunction of Roundup;

d. Failed to accompany their product with accurate warnings regarding the risks of all possible adverse side effects concerning Roundup;

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

     e. Failed to warn Plaintiff of the severity and duration of such adverse effects, as the warnings given did not accurately reflect the symptoms, or severity of the side effects including, but not limited to, the development of NHL;

     f. Failed to conduct adequate testing, clinical testing and post-marketing surveillance to determine the safety of Roundup;

     g. Failed to conduct adequate testing, clinical testing, and post-marketing surveillance to determine the safety of Roundup's "inert" ingredients and/or adjuvants;

     h. Negligently misrepresented the evidence of Roundup's genotoxicity and carcinogenicity;

     i. Were otherwise careless and/or negligent.

74. Despite the fact that Defendants knew or should have known that Roundup caused, or could cause, unreasonably dangerous side effects, Defendants continued and continue to market, manufacture, distribute, and/or sell Roundup to consumers, including the Plaintiff.

75. Defendants knew or should have known that consumers such as the Plaintiff would foreseeably suffer injury as a result of Defendants' failure to exercise ordinary care, as set forth above.

76. Defendants' violations of law and/or negligence were the proximate cause of Plaintiff's injuries, harm and economic loss, which Plaintiff suffered and/or will continue to suffer.

77. As a result of the foregoing acts and omissions, the Plaintiff suffered from serious and dangerous side effects including, but not limited to, NHL, as well as other severe and personal injuries which are permanent and lasting in nature, physical pain and mental anguish, diminished enjoyment of life, and financial expenses for hospitalization and medical care. Further, Plaintiff suffered life-threatening NHL, and severe personal injuries, which are

permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life.

78. WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in Plaintiff's favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all relief as this Court deems just and proper. Additionally, Plaintiff demands a jury trial on all issues contained herein.

## SECOND CAUSE OF ACTION
## (STRICT PRODUCTS LIABILITY – DESIGN DEFECT)

79. Plaintiff incorporates and re-alleges the allegations of paragraphs 1 through 77 above, as though set forth fully herein

80. At all times herein mentioned, the Defendants designed, researched, manufactured, tested, advertised, promoted, sold, distributed, and/or have acquired the Defendants who have designed, researched, tested, advertised, promoted, marketed, sold, and distributed Roundup as hereinabove described that was used by the Plaintiff.

81. Defendants' Roundup was expected to and did reach the usual consumers, handlers, and persons coming into contact with said product without substantial change in the condition in which it was produced, manufactured, sold, distributed, and marketed by the Defendants.

82. At those times, Roundup was in an unsafe, defective, and inherently dangerous condition, which was dangerous to users, and in particular, the Plaintiff herein.

83. The Roundup designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed by Defendants was defective in design or formulation in that, when it left the hands of the manufacturer and/or suppliers, the foreseeable risks exceeded the benefits associated with the design or formulation of Roundup.

84. The Roundup designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed by Defendants was defective in design and/or formulation, in that, when it left the hands of the Defendants manufacturers and/or suppliers, it was unreasonably dangerous, unreasonably dangerous in normal use, and it was more dangerous than an ordinary consumer would expect.

85. At all times herein mentioned, Roundup was in a defective condition and unsafe, and Defendants knew or had reason to know that said product was defective and unsafe, especially when used in the form and manner as provided by the Defendants. In particular, Defendants' Roundup was defective in the following ways:

    a. When placed in the stream of commerce, Defendants' Roundup Products were defective in design and formulation and, consequently, dangerous to an extent beyond that which an ordinary consumer would anticipate.

    b. When placed in the stream of commerce, Defendants' Roundup products were unreasonably dangerous in that they were hazardous and posed a grave risk of cancer and other serious illnesses when used in a reasonably anticipated manner.

    c. When placed in the stream of commerce, Defendants' Roundup products contained unreasonably dangerous design defects and were not reasonably safe when used in a reasonably anticipated manner.

    d. Defendants did not sufficiently test, investigate, or study its Roundup products.

    e. Exposure to Roundup presents a risk of harmful side effects that outweigh any potential utility stemming from the use of the herbicide.

f. Defendants new or should have known at the time of marketing its Roundup products that exposure to Roundup and could result in cancer and other severe illnesses and injuries.

g. Defendants did not conduct adequate post-marketing surveillance of its Roundup products.

