<u>Q</u>uery     **Reports**     **Utilities**     **Help**     **Log Out**

<span style="color:purple">**JURY**</span>

## US District Court Electronic Case Filing System
### District of Utah (Northern)
### CIVIL DOCKET FOR CASE #: 1:22-cv-00030-JNP

Carter v. Monsanto Company et al                 Date Filed: 02/28/2022
Assigned to: Judge Jill N. Parrish              Jury Demand: Plaintiff
Demand: $25,000                                 Nature of Suit: 365 Personal Inj. Prod.
Cause: 28:1331 Fed. Question: Personal Injury   Liability
                                                Jurisdiction: Federal Question

**<u>Plaintiff</u>**

**Alaine Carter**                    represented by    **Nathan A Duncan**
                                                       PECK BAXTER WATKINS &
                                                       BAILEY LLC
                                                       399 N MAIN ST STE 300
                                                       LOGAN, UT 84321
                                                       435-787-9700
                                                       Email: nduncan@peckbaxter.com
                                                       *LEAD ATTORNEY*
                                                       *ATTORNEY TO BE NOTICED*

                                                       **Brandon J. Baxter**
                                                       PECK BAXTER WATKINS &
                                                       BAILEY LLC
                                                       399 N MAIN ST STE 300
                                                       LOGAN, UT 84321
                                                       (435)787-9700
                                                       Email: bbaxter@peckhadfield.com
                                                       *ATTORNEY TO BE NOTICED*

V.

**<u>Defendant</u>**

**Monsanto Company**

**<u>Defendant</u>**

**Bayer Corporation**

| Date Filed | # | Docket Text |
|---|---|---|
| 02/28/2022 | 1 | Case has been indexed and assigned to Judge Jill N. Parrish. Plaintiff Alaine Carter is directed to E-File the <u>Complaint</u> and <u>cover sheet</u> (found under |

|  |  |  |
|---|---|---|
|  |  | Complaints and Other Initiating Documents) and pay the filing fee of $ 402.00 by the end of the business day. <br> NOTE: The court will not have jurisdiction until the opening document is electronically filed and the filing fee paid in the CM/ECF system. <br> Civil Summons may be issued electronically. Prepare the summons using the courts PDF version and email it to utdecf_clerk@utd.uscourts.gov for issuance. (af) (Entered: 02/28/2022) |
| 02/28/2022 | 2 | COMPLAINT against All Defendants (Filing fee $ 402, receipt number AUTDC-4262016) filed by Alaine Carter. (Attachments: # 1 Civil Cover Sheet Civil Cover Sheet) Assigned to Judge Jill N. Parrish (Duncan, Nathan) (Entered: 02/28/2022) |
| 02/28/2022 | 3 | **RESTRICTED DOCUMENT**Summons Issued Electronically as to Bayer Corporation. <br> Instructions to Counsel: <br> 1. Click on the document number. <br> 2. If you are prompted for an ECF login, enter your 'Attorney' login to CM/ECF. <br> 3. Print the issued summons for service. (af) (Entered: 02/28/2022) |
| 02/28/2022 | 4 | **RESTRICTED DOCUMENT**Summons Issued Electronically as to Monsanto Company. <br> Instructions to Counsel: <br> 1. Click on the document number. <br> 2. If you are prompted for an ECF login, enter your 'Attorney' login to CM/ECF. <br> 3. Print the issued summons for service. (af) (Entered: 02/28/2022) |

| PACER Service Center | | |
|---|---|---|
| **Transaction Receipt** | | |
| 03/04/2022 10:22:36 | | |
| **PACER Login:** | sh0019sh | **Client Code:** | 31943.356965 |
| **Description:** | Docket Report | **Search Criteria:** | 1:22-cv-00030-JNP |
| **Billable Pages:** | 1 | **Cost:** | 0.10 |

Nathan A. Duncan (#17056)
Brandon J. Baxter (#9122)
PECK HADFIELD BAXTER & MOORE, LLC
399 North Main Street, Suite 300
Logan, Utah 84321
Telephone: (435)787-9700
Facsimile: (435)787-2455
Email: nduncan@peckhadfield.com
Email: bbaxter@peckhadfield.com
*Attorneys for Plaintiff*

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH

| | |
|---|---|
| ALAINE CARTER,<br><br>   Plaintiff,<br><br>v.<br><br>MONSANTO COMPANY, INC. and<br>BAYER CORPORATION,<br><br>   Defendants. | **COMPLAINT**<br><br>Case No. |

Plaintiff, Alaine Carter, through counsel, Nathan A. Duncan and Brandon J. Baxter of the law firm Peck Hadfield Baxter & Moore, LLC, brings the following complaint against Defendants, Monsanto Company, Inc. ("Monsanto and Bayer Corporation").

**NATURE OF THE ACTION**

1. This is an action for damages suffered by Plaintiff as a direct and proximate result of Defendants' negligent and wrongful conduct in connection with the design, development, manufacture, testing, packaging, promoting, marketing, advertising, distribution, labeling, and/or sale of the herbicide Roundup, containing the active ingredient glyphosate.

