**Query**    **Reports**    **Utilities**    **Help**    **Log Out**

ACCO

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA (Western Division - Los Angeles)
# CIVIL DOCKET FOR CASE #: 2:22-cv-01986

| | |
|---|---|
| Sabouri et al v. Monsanto Company et al | Date Filed: 03/25/2022 |
| Assigned to: | Jury Demand: Both |
| Case in other court: Los Angeles Superior Court, 21STCV34775 | Nature of Suit: 365 Personal Inj. Prod. Liability |
| Cause: 28:1332 Diversity-Product Liability | Jurisdiction: Diversity |

**Plaintiff**

| | | |
|---|---|---|
| **Anousheh Sabouri** <br> *an individual and successor in interest to decedent Mike Esfahanian* | represented by | **Anousheh Sabouri** <br> PRO SE |

**Plaintiff**

| | | |
|---|---|---|
| **S. E.** <br> *a minor and successor in interest to decedent Mike Esfahanian, by and through her Guardian Ad Litem, SHIRIN SABOURI* | represented by | **S. E.** <br> PRO SE |

V.

**Defendant**

| | | |
|---|---|---|
| **Monsanto Company** | represented by | **Ryan S Killian** <br> Shook Hardy and Bacon LLP <br> 600 Travis Street Suite 3400 <br> Houston, TX 77002 <br> 713-227-8008 <br> Fax: 713-227-9508 <br> Email: rkillian@shb.com <br> *ATTORNEY TO BE NOTICED* |

**Defendant**

**Wilbur-Ellis Company LLC**
*a California limited liability corporation*

**Defendant**

**DOES 1 through 100, Inclusive,**

| Date Filed | # | Docket Text |
|---|---|---|
| 03/25/2022 | 1 | NOTICE OF REMOVAL from Los Angeles, case number 21STCV34775 Receipt No: CCACDC-33011295 - Fee: $402, filed by Defendant Monsanto Company. (Attachments: # 1 Exhibit) (Attorney Ryan S Killian added to party Monsanto Company(pty:dft))(Killian, Ryan) (Entered: 03/25/2022) |
| 03/25/2022 | 2 | CIVIL COVER SHEET filed by Defendant Monsanto Company. (Killian, Ryan) (Entered: 03/25/2022) |
| 03/25/2022 | 3 | CORPORATE DISCLOSURE STATEMENT filed by Defendant Monsanto Company identifying Bayer AG as Corporate Parent. (Killian, Ryan) (Entered: 03/25/2022) |
| 03/25/2022 | 4 | NOTICE of Interested Parties filed by Defendant Monsanto Company, identifying Monsanto Company, Bayer AG. (Killian, Ryan) (Entered: 03/25/2022) |
| 03/25/2022 | 5 | PROOF OF SERVICE filed by Defendant Monsanto Company, re Corporate Disclosure Statement 3 , Notice of Removal (Attorney Civil Case Opening), 1 , Civil Cover Sheet (CV-71) 2 , Certificate/Notice of Interested Parties 4 served on March 25, 2022. (Killian, Ryan) (Entered: 03/25/2022) |

| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 03/28/2022 08:47:39 | | | |
| **PACER Login:** | sh0019sh | **Client Code:** | 31943.356965 |
| **Description:** | Docket Report | **Search Criteria:** | 2:22-cv-01986 End date: 3/28/2022 |
| **Billable Pages:** | 1 | **Cost:** | 0.10 |

**SHOOK, HARDY & BACON L.L.P.**
Ryan S. Killian
CA Bar No. 294512
600 Travis Street, Suite 3400
Houston, TX 77002-2026
Telephone: (713) 227-8008
Facsimile:  (713) 227-9508
Email:      rkillian@shb.com

*Attorneys for Defendant*
*MONSANTO COMPANY*

# UNITED STATES DISTRICT COURT FOR THE

# CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION

|  |  |
|---|---|
| ANOUSHEH SABOURI, an individual and successor in interest to decedent Mike Esfahanian, and S.E., a minor and successor in interest to decedent Mike Esfahanian, by and through her Guardian Ad Litem, SHIRIN SABOURI,<br><br>     Plaintiffs,<br><br>     v.<br><br>MONSANTO COMPANY, a corporation; WILBUR-ELLIS COMPANY LLC, a California limited liability corporation; and DOES 1 through 100, Inclusive,<br><br>     Defendants | Case No.: 2:22-cv-01986<br><br>**DEFENDANT MONSANTO COMPANY'S NOTICE OF REMOVAL**<br><br>[Removal from Superior Court of California, County of Los Angeles, Case No. 21STCV34775] |

     By filing this Notice of Removal and related papers, Monsanto Company ("Monsanto") hereby removes this case to this Court pursuant to 28 U.S.C. §§ 1332, 1441, and 1446 (and any other applicable laws).[1]  In accordance with Section 1446(a), Monsanto provides the following statement of grounds for removal.

---

[1] The caption set forth above is correct.  As discussed below, although Chevron Corporation was initially named as a defendant in the state court lawsuit, Plaintiffs voluntarily dismissed that defendant.  Thus, it is not included in the caption here.

# INTRODUCTION

1.    In this products liability lawsuit, Plaintiffs seeks damages for decedent Mike Esfahanian's cancer (multiple myeloma) and death allegedly caused by exposure to Monsanto's Roundup®-branded herbicides, which have glyphosate as their active ingredient.  For decades, farmers have used glyphosate-based herbicides to increase crop yields, and home-owners, landscaping companies, and local government agencies have used these herbicides for highly effective weed control. Glyphosate is one of the most thoroughly studied herbicides in the world, and glyphosate-based herbicides have received regulatory approval in more than 160 countries.   Since 1974, when Monsanto first introduced a Roundup®-branded, glyphosate-based herbicide to the marketplace, the United States Environmental Protection Agency repeatedly has approved the sale of such herbicides without cancer warnings and repeatedly has concluded that glyphosate does not cause cancer – including as recently as 2020.  Nevertheless, Plaintiffs allege that decedent developed cancer and died due to his exposure to Monsanto's glyphosate-based herbicides.

2.    Multidistrict litigation proceedings involving numerous other Roundup® lawsuits are pending in the United States District Court for the Northern District of California (the "MDL Court").  *In re Roundup Prods. Liab. Litig.*, No. 3:16-md-02741-VC.

3.    Plaintiffs are California citizens and therefore of diverse citizenship from Monsanto.  Plaintiffs tried to avoid complete diversity and defeat Monsanto's right to remove this lawsuit to federal court by asserting claims against two in-forum California companies – Wilbur-Ellis Company LLC ("Wilbur-Ellis Company") and Chevron Corporation – that the Complaint alleges, upon mere information and belief, distributed or sold the Roundup®-branded herbicides that caused decedent's cancer and death.

4.      However, this removal-prevention strategy fails because Plaintiffs voluntarily dismissed Chevron Corporation and they do not have any viable claims against Wilbur-Ellis Company, so that defendant is fraudulently joined. Wilbur-Ellis Company is fraudulently joined because decedent allegedly used Roundup®-branded herbicides for residential use, but Wilbur-Ellis Company: (a) has not distributed, sold, or marketed Monsanto's Roundup®-branded herbicides that have been designed for the residential-lawn-and-garden market; and (b) has not designed or manufactured Monsanto's Roundup®-branded herbicides.  Moreover, the MDL Court repeatedly has held, in response to the same arguments asserted by Monsanto in other Roundup® lawsuits, that Wilbur-Ellis Company was fraudulently joined, *see infra* Paragraph 22, and that conclusion applies to this case as well.

5.      As discussed in more detail below, this Court should hold that it has subject matter jurisdiction and that removal is proper here based on complete diversity of citizenship because Plaintiffs fraudulently joined Wilbur-Ellis Company, which means that the presence of that California defendant – the only California defendant left in this case – must be disregarded when the Court evaluates the issue of diversity jurisdiction and the propriety of removal notwithstanding the presence of that in-forum defendant.

## BACKGROUND AND PROCEDURAL HISTORY

6.      In September 2021, Plaintiffs commenced this lawsuit in the Superior Court of the State of California for the County of Los Angeles by filing a Complaint, captioned *Anousheh Sabouri, an individual and successor in interest to decedent Mike Esfahanian, et al. v. Monsanto Company, et al.*, case number 21STCV34775, (the "State Court Action").

7.      Pursuant to 28 U.S.C. § 1446(a), true and correct copies of the Summons and Complaint served upon Monsanto in the State Court Action (and other filings available from the state court's files) are attached as **Exhibits 1-16**.

8.    Plaintiffs assert various product liability claims and seek compensatory and punitive damages for decedent's cancer and death allegedly caused by exposure to Monsanto's Roundup®-branded herbicides.  *See, e.g.*, **Exhibit 1,** State Court Complaint ¶¶ 1-2, 11-14, 134-36, 146-51.

9.    Plaintiffs make speculative, information-and-belief allegations regarding Wilbur-Ellis Company.  They allege that, "[o]n information and belief, Wilbur-Ellis was one of the distributors providing Roundup® and other glyphosate-containing products used by the Plaintiff [*sic*; should be "used by the decedent"]."  State Court Complaint ¶ 111; *see id.* ¶ 24 ("Upon information and belief, WILBUR-ELLIS COMPANY, LLC was responsible for marketing Roundup® and related Monsanto products during the time period in question."); *see also id.* ¶ 25 (making information-and-belief allegations regarding Chevron Corporation)

10.    Monsanto and Wilbur-Ellis Company have denied Plaintiffs' allegations. A true and correct copy of those defendants' Answers are attached as **Exhibit 12** and **Exhibit 14**.

11.    On March 15, 2022, Plaintiffs voluntarily dismissed all claims asserted against Chevron Corporation in the State Court Action.  Request for Dismissal (true and correct copy attached as **Exhibit 16**).  The Clerk of the Court entered the dismissal of Chevron Corporation on March 21, 2022.  *Id.*

12.    Before filing the State Court Action, Plaintiffs filed a diversity-jurisdiction-based lawsuit in this Court against Monsanto and asserted the same claims that Plaintiffs are asserting against Monsanto in the State Court Action.  *See* Federal Court Complaint (true and correct copy attached as **Exhibit 17**).  Plaintiffs subsequently filed an amended complaint in that federal court lawsuit that purported to add claims against Wilbur-Ellis Company and Chevron Corporation.  *See* Federal Court First Amended Complaint (true and correct copy attached as **Exhibit 18**). Plaintiffs voluntarily dismissed that lawsuit, asserting that the claims asserted against

Wilbur-Ellis Company and Chevron Corporation deprived this Court of diversity jurisdiction and that "Plaintiffs will file their complaint in Los Angeles County Superior Court." Notice of Dismissal (true and correct copy attached as **Exhibit 19**).

## BASIS FOR REMOVAL – DIVERSITY JURISDICTION

## I.   SUBSTANTIVE REQUIREMENTS FOR REMOVAL ARE SATISFIED

13.   Although complete diversity of citizenship usually is required for a federal court to have diversity jurisdiction, "one exception to the requirement of complete diversity is where a non-diverse defendant has been 'fraudulently joined.'" *Morris v. Princess Cruises, Inc.*, 236 F.3d 1061, 1067 (9th Cir. 2001). A defendant removing a lawsuit from state court based on fraudulent joinder of a co-defendant is required to show that there is no possibility that the state court would hold the co-defendant liable. *Grancare, LLC v. Thrower*, 889 F.3d 543, 548 (9th Cir. 2018). When fraudulent joinder applies – *i.e.*, when "the plaintiff fails to state a cause of action against a resident defendant, and the failure is obvious according to the settled rules of the state," *Morris*, 236 F.3d at 1067 (quotation marks omitted) – the fraudulently joined defendant's "presence in the lawsuit is ignored" for purposes of determining whether the court has jurisdiction based on diversity of citizenship, *id.* Moreover, "[f]raudulent joinder claims may be resolved by 'piercing the pleadings' and considering summary judgment-type evidence such as affidavits and deposition testimony." *Id.* at 1068 (quoting *Cavallini v. State Farm Mut. Auto Ins. Co.*, 44 F.3d 256, 263 (5th Cir. 1995)); *see McCabe v. General Foods Corp.*, 811 F.2d 1336, 1339 (9th Cir. 1987) ("The defendant seeking removal to the federal court is entitled to present the facts showing the joinder to be fraudulent."). Fraudulent joinder also renders the so-called "forum defendant rule" inapplicable because that statutory provision applies only to "properly joined" defendants. 28 U.S.C. § 1441(b)(2).

14.   In this case, Plaintiffs sued Wilbur-Ellis Company in the hope that adding claims against that California company would prevent removal due to lack of

diversity jurisdiction and/or due to the forum defendant rule. However, as discussed below, Wilbur-Ellis Company has been fraudulently joined.

15. Plaintiffs are, and were at the time the State Court Action was filed, California residents and citizens. *See* State Court Complaint ¶ 8; Federal Court Complaint ¶¶ 8, 40 (alleging that federal district court had subject matter jurisdiction based on diversity of citizenship); Westlaw PeopleMap Report for Anousheh Sabouri (excerpts attached as **Exhibit 20**). Before and when decedent died, he was a California resident and citizen. *See* State Court Complaint ¶¶ 8-9; Federal Court Complaint ¶ 40 (alleging that federal district court had subject matter jurisdiction based on diversity of citizenship); Westlaw PeopleMap Report for Mojtaba Esfahanian (excerpts attached as **Exhibit 21**); Westlaw Obituary (attached as **Exhibit 22**).[2]

16. Monsanto is, and was at the time the State Court Action was filed, a corporation incorporated under the laws of the State of Delaware with its principal place of business in the State of Missouri. Thus, Monsanto is deemed to be a citizen of Missouri and Delaware, for purposes of federal diversity jurisdiction.

17. Wilbur-Ellis Company is, and was at the time the State Court Action was filed, a limited liability company whose sole member is (and was at the time the State Court Action was filed) Wilbur-Ellis Holdings II, Inc. Declaration of George Pappas ¶ 4 (attached as **Exhibit 23**). Wilbur-Ellis Holdings II, Inc. is, and was at the time the State Court Action was filed, a corporation incorporated under the laws of the State of Delaware with its principal place of business in the State of California. *Id.* ¶ 5. Thus, Wilbur-Ellis Holdings II, Inc. is deemed to be a citizen of Delaware and California for purposes of federal diversity jurisdiction. Wilbur-Ellis Company is

---

[2] These exhibits show that decedent used more than one name, including Mojtaba Esfahanian and Mike Esfahanian. The date of the death on the obituary matches the date of death alleged in the State Court Complaint (February 2019), and the PeopleMap Report for Mr. Esfahanian shows that his spouse was Anousheh Sabouri, **Exhibit 21** at 22, 82.

deemed to be a citizen of the same states as its member Wilbur-Ellis Holdings II, Inc. – Delaware and California – for purposes of federal diversity jurisdiction.

