**Query    Reports    Utilities    Help    Log Out**

# U.S. District Court
## Western District of Virginia (Danville)
## CIVIL DOCKET FOR CASE #: 4:22-cv-00020-TTC

Hensley v. Monsanto Company et al
Assigned to: Judge Thomas T. Cullen
Demand: $2,000,000
Case in other court: Charlotte County Circuit Court, CL22000001-00
Cause: 28:1332 Diversity-Notice of Removal

Date Filed: 03/30/2022
Jury Demand: Both
Nature of Suit: 365 Personal Inj. Prod. Liability
Jurisdiction: Diversity

**Plaintiff**

**Norman Hensley**                              represented by    **Daniel J. Farnsworth , Jr.**
Farnsworth Law Offices
211 Pettigru Street
Greenville, SC 29601
864-250-9119
Email: dan@farnsworthlawoffices.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Monsanto Company**                            represented by    **Tamara Fishman**
Hollingsworth LLP
1350 I Street, NW
Washington, DC 20005
202-898-5800
Fax: 202-682-1639
Email: tbarago@hollingsworthllp.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Naturchem, Inc.**

| Date Filed | # | Docket Text |
|---|---|---|
| 03/30/2022 | 1 | NOTICE OF REMOVAL from Charlotte County Circuit Court, case number CL22000001-00 (Filing & Administrative fee $402.00; pay.gov receipt number AVAWDC-3920045) filed by Monsanto Company. (Attachments: # 1 Exhibit 1 - State Court Complaint, # 2 Exhibit 2 - Declaration of Nicholas Hooks, # 3 Civil Cover Sheet)(ham) |
| 03/30/2022 | 2 | Notice of Filing Requirement to Monsanto Company - Pursuant to Standing Order dated May 15, 2000, and the adoption of Rule 7.1 of the Federal Rules of Civil Procedures, effective December 1, 2002, nongovernmental corporate parties are directed to file a |

| | | |
|---|---|---|
| | | Corporate Disclosure Statement with their first appearance, pleading, motion or response. Click here to access the Corporate Disclosure Statement Form. This form should be electronically filed in this matter as ordered. (ham) |
| 03/30/2022 | | Tamara Barago, in accordance with Section B.9. of the Administrative Procedures for Filing, Signing and Verifying Pleadings and Papers by Electronic Means, a registered user is responsible for ensuring their mailing address, primary email address, and telephone number are kept up-to-date with this court by updating the information in their PACER account. To update your information, log into PACER.gov and click the Maintenance tab to Update this information with this court. (ham) |
| 03/30/2022 | | Daniel J. Farnsworth, Jr., in accordance with Section B.9. of the Administrative Procedures for Filing, Signing and Verifying Pleadings and Papers by Electronic Means, a registered user is responsible for ensuring their mailing address, primary email address, and telephone number are kept up-to-date with this court by updating the information in their PACER account. To update your information, log into PACER.gov and click the Maintenance tab to Update this information with this court. (ham) |
| 03/30/2022 | 3 | Positive Corporate Disclosure Statement by Monsanto Company identifying Other Affiliate Bayer AG for Monsanto Company. (Fishman, Tamara) |
| 03/30/2022 | 4 | Order Requesting Transmittal of Case File from Charlotte County Circuit Court. Signed by Judge Thomas T. Cullen on 3/30/2022. (Order mailed to Charlotte County Circuit Court via US Mail) (ham) |
| 03/30/2022 | 5 | ANSWER to Complaint (Notice of Removal) by Monsanto Company. (Fishman, Tamara) |

| **PACER Service Center** | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 03/31/2022 10:32:55 | | | |
| **PACER Login:** | sh0019sh | **Client Code:** | 31943.356965 |
| **Description:** | Docket Report | **Search Criteria:** | 4:22-cv-00020-TTC |
| **Billable Pages:** | 2 | **Cost:** | 0.20 |

CLERK'S OFFICE U.S. DIST. COURT
AT DANVILLE, VA
FILED

MAR 30 2022

JULIA C. DUDLEY, CLERK
BY:  s/ H. MCDONALD
    DEPUTY CLERK

# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### DANVILLE DIVISION

|  |  |
|---|---|
| NORMAN HENSLEY, | |
| Plaintiff, | Case No.  4:22CV00020 |
| v. | |
| MONSANTO COMPANY and NATURCHEM, INC., | |
| Defendants. | |

### DEFENDANT MONSANTO COMPANY'S NOTICE OF REMOVAL

Pursuant to 28 U.S.C. §§ 1332, 1441, and 1446 (and any other applicable laws), Defendant Monsanto Company ("Monsanto"), hereby gives notice of removal of this action, captioned *Norman Hensley v. Monsanto Company et al.*, bearing Case Number CL22000001-00, from the Circuit Court for the County of Charlotte, Virginia to this Court. Pursuant to 28 U.S.C. § 1446(a), Monsanto provides the following statement of grounds for removal.

### Introduction

1.  In this products liability lawsuit, Plaintiff Norman Hensley sues Monsanto for injuries allegedly caused by Monsanto's Roundup®-branded herbicides, which have glyphosate as their active ingredient. For decades, farmers have used glyphosate-based herbicides to increase crop yields, and home-owners, landscaping companies, and local government agencies have used these herbicides for highly effective weed control. Glyphosate is one of the most thoroughly studied herbicides in the world, and glyphosate-based herbicides have received regulatory approval in more than 160 countries. Since 1974, when Monsanto first introduced a

Roundup®-branded herbicide to the marketplace, the United States Environmental Protection Agency repeatedly has concluded — including as recently as 2020 — that glyphosate does not cause cancer. Nevertheless, Plaintiff alleges that exposure to Monsanto's Roundup®-branded, glyphosate-based herbicides caused his cancer — specifically, non-Hodgkin's lymphoma ("NHL").

2.      This is one of many lawsuits that have been filed against Monsanto involving Roundup®-branded herbicides. A multidistrict litigation ("MDL") proceeding is pending in the United States District Court for the Northern District of California, before the Honorable Vince G. Chhabria, pursuant to 28 U.S.C. § 1407. *See In re Roundup Prods. Liab. Litig.*, No. 3:16-md-02741-VC (N.D. Cal.); *In re Roundup Prods. Liab. Litig.*, MDL No. 2741, 214 F. Supp. 3d 1346 (J.P.M.L. 2016).

3.      As discussed in more detail below, Monsanto removes this lawsuit because this Court has subject matter jurisdiction based on diversity of citizenship. Plaintiff is a citizen of Virginia. For purposes of diversity jurisdiction, Monsanto is deemed to be a citizen of Missouri (where its principal place of business is located) and Delaware (Monsanto's state of incorporation). Defendant NaturChem, Inc. ("NaturChem") is deemed to be a citizen of South Carolina (its state of incorporation and where its principal place of business is located). Accordingly, complete diversity of citizenship exists in this case as required by 28 U.S.C. § 1332. The statutory amount-in-controversy requirement is also satisfied because Plaintiff seeks damages in excess of $2,000,000.

**Background and Procedural History**

4.      In January 2022, Plaintiff commenced this lawsuit in the Circuit Court for the County of Charlotte, Virginia by filing a complaint, captioned *Norman Hensley v. Monsanto Company et al.*, Case Number CL22000001-00 (the "Commonwealth Court Action").

5.      Pursuant to 28 U.S.C. § 1446(a), a true and correct copy of the Complaint purportedly "served" on Monsanto's registered agent in the Commonwealth Court Action is attached as **Exhibit 1.**[1] Plaintiff seeks compensatory and punitive damages based on the allegation that Monsanto's Roundup®-branded herbicides caused his NHL. *See, e.g.*, Complaint, Introduction & ¶¶ 2–5, 194–197.

## Basis for Removal — Diversity Jurisdiction

6.      Plaintiff is, and was at the time the Commonwealth Court Action was filed, a citizen of the Commonwealth of Virginia. *See* Complaint ¶ 1.

7.      Monsanto is, and was at the time the Commonwealth Court Action was filed, a corporation incorporated under the laws of the State of Delaware, with its principal place of business in the State of Missouri. *See* Complaint ¶ 6. Thus, Monsanto is deemed to be a citizen of Missouri and Delaware, for purposes of federal diversity jurisdiction.

8.      NaturChem is, and was at the time the Commonwealth Court Action was filed, a corporation incorporated under the laws of the State of South Carolina, with its principal place of business in the State of South Carolina. *See* Declaration of Nicholas Hooks ¶ 4 (attached as **Exhibit 2**). Thus, NaturChem is deemed to be a citizen of South Carolina, for purposes of federal diversity jurisdiction.[2]

9.      The Complaint seeks a judgment against Monsanto in an amount in excess of

---

[1] A summons was not served with the Complaint, so this was not proper service of process on Monsanto.

[2] Plaintiff attempted to avoid federal diversity-based jurisdiction by alleging that NaturChem is "domiciled in the Commonwealth of Virginia" and "a citizen of the Commonwealth of Virginia for the purpose of attempting to establish federal court diversity jurisdiction." Complaint ¶¶ 10, 16. Plaintiff is wrong. *See* Declaration of Nicholas Hooks ¶ 4; *see also Cent. W. Virginia Energy Co., Inc. v. Mountain State Carbon, LLC*, 636 F.3d 101, 102 (4th Cir. 2011) ("For federal diversity jurisdiction purposes, a corporation is a citizen of the states in which it has been incorporated and in which it has its principal place of business.").

$2,000,000, based on the allegation that Monsanto's Roundup®-branded herbicides caused Plaintiff's cancer (NHL). *See* Complaint ¶¶ 135, 157, 178, 192. Plaintiff also seeks punitive damages. *See id*. ¶¶ 194–98. Plaintiff thus seeks damages in excess of $75,000, exclusive of interest and costs, which satisfies the jurisdictional amount-in-controversy requirement. 28 U.S.C. § 1332(a); *see Dart Cherokee Basin Operating Co. v. Owens*, 574 U.S. 81, 89 (2014) ("[A] defendant's notice of removal need include only a plausible allegation that the amount in controversy exceeds the jurisdictional threshold."); *see also Ross v. First Family Fin. Servs., Inc.*, No. 2:01CV218-P-B, 2002 WL 31059582, at *8 (N.D. Miss. Aug. 29, 2002) ("[U]nspecified claims for punitive damage sufficiently serve to bring the amount in controversy over the requisite jurisdictional threshold set out in 28 U.S.C. § 1332."). In fact, other lawsuits seeking damages for NHL allegedly caused by Roundup®-branded herbicides have been filed against Monsanto in various federal courts asserting jurisdiction under Section 1332(a) and alleging damages in excess of $75,000, exclusive of interest and costs.

