AOV

# U.S. District Court
## Southern District of Florida (Ft Lauderdale)
## CIVIL DOCKET FOR CASE #: 0:22-cv-60727-AHS

Dallen v. Monsanto Company
Assigned to: Judge Raag Singhal
Case in other court: 17 Judicial Circuit in and for Broward County
                 Flor, CACE22004029
Cause: 28:1446 Notice of Removal-Personal Injury

Date Filed: 04/12/2022
Jury Demand: Both
Nature of Suit: 365 Personal Inj. Prod. Liability
Jurisdiction: Diversity

**Plaintiff**

**Jeanette Garavito Dallen**
*as the Personal Representative of teh Estate of : Dallen, Russell M, Jr. on behalf of the Estate and Survivors*

represented by **John J. Spittler , Jr.**
Spittler & Read
1865 Brickell Avenue
Suite TH-5
Miami, FL 33129
305-860-9992
Fax: 786-513-0370
Email: jjs@spittlerlaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Monsanto Company**

represented by **Melissa R. Alvarez**
McDermott Will & Emery
333 S.E. 2 Avenue
Suite 4500
Miami, FL 33131
305-347-6551
Fax: 305-468-6574
Email: malvarez@mwe.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Anthony Nolan Upshaw**
McDermott Will & Emery
333 SE 2 Avenue
Suite 4500
Miami, FL 33131
305-347-6540
Fax: 305-675-8031
Email: aupshaw@mwe.com
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 04/12/2022 | 1 | NOTICE OF REMOVAL (STATE COURT COMPLAINT - Complaint and Demand for Jury Trial) Filing fee $ 402.00 receipt number AFLSDC-15553442,no answer/affirmative defenses filed by Monsanto Company. (Attachments: # 1 Exhibit 1, # 2 Civil Cover Sheet) (Upshaw, Anthony) Modified on 4/12/2022 (mee). (Entered: 04/12/2022) |
| 04/12/2022 | 2 | Clerks Notice of Judge Assignment to Judge Raag Singhal.<br><br>Pursuant to 28 USC 636(c), the parties are hereby notified that the U.S. Magistrate Judge Alicia O. Valle is available to handle any or all proceedings in this case. If agreed, parties should complete and file the Consent form found on our website. It is not necessary to file a document indicating lack of consent.<br><br>Pro se (NON-PRISONER) litigants may receive Notices of Electronic Filings (NEFS) via email after filing a Consent by Pro Se Litigant (NON-PRISONER) to Receive Notices of Electronic Filing. The consent form is available under the forms section of our website. (mee) (Entered: 04/12/2022) |
| 04/12/2022 | 3 | ANSWER and Affirmative Defenses to Complaint re the Notice of Removal with Jury Demand by Monsanto Company. (Upshaw, Anthony) (Entered: 04/12/2022) |
| 04/12/2022 | 4 | Corporate Disclosure Statement by Monsanto Company identifying Corporate Parent Bayer AG for Monsanto Company (Upshaw, Anthony) (Entered: 04/12/2022) |
| 04/13/2022 | 5 | NOTICE OF COURT PRACTICE<br><br>Unless otherwise specified by the Court, every motion, legal memorandum, brief, and otherwise shall: be double-spaced, in justified alignment, in 12-point font, using either Times New Roman or Arial typeface. This Notice does **not** supplant the requirements and provisions of Local Rule 7.1(c). The Court cautions parties against excessive use of footnotes.<br><br>Multiple Plaintiffs or Defendants shall file joint motions with co-parties unless there are clear conflicts of position. If conflicts of position exist, parties shall explain the conflicts in their separate motions.<br><br>Parties are encouraged to seek extensions of time in a timely fashion. "A motion for extension of time is not self-executing; no motion is, unless expressly provided for by the applicable rule. Yet, by filing these motions on or near the last day, and then sitting idle pending the Court's disposition of the motion, parties essentially grant their own motion. The Court will not condone this." *Compere v. Nusret Miami, LLC*, 2020 WL 2844888, at *2 (S.D. Fla. May 7, 2020) (internal citations omitted).<br><br>Exhibits to pleadings and motions shall be docketed in accordance with the Courts CM/ECF procedures, Rule 3L.(2):<br><br>**(2) Describing an Attachment to a Docket Entry**<br><br>A party filing an attachment to a document shall select one of the prescribed attachment categories from the drop-down menu (e.g., affidavit, transcript), provide an alphabetical or numerical designation (e.g., Exhibit A, Exhibit 1), **and descriptively name each attachment (e.g., Exhibit 1 - Affidavit of Boo Radley**) in a manner that enables the Court to easily locate and distinguish attachments. (Emphasis added.) |

| | | |
|---|---|---|
| | | Local Rule 16.4, Local Rules for the United States District Court for the Southern District of Florida, requires that a Notice of Settlement "shall be filed and served jointly by counsel for all parties to the settlement." A unilateral notice of settlement will not stay pre-trial deadlines or hearings.<br><br>Failure to comply with any of these procedures may result in the imposition of appropriate sanctions.<br><br>Signed by Judge Raag Singhal on 4/13/2022. (pls) (Entered: 04/13/2022) |
| 04/13/2022 | 6 | **PAPERLESS ORDER TO FILE CERTIFICATE OF INTERESTED PERSONS**<br>Within **SEVEN (7) DAYS** of entry of an appearance, each party, including governmental parties, must file certificates of interested parties and corporate disclosure statements that contain a complete list of persons, associated persons, firms, partnerships, or corporations that have a financial interest in the outcome of this case, including subsidiaries, conglomerates, affiliates, parent corporations, and other identifiable legal entities related to a party. The parties shall not include Judge Singhal or the paired magistrate judges as interested parties unless they have an interest in the litigation. Throughout the pendency of the action, the parties are under a continuing obligation to amend, correct, and update the certificates. Signed by Judge Raag Singhal on 4/13/2022. (pls) (Entered: 04/13/2022) |

| PACER Service Center | | |
|---|---|---|
| **Transaction Receipt** | | |
| 04/13/2022 10:53:44 | | |
| **PACER Login:** | sh0019sh | **Client Code:** | 31943.356965 |
| **Description:** | Docket Report | **Search Criteria:** | 0:22-cv-60727-AHS |
| **Billable Pages:** | 2 | **Cost:** | 0.20 |

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA
### FORT LAUDERDALE DIVISION

JEANETTE GARAVITO DALLEN as the
Personal Representative of the Estate of:
DALLEN, RUSSELL M, JR. on behalf of the
Estate and Survivors,

              Plaintiff,

      v.

MONSANTO COMPANY,

           Defendant.

Case No. _____

## DEFENDANT MONSANTO COMPANY'S NOTICE OF REMOVAL

Pursuant to 28 U.S.C. §§ 1332, 1441, and 1446 (and any other applicable laws), Defendant

Monsanto Company ("Monsanto"), hereby gives notice of removal of this action, captioned

*Jeanette Garavito Dallen as the Personal Representative of the Estate of: Dallen, Russell M, JR.*

*on behalf of the Estate and Survivors v. Monsanto Company,* bearing Case Number CACE-22-

004029, from the Circuit Court of the 17th Judicial Circuit in and for Broward County, Florida to

the United States District Court for the Southern District of Florida.  Pursuant to 28 U.S.C.

§ 1446(a), Monsanto provides the following statement of grounds for removal.

### Introduction

1.      In this products liability lawsuit, Plaintiff seeks damages for decedent Russell M.

Dallen, Jr.'s cancer (non-Hodgkin's lymphoma ("NHL")) and death allegedly caused by exposure

to Monsanto's Roundup®-branded herbicides, which have glyphosate as their active ingredient.

For decades, farmers have used glyphosate-based herbicides to increase crop yields, and home-

owners, landscaping companies, and local government agencies have used these herbicides for

highly effective weed control. Glyphosate is one of the most thoroughly studied herbicides in the world, and glyphosate-based herbicides have received regulatory approval in more than 160 countries. Since 1974, when Monsanto first introduced a Roundup®-branded, glyphosate-based herbicide to the marketplace, the United States Environmental Protection Agency repeatedly has approved the sale of such herbicides without cancer warnings and repeatedly has concluded that glyphosate does not cause cancer – including as recently as 2020. Nevertheless, Plaintiff alleges that decedent developed cancer and died due to his exposure to Monsanto's glyphosate-based herbicides.

2.      This is one of many lawsuits that have been filed against Monsanto involving Roundup®-branded herbicides. A multidistrict litigation proceeding is pending in the United States District Court for the Northern District of California, before the Honorable Vince G. Chhabria, pursuant to 28 U.S.C. § 1407. *See In re Roundup Prods. Liab. Litig.*, No. 3:16-md- 02741-VC (N.D. Cal.); *In re Roundup Prods. Liab. Litig.*, MDL No. 2741, 214 F. Supp. 3d 1346 (J.P.M.L. 2016).

3.      As discussed in more detail below, Monsanto removes this lawsuit because this Court has subject matter jurisdiction based on diversity of citizenship. Plaintiff is a citizen of Florida, as was decedent before and at the time of his death. For purposes of diversity jurisdiction, Monsanto is deemed to be a citizen of Missouri (where its principal place of business is located) and Delaware (Monsanto's state of incorporation). Accordingly, complete diversity of citizenship exists in this case as required by 28 U.S.C. § 1332. The statutory amount-in-controversy requirement is also satisfied because Plaintiff seeks damages for cancer and death allegedly caused by exposure to Monsanto's Roundup®-branded herbicides.

## **Background and Procedural History**

4.      On March 18, 2022, Plaintiff commenced this lawsuit in the Circuit Court of the

17th Judicial Circuit in and for Broward County, Florida by filing a complaint, captioned *Jeanette*

*Garavito Dallen as the Personal Representative of the Estate of: Dallen, Russell M, JR. on behalf*

*of the Estate and Survivors v. Monsanto Company*, No. CACE-22-004029 (the "State Court

Action").

5.      Pursuant to 28 U.S.C. § 1446(a), true and correct copies of the Summons and

Complaint served upon Monsanto in the State Court Action (and other filings available from the

state court's files) are attached collectively as **Exhibit 1.**

6.      Plaintiff seeks damages for NHL and death allegedly caused by exposure to

Monsanto's glyphosate-based herbicides. *See, e.g.*, Complaint ¶¶ 16, 133, 154, 176, 198, 200–

202.

## **Basis For Removal — Diversity Jurisdiction**

7.      Plaintiff is, and was at the time the State Court Action was filed, a resident and

citizen of the State of Florida. *See* Complaint ¶ 11; *see also* Exh. A to Complaint (Death Certificate

identifying Plaintiff's address).

8.      Prior to and at the time of his death, decedent was a resident and citizen of the State

of Florida. *See* Complaint ¶ 14; *see also* Exh. A to Complaint (Death Certificate identifying

Decedent's address).

9.      Monsanto is, and was at the time the State Court Action was filed, a corporation

incorporated under the laws of the State of Delaware, with its principal place of business in the

State of Missouri. *See* Complaint ¶ 17. Thus, Monsanto is deemed to be a citizen of Missouri and

Delaware, for purposes of federal diversity jurisdiction.

10.     The Complaint seeks compensatory damages based on allegations that Monsanto's Roundup®-branded herbicides caused decedent's cancer and death.  Therefore, it is plausible from the face of the Complaint that Plaintiff seeks damages in excess of $75,000, exclusive of interest and costs, which satisfies the jurisdictional amount-in-controversy requirement. 28 U.S.C. § 1332(a); *see Dart Cherokee Basin Operating Co. v. Owens*, 574 U.S. 81, 89 (2014) ("[A] defendant's notice of removal need include only a plausible allegation that the amount in controversy exceeds the jurisdictional threshold."). Further, the Civil Cover Sheet filed by Plaintiff confirms that she seeks "over $100,000" in damages.  *See* Civil Cover Sheet, p. 1. In fact, numerous other lawsuits seeking damages for cancer allegedly caused by Roundup®-branded herbicides have been filed against Monsanto in other federal courts asserting jurisdiction under §1332(a) and alleging damages in excess of $75,000, exclusive of interest and costs.

11.     In sum, this Court has original subject matter jurisdiction over this action based on § 1332(a) because there is complete diversity of citizenship and the amount in controversy exceeds $75,000, exclusive of costs and interest.

## Procedural Requirements

12.     The Circuit Court of the 17th Judicial Circuit in and for Broward County, Florida is located within the Southern District of Florida. Therefore, removal to this Court satisfies the venue requirement of 28 U.S.C. § 1446(a).

13.     Monsanto received notice of process on March 23, 2022. This Notice of Removal is timely, in accordance with 28 U.S.C. § 1446(b)(1), because it is being filed within 30 days of March 23, 2022.

14.     The written notice required by 28 U.S.C. § 1446(d) will be promptly filed in the Circuit Court of the 17th Judicial Circuit in and for Broward County, Florida and will be promptly served on Plaintiff.

15.     Monsanto does not waive any defenses and expressly reserves its right to raise any and all defenses in subsequent proceedings.

16.     If any question arises as to the propriety of this removal, Monsanto requests the opportunity to present written and oral argument in support of removal.

### Conclusion

For the foregoing reasons, Monsanto removes this lawsuit to this Court pursuant to 28 U.S.C. §§ 1332, 1441, and 1446 (and any other applicable laws).


Dated: April 12, 2022                    Respectfully submitted,

                                         **McDERMOTT WILL & EMERY LLP**

                                         _/s/ Anthony N. Upshaw_____
                                         ANTHONY N. UPSHAW
                                         Florida Bar No.: 861091
                                         aupshaw@mwe.com
                                         MELISSA R. ALVAREZ
                                         Florida Bar No.: 820091
                                         malvarez@mwe.com
                                         333 SE 2nd Avenue, Suite 4500
                                         Miami, FL 33131
                                         Tel: (305) 329-4431
                                         Fax: (305) 675-8031
                                         **_Counsel for Defendant_**
                                         **_Monsanto Company_**


### CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this **12th day of April, 2022,** a true and correct copy of the foregoing was electronically filed with the Clerk of the Court using the CM/ECF system.

                                         _/s/  Anthony N. Upshaw_____

# EXHIBIT 1

# SPITTLER AND ASSOCIATES, P.A.

### ATTORNEYS AT LAW

JOHN J. SPITTLER, JR.

1865 Brickell Avenue TH-5.
Miami, FL 33129. U.S.A.
T: (1) 305-860-9992
(1) 305-860-9991.
F: (1)786-513-0370.
E:jjs@spittlerlaw.com
www.spittlerlaw.com

March 18, 2022.

**VIA FEDEX**

**Corporation Service Company**
1201 Hays Street, Tallahassee
FL. 32301-2525
Registered Agent in Florida for Monsanto Company

**RE: JEANETTE GARAVITO DALLEN as the Personal Representative of the Estate of: DALLEN, RUSSELL M. JR., on behalf of the Estate and Survivors v. Monsanto Company. (CACE-22-004029)**

This law firm represents JEANETTE GARAVITO DALLEN as the Personal Representative of the Estate of: DALLEN, RUSSELL M, JR., on behalf of the Estate and Survivors, and in such capacity please find enclosed Summons, Civil Cover Sheet, and Complaint on behalf of our clients to serve on Monsanto Company as its Registered Agent in Florida.

