# U.S. District Court
## District of New Jersey [LIVE] (Trenton)
## CIVIL DOCKET FOR CASE #: 3:22-cv-01358-GC-LHG

SAMRA et al v. MONSANTO COMPANY
Assigned to: Judge Georgette Castner
Referred to: Magistrate Judge Lois H. Goodman
Cause: 28:1332 Diversity-Product Liability

Date Filed: 03/14/2022
Jury Demand: Plaintiff
Nature of Suit: 365 Personal Inj. Prod. Liability
Jurisdiction: Diversity

**Plaintiff**

**KIMBERLY SAMRA**                    represented by   **LUKE JOSEPH SOSTARECZ**
                                                        RUSSO LAW OFFICES LLC
                                                        633 BELVIDERE ROAD
                                                        PHILLIPSBURG, NJ 08865
                                                        908-454-0806
                                                        Email: lukes@russolawllc.com
                                                        *ATTORNEY TO BE NOTICED*

**Plaintiff**

**MICHAEL SAMRA**                     represented by   **LUKE JOSEPH SOSTARECZ**
                                                        (See above for address)
                                                        *ATTORNEY TO BE NOTICED*

V.

**Defendant**

**MONSANTO COMPANY**

| Date Filed | # | Docket Text |
|------------|---|-------------|
| 03/14/2022 | 1 | COMPLAINT against MONSANTO COMPANY ( Filing and Admin fee $ 402 receipt number ANJDC-13253194) with JURY DEMAND, filed by MICHAEL SAMRA, KIMBERLY SAMRA. (Attachments: # 1 Exhibit Exhibit A)(SOSTARECZ, LUKE) (Entered: 03/14/2022) |
| 03/14/2022 |   | Judge Michael A. Shipp and Magistrate Judge Lois H. Goodman added. (jal, ) (Entered: 03/14/2022) |
| 03/14/2022 |   | CLERK'S QUALITY CONTROL MESSAGE - The case you electronically filed did not include a Civil Cover Sheet (JS-44), which is required to be submitted along with the initial pleading, as indicated in the Attorney Case Opening Guide. Please complete and file a Civil Cover Sheet using the event Exhibit (to Document) found under Civil/Other Filings/Other Documents. Please refer to the Attorney Case Opening Guide for processing electronically filed cases. (jal, ) (Entered: 03/14/2022) |
| 03/14/2022 | 2 | SUMMONS ISSUED as to MONSANTO COMPANY. Attached is the official court Summons, please fill out Defendant and Plaintiffs attorney information and serve. (jal, ) |

| | | (Entered: 03/14/2022) |
|---|---|---|
| 04/11/2022 | 3 | TEXT ORDER REASSIGNING CASE. Case reassigned to Judge Georgette Castner for all further proceedings. Judge Michael A. Shipp no longer assigned to case. So Ordered by Chief Judge Freda L. Wolfson on 4/11/2022. (jdg, ) (Entered: 04/11/2022) |

---

| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 05/23/2022 09:55:46 | | | |
| **PACER Login:** | sh0019sh | **Client Code:** | 31943.356965 rhb |
| **Description:** | Docket Report | **Search Criteria:** | 3:22-cv-01358-GC-LHG Start date: 1/1/1980 End date: 5/23/2022 |
| **Billable Pages:** | 2 | **Cost:** | 0.20 |



# Notice of Service of Process

**null / ALL**
**Transmittal Number: 24942527**
**Date Processed: 05/19/2022**

| | |
|---|---|
| **Primary Contact:** | Anne Troupis (Monsanto)<br>Bayer U.S. LLC<br>800 N Lindbergh Blvd<br>Saint Louis, MO 63167-1000 |

| | |
|---|---|
| **Entity:** | Monsanto Company<br>Entity ID Number  2282193 |
| **Entity Served:** | Monsanto Company |
| **Title of Action:** | Samra, Michael  vs. Monsanto Company |
| **Matter Name/ID:** | Samra, Michael  vs. Monsanto Company (12333069) |
| **Document(s) Type:** | Summons/Complaint |
| **Nature of Action:** | Product Liability |
| **Court/Agency:** | U.S. District Court, NJ |
| **Case/Reference No:** | 3:22-cv-01358 |
| **Jurisdiction Served:** | New Jersey |
| **Date Served on CSC:** | 05/17/2022 |
| **Answer or Appearance Due:** | 30 Days |
| **Originally Served On:** | CSC |
| **How Served:** | Certified Mail |
| Sender Information: | Russo Law Offices, LLC<br>908-454-0806 |

Information contained on this transmittal form is for record keeping, notification and forwarding the attached document(s). It does not constitute a legal opinion. The recipient is responsible for interpreting the documents and taking appropriate action.

**To avoid potential delay, please do not send your response to CSC**

251 Little Falls Drive, Wilmington, Delaware 19808-1674   (888) 690-2882   |   sop@cscglobal.com

AO 398 (Rev. 01/09) Notice of a Lawsuit and Request to Waive Service of a Summons

# UNITED STATES DISTRICT COURT
### for the

MICHAEL & KIMBERLY SAMRA
_____
Plaintiff
v.
MONSANTO COMPANY
_____
Defendant

)
)
)
)
)

Civil Action No. 3:22-cv-01358

## NOTICE OF A LAWSUIT AND REQUEST TO WAIVE SERVICE OF A SUMMONS

To: Monsanto Company
_____
*(Name of the defendant or - if the defendant is a corporation, partnership, or association - an officer or agent authorized to receive service)*

**Why are you getting this?**

A lawsuit has been filed against you, or the entity you represent, in this court under the number shown above.
A copy of the complaint is attached.

This is not a summons, or an official notice from the court. It is a request that, to avoid expenses, you waive formal
service of a summons by signing and returning the enclosed waiver. To avoid these expenses, you must return the signed
waiver within 30 days *(give at least 30 days, or at least 60 days if the defendant is outside any judicial district of the United States)*
from the date shown below, which is the date this notice was sent. Two copies of the waiver form are enclosed, along with
a stamped, self-addressed envelope or other prepaid means for returning one copy. You may keep the other copy.

**What happens next?**

If you return the signed waiver, I will file it with the court. The action will then proceed as if you had been served
on the date the waiver is filed, but no summons will be served on you and you will have 60 days from the date this notice
is sent (see the date below) to answer the complaint (or 90 days if this notice is sent to you outside any judicial district of
the United States).

If you do not return the signed waiver within the time indicated, I will arrange to have the summons and complaint
served on you. And I will ask the court to require you, or the entity you represent, to pay the expenses of making service.

Please read the enclosed statement about the duty to avoid unnecessary expenses.

I certify that this request is being sent to you on the date below.

Date: 3/14/22
_____

_____
*Signature of the attorney or unrepresented party*

Luke Sostarecz
_____
*Printed name*

433 Belvidere Rd. Phillipsburg
_____
*Address*

lukes@rusolawllc.com
_____
*E-mail address*

908-454-0806
_____
*Telephone number*

AO 399 (01/09) Waiver of the Service of Summons

# UNITED STATES DISTRICT COURT
### for the

MICHAEL & KIMBERLY GAMRA
_____
_Plaintiff_

MONSANTO COMPANY
_____
_Defendant_

)
)
)
)
)

Civil Action No. 3:22 - CV - 01358

## WAIVER OF THE SERVICE OF SUMMONS

To: LURE SOSTARETZ
_____
_(Name of the plaintiff's attorney or unrepresented plaintiff)_

I have received your request to waive service of a summons in this action along with a copy of the complaint, two copies of this waiver form, and a prepaid means of returning one signed copy of the form to you.

I, or the entity I represent, agree to save the expense of serving a summons and complaint in this case.

I understand that I, or the entity I represent, will keep all defenses or objections to the lawsuit, the court's jurisdiction, and the venue of the action, but that I waive any objections to the absence of a summons or of service.

I also understand that I, or the entity I represent, must file and serve an answer or a motion under Rule 12 within 60 days from _____, the date when this request was sent (or 90 days if it was sent outside the United States). If I fail to do so, a default judgment will be entered against me or the entity I represent.

Date: _____

_____
_Printed name of party waiving service of summons_

_____
_Signature of the attorney or unrepresented party_

_____
_Printed name_

_____
_Address_

_____
_E-mail address_

_____
_Telephone number_

### Duty to Avoid Unnecessary Expenses of Serving a Summons

Rule 4 of the Federal Rules of Civil Procedure requires certain defendants to cooperate in saving unnecessary expenses of serving a summons and complaint. A defendant who is located in the United States and who fails to return a signed waiver of service requested by a plaintiff located in the United States will be required to pay the expenses of service, unless the defendant shows good cause for the failure.

"Good cause" does _not_ include a belief that the lawsuit is groundless, or that it has been brought in an improper venue, or that the court has no jurisdiction over this matter or over the defendant or the defendant's property.

If the waiver is signed and returned, you can still make these and all other defenses and objections, but you cannot object to the absence of a summons or of service.

If you waive service, then you must, within the time specified on the waiver form, serve an answer or a motion under Rule 12 on the plaintiff and file a copy with the court. By signing and returning the waiver form, you are allowed more time to respond than if a summons had been served.

Russo Law Offices, LLC
633 Belvidere Road
Phillipsburg, NJ 08865
Phone: 908-454-0806
Luke J. Sostarecz, Esquire
Attorney ID: 273552019
*Attorney for Plaintiffs*

## IN THE DISTRICT COURT OF NEW JERSEY

|  |  |  |
|---|---|---|
| MICHAEL SAMRA AND KIMBERLY SAMRA, | ) ) ) | **CASE:** |
| Plaintiffs | ) | **COMPLAINT** |
| v. | ) ) | **JURY TRIAL DEMANDED** |
| MONSANTO COMPANY, | ) | |
| Defendant | ) | |

Plaintiffs, Michael Samra and Kimberly Samra, husband and wife, by way of Complaint against the Defendant, Monsanto Company say:

### PARTIES

1.     The Plaintiff, Michael Samra, is an adult individual residing at 330 1st Street, Phillipsburg, New Jersey.

2.     The Plaintiff, Kimberly Samra, is an adult individual residing at 330 1st Street, Phillipsburg, New Jersey.

3.     The Defendant, Monsanto Company, was at all times relevant to this litigation an American agrochemical and agricultural biotechnology corporation. Additionally, at all times relevant to this litigation, Monsanto Company was a Delaware corporation, with its principal place of business located at 800 North Lindbergh Boulevard, St. Louis Missouri 63167, and is authorized to do business and does do business in the State of New Jersey.

## NATURE OF THE CASE

4.     This is an action for damages suffered by the Plaintiffs as a direct and proximate result of

the Defendant, Monsanto's negligent and wrongful conduct in connection with the design,

development, manufacture, testing, packaging, promoting, marketing, advertising, distribution,

labeling, and/or sale of the herbicide Roundup®, containing the active ingredient glyphosate.

