JURY

# U.S. District Court
## Northern District of Texas (Dallas)
## CIVIL DOCKET FOR CASE #: 3:22-cv-01093-B

Wood v. Monsanto Company
Assigned to: Judge Jane J Boyle
Cause: 28:1332 Diversity-Product Liability

Date Filed: 05/17/2022
Jury Demand: Plaintiff
Nature of Suit: 367 Torts/Pers Inj: Health Care/Pharmaceutical Pers Inj/Product Liability
Jurisdiction: Diversity

**Plaintiff**

**Johnny Wood**                    represented by  **Ben C Martin**
Martin Baughman PLLC
3141 Hood Street, Ste 600
Dallas, TX 75219
214-761-6614
Fax: 214-744-7590
Email: bmartin@martinbaughman.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

V.

**Defendant**

**Monsanto Company**

| Date Filed | # | Docket Text |
|---|---|---|
| 05/17/2022 | 1 | COMPLAINT WITH JURY DEMAND against Monsanto Company filed by JOHNNY WOOD. (Filing fee $402; Receipt number 0539-12828935) Plaintiff will submit summons(es) for issuance. In each Notice of Electronic Filing, the judge assignment is indicated, and a link to the Judges Copy Requirements and Judge Specific Requirements is provided. The court reminds the filer that any required copy of this and future documents must be delivered to the judge, in the manner prescribed, within three business days of filing. Unless exempted, attorneys who are not admitted to practice in the Northern District of Texas must seek admission promptly. Forms, instructions, and exemption information may be found at www.txnd.uscourts.gov, or by clicking here: Attorney Information - Bar Membership. If admission requirements are not satisfied within 21 days, the clerk will notify the presiding judge. (Attachments: # 1 Cover Sheet) (Martin, Ben) (Entered: 05/17/2022) |
| 05/17/2022 | 2 | CERTIFICATE OF INTERESTED PERSONS/DISCLOSURE STATEMENT by JOHNNY WOOD. (Clerk QC note: No affiliate entered in ECF). (Martin, Ben) (Entered: 05/17/2022) |
| 05/17/2022 | 3 | Request for Clerk to issue Summons filed by JOHNNY WOOD. (Martin, Ben) (Entered: 05/17/2022) |
| 05/17/2022 | 4 | New Case Notes: A filing fee has been paid. Pursuant to Misc. Order 6, Plaintiff is provided |

| | | the Notice of Right to Consent to Proceed Before A U.S. Magistrate Judge (Judge Ramirez). Clerk to provide copy to plaintiff if not received electronically. (oyh) (Entered: 05/17/2022) |
|---|---|---|
| 05/17/2022 | 5 | Summons Issued as to Monsanto Company. (oyh) (Entered: 05/17/2022) |
| 05/18/2022 | 6 | Court Request for Recusal: Senior Judge A. Joe Fish recused. Pursuant to instruction in Special Order 3-249, the Clerk has reassigned the case to Judge Jane J Boyle for all further proceedings. Future filings should indicate the case number as: 3:22-cv-1093-B. (frw) (Entered: 05/18/2022) |

| PACER Service Center | | |
|---|---|---|
| Transaction Receipt | | |
| 06/02/2022 10:23:17 | | |
| **PACER Login:** | sh0019sh:2634072:0 | **Client Code:** 31943.356965rhb |
| **Description:** | Docket Report | **Search Criteria:** 3:22-cv-01093-B |
| **Billable Pages:** | 1 | **Cost:** 0.10 |

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| JOHNNY WOOD, | § | |
| *Plaintiff* | § | |
| | § | CASE NO.: 3:22-cv-1093 |
| v. | § | |
| | § | **PLAINTIFF'S COMPLAINT & JURY** |
| MONSANTO COMPANY, | § | **DEMAND** |
| *Defendant.* | § | |

Plaintiff, Johnny Wood, hereby complains against Defendant Monsanto Company

("Monsanto") and alleges as follows:

## NATURE OF THE ACTION

1.      This personal injury action is brought as a result of Defendant Monsanto's

misconduct and gross negligence with respect to its development, manufacturer, and sale

of Roundup—a dangerous and toxic weed killer, which contains no warnings relative to

the health hazards caused by exposure to this product. As discussed herein, Plaintiff

Johnny Wood was exposed to Monsanto's Roundup product and developed serious

personal injuries, including cancer, as a result. Plaintiff contends Defendant is liable for

these damages and requests a economic, compensatory, and punitive damages as well as

a trial by jury

## PARTIES

2.      Plaintiff, Johnny Wood, resides in Grandview, Johnson County, Texas.

3.      Defendant Monsanto Company is a Delaware corporation with its

headquarters and principal place of business in St. Louis, Missouri. Defendant Monsanto

may be served with service of process by serving its registered agent, Corporation Service Company, at 211 E. 7th Street Suite 620 Austin, TX 78701. At all times relevant to this cause of action, Defendant Monsanto Company maintained, and continues to maintain, significant, systematic and continuous contacts in Johnson County and throughout the State of Texas.

## JURISDICTION AND VENUE

4.      This court has jurisdiction over this action pursuant to 28 U.S.C. § 1332 because the amount in controversy as to Plaintiff exceeds $75,000.00, exclusive of interest and costs, and because there is complete diversity, since Defendant is incorporated in Delaware and has it principal place of business in Missouri, while Plaintiff is a citizen and resident of Texas.

5.      This Court has supplemental jurisdiction over the remaining common law and state law claims pursuant to 28 U.S.C. § 1367.

6.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2), because Defendant Monsanto transacts and conducts business in New Jersey, and, upon information and belief, a substantial part of the events, as well as corresponding evidence, giving rise to this Complaint occurred and are located in Texas.

## FACTUAL BACKGROUND

**A.      General Facts about Glyphosate and Roundup®**

7.      Glyphosate is a broad-spectrum, non-selective herbicide used in a wide variety of herbicidal products around the world.

8.      Plants treated with glyphosate translocate the systemic herbicide to their

2

roots, shoot regions, and fruit, where it interferes with the plant's ability to form aromatic amino acids necessary for protein synthesis. Treated plants generally die within two to three days. Because plants absorb glyphosate, it cannot be completely removed by washing or peeling produce or by milling, baking, or brewing grains.

9.      For nearly 40 years, farms across the world have used Roundup® without knowing of the dangers its use poses. That is because when Defendant Monsanto Company (hereinafter, "Monsanto") first introduced Roundup®, it touted glyphosate as a technological breakthrough that could kill almost every weed without causing harm either to people or to the environment. History has proven this claim to be wildly untrue. According to the World Health Organization ("WHO"), the main chemical ingredient of Roundup—glyphosate—is a probable cause of cancer. Those most at risk are farm workers and other individuals with workplace exposure to Roundup, such as garden center workers, nursery workers, landscapers, and ranchers like Mr. Wood. As a result of Monsanto's assurances to the public that Roundup was harmless, agricultural workers have been made victims of corporate greed. In order to prove its assurances, Monsanto has championed falsified data and has attacked legitimate studies that revealed Roundup's dangers. Monsanto has led a prolonged campaign of misinformation to convince government agencies, farmers, and the general population that Roundup is safe.

10.      The herbicidal properties of glyphosate were discovered in 1970 by Monsanto chemist John Franz. The first glyphosate-based herbicide was introduced to

the market in the mid-1970s under the brand name Roundup.[1] From the outset, Monsanto marketed Roundup as a "safe" general-purpose herbicide for widespread commercial and consumer use. It still markets Roundup as safe today.[2]

11.     In addition to the active ingredient glyphosate, Roundup formulations also contain adjuvants and other chemicals, such as the surfactant polyoxyethylene tallow amine ("POEA"), which are considered "inert" and therefore protected as "trade secrets" in manufacturing. Growing evidence suggests that these adjuvants and additional components of Roundup formulations are not, in fact, inert and are toxic in their own right.

## B.     Registration of Herbicides Under Federal Law

12.     The manufacture, formulation, and distribution of herbicides, such as Roundup, are regulated under the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA"), 7 U.S.C. § 136 *et seq.*  FIFRA requires that all pesticides be registered with the Environmental Protection Agency ("EPA") prior to their distribution, sale, or use, except as described by FIFRA. 7 U.S.C. § 136a(a).

13.     Because pesticides are toxic to plants, animals, and humans, at least to some degree, the EPA requires as part of the registration process, among other things, a variety of tests to evaluate the potential for exposure to pesticides, toxicity to people and other potential non-target organisms, and other adverse effects on the environment.

---

[1] Monsanto, *Backgrounder, History of Monsanto's Glyphosate Herbicide* (Sep. 2, 2015), http://www.monsanto.com/products/documents/glyphosate-background-materials/back_ history.pdf
[2] Monsanto, *What is Glyphosate?* (Sep. 2, 2015), http://www.monsanto.com/sitecollectiondocuments/ glyphosate-safety-health.pdf.

