# U.S. District Court
## District of Montana (Missoula)
## CIVIL DOCKET FOR CASE #: 9:22-cv-00099-DLC-KLD

Brown v. Monsanto Company et al
Assigned to: Judge Dana L. Christensen
Referred to: Magistrate Judge Kathleen L. DeSoto
Cause: 28:1332 Diversity-Personal Injury

Date Filed: 06/06/2022
Jury Demand: Both
Nature of Suit: 365 Personal Inj. Prod.
Liability
Jurisdiction: Diversity

**Plaintiff**

**Karen R. Brown**
*Individually and as Personal Representative
of the Estate of MICHAEL J. BROWN,
Deceased*

represented by **Dylan McFarland**
KNIGHT NICASTRO MACKAY, LLC
283 W. Front St.
Suite 203
Missoula, MT 59802
406-206-5747
Fax: 816-396-6233
Email: mcfarland@knightnicastro.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**James E. Roberts**
KNIGHT NICASTRO MACKAY, LLC
283 W. Front St.
Suite 203
Missoula, MT 59802
406-493-7287
Email: roberts@knightnicastro.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Thad A. Huse**
HUSE LAW OFFICE, P.C.
430 Ryman
PO Box 7796
Missoula, MT 59807
406-541-4040
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**William Adam Duerk**
KNIGHT NICASTRO MACKAY, LLC
283 W. Front St.
Suite 203
Missoula, MT 59802
406-546-0881
Email: duerk@knightnicastro.com

*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Monsanto Company**                    represented by   **Natasha Prinzing Jones**
                                                          BOONE KARLBERG, P.C.
                                                          201 West Main Street, Suite 300
                                                          PO Box 9199
                                                          Missoula, MT 59807-9199
                                                          406-543-6646
                                                          Fax: 549-6804
                                                          Email: npjones@boonekarlberg.com
                                                          *LEAD ATTORNEY*
                                                          *ATTORNEY TO BE NOTICED*

**Defendant**

**Bayer Corporation**                   represented by   **Natasha Prinzing Jones**
                                                          (See above for address)
                                                          *LEAD ATTORNEY*
                                                          *ATTORNEY TO BE NOTICED*

**Defendant**

**Bayer AG**

**Defendant**

**Does 1-10**

| Date Filed | # | Docket Text |
|---|---|---|
| 06/06/2022 | 1 | NOTICE OF REMOVAL by Monsanto Company from Montana Fourth Judicial District Court, Missoula County, case number DV-2019-761. (Attachments: # 1 Exhibit Service on Monsanto, # 2 Exhibit Consent by Bayer Corp., # 3 Civil Cover Sheet) (TAG) (Entered: 06/06/2022) |
| 06/06/2022 | | Filing fee: $ 402, receipt number AMTDC-2883600 (TAG) (Entered: 06/06/2022) |
| 06/06/2022 | 2 | ANSWER to Complaint with Jury Demand by Monsanto Company. (Jones, Natasha) (Entered: 06/06/2022) |
| 06/06/2022 | 3 | Corporate Disclosure Statement by Monsanto Company identifying Corporate Parent Bayer AG for Monsanto Company.. (Jones, Natasha) (Entered: 06/06/2022) |
| 06/06/2022 | 4 | ANSWER to Complaint with Jury Demand by Bayer Corporation. (Jones, Natasha) (Entered: 06/06/2022) |
| 06/06/2022 | 5 | Corporate Disclosure Statement by Bayer Corporation identifying Corporate Parent Bayer AG for Bayer Corporation.. (Jones, Natasha) (Entered: 06/06/2022) |
| 06/07/2022 | 6 | STATE COURT DOCUMENTS (APP) (Entered: 06/07/2022) |
| 06/07/2022 | 7 | STATE COURT COMPLAINT against All Defendants, filed by Karen R. Brown. (Attachments: # 1 State Court Amended Complaint, # 2 State Court Complaint) (APP) (Entered: 06/07/2022) |

| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 06/08/2022 09:43:00 | | | |
| **PACER Login:** | sh0019sh | **Client Code:** | 31943.356965 rhb |
| **Description:** | Docket Report | **Search Criteria:** | 9:22-cv-00099-DLC-KLD |
| **Billable Pages:** | 2 | **Cost:** | 0.20 |

