**Query**   **Reports**   **Utilities**   **Help**   **Log Out**

JKH

# U.S. District Court
## SOUTHERN DISTRICT OF TEXAS (Corpus Christi)
## CIVIL DOCKET FOR CASE #: 2:22-cv-00124

Luby, Jr. et al v. Naylors Farm and Ranch Supply Inc et al
Assigned to: Judge Nelva Gonzales Ramos
Case in other court: 214th District Court of Nueces County, TX,
              2021DCV-3783-F
Cause: 28:1332 Diversity-Product Liability

Date Filed: 06/06/2022
Jury Demand: Both
Nature of Suit: 365 Personal Inj. Prod.
Liability
Jurisdiction: Diversity

**Plaintiff**

**John Luby, Jr.**                     represented by   **Ernest W. Boyd , Jr**
Butch Boyd Law Firm
2905 Sackett St
Houston, TX 77098
713-589-8477
Fax: 713-589-8563
Email: butchboyd@butchboydlawfirm.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Michael Joshua Blanchard**
Butch Boyd Law Firm
2905 Sackett
Houston, TX 77098
713-589-8477
Email:
mikeblanchard@butchboydlawfirm.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Bridget Luby**                     represented by   **Ernest W. Boyd , Jr**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Michael Joshua Blanchard**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Berry Chase Peterson**                     represented by   **Ernest W. Boyd , Jr**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Michael Joshua Blanchard**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

<u>Plaintiff</u>

**Kathy Peterson**                    represented by **Ernest W. Boyd , Jr**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Michael Joshua Blanchard**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

<u>Defendant</u>

**Naylors Farm and Ranch Supply Inc**          represented by **Sonila Themeli**
Shook, Hardy & Bacon L.L.P.
600 Travis Street
Suite 3400
Houston, TX 77002
713-227-8008
Fax: 713-227-9508
Email: sthemeli@shb.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Ryan S Killian**
Shook Hardy Bacon LLP
600 Travis St
Ste 3400
Houston, TX 77002
713-227-8008
Email: rkillian@shb.com
*ATTORNEY TO BE NOTICED*

<u>Defendant</u>

**Monsanto Company**                    represented by **Sonila Themeli**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Ryan S Killian**
(See above for address)
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
|  |  |  |

| 06/06/2022 | 1 | NOTICE OF REMOVAL from 214 District Court, Nueces County, TX, case number 2021DCV-3783-F (Filing fee $ 402 receipt number ATXSDC-28280823) filed by Monsanto Company. (Attachments: # 1 Exhibit 1-A, # 2 Exhibit 1-B, # 3 Exhibit 1-C, # 4 Exhibit 1-D, # 5 Exhibit 1-E, # 6 Exhibit 1-F, # 7 Exhibit 1-G, # 8 Exhibit 2, # 9 Exhibit 3, # 10 Exhibit 4, # 11 Civil Cover Sheet)(Killian, Ryan) (Entered: 06/06/2022) |
| --- | --- | --- |
| 06/06/2022 | 2 | CORPORATE DISCLOSURE STATEMENT by Monsanto Company identifying Bayer AG as Corporate Parent, filed.(Killian, Ryan) (Entered: 06/06/2022) |
| 06/07/2022 | 3 | ORDER for Initial Pretrial and Scheduling Conference and Order to Disclose Interested Persons. Initial Conference set for 9/8/2022 at 09:00 AM before Judge Nelva Gonzales Ramos(Signed by Judge Nelva Gonzales Ramos) Parties notified.(SashaOzuna, 2) (Main Document 3 replaced on 6/8/2022) (SashaOzuna, 2). (Entered: 06/07/2022) |

| PACER Service Center | | | |
| --- | --- | --- | --- |
| Transaction Receipt | | | |
| 06/08/2022 11:25:03 | | | |
| PACER Login: | sh0019sh | Client Code: | 31943.356965 rhb |
| Description: | Docket Report | Search Criteria: | 2:22-cv-00124 |
| Billable Pages: | 3 | Cost: | 0.30 |

Filed
4/21/2022 11:32 AM
Anne Lorentzen
District Clerk
Nueces County, Texas

CAUSE NO. 2021DCV-3783-F

| | | |
|---|---|---|
| JOHN LUBY, JR., BRIDGET LUBY, | ) | IN THE DISTRICT COURT OF |
| BERRY CHASE PETERSON, AND | ) | |
| KATHY PETERSON | ) | |
| v. | ) | |
| | ) | NUECES COUNTY, TEXAS |
| | ) | |
| NAYLOR'S FARM & RANCH | ) | |
| SUPPLY, INC., ET AL | ) | 214th JUDICIAL DISTRICT |

## PLAINTIFFS' FIRST AMENDED ORIGINAL PETITION

COMES NOW the Plaintiff, JOHN LUBY, JR., BRIDGET LUBY, BERRY CHASE PETERSON and KATHY PETERSON and bring this action against Defendants Naylor's Farm & Ranch Supply, Inc. and Monsanto Company ("Monsanto"), as follows:

## INTRODUCTION

Plaintiffs bring this cause of action against Defendants for injuries sustained as a result of using Monsanto Company's unreasonably dangerous and defective product, Roundup®. More specifically, Plaintiffs' claims involve Defendant Naylor's Farm & Ranch Supply, Inc.'s negligent and wrongful conduct in connection with the promoting, marketing, advertising, distribution, and/or sale of Roundup® and/or other Monsanto Company glyphosate-containing products ("Roundup" or "Roundup®"). As a direct and proximate result of his exposure to Roundup® which is Manufactured by Defendant Monsanto and the product's active ingredient, glyphosate, Plaintiffs John Luby Jr. and Berry Chase Peterson developed non-Hodgkin's Lymphoma and Chronic Lymphocitic Leukemia - CLL.

## THE PARTIES

1.      Plaintiff JOHN LUBY, JR. is a resident of Corpus Christi, Nueces County, Texas. Plaintiff John Luby, Jr. purchased Roundup® from Defendant Naylor's Farm & Ranch Supply,

1

Inc. and used Roundup® in Texas between approximately 1991 and 2018 for personal and/or work related purposes and subsequently was diagnosed with non-Hodgkin's Lymphoma and Chronic Lymphocitic Leukemia – CLL. Plaintiff used Roundup® as directed at all relevant times.

2.     Plaintiff, BRIDGET LUBY is the spouse of John Luby, Jr. and is a resident of Corpus Christi, Nueces County, Texas.

3.     Plaintiff BERRY CHASE PETERSON is a resident of Corpus Christi, Nueces County, Texas.  Plaintiff Berry Chase Peterson purchased Roundup® from Defendant Naylor's Farm & Ranch Supply, Inc. and used Roundup® in Texas between approximately 1991 and 2018 for personal and/or work related purposes and subsequently was diagnosed with Chronic Lymphocytic Leukemia - CLL. Plaintiff used Roundup® as directed at all relevant times.

4.     Plaintiff, KATHY PETERSON is the spouse of Berry Chase Peterson and is a resident of Corpus Christi, Nueces County, Texas.

5.     Defendant Naylor's Farm & Ranch Supply, Inc. is a Texas corporation authorized to do business in the State of Texas with its headquarters and principal place of business in Nueces County, Texas. Defendant has made an appearance in this case.

6.     At all times relevant to this Petition, Naylor's Farm & Ranch Supply, Inc. distributed, sold, marketed, promoted and/or advertised Roundup®.

7.     Defendant Monsanto Company ("Monsanto") is a Delaware Company registered in and authorized to do business in Texas. It may be served with service of process through its registered agent, Corporation Service Company d/b/a CSC-Lawyers Incorporating Service Company, at 211 E. 7th St., Suite 260, Austin, TX 78701.

8.     Monsanto is the manufacturer of Roundup®.

2

## DISCOVERY CONTROL PLAN

9.      Pursuant to Rule 190.4 of the Texas Rules of Civil Procedure, discovery for this cause is intended to be conducted under Level 3.

