Query    Reports    Utilities    Help    Log Out

# U.S. District Court
## Middle District of Florida (Tampa)
## CIVIL DOCKET FOR CASE #: 8:22-cv-01293-CEH-JSS

Stevens v. Monsanto Company
Assigned to: Judge Charlene Edwards Honeywell
Referred to: Magistrate Judge Julie S. Sneed
Cause: 28:1332 Diversity-Product Liability

Date Filed: 06/03/2022
Jury Demand: Both
Nature of Suit: 365 Personal Inj. Prod. Liability
Jurisdiction: Diversity

**Plaintiff**

**Vickie Hall Stevens**
*Personal Representative of the Estate of Robert Stevens, and as Spouse*

represented by **Eric D. Roslansky**
The Ruth Law Team
8600 4th St N
PO Box 16847
St Petersburg, FL 33733-6847
727-327-3222
Email: eroslansky@getjustice.com
*ATTORNEY TO BE NOTICED*

**Austin Johnson Grinder**
The Ruth Law Team
8600 4th St N
PO Box 16847
St Petersburg, FL 33733-6847
727-327-3222
Fax: 727-323-7720
Email: agrinder@getjustice.com
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Monsanto Company**

| Date Filed | # | Docket Text |
|---|---|---|
| 06/03/2022 | 1 | COMPLAINT against Monsanto Company with Jury Demand (Filing fee $402 receipt number AFLMDC-19640819) filed by All Plaintiffs. (Attachments: # 1 Civil Cover Sheet, # 2 Proposed Summons)(Grinder, Austin) (Entered: 06/03/2022) |
| 06/03/2022 | 2 | NEW CASE ASSIGNED to Judge Charlene Edwards Honeywell and Magistrate Judge Julie S. Sneed. New case number: 8:22-cv-1293-CEH-JSS. (SJB) (Entered: 06/03/2022) |
| 06/04/2022 | 3 | NOTICE of Local Rule 1.07(c), Local Rule 3.02(a)(2), and Local Rule 3.03.<br><br>**-Local Rule 1.07(c)** requires lead counsel to *promptly* file a **Notice of a Related Action** that identifies and describes any related action pending in the Middle District or elsewhere. |

| | | |
|---|---|---|
| | | **-Local Rule 3.02(a)(2)** requires the parties in every civil proceeding, except those described in subsection (d), to file a case management report (CMR) using the uniform form at www.flmd.uscourts.gov. The CMR must be filed (1) within forty days after any defendant appears in an action originating in this court, (2) within forty days after the docketing of an action removed or transferred to this court, or (3) within seventy days after service on the United States attorney in an action against the United States, its agencies or employees. Judges may use a special CMR form for certain types of cases. These forms can be found at www.flmd.uscourts.gov under the Forms tab for each judge.<br><br>**-Local Rule 3.03** requires each party to file a disclosure statement with the first appearance that identifies (1) each person that has or might have an interest in the outcome, (2) each entity with publicly traded shares or debt potentially affected by the outcome, (3) each additional entity likely to actively participate, and (4) each person arguably eligible for restitution. The disclosure statement must include this certification - *I certify that, except as disclosed, I am unaware of an actual or potential conflict of interest affecting the district judge or the magistrate judge in this action, and I will immediately notify the judge in writing within fourteen days after I know of a conflict.* (Signed by Deputy Clerk.) (BGS) (Entered: 06/04/2022) |
| 06/04/2022 | 4 | NOTICE informing the parties that they may consent to the jurisdiction of a United States magistrate judge by filing Form AO 85 Notice, Consent, and Reference of a Civil Action to a Magistrate Judge using the event **Consent to Jurisdiction of US Magistrate Judge**. (Signed by Deputy Clerk.) (BGS) (Entered: 06/04/2022) |
| 06/06/2022 | 5 | CERTIFICATE of interested persons and corporate disclosure statement by Vickie Hall Stevens identifying Corporate Parent Monsanto Company for Vickie Hall Stevens. (Grinder, Austin) (Entered: 06/06/2022) |
| 06/06/2022 | 6 | NOTICE of a related action per Local Rule 1.07(c) by Vickie Hall Stevens. Related case(s): Yes (Grinder, Austin) (Entered: 06/06/2022) |
| 06/07/2022 | 7 | NOTICE to counsel Austin J. Grinder, Esquire; Eric D. Roslansky, Esquire of Local Rule 2.02(a), which requires designation of one lead counsel who - unless the party changes the designation - remains lead counsel throughout the action. File a **Notice of Lead Counsel Designation** to identify lead counsel. (Signed by Deputy Clerk.) (SEG) Modified text on 6/7/2022 (SEG). (Entered: 06/07/2022) |
| 06/07/2022 | 8 | SUMMONS issued as to Monsanto Company. (SEG) (Entered: 06/07/2022) |
| 06/10/2022 | 9 | RETURN of service executed on 6/8/2022 by Vickie Hall Stevens as to Monsanto Company. (Grinder, Austin) Modified text on 6/10/2022 (MCB). (Entered: 06/10/2022) |

| **PACER Service Center** | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 06/13/2022 14:20:32 | | | |
| **PACER Login:** | sh0019sh | **Client Code:** | 31943.356965 rhb |
| **Description:** | Docket Report | **Search Criteria:** | 8:22-cv-01293-CEH-JSS |
| **Billable Pages:** | 2 | **Cost:** | 0.20 |



# Notice of Service of Process

**LDD / ALL**
**Transmittal Number: 25045798**
**Date Processed: 06/09/2022**

| | |
|---|---|
| **Primary Contact:** | Anne Troupis (Monsanto)<br>Bayer U.S. LLC<br>800 N Lindbergh Blvd<br>Saint Louis, MO 63167-1000 |

| | |
|---|---|
| **Entity:** | Monsanto Company<br>Entity ID Number  2282193 |
| **Entity Served:** | Monsanto Company |
| **Title of Action:** | Stevens, Vickie Hall as the Personal Representative of the Estate of Robert Stevens vs. Monsanto |
| **Matter Name/ID:** | Stevens, Vickie Hall as the Personal Representative of the Estate of Robert Stevens vs. Monsanto (12423624) |
| **Document(s) Type:** | Summons/Complaint |
| **Nature of Action:** | Wrongful Death |
| **Court/Agency:** | U.S. District Court Middle District, FL |
| **Case/Reference No:** | 8:22-cv-01293 |
| **Jurisdiction Served:** | Florida |
| **Date Served on CSC:** | 06/09/2022 |
| **Answer or Appearance Due:** | 21 Days |
| **Originally Served On:** | CSC |
| **How Served:** | Personal Service |
| Sender Information: | The Ruth Law Team<br>727-327-3222 |

Information contained on this transmittal form is for record keeping, notification and forwarding the attached document(s). It does not constitute a legal opinion. The recipient is responsible for interpreting the documents and taking appropriate action.

**To avoid potential delay, please do not send your response to CSC**

251 Little Falls Drive, Wilmington, Delaware 19808-1674   (888) 690-2882   |   sop@cscglobal.com

AO 440 (Rev. 06/12) Summons in a Civil Action

# UNITED STATES DISTRICT COURT

for the

Middle District of Florida

| | |
|---|---|
| VICKIE HALL STEVENS as the Personal Representative of ROBERT STEVENS, individually and as spouse <br><br> *Plaintiff(s)* <br><br> v. <br><br> MONSANTO COMPANY <br><br> *Defendant(s)* | ) ) ) ) ) ) ) ) ) ) ) ) ) |

Civil Action No.  8:22-cv-01293-CEH-JSS

TIME: ___11:15 Am___

DATE: __6/9/22__

SERVER: __WK__

ID #: __249__

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*   MONSANTO COMPANY
c/o Corporation Service Company, Registered Agent
1201 Hays Street
Tallahassee, FL 32301-2525

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure. The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:   Austin J. Grinder
The Ruth Law Team
P.O. Box 16847
St. Petersburg, FL 33733-6847

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

*CLERK OF COURT*

Sarah Gardner

Date:   June 7, 2022

_____
*Signature of Clerk or Deputy Clerk*

AO 440 (Rev. 06/12)  Summons in a Civil Action (Page 2)

Civil Action No. 8:22-cv-01293-CEH-JSS

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

☐ I personally served the summons on the individual at *(place)* _____

_____ on *(date)* _____ ; or

☐ I left the summons at the individual's residence or usual place of abode with *(name)* _____

_____ , a person of suitable age and discretion who resides there,

on *(date)* _____ , and mailed a copy to the individual's last known address; or

☐ I served the summons on *(name of individual)* _____ , who is

designated by law to accept service of process on behalf of *(name of organization)* _____

_____ on *(date)* _____ ; or

☐ I returned the summons unexecuted because _____ ; or

☐ Other *(specify):*



My fees are $ _____ for travel and $ _____ for services, for a total of $ _____0.00____ .

