Query    Reports    Utilities    Help    Log Out

ECF

# U.S. District Court
## Southern District of New York (White Plains)
## CIVIL DOCKET FOR CASE #: 7:22-cv-00221-VB

DeMarmels v. Monsanto Company et al                  Date Filed: 01/11/2022
Assigned to: Judge Vincent L. Briccetti             Jury Demand: Plaintiff
Cause: 28:1332pl Diversity-Product Liability         Nature of Suit: 365 Personal Inj. Prod.
                                                     Liability
                                                     Jurisdiction: Diversity

**Plaintiff**

**Michael DeMarmels**                   represented by   **Vilma Blankowitz**
                                                         Law Office of Vilma Blankowitz
                                                         24 Continental Road
                                                         Warwick, NY 10990
                                                         845-544-7443
                                                         Fax: 845-533-1727
                                                         Email: vilmablankowitz@gmail.com
                                                         *ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Monsanto Company**

**Defendant**

**Bayer Corporation**

**Defendant**

**Bayer AG**

| Date Filed | # | Docket Text |
|---|---|---|
| 01/11/2022 | 1 | COMPLAINT against Bayer AG, Bayer Corporation, Monsanto Company. (Filing Fee $ 402.00, Receipt Number ANYSDC-25565070)Document filed by Michael DeMarmels.. (Blankowitz, Vilma) (Entered: 01/11/2022) |
| 01/11/2022 | 2 | CIVIL COVER SHEET filed..(Blankowitz, Vilma) (Entered: 01/11/2022) |
| 01/12/2022 | | CASE OPENING INITIAL ASSIGNMENT NOTICE: The above-entitled action is assigned to Judge Vincent L. Briccetti. Please download and review the Individual Practices of the assigned District Judge, located at https://nysd.uscourts.gov/judges/district-judges. Attorneys are responsible for providing courtesy copies to judges where their Individual Practices require such. Please download and review the ECF Rules and Instructions, located at https://nysd.uscourts.gov/rules/ecf-related-instructions..(pc) (Entered: 01/12/2022) |

| 01/12/2022 | | Magistrate Judge Paul E. Davison is so designated. Pursuant to 28 U.S.C. Section 636(c) and Fed. R. Civ. P. 73(b)(1) parties are notified that they may consent to proceed before a United States Magistrate Judge. Parties who wish to consent may access the necessary form at the following link: https://nysd.uscourts.gov/sites/default/files/2018-06/AO-3.pdf. (pc) (Entered: 01/12/2022) |
|---|---|---|
| 01/12/2022 | | Case Designated ECF. (pc) (Entered: 01/12/2022) |
| 02/10/2022 | 3 | REQUEST FOR ISSUANCE OF SUMMONS to Monsanto Company, Bayer Corporation and Bayer AG, re: 1 Complaint. Document filed by Michael DeMarmels..(Blankowitz, Vilma) (Entered: 02/10/2022) |
| 02/10/2022 | 4 | ELECTRONIC SUMMONS ISSUED as to Bayer AG, Bayer Corporation, Monsanto Company. (vf) (Entered: 02/10/2022) |
| 04/04/2022 | 5 | REQUEST FOR ISSUANCE OF AMENDED SUMMONS as to Monsanto Company, Bayer Corporation and Bayer AG, re: 1 Complaint. Document filed by Michael DeMarmels..(Blankowitz, Vilma) Modified on 4/5/2022 (lal). Modified on 4/7/2022 (pc). (Entered: 04/04/2022) |
| 04/06/2022 | 6 | **FILING ERROR - DEFICIENT PLEADING - SUMMONS REQUESTED - WRONG EVENT TYPE SELECTED FROM MENU -** REQUEST FOR ISSUANCE OF SUMMONS as to Monsanto Company, Bayer Corporation and Bayer AG, re: 1 Complaint. Document filed by Michael DeMarmels..(Blankowitz, Vilma) Modified on 4/7/2022 (pc). (Entered: 04/06/2022) |
| 04/07/2022 | 7 | ELECTRONIC AMENDED SUMMONS ISSUED as to Bayer AG, Bayer Corporation, Monsanto Company..(pc) (Entered: 04/07/2022) |
| 04/07/2022 | 8 | **FILING ERROR - DEFICIENT PLEADING - SUMMONS REQUEST PDF ERROR -** REQUEST FOR ISSUANCE OF AMENDED SUMMONS as to Monsanto Company, Bayer Corporation and Bayer AG, re: 1 Complaint. Document filed by Michael DeMarmels..(Blankowitz, Vilma) Modified on 4/8/2022 (lal). (Entered: 04/07/2022) |
| 04/08/2022 | | **\*\*\*NOTICE TO ATTORNEY REGARDING DEFICIENT REQUEST FOR ISSUANCE OF SUMMONS. Notice to Attorney Vilma Blankowitz to RE-FILE Document No. 8 Request for Issuance of Amended Summons,. The filing is deficient for the following reason(s): the PDF attached to the docket entry for the issuance of summons is not correct; party name listed on Summons PDF does not correspond to pleading caption. Re-file the document using the event type Request for Issuance of Summons found under the event list Service of Process - select the correct filer/filers - and attach the correct summons form PDF. (lal)** (Entered: 04/08/2022) |
| 04/12/2022 | 9 | ORDER: Accordingly, pursuant to Rule 4(m), this action will be dismissed without prejudice unless, on or before April 19, 2022, plaintiff either: (i) files on the ECF docket proof of service, indicating all defendants were served on or before April 11, 2022; or (ii) shows good cause in writing for his failure to comply with Rule 4(m). SO ORDERED. (Signed by Judge Vincent L. Briccetti on 4/12/2022) (mml) (Entered: 04/12/2022) |
| 04/15/2022 | 10 | AFFIDAVIT OF SERVICE of Summons and Complaint. Monsanto Company served on 4/7/2022, answer due 4/28/2022. Service was accepted by Secretary of State: Sue Zouky. Document filed by Michael DeMarmels..(Blankowitz, Vilma) (Entered: 04/15/2022) |
| 04/15/2022 | 11 | AFFIDAVIT OF SERVICE of Summons and Complaint. Bayer Corporation served on 4/7/2022, answer due 4/28/2022. Service was accepted by Secretary of State: Sue Zouky, Legal Clerk. Document filed by Michael DeMarmels..(Blankowitz, Vilma) (Entered: 04/15/2022) |
| 04/15/2022 | 12 | FIRST LETTER MOTION for Extension of Time *to serve complaint on Defendant Bayer* |

| | | |
|---|---|---|
| | | *AG* addressed to Judge Vincent L. Briccetti from Vilma Blankowitz, Esq. dated April 15, 2022. Document filed by Michael DeMarmels. (Attachments: # 1 Affidavit affidavit in support of motion for extension of time).(Blankowitz, Vilma) (Entered: 04/15/2022) |
| 04/15/2022 | 13 | ORDER granting in part and denying in part 12 Letter Motion for Extension of Time: It will not take 6-12 months to serve one of the world's largest pharmaceutical companies located in Germany. Plaintiff is granted an extension of time to serve Bayer AG until 7/15/2022. If for some reason plaintiff requires additional time to serve this defendant, he must make an application for a further extension of time prior to 7/15/2022. (HEREBY ORDERED by Judge Vincent L. Briccetti)(Text Only Order) (Briccetti, Vincent) (Entered: 04/15/2022) |

| PACER Service Center | | |
|---|---|---|
| **Transaction Receipt** | | |
| 07/06/2022 13:38:24 | | |
| **PACER Login:** | sh0019sh | **Client Code:** | 31943.356965 rhb |
| **Description:** | Docket Report | **Search Criteria:** | 7:22-cv-00221-VB |
| **Billable Pages:** | 2 | **Cost:** | 0.20 |

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

_____

MICHAEL DEMARMELS,                                Court File No.:

        Plaintiff,

   vs.                                                  **<u>COMPLAINT</u>**

MONSANTO COMPANY,   BAYER          JURY TRIAL DEMANDED
CORPORATION and BAYER AG,

       Defendants.

_____

    Plaintiff, Michael DeMarmels (collectively herein "Plaintiff"), by and through his

undersigned counsel, hereby bring this Complaint for damages against Defendants. Monsanto

Company, Bayer Corporation and Bayer AG and alleges the following:

<u>**NATURE OF THE CASE**</u>

1.    This is an action for damages suffered by Plaintiff as a proximate result of Defendants'

negligent and wrongful conduct relating to the design, development, manufacture, testing,

packaging, promoting, marketing, advertising, distribution, labeling, and sale of the herbicide

Roundup, containing the active ingredient glyphosate.

2.    Plaintiff maintains that Roundup and/or glyphosate was and still is defective, dangerous to

human health, unfit and unsuitable to be marketed and sold in commerce and lacked proper

warnings and directions as to the dangers associated with its use.

3.    Plaintiff's injuries were avoidable.

COMPLAINT

1

## JURISDICTION AND VENUE

4.      This Court has jurisdiction over Defendant and this action pursuant to 28 U.S.C. Section 1332 because there is complete diversity of citizenship between Plaintiff and Defendants. Defendants are either incorporated and/or have their principal place of business outside of the state in which the Plaintiff resides.

5.      The amount in controversy between Plaintiff and Defendants exceeds $75,000, exclusive of interest and cost.

6.      The Court also has supplemental jurisdiction pursuant to 28 U.S.C. Section 1367.

7.      Venue is proper within this district pursuant to 28 U.S.C. Section 1391 in that Defendants conduct business here and are subject to personal jurisdiction in this district.  Furthermore, Defendants sell, market and/or distribute Roundup within the Southern District of New York. Also, a substantial part of the acts and/or omissions giving rise to these claims occurred within this district.

