ACCO,MJDAP

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA (Eastern Division - Riverside)
## CIVIL DOCKET FOR CASE #: 5:22-cv-01363-SHK

William Wasson v. Monsanto Company
Assigned to: Magistrate Judge Shashi H. Kewalramani
Cause: 28:1332 Diversity-Product Liability

Date Filed: 08/02/2022
Jury Demand: Plaintiff
Nature of Suit: 365 Personal Inj. Prod.
Liability
Jurisdiction: Diversity

**Plaintiff**

**William Wasson**
*an individual*

represented by **Jessica S Williams**
Gomez Trial Attorneys
655 West Broadway Suite 1700
San Diego, CA 92101
619-237-3490
Fax: 619-237-3496
Email: jwilliams@thegomezfirm.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**John H. Gomez**
Gomez Trial Attorneys
655 West Broadway Suite 1700
San Diego, CA 92101
619-237-3490
Fax: 619-237-3496
Email: jgomez@thegomezfirm.com
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Monsanto Company**

| Date Filed | # | Docket Text |
|---|---|---|
| 08/02/2022 | 1 | COMPLAINT Receipt No: ACACDC-33740051 - Fee: $402, filed by Plaintiff William Wasson. (Attorney Jessica S Williams added to party William Wasson(pty:pla))(Williams, Jessica) (Entered: 08/02/2022) |
| 08/02/2022 | 2 | CIVIL COVER SHEET filed by Plaintiff William Wasson. (Williams, Jessica) (Entered: 08/02/2022) |
| 08/02/2022 | 3 | Request for Clerk to Issue Summons on Complaint (Attorney Civil Case Opening) 1 filed by Plaintiff William Wasson. (Williams, Jessica) (Entered: 08/02/2022) |

| 08/02/2022 | 4 | NOTICE of Interested Parties filed by Plaintiff William Wasson, identifying William Wasson. (Williams, Jessica) (Entered: 08/02/2022) |
|---|---|---|
| 08/03/2022 | 5 | NOTICE TO COUNSEL re Magistrate Judge Direct Assignment Program. This case has been randomly assigned to Magistrate Judge Shashi H. Kewalramani. (Attachments: # 1 CV-11C Statement of Consent to Proceed Before a United States Magistrate Judge) (ghap) (Entered: 08/03/2022) |
| 08/03/2022 | 6 | NOTICE OF DEFICIENCIES in Request to Issue Summons RE: Summons Request 3 . The following error(s) was found: The caption of the summons must match the caption of the complaint verbatim. If the caption is too large to fit in the space provided, enter the name of the first party and then write see attached.Next, attach a face page of the complaint or a second page addendum to the Summons. The summons cannot be issued until this defect has been corrected. Please correct the defect and re-file your request. (ghap) (Entered: 08/03/2022) |
| 08/08/2022 | 7 | Request for Clerk to Issue Summons on Complaint (Attorney Civil Case Opening) 1 filed by Plaintiff William Wasson. (Williams, Jessica) (Entered: 08/08/2022) |
| 08/09/2022 | 8 | 21 DAY Summons Issued re Complaint (Attorney Civil Case Opening) 1 as to Defendant Monsanto Company. (hr) (Entered: 08/09/2022) |

| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 08/30/2022 08:36:05 | | | |
| **PACER Login:** | JWalkerStubbs | **Client Code:** | 31943.356965 rhb |
| **Description:** | Docket Report | **Search Criteria:** | 5:22-cv-01363-SHK End date: 8/30/2022 |
| **Billable Pages:** | 2 | **Cost:** | 0.20 |



# Notice of Service of Process

null / ALL
**Transmittal Number: 25364950**
**Date Processed: 08/11/2022**

| | |
|---|---|
| **Primary Contact:** | Anne Troupis (Monsanto)<br>Bayer U.S. LLC<br>800 N Lindbergh Blvd<br>Saint Louis, MO 63167-1000 |

| | |
|---|---|
| **Entity:** | Monsanto Company<br>Entity ID Number  2282193 |
| **Entity Served:** | Monsanto Company |
| **Title of Action:** | Wasson, William  vs. Monsanto Company |
| **Matter Name/ID:** | Wasson, William  vs. Monsanto Company (12678298) |
| **Document(s) Type:** | Summons/Complaint |
| **Nature of Action:** | Product Liability |
| **Court/Agency:** | U.S. District Court Central District, CA |
| **Case/Reference No:** | 5:22-cv-1363 |
| **Jurisdiction Served:** | California |
| **Date Served on CSC:** | 08/10/2022 |
| **Answer or Appearance Due:** | 21 Days |
| **Originally Served On:** | CSC |
| **How Served:** | Personal Service |
| Sender Information: | Gomez Trial Attorneys<br>619-237-3490 |

Information contained on this transmittal form is for record keeping, notification and forwarding the attached document(s). It does not constitute a legal opinion. The recipient is responsible for interpreting the documents and taking appropriate action.

**To avoid potential delay, please do not send your response to CSC**

251 Little Falls Drive, Wilmington, Delaware 19808-1674   (888) 690-2882   |   sop@cscglobal.com

Case 5:22-cv-01363-SHK   Document 8   Filed 08/09/22   Page 1 of 2   Page ID #:55

AO 440 (Rev. 06/12) Summons in a Civil Action

# UNITED STATES DISTRICT COURT

for the

Central District of California

| | |
|---|---|
| WILLIAM WASSON, an individual, | ) ) ) ) ) ) ) ) ) ) ) |
| *Plaintiff(s)* | |
| v. | Civil Action No.  5:22-cv-01363-SHK |
| MONSANTO COMPANY | |
| *Defendant(s)* | |

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*  Monsanto Company
c/o Corporation Service Company dba CSC - Lawyers
Incorporating Service, 2710 Gateway Oaks Drive, Suite 150N, Sacramento, CA 95833

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:    Jessica S. Williams
Gomez Trial Attorneys
655 W Broadway Ste 1700
San Diego, CA 92101

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

CLERK OF COURT

Date:    08/09/2022



_____
*Signature of Clerk or Deputy Clerk*

AO 440 (Rev. 06/12)  Summons in a Civil Action (Page 2)

Civil Action No.   5:22-cv-01363-SHK

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

☐ I personally served the summons on the individual at *(place)* _____
_____ on *(date)* _____ ; or

☐ I left the summons at the individual's residence or usual place of abode with *(name)* _____
_____ , a person of suitable age and discretion who resides there,
on *(date)* _____ , and mailed a copy to the individual's last known address; or

☐ I served the summons on *(name of individual)* _____ , who is
designated by law to accept service of process on behalf of *(name of organization)* _____
_____ on *(date)* _____ ; or

☐ I returned the summons unexecuted because _____ ; or

☐ Other *(specify):*


My fees are $ _____ for travel and $ _____ for services, for a total of $   0.00   .

I declare under penalty of perjury that this information is true.


Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc:

## UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
### CIVIL COVER SHEET

| **I. (a) PLAINTIFFS** ( Check box if you are representing yourself ☐ ) | **DEFENDANTS** ( Check box if you are representing yourself ☐ ) |
|---|---|
| William Wasson | Monsanto Company |

| **(b)** County of Residence of First Listed Plaintiff   Riverside (CA) | County of Residence of First Listed Defendant   St. Louis (MO) |
|---|---|
| *(EXCEPT IN U.S. PLAINTIFF CASES)* | *(IN U.S. PLAINTIFF CASES ONLY)* |

| **(c)** Attorneys *(Firm Name, Address and Telephone Number)* If you are representing yourself, provide the same information. | Attorneys *(Firm Name, Address and Telephone Number)* If you are representing yourself, provide the same information. |
|---|---|
| John Gomez, Jessica Williams Gomez Trial Attorneys, 655 W Broadway Ste1700 San Diego, CA 92101 (619-237-3490) | |

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

☐ 1. U.S. Government Plaintiff

☐ 2. U.S. Government Defendant

☐ 3. Federal Question (U.S. Government Not a Party)

☒ 4. Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES**-For Diversity Cases Only (Place an X in one box for plaintiff and one for defendant)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☐ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☒ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. ORIGIN** (Place an X in one box only.)

☒ 1. Original Proceeding

☐ 2. Removed from State Court

☐ 3. Remanded from Appellate Court

☐ 4. Reinstated or Reopened

☐ 5. Transferred from Another District (Specify)

☐ 6. Multidistrict Litigation - Transfer

☐ 8. Multidistrict Litigation - Direct File

**V. REQUESTED IN COMPLAINT: JURY DEMAND:** ☒ Yes ☐ No (Check "Yes" only if demanded in complaint.)

**CLASS ACTION under F.R.Cv.P. 23:** ☐ Yes ☐ No     ☐ **MONEY DEMANDED IN COMPLAINT:** $

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)

28 U.S.C. Sec 1332 - Personal Injury - Product Liability

**VII. NATURE OF SUIT** (Place an X in one box only.)

| OTHER STATUTES | CONTRACT | REAL PROPERTY CONT. | IMMIGRATION | PRISONER PETITIONS | PROPERTY RIGHTS |
|---|---|---|---|---|---|
| ☐ 375 False Claims Act | ☐ 110 Insurance | ☐ 240 Torts to Land | ☐ 462 Naturalization Application | **Habeas Corpus:** | ☐ 820 Copyrights |
| ☐ 376 Qui Tam (31 USC 3729(a)) | ☐ 120 Marine | ☐ 245 Tort Product Liability | ☐ 465 Other Immigration Actions | ☐ 463 Alien Detainee | ☐ 830 Patent |
| ☐ 400 State Reapportionment | ☐ 130 Miller Act | ☐ 290 All Other Real Property | | ☐ 510 Motions to Vacate Sentence | ☐ 835 Patent - Abbreviated New Drug Application |
| ☐ 410 Antitrust | ☐ 140 Negotiable Instrument | **TORTS** | **TORTS** | ☐ 530 General | ☐ 840 Trademark |
| ☐ 430 Banks and Banking | ☐ 150 Recovery of Overpayment & Enforcement of Judgment | **PERSONAL INJURY** | **PERSONAL PROPERTY** | ☐ 535 Death Penalty | ☐ 880 Defend Trade Secrets Act of 2016 (DTSA) |
| ☐ 450 Commerce/ICC Rates/Etc. | | ☐ 310 Airplane | ☐ 370 Other Fraud | **Other:** | **SOCIAL SECURITY** |
| ☐ 460 Deportation | ☐ 151 Medicare Act | ☐ 315 Airplane Product Liability | ☐ 371 Truth in Lending | ☐ 540 Mandamus/Other | ☐ 861 HIA (1395ff) |
| ☐ 470 Racketeer Influenced & Corrupt Org. | ☐ 152 Recovery of Defaulted Student Loan (Excl. Vet.) | ☐ 320 Assault, Libel & Slander | ☐ 380 Other Personal Property Damage | ☐ 550 Civil Rights | ☐ 862 Black Lung (923) |
| ☐ 480 Consumer Credit | | ☐ 330 Fed. Employers' Liability | ☐ 385 Property Damage Product Liability | ☐ 555 Prison Condition | ☐ 863 DIWC/DIWW (405 (g)) |
| ☐ 485 Telephone Consumer Protection Act | ☐ 153 Recovery of Overpayment of Vet. Benefits | ☐ 340 Marine | **BANKRUPTCY** | ☐ 560 Civil Detainee Conditions of Confinement | ☐ 864 SSID Title XVI |
| ☐ 490 Cable/Sat TV | ☐ 160 Stockholders' Suits | ☐ 345 Marine Product Liability | ☐ 422 Appeal 28 USC 158 | **FORFEITURE/PENALTY** | ☐ 865 RSI (405 (g)) |
| ☐ 850 Securities/Commodities/Exchange | | ☐ 350 Motor Vehicle | ☐ 423 Withdrawal 28 USC 157 | ☐ 625 Drug Related Seizure of Property 21 USC 881 | **FEDERAL TAX SUITS** |
| ☐ 890 Other Statutory Actions | ☐ 190 Other Contract | ☐ 355 Motor Vehicle Product Liability | **CIVIL RIGHTS** | ☐ 690 Other | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| ☐ 891 Agricultural Acts | ☐ 195 Contract Product Liability | ☐ 360 Other Personal Injury | ☐ 440 Other Civil Rights | **LABOR** | ☐ 871 IRS-Third Party 26 USC 7609 |
| ☐ 893 Environmental Matters | ☐ 196 Franchise | ☐ 362 Personal Injury-Med Malpractice | ☐ 441 Voting | ☐ 710 Fair Labor Standards Act | |
| ☐ 895 Freedom of Info. Act | **REAL PROPERTY** | ☒ 365 Personal Injury-Product Liability | ☐ 442 Employment | ☐ 720 Labor/Mgmt. Relations | |
| ☐ 896 Arbitration | ☐ 210 Land Condemnation | ☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability | ☐ 443 Housing/ Accommodations | ☐ 740 Railway Labor Act | |
| ☐ 899 Admin. Procedures Act/Review of Appeal of Agency Decision | ☐ 220 Foreclosure | | ☐ 445 American with Disabilities- Employment | ☐ 751 Family and Medical Leave Act | |
| ☐ 950 Constitutionality of State Statutes | ☐ 230 Rent Lease & Ejectment | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 446 American with Disabilities-Other | ☐ 790 Other Labor Litigation | |
| | | | ☐ 448 Education | ☐ 791 Employee Ret. Inc. Security Act | |

