Query    Reports    Utilities    Help    Log Out

# U.S. District Court
## Middle District of Florida (Jacksonville)
## CIVIL DOCKET FOR CASE #: 3:22-cv-00694-TJC-MCR

Lamar v. Monsanto Company et al
Assigned to: Judge Timothy J. Corrigan
Referred to: Magistrate Judge Monte C. Richardson
Cause: 28:1332 Diversity-Personal Injury

Date Filed: 06/21/2022
Jury Demand: Plaintiff
Nature of Suit: 367 Personal Injury: Health Care/Pharmaceutical Personal Injury Product Liability
Jurisdiction: Diversity

**Plaintiff**

**Shanda Lamar**
*an individual and successor in interest to decedent Derrick Lamar*

represented by **Haytham Faraj**
The Law Offices of Haytham Faraj
8605 Santa Monica Blvd., Suite 44953
West Hollywood, CA 90069
323-463-9200
Email: service@farajlaw.com
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Monsanto Company**
*a corporation*

**Defendant**

**Does 1 through 100**
*Inclusive*

| Date Filed | # | Docket Text |
|---|---|---|
| 06/21/2022 | 1 | COMPLAINT against Does 1 through 100, Monsanto Company with Jury Demand filed by Shanda Lamar. (Attachments: # 1 Civil Cover Sheet, # 2 Proposed Summons) (Filing fee not paid)(SJW) (Entered: 06/22/2022) |
| 06/22/2022 | 2 | NOTICE to counsel Haytham Faraj Local Rule 2.01(c), Special Admission of Non-Resident Lawyer - File a Motion to Appear Pro Hac Vice. Co-counsel with filing rights may electronically file the motion on behalf of the non-resident lawyer or the motion may be filed on paper; Pay the Special Admission Fee; Submit a Pro Hac Vice E-File Registration through PACER. Visit www.flmd.uscourts.gov/for-lawyers for details (Signed by Deputy Clerk). (SJW) (Entered: 06/22/2022) |
| 06/27/2022 | | FEES Paid by Shanda Lamar (Filing fee $402.00, Receipt Number JAX035823). (BGR) (Entered: 06/28/2022) |
| 06/27/2022 | 3 | MOTION for Haytham Faraj to appear pro hac vice by Shanda Lamar. (BGR) Motions referred to Magistrate Judge Monte C. Richardson. (Entered: 06/28/2022) |

| 06/28/2022 | | PRO HAC VICE FEES paid by attorney Haytham Faraj, appearing on behalf of Shanda Lamar (Filing fee $150 receipt number JAX035824.) Related document: 3 MOTION for Haytham Faraj to appear pro hac vice. (BGR) (Entered: 06/28/2022) |
|---|---|---|
| 06/28/2022 | 4 | NOTICE of Local Rule 3.02(a)(2), which requires the parties in every civil proceeding, except those described in subsection (d), to file a case management report (CMR) using the uniform form at www.flmd.uscourts.gov. The CMR must be filed (1) within forty days after any defendant appears in an action originating in this court, (2) within forty days after the docketing of an action removed or transferred to this court, or (3) within seventy days after service on the United States attorney in an action against the United States, its agencies or employees. Judges may have a special CMR form for certain types of cases. These forms can be found at www.flmd.uscourts.gov under the Forms tab for each judge. (Signed by Deputy Clerk). (KKH) (Entered: 06/28/2022) |
| 06/29/2022 | 5 | **ENDORSED ORDER granting 3 Motion to Appear Pro Hac Vice. If Haytham Faraj, Esq has not already done so, he shall immediately register for a login and password for electronic filing at the Court's website at www.flmd.uscourts.gov. Signed by Magistrate Judge Monte C. Richardson on 6/29/2022. (MDH)** (Entered: 06/29/2022) |
| 08/05/2022 | 6 | PROPOSED summons to be issued by Shanda Lamar. (Faraj, Haytham) (Entered: 08/05/2022) |
| 08/08/2022 | 7 | SUMMONS issued as to Monsanto Company. (BD) (Entered: 08/08/2022) |
| 08/22/2022 | 8 | RETURN of service executed on 8/12/2022 as to Monsanto Company by Shanda Lamar (Faraj, Haytham) Modified text on 8/24/2022 (BD). (Entered: 08/22/2022) |

| PACER Service Center | | |
|---|---|---|
| **Transaction Receipt** | | |
| 10/10/2022 16:59:19 | | |
| **PACER Login:** | sh0019sh | **Client Code:** | 31943.356965 rhb |
| **Description:** | Docket Report | **Search Criteria:** | 3:22-cv-00694-TJC-MCR |
| **Billable Pages:** | 2 | **Cost:** | 0.20 |

Haytham Faraj, Esq. (SBN 291416)
**THE LAW OFFICES OF HAYTHAM FARAJ**
8605 Santa Monica Blvd., Suite 44953
West Hollywood, California 90069-4109
Telephone: (323) 463-9200
Facsimile: (202) 280-1039
Email: service@farajlaw.com

*Attorneys for Plaintiff*, SHANDA LAMAR

### UNITED STATES DISTRICT COURT

### FOR THE MIDDLE DISTRICT OF FLORIDA

| | |
|---|---|
| SHANDA LAMAR, an individual and successor in interest to decedent Derrick Lamar,<br><br>Plaintiff,<br><br>v.<br><br>MONSANTO COMPANY, a corporation; and DOES 1 through 100, Inclusive,<br><br>Defendants. | CASE NO.:<br><br>**COMPLAINT FOR DAMAGES:**<br><br>**1. STRICT PRODUCTS LIABILITY - DESIGN DEFECT;**<br>**2. STRICT PRODUCTS LIABILITY – FALURE TO WARN;**<br>**3. NEGLIGENCE;**<br>**4. BREACH OF EXPRESS WARRANTIES;**<br>**5. BREACH OF IMPLIED WARRANTIES;**<br>**6. FRAUD;**<br>**7. WRONGFUL DEATH; AND**<br>**8. EXEMPLARY DAMAGES.**<br><br>**\*\*DEMAND FOR JURY TRIAL\*\*** |

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

COMES NOW Plaintiff, SHANDA LAMAR, an individual and successor in interest to decedent Derrick Lamar; (hereinafter "Plaintiff"), who for causes of action against the Defendants, MONSANTO COMPANY, a corporation (hereinafter "Monsanto"), and DOES 1 through 100, Inclusive, and each of them (collectively hereinafter "DEFENDANTS") complains and alleges the following causes of action:

## **SUMMARY**

1. This case arises out of Monsanto's wrongful conduct in connection with the design, development, manufacture, testing, packaging, promoting, marketing, advertising, distribution, labeling, and sale of the herbicide Roundup, containing the active ingredient glyphosate. Glyphosate has been found to be carcinogenic, linked to causing various forms of cancer, and in particular large cell lymphoma. As such, Roundup is dangerous to human health and unfit to be marketed and sold in commerce, particularly without proper warnings and directions as to the dangers associated with its use.

2. On information and belief, Decedent Derrick Lamar (herein referred to as "DECEDENT"), who was exposed to Roundup extensively while using Roundup residentially for his personal use, was diagnosed with large cell lymphoma (Non-Hodgkin's Lymphoma). He was diagnosed on or

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

about June 12, 2020 and died as a result of his cancer in June 24, 2020.

Plaintiff SHANDA LAMAR, is the surviving spouse of Decedent.

## STATEMENT OF THE CASE

3.      In 1970, Defendant Monsanto Company discovered the herbicidal properties of glyphosate and began marketing it in products in 1974 under the brand name Roundup®. Roundup® is a non-selective herbicide used to kill weeds that commonly compete with the growing of crops. By 2001, glyphosate had become the most-used active ingredient in American agriculture with 85-90 millions of pounds used annually. That number grew to 185 million pounds by 2007. As of 2013, glyphosate was the world's most widely used herbicide.

4.      Monsanto is a multinational agricultural biotechnology corporation based in St. Louis, Missouri. It is the world's leading producer of glyphosate. As of 2009, Monsanto was the world's leading producer of seeds, accounting for 27% of the world seed market. The majority of these seeds are of the Roundup Ready® brand. The stated advantage of Roundup Ready® crops is that they substantially improve a farmer's ability to control weeds, since glyphosate can be sprayed in the fields during the growing season without harming their crops. In 2010, an estimated 70% of com and cotton, and 90% of soybean fields in the United States were Roundup Ready®.

3

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

5.     Monsanto's glyphosate products are registered in 130 countries and approved for use on over 100 different crops. They are ubiquitous in the environment. Numerous studies confirm that glyphosate is found in rivers, streams, and groundwater in agricultural areas where Roundup® is used. It has been found in food, in the urine of agricultural workers, and even in the urine of urban dwellers who are not in direct contact with glyphosate.

6.     On March 20, 2015, the International Agency for Research on Cancer ("IARC"), an agency of the World Health Organization ("WHO"), issued an evaluation of several herbicides, including glyphosate. That evaluation was based, in part, on studies of exposures to glyphosate in several countries around the world, and it traces the health implications from exposure to glyphosate since 2001.

7.     On July 29, 2015, the IARC issued the formal monograph relating to glyphosate. In that monograph, the IARC Working Group provides a thorough review of the numerous studies and data relating to glyphosate exposure in humans.

8.     The IARC Working Group classified glyphosate as a Group 2A herbicide, which means that it is probably carcinogenic to humans. The IARC Working Group concluded that the cancers most associated with

4

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

1  glyphosate exposure are non-Hodgkin's lymphoma and other hematopoietic

2  cancers, including large cell lymphoma.

3       7.     The IARC evaluation is significant. It confirms what has been

4  believed for years: that glyphosate is toxic to humans. Nevertheless,

5  Monsanto, since it began selling Roundup®, has represented it as safe to

6  humans and the environment. Indeed, Monsanto has repeatedly proclaimed

7  and continues to proclaim to the world, and particularly to United States

8  consumers, that glyphosate-based herbicides, including Roundup®, create

9  no unreasonable risks to human health or to the environment.

10                      **THE PARTIES**

11       8.     At all times relevant and mentioned herein, Plaintiff SHANDA

12  LAMAR, is the surviving spouse of Decedent. Plaintiff was, and is now, a

13  resident of the City of Green Cove Springs, Clay County, Florida. Pursuant

14  to Florida Statute §§768.19 and 20, Plaintiff is the heir, successor in interest

15  and person lawfully entitled to assert a cause of action of the wrongful death

16  of Decedent. No other persons have any claim, right or interest in the cause

17  of action for wrongful death that is superior to the claims by the Plaintiff.

18       9.     As a result of decedent DERRICK LAMAR'S exposure to

19  Roundup® and/or other Monsanto and/or Monsanto glyphosate containing

20  products in the state of Florida from approximately the mid-1990s to around

21  2020, Decedent was diagnosed with large cell (non-Hodgkin's) lymphoma,

22

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

which ultimately resulted in his untimely death on June 24, 2020. The conduct of defendants was a substantial factor and proximate cause of the serious personal injuries and death sustained by plaintiff's Decedent, DERRICK LAMAR.

10.  Plaintiff is informed and believes and based thereon alleges that as a direct and proximate result of Decedent's use of Roundup® and/or other Monsanto  glyphosate-containing products ("Roundup"), supplied, marketed, and/or distributed by defendants herein, decedent suffered significant harm, conscious pain and suffering, physical injury and bodily impairment including, but not limited to, Large cell lymphoma and other cancers, other permanent physical deficits, permanent bodily impairment and other injury sequelae. Decedent's injuries required medical intervention to address the adverse physical effects and damage caused by decedent's use of Roundup® and/or other Monsanto glyphosate-containing products ("Roundup"). These injuries ultimately resulted in Decedent's untimely death.

11.  As a direct and proximate result of the wrongful conduct, acts, omissions, fraudulent concealments, fraudulent misrepresentations, and fraudulent business practices by Defendants and DOES 1 through 100, inclusive, Decedent used and/or was exposed to Roundup® and was

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

1    diagnosed with serious health injuries including to large cell lymphoma

2    and/or other cancers.

3         12.    As a further direct and proximate result of defects in Roundup®

4    and the wrongful conduct, acts, omissions, and fraudulent misrepresentations

5    of Defendants, Decedent suffered severe mental and physical pain and has

6    and will sustain permanent injuries and emotional distress, along with

7    economic loss due to medical expenses and living-related expenses as a

8    result of lifestyle changes.

