ACCO,(KKx),DISCOVERY,MANADR

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA (Eastern Division - Riverside)
## CIVIL DOCKET FOR CASE #: 5:22-cv-01793-JGB-KK

Dan Rowland et al v. Monsanto Company et al
Assigned to: Judge Jesus G. Bernal
Referred to: Magistrate Judge Kenly Kiya Kato
Case in other court:  San Bernardino Superior, CIVSB2215447
Cause: 28:1441 Notice of Removal - Product Liability

Date Filed: 10/12/2022
Jury Demand: Both
Nature of Suit: 365 Personal Inj. Prod. Liability
Jurisdiction: Diversity

**Plaintiff**

**Dan Rowland**                                 represented by   **Mark P. Robinson , Jr.**
Robinson Calcagnie Inc
19 Corporate Plaza Drive
Newport Beach, CA 92660
949-720-1288
Fax: 949-720-1292
Email: mrobinson@robinsonfirm.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jennifer Maureen Collins**
Robinson Calcagnie Inc
19 Corporate Plaza Drive
Newport Beach, CA 92660
949-720-1288
Fax: 949-720-1292
Email: jcollins@robinsonfirm.com
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Phyllis Rowland**                             represented by   **Mark P. Robinson , Jr.**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jennifer Maureen Collins**
(See above for address)
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Monsanto Company**                            represented by   **Ryan S Killian**
*a corporation*                                                 Shook Hardy and Bacon LLP
600 Travis Street Suite 3400
Houston, TX 77002

713-227-8008
Fax: 713-227-9508
Email: rkillian@shb.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Orchard Supply Hardware**
*a corporation*

**Defendant**

**Does**
*1 through 100 inclusive*

| Date Filed | # | Docket Text |
|---|---|---|
| 10/12/2022 | 1 | NOTICE OF REMOVAL from San Bernardino, case number CIVSB2215447 with filing fee previously paid ($402.00 paid on 10/12/2022, receipt number BCACDC-34135612), filed by Defendant Monsanto Company. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8, # 9 Exhibit 9, # 10 Exhibit 10, # 11 Exhibit 11) (Attorney Ryan S Killian added to party Monsanto Company(pty:dft))(Killian, Ryan) (Entered: 10/12/2022) |
| 10/12/2022 | 2 | CIVIL COVER SHEET filed by Defendant Monsanto Company. (Killian, Ryan) (Entered: 10/12/2022) |
| 10/12/2022 | 3 | CORPORATE DISCLOSURE STATEMENT filed by Defendant Monsanto Company identifying Bayer AG as Corporate Parent. (Killian, Ryan) (Entered: 10/12/2022) |
| 10/12/2022 | 4 | NOTICE of Interested Parties filed by Defendant Monsanto Company, identifying Bayer AG. (Killian, Ryan) (Entered: 10/12/2022) |
| 10/12/2022 | 5 | PROOF OF SERVICE filed by Defendant Monsanto Company, re Corporate Disclosure Statement 3 , Civil Cover Sheet (CV-71) 2 , Notice of Removal (Attorney Civil Case Opening), 1 , Certificate/Notice of Interested Parties 4 served on 10/12/2022. (Killian, Ryan) (Entered: 10/12/2022) |
| 10/12/2022 | | CONFORMED FILED COPY OF COMPLAINT against Defendants Does 1 through 100 inclusive, Monsanto Company, Orchard Supply Hardware. Jury Demanded., filed by plaintiffs Dan Rowland, Phyllis Rowland. (FILED IN STATE COURT ON 7/20/2022 SUBMITTED ATTACHED EXHIBIT 1) (ghap) (Entered: 10/13/2022) |
| 10/12/2022 | | NON CONFORM COPY OF ANSWER to Complaint - (Discovery), filed by Defendant Monsanto Company. (SUBMITTED ATTACHED EXHIBIT 6)(ghap) (Entered: 10/13/2022) |
| 10/13/2022 | 6 | NOTICE OF ASSIGNMENT to District Judge Jesus G. Bernal and Magistrate Judge Kenly Kiya Kato. (ghap) (Entered: 10/13/2022) |
| 10/13/2022 | 7 | NOTICE TO PARTIES OF COURT-DIRECTED ADR PROGRAM filed. (ghap) (Entered: 10/13/2022) |
| 10/13/2022 | 8 | Notice to Counsel Re Consent to Proceed Before a United States Magistrate Judge. (ghap) (Entered: 10/13/2022) |

### PACER Service Center

| Transaction Receipt | | | |
|---|---|---|---|
| 10/14/2022 12:35:09 | | | |
| **PACER Login:** | sh0019sh | **Client Code:** | 31943.356965 rhb |
| **Description:** | Docket Report | **Search Criteria:** | 5:22-cv-01793-JGB-KK End date: 10/14/2022 |
| **Billable Pages:** | 3 | **Cost:** | 0.30 |

1   Steven R. Platt (SBN 245510)
    PARKER, MILLIKEN, CLARK,
2   O'HARA & SAMUELIAN, P.C.
    555 S. Flower St., 30th Floor
3   Los Angeles, CA 90071-2440
    Telephone: (213) 683-6500
4   Facsimile: (213) 683-6669
    splatt@pmcos.com
5
6   Ryan S. Killian (SBN 294512)
    SHOOK, HARDY & BACON L.L.P.
7   600 Travis Street, Suite 3400
    Houston, TX 77002-2926
8   Telephone: (713) 227-8008
    Facsimile: (713) 227-9508
9   rkillian@shb.com

10  Attorneys for Defendant MONSANTO COMPANY

11

12              **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

13                **FOR THE COUNTY OF SAN BERNARDINO**

14

15  DAN ROWLAND, *et al.,*              Case No. CIVSB2215447

16          Plaintiffs,                 **DEFENDANT MONSANTO COMPANY'S**
                                        **NOTICE OF FILING OF NOTICE OF**
17          v.                          **REMOVAL**

18  MONSANTO COMPANY, *et al.,*          Complaint Filed:    July 20, 2022
                                         Trial Date:         None set
19          Defendants.

20

21

22

23

24

25

26

27

28

MONSANTO COMPANY'S NOTICE OF FILING OF NOTICE OF REMOVAL

1   TO THE COURT, ALL PARTIES, AND THEIR ATTORNEYS OF RECORD:

2        PLEASE TAKE NOTICE (in accordance with 28 U.S.C. §1446(d)) that defendant

3   Monsanto Company has removed this action to the United States District Court for the Central

4   District of California ("District Court") by filing the attached Notice of Removal with the Clerk

5   of the District Court on October 12, 2022.  The Superior Court of the State of California may

6   proceed no further unless or until this case is remanded.

7    Dated:  October 12, 2022          PARKER, MILLIKEN, CLARK, O'HARA &
                                       SAMUELIAN, P.C.
8

9

10

11                                     _____
                                       Steven R. Platt (SBN 245510)
12
                                       SHOOK, HARDY & BACON L.L.P.
13                                     Ryan S. Killian (SBN 294512)

14                                     Attorneys for Defendant
                                       Monsanto Company
15

16

17

18

19

20

21

22

23

24

25

26

27

28

ATTACHMENT

1

**SHOOK, HARDY & BACON L.L.P**
2   Ryan S. Killian
    CA Bar No. 294512
3   600 Travis Street, Suite 3400
    Houston, TX 77002-2026
4   Telephone:   (713) 227-8008
    Facsimile:    (713) 227-9508
5   Email:        rkillian@shb.com

6   *Attorneys for Defendant*
    *MONSANTO COMPANY*

7

8                UNITED STATES DISTRICT COURT

9        CENTRAL DISTRICT OF CALIFORNIA – EASTERN DIVISION

10

11  | Dan Rowland and Phyllis Rowland, | Case No.: 5:22-CV-01793_ |
    |---|---|
12  | Plaintiffs, | _____ |
13  | v. | **MONSANTO COMPANY'S NOTICE** |
14  |  | **OF REMOVAL** |
15  | Monsanto Company, a corporation; |  |
16  | Orchard Supply Hardware, a corporation; and Does 1-100 | [Removal from Superior Court of California, County of San Bernardino, |
17  | inclusive, | Case No. CIVSB2215447 ] |
18  | Defendants. |  |
19

20          By filing this Notice of Removal and related papers, Defendant Monsanto

21   Company ("Monsanto") hereby removes this lawsuit to this Court pursuant to 28

22   U.S.C. §§ 1332, 1334, 1367, 1441, 1446, and 1452 (and any other applicable laws).

23                            **INTRODUCTION**

24          1.       This lawsuit seeks damages for personal injuries – non-Hodgkin's

25   lymphoma ("NHL") – allegedly caused by Plaintiff Dan Rowland's exposure to

26   Monsanto's Roundup®-branded herbicides, which have glyphosate as their active

27   ingredient.  Multidistrict litigation proceedings involving numerous other

28

1   Roundup® lawsuits are pending in this Court.  *In re Roundup Prods. Liab. Litig.*
2   Case No. 16-md-02741-VC.

3       2.    Both Plaintiffs (Mr. Rowland and Phyllis Rowland) are California
4   citizens and therefore of diverse citizenship from Monsanto.  Plaintiffs tried to
5   avoid complete diversity and defeat Monsanto's right to remove by asserting claims
6   against Orchard Supply Hardware, which Plaintiffs allege is a California company
7   with its principal place of business in California that supplied Mr. Rowland with the
8   Roundup®-branded herbicides that caused his NHL.[1]

9       3.    However, this attempt to deprive Monsanto of its important right to
10  have this lawsuit adjudicated in federal court fails because Orchard Supply
11  Hardware is no longer in existence – after undergoing liquidation in federal
12  bankruptcy proceedings and dissolving in December 2016.

13      4.    As discussed below, this Court has subject matter jurisdiction based on
14  diversity of citizenship.  Orchard Supply Hardware does not prevent removal
15  because a broad permanent injunction order issued by the Bankruptcy Court and
16  Orchard Supply Hardware's dissolution under governing Delaware law both make
17  clear that Plaintiffs have no viable claims against Orchard Supply Hardware, so its
18  presence should be disregarded on fraudulent joinder grounds.  In the alternative,
19  assuming for the sake of argument that Orchard Supply Hardware has not been
20  fraudulently joined, that defendant does not prevent removal because it is merely a
21  "nominal" party that does not have a real interest in the outcome of this lawsuit.

22      5.    There is an additional, alternative basis for this removal that does not
23  involve subject matter jurisdiction based on diversity of citizenship.  As discussed

---

[1] The caption of the Complaint names the defendant as "Orchard Supply Hardware, a corporation," but the complete name of that entity was "Orchard Supply Hardware Stores Corporation."  As discussed below, that company's name was changed to OSH 1 Liquidating Corporation in September 2013, and OSH 1 Liquidating Corporation dissolved in December 2016.  To maintain consistency with the name used in the Complaint, Monsanto refers herein to its co-defendant as "Orchard Supply Hardware."

CASE NO.: 5:22-CV-01793                                      NOTICE OF REMOVAL

below, this removal is also proper based on 28 U.S.C. § 1452 because 28 U.SC. § 1334(b) gives this Court subject matter jurisdiction – namely post-confirmation "related to" jurisdiction (jurisdiction related to bankruptcy proceedings after the plan has been approved).

## BACKGROUND AND PROCEDURAL HISTORY

6.     In July 2020, Plaintiffs commenced this lawsuit by filing a Complaint in the Superior Court of the State of California for San Bernardino County, captioned *Dan Rowland, et al. v. Monsanto Company, et al.*, Case No. CIVSB2215447 (the "State Court Action"). Pursuant to 28 U.S.C. § 1446(a), true and correct copies of the Summons and Complaint served upon Monsanto in the State Court Action (and other papers available from the state court's files) are attached as **Exhibits 1-5**.

7.     Plaintiffs sued Monsanto and Orchard Supply Hardware, asserting various product liability claims. The Complaint asserts certain claims jointly against Monsanto and Orchard Supply Hardware (strict liability, negligence) and asserts other claims against only Monsanto (fraud, breach of warranties). The Complaint seeks damages for NHL allegedly caused by Monsanto's Roundup®-branded herbicides, which Plaintiffs claim were supplied to Mr. Rowland by Orchard Supply Hardware. *See, e.g.*, Complaint ¶¶ 1, 8, 14, 15.

8.     Monsanto has denied Plaintiffs' allegations. A true and correct copy of Monsanto's Answer is attached as **Exhibit 6**.

9.     Orchard Supply Hardware has not filed an answer or otherwise entered an appearance in the State Court Action. *See* State Court Action Docket Sheet (attached as **Exhibit 7**). The docket sheet does not show that Plaintiffs have served the Summons and Complaint on Orchard Supply Hardware. *Id*.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## BASIS FOR REMOVAL

**I.     Substantive Requirements For Diversity-Jurisdiction Removal Are Satisfied**

### A. Plaintiffs fraudulently joined Orchard Supply Hardware

10.     Although complete diversity of citizenship usually is required for a federal court to have diversity jurisdiction, "one exception to the requirement of complete diversity is where a non-diverse defendant has been 'fraudulently joined.'"  *Morris v. Princess Cruises, Inc.*, 236 F.3d 1061, 1067 (9th Cir. 2001).  A defendant removing a lawsuit from state court based on fraudulent joinder of a co-defendant is required to show that there is no possibility that the state court would hold the co-defendant liable.  *Grancare, LLC v. Thrower*, 889 F.3d 543, 548 (9th Cir. 2018).  When fraudulent joinder applies – *i.e.*, when "the plaintiff fails to state a cause of action against a resident defendant, and the failure is obvious according to the settled rules of the state," *Morris*, 236 F.3d at 1067 (quotation marks omitted) – the fraudulently joined defendant's "presence in the lawsuit is ignored" for purposes of determining whether the court has jurisdiction based on diversity of citizenship, *id.*  Moreover, "[f]raudulent joinder claims may be resolved by 'piercing the pleadings' and considering summary judgment-type evidence."  *Id.* at 1068 (quoting *Cavallini v. State Farm Mut. Auto Ins. Co.*, 44 F.3d 256, 263 (5th Cir. 1995)); *see McCabe v. General Foods Corp.*, 811 F.2d 1336, 1339 (9th Cir. 1987) ("The defendant seeking removal to the federal court is entitled to present the facts showing the joinder to be fraudulent.").  Fraudulent joinder also renders the so-called "forum defendant rule" inapplicable because that statutory provision applies only to "properly joined" defendants.  28 U.S.C. § 1441(b)(2).

11.     The Complaint fails to disclose important events that led to Orchard Supply Hardware filing for bankruptcy and dissolving in December 2016.

12.     In June 2013,  Orchard Supply Hardware and certain related entities – collectively, the "OSH Debtors" – commenced bankruptcy proceedings in the

United States Bankruptcy Court for the District of Delaware by filing for relief under Chapter 11 of the United States Bankruptcy Code.  December 20, 2013 Order Confirming the Debtors' Modified Amended Plan of Liquidation Under Chapter 11 of the Bankruptcy Code at 1, 4 ("Confirmation Order") (attached as **Exhibit 8**).

