# U.S. District Court
## Southern District of California (San Diego)
## CIVIL DOCKET FOR CASE #: 3:22-cv-02037-BEN-DDL

| | |
|---|---|
| Cilli v. Monsanto Company et al | Date Filed: 12/22/2022 |
| Assigned to: Judge Roger T. Benitez | Jury Demand: Both |
| Referred to: Magistrate Judge David D. Leshner | Nature of Suit: 365 Personal Inj. Prod. Liability |
| Case in other court:  Superior Court, San Diego County, CA, 37-02022-00027689-CU-PL-CTL | Jurisdiction: Diversity |
| Cause: 28:1332pl Diversity-Product Liability | |

**Plaintiff**

**Gregory S. Cilli**                                      represented by **Michael Alan Feldman**
The Feldman Law Group
3636 4th Avenue
Suite 200
San Diego, CA 92103
619-297-5811
Fax: 619-600-5318
Email: veronica@sdlawyernow.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Monsanto Company**                                 represented by **Ryan Joseph Williams**
Shook, Hardy & Bacon
5 Park Plaza
Suite 1600
Irvine, CA 92614
949-475-1500
Email: rjwilliams@shb.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Bayer U.S., LLC**

**Defendant**

**Does 1 through 100**
*inclusive*

| Date Filed | # | Docket Text |
|---|---|---|
| 12/22/2022 | 1 | NOTICE OF REMOVAL with Jury Demand ( Filing fee $ 402 receipt number ACASDC- |

| | | 17447440.), filed by Monsanto Company. (Attachments: # 1 Civil Cover Sheet) |
|---|---|---|
| | | The new case number is 3:22-cv-2037-BEN-DDL. Judge Roger T. Benitez and Magistrate Judge David D. Leshner are assigned to the case.(ggv) (Entered: 12/22/2022) |
| 12/22/2022 | 2 | NOTICE of Party With Financial Interest by Monsanto Company. Identifying Corporate Parent Bayer AG for Monsanto Company. (ggv) (Entered: 12/22/2022) |
| 12/22/2022 | 3 | ANSWER to Complaint (Notice of Removal) by Monsanto Company. (ggv) (Entered: 12/22/2022) |

| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 12/23/2022 07:49:14 | | | |
| **PACER Login:** | sh0019sh | **Client Code:** | 31943.356965 rhb |
| **Description:** | Docket Report | **Search Criteria:** | 3:22-cv-02037-BEN-DDL |
| **Billable Pages:** | 1 | **Cost:** | 0.10 |

Ryan J. Williams (SBN: 228925)
SHOOK, HARDY & BACON L.L.P.
Jamboree Center
5 Park Plaza, Suite 1600
Irvine, California 92614-2546
Telephone: (949) 475-1500
Facsimile: (949) 475-0016
rjwilliams@shb.com

Attorneys for Defendant
MONSANTO COMPANY

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

GREGORY S. CILLI, an individual,

          Plaintiff,

    vs.

MONSANTO COMPANY; BAYER U.S. LLC, and DOES 1 through 100, inclusive,

          Defendants.

Case No.: **'22CV2037 BEN DDL**

**DEFENDANT MONSANTO COMPANY'S NOTICE OF REMOVAL**

[Filed concurrently with Civil Cover Sheet; Notice of Interested Parties]

Action Filed: 7/14/2022

    TO THE CLERK OF THE ABOVE ENTITLED COURT:

    PLEASE TAKE NOTICE THAT Defendant Monsanto Company ("Monsanto") hereby removes to this Court, pursuant to 28 U.S.C. §§ 1332, 1441, and 1446, the claims pending as Case No. 37-2022-00027689-CU-PL-CTL in the Superior Court of California, County of San Diego. In accordance with Section 1446(a), Monsanto provides the following statement of grounds for removal.

**Introduction**

    1.    In this products liability lawsuit, Plaintiff Gregory S. Cilli seeks damages for cancer – multiple myeloma ("MM") – allegedly caused by exposure to Monsanto's Roundup®-branded herbicides, which have glyphosate as their active ingredient. For

decades, farmers have used glyphosate-based herbicides to increase crop yields, and home-owners, landscaping companies, and local government agencies have used these herbicides for highly effective weed control. Glyphosate is one of the most thoroughly studied herbicides in the world, and glyphosate-based herbicides have received regulatory approval in more than 160 countries. Since 1974, when Monsanto first introduced a Roundup®-branded, glyphosate-based herbicide to the marketplace, the United States Environmental Protection Agency repeatedly has approved the sale of such herbicides without cancer warnings and repeatedly has concluded that glyphosate does not cause cancer. Nevertheless, Plaintiff alleges that he developed cancer caused by exposure to Monsanto's glyphosate-based herbicides.

2. This is one of many lawsuits that have been filed against Monsanto involving Roundup®-branded herbicides. A multidistrict litigation proceeding is pending in the United States District Court for the Northern District of California, before the Honorable Vince G. Chhabria, pursuant to 28 U.S.C. § 1407. *See In re Roundup Prods. Liab. Litig.,* No. 3:16-md-02741-VC (N.D. Cal.); *In re Roundup Prods. Liab. Litig.,* MDL No. 2741, 214 F. Supp. 3d 1346 (J.P.M.L. 2016).

3. As discussed in more detail below, Monsanto removes this lawsuit because this Court has subject matter jurisdiction based on diversity of citizenship. Plaintiff is a citizen of California. For purposes of diversity jurisdiction, none of the Defendants are citizens of California. Accordingly, complete diversity of citizenship exists in this case as required by 28 U.S.C. § 1332. The statutory amount-in-controversy requirement is also satisfied because Plaintiff seeks damages for cancer allegedly caused by exposure to Monsanto's Roundup®-branded herbicides.

## Background And Procedural History

4. Plaintiff commenced this lawsuit in the Superior Court of the State of California for the County of San Diego by filing a Complaint, captioned *Gregory S. Cilli v. Monsanto Company, et al.*, case number 37-2022-00027689-CU-PL-CTL, on or about July 14, 2022 (the "State Court Action").

2

5.     Plaintiff has not served the Summons and Complaint on Monsanto.  True and correct copies of the Summons and Complaint filed in the State Court Action (and other filings available from the state court's files) are attached as **Exhibit 1**.  Plaintiff seeks damages for MM allegedly caused by exposure to Monsanto's Roundup®-branded herbicides.  *See, e.g.*, Complaint ¶¶ 76, 95, 117, 133, 149.

6.     Monsanto has denied Plaintiff's allegations.  A true and correct copy of Monsanto's Answer (filed in the State Court Action) is attached as **Exhibit 2.**

### Basis For Removal – Diversity Jurisdiction

7.     Based on the allegations in the Complaint, Plaintiff is, and was at the time the State Court Action was filed, a California resident and citizen.  *See* Complaint ¶¶ 11, 14, 75.

8.     Monsanto is, and was at the time the State Court Action was filed, a corporation incorporated under the laws of the State of Delaware, with its principal place of business in the State of Missouri.  *See* Complaint ¶ 15.  Thus, Monsanto is deemed to be a citizen of Missouri and Delaware, for purposes of federal diversity jurisdiction.

9.     Defendant Bayer U.S., LLC ("Bayer U.S.") is, and was at the time the State Court Action was filed, a limited liability company whose sole member is, and was, Bayer Corporation.  *See* Complaint ¶ 16.   Bayer Corporation is, and was at the time the State Court Action was filed, a corporation incorporated under the laws of the State of Indiana, with its principal place of business in the State of New Jersey. *Id.*[1] Thus, Bayer U.S. is deemed to be a citizen of Indiana and New Jersey for purposes of federal diversity jurisdiction.

10.     The Complaint seeks compensatory and punitive damages based on the allegations that Monsanto's Roundup®-branded herbicides caused Plaintiff to develop cancer (MM).  Therefore, it is plausible from the face of the Complaint that Plaintiff

---

[1] Although certain allegations in Paragraph 16 of the Complaint are incorrect, the allegations in Paragraph 16 cited above are correct.

