COX

# United States District Court
## Northern District of Illinois - CM/ECF NextGen 1.6.3 (Chicago)
### CIVIL DOCKET FOR CASE #: 1:23-cv-00892

| | |
|---|---|
| Shaffer et al v. Monsanto Company | Date Filed: 02/13/2023 |
| Assigned to: Honorable Robert W. Gettleman | Jury Demand: Both |
| Case in other court: Circuit Court of Cook County, Illinois, 2022L011552 | Nature of Suit: 367 Personal Injury: Health Care/Pharmaceutical Personal Injury Product Liability |
| Cause: 28:1446 Petition for Removal | Jurisdiction: Diversity |

**Plaintiff**

**Steven A. Shaffer**                    represented by **Wade P. Callahan**
Arends & Callahan
10129 South Western Avenue
Chicago, IL 60643
(773) 298-1500
Fax: Not a member
Email: wade@arendscallahan.com
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Bethany Shaffer**                    represented by **Wade P. Callahan**
(See above for address)
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Monsanto Company**                    represented by **Riley C. Mendoza**
Shook, Hardy & Bacon LLP
111 S. Wacker Drive
Suite 5100
Chicago, IL 60606
(312) 704-7700
Fax: Not a member
Email: rmendoza@shb.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 02/13/2023 | 1 | NOTICE of Removal from Circuit Court of Cook County, Illinois, case number (2022L011552) filed by Monsanto Company Filing fee $ 402, receipt number AILNDC-20344634. (Attachments: # 1 Exhibit 1 - State Court Complaint)(Mendoza, Riley) (Entered: 02/13/2023) |

| 02/13/2023 | 2 | CIVIL Cover Sheet (Mendoza, Riley) (Entered: 02/13/2023) |
| 02/13/2023 | 3 | ATTORNEY Appearance for Defendant Monsanto Company by Riley C. Mendoza (Mendoza, Riley) (Entered: 02/13/2023) |
| 02/13/2023 | 4 | NOTIFICATION of Affiliates pursuant to Local Rule 3.2 by Monsanto Company (Mendoza, Riley) (Entered: 02/13/2023) |
| 02/13/2023 | 5 | *Defendant Monsanto Company's* ANSWER to Complaint with Jury Demand by Monsanto Company(Mendoza, Riley) (Entered: 02/13/2023) |
| 02/14/2023 |  | CASE ASSIGNED to the Honorable Robert W. Gettleman. Designated as Magistrate Judge the Honorable Susan E. Cox. Case assignment: Random assignment. (smb, ) (Entered: 02/14/2023) |
| 02/14/2023 |  | CLERK'S NOTICE: Pursuant to Local Rule 73.1(b), a United States Magistrate Judge of this court is available to conduct all proceedings in this civil action. If all parties consent to have the currently assigned United States Magistrate Judge conduct all proceedings in this case, including trial, the entry of final judgment, and all post-trial proceedings, all parties must sign their names on the attached Consent To form. This consent form is eligible for filing only if executed by all parties. The parties can also express their consent to jurisdiction by a magistrate judge in any joint filing, including the Joint Initial Status Report or proposed Case Management Order. (gcy, ) (Entered: 02/14/2023) |
| 02/14/2023 | 6 | MAILED Rule 77d Letter to Counsel of record. (gcy, ) (Entered: 02/14/2023) |

| **PACER Service Center** | | |
|---|---|---|
| **Transaction Receipt** | | |
| 02/16/2023 09:26:45 | | |
| **PACER Login:** | sh0019sh | **Client Code:** | 31943.356965 rhb |
| **Description:** | Docket Report | **Search Criteria:** | 1:23-cv-00892 |
| **Billable Pages:** | 2 | **Cost:** | 0.20 |

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

|  |  |
|---|---|
| STEVEN A. SHAFFER and<br>BETHANY SHAFFER,<br><br>    Plaintiffs,<br><br>  v.<br><br>MONSANTO COMPANY,<br><br>    Defendant. | Case No. 1:23-cv-00892 |

## DEFENDANT MONSANTO COMPANY'S NOTICE OF REMOVAL

Pursuant to 28 U.S.C. §§ 1332, 1441, and 1446, Defendant Monsanto Company ("Monsanto"), hereby gives notice of removal of this action, captioned *Steven A. Shaffer and Bethany Shaffer v. Monsanto Company,* bearing Case Number 2022L011552, from the Circuit Court of Cook County, Illinois to the United States District Court for the Northern District of Illinois. Pursuant to 28 U.S.C. § 1446(a), Monsanto provides the following statement of grounds for removal.

## Introduction

1. In this products liability lawsuit, Plaintiffs Steven A. Shaffer and Bethany Shaffer sue Monsanto for injuries allegedly caused by Monsanto's Roundup®-branded herbicides, which have glyphosate as their active ingredient. For decades, farmers have used glyphosate-based herbicides to increase crop yields, and home-owners, landscaping companies, and local government agencies have used these herbicides for highly effective weed control. Glyphosate is one of the most thoroughly studied herbicides in the world, and glyphosate-based herbicides have received regulatory approval in more than 160 countries. Since 1974, when Monsanto first introduced a Roundup®-branded herbicide to the marketplace, the United States Environmental

Protection Agency repeatedly has concluded that glyphosate does not cause cancer. Nevertheless, Plaintiffs allege that Mr. Shaffer developed cancer—specifically, non-Hodgkin's lymphoma ("NHL")—caused by exposure to Monsanto's glyphosate-based herbicides.

2.     This is one of many lawsuits that have been filed against Monsanto involving Roundup®-branded herbicides. A multidistrict litigation proceeding is pending in the United States District Court for the Northern District of California, before the Honorable Vince G. Chhabria, pursuant to 28 U.S.C. § 1407. *See In re Roundup Prods. Liab. Litig.*, No. 3:16-md- 02741-VC (N.D. Cal.); *In re Roundup Prods. Liab. Litig.*, MDL No. 2741, 214 F. Supp. 3d 1346 (J.P.M.L. 2016).

3.     As discussed in more detail below, Monsanto removes this lawsuit because this Court has subject matter jurisdiction based on diversity of citizenship. Plaintiffs are citizens of Illinois. For purposes of diversity jurisdiction, Monsanto is deemed to be a citizen of Missouri (where its principal place of business is located) and Delaware (Monsanto's state of incorporation). Accordingly, complete diversity of citizenship exists in this case as required by 28 U.S.C. § 1332. The statutory amount-in-controversy requirement is also satisfied because Plaintiffs seek damages for cancer allegedly caused by exposure to Monsanto's Roundup®-branded herbicides.

### Background and Procedural History

4.     In December 2022, Plaintiffs commenced this lawsuit in the Circuit Court of Cook County, Illinois by filing a complaint, captioned *Steven A. Shaffer and Bethany Shaffer v. Monsanto Company,* Case Number 2022L011552 (the "State Court Action").

5.     Pursuant to 28 U.S.C. § 1446(a), true and correct copies of the Summons and Complaint served upon Monsanto in the State Court Action are attached collectively as **Exhibit 1.**

6.     Plaintiffs seek damages for cancer allegedly caused by exposure to Monsanto's glyphosate-based herbicides. *See, e.g.*, Complaint ¶¶ 109, 115–116.

### Basis For Removal — Diversity Jurisdiction

7.     Plaintiffs are, and were at the time the State Court Action was filed, a resident and citizen of the State of Illinois. *See* Complaint ¶¶ 1, 118, 127, .

8.     Monsanto is, and was at the time the State Court Action was filed, a corporation incorporated under the laws of the State of Delaware, with its principal place of business in the State of Missouri. *See* Complaint ¶ 5. Thus, Monsanto is deemed to be a citizen of Missouri and Delaware, for purposes of federal diversity jurisdiction.

