**Query**   **Reports**   **Utilities**   **Help**   **Log Out**

# U.S. District Court
## Western District of North Carolina (Statesville)
## CIVIL DOCKET FOR CASE #: 5:23-cv-00013-KDB-DCK

Holbrook v. Monsanto Company
Assigned to: District Judge Kenneth D. Bell
Referred to: Magistrate Judge David Keesler
Cause: 28:1332 Diversity-Product Liability

Date Filed: 01/31/2023
Jury Demand: Plaintiff
Nature of Suit: 365 Personal Inj. Prod.
Liability
Jurisdiction: Diversity

**<u>Plaintiff</u>**

**Vetril Holbrook**

represented by **Jessica S. Williams**
Gomez Trial Attorneys
655 West Broadway
Ste 1700
San Diego, CA 92101
619-237-3490
Fax: 619-237-3496
Email: jwilliams@thegomezfirm.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Sarah Bain Stump**
Whitley Law Firm
3301 Benson Drive, Ste. 120
Raleigh, NC 27609
919-785-5000
Fax: 919-785-3729
Email: sbd@whitleylawfirm.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

**<u>Defendant</u>**

**Monsanto Company**

| Date Filed | # | Docket Text |
|---|---|---|
| 01/31/2023 | 1 | COMPLAINT against All Defendants with Jury Demand ( Filing fee $ 402 receipt number ANCWDC-5922835), filed by Vetril Holbrook.(Stump, Sarah) (Additional attachment(s) added on 1/31/2023: # 1 Cover Sheet) (mek). (Entered: 01/31/2023) |
| 01/31/2023 | | Case assigned to District Judge Kenneth D. Bell and Magistrate Judge David Keesler. Notice: You must click this link to retrieve the **<u>Case Assignment Packet</u>**. *This is your only notice - you will not receive a separate document.*(nvc) (Entered: 01/31/2023) |

| 01/31/2023 | | Clerk's Entry and Service of **Standing Order Requiring an Initial Settlement Conference in Civil Cases** assigned to the Honorable Kenneth D. Bell (5:19-mc-5 (Doc. No. 1)). The parties are directed to click on the link above to retrieve the Order. The filing party is directed to serve a copy of the Order with service. (nvc) (Entered: 01/31/2023) |
|---|---|---|
| 02/01/2023 | 2 | Disclosure Statement of Citizenship of Party or Intervenor by Vetril Holbrook. (Stump, Sarah) (Entered: 02/01/2023) |
| 02/01/2023 | 3 | Corporate Disclosure Statement by Vetril Holbrook. (Stump, Sarah) (Entered: 02/01/2023) |
| 02/01/2023 | 4 | NOTICE of Appearance by Sarah Bain Stump on behalf of Vetril Holbrook (Stump, Sarah) (Entered: 02/01/2023) |
| 02/01/2023 | 5 | MOTION for Leave to Appear Pro Hac Vice as to Jessica S. Williams Filing fee $ 288, receipt number ANCWDC-5924501. by Vetril Holbrook. (Stump, Sarah). Motions referred to David Keesler. (Entered: 02/01/2023) |
| 02/01/2023 | 6 | **ORDER granting 5 Motion for Leave to Appear Pro Hac Vice added Jessica S. Williams for Vetril Holbrook** *(Pro Hac Vice Attorney served via NEF)*. **Signed by Magistrate Judge David Keesler on 2/1/23.** (mga) (Entered: 02/01/2023) |
| 02/01/2023 | | Notice to jwilliams@thegomezfirm.com: Pursuant to Local Rule 83.1 you are required to *(Attorney served via NEF)* Deadline by 2/8/2023. (mga) (Entered: 02/01/2023) |
| 02/09/2023 | | SECOND Notice to Jessica S. Williams: Pursuant to Local Rule 83.1 you are required to **Register** for E-Filing Access or Link Existing Account **Link**. *(Attorney served via NEF)* Deadline by 2/16/2023. (rth) (Entered: 02/09/2023) |
| 02/10/2023 | 7 | Summons Issued Electronically as to Monsanto Company. **NOTICE: Counsel shall print the summons and serve with other case opening documents in accordance with Fed.R.Civ.P.4** . (nvc) (Entered: 02/10/2023) |

| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 02/16/2023 10:36:02 | | | |
| **PACER Login:** | sh0019sh | **Client Code:** | 31943.356965 rhb |
| **Description:** | Docket Report | **Search Criteria:** | 5:23-cv-00013-KDB-DCK |
| **Billable Pages:** | 2 | **Cost:** | 0.20 |

THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| VETRIL HOLBROOK, by and through her representatives BRYCE HOLBROOK and SUWON HOLBROOK, and on behalf of all living heirs, | ) ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) |
| MONSANTO COMPANY, | ) ) |
| Defendant. | ) ) |

Case No. 5:23-cv-13

**COMPLAINT AND
DEMAND FOR JURY TRIAL**

## INTRODUCTION

Plaintiff VETRIL HOLBROOK, by through her representatives BRYCE HOLBROOK and SUWON HOLBROOK and on behalf of all living heirs ("Plaintiff"), brings this action against Defendant Monsanto Company, and allege as follows:

## JURISDICTION AND VENUE

1.     This Court has jurisdiction over Defendants and this action pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship between Plaintiff and Defendants. Defendants are all either incorporated and/or have their principal place of business outside of the state in which the Plaintiff resides.

2.     The amount in controversy between Plaintiff and Defendants exceeds $75,000, exclusive of interest and cost.

3.     The Court also has supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

4.     Venue is proper within this district pursuant to 28 U.S.C. § 1391 in that Defendants

conduct business here and are subject to personal jurisdiction in this district. Furthermore, Defendants sell, market, and/or distribute Roundup® within the District of North Carolina. Also, a substantial part of the acts and/or omissions giving rise to these claims occurred within this district.

## THE PARTIES

### *Plaintiff*

5.      Plaintiff Vetril Holbrook was a citizen of North Carolina and at all times relevant resided in the County of Wilkes County. Plaintiff Vetril Holbrook purchased and used Roundup® in North Carolina for many years prior to her diagnosis of Large B-Cell Lymphoma, a subtype of non-Hodgkin lymphoma ("NHL") in or about January 2021. Plaintiff Vetril Holbrook's diagnosis of Large B-Cell Lymphoma ultimately caused her death on February 2, 2021.

6.      Bryce Holbrook is a citizen of North Carolina and resides in the County of Wilkes County. Bryce Holbrook is the child of Vetril Holbrook and is the next of kin and Personal Representative of the Estate of Vetril Holbrook, a North Carolina Estate.

7.      Plaintiff Suwon Holbrook is a citizen of North Carolina and resides in the County of Wilkes County. Plaintiff Suwon Holbrook is the child of Vetril Holbrook and is the next of kin and Personal Representative of the Estate of Vetril Holbrook, a North Carolina Estate.

### *Defendant*

8.      Defendant Monsanto Company is a Delaware corporation with its headquarters and principal place of business in St. Louis, Missouri.

9.      At all times relevant to this complaint, Monsanto was the entity that discovered the herbicidal properties of glyphosate and the manufacturer of Roundup®, which contains the active ingredient glyphosate and the surfactant POEA, as well as adjuvants and other "inert" ingredients.

10.     Defendant advertises and sell goods, specifically Roundup, in the State of North

Carolina.

11. Defendant transacted and conducted business within the State of North Carolina that relates to the allegations in this Complaint.

12. Defendant derived substantial revenue from goods and products used in the State of North Carolina.

13. Defendant expected or should have expected their acts to have consequences within the State of North Carolina, and derived substantial revenue from interstate commerce.

14. Defendant engaged in the business of designing, developing, manufacturing, testing, packaging, marketing, distributing, labeling, and/or selling Roundup.

15. Defendant is authorized to do business in North Carolina and derive substantial income from doing business in this state.

16. Upon information and belief, Defendant purposefully availed themselves of the privilege of conducting activities with the State of North Carolina, thus invoking the benefits and protections of its laws.

17. Upon information and belief, Defendant designed, sold, advertised, manufactured and/or distributed Roundup, with full knowledge of its dangerous and defective nature.

## FACTUAL ALLEGATIONS

18. At all relevant times, Defendant was in the business of, and did, design, research, manufacture, test, advertise, promote, market, sell, distribute, and/or have acquired and are responsible for Defendant who has designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed the commercial herbicide Roundup.

19. Monsanto is a multinational agricultural biotechnology corporation based in St. Louis, Missouri. It is the world's leading producer of glyphosate.

20. Defendant discovered the herbicidal properties of glyphosate during the 1970's and

subsequently began to design, research, manufacture, sell and distribute glyphosate based "Roundup" as a broad-spectrum herbicide.

21.     Glyphosate is the active ingredient in Roundup.

22.     Glyphosate is a broad-spectrum herbicide used to kill weeds and grasses known to compete with commercial crops grown around the globe.

23.     Glyphosate is a "non-selective" herbicide, meaning it kills indiscriminately based only on whether a given organism produces a specific enzyme, 5-enolpyruvylshikimic acid-3-phosphate synthase, known as EPSP synthase.

24.     Glyphosate inhibits the enzyme 5-enolpyruvylshikimic acid-3-phosphate synthase that interferes with the shikimic pathway in plants, resulting in the accumulation of shikimic acid in plant tissue and ultimately plant death.

25.     Sprayed as a liquid, plants absorb glyphosate directly through their leaves, stems, and roots, and detectable quantities accumulate in the plant tissues.

26.     Each year, approximately 250 million pounds of glyphosate are sprayed on crops, commercial nurseries, suburban lawns, parks, and golf courses. This increase in use has been driven largely by the proliferation of genetically engineered crops, crops specifically tailored to resist the activity of glyphosate.

27.     Defendant is intimately involved in the development, design, manufacture, marketing, sale, and/or distribution of genetically modified ("GMO") crops, many of which are marketed as being resistant to Roundup i.e., "Roundup Ready®." As of 2009, Defendant was the world's leading producer of seeds designed to be Roundup Ready®. In 2010, an estimated 70% of corn and cotton, and 90% of soybean fields in the United States contained Roundup Ready® seeds.

28.     The original Roundup, containing the active ingredient glyphosate, was introduced in 1974. Today, glyphosate products are among the world's most widely used herbicides.

Monsanto's glyphosate products are registered in more than 130 countries and are approved for weed control in more than 100 crops. No other herbicide active ingredient compares in terms of number of approved uses.[1]

29.     For nearly 40 years, farmers across the globe have used Roundup, unaware of its carcinogenic properties.

### REGISTRATION OF HERBICIDES UNDER FEDERAL LAW

30.     The manufacture, formulation and distribution of herbicides, such as Roundup, are regulated under the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA"), 7. U.S.C. § 136 *et seq*. FIFRA requires that all pesticides be registered with the Environmental Protection Agency ("EPA) prior to their distribution, sale, or use, except as described by FIFRA 7 U.S.C. 136a(a).

31.     The EPA requires as part of the registration process, among other requirements, a variety of tests to evaluate the potential for exposure to pesticides, toxicity to people and other potential non-target organisms, and other adverse effects on the environment. Registration by the EPA, however, is not an assurance or finding of safety. The determination the EPA makes in registering or re-registering a product is not that the product is "safe," but rather that use of the product in accordance with its label directions "will not generally cause unreasonable adverse effects on the environment." 7 U.S.C. § 136(a)(c)(5)(D).

32.     FIFRA defines "unreasonable adverse effects on the environment" to mean "any unreasonable risk to man or the environment, taking into account the economic, social, and environmental costs and benefits of the use of any pesticide." 7 U.S.C. § 136(bb). FIFRA thus requires the EPA to make a risk/benefit analysis in determining whether a registration should be granted or allowed to continue to be sold in commerce.