86. Defendants knew or should have known that at all times herein mentioned its Roundup was in a defective condition and was and is inherently dangerous and unsafe.

87. Plaintiff was exposed to Defendants' Roundup while gardening and caring for the lawn of his property as described above, without knowledge of Roundup's dangerous characteristics.

88. At the time of the Plaintiff's use of and exposure to Roundup, Roundup was being used for the purposes and in a manner normally intended, as a broad-spectrum herbicide.

89. Defendants with this knowledge voluntarily designed its Roundup with a dangerous condition for use by the public, and in particular the Plaintiff.

90. Defendants had a duty to create a product that was not unreasonably dangerous for its normal, intended use.

91. Defendants created a product that was and is unreasonably dangerous for its normal, intended use.

92. Defendants marketed and promoted a product in such a manner so as to make it inherently defective as the product downplayed its suspected, probable, and established health risks inherent with its normal, intended use.

93. The Roundup designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed by Defendants was manufactured defectively in that Roundup left the

hands of Defendants in a defective condition and was unreasonably dangerous to its intended users.

94. The Roundup designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed by Defendants reached their intended users in the same defective and unreasonably dangerous condition in which the Defendants' Roundup was manufactured.

95. Defendants designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed a defective product, which created an unreasonable risk to the health of consumers and to the Plaintiff in particular, and Defendants are therefore strictly liable for the injuries sustained by the Plaintiff.

96. The Plaintiff could not, by the exercise of reasonable care, have discovered Roundup's defects herein mentioned or perceived its danger.

97. By reason of the foregoing, the Defendants have become strictly liable to the Plaintiff for the manufacturing, marketing, promoting, distribution, and selling of a defective product, Roundup.

98. Defects in Defendants' Roundup were the cause or a substantial factor in causing Plaintiff's injuries.

99. As a result of the foregoing acts and omission, the Plaintiff developed NHL, and suffered severe and personal injuries, which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life, and financial expenses for hospitalization and medical care.

100.    WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in Plaintiff's favor for compensatory and punitive damages, together with interest, costs herein incurred,

attorneys' fees and all relief as this Court deems just and proper. Additionally, Plaintiff demands a jury trial on all issues contained herein.

## THIRD CAUSE OF ACTION
## (STRICT PRODUCTS LIABILITY – FAILURE TO WARN)

101.    Plaintiff incorporates and re-alleges the allegations of paragraphs 1 through 99 above, as though set forth fully herein

102.    Defendants have engaged in the business of selling, testing, distributing, supplying, manufacturing, marketing, and/or promoting Roundup, and through that conduct have knowingly and intentionally placed Roundup into the stream of commerce with full knowledge that it reaches consumers such as Plaintiff who are exposed to it through ordinary and reasonably foreseeable uses.

103.    Defendants did sell, distribute, supply, manufacture, and/or promote Roundup to Plaintiff. Additionally, Defendants expected the Roundup that they were selling, distributing, supplying, manufacturing, and/or promoting to reach – and Roundup did in fact reach – consumers, including Plaintiff, without any substantial change in the condition of the product from when it was initially distributed by Defendants.

104.    At the time of manufacture, Defendant could have provided the warnings or instructions regarding the full and complete risks of Roundup and glyphosate-containing products because it knew or should have known of the unreasonable risks of harm associated with the use of and/or exposure to such products.

105.    At all times herein mentioned, the aforesaid product was defective and unsafe in manufacture such that it was unreasonably dangerous to the user and was so at the time it was distributed by Defendants and at the time Plaintiff was exposed to and/or ingested the product. The defective condition of Roundup was due in part to the fact that it was not

1
2
3

accompanied by proper warnings regarding its carcinogenic qualities and possible side effects, including, but not limited to, developing non-Hodgkin's lymphoma as a result of exposure and use.

4
5
6
7

106. Roundup did not contain a warning or caution statement, which was necessary and, if complied with, was adequate to protect health those exposed in violation of 7 U.S.C. § 136j(a)(1)(E).