2. "Roundup" refers to all formulations of Defendants' roundup products, including, but not

limited to, Roundup Concentrate Poison Ivy and Tough Brush Killer 1, Roundup Custom Herbicide, Roundup D-Pak herbicide, Roundup Dry Concentrate, Roundup Export Herbicide, Roundup Fence & Hard Edger 1, Roundup Garden Foam Weed & Grass Killer, Roundup Grass and Weed Killer, Roundup Herbicide, Roundup Original 2k herbicide, Roundup Original II Herbicide, Roundup Pro Concentrate, Roundup Prodry Herbicide, Roundup Promax, Roundup Quik Stik Grass and Weed Killer, Roundup Quikpro Herbicide, Roundup Rainfast Concentrate Weed & Grass Killer, Roundup Rainfast Super Concentrate Weed & Grass Killer, Roundup Ready-to-Use Extended Control Weed & Grass Killer 1 Plus Weed Preventer, Roundup Ready-to-Use Weed & Grass Killer, Roundup Ready-to-Use Weed and Grass Killer 2, Roundup Ultra Dry, Roundup Ultra Herbicide, Roundup Ultramax, Roundup VM Herbicide, Roundup Weed & Grass Killer Concentrate, Roundup Weed & Grass Killer Concentrate Plus, Roundup Weed & Grass killer Ready-to-Use Plus, Roundup Weed & Grass Killer Super Concentrate, Roundup Weed & Grass Killer1 Ready-to-Use, Roundup WSD Water Soluble Dry Herbicide Deploy Dry Herbicide, or any other formulation of containing the active ingredient glyphosate.

3.  Roundup and/or glyphosate is defective, dangerous to human health, unfit and unsuitable to be marketed and sold in commerce, and lacked proper warnings and directions as to the dangers associated with its use.

4.  Plaintiff's injuries as set forth below, like those striking thousands of similarly situated victims across the country, were avoidable.

## PARTIES, JURISDICTION, AND VENUE

5.  At all times relevant to this Complaint, Plaintiff was a resident of Box Elder County, Utah. Plaintiff used Roundup for personal and/or work-related purposes beginning in approximately 1980 and continuing for many years. Plaintiff was diagnosed with B-cell non-

Hodgkin's Lymphoma ("NHL") in July 2009. Plaintiff used Roundup as directed by Defendants at all relevant times.

6.   Defendant, Monsanto Company ("Monsanto") is a Delaware corporation with its headquarters and principal place of business in Missouri. Monsanto is a multinational agrochemical and agricultural biotechnology corporation, and conducts business throughout the United States, including the State of Utah. Monsanto is registered to conduct business in the State of Utah. Monsanto's registered agent is Corporation Service Company at 15 West South Temple, Suite 600, Salt Lake City, 84101.

7.   Defendant, Bayer Corporation, represents Bayer AG in the United States of America by Bayer Corporation "in all strategic business areas," a New Jersey corporation, with its headquarters and principal place of business in Whippany, New Jersey. Bayer Corporation is registered to conduct business in the State of Utah. Bayer Corporation's registered agent is Corporation Service Company at 15 West South Temple, Suite 600, Salt Lake City, 84101.

8.   Defendants advertise and sell goods, specifically Roundup, in Box Elder County, Utah.

9.   Defendants transacted and conducted business in the State of Utah that relates to the allegations in this Complaint.

10. Defendants derived substantial revenue and income from goods sold in the State of Utah. These products included, but were not limited to Roundup.

11. Defendants expected or should have expected their acts to have consequences within the State of Utah, and derived substantial revenue from interstate commerce.

12. Defendants engaged in the business of designing, developing, manufacturing, testing, packaging, marketing, distributing, labeling, and/or selling Roundup.

13. Upon information and belief, Defendants purposefully availed themselves of the privilege

of conducting activities with the State of Utah, thus invoking the benefits and protections of its laws.

14. Upon information and belief, Defendants did act together to design, sell, advertise, manufacture and/or distribute Roundup, with full knowledge of its dangerous and defective nature.

## GENERAL ALLEGATIONS

15. Plaintiff incorporates by reference the preceding allegations as if set forth in full here.

16. Glyphosate is the active ingredient in Roundup.

17. Monsanto is the world's leading producer of glyphosate.

18. For nearly 40 years, farmers and consumers around the world have used Roundup without knowing the dangers its use poses.

19. That is because, when Monsanto first introduced Roundup, it touted glyphosate as a technological breakthrough: it could kill almost every weed without causing harm either to people or to the environment. However, history has demonstrated otherwise.

20. According to the World Health Organization ("WHO"), glyphosate is a probable carcinogen.

21. Despite the carcinogenic nature of glyphosate, Monsanto assured the public that Roundup was harmless.

22. In order to prove this, Monsanto reported misleading data and attacked legitimate studies exposing glyphosate's dangers.

23. As a result of this misleading conduct, consumers, including Plaintiff, have been exposed to a carcinogen, while Monsanto has made billions in profits.