18. Wilbur-Ellis Company has been in the business of, among other things, distributing and selling certain pesticides and herbicides, including certain Monsanto glyphosate-based Roundup®-branded herbicides. *See* Declaration of Scott Hushbeck ¶ 4 ("Hushbeck Declaration") (attached as **Exhibit 24**). Glyphosate-based herbicide products (including Monsanto's glyphosate-based Roundup®-branded herbicides) have been designed for and sold to three different markets: (a) the agricultural market; (b) the residential-lawn-and-garden market; and (c) what Wilbur-Ellis Company calls the professional market, which involves herbicide products that are designed for and sold to, for example, landscaping companies, golf courses, schools, or state and local government agencies (to maintain roads, parks, and/or rights-of-way). *Id.*

19. Wilbur-Ellis Company has been in the business of distributing and selling only certain categories of Roundup®-branded herbicide products – namely, distributing and selling herbicides for the agricultural market and for the professional market. *See* Hushbeck Declaration ¶ 5. Wilbur-Ellis Company has not been in the business of distributing, marketing, or selling Monsanto's glyphosate-based Roundup®-branded herbicides that have been designed for the residential-lawn-and-garden market. *Id.* For example, Wilbur-Ellis Company has not played any role in the chain of distribution leading to Monsanto's glyphosate-based Roundup®-branded lawn-and-garden herbicides being sold at Home Depot, Lowe's, Target, Walmart, Costco, Ace Hardware, or other national retail stores. *Id.*

20. Moreover, Wilbur-Ellis Company has not been the sole or exclusive distributor of Monsanto's glyphosate-based Roundup®-branded herbicides in the State of California. *See* Hushbeck Declaration ¶ 6.

21. Wilbur-Ellis Company has not designed or manufactured Monsanto's glyphosate-based Roundup®-branded herbicides. *See* Hushbeck Declaration ¶ 7.

22. Decedent allegedly used Roundup®-branded herbicides for residential use. *See* State Court Complaint ¶ 2. Thus, as the MDL Court has held in other Roundup® lawsuits involving Wilbur-Ellis Company when ruling on the same fraudulent joinder argument presented here, Plaintiffs do not have any viable claims against Wilbur-Ellis Company. *See* Amended Pretrial Order No. 244, *In re Roundup Prods. Liab. Litig. (Roybal)*, No. 16-md-02741-VC, 2021 WL 4186714 (N.D. Cal. Sept. 15, 2021); Pretrial Order No. 248, *In re Roundup Prods. Liab. Litig. (Carson)*, No. 16-md-02741-VC, 2021 WL 4314138 (N.D. Cal. Sept. 23, 2021); Pretrial Order No. 247, *In re Roundup Prods. Liab. Litig. (Pike)*, No. 16-md-02741-VC, 2021 WL 4315486 (N.D. Cal. Sept. 22, 2021); *see also, e.g.*, *Martinez v. McKesson Corp.*, No. 3:15-cv-02903-H-JLB, 2016 WL 5930271 (S.D. Cal. Apr. 7, 2016) (holding that California defendant was fraudulently joined because it did not manufacture Mirena and did not distribute *plaintiff's* Mirena); *Tucker v. McKesson Corp.*, No. C 10–2981 SBA, 2011 WL 4345166 (N.D. Cal. Sept. 14, 2011) (holding that California defendant was fraudulently joined because it did not distribute morphine tablets to pharmacy where decedent obtained morphine tablets at issue in lawsuit); *Vu v. Ortho-McNeil Pharm., Inc.*, 602 F. Supp. 2d 1151, 1154-55 (N.D. Cal. 2009) (holding that California defendant was fraudulently joined because she did not market or distribute Children's Tylenol Plus Multi-Symptom Cold medicine); *Aronis v. Merck & Co.*, No. Civ. S-05-0486 WBS DAD, 2005 WL 5518485 (E.D. Cal. May 3, 2005) (holding that California defendant was fraudulently joined because plaintiff alleged merely that defendant was a major distributor of Vioxx without connecting defendant to plaintiff's injuries).

23. For the foregoing reasons, the Court should hold that Plaintiffs fraudulently joined Wilbur-Ellis Company and should disregard the citizenship of that defendant when assessing whether this lawsuit has been properly removed.

24. The only other California defendant named in the Complaint (Chevron Corporation) has been voluntarily dismissed, *see supra* Paragraph 11, so there is complete diversity of citizenship between Plaintiffs and Monsanto (disregarding the citizenship of the fraudulently joined California defendant (Wilbur-Ellis Company)).[3]

25. The Complaint seeks compensatory and punitive damages based on allegations that Monsanto's Roundup®-branded herbicides caused decedent's cancer and death. Therefore, it is plausible from the face of the Complaint that Plaintiffs seek damages in excess of $75,000, exclusive of interest and costs, which satisfies the jurisdictional amount-in-controversy requirement. 28 U.S.C. § 1332(a); *see Dart Cherokee Basin Operating Co. v. Owens*, 574 U.S. 81, 89 (2014) ("[A] defendant's notice of removal need include only a plausible allegation that the amount in controversy exceeds the jurisdictional threshold."); *see also Ross v. First Family Fin. Servs., Inc.*, No. 2:01CV218-P-B, 2002 WL 31059582, at *8 (N.D. Miss. Aug. 29, 2002) ("[U]nspecified claims for punitive damage sufficiently serve to bring the amount in controversy over the requisite jurisdictional threshold set out in 28 U.S.C. § 1332."). In fact, numerous other lawsuits seeking damages for NHL allegedly caused by Roundup®-branded herbicides have been filed against Monsanto in other federal courts asserting jurisdiction under Section 1332(a) and alleging damages in excess of $75,000, exclusive of interest and costs. Moreover, Plaintiffs asserted that the jurisdictional amount-in-controversy was satisfied when they filed the same claims at issue here in this Court. Federal Court Complaint ¶ 41.

26. In sum, this Court has original subject matter jurisdiction over this lawsuit based on Section 1332(a) because there is complete diversity of citizenship between Plaintiffs and Monsanto, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

---

[3] The citizenship of "Doe" defendants must be disregarded when determining whether this lawsuit is removable based on Section 1332(a). *See* 28 U.S.C. § 1441(b)(1).

## II. PROCEDURAL REQUIREMENTS FOR REMOVAL ARE SATISFIED

27.    The Superior Court of the State of California for Los Angeles County is located within the Central District of California.  Therefore, removal to this Court satisfies the venue requirement of 28 U.S.C. § 1446(a).

28.    This Notice of Removal is timely.  When the State Court Action was commenced, the "case stated by the initial pleading [was] not removable," 28 U.S.C § 1446(b)(3), because the Complaint included claims against California defendants. Thus, based on the face of the Complaint, this lawsuit was not removable due to lack of diversity of citizenship and due to the forum defendant rule, 28 U.S.C. § 1441(b)(2).  The dismissal of Chevron Corporation from the State Court Action, which was requested by Plaintiffs in their March 15, 2022 filing and entered by the Clerk's Office on March 21, 2022, Exhibit 16, was the "other paper from which it may first be ascertained that [this] case is one which is or has become removable." § 1446(b)(3).  Regardless of which March 2022 date is deemed to be the triggering date for purposes of Section 1446(b)(3), this Notice of Removal is timely because Monsanto is filing it within 30 days of the earlier date, March 15, 2022.

29.    The written notice required by 28 U.S.C. § 1446(d) will be promptly filed in the Superior Court of the State of California for Los Angeles County and will be promptly served on Plaintiffs.

30.    Monsanto does not waive any defenses and expressly reserves its right to raise any and all defenses in subsequent proceedings.

31.    If any question arises as to the propriety of this removal, Monsanto requests the opportunity to present written and oral argument in support of removal.

**CONCLUSION**

For the foregoing reasons, Monsanto removes this lawsuit to this Court pursuant to 28 U.S.C. §§ 1332, 1441, and 1446 (and any other applicable laws).

DATED:  March 25, 2022                      Respectfully submitted,

                                            SHOOK, HARDY & BACON L.L.P.

                                            BY: */s/ Ryan S. Killian*
                                                Ryan S. Killian
                                                CA Bar No. 294512
                                                600 Travis Street, Suite 3400
                                                Houston, TX 77002-2926
                                                Telephone:  (713) 227-8008
                                                Facsimile:  (713) 227-9508
                                                Email:   rkillian@shb.com

                                            *Attorneys for Defendant*
                                            *MONSANTO COMPANY*

# **CERTIFICATE OF SERVICE**

I certify that on the 25th day of March 2022, I electronically transmitted the foregoing *Monsanto Company's Notice of Removal* to the Clerk of the Court for the United States District Court Central District of California, by using the CM/ECF system for filing. Transmittal of a true and correct copy of the foregoing document was served electronically or by another manner as authorized by Fed. R. Civ. P. 5.

*/s/ Ryan S. Killian*
Ryan S. Killian

Electronically FILED by Superior Court of California, County of Los Angeles on 09/21/2021 01:31 PM Sherri R. Carter, Executive Officer/Clerk of Court, by C. Monroe,Deputy Clerk
Case Case M0198b 2D4CuDeumenha3tAW593/25/22 0Bage22 oiPage 1Pge7D #:14
Assigned for all purposes to: Spring Street Courthouse, Judicial Officer: William Crowfoot

Haytham Faraj, Esq. (SBN 291416)
Katherine K. Melik-Stepanyan, Esq. (SBN 315015)
**THE LAW OFFICES OF HAYTHAM FARAJ**
8605 Santa Monica Blvd., Suite 44953
West Hollywood, California 90069-4109
Telephone:     (323) 463-9200
Facsimile:     (202) 280-1039
Email:        service@farajlaw.com

Attorneys for Plaintiffs, ANOUSHEH SABOURI
and S███ E███████, a minor by and through
her GAL, SHIRIN SABOURI

## SUPERIOR COURT OF THE STATE OF CALIFORNIA

## COUNTY OF LOS ANGELES

ANOUSHEH SABOURI, an individual and
successor in interest to decedent Mike
Esfahanian; S███ E███████, a minor
and successor in interest to decedent Mike
Esfahanian, by and through her Guardian Ad
Litem, SHIRIN SABOURI,

            Plaintiffs,

    v.

MONSANTO COMPANY, a corporation;
WILBUR-ELLIS COMPANY, LLC, a
California limited liability corporation;
CHEVRON CORPORATION, a corporation;
and DOES 1 through 100, Inclusive,

            Defendants.

CASE NO.:  21STCV34775

**COMPLAINT FOR DAMAGES**

1. **STRICT PRODUCTS LIABILITY -
   DESIGN DEFECT;**
2. **STRICT PRODUCTS LIABILITY –
   FALURE TO WARN;**

3. **NEGLIGENCE;**

4. **BREACH OF EXPRESS
   WARRANTIES;**

5. **BREACH OF IMPLIED
   WARRANTIES;**

6. **FRAUD;**

7. **WRONGFUL DEATH; AND**

8. **EXEMPLARY DAMAGES.**

**\*\*DEMAND FOR JURY TRIAL\*\***

COME NOW Plaintiffs, ANOUSHEH SABOURI, an individual and successor in interest to decedent Mike Esfahanian; S█████ E███████████, a minor and successor in interest to decedent Mike Esfahanian, by and through her Guardian Ad Litem, SHIRIN SABOURI (collectively hereinafter "Plaintiffs"), who for causes of action against the Defendants, MONSANTO COMPANY, a corporation (hereinafter "Monsanto"), WILBUR-ELLIS COMPANY, LLC, a California limited liability corporation (hereinafter "Wilbur-Ellis"), CHEVRON CORPORATION, a corporation (hereinafter "Chevron"), and DOES 1 through 100, Inclusive, and each of them (collectively hereinafter "DEFENDANTS") complain and allege the following causes of action:

## SUMMARY

1.     This case arises out of Monsanto's and Wilbur-Ellis' wrongful conduct in connection with the design, development, manufacture, testing, packaging, promoting, marketing, advertising, distribution, labeling, and sale of the herbicide Roundup, containing the active ingredient glyphosate.  Glyphosate has been found to be carcinogenic, linked to causing various forms of cancer, and in particular multiple myeloma.  As such, Roundup is dangerous to human health and unfit to be marketed and sold in commerce, particularly without proper warnings and directions as to the dangers associated with its use.

2.     On information and belief, Decedent MIKE ESFAHANIAN (herein referred to as "DECEDENT"), who was exposed to Roundup extensively while using Roundup residentially for his personal use, was diagnosed with multiple myeloma in April 2018 and died as a result of his cancer in February 2019. Plaintiff ANOUSHEH SABOURI, is the surviving spouse of Decedent and Plaintiff S█████ E███████████, a minor, is the surviving daughter of decedent.

/ / /

/ / /

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

## STATEMENT OF THE CASE

3.     In 1970, Defendant Monsanto Company discovered the herbicidal properties of glyphosate and began marketing it in products in 1974 under the brand name Roundup®. Roundup® is a non-selective herbicide used to kill weeds that commonly compete with the growing of crops. By 2001, glyphosate had become the most-used active ingredient in American agriculture with 85-90 millions of pounds used annually. That number grew to 185 million pounds by 2007. As of 2013, glyphosate was the world's most widely used herbicide.

4.     Monsanto is a multinational agricultural biotechnology corporation based in St. Louis, Missouri. It is the world's leading producer of glyphosate. As of 2009, Monsanto was the world's leading producer of seeds, accounting for 27% of the world seed market. The majority of these seeds are of the Roundup Ready® brand. The stated advantage of Roundup Ready® crops is that they substantially improve a farmer's ability to control weeds, since glyphosate can be sprayed in the fields during the growing season without harming their crops. In 2010, an estimated 70% of com and cotton, and 90% of soybean fields in the United States were Roundup Ready®.

5.     Monsanto's glyphosate products are registered in 130 countries and approved for use on over 100 different crops. They are ubiquitous in the environment. Numerous studies confirm that glyphosate is found in rivers, streams, and groundwater in agricultural areas where Roundup® is used. It has been found in food, in the urine of agricultural  workers, and even in the urine of urban dwellers who are not in direct contact with glyphosate.

6.     On March 20, 2015, the International Agency for Research on Cancer ("IARC"), an agency of the World Health Organization ("WHO"), issued an evaluation of several herbicides, including glyphosate. That evaluation was based, in part, on studies of exposures to

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

glyphosate in several countries around the world, and it traces the health implications from

exposure to glyphosate since 2001.

7.     On July 29, 2015, the IARC issued the formal monograph relating to glyphosate. In that monograph, the IARC Working Group provides a thorough review of the numerous studies and data relating to glyphosate exposure in humans.

8.     The IARC Working Group classified glyphosate as a Group 2A herbicide, which means that it is probably carcinogenic to humans. The IARC Working Group concluded that the cancers most associated with glyphosate exposure are non-Hodgkin lymphoma and other hematopoietic cancers, including multiple myeloma.

7.     The IARC evaluation is significant. It confirms what has been believed for years: that glyphosate is toxic to humans. Nevertheless, Monsanto, since it began selling Roundup®, has represented it as safe to humans and the environment. Indeed, Monsanto has repeatedly proclaimed and continues to proclaim to the world, and particularly to United States consumers, that glyphosate-based herbicides, including Roundup®, create no unreasonable risks to human health or to the environment.