10.     In sum, this Court has original subject matter jurisdiction over this action based on Section 1332(a) because there is complete diversity of citizenship and the amount in controversy exceeds $75,000, exclusive of costs and interest.

## **Procedural Requirements**

11.     The Circuit Court for the County of Charlotte, Virginia is located within the Western District of Virginia. Therefore, removal to this Court satisfies the venue requirements of 28 U.S.C. § 1446(a).

12.     Monsanto's registered agent received the Complaint on March 9, 2022, but a summons was not served with the Complaint. This Notice of Removal is timely because proper service of process has not been effected on Monsanto, so there currently is no deadline for Monsanto to file this Notice of Removal.  In the alternative, if "service" of the Complaint

without a summons is deemed proper service of process on Monsanto, then this Notice of Removal is timely, in accordance with 28 U.S.C. § 1446(b)(1), because it is being filed within 30 days of March 9, 2022.

13.     Naturchem's consent to removal is not required because NaturChem has not been served in the Commonwealth Court Action. *See* 28 U.S.C. § 1446(b)(2)(A); *see also* Declaration of Nicholas Hooks ¶ 5. Nevertheless, if NaturChem's consent to removal is deemed required, NaturChem consents to this removal. *See* Declaration of Nicholas Hooks ¶ 5.

14.     The written notice required by 28 U.S.C. § 1446(d) will be promptly filed in the Circuit Court for the County of Charlotte, Virginia and will be promptly served on Plaintiff.

15.     Monsanto does not waive any defenses and expressly reserves its right to raise any and all defenses in future proceedings.

16.     If any question arises as to the propriety of this removal, Monsanto requests the opportunity to present written and oral argument in support of removal.

## <u>Conclusion</u>

For the foregoing reasons, Monsanto removes this lawsuit to this Court pursuant to 28 U.S.C. §§ 1332, 1441, and 1446 (and any other applicable laws).

Dated: March 30, 2022                 Respectfully submitted,


By: */s/ Tamara Barago*
Tamara Barago (Virginia Bar No. 80361)
HOLLINGSWORTH LLP
1350 I Street, N.W.
Washington, DC 20005
Telephone: (202) 898-5800
Fax: (202) 682-1639
tbarago@hollingsworthllp.com

***Counsel for Defendant Monsanto Company***

## CERTIFICATE OF SERVICE

I hereby certify that on this 30th day of March, 2022, the foregoing Notice of Removal

was sent by first class mail to the following:


       Daniel J. Farnsworth, Jr.
       PETTUS / FARNSWORTH, LLC
       201 King Street
       Keysville, Virginia 23947

       Counsel for Plaintiff



       */s/ Tamara Barago*
       Tamara Barago

EXHIBIT 1

IN THE CIRCUIT COURT FOR THE COUNTY OF CHARLOTTE

NORMAN HENSLEY

    Plaintiff,

       v.

MONSANTO COMPANY
800 Lindbergh Boulevard
St. Louis Missouri 63167

    SERVE Registered Agent:
    Corporation Service Company
    100 Shockoe Slip F12
    Richmond, Virginia 23219

AND

NATURCHEM, INC.
488 Plank Rd.
Farmville, Virginia 23901

    Defendants.

CL22 000001-00

FILED IN THE CLERK'S OFFICE
OF THE CIRCUIT COURT OF THE
CHARLOTTE CIRCUIT COURT
DATE: 01/06/2022 @15:00:43

NAN COLLEY , CLERK
TESTE: _____
GLERK/DEPUTY CLERK



COPY

## COMPLAINT

COMES NOW Plaintiff Norman Hensley, by and through undersigned counsel, and for his causes of action against Defendants Monsanto Company and Naturchem, Inc. alleging the following upon information and belief, except those allegations that pertain to Plaintiff, which are based on personal knowledge:

## INTRODUCTION

Plaintiff brings this cause of action against all Defendants individually and collectively, jointly and severally. All claims in this action are a direct and proximate result of Defendants' negligent, willful, and wrongful conduct in connection with the design, development, manufacture, testing, packaging, promoting, marketing, distribution, and/or

sale of the products as Roundup®. Plaintiff seeks recovery for damages as a result of Norman Hensley developing Non-Hodgkin's Lymphoma ("NHL"), which was directly and proximately caused by such wrongful conduct by Defendants, the unreasonably dangerous and defective nature of Roundup®, and its active ingredient, glyphosate, and the attendant effects of developing NHL. All of the claims involve common questions of law and fact and share legal and medical issues that arise out of Plaintiff's exposure to Roundup®.

## THE PARTIES

## PLAINTIFF

### *NORMAN HENSLEY*

1. Plaintiff Norman Hensley is a citizen and resident of Charlotte County, in the Commonwealth of Virginia.

2. Plaintiff was first exposed to Roundup® in Virginia as early as 2014. He was exposed until approximately April 2019 while working for NatureChem, Inc. Plaintiff was directed to spray Roundup® along roadways and other vast areas throughout the Southside Virginia region and the Commonwealth, on a routine basis while employed with NatureChem.

3. On or about April, 2019, Norman Hensley was diagnosed with Large B-Cell Lymphoma (Non-Hodkins Lymphoma) and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

4. As a direct and proximate result of these injuries, Plaintiff has incurred medical expenses and has endured and will endure severe pain, suffering, physical and mental limitations, along with loss of enjoyment and interruption of daily living; Plaintiff being severely damaged in both a personal and pecuniary nature.

5. During the entire time that Plaintiff was exposed to Roundup®, he did not know that exposure to Roundup® was injurious to his health or the health of others, nor did his employer, Plaintiff NatureChem suggest or require any safety precautions when handling and being exposed, often daily, to Roundup® chemicals.

### DEFENDANTS

6. Defendant Monsanto is a Delaware corporation with its headquarters and principal place of business in St. Louis, Missouri. At all relevant times, Monsanto also regularly conducted, transacted, and solicited business in St. Louis, Missouri, as well as in all States of the United States. Monsanto's world headquarters are located at 800 Lindbergh Boulevard in St. Louis County, Missouri.

7. At all times relevant to this complaint, Monsanto was the entity that discovered the herbicidal properties of glyphosate and the manufacturer of Roundup®, which contains the active ingredient glyphosate and the surfactant POEA, as well as adjuvants and other "inert" ingredients. On information and belief, important scientific, manufacturing, marketing, sales, and other business decisions regarding Roundup® were made from and in the State of Missouri.

8. At all times relevant to this complaint, Monsanto was engaged in the business of manufacturing, marketing, testing, promoting, selling, and/or distributing Roundup® in the State of Missouri.

9. At all relevant times, Monsanto had, and continues to have, regular and systematic contact with and conducts business in and from the Commonwealth of Virginia, such that it has purposefully availed itself of the laws of the Commonwealth and expects to both sue and to be sued in Virginia. In the alternative, Monsanto's presence in the Commonwealth of Virginia satisfies the due process requirements for Virginia courts to exercise jurisdiction over it.

10. Defendant NaturChem, Inc. (hereinafter "NaturChem") is a company doing business in and formerly employing Plaintiff and is domiciled in the Commonwealth of Virginia.

11. NaturChem provides vegetation management solutions and used Roundup® regularly in the services provided.

## JURISDICTION AND VENUE

12. At all times relevant hereto, Monsanto maintains a registered agent in the City of Richmond where it accepts service of process and seeks redress for its grievances.

13. Venue is proper in the Circuit Court for Richmond pursuant to Va. Code § 8.01-262(2).

14. This Court has personal jurisdiction over all Defendants pursuant to Va. Code § 8.01-328.1.A in that each caused tortious injury by an act or omission in the Commonwealth of Virginia, each transacts business in the Commonwealth of Virginia; each supplies services and things in the Commonwealth of Virginia; and are otherwise subject to service of process in the Commonwealth.

15. This Court has subject matter jurisdiction pursuant to VA Code § 17.1-513

16. No federal court has subject matter jurisdiction pursuant to 28 USC § 1332 as complete diversity is lacking in that Plaintiff and Defendant NaturChem is a citizen of the Commonwealth of Virginia for the purpose of attempting to establish federal court diversity jurisdiction. Any attempt to remove the matter pursuant to 28 U.S.C. § 1332 alleging complete diversity of the parties would be frivolous and dilatory.

## ALLEGATION COMMON TO ALL COUNTS

17. In 1970, Defendant Monsanto Company, Inc. ("Monsanto") discovered the herbicidal properties of glyphosate and began marketing it in products in 1974 under the brand name Roundup®. Roundup® is a non-selective herbicide used to kill weeds that commonly compete with the growing of crops. In addition to the active ingredient

glyphosate, Roundup® contains the surfactant Polyethoxylated tallow amine (POEA) and/or adjuvants and other so-called "inert" ingredients. In 2001, glyphosate was the most-used pesticide active ingredient in American agriculture with 85-90 million pounds used annually. That number grew to 185 million pounds in 2007. As of 2013, glyphosate was the world's most widely used herbicide.

18. Monsanto is a multinational agricultural biotechnology corporation based in St. Louis, Missouri, and incorporated in Delaware. It is the world's leading produced of glyphosate. As of 2009, Monsanto was the world's leading producer of seeds, accounting for 27% of the world seed market. The majority of these seeds are of the Roundup Ready® brand. The stated advantage of Roundup Ready® crops is that they substantially improve a farmer's ability to control weeds, because glyphosate can be sprayed in the fields during the growing season without harming crops. In 2010, an estimated 70% of corn and cotton and 90% of soybean fields in the United States were Roundup Ready®.

19. Monsanto's glyphosate products are registered in 130 countries and approved for use on over 100 different crops. They are ubiquitous in the environment. Numerous studies confirm that glyphosate is found in rivers, streams, and groundwater in agricultural areas where Roundup® is used. It has been found in food, in the urine of agricultural workers, and even in the urine of urban dwellers who are not in direct contact with glyphosate.