If you have any questions, please contact me directly via email or telephone below. Thank you.

**JOHN J. SPITTLER, JR.**
FBN: 194894
1865 Brickell Avenue, TH-5
Miami, Florida 33129
Telephone: (305) 860-9991
E-Mail: jjs@spittlerlaw.com

☑ IN THE CIRCUIT COURT OF THE SEVENTEENTH JUDICIAL CIRCUIT IN AND FOR BROWARD COUNTY, FLORIDA.

| DIVISION<br>☑ CIVIL<br>☐ DISTRICTS<br>☐ OTHER | SUMMONS 20 DAY CORPORATE SERVICE<br>(a) GENERAL FORMS | CASE NUMBER<br>CACE-22-004029 |
|---|---|---|
| **Plaintiff(s)**<br>JEANETTE GARAVITO DALLEN<br>as the Personal Representative of the<br>Estate of: DALLEN, RUSSELL M, JR.<br>on behalf of the Estate and Survivors, | **VS. DEFENDANT(S)**<br>Monsanto Company | **SERVICE** |

**THE STATE OF FLORIDA:**

To Each Sheriff of the State:

YOU ARE COMMANDED to serve this summons and copy of the complaint or petition in this action on defendant(s): Monsanto Company through its Registered Agent Corporation

Service Company, 1201 Hays Street, Tallahassee, FL 32301-2525

Each defendant is required to serve written defense to the complaint or petition on Plaintiff's Attorney: John J. Spittler Jr. of Spittler and Associates, P.A.

whose address is: 1865 Brickell Avenue Suite TH-V

Miami, Florida, 33129

Telephone: (305) 860-9992

CLOCK IN

within 20 days " **Except when suit is brought pursuant to s. 768.28, Florida Statutes, if the State of Florida, one of its agencies, or one of its officials or employees sued in his or her official capacity is a defendant, the time to respond shall be 40 days. When suit is brought pursuant to. 768.28, Florida Statutes, the time to respond shall be 30 days."** after service of this summons on that defendant , exclusive of the day of service, and to file the original of the defenses with the Clerk of this Clerk Court either before service on Plaintiff's attorney or immediately thereafter. If a defendant fails to do so, a default will be entered against that defendant for the relief demanded in the complaint or petition.

| | | DATE |
|---|---|---|
| Brenda D. Foreman<br>**CLERK of COURTS** | | |
| | DEPUTY CLERK | |

## AMERICANS WITH DISABILITIES ACT OF 1990
## ADA NOTICE

**"If you are a person with a disability who needs any accommodation in order to participate in this proceeding, you are entitled, at no cost to you, to the provision of certain assistance. Please contact the office of Brenda D. Foreman, Clerk of Court, , 201 SE 6th St, Fort Lauderdale, FL 33301; Telephone (954) 831-6565; at least seven (7) days before your scheduled court appearance, or immediately upon receiving this notification if the time before the scheduled appearance is less than seven (7) days; if you are hearing or voice impaired, call 711."**

**FORM 1.997.   CIVIL COVER SHEET**

The civil cover sheet and the information contained in it neither replace nor supplement the filing and service of pleadings or other documents as required by law. This form must be filed by the plaintiff or petitioner with the Clerk of Court for the purpose of reporting uniform data pursuant to section 25.075, Florida Statutes. (See instructions for completion.)

### I.     CASE STYLE

IN THE CIRCUIT/COUNTY COURT OF THE SEVENTEENTH   JUDICIAL CIRCUIT,
IN AND FOR BROWARD   COUNTY, FLORIDA

JEANETTE DALLEN
Plaintiff

Case # _____
Judge  _____

vs.

Monsanto Company
Defendant

### II.     AMOUNT OF CLAIM

Please indicate the estimated amount of the claim, rounded to the nearest dollar. The estimated amount of the claim is requested for data collection and clerical processing purposes only. The amount of the claim shall not be used for any other purpose.

☐ $8,000 or less
☐ $8,001 - $30,000
☐ $30,001- $50,000
☐ $50,001- $75,000
☐ $75,001 - $100,000
☒ over $100,000.00

### III.     TYPE OF CASE     (If the case fits more than one type of case,   select the most definitive category.) If the most descriptive label is a subcategory (is indented under a broader category), place an x on both the main category and subcategory lines.

- 1 -

## CIRCUIT CIVIL

☐ Condominium
☐ Contracts and indebtedness
☐ Eminent domain
☐ Auto negligence
☐ Negligence—other
    ☐ Business governance
    ☐ Business torts
    ☐ Environmental/Toxic tort
    ☐ Third party indemnification
    ☐ Construction defect
    ☐ Mass tort
    ☐ Negligent security
    ☐ Nursing home negligence
    ☐ Premises liability—commercial
    ☐ Premises liability—residential
☒ Products liability
☐ Real Property/Mortgage foreclosure
    ☐ Commercial foreclosure
    ☐ Homestead residential foreclosure
    ☐ Non-homestead residential foreclosure
    ☐ Other real property actions

☐Professional malpractice
    ☐ Malpractice—business
    ☐ Malpractice—medical
    ☐ Malpractice—other professional
☐ Other
    ☐ Antitrust/Trade regulation
    ☐ Business transactions
    ☐ Constitutional challenge—statute or ordinance
    ☐ Constitutional challenge—proposed amendment
    ☐ Corporate trusts
    ☐ Discrimination—employment or other
    ☐ Insurance claims
    ☐ Intellectual property
    ☐ Libel/Slander
    ☐ Shareholder derivative action
    ☐ Securities litigation
    ☐ Trade secrets
    ☐ Trust litigation

## COUNTY CIVIL

☐ Small Claims up to $8,000
☐ Civil
☐ Real property/Mortgage foreclosure

☐ Replevins
☐ Evictions
    ☐ Residential Evictions
    ☐ Non-residential Evictions
☐ Other civil (non-monetary)

## COMPLEX BUSINESS COURT

This action is appropriate for assignment to Complex Business Court as delineated and mandated by the Administrative Order.  Yes ☐ No ☒

**IV.**     **REMEDIES SOUGHT** (check all that apply):
☒ Monetary;
☐ Nonmonetary declaratory or injunctive relief;
☐ Punitive

**V.**     **NUMBER OF CAUSES OF ACTION:** [ ]
(Specify)

   <u>5</u>

**VI.**     **IS THIS CASE A CLASS ACTION LAWSUIT?**
    ☐ yes
    ☒ no

**VII.**     **HAS NOTICE OF ANY KNOWN RELATED CASE BEEN FILED?**
    ☒ no
    ☐ yes If "yes," list all related cases by name, case number, and court.

**VIII.**     **IS JURY TRIAL DEMANDED IN COMPLAINT?**
    ☒ yes
    ☐ no

I CERTIFY that the information I have provided in this cover sheet is accurate to the best of my knowledge and belief, and that I have read and will comply with the requirements of Florida Rule of Judicial Administration 2.425.

Signature: <u>s/ John J. Spittler Jr.</u>         Fla. Bar # <u>194894</u>
          Attorney or party                 (Bar # if attorney)

<u>John J. Spittler Jr.</u>          <u>03/18/2022</u>
 (type or print name)         Date

Filing # 145986186 E-Filed 03/18/2022 12:05:21 PM

IN THE CIRCUIT COURT OF THE 17TH
JUDICIAL CIRCUIT IN AND FOR BROWARD
COUNTY, FLORIDA.

GENERAL JURISDICTION DIVISION

**JEANETTE GARAVITO DALLEN**
**as the Personal Representative of the**
**Estate of: DALLEN, RUSSELL M, JR.**
**on behalf of the Estate and Survivors,**

        Case number: CACE-22-004029

        Plaintiff,

v.

**MONSANTO COMPANY,**

        Defendants,

_____/

## COMPLAINT AND DEMAND FOR JURY TRIAL

COMES NOW, the Plaintiff, JEANETTE GARAVITO DALLEN as the Personal Representative

of the Estate of DALLEN, RUSSELL M, JR. on behalf of the Estate and Survivors, from herein

referred to as "Dallen," by and through undesigned counsel, and sues the Defendant,

MONSANTO COMPANY, from herein referred to as "Monsanto" and alleges as follows:

### I.    INTRODUCTION

1. Defendant Monsanto discovered the herbicidal properties of glyphosate in 1970 and
   began marketing it in products in 1974 under the brand name Roundup®.

2. Beginning in 1974, Defendant Monsanto has produced, marketed and sold Roundup®, its
   formulations, and derivative products, including but not limited to: RoundUp Quick-Pro,
   Roundup Concentrate Poison Ivy and Tough Brush Killer 1, Roundup Custom Herbicide,
   Roundup D-Pak Herbicide, Roundup Dry Concentrate, Roundup Export Herbicide,
   Roundup Fence & Hard Edger 1, Roundup Garden Foam Weed & Grass Killer, Roundup
   Herbicide, Roundup Original 2k Herbicide, Roundup Promax, Roundup Quik Stik Grass

and Weed Killer, Roundup Quikpro Herbicide, Roundup Rainfast Concentrate Weed & Grass Killer, Roundup Rainfast Super Concentrate Weed & Grass Killer, Roundup Ready-to-Use Extended Control Weed & Grass Killer 1 Plus Weed Preventer, Roundup Ready-to-Use Weed & Grass Killer, Roundup Ready-to-Use Weed and Grass Killer 2, Roundup Ultra Dry, Roundup Ultra Herbicide, Roundup Ultramax, Roundup VM Herbicide, Roundup Weed & Grass Killer Concentrate, Roundup Weed & Grass Killer Concentrate Plus, Roundup Weed & Grass Killer Ready-to-Use Plus, Roundup Weed & Grass Killer Super Concentrate, Roundup Weed & Grass Killer 1 Ready-to-Use, Roundup WSD Water Soluble Dry Herbicide Deploy Dry Herbicide, or any other formulation of containing the active ingredient glyphosate herein referred to collectively as, "Roundup".

3. Roundup is a non-selective herbicide used to kill weeds that commonly compete with residential grass lawns and the growing of crops.[1] As of 2013, glyphosate was the world's most widely used herbicide.

4. Defendant Monsanto is a multinational agricultural biotechnology corporation based in St. Louis, Missouri. It is the world's leading producer of glyphosate. As of 2009, Defendant Monsanto was the world's leading producer of seeds, accounting for 27% of the world seed market. [2] The majority of these seeds are of the Roundup Ready brand. The stated advantage of Roundup is that it substantially improve's a homeowner's and

---

[1]    Arthur Grube et al., U.S.-Envtl. Prot. Agency, *Pesticides Industry Sales and Usage*, 2006-2007 Market Estimates 14 (2011), available at
https://www.epa.gov/sites/default/files/201510/documents/market_estimates2007.pdf.
By 2001, glyphosate had become the most-used active ingredient in American agriculture with 85-90 million of pounds used annually. That number grew to 185 million pounds by 2007.

[2]    ETC Group, Who WiN Control the Green Economy? 22 (2011), available at
https://www.etcgroup.org/content/who-will-control-green-economy-0

farmer's ability to control weeds, since glyphosate can be sprayed in residential and commercial yards, without harming the grass. [3]

5. Monsanto's glyphosate products and glyphosate-based formulations are registered in 130 countries and approved for use on over 100 different crops[4]. Numerous studies confirm that glyphosate is found in rivers, streams, and groundwater in residential and agricultural areas where Roundup is used.[5] It has been found in food[6], in the urine of users of the product[7], and even in the urine of urban dwellers who are not in direct contact with glyphosate.[8]

6. The International Agency for Research on Cancer ("IARC") an agency of the World Health Organization ("WHO"), issued an evaluation on May 20, 2015, of several herbicides, including glyphosate. That evaluation was based, in part, on studies of exposures to glyphosate in several countries around the world and it has traced the health implications from exposure to glyphosate since 2001. On July 29, 2015, IARC issued the formal monograph relating to glyphosate. In that monograph, the IARC Working Group

---

[3] WilliamNeuman & Andrew Pollack, Farmers Cope FFi-th Roundup-Resistant FFeeds, N.Y. TIMES, May 3, 2010, available at https://www.nytimes.com/2010/05/04/business/energy-environment/04weed.html

[4] Monsanto, Backgrounder-History of Monsanto's Glyphosate Herbicides (June 2005), available at https://monsanto.com/app/uploads/2017/06/back_history.pdf

[5] See U.S. Geological Survey, USGS Technical Announcement: *Widely Used Herbicide Commonly Found in Rain and Streams in the Mississippi River Basin* 0011), available at https://archive.usgs.gov/archive/sites/www.usgs.gov/newsroom/article.asp-ID=2909.html

[6] Thomas Bohnetal., Compositional Differences in Soybeans on the Market: Glyphosate Accumulates in Roundup Ready GM Soybeans, 153 FOOD CHEMISTRY 207 (2013), available at https://www.sciencedirect.com/science/article/pii/S0308814613019201.

[7] John F. Acquavella et al., *Glyphosate Biomonitoring for Farmers and Their Families: Results from the Farm Family Exposure Study,* 112(3) ENVTL. HEALTH PERSPECTIVES 321 (2004), available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC1241861/

[8] Dirk Brandli & Sandra Reinacher, *Herbicides found in Human Urine,* 1 ITHAKA JOURNAL 270 (2012), available https://www.ithaka-journal.net/druckversionen/e052012-herbicides-urine.pdf

provides a thorough review of the numerous studies and data relating to glyphosate exposure in humans.

7. The IARC Working Group classified glyphosate as a Group 2A carcinogen, which means that it is probably carcinogenic to humans. The IARC Working Group concluded that the cancers most associated with glyphosate exposure are non-Hodgkin's lymphoma and other hematopoietic cancers, including lymphocytic lymphoma/chronic lymphocytic leukemia, *B-cell lymphoma*, and multiple myeloma.[9] The IARC evaluation is significant. It confirms what has been believed for years: that glyphosate is toxic to humans:

   a) More likely than not, glyphosate causes *non-Hodgkin's lymphoma* and other hematopoietic cancers, including lymphocytic lymphoma/chronic lymphocytic leukemia, *B-cell lymphoma*, and multiple myeloma.

   b) More likely than not, glyphosate-based formulations cause *non-Hodgkin's lymphoma.*

   c) More likely than not, *Roundup* causes *non-Hodgkin's lymphoma.*

8. Notwithstanding the scientifically based facts described above, Defendant Monsanto, commenced selling Roundup and has represented it as safe to humans and the environment. Defendant Monsanto has repeatedly proclaimed and continues to proclaim to the world, and particularly to United States consumers, that glyphosate-based herbicides, including Roundup, create no unreasonable risks to human health or to the environment.

## II.    JURISDICTION AND VENUE

---

[9]    See Guyton et al., Carcinogenicity of Tetrachlorvinphos, Parathion, Malathion, Diazinon & Glyphosate, supra.