5.     The Plaintiffs maintain that Roundup® and/or glyphosate is defective, dangerous to

human health, unfit and unsuitable to be marketed and sold in commerce and lacked proper

warnings and directs as to the dangers associated with its use.

6.     "Roundup®" refers to all formulations of Defendant's Roundup® products, including but

not limited to, Roundup® Ready-to-Use Extended Control Weed and Grass Killer Plus Weed

Preventer II, or any other product under the "Roundup®" name containing the active ingredient

glyphosate.

## JURISDICTION AND VENUE

7.     This Court has jurisdiction over the Defendant and this action pursuant to 28 U.S.C. §

1332 because there is complete diversity of citizenship between the Plaintiffs and the Defendant.

The Defendant is incorporated and has its principal place of business outside of the state in

which the Plaintiff resides.

8.     The amount in controversy between the Plaintiff and the Defendant exceeds $75,000,

exclusive of interest and cost.

9.     The Court that also has supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

10.     Venue is proper within this district pursuant to 28 U.S.C. § 1391 in that Defendant

conducts business here and is subject to personal jurisdiction in this district. Furthermore, the

Defendant sells, markets, and/or distributes Roundup® within the State of New Jersey. Also, a

substantial part of the acts and/or omissions giving rise to these claims occurred within this district.

11. The Defendant advertises and sells goods, specifically Roundup®, in the State of New Jersey.

12. The Defendant transacted and conducted business within the State of New Jersey that relates to the allegations in this Complaint.

13. The Defendant derived substantial revenue from goods and products used in the State of New Jersey.

14. The Defendant expected or should have expected its acts to have consequences within the State of New Jersey, and derived substantial revenue from interstate commerce.

15. The Defendant engaged in the business of designing, developing, manufacturing, testing, packaging, marketing, distributing, labeling, and/or selling Roundup®.

16. The Defendant is authorized to do business in the State of New Jersey and derives substantial income from doing business in this state.

17. Upon information and belief, the Defendant purposefully availed itself of the privilege of conducting activities with the State of New Jersey, thus invoking the benefits and protects of its laws.

18. Upon information and belief, the Defendant did design, sell, advertise manufacture and/or distribute Roundup®, with full knowledge of its dangerous and defective nature.

## FACTUAL ALLEGATIONS

19.     At all times relevant to this litigation, the Defendant was in the business of, and did, design, research, manufacture, test advertise, promote, market, sell, distribute, and/or has acquired and is responsible for the commercial herbicide Roundup®.

20.     Monsanto is a multinational agricultural biotechnology corporation based in St. Louis Missouri. It is the world's leading producer of glyphosate.

21.     The Defendant discovered the herbicidal properties of glyphosate during the 1970's and subsequently began to design, research, manufacture, sell and distribute glyphosate based "Roundup®" as a broad-spectrum herbicide.

22.     Glyphosate is the active ingredient in Roundup®.

23.     Glyphosate is a broad-spectrum herbicide used to kill weeds and grasses known to compete with commercial crops grown around the globe.

24.     Glyphosate is a "non-selective" herbicide, meaning it kills indiscriminately based only on whether a given organism produces a specific enzyme, 5-enolpyruvylshikimic acid-3-phosphate synthase, known as EPSP synthase.

25.     Glyphosate inhibits the enzyme 5-enolpyruvylshikimic acid-3-phosphate synthase that interferes with the shikimic pathway in plants, resulting in the accumulation of shikimic acid in plant tissue and ultimately plant death.

26.     Sprayed as a liquid, plants absorb glyphosate directly through their leaves, stems, and roots, and detectable quantities accumulate in the plant tissues.

27.     Each year, approximately 250 million pounds of glyphosate are sprayed on crops, commercial nurseries, suburban lawns, parks, and golf courses. This increase in use has been

driven largely by the proliferation of genetically engineered crops, crops specifically tailored to resist the activity of glyphosate.

28.    The Defendant is intimately involved in the development, design, manufacture, marketing, sale, and/or distribution of genetically modified ("GMO") crops, many of which are marketed as being resistant to Roundup® *i.e.*, "Roundup® Ready." As of 2008, the Defendant was the world's leading producer of seeds designed to be Roundup® Ready. In 2010 an estimated 70% of corn and cotton, and 90% of soybean fields in the United States contained Roundup® Ready seeds.

29.    The original Roundup®, containing the active ingredient glyphosate, was introduced in 1974. Today, glyphosate products are among the world's most widely used herbicides.[1]

30.    For nearly 40 years, consumers, farmers, and the public have used Roundup®, unaware of its carcinogenic properties.

## REGISTRATION OF HERBICIDES UNDER FEDERAL LAW

31.    The manufacture, formulation, and distribution of herbicides, such as Roundup® are regulated under the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA"), 7. U.S.C. § 136 *et seq*. FIFRA requires that all pesticides be registered with the Environmental Protection Agency ("EPA") prior to their distribution, sale, or use, except as described by FIFRA 7 U.S.C. § 136a(a).

32.    The EPA requires as part of the registration process, among other requirements, a variety of tests to evaluate the potential for exposure to pesticides, toxicity to people and other potential non-target organisms, and other adverse effects on the environment. Registration by the EPA, however, is not an assurance or finding of safety. The determination the EPA makes in registering or re-registering a product is not that the product is "safe," but rather than use of the

---

[1] *Backgrounder*, History of Monsanto's Glyphosate Herbicides, June 2005.

product in accordance with its label directions "will not generally cause unreasonable adverse effects on the environment." 7 U.S.C. § 136(a)(c)(5)(D).

33.     FIFRA defines "unreasonable adverse effects on the environment" to mean "any unreasonable risk to man or the environment, taking into account the economic, social, and environmental costs and benefits of the use of any pesticide." 7 U.S.C. § 136(bb). FIFRA thus requires the EPA to make a risk/benefit analysis in determining whether a registration should be granted or allowed to continue to be sold in commerce.

34.     The EPA and the State of Missouri registered Roundup® for distribution, sale, and manufacture in the United States and the State of Missouri.

35.     FIFRA generally requires that the registrant, Monsanto, conduct health and safety testing of pesticide products. The government is not required, nor is it able, to perform the product tests that are required of the manufacturer.

36.     The evaluation of each pesticide product distributed, sold, or manufactured is completed at the time the product is initially registered. The data necessary for registration of a pesticide has changed over time. The EPA is now in the process of re-evaluating all pesticide products through Congressionally mandated process called "re-registration." 7 U.S.C. § 136a-1. In order to reevaluate these pesticides, the EPA demands the completion of additional tests and the submission of data for the EPA's review and evaluation.

37.     In the case of glyphosate and Roundup®, the EPA had planned to release its preliminary risk assessment – in relation to the registration process – no later than July 2015. The EPA completed its review of glyphosate in early 2015 but delayed releasing the assessment pending further review in light of the World Health Organization's March 24, 2015, but delayed finding

that glyphosate is a "probable carcinogen" as demonstrated by the mechanistic evidence of

carcinogenicity in humans and sufficient evidence of carcinogenicity in animals.

## MONSANTO'S FALSE REPRESENTATIONS REGARDING

## THE SAFETY OF ROUNDUP®

38.     In 1996, the New York Attorney General (NYAG") filed a lawsuit against Monsanto

based on its false and misleading advertising of Roundup® products. Specifically, the lawsuit

challenged Monsanto's general representations that its spray-on glyphosate-based herbicides,

including Roundup®, were **"safer than table salt"** and **"practically non-toxic"** to mammals,

birds, and fish. Among the representations the NYAG found deceptive and misleading about the

human and environmental safety of Roundup® are the following:

(a)     Remember that environmentally friendly Roundup® herbicide is biodegradable. It won't build up in the soil so you can use Roundup® with confidence along customers' driveways, sidewalks and fences...;

(b)     And remember that Roundup® is biodegradable and won't build up in the soil. That will give you the environmental confidence you need to use Roundup® everywhere you've got a weed, brush, edging or trimming problem;

(c)     Roundup® biodegrades into naturally occurring elements;

(d)     Remember that versatile Roundup® herbicide stays where you put it. That means there's no washing or leaching to harm customers' shrubs or other desirable vegetation;

(e)     This non-residential herbicide will not wash or leach in the soil. It ... stays where you apply it;

(f)     You can apply Accord with "confidence because it will stay where you put it" it bonds tightly to soil particles, preventing leaching. Then, soon after application, soil microorganisms biodegrade Accord into natural products;

(g)     Glyphosate is less toxic to rats than table salt following acute oral ingestion;

(h)     Glyphosate's safety margin is much greater than required. It has over 1,00-fold safety margin in food and over a 700-fold safety margin for workers who manufacture it or use it;

(i)     You can feel good about using herbicides by Monsanto. They carry a toxicity category rating of 'practically non-toxic' as it pertains to mammals, birds, and fish; and

(j)     "Roundup® can be used where kids and pets will play and breaks down into natural material." This ad depicts a person with his head in the ground and a pet dog standing in an area which has been treated with Roundup®."[2]

39.     On November 19, 1996, Monsanto entered an Assurance of Discontinuance with the

NYAG, in which Monsanto agreed, among other things, "to cease and desist from publishing or

broadcasting any advertisements [in New York] that represent, directly or by implication" that:

(a)     Its glyphosate-containing pesticide products or any component thereof are safe, non-toxic, harmless or free from risk;

(b)     Its glyphosate-containing pesticide products or any component thereof manufactured, formulated, distributed or sold by Monsanto are biodegradable;

(c)     Its glyphosate-containing pesticide products or any component thereof stay where they are applied under all circumstances and will not move through the environment by any means;

(d)     Its glyphosate-containing pesticide products or any component thereof are "good" for the environment or are "known for their environmental characteristics."

(e)     Glyphosate-containing pesticide products or any component thereof are safer or less toxic than common consumer products other than herbicides; and

(f)     Its glyphosate-containing products or any component thereof might be classified as "practically non-toxic"

40.     Monsanto did not alter its advertising in the same manner in any state other than New

York, and on information and belief still has not done so today.

41.     In 2009, France's highest court ruled that Monsanto had not told the truth about the safety

of Roundup®. The French court affirmed an earlier judgment that Monsanto had falsely

advertised its herbicide Roundup® as "biodegradable" and that it "left the soil clean."[3]

---

[2] Attorney General for the State of New York, In the Matter of Monsanto Company, Assurance of Discontinuance Pursuant to Executive Law § 63(15) (Nov. 1996).