Registration by the EPA, however, is not an assurance or finding of safety. The determination the EPA must make in registering or re-registering a product is not that the product is "safe," but rather that use of the product in accordance with its label directions "will not generally cause unreasonable adverse effects on the environment." 7 U.S.C. § 136a(c)(5)(D).

14.    FIFRA defines "unreasonable adverse effects on the environment" to mean "any unreasonable risk to man or the environment, taking into account the economic, social, and environmental costs and benefits of the use of any pesticide." 7 U.S.C. § 136(bb). FIFRA thus requires EPA to make a risk/benefit analysis in determining whether a registration should be granted or a pesticide allowed to continue to be sold in commerce.

15.    The EPA and the State of California registered Roundup® for distribution, sale, and manufacture in the United States and the State of California.

16.    FIFRA generally requires that the registrant—Monsanto in the case of Roundup—conducts the health and safety testing of pesticide products. The EPA has protocols governing the conduct of tests required for registration and the laboratory practices that must be followed in conducting these tests. The data produced by the registrant must be submitted to the EPA for review and evaluation. The government is not required, nor is it able, however, to perform the product tests that are required of the manufacturer.

17.    The evaluation of each pesticide product distributed, sold, or manufactured is completed at the time the product is initially registered. The data necessary for

registration of a pesticide has changed over time. The EPA is now in the process of re-evaluating all pesticide products through a Congressionally-mandated process called "re-registration." 7 U.S.C. § 136a-1. In order to reevaluate these pesticides, the EPA is demanding the completion of additional tests and the submission of data for the EPA's recent review and evaluation.

18.     In the case of glyphosate, and therefore Roundup, the EPA had planned on releasing its preliminary risk assessment—in relation to the reregistration process—no later than July 2015. The EPA completed its review of glyphosate in early 2015, but it delayed releasing the risk assessment pending further review in light of the WHO's health-related findings.

## C.     Scientific Fraud Underlying the Marketing and Sale of Glyphosate/ Roundup

19.     Based on early studies showing that glyphosate could cause cancer in laboratory animals, the EPA originally classified glyphosate as possibly carcinogenic to humans (Group C) in 1985. After pressure from Monsanto, including contrary studies it provided to the EPA, the EPA changed its classification to evidence of non-carcinogenicity in humans (Group E) in 1991. In so classifying glyphosate, however, the EPA made clear that the designation did not mean the chemical does not cause cancer: "It should be emphasized, however, that designation of an agent in Group E is based on the available evidence at the time of evaluation and should not be interpreted as a definitive conclusion that the agent will not be a carcinogen under any circumstances."[3]

---

[3] U.S. Envtl. Prot. Agency, Memorandum, Subject: SECOND Peer Review of Glyphosate 1 (1991), available at http://www.epa.gov/pesticides/chem_search/cleared_reviews/csr_PC-103601_30-Oct-91_265.pdf.

20.     On two occasions, the EPA found that the laboratories hired by Monsanto
to test the toxicity of its Roundup products for registration purposes committed fraud.

21.     In the first instance, Monsanto, in seeking initial registration of Roundup
by the EPA, hired Industrial Bio-Test Laboratories ("IBT") to perform and evaluate
pesticide toxicology studies relating to Roundup.[4] IBT performed about 30 tests on
glyphosate and glyphosate-containing products, including nine of the 15 residue studies
needed to register Roundup.

22.     In 1976, the United States Food and Drug Administration ("FDA")
performed an inspection of IBT that revealed discrepancies between the raw data and the
final report relating to the toxicological impacts of glyphosate. The EPA subsequently
audited IBT; it too found the toxicology studies conducted for the Roundup® herbicide
to be invalid.[5] An EPA reviewer stated, after finding "routine falsification of data" at IBT,
that it was "hard to believe the scientific integrity of the studies when they said they took
specimens of the uterus from male rabbits."[6]

23.     Three top executives of IBT were convicted of fraud in 1983.

---

[4] Monsanto, *Backgrounder*, *Testing Fraud: IBT and Craven Laboratories* (Sep. 2, 2015),
http://www.monsanto.com/products/documents/glyphosate-background-materials/ibt_craven_bkg.pdf.
[5] U.S. Envtl. Prot. Agency, Summary of the IBT Review Program Office of Pesticide Programs (1983),
available at https://nepis.epa.gov/Exe/ZyNET.exe/91014ULV.TXT?ZyActionD=ZyDocument&Client=
EPA&Index=1981+Thru+1985&Docs=&Query=&Time=&EndTime=&SearchMethod=1&TocRestrict
=n&Toc=&TocEntry=&QField=&QFieldYear=&QFieldMonth=&QFieldDay=&IntQFieldOp=0&ExtQ
FieldOp=0&XmlQuery=&File=D%3A%5Czyfiles%5CIndex%20Data%5C81thru85%5CTxt%5C000000
22%5C91014ULV.txt&User=ANONYMOUS&Password=anonymous&SortMethod=h%7C-
&MaximumDocuments=1&FuzzyDegree=0&ImageQuality=r75g8/r75g8/x150y150g16/i425&Display
=p%7Cf&DefSeekPage=x&SearchBack=ZyActionL&Back=ZyActionS&BackDesc=Results%20page&
MaximumPages=1&ZyEntry=1&SeekPage=x&ZyPURL.#
[6] Marie-Monique Robin, *The World According to Monsanto: Pollution, Corruption and the Control of
the World's Food Supply* (2011) (citing U.S. Envtl. Prot. Agency, Data Validation, Memo from K.
Locke, Toxicology Branch, to R. Taylor, Registration Branch. Washington, D.C. (August 9, 1978)).

24.    In the second incident of data falsification, Monsanto hired Craven Laboratories in 1991 to perform pesticide and herbicide studies, including for Roundup. In that same year, the owner of Craven Laboratories and three of its employees were indicted, and later convicted, of fraudulent laboratory practices in the testing of pesticides and herbicides.[7]

25.    Despite the falsity of the tests that underlie its registration, within a few years of its launch, Monsanto was marketing Roundup in 115 countries.

**D.    The Importance of Roundup to Monsanto's Market Dominance and Profits**

26.    The success of Roundup® was key to Monsanto's continued reputation and dominance in the marketplace.    Largely due to the success of Roundup® sales, Monsanto's agriculture division was out-performing its chemicals division's operating income, and that gap increased yearly.  But with its patent for glyphosate expiring in the United States in the year 2000, Monsanto needed a strategy to maintain its Roundup® market dominance and to ward off impending competition.

27.    In response, Monsanto began the development and sale of genetically engineered Roundup Ready® seeds in 1996.  Since Roundup Ready crops are resistant to glyphosate, farmers can spray Roundup onto their fields during the growing season without harming the crop.  This allowed Monsanto to expand its market for Roundup even further; by 2000, Monsanto's biotechnology seeds were planted on more than 80 million acres worldwide and nearly 70% of American soybeans were planted from

---

[7] Monsanto, *Backgrounder, Testing Fraud: IBT and Craven Laboratories*, *supra* n. 4.

8

Roundup Ready seeds. It also secured Monsanto's dominant share of the glyphosate/Roundup market through a marketing strategy that coupled proprietary Roundup Ready seeds with continued sales of its Roundup herbicide.

28.     Through a three-pronged strategy of increasing production, decreasing prices, and by coupling with Roundup Ready seeds, Roundup became Monsanto's most profitable product. In 2000, Roundup accounted for almost $2.8 billion in sales, outselling other herbicides by a margin of five to one, and accounting for close to half of Monsanto's revenue.[8] Today, glyphosate remains one of the world's largest herbicides by sales volume.

## E.     Monsanto's Decades-Long Knowledge that its Advertising of Roundup's Safety is False

29.     In 1996, the New York Attorney General filed a lawsuit against Monsanto based on its false and misleading advertising of Roundup products. Specifically, the lawsuit challenged Monsanto's general representations that its spray-on glyphosate-based herbicides, including Roundup, were "safer than table salt" and "practically non-toxic" to mammals, birds, and fish. Among the representations the New York Attorney General found deceptive and misleading about the human and environmental safety of glyphosate and/or Roundup are the following:

a) "Remember that environmentally friendly Roundup herbicide is biodegradable. It won't build up in the soil so you can use Roundup with confidence along customers' driveways, sidewalks and fences ..."

b) "And remember that Roundup is biodegradable and won't build up in

---

[8] David Barboza, *The Power of Roundup; A Weed Killer Is A Block for Monsanto to Build On*, N.Y. TIMES, Aug. 2, 2001, *available at* http://www.nytimes.com/2001/08/02/business/the-power-of-roundup-a-weed-killer-is-a-block-for-monsanto-to-build-on.html.

the soil. That will give you the environmental confidence you need to use Roundup everywhere you've got a weed, brush, edging or trimming problem."

c) "Roundup biodegrades into naturally occurring elements."

d) "Remember that versatile Roundup herbicide stays where you put it. That means there's no washing or leaching to harm customers' shrubs or other desirable vegetation."

e) "This non-residual herbicide will not wash or leach in the soil. It ... stays where you apply it."

f) "You can apply Accord with 'confidence because it will stay where you put it' it bonds tightly to soil particles, preventing leaching. Then, soon after application, soil microorganisms biodegrade Accord into natural products."

g) "Glyphosate is less toxic to rats than table salt following acute oral ingestion."

h) "Glyphosate's safety margin is much greater than required. It has over a 1,000-fold safety margin in food and over a 700-fold safety margin for workers who manufacture it or use it."

i) "You can feel good about using herbicides by Monsanto. They carry a toxicity category rating of 'practically non-toxic' as it pertains to mammals, birds and fish."

j) "Roundup can be used where kids and pets will play and breaks down into natural material." This ad depicts a person with his head in the ground and a pet dog standing in an area which has been treated with Roundup.[9]

30.   On November 19, 1996, Monsanto entered into an Assurance of

Discontinuance with the New York Attorney General, in which Monsanto agreed, among

other things, "to cease and desist from publishing or broadcasting any advertisements [in

---

[9] Attorney General of the State of New York, In the Matter of Monsanto Company, Assurance of Discontinuance Pursuant to Executive Law § 63(15) (Nov. 1996).