FILED
05/02/2022
*Shirley Faust*
CLERK
Missoula County District Court
STATE OF MONTANA
By: Cheyenne Campbell
DV-32-2019-0000761-PL
Larson, John W
8.00

Dylan M. McFarland
James E. Roberts
W. Adam Duerk
KNIGHT NICASTRO MACKAY, LLC
283 West Front Street, Suite 203
Missoula, Montana 59802
Telephone:  (406) 206-5747
Facsimile:   (816) 396-6233
mcfarland@knightnicastro.com
roberts@knightnicastro.com
duerk@knightnicastro.com

Thad Huse
HUSE LAW OFFICE, P.C.
430 Ryman Street
Missoula, Montana 59802
Telephone:  (406) 541-4040
thuse@huselaw.com
       *Attorneys for Plaintiff*

## MONTANA FOURTH JUDICIAL DISTRICT COURT
## MISSOULA COUNTY

| | |
|---|---|
| KAREN R. BROWN, Individually and as Personal Representative of the Estate of MICHAEL J. BROWN, Deceased,<br><br>                    Plaintiff,<br><br>-vs.-<br><br>MONSANTO COMPANY, BAYER CORPORATION, BAYER AG, and DOES 1-10.<br>                    Defendants. | Cause No.: DV-2019-761<br>Dept. No. 1<br><br>**SECOND AMENDED COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL** |

Plaintiff, Karen R. Brown as Personal Representative of the Estate of Michael J. Brown, deceased, brings this complaint for damages against defendants Monsanto Company, Bayer Corporation, and Bayer AG , Plaintiff alleges as follows:

## **PARTIES, JURISDICTION, AND VENUE**

1.     Karen R. Brown is a citizen and resident of Missoula County, Montana. Plaintiff is the widow and Personal Representative of the Estate of the decedent, Michael J. Brown.  Mr. Brown was a citizen and resident of Missoula County, Montana until his death on April 21, 2018.

2.     Monsanto Company is a Delaware Corporation with its principal place of business in St. Louis, Missouri. Monsanto sells its products throughout the United States, including in Montana. Monsanto Company is registered with the Montana Secretary of State and its registered agent is located at 26 W Sixth Ave, Helena, MT 59624.

3.     Defendant Bayer Corporation is an Indiana Corporation that has its principal place of business and United States and headquarters in Pittsburgh, Pennsylvania.  Bayer Corporation, through the purchase of Defendant Monsanto, was at all times responsible for the research, testing, development, manufacturing, sales, distribution, promotion, labeling and marketing of Roundup, which it placed into the stream of commerce and continues to place in the stream of commerce in the United States.  At all times relevant hereto, Defendant Bayer Corporation regularly conducted business in the State of Montana and in Missoula County.

4.      Defendant Bayer AG is a German Corporation that has its corporate headquarters at Leverkusen, Germany.   Bayer AG, through the purchase of Monsanto, was at all times responsible for the research, testing, development, manufacturing, sales, distribution, promotion, labeling and marketing of Roundup, which it placed into the stream of commerce and continues to place in the stream of commerce in the United States.  At all times relevant hereto, Defendant Bayer AG regularly conducted business in the State of Montana and in Missoula County.