## NATURE OF THE ACTION

10.     In 1970, Monsanto Company discovered the herbicidal properties of glyphosate and in 1974 began marketing it in products under the brand name Roundup®. Roundup® is a non-selective herbicide used to kill weeds that commonly compete with the growing of crops. By 2001, glyphosate had become the most-used active ingredient in American agriculture with 85–90 million pounds used annually. That number grew to 185 million pounds by 2007. As of 2013, glyphosate was the world's most widely used herbicide.

11.     Monsanto is a multinational agricultural biotechnology corporation based in St. Louis, Missouri. It is the world's leading producer of glyphosate.

12.     Monsanto's glyphosate products are registered in 130 countries and approved for use on over 100 different crops. They are ubiquitous in the environment. Numerous studies confirm that glyphosate is found in rivers, streams, and groundwater in agricultural areas where Roundup® is used. It has been found in food, in the urine of agricultural workers, and even in the urine of urban dwellers who are not in direct contact with glyphosate.

13.     On March 20, 2015, the International Agency for Research on Cancer ("IARC"), an agency of the World Health Organization ("WHO"), issued an evaluation of several herbicides, including glyphosate. That evaluation was based, in part, on studies of exposures to glyphosate in several countries around the world, and it traces the health implications from exposure to glyphosate since 2001.

14.     On July 29, 2015, IARC issued the formal monograph relating to glyphosate. In

3

that monograph, the IARC Working Group provides a thorough review of the numerous studies and data relating to glyphosate exposure in humans.

15.     The IARC Working Group classified glyphosate as a Group 2A herbicide, which means that it is probably carcinogenic to humans. The IARC Working Group concluded that the cancers most associated with glyphosate exposure are non-Hodgkin lymphoma and other hematopoietic cancers, including lymphocytic lymphoma/chronic lymphocytic leukemia, B-cell lymphoma, and multiple myeloma.   The IARC evaluation is significant as it confirms that glyphosate is toxic to humans.

## JURISDICTION AND VENUE

16.     Naylor's Farm & Ranch Supply, Inc engaged in the business of distributing, selling, promoting and/or advertising Roundup® products in the State of Texas and the County of Nueces.

17.     Jurisdiction is proper in this Court because (1) Plaintiffs do not allege any violation of federal law; (2) the parties are not completely diverse in citizenship; and (3) Defendants did and are doing business within the State of Texas and committed a tort in whole or in part in this state against the Plaintiffs, as more fully set forth herein. The damages suffered and sought to be recovered herein exceed the minimum jurisdictional limits of this Court.

18.     Venue is proper in Nueces County, Texas pursuant to Texas Civil Practice & Remedies Code, Chapter 15, §15.002(a)(1) and (a)(3), and §15.005 in that the Defendant, Naylor's Farm & Ranch Supply, Inc., is a resident of and/or has its principal place of business in Nueces County, Texas.

## FACTS

19.     Glyphosate is a broad-spectrum, non-selective herbicide used in a wide variety of herbicidal products around the world.

4

20. Plants treated with glyphosate translocate the systemic herbicide to their roots, shoot regions and fruit, where it interferes with the plant's ability to form aromatic amino acids necessary for protein synthesis. Treated plants generally die within two to three days. Because plants absorb glyphosate, it cannot be completely removed by washing or peeling produce or by milling, baking, or brewing grains.

21. For nearly 40 years, farms across the world have used Roundup® without knowing of the dangers its use poses. According to the WHO, the main chemical ingredient of Roundup®—glyphosate—is a probable cause of cancer. Those most at risk are farm workers and other individuals with workplace exposure to Roundup®, such as workers in garden centers, nurseries, and landscapers. The first glyphosate-based herbicide was introduced to the market in the mid-1970s under the brand name Roundup®.

22. The manufacture, formulation and distribution of herbicides, such as Roundup®, are regulated under the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA" or "Act"), 7 U.S.C. § 136 et seq. FIFRA requires that all pesticides be registered with the Environmental Protection Agency ("EPA" or "Agency") prior to their distribution, sale, or use, except as described by the Act. 7 U.S.C. § 136a(a).

23. Because pesticides are toxic to plants, animals, and humans, at least to some degree, the EPA requires as part of the registration process, among other things, a variety of tests to evaluate the potential for exposure to pesticides, toxicity to people and other potential non-target organisms, and other adverse effects on the environment. Registration by the EPA, however, is not an assurance or finding of safety. The determination the Agency must make in registering or re-registering a product is not that the product is "safe," but rather that use of the product in

5

accordance with its label directions "will not generally cause unreasonable adverse effects on the environment." 7 U.S.C. § 136a(c)(5)(D).

24.     FIFRA defines "unreasonable adverse effects on the environment" to mean "any unreasonable risk to man or the environment, taking into account the economic, social, and environmental costs and benefits of the use of any pesticide." 7 U.S.C. § 136(bb). FIFRA thus requires EPA to make a risk/benefit analysis in determining whether a registration should be granted or allowed to continue to be sold in commerce.

25.     FIFRA generally requires that the registrant, Monsanto in the case of Roundup®, conducts the health and safety testing of pesticide products. The EPA has protocols governing the conduct of tests required for registration and the laboratory practices that must be followed in conducting these tests. The data produced by the registrant must be submitted to the EPA for review and evaluation. The government is not required, nor is it able, to perform the product tests that are required of the manufacturer.

26.     The evaluation of each pesticide product distributed, sold, or manufactured is completed at the time the product is initially registered. The data necessary for registration of a pesticide has changed over time. The EPA is now in the process of re-evaluating all pesticide products through a Congressionally-mandated process called "re-registration." 7 U.S.C. § 136a-1. In order to reevaluate these pesticides, the EPA is demanding the completion of additional tests and the submission of data for the EPA's review and evaluation.

27.     In the case of glyphosate, and therefore Roundup®, the EPA had planned on releasing its preliminary risk assessment —in relation to the re-registration process—no later than July 2015. The EPA completed its review of glyphosate in early 2015, but it delayed releasing the risk assessment pending further review in light of the WHO's health-related findings.

6

28.     Based on early studies that glyphosate could cause cancer in laboratory animals, the EPA originally classified glyphosate as possibly carcinogenic to humans (Group C) in 1985. After pressure from Monsanto, including contrary studies it provided to the EPA, the EPA changed its classification to evidence of non-carcinogenicity in humans (Group E) in 1991. In so classifying glyphosate, however, the EPA made clear that the designation did not mean the chemical does not cause cancer: "It should be emphasized, however, that designation of an agent in Group E is based on the available evidence at the time of evaluation and should not be interpreted as a definitive conclusion that the agent will not be a carcinogen under any circumstances."

29.     On two occasions, the EPA found that the laboratories hired by Monsanto to test the toxicity of its Roundup® products for registration purposes committed fraud.

30.     In the first instance, Monsanto, in seeking initial registration of Roundup® by EPA, hired Industrial Bio-Test Laboratories ("IBT") to perform and evaluate pesticide toxicology studies relating to Roundup®. IBT performed about 30 tests on glyphosate and glyphosate-containing products, including nine of the 15 residue studies needed to register Roundup®.

31.     In 1976, the United States Food and Drug Administration ("FDA") performed an inspection of Industrial Bio-Test Industries ("IBT") that revealed discrepancies between the raw data and the final report relating to the toxicological impacts of glyphosate. The EPA subsequently audited IBT; it too found the toxicology studies conducted for the Roundup® herbicide to be invalid. An EPA reviewer stated, after finding "routine falsification of data" at IBT, that it was "hard to believe the scientific integrity of the studies when they said they took specimens of the uterus from male rabbits."

32.     Three top executives of IBT were convicted of fraud in 1983.

33.     In the second incident of data falsification, Monsanto hired Craven Laboratories in

7

1991 to perform pesticide and herbicide studies, including for Roundup®. In that same year, the owner of Craven Laboratories and three of its employees were indicted, and later convicted, of fraudulent laboratory practices in the testing of pesticides and herbicides.

34.     Despite the falsity of the tests that underlie its registration, within a few years of its launch, Monsanto was marketing Roundup® in 115 countries.