I declare under penalty of perjury that this information is true.


Date: _____

_____
*Server's signature*

_____
*Printed name and title*


_____
*Server's address*

Additional information regarding attempted service, etc:

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
CIVIL DIVISION

VICKIE HALL STEVENS as the Personal
Representative of the Estate of ROBERT
STEVENS, and as spouse,

     Plaintiffs,

      v.

MONSANTO COMPANY,

     Defendant.

Case No: 8:22-cv-01293

_____/

## COMPLAINT FOR DAMAGES FOR WRONGFUL DEATH

Plaintiff, VICKIE HALL STEVENS as the Personal Representative of the Estate of

ROBERT STEVENS, as spouse by and through her undersigned counsel, hereby bring this

Complaint for damages against Defendant Monsanto Company (Defendant). It is intended that

this action be transferred to the pending MDL 2741, In Re: Roundup Products Liability Litigation.

Any venue or jurisdiction issues can be resolved if and when this action is being retransferred.

## NATURE OF THE CASE

1.    This is an action for the wrongful death of ROBERT STEVENS as a direct and

proximate result of Defendant's negligent and wrongful conduct in connection with the design,

development, manufacture, testing, packaging, promoting, marketing, advertising, distribution,

labeling, and sale of the herbicide Roundup, containing the active ingredient glyphosate.

2.    Plaintiff maintains that Roundup and glyphosate are defective, dangerous to human

health, unfit and unsuitable to be marketed and sold in commerce, and lacked proper warnings and

directions as to the dangers associated with its use.

1

## JURISDICTION AND VENUE

3.     This Court has jurisdiction over Defendant and this action pursuant to 28 U.S.C. 1332 because there is complete diversity of citizenship between Plaintiff and Defendant. Defendant is either incorporated and/or has its principal place of business outside of the state in which the Plaintiff resides

4.     The amount in controversy between Plaintiff and Defendant exceeds $75,000, exclusive of interest and cost.

5.     The Court also has supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

6.     Venue is proper within this district pursuant to 28 U.S.C. § 1391 in that Defendant conducts business here and is subject to personal jurisdiction in this district. Furthermore, Defendant sells, markets, and/or distributes Roundup® within the Middle District of Florida. Also, a substantial part of the acts and/or omissions giving rise to these claims occurred within this district.

## PARTIES

7.     ROBERT STEVENS, was a citizen of Florida and died in Pinellas County, Florida.

8.     Plaintiff, VICKIE HALL STEVENS, spouse, is a citizen of Florida and resides in Pinellas County, Florida.

9.     Plaintiff brings this action for the wrongful death of ROBERT STEVENS due to ROBERT STEVENS' exposure to Roundup® ("Roundup") containing the active ingredient glyphosate and the surfactant polyethoxylated tallow amine ("POEA"). As a direct and proximate result of being exposed to Roundup, ROBERT STEVENS has developed and been diagnosed with Non-Hodgkin's Lymphoma which caused and/or contributed to his death.

10.     "Roundup" refers to all formulations of Defendant's Roundup products that contain the active ingredient glyphosate.

11.     Defendant MONSANTO COMPANY is a Delaware corporation, in "active" status, with a principle place of business in St. Louis, Missouri.

12.     Defendant advertises and sells goods, specifically Roundup, in Pinellas County, Florida.

13.     Defendant transacted and conducted business within the State of Florida that relates to the allegations in this Complaint.

14.     Defendants derived substantial revenue from goods and products used in the State of Florida.

15.     Defendant expected or should have expected their acts to have consequences within the State of Florida, and derived substantial revenue from interstate commerce.

16.     Defendant engaged in the business of designing, developing, manufacturing, testing, packaging, marketing, distributing, labeling, and/or selling Roundup. Defendant is authorized to do business in Florida and derives substantial income from doing business in this state.

17.     Upon information and belief, Defendant purposefully availed themselves of the privilege of conducting activities with the State of Florida, thus invoking the benefits and protections of its laws.

18.     Upon information and belief, Defendant did design, sell, advertise, manufacture and/or distribute Roundup, with full knowledge of its dangerous and defective nature.

**FACTUAL ALLEGATIONS**

3

19.     At all relevant times, Defendant was in the business of, and did, design, research, manufacture, test, advertise, promote, market, sell, distribute, and/or has acquired and is responsible for the commercial herbicide Roundup.

20.     Monsanto is a multinational agricultural biotechnology corporation based in St. Louis, Missouri. It is the world's leading producer of glyphosate.

21.     Defendant discovered the herbicidal properties of glyphosate during the 1970's and subsequently began to design, research, manufacture, sell and distribute glyphosate based "Roundup" as a broad-spectrum herbicide.

22.     Glyphosate is the active ingredient in Roundup.

23.     Glyphosate is a broad-spectrum herbicide used to kill weeds and grasses known to compete with commercial crops grown around the globe.

## REGISTRATION OF HERBICIDES UNDER FEDERAL LAW

24.     The manufacture, formulation and distribution of herbicides, such as Roundup, are regulated under the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA"), 7 U.S.C. § 136 *et seq*. FIFRA requires that all pesticides be registered with the Environmental Protection Agency ("EPA) prior to their distribution, sale, or use, except as described by FIFRA 7 U.S.C. 136a(a).

25.     The EPA requires as part of the registration process, among other requirements, a variety of tests to evaluate the potential for exposure to pesticides, toxicity to people and other potential non-target organisms, and other adverse effects on the environment. Registration by the EPA, however, is not an assurance or finding of safety. The determination the EPA makes in registering or re-registering a product is not that the product is "safe," but rather that use of the

product in accordance with its label directions "will not generally cause unreasonable adverse effects on the environment." 7 U.S.C. § 136(a)(c)(5)(D).

26.     FIFRA defines "unreasonable adverse effects on the environment" to mean "any unreasonable risk to man or the environment, taking into account the economic, social, and environmental costs and benefits of the use of any pesticide." 7 U.S.C. § 136(bb). FIFRA thus requires the EPA to make a risk/benefit analysis in determining whether a registration should be granted or allowed to continue to be sold in commerce.

27.     The EPA and the State of Florida registered Roundup for distribution, sale, and manufacture in the United States and the State of Florida.

28.     FIFRA generally requires that the registrant, Monsanto, conduct health and safety testing of pesticide products. The government is not required, nor is it able, to perform the product tests that are required of the manufacturer.

29.     The evaluation of each pesticide product distributed, sold, or manufactured is completed at the time the product is initially registered. The data necessary for registration of a pesticide has changed over time. The EPA is now in the process of re-evaluating all pesticide products through a Congressionally-mandated process called "re-registration." 7 U.S.C. § 136a-1. In order to reevaluate these pesticides, the EPA demands the completion of additional tests and the submission of data for the EPA's review and evaluation.

30.     In the case of glyphosate and Roundup, the EPA had planned on releasing its preliminary risk assessment – in relation to the registration process – no later than July 2015. The EPA completed its review of glyphosate in early 2015, but delayed releasing the assessment pending further review in light of the World Health Organization's March 24, 2015 finding that

glyphosate is a "probable carcinogen" as demonstrated by the mechanistic evidence of carcinogenicity in humans and sufficient evidence of carcinogenicity in animals.

## MONSANTO'S FALSE REPRESENTATIONS REGARDING THE SAFETY OF ROUNDUP

31.    In 1996, the New York Attorney General ("NYAG") filed a lawsuit against Monsanto based on its false and misleading advertising of Roundup products. Specifically, the lawsuit challenged Monsanto's general representations that its spray-on glyphosate-based herbicides, including Roundup, were "safer **than table salt**" and "practically **non-toxic**" to mammals, birds, and fish. Among the representations the NYAG found deceptive and misleading about the human and environmental safety of Roundup are the following:

32.    Remember that environmentally friendly Roundup herbicide is biodegradable. It won't build up in the soil so you can use Roundup with confidence along customers' driveways, sidewalks and fences ...

   a) And remember that Roundup is biodegradable and won't build up in the soil. That will give you the environmental confidence you need to use Roundup everywhere you've got a weed, brush, edging or trimming problem.

   b) Roundup biodegrades into naturally occurring elements.

   c) Remember that versatile Roundup herbicide stays where you put it. That means there's no washing or leaching to harm customers' shrubs or other desirable vegetation.

   d) This non-residual herbicide will not wash or leach in the soil. It... stays where you apply it.

   e) You can apply Accord with "confidence because it will stay where you put it" it bonds tightly to soil particles, preventing leaching. Then, soon after application, soil microorganism's biodegrade Accord into natural products.

   f) Glyphosate is less toxic to rats than table salt following acute oral ingestion.