## PARTIES

8.      Plaintiff, Michael DeMarmels (hereinafter "Plaintiff"), is a natural person and at all relevant times a resident and citizen of Orange County, New York.

9.      Plaintiff brings this action for injuries sustained by exposure to Roundup ("Roundup") containing the active ingredient glyphosate and the surfactant POEA.  As a direct and proximate result of being exposed to Roundup, Plaintiff developed non-Hodgkin's Lymphoma.

10.      "Roundup" refers to all formulations of Defendant's roundup products, including, but not limited to, Roundup Grass and Weed Killer, and any other formulation of containing the active ingredient glyphosate.

11.     Defendant MONSANTO COMPANY (hereinafter referred to as "MONSANTO") was a Delaware corporation, with a principal place of business in St. Louis, Missouri.

12.     Defendant, BAYER CORPORATION ("hereinafter referred to as "Bayer Corp.") is an Indiana Corporation that has its principal place of business at 100 Bayer Boulevard, Whippany, NJ 07981.

13.     Defendant, BAYER CORP., is the American subsidiary of Defendant, BAYER AG.

14.     Defendant, BAYER AG, is a German chemical and pharmaceutical company that is headquartered in Leverkusen, North Rhine Westphalia, Germany.

15.     Defendant, BAYER AG, is the parent/holding company of Defendants, BAYER CORP. and MONSANTO.

16.     Upon information and belief, Defendant, MONSANTO is an indirect, wholly owned subsidiary of BAYER AG.

17.     Defendant, BAYER AG, is a publicly held corporation.

18.     All references to the acts and omissions of Defendants in this complaint shall mean and refer to the actions of Defendant, MONSANTO, as well as any acts and omissions of Defendants, BAYER CORP. and BAYER AG on and after the date they acquired MONSANTO.  Further, Defendants, BAYER CORP. and BAYER AG, are jointly and severally liable with MONSANTO, as set forth in this Complaint as the parent of MONSANTO, as an affiliate of MONSANTO and under the doctrine of successor liability by contract, the common law or otherwise.

19.     At all times hereinafter mentioned, Defendants, advertised and sold goods, specifically Roundup, in the State of New York

COMPLAINT

20.    At all times hereinafter mentioned, Defendants transacted and conducted business that relates to the allegations in this Complaint within the State of New York.

21.    Defendants derived substantial revenue from goods and products sold and used in the State of New York.

22.    Defendants expected or should have expected their acts to have consequences within the State of New York.

23.    Defendants engaged in the business of designing, developing, manufacturing, testing, packaging, marketing, distributing, labeling, and/or selling Roundup.

24.    Defendants are authorized to do business in New York and derive substantial income from doing business in this state.

25.    Upon information and belief, Defendants purposefully availed themselves of the privilege of conducting business within the State of New York, thus invoking the benefits and protections of its laws.

26.    Upon information and belief, Defendants did act to design, sell, advertise, manufacture and distribute Roundup, with complete knowledge of its dangerous and defective nature.

## **FACTUAL ALLEGATIONS**

27.    At all times hereinafter mentioned, Defendants were in the business of, and did, design, research, manufacture, test, advertise, promote, market, sell, distribute, and/or have acquired and were responsible for the commercial herbicide Roundup.

28.    At all times hereinafter mentioned, Defendant, MONSANTO, was a multinational agricultural biotechnology corporation based in St. Louis, Missouri and was the world's leading producer of glyphosate.

COMPLAINT
4

29.     Defendant, MONSANTO, discovered the herbicidal properties of glyphosate during the 1970's and thereafter began to design, research, manufacture, sell and distribute glyphosate based "Roundup" product as a broad spectrum herbicide.

30.     Glyphosate is the active ingredient in Roundup.

31.     Glyphosate is a broad-spectrum herbicide used to kill weeds and grasses known compete with commercial crops grown around the globe.

32.     Glyphosate is a "non-selective" herbicide, meaning it kills indiscriminately based only on whether a given organism produces a specific enzyme, 5-enolpyruvylshikimate acid-3-phosphate synthase, known as EPSP synthase.

33.     Glyphosate inhibits the enzyme 5-enolpyruvylshikimate acid 3-phosphate synthase that interferes with the shikimic pathway in plants, resulting in the accumulation of shikimic acid in plant tissue and ultimately plant death.

34.     Sprayed as liquid, plants absorb glyphosate directly through their leaves, stems, and roots, and detectable quantities accumulate in the plant tissues.

35.     Each year, approximately 250 million pounds of glyphosate are sprayed on crops, commercial nurseries, suburban lawns, parks, and gold courses.  This increase in use has been driven largely by the proliferation of genetically engineered crops, crops specifically tailored to resist the activity of glyphosate.

36.     Defendants were and are intimately involved in the development, design, manufacture, marketing, sale, and/or distribution of genetically modified ("GMO") crops, many of which are marketed as being resistant to Roundup i.e., "Roundup Ready."   As of 2009, Defendant, MONSANTO, was the world's leading producer of seeds designed to be Roundup Ready.  In 2010,

an estimated 70% of corn and cotton, and 90% of soybean fields in the United States contained Roundup Ready seeds.

37.     The original Roundup, containing the active ingredient glyphosate, was introduced in 1974. Today, glyphosate products are among the world's most widely used herbicides.[1]

38.     For nearly 45 years, consumers, farmers, and the public have used Roundup, unaware of its carcinogenic properties.

## REGISTRATION OF HERBICIDES UNDER FEDERAL LAW

39.     The manufacture, formulation and distribution of herbicides, such as Roundup, are regulated under the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA"), 7 U.S.C. Section 136 et seq. FIFRA requires that all pesticides be registered with the Environmental Protection Agency ("EPA") prior to their distribution, sale, or use, except as described by FIFRA 7 U.S.C. 136a(a).

40.     The EPA requires as part of the registration process, among other requirements, a variety of tests to evaluate the potential for exposure to pesticides, toxicity to people and other potential non-target organisms, and other adverse effects on the environment.  Registration by the EPA, however, is not an assurance or finding of safety.  The determination the EPA makes in registering or re-registering a product is not that the product is "safe", but rather that use of the product in accordance with its label directions "will not generally cause unreasonable adverse effects on the environment." 7 U.S.C. Section 136a(c)(5)(D).

41.     FIFRA defines "unreasonable adverse effects on the environment" to mean "any unreasonable risk to man or the environment, taking into account the economic, social and

---

[1] *Backgrounder,* History of Monsanto's Glyphosate Herbicides, June 2005.

environmental costs and benefits of the use of any pesticide." 7 U.S.C. Section 136 (bb). FIFRA thus requires the EPA to make a risk/benefit analysis in determining whether a registration should be granted or allowed to continue to be sold in commerce.

42. The EPA and the State of New York registered Roundup for distribution, sale and manufacture in the United States and the State of New York.

43. FIFRA generally requires that the registrant conduct health and safety testing of pesticide products. The government is not required, nor is it able, to perform the product tests that are required of the manufacturer.

44. The evaluation of each pesticide product distributed, sold, or manufactured is completed at the time the product is initially registered. The data necessary for registration of a pesticide has changed over time. The EPA is now in the process of re-evaluating all pesticide products through a Congressionally-mandated process called "re-registration." 7 U.S.C. Section 136a-1. In order to re-evaluate these pesticides, the EPA demands the completion of additional tests and the submission of data for the EPA's review and evaluation.

45. In the case of glyphosate and Roundup, the EPA had planned on releasing its preliminary risk assessment - in relation to the registration process - no later than July 2015. The EPA completed its review of glyphosate in early 2015, but delayed releasing the assessment pending further review in light of the World Health Organization's findings on March 24, 2015 that glyphosate is a "probable carcinogen" as demonstrated by the mechanistic evidence of carcinogenicity in humans and sufficient evidence of carcinogenicity in animals.

**DEFENDANTS' FALSE REPRESENTATIONS**

46.    In 1996, the New York Attorney General (hereinafter referred to as "NYAG") filed a lawsuit against Monsanto based on its false and misleading advertising of Roundup products. Specifically, the lawsuit challenged Monsanto's general representation that its spray-on glyphosate-based herbicides, including Roundup, were "safer than table salt" and "practically non-toxic" to mammals, birds, and fish.  Among the representations the NYAG found deceptive and misleading about the human and environmental safety of Roundup are the following:

a)    Remember that environmentally friendly Roundup herbicide is biodegradable.  It won't build up in the soil so you can use Roundup with confidence along customers' driveways, sidewalks and fences….

b)    And remember that Roundup is biodegradable and won't build up in the soil.  That will give you the environmental confidence you need to use Roundup everywhere you've got a week, brush, edging or trimming problem.

c)    Roundup biodegrades into naturally occurring elements.

d)    Remember that versatile Roundup herbicide stays where you put it. That means there's no washing or leaching to harm customers' shrubs or other desirable vegetation.

e)    This non-residual herbicide will not wash or leach in the soil.  It ….stays where you apply it.

f)    You can apply Accord with "confidence because it will stay where you put it" it bonds tightly to soil particles, preventing

COMPLAINT

8

leaching. Then, soon after application, soil microorganisms biodegrade Accord into natural products.

g)   Glyphosate is less toxic to rats than table salt following acute oral ingestion.

h)   Glyphosate's safety margin is much greater than required. It has over a 1,000-fold safety margin in food and over a 700-fold safety margin for workers who manufacture it or use it.

i)   You can feel good about using herbicides by Monsanto. They carry a toxicity category rating of 'practically non-toxic' as it pertains to mammals, birds and fish.

j)   "Roundup can be used where kids and pets will play and breaks down into natural material." This ad depicts a person with his head in the ground and a pet dog standing in an area which has been treated with Roundup. [2]

47.   On November 19, 1996, Defendant, MONSANTO, entered into an Assurance of Discontinuance with the NYAG, in which Monsanto agreed, among other things, "to cease and desist from publishing or broadcasting any advertisements [in New York] that represent, directly or by implication" that:

a)   its glyphosate-containing pesticide products or any component thereof are safe, non-toxic, harmless or free

---

[2] Attorney General of the State of New York, In the Matter of Monsanto Company, Assurance of Discontinuance Pursuant to Executive Law Section 63(15) (Nov. 1996).