**FOR OFFICE USE ONLY:**     Case Number:

| CV-71 (10/20) | CIVIL COVER SHEET | Page 1 of 3 |
|---|---|---|

Case 5:22-cv-01363   Document 3   Filed 08/02/22   Page 2 of 3   Page ID #:43

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL COVER SHEET**

**VIII. VENUE:** Your answers to the questions below will determine the division of the Court to which this case will be initially assigned. This initial assignment is subject to change, in accordance with the Court's General Orders, upon review by the Court of your Complaint or Notice of Removal.

| QUESTION A:  Was this case removed from state court? | STATE CASE WAS PENDING IN THE COUNTY OF: | INITIAL DIVISION IN CACD IS: |
|---|---|---|
| ☐ Yes  ☒ No<br><br>If "no," skip to Question B. If "yes," check the box to the right that applies, enter the corresponding division in response to Question E, below, and continue from there. | ☐ Los Angeles, Ventura, Santa Barbara, or San Luis Obispo | Western |
| | ☐ Orange | Southern |
| | ☐ Riverside or San Bernardino | Eastern |

| QUESTION B:  Is the United States, or one of its agencies or employees, a PLAINTIFF in this action? | B.1. Do 50% or more of the defendants who reside in the district reside in Orange Co.?<br><br>*check one of the boxes to the right* ☞ | ☐ YES. Your case will initially be assigned to the Southern Division. Enter "Southern" in response to Question E, below, and continue from there. |
|---|---|---|
| ☐ Yes  ☒ No | | ☐ NO. Continue to Question B.2. |
| | B.2. Do 50% or more of the defendants who reside in the district reside in Riverside and/or San Bernardino Counties?  (Consider the two counties together.)<br><br>*check one of the boxes to the right* ☞ | ☐ YES. Your case will initially be assigned to the Eastern Division. Enter "Eastern" in response to Question E, below, and continue from there. |
| If "no," skip to Question C. If "yes," answer Question B.1, at right. | | ☐ NO. Your case will initially be assigned to the Western Division. Enter "Western" in response to Question E, below, and continue from there. |

| QUESTION C:  Is the United States, or one of its agencies or employees, a DEFENDANT in this action? | C.1. Do 50% or more of the plaintiffs who reside in the district reside in Orange Co.?<br><br>*check one of the boxes to the right* ☞ | ☐ YES. Your case will initially be assigned to the Southern Division. Enter "Southern" in response to Question E, below, and continue from there. |
|---|---|---|
| ☐ Yes  ☒ No | | ☐ NO. Continue to Question C.2. |
| | C.2. Do 50% or more of the plaintiffs who reside in the district reside in Riverside and/or San Bernardino Counties?  (Consider the two counties together.)<br><br>*check one of the boxes to the right* ☞ | ☐ YES. Your case will initially be assigned to the Eastern Division. Enter "Eastern" in response to Question E, below, and continue from there. |
| If "no," skip to Question D. If "yes," answer Question C.1, at right. | | ☐ NO. Your case will initially be assigned to the Western Division. Enter "Western" in response to Question E, below, and continue from there. |

| QUESTION D: Location of plaintiffs and defendants? | A.<br>Orange County | B.<br>Riverside or San Bernardino County | C.<br>Los Angeles, Ventura, Santa Barbara, or San Luis Obispo County |
|---|---|---|---|
| Indicate the location(s) in which 50% or more of *plaintiffs who reside in this district* reside.  (Check up to two boxes, or leave blank if none of these choices apply.) | ☐ | ☒ | ☐ |
| Indicate the location(s) in which 50% or more of *defendants who reside in this district* reside.  (Check up to two boxes, or leave blank if none of these choices apply.) | ☐ | ☐ | ☐ |

| D.1.  Is there at least one answer in Column A? | D.2.  Is there at least one answer in Column B? |
|---|---|
| ☐ Yes  ☒ No | ☒ Yes  ☐ No |
| If "yes," your case will initially be assigned to the<br>SOUTHERN DIVISION.<br>Enter "Southern" in response to Question E,  below, and continue from there.<br>If "no," go to question D2 to the right. ☞ | If "yes," your case will initially be assigned to the<br>EASTERN DIVISION.<br>Enter "Eastern" in response to Question E,  below.<br>if "no," your case will be assigned to the WESTERN DIVISION.<br>Enter "Western" in response to Question E, below. ⬇ |

| QUESTION E: Initial Division? | INITIAL DIVISION IN CACD |
|---|---|
| Enter the initial division determined by Question A, B, C, or D above: ☞ | EASTERN |

| QUESTION F: Northern Counties? | | |
|---|---|---|
| Do 50% or more of plaintiffs or defendants in this district reside in Ventura, Santa Barbara, or San Luis Obispo counties? | ☐ Yes | ☒ No |

## UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
### CIVIL COVER SHEET

**IX(a). IDENTICAL CASES:** Has this action been previously filed **in this court?**     ☒ NO     ☐ YES

If yes, list case number(s): _____

**IX(b). RELATED CASES:** Is this case related (as defined below) to any civil or criminal case(s) previously filed **in this court?**     ☒ NO     ☐ YES

If yes, list case number(s): _____

**Civil cases** are related when they (check all that apply):

☐ A. Arise from the same or a closely related transaction, happening, or event;

☐ B. Call for determination of the same or substantially related or similar questions of law and fact; or

☐ C. For other reasons would entail substantial duplication of labor if heard by different judges.

Note: That cases may involve the same patent, trademark, or copyright is not, in itself, sufficient to deem cases related.

**A civil forfeiture case and a criminal case** are related when they (check all that apply):

☐ A. Arise from the same or a closely related transaction, happening, or event;

☐ B. Call for determination of the same or substantially related or similar questions of law and fact; or

☐ C. Involve one or more defendants from the criminal case in common and would entail substantial duplication of labor if heard by different judges.

---

**X.  SIGNATURE OF ATTORNEY**
**(OR SELF-REPRESENTED LITIGANT):**    /s/ Jessica S. Williams          DATE:  08/02/2022

**Notice to Counsel/Parties:** The submission of this Civil Cover Sheet is required by Local Rule 3-1. This Form CV-71 and the information contained herein neither replaces nor supplements the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. For more detailed instructions, see separate instruction sheet (CV-071A).

---

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405 (g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405 (g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405 (g)) |

**GOMEZ TRIAL ATTORNEYS**
John H. Gomez (SBN 171485)
Jessica S. Williams (SBN 314762)
655 West Broadway, Suite 1700
San Diego, California 92101
Telephone: (619) 237-3490
Fax: (619) 237-3496
Email: john@thegomezfirm.com
jwilliams@thegomezfirm.com

Attorneys for Plaintiffs

## UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| WILLIAM WASSON, an individual,<br><br>                    Plaintiff,<br><br>v.<br><br>MONSANTO COMPANY,<br><br>                    Defendant. | CASE NO.: 5:22-cv-1363<br><br>**COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

## COMPLAINT

Plaintiff, WILLIAM WASSON ("Plaintiff"), by and through his undersigned attorneys, hereby brings this Complaint for damages against Defendant Monsanto Company and allege the following:

## NATURE OF THE CASE

1.     This is an action for damages suffered by Plaintiff as a direct and proximate result of Defendant's negligent and wrongful conduct in connection with the design, development, manufacture, testing, packaging, promoting, marketing, advertising, distribution, labeling, and/or sale of the herbicide Roundup®, containing

1   the active ingredient glyphosate.

2       2.    Plaintiff maintains that Roundup® and/or glyphosate is defective,

3   dangerous to human health, unfit and unsuitable to be marketed and sold in commerce,

4   and lacked proper warnings and directions as to the dangers associated with its use.

5       3.    Plaintiff's injuries, like those striking thousands of similarly situated

6   victims across the country, were avoidable.

7   <div align="center">**JURISDICTION AND VENUE**</div>

8       4.    This Court has jurisdiction over Defendant and this action pursuant to 28

9   U.S.C. § 1332 because there is complete diversity of citizenship between Plaintiff and

10   Defendant. Defendant is incorporated and has its principal place of business outside of

11   the state in which the Plaintiff resides.

12       5.    The amount in controversy between Plaintiff and Defendant exceeds

13   $75,000, exclusive of interest and cost.

14       6.    The Court also has supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

15       7.    Venue is proper within this district pursuant to 28 U.S.C. § 1391 in that

16   Defendant conducts business here and is subject to personal jurisdiction in this district.

17   Furthermore, Defendant sells, markets, and/or distributes Roundup® within the state of

18   California. Also, a substantial part of the acts and/or omissions giving rise to these

19   claims occurred within this district.

20   <div align="center">**PARTY**</div>

21       8.    Plaintiff, William Wasson, an individual, is a natural person and at all

22   relevant times a resident and citizen of Riverside County, California. Plaintiff brings

23   this action for personal injuries sustained by exposure to Roundup® ("Roundup")

24   containing the active ingredient glyphosate and the surfactant POEA. As a direct and

25   proximate result of being exposed to Roundup, Plaintiff developed T Cell Large

26   Granular Lymphocytic Leukemia, a subtype of Non-Hodgkin's Lymphoma.

27       9.    "Roundup" refers to all formulations of Defendant's roundup products,

28   including, but not limited to, Roundup Concentrate Poison Ivy and Tough Brush Killer

1   1, Roundup Custom Herbicide, Roundup D-Pak herbicide, Roundup Dry Concentrate,
2   Roundup Export Herbicide, Roundup Fence & Hard Edger 1, Roundup Garden Foam
3   Weed & Grass Killer, Roundup Grass and Weed Killer, Roundup Herbicide, Roundup
4   Original 2k Herbicide, Roundup Original II Herbicide, Roundup Pro Concentrate,
5   Roundup Prodry Herbicide, Roundup Promax, Roundup Quik Stik Grass and Weed
6   Killer, Roundup Quikpro Herbicide, Roundup Rainfast Concentrate Weed & Grass
7   Killer, Roundup Rainfast Super Concentrate Weed & Grass Killer, Roundup Ready-to-
8   Use Extended Control Weed & Grass Killer 1 Plus Weed Preventer, Roundup Ready-to-
9   Use Weed & Grass Killer, Roundup Ready-to-Use Weed and Grass Killer 2, Roundup
10  Ultra Dry, Roundup Ultra Herbicide, Roundup Ultramax, Roundup VM Herbicide,
11  Roundup Weed & Grass Killer Concentrate, Roundup Weed & Grass Killer Concentrate
12  Plus, Roundup Weed & Grass killer Ready-to-Use Plus, Roundup Weed & Grass Killer
13  Super Concentrate, Roundup Weed & Grass Killer1 Ready-to-Use, Roundup WSD
14  Water Soluble Dry Herbicide Deploy Dry Herbicide, or any other formulation of
15  containing the active ingredient glyphosate.

16      10.    Defendant MONSANTO COMPANY is a Delaware corporation with its
17  headquarters and principal place of business in St. Louis, Missouri.

18      11.    Defendant advertises and sells goods, specifically Roundup, in Riverside
19  County, California.

20      12.    Defendant transacted and conducted business within the State of California
21  that relates to the allegations in this Complaint.

22      13.    Defendant derived substantial revenue from goods and products used in the
23  State of California.

24      14.    Defendant expected or should have expected their acts to have
25  consequences within the State of California and derived substantial revenue from
26  interstate commerce.