9         13.    As a further direct and proximate result of defects in Roundup®

10   and the wrongful conduct, acts, omissions, and fraudulent misrepresentations

11   of Defendants, Decedent required medical intervention in efforts to maintain

12   and/or save Decedent.

13        14.    Plaintiff is an individual who suffered damages as a result of

14   injuries resulting from Decedent's use and/or exposure to Roundup® and are

15   authorized to bring an action for the causes of actions alleged herein

16   including, but not limited to, injuries and damages sustained by Plaintiff

17   resulting from Decedent's use of Roundup®. Said injuries and damages

18   sustained by Plaintiff were caused or substantially contributed to by the

19   wrongful conduct of Defendants and DOES 1 through 100, inclusive.

20        15.    The product warnings for Roundup® in effect during the time

21   period Decedent used and/or was exposed to Roundup® were vague,

22

7

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

incomplete or otherwise inadequate, both substantively and graphically, to alert consumers to the severe health risks associated with Roundup® use and/or exposure.

16.    The Defendants and DOES 1 through 100, and each of them, inclusive, did not provide adequate warnings to consumers including Decedent and the general public about the increased risk of the serious adverse events described herein.

17.    Had Decedent and/or Plaintiff been adequately warned by the Defendants and DOES 1 through 100, and each of them, inclusive, of the potential life-threatening side effects of Roundup®, Decedent would not have purchased, used, or been exposed to Roundup®.

18.    By reason of the foregoing, Decedent developed serious and dangerous side effects including large cell lymphoma (NHL) and other cancers, related injury sequelae, physical pain and suffering, mental anguish, loss of enjoyment of life, and death. By reason of the foregoing, Plaintiff suffered damages and losses, as alleged herein. Plaintiff's general and special damages exceed the jurisdictional limits of this Court.

## DEFENDANTS

19.    Plaintiff is informed and believes, and thereupon alleges, that defendant Monsanto Company (hereinafter "Monsanto" or "defendant Monsanto"), is, and at all times relevant was, a Delaware corporation, with

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

1  its headquarters in St. Louis, Missouri and multiple principal places of

2  business throughout the world. At all times relevant to this complaint,

3  Monsanto was the entity that discovered the herbicidal properties of

4  glyphosate and manufactured Roundup®. Monsanto has regularly transacted

5  and conducted business within the State of Florida and has derived

6  substantial revenue from goods and products, including Roundup®, used in

7  the State of Florida and employs sales representatives in the State of Florida.

8  Moreover, upon information and belief, Monsanto, registered, distributed,

9  marketed, advertised, and sold Roundup® products to Florida consumers.

10     20.    Plaintiff is informed, believes and based thereon alleges, that in

11  committing the acts alleged herein, each and every managing agent, agent,

12  representative and/or employee of the Defendants was working within the

13  course and scope of said agency, representation and/or employment with the

14  knowledge, consent, ratification, and authorization of the Defendants and

15  their directors, officers and/or managing agents.

16     21.    The true names and/or capacities, whether individual, corporate,

17  partnership, associate, governmental, or otherwise, of Defendant DOES 1

18  through 100, inclusive, and each of them, are unknown to Plaintiff at this

19  time, who therefore sue said Defendants by such fictitious names. Plaintiff is

20  informed, believes and thereon allege, that each Defendant designated herein

21  as a DOE caused injuries and damages proximately thereby to Plaintiff as

22

9

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

hereinafter alleged; and that each DOE Defendant is liable to the Plaintiff for the acts and omissions alleged herein below, and the resulting injuries to Plaintiff, and damages sustained by the Plaintiff. Plaintiff will amend this Complaint to allege the true names and capacities of said DOE Defendants when the same are ascertained.

22.     Plaintiff is informed, believes, and thereon alleges, that at all times herein mentioned, each of the named Defendants and each of the DOE Defendants was the agent, servant, employee and/or joint venturer of the other co-Defendants and other DOE Defendants, and each of them, and at all said times, each named Defendant and each DOE Defendant was acting in the full course, scope and authority of said agency, service, employment and/or joint venture.

23.     Plaintiff is informed, believes and alleges that at all times mentioned herein, Defendants and DOES 1 through 100, inclusive, and each of them, were also known as, formerly known as and/or were the successors and/or predecessors in interest/business/product line/or a portion thereof, assigns, a parent, a subsidiary (wholly or partially owned by, or the whole or partial owner), affiliate, partner, co-venturer, merged company, alter egos, agents, equitable trustees and/or fiduciaries of and/or were members in an entity or entities engaged in the funding, researching, studying, manufacturing, fabricating, designing, developing, labeling, assembling,

10

1  distributing, supplying, leasing, buying, offering for sale, selling, inspecting,

2  servicing, contracting others for marketing, warranting, rebranding,

3  manufacturing for others, packaging and advertising of Roundup® and/or

4  other Montsano glyphosate-containing products. Defendants and DOES 1

5  through 100, inclusive, and each of them, are liable for the acts, omissions

6  and tortious conduct of their successors and/or predecessors in

7  interest/business/product line/or a portion thereof, assigns, parents,

8  subsidiaries, affiliates, partners, co-venturers, merged companies, alter egos,

9  agents, equitable trustees, fiduciaries and/or their alternate entities in that

10  Defendants and DOES 1 through 100, inclusive, and each of them, enjoy the

11  goodwill originally attached to each such alternate entity, acquired the assets

12  or product line (or portion thereof), and in that there has been a virtual

13  destruction of Plaintiff's remedy against each such alternate entity, and that

14  each such Defendant has the ability to assume the risk spreading role of each

15  such alternate entity.

16       24.      Plaintiff is informed, believes, and thereon alleges, that at all

17  times herein mentioned, Defendants and DOES 1 through 100, inclusive,

18  and each of them, were and are corporations organized and existing under

19  the laws of the State of Florida or the laws of some state or foreign

20  jurisdiction; that each of the said Defendants and DOE Defendants were and

21  are authorized to do and are doing business in the State of Florida and

22

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

1    regularly conducted business in Florida, including in Clay County.

2        25.    Upon information and belief, at all relevant times, Defendants

3    and DOES 1 through 100, and each of them, inclusive, were engaged in the

4    business of researching, developing, designing, licensing, manufacturing,

5    distributing, labeling, selling, marketing, and/or introducing into interstate

6    commerce and into the State of Florida, including in Clay County, either

7    directly or indirectly through third parties or related entities, Roundup®

8    and/or other Monstano glyphosate-containing products.

9        26.    At all relevant times, Defendants and DOES 1 through 100,

10   inclusive, and each of them, conducted regular and sustained business and

11   engaged in substantial commerce and business activity in the State of

12   Florida, which included but was not limited to selling, marketing and

13   distributing Roundup® and/or other Monstano glyphosate-containing

14   products in the State of Florida, including Clay County. Specifically,

15   Decedent purchased all of its Roundup® products for residential use from

16   retailers in Clay County.

17       27.    At all relevant times, Defendants and DOES 1 through 100,

18   inclusive, and each of them, expected or should have expected that their acts

19   would have consequences within the United States of America including the

20   State of Florida, including Clay County, and said Defendants derived and

21   derive substantial revenue therefrom.

22

12

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

1                                  **AGENCY**

2         28.     Each of the Defendants named in this Complaint, including

3 each of the DOE Defendants, is, and at all relevant times herein mentioned

4 was, the co-conspirator of each other Defendant in connection with the

5 wrongful conduct described herein, and, therefore, each Defendant is jointly

6 and severally liable to Plaintiff for the damages sustained as a proximate

7 result of each other Defendant.

8         29.     Each Defendant entered into an express or implied agreement,

9 understanding, and/or concert of action with each of the other Defendants to

10 commit the wrongs herein alleged. These affirmative wrongful acts

11 included, but were not limited to, the conspiracy to defraud, deceive, and

12 hide the dangers of glyphosate from the public, beginning in 1976, through

13 Defendants' routine falsification of data for toxicity studies needed to

14 register Roundup®. In 1976, the United States Food and Drug

15 Administration ("FDA") performed an inspection of Industrial Bio-Test

16 Industries ("IBT") that revealed discrepancies between the raw data and the

17 final report relating to the toxicological impacts of glyphosate. The EPA

18 subsequently audited IBT; it too found the toxicology studies conducted for

19 the Roundup® herbicide to be invalid. An EPA reviewer stated, after finding

20 "routine falsification of data" at IBT, that it was "hard to believe the

21 scientific integrity of the studies when they said they took specimens of the

13

22 **COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

1   uterus from male rabbits."

2        30.    The conspiracy was furthered in 1991 when Defendant

3   Monsanto hired Craven Laboratories in 1991 to perform pesticide and

4   herbicide studies, including for Roundup®. In that same year, the owner of

5   Craven Laboratories and three of its employees were indicted, and later

6   convicted, of fraudulent laboratory practices in the testing of pesticides and

7   herbicides.

8        31.    The conspiracy was furthered through 2000 through present

9   with  publication of studies through companies such as Intertek and

10   Exponent, Inc., which minimize any safety concerns about the use of

11   glyphosate

12        32.    The conspiracy was furthered when Monsanto held secret ex

13   parte meetings and conversations with certain EPA employees to collude in

14   a strategy to re-register glyphosate and to quash investigations into the

15   carcinogenicity of glyphosate by other federal agencies such as the Agency

16   for Toxic Substances and Disease Registry. In March 2015, The Joint

17   Glyphosate Task Force, at Monsanto's behest, issued a press release sharply

18   criticizing IARC, stating that IARC's conclusion was "baffling" and falsely

19   claiming that "IARC did not consider any new or unique research findings

20   when making its decision. It appears that only by deciding to exclude certain

21   available scientific information and by adopting a different approach to

22

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

1  interpreting the studies was this possible."

2  33.   The conspiracy was furthered in 2011when Defendants co-

3  opted studies which falsely proclaimed the safety of glyphosate. In October

4  2015, the Defendants, as members of the Joint Glyphosate Task Force, wrote

5  to the state of Florida to try to stop Florida from warning the public about

6  the carcinogenicity of glyphosate, arguing that the IARC classification was

7  mistaken. In January of 2016, Monsanto filed a lawsuit to stop Florida from

8  warning the public about the carcinogenicity of glyphosate.

9  34.   Plaintiff is informed, believes, and thereon alleges that at all

10  times herein alleged, each of the Defendants, including, but not limited to

11  DOES 1 through 100, was the agent, servant, partner, aider and abettor, co-

12  conspirator, alter ego, and/or joint venturer of the other herein and were at

13  all times operating and acting within the purpose and scope of said agency,

14  service, employment, partnership, conspiracy, alter ego, and/or joint venture

15  and rendered substantial assistance and encouragement to the other

16  Defendants, knowing that their conduct constituted a breach of duty owed to

17  Plaintiff.

18  35.   Plaintiff is informed, believes, and thereon alleges, that there

19  exists, and at all times herein alleged, there existed, a unity of interest in

20  ownership between each of the aforesaid Defendants, including DOES 1

21  through 100, such that any individuality and separateness between these

22

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

1    Defendants has ceased and these Defendants each are the alter-ego of the

2    others and exerted control over those Defendants. Adherence to the fiction

3    of the separate existence of each of these Defendants as an entity distinct

4    from the others will permit an abuse of the corporate privilege and would

5    sanction fraud and would promote injustice.

6        36.    Each of these acts and failures to act is alleged against each

7    defendant whether acting individually, jointly, or severally. Each of the

8    defendants or their alter egos agreed and conspired with the others in the

9    commission of these acts or failures to act.

10       37.    Defendants, and each of them, committed these acts alleged

11   herein maliciously, fraudulently, and oppressively, and with the wrongful

12   intention of injuring Plaintiff, and acted with an improper and evil motive

13   amounting to malice or despicable conduct. Alternatively, Defendants'

14   wrongful conduct was carried out with a conscious disregard for Plaintiff's

15   rights.

16       38.    Defendants' conduct warrants the assessment of punitive

17   damages in an amount sufficient to punish Defendants and deter others from

18   engaging in similar conduct.

19       39.    Each of these acts and failures to act are alleged against each

20   Defendant whether acting individually, jointly, or severally. Each of the

21   Defendants or their alter egos agreed and conspired with the others in the

22

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

1  commission of these acts or failures to act.