13.    In September 2013, in connection with those bankruptcy proceedings, the name of Orchard Supply Hardware was changed to "OSH 1 Liquidating Corporation."  Confirmation Order at 1 n.1; September 6, 2013 Certificate of Amendment to Certificate of Formation of Orchard Supply Hardware Stores Corporation (attached as **Exhibit 9**).

14.    In December 2013, the Bankruptcy Court entered the Confirmation Order, which confirmed the OSH Debtors' Plan of Liquidation.  Confirmation Order at 17.  The Plan of Liquidation is attached as Exhibit A to the Confirmation Order.[2]

15.    In February 2014, the Plan of Liquidation became effective.  February 24, 2014 Notice of (I) Entry of Confirmation Order, (II) Occurrence of Effective Date Under Debtors' Modified First Amended Plan of Liquidation Under Chapter 11 of the Bankruptcy Code [ . . . etc.] at 2 (attached as **Exhibit 10**).

16.    In accordance with the Plan of Liquidation and Delaware law, OSH 1 Liquidating Corporation (formerly known as Orchard Supply Hardware) was dissolved in December 2016 and filed a "certificate of dissolution" with the Delaware Secretary of State.  December 23, 2016 Certificate of Dissolution (Section 275) of OSH 1 Liquidating Corporation ("Certificate of Dissolution") (attached as **Exhibit 11**); *see* Plan of Liquidation at 18.

17.    Pursuant to the Plan of Liquidation, "***all*** of the Debtors' liabilities, assets, title, discretion, privileges, and rights . . . [were] transferred to, and vest in,

---

[2] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Plan of Liquidation, which is attached as Exhibit A to the Confirmation Order (attached as Exhibit 8).

CASE NO.: 5:22-CV-01793                                                    NOTICE OF REMOVAL

the Liquidating Trustee on the Effective Date; *provided, however*, that such assets, privileges and rights shall not include any such assets, privileges and rights to be transferred to the GUC Trust under the Plan." Confirmation Order ¶ 12 (first emphasis added, second emphasis in original). Thus, the Confirmation Order and the Plan of Liquidation provide that *all* of the Debtors' assets, including the assets of OSH 1 Liquidating Corporation (formerly known as Orchard Supply Hardware), were transferred to either the Liquidating Trust or the GUC Trust. Likewise, all unsecured claims were channeled to the GUC Trust.

18. The Confirmation Order and the Plan of Liquidation include a broad permanent injunction in favor of the OSH Debtors, including OSH 1 Liquidating Corporation (formerly known as Orchard Supply Hardware). Paragraph 21 of the Confirmation Order approves the injunction set forth in the Plan of Liquidation, as modified in the Confirmation Order. Paragraph 48 of the Confirmation Order sets forth the as-amended injunction provision:

> 48. Article IX.F.1 of the Plan [of Liquidation] shall be deleted in its entirety and replaced as follows: "Except with respect to those obligations otherwise provided for in the Plan, from and after the Effective Date, all Entities are permanently enjoined from commencing or continuing in any manner against the Debtors, the Estates, the Responsible Person, the Liquidation Trust, the Liquidation Trustee, the Creditors Committee, the GUC Trust, and the GUC Trustee, and their successors and assigns, and their assets and properties, as the case may be, any suit, action or other proceeding, on account of or respecting any Claim or Equity Interest, demand, liability, obligation, debt, right, Cause of Action, interest or remedy released or satisfied or to be released or satisfied pursuant to the Plan or the Confirmation Order."

19. Under that broad permanent injunction ordered by the Bankruptcy Court, all "Entities" are enjoined from commencing any suit or action against the OSH Debtors, including OSH 1 Liquidating Corporation (formerly known as

1  Orchard Supply Hardware). "Entity" is defined in the Plan of Liquidation by

2  reference to 11 U.S.C. § 101(15), which defines "entity" to include "person."

3  "Person" in turn is defined in 11 U.S.C. § 101(41), and it includes "individual."

4       20.    Thus, Plaintiffs are persons who are asserting a suit or action here

5  against Orchard Supply Hardware that violates – and is squarely prohibited by – the

6  Bankruptcy Court's broad permanent injunction. Plaintiffs do not have any viable

7  claims against Orchard Supply Hardware because there is no possibility that a state

8  court would hold that defendant liable in these circumstances.

9       21.    There is an additional, independent basis for the Court to conclude that

10  Plaintiffs have no viable claims against Orchard Supply Hardware and hold that this

11  defendant's presence should be disregarded on fraudulent joinder grounds.

12  Plaintiffs' personal injury claims against Orchard Supply Hardware are precluded

13  by governing Delaware law and the December 2016 dissolution of OSH 1

14  Liquidating Corporation (formerly known as Orchard Supply) discussed above.

15       22.    The question of whether Plaintiffs can assert those claims against the

16  dissolved entity at issue here is governed by Delaware law because OSH 1

17  Liquidating Corporation was formed under Delaware law and thereafter remained a

18  Delaware corporation. *See Greb v. Diamond Int'l Corp.*, 56 Cal. 4th 243 (2013)

19  (affirming California trial court's demurrer ruling in favor of dissolved company

20  that had done business in California, based on defendant's lack of capacity to be

21  sued under Delaware law; holding that California plaintiffs could not assert

22  personal injury claims against that defendant because it had been formed and

23  dissolved under Delaware law, so its capacity to be sued was governed by Delaware

24  law; rejecting plaintiffs' argument that defendant's capacity to be sued was

25  governed by California law).

26       23.    Delaware's General Corporation Law states that a Delaware

27  corporation cannot be sued after three years from dissolution "or for such longer

28  period as the Court of Chancery shall in its discretion direct . . . ." Del. Code Ann.

Tit. 8, § 278. "Once the three-year period has expired, no new suits can be brought against the corporation. . . . [O]nce the three-year period has expired and there is no pending litigation or assets to be disposed of, the Court [of Chancery] no longer has discretion to 'continue' the corporate existence under § 278." *In re Dow Chemical Int'l, Inc.,* Civil Action No. 3972-CC, 2008 WL 4603580, at *1 (Del. Ch. Ct. Oct. 14, 2008) ("*Dow I*") (citing cases); *see In re Dow Chemical Int'l, Inc.,* Civil Action No. 3972-CC, 2008 WL 4989069 (Del. Ch. Ct. Nov. 18, 2008) ("*Dow II*") (denying motion for re-argument and re-affirming ruling issued in *Dow I*). As discussed above, OSH 1 Liquidating Corporation (formerly known as Orchard Supply Hardware) was dissolved and filed its Certificate of Dissolution with the Delaware Secretary of State in December 2016, *see supra*, more than three years before Plaintiff commenced this lawsuit in July 2022. Further, the Delaware Chancery Court lacks discretion in this instance to continue OSH 1 Liquidation Corporation's corporate existence because there are no assets of that dissolved corporation remaining to be disposed of. *See Dow I*, 2008 WL 4603580; *Dow II*, 2008 WL 4989069. As discussed above, the Confirmation Order and the Plan of Liquidation expressly provide that ***all*** assets of OSH 1 Liquidating Corporation (formerly known as Orchard Supply Hardware) were transferred to the Liquidating Trust or the GUC Trust. The inescapable result of the Confirmation Order, the Plan of Liquidation, and the Certificate of Dissolution is that OSH 1 Liquidating Corporation (formerly known as Orchard Supply Hardware) ceased to exist in December 2016 and that all of its assets were transferred such that no undisposed-of assets remain for that dissolved corporation.

24. Therefore, when Plaintiffs filed this lawsuit in July 2022, they included claims against a company – Orchard Supply Hardware – that no longer exists and lacks the capacity to be sued under governing Delaware law. *See* Del. Code Ann. Tit. 8, § 278; *Dow I*, 2008 WL 4603580; *Dow II*, 2008 WL 4989069.

25.     For the foregoing reasons, the Court should hold that Plaintiffs fraudulently joined Orchard Supply Hardware and should disregard the citizenship of that dissolved corporation when assessing whether this lawsuit has been properly removed.

26.     Plaintiffs are, and were at the time the State Court Action was filed, citizens of the State of California.  Complaint ¶ 14.

27.     Monsanto is, and was at the time the State Court Action was filed, a corporation organized under the laws of the State of Delaware with its principal place of business in the State of Missouri.  Accordingly, Monsanto is deemed to be a citizen of Delaware and Missouri for purposes of federal diversity jurisdiction.

28.     Thus, complete diversity of citizenship exists between Plaintiffs and Monsanto (disregarding the presence of the fraudulently joined defendant).[3]

*                    *                    *                    *

29.     The Complaint seeks compensatory and punitive damages based on allegations that Monsanto's Roundup®-branded herbicides caused Mr. Rowland to develop cancer (NHL).  Therefore, it is plausible from the face of the Complaint that Plaintiffs seek damages in excess of $75,000, exclusive of interest and costs, which satisfies the jurisdictional amount-in-controversy requirement.  28 U.S.C. § 1332(a); *see Dart Cherokee Basin Operating Co. v. Owens*, 574 U.S. 81, 89 (2014) ("[A] defendant's notice of removal need include only a plausible allegation that the amount in controversy exceeds the jurisdictional threshold."); *see also Ross v. First Family Fin. Servs., Inc.*, No. 2:01CV218-P-B, 2002 WL 31059582, at *8 (N.D. Miss. Aug. 29, 2002) ("[U]nspecified claims for punitive damage sufficiently serve to bring the amount in controversy over the requisite jurisdictional threshold set out in 28 U.S.C. § 1332.").  In fact, other lawsuits seeking damages for cancer

---

[3] The citizenship of "Doe" defendants must be disregarded when determining whether this lawsuit is removable based on § 1332(a).  *See* 28 U.S.C. § 1441(b)(1).

allegedly caused by Roundup®-branded herbicides have been filed against Monsanto in other federal courts asserting jurisdiction under Section 1332(a) and alleging damages in excess of $75,000, exclusive of interest and costs.

30.     Thus, this Court has original subject matter jurisdiction over Plaintiffs' claims based on Section 1332(a) because there is complete diversity of citizenship between Plaintiffs and Monsanto (disregarding the citizenship of the fraudulently joined defendant) and because the amount in controversy exceeds $75,000, exclusive of interest and costs.

## B. In the alternative, Orchard Supply Hardware is merely a "nominal" party and therefore does not prevent removal

31.     Even assuming for the sake of argument that Orchard Supply Hardware was not fraudulently joined, that defendant nevertheless does not prevent removal because it is merely a "nominal" party.

32.     When a federal court decides whether it has subject matter jurisdiction based on diversity of citizenship, the court should disregard any nominal party that does not have a real interest in the litigation.  *See Navarro Savings Ass'n v. Lee*, 446 U.S. 458, 461 (1980); *Strotek Corp. v. Air Transp. Ass'n of Am.*, 300 F.3d 1129, 1133 (9th Cir. 2002); *see also Johnson v. SmithKline Beecham Corp.*, 724 F.3d 337, 358-59 (3d Cir. 2013) (citing, *inter alia*, *Strotek Corp.*, 300 F.3d at 1133); *Anderson v. Corinthian Colleges, Inc.*, No. C06-5157 FDB, 2006 U.S. Dist. LEXIS 43770, at *11 (W.D. Wash. May 25, 2006) (citing, *inter alia*, *Strotek Corp.*, 300 F.3d at 1133-34).

33.     Orchard Supply Hardware no longer exists, having undergone liquidation, wind-down, and dissolution as part of the bankruptcy proceedings discussed above.  That defendant has nothing at stake in – and has no real interest in the outcome of – this lawsuit.  Thus, Orchard Supply Hardware is a nominal party that does not destroy diversity jurisdiction and does not prevent removal.  *See*

1  *Strotek Corp.*, 300 F.3d at 1133 (dissolved entity that did not have any stake in

2  outcome of lawsuit was a nominal party that was disregarded when deciding

3  whether diversity jurisdiction exists and whether removal was proper; affirming

4  denial of remand motion); *Johnson*, 724 F.3d at 358-59 (3d Cir. 2013) (corporate

5  defendant that converted to limited liability company did not destroy diversity

6  jurisdiction and did not preclude removal because it was a nominal party with no

7  interest in outcome of lawsuit; affirming denial of remand motion); *Anderson*, 2006

8  U.S. Dist. LEXIS 43770, at *11 (ignoring presence of dissolved corporate

9  defendant because it was "a nominal party that ha[d] no stake in the outcome of this

10 litigation"; denying remand motion).

      34.    In sum, complete diversity of citizenship exists between Plaintiffs and

12 Monsanto, and the amount-in-controversy requirement is satisfied (as discussed

13 above), so the Court has diversity jurisdiction in this case.

## II.   Substantive Requirements For Removal Based On 28 U.S.C. § 1452(a) Are Satisfied

      35.    "A party may remove any claim or cause of action in a civil action . . .

17 to the district court for the district where such civil action is pending, if such district

18 court has jurisdiction of such claim or cause of action under section 1334 of this

19 title." 28 U.S.C. § 1452(a). Pursuant to 28 U.S.C. § 1334, district courts have

20 subject matter jurisdiction ("original . . . jurisdiction") over all civil proceedings

21 that are, among other things, "*related to* cases under title 11 [Bankruptcy]." 28

22 U.S.C. § 1334(b) (emphasis added). Section 1334 post-confirmation "related to"

23 jurisdiction – *i.e.*, jurisdiction related to bankruptcy proceedings after the plan has

24 been approved (as occurred in the Orchard Supply Hardware bankruptcy

25 proceedings at issue here) – requires a "close nexus" to the bankruptcy plan or

26 proceeding and encompasses matters affecting "the interpretation, implementation,

27 consummation, execution, or administration of the confirmed plan." *In re Pegasus

28 Gold*, 394 F.3d 1189, 1194 (9th Cir. 2005) (quotation marks omitted); *In Re Valley*

*Health Sys.*, 584 F. App'x 477, 478 (9th Cir. 2014) (same); *In re Wilshire Courtyard,* 729 F.3d 1279, 1289 (9th Cir. 2013) (same).

36.    Here, the claims asserted by Plaintiffs against one of the OSH Debtors, in direct contravention of the Plan of Liquidation and the Confirmation Order, affects the interpretation, implementation, consummation, and/or administration of the Plan of Liquidation, including the injunction contained therein and in the Confirmation Order.  Indeed, the interpretation and application of the scope of the injunction falls within the scope of the Bankruptcy Court's jurisdictional power to interpret and enforce its own orders.  *See Travelers Indemn. Co. v. Bailey,* 557 U.S. 137, 151 (2009) (holding that bankruptcy court had jurisdiction to interpret and enforce its own injunction order); *Valley Health Sys.*, 584 F. App'x at 478-80 (holding that removal was proper and that bankruptcy court had Section 1344(b) post-confirmation "related to" jurisdiction because resolving mandamus petition filed in state court would require "determin[ing] whether the confirmed bankruptcy plan discharged Appellees' claims" and "whether the bankruptcy court's confirmation order enjoins Appellees from continuing their mandamus action"); *Wilshire Courtyard*, 729 F.3d at 1289-90 (holding that bankruptcy court had jurisdiction to interpret and enforce its own injunction order; quoting and applying *Travelers Indemn. Co.*, 557 U.S. at 151).