CASE NO.:                                        MONSANTO COMPANY'S NOTICE OF REMOVAL

seeks damages in excess of $75,000, exclusive of interest and costs, which satisfies the jurisdictional amount-in-controversy requirement. 28 U.S.C. § 1332(a); *see Dart Cherokee Basin Operating Co. v. Owens*, 574 U.S. 81, 89 (2014) ("[A] defendant's notice of removal need include only a plausible allegation that the amount in controversy exceeds the jurisdictional threshold."); *see also Ross v. First Family Fin. Servs., Inc.*, No. 2:01CV218-P-B, 2002 WL 31059582, at *8 (N.D. Miss. Aug. 29, 2002) ("[U]nspecified claims for punitive damage sufficiently serve to bring the amount in controversy over the requisite jurisdictional threshold set out in 28 U.S.C. § 1332."). In fact, numerous other lawsuits seeking damages for cancer allegedly caused by Roundup®-branded herbicides have been filed against Monsanto in other federal courts asserting jurisdiction under Section 1332(a) and alleging damages in excess of $75,000, exclusive of interest and costs.

11. In sum, this Court has original subject matter jurisdiction over this action based on Section 1332(a) because there is complete diversity of citizenship, and the amount in controversy exceeds $75,000, exclusive of interest and costs.[2]

## **Procedural Requirements**

12. The Superior Court of San Diego County, California is located within the Southern District of California. Therefore, removal to this Court satisfies the venue requirement of 28 U.S.C. § 1446(a).

13. Monsanto has not been served with the Summons and Complaint, so this Notice of Removal is timely.

14. Bayer U.S.'s consent to removal is not required because Bayer U.S. has not been served in the State Court Action. 28 U.S.C. § 1446(b)(2)(A); *see* Defendant Bayer U.S. LLC's Consent to Removal attached as **Exhibit 3.** Consent to removal by Bayer U.S. also is not required because California courts lack personal jurisdiction over Bayer U.S. for the claims asserted in this lawsuit, Defendant Bayer U.S. LLC's

---

[2] The citizenship of "Doe" defendants must be disregarded when determining whether this lawsuit is removable based on § 1332(a). *See* 28 U.S.C. § 1441(b)(1).

Consent to Removal, so Bayer U.S. has not been "properly joined," 1446(b)(2)(A). Nevertheless, to the extent that Bayer U.S.'s consent may be deemed required, Bayer U.S. consents to this removal. Defendant Bayer U.S. LLC's Consent to Removal.

15.    The written notice required by 28 U.S.C. § 1446(d) will be promptly filed in the Superior Court of San Diego County, California and will be promptly served on Plaintiff.

16.    Monsanto does not waive any defenses and expressly reserves its right to raise any and all defenses in subsequent proceedings.

17.    If any question arises as to the propriety of this removal, Monsanto requests the opportunity to present written and oral argument in support of removal.

## Conclusion

For the foregoing reasons, Monsanto removes this lawsuit to this Court pursuant to 28 U.S.C. §§ 1332, 1441, and 1446 (and any other applicable laws).


Dated: December 22, 2022          Respectfully submitted,

SHOOK, HARDY & BACON L.L.P.


By:   _/s/ Ryan J. Williams_
                     Ryan J. Williams

Attorneys for Defendant
MONSANTO COMPANY

# Exhibit 1

1  Michael A. Feldman, Esq., SBN 110580
   **THE FELDMAN LAW GROUP**
2  329 Pennsylvania Avenue
   San Diego, California 92103
3  Telephone: (619) 297-5811
   Facsimile: (619) 600-5318
4  Email: tflg@thefeldmanlawgroup.com

5  Attorneys for Plaintiff Gregory S. Cilli

6

7

8              **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

9                    **FOR THE COUNTY OF SAN DIEGO**

10

11  GREGORY S. CILLI, an individual          )   CASE NO.  37-2022-00027689-CU-PL-CTL
                                             )
12          Plaintiff,                       )   **COMPLAINT FOR DAMAGES AND**
                                             )   **DEMAND FOR JURY TRIAL**
13     v.                                    )
                                             )   1. Strict Liability - Design Defect
14  MONSANTO COMPANY; BAYER U.S.,            )   2. Strict Liability - Failure to Warn
    LLC, and DOES 1 through 100, inclusive,  )   3. Negligence
15                                           )   4. Breach of Implied Warranty
           Defendants.                       )   5. Punitive Damage
16                                           )
                                             )   **JURY TRIAL DEMAND**
17                                           )
                                             )
18  _____ )

19         Plaintiff, by attorneys THE FELDMAN LAW GROUP, alleges upon information and

20  belief the following:

21                          **STATEMENT OF THE CASE**

22         1.      In 1970, Defendant Monsanto Company, Inc., discovered the herbicidal properties

23  of glyphosate and began marketing it in products in 1974 under the brand name Roundup®.

24  Roundup® is a non-selective herbicide used to kill weeds that commonly compete with the

25  growing of crops. By 2001, glyphosate had become the most-used active ingredient in American

26  agriculture with 85-90 millions of pounds used annually. That number grew to 185 million

27  pounds by 2007. As of 2013, glyphosate was the world's most widely used herbicide.

28

2.      At all times relevant Monsanto is and was a multinational agricultural biotechnology corporation based in St. Louis, Missouri. It is the world's leading producer of glyphosate. As of 2009, Monsanto was the world's leading producer of seeds, accounting for 27% of the world seed market. The majority of these seeds are of the Roundup Ready® brand. The stated advantage of Roundup Ready® crops is that they substantially improve a farmer's ability to control weeds, since glyphosate can be sprayed in the fields during the growing season without harming their crops. In 2010, an estimated 70% of corn and cotton, and 90% of soybean fields in the United States were Roundup Ready®.

3.      Monsanto's glyphosate products are registered in 130 countries and approved for use on over 100 different crops. They are ubiquitous in the environment. Numerous studies confirm that glyphosate is found in rivers, streams, and groundwater in agricultural areas where Roundup® is used. It has been found in food, in the urine of agricultural workers, and even in the urine of urban dwellers who are not in direct contact with glyphosate.

4.      On March 20, 2015, the International Agency for Research on Cancer ("IARC"), an agency of the World Health Organization ("WHO"), issued an evaluation of several herbicides, including glyphosate. That evaluation was based, in part, on studies of exposures to glyphosate in several countries around the world, and it traces the health implications from exposure to glyphosate since 2001.

5.      On July 29, 2015, IARC issued the formal monograph relating to glyphosate. In that monograph, the IARC Working Group provides a thorough review of the numerous studies and data relating to glyphosate exposure in humans.

6.      The IARC Working Group classified glyphosate as a Group 2A herbicide, which means that it is probably carcinogenic to humans. The IARC Working Group concluded that the cancers most associated with glyphosate exposure are non-Hodgkin lymphoma and other haematopoietic cancers, including lymphocytic lymphoma/chronic lymphocytic leukemia, B-cell lymphoma, and multiple myeloma.

///

**COMPLAINT**
- 2 -

1  7.  The IARC evaluation is significant. It confirms what has been believed for years:
2  that glyphosate is toxic to humans.

3  8.  Nevertheless, Monsanto, since it began selling Roundup®, has represented it as
4  safe to humans and the environment. Indeed, Monsanto has repeatedly proclaimed and continues
5  to proclaim to the world, and particularly to United States consumers, that glyphosate-based
6  herbicides, including Roundup®, create no unreasonable risks to human health or to the
7  environment.

8  **JURISDICTION AND VENUE**

9  9.  The California Superior Court has jurisdiction over this action pursuant to
10  California Constitution Article VI, Section 10, which grants the Superior Court "original
11  jurisdiction in all causes except those given by statute to other trial courts." The statutes under
12  which this action brought do not specify any other basis for jurisdiction.

13  10.  The California Superior Court has jurisdiction over Defendants because, based on
14  information and belief, each is California resident, a corporation and/or entity organized under
15  the laws of the State of California, a foreign corporation or association authorized to do business
16  in California and registered with the California Secretary of State or has sufficient minimum
17  contacts in California, or otherwise intentionally avails itself of the California market so as to
18  render the exercise of jurisdiction over it by the California courts consistent with traditional
19  notions of fair play and substantial justice.

20  11.  Venue is proper in this Court pursuant to California Code of Civil Procedure
21  section 395 in that Plaintiff is a resident of San Diego County.

22  12.  Furthermore Defendants have purposefully availed themselves of the benefits and
23  the protections of the laws within the State of California. In particular, Monsanto and its
24  successor-in-interest Defendant Bayer U.S., LLC has had sufficient contact such that the exercise
25  of jurisdiction would be consistent with the traditional notions of fair play and substantial justice.

26  13.  Plaintiff seeks relief within the jurisdictional limits of the Court.

27
28

1

2

## THE PARTIES

### Plaintiff

3       14.     Plaintiff Gregory S. Cilli is a competent individual over the age of 18, a resident

4   and citizen of the United States, and hereby submits to the jurisdiction of the Court and alleges

5   that venue in this court is proper.  He resides in San Diego, California.