9.     The Complaint seeks damages based on the allegations that Monsanto's Roundup®-branded herbicides caused Mr. Shaffer to develop cancer (NHL). Therefore, it is plausible from the face of the Complaint that Plaintiffs seek damages in excess of $75,000, exclusive of interest and costs, which satisfies the jurisdictional amount-in-controversy requirement. 28 U.S.C. § 1332(a); *see Dart Cherokee Basin Operating Co. v. Owens*, 574 U.S. 81, 89 (2014) ("[A] defendant's notice of removal need include only a plausible allegation that the amount in controversy exceeds the jurisdictional threshold."). In fact, numerous other lawsuits seeking damages for cancer allegedly caused by Roundup®-branded herbicides have been filed against Monsanto in other federal courts asserting jurisdiction under §1332(a) and alleging damages in excess of $75,000, exclusive of interest and costs.

10.     In sum, this Court has original subject matter jurisdiction over this action based on § 1332(a) because there is complete diversity of citizenship and the amount in controversy exceeds $75,000, exclusive of costs and interest.

**Procedural Requirements**

11.     The Circuit Court of Cook County, Illinois is located within the Northern District of Illinois. Therefore, removal to this Court satisfies the venue requirement of 28 U.S.C. § 1446(a).

12.     Monsanto received notice of process on January 19, 2023. This Notice of Removal is timely, in accordance with 28 U.S.C. § 1446(b)(1), because it is being filed within 30 days of January 19, 2023.

13.     The written notice required by 28 U.S.C. § 1446(d) will be promptly filed in the Circuit Court of Cook County, Illinois and will be promptly served on Plaintiffs.

14.     Monsanto does not waive any defenses and expressly reserves its right to raise any and all defenses in subsequent proceedings.

15.     If any question arises as to the propriety of this removal, Monsanto requests the opportunity to present written and oral argument in support of removal.

**Conclusion**

For the foregoing reasons, Monsanto removes this lawsuit to this Court pursuant to 28 U.S.C. §§ 1332, 1441, and 1446 (and any other applicable laws).

Dated:  February 13, 2023

Respectfully submitted,

**MONSANTO COMPANY**

By: _/s/   Riley C. Mendoza_____
    One of Its Attorneys

Riley C. Mendoza (#6314666)
**SHOOK, HARDY & BACON L.L.P.**
111 S. Wacker Drive, Suite 4700
Chicago, Illinois 60606
Telephone:  (312) 704-7700
rmendoza@shb.com

*Attorneys for Defendant Monsanto Company*

## <u>CERTIFICATE OF SERVICE</u>

I, Riley C. Mendoza, an attorney, hereby certify that on **February 13, 2023**, I caused a

true and complete copy of the foregoing **DEFENDANT MONSANTO COMPANY'S**

**NOTICE OF REMOVAL** to be electronically filed with the Court via the Court's ECF system.

I further certify that I emailed a copy of same upon the following counsel of record:

Wade P. Callahan
**ARENDS & CALLAHAN**
10129 S. Western Ave.
Chicago, IL  60643
(773) 298-1500
wade@arendscallahan.com

***Attorneys for Plaintiffs***

  /s/  *Riley C. Mendoza*

# EXHIBIT 1

FILED
12/30/2022 1:06 PM
IRIS Y. MARTINEZ
CIRCUIT CLERK
COOK COUNTY, IL
2022L011552
Calendar, F
20853206

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## COUNTY DEPARTMENT, LAW DIVISION

Steven A. Shaffer and Bethany Shaffer, )
)
Plaintiffs, ) Case No. 2022L011552
)
vs. ) Please serve:
) Monsanto Company
Monsanto Company, ) c/o Illinois Corporation Service Company
) 801 Adlai Stevenson Drive
Defendant. ) Springfield, IL 62703

### SUMMONS

To each defendant:

YOU ARE SUMMONED and required to file an answer to the complaint in this case, a copy of which is hereto attached, or otherwise file an appearance, in the office of the Clerk of this Court within 30 days after service of this summons, not counting the day of service. IF YOU FAIL TO DO SO A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE RELIEF ASKED IN THE COMPLAINT.

E-filing is now mandatory for all documents in civil cases with limited exceptions. To e-file, you must first create an account with an e-filing service provider. Visit https://efile.illinoiscourts.gov/serviceproviders.htm to learn more and select a service provider. If you need additional help or have trouble e-filing, visit https://www.illinoiscourts.gov/FAQ/gethelp.asp, or talk with your local circuit clerk's office.

To the officer:

This summons must be returned by the officer or other person to whom it was given for service, with endorsement of service and fees, if any, immediately after service. If service cannot be made, this summons shall be returned so endorsed. This summons may not be served later than 30 days after its date.

WITNESS_____, 2022

Atty. No. 42458
Wade P. Callahan
Arends & Callahan                                    12/30/2022 1:06 PM IRIS Y. MARTINEZ
10129 S. Western Avenue                              _____
Chicago, IL 60643                                    Clerk of the Court
(773) 298-1500
wade@arendscallahan.com                              Date of Service: _____, 2022
ac.19289                                             (To be inserted by officer on copy left with
                                                     Defendant or other person)
**IRIS Y. MARTINEZ, CLERK OF THE CIRCUIT COURT OF COOK COUNTY**

Law Division initial Case Management Dates will be heard via Zoom. For Jury trial date: 3/1/2023 9:30 AM more information and Zoom Meeting IDs go to https://www.cookcountycourt.org/HOME/Zoom-Links/Agg4906_SelectTab/12
mote Court date: 3/1/2023 9:30 AM

FILED
12/30/2022 1:06 PM
IRIS Y. MARTINEZ
CIRCUIT CLERK
COOK COUNTY, IL
2022L011552
Calendar, F
20853206

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## COUNTY DEPARTMENT, LAW DIVISION

|  |  |
|---|---|
| Steven A. Shaffer and Bethany Shaffer, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| vs. | ) Case No. 2022L011552 |
| | ) |
| Monsanto Company, | ) |
| | ) |
| Defendant. | ) |

### <u>COMPLAINT</u>

NOW COME the Plaintiffs, Steven A. Shaffer and Bethany Shaffer, by and through their attorneys, Arends & Callahan, and complain against Defendant, Monsanto Company as follows:

#### Allegations Common to all Counts

1.      Plaintiff, Steven A. Shaffer is, and has been at all relevant times herein, a resident of the State of Illinois.

2.      Defendant, Monsanto Company ("Monsanto") is, and has been at all relevant times herein, a foreign corporation licensed to do business in the State of Illinois.

3.      At all times relevant, Monsanto designed, manufactured, marketed, and sold an herbicide known as Roundup.

4.      Roundup is a non-selective herbicide marketed to agricultural workers, landscapers, groundskeepers, homeowners and others to kill weeds.

5.      Monsanto is a multinational biotechnology company with its principal place of business in St. Louis, Missouri.

6. "Roundup" refers here to all formulations of Monsanto's Roundup products that contain the active ingredient glyphosate, including, but not limited to, Roundup Concentrate Poison Ivy and Tough Brush Killer 1, Roundup Concentrate, Roundup Custom Herbicide, Roundup D-Pak, Roundup Fence and Hard Edge, Roundup Foam Weed & Grass Killer, Roundup Grass and Weed Killer, Roundup Herbicide, Roundup Original2K Herbicide, Roundup Promax, Roundup QuikStik Grass and Weed Killer, Roundup Quickpro Herbicide, Roundup Rainforest Concentrate Weed and Grass Killer, Roundup Rainforest SuperConcentrate Weed & Grass Killer, and Roundup Ready-to-Use Extended Control Weed & Grass Killer Plus Weed Preventer, *inter alia.*

7. Monsanto has advertised and sold goods, including Roundup, in the State of Illinois for many years.

8. Monsanto has transacted and conducted business in the State of Illinois for many years.

9. Monsanto has derived substantial revenue from goods and products sold and used in the State of Illinois.

10. Monsanto has transacted and conducted extensive business within the State of Illinois that directly relates to the allegations in this Complaint.