---

[1] 2 *Backgrounder*, History of Monsanto's Glyphosate Herbicides, June 2005.

33.     The EPA and the State of North Carolina registered Roundup for distribution, sale, and manufacture in the United States and the State of North Carolina.

34.     FIFRA generally requires that the registrant, Monsanto, conduct health and safety testing of pesticide products. The government is not required, nor is it able, to perform the product tests that are required of the manufacturer.

35.     The evaluation of each pesticide product distributed, sold, or manufactured is completed at the time the product is initially registered. The data necessary for registration of a pesticide has changed over time. The EPA is now in the process of re-evaluating all pesticide products through a Congressionally-mandated process called "re-registration." 7 U.S.C. § 136a-1. In order to reevaluate these pesticides, the EPA demands the completion of additional tests and the submission of data for the EPA's review and evaluation.

36.     In the case of glyphosate and Roundup, the EPA had planned on releasing its preliminary risk assessment – in relation to the registration process – no later than July 2015. The EPA completed its review of glyphosate in early 2015, but delayed releasing the assessment pending further review in light of the World Health Organization's findings.

## MONSANTO'S FALSE REPRESENTATIONS REGARDING THE SAFETY OF ROUNDUP®

37.     In 1996, the New York Attorney General ("NYAG") filed a lawsuit against Monsanto based on its false and misleading advertising of Roundup products. Specifically, the lawsuit challenged Monsanto's general representations that its spray-on glyphosate-based herbicides, including Roundup, were "safer **than table salt**" and "practically **non-toxic**" to mammals, birds, and fish. Among the representations the NYAG found deceptive and misleading about the human and environmental safety of Roundup are the following:

a.) Remember that environmentally friendly Roundup herbicide is

biodegradable. It won't build up in the soil so you can use Roundup with confidence along customers' driveways, sidewalks and fences ...

b.) And remember that Roundup is biodegradable and won't build up in the soil. That will give you the environmental confidence you need to use Roundup everywhere you've got a weed, brush, edging or trimming problem.

c.) Roundup biodegrades into naturally occurring elements.

d.) Remember that versatile Roundup herbicide stays where you put it. That means there's no washing or leaching to harm customers' shrubs or other desirable vegetation.

e.) This non-residual herbicide will not wash or leach in the soil. It ... stays where you apply it.

f.) You can apply Accord with "confidence because it will stay where you put it" it bonds tightly to soil particles, preventing leaching. Then, soon after application, soil microorganisms biodegrade Accord into natural products.

g.) Glyphosate is less toxic to rats than table salt following acute oral ingestion.

h.) Glyphosate's safety margin is much greater than required. It has over a 1,000-fold safety margin in food and over a 700-fold safety margin for workers who manufacture it or use it.

i.) You can feel good about using herbicides by Monsanto. They carry a toxicity category rating of 'practically non-toxic' as it

pertains to mammals, birds and fish.

j.) "Roundup can be used where kids and pets will play and breaks down into natural material." This ad depicts a person with his head in the ground and a pet dog standing in an area which has been treated with Roundup.[2]

38. On November 19, 1996, Monsanto entered into an Assurance of Discontinuance with NYAG, in which Monsanto agreed, among other things, "to cease and desist from publishing or broadcasting any advertisements [in New York] that represent, directly or by implication" that:

a.) its glyphosate-containing pesticide products or any component thereof are safe, non-toxic, harmless or free from risk.

b.) its glyphosate-containing pesticide products or any component thereof manufactured, formulated, distributed or sold by Monsanto are biodegradable

c.) its glyphosate-containing pesticide products or any component thereof stay where they are applied under all circumstances and will not move through the environment by any means.

d.) its glyphosate-containing pesticide products or any component thereof are "good" for the environment or are "known for their environmental characteristics."

e.) glyphosate-containing pesticide products or any component thereof are safer or less toxic than common consumer products other than herbicides;

---

[2] Attorney General of the State of New York, In the Matter of Monsanto Company, Assurance of Discontinuance Pursuant to Executive Law § 63(15) (Nov. 1996).

> f.) its glyphosate-containing products or any component thereof
>
> might be classified as "practically non-toxic.

39.     Monsanto did not alter its advertising in the same manner in any state other than New York, and on information and belief still has not done so today.

40.     In 2009, France's highest court ruled that Monsanto had not told the truth about the safety of Roundup. The French court affirmed an earlier judgment that Monsanto had falsely advertised its herbicide Roundup as "biodegradable" and that it "left the soil clean."[3]

## EVIDENCE OF CARCINOGENICITY IN ROUNDUP

41.     As early as the 1980's, Monsanto was aware of glyphosate's carcinogenic properties.

42.     On March 4, 1985, a group of the Environmental Protection Agency's ("EPA") Toxicology Branch published a memorandum classifying glyphosate as a Category C oncogene.[4] Category C oncogenes are possible human carcinogens with limited evidence of carcinogenicity.

43.     In 1986, the EPA issued a Registration Standard for glyphosate (NTIS PB87-103214). The Registration standard required additional phytotoxicity, environmental fate, toxicology, product chemistry, and residue chemistry studies. All of the data required was submitted and reviewed and/or waived.[5]

44.     In October 1991, the EPA published a Memorandum entitled "Second Peer Review of Glyphosate." The memorandum changed glyphosate's classification to Group E (evidence of non-carcinogenicity for humans). Two peer review committee members did not concur with the conclusions of the committee and one member refused to sign.[6]

---

[3] *Monsanto Guilty in 'False Ad' Row,* BBC, Oct. 15, 2009, *available at* http://news.bbc.co.uk/2/hi/europe/8308903.stm.
[4] Consensus Review of Glyphosate, Casewell No. 661A. March 4, 1985. United States Environmental Protection Agency.
[5] http://www.epa.gov/oppsrrd1/reregistration/REDs/factsheets/0178fact.pdf
[6] Second Peer Review of Glyphosate, CAS No. 1071-83-6. October 30, 1881. United States Environmental

45.     In addition to the toxicity of the active molecule, many studies support the hypothesis that glyphosate formulations found in Defendant's Roundup products are more dangerous and toxic than glyphosate alone.[7] As early as 1991, evidence existed demonstrating that glyphosate formulations were significantly more toxic than glyphosate alone.[8]

46.     In 2002, Julie Marc published a study entitled "Pesticide Roundup Provokes Cell Division Dysfunction at the Level of CDK1/Cyclin B Activation."

47.     The study found that Defendant's Roundup caused delays in the cell cycles of sea urchins, while the same concentrations of glyphosate alone proved ineffective and did not alter cell cycles.

48.     In 2004, Julie Marc published a study entitled "Glyphosate-based pesticides affect cell cycle regulation." The study demonstrated a molecular link between glyphosate-based products and cell cycle dysregulation.

49.     The study noted that "cell-cycle dysregulation is a hallmark of tumor cells and human cancer. Failure in the cell-cycle checkpoints leads to genomic instability and subsequent development of cancers from the initial affected cell." Further, "[s]ince cell cycle disorders such as cancer result from dysfunction of unique cell, it was of interest to evaluate the threshold dose of glyphosate affecting cells."[9]

50.     In 2005, Francisco Peixoto published a study showing that Roundup's effects on rat liver mitochondria are much more toxic and harmful than the same concentrations of glyphosate alone.

51.     The Peixoto study suggested that the harmful effects of Roundup on mitochondrial bioenergetics could not be exclusively attributed to glyphosate and could be the result of other

---

Protection Agency.

[7] Martinez et al. 2007; Benachour 2009; Gasnier et al. 2010; Peixoto 2005; Marc 2004
[8] Martinez et al 1991.
[9] (Molinari, 2000; Stewart et al., 2003)

chemicals, namely the surfactant POEA, or alternatively due to the possible synergy between glyphosate and Roundup formulation products.

52.     In 2009, Nora Benachour and Gilles-Eric Seralini published a study examining the effects of Roundup and glyphosate on human umbilical, embryonic, and placental cells.

53.     The study used dilution levels of Roundup and glyphosate far below agricultural recommendations, corresponding with low levels of residues in food. The study concluded that supposed "inert" ingredients, and possibly POEA, change human cell permeability and amplify toxicity of glyphosate alone. The study further suggested that determinations of glyphosate toxicity should take into account the presence of adjuvants, or those chemicals used in the formulation of the complete pesticide. The study confirmed that the adjuvants in Roundup are not inert and that Roundup is always more toxic than its active ingredient glyphosate.

54.     The results of these studies were confirmed in recently published peer-reviewed studies and were at all times available and/or known to Defendant.

55.     Defendant knew or should have known that Roundup is more toxic than glyphosate alone and that safety studies on Roundup, Roundup's adjuvants and "inert" ingredients, and/or the surfactant POEA were necessary to protect Plaintiff from Roundup.

56.     Defendant knew or should have known that tests limited to Roundup's active ingredient glyphosate were insufficient to prove the safety of Roundup.

57.     Defendant failed to appropriately and adequately test Roundup, Roundup's adjuvants and "inert" ingredients, and/or the surfactant POEA to protect Plaintiff from Roundup.

58.     Rather than performing appropriate tests, Defendant relied upon flawed industry-supported studies designed to protect Defendant's economic interests rather than Plaintiff and the consuming public.

59.     Despite their knowledge that Roundup was considerably more dangerous than

glyphosate alone, Defendant continued to promote Roundup as safe.

## IARC CLASSIFICATION OF GLYPHOSATE

60.     The International Agency for Research on Cancer ("IARC") is the specialized intergovernmental cancer agency the World Health Organization ("WHO") of the United Nations tasked with conducting and coordinating research into the causes of cancer.

61.     An IARC Advisory Group to Recommend Priorities for IARC Monographs during 2015–2019 met in April 2014. Though nominations for the review were solicited, a substance must meet two criteria to be eligible for review by the IARC Monographs: there must already be some evidence of carcinogenicity of the substance, and there must be evidence that humans are exposed to the substance.

62.     IARC set glyphosate for review in 2015-2016. IARC uses five criteria for determining priority in reviewing chemicals. The substance must have a potential for direct impact on public health; scientific literature to support suspicion of carcinogenicity; evidence of significant human exposure; high public interest and/or potential to bring clarity to a controversial area and/or reduce public anxiety or concern; related agents similar to one given high priority by the above considerations. Data reviewed is sourced preferably from publicly accessible, peer-reviewed data.

63.     On March 24, 2015, after its cumulative review of human, animal, and DNA studies for more than one (1) year, many of which have been in Defendant's possession since as early as 1985, the IARC's working group published its conclusion that the glyphosate contained in Defendants' Roundup herbicide, is a Class 2A "probable carcinogen" as demonstrated by the mechanistic evidence of carcinogenicity in humans and sufficient evidence of carcinogenicity in animals.

64.     The IARC's full Monograph was published on July 29, 2015 and established

glyphosate as a class 2A probable carcinogen to humans. According to the authors glyphosate demonstrated sufficient mechanistic evidence (genotoxicity and oxidative stress) to warrant a 2A classification based on evidence of carcinogenicity in humans and animals.

65.     The IARC Working Group found an increased risk between exposure to glyphosate and non-Hodgkin's lymphoma ("NHL") and several subtypes of NHL, and the increased risk continued after adjustment for other pesticides.

66.     The IARC also found that glyphosate caused DNA and chromosomal damage in human cells.

## EARLIER EVIDENCE OF GLYPHOSATE'S DANGER

67.     Despite the new classification by the IARC, Defendant has had ample evidence of glyphosate and Roundup's genotoxic properties for decades.

68.     Genotoxicity refers to chemical agents that are capable of damaging the DNA within a cell through genetic mutations, which is a process that is believed to lead to cancer.