8
9
10

107. Defendants' failure to include a warning or caution statement which was necessary and, if complied with, was adequate to protect the health of those exposed, violated 7 U.S.C. § 136j(a)(1)(E) as well as the laws of the State of California.

11

108. Defendants could have amended the label of Roundup to provide additional warnings.

12
13
14
15
16

109. At all times herein mentioned, Defendants had a duty to properly design, manufacture, compound, test, inspect, package, label, distribute, market, examine, maintain supply, provide proper warnings, and take such steps to assure that the product did not cause users to suffer from unreasonable and dangerous side effects.

17
18

110. Defendants labeled, distributed, and promoted the aforesaid product that it was dangerous and unsafe for the use and purpose for which it was intended.

19
20
21

111. Defendants failed to warn of the nature and scope of the side effects associated with Roundup, namely its carcinogenic properties and its propensity to cause or serve as a substantial contributing factor in the development of NHL.

22
23
24
25
26

112. Defendants were aware of the probable consequences of the aforesaid conduct. Despite the fact that Defendants knew or should have known that Roundup caused serious injuries, Defendants failed to exercise reasonable care to warn of the dangerous carcinogenic properties and side effect of developing NHL from Roundup exposure, even though these

27
28

COMPLAINT FOR DAMAGES
- 23 -
1-024

side effects were known or reasonably scientifically knowable at the time of distribution. Defendants willfully and deliberately failed to avoid the consequences associated with their failure to warn, and in doing so, Defendants acted with a conscious disregard for the safety of Plaintiff.

113. At the time of exposure, Plaintiff could not have reasonably discovered any defect in Roundup prior through the exercise of reasonable care.

114. Defendants, as the manufacturers and/or distributors of the subject product, are held to the level of knowledge of an expert in the field.

115. Plaintiff reasonably relied upon the skill, superior knowledge, and judgment of Defendants.

116. Had Defendants properly disclosed the risks associated with Roundup, Plaintiff would have avoided the risk of NHL by not using Roundup.

117. The information that Defendants did provide or communicate failed to contain adequate warnings and precautions that would have enabled Plaintiff, and similarly situated individuals, to utilize the product safely and with adequate protection. Instead, Defendants disseminated information that was inaccurate, false, and misleading and which failed to communicate accurately or adequately the comparative severity, duration, and extent of the risk of injuries associated with use of and/or exposure to Roundup and glyphosate; continued to promote the efficacy of Roundup, even after it knew or should have known of the unreasonable risks from use or exposure; and concealed, downplayed, or otherwise suppressed, through aggressive marketing and promotion, any information or research about the risks and dangers of exposure to Roundup and glyphosate.

118.    As a direct and proximate result of Defendants' actions as alleged herein, and in such other ways to be later shown, the subject product caused Plaintiff to sustain injuries as herein alleged.

119.    WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in Plaintiff's favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all relief as this Court deems just and proper. Additionally, Plaintiff demands a jury trial on all issues contained herein.

## FOURTH CAUSE OF ACTION
### (BREACH OF IMPLIED WARRANTIES)

120.    Plaintiff incorporates and re-alleges the allegations of paragraphs 1 through 118 above, as though set forth fully herein

121.    At all times herein mentioned, the Defendants manufactured, distributed, compounded, recommended, merchandized, advertised, promoted, and sold Roundup and/or have recently acquired the Defendants who have manufactured, compound portrayed, distributed, recommended, merchandized, advertised, promoted, and sold Roundup, as a broad-spectrum herbicide. These actions were under the ultimate control and supervision of Defendants.

122.    At the time Defendants marketed, sold, and distributed Roundup for use by Plaintiff, Defendants knew of Roundup's intended use and impliedly warranted the product to be or merchantable quality and safe and fit for this use.

123.    The Defendants impliedly represented and warranted to Plaintiff and users of Roundup, the agricultural community, and/or the EPA that Roundup was safe and of merchantable quality and fit for the ordinary purpose for which it was to be used.

124.    These representations and warranties were false, misleading, and inaccurate in that Roundup was unsafe, unreasonably dangerous, not of merchantable quality, and defective.