24. Glyphosate is a broad-spectrum, non-selective herbicide used in a wide variety of

herbicidal products around the world, including the popular herbicide Roundup. As a systemic herbicide, glyphosate is absorbed by the plant's roots, stems, or foliage and is translocated throughout the plant. Glyphosate prevents the plant's ability to form aromatic amino acids necessary for protein synthesis and therefore results in plant death. Plants treated with glyphosate generally die within two to three days. Because plants absorb glyphosate, it cannot be completely removed by washing or peeling produce, or by milling, baking, or brewing grains.

25. The herbicidal properties of glyphosate were discovered in 1970 by Monsanto chemist John Franz. The first glyphosate-based herbicide was introduced to the market in the mid-1970s under the brand name Roundup and was marketed as a safe general-purpose herbicide for commercial and consumer use.

26. The manufacture, formulation, and distribution of herbicides, such as Roundup, are regulated in the United States under the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA" or "Act"), 7 U.S.C. § 136 et seq. FIFRA requires that all pesticides be registered with the Environmental Protection Agency ("EPA" or "Agency") prior to their distribution, sale, or use, except as described by the Act. 7 U.S.C. § 136a(a).

27. Because pesticides are toxic to plants, animals, and humans, at least to some degree, the EPA requires as part of the registration process, among other things, a variety of tests to evaluate the potential for exposure to pesticides, toxicity to people and other potential non-target organisms, and other adverse effects on the environment. Registration by the EPA, however, is not an assurance or finding of safety. The determination the Agency must make in registering or reregistering a product is not that the product is "safe," but rather that use of the product in accordance with its label directions "will not generally cause unreasonable adverse effects on the environment." 7 U.S.C. § 136a(c)(5)(D).

28. FIFRA defines "unreasonable adverse effects on the environment" to mean "any unreasonable risk to man or the environment, taking into account the economic, social, and environmental costs and benefits of the use of any pesticide." 7 U.S.C. § 136(bb). FIFRA thus requires EPA to make a risk/benefit analysis in determining whether a registration should be granted or allowed to continue to be sold in commerce.

29. The EPA registered Roundup for distribution, sale, and manufacture in the United States, including in the State of Utah.

30. FIFRA generally requires that the registrant, Monsanto in the case of Roundup, conduct the health and safety testing of pesticide products. The EPA has protocols governing the conduct of tests required for registration and the laboratory practices that must be followed in conducting these tests. The data produced by the registrant must be submitted to the EPA for review and evaluation. The government is not required, nor is it able, however, to perform the product tests that are required of the manufacturer.

31. The evaluation of each pesticide product distributed, sold, or manufactured is completed at the time the product is initially registered. The data necessary for registration of a pesticide has changed over time. The EPA is now in the process of re-evaluating all pesticide products through a Congressionally-mandated process called "re-registration." 7 U.S.C. § 136a-1.

32. Based on early studies that glyphosate could cause cancer in laboratory animals, the EPA originally classified glyphosate as possibly carcinogenic to humans (Group C) in 1985.

33. After pressure from Monsanto, including contrary studies it provided to the EPA, the EPA changed its classification to evidence of non-carcinogenicity in humans (Group E) in 1991.

34. In so classifying glyphosate, however, the EPA made clear that the designation did not mean the chemical does not cause cancer: "It should be emphasized, however, that designation of

an agent in Group E is based on the available evidence at the time of evaluation and should not be interpreted as a definitive conclusion that the agent will not be a carcinogen under any circumstances."

35. On two occasions, the EPA found that the laboratories hired by Monsanto to test the toxicity of its Roundup products for registration purposes committed fraud.

36. In the first instance, Monsanto, in seeking initial registration of Roundup by EPA, hired Industrial Bio-Test Laboratories ("IBT") to perform and evaluate pesticide toxicology studies relating to Roundup. IBT performed about 30 tests on glyphosate and glyphosate containing products, including nine of the 15 residue studies needed to register Roundup.

37. In 1976, the United States Food and Drug Administration ("FDA") performed an inspection of Industrial Bio-Test Industries ("IBT") that revealed discrepancies between the raw data and the final report relating to the toxicological impacts of glyphosate.

38. The EPA subsequently audited IBT; it too found the toxicology studies conducted for the Roundup herbicide to be invalid.

39. An EPA reviewer stated, after finding "routine falsification of data" at IBT, that it was "hard to believe the scientific integrity of the studies when they said they took specimens of the uterus from male rabbits."

40. Three top executives of IBT were convicted of fraud in 1983.

41. In the second incident of data falsification, Monsanto hired Craven Laboratories in 1991 to perform pesticide and herbicide studies, including for Roundup.

42. In that same year, the owner of Craven Laboratories and three of its employees were indicted, and later convicted, of fraudulent laboratory practices in the testing of pesticides and herbicides.

43. On March 20, 2015, the International Agency for Research on Cancer ("IARC"), an agency of the World Health Organization ("WHO"), issued an evaluation of several herbicides, including glyphosate. That evaluation was based, in part, on studies of exposures to glyphosate in several countries around the world, and it traces the health implications from exposure to glyphosate since 2001.