## THE PARTIES

8.     At all times relevant and mentioned herein, Plaintiff ANOUSHEH SABOURI, is the surviving spouse of Decedent and Plaintiff S██████ E██████████ a minor, is the surviving daughter of Decedent. Plaintiffs were, and are now, residents of the City of Topanga, County of Los Angeles, California. Pursuant to the operation of *Code of Civil Procedure* section 377.60, Plaintiffs are the heirs, successors in interest and persons lawfully entitled to assert a cause of action of the wrongful death of Decedent. No other persons have any claim, right or interest in the cause of action for wrongful death that is superior to the claims by the Plaintiffs.

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

9. As a result of decedent MIKE ESFAHANIAN'S exposure to Roundup® and/or other Monsanto and/or Monsanto glyphosate containing products in the state of California from approximately the mid-1990s to around 2018, Decedent was diagnosed with multiple myeloma, which ultimately resulted in his untimely death on February 9, 2019. The conduct of defendants was a substantial factor and proximate cause of the serious personal injuries and death sustained by plaintiffs' Decedent, MIKE ESFAHANIAN.

10. Plaintiffs are informed and believe and based thereon allege that as a direct and proximate result of Decedent's use of Roundup® and/or other Monsanto and/or Monsanto Chevron glyphosate-containing products ("Roundup"), supplied, marketed, and/or distributed by defendants herein, decedent suffered significant harm, conscious pain and suffering, physical injury and bodily impairment including, but not limited to, multiple myeloma and other cancers, other permanent physical deficits, permanent bodily impairment and other injury sequelae. Decedent's injuries required medical intervention to address the adverse physical effects and damage caused by decedent's use of Roundup® and/or other Monsanto glyphosate-containing products ("Roundup"). These injuries ultimately resulted in Decedent's untimely death.

11. As a direct and proximate result of the wrongful conduct, acts, omissions, fraudulent concealments, fraudulent misrepresentations, and fraudulent business practices by Defendants and DOES1 through 100, inclusive, Decedent used and/or was exposed to Roundup® and was diagnosed with serious health injuries including to multiple myeloma and/or other cancers.

12. As a further direct and proximate result of defects in Roundup® and the wrongful conduct, acts, omissions, and fraudulent misrepresentations of Defendants, Decedent suffered severe mental and physical pain and have and will sustain permanent injuries and emotional

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

distress, along with economic loss due to medical expenses and living-related expenses as a result of lifestyle changes.

13.     As a further direct and proximate result of defects in Roundup® and the wrongful conduct, acts, omissions, and fraudulent misrepresentations of Defendants, Decedent required medical intervention in efforts to maintain and/or save Decedent.

14.     Plaintiffs are individuals who suffered damages as a result of injuries resulting from Decedent's use and/or exposure to Roundup® and are authorized to bring an action for the causes of actions alleged herein including, but not limited to, injuries and damages sustained by Plaintiffs resulting from Decedent's use of Roundup®. Said injuries and damages sustained by Plaintiffs were caused or substantially contributed to by the wrongful conduct of Defendants and DOES 1 through 100, inclusive.

15.     The product warnings for Roundup® in effect during the time period Decedent used and/or was exposed to Roundup® were vague, incomplete or otherwise inadequate, both substantively and graphically, to alert consumers to the severe health risks associated with Roundup® use and/or exposure.

16.     The Defendants and DOES 1 through 100, and each of them, inclusive, did not provide adequate warnings to consumers including Decedent and the general public about the increased risk of the serious adverse events described herein.

17.     Had Decedent and/or Plaintiffs been adequately warned by the Defendants and DOES 1 through 100, and each of them, inclusive, of the potential life-threatening side effects of Roundup®, Decedent would not have purchased, used, or been exposed to Roundup®.

18.     By reason of the foregoing, Decedent developed serious and dangerous side effects including multiple myeloma and other cancers, related injury sequelae, physical pain and suffering, mental anguish, loss of enjoyment of life, and death. By reason of the foregoing,

6

Plaintiffs suffered damages and losses, as alleged herein. Plaintiffs' general and special damages exceed the jurisdictional limits of this Court.

19.    Plaintiffs have reviewed potential legal claims and causes of action against the Defendants and have intentionally chosen only to pursue claims based on state law. Any reference to any federal agency, regulation or rule is stated solely as background information, and Plaintiffs are not making any claims which raise federal questions. Thus, California state jurisdiction and venue is proper.

## DEFENDANTS

20.    Plaintiffs are informed and believe, and thereupon allege, that defendant Monsanto Company (hereinafter "Monsanto" or "defendant Monsanto"), is, and at all times relevant was, a Delaware corporation, with its headquarters in St. Louis, Missouri and multiple principal places of business throughout the world, including in St. Louis, Missouri, Oxnard, California, Woodland, and, at all relevant times to this complaint, San Ramon, California. At all times relevant to this complaint, Monsanto was the entity that discovered the herbicidal properties of glyphosate and manufactured Roundup®. Monsanto has regularly transacted and conducted business within the State of California and has derived substantial revenue from goods and products, including Roundup®, used in the State of California and employs sales representatives in the State of California. Specifically, Monsanto operated a residential products division known as the Solaris Group of Monsanto Company (hereinafter "Solaris Group"), headquartered in San Ramon, California. Moreover, upon information and belief, Solaris Group manufactured, registered, distributed, marketed, advertised, and sold Roundup® products to California consumers. At all relevant times, Monsanto has conducted testing, research, and analyses on its Roundup® and other glyphosate-based formulations within California and manufactured said products in California, utilizing principal laboratories and manufacturing sites

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

throughout the State of California in locations such as San Ramon, Oxnard and Woodland. Monsanto expected or should have expected its acts to have consequences within the State of California because it derived substantial revenue from interstate commerce and invoked the benefits and protection of the State of California's laws

21.     Defendant Wilbur-Ellis Company LLC is a California limited liability corporation with its headquarters and principal place of business in San Francisco, California. At all times relevant to this complaint, Wilbur-Ellis Company, LLC sold and distributed Monsanto products, including Roundup®, within the State of California.

22.     Defendant CHEVRON CORPORATION (hereinafter "Chevron" or "Monsanto Chevron") is a Delaware corporation with its headquarters and principal place of business in San Ramon, California. Chevron, through its Ortho Consumer Products Division, investigated and prepared storage stability data, and conducted other testing, research and analyses, to support the EPA registration of Roundup® and other glyphosate-based formulations intended for the residential consumer market. The research was then submitted to the EPA by Monsanto in furtherance of continued registration of Roundup® products and other glyphosate-based formulations. Under the entity name "Monsanto Chevron," Chevron directly contributed to the continued registration of the carcinogenic Roundup® products and other glyphosate-based formulations that were tested, researched, analyzed, manufactured, registered, distributed, marketed and sold in California, aimed at a California consumer market, and purchased and used by Plaintiff. Moreover, upon information and belief, and at all times relevant to this complaint, Chevron manufactured, marketed and distributed glyphosate-based formulations in California.

23.     At all relevant times alleged herein, one or more of the corporate Defendants was, and now is, a corporation with its principal place of business in the State of California and, therefore, is a citizen of the State of California.

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

24. Upon information and belief, WILBUR-ELLIS COMPANY, LLC was responsible for marketing Roundup® and related Monsanto products during the time period in question.

25. Upon information and belief, at all times relevant to this complaint, the CHEVRON CORPORATION, operating as "Monsanto Chevron," manufactured, marketed, registered, distributed, and sold Roundup® products and other glyphosate-based formulations, and investigated and prepared· storage stability data for submission to the EPA in furtherance of the continued registration of Roundup® products and other glyphosate-based formulations for use by consumers.

26. Plaintiffs are informed and believe, and based thereon allege, that in committing the acts alleged herein, each and every managing agent, agent, representative and/or employee of the Defendants was working within the course and scope of said agency, representation and/or employment with the knowledge, consent, ratification, and authorization of the Defendants and their directors, officers and/or managing agents.

27. The true names and/or capacities, whether individual, corporate, partnership, associate, governmental, or otherwise, of Defendant DOES 3 through 100, inclusive, and each of them, are unknown to Plaintiffs at this time, who therefore sue said Defendants by such fictitious names. Plaintiffs are informed and believe, and thereon allege, that each Defendant designated herein as a DOE caused injuries and damages proximately thereby to Plaintiffs as hereinafter alleged; and that each DOE Defendant is liable to the Plaintiffs for the acts and omissions alleged herein below, and the resulting injuries to Plaintiffs, and damages sustained by the Plaintiffs. Plaintiffs will amend this Complaint to allege the true names and capacities of said DOE Defendants when the same are ascertained.

28. Plaintiffs are informed and believe, and thereon allege, that at all times herein

1  mentioned, each of the named Defendants and each of the DOE Defendants was the agent,

2  servant, employee and/or joint venturer of the other co-Defendants and other DOE Defendants,

3  and each of them, and at all said times, each named Defendant and each DOE Defendant was

4  acting in the full course, scope and authority of said agency, service, employment and/or joint

5  venture.

6       29.    Plaintiffs are informed and believe and allege that at all times mentioned herein,

7  Defendants and DOES 1 through 100, inclusive, and each of them, were also known as, formerly

8  known as and/or were the successors and/or predecessors in interest/business/product line/or a

9  portion thereof, assigns, a parent, a subsidiary (wholly or partially owned by, or the whole or

10  partial owner), affiliate, partner, co-venturer, merged company, alter egos, agents, equitable

11  trustees and/or fiduciaries of and/or were members in an entity or entities engaged in the funding,

12  researching, studying, manufacturing, fabricating, designing, developing, labeling, assembling,

13  distributing, supplying, leasing, buying, offering for sale, selling, inspecting, servicing,

14  contracting others for marketing, warranting, rebranding, manufacturing for others, packaging

15  and advertising of Roundup® and/or other Monstano glyphosate-containing products.

16  Defendants and DOES 1 through 100, inclusive, and each of them, are liable for the acts,

17  omissions and tortious conduct of their successors and/or predecessors in

18  interest/business/product line/or a portion thereof, assigns, parents, subsidiaries, affiliates,

19  partners, co-venturers, merged companies, alter egos, agents, equitable trustees, fiduciaries

20  and/or their alternate entities in that Defendants and DOES 1 through 100, inclusive, and each of

21  them, enjoy the goodwill originally attached to each such alternate entity, acquired the assets or

22  product line (or portion thereof), and in that there has been a virtual destruction of Plaintiffs'

23  remedy against each such alternate entity, and that each such Defendant has the ability to assume

24  the risk spreading role of each such alternate entity.

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

30.     Plaintiffs are informed and believe, and thereon allege, that at all times herein mentioned, Defendants and DOES 1 through 100, inclusive, and each of them, were and are corporations organized and existing under the laws of the State of California or the laws of some state or foreign jurisdiction; that each of the said Defendants and DOE Defendants were and are authorized to do and are doing business in the State of California and regularly conducted business in California, including in Los Angeles County.

31.     Upon information and belief, at all relevant times, Defendants and DOES 1 through 100, and each of them, inclusive, were engaged in the business of researching, developing, designing, licensing, manufacturing, distributing, labeling, selling, marketing, and/or introducing into interstate commerce and into the State of California, including in Los Angeles County, either directly or indirectly through third parties or related entities, Roundup® and/or other Montano glyphosate-containing products.

32.     At all relevant times, Defendants and DOES 1 through 100, inclusive, and each of them, conducted regular and sustained business and engaged in substantial commerce and business activity in the State of California, which included but was not limited to selling, marketing and distributing Roundup® and/or other Montano glyphosate-containing products in the State of California, including Los Angeles County. Specifically, Decedent purchased all of its Roundup® products for residential use from retailers in Los Angeles County.

33.     At all relevant times, Defendants and DOES 1 through 100, inclusive, and each of them, expected or should have expected that their acts would have consequences within the United States of America including the State of California, including Los Angeles County, and said Defendants derived and derive substantial revenue therefrom.

## **AGENCY**

34.     Each of the Defendants named in this Complaint, including each of the DOE

11

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

Defendants, is, and at all relevant times herein mentioned was, the co-conspirator of each other Defendant in connection with the wrongful conduct described herein, and, therefore, each Defendant is jointly and severally liable to Plaintiffs for the damages sustained as a proximate result of each other Defendant.

35.     Each Defendant entered into an express or implied agreement, understanding, and/or concert of action with each of the other Defendants to commit the wrongs herein alleged. These affirmative wrongful acts included, but were not limited to, the conspiracy to defraud, deceive, and hide the dangers of glyphosate from the public, beginning in 1976, through Defendants' routine falsification of data for toxicity studies needed to register Roundup®. In 1976, the United States Food and Drug Administration ("FDA") performed an inspection of Industrial Bio-Test Industries ("IBT") that revealed discrepancies between the raw data and the final report relating to the toxicological impacts of glyphosate. The EPA subsequently audited IBT; it too found the toxicology studies conducted for the Roundup® herbicide to be invalid. An EPA reviewer stated, after finding "routine falsification of data" at IBT, that it was "hard to believe the scientific integrity of the studies when they said they took specimens of the uterus from male rabbits."

36.     The conspiracy was furthered in 1991 when Defendant Monsanto hired Craven Laboratories in 1991 to perform pesticide and herbicide studies, including for Roundup®. In that same year, the owner of Craven Laboratories and three of its employees were indicted, and later convicted, of fraudulent laboratory practices in the testing of pesticides and herbicides.

37.     The conspiracy was furthered through 2000 through present with publication of studies through companies such as Intertek and Exponent, Inc., which minimize any safety concerns about the use of glyphosate

38.     The conspiracy was furthered when Monsanto held secret ex parte meetings and

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

conversations with certain EPA employees to collude in a strategy to re-register glyphosate and to quash investigations into the carcinogenicity of glyphosate by other federal agencies such as the Agency for Toxic Substances and Disease Registry. In March 2015, The Joint Glyphosate Task Force, at Monsanto's behest, issued a press release sharply criticizing IARC, stating that IARC's conclusion was "baffling" and falsely claiming that "IARC did not consider any new or unique research findings when making its decision. It appears that only by deciding to exclude certain available scientific information and by adopting a different approach to interpreting the studies was this possible."

39.     The conspiracy was furthered in 2011when Defendants co-opted studies which falsely proclaimed the safety of glyphosate. In October 2015, the Defendants, as members of the Joint Glyphosate Task Force, wrote to the state of California to try to stop California from warning the public about the carcinogenicity of glyphosate, arguing that the IARC classification was mistaken. In January of 2016, Monsanto filed a lawsuit to stop California from warning the public about the carcinogenicity of glyphosate.

40.     Plaintiffs are further informed and believe and thereon allege that at all times herein alleged, each of the Defendants, including, but not limited to DOES 1 through 100, was the agent, servant, partner, aider and abettor, co-conspirator, alter ego, and/or joint venturer of the other herein and were at all times operating and acting within the purpose and scope of said agency, service, employment, partnership, conspiracy, alter ego, and/or joint venture and rendered substantial assistance and encouragement to the other Defendants, knowing that their conduct constituted a breach of duty owed to Plaintiffs.