20. On March 20, 2015, the International Agency for Research on Cancer ("IARC"), an agency of the World Health Organization ("WHO"), issued an evaluation of several herbicides, including glyphosate. That evaluation was based, in part, on studies of exposures to glyphosate in several countries around the world, and it traces the health implications from exposure to glyphosate since 2001.

21. On July 29, 2015, IARC issued the formal monograph relating to glyphosate. In that monograph, the IARC Working Group provides a thorough review of the numerous studies and data relating to glyphosate exposure in humans.

22. The IARC Working Group classified glyphosate as a Group 2A herbicide, which means that it is *probably carcinogenic to humans*. The IARC Working Group concluded that cancers most associated with glyphosate exposure are NHL and other haematopoietic cancers, including lymphocytic lymphoma/ chronic lymphocytic leukemia, B-cell lymphoma, and multiple myeloma.

23. The IARC evaluation is significant. It confirms what has been believed for years: that glyphosate is toxic to humans.

24. Nevertheless, Monsanto, since it began selling Round®, has represented it as safe to humans and the environment. Indeed, Monsanto has repeatedly proclaimed and continues to proclaim to the world, and particularly to United States consumers, that glyphosate-based herbicides, including Round-up®, create no unreasonable risks to human health or to the environment.

### FACTS

25. Glyphosate is a broad-spectrum, non-selective herbicide used in a wide variety of herbicidal products around the world.

26. Plants treated with glyphosate translocate the system herbicide to their roots, shoot regions, and fruit, where it interferes with the plant's ability to form aromatic amino acids necessary for protein synthesis. Treated plants generally die within two or three days. Because plants absorb glyphosate, it cannot be completely removed by washing or peeling produce or by milling, baking, or brewing grains.

27. For nearly 40 years, farms across the world have used Roundup® without knowing of the dangers its use poses. That is because when Monsanto first introduced Roundup®, it touted glyphosate as a technological breakthrough: it could kill almost every weed

without causing harm either to people or to the environment. Of course, history has shown that not to be true. According to the WHO, the main chemical ingredient of Roundup®-glyphosate- is a probable cause of cancer. Those most at risk are farm workers and other individuals with workplace exposure to Roundup®, such as garden center workers, nursery workers, and landscapers. Agricultural workers are, once again, victims of corporate greed. Monsanto assured the public that Roundup® was harmless. In order to prove this, Monsanto has championed falsified data and has attacked legitimate studies that revealed the dangers of Roundup®. Monsanto has led a prolonged campaign of misinformation to convince government agencies, farmers and the general population that Roundup® is safe.

### The Discovery of Glyphosate and Development of Roundup®

28. The herbicidal properties of glyphosate were discovered in 1970 by Monsanto chemist John Franz. The first glyphosate-based herbicide was introduced to the market in the mid-1970s under the brand name Roundup®. From the outset, Monsanto marketed Roundup® as a "safe" general-purpose herbicide for widespread commercial and consumer use. It still markets Roundup® as safe today.

29. In addition to the activate ingredient glyphosate, Roundup® formulations also contain adjuvants and other chemicals, such as the surfactant POEA, which are considered "inert" and therefore protected as "trade secrets" in manufacturing. Growing evidence suggest that these adjuvants and additional components of Roundup® formulations are not, in fact, inert and are toxic in their own right.

### Registration of Herbicides under Federal Law

30. The manufacture, formulation, and distribution of herbicides, such as Roundup®, are regulated under the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA" or "Act"), 7 U.S.C. § 136 et seq. FIFRA requires that all pesticides be registered with the

Environmental Protection Agency ("EPA" or "Agency") prior to their distribution, sale, or use, except as described by the Act. 7 U.S.C. § 136a(a).

31. Because pesticides are toxic to plants, animals, and humans, at least to some degree, the EPA requires as part of the registration process, among other things, a variety of tests to evaluate the potential for exposure to pesticides, toxicity to people and other potential non-target organisms, and other adverse effects on the environment. Registration by the EPA, however, is not an assurance or finding of safety. The determination the Agency must make in registering or re-registering a product is not that the product is "safe," but rather that use of the product in accordance with its label directions "will not generally cause unreasonable adverse effects on the environment." 7 U.S.C. § 136a(c)(5)(D).

32. FIFRA defines "unreasonable adverse effects on the environment" to mean "any unreasonable risk to man or the environment, taking into account the economic, social, and environmental costs and benefits of the use of any pesticide." 7 U.S.C. § 136(bb). FIFRA thus requires EPA to make a risk/benefit analysis in determining whether a registration should be granted, or a pesticide allowed to continue to be sold in commerce.

33. The EPA and the State of California registered Roundup® for distribution, sale, and manufacture in the United States.

34. FIFRA generally requires that the registrant, Monsanto in the case of Roundup®, conducts the health and safety testing of pesticide products. The EPA has protocols governing the conduct of the tests required for registration and the laboratory practices that must be followed in conducting these tests. The data produced by the registrant must be submitted to the EPA for review and evaluation. The government is not required, nor is it able, however, to perform the product tests that are required of the manufacturer.

35. The evaluation of each pesticide product distributed, sold, or manufactured is completed at the time the product is initially registered. The data necessary for registration of a pesticide has changed over time. The EPA is now in the process of re-evaluating all pesticide products through a Congressionally-mandated process called "re-registration." 7 U.S.C. § 136A-1. In order to re-evaluate these pesticides, the EPA is demanding the completion of additional tests and the submission of data for the EPS's recent review and evaluation.

36. In the case of glyphosate, and therefore Roundup®, the EPA had planned on releasing its preliminary risk assessment-in relation to the reregistration process-no later than July 2015. The EPA completed its review of glyphosate in early 2015, but it delayed releasing the risk assessment pending further review in light of the WHO's health-related findings.

*Scientific Fraud Underlying the Marketing and Sale of Glyphosate/Roundup®*

37. Based on early studies showing that glyphosate could case cancer in laboratory animals, the EPA originally classified glyphosate as *possibly carcinogenic to humans* (Group C) in 1985. After pressure from Monsanto, including contrary studies it provided to the EPA, the EPA changed its classification to *evidence of non-carcinogenicity in humans (*Group E) in 1991. In so classifying glyphosate, however, the EPA made clear that the designation did not mean the chemical does not cause cancer: "It should be emphasized, however, that designation of an agent in Group E is based on the available evidence at the time of evaluation and should not be interpreted as a definitive conclusion that the agent will not be a carcinogen under any circumstances."

38. On two occasions, the EPA found that the laboratories hired by Monsanto to test the toxicity of its Roundup® products for registration purposed committed fraud.

39. In the first instance, Monsanto, in seeking initial registration of Roundup® by the EPA, hired Industrial Bio-Test Laboratories ("IBT") to perform and evaluate pesticide toxicology studies relating to Roundup®. IBT performed about 30 tests on glyphosate and glyphosate-containing products, including nine of the 15 residue studies needed to register Roundup®.

40. In 1976, the United States Food and Drug Administration ("FDA") performed an inspection of IBT that revealed discrepancies between the raw data and the final report relating to the toxicological impacts of glyphosate. The EPA subsequently audited IBT; it too found the toxicology studies conducted for the Roundup® herbicide to be invalid. An EPA reviewer stated, after finding "routine falsification of data" at IBT, that it was "hard to believe the scientific integrity of the studies when they said they took specimens of the uterus from male rabbits."

41. Three top executives of IBT were convicted of fraud in 1983.

42. In the second incident of data falsification, Monsanto hired Craven Laboratories in 1991 to perform pesticide and herbicide studies, including for Roundup®. In that same year, the owner of Craven Laboratories and three of its employees were indicted, and later convicted, of fraudulent laboratory practices in the testing of pesticides and herbicides.

43. Despite the falsity of the tests that underlie its registration, within a few years of its launch, Monsanto was marketing Roundup® in 115 countries.

### *The Importance of Roundup® to Monsanto's Market Dominance Profits*

44. The success of Roundup® was key to Monsanto's continued reputation and dominance in the marketplace. Largely due to the success of Roundup® sales, Monsanto's agriculture division was out-performing its chemicals division's operating income, and that gap increased yearly. But with its patent for glyphosate expiring in

the United States in the year 2000, Monsanto needed a strategy to maintain its
Roundup® market dominance and to ward off impending competition.

45. In response, Monsanto began the development and sale of genetically engineered
Roundup Ready® seeds in 1996. Since Roundup Ready® crops are resistant to
glyphosate farmers can spray Roundup® onto their fields during the growing season
without harming the crop. This allowed Monsanto to expand its market for Roundup®
even further; by 2000, Monsanto's biotechnology seeds were planted on more than 80
million acres worldwide and nearly 70% of American soybeans were planted from
Roundup Ready® seeds. It also secured Monsanto's dominant share of the
glyphosate/Roundup® market through a marketing strategy that coupled proprietary
Roundup Ready® seeds with continued sales of its Roundup® herbicide.

46. Through a three-pronged strategy of increasing production, decreasing prices, and by
coupling with Roundup Ready® seeds, Roundup® became Monsanto's most
profitable product. In 2000, Roundup® account for almost $2.8 billion in sales,
outselling other herbicides by a margin of five to one, and accounting for close to half
of Monsanto's revenue. Today, glyphosate remains one of the world's largest
herbicides by sales volume.

*Monsanto has known for decades that it falsely advertises the safety of Roundup®*

47. In 1996, the New York Attorney General ("NYAG") filed a lawsuit against Monsanto
based on its false and misleading advertising of Roundup® products. Specifically, the
lawsuit challenged Monsanto's general representations that its spray-on glyphosate-
based herbicides, including Roundup®, were **"safer than table salt"** and
**"practically non-toxic"** to mammals, birds, and fish. Among the representations the
NYAG found deceptive and misleading about the human and environmental safety of
glyphosate and/or Roundup® are the following:

a. "Remember that environmentally friendly Roundup herbicide is biodegradable. It won't build up in the soil so you can use Roundup with confidence along customers' driveways, sidewalks and fences…"

b. "And remember that Roundup is biodegradable and won't build up in the soil. That will give you the environmental confidence you need to use Roundup everywhere you've got a weed, brush, edging or trimming problem."

c. "Roundup biodegrades into naturally occurring elements."

d. "Remember that versatile Roundup herbicide stays where you put it. That means there's no washing or leaching to harm customers' shrubs or other desirable vegetation."

e. "This non-residual herbicide will not wash or leach in the soil. It… stays where you apply it."

f. "You can apply Accord with 'confidence because it will stay where you put it' it bonds tightly to soil particles, preventing leaching. Then, soon after application, soil microorganisms biodegrade Accord into natural products."

g. "Glyphosate is less toxic to rats than table salt following acute oral ingestion."

h. "Glyphosate's safety margin is much greater than required. It has over a 1,000-fold safety margin in food and over a 700-fold safety margin for workers who manufacture it or use it."

i. "You can feel good about using herbicides by Monsanto. They carry a toxicity category rating of 'practically non-toxic' as it pertains to mammals, birds and fish."

j. "Roundup can be used where kids and pets will play and breaks down into natural material." This ad depicts a person with his head in the ground and a pet dog standing in an area which has been treated with Roundup.