9. This Court has jurisdiction over the Defendant pursuant to F.S. §§ 48.193 (1)(a), (6)(b), and (9)(2), because Monsanto transacts business in Florida and maintains sufficient contacts with the State of Florida such that this Court's exercise of personal jurisdiction over it does not offend traditional notions of fair play and substantial justice.

10. Venue is proper is this Judicial District pursuant o F.S. §§ 47.011 and 47.051.

### III.    PARTIES

<div align="center">PLAINTIFF</div>

11. Plaintiff, JEANETTE GARAVITO DALLEN as the Personal Representative of the Estate of: DALLEN, RUSSELL M. JR. on behalf of the Estate and Survivors ("Dallen"), is a resident of Broward County, Florida.

12. Russell M. Dallen Jr. passed away on September 17, 2021, at Sylvester Comprehensive Cancer Center, in Florida, the cause of death was non-Hodgkin's diffuse large B cell Lymphoma. (See attached Death Certificate as Exhibit "A").

13. Russell M. Dallen Jr. was a was a financial advisor, international lawyer renowned national and international economist. He was head of the investment bank Caracas Capital Markets, managing partner at family office Ophiuchus Capital Management and a strategic advisor to the exchange-traded Venezuela Opportunity Fund.

14. In December 2020, Russell M. Dallen Jr., then a 57-year-old citizen of Florida, was diagnosed with non-Hodgkin's lymphoma. One week later after diagnosis, on December 21, 2020, Russell M. Dallen Jr., started his first chemotherapy session.

15. For over ten years, Russell M. Dallen Jr., regularly used Roundup products to control weeds around his backyard and driveway. Russell M. Dallen Jr. would use the Roundup products at least twice per month.

16. On September 17, 2021, Russell M. Dallen Jr., not even a year after being diagnosed with non-Hodgkin's lymphoma Plaintiff died due to a diffuse large B cell Lymphoma caused by Defendant.

**DEFENDANT**

17. Monsanto Company is a Delaware corporation, with its headquarters and principal place of business in St. Louis, Missouri, is authorized to do business in the across the United States including Florida and conducted significant business within this judicial district at all times relevant herein.

18. At all times relevant to this complaint, Defendant Monsanto discovered the herbicidal properties of glyphosate and was the manufacturer of Roundup.

19. Defendant Monsanto has regularly transacted and conducted business within this judicial district for years, and has derived substantial revenue from goods and products, including Roundup, used in this judicial district during that same time.

20. Defendant Monsanto expected or should have expected their acts to have consequences within the State of Florida and derived substantial revenue from interstate commerce.

21. Plaintiff is informed and believes that Defendant Monsanto did design, formulate, sell, advertise, manufacture, and/or distribute Roundup with full knowledge of its dangerous and defective nature.

22. Plaintiff is informed and believes that in committing the acts alleged herein, each and every managing agent, agent, representative and/or employee of the Defendant was working within the course and scope of said agency, representation and/or employment with the knowledge, consent, ratification, and authorization of the Defendant and their directors, officers and/or managing agents.

## IV.    FACTS COMMON TO ALL COUNTS

23. At all times relevant to this complaint, Monsanto was the entity that discovered the herbicidal properties of glyphosate and the manufacturer of Roundup, which contains the active ingredient glyphosate and the surfactant POEA, as well as adjuvants and other "inert" ingredients.

24. Glyphosate is a broad-spectrum, non-selective herbicide used in a wide variety of herbicidal products around the world. Plants treated with glyphosate translocate the systemic herbicide to their roots, shoot regions and fruit, where it interferes with the plant's ability to form aromatic amino acids necessary for protein synthesis. Treated plants generally die within two to three days. Because plants absorb glyphosate, it cannot be completely removed by washing or peeling produce or by milling, baking, or brewing grains.

25. For nearly 40 years, farms across the world have used Roundup without knowing of the dangers its use poses. That is because when Defendant Monsanto first introduced Roundup, it touted glyphosate as a technological breakthrough: it could kill almost every weed without causing harm either to people or to the environment. Of course, history has shown that not to be true. According to the WHO, the main chemical ingredient of a probable cause of cancer. Defendant Monsanto assured the public that Roundup was harmless. In order to prove this, Defendant Monsanto championed falsified data and attacked legitimate studies that revealed its dangers. Defendant Monsanto led a prolonged campaign of misinformation to convince government agencies, farmers, and the general population that Roundup was safe.

### The Discovery of Glyphosate and Development of Roundup

26. The herbicidal properties of glyphosate were discovered in 1970 by Defendant Monsanto chemist John Franz. The first glyphosate-based herbicide was introduced to the market in the mid-1970s under the brand name Roundup.[10] From the outset, Defendant Monsanto marketed Roundup as a "safe" general-purpose herbicide for widespread commercial and consumer use. It still markets Roundup as safe today.[11]

27. In addition to the active ingredient glyphosate, Roundup formulations also contain adjuvants and other chemicals such as the surfactant POEA, which are considered "inert" and therefore, protected as "trade secrets" in manufacturing. Growing evidence suggests that these adjuvants and additional components of Roundup formulations are not, in fact, inert and are toxic in their own right.

### The Registration of Herbicides under Federal Law

28. The manufacture, formulation, and distribution of herbicides, such as Roundup, are regulated under the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA" or "Act"), 7 U.S.C. § 136 et seq. FIFRA requires that all pesticides be registered with the Environmental Protection Agency ("EPA" or "Agency") prior to their distribution, sale, or use, except as described by the Act. 7 U.S.C. § 136a(a).

29. Because pesticides are toxic to plants, animals, and humans, at least to some degree, the EPA requires as part of the registration process, among other things, a variety of tests to evaluate the potential for exposure to pesticides, toxicity to people and other potential non-target organisms, and other adverse effects on the environment. Registration by the EPA, however, is not an assurance or finding of safety. The determination the Agency must make in registering or reregistering a product is not that the product is "safe," but

---

[10] Monsanto, *Backgrounder-History of Monsanto's Glyphosate Herbicides* (June 2005), supra.

[11] See Monsanto, Crop Protection, https://www.bayer.com/en/agriculture (last visited February 16, 2022).

rather that use of the product in accordance with its label directions "will not generally cause unreasonable adverse effects on the environment." 7 U.S.C. § 136a(c)(5)(D).

30. FIFRA defines "unreasonable adverse effects on the environment" to mean "any unreasonable risk to man or the environment, taking into account the economic, social, and environmental costs and benefits of the use of any pesticide." 7 U.S.C. § 136(bb). FIFRA thus requires EPA to make a risk/benefit analysis in determining whether a registration should be granted or allowed to continue to be sold in commerce.

31. The EPA and the State of Florida registered Roundup for distribution, sale, and manufacture in the United States and the State of Florida.

32. FIFRA generally requires that the registrant, Defendant Monsanto in the case of Roundup conducts the health and safety testing of pesticide products. The EPA has protocols governing the conduct of tests required for registration and the laboratory practices that must be followed in conducting these tests. The data produced by the registrant must be submitted to the EPA for review and evaluation. The government is not required, nor is it able, however, to perform the product tests that are required of the manufacturer.

33. The evaluation of each pesticide product distributed, sold, or manufactured is completed at the time the product is initially registered. The data necessary for registration of a pesticide has changed over time. The EPA is now in the process of re-evaluating all pesticide products through a Congressionally- mandated process called "re-registration."7 U.S.C. § 136a-1. In order to reevaluate these pesticides, the EPA is demanding the completion of additional tests and the submission of data for the EPA's review and evaluation.

34. In the case of glyphosate, and therefore Roundup@, the EPA had planned on releasing its preliminary risk assessment -in relation to the reregistration process-no later than July 2015. The EPA completed its review of glyphosate in early 2015, but it delayed releasing the risk assessment pending further review in light of the WHO's health-related findings.

**Scientific Fraud Underlying the Marketing and Sale of Glyphosate/Roundup**

35. Based on early studies that glyphosate could cause cancer inlaboratory animals, the EPA originally classified glyphosate as possibly carcinogenic to humans (Group C) in 1985. After pressure from Defendant Monsanto, including contrary studies it provided to the EPA, the EPA changed its classification to evidence of *non-carcinogenicity in humans* (Group E in 1991. In so classifying glyphosate, however, the EPA made clear that the designation did not mean the chemical does not cause cancer: "It should be emphasized, however, that designation of an agent in Group E is based on the available evidence at the time of evaluation and should not be interpreted as a definitive conclusion that the agent will not be a carcinogen under any circumstances."[12]

36. On two occasions, the EPA found that the laboratories hired by Defendant Monsanto to test the toxicity of its Roundup products for registration purposes committed fraud.

37. In the first instance, Defendant Monsanto, in seeking initial registration of Roundup by EPA, hired Industrial Bio-Test Laboratories ("IBT") to perform and evaluate pesticide toxicology studies relating to Roundup[13]. IBT performed about 30 tests on glyphosate

---

[12] U.S. Envtl. Prot. Agency, Memorandum, Subject: SECOND Peer Review of Glyphosate 1 0991), available at https://archive.epa.gov/pesticides/chemical/foia/web/pdf/103601/417300-1991-10-30a.pdf.

[13] Monsanto, Backgrounder, Testing Fraud: IBT and Craven Laboratories (June 2005), available at https://monsanto.com/app/uploads/2017/06/ibt_craven_bkg.pdf.

and glyphosate-based formulations, including nine of the 15 residue studies needed to register Roundup.

38. In 1976, the United States Food and Drug Administration("FDA") performed an inspection of Industrial Bio-Test Industries ("IBT") that revealed discrepancies between the raw data and the final report relating to the toxicological impacts of glyphosate. The EPA subsequently audited IBT; it too found the toxicology studies conducted for the Roundup herbicide to be invalid.[14] An EPA reviewer stated, after finding "routine falsification of data" at IBT, that it was "hard to believe the scientific integrity of the studies when they said they took specimens of the uterus from male rabbits."[15]

39. Three top executives of IBT were convicted of fraud in 1983.

40. In the second incident of data falsification, Defendant Monsanto hired Craven Laboratories in 1991 to perform pesticide and herbicide studies, including for Roundup. In that same year, the owner of Craven Laboratories and three of its employees were indicted, and later convicted, of fraudulent laboratory practices in the testing of pesticides and herbicides.[16]

41. Despite the falsity of the tests that underlie its registration, within a few years of its launch, Defendant Monsanto was marketing Roundup in 115 countries.

---

[14] U.S. Envtl. *Prot. Agency, Summary of the IBT Review Program Office of Pesticide Programs* (1983), available at https://nepis.epa.gov/Exe/ZyNET.exe/91014ULV.TXT?ZyActionD=ZyDocument&Client=EPA&Index=1981+Thru+1985&Doc s=&Query=&Time=&EndTime=&SearchMethod=1&TocRestrict=n&Toc=&TocEntry=&QField=&QFieldYear=&QFieldMonth =&QFieldDay=&IntQFieldOp=0&ExtQFieldOp=0&XmlQuery=&File=D%3A%5Czyfiles%5CIndex%20Data%5C81thru85%5 CTxt%5C00000022%5C91014ULV.txt&User=ANONYMOUS&Password=anonymous&SortMethod=h%7C- &MaximumDocuments=1&FuzzyDegree=0&ImageQuality=r75g8/r75g8/x150y150g16/i425&Display=hpfr&DefSeekPage=x& SearchBack=ZyActionL&Back=ZyActionS&BackDesc=Results%20page&MaximumPages=1&ZyEntry=1&SeekPage=x&ZyP URL

[15] Marie-Monique Robin, The WorldAccording to Monsanto*: Pollution, Corruption, and the Control of the World's Food Supply* (2011) (citing U.S. Envtl. Prot. Agency, Data Validation, Memo from K. Locke, Toxicology Branch, to R. Taylor, Registration Branch. Washington, D.C. (August 9, 1978)).

[16] Monsanto, *Backgrounder, Testing Fraud: IBT and Craven Laboratories, supra.*

**The importance of Roundup to Defendant Monsanto's Market Dominance Profits**

42. The success of Roundup was key to Defendant Monsanto's continued reputation and dominance in the marketplace. Largely due to the success of Roundup sales, Defendant Monsanto's agriculture division was outperforming its chemicals division's operating income, and that gap increased yearly. But with its patent for glyphosate expiring in the United States in the year 2000, Defendant Monsanto needed a strategy to maintain its Roundup market dominance and to ward off impending competition.

43. In response, Defendant Monsanto began the development and sale of genetically engineered Roundup Ready seeds in 1996. Since Roundup Ready crops are resistant to glyphosate; farmers can spray Roundup onto their fields during the growing season without harming the crop. This allowed Defendant Monsanto to expand its market for Roundup even further.

44. By 2000, Defendant Monsanto's biotechnology seeds were planted on more than 80 million acres worldwide and nearly 70% of American soybeans were planted from Roundup Ready seeds. It also secured Defendant Monsanto's dominant share of the glyphosate/Roundup market through a marketing strategy that coupled proprietary Roundup Ready seeds with continued sales of its Roundup herbicide.

45. Through a three-pronged strategy of increased production, decreased prices and by coupling Roundup with Roundup Ready seeds, Roundup became Defendant Monsanto's most profitable product. In 2000, Roundup accounted for almost $2.8 billion in sales, outselling other herbicides by a margin of five to one, and accounting for close to half of

Defendant Monsanto's revenue.[17] Today, glyphosate remains one of the world's largest herbicides by sales volume.

**Defendant Monsanto has known for decades that it falsely advertises the safety of Roundup**

46. In 1996, the New York Attorney General ("NYAG") filed a lawsuit against Defendant Monsanto based on its false and misleading advertising of Roundup products. Specifically, the lawsuit challenged Defendant Monsanto's general representations that its spray on glyphosate-based herbicides, including Roundup, were "**safer than table salt**" and "**practically non-toxic**" to mammals, birds, and fish. Among the representations the NYAG found deceptive and misleading about the human and environmental safety of Roundup are the following:

a) Remember that environmentally friendly Roundup herbicide is biodegradable. It won't build up in the soil so you can use Roundup with confidence along customers' driveways, sidewalk sand fences...

b) Roundup is biodegradable and won't build up in the soil. That will give you the environmental confidence you need to use Roundup everywhere you've got a weed, brush, edging or trimming problem.

c) Roundup biodegrades into naturally occurring elements.

d) Remember that versatile Roundup herbicide stays where you put it. That means there's no washing or leaching to harm customers' shrubs or other desirable vegetation.