## EVIDENCE OF CARCINOGENICITY IN ROUNDUP®

42.     As early as the 1980's Monsanto was aware of glyphosate's carcinogenic properties.

43.     On March 4, 1985, a group of Environmental Protection Agency's ("EPA") Toxicology

Branch published a memorandum classifying glyphosate as a Category C oncogene. Category C

oncogenes are possible human carcinogens with limited evidence of carcinogenicity. [4]

44.     In 1986, the EPA issued a Registration Standard for glyphosate (NTIS PB87 – 103214).

The Registration Standard required additional phytotoxicity, environmental fate, toxicology,

product chemistry, and residue chemistry studies. All the data required was submitted and

reviewed and/or waived.[5]

45.     In October 1991, the EPA published a Memorandum entitled "Second Peer Review of

Glyphosate." The memorandum changed glyphosate's classification to Group E (evidence of

non-carcinogenicity for humans). Two peer review committee members did not concur with the

conclusions of the committee and one member refused to sign.[6]

46.     In addition to the toxicity of the active molecule, many studies support the hypothesis

that glyphosate formulations found in Defendant's Roundup® products are more dangerous and

toxic than glyphosate alone.[7] As early as 1991 evidence existed demonstrating that glyphosate

formulations were significantly more toxic than glyphosate alone.[8]

47.     In 2002, Julie Marc published a study entitled "Pesticide Roundup® Provokes Cell

Division Dysfunction at the Level of CDK1/Cyclin B Activation."

---

[3] *Monsanto Guilty in 'False Ad' Row*, BBC, Oct. 15, 2009, *available at*
htts://news.bbc.co.uk/2/hi/Europe/8308903.stm.
[4] Consensus Review of Glyphosate, Casewell No. 661A. March 4, 1985. United States Environmental Protection
Agency.
[5] http://www.epa.gov/oppsrrd1/reregistration/REDs/factsheets/0178fact.pdf
[6] Second Peer Review of Glyphosate, CAS No. 1071-83-6. October 30, 1981. United States Environmental
Protection Agency.
[7] Martinez et all. 2007; Benachour 2009; Gasnier et al. 2010; Peixoto 2005; Marc 2004.
[8] Martinez et al 1991.

48.     The study found that Defendant's Roundup® caused delays in the cell cycles of sea urchins, while the same concentrations of glyphosate alone proved ineffective and did not alter cell cycles.

49.     In 2004, Julie Marc published a study entitled "Glyphosate-based pesticides affect cell cycle regulation." The study demonstrated a molecular link between glyphosate-based products and cell cycle dysregulation.

50.     The study noted that "cell-cycle dysregulation is a hallmark of tumor cells and human cancer. Failure in the cell-cycle checkpoints leads to genomic instability and subsequent development of cancers from the initial affected cell." Further, "[s]ince cell cycle disorders such as cancer result from dysfunction of unique cell, it was of interest to evaluate the threshold dose of glyphosate affecting cells."[9]

51.     In 2005, Francisco Peixoto published a study showing that Roundup®'s effects on rat liver mitochondria are much more toxic and harmful than the same concentrations of glyphosate alone.

52.     The Peixoto study suggested that the harmful effects of Roundup® on mitochondrial bioenergetics could not be exclusively attributed to glyphosate and could be the result of other chemicals, namely the surfactant POEA, or alternatively due to the possible synergy between glyphosate and Roundup® formulation products.

53.     In 2009, Nora Benachour and Gilles-Eric Seralini published a study examining the effects of Roundup® and glyphosate on human umbilical, embryonic, and placental cells.

54.     The study used dilution levels of Roundup® and glyphosate far below agricultural recommendations, corresponding with low levels of residues in food. The study concluded that supposed "inert" ingredients, and possibly POEA, change human cell permeability and amplify

---

[9] (Molinari, 2000; Stewart et al., 2003)

toxicity of glyphosate alone. The study further suggested that determinations of glyphosate toxicity should consider the presence of adjuvants, or those chemicals used in the formulation of the complete pesticide. The study confirmed that the adjuvants in Roundup® are not inert and that Roundup® is always more toxic than its active ingredient glyphosate.

55.     The results of these studies were confirmed in recently published peer-reviewed studies and were always available and/or known to the Defendant.

56.     The Defendant knew or should have known that Roundup® is more toxic than glyphosate alone and that safety studies on Roundup®, Roundup®'s adjuvants and "inert" ingredients, and/or the surfactant POEA were necessary to protect the Plaintiff from Roundup®.

57.     The Defendant knew or should have known that tests limited to Roundup®'s active ingredient glyphosate were insufficient to prove the safety of Roundup®.

58.     The Defendant failed to appropriately and adequately test Roundup®, Roundup®'s adjuvants and "inert" ingredients, and/or the surfactant POEA to protect the Plaintiff from Roundup®.

59.     Rather than performing the appropriate tests, the Defendant relied upon flawed industry-supported studies designed to protect the Defendant's economic interests rather than Plaintiff and the consuming public.

60.     Despite its knowledge that Roundup® was considerably more dangerous than glyphosate alone, the Defendant continued to promote Roundup® as safe.

## IARC CLASSIFICATION OF GLYPHOSATE

61.     The International Agency for Research on Cancer ("IARC") is the specialized intergovernmental cancer agency the World Health Organization ("WHO") of the United Nations tasked with conducting and coordinating research into the causes of cancer.

62.     An IARC Advisory Group to Recommend Priorities for IARC Monographs during 2015-2019 met in April 2014. Though nominations for the review were solicited, a substance must meet two criteria to be eligible for review by the IARC Monographs: there must already be some evidence of carcinogenicity of the substance, and there must be evidence that humans are exposed to the substance.

63.     The IARC set glyphosate for review in 2015-2016. The IARC uses five (5) criteria for determining priority in reviewing chemicals. The substance must have a potential for direct impact on public health; whether there is scientific literature to support the suspicion of carcinogenicity; evidence of significant human exposure; high public interest and/or the potential to bring clarity to a controversial area and/or reduce public anxiety or concern; related agents similar to one given high priority by the above considerations. The data reviewed is sourced preferably from publicly accessible, peer-reviewed data.

64.     On March 24, 2015, after its cumulative review of human, animal, and DNA studies for more than one (1) year, man of which have been in the Defendant's possession since as early as 1985, the IARC's working group published its conclusion that the glyphosate contained in the Defendant's Roundup® herbicide, is a Class 2A "probably carcinogen" as demonstrated by the mechanistic evidence of carcinogenicity in humans and sufficient evidence of carcinogenicity in animals.

65.     The IARC's full Monograph was published on July 29, 2015, and established glyphosate as a class 2A *probable* carcinogen to humans. According to the authors, glyphosate demonstrated sufficient mechanistic evidence (genotoxicity and oxidative stress) to warrant a 2A classification based on evidence of carcinogenicity in humans and animals.

66.     The IARC Working Group found an increased risk between exposure to glyphosate and non-Hodgkin's lymphoma ("NHL") and several subtypes of NHL, and the increased risk continued after adjustment for other pesticides.

67.     The IARC also found that glyphosate caused DNA and chromosomal damage in human cells.

### EARLIER EVIDENCE OF GLYPHOSATE'S DANGER

68.     Prior to the new classification of Roundup® by the IARC, the Defendant had ample evidence of glyphosate and Roundup®'s genotoxic properties for decades.

69.     Genotoxicity refers to chemical agents that are capable of damaging the DNA within a cell through genetic mutations, which is a process that is believed to lead to cancer.

70.     In 1997, Chris Clements published "Genotoxicity of select herbicides in *Rana castebeiana* tadpoles using the alkaline single-cell gel DNA electrophoresis (comet) assay."

71.     The study found that tadpoles exposed to Roundup® showed significant DNA damage compared to unexposed control animals.

72.     Both human and animal studies have shown that glyphosate and glyphosate-based formulations such as Roundup® can induce oxidative stress.

73.     Oxidative stress and associated chronic inflammation are believed to be involved in carcinogenesis.

74.     The IARC Monograph notes that "[s]trong evidence exists that glyphosate, AMPA and glyphosate-based formulations can induce oxidative stress."

75.     In 2006 Cesar Paz-y-Mino published a study examining DNA damage in human subjects exposed to glyphosate.

76.     The study produced evidence of chromosomal damage in blood cells showing significantly greater damage after exposure to glyphosate than before in the same individuals, suggesting that the glyphosate formulation used during aerial spraying had a genotoxic effect on exposed individuals.

77.     The IARC Monograph reflects the volume of evidence of glyphosate pesticides' genotoxicity noting "[t]he evidence for genotoxicity caused by glyphosate-based formulations is strong."

78.     Despite knowledge to the contrary, the Defendant maintains that there is no evidence that Roundup® is genotoxic, that regulatory authorities and independent experts are in agreement that Roundup® is not genotoxic, and that there is no evidence that Roundup® is genotoxic.

79.     In addition to glyphosate and Roundup®'s genotoxic properties, the Defendant has long been aware of glyphosate's carcinogenic properties.

80.     Glyphosate and Roundup® have long been associated with carcinogenicity and the development of numerous forms of cancer, including, but not limited to, non-Hodgkin's lymphoma, Hodgkin's lymphoma, multiple myeloma, and soft tissue sarcoma.

81.     The Defendant has known of this association since the early to mid-1980's and numerous human and animal studies have evidenced the carcinogenicity of glyphosate and/or Roundup®.

82.     In 1985, the EPA studied the effects of glyphosate in mice finding a dose related response in male mice linked to rental tubal adenomas, a rare tumor. The study concluded glyphosate was oncogenic.

83.     In 2003, Lennart Hardell and Mikael Eriksson published the results of two case-controlled studies on pesticides as a risk factor for NHL and hairy cell leukemia.

84.     The study concluded that glyphosate had the most significant relationship to NHL among all herbicides studies with an increased odds ratio of 3.11.

85.     In 2003, AJ De Roos published a study examining the pooled data of mid-western farms, examining pesticides and herbicides as risk factors for NHL.

86.     The study, which controlled for potential confounders, found a relationship between increased NHL incidence and glyphosate.

87.     In 2008, Mikael Eriksson published a population-based case-control study of exposure to various pesticides as a risk factor for NHL.

88.     This strengthened previous associations between glyphosate and NHL.

89.     Despite this knowledge, the Defendant continued to issue broad and sweeping statements suggesting that Roundup® was, and is, safer than ordinary household items such as table salt, despite a lack of scientific support for the accuracy and validity of these statements and, in fact, voluminous evidence to the contrary.

90.     Upon information and belief, these statements and representations have been made with the intent of inducing the Plaintiff, the agricultural community, and the public at large to purchase and increase the use of the Defendant's Roundup® for Defendant's pecuniary gain, and in fact, did induce the Plaintiff to use Roundup®.

91.     The Defendant made these statements with complete disregard and reckless indifference to the safety of the Plaintiff and the general public.