New York] that represent, directly or by implication" that:

> a) its glyphosate-containing pesticide products or any component thereof are safe, non-toxic, harmless or free from risk.
>
> b) its glyphosate-containing pesticide products or any component thereof manufactured, formulated, distributed or sold by Monsanto are biodegradable
>
> c) its glyphosate-containing pesticide products or any component thereof stay where they are applied under all circumstances and will not move through the environment by any means.
>
> d) its glyphosate-containing pesticide products or any component thereof are "good" for the environment or are "known for their environmental characteristics."
>
> e) glyphosate-containing pesticide products or any component thereof are safer or less toxic than common consumer products other than herbicides;
>
> f) its glyphosate-containing products or any component thereof might be classified as "practically non-toxic."

31.     Monsanto did not alter its advertising in the same manner in any state other than New York, and on information and belief it still has not done so today.

32.     In 2009, France's highest court ruled that Monsanto had not told the truth about the safety of Roundup®.  The French court affirmed an earlier judgement that Monsanto had falsely advertised its herbicide Roundup® as "biodegradable" and that it "left the soil clean."[10]

## F.     Classifications and Assessments of Glyphosate

33.     The International Agency for Research on Cancer ("IARC")—an agency of the WHO—maintains stringent procedures for the evaluation of a chemical agent, and

---

[10] *Monsanto Guilty in 'False Ad' Row*, BBC, Oct. 15, 2009, *available at* http://news.bbc.co.uk/2/hi/europe/ 8308903.stm.

the IARC's process for the classification of glyphosate followed these procedures. Over time, the IARC Monograph program has reviewed 980 agents. Of those reviewed, it has determined 116 agents to be Group 1 (Known Human Carcinogens); 73 agents to be Group 2A (Probable Human Carcinogens); 287 agents to be Group 2B (Possible Human Carcinogens); 503 agents to be Group 3 (Not Classified); and one agent to be Probably Not Carcinogenic.

34.     The established procedure for IARC Monograph evaluations is described in the IARC Programme's Preamble.[11] Evaluations are performed by panels of international experts, selected on the basis of their expertise and the absence of actual or apparent conflicts of interest.

35.     One year before the Monograph meeting, the meeting is announced and there is a call both for data and for experts. Eight months before the Monograph meeting, the Working Group membership is selected, and the sections of the Monograph are developed by the Working Group members. One month prior to the Monograph meeting, the call for data is closed and the various draft sections are distributed among Working Group members for review and comment. Finally, at the Monograph meeting, the Working Group finalizes review of all literature, evaluates the evidence in each category, and completes the overall evaluation. Within two weeks after the Monograph meeting, the summary of the Working Group findings are published in *The Lancet Oncology*, and within a year after the meeting, the finalized Monograph is published.

---

[11] World Health Org., *IARC Monographs on the Evaluation of Carcinogenic Risks to Humans: Preamble* (2006), *available at* http://monographs.iarc.fr/ENG/Preamble/CurrentPreamble.pdf.

36.     In assessing an agent, the IARC Working Group reviews the following information: (a) human, experimental, and mechanistic data; (b) all pertinent epidemiological studies and cancer bioassays; and (c) representative mechanistic data. The studies must be publicly available and have sufficient detail for meaningful review, and reviewers cannot be associated with the underlying study.

37.     In March 2015, IARC reassessed glyphosate. The summary published in *The Lancet Oncology* reported that glyphosate is a Group 2A agent and probably carcinogenic in humans.

38.     On July 29, 2015, IARC issued its Monograph for glyphosate, Monograph Volume 112. For Volume 112, a Working Group of 17 experts from 11 countries met at IARC from March 3–10, 2015 to assess the carcinogenicity of certain herbicides, including glyphosate. The March meeting culminated a nearly one-year review and preparation by the IARC Secretariat and the Working Group, including a comprehensive review of the latest available scientific evidence. According to published procedures, the Working Group considered "reports that have been published or accepted for publication in the openly available scientific literature" as well as "data from governmental reports that are publicly available."

39.     The studies considered the following exposure groups: (1) occupational exposure of farmers and tree nursery workers in the United States, forestry workers in Canada and Finland and municipal weed-control workers in the United Kingdom; and (2) para-occupational exposure in farming families.

40.     Glyphosate was identified as the second-most used household herbicide in

the United States for weed control between 2001 and 2007 and the most heavily used herbicide in the world in 2012.

41.     Exposure pathways are identified as air (especially during spraying), water, and food. Community exposure to glyphosate is widespread and found in soil, air, surface water, and groundwater, as well as in food.

42.     The assessment of the IARC Working Group identified several case control studies of occupational exposure in the United States, Canada, and Sweden. These studies show a human health concern from agricultural and other work-related exposure to glyphosate.

43.     The IARC Working Group found an increased risk between exposure to glyphosate and NHL and several subtypes of NHL, and the increased risk persisted after adjustment for other pesticides.

44.     The IARC Working Group also found that glyphosate caused DNA and chromosomal damage in human cells. One study in community residents reported increases in blood markers of chromosomal damage (micronuclei) after glyphosate formulations were sprayed.

45.     In male CD-1 mice, glyphosate induced a positive trend in the incidence of a rare tumor: renal tubule carcinoma. A second study reported a positive trend for haemangiosarcoma in male mice. Glyphosate increased pancreatic islet-cell adenoma in male rats in two studies.  A glyphosate formulation promoted skin tumors in an initiation-promotion study in mice.

46.     The IARC Working Group also noted that glyphosate has been detected in

14

the urine of agricultural workers, indicating absorption. Soil microbes degrade glyphosate to aminomethylphosphoric acid ("AMPA"). Blood AMPA detection after exposure suggests intestinal microbial metabolism in humans.

47.     The IARC Working Group further found that glyphosate and glyphosate formulations induced DNA and chromosomal damage in mammals, and in human and animal cells in utero.

48.     The IARC Working Group also noted genotoxic, hormonal, and enzymatic effects in mammals exposed to glyphosate.[12] Essentially, glyphosate inhibits the biosynthesis of aromatic amino acids, which leads to several metabolic disturbances, including the inhibition of protein and secondary product biosynthesis and general metabolic disruption.

49.     The IARC Working Group also reviewed an Agricultural Health Study, consisting of a prospective cohort of 57,311 licensed pesticide applicators in Iowa and North Carolina.[13] While this study differed from others in that it was based on a self-administered questionnaire, the results support an association between glyphosate exposure and multiple myeloma, hairy cell leukemia ("HCL"), and chronic lymphocytic leukemia ("CLL"), in addition to several other cancers.

**G.     Other Findings Related to Glyphosate's Dangers to Human Health**

---

[12] Guyton *et al.*, *Carcinogenicity of Tetrachlorvinphos, Parathion, Malathion, Diazinon & Glyphosate*, LANCET ONCOL. (May 2015), *available at* https://www.thelancet.com/journals/lanonc/article/PIIS1470-2045(15)70134-8/fulltext.
[13] Anneclare J. De Roos et al., *Cancer Incidence Among Glyphosate-Exposed Pesticide Applicators in the Agricultural Health Study*, 113 ENVT'L HEALTH PERSPECTIVES 49–54 (2005), *available at* http://www.ncbi.nlm.nih.gov/pmc/articles/PMC1253709/pdf/ehp0113-000049.pdf.

50.    The EPA has a technical fact sheet, as part of its Drinking Water and Health, National Primary Drinking Water Regulations publication, relating to glyphosate.  This technical fact sheet predates IARC's March 20, 2015 evaluation. The fact sheet describes the release patterns for glyphosate as follows:

**Release Patterns**

Glyphosate is released to the environment in its use as a herbicide for controlling woody and herbaceous weeds on forestry, right-of-way, cropped and non-cropped sites. These sites may be around water and in wetlands.