5.      Monsanto designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed the commercial herbicide Roundup.

6.      This Court has personal jurisdiction over Defendants Monsanto Company, Bayer AG and Bayer Corporation (collectively "Monsanto") because Monsanto transacts business in and is a corporation doing business within Montana. Monsanto knows that its Roundup products are and were sold throughout Montana, and, more specifically, caused Roundup to be sold to Plaintiff in Montana. In addition, Monsanto maintains sufficient contacts with the State of Montana such that this Court's exercise of personal jurisdiction over it does not offend traditional notions of fair play and substantial justice.

7.      Monsanto advertises and sells goods, specifically Roundup, throughout Montana. It derived substantial revenue from goods and products used in Montana. It expected its acts to have consequences within Montana and derived substantial revenue from interstate commerce. Specific to this case, Monsanto engaged in the

business of developing, manufacturing, testing, packaging, marketing, distributing, labeling, and selling Roundup. Monsanto purposefully availed itself of the privilege of conducting activities within Montana, thus invoking the benefits and protections of its laws.

8.   This Court has jurisdiction over the subject matter of this litigation pursuant to Mont. Code Ann. § 3-5-302.

9.   Venue properly lies in Missoula County pursuant to Mont. Code Ann. § 25-2-122, because the tort was committed in Missoula County.

## GENERAL ALLEGATIONS

10.   Roundup is a product which is designed to kill.  Roundup is an herbicide used to kill weeds, especially broadleaf weeds and grasses.  It is also deadly to humans.

11.   Glyphosate, which is an active ingredient in Roundup, is a carcinogen. It has been identified as causing various forms of cancer, in particular Non- Hodgkin Lymphoma ("NHL"), specifically an aggressive form of NHL identified as Diffuse Large B-Cell Lymphoma, the same disease that caused Plaintiff's death.

12.   2, 4-dichlorophenoxyacetic acid is a carcinogen.  It has been identified as causing various forms of cancer and is used in a number of Roundup products including those used by Plaintiff.

13.   "Roundup" refers to all formulations of Monsanto's Roundup products, including, but not limited to, Roundup Concentrate Poison Ivy and Tough Brush

Killer 1, Roundup Custom Herbicide, Roundup D-Pak herbicide, Roundup Dry Concentrate, Roundup Export Herbicide, Roundup Fence & Hard Edger 1, Roundup Garden Foam, Weed & Grass Killer, Roundup Grass and Weed Killer, Roundup Herbicide, Roundup Original 2k herbicide, Roundup Original II Herbicide, Roundup Pro Concentrate, Roundup Prodry Herbicide, Roundup Promax, Roundup Quik Stik Grass and Weed Killer, Roundup Quikpro Herbicide, Roundup Rainfast Concentrate Weed & Grass Killer, Roundup Rainfast Super Concentrate Weed & Grass Killer, Roundup Ready-to-Use Extended Control Weed & Grass Killer 1 Plus Weed Preventer, Roundup Ready-to-Use Weed & Grass Killer, Roundup Ready-to- Use Weed and Grass Killer 2, Roundup Ultra Dry, Roundup Ultra Herbicide, Roundup Ultramax, Roundup VM Herbicide, Roundup Weed & Grass Killer Concentrate, Roundup Weed & Grass Killer Concentrate Plus, Roundup Weed & Grass killer Ready-to-Use Plus, Roundup Weed & Grass Killer Super Concentrate, Roundup Weed & Grass Killer Ready- to-Use, Roundup WSD Water Soluble Dry Herbicide Deploy Dry Herbicide, or any other formulation containing the active ingredient glyphosate.

14.     Monsanto is the world's leading producer of glyphosate.

15.     Monsanto discovered the herbicidal properties of glyphosate during the 1970's and developed it as a broad-spectrum herbicide used to kill weeds and grasses known to compete with commercial crops grown around the globe.

16.    Sprayed as a liquid, plants absorb glyphosate directly through their leaves, stems, and roots; and detectable quantities accumulate in the plant tissues.