35.     The IARC process for the classification of glyphosate followed the stringent procedures for the evaluation of a chemical agent. Over time, the IARC Monograph program has reviewed 980 agents. Of those reviewed, it has determined 116 agents to be Group 1 (Known Human Carcinogens); 73 agents to be Group 2A (Probable Human Carcinogens); 287 agents to be Group 2B (Possible Human Carcinogens); 503 agents to be Group 3 (Not Classified); and one agent to be Probably Not Carcinogenic.

36.     The evaluations are performed by panels of international experts, selected on the basis of their expertise and the absence of actual or apparent conflicts of interest.

37.     One year before the Monograph meeting, the meeting is announced and there is a call both for data and for experts. Eight months before the Monograph meeting, the Working Group membership is selected and the sections of the Monograph are developed by the Working Group members. One month prior to the Monograph meeting, the call for data is closed and the various draft sections are distributed among Working Group members for review and comment. Finally, at the Monograph meeting, the Working Group finalizes review of all literature, evaluates the evidence in each category, and completes the overall evaluation. Within two weeks after the Monograph meeting, the summary of the Working Group findings is published in Lancet Oncology, and within a year after the meeting, the final Monograph is finalized and published.

8

38.     In assessing an agent, the IARC Working Group reviews the following information:

a)      human, experimental, and mechanistic data;

b)      all pertinent epidemiological studies and cancer bioassays; and

c)      representative mechanistic data. The studies must be publicly available and have sufficient detail for meaningful review, and reviewers cannot be associated with the underlying study.

39.     In March 2015, IARC reassessed glyphosate. The summary published in The Lancet Oncology reported that glyphosate is a Group 2A agent and probably carcinogenic in humans.

40.     On July 29, 2015, IARC issued its Monograph for glyphosate, Monograph 112. For Volume 112, the volume that assessed glyphosate, a Working Group of 17 experts from 11 countries met at IARC from March 3–10, 2015, to assess the carcinogenicity of certain herbicides, including glyphosate. The March meeting culminated nearly a one-year review and preparation by the IARC Secretariat and the Working Group, including a comprehensive review of the latest available scientific evidence. According to published procedures, the Working Group considered "reports that have been published or accepted for publication in the openly available scientific literature" as well as "data from governmental reports that are publicly available."

41.     The studies considered the following exposure groups: occupational exposure of farmers and tree nursery workers in the United States, forestry workers in Canada and Finland, municipal weed-control workers in the United Kingdom; and para-occupational exposure in farming families.

9

42.     Glyphosate was identified as the second-most used household herbicide in the United States for weed control between 2001 and 2007 and the most heavily used herbicide in the world in 2012.

43.     Exposure pathways are identified as air (especially during spraying), water, and food. Community exposure to glyphosate is widespread and found in soil, air, surface water, and groundwater, as well as in food.

44.     The assessment of the IARC Working Group identified several case control studies of occupational exposure in the United States, Canada, and Sweden. These studies show a human health concern from agricultural and other work-related exposure to glyphosate.

45.     The IARC Working Group found an increased risk between exposure to glyphosate Chronic Lymphocytic Leukemia – CLL, non-Hodgkin's lymphoma ("NHL") and several subtypes of NHL.  The increased risk persisted after adjustment for other pesticides.

46.     The IARC Working Group also found that glyphosate caused DNA and chromosomal damage in human cells. One study in community residents reported increases in blood markers of chromosomal damage (micronuclei) after glyphosate formulations were sprayed.

47.     The IARC Working Group also noted that glyphosate has been detected in the urine of agricultural workers, indicating absorption. Soil microbes degrade glyphosate to aminomethylphosphoric acid (AMPA). Blood AMPA detection after exposure suggests intestinal microbial metabolism in humans.

48.     The IARC Working Group further found that glyphosate and glyphosate formulations induced DNA and chromosomal damage in mammals, and in human and animal cells in utero.

10

49.     The IARC Working Group noted genotoxic, hormonal, and enzymatic effects in mammals exposed to glyphosate. Essentially, glyphosate inhibits the biosynthesis of aromatic amino acids, which leads to several metabolic disturbances, including the inhibition of protein and secondary product biosynthesis and general metabolic disruption.

50.     The IARC Working Group also reviewed an Agricultural Health Study, consisting of a prospective cohort of 57,311 licensed pesticide applicators in Iowa and North Carolina. While this study differed from others in that it was based on a self-administered questionnaire, the results support an association between glyphosate exposure and Multiple Myeloma, Hairy Cell Leukemia (HCL), and Chronic Lymphocytic Leukemia (CLL), in addition to several other cancers.

51.     The EPA has a technical fact sheet, as part of its Drinking Water and Health, National Primary Drinking Water Regulations publication, relating to glyphosate. This technical fact sheet predates the IARC March 20, 2015, evaluation. The fact sheet describes the release patterns for glyphosate as follows:

> * Glyphosate is released to the environment in its use as an herbicide for controlling woody and herbaceous weeds on forestry, right-of-way, cropped and non-cropped sites. These sites may be around water and in wetlands.
>
> * It may also be released to the environment during its manufacture, formulation, transport, storage, disposal, and cleanup, and from spills. Since glyphosate is not a listed chemical in the Toxics Release Inventory, data on releases during its manufacture and handling are not available.
>
> * Occupational workers and home gardeners may be exposed to glyphosate by inhalation and dermal contact during spraying, mixing, and cleanup. They may also be exposed by touching soil and plants to which glyphosate was applied.

\* Occupational exposure may also occur during glyphosate's manufacture, transport storage, and disposal.

52. In 1995, the Northwest Coalition for Alternatives to Pesticides reported that in California, the state with the most comprehensive program for reporting of pesticide-caused illness, glyphosate was the third most commonly-reported cause of pesticide illness among agricultural workers.

53. Several countries around the world have instituted bans on the sale of Roundup® and other glyphosate-containing herbicides, both before and since IARC first announced its assessment for glyphosate in March 2015, and more countries undoubtedly will follow suit as the dangers of the use of Roundup® are more widely known. The Netherlands issued a ban on all glyphosate-based herbicides in April 2014, including Roundup®, which took effect by the end of 2015. In issuing the ban, the Dutch Parliament member who introduced the successful legislation stated: "Agricultural pesticides in user-friendly packaging are sold in abundance to private persons. In garden centers, Roundup® is promoted as harmless, but unsuspecting customers have no idea what the risks of this product are. Especially children are sensitive to toxic substances and should therefore not be exposed to it."

54. The Brazilian Public Prosecutor in the Federal District requested that the Brazilian Justice Department suspend the use of glyphosate.

55. France banned the private sale of Roundup® and glyphosate following the IARC assessment for Glyphosate.

56. Bermuda banned both the private and commercial sale of glyphosates, including Roundup®. The Bermuda government explained its ban as follows: "Following a recent scientific study carried out by a leading cancer agency, the importation of weed spray 'Roundup' has been

suspended."

57.     The Sri Lankan government banned the private and commercial use of glyphosates, particularly out of concern that glyphosate has been linked to fatal kidney disease in agricultural workers.

58.     The government of Colombia announced its ban on using Roundup® and glyphosate to destroy illegal plantations of coca, the raw ingredient for cocaine, because of the WHO's finding that glyphosate is probably carcinogenic.

## DISCOVERY RULE

59.     Plaintiffs hereby plead and invoke the "discovery rule" if necessary. Plaintiffs will show that after reasonably exercising due diligence, they did not learn the nature of the cause of their cancers or that such cancers were chemically-related until less than the time periods provided by the relevant statutes of limitations.

## CLAIMS

### COUNT I
### STRICT LIABILITY
### (FAILURE TO WARN)

60.     Plaintiffs incorporate by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

61.     Plaintiffs bring this strict liability claim against Defendants for failure to warn.

62.     At all times relevant to this litigation, Defendants engaged in the business of selling, distributing, and/or promoting Roundup® products, which are defective and unreasonably dangerous to consumers, including Plaintiffs, because they do not contain adequate warnings or instructions concerning the dangerous characteristics of Roundup® and, specifically, the active ingredient glyphosate. These actions were under the ultimate control and supervision of

Defendants.