6

g) Glyphosate's safety margin is much greater than required. It has over a 1,000-fold safety margin in food and over a 700-fold safety margin for workers who manufacture it or use it.

h) You can feel good about using herbicides by Monsanto. They carry a toxicity category rating of 'practically non-toxic' as it pertains to mammals, birds and fish.

i) "Roundup can be used where kids and pets will play and breaks down into natural material." This ad depicts a person with his head in the ground and a pet dog standing in an area which has been treated with Roundup.[1]

33.   On November 19, 1996, Monsanto entered into an Assurance of Discontinuance with NYAG, in which Monsanto agreed, among other things, "to cease and desist from publishing or broadcasting any advertisements [in New York] that represent, directly or by implication" that:

   a.   its glyphosate-containing pesticide products or any component thereof are safe, non-toxic, harmless or free from risk.

   b.   its glyphosate-containing pesticide products or any component thereof manufactured, formulated, distributed or sold by Monsanto are biodegradable

   c.   its glyphosate-containing pesticide products or any component thereof stay where they are applied under all circumstances and will not move through the environment by any means.

   d.   its glyphosate-containing pesticide products or any component thereof are "good" for the environment or are "known for their environmental characteristics."

   e.   glyphosate-containing pesticide products or any component thereof are safer or less toxic than common consumer products other than herbicides;

   f.   its glyphosate-containing products or any component thereof might be classified as "practically non-toxic.

---

[1] Attorney General of the State of New York, In the Matter of Monsanto Company, Assurance of Discontinuance Pursuant to Executive Law § 63(15) (Nov. 1996).

34.     Monsanto did not alter its advertising in the same manner in any state other than New York, and on information and belief still has not done so today.

35.     In 2009, France's highest court ruled that Monsanto had not told the truth about the safety of Roundup. The French court affirmed an earlier judgment that Monsanto had falsely advertised its herbicide Roundup as "biodegradable" and that it "left the soil clean."[2]

## EVIDENCE OF CARCINOGENICITY IN ROUNDUP

36.     As early as the 1980's Monsanto was aware of glyphosate's carcinogenic properties.

37.     On March 4, 1985, a group of the Environmental Protection Agency's ("EPA") Toxicology Branch published a memorandum classifying glyphosate as a Category C oncogene.[3] Category C oncogenes are possible human carcinogens with limited evidence of carcinogenicity.

38.     In 1986, the EPA issued a Registration Standard for glyphosate (NTIS PB87-103214). The Registration standard required additional phytotoxicity, environmental fate, toxicology, product chemistry, and residue chemistry studies. All of the data required was submitted and reviewed and/or waived.[4]

39.     In October 1991 the EPA published a Memorandum entitled "Second Peer Review of Glyphosate." The memorandum changed glyphosate's classification to Group E (evidence of non-carcinogenicity for humans). Two peer review committee members did not concur with the conclusions of the committee and one member refused to sign.[5]

---

[2] *Monsanto Guilty in 'False Ad' Row,* BBC, Oct. 15, 2009, *available at* http://news.bbc.co.uk/2/hi/europe/8308903.stm.

[3] Consensus Review of Glyphosate, Casewell No. 661A. March 4, 1985. United States Environmental Protection Agency.

[4] http://www.epa.gov/oppsrrd1/reregistration/REDs/factsheets/0178fact.pdf

[5] Second Peer Review of Glyphosate, CAS No. 1071-83-6. October 30, 1881. United States Environmental Protection Agency.

40.     In addition to the toxicity of the active molecule, many studies support the hypothesis that glyphosate formulations found in Defendant Roundup products are more dangerous and toxic than glyphosate alone. [6] As early as 1991 evidence existed demonstrating that glyphosate formulations were significantly more toxic than glyphosate alone.[7]

41.     In 2002, Julie Marc published a study entitled "Pesticide Roundup Provokes Cell Division Dysfunction at the Level of CDK1/Cyclin B Activation."

42.     The study found that Defendant Roundup caused delays in the cell cycles of sea urchins, while the same concentrations of glyphosate alone proved ineffective and did not alter cell cycles.

43.     In 2004, Julie Marc published a study entitled "Glyphosate-based pesticides affect cell cycle regulation." The study demonstrated a molecular link between glyphosate-based products and cell cycle dysregulation.

44.     The study noted that "cell-cycle dysregulation is a hallmark of tumor cells and human cancer. Failure in the cell-cycle checkpoints leads to genomic instability and subsequent development of cancers from the initial affected cell." Further, "[s]ince cell cycle disorders such as cancer result from dysfunction of unique cell, it was of interest to evaluate the threshold dose of glyphosate affecting cells." [8]

45.     In 2005, Francisco Peixoto published a study showing that Roundup's effects on rat liver mitochondria are much more toxic and harmful than the same concentrations of glyphosate alone.

---

[6] Martinez et al. 2007; Benachour 2009; Gasnier et al. 2010; Peixoto 2005; Marc 2004
[7] Martinez et al 1991
[8] (Molinari, 2000; Stewart et al., 2003)

46.     The Peixoto study suggested that the harmful effects of Roundup on mitochondrial bioenergetics could not be exclusively attributed to glyphosate and could be the result of other chemicals, namely the surfactant POEA, or alternatively due to the possible synergy between glyphosate and Roundup formulation products.

47.     In 2009, Nora Benachour and Gilles-Eric Seralini published a study examining the effects of Roundup and glyphosate on human umbilical, embryonic, and placental cells.

48.     The study used dilution levels of Roundup and glyphosate far below agricultural recommendations, corresponding with low levels of residues in food. The study concluded that supposed "inert" ingredients, and possibly POEA, change human cell permeability and amplify toxicity of glyphosate alone. The study further suggested that determinations of glyphosate toxicity should take into account the presence of adjuvants, or those chemicals used in the formulation of the complete pesticide. The study confirmed that the adjuvants in Roundup are not inert and that Roundup is always more toxic than its active ingredient glyphosate.

49.     The results of these studies were confirmed in recently published peer-reviewed studies and were at all times available and/or known to Defendant.

50.     Defendant knew or should have known that Roundup is more toxic than glyphosate alone and that safety studies on Roundup, Roundup's adjuvants and "inert" ingredients, and/or the surfactant POEA were necessary to protect Plaintiff from Roundup.

51.     Defendant knew or should have known that tests limited to Roundup's active ingredient glyphosate were insufficient to prove the safety of Roundup.

52.     Defendant failed to appropriately and adequately test Roundup, Roundup's adjuvants and "inert" ingredients, and/or the surfactant POEA to protect Plaintiff from Roundup.

53.     Rather than performing appropriate tests, Defendant relied upon flawed industry-supported studies designed to protect Defendant economic interests rather than Plaintiff and the consuming public.

54.     Despite its knowledge that Roundup was considerably more dangerous than glyphosate alone, Defendant continued to promote Roundup as safe.

## IARC CLASSIFICATION OF GLYPHOSATE

55.     The International Agency for Research on Cancer ("IARC") is the specialized intergovernmental cancer agency the World Health Organization ("WHO") of the United Nations tasked with conducting and coordinating research into the causes of cancer.

56.     An IARC Advisory Group to Recommend Priorities for IARC Monographs during 2015–2019 met in April 2014. Though nominations for the review were solicited, a substance must meet two criteria to be eligible for review by the IARC Monographs: there must already be some evidence of carcinogenicity of the substance, and there must be evidence that humans are exposed to the substance.

57.     IARC set glyphosate for review in 2015-2016. IARC uses five criteria for determining priority in reviewing chemicals. The substance must have a potential for direct impact on public health; scientific literature to support suspicion of carcinogenicity; evidence of significant human exposure; high public interest and/or potential to bring clarity to a controversial area and/or reduce public anxiety or concern; related agents similar to one given high priority by the above considerations. Data reviewed is sourced preferably from publicly accessible, peer-reviewed data.

58.     On March 24, 2015, after its cumulative review of human, animal, and DNA studies for more than one (1) year, many of which have been in Defendant possession since as early as

1985, the IARC's working group published its conclusion that the glyphosate contained in Defendant Roundup herbicide, is a Class 2A "probable carcinogen" as demonstrated by the mechanistic evidence of carcinogenicity in humans and sufficient evidence of carcinogenicity in animals.

59.     The IARC's full Monograph was published on July 29, 2015 and established glyphosate as a class 2A *probable* carcinogen to humans. According to the authors glyphosate demonstrated sufficient mechanistic evidence (genotoxicity and oxidative stress) to warrant a 2A classification based on evidence of carcinogenicity in humans and animals.

60.     The IARC Working Group found an increased risk between exposure to glyphosate and non-Hodgkin's lymphoma ("NHL") and several subtypes of NHL, and the increased risk continued after adjustment for other pesticides.