COMPLAINT

9

from risk.

b)     its glyphosate-containing pesticide products or any component thereof manufactured, formulated, distributed or sold by Monsanto are biodegradable.

c)     its glyphosate-containing pesticide products or any component thereof stay where they are applied under all circumstances and will not move through the environment by any means.

d)     its glyphosate-containing pesticide products or any component thereof are "good" for the environment or are "known for their environmental characteristics."

e)     glyphosate-containing pesticide products or any component thereof are safer or less toxic than common consumer products other than herbicides;

f)     its glyphosate-containing products or any component thereof might be classified as "practically" non-toxic.

48.     Defendant, MONSANTO, did not alter its advertising in the same manner in any state other than New York, and on information and belief still has not done so today.

49.     In 2009, France's highest court ruled that Monsanto had not told the truth about the safety of Roundup. The French court affirmed an earlier judgment that Monsanto had falsely advertised its herbicide Roundup as "biodegradable" and that it "left the soil clean."[3]

## EVIDENCE OF CARCINOGENICITY

50.     As early as the 1980's Defendant, MONSANTO, was aware of glyphosate's carcinogenic properties.

---

[3] *Monsanto Guilty in 'False Ad' Row,* BBC, Oct. 15, 2009, *available at* https://news.bbc.uk/2/hi/europe/8308903.stm

COMPLAINT

10

51.     On March 4, 1985, a group of the Environmental Protection Agency's ("EPA") Toxicology Branch published a memorandum classifying glyphosate as a Category C oncogene.[4] Category C oncogenes are possible human carcinogens with limited evidence of carcinogenicity.

52.     In 1986, the EPA issued a Registration Standard for glyphosate (NTIS PB87-103214). The Registration Standard required additional phytotoxicity, environmental fate, toxicology, product chemistry, and residue chemistry studies.  All of the date required was submitted and reviewed and/or waived.[5]

53.     In October 1991 the EPA published a Memorandum entitled "Second Peer Review of Glyphosate." The memorandum changed glyphosate's classification to Group E (evidence of non-carcinogenicity for humans).  Two peer review committee members did not concur with the conclusions of the committee and one member refused to sign.[6]

54.     In addition to the toxicity of the active molecule, many studies support the hypothesis that glyphosate formulations found in Defendant's Roundup products are more dangerous and toxic than glyphosate alone.[7]  As early as 1991 evidence existed demonstrating that glyphosate formulations were significantly more toxic than glyphosate alone.[8]

55.     In 2002, Julie Marc published a study entitled "Pesticide Roundup Provokes Cell Division Dysfunction at the Level of CDK1/Cyclin B Activation."

---

[4] Consensus Review of Glyphosate, Casewell No. 661A. March 4, 1985. United States Environmental Protection Agency.
[5] http://www.epa.gov/oppsrrd1/reregistration/REDs/factsheets/0178fact.pdf
[6] Second Peer Review of Glyphosate, CAS No. 1071-83-6. October 30, 1881. United States Environmental Protection Agency.
[7] Martinez et al. 2007; Benachour 2009; Gasnier et al. 2010; Peixoto 2005; Marc 2004
[8] Martinez et al 1991

56.     The study found that Defendants' Roundup caused delays in the cell cycles of sea urchins, while the same concentrations of glyphosate alone proved ineffective and did not alter cell cycles.

57.     In 2004, Julie Marc published a study entitled "Glyphosate-based affect cell cycle regulation." The study demonstrated a molecular link between glyphosate-based products and cell cycle dysregulation.

58.     The study noted that "cell-cycle dysregulation is a hallmark of tumor cells and human cancer. Failure in the cell-cycle checkpoints leads to genomic instability and subsequent development of cancers from the initial affect cell." Further, "[s]ince cell cycle disorders such as cancer result from dysfunction of unique cell, it was of interest to evaluate the threshold dose of glyphosate affecting cells."[9]

59.     In 2005, Francisco Peixoto published a study showing that Roundup's effects on rat liver mitochondria are much more toxic and harmful than the same concentrations of glyphosate alone.

60.     The Peixoto study suggested that the harmful effects of Roundup on mitochondrial biogenetic could not be exclusively attributed to glyphosate and could be the result of other chemicals, namely the surfactant POEA, or alternatively due to the possible synergy between glyphosate and Roundup formulation products.

61.     In 2009, Nora Benachour and Gilles-Eric Seralini published a study examining the effects of Roundup and glyphosate on human umbilical, embryonic, and placental cells.

62.     The study used dilution levels of Roundup and glyphosate far below agricultural recommendations, corresponding with low levels of residues in food. The study concluded that supposed "inert" ingredients, and possibly POEA, change human cell permeability and amplify

---

[9] (Molinari, 2000; Stewart et al., 2003)

COMPLAINT
12

toxicity of glyphosate alone. The study further suggested that determination of glyphosate toxicity should take into account the presence of adjuvants, or those chemicals used in the formulation of the complete pesticide. The study confirmed the adjuvants in Roundup are not inert and that Roundup is always more toxic than its active ingredient glyphosate.

63.     The results of these studies were confirmed in recently published peer-reviewed studies and were at all times available and known to Defendants.

64.     Defendants knew or should have known that Roundup is more toxic than glyphosate alone and that safety studies on Roundup, Ronndup's adjuvants and "inert" ingredients, and/or the surfactant POEA were necessary to protect Plaintiff from Roundup.

65.     Defendants knew or should have known that tests limited to Roundup's active ingredient glyphosate were insufficient to prove the safety of Roundup.

66.     Defendants failed to appropriately and adequately test Roundup, Roundup's adjuvants and "inert" ingredients, and/or the surfactant POEA to protect Plaintiff from Roundup.

67.     Rather than performing appropriate tests, Defendants relied upon flawed industry-supported studies designed to protect Defendants' economic interests rather than Plaintiff and the consuming public.

68.     Despite their knowledge that Roundup was considerably more dangerous than glyphosate alone, Defendants continued to promote Roundup as safe.

**CLASSIFICATION OF GLYPHOSATE BY IARC**

69.     The International Agency for Research on Cancer ("IARC") is the specialized intergovernmental cancer agency the World Health Organization ("WHO") of the United Nations tasked with conducting and coordinating research into the causes of cancer.

70.     An IARC Advisory Group to Recommend Priorities for IARC Monographs during 2015-2019 met in April 2014. Though nominations for the review were solicited, a substance must meet two criteria to be eligible for review by the IARC Monographs: there must already be some evidence of carcinogenicity of the substance, and there must be evidence that humans are exposed to the substance.

71.     IARC set glyphosate for review in 2015-2016.  IARC uses five criteria for determining priority in reviewing chemicals.  The substance must have a potential for direct impact on public health; scientific literature to support suspicion of carcinogenicity; evidence of significant human exposure; high public interest and/or potential to bring clarity to a controversial area and/or reduce public anxiety or concern; related agents similar to one given high priority by the above considerations.  Data reviewed is sourced preferably from publicly accessible, peer-reviewed data.

72.     On March 24, 2015, after its cumulative review of human, animal, and DNA studies for more than one (1) year, many of which have been in Defendant, MONSANTO's, possession since as early as 1985, the IARC's working group published its conclusion that the glyphosate contained in Defendants' Roundup herbicide, is a Class 2A "probable carcinogen" as demonstrated by the mechanistic evidence of carcinogenicity in humans and sufficient evidence of carcinogenicity in animals.

73.     The IARC's full Monograph was published on July 29, 2015 and established glyphosate as a class 2A *probable* carcinogen to humans.  According to the authors glyphosate demonstrated sufficient mechanistic evidence (genotoxicity and oxidative stress) to warrant a 2A classification based on evidence of carcinogenicity in humans and animals.

74. The IARC Working Group found an increased risk between exposure to glyphosate and non-Hodgkin's lymphoma ("NHL") and several subtypes of NHL, and the increased risk continued after adjustment for other pesticides.

75. The IARC also found that glyphosate caused DNA and chromosomal damage in human cells.

## EVIDENCE OF GLYPHOSATE'S DANGER

76. Despite the new classification by the IARC, Defendants have had ample evidence of glyphosate and Roundup's gene-toxic properties for decades.

77. Genotoxicity refers to chemical agents that are capable of damaging the DNA within a cell through genetic mutations, which is a process that is believed to lead to cancer.

78. In 1997, Chris Clements published "Genotoxicity of select herbicides in *Rana catesbeiana* tadpoles using the alkaline single-cell gel DNA electrophoresis (comet) assay."

79. The study found that tadpoles exposed to Roundup showed significant DNA damage when compared with unexposed control animals.