27      15.    Defendant engaged in the business of designing, developing,
28  manufacturing, testing, packaging, marketing, distributing, labeling, and/or selling

1 | Roundup.

2 |     16.    Defendant is authorized to do business in California and derives substantial

3 | income from doing business in this state.

4 |     17.    Upon information and belief, Defendant purposefully availed itself to the

5 | privilege of conducting activities with the State of California, thus invoking the benefits

6 | and protections of its laws.

7 |     18.    Upon information and belief, Defendant designs, sells, advertises,

8 | manufactures and/or distributes Roundup, with full knowledge of its dangerous and

9 | defective nature.

10 | **FACTUAL ALLEGATIONS**

11 |     19.    At all relevant times, Defendant was in the business of, and did, design,

12 | research, manufacture, test, advertise, promote, market, sell, distribute, and/or have

13 | acquired and are responsible for Defendant who have designed, researched,

14 | manufactured, tested, advertised, promoted, marketed, sold, and distributed the

15 | commercial herbicide Roundup.

16 |     20.    Monsanto is a multinational agricultural biotechnology corporation based

17 | in St. Louis, Missouri. It is the world's leading producer of glyphosate.

18 |     21.    Defendant discovered the herbicidal properties of glyphosate during the

19 | 1970's and subsequently began to design, research, manufacture, sell and distribute

20 | glyphosate based "Roundup" as a broad-spectrum herbicide.

21 |     22.    Glyphosate is the active ingredient in Roundup.

22 |     23.    Glyphosate is a broad-spectrum, non-selective herbicide used to kill weeds

23 | and grasses known to compete with commercial crops grown around the globe.

24 |     24.    Glyphosate is a "non-selective" herbicide, meaning it kills indiscriminately

25 | based only on whether a given organism produces a specific enzyme, 5-

26 | enolpyruvylshikimic acid-3-phosphate synthase, known as EPSP synthase.

27 |     25.    Glyphosate inhibits the enzyme 5-enolpyruvylshikimic acid-3-phosphate

28 | synthase that interferes with the shikimic pathway in plants, resulting in the

1  accumulation of shikimic acid in plant tissue and ultimately plant death.

2      26.     Sprayed as a liquid, plants absorb glyphosate directly through their leaves,
3  stems, and roots, and detectable quantities accumulate in the plant tissues.

4      27.     Each year, approximately 250 million pounds of glyphosate are sprayed on
5  crops, commercial nurseries, suburban lawns, parks, and golf courses. This increase in
6  use has been driven largely by the proliferation of genetically engineered crops, crops
7  specifically tailored to resist the activity of glyphosate.

8      28.     Defendant is intimately involved in the development, design, manufacture,
9  marketing, sale, and/or distribution of genetically modified ("GMO") crops, many of
10  which are marketed as being resistant to Roundup i.e., "Roundup Ready®." As of 2009,
11  Defendant was the world's leading producer of seeds designed to be Roundup Ready®.
12  The stated advantage of Roundup Ready® crops is that substantially improve a farmer's
13  ability to control weeds, since glyphosate can be sprayed int eh fields during the
14  growing season without harming their crops.  In 2010, an estimated 70% of corn and
15  cotton, and 90% of soybean fields in the United States contained Roundup Ready®
16  seeds.

17      29.     The original Roundup, containing the active ingredient glyphosate, was
18  introduced in 1974. Today, glyphosate products are among the world's most widely
19  used herbicides. Monsanto's glyphosate products are registered in more than 130
20  countries and are approved for weed control in more than 100 crops.  No other herbicide
21  active ingredient compares in terms of number of approved uses.[1]  They are ubiquitous
22  in the environment.  Numerous studies confirm that glyphosate is found in rivers,
23  streams, and groundwater in agricultural workers, and even in the urine of urban
24  dwellers who are not in direct contact with glyphosate.

25      30.     For nearly 40 years, farmers across the globe have used Roundup, unaware
26  of its carcinogenic properties.

27

28  _____
[1] 2 *Backgrounder*, History of Monsanto's Glyphosate Herbicides, June 2005.

## REGISTRATION OF HERBICIDES UNDER FEDERAL LAW

31.     The manufacture, formulation and distribution of herbicides, such as Roundup, are regulated under the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA"), 7. U.S.C. § 136 *et seq*. FIFRA requires that all pesticides be registered with the Environmental Protection Agency ("EPA) prior to their distribution, sale, or use, except as described by FIFRA 7 U.S.C. 136a(a).

32.     The EPA requires as part of the registration process, among other requirements, a variety of tests to evaluate the potential for exposure to pesticides, toxicity to people and other potential non-target organisms, and other adverse effects on the environment. Registration by the EPA, however, is not an assurance or finding of safety. The determination the EPA makes in registering or re-registering a product is not that the product is "safe," but rather that use of the product in accordance with its label directions "will not generally cause unreasonable adverse effects on the environment." 7 U.S.C. § 136(a)(c)(5)(D).

33.     FIFRA defines "unreasonable adverse effects on the environment" to mean "any unreasonable risk to man or the environment, taking into account the economic, social, and environmental costs and benefits of the use of any pesticide." 7 U.S.C. § 136(bb). FIFRA thus requires the EPA to make a risk/benefit analysis in determining whether a registration should be granted or allowed to continue to be sold in commerce.

34.     The EPA and the State of California registered Roundup for distribution, sale, and manufacture in the United States and the State of California.

35.     FIFRA generally requires that the registrant, Monsanto, conduct health and safety testing of pesticide products. The government is not required, nor is it able, to perform the product tests that are required of the manufacturer.

36.     The evaluation of each pesticide product distributed, sold, or manufactured is completed at the time the product is initially registered. The data necessary for registration of a pesticide has changed over time. The EPA is now in the process of re-evaluating all pesticide products through a Congressionally-mandated process called

1   "re-registration." 7 U.S.C. § 136a-1. In order to reevaluate these pesticides, the EPA
2   demands the completion of additional tests and the submission of data for the EPA's
3   review and evaluation.

4        37.    In the case of glyphosate and Roundup, the EPA had planned on releasing
5   its preliminary risk assessment – in relation to the registration process – no later than
6   July 2015. The EPA completed its review of glyphosate in early 2015, but delayed
7   releasing the assessment pending further review in light of the World Health
8   Organization's findings.

9                    **SCIENTIFIC FRAUD UNDERLYING THE MARKETING**
10                            **AND SALE OF ROUNDUP®**

11       38.    On two occasions, the EPA found that the laboratories hired by Monsanto
12   to test the toxicity of its Roundup® products for registration purposes committed fraud.

13       39.    In the first instance, Monsanto, in seeking initial registration of Roundup®
14   by EPA, hired Industrial Bio-Test Laboratories ("IBT,") to perform and evaluate
15   pesticide toxicology studies relating to Roundup®. IBT, performed about 30 tests on
16   glyphosate and glyphosate-containing products, including nine of the 15 residue studies
17   needed to register Roundup®.

18       40.    In 1976, the United States Food and Drug Administration ("FDA")
19   performed an inspection of Industrial Bio-Test Industries ("IBT,") that revealed
20   discrepancies between the raw data and the final report relating to the toxicological
21   impacts of glyphosate. The EPA subsequently audited IBT,; it too found the toxicology
22   studies conducted for the Roundup® herbicide to be invalid. An EPA reviewer stated,
23   after finding "routine falsification of data" at IBT, that it was "hard to believe the
24   scientific integrity of the studies when they said they took specimens of the uterus from
25   male rabbits."

26       41.    Three top executives of IBT, were convicted of fraud in 1983.

27       42.    In the second incident of data falsification, Monsanto hired Craven
28   Laboratories in 1991 to perform pesticide and herbicide studies, including for

1  Roundup®. In that same year, the owner of Craven Laboratories and three of its
2  employees were indicted, and later convicted, of fraudulent laboratory practices in the
3  testing of pesticides and herbicides.

4      43.   Despite the falsity of the tests that underlie its registration, within a few
5  years of its launch, Monsanto was marketing Roundup® in 115 countries.

6  **IMPORTANCE OF ROUNDUP® TO MONSANTO'S**
7  **MARKET DOMINANCE PROFITS**

8      44.   The success of Roundup® was key to Monsanto's continued reputation and
9  dominance in the marketplace. Largely due to the success of Roundup® sales,
10 Monsanto's agriculture division was out-performing its chemicals division's operating
11 income, and that gap increased yearly. But with its patent for glyphosate expiring in the
12 United States in the year 2000, Monsanto needed a strategy to maintain its Roundup®
13 market dominance and to ward off impending competition.

14     45.   In response, Monsanto began the development and sale of genetically
15 engineered Roundup Ready® seeds in 1996. Since Roundup Ready® crops are resistant
16 to glyphosate; farmers can spray Roundup® onto their fields during the growing season
17 without harming the crop. This allowed Monsanto to expand its market for Roundup®
18 even further; by 2000, Monsanto's biotechnology seeds were planted on more than 80
19 million acres worldwide and nearly 70% of American soybeans were planted from
20 Roundup Ready® seeds. It also secured Monsanto's dominant share of the
21 glyphosate/Roundup® market through a marketing strategy that coupled proprietary
22 Roundup Ready® seeds with continued sales of its Roundup® herbicide.

23     46.   Through a three-pronged strategy of increased production, decreased
24 prices, and by coupling with Roundup Ready® seeds, Roundup® became Monsanto's
25 most profitable product. In 2000, Roundup® accounted for almost $2.8 billion in sales,
26 outselling other herbicides by a margin of five to one, and accounting for close to half of
27 Monsanto's revenue. Today, glyphosate remains one of the world's largest herbicides by
28 sales volume.

## MONSANTO'S FALSE REPRESENTATIONS REGARDING THE
## SAFETY OF ROUNDUP®

47.   In 1996, the New York Attorney General ("NYAG") filed a lawsuit against Monsanto based on its false and misleading advertising of Roundup products. Specifically, the lawsuit challenged Monsanto's general representations that its spray-on glyphosate-based herbicides, including Roundup, were "safer **than table salt**" and "practically **non-toxic**" to mammals, birds, and fish. Among the representations the NYAG found deceptive and misleading about the human and environmental safety of Roundup are the following:

> a.) Remember that environmentally friendly Roundup herbicide is biodegradable. It won't build up in the soil so you can use Roundup with confidence along customers' driveways, sidewalks and fences ...

> b.) And remember that Roundup is biodegradable and won't build up in the soil. That will give you the environmental confidence you need to use Roundup everywhere you've got a weed, brush, edging or trimming problem.

> c.) Roundup biodegrades into naturally occurring elements.

> d.) Remember that versatile Roundup herbicide stays where you put it. That means there's no washing or leaching to harm customers' shrubs or other desirable vegetation.

> e.) This non-residual herbicide will not wash or leach in the soil. It ... stays where you apply it.

> f.) You can apply Accord with "confidence because it will stay where you put it" it bonds tightly to soil particles, preventing leaching. Then, soon after application, soil microorganisms biodegrade Accord into natural products.

> g.) Glyphosate is less toxic to rats than table salt following acute oral ingestion.

> h.) Glyphosate's safety margin is much greater than required. It

Gomez
Trial Attorneys

1   has over a 1,000-fold safety margin in food and over a 700-
2   fold safety margin for workers who manufacture it or use it.

3   i.) You can feel good about using herbicides by Monsanto.
    They carry a toxicity category rating of 'practically non-
4   toxic' as it pertains to mammals, birds and fish.

5   j.) "Roundup can be used where kids and pets will play and
6   breaks down into natural material." This ad depicts a person
    with his head in the ground and a pet dog standing in an area
7   which has been treated with Roundup.[2]

8

9       48.    On November 19, 1996, Monsanto entered into an Assurance of
10  Discontinuance with NYAG, in which Monsanto agreed, among other things, "to cease
11  and desist from publishing or broadcasting any advertisements [in New York] that
12  represent, directly or by implication" that:

13          a.) its glyphosate-containing pesticide products or any
            component thereof are safe, non-toxic, harmless or free from
14          risk.

15                              ***

16          b.) its glyphosate-containing pesticide products or any
            component thereof manufactured, formulated, distributed or
17          sold by Monsanto are biodegradable

18                              ***

19          c.) its glyphosate-containing pesticide products or any
            component thereof stay where they are applied under all
20          circumstances and will not move through the environment
21          by any means.

22                              ***

23          d.) its glyphosate-containing pesticide products or any
            component thereof are "good" for the environment or are
24          "known for their environmental characteristics."