2  ## JURISDICTION AND VENUE

3      40.    This Court has jurisdiction over Defendants and this action

4  pursuant to 28 U.S.C. § 1332 because there is complete diversity of

5  citizenship between Plaintiff and Defendants. Defendants are all either

6  incorporated and/or have their principal place of business outside of the state

7  in which the Plaintiff reside.

8      41.    The amount in controversy between Plaintiff and Defendants

9  exceeds $75,000, exclusive of interest and cost.

10     42.    The Court also has supplemental jurisdiction pursuant to 28

11 U.S.C. § 1367.

12     43.    Venue is proper within this district pursuant to 28 U.S.C. §

13 1391 in that Defendants conduct business here and are subject to personal

14 jurisdiction in this district. Furthermore, Defendants sell, market, and/or

15 distribute Roundup ® within the Middle District of Florida. Also, a

16 substantial part of the acts and/or omissions giving rise to these claims

17 occurred within this district.

18  ## FACTUAL ALLEGATIONS

19     44.    Glyphosate is a broad-spectrum, non-selective herbicide used in

20 a wide variety of herbicidal products around the world.

21     45.    Plants treated with glyphosate translocate the systemic

22

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

1 herbicide to their roots, shoot regions and fruit, where it interferes with the

2 plant's ability to form aromatic amino acids necessary for protein synthesis.

3 Treated plants generally die within two to three days. Because plants absorb

4 glyphosate, it cannot be completely removed by washing or peeling produce

5 or by milling, baking, or brewing grains.

6    46.    For nearly 40 years, farms across the world have used

7 Roundup® without knowing of the dangers its use poses.

8    47.    That is because when Monstano first introduced Roundup®, it

9 touted glyphosate as a technological breakthrough: it could kill almost every

10 weed without causing harm either to people or to the environment. Of

11 course, history has shown that not to be true. According to the WHO, the

12 main chemical ingredient of Roundup®--glyphosate--is a probable cause of

13 cancer. Those most at risk are farm workers and other individuals with

14 workplace exposure to Roundup®, such as workers in garden centers,

15 nurseries, and landscapers. Agricultural workers are, once again, victims of

16 corporate greed. Monstano assured the public that Roundup® was harmless.

17 In order to prove this, Monstano championed falsified data and attacked

18 legitimate studies that revealed its dangers. Monstano led a prolonged

19 campaign of misinformation to convince government agencies, farmers and

20 the general population that Roundup® was safe.

21 / / /

22

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

*The Discovery of Glyphosate and Development of Roundup®*

48.     The herbicidal properties of glyphosate were discovered in 1970 by Monstano chemist John Franz. The first glyphosate-based herbicide was introduced to the market in the mid-1970s under the brand name Roundup®. From the outset, Monstano marketed Roundup® as a "safe" general-purpose herbicide for widespread commercial and consumer use. Monstano still markets Roundup® as safe today.

*Registration of Herbicides under Federal Law*

49.     The manufacture, formulation and distribution of herbicides, such as Roundup®, are regulated under the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA" or "Act"), 7 U.S.C. § 136 *et seq.* FIFRA requires that all herbicides be registered with the Environmental Protection Agency ("EPA" or "Agency") prior to their distribution, sale, or use, except as described by the Act. 7 U.S.C. § 136a (a).

50.     Because herbicides are toxic to plants, animals, and humans, at least to some degree, the EPA requires as part of the registration process, among other things, a variety of tests to evaluate the potential for exposure to herbicides, toxicity to people and other potential non-target organisms, and other adverse effects on the environment. Registration by the EPA, however, is not an assurance or finding of safety. The determination the Agency must make in registering or re-registering a product is not that the

19

1    product is "safe," but rather that use of the product in accordance with its

2    label directions "will not generally cause unreasonable adverse effects on the

3    environment." 7 U.S.C. § 136a(c) (5) (D).

4         51.    FIFRA defines "unreasonable adverse effects on the

5    environment" to mean "any unreasonable risk to man or the environment,

6    taking into account the economic, social, and environmental costs and

7    benefits of the use of any pesticide." 7 U.S.C. § 136(bb). FIFRA thus 5

8    requires EPA to make a risk/benefit analysis in determining whether a

9    registration of a product should be granted or allowed so that the product

10   may continue to be sold in commerce.

11        52.    The EPA registered Roundup® for distribution, sale, and

12   manufacture in the United States including the State of Florida. The EPA's

13   decision to register Roundup, however, was based on studies on the active

14   chemical, glyphosate, and not the formulated Roundup product which

15   contains a cocktail of other ingredients such as surfactants, adjuvants, and

16   inert compounds, all of which, as discussed in greater detail below,

17   contribute to the health risks associated with Roundup exposure.[1]

18        53.    FIFRA generally requires the registrant, Monsanto in the case

19

20   _____
     [1] Surfactants are compounds which contribute to the even and effective spread of
     glyphosate across the surface of a leaf and increase the rate of penetration through the plant.
21   It has been shown that surfactants also greatly increase the amount and rate of Roundup®
     absorbed by human skin.

22

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

1   of Roundup®, to conduct health and safety testing of herbicide products.

2   The EPA has protocols governing the conduct of tests required for

3   registration and the laboratory practices that must be followed in conducting

4   these tests. The data produced by the registrant must be submitted to the

5   EPA for review and evaluation. The government is not required, nor is it

6   able, however, to perform the product tests that are required of the

7   manufacturer.

8       54.    The evaluation of each herbicide product distributed, sold, or

9   manufactured is completed at the time the product is initially registered. The

10  data necessary for registration of an herbicide has changed over time. The

11  EPA is now in the process of re-evaluating all herbicide products through a

12  Congressionally mandated process called "re-registration." 7 U.S.C. § 136a-

13  I. In order to reevaluate these herbicides, the EPA is demanding the

14  completion of additional tests and the submission of data for the EPA's

15  review and evaluation.

16      55.    In the case of glyphosate, and therefore Roundup®, the EPA

17  had planned on releasing its preliminary risk assessment -in relation to the

18  re-registration process-no later than July 2015. The EPA completed its

19  review of glyphosate in early 2015, but it delayed releasing the risk

20  assessment pending further review in light of the WHO's health-related

21  findings. "On September 12, 2016, the EPA's office of Pesticide Programs

22

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

1  released an interim report, titled "Glyphosate Issue Paper: Evaluation of

2  Carcinogenic Potential," ("2016 Issue Paper") detailing the agency's review

3  of a small portion of the existing literature on Roundup. The 2016 Issue

4  Paper contains a review of studies submitted to the agency by Monsanto, as

5  well as the general independent scientific literature on glyphosate

6  carcinogenicity.

7      56.    Immediately following the publication of the 2016 Issue Paper,

8  the FIFRA Scientific Advisory Panel ("SAP") issued a report which

9  reviewed the EPA's 2016 Issue Paper, and the conclusions therein. The SAP

10  strongly criticized the EPA's conclusions and questioned the scientific

11  approach of the agency, noting that that agency had failed to follow its own

12  guidelines.

13  ***Scientific Fraud Underlying the Marketing and Sale of***

14  ***Glyphosate/Roundup®***

15      57.    Based on early studies that glyphosate could cause cancer in

16  laboratory animals, the EPA originally classified glyphosate as *possibly*

17  *carcinogenic to humans* (Group C) in 1985. After pressure from Monsanto,

18  including contrary studies it provided to the EPA, in 1991 the EPA changed

19  its classification to *evidence of non-carcinogenicity in humans* (Group E). In

20  so classifying glyphosate, however, the EPA made clear that the designation

21  did not mean the chemical does not cause cancer: "It should be emphasized,

22

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

however, that designation of an agent in Group E is based on the available evidence at the time of evaluation and should not be interpreted as a definitive conclusion that the agent will not be a carcinogen under any circumstances.

58.    On two occasions, the EPA found that the laboratories hired by Monsanto to test the toxicity of its Roundup® products for registration purposes committed fraud.

59.    In the first instance, Monsanto, in seeking initial registration of Roundup® by EPA, hired Industrial Bio-Test Laboratories ("IBT") to perform and evaluate herbicide toxicology studies relating to Roundup®. IBT performed about 30 tests on glyphosate and glyphosate-containing products, including nine of the 15 residue studies needed to register Roundup®.

60.    In 1976, the United States Food and Drug Administration ("FDA") performed an inspection of Industrial Bio-Test Industries ("IBT") that revealed discrepancies between the raw data and the final report relating to the toxicological impacts of glyphosate. The EPA subsequently audited IBT; it too found the toxicology studies conducted for the Roundup® herbicide to be invalid. An EPA reviewer stated, after finding "routine falsification of data" at IBT, that it was "hard to believe the scientific integrity of the studies when they said they took specimens of the uterus

23

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

1    from male rabbits."

2        61.    Three top executives of IBT were convicted of fraud in 1983.

3        62.    In the second incident of data falsification, Monsanto hired

4    Craven Laboratories in 1991 to perform pesticide and herbicide studies,

5    including for Roundup®. In that same year, the owner of Craven

6    Laboratories and three of its employees were indicted, and later convicted,

7    of fraudulent laboratory practices in the testing of pesticides and herbicides.

8        63.    Despite the falsity of the tests that underlie its registration,

9    within a few years of its launch, Monsanto was marketing Roundup® in 115

10   countries.

11       64.    Multiple studies have been ghostwritten in part and/or

12   published by Monsanto through companies such as Intertek and Exponent,

13   Inc., from 2000 through the present which minimize any safety concerns

14   about the use of glyphosate. The studies are used to convince regulators to

15   allow the sale of Roundup® and customers to use Roundup®. Such studies

16   include, but are not limited to Williams (2000); Williams (2012); Kier &

17   Kirkland (2013); Kier (2015); Bus (2016); Chang (2016); and the Intertek

18   Expert Panel Manuscripts. All of these studies have been submitted to and

19   relied upon by the public and the EPA in assessing the safety of glyphosate.

20   Through these means, Monsanto has fraudulently represented that

21   independent scientists have concluded that Glyphosate is safe. In fact,

22

24

1    Monsanto paid these so-called "independent experts," and Monsanto failed

2    to disclose the significant role Monsanto had in creating the manuscripts

3    produced by the "independent" experts. Further, Monsanto has ghostwritten

4    editorials to advocate for the safety of glyphosate in newspapers and

5    magazines for scientists such as Robert Tarone and Henry Miller. Monsanto

6    has also ghostwritten letters by supposedly independent scientists which

7    have been submitted to regulatory agencies who are reviewing the safety of

8    glyphosate.

9        65.    Monsanto has also violated federal regulations in holding secret

10    ex parte meetings and conversations with certain EPA employees to collude

11    in a strategy to re-register glyphosate and to quash investigations into the

12    carcinogenicity of glyphosate by other federal agencies such as the Agency

13    for Toxic Substances and Disease Registry. Monsanto's close connection

14    with the EPA arises in part from its offering of lucrative consulting gigs to

15    retiring EPA officials. In March 2015, The Joint Glyphosate Task Force, at

16    Monsanto's behest, issued a press release sharply criticizing IARC, stating

17    that IARC's conclusion was "baffling" and falsely claiming that "IARC did

18    not consider any new or unique research findings when making its decision.

19    It appears that only by deciding to exclude certain available scientific

20    information and by adopting a different approach to interpreting the studies

21    was this possible."

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

66.     Beginning in 2011, the Federal Institute for Risk Assessment (BfR) in Germany began preparing a study on the safety of glyphosate. Through the Glyphosate Task Force, Defendants were able to co-opt this study, becoming the sole providers of data and ultimately writing the report, which was rubber-stamped by the BfR. The Glyphosate Task Force was solely responsible for preparing and submitting a summary of studies relied upon by the BfR. Defendants have used this self-serving report (which they, in fact, wrote) to falsely proclaim the safety of glyphosate. In October 2015, the Defendants, as members of the Joint Glyphosate Task Force, wrote to the state of Florida to try to stop Florida from warning the public about the carcinogenicity of glyphosate, arguing that the IARC classification was mistaken. In January of 2016, Monsanto filed a lawsuit to stop Florida from warning the public about the carcinogenicity of glyphosate.

### The Importance of Roundup® to Monsanto's Market Dominance Profits

67.     The success of Roundup® was key to Monsanto's continued reputation and dominance in the marketplace. Largely due to the success of Roundup® sales, Monsanto's agriculture division was outperforming its chemicals division's operating income, and that gap increased  yearly. But with its patent for glyphosate expiring in the United States in the year 2000, Monsanto needed a strategy to maintain its Roundup® market dominance

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

1 and to ward off impending competition.