37.    Any challenge here by Plaintiffs to the scope and effect of the Bankruptcy Court's injunction in the Plan of Liquidation and the Confirmation Order is an improper collateral attack, violates principles of res judicata, and should not be permitted. *See Celotex Corp. v. Edwards*, 514 U.S. 300, 301-13 (1995) (rejecting respondent's attempts to collaterally attack bankruptcy court's injunction); *see also Smith v. Charter Commc'ns, Inc*., No. CV 09 03716 RGK (AGRx), 2010 WL 11519549, at *4 (C.D. Cal. Apr. 29, 2010) (holding that "Plaintiff cannot . . . collaterally attack the Plan and the bankruptcy court's confirmation order"), *aff'd sub nom. Smith v. Charter Commc'ns, Inc. (St. Louis),*

467 F. App'x 742 (9th Cir. 2012); *Trulis v. Barton*, 107 F.3d 685, 691 (9th Cir. 1995) (when parties failed to challenge plan of reorganization on direct appeal, "res judicata principles preclude collateral attack.").

38.     Furthermore, collateral attacks on final bankruptcy court orders are not permitted even if the challenge is based on an argument that the provision exceeded the bankruptcy court's jurisdiction.  *See Travelers*, 557 U.S. at 152 ("Those [bankruptcy court] orders are not any the less preclusive because the attack is on the Bankruptcy Court's conformity with its subject-matter jurisdiction, for '[e]ven subject-matter jurisdiction … may not be attacked collaterally.'") (citing *Kontrick v. Ryan*, 540 U.S. 443, 455 n. 9 (2004); *see also In re Pardee*, 218 B.R. 916, 925 (B.A.P. 9th Cir. 1998) (enforcing a confirmed chapter 13 plan despite the fact that it contained a provision contrary to the Bankruptcy Code where a creditor failed to object, as "the finality of confirmation orders is a bedrock principle of bankruptcy law in the Ninth Circuit"), *aff'd*, 193 F.3d 1083 (9th Cir. 1999).  Thus, to the extent that Plaintiffs intend to challenge any aspect of the injunction – including the Bankruptcy Court's jurisdiction to enter that injunction – they are required to bring that challenge to the Bankruptcy Court (*i.e.*, Plaintiffs could seek to reopen the OSH Debtors' bankruptcy case and seek relief from the injunction from that court). Plaintiffs are not permitted to challenge the Bankruptcy Court's injunction here in the context of removal.

39.     Finally, if this Court has Section 1334 subject matter jurisdiction over one or more – but not all – of Plaintiff's claims, Plaintiff's remaining claims are within the Court's supplemental jurisdiction.  *See* 28 U.S.C. § 1367; *Pegasus Gold*, 394 F.3d at 1194-95 (quoting and applying § 1367).

## III.   Procedural Requirements For Removal Are Satisfied

40.     The Superior Court of the State of California for San Bernardino County is located within the Central District of California.  Therefore, removal to this Court satisfies the venue requirements of 28 U.S.C. § 1446(a) and Rule

CASE NO.: 5:22-CV-01793                                                     NOTICE OF REMOVAL

9027(a)(1) of the Federal Rules of Bankruptcy Procedure.

41.     Monsanto received notice of process in the State Court Action on September 14, 2022.  This Notice of Removal is timely because it is being filed within thirty days of that date.  *See, e.g.*, 28 U.S.C. § 1446(b)(1); Bankruptcy Rule 9027(a)(3); *Murphy Bros., Inc. v. Michetti Pipe Stringing, Inc.*, 526 U.S. 344 (1999).

42.     Orchard Supply Hardware's consent to diversity-jurisdiction removal is not required because that defendant has not been properly joined and/or is merely a nominal party.  *See* 28 U.S.C. § 1446(b)(2)(A); *United Computer Sys., Inc. v. AT&T Corp.*, 298 F.3d 756, 762 (9th Cir. 2002); *see also Johnson*, 724 F.3d at 359 n.27.  Moreover, Section 1452 and Bankruptcy Rule 9027 do not require consent to removal.

43.     Bankruptcy Rule 9027(a)(1) requires that this Notice of Removal "contain a statement that upon removal of the claim or cause of action, the party filing the notice does or does not consent to entry of final orders or judgment by the bankruptcy court."  Monsanto states that it does not consent to the entry of final orders or judgments by the bankruptcy court if it is determined that the bankruptcy court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

44.     The written notice required by 28 U.S.C. § 1446(d) and Bankruptcy Rule 9027(c) will be promptly filed in the Superior Court of the State of California for San Bernardino County and will be promptly served on Plaintiffs.

45.     Monsanto does not waive any defenses and expressly reserves its right to raise any and all defenses in subsequent proceedings.

46.     If any question arises as to the propriety of this removal, Monsanto requests the opportunity to present written and oral argument in support of removal.

# <u>CONCLUSION</u>

For the foregoing reasons, Monsanto removes this lawsuit to this Court pursuant to 28 U.S.C. §§ 1332, 1334, 1367, 1441, 1446, and 1452 (and any other applicable laws).

DATED: October 12, 2022                    Respectfully submitted,

By: */s/ Ryan S. Killian*
Ryan S. Killian
Attorneys for Defendant
MONSANTO COMPANY

**<u>CERTIFICATE OF SERVICE</u>**

I certify that on the 12th of October 2022, I electronically transmitted the foregoing, Monsanto Company's Notice of Removal, to the Clerk of the Court using the ECF system for filing and transmittal, and a true and correct copy of the foregoing document was served electronically or by another manner as authorized by Fed. R. Civ. P. 5.

*/s/ Ryan S. Killian*
Ryan S. Killian
Attorneys for Defendant
MONSANTO COMPANY

CASE NO.: 5:22-CV-01793                                        NOTICE OF REMOVAL

## <u>PROOF OF SERVICE</u>

I am employed in the County of Los Angeles, State of California.  I am over the age of 18 and not a party to the within action.  My business address is 555 South Flower Street, 30th Floor, Los Angeles, California 90071.

On October 12, 2022, I served a true and correct copy of the document described as **DEFENDANT MONSANTO COMPANY'S NOTICE OF FILING OF NOTICE OF REMOVAL** on the interested parties, as follows:

| | |
|---|---|
| ☐ | By submitting an electronic version of the document via FTP upload to the Court's Electronic Filing and Service Provider, One Legal |
| ☐ | By electronic transfer to Case Anywhere via the Internet, pursuant to the Court's Case Management Order No. 2 Authorizing Electronic Service dated March 23, 2018. |
| ☒ | By placing a true copy in envelope(s) addressed as referenced below. The envelope(s) were then sealed and deposited for collection and mailing in accordance with my employer's normal procedures.  I am readily familiar with the firm's practice for collection and processing correspondence for mailing.  Under that practice it would be deposited with the U.S. Postal Service, with all postage prepaid, at Downey, California, on the same day in the ordinary course of business. |

| | |
|---|---|
| Mark P. Robinson, Jr.<br>Jennifer M. Collins<br>Robinson Calcagnie, Inc.<br>19 Corporate Plaza Dr.<br>Newport Beach, CA 92660 | Attorneys for Plaintiffs |

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct, and that this Proof of Service was executed on October 12, 2022 at Los Angeles, California.

_____
Lety G. Perez

COPY

1
2
3
4
5
6
7

Mark P. Robinson, Jr., Esq. (SBN: 054426)
mrobinson@robinsonfirm.com
Jennifer M. Collins, Esq. (SBN: 288579)
jcollins@robinsonfirm.com
**ROBINSON CALCAGNIE, INC.**
19 Corporate Plaza Dr.
Newport Beach, CA 92660
Telephone: (949) 720-1288
Facsimile: (949) 720-1292

*Attorneys for Plaintiffs*

F I L E D
SUPERIOR COURT OF CALIFORNIA
COUNTY OF SAN BERNARDINO
SAN BERNARDINO DISTRICT

JUL 20 2022

BY _____ DEPUTY

8
9
10

## SUPERIOR COURT OF THE STATE OF CALIFORNIA

## FOR THE COUNTY OF SAN BERNARDINO

## (UNLIMITED JURISDICTION)

11
12
13
14
15
16
17
18
19
20

DAN ROWLAND and PHYLLIS ROWLAND;

Plaintiffs,

v.

MONSANTO COMPANY, a corporation;
ORCHARD SUPPLY HARDWARE, a
corporation; and DOES 1 through 100 inclusive,

Defendants.

CASE No. **CIV SB 2 2 1 5 4 4 7**

**COMPLAINT FOR DAMAGES AND
DEMAND FOR JURY TRIAL**

1. **Strict Liability – Design Defect**
2. **Strict Liability – Failure to Warn**
3. **Negligence**
4. **Fraud**
5. **Breach of Express Warranties**
6. **Breach of Implied Warranties**
7. **Loss of Consortium**
8. **Exemplary and Punitive Damages**

**JURY TRIAL DEMANDED**

21
22
23
24
25
26
27
28

Plaintiffs, by and through their attorneys, Robinson Calcagnie, Inc., allege the following upon information and belief:

### STATEMENT OF THE CASE

1. In 1970, Defendant Monsanto Company discovered the herbicidal properties of glyphosate and began marketing it in products in 1974 under the brand name Roundup®. Roundup® is a non-selective herbicide used to kill weeds that commonly compete with the growing of crops. By 2001, glyphosate had become the most-used active ingredient in American

1

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

1  agriculture with 85–90 millions of pounds used annually. That number grew to 185 million pounds
2  by 2007.  As of 2013, glyphosate was the world's most widely used herbicide.

3        2.      Monsanto is a multinational agricultural biotechnology corporation based in St.
4  Louis, Missouri. It is the world's leading producer of glyphosate. As of 2009, Monsanto was the
5  world's leading producer of seeds, accounting for 27% of the world seed market. The majority of
6  these seeds are of the Roundup Ready® brand. The stated advantage of Roundup Ready® crops is
7  that they substantially improve a farmer's ability to control weeds, since glyphosate can be
8  sprayed in the fields during the growing season without harming their crops. In 2010, an estimated
9  70% of corn and cotton, and 90% of soybean fields in the United States were Roundup Ready®.

10        3.      Monsanto's glyphosate products are registered in 130 countries and approved for
11  use on over 100 different crops. They are ubiquitous in the environment. Numerous studies
12  confirm that glyphosate is found in rivers, streams, and groundwater in agricultural areas where
13  Roundup® is used. It has been found in food, in the urine of agricultural workers, and even in the
14  urine of urban dwellers who are not in direct contact with glyphosate.

15        4.      On March 20, 2015, the International Agency for Research on Cancer ("IARC"), an
16  agency of the World Health Organization ("WHO"), issued an evaluation of several herbicides,
17  including glyphosate. That evaluation was based, in part, on studies of exposures to glyphosate in
18  several countries around the world, and it traces the health implications from exposure to
19  glyphosate since 2001.

20        5.      On July 29, 2015, the IARC issued the formal monograph relating to glyphosate. In
21  that monograph, the IARC Working Group provides a thorough review of the numerous studies
22  and data relating to glyphosate exposure in humans.

23        6.      The IARC Working Group classified glyphosate as a Group 2A herbicide, which
24  means that it is probably carcinogenic to humans. The IARC Working Group concluded that the
25  cancers most associated with glyphosate exposure are Non-Hodgkin's Lymphoma and other
26  haematopoietic cancers, including lymphocytic lymphoma/chronic lymphocytic leukemia, B-cell
27  lymphoma, and multiple myeloma.

28  / / /

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

7.      The IARC evaluation is significant. It confirms what has been believed for years: that glyphosate is toxic to humans. Nevertheless, Monsanto, since it began selling Roundup®, has represented it as safe to humans and the environment. Indeed, Monsanto has repeatedly proclaimed and continues to proclaim to the world, and particularly to United States consumers, that glyphosate-based herbicides, including Roundup®, create no unreasonable risks to human health or to the environment.

8.      Orchard Supply Hardware is a California company with its headquarters and principal place of business in San Jose, California.  At all times material relevant to this complaint, Orchard's Hardware retailed Monsanto products, including Roundup®.  Orchard Hardware supplied Plaintiff with the Roundup® products which caused Plaintiff Dan Rowland's Non-Hodgkin's Lymphoma.  Orchard Supply Hardware never warned Plaintiff of the carcinogenic potential of Roundup®, and still retails Roundup® today.

## JURISDICTION AND VENUE

9.      The California Superior Court has jurisdiction over this action pursuant to California Constitution Article VI, Section 10, which grants the Superior Court "original jurisdiction in all causes except those given by statute to other trial courts." The Statutes under which this action is brought do not specify any other basis for jurisdiction.

10.      The California Superior Court has jurisdiction over the Defendants because, based on information and belief, each is a California resident, a corporation and/or entity organized under the laws of the State of California, a foreign corporation or association authorized to do business in California and registered with the California Secretary of State or that has sufficient minimum contacts in California, or otherwise intentionally avails itself of the California market so as to render the exercise of jurisdiction over it by the California courts consistent with traditional notions of fair play and substantial justice.

11.      Venue is proper in this Court pursuant to California Code of Civil Procedure Section 395 in that the subject injury occurred in San Bernardino County.

12.      Furthermore, the Defendants have purposefully availed themselves of the benefits and the protections of the laws within the State of California. Monsanto has had sufficient contact

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

1  such that the exercise of jurisdiction would be consistent with the traditional notions of fair play

2  and substantial justice.

3        13.     Plaintiffs seek relief that is within the jurisdictional limits of this Court.

4  **PARTIES**

5        14.     Plaintiff Dan Rowland is a competent individual over the age of 18, resident and

6  citizen of the State of California, who submits to the jurisdiction this Court and alleges venue in

7  this Court is proper.  Plaintiff Phyllis Rowland is a competent individual over the age of 18,

8  resident and citizen of the State of California, who submits to the jurisdiction of this Court and

9  alleges venue in this Court is proper.  As a result of Plaintiff Dan Rowland's exposure to

10  Roundup® in the State of California from approximately 1990 to 2016, Plaintiff Dan Rowland

11  was diagnosed with Non-Hodgkin's Lymphoma.

12        15.     Plaintiffs (hereinafter, "Plaintiff" or "Plaintiff Dan Rowland) are informed and

13  believe and based thereon allege that as a direct and proximate result of Plaintiff's use of

14  Roundup® and/or other Monsanto glyphosate-containing products ("Roundup®"), supplied and/or

15  distributed by Defendants herein, Plaintiff suffered significant harm, conscious pain and suffering,

16  physical injury and bodily impairment including, but not limited to Non-Hodgkin's Lymphoma

17  and other cancers, other permanent physical deficits, permanent bodily impairment and other

18  injury sequelae. Plaintiff's injuries required medical intervention to address the adverse physical

19  effects and damage caused by Plaintiff's use of Roundup® and/or other Monsanto glyphosate-

20  containing products ("Roundup®").