6

### Defendants

7       15.     Defendant Monsanto Company is a Delaware corporation with its headquarters

8   and principal place of business in St. Louis, Missouri.  At all times relevant to this complaint,

9   Monsanto was the entity that discovered the herbicidal properties of glyphosate and is the

10  manufacturer of Roundup®.  Monsanto has regularly transacted and conducted business within

11  the state of California, and has derived substantial revenue from goods and products, including

12  Roundup, used in the State of California.  Monsanto expected or should have expected their acts

13  to have consequences within the State of California, and derived substantial revenue from

14  interstate commerce.

15      16.     Defendant Bayer U.S., LLC ("Bayer") is a Delaware limited liability company

16  whose sole member is Bayer Corporation, an Indiana corporation with its principal place of

17  business in New Jersey. In 2018, Bayer acquired Monsanto.  As a result of that transaction, Bayer

18  is the successor-in-interest of Monsanto and as such was delegated all liabilities of Monsanto.

19      17.     At all times relevant to this complaint, Does 1-25 sold and distributed Monsanto

20  products including Roundup within the State of California.

21      18.     Plaintiff is informed and believes, and based thereon alleges, that in committing

22  the acts alleged herein, each and every managing agent, agent, representative and/or employee of

23  Defendants was working within the course and scope of said agency, representation and/or

24  employment with the knowledge, consent, ratification, and authorization of Defendants and their

25  directors, officers and/or managing agents.

26  ///

27  ///

28

1

**FACTS**

2      19.     Glyphosate is a broad-spectrum, non-selective herbicide used in a wide variety of

3 herbicidal products around the world.

4      20.     Plants treated with glyphosate translocate the systemic herbicide to their roots,

5 shoot regions and fruit, where it interferes with the plant's ability to form aromatic amino acids

6 necessary for protein synthesis. Treated plants generally die within two to three days. Because

7 plants absorb glyphosate, it cannot be completely removed by washing or peeling produce or by

8 milling, baking, or brewing grains.

9      21.     For nearly 40 years, farms across the world have used Roundup® without

10 knowing of the dangers its use poses. That is because when Monsanto first introduced

11 Roundup®, it touted glyphosate as a technological breakthrough: it could kill almost every weed

12 without causing harm either to people or to the environment. Of course, history has shown that

13 not to be true. According to the WHO, the main chemical ingredient of Roundup®-glyphosate-is

14 a probable cause of cancer. Those most at risk are farm workers and other individuals with

15 workplace exposure to Roundup®, such as workers in garden centers, nurseries, and landscapers.

16 Agricultural workers are, once again, victims of corporate greed.

17      22.     Monsanto assured the public that Roundup® was harmless. In order to prove this,

18 Monsanto championed falsified data and attacked legitimate studies that revealed its dangers.

19 Monsanto led a prolonged campaign of misinformation to convince government agencies,

20 farmers and the general population that Roundup® was safe.

21

### *The Discovery of Glyphosate and Development of Roundup®*

22      23.     The herbicidal properties of glyphosate were discovered in 1970 by Monsanto

23 chemist John Franz. The first glyphosate-based herbicide was introduced to the market in the

24 mid-1970s under the brand name Roundup®. From the outset, Monsanto marketed Roundup®

25 as a "safe" general-purpose herbicide for widespread commercial and consumer use. It still

26 markets Roundup® as safe today.

27 ///

28

1

### *Registration of Herbicides Under Federal Law*

2      24.    The manufacture, fonnulation and distribution of herbicides, such as Roundup®,
3   are regulated under the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA" or "Act'),
4   7 U.S.C. § 136 et seq.  FIFRA requires that all pesticides be registered with the Environmental
5   Protection Agency ("EPA" or "Agency") prior to their distribution, sale, or use, except as
6   described by the Act. 7 U.S.C. § 136a(a).

7      25.    Because pesticides are toxic to plants, animals, and humans, at least to some
8   degree, the EPA requires as part of the registration process, among other things, a variety of tests
9   to evaluate the potential for exposure to pesticides, toxicity to people and other potential
10   non-target organisms, and other adverse effects on the environment Registration by the EPA,
11   however, is not an assurance or finding of safety.  The determination the Agency must make in
12   registering or re-registering a product is not that the product is "safe," but rather that use of the
13   product in accordance with its label directions "will not generally cause unreasonable adverse
14   effects on the environment." 7 U.S.C. § 136a(c)(5)(D).

15      26.    FIFRA defines "unreasonable adverse effects on the environment" to mean "any
16   unreasonable risk to man or the environment, taking into account the economic, social, and
17   environmental costs and benefits of the use of any pesticide." 7 U.S.C. § 136(bb).  FIFRA thus
18   requires EPA to make a risk/benefit analysis in determining whether a registration should be
19   granted or allowed to continue to be sold in commerce.

20      27.    The EPA and the State of California registered Roundup® for distribution, sale,
21   and manufacture in the United St.ates and the State of California.

22      28.    FIFRA generally requires that the registrant, Monsanto in the case of Roundup®,
23   conducts the health and safety testing of pesticide products.  The EPA has protocols governing
24   the conduct of tests required for registration and the laboratory practices that must be followed
25   conducting these tests.  The data produced by the registrant must be submitted to the EPA for
26   review and evaluation.  The government is not required, nor is it able, however, to perform the
27   product tests that are required of the manufacturer.

28

1    29.    The evaluation of each pesticide product distributed, sold, or manufactured is
2    completed at the time the product is initially registered. The data necessary for registration of a
3    pesticide has changed over time. The EPA is now in the process of re-evaluating all pesticide
4    products through a Congressionally-mandated process called "re-registration." 7 U.S.C. §
5    136a-1. In order to reevaluate these pesticides, the EPA is demanding the completion of
6    additional tests and the submission of data for the EPA's review and evaluation.

7    30.    In the case of glyphosate, and therefore Roundup®, the EPA had planned on
8    releasing its preliminary risk assessment-in relation to the reregistration process-no later than
9    July 2015. The EPA completed its review of glyphosate in early 2015, but it delayed releasing
10   the risk assessment pending further review in light of the WHO's health-related findings.

11    *Scientific Fraud Underlying the Marketing and Sale of Glyphosate/Roundup*

12    31.    Based on early studies that glyphosate could cause cancer in laboratory animals,
13   the EPA originally classified glyphosate as possibly carcinogenic to humans (Group C) in 1985.
14   After pressure from Monsanto, including contrary studies it provided to the EPA, the EPA
15   changed its classification to evidence of non-carcinogenicity in humans (Group E) in 1991. In so
16   classifying glyphosate, however, the EPA made clear that the designation did not mean the
17   chemical does not cause cancer: "It should be emphasized, however, that designation of an agent
18   in Group E is based on the available evidence at the time of evaluation and should not be
19   interpreted as a definitive conclusion that the agent will not be a carcinogen under any
20   circumstances."

21    32.    On two occasions, the EPA found that the laboratories hired by Monsanto to test
22   the toxicity of its Roundup® products for registration purposes committed fraud.

23    33.    In the first instance, Monsanto, in seeking initial registration of Roundup® by
24   EPA, hired Industrial Bio-Test Laboratories ("IBT") to perform and evaluate pesticide toxicology
25   studies relating to Roundup®. IBT performed about 30 tests on glyphosate and
26   glyphosate-containing products, including nine of the 15 residue studies needed to register
27   Roundup®.

28

34. In 1976, the United States Food and Drug Administration ("FDA") performed an inspection of Industrial Bio-Test Industries ("IBT") that revealed discrepancies between the raw data and the final report relating to the toxicological impacts of glyphosate. The EPA subsequently audited IBT; it too found the toxicology studies conducted for the Roundup® herbicide to be invalid. An EPA reviewer stated, after finding "routine falsification of data" at IBT, that it was "hard to believe the scientific integrity of the studies when they said they took specimens of the uterus from male rabbits."

35. Three top executives of IBT were convicted of fraud in 1983.

36. In the second incident of data falsification, Monsanto hired Craven Laboratories in 1991 to perfonn pesticide and herbicide studies, including for Roundup®. In that same year, the own of Craven Laboratories and three of its employees were indicted, and later convicted, of fraudulent laboratory practices in the testing of pesticides and herbicides.

37. Despite the falsity of the tests that underlie its registration, within a few years of its launch, Monsanto was marketing Roundup® in 115 countries.