11. Monsanto expected or reasonably should have expected that its acts would have consequences within the State of Illinois, and derived substantial revenue from interstate commerce, including commerce in Illinois.

12. Monsanto purposely availed itself of the privileges of conducting activities within the State of Illinois and invoked the benefits and protections of Illinois law.

13.     Plaintiff, Steven A. Shaffer worked as a groundskeeper during the spring, summer and fall seasons from 1998 through 2001.

14.     Plaintiff, Steven A. Shaffer regularly used Roundup and was regularly exposed to Roundup in the performance of his duties as a groundskeeper.

15.     Monsanto maintains sufficient and ongoing contacts within the State of Illinois such that this Court's exercise of personal jurisdiction does not offend traditional notions of fair play and substantial justice.

16.     Monsanto is the world's leading producer of glyphosate.

17.     Glyphosate is the active ingredient in Roundup.

18.     Monsanto discovered the herbicidal properties of glyphosate during the 1970's and subsequently began to design, research, manufacture, sell, and distribute glyphosate based Roundup as a broad-spectrum herbicide.

19.     Glyphosate is a broad-spectrum herbicide used to kill weeds and grasses known to compete with desirable plants grown around the globe.

20.     Glyphosate is a "non-selective" herbicide, meaning it kills indiscriminately, based only on whether a given organism produces a specific enzyme, 5-enolpyruvylshikimic acid-3-phosphate synthase, known as EPSP synthase.

21.     Glyphosate inhibits the enzyme 5-enolpyruvylshikimic acid-3-phosphate synthase that interferes with the shikimic pathway in plants, resulting in the accumulation of shikimic acid in plant tissue and ultimately in plant death.

22.     Sprayed as a liquid, plants absorb glyphosate directly through their leaves, stems, and roots, and detectable quantities accumulate in the plant tissues.

23. Each year, approximately 250 million pounds of glyphosate are sprayed on crops, commercial nurseries, suburban lawns, parks, and golf courses. \

24. Monsanto is intimately involved in the development, design, manufacture, marketing, sale, and/or distribution of genetically modified ("GMO") crops, many of which are marketed as being resistant to Roundup *i.e.,* "Roundup Ready®."

25. As of 2009, Monsanto was the world's leading producer of seeds designed to be Roundup Ready. In 2010, an estimated 70% of corn and cotton, and 90% of soybean fields in the United States, contained Roundup Ready® seeds.

26. The original Roundup, containing the active ingredient glyphosate, was introduced in 1974. Today, glyphosate products are among the world's most widely used herbicides.

27. For nearly 40 years, agricultural workers, landscapers, groundskeepers, other commercial users, homeowners, consumers and the general public have used Roundup, unaware of its carcinogenic properties.

28. The manufacture, formulation, and distribution of herbicides, such as Roundup, are regulated under the Federal Insecticide, Fungicide, and Rodentcide Act ("FIFRA"), 7 U.S.C. § 136 *et seq.* FIFRA requires that all pesticides be registered with the Environmental Protection Agency ("EPA") prior to their distribution, sale, or use, except as described by FIFRA 7 U.S.C. 136a(a).

29. The EPA requires as part of the registration process, among other requirements, a variety of tests to evaluate the potential for exposure to pesticides, toxicity to people and other potential non-target organisms, and other adverse effects on the environment. Registration by the EPA, however, is not an assurance or finding of

safety. The determination the EPA makes in registering or re-registering a product is not that the product is "safe," but rather that use of the product in accordance with its label directions "will not generally cause unreasonable adverse effects on the environment." 7 U.S.C. § 136(a)(c)(5)(D).

30.    FIFRA defines "unreasonable adverse effects on the environment" to be "any unreasonable risk to man or the environment, taking into account the economic, social, and environmental costs and benefits of the use of and pesticide." 7 U.S.C. § 136(bb). FIFRA thus requires the EPA to make a risk/benefit analysis in determining whether a registration should be granted or allowed to continue to be sold in commerce.

31.    The EPA and the State of Illinois registered Roundup for the distribution, sale, and manufacture in the United States and the State of Illinois.

32.    FIFRA generally requires that the registrant, Monsanto, conduct health and safety testing of pesticide products. The government is not required, nor is it able, to perform the product tests that are required of the manufacturer.

33.    The evaluation of each pesticide product distributed, sold, or manufactured is completed at the time the product is initially registered. The data necessary for registration of a pesticide has changed over time. The EPA has reevaluated all pesticide products through a Congressionally mandated process called "re-registration." 7 U.S.C. § 136a-1. In order to reevaluate these pesticides, the EPA demanded the completion of additional tests and the submission of data for the EPA's review and evaluation.

34.    In the case of glyphosate and Roundup, the EPA had planned on releasing its preliminary risk assessment — in relation to the registration process — no later than

July 2015. The EPA completed its review of glyphosate in early 2015, but delayed releasing the assessment pending further review in light of the World Health Organization's March 24, 2015, finding that glyphosate is a "probable carcinogen" as demonstrated by the mechanistic evidence of carcinogenicity in humans and sufficient evidence of carcinogenicity in animals.

35.     In 1996, the New York Attorney General ("NYAG") filed a lawsuit against Monsanto based on its false and misleading advertising of Roundup products. Specifically, the lawsuit challenged Monsanto's general representations that its spray-on glyphosate-based herbicides, including Roundup, were "safer than table salt" and "practically non-toxic" to mammals, birds, and fish. Among the representations the NYAG found deceptive and misleading about the human and environmental safety of Roundup are the following:

a)     Remember that environmentally friendly Roundup herbicide is biodegradable. It won't build up in the soil so you can use Roundup with confidence along customers' driveways, sidewalks and fences.

b)     And remember that Roundup is biodegradable and won't build up in the soil. That will give you the environmental confidence you need to use Roundup everywhere you've got a weed, brush, edging or trimming problem.

c)     Roundup biodegrades into naturally occurring elements.

d)     Remember that versatile Roundup herbicide stays where you put it. That means there's no washing or leaching to harm customers' shrubs or other desirable vegetation.

e)     This non-residual herbicide will not wash or leach in the soil. It ... stays where you apply it.

f)     Glyphosate is less toxic to rats than table salt following acute oral ingestion.

g) Glyphosate's safety margin is much greater than required. It has over a 1,000-fold safety margin in food and over a 700-fold safety margin for workers who manufacture it or use it.

h) You can feel good about using herbicides by Monsanto. They carry a toxicity category rating of `practically non-toxic' as it pertains to mammals, birds, and fish.

i) Roundup can be used where kids and pets will play and breaks down into natural material.

36. On November 19, 1996, Monsanto entered into an Assurance of Discontinuance with the NYAG, in which Monsanto agreed, among other things, "to cease and desist from publishing or broadcasting any advertisements [in New York] that represent, directly or by implication" that:

a) its glyphosate-containing pesticide products or any component thereof are safe, non-toxic, harmless or free from risk.

b) its glyphosate-containing pesticide products or any component thereof manufactured, formulated, distributed or sold by Monsanto are biodegradable.

c) its glyphosate-containing pesticide products or any component thereof stay where they are applied under all circumstances and will not move through the environment by any means.

d) its glyphosate-containing pesticide products or any component thereof are "good" for the environment or are "known for their environmental characteristics."

e) glyphosate-containing pesticide products or any component thereof are safer or less toxic than common consumer products other than herbicides.

f) its glyphosate-containing products or any component thereof might be classified as "practically non-toxic."

37. Monsanto did not alter its advertising in the same manner in any other state.

38. In 2009, France's highest court ruled that Monsanto had not told the truth about the safety of Roundup. The French court affirmed an earlier judgment that Monsanto had falsely advertised its herbicide Roundup as "biodegradable" and that it "left the soil clean."