69.     In 1997, Chris Clements published "Genotoxicity of select herbicides in *Rana catesbeiana* tadpoles using the alkaline single-cell gel DNA electrophoresis (comet) assay."

70.     The study found that tadpoles exposed to Roundup showed significant DNA damage when compared with unexposed control animals.

71.     Both human and animal studies have shown that glyphosate and glyphosate-based formulations such as Roundup can induce oxidative stress.

72.     Oxidative stress and associated chronic inflammation are believed to be involved in carcinogenesis.

73.     The IARC Monograph notes that "[s]trong evidence exists that glyphosate, AMPA and glyphosate-based formulations can induce oxidative stress."

74.     In 2006 César Paz-y-Miño published a study examining DNA damage in human

subjects exposed to glyphosate.

75.     The study produced evidence of chromosomal damage in blood cells showing significantly greater damage after exposure to glyphosate than before in the same individuals, suggesting that the glyphosate formulation used during aerial spraying had a genotoxic effect on exposed individuals.

76.     The IARC Monograph reflects the volume of evidence of glyphosate pesticides' genotoxicity noting "[t]he evidence for genotoxicity caused by glyphosate-based formulations is strong."

77.     Despite knowledge to the contrary, Defendant maintains that there is no evidence that Roundup is genotoxic, that regulatory authorities and independent experts are in agreement that Roundup is not genotoxic, and that there is no evidence that Roundup is genotoxic.

78.     In addition to glyphosate and Roundup's genotoxic properties, Defendant has long been aware of glyphosate's carcinogenic properties.

79.     Glyphosate and Roundup in particular have long been associated with carcinogenicity and the development of numerous forms of cancer, including, but not limited to, non-Hodgkin's lymphoma, Hodgkin's lymphoma, multiple myeloma, and soft tissue sarcoma.

80.     Defendant has known of this association since the early to mid-1980s and numerous human and animal studies have evidenced the carcinogenicity of glyphosate and/or Roundup.

81.     In 1985, the EPA studied the effects of glyphosate in mice finding a dose related response in male mice linked to renal tubal adenomas, a rare tumor. The study concluded the glyphosate was oncogenic.

82.     In 200, Lennart Hardell and Mikael Eriksson published the results of two case-controlled studies on pesticides as a risk factor for NHL and hairy cell leukemia.

83.     The study concluded that glyphosate had the most significant relationship to NHL

among all herbicide studies with an increased odds ratio of 3.11.

84.    In 2003, AJ De Roos published a study examining the pooled data of mid-western farmers, examining pesticides and herbicides as risk factors for NHL.

85.    The study, which controlled for potential confounders, found a relationship between increased NHL incidence and glyphosate.

86.    In 2008, Mikael Eriksson published a study a population-based case-control study of exposure to various pesticides as a risk factor for NHL.

87.    This strengthened previous associations between glyphosate and NHL.

88.    In spite of this knowledge, Defendant continued to issue broad and sweeping statements suggesting that Roundup was, and is, safer than ordinary household items such as table salt, despite a lack of scientific support for the accuracy and validity of these statements and, in fact, voluminous evidence to the contrary.

89.    Upon information and belief, these statements and representations have been made with the intent of inducing Plaintiff, the agricultural community, and the public at large to purchase, and increase the use of, Defendant's Roundup for Defendant's pecuniary gain, and in fact did induce Plaintiff to use Roundup.

90.    Defendant made these statements with complete disregard and reckless indifference to the safety of Plaintiff and the general public.

91.    Notwithstanding Defendant's representations, scientific evidence has established a clear association between glyphosate and genotoxicity, inflammation, and an increased risk of many cancers, including, but not limited to, NHL, Multiple Myeloma, and soft tissue sarcoma.

92.    Defendant knew or should have known that glyphosate is associated with an increased risk of developing cancer, including, but not limited to, NHL, Multiple Myeloma, and soft tissue sarcomas.

93.     Defendant failed to appropriately and adequately inform and warn Plaintiff of the serious and dangerous risks associated with the use of and exposure to glyphosate and/or Roundup, including, but not limited to, the risk of developing NHL, as well as other severe and personal injuries, which are permanent and/or long-lasting in nature, cause significant physical pain and mental anguish, diminished enjoyment of life, and the need for medical treatment, monitoring and/or medications.

94.     Despite the IARC's classification of glyphosate as a class 2A probable carcinogen, Defendant continues to maintain that glyphosate and/or Roundup is safe, non-carcinogenic, non-genotoxic, and falsely warrant to users and the general public that independent experts and regulatory agencies agree that there is no evidence of carcinogenicity or genotoxicity in glyphosate and Roundup.

95.     Defendant has claimed and continues to claim that Roundup is safe, non-carcinogenic, and non-genotoxic.

96.     Monsanto claims on its website that "[r]egulatory authorities and independent experts around the world have reviewed numerous long-term/carcinogenicity and genotoxicity studies and agree that there is no evidence that glyphosate, the active ingredient in Roundup brand herbicides and other glyphosate-based herbicides, causes cancer, even at very high doses, and that it is not genotoxic".[10]

97.     Ironically, the primary source for this statement is a 1986 report by the WHO, the same organization that now considers glyphosate to be a probable carcinogen.

98.     Glyphosate, and Defendant's Roundup products in particular, have long been associated with serious side effects and many regulatory agencies around the globe have banned

---

[10] Backgrounder - Glyphosate: No Evidence of Carcinogenicity. Updated November 2014. (downloaded October 9 2015)

or are currently banning the use of glyphosate herbicide products.

99.     Defendant's statements proclaiming the safety of Roundup and disregarding its dangers misled Plaintiff.

100.    Despite Defendant's knowledge that Roundup was associated with an elevated risk of developing cancer, Defendant's promotional campaigns focused on Roundup's purported "safety profile."

101.    Defendant's failure to adequately warn Plaintiff resulted in (1) Plaintiff using and being exposed to glyphosate instead of using another acceptable and safe method of controlling unwanted weeds and pests; and (2) scientists and physicians failing to warn and instruct consumers about the risk of cancer, including NHL, and other injuries associated with Roundup.

102.    Defendant failed to seek modification of the labeling of Roundup to include relevant information regarding the risks and dangers associated with Roundup exposure.

103.    The failure of Defendant to appropriately warn and inform the EPA has resulted in inadequate warnings in safety information presented directly to users and consumers.

104.    The failure of Defendant to appropriately warn and inform the EPA has resulted in the absence of warning or caution statements that are adequate to protect health and the environment.

105.    The failure of Defendant to appropriately warn and inform the EPA has resulted in the directions for use that are not adequate to protect health and the environment.

106.    By reason of the foregoing acts and omissions, Plaintiff seeks compensatory damages as a result of Plaintiff's use of, and exposure to, Roundup which caused or was a substantial contributing factor in causing Plaintiff to suffer from cancer, specifically NHL, and Plaintiff suffered severe and personal injuries which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life.   Sadly, Plaintiff's injuries

ultimately led to her death.

107.     By reason of the foregoing, Plaintiff was severely and permanently injured.

108.     By reason of the foregoing acts and omissions, Plaintiff endured and suffered emotional and mental anguish, medical expenses, and other economic and non-economic damages, as a result of the actions and inactions of the Defendant.

## PLAINTIFF'S EXPOSURE TO ROUNDUP

109.     Plaintiff used Roundup to control weeds both on her residential property and around their farm and fence area where their cattle was held.

110.     For many years, Plaintiff sprayed Roundup on a regular basis. Plaintiff followed all safety and precautionary warnings during the course of use.

111.     Plaintiff was subsequently diagnosed with large B-cell Non-Hodgkin Lymphoma in January 2021.

112.     Plaintiff passed away from large B-cell Non-Hodgkin Lymphoma on February 2, 2021 in Wilkes County in North Carolina.

113.     As a result of her injury, Plaintiff has incurred significant economic and non-economic damages.

## EQUITABLE TOLLING OF APPLICABLE STATUTE OF LIMITATIONS

114.     Plaintiff incorporates by reference all prior paragraphs of this Complaint as if fully set forth herein.

115.     The running of any statute of limitations has been tolled by reason of Defendant's fraudulent concealment. Defendant, through their affirmative misrepresentations and omissions, actively concealed from Plaintiff the true risks associated with Roundup and glyphosate. Indeed, even as of July 2016, Defendant continued to represent to the public that "*Scientists are in*

*agreement* that there is *no evidence* glyphosate causes cancer." (emphasis added)[11]

116.    As a result of Defendant's actions, Plaintiff was unaware, and could not reasonably know or have learned through reasonable diligence that Roundup and/or glyphosate contact, exposed Plaintiff to the risks alleged herein and that those risks were the direct and proximate result of Defendant's acts and omissions.

117.    Furthermore, Defendant is estopped from relying on any statute of limitations because of their fraudulent concealment of the true character, quality and nature of Roundup. Defendant was under a duty to disclose the true character, quality, and nature of Roundup because this was non-public information over which Defendant had and continues to have exclusive control, and because Defendant knew that this information was not available to Plaintiff or to distributors of Roundup. In addition, Defendant is estopped from relying on any statute of limitations because of their intentional concealment of these facts.

118.    Plaintiff had no knowledge that Defendant was engaged in the wrongdoing alleged herein. Because of the fraudulent acts of concealment of wrongdoing by Defendant, Plaintiff could not have reasonably discovered the wrongdoing at any time prior. Also, the economics of this fraud should be considered. Defendant had the ability to and did spend enormous amounts of money in furtherance of their purpose of marketing, promoting and/or distributing a profitable herbicide, notwithstanding the known or reasonably known risks. Plaintiff and medical professionals could not have afforded and could not have possibly conducted studies to determine the nature, extent, and identity of related health risks, and were forced to rely on only the Defendant's representations. Accordingly, Defendant is precluded by the discovery rule and/or the doctrine of fraudulent concealment from relying upon any statute of limitations.

---

[11]  Backgrounder - Glyphosate: No Evidence of Carcinogenicity. Updated November 2014. (downloaded October 9 2015)

## CLAIM ONE

### STRICT LIABILITY (DESIGN DEFECT)

119.    Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

120.    Plaintiff brings this strict liability claim against Defendant for defective design.

121.    At all times relevant to this litigation, Defendant engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting Roundup® products, which are defective and unreasonably dangerous to consumers and users and other persons coming into contact them, including Plaintiff, thereby placing Roundup® products into the stream of commerce.  These actions were under the ultimate control and supervision of Defendant.  At all times relevant to this litigation, Defendant designed, researched, developed, formulated, manufactured, produced, tested, assembled, labeled, advertised, promoted, marketed, sold, and distributed the Roundup® products used by Plaintiff, and/or to which Plaintiff was exposed, as described above.

122.    At all times relevant to this litigation, Defendant's Roundup® products were manufactured, designed, and labeled in an unsafe, defective, and inherently dangerous manner that was dangerous for use by or exposure to the public, and, in particular, the Plaintiff.

123.    At all times relevant to this litigation, Defendant's Roundup® products reached the intended consumers, handlers, and users or other persons coming into contact with these products in North Carolina and throughout the United States, including Plaintiff, without substantial change in their condition as designed, manufactured, sold, distributed, labeled, and marketed by Defendant.

124.    Defendant's Roundup® products, as researched, tested, developed, designed, licensed, formulated, manufactured, packaged, labeled, distributed, sold, and marketed by

Defendant were defective in design and formulation in that when they left the hands of the Defendant's manufacturers and/or suppliers, they were unreasonably dangerous and dangerous to an extent beyond that which an ordinary consumer would contemplate.