125. Plaintiff and/or the EPA did rely on said implied warranty of merchantability of fitness for particular use and purpose.

126. Plaintiff reasonably relied upon the skill and judgment of Defendants as to whether Roundup was of merchantable quality and safe and fit for its intended use.

127. Roundup was injected into the stream of commerce by the Defendants in a defective, unsafe, and inherently dangerous condition, and the products' materials were expected to and did reach users, handlers, and persons coming into contact with said products without substantial change in the condition in which they were sold.

128. The Defendants breached the aforesaid implied warranties, as their herbicide Roundup was not fit for its intended purposes and uses.

129. As a result of the foregoing acts and omissions, Plaintiff suffered from NHL and Plaintiff suffered severe and personal injuries which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life, financial expenses for hospitalization and medical care, including medical expenses and other economic, and non-economic damages.

130. WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in Plaintiff's favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all relief as this Court deems just and proper. Additionally, Plaintiff demands a jury trial on all issues contained herein.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment against the Defendants on each of the above-referenced claims and causes of action and as follows:

1. Awarding compensatory damages in excess of the jurisdictional amount, including, but not limited to pain, suffering, emotional distress, loss of enjoyment of life, and other non-economic damages in an amount to be determined at trial of this action;

2. Awarding compensatory damages to Plaintiff for past and future damages, including, but not limited to, Plaintiff's pain and suffering and for severe and permanent personal injuries sustained by the Plaintiff including health care costs and economic loss;

3. Awarding economic damages in the form of medical expenses, out of pocket expenses, lost earnings and other economic damages in an amount to be determine at trial of this action;

4. Punitive and/or exemplary damages for the wanton, willful, fraudulent, and reckless acts of the Defendants who demonstrated a complete disregard and reckless indifference for the safety and welfare of the general public and to the Plaintiff in an amount sufficient to punish Defendants and deter future similar conduct, to the extent allowed by applicable law;

5. Pre-judgment interest;

6. Post-judgment interest;

7. Awarding Plaintiff reasonable attorneys' fees;

8. Awarding Plaintiff the costs of these proceedings; and

9. Such other and further relief as this Court deems just and proper.

## **DEMAND FOR JURY TRIAL**

Plaintiff hereby demands trial by jury as to all issues.

Date: February 9, 2022

Sarkissian Law Group

By:

Areg A. Sarkissian, Esq.
Attorney for Plaintiff

1  <u>**PROOF OF SERVICE**</u>

2

3       I am employed in the County of Los Angeles, State of California.  I am over the age of 18

4  and not a party to the within action.  My business address is 555 S. Flower Street, 30th Floor, Los

5  Angeles, CA 90071.

6       On February 15, 2022, I served a true and correct copy of the document described as

7  ANSWER OF MONSANTO COMPANY TO UNVERIFIED COMPLAINT; DEMAND FOR

8  JURY TRIAL on the interested parties, as follows:

9   ☐  By submitting an electronic version of the document via FTP upload to the Court's
10      Electronic Filing and Service Provider, One Legal

11  ☐  By electronic transfer to Case Anywhere via the Internet, pursuant to the Court's Case
        Management Order No. 2 Authorizing Electronic Service dated March 23, 2018.

12  ☒  By placing a true copy in envelope(s) addressed as referenced below. The envelope(s)
13      were then sealed and deposited for collection and mailing in accordance with my
        employer's normal procedures.  I am readily familiar with the firm's practice for
14      collection and processing correspondence for mailing.  Under that practice it would be
        deposited with the U.S. Postal Service, with all postage prepaid, at Los Angeles,
15      California, on the same day in the ordinary course of business.

16              Areg A. Sarkissian, Esq.
                SARKISSIAN LAW GROUP
17              Encino Office Park 1
                6345 Balboa Blvd., Ste 114
18              Encino, CA 91316

19

20       I declare under penalty of perjury under the laws of the State of California that the

21  foregoing is true and correct, and that this Proof of Service was executed on February 15, 2022 at

22  Los Angeles, California.

23                                                    *Marianne Hendrix*

24                                          _____
                                                    Marianne Hendrix
25

26

27

28

5-010
PROOF OF SERVICE