44. On July 29, 2015, IARC issued the formal monograph relating to glyphosate. In that monograph, the IARC Working Group provides a thorough review of the numerous studies and data relating to glyphosate exposure in humans.

45. The IARC Working Group classified glyphosate as a Group 2A herbicide, which means that it is probably carcinogenic to humans. The IARC Working Group concluded that the cancers most associated with glyphosate exposure are non-Hodgkin lymphoma and other hematopoietic cancers, including lymphocytic lymphoma/chronic lymphocytic leukemia, B-cell lymphoma, and multiple myeloma.

46. The IARC evaluation is significant. It confirms that glyphosate is toxic to humans.

47. Nevertheless, Monsanto, since it began selling Roundup, has represented it as safe to humans and the environment. Indeed, Monsanto has repeatedly proclaimed and continues to proclaim to the world, and particularly to United States consumers, that glyphosate-based herbicides, including Roundup, create no unreasonable risks to human health or to the environment.

48. Defendants knew or should have known that Roundup is more toxic than glyphosate alone and that safety studies on Roundup, Roundup's adjuvants and "inert" ingredients, and/or the surfactant POEA were necessary to protect Plaintiff from Roundup.

49. Defendants knew or should have known that tests limited to Roundup's active ingredient

glyphosate were insufficient to prove the safety of Roundup.

50. Defendants failed to appropriately and adequately test Roundup, Roundup's adjuvants and "inert" ingredients, and/or the surfactant POEA to protect Plaintiff from Roundup.

51. Rather than performing appropriate tests, Defendants relied upon flawed industry-supported studies designed to protect Defendants' economic interests rather than Plaintiff and the consuming public.

52. Despite their knowledge that Roundup was considerably more dangerous than glyphosate alone, Defendants continued to promote Roundup as safe.

53. Plaintiff used Roundup beginning in approximately 1980.

54. Plaintiff used Roundup on a weekly basis for approximately 40 years to control weeds around her home.

55. Plaintiff sprayed Roundup in the spring and summer months around her flower garden and farm ditch banks.

56. Plaintiff was also exposed to Roundup when she washed her husband's clothing that he wore while spraying Roundup.

57. In the course of spraying Roundup, Plaintiff followed all safety and precautionary warnings during the course of use.

58. Plaintiff was subsequently diagnosed with B-cell non-Hodgkin's lymphoma in July 2009.

59. As a result of her injury, Plaintiff has incurred significant economic and non-economic damages.

## TOLLING OF THE APPLICABLE STATUTES OF LIMITATION

60. Plaintiff incorporates by reference the preceding allegations as if set forth in full here.

61. Plaintiff suffered an illness that has a latency period and does not arise until many years

after exposure. Plaintiff could not have been aware of her causes of action against Defendant until both discovering their injuries and discovering the wrongful acts of Defendant.

62. The running of any statute of limitations has been tolled by reason of Monsanto's fraudulent concealment. Monsanto, through its affirmative misrepresentations and omissions, actively concealed from Plaintiff the true risks associated with Roundup and glyphosate.

63. As a result of Defendants' actions, Plaintiff was unaware, and could not reasonably know or have learned through reasonable diligence that Roundup and/or glyphosate contact, exposed Plaintiff to the risks alleged herein and that those risks were the direct and proximate result of Defendants' acts and omissions.

64. Furthermore, Defendants are estopped from relying on any statute of limitations because of their fraudulent concealment of the true character, quality and nature of Roundup. Monsanto was under a duty to disclose the true character, quality, and nature of Roundup because this was non-public information over which Defendants had and continue to have exclusive control, and because Monsanto knew that this information was not available to Plaintiff or to distributors of Roundup. In addition, Defendants are estopped from relying on any statute of limitations because of their intentional concealment of these facts.

65. Plaintiff had no knowledge that Monsanto was engaged in the wrongdoing alleged herein. Because of the fraudulent acts of concealment of wrongdoing by Monsanto, Plaintiff could not have reasonably discovered the wrongdoing at any time prior. Also, the economics of this fraud should be considered. Monsanto had the ability to and did spend enormous amounts of money in furtherance of their purpose of marketing, promoting and/or distributing a profitable herbicide, notwithstanding the known or reasonably known risks. Plaintiff and medical professionals could not have afforded and could not have possibly conducted studies to determine the nature, extent,

and identity of related health risks, and were forced to rely on only the Defendants'

representations. Accordingly, Defendants are precluded by the discovery rule and/or the doctrine

of fraudulent concealment from relying upon any statute of limitations.

### FIRST CAUSE OF ACTION
#### (Negligence)

66. Plaintiff incorporates by reference the preceding allegations as if set forth in full.

67. Monsanto directly or indirectly, caused Roundup products to be sold, distributed,

packaged, labeled, marketed, promoted, and/or used by Plaintiff.