41.     Plaintiffs are informed and believe, and thereon allege, that there exists, and at all times herein alleged, there existed, a unity of interest in ownership between each of the aforesaid Defendants, including DOES 1 through 100, such that any individuality and separateness

between these Defendants has ceased and these Defendants each are the alter-ego of the others and exerted control over those Defendants. Adherence to the fiction of the separate existence of each of these Defendants as an entity distinct from the others will permit an abuse of the corporate privilege and would sanction fraud and would promote injustice.

42.   Each of these acts and failures to act is alleged against each defendant whether acting individually, jointly, or severally. Each of the defendants or their alter egos agreed and conspired with the others in the commission of these acts or failures to act.

43.   Defendants, and each of them, committed these acts alleged herein maliciously, fraudulently, and oppressively, and with the wrongful intention of injuring Plaintiffs, and acted with an improper and evil motive amounting to malice or despicable conduct. Alternatively, Defendants' wrongful conduct was carried out with a conscious disregard for Plaintiffs' rights.

44.   Defendants' conduct warrants the assessment of punitive damages in an amount sufficient to punish Defendants and deter others from engaging in similar conduct.

45.   Each of these acts and failures to act are alleged against each Defendant whether acting individually, jointly, or severally. Each of the Defendants or their alter egos agreed and conspired with the others in the commission of these acts or failures to act.

## JURISDICTION AND VENUE

46.   The California Superior Court has jurisdiction over this action pursuant to California Constitution Article VI, Section 10, which grants the Superior Court "Original jurisdiction in all causes except those given by statute to other trial courts." The Statutes under which this action is brought do not specify any other basis for jurisdiction.

47.   This Court has personal jurisdiction over defendants since they are and, were at all relevant times, residents of and/or authorized to conduct business in the State of California. Defendants conducted such business within the State, including the performance of acts that

1   caused or contributed to the harm giving rise to this action. Furthermore, defendants have

2   sufficient minimum contacts in California, or principal place of business in California or,

3   otherwise, intentionally avails itself of the California marker so as to render the exercise of

4   jurisdiction over it by this State's courts, as is consistent with traditional notions of fair play and

5   substantial justice.

6       48.    Plaintiffs are informed and believes and, on that basis, alleges that defendants

7   have purposefully availed themselves of the privileges and benefits of conducting activities and

8   business within the forum State, and have invoked the benefits and protections of its laws.

9

10                              **FACTUAL ALLEGATIONS**

11      49.    Glyphosate is a broad-spectrum, non-selective herbicide used in a wide variety of

12  herbicidal products around the world.

13      50.    Plants treated with glyphosate translocate the systemic herbicide to their roots,

14  shoot regions and fruit, where it interferes with the plant's ability to form aromatic amino acids

15  necessary for protein synthesis. Treated plants generally die within two to three days. Because

16  plants absorb glyphosate, it cannot be completely removed by washing or peeling produce or by

17  milling, baking, or brewing grains.

18

19      51.    For nearly 40 years, farms across the world have used Roundup® without

20  knowing of the dangers its use poses.

21      52.    That is because when Monstano first introduced Roundup®, it touted glyphosate

22  as a technological breakthrough: it could kill almost every weed without causing harm either to

23  people or to the environment. Of course, history has shown that not to be true. According to the

24  WHO, the main chemical ingredient of Roundup®--glyphosate--is a probable cause of cancer.

25  Those most at risk are farm workers and other individuals with workplace exposure to

26  Roundup®, such as workers in garden centers, nurseries, and landscapers. Agricultural workers

27

28

are, once again, victims of corporate greed. Monstano assured the public that Roundup® was harmless. In order to prove this, Monstano championed falsified data and attacked legitimate studies that revealed its dangers. Monstano led a prolonged campaign of misinformation to convince government agencies, farmers and the general population that Roundup® was safe.

### The Discovery of Glyphosate and Development of Roundup®

53.     The herbicidal properties of glyphosate were discovered in 1970 by Monstano chemist John Franz. The first glyphosate-based herbicide was introduced to the market in the mid-1970s under the brand name Roundup®. From the outset, Monstano marketed Roundup® as a "safe" general-purpose herbicide for widespread commercial and consumer use. Monstano still markets Roundup® as safe today.

### Registration of Herbicides under Federal Law

54.     The manufacture, formulation and distribution of herbicides, such as Roundup®, are regulated under the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA" or "Act"), 7 U.S.C. § 136 *et seq.* FIFRA requires that all herbicides be registered with the Environmental Protection Agency ("EPA" or "Agency") prior to their distribution, sale, or use, except as described by the Act. 7 U.S.C. § 136a (a).

55.     Because herbicides are toxic to plants, animals, and humans, at least to some degree, the EPA requires as part of the registration process, among other things, a variety of tests to evaluate the potential for exposure to herbicides, toxicity to people and other potential non-target organisms, and other adverse effects on the environment. Registration by the EPA, however, is not an assurance or finding of safety. The determination the Agency must make in registering or re-registering a product is not that the product is "safe," but rather that use of the product in accordance with its label directions "will not generally cause unreasonable adverse effects on the environment." 7 U.S.C. § 136a(c) (5) (D).

56.     FIFRA defines "unreasonable adverse effects on the environment" to mean "any unreasonable risk to man or the environment, taking into account the economic, social, and environmental costs and benefits of the use of any pesticide." 7 U.S.C. § 136(bb). FIFRA thus requires EPA to make a risk/benefit analysis in determining whether a registration of a product should be granted or allowed so that the product may continue to be sold in commerce.

57.     The EPA registered Roundup® for distribution, sale, and manufacture in the United States including the State of California. The EPA's decision to register Roundup, however, was based on studies on the active chemical, glyphosate, and not the formulated Roundup product which contains a cocktail of other ingredients such as surfactants, adjuvants, and inert compounds, all of which, as discussed in greater detail below, contribute to the health risks associated with Roundup exposure.[1]

58.     FIFRA generally requires the registrant, Monsanto in the case of Roundup®, to conduct health and safety testing of herbicide products. The EPA has protocols governing the conduct of tests required for registration and the laboratory practices that must be followed in conducting these tests. The data produced by the registrant must be submitted to the EPA for review and evaluation. The government is not required, nor is it able, however, to perform the product tests that are required of the manufacturer.

59.     The evaluation of each herbicide product distributed, sold, or manufactured is completed at the time the product is initially registered. The data necessary for registration of an herbicide has changed over time. The EPA is now in the process of re-evaluating all herbicide products through a Congressionally mandated process called "re-registration." 7 U.S.C. § 136a-I. In order to reevaluate these herbicides, the EPA is demanding the completion of additional tests

---

[1] Surfactants are compounds which contribute to the even and effective spread of glyphosate across the surface of a leaf and increase the rate of penetration through the plant. It has been shown that surfactants also greatly increase the amount and rate of Roundup® absorbed by human skin.

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

1    and the submission of data for the EPA's review and evaluation.

2         60.    In the case of glyphosate, and therefore Roundup®, the EPA had planned on

3    releasing its preliminary risk assessment -in relation to the re-registration process-no later than

4    July 2015. The EPA completed its review of glyphosate in early 2015, but it delayed releasing

5    the risk assessment pending further review in light of the WHO's health-related findings. "On

6    September 12, 2016, the EPA's office of Pesticide Programs released an interim report,

7    titled "Glyphosate Issue Paper: Evaluation of Carcinogenic Potential," ("2016 Issue Paper"")

8    detailing the agency's review of a small portion of the existing literature on Roundup. The

9    2016 Issue Paper contains a review of studies submitted to the agency by Monsanto, as well

10   as the general independent scientific literature on glyphosate carcinogenicity.

11        61.    Immediately following the publication of the 2016 Issue Paper, the

12   FIFRA Scientific Advisory Panel ("SAP") issued a report which reviewed the EPA's 2016

13   Issue Paper, and the conclusions therein. The SAP strongly criticized the EPA's conclusions

14   and questioned the scientific approach of the agency, noting that that agency had failed

15   to follow its own guidelines.

16        ***Scientific Fraud Underlying the Marketing and Sale of Glyphosate/Roundup®***

17        62.    Based on early studies that glyphosate could cause cancer in laboratory animals,

18   the EPA originally classified glyphosate as *possibly carcinogenic to humans* (Group C) in 1985.

19   After pressure from Monsanto, including contrary studies it provided to the EPA, in 1991 the

20   EPA changed its classification to *evidence of non-carcinogenicity in humans* (Group E). In so

21   classifying glyphosate, however, the EPA made clear that the designation did not mean the

22   chemical does not cause cancer: "It should be emphasized, however, that designation of an agent

23   in Group E is based on the available evidence at the time of evaluation and should not be

24   interpreted as a definitive conclusion that the agent will not be a carcinogen under any

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

circumstances.

63.     On two occasions, the EPA found that the laboratories hired by Monsanto to test the toxicity of its Roundup® products for registration purposes committed fraud.

64.     In the first instance, Monsanto, in seeking initial registration of Roundup® by EPA, hired Industrial Bio-Test Laboratories ("IBT") to perform and evaluate herbicide toxicology studies relating to Roundup®. IBT performed about 30 tests on glyphosate and glyphosate-containing products, including nine of the 15 residue studies needed to register Roundup®.

65.     In 1976, the United States Food and Drug Administration ("FDA") performed an inspection of Industrial Bio-Test Industries ("IBT") that revealed discrepancies between the raw data and the final report relating to the toxicological impacts of glyphosate. The EPA subsequently audited IBT; it too found the toxicology studies conducted for the Roundup® herbicide to be invalid. An EPA reviewer stated, after finding "routine falsification of data" at IBT, that it was "hard to believe the scientific integrity of the studies when they said they took specimens of the uterus from male rabbits."

66.     Three top executives of IBT were convicted of fraud in 1983.

67.     In the second incident of data falsification, Monsanto hired Craven Laboratories in 1991 to perform pesticide and herbicide studies, including for Roundup®. In that same year, the owner of Craven Laboratories and three of its employees were indicted, and later convicted, of fraudulent laboratory practices in the testing of pesticides and herbicides.

68.     Despite the falsity of the tests that underlie its registration, within a few years of its launch, Monsanto was marketing Roundup® in 115 countries.

69.     Multiple studies have been ghostwritten in part and/or published by Monsanto through companies such as Intertek and Exponent, Inc., from 2000 through the present which

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

1  minimize any safety concerns about the use of glyphosate. The studies are used to convince

2  regulators to allow the sale of Roundup® and customers to use Roundup®. Such studies include,

3  but are not limited to Williams (2000); Williams (2012); Kier & Kirkland (2013); Kier (2015);

4  Bus (2016); Chang (2016); and the Intertek Expert Panel Manuscripts. All of these studies have

5  been submitted to and relied upon by the public and the EPA in assessing the safety of

6  glyphosate. Through these means, Monsanto has fraudulently represented that independent

7  scientists have concluded that Glyphosate is safe. In fact, Monsanto paid these so-called

8  "independent experts," and Monsanto failed to disclose the significant role Monsanto had in

9  creating the manuscripts produced by the "independent" experts. Further, Monsanto has

10  ghostwritten editorials to advocate for the safety of glyphosate in newspapers and magazines for

11  scientists such as Robert Tarone and Henry Miller. Monsanto has also ghostwritten letters by

12  supposedly independent scientists which have been submitted to regulatory agencies who are

13  reviewing the safety of glyphosate.

14  

15      70.     Monsanto has also violated federal regulations in holding secret ex parte meetings

16  and conversations with certain EPA employees to collude in a strategy to re-register glyphosate

17  and to quash investigations into the carcinogenicity of glyphosate by other federal agencies such

18  as the Agency for Toxic Substances and Disease Registry. Monsanto's close connection with the

19  EPA arises in part from its offering of lucrative consulting gigs to retiring EPA officials. In

20  March 2015, The Joint Glyphosate Task Force, at Monsanto's behest, issued a press release

21  sharply criticizing IARC, stating that IARC's conclusion was "baffling" and falsely claiming that

22  "IARC did not consider any new or unique research findings when making its decision. It

23  appears that only by deciding to exclude certain available scientific information and by adopting

24  a different approach to interpreting the studies was this possible."

25      71.     Beginning in 2011, the Federal Institute for Risk Assessment (BfR) in Germany

26  

27  

28

began preparing a study on the safety of glyphosate. Through the Glyphosate Task Force,
Defendants were able to co-opt this study, becoming the sole providers of data and ultimately
writing the report, which was rubber-stamped by the BfR. The Glyphosate Task Force was solely
responsible for preparing and submitting a summary of studies relied upon by the BfR.
Defendants have used this self-serving report (which they, in fact, wrote) to falsely proclaim the
safety of glyphosate. In October 2015, the Defendants, as members of the Joint Glyphosate Task
Force, wrote to the state of California to try to stop California from warning the public about the
carcinogenicity of glyphosate, arguing that the IARC classification was mistaken. In January of
2016, Monsanto filed a lawsuit to stop California from warning the public about the
carcinogenicity of glyphosate.

### *The Importance of Roundup® to Monsanto's Market Dominance Profits*

72.     The success of Roundup® was key to Monsanto's continued reputation and
dominance in the marketplace. Largely due to the success of Roundup® sales, Monsanto's
agriculture division was outperforming its chemicals division's operating income, and that gap
increased  yearly. But with its patent for glyphosate expiring in the United States in the year
2000, Monsanto needed a strategy to maintain its Roundup® market dominance and to ward off
impending competition.

73.     In response, Monsanto began the development and sale of genetically engineered

74.     Roundup Ready® seeds in 1996. Since Roundup Ready® crops are resistant to
glyphosate, farmers can spray Roundup® onto their fields during the growing season without
harming the crop. This allowed Monsanto to expand its market  for Roundup® even further. By
2000, Monsanto's biotechnology seeds were planted on more than 80 million acres worldwide,
and nearly 70% of American soybeans were planted from Roundup Ready® seeds. It also
secured Monsanto's dominant share of the glyphosate/Roundup® market through a marketing

1-022
**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

strategy that coupled proprietary Roundup Ready® seeds with continued sales of its Roundup® herbicide

75.     Through a three-pronged strategy of increased production, decreased prices, and by coupling Roundup Ready® seeds with Roundup® herbicide, Roundup® became Monsanto's most profitable product. In 2000, Roundup® accounted for almost $2.8 billion in sales, outselling other herbicides by a margin of five to one and accounting for close to half of Monsanto's revenue. Today, glyphosate remains one of the world's largest herbicides by sales volume.

**Monsanto has known for decades that *it* falsely advertises the safety of Roundup®.**

76.     In 1996, the New York Attorney General ("NYAG") filed a lawsuit againstMonsanto based on its false and misleading advertising of Roundup ® products. Specifically, the lawsuit challenged Monsanto's general representations that its spray-on glyphosate-based herbicides, including Roundup®, were "safer than table salt" and "practically non-toxic" to mammals, birds, and fish. Among the representations the NYAG found deceptive and misleading about the human and environmental safety of Roundup® are the following:

a.    Remember that environmentally friendly Roundup® herbicide is biodegradable. It won't build up in the soil so you can use Roundup® with confidence along customers' driveways, sidewalks and fences...

b.    And remember that Roundup® is biodegradable and won't build up in the soil. That will give you the environmental confidence you need to use Roundup® everywhere you've got a weed, brush, edging or trimming problem.

c.    Roundup® biodegrades into naturally occurring elements.