48. On November 19, 1996, Monsanto entered into an Assurance of Discontinuance with

NYAG, in which Monsanto agreed, among other things, "to cease and desist from

publishing or broadcasting any advertisements [in New York] that represent, directly

or by implication" that:

a. Its glyphosate-containing pesticide products or any component thereof are safe, non-toxic, harmless or free from risk.

b. Its glyphosate-containing pesticide products or any component thereof manufactured, formulated, distributed or sold by Monsanto are biodegradable.

c. Its glyphosate-containing pesticide products or any component thereof stay where they are applied under all circumstances and will not move through the environment by any means.

d.  Its glyphosate-containing pesticide products or any component thereof are "good" for the environment or are "known for their environmental characteristics."

e.  Glyphosate-containing pesticide products or any component thereof are safer or less toxic than common consumer products other than herbicides;

f.  Its glyphosate-containing products or any component thereof might be classified as "practically non-toxic."

49. Monsanto did not alter its advertising in the same manner in any state other than New York, and on information and belief it still has not done so today.

50. In 2009, France's highest court ruled that Monsanto had not told the truth about the safety of Roundup®. The French court affirmed an earlier judgement that Monsanto had falsely advertised its herbicide Roundup® as "biodegradable" and that it "left the soil clean."

### Classifications and Assessments of Glyphosate

51. The IARC process for the classification of glyphosate followed IARC's stringent procedures for the evaluation of a chemical agent. Over time, the IARC Monograph program has reviewed 980 agents. Of those reviewed, it has determined 116 agents to be Group 1 (Known Human Carcinogens); 73 agents to be Group 2A (Probable Human Carcinogens); 287 agents to be Group 2B (Possible Human Carcinogens); 503 agents to be Group 3 (Not Classified); and one agent to be Probably Not Carcinogenic.

52. The established procedure for IARC Monograph evaluations is described in the IARC Programme's Preamble. Evaluations are performed by panels of international experts, selected on the basis of their expertise and the absence of actual or apparent conflicts of interest.

53. One year before the Monograph meeting, the meeting is announced and there is a call both for data and for experts. Eight months before the Monograph meeting, the Working Group membership is selected, and the sections of the Monograph are

developed by the Working Group members. One month prior to the Monograph meeting, the call for data is closed and the various draft sections are distributed among Working Group members for review and comment. Finally, at the Monograph meeting, the Working Group finalizes review of all literature, evaluates the evidence in each category, and completes the overall evaluation. Within two weeks after the Monograph meeting, the summary of the Working Group findings are published in *The Lancet Oncology*, and within a year after the meeting, the finalized Monograph is published.

54. In assessing an agent, the IARC Working Group reviews the following information: (a) human, experimental, and mechanistic data; (b) all pertinent epidemiological studies and cancer bioassays; and (c) representative mechanistic data. The studies must be publicly available and have sufficient detail for meaningful review, and reviewers cannot be associated with the underlying study.

55. In March 2015, IARC reassessed glyphosate. The summary published in *The Lancet Oncology* reported that glyphosate is a Group 2A agent and probably carcinogenic in humans.

56. On July 29, 2015, IARC issued its Monograph for glyphosate, Monograph Volume 112. For Volume 112, a Working Group of 17 experts from 11 countries met at IARC from March 3-10, 2015 to assess the carcinogenicity of certain herbicides, including glyphosate. The March meeting culminated a nearly one-year review and preparation by the IARC Secretariat and the Working Group, including a comprehensive review of the latest available scientific evidence. According to published procedures, the Working Group considered "reports that have been published or accepted for publication in the openly available scientific literature" as well as "data from governmental reports that are publicly available."

57. The studies considered the following exposure groups: (1) occupational exposure of farmers and tree nursery workers in the United States, forestry workers in Canada and Finland and municipal weed-control workers in the United Kingdom; and (2) para-occupational exposure in farming families.

58. Glyphosate was identified as the second-most used household herbicide in the United States for weed control between 2001 and 2007 and the most heavily used herbicide in the world in 2012.

59. Exposure pathways are identified as air (especially during spraying), water, and food. Community exposure to glyphosate is widespread and fund in soil, air, surface water, and groundwater, as well as in food.

60. The assessment of the IARC Working Group identified several case control studies of occupational exposure in the United States, Canada, and Sweden. These studies show a human health concern from agricultural and other work-related exposure to glyphosate.

61. The IARC Working Group found an increased risk between exposure to glyphosate and NHL and several subtypes of NHL, and the increased risk persisted after adjustment for other pesticides.

62. The IARC Working Group also found that glyphosate caused DNA and chromosomal damage in human cells. One study in community residents reported increases in blood markers of chromosomal damage (micronuclei) after glyphosate formulations were sprayed.

63. In male CD-1 mice, glyphosate induced a positive trend in the incidence of a rare tumor: renal tubule carcinoma. A second study reported a positive trend for haemangiosarcoma in male mice. Glyphosate increased pancreatic islet-cell adenoma in male rats in two studies. A glyphosate formulation promoted skin tumors in an initiation-promotion study in mice.

64. The IARC Working Group also noted that glyphosate has been detected in the urine of agricultural workers, indicating absorption. Soil microbes degrade glyphosate to aminomethylphosphoric acid (AMPA). Blood AMPA detection after exposure suggests intestinal microbial metabolism in humans.

65. The IARC Working Group further found that glyphosate and glyphosate formulations induced DNA and chromosomal damage in mammals, and in human and animal cells in utero.

66. The IARC Working Group also noted genotoxic, hormonal, and enzymatic effects in mammals exposed to glyphosate. Essentially, glyphosate inhibits the biosynthesis of aromatic amino acids, which leads to several metabolic disturbances, including the inhibition of protein and secondary product biosynthesis and general metabolic disruption.

67. The IARC Working Group also reviewed an Agricultural Health Study, consisting of a prospective cohort of 57,311 licensed pesticide applicators in Iowa and North Carolina. While this study differed from others in that it was based on a self-administered questionnaire, the results support an association between glyphosate exposure and multiple myeloma, hairy cell leukemia (HCL), and chronic lymphocytic leukemia (CLL), in addition to several other cancers.

### *Other Earlier Findings About Glyphosate's Dangers to Human Health*

68. The EPA has a technical fact sheet, as part of its Drinking Water and Health, National Primary Drinking Water Regulations publication, relating to glyphosate. This technical fact sheet predates IARC's March 20, 2015 evaluation. The fact sheet describes the release patterns for glyphosate as follows:

#### Release Patterns

Glyphosate is released to the environment in its use as a herbicide for controlling woody and herbaceous weeds on forestry, right-of-way, cropped and non-cropped sites. These sites may be around water and in wetlands.

It may also be released to the environment during its manufacture, formulation, transport, storage, disposal and cleanup, and from spills. Since glyphosate is not a listed chemical in the Toxics Release Inventory, data on releases during it manufacture and handling are not available.

Occupational workers and home gardeners may be exposed to glyphosate by inhalation and dermal contact during spraying, mixing, and cleanup. They may also be exposed by touching soil and plants to which glyphosate was applied. Occupational exposure may also occur during glyphosate's manufacture, transport storage, and disposal.

69. In 1995, the Northwest Coalition for Alternatives to Pesticides reported that in California, the state with the most comprehensive program for reporting of pesticide-caused illness, glyphosate was the third most commonly-reported cause of pesticide illness among agricultural workers.

### *The Toxicity of Other Ingredients in Roundup®*

70. In addition to the toxicity of the active ingredient, glyphosate, several studies support the hypothesis that the glyphosate-based formulation in Defendant's Roundup® products is more dangerous and toxic than glyphosate alone. Indeed, as early as 1991, available evidence demonstrated that glyphosate formulations were significantly more toxic than glyphosate alone.

71. In 2002, a study by Julie Marc, entitled "Pesticide Roundup Provokes Cell Division Dysfunction at the Level of CDK1/Cyclin B Activation," revealed that Roundup® causes delays in the cell cycles of sea urchins but that the same concentrations of glyphosate alone were ineffective and did not alter cell cycles.

72. A 2004 study by Marc and others, entitled "Glyphosate-based pesticides affect cell cycle regulation," demonstrated a molecular link between glyphosate-based products and cell cycle dysregulation. The researchers noted that "cell-cycle dysregulation is a hallmark of tumor cells and human cancer. Failure in the cell-cycle checkpoints leads genomic instability and subsequent development of cancers from the initial affected

cell." Further, "[s]ince cell cycle disorders such as cancer result from dysfunction of a unique cell, it was of interest to evaluate the threshold dose of glyphosate affecting the cells."

73. In 2005, a study by Francisco Peixoto, entitled "Comparative effects of the Roundup and glyphosate on mitochondrial oxidative phosphorylation," demonstrated that Roundup®'s effects on rat liver mitochondria are far more toxic than equal concentrations of glyphosate alone. The Peixoto study further suggested that the harmful effects of Roundup® on mitochondrial bioenergetics could not be exclusively attributed to glyphosate but could be the result of other chemicals, such as the surfactant POEA, or in the alternative, due to a potential synergic effect between glyphosate and other ingredients in the Roundup® formulation.

74. In 2009, Nora Benachour and Gilles-Eric Seralini published a study examining the effects of Roundup® and glyphosate on human umbilical, embryonic, and placental cells. The study tested dilution levels of Roundup® and glyphosate that were far below agricultural recommendations, corresponding with low levels of residue in food. The researchers ultimately concluded that supposed "inert" ingredients, and possibly POEA, alter human cell permeability and amplify toxicity of glyphosate alone. The researchers further suggested that assessments of glyphosate toxicity should account for the presence of adjuvants or additional chemicals used in the formulation of the complete pesticide. The study confirmed that the adjuvants present in Roundup® are not, in fact, inert and that Roundup® is potentially far more toxic than its active ingredient glyphosate alone.