---

[17] David Barboza, *The Power of Roundup; A Weed Killer Is a Block for Monsanto to Build On*, -NY. TIMES, Aug. 2, 2001, available at https://www.nytimes.com/2001/08/02/business/the-power-of-roundup-a-weed-killer-is-a-block-for-monsanto-to-build-on.html

e) This non-residual herbicide will not wash or leach in the soil. It... stays where you apply it.

f) You can apply Accord with "confidence because it will stay where you put it" it bonds tightly to soil particles, preventing leaching. Then, soon after application, soil microorganisms biodegrade accord into natural products.

g) Glyphosate is less toxic to rats than table salt following acute oral ingestion.

h) Glyphosate's safety margin is much greater than required. It has over a 1,000- fold safety margin in food and over a 700-fold safety margin for workers who manufacture it or use it.

i) You can feel good about using herbicides by Monsanto. They carry a toxicity category rating of 'practically non-toxic' as it pertains to mammals, birds and fish.

j) "Roundup can be used where kids and pets will play and breaks down into natural material." This ad depicts a person with his head in the ground and a pet dog standing in an area which has been treated with Roundup.[18]

47. On November 19, 1996, Defendant Monsanto entered an Assurance of Discontinuance with NYAG, in which Defendant Monsanto agreed, among other things, "to cease and desist from publishing or broadcasting any advertisements [in New York] that represent, directly or by implication" that:

a) its glyphosate-based pesticide products or any component thereof are safe, nontoxic, harmless, or free from risk.

b) its glyphosate-based pesticide products or any component thereof manufactured, formulated, distributed, or sold by Monsanto are biodegradable.

---

[18] Attorney General of the State of New York, in the Matter of Monsanto Company, Assurance of Discontinuance Pursuant to Executive Law § 63(15) (Nov. 1996).

c) its glyphosate-based pesticide products or any component thereof stay where they are applied under all circumstances and will not move through the environment by any means.

d) its glyphosate-based pesticide products or any component thereof are "good" for the environment or are "known for their environmental characteristics."

e) glyphosate-based pesticide products or any component thereof are safer or less toxic than common consumer products other than herbicides.

f) its glyphosate-based formulations or any component thereof might be classified as "practically non-toxic."

48. Defendant Monsanto did not alter its advertising in the same manner in any state other than New York, and on information and belief still has not done so today.

49. In 2009, France's highest court ruled that Defendant Monsanto had not told the truth about the safety of Roundup. The French court affirmed an earlier judgement that Defendant Monsanto had falsely advertised its herbicide Roundup as "biodegradable" and that it "left the soil clean."[19]

### Classification and Assessments of Glyphosate

50. The IARC process for the classification of glyphosate followed the stringent procedures for the evaluation of a chemical agent. Over time, the IARC Monograph program has reviewed 980 agents. Of those reviewed, it has determined 116 agents to be Group 1 (Known Human Carcinogens); 73 agents to be Group 2A (Probable Human Carcinogens); 287 agents to be Group 2B (Possible Human Carcinogens); 503 agents to be Group 3 (Not Classified); and one agent to be Probably Not Carcinogenic.

---

[19] *Monsanto Guilty in 'False Ad' Row*, BBC, Oct. 15 2009, available at http:news.bbc.co.uk/2/hi/Europe/8308903.stm.

51. The established procedure for IARC Monograph evaluations is described in the IARC Program's Preamble.[20] Evaluations are performed by panels of international experts, selected on the basis of their expertise and the absence of actual or apparent conflicts of interest.

52. One year before the Monograph meeting, the meeting is announced and there is a call both for data and for experts. Eight months before the Monograph meeting, the Working Group membership is selected, and the sections of the Monograph are developed by the Working Group members. One month prior to the Monograph meeting, the call for data is closed and the various draft sections are distributed among Working Group members for review and comment. Finally, at the Monograph meeting, the Working Group finalizes review of all literature, evaluates the evidence in each category, and completes the overall evaluation. Within two weeks after the Monograph meeting, the summary of the Working Group findings is published in Lancet Oncology, and within a year after the meeting, the final Monograph is finalized and published.

53. In assessing an agent, the IARC Working Group reviews the following information: (a) human, experimental, and mechanistic data; (b) all pertinent epidemiological studies and cancer bioassays; and (c) representative mechanistic data. The studies must be publicly available and have sufficient detail for meaningful review, and reviewers cannot be associated with the underlying study.

---

[20] World Health Org., *IARC Monographs on the Evaluation of Carcinogenic Risks to Humans*: Preamble (2006), available at https://publications.iarc.fr/Book-And-Report-Series/Iarc-Monographs-On-The-Identification-Of-Carcinogenic-Hazards-To-Humans

54. In March 2015, IARC reassessed glyphosate. The summary published in The Lancet Oncology reported that glyphosate is a Group 2A agent and probably carcinogenic in humans.

55. On July 29, 2015, IARC issued its Monograph for glyphosate, Monograph 112. For Volume 112, the volume that assessed glyphosate, a Working Group of 17 experts from 11 countries met at IARC from March 3-10, 2015, to assess the carcinogenicity of certain herbicides, including glyphosate. The March meeting culminated nearly a one-year review and preparation by the IARC Secretariat and the Working Group, including a comprehensive review of the latest available scientific evidence. According to published procedures, the Working Group considered "reports that have been published or accepted for publication in the openly available scientific literature" as well as "data from governmental reports that are publicly available."

56. The studies considered the following exposure groups: occupational exposure of farmers and tree nursery workers in the United States, forestry workers in Canada and Finland and municipal weed-control workers in the United Kingdom; and para-occupational exposure in farming families.

57. Glyphosate was identified as the second-most used household herbicide in the United States for weed control between 2001 and 2007 and the most heavily used herbicide in the world in 2012.

58. Exposure pathways are identified as air (especially during spraying), water, and food. Community exposure to glyphosate is widespread and found in soil, air, surface water, and groundwater, as well as in food.

59. The assessment of the IARC Working Group identified several case-control studies of occupational exposure in the United States, Canada, and Sweden. These studies show a human health concern from agricultural and other work-related exposure to glyphosate.

60. The IARC Working Group found an increased risk between exposure to glyphosate and non-Hodgkin's lymphoma ("NHL") and several subtypes of NHL, and the increased risk persisted after adjustment for other pesticides.

61. The IARC Working Group also found that glyphosate caused DNA and chromosomal damage in human cells. One study in community residents reported increases in blood markers of chromosomal damage (micronuclei) after glyphosate formulations were sprayed.

62. In male CD- 1 mice, glyphosate induced a positive trend in the incidence of a rare tumor, renal tubule carcinoma. A second study reported a positive trend for hemangiosarcoma in male mice. Glyphosate increased pancreatic islet-cell adenoma in male rats in two studies. A glyphosate formulation promoted skin tumors in an initial promotion study in mice.

63. The IARC Working Group also noted that glyphosate has been detected in the urine of agricultural workers, indicating absorption. Soil microbes degrade glyphosate to aminomethylphosphoric acid (AMPA). Blood AMPA detection after exposure suggests intestinal microbial metabolism in humans.

64. The IARC Working Group further found that glyphosate and glyphosate formulations induced DNA and chromosomal damage in mammals, and in human and animal cells in utero.

65. The IARC Working Group also noted genotoxic, hormonal, and enzymatic effects in mammals exposed to glyphosate. [21] Essentially, glyphosate inhibits the biosynthesis of aromatic amino acids, which leads to several metabolic disturbances, including the inhibition of protein and secondary product biosynthesis and general metabolic disruption.

66. The IARC Working Group also reviewed an Agricultural Health Study, consisting of a prospective cohort of 57,311 licensed pesticide applicators in Iowa and North Carolina. [22] While this study differed from others in that it was based on a self-administered questionnaire, the results support an association between glyphosate exposure and Multiple Myeloma, Hairy Cell Leukemia (HCL), and Chronic Lymphocytic Leukemia (CLL), in addition to several other cancers.

### Other Earlier Findings About Glyphosate's Dangers to Human Health

67. The EPA has a technical fact sheet, as part of its Drinking Water and Health, National Primary Drinking Water Regulations publication, relating to glyphosate. This technical fact sheet predates the IARC March 20, 2015, evaluation. The fact sheet describes the release patterns for glyphosate as follows:

**Release Patterns:**

Glyphosate is released to the environment in its use as an herbicide for controlling woody and herbaceous weeds on forestry, right-of-way, cropped and non-cropped sites. These sites may be around water and in wetlands. It may also be released to

---

[21] Guyton et al., Carcinogenicity of Tetrachlorvinphos, Parathion, Malathion, Diazinon & Glyphosate, supra at 77.

[22] Anneclare J. De Roos et al., Cancer Incidence Among Glyphosate-Exposed Pesticide Applicators in the Agricultural Health Study, 113 Envt'l Health Perspectives 49-54 (2005), available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC1253709/

the environment during its manufacture, formulation, transport, storage, disposal and cleanup, and from spills. Since glyphosate is not a listed chemical in the Toxics Release Inventory, data on releases during its manufacture and handling are not available.[23]

68. Occupational workers and home gardeners may be exposed to glyphosate by inhalation and dermal contact during spraying, mixing, and cleanup. They may also be exposed by touching soil and plants to which glyphosate was applied. Occupational exposure may also occur during glyphosate's manufacture, transport storage, and disposal.

69. In 1995, the Northwest Coalition for Alternatives to Pesticides reported that in California, the state with the most comprehensive program for reporting of pesticide-caused illness, glyphosate was the third most commonly reported cause of pesticide illness among agricultural workers. [24]

### The Toxicity of Other Ingredients in Roundup

70. In addition to the toxicity of the active ingredient glyphosate, several studies support the hypothesis that the glyphosate-based formulation in Defendant's Roundup products is more dangerous and toxic than glyphosate alone. Indeed, as early as 1991, available evidence demonstrated that glyphosate formulations were significantly more toxic than glyphosate alone.[25]

---

[23] Nat'l Pesticide Info. Center, *Glyphosate: General Fact Sheet,* supra.

[24] Caroline Cox, Glyphosate, Part 2: *Human Exposure and Ecological Effects*, 15 J. PESTICIDE REFOM 4 (1995),W.S. Peasetal*, Preventing pesticide-related illness in California agriculture: Strategiesand priorities.Environmental Health Policy Program* Report, Univ. of Cal. School of Public Health, Calif. Policy Seminar (1993). 25 Martinez, T.T. and K. Brown, *Oral and pulmonary toxicology of the surfactant used in Roundup herbicide*, PROC. WEST. PHARMACOL. SOC. 34:43-46 (1991).

[25] Maxtinez, T.T. andK. Brown, Oralandpulmonarytoxicologyofthe su*ctant used in Roundup herbicide, PROC. WEST. PHARMACOL. SOC. 34:43-46 (1991).

71. In 2002, a study by Julie Marc, entitled "Pesticide Roundup Provokes Cell Division Dysfunction at the Level of CDK1/Cyclin B Activation," revealed that Roundup causes delays in the cell cycles of sea urchins but that the same concentrations of glyphosate alone were ineffective and did not alter cell cycles.[26]

72. A 2004 study by Marc and others, entitled "Glyphosate-based pesticides affect cell cycle regulation," demonstrated a molecular link between glyphosate-based products and cell cycle dysregulation. The researchers noted that "cell cycle dysregulation is a hallmark of tumor cells and human cancer. Failure in the cell cycle checkpoints leads to genomic instability and subsequent development of cancer from the initial affect cell." Further, "[s]ince cell cycle disorder such as cancer result from dysfunctions of a unique cell, it was of interest to evaluate the threshold dose of glyphosate affecting the cells."[27]

73. In 2005, a study by Francisco Peixoto entitled "Comparative effects of Roundup and glyphosate on mitochondrial oxidative phosphorylation," demonstrated that Roundup's effects on rat liver mitochondria are far more toxic than equal concentrations of glyphosate alone. The Peixoto study further suggested that the harmful effects of Roundup on mitochondrial bioenergetics could not be exclusively attributed to glyphosate but could be the result of other chemicals, such as the surfactant POEA, or in the alternative, due to a potential synergic effect between glyphosate and other ingredients in the Roundup formulation.[28]

---

[26] Julie Marc, et al., *Pesticide Roundup Provokes Cell Division Dysfunction at the Level of CDK1/Cyclin B Activation*, 15 CHEM. RES. TOXICOL. 326-331 (2002), available at http://pubs.acs.org/doi/full/10.1021/tx015543g.

[27] Julie Marc, et al., *Glyphosate-based pesticides affect cell cycle regulation*, 96 BIOLOGY OF THE CELL 245,245-249 (2004), available at https://www.ncbi.nlm.nih.gov/pubmed/15182708.

[28] Francisco Peixoto, Comparative effects of the Roundup and glyphosate on mitochondrial oxidative phosphorylation, 61 CHEMOSPHERE 1115, 1122 (2005), available at http://www.ncbi.nlm.nih.gov/pubmed/16263381.

74. In 2009, Nora Benachour and Gilles-Eric Seralini published a study examining the effects of Roundup and glyphosate on human umbilical, embryonic, and placental cells. The study tested dilution levels of Roundup and glyphosate that were far below agricultural recommendations, corresponding with low levels of residue in food. The researchers ultimately concluded that supposed "inert" ingredients, and possibly POEA, alter human cell permeability and amplify toxicity of glyphosate alone. The researchers further suggested that assessments of glyphosate toxicity should account for the presence of adjuvants or additional chemicals used in the formulation of the complete pesticide. The study confirmed that the adjuvants present in Roundup are not, in fact, inert and that Roundup is potentially far more toxic than its active ingredient glyphosate alone.[29]

75. The results of these studies were at all times available to Monsanto. Monsanto thus knew or should have known that Roundup was and is more toxic than glyphosate alone and that safety studies of Roundup, Roundup's adjuvants and "inert" ingredients, and/or the surfactant POEA were necessary to protect Plaintiff from dying because of Roundup.

76. Despite its knowledge that Roundup is considerably more dangerous than glyphosate alone, Monsanto continued to promote Roundup as safe.

**Worldwide Bans on Roundup/Glyphosate**

77. Several countries around the world have instituted bans on the sale of Roundup and other glyphosate-based herbicides, both before and since IARC first announced its assessment for glyphosate in March 2015, and more countries undoubtedly will follow suit in light of the as the dangers of the use of Roundup are more widely known.

---

[29] Nora Benachour, et al., *Glyphosate Formulations Induce Apoptosis and Necrosis in Human Umbilical, Embryonic, and Placental Cells*, 22 CHEM. RES. TOXICOL. 97-105 (2008), available at https://doi.org/10.1021/tx800218n

78. The Netherlands issued a ban on all glyphosate-based herbicides in April 2014, including Roundup, which takes effect by the end of 2015. In issuing the ban, the Dutch Parliament member who introduced the successful legislation stated: "Agricultural pesticides in user-friendly packaging are sold in abundance to private persons. In garden centers, Roundup is promoted as harmless, but unsuspecting customers have no idea what the risks of this product are. Especially children are sensitive to toxic substances and should therefore not be exposed to it."[30]

79. The Brazilian Public Prosecutor in the Federal District requested that the Brazilian Justice Department suspend the use of glyphosate.[31]

80. France banned the private sale of Roundup and glyphosate following the IARC assessment for Glyphosate.[32]

81. Bermuda banned both the private and commercial sale of glyphosates, including Roundup. The Bermuda government explained its ban as follows: "Following a recent scientific study carried out by a leading cancer agency, the importation of weed spray 'Roundup' has been suspended."[33]

---

[30] *Holland 's Parliament Bans Glyphosate Herbicides*, The Real Agenda, April 14, 2014, available at http://real-agenda.com/hollands-parliment-bans-glyphosate-herbicides/.