92.     Notwithstanding the Defendant's representations, scientific evidence has established a clear association between glyphosate and genotoxicity, inflammation, and an increased risk of many cancers, including, but not limited to NHL, Multiple Myeloma, and soft tissue sarcoma.

93.     The Defendant knew or should have known that glyphosate is associated with an increased risk of developing cancer, including but not limited to NHL, Multiple Myeloma, and soft tissue sarcoma.

94.     The Defendant failed to appropriately and adequately inform and warn the Plaintiff of the serious and dangerous risks associated with the use of and exposure to glyphosate and/or Roundup®, including, but not limited to, the risk of developing NHL, as well as other severe and personal injuries which are permanent and/or long-lasting in nature, cause significant physical pain and mental anguish, diminished enjoyment of life, and the need for medical treatment, monitoring, and/or medications.

95.     Despite the IARC's classification of glyphosate as a class 2A probably carcinogen, the Defendant continues to maintain that glyphosate and/or Roundup® is safe, non-carcinogenic, non-genotoxic, and falsely warrant users and the general public that independent experts and regulatory agencies agree that there is no evidence of carcinogenicity or genotoxicity in glyphosate and Roundup®.

96.     The Defendant has claimed and continues to claim that Roundup® is safe, non-carcinogenic, and non-genotoxic. These misrepresentations are consistent with the Defendant's cavalier approach to investigation and ensuring the safety of its products, the safety of the public at large, and the safety of the Plaintiff.

## SCIENTIFIC FRAUD UNDERLYING THE SAFETY

## DETERMINATIONS OF GLYPHOSATE

97. After the EPA's 1985 classification of glyphosate as possibly carcinogenic to humans (Group C), Monsanto exerted pressure upon the EPA to change its classification.

98. This culminated in the EPA's reclassification of glyphosate to Group E, which was based upon evidence of non-carcinogenicity in humans.

99. In so classifying, the EPA stated that "[i]t should be emphasized, however, that designation of an agent in Group E is based on the available evidence at the time of evaluation and should not be interpreted as a definitive conclusion that the agent will not be a carcinogen under any circumstances."

100. On two occasions, the EPA found that laboratories hired by Monsanto to test the toxicity of its Roundup® products for registration purposes committed scientific fraud.

101. In the first instances, Monsanto hired Industrial Bio-Test Laboratories ("IBT") to perform and evaluate pesticide toxicology studies relating to Roundup®. IBT performed approximately 30 tests on glyphosate and glyphosate-containing products, including 11 of the 19 chronic toxicology studies needed to register Roundup® with the EPA.

102. In 1976, the Food and Drug Administration ("FDA") performed an inspection of IBT and discovered discrepancies between the raw data and the final report relating to toxicological impacts of glyphosate. The EPA subsequently audited the IBT and determined that the toxicology studies conducted for Roundup® were invalid. And EPA reviewer stated, after finding "routine falsification of data" at IBT that it was "hard to believe the scientific integrity of the studies when they said they took specimens of the uterus from male rabbits."

103. Three top executives of IBT were convicted of fraud in 1983.

104.    In the second incident, Monsanto hired Craven Laboratories ("Craven") in 1990 to perform pesticide and herbicide studies, including several studies on Roundup®.

105.    In March of 1991, the EPA announced that it was investigating Craven for "allegedly falsifying test data used by chemical firms to win EPA approval of pesticides."

106.    The investigation led to the indictments of the laboratory owner and a handful of employees.

## MONSANTO'S CONTINUING DISREGARD FOR THE SAFETY
## OF PLAINTIFF AND THE PUBLIC

107.    Monsanto claims on its website that "[r]egulatory authorities and independent experts around the world have reviewed numerous long-term/carcinogenicity and genotoxicity studies and agree that there is no evidence that glyphosate, the active ingredient in Roundup® brand herbicides and other glyphosate-based herbicides, causes cancer, even at very high doses, and that it is not genotoxic."[10]

108.    Ironically, the primary source for this statement is a 1986 report by the WHO, the same organization that now considers glyphosate to be a probable carcinogen.

109.    Glyphosate, and the Defendant's Roundup® products in particular, have been associated with serious side effects and many regulatory agencies around the globe have banned or are currently banning the use of glyphosate herbicide products.

110.    The Defendant's statements proclaiming the safety of Roundup® and disregarding its dangers mislead the Plaintiff.

---

[10] Backgrounder – Glyphosate: No Evidence of Carcinogenicity. Updated Number 2014. (downloaded October 9, 2015)

111. Despite the Defendant's knowledge that Roundup® was associated with an elevated risk of developing cancer, the Defendant's promotional campaigns focused on Roundup®'s purported "safety profile."

112. The Defendant's failure to adequately warn the Plaintiff resulted in (1) the Plaintiff using and being exposed to glyphosate instead of using another acceptable and safe method of controlling unwanted weeds and pests; and (2) scientists and physicians failing to warn and instruct consumers about the risk of cancer, including NHL, and other injuries associated with Roundup®.

113. The Defendant failed to seek modification of the labeling of Roundup® to include relevant information regarding the risks and dangers associated with Roundup® exposure.

114. The failure of the Defendant to appropriately warn and inform the EPA has resulted in inadequate warnings in safety information presented directly to users and consumers.

115. The failure of the Defendant to appropriately warn and inform the EPA has resulted in the absence of warning or caution statements that are adequate to protect health and the environment.

116. The failure of the Defendant to appropriately warn and inform the EPA has resulted in the directions for use that are not adequate to protect public health and the environment.

117. By reason of the foregoing acts and omissions, the Plaintiff seeks compensatory damages as a result of the Plaintiff's use of, and exposure to, Roundup® which caused or was a substantial contributing factor in causing Plaintiff to suffer from caner, specifically NHL, as well as other severe and permanent injuries including but not limited to hypogammaglobulinemia, monocytosis, mental anguish, and the loss of enjoyment of life.

118. By reason of the foregoing, the Plaintiff is severely and permanently injured.

119. By reason of the foregoing acts and omissions, the Plaintiff has endured and, in some categories continues to suffer, emotional and mental anguish, medical expenses, and other economic and non-economic damages, as a result of the actions and inactions of the Defendant.

## PLAINTIFF'S EXPOSURE TO ROUNDUP®

120. Plaintiff, Michael Samra, used Roundup® beginning in approximately 2003 and continued through 2018.

121. For years, Plaintiff, Michael Samra, sprayed Roundup® on a regular basis. Plaintiff followed all safety and precautionary warnings during the course of use.

122. Plaintiff, Michael Samra, was subsequently diagnosed with Non-Hodgkin's Lymphoma in or about June 2017. The development of Plaintiff's Non-Hodgkin's Lymphoma, hypogammaglobulinemia, monocytosis, frequent fevers which at times last as long as eight (8) weeks, mouth sores, loss of taste, loss of smell, weight loss, frequent infections, were proximately and actually caused by his exposure to the Defendant's Roundup® products.

123. As a result of his injury, the Plaintiff has incurred significant economic and non-economic damages.

## EQUITABLE TOLLING OF APPLICABLE STATUTE OF LIMITATIONS

124. Plaintiffs incorporate by reference each and every allegation set forth in paragraphs one (1) through paragraph one hundred twenty-three (123) as though fully set forth herein.

125. The running of any statute of limitations has been tolled by reason of Defendant's fraudulent concealment. The Defendant, through its affirmative misrepresentations and omissions, actively concealed from the Plaintiff the true risks associated with Roundup® and glyphosate.

126.    At all times relevant to this litigation, the Defendant has maintained that Roundup® is safe, non-toxic, and non-carcinogenic.

127.    Even as of July 2016, the Defendant continued to represent to the public that "Regulatory authorities and independent experts around the world have reviewed numerous long-term/carcinogenicity and genotoxicity studies and agree there is *no evidence* that glyphosate, the active ingredient in Roundup® brand herbicides and other glyphosate-based herbicides, causes cancer, even at very high doses, and that is not genotoxic." (emphasis added).[11]

128.    As a result of the Defendant's actions, the Plaintiff was unaware, and could not reasonably know or have learned through reasonable diligence that Roundup® and/or glyphosate contact exposed the Plaintiff to risks alleged herein and that those risks were the direct and proximate result of the Defendant's acts and omissions.

129.    Furthermore, the Defendant is estopped from relying on any statute of limitations because of its fraudulent concealment of the true character, quality, and nature of Roundup®. The Defendant was under a duty to disclose the true character, quality, and nature of Roundup® because this was non-public information over which the Defendant had and continues to have exclusive control, and because the Defendant knew that this information was not available to the Plaintiff or to distributers of Roundup®. In addition, the Defendant is estopped from relying on any statute of limitations because of its intentional concealment of these facts.

130.    The Plaintiff had no knowledge that the Defendant was engaged in the wrongdoing alleged herein. Because of the fraudulent concealment of wrongdoing by the Defendant, the plaintiff could not have reasonably discovered the wrongdoing at any time prior. Also, the economics of this fraud should be considered. The Defendant had the ability to and did spend

---

[11] Backgrounder – Glyphosate: No Evidence of Carcinogenicity. Updated November 2014. (downloaded October 9 2015).

enormous amounts of money in furtherance of its purpose of marketing, promoting and/or distributing a profitable herbicide, notwithstanding the known or reasonably known risks. The Plaintiff and medical professionals could not have afforded and could not have possibly conducted studies to determine the nature, extent, and identity of related health risks, and were forced to rely on only the Defendant's representations. Accordingly, the Defendant is precluded by the discovery rule and/or the doctrine of fraudulent concealment from relying upon any statute of limitations.

**COUNT I**

**STRICT LIABILITY (DESIGN DEFECT)**

131.    Plaintiffs incorporate by reference each and every allegation set forth in paragraphs one (1) through paragraph one hundred thirty (130) as though fully set forth herein.

132.    Plaintiffs bring this strict liability claim against the Defendant, Monsanto, for defective design.

133.    At all times relevant to this litigation, the Defendant, Monsanto, was engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting of Roundup® products, which are defective and unreasonably dangerous to consumers, including the Plaintiff, thereby placing Roundup® products into the stream of commerce. These actions were under the ultimate control and supervision of the Defendant, Monsanto.

134.    At all times relevant to this litigation, the Defendant, Monsanto, designed, researched, developed, manufactured, produced, tested, assembled, labeled, advertised, promoted, marketed, sold, and distributed the Roundup® products used by Plaintiff, as described above.

135. At all times relevant to this litigation, the Defendant, Monsanto's, Roundup® products were manufactured, designed, and labeled in an unsafe, defective, and inherently dangerous manner that was dangerous for use by or exposure to the public, and, in particular, the Plaintiff.

136. At all times relevant to this litigation, the Defendant, Monsanto's, Roundup® products reached the intended consumers, handlers, and users or other persons coming into contact with these products in New Jersey and throughout the United States, including the Plaintiff, without substantial change in their condition as designed, manufactured, sold, distributed, labeled, and marketed by the Defendant, Monsanto.