It may also be released to the environment during its manufacture, formulation, transport, storage, disposal and cleanup, and from spills. Since glyphosate is not a listed chemical in the Toxics Release Inventory, data on releases during its manufacture and handling are not available.

. . .

Occupational workers and home gardeners may be exposed to glyphosate by inhalation and dermal contact during spraying, mixing, and cleanup. They may also be exposed by touching soil and plants to which glyphosate was applied. Occupational exposure may also occur during glyphosate's manufacture, transport storage, and disposal.[14]

51.    In 1995, the Northwest Coalition for Alternatives to Pesticides reported that in California, the state with the most comprehensive program for reporting of pesticide-caused illness, glyphosate was the third most commonly reported cause of pesticide illness among agricultural workers.[15]

---

[14] U.S. Envtl. Prot. Agency, *Technical Factsheet on: Glyphosate*, *available at* https://www3.epa.gov/ pesticides/chem_search/reg_actions/reregistration/fs_PC-417300_1-Sep-93.pdf.

[15] Caroline Cox, *Glyphosate, Part 2: Human Exposure and Ecological Effects*, 15 J. PESTICIDE REFORM 4 (1995); W.S. Peas *et al.*, *Preventing pesticide-related illness in California agriculture: Strategies and priorities. Environmental Health Policy Program Report*, Univ. of Cal. School of Public Health, Calif. Policy Seminar (1993).

**H.      Toxicity of Other Ingredients in Roundup**

52.      In addition to the toxicity of the active ingredient, glyphosate, several studies support the hypothesis that the glyphosate-based formulation in Monsanto's Roundup products is more dangerous and toxic than glyphosate alone. Indeed, as early as 1991, available evidence demonstrated that glyphosate formulations were significantly more toxic than glyphosate alone.[16]

53.      In 2002, a study by Julie Marc, entitled "Pesticide Roundup Provokes Cell Division Dysfunction at the Level of CDK1/Cyclin B Activation," revealed that Roundup causes delays in the cell cycles of sea urchins but that the same concentrations of glyphosate alone were ineffective and did not alter cell cycles.[17]

54.      A 2004 study by Marc and others, entitled "Glyphosate-based pesticides affect cell cycle regulation," demonstrated a molecular link between glyphosate-based products and cell cycle dysregulation. The researchers noted that "cell-cycle dysregulation is a hallmark of tumor cells and human cancer. Failure in the cell-cycle checkpoints leads genomic instability and subsequent development of cancers from the initial affected cell." Further, "[s]ince cell cycle disorders such as cancer result from dysfunction of a unique cell, it was of interest to evaluate the threshold dose of glyphosate affecting the cells."[18]

---

[16] Martinez, T.T. and K. Brown, *Oral and pulmonary toxicology of the surfactant used in Roundup herbicide*, PROC. WEST. PHARMACOL. SOC. 34:43-46 (1991).

[17] Julie Marc, et al., *Pesticide Roundup Provokes Cell Division Dysfunction at the Level of CDK1/ Cyclin B Activation*, 15 CHEM. RES. TOXICOL. 326–331 (2002), *available at* http://pubs.acs.org/doi/full/ 10.1021/tx015543g.

[18] Julie Marc, et al., *Glyphosate-based pesticides affect cell cycle regulation*, 96 BIOLOGY OF THE CELL 245, 245-249 (2004), *available at* http://onlinelibrary.wiley.com/doi/10.1016/j.biolcel.2003.11.010/epdf.

55.     In 2005, a study by Francisco Peixoto, entitled "Comparative effects of the Roundup and glyphosate on mitochondrial oxidative phosphorylation," demonstrated that Roundup's effects on rat liver mitochondria are far more toxic than equal concentrations of glyphosate alone. The Peixoto study further suggested that the harmful effects of Roundup on mitochondrial bioenergetics could not be exclusively attributed to glyphosate but could be the result of other chemicals, such as the surfactant POEA, or in the alternative, due to a potential synergic effect between glyphosate and other ingredients in the Roundup formulation.[19]

56.     In 2009, Nora Benachour and Gilles-Eric Seralini published a study examining the effects of Roundup and glyphosate on human umbilical, embryonic, and placental cells. The study tested dilution levels of Roundup and glyphosate that were far below agricultural recommendations, corresponding with low levels of residue in food. The researchers ultimately concluded that supposed "inert" ingredients, and possibly POEA, alter human cell permeability and amplify toxicity of glyphosate alone. The researchers further suggested that assessments of glyphosate toxicity should account for the presence of adjuvants or additional chemicals used in the formulation of the complete pesticide. The study confirmed that the adjuvants present in Roundup are not, in fact, inert and that Roundup is potentially far more toxic than its active ingredient glyphosate

---

[19] Francisco Peixoto, *Comparative effects of the Roundup and glyphosate on mitochondrial oxidative phosphorylation*, 61 CHEMOSPHERE 1115, 1122 (2005), *available at* https://www.researchgate.net/publication/7504567_Comparative_effects_of_the_Roundup_and_glyphosate_on_mitochondrial_oxidative_phosphorylation.

alone.[20]

57.    The results of these studies were at all times available to Monsanto.

58.    Monsanto's chief toxicologist Donna Farmer has admitted that she cannot say that Roundup does not cause cancer because Monsanto has not performed carcinogenicity studies with the formulated product Roundup, the very product that caused Plaintiffs' NHL.[21] Indeed, she further admitted that in the 35 years that Monsanto has marketed Roundup to the public, Monsanto has conducted no chronic carcinogenicity studies on the formulated Roundup product merely because EPA did not require that such a study be performed for registration of glyphosate.[22]

59.    Monsanto thus knew or should have known that Roundup is more toxic than glyphosate alone and that safety studies of Roundup, Roundup's adjuvants and "inert" ingredients, and/or the surfactant POEA were necessary to protect Plaintiff and other end users from Roundup.

60.    Despite its knowledge that Roundup is considerably more dangerous than glyphosate alone, Monsanto continued to promote Roundup as safe.

I.    The EPA's Review of Glyphosate

61.    In April 2016, personnel within the EPA's Office of Pesticides Program ("OPP") leaked and posted on the internet a draft report on glyphosate carcinogenicity,

---

[20] Nora Benachour, et al., *Glyphosate Formulations Induce Apoptosis and Necrosis in Human Umbilical, Embryonic, and Placental Cells*, 22 CHEM. RES. TOXICOL. 97-105 (2008), *available at* http://big.assets.huffingtonpost.com/france.pdf.
[21] *See* Plaintiffs' Submission in Response to Pretrial Order No. 8, Ex. 7, *In re: Roundup Products Liability Litigation*, MDL No. 2741 (N.D. Cal., Mar. 14, 2017), ECF No. 187-7.
[22] *See id.*

entitled Cancer Assessment Review Committee ("CARC") report, dated October 2015.
The EPA removed the documents by May 2, 2016, within days of initially posting it
online. An EPA spokesperson subsequently issued a statement on the agency's
glyphosate review:

> Glyphosate documents were inadvertently posted to the Agency's docket.
> These documents have now been taken down because our assessment is not
> final. EPA has not completed our cancer review. We will look at the work
> of other governments as well as work by HHS's Agricultural Health Study
> as we move to make a decision on glyphosate. Our assessment will be peer
> reviewed and completed by end of 2016.[23]

62.    On September 12, 2016, EPA's OPP submitted a report on the carcinogenic
potential of glyphosate, wherein it issued a "proposed conclusion" that glyphosate is
"'not likely to be carcinogenic to humans' at doses relevant to human health risk
assessment."[24]   There are no authors listed on this issue paper, which reiterates and
adopts the conclusions of the October 2015 leaked assessment.   The issue paper is based
upon a review of industry-sponsored articles and studies.   The OPP acknowledged that
it rejected all studies that considered Roundup®—the formulated product—instead of
studies that isolated glyphosate because "[g]lyphosate formulations contain various
components other than glyphosate and it has been hypothesized these components are
more toxic than glyphosate alone."[25]

---

[23] Carey Gillam, *What Is Going On With Glyphosate? EPA's Odd Handling of Controversial
Chemical*, HUFFINGTON POST, May 2, 2016, *available at* http://www.huffingtonpost.com/carey-gillam/
what-is-going-on-with-gly_b_9825326.html; *see also* P.J. Huffstutter, *EPA takes offline report that
says glyphosate not likely carcinogenic*, REUTERS, May 2, 2016, *available at* http://www.reuters.com/
article/us-usa-glyphosate-epa-idUSKCN0XU01K.
[24] See EPA's Office of Pesticide Programs, Glyphosate Issue Paper: Evaluation of Carcinogenic
Potential (Sept. 12, 2016), *available at* https://www.epa.gov/sites/production/files/2016-09/documents/
glyphosate_issue_paper_evaluation_of_carcinogenic_potential.pdf.
[25] *Id.*

63.     Thus, the OPP notes dozens of studies considered by IARC were not reviewed by the OPP because the OPP's "evaluation focused on studies on the active ingredient glyphosate" and "additional research could also be performed to determine whether formulation components, such as surfactants, influence the toxicity of glyphosate formulations."[26]

64.     From December 13 to 16, 2016, the EPA held FIFRA Scientific Advisory Panel ("SAP") meetings to consider issues raised by the OPP's evaluation of glyphosate. Again, OPP only allowed the SAP to consider studies of glyphosate alone, and not any study of the formulated product.  In its Charge to the FIFRA SAP, the OPP noted that "[a]lthough there are studies available on glyphosate-based pesticide formulations, the agency is soliciting advice from the FIFRA Scientific Advisory Panel (SAP) on this evaluation of human carcinogenic potential for the active ingredient glyphosate only at this time."[27]

65.     The OPP draft assessment therefore does not actually consider the product at issue in this litigation or, more importantly, how glyphosate, in conjunction with surfactants and other chemicals, affects carcinogenicity.