17.    Roundup was introduced in 1974 and is today one of the world's most widely used herbicides.

18.    Since it was introduced in 1974, farmers, ranchers and consumers have used Roundup unaware it is a carcinogen.

19.    Monsanto represented to farmers, ranchers and consumers that its spray-on glyphosate-based herbicides, including Roundup, were "safer than table salt" and "practically non-toxic" to mammals, birds, and fish.

20.    Monsanto also represented to farmers, ranchers and consumers:

a.    Remember that environmentally friendly Roundup herbicide is biodegradable. It won't build up in the soil so you can use Roundup with confidence along customers' driveways, sidewalks and fences.

b.    And remember that Roundup is biodegradable and won't build up in the soil. That will give you the environmental confidence you need to use Roundup everywhere you've got a weed, brush, edging or trimming problem.

c.    Roundup biodegrades into naturally occurring elements.

d.    You can apply Roundup with "confidence because it will stay where you put it" it bonds tightly to soil particles, preventing leaching. Then, soon after application, soil microorganisms biodegrade Roundup into natural products.

e.    Glyphosate is less toxic to rats than table salt following acute oral ingestion.

  f. Glyphosate's safety margin is much greater than required. It has over a 1,000-fold safety margin in food and over a 700-fold safety margin for workers who manufacture it or use it.

  g. You can feel good about using herbicides by Monsanto. They carry a toxicity category rating of 'practically non-toxic' as it pertains to mammals, birds and fish.

  h. Roundup can be used where kids and pets will play and breaks down into natural material.

21. On November 19, 1996, Monsanto entered into an Assurance of Discontinuance with the New York Attorney General, in which Monsanto agreed, among other things, "to cease and desist from publishing or broadcasting any advertisements [in New York] that represent, directly or by implication" that:

  a. Remember that environmentally friendly Roundup herbicide is biodegradable. It won't build up in the soil so you can use Roundup with confidence along customers' driveways, sidewalks and fences.

  b. its glyphosate-containing pesticide products or any component thereof manufactured, formulated, distributed or sold by Monsanto are biodegradable;

  c. its glyphosate-containing pesticide products or any component thereof stay where they are applied under all circumstances and will not move through the environment by any means;

  d. its glyphosate-containing pesticide products or any component thereof are "good" for the environment or are "known for their environmental characteristics;"

  e. glyphosate-containing pesticide products or any component thereof are safer or less toxic than common consumer products other than herbicides; and

  f. its glyphosate-containing products or any component thereof might be classified as "practically non-toxic."

22.     However, Monsanto did not alter its advertising in the same manner in any state other than New York and continued to make those misrepresentations to the citizens and consumers in Montana, including Plaintiff.

23.     The International Agency for Research on Cancer ("IARC") is the specialized intergovernmental agency that the World Health Organization ("WHO") of the United Nations tasked with conducting and coordinating research into the causes of cancer.

24.     An IARC Advisory Group to report on the Recommend Priorities for IARC Monographs during 2015-2019, met in April 2014.   The IARC noted an association between glyphosate and NHL and the IARC set glyphosate for review in 2015-2016.

25.     On March 24, 2015, after IARC reviewed numerous studies, many of which had been in Monsanto's possession since as early as 1985, the IARC's working group published its conclusion that the glyphosate contained in Monsanto's Roundup herbicide, is classified as a Group 2A chemical ("probably carcinogenic to humans") as demonstrated by the mechanistic evidence (genotoxicity and oxidative stress) of carcinogenicity in humans and sufficient evidence of carcinogenicity in animals.

26.     The IARC's full Monograph was published on July 29, 2015, and established glyphosate as a Group 2A probable carcinogen to humans. According to the authors, glyphosate demonstrated sufficient mechanistic evidence to warrant a 2A classification based on evidence of carcinogenicity in humans and animals.

27.     The IARC Working Group found an increased risk between exposure to glyphosate and NHL and several subtypes of NHL, and the increased risk continued after adjustment for other pesticides.