63. Defendants distributed, marketed, promoted, sold, and/or otherwise released into the stream of commerce Roundup® products, and in the course of same, directly advertised or marketed the products to consumers and end users, including Plaintiffs, and therefore had a duty to warn of the risks associated with the use of Roundup® and glyphosate-containing products.

64. At all times relevant to this litigation, Defendants had a duty to properly market, promote, sell, distribute, maintain supply, provide proper warnings and/or and take such steps as necessary to ensure that Roundup® products did not cause users and consumers to suffer from unreasonable and dangerous risks. Defendants had a continuing duty to warn Plaintiffs of the dangers associated with Roundup® use and exposure. Defendants, as seller, promoter, marketer and/or distributor of chemical herbicides is held to the knowledge of an expert in the field.

65. At all times relevant to this litigation, Defendants could have provided the warnings or instructions regarding the full and complete risks of Roundup® and glyphosate-containing products because it knew or should have known of the unreasonable risks of harm associated with the use of and/or exposure to such products.

66. At all times relevant to this litigation, Defendants failed to investigate, study, test, or promote the safety or to minimize the dangers to users and consumers of its product and to those who would foreseeably use or be harmed by these herbicides, including Plaintiffs.

67. Despite the fact that Defendants knew or should have known that Roundup® posed a grave risk of harm, it failed to exercise reasonable care to warn of the dangerous risks associated with use and exposure. The dangerous propensities of these products and the carcinogenic characteristics of glyphosate, as described above, were known to Defendants, or scientifically knowable to Defendants through appropriate research and testing by known methods, at the time

14

it distributed, marketed, promoted, supplied and/or sold the product, and not known to end users and consumers, such as Plaintiffs.

68. These products created significant risks of serious bodily harm to consumers, as alleged herein, and Defendants failed to adequately warn consumers and reasonably foreseeable users of the risks of exposure to its products. Defendants has wrongfully concealed information concerning the dangerous nature of Roundup® and its active ingredient glyphosate, and further made false and/or misleading statements concerning the safety of Roundup® and glyphosate.

69. At all times relevant to this litigation, Roundup® products reached the intended consumers, handlers, and users or other persons coming into contact with these products in Texas and throughout the United States, including Plaintiffs, without substantial change in their condition as sold, distributed, promoted, and marketed by Defendants.

70. Plaintiffs John Luby Jr. and Berry Chase Peterson were exposed to Roundup® products in the course of their personal and/or work-related use of Roundup®, without knowledge of its dangerous characteristics.

71. At all times relevant to this litigation, Plaintiffs John Luby Jr. and Berry Chase Peterson used and/or were exposed to the use of Roundup® products in their intended or reasonably foreseeable manner without knowledge of their dangerous characteristics.

72. Plaintiffs could not have reasonably discovered the defects and risks associated with Roundup® or glyphosate-containing products prior to or at the time of Plaintiffs exposure. Plaintiffs relied upon the skill, superior knowledge, and judgment of Defendants.

73. These products were defective because the minimal warnings disseminated with Roundup® products were inadequate, and they failed to communicate adequate information on the dangers and safe use/exposure and failed to communicate warnings and instructions that were

appropriate and adequate to render the products safe for their ordinary, intended, and reasonably foreseeable uses, including agricultural and landscaping applications.

74.     The information that Defendants did provide or communicate failed to contain relevant warnings, hazards, and precautions that would have enabled consumers such as Plaintiffs John Luby Jr. and Berry Chase Peterson to utilize the products safely and with adequate protection. Instead, Defendants disseminated information that was inaccurate, false, and misleading and which failed to communicate accurately or adequately the comparative severity, duration, and extent of the risk of injuries and/or death with use of and/or exposure to Roundup® and glyphosate; continued to aggressively promote the efficacy of the products, even after it knew or should have known of the unreasonable risks from use or exposure; and concealed, downplayed, or otherwise suppressed, through aggressive marketing and promotion, any information or research about the risks and dangers of exposure to Roundup® and glyphosate.

75.     As a result of their inadequate warnings, Roundup® products were defective and unreasonably dangerous when they were distributed, marketed, and promoted by Defendants, and used by Plaintiff John Luby, Jr. in his personal and/or work-related use.

76.     Defendants are liable to Plaintiffs for injuries caused by Defendants' negligent or willful failure, as described above, to provide adequate warnings or other clinically relevant information and data regarding the appropriate use of these products and the risks associated with the use of or exposure to Roundup® and glyphosate.

77.     The defects in Roundup® products caused or contributed to cause Plaintiffs' injuries, and, but for this misconduct and omissions, Plaintiffs would not have sustained their injuries.

78.     Had Defendants provided adequate warnings and instructions and properly

disclosed and disseminated the risks associated with Roundup® products, Plaintiffs could have avoided the risk of developing injuries as alleged herein.

79.     As a direct and proximate result of Defendants placing defective Roundup® products into the stream of commerce, Plaintiffs have suffered and continue to suffer severe injuries and/or died and have endured physical pain and discomfort, as well as economic hardship, including considerable financial expenses for medical care and treatment.

**COUNT III**
**NEGLIGENCE**

80.     Defendants, directly or indirectly, caused Roundup® products to be sold to, distributed to, promoted to, and/or used by Plaintiffs.

81.     At all times relevant to this litigation, Defendants had a duty to exercise reasonable care in the advertisement, supply, promotion, sale, and distribution of Roundup® products, including the duty to take all reasonable steps necessary to promote, and/or sell a product that was not unreasonably dangerous to consumers and users of the product.

82.     Defendants' duty of care owed to consumers and the general public included providing accurate, true, and correct information concerning the risks of using Roundup® and appropriate, complete, and accurate warnings concerning the potential adverse effects of exposure to Roundup®, and, in particular, its active ingredient glyphosate.

83.     At all times relevant to this litigation, Defendants knew or, in the exercise of reasonable care should have known, of the hazards and dangers of Roundup® and specifically, the carcinogenic properties of the chemical glyphosate.

84.     Accordingly, at all times relevant to this litigation, Defendants knew or, in the exercise of reasonable care, should have known that use of or exposure to Roundup® products could cause or be associated with Plaintiffs' injuries and thus created a dangerous and

unreasonable risk of injury and/or death to the users of these products, including Plaintiffs.

85.     Further, Defendants knew or, in the exercise of reasonable care should have known, that users and consumers of Roundup® were unaware of the risks and the magnitude of the risks associated with use of and/or exposure to Roundup® and glyphosate-containing products.

86.     As such, Defendants breached the duty of reasonable care and failed to exercise ordinary care in the supply, promotion, advertisement, sale, and distribution of Roundup® products, in that Defendants promoted, and/or sold defective herbicides containing the chemical glyphosate, knew or had reason to know of the defects inherent in these products, knew or had reason to know that a user's or consumer's exposure to the products created a significant risk of harm and unreasonably dangerous side effects, and failed to prevent or adequately warn of these risks of injuries and/or death.

87.     Despite having ability and means to investigate and study these products and to provide adequate warnings, Defendants failed to do so. Indeed, Defendants wrongfully concealed information and made false and/or misleading statements concerning the safety and/or exposure to Roundup® and glyphosate.