61.     The IARC also found that glyphosate caused DNA and chromosomal damage in human cells.

## **EARLIER EVIDENCE OF GLYPHOSATE'S DANGER**

62.     Despite the new classification by the IARC, Defendant has had ample evidence of glyphosate and Roundup's genotoxic properties for decades.

63.     Genotoxicity refers to chemical agents that are capable of damaging the DNA within a cell through genetic mutations, which is a process that is believed to lead to cancer.

64.     In 1997, Chris Clements published "Genotoxicity of select herbicides in *Rana catesbeiana* tadpoles using the alkaline single-cell gel DNA electrophoresis (comet) assay."

65.     The study found that tadpoles exposed to Roundup showed significant DNA damage when compared with unexposed control animals.

66.   Both human and animal studies have shown that glyphosate and glyphosate-based formulations such as Roundup can induce oxidative stress.

67.   Oxidative stress and associated chronic inflammation are believed to be involved in carcinogenesis.

68.   The IARC Monograph notes that "[s]trong evidence exists that glyphosate, AMPA and glyphosate-based formulations can induce oxidative stress."

69.   In 2006 César Paz-y-Miño published a study examining DNA damage in human subjects exposed to glyphosate.

70.   The study produced evidence of chromosomal damage in blood cells showing significantly greater damage after exposure to glyphosate than before in the same individuals, suggesting that the glyphosate formulation used during aerial spraying had a genotoxic effect on exposed individuals.

71.   The IARC Monograph reflects the volume of evidence of glyphosate pesticides' genotoxicity noting "[t]he evidence for genotoxicity caused by glyphosate-based formulations is strong."

72.   Despite knowledge to the contrary, Defendant maintains that there is no evidence that Roundup is genotoxic, that regulatory authorities and independent experts are in agreement that Roundup is not genotoxic, and that there is no evidence that Roundup is genotoxic.

73.   In addition to glyphosate and Roundup's genotoxic properties, Defendant has long been aware of glyphosate's carcinogenic properties.

74.   Glyphosate and Roundup in particular have long been associated with carcinogenicity and the development of numerous forms of cancer, including, but not limited to, non-Hodgkin's lymphoma, Hodgkin's lymphoma, multiple myeloma, and soft tissue sarcoma.

75.     Defendant has known of this association since the early to mid-1980s and numerous human and animal studies have evidenced the carcinogenicity of glyphosate and/or Roundup.

76.     In 1985 the EPA studied the effects of glyphosate in mice finding a dose related response in male mice linked to renal tubal adenomas, a rare tumor. The study concluded the glyphosate was oncogenic.

77.     In 2003 Lennart Hardell and Mikael Eriksson published the results of two case controlled studies on pesticides as a risk factor for NHL and hairy cell leukemia.

78.     The study concluded that glyphosate had the most significant relationship to NHL among all herbicides studies with an increased odds ratio of 3.11.

79.     In 2003 AJ De Roos published a study examining the pooled data of mid-western farmers, examining pesticides and herbicides as risk factors for NHL.

80.     The study, which controlled for potential confounders, found a relationship between increased NHL incidence and glyphosate.

81.     In 2008 Mikael Eriksson published a population based case-control study of exposure to various pesticides as a risk factor for NHL.

82.     This strengthened previous associations between glyphosate and NHL.

83.     In spite of this knowledge, Defendant continued to issue broad and sweeping statements suggesting that Roundup was, and is, safer than ordinary household items such as table salt, despite a lack of scientific support for the accuracy and validity of these statements and, in fact, voluminous evidence to the contrary.

84.     Upon information and belief, these statements and representations have been made with the intent of inducing Plaintiff, the agricultural community, and the public at large to purchase

and increase the use of Defendant Roundup for Defendant pecuniary gain, and in fact, did induce Plaintiff to use Roundup.

85.    Defendant made these statements with complete disregard and reckless indifference to the safety of Plaintiff and the general public.

86.    Notwithstanding Defendant representations, scientific evidence has established a clear association between glyphosate and genotoxicity, inflammation, and an increased risk of many cancers, including, but not limited to, NHL, Multiple Myeloma, and soft tissue sarcoma.

87.    Defendant knew or should have known that glyphosate is associated with an increased risk of developing cancer, including, but not limited to, NHL, Multiple Myeloma, and soft tissue sarcomas.

88.    Defendant failed to appropriately and adequately inform and warn Plaintiff of the serious and dangerous risks associated with the use of and exposure to glyphosate and/or Roundup, including, but not limited to, the risk of developing NHL, as well as other severe and personal injuries, which are permanent and/or long-lasting in nature, cause significant physical pain and mental anguish, diminished enjoyment of life, and the need for medical treatment, monitoring and/or medications.

89.    Despite the IARC's classification of glyphosate as a class 2A probable carcinogen, Defendant continues to maintain that glyphosate and/or Roundup is safe, non- carcinogenic, non-genotoxic, and falsely warrant to users and the general public that independent experts and regulatory agencies agree that there is no evidence of carcinogenicity or genotoxicity in glyphosate and Roundup.

90.    Defendant has claimed and continue to claim that Roundup is safe, non-carcinogenic, and non-genotoxic. These misrepresentations are consistent with Defendant cavalier

15

approach to investigating and ensuring the safety of its products, the safety of the public at large, and the safety of Plaintiff.

## SCIENTIFIC FRAUD UNDERLYING THE SAFETY DETERMINATIONS OF GLYPHOSATE

91.     After the EPA's 1985 classification of glyphosate as possibly carcinogenic to humans (Group C), Monsanto exerted pressure upon the EPA to change its classification.

92.     This culminated in the EPA's reclassification of glyphosate to Group E, which was based upon evidence of non-carcinogenicity in humans.

93.     In so classifying, the EPA stated that "[i]t should be emphasized, however, that designation of an agent in Group E is based on the available evidence at the time of evaluation and should not be interpreted as a definitive conclusion that the agent will not be a carcinogen under any circumstances."

94.     On two occasions, the EPA found that laboratories hired by Monsanto to test the toxicity of its Roundup products for registration purposes committed scientific fraud.

95.     In the first instance, Monsanto hired Industrial Bio-Test Laboratories ("IBT") to perform and evaluate pesticide toxicology studies relating to Roundup. IBT performed approximately 30 tests on glyphosate and glyphosate-containing products, including 11 of the 19 chronic toxicology studies needed to register Roundup with the EPA.

96.     In 1976, the Food and Drug Administration ("FDA") performed an inspection of IBT and discovered discrepancies between the raw data and the final report relating to toxicological impacts of glyphosate. The EPA subsequently audited IBT and determined that the toxicology studies conducted for Roundup were invalid. An EPA reviewer stated, after finding "routine falsification of data" at IBT, that it was "hard to believe the scientific integrity of the studies when they said they took specimens of the uterus from male rabbits."

97.     Three top executives of IBT were convicted of fraud in 1983.

98.     In the second incident, Monsanto hired Craven Laboratories ("Craven") in 1990 to perform pesticide and herbicide studies, including several studies on Roundup.

99.     In March of 1991, the EPA announced that it was investigating Craven for "allegedly falsifying test data used by chemical firms to win EPA approval of pesticides." The investigation lead to the indictments of the laboratory owner and a handful of employees.

## MONSANTO'S CONTINUING DISREGARD FOR THE SAFETY OF PLAINTIFF AND THE PUBLIC

100.    Monsanto claims on its website that "[r]egulatory authorities and independent experts around the world have reviewed numerous long-term/carcinogenicity and genotoxicity studies and agree that there is no evidence that glyphosate, the active ingredient in Roundup brand herbicides and other glyphosate-based herbicides, causes cancer, even at very high doses, and that it is not genotoxic."[9]

101.    Ironically, the primary source for this statement is a 1986 report by the WHO, the same organization that now considers glyphosate to be a probable carcinogen.

102.    Glyphosate, and Defendant Roundup products in particular, have long been associated with serious side effects and many regulatory agencies around the globe have banned or are currently banning the use of glyphosate herbicide products.

103.    Defendant statements proclaiming the safety of Roundup and disregarding its dangers misled Plaintiff.

---

[9] Backgrounder - Glyphosate: No Evidence of Carcinogenicity. Updated November 2014. (downloaded October 9 2015)

104.    Despite Defendant knowledge that Roundup was associated with an elevated risk of developing cancer, Defendant promotional campaigns focused on Roundup's purported "safety profile."

105.    Defendant failure to adequately warn Plaintiff resulted in (1) Plaintiff using and being exposed to glyphosate instead of using another acceptable and safe method of controlling unwanted weeds and pests; and (2) scientists and physicians failing to warn and instruct consumers about the risk of cancer, including NHL, and other injuries associated with Roundup.