80. Both human and animal studies have shown that glyphosate and glyphosate-based formulations such as Roundup can induce oxidative stress.

81. Oxidative stress and associated chronic inflammation are believed to be involved in carcinogenesis.

82. The IARC Monograph notes that "[s]trong evidence exists that glyphosate, AMPA and glyphosate-based formulations can induce oxidative stress."

83. In 2006 Cesar Paz-y-Mino published a study examining DNA damage in human subject exposed to glyphosate.

COMPLAINT
15

84.     The study produced evidence of chromosomal damage in blood cells showing significantly greater damage after exposure to glyphosate than before in the same individuals, suggesting that the glyphosate formulation used during aerial spraying had a genotoxic effect on exposed individuals.

85.     The IARC Monograph reflects the volume of evidence of glyphosate pesticides' genotoxicity noting "[t]he evidence for genotoxicity caused by glyphosate-based formulation is strong."

86.     Despite knowledge to the contrary, Defendants maintain that there is no evidence that Roundup is genotoxic, that regulatory authorities and independent experts are in agreement that Roundup is not genotoxic, and that there is no evidence that Roundup is genotoxic.

87.     In addition to glyphosate and Roundup's genotoxic properties, Defendants have long been aware of glyphosate's carcinogenic properties.

88.     Glyphosate and Roundup in particular have long been associated with carcinogenicity and the development of numerous forms of cancer, including, but not limited to, non-Hodgkin's lymphoma, Hodgkin's lymphoma, multiple myeloma, and soft tissue sarcoma.

89.     Defendant, MONSANTO, had known of this association since the early to mid-1980s and numerous human and animal studies have evidenced the carcinogenicity of glyphosate and/or Roundup.

90.     In 1985 the EPA studied the effects of glyphosate in mice finding a dose related response in male mice linked to renal tubal adenomas, a rare tumor. The study concluded the glyphosate was oncogenic.

91.     In 2003 Lennart Hardell and Mikael Eriksson published the results of two case controlled studies on pesticides as a risk factor for NHL and hairy cell leukemia.

92.     The study concluded that glyphosate had the most significant relationship to NHL among all herbicides studied with an increased odds ratio of 3:11.

93.     In 2003 AJ De Roos published a study examining the pooled data of mid-western farmers, examining pesticides and herbicides as risk factors for NHL.

94.     The study, which controlled for potential confounders, found a relationship between increased NHL incidence and glyphosate.

95.     In 2008 Mikael Eriksson published a study a population based case-control study of exposure to various pesticides as a risk factor for NHL. This strengthened previous associations between glyphosate and NHL.

96.     In spite of this knowledge, Defendants continued to issue broad and sweeping statements suggesting that Roundup was, and is, safer than ordinary household items such as table salt, despite a lack of scientific support for the accuracy and validity of these statements and, in fact, voluminous evidence to the contrary.

97.     Upon information and belief, the statements and representation have been made with the intent of inducing Plaintiff, the agricultural community, and the public at large to purchase, and increase the use of, Defendants' Roundup for Defendants' pecuniary gain, and in fact did induce Plaintiff to use Roundup.

98.     Defendants made these statements with complete disregard and reckless indifference to the safety of Plaintiff and the general public.

99.     Notwithstanding Defendants' representations, scientific evidence has established a clear association between glyphosate and genotoxicity, inflammation, and an increased risk of many cancers, including, but not limited to, NHL, Multiple Myeloma, and soft tissue sarcoma.

100.     Defendants knew or should have known that glyphosate is associated with an increased risk of developing cancer, including, but not limited to, NHL, Multiple Myelomas, and soft tissue sarcomas.

101.     Defendants failed to appropriately and adequately inform and warn Plaintiff of the serious and dangerous risks associated with the use of and exposure to glyphosate and/or Roundup, including, but not limited to, the risk of developing NHL, as well as other severe and personal injuries, which are permanent and/or long lasting in nature, cause significant physical pain and mental anguish, diminished enjoyment of life, and the need for medical treatment, monitoring and/or medications.

102.     Despite the IARC's classification of glyphosate as a class 2A probable carcinogen, Defendants continue to maintain that glyphosate and/or Roundup is safe, non-carcinogenic, non-genotoxic, and falsely warrant to users and the general public that independent experts and regulatory agencies agree that there is no evidence of carcinogenicity or genotoxicity in glyphosate and Roundup.

103.     Defendants have claimed and continue to claim that Roundup is safe, nocarcinogenic, and non-genotoxic.  These misrepresentations are consistent with Defendants' cavalier approach to investigating and ensuring the safety of its products, the safety of the public at large, and the safety of the Plaintiff.

104.     Defendant, MONSANTO, claimed on its website that "[r]egulatory authorities and independent experts around the world have reviewed numerous long-term/carcinogenicity and genotoxicity studies and agree that there is no evidence that glyphosate, the active ingredient in Roundup brand herbicides and other glyphosate-based herbicides, causes cancer, even at very high doeses, and that it is not gene-toxic."[10]

105.     Ironically, the primary source for this statement is a 1986 report by the WHO, the same organization that now considers glyphosate to be a probable carcinogen.

106.     Glyphosate, and Defendant's Roundup products in particular, have long been associated with serious side effects and many regulatory agencies around the globe have banned or are currently banning the use of glyphosate herbicide products.

107.     Defendants' statements proclaiming the safety of Roundup and disregarding its dangers misled Plaintiff.

108.     Despite Defendants' knowledge that Roundup was associated with an elevated risk of developing cancer, Defendants' promotional campaigns focused on Roundup's purported "safety profile."

109.     Defendants' failure to adequately warn Plaintiff resulted in (1) Plaintiff using and being exposed to glyphosate instead of using another acceptable and safe method of controlling unwanted weeds and pests; and (2) scientists and physicians failing to warn and instruct consumers about the risk of cancer, including NHL, and other injuries associated with Roundup.

---

[10] Backgrounder-Glyphosate: No Evidence of Carcinogenicity Updated November 2014. (downloaded October 9, 2015)

110.    Defendants failed to seek modifications of the labeling of Roundup to include relevant information regarding the risks and dangers associated with Roundup exposure.

111.    The failure of Defendants to appropriately warn and inform the EPA has resulted in inadequate warnings safety information presented directly to users and consumers.

112.    The failure of Defendants to appropriately warn and inform the EPA resulted in the absence of warning or caution statement that are adequate to protect health and the environment.

113.    The failure of Defendants to appropriately warn and inform the EPA has resulted in the directions for use that are not adequate to protect health and the environment.

114.    By reason of the foregoing action and omissions, Plaintiff seeks compensatory damages as a result of Plaintiff's use of, and exposure to, Roundup which caused or was a substantial contributing factor in causing Plaintiff to suffer from cancer, specifically NHL, and Plaintiff suffered severe and personal injuries which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life.

115.    By reason of the foregoing, Plaintiff is severely and permanently injured.

116.    By reason of the foregoing acts and omissions, Plaintiff has endured and, in some categories continues to suffer, emotion and mental anguish, medical expenses, and other economic and non-economic damages, as a result of the actions and inactions of the Defendant.

## **PLAINTIFF'S EXPOSURE TO ROUNDUP**

117.    Plaintiff incorporates by reference all prior paragraphs of this Complaint as if fully set forth herein.

118.    For many years, Plaintiff sprayed Roundup on a regular basis as a part of his employment in agriculture and for personal use. Plaintiff followed all safety and precautionary warnings during the course of use.

119.    Plaintiff developed NHL and was diagnosed by his physician in March 2005.

120.    Plaintiff developed NHL as a result of his exposure to Defendant's Roundup product. As a result of his injury, Plaintiff has incurred physical injury, significant economic and non-economic damages.

## EQUITABLE TOLLING OF STATUTE OF LIMITATIONS

121.    Plaintiff repeats, reiterates and re-alleges each and every allegation of this Complaint contained in each of the foregoing paragraphs, with the same force and effect as if more fully set forth herein.

122.    The running of any statute of limitations has been tolled by reason of Defendants' fraudulent concealment. Defendants, through their affirmative misrepresentations and omissions, actively concealed from Plaintiff the true risks associated with Roundup and glyphosate.

123.    At all relevant times, Defendants have maintained that Roundup is safe, non-toxic, and non-carcinogenic.

124.    Indeed, even as of July 2016, Defendants continue to represent to the public that "Regulatory authorities and independent experts around the world have reviewed numerous long-term/carcinogenicity and genotoxicity studies and *agree* that there is *no evidence* that glyphosate, the active ingredient in Roundup brand herbicides and other glyphosate-based herbicides, causes

cancer, even at very high doses, and that it is not gene-toxic." (emphasis added)[11]

125.    As a result of Defendants' actions, Plaintiff was unaware, and could not reasonably known or have learned through reasonable diligence that Roundup and/or glyphosate contact, exposed Plaintiff to risks alleged herein and that those risks were the proximate result of Defendants' acts and omissions.

126.    Furthermore, Defendants are estopped from relying on any statute of limitations because of their fraudulent concealment of the true character, quality and nature of Roundup.  Defendants were under a duty to disclose the true character, quality, and nature of Roundup because this was non-public information over which Defendants had and continue to have exclusive control, and because Defendants knew that this information was not available to Plaintiff or to distributors of Roundup.  In addition, Defendants are estopped from relying on any statute of limitations because of their intentional concealment of these facts.