25                              ***

26          e.) glyphosate-containing pesticide products or any component
            thereof are safer or less toxic than common consumer

27  _____

28  [2] Attorney General of the State of New York, In the Matter of Monsanto Company,
    Assurance of Discontinuance Pursuant to Executive Law § 63(15) (Nov. 1996).

products other than herbicides;

***

f.) its glyphosate-containing products or any component thereof
might be classified as "practically non-toxic."

49.     Monsanto did not alter its advertising in the same manner in any state other than New York, and on information and belief still has not done so today.

50.     In 2009, France's highest court ruled that Monsanto had not told the truth about the safety of Roundup. The French court affirmed an earlier judgment that Monsanto had falsely advertised its herbicide Roundup as "biodegradable" and that it "left the soil clean."[3]

## EVIDENCE OF CARCINOGENICITY IN ROUNDUP

51.     As early as the 1980's, Monsanto was aware of glyphosate's carcinogenic properties.

52.     On March 4, 1985, a group of the Environmental Protection Agency's ("EPA") Toxicology Branch published a memorandum classifying glyphosate as a Category C oncogene.[4] Category C oncogenes are possible human carcinogens with limited evidence of carcinogenicity.

53.     In 1986, the EPA issued a Registration Standard for glyphosate (NTIS PB87-103214).   The   Registration   standard   required   additional   phytotoxicity, environmental fate, toxicology, product chemistry, and residue chemistry studies. All of the data required was submitted and reviewed and/or waived.[5]

54.     In October 1991, the EPA published a Memorandum entitled "Second Peer Review of Glyphosate." The memorandum changed glyphosate's classification to Group E (evidence of non-carcinogenicity for humans). Two peer review committee members did not concur with the conclusions of the committee and one member refused

[3] *Monsanto Guilty in 'False Ad' Row,* BBC, Oct. 15, 2009, *available at* http://news.bbc.co.uk/2/hi/europe/8308903.stm.
[4] Consensus Review of Glyphosate, Casewell No. 661A. March 4, 1985. United States Environmental Protection Agency.
[5] http://www.epa.gov/oppsrrd1/reregistration/REDs/factsheets/0178fact.pdf

1  to sign.[6]

2      55.    In addition to the toxicity of the active molecule, many studies support the

3  hypothesis that glyphosate formulations found in Defendant's Roundup products are

4  more dangerous and toxic than glyphosate alone.[7]  As early as 1991, evidence existed

5  demonstrating that glyphosate formulations were significantly more toxic than

6  glyphosate alone.[8]

7      56.    In 2002, Julie Marc published a study entitled "Pesticide Roundup

8  Provokes Cell Division Dysfunction at the Level of CDK1/Cyclin B Activation."

9      57.    The study found that Defendant's Roundup caused delays in the cell cycles

10  of sea urchins, while the same concentrations of glyphosate alone proved ineffective and

11  did not alter cell cycles.

12      58.    In 2004, Julie Marc published a study entitled "Glyphosate-based

13  pesticides affect cell cycle regulation." The study demonstrated a molecular link

14  between glyphosate-based products and cell cycle dysregulation.

15      59.    The study noted that "cell-cycle dysregulation is a hallmark of tumor cells

16  and human cancer. Failure in the cell-cycle checkpoints leads to genomic instability and

17  subsequent development of cancers from the initial affected cell." Further, "[s]ince cell

18  cycle disorders such as cancer result from dysfunction of unique cell, it was of interest

19  to evaluate the threshold dose of glyphosate affecting cells."[9]

20      60.    In 2005, Francisco Peixoto published a study showing that Roundup's

21  effects on rat liver mitochondria are much more toxic and harmful than the same

22  concentrations of glyphosate alone.

23      61.    The Peixoto study suggested that the harmful effects of Roundup on

24  mitochondrial bioenergetics could not be exclusively attributed to glyphosate and could

25  _____

26  [6] Second Peer Review of Glyphosate, CAS No. 1071-83-6. October 30, 1881. United States Environmental Protection Agency.

27  [7] Martinez et al. 2007; Benachour 2009; Gasnier et al. 2010; Peixoto 2005; Marc 2004

28  [8] Martinez et al 1991.
[9] (Molinari, 2000; Stewart et al., 2003)

Gomez
Trial Attorneys

-12-

**PLAINTIFFS' COMPLAINT**

be the result of other chemicals, namely the surfactant POEA, or alternatively due to the possible synergy between glyphosate and Roundup formulation products.

62.    In 2009, Nora Benachour and Gilles-Eric Seralini published a study examining the effects of Roundup and glyphosate on human umbilical, embryonic, and placental cells.

63.    The study used dilution levels of Roundup and glyphosate far below agricultural recommendations, corresponding with low levels of residues in food. The study concluded that supposed "inert" ingredients, and possibly POEA, change human cell permeability and amplify toxicity of glyphosate alone. The study further suggested that determinations of glyphosate toxicity should take into account the presence of adjuvants, or those chemicals used in the formulation of the complete pesticide. The study confirmed that the adjuvants in Roundup are not inert and that Roundup is always more toxic than its active ingredient glyphosate.

64.    The results of these studies were confirmed in recently published peer-reviewed studies and were at all times available and/or known to Defendant.

65.    Defendant knew or should have known that Roundup is more toxic than glyphosate alone and that safety studies on Roundup, Roundup's adjuvants and "inert" ingredients, and/or the surfactant POEA were necessary to protect Plaintiff from Roundup.

66.    Defendant knew or should have known that tests limited to Roundup's active ingredient glyphosate were insufficient to prove the safety of Roundup.

67.    Defendant failed to appropriately and adequately test Roundup, Roundup's adjuvants and "inert" ingredients, and/or the surfactant POEA to protect Plaintiff from Roundup.

68.    Rather than performing appropriate tests, Defendant relied upon flawed industry-supported studies designed to protect Defendant's economic interests rather

Gomez
Trial Attorneys

1   than Plaintiff and the consuming public.

2   69.    Despite their knowledge that Roundup was considerably more dangerous

3   than glyphosate alone, Defendant continued to promote Roundup as safe.

4

5   ## IARC CLASSIFICATION OF GLYPHOSATE

6   70.    The International Agency for Research on Cancer ("IARC") is the

7   specialized intergovernmental cancer agency the World Health Organization ("WHO")

8

9   of the United Nations tasked with conducting and coordinating research into the causes

10  of cancer. The IARC process for the classification of glyphosate followed the stringent

11  procedures for the evaluation of a chemical agent. Over time, the IARC Monograph

12  program has reviewed 980 agents. Of those reviewed, it has determined 116 agents to be

13

14  Group 1 (Known Human Carcinogens); 73 agents to be Group 2A (Probable Human

15  Carcinogens); 287 agents to be Group 2B (Possible Human Carcinogens); 503 agents to

16

17  be Group 3 (Not Classified); and one agent to be Probably Not Carcinogenic.

18  71.    The established procedure for IARC Monograph evaluations is described in

19  the IARC Programme's Preamble. Evaluations are performed by panels of international

20

21  experts, selected on the basis of their expertise and the absence of actual or apparent

22  conflicts of interest.

23

24  72.    One year before the Monograph meeting, the meeting is announced and

25  there is a call both for data and for experts. Eight months before the Monograph

26  meeting, the Working Group membership is selected and the sections of the Monograph

27

28  are developed by the Working Group members. One month prior to the Monograph

1  meeting, the call for data is closed and the various draft sections are distributed among

2  Working Group members for review and comment. Finally, at the Monograph meeting,

3  the Working Group finalizes review of all literature, evaluates the evidence in each

4

5  category, and completes the overall evaluation. Within two weeks after the Monograph

6  meeting, the summary of the Working Group findings is published in Lancet Oncology,

7  and within a year after the meeting, the final Monograph is finalized and published.

8

9      73.    In assessing an agent, the IARC Working Group reviews the following

10  information:

11      a)    human, experimental, and mechanistic data;
        b)    all pertinent epidemiological studies and cancer bioassays; and
12      c)    representative mechanistic data. The studies must be publicly available and
13            have sufficient detail for meaningful review, and reviewers cannot be
            associated with the underlying study.

14

15      74.    In March 2015, IARC reassessed glyphosate. The summary published in

16  The Lancet Oncology reported that glyphosate is a Group 2A agent and probably

17  carcinogenic in humans.

18      75.    On July 29, 2015, IARC issued its Monograph for glyphosate, Monograph

19  112. For Volume 112, the volume that assessed glyphosate, a Working Group of 17

20  experts from 11 countries met at IARC from March 3–10, 2015, to assess the

21  carcinogenicity of certain herbicides, including glyphosate. The March meeting

22  culminated nearly a one-year review and preparation by the IARC Secretariat and the

23  Working Group, including a comprehensive review of the latest available scientific

24  evidence. According to published procedures, the Working Group considered "reports

25  that have been published or accepted for publication in the openly available scientific

26  literature" as well as "data from governmental reports that are publicly available."

27  ///

28  ///

76.    The studies considered the following exposure groups: occupational exposure of farmers and tree nursery workers in the United States, forestry workers in Canada and Finland, and municipal weed-control workers in the United Kingdom; and para-occupational exposure in farming families.

77.    Glyphosate was identified as the second-most used household herbicide in the United States for weed control between 2001 and 2007 and the most heavily used herbicide in the world in 2012.

78.    Exposure pathways are identified as air (especially during spraying), water, and food. Community exposure to glyphosate is widespread and found in soil, air, surface water, and groundwater, as well as in food.

79.    The assessment of the IARC Working Group identified several case control studies of occupational exposure in the United States, Canada, and Sweden. These studies show a human health concern from agricultural and other work-related exposure to glyphosate.

80.    The IARC Working Group found an increased risk between exposure to glyphosate and non-Hodgkin lymphoma ("NHL") and several subtypes of NHL, and the increased risk persisted after adjustment for other pesticides.

81.    The IARC Working Group also found that glyphosate caused DNA and chromosomal damage in human cells. One study in community residents reported increases in blood markers of chromosomal damage (micronuclei) after glyphosate formulations were sprayed.

82.    In male CD-1 mice, glyphosate induced a positive trend in the incidence of a rare tumor, renal tubule carcinoma. A second study reported a positive trend for haemangiosarcoma in male mice. Glyphosate increased pancreatic islet-cell adenoma in male rats in two studies. A glyphosate formulation promoted skin tumors in an initiation-promotion study in mice.

83.    The IARC Working Group also noted that glyphosate has been detected in the urine of agricultural workers, indicating absorption. Soil microbes degrade

1   glyphosate to aminomethylphosphoric acid (AMPA). Blood AMPA detection after
2   exposure suggests intestinal microbial metabolism in humans.

3       84.   The IARC Working Group further found that glyphosate and glyphosate
4   formulations induced DNA and chromosomal damage in mammals, and in human and
5   animal cells in utero.

6       85.   The IARC Working Group also noted genotoxic, hormonal, and enzymatic
7   effects in mammals exposed to glyphosate. Essentially, glyphosate inhibits the
8   biosynthesis of aromatic amino acids, which leads to several metabolic disturbances,
9   including the inhibition of protein and secondary product biosynthesis and general
10  metabolic disruption.

11      86.   The IARC Working Group also reviewed an Agricultural Health Study,
12  consisting of a prospective cohort of 57,311 licensed pesticide applicators in Iowa and
13  North Carolina. While this study differed from others in that it was based on a self-
14  administered questionnaire, the results support an association between glyphosate
15  exposure and Multiple Myeloma, Hairy Cell Leukemia (HCL), and Chronic
16  Lymphocytic Leukemia (CLL), in addition to several other cancers.

17                    **EARLIER EVIDENCE OF GLYPHOSATE'S DANGER**

18      87.   Despite the new classification by the IARC, Defendant has had ample
19  evidence of glyphosate and Roundup's genotoxic properties for decades.

20      88.   Genotoxicity refers to chemical agents that are capable of damaging the
21  DNA within a cell through genetic mutations, which is a process that is believed to lead
22  to cancer.

23      89.   In 1997, Chris Clements published "Genotoxicity of select herbicides in
24  *Rana catesbeiana* tadpoles using the alkaline single-cell gel DNA electrophoresis
25  (comet) assay."

26      90.   The study found that tadpoles exposed to Roundup showed significant
27  DNA damage when compared with unexposed control animals.

28      91.   Both human and animal studies have shown that glyphosate and

1 glyphosate-based formulations such as Roundup can induce oxidative stress.