2   68. In response, Monsanto began the development and sale of

3 genetically engineered

4   69. Roundup Ready® seeds in 1996. Since Roundup Ready® crops

5 are resistant to glyphosate, farmers can spray Roundup® onto their fields

6 during the growing season without harming the crop. This allowed

7 Monsanto to expand its market for Roundup® even further. By 2000,

8 Monsanto's biotechnology seeds were planted on more than 80 million acres

9 worldwide, and nearly 70% of American soybeans were planted from

10 Roundup Ready® seeds. It also secured Monsanto's dominant share of the

11 glyphosate/Roundup® market through a marketing strategy that coupled

12 proprietary Roundup Ready® seeds with continued sales of its

13 Roundup® herbicide

14   70. Through a three-pronged strategy of increased production,

15 decreased prices, and by coupling Roundup Ready® seeds with

16 Roundup® herbicide, Roundup® became Monsanto's most profitable

17 product. In 2000, Roundup® accounted for almost $2.8 billion in

18 sales, outselling other herbicides by a margin of five to one and

19 accounting for close to half of Monsanto's revenue. Today, glyphosate

20 remains one of the world's largest herbicides by sales volume.

21   ***Monsanto has known for decades that it falsely advertises the***

22

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

1   *safety of Roundup®.*

2      71.     In 1996, the New York Attorney General ("NYAG") filed

3   a lawsuit againstMonsanto based on its false and misleading advertising

4   of Roundup ® products. Specifically, the lawsuit challenged Monsanto's

5   general representations that its spray-on glyphosate-based herbicides,

6   including Roundup®, were "safer than table salt" and "practically non-

7   toxic" to mammals, birds, and fish. Among the representations the NYAG

8   found deceptive and misleading about the human and environmental

9   safety of Roundup® are the following:

10         a. Remember that environmentally friendly Roundup® herbicide is

11            biodegradable. It won't build up in the soil so you can use

12            Roundup® with confidence along customers' driveways,

13            sidewalks and fences...

14         b. And remember that Roundup® is biodegradable and won't build

15            up in the soil. That will give you the environmental confidence

16            you need to use Roundup® everywhere you've got a weed,

17            brush, edging or trimming problem.

18         c. Roundup® biodegrades into naturally occurring elements.

19         d. Remember that versatile Roundup® herbicide stays where you

20            put it. That means there's no washing or leaching to harm

21            customers' shrubs or other desirable vegetation.

22

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

e.  This non-residual herbicide will not wash or leach in the soil. It ... stays where you apply it.

f.  You can apply Accord (glyphosate-containing herbicide) with "confidence because it will stay where you put it;" it bonds tightly to soil particles, preventing leaching. Then, soon after application, soil microorganisms biodegrade Accord into natural products.

g.  Glyphosate is less toxic to rats than table salt following acute oral ingestion.

h.  Glyphosate's safety margin is much greater than required. It has over a 1,000-fold safety margin in food and over a 700-fold safety margin for workers who manufacture or use it.

i.  You can feel good about using herbicides by Monsanto. They carry a toxicity category rating of 'practically non-toxic' as it pertains to mammals, birds and fish.

j.  "Roundup can be used where kids and pets will play and breaks down into natural material." This ad depicts a person with his head in the ground and a pet dog standing in an area which has been treated with Roundup.

72.  On November 19, 1 996, Monsanto entered into an Assurance of Discontinuance with NYAG, in which Monsanto agreed, among other

29

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

1  things, "to cease and desist from publishing or broadcasting any

2  advertisements [in New York] that represent, directly or by implication"

3  that:

    a.  its glyphosate-containing herbicide products or any component

       thereof are safe, non-toxic, harmless or free from risk. * * *

    b.  its glyphosate-containing herbicide products or any component

       thereof manufactured, formulated, distributed or sold by

       Monsanto are biodegradable * * *

    c.  its glyphosate-containing herbicide products or any component

       thereof stay where they are applied under all circumstances and

       will not move through the environment by any means.

    d.  its glyphosate-containing herbicide products or any component

       thereof are "good" for the environment or are "known for their

       environmental characteristics." * * *

    e.  glyphosate-containing herbicide products or any component

       thereof are safer or less toxic than common consumer products

       other than herbicides;

    f.  its glyphosate-containing products or any component thereof

       might be classified as "practically non-toxic."

    73.  Monsanto did not alter its advertising in the same manner in

any state other than New York, and, on information and belief, still has not

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

1    done so today.

2        74.    In 2009, France's highest court ruled that Monsanto had not

3    told the truth about the safety of Roundup®. The French court affirmed an

4    earlier judgement that Monsanto had falsely advertised its herbicide

5    Roundup® as "biodegradable" and that it "left the soil clean."

6        ***Classifications and Assessments of Glyphosate***

7        75.    The IARC process for the classification of glyphosate followed

8    the stringent procedures for the evaluation of a chemical agent. Over time,

9    the IARC Monograph program has reviewed 980 agents. Of those reviewed,

10   it has determined 116 agents to be Group I (Known Human Carcinogens);

11   73 agents to be Group 2A (Probable Human Carcinogens); 287 agents to be

12   Group 2B (Possible Human Carcinogens); 503 agents to be Group 3 (Not

13   Classified); and one agent to be Probably Not Carcinogenic.

14       76.    The established procedure for IARC Monograph evaluations is

15   described in the IARC Programme's Preamble. Evaluations are performed

16   by panels of international experts, selected on the basis of their expertise and

17   the absence of actual or apparent conflicts of interest.

18       77.    One year before the Monograph meeting, the meeting is

19   announced and there is a call both for data and for experts. Eight months

20   before the Monograph meeting, the Working Group membership is selected,

21   and the sections of the Monograph are developed by the Working Group

22

31

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

members. One month prior to the Monograph meeting, the call for data is closed, and the various draft sections are distributed among Working Group members for review and comment. Finally, at the Monograph meeting, the Working Group finalizes review of all literature, evaluates the evidence in each category, and completes the overall evaluation. Within two weeks after the Monograph meeting, the summary of the Working Group findings is published in Lancet Oncology, and within a year after the meeting, the final Monograph is finalized and published.

78.     In assessing a chemical agent, the IARC Working Group reviews the following information:

(a) human, experimental, and mechanistic data;

(b) all pertinent epidemiological studies and cancer bioassays; and

(c) representative mechanistic data.

The studies must be publicly available and have sufficient detail for meaningful review, and reviewers cannot be associated with the underlying study.

79.     In March of 2015, IARC reassessed glyphosate. The summary published in The Lancet Oncology reported that glyphosate is a Group 2A agent, that is, glyphosate is probably carcinogenic in humans.

80.     On July 29, 2015, IARC issued its Monograph for glyphosate, Monograph 112. For Volume 112, the volume that assessed glyphosate, a

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

Working Group of 17 experts from II countries met at IARC from March 3-10, 2015, to assess the carcinogenicity of certain herbicides, including glyphosate. The March meeting culminated nearly a one-year review and preparation by the IARC Secretariat and the Working Group, including a comprehensive review of the latest available scientific evidence. According to published procedures, the Working Group considered "reports that have been published or accepted for publication in the openly available scientific literature" as well as "data from governmental reports that are publicly available."

81.     The studies considered the following exposure groups: occupational exposure of farmers and tree nursery workers in the United States, forestry workers in Canada and Finland and municipal weed-control workers in the United Kingdom; and para-occupational exposure in farming families.

82.     Glyphosate was identified as the second-most used household herbicide in the United States for weed control between 2001 and 2007 and the most heavily used herbicide in the world in 2012.

83.     Exposure pathways are identified as air (especially during spraying), water, and food. Community exposure to glyphosate is widespread and found in soil, air, surface water, and groundwater, as well as in food.

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

84.     The assessment of the IARC Working Group identified several case control studies of occupational exposure in the United States, Canada, and Sweden. These studies show a human health concern from agricultural and other work-related exposure to glyphosate.

85.     The IARC Working Group found an increased risk between exposure to glyphosate and non-Hodgkin lymphoma ("NHL") and several subtypes of NHL, and the increased risk persisted after adjustment for other pesticides.

86.     The IARC Working Group also found that glyphosate caused DNA and chromosomal damage in human cells. One study in community residents reported increases in blood markers of chromosomal damage (micronuclei) after glyphosate formulations were sprayed.

87.     In male CD-I mice, glyphosate induced a positive trend in the incidence of a rare tumor, renal tubule carcinoma. A second study reported a positive trend for hemangiosarcoma in male mice. Glyphosate increased pancreatic islet-cell adenoma in male rats in two studies. A glyphosate formulation promoted skin tumors in an initiation-promotion study in mice.

88.     The IARC Working Group also noted that glyphosate has been detected in the urine of agricultural workers, indicating absorption. Soil microbes degrade glyphosate to aminomethylphosphoric acid (AMPA). Blood AMPA detection after exposure suggests intestinal microbial

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

1   metabolism in humans.

2       89.    The IARC Working Group further found that glyphosate and

3   glyphosate formulations induced DNA, oxidative stress, and chromosomal

4   damage in mammals and in human and animal cells in utero.

5       90.    In addition to DNA damage and oxidative stress, scientists have

6   suggested that Roundup®'s association with various serious health

7   conditions is linked to the effect Roundup® has on the digestive system.

8   Specifically, scientists believe the same mechanism that makes Roundup®

9   toxic to weeds also makes it toxic to the microbes within the human gut and

10   mucous membranes. When humans are exposed to Roundup®, this exposure

11   leads to a chronic inflammatory state in the gut, as well an impaired gut

12   barrier, which can lead to many long-term health effects, including an

13   increased risk of cancer. Monsanto has deliberately refused to conduct tests

14   on this aspect of Roundup®'s mechanism of action.

15       91.    Many Roundup® products bear a label which either reads:

16   "glyphosate targets an enzyme found in plants but not in people or pets" or

17   "this Roundup formula targets an enzyme in plants but not in people or

18   pets." These statements are false because it has been established that the

19   human body is host to microorganisms which contain the enzyme Monsanto

20   asserts is not found in humans.

21       92.    Thus, glyphosate targets microbes within the human body

22

35

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

1  which contain the enzyme affected by glyphosate, leading to a variety of

2  adverse health effects. The IARC Working Group also noted genotoxic,

3  hormonal, and enzymatic effects in mammals exposed to glyphosate.

4  Essentially, glyphosate inhibits the biosynthesis of aromatic amino acids,

5  which leads to several metabolic disturbances, including the inhibition of

6  protein and secondary product biosynthesis and general metabolic

7  disruption.

8      93.    The IARC Working Group also reviewed an Agricultural

9  Health Study consisting of a prospective cohort of 57,311 licensed pesticide

10  applicators in Iowa and North Carolina. While this study differed from

11  others in that it was based on a self-administered questionnaire, the results

12  support an association between glyphosate exposure and Large cell

13  lymphoma (NHL), Hairy Cell Leukemia (HCL), and Chronic Lymphocytic

14  Leukemia (CLL), in addition to several other cancers.

15  ***Other Earlier Findings about Glyphosate's Dangers to Human***

16  ***Health***

17      94.    The EPA has a technical fact sheet, as part of its Drinking

18  Water and Health, National Primary Drinking Water Regulations

19  publication, relating to glyphosate. This technical fact sheet predates the

20  IARC March 20, 2015, evaluation. The fact sheet describes the release

21  patterns for glyphosate as follows:

22

36

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

1                                     **Release Patterns**

2          95.     Glyphosate is released to the environment in its use as an

3 herbicide for controlling woody and herbaceous weeds on forestry, right-of-

4 way, cropped and non-cropped sites. These sites may be around water and in

5 wetlands.

6         96.     It may also be released to the environment during its

7 manufacture, formulation, transport, storage, disposal and cleanup, and from

8 spills. Since glyphosate is not a listed chemical in the Toxics Release

9 Inventory, data on releases during its manufacture and handling are not

10 available.

11         97.     Occupational workers and home gardeners may be exposed to

12 glyphosate by inhalation and dermal contact during spraying, mixing, and

13 cleanup. They may also be exposed by touching soil and plants to which

14 glyphosate was applied. Occupational exposure may also occur during

15 glyphosate's manufacture, transport, storage, and disposal.