21        16.     As a direct and proximate result of the wrongful conduct, acts, omissions,

22  fraudulent concealments, fraudulent misrepresentations, and fraudulent business practices by

23  Defendants and DOES 1 through 100, inclusive, Plaintiff used and/or was exposed to Roundup®

24  and was diagnosed with serious health injuries including Non-Hodgkin's Lymphoma and/or other

25  cancers.

26        17.     As a further direct and proximate result of defects in Roundup® and the wrongful

27  conduct, acts, omissions, and fraudulent misrepresentations of Defendants, Plaintiff suffered

28  severe mental and physical pain and have and will sustain permanent injuries and emotional

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

distress, along with economic loss due to medical expenses and living-related expenses as a result of lifestyle changes.

18.     As a further direct and proximate result of defects in Roundup® and the wrongful conduct, acts, omissions, and fraudulent misrepresentations of Defendants, Plaintiff required medical intervention in efforts to maintain and/or save Plaintiff.

19.     Plaintiff is an individual who suffered damages as a result of injuries resulting from Plaintiff's use and/or exposure to Roundup® and are authorized to bring an action for the causes of actions alleged herein including, but not limited to, injuries and damages sustained by Plaintiff resulting from Plaintiff's use of Roundup®. Said injuries and damages sustained by Plaintiff were caused or substantially contributed to by the wrongful conduct of Defendants and DOES 1 through 100, inclusive.

20.     The product warnings for Roundup® in effect during the time period Plaintiff used and/or was exposed to Roundup® were vague, incomplete or otherwise inadequate, both substantively and graphically, to alert consumers to the severe health risks associated with Roundup® use and/or exposure.

21.     The Defendants and DOES 1 through 100, and each of them, inclusive, did not provide adequate warnings to consumers including Plaintiff and the general public about the increased risk of the serious adverse events described herein.

22.     Had Plaintiff been adequately warned by the Defendants and DOES 1 through 100, and each of them, inclusive, of the potential life-threatening side effects of Roundup®, Plaintiff would not have purchased, used, or been exposed to Roundup®.

23.     By reason of the foregoing, Plaintiff developed serious and dangerous side effects including Non-Hodgkin's Lymphoma and other cancers, related injury sequelae, physical pain and suffering, mental anguish, and loss of enjoyment of life. By reason of the foregoing, Plaintiff suffered economic losses and special damages including, but not limited to, loss of earning and medical expenses. Plaintiff's general and special damages exceed the jurisdictional limits of this Court.

/ / /

24.     Plaintiff has reviewed potential legal claims and causes of action against the Defendants and have intentionally chosen only to pursue claims based on state law. Any reference to any federal agency, regulation or rule is stated solely as background information, and Plaintiff is not making any claims which raise federal questions. Thus, California state jurisdiction and venue are proper.

**Defendants**

25.     Defendant Monsanto Company ("Monsanto") is a Delaware corporation with its headquarters and principal place of business in St. Louis, Missouri. At all times relevant to this complaint, Monsanto was the entity that discovered the herbicidal properties of glyphosate and manufactured Roundup®. Monsanto has regularly transacted and conducted business within the State of California and has derived substantial revenue from goods and products, including Roundup®, used in the State of California and employs sales representatives in the State of California. Monsanto expected or should have expected its acts to have consequences within the State of California because it derived substantial revenue from interstate commerce and invoked the benefits and protection of the State of California's laws.

26.     Plaintiff is informed and believes, and based thereon allege, that in committing the acts alleged herein, each and every managing agent, agent, representative and/or employee of the Defendants was working within the course and scope of said agency, representation and/or employment with the knowledge, consent, ratification, and authorization of the Defendants and their directors, officers and/or managing agents.

27.     At all relevant times alleged herein, one or more of the corporate Defendants was, and now is, a corporation with its principal place of business in the State of California and, therefore, is a citizen of the State of California.

28.     The true names and/or capacities, whether individual, corporate, partnership, associate, governmental, or otherwise, of Defendant DOES 1 through 100, inclusive, and each of them, are unknown to Plaintiff at this time, who therefore sue said Defendants by such fictitious names. Plaintiff is informed and believes, and thereon allege, that each Defendant designated herein as a DOE caused injuries and damages proximately thereby to Plaintiff as hereinafter

6

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

1  alleged; and that each DOE Defendant is liable to the Plaintiff for the acts and omissions alleged

2  herein below, and the resulting injuries to Plaintiff, and damages sustained by the Plaintiff.

3  Plaintiff will amend this Complaint to allege the true names and capacities of said DOE

4  Defendants when the same are ascertained.

5      29.     Plaintiff is informed and believes, and thereon allege, that at all times herein

6  mentioned, each of the named Defendants and each of the DOE Defendants was the agent, servant,

7  employee and/or joint venturer of the other co-Defendants and other DOE Defendants, and each of

8  them, and at all said times, each named Defendant and each DOE Defendant was acting in the full

9  course, scope and authority of said agency, service, employment and/or joint venture.

10     30.     Plaintiff is informed and believes, and allege that at all times mentioned herein,

11  Defendants and DOES 1 through 100, inclusive, and each of them, were also known as, formerly

12  known as and/or were the successors and/or predecessors in interest/business/product line/or a

13  portion thereof, assigns, a parent, a subsidiary (wholly or partially owned by, or the whole or

14  partial owner), affiliate, partner, co-venturer, merged company, alter egos, agents, equitable

15  trustees and/or fiduciaries of and/or were members in an entity or entities engaged in the funding,

16  researching, studying, manufacturing, fabricating, designing, developing, labeling, assembling,

17  distributing, supplying, leasing, buying, offering for sale, selling, inspecting, servicing, contracting

18  others for marketing, warranting, rebranding, manufacturing for others, packaging and advertising

19  of Roundup® and/or other Monsanto glyphosate-containing products. Defendants and DOES 1

20  through 100, inclusive, and each of them, are liable for the acts, omissions and tortious conduct of

21  their successors and/or predecessors in interest/business/product line/or a portion thereof, assigns,

22  parents, subsidiaries, affiliates, partners, co-venturers, merged companies, alter egos, agents,

23  equitable trustees, fiduciaries and/or their alternate entities in that Defendants and DOES 1

24  through 100, inclusive, and each of them, enjoy the goodwill originally attached to each such

25  alternate entity, acquired the assets or product line (or portion thereof), and in that there has been a

26  virtual destruction of Plaintiff's remedy against each such alternate entity, and that each such

27  Defendant has the ability to assume the risk spreading role of each such alternate entity.

28  / / /

1   31.   Plaintiff is informed and believes, and thereon allege, that at all times herein

2   mentioned, Defendants and DOES 1 through 100, inclusive, and each of them, were and are

3   corporations organized and existing under the laws of the State of California or the laws of some

4   state or foreign jurisdiction; that each of the said Defendants and DOE Defendants were and are

5   authorized to do and are doing business in the State of California and regularly conducted business

6   in California, including in San Bernardino County.

7   32.   Upon information and belief, at all relevant times, Defendants and DOES 1 through

8   100, and each of them, inclusive, were engaged in the business of researching, developing,

9   designing, licensing, manufacturing, distributing, selling, marketing, and/or introducing into

10   interstate commerce and into the State of California, including in San Bernardino County, either

11   directly or indirectly through third parties or related entities, Roundup® and/or other Monsanto

12   glyphosate-containing products.

13   33.   At all ®relevant times, Defendants and DOES 1 through 100, inclusive, and each of

14   them, conducted regular and sustained business and engaged in substantial commerce and business

15   activity in the State of California, which included but was not limited to selling, marketing and

16   distributing Roundup® and/or other Monsanto glyphosate-containing products in the State of

17   California, including San Bernardino County.

18   34.   At all relevant times, Defendants and DOES 1 through 100, inclusive, and each of

19   them, expected or should have expected that their acts would have consequences within the United

20   States of America including the State of California, including San Bernardino County, and said

21   Defendants derived and derive substantial revenue therefrom.

**EQUITABLE TOLLING**

23   35.   Plaintiff has suffered an illness that has a latency period and does not arise until

24   years after exposure. Plaintiff had no way of knowing about the risk of serious illness associated

25   with the use of and/or exposure to Roundup® and glyphosate until made aware that Plaintiff's

26   illness, including Non-Hodgkin's Lymphoma could be caused by use and/or exposure to

27   Roundup®. The discovery rule applies, and the statute of limitations was tolled until the day

28   Plaintiff knew or had reason to know that Plaintiff's illnesses, including Non-Hodgkin's

8

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

1   Lymphoma, were linked to Plaintiff's use and/or exposure to Roundup®.

2       36.     Within the time period of any applicable statute of limitations, Plaintiff could not

3   have discovered through the exercise of reasonable diligence that exposure to Roundup® and

4   glyphosate is injurious to human health.

5       37.     Plaintiff did not discover and did not know of facts that would cause a reasonable

6   person to suspect the risk associated with the use of and/or exposure to Roundup® and glyphosate

7   nor would a reasonable and diligent investigation by Plaintiff have disclosed that Roundup® and

8   glyphosate would cause Plaintiff's illnesses.

9       38.     The expiration of any applicable statute of limitations has been equitably tolled by

10  reason of Monsanto's fraudulent misrepresentations and fraudulent concealment and fraudulent

11  conduct. Through affirmative misrepresentations and omissions, Defendants actively concealed

12  from Plaintiff the true risks associated with use of and/or exposure to Roundup®.

13      39.     As a result of Defendants' actions, Plaintiff could not reasonably have known or

14  learned through reasonable diligence that Plaintiff had been exposed to the risks alleged herein and

15  that those risks were the direct and proximate result of Defendants' acts and omissions.

16      40.     Defendants are estopped from relying on any statute of limitations because of their

17  concealment of the truth regarding the safety of Roundup®. Defendants had a duty to disclose the

18  true character, quality and nature of Roundup® because this was non-public information over

19  which Defendants continue to have exclusive control. Defendants knew that this information was

20  not available to Plaintiff, Plaintiff'' medical providers and/or health facilities, yet Defendants

21  failed to disclose the information to the public, including Plaintiff.

22      41.     Defendants had the ability to and did spend enormous amounts of money in

23  furtherance of the purposes of marketing and promoting a profitable product, notwithstanding the

24  known or reasonably knowable risks. Plaintiff and medical professionals could not have afforded

25  to and could not have possibly conducted studies to determine the nature, extent, and identity of

26  related health risks and were forced to rely on Defendants' representations.

27  ///

28  ///

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

1

**FACTS**

2      42.    Glyphosate is a broad-spectrum, non-selective herbicide used in a wide variety of

3 herbicidal products around the world.

4      43.    Plants treated with glyphosate translocate the systemic herbicide to their roots,

5 shoot regions and fruit, where it interferes with the plant's ability to form aromatic amino acids

6 necessary for protein synthesis. Treated plants generally die within two to three days. Because

7 plants absorb glyphosate, it cannot be completely removed by washing or peeling produce or by

8 milling, baking, or brewing grains.

9      44.    For nearly 40 years, farms across the world have used Roundup® without knowing

10 of the dangers its use poses.

11      45.    That is because when Monsanto first introduced Roundup®, it touted glyphosate as

12 a technological breakthrough: it could kill almost every weed without causing harm either to

13 people or to the environment. Of course, history has shown that not to be true. According to the

14 WHO, the main chemical ingredient of Roundup®—glyphosate—is a probable cause of cancer.

15 Those most at risk are farm workers and other individuals with workplace exposure to Roundup®,

16 such as workers in garden centers, nurseries, and landscapers. Agricultural workers are, once

17 again, victims of corporate greed. Monsanto assured the public that Roundup® was harmless. In

18 order to prove this, Monsanto championed falsified data and attacked legitimate studies that

19 revealed its dangers. Monsanto led a prolonged campaign of misinformation to convince

20 government agencies, farmers and the general population that Roundup® was safe.

21      *The Discovery of Glyphosate and Development of Roundup®*

22      46.    The herbicidal properties of glyphosate were discovered in 1970 by Monsanto

23 chemist John Franz. The first glyphosate-based herbicide was introduced to the market in the mid-

24 1970s under the brand name Roundup®. From the outset, Monsanto marketed Roundup® as a

25 "safe" general-purpose herbicide for widespread commercial and consumer use; Osborn & Barr

26 joined or took over these misleading marketing efforts in the early 1990s and continued through

27 2012. Monsanto still markets Roundup® as safe today.

28 / / /

10

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

*Registration of Herbicides under Federal Law*

47.     The manufacture, formulation and distribution of herbicides, such as Roundup®, are regulated under the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA" or "Act"), 7 U.S.C. § 136 *et seq*. FIFRA requires that all herbicides be registered with the Environmental Protection Agency ("EPA" or "Agency") prior to their distribution, sale, or use, except as described by the Act. 7 U.S.C. § 136a (a).

48.     Because herbicides are toxic to plants, animals, and humans, at least to some degree, the EPA requires as part of the registration process, among other things, a variety of tests to evaluate the potential for exposure to herbicides, toxicity to people and other potential non-target organisms, and other adverse effects on the environment. Registration by the EPA, however, is not an assurance or finding of safety. The determination the Agency must make in registering or re-registering a product is not that the product is "safe," but rather that use of the product in accordance with its label directions "will not generally cause unreasonable adverse effects on the environment." 7 U.S.C. § 136a(c) (5) (D).

49.     FIFRA defines "unreasonable adverse effects on the environment" to mean "any unreasonable risk to man or the environment, taking into account the economic, social, and environmental costs and benefits of the use of any pesticide." 7 U.S.C. § 136(bb). FIFRA thus requires EPA to make a risk/benefit analysis in determining whether a registration of a product should be granted or allowed so that the product may continue to be sold in commerce.

50.     The EPA registered Roundup® for distribution, sale, and manufacture in the United States including the State of California.

51.     FIFRA generally requires the registrant, Monsanto in the case of Roundup®, to conduct health and safety testing of herbicide products. The EPA has protocols governing the conduct of tests required for registration and the laboratory practices that must be followed in conducting these tests. The data produced by the registrant must be submitted to the EPA for review and evaluation. The government is not required, nor is it able, however, to perform the product tests that are required of the manufacturer.

/ / /

11

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

52.     The evaluation of each herbicide product distributed, sold, or manufactured is completed at the time the product is initially registered. The data necessary for registration of a herbicide has changed over time. The EPA is now in the process of re-evaluating all herbicide products through a Congressionally-mandated process called "re-registration." 7 U.S.C. § 136a-1. In order to reevaluate these herbicides, the EPA is demanding the completion of additional tests and the submission of data for the EPA's review and evaluation.

53.     In the case of glyphosate, and therefore Roundup®, the EPA had planned on releasing its preliminary risk assessment —in relation to the re-registration process—no later than July 2015. The EPA completed its review of glyphosate in early 2015, but it delayed releasing the risk assessment pending further review in light of the WHO's health-related findings.