### *The Importance of Roundup® to Monsanto's Market Dominance Profits*

38. The success of Roundup® was key to Monsanto's continued reputation and dominance the marketplace. Largely due to the success of Roundup® sales, Monsanto's agriculture division was out-performing its chemicals division's operating income, and that gap increased yearly. But with its patent for glyphosate expiring in the United States in the year 2000, Monsanto needed a strategy to maintain its Roundup® market dominance and to ward off impending competition.

39. In response, Monsanto began the development and sale of genetically engineered Roundup Ready® seeds in 1996. Since Roundup Ready® crops are resistant to glyphosate; farmers can spray Roundup® onto their fields during the growing season without harming the crop. These seeds allowed Monsanto to expand its market for Roundup® even further; by 2000, Monsanto's biotechnology seeds were planted on more than 80 million acres worldwide and nearly 70% of American soybeans were planted from Roundup Ready® seeds.

1  It also secured Monsanto's dominant share of the glyphosate/Roundup® market through a
2  marketing strategy that coupled proprietary Roundup Ready® seeds with continued sales of its
3  Roundup® herbicid .

4      40.    Through a three-pronged strategy of increased production, decreased prices and by
5  coupling with Roundup Ready® seeds, Roundup® became Monsanto's most profitable product.
6  In 2000, Roundup® accounted for almost $2.8 billion in sales, outselling other herbicides by a
7  margin of five to one, and accounting for close to half of Monsanto's revenue.  Today, glyphosate
8  remains one of the world's largest herbicides by sales volume.

9      *Monsanto has known for decades that it falsely advertises the safety of Roundup®*

10      41.    In 1996, the New York Attorney General ("NYAG") filed a lawsuit against
11  Monsanto based on its false and misleading advertising of Roundup ® products. Specifically, the
12  lawsuit challenged Monsanto's general representations that its spray-on glyphosate-based
13  herbicides, including Roundup®, were "safer than table salt" and "practically non-toxic" to
14  mammals, birds, and fish. Among the representations the NY AG found deceptive and
15  misleading about the human and environmental safety of Roundup® are the following:

16      a)    Remember that environmentally friendly Roundup herbicide is
17  biodegradable.  It won't build up in the soil so you can use Roundup with confidence along
18  customers' driveways, sidewalks and fences ...

19      b)    And remember that Roundup is biodegradable and won't build up in the
20  soil.  That will give you the environmental confidence you need to use Roundup everywhere
21  you've got a weed, brush, edging or trimming problem.

22      c)    Roundup biodegrades into naturally occurring elements.

23      d)    Remember that versatile Roundup herbicide stays where you put it. That
24  means there's no washing or leaching to harm customers' shrubs or other desirable vegetation.

25      e)    This non-residual herbicide will not wash or leach in the soil. It ... stays
26  where you apply it.

27  ///

28

COMPLAINT<br>- 9 -

1-010

1          f)          You can apply Accord with "confidence because it will stay where you put

2     it," it bonds tightly to soil particles, preventing leaching. Then, soon after application, soil

3     microorganisms biodegrade Accord into natural products.

4          g)          Glyphosate is less toxic to rats than table salt following acute oral

5     ingestion.

6          h)          Glyphosate's safety margin is much greater than required. It has over a

7     1,000-fold safety margin in food and over a 700-fold safety margin for workers who manufacture

8     it or use it.

9          i)          You can feel good about using herbicides by Monsanto. They carry a

10    toxicity category rating of 'practically non-toxic' as it pertains to mammals, birds and fish.

11

12         j)          "Roundup can be used where kids and pets will play and breaks down into

13    natural material." This ad depicts a person with his head in the ground and a pet dog standing in

14    an area which has been treated with Roundup.

15    42.     On November 19, 1996, Monsanto entered into an Assurance of Discontinuance

16    with NY AG, in which Monsanto agreed, among other things, "to cease and desist from

17    publishing or broadcasting any advertisements [in New York] that represent, directly or by

18    implication" that:

19         a)          its glyphosate-containing pesticide products or any component thereof are

20    safe, non-toxic, harmless or free from risk.

21         b)          its glyphosate-containing pesticide products or any component thereof

22    manufactured, formulated, distributed or sold by Monsanto are biodegradable

23         c)          its glyphosate-containing pesticide products or any component thereof stay

24    where they are applied under all circumstances and will not move through the environment by

25    any means.

26    ///

27    ///

28

d)    its glyphosate-containing pesticide products or any component thereof are "good" for the environment or are "known for their environmental characteristics."

e)    glyphosate-containing pesticide products or any component thereof are safer or less toxic than common consumer products other than herbicides;

f)    its glyphosate-containing products or any component thereof might be classified as "practically non-toxic."

43.    Monsanto did not alter its advertising in the same manner in any state other than New York, and on information and belief still has not done so today.

44.    In 2009, France's highest court ruled that Monsanto had not told the truth about the safety of Roundup®. The French court affirmed an earlier judgement that Monsanto had falsely advertised its herbicide Roundup® as "biodegradable" and that it "left the soil clean."

### *Classifications and Assessments of Glyphosate*

45.    The IARC process for the classification of glyphosate followed the stringent procedures for the evaluation of a chemical agent. Over time, the IARC Monograph program has reviewed 980 agents. Of those reviewed, it has determined 116 agents to be Group 1 (Known Human Carcinogens); 73 agents to be Group 2A (Probable Human Carcinogens); 287 agents to be Group 2B (Possible Human Carcinogens); 503 agents to be Group 3 (Not Classified); and one agent to be Probably Not Carcinogenic.

46.    The established procedure for IARC Monograph evaluations is described in the IARC Programme's Preamble. Evaluations are performed by panels of international experts, selected on the basis of their expertise and the absence of actual or apparent conflicts of interest.

47.    One year before the Monograph meeting, the meeting is announced and there is a call both for data and for experts. Eight months before the Monograph meeting, the Working Group membership is selected and the sections of the Monograph are developed by the Working Group members. One month prior to the Monograph meeting, the call for data is closed and the various draft sections are distributed among Working Group members for review and comment.

1-012

1   Finally, at the Monograph meeting, the Working Group finalizes review of all literature,

2   evaluates the evidence in each category, and completes the overall evaluation. Within two weeks

3   after the Monograph meeting, the summary of the Working Group findings are published in

4   Lancet Oncology, and within a year after the meeting, the final Monograph is finalized and

5   published.

6         48.     In assessing an agent, the IARC Working Group reviews the following

7   information: (a) human, experimental, and mechanistic data; (b) all pertinent epidemiological

8   studies and cancer bioassays; and (c) representative mechanistic data. The studies must be

9   publicly available and have sufficient detail for meaningful review, and reviewers cannot be

10   associated with the underlying study.

11         49.     In March 2015, IARC reassessed glyphosate. The summary published in The

12   Lancet Oncology reported that glypbosate is a Group 2A agent and probably carcinogenic in

13   humans.

14         50.     On July 29, 2015, IARC issued its Monograph for glyphosate, Monograph 112.

15   For Volume 112, the volume that assessed glyphosate, a Working Group of 17 experts from

16   11countries met at IARC from March 3-10, 2015, to assess the carcinogenicity of certain

17   herbicides, including glyphosate. The March meeting culminated nearly a one-year review and

18   preparation by the IARC Secretariat and the Working Group, including a comprehensive review

19   of the latest available scientific evidence. According to published procedures, the Working

20   Group considered "reports that have been published or accepted for publication in the openly

21   available scientific literature" as well as "data from governmental reports that are publicly

22   available."

23         51.     The studies considered the following exposure groups: occupational exposure of

24   farmers and tree nursery workers in the United States, forestry workers in Canada and Finland

25   and municipal weed-control workers in the United Kingdom; and para-occupational exposure in

26   farming families.

27   ///

28

**COMPLAINT**
- 12 -

1      52.     Glyphosate was identified as the second-most used household herbicide in the
2 United States for weed control between 2001 and 2007 and the most heavily used herbicide in
3 the world in 2012.

4      53.     Exposure pathways are identified as air (especially during spraying), water, and
5 food. Community exposure to glyphosate is widespread and found in soil, air, surface water, and
6 groundwater, as well as in food.

7      54.     The assessment of the IARC Working Group identified several case control
8 studies of occupational exposure in the United States, Canada, and Sweden. These studies show
9 a human health concern from agricultural and other work-related exposure to glyphosate.

10      55.     The IARC Working Group found an increased risk between exposure to
11 glyphosate and non-Hodgkin lymphoma ("NHL") and several subtypes of NHL, and the
12 increased risk persisted after adjustment for other pesticides.