39. As early as the 1980's Monsanto was aware of glyphosate's carcinogenic properties.

40. On March 4, 1985, a group of the Environmental Protection Agency's ("EPA") Toxicology Branch published a memorandum classifying glyphosate as a Category C oncogene. Category C oncogenes are possible human carcinogens with limited evidence of carcinogenicity.

41. In 1986, the EPA issued a Registration Standard for glyphosate (NTIS PB87-103214). The Registration standard required additional phytotoxicity, environmental fate, toxicology, product chemistry, and residue chemistry studies. All of the data required was submitted and reviewed and/or waived.

42. In October 1991, the EPA published a Memorandum entitled "Second Peer Review of Glyphosate." The memorandum changed glyphosate's classification to Group E (evidence of non-carcinogenicity for humans). Two peer review committee members did not concur with the conclusions and one member refused to sign.

43. In addition to the toxicity of the active molecule, many studies support the hypothesis that glyphosate formulations found in Monsanto's Roundup products are more dangerous and toxic than glyphosate alone. As early as 1991, evidence existed demonstrating that glyphosate formulations were significantly more toxic than glyphosate alone.

44.    In 2002, Julie Marc published a study entitled "Pesticide Roundup Provokes Cell Division Dysfunction at the Level of CDKI/Cyclin B Activation."

45.    The study found that Roundup caused delays in the cell cycles of sea urchins, while the same concentrations of glyphosate alone did not alter cell cycles.

46.    In 2004, Julie Marc published a study entitled "Glyphosate-based Pesticides Affect Cell Cycle Regulation." The study demonstrated a molecular link between glyphosate based products and cell cycle dysregulation.

47.    The study noted that "cell-cycle dysregulation is a hallmark of tumor cells and human cancer. Failure in the cell-cycle checkpoints leads to genomic instability and subsequent development of cancers from the initial affected cell." Further, "[s]ince cell cycle disorders such as cancer result from dysfunction of unique cells, it was of interest to evaluate the threshold dose of glyphosate affecting cells."

48.    In 2005, Francisco Peixoto published a study showing that Roundup's effects on rat liver mitochondria are much more toxic and harmful than the same concentrations to glyphosate alone.

49.    The Peixoto study suggested that the harmful effects of Roundup on mitochondrial bioenergetics could not be exclusively attributed to glyphosate and could be the result of other chemicals, such as the surfactant POEA, or alternatively due to the possible synergy between glyphosate and Roundup formulation products.

50.    In 2009, Nora Benachour and Gilles-Eric Seralini published a study examining the effects of Roundup and glyphosate on human umbilical, embryonic, and placental cells.

51.     The study used dilution levels of Roundup and glyphosate far below agricultural recommendations, corresponding with low levels of residues in food. The study concluded that supposed "inert" ingredients, and possibly POEA, change human cell permeability and amplify toxicity of glyphosate alone. The study further suggested that determinations of glyphosate toxicity should take into account the presence of adjuvants, or those chemicals used in the formulation of the complete pesticide. The study confirmed that the adjuvants in Roundup are not inert and that Roundup is always more toxic than its active ingredient glyphosate.

52.     The results of these studies were confirmed in recently published peer-reviewed studies and were at all times available and/or known to Monsanto.

53.     Monsanto knew or should have known that Roundup is more toxic than glyphosate alone and that safety studies on Roundup, Roundup's adjuvants and "inert" ingredients, and/or the surfactant POEA were necessary to protect Plaintiff, Steven A. Shaffer from Roundup.

54.     Monsanto knew or should have known that tests limited to Roundup's active ingredient glyphosate were insufficient to prove the safety of Roundup.

55.     Monsanto failed to appropriately and adequately test Roundup, Roundup's adjuvants and "inert" ingredients, and/or the surfactant POEA to protect Plaintiff, Steven A. Shaffer from Roundup.

56.     Rather than performing appropriate tests, Monsanto relied upon flawed industry-supported studies designed to protect Monsanto's economic interests rather than Plaintiff, Steven A. Shaffer, agricultural workers, landscapers, groundskeepers, other commercial users, homeowners, consumers and the general public.

57.     Despite its knowledge that Roundup was considerably more dangerous than glyphosate alone, Monsanto continued to promote Roundup as safe.

58.     The International Agency for Research on Cancer ("IARC") is the specialized intergovernmental cancer agency which the World Health Organization ("WHO") of the United Nations tasked with conducting and coordinating research into the causes of cancer.

59.     An IARC Advisory Group to Recommend Priorities for IARC Monographs during 2015-2019 met in April 2014. Though nominations for the review were solicited, a substance must meet two criteria to be eligible for review by the IARC Monographs: there must already be some evidence of carcinogenicity of the substance, and there must be evidence that humans are exposed to the substance.

60.     IARC set glyphosate for review in 2015-2016. IARC uses five criteria for determining priority in reviewing chemicals. The substance must have a potential for direct impact on public health; scientific literature to support suspicion of carcinogenicity; evidence of significant human exposure; high public interest and/or potential to bring clarity to a controversial area and/or reduce public anxiety or concern; and related agents similar to one given high priority by the above considerations. Data reviewed is sourced preferably from publicly accessible, peer-reviewed data.

61.     On March 24, 2015, after its cumulative review of human, animal, and DNA studies for more than one (1) year, many of which have been in Monsanto's possession since as early as 1985, the IARC's Working Group published its conclusion that the glyphosate contained in Monsanto's Roundup herbicide is a Class 2A "probable carcinogen" as demonstrated by the mechanistic evidence of carcinogenicity in humans

and sufficient evidence of carcinogenicity in animals.

62.     The IARC's full Monograph was published on July 29, 2015, and established glyphosate as a class *2A probable* carcinogen to humans. According to the authors, glyphosate demonstrated sufficient mechanistic evidence (genotoxicity and oxidative stress) to warrant a 2A classification based on evidence of carcinogenicity in humans and animals.

63.     The IARC's Working Group found an increased risk between exposure to glyphosate and non-Hodgkin's lymphoma ("NHL") and several subtypes of NHL, and the increased risk continued after adjustment for other pesticides.

64.     The IARC also found that glyphosate caused DNA and chromosomal damage in human cells.

65.     Even without the new classification by the IARC, Monsanto had ample evidence of glyphosate and Roundup's genotoxic properties for decades.

66.     Genotoxic chemical agents are those that are capable of damaging the DNA within a cell through genetic mutations, which is a process that can lead to cancer.

67.     In 1997, Chris Clements published "Genotoxicity of select herbicides in *Rana catesbeiana* tadpoles using the alkaline single-cell gel DNA electrophoresis (comet) assay."

68.     The study found that tadpoles exposed to Roundup showed significant DNA damage when compared with unexposed control animals.

69.     Both human and animal studies have shown that glyphosate and glyphosate-based formulations such as Roundup can induce oxidative stress.

70.     Oxidative stress and associated chronic inflammation are believed to be involved in carcinogenesis.

71.     The IARC Monograph notes that "[s]trong evidence exists that glyphosate, AMPA and glyphosate-based formulations can induce oxidative stress."

72.     In 2006 Cesar Paz-y-Mino published a study examining DNA damage in human subjects exposed to glyphosate.

73.     The study produced evidence of chromosomal damage in blood cells showing significantly greater damage after exposure to glyphosate than before in the same individuals, suggesting that the glyphosate formulation used during aerial spraying had a genotoxic effect on exposed individuals.

74.     The IARC Monograph reflects the volume of evidence of glyphosate pesticides' genotoxicity noting "[t]he evidence for genotoxicity caused by glyphosate-based formulations is strong."

75.     Despite knowledge to the contrary, Monsanto maintains that there is no evidence that Roundup is genotoxic, that regulatory authorities and independent experts are in agreement that Roundup is not genotoxic, and that there is no evidence that Roundup is genotoxic.