125.    Defendant's Roundup® products, as researched, tested, developed, designed, licensed, formulated, manufactured, packaged, labeled, distributed, sold, and marketed by Defendant were defective in design and formulation in that when they left the hands of Defendant's manufacturers and/or suppliers, the foreseeable risks associated with these products' reasonably foreseeable uses exceeded the alleged benefits associated with their design and formulation.

126.    Therefore, at all times relevant to this litigation, Defendant's Roundup® products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold and marketed by Defendant, were defective in design and formulation, in one or more of the following ways:

a.    When placed in the stream of commerce, Defendant's Roundup® products were defective in design and formulation, and, consequently, dangerous to an extent beyond that which an ordinary consumer would contemplate.

b.    When placed in the stream of commerce, Defendant's Roundup® products were unreasonably dangerous in that they were hazardous and posed a grave risk of cancer and other serious illnesses when used in a reasonably anticipated manner.

c.    When placed in the stream of commerce, Defendant's Roundup® products contained unreasonably dangerous design defects and were not reasonably safe when used in a reasonably anticipated or intended manner.

d.    Defendant did not sufficiently test, investigate, or study its Roundup® products and, specifically, the active ingredient glyphosate.

e. Exposure to Roundup® and glyphosate-containing products presents a risk of harmful side effects that outweighs any potential utility stemming from the use of the herbicide.

f. Defendant knew or should have known at the time of marketing its Roundup® products that exposure to Roundup® and specifically, its active ingredient glyphosate, could result in cancer and other severe illnesses and injuries.

g. Defendant did not conduct adequate post-marketing surveillance of its Roundup® products.

h. Defendant could have employed safer alternative designs and formulations.

127. At all times relevant to this litigation, Plaintiff used and/or was exposed to the use of Defendant's Roundup® products in an intended or reasonably foreseeable manner without knowledge of their dangerous characteristics.

128. Plaintiff could not have reasonably discovered the defects and risks associated with Roundup® or glyphosate-containing products before or at the time of exposure.

129. The harm caused by Defendant's Roundup® products far outweighed their benefit, rendering Defendant's products dangerous to an extent beyond that which an ordinary consumer would contemplate. Defendant's Roundup® products were and are more dangerous than alternative products and Defendant could have designed its Roundup® products to make them less dangerous. Indeed, at the time that Defendant designed its Roundup® products, the state of the industry's scientific knowledge was such that a less risky design or formulation was attainable.

130. At the time Roundup® products left Defendant's control, there was a practical, technically feasible, and safer alternative design that would have prevented the harm without substantially impairing the reasonably anticipated or intended function of Defendant's Roundup® herbicides.

131.    Defendant's defective design of Roundup® amounts to willful, wanton, and/or reckless conduct by Defendant.

132.    Therefore, as a result of the unreasonably dangerous condition of its Roundup® products, Defendant is strictly liable to Plaintiff.

133.    The defects in Defendant's Roundup® products were substantial and contributing factors in causing Plaintiff's grave injuries, and, but for Defendant's misconduct and omissions, Plaintiff would not have sustained her injuries.

134.    As a direct and proximate result of Defendant placing its defective Roundup® products into the stream of commerce, Plaintiff suffered grave injuries, and endured pain and discomfort, as well as economic hardship, including considerable financial expenses for medical care and treatment.

135.    WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in Plaintiff's favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees, and all such other and further relief as this Court deems just and proper. Plaintiff also demands a jury trial on the issues contained herein.

## CLAIM TWO

### STRICT LIABILITY (FAILURE TO WARN)

136.    Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

137.    Plaintiff brings this strict liability claim against Defendant for failure to warn.

138.    At all times relevant to this litigation, Defendant engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting Roundup® products, which are defective and unreasonably dangerous to consumers, including Plaintiff, because they do not contain adequate warnings or instructions concerning the dangerous

characteristics of Roundup® and specifically, the active ingredient glyphosate. These actions were under the ultimate control and supervision of Defendant.

139. Defendant researched, developed, designed, tested, manufactured, inspected, labeled, distributed, marketed, promoted, sold, and otherwise released into the stream of commerce its Roundup® products, and in the course of same, directly advertised or marketed the products to consumers and end users, including Plaintiff, and Defendant therefore had a duty to warn of the risks associated with the reasonably foreseeable uses (and misuses) of Roundup® and glyphosate-containing products.

140. At all times relevant to this litigation, Defendant had a duty to properly test, develop, design, manufacture, inspect, package, label, market, promote, sell, distribute, maintain supply, provide proper warnings, and take such steps as necessary to ensure that its Roundup® products did not cause users and consumers to suffer from unreasonable and dangerous risks. Defendant had a continuing duty to warn Plaintiff of the dangers associated with Roundup® use and exposure. Defendant, as manufacturer, seller, or distributor of chemical herbicides, is held to the knowledge of an expert in the field.

141. At the time of manufacture, Defendant could have provided warnings or instructions regarding the full and complete risks of Roundup® and glyphosate-containing products because it knew or should have known of the unreasonable risks of harm associated with the use of and/or exposure to these products.

142. At all times relevant to this litigation, Defendant failed to investigate, study, test, or promote the safety or to minimize the dangers to users and consumers of its Roundup® products and to those who would foreseeably use or be harmed by Defendant's herbicides, including Plaintiff.

143. Despite the fact that Defendant knew or should have known that Roundup®

products posed a grave risk of harm, it failed to warn of the dangerous risks associated with their use and exposure. The dangerous propensities of its products and the carcinogenic characteristics of glyphosate, as described above, were known to Defendant, or scientifically knowable to Defendant through appropriate research and testing by known methods, at the time it distributed, supplied, or sold the product, and not known to end users and consumers, such as Plaintiff.

144.    Defendant knew or should have known that its Roundup® and glyphosate-containing products created significant risks of serious bodily harm to consumers, as alleged herein, and Defendant failed to adequately warn consumers and reasonably foreseeable users of the risks of exposure to these products. Defendant has wrongfully concealed information concerning the dangerous nature of Roundup® and its active ingredient glyphosate, and further made false and/or misleading statements concerning the safety of Roundup® and glyphosate.

145.    At all times relevant to this litigation, Defendant's Roundup® products reached the intended consumers, handlers, and users or other persons coming into contact with these products throughout the United States, including Plaintiff, without substantial change in their condition as designed, manufactured, sold, distributed, labeled, and marketed by Defendant.

146.    At all times relevant to this litigation, Plaintiff used and/or was exposed to the use of Defendant's Roundup® products in their intended or reasonably foreseeable manner without knowledge of their dangerous characteristics.

147.    Plaintiff could not have reasonably discovered the defects and risks associated with Roundup® or glyphosate-containing products before or at the time of Plaintiff's exposure. Plaintiff relied upon the skill, superior knowledge, and judgment of Defendant.

148.    Defendant knew or should have known that the minimal warnings disseminated with its Roundup® products were inadequate, but it failed to communicate adequate information on the dangers and safe use/exposure and failed to communicate warnings and instructions that

were appropriate and adequate to render the products safe for their ordinary, intended, and reasonably foreseeable uses, including agricultural and horticultural applications.

149.    The information that Defendant did provide or communicate failed to contain relevant warnings, hazards, and precautions that would have enabled agricultural workers, horticultural workers and/or at-home users such as Plaintiff to utilize the products safely and with adequate protection. Instead, Defendant disseminated information that was inaccurate, false, and misleading and which failed to communicate accurately or adequately the comparative severity, duration, and extent of the risk of injuries associated with use of and/or exposure to Roundup® and glyphosate; continued to aggressively promote the efficacy of its products, even after it knew or should have known of the unreasonable risks from use or exposure; and concealed, downplayed, or otherwise suppressed, through aggressive marketing and promotion, any information or research about the risks and dangers of exposure to Roundup® and glyphosate.

150.    To this day, Defendant has failed to adequately and accurately warn of the true risks of Plaintiff's injuries associated with the use of and exposure to Roundup® and its active ingredient glyphosate, a probable carcinogen.

151.    As a result of their inadequate warnings, Defendant's Roundup® products were defective and unreasonably dangerous when they left the possession and/or control of Defendant, were distributed by Defendant, and used by Plaintiff.

152.    Defendant is liable to Plaintiff for injuries caused by its failure, as described above, to provide adequate warnings or other clinically relevant information and data regarding the appropriate use of its Roundup® products and the risks associated with the use of or exposure to Roundup® and glyphosate.

153.    The defects in Defendant's Roundup® products were substantial and contributing factors in causing Plaintiff's injuries, and, but for Defendant's misconduct and omissions, Plaintiff

would not have sustained her injuries.

154.    Had Defendant provided adequate warnings and instructions and properly disclosed and disseminated the risks associated with its Roundup® products, Plaintiff could have avoided the risk of developing injuries as alleged herein.

155.    As a direct and proximate result of Defendant placing its defective Roundup® products into the stream of commerce, Plaintiff suffered severe injuries, and endured physical pain and discomfort, as well as economic hardship, including considerable financial expenses for medical care and treatment.

156.    WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in Plaintiff's favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees, and all such other and further relief as this Court deems just and proper. Plaintiff also demands a jury trial on the issues contained herein.

## CLAIM THREE

## NEGLIGENCE

157.    Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

158.    Defendant, directly or indirectly, caused Roundup® products to be sold, distributed, packaged, labeled, marketed, promoted, and/or used by Plaintiff.

159.    At all times relevant to this litigation, Defendant had a duty to exercise reasonable care in the design, research, manufacture, marketing, advertisement, supply, promotion, packaging, sale, and distribution of its Roundup® products, including the duty to take all reasonable steps necessary to manufacture, promote, and/or sell a product that was not unreasonably dangerous to consumers, users, and other persons coming into contact with the product.

160.    At all times relevant to this litigation, Defendant had a duty to exercise reasonable

care in the marketing, advertisement, and sale of its Roundup® products. Defendant's duty of care owed to consumers and the general public included providing accurate, true, and correct information concerning the risks of using Roundup® and appropriate, complete, and accurate warnings concerning the potential adverse effects of exposure to Roundup® and, in particular, its active ingredient glyphosate.

161.     At all times relevant to this litigation, Defendant knew or, in the exercise of reasonable care, should have known of the hazards and dangers of Roundup® and specifically, the carcinogenic properties of the chemical glyphosate.

162.     Accordingly, at all times relevant to this litigation, Defendant knew or, in the exercise of reasonable care, should have known that use of or exposure to its Roundup® products could cause Plaintiff's injuries and thus created a dangerous and unreasonable risk of injury to the users of these products, including Plaintiff.

163.     Defendant knew or, in the exercise of reasonable care, should have known that Roundup® is more toxic than glyphosate alone and that safety studies on Roundup®, Roundup®'s adjuvants and "inert" ingredients, and/or the surfactant POEA were necessary to protect Plaintiff from Roundup®.

164.     Defendant knew or, in the exercise of reasonable care, should have known that tests limited to Roundup®'s active ingredient glyphosate were insufficient to prove the safety of Roundup®.

165.     Defendant also knew or, in the exercise of reasonable care, should have known that users and consumers of Roundup® were unaware of the risks and the magnitude of the risks associated with the use of and/or exposure to Roundup® and glyphosate- containing products.

166.     As such, Defendant breached its duty of reasonable care and failed to exercise ordinary care in the design, research, development, manufacture, testing, marketing, supply,

promotion, advertisement, packaging, sale, and distribution of its Roundup® products, in that Defendant manufactured and produced defective herbicides containing the chemical glyphosate, knew or had reason to know of the defects inherent in its products, knew or had reason to know that a user's or consumer's exposure to the products created a significant risk of harm and unreasonably dangerous side effects, and failed to prevent or adequately warn of these risks and injuries.