68. At all times relevant to this litigation, Monsanto had a duty to exercise reasonable care in

the design, research, manufacture, marketing, advertisement, supply, promotion, packaging, sale,

and distribution of Roundup products, including the duty to take all reasonable steps necessary to

manufacture, promote, and/or sell a product that was not unreasonably dangerous to consumers

and users of the product.

69. At all times relevant to this litigation, Monsanto had a duty to exercise reasonable care in

the marketing, advertisement, and sale of the Roundup products.

70. Monsanto's duty of care owed to consumers and the general public, including Plaintiff

included providing accurate, true, and correct information concerning the risks of using Roundup

and appropriate, complete, and accurate warnings concerning the potential adverse effects of

exposure to Roundup, and, in particular, its active ingredient glyphosate.

71. At all times relevant to this litigation, Monsanto knew or, in the exercise of reasonable

care, should have known of the hazards and dangers of Roundup and specifically, the

carcinogenic properties of the chemical glyphosate.

72. Accordingly, at all times relevant to this litigation, Monsanto knew or, in the exercise of

reasonable care, should have known that use of or exposure to its Roundup products could cause

or be associated with Plaintiff's injuries and thus created a dangerous and unreasonable risk of injury to the users of these products, including Plaintiff.

73. Monsanto also knew or, in the exercise of reasonable care, should have known that users and consumers of Roundup, including Plaintiff, were unaware of the risks and the magnitude of the risks associated with use of and/or exposure to Roundup and glyphosate-containing products.

74. As such, Defendants breached the duty of reasonable care and failed to exercise ordinary care in the design, research, development, manufacture, testing, marketing, supply, promotion, advertisement, packaging, sale, and distribution of its Roundup products, in that Monsanto manufactured, marketed, promoted, and sold defective herbicides containing the chemical glyphosate, knew or had reason to know of the defects inherent in these products, knew or had reason to know that a user's or consumer's exposure to the products created a significant risk of harm and unreasonably dangerous side effects, and failed to prevent or adequately warn of these risks and injuries and/or death.

75. Despite an ability and means to investigate, study, and test these products and to provide adequate warnings, Defendants have failed to do so. Indeed, Defendants have wrongfully concealed information and has further made false and/or misleading statements concerning the safety and/or exposure to Roundup and glyphosate.

76. Defendants were negligent in the following respects:

    a.  Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing its Roundup products without thorough and adequate pre- and post-market testing;

    b.  Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing Roundup while negligently and/or

intentionally concealing and failing to disclose the results of trials, tests, and studies of exposure to glyphosate, and, consequently, the risk of serious harm associated with human use of and exposure to Roundup;

c.  Failing to undertake sufficient studies and conduct necessary tests to determine whether or not Roundup products and glyphosate-containing products were safe for their intended use in agriculture and horticulture;

d.  Failing to use reasonable and prudent care in the design, research, manufacture, and development of Roundup products so as to avoid the risk of serious harm associated with the prevalent use of Roundup/glyphosate as an herbicide;

e.  Failing to design and manufacture Roundup products so as to ensure they were at least as safe and effective as other herbicides on the market;

f.  Failing to provide adequate instructions, guidelines, and safety precautions to those persons who Monsanto could reasonably foresee would use and be exposed to its Roundup products;

g.  Failing to disclose to Plaintiff, users/consumers, and the general public that use of and exposure to Roundup presented severe risks of cancer and other grave illnesses;

h.  Failing to warn Plaintiff, users/consumers, and the general public that the product's risk of harm was unreasonable and that there were safer and effective alternative herbicides available to Plaintiff and other consumers;

i.  Systematically suppressing or downplaying contrary evidence about the risks, incidence, and prevalence of the side effects of Roundup and glyphosate-containing products;

    j.   Representing that its Roundup products were safe for their intended use when, in fact, Monsanto knew or should have known that the products were not safe for their intended purpose;

    k.   Declining to make or propose any changes to Roundup products' labeling or other promotional materials that would alert the consumers and the general public of the risks of Roundup and glyphosate;

    l.   Advertising, marketing, and recommending the use of the Roundup products, while concealing and failing to disclose or warn of the dangers known by Monsanto to be associated with or caused by the use of or exposure to Roundup and glyphosate;

    m.   Continuing to disseminate information to its consumers, which indicate or imply that Monsanto's Roundup products are not unsafe for use in the agricultural and horticultural industries; and

    n.   Continuing the manufacture and sale of its products with the knowledge that the products were unreasonably unsafe and dangerous.

77. Defendants knew and/or should have known that it was foreseeable that consumers such as Plaintiff would suffer injuries and/or death as a result of Monsanto's failure to exercise ordinary care in the manufacturing, marketing, promotion, labeling, distribution, and sale of Roundup.

78. Plaintiff did not know the nature and extent of the injuries and/or death that could result from the intended use of and/or exposure to Roundup or its active ingredient glyphosate.

79. Defendants' negligence was the proximate cause of the injuries, harm, economic losses, and non-economic losses that Plaintiff suffered, as described herein.