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

d. Remember that versatile Roundup® herbicide stays where you put it. That means there's no washing or leaching to harm customers' shrubs or other desirable vegetation.

e. This non-residual herbicide will not wash or leach in the soil. It ... stays where you apply it.

f. You can apply Accord (glyphosate-containing herbicide) with "confidence because it will stay where you put it;" it bonds tightly to soil particles, preventing leaching. Then, soon after application, soil microorganisms biodegrade Accord into natural products.

g. Glyphosate is less toxic to rats than table salt following acute oral ingestion.

h. Glyphosate's safety margin is much greater than required. It has over a 1,000-fold safety margin in food and over a 700-fold safety margin for workers who manufacture or use it.

i. You can feel good about using herbicides by Monsanto. They carry a toxicity category rating of 'practically non-toxic' as it pertains to mammals, birds and fish.

j. "Roundup can be used where kids and pets will play and breaks down into natural material." This ad depicts a person with his head in the ground and a pet dog standing in an area which has been treated with Roundup.

77. On November 19, 1 996, Monsanto entered into an Assurance of Discontinuance with NYAG, in which Monsanto agreed, among other things, "to cease and desist from publishing or broadcasting any advertisements [in New York] that represent, directly or by implication" that:

a. its glyphosate-containing herbicide products or any component thereof are safe, non-toxic, harmless or free from risk. * * *

b. its glyphosate-containing herbicide products or any component thereof manufactured, formulated, distributed or sold by Monsanto are biodegradable * * *

c. its glyphosate-containing herbicide products or any component thereof stay where they are applied under all circumstances and will not move through the environment by any means.

d. its glyphosate-containing herbicide products or any component thereof are "good" for the environment or are "known for their environmental characteristics." * * *

e. glyphosate-containing herbicide products or any component thereof are safer or less toxic than common consumer products other than herbicides;

f. its glyphosate-containing products or any component thereof might be classified as "practically non-toxic."

78. Monsanto did not alter its advertising in the same manner in any state other than New York, and, on information and belief, still has not done so today.

79. In 2009, France's highest court ruled that Monsanto had not told the truth about the safety of Roundup®. The French court affirmed an earlier judgement that Monsanto had falsely advertised its herbicide Roundup® as "biodegradable" and that it "left the soil clean."

***Classifications and Assessments of Glyphosate***

80. The IARC process for the classification of glyphosate followed the stringent procedures for the evaluation of a chemical agent. Over time, the IARC Monograph program has reviewed 980 agents. Of those reviewed, it has determined 116 agents to be Group I (Known Human Carcinogens); 73 agents to be Group 2A (Probable Human Carcinogens); 287 agents to be Group 2B (Possible Human Carcinogens); 503 agents to be Group 3 (Not Classified); and one agent to be Probably Not Carcinogenic.

1-025
**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

81.     The established procedure for IARC Monograph evaluations is described in the IARC Programme's Preamble. Evaluations are performed by panels of international experts, selected on the basis of their expertise and the absence of actual or apparent conflicts of interest.

82.     One year before the Monograph meeting, the meeting is announced and there is a call both for data and for experts. Eight months before the Monograph meeting, the Working Group membership is selected, and the sections of the Monograph are developed by the Working Group members. One month prior to the Monograph meeting, the call for data is closed, and the various draft sections are distributed among Working Group members for review and comment. Finally, at the Monograph meeting, the Working Group finalizes review of all literature, evaluates the evidence in each category, and completes the overall evaluation. Within two weeks after the Monograph meeting, the summary of the Working Group findings is published in Lancet Oncology, and within a year after the meeting, the final Monograph is finalized and published.

83.     In assessing a chemical agent, the IARC Working Group reviews the following information:

            (a)  human, experimental, and mechanistic data;

            (b)  all pertinent epidemiological studies and cancer bioassays; and

            (c)  representative mechanistic data.

        The studies must be publicly available and have sufficient detail for meaningful review, and reviewers cannot be associated with the underlying study.

84.     In March of 2015, IARC reassessed glyphosate. The summary published in The Lancet Oncology reported that glyphosate is a Group 2A agent, that is, glyphosate is probably carcinogenic in humans.

85.     On July 29, 2015, IARC issued its Monograph for glyphosate, Monograph 112.

1-026
**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

For Volume 112, the volume that assessed glyphosate, a Working Group of 17 experts from II countries met at IARC from March 3-10, 2015, to assess the carcinogenicity of certain herbicides, including glyphosate. The March meeting culminated nearly a one-year review and preparation by the IARC Secretariat and the Working Group, including a comprehensive review of the latest available scientific evidence. According to published procedures, the Working Group considered "reports that have been published or accepted for publication in the openly available scientific literature" as well as "data from governmental reports that are publicly available."

86.     The studies considered the following exposure groups: occupational exposure of farmers and tree nursery workers in the United States, forestry workers in Canada and Finland and municipal weed-control workers in the United Kingdom; and para-occupational exposure in farming families.

87.     Glyphosate was identified as the second-most used household herbicide in the United States for weed control between 2001 and 2007 and the most heavily used herbicide in the world in 2012.

88.     Exposure pathways are identified as air (especially during spraying), water, and food. Community exposure to glyphosate is widespread and found in soil, air, surface water, and groundwater, as well as in food.

89.     The assessment of the IARC Working Group identified several case control studies of occupational exposure in the United States, Canada, and Sweden. These studies show a human health concern from agricultural and other work-related exposure to glyphosate.

90.     The IARC Working Group found an increased risk between exposure to glyphosate and non-Hodgkin lymphoma ("NHL") and several subtypes of NHL, and the increased risk persisted after adjustment for other pesticides.

1-027
**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

91. The IARC Working Group also found that glyphosate caused DNA and chromosomal damage in human cells. One study in community residents reported increases in blood markers of chromosomal damage (micronuclei) after glyphosate formulations were sprayed.

92. In male CD-I mice, glyphosate induced a positive trend in the incidence of a rare tumor, renal tubule carcinoma. A second study reported a positive trend for hemangiosarcoma in male mice. Glyphosate increased pancreatic islet-cell adenoma in male rats in two studies. A glyphosate formulation promoted skin tumors in an initiation-promotion study in mice.

93. The IARC Working Group also noted that glyphosate has been detected in the urine of agricultural workers, indicating absorption. Soil microbes degrade glyphosate to aminomethylphosphoric acid (AMPA). Blood AMPA detection after exposure suggests intestinal microbial metabolism in humans.

94. The IARC Working Group further found that glyphosate and glyphosate formulations induced DNA, oxidative stress, and chromosomal damage in mammals and in human and animal cells in utero.

95. In addition to DNA damage and oxidative stress, scientists have suggested that Roundup®'s association with various serious health conditions is linked to the effect Roundup® has on the digestive system. Specifically, scientists believe the same mechanism that makes Roundup® toxic to weeds also makes it toxic to the microbes within the human gut and mucous membranes. When humans are exposed to Roundup®, this exposure leads to a chronic inflammatory state in the gut, as well an impaired gut barrier, which can lead to many long-term health effects, including an increased risk of cancer. Monsanto has deliberately refused to conduct tests on this aspect of Roundup®'s mechanism of action.

96. Many Roundup® products bear a label which either reads: "glyphosate targets an

1-028
**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

enzyme found in plants but not in people or pets" or "this Roundup formula targets an enzyme in plants but not in people or pets." These statements are false because it has been established that the human body is host to microorganisms which contain the enzyme Monsanto asserts is not found in humans.

97.     Thus, glyphosate targets microbes within the human body which contain the enzyme affected by glyphosate, leading to a variety of adverse health effects. The IARC Working Group also noted genotoxic, hormonal, and enzymatic effects in mammals exposed to glyphosate. Essentially, glyphosate inhibits the biosynthesis of aromatic amino acids, which leads to several metabolic disturbances, including the inhibition of protein and secondary product biosynthesis and general metabolic disruption.

98.     The IARC Working Group also reviewed an Agricultural Health Study consisting of a prospective cohort of 57,311 licensed pesticide applicators in Iowa and North Carolina. While this study differed from others in that it was based on a self-administered questionnaire, the results support an association between glyphosate exposure and Multiple Myeloma, Hairy Cell Leukemia (HCL), and Chronic Lymphocytic Leukemia (CLL), in addition to several other cancers.

***Other Earlier Findings about Glyphosate's Dangers to Human Health***

99.     The EPA has a technical fact sheet, as part of its Drinking Water and Health, National Primary Drinking Water Regulations publication, relating to glyphosate. This technical fact sheet predates the IARC March 20, 2015, evaluation. The fact sheet describes the release patterns for glyphosate as follows:

**Release Patterns**

100.     Glyphosate is released to the environment in its use as an herbicide for controlling woody and herbaceous weeds on forestry, right-of-way, cropped and non-cropped sites. These

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

sites may be around water and in wetlands.

101.    It may also be released to the environment during its manufacture, formulation, transport, storage, disposal and cleanup, and from spills. Since glyphosate is not a listed chemical in the Toxics Release Inventory, data on releases during its manufacture and handling are not available.

102.    Occupational workers and home gardeners may be exposed to glyphosate by inhalation and dermal contact during spraying, mixing, and cleanup. They may also be exposed by touching soil and plants to which glyphosate was applied. Occupational exposure may also occur during glyphosate's manufacture, transport, storage, and disposal.

103.    In 1995, the Northwest Coalition for Alternatives to Pesticides reported that in California, the state with the most comprehensive program for reporting of pesticide-caused illness, glyphosate was the third most commonly-reported cause of pesticide illness among agricultural workers.

### Recent Worldwide Bans on Roundup®/Glyphosate

104.    Several countries around the world have instituted bans on the sale of Roundup® and other glyphosate-containing herbicides, both before and since IARC first announced its assessment for glyphosate in March 2015, and more countries undoubtedly will follow suit in light of this assessment as the dangers of the use of Roundup® are more widely known. The Netherlands issued a ban on all glyphosate-based herbicides in April 2014, including Roundup®, which takes effect by the end of 2015. In issuing the ban, the Dutch Parliament member who introduced the successful legislation stated: "Agricultural pesticides in user-friendly packaging are sold in abundance to private persons. In garden centers, Roundup® is promoted as harmless, but unsuspecting customers have no idea what the risks of this product are. Especially children are sensitive to toxic substances and should therefore not be exposed to it."

105.    The Brazilian Public Prosecutor in the Federal District requested that the Brazilian Justice Department suspend the use of glyphosate.

106.    France banned the private sale of Roundup® and glyphosate following the IARC assessment for Glyphosate.

107.    Bermuda banned both the private and commercial sale of glyphosates, including Roundup®. The Bermuda government explained its ban as follows: "Following a recent scientific study carried out by a leading cancer agency, the importation of weed spray 'Roundup' has been suspended."

108.    The Sri Lankan government banned the private and commercial use of glyphosates, particularly out of concern that glyphosate has been linked to fatal kidney disease in agricultural workers.

109.    The government of Columbia announced its ban on using Roundup® and glyphosate to destroy illegal plantations of coca, the raw ingredient for cocaine, because of the WHO's finding that glyphosate is probably carcinogenic.

110.    On information and belief, Wilbur-Ellis was, at all relevant times, engaged in the distribution of Roundup®, Roundup-ready® crops and other glyphosate-containing products from Monsanto to retailers and commercial/agricultural users in California.

111.    Wilbur-Ellis had superior knowledge compared to Roundup® users and consumers, including regarding the carcinogenic properties of the product, yet failed to accompany its sales and or marketing of Roundup® with any warnings or precautions for that grave danger. On information and belief, Wilbur-Ellis was one of the distributors providing Roundup® and other glyphosate-containing products used by the Plaintiff.

112.    On information and belief, Chevron and Monsanto Chevron were, at all relevant times, engaged in the testing, research, and analyses of Roundup and other glyphosate-based

1-031
**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

1  formulations, including investigation and preparation of storage stability data for Roundup and

2  other glyphosate-based formulations for submission to the EPA, and were, at all relevant times,

3  involved in the manufacture, registration, marketing, distribution and sale of Roundup®,

4  Roundup-ready® crops and other glyphosate-based formulations to retailers and residential users

5  in California.

6      113.    Monsanto and Monsanto Chevron had superior knowledge compared to

7  Roundup® users and consumers, including regarding the carcinogenic properties of the product,

8  yet failed to accompany its registration, sales, distribution and or marketing of Roundup® and

9  other glyphosate-based formulations with any warnings or precautions for that grave danger. On

10  information and belief, Chevron and Monsanto Chevron participated in the preparation  of

11  storage stability and other testing on Roundup® and other glyphosate-containing products which

12  were used by the Plaintiff.

## LIMITATIONS ON ALLEGATIONS

13      114.    Plaintiffs incorporate by reference each allegation set forth in preceding

14  paragraphs as if fully stated herein.

15      115.    The allegations in this pleading are made pursuant to California law. To the extent

16  California law imposes a duty or obligation on Defendants that exceeds those required by federal

17  law, Plaintiffs do not assert such claims. All claims asserted herein run parallel to federal law,

18  *i.e.,* the Defendants' violations of California law were also violations of federal law. Had

19  Defendants honestly complied with California law, they would also have complied with federal

20  law.

21      116.    Additionally, Plaintiffs' claims do not seek to enforce federal law. These claims

22  are brought under California law, notwithstanding that such claims run parallel to federal law.

23      117.    As alleged herein, Defendants violated U.S.C. § 136j and 40 C.F.R. §

31

1  156.10(a)(5) by distributing Roundup®, which was misbranded pursuant to 7 U.S.C. § 136(g).

2  Federal law specifically prohibits the distribution of a misbranded herbicide.

3  **<u>EQUITABLE TOLLING OF APPLICABLE STATUTE OF LIMITATIONS</u>**

4      118.    Decedent has suffered an illness that has a latency period and does not arise until

5  years after exposure. Decedent and plaintiffs had no way of knowing about the risk of serious

6  illness associated with the use of and/or exposure to Roundup® and glyphosate until made aware

7  that decedent's illnesses, including multiple myeloma, could be caused by use and/or exposure to

8  Roundup®. The discovery rule applies, and the statute of limitations was tolled until the day

9  plaintiffs knew or had reason to know that decedent's illnesses, including myeloma, were linked

10 to decedent's use and/or exposure to Roundup®.

11

12     119.    Within the time period of any applicable statute of limitations, plaintiffs could not

13 have discovered through the exercise of reasonable diligence that exposure to Roundup® and

14 glyphosate is injurious to human health.

15

16     120.    Plaintiffs did not discover and did not know of facts that would cause a reasonable

17 person to suspect the risk associated with the use of and/or exposure to Roundup® and

18 glyphosate, nor would a reasonable and diligent investigation by plaintiffs have disclosed that

19 Roundup® and glyphosate would cause decedent's illnesses.

20     121.    The expiration of any applicable statute of limitations has been equitably tolled by

21 reason of Monsanto's fraudulent misrepresentations and fraudulent concealment and fraudulent

22 conduct. Through affirmative misrepresentations and omissions, defendants actively concealed

23 from plaintiffs and decedent the true risks associated with use of and/or exposure to Roundup®.