75. The results of these studies were at all times available to Defendant. Defendant thus knew or should have known that Roundup® is more toxic than glyphosate alone and that safety studies of Roundup®, Roundup's adjuvants and "inert" ingredients, and/or the surfactant POEA were necessary to protect Plaintiff from Roundup®.

76. Despite its knowledge that Roundup® is considerably more dangerous than glyphosate alone, Defendant continued to promote Roundup® as safe.

### Recent Worldwide Bans on Roundup®/ Glyphosate

77. Several countries around the world have instituted bans on the sale of Roundup® and other glyphosate-containing herbicides, both before and since IARC first announced its assessment for glyphosate in March 2015, and more countries undoubtedly will follow suit as the dangers of the use of Roundup® become more widely known.

78. The Netherlands issued a ban on non-commercial use of all glyphosate-based herbicides in April 2014, including Roundup®. In issuing the ban, the Dutch parliament member who introduced the successful legislation stated: "Agricultural pesticides in user-friendly packaging are sold in abundance to private persons. In garden centers, Roundup® is promoted as harmless, but unsuspecting customers have no idea what the risks of this product are. Especially children are sensitive to toxic substances and should therefore not be exposed to it."

79. The Brazilian Public Prosecutor in the Federal District requested that the Brazilian Justice Department suspend the use of glyphosate.

80. France banned the private sale of Roundup® and glyphosate following the IARC assessment for Glyphosate.

81. Bermuda banned both the private and commercial sale of glyphosates, including Roundup®. The Bermuda government explained its ban as follows: "Following a recent scientific study carried out by a leading cancer agency, the importation of weed spray 'Roundup' has been suspended."

82. The Sri Lankan government banned the private and commercial use of glyphosate, particularly out of concern that glyphosate has been linked to fatal kidney disease in agricultural workers.

83. The government of Colombia announced its ban on using Roundup® and glyphosate to destroy illegal plantations of coca, the raw ingredient for cocaine, because of the WHO's finding that glyphosate is probably carcinogenic.

### Statement of Concern Regarding Glyphosate-Based Herbicides

84. On February 17, 2016, a consensus statement published in the journal *Environmental Health,* entitled "Concerns over use of glyphosate-based herbicides and risks associated with exposures: a consensus statement," assessed the safety of glyphosate-based herbicides (GBHs). The paper's "focus is on the unanticipated effects arising from the worldwide increase in use of GBHs, coupled with recent discoveries about the toxicity and human health risks stemming from use of GBHs." The researchers drew seven factual conclusions about GBHs:

   a. GBHs are the most heavily applied herbicide in the world and usage continues to rise;

   b. Worldwide, GBHs often contaminate drinking water sources, precipitation, and air, especially in agricultural regions;

   c. The half-life of glyphosate in water and soil is longer than previously recognized;

   d. Glyphosate and its metabolites are widely present in the global soybean supply;

   e. Human exposures to GBHs are rising;

   f. Glyphosate is now authoritatively classified as a probable human carcinogen; and

   g. Regulatory estimates of tolerable daily intakes for glyphosate in the United States and European Union are based on outdated science.

85. The researchers noted that GBH use has increased approximately 100-fold since the 1970s. Further, far from posing a limited hazard to vertebrates, as previously believed, two decades of evidence demonstrated that "several vertebrate pathways are likely targets of action, including hepatorenal damage, effects on nutrient balance through glyphosate chelating action and endocrine disruption."

86. The paper attributes uncertainties in current assessments of glyphosate formulations to the fact that "[t]he full list of chemicals in most commercial GBHs is protected as 'commercial business information,' despite the universally accepted relevance of such information to scientists hoping to conduct an accurate risk assessment of these herbicide formulations." Further, the researchers argue, "[t]he distinction in regulatory review and decision processes between 'active' and 'inert' ingredients has no toxicological justification, given increasing evidence that several so-called 'inert' adjuvants are toxic in their own right."

87. Among various implications, the researchers conclude that "existing toxicological data and risk assessments are not sufficient to infer that GBHs, as currently used, are safe." Further, "GBH-product formulations are more potent, or toxic, than glyphosate alone to a wide array of non-target organisms including mammals, aquatic insects, and fish." Accordingly, "risk assessments of GBHs that are based on studies quantifying the impacts of glyphosate alone underestimate both toxicity and exposure, and thus risk." The paper concludes that this "shortcoming has repeatedly led regulators to set inappropriately high exposure thresholds."

88. The researchers also critique the current practice of regulators who largely rely on "unpublished, non-peer reviewed data generated by the registrants" but ignore "published research because it often uses standards and procedures to assess quality that are different from those codified in regulatory agency data requirements, which largely focus on avoiding fraud." In the researchers' view, "[s]cientists independent of the registrants should conduct regulatory tests of GBHs that include glyphosate alone, as well as GBH-product formulations."

89. The researchers also call for greater inclusion of GBHs in government-led toxicology testing programs:

    a. Fresh and independent examination of GBH toxicity should be undertaken, and... this re-examination be accompanied by systematic efforts by relevant

agencies to monitor GBH levels in people and in the food supply, none of which are occurring today. The U.S. National Toxicology Program should prioritize a thorough toxicological assessment of the multiple pathways now identified as potentially vulnerable to GBHs.

90. The researchers suggest that, in order to fill the gap created by an absence of government funds to support research on GBHs, regulators could adopt a system through which manufacturers fund the registration process and the necessary testing:

"[W]e recommend that a system be put in place through which manufacturers of GBHs provide funds to the appropriate regulatory body as part of routine registration actions and fees. Such funds should then be transferred to appropriate government research institutes, or to an agency experienced in the award of competitive grants. In either case, funds would be made available to independent scientists to conduct the appropriate long-term (minimum 2 years) safety studies in recognized animal model systems. A thorough and modern assessment of GBH toxicity will encompass potential endocrine disruption, impacts on the gut microbiome, carcinogenicity, and multigenerational effects looking at reproductive capability and frequency of birth defects."

### *FDA Announces Testing of Glyphosate Residue in Foods*

91. On February 17, 2016, the U.S. Food and Drug Administration ("FDA") announced that, for the first time in its history, the agency planned to start testing certain foods for glyphosate residues. FDA spokeswoman Lauren Sucher explained: "The agency is now considering assignments for Fiscal Year 2016 to measure glyphosate in soybeans, corn, milk, and eggs, among other potential foods."

92. In 2014, the U.S. Government Accountability Office (GAO) had severely rebuked the FDA for its failures to both monitor for pesticide residue, including that of glyphosate, and to disclose the limitations of its monitoring and testing efforts to the public. The GAO had cited numerous undisclosed deficiencies in the FDA's process, specifically highlighting its omission of glyphosate testing.

93. Indeed, in the past, both the FDA and the U.S. Department of Agriculture (USDA) had routinely excluded glyphosate from their testing for the residues of hundreds of other pesticides, on the rationale that it was too expensive and unnecessary to protect

public health. Ms. Sucher, the FDA spokeswoman, however, now states that "the agency has developed 'streamlined methods' for testing for the weed killer."

94. The FDA's move is significant as the agency possess enforcement authority and can seek action if pesticide residues exceed enforcement guidelines.

### *European Union Vote on Glyphosate Renewal*

95. The license for glyphosate in the European Union (EU) was set to expire on June 30, 2016.

96. Without an extension of the license, Monsanto's Roundup® and other glyphosate-based herbicides faced a general phase out in EU markets.

97. In the months leading up to the license expiration date, protracted meetings and votes among national experts from the 28 EU Member States failed to produce agreement on an extension.

98. For instance, on March 4, 2016, *The Guardian* reported that France, the Netherlands, and Sweden disagreed glyphosate was harmless. The paper quoted the Swedish environment minister, Åsa Romson, as stating: "We won't take risks with glyphosate, and we don't think that the analysis done so far is good enough. We will propose that no decision is taken until further analysis has been done…"

99. The Netherlands argued that relicensing should be placed on hold until after a separate evaluation of glyphosate's toxicity can be conducted. Leading up to the vote, Italy joined the other EU states in opposing the license renewal, citing health concerns.

100. On June 6, 2016, Member States voted but failed to reach a qualified majority in favor or against the re-authorization of glyphosate.

101. On June 29, 2016, the EU Commission extended the European license for glyphosate for 18 months to allow the European Chemical Agency to rule on the safety of the chemical.

102. On July 11, 2016, the EU voted in favor of a proposal to restrict the conditions of use of glyphosate in the EU, including a ban on common co-formulant POE-tallowamine (POEA) from all glyphosate-based herbicides, including Roundup®.

103. These restrictions, which are non-binding on the EU states, are expected to apply until the European Chemical Agency issues an opinion on the chemical's safety.

## TOLLING OF THE STATUTE OF LIMITATIONS

### *Discovery Rule Tolling*

104. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

105. Plaintiff has suffered an illness that has a latency period and does not arise until years after exposure. Plaintiff had no way of knowing about the risk of serious illness associated with the use of and/or exposure to Roundup® and glyphosate until he was made aware that his metastatic cancer could be caused by their use and/or exposure to Roundup®. Consequently, the discovery rule applies to these cases, and the statute of limitations has been tolled until the day that Plaintiff knew or had reason to know that his metastatic cancer was linked to his use of and/or exposure to Roundup®.

106. Within the time period of any applicable statutes of limitations, Plaintiff could not have discovered, through the exercise of reasonable diligence, that exposure to Roundup® and glyphosate is injurious to human health.

107. Plaintiff did not discover and did not know of facts that would cause a reasonable person to suspect, the risks associated with the use of and/or exposure to Roundup® and glyphosate; nor would a reasonable and diligent investigation by him have disclosed that Roundup® and glyphosate would cause his metastatic cancer.

108. Furthermore, the running of the statute of limitations has been equitably tolled by reason of Defendant's fraudulent concealment and conduct. Through its affirmative misrepresentations and omissions, Defendant actively concealed from Plaintiff the true risks associated with use of or exposure to Roundup®.

109. As a result of Defendant's actions, Plaintiff was not aware, and could not reasonably know or have learned through reasonable diligence, that he had been exposed to the risks alleged herein and that those risks were the direct and proximate result of Defendant's acts and omissions.