[31] Christina Sarich, *Brazil's Public Prosecutor Wants to Ban Monsanto's Chemicals Following Recent Glyphosate- Cancer Link*, GLOBAL RESEARCH, MAY 14, 2015, available at https://www.globalresearch.ca/brazils-public-prosecutor-wants-to-ban-monsantos-chemicals-following-recent-glyphosate-cancer-link/5449440 see *Ministerio Publico Federal, MPF/DF reforca pedido para que glifosato seja banido do Mercado nacional*,April 14, 2015, available at http://www.mpf.mp.br?df/sala-de-imprensa/noticias-df/mpf-df-reforca-pedido-para-que-glifosato-seja-banido-do-mercado-nacional.

[32] Zoe Schlanger, *France Bans Sales of Monsanto's Roundup in Garden Centers, 3 Months After U.N. Calls it "Probable Carcinogen"*, NEWS WEEK, JUNE 15,2015, available at https://www.newsweek.com/france-bans-sale-monsantos-roundup-garden-centers-after-un-names-it-probable-343311

[33] Health Minister: *Importation of Roundup Weed Spray Suspended*, Today in Bermuda, May 11, 2015, available at https://bernews.com/2015/05/importation-weed-spray-round-suspended/

82. The Sri Lankan government banned the private and commercial use of glyphosates, particularly out of concern that glyphosate has been linked to fatal kidney disease in agricultural workers.[34]

83. The government of Colombia announced its ban on using Roundup and glyphosate to destroy illegal plantations of coca, the raw ingredient for cocaine, because of the WHO's finding that glyphosate is probably carcinogenic.[35]

**Proposition 65 Listing**

84. On September 4, 2015, California's Office of Environmental Health Hazard Assessment ("OEHHA") published a notice of intent to include glyphosate on the state's list of 36 known carcinogens under Proposition 65.[36] California's Safe Drinking Water and Toxic Enforcement Act of 1986 (informally known as "Proposition 65"), requires the state to maintain and, at least, once a year, revise and republish a list of chemicals "known to the State of California to cause cancer or reproductive toxicity."[37] The OEHHA determined that glyphosate met the criteria for the listing mechanism under the Labor Code following the IARC's assessment of the chemical.[38]

---

[34] *Sri Lanka's New President Puts Immediate Ban on Glyphosate Herbicides*, Sustainable Pulse, May 25, 2015, available at https://sustainablepulse.com/2015/05/25/sri-lankas-new-president-puts-immediate-ban-on-glyphosate-herbicides/

[35] *Colombia to ban coca spraying herbicide glyphosate*, BBC, May 10, 2015, available at https://www.bbc.com/news/world-latin-america-32677411

[36] Cal. Envtl. Prot. Agency Office of Envtl. Health Hazard Assessment, *Notice of Intent to List Chemicals by the Labor Code Mechanism: Tetrachlorvinphos, Parathion, Malathion, Glyphosate* (Sept. 4, 2015), available at https://oehha.ca.gov/proposition-65/crnr/notice-intent-list-tetrachlorvinphos-parathion-malathion-glyphosate

[37] Frequently Asked Questions, STATE OF CAL. DEPT OF JUSTICE, OFFICE OF THE ATTORNEY GENERAL, available at https://oag.ca.gov/prop65/faq

[38] Cal. Envtl. Prot. Agency Office of Envtl. Health Hazard Assessment, *Notice of Intent to List Chemicals*

85. The listing process under the Labor Code is essentially automatic. The list of known carcinogens, at a minimum, must include substances identified by reference in Labor Code § 6382(b)(1). That section of the Labor Code identifies "[s]ubstances listed as human or animal carcinogens by the International Agency for Research on Cancer (IARC)." The IARC's classification of glyphosate as a Group 2A chemical ("probably carcinogenic to humans") therefore triggered the listing.

86. A business that deploys a listed chemical in its products must provide "clear and reasonable warnings" to the public prior to exposure to the chemical. To be clear and reasonable, a warning must "(1) clearly communicate that the chemical is known to cause cancer, and/or birth defects or other reproductive harm; and (2) effectively reach the person before exposure." [39] The law also prohibits the discharge of listed chemicals into drinking water.

87. Monsanto disputed the listing decision and, in January 2016, filed a lawsuit against OEHHA and the agency's acting director, Lauren Zeise, in California state court, seeking declaratory and injunctive relief to prevent OEHHA from listing glyphosate.[40]

88. Monsanto alleged that OEHHA's exclusive reliance of the IARC decision signified that "OEHHA effectively elevated the determination of an ad hoc committee of an unelected, foreign body, which answers to no United States official (let alone any California state

---

by the Labor Code Mechanism: Tetrachlorvinphos, Parathion, Malathion, Glyphosate, supra.

[39] Frequently Asked Questions, STATE OF CAL. DEPARTMENT OF JUSTICE, OFFICE OF THE ATTORNEY GENERAL, supra.

[40] Monsanto Company's Verified Petition for Writ of Mandate and Complaint for Preliminary and Permanent Injunctive and Declaratory Relief, Monsanto Co. v. Office of the Envt'l Health Hazard Assessment, et al., No. 16- CECG-00183 (Cal. Super. Ct.).

official), over the conclusions of its own scientific experts."[41] Monsanto further alleged that the Labor Code listing mechanism presented various constitutional violations because it "effectively empowers an unelected, undemocratic, unaccountable, and foreign body to make laws applicable in California.[42] Among other things, Monsanto argued that Proposition 65's requirement to provide a "clear and reasonable warning" to consumers that the chemical is a known carcinogen would damage its reputation and violate First Amendment rights. [43]

89. On November 12, 2015, the European Food Safety Authority ("EFSA"), the European Union's primary agency for food safety, reported on its evaluation of the Renewal Assessment Report ("RAR") on glyphosate.[44] The Rapporteur Member State assigned to glyphosate, the German Federal Institute for Risk Assessment ("BfR"), had produced the RAR as part of the renewal process for glyphosate in the EU.

90. The BfR sent its draft RAR to the EFSA and the RAR underwent a peer review process by EFSA, other member states, and industry groups. As part of the on-going peer review of Germany's reevaluation of glyphosate, the EFSA had also received a second mandate from the European Commission to consider the IARC's findings regarding the potential carcinogenicity of glyphosate and glyphosate containing products.

91. Based on a review of the RAR, which included data from industry-submitted unpublished studies, the EFSA sent its own report ("Conclusion") to the European Commission,

---

[41] *Id.* at 2.

[42] *Id* at 3.

[43] *Id.*

[44] European Food Safety Auth., *Conclusion on the peer review of the pesticide risk assessment of the active substance glyphosate*, available at https://www.efsa.europa.eu/en/efsajournal/pub/4302

finding that "glyphosate is unlikely to pose a carcinogenic hazard to humans and the evidence does not support classification with regard to its carcinogenic potential according to Regulation ("EC") No. 1271/2008."[45] The EFSA therefore disagreed with the IARC: glyphosate was not genotoxic and did not present a carcinogenic threat to humans.

92. In explaining why its results departed from the IARC's conclusion, the EFSA drew a distinction between the EU and the IARC approaches to the study and classification of chemicals.[46] Although the IARC examined "both glyphosate - an active substance – and glyphosate-based formulations, grouping all formulations regardless of their composition," the EFSA explained that it considered only glyphosate and that its assessment focuses on "each individual chemical, and each marketed mixture separately."[47] The IARC, on the other hand, "assesses generic agents, including groups of related chemicals, as well as occupational or environmental exposure, and cultural or behavioral practices."[48] The EFSA accorded greater weight to studies conducted with glyphosate alone than studies of formulated products.[49]

93. The EFSA went further and noted:

> [A]lthough some studies suggest that certain glyphosate-based formulations may be genotoxic (i.e., damaging to DNA), other that look solely at the active substance glyphosate do not show this effect. It is likely, therefore, that the **genotoxic effects observed in some glyphosate-based formulations are related to the other**

---

[45] *Id.*

[46] *EFSA Fact Sheet: Glyphosate*, EFSA, available at
https://www.efsa.europa.eu/sites/default/files/corporate_publications/files/efsaexplainsglyphosate151112en.pdf

[47] *Id.*

[48] *Id.*

[49] *Id.*

constituents or co-formulants." Similarly, certain glyphosate-based formulations display higher toxicity than that of the active ingredient, presumably because of the presence of co-formulants. In its assessment, the **EFSA proposes that the toxicity of each pesticide formulation and in particular its genotoxic potential should be further considered and addressed by Member State authorities while they reassess used of glyphosate-based formulations in their own territories.**[50] (Emphasis added).

94. Notwithstanding its conclusion, the EFSA did set exposure levels for glyphosate. Specifically, the EFSA proposed an acceptable daily intake ("ADI") of 0.5 mg/kg of body weight per day; an acute reference dose ("AR-fD") of 0.5 mg/kg of body weight; and an acceptable operator exposure level of ("AOEL") of 0.1 mg/kg of body weight per day.[51]

**Leading Scientists Dispute the EFSA's Conclusion**

95. On November 27, 2015, 96 independent academic and governmental scientists from around the world submitted an open letter to the EU health commissioner, Vytenis Andriukaitis.[52] The scientists expressed their strong concerns and urged the commissioner to disregard the "flawed" EFSA report, arguing that "the BfR decision is not credible because it is not supported by the evidence, and it was not reached in an open and transparent manner.[53]

---

[50] *Id.*

[51] European Food Safety Auth., *Conclusion on the peer review of the pesticide risk assessment of the active substance glyphosate*, *supra*.

[52] Letter from Christopher J. Portier et al. to Commission Vytenis Andriukaitis, Open letter: Review of the Carcinogenicity of Glyphosate by EFSA and BfR (Nov. 27, 2015), available at https://www.efsa.europa.eu/sites/default/files/Prof_Portier_letter.pdf

[53] *Id.*

96. Signatories to the letter included Dr. Christopher J. Portier, Ph.D., and other renowned international experts in the field, some of whom were part of the IARC Working Group assigned to glyphosate.

97. In an exhaustive and careful examination, the scientists scrutinized the EFSA's conclusions and outlined why the IARC Working Group decision was "by far the more credible":

> The IARC WG decision was reached relying on open and transparent procedures by independent scientists who completed thorough statements and were not affiliated or financially supported in any way by the chemical manufacturing industry. It is fully referenced and depends entirely on reports published in the open, peer-reviewed biomedical literature. It is part of a long tradition of deeply researched and highly credible reports on the carcinogenicity of hundreds of chemicals issued over the past four decades by IARC and used today by international agencies and regulatory bodies around the world as a basis for risk assessment, regulation, and public health policy.[54]

98. With respect to human data, the scientists pointed out that the EFSA agreed with the IARC that there was "limited evidence of carcinogenicity" for non-Hodgkin lymphoma, but the EFSA nonetheless dismissed an association between glyphosate exposure and carcinogenicity. The IARC applied three levels of evidence in its analysis of human data, including sufficient evidence and limited evidence. The EFSA's ultimate conclusion that "there was no unequivocal evidence for a clear and strong association of NHL with glyphosate" was misleading because it was tantamount to the IARC's highest level of evidence: "sufficient evidence," which means that a causal relationship has been established. However, the scientist argued, "[l]egitimate public health concerns arise when 'causality is credible,' i.e. when there is limited evidence."[55]

99. Among its many other deficiencies, the EFSA's conclusions regarding animal carcinogenicity data were "scientifically unacceptable," particularly in BfR's use of

---

[54] *Id.*
[55] *Id.*

historical control data and in its trend analysis. Indeed, the BfR's analysis directly contradicted the Organization for Economic Co-operation and Development ("OECD") testing guidelines while citing and purporting to follow those same guidelines.

100.     For instance, the EFSA report dismisses observed trends in tumor incidence "because there are no individual treatment groups that are significantly different from control and because the maximum observed response is reportedly within the range of the historical control data." However, according to the scientists, concurrent controls are recommended over historical control in all guidelines, scientific reports, and publications, and, if historical control data is employed, such data "should be from studies in the same timeframe, for the same exact animal strain, preferably from the same laboratory or the same supplier and preferably reviewed by the same pathologist." The BfR's use of historical control data violated these precautions: "only single study used the same mouse strain as the historian controls but was reported more than 10 years after the historical control dataset was developed." Further deviating from sound scientific practices, the data used by the BfR came from studies in seven different laboratories. The scientists concluded:

BfR reported seven positive mouse studies with three studies showing increases in renal tumors, two with positive findings for hemangiosarcomas, and two with positive findings for malignant lymphomas. BfR additionally reported two positive findings for tumors in rats. Eliminating the inappropriate use of historical data, the unequivocal conclusion is that these are not negative studies, but in fact document the carcinogenicity of glyphosate in laboratory animals.[56]

101.     The letter also critiques the EFSA's report's lack of transparency and the opacity surrounding the data cited in the report: "citations for almost all of the references, even those from the open scientific literature, have been redacted from the document" and

---

56

"there are no authors or contributors listed for either document, a requirement for publication in virtually all scientific journals." Because the BfR relied on unpublished, confidential industry provided studies, it is "impossible for any scientist not associated with BfR to review this conclusion with scientific confidence."[57]

102.     On March 3, 2016, the letter was published in the Journal of Epidemiology & Community Health.[58]

### Statement of Concern Regarding Glyphosate-Based Herbicides

103.     On February 17, 2016, a consensus statement published in the Journal of Environmental Health, entitled "Concerns over use of glyphosate-based herbicides and risks associated with exposures: a consensus statement, "assessed the safety of glyphosate-based herbicides ("GBHs").[59] The paper's "focus is on the unanticipated effects arising from the worldwide increase in use of GBHs, coupled with recent discoveries about the toxicity and human health risks stemming from use of GBHs."[60] The researchers drew seven factual conclusions about GBHs.

    i.     GBHs are the most heavily applied herbicide in the world and usage continues to rise;

---

[57] *Id.*

[58] Christopher J. Portier, et al., *Differences in the carcinogenic evaluation of glyphosate between the International Agency for Research on Cancer (IARC) and the European Food Safety Authority* (EFSA), JOURNAL OF EPIDEMIOLOGY& CMTY. HEALTH, Marc. 3, 2016, available at https://jech.bmj.com/content/jech/70/8/741.full.pdf

[59] John P. Myers, et al., *Concerns over use of glyphosate-based herbicides and risks associated with exposures. a consensus statement,* Environmental Health (2016), available at https://ehjournal.biomedcentral.com/articles/10.1186/s12940-016-0117-0