137. The Defendant, Monsanto's, Roundup® products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold, and marketed by the Defendant, Monsanto, were defective in design and formulation in that, when they left the hands of the Defendant, Monsanto's, manufacturers and/or suppliers, they were unreasonably dangerous and dangerous to an extent beyond that which an ordinary consumer would contemplate.

138. The Defendant, Monsanto's, Roundup® products, as researched, tested, developed, designed, licensed, manufactured, packed, labeled, distributed, sold, and marketed by the Defendant, Monsanto, were defective in design and formulation in that, when they left the hands of the Defendant, Monsanto's manufacturers and/or suppliers, the foreseeable risks exceeded the alleged benefits associated with their design and formulation.

139. At all times relevant to this action, the Defendant, Monsanto, knew or had reason to know that its Roundup® products were defective and were inherently dangerous and unsafe when used in the manner instructed and provided by the Defendant, Monsanto.

140. Therefore, at all times relevant to this action, the Defendant, Monsanto's Roundup® products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold, and marketed by the Defendant, Monsanto, were defective in design and formulation, in the following ways:

(a) When placed in the stream of commerce, the Defendant, Monsanto's, Roundup® products were defective in design and formulation, and, consequently, dangerous to an extent beyond that which an ordinary consumer would contemplate;

(b) When placed in the stream of commerce, the Defendant, Monsanto's, Roundup® products were unreasonably dangerous in that they were hazardous and posed a grave risk of Non-Hodgkin's Lymphoma and other serious illnesses when used in a reasonably anticipated manner;

(c) When placed in the stream of commerce, the Defendant, Monsanto's, Roundup® products contained unreasonably dangerous design defects and were not reasonably safe when used in a reasonably anticipated or intended manner;

(d) The Defendant, Monsanto, did not sufficiently test, investigate, or study its Roundup® products and, specifically, the active ingredient glyphosate;

(e) Exposure to Roundup® and glyphosate-containing products presents a risk of harmful side effects that outweigh any potential utility stemming from the use of the herbicide;

(f) The Defendant, Monsanto, knew or should have known at the time of marketing its Roundup® products that exposure to Roundup® and specifically, its active ingredient glyphosate, could result in Non-Hodgkin's Lymphoma and other severe illnesses and injuries;

(g) The Defendant, Monsanto, did not conduct adequate post-marketing surveillance of its Roundup® products.

(h) The Defendant, Monsanto, could have employed safer alternative designs and formulations;

(i) The Plaintiff was exposed to the Defendant, Monsanto's, Roundup® products in the course of spraying his properties, as described above, without knowledge of Roundup®'s dangerous characteristics;

(j) At all times relevant to this litigation, the Plaintiff used and/or was exposed to the use of the Defendant, Monsanto's Roundup® products in an intended or

reasonably foreseeable manner, i.e., as a consumer, without knowledge of Roundup®'s dangerous characteristics;

(k)     The Plaintiff could not reasonably have discovered the defects and risks associated with Roundup® or glyphosate-containing products before or at the time of exposure due to the Defendant, Monsanto's, suppression of scientific information linking glyphosate to Non-Hodgkin's Lymphoma;

(l)     The harm caused by the Defendant, Monsanto's, Roundup® product far outweighed their benefit rendering the Defendant, Monsanto's, product dangerous to an extent beyond that which an ordinary consumer would contemplate. The Defendant, Monsanto's. Roundup® products were and are more dangerous than the alternative products and the Defendant, Monsanto, could have designed its Roundup® products to make them less dangerous. Indeed, at the time the Defendant, Monsanto, designed its Roundup® products, the state of the industry's scientific knowledge was such that a less risky design or formulation was attainable;

(m)     At the time Roundup® products left the Defendant, Monsanto's control, there was a practical, technically feasible and safer alternative designed that would have prevented the harm without substantially impairing the reasonably anticipated or intended function of the Defendant, Monsanto's, herbicides; and

(n)     The Defendant, Monsanto's defective design or its Roundup® products was willful, wanton, fraudulent, malicious, and conducted with reckless disregard for the health and safety of users of the Roundup® products, including the Plaintiff here.

141.     Therefore, as a result of the unreasonably dangerous condition of its Roundup® products, the Defendant, Monsanto, is strictly liable to the Plaintiffs.

142.     The defects in the Defendant, Monsanto's, Roundup® products were substantial and contributing factors in causing the Plaintiff's injuries and, but for the Defendant, Monsanto's misconduct and omissions, the Plaintiff would not have sustained his injuries.

143.     The Defendant, Monsanto's, conduct, as described above was reckless. The Defendant, Monsanto, risked the lives of the consumers and users of its products, including the Plaintiff, with knowledge of the safety problems associated with Roundup® and glyphosate-containing products, and suppressed this knowledge from the general public. The Defendant, Monsanto,

made conscious decisions not to redesign, warn or inform the unsuspecting public. The Defendant, Monsanto's reckless conduct warrants an award of punitive damages.

144.    As a direct and proximate result of the Defendant, Monsanto's, placing its defective Roundup® products into the stream of commerce, the Plaintiff developed Non-Hodgkin's Lymphoma, hypogammaglobulinemia, monocytosis, frequent fevers which at times last as long as eight (8) weeks, mouth sores, loss of taste, loss of smell, weight loss, frequent infections inflicting total and permanent injury upon the Plaintiff with a drastic loss of function, and further subjecting him to medical treatment, including but not limited to months of chemotherapy, IVIG infusions, and necessitating numerous medications. Plaintiff's extensive injuries and medical treatment have further directly and proximately caused him a loss of income and loss of earning capacity which has further exposed him and will continue to expose him to severe trauma, anxiety, stress, psychological dysfunction and loss of enjoyment of life together with extensive treatment which will be required over his lifetime.

WHEREFORE, Plaintiff, Michael Samra, demands judgment against the Defendant, Monsanto Company, for compensatory and punitive damages, together with interest, costs herein incurred, attorney's fees and all such other and further relief as this Court deems just and proper.

### COUNT II

### STRICT LIABILTY (FAILURE TO WARN)

145.    Plaintiffs incorporate by reference each and every allegation set forth in paragraphs one (1) through paragraph one hundred forty-four (144) as though fully set forth herein.

146.    The Plaintiffs bring this struck liability claim against the Defendant, Monsanto, for failure to warn.

147.    At all times relevant to this litigation, the Defendant, Monsanto, engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting Roundup® products, which are defective and unreasonably dangerous to consumers, including the Plaintiff, because they do not contain adequate warnings or instructions concerning the dangerous characteristics of Roundup® and specifically, the active ingredient glyphosate. These actions were under the ultimate control and supervision of the Defendant, Monsanto.

148.    The Defendant, Monsanto, researched, developed, designed, tested, manufactured, inspected, labeled, distributed, marketed, promoted, sold, and otherwise released into the stream of commerce its Roundup® products, and in the course of same, directly advertised or marketed the products to consumers and end users, including the Plaintiff, and therefore had a duty to warn of the risks associated with the use of Roundup® and glyphosate-containing products.

149.    At all times relevant to this litigation, the Defendant, Monsanto, had a duty to properly test, develop, design, manufacture, inspect, package, label, market, promote, sell, distribute, maintain, supply, provide proper warnings, and take such steps as necessary to ensure its Roundup® products did not cause users and consumers to suffer from unreasonable and dangerous risks. The Defendant, Monsanto, had a continuing duty to warn the Plaintiff of the dangers associated with Roundup® use and exposure. The Defendant, Monsanto, as a manufacture, seller, or distributor of chemical herbicides, is held to the knowledge of an expert in the field.

150.    At the time of manufacture, the Defendant, Monsanto, could have provided the warnings or instructions regarding the full and complete risks of Roundup® and glyphosate-containing products because it knew or should have known of the unreasonable risks of harm associated with the use of and/or exposure to such products.

151.    At all times relevant to this litigation, the Defendant, Monsanto, failed to investigate, study, test, or promote the safety or to minimize the dangers to users and consumers of its product and to those who would foreseeably use or be harmed by the Defendant, Monsanto's, herbicides, including the Plaintiff.

152.    Despite the fact that the Defendant, Monsanto, knew or should have known that Roundup® posed a grave risk of harm, it failed to exercise reasonable care to warn of the dangerous risks associated with use and exposure. The dangerous propensities of its products and the carcinogenic characteristics of glyphosate, as described above, were known to, or scientifically knowable to the Defendant, Monsanto, through appropriate research and testing by known methods, at the time it distributed, supplied, or sold the product, and not known to end users and consumers, such as the Plaintiff.

153.    The Defendant, Monsanto, knew or should have known that its products created significant risks of serious bodily harm to consumers, as alleged herein, and the Defendant, Monsanto, failed to adequately warn consumers, i.e., the reasonably foreseeable users, of the risks of exposure to its products. The Defendant, Monsanto, has wrongfully concealed information concerning the dangerous nature of Roundup® and its active ingredient glyphosate, and further made false and/or misleading statements concerning the safety of Roundup® and glyphosate.

154.    At all times relevant to this litigation, the Defendant, Monsanto's Roundup® products reached the intended consumers, handlers, and users or other persons coming into contact with these products in New Jersey and throughout the United States, including the Plaintiff, without substantial change in their condition as designed, manufactured, sold, distributed, labeled, and marketed by the Defendant, Monsanto.

155.    The Plaintiff was exposed to the Defendant, Monsanto's Roundup® products in the course of spaying his property, as described above, without knowledge of their dangerous characteristics.

156.    At all times relevant to this litigation, the Plaintiff used and/or was exposed to the use of the Defendant, Monsanto's Roundup® products while using them for their intended or reasonably foreseeable purposes, without knowledge of their dangerous characteristics.

157.    The Plaintiff could not have reasonably discovered the defects and risks associated with Roundup® or glyphosate-containing products prior to or at the time of the Plaintiff's exposure. The Plaintiff relied upon the skill, superior knowledge, and judgment of the Defendant, Monsanto, to know about and disclose serious health risks associated with using the products.

158.    The Defendant, Monsanto, knew or should have known that the minimal warnings disseminated with its Roundup® products were inadequate, failed to communicate adequate information on the dangers and safe use/exposure, and failed to communicate warnings and instructions that were appropriate and adequate to render the products safe for their ordinary, intended and reasonably foreseeable uses, including agricultural and horticultural applications.