66.     On March 16, 2017, the final SAP meeting minutes and report were released, revealing disagreement and lack of consensus among the scientists on whether there was

---

[26] *Id.*
[27] EPA OPP, Glyphosate: Evaluation of Carcinogenic Potential, Charge to the FIFRA SAP for the October 18-21, 2016 Meeting, available at, https://www.epa.gov/sites/production/files/2016-11/ documents/glyphosate_sap_charge_questions_-final.pdf.

a positive association between *glyphosate* exposure and NHL.[28]

**J.     Monsanto's Industry Connections**

67.     Recently unsealed documents in the federal Roundup® MDL litigation reveal the extent to which Monsanto has been able to leverage its contacts within the EPA to protect glyphosate and Roundup® from scrutiny and review.

68.     Internal Monsanto documents, including email communications, demonstrate that Jess Rowland, former Deputy Division Director, Health Effects Division of the EPA's OPP, and formerly the chair of the CARC (the same committee that inadvertently leaked the EPA's glyphosate report in April 2016), repeatedly and directly intervened on Monsanto's behalf.   These same documents reveal that Monsanto was secure in the knowledge that it had allies within the EPA.

69.     To begin, in the months following IARC's initial March 2015 announcement that it had classified glyphosate as a probable carcinogen, Monsanto turned its attention to the EPA's review of glyphosate.   In one April 27, 2015 email, Monsanto official Bill Heydens wrote to colleagues to suggest "approaching EPA and…. ask if there is anything that would help them defend the situation?"   His colleague Dan Jenkins responded: "I think you and I could get on the phone w Jess Rowland and discuss this pretty openly. He'll give us straight talk."[29]

---

[28] FIFRA Scientific Advisory Panel Meeting Minutes and Final Report No. 2017-01, A Set of Scientific Issues Being Considered by the Environmental Protection Agency Regarding: EPA's Evaluation of the Carcinogenic Potential of Glyphosate, *available at* https://www.epa.gov/sites/production/files/2017-03/documents/december_13-16_2016_final_report_03162017.pdf.

[29] *See* Plaintiffs' Motion to Compel the Deposition of Jess Rowland, Ex. D, In re: Roundup Products Liability Litigation, MDL No. 2741 (N.D. Cal., Mar. 14, 2017), ECF No. 189-4.

70.     The following day, Mr. Jenkins spoke to Mr. Rowland by telephone and then relayed the substance of the conversation for his colleagues in an April 28, 2015 email.  Specifically, he reported back that with respect to the CARC investigation, Mr. Rowland had stated: "We have enough to sustain our conclusions. Don't need gene tox or epi . . . . I am the chair of the CARC and my folks are running this process for glyphosate in reg review. I have called a CARC meeting in June."[30]  Thus, even though the ostensible purpose of the CARC review was to evaluate the exhaustive IARC assessment on glyphosate, and even though the full IARC monograph on glyphosate would not be completed until July 2015, Mr. Rowland had already formed his conclusion months earlier—in April 2015.

71.     Mr. Rowland also intervened to halt another agency's review of glyphosate. When the Agency for Toxic Substances and Disease Registry ("ATSDR"), a federal public health agency of the U.S. Department of Health and Human Services, announced in February 2015 that it planned to publish a toxicological review of glyphosate, it was Mr. Rowland who helped Monsanto stop the ATSDR's investigation. In the same April 28, 2015, email discussed above, Mr. Jenkins explained that Mr. Rowland wanted to help Monsanto stop an investigation concerning the carcinogenicity of glyphosate being conducted by ATSDR.[31] Since ATSDR is not controlled by the EPA, according to Mr. Jenkins, Mr. Rowland had bragged: "If I can kill this I should get a medal."[32] Jenkins cautioned, however, that Monsanto should not "get your hopes up, I doubt EPA and Jess

---

[30] *Id.*
[31] *See id.*
[32] *Id.*

23

can kill this; but it's good to know they are going to actually make the effort now to coordinate due to our pressing and their shared concern that ATSDR is consistent in its conclusions with the EPA."[33]  The ATSDR never published its toxicological profile of glyphosate.

72.     Further, the released documents reveal Monsanto's confidence that its allies within the EPA would continue to support glyphosate.  In an internal memo on glyphosate, Monsanto executives wrote: "We know, *but cannot say*, that EPA's Office of Pesticide Program scientists strongly feel that glyphosate does not cause cancer and have defended their written determination internally for months."[34]  Notably, when Mr. Rowland attended the IARC glyphosate meetings as an observed for the EPA, internal communications indicate Monsanto was not displeased with his attendance since, "we all know Jess." [35]

K.      **Recent Worldwide Bans on Glyphosate/Roundup**

73.     Several countries around the world have instituted bans on the sale of Roundup and other glyphosate-containing herbicides, both before and since IARC first announced its assessment for glyphosate in March 2015, and more countries undoubtedly will follow suit as the dangers of the use of Roundup become more widely known. The Netherlands issued a ban on all glyphosate-based herbicides in April 2014, including Roundup, which will take effect by the end of 2015. In issuing the ban, the Dutch

---

[33] *Id.*
[34] *See* Plaintiffs' Motion to Compel the Deposition of Jess Rowland, Ex. E, In re: Roundup Products Liability Litigation, MDL No. 2741 (N.D. Cal., Mar. 14, 2017), ECF No. 189-5 (emphasis original).
[35] *See* Plaintiffs' Motion to Compel the Deposition of Jess Rowland, Ex. G, *In re: Roundup Products Liability Litigation*, MDL No. 2741 (N.D. Cal., Mar. 14, 2017), ECF No. 189-7.

Parliament member who introduced the successful legislation stated: "Agricultural pesticides in user-friendly packaging are sold in abundance to private persons. In garden centers, Roundup is promoted as harmless, but unsuspecting customers have no idea what the risks of this product are. Especially children are sensitive to toxic substances and should therefore not be exposed to it."[36]

74.     The Brazilian Public Prosecutor in the Federal District requested that the Brazilian Justice Department suspend the use of glyphosate.[37]

75.     France banned the private sale of Roundup and glyphosate following the IARC assessment for Glyphosate.[38]

76.     Bermuda banned both the private and commercial sale of glyphosates, including Roundup. The Bermuda government explained its ban as follows: "Following a recent scientific study carried out by a leading cancer agency, the importation of weed spray 'Roundup' has been suspended."[39]

77.     The Sri Lankan government banned the private and commercial use of glyphosate, particularly out of concern that glyphosate has been linked to fatal kidney

---

[36] *Holland's Parliament Bans Glyphosate Herbicides*, The Real Agenda, April 14, 2014, *available at* http://real-agenda.com/hollands-parliament-bans-glyphosate-herbicides/.
[37] Christina Sarich, *Brazil's Public Prosecutor Wants to Ban Monsanto's Chemicals Following Recent Glyphosate-Cancer Link*, GLOBAL RESEARCH, May 14, 2015, *available at* http://www.globalresearch.ca/brazils-public-prosecutor-wants-to-ban-monsantos-chemicals-following-recent-glyphosate-cancer-link/5449440; *see* Ministério Público Federal, *MPF/DF reforça pedido para que glifosato seja banido do mercado nacional*, April, 14, 2015, *available at* http://noticias.pgr.mpf.mp.br/noticias/noticias-do-site/copy_of_meio-ambiente-e-patrimonio-cultural/mpf-df-reforca-pedido-para-que-glifosato-seja-banido-do-mercado-nacional.
[38] Zoe Schlanger, *France Bans Sales of Monsanto's Roundup in Garden Centers, 3 Months After U.N. Calls it 'Probable Carcinogen'*, NEWSWEEK, June 15, 2015, *available at* http://www.newsweek.com/france-bans-sale-monsantos-roundup-garden-centers-after-un-names-it-probable-343311.
[39] *Health Minister: Importation of Roundup Weed Spray Suspended*, Today in Bermuda, May 11, 2015, *available at* http://www.todayinbermuda.com/news/health/item/1471-health-minister-importation-of-roundup-weed-spray-suspended.