28.     The IARC also found that glyphosate caused DNA and chromosomal damage in human cells.

29.     Despite the relatively new classification by the IARC, Monsanto had ample evidence of the dangers of glyphosate in humans and Roundup's genotoxic properties for decades prior to the IARC's classification.

30.     Genotoxicity refers to chemical agents capable of damaging the DNA within a cell through genetic mutations, which is a process that is believed to lead to cancer.

31.     In 1997, Chris Clements published "Genotoxicity of select herbicides in Rana catesbeiana tadpoles using the alkaline single-cell gel DNA electrophoresis (comet) assay." The study found that tadpoles exposed to Roundup showed significant DNA damage when compared with unexposed control animals.

32.     In 2003, Lennart Hardell and Mikael Eriksson published the results of two case-controlled studies on pesticides as a risk factor for NHL and hairy cell leukemia. The study concluded that glyphosate had the most significant relationship to NHL among all herbicide studies with an increased odds ratio of 3:11.

33.     In 2003, AJ De Roos published a study examining the pooled data of mid-western farmers, examining pesticides and herbicides as risk factors for NHL.

The study, which controlled for potential confounders, found a relationship between increased NHL incidence and glyphosate.

34.     In 2006, Cesar Paz-y-Mino published a study examining DNA damage in human subjects exposed to glyphosate. The study produced evidence of chromosomal damage in blood cells showing significantly greater damage after exposure to glyphosate than before in the same individuals, suggesting that the glyphosate formulation used during aerial spraying had a genotoxic effect on exposed individuals.

35.     In 2008, Mikael Eriksson published a population-based case-control study of exposure to various pesticides as a risk factor for NHL. This strengthened previous associations between glyphosate and NHL.

36.     In spite of this knowledge, Monsanto continued to issue broad and sweeping statements suggesting that Roundup was, and is, safer than ordinary household items such as table salt, despite a lack of scientific support for the accuracy and validity of these statements and, in fact, voluminous evidence to the contrary.

37.     These statements and representations have been made with the intent of inducing Plaintiff, the agricultural community, and the public at large to purchase, and increase the use of Roundup for Monsanto's pecuniary gain, and in fact did induce Plaintiff to use Roundup.

38.     Monsanto failed to appropriately and adequately inform and warn Plaintiff of the serious and dangerous risks associated with the use of and exposure to glyphosate and/or Roundup, including, but not limited to, the risk of developing NHL, as well as other severe and personal injuries, which are permanent and/or long-lasting in nature, cause significant physical pain and mental anguish, diminished enjoyment of life, and the need for medical treatment, monitoring, and/or medications.

39.     For years, as Mr. Brown was exposed to Roundup, he was unaware of any causal link between Roundup and cancer, or any health risks related to Defendant's product.  To the contrary, Monsanto regularly advertised that Roundup was safe to use.

40.     Mr. Brown did not use any personal protective equipment when mixing Roundup, spraying Roundup, applying Roundup or cleaning Roundup after spillage or use.  To the contrary, Mr. Brown often mixed, sprayed or cleaned Roundup in a short-sleeved shirt, or no shirt, in shorts, with open toed footwear or sandals and with nothing covering his hands, face or mouth.

41.     During the entire time in which Plaintiff was exposed to Roundup, he did not know exposure to Roundup was injurious to his health or the health of others.

42.     Monsanto did not warn Mr. Brown that the use of personal protective equipment when using Roundup was required or even recommended.

43.     Monsanto did not warn Mr. Brown that exposure to Roundup was dangerous and potentially fatal.

44.     Plaintiff routinely sprayed Roundup around his personal property, his neighbor's property, his father's property, his business property and his lake property.

45.     Plaintiff routinely mixed Roundup prior to application and carried Roundup in his vehicle as he used it on a regular basis.

46.     After more than 30 years of exposure to Roundup, on July 29, 2016, doctors diagnosed Mr. Brown with Stage III, Diffuse Large B-cell Non-Hodgkin's Lymphoma.