88.     Defendants were negligent in one or more of the following respects:

> a)     Promoting, selling, and/or distributing Roundup® products with the knowledge that there was not thorough and adequate pre- and post-market testing;
>
> b)     Promoting, selling, and/or distributing Roundup® while negligently and/or intentionally concealing and failing to disclose the results of trials, tests, and studies of exposure to glyphosate, and, consequently, the risk of serious harm associated with human use of

18

and exposure to Roundup®;

c)   Failing to provide adequate instructions, guidelines, and safety precautions to those persons who Defendants could reasonably foresee would use and be exposed to its Roundup® products;

d)   Failing to disclose to Plaintiffs, users/consumers, and the general public that use of and exposure to Roundup® presented severe risks of cancer and other grave illnesses;

e)   Failing to warn Plaintiffs, users/consumers, and the general public that the product's risk of harm was unreasonable and that there were safer and effective alternative herbicides available to Plaintiffs and other consumers;

f)   Representing that Roundup® products were safe for their intended use when, in fact, Defendants knew that the products were not safe for their intended purpose;

g)   Declining to make or propose any changes to Roundup® products' labeling or other promotional materials that would alert the consumers and the general public of the risks of Roundup® and glyphosate;

h)   Advertising, marketing, and recommending the use of Roundup® products, while concealing and failing to disclose or warn of the dangers associated with or caused by the use of or exposure to Roundup® and glyphosate;

i)   Continuing to disseminate information to its consumers, which

19

indicate or imply that Roundup® products are not unsafe for use in the agricultural and horticultural industries; and

j)      Continuing sale of Roundup® products with the knowledge that the products were unreasonably unsafe and dangerous.

89.     Defendants knew or should have known that it was foreseeable that consumers such as Plaintiffs would suffer injuries and/or death as a result of Defendants' failure to exercise ordinary care in the promotion, distribution, and sale of Roundup®.

90.     Plaintiffs did not know the nature and extent of the injuries and/or death that could result from the intended use of and/or exposure to Roundup® or its active ingredient glyphosate.

91.     Defendants' negligence was a proximate cause of the injuries, harm, and economic losses Plaintiffs has suffered, as described herein.

**COUNT IV**
**BREACH OF IMPLIED WARRANTY**

92.     Plaintiffs incorporate by reference all preceding paragraphs and all factual allegations contained herein.

93.     Defendants distributed, supplied and sold Roundup® for use by the Plaintiffs as an herbicide and weed killer.

94.     At the time they marketed, distributed, supplied, and sold Roundup® products, Defendants knew of the use for which the products were intended and impliedly warranted them to be of merchantable quality, safe, and fit for their intended use.

95.     Plaintiffs reasonably relied upon the skill, superior knowledge and judgment of Defendants.

96.     Plaintiffs purchased and used Roundup® for its intended purpose.

97.     Due to the Defendants' wrongful conduct as alleged herein, the Plaintiffs could not

have known about the nature of the risks and side effects associated with Roundup® .

98.     Contrary to Defendants' implied warranties regarding Roundup®, the product was not of merchantable quality, was not safe, and was unfit for its intended uses and purposes, as alleged herein.

99.     As a direct and proximate result of Defendant's breach of implied warranty, the Plaintiffs suffered severe and permanent injuries, which are continuing in nature.

**COUNT V**
**BREACH OF EXPRESS WARRANTY**

100.    Plaintiffs incorporates by reference all preceding paragraphs and all factual allegations contained herein.

101.    At all times hereinafter mentioned, Defendants, by direct and indirect advertising, promoting and selling Roundup® for use by Plaintiffs as an herbicide/weed killer, and by knowing that Roundup® would be used by Plaintiffs in reliance upon the representations of Defendants, expressly warranted to all foreseeable users of Roundup®, including the Plaintiffs, that Roundup® was safe for use by humans as an herbicide/weed killer.

102.    At all times hereinafter mentioned, Plaintiffs relied upon the aforesaid express warranties by Defendants.

103.    At all times hereinafter mentioned, Plaintiffs' use of Roundup® prior to and up to the time of injury was consistent with the purposes for which Defendants directly and indirectly advertised, promoted, and sold Roundup®, and Plaintiffs' use of Roundup® was reasonably contemplated, intended and foreseen by Defendants at the time of the sale of Roundup® by Defendants to Plaintiff, and, therefore, Plaintiffs' use of Roundup® was within the scope of the above-described express warranties.

104.    Defendants breached the aforesaid express warranties because Roundup® was not safe for use by humans as herbicides/weed killers, and because Plaintiffs' use of Roundup® as an herbicide/weed killer caused or contributed to his injuries described herein.

105.    As a direct and proximate result of Defendants' breach of express warranty, the Plaintiff suffered severe and permanent physical injuries which are continuing in nature.

## COUNT VI
## LOSS OF CONSORTIUM

106.    Plaintiff, Bridget Luby hereby incorporates by reference all preceding paragraphs as if fully set forth herein and further alleges as follows:

107.    Plaintiff Bridget Luby was at all times relevant hereto the spouse of John Luby. For reasons set forth herein, Plaintiff Bridget Luby has been caused, presently and in the future to suffer the loss of Plaintiff John Luby's companionship and society, and accordingly, the Plaintiff Bridget Luby has been caused great mental anguish.

108.    Plaintiff, Kathy Peterson hereby incorporates by reference all preceding paragraphs as if fully set forth herein and further alleges as follows:

109.    Plaintiff Kathy Peterson was at all times relevant hereto the spouse of Berry Chase Peterson.  For reasons set forth herein, Plaintiff Kathy Peterson has been caused, presently and in the future to suffer the loss of Plaintiff Berry Chase Peterson's companionship and society, and accordingly, the Plaintiff Kathy Peterson has been caused great mental anguish.

## COUNT VI
## PLAINTIFF'S DAMAGES

110.    As a direct and proximate result of Defendants' conduct and/or the unreasonably dangerous and defective product (Roundup®) they advertised, promoted, sold and/or otherwise provided as referenced above, Plaintiffs John Luby, Jr. developed non-Hodgkin's lymphoma and Berry Chase Peterson developed Chronic Lymphocitic Leukemia - CLL and both have suffered personal injury damages and other damages under the law in the following particulars, for which they seek recovery:

a)    Plaintiffs have and will continue to suffer great physical pain, suffering and mental anguish;

b)    Plaintiffs have incurred, and will continue to incur, significant hospital, medical, pharmaceutical and other expenses;

c)    Plaintiffs have suffered, and will continue to suffer, lost earnings and lost earning capacity;

d)    Plaintiffs have suffered, and will continue to suffer, physical impairment and disfigurement;

e)    Plaintiffs have suffered, and will continue to suffer, partial and/or permanent disability;

f)    Plaintiffs will require medical monitoring to aid in the detection and treatment of any recurrences of non-Hodgkin's lymphoma and CLL;

g)    Prior to Plaintiffs being diagnosed with non-Hodgkin's lymphoma and CLL they were extremely active and anticipated in numerous hobbies and activities. Since their diagnosis, they have been prevented from engaging in some of those activities which were normal prior to the development of the Plaintiffs' injuries. Plaintiffs will also be prevented from participating in and enjoying the benefits of a full and complete life as a result of developing non-Hodgkin's lymphoma and Chronic Lymphocytic Leukemia - CLL.

23

## JURY DEMAND

111.    Pursuant to Rule 216 of the Texas Rules of Civil Procedure, Plaintiffs respectfully requests that this case be tried before a jury.

## TRCP 28

112.    Plaintiffs hereby move pursuant to Tex.R.Civ.P. 28 that any defect in the naming of Defendants be corrected by Defendants by informing the Court of its correct legal status and name.

## PRAYER

**WHEREFORE, PREMISES CONSIDERED,** Plaintiffs respectfully pray that Defendants be cited to appear and answer herein, and that upon a final hearing of the cause, judgment be entered for the Plaintiffs against Defendants for actual damages as the Jury deems just and fair, together with pre-judgment interest at the maximum rate allowed by law, post-judgment interest at the legal rate, costs of court, and such other and further relief to which the Plaintiffs may be entitled at law or in equity.

Respectfully submitted,

**BUTCH BOYD LAW FIRM**

ERNEST W. BOYD
State Bar No. 00783694
butchboyd@butchboydlawfirm.com
MICHAEL J. BLANCHARD
State Bar No. 24036231
mikeblanchard@butchboydlawfirm.com
2905 Sackett Street
Houston, TX 77098
Phone: (713) 589-8477
Fax:(713) 589-8563

24

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on this 21ᵗʰ day of April, 2022, a true and correct copy of the foregoing document was served upon the following via the Court's electronic notification system.