106.    Defendant failed to seek modification of the labeling of Roundup to include relevant information regarding the risks and dangers associated with Roundup exposure.

107.    The failure of Defendant to appropriately warn and inform the EPA has resulted in inadequate warnings in safety information presented directly to users and consumers.

108.    The failure of Defendant to appropriately warn and inform the EPA has resulted in the absence of warning or caution statements that are adequate to protect health and the environment.

109.    The failure of Defendant to appropriately warn and inform the EPA has resulted in the directions for use that are not adequate to protect health and the environment.

110.    By reason of the foregoing acts and omissions, Plaintiffs seek compensatory damages as a result of ROBERT STEVENS' use of, and exposure to, Roundup which caused or was a substantial contributing factor in causing ROBERT STEVENS to suffer from cancer, specifically NHL, and caused or contributed to his death.

111.    By reason of the foregoing, ROBERT STEVENS' died.

112.     By reason of the foregoing acts and omissions, Plaintiff has endured and, in some categories continues to suffer, emotional and mental anguish, medical expenses, and other economic and non-economic damages, as a result of the actions and inactions of the Defendant.

## ROBERT STEVENS' EXPOSURE TO ROUNDUP
## EQUITABLE TOLLING OF APPLICABLE STATUTE OF LIMITATIONS

113.     Plaintiff incorporates by reference all prior paragraphs of this Complaint as if fully set forth herein.

114.     The running of any statute of limitations has been tolled by reason of Defendant fraudulent concealment. Defendant, through its affirmative misrepresentations and omissions, actively concealed from Plaintiff the true risks associated with Roundup and glyphosate.

115.     At all relevant times, Defendant has maintained that Roundup is safe, non-toxic, and non-carcinogenic.

116.     Indeed, even as of July 2016, Defendant continues to represent to the public that "Regulatory authorities and independent experts around the world have reviewed numerous long-term/carcinogenicity and genotoxicity studies and *agree* that there is *no evidence* that glyphosate, the active ingredient in Roundup® brand herbicides and other glyphosate-based herbicides, causes cancer, even at very high doses, and that it is not genotoxic" (emphasis added).[10]

117.     As a result of Defendant actions, Plaintiff was unaware, and could not reasonably know or have learned through reasonable diligence that Roundup and/or glyphosate contact, exposed Plaintiff to the risks alleged herein and that those risks were the direct and proximate result of Defendant acts and omissions.

---

[10] Backgrounder - Glyphosate: No Evidence of Carcinogenicity. Updated November 2014. (downloaded October 9 2015)

118.    Furthermore, Defendant is estopped from relying on any statute of limitations because of its fraudulent concealment of the true character, quality and nature of Roundup. Defendant was under a duty to disclose the true character, quality, and nature of Roundup because this was non-public information over which Defendant had and continues to have exclusive control, and because Defendant knew that this information was not available to Plaintiff or to distributors of Roundup. In addition, Defendant is estopped from relying on any statute of limitations because of its intentional concealment of these facts.

119.    Plaintiff had no knowledge that Defendant was engaged in the wrongdoing alleged herein. Because of the fraudulent acts of concealment of wrongdoing by Defendant, Plaintiff could not have reasonably discovered the wrongdoing at any time prior. Also, the economics of this fraud should be considered. Defendant had the ability to and did spend enormous amounts of money in furtherance of its purpose of marketing, promoting and/or distributing a profitable herbicide, notwithstanding the known or reasonably known risks. Plaintiff and medical professionals could not have afforded and could not have possibly conducted studies to determine the nature, extent, and identity of related health risks, and were forced to rely on only the Defendant representations. Accordingly, Defendant is precluded by the discovery rule and/or the doctrine of fraudulent concealment from relying upon any statute of limitations.

## FIRST CAUSE OF ACTION (NEGLIGENCE)

120.    Plaintiff re-alleges each and every allegation of this Complaint contained in each of the foregoing paragraphs with the same force and effect as if fully set forth herein.

121.    Defendant had a duty to exercise reasonable care in the designing, researching, testing, manufacturing, marketing, supplying, promoting, packaging, sale, and distribution of

Roundup into the stream of commerce, including a duty to assure that the product would not cause users to suffer unreasonable, dangerous side effects.

122.   Defendant failed to exercise ordinary care in the designing, researching, testing, manufacturing, marketing, supplying, promoting, packaging, sale, testing, quality assurance, quality control, and distribution of Roundup into interstate commerce in that Defendant knew or should have known that using Roundup created a high risk of unreasonable, dangerous side effects, including, but not limited to, the development of NHL, as well as other severe and personal injuries which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life, as well as need for lifelong medical treatment, monitoring, and medications.

123.   The negligence by the Defendant, its agents, servants, and employees, included but was not limited to the following acts and omissions:

124.   Manufacturing, producing, promoting, formulating, creating, and designing Roundup without thoroughly testing it;

125.   Failing to test Roundup and failing to adequately, sufficiently, and properly test Roundup;

126.   Not conducting sufficient testing programs to determine whether or not Roundup was safe for use; in that Defendant herein knew or should have known that Roundup was unsafe and unfit for use by reason of the dangers to its users;

127.   Not conducting sufficient testing programs and studies to determine Roundup's carcinogenic properties even after Defendant had knowledge that Roundup is, was, or could be carcinogenic;

128.   Failing to conduct sufficient testing programs to determine the safety of "inert" ingredients and adjuvants contained within Roundup, and the propensity of these ingredients to

render Roundup toxic, increase the toxicity of Roundup, whether these ingredients are carcinogenic, magnify the carcinogenic properties of Roundup, and whether or not "inert" ingredients and adjuvants were safe for use; Negligently failing to adequately and correctly warn the Plaintiff, the public, the medical and agricultural professions, and the EPA of the dangers of Roundup;

129.    Negligently failing to petition the EPA to strength the warnings associated with Roundup;

130.    Failing to provide adequate cautions and warnings to protect the health of users, handlers, applicators, and persons who would reasonably and foreseeably come into contact with Roundup;

131.    Negligently marketing, advertising, and recommending the use of Roundup without sufficient knowledge as to its dangerous propensities;

132.    Negligently representing that Roundup was safe for use for its intended purpose, and that Roundup was safer than ordinary and common items such as table salt, when, in fact, it was unsafe;

133.    Negligently representing that Roundup had equivalent safety and efficacy as other forms of herbicides;

134.    Negligently designing Roundup in a manner, which was dangerous to its users;

135.    Negligently manufacturing Roundup in a manner, which was dangerous to its users;

136.    Negligently producing Roundup in a manner, which was dangerous to its users;

137.    Negligently formulating Roundup in a manner, which was dangerous to its users;

138.    Concealing information from the Plaintiff while knowing that Roundup was unsafe, dangerous, and non-conforming with EPA regulations; and

139.    Improperly concealing and misrepresenting information from the Plaintiff, scientific and medical professionals, and the EPA, concerning the severity of risks and dangers of Roundup compared to other forms of herbicides.

140.    Negligently selling Roundup with a false and misleading label.

141.    Defendant under-reported, underestimated, and downplayed the serious dangers of Roundup.

142.    Defendant negligently and deceptively compared the safety risks and dangers of Roundup with common everyday foods such as table salt, and other forms of herbicides.

143.    Defendant was negligent and violated New York law in the designing, researching, supplying, manufacturing, promoting, packaging, distributing, testing, advertising, warning, marketing, and selling of Roundup in that they:

    a.  Failed to use ordinary care in designing and manufacturing Roundup so as to avoid the aforementioned risks to individuals when Roundup was used as an herbicide; Failed to accompany their product with proper and accurate warnings regarding all possible adverse side effects associated with the use of Roundup;

    b.  Failed to accompany their product with proper warnings regarding all possible adverse side effects concerning the failure and malfunction of Roundup;

    c.  Failed to accompany their product with accurate warnings regarding the risks of all possible adverse side effects concerning Roundup;

    d.  Failed to warn Plaintiff of the severity and duration of such adverse effects, as the warnings given did not accurately reflect the symptoms, or severity of the side effects including, but not limited to, the development of NHL;

e.  Failed to conduct adequate testing, clinical testing and post-marketing surveillance to determine the safety of Roundup;

f.  Failed to conduct adequate testing, clinical testing, and post-marketing surveillance to determine the safety of Roundup's "inert" ingredients and adjuvants;

g.  Negligently misrepresented the evidence of Roundup's genotoxicity and carcinogenicity;

h.  Were otherwise careless and negligent.

144.  Despite the fact that Defendant knew or should have known that Roundup caused, or could cause, unreasonably dangerous side effects, Defendant continued and continues to market, manufacture, distribute, and sell Roundup to consumers, including ROBERT STEVENS.