127.    Plaintiff had no knowledge that Defendants were engaged in the wrongdoing alleged herein.  Because of the fraudulent acts of concealment of wrongdoing by Defendants, Plaintiff could not have reasonably discovered the wrongdoing at any time prior.  Also, the economics of this fraud should be considered.  Defendants had the ability to and did spend enormous amounts of money in furtherance of their purpose of marketing, promoting and/or distributing a profitable herbicide, notwithstanding the known or reasonably known risks.  Plaintiff and medical professionals could not have afforded and could not have possibly conducted studies to determine the nature, extent, and identity of related health risks, and were forced to rely on only the

---

[11] Backgrounder - Glyphosate: No Evidence of Carcinogenicity. Updated November 2014 (downloaded October 9 2015)

Defendants' representation.  Accordingly, Defendant is precluded by the discovery rule and/or the doctrine of fraudulent concealment from relying upon any statute of limitations.

## FIRST CAUSE OF ACTION
## NEGLIGENCE

128.    Plaintiff repeats, reiterates and re-alleges each and every allegation of this Complaint contained in each of the foregoing paragraphs, with the same force and effect as if more fully set forth herein

129.    Defendants had a duty to exercise reasonable care in the designing , researching, testing, manufacturing, marketing, supplying, promoting, packaging, sale, and/or distribution of Roundup into the stream of commerce, including a duty to assure that the product would not cause users to suffer unreasonable, dangerous side effects.

130.    Defendants failed to exercise ordinary care in the designing, researching, testing, manufacturing, marketing, supplying, promoting, packaging, sale, testing, quality assurance, quality control, and/or distribution of Roundup into interstate commerce in that Defendants knew or should have known that using Roundup created a high risk of unreasonable, dangerous side effect, including, but not limited to, the development of NHL, as well as other severe and personal injuries which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life, as well as need for lifelong medical treatment, monitoring, and/or medications.

131.    The negligence by the Defendants, their agents, servants, and/or employees, included but was not limited to the following acts and/or omissions:

a.    Manufacturing, producing, promoting, formulating, creating, and/or designing Roundup without thoroughly testing it;

COMPLAINT
23

b.      failing to test Roundup and/or failing to adequately, sufficiently, and properly test Roundup;

c.      Not conducting sufficient testing programs to determine whether or not Roundup was safe for use; in that Defendants herein knew or should have known that Roundup was unsafe and unfit for use by reason of the dangers to its users;

d.      Not conducting sufficient testing programs and studies to determine Roundup's carcinogenic properties even after DefendantS had knowledge that Roundup is, was, or could be carcinogenic;

e.      Failing to conduct sufficient testing programs to determine the safety of "inert" ingredients and/or adjuvants contained within Roundup, and the propensity of the ingredients to render Roundup toxic, increase the toxicity of Roundup, whether these ingredients are carcinogenic, magnify the carcinogenic properties of Roundup, and whether or not "inert" ingredients and/or adjuvants were safe for use.

f.      Negligently failing to adequately and correctly warn the Plaintiff, the public, the medical and agricultural professions, and the EPA of the dangers of Roundup;

g.      Negligently failing to petition the EPA to strengthen the warnings associated with Roundup;

h.      Failing to provide adequate cautions and warnings to protect the health of users, handlers, applicators, and personals who would reasonably and foreseeably come into contact with Roundup;

i.      Negligently marketing, advertising, and recommending the use of Roundup without sufficient knowledge as to its dangerous propensities;

j.      Negligently representing that Roundup was safe for use for its intended purpose, and/or that Roundup was safer than ordinary and common items such as table salt, when, in fact, it was unsafe;

k.      Negligently representing that Roundup had equivalent safety and efficacy as other forms of herbicides;

l.      Negligently designing Roundup in a manner, which was dangerous to its users;

m.      Negligently manufacturing Roundup in a manner, which was dangerous to its users;

n.      Negligently producing Roundup in a manner, which was dangerous to its users;

o.      Negligently formulating Roundup in a manner, which was dangerous to its users;

p.      Concealing information from the Plaintiff while knowing that Roundup was unsafe, dangerous, and/or non-conforming with EPA regulations;

q.      Improperly concealing and/or misrepresenting information from the Plaintiff, scientific and medical professionals, and/or the EPA, concerning the severity of risks and dangers of Roundup compared to other forms of herbicides; and

r.      Negligently selling Roundup with a false and misleading label.

132.    Defendants under-reported, underestimated, and downplayed the serious dangers of Roundup.

133.    Defendants negligently and deceptively compared the safety risks and/or dangers of Roundup with common everyday foods such as table salt, and other forms of herbicides.

134.    Defendants were negligent and violated New York law in the designing, researching, supplying, manufacturing, promoting, packaging, distributing, testing, advertising, warning, marketing, and selling of roundup in that they:

COMPLAINT
25

a.      Failed to use ordinary care in designing and manufacturing Roundup so as to avoid the aforementioned risks to individuals when Roundup was used as an herbicide;

b.      Failed to accompany their product with proper and/or accurate warnings regarding all possible adverse side effects associated with the use of Roundup;

c.      Failed to accompany their product with proper warnings regarding all possible adverse side effects concerning the failure and/or malfunction of Roundup;

d.      Failed to accompany their product with accurate warnings regarding the risks of all possible adverse side effects concerning Roundup;

e.      Failed to warn Plaintiff of the severity and duration of such adverse effects, as the warnings given did not accurately reflect the symptoms, or severity of the side effects including, but not limited to, the development of NHL;

f.      Failed to conduct adequate testing, clinical testing and post-marketing surveillance to determine the safety of Roundup;

g.      Failed to conduct adequate testing, clinical testing, and post-marketing surveillance to determine the safety of Roundup's "inert" ingredients and/or adjuvants'

h.      Negligently misrepresented the evidence of Roundup's genotoxicity and carcinogenicity; and

i.      Were otherwise careless and/or negligent.

134.    Despite the fact that Defendants knew or should have known that Roundup caused or could cause, unreasonably dangerous side effects, Defendants continued and continues to market, manufacture, distribute, and/or sell Roundup to consumers, including the Plaintiff.

135.    Defendants knew or should have known that consumers such as the Plaintiff would foreseeably suffer injury as a result of Defendants' failure to exercise ordinary care, as set further above.

136.    Defendants' violations of law and negligence were the proximate cause of Plaintiff's injuries, harm and economic loss, which Plaintiff suffered and/or will continue to suffer.

137.    As a result of the foregoing acts and omissions, the Plaintiff suffered from serious and dangerous side effects including, but not limited to, NHL, as well as other severe and personal injuries which are permanent and lasting in nature, physical pain and mental anguish, diminished enjoyment of life, and financial expenses for hospitalization and medical care.  Further, Plaintiff suffered life-threatening NHL, and severe personal injuries, which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life.

**SECOND CAUSE OF ACTION**
**<u>STRICT PRODUCTS LIABILITY - DESIGN DEFECT</u>**

138.    Plaintiff repeats, reiterate and re-alleges each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

139.    At all times herein mentioned, the Defendants designed, researched, manufactured, tested, advertised, promoted, sold, distributed, and/or had acquired the entity who has designed, researched, tested, advertised, promoted, marketed, sold, and distributed Roundup as herein above described that was used by the Plaintiff.

140.    Defendants' Roundup was expected to and did reach the usual consumers, handlers, and persons coming into contact with said product without substantial change in the condition in which it was produced, manufactured, sold, distributed, and marketed by the Defendants.

COMPLAINT
27

141.    At those times, Roundup was in an unsafe, defective, and inherently dangerous condition, which was dangerous to users, and in particular, the Plaintiff herein.

142.    The Roundup designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed by Defendants were defective in design or formulation in that, when it left the hands of the manufacturer and/or suppliers, the foreseeable risks exceeded the benefits associated with the design or formulation of Roundup.

143.    The Roundup designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed by Defendants were defective in design and/or formulation, in that, when it left the hands of the Defendants' manufacturer and/or supplier, it was unreasonably dangerous, unreasonable dangerous in normal use, and it was more dangerous than an ordinary consumer would expect.

144.    At all times herein mentioned, Roundup was in a defective condition and unsafe, and Defendants knew or had reason to know that said product was defective and unsafe, especially when used in the form and manner as provided by the Defendants. In particular, Defendants' Roundup was defective in the following ways:

    a.    When placed in the stream of commerce, Defendants' Roundup Products were defective in design and formulation and, consequently, dangerous to an extent beyond that which an ordinary consumer would anticipate.

    b.    When placed in the stream of commerce, Defendants' Roundup products were unreasonably dangerous intuit they were hazardous and posed a grave risk of cancer and other serious illnesses when used in a reasonably anticipated manner.

COMPLAINT
28

      c.      When place in the stream of commerce, Defendants' Roundup products contained unreasonably dangerous design defects and were not reasonably safe when used in a reasonably anticipated manner.

      d.      Defendants did not sufficiently test, investigate, or study its Roundup products.

      e.      Exposure to Roundup presents a risk of harmful side effects that outweigh any potential benefit stemming from the use of the herbicide.

      f.      Defendants knew or should have known at the time of marketing its Roundup products that exposure to Roundup could result in cancer and other severe illnesses and injuries.

      g.      Defendants did not conduct adequate post-marketing surveillance of its Roundup products.

145.    Defendants knew, or should have know that at all times herein mentioned its Roundup was in a defective condition, and was and is inherently dangerous and unsafe.

146.    Plaintiff was exposed to Defendants' Roundup, as described above, without knowledge of Roundup's dangerous characteristics.

147.    At the time of the Plaintiff's use of and exposure to Roundup, Roundup was being used for the purposes and in a manner normally intended, as a broad-spectrum herbicide.