2      92.    Oxidative stress and associated chronic inflammation are believed to be
3 involved in carcinogenesis.

4      93.    The IARC Monograph notes that "[s]trong evidence exists that glyphosate,
5 AMPA and glyphosate-based formulations can induce oxidative stress."

6      94.    In 2006 César Paz-y-Miño published a study examining DNA damage in
7 human subjects exposed to glyphosate.

8      95.    The study produced evidence of chromosomal damage in blood cells
9 showing significantly greater damage after exposure to glyphosate than before in the
10 same individuals, suggesting that the glyphosate formulation used during aerial spraying
11 had a genotoxic effect on exposed individuals.

12      96.    The IARC Monograph reflects the volume of evidence of glyphosate
13 pesticides' genotoxicity noting "[t]he evidence for genotoxicity caused by glyphosate-
14 based formulations is strong."

15      97.    Despite knowledge to the contrary, Defendant maintains that there is no
16 evidence that Roundup is genotoxic, that regulatory authorities and independent experts
17 are in agreement that Roundup is not genotoxic, and that there is no evidence that
18 Roundup is genotoxic.

19      98.    In addition to glyphosate and Roundup's genotoxic properties, Defendant
20 has long been aware of glyphosate's carcinogenic properties.

21      99.    Glyphosate and Roundup in particular have long been associated with
22 carcinogenicity and the development of numerous forms of cancer, including, but not
23 limited to, Non-Hodgkin's Lymphoma, Hodgkin's lymphoma, multiple myeloma, and
24 soft tissue sarcoma.

25      100.   Defendant have known of this association since the early to mid-1980s and
26 numerous human and animal studies have evidenced the carcinogenicity of glyphosate
27 and/or Roundup.

28      101.   In 1985, the EPA studied the effects of glyphosate in mice finding a dose-

1 related response in male mice linked to renal tubal adenomas, a rare tumor. The study
2 concluded the glyphosate was oncogenic.

3   102. In 2003, Lennart Hardell and Mikael Eriksson published the results of a
4 two case-controlled studies on pesticides as a risk factor for NHL and hairy cell
5 leukemia.

6   103. The study concluded that glyphosate had the most significant relationship
7 to NHL among all herbicides studies with an increased odds ratio of 3.11.

8   104. In 2003, AJ De Roos published a study examining the pooled data of mid-
9 western farmers, examining pesticides and herbicides as risk factors for NHL.

10   105. The study, which controlled for potential confounders, found a relationship
11 between increased NHL incidence and glyphosate.

12   106. In 2008, Mikael Eriksson published a study a population-based case-
13 control study of exposure to various pesticides as a risk factor for NHL.

14   107. This strengthened previous associations between glyphosate and NHL.

15   108. In spite of this knowledge, Defendant continued to issue broad and
16 sweeping statements suggesting that Roundup was, and is, safer than ordinary
17 household items such as table salt, despite a lack of scientific support for the accuracy
18 and validity of these statements and, in fact, voluminous evidence to the contrary.

19   109. Upon information and belief, these statements and representations have
20 been made with the intent of inducing Plaintiff, the agricultural community, and the
21 public at large to purchase, and increase the use of, Defendant's Roundup for
22 Defendant's pecuniary gain, and in fact did induce Plaintiff to use Roundup.

23   110. Defendant made these statements with complete disregard and reckless
24 indifference to the safety of Plaintiff and the general public.

25   111. Notwithstanding Defendant's representations, scientific evidence has
26 established a clear association between glyphosate and genotoxicity, inflammation, and
27 an increased risk of many cancers, including, but not limited to, NHL, Multiple
28 Myeloma, and soft tissue sarcoma.

1    112.   Defendant knew or should have known that glyphosate is associated with
2  an increased risk of developing cancer, including, but not limited to, NHL, Multiple
3  Myeloma, and soft tissue sarcomas.

4    113.   Defendant failed to appropriately and adequately inform and warn Plaintiff
5  of the serious and dangerous risks associated with the use of and exposure to glyphosate
6  and/or Roundup, including, but not limited to, the risk of developing NHL, as well as
7  other severe and personal injuries, which are permanent and/or long-lasting in nature,
8  cause significant physical pain and mental anguish, diminished enjoyment of life, and
9  the need for medical treatment, monitoring and/or medications.

10    114.   Despite the IARC's classification of glyphosate as a class 2A probable
11  carcinogen, Defendant continue to maintain that glyphosate and/or Roundup is safe,
12  non-carcinogenic, non-genotoxic, and falsely warrant to users and the general public
13  that independent experts and regulatory agencies agree that there is no evidence of
14  carcinogenicity or genotoxicity in glyphosate and Roundup.

15    115.   Defendant has claimed and continue to claim that Roundup is safe, non-
16  carcinogenic, and non-genotoxic.

17    116.   Monsanto claims on its website that "[r]egulatory authorities and
18  independent experts around the world have reviewed numerous long-
19  term/carcinogenicity and genotoxicity studies and agree that there is no evidence that
20  glyphosate, the active ingredient in Roundup brand herbicides and other glyphosate-
21  based herbicides, causes cancer, even at very high doses, and that it is not genotoxic".[10]

22    117.   Ironically, the primary source for this statement is a 1986 report by the
23  WHO, the same organization that now considers glyphosate to be a probable
24  carcinogen.

25    118.   Glyphosate, and Defendant's Roundup products in particular, have long
26  been associated with serious side effects and many regulatory agencies around the globe

27
28  [10] Backgrounder - Glyphosate: No Evidence of Carcinogenicity. Updated November
   2014. (downloaded October 9 2015)

Gomez
Trial Attorneys

1  have banned or are currently banning the use of glyphosate herbicide products.

2  119. Defendant's statements proclaiming the safety of Roundup and
3  disregarding its dangers misled Plaintiff.

4  120. Despite Defendant's knowledge that Roundup was associated with an
5  elevated risk of developing cancer, Defendant's promotional campaigns focused on
6  Roundup's purported "safety profile."

7  121. Defendant's failure to adequately warn Plaintiff resulted in (1) Plaintiff
8  using and being exposed to glyphosate instead of using another acceptable and safe
9  method of controlling unwanted weeds and pests; and (2) scientists and physicians
10  failing to warn and instruct consumers about the risk of cancer, including NHL, and
11  other injuries associated with Roundup.

12  122. Defendant failed to seek modification of the labeling of Roundup to
13  include relevant information regarding the risks and dangers associated with Roundup
14  exposure.

15  123. The failure of Defendant to appropriately warn and inform the EPA has
16  resulted in inadequate warnings in safety information presented directly to users and
17  consumers.

18  124. The failure of Defendant to appropriately warn and inform the EPA has
19  resulted in the absence of warning or caution statements that are adequate to protect
20  health and the environment.

21  125. The failure of Defendant to appropriately warn and inform the EPA has
22  resulted in the directions for use that are not adequate to protect health and the
23  environment.

24  126. By reason of the foregoing acts and omissions, Plaintiff seeks
25  compensatory damages as a result of Plaintiff's use of, and exposure to, Roundup which
26  caused or was a substantial contributing factor in causing Plaintiff to suffer from cancer,
27  specifically NHL, and Plaintiff suffered severe and personal injuries which are
28  permanent and lasting in nature, physical pain and mental anguish, including diminished

1  enjoyment of life.

2      127.   By reason of the foregoing, Plaintiff is severely and permanently injured.

3      128.   By reason of the foregoing acts and omissions, Plaintiff has endured and, in

4  some categories continues to suffer, emotional and mental anguish, medical expenses,

5  and other economic and non-economic damages, as a result of the actions and inactions

6  of the Defendant.

7  **RECENT WORLDWIDE BANS ON ROUNDUP®/GLYPHOSATE**

8      129.   Several countries around the world have instituted bans on the sale of

9  Roundup® and other glyphosate-containing herbicides, both before and since IARC

10  first announced its assessment for glyphosate in March 2015, and more countries

11  undoubtedly will follow suit as the dangers of the use of Roundup® are more widely

12  known. The Netherlands issued a ban on all glyphosate-based herbicides in April 2014,

13  including Roundup®, which took effect by the end of 2015. In issuing the ban, the

14  Dutch Parliament member who introduced the successful legislation stated:

15  "Agricultural pesticides in user-friendly packaging are sold in abundance to private

16  persons. In garden centers, Roundup® is promoted as harmless, but unsuspecting

17  customers have no idea what the risks of this product are. Especially children are

18  sensitive to toxic substances and should therefore not be exposed to it."

19      130.   The Brazilian Public Prosecutor in the Federal District requested that the

20  Brazilian Justice Department suspend the use of glyphosate.

21      131.   France banned the private sale of Roundup® and glyphosate following the

22  IARC assessment for Glyphosate.

23      132.   Bermuda banned both the private and commercial sale of glyphosates,

24  including Roundup®. The Bermuda government explained its ban as follows:

25  "Following a recent scientific study carried out by a leading cancer agency, the

26  importation of weed spray 'Roundup' has been suspended."

27  ///

28

Gomez
Trial Attorneys

PLAINTIFFS' COMPLAINT

1      133.   The Sri Lankan government banned the private and commercial use of
2 glyphosates, particularly out of concern that glyphosate has been linked to fatal kidney
3 disease in agricultural workers.

4      134.   The government of Columbia announced its ban on using Roundup® and
5 glyphosate to destroy illegal plantations of coca, the raw ingredient for cocaine, because
6 of the WHO's finding that glyphosate is probably carcinogenic.

7 <div align="center">**PLAINTIFF'S EXPOSURE TO ROUNDUP**</div>

8      135.   Plaintiff used Roundup to control weeds on his residential property.

9      136.   For many years, Plaintiff sprayed Roundup on a regular basis. Plaintiff
10 followed all safety and precautionary warnings during the course of use.

11      137.   Plaintiff was subsequently diagnosed with T Cell Large Granular
12 Lymphocytic Leukemia in 2020.

13      138.   As a result of his injury, Plaintiff has incurred significant economic and
14 non-economic damages.

15 <div align="center">**EQUITABLE TOLLING OF APPLICABLE**</div>
16 <div align="center">**STATUTE OF LIMITATIONS**</div>

17      139.   Plaintiff incorporates by reference all prior paragraphs of this Complaint as
18 if fully set forth herein.

19      140.   The running of any statute of limitations has been tolled by reason of
20 Defendant's fraudulent concealment. Defendant, through their affirmative
21 misrepresentations and omissions, actively concealed from Plaintiff the true risks
22 associated with Roundup and glyphosate. Indeed, even as of July 2016, Defendant
23 continue to represent to the public that "*Scientists are in agreement* that there is *no
24 evidence* glyphosate causes cancer." (emphasis added)[11]

25      141.   As a result of Defendant's actions, Plaintiff was unaware, and could not
26 reasonably know or have learned through reasonable diligence that Roundup and/or

27 ────────────────────
28 [11]  Backgrounder - Glyphosate: No Evidence of Carcinogenicity. Updated November 2014. (downloaded October 9 2015)

1  glyphosate contact, exposed Plaintiff to the risks alleged herein and that those risks were

2  the direct and proximate result of Defendant's acts and omissions.

3      142.  Furthermore, Defendant is estopped from relying on any statute of

4  limitations because of their fraudulent concealment of the true character, quality and

5  nature of Roundup. Defendant was under a duty to disclose the true character, quality,

6  and nature of Roundup because this was non-public information over which Defendant

7  had and continue to have exclusive control, and because Defendant knew that this

8  information was not available to Plaintiff or to distributors of Roundup. In addition,

9  Defendant is estopped from relying on any statute of limitations because of their

10  intentional concealment of these facts.

11      143.  Plaintiff had no knowledge that Defendant was engaged in the wrongdoing

12  alleged herein. Because of the fraudulent acts of concealment of wrongdoing by

13  Defendant, Plaintiff could not have reasonably discovered the wrongdoing at any time

14  prior. Also, the economics of this fraud should be considered. Defendant had the ability

15  to and did spend enormous amounts of money in furtherance of their purpose of

16  marketing, promoting and/or distributing a profitable herbicide, notwithstanding the

17  known or reasonably known risks. Plaintiff and medical professionals could not have

18  afforded and could not have possibly conducted studies to determine the nature, extent,

19  and identity of related health risks, and were forced to rely on only the Defendant's

20  representations. Accordingly, Defendant is precluded by the discovery rule and/or the

21  doctrine of fraudulent concealment from relying upon any statute of limitations.