16         ***Recent Worldwide Bans on Roundup®/Glyphosate***

17         98.     Several countries around the world have instituted bans on the

18 sale of Roundup® and other glyphosate-containing herbicides, both before

19 and since IARC first announced its assessment for glyphosate in March

20 2015, and more countries undoubtedly will follow suit in light of this

21 assessment as the dangers of the use of Roundup® are more widely known.

22

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

1   The Netherlands issued a ban on all glyphosate-based herbicides in April

2   2014, including Roundup®, which takes effect by the end of 2015. In

3   issuing the ban, the Dutch Parliament member who introduced the successful

4   legislation stated: "Agricultural pesticides in user-friendly packaging are

5   sold in abundance to private persons. In garden centers, Roundup® is

6   promoted as harmless, but unsuspecting customers have no idea what the

7   risks of this product are. Especially children are sensitive to toxic substances

8   and should therefore not be exposed to it."

9       99.    The Brazilian Public Prosecutor in the Federal District

10  requested that the Brazilian Justice Department suspend the use of

11  glyphosate.

12      100.   France banned the private sale of Roundup® and glyphosate

13  following the IARC assessment for Glyphosate.

14      101.   Bermuda banned both the private and commercial sale of

15  glyphosates, including Roundup®. The Bermuda government explained its

16  ban as follows: "Following a recent scientific study carried out by a leading

17  cancer agency, the importation of weed spray 'Roundup' has been

18  suspended."

19      102.   The Sri Lankan government banned the private and commercial

20  use of glyphosates, particularly out of concern that glyphosate has been

21  linked to fatal kidney disease in agricultural workers.

22

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

103.   The government of Columbia announced its ban on using Roundup® and glyphosate to destroy illegal plantations of coca, the raw ingredient for cocaine, because of the WHO's finding that glyphosate is probably carcinogenic.

104.   Monsanto had superior knowledge compared to Roundup® users and consumers, including regarding the carcinogenic properties of the product, yet failed to accompany its registration, sales, distribution and or marketing of Roundup® and other glyphosate-based formulations with any warnings or precautions for that grave danger.

## EQUITABLE TOLLING OF APPLICABLE STATUTE OF LIMITATIONS

105.   Decedent has suffered an illness that has a latency period and does not arise until years after exposure. Decedent and Plaintiff had no way of knowing about the risk of serious illness associated with the use of and/or exposure to Roundup® and glyphosate until made aware that decedent's illnesses, including large cell lymphoma (NHL), could be caused by use and/or exposure to Roundup®. The discovery rule applies, and the statute of limitations was tolled until the day Plaintiff knew or had reason to know that decedent's illnesses, including myeloma, were linked to decedent's use and/or exposure to Roundup®.

106.   Within the time period of any applicable statute of limitations,

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

1    Plaintiff could not have discovered through the exercise of reasonable

2    diligence that exposure to Roundup® and glyphosate is injurious to human

3    health.

4         107.   Plaintiff did not discover and did not know of facts that would

5    cause a reasonable person to suspect the risk associated with the use of

6    and/or exposure to Roundup® and glyphosate, nor would a reasonable and

7    diligent investigation by Plaintiff have disclosed that Roundup® and

8    glyphosate would cause decedent's illnesses.

9         108.   The expiration of any applicable statute of limitations has been

10   equitably tolled by reason of Monsanto's fraudulent misrepresentations and

11   fraudulent concealment and fraudulent conduct. Through affirmative

12   misrepresentations and omissions, defendants actively concealed from

13   Plaintiff and decedent the true risks associated with use of and/or exposure

14   to Roundup®.

15        109.   As a result of defendants' actions, Plaintiff could not

16   reasonably have known or learned through reasonable diligence that

17   decedent had been exposed to the risks alleged herein and that those risks

18   were the direct and proximate result of defendants' acts and omissions.

19        110.   Defendants are estopped from relying on any statute of

20   limitations because of their concealment of the truth regarding the safety of

21   Roundup®. Defendants had a duty to disclose the true character, quality and

22

40

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

1    nature of Roundup® because this was non-public information over which

2    defendants continue to have exclusive control. Defendants knew that this

3    information was not available to Plaintiff or decedent, decedent's medical

4    providers and/or health facilities, yet defendants failed to disclose the

5    information to the public, including Plaintiff and decedent.

6         111.   Defendants had the ability to and did spend enormous amounts

7    of money in furtherance of the purposes of marketing and promoting a

8    profitable product, notwithstanding the known or reasonably knowable risks.

9    Plaintiff, decedent, and medical professionals could not have afforded to and

10   could not have possibly conducted studies to determine the nature, extent,

11   and identity of related health risks and were forced to rely on defendants'

12   representations.

13              **FIRST CAUSE OF ACTION**

14   **(STRICT PRODUCTS LIABILITY--DESIGN DEFECT by Plaintiff as**

15   **Against All Defendants, and DOES 1 Through 100, Inclusive)**

16        112.   Plaintiff re-alleges and incorporates herein by reference each

17   and every allegation and statement contained in the prior paragraphs.

18        113.   At all relevant times, defendants designed, developed, tested,

19   manufactured, fabricated, assembled, distributed, bought, sold, inspected,

20   serviced, repaired, maintained, marketed, warranted, supplied, modified,

21   placed, and/or provided Roundup® products, which are defective and

22

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

1   unreasonably dangerous to consumers, including decedent, thereby placing

2   Roundup® products into the stream of commerce. These actions were under

3   the ultimate control and supervision of defendants. At all relevant times,

4   defendants designed, researched, developed, manufactured, produced, tested,

5   assembled, labeled, advertised, promoted, marketed, sold, and distributed the

6   Roundup® products used by plaintiff, as described herein.

7       114.   At all relevant times, defendants' Roundup® products were

8   manufactured, designed, and labeled in an unsafe, defective, and inherently

9   dangerous manner that was dangerous for use by or exposure to the public,

10  including decedent.

11      115.   At all relevant times, defendants' Roundup® products were

12  defectively designed, tested, developed, and manufactured when placed on

13  the market by defendants, and was of such a nature that the defects would

14  not be discovered in the normal course of inspection and operation by users

15  thereof. Moreover, Roundup® products failed to provide adequate warnings

16  or instructions concerning the dangerous characteristics of Roundup®. In

17  particular, defendants failed to provide adequate warnings or instructions

18  concerning the Roundup®'s active ingredient, glyphosate.

19      116.   Defendants researched, developed, designed, tested,

20  manufactured, inspected, labeled, distributed, marketed, promoted, sold, and

21  otherwise released into the stream of commerce its Roundup® products, and

22

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

1 in the course of same, directly advertised or marketed the products to

2 consumers and end users, including decedent, and therefore had a duty to

3 warn of the risks associated with the use of Roundup® and glyphosate-

4 containing products.

5       117.   At all relevant times, defendants had a duty to properly test,

6 develop, design, manufacture, inspect, package, label, market, promote,

7 sell, distribute, maintain, supply, provide proper warnings, and take such

8 steps as necessary to ensure its Roundup® products did not cause users and

9 consumers to suffer from unreasonable and dangerous risks. Defendants

10 had a continuing duty to warn decedent of dangers associated with Roundup

11 use and exposure. Defendants, as manufacturer, seller, or distributor of

12 chemical herbicides are held to the knowledge of an expert in the field.

13       118.   At all relevant times, defendants' Roundup® products reached

14 the intended consumers, handlers, and users in Florida and throughout the

15 United States, including decedent, without substantial change in the

16 condition, as designed, manufactured, sold, distributed, labeled, and

17 marketed by defendants. At all relevant times, Defendants registered,

18 researched, manufactured, distributed, marketed and sold Roundup® and

19 other glyphosate-based formulations within Florida and aimed at a Florida

20 consumer and industrial market.  Monsanto was involved in the testing,

21 research, analyses of Roundup® and other glyphosate-based formulations,

22

43

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

1 including investigation and preparation of storage stability data and other

2 data submissions to the EPA for the continued registration of Roundup®

3 and other glyphosate-based formulations for use by consumers, including

4 Plaintiff, in Florida, and throughout the United States.

5     119.  Defendants' Roundup® products, as researched, tested,

6 developed, designed, licensed, manufactured, packaged, labeled, distributed,

7 sold, and marketed by defendants were defective in design and formulation

8 in that, when they left the hands of defendants' manufacturers and/or

9 suppliers, the foreseeable risks exceeded the alleged benefits associated with

10 their design and formulation.

11     120.  At all relevant times, defendants knew or had reason to know

12 that Roundup® products were defective and were inherently dangerous and

13 unsafe when used in the manner instructed and provided by defendants.

14     121.  Therefore, at all relevant times, Defendants' Roundup®

15 products, as researched, tested, developed, designed, licensed, manufactured,

16 packaged, labeled, distributed, sold and marketed by Defendants were

17 defective in design and formulation, in one or more of the following ways:

18       a.  When placed in the stream of commerce, Defendants'

19           Roundup® products were defective in design and formulation,

20           and, consequently, dangerous to an extent beyond that which an

21           ordinary consumer would contemplate;

22

44

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

b. When placed in the stream of commerce, Defendants'
Roundup® products were unreasonably dangerous in that they
were hazardous and posed a grave risk of cancer and other
serious illnesses when used in a reasonably anticipated manner;

c. When placed in the stream of commerce, Defendants'
Roundup® products contained unreasonably dangerous design
defects and were not reasonably safe when used in a reasonably
anticipated or intended manner;

d. Defendants did not sufficiently test, investigate, or study its
Roundup® products and, specifically, the active ingredient
glyphosate;

e. Exposure to Roundup® and glyphosate-containing products
presents a risk of harmful side effects that outweigh any
potential utility stemming from the use of the herbicide;

f. Defendants knew or should have known at the time of
marketing Roundup® products that exposure to Roundup® and
specifically, its active ingredient glyphosate, could result in
cancer and other severe illnesses and injuries; and

g. Defendants did not conduct adequate post-marketing
surveillance of its Roundup® products.

122. Defendants knew, or should have known that at all times herein

45

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

1  mentioned its Roundup was in a defective condition, and was and is

2  inherently dangerous and unsafe.

3      123.   Decedent was exposed to Defendants' Roundup, as described

4  above, without knowledge of Roundup's dangerous characteristics.

5      124.   At the time of the Decedent's use of and exposure to Roundup,

6  Roundup was being used for the purposes and in a manner normally

7  intended, as a broad-spectrum herbicide.

8      125.   Defendants with this knowledge voluntarily designed its

9  Roundup with a dangerous condition for use by the public, and in particular

10  the Decedent.

11      126.   Defendants had a duty to create a product that was not

12  unreasonably dangerous for its normal, intended use.

13      127.   Defendants created a product that was and is unreasonably

14  dangerous for its normal, intended use.

15      128.   Defendants marketed and promoted a product in such a manner

16  so as to make it inherently defective as the product downplayed its

17  suspected, probable, and established health risks inherent with its normal,

18  intended use.

19      129.   The Roundup designed, researched, manufactured, tested,

20  advertised, promoted, marketed, sold, and distributed by Defendants was

21  manufactured defectively in that Roundup left the hands of Defendants in a

22

46

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

defective condition and was unreasonably dangerous to its intended users.

130.    The Roundup designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed by Defendants reached their intended users in the same defective and unreasonably dangerous condition in which the Defendants' Roundup was manufactured.

131.    Defendants designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed a defective product, which created an unreasonable risk to the health of consumers and to the Decedent in particular, and Defendants are therefore strictly liable for the injuries sustained by the Decedent.

132.    The Decedent could not, by the exercise of reasonable care, have discovered Roundup's defects herein mentioned or perceived its danger.

133.    By reason of the foregoing, the Defendants have become strictly liable to the Plaintiff for the manufacturing, marketing, promoting, distribution, and selling of a defective product, Roundup.

134.    Defendants' defective design, of Roundup amounts to willful, wanton, and/or reckless conduct by Defendants.

135.    Defects in Defendants' Roundup were the cause or a substantial factor in causing Plaintiff's injuries.

136.    As a result of the foregoing acts and omission, the Decedent

47

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

1   developed large cell lymphoma (NHL), and suffered severe and personal

2   injuries, which are permanent and lasting in nature, physical pain and mental

3   anguish, including diminished enjoyment of life, and financial expenses for

4   hospitalization and medical care.