### Scientific Fraud Underlying the Marketing and Sale of Glyphosate/Roundup®

54.     Based on early studies that glyphosate could cause cancer in laboratory animals, the EPA originally classified glyphosate as *possibly carcinogenic to humans* (Group C) in 1985. After pressure from Monsanto, including contrary studies it provided to the EPA, in 1991 the EPA changed its classification to *evidence of non-carcinogenicity in humans* (Group E). In so classifying glyphosate, however, the EPA made clear that the designation did not mean the chemical does not cause cancer: "It should be emphasized, however, that designation of an agent in Group E is based on the available evidence at the time of evaluation and should not be interpreted as a definitive conclusion that the agent will not be a carcinogen under any circumstances."

55.     On two occasions, the EPA found that the laboratories hired by Monsanto to test the toxicity of its Roundup® products for registration purposes committed fraud.

56.     In the first instance, Monsanto, in seeking initial registration of Roundup® by EPA, hired Industrial Bio-Test Laboratories ("IBT") to perform and evaluate herbicide toxicology studies relating to Roundup®. IBT performed about 30 tests on glyphosate and glyphosate-containing products, including nine of the 15 residue studies needed to register Roundup®.

57.     In 1976, the United States Food and Drug Administration ("FDA") performed an inspection of Industrial Bio-Test Industries ("IBT") that revealed discrepancies between the raw

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

1    data and the final report relating to the toxicological impacts of glyphosate. The EPA subsequently

2    audited IBT; it too found the toxicology studies conducted for the Roundup® herbicide to be

3    invalid. An EPA reviewer stated, after finding "routine falsification of data" at IBT, that it was

4    "hard to believe the scientific integrity of the studies when they said they took specimens of the

5    uterus from male rabbits."

6        58.    Three top executives of IBT were convicted of fraud in 1983.

7        59.    In the second incident of data falsification, Monsanto hired Craven Laboratories in

8    1991 to perform pesticide and herbicide studies, including for Roundup®. In that same year, the

9    owner of Craven Laboratories and three of its employees were indicted, and later convicted, of

10    fraudulent laboratory practices in the testing of pesticides and herbicides.

11        60.    Despite the falsity of the tests that underlie its registration, within a few years of its

12    launch, Monsanto was marketing Roundup® in 115 countries.

13        61.    Multiple studies have been ghostwritten in part and/or published by Monsanto

14    through companies such as Intertek and Exponent, Inc., from 2000 through the present which

15    minimize any safety concerns about the use of glyphosate. The studies are used to convince

16    regulators to allow the sale of Roundup® and customers to use Roundup®. Such studies include,

17    but are not limited to Williams (2000); Williams (2012); Kier & Kirkland (2013); Kier (2015);

18    Bus (2016); Chang (2016); and the Intertek Expert Panel Manuscripts. All of these studies have

19    been submitted to and relied upon by the public and the EPA in assessing the safety of glyphosate.

20    Through these means, Monsanto has fraudulently represented that independent scientists have

21    concluded that Glyphosate is safe. In fact, Monsanto paid these so-called "independent experts,"

22    and Monsanto failed to disclose the significant role Monsanto had in creating the manuscripts

23    produced by the "independent" experts. Further, Monsanto has ghostwritten editorials to advocate

24    for the safety of glyphosate in newspapers and magazines for scientists such as Robert Tarone and

25    Henry Miller. Monsanto has also ghostwritten letters by supposedly independent scientists which

26    have been submitted to regulatory agencies who are reviewing the safety of glyphosate.

27        62.    Monsanto has also violated federal regulations in holding secret ex parte meetings

28    and conversations with certain EPA employees to collude in a strategy to re-register glyphosate

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

1  and to quash investigations into the carcinogenicity of glyphosate by other federal agencies such

2  as the Agency for Toxic Substances and Disease Registry. Monsanto's close connection with the

3  EPA arises in part from its offering of lucrative consulting gigs to retiring EPA officials. In March

4  2015, The Joint Glyphosate Task Force, at Monsanto's behest, issued a press release sharply

5  criticizing IARC, stating that IARC's conclusion was "baffling" and falsely claiming that "IARC

6  did not consider any new or unique research findings when making its decision. It appears that

7  only by deciding to exclude certain available scientific information and by adopting a different

8  approach to interpreting the studies was this possible."

9       63.    Beginning in 2011, the Federal Institute for Risk Assessment (BfR) in Germany

10  began preparing a study on the safety of glyphosate. Through the Glyphosate Task Force,

11  Defendants were able to co-opt this study, becoming the sole providers of data and ultimately

12  writing the report, which was rubber-stamped by the BfR. The Glyphosate Task Force was solely

13  responsible for preparing and submitting a summary of studies relied upon by the BfR.

14  Defendants have used this self-serving report (which they, in fact, wrote) to falsely proclaim the

15  safety of glyphosate. In October 2015, the Defendants, as members of the Joint Glyphosate Task

16  Force, wrote to the state of California to try to stop California from warning the public about the

17  carcinogenicity of glyphosate, arguing that the IARC classification was mistaken. In January of

18  2016, Monsanto filed a lawsuit to stop California from warning the public about the

19  carcinogenicity of glyphosate.

20       ***The Importance of Roundup® to Monsanto's Market Dominance Profits***

21       64.    The success of Roundup® was key to Monsanto's continued reputation and

22  dominance in the marketplace. Largely due to the success of Roundup® sales, Monsanto's

23  agriculture division was out-performing its chemicals division's operating income, and that gap

24  increased yearly. But with its patent for glyphosate expiring in the United States in the year 2000,

25  Monsanto needed a strategy to maintain its Roundup® market dominance and to ward off

26  impending competition.

27       65.    In response, Monsanto began the development and sale of genetically engineered

28  Roundup Ready® seeds in 1996. Since Roundup Ready® crops are resistant to glyphosate,

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

1  farmers can spray Roundup® onto their fields during the growing season without harming the

2  crop. This allowed Monsanto to expand its market for Roundup® even further. By 2000,

3  Monsanto's biotechnology seeds were planted on more than 80 million acres worldwide, and

4  nearly 70% of American soybeans were planted from Roundup Ready® seeds. It also secured

5  Monsanto's dominant share of the glyphosate/Roundup® market through a marketing strategy that

6  coupled proprietary Roundup Ready® seeds with continued sales of its Roundup® herbicide.

7      66.    Through a three-pronged strategy of increased production, decreased prices, and by

8  coupling Roundup Ready® seeds with Roundup® herbicide, Roundup® became Monsanto's most

9  profitable product. In 2000, Roundup® accounted for almost $2.8 billion in sales, outselling other

10  herbicides by a margin of five to one and accounting for close to half of Monsanto's revenue.

11  Today, glyphosate remains one of the world's largest herbicides by sales volume.

12  ***Monsanto has known for decades that it falsely advertises the safety of Roundup®.***

13      67.    In 1996, the New York Attorney General ("NYAG") filed a lawsuit against

14  Monsanto based on its false and misleading advertising of Roundup® products. Specifically, the

15  lawsuit challenged Monsanto's general representations that its spray-on glyphosate-based

16  herbicides, including Roundup®, were "**safer than table salt**" and "**practically non-toxic**" to

17  mammals, birds, and fish. Among the representations the NYAG found deceptive and misleading

18  about the human and environmental safety of Roundup® are the following:

19          a.  Remember that environmentally friendly Roundup® herbicide is biodegradable. It

20              won't build up in the soil so you can use Roundup® with confidence along

21              customers' driveways, sidewalks and fences...

22          b.  And remember that Roundup® is biodegradable and won't build up in the soil. That

23              will give you the environmental confidence you need to use Roundup® everywhere

24              you've got a weed, brush, edging or trimming problem.

25          c.  Roundup® biodegrades into naturally occurring elements.

26          d.  Remember that versatile Roundup® herbicide stays where you put it. That means

27              there's no washing or leaching to harm customers' shrubs or other desirable

28              vegetation.

15

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

1  e. This non-residual herbicide will not wash or leach in the soil. It ... stays where you

2    apply it.

3  f. You can apply Accord (glyphosate-containing herbicide) with "confidence because

4    it will stay where you put it;" it bonds tightly to soil particles, preventing leaching.

5    Then, soon after application, soil microorganisms biodegrade Accord into natural

6    products.

7  g. Glyphosate is less toxic to rats than table salt following acute oral ingestion.

8  h. Glyphosate's safety margin is much greater than required. It has over a 1,000-fold

9    safety margin in food and over a 700-fold safety margin for workers who

10    manufacture or use it.

11  i. You can feel good about using herbicides by Monsanto. They carry a toxicity

12    category rating of 'practically non-toxic' as it pertains to mammals, birds and fish.

13  j. "Roundup® can be used where kids and pets will play and breaks down into natural

14    material." This ad depicts a person with his head in the ground and a pet dog

15    standing in an area which has been treated with Roundup®.

16 68.  On November 19, 1996, Monsanto entered into an Assurance of Discontinuance

17 with NYAG, in which Monsanto agreed, among other things, "to cease and desist from publishing

18 or broadcasting any advertisements [in New York] that represent, directly or by implication" that:

19  a. its glyphosate-containing herbicide products or any component thereof are safe,

20    non-toxic, harmless or free from risk. * * *

21  b. its glyphosate-containing herbicide products or any component thereof

22    manufactured, formulated, distributed or sold by Monsanto are biodegradable * * *

23  c. its glyphosate-containing herbicide products or any component thereof stay where

24    they are applied under all circumstances and will not move through the

25    environment by any means. * * *

26  d. its glyphosate-containing herbicide products or any component thereof are "good"

27    for the environment or are "known for their environmental characteristics." * * *

28 ///

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

1      e.   glyphosate-containing herbicide products or any component thereof are safer or less

2           toxic than common consumer products other than herbicides;

3      f.   its glyphosate-containing products or any component thereof might be classified as

4           "practically non-toxic."

5    69.    Monsanto did not alter its advertising in the same manner in any state other than

6    New York, and, on information and belief, still has not done so today.

7    70.    In 2009, France's highest court ruled that Monsanto had not told the truth about the

8    safety of Roundup®. The French court affirmed an earlier judgement that Monsanto had falsely

9    advertised its herbicide Roundup® as "biodegradable" and that it "left the soil clean."

10   ***Classifications and Assessments of Glyphosate***

11   71.    The IARC process for the classification of glyphosate followed the stringent

12   procedures for the evaluation of a chemical agent. Over time, the IARC Monograph program has

13   reviewed 980 agents. Of those reviewed, it has determined 116 agents to be Group 1 (Known

14   Human Carcinogens); 73 agents to be Group 2A (Probable Human Carcinogens); 287 agents to be

15   Group 2B (Possible Human Carcinogens); 503 agents to be Group 3 (Not Classified); and one

16   agent to be Probably Not Carcinogenic.

17   72.    The established procedure for IARC Monograph evaluations is described in the

18   IARC Programme's Preamble. Evaluations are performed by panels of international experts,

19   selected on the basis of their expertise and the absence of actual or apparent conflicts of interest.

20   73.    One year before the Monograph meeting, the meeting is announced and there is a

21   call both for data and for experts. Eight months before the Monograph meeting, the Working

22   Group membership is selected, and the sections of the Monograph are developed by the Working

23   Group members. One month prior to the Monograph meeting, the call for data is closed, and the

24   various draft sections are distributed among Working Group members for review and comment.

25   Finally, at the Monograph meeting, the Working Group finalizes review of all literature, evaluates

26   the evidence in each category, and completes the overall evaluation. Within two weeks after the

27   Monograph meeting, the summary of the Working Group findings are published in Lancet

28   Oncology, and within a year after the meeting, the final Monograph is finalized and published.

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

74.     In assessing a chemical agent, the IARC Working Group reviews the following information:

    a.   human, experimental, and mechanistic data;

    b.   all pertinent epidemiological studies and cancer bioassays; and

    c.   representative mechanistic data.

The studies must be publicly available and have sufficient detail for meaningful review, and reviewers cannot be associated with the underlying study.

75.     In March of 2015, IARC reassessed glyphosate. The summary published in *The Lancet Oncology* reported that glyphosate is a Group 2A agent, that is, glyphosate is probably carcinogenic in humans.

76.     On July 29, 2015, IARC issued its Monograph for glyphosate, Monograph 112. For Volume 112, the volume that assessed glyphosate, a Working Group of 17 experts from 11 countries met at IARC from March 3–10, 2015, to assess the carcinogenicity of certain herbicides, including glyphosate. The March meeting culminated nearly a one-year review and preparation by the IARC Secretariat and the Working Group, including a comprehensive review of the latest available scientific evidence. According to published procedures, the Working Group considered "reports that have been published or accepted for publication in the openly available scientific literature" as well as "data from governmental reports that are publicly available."

77.     The studies considered the following exposure groups: occupational exposure of farmers and tree nursery workers in the United States, forestry workers in Canada and Finland and municipal weed-control workers in the United Kingdom; and para-occupational exposure in farming families.

78.     Glyphosate was identified as the second-most used household herbicide in the United States for weed control between 2001 and 2007 and the most heavily used herbicide in the world in 2012.

79.     Exposure pathways are identified as air (especially during spraying), water, and food. Community exposure to glyphosate is widespread and found in soil, air, surface water, and groundwater, as well as in food.

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

80.     The assessment of the IARC Working Group identified several case control studies of occupational exposure in the United States, Canada, and Sweden. These studies show a human health concern from agricultural and other work-related exposure to glyphosate.

81.     The IARC Working Group found an increased risk between exposure to glyphosate and Non-Hodgkin's Lymphoma ("NHL") and several subtypes of NHL, and the increased risk persisted after adjustment for other pesticides.

82.     The IARC Working Group also found that glyphosate caused DNA and chromosomal damage in human cells. One study in community residents reported increases in blood markers of chromosomal damage (micronuclei) after glyphosate formulations were sprayed.

83.     In male CD-1 mice, glyphosate induced a positive trend in the incidence of a rare tumor, renal tubule carcinoma. A second study reported a positive trend for haemangiosarcoma in male mice. Glyphosate increased pancreatic islet-cell adenoma in male rats in two studies. A glyphosate formulation promoted skin tumors in an initiation-promotion study in mice.

84.     The IARC Working Group also noted that glyphosate has been detected in the urine of agricultural workers, indicating absorption. Soil microbes degrade glyphosate to aminomethylphosphoric acid (AMPA). Blood AMPA detection after exposure suggests intestinal microbial metabolism in humans.

85.     The IARC Working Group further found that glyphosate and glyphosate formulations induced DNA, oxidative stress, and chromosomal damage in mammals and in human and animal cells in utero.

86.     In addition to DNA damage and oxidative stress, scientists have suggested that Roundup's® association with various serious health conditions is linked to the effect Roundup® has on the digestive system. Specifically, scientists believe the same mechanism that makes Roundup® toxic to weeds also makes it toxic to the microbes within the human gut and mucous membranes. When humans are exposed to Roundup®, this exposure leads to a chronic inflammatory state in the gut, as well an impaired gut barrier, which can lead to many long-term health effects, including an increased risk of cancer. Monsanto has deliberately refused to conduct tests on this aspect of Roundup's® mechanism of action.