13      56.     The IARC Working Group also found that glyphosate caused DNA and
14 chromosomal damage in human cells. One study in community residents reported increases in
15 blood markers 14 of chromosomal damage (micronuclei) after glyphosate formulations were
16 sprayed.

17      57.     In male CD-I mice, glyphosate induced a positive trend in the incidence of a rare
18 tumor renal tubule carcinoma. A second study reported a positive trend for hemangiosarcoma in
19 male mice. Glyphosate increased pancreatic islet-cell adenoma in male rats in two studies. A
20 glyphosate formulation promoted skin tumors in an initiation-promotion study in mice.

21      58.     The IARC Working Group also noted that glyphosate has been detected in the
22 urine of agricultural workers, indicating absorption. Soil microbes degrade glyphosate to
23 aminomethylphosphoric acid (AMP A). Blood AMP A detection after exposure suggests
24 intestinal microbial metabolism in humans.

25      59.     The IARC Working Group further found that glyphosate and glyphosate
26 formulations induced DNA and chromosomal damage in mammals, and in human and animal
27 cells in utero.

28

60. The IARC Working Group also noted genotoxic, hormonal, and enzymatic effects in mammals exposed to glyphosate. Essentially, glyphosate inhibits the biosynthesis of aromatic amino acids, which leads to several metabolic disturbances, including the inhibition of protein and secondary product biosynthesis and general metabolic disruption.

61. The IARC Working Group also reviewed an Agricultural Health Study, consisting of a prospective cohort of 57,311 licensed pesticide applicators in Iowa and North Carolina. While this study differed from others in that it was based on a self-administered questionnaire, the results support an association between glyphosate exposure and Multiple Myeloma, Hairy Cell Leukemia (HCL), and Chronic Lymphocytic Leukemia (CLL), in addition to several other cancers.

*Other Earlier Findings About Glyphosate's Dangers to Human Health*

62. The EPA has a technical fact sheet, as part of its Drinking Water and Health, National Primary Drinking Water Regulations publication, relating to glyphosate. This technical fact sheet predates the IARC March 20, 2015, evaluation. The fact sheet describes the release patterns for glyphosate as follows:

*Release Patterns*

63. Glyphosate is released to the environment in its use as a herbicide for controlling woody and herbaceous weeds on forestry, right-of-way, cropped and non-cropped sites. These sites may be around water and in wetlands.

64. It may also be released to the environment during its manufacture, formulation, transport, storage, disposal and cleanup, and from spills. Since glyphosate is not a listed chemical in the Toxics Release Inventory, data on releases during its manufacture and handling are not available.

65. Occupational workers and home gardeners may be exposed to glyphosate by inhalation and dermal contact during spraying, mixing, and cleanup. They may also be exposed by touching soil and plants to which glyphosate was applied. Occupational exposure may also occur during glyphosate's manufacture, transport storage, and disposal.

**COMPLAINT**
- 14 -

1    66.    In 1995, the Northwest Coalition for Alternatives to Pesticides reported that in

2  California, the state with the most comprehensive program for reporting of pesticide-caused

3  illness, glyphosate was the third most commonly-reported cause of pesticide illness among

4  agricultural workers.

5              ***Recent Worldwide Bans on RoundUp®/Glyphosate***

6    67.    Several countries around the world have instituted bans on the sale of Roundup®

7  and other glyphosate-containing herbicides, both before and since IARC first announced its

8  assessment for glyphosate in March 2015, and more countries undoubtedly will follow suit in

9  light of the as the dangers of the use of Roundup® are more widely known.  The Netherlands

10  issued a ban on all glyphosate-based herbicides in April 2014, including Roundup®, which takes

11  effect by the end of 2015.  In issuing the ban, the Dutch Parliament member who introduced the

12  successful legislation stated: "Agricultural pesticides in user-friendly packaging are sold in

13  abundance to private persons. In garden centers, Roundup® is promoted as harmless, but

14  unsuspecting customers have no idea what the risks of this product are.  Especially children are

15  sensitive to toxic substances and should therefore not be exposed to it."

16    68.    The Brazilian Public Prosecutor in the Federal District requested that the Brazilian

17  Justice Department suspend the use of glyphosate.

18    69.    France banned the private sale of Roundup® and glyphosate following the IARC

19  assessment for Olyphosate.

20    70.    Bermuda banned both the private and commercial sale of glyphosates, including

21  Roundup®. The Bennuda government explained its ban as follows: "Following a recent scientific

22  study carried out by a leading cancer agency, the importation of weed spray 'Roundup' has been

23  suspended."

24    71.    The Sri Lankan government banned the private and commercial use of

25  glyphosates, particularly out of concern that Glyphosate has been linked to fatal kidney disease in

26  agricultural workers.

27  ///

28

**COMPLAINT**
- 15 -

1    72.    The government of Columbia announced its ban on using Roundup® and

2   glyphosate to destroy illegal plantations of coca, the raw ingredient for cocaine, because of the

3   WHO's finding that glyphosate is probably carcinogenic.

4    73.    On information and belief, Doe Defendants 1-10 was, at all relevant times,

5   engaged in the distribution of Roundup, Roundup-ready crops and other glyphosate-containing

6   products from Monsanto to retailers and commercial/agricultural users in California.

7    74.    Doe Defendants 1-10 had superior knowledge compared to Roundup users and

8   consumers, including regarding the carcinogenic properties of the product, yet failed to

9   accompany its sales and/or marketing of Roundup with any warnings or precautions for that

10  grave danger. On information and belief, Doe Defendants 1-10 were distributors providing

11  Roundup and other glyphosate-containing products actually used at Plaintiff's home.

12                    ***Plaintiff's Exposure to Roundup®***

13    75.    Beginning November, 2009, Plaintiff rented a single family home in San Diego,

14  California. From November, 2009, through June, 2017, the property owner applied Roundup

15  throughout the property weekly where Plaintiff would walk and spend time in the course of his

16  normal use of the home.

17    76.    Plaintiff was diagnosed with multiple myeloma on or after July 16, 2020, at the

18  age of 64.

19                              **CLAIM ONE**

20                    **STRICT LIABILITY (DESIGN DEFECT)**

21    77.    Plaintiff incorporates by reference each and every allegation set forth in the

22  preceding paragraphs as if fully stated herein.

23    78.    Plaintiff brings this strict liability claim against Defendants for defective design.

24    79.    At all times relevant to this litigation, Defendants engaged in the business of

25  testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting

26  Roundup® products, which are defective and unreasonably dangerous to consumers, including

27  ///

28

1 Plaintiff, thereby placing Roundup® products into the stream of commerce. These actions were
2 under the ultimate control and supervision of Defendants. At all times relevant to this litigation,
3 Defendants designed, researched, developed, manufactured, produced, tested, assembled, labeled,
4 advertised, promoted, marketed, sold, and distributed the Roundup® products that Plaintiff was
5 exposed to, as described above.

6      80.    At all times relevant to this litigation, Defendants' Roundup® products were
7 manufactured, designed, and labeled in an unsafe, defective, and inherently dangerous manner
8 that was dangerous for use by or exposure to the public, and, in particular, Plaintiff.

9      81.    At all times relevant to this litigation, Defendants' Roundup® products reached
10 the intended consumers, handlers, and users or other persons coming into contact with these
11 products in California and throughout the United States, including Plaintiff, without substantial
12 change in their condition as designed, manufactured, sold, distributed, labeled, and marketed by
13 Defendants.

14      82.    Defendants' Roundup® products, as researched, tested, developed, designed,
15 licensed, manufactured, packaged, labeled, distributed, sold, and marketed by Defendants were
16 defective in design and formulation in that when they left the hands of the Defendants'
17 manufacturers and/or suppliers, they were unreasonably dangerous and dangerous to an extent
18 beyond that which an ordinary consumer would contemplate.

19      83.    Defendants' Roundup® products, as researched, tested, developed, designed,
20 licensed, manufactured, packaged, labeled, distributed, sold, and marketed by Defendants were
21 defective in design and formulation in that when they left the hands of Defendants'
22 manufacturers and/or suppliers, the foreseeable risks exceeded the alleged benefits associated
23 with their design and formulation.

24      84.    At all times relevant to this action, Defendants knew or had reason to know that
25 Roundup® products were defective and were inherently dangerous and unsafe when used in the
26 manner instructed and provided by Defendants.