76.     In addition to glyphosate and Roundup's genotoxic properties, Monsanto has long been aware of glyphosate's carcinogenic properties.

77.     Glyphosate and Roundup in particular have long been associated with carcinogenicity and the development of numerous forms of cancer, including, but not limited to, non-Hodgkin's lymphoma, Hodgkin's lymphoma, multiple myeloma, and soft tissue sarcoma.

78. Monsanto has known of this association since the early to mid-1980s and numerous human and animal studies have evidenced the carcinogenicity of glyphosate and/or Roundup.

79. In 1985, the EPA studied the effects of glyphosate in mice, finding a dose-related response in male mice linked to renal tubal adenomas, a rare tumor. The study concluded the glyphosate was oncogenic.

80. In 2003, Lennart Hardell and Mikael Eriksson published the results of two case-controlled studies on pesticides as a risk factor for NHL and hairy cell leukemia.

81. The study concluded that glyphosate had the most significant relationship to NHL among all herbicides studied.

82. In 2003, AJ De Roos published a study examining the pooled data of mid-western farmers, examining pesticides and herbicides as risk factors for NHL.

83. The study, which controlled for potential confounders, found a relationship between increased NHL incidence and glyphosate.

84. In 2008, Mikael Eriksson published a population-based case-controlled study of exposure to various pesticides as a risk factor for NHL.

85. This study strengthened previous associations between glyphosate and NHL.

86. In spite of this knowledge, Monsanto continued to issue broad and sweeping statements suggesting that Roundup was, and is, safer than ordinary household items such as table salt, despite a lack of scientific support for the accuracy and validity of these statements and, in fact, voluminous evidence to the contrary.

87.     These statements and representations were made with the intent of inducing agricultural workers, landscapers, groundskeepers, other commercial users, homeowners, consumers and the general public to purchase and increase the use of Roundup for Monsanto's pecuniary gain, and, in fact, did induce Plaintiff, Steven A. Shaffer to use Roundup.

88.     Monsanto made these statements with complete disregard and reckless indifference to the safety of Plaintiff, Steven A. Shaffer, agricultural workers, landscapers, groundskeepers, other commercial users, homeowners, consumers and the general public.

89.     Notwithstanding Monsanto's representations, scientific evidence has established a clear association between glyphosate and genotoxicity, inflammation, and an increased risk of many cancers, including, but not limited to, NHL, multiple myeloma, and soft tissue sarcoma.

90.     Monsanto knew, or should have known, that glyphosate is associated with an increased risk of developing cancer, including, but not limited to, NHL, multiple myeloma, and soft tissue sarcomas.

91.     Monsanto failed to appropriately and adequately inform and warn Plaintiff, Steven A. Shaffer of the serious and dangerous risks associated with the use of and exposure to glyphosate and/or Roundup, including, but not limited to, the risk of developing NHL.

92.     Despite the IARC's classification of glyphosate as a Class 2A probable carcinogen, Monsanto continues to maintain that glyphosate and/or Roundup is safe, non-carcinogenic, non-genotoxic, and falsely warrant to users and the general

public that independent experts and regulatory agencies agree that there is no evidence of carcinogenicity or genotoxicity in glyphosate and Roundup.

93.     Monsanto has claimed and continues to claim that Roundup is safe, non-carcinogenic, and non-genotoxic. These misrepresentations are consistent with Monsanto's cavalier approach to investigating and ensuring the safety of its products, the safety of the public at large, and the safety of Plaintiff, Steven A. Shaffer.

94.     After the EPA's 1985 classification of glyphosate as possibly carcinogenic to humans (Group C), Monsanto exerted pressure upon the EPA to change its classification.

95.     This culminated in the EPA's reclassification of glyphosate to Group E, which was based upon evidence of non-carcinogenicity in humans.

96.     In so classifying, the EPA stated that "[i]t should be emphasized, however, that designation of an agent in Group E is based on the available evidence at the time of evaluation and should not be interpreted as a definitive conclusion that the agent will not be a carcinogen under any circumstances."

97.     On two occasions, the EPA found that laboratories hired by Monsanto to test the toxicity of its Roundup products for registration purposes committed scientific fraud.

98.     In the first instance, Monsanto hired Industrial Bio-Test Laboratories ("IBT") to perform and evaluate pesticide toxicology studies relating to Roundup. IBT performed approximately 30 tests on glyphosate and glyphosate-containing products, including 11 of the 19 chronic toxicology studies needed to register Roundup with the EPA.

99.    In 1976, the Food and Drug Administration ("FDA") performed an inspection of IBT and discovered discrepancies between the raw data and the final report relating to toxicological impacts of glyphosate. The EPA subsequently audited IBT and determined that the toxicology studies conducted for Roundup were invalid. An EPA reviewer stated, after finding "routine falsification of data" at IBT, that it was "hard to believe the scientific integrity of the studies when they said they took specimens of the uterus from male rabbits."

100.    Three top executives of IBT were convicted of fraud in 1983.

101.    In the second incident, Monsanto hired Craven Laboratories ("Craven") in 1990 to perform pesticide and herbicide studies, including several studies on Roundup.

102.    In March of 1991, the EPA announced that it was investigating Craven for "allegedly falsifying test data used by chemical firms to win EPA approval of pesticides."

103.    The investigation led to the indictments of the laboratory owner and a handful of employees.

104.    Monsanto has claimed that "[r]egulatory authorities and independent experts around the world have reviewed numerous long-term/carcinogenicity and genotoxicity studies and agree that there is no evidence that glyphosate, the active ingredient in Roundup brand herbicides and other glyphosate-based herbicides, causes cancer, even at very high doses, and that it is not genotoxic."

105.    Ironically, the primary source for this statement is an outdated 1986 report by the WHO, the same organization that now considers glyphosate to be a probable carcinogen.

106.     Glyphosate, and Monsanto's Roundup products, in particular, have long been associated with serious side effects and many regulatory agencies around the globe have banned or are currently banning the use of glyphosate-containing herbicide products.

107.     Monsanto's statements proclaiming the safety of Roundup and disregarding its dangers misled Plaintiff Steven A. Shaffer.

108.     Despite Monsanto's knowledge that Roundup was associated with an elevated risk of developing cancer, Monsanto's promotional campaigns focused on Roundup's purported "safety profile."

109.     Monsanto's failure to provide adequate warning about the dangers of Roundup resulted in (1) Plaintiff, Steven A. Shaffer using and being exposed to glyphosate instead of using another acceptable and safe method of controlling unwanted weeds; and (2) scientists and physicians failing to provide warning and instructions about the risk of cancer, including NHL, and other injuries associated with Roundup.

110.     Monsanto failed to seek modification of the labeling of Roundup to include relevant information regarding the risks and dangers associated with Roundup exposure.

111.     The failure of Monsanto to appropriately warn and inform the EPA has resulted in inadequate instructions and warnings in safety information presented directly to users of Roundup.

112.     The failure of Monsanto to appropriately warn and inform the EPA has resulted in the lack of warning or caution statements that are adequate to protect health and the environment.

## COUNT I-STRICT LIABILITY
### (Steven A. Shaffer v Monsanto Company)

1-112.  Plaintiff, Steven A. Shaffer repeats, realleges, and incorporates herein all Allegations Common to All Counts.

113.    In performing his duties as a groundskeeper, Plaintiff, Steven A. Shaffer would regularly mix and spray Roundup between ten (10) to twenty (20) hours per week.

114.    Plaintiff, Steven A. Shaffer did not know the nature and extent of the injuries that could result from the use of and exposure to Roundup.

115.    In 2011, at the age of 33 years old, Plaintiff, Steven A. Shaffer was diagnosed with Diffuse Large B Cell Non-Hodgkin's lymphoma.