167.    Defendant failed to appropriately and adequately test Roundup®, Roundup®'s adjuvants and "inert" ingredients, and/or the surfactant POEA to protect Plaintiff from Roundup®.

168.    Despite its ability and means to investigate, study, and test its products and to provide adequate warnings, Defendant has failed to do so. Indeed, Defendant has wrongfully concealed information and has further made false and/or misleading statements concerning the safety and/or exposure to Roundup® and glyphosate.

169.    Defendant's negligence included:

    a.  Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing its Roundup® products without thorough and adequate pre- and post-market testing;

    b.  Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing Roundup® while negligently and/or intentionally concealing and failing to disclose the results of trials, tests, and studies of exposure to glyphosate, and, consequently, the risk of serious harm associated with human use of and exposure to Roundup®;

    c.  Failing to undertake sufficient studies and conduct necessary tests to determine whether or not Roundup® products and glyphosate-containing products were safe for their intended use in agriculture, horticulture, and at-home use;

d.   Failing to undertake sufficient studies and conduct necessary tests to determine the safety of "inert" ingredients and/or adjuvants contained within Roundup®, and the propensity of these ingredients to render Roundup® toxic, increase the toxicity of Roundup®, whether these ingredients are carcinogenic, magnify the carcinogenic properties of Roundup®, and whether or not "inert" ingredients and/or adjuvants were safe for use;

e.   Failing to use reasonable and prudent care in the design, research, manufacture, formulation, and development of Roundup® products so as to avoid the risk of serious harm associated with the prevalent use of Roundup®/glyphosate as an herbicide;

f.   Failing to design and manufacture Roundup® products so as to ensure they were at least as safe and effective as other herbicides on the market;

g.   Failing to provide adequate instructions, guidelines, and safety precautions to those persons who Defendant could reasonably foresee would use and/or be exposed to its Roundup® products;

h.   Failing to disclose to Plaintiff, users, consumers, and the general public that the use of and exposure to Roundup® presented severe risks of cancer and other grave illnesses;

i.   Failing to warn Plaintiff, users, consumers, and the general public that the product's risk of harm was unreasonable and that there were safer and effective alternative herbicides available to Plaintiff and other users or consumers;

j.   Systematically suppressing or downplaying contrary evidence about the risks, incidence, and prevalence of the side effects of Roundup® and glyphosate-containing products;

k. Representing that its Roundup® products were safe for their intended use when, in fact, Defendant knew or should have known that the products were not safe for their intended use;

l. Declining to make or propose any changes to Roundup® products' labeling or other promotional materials that would alert the consumers and the general public of the risks of Roundup® and glyphosate;

m. Advertising, marketing, and recommending the use of Roundup® products, while concealing and failing to disclose or warn of the dangers known by Defendant to be associated with or caused by the use of or exposure to Roundup® and glyphosate;

n. Continuing to disseminate information to its consumers, which indicate or imply that Defendant's Roundup® products are not unsafe for use in the agricultural, horticultural industries, and/or home use; and

o. Continuing the manufacture and sale of its products with the knowledge that the products were unreasonably unsafe and dangerous.

170. Defendant knew and/or should have known that it was foreseeable that consumers and/or users, such as Plaintiff, would suffer injuries as a result of Defendant's failure to exercise ordinary care in the manufacturing, marketing, labeling, distribution, and sale of Roundup®.

171. Plaintiff did not know the nature and extent of the injuries that could result from the intended use of and/or exposure to Roundup® or its active ingredient glyphosate.

172. Defendant's negligence was the proximate cause of the injuries, harm, and economic losses that Plaintiff suffered, and will continue to suffer, as described herein.

173. Defendant's conduct, as described above, was reckless. Defendant regularly risks the lives of consumers and users of its products, including Plaintiff, with full knowledge of the

dangers of its products. Defendant has made conscious decisions not to redesign, re-label, warn, or inform the unsuspecting public, including Plaintiff. Defendant's reckless conduct therefore warrants an award of punitive damages.

174. As a proximate result of Defendant's wrongful acts and omissions in placing its defective Roundup® products into the stream of commerce without adequate warnings of the hazardous and carcinogenic nature of glyphosate, Plaintiff suffered severe and permanent physical and emotional injuries. Plaintiff endured pain and suffering and suffered economic losses (including significant expenses for medical care and treatment).

175. WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in Plaintiff's favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees, and all such other and further relief as this Court deems just and proper. Plaintiff also demands a jury trial on the issues contained herein.

## CLAIM FOUR

### BREACH OF EXPRESS WARRANTY

176. Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

177. Roundup® which was designed, tested, manufactured, distributed, promoted and sold by Defendant, was expected to, and did, reach Plaintiff without any substantial change in its condition

178. Defendant, through its advertising and promotional materials, expressly warranted that Roundup® was safe for its intended use and was not unreasonably dangerous for its intended purpose.

179. Defendant breached its express warranties in that Roundup® was not safe for its intended use in light of the unreasonably high risk of cancer associated with its use, including the

risk of NHL.

180.    Plaintiff reasonably relied to her detriment on Defendant's express warranties.

181.    As a proximate result of Defendant's wrongful acts and omissions in placing its defective Roundup® products into the stream of commers, Plaintiff suffered severe and permanent physical and emotional injuries. Plaintiff endured pain and suffering and suffered economic losses (including significant expenses for medical care and treatment).

182.    WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in Plaintiff's favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees, and all such other and further relief as this Court deems just and proper. Plaintiff also demands a jury trial on the issues contained herein.

## CLAIM FIVE

### BREACH OF IMPLIED WARRANTY

183.    Plaintiff incorporates by reference each and every allegation set forth in the Preceding paragraphs as if fully stated herein.

184.    Roundup® which was designed, tested, manufactured, distributed, promoted and sold by Defendant, was expected to, and did, reach Plaintiff without any substantial change in its condition.

185.    At the time Defendant manufactured, marketed, sold, and distributed Roundup® Defendant knew of the use for which Roundup® was intended and impliedly warranted, through their advertising and promotional materials, that Roundup® was of merchantable quality, fitness and safe for the use for which it was intended.

186.    Plaintiff reasonably relied upon the skill and judgment of Defendant as to whether Roundup® was of merchantable quality and safe for its intended use and upon Defendant's implied warranty as to such matters.

187.    Contrary to the implied warranty, Defendant's product Roundup® was not of merchantable quality or safe for its intended use because it was unreasonably dangerous as described herein.

188.    As a proximate result of Defendant's wrongful acts and omissions in placing its defective Roundup® products into the stream of commerce, Plaintiff suffered severe and permanent physical and emotional injuries. Plaintiff endured pain and suffering and suffered economic losses (including significant expenses for medical care and treatment).

189.    WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in Plaintiff's favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees, and all such other and further relief as this Court deems just and proper. Plaintiff also demands a jury trial on the issues contained herein.

## **CLAIM SIX**

### **NEGLIGENT MISREPRESENTATION AND/OR FRAUD**

190.    Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

191.    Defendant is the manufacturer, designer, distributor, seller or supplier of Roundup® and, while engaged in the course of such business, made representations to Plaintiff regarding the character and/or quality of for guidance in her decision to select Roundup® for use.

192.    Defendant had a duty to disclose material information about serious health effects to consumers such as Plaintiff. Defendant intentionally failed to disclose this information for the purpose of inducing consumers, including Plaintiff, to purchase Defendant's dangerous products.

193.    Specifically, Defendant's advertisements regarding Roundup® made material misrepresentations to the effect that Roundup® was safe, which misrepresentations Defendant knew to be false, for the purpose of fraudulently inducing consumers, such as Plaintiff, to purchase

said product. Defendant further misrepresented that its products were just as safe, and just as effective or more effective, than other weed control products on the market.

194.    Defendant's representations regarding the character or quality of Roundup® were untrue.  In addition, Defendant fraudulently suppressed material information regarding the safety of Roundup®, including the dangers known by Defendant to be associated with or caused by the use of or exposure to Roundup® and glyphosate.

195.    Defendant had actual knowledge based on the results of trials, tests, and studies of exposure to glyphosate, of the risk of serious harm associated with human use of and exposure to Roundup®.

196.    Defendant negligently and/or intentionally misrepresented or omitted this information in its product labeling, promotions and advertisements and instead labeled, promoted and advertised its products as safe and effective in order to avoid losses and sustain profits in its sales to consumers.

197.    In supplying the false information, Defendant failed to exercise reasonable care or competence in obtaining or communicating information to their intended recipients, including Plaintiff.

198.    Plaintiff reasonably relied to her detriment upon Defendant's misrepresentations and/or omissions in its labeling, advertisements, and promotions concerning the serious risks posed by the product.  Plaintiff reasonably relied upon Defendant's representations to her that Roundup® was safe for use and that Defendant's labeling, advertisements and promotions fully described all known risks of the product.

199.    Defendant is estopped from relying on any statute of limitations defenses because Defendant actively concealed the defects from consumers, such as Plaintiff.  Instead of revealing the defects, Defendant continued to represent its product as safe for its intended use.

200.    As a direct and proximate result of Plaintiff's use of Roundup® as manufactured, designed, sold, supplied and introduced into the stream of commerce by Defendant, Plaintiff suffered personal injury and non-economic damages.

## CLAIM SEVEN

### UNFAIR AND DECEPTIVE TRADE PRACTICES

201.    Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

202.    By reason of its conduct as alleged herein, Defendant violated the provisions of Chapter 75 of the North Carolina General Statutes by inducing Plaintiff to use Roundup® through the use of false and/or misleading advertising, representations and statements.

203.    By engaging in the conduct described herein, Defendant violated Chapter 75 of the North Carolina General Statutes by, among other things:

a)      engaging in unfair or deceptive trade practices as defined in this statute by making false and misleading oral and written statements that had the capacity, tendency, or effect of deceiving or misleading consumers;

b)      engaging in unfair or deceptive trade practices as defined in this statute by making representations that its products had an approval, characteristic, ingredient, use or benefit which they did not have, including but not limited to statements concerning the health consequences of the use of Roundup®;

c)      engaging in unfair or deceptive trade practices as defined in this statute by failing to state material facts the omission of which deceived or tended to deceive, including but not limited to facts relating to the health consequences of the use of Roundup®;

d)      engaging in unfair or deceptive trade practices as defined in this statute through deception, fraud, misrepresentation and knowing concealment, suppression and omission of

material facts with the intent that consumers rely upon the same in connection with the use and continued use of Roundup®.

## CLAIM EIGHT

## PUNITIVE DAMAGES

204.   Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

205.   The conduct of Defendant described above was fraudulent, malicious, and willful or wanton in that it demonstrated a conscious and intentional disregard of and indifference to the safety of others, including Plaintiff, which Defendant knew or should have known was likely to result in serious injury or death to members of the consuming public, including Plaintiff.

206.   As a direct and proximate result of the intentional, willful, and wanton misconduct of Defendant, Plaintiff was caused to suffer NHL, as well as the damages alleged herein. Plaintiff is entitled to recover punitive damages as a result of Defendant's conduct.

## CLAIM NINE

## WRONGFUL DEATH

207.   Plaintiffs incorporate by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

208.   Plaintiffs bring this claim on behalf of and for the benefit of Plaintiff Vetril Holbrook (hereinafter referred to as "Decedent Plaintiff") and her lawful beneficiaries.

209.   As a direct and proximate result of the conduct of Defendant and the defective nature of Roundup® as outlined above, Decedent Plaintiff suffered bodily injury resulting in pain and suffering, disability, disfigurement, mental anguish, loss of capacity of the enjoyment of life, shorted life expectancy, expenses for hospitalization, medical and nursing treatment, loss of earnings, loss of ability to earn, funeral expenses and death.