80. Monsanto's conduct, as described above, was reckless. Monsanto regularly risked the lives of consumers and users of its products, including Plaintiff, with full knowledge of the dangers of these products. Monsanto has made conscious decisions not to redesign, re-label, warn, or inform the unsuspecting public, including Plaintiff. Monsanto's reckless conduct therefore warrants an award of aggravated or punitive damages.

81. As a proximate result of Monsanto's wrongful acts and omissions in placing defective Roundup products into the stream of commerce without adequate warnings of the hazardous and carcinogenic nature of glyphosate, Plaintiff suffered severe and permanent physical and emotional injuries. Plaintiff has endured non-economic damages, loss of enjoyment of life, pain and suffering, and has suffered economic losses (including significant expenses for medical care and treatment).

### SECOND CAUSE OF ACTION
**(Strict Products Liability-Design Defect)**

82. Plaintiff incorporates by reference the preceding allegations as if set forth in full.

83. At all times herein mentioned, Defendants designed, researched, manufactured, tested, advertised, promoted, sold, distributed, and/or have acquired the Defendants who have designed, researched, tested, advertised, promoted, marketed, sold, and distributed Roundup as hereinabove described that was used by the Plaintiff.

84. Defendants' Roundup was expected to and did reach the usual consumers (including Plaintiff), handlers, and persons coming into contact with said product without substantial change in the condition in which it was produced, manufactured, sold, distributed, and marketed by the Defendants.

85. At those times, Roundup was in an unsafe, defective, and inherently dangerous condition, which was dangerous to users, and in particular, the Plaintiff herein.

86. The Roundup designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed by Defendants was defective in design or formulation in that, when it left the hands of the manufacturer and/or suppliers, the foreseeable risks exceeded the benefits associated with the design or formulation of Roundup.

87. The Roundup designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed by Defendants was defective in design and/or formulation, in that, when it left the hands of the Defendants manufacturers and/or suppliers, it was unreasonably dangerous, unreasonably dangerous in normal use, and it was more dangerous than an ordinary consumer would expect.

88. At all times herein mentioned, Roundup was in a defective condition and unsafe, and Defendants knew or had reason to know that said product was defective and unsafe, especially when used in the form and manner as provided by the Defendants. In particular, Defendants' Roundup was defective in the following ways:

a. When placed in the stream of commerce, Defendants' Roundup Products were defective in design and formulation and, consequently, dangerous to an extent beyond that which an ordinary consumer would anticipate.

b. When placed in the stream of commerce, Defendants' Roundup products were unreasonably dangerous in that they were hazardous and posed a grave risk of cancer and other serious illnesses when used in a reasonably anticipated manner.

c. When placed in the stream of commerce, Defendants' Roundup products contained unreasonably dangerous design defects and were not reasonably safe when used in a reasonably anticipated manner.

d. Defendants did not sufficiently test, investigate, or study its Roundup products.

e.  Exposure to Roundup presents a risk of harmful side effects that outweigh any potential utility stemming from the use of the herbicide.

f.  Defendants new or should have known at the time of marketing its Roundup products that exposure to Roundup and could result in cancer and other severe illnesses and injuries.

g.  Defendants did not conduct adequate post-marketing surveillance of its Roundup products.

89. Defendants knew, or should have known that at all times herein mentioned its Roundup was in a defective condition, and was and is inherently dangerous and unsafe.

90. Plaintiff was exposed to Defendants' Roundup without knowledge of Roundup's dangerous characteristics.

91. At the time of the Plaintiff's use of and exposure to Roundup, Roundup was being used for the purposes and in a manner normally intended, as a broad-spectrum herbicide.

92. Defendants with this knowledge voluntarily designed its Roundup with a dangerous condition for use by the public, and in particular the Plaintiff.

93. Defendants had a duty to create a product that was not unreasonably dangerous for its normal, intended use.

94. Defendants created a product that was and is unreasonably dangerous for its normal, intended use.

95. Defendants marketed and promoted a product in such a manner so as to make it inherently defective as the product downplayed its suspected, probable, and established health risks inherent with its normal, intended use.

96. The Roundup designed, researched, manufactured, tested, advertised, promoted,

marketed, sold, and distributed by Defendants was manufactured defectively in that Roundup left the hands of Defendants in a defective condition and was unreasonably dangerous to its intended users.

97. The Roundup designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed by Defendants reached their intended users in the same defective and unreasonably dangerous condition in which the Defendants' Roundup was manufactured.

98. Defendants designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed a defective product, which created an unreasonable risk to the health of consumers and to the Plaintiff in particular, and Defendants are therefore strictly liable for the injuries sustained by the Plaintiff.

99. Plaintiff could not, by the exercise of reasonable care, have discovered Roundup's defects herein mentioned or perceived its danger.

100. By reason of the foregoing, the Defendants have become strictly liable to the Plaintiff for the manufacturing, marketing, promoting, distribution, and selling of a defective product, Roundup.