24     122.    As a result of defendants' actions, plaintiffs could not reasonably have known or

25 learned through reasonable diligence that decedent had been exposed to the risks alleged herein

26 and that those risks were the direct and proximate result of defendants' acts and omissions.

27

28

123.     Defendants are estopped from relying on any statute of limitations because of their concealment of the truth regarding the safety of Roundup®. Defendants had a duty to disclose the true character, quality and nature of Roundup® because this was non-public information over which defendants continue to have exclusive control. Defendants knew that this information was not available to plaintiffs or decedent, decedent's medical providers and/or health facilities, yet defendants failed to disclose the information to the public, including plaintiffs and decedent.

124.     Defendants had the ability to and did spend enormous amounts of money in furtherance of the purposes of marketing and promoting a profitable product, notwithstanding the known or reasonably knowable risks. Plaintiffs, decedent, and medical professionals could not have afforded to and could not have possibly conducted studies to determine the nature, extent, and identity of related health risks and were forced to rely on defendants' representations.

## **FIRST CAUSE OF ACTION**

## **(STRICT PRODUCTS LIABILITY--DESIGN DEFECT by All Plaintiffs as Against All Defendants, and DOES 1 Through 100, Inclusive)**

125.     Plaintiffs re-allege and incorporate herein by reference each and every allegation and statement contained in the prior paragraphs.

126.     At all relevant times, defendants designed, developed, tested, manufactured, fabricated, assembled, distributed, bought, sold, inspected, serviced, repaired, maintained, marketed, warranted, supplied, modified, placed, and/or provided Roundup® products, which are defective and unreasonably dangerous to consumers, including decedent, thereby placing Roundup® products into the stream of commerce. These actions were under the ultimate control and supervision of defendants. At all relevant times, defendants designed, researched, developed, manufactured, produced, tested, assembled, labeled, advertised, promoted, marketed, sold, and

distributed the Roundup® products used by plaintiffs, as described herein.

127.   At all relevant times, defendants' Roundup® products were manufactured, designed, and labeled in an unsafe, defective, and inherently dangerous manner that was dangerous for use by or exposure to the public, including decedent.

128.   At all relevant times, defendants' Roundup® products were defectively designed, tested, developed, and manufactured when placed on the market by defendants, and was of such a nature that the defects would not be discovered in the normal course of inspection and operation by users thereof. Moreover, Roundup® products failed to provide adequate warnings or instructions concerning the dangerous characteristics of Roundup®. In particular, defendants failed to provide adequate warnings or instructions concerning the Roundup®'s active ingredient, glyphosate.

129.   Defendants researched, developed, designed, tested, manufactured, inspected, labeled, distributed, marketed, promoted, sold, and otherwise released into the stream of commerce its Roundup® products, and in the course of same, directly advertised or marketed the products to consumers and end users, including decedent, and therefore had a duty to warn of the risks associated with the use of Roundup® and glyphosate-containing products.

130.   At all relevant times, defendants had a duty to properly test, develop, design, manufacture, inspect, package, label, market, promote, sell, distribute, maintain, supply, provide proper warnings, and take such steps as necessary to ensure its Roundup® products did not cause users and consumers to suffer from unreasonable and dangerous risks. Defendants had a continuing duty to warn decedent of dangers associated with Roundup use and exposure. Defendants, as manufacturer, seller, or distributor of chemical herbicides are held to the knowledge of an expert in the field.

131.   At all relevant times, defendants' Roundup® products reached the intended

consumers, handlers, and users in California and throughout the United States, including

decedent, without substantial change in the condition, as designed, manufactured, sold,

distributed, labeled, and marketed by defendants. At all relevant times, Defendants registered,

researched, manufactured, distributed, marketed and sold Roundup® and other glyphosate-based

formulations within California and aimed at a California consumer and industrial market.

Chevron, in a joint effort with Monsanto, Monsanto Chevron, was involved in the testing,

research, analyses of Roundup® and other glyphosate-based formulations, including

investigation and preparation of storage stability data and other data submissions to the EPA for

the continued registration of Roundup® and other glyphosate-based formulations for use by

consumers, including Plaintiff, in California, and throughout the United States. The Wilbur-Ellis

Defendants were at all relevant times involved in the marketing, distribution, and sale of

Roundup® and glyphosate-based formulations marketed and sold in California.

132.    Defendants' Roundup® products, as researched, tested, developed, designed,

licensed, manufactured, packaged, labeled, distributed, sold, and marketed by defendants were

defective in design and formulation in that, when they left the hands of defendants'

manufacturers and/or suppliers, the foreseeable risks exceeded the alleged benefits associated

with their design and formulation.

133.    At all relevant times, defendants knew or had reason to know that Roundup®

products were defective and were inherently dangerous and unsafe when used in the manner

instructed and provided by defendants.

134.    Therefore, at all relevant times, Defendants' Roundup® products, as researched,

tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold and

marketed by Defendants were defective in design and formulation, in one or more of the

following ways:

a. When placed in the stream of commerce, Defendants' Roundup® products were defective in design and formulation, and, consequently, dangerous to an extent beyond that which an ordinary consumer would contemplate;

b. When placed in the stream of commerce, Defendants' Roundup® products were unreasonably dangerous in that they were hazardous and posed a grave risk of cancer and other serious illnesses when used in a reasonably anticipated manner;

c. When placed in the stream of commerce, Defendants' Roundup® products contained unreasonably dangerous design defects and were not reasonably safe when used in a reasonably anticipated or intended manner;

d. Defendants did not sufficiently test, investigate, or study its Roundup® products and, specifically, the active ingredient glyphosate;

e. Exposure to Roundup® and glyphosate-containing products presents a risk of harmful side effects that outweigh any potential utility stemming from the use of the herbicide;

f. Defendants knew or should have known at the time of marketing Roundup® products that exposure to Roundup® and specifically, its active ingredient glyphosate, could result in cancer and other severe illnesses and injuries; and

g. Defendants did not conduct adequate post-marketing surveillance of its Roundup® products.

135. Defendants knew, or should have known that at all times herein mentioned its Roundup was in a defective condition, and was and is inherently dangerous and unsafe.

136. Decedent was exposed to Defendants' Roundup, as described above, without knowledge of Roundup's dangerous characteristics.

137. At the time of the Decedent's use of and exposure to Roundup, Roundup was

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

being used for the purposes and in a manner normally intended, as a broad-spectrum herbicide.

138.   Defendants with this knowledge voluntarily designed its Roundup with a dangerous condition for use by the public, and in particular the Decedent.

139.   Defendants had a duty to create a product that was not unreasonably dangerous for its normal, intended use.

140.   Defendants created a product that was and is unreasonably dangerous for its normal, intended use.

141.   Defendants marketed and promoted a product in such a manner so as to make it inherently defective as the product downplayed its suspected, probable, and established health risks inherent with its normal, intended use.

142.   The Roundup designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed by Defendants was manufactured defectively in that Roundup left the hands of Defendants in a defective condition and was unreasonably dangerous to its intended users.

143.   The Roundup designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed by Defendants reached their intended users in the same defective and unreasonably dangerous condition in which the Defendants' Roundup was manufactured.

144.   Defendants designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed a defective product, which created an unreasonable risk to the health of consumers and to the Decedent in particular, and Defendants are therefore strictly liable for the injuries sustained by the Decedent.

145.   The Decedent could not, by the exercise of reasonable care, have discovered Roundup's defects herein mentioned or perceived its danger.

146.   By reason of the foregoing, the Defendants have become strictly liable to the

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

1  Plaintiffs for the manufacturing, marketing, promoting, distribution, and selling of a defective

2  product, Roundup.

3    147.    Defendants' defective design, of Roundup amounts to willful, wanton, and/or

4  reckless conduct by Defendants.

5    148.    The conduct of defendants was a substantial factor and proximate cause of the

6  serious personal injuries and death sustained by plaintiffs' decedent, Mike Esfahanian. After the

7  initial injury, decedent, Mike Esfahanian, survived for an appreciable period of time. Plaintiffs,

8  as successors in interest to decedent, Mike Esfahanian, seek all damages otherwise accruing to

9  the decedent in a survival action brought pursuant to the California *Code of Civil Procedure*

10  section 377.34.

11

12    149.    As a result of the foregoing acts and omission, the Decedent developed multiple

13  myeloma, and suffered severe and personal injuries, which are permanent and lasting in nature,

14  physical pain and mental anguish, including diminished enjoyment of life, and financial expenses

15  for hospitalization and medical care.

16

17    150.    As a result of the foregoing acts and omissions, Plaintiffs, and each of them, have

18  suffered a loss of love, companionship, comfort, affection, society, solace and moral support, all

19  to their respective non-economic damages in a sum within the unlimited jurisdiction of this Court

20  and will be established at trial according to proof.

21    151.    As a result of the foregoing acts and omissions, Plaintiffs, and each of them, and

22  each of them, have incurred funeral and burial expenses in an amount not yet fully ascertained

23  but according to proof at the time of trial.

24

25    152.    WHEREFORE, Plaintiffs respectfully requests this Court to enter judgment in

26  plaintiffs' favor for compensatory and punitive damages, together with interest, costs herein

27  incurred, attorneys' fees and all such other and further relief as this Court deems just and proper.

28

**SECOND CAUSE OF ACTION**

**(STRICT PRODUCTS LIABILITY--FAILURE TO WARN by All Plaintiffs as Against**

**All Defendants, and DOES 1 Through 100, Inclusive)**

153.    Plaintiffs repeat, reiterate and re-allege each and every allegation of this

Complaint contained in each of the foregoing paragraphs inclusive, with the same force and

effect as if more fully set forth herein.

154.    At all relevant times, Defendants engaged in the business of testing, developing,

designing, manufacturing, marketing, selling, distributing, and promoting Roundup® products

which are defective and unreasonably dangerous to consumers, including Plaintiff, because they

do not contain adequate warnings or instructions concerning the dangerous characteristics of

Roundup® and specifically, the active ingredient glyphosate. These actions were under the

ultimate control and supervision of Defendants. At all relevant times, Defendants registered

researched, manufactured, distributed, marketed and sold Roundup® and other glyphosate-based

formulations within California and aimed at a California consumer and industrial market.

Chevron, in a joint effort with Monsanto, Monsanto Chevron, was involved in the testing,

research, analyses of Roundup® and other glyphosate-based formulations, including

investigation and preparation of storage stability data and other data submissions to the EPA for

the continued registration of Roundup® and other glyphosate-based formulations for use by

consumers, including Plaintiff, in California and throughout the United States. The Wilbur-Ellis

Defendants were at all relevant times involved in the marketing, distribution, and sale of

Roundup® and glyphosate-based formulations marketed and sold in California.

155.    Defendants did in fact sell, distribute, supply, manufacture, and/or promote

Roundup to Plaintiff. Additionally, Defendants expected the Roundup that they were selling,

distributing, supplying, manufacturing, and/or promoting to reach--and Roundup did in fact

1    reach--consumers, including Decedent, without any substantial change in the condition of the

2    product from when it was initially distributed by Defendants.

3        156.    At the time of manufacture, Defendants could have provided the warnings or

4    instructions regarding the full and complete risks of Roundup and glyphosate-containing

5    products because it knew or should have known of the unreasonable risks of harm associated

6    with the use of and/or exposure to such products.

7        157.    At all times herein mentioned, the aforesaid product was defective and unsafe in

8    manufacture such that it was unreasonably dangerous to the user, and was so at the time it was

9    distributed by Defendants and at the time Decedent was exposed to and/or ingested the product.

10   The defective condition of Roundup was due in part to the fact that it was not accompanied by

11   proper warnings regarding its carcinogenic qualities and possible side effects, including, but not

12   limited to, developing multiple myeloma as a result of exposure and use.

13       158.    Roundup did not contain a warning or caution statement, which was necessary

14   and, if complied with, was adequate to protect health those exposed in violation of 7 U.S.C. §

15   136j(a)(1)(E).

16       159.    Defendants' failure to include a warning or caution statement which was

17   necessary and, if complied with, was adequate to protect the health of those exposed, violated 7

18   U.S.C. § 136j(a)(1)(E) as well as the laws of the State of California.

19       160.    Defendants could have amended the label of Roundup to provide additional

20   warnings.

21       161.    This defect caused serious injury to Decedent, who used Roundup in its intended

22   and foreseeable manner.

23       162.    At all times herein mentioned, Defendants had a duty to properly design,

24   manufacture, compound, test, inspect, package, label, distribute, market, examine, maintain

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

1  supply, provide proper warnings, and take such steps to assure that the product did not cause

2  users to suffer from unreasonable and dangerous side effects.

3  163.    Defendants labeled, distributed, and promoted the aforesaid product that it was

4  dangerous and unsafe for the use and purpose for which it was intended.

5  164.    Defendants failed to warn of the nature and scope of the side effects associated

6  with Roundup, namely its carcinogenic properties and its propensity to cause or serve as a

7  substantial contributing factor in the development of multiple myeloma.

8  

9  165.    Defendants were aware of the probable consequences of the aforesaid conduct.

10  Despite the fact that Defendants knew or should have known that Roundup caused serious

11  injuries, Defendants failed to exercise reasonable care to warn of the dangerous carcinogenic

12  properties and side effect of developing multiple myeloma from Roundup exposure, even though

13  these side effects were known or reasonably scientifically knowable at the time of distribution.

14  Defendants willfully and deliberately failed to avoid the consequences associated with their

15  failure to warn, and in doing so, Defendants acted with a conscious disregard for the safety of

16  Decedent.

17  

18  166.    At the time of exposure, Decedent could not have reasonably discovered any

19  defect in Roundup prior through the exercise of reasonable care.

20  167.    Defendants, as the manufacturer and/or distributor of the subject product, is held

21  to the level of knowledge of an expert in the field.

22  

23  168.    Decedent reasonably relied upon the skill, superior knowledge, and judgment of

24  Defendants.

25  169.    Had Defendants properly disclosed the risks associated with Roundup, Decedent

26  would have avoided the risk of multiple myeloma by not using Roundup.

27  170.    The information that Defendants did provide or communicate failed to contain

28  

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

adequate warnings and precautions that would have enabled Decedent, and similarly situated individuals, to utilize the product safely and with adequate protection. Instead, Defendants disseminated information that was inaccurate, false, and misleading and which failed to communicate accurately or adequately the comparative severity, duration, and extent of the risk of injuries associated with use of and/or exposure to Roundup and glyphosate; continued to promote the efficacy of Roundup, even after it knew or should have known of the unreasonable risks from use or exposure; and concealed, downplayed, or otherwise suppressed, through aggressive marketing and promotion, any information or research about the risks and dangers of exposure to Roundup and glyphosate.

171.    To this day, Defendants have failed to adequately warn of the true risks of Decedent's injuries associated with the use of and exposure to Roundup.

172.    As a result of their inadequate warnings, Defendants' Roundup products were defective and unreasonably dangerous when they left the possession and/or control of Defendants, were distributed by Defendants, and used by Decedent.