110. Furthermore, Defendant is estopped from relying on any statute of limitations because of its concealment of the truth regarding the safety of Roundup®. Defendant was under a duty to disclose the true character, quality and nature of Roundup® because this was non-public information over which it continues to have exclusive control. Defendant knew that this information was not available to Plaintiff, his medical providers and/or their health facilities, yet it failed to disclose the information to the public.

111. Defendant had the ability to and did spend enormous amounts of money in furtherance of their purposes of marketing and promoting a profitable product, notwithstanding the known or reasonably knowable risks. Plaintiff and medical professionals could not have afforded to and could not have possibly conducted studies to determine the nature, extent and identity of related health risks, and they were forced to rely on Defendant's representations.

112. For these reasons, all applicable statutes of limitations have been tolled by operation of the discovery rule with respect to Plaintiff's claims.

*Estoppel*

113. Monsanto was under a continuous duty to disclose to consumers, users and other persons coming into contact with its products, including Plaintiff, accurate safety

information concerning its products and the risks associate with the use of and/or exposure to Roundup® and glyphosate.

114. Instead, Monsanto knowingly, affirmatively, and actively concealed safety information concerning Roundup® and glyphosate and the serious risks associated with the use of and/or exposure to its products.

115. Based on the foregoing, Monsanto is estopped from relying on any statutes of limitations in defense of this action.

## STRICT LIABILITY FOR DEFECTIVE MANUFACTURE AND DESIGN
### COUNT I

116. Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

117. Plaintiff brings this strict liability claim against Defendants for defective manufacture and design.

118. At all relevant times, Defendants each engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting Roundup® products, which are defective and unreasonably dangerous to consumers, users, and other persons coming into contact with them, including Plaintiff, thereby placing Roundup® products into the stream of commerce. These actions were under the ultimate control and supervision of Defendants.

119. At all times relevant to this litigation, Defendants designed, researched, developed, formulated, manufactured, produced, tested, assembled, labeled, advertise, promoted, marketed, sold, and distributed the Roundup® products used by Plaintiff, and/or to which Plaintiff was exposed, as described above.

120. At all times relevant to this litigation, Monsanto's Roundup® products were manufactured, designed, and labeled in an unsafe, defective, and inherently dangerous manner that was dangerous for use by or exposure to the public, and, in particular, to Plaintiff.

121. At all times relevant to this litigation, Monsanto's Roundup® products reached the intended consumers, handlers, and users or other persons coming into contact with these products throughout the United States, including Plaintiff, without substantial change in their condition as designed, manufactured, sold, distributed, labeled, and marketed by Defendant.

122. Monsanto's Roundup® products as researched, tested, developed, designed, licensed, formulated, manufactured, packaged, labeled, distributed, sold, and marketed by Defendant, were defectively manufactured and designed by Defendant in that when they left the hands of the Defendant's manufacturers and/or suppliers, they were unreasonably dangerous because they were not as safe as an ordinary consumer would expect when used in an intended or reasonably foreseeable manner.

123. Monsanto's Roundup® products, as researched, tested, developed, designed, licensed, formulated, manufactured, packaged, labeled, distributed, sold, and marketed by Defendant, were defective in manufacture, design and formulation in that when they left the hands of Defendant's manufacturers and/or suppliers, the foreseeable risks associated with these products' reasonably foreseeable uses exceeded the alleged benefits associated with their design and formulation.

124. At all relevant times, Monsanto's Roundup® products created significant risks to the health and safety of consumers and others who were exposed to the products that far outweigh the risks posed by other products on the market used for the same or similar purpose.

125. Therefore, at all relevant times to this litigation, Monsanto's Roundup® products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold and marketed by Defendant, were defective in design and formulation, in one or more of the following ways:

a. When placed in the stream of commerce, Roundup® products were defective in design and formulation, and, consequently, dangerous to an extent beyond that which an ordinary consumer would expect.

b. When placed in the stream of commerce, Roundup® products were unreasonably dangerous in that they were hazardous and posed a grave risk of cancer and other serious illnesses when used in a reasonably anticipated manner.

c. When placed in the stream of commerce, Roundup® products contained unreasonably dangerous design defects and were not reasonably safe when used in a reasonably anticipated or intended manner.

d. Defendants did not sufficiently test, investigate, or study its Roundup® products and, specifically, the active ingredient glyphosate.

e. Exposure to Roundup® and glyphosate-containing products presents a risk of harmful side effects that outweighs any potential utility stemming from the use of the herbicide.

f. Defendants knew or should have known at the time of marketing its Roundup® products that exposure to Roundup® and specifically, its active ingredient glyphosate, could result in cancer and other severe illnesses and injuries.

g. Defendants did not conduct adequate post-marketing surveillance of its Roundup® products.

h. Defendants could have employed safer alternative designs and formulations.

126. At all times relevant to this litigation, Plaintiff used and/or was exposed to Roundup® products in an intended or reasonably foreseeable manner without knowledge of their dangerous characteristics.

127. Plaintiff could not have reasonably discovered the defects and risks associated with Roundup® or glyphosate-containing products before or at the time of exposure.

128. The harm caused by Roundup® products far outweighed their benefit, rendering Defendants' products dangerous to an extent beyond that which an ordinary consumer would contemplate. Defendants' Roundup® products were and are more dangerous than alternative products and Defendant could have designed its Roundup® products to make them less dangerous. Indeed, at the time that Defendant designed its Roundup® products, the state of the industry's scientific knowledge was such that a less risky design or formulation was attainable.

129. Defendants' defective design of Roundup® amounts to willful, wanton, and/or reckless conduct by Defendant.

130. As a direct and proximate result of the defective design and manufacture of Roundup® products, Plaintiff developed NHL and has been injured catastrophically and has been caused severe and permanent pain, suffering, disability, impairment, loss of enjoyment of life, loss of care, comfort and economic damages.

131. Therefore, as a result of the unreasonably dangerous condition of its Roundup® products, Defendant is strictly liable to Plaintiff.

132. The defects in Defendants' Roundup® products were substantial and contributing factors in causing Plaintiff's injuries.

133. As a direct and proximate result of Defendants placing the defective Roundup® products into the stream of commerce, Plaintiff has suffered and continues to suffer injuries, and he has endured pain and discomfort, as well as economic hardship, including considerable financial expenses for medical care and treatment. Plaintiff will continue to incur these expenses in the future.

134. As a direct and proximate result of Defendants' sale and distribution of Roundup®, as aforesaid, Plaintiff suffered serious bodily injury.

135. WHEREFORE, Plaintiff prays for judgment against Defendants Monsanto and NaturChem in a fair and reasonable sum in excess of Two Million ($2,000,000) Dollars together with costs expended herein and such further and other relief as the Court deems just and proper.

## FAILURE TO WARN
### COUNT II

136. Plaintiff incorporates by reference every other paragraph of this Complaint as if each were set forth fully and completely herein.

137. Plaintiff brings this strict liability claim against Defendant for failure to warn.

138. At all relevant times, Defendants engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting Roundup® products, which are defective and unreasonably dangerous to consumers, including Plaintiff, because they do not contain adequate warnings or instructions concerning the dangerous characteristics of Roundup® and specifically, the active ingredient glyphosate. These actions were under the ultimate control and supervision of Defendants.

139. Defendants researched, developed, designed, tested, manufactured, inspected, labeled, distributed, marketed, promoted, sold, and otherwise released into the stream of commerce its Roundup® products, and in the course of same, directly advertised or marketed the products to consumers and end users, including Plaintiff, and person responsible for consumers (such as employers), and Defendants therefore had a duty to warn of the risks associated with the reasonably foreseeable uses (and misuses) of Roundup® and glyphosate-containing products and a duty to instruct on the proper, safe use of these products.

140. At all times relevant to this litigation, Defendants had a duty to properly test, develop, design, manufacture, inspect, package, label, market, promote, sell, distribute, maintain supply, provide proper warnings, and take such steps as

necessary to ensure that its Roundup® products did not cause users and consumers to suffer from unreasonable and dangerous risks. Defendants had a continuing duty to warn Plaintiff of the dangers associated with Roundup® use and exposure, and a continuing duty to instruct on the proper, safe use of these products. Defendant, as manufacturer, seller, or distributor of chemical herbicides, is held to the knowledge of an expert in the field.

141. At the time of manufacture, Defendants could have provided warnings or instructions regarding the full and complete risks of Roundup® and glyphosate-containing products because it knew or should have known of the unreasonable risks of harm associated with the use of and/or exposure to these products.

142. At all times relevant to this litigation, Defendants failed to investigate, study, test, or promote the safety of its Roundup® products. Defendants also failed to minimize the dangers to users and consumers of its Roundup® products and to those who would foreseeably use or be harmed by Defendants' herbicides, including Plaintiff.

143. Despite the fact that Defendants knew or should have known that Roundup® products posed a grave risk of harm, it failed to warn of the dangerous risks associated with their use and exposure. The dangerous propensities of its products and the carcinogenic characteristics of glyphosate, as described above, were known to Defendants, or scientifically knowable to Defendants through appropriate research and testing by known methods, at the time it distributed, supplied, or sold the product, and not known to end users and consumers, such as Plaintiff and Plaintiff's employers.

144. Defendants knew or should have known that its Roundup® and glyphosate-containing products created significant risks of seriously bodily harm to consumers, as alleged herein, and Defendants failed to adequately warn consumers and reasonably foreseeable users of the risks of exposure to these products. Defendants

have wrongfully concealed information concerning the dangerous nature of Roundup® and its active ingredient glyphosate, and further made false and/or misleading statements concerning the safety of Roundup® and glyphosate.

145. At all times relevant to this litigation, Defendant's Roundup® products reached the intended consumers, handlers, and users or other persons coming into contact with these products throughout the United States, including Plaintiff, without substantial change in their condition as designed, manufactured, sold, distributed, labeled, and marketed by Defendant.

146. At all times relevant to this litigation, Plaintiff used and/or was exposed to the use of Defendant's Roundup® products in their intended or reasonably foreseeable manner without knowledge of their dangerous characteristics.

147. Plaintiff could not have reasonably discovered the defects and risks associated with Roundup® or glyphosate-containing products before or at the time of Plaintiff's exposure. Plaintiff relied upon the skill, superior knowledge, and judgment of Defendant.