[60] *Id.*

  ii. Worldwide, GBHs often contaminate drinking water sources, precipitation, and air, especially in agricultural regions;

  iii. The half-life of glyphosate in water and soil is longer than previously recognized;

  iv. Glyphosate and its metabolics are widely present in the global soybean supply;

  v. Human exposures to GBHs are rising;

  vi. Glyphosate is now authoritatively classified as a probable human carcinogen and;

  vii. Regulatory estimates of tolerable daily intakes for glyphosate in the United States and European Union are based on outdated science.[61]

104. The researchers noted that GBH use has increased approximately 100-fold since the 1970s. Further, far from posing a limited hazard to vertebrates, as previously believed, two decades of evidence demonstrated that "several vertebrate pathways are likely targets of action, including hepatorenal damage, effects on nutrient balance through glyphosate chelating action and endocrine disruption."[62]

105. The paper attributed uncertainties in current assessments of glyphosate formulations to the fact that "[t]he full list of chemicals in most commercial GBHs is protected as 'commercial business information,' despite the universally accepted relevance of such information to scientists hoping to conduct an accurate risk assessment of these herbicide formulations. Further, the researchers argue, "[t]he distinction in regulatory review and decision processes between 'active' and 'inert' ingredients has no

---

[61] *Id.*

[62] Id.

toxicological justification, given increasing evidence that several so-called 'inert' adjuvants are toxic in their own right.[63]

106.     Among various implications, the researchers conclude that "existing toxicological data and risk assessments are not sufficient to infer that GBHs, as currently used, are safe." Further, "GBH-product formulations are more potent, or toxic, than glyphosate alone to a wide array of non-target organisms including mammals, aquatic insects, and fish." Accordingly, "risk assessments of GBHs that are based on studies quantifying the impacts of glyphosate alone underestimate both toxicity and exposure, and thus risk." The paper concludes that this "shortcoming has repeatedly led regulators to set inappropriately high exposure thresholds."[64]

107.     The researchers also critique the current practice of regulators who largely rely on unpublished, non-peer-reviewed data generated by the registrants" but ignore "published research because it often uses standards and procedures to assess quality that are different from those codified in regulatory agency data requirements, which largely focus on avoiding fraud." In the researchers' view, "[s]cientists independent of the registrants should conduct regulatory tests of GBHs that include glyphosate alone, as well as GBH-product formulations."[65]

108.     The researchers also call for greater inclusion of GBHs in government-led toxicology testing programs:

[A] fresh and independent examination of GBH toxicity should be undertaken, and
... this reexamination be accompanied by systemic efforts by relevant agencies to
Monitor GBH levels in people and in the food supply, none of which are occurring

---

[63] *Id.*
[64] *Id.*
[65] *Id.*

today. The U.S. National Toxicology Program should prioritize a thorough toxicology assessment of the multiple pathways now identified as potentially vulnerable of GBHs.[66]

109.     The researchers suggest that, in order to fill the gap created by an absence of

government funds to support research on GBHs, regulators could adopt a system

through which manufacturers fund the registration process and the necessary testing:

[W]e recommend that a system be put in place through which manufacturers of GBHs provide funds to the appropriate regulatory body as part of routine registration actions and fees. Such finds should then be transferred to appropriate government research institutes, or to an agency experienced in the award of competitive grants. In either case, funds would be made available to independent scientists to conduct the appropriate long-term (minimum 2 years) safety studies in recognized animal model systems. A thorough and modern assessment of GBH toxicity will encompass potential endocrine disruption, impacts on the gut microbiome, carcinogenicity, and multigenerational effects looking a reproductive capability and frequency of birth defects.[67]

**The FDA Announces Testing of Glyphosate Residue in Foods**

110.     On February 17, 2016, the U.S. Food and Drug Administration ("FDA")

announced that, for the first time in its history, the agency planned to start testing certain

foods for glyphosate residues. FDA spokesperson Lauren Sucher explained: "The

agency is now considering assignments for Fiscal Year 2016 to measure glyphosate in

soybeans, corn, milk, and eggs, among other potential foods."[68]

111.     In 2004, the U.S. Government Accountability Office ("GAO") had severely

---

[66] *Id.*

[67] *Id.*

[68] Carey Gillam, *FDA to Start Testing for Glyphosate in Food*, TIME, Feb. 17, 2016, available at https://civileats.com/2016/02/17/fda-to-start-testing-for-glyphosate-in-food/

Rebuked the FDA for its failures to both monitor for pesticide residue, including that of glyphosate, and to disclose the limitations of its monitoring and testing efforts to the public.[69]

112.    Indeed, in the past, both the FDA and the U.S. Department of Agriculture ("USDA") had routinely excluded glyphosate from their testing for the residues of hundreds of other pesticides, on the rationale that it was too expensive and unnecessary to protect public health. Ms. Sucher (the FDA spokesperson) now states, however, that "the agency has developed 'streamlined methods' for testing for the weed killer."[70]

113.    The FDA's move is significant as the agency possesses enforcement authority and can seek action if pesticide residues exceed enforcement guidelines.[71]

### European Union Vote on Glyphosate Renewal

114.    The license for glyphosate in the European Union was set to expire in June 2016.

115.    Without extension of the license, Monsanto's Roundup and other glyphosate-based herbicides faced a general phase out in EU markets.[72]

116.    In the months leading up to the license expiration date, protracted meetings, and votes among national experts from the 28 EU Member States failed to produce agreement on an extension.

117.    For instance, on March 4, 2016, The Guardian reported that France, the Netherlands, and Sweden did not support the EFSA's assessment that glyphosate was

---

[69] U.S. GOV'T ACCOUNTABILITY OFFICE, GAO-15-38, FDA AND USDA SHOULD STRENGTHEN PESTICIDE RESIDUE MONITORING PROGRAMS AND FURTHER DISCLOSE MONITORING LIMITATIONS (2014), available at https://www.gao.gov/products/gao-15-38

[70] Gilliam, *supra* note 68.
[71]
[72]

harmless.[73] The paper quoted the Swedish Environmental Minister, Asa Romson, as stating "We won't take risks with glyphosate, and we don't think that the analysis done so far is good enough. We will propose that no decision is taken until further analysis has been done and the EFSA scientists have been more transparent about their considerations.[74]

118.     The Netherlands argued that relicensing should be placed on hold until after a separate evaluation of glyphosate's toxicity can be conducted.[75] Leading up to the vote Italy joined the other EU states in opposing licensing renewal, citing health concerns.

119.     On June 6, 2016, the Member States voted but failed to reach a qualified majority in favor or against the re-authorization of glyphosate.[76]

120.     On June 29, 2016, the EU Commission extended the European license for glyphosate for 18 months to allow the European Chemical Agency to rule on the safety of the chemical.

121.     On July 11, 2016, the EU voted in favor of a proposal to restrict the conditions of use of glyphosate in the EU, including a ban on common co-formulant POEA from all glyphosate- based herbicides, including Roundup.

---

[73] Arthur Neslen, *EU States rebel against plans to relicense weed killer glyphosate*, THE GUARDIAN, Mar. 4, 2016, available at https://www.theguardian.com/environment/2016/mar/04/eu-states-rebel-against-plans-to-relicense-weedkiller-glyphosate

[74] *Id.*

[75] Arthur Neslen, *Controversial chemical in Roundup weed killer escapes immediate ban*, THE GUARDIAN, June 29, 2016, available at https://www.theguardian.com/business/2016/jun/29/controversial-chemical-roundup-weedkiller-escapes-immediate-ban

[76] *Id.*

122. On November 13, 2017, after heated debate over whether it causes cancer, and in a very tight vote, the EU voted in favor of a limited (5-year) license for the use of glyphosate.[77]

### Russell M. Dallen Jr. Exposure to Roundup

123. Russell M. Dallen Jr., began using Roundup around 2010 at his residence home in Broward, Florida.

124. For over 10 years Russell M. Dallen Jr., would take care of his lawn and would at least twice per month spray Roundup products across his lawn to control weeds in his residence.

125. After years of exposure to Roundup various products, in December 2020, Russell M. Dallen Jr., was diagnosed with non-Hodking's lymphoma specifically Large B-cell Lymphoma, which less than a year later caused his death.

### V. FRAUDULENT CONCEALMENT

126. All applicable statutes of limitations have also been tolled by Monsanto's knowing and active fraudulent concealment and denial of the facts alleged herein through the time period relevant to this action.

127. Instead of disclosing critical safety information about Roundup and glyphosate, Monsanto has consistently and falsely represented the safety of its Roundup products.

128. Monsanto was under a continuous duty to disclose to consumer, users and other persons coming into contact with its products, including Plaintiff, accurate safety information concerning its products and the risks associated with the use of and/or exposure to Roundup and glyphosate.

---

[77]

129.    Instead, Monsanto knowingly, affirmatively, and actively concealed safety information concerning Roundup and glyphosate and the serious risks with the use of and/or exposure to its products.

130.    Based on the foregoing, Monsanto is estopped from relying on any statutes of limitations in defense of this action.

## COUNT I:
## STRICT LIABILITY (DESIGN DEFECT)

131.    Plaintiff incorporates by reference each and every allegation set forth above as if fully stated herein.

132.    Plaintiff brings this breach of warranty claim against Defendant Monsanto for defective design.

133.    Russell M. Dallen Jr. developed non-Hodgkin's lymphoma which caused him intensive pain, suffering, disability, and loss of his life as a result of using Monsanto's Roundup products.

134.    At the time Monsanto's Roundup products left its control, it was unreasonably dangerous in that it was a carcinogenic glyphosate-based formulation.

135.    At all times relevant to this litigation, Defendant Monsanto engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting Roundup products, which are defective and unreasonably dangerous to consumers and laborers using the products, including deceased Mr. Russell M. Dallen Jr., thereby placing Roundup products into the stream of commerce. These actions were under the ultimate control and supervision of Defendant Monsanto. At all times relevant to this litigation, Defendant Monsanto designed, researched, developed,

manufactured, produced, tested, assembled, labeled, advertised, promoted, marketed, sold, and distributed the Roundup products that Mr. Russell M. Dallen Jr. was exposed to, as described above.

136.    At all times relevant to this litigation, Defendant Monsanto's Roundup products were manufactured, designed, formulated and labeled in an unsafe, defective, and inherently dangerous manner that was dangerous for use by or exposure to the public, and, in particular, to Mr. Russell M. Dallen Jr.

137.    At all times relevant to this litigation, Defendant's Roundup products reached the intended consumers, handlers, and users or other persons coming into contact with these products in Florida and throughout the United States, including Russell M. Dallen Jr. and his family, without substantial change in their condition as designed, manufactured, sold, distributed, labeled, and marketed by Defendant.

138.    Defendant Monsanto's Roundup products, as researched, tested, developed, designed, formulated, licensed, manufactured, packaged, labeled, distributed, sold, and marketed by Defendant Monsanto were defective in design and formulation in that when they left the hands of the Defendant Monsanto's manufacturers and/or suppliers, they were unreasonably dangerous and dangerous to an extent beyond that which an ordinary consumer would contemplate.

139.    Defendant Monsanto's Roundup products, as researched, tested, developed, designed, formulated, licensed, manufactured, packaged, labeled, distributed, sold, and marketed by Defendant Monsanto were defective in design and formulation in that when they left the hands of Defendant Monsanto's manufacturers and/or suppliers, the

foreseeable risks exceeded the alleged benefits associated with their design and formulation.

140. At all times relevant to this action, Defendant Monsanto knew or had reason to know that its Roundup products were defective and were inherently dangerous and unsafe when used in the manner instructed and provided by Defendant Monsanto.

141. Therefore, at all times relevant to this litigation, Defendant Monsanto's Roundup products, as researched, tested, developed, designed, formulated, licensed, manufactured, packaged, labeled, distributed, sold and marketed by Defendant Monsanto were defective in design and formulation, in one or more of the following ways:

a) When placed in the stream of commerce, Defendant Monsanto's Roundup products were defective in design and formulation, and, consequently, dangerous to an extent beyond that which an ordinary consumer would contemplate;

b) When placed in the stream of commerce, Defendant Monsanto's Roundup products were unreasonably dangerous in that they were hazardous and posed a grave risk of cancer and other serious illnesses when used in a reasonably anticipated manner;

c) When placed in the stream of commerce, Defendant Monsanto's Roundup products contained unreasonably dangerous design defects and were not reasonably safe when used in a reasonably anticipated or intended manner;

d) Defendant Monsanto did not sufficiently test, investigate, or study its Roundup products and, specifically, the active ingredient glyphosate;

e) Exposure to Roundup and glyphosate-based formulations presents a risk of harmful side effects including without limitation causing non-Hodgkin's

lymphoma, that outweigh any potential utility stemming from the use of the herbicide;

f) Defendant Monsanto knew or should have known at the time of marketing its Roundup products that exposure to Roundup and specifically, its active ingredient glyphosate, could result in cancer and other severe illnesses, injuries and even causing death;

g) Defendant Monsanto did not conduct adequate post-marketing surveillance of its Roundup products; and/or

h) Defendant Monsanto could have employed safer alternative designs and formulations.

142. Russell M. Dallen Jr. was exposed to Defendant Monsanto's Roundup products as a homeowner regularly and consistently using those products around his lawn.

143. At all times relevant to this litigation, Russell M. Dallen Jr. was exposed to the use of Defendant Monsanto's Roundup products in an intended or reasonably foreseeable manner without knowledge of their dangerous characteristics.

144. Russell M. Dallen Jr. could not have reasonably discovered the defects and risks associated with Roundup or glyphosate-based formulations before or at the time of exposure.

145. The harm caused by Defendant Monsanto's Roundup products, (i.e. non-Hodgkin's lymphoma), far outweighed their benefit, getting rid of weeds, rendering Defendant Monsanto's products dangerous to an extent beyond that which an ordinary consumer would contemplate.

146.     Defendant Monsanto's Roundup products were and are more dangerous than alternative products and Defendant Monsanto could have designed its Roundup products to make them less dangerous. Indeed, at the time that Defendant Monsanto designed its Roundup products, the state of the industry's scientific knowledge was such that a less risky design or formulation was attainable.

147.     At the time Roundup products left Defendant Monsanto's control, there was a practical, technically feasible and safer alternative design that would have prevented the harm without substantially impairing the reasonably anticipated or intended function of Defendant Monsanto's herbicides.

148.     Therefore, as a result of the unreasonably dangerous condition of its Roundup products, Defendant Monsanto is strictly liable to Petitioner.

149.     The defects in Defendant Monsanto's Roundup products were substantial and contributing factors in causing Russell M. Dallen Jr's death, including his non-Hodgkin's lymphoma, and, but for Defendant Monsanto's misconduct and omissions, Russell M. Dallen Jr. would not have gotten sick with non-Hodgkin's lymphoma causing his death.

150.     Defendant Monsanto risked the lives of consumers and users of its products, including Russell M. Dallen Jr., with knowledge of the safety problems associated with Roundup and glyphosate-based formulations, and suppressed this knowledge from the general public.

151.     As a direct proximate result of Defendant Monsanto's wrongful acts and omissions, Russell M. Dallen Jr. suffered and passed away including without limitation injuries of a personal and pecuniary nature including, but not limited to hospital, medical, and related expenses; loss of income; disability and disfigurement; loss of normal life;

pain and suffering; risk of susceptibility and future injury and relapse; and physical and emotional trauma.