159.    The information that the Defendant, Monsanto, did provide, communicate, or contain relevant warnings, hazards, and precautions that would have enabled consumers such as Plaintiff to utilize the products safely and with adequate protection. Instead, the Defendant, Monsanto, disseminated information that was inaccurate, false and misleading, and which failed to communicate accurately or adequately the comparative severity, duration, and extent of the risk of injuries with use of and/or exposure to Roundup® and glyphosate; continued to aggressively promote the efficacy of its products, even after it knew or should have known of the unreasonable risks from use or exposure; and concealed, downplayed, or otherwise suppressed,

through aggressive marketing and promotion, any information or research about the risks and dangers of exposure to Roundup® and glyphosate.

160.    This alleged failure to warn is not limited to the information contained on Roundup®'s labeling. The Defendant, Monsanto, was able, in accord with federal law, to comply with New Jersey law by disclosing the known risks associated with Roundup® through other non-labeling mediums, i.e., promotion, advertisements, public service announcements, and/or public information sources. The Defendant, Monsanto, however, did not disclose these known risks through any medium.

161.    To this day, the Defendant, Monsanto, has failed to adequately and accurately warn of the risks of cancer associated with the use of and exposure to Roundup® and its active ingredient glyphosate.

162.    As a result of their inadequate warnings, the Defendant, Monsanto's Roundup® products were defective and unreasonably dangerous when they left the possession and/or control of the Defendant, Monsanto, were distributed by the Defendant, Monsanto, and used by the Plaintiff in the spraying of his property.

163.    The Defendant, Monsanto, is liable to the Plaintiffs for injuries caused by its negligent or willful failure, as described above, to provide adequate warnings or other clinically relevant information and data regarding the appropriate use of its products and the risks associated with the use of or expose to Roundup® and glyphosate.

164.    Had the Defendant, Monsanto, provided adequate warnings and instructions and properly disclosed and disseminated the risks associated with its Roundup® products, the Plaintiff could have avoided the risk of developing injuries and could have obtained or used alternative herbicides.

165.    As a direct and proximate result of the Defendant, Monsanto, placing its defective Roundup® products into the stream of commerce without adequate warnings and instructions, the Plaintiff developed Non-Hodgkin's Lymphoma, hypogammaglobulinemia, monocytosis, frequent fevers which at times last as long as eight (8) weeks, mouth sores, loss of taste, loss of smell, weight loss, frequent infections inflicting total and permanent injury upon the Plaintiff with a drastic loss of function, and further subjecting him to medical treatment, including but not limited to months of chemotherapy, IVIG infusions, and necessitating numerous medications. Plaintiff's extensive injuries and medical treatment have further directly and proximately caused him a loss of income and loss of earning capacity which has further exposed him and will continue to expose him to severe trauma, anxiety, stress, psychological dysfunction and loss of enjoyment of life together with extensive treatment which will be required over his lifetime.

WHEREFORE, Plaintiff, Michael Samra, demands judgment against the Defendant, Monsanto Company for compensatory and punitive damages, together with interest, costs herein incurred, attorney's fees and all such other and further relief as this Court deems just and proper.

## COUNT III

## NEGLIGENCE

166.    Plaintiffs incorporate by reference each and every allegation set forth in paragraphs one (1) through paragraph one hundred sixty-five (165) as though fully set forth herein.

167.    The Defendant, Monsanto, directly or indirectly caused Roundup® products to be sold, distributed, packaged, labeled, marketed, promoted, and/or use by the Plaintiff.

168.    At all times relevant to this litigation, the Defendant, Monsanto, had a duty to exercise reasonable care in the design, research, manufacture, marketing, advertisement, supply, promotion, packaging, sale, and distribution of its Roundup® products, including the duty to

take all reasonable steps necessary to manufacture, promote, and/or sell a product that was not unreasonably dangerous to consumers and users of the product.

169.    At all times relevant to this litigation, the Defendant, Monsanto, had a duty to exercise reasonable care in the marketing, advertisement, and sale of the Roundup® products. The Defendant, Monsanto's duty of care owed to consumers and the general public included providing accurate, true, and correct information concerning the risk of using Roundup® and appropriate, complete, and accurate warnings concerning the potential adverse effects of exposure to Roundup®, and, in particular, its active ingredient glyphosate.

170.    At all times relevant to this litigation, the Defendant, Monsanto, knew or, in the exercise of reasonable care, should have known of the hazards and dangers of Roundup® and specifically, the carcinogenic properties of the chemical glyphosate.

171.    Accordingly, at all times relevant to this litigation, the Defendant, Monsanto, knew or in the exercise of reasonable care, should have known that use of or exposure to its Roundup® products could cause or be associated with Plaintiff's injuries and thus, created a dangerous and unreasonable risk of injury to the users of these products, including the Plaintiff.

172.    The Defendant, Monsanto, also knew or in the exercise of reasonable care should have known that users and consumers of Roundup® were unaware of the risks and magnitude of the risks associated with use of and/or exposure to Roundup® and glyphosate-containing products.

173.    As such, The Defendant, Monsanto, breached its duty of reasonable care and failed to exercise ordinary care in the design, research, development, manufacture, testing, marketing, supply, promotion, advertisement, packaging, sale, and distribution of its Roundup® products, in that the Defendant, Monsanto, manufactured and produced defective herbicides containing the chemical glyphosate, knew or had reason to know of the defects inherent in its products, knew or

had reason to know that a user or consumer's exposure to the products created a significant risk of harm and unreasonably dangerous side effects, and failed to prevent or adequately warn of these risks and injuries.

174.    The Defendant, Monsanto, was negligent in its promotion of Roundup®, outside of the labeling context, by failing to disclose material risk information as part of its promotion and marketing of Roundup®, including the internet, television, print advertisements, etc. Nothing prevented the Defendant, Monsanto, from being honest in its promotional activities, and in fact, the Defendant had a duty to disclose the true nature of the risks associated with Roundup® in its promotional efforts.

175.    Despite its ability and means to investigate, study, and test its products and to provide adequate warnings, the Defendant, had categorically failed to do so. Indeed, the Defendant, has wrongfully concealed information and has further made false and/or misleading statements concerning the safety of exposure to Roundup® and glyphosate.

176.    The Defendant's negligence includes but is not limited to the following:

    (a)    Manufacturing, producing, promoting, formulating, creating developing, designing, selling, and/or distributing its Roundup® products without thorough and adequate pre and post-market testing;

    (b)    Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing Roundup® while negligently and/or intentionally concealing and failing to disclose the results of trials, tests, and studies of exposure to glyphosate, and consequently, the risk of serious harm associated with human use of and exposure to Roundup®;

    (c)    Failing to undertake sufficient studies and conduct necessary tests to determine whether or not Roundup® products and glyphosate-containing products were safe for their intended use in agriculture and horticulture;

    (d)    Failing to use reasonable and prudent care in the design, research, manufacture, and development of Roundup® products so as to avoid the risk of serious harm associated with the prevalent use of Roundup®/glyphosate as an herbicide;

(e)    Failing to design and manufacture Roundup® products so as to ensure they were at least as safe and effective as other herbicides on the market;

(f)    Failing to provide adequate instructions, guidelines, and safety precautions to those persons the Defendant, Monsanto, could reasonably foresee would use and be exposed to its Roundup® products;

(g)    Failing to disclose to the Plaintiff, other Roundup® users/consumers, and the general public that use of and exposure to Roundup® presented severe risks of Non-Hodgkin's Lymphoma and other grave illnesses;

(h)    Failing to warn the Plaintiff, other Roundup® users/consumers, and the general public that Roundup®'s risk of harm was unreasonable and that there were other safer alternative herbicides available;

(i)    Systematically suppressing and downplaying evidence pertaining to the risks and prevalence of side effects of Roundup® and glyphosate containing products;

(j)    Representing that its Roundup® products were safe for their intended use when, in fact, the Defendant knew or should have known the products were not safe for their intended purpose;

(k)    Declining to make or propose any changes to Roundup® products' labeling or other promotional materials that would alert consumers and the general public of the risks of Roundup® and glyphosate;

(l)    Advertising, marketing, and recommending the use of Roundup® products while concealing and failing to disclose or warn of the dangers known (by the Defendant) to be associated with or caused by the use or exposure to Roundup® and glyphosate;

(m)    Continuing to disseminate information to its consumers, which indicate or imply that Roundup® products are safe for use in the agricultural and horticultural industries; and

(n)    Continuing the manufacture and sale of its products with the knowledge that the products were unreasonably unsafe and dangerous.

177.    The Defendant knew or should have known that it was foreseeable consumers such as the Plaintiff would suffer injuries as a result of the Defendant's failure to exercise ordinary care in the manufacturing, marketing, labeling, distribution, and sale of Roundup®.

178.    The Plaintiff did not know the nature and extent of the injuries that could result from the intended use and exposure to Roundup® or its active ingredient glyphosate.

179.    The Defendant, Monsanto's negligence was the proximate cause of the Plaintiff's injuries.

180.    The Defendant's conduct as described above was reckless. The Defendant regularly engages in the practice of risking the lives of consumers and users of its Roundup® products, including the Plaintiff, with full knowledge of the dangers of its products. The Defendant has made conscious decisions not to redesign, re-label, warn, or inform the unsuspecting public, including the Plaintiff. The Defendant's reckless conduct warrants an award of punitive damages.

181.    As a direct and proximate result of the Defendant's negligence the Plaintiff developed Non-Hodgkin's Lymphoma, hypogammaglobulinemia, monocytosis, frequent fevers which at times last as long as eight (8) weeks, mouth sores, loss of taste, loss of smell, weight loss, frequent infections inflicting total and permanent injury upon the Plaintiff with a drastic loss of function, and further subjecting him to medical treatment, including but not limited to months of chemotherapy, IVIG infusions, and necessitating numerous medications. Plaintiff's extensive injuries and medical treatment have further directly and proximately caused him a loss of income and loss of earning capacity which has further exposed him and will continue to expose him to severe trauma, anxiety, stress, psychological dysfunction and loss of enjoyment of life together with extensive treatment which will be required over his lifetime.

    WHEREFORE, Plaintiff, Michael Samra demands judgment against the Defendant, Monsanto Company for compensatory and punitive damages, together with interest, costs herein incurred, attorney's fees and all such other and further relief as this Court deems just and proper.

## COUNT IV

### BREACH OF IMPLIED WARRANTIES

182.     Plaintiffs incorporate by reference each and every allegation set forth in paragraphs one (1) through paragraph one hundred eighty-one (181) as though fully set forth herein.

183.     At all times relevant to this litigation, Monsanto engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting its Roundup® products, which are defective and unreasonably dangerous to consumers, including the Plaintiff, thereby placing Roundup® products into the stream of commerce. These actions were under the ultimate control and supervision of Monsanto.

184.     Before the time Plaintiff was exposed to the aforementioned Roundup® products, Monsanto impliedly warranted to its consumers – including the Plaintiff – that its Roundup® products were of merchantable quality and safe and fit for the use for which they were intended; specifically, as agricultural herbicides.