disease in agricultural workers.[40]

78.     The government of Colombia announced its ban on using Roundup and glyphosate to destroy illegal plantations of coca, the raw ingredient for cocaine, because of the WHO's finding that glyphosate is probably carcinogenic.[41]

## L.     Statements of Concern Regarding Glyphosate-Based Herbicides

79.     On February 17, 2016, a consensus statement published in the journal *Environmental Health*, entitled "Concerns over use of glyphosate-based herbicides and risks associated with exposures: a consensus statement," assessed the safety of glyphosate-based herbicides ("GBHs").[42] The paper's "focus is on the unanticipated effects arising from the worldwide increase in use of GBHs, coupled with recent discoveries about the toxicity and human health risks stemming from use of GBHs."[43] The researchers drew seven factual conclusions about GBHs:

     i.     GBHs are the most heavily applied herbicide in the world and usage continues to rise;

     ii.     Worldwide, GBHs often contaminate drinking water sources, precipitation, and air, especially in agricultural regions;

     iii.     The half-life of glyphosate in water and soil is longer than previously recognized;

     iv.     Glyphosate and its metabolites are widely present in the global soybean supply;

---

[40] *Sri Lanka's New President Puts Immediate Ban on Glyphosate Herbicides*, Sustainable Pulse, May 25, 2015, *available at* http://sustainablepulse.com/2015/05/25/sri-lankas-new-president-puts-immediate-ban-on-glyphosate-herbicides/#.VeduYk3bKAw.
[41] *Columbia to ban coca spraying herbicide glyphosate*, BBC, May 10, 2015, *available at* http://www.bbc.com/news/world-latin-america-32677411.
[42] John P. Myers, et al, *Concerns over use of glyphosate-based herbicides and risks associated with exposures: a consensus statement*, Environmental Health (2016), *available at* http://ehjournal.biomedcentral.com/articles/10.1186/s12940-016-0117-0.
[43] *Id.*

v.    Human exposures to GBHs are rising;

vi.    Glyphosate is now authoritatively classified as a probable human carcinogen; and

vii.    Regulatory estimates of tolerable daily intakes for glyphosate in the United States and European Union are based on outdated science.[44]

80.    The researchers noted that GBH use has increased approximately 100-fold since the 1970s. Further, far from posing a limited hazard to vertebrates, as previously believed, two decades of evidence demonstrated that "several vertebrate pathways are likely targets of action, including hepatorenal damage, effects on nutrient balance through glyphosate chelating action and endocrine disruption."[45]

81.    The paper attributes uncertainties in current assessments of glyphosate formulations to the fact that "[t]he full list of chemicals in most commercial GBHs is protected as 'commercial business information,' despite the universally accepted relevance of such information to scientists hoping to conduct an accurate risk assessment of these herbicide formulations." Further, the researchers argue, "[t]he distinction in regulatory review and decision processes between 'active' and 'inert' ingredients has no toxicological justification, given increasing evidence that several so-called 'inert' adjuvants are toxic in their own right."[46]

82.    Among various implications, the researchers conclude that "existing toxicological data and risk assessments are not sufficient to infer that GBHs, as currently used, are safe." Further, "GBH-product formulations are more potent, or toxic, than

---

[44] *Id.*
[45] *Id.*
[46] *Id.*

glyphosate alone to a wide array of non-target organisms including mammals, aquatic insects, and fish." Accordingly, "risk assessments of GBHs that are based on studies quantifying the impacts of glyphosate alone underestimate both toxicity and exposure, and thus risk." The paper concludes that this "shortcoming has repeatedly led regulators to set inappropriately high exposure thresholds."[47]

83.      The researchers also critique the current practice of regulators who largely rely on "unpublished, non-peer reviewed data generated by the registrants" but ignore "published research because it often uses standards and procedures to assess quality that are different from those codified in regulatory agency data requirements, which largely focus on avoiding fraud." In the researchers' view, "[s]cientists independent of the registrants should conduct regulatory tests of GBHs that include glyphosate alone, as well as GBH-product formulations."[48]

84.      The researchers also call for greater inclusion of GBHs in government-led toxicology testing programs:

> [A] fresh and independent examination of GBH toxicity should be undertaken, and . . . this re-examination be accompanied by systematic efforts by relevant agencies to monitor GBH levels in people and in the food supply, none of which are occurring today. The U.S. National Toxicology Program should prioritize a thorough toxicological assessment of the multiple pathways now identified as potentially vulnerable to GBHs.[49]

---

[47] *Id*.
[48] *Id*.
[49] *Id*.

28

85.    The researchers suggest that, in order to fill the gap created by an absence of government funds to support research on GBHs, regulators could adopt a system through which manufacturers fund the registration process and the necessary testing:

> [W]e recommend that a system be put in place through which manufacturers of GBHs provide funds to the appropriate regulatory body as part of routine registration actions and fees. Such funds should then be transferred to appropriate government research institutes, or to an agency experienced in the award of competitive grants. In either case, funds would be made available to independent scientists to conduct the appropriate long-term (minimum 2 years) safety studies in recognized animal model systems. A thorough and modern assessment of GBH toxicity will encompass potential endocrine disruption, impacts on the gut microbiome, carcinogenicity, and multigenerational effects looking at reproductive capability and frequency of birth defects.[50]

86.    Despite these stated concerns, Monsanto, to date, has failed to test its formulated Roundup products.

**M.    Facts Specific to Johnny Wood**

87.    Plaintiff Johnny Wood was first exposed to Roundup in Grandview, Texas at some point in the late 1970s. He was exposed until approximately November 2021.

88.    Over the course of more than four decades, he purchased Roundup on a regular basis for use around his ranch.

89.    In December 2021, Mr. Wood was diagnosed with stage 4 mantle cell lymphoma ("MCL"), a type of non-Hodgkins lymphoma, at Baylor Scott & White All Saints Medical Center in Fort Worth, Texas.

90.    During the entire time that Mr. Wood utilized Roundup on his ranch, he

---

[50] *Id.*

did not know that exposure to Roundup was injurious to his health or to the health of others.

91.     Mr. Wood's stage 4 MCL is the direct and proximate result of the unreasonably dangerous and defective nature of Roundup and the Defendants' wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and/or sale of Roundup.  Mr. Wood continues to suffer from MCL and all attendant pain, suffering, and fatigue, and as a result of these injuries, has incurred medical expenses in the past and will, in all likelihood, continue to incur medical expenses in the future.

## EQUITABLE TOLLING OF THE STATUTE OF LIMITATIONS

92.     Plaintiff incorporates by reference all paragraphs contained in Section IV of this Petition as if fully set forth herein.

93.     Plaintiff Johnny Wood has suffered an illness that has a latency period and does not arise until years after exposure.  He had no way of knowing about the risks of serious illness associated with the use of and/or exposure to Roundup and glyphosate until he was made recently aware that his MCL could be caused by his use of and/or exposure to Roundup.  This is particularly true, here, where Defendants have gone to great lengths and considerable expense to *deny* any causal relationship between Roundup exposure and MCL.

94.     Within the time period of any applicable statutes of limitations, Plaintiff could not have discovered, through the exercise of reasonable diligence, that exposure to Roundup and glyphosate is injurious to human health.

95.     Plaintiff did not discover, and did not know, of facts that would cause a reasonable person to suspect, the risks associated with the use of and/or exposure to Roundup and glyphosate, nor would a reasonable and diligent investigation by him have disclosed that Roundup and glyphosate would cause his MCL.

96.     Furthermore, the running of the statute of limitations has been equitably tolled by reason of Monsanto's fraudulent concealment and conduct, as alleged above. Through its affirmative misrepresentations and omissions, Monsanto actively concealed from Plaintiff the true risks associated with the use of or exposure to Roundup.

97.     As a result of Monsanto's actions, Plaintiff was unaware, and could not reasonably know or have learned through reasonable diligence, that he had been exposed to the risks alleged herein and that those risks were the direct and proximate result of Monsanto's acts and omissions.

98.     Monsanto is further estopped from relying on any statute of limitations because of its concealment of the truth regarding the safety of Roundup. Monsanto was under a continuous duty to disclose to consumers, users, and any other persons coming into contact with Roundup the true character, quality, and nature of Roundup—as well as accurate safety information concerning the risks associated with the use of and/or exposure to the product—because this was non-public information over which Monsanto had and continues to have exclusive control.

99.     Monsanto knew that this information was not available to Plaintiff, his medical providers and/or his health facilities, yet it failed to disclose the information to the public. Instead, Monsanto knowingly, affirmatively, and actively concealed safety

information concerning Roundup and glyphosate and the serious risks associated with the use of and/or exposure to these products. Monsanto had the ability to and did spend enormous amounts of money in furtherance of its purposes of marketing and promoting a profitable product, notwithstanding the known or reasonably knowable risks. Plaintiff and his medical professionals could not have afforded to and could not have possibly conducted studies to determine the nature, extent, and identity of related health risks, and they were forced to rely on Monsanto's representations.