47.     As a result of the NHL diagnosis caused by Defendant's product, Mr. Brown underwent a significant amount of treatment, including chemotherapy and stem-cell therapy in his attempt to battle the disease.  In doing so, Mr. Brown and his family incurred a considerable amount of medical expenses and incidental expenses.

48.     Mr. Brown ultimately succumbed to NHL on April 21, 2018, at the age of 60.

49.     By reason of the foregoing acts and omissions, Plaintiff seeks compensatory damages as a result of Plaintiff's use of, and exposure to, Roundup, which caused or was a substantial contributing factor in causing Mr. Brown to suffer from cancer and ultimately, his death. Plaintiff endured pain and suffering,

emotional and mental anguish, medical expenses, loss of income, funeral expenses and other economic and non-economic damages.

## **COUNT I - Negligence**

50.     Plaintiff re-alleges each paragraph above as if fully set forth herein.

51.     Monsanto had a duty to exercise reasonable care in designing, researching, testing, manufacturing, marketing, supplying, promoting, packaging, sale, and/or distribution of Roundup to ordinary consumers such as Plaintiff.

52.     Monsanto failed to exercise ordinary care in the designing, researching, testing, manufacturing, marketing, supplying, promoting, packaging, sale, testing, quality assurance, quality control, and/or distribution of Roundup to ordinary consumers such as Plaintiff, in that Monsanto knew or should have known that using Roundup created a high risk of unreasonable, dangerous side effects, including, but not limited to, the development of NHL, as well as other severe and personal injuries which are permanent and lasting in nature, result in physical pain and mental anguish, including diminished enjoyment of life, as well as need for medical treatment and potentially, death.

53.     Monsanto breached their duty to Plaintiff when they introduced, marketed and sold a product that they knew or should have known was a carcinogen dangerous to humans without proper warning, adequate testing and a failure to use of ordinary care in the design or manufacture of Roundup.

54.     Despite the fact that Monsanto knew or should have known that Roundup caused, or could cause, harm to humans and consumers like Plaintiff, Defendants continued and continues to market, manufacture, distribute, and/or sell Roundup to consumers, including the Plaintiff.

55.     Monsanto knew or should have known that consumers such as the Plaintiff would foreseeably suffer injury as a result of Defendant's failure to exercise ordinary care, as set forth above.

56.     Defendants' violations of law and/or negligence were the proximate cause of Plaintiff's injuries, harm, damages and economic loss, which Plaintiff suffered.

57.     As a result of the foregoing acts and omissions, the Plaintiff suffered and ultimately died from NHL.  As a result of Defendants' negligence, Plaintiff suffered physical pain and mental anguish, diminished enjoyment of life, past medical care, loss of income and ultimately, death.   These damages will be determined by a jury at trial.

## COUNT II – Negligent Misrepresentation

58.     Plaintiff re-alleges each paragraph above as if fully set forth herein.

59.     Monsanto made representations as to material fact regarding its product Roundup.  Specifically, Monsanto made the following representations:

> a.      Remember that environmentally friendly Roundup herbicide is biodegradable. It won't build up in the soil so you can use

Roundup with confidence along customers' driveways, sidewalks and fences.

b.      And remember that Roundup is biodegradable and won't build up in the soil. That will give you the environmental confidence you need to use Roundup everywhere you've got a weed, brush, edging or trimming problem.

c.      Roundup biodegrades into naturally occurring elements.

d.      You can apply Roundup with "confidence because it will stay where you put it" it bonds tightly to soil particles, preventing leaching. Then, soon after application, soil microorganisms biodegrade Roundup into natural products.

e.      Glyphosate is less toxic to rats than table salt following acute oral ingestion.

f.      Glyphosate's safety margin is much greater than required. It has over a 1,000-fold safety margin in food and over a 700-fold safety margin for workers who manufacture it or use it.

g.      You can feel good about using herbicides by Monsanto. They carry a toxicity category rating of 'practically non-toxic' as it pertains to mammals, birds and fish.

h.      Roundup can be used where kids and pets will play and breaks down into natural material.