E. James Shepherd (Lead Counsel)
Jennise W. Stubbs
Sonila Themeli
Shook, Hardy & Bacon, LLP
JPMorgan Chase Tower
600 Travis Street, Suite 340
Houston, Texas 77002
Tel: (713) 227-8008
Fax: (713) 227-9508
eshepherd@shb.com
jstubbs@shb.com
sthemeli@shb.com
***Attorneys for Defendant Naylor's Farm & Ranch Supply, Inc***

_____
MICHAEL J. BLANCHARD

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

LeRae Karn on behalf of Ernest Boyd
Bar No. 783694
lerae.hancock@live.com
Envelope ID: 63866184
Status as of 4/27/2022 9:13 AM CST

Associated Case Party: John Luby

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Ernest W. "Butch" Boyd | | butchboyd@butchboydlawfirm.com | 4/25/2022 12:25:02 PM | SENT |

Associated Case Party: Naylor s Farm & Ranch Supply, Inc.,

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Jennise WalkerStubbs | | jstubbs@shb.com | 4/25/2022 12:25:02 PM | SENT |
| E. James Shepherd | | eshepherd@shb.com | 4/25/2022 12:25:02 PM | SENT |
| Sonila Themeli | | sthemeli@shb.com | 4/25/2022 12:25:02 PM | SENT |

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Ernest W. "Butch" Boyd | | butchboyd@butchboydlawfirm.com | 4/25/2022 12:25:02 PM | SENT |
| Jeremy R. Stone | | jeremystone@butchboydlawfirm.com | 4/25/2022 12:25:02 PM | SENT |
| Michael J. Blanchard | | mikeblanchard@butchboydlawfirm.com | 4/25/2022 12:25:02 PM | SENT |
| LeRae Karn | | leraekarn@butchboydlawfirm.com | 4/25/2022 12:25:02 PM | SENT |
| Sandy Murray | | sandymurray@butchboydlawfirm.com | 4/25/2022 12:25:02 PM | SENT |

# **<u>NOTICE</u>**

As a result of COVID-19

**<u>ALL COURTS </u>** are

having ALL hearings

remotely using ZOOM.


Please contact the respective Court

for further instructions.

Misc. No. _____

# NUECES COUNTY STANDING ORDERS ON REMOTE PROCEEDINGS IN CIVIL, FAMILY AND FELONY CRIMINAL CASES

These Standing Orders on Remote Proceedings in Civil, Family and Felony Criminal Cases were unanimously adopted by the Nueces County District Judges during a specially held meeting on April 16, 2020. These orders are effective on April 16, 2020 and shall remain in effect until the Governor of the State of Texas and/or The Supreme Court of Texas lifts all emergency orders and/or the orders are revoked by the Board of Judges.

**WE, THE UNDERSIGNED NUECES COUNTY DISTRICT JUDGES AND TITLE IV-D JUDGE, FIND:**

1. Governor Abbott declared a State of Emergency for the State of Texas regarding the COVID-19 Virus;
2. The Supreme Court of Texas issued multiple emergency Orders regarding the COVID-19 State of Disaster, requiring measures to help mitigate the spread of COVID-19 to protect the health and welfare of all; and
3. Nueces County adopted The Order to Stay at Home.

**IT IS THEREFORE ORDERED:**

**A. All jury trials are hereby cancelled and will resume on June 1, 2020.**

**B. All essential and non-essential hearings will be held via Zoom and/or CourtCall videoconferencing until further order of the courts.**

**C. The general requirements for remote Civil, Family and Criminal proceedings are as follows:**

**1.     Notification of Information for Remote Proceeding**

When a court proceeding is scheduled, the court will e-mail the parties, through their attorneys, if represented, the information needed to attend the proceeding by Zoom and/or CourtCall video conferencing.

Each attorney or self-represented party **shall** communicate this information to the attorney's clients and witnesses, including any witnesses the attorney subpoenaed for the proceeding, and **shall** provide each such person with a copy of this order.

**2.     Use of Real Names**

In all communications with the court and during the court proceeding, including when joining a Zoom meeting and/or CourtCall video conferencing, each party, attorney, witness, or other persons attending the proceeding shall use that person's real name when identifying him or herself. Any party not identified properly will not be allowed access to the hearing.

### 3. Interpreter

A self-represented party or attorney acting on a party's behalf **shall** contact the court coordinator as soon as possible, but not less than 48 hours, after the court proceeding is scheduled if an interpreter will be needed.

### 4. Necessary Hardware and Software

At least 48 hours before the proceeding, each party, attorney, witness or other person attending the proceeding **shall** create a zoom account at https://zoom.us/home and/or contact CourtCall (888-882-6878) to schedule the hearing.

The person **shall** create the account using the person's legal name and the person's real e- mail address. For each attorney, that e-mail address **shall** be the same as the one described in Rule 21(f)(2) of the Texas Rules of Civil Procedure.

At least 48 hours before the proceeding, each person **shall** download and install the Zoom app on a compatible device (e.g. computer, smart phone, tablet) that the person intends to use to communicate with the court during the proceeding and/or have CourtCall videoconferencing enabled.

The device must have a functional speaker, video camera, microphone, and a reliable internet, or data, connection.

If a person, including a witness, knows he or she cannot attend the proceeding by video, that person or that person's attorney, if represented, **shall** contact the court as soon as possible, but not later than 48 hours before the proceeding. The person or that person's attorney if represented, **shall** join the meeting telephonically and show good cause for failure to appear by video at the proceeding.

### 6. Submission of Exhibits by e-filing and to the Parties

To be <u>potentially</u> admissible into evidence, all exhibits, other than rebuttal exhibits, **shall** be e-filed with the District Clerk and copies transmitted to all parties not later than 48 hours before the court proceeding in the manner required in subsection (7) herein. If the exhibits are note-filed within that time period, those exhibits will not be admissible during the hearing.

### 7. Format of Exhibits

Any party needing to admit either exhibits or other evidence, must electronically e-file the same in PDF format in advance of the hearing, already pre-marked with exhibit stickers and chronologically numbered, for ease of reference and directing a witness's attention during remote proceedings. The pages of each exhibit, deposition, or declaration of other proffered evidence, must be sequentially numbered for ease of reference. Copies must be contemporaneously directed to opposing counsel.

Each exhibit **shall** be in PDF format unless the exhibit is an image file, audio file, or video file. The file name of each exhibit file **shall** state the name of the exhibit. A party wanting to offer any audio recordings or video recordings **shall** upload the labeled files to a folder in Dropbox, or similar cloud storage service, and **shall** include a link to the folder in the party's e- mail exhibit. All audio and video recordings **shall** be in the MP4 format. Unless critical to an issue in the case, a party must redact personal identifying information and sensitive personal information from an exhibit before submitting it.

### 8. Exhibits with Rebuttal or Unanticipated Evidence

During the proceeding, and only with the permission of the court, a party may offer as rebuttal evidence, an exhibit, if the party could not have reasonably anticipated the need for such evidence before beginning the proceeding, through the Chat/File feature in Zoom and/or CourtCall videoconferencing.

### 9. Submission of Orders, Pleadings, and Other Documents

A meaningful conference between opposing attorneys **shall** be required prior to court intervention. Parties and attorneys are hereby advised that the present public health crisis demands that whenever possible, attorneys come to an agreement without necessitating a hearing before the court.

The parties **shall** confer before the court proceeding, and at least 48 hours before the proceeding is scheduled to begin, **shall** e-mail opposing counsel or pro se litigant - whichever applies, electronic copies of all orders, pleadings, returns of citations, and other documents filed with the district clerk that are relevant to the proceeding. If the documents are too voluminous to attach to an e-mail, the parties **shall** upload the documents to a folder in Dropbox, or similar cloud-based storage service, and include a link to the folder in the e-mail. Each document **shall** be in PDF format with a file name that reflects the title of the document. However, if the document is an audio or video file, the party may use the file format described by paragraph 7 above.