145.  Defendant knew or should have known that consumers such as ROBERT STEVENS would foreseeably suffer injury as a result of Defendant's failure to exercise ordinary care, as set forth above.

146.  Defendant's violations of law and negligence were the proximate cause of ROBERT STEVENS' injuries, death, harm and economic loss, which Plaintiff suffered and will continue to suffer.

147.  As a result of the foregoing acts and omissions, ROBERT STEVENS suffered from serious and dangerous side effects including, but not limited to, NHL, as well as other severe and personal injuries which are permanent and lasting in nature, physical pain and mental anguish, diminished enjoyment of life, and financial expenses for hospitalization and medical care. Further, ROBERT STEVENS suffered life-threatening NHL, and severe personal injuries, which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life.

148.   As a direct and proximate result of the above-described negligence of Defendant as herein above alleged, resulting in the death of ROBERT STEVENS, the decedent's surviving spouse, VICKIE HALL STEVENS, claims all damages allowed under the Florida Wrongful Death Act, including but not limited to:

    a)    Loss of support and services of the decedent from the date of his death to the date he would have died had he lived out her normal life expectancy;

    b)    Loss of custody, companionship, and relationship;

    c)    Mental pain and suffering from the date of his father's injury/death.

    d)    Medical expenses due to decedent's injury;

    e)    Funeral and burial expenses

149.   As a direct and proximate result of the above-described negligence of Defendants as herein above alleged, resulting in the death of ROBERT STEVENS, the decedent's surviving children claim all damages allowed under the Florida Wrongful Death Act, including but not limited to:

    a)    Loss of support and services of the decedent from the date of his death to the date he would have died had he lived out his normal life expectancy;

    b)    Loss of custody, companionship, and relationship;

    c)    Mental pain and suffering from the date of his father's injury/death.

    d)    Medical expenses due to decedent's injury;

    e)    Funeral and burial expenses

150.   As a direct and proximate result of the death of ROBERT STEVENS, the Personal Representative of the estate claims all damages of said estate including all damages allowed under the Florida Wrongful Death Act, including but not limited to:

a)   Loss of earnings of the decedent from the date death to the date he would have died had he lived out her normal life expectancy.

b)   Loss of net accumulations;

c)   Medical expenses due to decedent's injury;

d)   Funeral and burial expenses

151.   WHEREFORE, Plaintiff respectfully request that this Court enter judgment in Plaintiff's favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all relief as this Court deems just and proper. Additionally, Plaintiff demand a jury trial on all issues contained herein.

## SECOND CAUSE OF ACTION
## (STRICT PRODUCTS LIABILITY – DESIGN DEFECT)

152.   Plaintiff re-alleges each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

153.   At all times herein mentioned, the Defendant designed, researched, manufactured, tested, advertised, promoted, sold, distributed, and had acquired the entity who has designed, researched, tested, advertised, promoted, marketed, sold, and distributed Roundup as hereinabove described that was used by the Plaintiff.

154.   Defendant's Roundup was expected to and did reach the usual consumers, handlers, and persons coming into contact with said product without substantial change in the condition in which it was produced, manufactured, sold, distributed, and marketed by the Defendant.

155.   At those times, Roundup was in an unsafe, defective, and inherently dangerous condition, which was dangerous to users, and in particular, ROBERT STEVENS.

26

156.     The Roundup designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed by Defendant were defective in design or formulation in that, when it left the hands of the manufacturer and suppliers, the foreseeable risks exceeded the benefits associated with the design or formulation of Roundup.

157.     The Roundup designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed by Defendant were defective in design and formulation, in that, when it left the hands of the Defendant's manufacturer and supplier, it was unreasonably dangerous, unreasonably dangerous in normal use, and it was more dangerous than an ordinary consumer would expect.

158.     At all times herein mentioned, Roundup was in a defective condition and unsafe, and Defendant knew or had reason to know that said product was defective and unsafe, especially when used in the form and manner as provided by the Defendant. In particular, Defendant's Roundup was defective in the following ways:

      a.  When placed in the stream of commerce, Defendant's Roundup Products were defective in design and formulation and, consequently, dangerous to an extent beyond that which an ordinary consumer would anticipate.

      b.  When placed in the stream of commerce, Defendant's Roundup products were unreasonably dangerous in that they were hazardous and posed a grave risk of cancer and other serious illnesses when used in a reasonably anticipated manner.

      c.  When placed in the stream of commerce, Defendant's Roundup products contained unreasonably dangerous design defects and were not reasonably safe when used in a reasonably anticipated manner.

      d.  Defendant did not sufficiently test, investigate, or study its Roundup products.

    e.   Exposure to Roundup presents a risk of harmful side effects that outweigh any potential utility stemming from the use of the herbicide.

    f.   Defendant knew or should have known at the time of marketing its Roundup products that exposure to Roundup and could result in cancer and other severe illnesses and injuries.

Defendant did not conduct adequate post-marketing surveillance of its Roundup products.

159.    Defendant knew, or should have known that at all times herein mentioned its Roundup was in a defective condition, and was and is inherently dangerous and unsafe.

160.    ROBERT STEVENS was exposed to Defendant's Roundup, as described above, without knowledge of Roundup's dangerous characteristics.

161.    At the time of ROBERT STEVENS' use of and exposure to Roundup, Roundup was being used for the purposes and in a manner normally intended, as a broad-spectrum herbicide.

162.    Defendant with this knowledge voluntarily designed its Roundup with a dangerous condition for use by the public, and in particular to ROBERT STEVENS.

163.    Defendant had a duty to create a product that was not unreasonably dangerous for its normal, intended use.

164.    Defendant created a product that was and is unreasonably dangerous for its normal, intended use.

165.    Defendant marketed and promoted a product in such a manner so as to make it inherently defective as the product downplayed its suspected, probable, and established health risks inherent with its normal, intended use.

166.    The Roundup designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed by Defendant was manufactured defectively in that Roundup left the hands of Defendant in a defective condition and was unreasonably dangerous to its intended users.

167.    The Roundup designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed by Defendant reached their intended users in the same defective and unreasonably dangerous condition in which the Defendant's Roundup was manufactured.

168.    Defendant designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed a defective product, which created an unreasonable risk to the health of consumers and to ROBERT STEVENS in particular, and Defendant is therefore strictly liable for the injuries sustained by the Plaintiff.

169.    The Plaintiff and ROBERT STEVENS could not, by the exercise of reasonable care, have discovered Roundup's defects herein mentioned or perceived its danger.

170.    By reason of the foregoing, the Defendant has become strictly liable to the Plaintiff for the manufacturing, marketing, promoting, distribution, and selling of a defective product, Roundup.

171.    Defendant's defective design, of Roundup amounts to willful, wanton, and reckless conduct by Defendant.

172.    Defects in Defendant's Roundup were the cause or a substantial factor in causing Plaintiff's injuries.

173.    As a result of the foregoing acts and omissions, ROBERT STEVENS suffered from serious and dangerous side effects including, but not limited to, NHL, as well as other severe and personal injuries which are permanent and lasting in nature, physical pain and mental anguish,

diminished enjoyment of life, and financial expenses for hospitalization and medical care. Further, ROBERT STEVENS suffered life-threatening NHL, and severe personal injuries, which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life.

174.   As a direct and proximate result of the above-described negligence of Defendant as herein above alleged, resulting in the death of ROBERT STEVENS, the decedent's surviving spouse, VICKIE HALL STEVENS, claims all damages allowed under the Florida Wrongful Death Act, including but not limited to:

      a)      Loss of support and services of the decedent from the date of his death to the date he would have died had he lived out her normal life expectancy;

      b)      Loss of custody, companionship, and relationship;

      c)      Mental pain and suffering from the date of his father's injury/death.

      d)      Medical expenses due to decedent's injury;

      e)      Funeral and burial expenses

175.   As a direct and proximate result of the above-described negligence of Defendants as herein above alleged, resulting in the death of ROBERT STEVENS, the decedent's surviving children claim all damages allowed under the Florida Wrongful Death Act, including but not limited to:

      a)      Loss of support and services of the decedent from the date of his death to the date he would have died had he lived out his normal life expectancy;

      b)      Loss of custody, companionship, and relationship;

      c)      Mental pain and suffering from the date of his father's injury/death.

      d)      Medical expenses due to decedent's injury;

      c)     Funeral and burial expenses

176.   As a direct and proximate result of the death of ROBERT STEVENS, the Personal Representative of the estate claims all damages of said estate including all damages allowed under the Florida Wrongful Death Act, including but not limited to:

      a)     Loss of earnings of the decedent from the date death to the date he would have died had he lived out her normal life expectancy.

      b)     Loss of net accumulations;

      c)     Medical expenses due to decedent's injury;

      d)     Funeral and burial expenses

177.   WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in Plaintiff's favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all relief as this Court deems just and proper. Additionally, Plaintiff demands a jury trial on all issues contained herein.