148.    Defendants knowingly and voluntarily designed its Roundup with a dangerous condition for use by the public, and in particular the Plaintiff.

149.    Defendants had a duty to create a product that was not unreasonably dangerous for its normal, intended use.

150.   Defendants created a product that was and is unreasonably dangerous for its normal, intended use.

151.   Defendants marketed and promoted a product in such a manner so as to make it inherently defective because the product downplayed its suspected, probably, and established health risks inherent with its normal, intended use.

152.   The Roundup designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed by Defendants was manufactured defectively in that Roundup left the hands of Defendants in a defective condition and was unreasonably dangerous to its intended users.

153.   The Roundup designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed by Defendants reached their intended users in the same defective and unreasonable dangerous condition in which the Defendants' Roundup was manufactured.

154.   Defendants designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed a defective product, which created an unreasonable risk to the health of consumers and to the Plaintiff in particular, and Defendant is therefore strictly liable for the injuries sustained by the Plaintiff.

155.   The Plaintiff could not, by the exercise of reasonable care, have discovered Roundup's defect herein mentioned or perceived its danger.

156.   By reason of the foregoing, the Defendants have become strictly liable to the Plaintiff for the manufacturing, marketing, promoting, distribution, and selling of a defective product, Roundup.

157.   Defendants' defective design of Roundup amounts to willful, wanton, and/or reckless conduct by Defendants.

158.     Defects in Defendants' Roundup were the cause or a substantial factor in causing Plaintiff's injuries.

159.     As a result of the foregoing acts and omission, the Plaintiff developed NHL, and suffered severe and personal injuries, which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life, and financial expenses for hospitalization and medical care.

### THIRD CAUSE OF ACTION
### STRICT PRODUCTS LIABILITY - FAILURE TO WARN

160.     Plaintiff repeats, reiterates, and re-alleges each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

161.     Defendants have engaged in the business of selling, testing, distributing, supplying, manufacturing, marketing, and/or promoting Roundup, and through that conduct has knowingly and intentionally placed Roundup into the stream of commerce with full knowledge that it reaches consumers such as Plaintiff who are exposed to it through ordinary and reasonably foreseeable uses.

162.     Defendants did in fact sell, distribute, supply, manufacture, and/or promote Roundup to Plaintiff.  Additionally, Defendants expected the Roundup that they were selling, distributing, supplying, manufacturing, and/or promoting to reach, and did in fact reach, consumers including Plaintiff, without any substantial change in the condition of the product from when it was initially distributed by Defendants.

163.     At the time of manufacture, Defendants could have provided the warnings or instructions regarding the full and complete risks of Roundup and glyphosate-containing products because it

knew or should have known of the unreasonable risks of harm associated with the use of and/or exposure to such products.

164.    At all times herein mentioned, the aforesaid product was defective and unsafe in manufacture such that it was unreasonably dangerous to the user, and was so at the time it was distributed by Defendants and at the time Plaintiff was exposed to and/or ingested the product. The defective condition of Roundup was due in part to the fact that it was not accompanied by proper warnings regarding its carcinogenic qualities and possible side effects, including, but not limited to, developing NHL as a result of exposure and use.

165.    Roundup did not contain a warning or caution statement, which was necessary and, if complied with, was adequate to protect health those exposed in violation of 7 U.S.C. Section 136j(a)(1)(E).

166.    Defendants' failure to include a warning or caution statement which was necessary and, if complied with, was adequate to protect the health of those exposed, violated 7 U.S.C. Section 136j(a)(1)(E) as well as the laws of the State of New York.

167.    Defendants could have amended the label of Roundup to provide additional warnings.

168.    This defect caused serious injury to Plaintiff, who used Roundup in its intended and foreseeable manner.

169.    At all times hereinafter mentioned, Defendants had a duty to properly design, manufacture, compound, test, inspect, package, label, distribute, market, examine, maintain, supply, provide proper warnings, and take such steps to assure that the product did not cause users to suffer from unreasonable and dangerous side effects.

170.    Defendants labeled, distributed, and promoted the aforesaid product despite the fact that it was dangerous and unsafe for the use and purpose for which it was intended.

171.    Defendants failed to warn of the nature and scope of the side effects associated with Roundup, namely its carcinogenic properties and its propensity to use or serve as a substantial contributing factor in the development of NHL.

172.    Defendants were aware of the probable consequences of the aforesaid conduct.  Despite the fact that Defendants knew or should have known the roundup caused serious injuries, Defendants failed to exercise reasonable care to warn of the dangerous carcinogenic properties and side effect of developing NHL from Roundup exposure, even though these side effects were known or reasonably scientifically knowable at the time of distribution.  Defendants willfully and deliberately failed to avoid the consequence associated with their failure to warn, and in doing so, Defendants acted with a conscious disregard for the safety of Plaintiff.

173.    At the time of exposure, Plaintiff could not have reasonably discovered any defect in Roundup prior through the exercise of reasonable care.

174.    Defendants, as the manufacturer and/or distributor of the subject product, is held to the level of knowledge of an expert in the field.

175.    Plaintiff reasonably relied upon the skill, superior knowledge, and judgment of Defendants.

176.    Upon information and belief, had Defendants properly disclosed the risks associated with Roundup, Plaintiff would've avoided the risk of NHL by not using Roundup.

177.    The information that Defendants did provide or communicate failed to contain adequate warnings and precautions that would have enable Plaintiff, and similarly situation individuals, to utilize the product safely and with adequate protection.  Instead, Defendants disseminated

COMPLAINT
33

information that was inaccurate, false, and misleading and which failed to communicate accurately or adequately the comparative severity, duration, and extent of the risk of injuries associated with use of and/or exposure to Roundup and glyphosate; continued to promote the efficacy of Roundup, even after it knew or should have known of the unreasonable risks from use or exposure; and concealed, downplayed, or otherwise suppressed, through aggressive marketing and promotion, any information or research about the risks and dangers of exposure to Roundup and glyphosate.

178. Defendants continue to fail to adequately warn of the true risks of Plaintiff injuries associated with the use of and exposure to Roundup.

179. As a result of their inadequate warnings, Defendants' Roundup products were defective and unreasonably dangerous when they left the possession and/or control of Defendants, were distributed by Defendants, and used by Plaintiff.

180. As a direct and proximate result of Defendants' actions as alleged herein, the subject product caused Plaintiff to sustain injuries as herein alleged.

## FOURTH CAUSE OF ACTION
## BREACH OF IMPLIED WARRANTY

181. Plaintiff repeats, reiterates, and re-alleges each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

182. At all times herein mentioned, the Defendants manufactured, distributed, compounded, recommended, merchandized, advertised, promoted, and sold Roundup and/or have recently acquired the entity who manufactured, compound portrayed, distributed, recommended, merchandized, advertised, promoted, and sold Roundup, as a broad spectrum herbicide. these actions were under the ultimate control and supervision of Defendants.

COMPLAINT
34

183. At the time Defendants marketed, sold, and distributed Roundup for use by Plaintiff, Defendants knew of Roundup's intended use and impliedly warranted the product to be or merchantable quality and safe and fit for this use.

184. Defendants impliedly represented and warranted to Plaintiff and users of Roundup, the agricultural community, and/or the EOA that Roundup was safe and of merchantable quality and fit for the ordinary purpose for which it was to be used.

185. These representations and warranties were false, misleading, and inaccurate in that Roundup was unsafe, unreasonably dangerous, not of merchantable quality, and defective.

186. Plaintiff and/or the EPA did rely on said implied warranty of merchantability of fitness for particular use and purpose.

187. Plaintiff reasonably relied upon the skill and judgment of Defendants as to whether Roundup was of merchantable quality and safe and fit for its intended use.

188. Roundup was injected into the stream of commerce by the Defendants in a defective, unsafe, and inherently dangerous condition, and the products' materials were expected to and did reach users, handlers, and persons coming into contact with said products without substantial change in the condition in which they were sold.

189. The Defendants breached the aforesaid implied warranties, as their herbicide Roundup was not fit for its intended purposes and uses.

190. As a result of the foregoing acts and omissions, Plaintiff suffered from NHL and Plaintiff suffered severe and personal injuries which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life, financial expenses for hospitalization and medical care, including medical expenses and other economic, and non-economic damages.

COMPLAINT

## FIFTH CAUSE OF ACTION
## VIOLATION OF THE CONSUMER FRAUD ACT

191.    Plaintiff incorporates by reference all previous paragraphs of this Complaint as if fully set forth herein and further alleges the following:

192.    Plaintiff brings this cause of action pursuant to N.Y. Gen. Bus. Law Sections 349 & 350 and N.Y. Exec. Law Section 63(12).

193.    Defendants fraudulently, intentionally, negligently, and/or innocently misrepresented to the public, and to the Plaintiff, both directly and indirectly, the safety of Roundup products, and fraudulently, intentionally, negligently and/or innocently concealed, suppressed, or omitted material, adverse information regarding the safety of Roundup.  This deception caused injury to Plaintiff in violation of the Consumer Fraud Act of the Plaintiff's home state which creates private right of actionability the Plaintiff.

194.    The intentional, negligent, and/or innocent misrepresentations and omissions of Defendants regarding the safety of Roundup products were communicated to Plaintiff directly through national and regional advertising, marketing and promotion efforts, as well as the packaging and sales aids.  The safety of Roundup products was also intentionally, negligently and/or innocently misrepresented to Plaintiff and the public with the intent that such misrepresentations would cause Plaintiff and other potential consumers to purchase and use or continue to purchase and use Roundup products.