22  **FIRST CAUSE OF ACTION**

23  **(NEGLIGENCE)**

24      144.  Plaintiff repeats, reiterates, and re-alleges each and every allegation of this

25  Complaint contained in each of the foregoing paragraphs inclusive, with the same force

26  and effect as if more fully set forth herein.

27      145.  Defendant had a duty to exercise reasonable care in the designing,

28  researching, testing, manufacturing, marketing, supplying, promoting, packaging, sale,

1   and/or distribution of Roundup into the stream of commerce, including a duty to assure
2   that the product would not cause users to suffer unreasonable, dangerous side effects.

3       146.   Defendant failed to exercise ordinary care in the designing, researching,
4   testing, manufacturing, marketing, supplying, promoting, packaging, sale, testing,
5   quality assurance, quality control, and/or distribution of Roundup into interstate
6   commerce in that Defendant knew or should have known that using Roundup created a
7   high risk of unreasonable, dangerous side effects, including, but not limited to, the
8   development of NHL, as well as other severe and personal injuries which are permanent
9   and lasting in nature, physical pain and mental anguish, including diminished enjoyment
10  of life, as well as need for lifelong medical treatment, monitoring, and/or medications.

11      147.   The negligence by the Defendant, their agents, servants, and/or employees,
12  included but was not limited to the following acts and/or omissions:

13      a.   Manufacturing, producing, promoting, formulating, creating, and/or
14         designing Roundup without thoroughly testing it;

15      b.   Failing to test Roundup and/or failing to adequately, sufficiently, and
16         properly test Roundup;

17      c.   Not conducting sufficient testing programs to determine whether or not
18         Roundup was safe for use; in that Defendant herein knew or should
19         have known that Roundup was unsafe and unfit for use by reason of the
       dangers to its users;

20      d.   Not conducting sufficient testing programs and studies to determine
21         Roundup's carcinogenic properties even after Defendant had knowledge
22         that Roundup is, was, or could be carcinogenic;

23      e.   Failing to conduct sufficient testing programs to determine the safety of
24         "inert" ingredients and/or adjuvants contained within Roundup, and the
       propensity of these ingredients to render Roundup toxic, increase the
25         toxicity of Roundup, whether these ingredients are carcinogenic,
       magnify the carcinogenic properties of Roundup, and whether or not
26         "inert" ingredients and/or adjuvants were safe for use;

27      f.   Negligently failing to adequately and correctly warn the Plaintiff, the
28         public, the medical and agricultural professions, and the EPA of the

dangers of Roundup;

g. Negligently failing to petition the EPA to strength the warnings associated with Roundup;

h. Failing to provide adequate cautions and warnings to protect the health of users, handlers, applicators, and persons who would reasonably and foreseeably come into contact with Roundup;

i. Negligently marketing, advertising, and recommending the use of Roundup without sufficient knowledge as to its dangerous propensities;

j. Negligently representing that Roundup was safe for use for its intended purpose, and/or that Roundup was safer than ordinary and common items such as table salt, when, in fact, it was unsafe;

k. Negligently representing that Roundup had equivalent safety and efficacy as other forms of herbicides;

l. Negligently designing Roundup in a manner, which was dangerous to its users;

m. Negligently manufacturing Roundup in a manner, which was dangerous to its users;

n. Negligently producing Roundup in a manner, which was dangerous to its users;

o. Negligently formulating Roundup in a manner, which was dangerous to its users;

p. Concealing information from the Plaintiff while knowing that Roundup was unsafe, dangerous, and/or non-conforming with EPA regulations; and

q. Improperly concealing and/or misrepresenting information from the Plaintiff, scientific and medical professionals, and/or the EPA, concerning the severity of risks and dangers of Roundup compared to other forms of herbicides.

r. Negligently selling Roundup with a false and misleading label.

148. Defendant under-reported, underestimated, and downplayed the serious dangers of Roundup.

1    149.   Defendant negligently and deceptively compared the safety risks and/or

2    dangers of Roundup with common everyday foods such as table salt, and other forms of

3    herbicides.

4    150.   Defendant was negligent and/or violated California law in the designing,

5    researching, supplying, manufacturing, promoting, packaging, distributing, testing,

6    advertising, warning, marketing, and selling of Roundup in that they:

7        a.   Failed to use ordinary care in designing and manufacturing Roundup so
        as to avoid the aforementioned risks to individuals when Roundup was
8          used as an herbicide;

9

10       b.   Failed to accompany their product with proper and/or accurate warnings
        regarding all possible adverse side effects associated with the use of
11         Roundup;

12       c.   Failed to accompany their product with proper warnings regarding all
13         possible adverse side effects concerning the failure and/or malfunction
        of Roundup;
14

15       d.   Failed to accompany their product with accurate warnings regarding the
        risks of all possible adverse side effects concerning Roundup;
16

17       e.   Failed to warn Plaintiff of the severity and duration of such adverse
        effects, as the warnings given did not accurately reflect the symptoms,
18         or severity of the side effects including, but not limited to, the
        development of NHL;
19

20       f.   Failed to conduct adequate testing, clinical testing and post-marketing
        surveillance to determine the safety of Roundup;
21

22       g.   Failed to conduct adequate testing, clinical testing, and post-marketing
        surveillance to determine the safety of Roundup's "inert" ingredients
23         and/or adjuvants;

24       h.   Negligently misrepresented the evidence of Roundup's genotoxicity and
25         carcinogenicity;

26       i.   Were otherwise careless and/or negligent.

27   151.   Despite the fact that Defendant knew or should have known that Roundup

28   caused, or could cause, unreasonably dangerous side effects, Defendant continued and

Gomez
Trial Attorneys

1  continue to market, manufacture, distribute, and/or sell Roundup to consumers,
2  including the Plaintiff.

3      152.  Defendant knew or should have known that consumers such as the Plaintiff
4  would foreseeably suffer injury as a result of Defendant's failure to exercise ordinary
5  care, as set forth above.

6      153.  Defendant's violations of law and/or negligence were the proximate cause
7  of Plaintiff's injuries, harm and economic loss, which Plaintiff suffered and/or will
8  continue to suffer.

9      154.  As a result of the foregoing acts and omissions, the Plaintiff suffered from
10  serious and dangerous side effects including, but not limited to, NHL, as well as other
11  severe and personal injuries which are permanent and lasting in nature, physical pain
12  and mental anguish, diminished enjoyment of life, and financial expenses for
13  hospitalization and medical care. Further, Plaintiff suffered life-threatening NHL, and
14  severe personal injuries, which are permanent and lasting in nature, physical pain and
15  mental anguish, including diminished enjoyment of life.

16      155.  WHEREFORE, Plaintiff respectfully requests that this Court enter
17  judgment in Plaintiff's favor for compensatory and punitive damages, together with
18  interest, costs herein incurred, attorneys' fees and all relief as this Court deems just and
19  proper. Additionally, Plaintiff demands a jury trial on all issues contained herein.

20                                               **SECOND CAUSE OF ACTION**
21                     **(STRICT PRODUCTS LIABILITY – DESIGN DEFECT)**

22      156.  Plaintiff repeats, reiterates and, re-alleges each and every allegation of this
23  Complaint contained in each of the foregoing paragraphs inclusive, with the same force
24  and effect as if more fully set forth herein.

25      157.  At all times herein mentioned, the Defendant designed, researched,
26  manufactured, tested, advertised, promoted, sold, distributed, and/or have acquired the
27  Defendant who have designed, researched, tested, advertised, promoted, marketed, sold,
28  and distributed Roundup as hereinabove described that was used by the Plaintiff.

158. Defendant's Roundup was expected to and did reach the usual consumers, handlers, and persons coming into contact with said product without substantial change in the condition in which it was produced, manufactured, sold, distributed, and marketed by the Defendant.

159. At those times, Roundup was in an unsafe, defective, and inherently dangerous condition, which was dangerous to users, and in particular, the Plaintiff herein.

160. The Roundup designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed by Defendant was defective in design or formulation in that, when it left the hands of the manufacturer and/or suppliers, the foreseeable risks exceeded the benefits associated with the design or formulation of Roundup.

161. The Roundup designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed by Defendant was defective in design and/or formulation, in that, when it left the hands of the Defendant manufacturers and/or suppliers, it was unreasonably dangerous, unreasonably dangerous in normal use, and it was more dangerous than an ordinary consumer would expect.

162. At all times herein mentioned, Roundup was in a defective condition and unsafe, and Defendant knew or had reason to know that said product was defective and unsafe, especially when used in the form and manner as provided by the Defendant. In particular, Defendant's Roundup was defective in the following ways:

    a. When placed in the stream of commerce, Defendant's Roundup Products were defective in design and formulation and, consequently, dangerous to an extent beyond that which an ordinary consumer would anticipate.

    b. When placed in the stream of commerce, Defendant's Roundup products were unreasonably dangerous in that they were hazardous and posed a grave risk of cancer and other serious illnesses when used in a reasonably anticipated manner.

c. When placed in the stream of commerce, Defendant's Roundup products contained unreasonably dangerous design defects and were not reasonably safe when used in a reasonably anticipated manner.

d. Defendant did not sufficiently test, investigate, or study its Roundup products.

e. Exposure to Roundup presents a risk of harmful side effects that outweigh any potential utility stemming from the use of the herbicide.

f. Defendant knew or should have known at the time of marketing its Roundup products that exposure to Roundup and could result in cancer and other severe illnesses and injuries.

g. Defendant did not conduct adequate post-marketing surveillance of its Roundup products.

163.   Defendant knew, or should have known that at all times herein mentioned its Roundup was in a defective condition, and was and is inherently dangerous and unsafe.

164.   Plaintiff was exposed to Defendant's Roundup in the course of his residential spraying, as described above, without knowledge of Roundup's dangerous characteristics.

165.   At the time of the Plaintiff's use of and exposure to Roundup, Roundup was being used for the purposes and in a manner normally intended, as a broad-spectrum herbicide.

166.   Defendant with this knowledge voluntarily designed its Roundup with a dangerous condition for use by the public, and in particular the Plaintiff.

167.   Defendant had a duty to create a product that was not unreasonably dangerous for its normal, intended use.

168.   Defendant created a product that was and is unreasonably dangerous for its normal, intended use.

169.   Defendant marketed and promoted a product in such a manner so as to

1   make it inherently defective as the product downplayed its suspected, probable, and
2   established health risks inherent with its normal, intended use.

3       170.   The Roundup designed, researched, manufactured, tested, advertised,
4   promoted, marketed, sold, and distributed by Defendant was manufactured defectively
5   in that Roundup left the hands of Defendant in a defective condition and was
6   unreasonably dangerous to its intended users.

7       171.   The Roundup designed, researched, manufactured, tested, advertised,
8   promoted, marketed, sold, and distributed by Defendant reached their intended users in
9   the same defective and unreasonably dangerous condition in which the Defendant's
10  Roundup was manufactured.

11      172.   Defendant designed, researched, manufactured, tested, advertised,
12  promoted, marketed, sold, and distributed a defective product, which created an
13  unreasonable risk to the health of consumers and to the Plaintiff in particular, and
14  Defendant is therefore strictly liable for the injuries sustained by the Plaintiff.

15      173.   The Plaintiff could not, by the exercise of reasonable care, have discovered
16  Roundup's defects herein mentioned or perceived its danger.

17      174.   By reason of the foregoing, the Defendant has become strictly liable to the
18  Plaintiff for the manufacturing, marketing, promoting, distribution, and selling of a
19  defective product, Roundup.

20      175.   Defendant's defective design, of Roundup amounts to willful, wanton,
21  and/or reckless conduct by Defendant.

22      176.   Defects in Defendant's Roundup were the cause or a substantial factor in
23  causing Plaintiff's injuries.

24      177.   As a result of the foregoing acts and omission, the Plaintiff developed
25  NHL, and suffered severe and personal injuries, which are permanent and lasting in
26  nature, physical pain and mental anguish, including diminished enjoyment of life, and
27  financial expenses for hospitalization and medical care.

28      178.   WHEREFORE, Plaintiff respectfully requests that this Court enter

1   judgment in Plaintiff's favor for compensatory and punitive damages, together with

2   interest, costs herein incurred, attorneys' fees and all relief as this Court deems just and

3   proper. Additionally, Plaintiff demands a jury trial on all issues contained herein.