5   137.   As a result of the foregoing acts and omissions, Plaintiff has

6   suffered a loss of love, companionship, comfort, affection, society, solace

7   and moral support, all to their respective non-economic damages in a sum

8   within the unlimited jurisdiction of this Court and will be established at trial

9   according to proof.

10   138.   As a result of the foregoing acts and omissions, Plaintiff, has

11   incurred funeral and burial expenses in an amount not yet fully ascertained

12   but according to proof at the time of trial.

13   139.   WHEREFORE, Plaintiff respectfully requests this Court to

14   enter judgment in plaintiff's favor for compensatory and punitive damages,

15   together with interest, costs herein incurred, attorneys' fees and all such

16   other and further relief as this Court deems just and proper.

17   **SECOND CAUSE OF ACTION**

18   **(STRICT PRODUCTS LIABILITY--FAILURE TO WARN Plaintiff as**

19   **Against All Defendants, and DOES 1 Through 100, Inclusive)**

20   140.   Plaintiff repeats, reiterates and re-alleges each and every

21   allegation of this Complaint contained in each of the foregoing paragraphs

22

48

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

1    inclusive, with the same force and effect as if more fully set forth herein.

2        141.   At all relevant times, Defendants engaged in the business of

3    testing, developing, designing, manufacturing, marketing, selling,

4    distributing, and promoting Roundup® products which are defective and

5    unreasonably dangerous to consumers, including Plaintiff, because they do

6    not contain adequate warnings or instructions concerning the dangerous

7    characteristics of Roundup® and specifically, the active ingredient

8    glyphosate. These actions were under the ultimate control and supervision of

9    Defendants. At all relevant times, Defendants registered researched,

10   manufactured, distributed, marketed and sold Roundup® and other

11   glyphosate-based formulations within Florida and aimed at a Florida

12   consumer and industrial market. Monsanto was involved in the testing,

13   research, analyses of Roundup® and other glyphosate-based formulations,

14   including investigation and preparation of storage stability data and other

15   data submissions to the EPA for the continued registration of Roundup® and

16   other glyphosate-based formulations for use by consumers, including

17   Plaintiff, in Florida and throughout the United States. Monsanto or its agents

18   were at all relevant times involved in the marketing, distribution, and sale of

19   Roundup® and glyphosate-based formulations marketed and sold in Florida.

20       142.   Defendants did in fact sell, distribute, supply, manufacture,

21   and/or promote Roundup to Plaintiff. Additionally, Defendants expected the

22

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

1   Roundup that they were selling, distributing, supplying, manufacturing,

2   and/or promoting to reach--and Roundup did in fact reach--consumers,

3   including Decedent, without any substantial change in the condition of the

4   product from when it was initially distributed by Defendants.

5       143.   At the time of manufacture, Defendants could have provided

6   the warnings or instructions regarding the full and complete risks of

7   Roundup and glyphosate-containing products because it knew or should

8   have known of the unreasonable risks of harm associated with the use of

9   and/or exposure to such products.

10      144.   At all times herein mentioned, the aforesaid product was

11   defective and unsafe in manufacture such that it was unreasonably

12   dangerous to the user, and was so at the time it was distributed by

13   Defendants and at the time Decedent was exposed to and/or ingested the

14   product. The defective condition of Roundup was due in part to the fact that

15   it was not accompanied by proper warnings regarding its carcinogenic

16   qualities and possible side effects, including, but not limited to, developing

17   large cell lymphoma (NHL) as a result of exposure and use.

18      145.   Roundup did not contain a warning or caution statement, which

19   was necessary and, if complied with, was adequate to protect health those

20   exposed in violation of 7 U.S.C. § 136j(a)(1)(E).

21      146.   Defendants' failure to include a warning or caution statement

22

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

1    which was necessary and, if complied with, was adequate to protect the

2    health of those exposed, violated 7 U.S.C. § 136j(a)(1)(E) as well as the laws

3    of the State of Florida.

4        147.   Defendants could have amended the label of Roundup to

5    provide additional warnings.

6        148.   This defect caused serious injury to Decedent, who used

7    Roundup in its intended and foreseeable manner.

8        149.   At all times herein mentioned, Defendants had a duty to

9    properly design, manufacture, compound, test, inspect, package, label,

10   distribute, market, examine, maintain supply, provide proper warnings, and

11   take such steps to assure that the product did not cause users to suffer from

12   unreasonable and dangerous side effects.

13       150.   Defendants labeled, distributed, and promoted the aforesaid

14   product that it was dangerous and unsafe for the use and purpose for which it

15   was intended.

16       151.   Defendants failed to warn of the nature and scope of the side

17   effects associated with Roundup, namely its carcinogenic properties and its

18   propensity to cause or serve as a substantial contributing factor in the

19   development of large cell lymphoma (NHL).

20       152.   Defendants were aware of the probable consequences of the

21   aforesaid conduct. Despite the fact that Defendants knew or should have

22

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

1  known that Roundup caused serious injuries, Defendants failed to exercise

2  reasonable care to warn of the dangerous carcinogenic properties and side

3  effect of developing large cell lymphoma (NHL) from Roundup exposure,

4  even though these side effects were known or reasonably scientifically

5  knowable at the time of distribution. Defendants willfully and deliberately

6  failed to avoid the consequences associated with their failure to warn, and in

7  doing so, Defendants acted with a conscious disregard for the safety of

8  Decedent.

9       153.    At the time of exposure, Decedent could not have reasonably

10  discovered any defect in Roundup prior through the exercise of reasonable

11  care.

12       154.   Defendants, as the manufacturer and/or distributor of the

13  subject product, is held to the level of knowledge of an expert in the field.

14       155.   Decedent reasonably relied upon the skill, superior knowledge,

15  and judgment of Defendants.

16       156.   Had Defendants properly disclosed the risks associated with

17  Roundup, Decedent would have avoided the risk of large cell lymphoma

18  (NHL) by not using Roundup.

19       157.   The information that Defendants did provide or communicate

20  failed to contain adequate warnings and precautions that would have enabled

21  Decedent, and similarly situated individuals, to utilize the product safely and

22

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

1 with adequate protection. Instead, Defendants disseminated information that

2 was inaccurate, false, and misleading and which failed to communicate

3 accurately or adequately the comparative severity, duration, and extent of

4 the risk of injuries associated with use of and/or exposure to Roundup and

5 glyphosate; continued to promote the efficacy of Roundup, even after it

6 knew or should have known of the unreasonable risks from use or exposure;

7 and concealed, downplayed, or otherwise suppressed, through aggressive

8 marketing and promotion, any information or research about the risks and

9 dangers of exposure to Roundup and glyphosate.

10   158. To this day, Defendants have failed to adequately warn of the

11 true risks of Decedent's injuries associated with the use of and exposure to

12 Roundup.

13   159. As a result of their inadequate warnings, Defendants' Roundup

14 products were defective and unreasonably dangerous when they left the

15 possession and/or control of Defendants, were distributed by Defendants,

16 and used by Decedent.

17   160. As a direct and proximate result of Defendants' actions as

18 alleged herein, and in such other ways to be later shown, the subject product

19 caused Decedent to sustain injuries as herein alleged.

20   161. As a result of the foregoing acts and omissions, Plaintiff has

21 suffered a loss of love, companionship, comfort, affection, society, solace,

22

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

1    moral support and pain and suffering in a sum within the unlimited

2    jurisdiction of this Court and will be established at trial according to proof.

3        162.   As a result of the foregoing acts and omissions, plaintiff has

4    incurred funeral and burial expenses in an amount not yet fully ascertained

5    but according to proof at the time of trial.

6        163.   WHEREFORE, Plaintiff respectfully request that this Court

7    enter judgment in Plaintiff's favor for compensatory and punitive damages,

8    together with interest, costs herein incurred, attorneys' fees and all relief as

9    this Court deems just and proper.

10                    **THIRD CAUSE OF ACTION**

11    **(NEGLIGENCE by Plaintiff as Against All Defendants and DOES**

12                    **1 Through 100, Inclusive)**

13        164.   Plaintiff re-alleges and incorporates herein by reference each

14    and every allegation and statement contained in the prior paragraphs.

15        165.   Defendants, directly or indirectly, caused Roundup® products

16    to be sold, distributed, packaged, labeled, marketed, promoted, and/or used

17    by Plaintiff.

18        166.   At all relevant times, Defendants had a duty to exercise

19    reasonable care in the design, research, manufacture, marketing,

20    advertisement, supply, promotion, packaging, sale, and distribution of

21    Roundup products, including the duty to take all reasonable steps necessary

22

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

1 to manufacture, promote, and/or sell a product that was not unreasonably

2 dangerous to consumers and users of the product.

3     167. At all relevant times, Defendants had a duty to exercise

4 reasonable care in the marketing, advertisement, and sale of the Roundup®

5 products. Defendants' duty of care owed to consumers and the general

6 public included providing accurate, true, and correct information concerning

7 the risks of using Roundup and appropriate, complete, and accurate

8 warnings concerning the potential adverse effects of exposure to Roundup®,

9 and, in particular, its active ingredient glyphosate.

10     168. At all relevant times, Defendants knew or, in the exercise of

11 reasonable care, should have known of the hazards and dangers of

12 Roundup® and, specifically, the carcinogenic properties of the chemical

13 glyphosate.

14     169. Accordingly, at all relevant times, Defendants knew or, in the

15 exercise of reasonable care, should have known that use of or exposure to

16 Roundup® products could cause or be associated with Plaintiff's injuries,

17 and thus, create a dangerous and unreasonable risk of injury to the users of

18 these products, including Plaintiff.

19     170. Defendants also knew or, in the exercise of reasonable care,

20 should have known that users and consumers of Roundup® were unaware of

21 the risks and the magnitude of the risks associated with use of and/or

22

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

1    exposure to Roundup® and glyphosate-containing products.

2        171.   As such, Defendants breached their duty of reasonable care and

3    failed to exercise ordinary care in the design, research, development,

4    manufacture, testing, marketing, supply, promotion, advertisement,

5    packaging, sale, and distribution of Roundup® products, in that Defendants

6    manufactured and produced defective herbicides containing the chemical

7    glyphosate; knew or had reason to know of the defects inherent in its

8    products; knew or had reason to know that a user's or consumer's exposure

9    to the products created a significant risk of harm and unreasonably

10   dangerous side effects; and failed to prevent or adequately warn of these

11   risks and injuries. Indeed, Defendants deliberately refused to test Roundup®

12   products because they knew that the chemical posed serious health risks to

13   humans.

14       172.   Defendants were negligent in their promotion of Roundup®,

15   outside of the labeling context, by failing to disclose material risk

16   information as part of their promotion and marketing of Roundup, including

17   the Internet, television, print advertisements, etc. Nothing prevented

18   Defendants from being honest in their promotional activities, and, in fact,

19   Defendants had a duty to disclose the truth about the risks associated with

20   Roundup in their promotional efforts, outside of the context of labeling.

21       173.   Despite their ability and means to investigate, study, and test

22

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

the products and to provide adequate warnings, Defendants have failed to do so. Indeed, Defendants have wrongfully concealed information and have further made false and/or misleading statements concerning the safety and/or exposure to Roundup and glyphosate.

174.     Defendants' negligence included:

a.  Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing Roundup® products without thorough and adequate pre- and post-market testing;

b.  Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing Roundup® while negligently and/or intentionally concealing and failing to disclose the results of trials, tests, and studies of exposure to glyphosate, and, consequently, the risk of serious harm associated with human use of and exposure to Roundup;

c.  Failing to undertake sufficient studies and conduct necessary tests to determine whether or not Roundup® products and glyphosate-containing products were safe for their intended use in agriculture and horticulture;

d.  Failing to use reasonable and prudent care in the design, research, manufacture, and development of Roundup® products

57

so as to avoid the risk of serious harm associated with the prevalent use of Roundup/glyphosate as an herbicide;

e. Failing to design and manufacture Roundup® products so as to ensure they were at least as safe and effective as other herbicides on the market;

f. Failing to provide adequate instructions, guidelines, and safety precautions to those persons Defendants could reasonably foresee would use and be exposed to Roundup® products;

g. Failing to disclose to decedent, Plaintiff, users/consumers, and the general public that use of and exposure to Roundup® presented severe risks of cancer and other grave illnesses;

h. Failing to warn decedent, Plaintiff, consumers, and the general public that the product's risk of harm was unreasonable and that there were safer and effective alternative herbicides available to decedent Plaintiff and other consumers;

i. Systematically suppressing or downplaying contrary evidence about the risks, incidence, and prevalence of the side effects of Roundup® and glyphosate-containing products;

j. Representing that their Roundup® products were safe for their intended use when, in fact, Defendants knew or should have known the products were not safe for their intended purpose;

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

k.  Declining to make or propose any changes to Roundup®
products' labeling or other promotional materials that would
alert consumers and the general public of the risks of
Roundup® and glyphosate;

l.  Advertising, marketing, and recommending the use of the
Roundup® products, while concealing and failing to disclose or
warn of the dangers known (by Defendants) to be associated
with or caused by the use of or exposure to Roundup® and
glyphosate;

m. Continuing to disseminate information to its consumers, which
indicate or imply that Defendants' Roundup® products are not
unsafe for use in the agricultural and horticultural industries;
and

n.  Continuing the manufacture and sale of their products with the
knowledge that the products were unreasonably unsafe and
dangerous.