19

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

87.     Many Roundup® products bear a label which either reads: "glyphosate targets an enzyme found in plants but not in people or pets" or "this Roundup® formula targets an enzyme in plants but not in people or pets." These statements are false because it has been established that the human body is host to microorganisms which contain the enzyme Monsanto asserts is not found in humans.

88.     Thus, glyphosate targets microbes within the human body which contain the enzyme affected by glyphosate, leading to a variety of adverse health effects. The IARC Working Group also noted genotoxic, hormonal, and enzymatic effects in mammals exposed to glyphosate. Essentially, glyphosate inhibits the biosynthesis of aromatic amino acids, which leads to several metabolic disturbances, including the inhibition of protein and secondary product biosynthesis and general metabolic disruption.

89.     The IARC Working Group also reviewed an Agricultural Health Study consisting of a prospective cohort of 57,311 licensed pesticide applicators in Iowa and North Carolina. While this study differed from others in that it was based on a self-administered questionnaire, the results support an association between glyphosate exposure and Multiple Myeloma, Hairy Cell Leukemia (HCL), and Chronic Lymphocytic Leukemia (CLL), in addition to several other cancers.

***Other Earlier Findings about Glyphosate's Dangers to Human Health***

90.     The EPA has a technical fact sheet, as part of its Drinking Water and Health, National Primary Drinking Water Regulations publication, relating to glyphosate. This technical fact sheet predates the IARC March 20, 2015, evaluation. The fact sheet describes the release patterns for glyphosate as follows:

**Release Patterns**

91.     Glyphosate is released to the environment in its use as an herbicide for controlling woody and herbaceous weeds on forestry, right-of-way, cropped and non-cropped sites. These sites may be around water and in wetlands.

92.     It may also be released to the environment during its manufacture, formulation, transport, storage, disposal and cleanup, and from spills. Since glyphosate is not a listed chemical in the Toxics Release Inventory, data on releases during its manufacture and handling are not

1    available.

2        93.     Occupational workers and home gardeners may be exposed to glyphosate by

3    inhalation and dermal contact during spraying, mixing, and cleanup. They may also be exposed by

4    touching soil and plants to which glyphosate was applied. Occupational exposure may also occur

5    during glyphosate's manufacture, transport, storage, and disposal.

6        94.     In 1995, the Northwest Coalition for Alternatives to Pesticides reported that in

7    California, the state with the most comprehensive program for reporting of pesticide-caused

8    illness, glyphosate was the third most commonly-reported cause of pesticide illness among

9    agricultural workers.

10    ***Recent Worldwide Bans on Roundup®/Glyphosate***

11        95.     Several countries around the world have instituted bans on the sale of Roundup®

12    and other glyphosate-containing herbicides, both before and since IARC first announced its

13    assessment for glyphosate in March 2015, and more countries undoubtedly will follow suit in light

14    of this assessment as the dangers of the use of Roundup® are more widely known. The

15    Netherlands issued a ban on all glyphosate-based herbicides in April 2014, including Roundup®,

16    which takes effect by the end of 2015. In issuing the ban, the Dutch Parliament member who

17    introduced the successful legislation stated: "Agricultural pesticides in user-friendly packaging are

18    sold in abundance to private persons. In garden centers, Roundup® is promoted as harmless, but

19    unsuspecting customers have no idea what the risks of this product are. Especially children are

20    sensitive to toxic substances and should therefore not be exposed to it."

21        96.     The Brazilian Public Prosecutor in the Federal District requested that the Brazilian

22    Justice Department suspend the use of glyphosate.

23        97.     France banned the private sale of Roundup® and glyphosate following the IARC

24    assessment for Glyphosate.

25        98.     Bermuda banned both the private and commercial sale of glyphosates, including

26    Roundup®. The Bermuda government explained its ban as follows: "Following a recent scientific

27    study carried out by a leading cancer agency, the importation of weed spray 'Roundup®' has been

28    suspended."

21

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

1      99.     The Sri Lankan government banned the private and commercial use of glyphosates,

2    particularly out of concern that glyphosate has been linked to fatal kidney disease in agricultural

3    workers.

4      100.    The government of Columbia announced its ban on using Roundup® and

5    glyphosate to destroy illegal plantations of coca, the raw ingredient for cocaine, because of the

6    WHO's finding that glyphosate is probably carcinogenic.

7      101.    On information and belief, Orchard Supply Hardware was, at all relevant times,

8    engaged in the distribution of Roundup®, Roundup-Ready® crops and other glyphosate-

9    containing products from Monsanto to other retailers and to commercial, agricultural and casual

10    home-users in California.

11      102.    Orchard Supply Hardware had superior knowledge compared to Roundup® users

12    and consumers, including regarding the carcinogenic properties of the product, yet failed to

13    accompany its sales and or marketing of Roundup® with any warnings or precautions for that

14    grave danger. On information and belief, Orchard Supply Hardware was one of the distributors

15    providing Roundup® and other glyphosate-containing products actually used by the Plaintiff.

16                        **LIMITATION ON ALLEGATIONS**

17      103.    Plaintiff incorporates by reference each allegation set forth in preceding paragraphs

18    as if fully stated herein.

19      104.    The allegations in this pleading are made pursuant to California law. To the extent

20    California law imposes a duty or obligation on Defendants that exceeds those required by federal

21    law, Plaintiff does not assert such claims. All claims asserted herein run parallel to federal law,

22    *i.e.*, the Defendants' violations of California law were also violations of federal law. Had

23    Defendants honestly complied with California law, they would also have complied with federal

24    law.

25      105.    Additionally, Plaintiff's claims do not seek to enforce federal law. These claims are

26    brought under California law, notwithstanding that such claims run parallel to federal law.

27      106.    As alleged herein, Defendants violated U.S.C. § 136j and 40 C.F.R. § 156.10(a)(5)

28    by distributing Roundup®, which was misbranded pursuant to 7 U.S.C. § 136(g). Federal law

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

1    specifically prohibits the distribution of a misbranded herbicide.

2                    **COUNT I:  STRICT LIABILITY (DESIGN DEFECT)**

3          107.    Plaintiff incorporates by reference each allegation set forth in preceding paragraphs

4    as if fully stated herein.

5          108.    Plaintiff brings this strict liability claim against Defendants for defective design.

6          109.    At all relevant times, Defendants engaged in the business of testing, developing,

7    designing, manufacturing, marketing, selling, distributing, and promoting Roundup® products,

8    which are defective and unreasonably dangerous to consumers, including Plaintiff, thereby placing

9    Roundup® products into the stream of commerce. These actions were under the ultimate control

10   and supervision of Defendants. At all relevant times, Defendants designed, researched, developed,

11   manufactured, produced, tested, assembled, labeled, advertised, promoted, marketed, sold, and

12   distributed the Roundup® products used by Plaintiff, as described herein.

13          110.    At all relevant times, Defendants' Roundup® products were manufactured,

14   designed, and labeled in an unsafe, defective, and inherently dangerous manner that was

15   dangerous for use by or exposure to the public, including Plaintiff.

16          111.    At all relevant times, Defendants' Roundup® products reached the intended

17   consumers, handlers, and users or other persons coming into contact with these products in

18   California and throughout the United States, including Plaintiff, without substantial change in their

19   condition as designed, manufactured, sold, distributed, labeled, and marketed by Defendants.

20          112.    Defendants' Roundup® products, as researched, tested, developed, designed,

21   licensed, manufactured, packaged, labeled, distributed, sold, and marketed by Defendants were

22   defective in design and formulation in that, when they left the control of Defendants'

23   manufacturers and/or suppliers, they were unreasonably dangerous and dangerous to an extent

24   beyond that which an ordinary consumer would contemplate.

25          113.    Defendants' Roundup® products, as researched, tested, developed, designed,

26   licensed, manufactured, packaged, labeled, distributed, sold, and marketed by Defendants were

27   defective in design and formulation in that, when they left the hands of Defendants' manufacturers

28   and/or suppliers, the foreseeable risks exceeded the alleged benefits associated with their design

and formulation.

114.   At all relevant times, Defendants knew or had reason to know that Roundup® products were defective and were inherently dangerous and unsafe when used in the manner instructed and provided by Defendants.

115.   Therefore, at all relevant times, Defendants' Roundup® products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold and marketed by Defendants were defective in design and formulation, in one or more of the following ways:

    a.   When placed in the stream of commerce, Defendants' Roundup® products were defective in design and formulation, and, consequently, dangerous to an extent beyond that which an ordinary consumer would contemplate;

    b.   When placed in the stream of commerce, Defendants' Roundup® products were unreasonably dangerous in that they were hazardous and posed a grave risk of cancer and other serious illnesses when used in a reasonably anticipated manner;

    c.   When placed in the stream of commerce, Defendants' Roundup® products contained unreasonably dangerous design defects and were not reasonably safe when used in a reasonably anticipated or intended manner;

    d.   Defendants did not sufficiently test, investigate, or study its Roundup® products and, specifically, the active ingredient glyphosate;

    e.   Exposure to Roundup® and glyphosate-containing products presents a risk of harmful side effects that outweigh any potential utility stemming from the use of the herbicide;

    f.   Defendants knew or should have known at the time of marketing Roundup® products that exposure to Roundup® and specifically, its active ingredient glyphosate, could result in cancer and other severe illnesses and injuries;

    g.   Defendants did not conduct adequate post-marketing surveillance of its Roundup® products; and

    h.   Defendants could have employed safer alternative designs and formulations.

24

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

116.    Plaintiff was exposed to Defendants' Roundup® products without knowledge of Roundup's® dangerous characteristics.

117.    At all times relevant to this litigation, Plaintiff used and/or was exposed to the use of Defendants' Roundup® products in an intended or reasonably foreseeable manner without knowledge of Roundup's® dangerous characteristics.

118.    Plaintiff could not reasonably have discovered the defects and risks associated with Roundup® or glyphosate-containing products before or at the time of exposure due to the Defendants' suppression of scientific information linking glyphosate to cancer.

119.    The harm caused by Defendants' Roundup® products far outweighed their benefit, rendering Defendants' product dangerous to an extent beyond that which an ordinary consumer would contemplate. Defendants' Roundup® products were and are more dangerous than alternative products, and Defendants could have designed Roundup® products to make them less dangerous. Indeed, at the time Defendants designed Roundup® products, the state of the industry's scientific knowledge was such that a less risky design or formulation was attainable.

120.    At the time Roundup® products left Defendants' control, there was a practical, technically feasible and safer alternative design that would have prevented the harm without substantially impairing the reasonably anticipated or intended function of Defendants' herbicides.

121.    Defendants' defective design of Roundup® products was willful, wanton, fraudulent, malicious, and conducted with reckless disregard for the health and safety of users of the Roundup® products, including Plaintiff herein.

122.    Therefore, as a result of the unreasonably dangerous condition of its Roundup® products, Defendants are strictly liable to Plaintiff.

123.    The defects in Defendants' Roundup® products were substantial and contributing factors in causing Plaintiff'' injuries, and, but for Defendants' misconduct and omissions, Plaintiff would not have sustained injuries.

124.    Defendants' conduct, as described above, was reckless. Defendants risked the lives of consumers and users of its products, including Plaintiff, with knowledge of the safety problems associated with Roundup® and glyphosate-containing products, and suppressed this knowledge

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

1   from the general public. Defendants made conscious decisions not to redesign, warn or inform the

2   unsuspecting public. Defendants' reckless conduct warrants an award of punitive damages.

3         125.    As a direct and proximate result of Defendants placing its defective Roundup®

4   products into the stream of commerce, and the resulting injuries, Plaintiff has sustained pecuniary

5   loss including general damages in a sum which exceeds the jurisdictional minimum of this Court.

6         126.    As a proximate result of Defendants placing its defective Roundup® products into

7   the stream of commerce, as alleged herein, there was a measurable and significant interval of time

8   during which Plaintiff has suffered great mental anguish and other personal injury and damages.

9         127.    As a proximate result of the Defendants placing its defective Roundup® products

10   into the stream of commerce, as alleged herein, Plaintiff sustained loss of income, loss of earning

11   capacity and/or property damage.

12         128.    WHEREFORE, Plaintiff respectfully requests this Court to enter judgment in

13   Plaintiff's favor for compensatory and punitive damages, together with interest, costs herein

14   incurred, attorneys' fees and all such other and further relief as this Court deems just and proper.

15                    **COUNT II:  STRICT LIABILITY (FAILURE TO WARN)**

16         129.    Plaintiff incorporates by reference each allegation set forth in preceding paragraphs

17   as if fully stated herein.

18         130.    Plaintiff brings this strict liability claim against Defendants for failure to warn.

19         131.    At all relevant times, Defendants engaged in the business of testing, developing,

20   designing, manufacturing, marketing, selling, distributing, and promoting Roundup® products

21   which are defective and unreasonably dangerous to consumers, including Plaintiff, because they do

22   not contain adequate warnings or instructions concerning the dangerous characteristics of

23   Roundup® and specifically, the active ingredient glyphosate. These actions were under the ultimate

24   control and supervision of Defendants.

25         132.    Defendants researched, developed, designed, tested, manufactured, inspected,

26   labeled, distributed, marketed, promoted, sold, and otherwise released into the stream of

27   commerce its Roundup® products, and in the course of same, directly advertised or marketed the

28   products to consumers and end users, including Plaintiff, and therefore had a duty to warn of the

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

1   risks associated with the use of Roundup® and glyphosate-containing products.

2        133.   At all relevant times, Defendants had a duty to properly test, develop, design,

3   manufacture, inspect, package, label, market, promote, sell, distribute, maintain, supply, provide

4   proper warnings, and take such steps as necessary to ensure its Roundup® products did not cause

5   users and consumers to suffer from unreasonable and dangerous risks. Defendants had a continuing

6   duty to warn Plaintiff of dangers associated with Roundup® use and exposure. Defendants, as

7   manufacturer, seller, or distributor of chemical herbicides are held to the knowledge of an expert in

8   the field.

9        134.   At the time of manufacture, Defendants could have provided the warnings or

10   instructions regarding the full and complete risks of Roundup® and glyphosate-containing

11   products because they knew or should have known of the unreasonable risks of harm associated

12   with the use of and/or exposure to such products.

13        135.   At all relevant times, Defendants failed and deliberately refused to investigate,

14   study, test, or promote the safety or to minimize the dangers to users and consumers of their

15   product and to those who would foreseeably use or be harmed by Defendants' herbicides,

16   including Plaintiff.

17        136.   Despite the fact that Defendants knew or should have known that Roundup® posed

18   a grave risk of harm, they failed to exercise reasonable care to warn of the dangerous risks

19   associated with use and exposure. The dangerous propensities of their products and the

20   carcinogenic characteristics of glyphosate, as described above, were known to Defendants, or

21   scientifically knowable to Defendants through appropriate research and testing by known methods,

22   at the time they distributed, supplied or sold the product, and were not known to end users and

23   consumers, such as Plaintiff.

24        137.   Defendants knew or should have known that their products created significant risks

25   of serious bodily harm to consumers, as alleged herein, and Defendants failed to adequately warn

26   consumers, *i.e.*, the reasonably foreseeable users, of the risks of exposure to its products.