27 ///

28

1    85.    Therefore, at all times relevant to this litigation, Defendants' Roundup® products,

2    as researched, tested, developed, designed, licensed, manufactured, packaged, labeled,

3    distributed, sold and marketed by Defendants were defective in design and formulation, in one or

4    more of the following ways:

5            a.    When placed in the stream of commerce, Defendants' Roundup® products

6    were defective in design and formulation, and, consequently, dangerous to an extent beyond that

7    which an ordinary consumer would contemplate.

8            b.    When placed in the stream of commerce, Defendants' Roundup® products

9    were unreasonably dangerous in that they were hazardous and posed a grave risk of cancer and

10   other serious illnesses when used in a reasonably anticipated manner.

11           c.    When placed in the stream of commerce, Defendants' Roundup® products

12   contained unreasonably dangerous design defects and were not reasonably safe when used in a

13   reasonably anticipated or intended manner.

14           d.    Defendants did not sufficiently test, investigate, or study its Roundup®

15   products and, specifically, the active ingredient glyphosate.

16           e.    Exposure to Roundup® and glyphosate-containing products presents a risk

17   of harmful side effects that outweigh any potential utility stemming from the use of the herbicide.

18           f.    Defendants knew or should have known at the time of marketing its

19   Roundup® products that exposure to Roundup® and specifically, its active ingredient

20   glyphosate, could result in cancer and other severe illnesses and injuries.

21           g.    Defendants did not conduct adequate post-marketing surveillance of its

22   Roundup® products.

23           h.    Defendants could have employed safer alternative designs and

24   formulations.

25   86.    Plaintiff was exposed to Defendants' Roundup® products while living on a

26   commercial sod farm, as described above, without knowledge of its dangerous characteristics.

27   ///

28

1      87.    At all times relevant to this litigation, Plaintiff was exposed to the use of

2 Defendants' Roundup® products in an intended or reasonably foreseeable manner without

3 knowledge of their dangerous characteristics.

4      88.    Plaintiff could not have reasonably discovered the defects and risks associated

5 with Roundup® or glyphosate-containing products before or at the time of exposure.

6      89.    The harm caused by Defendants' Roundup® products far outweighed their

7 benefit, rendering Defendants' products dangerous to an extent beyond that which an ordinary

8 consumer would contemplate. Defendants' Roundup® products were and are more dangerous

9 than alternative products and Defendants could have designed its Roundup® products to make

10 themless dangerous. Indeed, at the time that Defendants designed its Roundup® products, the

11 state of the industry's scientific knowledge was such that a less risky design or formulation was

12 attainable.

13      90.    At the time Roundup® products left Defendants' control, there was a practical,

14 technically feasible and safer alternative design that would have prevented the hann without

15 substantially impairing the reasonably anticipated or intended function of Defendants' herbicides.

16      91.    Defendants' defective design of its Roundup® products was willful, wanton,

17 fraudulent, malicious, and conducted with reckless disregard for the health and safety of users of

18 the Roundup® products, including Plaintiff.

19      92.    Therefore, as a result of the unreasonably dangerous condition of its Roundup®

20 products, Defendants are strictly liable to Plaintiff.

21      93.    The defects in Defendants' Roundup® products were substantial and contributing

22 factors in causing Plaintiff's grave injuries, and, but for Defendants' misconduct and omissions,

23 Plaintiff would not have sustained his injuries.

24      94.    Defendants' conduct, as described above, was reckless. Defendants risked the

25 lives of consumers and users of its products, including Plaintiff, with knowledge of the safety

26 problems associated with Roundup® and glyphosate-containing products, and suppressed this

27 knowledge from the general public.

28

1 Defendants made conscious decisions not to redesign, warn or inform the unsuspecting public.

2 Defendants' reckless conduct warrants an award of punitive damages.

3    95.    As a direct and proximate result of Defendants placing defective Roundup®

4 products in the stream of commerce, Plaintiff has suffered and continues to suffer grave injuries,

5 and has endured physical pain and discomfort, as well as economic hardship, including

6 considerable financial expenses for medical care and treatment. Plaintiff will continue to incur

7 these expenses in the future.

8    96.    WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in

9 Plaintiff's favor for compensatory and punitive damages, together with interest, costs herein

10 incurred, attorneys' fees and all such other and further relief as this Court deems just and proper.

11 Plaintiff also demands a jury trial on the issues contained herein.

## CLAIM TWO

### STRICT LIABILITY (FAILURE TO WARN)

14    97.    Plaintiff incorporates by reference each and every allegation set forth in the

15 preceding paragraphs as if fully stated herein.

16    98.    Plaintiff brings this strict liability claim against Defendants for failure to warn.

17    99.    At all times relevant to this litigation, Defendants engaged in the business of

18 testing, developing, designing, manufacturing, marketing, selling, distributing, promoting and

19 applying Roundup® products, which are defective and unreasonably dangerous to consumers,

20 including Plaintiff, because they do not contain adequate warnings or instructions concerning the

21 dangerous characteristics of Roundup® and specifically, the active ingredient glyphosate. These

22 actions were under the ultimate control and supervision of Defendants.

23    100.    Monsanto researched, developed, designed, tested, manufactured, inspected,

24 labeled, distributed, marketed, promoted, sold, and otherwise released into the stream of

25 commerce its 12 Roundup® products, and in the course of same, directly advertised or marketed

26 the products to consumers and end users, including Plaintiff and persons responsible for

27 consumers (such as property owners), and therefore had a duty to warn of the risks associated

28

1 with the use of Roundup® and glyphosate-containing products.

2      101.    At all times relevant to this litigation, Defendants had a duty to properly test,
3 develop, design, manufacture, inspect, package, label, market, promote, sell, distribute, maintain
4 supply, provide proper warnings, and take such steps as necessary to ensure that Roundup®
5 products did not cause users and conswners to suffer from unreasonable and dangerous risks.
6 Defendants had a continuing duty to warn Plaintiff of the dangers associated with Roundup® use
7 and exposure. Defendants, as manufacturer, seller, or distributor of chemical herbicides, are held
8 to the knowledge of an expert in the field.

9      102.    At the time of manufacture, Defendants could have provided the warnings or
10 instructions regarding the full and complete risks of Roundup® and glyphosate-containing
11 products because they knew or should have known of the unreasonable risks of harm associated
12 with the use of and/or exposure to such products.

13      103.    At all times relevant to this litigation, Defendants failed to investigate, study, test,
14 or promote the safety or to minimize the dangers to users and consumers of this product and to
15 those who would foreseeably use or be banned by Roundup, including Plaintiff.

16      104.    Despite the fact that Defendants knew or should have known that Roundup posed
17 a grave risk of hann, they failed to exercise reasonable care to warn of the dangerous risks
18 associated with use and exposure. The dangerous propensities of its products and the
19 carcinogenic characteristics of glyphosate, as described above, were known to Defendants, or
20 scientifically knowable to Defendants through appropriate research and testing by known
21 methods, at the time it distributed, supplied or sold the product, and not known to end users and
22 consumers, such as Plaintiff.

23      105.    Defendants knew or should have known that these products created significant
24 risks of serious bodily harm to consumers, as alleged herein, and Defendants failed to adequately
25 warn consumers and reasonably foreseeable users of the risks of exposure to its products.

26 ///

27 ///

28

COMPLAINT
- 21 -

1  Defendants have wrongfully concealed information concerning the dangerous nature of

2  Roundup® and its active ingredient glyphosate, and further made false and/or misleading

3  statements concerning the safety of Roundup® and glyphosate.

4      106.    At all times relevant to this litigation, Defendants' Roundup® products reached

5  the intended consumers, handlers, and users or other persons coming into contact with these

6  products in California and throughout the United States, including Plaintiff, without substantial

7  change in their condition as designed, manufactured, sold, distributed, labeled, marketed and

8  sprayed/applied by Defendants.

9      107.    Plaintiff was exposed to Roundup® products, as described above, without

10  knowledge of their dangerous characteristics.

11      108.    At all times relevant to this litigation, Plaintiff was exposed to the use of

12  Defendants' Roundup® products in their intended or reasonably foreseeable manner without

13  knowledge of their dangerous characteristics.

14      109.    Plaintiff could not have reasonably discovered the defects and risks associated

15  with Roundup® or glyphosate-containing products prior to or at the time of Plaintiff's exposure.

16  Plaintiff relied upon the skill, superior knowledge, and judgment of Defendants.

17      110.    Defendants knew or should have known that the minimal warnings disseminated

18  with or accompanying the application of Roundup® products were inadequate, but they failed to

19  communicate adequate information on the dangers and safe use/exposure and failed to

20  communicate warnings and instructions that were appropriate and adequate to render the

21  products safe for their ordinary, intended and reasonably foreseeable uses, including agricultural

22  and horticultural applications.