116.    Since 2011, Plaintiff, Steven A. Shaffer has continued to suffer severe, life altering and life threatening illnesses and complications related to the use of and exposure to Roundup and the resulting treatment for Diffuse Large B Cell Non-Hodgkin's lymphoma, including a 2014 leukemia diagnosis and a 2022 lung transplant, for which, at the time of filing this Complaint, Plaintiff, Steven A. Shaffer remains hospitalized.

117.    At all times relevant, Monsanto designed, researched, manufactured, tested, advertised, promoted, sold, and distributed the Roundup that Plaintiff, Steven A. Shaffer used.

118.    At all times relevant, the Roundup reached the intended consumers, handlers, users and other persons coming into contact with these products in Illinois, including Plaintiff, Steven A. Shaffer, without substantial change in the condition in which it was produced, manufactured, sold, distributed, and marketed by Monsanto.

119.    At the time the product left the control of Monsanto, the Roundup was in an unsafe, defective, and inherently dangerous condition, which was dangerous to users and, in particular, Plaintiff, Steven A. Shaffer.

120.    The Roundup designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed by Monsanto was defective in design or formulation in that, when it left the hands of the manufacturer and/or suppliers, the foreseeable risks exceeded the benefits associated with the design or formulation of Roundup.

121.    The Roundup designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed by Monsanto were defective in design and/or formulations, in that, when it left the hands of Monsanto's manufacturers and/or suppliers, it was unreasonably dangerous, unreasonably dangerous in normal use, and more dangerous than ordinary consumers, laborers and users would contemplate.

122.    At all times relevant, the Roundup was in a defective condition and unsafe, and Monsanto knew or had reason to know that said product was defective and unsafe, especially when used in the form and manner as provided by Monsanto. In particular, Roundup was defective in one or more of the following ways:

   a)    When placed in the stream of commerce, Roundup products were defective in design and formulation and, consequently, dangerous to an extent beyond that which an ordinary consumer would contemplate;

   b)    When placed in the stream of commerce, Roundup products were unreasonably dangerous in that they were hazardous and posed a grave risk of cancer and other serious illnesses when used in a reasonably anticipated manner;

   c)    When placed in the stream of commerce, Roundup products contained unreasonably dangerous design defects and were not reasonably safe when used in a reasonably anticipated manner;

d)   Monsanto did not sufficiently test, investigate, or study its Roundup products;

e)   Exposure to Roundup presents a risk of harmful side effects that outweigh any potential utility stemming from the use of the herbicide;

f)   Monsanto knew or should have known at the time of marketing the Roundup products that exposure to Roundup could result in cancer and other severe illnesses and injuries;

g)   Monsanto did not conduct adequate post-marketing surveillance of the Roundup products; and

h)   Monsanto failed to warn consumers, foreseeable users, government agencies and others that exposure to Roundup could result in cancer and other severe illnesses and injuries.

123.   Monsanto knew, or should have known, that Roundup was in a defective condition and was and is inherently dangerous and unsafe.

124.   Plaintiff, Steven A. Shaffer was exposed to Roundup, as described above, without knowledge of Roundup's dangerous characteristics.

125.   At the time of Plaintiff, Steven A. Shaffer's use and exposure to Roundup, Roundup was being used for the purposes and in a manner normally intended, as a broad-spectrum herbicide.

126.   Monsanto, with this knowledge, voluntarily designed Roundup with a dangerous condition for use by the public and, in particular, Plaintiff Steven A. Shaffer.

127.   Monsanto marketed and promoted Rounding product, including in Illinois, to consumers, laborers and users like Plaintiff Steven A. Shaffer in such a manner so as to make it inherently defective as Monsanto downplayed the product's suspected, probable, and established health risks inherent with its normal, intended use.

128.     As a proximate result of one or more of the foregoing unreasonably dangerous acts, omissions or conditions, Plaintiff, Steven A. Shaffer was exposed to Roundup.

129.     As a proximate result of one or more of the foregoing unreasonably dangerous acts, omissions or conditions, Plaintiff Steven A. Shaffer was diagnosed with Diffuse Large B Cell Non-Hodgkin's lymphoma.

130.     As a proximate result of one or more of the foregoing unreasonably dangerous acts, omissions or conditions, Plaintiff, Steven A. Shaffer continues to suffer severe, life altering and life threatening illnesses and complications related to the use of and exposure to Roundup and the resulting treatment for Diffuse Large B Cell Non-Hodgkin's lymphoma, including leukemia and a lung transplant, for which, at the time of filing this Complaint, Plaintiff, Steven A. Shaffer remains hospitalized.

131.     As a proximate result of one or more of the foregoing unreasonably dangerous acts, omissions or conditions, Plaintiff, Steven A. Shaffer has suffered and continues to suffer grave injuries, has endured pain and discomfort, as well as economic hardship, including but not limited to, considerable financial expenses for medical care and treatment. Plaintiff, Steven A. Shaffer will continue to incur these expenses in the future.

132.     Plaintiff, Steven A. Shaffer did not discover the link between the use of Roundup and the Diffuse Large B Cell Non-Hodgkin's lymphoma diagnosis until November 2022.

133.    The running of any statute of limitations or statute of repose has been tolled by reason of Monsanto's fraudulent concealment. Monsanto, through its affirmative misrepresentations and omissions, actively concealed from Plaintiff, Steven A. Shaffer the true risks associated with Roundup.

134.    At all relevant times, Monsanto has maintained that Roundup is safe, non-toxic, and non-carcinogenic.

135.    Indeed, even as of July 2016, Monsanto continued to represent to the public that "[r]egulatory authorities and independent experts around the world have reviewed numerous long-term/carcinogenicity and genotoxicity studies and agree that there is *no evidence* that glyphosate, the active ingredient in Roundup® brand herbicides and other glyphosate-based herbicides, causes cancer, even at very high doses, and that it is not genotoxic" (emphasis added).

136.    As a result of Monsanto's actions, Plaintiff, Steven A. Shaffer was unaware, and could not reasonably know or have learned through reasonable diligence, that contact with Roundup exposed Plaintiff, Steven A. Shaffer to the risks alleged herein and that those risks were the direct and proximate result of Monsanto's acts and omissions.

137.    Because of the fraudulent concealment of the true character, quality, and nature of Roundup, Monsanto is estopped from relying on any statute of limitations or statute of repose. Monsanto was under a duty to disclose the true character, quality, and nature of Roundup because this was non-public information over which Monsanto had and continues to have exclusive control, and because Monsanto knew that this information was not available to Plaintiff, Steven A. Shaffer. In addition, Monsanto is

estopped from relying on any statute of limitations or statute of repose because of its intentional concealment of these facts.

138.    Plaintiff, Steven A. Shaffer had no knowledge that Monsanto was engaged in the wrongdoing alleged herein. Because of the fraudulent acts of concealment of wrongdoing by Monsanto, Plaintiff, Steven A. Shaffer could not have reasonably discovered the wrongdoing at any time prior. Additionally, the economics of this fraud should be considered. Monsanto had the ability to and did spend enormous amounts of money in furtherance of its purpose of marketing, promoting and/or distributing a profitable herbicide, notwithstanding the known or reasonably knowable risks. Plaintiff, Steven A. Shaffer could not have afforded and could not have possibly conducted studies to determine the nature, extent, and identity of related health risks, and were forced to rely on only Monsanto's representations. Accordingly, Monsanto is precluded by the discovery rule and/or the doctrine of fraudulent concealment from relying upon any statute of limitations or statute of repose.

WHEREFORE, Plaintiff, Steven A. Shaffer respectfully requests that this Court enter judgment in favor of Plaintiff, Steven A. Shaffer and against Defendant, Monsanto Company in excess of $50,000.00, plus the costs of this suit, and for any further relief the Court deems just and equitable.

## COUNT II-NEGLIGENCE
### (Steven A. Shaffer v. Monsanto Company)

1-112.  Plaintiff, Steven A. Shaffer repeats, realleges, and incorporates herein all Allegations Common to All Counts.