210.     As a direct and proximate result of the conduct of Defendant, Decedent Plaintiff's beneficiaries have incurred hospital, nursing and medical expenses, and estate administration expenses as a result of Decedent Plaintiff's death. Decedent Plaintiff brings this claim on behalf of her lawful beneficiaries for these damages and for all pecuniary losses under applicable state statutory and/or common laws.

## CLAIM TEN

### SURVIVAL ACTION

211.     Plaintiffs incorporate by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

212.     As a direct and proximate result of the conduct of Defendant, Decedent Plaintiff, prior to her death, was obligated to spend various sums of money to treat her injuries, which debts have been assumed by her Estate. As a direct and proximate cause of the aforesaid, Decedent Plaintiff endured pain and suffering, mental anguish and impairment of the enjoyment of life, until the date of her death; and, as a direct and proximate result of the aforesaid, Decedent Plaintiff's lawful beneficiaries suffered a loss of earnings and earning capacity. Decedent Plaintiff brings this claim on behalf of her Estate under applicable state statutory and/or common laws.

213.     As a direct and proximate result of the conduct of Defendant, Decedent Plaintiff and her heirs, until the time of her death, suffered a disintegration and deterioration of the family unit and the relationships existing therein, resulting in enhanced anguish, depression and other symptoms of psychological stress and disorder.

214.     As a direct and proximate result of the aforesaid and including the observance of the suffering and physical deterioration of Decedent Plaintiff until the date of her death, Decedent Plaintiff's heirs have and will continue to suffer permanent and ongoing psychological damage which may require future psychological and medical treatment. Decedent Plaintiff's heirs,

Personal Representatives of her Estate, bring the claim on behalf of the Estate for damages under applicable statutory and/or common laws, and in their own right.

215.     WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in Plaintiffs' favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees, and all such other and further relief as this Court deems just and proper. Plaintiffs also demand a jury trial on the issues contained herein.

### JURY TRIAL DEMAND

216.     Plaintiff demands a trial by jury on all the triable issues within this pleading.

///

///

///

///

///

///

///

///

///

///

///

///

///

///

///

## PRAYER FOR RELIEF

217.    WHEREFORE, Plaintiff requests that the Court enter judgment in their favor and against Monsanto, awarding as follows:

A.     Compensatory damages in an amount to be proven at trial;

B.     Treble and/or punitive damages;

C.     Treble damages and attorney fees pursuant to Chapter 75 of the North Carolina General Statutes [UDTP Act];

D.     Costs including reasonable attorneys' fees, court costs, and other litigation expenses; and

E.     Any other relief the Court may deem just and proper.

Dated: January 31, 2023

Respectfully Submitted,

/s/ Sarah B.Stump
SARAH B. STUMP
N.C. Bar#: 52686
WHITLEY LAW FIRM
3301 Benson Dr.
Suite 120
Raleigh, NC 27609
Tel: (919) 785-5000
Fax: (919) 785-3729
sbd@whitleylawfirm.com

/s/ Jessica S. Williams
JESSICA S. WILLIAMS
GOMEZ TRIAL ATTORNEYS
John H. Gomez (CA SBN 171485)
Jessica S. Williams (CA SBN 314762)
Cristina Murillo (CA SBN 345769)
655 West Broadway, Suite 1700
San Diego, CA 92101
Tel: (619) 237-3490
Fax: (619) 237-3496
*Attorneys for Plaintiffs*

JS 44 (Rev. 04/21)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS
VETRIL HOLBROOK, by and through her representatives BRYCE HOLBROOK and SUWON HOLBROOK, and on behalf of all living heirs,

### DEFENDANTS
MONSANTO COMPANY

**(b)** County of Residence of First Listed Plaintiff   Wilkes County, NC
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant   St. Louis, Missouri
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Whitley Law Firm          Gomez Trial Attorneys
3301 Benson Dr., Ste. 120   655 W Broadway, Ste. 1700
Raleigh, NC 27609          San Diego, CA 92101

Attorneys *(If Known)*
SHOOK, HARDY & BACON L.L.P.
600 Travis Street, Suite 3400
Houston, TX 77002-2026

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- [ ] 1  U.S. Government Plaintiff
- [ ] 2  U.S. Government Defendant
- [ ] 3  Federal Question *(U.S. Government Not a Party)*
- [x] 4  Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)* and One Box for Defendant)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | [x] 1 | [ ] 1 | Incorporated or Principal Place of Business In This State | [ ] 4 | [ ] 4 |
| Citizen of Another State | [ ] 2 | [ ] 2 | Incorporated and Principal Place of Business In Another State | [ ] 5 | [x] 5 |
| Citizen or Subject of a Foreign Country | [ ] 3 | [ ] 3 | Foreign Nation | [ ] 6 | [ ] 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*
Click here for: Nature of Suit Code Descriptions.

**CONTRACT**
- [ ] 110 Insurance
- [ ] 120 Marine
- [ ] 130 Miller Act
- [ ] 140 Negotiable Instrument
- [ ] 150 Recovery of Overpayment & Enforcement of Judgment
- [ ] 151 Medicare Act
- [ ] 152 Recovery of Defaulted Student Loans (Excludes Veterans)
- [ ] 153 Recovery of Overpayment of Veteran's Benefits
- [ ] 160 Stockholders' Suits
- [ ] 190 Other Contract
- [ ] 195 Contract Product Liability
- [ ] 196 Franchise

**REAL PROPERTY**
- [ ] 210 Land Condemnation
- [ ] 220 Foreclosure
- [ ] 230 Rent Lease & Ejectment
- [ ] 240 Torts to Land
- [ ] 245 Tort Product Liability
- [ ] 290 All Other Real Property

**TORTS**
PERSONAL INJURY
- [ ] 310 Airplane
- [ ] 315 Airplane Product Liability
- [ ] 320 Assault, Libel & Slander
- [ ] 330 Federal Employers' Liability
- [ ] 340 Marine
- [ ] 345 Marine Product Liability
- [ ] 350 Motor Vehicle
- [ ] 355 Motor Vehicle Product Liability
- [ ] 360 Other Personal Injury
- [ ] 362 Personal Injury - Medical Malpractice

PERSONAL INJURY
- [x] 365 Personal Injury - Product Liability
- [ ] 367 Health Care/ Pharmaceutical Personal Injury Product Liability
- [ ] 368 Asbestos Personal Injury Product Liability

PERSONAL PROPERTY
- [ ] 370 Other Fraud
- [ ] 371 Truth in Lending
- [ ] 380 Other Personal Property Damage
- [ ] 385 Property Damage Product Liability

**CIVIL RIGHTS**
- [ ] 440 Other Civil Rights
- [ ] 441 Voting
- [ ] 442 Employment
- [ ] 443 Housing/ Accommodations
- [ ] 445 Amer. w/Disabilities - Employment
- [ ] 446 Amer. w/Disabilities - Other
- [ ] 448 Education

**PRISONER PETITIONS**
Habeas Corpus:
- [ ] 463 Alien Detainee
- [ ] 510 Motions to Vacate Sentence
- [ ] 530 General
- [ ] 535 Death Penalty
Other:
- [ ] 540 Mandamus & Other
- [ ] 550 Civil Rights
- [ ] 555 Prison Condition
- [ ] 560 Civil Detainee - Conditions of Confinement

**FORFEITURE/PENALTY**
- [ ] 625 Drug Related Seizure of Property 21 USC 881
- [ ] 690 Other

**LABOR**
- [ ] 710 Fair Labor Standards Act
- [ ] 720 Labor/Management Relations
- [ ] 740 Railway Labor Act
- [ ] 751 Family and Medical Leave Act
- [ ] 790 Other Labor Litigation
- [ ] 791 Employee Retirement Income Security Act

**IMMIGRATION**
- [ ] 462 Naturalization Application
- [ ] 465 Other Immigration Actions

**BANKRUPTCY**
- [ ] 422 Appeal 28 USC 158
- [ ] 423 Withdrawal 28 USC 157

**INTELLECTUAL PROPERTY RIGHTS**
- [ ] 820 Copyrights
- [ ] 830 Patent
- [ ] 835 Patent - Abbreviated New Drug Application
- [ ] 840 Trademark
- [ ] 880 Defend Trade Secrets Act of 2016

**SOCIAL SECURITY**
- [ ] 861 HIA (1395ff)
- [ ] 862 Black Lung (923)
- [ ] 863 DIWC/DIWW (405(g))
- [ ] 864 SSID Title XVI
- [ ] 865 RSI (405(g))

**FEDERAL TAX SUITS**
- [ ] 870 Taxes (U.S. Plaintiff or Defendant)
- [ ] 871 IRS—Third Party 26 USC 7609

**OTHER STATUTES**
- [ ] 375 False Claims Act
- [ ] 376 Qui Tam (31 USC 3729(a))
- [ ] 400 State Reapportionment
- [ ] 410 Antitrust
- [ ] 430 Banks and Banking
- [ ] 450 Commerce
- [ ] 460 Deportation
- [ ] 470 Racketeer Influenced and Corrupt Organizations
- [ ] 480 Consumer Credit (15 USC 1681 or 1692)
- [ ] 485 Telephone Consumer Protection Act
- [ ] 490 Cable/Sat TV
- [ ] 850 Securities/Commodities/ Exchange
- [ ] 890 Other Statutory Actions
- [ ] 891 Agricultural Acts
- [ ] 893 Environmental Matters
- [ ] 895 Freedom of Information Act
- [ ] 896 Arbitration
- [ ] 899 Administrative Procedure Act/Review or Appeal of Agency Decision
- [ ] 950 Constitutionality of State Statutes

## V. ORIGIN *(Place an "X" in One Box Only)*
- [x] 1 Original Proceeding
- [ ] 2 Removed from State Court
- [ ] 3 Remanded from Appellate Court
- [ ] 4 Reinstated or Reopened
- [ ] 5 Transferred from Another District *(specify)*
- [ ] 6 Multidistrict Litigation - Transfer
- [ ] 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
28 U.S.C. Sec 1332
Brief description of cause:
Personal Injury - Product Liability

## VII. REQUESTED IN COMPLAINT:
- [ ] CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

DEMAND $ Exceeds $75,000

CHECK YES only if demanded in complaint:
JURY DEMAND: [x] Yes [ ] No

## VIII. RELATED CASE(S) IF ANY
*(See instructions):*   JUDGE _____   DOCKET NUMBER _____

DATE   Jan 31, 2023

SIGNATURE OF ATTORNEY OF RECORD
/s/ Sarah Stump

FOR OFFICE USE ONLY

RECEIPT # _____ AMOUNT _____ APPLYING IFP _____ JUDGE _____ MAG. JUDGE _____

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
Electronic Case Opening

All civil cases filed in the Western District of North Carolina are assigned to an Article III U.S. District Judge upon the initial filing.  You will receive an electronic notice of the judge assignment.

Attached to this notice you will find the following forms:

- Joint Stipulation of Consent to the Exercise of Jurisdiction by a U.S. Magistrate Judge

- Disclosure of Corporate Affiliations and Other Entities with a Direct Financial Interest in Ligitation

- Certification and Report of F.R.C.P. 26(f) Conference and Discovery Plan

Counsel/Parties may consent to the jurisdiction of a U.S. Magistrate Judge by filing a **Joint Consent to the Exercise of Jurisdiction by a United States Magistrate Judge**. Counsel/Parties may consent to magistrate judge jurisdiction any time after service of the contents of this packet on the parties and are now **REQUIRED** to discuss the issue of consent to the jurisdiction of a magistrate judge at the Rule 26 (Initial Attorney's Conference) and if consent of **ALL** parties is granted, file a **JOINT STIPULATION OF CONSENT**.  These forms are included in this packet.

The Plaintiff is required to serve this Notice and the attached forms on all defendants with service of the complaint.  In removal actions, the removing party shall be responsible for the service of this Notice and the attached forms.