101. Defendants' defective design, of Roundup amounts to willful, wanton, and/or reckless conduct by Defendants.

102. Defects in Defendants' Roundup were the cause Plaintiff's injuries.

103. As a result of the foregoing acts and omission, Plaintiff developed NHL, and suffered severe and personal injuries, which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life, and financial expenses for hospitalization and medical care.

### THIRD CAUSE OF ACTION
### (Strict Products Liability-Failure to Warn)

104.     Plaintiff incorporates by reference the preceding allegations as if set forth in full.

105.     Defendants have engaged in the business of selling, testing, distributing,

supplying, manufacturing, marketing, and/or promoting Roundup, and through that conduct have

knowingly and intentionally placed Roundup into the stream of commerce with full knowledge

that it reaches consumers such as Plaintiff who are exposed to it through ordinary and reasonably

foreseeable uses.

106.     Defendants did in fact sell, distribute, supply, manufacture, and/or promote

Roundup to Plaintiff. Additionally, Defendants expected the Roundup that they were selling,

distributing, supplying, manufacturing, and/or promoting to reach – and Roundup did in fact

reach – consumers, including Plaintiff, without any substantial change in the condition of the

product from when it was initially distributed by Defendants.

107.     At the time of manufacture, Defendant could have provided the warnings or

instructions regarding the full and complete risks of Roundup and glyphosate-containing

products because it knew or should have known of the unreasonable risks of harm associated

with the use of and/or exposure to such products.

108.     At all times herein mentioned, the aforesaid product was defective and unsafe in

manufacture such that it was unreasonably dangerous to the user, and was so at the time it was

distributed by Defendants and at the time Plaintiff was exposed to and/or ingested the product.

The defective condition of Roundup was due in part to the fact that it was not accompanied by

proper warnings regarding its carcinogenic qualities and possible side effects, including, but not

limited to, developing non-Hodgkin's lymphoma as a result of exposure and use.

109.     Roundup did not contain a warning or caution statement, which was necessary

and, if complied with, was adequate to protect health those exposed in violation of 7 U.S.C. § 136j(a)(1)(E).

110. Defendants' failure to include a warning or caution statement which was necessary and, if complied with, was adequate to protect the health of those exposed, violated 7 U.S.C. § 136j(a)(1)(E) as well as the laws of the State of Utah.

111. Defendants could have amended the label of Roundup to provide additional warnings.

112. This defect caused serious injury to Plaintiff, who used Roundup in its intended and foreseeable manner.

113. At all times herein mentioned, Defendants had a duty to properly design, manufacture, compound, test, inspect, package, label, distribute, market, examine, maintain supply, provide proper warnings, and take such steps to assure that the product did not cause users to suffer from unreasonable and dangerous side effects.

114. Defendants labeled, distributed, and promoted the aforesaid product that it was dangerous and unsafe for the use and purpose for which it was intended.

115. Defendants failed to warn of the nature and scope of the side effects associated with Roundup, namely its carcinogenic properties and its propensity to cause or serve as a substantial contributing factor in the development of NHL.

116. Defendants were aware of the probable consequences of the aforesaid conduct. Despite the fact that Defendants knew or should have known that Roundup caused serious injuries, Defendants failed to exercise reasonable care to warn of the dangerous carcinogenic properties and side effect of developing NHL from Roundup exposure, even though these side effects were known or reasonably scientifically knowable at the time of distribution. Defendants

willfully and deliberately failed to avoid the consequences associated with their failure to warn, and in doing so, Defendants acted with a conscious disregard for the safety of Plaintiff.

117.    At the time of exposure, Plaintiff could not have reasonably discovered any defect in Roundup prior through the exercise of reasonable care.

118.    Defendants, as the manufacturers and/or distributors of the subject product, are held to the level of knowledge of an expert in the field.

119.    Plaintiff reasonably relied upon the skill, superior knowledge, and judgment of Defendants.

120.    Had Defendants properly disclosed the risks associated with Roundup and provided Plaintiff with adequate warning, Plaintiff would have avoided the risk of NHL by not using Roundup.

121.    The information that Defendants did provide or communicate failed to contain adequate warnings and precautions that would have enabled Plaintiff, and similarly situated individuals, to utilize the product safely and with adequate protection. Instead, Defendants disseminated information that was inaccurate, false, and misleading and which failed to communicate accurately or adequately the comparative severity, duration, and extent of the risk of injuries associated with use of and/or exposure to Roundup and glyphosate; continued to promote the efficacy of Roundup, even after it knew or should have known of the unreasonable risks from use or exposure; and concealed, downplayed, or otherwise suppressed, through aggressive marketing and promotion, any information or research about the risks and dangers of exposure to Roundup and glyphosate.

122.    As a result of their inadequate warnings, Defendants' Roundup products were defective and unreasonably dangerous when they left the possession and/or control of Defendant,

were distributed by Defendant, and used by Plaintiff.

123.     As a direct and proximate result of Defendants' actions as alleged herein, and in

Roundup caused Plaintiff to sustain injuries as herein alleged.