173.    As a direct and proximate result of Defendants' actions as alleged herein, and in such other ways to be later shown, the subject product caused the serious personal injuries and death sustained by plaintiffs' decedent, Mike Esfahanian. After the initial injury, decedent, Mike Esfahanian, survived for an appreciable period of time. Plaintiffs, as successors in interest to decedent, Mike Esfahanian, seek all damages otherwise accruing to the decedent in a survival action brought pursuant to the California *Code of Civil Procedure* section 377.34.

174.    As a result of the foregoing acts and omissions, Plaintiffs, and each of them, have suffered a loss of love, companionship, comfort, affection, society, solace and moral support, all to their respective non-economic damages in a sum within the unlimited jurisdiction of this Court and will be established at trial according to proof.

175.    As a result of the foregoing acts and omissions, Plaintiffs, and each of them, have incurred funeral and burial expenses in an amount not yet fully ascertained but according to proof at the time of trial.

176.    WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in Plaintiffs' favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all relief as this Court deems just and proper.

## THIRD CAUSE OF ACTION

### (NEGLIGENCE by All Plaintiffs as Against All Defendants and DOES 1 Through 100, Inclusive)

177.    Plaintiffs re-allege and incorporate herein by reference each and every allegation and statement contained in the prior paragraphs.

178.    Defendants, directly or indirectly, caused Roundup® products to be sold, distributed, packaged, labeled, marketed, promoted, and/or used by Plaintiffs.

179.    At all relevant times, Defendants had a duty to exercise reasonable care in the design, research, manufacture, marketing, advertisement, supply, promotion, packaging, sale, and distribution of Roundup products, including the duty to take all reasonable steps necessary to manufacture, promote, and/or sell a product that was not unreasonably dangerous to consumers and users of the product.

180.    At all relevant times, Defendants had a duty to exercise reasonable care in the marketing, advertisement, and sale of the Roundup® products. Defendants' duty of care owed to consumers and the general public included providing accurate, true, and correct information concerning the risks of using Roundup and appropriate, complete, and accurate warnings concerning the potential adverse effects of exposure to Roundup®, and, in particular, its active ingredient glyphosate.

181. At all relevant times, Defendants knew or, in the exercise of reasonable care, should have known of the hazards and dangers of Roundup® and, specifically, the carcinogenic properties of the chemical glyphosate.

182. Accordingly, at all relevant times, Defendants knew or, in the exercise of reasonable care, should have known that use of or exposure to Roundup® products could cause or be associated with Plaintiffs' injuries, and thus, create a dangerous and unreasonable risk of injury to the users of these products, including Plaintiffs.

183. Defendants also knew or, in the exercise of reasonable care, should have known that users and consumers of Roundup® were unaware of the risks and the magnitude of the risks associated with use of and/or exposure to Roundup® and glyphosate-containing products.

184. As such, Defendants breached their duty of reasonable care and failed to exercise ordinary care in the design, research, development, manufacture, testing, marketing, supply, promotion, advertisement, packaging, sale, and distribution of Roundup® products, in that Defendants manufactured and produced defective herbicides containing the chemical glyphosate; knew or had reason to know of the defects inherent in its products; knew or had reason to know that a user's or consumer's exposure to the products created a significant risk of harm and unreasonably dangerous side effects; and failed to prevent or adequately warn of these risks and injuries. Indeed, Defendants deliberately refused to test Roundup® products because they knew that the chemical posed serious health risks to humans.

185. Defendants were negligent in their promotion of Roundup®, outside of the labeling context, by failing to disclose material risk information as part of their promotion and marketing of Roundup, including the Internet, television, print advertisements, etc. Nothing prevented Defendants from being honest in their promotional activities, and, in fact, Defendants had a duty to disclose the truth about the risks associated with Roundup in their promotional

efforts, outside of the context of labeling.

186.  Despite their ability and means to investigate, study, and test the products and to provide adequate warnings, Defendants have failed to do so. Indeed, Defendants have wrongfully concealed information and have further made false and/or misleading statements concerning the safety and/or exposure to Roundup and glyphosate.

187.  Defendants' negligence included:

    a.  Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing Roundup® products without thorough and adequate pre- and post-market testing;

    b.  Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing Roundup® while negligently and/or intentionally concealing and failing to disclose the results of trials, tests, and studies of exposure to glyphosate, and, consequently, the risk of serious harm associated with human use of and exposure to Roundup;

    c.  Failing to undertake sufficient studies and conduct necessary tests to determine whether or not Roundup® products and glyphosate-containing products were safe for their intended use in agriculture and horticulture;

    d.  Failing to use reasonable and prudent care in the design, research, manufacture, and development of Roundup® products so as to avoid the risk of serious harm associated with the prevalent use of Roundup/glyphosate as an herbicide;

    e.  Failing to design and manufacture Roundup® products so as to ensure they were at least as safe and effective as other herbicides on the market;

    f.  Failing to provide adequate instructions, guidelines, and safety precautions to those persons Defendants could reasonably foresee would use and be exposed to

Roundup® products;

g.  Failing to disclose to Plaintiffs, users/consumers, and the general public that use of and exposure to Roundup® presented severe risks of cancer and other grave illnesses;

h.  Failing to warn Plaintiffs, consumers, and the general public that the product's risk of harm was unreasonable and that there were safer and effective alternative herbicides available to Plaintiffs and other consumers;

i.  Systematically suppressing or downplaying contrary evidence about the risks, incidence, and prevalence of the side effects of Roundup® and glyphosate-containing products;

j.  Representing that their Roundup® products were safe for their intended use when, in fact, Defendants knew or should have known the products were not safe for their intended purpose;

k.  Declining to make or propose any changes to Roundup® products' labeling or other promotional materials that would alert consumers and the general public of the risks of Roundup® and glyphosate;

l.  Advertising, marketing, and recommending the use of the Roundup® products, while concealing and failing to disclose or warn of the dangers known (by Defendants) to be associated with or caused by the use of or exposure to Roundup® and glyphosate;

m.  Continuing to disseminate information to its consumers, which indicate or imply that Defendants' Roundup® products are not unsafe for use in the agricultural and horticultural industries; and

n.  Continuing the manufacture and sale of their products with the knowledge that the

products were unreasonably unsafe and dangerous.

188.     Defendants knew and/or should have known that it was foreseeable consumers such as Plaintiffs would suffer injuries as a result of Defendants' failure to exercise ordinary care in the manufacturing, marketing, labeling, distribution, and sale of Roundup®.

189.     Decedent did not know the nature and extent of the injuries that could result from the intended use of and/or exposure to Roundup® or its active ingredient glyphosate.

190.     Defendants' negligence was the proximate cause of decedent's injuries and untimely death, *i.e.*, absent defendants' negligence, decedent would not have developed cancer and plaintiffs' husband and father would still be here today.

191.     Defendants' conduct, as described above, was reckless. Defendants regularly risked the lives of consumers and users of their products, including decedent, with full knowledge of the dangers of their products. Defendants have made conscious decisions not to redesign, re-label, warn, or inform the unsuspecting public, including decedent. Defendants' reckless conduct therefore warrants an award of punitive damages.

192.     As a result of the foregoing acts and omissions, the Decedent suffered from serious and dangerous side effects including, but not limited to, multiple myeloma, as well as other severe and personal injuries which are permanent and lasting in nature, physical pain and mental anguish, diminished enjoyment of life, and financial expenses for hospitalization and medical care. Further, Decedent suffered life-threatening multiple myeloma, and severe personal injuries, which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life.

193.     The conduct of defendants was a substantial factor and proximate cause of the serious personal injuries and death sustained by plaintiffs' decedent, Mike Esfahanian. After the initial injury, decedent, Mike Esfahanian, survived for an appreciable period of time. Plaintiffs,

47

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

as successors in interest to decedent, Mike Esfahanian, seek all damages otherwise accruing to the decedent in a survival action brought pursuant to the California *Code of Civil Procedure* section 377.34.

194.    Plaintiffs are informed and believe, and thereon alleges, that at all times herein relevant, that the conduct of defendants was a substantial factor in causing plaintiffs' damages as alleged herein.

195.    As a result of the foregoing acts and omissions, Plaintiffs, and each of them, have suffered a loss of love, companionship, comfort, affection, society, solace and moral support, all to their respective non-economic damages in a sum within the unlimited jurisdiction of this Court and will be established at trial according to proof.

196.    As a result of the foregoing acts and omissions, Plaintiffs, and each of them, and each of them, have incurred funeral and burial expenses in an amount not yet fully ascertained but according to proof at the time of trial.

197.    WHEREFORE, plaintiffs respectfully request this Court to enter judgment in plaintiffs' favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all such other and further relief as this Court deems just and proper.

## **FOURTH CAUSE OF ACTION**

### **(BREACH OF EXPRESS WARRANTIES by All Plaintiffs as Against Defendant Monsanto Company, and DOES 1 Through 100, Inclusive)**

198.    Plaintiffs re-allege and incorporate herein by reference each and every allegation and statement contained in the prior paragraphs.

199.    At all relevant times, Defendant Monsanto engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting Roundup® products, which are defective and unreasonably dangerous to consumers, including

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

Plaintiffs, thereby placing Roundup® products into the stream of commerce. These actions were under the ultimate control and supervision of Defendant Monsanto.

200. Defendant Monsanto had a duty to exercise reasonable care in the research, development, design, testing, packaging, manufacture, inspection, labeling, distributing, marketing, promotion, sale, and release of Roundup® products, including a duty to:

  a. ensure that its products did not cause the user unreasonably dangerous side effects;

  b. warn of dangerous and potentially fatal side effects; and

  c. disclose adverse material facts, such as the true risks associated with the use of and exposure to Roundup® and glyphosate-containing products, when making representations to consumers and the general public, including Plaintiffs.

201. As alleged throughout this pleading, the ability of Defendant Monsanto to properly disclose those risks associated with Roundup® is not limited to representations made on the labeling.

202. At all relevant times, Defendant Monsanto expressly represented and warranted to the purchasers of its products, by and through statements made by Defendant Monsanto in labels, publications, package inserts, and other written materials intended for consumers and the general public, that Roundup® products were safe to human health and the environment, effective, fit, and proper for their intended use. Defendant Monsanto advertised, labeled, marketed, and promoted Roundup® products, representing the quality to consumers and the public in such a way as to induce their purchase or use, thereby making an express warranty that Roundup® products would conform to the representations.

203. These express representations include incomplete warnings and instructions that purport, but fail, to include the complete array of risks associated with use of and/or exposure to

1-050
**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

Roundup® and glyphosate. Defendant Monsanto knew and/or should have known that the risks expressly included in Roundup® warnings and labels did not and do not accurately or adequately set forth the risks of developing the serious injuries complained of herein. Nevertheless, Defendant Monsanto expressly represented that Roundup® products were safe and effective, that they were safe and effective for use by individuals such as the Plaintiffs, and/or that they were safe and effective as agricultural herbicides.

204. The representations about Roundup®, as set forth herein, contained or constituted affirmations of fact or promises made by the seller to the buyer, which related to the goods and became part of the basis of the bargain, creating an express warranty that the goods would conform to the representations.

205. Defendant Monsanto placed Roundup® products into the stream of commerce for sale and recommended their use to consumers and the public without adequately warning of the true risks of developing the injuries associated with the use of and exposure to Roundup® and its active ingredient glyphosate.

206. Defendant Monsanto breached these warranties because, among other things, Roundup® products were defective, dangerous, and unfit for use, did not contain labels representing the true and adequate nature of the risks associated with their use, and were not merchantable or safe for their intended, ordinary, and foreseeable use and purpose. Specifically, Defendant Monsanto breached the warranties in the following ways:

    a. Defendant Monsanto represented through its labeling, advertising, and marketing materials that Roundup® products were safe, and fraudulently withheld and concealed information about the risks of serious injury associated with use of and/or exposure to Roundup® and glyphosate by expressly limiting the risks associated with use and/or exposure within its warnings and labels; and

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

b.  Defendant Monsanto represented that Roundup® products were safe for use and fraudulently concealed information that demonstrated that glyphosate, the active ingredient in Roundup®, had carcinogenic properties, and that Roundup® products, therefore, were not safer than alternatives available on the market.

207.  Decedent detrimentally relied on the express warranties and representations of defendant Monsanto concerning the safety and/or risk profile of Roundup® in making a decision to purchase the product. Decedent reasonably relied upon defendant Monsanto to disclose known defects, risks, dangers, and side effects of Roundup® and glyphosate. Decedent would not have purchased or used Roundup® had defendant Monsanto properly disclosed the risks associated with the product, either through advertising, labeling, or any other form of disclosure.

208.  Defendant Monsanto had sole access to material facts concerning the nature of the risks associated with its Roundup® products, as expressly stated within their warnings and labels, and knew that consumers and users such as decedent could not have reasonably discovered that the risks expressly included in Roundup® warnings and labels were inadequate and inaccurate.

209.  Decedent had no knowledge of the falsity or incompleteness of defendant Monsanto's statements and representations concerning Roundup.

210.  Decedent used and/or was exposed to Roundup® as researched, developed, designed, tested, manufactured, inspected, labeled, distributed, packaged, marketed, promoted, sold, or otherwise released into the stream of commerce by defendant Monsanto.

211.  Had the warnings, labels, advertisements, or promotional material for Roundup® products accurately and adequately set forth the true risks associated with the use of such products, including decedent's injuries, rather than expressly excluding such information and warranting that the products were safe for their intended use, Decedent could have avoided the

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

injuries complained of herein, including his untimely death.

212.  As a direct and proximate result of defendant Monsanto's breach of express warranty, plaintiffs have sustained pecuniary loss and general damages in a sum exceeding the jurisdictional minimum of this Court.

213.  As a direct and proximate result of the conduct of defendant Monsanto's breach of express warranty, Decedent suffered from serious and dangerous side effects including, but not limited to, multiple myeloma, as well as other severe and personal injuries which are permanent and lasting in nature, physical pain and mental anguish, diminished enjoyment of life, and financial expenses for hospitalization and medical care. Further, Decedent suffered life-threatening multiple myeloma, and severe personal injuries, which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life.

214.  The conduct of defendants was a substantial factor and proximate cause of the serious personal injuries and death sustained by plaintiffs' decedent, Mike Esfahanian. After the initial injury, decedent, Mike Esfahanian, survived for an appreciable period of time. Plaintiffs, as successors in interest to decedent, Mike Esfahanian, seek all damages otherwise accruing to the decedent in a survival action brought pursuant to the California *Code of Civil Procedure* section 377.34.

215.  Plaintiffs are-informed and believe, and thereon alleges, that at all times herein relevant, that the conduct of defendants was a substantial factor in causing plaintiffs' damages as alleged herein.

216.  As a result of the foregoing acts and omissions, Plaintiffs, and each of them, have suffered a loss of love, companionship, comfort, affection, society, solace and moral support, all to their respective non-economic damages in a sum within the unlimited jurisdiction of this Court and will be established at trial according to proof.

217. As a result of the foregoing acts and omissions, Plaintiffs, and each of them, have incurred funeral and burial expenses in an amount not yet fully ascertained but according to proof at the time of trial.