148. Defendants knew or should have known that the minimal warnings disseminated with its Roundup® products were inadequate, but it failed to communicate adequate information on the dangers and safe use/exposure and failed to communicate warnings and instructions that were appropriate and adequate to render the products safe for their ordinary, intended, and reasonably foreseeable uses, including agricultural and horticultural applications.

149. The information that Defendants did provide or communicate failed to contain relevant warnings, hazards, and precautions that would have enabled agricultural workers, horticultural workers and/or at-home users such as Plaintiff to utilize the products safely and with adequate protection. Instead, Defendants disseminated information that was inaccurate, false, and misleading and which failed to

communicate accurately or adequately the comparative severity, duration, and extent of the risk of injuries associated with use of and/or exposure to Roundup® and glyphosate; continued to aggressively promote the efficacy of its products, even after it knew or should have known of the unreasonable risks from use or exposure; and concealed, downplayed, or otherwise suppressed, through aggressive marketing and promotion, any information or research about the risks and dangers of exposure to Roundup® and glyphosate.

150. To this day, Defendants have failed to adequately and accurately warn of the true risks of Plaintiff's injuries caused by the use of and exposure to Roundup® and its active ingredient glyphosate, a probable carcinogen.

151. As a result of their inadequate warnings, Defendants' Roundup® products were defective and unreasonably dangerous when they left the possession and/or control of Defendants, were distributed by Defendants, and used by Norman Hensley.

152. Defendants are liable to Plaintiff for injuries caused by its failure to provide adequate warnings or other clinically relevant information and data regarding the appropriate use of its Roundup® products and the risks associated with the use of or exposure to Roundup® and glyphosate.

153. The defects in Defendant's Roundup® products were substantial and contributing factors in causing Plaintiff's injuries, and, but for Defendants' misconduct and omissions, Plaintiff would not have sustained injuries.

154. Had Defendants provided adequate warnings and instructions and properly disclosed and disseminated the risks associate with its Roundup® products, Plaintiff could have avoided the risk of developing injuries as alleged herein and Plaintiff could have obtained alternative herbicides.

155. As a direct and proximate result of Defendant placing its defective Roundup® products into the stream of commerce and failing to warn Plaintiff of the increased

risk of NHL associated with the use of and/or exposure to Roundup® products as described herein, Plaintiff has developed NHL and has been injured catastrophically and has been caused severe and permanent pain, suffering, disability, impairment, loss of enjoyment of life, loss of care, comfort and economic damages, including for medical care and treatment. Plaintiff will continue to incur these expenses in the future.

156. As a direct and proximate result of Defendants' failure to warn, as aforesaid, Mr. Hensley suffered serious bodily injury.

157. WHEREFORE, Plaintiff prays for judgment against Defendant Monsanto in a fair and reasonable sum in excess of Two Million ($2,000,000) Dollars, together with costs expended herein and such further and other relief as the Court deems just and proper.

## NEGLIGENCE
### COUNT III

158. Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

159. At all relevant times, Defendants breached their duties to Plaintiff and were otherwise negligent in marketing, designing, manufacturing, producing, supplying, inspecting, testing, selling and/or distribution Roundup® products.

160. Defendants, directly or indirectly, caused Roundup® products to be purchased and/or used by Plaintiff.

161. At all times relevant to this litigation, Defendants had a duty to exercise reasonable care in the design, research, manufacture, marketing, advertisement, supply, promotion, packaging, sale, and distribution of Roundup® products, including the duty to take all reasonable steps necessary to manufacture, promote, and/or sell a product that was not unreasonably dangerous to consumers, users, and other persons coming into contact with the product.

162. At all times relevant to this litigation, Defendants had a duty to exercise reasonable care in the marketing, advertisement, and sale of its Roundup® products. Defendants' duty of care owed to consumers and the general public included providing accurate, true, and correct information concerning the risks of using Roundup® and appropriate, complete, and accurate warnings concerning the potential adverse effects of exposure to Roundup® and, in particular, its active ingredient glyphosate.

163. At all times relevant to this litigation, Defendants knew or, in the exercise of reasonable care, should have known of the hazards and dangers of Roundup® and specifically, the carcinogenic properties of the chemical glyphosate.

164. Accordingly, at all times relevant to this litigation, Defendants knew or, in the exercise of reasonable care, should have known that use of or exposure to its Roundup® products could cause Plaintiff's injuries and thus created a dangerous and unreasonable risk of injury to the users of these products, including Plaintiff.

165. Defendants knew or, in the exercise of reasonable care, should have known that Roundup® is more toxic than glyphosate alone and that safety studies on Roundup®, Roundup®'s adjuvants and "inert" ingredients, and/or the surfactant POEA were necessary to protect Plaintiff from Roundup®.

166. Defendants knew or, in the exercise of reasonable care, should have known that tests limited to Roundup® active ingredient glyphosate were insufficient to prove the safety of Roundup®.

167. Defendants also knew or, in the exercise of reasonable care, should have known that users and consumers of Roundup® were unaware of the risks and magnitude of the risks associated with the use of and/or exposure to Roundup® and glyphosate-containing products.

168. As such, Defendants each breached its duty of reasonable care and failed to exercise ordinary care in the design, research, development, manufacture, testing, marketing,

supply, promotion, advertisement, packaging, sale, and distribution of its Roundup®

products, in that Defendant manufactured and produced defective herbicides

containing the chemical glyphosate, knew or had reason to know of the defects

inherent in its products, knew or had reason to know that a user's or consumer's

exposure to the products created a significant risk of harm and unreasonably

dangerous side effects, and failed to prevent or adequately warn of these risks and

injuries.

169. Defendants failed to appropriately and adequately test Roundup®, Roundup®'s

adjuvants and "inert" ingredients, and/or the surfactant POEA to protect Plaintiff from

Roundup®.

170. Despite its ability and means to investigate, study, and test its products and to provide

adequate warnings, Defendants failed to do so.

171. Defendants' negligence included:

    a. Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing its Roundup® products without thorough and adequate pre- and post-market testing;

    b. Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing Roundup® while negligently and/or intentionally concealing and failing to disclose the results of trials, tests, and studies of exposure to glyphosate, and, consequently, the risk of serious harm associated with human use of and exposure to Roundup®;

    c. Failing to undertake sufficient studies and conduct necessary tests to determine whether or not Roundup® products and glyphosate-containing products were safe for their intended use in agriculture, horticulture, and at-home use;

    d. Failing to undertake sufficient studies and conduct necessary tests to determine the safety of "inert" ingredients and/or adjuvants contained within Roundup®, and the propensity of these ingredients to render Roundup® toxic, increase the toxicity of Roundup®, whether these ingredients are carcinogenic, magnify the carcinogenic properties of Roundup®, and whether or not "inert" ingredients and/or adjuvants were safe for use;

    e. Failing to use reasonable and prudent care in the design, research, manufacture, formulation, and development of Roundup® products so as to avoid the risk of serious harm associated with the prevalent use of Roundup®/glyphosate as an herbicide;

    f. Failing to design and manufacture Roundup® products so as to ensure they were at least as safe and effective as other herbicides on the market;

g. Failing to provide adequate instructions, guidelines, and safety precautions to those persons who Defendant could reasonably foresee would use and/or be exposed to its Roundup® products;

h. Failing to disclose to Plaintiff, users, consumers, and the general public that the use of and exposure to Roundup® presented severe risks of cancer and other grave illnesses;

i. Failing to warn Plaintiff, users, consumers, and the general public that the product's risk of harm was unreasonable and that there were safer and effective alternative herbicides available to Plaintiff and other users or consumers;

j. Systematically suppressing or downplaying contrary evidence about the risks, incidence, and prevalence of the side effects of Roundup® and glyphosate-containing products;

k. Representing that its Roundup® products were safe for their intended use when, in fact, Defendants knew or should have known that the products were not safe for their intended use;

l. Declining to make or propose any changes to Roundup® products' labeling or other promotional materials that would alert the consumers and the general public of the risks of Roundup® and glyphosate;

m. Advertising, marketing, and recommending the use of Roundup® products, while concealing and failing to disclose or warn of the dangers known by Defendants to be associated with or caused by the use of or exposure to Roundup® and glyphosate;

n. Continuing to disseminate information to its consumers, which indicate or imply that Defendant's Roundup® products are not unsafe for use in the agricultural, horticultural industries, and/or home use; and

o. Continuing the manufacture and sale of its products with the knowledge that the products were unreasonably unsafe and dangerous.

172. Defendants knew and/or should have known that it was foreseeable that consumers and/or users, such as Plaintiff, would suffer injuries as a result of Defendants' failure to exercise ordinary care in the manufacturing, marketing, labeling, distribution, and sale of Roundup®.

173. Plaintiff did not know the nature and extent of the injuries that could result from the intended use of and/or exposure to Roundup® or its active ingredient glyphosate.

174. As a direct and proximate result of Defendants' negligence, Plaintiff developed the injuries, harm, and economic losses that Plaintiff suffered, and will continue to suffer, as described herein.

175. Defendants' conduct, as described above, was reckless. Defendants regularly risk the lives of consumers and users of its products, including Plaintiff, with full knowledge of the dangers of its products. Defendants made conscious decisions not to redesign,

re-label, warn, or inform the unsuspecting public, including Plaintiff. Defendants' reckless conduct therefore warrants an award of punitive damages.

176. As a proximate result of Defendants' wrongful acts and omissions in placing its defective Roundup® products into the stream of commerce without adequate warnings of the hazardous and carcinogenic nature of glyphosate, Plaintiff developed NHL and has been injured catastrophically and has been caused severe and permanent pain, suffering, disability, impairment, loss of enjoyment of life, loss of comfort and economic damages, including significant expenses for medical care and treatment, and will continue to incur these expenses in the future.

177. As a direct and proximate result of Defendants' negligent acts and omissions, as aforesaid, Mr. Hensley suffered serious bodily injury.

178. WHEREFORE, Plaintiff prays for judgment against Defendant Monsanto in a fair and reasonable sum in excess of Two Million ($2,000,000) Dollars, together with costs expended herein and such further and other relief as the Court deems just and appropriate.

## BREACH OF IMPLIED WARRANTIES
### COUNT IV

179. Plaintiff incorporates by reference each of the preceding paragraphs as if fully set forth herein.

180. At all relevant times, Defendants engaged in the business of testing, developing, designing, formulating, manufacturing, marketing, selling, distributing, and promoting its Roundup® products, which are defective and unreasonably dangerous to users, consumers and those in proximity to users, including decedent, thereby placing Roundup® products into the stream of commerce. These actions were under the ultimate control and supervision of Defendants.