## COUNT II:
## STRICT LIABILITY (FAILURE TO WARN)

152.     Plaintiff incorporates by reference each and every allegation set forth above as if fully stated herein.

153.     Plaintiff brings this breach of warranty claim against Defendant Monsanto for failure to warn.

154.     Russell M. Dallen Jr. developed non-Hodgkin's lymphoma which caused him inter alia pain, suffering, disability, and death as a result of using Monsanto's Roundup products.

155.     At the time Monsanto's Roundup products left its control, it was unreasonably dangerous in that it was a carcinogenic glyphosate-based formulation.

156.     At all times relevant to this litigation, Defendant Monsanto engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, promoting, and applying Roundup products, which are defective and unreasonably dangerous to consumers, including Russell M. Dallen Jr., because they do not contain adequate warnings or instructions concerning the dangerous characteristics of Roundup and specifically, the active ingredient glyphosate. These actions were under the ultimate control and supervision of Defendant Monsanto.

157.     Defendant Monsanto researched, developed, designed, tested, manufactured, inspected, labeled, distributed, marketed, promoted, sold, and otherwise released into the stream of commerce its Roundup products, and in the course of same, directly advertised or marketed the products to consumers and end users, including Russell M. Dallen Jr.,

and persons responsible for consumers (such as employers), and therefore had a duty to warn of the risks associated with the use of Roundup and glyphosate-based formulations.

158.     At all times relevant to this litigation, Defendant Monsanto had a duty to properly test, develop, design, manufacture, inspect, package, label, market, promote, sell, distribute, maintain supply, provide proper warnings, and take such steps as necessary to ensure that Roundup products did not cause users and consumers to suffer from unreasonable and dangerous risks. Defendant Monsanto had a continuing duty to warn Russell M. Dallen Jr. of the dangers associated with Roundup use and exposure. Defendant Monsanto, as manufacturer, seller, or distributor of chemical herbicides is held to the knowledge of an expert in the field.

159.     At all times relevant to this litigation, Defendant Monsanto failed to investigate, study, test, or promote the safety or to minimize the dangers to users and consumers of this product and to those who would foreseeably use or be harmed and by Roundup, including Russell M. Dallen Jr.

160.     Despite the fact that Defendant Monsanto knew or should have known that Roundup posed a grave risk of harm, it failed to exercise reasonable care to warn of the dangerous risks associated with use and exposure. The dangerous propensities of its products and the carcinogenic characteristics of glyphosate, as described above, were known to Defendant Monsanto, or scientifically knowable to Defendant Monsanto through appropriate research and testing by known methods, at the time it distributed, supplied or sold the product, and not known to end users and consumers, such as deceased Russell M. Dallen Jr.

161.     Defendant Monsanto knew or should have known that these products created significant risks of serious bodily harm to consumers, as alleged herein, and Defendant Monsanto failed to adequately warn consumers and reasonably foreseeable users of the risks of exposure to its products. Defendant Monsanto has wrongfully concealed information concerning the dangerous nature of Roundup and its active ingredient glyphosate, and further made false and/or misleading statements concerning the safety of Roundup and glyphosate.

162.     At all times relevant to this litigation, Defendant Monsanto's Roundup products reached the intended consumers, handlers, and users or other persons coming into contact with these products in Florida and throughout the United States, including Russell M. Dallen Jr., without substantial change in their condition as designed, manufactured, sold, distributed, labeled, marketed and sprayed/applied by Defendant Monsanto.

163.     Russell M. Dallen Jr. was exposed to Roundup products, as described above, without knowledge of their dangerous characteristics.

164.     At all times relevant to this litigation, Russell M. Dallen Jr. was exposed to the use of Defendant Monsanto's Roundup products in their intended or reasonably foreseeable manner without knowledge of their dangerous characteristics.

165.     Russell M. Dallen Jr. could not have reasonably discovered the defects and risks associated with Roundup or glyphosate-based formulations prior to or at the time of Russell M. Dallen Jr.'s exposure due to this failure to warn. Russell M. Dallen Jr. relied upon the skill, superior knowledge, and judgment of Defendant Monsanto.

166.     Defendant Monsanto knew or should have known that the minimal warnings disseminated with or accompanying the application of Roundup products were

inadequate, but they failed to communicate adequate information on the dangers and safe use/exposure and failed to communicate warnings and instructions that were appropriate and adequate to render the products safe for their ordinary, intended and reasonably foreseeable uses, including agricultural and horticultural applications.

167.      The information that Defendant Monsanto did provide or communicate failed to contain relevant warnings, hazards, and precautions that would have enabled those exposed, such as Russell M. Dallen Jr., to utilize the products safely and with adequate protection.

168.      Instead, Defendant Monsanto disseminated information that was inaccurate, false, and misleading and which failed to communicate accurately or adequately the comparative severity, duration, and extent of the risk of injuries with use of and/or exposure to Roundup and glyphosate; continued to aggressively promote the efficacy of its products, even after it knew or should have known of the unreasonable risks from use or exposure; and concealed, downplayed, or otherwise suppressed, through aggressive marketing and promotion, any information or research about the risks and dangers of exposure to Roundup and glyphosate.

169.      To this day, Defendant Monsanto has failed to adequately and accurately warn of the true risks of Russell M. Dallen Jr. injuries associated with the use of and exposure to Roundup and its active ingredient glyphosate, a probable carcinogen that led to Russell M. Dallen Jr's death.

170.      As a result of their inadequate warnings, Roundup products were defective and unreasonably dangerous when they left the possession and/or control of Defendant

Monsanto, were distributed by Defendant Monsanto and when Russell M. Dallen Jr. became exposed.

171.    Defendant Monsanto is liable to Russell M. Dallen Jr. and his personal representative for injuries caused by its failure, as described above, to provide adequate warnings or other clinically relevant information and data regarding the appropriate use of their products and the risks associated with the use of or exposure to Roundup, glyphosate and glyphosate-based formulations.

172.    The defects in these Roundup products were substantial and contributing factors in causing Russell M. Dallen Jr.'s injuries and death, and, but for Defendant Monsanto's misconduct and omissions, Russell M. Dallen Jr.'s would not had developed non-Hodgkin's Lymphoma causing his death.

173.    Had Defendant Monsanto provided adequate warnings and instructions and properly disclosed and disseminated the risks associated with Roundup products and application, Russell M. Dallen Jr could have avoided the risk of developing injuries as alleged herein.

174.    As a direct and proximate result of Defendant Monsanto placing its defective Roundup into the stream of commerce without appropriate warnings as further set forth above, Russell M. Dallen Jr. suffered and died, and his family continues to suffer pecuniary loss including without limitation injuries of a personal and pecuniary nature including, but not limited to hospital, medical, and related expenses; loss of income; loss of normal life; pain and suffering; risk of susceptibility and future injury and relapse; and physical and emotional trauma.

## COUNT III:
## NEGLIGENCE

175. Plaintiff incorporates by reference each and every allegation set forth above as if fully stated herein.

176. Russell M. Dallen Jr. developed non-Hodgkin's lymphoma which caused him inter alia pain, suffering, disability, loss of normal life and at the end loss of his life as a result of using Monsanto's Roundup products.

177. Defendant Monsanto, directly or indirectly, caused Roundup products to be sold, distributed, packaged, labeled, marketed, promoted, and/or used by Russell M. Dallen Jr.

178. At all times relevant to this litigation, Defendant Monsanto knew or, in the exercise of reasonable care, should have known of the hazards and dangers of Roundup and specifically, the carcinogenic properties of the chemical glyphosate.

179. Accordingly, at all times relevant, Monsanto knew or, in the exercise of reasonable care, should have known that use of or exposure to its Roundup products could cause or be associated with Russell M. Dallen Jr.'s injuries and thus created a dangerous and unreasonable risk of injury to the users of these products, including Russell M. Dallen Jr.

180. Defendant Monsanto also knew or, in the exercise of reasonable care, should have known that users and consumers of Roundup were unaware of the risks and the magnitude of the risks associated with use of and/or exposure to Roundup and glyphosate-based formulations.

181. It was the duty of the Defendant, Monsanto, before and at the time of the occurrences, to use ordinary care for the safety of Russell M. Dallen Jr.

182. Notwithstanding said duty, the Defendant, Monsanto, committed one or more of the following acts and/or omissions:

a) Promoted, developed, designed, sold, and/or distributed its Roundup products without thorough and adequate pre-and post-market testing;

b) Promoted, developed, designed, sold, and/or distributed Roundup while concealing and failing to disclose the results of trials, tests, and studies of exposure to glyphosate, and, consequently, the risk of serious harm associated with human use of and exposure to Roundup;

c) Failed to undertake sufficient studies and conduct necessary tests to determine whether or not Roundup products and glyphosate-based formulations were safe for their intended use in agriculture and horticulture;

d) Failed to use reasonable and prudent care in the design, research, manufacture, and development of Roundup products so as to avoid the risk of serious harm associated with the prevalent use of Roundup/glyphosate as an herbicide;

e) Failed to design and manufacture Roundup products so as to ensure they were at least as safe and effective as other herbicides on the market;

f) Failed to provide adequate instructions, guidelines, and safety precautions to those persons who Defendant Monsanto could reasonably foresee would use and be exposed to its Roundup products;

g) Failed to disclose to Russell M. Dallen Jr., users/consumers, and the general public that use of and exposure to Roundup presented severe risks of cancer and other grave illnesses;

h) Failed to warn Russell M. Dallen Jr., consumers, and the general public that the product's risk of harm was unreasonable and that there were safer and effective alternative herbicides available to Russell M. Dallen Jr. and other consumers;

i) Systematically suppressed or downplayed contrary evidence about the risks, incidence, and prevalence of the side effects of Roundup and glyphosate-based formulations;

j) Represented that its Roundup products were safe for their intended use when, in fact, Defendant Monsanto knew or should have known that the products were not safe for their intended purpose;

k) Declined to make or propose any changes to Roundup products' labeling or other promotional materials that would alert the consumers and the general public of the risks of Roundup and glyphosate;

l) Advertised, marketed, and recommended the use of the Roundup products, while concealing and failing to disclose or warn of the dangers known by Defendant Monsanto to be associated with or caused by the use of or exposure to Roundup and glyphosate;

m) Continued to disseminate information to its consumers, which indicate or imply that Defendant Monsanto's Roundup products are not unsafe for use in the agricultural and horticultural industries; and/or

n) Continued the manufacture and sale of its products with the knowledge that the products were unreasonably unsafe and dangerous.

183. As a result of one or more of the above acts and/or omissions, Russell M. Dallen Jr. developed non-Hodgkin's lymphoma which caused his death.

184. Defendant Monsanto knew and/or should have known that it was foreseeable that consumers, such as Russell M. Dallen Jr., would suffer injuries, including without

limitation non-Hodgkin's lymphoma, as a result of Defendant Monsanto's failure to exercise ordinary care.

185.     Russell M. Dallen Jr. did not know the nature and extent of the injuries that could result from the intended use of and/or exposure to Roundup or its active ingredient glyphosate.

186.     Defendant Monsanto's negligence was the proximate cause of the injuries, harm, economic losses, and death of Russell M. Dallen Jr. his family suffered and continues to suffer, as described herein.

187.     As a direct and proximate result of Defendant Monsanto's acts and/or omissions, Russell M. Dallen Jr. suffered and his family continues to suffer pecuniary loss including without limitation injuries of a personal and pecuniary nature including, but not limited to hospital, medical, and related expenses; loss of income; disability; loss of normal life; pain and suffering; risk of susceptibility and future injury and relapse; and physical and emotional trauma.

### COUNT IV:
### NEGLIGENT MISREPRESENTATION AND/OR FRAUD

188.     Plaintiff repeats, reiterates, and re-alleges each and every allegation of the complaint above as if fully set forth herein.

189.     Defendant is the manufacturer, designer, distributor, seller or supplier of Roundup and, while engaged in the course of such business, made representations to Russell M. Dallen Jr. regarding the character and/or quality of, for guidance in Decedent Russell M. Dallen Jr.'s decision to select Roundup for use.

190.     Defendant had a duty to disclose material information about serious health effects to consumers such as Russell M. Dallen Jr. Defendant intentionally failed to disclose this

information for the purpose of inducing consumers, including Russell M. Dallen Jr., to purchase Defendant's dangerous products.

191.    Specifically, Defendant's advertisements regarding Roundup made material misrepresentations to the effect that Roundup was safe, which misrepresentations Defendant knew to be false, for the purpose of fraudulently inducing consumers, such as Russell M. Dallen Jr., to purchase said product. Defendant further misrepresented that its products were just as safe, and just as effective or more effective, than other weed control products on the market.

192.    Defendant's representations regarding the character or quality of Roundup were untrue. In addition, Defendant fraudulently suppressed material information regarding the safety of Roundup, including the dangers known by Defendant to be associated with or caused by the use of or exposure to Roundup and glyphosate.

193.    Defendant had actual knowledge based on the results of trials, tests, and studies of exposure to glyphosate, of the risk of serious harm associated with human use of and exposure to Roundup.

194.    Defendant negligently and or intentionally misrepresented or omitted this information in its product labeling, promotions and advertisements and instead labeled, promoted and advertised its products as safe and effective in order to avoid losses and sustain profits in its sales to consumers.

195.    In supplying the false information, Defendant failed to exercise reasonable care or competence in obtaining or communicating information to their intended recipients, including Russell M. Dallen Jr.

196.     Russell M. Dallen Jr. reasonably relied to his detriment upon Defendant's misrepresentations and/or omissions in its labeling, advertisements, and promotions concerning the serious risks posed by the product. Russell M. Dallen Jr. reasonably relied upon Defendant s representations that Roundup was safe for use and that Defendant's labeling, advertisements and promotions fully described all known risks of the product.

197.     Defendant is estopped from relying on any statute of limitations defenses because Defendant actively concealed the defects from consumers, such as the deceased Russell M. Dallen Jr. Instead of revealing the defects, Defendant continued to represent its product as safe for its intended use.

198.     As a direct and proximate result of Russell M. Dallen Jr. use of Roundup as manufactured, designed, sold, supplied, and introduced into the stream of commerce by Defendant, Russell M. Dallen Jr. suffered personal injury, non-economic damages, and death. His family will continue to suffer such harm and damages in the future.

## COUNT V:
## WRONGFUL DEATH (WRONGFUL ACTS)

199.     Plaintiff incorporates by reference each and every allegation set forth above as if fully stated herein.

200.     This is an action for wrongful death of Russell M. Dallen Jr. on September 17, 2021, who died of a large B-cell Lymphoma caused by Defendant Monsanto.

201.     Defendant and its employees, agents and representatives caused the death of Russell M. Dallen Jr. by failing to implement taking action(s) to protect Dallen and others after discovering the lethal component parts of Roundup they discovered through testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting Roundup products. Defendant(s) disregarded through wrongful actions and/or proper

actions relevant to the death of Russell M. Dallen Jr. and continues up to today conducting this death threatening wrongful behavior.