185.     The Defendant, Monsanto, however, failed to disclose that Roundup® has dangerous propensities when used as intended and that the use of and exposure to Roundup® and glyphosate-containing products carries and increased risk of developing severe injuries and death – including Plaintiff's Non-Hodgkin's Lymphoma.

186.     The Plaintiff was the intended beneficiary of the implied warranties made by Monsanto to the be the purchaser of its herbicides.

187.     The Roundup® products were expected to reach and did in fact reach consumers and users, including the Plaintiff, without substantial change in the condition in which they were manufactured and sold by the Defendant.

188.    At all times relevant to this litigation, Monsanto was aware that consumers and users of its products, including the Plaintiff, would use Roundup® products as marketed by the Defendant - which is to say that the Plaintiff was a foreseeable user of Roundup®.

189.    Monsanto intended that its Roundup® products be used in the manner in which the Plaintiff in fact used them and which Monsanto impliedly warranted each product to be of merchantable quality, safe, and fit for use, despite the fact that Roundup® was not adequately tested or researched.

190.    In reliance upon Monsanto's implied warranty, the Plaintiff used Roundup® as instructed and labeled and in the foreseeable manner intended, recommended, promoted, and marketed by Monsanto.

191.    The Plaintiff could not have reasonably discovered or known of the risks of serious injury associated with Roundup® or glyphosate.

192.    Monsanto breached its implied warranty to the Plaintiff in that its Roundup® products were not of merchantable quality, safe, or fit for their intended use, or adequately tested. Roundup® has dangerous propensities when used as intended and can cause severe injuries, including those injuries stated herein – namely, Non-Hodgkin's Lymphoma.

193.    The harm caused by Monsanto's Roundup® products far outweighed their benefit, rendering the products more dangerous than an ordinary consumer or user would expect and more dangerous than alternative products.

194.    As a direct and proximate result of Monsanto's breach of implied warranty, the Plaintiff developed Non-Hodgkin's Lymphoma, hypogammaglobulinemia, monocytosis, frequent fevers which at times last as long as eight (8) weeks, mouth sores, loss of taste, loss of smell, weight loss, frequent infections inflicting total and permanent injury upon the Plaintiff with a drastic

loss of function, and further subjecting him to medical treatment, including but not limited to months of chemotherapy, IVIG infusions, and necessitating numerous medications. Plaintiff's extensive injuries and medical treatment have further directly and proximately caused him a loss of income and loss of earning capacity which has further exposed him and will continue to expose him to severe trauma, anxiety, stress, psychological dysfunction and loss of enjoyment of life together with extensive treatment which will be required over his lifetime.

WHEREFORE, Plaintiff, Michael Samra, demands judgment against the Defendant, Monsanto Company, for compensatory and punitive damages, together with interest, costs herein incurred, attorney's fees and all such other and further relief as this Court deems just and proper.

### COUNT V

### BREACH OF EXPRESS WARRANTIES

195.    Plaintiffs incorporate by reference each and every allegation set forth in paragraphs one (1) through paragraph one hundred ninety-four (194) as though fully set forth herein.

196.    Monsanto has special knowledge skill and expertise germane to herbicides and their design manufacture, testing, and marketing. At all times relevant, Monsanto engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting its Roundup® products, which were defective and unreasonably dangerous to consumers, including the Plaintiff. These actions unequivocally prove Roundup® products were placed into the stream of commerce. These actions were under the ultimate control and supervision of Monsanto. Therefore, Plaintiffs assert breach of express warranty claims.

197.    Monsanto had a duty to exercise reasonable care in the research, development, design, testing, packaging, manufacture, inspection, labeling, distributing, marketing, promotion, sale, and release of its Roundup® products, including a duty to:

(a) Reasonably assure that its products did not cause their users unreasonably dangerous side effects;

(b) Warn of dangerous and potentially fatal side effects; and

(c) Disclose adverse material facts, such as the true risks associated with use of Roundup® and glyphosate-containing products when making representations to consumers and the general public – including the Plaintiff.

198. Monsanto expressly represented and warranted matters to the Plaintiff and other consumers and users by and through statements made in labels, publications, package inserts, and other written materials. These representations included assurances that its Roundup® products were safe to human health and the environment, effective, fit, and proper for their intended use and posed no risk of harm to humans. Monsanto advertised, labeled, marketed, and promoted Roundup® products by representing the quality of the product to consumers and the public in such a way as to induce purchase or use, thereby making an express warranty that its Roundup® products would conform to those representations.

199. These express representations include incomplete warnings and instructions that purport but fail to include the complete array of risks associated with use of and/or exposure to Roundup® and glyphosate. Monsanto knew or should have known that the risks expressly included in Roundup®'s warnings and labels did not and do not accurately or adequately set forth the risks of developing the serious injuries complained of herein. Nevertheless, Monsanto expressly represented that its Roundup® products were safe and effective, that they were safe and effective for use by individuals such as the Plaintiff and that they were safe and effective as agricultural herbicides.

200. The representations about Roundup® as set forth herein contained or constituted affirmations of fact or promises made by the seller to the buyer which related to the goods and became part of the business bargain. This created an express warranty that the goods would

conform to the representations. Monsanto placed its Roundup® products in the stream of commerce for sale and recommended use without adequately warning of the true risks of developing the injuries associated with the use of an exposure to Roundup® and its active ingredient glyphosate.

201.    Monsanto breached these warranties because its Roundup® products were defective, dangerous, unfit for use, did not contain labels representing the true and adequate nature of the risks associated with their use, and were not merchantable or safe for their intended, ordinary, and foreseeable use and purpose. Monsanto breached the warranties as follows:

    (a)    Monsanto represented through its labeling, advertising, and marketing materials that its Roundup® products were safe, and intentionally withheld and concealed information about the risks of serious injury and disease associated with the use of and/or exposure to Roundup® and glyphosate by expressly limiting the risks associated with use and/or exposure within its warnings and labels; and

    (b)    Monsanto represented that its Roundup® products were safe for use and fraudulently concealed information that demonstrated that glyphosate, an active ingredient in Roundup®, had carcinogenic properties – rendering Roundup® products less safe than alternative products available on the market.

202.    The Plaintiff justifiably and detrimentally relied upon the express warranties and representations of Monsanto in the purchase and use of its Roundup® products. When the Plaintiff made the decision to purchase Roundup®, he reasonably relied upon Monsanto to disclose known risks, dangers, and effects of Roundup® and glyphosate and he relied upon their continuing representations that the product was safe.

204.    The Plaintiff had no knowledge of the falsity or incomplete nature of Monsanto's statements and representations concerning Roundup®.

205.    As a direct and proximate result Monsanto's breach of express warranty, the Plaintiff developed Non-Hodgkin's Lymphoma, hypogammaglobulinemia, monocytosis, frequent fevers

which at times last as long as eight (8) weeks, mouth sores, loss of taste, loss of smell, weight loss, frequent infections inflicting total and permanent injury upon the Plaintiff with a drastic loss of function, and further subjecting him to medical treatment, including but not limited to months of chemotherapy, IVIG infusions, and necessitating numerous medications. Plaintiff's extensive injuries and medical treatment have further directly and proximately caused him a loss of income and loss of earning capacity which has further exposed him and will continue to expose him to severe trauma, anxiety, stress, psychological dysfunction and loss of enjoyment of life together with extensive treatment which will be required over his lifetime.

WHEREFORE, Plaintiff, Michael Samra, demands judgment against the Defendant, Monsanto Company, for compensatory and punitive damages, together with interest, costs herein incurred, attorney's fees and all such other and further relief as this Court deems just and proper.

## COUNT VI

## LOSS OF CONSORTIUM

206. Plaintiffs incorporate by reference each and every allegation set forth in paragraphs one (1) through paragraph two hundred five (205) as though fully set forth herein.

207. At all times relevant herein, Plaintiff, Kimberly Samra, was the wife of Plaintiff, Michael Samra.

208. As a result of the injuries and damages caused to the Plaintiff, Michael Samra, by Monsanto's tortious conduct, Plaintiff, Michael Samra was unable to perform activities he had previously performed for the household, for the family and for his own support. Consequently, the Plaintiff, Kimberly Samra was required to:

(a)     Perform most of the upkeep around the house; and

(b)     Take over many of the activities and responsibilities the Plaintiff, Michael Samra, previously performed.

209.     As a result of Monsanto's tortious conduct and Plaintiff, Michael Samra's extensive injuries including but not limited to Non-Hodgkin's Lymphoma, hypogammaglobulinemia, monocytosis, frequent fevers which at times last as long as eight (8) weeks, mouth sores, loss of taste, loss of smell, weight loss, and frequent infections, Plaintiff, Kimberly Samra effectively lost the companionship and accompaniment of her husband.

210.     As a direct and proximate result of the injuries caused to the Plaintiff, Michael Samra, due to Monsanto's tortious conduct, Plaintiff, Kimberly Samra, suffered the loss of her husband's consortium, companionship, intimacy, affection, services, and support.

WHEREFORE, Plaintiff, Kimberly Samra, demands judgment against the Defendant, Monsanto Company, for all such compensatory, statutory, and punitive damages available under applicable law, together with interest, costs of suit, attorneys' fees and all such other relief as the Court deems proper and appropriate.

## COUNT VII

### PUNITIVE DAMAGES

211.     Plaintiffs incorporate by reference each and every allegation set forth in paragraphs one (1) through paragraph two hundred ten (210) as though fully set forth herein.

212.     Monsanto's conduct as alleged herein was done with oppression and malice. Monsanto was fully aware of Roundup®'s grave safety risks. Nonetheless, Monsanto deliberately crafted its label, marketing, and promotion to mislead consumers.

213.     Monsanto was acutely aware they could turn a massive profit by acting as though Roundup® was harmless to humans and that full disclosure of Roundup®'s true risks would limit the amount of money Monsanto would make by selling Roundup® in New Jersey.

214.    The was accomplished not only through its misleading and labeling but through a comprehensive scheme of selective fraudulent research and testing, misleading advertising, and deception omissions as more fully alleged throughout this Complaint. Plaintiff, like other consumers in New Jersey was robbed of his right to make an informed decision about whether to purchase and use a herbicide on his property knowing the full risks attendant to that use. Such conduct was done with conscious disregard for the Plaintiff's health and safety.

215.    There is no indication that Monsanto will stop its deceptive and unlawful marketing practices unless it is punished and deterred. Accordingly, Plaintiffs request punitive damages against Monsanto for the damage caused to them.

## JURY DEMAND

Plaintiffs demand a trial by jury on all triable issues within this pleading.

## DESIGNATION OF TRIAL COUNSEL

Luke J. Sostarecz, Esquire, is hereby designated as trial counsel in this matter.