## CAUSES OF ACTION AGAINST DEFENDANT MONSANTO COMPANY

### COUNT ONE: NEGLIGENCE

100.    Plaintiff incorporates by reference each paragraph of this Complaint as if fully set forth herein and further alleges as follows:

101.    At all times relevant to this cause of action, Monsanto was in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting Roundup, including the Roundup at issue in this case.

102.    Monsanto had a duty to exercise reasonable and prudent care in the development, research, testing, design, manufacture, inspection, marketing, labeling, promotion, distribution, and sale of Roundup so as to avoid exposing others to foreseeable and unreasonable risks of harm.

103.    At all relevant times hereto, Monsanto duty of care included the duty to provide accurate, true, and correct information concerning the risks of using Roundup and appropriate, complete, and accurate warnings concerning the potential adverse effects of exposure to Roundup and, in particular, its active ingredient glyphosate.

104.    At all relevant times hereto, Monsanto knew or, in the exercise of reasonable care, should have known about the carcinogenic properties of the chemical glyphosate and knew, or in the exercise of reasonable care, should have known that the use of or exposure to Roundup products could cause Plaintiff's injuries.

105.    Accordingly, Monsanto knew or should have known that Roundup was dangerous or was likely to be dangerous when used in its intended or reasonably foreseeable manner.

106.    Monsanto knew or, in the exercise of reasonable care, should have known that Roundup is more toxic than glyphosate alone and that safety studies on Roundup, Roundup's adjuvants and "inert" ingredients, and/or the surfactant POEA were necessary to protect end users, including Plaintiff, from Roundup.

107.    Monsanto knew or, in the exercise of reasonable care, should have known that users and consumers of Roundup, including Plaintiff, were unaware of the risks and the magnitude of the risks associated with the use of and/or exposure to Roundup and glyphosate-containing products.

108.    Monsanto breached its duty of reasonable care and failed to exercise ordinary care in the design, research, development, manufacture, testing, marketing, supply, promotion, advertisement, packaging, sale, and distribution of its Roundup products, in that Monsanto manufactured and produced defective herbicides containing the chemical glyphosate, knew or had reason to know of the defects inherent in its products, knew or had reason to know that a user's or consumer's exposure to the products created a significant risk of harm and unreasonably dangerous side effects, and

failed to prevent or adequately warn of these risks and injuries.

109.    Monsanto failed to appropriately and adequately test Roundup, Roundup's adjuvants and "inert" ingredients, and/or the surfactant POEA to protect Plaintiff from Roundup.

110.    Despite its ability and means to investigate, study, and test its products and to provide adequate warnings, Monsanto has failed to do so. Indeed, Monsanto has wrongfully concealed information and has further made false and/or misleading statements concerning the safety and/or exposure to Roundup and glyphosate.

111.    Monsanto's breached its duty to exercise reasonable and prudent care in the development, testing, design, manufacture, inspection, marketing, labeling, promotion, distribution, and sale of Roundup in the following ways:

    a.    Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing its Roundup products without thorough and adequate pre- and post-market testing;

    b.    Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing Roundup while negligently and/or intentionally concealing and failing to disclose the results of trials, tests, and studies of exposure to glyphosate, and, consequently, the risk of serious harm associated with human use of and exposure to Roundup;

    c.    Failing to undertake sufficient studies and conduct necessary tests to determine whether or not Roundup products and glyphosate-containing products were safe for their intended use in agriculture, horticulture, and at-home use;

    d.    Failing to test, investigate, or study its formulated Roundup products;

    e.    Failing to undertake sufficient studies and conduct necessary tests to determine the safety of "inert" ingredients and/or adjuvants

contained within Roundup, and the propensity of these ingredients to render Roundup toxic, increase the toxicity of Roundup, whether these ingredients are carcinogenic, magnify the carcinogenic properties of Roundup, and whether or not "inert" ingredients and/or adjuvants were safe for use;

f.  Failing to use reasonable and prudent care in the design, research, manufacture, formulation, and development of Roundup products so as to avoid the risk of serious harm associated with the prevalent use of Roundup/glyphosate as an herbicide;

g.  Failing to design and manufacture Roundup products so as to ensure they were at least as safe and effective as other herbicides on the market;

h.  Failing to provide adequate instructions, guidelines, and safety precautions to those persons who Monsanto could reasonably foresee would use and/or be exposed to its Roundup products;

i.  Failing to disclose to Plaintiff, users, consumers, and the general public that the use of and exposure to Roundup presented severe risks of cancer and other grave illnesses;

j.  Failing to warn Plaintiff, users, consumers, and the general public that the product's risk of harm was unreasonable and that there were safer and effective alternative herbicides available to Plaintiff and other users or consumers;

k.  Systematically suppressing or downplaying contrary evidence about the risks, incidence, and prevalence of the side effects of Roundup and glyphosate-containing products;

l.  Representing that its Roundup products were safe for their intended use when, in fact, Monsanto knew or should have known that the products were not safe for their intended use;

m.  Declining to make or propose any changes to Roundup products' labeling or other promotional materials that would alert the consumers and the general public of the risks of Roundup and glyphosate;

n.  Advertising, marketing, and recommending the use of Roundup products, while concealing and failing to disclose or warn of the dangers known by Monsanto to be associated with or caused by the use of or exposure to Roundup and glyphosate;

o.   Continuing to disseminate information to its consumers, which indicate or imply that Monsanto's Roundup products are not unsafe for use in the agricultural, horticultural industries, and/or home use; and

p.   Continuing the manufacture and sale of its products with the knowledge that the products were unreasonably unsafe and dangerous.

112.   A reasonable manufacturer, distributor, or seller under the same or similar circumstances would not have engaged in the aforementioned acts and omissions.

113.   Plaintiff did not know the nature and extent of the injuries that could result from the intended use of and/or exposure to Roundup or its active ingredient glyphosate.

114.   Monsanto's negligence was the proximate cause of the injuries, harm, and economic losses that Plaintiff suffered, and will continue to suffer, as described herein. As a proximate result of Monsanto's wrongful acts and omissions in placing its defective Roundup products into the stream of commerce without adequate warnings of the hazardous and carcinogenic nature of glyphosate, Plaintiff developed MCL and has suffered, and will continue to suffer, serious physical injuries, pain and suffering, mental anguish, medical expenses, loss of enjoyment of life, disability, and other losses, in an amount to be determined at trial.

**COUNT TWO: STRICT LIABILITY DESIGN DEFECT**

115.   Plaintiff incorporates by reference each paragraph of this Complaint as if fully set forth herein and further alleges as follows:

116.   At all times relevant hereto, Monsanto was in the business of testing, developing, designing, manufacturing, marketing, promoting, distributing, and selling

into the stream of commerce Roundup products, including those used by Plaintiff.

117.    At all times relevant hereto, Monsanto's Roundup products reached the intended consumers, handlers, and users or other persons coming into contact with these products in Texas and throughout the United States without substantial change in their condition as designed, manufactured, sold, distributed, labeled, and marketed by Monsanto.

118.    At all times relevant hereto, Monsanto's Roundup products were manufactured and designed in an unsafe, defective, and inherently dangerous manner that was dangerous for use by or exposure to the public, and, in particular, Plaintiff Johnny Wood.

119.    Monsanto's Roundup products were defectively designed in that when they left Monsanto's control, they were unreasonably dangerous because they were not as safe as an ordinary consumer would expect when used in an intended or reasonably foreseeable manner.

120.    Monsanto's Roundup products were defective in design and formulation in that the foreseeable risks associated with these products' reasonably foreseeable uses exceeded the alleged benefits associated with their design and formulation—namely, Roundup posed a grave risk of cancer and other serious illnesses when used in a reasonably anticipated manner.

121.    Upon information and belief, Monsanto did not sufficiently test, investigate, or study its Roundup products and, specifically, the active ingredient

glyphosate, before placing these products into the stream of commerce, nor did Monsanto conduct adequate post-marketing surveillance of these products.

122.    At all relevant times hereto, Monsanto's Roundup products were and are more dangerous than alternative products, and it was economically and technologically feasible for Monsanto to design its Roundup products to make them less dangerous.

123.    Plaintiff used Roundup in a manner that was reasonably foreseeable to Monsanto.

124.    Plaintiff could not have, by the exercise of reasonable care, discovered the defects and risks associated with Roundup or glyphosate-containing products before or at the time of exposure.

125.    As a direct and proximate result of the defective design of Monsanto's Roundup products, Plaintiff developed MCL and has suffered, and will continue to suffer, serious physical injuries, pain and suffering, mental anguish, medical expenses, loss of enjoyment of life, disability, and other losses, in an amount to be determined at trial.