60.    These representations by Monsanto were untruthful when they were made, and the Monsanto knew or should have known they were untruthful.

61.    Plaintiff relied on Monsanto's representations and as a result did not use any personal protective equipment when using, applying, mixing or cleaning up Roundup.

62.     Plaintiff's reliance on Monsanto's representations caused him damages, specifically it caused a carcinogen to come in contact with his skin, on multiple occasions and ultimately caused NHL and untimely death.

## **COUNT III – Strict Products Liability (Design Defect)**

63.     Plaintiff re-alleges each paragraph above as if fully set forth herein.

64.     At all times relevant, Monsanto designed, researched, manufactured, tested, advertised, promoted, sold, and distributed Roundup as hereinabove described that was used by Plaintiff.

65.     Roundup was expected to and did reach consumers and persons coming into contact with it without substantial change in the condition in which it was produced, manufactured, sold, distributed, and marketed.

66.     Roundup was and is defective because it was and is dangerous to an extent beyond that which an ordinary consumer would anticipate.

67.     Plaintiff was exposed to Roundup without knowledge of Roundup's dangerous characteristics.

68.     At the time of Plaintiff's use of and exposure to Roundup, Roundup was being used for the purposes and in a manner normally intended, as a broad-spectrum herbicide.

69.     Plaintiff's use of, and exposure to, Roundup caused or was a substantial contributing factor in causing Mr. Brown to suffer from, and ultimately die of cancer.

Plaintiff endured pain and suffering, emotional and mental anguish, medical expenses, loss of income, funeral expenses and other economic and non-economic damages.

## **COUNT IV - Strict Products Liability (Failure to Warn)**

70.     Plaintiff re-alleges each paragraph above as if fully set forth herein.

71.     At all times relevant, Monsanto designed, researched, manufactured, tested, advertised, promoted, sold, and distributed Roundup as hereinabove described that was used by Plaintiff.

72.     Warnings or instructions regarding the full and complete risks of Roundup and glyphosate-containing products should have been prominently included with Roundup because of the risks of harm associated with the use of and/or exposure to such products.

73.     At all relevant times, Roundup was defective because it was not accompanied by proper warnings regarding its carcinogenic qualities and possible side effects, including, but not limited to, developing NHL as a result of exposure and use.

74.     Had Plaintiff been appropriately warned, he would not have used Roundup or would have taken additional precautions to limit Roundup exposure.

75.     Plaintiff's use of, and exposure to, Roundup caused or was a substantial contributing factor in causing Mr. Brown's cancer. Plaintiff endured pain and

suffering, emotional and mental anguish, medical expenses, loss of income, funeral expenses and other economic and non-economic damages.

### COUNT V (Violation of Montana's Consumer Protection Act)

76.     Plaintiff re-alleges each paragraph above as if fully set forth herein.

77.     At the time that Plaintiff was using and being exposed to Roundup, Monsanto was aware of the risk that Roundup posed to consumers, such as Plaintiff, related to cancer and specifically NHL.

78.     In violation of Montana's Consumer Protection Act, Monsanto engaged in deceptive trade practices described herein in the marketing and sale of Roundup by misrepresenting and/or failing to warn about the risk of cancer posed by Roundup.

79.     Plaintiff was injured as a direct and proximate result of Monsanto's conduct.

### COUNT VI – Wrongful Death

80.     Plaintiff re-alleges and re-states each paragraph as if fully set forth herein.

81.     Michael Brown's death was caused, in whole or in part, by Defendants' acts and omissions as alleged above.

82.     Michael Brown is survived by his wife, Karen Brown, and his children.

83.     As a result of Defendants' acts and omissions, Defendants are liable for Plaintiff's damages of grief, sorrow, and mental anguish, emotional distress damages and funeral expenses arising from the death of Michael Brown.