### 10. Electronic Signatures

In accordance with the Electronic Signatures in Global and National Commerce Act (E- Sign Act) and the Uniform Electronic Signatures Act, all parties will be allowed to electronically sign any necessary documents that are to be provided to the court.

### 11. Submission of Late Responses and Replies

Each party shall e-mail to the court coordinator and each of the other parties any responses or replies the party e-filed with the district clerk, if less than 48 hours before the court proceeding. The e-mailing of such a document to the court coordinator is not a substitute for e- filing the document with the district clerk. No party shall include the judge or court coordinator as a service contact when e-filing a document.

**12.    Submission of Case Law, Statutes, Regulations, or Similar Documents**

If a party wants the court to consider any case law, statute, regulation, or similar document, the party **shall** e-mail to the court or court coordinator such case law, statute, regulation or similar document. Failure to comply with the procedures in this order for submitting proposed exhibits, information required by the court's local rules, responses and replies, or supporting statutes, case law, regulations, or similar documents without good cause may result, as applicable, in the exclusion of the exhibits, or the documents not being recognized by the court, or other sanction as provided by the court's local rules or inherent powers.

**13.    Dress Code and Location**

You are hereby advised that remote proceedings are official court proceedings. Therefore, all parties, witnesses, experts, or anyone involved in the proceeding **shall** appear in appropriate business attire.

Additionally, all parties, witnesses, experts, or anyone involved in the proceeding, **shall** be in an appropriate location, free from all distractions, while participating in the remote proceeding.

**14.    Opening in Zoom App**

Before the proceeding begins, when a person attempts to join a Zoom court proceeding from the Zoom webpage, the webpage will ask whether to open the Zoom app. Each person **shall** instruct Zoom to open the Zoom app and allow it to install the program and not rely on the web browser. In this way, the attorneys and parties will have the means to communicate confidentially in private breakout rooms, which are unavailable on the website-based plug-in.

**15.    Joining Proceeding before Scheduled Start**

The parties, attorneys, witnesses, and all other persons attending the proceedings s **all** join the proceeding on Zoom by clicking on the Zoom link sent by the court at least ten (10) minutes before the proceeding is scheduled to begin

**16.    Virtual Waiting Room**

When each person joins the meeting, the person will appear in a virtual waiting room with all other parties, attorneys and witnesses. There may be several cases sent on the docket at the same time. When the case is called, the court will bring the attorneys and clients into the virtual courtroom. When the court brings the attorneys and clients into the virtual courtroom, their video will automatically be on and their audio **shall** remain muted until the proceeding begins. The attorneys **shall** always appear on video during the proceeding, except when the court recesses the proceeding. As soon as your hearing is concluded, you are excused from the virtual courtroom.

### 17.   Witnesses

When taking the oath to testify and when testifying, **each witness shall appear on video,** unless the witness is in the presence of a notary public, identified to the court, who can verify the identity of the witness, in which case the witness may testify 1hrough Zoom via audio only. Otherwise, all other potential witnesses who are not on video through zoom may not testify.

Unless permitted by the court or as provided below, a witness may not have access to any electronic information or physical notes while testifying, just as if the witness were on the witness stand in a courtroom. Except during a recess in the proceeding, no person **shall** communicate, verbally or non-verbally, with a witness through any method other than the video or audio means shared with all the participants in the proceeding who are present in the virtual courtroom. There will be no private chatting in the virtual courtroom between the participants without permission of the court. If "The Rule" is invoked, no one may communicate in any manner, including by telephone, text message, or e-mail, with any witness placed under the Rule, except as permitted by the Rule and then only during a recess in the proceeding. While placed under "the Rule," witnesses who are not testifying at the time, are prohibited from viewing the proceeding, including the court's YouTube live video link.

A list of witnesses **shall** be provided to the court no later than 48 hours before the scheduled hearing date.

All attorneys are reminded they are officers of the court and are expected to abide by all terms of the Texas Lawyer's Creed and ethical rules of conduct.

### 18.   Muting of Microphone

All persons participating in the proceedings except the Judge, the currently testifying witness, participating attorneys, or self-represented party, **shall** have their microphones muted.

### 19.   Recesses

The court may recess the proceeding for breaks or to allow attorneys to confer with their clients. If an attorney wishes to confer with a client, the attorney shall make that request to the court, identifying the client by name. The court will send those video streams into a confidential breakout room to confer for a period of no more than ten (10) minutes. In a similar manner, attorneys or self-represented parties may ask the court to confer privately with one another. An attorney or self-represented parties may ask the court to confer privately with one another. An attorney or self-represented party may ask the court to allow the attorney or self-represented party to confer privately with a witness

### 20.   Defendants and/or Respondents in the Nueces County Jail

All attorneys are advised that the jail is equipped with a computer, capable of Zoom and/or CourtCall videoconferencing, so that defendants and/or respondents in custody are able to participate in any essential hearings. Additionally, the jail has allowed 2P, and the 4th

and 5th floors of the jail, for attorneys to use for confidential communications when visiting their clients.

Also, the jail has made available an unrecorded telephonic line, Monday through Friday, from 8:00 a.m. to 4:00 p.m., by appointment only through the Sheriff's Office, so that attorneys and defendants and/or respondents may communicate remotely without exposing any party to any unnecessary risks or waiver of constitutionally protected privileges.

Per Sheriff Hooper, any attorney who calls and requests an attorney/client telephone conference, should fax that request to Jail Administration. For inmates housed at the Main Jail, use fax: 361.887.2240; for the inmates housed at the Annex, use fax: 361.289.4208. This request from the attorney needs to be sent Monday - Fliday between the hours of 8:00 a.m. to 4:00 p.m. Once the request is received, the request will be forwarded to Inmate Management. When the request is received at Inmate Management, the inmate will be taken to an office at the mutually agreed upon telephone time, Monday- Friday between the hours of 8:00 a.m. to 4:00 p.m. Any attorney's request for a telephone conference received after 4:00 p.m. will not be responded to until the following business day. If the attorney is requesting to talk to their client via telephone, but not requesting a specific time to speak with them, the attorney's telephone number will be taken down and the inmate will call from the unit using the designated attorney telephone line (which is a free attorney phone call). All phones used for said conferences are secure and not subject to monitoring or recording.

In addition, the Nueces County Sheriff's Office must be in compliance with the feeding schedules as per the Texas Commission on Jail Standards, so attorney telephone calls will NOT be completed during the hours of 4:30 a.m. to 5:30 a.m. or 10:30 a.m. to 11:30 a.m. or 4:30 p.m. to 5:30 p.m. In addition, attorney telephone calls will not impede inmate roll call or head counts. Please contact Sheriff's office for these times.

The attorneys are also advised that the Nueces County Jail is OPEN as usual for in person attorney visits

**21.   No Circumvention of Order**

No attorney, party, or witness may circumvent the terms of this order by having another person perform a task prohibited for that party or attorney.

**21.   Special Provisions for Criminal Law Hearings**

**a.   Waiver to be Signed by Defendant and the Attorney Representing the State**

As a prerequisite to any felony criminal proceeding conducted through Zoom and/or CourtCall videoconferencing, the defendant **shall** be required to execute a waiver of the defendant's right to appear in court in person and with counsel. Waiver forms **shall** be included in the plea/MTR documents, and **shall** be signed by the defendant and the attorney representing the state, as required by the Code of Criminal Procedure, §27.18(a)(l).

**b.    Agreement Notifications**

If a plea offer is accepted or there is an agreed recommendation on an MTR, the defense attorney **shall** notify the court coordinator by e-mail and obtain a setting for said hearing.

**c.    Hearing Notifications**

The court coordinator **shall** send via email the hearing notices to the following persons:

      i.   the designated clerk in the District Clerk's office;
      ii.  the designated jail officer in the Nueces County Jail;
      iii. the attorneys for the state and the defendant; and
      iv. the designated court probation officer assigned to each court, who in turn will notify the specific probation officer assigned to that case

**d.    Telephone Number for Defendant on Bond**

If a pre-sentence investigation (PSI) is requested and the defendant is on Bond, the defendant's attorney shall also provide a working telephone number for the defendant, in order that the CSCD may contact the defendant and conduct a pre-sentence interview and prepare a PSI report prior to any plea.