### THIRD CAUSE OF ACTION
### (STRICT PRODUCTS LIABILITY – FAILURE TO WARN)

178.   Plaintiff re-alleges each and every allegation of this Complaint contained in each of the foregoing paragraphs, with the same force and effect as if fully set forth herein.

179.   Defendant has engaged in the business of selling, testing, distributing, supplying, manufacturing, marketing, and promoting Roundup, and through that conduct has knowingly and intentionally placed Roundup into the stream of commerce with full knowledge that it reaches consumers such as ROBERT STEVENS who are exposed to it through ordinary and reasonably foreseeable uses.

180.   Defendant did in fact sell, distribute, supply, manufacture, and promote Roundup to ROBERT STEVENS. Additionally, Defendant expected the Roundup that they were selling,

distributing, supplying, manufacturing, and promoting to reach – consumers, including ROBERT STEVENS, without any substantial change in the condition of the product from when it was initially distributed by Defendant.

181.   At the time of manufacture, Defendant could have provided  the warnings or instructions regarding the full and complete risks of Roundup and glyphosate- containing products because it knew or should have known of the unreasonable risks of harm associated with the use of and exposure to such products.

182.   At all times herein mentioned, the product was defective and unsafe in manufacture such that it was unreasonably dangerous to the user, and was so at the time it was distributed by Defendant and at the time ROBERT STEVENS was exposed to the product. The defective condition of Roundup was due in part to the fact that it was not accompanied by proper warnings regarding its carcinogenic qualities and possible side effects, including, but not limited to, developing non-Hodgkin's lymphoma as a result of exposure and use.

183.   Roundup did not contain a warning or caution statement, which was necessary and, if complied with, was adequate to protect health those exposed in violation of 7 U.S.C.§136j(a)(1)(E).

184.   Defendant's failure to include a warning or caution statement which was necessary and, if complied with, was adequate to protect the health of those exposed, violated 7 U.S.C. §136j(a)(1)(E) as well as the laws of the State of Florida.

185.   Defendant could have amended the label of Roundup to provide additional warnings.

186.   This defect caused serious injury to ROBERT STEVENS, who used Roundup in its intended and foreseeable manner.

187.    At all times herein mentioned, Defendant had a duty to properly design, manufacture, compound, test, inspect, package, label, distribute, market, examine, maintain supply, provide proper warnings, and take such steps to assure that the product did not cause users to suffer from unreasonable and dangerous side effects.

188.    Defendant labeled, distributed, and promoted the product that it was dangerous and unsafe for the use and purpose for which it was intended.

189.    Defendant failed to warn of the nature and scope of the side effects associated with Roundup, namely its carcinogenic properties and its propensity to cause or serve as a substantial contributing factor in the development of NHL.

190.    Defendant was aware of the probable consequences of the aforesaid conduct. Despite the fact that Defendant knew or should have known that Roundup caused serious injuries, Defendant failed to exercise reasonable care to warn of the dangerous carcinogenic properties and side effect of developing NHL from Roundup exposure, even though these side effects were known or reasonably scientifically knowable at the time of distribution. Defendant willfully and deliberately failed to avoid the consequences associated with their failure to warn, and in doing so, Defendant acted with a conscious disregard for the safety of ROBERT STEVENS.

191.    At the time of exposure, ROBERT STEVENS could not have reasonably discovered any defect in Roundup prior through the exercise of reasonable care.

192.    Defendant, as the manufacturer and distributor of the subject product, is held to the level of knowledge of an expert in the field.

193.    ROBERT STEVENS reasonably relied upon the skill, superior knowledge, and judgment of Defendant.

194.    Had Defendant properly disclosed the risks associated with Roundup, ROBERT STEVENS would have avoided the risk of NHL by not using Roundup.

195.    The information that Defendant did provide or communicate failed   to contain adequate warnings and precautions that would have enabled ROBERT STEVENS, and similarly situated individuals, to utilize the product safely and with adequate protection. Instead, Defendant disseminated information that was inaccurate, false,   and   misleading and which failed to communicate accurately or adequately the comparative severity, duration, and extent of the risk of injuries associated with use of and exposure to Roundup and glyphosate; continued to promote the efficacy of Roundup, even after it knew or should have known of the unreasonable risks from use or exposure; and concealed, downplayed, or otherwise suppressed, through aggressive marketing and promotion, any information or research about the risks and dangers of exposure to Roundup and glyphosate.

196.    To this day, Defendant has failed to adequately warn of the true risks of ROBERT STEVENS 'injuries associated with the use of and exposure to Roundup.

197.    As a result of their inadequate warnings, Defendant's Roundup products were defective and unreasonably dangerous when they left the possession and control of Defendant, were distributed by Defendant, and used by ROBERT STEVENS.

198.    As a direct and proximate result of Defendant's actions as alleged herein, and in such other ways to be later shown, the subject product caused ROBERT STEVENS to sustain injuries as herein alleged.

199.    As a direct and proximate result of the above-described negligence of Defendant as herein above alleged, resulting in the death of ROBERT STEVENS, the decedent's surviving

spouse, VICKIE HALL STEVENS, claims all damages allowed under the Florida Wrongful Death Act, including but not limited to:

      a)    Loss of support and services of the decedent from the date of his death to the date he would have died had he lived out her normal life expectancy;

      b)    Loss of custody, companionship, and relationship;

      c)    Mental pain and suffering from the date of his father's injury/death.

      d)    Medical expenses due to decedent's injury;

      e)    Funeral and burial expenses

200.    As a direct and proximate result of the above-described negligence of Defendants as herein above alleged, resulting in the death of ROBERT STEVENS, the decedent's surviving children claim all damages allowed under the Florida Wrongful Death Act, including but not limited to:

      a)    Loss of support and services of the decedent from the date of his death to the date he would have died had he lived out his normal life expectancy;

      b)    Loss of custody, companionship, and relationship;

      c)    Mental pain and suffering from the date of his father's injury/death.

      d)    Medical expenses due to decedent's injury;

      e)    Funeral and burial expenses

201.    As a direct and proximate result of the death of ROBERT STEVENS, the Personal Representative of the estate claims all damages of said estate including all damages allowed under the Florida Wrongful Death Act, including but not limited to:

      a)    Loss of earnings of the decedent from the date death to the date he would have died had he lived out her normal life expectancy.

      b)     Loss of net accumulations;

      c)     Medical expenses due to decedent's injury;

      d)     Funeral and burial expenses

202.    WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in Plaintiff's favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all relief as this Court deems just and proper. Additionally, Plaintiff demands a jury trial on all issues contained herein.

### FOURTH CAUSE OF ACTION
### (BREACH OF IMPLIED WARRANTIES)

203.    Plaintiff re-alleges each and every allegation of this Complaint contained in each of the foregoing paragraphs, with the same force and effect as if fully set forth herein.

204.    At all times herein mentioned, the Defendant manufactured, distributed, compounded, recommended, merchandized, advertised, promoted, and sold Roundup and have recently acquired the entity who manufactured, compound portrayed, distributed, recommended, merchandized, advertised, promoted, and sold Roundup, as a broad spectrum herbicide. These actions were under the ultimate control and supervision of Defendant.

205.    At the time Defendant marketed, sold, and distributed Roundup for use by ROBERT STEVENS Defendant knew of Roundup's intended use and impliedly warranted the product to be of merchantable quality and safe and fit for this use.

206.    The Defendant impliedly represented and warranted to ROBERT STEVENS and users of Roundup, and the EPA that Roundup was safe and of merchantable quality and fit for the ordinary purpose for which it was to be used.

207.   These representations and warranties were false, misleading, and inaccurate in that Roundup was unsafe, unreasonably dangerous, not of merchantable quality, and defective.

208.   ROBERT STEVENS and the EPA did rely on said implied warranty of merchantability of fitness for particular use and purpose.

209.   ROBERT STEVENS reasonably relied upon the skill and judgment of Defendant as to whether Roundup was of merchantable quality and safe and fit for its intended use.

210.   Roundup was placed into the stream of commerce by the Defendant in a defective, unsafe, and inherently dangerous condition, and the products' materials were expected to and did reach users, handlers, and persons coming into contact with said products without substantial change in the condition in which they were sold.

211.   The Defendant breached the aforesaid implied warranties, as its herbicide Roundup was not fit for its intended purposes and uses.

212.   As a result of the foregoing acts and omissions, ROBERT STEVENS suffered from NHL which caused or contributed to his death.