195.    Defendants either knew or should have known of the material representations they were making regarding the safety and relative utility of Roundup products.

COMPLAINT
36

196.     Defendants fraudulently, intentionally, negligently, and/or innocently made the misrepresentations and/or actively concealed, suppressed, or omitted this material information with the specific desire to induce Plaintiff and the consuming public to purchase and use Roundup products.  Defendants fraudulently, intentionally, negligently, and/or innocently, knew or should have known that Plaintiff and the consuming public would rely on such material misrepresentations and/or omissions in selecting and applying Roundup products.  Defendants knew or should have known that Plaintiff would rely on their false representations and omissions.

197.     Defendants made these misrepresentations and actively concealed adverse information including the risk of NHL, at a time when, their agents and/or employees knew or would have known, the product had defects, dangers, and characteristics that were other than what was represented to the consuming public.  Specifically, Defendants misrepresented and actively concealed, suppressed, and omitted that there had been inadequate testing of the safety and efficacy of Roundup, and that prior studies, research reports, and/or testing had been conducted linking the use of the drug with serious health events, including NHL.

198.     Despite the fact that Defendants knew or should have known of reports of severe risks including NHL, with Roundup use and exposure, this information was strategically minimized, understated, or omitted in order to create the impression that the human dangers of Roundup were nonexistent, particularly in light of its purported utility.

199.     The fraudulent, intentional, negligent and/or innocent material misrepresentation and/or active concealment, suppression and omission by Defendants were perpetuated directly and/or indirectly through the advertisements, packaging, sales aids, furtive public relations efforts, and

other marketing and promotional pieces authored, analyzed, created, compiled, designed, drafted, disseminated, distributed, edited, evaluated, marketed, published, and supplied by Defendants.

200.    If Plaintiff had known the true facts concerning the risks associated with Roundup exposure, Plaintiff would have used a safer alternative.

201.    Plaintiff's reliance upon the material misrepresentations and omissions was justified, because said misrepresentations and omissions were made by individuals and entities who were in a position to know the true facts concerning Roundup while Plaintiff was not in a position to know the true facts because Defendants overstated the benefits and safety of Roundup and downplayed the risk of lymphoma, thereby inducing Plaintiff to use the herbicide rather than safer alternatives.

202.    Federal law and the EPA do not authorize and specifically prohibit the deceptions, misrepresentations and omissions made by Defendants.

203.    As a direct and proximate result of Defendants' actions and inactions, Plaintiff was exposed to Roundup and suffered and will continue to suffer injuries and damages, as set forth herein.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment against the Defendants on each of the above referenced claims and causes of action and as follows:

1.    Awarding compensatory damages in excess of the jurisdictional amount, including but not limited to pain, suffering, emotional distress, loss of enjoyment of life, and other non-economic damages in an amount to be determined at trial of this action;

2.    Awarding compensatory damages to Plaintiff for past and future damages, including, but not limited to, Plaintiff's pain and suffering and for severe and permanent personal injuries sustained by the Plaintiff including health care costs and economic loss;

3.      Awarding economic damages in the form of medical expenses, out of pocket expenses, lost earnings and other economic damages in an amount to be determined at trial of this action;

4.      Punitive and/or exemplary damages for wanton, willful, fraudulent, and reckless acts of the Defendant who demonstrated a complete disregard and reckless indifference for the safety and welfare of the general public and to the Plaintiff in an amount sufficient to punish Defendant and deter future similar conduct, to the extent allowed by applicable law;

5.      Pre-judgment interest;

6.      Post-judgment interest;

7.      Awarding Plaintiff the costs of these proceedings; and

8.      Such other and further relief as this Court deems just and proper.

### **DEMAND FOR JURY TRIAL**

Plaintiff hereby demands trial by jury as to all issues.

Dated: Warwick, New York
          January 10, 2021

s/*Vilma Blankowitz*
VILMA BLANKOWITZ, ESQ.
Attorney for Plaintiff
24 Continental Road
Warwick, NY 10990
(845)544-7443
Fax:  (845) 533-1727
**vilmablankowitz@gmail.com**

COMPLAINT
39

Query    Reports    Utilities    Help    Log Out

ECF

# U.S. District Court
## Southern District of New York (White Plains)
## CIVIL DOCKET FOR CASE #: 7:22-cv-00221-VB

DeMarmels v. Monsanto Company et al
Assigned to: Judge Vincent L. Briccetti
Cause: 28:1332pl Diversity-Product Liability

Date Filed: 01/11/2022
Jury Demand: Plaintiff
Nature of Suit: 365 Personal Inj. Prod.
Liability
Jurisdiction: Diversity

**Plaintiff**

**Michael DeMarmels**

represented by **Vilma Blankowitz**
Law Office of Vilma Blankowitz
24 Continental Road
Warwick, NY 10990
845-544-7443
Fax: 845-533-1727
Email: vilmablankowitz@gmail.com
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Monsanto Company**

**Defendant**

**Bayer Corporation**

**Defendant**

**Bayer AG**

| Date Filed | # | Docket Text |
|---|---|---|
| 01/11/2022 | 1 | COMPLAINT against Bayer AG, Bayer Corporation, Monsanto Company. (Filing Fee $ 402.00, Receipt Number ANYSDC-25565070)Document filed by Michael DeMarmels.. (Blankowitz, Vilma) (Entered: 01/11/2022) |
| 01/11/2022 | 2 | CIVIL COVER SHEET filed..(Blankowitz, Vilma) (Entered: 01/11/2022) |
| 01/12/2022 | | CASE OPENING INITIAL ASSIGNMENT NOTICE: The above-entitled action is assigned to Judge Vincent L. Briccetti. Please download and review the Individual Practices of the assigned District Judge, located at https://nysd.uscourts.gov/judges/district-judges. Attorneys are responsible for providing courtesy copies to judges where their Individual Practices require such. Please download and review the ECF Rules and Instructions, located at https://nysd.uscourts.gov/rules/ecf-related-instructions..(pc) (Entered: 01/12/2022) |
| 01/12/2022 | | Magistrate Judge Paul E. Davison is so designated. Pursuant to 28 U.S.C. Section 636(c) |

| | and Fed. R. Civ. P. 73(b)(1) parties are notified that they may consent to proceed before a United States Magistrate Judge. Parties who wish to consent may access the necessary form at the following link: https://nysd.uscourts.gov/sites/default/files/2018-06/AO-3.pdf. (pc) (Entered: 01/12/2022) |
|---|---|
| 01/12/2022 | Case Designated ECF. (pc) (Entered: 01/12/2022) |

<table>
<tr><td colspan="4" align="center">**PACER Service Center**</td></tr>
<tr><td colspan="4" align="center">**Transaction Receipt**</td></tr>
<tr><td colspan="4" align="center">01/12/2022 16:33:21</td></tr>
<tr><td>**PACER Login:**</td><td>aporter11</td><td>**Client Code:**</td><td>1102169.00002/20143</td></tr>
<tr><td>**Description:**</td><td>Docket Report</td><td>**Search Criteria:**</td><td>7:22-cv-00221-VB</td></tr>
<tr><td>**Billable Pages:**</td><td>1</td><td>**Cost:**</td><td>0.10</td></tr>
</table>

# CIVIL COVER SHEET

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for use of the Clerk of Court for the purpose of initiating the civil docket sheet.

| PLAINTIFFS | DEFENDANTS |
|---|---|
| Michael DeMarmels | Monsanto Company, Bayer Corporation and Bayer AG, |

| ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER | ATTORNEYS (IF KNOWN) |
|---|---|
| Law Office of Vilma Blankowitz<br>24 Continental Road, Warwick, NY 10990<br>845-544-7443 | Vilma Blankowitz, Esq. |

CAUSE OF ACTION (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE)
(DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY)

28 USC Section 1332

Has this action, case, or proceeding, or one essentially the same been previously filed in SDNY at any time? No [x] Yes [ ]    Judge Previously Assigned

If yes, was this case Vol. [ ] Invol. [ ] Dismissed. No [ ] Yes [ ] If yes, give date _____ & Case No. _____

IS THIS AN INTERNATIONAL ARBITRATION CASE?    No [x]    Yes [ ]