4   <div align="center">**THIRD CAUSE OF ACTION**</div>

5   <div align="center">**(STRICT PRODUCTS LIABILITY – FAILURE TO WARN)**</div>

6   179.   Plaintiff repeats, reiterates, and re-alleges each and every allegation of this

7   Complaint contained in each of the foregoing paragraphs inclusive, with the same force

8   and effect as if more fully set forth herein.

9   180.   Defendant has engaged in the business of selling, testing, distributing,

10   supplying, manufacturing, marketing, and/or promoting Roundup, and through that

11   conduct have knowingly and intentionally placed Roundup into the stream of commerce

12   with full knowledge that it reaches consumers such as Plaintiff who are exposed to it

13   through ordinary and reasonably foreseeable uses.

14   181.   Defendant did in fact sell, distribute, supply, manufacture, and/or promote

15   Roundup to Plaintiff. Additionally, Defendant expected the Roundup that they were

16   selling, distributing, supplying, manufacturing, and/or promoting to reach – and

17   Roundup did in fact reach – consumers, including Plaintiff, without any substantial

18   change in the condition of the product from when it was initially distributed by

19   Defendant.

20   182.   At the time of manufacture, Defendant could have provided the warnings

21   or instructions regarding the full and complete risks of Roundup and glyphosate-

22   containing products because it knew or should have known of the unreasonable risks of

23   harm associated with the use of and/or exposure to such products.

24   183.   At all times herein mentioned, the aforesaid product was defective and

25   unsafe in manufacture such that it was unreasonably dangerous to the user, and was so

26   at the time it was distributed by Defendant and at the time Plaintiff was exposed to

27   and/or ingested the product. The defective condition of Roundup was due in part to the

28   fact that it was not accompanied by proper warnings regarding its carcinogenic qualities

Gomez
Trial Attorneys

1   and possible side effects, including, but not limited to, developing Non-Hodgkin's
2   Lymphoma as a result of exposure and use.

3       184.   Roundup did not contain a warning or caution statement, which was
4   necessary and, if complied with, was adequate to protect health those exposed in
5   violation of 7 U.S.C. § 136j(a)(1)(E).

6       185.   Defendant's failure to include a warning or caution statement which was
7   necessary and, if complied with, was adequate to protect the health of those exposed,
8   violated 7 U.S.C. § 136j(a)(1)(E) as well as the laws of the State of California.

9       186.   Defendant could have amended the label of Roundup to provide additional
10   warnings.

11       187.   This defect caused serious injury to Plaintiff, who used Roundup in its
12   intended and foreseeable manner.

13       188.   At all times herein mentioned, Defendant had a duty to properly design,
14   manufacture, compound, test, inspect, package, label, distribute, market, examine,
15   maintain supply, provide proper warnings, and take such steps to assure that the product
16   did not cause users to suffer from unreasonable and dangerous side effects.

17       189.   Defendant labeled, distributed, and promoted the aforesaid product that it
18   was dangerous and unsafe for the use and purpose for which it was intended.

19       190.   Defendant failed to warn of the nature and scope of the side effects
20   associated with Roundup, namely its carcinogenic properties and its propensity to cause
21   or serve as a substantial contributing factor in the development of NHL.

22       191.   Defendant was aware of the probable consequences of the aforesaid
23   conduct. Despite the fact that Defendant knew or should have known that Roundup
24   caused serious injuries, Defendant failed to exercise reasonable care to warn of the
25   dangerous carcinogenic properties and side effect of developing NHL from Roundup
26   exposure, even though these side effects were known or reasonably scientifically
27   knowable at the time of distribution. Defendant willfully and deliberately failed to avoid
28   the consequences associated with their failure to warn, and in doing so, Defendant acted

1   with a conscious disregard for the safety of Plaintiff.

2   192.   At the time of exposure, Plaintiff could not have reasonably discovered any
3   defect in Roundup prior through the exercise of reasonable care.

4   193.   Defendant, as the manufacturer and/or distributor of the subject product,
5   are held to the level of knowledge of an expert in the field.

6   194.   Plaintiff reasonably relied upon the skill, superior knowledge, and
7   judgment of Defendant.

8   195.   Had Defendant properly disclosed the risks associated with Roundup,
9   Plaintiff would have avoided the risk of NHL by not using Roundup.

10   196.   The information that Defendant did provide or communicate failed to
11   contain adequate warnings and precautions that would have enabled Plaintiff, and
12   similarly situated individuals, to utilize the product safely and with adequate protection.
13   Instead, Defendant disseminated information that was inaccurate, false, and misleading
14   and which failed to communicate accurately or adequately the comparative severity,
15   duration, and extent of the risk of injuries associated with use of and/or exposure to
16   Roundup and glyphosate; continued to promote the efficacy of Roundup, even after it
17   knew or should have known of the unreasonable risks from use or exposure; and
18   concealed, downplayed, or otherwise suppressed, through aggressive marketing and
19   promotion, any information or research about the risks and dangers of exposure to
20   Roundup and glyphosate.

21   197.   To this day, Defendant has failed to adequately warn of the true risks of
22   Plaintiff's injuries associated with the use of and exposure to Roundup.

23   198.   As a result of their inadequate warnings, Defendant's Roundup products
24   were defective and unreasonably dangerous when they left the possession and/or control
25   of Defendant, were distributed by Defendant, and used by Plaintiff.

26   199.   As a direct and proximate result of Defendant's actions as alleged herein,
27   and in such other ways to be later shown, the subject product caused Plaintiff to sustain
28   injuries as herein alleged.

1    200.   WHEREFORE, Plaintiff respectfully requests that this Court enter

2  judgment in Plaintiff's favor for compensatory and punitive damages, together with

3  interest, costs herein incurred, attorneys' fees and all relief as this Court deems just and

4  proper. Additionally, Plaintiff demands a jury trial on all issues contained herein.

5                      **FOURTH CAUSE OF ACTION**

6                  **(BREACH OF IMPLIED WARRANTIES)**

7    201.   Plaintiff repeats, reiterates, and re-alleges each and every allegation of this

8  Complaint contained in each of the foregoing paragraphs inclusive, with the same force

9  and effect all if more fully set forth herein.

10    202.   At all times herein mentioned, the Defendant manufactured, distributed,

11  compounded, recommended, merchandized, advertised, promoted, and sold Roundup

12  and/or have recently acquired the Defendant who have manufactured, compound

13  portrayed, distributed, recommended, merchandized, advertised, promoted, and sold

14  Roundup, as a broad-spectrum herbicide. These actions were under the ultimate control

15  and supervision of Defendant.

16    203.   At the time Defendant marketed, sold, and distributed Roundup for use by

17  Plaintiff, Defendant knew of Roundup's intended use and impliedly warranted the

18  product to be or merchantable quality and safe and fit for this use.

19    204.   The Defendant impliedly represented and warranted to Plaintiff and users

20  of Roundup, the agricultural community, and/or the EPA that Roundup was safe and of

21  merchantable quality and fit for the ordinary purpose for which it was to be used.

22    205.   These representations and warranties were false, misleading, and inaccurate

23  in that Roundup was unsafe, unreasonably dangerous, not of merchantable quality, and

24  defective.

25    206.   Plaintiff and/or the EPA did rely on said implied warranty of

26  merchantability of fitness for particular use and purpose.

27    207.   Plaintiff reasonably relied upon the skill and judgment of Defendant as to

28  whether Roundup was of merchantable quality and safe and fit for its intended use.

208.   Roundup was injected into the stream of commerce by the Defendant in a defective, unsafe, and inherently dangerous condition, and the products' materials were expected to and did reach users, handlers, and persons coming into contact with said products without substantial change in the condition in which they were sold.

209.   The Defendant breached the aforesaid implied warranties, as their herbicide Roundup was not fit for its intended purposes and uses.

210.   As a result of the foregoing acts and omissions, Plaintiff suffered from NHL and Plaintiff suffered severe and personal injuries which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life, financial expenses for hospitalization and medical care, including medical expenses and other economic, and non-economic damages.

211.   WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in Plaintiff's favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all relief as this Court deems just and proper. Additionally, Plaintiff demands a jury trial on all issues contained herein.

## FIFTH CAUSE OF ACTION

## (FRAUD)

212.   Plaintiff repeats, reiterates, and re-alleges each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect all if more fully set forth herein.

213.   Defendant misrepresented and/or failed to disclose, inter alia, that: glyphosate and its major metabolite aminomethylphosphonic acid (AMPA) could cause cancer; glyphosate and AMPA are known to be genotoxic in humans and laboratory animals because exposure is known to cause DNA strand breaks (a precursor to cancer); glyphosate and AMPA are known to induce oxidative stress in humans and laboratory animals (a precursor to cancer); glyphosate and AMPA interfere with the aromatic amino acids within the human gut, leading to downstream health conditions including cancer; exposure to glyphosate and AMPA is causally associated with Non-Hodgkin

1  Lymphoma; and the laboratory tests attesting to the safety of glyphosate were flawed
2  and/or fraudulent.

3      214.   Due to these misrepresentations and omissions, at all times relevant to this
4  litigation, Defendant's Roundup® was misbranded under 7 U.S.C. § 136(g) and its
5  distribution within California and around the United States was a violation of 7 U.S.C. §
6  136j and 40 C.F.R. § 156.10(a)(5).

7      215.   Plaintiff relied on the Defendant's misrepresentations and/or material
8  omissions regarding the safety of Roundup® and its active ingredient glyphosate in
9  deciding whether to purchase and/or use the product. Plaintiff did not know nor could
10 Plaintiff have reasonably known of the misrepresentations and/or material omissions by
11 Defendant concerning Roundup® and its active ingredient glyphosate.

12     216.   The misrepresentations and/or material omissions that form the basis of this
13 fraud claim are not limited to statements made on the Roundup® labeling, as defined
14 under federal law, but also involve Defendant's representations and omissions made as
15 part of its promotion and marketing of Roundup®, including on the Internet, television,
16 in print advertisements, etc.   Nothing prevented Defendant from disclosing the truth
17 about the risks associated with Roundup® in its promotional efforts outside of the
18 labeling context, using the forms of media and promotion Defendant traditionally used
19 to promote the product's efficacy and benefits.

20     217.   When Defendant made the misrepresentations and/or omissions as alleged
21 in this pleading, it did so with the intent of defrauding and deceiving the public in
22 general and the agricultural community and with the intent of inducing the public and
23 agricultural community to purchase and use Roundup®.

24     218.   Defendant made these misrepresentations and/or material omissions with
25 malicious, fraudulent and/or oppressive intent toward Plaintiff and the public generally.
26 Defendant's conduct was willful, wanton, and/or reckless. Defendant deliberately
27 recommended, manufactured, produced, marketed, sold, distributed, merchandized,
28 packaged, promoted and advertised the dangerous and defective herbicide Roundup®.

1  This constitutes an utter, wanton, and conscious disregard of the rights and safety of a
2  large segment of the public, and by reason thereof, Defendant is liable for reckless,
3  willful, and wanton acts and omissions which evidence a total and conscious disregard
4  for the safety of Plaintiff and others which proximately caused the injuries as set forth
5  herein.

6    219.  As a result of the foregoing acts and omissions, Plaintiff suffered from
7  NHL and Plaintiff suffered severe and personal injuries which are permanent and lasting
8  in nature, physical pain and mental anguish, including diminished enjoyment of life,
9  financial expenses for hospitalization and medical care, including medical expenses and
10  other economic, and non-economic damages.

11   220.  WHEREFORE, Plaintiff respectfully requests that this Court enter
12  judgment in Plaintiff's favor for compensatory and punitive damages, together with
13  interest, costs herein incurred, attorneys' fees and all relief as this Court deems just and
14  proper. Additionally, Plaintiff demands a jury trial on all issues contained herein.

15   <center>**SIXTH CAUSE OF ACTION**</center>
16   <center>**(PUNITIVE DAMAGES)**</center>

17   221.  Plaintiff repeats, reiterates, and re-alleges each and every allegation of this
18  Complaint contained in each of the foregoing paragraphs inclusive, with the same force
19  and effect all if more fully set forth herein.

20   222.  Plaintiff brings claims of punitive damages against Defendant.

21   223.  At all times material hereto, the Defendant knew or should have known
22  that the product was inherently dangerous with respect to its health risk.

23   224.  At all times material hereto, the Defendant attempted to misrepresent and
24  did misrepresent facts concerning the safety of the subject product.

25   225.  Defendant's misrepresentations included knowingly withholding material
26  information from the public, including Plaintiff, concerning the safety of the subject
27  products.