175.  Defendants knew and/or should have known that it was
foreseeable consumers such as Plaintiff would suffer injuries as a result of
Defendants' failure to exercise ordinary care in the manufacturing,
marketing, labeling, distribution, and sale of Roundup®.

176.  Decedent did not know the nature and extent of the injuries that

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

1 could result from the intended use of and/or exposure to Roundup® or its

2 active ingredient glyphosate.

3     177. Defendants' negligence was the proximate cause of decedent's

4 injuries and untimely death, *i.e.,* absent defendants' negligence, decedent

5 would not have developed cancer and plaintiff's husband would still be here

6 today.

7     178. Defendants' conduct, as described above, was reckless.

8 Defendants regularly risked the lives of consumers and users of their

9 products, including decedent, with full knowledge of the dangers of their

10 products. Defendants have made conscious decisions not to redesign, re-

11 label, warn, or inform the unsuspecting public, including decedent.

12 Defendants' reckless conduct therefore warrants an award of punitive

13 damages.

14     179. As a result of the foregoing acts and omissions, the Decedent

15 suffered from serious and dangerous side effects including, but not limited

16 to, large cell lymphoma (NHL), as well as other severe and personal injuries

17 which are permanent and lasting in nature, physical pain and mental anguish,

18 diminished enjoyment of life, and financial expenses for hospitalization and

19 medical care. Further, Decedent suffered life-threatening large cell

20 lymphoma (NHL), and severe personal injuries, which are permanent and

21 lasting in nature, physical pain and mental anguish, including diminished

22

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

enjoyment of life.

180.   The conduct of defendants was a substantial factor and proximate cause of the serious personal injuries and death sustained by plaintiff's decedent, Derrick Lamar.

181.   Plaintiff is informed, believes and thereon alleges, that at all times herein relevant, that the conduct of defendants was a substantial factor in causing plaintiff's damages as alleged herein.

182.   As a result of the foregoing acts and omissions, Plaintiff has suffered a loss of love, companionship, comfort, affection, society, solace, moral support and pain and suffering, in a sum within the unlimited jurisdiction of this Court and will be established at trial according to proof.

183.   As a result of the foregoing acts and omissions, Plaintiff, has incurred funeral and burial expenses in an amount not yet fully ascertained but according to proof at the time of trial.

184.   WHEREFORE, plaintiff respectfully requests this Court to enter judgment in plaintiff's favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all such other and further relief as this Court deems just and proper.

## FOURTH CAUSE OF ACTION

**(BREACH OF EXPRESS WARRANTIES by Plaintiff as Against Defendant Monsanto Company, and DOES 1 Through**

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

**100, Inclusive)**

185.  Plaintiff re-allege and incorporate herein by reference each and every allegation and statement contained in the prior paragraphs.

186.  At all relevant times, Defendant Monsanto engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting Roundup® products, which are defective and unreasonably dangerous to consumers, including Plaintiff, thereby placing Roundup® products into the stream of commerce. These actions were under the ultimate control and supervision of Defendant Monsanto.

187.  Defendant Monsanto had a duty to exercise reasonable care in the research, development, design, testing, packaging, manufacture, inspection, labeling, distributing, marketing, promotion, sale, and release of Roundup® products, including a duty to:

    a.    ensure that its products did not cause the user unreasonably dangerous side effects;

    b.    warn of dangerous and potentially fatal side effects; and

    c.    disclose adverse material facts, such as the true risks associated with the use of and exposure to Roundup® and glyphosate-containing products, when making representations to consumers and the general public, including Plaintiff.

188.  As alleged throughout this pleading, the ability of Defendant

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

1   Monsanto to properly disclose those risks associated with Roundup® is not

2   limited to representations made on the labeling.

3          189.  At all relevant times, Defendant Monsanto expressly

4   represented and warranted to the purchasers of its products, by and through

5   statements made by Defendant Monsanto in labels, publications, package

6   inserts, and other written materials intended for consumers and the general

7   public, that Roundup® products were safe to human health and the

8   environment, effective, fit, and proper for their intended use. Defendant

9   Monsanto advertised, labeled, marketed, and promoted Roundup® products,

10  representing the quality to consumers and the public in such a way as to

11  induce their purchase or use, thereby making an express warranty that

12  Roundup® products would conform to the representations.

13         190.  These express representations include incomplete warnings and

14  instructions that purport, but fail, to include the complete array of risks

15  associated with use of and/or exposure to Roundup® and glyphosate.

16  Defendant Monsanto knew and/or should have known that the risks

17  expressly included in Roundup® warnings and labels did not and do not

18  accurately or adequately set forth the risks of developing the serious injuries

19  complained of herein. Nevertheless, Defendant Monsanto expressly

20  represented that Roundup® products were safe and effective, that they were

21  safe and effective for use by individuals such as the Plaintiff, and/or that

22

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

1   they were safe and effective as agricultural herbicides.

2         191.  The representations about Roundup®, as set forth herein,

3   contained or constituted affirmations of fact or promises made by the seller

4   to the buyer, which related to the goods and became part of the basis of the

5   bargain, creating an express warranty that the goods would conform to the

6   representations.

7         192.  Defendant Monsanto placed Roundup® products into the

8   stream of commerce for sale and recommended their use to consumers and

9   the public without adequately warning of the true risks of developing the

10   injuries associated with the use of and exposure to Roundup® and its active

11   ingredient glyphosate.

12         193.  Defendant Monsanto breached these warranties because, among

13   other things, Roundup® products were defective, dangerous, and unfit for

14   use, did not contain labels representing the true and adequate nature of the

15   risks associated with their use, and were not merchantable or safe for their

16   intended, ordinary, and foreseeable use and purpose. Specifically, Defendant

17   Monsanto breached the warranties in the following ways:

18         a.  Defendant Monsanto represented through its labeling,

19              advertising, and marketing materials that Roundup® products

20              were safe, and fraudulently withheld and concealed information

21              about the risks of serious injury associated with use of and/or

22

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

exposure to Roundup® and glyphosate by expressly limiting the risks associated with use and/or exposure within its warnings and labels; and

    b.  Defendant Monsanto represented that Roundup® products were safe for use and fraudulently concealed information that demonstrated that glyphosate, the active ingredient in Roundup®, had carcinogenic properties, and that Roundup® products, therefore, were not safer than alternatives available on the market.

194.  Decedent detrimentally relied on the express warranties and representations of defendant Monsanto concerning the safety and/or risk profile of Roundup® in making a decision to purchase the product. Decedent reasonably relied upon defendant Monsanto to disclose known defects, risks, dangers, and side effects of Roundup® and glyphosate. Decedent would not have purchased or used Roundup® had defendant Monsanto properly disclosed the risks associated with the product, either through advertising, labeling, or any other form of disclosure.

195.  Defendant Monsanto had sole access to material facts concerning the nature of the risks associated with its Roundup® products, as expressly stated within their warnings and labels, and knew that consumers and users such as decedent could not have reasonably discovered that the

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

1  risks expressly included in Roundup® warnings and labels were inadequate

2  and inaccurate.

3     196.  Decedent had no knowledge of the falsity or incompleteness of

4  defendant Monsanto's statements and representations concerning Roundup.

5     197.  Decedent used and/or was exposed to Roundup® as researched,

6  developed, designed, tested, manufactured, inspected, labeled, distributed,

7  packaged, marketed, promoted, sold, or otherwise released into the stream of

8  commerce by defendant Monsanto.

9     198.  Had the warnings, labels, advertisements, or promotional

10  material for Roundup® products accurately and adequately set forth the true

11  risks associated with the use of such products, including decedent's injuries,

12  rather than expressly excluding such information and warranting that the

13  products were safe for their intended use, Decedent could have avoided the

14  injuries complained of herein, including his untimely death.

15     199.  As a direct and proximate result of defendant Monsanto's

16  breach of express warranty, plaintiff has sustained pecuniary loss and

17  general damages in a sum exceeding the jurisdictional minimum of this

18  Court.

19     200.   As a direct and proximate result of the conduct of defendant

20  Monsanto's breach of express warranty, Decedent suffered from serious and

21  dangerous side effects including, but not limited to, large cell lymphoma

22

66

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

1  (NHL), as well as other severe and personal injuries which are permanent

2  and lasting in nature, physical pain and mental anguish, diminished

3  enjoyment of life, and financial expenses for hospitalization and medical

4  care. Further, Decedent suffered life-threatening large cell lymphoma

5  (NHL), and severe personal injuries, which are permanent and lasting in

6  nature, physical pain and mental anguish, including diminished enjoyment of

7  life.

8      201.  The conduct of defendants was a substantial factor and

9  proximate cause of the. serious personal injuries and death sustained by

10  plaintiff's decedent, Derrick Lamar.

11      202.  Plaintiff is informed, believes and thereon alleges, that at all

12  times herein relevant, that the conduct of defendants was a substantial factor

13  in causing plaintiff's damages as alleged herein.

14      203.   As a result of the foregoing acts and omissions, Plaintiffhas

15  suffered a loss of love, companionship, comfort, affection, society, solace,

16  moral support and pain and suffering, all to their respective non-economic

17  damages in a sum within the unlimited jurisdiction of this Court and will be

18  established at trial according to proof.

19      204.   As a result of the foregoing acts and omissions, Plaintiff has

20  incurred funeral and burial expenses in an amount not yet fully ascertained

21  but according to proof at the time of trial.

22

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

205.  WHEREFORE, plaintiff respectfully requests that this Court enter judgment in plaintiff's favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all such other and further relief as this Court deems just and proper.

## FIFTH CAUSE OF ACTION

**(BREACH OF IMPLIED WARRANTIES by Plaintiff as Against All Defendants, and DOES 1 Through 100, Inclusive)**

206.  Plaintiff re-alleges and incorporates herein by reference each and every allegation and statement contained in the prior paragraphs.

207.  At all relevant times, Defendants engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting Roundup® products, which were and are defective and unreasonably dangerous to consumers, including decedent, thereby placing Roundup® products into the stream of commerce.

208.  Before the time decedent was exposed to the aforementioned Roundup® products, Defendants impliedly warranted to its consumers, including decedent, that Roundup® products were of merchantable quality and safe and fit for the use for which they were intended; specifically, as agricultural herbicides.

209.  But Defendants failed to disclose that Roundup® has dangerous propensities when used as intended and that use of and/or exposure to

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

Roundup® and glyphosate-containing products carries an increased risk of developing severe injuries, including decedent's injuries.

210. Decedent was an intended beneficiary of the implied warranties made by defendant Monsanto to purchasers of its herbicides.

211. The Roundup® products were expected to reach and did in fact reach consumers and users, including decedent, without substantial change in the condition in which they were manufactured and sold by defendant Monsanto.

212. At all relevant times, Defendants aware that consumers and users of its products, including decedent, would use Roundup® products as marketed by defendant Monsanto, which is to say that decedent was a foreseeable user of Roundup®.

213. Defendants intended that Roundup® products be used in the manner in which decedent, in fact, used them and which Defendants impliedly warranted to be of merchantable quality, safe, and fit for this use, despite the fact that Roundup® was not adequately tested or researched.

214. In reliance upon Defendants' implied warranty, decedent used Roundup® as instructed and labeled and in the foreseeable manner intended, recommended, promoted, and marketed by defendant Monsanto.

215. Decedent could not have reasonably discovered or known of the risks of serious injury associated with Roundup® or glyphosate.

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

216. Defendants breached its implied warranty to decedent in that Roundup® products were not of merchantable quality, safe, or fit for their intended use, or adequately tested. Roundup® has dangerous propensities when used as intended and can cause serious injuries, including those injuries complained of herein.