27   Defendants have wrongfully concealed information concerning the dangerous nature of Roundup®

28   and its active ingredient glyphosate and, further, have made false and/or misleading statements

1    concerning the safety of Roundup® products and glyphosate.

2         138.   At all relevant times, Defendants' Roundup® products reached the intended

3    consumers, handlers, and users or other persons coming into contact with these products in

4    California and throughout the United States, including Plaintiff, without substantial change in their

5    condition as designed, manufactured, sold, distributed, labeled, and marketed by Defendants.

6         139.   Plaintiff was exposed to Defendants' Roundup® products without knowledge of

7    their dangerous characteristics.

8         140.   At all relevant times, Plaintiff used and/or was exposed to the use of Defendants'

9    Roundup® products while using them for their intended or reasonably foreseeable purposes,

10   without knowledge of their dangerous characteristics.

11        141.   Plaintiff could not have reasonably discovered the defects and risks associated with

12   Roundup® or glyphosate-containing products prior to or at the time of Plaintiff's exposure.

13   Plaintiff relied upon the skill, superior knowledge, and judgment of Defendants to know about and

14   disclose serious health risks associated with using Defendants' products.

15        142.   Defendants knew or should have known that the minimal warnings disseminated

16   with their Roundup® products were inadequate, failed to communicate adequate information on

17   the dangers and safe use/exposure, and failed to communicate warnings and instructions that were

18   appropriate and adequate to render the products safe for their ordinary, intended and reasonably

19   foreseeable uses, including agricultural and horticultural applications.

20        143.   The information that Defendants did provide or communicate failed to contain

21   relevant warnings, hazards, and precautions that would have enabled consumers such as Plaintiff to

22   utilize the products safely and with adequate protection. Instead, Defendants disseminated

23   information that was inaccurate, false and misleading, and which failed to communicate accurately

24   or adequately the comparative severity, duration, and extent of the risk of injuries with use of

25   and/or exposure to Roundup® and glyphosate; continued to aggressively promote the efficacy of its

26   products, even after they knew or should have known of the unreasonable risks from use or

27   exposure; and concealed, downplayed, or otherwise suppressed, through aggressive marketing and

28   promotion, any information or research about the risks and dangers of exposure to Roundup® and

1    glyphosate.

2        144.    This alleged failure to warn is not limited to the information contained on

3    Roundup's® labeling. The Defendants were able, in accord with federal law, to comply with

4    California law by disclosing the known risks associated with Roundup® through other non-

5    labeling mediums, *i.e.*, promotion, advertisements, public service announcements, and/or public

6    information sources. But the Defendants did not disclose these known risks through any medium.

7        145.    To this day, Defendants have failed to adequately and accurately warn of the risks

8    of cancer associated with the use of and exposure to Roundup® and its active ingredient

9    glyphosate.

10        146.    As a result of their inadequate warnings, Defendants' Roundup® products were

11    defective and unreasonably dangerous when they left the possession and/or control of Defendants,

12    were distributed by Defendants, and used by Plaintiff.

13        147.    Defendants are liable to Plaintiff for injuries caused by their negligent or willful

14    failure, as described above, to provide adequate warnings or other clinically relevant information

15    and data regarding the appropriate use of their products and the risks associated with the use of or

16    exposure to Roundup® and glyphosate.

17        148.    Had Defendants provided adequate warnings and instructions and properly

18    disclosed and disseminated the risks associated with their Roundup® products, Plaintiff could

19    have avoided the risk of developing injuries and could have obtained or used alternative

20    herbicides.

21        149.    As a direct and proximate result of Defendants placing defective Roundup®

22    products into the stream of commerce, Plaintiff was injured and have sustained pecuniary loss

23    resulting and general damages in a sum exceeding the jurisdictional minimum of this Court.

24        150.    As a proximate result of Defendants placing defective Roundup® products into the

25    stream of commerce, as alleged herein, there was a measurable and significant interval of time

26    during which Plaintiff suffered great mental anguish and other personal injury and damages.

27        151.    As a proximate result of Defendants placing defective Roundup® products into the

28    stream of commerce, as alleged herein, Plaintiff sustained loss of income, loss of earning capacity

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

1  and property damage.

2      152.    WHEREFORE, Plaintiff respectfully request this Court to enter judgment in

3  Plaintiff'' favor for compensatory and punitive damages, together with interest, costs herein

4  incurred, attorneys' fees and all such other and further relief as this Court deems just and proper.

5                     **COUNT III:  NEGLIGENCE**

6      153.    Plaintiff incorporates by reference each allegation set forth in preceding paragraphs

7  as if fully stated herein.

8      154.    Defendants, directly or indirectly, caused Roundup® products to be sold,

9  distributed, packaged, labeled, marketed, promoted, and/or used by Plaintiff.

10      155.    At all relevant times, Defendants had a duty to exercise reasonable care in the

11  design, research, manufacture, marketing, advertisement, supply, promotion, packaging, sale, and

12  distribution of Roundup® products, including the duty to take all reasonable steps necessary to

13  manufacture, promote, and/or sell a product that was not unreasonably dangerous to consumers

14  and users of the product.

15      156.    At all relevant times, Defendants had a duty to exercise reasonable care in the

16  marketing, advertisement, and sale of the Roundup® products. Defendants' duty of care owed to

17  consumers and the general public included providing accurate, true, and correct information

18  concerning the risks of using Roundup® and appropriate, complete, and accurate warnings

19  concerning the potential adverse effects of exposure to Roundup®, and, in particular, its active

20  ingredient glyphosate.

21      157.    At all relevant times, Defendants knew or, in the exercise of reasonable care,

22  should have known of the hazards and dangers of Roundup® and, specifically, the carcinogenic

23  properties of the chemical glyphosate.

24      158.    Accordingly, at all relevant times, Defendants knew or, in the exercise of

25  reasonable care, should have known that use of or exposure to Roundup® products could cause or

26  be associated with Plaintiff's injuries, and thus, create a dangerous and unreasonable risk of injury

27  to the users of these products, including Plaintiff.

28  / / /

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

159.    Defendants also knew or, in the exercise of reasonable care, should have known that users and consumers of Roundup® were unaware of the risks and the magnitude of the risks associated with use of and/or exposure to Roundup® and glyphosate-containing products.

160.    As such, Defendants breached their duty of reasonable care and failed to exercise ordinary care in the design, research, development, manufacture, testing, marketing, supply, promotion, advertisement, packaging, sale, and distribution of Roundup® products, in that Defendants manufactured and produced defective herbicides containing the chemical glyphosate; knew or had reason to know of the defects inherent in its products; knew or had reason to know that a user's or consumer's exposure to the products created a significant risk of harm and unreasonably dangerous side effects; and failed to prevent or adequately warn of these risks and injuries. Indeed, Defendants deliberately refused to test Roundup® products because they knew that the chemical posed serious health risks to humans.

161.    Defendants were negligent in their promotion of Roundup®, outside of the labeling context, by failing to disclose material risk information as part of their promotion and marketing of Roundup®, including the Internet, television, print advertisements, etc. Nothing prevented Defendants from being honest in their promotional activities, and, in fact, Defendants had a duty to disclose the truth about the risks associated with Roundup® in their promotional efforts, outside of the context of labeling.

162.    Despite their ability and means to investigate, study, and test the products and to provide adequate warnings, Defendants have failed to do so. Indeed, Defendants have wrongfully concealed information and have further made false and/or misleading statements concerning the safety and/or exposure to Roundup® and glyphosate.

163.    Defendants' negligence included:

    a.  Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing Roundup® products without thorough and adequate pre- and post-market testing;

    b.  Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing Roundup® while negligently and/or

31

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

intentionally concealing and failing to disclose the results of trials, tests, and studies of exposure to glyphosate, and, consequently, the risk of serious harm associated with human use of and exposure to Roundup®;

c.  Failing to undertake sufficient studies and conduct necessary tests to determine whether or not Roundup® products and glyphosate-containing products were safe for their intended use in agriculture and horticulture;

d.  Failing to use reasonable and prudent care in the design, research, manufacture, and development of Roundup® products so as to avoid the risk of serious harm associated with the prevalent use of Roundup®/glyphosate as an herbicide;

e.  Failing to design and manufacture Roundup® products so as to ensure they were at least as safe and effective as other herbicides on the market;

f.  Failing to provide adequate instructions, guidelines, and safety precautions to those persons Defendants could reasonably foresee would use and be exposed to Roundup® products;

g.  Failing to disclose to Plaintiff, users/consumers, and the general public that use of and exposure to Roundup® presented severe risks of cancer and other grave illnesses;

h.  Failing to warn Plaintiff, consumers, and the general public that the product's risk of harm was unreasonable and that there were safer and effective alternative herbicides available to Plaintiff and other consumers;

i.  Systematically suppressing or downplaying contrary evidence about the risks, incidence, and prevalence of the side effects of Roundup® and glyphosate-containing products;

j.  Representing that their Roundup® products were safe for their intended use when, in fact, Defendants knew or should have known the products were not safe for their intended purpose;

k.  Declining to make or propose any changes to Roundup® products' labeling or other promotional materials that would alert consumers and the general public of

32

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

the risks of Roundup® and glyphosate;

l.   Advertising, marketing, and recommending the use of the Roundup® products, while concealing and failing to disclose or warn of the dangers known (by Defendants) to be associated with or caused by the use of or exposure to Roundup® and glyphosate;

m.   Continuing to disseminate information to its consumers, which indicate or imply that Defendants' Roundup® products are not unsafe for use in the agricultural and horticultural industries; and

n.   Continuing the manufacture and sale of their products with the knowledge that the products were unreasonably unsafe and dangerous.

164.   Defendants knew and/or should have known that it was foreseeable consumers such as Plaintiff would suffer injuries as a result of Defendants' failure to exercise ordinary care in the manufacturing, marketing, labeling, distribution, and sale of Roundup®.

165.   Plaintiff did not know the nature and extent of the injuries that could result from the intended use of and/or exposure to Roundup® or its active ingredient glyphosate.

166.   Defendants' negligence was the proximate cause of Plaintiff's injuries, *i.e.*, absent Defendants' negligence, Plaintiff would not have developed cancer.

167.   Defendants' conduct, as described above, was reckless. Defendants regularly risked the lives of consumers and users of their products, including Plaintiff, with full knowledge of the dangers of their products. Defendants have made conscious decisions not to redesign, re-label, warn, or inform the unsuspecting public, including Plaintiff. Defendants' reckless conduct therefore warrants an award of punitive damages.

168.   As a direct and proximate result of Defendants placing defective Roundup® products into the stream of commerce, Plaintiff was injured and has sustained pecuniary loss and general damages in a sum exceeding the jurisdictional minimum of this Court.

169.   As a proximate result of Defendants placing defective Roundup® products into the stream of commerce, as alleged herein, there was a measurable and significant interval of time during which Plaintiff suffered great mental anguish and other personal injury and damages.

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

170.     As a proximate result of Defendants placing defective Roundup® products into the stream of commerce, as alleged herein, Plaintiff sustained a loss of income, loss of earning capacity and property damage.

171.     WHEREFORE, Plaintiff respectfully requests this Court to enter judgment in Plaintiff's favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all such other and further relief as this Court deems just and proper.

## COUNT IV: FRAUD

### (MONSANTO)

172.     Plaintiff incorporates by reference each allegation set forth in preceding paragraphs as if fully stated herein.

173.     Defendant Monsanto has defrauded the agricultural community in general and Plaintiff in particular by misrepresenting the true safety of its Roundup® and by failing to disclose known risks of cancer.

174.     Defendant Monsanto misrepresented and/or failed to disclose, *inter alia*, that: glyphosate and its major metabolite aminomethylphosphonic acid (AMPA) could cause cancer; glyphosate and AMPA are known to be genotoxic in humans and laboratory animals because exposure is known to cause DNA strand breaks (a precursor to cancer); glyphosate and AMPA are known to induce oxidative stress in humans and laboratory animals (a precursor to cancer); glyphosate and AMPA interfere with the aromatic amino acids within the human gut, leading to downstream health conditions including cancer; exposure to glyphosate and AMPA is causally associated with Non-Hodgkin's Lymphoma; and the laboratory tests attesting to the safety of glyphosate were flawed and/or fraudulent.

175.     Due to these misrepresentations and omissions, at all times relevant to this litigation, Defendant's Roundup® was misbranded under 7 U.S.C. § 136(g) and its distribution within California and around the United States was a violation of 7 U.S.C. § 136j and 40 C.F.R. § 156.10(a)(5).

176.     Plaintiff relied on the Defendant's misrepresentations and/or material omissions regarding the safety of Roundup® and its active ingredient glyphosate in deciding whether to

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

1   purchase and/or use the product. Plaintiff did not know nor could he reasonably have known of the

2   misrepresentations and/or material omissions by Defendant concerning Roundup® and its active

3   ingredient glyphosate.

4        177.    The misrepresentations and/or material omissions that form the basis of this fraud

5   claim are not limited to statements made on the Roundup® labeling, as defined under federal law,

6   but also involve Defendant Monsanto's representations and omissions made as part of its

7   promotion and marketing of Roundup®, including on the Internet, television, in print

8   advertisements, etc. Nothing prevented Defendant Monsanto from disclosing the truth about the

9   risks associated with Roundup® in its promotional efforts outside of the labeling context, using

10  the forms of media and promotion Defendant Monsanto traditionally used to promote the

11  product's efficacy and benefits.

12       178.    When Defendant Monsanto made the misrepresentations and/or omissions as

13  alleged in this pleading, it did so with the intent of defrauding and deceiving the public in general

14  and the agricultural community and with the intent of inducing the public and agricultural

15  community to purchase and use Roundup®.

16       179.    Defendant Monsanto made these misrepresentations and/or material omissions with

17  malicious, fraudulent and/or oppressive intent toward Plaintiff and the public generally.

18  Defendant's conduct was willful, wanton, and/or reckless. Defendant deliberately recommended,

19  manufactured, produced, marketed, sold, distributed, merchandized, packaged, promoted and

20  advertised the dangerous and defective herbicide Roundup®. This constitutes an utter, wanton,

21  and conscious disregard of the rights and safety of a large segment of the public, and by reason

22  thereof, Defendant is liable for reckless, willful, and wanton acts and omissions which evidence a

23  total and conscious disregard for the safety of Plaintiff and others which proximately caused the

24  injuries as set forth herein.

25       180.    As a proximate result of Defendant Monsanto's fraudulent and deceitful conduct

26  and representations, Plaintiff has sustained damages and other losses in an amount to be proven at

27  trial.

28  ///

181.    As a proximate result of Defendant Monsanto's fraud, as alleged herein, Plaintiff sustained a loss of income, loss of earning capacity and property damage, including lost income.

182.    WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in Plaintiff's favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all such other and further relief as this Court deems just and proper.

## COUNT V:  BREACH OF EXPRESS WARRANTIES
### (MONSANTO)

183.    Plaintiff incorporates by reference each allegation set forth in preceding paragraphs as if fully stated herein.

184.    At all relevant times, Defendant Monsanto engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting Roundup® products, which are defective and unreasonably dangerous to consumers, including Plaintiff, thereby placing Roundup® products into the stream of commerce. These actions were under the ultimate control and supervision of Defendant Monsanto.