23      111.    The information that Defendants did provide or communicate failed to contain

24  relevant warnings, hazards, and precautions that would have enabled those exposed such as

25  Plaintiff to utilize the products safely and with adequate protection. Instead, Defendants

26  disseminated information that was inaccurate, false, and misleading and which failed to

27  communicate accurately or adequately the comparative severity, duration, and extent of the risk

28

1 of injuries with use of and/or exposure to Roundup® and glyphosate; continued to aggressively

2 promote the efficacy of its products, even after it knew or should have known of the

3 unreasonable risks from use or exposure; and concealed, downplayed, or otherwise suppressed,

4 through aggressive

5 marketing and promotion, any infonnation or research about the risks and dangers of exposure to

6 Roundup® and glyphosate.

7     112.    At all times relevant Defendants have failed to adequately and accurately warn of

8 the true risks of Plaintiff's injuries associated with the use of and exposure to Roundup® and its

9 active ingredient glyphosate, a probable carcinogen.

10     113.    As a result of their inadequate warnings, Roundup® products were defective and

11 unreasonably dangerous when they left the possession and/or control of Defendants, were sold or

12 distributed by Defendants, were applied by Defendants, and when Plaintiff became exposed.

13     114.    Defendants are liable to Plaintiff for injuries caused by negligent or willful failure,

14 as described above, to provide adequate warnings or other clinically relevant information and

15 data regarding the appropriate use of their products and the risks associated with the use of or

16 exposure to Roundup® and glyphosate.

17     115.    The defects in these Roundup® products were substantial and contributing factors

18 in causing Plaintiff's injuries, and, but for Defendants' misconduct and omissions, Plaintiff

19 would not have sustained his injuries.

20     116.    Had Defendants provided adequate warnings and instructions and properly

21 disclosed and disseminated the risks associated with Roundup® products and application,

22 Plaintiff could have avoided the risk of developing injuries as alleged herein and property owner

23 could have obtained alternative herbicides or used none at all.

24     117.    As a direct and proximate result of Defendants placing defective Roundup®

25 products in the stream of commerce and exposing Plaintiff to them, Plaintiff has suffered and

26 continues to suffer severe injuries, and has endured physical pain and discomfort, as well as

27 economic hardship, Plaintiff will continue to incur these expenses in the future.

28

1    118.    WHEREFORE, Plaintiff respectfully requests this Court enter judgment in

2  Plaintiff's favor for compensatory and punitive damages, together with interest, costs herein

3  incurred, attorneys' fees and all such other and further relief as this Court deems just and proper.

4  Plaintiff also demands a jury trial on the issues contained herein.

5                                **CLAIM THREE**

6                                **NEGLIGENCE**

7    119.    Plaintiff incorporates by reference each and every allegation set forth in the

8  preceding paragraphs as if fully stated herein.

9    120.    Defendants, directly or indirectly, caused Roundup® products to be sold,

10  distributed, packaged, labeled, marketed, promoted, and/or used by the property owner.

11    121.    At all times relevant to this litigation, Defendants had a duty to exercise

12  reasonable care in the design, research, manufacture, marketing, advertisement, supply,

13  promotion, packaging, sale, and distribution of Roundup® products, including the duty to take all

14  reasonable steps necessary to manufacture, promote, and/or sell a product that was not

15  unreasonably dangerous to consumers and users of the product.

16    122.    At all times relevant to this litigation, Defendants had a duty to exercise

17  reasonable care in the marketing, advertisement, and sale of the Roundup® products.

18  Defendants' duty of care owed to consumers and the general public included providing accurate,

19  true, and correct information concerning the risks of using Roundup® and appropriate, complete,

20  and accurate warnings concerning the potential adverse effects of exposure to Roundup®, and, in

21  particular, its active ingredient glyphosate.

22    123.    At all times relevant to this litigation, Defendants knew or, in the exercise of

23  reasonable care, should have known of the hazards and dangers of Roundup® and specifically,

24  the carcinogenic properties of the chemical glyphosate.

25    124.    Accordingly, at all times relevant to this litigation, Defendants knew or, in the

26  exercise of reasonable care, should have known that use of or exposure to Roundup® products

27  could cause or be associated with Plaintiff's injuries and thus created a dangerous and

28

                                **COMPLAINT**
                                    - 24 -

1   unreasonable risk of injury to those exposed to these products, including Plaintiff.

2       125.    Defendants also knew or, in the exercise of reasonable care, should have known,

3   that users and consumers of Roundup® were unaware of the risks and the magnitude of the risks

4   associated with use of and/or exposure to Roundup® and glyphosate-containing products.

5       126.    As such, Defendants breached their duty of reasonable care and failed to exercise

6   ordinary care in the design, research, development, manufacture, testing, marketing, supply,

7   promotion, advertisement, packaging, sale, and distribution of its Roundup® products, in that

8   Defendants manufactured and produced defective herbicides containing the chemical glyphosate,

9   knew or had reason to know of the defects inherent in its products, knew or had reason to know

10  that a user's or consumer's exposure to the products created a significant risk of harm and

11  unreasonably dangerous side effects, and failed to prevent or adequately warn of these risks and

12  injuries.

13      127.    Despite ability and means to investigate, study, and test products and to provide

14  adequate warnings, Defendants have failed to do so. Indeed, Defendants wrongfully concealed

15  information and has further made false and/or misleading statements concerning the safety and/or

16  exposure to Roundup® and glyphosate.

17      128.    Defendants' negligence included:

18          a.      Manufacturing, producing, promoting, formulating, creating, developing,

19  designing, selling, and/or distributing Roundup® products without thorough and adequate pre-

20  and post-market testing;

21          b.      Manufacturing, producing, promoting, formulating, creating, developing,

22  designing, selling, and/or distributing Roundup® while negligently and/or intentionally

23  concealing and failing to disclose the results of trials, tests, and studies of exposure to

24  glyphosate, and, consequently, the risk of serious harm associated with human use of and

25  exposure to Roundup®;

26  ///

27  ///

28

COMPLAINT
- 25 -

1        c.      Failing to undertake sufficient studies and conduct necessary tests to

2   determine whether or not Roundup® products and glyphosate-containing products were safe for

3   their intended use in agriculture and horticulture;

4        d.      Failing to use reasonable and prudent care in the design, research,

5   manufacture, and development of Roundup® products so as to avoid the risk of serious harm

6   associated with the prevalent use of Roundup®/glyphosate as an herbicide;

7        e.      Failing to design and manufacture Roundup® products so as to ensure

8   they were at least as safe and effective as other herbicides on the market;

9        f.      Failing to provide adequate instructions, guidelines, and safety precautions

10  to those persons who Defendants could reasonably foresee would use and be exposed to its

11  Roundup® products;

12       g.      Failing to disclose to Plaintiff, users/consumers, and the general public

13  that use of and exposure to Roundup® presented severe risks of cancer and other grave illnesses;

14       h.      Failing to warn Plaintiff, consumers, and the general public that the

15  product's risk of harm was unreasonable and that there were safer and effective alternative

16  herbicides available to Plaintiff and other consumers;

17       i.      Systematically suppressing or downplaying contrary evidence about the

18  risks, incidence, and prevalence of the side effects of Roundup® and glyphosate-containing

19  products;

20       j.      Representing that its Roundup® products were safe for their intended use

21  when, in fact Defendants knew or should have known that the products were not safe for their

22  intended purpose;

23       k.      Declining to make or propose any changes to Rowidup® products'

24  labeling or other promotional materials that would alert the consumers and the general public of

25  the risks of Roundup® and glyphosate;

26  ///

27  ///

28

1-027

1             l.      Advertising, marketing, and commending the use of the Roundup®

2 products, while concealing and failing to disclose or warn of the dangers known by Defendants to

3 be associated with or caused by the use of or exposure to Roundup® and glyphosate;

4             m.      Continuing to disseminate infonnation to its consumers, which indicate or

5 imply that Defendants' Roundup® products are not unsafe for use in the agricultural and

6 horticultural industries; and

7             n.      Continuing the manufacture and sale of its products with the knowledge

8 that the products were unreasonably unsafe and dangerous.

9      129.      Defendants knew and/or should have known that it was foreseeable that

10 individuals such as Plaintiff would suffer injuries as a result of Defendants' failure to exercise

11 ordinary care in the manufacturing, marketing, labeling, distribution, and sale of Roundup®.

12      130.      Neither the Plaintiff nor the property owner knew of the nature and extent of the

13 injuries that could result from the intended use of and/or exposure to Roundup® or its active

14 ingredient glyphosate.

15      131.      Defendants' negligence was the proximate cause of the injuries, harm, and

16 economic losses that Plaintiff suffered, and will continue to suffer, as described herein.

17      132.      Defendants' conduct, as described above, was reckless. Defendants regularly risk

18 the lives of consumers and those exposed to their products with full knowledge of the dangers of

19 its products. Defendants made conscious decisions not to redesign, re-label, warn, or inform the

20 unsuspecting public. Defendants' reckless conduct therefore warrants an award of punitive

21 damages.

22      133.      As a proximate result of Defendants' wrongful acts and omissions in placing

23 defective Roundup® products into the stream of commerce without adequate warnings of the

24 hazardous and carcinogenic nature of glyphosate, Plaintiff has suffered and continues to suffer

25 severe and permanent physical and emotional injuries. Plaintiff has endured pain and suffering,

26 have suffered economic losses (including significant expenses for medical care and treatment)

27 and will continue to incur these expenses in the future.

28

**COMPLAINT**

- 27 -

1-028

1       134.   WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in

2  Plaintiff's favor for compensatory and punitive damages, together with interest, costs herein

3  incurred, attorneys' fees and all such other and further relief as this Court deems just and proper.

4  Plaintiff also demands a jury trial on the issues contained herein.

5                           **CLAIM FIVE**

6               **BREACH OF IMPLIED WARRANTIES**

7       135.   Plaintiff incorporates by reference each and every allegation set forth in the

8  preceding paragraphs as if fully stated herein.

9       136.   At all times relevant to this litigation, Defendants engaged in the business of

10  testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting

11  Roundup® products, which are defective and unreasonably dangerous to those exposed to its

12  products, including Plaintiff, thereby placing Roundup® products into the stream of commerce.

13  These actions were under the ultimate control and supervision of Defendants.

14       137.   Before the time that Plaintiff was exposed to the use of the aforementioned

15  Roundup® products, Defendants impliedly warranted to consumers and those exposed, including

16  Plaintiff, that Roundup® products were of merchantable quality and safe and fit for the use for

17  which they were intended; specifically, as horticultural herbicides.

18       138.   Defendants, however, failed to disclose that Roundup® has dangerous

19  propensities when used as intended and that the use of and/or exposure to Roundup® and

20  glyphosate-containing products carries an increased risk of developing severe injuries, including

21  Plaintiff's injuries.

22       139.   Plaintiff reasonably relied upon the skill, superior knowledge and judgment of

23  Defendants and upon their implied warranties that the Roundup® products were of merchantable

24  quality and fit for their intended purpose or use.

25       140.   Upon information and belief, Plaintiff was at all relevant times in privity with

26  Defendants.

27  ///

28

1       141.   Plaintiff is the intended third-party beneficiaries of implied warranties made by

2  Defendants to the purchasers of their horticultural herbicides, and as such Plaintiff is entitled to

3  assert this claim.

4       142.   The Roundup® products were expected to reach and did in fact reach consumers,

5  users, and those exposed to the products, including Plaintiff, without substantial change in the

6  condition in which they were manufactured and sold by Defendants.

7       143.   At all times relevant to this litigation, Defendants were aware that consumers,

8  users, and those exposed to their products, including Plaintiff, would use or be exposed to

9  Roundup® products as marketed by Defendants, which is to say that Plaintiff was a foreseeable

10  user of Roundup®.

11      144.   Defendants intended that Roundup® products be used in the manner in which

12  Plaintiff was exposed to them and Defendants impliedly warranted each product to be of

13  merchantable quality, safe, and fit for this use, despite the fact that Roundup® was not

14  adequately tested or researched.

15      145.   In reliance upon Defendants' implied warranty, Plaintiff used or was exposed to

16  Roundup® as instructed and labeled and in the foreseeable manner intended, recommended,

17  promoted and marketed by Defendants.

18      146.   Plaintiff could not have reasonably discovered or known of the risks of serious

19  injury associated with Roundup® or glyphosate.

20      147.   Defendants breached their implied warranty to Plaintiff in that Roundup®

21  products were not of merchantable quality, safe, or fit for their intended use, or adequately tested.

22  Roundup® has dangerous propensities when used as intended and can cause serious injuries,

23  including those injuries complained of herein.

24      148.   The harm caused by Roundup® products far outweighed their benefit, rendering

25  the products more dangerous than an ordinary consumer or user would expect and more

26  dangerous than alternative products.

27

28

1        149.    As a direct and proximate result of Defendants' wrongful acts and omissions

2  Plaintiff has suffered severe and permanent physical and emotional injuries. Plaintiff has endured

3  pain and suffering, has suffered economic loss and will continue to incur these expenses in the

4  future.

5        150.    WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in

6  Plaintiff's favor for compensatory and punitive damages, together with interest, costs herein

7  incurred, attorneys' fees, and all such other and further relief as this Court deems just and proper.

8  Plaintiff also demands a jury trial on the issues contained herein.

9                           **COUNT SEVEN**

10                       **PUNITIVE DAMAGES**

11        151.    Plaintiff repeats and reiterates the allegations previously set forth herein.

12        152.    At all times material hereto, the Defendants knew or should have known that the

13  subject product was inherently dangerous with respect to its health risks.

14        153.    At all times material hereto, the Defendants attempted to misrepresent and did

15  misrepresent facts concerning the safety of the subject product.

16        154.    Defendants' misrepresentations included knowingly withholding material

17  information from the public, including Plaintiff, concerning the safety of the subject product.

18        155.    At all times material hereto, the Defendants knew and recklessly disregarded the

19  fact that human exposure to Roundup can and does cause health hazards, including multiple

20  myeloma.

21        156.    Notwithstanding the foregoing, the Defendants continued to aggressively market

22  and apply the subject product without disclosing the aforesaid risks.

23        157.    Defendants knew of the subject product's defective and unreasonably dangerous

24  nature, as set forth herein, but continued to design, develop, manufacture, market, distribute, sell,

25  and apply it so as to maximize sales and profits at the expense of the health and safety of the

26  public, including Plaintiff, in conscious and/or negligent disregard of the foreseeable harm

27  caused by Roundup.

28

**COMPLAINT**

- 30 -

1    158.   The Defendants intentionally concealed and/or recklessly failed to disclose to the

2    public, including Plaintiff, the potentially life-threatening hazards of Roundup in order to ensure

3    continued and increased sales.

4    159.   The Defendants' intentional and/or reckless failure to disclose information

5    deprived the Plaintiff of necessary information to enable Plaintiff to weigh the true risks of using

6    or being exposed to the subject product against its benefits.

7    160.   As a direct and proximate result of the Defendants' conscious and deliberate

8    disregard for the rights and safety of the public such as Plaintiff, Plaintiff suffered severe and

9    permanent physical injuries.  Plaintiff has endured substantial pain and suffering and has

10   undergone and will undergo extensive medical and surgical procedures, including chemotherapy

11   and stem cell transplant therapy.  Plaintiff has lost past earnings and has suffered a loss of

12   earning capacity.  Plaintiff has suffered and will continue to suffer economic loss, and has

13   otherwise been physically, emotionally and economically injured.  Plaintiff's injuries and

14   damages are permanent and will continue into the future.

15   161.  The aforesaid conduct of the Defendants was committed with knowing, conscious,

16   and deliberate disregard for the rights and safety of the public, including Plaintiff, thereby

17   entitling the Plaintiff to punitive damages in an amount appropriate to punish the Defendants and

18   deter them from similar conduct in the future.

19   162.   WHEREFORE, Plaintiff demands judgment against Defendants for

20   compensatory, treble and punitive damages, together with interest, costs of suit, attorneys' fees,

21   and all such other relief as the Court deems proper.

**PRAYER FOR RELIEF**

23   WHEREFORE, Plaintiff requests that the Court enter judgment in their favor and

24   against Defendants, awarding as follows:

25   A.    Compensatory damages in an amount to be proven at trial;

26   B.    Punitive damages;

27

28

1        C.     Costs including reasonable attorneys' fees, court costs, and other litigation

2  expenses; and

3        D.     Any other relief the Court may deem just and proper.

4  Dated: 7/14/22                   THE FELDMAN LAW GROUP

5

6                                  MICHAEL A. FELDMAN

7                                  Attorney for Plaintiff

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

---

**COMPLAINT**

- 32 -