113.    In performing his duties as a groundskeeper, Plaintiff, Steven A. Shaffer would regularly mix and spray Roundup between ten (10) to twenty (20) hours per week.

114.    Plaintiff, Steven A. Shaffer did not know the nature and extent of the injuries that could result from the use of and exposure to Roundup.

115.    In 2011, at the age of 33 years old, Plaintiff, Steven A. Shaffer was diagnosed with Diffuse Large B Cell Non-Hodgkin's lymphoma.

116.    Since 2011, Plaintiff, Steven A. Shaffer has continued to suffer severe, life altering and life threatening illnesses and complications related to the use of and exposure to Roundup and the resulting treatment for Diffuse Large B Cell Non-Hodgkin's lymphoma, including a 2014 leukemia diagnosis and a 2022 lung transplant, for which, at the time of filing this Complaint, Plaintiff, Steven A. Shaffer remains hospitalized.

117.    At all times relevant, Monsanto designed, researched, manufactured, tested, advertised, promoted, sold, and distributed the Roundup that Plaintiff, Steven A. Shaffer used.

118.    At all times relevant, the Roundup reached the intended consumers, handlers, users and other persons coming into contact with these products in Illinois, including Plaintiff, Steven A. Shaffer, without substantial change in the condition in which it was produced, manufactured, sold, distributed, and marketed by Monsanto.

119.    At the time the product left the control of Monsanto, the Roundup was in an unsafe, defective, and inherently dangerous condition, which was dangerous to users and, in particular, Plaintiff, Steven A. Shaffer.

120.    The Roundup designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed by Monsanto was defective in design or formulation in that, when it left the hands of the manufacturer and/or suppliers, the foreseeable risks exceeded the benefits associated with the design or formulation of

Roundup.

121. The Roundup designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed by Monsanto was defective in design and/or formulation, in that, when it left the hands of Monsanto's manufacturers and/or suppliers, it was unreasonably dangerous, unreasonably dangerous in normal use, and more dangerous than ordinary consumers, laborers and users would contemplate.

122. At all relevant times herein, Monsanto, individually and by and through its agents and employees, was negligent in one or more of the following ways:

a) Manufactured, produced, promoted, formulated, created, and/or designed Roundup without thoroughly testing it;

b) Failed to test Roundup and/or failed to adequately, sufficiently, and properly test Roundup;

c) Failed to conduct sufficient testing to determine the safety of "inert" ingredients and/or adjuvants contained within Roundup; the propensity of these ingredients to render Roundup toxic, increase the toxicity of Roundup, or magnify the carcinogenic properties of Roundup; whether these ingredients are carcinogenic; and whether or not "inert" ingredients and/or adjuvants were safe for use;

d) Failed to adequately and correctly warn Plaintiff, Steven A. Shaffer, the public, and the EPA of the dangers of Roundup;

e) Failed to provide adequate cautions and warnings to protect the health of users, handlers, applicators, and persons who would reasonably and foreseeably come into contact with Roundup;

f) Marketed, advertised, and recommended the use of Roundup without sufficient knowledge as to its dangerous propensities;

g) Represented that Roundup was safe for use for its intended purpose, and/or that Roundup was safer than ordinary and common items such as table salt, when, in fact, it was unsafe;

h) Manufactured, produced, and formulated Roundup in a manner, which was dangerous to its users;

    i)      Concealed information from the public while knowing that Roundup was unsafe, dangerous, and/or non-conforming with EPA regulations; and

    j)      Sold Roundup with a false and misleading label.

123.    Monsanto knew, or should have known, that Roundup was in a defective condition and was and is inherently dangerous and unsafe.

124.    Plaintiff, Steven A. Shaffer was exposed to Roundup, as described above, without knowledge of Roundup's dangerous characteristics.

125.    At the time of Plaintiff, Steven A. Shaffer's use and exposure to Roundup, Roundup was being used for the purposes and in a manner normally intended, as a broad-spectrum herbicide.

126.    Monsanto, with this knowledge, voluntarily designed Roundup with a dangerous condition for use by the public and, in particular, Plaintiff Steven A. Shaffer.

127.    Monsanto marketed and promoted Roundup, including in Illinois, to consumers, laborers and users like Plaintiff, Steven A. Shaffer in such a manner so as to make it inherently defective as Monsanto downplayed the product's suspected, probable, and established health risks inherent with its normal, intended use.

128.    As a proximate result of one or more of the foregoing negligent acts and/or omissions, Plaintiff, Steven A. Shaffer was exposed to Roundup.

129.    As a proximate result of one or more of the foregoing negligent acts and/or omissions, Plaintiff Steven A. Shaffer was diagnosed with Diffuse Large B Cell Non-Hodgkin's lymphoma.

130. As a proximate result of one or more of the foregoing negligent acts and/or omissions, Plaintiff, Steven A. Shaffer continues to suffer severe, life altering and life threatening illnesses and complications related to the use of and exposure to Roundup and the resulting treatment for Diffuse Large B Cell Non-Hodgkin's lymphoma, including leukemia and a lung transplant, for which, at the time of filing this Complaint, Plaintiff, Steven A. Shaffer remains hospitalized.

131. As a proximate result of one or more of the foregoing unreasonably dangerous acts, omissions or conditions, Plaintiff, Steven A. Shaffer has suffered and continues to suffer grave injuries, has endured pain and discomfort, as well as economic hardship, including but not limited to, considerable financial expenses for medical care and treatment. Plaintiff, Steven A. Shaffer will continue to incur these expenses in the future.

132. Plaintiff, Steven A. Shaffer did not discover the link between the use of Roundup and the Diffuse Large B Cell Non-Hodgkin's lymphoma diagnosis until November 2022.

133. The running of any statute of limitations has been tolled by reason of Monsanto's fraudulent concealment. Monsanto, through its affirmative misrepresentations and omissions, actively concealed from Plaintiff, Steven A. Shaffer the true risks associated with Roundup.

134. At all relevant times, Monsanto has maintained that Roundup is safe, non-toxic, and non-carcinogenic.

135.    Indeed, even as of July 2016, Monsanto continued to represent to the public that "[r]egulatory authorities and independent experts around the world have reviewed numerous long-term/carcinogenicity and genotoxicity studies and agree that there is *no evidence* that glyphosate, the active ingredient in Roundup® brand herbicides and other glyphosate-based herbicides, causes cancer, even at very high doses, and that it is not genotoxic" (emphasis added).

136.    As a result of Monsanto's actions, Plaintiff, Steven A. Shaffer was unaware, and could not reasonably know or have learned through reasonable diligence, that contact with Roundup exposed Plaintiff, Steven A. Shaffer to the risks alleged herein and that those risks were the direct and proximate result of Monsanto's acts and omissions.

137.    Because of the fraudulent concealment of the true character, quality, and nature of Roundup, Monsanto is estopped from relying on any statute of limitations. Monsanto was under a duty to disclose the true character, quality, and nature of Roundup because this was non-public information over which Monsanto had and continues to have exclusive control, and because Monsanto knew that this information was not available to Plaintiff, Steven A. Shaffer.  In addition, Monsanto is estopped from relying on any statute of limitations because of its intentional concealment of these facts.

138.    Plaintiff, Steven A. Shaffer had no knowledge that Monsanto was engaged in the wrongdoing alleged herein. Because of the fraudulent acts of concealment of wrongdoing by Monsanto, Plaintiff, Steven A. Shaffer could not have reasonably discovered the wrongdoing at any time prior. Additionally, the economics of this fraud should be considered.  Monsanto had the ability to and did spend enormous amounts of

money in furtherance of its purpose of marketing, promoting and/or distributing a profitable herbicide, notwithstanding the known or reasonably knowable risks. Plaintiff, Steven A. Shaffer could not have afforded and could not have possibly conducted studies to determine the nature, extent, and identity of related health risks, and were forced to rely on only Monsanto's representations. Accordingly, Monsanto is precluded by the discovery rule and/or the doctrine of fraudulent concealment from relying upon any statute of limitations.

WHEREFORE, Plaintiff, Steven A. Shaffer respectfully requests that this Court enter judgment in favor of Plaintiff, Steven A. Shaffer and against Defendant, Monsanto Company in excess of $50,000.00, plus the costs of this suit, and for any further relief the Court deems just and equitable.

## COUNT III-LOSS OF CONSORTIUM
### (Bethany Shaffer v. Monsanto Company)

1-112.  Plaintiff, Bethany Shaffer repeats, realleges, and incorporates herein all Allegations Common to All Counts.

113.    In performing his duties as a groundskeeper, Plaintiff, Steven A. Shaffer would regularly mix and spray Roundup between ten (10) to twenty (20) hours per week.

114.    Plaintiff, Steven A. Shaffer did not know the nature and extent of the injuries that could result from the use of and exposure to Roundup.

115.    In 2007, Plaintiff, Steven A. Shaffer and Plaintiff, Bethany Shaffer married.

116.    In 2011, at the age of 33 years old, Plaintiff, Steven A. Shaffer was diagnosed with Diffuse Large B Cell Non-Hodgkin's lymphoma.

117.    Since 2011, Plaintiff, Steven A. Shaffer has continued to suffer severe, life altering and life threatening illnesses and complications related to the use of and exposure to Roundup and the resulting treatment for Diffuse Large B Cell Non-Hodgkin's lymphoma, including a 2014 leukemia diagnosis and a 2022 lung transplant, for which, at the time of filing this Complaint, Plaintiff, Steven A. Shaffer remains hospitalized.

118.    As a proximate result of the injuries sustained by Plaintiff, Steven A. Shaffer as alleged in Count I and Count II of this Complaint, Plaintiff, Bethany Shaffer has been and will continue to be denied the loss of comfort, care, assistance, affection, society, protection and marital intimacy from her martial relationship with Plaintiff, Steven A. Shaffer.

119.    Plaintiff, Bethany Shaffer did not discover the link between the injuries sustained by Plaintiff, Steven A. Shaffer as alleged in County I and Count II of this Complaint and her loss of consortium until November 2022.

120.    The running of any statute of limitations or statute of repose has been tolled by reason of Monsanto's fraudulent concealment. Monsanto, through its affirmative misrepresentations and omissions, actively concealed from Plaintiff, Steven A. Shaffer and Plaintiff Bethany Shaffer the true risks associated with Roundup.

121.    At all relevant times, Monsanto has maintained that Roundup is safe, non-toxic, and non-carcinogenic.

122.    Indeed, even as of July 2016, Monsanto continued to represent to the public that"[r]egulatory authorities and independent experts around the world have reviewed numerous long-term/carcinogenicity and genotoxicity studies and agree that there is *no evidence* that glyphosate, the active ingredient in Roundup® brand herbicides

and other glyphosate-based herbicides, causes cancer, even at very high doses, and that it is not genotoxic" (emphasis added).

123.    As a result of Monsanto's actions, Plaintiff, Steven A. Shaffer and Plaintiff Bethany Shaffer were unaware, and could not reasonably know or have learned through reasonable diligence, that contact with Roundup exposed Plaintiff, Steven A. Shaffer to the risks alleged herein and that those risks were the direct and proximate result of Monsanto's acts and omissions.

124.    Because of the fraudulent concealment of the true character, quality, and nature of Roundup, Monsanto is estopped from relying on any statute of limitations or statute of repose. Monsanto was under a duty to disclose the true character, quality, and nature of Roundup because this was non-public information over which Monsanto had and continues to have exclusive control, and because Monsanto knew that this information was not available to Plaintiff, Steven A. Shaffer, or Plaintiff Bethany Shaffer. In addition, Monsanto is estopped from relying on any statute of limitations or statute of repose because of its intentional concealment of these facts.

125.    Plaintiff, Steven A. Shaffer and Plaintiff, Bethany Shaffer had no knowledge that Monsanto was engaged in the wrongdoing alleged herein. Because of the fraudulent acts of concealment of wrongdoing by Monsanto, Plaintiff, Steven A. Shaffer and Plaintiff, Bethany Shaffer could not have reasonably discovered the wrongdoing at any time prior. Additionally, the economics of this fraud should be considered. Monsanto had the ability to and did spend enormous amounts of money in furtherance of its purpose of marketing, promoting and/or distributing a profitable herbicide, notwithstanding the known or reasonably knowable risks. Plaintiff, Steven A. Shaffer

and Plaintiff, Bethany Shaffer could not have afforded and could not have possibly conducted studies to determine the nature, extent, and identity of related health risks, and were forced to rely on only Monsanto's representations. Accordingly, Monsanto is precluded by the discovery rule and/or the doctrine of fraudulent concealment from relying upon any statute of limitations or statute of repose.

WHEREFORE, Plaintiff, Bethany Shaffer respectfully requests that this Court enter judgment in favor of Plaintiff, Bethany Shaffer and against Defendant, Monsanto Company in excess of $50,000.00, plus the costs of this suit, and for any further relief the Court deems just and equitable.

Respectfully submitted,
Steven A. Shaffer and Bethany Shaffer, Plaintiffs

/s/Wade Callahan
By: Wade Callahan, Attorney

Atty. No. 42458
Wade P. Callahan
Arends & Callahan
10129 S. Western Ave.
Chicago, IL 60643
(773) 298-1500
wade@arendscallahan.com
ac.19273

STATE OF ILLINOIS )
       )   SS:
COUNTY OF COOK )

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## COUNTY DEPARTMENT, LAW DIVISION

| | | |
|---|---|---|
| Steven A. Shaffer and Bethany Shaffer, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Case No. |
| vs. | ) | |
| | ) | |
| Monsanto Company, | ) | |
| | ) | |
| Defendant. | ) | |

### DAMAGES AFFIDAVIT

Pursuant to Supreme Court Rule 222(b), I, Wade P. Callahan, attorney, duly sworn state:

  1. I am the attorney for Plaintiffs in the case captioned *Steven A. Shaffer and Bethany Shaffer vs. Monsanto Company*.

  2. The money damages sought in this matter exceed $50,000.00.

Affiant further saith not.

_____
Affiant

```
OFFICIAL SEAL
WADE B ARENDS
NOTARY PUBLIC - STATE OF ILLINOIS
MY COMMISSION EXPIRES:09/29/24
```

Subscribed and Sworn to before me this
30th day of December 2022

_____
Notary Public

Atty. No. 42458
Wade P. Callahan
Arends & Callahan
10129 S. Western Ave.
Chicago, IL 60643
(773) 298-1500
wade@arendscallahan.com
ac.19291

Case 3:23-md-03082 Document 12-14 Filed 02/16/23 Page 37 of 43 PageID #:42

FILED
12/30/2022 1:06 PM
IRIS Y. MARTINEZ
CIRCUIT CLERK
COOK COUNTY, IL
2022L011552
Calendar, F
20853206

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## COUNTY DEPARTMENT, LAW DIVISION

Steven A. Shaffer and Bethany Shaffer,      )
                                            )
                        Plaintiffs,         )
                                            )     Case No.  2022L011552
vs.                                         )
                                            )
Monsanto Company,                           )
                                            )
                        Defendant.          )

### JURY DEMAND

The undersigned, Plaintiffs Steven A. Shaffer and Bethany Shaffer hereby demand a trial by jury.

Respectfully submitted,
Steven A. Shaffer and Bethany Shaffer, Plaintiffs

/s/Wade Callahan
By: Wade Callahan, Attorney

Atty. No. 42458
Wade P. Callahan
Arends & Callahan
10129 S. Western Ave.
Chicago, IL 60643
(773) 298-1500
wade@arendscallahan.com
ac.19290