The Local Rules and Court Forms are available on the Court's website at www. ncwd.uscourts.gov

## NOTICE OF AVAILABILITY OF MAGISTRATE JUDGE TO EXERCISE JURISDICTION

In accordance with the provisions of Title 28, United States Code, Section 636(c), you are hereby notified that a United States magistrate judge of this District Court is available to exercise the Court's jurisdiction and to conduct any or all proceedings in this case including a jury or nonjury trial, and entry of a final judgment.  Exercise of this jurisdiction by a magistrate judge is, however, permitted *only if all parties voluntarily consent.*

You may, without adverse substantive consequences, withhold your consent.  If any party withholds consent, the identity of the parties consenting or withholding consent will not be communicated to any magistrate judge or to the district judge to whom the case has been assigned.  Failure to file the Joint Stipulation of Consent constitutes the withholding of consent; no declination of consent is to be filed.

An appeal from a judgment entered by a magistrate judge may be taken directly to the United States Court of Appeals for this judicial circuit in the same manner as an appeal from any other judgment of a district court.

Consent to the jurisdiction of a magistrate judge is exercised in this district by the filing of a Joint Stipulation of Consent which is to be executed by the parties any time after service of this Notice but not later than immediately after the Initial Attorney's Conference.  To withhold consent to the jurisdiction of a magistrate judge the parties are NOT to file anything; the case will remain with the Article III judge already assigned to the case.  Parties are reminded that each Article III judge may and regularly do refer civil matters to the magistrates in this district in accordance with their own Order of Reference.  Orders of Reference for each Article III judge are available on the court's web site at www.ncwd.uscourts.gov.

Local Rule 16.1(A) requires that "as soon as practicable,  and in any event not later than fourteen (14) days from joinder of the issues, the parties or their counsel shall confer as provided by the Fed. R. Civ. P. 26(f), and conduct an "Initial Attorney's Conference." The parties are directed to discuss the issue of consent to the jurisdiction of a magistrate judge at this conference, and if ALL parties agree, execute a Joint Stipulation of Consent and file this stipulation with the Certification and Report of Initial Attorneys Conference as required by the above local rule.

Local Rule 16.1(B) defines joinder of issues for the limited purpose of the local rules as occurring "when the last responsive pleading other than a Motion to Dismiss is filed. Where a briefed Motion to Dismiss is filed, either as a separate pleading or is included in the Answer and accompanied by a brief, joinder of the issues does not occur until that motion is resolved and the Answer to the Complaint, Reply to a Counterclaim, or a Crossclaim is filed.  Motions to dismiss contained in an Answer, but not supported by a brief, simply preserve the motion and do not prevent joinder of the issues."

## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF NORTH CAROLINA

### Joint Stipulation of Consent to Exercise Jurisdiction
### by a United States Magistrate Judge

**Case No.**


**Plaintiff,**

**v.**


**Defendant.**


In accordance with the provisions of Title 28, United States Code, Section 636(c) and Fed. R. Civ. P. 73, the parties in this case consent to have a United States magistrate judge conduct any and all proceedings in the case, including trial, order the entry of a final judgment and conduct all post-judgment proceedings.


| Counsel's Signature | Party | Date |
|---|---|---|
| Counsel's Signature | Party | Date |
| Counsel's Signature | Party | Date |
| Counsel's Signature | Party | Date |
| Counsel's Signature | Party | Date |
| Counsel's Signature | Party | Date |

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
Case No.

|  |  | ) |
|---|---|---|
|  | Plaintiff(s), | ) |
| v. |  | ) |
|  |  | ) |
|  |  | ) |
|  | Defendant(s). | ) |

## DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER ENTITIES
## WITH A DIRECT FINANCIAL INTEREST IN LITIGATION

Only one form need be completed for each nongovernmental party even if the party is represented by more than one attorney.  Disclosures must be filed on behalf of individual nongovernmental parties as well as nongovernmental corporate parties.  Counsel have a continuing duty to update this information.  Please file an original and one copy of this form, plaintiff or moving party must serve this on the defendant(s) or respondent(s) when initial service is made.

_____ who is _____
*(Name of Party)*                            *(Plaintiff / moving party or defendant)*
makes the following disclosure:

1.  Is party a publicly held corporation or other publicly held entity?
       Yes                    No

2.  Does party have any parent corporations?
       Yes                    No

    If yes, identify all parent corporations, including grandparent and great-grandparent corporations:

3.  Is 10% or more of the stock of a party owned by a publicly held corporation or other publicly held entity?
       Yes                    No

    If yes, identify all such owners:

4.  Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?
       Yes                    No

    If yes, identify entity and nature of interest:

s/ _____          _____
Signature                                                    Date

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CIVIL NO. _____

|  |  |  |
|---|---|---|
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| Plaintiff(s), | ) | CERTIFICATION AND REPORT |
| | ) | OF F.R.C.P. 26(f) CONFERENCE |
| vs. | ) | AND DISCOVERY PLAN |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| Defendant(s). | ) | |

*Please fill in or check the appropriate blanks (print legibly) to certify completion of the Rule 26(f) Attorney's Conference and provide the required information to the Court.  Where the parties were unable to agree on a specific provision or item, please so note and attach any necessary explanation.  Please note that this information will be used as a guideline by the judge conducting the Initial Pretrial Conference or issuing the Initial Pretrial Order.*

1.  Certification of Conference.  Pursuant to Fed. R. Civ. P. 26(f), a meeting was held on _____ *(date)* [ ] at _____ *(place)* or [ ] by telephone and was conducted by the undersigned counsel for the designated parties in the above captioned case.

2.  Pre-Discovery Disclosures.  The information required by Fed. R. Civ. P. 26(a)(1) *(check one)* [ ] has been exchanged [ ] will be exchanged by _____ *(date)*.

3.  Discovery Plan.  The parties jointly propose to the court the following discovery plan: [*Use separate paragraphs or subparagraphs as necessary if parties disagree.*]

    a)  All discovery shall be commenced in time to be completed by _____ *(date)*. [*If needed*]  Discovery on _____

    _____

    *(identify any issues requiring early discovery)* will be completed by _____ _____ *(date)*.

    b)  Discovery Limits:
        1)  Maximum of _____ *(ordinarily 20)* interrogatories by each party to any other party.
        2)  Maximum of _____ *(ordinarily 20)* requests for admission by each party to any other party.
        3)  Maximum of _____ depositions by plaintiff(s) and _____ by defendant(s) *(ordinarily 6 each)* [or ___ by *each* plaintiff and ___ by *each* defendant].

   c) Reports from retained experts under Rule 26(a)(2) will be due:
      -from plaintiff(s) by _____*(date)*
      -from defendant(s) by _____*(date)*
      Supplementations under Rule 26(e) due _____ *(list times(s) or interval(s))*

4.  Other Items.  *[Attach separate paragraphs as necessary if parties disagree.]*

   a)  The parties [ ] request [ ] do not request a conference with the court before entry
      of the scheduling order.

   b) All potentially dispositive motions should be filed by _____
      _____ *(date, ordinarily one month after the close of discovery)*.

   c) Settlement:
      [ ] is likely
      [ ] is unlikely
      [ ] cannot be evaluated prior to _____ *(date)*
      [ ] may be enhanced by use of the following ADR procedure:
          [ ] Mediated Settlement Conference
          [ ] binding arbitration
          [ ] judicial settlement conference
          [ ] other _____

      The parties agree that the above selected ADR procedure would be most useful
      if conducted:

          [ ] after resolution of any outstanding dispositive motions, but prior to
            further discovery;
          [ ] after an initial round of preliminary discovery to be completed by
            _____*(date)*;
          [ ] after the completion of discovery;
          [ ] after resolution of summary judgment motions, if any;
          [ ] not applicable.

   d) Final lists of witnesses and exhibits under Rule 26(a)(3) are due:
      from plaintiff(s) by _____ *(date)*
      from defendant(s) by _____ *(date)*

   e) If the case is ultimately tried, trial is expected to take approximately _____
      _____ days.

   f)  [ ] The parties have discussed the issue of consent to the jurisdiction of a U.S.
      Magistrate Judge.

5. Please identify any other matters regarding discovery or case management which may require the Court's attention (e.g., concerns re: confidentiality, protective orders, etc., unmovable scheduling conflicts):


| *Plaintiff's Counsel* | *Party* | *Date* | | *Defendant's Counsel* | *Party* | *Date* |
|---|---|---|---|---|---|---|
| *Plaintiff's Counsel* | *Party* | *Date* | | *Defendant's Counsel* | *Party* | *Date* |
| *Plaintiff's Counsel* | *Party* | *Date* | | *Defendant's Counsel* | *Party* | *Date* |
| *Plaintiff's Counsel* | *Party* | *Date* | | *Defendant's Counsel* | *Party* | *Date* |
| *Plaintiff's Counsel* | *Party* | *Date* | | *Defendant's Counsel* | *Party* | *Date* |

*(Attach additional Sheets if necessary)*

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
DOCKET NO. 5:19-MC-5

IN RE:   **STANDING ORDER REQUIRING AN INITIAL
SETTLEMENT CONFERENCE IN CIVIL CASES
ASSIGNED TO THE HONORABLE KENNETH
D. BELL**

---

**THIS STANDING ORDER** shall apply to all adversarial civil actions assigned to the

Honorable Kenneth D. Bell; however, cases involving review of a previously developed record,

such as habeas corpus (including claims pursuant to 28 U.S.C. §2255), bankruptcy appeals, and

social security appeals are not subject to this Order.  If counsel are unsure whether this Order

appropriately applies to an action, then the parties should promptly seek relief from or clarification

of this Order.

Rule 1 of the Federal Rules of Civil Procedure ("FRCP") provides that the Court and the

parties should conduct the litigation of all civil actions filed in the United States district courts to

"secure the just, speedy, and inexpensive determination" of those actions. Fed. R. Civ. P. 1. While

the Court stands ready to adjudicate all cases and controversies appropriately before the Court,

most cases are ultimately resolved not by the Court but rather through the parties' voluntary

settlement of the case.

There are many reasons for these settlements. A lawsuit in a United States District Court

requires a substantial commitment of time, money and effort notwithstanding the Court's desire to

manage the litigation efficiently.  Through a negotiated settlement of their dispute, the parties can

avoid the ongoing costs and risks inherent in a legal action as well as the emotional toll that often

accompanies lengthy litigation. Further, in a settlement the parties can agree on business solutions,

accommodations or equitable relief different than or beyond that which may be ordered by the Court, even if a party is successful in the party's claims or defenses.

Despite the many benefits of settlement, particularly early in a case before substantial costs have been incurred and positions have hardened, some parties are unwilling to raise the topic of settlement because of a perception that doing so might somehow disadvantage them in the settlement negotiations. This reluctance to discuss settlement unnecessarily prolongs the case.

Based on these facts, the Court finds that, consistent with both the letter and spirit of FRCP Rule 1, it is in the interests of the parties and the Court to require that the parties participate in a settlement conference prior to the filing of an Answer or other response (such as motion to dismiss under FRCP Rule 12) to establish an early opportunity for the parties to resolve the action. Accordingly, the Court hereby ORDERS that:

1.  The parties and/or their counsel meet either in person or by telephone to meaningfully discuss the possibility of settling this matter prior to the filing of an Answer or other response to the Complaint. Because the Plaintiff may not know the identity of counsel for the Defendant, the Defendant or Defendant's counsel is responsible for initiating a communication to arrange the settlement conference mandated by this Order. (In the event there are multiple Defendants represented by different counsel, the Defendants' counsel should collectively arrange for a communication to the Plaintiff's counsel (or the Plaintiff if unrepresented));

2.  The parties jointly prepare a Certificate of Settlement Conference in the form attached to this Order to inform the Court of the results of their settlement discussions. The Certificate must be signed by <u>both</u> the party and counsel, and the signature of the party certifies that the party has received a copy of this Order and

has either participated in directly or conferred with counsel in detail regarding the settlement discussions.

3. The parties must file the Certificate with the Court prior to or together with the Defendant's Answer or other response to the Complaint.[1] Defendant shall not, however, delay the timely filing of an Answer or other response to the Complaint because of the failure of the parties to sign the Certification. (In the event that the Defendant is unable to timely file the Certification, Defendant shall file a brief notice with the Court describing the reason for the delay or the parties should jointly move for leave to extend the time for filing the Certification); and

4. The Plaintiff is required to serve a copy of this Order on the Defendant(s) together with the service of the Summons and Complaint.

Signed: July 16, 2019

Kenneth D. Bell
United States District Judge

---

[1] While either party may file the Certification, as a practical matter the Defendant will be most knowledgeable about the timing of the responsive pleading or motion and thus is likely to be in the best position to make a timely filing if the case is not resolved.

**FOR THE WESTERN DISTRICT OF NORTH CAROLINA
STATESVILLE     DIVISION
CIVIL ACTION NO:**

|  |  |  |
|---|---|---|
| Plaintiff, | ) ) ) ) | |
| v. | ) ) ) | <u>**CERTIFICATE OF SETTLEMENT CONFERENCE**</u> |
| Defendant. | ) ) ) ) | |
| _____ | ) | |

The parties to this action hereby certify that they have met in person and/or by telephone and discussed in good faith if this matter can be resolved without the need for further proceedings in this Court. The results of those settlement negotiations are:

☐ The parties have agreed to resolve this case by a voluntary settlement. A notice of dismissal of the action will be filed within 14 days.

☐ The parties have not yet reached a settlement but believe they may be able to do so through a Mediation or the assistance of the Court. The Mediator selected by the parties is _____. The parties request a stay of this action for up to 14 days to conduct the Mediation and/or engage in additional settlement discussions. **[Applicable only for the Initial Settlement Conference]**.

☐ The parties have not yet been able to resolve this case through a voluntary settlement.

*[signature for Plaintiff(s)' counsel]*                    *[signature for Defendant(s)' counsel]*

*[signature for Plaintiff(s)]\**                    *[signature for Defendant(s)]\**

*A party's signature certifies that the party has received a copy of the Court's Standing Order Requiring an Initial Settlement Conference and has either participated in directly or conferred with counsel in detail regarding the settlement discussions between or among the parties.

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CASE NO.  5:23-cv-13

VETRIL HOLBROOK, by and through her representatives
BRYCE HOLBROOK and SUWON HOLBROOK, and on
behalf of all living heirs,                                                    )
                                                                               )
                                                                               )
                              Plaintiff(s),                                    )
v.                                                                             )
                                                                               )
MONSANTO COMPANY                                                               )
                                                                               )
                                                                               )
                              Defendant(s).                                    )

DISCLOSURE BY PARTY OR INTERVENOR
IN A DIVERSITY CASE

This disclosure must be filed on behalf of each party or intervenor to an action in which
jurisdiction is based on diversity under 28 U.S.C. § 1332(a).  Counsel has a continuing duty
to update this information. An executed form should be electronically filed. The disclosing
party must file this disclosure at the time of the party's first appearance, pleading, petition,
motion, response, or other request addressed to the Court.  The disclosing party also must
serve this form on the other parties to the action.

VETRIL HOLBROOK, by and through her
representatives BRYCE HOLBROOK and SUWON                    Plaintiff
HOLBROOK, and on behalf of all living heirs,
_____ who is _____
*(Name of Party)*                                          *(Plaintiff / Defendant/Movant/Intervenor)*

makes the following disclosures:

    1.    Is the party identified above an individual?

        **X** YES          ___ NO

        If the answer is "YES," identify the State citizenship of that
individual:

           North Carolina
           _____

    If the answer is "NO," proceed to question No. 2 below.

2.  Identify the name and State citizenship of every individual or entity whose citizenship is attributable[1] to the party identified above:

Name of Individual/Entity

Citizenship

Vetril Holbrook

North Carolina

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

s/ Sarah Stump

02/01/2023

Signature of Attorney

Date

---

[1] "For purposes of diversity jurisdiction, the citizenship of a limited liability company . . . is determined by the citizenship of all of its members." Cent. W. Va. Energy Co., Inc. v. Mountain State Carbon, LLC, 636 F.3d 101, 103 (4th Cir. 2011). When members are LLCs themselves, the citizenship issues must be traced through until one reaches only individuals and/or corporations. See Jennings v. HCR ManorCare, Inc., 901 F.Supp.2d 649, 651 (D.S.C. 2012) ("an LLC's members' citizenship must be traced through however many layers of members there may be").

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CASE NO. 5:23-cv-13

VETRIL HOLBROOK, by and through her
representatives BRYCE HOLBROOK and SUWON
HOLBROOK, and on behalf of all living heirs,       )
                                                    )
                                                    )
Plaintiff(s),       )
                                                    )
v.                                                  )
                                                    )
                                                    )
MONSANTO COMPANY                                    )
                                                    )
Defendant(s).       )

DISCLOSURE BY NON-GOVERNMENTAL CORPORATE PARTY
OR PROPOSED INTERVENOR OF CORPORATE
AFFILIATIONS AND OTHER ENTITIES WITH A DIRECT
FINANCIAL INTEREST IN LITIGATION

This disclosure must be filed on behalf of each nongovernmental corporate entity that is a party or proposed intervenor to the action. Counsel has a continuing duty to update this information. An executed form should be electronically filed. The disclosing party must serve this form on the other parties to this action.

VETRIL HOLBROOK, by and through her
representatives BRYCE HOLBROOK and SUWON
HOLBROOK, and on behalf of all living heirs,   who is   Plaintiff _____
_(Name of Party)_                                        _(Plaintiff / Defendant/Movant/Intervenor)_
makes the following disclosure:

1. Is the party a publicly held corporation or other publicly-held entity?
   ☐ Yes        ☒ No

2. Does the party have any parent corporations?
   ☐ Yes        ☒ No

   If yes, identify all parent corporations, including grandparent and great-grandparent corporations:

3. Is 10% or more of the stock of a party owned by a publicly-held corporation or other publicly-held entity?
   ☐ Yes        ☒ No

   If yes, identify all such owners:

4. Is there any other publicly-held corporation or other publicly-held entity that has a direct financial interest in the outcome of the litigation?

   ☐ Yes        ☒ No

   If yes, identify the entity and the nature of its interest:

5. Is the party a trade association?

   ☐ Yes        ☒ No

   If yes, identify all members of the association, their parent corporations, and any publicly held companies that own 10% or more of a member's stock:

6. If the case arises out of a bankruptcy proceeding, identify any trustee and the members of any creditors' committee:

   N/A

   s/ Sarah Stump
   _____
   Signature of Attorney

   02/01/2023
   _____
   Date

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
<u>Statesville</u> DIVISION
DOCKET NO. <u>5:23-cv-13</u>

VETRIL HOLBROOK, by and through her representatives
BRYCE HOLBROOK and SUWON HOLBROOK, and on
behalf of all living heirs,                          )
                                                     )
     Plaintiff,                                     )
                                                     )
                                                     )
vs.                                                  )          MOTION FOR ADMISSION
                                                     )          *PRO HAC VICE*
MONSANTO COMPANY                               ,     )          and AFFIDAVIT
                                                     )
     Defendant.                                     )
                                                     )
                                                     )
_____                 )

    NOW COMES <u>Sarah Stump</u> ("Local Counsel"), a member in good standing with the Bar with the United States District Court for the Western District of North Carolina ("WDNC"), and moves for the admission of <u>Jessica S. Williams</u> ("Applicant"), who seeks permission to represent <u>VETRIL HOLBROOK, by and through her representatives BRYCE HOLBROOK and SUWON HOLBROOK, and on behalf of all living heirs</u> ("Client") in this above-captioned case.

    By signing this motion, Local Counsel and Applicant certify that:

    1.    Applicant is a member in good standing of the bar of the highest court of the State or of the District of Columbia where Applicant regularly practices law, which is <u>California</u>.

    2.    Applicant practices under the name of or as a member of the following firm:

**Firm Name:** <u>**Gomez Trial Attorneys**</u>

**Mailing Address:** <u>**655 W Broadway Ste 1700**</u>

**City / State / Zip:** <u>**San Diego, CA 92101**</u>

**Telephone Number:** <u>**(619) 237-3490**</u>    **Facsimile Number:** <u>**(619) 237-3496**</u>

**Email Address (required):** <u>**jwilliams@thegomezfirm.com**</u>

1

3.      Applicant certifies that s/he is also admitted to practice before and remains in good standing with the Courts in the following jurisdictions:

California State Court, Southern District of California and Central District of California

_____

4.      Applicant certifies s/he has never been the subject of any formal suspension or disbarment proceedings; never been denied admission *pro hac vice* in this or any other jurisdiction or had *pro hac vice* admission revoked; never had any certificate or privilege to appear and practice before any judicial or administrative body suspended or revoked; and has never received public discipline by any court or lawyer regulatory organization.   If Applicant cannot so certify, the applicant has attached a separate explanation including particular information disclosing the disciplinary history or the denial of admission.

5.      Applicant certifies that the client requested Applicant to represent it in this matter, along with Local Counsel.

6.      Applicant agrees to be subject to the Orders of the WDNC, including the Local Rules of the WDNC, and amenable to the disciplinary action and the civil jurisdiction of the WDNC in all respects as if the applicant were a regularly admitted and licensed member of the Bar of this Court in good standing.

7.      Local Counsel is satisfied that Applicant is qualified to practice before the Bar of the WDNC.

8.      Local Counsel has conferred with counsel for the other parties, who have indicated they          oppose this motion.

9.      The required fee for admission *pro hac vice* is being submitted with the filing of this motion.

10.      Applicant consents to electronic notification.

2

By signing this Motion, we so certify.

This, the <u>1st</u> day of <u>February</u>, 20<u>23</u>.

<u>/s/ Sarah Stump</u>                     <u>/s/ Jessica S. Williams</u>

Local Counsel                             Applicant

Attorney Name  Sarah Stump
Bar Number  52686
Firm Name  WHITLEY LAW FIRM
Firm Address  3301 Benson Drive, Suite 120
Firm City / State / Zip  Raleigh, NC 27609
Telephone Number  (919) 785-5000
Fax Number  (919) 785-3729
Email Address  sbd@whitleylawfirm.com

3

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
STATESVILLE DIVISION
CASE NO.  5:23-CV-013-KDB-DCK

| | | |
|---|---|---|
| VETRIL HOLBROOK, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **ORDER** |
| | ) | |
| MONSANTO COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**THIS MATTER IS BEFORE THE COURT** on the "Motion For Admission *Pro Hac Vice* and Affidavit*" (Document No. 5) filed by Sarah Stump, concerning Jessica S. Williams, on February 1, 2023.  Jessica S. Williams seeks to appear as counsel *pro hac vice* for Plaintiff.  Upon review and consideration of the motion, which was accompanied by submission of the necessary fee and information, the Court will <u>grant</u> the motion.

**IT IS, THEREFORE, ORDERED** that in accordance with Local Rule 83.1, the "Motion For Admission *Pro Hac Vice* and Affidavit" (Document No. 5) is **GRANTED**.  Jessica S. Williams is hereby admitted *pro hac vice* to represent Plaintiff.

**SO ORDERED**.

Signed: February 1, 2023

David C. Keesler
United States Magistrate Judge