### FOURTH CAUSE OF ACTION
### (Breach of Implied Warranties)

124.     Plaintiff incorporates by reference the preceding allegations as if set forth in full.

125.     At all times herein mentioned, the Defendants manufactured, distributed,

compounded, recommended, merchandized, advertised, promoted, and sold Roundup and/or

have recently acquired the Defendants who have manufactured, compound portrayed,

distributed, recommended, merchandized, advertised, promoted, and sold Roundup, as a broad-

spectrum herbicide. These actions were under the ultimate control and supervision of

Defendants.

126.     At the time Defendants marketed, sold, and distributed Roundup for use by

Plaintiff, Defendants knew of Roundup's intended use and impliedly warranted the product to be

or merchantable quality and safe and fit for this use.

127.     Defendants impliedly represented and warranted to Plaintiff and users of

Roundup, the agricultural community, and/or the EPA that Roundup was safe and of

merchantable quality and fit for the ordinary purpose for which it was to be used.

128.     These representations and warranties were false, misleading, and inaccurate in

that Roundup was unsafe, unreasonably dangerous, not of merchantable quality, and defective.

129.     Plaintiff and/or the EPA did rely on said implied warranty of merchantability of

fitness for particular use and purpose.

130.     Plaintiff reasonably relied upon the skill and judgment of Defendants as to

whether Roundup was of merchantable quality and safe and fit for its intended use.

131.     Roundup was injected into the stream of commerce by the Defendants in a
defective, unsafe, and inherently dangerous condition, and the products' materials were expected
to and did reach users, handlers, and persons coming into contact with said products without
substantial change in the condition in which they were sold.

132.     Defendants breached the aforesaid implied warranties, as their herbicide Roundup
was not fit for its intended purposes and uses.

133.     As a result of the foregoing acts and omissions, Plaintiff suffered from NHL and
Plaintiff suffered severe and personal injuries which are permanent and lasting in nature,
physical pain and mental anguish, including diminished enjoyment of life, financial expenses for
hospitalization and medical care, including medical expenses and other economic, and non-
economic damages.

**FIFTH CAUSE OF ACTION**
**(Successor Liability)**

134.     Plaintiff incorporates by reference the preceding allegations as if set forth in full.

135.     Bayer Corporation is liable for the conduct of Monsanto described above in
causes of action. Upon information published by Bayer Corporation in its official filings and on
its social media and upon belief, Bayer Corporation completed the purchase of the Monsanto
Company for over sixty-six billion dollars ($66,000,000,000.00). The deal was entered into in
2016 and finally approved by the respective regulatory agencies in 2018. The relevant Monsanto
product, Roundup, was part of that deal. Roundup continues to be manufactured and marketed
without any significant changes by Bayer Corporation.

136.     Under successor liability, regardless of whether the liabilities were expressly
purchase, Bayer Corporation is held responsible for the liabilities of Monsanto as a result of the
transaction being a de facto merger, Bayer Corporation is a mere continuation of Monsanto, and

Bayer Corporation continues essentially the same operations or product line of Monsanto. Specifically, Roundup continues to be manufactured and marketed without any significant change.

137.     As recently as February 2020, Bayer CEO Werner Bauman stated "we [Bayer] remain firmly convinced that our glyphosate-based herbicides are safe and are not carcinogenic" in his letter to "stockholders and friends of Bayer" published in Bayer's 2020 annual report.

138.     This continued effort to not only diminish but completely disregard the evidence of the carcinogencity of their product highlights an attitude of corporate irresponsibility and callous disregard for human life in favor of profits.

139.     Such conduct is evidence Bayer will continue Monsanto's negligence and gross negligence in exchange for profit.

140.     As a direct and proximate result of Bayer Corporation's actions and inactions, Plaintiff was exposed to Roundup and suffered and will continue to suffer injuries and damages, as set forth herein.

## DAMAGES

141.     Plaintiff incorporates by reference the preceding allegations as if set forth in full.

142.     Defendants' negligence, careless, and reckless conduct, described more fully above, caused serious injury and harm to Plaintiff.

143.     As a result of Defendants' negligent, careless, and reckless acts and/or omissions, Plaintiff has suffered and continues to suffer injuries that have caused him economic and noneconomic damages in amounts to be proven at trial.

144.     Plaintiff is entitled to recover from Defendants for economic and noneconomic damages relating to his injuries caused by the negligent, careless and reckless conduct of

Defendants.

145.     Plaintiff is also entitled to recover punitive damages from Defendants.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment against Defendants as follows:

A.     For judgment against Defendants in an amount to be determined at trial for

Plaintiff's economic and noneconomic damages;

B.     For punitive damages;

C.     For pre-judgment and post-judgment interest as appropriate;

D.     For fees and costs incurred in bringing this action as appropriate; and

E.     For such other and further relief as the Court deems just and appropriate under the

circumstances.

## JURY TRIAL DEMAND

146.     Plaintiff respectfully requests a jury trial.

DATED this 25th day of February 2022.


                                        PECK HADFIELD BAXTER & MOORE, LLC

                                        */s/Nathan A. Duncan*
                                        Nathan A. Duncan
                                        *Attorneys for Plaintiff*