218. WHEREFORE, plaintiffs respectfully requests that this Court enter judgment in plaintiffs' favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all such other and further relief as this Court deems just and proper.

## FIFTH CAUSE OF ACTION

**(BREACH OF IMPLIED WARRANTIES by All Plaintiffs as Against All Defendants, and DOES 1Through 100, Inclusive)**

219. Plaintiffs re-allege and incorporate herein by reference each and every allegation and statement contained in the prior paragraphs.

220. At all relevant times, Defendants engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting Roundup® products, which were and are defective and unreasonably dangerous to consumers, including decedent, thereby placing Roundup® products into the stream of commerce.

221. Before the time decedent was exposed to the aforementioned Roundup® products, Defendants impliedly warranted to its consumers, including decedent, that Roundup® products were of merchantable quality and safe and fit for the use for which they were intended; specifically, as agricultural herbicides.

222. But Defendants failed to disclose that Roundup® has dangerous propensities when used as intended and that use of and/or exposure to Roundup® and glyphosate-containing products carries an increased risk of developing severe injuries, including decedent's injuries.

223. Decedent was an intended beneficiary of the implied warranties made by defendant Monsanto to purchasers of its herbicides.

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

224.    The Roundup® products were expected to reach and did in fact reach consumers and users, including decedent, without substantial change in the condition in which they were manufactured and sold by defendant Monsanto.

225.    At all relevant times, Defendants aware that consumers and users of its products, including decedent, would use Roundup® products as marketed by defendant Monsanto, which is to say that decedent was a foreseeable user of Roundup®.

226.    Defendants intended that Roundup® products be used in the manner in which decedent, in fact, used them and which Defendants impliedly warranted to be of merchantable quality, safe, and fit for this use, despite the fact that Roundup® was not adequately tested or researched.

227.    In reliance upon Defendants' implied warranty, decedent used Roundup® as instructed and labeled and in the foreseeable manner intended, recommended, promoted, and marketed by defendant Monsanto.

228.    Decedent could not have reasonably discovered or known of the risks of serious injury associated with Roundup® or glyphosate.

229.    Defendants breached its implied warranty to decedent in that Roundup® products were not of merchantable quality, safe, or fit for their intended use, or adequately tested. Roundup® has dangerous propensities when used as intended and can cause serious injuries, including those injuries complained of herein.

230.    The harm caused by Defendants' Roundup® products far outweighed their benefit, rendering the products more dangerous than an ordinary consumer or user would expect and more dangerous than alternative products.

231.    As a direct and proximate result of Defendants' breach of implied warranty, the Decedent suffered from serious and dangerous side effects including, but not limited to, multiple

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

myeloma, as well as other severe and personal injuries which are permanent and lasting in nature, physical pain and mental anguish, diminished enjoyment of life, and financial expenses for hospitalization and medical care. Further, Decedent suffered life-threatening multiple myeloma, and severe personal injuries, which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life.

232.    As a direct and proximate result of Defendants' breach of implied warranty, plaintiffs have sustained pecuniary loss and general damages in a sum exceeding the jurisdictional minimum of this Court.

233.    The conduct of defendants was a substantial factor and proximate cause of the serious personal injuries and death sustained by plaintiffs' decedent, Mike Esfahanian.

234.    Plaintiffs are informed and believe, and thereon alleges, that at all times herein relevant, that the conduct of defendants was a substantial factor in causing plaintiffs' damages as alleged herein.

235.    As a result of the negligence of said Defendants, and each of them, Plaintiffs, and each of them, have suffered a loss of love, companionship, comfort, affection, society, solace and moral support, all to their respective non-economic damages in a sum within the unlimited jurisdiction of this Court and will be established at trial according to proof.

236.    As a further result of the negligence of said Defendants, and each of them, Plaintiffs, and each of them, have incurred funeral and burial expenses in an amount not yet fully ascertained but according to proof at the time of trial.

237.    WHEREFORE, plaintiffs respectfully requests that this Court enter judgment in plaintiffs' favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all such other and further relief as this Court deems just and proper.

/ / /

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

**SIXTH CAUSE OF ACTION**

**(FRAUD by All Plaintiffs as Against Defendant Monsanto Company, and DOES**

**1 Through 100, Inclusive)**

238.    Plaintiffs re-allege and incorporate herein by reference each and every allegation and statement contained in the prior paragraphs.

239.    Defendant Monsanto has defrauded the agricultural community in general and decedent Plaintiffs in particular by misrepresenting the true safety of its Roundup® and by failing to disclose known risks of cancer.

240.    Defendant Monsanto misrepresented and/or failed to disclose, inter alia, that: glyphosate and its major metabolite aminomethylphosphonic acid (AMPA) could cause cancer; glyphosate and AMPA are known to be genotoxic in humans and laboratory animals because exposure is known to cause DNA strand breaks (a precursor to cancer); glyphosate and AMPA are known to induce oxidative stress in humans and laboratory animals (a precursor to cancer); glyphosate and AMPA interfere with the aromatic amino acids within the human gut, leading to downstream health conditions including cancer; exposure to glyphosate and AMPA is causally associated with multiple myeloma; and the laboratory tests attesting to the safety of glyphosate were flawed and/or fraudulent.

241.    Due to these misrepresentations and omissions, at all times relevant to this litigation, Defendant's Roundup® was misbranded under 7 U.S.C. § 136(g) and its distribution within California and around the United States was a violation of 7 U.S.C. § 136j and 40 C.F.R. § 156.10(a)(5).

242.    Decedent relied on the Defendant's misrepresentations and/or material omissions regarding the safety of Roundup® and its active ingredient glyphosate in deciding whether to purchase and/or use the product. Decedent and/or plaintiffs did not know nor could they

1    reasonably have known of the misrepresentations and/or material omissions by Defendant

2    concerning Roundup® and its active ingredient glyphosate.

3         243.    The misrepresentations and/or material omissions that form the basis of this fraud

4    claim are not limited to statements made on the Roundup® labeling, as defined under federal

5    law, but also involve Defendant Monsanto's representations and omissions made as part of its

6    promotion and marketing of Roundup®, including on the Internet, television, in print

7    advertisements, etc. Nothing prevented Defendant Monsanto from disclosing the truth about the

8    risks associated with Roundup® in its promotional efforts outside of the labeling context, using

9    the forms of media and promotion Defendant Monsanto traditionally used to promote the

10   product's efficacy and benefits.

11        244.    When Defendant Monsanto made the misrepresentations and/or omissions as

12   alleged in this pleading, it did so with the intent of defrauding and deceiving the public in general

13   and the agricultural community and with the intent of inducing the public and agricultural

14   community to purchase and use Roundup®.

15        245.    Defendant Monsanto made these misrepresentations and/or material omissions

16   with malicious, fraudulent and/or oppressive intent toward Plaintiffs and the public generally.

17   Defendant's conduct was willful, wanton, and/or reckless. Defendant deliberately recommended,

18   manufactured, produced, marketed, sold, distributed, merchandized, packaged, promoted and

19   advertised the dangerous and defective herbicide Roundup®. This constitutes an utter, wanton,

20   and conscious disregard of the rights and safety of a large segment of the public, and by reason

21   thereof, Defendant is liable for reckless, willful, and wanton acts and omissions which evidence

22   a total and conscious disregard for the safety of Plaintiffs and others which proximately caused

23   the injuries as set forth herein.

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

246.    As a proximate result of defendant Monsanto's fraudulent and deceitful conduct and representations, plaintiffs have sustained damages and other losses in an amount to be proven at trial.

247.    As a direct and proximate result of the conduct of defendants, the Decedent suffered from serious and dangerous side effects including, but not limited to, multiple myeloma, as well as other severe and personal injuries which are permanent and lasting in nature, physical pain and mental anguish, diminished enjoyment of life, and financial expenses for hospitalization and medical care. Further, Decedent suffered life-threatening multiple myeloma, and severe personal injuries, which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life.

248.    The conduct of defendants was a substantial factor and proximate cause of the serious personal injuries and death sustained by plaintiffs' decedent, Mike Esfahanian. After the initial injury, decedent, Mike Esfahanian, survived for an appreciable period of time. Plaintiffs, as successors in interest to decedent, Mike Esfahanian, seek all damages otherwise accruing to the decedent in a survival action brought pursuant to the California *Code of Civil Procedure* section 377.34.

249.    Plaintiffs are informed and believe, and thereon alleges, that at all times herein relevant, that the conduct of defendants was a substantial factor in causing plaintiffs' damages as alleged herein.

250.    As a direct and proximate result of the conduct of defendants, and each of them, Plaintiffs, and each of them, have suffered a loss of love, companionship, comfort, affection, society, solace and moral support, all to their respective non-economic damages in a sum within the unlimited jurisdiction of this Court and will be established at trial according to proof.

251.    As a further result of the negligence of said Defendants, and each of them,

Plaintiffs, and each of them, have incurred funeral and burial expenses in an amount not yet fully ascertained but according to proof at the time of trial.

252.    WHEREFORE, plaintiffs respectfully requests that this Court enter judgment in plaintiffs' favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all such other and further relief as this Court deems just and proper.

## SEVENTH CAUSE OF ACTION

**(WRONGFUL DEATH by Plaintiffs Against All Defendants, and DOES 1 Through 100, Inclusive)**

253.    Plaintiffs repeat, reiterate, and re-allege each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect all if more fully set forth herein.

254.    Plaintiff ANOUSHEH SABOURI, is the surviving spouse of Decedent and Plaintiff S█████ E██████████, a minor, is the surviving daughter of decedent. Plaintiffs are the Decedent's only heirs and bring herein this wrongful death claim.

255.    Decedent died as a direct and proximate result of Defendants' negligent and wrongful conduct in connection with the design, development, manufacture, testing, packaging, promoting, marketing, advertising, distribution, labeling, and/or sale of the herbicide Roundup, containing the active ingredient glyphosate.

256.    Defendants' wrongful conduct has proximately caused Decedent's heirs to suffer the loss of Decedent's companionship, services, society, marital association, love and consortium.

257.    The conduct of defendants was a substantial factor and proximate cause of the serious personal injuries and death sustained by plaintiffs' decedent, Mike Esfahanian. After the initial injury, decedent, Mike Esfahanian, survived for an appreciable period of time. Plaintiff

1   Joe Greer, Sr., as successor in interest to decedent Mike Esfahanian, seeks all damages otherwise

2   accruing to the decedent in a survival action brought pursuant to the California *Code of Civil*

3   *Procedure* section 377.34.

4       258.    As a direct and proximate result of the conduct of defendants, and each of them,

5   Plaintiffs, and each of them, have suffered a loss of love, companionship, comfort, affection,

6   society, solace and moral support, all to their respective non-economic damages in a sum within

7   the unlimited jurisdiction of this Court and will be established at trial according to proof.

8
9       259.    As a further result of the negligence of said Defendants, and each of them,

10  Plaintiffs, and each of them, have incurred funeral and burial expenses in an amount not yet fully

11  ascertained but according to proof at the time of trial.

12      260.    WHEREFORE, Plaintiffs ANOUSHEH SABOURI and S██ E████████,

13  a minor, respectfully request that this Court enter judgment in Plaintiffs' favor for compensatory

14  and punitive damages, together with interest, costs herein incurred, attorneys' fees and all relief

15  as this Court deems just and proper.

16
17                          **EIGHTH CAUSE OF ACTION**

18  **(EXEMPLARY DAMAGES by Plaintiffs Against All Defendants, and DOES 1 Through**

19                          **100, Inclusive)**

20      261.    Plaintiffs incorporate by reference each allegation set forth in preceding

21  paragraphs as if fully stated herein.

22      262.    Defendants' conduct as alleged herein was done with oppression, fraud, and

23  malice. Defendants were fully aware of the safety risks of Roundup®. Nonetheless, Defendants

24  deliberately crafted their label, marketing, and promotion to mislead farmers and consumers.

25
26      263.    This was not done by accident or through some justifiable negligence. Rather,

27  Defendants knew that it could turn a profit by convincing the agricultural industry that Roundup

28

was harmless to humans, and that full disclosure of the true risks of Roundup® would limit the amount of money Defendants would make selling Roundup® in California. Defendants' objection was accomplished not only through its misleading labeling, but through a comprehensive scheme of selective fraudulent research and testing, misleading advertising, and deceptive omissions as more fully alleged throughout this pleading. Plaintiffs were denied the right to make an informed decision about whether to purchase, use, or be exposed to an herbicide, knowing the full risks attendant to that use. Such conduct was done with conscious disregard of Plaintiffs' rights.

264.   There is no indication that Defendants will stop their deceptive and unlawful marketing practices unless they are punished and deterred. Accordingly, Plaintiffs request punitive damages against the Defendants for the harms caused to Plaintiffs.

265.   The conduct of defendants was a substantial factor and proximate cause of the serious personal injuries and death sustained by plaintiffs' decedent, Mike Esfahanian.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff ANOUSHEH SABOURI and Plaintiff S█████ E█████████, a minor, hereby pray for judgment against Defendants, and each of them, jointly and severally as follows:

1.   Awarding compensatory damages in excess of the jurisdictional amount, including, but not limited to pain, suffering, emotional distress, loss of enjoyment of life, and other non-economic damages in an amount to be determined at trial of this action;

2.   Awarding compensatory damages to Plaintiffs for past and future damages, including, but not limited to, Plaintiffs' pain and suffering and for severe and permanent personal injuries sustained by the Plaintiffs including health care costs and economic loss;

3.   Awarding economic damages in the form of medical expenses, out of pocket

1  expenses, lost earnings and other economic damages in an amount to be determine at trial of this

2  action;

3     4.     Punitive and/or exemplary damages for the wanton, willful, fraudulent, and

4  reckless acts of the Defendants who demonstrated a complete disregard and reckless indifference

5  for the safety and welfare of the general public and to the Plaintiffs in an amount sufficient to punish

6  Defendants and deter future similar conduct, to the extent allowed by applicable law;

7     5.     Pre-judgment interest;

8     6.     Post-judgment interest;

9     7.     Awarding Plaintiffs reasonable attorneys' fees;

10    8.     Awarding Plaintiffs the costs of these proceedings; and

11    9.     Such other and further relief as this Court deems just and proper.

12

13

14    DATED: September 21, 2021         **THE LAW OFFICES OF HAYTHAM FARAJ**

15

16

17

18    By:_____
         HAYTHAM FARAJ, ESQ.
19       Attorneys for Plaintiffs, ANOUSHEH
         SABOURI and S███ E██████████, a minor
20

21

22

23

24

25

26

27

28

1-063
**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

1

## <u>DEMAND FOR JURY TRIAL</u>

2

      Plaintiff ANOUSHEH SABOURI and Plaintiff S██ E██████ a minor, hereby

3

demand a trial by jury on all of the causes of action.

4

5

DATED: September 21, 2021     **THE LAW OFFICES OF HAYTHAM FARAJ**

6

7

8

     By:_____

9

     HAYTHAM FARAJ, ESQ.

10

     Attorneys for Plaintiffs, ANOUSHEH
     SABOURI and S██ E██████, a minor

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

63