181. Before the time that Plaintiff was exposed to the use of the aforementioned Roundup® products, Defendants impliedly warranted to its consumers and users-

including Norman Hensley-that its Roundup® products were of merchantable quality and safe and fit for the use for which they were intended; specifically, as horticultural herbicides.

182. Defendants, however, failed to disclose that Roundup® has dangerous propensities when used as intended and that the use of and/or exposure to Roundup® and glyphosate-containing products carries an increased risk of developing severe injuries, including Plaintiff's injuries.

183. Upon information and belief, Plaintiff reasonably relied upon the skill, superior knowledge and judgment of Defendants and upon its implied warranties that the Roundup® products were of merchantable quality and fit for their intended purpose or use.

184. The Roundup® products were expected to reach and did in fact reach consumers, users and those in proximity to users, including Plaintiff, without substantial change in the condition in which they were manufactured and sold by Defendant.

185. At all relevant times, Defendant was aware that consumers, users, and those in proximity of users of its products, including Plaintiff, would use Roundup® products as marketed by Defendant, which is to say that Plaintiff were the foreseeable users of Roundup®.

186. Defendants intended that its Roundup® products be used in the manner in which Plaintiff in fact used or were exposed to them and Defendants impliedly warranted each product to be of merchantable quality, safe, and fit for this use, despite the fact that Roundup® was not adequately tested or researched.

187. In reliance upon Defendants' implied warranty, Plaintiff used or was in proximity to the use of Roundup® as instructed and labeled and in the foreseeable manner intended, recommended, promoted and marketed by Defendants.

188. Plaintiff could not have reasonably discovered or known of the risks of serious injury associated with Roundup® or glyphosate.

189. The harm caused by Defendants' Roundup® products far outweighed their benefit, rendering the products more dangerous than an ordinary consumer or user would expect and more dangerous than alternative products.

190. As a direct and proximate result of Defendant's wrongful acts and omissions Plaintiff has suffered severe and permanent physical and emotional injuries. Plaintiff has endured pain and suffering, has suffered economic loss, including expenses for medical care and treatment, and will continue to incur these expenses in the future.

191. As a direct and proximate result of Defendants' breach, as aforesaid, Mr. Hensley suffered serious bodily injury.

192. WHEREFORE, Plaintiff prays for judgment against Defendant Monsanto in a fair and reasonable sum in excess of Two Million ($2,000,000), together with costs expended herein and such further and other relief as the Court deems just and appropriate.

**PUNITIVE DAMAGES**
**COUNT V**

193. Plaintiff incorporates by reference every other paragraph of this Complaint as if each were set forth herein.

194. Defendants have acted willfully, wantonly, intentionally, and recklessly in one or more of the following ways:

    a. Defendant knew of the unreasonably high risk of NHL posed by the Roundup® products before manufacturing, marketing, distributing, and/or selling the Roundup® products, yet purposefully proceeded with such action;

    b. Despite knowledge of the high risk of NHL associated with use and/or exposure to Roundup® products, Defendants affirmatively minimized the risk through marketing and promotional efforts and product labeling;

    c.  Through the actions outlined above, Defendants expressed a reckless indifference to the safety of users of Roundup® products, including Plaintiff.

195. Defendants knew of the dangers and risk of Roundup® products, yet it concealed and/or omitted this information from labels and warnings contained on Roundup® products in furtherance of its knowing and willful actions.

196. These actions were outrageous because of Defendants' reckless indifference to the safety of users of Roundup® products and/or those who became exposed to it.

197. As a direct and proximate result of the willful, wanton, malicious, intentionally and/or reckless conduct of Defendants, Plaintiff has sustained damages.

198. WHEREFORE, Plaintiff prays for a judgment for punitive damages against Defendant, jointly and severally, in a fair and reasonable amount sufficient to punish Defendant and deter it and others from engaging in similar conduct in the future, costs expended herein, and such further and other relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues allowed and each of the claims alleged herein.

Daniel J. Farnsworth, Jr.
Pettus / Farnsworth, LLC
201 King Street
Keysville, Virginia 23947
Post Office Box 8719
Greenville, South Carolina 29604
864.250.9119 Telephone
864.250.9120 Facsimile
Dan@FarnsworthLawOffices.com

Keysville, Virgnia
October 30, 2021

# COVER SHEET FOR FILING CIVIL ACTIONS

COMMONWEALTH OF VIRGINIA

Case No. CL 22 000001-00
(CLERK'S OFFICE USE ONLY)

CHARLOTTE COUNTY ......................................................... Circuit Court

NORMAN HENSLEY ........ v./In re: MONSANTO COMPANY AND NATURCHEM, INC.
PLAINTIFF(S)                               DEFENDANT(S)

I, the undersigned [ ] plaintiff [ ] defendant [ ] attorney for [ ] plaintiff [ ] defendant hereby notify the Clerk of Court that I am filing the following civil action. (Please indicate by checking box that most closely identifies the claim being asserted or relief sought.)

## GENERAL CIVIL

**Subsequent Actions**
- [ ] Claim Impleading Third Party Defendant
  - [ ] Monetary Damages
  - [ ] No Monetary Damages
- [ ] Counterclaim
  - [ ] Monetary Damages
  - [ ] No Monetary Damages
- [ ] Cross Claim
- [ ] Interpleader
- [ ] Reinstatement (other than divorce or driving privileges)
- [ ] Removal of Case to Federal Court

**Business & Contract**
- [ ] Attachment
- [ ] Confessed Judgment
- [ ] Contract Action
- [ ] Contract Specific Performance
- [ ] Detinue
- [ ] Garnishment

**Property**
- [ ] Annexation
- [ ] Condemnation
- [ ] Ejectment
- [ ] Encumber/Sell Real Estate
- [ ] Enforce Vendor's Lien
- [ ] Escheatment
- [ ] Establish Boundaries
- [ ] Landlord/Tenant
  - [ ] Unlawful Detainer
- [ ] Mechanics Lien
- [ ] Partition
- [ ] Quiet Title
- [ ] Termination of Mineral Rights

**Tort**
- [ ] Asbestos Litigation
- [ ] Compromise Settlement
- [ ] Intentional Tort
- [ ] Medical Malpractice
- [ ] Motor Vehicle Tort
- [ ] Product Liability
- [ ] Wrongful Death
- [x] Other General Tort Liability

## ADMINISTRATIVE LAW

- [ ] Appeal/Judicial Review of Decision of (select one)
  - [ ] ABC Board
  - [ ] Board of Zoning
  - [ ] Compensation Board
  - [ ] DMV License Suspension
  - [ ] Employee Grievance Decision
  - [ ] Employment Commission
  - [ ] Local Government
  - [ ] Marine Resources Commission
  - [ ] School Board
  - [ ] Voter Registration
  - [ ] Other Administrative Appeal

## DOMESTIC/FAMILY

- [ ] Adoption
  - [ ] Adoption – Foreign
- [ ] Adult Protection
- [ ] Annulment
  - [ ] Annulment – Counterclaim/Responsive Pleading
- [ ] Child Abuse and Neglect – Unfounded Complaint
- [ ] Civil Contempt
- [ ] Divorce (select one)
  - [ ] Complaint – Contested*
  - [ ] Complaint – Uncontested*
  - [ ] Counterclaim/Responsive Pleading
  - [ ] Reinstatement – Custody/Visitation/Support/Equitable Distribution
- [ ] Separate Maintenance
  - [ ] Separate Maintenance Counterclaim

## WRITS

- [ ] Certiorari
- [ ] Habeas Corpus
- [ ] Mandamus
- [ ] Prohibition
- [ ] Quo Warranto

## PROBATE/WILLS AND TRUSTS

- [ ] Accounting
- [ ] Aid and Guidance
- [ ] Appointment (select one)
  - [ ] Guardian/Conservator
  - [ ] Standby Guardian/Conservator
  - [ ] Custodian/Successor Custodian (UTMA)
- [ ] Trust (select one)
  - [ ] Impress/Declare/Create
  - [ ] Reformation
- [ ] Will (select one)
  - [ ] Construe
  - [ ] Contested

## MISCELLANEOUS

- [ ] Amend Death Certificate
- [ ] Appointment (select one)
  - [ ] Church Trustee
  - [ ] Conservator of Peace
  - [ ] Marriage Celebrant
- [ ] Approval of Transfer of Structured Settlement
- [ ] Bond Forfeiture Appeal
- [ ] Declaratory Judgment
- [ ] Declare Death
- [ ] Driving Privileges (select one)
  - [ ] Reinstatement pursuant to § 46.2-427
  - [ ] Restoration – Habitual Offender or 3rd Offense
- [ ] Expungement
- [ ] Firearms Rights – Restoration
- [ ] Forfeiture of Property or Money
- [ ] Freedom of Information
- [ ] Injunction
- [ ] Interdiction
- [ ] Interrogatory
- [ ] Judgment Lien-Bill to Enforce
- [ ] Law Enforcement/Public Official Petition
- [ ] Name Change
- [ ] Referendum Elections
- [ ] Sever Order
- [ ] Taxes (select one)
  - [ ] Correct Erroneous State/Local
  - [ ] Delinquent
- [ ] Vehicle Confiscation
- [ ] Voting Rights – Restoration
- [ ] Other (please specify)

[ ] Damages in the amount of $ 2,000,000.00 are claimed.

DATE ...........................

Daniel I Farnsworth, Jr.
PRINT NAME

[ ] PLAINTIFF   [ ] DEFENDANT   [x] ATTORNEY FOR   [x] PLAINTIFF
                                                    [ ] DEFENDANT

211 Pettigru Street Greenville, SC 29601
ADDRESS/TELEPHONE NUMBER OF SIGNATOR

864-250-9119

Dan @ Farnsworth Law offices. Com
EMAIL ADDRESS OF SIGNATOR (OPTIONAL)

*"Contested" divorce means any of the following matters are in dispute: grounds of divorce, spousal support and maintenance, child custody and/or visitation, child support, property distribution or debt allocation. An "Uncontested" divorce is filed on no fault grounds and none of the above issues are in dispute.

FORM CC-1416 (MASTER) PAGE ONE 07/16