202.  The wrongful behavior of the Defendant and its employees, agents, and representatives, as set forth above, were the direct and proximate cause of the serious illness contracted by Russell M. Dallen Jr. (non-Hodgkin's large B-cell Lymphoma) and proximately resulted in his death.

203.  Plaintiff Jeanette Garavito Dallen as the Personal Representative of the Estate of Russell M. Dallen Jr. on behalf of the Estate and Survivors seeks damages arising from Defendant's wrongful acts and failure to protect the life and health of Russell M. Dallen Jr.

204.  Plaintiff Jeanette Garavito Dallen as the Personal Representative of the Estate of Russell M. Dallen Jr. on behalf of the Estate and Survivors, including herself as the wife of Russell M. Dallen Jr. and Russell M. Dallen III. the son of Russell M. Dallen Jr. and Jeanette Garavito Dallen, born on June 22, 2009 have sustained the following damages:

   a) Loss of support and services of husband.
   b) Mental pain and suffering from date of diagnosis, to the passing away of husband and the lasting pain of losing a loved one.

205.  The Estate of Russell M. Dallen Jr. has sustained the following damages:
   a) Loss of earnings of Russell M. Dallen Jr. from the date of his diagnosis, less loss support of his survivors excluding contributions in kind with interest.
   b) Loss of perspective net estate accumulations;

c) Funeral and burial expenses incurred as a result of the death of Russell M. Dallen Jr. that have become a charge against her estate or that were paid on her behalf.

206.     Each and every other survivor has sustained the following damages:

a) Loss of support and services from a family member and;

b) Mental pain and suffering from the date of the diagnosis and continuing for the remainder of their life.

## **PRAYER FOR RELIEF**

WHEREFORE: Plaintiff, requests judgment against Defendant for damages for all injuries and losses recoverable, but not limited to:

a) Awarding compensatory damages in excess of the jurisdictional amount, including, but not limited to pain, suffering, emotional distress, wrongful death and other non-economic damages in an amount to be determined at trial of this action;

b) Awarding compensatory damages to Plaintiff for past and future damages, including, but not limited to, Plaintiff's pain and suffering and for severe and permanent personal injuries sustained by the Plaintiff including health care costs and economic loss;

c) Awarding economic damages in the form of medical expenses, out of pocket expenses, lost earnings and other economic damages in an amount to be determine at trial of this action;

d) Award all damages allowable pursuant to the Wrongful Death Act, Florida Statute §§ 768.16-768.27, specifically §768.21.

e) Pre-judgment interest;

f) Post-judgment interest;

g)  Awarding Plaintiff reasonable attorneys' fees;

h)  Awarding Plaintiff the costs of these proceedings; and

i)  Such other and further relief as this Court deems just.

## DEMAND FOR JURY TRIAL

Plaintiff demands trial by jury of all claims so

triable. Dated: March 18, 2022.

Respectfully Submitted,

**SPITTLER & ASSOCIATES, P.A.**
**/s/John J. Spittler, Jr.**
JOHN J. SPITTLER, JR.
FBN: 194894
1865 Brickell Avenue, TH-5
Miami, Florida 33129
Telephone: (305) 860-9991
E-Mail: jjs@spittlerlaw.com

# Exhibit "A"

**STATE OF FLORIDA**

THIS DOCUMENT HAS A LIGHT BACKGROUND ON TRUE WATERMARKED PAPER - HOLD TO LIGHT TO VERIFY FLORIDA WATERMARK

## BUREAU of VITAL STATISTICS

# CERTIFICATION OF DEATH

**STATE FILE NUMBER:** 2021195749      **DATE ISSUED:** SEPTEMBER 30, 2021

**DECEDENT INFORMATION**      **DATE FILED:** SEPTEMBER 30, 2021

NAME: RUSSELL M DALLEN II

DATE OF DEATH: SEPTEMBER 17, 2021    SEX: MALE    SSN: 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    AGE: 058 YEARS
DATE OF BIRTH: JANUARY 20, 1963    BIRTHPLACE: BILOXI, MISSISSIPPI, UNITED STATES
PLACE OF DEATH: INPATIENT
FACILITY NAME OR STREET ADDRESS: UNIVERSITY OF MIAMI HOSPITAL
LOCATION OF DEATH: MIAMI, MIAMI-DADE COUNTY, 33136
RESIDENCE: 1301 SW 75TH AVENUE, PLANTATION, FLORIDA 33317, UNITED STATES    COUNTY: BROWARD
OCCUPATION, INDUSTRY: CONSULTANT, FINANCE
EDUCATION: DOCTORATE OR PROFESSIONAL DEGREE    EVER IN U.S. ARMED FORCES? NO
HISPANIC OR HAITIAN ORIGIN? NO, NOT OF HISPANIC/HAITIAN ORIGIN
RACE: WHITE

## SURVIVING SPOUSE / PARENT NAME INFORMATION
**(NAME PRIOR TO FIRST MARRIAGE, IF APPLICABLE)**

MARITAL STATUS: MARRIED
SURVIVING SPOUSE NAME: JEANETTE GARAVITO
FATHER'S/PARENT'S NAME: RUSSELL DALLEN
MOTHER'S/PARENT'S NAME: FAYE ANNETTE WARNER

## INFORMANT, FUNERAL FACILITY AND PLACE OF DISPOSITION INFORMATION

INFORMANT'S NAME: JEANETTE DALLEN
RELATIONSHIP TO DECEDENT: WIFE
INFORMANT'S ADDRESS: 1301 SW 75TH AVENUE, PLANTATION, FLORIDA 33317, UNITED STATES
FUNERAL DIRECTOR/LICENSE NUMBER: LAWRENCE M SCHUVAL, F024258
FUNERAL FACILITY: EDEN FUNERAL SERVICES LLC F328597
     2450 W SAMPLE RD 2, POMPANO BEACH, FLORIDA 33073
METHOD OF DISPOSITION: BURIAL
PLACE OF DISPOSITION: TEMPLE BETH EL MEMORIAL GARDENS
     DAVIE, FLORIDA

## CERTIFIER INFORMATION

TYPE OF CERTIFIER: CERTIFYING PHYSICIAN    MEDICAL EXAMINER CASE NUMBER: NOT APPLICABLE
TIME OF DEATH (24 HOUR): 0128    DATE CERTIFIED: SEPTEMBER 29, 2021
CERTIFIER'S NAME: LAZAROS JOHN LEKAKIS
CERTIFIER'S LICENSE NUMBER: ME108303
NAME OF ATTENDING PRACTITIONER (IF OTHER THAN CERTIFIER): NOT APPLICABLE

## CAUSE OF DEATH AND INJURY INFORMATION

MANNER OF DEATH: NATURAL
CAUSE OF DEATH - PART I - AND APPROXIMATE INTERVAL: ONSET TO DEATH
a. DIFFUSE LARGE B CELL LYMPHOMA      | 9 MONTHS

b.

c.

d.

PART II - OTHER SIGNIFICANT CONDITIONS CONTRIBUTING TO DEATH BUT NOT RESULTING IN THE UNDERLYING CAUSE GIVEN IN PART I:
STREPTOCOCCAL BACTEREMIA

AUTOPSY PERFORMED? NO    AUTOPSY FINDINGS AVAILABLE TO COMPLETE CAUSE OF DEATH?
DATE OF SURGERY:    DID TOBACCO USE CONTRIBUTE TO DEATH? NO
REASON FOR SURGERY:
PREGNANCY INFORMATION: NOT APPLICABLE
DATE OF INJURY: NOT APPLICABLE    TIME OF INJURY (24 HOUR):    INJURY AT WORK?
LOCATION OF INJURY:
DESCRIBE HOW INJURY OCCURRED:

PLACE OF INJURY:
IF TRANSPORTATION INJURY, STATUS OF DECEDENT:    TYPE OF VEHICLE:

_[signature]_    ,STATE REGISTRAR

REQ: 2023214218

THE ABOVE SIGNATURE CERTIFIES THAT THIS IS A TRUE AND CORRECT COPY OF THE OFFICIAL RECORD ON FILE IN THIS OFFICE
**WARNING:** - THIS DOCUMENT IS PRINTED OR PHOTOCOPIED ON SECURITY PAPER WITH WATERMARKS OF THE GREAT SEAL OF THE STATE OF FLORIDA. DO NOT ACCEPT WITHOUT VERIFYING THE PRESENCE OF THE WATER-MARKS. THE DOCUMENT FACE CONTAINS A MULTICOLORED BACKGROUND, GOLD EMBOSSED SEAL AND THERMOCHROMIC FL. THE BACK CONTAINS SPECIAL LINES WITH TEXT. THIS DOCUMENT WILL NOT PRODUCE A COLOR COPY.

DH FORM 1847 (03-13)


CERTIFICATION OF VITAL RECORD


Florida HEALTH

* 5 8 9 1 6 8 5 0 *



FedEx

ORIGIN ID:JDMA (305) 860-9992
JOHN J. SPITTLER JR., ESQ
1865 BRICKELL AVENUE
TH5
MIAMI, FL 33129
UNITED STATES US

SHIP DATE: 18MAR22
ACTWGT: 0.50 LB
CAD: 104054602/INET4460

BILL SENDER

TO REGISTERED AGENT CORPORATION
MONSANTO
1201 HAYS ST

TALLAHASSEE FL 32301
(850) 521-1000
INV:
PO: REF:
DEPT:

56DJ5/EB02/FE4A

FedEx Ship Manager - Print Your Label(s)

FedEx Express

E

TRK# 0201 7763 3883 5930

WED - 23 MAR 4:30P
EXPRESS SAVER

4Z QTALQ

32301
FL-US TLH

3/18/22, 1:39 PM

0323 WED 03/23 09:04 SM-1D3223727
MONSANTO
1201 HAYS ST
TALLAHASSEE FL
136-4010
32301-2699-99 G
ETP:4
PD:6P:100:Y
1195284262750003230100776338836930

Insert shipping document here.

JS 44 (Rev. 10/20) FLSD Revised 02/18/2021

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)* NOTICE: Attorneys MUST Indicate All Re-filed Cases Below.

## I. (a) PLAINTIFFS

Jeanette Garavito Dallen as PR of the Estate of L

## DEFENDANTS

Monsanto Company

**(b)** County of Residence of First Listed Plaintiff  Broward County, FL
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*

John J. Spittler, Jr., Spittler & Associates, P.A., 1865 Brickell Avenue, 

Attorneys *(If Known)*

Anthony N. Upshaw, McDERMOTT WILL & EMERY, LLP, 333 S

**(d)** Check County Where Action Arose:  ☐ MIAMI- DADE  ☐ MONROE  ☒ BROWARD  ☐ PALM BEACH  ☐ MARTIN  ☐ ST. LUCIE  ☐ INDIAN RIVER  ☐ OKEECHOBEE  ☐ HIGHLANDS

## II. BASIS OF JURISDICTION  *(Place an "X" in One Box Only)*

☐ 1  U.S. Government Plaintiff

☐ 2  U.S. Government Defendant

☐ 3  Federal Question
*(U.S. Government Not a Party)*

☒ 4  Diversity
*(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff)*
*(For Diversity Cases Only)* and One Box for Defendant)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☒ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*
Click here for: Nature of Suit Code Descriptions

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☒ 365 Personal Injury - Product Liability | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729 (a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 367 Health Care/ | | | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & | Pharmaceutical Personal Injury | | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | Slander | Product Liability | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' Liability | ☐ 368 Asbestos Personal | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted | ☐ 340 Marine | Injury Product Liability | | ☐ 835 Patent – Abbreviated New Drug Application | ☐ 460 Deportation |
| Student Loans | ☐ 345 Marine Product Liability | **PERSONAL PROPERTY** | **LABOR** | ☐ 840 Trademark ☐ 880 Defend Trade Secrets Act of 2016 | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| (Excl. Veterans) | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | ☐ 710 Fair Labor Standards Act | | ☐ 480 Consumer Credit (15 USC 1681 or 1692) |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 355 Motor Vehicle Product Liability | ☐ 371 Truth in Lending ☐ 380 Other Personal | ☐ 720 Labor/Mgmt. Relations | **SOCIAL SECURITY** | ☐ 485 Telephone Consumer Protection Act (TCPA) |
| ☐ 160 Stockholders' Suits | ☐ 360 Other Personal Injury | Property Damage | ☐ 740 Railway Labor Act | ☐ 861 HIA (1395ff) ☐ 862 Black Lung (923) | ☐ 490 Cable/Sat TV |
| ☐ 190 Other Contract | ☐ 362 Personal Injury - Med. Malpractice | ☐ 385 Property Damage Product Liability | ☐ 751 Family and Medical Leave Act | ☐ 863 DIWC/DIWW (405(g)) ☐ 864 SSID Title XVI | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 195 Contract Product Liability | | | ☐ 790 Other Labor Litigation | ☐ 865 RSI (405(g)) | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | | | ☐ 791 Empl. Ret. Inc. Security Act | | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | | | ☐ 893 Environmental Matters |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | | **FEDERAL TAX SUITS** | ☐ 895 Freedom of Information Act |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 896 Arbitration |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate Sentence | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | **Other:** | | | ☐ 950 Constitutionality of State Statutes |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 530 General | **IMMIGRATION** | | |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | ☐ 535 Death Penalty ☐ 540 Mandamus & Other | ☐ 462 Naturalization Application | | |
| | ☐ 448 Education | ☐ 550 Civil Rights ☐ 555 Prison Condition ☐ 560 Civil Detainee – Conditions of Confinement | ☐ 465 Other Immigration Actions | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

☐ 1  Original Proceeding

☒ 2  Removed from State Court

☐ 3  Re-filed **(See VI below)**

☐ 4  Reinstated or Reopened

☐ 5  Transferred from another district *(specify)*

☐ 6  Multidistrict Litigation Transfer

☐ 7  Appeal to District Judge from Magistrate Judgment

☐ 8  Multidistrict Litigation – Direct File

☐ 9  Remanded from Appellate Court

## VI. RELATED/ RE-FILED CASE(S)

(See instructions):  a) Re-filed Case ☐ YES ☒ NO  b) Related Cases ☐ YES ☐ NO

JUDGE:  DOCKET NUMBER:

## VII. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing and Write a Brief Statement of Cause *(Do not cite jurisdictional statutes unless diversity)*:
28 U.S.C. sections 1332, 1441 and 1446 - Product liability/personal injury for exposure to herbicide
LENGTH OF TRIAL via _____ days estimated (for both sides to try entire case)

## VIII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:  ☒ Yes  ☐ No

ABOVE INFORMATION IS TRUE & CORRECT TO THE BEST OF MY KNOWLEDGE

DATE  04/12/2022

SIGNATURE OF ATTORNEY OF RECORD  /s/ Anthony N. Upshaw

FOR OFFICE USE ONLY : RECEIPT #          AMOUNT          IFP          JUDGE          MAG JUDGE