## TRANSFER TO MASTER DOCKET

Plaintiffs request for this case to be transferred to the UNITED STATES JUDICAL PANEL on MULTIDISTRICT LITIGATION Master Docket, under the Style "In Re: Roundup® Products Liability Litigation" and the identification MDL No. 2741, within the Northern District of California as so ordered in the Transfer Order attached hereto as Exhibit A.

## CERTIFICATION

The matter in controversy is not the subject of any other action pending in any

Court or of a pending arbitration proceeding and no other action or arbitration proceeding is

contemplated.

Dated: March 14, 2022

RUSSO LAW OFFICES, LLC

By: _Luke Sostarecz_

Luke Sostarecz, Esquire
Attorney for Plaintiffs

## CERTIFICATE OF SERVICE

I, Luke Sostarecz, hereby certify that, on March 14, 2022, I electronically filed the foregoing with the Clerk for the United States District Court of New Jersey using the CM/ECF system, which shall send electronic notification to counsel of record.

Dated: March 14, 2022

Luke Sostarecz, Esquire
Attorney for Plaintiffs

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: ROUNDUP PRODUCTS LIABILITY LITIGATION | MDL No. 2741 |
| | Case No. 16-md-02741-VC |
| This document relates to: | **PRETRIAL ORDER NO. 1** |
| ALL ACTIONS | |

The Judicial Panel on Multidistrict Litigation ("the Panel") has transferred to this Court certain lawsuits relating to the allegedly carcinogenic qualities of the glyphosate-based herbicide Roundup. The Court orders as follows:

1.    **Applicability of Order.** The provisions of this Order shall govern the practice and procedure in the actions transferred to this Court for pretrial proceedings as part of MDL No. 2741. This Order also applies to all related cases filed in the Northern District of California and all "tag-along" actions later filed in, removed to, or transferred to this Court. *See* Panel Rule 1.1(h).

2.    **Consolidation.** The civil actions governed by this Order are consolidated for pretrial purposes. Any tag-along action transferred to this Court or filed in this District will be automatically consolidated with this action without the need for future motions or orders. Pretrial consolidation does not mean the actions should be consolidated for trial, nor does it make any entity a party to an action in which it wasn't named, served, or added in accordance with the Federal Rules of Civil Procedure.

To facilitate consolidation, all parties to this MDL must notify the Panel of any related or tag-along action of which they are or become aware. *See* Panel Rules 7.1, 7.2.

3. **Master docket file.** The Clerk of Court will maintain a master docket case file under the style "In Re: Roundup Products Liability Litigation" and the identification "MDL No. 2741." When a pleading applies to all actions, this shall be indicated in the caption by the words "This document relates to: ALL ACTIONS." When a pleading applies to only certain actions, this shall be indicated in the caption by the words "This document relates to: [individual case(s), as identified by this Court's case number(s)]."

4. **Filing.** Each attorney of record must become a Northern District of California ECF user with a user ID and password. If counsel has not already done so, counsel must register immediately and be issued a user ID and password. Forms and instructions can be found on the Court's website at www.cand.uscourts.gov/cm-ecf.

All documents must be filed in the master docket, 16-md-2741. Documents that pertain to only certain actions must also be filed in the individual cases to which the document pertains.

5. **Appearances.** Counsel who appeared in a transferor court prior to transfer don't need to enter an additional appearance before this Court. Attorneys admitted to practice and in good standing in any United States District Court are admitted pro hac vice in this MDL. The requirements of Northern District of California Civil Local Rule 11-3, including the requirement to retain local counsel, are waived. Counsel are advised that the Court typically requires in-person as opposed to telephonic appearances for those wishing to participate at a hearing. Counsel should consult the Standing Order for Civil Cases Before Judge Chhabria.

6. **Liaison counsel.** Before the initial case management conference, counsel for the plaintiffs shall confer and seek consensus on the selection of one or more liaison counsel. Liaison counsel will handle administrative matters on behalf of the plaintiffs in their liaison group. The Court anticipates that liaison counsel will be responsible for preparing, maintaining, and transmitting copies of the documents served on them, this Court's orders and notices, and the Panel's orders and notices. *See* Panel Rule 4.1.

2

The expenses incurred as liaison counsel shall be shared equally by all members of the liaison group. If the plaintiffs' counsel are unable to agree on a means of sharing expenses, the Court will decide.

The selection of liaison counsel shall be subject to the Court's approval. If the plaintiffs' counsel are unable to reach consensus at or before the initial case management conference, the Court will appoint liaison counsel.

At the initial case management conference, all parties should be prepared to discuss any further needs for organizational structure, administrative or otherwise.

7. **Lead counsel.** The Court anticipates appointing a plaintiffs' lead counsel to coordinate and conduct pretrial activities. The Court requires individual applications, and any attorney who has filed an action in this MDL may apply. Applications must be filed in the master docket by Thursday, October 20, 2016. Courtesy chambers copies are not required.

Each attorney's application must include a resume not exceeding two pages and a letter not exceeding three pages. The letter should address:

     i. professional experience with MDLs and with the subject matter of this litigation;

     ii. familiarity with the claims before the Court;

     iii. present and future ability to commit to time-consuming litigation;

     iv. ability to work cooperatively with others;

     v. resources available to prosecute this litigation in a timely manner; and

     vi. ability to maintain reasonable fees and expenses.

Applications may also include an attachment indicating the names of other counsel who have filed cases in this MDL and who support the applicant's appointment as lead counsel.

Responses or objections must be filed in the master docket by Thursday, October 27, 2016. Courtesy chambers copies are not required.

Applicants and objectors will have the opportunity to address the Court briefly in person at the initial case management conference. The Court will appoint lead counsel as soon as possible thereafter.

3

The Court is tentatively of the view that a Plaintiffs' Steering Committee is unnecessary. However, counsel should be prepared to discuss this, and any other needs for organizational structure, at the initial case management conference.

8. **Initial case management conference.** An initial case management conference will be held Wednesday, November 9, 2016, at 9:30 am, in Courtroom 4, 17th Floor, 450 Golden Gate Avenue, San Francisco, California.

The case management conference will include discussion of the following matters:

i. The appointment of liaison and lead counsel for the plaintiffs, and any further needs for organizational structure.

ii. The possibility of bifurcating proceedings to address general causation before any plaintiff-specific questions. In the two actions previously pending in the Northern District of California, this Court granted Monsanto's request to bifurcate proceedings. *See* Order (Dkt. 66), *Hardeman v. Monsanto Co.*, No. 16-cv-0525 (N.D. Cal. June 16, 2016). However, because not all parties to the MDL have had an opportunity to be heard on this issue, the Court will consider additional arguments regarding bifurcation at the case management conference.

iii. The schedule for discovery. This Court entered a scheduling order for bifurcated discovery in the cases already pending before it. *See* Scheduling Order (Dkt. 74), *Hardeman v. Monsanto Co.*, No. 16-cv-0525 (N.D. Cal. June 24, 2016). If proceedings are bifurcated in the MDL, the Court is hopeful the discovery deadlines will remain relatively close to those previously set.

iv. The merits of appointing an independent expert, at the parties' shared expense, to assist the Court in understanding technical and scientific issues.

9. **Case management statements.** The defendant shall file a case management statement no later than October 20, 2016. The plaintiffs shall file a single, consolidated case management statement no later than October 27, 2016.

The content and formatting requirements of the Standing Order for All Judges of the

Northern District of California are waived. However, the parties are encouraged to include in their statements any information required under that order that remains applicable to case management in this MDL. Statements must also address the subjects this Court has set for discussion at the initial case management conference. If the parties wish to discuss any other matters at the initial case management conference, they should lay the groundwork for that discussion in their case management statements. The parties should also include a list of all known similar cases pending in federal or state court.

10. **Conference appearances.** Counsel intending to participate at the initial case management conference must appear in person. Plaintiffs with similar interests may, without waiving defenses or affecting future representation, agree on a single attorney to attend the conference on their behalf. Those not actively participating in the conference may listen to it through CourtCall. CourtCall access can be arranged by calling (866) 582-6878 no later than noon on November 8, 2016.

11. **Pending motions and discovery.** All pending motions must be renoticed once the Court sets a schedule for such motions. Any orders previously entered by a transferor court — including protective orders — shall remain in effect until this Court orders otherwise.

To the extent the parties conclude it is practical, discovery pending in any action may proceed between now and November 9th to the extent contemplated in *Hardeman v. Monsanto Co.*, No. 16-cv-00525, and *Stevick v. Monsanto Co.*, No. 16-cv-02341. For example, as discussed in a separate order for the *Hardeman* and *Stevick* cases, Monsanto is required to produce the information sought by the plaintiffs in their motion to compel. *See* Dkt. 80, *Hardeman v. Monsanto Co.*, No. 16-cv-0525. There seems to be no reason for this production not to proceed as anticipated. With respect to all other discovery matters, the Court will defer to the parties on what should proceed between now and November 9th, but the Court encourages the parties to keep moving forward.

12. **Preservation of evidence.** All parties and counsel are reminded of their duty to preserve evidence that may be relevant to this action, including electronically stored information.

Any evidence-preservation order previously entered in any of the transferred actions shall remain in effect until this Court orders otherwise. Until the parties reach an agreement on a preservation plan for all cases or the Court orders otherwise, each party shall take reasonable steps to preserve all evidence that may be relevant to this litigation. Counsel, as officers of the court, must exercise all reasonable efforts to notify parties and nonparties, including the employees of corporate or institutional parties, of their preservation obligations.

13. **Communication with the Court.** Unless otherwise ordered, all substantive communication with the Court must be written and e-filed.

The Court recognizes that cooperation between plaintiffs' counsel and between defendants' counsel is essential for resolving complex litigation in an orderly and efficient manner. To that end, sharing information between plaintiffs' counsel and between defendants' counsel shall not be deemed a waiver of the attorney-client privilege or the work-product protection, and cooperation of this kind shall not be used against any plaintiff by any defendant or against any defendant by any plaintiff.

Nothing contained in this provision shall be construed to limit the rights of any party or counsel to assert the attorney-client privilege or work-product protection.

**IT IS SO ORDERED.**

Dated: October 6, 2016

VINCE CHHABRIA
United States District Judge

6



**P** US POSTAGE & FEES PAID
4 LB PRIORITY MAIL RATE
ZONE 1 NO SURCHARGE,
ComPisPrice

062S0000993650
6395521
FROM 08865

stamps
endicia
03/14/2022

# PRIORITY MAIL 1-DAY™

**0020**

RUSSO LAW OFFICES
633 BELVIDERE ROAD
PHILLSIPBURG NJ 08865

C064

SHIP
TO:
MONSANTO COMPANY
SUITE 160
PRINCETON SOUTH CORPORATE CENTER
100 CHARLES EWING BLVD.
EWING NJ 08628-3454

## USPS TRACKING #



9405 5116 9900 0325 9087 56