**COUNT THREE: STRICT LIABILITY FAILURE TO WARN**

126.    Plaintiff incorporates by reference each paragraph of this Complaint as if fully set forth herein and further alleges as follows:

127.    At all relevant times hereto, Monsanto designed, set specifications, formulated, manufactured, prepared, processed, marketed, labeled, distributed, and sold Roundup, including the Roundup products used by Plaintiff, into the stream of commerce and in the course of same, directly advertised and marketed the products to

consumers.

128.    At the time Monsanto designed, formulated, manufactured, marketed, labeled, distributed, and sold Roundup into the stream of commerce, Monsanto knew or should have known that Roundup presented an unreasonable danger to its users when put to its intended and reasonably anticipated use—namely that Roundup posed a grave risk of cancer and other serious illnesses.

129.    Consequently, Monsanto had a duty to warn of the risks of harm associated with the use of Roundup and to provide adequate instructions on the safe and proper use of the product. This duty extended to dangers and proper safety instructions that Monsanto became aware of even after it began placing Roundup into the stream of commerce.

130.    Monsanto, however, failed to adequately warn of the dangerous risks associated with the use of and exposure to Roundup products. Monsanto also actively concealed information concerning the dangerous nature of Roundup and its active ingredient glyphosate, making false and/or misleading statements concerning the safety of the product.

131.    The information that Monsanto did provide failed to contain relevant warnings, hazards, and precautions that would have enabled agricultural workers and/or at-home users like Plaintiff to utilize the products safely and with adequate protection. Instead, Monsanto disseminated information that was inaccurate, false, misleading, and which failed to communicate accurately or adequately the comparative severity, duration, and extent of the risk of injuries associated with use of and/or

exposure to Roundup and glyphosate. Monsanto continued to aggressively promote the efficacy of its products even after it knew or should have known of the unreasonable risks from use or exposure, and it concealed, downplayed, and/or otherwise suppressed, through aggressive marketing and promotion, any information or research about the risks and dangers of exposure to Roundup and glyphosate.

132.    At all relevant times hereto, Plaintiff used Roundup products in their a normal, customary, intended, and foreseeable manner, without knowledge of Roundup's dangerous characteristics.  Plaintiff would not have used the products if he had been adequately warned about the carcinogenic properties of Roundup.

133.    As such, Roundup was defective and unreasonable dangerous at the time of release into the stream of commerce, due to inadequate warnings, labeling, and/or instructions accompanying the product.

134.    As a direct and proximate result of Monsanto's lack of sufficient warning and/or instructions, Plaintiff developed MCL and has suffered, and will continue to suffer, serious physical injuries, pain and suffering, mental anguish, medical expenses, loss of enjoyment of life, disability, and other losses, in an amount to be determined at trial.

## COUNT FOUR: BREACH OF EXPRESS WARRANTIES

135.    Plaintiff incorporates by reference each paragraph of this Complaint as if fully set forth herein and further alleges as follows:

136.    At all relevant times hereto, Monsanto designed, set specifications, formulated, manufactured, prepared, processed, marketed, labeled, distributed, and sold

Roundup, including the Roundup products used by Plaintiff, into the stream of commerce and in the course of same, directly advertised and marketed the products to consumers.

137.    Monsanto breached express warranties under Section 2.313 of the Texas Business and Commerce Code.

138.    Before and during the time that Plaintiff purchased and was exposed to Roundup products, Monsanto expressly warranted to the consumers and users of its products—including Plaintiff—that these products were safe and fit for use as horticultural herbicides.

139.    Plaintiff relied on these representations in determining which herbicides to purchase for use on his ranch, and as such, these representations became part of the basis of the bargain and created an express warranty that Roundup would conform to Monsanto's representations.

140.    At the time of Plaintiff's purchasing of Roundup products, these products were not safe, in that the use of and/or exposure to Roundup posed a grave risk of cancer and other serious illnesses.

141.    As a direct and proximate result of Monsanto's breach of its express warranty, as described herein, Plaintiff developed MCL and has suffered, and will continue to suffer, serious physical injuries, pain and suffering, mental anguish, medical expenses, loss of enjoyment of life, disability, and other losses, in an amount to be determined at trial.

## COUNT FIVE: BREACH OF IMPLIED WARRANTIES

142.    Plaintiff incorporates by reference each paragraph of this Complaint as if fully set forth herein and further alleges as follows:

143.    At all relevant times hereto, Monsanto designed, set specifications, formulated, manufactured, prepared, processed, marketed, labeled, distributed, and sold Roundup, including the Roundup products used by Plaintiff, into the stream of commerce and in the course of same, directly advertised and marketed the products to consumers.

144.    Monsanto breached the implied warranties of merchantability and fitness for a particular purpose under the Texas Business and Commerce Code §§ 2.314 and 2.315.

145.    At the time and place of sale, distribution, and supply of the Roundup products purchased by Plaintiff, Monsanto expressly represented and warranted, by labeling materials submitted with the product, that Roundup was safe and effective for its intended and reasonably foreseeable use.

146.    Monsanto knew of the intended and reasonably foreseeable use of Roundup at the time it marketed, sold, and distributed the product for use by Plaintiff, and impliedly warranted the product to be of merchantable quality and safe and fit for its intended use.

147.    Monsanto impliedly represented and warranted to agricultural workers, farmers, and the general population—including Plaintiff—that Roundup was safe, of merchantable quality, and fit for the ordinary purpose for which the product was intended and marketed to be used.

148.    The representations and implied warranties made by Monsanto were false, misleading, and inaccurate because Roundup was defective, unsafe, unreasonably dangerous, and not of merchantable quality, when used in its intended and/or reasonably foreseeable manner as a horticultural herbicide.  Specifically, at the time of Plaintiff's purchase of Roundup, it was not in a merchantable condition in that the use of and/or exposure to Roundup posed a grave risk of cancer and other serious illnesses.

149.    Plaintiff reasonably relied on the superior skill and judgment of Monsanto, as the designer, researcher, and manufacturer of Roundup, as to whether Roundup was of merchantable quality and safe and fit for its intended use. Plaintiff also relied specifically on the implied warranty of merchantability and fitness for the particular use and purpose for which Roundup was manufactured and sold.

150.    Monsanto placed its Roundup products into the stream of commerce in a defective, unsafe, and unreasonably dangerous condition, and these products were expected to and did reach Plaintiff without substantial change in the condition in which the Roundup products were manufactured and sold.

151.    Monsanto breached its implied warranties because Roundup was not fit for its intended use and purpose.

152.    As a direct and proximate result of Monsanto's breach of its implied warranties, as described herein, Plaintiff developed MCL and has suffered, and will continue to suffer, serious physical injuries, pain and suffering, mental anguish, medical expenses, loss of enjoyment of life, disability, and other losses, in an amount to be determined at trial.

## PLAINTIFF IS ENTITLED TO PUNITIVE DAMAGES

153.    Plaintiff incorporates by reference each paragraph of this Complaint as if fully set forth herein and further alleges as follows:

154.    As described above, Monsanto regularly risks the lives of consumers and users of its products, including Plaintiff, with full knowledge of the dangers of its products. Over the course of decades, Monsanto has made conscious decisions not to redesign, re-label, warn, or inform the unsuspecting public, including Plaintiff. Monsanto's grossly negligent conduct warrants an award of exemplary damages.

155.    Monsanto's conduct, when viewed objectively, involved an extreme degree of risk, considering the probability and magnitude of potential harm to Plaintiff. Furthermore, Monsanto had actual, subjective awareness of the risks posed by Roundup, but nevertheless proceeded with conscious indifference to the rights, safety, and welfare of Plaintiff.  These actions constitute gross negligence as the term is defined by Texas law and, therefore, Plaintiff is entitled to exemplary damages.

## CONCLUSION AND PRAYER

WHEREFORE, Plaintiff pray for judgment as follows:

1.    For compensatory damages in an amount to be proven at trial;

2.    For damages for past, present, and future emotional distress, mental anguish, and other non-economic losses sustained as a result of Defendant's conduct;

3.    For reasonable and necessary medical expenses for treatment received in the past and, based upon reasonable medical probability, reasonable medical expenses Plaintiff will need in the future;

44

4.      For interest as permitted by law;

5.      For attorney's fees, expenses, and recoverable costs incurred in connection with this action; and

6.      For such other and further relief as the Court deems proper.

## JURY DEMAND

Plaintiff requests a trial by jury as to every claim and issue.

Respectfully Submitted,

Dated: May 17,2022        */s/ Ben C. Martin*                .
Ben C. Martin (Texas Bar No. 13052400)
Laura J. Baughman (Texas Bar No. 00791846)
**MARTIN | BAUGHMAN, PLLC**
3141 Hood Street, Suite 600
Dallas, TX 75219
Telephone: (214) 761-6614
Facsimile: (214) 744-7590
bmartin@martinbaughman.com
lbaughman@martinbaughman.com
*COUNSEL FOR PLAINTIFF*