84.     As a direct and proximate cause of Defendants' acts and omissions, Plaintiff has sustained damages in an amount to be determined by trial.

## COUNT VII – Survivorship

85.     Plaintiff re-alleges each paragraph as if fully set forth herein.

86.     As a result of Defendants' acts and omissions, Michael Brown sustained damages, including but not limited to pain and suffering, medical expenses, funeral expenses, and emotional distress damages from the time he was diagnosed with NHL on July 29, 2016, until his death on April 21, 2018.

87.     As a direct and proximate cause of Defendants' acts and omissions, Michael Brown suffered damages in amounts to be determined at trial.

## COUNT VIII - (Punitive Damages)

88.     Plaintiff re-alleges each paragraph as if fully set forth herein.

89.     Defendants knew or should have known about the risks posed by Roundup, but recklessly failed to warn consumers. Instead, as alleged above, Monsanto promoted Roundup without regard for its toxic effects. Monsanto deliberately proceeded to act in conscious disregard or indifference to a high

probability of injury. Monsanto's acts demonstrate indifference to the health and well-being of consumers, including Plaintiff.

90.    Plaintiff is entitled to punitive damages in an amount sufficient to punish Monsanto and deter them and other companies from acting in this manner in the future.

## **DOE DEFENDANTS 1-10**

91.    Plaintiff re-alleges each paragraph as if fully set forth herein.

92.    The true names and capacities of the defendants named herein as Does A-Z, inclusive, are unknown to Plaintiff at this time, who therefore brings this action against said defendants by fictitious name.  Plaintiff will seek leave to amend the complaint to state the true names and capacities of Defendants Does 1-10 when the same have been ascertained, together with further charging allegations, as appropriate. Plaintiff is informed and believes and thereon alleges that each of said fictitiously named defendants may be legally responsible in some manner for the occurrences alleged herein and that plaintiff's damages as alleged herein may have been proximately caused in part by unlawful acts or omissions of said fictitiously named defendants.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands judgment against Defendants jointly and severally for all the damages allowed by law, including but not limited to:

1.      All damages, special and general, recoverable under Montana law, with the exception of loss of income, loss of earnings or loss of earning capacity, in a reasonable sum to be proven at trial;

2.      All wrongful death damages afforded to and recoverable by Michael Brown's heirs including but not limited to compensatory damages, and grief, sorrow and mental anguish;

3.      All survivorship damages afforded to and recoverable by Michael Brown from the time that he was diagnosed with NHL until the time of his death including but not limited to medical expenses, funeral expenses, and reasonable compensation for pain, suffering, and emotional distress damages.

4.      Punitive damages in a sufficient amount to discourage Monsanto and others from engaging in like conduct in the future; and,

5.      Such other relief, including attorneys' fees and pre or post-judgment interest, as the Court deems just and proper under the circumstances, or that is appropriate under law or equity.

## <u>REQUEST FOR JURY TRIAL</u>

Plaintiff requests that all issues of fact be determined by a twelve-person jury.

DATED this 2nd day of May, 2022.

**KNIGHT NICASTRO MACKAY, LLC**

By: _____

      Dylan M. McFarland
      James E. Roberts
      W. Adam Duerk
      283 West Front Street, Suite 203
      Missoula, Montana 59802
      Telephone:   (406) 206-5747
      Facsimile:    (816) 396-6233
      mcfarland@knightnicastro.com
      roberts@knightnicastro.com
      duerk@knightnicastro.com

      **HUSE LAW OFFICE, P.C.**
      Thad Huse
      430 N. Ryman Street
      Missoula, Montana 59802
      Telephone:   (406) 541-4040
      thuse@huselaw.com

      *Attorneys for Plaintiff*