**e.    Preparation of Bill of Costs**

Unless waived, the district clerk's office shall prepare the Bill of Costs and provide it to the prosecuting attorney assigned to the case for inclusion in plea documents.

**f.    Submission and Review of Plea Documents**

Not later than noon on the third business day prior to the plea/MTR hearing, the prosecuting attorney assigned to the case shall prepare the documents, for the plea hearing, sign the paperwork where indicated, and send said documents to the defendant's attorney for review.

The attorney and the defendant are to review the documentation, and the defendant is to initial and sign all applicable plea paperwork. The defendant's attorney shall follow these steps to secure the defendant's initials and signatures on the applicable paperwork:

      i.   Those defense attorneys that go to the jail in person, are to use the officers in the jail to assist in having the required documents initialed and signed;
      ii.  Those defense attorneys that do not go to the jail, will call the Sheriff's Office to set up an appointment to meet with their client, as set out in section twenty (20) above;

iii.   Review all required paperwork with the defendant; the jail will have a copy of all necessary admonishments;

iv.   Make sure that the defendant reviews, initials, and signs where required;

v.   Completion and filing of documents:

    A.   For those defense attorneys that go to the jail in person to meet with their clients and obtain the required initials and signatures with the assistance of the jail officers, those attorneys shall be responsible for scanning and e- filing the completed documents to the district clerk's office;

    B.   For those defense attorneys that do not go to the jail to meet with their clients in person; wherein the jail officers have assisted them in obtaining the necessary initials and signatures, the district attorney shall be responsible to scan and forward to the defense attorney for e-filing with the district clerk's office, the completed documents; or

    C.   For those defense attorneys who do not want the district attorney's office to scan and e-mail the completed documents to them for e-filing, said defense attorneys may call the Sheriff's Office to make arrangements to pick up the completed documents for scanning and e-filing to the district clerk's office.

vi.   The defense attorneys will e-file all plea and/or MTR paperwork. Each file must be a "Lead Document".

All necessary documents must be e-filed with the Nueces County District Clerk's office no later than 48 hours prior to the scheduled court date. All hearings, where the documents are not e-filed 48 hours in advance, will be canceled and defense counsel shall contact the court coordinator to obtain another hearing date.

**g.   Signing of Plea Documents by Defendant in Custody**

    i.   Documents delivered to the Nueces County Jail

    Multiple copies of all necessary documents are available' at the Nueces County Jail. The Local Administrative Judge has delivered to the jail, multiple copies of all necessary pleas, revocations, waivers, and other forms regularly used by the court during business.

    ii.   Attorney Communication

    Attorneys for defendants in custody are to contact the jail to schedule a date and time, prior to the scheduled court date, to set up a time for the attorney to review all necessary documents via an unrecorded telephone line.

**h.   Signing of the Plea Documents by Defendant on Bond**

    The attorney and the defendant are to review all necessary plea or revocation paperwork prior to the scheduled court date. Both the attorney and the defendant are to fill out all the necessary paperwork, e-file it, and submit it to the prosecutor

no later than 48 hours prior to the scheduled court date. If the documents are not e-filed 48 hours in advance of the scheduled date and time of the hearing, the hearing will be canceled, and the defense attorney shall contact the court coordinator to obtain another hearing date.

### i.   Submission of Completed Documents

When any necessary plea or revocation documents are signed by all necessary parties, the documents are to be e-filed and submitted to the court no later than 48 hours prior to the proceeding. If the documents are not e-filed 48 hours in advance of the scheduled date and time of the hearing, the hearing will be canceled, and the defense attorney **shall** contact the court coordinator to obtain another hearing date.

## 22.   Special Provisions for Criminal Law Hearings

When the Court grants an application to interview a child in chambers in accordance with Section 153.009, Texas Family Code, the following procedures shall apply to the Court's interview with the child:

a.   The Court shall conduct the interview with the child using Zoom. The Court will notify the parties and attorneys by e-mail of the Zoom meeting, in which the Court will confer with the child or if more than one child, each will be interviewed child separately. The party in possession of the child at the time of the interview shall ensure the child is available at the time of the Zoom meeting and has possession of a separate device (for example, computer, tablet, smartphone) that the child will use to communicate with the Court during the interview.

b.   When the Court begins the Zoom meeting, the party in possession of the child or an adult designated by that party shall join the meeting, identify himself or herself to the Court, and then leave the room.

c.   While the Court is interviewing the child, no person may be present in the same room as the child or may be located outside of the room in which the child is physically located and/or within a distance in which the person can hear the child's interview.

d.   With the exception of the Court's court reporter, no person including the child, may record any statements of the child or the Court made during the interview.

e.   **Additionally, no parent, guardian or person in possession of the child, shall in any way instruct, coach or prompt the child immediately before or during the child's interview with the court. Any parent, guardian or person in possession of the child, is subject to contempt of court for violation of this provision.**

IT IS FURTHER ORDERED that in compliance with the Open Courts provision of the Texas Constitution:

I.    The Office of Court Administration is providing Judges the ability to stream and host court proceedings via Zoom and/or CourtCall videoconferencing, via YouTube.

Under the Open Courts provision of the Texas Constitution, all courts are required to maintain public access. In general, court proceedings, are presumptively open to the public in Texas state Courts. This YouTube Channel is setup to comply with that provision, however recording of these proceedings is strictly prohibited. Participants and viewers are hereby admonished that violators are subject to the Court's contempt powers. The punishment for contempt of a court is a fine or note more than $500 or confinement in the county jail for not more than six (6) months, or both such a fine and confinement in jail. Tex. Gov. Code, Sec. 21.002.

**THESE ORDERS SHALL REMAIN IN FULL FORCE AND EFFECT UNTIL SET ASIDE.**

28th Judicial District Court
Hon. Nanette Hasette

117th Judicial District Court
Hon. Sandra Watts

94th Judicial District Court
Hon. Bobby Galvan

347th Judicial District Court
Hon. Missy Medary

319th Judicial District Court
Hon. David Stith

148th Judicial District Court
Hon. Carlos Valdez

214th Judicial District Court
Hon. Inna Klein

105th Judicial District Court
Hon. Jack Pulcher

Title IV-D Court
Hon. Susan E. Barclay

DUE TO THE CORONAVIRUS (COVID-19) CRISIS
NUECES COUNTY RESOLUTION REGARDING THE CANCELLATION OF JURY TRIALS IN THE
DISTRICT COURTS AND COUNTY COURTS AT LAW OF NUECES COUNTY , TEXAS

Due to the coronavirus (COVID-19) crisis and to ensure the safety of the public,
court staff(s), and litigants, and pursuant to the 33rd Emergency Order of the Supreme
Court of Texas and the Certified Nueces County Re-Opening Plan approved by the
District and County Court at Law Judges on December 14, 2020 and submitted to the
Office of Court Administration after approval by the Nueces County Health District and
the Fifth Administrative Region, it has been determined by the Nueces County Health
District that in-person hearings and jury trials should be cancelled until May 1, 2021 due
to the levels of contagion in the County.

IT IS THEREFORE ORDERED that all civil, criminal, and family law jury trials are
cancelled until May 1, 2021.

This Order is effective February 2, 2021 and will apply to the District Courts and
County Courts at Law of Nueces County, except as amended or supplemented by the
Presiding Judge of County Court at Law No. 5.


Signed this 2nd day of February, 2021.

Hon. Inna Klein
Local Administrative Judge

FILED

MAR 0 4 2021

ANNE LORENTZEN, CLERK
COUNTY & DISTRICT COURTS NUECES COUNTY, TEXAS
BY_____ DEPUTY

SCANNED

MAR 0 4 2021

ANNE LORENTZEN, CLERK
COUNTY & DISTRICT COURTS NUECES COUNTY, TEXAS
BY_____ DEPUTY