213.   As a direct and proximate result of the above-described negligence of Defendant as herein above alleged, resulting in the death of ROBERT STEVENS, the decedent's surviving spouse, VICKIE HALL STEVENS, claims all damages allowed under the Florida Wrongful Death Act, including but not limited to:

      a)     Loss of support and services of the decedent from the date of his death to the date he would have died had he lived out her normal life expectancy;

      b)     Loss of custody, companionship, and relationship;

      c)     Mental pain and suffering from the date of his father's injury/death.

      d)     Medical expenses due to decedent's injury;

    e)     Funeral and burial expenses

214.   As a direct and proximate result of the above-described negligence of Defendants as herein above alleged, resulting in the death of ROBERT STEVENS, the decedent's surviving children claim all damages allowed under the Florida Wrongful Death Act, including but not limited to:

    a)     Loss of support and services of the decedent from the date of his death to the date he would have died had he lived out his normal life expectancy;

    b)     Loss of custody, companionship, and relationship;

    c)     Mental pain and suffering from the date of his father's injury/death.

    d)     Medical expenses due to decedent's injury;

    e)     Funeral and burial expenses

215.   As a direct and proximate result of the death of ROBERT STEVENS, the Personal Representative of the estate claims all damages of said estate including all damages allowed under the Florida Wrongful Death Act, including but not limited to:

    a)     Loss of earnings of the decedent from the date death to the date he would have died had he lived out her normal life expectancy.

    b)     Loss of net accumulations;

    c)     Medical expenses due to decedent's injury;

    d)     Funeral and burial expenses

216.   WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in Plaintiff's favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all relief as this Court deems just and proper. Additionally, Plaintiff demands a jury trial on all issues contained herein.

## FIFTH CAUSE OF ACTION
### (VIOLATION OF THE CONSUMER FRAUD ACT)

217.    Plaintiff re-alleges each and every allegation of this Complaint contained in each of the foregoing paragraphs, with the same force and effect as if fully set forth herein.

218.    Plaintiff brings this cause of action pursuant to Florida Statute §§ 501 and California Business & Professions Code § 17500, California Civil Code §1750 et. seq.

219.    Defendant fraudulently, intentionally, negligently, and innocently misrepresented to the public, and to ROBERT STEVENS, both directly and by and through the media and purported "community outreach" programs, the safety of Roundup products, and fraudulently, intentionally, negligently and innocently concealed, suppressed, or omitted material, adverse information regarding the safety of Roundup. This deception caused injury to ROBERT STEVENS in violation of the Consumer Fraud Act of Plaintiff's home state which creates a private right of action by Plaintiff.

220.    The intentional, negligent, and innocent misrepresentations and omissions of Defendant regarding the safety of Roundup products were communicated to ROBERT STEVENS directly through national and regional advertising, marketing and promotion efforts, as well as the packaging and sales aids. The safety of Roundup products was also intentionally, negligently, and innocently misrepresented to ROBERT STEVENS and the public with the intent that such misrepresentations would cause Plaintiff and other potential consumers to purchase and use or continue to purchase and use Roundup products.

221.    Defendant either knew or should have known of the material representations they were making regarding the safety and relative utility of Roundup products.

222.   Defendant fraudulently, intentionally, negligently, and innocently made the misrepresentations and actively concealed, suppressed, or omitted this material information with the specific desire to induce ROBERT STEVENS, and the consuming public to purchase and use Roundup products. Defendant fraudulently, intentionally, negligently, and innocently, knew or should have known that ROBERT STEVENS and the consuming public would rely on such material misrepresentations and omissions in selecting and applying Roundup products. Defendant knew or should have known that Plaintiff would rely on their false representations and omissions.

223.   Defendant made these misrepresentations and actively concealed adverse information including the risk of non-Hodgkin lymphoma, at a time when, their agents   and employees knew or should have known, the product had defects, dangers, and characteristics that were other than what was represented to the consuming public. Specifically, Defendant misrepresented and actively concealed, suppressed, and omitted that there had been inadequate testing of the safety and efficacy of Roundup, and that prior studies, research, reports, and testing had been conducted linking the use of the drug with serious health events, including non-Hodgkin lymphoma.

224.   193   Despite the fact that Defendant knew or should have known of reports of severe risks including non-Hodgkin lymphoma, with Roundup use and exposure, this information was strategically minimized, understated, or omitted in order to create the impression that the human dangers of Roundup were nonexistent, particularly in light of its purported utility.

225.   The fraudulent, intentional, negligent and innocent material misrepresentations and active concealment, suppression, and omissions by Defendant were perpetuated directly and indirectly through the advertisements, packaging, sales aids, furtive public relations efforts, and

other marketing and promotional pieces authored, analyzed, created, compiled, designed, drafted, disseminated, distributed, edited, evaluated, marketed, published, and supplied by Defendant.

226.   If ROBERT STEVENS had known the true facts concerning the risks associated with Roundup exposure, ROBERT STEVENS would have used a safer alternative.

227.   ROBERT STEVENS' reliance upon the material misrepresentations and omissions was justified, among other reasons, because said misrepresentations and omissions were made by individuals and entities who were in a position to know the true facts concerning Roundup while ROBERT STEVENS was not in a position to know the true facts because Defendant overstated the benefits and safety of Roundup and downplayed the risk of NHL, thereby inducing ROBERT STEVENS to use the herbicide rather than safer alternatives.

228.   Federal law and the EPA do not authorize and specifically prohibit the deceptions, misrepresentations and omissions made by Defendant.

229.   As a direct and proximate result of Defendant's actions and inactions, ROBERT STEVENS was exposed to Roundup and suffered injuries and damages, as set forth herein.

230.   As a direct and proximate result of the above-described negligence of Defendant as herein above alleged, resulting in the death of ROBERT STEVENS, the decedent's surviving spouse, VICKIE HALL STEVENS, claims all damages allowed under the Florida Wrongful Death Act, including but not limited to:

       a)   Loss of support and services of the decedent from the date of his death to the date he would have died had he lived out her normal life expectancy;

       b)   Loss of custody, companionship, and relationship;

       c)   Mental pain and suffering from the date of his father's injury/death.

       d)   Medical expenses due to decedent's injury;

41

e)      Funeral and burial expenses

231.    As a direct and proximate result of the above-described negligence of Defendants as herein above alleged, resulting in the death of ROBERT STEVENS, the decedent's surviving children claim all damages allowed under the Florida Wrongful Death Act, including but not limited to:

a)      Loss of support and services of the decedent from the date of his death to the date he would have died had he lived out his normal life expectancy;

b)      Loss of custody, companionship, and relationship;

c)      Mental pain and suffering from the date of his father's injury/death.

d)      Medical expenses due to decedent's injury;

e)      Funeral and burial expenses

232.    As a direct and proximate result of the death of ROBERT STEVENS, the Personal Representative of the estate claims all damages of said estate including all damages allowed under the Florida Wrongful Death Act, including but not limited to:

a)      Loss of earnings of the decedent from the date death to the date he would have died had he lived out her normal life expectancy.

b)      Loss of net accumulations;

c)      Medical expenses due to decedent's injury;

d)      Funeral and burial expenses

233.    WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in Plaintiff's favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all relief as this Court deems just and proper. Additionally, Plaintiff demands a jury trial on all issues contained herein.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment against the Defendant on each of the above-referenced claims and causes of action and as follows:

1.      Awarding compensatory damages in excess of the jurisdictional amount, including, but not limited to, pain, suffering, emotional distress, loss of enjoyment of life, and other non-economic damages in an amount to be determined at trial of this action;

2.      Awarding compensatory damages to Plaintiff for past and future damages, including, but not limited to, Plaintiff's pain and suffering and for severe and permanent personal injuries sustained by the Plaintiff including health care costs and economic loss;

3.      Awarding economic damages in the form of medical expenses, out of pocket expenses, lost earnings and other economic damages in an amount to be determine at trial of this action;

4.      Punitive and exemplary damages for the wanton, willful, fraudulent, and reckless acts of the Defendant who demonstrated a complete disregard and reckless indifference for the safety and welfare of the general public and to the Plaintiff in an amount sufficient to punish Defendant and deter future similar conduct, to the extent allowed by applicable law;

5.      Pre-judgment interest;

6.      Post-judgment interest;

7.      Awarding Plaintiff reasonable attorneys' fees;

8.      Awarding Plaintiff the costs of these proceedings; and

9.      Such other and further relief as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands trial by jury as to all issues.

Dated:  June 3, 2022

_Austin Grinder_
_____

Austin J. Grinder, Esquire
Fla Bar No: 0054029
agrinder@getjustice.com
Eric D. Roslansky, Esquire
Fla Bar No: 0042067
eroslansky@getjustice.com
roundup-service@getjustice.com
THE RUTH LAW TEAM
P.O. Box 16847
St. Petersburg, FL  33733-6847
(727) 327-3222
Attorneys for Plaintiffs

/tad