*(PLACE AN [x] IN ONE BOX ONLY)*    NATURE OF SUIT

## TORTS

| CONTRACT | PERSONAL INJURY | PERSONAL INJURY | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| [ ] 110 INSURANCE | [ ] 310 AIRPLANE | [ ] 367 HEALTHCARE/ | [ ] 625 DRUG RELATED | [ ] 422 APPEAL | [ ] 375 FALSE CLAIMS |
| [ ] 120 MARINE | [ ] 315 AIRPLANE PRODUCT | PHARMACEUTICAL PERSONAL | SEIZURE OF PROPERTY | 28 USC 158 | [ ] 376 QUI TAM |
| [ ] 130 MILLER ACT | LIABILITY | INJURY/PRODUCT LIABILITY | 21 USC 881 | [ ] 423 WITHDRAWAL | [ ] 400 STATE |
| [ ] 140 NEGOTIABLE | [ ] 320 ASSAULT, LIBEL & | [x] 365 PERSONAL INJURY | [ ] 690 OTHER | 28 USC 157 | REAPPORTIONMENT |
| INSTRUMENT | SLANDER | PRODUCT LIABILITY | | | [ ] 410 ANTITRUST |
| [ ] 150 RECOVERY OF | [ ] 330 FEDERAL | [ ] 368 ASBESTOS PERSONAL | | | [ ] 430 BANKS & BANKING |
| OVERPAYMENT & | EMPLOYERS' | INJURY PRODUCT | PROPERTY RIGHTS | | [ ] 450 COMMERCE |
| ENFORCEMENT | LIABILITY | LIABILITY | [ ] 820 COPYRIGHTS [ ] 880 DEFEND TRADE SECRETS ACT | | [ ] 460 DEPORTATION |
| OF JUDGMENT | [ ] 340 MARINE | | [ ] 830 PATENT | | [ ] 470 RACKETEER INFLU- |
| [ ] 151 MEDICARE ACT | [ ] 345 MARINE PRODUCT | PERSONAL PROPERTY | [ ] 835 PATENT-ABBREVIATED NEW DRUG APPLICATION | | ENCED & CORRUPT |
| [ ] 152 RECOVERY OF | LIABILITY | [ ] 370 OTHER FRAUD | [ ] 840 TRADEMARK | | ORGANIZATION ACT |
| DEFAULTED | [ ] 350 MOTOR VEHICLE | [ ] 371 TRUTH IN LENDING | | | (RICO) |
| STUDENT LOANS | [ ] 355 MOTOR VEHICLE | | | SOCIAL SECURITY | [ ] 480 CONSUMER CREDIT |
| (EXCL VETERANS) | PRODUCT LIABILITY | | LABOR | [ ] 861 HIA (1395ff) | [ ] 485 TELEPHONE CONSUMER |
| [ ] 153 RECOVERY | [ ] 360 OTHER PERSONAL | [ ] 380 OTHER PERSONAL | [ ] 710 FAIR LABOR | [ ] 862 BLACK LUNG (923) | PROTECTION ACT |
| OF OVERPAYMENT | INJURY | PROPERTY DAMAGE | STANDARDS ACT | [ ] 863 DIWC/DIWW (405(g)) | |
| OF VETERAN'S | [ ] 362 PERSONAL INJURY - | [ ] 385 PROPERTY DAMAGE | [ ] 720 LABOR/MGMT | [ ] 864 SSID TITLE XVI | [ ] 490 CABLE/SATELLITE TV |
| BENEFITS | MED MALPRACTICE | PRODUCT LIABILITY | RELATIONS | [ ] 865 RSI (405(g)) | [ ] 850 SECURITIES/ |
| [ ] 160 STOCKHOLDERS | | | [ ] 740 RAILWAY LABOR ACT | | COMMODITIES/ |
| SUITS | | PRISONER PETITIONS | [ ] 751 FAMILY MEDICAL | | EXCHANGE |
| [ ] 190 OTHER | | [ ] 463 ALIEN DETAINEE | LEAVE ACT (FMLA) | FEDERAL TAX SUITS | |
| CONTRACT | | [ ] 510 MOTIONS TO | [ ] 790 OTHER LABOR | [ ] 870 TAXES (U.S. Plaintiff or | [ ] 890 OTHER STATUTORY |
| [ ] 195 CONTRACT | ACTIONS UNDER STATUTES | VACATE SENTENCE | LITIGATION | Defendant) | ACTIONS |
| PRODUCT | | 28 USC 2255 | [ ] 791 EMPL RET INC | [ ] 871 IRS-THIRD PARTY | [ ] 891 AGRICULTURAL ACTS |
| LIABILITY | CIVIL RIGHTS | [ ] 530 HABEAS CORPUS | SECURITY ACT (ERISA) | 26 USC 7609 | [ ] 893 ENVIRONMENTAL |
| [ ] 196 FRANCHISE | | [ ] 535 DEATH PENALTY | | | MATTERS |
| | [ ] 440 OTHER CIVIL RIGHTS | [ ] 540 MANDAMUS & OTHER | | | [ ] 895 FREEDOM OF |
| | (Non-Prisoner) | | IMMIGRATION | | INFORMATION ACT |
| REAL PROPERTY | [ ] 441 VOTING | | [ ] 462 NATURALIZATION | | [ ] 896 ARBITRATION |
| [ ] 210 LAND | [ ] 442 EMPLOYMENT | PRISONER CIVIL RIGHTS | APPLICATION | | [ ] 899 ADMINISTRATIVE |
| CONDEMNATION | [ ] 443 HOUSING/ | | [ ] 465 OTHER IMMIGRATION | | PROCEDURE ACT/REVIEW OR |
| [ ] 220 FORECLOSURE | ACCOMMODATIONS | [ ] 550 CIVIL RIGHTS | ACTIONS | | APPEAL OF AGENCY DECISION |
| [ ] 230 RENT LEASE & | [ ] 445 AMERICANS WITH | [ ] 555 PRISON CONDITION | | | [ ] 950 CONSTITUTIONALITY OF |
| EJECTMENT | DISABILITIES - | [ ] 560 CIVIL DETAINEE | | | STATE STATUTES |
| [ ] 240 TORTS TO LAND | EMPLOYMENT | CONDITIONS OF CONFINEMENT | | | |
| [ ] 245 TORT PRODUCT | [ ] 446 AMERICANS WITH | | | | |
| LIABILITY | DISABILITIES -OTHER | | | | |
| [ ] 290 ALL OTHER | [ ] 448 EDUCATION | | | | |
| REAL PROPERTY | | | | | |

*Check if demanded in complaint:*

[ ] CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $_____ OTHER _____

*Check YES only if demanded in complaint*
JURY DEMAND: [x] YES [ ] NO

DO YOU CLAIM THIS CASE IS RELATED TO A CIVIL CASE NOW PENDING IN S.D.N.Y.
AS DEFINED BY LOCAL RULE FOR DIVISION OF BUSINESS 13?
IF SO, STATE:

JUDGE _____ DOCKET NUMBER_____

NOTE: You must also submit at the time of filing the Statement of Relatedness form (Form IH-32).

*(PLACE AN  x  IN ONE BOX ONLY)*                              **ORIGIN**

| | | | | | | |
|---|---|---|---|---|---|---|
| [x] 1 Original Proceeding | [ ] 2 Removed from State Court | [ ] 3 Remanded from Appellate Court | [ ] 4 Reinstated or Reopened | [ ] 5 Transferred from (Specify District) | [ ] 6 Multidistrict Litigation (Transferred) | [ ] 7 Appeal to District Judge from Magistrate Judge |

        [ ] a. **all parties represented**

        [ ] b. **At least one party is pro se.**        [ ] 8 Multidistrict Litigation (Direct File)

*(PLACE AN  x  IN ONE BOX ONLY)*        **BASIS OF JURISDICTION**        *IF DIVERSITY, INDICATE CITIZENSHIP BELOW.*

[ ] 1 U.S. PLAINTIFF    [ ] 2 U.S. DEFENDANT    [ ] 3 FEDERAL QUESTION    [x] 4 DIVERSITY

        (U.S. NOT A PARTY)

CITIZENSHIP OF PRINCIPAL PARTIES (FOR DIVERSITY CASES ONLY)

(Place an [X] in one box for Plaintiff and one box for Defendant)

| | PTF | DEF | | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|---|---|---|
| CITIZEN OF THIS STATE | [x] 1 | [ ] 1 | CITIZEN OR SUBJECT OF A FOREIGN COUNTRY | [ ] 3 | [ ] 3 | INCORPORATED and PRINCIPAL PLACE OF BUSINESS IN ANOTHER STATE | [ ] 5 | [x] 5 |
| CITIZEN OF ANOTHER STATE | [ ] 2 | [ ] 2 | INCORPORATED or PRINCIPAL PLACE OF BUSINESS IN THIS STATE | [ ] 4 | [ ] 4 | FOREIGN NATION | [ ] 6 | [ ] 6 |

PLAINTIFF(S) ADDRESS(ES) AND COUNTY(IES)

Michael DeMarmels
56 Foley Road
Warwick, NY 10990
Orange County, NY

DEFENDANT(S) ADDRESS(ES) AND COUNTY(IES)

| | | |
|---|---|---|
| Monsanto Company | Bayer Corporation | Bayer AG |
| c/o Bayer Corporation | 100 Bayer Boulevard | Building W 11 Leverkusen NW |
| 100 Bayer Boulevard | Whippany, NJ 07981 | 51368 Germany |
| Whippany, NJ 07981 (Morris Cty, NJ) | (Morris County, NJ) | |

DEFENDANT(S) ADDRESS UNKNOWN
REPRESENTATION IS HEREBY MADE THAT, AT THIS TIME, I HAVE BEEN UNABLE, WITH REASONABLE DILIGENCE, TO ASCERTAIN
THE RESIDENCE ADDRESSES OF THE FOLLOWING DEFENDANTS:

**COURTHOUSE ASSIGNMENT**

I hereby certify that this case should be assigned to the courthouse indicated below pursuant to Local Rule for Division of Business 18, 20 or 21.

Check one:   THIS ACTION SHOULD BE ASSIGNED TO:   [x] WHITE PLAINS   [ ] MANHATTAN

DATE 1/10/2022                        ADMITTED TO PRACTICE IN THIS DISTRICT
            SIGNATURE OF ATTORNEY OF RECORD    [ ] NO
                                     [x] YES (DATE ADMITTED Mo. 10   Yr. 2019   )
RECEIPT #                               Attorney Bar Code # 2961027

Magistrate Judge is to be designated by the Clerk of the Court.

Magistrate Judge _____ is so Designated.

Ruby J. Krajick, Clerk of Court by _____ Deputy Clerk, DATED _____.

UNITED STATES DISTRICT COURT (NEW YORK SOUTHERN)