28   226.  At all times material hereto, the Defendant knew and recklessly

1  disregarded the fact that human exposure to Roundup can and does cause health hazard,
2  including Non-Hodgkin's Lymphoma.

3      227. Notwithstanding the foregoing, the Defendant continued to aggressively
4  market and apply the subject product without disclosing the aforesaid risks.

5      228. Defendant knew of the subject products' defective and unreasonably
6  dangerous nature as set forth herein, but continued to design, develop, manufacture,
7  market, distribute, sell and apply it so as to maximize sales and profits at the expense of
8  the health and safety of the public, including Plaintiff, in conscious and/or negligent
9  disregard of the foreseeable harm caused by Roundup.

10     229. Defendant intentionally concealed and/or recklessly failed to disclose to the
11 public, including Plaintiff, the potentially life-threatening hazards of Roundup in order
12 to ensure continued and increased sales.

13     230. Defendant's intentional and/or reckless failure to disclose information
14 deprived the Plaintiff of necessary information to enable Plaintiff to weigh the true risks
15 of using or being exposed to the subject product against its benefits.

16     231. foregoing acts and omissions, Plaintiff suffered from NHL and Plaintiff
17 suffered severe and personal injuries which are permanent and lasting in nature,
18 physical pain and mental anguish, including diminished enjoyment of life, financial
19 expenses for hospitalization and medical care, including medical expenses and other
20 economic, and non-economic damages.

21     232. WHEREFORE, Plaintiff respectfully requests that this Court enter
22 judgment in Plaintiff's favor for compensatory and punitive damages, together with
23 interest, costs herein incurred, attorneys' fees and all relief as this Court deems just and
24 proper in Order to deter Defendant from similar conduct in the future. Additionally,
25 Plaintiff demands a jury trial on all issues contained herein.

26 ///

27 ///

28 ///

Gomez
Trial Attorneys

PLAINTIFFS' COMPLAINT

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment against the Defendant on each of the above-referenced claims and causes of action and as follows:

1.    Awarding compensatory damages in excess of the jurisdictional amount, including, but not limited to pain, suffering, emotional distress, loss of enjoyment of life, and other non-economic damages in an amount to be determined at trial of this action;

2.    Awarding compensatory damages to Plaintiff for past and future damages, including, but not limited to, Plaintiff's pain and suffering and for severe and permanent personal injuries sustained by the Plaintiff including health care costs and economic loss;

3.    Awarding economic damages in the form of medical expenses, out of pocket expenses, lost earnings and other economic damages in an amount to be determine at trial of this action;

4.    Punitive and/or exemplary damages for the wanton, willful, fraudulent, and reckless acts of the Defendant who demonstrated a complete disregard and reckless indifference for the safety and welfare of the general public and to the Plaintiff in an amount sufficient to punish Defendant and deter future similar conduct, to the extent allowed by applicable law;

5.    Pre-judgment interest;

6.    Post-judgment interest;

7.    Awarding Plaintiff reasonable attorneys' fees;

8.    Awarding Plaintiff the costs of these proceedings; and

9.    Such other and further relief as this Court deems just and proper.

///

///

///

///

1
2

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands trial by jury as to all issues.

3
4  Dated:  August 2, 2022                         **GOMEZ TRIAL ATTORNEYS**

5
6                                            By: /s/ Jessica S. Williams
                                                  Jessica S. Williams
7
8                                            John H. Gomez (SBN 171485)
                                             Jessica S. Williams (SBN 314762)
9                                            *Attorneys for the Plaintiff*

10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

## NOTICE TO COUNSEL
### (For use in Direct Assignment of Civil Cases to Magistrate Judges Program only)

***The court has directed that the following rules be specifically called to your attention:***

I.     Notice of Right to Consent to Disposition of a Civil Case by a United States Magistrate Judge [28 U.S.C. § 636(c) and General Order 12-02].
II.    Continuing Obligation to Report Related Cases (Local Rule 83-1.3.3)
III.   Service of Papers and Process (Local Rule 4)

## I.   NOTICE OF RIGHT TO CONSENT TO DISPOSITION OF A CIVIL CASE BY A UNITED STATES MAGISTRATE

*Pursuant to Local Rule 73-2, the initiating party must serve this notice and consent form CV-11C on each party at the time of service of the summons and complaint or other initial pleading.*

This case has been randomly assigned to Magistrate Judge **Shashi H. Kewalramani** under the Direct Assignment of Civil Cases to Magistrate Judge Program in accordance with General Order 12-02. The case number on all documents filed with the court must read as follows:

### 5:22-cv-1363-SHK

The parties are advised that their consent is required if the above assigned magistrate judge is to conduct all further proceedings in the case, including trial and final entry of judgment pursuant to 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73. Should the parties not consent to proceed before the above assigned magistrate judge, the case will be randomly reassigned to a district judge. If this occurs, the parties cannot later consent to reassignment of the case to any other magistrate judge.

**The parties are further advised that they are free to withhold consent without adverse substantive consequences.** If the parties agree to the exercise of jurisdiction by the magistrate judge, the parties shall jointly or separately file a statement of consent setting forth such election. **Except as provided in Local Rule 73-2.4.1.1, for cases originally filed in district court and initially assigned only to a magistrate judge, the statement of consent shall be filed within 42 days after service of the summons and complaint upon that defendant, and within 42 days by plaintiff after service upon the first-served defendant. If the United States, an agency of the United States, or an officer or employee of the United States is a defendant, the statement of consent shall be filed by the government defendant within 60 days after service of the summons and complaint upon that defendant.**

**For cases removed from state court and initially assigned only to a magistrate judge, a joint or separate statements of consent shall be filed by plaintiff and all defendants upon whom service has been effected, within 14 days after the notice of removal is filed.**

Since magistrate judges do not handle felony criminal trials, civil trial dates are not at risk of being preempted by a felony criminal trial, which normally has priority. Further, in some cases, the magistrate judge may be able to assign an earlier trial date than a district judge. There may be other advantages or disadvantages which you will want to consider.

Any appeal from a judgment of the magistrate judge shall be taken to the United States Court of Appeals in the same manner as an appeal from any other judgment of the district court in accordance with 28 U.S.C. § 636(c)(3).

If a party has not consented to the exercise of jurisdiction by the magistrate judge within the time required by Local Rule 73-2, the case shall be randomly reassigned to a district judge and a magistrate judge shall be randomly assigned to the case as the discovery judge. (Local Rule 73-2.6)

You may contact the Civil Consent Case Coordinator at (213) 894-1871 or *consentcoordinator@cacd.uscourts.gov* if you have any questions about the Direct Assignment of Civil Cases to Magistrate Judges Program.

## II.    CONTINUING OBLIGATION TO REPORT RELATED CASES

Parties are under the continuing obligation to promptly advise the Court whenever one or more civil actions or proceedings previously commenced and one or more currently filed appear to be related.

Local Rule 83-1.3.3 states: "It shall be the continuing duty of the attorney in any case promptly to bring to the attention of the Court, by filing a Notice of Related Case(s) pursuant to Local Rule 83-1.3, all facts which in the opinion of the attorney or party appear relevant to a determination whether such action and one or more pending actions should, under the criteria and procedures set forth in Local Rule 83-1.3, be heard by the same judge."

Local Rule 83-1.2.1 states: "It is not permissible to dismiss and thereafter re-file an action for the purpose of obtaining a different judge."

Local Rule 83-1.2.2 provides:  Whenever an action is dismissed by a party or by the Court before judgment and thereafter the same or essentially the same claims, involving the same or essentially the same parties, are alleged in another action, the later-filed action shall be assigned to the judge to whom the first filed action was assigned.  It shall be the duty of every attorney in any such later-filed action to bring those facts to the attention of the Court in the Civil Cover Sheet and by the filing of a Notice of Related Case(s) pursuant to L.R. 83-1.3.

## III.    SERVICE OF PAPERS AND PROCESS

Local Rule 4-2 states: "Except as otherwise provided by order of Court, or when required by the treaties or statutes of the United States, process shall not be presented to a United States Marshal for service."  Service of process must be accomplished in accordance with Rule 4 of the Federal Rules of Civil Procedure or in any manner provided by State Law, when applicable.  Service upon the United States, an officer or agency thereof, shall be served pursuant to the provisions of FRCP 4(i).  Service should be promptly made; unreasonable delay may result in dismissal of the action under Local Rule 41 and Rule 4(m) of the Federal Rules of Civil Procedure.  Proof of service or a waiver of service of summons and complaint must be filed with the court.

Clerk, U.S. District Court

_August 3, 2022_
Date

By  _/s/ Geneva Hunt_
Deputy Clerk

Case 5:22-cv-01363-SHK    Document 5-1    Filed 08/03/22    Page 1 of 1    Page ID #:50

NAME, ADDRESS & TELEPHONE NUMBER OF ATTORNEY(S) OR PRO PER

ATTORNEY(S) FOR:

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | CASE NUMBER: |
|---|---|
| Plaintiff(s) | |
| v. | **STATEMENT OF CONSENT TO PROCEED BEFORE A UNITED STATES MAGISTRATE JUDGE** (For use in Direct Assignment of Civil Cases to Magistrate Judges Program Only) |
| Defendant(s). | |

**(THIS FORM SHALL BE USED ONLY FOR CASES IN WHICH A MAGISTRATE JUDGE IS INITIALLY ASSIGNED PURSUANT TO LOCAL RULE 73-2.)**

In accordance with General Order 12-02 and Local Rule 73-2 the above-captioned civil matter has been randomly assigned to Magistrate Judge _____ . All parties to the above-captioned civil matter are to select one of the following two options and file this document with the Clerk's Office.

☐  The party or parties listed below to the above-captioned civil matter **consent** pursuant to the provisions of 28 U.S.C. § 636(C) and F.R.Civ.P. 73(b), to have the assigned Magistrate Judge conduct all further proceedings in this case, including trial and entry of final judgment.

   Any appeal from a judgment of the assigned Magistrate Judge shall be taken to the United States Court of Appeals in the same manner as an appeal from any other judgment of the District Court in accordance with 28 U.S.C. § 636(c)(3).

☐  The party or parties listed below to the above-captioned civil matter **do not consent** to proceed before the assigned Magistrate Judge.

   The party or parties listed below acknowledge that they are free to withhold consent without adverse substantive consequences.

| Name of Counsel (OR Party if Pro Per) | Signature and date | Counsel for (Name of Party or Parties) |
|---|---|---|
| | | |
| | | |
| | | |

**NOTICE TO COUNSEL FROM CLERK:**

All parties having consented to proceed before the assigned Magistrate Judge, this case will remain assigned to United States Magistrate Judge _____ for all further proceedings.

CV-11C (05/14)     STATEMENT OF CONSENT TO PROCEED BEFORE A UNITED STATES MAGISTRATE JUDGE
(For use in Direct Assignment of Civil Cases to Magistrate Judges Program only)

NAME, ADDRESS, AND TELEPHONE NUMBER OF ATTORNEY(S)
OR OF PARTY APPEARING IN PRO PER
GOMEZ TRIAL ATTORNEYS
John H. Gomez (SBN 171485)
Jessica S. Williams (SBN 314762)
655 West Broadway, Suite 1700
San Diego, California 92101
Telephone: (619) 237-3490
Fax: (619) 237-3496

ATTORNEY(S) FOR: William Wasson

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| WILLIAM WASSON | CASE NUMBER: |
|---|---|
| Plaintiff(s), | 5:22-cv-1363 |
| v. | |
| MONSANTO COMPANY | CERTIFICATION AND NOTICE OF INTERESTED PARTIES (Local Rule 7.1-1) |
| Defendant(s) | |

TO:     THE COURT AND ALL PARTIES OF RECORD:

The undersigned, counsel of record for _____ William Wasson
or party appearing in pro per, certifies that the following listed party (or parties) may have a pecuniary interest in
the outcome of this case.  These representations are made to enable the Court to evaluate possible disqualification
or recusal.

(List the names of all such parties and identify their connection and interest. Use additional sheet if necessary.)

| PARTY | CONNECTION / INTEREST |
|---|---|
| Plaintiff William Wasson | Plaintiff injured by Roundup. |

| August 2, 2022 | /s/ Jessica S. Williams |
|---|---|
| Date | Signature |

Attorney of record for (or name of party appearing in pro per):

William Wasson

CV-30 (05/13)                          NOTICE OF INTERESTED PARTIES