217. The harm caused by Defendants' Roundup® products far outweighed their benefit, rendering the products more dangerous than an ordinary consumer or user would expect and more dangerous than alternative products.

218. As a direct and proximate result of Defendants' breach of implied warranty, the Decedent suffered from serious and dangerous side effects including, but not limited to, large cell lymphoma (NHL), as well as other severe and personal injuries which are permanent and lasting in nature, physical pain and mental anguish, diminished enjoyment of life, and financial expenses for hospitalization and medical care. Further, Decedent suffered life-threatening large cell lymphoma (NHL), and severe personal injuries, which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life.

219. As a direct and proximate result of Defendants' breach of implied warranty, plaintiff has sustained pecuniary loss and general damages in a sum exceeding the jurisdictional minimum of this Court.

70

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

1    220.  The conduct of defendants was a substantial factor and

2  proximate cause of the serious personal injuries and death sustained by

3  plaintiff's decedent, Derrick Lamar.

4    221.  Plaintiff is informed and believes, and thereon alleges, that at

5  all times herein relevant, that the conduct of defendants was a substantial

6  factor in causing plaintiff's damages as alleged herein.

7    222.  As a result of the negligence of said Defendants, and each of

8  them, Plaintiff has suffered a loss of love, companionship, comfort,

9  affection, society, solace, moral support and pain and suffering damages in a

10  sum within the unlimited jurisdiction of this Court and will be established at

11  trial according to proof.

12    223.  As a further result of the negligence of said Defendants, and

13  each of them, Plaintiff has incurred funeral and burial expenses in an amount

14  not yet fully ascertained but according to proof at the time of trial.

15    224.  WHEREFORE, Plaintiff respectfully requests that this Court

16  enter judgment in plaintiff's favor for compensatory and punitive damages,

17  together with interest, costs herein incurred, attorneys' fees and all such

18  other and further relief as this Court deems just and proper.

19               **SIXTH CAUSE OF ACTION**

20    **(FRAUD Plaintiff as Against Defendant Monsanto Company,**

21           **and DOES 1 Through 100, Inclusive)**

22

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

225. Plaintiff re-alleges and incorporates herein by reference each and every allegation and statement contained in the prior paragraphs.

226. Defendant Monsanto has defrauded the agricultural community in general and decedent Plaintiff in particular by misrepresenting the true safety of its Roundup® and by failing to disclose known risks of cancer.

227. Defendant Monsanto misrepresented and/or failed to disclose, inter alia, that: glyphosate and its major metabolite aminomethylphosphonic acid (AMPA) could cause cancer; glyphosate and AMPA are known to be genotoxic in humans and laboratory animals because exposure is known to cause DNA strand breaks (a precursor to cancer); glyphosate and AMPA are known to induce oxidative stress in humans and laboratory animals (a precursor to cancer); glyphosate and AMPA interfere with the aromatic amino acids within the human gut, leading to downstream health conditions including cancer; exposure to glyphosate and AMPA is causally associated with large cell lymphoma (NHL); and the laboratory tests attesting to the safety of glyphosate were flawed and/or fraudulent.

228. Due to these misrepresentations and omissions, at all times relevant to this litigation, Defendant's Roundup® was misbranded under 7 U.S.C. § 136(g) and its distribution within Florida and around the United States was a violation of 7 U.S.C. § 136j and 40 C.F.R. § 156.10(a)(5).

229. Decedent relied on the Defendant's misrepresentations and/or

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

1  material omissions regarding the safety of Roundup® and its active

2  ingredient glyphosate in deciding whether to purchase and/or use the

3  product. Decedent and/or Plaintiff did not know nor could they reasonably

4  have known of the misrepresentations and/or material omissions by

5  Defendant concerning Roundup® and its active ingredient glyphosate.

6      230.  The misrepresentations and/or material omissions that form the

7  basis of this fraud claim are not limited to statements made on the

8  Roundup® labeling, as defined under federal law, but also involve

9  Defendant Monsanto's representations and omissions made as part of its

10  promotion and marketing of Roundup®, including on the Internet,

11  television, in print advertisements, etc. Nothing prevented Defendant

12  Monsanto from disclosing the truth about the risks associated with

13  Roundup® in its promotional efforts outside of the labeling context, using

14  the forms of media and promotion Defendant Monsanto traditionally used to

15  promote the product's efficacy and benefits.

16      231.  When Defendant Monsanto made the misrepresentations and/or

17  omissions as alleged in this pleading, it did so with the intent of defrauding

18  and deceiving the public in general and the agricultural community and with

19  the intent of inducing the public and agricultural community to purchase and

20  use Roundup®.

21      232.  Defendant Monsanto made these misrepresentations and/or

22

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

material omissions with malicious, fraudulent and/or oppressive intent

toward Plaintiff and the public generally. Defendant's conduct was willful,

wanton, and/or reckless. Defendant deliberately recommended,

manufactured, produced, marketed, sold, distributed, merchandized,

packaged, promoted and advertised the dangerous and defective herbicide

Roundup®. This constitutes an utter, wanton, and conscious disregard of the

rights and safety of a large segment of the public, and by reason thereof,

Defendant is liable for reckless, willful, and wanton acts and omissions

which evidence a total and conscious disregard for the safety of Plaintiff and

others which proximately caused the injuries as set forth herein.

233. As a proximate result of defendant Monsanto's fraudulent and

deceitful conduct and representations, Plaintiff has sustained damages and

other losses in an amount to be proven at trial.

234. As a direct and proximate result of the conduct of defendants,

the Decedent suffered from serious and dangerous side effects including, but

not limited to, large cell lymphoma (NHL), as well as other severe and

personal injuries which are permanent and lasting in nature, physical pain

and mental anguish, diminished enjoyment of life, and financial expenses for

hospitalization and medical care. Further, Decedent suffered life-threatening

large cell lymphoma (NHL), and severe personal injuries, which are

permanent and lasting in nature, physical pain and mental anguish, including

74

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

1    diminished enjoyment of life.

2        235.  The conduct of defendants was a substantial factor and

3    proximate cause of the serious personal injuries and death sustained by

4    plaintiff's decedent, Derrick Lamar.

5        236.  Plaintiff is informed, believes and thereon alleges, that at all

6    times herein relevant, that the conduct of defendants was a substantial factor

7    in causing plaintiff's damages as alleged herein.

8        237.  As a direct and proximate result of the conduct of defendants,

9    and each of them, Plaintiff has suffered a loss of love, companionship,

10   comfort, affection, society, solace, moral support and pain and suffering

11   damages in a sum within the unlimited jurisdiction of this Court and will be

12   established at trial according to proof.

13       238.  As a further result of the negligence of said Defendants, and

14   each of them, Plaintiff has incurred funeral and burial expenses in an amount

15   not yet fully ascertained but according to proof at the time of trial.

16       239.  WHEREFORE, plaintiff respectfully requests that this Court

17   enter judgment in plaintiff's favor for compensatory and punitive damages,

18   together with interest, costs herein incurred, attorneys' fees and all such

19   other and further relief as this Court deems just and proper.

20   / / /

21   / / /

22

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

## SEVENTH CAUSE OF ACTION

## (WRONGFUL DEATH by Plaintiff Against All Defendants, and DOES 1 Through 100, Inclusive)

240.  Plaintiff repeats, reiterates, and re-alleges each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect all if more fully set forth herein.

241.  Plaintiff SHANDA LAMAR, is the surviving spouse of Decedent. Plaintiff is the Decedent's only heir and brings herein this wrongful death claim.

242.  Decedent died as a direct and proximate result of Defendants' negligent and wrongful conduct in connection with the design, development, manufacture, testing, packaging, promoting, marketing, advertising, distribution, labeling, and/or sale of the herbicide Roundup, containing the active ingredient glyphosate.

243.  Defendants' wrongful conduct has proximately caused Decedent's heirs to suffer the loss of Decedent's companionship, services, society, marital association, love and consortium.

244.   As a direct and proximate result of the conduct of defendants, and each of them, Plaintiff has suffered a loss of love, companionship, comfort, affection, society, solace and moral support, all to their respective non-economic damages in a sum within the unlimited jurisdiction of this

76

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

1    Court and will be established at trial according to proof.

2         245.   As a further result of the negligence of said Defendants, and

3    each of them, Plaintiff has incurred funeral and burial expenses in an amount

4    not yet fully ascertained but according to proof at the time of trial.

5         246.  WHEREFORE, Plaintiff SHANDA LAMAR respectfully

6    requests that this Court enter judgment in Plaintiff's favor for compensatory

7    and punitive damages, together with interest, costs herein incurred,

8    attorneys' fees and all relief as this Court deems just and proper.

9                    **EIGHTH CAUSE OF ACTION**

10   **(EXEMPLARY DAMAGES by Plaintiff Against All Defendants, and**

11                  **DOES 1 Through 100, Inclusive)**

12        247.  Plaintiff incorporates by reference each allegation set forth in

13   preceding paragraphs as if fully stated herein.

14        248.  Defendants' conduct as alleged herein was done with

15   oppression, fraud, and malice. Defendants were fully aware of the safety

16   risks of Roundup®. Nonetheless, Defendants deliberately crafted their label,

17   marketing, and promotion to mislead farmers and consumers.

18        249.  This was not done by accident or through some justifiable

19   negligence. Rather, Defendants knew that it could turn a profit by

20   convincing the agricultural industry that Roundup was harmless to humans,

21   and that full disclosure of the true risks of Roundup® would limit the

22

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

1 amount of money Defendants would make selling Roundup® in Florida.

2 Defendants' objection was accomplished not only through its misleading

3 labeling, but through a comprehensive scheme of selective fraudulent

4 research and testing, misleading advertising, and deceptive omissions as

5 more fully alleged throughout this pleading. Plaintiff was denied the right to

6 make an informed decision about whether to purchase, use, or be exposed to

7 an herbicide, knowing the full risks attendant to that use. Such conduct was

8 done with conscious disregard of Plaintiff's rights.

9     250. There is no indication that Defendants will stop their deceptive

10 and unlawful marketing practices unless they are punished and deterred.

11 Accordingly, Plaintiff requests punitive damages against the Defendants for

12 the harms caused to Plaintiff.

13     251. The conduct of defendants was a substantial factor and

14 proximate cause of the serious personal injuries and death sustained by

15 plaintiff's decedent, Derrick Lamar.

16 / / /

17 / / /

18 / / /

19 / / /

20 / / /

21 / / /

22

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

# **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff SHANDA LAMAR hereby prays for judgment against Defendants, and each of them, jointly and severally as follows:

1.     Awarding compensatory damages in excess of the jurisdictional amount, including, but not limited to pain, suffering, emotional distress, loss of enjoyment of life, and other non-economic damages in an amount to be determined at trial of this action;

2.     Awarding compensatory damages to Plaintiff for past and future damages, including, but not limited to, Plaintiff's pain and suffering and for severe and permanent personal injuries sustained by the Plaintiff including health care costs and economic loss;

3.     Awarding economic damages in the form of medical expenses, out of pocket expenses, lost earnings and other economic damages in an amount to be determine at trial of this action;

4.     Punitive and/or exemplary damages for the wanton, willful, fraudulent, and reckless acts of the Defendants who demonstrated a complete disregard and reckless indifference for the safety and welfare of the general public and to the Plaintiff in an amount sufficient to punish Defendants and deter future similar conduct, to the extent allowed by applicable law;

5.     Pre-judgment interest;

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

6.    Post-judgment interest;

7.    Awarding Plaintiff reasonable attorneys' fees;

8.    Awarding Plaintiff the costs of these proceedings; and

9.    Such other and further relief as this Court deems just and proper.


DATED: June 21, 2022        **THE LAW OFFICES OF HAYTHAM FARAJ**



By: ___/s/ Haytham Faraj_____
         HAYTHAM FARAJ, ESQ.
         Attorneys for Plaintiff, SHANDA LAMAR

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

## **DEMAND FOR JURY TRIAL**

Plaintiff SHANDA LAMAR hereby demands a trial by jury on all of the causes of action.

DATED: June 21, 2022          **THE LAW OFFICES OF HAYTHAM FARAJ**


By:   /s/ Haytham Faraj
HAYTHAM FARAJ, ESQ.
Attorneys for Plaintiff, SHANDA LAMAR

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**