185.    Defendant Monsanto had a duty to exercise reasonable care in the research, development, design, testing, packaging, manufacture, inspection, labeling, distributing, marketing, promotion, sale, and release of Roundup® products, including a duty to:

    a.  ensure that its products did not cause the user unreasonably dangerous side effects;

    b.  warn of dangerous and potentially fatal side effects; and

    c.  disclose adverse material facts, such as the true risks associated with the use of and exposure to Roundup® and glyphosate-containing products, when making representations to consumers and the general public, including Plaintiff.

186.    As alleged throughout this pleading, the ability of Defendant Monsanto to properly disclose those risks associated with Roundup® is not limited to representations made on the labeling.

187.    At all relevant times, Defendant Monsanto expressly represented and warranted to the purchasers of its products, by and through statements made by Defendant Monsanto in labels, publications, package inserts, and other written materials intended for consumers and the general

36

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

public, that Roundup® products were safe to human health and the environment, effective, fit, and proper for their intended use. Defendant Monsanto advertised, labeled, marketed, and promoted Roundup® products, representing the quality to consumers and the public in such a way as to induce their purchase or use, thereby making an express warranty that Roundup® products would conform to the representations.

188.    These express representations include incomplete warnings and instructions that purport, but fail, to include the complete array of risks associated with use of and/or exposure to Roundup® and glyphosate. Defendant Monsanto knew and/or should have known that the risks expressly included in Roundup® warnings and labels did not and do not accurately or adequately set forth the risks of developing the serious injuries complained of herein. Nevertheless, Defendant Monsanto expressly represented that Roundup® products were safe and effective, that they were safe and effective for use by individuals such as the Plaintiff, and/or that they were safe and effective as agricultural herbicides.

189.    The representations about Roundup®, as set forth herein, contained or constituted affirmations of fact or promises made by the seller to the buyer, which related to the goods and became part of the basis of the bargain, creating an express warranty that the goods would conform to the representations.

190.    Defendant Monsanto placed Roundup® products into the stream of commerce for sale and recommended their use to consumers and the public without adequately warning of the true risks of developing the injuries associated with the use of and exposure to Roundup® and its active ingredient glyphosate.

191.    Defendant Monsanto breached these warranties because, among other things, Roundup® products were defective, dangerous, and unfit for use, did not contain labels representing the true and adequate nature of the risks associated with their use, and were not merchantable or safe for their intended, ordinary, and foreseeable use and purpose. Specifically, Defendant Monsanto breached the warranties in the following ways:

a.    Defendant Monsanto represented through its labeling, advertising, and marketing materials that Roundup® products were safe, and fraudulently withheld and

37

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

1      concealed information about the risks of serious injury associated with use of

2      and/or exposure to Roundup® and glyphosate by expressly limiting the risks

3      associated with use and/or exposure within its warnings and labels; and

4      b.  Defendant Monsanto represented that Roundup® products were safe for use and

5      fraudulently concealed information that demonstrated that glyphosate, the active

6      ingredient in Roundup®, had carcinogenic properties, and that Roundup®

7      products, therefore, were not safer than alternatives available on the market.

8      192.   Plaintiff detrimentally relied on the express warranties and representations of

9 Defendant Monsanto concerning the safety and/or risk profile of Roundup® in making a decision to

10 purchase the product. Plaintiff reasonably relied upon Defendant Monsanto to disclose known

11 defects, risks, dangers, and side effects of Roundup® and glyphosate. Plaintiff would not have

12 purchased or used Roundup® had Defendant Monsanto properly disclosed the risks associated with

13 the product, either through advertising, labeling, or any other form of disclosure.

14      193.   Defendant Monsanto had sole access to material facts concerning the nature of the

15 risks associated with its Roundup® products, as expressly stated within their warnings and labels,

16 and knew that consumers and users such as Plaintiff could not have reasonably discovered that the

17 risks expressly included in Roundup® warnings and labels were inadequate and inaccurate.

18      194.   Plaintiff had no knowledge of the falsity or incompleteness of Defendant

19 Monsanto's statements and representations concerning Roundup®.

20      195.   Plaintiff used and/or was exposed to Roundup® as researched, developed,

21 designed, tested, manufactured, inspected, labeled, distributed, packaged, marketed, promoted,

22 sold, or otherwise released into the stream of commerce by Defendant Monsanto.

23      196.   Had the warnings, labels, advertisements, or promotional material for Roundup®

24 products accurately and adequately set forth the true risks associated with the use of such products,

25 including Plaintiff's injuries, rather than expressly excluding such information and warranting that

26 the products were safe for their intended use, Plaintiff could have avoided the injuries complained

27 of herein.

28 ///

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

1    197.    As a direct and proximate result of Defendant Monsanto's breach of express

2    warranty, Plaintiff has sustained pecuniary loss and general damages in a sum exceeding the

3    jurisdictional minimum of this Court.

4    198.    As a proximate result of Defendant Monsanto's breach of express warranty, as

5    alleged herein, there was a measurable and significant interval of time during which Plaintiff

6    suffered great mental anguish and other personal injury and damages.

7    199.    As a proximate result of Defendant Monsanto's breach of express warranty, as

8    alleged herein, Plaintiff sustained a loss of income, loss of earning capacity, and property damage.

9    200.    WHEREFORE, Plaintiff respectfully requests this Court to enter judgment in

10   Plaintiff's favor for compensatory and punitive damages, together with interest, costs herein

11   incurred, attorneys' fees, and all such other and further relief as this Court deems just and proper.

12   ## COUNT VI:  BREACH OF IMPLIED WARRANTIES

13   ### (MONSANTO)

14   201.    Plaintiff incorporates by reference every allegation set forth in preceding

15   paragraphs as if fully stated herein.

16   202.    At all relevant times, Defendant Monsanto engaged in the business of testing,

17   developing, designing, manufacturing, marketing, selling, distributing, and promoting Roundup®

18   products, which were and are defective and unreasonably dangerous to consumers, including

19   Plaintiff, thereby placing Roundup® products into the stream of commerce.

20   203.    Before the time Plaintiff was exposed to the aforementioned Roundup® products,

21   Defendant Monsanto impliedly warranted to its consumers, including Plaintiff, that Roundup®

22   products were of merchantable quality and safe and fit for the use for which they were intended;

23   specifically, as agricultural herbicides.

24   204.    But Defendant Monsanto failed to disclose that Roundup® has dangerous

25   propensities when used as intended and that use of and/or exposure to Roundup® and glyphosate-

26   containing products carries an increased risk of developing severe injuries, including Plaintiff's

27   injuries.

28   / / /

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

1     205.    Plaintiff was the intended beneficiary of the implied warranties made by Defendant

2 Monsanto to purchasers of its herbicides.

3     206.    The Roundup® products were expected to reach and did in fact reach consumers

4 and users, including Plaintiff, without substantial change in the condition in which they were

5 manufactured and sold by Defendant Monsanto.

6     207.    At all relevant times, Defendant Monsanto was aware that consumers and users of

7 its products, including Plaintiff, would use Roundup® products as marketed by Defendant

8 Monsanto, which is to say that Plaintiff were foreseeable users of Roundup®.

9     208.    Defendant Monsanto intended that Roundup® products be used in the manner in

10 which Plaintiff, in fact, used them and which Defendant Monsanto impliedly warranted to be of

11 merchantable quality, safe, and fit for this use, despite the fact that Roundup® was not adequately

12 tested or researched.

13     209.    In reliance upon Defendant Monsanto's implied warranty, Plaintiff used Roundup®

14 as instructed and labeled and in the foreseeable manner intended, recommended, promoted, and

15 marketed by Defendant Monsanto.

16     210.    Plaintiff could not have reasonably discovered or known of the risks of serious

17 injury associated with Roundup® or glyphosate.

18     211.    Defendant Monsanto breached its implied warranty to Plaintiff in that Roundup®

19 products were not of merchantable quality, safe, or fit for their intended use, or adequately tested.

20 Roundup® has dangerous propensities when used as intended and can cause serious injuries,

21 including those injuries complained of herein.

22     212.    The harm caused by Defendant's Roundup® products far outweighed their benefit,

23 rendering the products more dangerous than an ordinary consumer or user would expect and more

24 dangerous than alternative products.

25     213.    As a direct and proximate result of Defendant's breach of implied warranty,

26 Plaintiff have sustained pecuniary loss and general damages in a sum exceeding the jurisdictional

27 minimum of this Court.

28 / / /

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

214.   As a proximate result of the Defendant's breach of implied warranty, as alleged herein, there was a measurable and significant interval of time during which Plaintiff suffered great mental anguish and other personal injury and damages.

215.   As a proximate result of Defendant's breach of implied warranty, as alleged herein, Plaintiff sustained a loss of income, loss of earning capacity, and property damage.

216.   WHEREFORE, Plaintiff respectfully requests this Court to enter judgment in Plaintiff's favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all such other and further relief as this Court deems just and proper.

### COUNT VII: LOSS OF CONSORTIUM

217.   Plaintiff incorporates by reference each allegation set forth in preceding paragraphs as if fully stated herein.

218.   Plaintiffs Dan Rowland and Phyllis Rowland are currently lawfully married spouses and were married to one another at all material times hereto. Plaintiff Phyllis Rowland was entitled to Plaintiff Dan Rowland's love, comfort, care, affection, companionship, services, society, advice, moral support, guidance, counsel, and consortium and was deprived of such due to Defendants' conduct.

219.   By reason of the injuries sustained by Plaintiff Dan Rowland, Plaintiff Phyllis Rowland will continue to be deprived of Plaintiff Dan Rowland's love, comfort, care, affection, companionship, services, society, advice, moral support, guidance, counsel, and consortium and as a result, has sustained general and special damages.

220.   WHEREFORE, Plaintiffs each respectfully request that this Court enter judgment in Plaintiffs' favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all such other and further relief as this Court deems just and proper.

### COUNT VIII: EXEMPLARY AND PUNITIVE DAMAGES

221.   Plaintiff incorporates by reference each allegation set forth in preceding paragraphs as if fully stated herein.

222.   At all times material hereto, the Defendants knew or should have known that the subject product was inherently dangerous with respect to its health risks.

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

223.    At all times material hereto, the Defendants attempted to misrepresent and did misrepresent facts concerning the safety of the subject product.

224.    Defendants' misrepresentations included knowingly withholding material information from the public, including Plaintiff herein, concerning the safety of the subject product.

225.    At all times material hereto, Defendants knew and recklessly disregarded the fact that human exposure to Roundup® can and does cause health hazards, including Non-Hodgkin's Lymphoma.

226.    Notwithstanding the foregoing, the Defendants continues to aggressively market and apply the subject product without disclosing the aforementioned risks.

227.    Defendants knew of the subject product's defective and unreasonably dangerous nature, as set forth herein, but continues to design, develop, manufacture, market, distribute, sell, and apply it so as to maximize sales and profits at the expense of the health and safety of the public, including the Plaintiff herein, in conscious and/or negligent disregard of the foreseeable harm caused by Roundup®.

228.    The Defendants intentionally concealed and/or recklessly failed to disclose to the public, including Plaintiff herein, the potentially life-threatening hazards of Roundup® in order to ensure continued and increased sales.

229.    The Defendants' intentional and/or reckless failure to disclose information deprived the Plaintiff herein of necessary information to enable Plaintiff to weigh the true risks of using or being exposed to Roundup® against its benefits.

230.    Defendants' conduct as alleged herein was done with oppression, fraud, and malice. Defendants were fully aware of the safety risks of Roundup®. Nonetheless, Defendants deliberately crafted their label, marketing, and promotion to mislead farmers and consumers.

231.    This was not done by accident or through some justifiable negligence. Rather, Defendants knew that it could turn a profit by convincing the agricultural industry that Roundup® was harmless to humans, and that full disclosure of the true risks of Roundup® would limit the amount of money Defendants would make selling Roundup® in California. Defendants' objection

42

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

1   was accomplished not only through its misleading labeling, but through a comprehensive scheme of

2   selective fraudulent research and testing, misleading advertising, and deceptive omissions as more

3   fully alleged throughout this pleading. Plaintiff was denied the right to make an informed decision

4   about whether to purchase, use, or be exposed to an herbicide, knowing the full risks attendant to

5   that use. Such conduct was done with conscious disregard of Plaintiff's rights.

6       232.    As a direct and proximate result of the Defendants' conscious, knowing, and

7   deliberate disregard for the rights and safety of consumers, including Plaintiff herein, Plaintiff

8   suffered severe and permanent physical injuries.  The Plaintiff has endured substantial pain and

9   suffering and has undergone extensive medical and surgical procedures. Plaintiff has incurred

10  significant expenses for medical care and treatment, and will continue to incur such expenses in the

11  future.  The Plaintiff has lost past earnings and has suffered a loss of earning capacity.  The Plaintiff

12  has suffered and will continue to suffer economic loss, and has otherwise been physically,

13  emotionally, and economically injured. The Plaintiff's injuries and damages are permanent and will

14  continue into the future.

15      233.    The aforementioned conduct of the Defendants was committed with knowing,

16  conscious, and deliberate disregard for the rights and safety of consumers, including the Plaintiff

17  herein, thereby entitling Plaintiff to punitive damages in an amount appropriate to punish the

18  Defendants and deter them from similar conduct in the future.

19      234.    There is no indication that Defendants will stop their deceptive and unlawful

20  marketing practices unless they are punished and deterred. Accordingly, Plaintiff requests punitive

21  damages against the Defendants for the harms caused to Plaintiff.

22      235.    WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in

23  Plaintiff's favor for compensatory, treble and punitive damages, together with interest, costs

24  herein incurred, attorneys' fees, and all such other and further relief as this Court deems just and

25  proper.

26                         **JURY TRIAL DEMAND**

27      236.    Plaintiffs demand a trial by jury on all of the triable issues within this pleading.

28  / / /

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

## PRAYER FOR RELIEF

237.    WHEREFORE, Plaintiffs Dan Rowland and Phyllis Rowland request that this Court enter judgment in their favor and against the Defendants, awarding as follows:

    a.   Judgment for Plaintiffs and against Defendants;

    b.   For compensatory damages in an amount to be proven at trial;

    c.   For mental and physical suffering, according to proof;

    d.   For lost wages, according to proof;

    e.   For disgorgement of profits, according to proof;

    f.   For exemplary and punitive damages sufficient to punish and deter the Defendants and others from future fraudulent practices;

    g.   For default judgment as a sanction for the bad faith destruction of evidence, if any, and according to proof, if any;

    h.   For costs including reasonable attorneys' fees, court costs, and other litigation expenses;

    i.   For pre-judgment and post-judgment interest; and

    j.   For any other relief the Court may deem just and proper.

Dated: July 18, 2022                    **ROBINSON CALCAGNIE, INC.**


By: *Mark P. Robinson, Jr.*
Mark P. Robinson, Jr., Esq.
Jennifer M. Collins, Esq.
*Attorneys for Plaintiffs*

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL