Query    Reports    Utilities    Help    Log Out

# United States District Court
## Eastern District of Pennsylvania (Philadelphia)
## CIVIL DOCKET FOR CASE #: 2:23-cv-01234-MRP

| | |
|---|---|
| CARANCI et al v. MONSANTO COMPANY et al | Date Filed: 03/30/2023 |
| Assigned to: HONORABLE MIA ROBERTS PEREZ | Jury Demand: None |
| Case in other court:  Philadelphia Court of Common Pleas, 210602213 | Nature of Suit: 365 P.I.: Personal Inj. Prod. Liability |
| Cause: 28:1332 Diversity-Product Liability | Jurisdiction: Diversity |

**Plaintiff**

**ERNEST CARANCI**                    represented by   **THOMAS R. KLINE**
KLINE & SPECTER
1525 LOCUST STREET
19TH FLOOR
PHILADELPHIA, PA 19102
215-772-1000
Email: thomas.kline@klinespecter.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**CARMELA CARANCI**                    represented by   **THOMAS R. KLINE**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**MONSANTO COMPANY**                    represented by   **CHANDA A MILLER**
Barnes & Thornburg LLP
100 N 18th Street, Suite 415
Philadelphia, PA 19103
445-201-8900
Fax: 445-201-8901
Email: chanda.miller@btlaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**JOSEPH H. BLUM**
Shook Hardy & Bacon, L.L.P.
Two Commerce Square
2001 Market Street, Suite 3000
PHILADELPHIA, PA 19103
215-575-3115
Fax: 215-278-2594

Email: jblum@shb.com
*ATTORNEY TO BE NOTICED*

**Defendant**

**PENN HARDWARE, INC.**

**Defendant**

**PENN HARDWARE TWO, INC.**

| Date Filed | # | Docket Text |
|---|---|---|
| 03/30/2023 | 1 | NOTICE OF REMOVAL by MONSANTO COMPANY (Filing fee $ 402 receipt number APAEDC-16596236), filed by MONSANTO COMPANY. (Attachments: # 1 Certificate of Service, # 2 Exhibit A (Part 1), # 3 Exhibit A (Part 2), # 4 Exhibit A (Part 3), # 5 Exhibit B, # 6 Exhibit C, # 7 Exhibit D, # 8 Exhibit E, # 9 Exhibit F, # 10 Exhibit G, # 11 Exhibit H, # 12 Exhibit I, # 13 Exhibit J, # 14 Exhibit K, # 15 Exhibit L, # 16 Civil Cover Sheet, # 17 Designation Form)(BLUM, JOSEPH) (Entered: 03/30/2023) |
| 03/30/2023 | 2 | Disclosure Statement Form pursuant to FRCP 7.1 including Bayer AG with Certificate of Service by MONSANTO COMPANY.(BLUM, JOSEPH) (Entered: 03/30/2023) |
| 03/30/2023 | 3 | NOTICE of Appearance by CHANDA A MILLER on behalf of MONSANTO COMPANY with Certificate of Service(MILLER, CHANDA) (Entered: 03/30/2023) |

| PACER Service Center | | |
|---|---|---|
| **Transaction Receipt** | | |
| 03/30/2023 15:16:09 | | |
| **PACER Login:** | sh0019sh | **Client Code:** | 99999.00005 |
| **Description:** | Docket Report | **Search Criteria:** | 2:23-cv-01234-MRP |
| **Billable Pages:** | 2 | **Cost:** | 0.20 |

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |  |
|---|---|---|---|
| ERNEST CARANCI and CARMELA CARANCI, | ) ) ) |  |  |
| Plaintiffs | ) ) |  |  |
| v. | ) ) | No. _____ |  |
| MONSANTO COMPANY, PENN HARDWARE, INC., and PENN HARDWARE TWO, INC., | ) ) ) ) |  |  |
| Defendants | ) ) |  |  |

## DEFENDANT MONSANTO COMPANY'S NOTICE OF REMOVAL

Pursuant to 28 U.S.C. §§ 1332, 1441, and 1446 (and any other applicable laws), Defendant Monsanto Company ("Monsanto") hereby gives notice of removal of this action, captioned *Ernest Caranci, et al. v. Monsanto Company, et al.*, bearing case number 210602213, from the Court of Common Pleas of Philadelphia County, Pennsylvania to the United States District Court for the Eastern District of Pennsylvania.[1] Pursuant to 28 U.S.C. § 1446(a), Monsanto provides the following statement of grounds for removal.

## Introduction

1. Plaintiffs Ernest Caranci and Carmela Caranci bring this product liability lawsuit against Monsanto alleging injuries from the use of Monsanto's Roundup®-branded herbicides, which have glyphosate as their active ingredient. For decades, farmers have used glyphosate-based herbicides to increase crop yields, and home-owners, landscaping companies, and local government agencies have used these herbicides for highly effective weed control. Glyphosate is one of the most thoroughly studied herbicides in the world, and glyphosate-based herbicides have

---

[1] This caption is correct. Although Plaintiffs named other companies as defendants in the Complaint, those defendants were voluntarily dismissed (as discussed below), so they are no longer part of this lawsuit. *See* ¶ 14, *infra*.

received regulatory approval in more than 160 countries. Since 1974, when Monsanto first introduced a Roundup®-branded herbicide to the marketplace, the United States Environmental Protection Agency repeatedly has concluded that glyphosate does not cause cancer. Nevertheless, Plaintiffs allege that Mr. Caranci developed cancer—specifically, chronic lymphocytic leukemia ("CLL")—caused by exposure to Monsanto's glyphosate-based herbicides.

2.      This is one of many lawsuits that have been filed against Monsanto involving Roundup®-branded herbicides. A multidistrict litigation ("MDL") proceeding is pending in the United States District Court for the Northern District of California, before the Honorable Vince G. Chhabria, pursuant to 28 U.S.C. § 1407. *See In re Roundup Prods. Liab. Litig.*, No. 3:16-md-02741-VC (N.D. Cal.); *In re Roundup Prods. Liab. Litig.*, MDL No. 2741, 214 F. Supp. 3d 1346 (J.P.M.L. 2016). This case properly belongs in federal court—and more specifically, in the *Roundup* MDL proceeding.

3.      Plaintiffs are Pennsylvania citizens and therefore of diverse citizenship from Monsanto. Plaintiffs tried to avoid complete diversity and defeat Monsanto's right to remove by asserting claims against two in-forum Pennsylvania companies—Penn Hardware, Inc. and Penn Hardware Two, Inc. (collectively, the "Retailer Defendants")—from which Plaintiffs allege Mr. Caranci purchased Roundup®-branded products. However, this strategy fails because Plaintiffs have no viable claims against these in-forum defendants, so they are fraudulently joined: One of those defendants was no longer in existence when Mr. Caranci first purchased Roundup; the other was not yet in existence when Plaintiff stopped shopping at "Penn Hardware."

4.      Moreover, Plaintiffs' attempt to avoid litigating this case in federal court by naming non-diverse defendants (one of which has not been in existence for many years) while knowing all along that they have **no viable claims** against the only existing Retailer Defendant, Penn Hardware Two, Inc., constitutes bad faith. This fact was only revealed to Monsanto this month, at Plaintiff Ernest Caranci's March 3, 2023 deposition. In light of Plaintiffs' bad faith, the one-year limitation on diversity-based removals of action is inapplicable to this action. *See* 28 U.S.C. 1446 (c)(1) (providing for "bad faith" exception to one year limitation).

5.      Specifically, Monsanto learned for the first time at Mr. Caranci's deposition on March 3, 2023 that Mr. Caranci has not shopped at any "Penn Hardware" store since 1992. However, Penn Hardware Two, Inc. (a separate entity from Penn Hardware, Inc.) was not incorporated until 2005.  Accordingly, Mr. Caranci never bought a Roundup® product from Penn Hardware Two, Inc.  Plaintiffs thus have no viable claims against that defendant for purchases that allegedly occurred long before it existed.   The presence of this in-forum defendant must be disregarded when the Court evaluates the issue of diversity jurisdiction.

6.      The only other remaining in-state defendant, Penn Hardware, Inc., has not been an existing entity since 1986, which renders Plaintiffs' claims against it baseless for two different reasons: (1) Mr. Caranci did not begin using Roundup® until 1989—three years *after* Penn Hardware, Inc. had already ceased to exist, and (2) as a long-defunct entity, Penn Hardware, Inc. cannot be sued as a matter of law.  Accordingly, Penn Hardware, Inc. was also fraudulently joined. In addition, although Plaintiffs filed an affidavit of service on Penn Hardware, Inc., it is clear from the face of the affidavit of service that Penn Hardware, Inc. was not actually served.  Even if there had been valid service on this defunct entity (which has never occurred), Plaintiffs never pursued a default judgment when the company did not answer.

7.      Underscoring that Plaintiffs never had a good faith intent to prosecute their claims against the diversity-destroying defendants, Plaintiffs have never served any discovery on these local defendants and otherwise failed to litigate their claims against them.  *See In re Roundup Products Liab. Litig. (Renteria)*, No. 16-MD-02741-VC, 2022 WL 17839995 (N.D. Cal. Aug. 30, 2022) (making Section 1446(c)(1) bad-faith finding and denying remand motion because plaintiff engaged in "removal-thwarting gamesmanship" and did not actively litigate any claims against removal-spoiling defendant in state court).

8.      The timing of case-specific discovery and Mr. Caranci's deposition was governed by the case management orders applicable to all cases in the *In Re: Roundup® Products Liability Litigation* mass tort program in the Court of Common Pleas of Philadelphia County. Consequently, while Plaintiffs have known since they filed this case that they have no viable claims

against the Retailer Defendants, Monsanto was not able to learn this information until the applicable case management orders permitted case-specific discovery.

9. Accordingly, this Court should hold that it has subject matter jurisdiction and that removal is proper and timely here based on complete diversity of citizenship and Plaintiffs' bad faith efforts to avoid federal court and the *In re Roundup* MDL proceeding.

**Background and Procedural History**

10. Plaintiffs commenced this lawsuit in the Court of Common Pleas of Philadelphia County, Pennsylvania by filing a Complaint, captioned *Ernest Caranci, et al. v. Monsanto Company, et al.*, case number 210602213, on or about June 29, 2021 (the "State Court Action").

11. Pursuant to 28 U.S.C. § 1446(a), true and correct copies of the Complaint (and other filings available from the files of the Court of Common Pleas) are collectively attached as **Exhibit A**.

12. Plaintiffs originally named five defendants in this case: Monsanto Company, Bayer AG, S&H Hardware & Supply Co., Penn Hardware, Inc., and Penn Hardware Two, Inc.

13. On August 23, 2021, S&H Hardware & Supply Co. filed a Suggestion of Bankruptcy and this case was placed on deferred status. *See* S&H Hardware & Supply Co.'s Suggestion of Bankruptcy, attached as **Exhibit B**.

14. On April 20, 2022, Plaintiffs dismissed their claims against Bayer AG and S&H Hardware & Supply Co. by stipulation of the parties. *See* Stipulation to Discontinue Claims Against Bayer AG, attached as **Exhibit C**; Stipulation to Discontinue Claims Against S&H Supply Co., attached as **Exhibit D**. Thus, the only remaining defendants are Monsanto, Penn Hardware, Inc., and Penn Hardware Two.

15. On May 11, 2022, while this case remained in deferred status, the Court of Common Pleas of Philadelphia County entered an order creating the *In Re: Roundup® Products Liability Litigation* mass tort program. *See* Order Granting Petition to Coordinate Roundup Products Liability Cases in *In Re: Roundup® Products Liability Litigation*, attached as **Exhibit E**. This case is included in the *In Re: Roundup® Products Liability Litigation* mass tort program.

16.     On June 7, 2022, the Philadelphia Court of Common Pleas entered a case management order staying all discovery in the *In Re: Roundup® Products Liability Litigation* mass tort program cases.  *See* Case Management Order 1 ("CMO 1"), attached as **Exhibit F**, at ¶ 2.

17.     On February 6, 2023, the Philadelphia Court of Common Pleas entered Case Management Order 6, which identified twelve cases for case-specific discovery and trial.  *See* Case Management Order 6 ("CMO 6"), attached as **Exhibit G**.  This case is one of the cases identified in CMO 6.  *Id.* at Ex. A.

18.     On March 3, 2023, Monsanto deposed Mr. Caranci and learned for the first time facts allowing it to determine that Penn Hardware Two, Inc. is fraudulently joined.  Accordingly, Monsanto now timely files this Notice of Removal.  U.S.C. § 1446(b)(3) ("[I]f the case stated by the initial pleading is not removable, a notice of removal may be filed within thirty days after receipt by the defendant, through service or otherwise, of a copy of an amended pleading, motion, order or other paper from which it may first be ascertained that the case is one which is or has become removable.").

## Basis For Removal – Diversity Jurisdiction

## I.     The Substantive Requirements for Removal Are Satisfied.

### A. There is Complete Diversity of Citizenship Between Plaintiffs and the Only Properly Joined Defendant, Monsanto.

19.     Although complete diversity of citizenship usually is required for a federal court to have diversity jurisdiction, "[t]he doctrine of fraudulent joinder represents an exception to the requirement that removal be predicated solely upon complete diversity."  *In re Briscoe*, 448 F.3d 201, 215 (3d Cir. 2006); *see also Morris v. Princess Cruises, Inc.*, 236 F.3d 1061, 1067 (9th Cir. 2001).  A defendant removing a lawsuit from state court based on fraudulent joinder of a co-defendant is required to show that "there is no reasonable basis in fact or colorable ground supporting the claim against the joined defendant, or no real intention in good faith to prosecute the action against the defendant or seek a joint judgment."  *Briscoe*, 448 F.3d at 217.  When fraudulent joinder applies, the court can "disregard, for jurisdictional purposes, the citizenship of

certain nondiverse defendants." *Id.* at 216. Moreover, "a court can look to more than just the pleading allegations to identify indicia of fraudulent joinder." *Id.* at 219; *see also McCabe v. General Foods Corp.*, 811 F.2d 1336, 1339 (9th Cir. 1987) ("The defendant seeking removal to the federal court is entitled to present the facts showing the joinder to be fraudulent."). Fraudulent joinder also renders the so-called "forum defendant rule" inapplicable because that statutory provision applies only to "properly joined" defendants. 28 U.S.C. § 1441(b)(2).

20. In this case, Plaintiffs sued the Retailer Defendants in the hope that adding claims against Pennsylvania companies would prevent removal due to lack of diversity jurisdiction and/or due to the forum defendant rule. However, both of those Pennsylvania defendants have been fraudulently joined.

21. Plaintiffs are, and were at the time the State Court Action was filed, citizens of Pennsylvania. Complaint ¶¶ 1-2.

22. Monsanto is, and was at the time the State Court Action was filed, a corporation organized under the laws of the State of Delaware with its principal place of business in the State of Missouri. Complaint ¶ 14. Accordingly, Monsanto is deemed to be a citizen of Delaware and Missouri for purposes of federal diversity jurisdiction.

23. Plaintiffs allege that Penn Hardware, Inc. is a Pennsylvania Corporation with its principal place of business in Pennsylvania. Complaint ¶ 22.

24. Plaintiffs allege that Penn Hardware Two, Inc. is a Pennsylvania Corporation with its principal place of business in Pennsylvania. Complaint ¶ 25.

25. Therefore, disregarding the only two remaining Pennsylvania defendants—which were fraudulently joined by Plaintiffs—means that there is complete diversity of citizenship and that the forum defendant rule does not apply.[2]

---

[2] The citizenship of S&H Hardware & Supply Co. and Bayer AG is to be disregarded because these defendants have been voluntarily dismissed. *See, e.g.*, *Rubino v. Genuardi's Inc.*, No. CIV.A. 10-6078, 2011 WL 344081, at *6 (E.D. Pa. Jan. 31, 2011).

### 1.    Plaintiffs fraudulently joined Penn Hardware, Inc.

26.    According to Mr. Caranci's sworn Plaintiff Fact Sheet, Mr. Caranci did not use Roundup®-branded herbicides until 1989.  *See* Plaintiff Fact Sheet at 11-13, attached as **Exhibit H**. But Penn Hardware, Inc. ceased to exist effective December 31, 1986.  *See* December 30, 1986 Articles of Merger, attached as **Exhibit I** (identifying Penn Hardware, Inc. as a disappearing corporation following merger).  Mr. Caranci has no viable claim against Penn Hardware, Inc. for the simple reason that Penn Hardware, Inc. had already ceased to exist when Mr. Caranci first purchased Roundup®-branded herbicides.  The Articles of Merger are a matter of public record— accordingly, Plaintiffs should have discovered them when investigating their claims and filing this lawsuit and, as a result, known that Mr. Caranci never purchased Roundup®-branded herbicides from Penn Hardware, Inc.

27.    Plaintiffs also should have known that Penn Hardware, Inc. is not an existing entity that can be sued. Although their corporate names are similar, Penn Hardware, Inc. and Penn Hardware Two, Inc. are not related entities.  *See id.* (indicating that Penn Hardware, Inc., Fisher's Drexeline True Value Hardware, Inc., and Fisher's Philadelphia True Value Hardware, Inc. merged to become Fisher's True Value Hardware, Inc.); *see also* Articles of Incorporation for Penn Hardware Two, Inc., attached as **Exhibit J.**  It is evident from the face of these publicly available documents that Penn Hardware, Inc. and Penn Hardware Two, Inc. are separate entities.

28.    Under Pennsylvania law, a dissolved corporation may not be sued unless it has been served within two years of its dissolution.  *See* 15 Pa.C.S.A. § 1979(a)(2); *see also Lanzafame v. Jamison Contractors, Inc.*, No. 04-CV-4744 ARR SMG, 2007 WL 2746910, at *1 (E.D.N.Y. Sept. 19, 2007) ("Under Pennsylvania law, a dissolved corporation may be sued only if it is served within two years of its dissolution.").

29.    Here, Penn Hardware, Inc. has not been an existing entity since 1986.  Plaintiffs do not have any viable claims against Penn Hardware, Inc. for this additional reason.  *See* 15 Pa.C.S.A. § 1979(a)(2).  Consequently, Plaintiffs also have not properly served Penn Hardware, Inc.

30.     For both of these independent reasons, Plaintiffs fraudulently joined Penn Hardware, Inc. and its citizenship should be disregarded when assessing whether this lawsuit has been properly removed.

### 2.     Plaintiffs fraudulently joined Penn Hardware Two, Inc.

31.     Penn Hardware Two, Inc. is also fraudulently joined because Mr. Caranci never purchased Roundup®-branded herbicides from this defendant.

32.     Penn Hardware Two, Inc. was incorporated on July 28, 2005.  *See* Articles of Incorporation for Penn Hardware Two, Inc., attached as **Exhibit J**.  The Articles of Incorporation for Penn Hardware Two, Inc. are publicly available.

33.     At Mr. Caranci's deposition, he testified that he purchased Roundup®-branded products from a "Penn Hardware" store when he lived on Marsden Street in Philadelphia, Pennsylvania, *see* Dep. Trans. of Ernest Caranci, 137:16-138:1, attached as **Exhibit K**, and that he stopped shopping at "Penn Hardware" after he moved away from Marsden Street in Philadelphia, Pennsylvania in 1992:

> Q.  So I just want to make sure I understand.  So when you moved from Marsden, did you stop shopping at Penn Hardware?
>
> A.  Yes.
>
> * * * * *
>
> Q.   Tell me again the year you moved from Marsden?
>
> A.  When I move? [sic]
>
> Q.  Yeah.  When you moved out of that house?
>
> A.  '92.
>
> Q.  Okay.  So after '92, you would not have gone back to Penn Hardware?
>
> A. Oh, no.

*See id.* at 137:23-138:1.

34. Based on Mr. Caranci's own testimony, Plaintiffs have no viable claims against Penn Hardware Two, Inc. because it did not even exist before or in 1992—when Mr. Caranci admits that he stopped shopping at "Penn Hardware."

35. Accordingly, Plaintiffs fraudulently joined Penn Hardware Two, Inc. and its citizenship should be disregarded when assessing whether this lawsuit has been properly removed.

**B.      The Amount-in-Controversy Requirement is Satisfied.**

36. The Complaint seeks compensatory and punitive damages based on the allegations that Monsanto's Roundup®-branded herbicides caused Mr. Caranci to develop cancer (CLL). It is plausible from the face of the Complaint that Plaintiffs seek damages in excess of $75,000, exclusive of interest and costs, which satisfies the jurisdictional amount-in-controversy requirement. 28 U.S.C. § 1332(a); *see Dart Cherokee Basin Operating Co. v. Owens*, 574 U.S. 81, 89 (2014) ("[A] defendant's notice of removal need include only a plausible allegation that the amount in controversy exceeds the jurisdictional threshold."); *see also Strauss v. Ghuman Truck Serv.*, No. 15-0900, 2015 WL 1822576, at *2-3 (E.D. Pa. Apr. 22, 2015) (finding amount-in-controversy requirement met based "[o]n the face of the instant Complaint" where the plaintiff "claimed serious injuries, medical expenses, and present and future wage loss that clearly indicate[d] that the amount in controversy is in excess of $75,000"); *Ross v. First Family Fin. Servs., Inc.*, No. 2:01CV218-P-B, 2002 WL 31059582, at *8 (N.D. Miss. Aug. 29, 2002) ("[U]nspecified claims for punitive damage sufficiently serve to bring the amount in controversy over the requisite jurisdictional threshold set out in 28 U.S.C. § 1332."). In fact, numerous other lawsuits seeking damages for cancer allegedly caused by Roundup®-branded herbicides have been filed against Monsanto in other federal courts asserting jurisdiction under Section 1332(a) and alleging damages in excess of $75,000, exclusive of interest and costs.

37. In sum, this Court has original subject matter jurisdiction over this action based on Section 1332(a) because there is complete diversity of citizenship between Plaintiffs and Monsanto, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

### Procedural Requirements

**I.     The Procedural Requirements for Removal Are Satisfied**

**A.     This Notice of Removal is Timely.**

38.   This Notice of Removal is timely in accordance with 28 U.S.C. § 1446(b)(3), which states that "if the case stated by the initial pleading is not removable, a notice of removal may be filed within thirty days after receipt by the defendant, through service or otherwise, of a copy of an amended pleading, motion, order or other paper from which it may first be ascertained that the case is one which is or has become removable."  28 U.S.C. § 1446(b)(3).

39.   When the State Court Action was commenced, the "case stated by the initial pleading [was] not removable," § 1446(b)(3), because the Complaint included claims against non-diverse, Pennsylvania defendants.  Thus, based on the face of the Complaint, this lawsuit was not removable at that point due to lack of diversity of citizenship and due to the forum defendant rule, 28 U.S.C. § 1441(b)(2).  Mr. Caranci's March 3, 2023 deposition was the "other paper from which it may first be ascertained that [this] case is one which is or has become removable," § 1446(b)(3), because that is when Mr. Caranci first disclosed information to Monsanto from which it could ascertain that Penn Hardware Two, Inc. is fraudulently joined and, more importantly, that the case was removable.  This Notice of Removal is timely because it is being filed within 30 days of March 3, 2023.

40.   This Notice of Removal is also timely pursuant to 28 U.S.C. § 1446(c)(1), which states that a case may not be removed "more than 1 year after commencement of the action, unless the district court finds that the plaintiff has acted in bad faith in order to prevent a defendant from removing the action."  28 U.S.C.A. § 1446(c)(1).

41.  "[B]ad faith is evidenced by intentional conduct on behalf of the plaintiff which denies the defendant to remove the case to federal court."  *Bolus v. IAT Ins. Grp.,* No. 19-1712, 2019 WL 3001628, at *3 (E.D. Pa. July 9, 2019).  Whether a plaintiff acted in bad faith can be ascertained by circumstantial evidence.  *In re: Asbestos Prods. Liab. Litig. (No. VI),* No. 16-cv-02408, 2016 WL 4264193, at *2 (E.D. Pa. Aug. 11, 2016).

42.  Here, Plaintiffs acted in bad faith by asserting claims against the Retailer Defendants contrary to facts establishing that neither of these defendants could be potentially liable for their claims.

43.  In their Complaint, Plaintiffs alleged that Mr. Caranci "was exposed to Roundup throughout the 1990s and 2000s" and that he "purchased the Roundup he used from . . . Penn Hardware, Inc. and Penn Hardware Two, Inc.'s stores."  Compl. ¶¶ 4, 6. But the evidence establishes that Mr. Caranci did not purchase Roundup®-branded products from either of these entities.  Penn Hardware, Inc. had already ceased to exist by the time Mr. Caranci first *started* purchasing Roundup®-branded products, and Penn Hardware Two, Inc. did not exist until after Mr. Caranci admittedly *stopped* shopping at any "Penn Hardware" store.

44.  Mr. Caranci knew or should have known four important facts:  (1) when he started purchasing Roundup®-branded products; (2) when he stopped purchasing Roundup®-branded products from any "Penn Hardware" store;  (3) that Penn Hardware Inc. ceased to exist in 1986 from publicly available information; and (4) that Penn Hardware Two, Inc. formed in 2005, again, from publicly available information.  Indeed, based on Plaintiffs' decision to separately name the Retailer Defendants, it appears Plaintiffs consulted these very public records prior to filing suit.

45.  Plaintiffs' bad faith in suing the Retailer Defendants is also evident from the fact that Plaintiffs have failed to actively litigate—indeed, have failed to litigate at all—their claims

against those defendants.  *See, e.g.*, *Aguayo v. AMCO Ins. Co.*, 59 F. Supp. 3d 1225, 1262 (D.N.M.

2014) (stating that "[f]ailure to actively litigate against the removal spoiler will be deemed bad

faith"); *Massey v. 21st Century Centennial Ins. Co.*, No. 2:17-cv-01922, 2017 WL 3261419, at *4–

6 (S.D. W. Va. July 31, 2017) (relying on *Aguayo*, making Section 1446(c)(1) bad-faith finding,

and denying remand motion because, *inter alia*, plaintiff did not actively litigate her case against

removal-spoiling defendant in state court); *Forth v. Diversey Corp.*, No 13-CV-808-A, 2013 WL

6096528, at *3 (W.D.N.Y. Nov. 20, 2013) (making Section 1446(c)(1) bad-faith finding and

denying remand motion because, *inter alia*, plaintiffs did not obtain any discovery from removal-

spoiling defendant in state court).

46.  In the *In re Roundup* MDL proceeding, that court explained that the "bad faith"

standard involves determining whether the plaintiff has engaged in "gamesmanship" to prevent

removal as opposed to "actively litigat[ing] against the removal spoiler in state court: asserting

valid claims, taking discovery, negotiating settlement, seeking default judgments if the defendant

does not answer the complaint, et cetera." *In re Roundup Products Liab. Litig. (Renteria)*, No. 16-

MD-02741-VC, 2022 WL 17839995, at *3 (N.D. Cal. Aug. 30, 2022) (quoting *Aguayo*, 59 F.

Supp. 3d at 1262 (making Section 1446(c)(1) bad-faith finding and denying remand motion

because plaintiff engaged in "removal-thwarting gamesmanship" and did not actively litigate any

claims against removal-spoiling defendant in state court).

47.  Here, Plaintiffs have not actively litigated their claims against the Retailer

Defendants—and instead engaged in the type of removal-thwarting gamesmanship that 28 U.S.C.

§ 1446(c)(1) is intended to prevent.  Specifically:

       a.  Plaintiffs failed to serve Penn Hardware, Inc. Plaintiffs should have known that

           Penn Hardware, Inc. no longer exists by consulting the public records—which

again it appears they did in fact do. Nonetheless, rather than exercising any form of diligence with regard to this entity, Plaintiffs merely purported to serve Penn Hardware, Inc. by delivering the summons and complaint to an entity that they *know* (as shown by the caption of the Complaint) to be a separate entity—Penn Hardware Two, Inc.. *See* Affidavit of Service on Penn Hardware Two, Inc., attached as **Exhibit L**. This patently ineffective service illustrates Plaintiffs' bad faith.

b. Despite claiming to have effectuated service as of June 29, 2021, Plaintiffs never pursued a default judgment against Penn Hardware, Inc. even though it has not filed an answer to this day (a fact that makes sense, given that Penn Hardware, Inc. is not an existing entity).

c. Plaintiffs never served written discovery requests on, or sought depositions of, the Retailer Defendants.

d. In sum, Plaintiffs have wholly failed to litigate their claims against the Retailer Defendants.

48. Plaintiffs' actions (and lack of actions) vis-à-vis the Retailer Defendants show Plaintiffs' bad faith in naming the Retailer Defendants solely in an effort to avoid federal court—and deprive Monsanto of its right to remove this case to federal court. Plaintiffs apparently never intended to pursue claims against the Retailer Defendants at all.

49. Plaintiffs have known all along that they have no viable claims against Penn Hardware, Inc. (based upon publicly available corporate merger documents) or Penn Hardware Two, Inc. (based upon Mr. Caranci's own knowledge of his dates of purchase and publicly available information).

50.   Monsanto, on the other hand, was not able to discover that Penn Hardware Two, Inc. was fraudulently joined until the stay in the case was lifted, when Monsanto was permitted to seek and take Mr. Caranci's deposition, which it promptly did.

**B.     The Other Procedural Requirements of Removal Are Satisfied.**

51.   The Court of Common Pleas of Philadelphia County, Pennsylvania is located within the Eastern District of Pennsylvania.  Therefore, removal to this Court satisfies the venue requirement of 28 U.S.C. § 1446(a).

52.   Consent to removal is not required from the only remaining defendants (Penn Hardware, Inc. and Penn Hardware Two, Inc.) because they are not "properly joined."  28 U.S.C. § 1446(b)(2)(A).  Consent to removal is also not required from Penn Hardware, Inc. because it has not been "properly served."  *Id.*

53.   The written notice required by 28 U.S.C. § 1446(d) will be promptly filed in the Court of Common Pleas of Philadelphia County, Pennsylvania and will be promptly served on Plaintiffs.

54.   Monsanto does not waive any defenses and expressly reserves its right to raise any and all legal defenses in subsequent proceedings.

55.   If any question arises as to the propriety of this removal, Monsanto requests the opportunity to present written and oral argument in support of removal.

## Conclusion

For the foregoing reasons, Monsanto removes this lawsuit to this Court pursuant to 28 U.S.C. §§ 1332, 1441, and 1446 (and any other applicable laws).

SHOOK, HARDY & BACON L.L.P.

Dated: March 30, 2023

By: */s/ Joseph H. Blum*
Joseph H. Blum (PA Bar No. 36874)
Erin L. Leffler (PA Bar No. 204507)
Two Commerce Square
2001 Market Street, Suite 3000
Philadelphia, PA 19103
Phone: 215-278-2555
Fax: 215-278-2594
jblum@shb.com
eleffler@shb.com

*Attorneys for Defendant Monsanto Company*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that a true and correct copy of the foregoing Notice of

Removal has been served by e-mail and Federal Express on the following counsel of record:

        Thomas R. Kline, Esq.
        Tobi L. Millrood, Esq.
        Lorraine H. Donnelly, Esq.
        Helen A. Lawless, Esq.
        Christopher A. Gomez, Esq.
        Melissa A. Merk, Esq.
        KLINE & SPECTER, P.C.
        1525 Locust Street, 18th Floor
        Philadelphia, PA 19102

        *Attorneys for Plaintiffs*

Dated:  March 30, 2023            */s/ Joseph H. Blum*
                              Joseph H. Blum

                              *Attorneys for Defendant Monsanto Company*

**KLINE & SPECTER, P.C.**
By:    THOMAS R. KLINE, ESQUIRE
        KILA B. BALDWIN, ESQUIRE
        THOMAS E. BOSWORTH, ESQUIRE
        PHILIP M. PASQUARELLO, ESQUIRE
Attorney I.D. Nos. 28895/94430/323350/326263
1525 Locust Street
Philadelphia, PA 19102
(215) 772-1000
Attorneys for Plaintiffs

*Filed and Attested by the
Office of Judicial Records
28 AUG 2021 08:41 am
M. RUSSO*

| | |
|---|---|
| **ERNEST CARANCI** and **CARMELA CARANCI**, 1235 Serota Place Philadelphia, PA 19115 | **COURT OF COMMON PLEAS PHILADELPHIA COUNTY, PENNSYLVANIA** |
| *Plaintiffs* | **JUNE TERM, 2021** |
| v. | **CIVIL ACTION NO.** |
| **MONSANTO COMPANY** 800 N. Lindbergh Blvd. St. Louis, MO 63167 | **JURY TRIAL DEMANDED** |
| *And* | **CIVIL ACTION – PRODUCT LIABILITY** |
| **BAYER AG** 100 Bayer Blvd. Whippany, NJ 07981 | **NOTICE TO PLEAD AND COMPLAINT** |
| *And* | |
| **S&H HARDWARE & SUPPLY CO.** 6700 Castor Ave. Philadelphia, PA 19149 | |
| *And* | |
| **PENN HARDWARE, INC.** 7404 Frankford Ave. Philadelphia, PA 19136 | **(continued on next page)** |
| *And* | |

1

Case ID: 210602213

**PENN HARDWARE TWO, INC.**
7404 Frankford Ave.
Philadelphia, PA 19136

*Defendants.*

## NOTICE TO PLEAD TO AMENDED COMPLAINT

### NOTICE

You have been sued in court. If you wish to defend against the claims set forth in the following pages, you must take action within twenty (20) days after this complaint and notice are served, by entering a written appearance personally or by attorney and filing in writing with the court your defenses or objections to the claims set forth against you. You are warned that if you fail to do so the case may proceed without you and a judgment may be entered against you by the court without further notice for any money claimed in the complaint or for any other claim or relief requested by the plaintiff. You may lose money or property or other rights important to you.

YOU SHOULD TAKE THIS PAPER TO YOUR LAWYER AT ONCE. IF YOU DO NOT HAVE A LAWYER, GO TO OR TELEPHONE THE OFFICE SET FORTH BELOW TO FIND OUT WHERE YOU CAN GET LEGAL HELP.

**Lawyer Referral Service**
**Philadelphia Bar Association**
**1101 Market Street, 11th Floor**
**Philadelphia, PA 19107**
**(215) 238-6338**

### ADVISO

Lee han demandado a used en la corte. Si usted quiere defenderse de estas demandas expuestas en las paginas siguientes, usted tiene veinte (20) dias de plazo al partir de la fecha de la demanda y la notificacion. Hace falta asentar una comparencia escrita o en persona o con un abogado y entregar a la corte en forma escrita sus defensas o sus objeciones a las demandas en contra de su persona. Sea avisado que si usted no se defiende, la corte tomara medidas y puede continuar la demanda en contra suya sin previo aviso o notificacion. Ademas, la corte pueda decidir a favor del demandante y requiere que usted cumpla con todas las provisiones de esta demanda. Usted puede perder dinero o sus propiedades u otros derechos importantes para usted.

LLEVE ESTA DEMANDA A UN ABOGADO INMEDIATAMENTE, SI NO TIENE ABOGADO O SI NO TIENE EL DINERO SUFICIENTE DE PAGAR TAL SERVICIO, VAYA EN PERSONA O LLAME POR TELEFONO A LA OFICINA CUYA DIRECCION SE ENCUENTRA ESCRITA ABAJO PARA AVERIGUAR DONDE SE PUEDE CONSEGUIR ASISTENCIA LEGAL.

**Lawyer Referral Service**
**Philadelphia Bar Association**
**1101 Market Street, 11th Floor**
**Philadelphia, PA 19107**
**(215) 238-6338**

2

Case ID: 210602213

## AMENDED COMPLAINT

## INTRODUCTION

Plaintiffs bring this cause of action against Defendants. Plaintiff, Ernest Caranci, suffered significant injuries, including, but not limited to, Non-Hodgkin's Lymphoma ("NHL"), as a direct and proximate result of Defendants' negligent, reckless, willful, and otherwise wrongful conduct in connection with the design, development, manufacture, testing, packaging, promoting, marketing, distribution, and/or sale of the product known as Roundup®("Roundup"). Plaintiffs in this action seek recovery for damages as a result of Ernest Caranci's developing NHL and his resulting injuries, damages, and pain and suffering, all of which was directly and proximately caused by such wrongful conduct by Defendants, the unreasonably dangerous and defective nature of Roundup, and its active ingredient, glyphosate, and the attendant effects of developing NHL.

## THE PARTIES

### PLAINTIFFS

1.      Plaintiff, Ernest Caranci, is an adult citizen and resident of the Commonwealth of Pennsylvania, residing at 1235 Serota Place, Philadelphia, Pennsylvania 19115.

2.      Plaintiff, Carmela Caranci, wife of Ernest Caranci, is an adult citizen and resident of the Commonwealth of Pennsylvania, residing at 1235 Serota Place, Philadelphia, Pennsylvania 19115.

3.      Plaintiffs bring this action for personal injuries and damages sustained due to exposure to Roundup containing the active ingredient glyphosate and the surfactant polyethoxylated tallow amine ("POEA"). As a direct and proximate result of being exposed to Roundup, Ernest Caranci developed NHL.

4.      Ernest Caranci was exposed to Roundup throughout the 1990s and 2000s,.

3

Case ID: 210602213

5.      During that time period, Mr. Caranci would spray Roundup, while wearing gloves, two to three times per week for four to six months of each year.

6.      Ernest Caranci purchased the Roundup he used from S&H Hardware & Supply Co.'s, Penn Hardware, Inc.'s, and Penn Hardware Two, Inc.'s stores, all of which were at all times located in Philadelphia County, Pennsylvania.

7.      All of Plaintiff Ernest Caranci's purchases of Roundup were made in and occurred in Philadelphia County, Pennsylvania.

8.      All of Plaintiff Ernest Caranci's usage of Roundup occurred in Philadelphia County, Pennsylvania.

9.      Plaintiff, Ernest Caranci, developed NHL due to his use of Roundup in Philadelphia County.

10.      Following years of routine and repeated usage of Roundup, Ernest Caranci was diagnosed with NHL. Following his diagnosis, Ernest Caranci suffered numerous effects attendant to NHL, including chemotherapy, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup and Defendants' wrongful conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup.

11.      As a direct and proximate result of being exposed to Roundup, plaintiff Ernest Caranci developed NHL.

12.      As a direct and proximate result of these injuries, Ernest Caranci incurred medical expenses, endured pain and suffering and loss of enjoyment of life, lost wages, lost earning capacity, and has otherwise been damaged in a personal and pecuniary nature.

13.      During the entire time that Ernest Caranci was exposed to Roundup, he did not know that exposure to Roundup was injurious to his health or the health of others.

4

Case ID: 210602213

## DEFENDANTS

### MONSANTO

14.     Defendant, Monsanto Company ("Monsanto"), is a Delaware corporation with its headquarters and principal place of business in St. Louis, Missouri.    At all relevant times, Monsanto regularly conducted, transacted, and solicited business in Pennsylvania, including in Philadelphia County.

15.     At all times relevant to this complaint, Monsanto was the entity that discovered the herbicidal properties of glyphosate and the manufacturer of Roundup, which contains the active ingredient glyphosate and the surfactant POEA, as well as adjuvants and other "inert" ingredients.

### BAYER AG

16.     Defendant, Bayer AG, is a German multinational corporation with its global headquarters located in Leverkusen, Germany. At all relevant times, Bayer AG regularly conducted, transacted, and solicited business in Pennsylvania, including in Philadelphia County. Bayer AG's U.S. headquarters is located at l00 Bayer Blvd., Whippany, New Jersey. Bayer AG regularly conducts business in the Commonwealth of Pennsylvania, including in Philadelphia County.

17.     In June of 2018, Bayer AG acquired Defendant Monsanto, including its assets and liabilities, which, in turn, include the Roundup brand, for $66 billion. Through the merger, Bayer AG became the sole shareholder of Monsanto.

18.     Although Monsanto has continued to sell, distribute, and market the Roundup products at issue after the Bayer AG acquisition, on information and belief, Bayer AG undercapitalized Monsanto, exerted substantial control over Monsanto, and/or jointly participated in the commission of tortious and/or fraudulent activity with Monsanto, such that recognizing Bayer AG's distinct corporate form and shielding Bayer AG from liability would defeat public

Case ID: 210602213

policy and bring about injustices to plaintiffs, like Ernest Caranci herein, and others similarly situated. Alternatively, following the acquisition, Monsanto has been a mere alter-ego of Bayer. Alternatively, Bayer has been named as a successor to Monsanto.

## S&H HARDWARE & SUPPLY CO.

19.     Defendant, S&H Hardware & Supply Co., is a corporation that was and is incorporated under the laws of and in the Commonwealth of Pennsylvania, with its principal place of business and a registered office located at 6700 Castor Avenue, Philadelphia, Pennsylvania 19149. S&H Hardware & Supply Co. engaged in the marketing, sale, and distribution of a product line of herbicide Roundup, which contains the active ingredient glyphosate.

20.     At all relevant times, S&H Hardware & Supply Co. sold Roundup products to users, including Ernest Caranci, within the Commonwealth of Pennsylvania and City of Philadelphia, including this county, and derived substantial revenue from such sales.

21.     At all relevant times, S&H Hardware & Supply Co. regularly conducted business in Philadelphia County.

## PENN HARDWARE INC. AND PENN HARDWARE TWO, INC.

22.     Defendant, Penn Hardware, Inc., was at all times relevant hereto incorporated under the laws of and in the Commonwealth of Pennsylvania, with its principal place of business and a registered office located at 7404 Frankford Avenue, Philadelphia, Pennsylvania 19136.

23.     At all relevant times, Penn Hardware, Inc., sold Roundup products to users, including Ernest Caranci, within the Commonwealth of Pennsylvania and City of Philadelphia, including this county, and derived substantial revenue from such sales.

24.     At all relevant times, Penn Hardware, Inc. regularly conducted business in Philadelphia County.

Case ID: 210602213

25.    Defendant, Penn Hardware Two, Inc., was at all times relevant hereto incorporated under the laws of and in the Commonwealth of Pennsylvania, with its principal place of business and a registered office located at 7404 Frankford Avenue, Philadelphia, Pennsylvania 19136.

26.    At all relevant times, Penn Hardware Two, Inc., sold Roundup products to users, including Ernest Caranci, within the Commonwealth of Pennsylvania and City of Philadelphia, including this county, and derived substantial revenue from such sales.

27.    At all relevant times, Penn Hardware Two, Inc. regularly conducted business in Philadelphia County.

## JURISDICTION AND VENUE

28.    At all relevant times, Monsanto had, and continues to have, regular and systematic contact with and conducts business in and from the Commonwealth of Pennsylvania, such that it has purposefully availed itself of the laws of the Commonwealth and expects to both sue and be sued in Pennsylvania.  Additionally, Monsanto's presence in the Commonwealth of Pennsylvania satisfies the due process requirements for Pennsylvania courts to exercise jurisdiction over it. Additionally, Monsanto has consented to the exercise of jurisdiction over it by Pennsylvania courts by registering to and conducting business from the Commonwealth of Pennsylvania.

29.    At all relevant times, Monsanto has transacted business in the Commonwealth of Pennsylvania including by: (1) selling and distributing products and merchandise, including Roundup products, in the Commonwealth of Pennsylvania for the purpose of realizing pecuniary benefit from those sales and distributions; (2) shipping products and merchandise, including Roundup products, directly into and through the Commonwealth of Pennsylvania; (3) engaging in business in the Commonwealth of Pennsylvania; and/or (4) owning, using, and/or possessing real property situated in the Commonwealth of Pennsylvania.

7

Case ID: 210602213

30.     At all relevant times, Monsanto has contracted to supply services or things, including Roundup products, in the Commonwealth of Pennsylvania.

31.     At all relevant times, Bayer AG had, and continues to have, regular and systematic contact with and conducts business in and from the Commonwealth of Pennsylvania, such that it has purposefully availed itself of the laws of the Commonwealth and expects to both sue and be sued in Pennsylvania.  Additionally, Bayer AG's presence in the Commonwealth of Pennsylvania satisfies the due process requirements for Pennsylvania courts to exercise jurisdiction over it.  Additionally, Bayer AG has consented to the exercise of jurisdiction over it by Pennsylvania courts by registering to and conducting business from the Commonwealth of Pennsylvania.

32.     At all relevant times, Bayer AG has transacted business in the Commonwealth of Pennsylvania including by: (1) selling and distributing products and merchandise, including Roundup products, in the Commonwealth of Pennsylvania for the purpose of realizing pecuniary benefit from those sales and distributions; (2) shipping products and merchandise, including Roundup products, directly into and through the Commonwealth of Pennsylvania; (3) engaging in business in the Commonwealth of Pennsylvania; and/or (4) owning, using, and/or possessing real property situated in the Commonwealth of Pennsylvania.

33.     At all relevant times, Bayer AG has contracted to supply services or things, including Roundup products, in the Commonwealth of Pennsylvania.

34.     At all relevant times, S&H Hardware & Supply Co. had, and continues to have, regular and systematic contact with and conducts business in and from the Commonwealth of Pennsylvania, such that it has purposefully availed itself of the laws of the Commonwealth and expects to both sue and be sued in Pennsylvania.  Additionally, S&H Hardware & Supply Co.'s presence in the Commonwealth of Pennsylvania satisfies the due process requirements for

8

Case ID: 210602213

Pennsylvania courts to exercise jurisdiction over it. Additionally, S&H Hardware & Supply Co. has consented to the exercise of jurisdiction over it by Pennsylvania courts by registering to and conducting business from the Commonwealth of Pennsylvania.

35. At all relevant times, S&H Hardware & Supply Co. has transacted business in the Commonwealth of Pennsylvania including by: (1) selling and distributing products and merchandise, including Roundup products, in the Commonwealth of Pennsylvania for the purpose of realizing pecuniary benefit from those sales and distributions; (2) shipping products and merchandise, including Roundup products, directly into and through the Commonwealth of Pennsylvania; (3) engaging in business in the Commonwealth of Pennsylvania; and/or (4) owning, using, and/or possessing real property situated in the Commonwealth of Pennsylvania.

36. At all relevant times, S&H Hardware & Supply Co. has contracted to supply services or things, including Roundup products, in the Commonwealth of Pennsylvania.

37. At all relevant times, Penn Hardware, Inc., had, and continues to have, regular and systematic contact with and conducts business in and from the Commonwealth of Pennsylvania, such that it has purposefully availed itself of the laws of the Commonwealth and expects to both sue and be sued in Pennsylvania. Additionally, Penn Hardware, Inc.'s presence in the Commonwealth of Pennsylvania satisfies the due process requirements for Pennsylvania courts to exercise jurisdiction over it. Additionally, Penn Hardware, Inc. has consented to the exercise of jurisdiction over it by Pennsylvania courts by registering to and conducting business from the Commonwealth of Pennsylvania.

38. At all relevant times, Penn Hardware, Inc. has transacted business in the Commonwealth of Pennsylvania including by: (1) selling and distributing products and merchandise, including Roundup products, in the Commonwealth of Pennsylvania for the purpose

9

Case ID: 210602213

of realizing pecuniary benefit from those sales and distributions; (2) shipping products and merchandise, including Roundup products, directly into and through the Commonwealth of Pennsylvania; (3) engaging in business in the Commonwealth of Pennsylvania; and/or (4) owning, using, and/or possessing real property situated in the Commonwealth of Pennsylvania.

39.     At all relevant times, Penn Hardware, Inc. has contracted to supply services or things, including Roundup products, in the Commonwealth of Pennsylvania.

40.     At all relevant times, Penn Hardware Two, Inc., had, and continues to have, regular and systematic contact with and conducts business in and from the Commonwealth of Pennsylvania, such that it has purposefully availed itself of the laws of the Commonwealth and expects to both sue and be sued in Pennsylvania.  Additionally, Penn Hardware Two, Inc.'s presence in the Commonwealth of Pennsylvania satisfies the due process requirements for Pennsylvania courts to exercise jurisdiction over it. Additionally, Penn Hardware Two, Inc. has consented to the exercise of jurisdiction over it by Pennsylvania courts by registering to and conducting business from the Commonwealth of Pennsylvania.

41.     At all relevant times, Penn Hardware Two, Inc. has transacted business in the Commonwealth of Pennsylvania including by: (1) selling and distributing products and merchandise, including Roundup products, in the Commonwealth of Pennsylvania for the purpose of realizing pecuniary benefit from those sales and distributions; (2) shipping products and merchandise, including Roundup products, directly into and through the Commonwealth of Pennsylvania; (3) engaging in business in the Commonwealth of Pennsylvania; and/or (4) owning, using, and/or possessing real property situated in the Commonwealth of Pennsylvania.

42.     At all relevant times, Penn Hardware Two, Inc. has contracted to supply services or things, including Roundup products, in the Commonwealth of Pennsylvania.

10

Case ID: 210602213

43.     Venue is proper in Philadelphia County under Pennsylvania Rule of Civil Procedure 2179 because: (1) one or more defendants has a registered office and/or principal place of business located in Philadelphia County; (2) one or more defendants regularly conducts business in Philadelphia County; (3) the cause of action in this case arose in Philadelphia County; and/or (4) one or more transactions or occurrences took place in Philadelphia County out of which the cause of action arose.

### LACK OF FEDERAL SUBJECT MATTER JURISDICTION

44.     This case is not removable because Plaintiffs do not make or allege any claims that implicate a federal question. Additionally, the parties are not completely diverse, as is required to make a case removable on the basis of 28 U.S.C. § 1332 and § 1446. And finally, multiple defendants are residents and citizens of the Commonwealth of Pennsylvania. Any attempts to remove this case to federal court would be frivolous and without legal basis.

### ALLEGATIONS COMMON TO ALL COUNTS

45.     In 1970, Defendant Monsanto Company, Inc. ("Monsanto") discovered the herbicidal properties of glyphosate and began marketing it in products in 1974 under the brand name Roundup. Roundup is a non-selective herbicide used to kill weeds that commonly compete with the growing of crops. In addition to the active ingredient glyphosate, Roundup contains the surfactant Polyethoxylated tallow amine (POEA) and/or adjuvants and other so-called "inert" ingredients. In 2001, glyphosate was the most-used pesticide active ingredient in American agriculture with 85–90 million pounds used annually. That number grew to 185 million pounds in 2007.[1] As of 2013, glyphosate was the world's most widely used herbicide.

---

[1] Arthur Grube et al., U.S. Envtl. Prot. Agency, *Pesticides Industry Sales and Usage, 2006–2007 Market Estimates* 14 (2011), *available at* http://www.epa.gov/pesticides/pestsales/07pestsales/market_estimates2007.pdf.

Case ID: 210602213

46.     Monsanto is a multinational agricultural biotechnology corporation based in St. Louis, Missouri, and incorporated in Delaware.  It is the world's leading producer of glyphosate.  As of 2009, Monsanto was the world's leading producer of seeds, accounting for 27% of the world seed market.[2]  The majority of these seeds are of the Roundup Ready® brand.  The stated advantage of Roundup Ready® crops is that they substantially improve a farmer's ability to control weeds, because glyphosate can be sprayed in the fields during the growing season without harming the crops.  In 2010, an estimated 70% of corn and cotton and 90% of soybean fields in the United States were Roundup Ready®.[3]

47.     Monsanto's glyphosate products are registered in 130 countries and approved for use on over 100 different crops.[4]  They are ubiquitous in the environment.  Numerous studies confirm that glyphosate is found in rivers, streams, and groundwater in agricultural areas where Roundup is used.[5]  It has been found in food,[6] in the urine of agricultural workers,[7] and even in the urine of urban dwellers who are not in direct contact with glyphosate.[8]

---

2 ETC Group, *Who Will Control the Green Economy?* 22 (2011), *available at* http://www.etcgroup.org/files/publication/pdf_file/ETC_wwctge_4web_Dec2011.pdf.

3 William Neuman & Andrew Pollack, *Farmers Cope With Roundup-Resistant Weeds*, N.Y. TIMES, May 3, 2010, *available at* http://www.nytimes.com/2010/05/04/business/energy-environment/04weed.html?pagewan.

4 Monsanto, *Backgrounder-History of Monsanto's Glyphosate Herbicides* (Sep. 2, 2015), http://www.monsanto.com/products/documents/glyphosate-background-materials/back_history.pdf.

5 *See* U.S. Geological Survey, *USGS Technical Announcement: Widely Used Herbicide Commonly Found in Rain and Streams in the Mississippi River Basin* (2011), *available at* http://www.usgs.gov/newsroom/article.asp?ID=2909; *see also* U.S. Envtl. Prot. Agency, *Technical Factsheet on: Glyphosate*, *available at* http://www.epa.gov/safewater/pdfs/factsheets/soc/tech/glyphosa.pdf.

6 Thomas Bohn et al., *Compositional Differences in Soybeans on the Market: Glyphosate Accumulates in Roundup®Ready GM Soybeans*, 153 FOOD CHEMISTRY 207 (2013), *available at* http://www.sciencedirect.com/science/article/pii/S0308814613019201.

7 John F. Acquavella et al., *Glyphosate Biomonitoring for Farmers and Their Families: Results from the Farm Family Exposure Study*, 112(3) ENVTL. HEALTH PERSPECTIVES 321 (2004), *available at* http://www.ncbi.nlm.nih.gov/pmc/articles/PMC1241861/; Kathryn Z. Guyton et al., *Carcinogenicity of Tetrachlorvinphos, Parathion, Malathion, Diazinon & Glyphosate*, 112 IARC Monographs 76, section 5.4 (2015), *available at* http://dx.doi.org/10.1016/S1470-2045(15)70134-8.

8 Dirk Brändli & Sandra Reinacher, *Herbicides found in Human Urine*, 1 ITHAKA JOURNAL 270 (2012), *available at* http://www.ithaka-journal.net/druckversionen/e052012-herbicides-urine.pdf.

Case ID: 210602213

48.     On March 20, 2015, the International Agency for Research on Cancer ("IARC"), an agency of the World Health Organization ("WHO"), issued an evaluation of several herbicides, including glyphosate.  That evaluation was based, in part, on studies of exposures to glyphosate in several countries around the world, and it traces the health implications from exposure to glyphosate since 2001.

49.     On July 29, 2015, IARC issued the formal monograph relating to glyphosate.  In that monograph, the IARC Working Group provides a thorough review of the numerous studies and data relating to glyphosate exposure in humans.

50.     The IARC Working Group classified glyphosate as a Group 2A herbicide, which means that it is *probably carcinogenic to humans*.  The IARC Working Group concluded that the cancers most associated with glyphosate exposure are Non-Hodgkin's Lymphoma ("NHL") and other hematopoietic cancers, including lymphocytic lymphoma / chronic lymphocytic leukemia, B-cell lymphoma, and multiple myeloma.[9]

51.     The IARC evaluation is significant.  It confirms what has been believed for years: that glyphosate is toxic to humans.

52.     Nevertheless, Monsanto, since it began selling Roundup, has represented it as safe to humans and the environment.  Indeed, Monsanto has repeatedly proclaimed and continues to proclaim to the world, and particularly to United States consumers, that glyphosate-based herbicides, including Roundup, create no unreasonable risks to human health or to the environment.

---

9 *See* Guyton et al., *Carcinogenicity of Tetrachlorvinphos, Parathion, Malathion, Diazinon & Glyphosate*, *supra.*

Case ID: 210602213

## FACTS

53.     Glyphosate is a broad-spectrum, non-selective herbicide used in a wide variety of herbicidal products around the world.

54.     Plants treated with glyphosate translocate the systemic herbicide to their roots, shoot regions, and fruit, where it interferes with the plant's ability to form aromatic amino acids necessary for protein synthesis.  Treated plants generally die within two to three days.  Because plants absorb glyphosate, it cannot be completely removed by washing or peeling produce or by milling, baking, or brewing grains.

55.     For nearly 40 years, farms across the world have used Roundup without knowing of the dangers its use poses.  That is because when Monsanto first introduced Roundup, it touted glyphosate as a technological breakthrough: it could kill almost every weed without causing harm either to people or to the environment.   Of course, history has shown that not to be true. According to the WHO, the main chemical ingredient of Roundup—glyphosate—is a probable cause of cancer.   Those most at risk are farm workers and other individuals with workplace exposure to Roundup, such as garden center workers, nursery workers, and landscapers. Agricultural workers are, once again, victims of corporate greed.  Monsanto assured the public that Roundup was harmless.  In order to prove this, Monsanto has championed falsified data and has attacked legitimate studies that revealed Roundup's dangers.  Monsanto has led a prolonged campaign of misinformation to convince government agencies, farmers and the general population that Roundup is safe.

### *The Discovery of Glyphosate and Development of Roundup*

56.     The herbicidal properties of glyphosate were discovered in 1970 by Monsanto chemist John Franz. The first glyphosate-based herbicide was introduced to the market in the

Case ID: 210602213

mid-1970s under the brand name Roundup.[10]  From the outset, Monsanto marketed Roundup as a "safe" general-purpose herbicide for widespread commercial and consumer use.  It still markets Roundup as safe today.[11]

57.     In addition to the active ingredient glyphosate, Roundup formulations also contain adjuvants and other chemicals, such as the surfactant POEA, which are considered "inert" and therefore protected as "trade secrets" in manufacturing.  Growing evidence suggests that these adjuvants and additional components of Roundup formulations are not, in fact, inert and are toxic in their own right.

### *Registration of Herbicides under Federal Law*

58.     The manufacture, formulation, and distribution of herbicides, such as Roundup, are regulated under the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA" or "Act"), 7 U.S.C. § 136 *et seq.*  FIFRA requires that all pesticides be registered with the Environmental Protection Agency ("EPA" or "Agency") prior to their distribution, sale, or use, except as described by the Act.  7 U.S.C. § 136a(a).

59.     Because pesticides are toxic to plants, animals, and humans, at least to some degree, the EPA requires as part of the registration process, among other things, a variety of tests to evaluate the potential for exposure to pesticides, toxicity to people and other potential non-target organisms, and other adverse effects on the environment.  Registration by the EPA, however, is not an assurance or finding of safety.  The determination the Agency must make in registering or re-registering a product is not that the product is "safe," but rather that use of the

---

10 Monsanto, *Backgrounder, History of Monsanto's Glyphosate Herbicide* (Sep. 2, 2015), http://www.monsanto.com/products/documents/glyphosate-background-materials/back_history.pdf.

11 Monsanto, *What is Glyphosate?* (Sep. 2, 2015), http://www.monsanto.com/sitecollectiondocuments/glyphosate-safety-health.pdf.

Case ID: 210602213

product in accordance with its label directions "will not generally cause unreasonable adverse effects on the environment." 7 U.S.C. § 136a(c)(5)(D).

60.    FIFRA defines "unreasonable adverse effects on the environment" to mean "any unreasonable risk to man or the environment, taking into account the economic, social, and environmental costs and benefits of the use of any pesticide." 7 U.S.C. § 136(bb). FIFRA thus requires EPA to make a risk/benefit analysis in determining whether a registration should be granted, or a pesticide allowed to continue to be sold in commerce.

61.    The EPA and the State of California registered Roundup for distribution, sale, and manufacture in the United States and the State of California.

62.    FIFRA generally requires that the registrant, Monsanto in the case of Roundup, conducts the health and safety testing of pesticide products. The EPA has protocols governing the conduct of tests required for registration and the laboratory practices that must be followed in conducting these tests. The data produced by the registrant must be submitted to the EPA for review and evaluation. The government is not required, nor is it able, however, to perform the product tests that are required of the manufacturer.

63.    The evaluation of each pesticide product distributed, sold, or manufactured is completed at the time the product is initially registered. The data necessary for registration of a pesticide has changed over time. The EPA is now in the process of re-evaluating all pesticide products through a Congressionally-mandated process called "re-registration." 7 U.S.C. § 136a-1. In order to reevaluate these pesticides, the EPA is demanding the completion of additional tests and the submission of data for the EPA's recent review and evaluation.

64.    In the case of glyphosate, and therefore Roundup, the EPA had planned on releasing its preliminary risk assessment—in relation to the reregistration process—no later than

Case ID: 210602213

July 2015.  The EPA completed its review of glyphosate in early 2015, but it delayed releasing

the risk assessment pending further review in light of the WHO's health-related findings.

### *Scientific Fraud Underlying the Marketing and Sale of Glyphosate/Roundup*

65.      Based on early studies showing that glyphosate could cause cancer in laboratory

animals, the EPA originally classified glyphosate as *possibly carcinogenic to humans* (Group C)

in 1985.  After pressure from Monsanto, including contrary studies it provided to the EPA, the

EPA changed its classification to *evidence of non-carcinogenicity in humans* (Group E) in 1991.

In so classifying glyphosate, however, the EPA made clear that the designation did not mean the

chemical does not cause cancer:  "It should be emphasized, however, that designation of an agent

in Group E is based on the available evidence at the time of evaluation and should not be

interpreted as a definitive conclusion that the agent will not be a carcinogen under any

circumstances."[12]

66.      On two occasions, the EPA found that the laboratories hired by Monsanto to test

the toxicity of its Roundup products for registration purposes committed fraud.

67.      In the first instance, Monsanto, in seeking initial registration of Roundup by the

EPA, hired Industrial Bio-Test Laboratories ("IBT") to perform and evaluate pesticide

toxicology studies relating to Roundup.[13]  IBT performed about 30 tests on glyphosate and

glyphosate-containing products, including nine of the 15 residue studies needed to register

Roundup.

68.      In 1976, the United States Food and Drug Administration ("FDA") performed an

inspection of IBT that revealed discrepancies between the raw data and the final report relating

---

12  U.S. Envtl. Prot. Agency, *Memorandum, Subject: SECOND Peer Review of Glyphosate* 1 (1991), *available at* http://www.epa.gov/pesticides/chem_search/cleared_reviews/csr_PC-103601_30-Oct-91_265.pdf.

13 Monsanto, *Backgrounder, Testing Fraud: IBT and Craven Laboratories* (Sep. 2, 2015), http://www.monsanto.com/products/documents/glyphosate-background-materials/ibt_craven_bkg.pdf.

Case ID: 210602213

to the toxicological impacts of glyphosate.  The EPA subsequently audited IBT; it too found the toxicology studies conducted for the Roundup herbicide to be invalid.[14]  An EPA reviewer stated, after finding "routine falsification of data" at IBT, that it was "hard to believe the scientific integrity of the studies when they said they took specimens of the uterus from male rabbits."[15]

69.     Three top executives of IBT were convicted of fraud in 1983.

70.     In the second incident of data falsification, Monsanto hired Craven Laboratories in 1991 to perform pesticide and herbicide studies, including for Roundup.  In that same year, the owner of Craven Laboratories and three of its employees were indicted, and later convicted, of fraudulent laboratory practices in the testing of pesticides and herbicides.[16]

71.     Despite the falsity of the tests that underlie its registration, within a few years of its launch, Monsanto was marketing Roundup in 115 countries.

### The Importance of Roundup® to Monsanto's Market Dominance Profits

72.     The success of Roundup was key to Monsanto's continued reputation and dominance in the marketplace.  Largely due to the success of Roundup sales, Monsanto's agriculture division was out-performing its chemicals division's operating income, and that gap increased yearly.  But with its patent for glyphosate expiring in the United States in the year

---

14 U.S. Envtl. Prot. Agency, *Summary of the IBT Review Program Office of Pesticide Programs* (1983), *available at* http://nepis.epa.gov/Exe/ZyNET.exe/91014ULV.TXT?ZyActionD=ZyDocument&Client=EPA&Index=1981+Thru+1985&Docs=&Query=&Time=&EndTime=&SearchMethod=1&TocRestrict=n&Toc=&TocEntry=&QField=&QFieldYear=&QFieldMonth=&QFieldDay=&IntQFieldOp=0&ExtQFieldOp=0&XmlQuery=&File=D%3A%5Czyfiles%5CIndex%20Data%5C81thru85%5CTxt%5C00000022%5C91014ULV.txt&User=ANONYMOUS&Password=anonymous&SortMethod=h%7C-&MaximumDocuments=1&FuzzyDegree=0&ImageQuality=r75g8/r75g8/x150y150g16/i425&Display=p%7Cf&DefSeekPage=x&SearchBack=ZyActionL&Back=ZyActionS&BackDesc=Results%20page&MaximumPages=1&ZyEntry=1&SeekPage=x&ZyPURL.

15 Marie-Monique Robin, *The World According to Monsanto: Pollution, Corruption and the Control of the World's Food Supply* (2011) (citing U.S. Envtl. Prot. Agency, *Data Validation, Memo from K. Locke, Toxicology Branch, to R. Taylor, Registration Branch. Washington, D.C.* (August 9, 1978)).

16 Monsanto, *Backgrounder, Testing Fraud: IBT and Craven Laboratories*, *supra.*

Case ID: 210602213

2000, Monsanto needed a strategy to maintain its Roundup market dominance and to ward off impending competition.

73.     In response, Monsanto began the development and sale of genetically engineered Roundup Ready® seeds in 1996.  Since Roundup Ready® crops are resistant to glyphosate, farmers can spray Roundup onto their fields during the growing season without harming the crop. This allowed Monsanto to expand its market for Roundup even further; by 2000, Monsanto's biotechnology seeds were planted on more than 80 million acres worldwide and nearly 70% of American soybeans were planted from Roundup Ready® seeds.  It also secured Monsanto's dominant share of the glyphosate/Roundup market through a marketing strategy that coupled proprietary Roundup Ready® seeds with continued sales of its Roundup herbicide.

74.     Through a three-pronged strategy of increasing production, decreasing prices, and by coupling with Roundup Ready® seeds, Roundup became Monsanto's most profitable product. In 2000, Roundup accounted for almost $2.8 billion in sales, outselling other herbicides by a margin of five to one, and accounting for close to half of Monsanto's revenue.[17]   Today, glyphosate remains one of the world's largest herbicides by sales volume.

### *Monsanto has known for decades that it falsely advertises the safety of Roundup*

75.     In 1996, the New York Attorney General ("NYAG") filed a lawsuit against Monsanto based on its false and misleading advertising of Roundup products.  Specifically, the lawsuit challenged Monsanto's general representations that its spray-on glyphosate-based herbicides, including Roundup, were "**safer than table salt**" and "**practically non-toxic**" to mammals, birds, and fish.   Among the representations the NYAG found deceptive and

---

17 David Barboza, *The Power of Roundup; A Weed Killer Is A Block for Monsanto to Build On*, N.Y. TIMES, Aug. 2, 2001, *available at* http://www.nytimes.com/2001/08/02/business/the-power-of-roundup-a-weed-killer-is-a-block-for-monsanto-to-build-on.html.

Case ID: 210602213

misleading about the human and environmental safety of glyphosate and/or Roundup are the following:

a)  "Remember that environmentally friendly Roundup® herbicide is biodegradable. It won't build up in the soil so you can use Roundup® with confidence along customers' driveways, sidewalks and fences ..."

b)  "And remember that Roundup® is biodegradable and won't build up in the soil. That will give you the environmental confidence you need to use Roundup® everywhere you've got a weed, brush, edging or trimming problem."

c)  "Roundup® biodegrades into naturally occurring elements."

d)  "Remember that versatile Roundup® herbicide stays where you put it. That means there's no washing or leaching to harm customers' shrubs or other desirable vegetation."

e)  "This non-residual herbicide will not wash or leach in the soil. It ... stays where you apply it."

f)  "You can apply Accord with 'confidence because it will stay where you put it' it bonds tightly to soil particles, preventing leaching. Then, soon after application, soil microorganisms biodegrade Accord into natural products."

g)  "Glyphosate is less toxic to rats than table salt following acute oral ingestion."

h)  "Glyphosate's safety margin is much greater than required. It has over a 1,000-fold safety margin in food and over a 700-fold safety margin for workers who manufacture it or use it."

i)  "You can feel good about using herbicides by Monsanto. They carry a toxicity category rating of 'practically non-toxic' as it pertains to mammals, birds and fish."

j)  "Roundup® can be used where kids and pets will play and breaks down into natural material." This ad depicts a person with his head in the ground and a pet dog standing in an area which has been treated with Roundup.[18]

---

18 Attorney General of the State of New York, In the Matter of Monsanto Company, Assurance of Discontinuance Pursuant to Executive Law § 63(15) (Nov. 1996).

20

Case ID: 210602213

76.     On November 19, 1996, Monsanto entered into an Assurance of Discontinuance with NYAG, in which Monsanto agreed, among other things, "to cease and desist from publishing or broadcasting any advertisements [in New York] that represent, directly or by implication" that:

a)    its glyphosate-containing pesticide products or any component thereof are safe, non-toxic, harmless or free from risk.

b)    its glyphosate-containing pesticide products or any component thereof manufactured, formulated, distributed or sold by Monsanto are biodegradable

c)    its glyphosate-containing pesticide products or any component thereof stay where they are applied under all circumstances and will not move through the environment by any means.

d)    its glyphosate-containing pesticide products or any component thereof are "good" for the environment or are "known for their environmental characteristics."

e)    glyphosate-containing pesticide products or any component thereof are safer or less toxic than common consumer products other than herbicides;

f)    its glyphosate-containing products or any component thereof might be classified as "practically non-toxic."

77.     Monsanto did not alter its advertising in the same manner in any state other than New York, and on information and belief it still has not done so today.

78.     In 2009, France's highest court ruled that Monsanto had not told the truth about the safety of Roundup.  The French court affirmed an earlier judgement that Monsanto had falsely advertised its herbicide Roundup as "biodegradable" and that it "left the soil clean."[19]

---

19 *Monsanto Guilty in 'False Ad' Row*, BBC, Oct. 15, 2009, *available at* http://news.bbc.co.uk/2/hi/europe/8308903.stm.

21

Case ID: 210602213

### Classifications and Assessments of Glyphosate

79.     The IARC process for the classification of glyphosate followed IARC's stringent procedures for the evaluation of a chemical agent.  Over time, the IARC Monograph program has reviewed 980 agents.  Of those reviewed, it has determined 116 agents to be Group 1 (Known Human Carcinogens); 73 agents to be Group 2A (Probable Human Carcinogens); 287 agents to be Group 2B (Possible Human Carcinogens); 503 agents to be Group 3 (Not Classified); and one agent to be Probably Not Carcinogenic.

80.     The established procedure for IARC Monograph evaluations is described in the IARC Programme's Preamble.[20]  Evaluations are performed by panels of international experts, selected on the basis of their expertise and the absence of actual or apparent conflicts of interest.

81.     One year before the Monograph meeting, the meeting is announced and there is a call both for data and for experts.  Eight months before the Monograph meeting, the Working Group membership is selected and the sections of the Monograph are developed by the Working Group members.  One month prior to the Monograph meeting, the call for data is closed and the various draft sections are distributed among Working Group members for review and comment.  Finally, at the Monograph meeting, the Working Group finalizes review of all literature, evaluates the evidence in each category, and completes the overall evaluation.  Within two weeks after the Monograph meeting, the summary of the Working Group findings are published in *The Lancet Oncology*, and within a year after the meeting, the finalized Monograph is published.

82.     In assessing an agent, the IARC Working Group reviews the following information: (a) human, experimental, and mechanistic data; (b) all pertinent epidemiological studies and cancer bioassays; and (c) representative mechanistic data.  The studies must be publicly available and

---

20 World Health Org., *IARC Monographs on the Evaluation of Carcinogenic Risks to Humans: Preamble* (2006), available at http://monographs.iarc.fr/ENG/Preamble/CurrentPreamble.pdf.

Case ID: 210602213

have sufficient detail for meaningful review, and reviewers cannot be associated with the underlying study.

83.     In March 2015, IARC reassessed glyphosate.  The summary published in *The Lancet Oncology* reported that glyphosate is a Group 2A agent and probably carcinogenic in humans.

84.     On July 29, 2015, IARC issued its Monograph for glyphosate, Monograph Volume 112.  For Volume 112, a Working Group of 17 experts from 11 countries met at IARC from March 3–10, 2015 to assess the carcinogenicity of certain herbicides, including glyphosate.  The March meeting culminated a nearly one-year review and preparation by the IARC Secretariat and the Working Group, including a comprehensive review of the latest available scientific evidence. According to published procedures, the Working Group considered "reports that have been published or accepted for publication in the openly available scientific literature" as well as "data from governmental reports that are publicly available."

85.     The studies considered the following exposure groups: (1) occupational exposure of farmers and tree nursery workers in the United States, forestry workers in Canada and Finland and municipal weed-control workers in the United Kingdom; and (2) para-occupational exposure in farming families.

86.     Glyphosate was identified as the second-most used household herbicide in the United States for weed control between 2001 and 2007 and the most heavily used herbicide in the world in 2012.

87.     Exposure pathways are identified as air (especially during spraying), water, and food.  Community exposure to glyphosate is widespread and found in soil, air, surface water, and groundwater, as well as in food.

Case ID: 210602213

88.　The assessment of the IARC Working Group identified several case control studies of occupational exposure in the United States, Canada, and Sweden. These studies show a human health concern from agricultural and other work-related exposure to glyphosate.

89.　The IARC Working Group found an increased risk between exposure to glyphosate and NHL and several subtypes of NHL, and the increased risk persisted after adjustment for other pesticides.

90.　The IARC Working Group also found that glyphosate caused DNA and chromosomal damage in human cells. One study in community residents reported increases in blood markers of chromosomal damage (micronuclei) after glyphosate formulations were sprayed.

91.　In male CD-1 mice, glyphosate induced a positive trend in the incidence of a rare tumor: renal tubule carcinoma. A second study reported a positive trend for hemangiosarcoma in male mice. Glyphosate increased pancreatic islet-cell adenoma in male rats in two studies. A glyphosate formulation promoted skin tumors in an initiation-promotion study in mice.

92.　The IARC Working Group also noted that glyphosate has been detected in the urine of agricultural workers, indicating absorption. Soil microbes degrade glyphosate to aminomethylphosphoric acid (AMPA). Blood AMPA detection after exposure suggests intestinal microbial metabolism in humans.

93.　The IARC Working Group further found that glyphosate and glyphosate formulations induced DNA and chromosomal damage in mammals, and in human and animal cells in utero.

94.　The IARC Working Group also noted genotoxic, hormonal, and enzymatic effects in mammals exposed to glyphosate.[21] Essentially, glyphosate inhibits the biosynthesis of aromatic

---

21 Guyton et al., *Carcinogenicity of Tetrachlorvinphos, Parathion, Malathion, Diazinon & Glyphosate*, *supra* at 77.

Case ID: 210602213

amino acids, which leads to several metabolic disturbances, including the inhibition of protein and secondary product biosynthesis and general metabolic disruption.

95.     The IARC Working Group also reviewed an Agricultural Health Study, consisting of a prospective cohort of 57,311 licensed pesticide applicators in Iowa and North Carolina.[22] While this study differed from others in that it was based on a self-administered questionnaire, the results support an association between glyphosate exposure and multiple myeloma, hairy cell leukemia (HCL), and chronic lymphocytic leukemia (CLL), in addition to several other cancers.

### *Other Earlier Findings About Glyphosate's Dangers to Human Health*

96.     The EPA has a technical fact sheet, as part of its Drinking Water and Health, National Primary Drinking Water Regulations publication, relating to glyphosate. This technical fact sheet predates IARC's March 20, 2015 evaluation. The fact sheet describes the release patterns for glyphosate as follows:

**Release Patterns**

Glyphosate is released to the environment in its use as a herbicide for controlling woody and herbaceous weeds on forestry, right-of-way, cropped and non-cropped sites. These sites may be around water and in wetlands.

It may also be released to the environment during its manufacture, formulation, transport, storage, disposal and cleanup, and from spills. Since glyphosate is not a listed chemical in the Toxics Release Inventory, data on releases during its manufacture and handling are not available.

Occupational workers and home gardeners may be exposed to glyphosate by inhalation and dermal contact during spraying, mixing, and cleanup. They may also be exposed by touching soil and plants to which glyphosate was applied. Occupational exposure

---

22 Anneclare J. De Roos et al., *Cancer Incidence Among Glyphosate-Exposed Pesticide Applicators in the Agricultural Health Study*, 113 Envt'l Health Perspectives 49–54 (2005), *available at* http://www.ncbi.nlm.nih.gov/pmc/articles/PMC1253709/pdf/ehp0113-000049.pdf.

Case ID: 210602213

may also occur during glyphosate's manufacture, transport storage, and disposal.[23]

97.     In 1995, the Northwest Coalition for Alternatives to Pesticides reported that in California, the state with the most comprehensive program for reporting of pesticide-caused illness, glyphosate was the third most commonly-reported cause of pesticide illness among agricultural workers.[24]

### The Toxicity of Other Ingredients in Roundup

98.     In addition to the toxicity of the active ingredient, glyphosate, several studies support the hypothesis that the glyphosate-based formulation in Defendants' Roundup products is more dangerous and toxic than glyphosate alone.  Indeed, as early as 1991, available evidence demonstrated that glyphosate formulations were significantly more toxic than glyphosate alone.[25]

99.     In 2002, a study by Julie Marc, entitled "Pesticide Roundup® Provokes Cell Division Dysfunction at the Level of CDK1/Cyclin B Activation," revealed that Roundup causes delays in the cell cycles of sea urchins but that the same concentrations of glyphosate alone were ineffective and did not alter cell cycles.[26]

100.     A 2004 study by Marc and others, entitled "Glyphosate-based pesticides affect cell cycle regulation," demonstrated a molecular link between glyphosate-based products and cell cycle dysregulation.  The researchers noted that "cell-cycle dysregulation is a hallmark of tumor cells and human cancer.  Failure in the cell-cycle checkpoints leads genomic instability and

---

23 U.S. Envtl. Prot. Agency, *Technical Factsheet on: Glyphosate*, *supra*.

24 Caroline Cox, *Glyphosate, Part 2: Human Exposure and Ecological Effects*, 15 J. PESTICIDE REFORM 4 (1995); W.S. Peas et al., *Preventing pesticide-related illness in California agriculture: Strategies and priorities. Environmental Health Policy Program Report*, Univ. of Cal. School of Public Health, Calif. Policy Seminar (1993).

25 Martinez, T.T. and K. Brown, *Oral and pulmonary toxicology of the surfactant used in Roundup® herbicide*, PROC. WEST. PHARMACOL. SOC. 34:43-46 (1991).

26 Julie Marc, et al., *Pesticide Roundup® Provokes Cell Division Dysfunction at the Level of CDK1/Cyclin B Activation*, 15 CHEM. RES. TOXICOL. 326–331 (2002), *available at* http://pubs.acs.org/doi/full/10.1021/tx015543g.

Case ID: 210602213

subsequent development of cancers from the initial affected cell."  Further, "[s]ince cell cycle disorders such as cancer result from dysfunction of a unique cell, it was of interest to evaluate the threshold dose of glyphosate affecting the cells."[27]

101.   In 2005, a study by Francisco Peixoto, entitled "Comparative effects of the Roundup® and glyphosate on mitochondrial oxidative phosphorylation," demonstrated that Roundup's effects on rat liver mitochondria are far more toxic than equal concentrations of glyphosate alone.  The Peixoto study further suggested that the harmful effects of Roundup on mitochondrial bioenergetics could not be exclusively attributed to glyphosate but could be the result of other chemicals, such as the surfactant POEA, or in the alternative, due to a potential synergic effect between glyphosate and other ingredients in the Roundup formulation.[28]

102.   In 2009, Nora Benachour and Gilles-Eric Seralini published a study examining the effects of Roundup and glyphosate on human umbilical, embryonic, and placental cells.  The study tested dilution levels of Roundup and glyphosate that were far below agricultural recommendations, corresponding with low levels of residue in food.  The researchers ultimately concluded that supposed "inert" ingredients, and possibly POEA, alter human cell permeability and amplify toxicity of glyphosate alone.  The researchers further suggested that assessments of glyphosate toxicity should account for the presence of adjuvants or additional chemicals used in the formulation of the complete pesticide.  The study confirmed that the adjuvants present in

---

27 Julie Marc, et al., *Glyphosate-based pesticides affect cell cycle regulation*, 96 BIOLOGY OF THE CELL 245, 245-249 (2004), *available at* http://onlinelibrary.wiley.com/doi/10.1016/j.biolcel.2003.11.010/epdf.

28 Francisco Peixoto, *Comparative effects of the Roundup® and glyphosate on mitochondrial oxidative phosphorylation*, 61 CHEMOSPHERE 1115, 1122 (2005), *available at* https://www.researchgate.net/publication/7504567_Comparative_effects_of_the_Roundup_and_glyphosate_on_mitochondrial_oxidative_phosphorylation.

Case ID: 210602213

Roundup are not, in fact, inert and that Roundup is potentially far more toxic than its active ingredient glyphosate alone.[29]

103.    The results of these studies were at all times available to Defendants.

104.    Monsanto's chief toxicologist Donna Farmer has admitted that she cannot say that Roundup does not cause cancer because Monsanto has not performed carcinogenicity studies with the formulated product Roundup, the very product that caused Ernest Caranci's NHL.[30]  Indeed, she further admitted that in the 35 years that Monsanto has marketed Roundup to the public, Monsanto has conducted no chronic carcinogenicity studies on the formulated Roundup product merely because EPA did not require that such a study be performed for registration of glyphosate.[31]

105.    Defendants thus knew or should have known that Roundup is more toxic than glyphosate alone and that safety studies of Roundup, Roundup's adjuvants and "inert" ingredients, and/or the surfactant POEA were necessary to protect Ernest Caranci from Roundup.

106.    Despite its knowledge that Roundup is considerably more dangerous than glyphosate alone, Defendants continued to promote Roundup as safe.

### *Monsanto's Industry Ties*

107.    Monsanto has been able to leverage its contacts within the EPA to protect glyphosate and Roundup from scrutiny and review.

108.    Internal Monsanto documents, including email communications, demonstrate that Jess Rowland, former Deputy Division Director, Health Effects Division of the EPA's OPP, and

---

29 Nora Benachour, et al., *Glyphosate Formulations Induce Apoptosis and Necrosis in Human Umbilical, Embryonic, and Placental Cells*, 22 CHEM. RES. TOXICOL. 97-105 (2008), *available at* http://big.assets.huffingtonpost.com/france.pdf.
30 *See* Plaintiffs' Submission in Response to Pretrial Order No. 8, Ex. 7, *In re: Roundup® Products Liability Litigation*, MDL No. 2741 (N.D. Cal., Mar. 14, 2017), ECF No. 187-7.
31 *See id.*

28

Case ID: 210602213

formerly the chair of the CARC (the same committee that inadvertently leaked the EPA's glyphosate report in April 2016), repeatedly and directly intervened on Monsanto's behalf. These same documents reveal that Monsanto was secure in the knowledge that it had allies within the EPA.

109.   To begin, in the months following IARC's initial March 2015 announcement that it had classified glyphosate as a probable carcinogen, Monsanto turned its attention to the EPA's review of glyphosate. In one April 27, 2015 email, Monsanto official Bill Heydens wrote to colleagues to suggest "approaching EPA and…. ask if there is anything that would help them defend the situation?" His colleague Dan Jenkins responded: "I think you and I could get on the phone w Jess Rowland and discuss this pretty openly. He'll give us straight talk."[32]

110.   The following day, Mr. Jenkins spoke to Mr. Rowland by telephone and then relayed the substance of the conversation for his colleagues in an April 28, 2015 email. Specifically, he reported back that with respect to the CARC investigation, Mr. Rowland had stated: "We have enough to sustain our conclusions. Don't need gene tox or epi . . . . I am the chair of the CARC and my folks are running this process for glyphosate in reg review. I have called a CARC meeting in June."[33] Thus, even though the ostensible purpose of the CARC review was to evaluate the exhaustive IARC assessment on glyphosate, and even though the full IARC monograph on glyphosate would not be completed until July 2015, Mr. Rowland had already formed his conclusion months earlier—in April 2015.

111.   Mr. Rowland also intervened to halt another agency's review of glyphosate. When the Agency for Toxic Substances and Disease Registry (ATSDR), a federal public health agency

---

32 *See* Plaintiffs' Motion to Compel the Deposition of Jess Rowland, Ex. D, In re: Roundup® Products Liability Litigation, MDL No. 2741 (N.D. Cal., Mar. 14, 2017), ECF No. 189-4.

33 *Id.*

Case ID: 210602213

of the U.S. Department of Health and Human Services, announced in February 2015 that it planned to publish a toxicological review of glyphosate, it was Mr. Rowland who helped Monsanto stop the ATSDR's investigation. In the same April 28, 2015, email discussed above, Mr. Jenkins explained that Mr. Rowland wanted to help Monsanto stop an investigation concerning the carcinogenicity of glyphosate being conducted by ATSDR.[34] Since ATSDR is not controlled by the EPA, according to Mr. Jenkins, Mr. Rowland had bragged: "If I can kill this I should get a medal."[35] Jenkins cautioned, however, that Monsanto should not "get your hopes up, I doubt EPA and Jess can kill this; but it's good to know they are going to actually make the effort now to coordinate due to our pressing and their shared concern that ATSDR is consistent in its conclusions with the EPA."[36] The ATSDR never published its toxicological profile of glyphosate.

112. Further, the released documents reveal Monsanto's confidence that its allies within the EPA would continue to support glyphosate. In an internal memo on glyphosate, Monsanto executives wrote: "We know, *but cannot say*, that EPA's Office of Pesticide Program scientists strongly feel that glyphosate does not cause cancer and have defended their written determination internally for months."[37] Notably, when Mr. Rowland attended the IARC glyphosate meetings as an observed for the EPA, internal communications indicate Monsanto was not displeased with his attendance since, "we all know Jess."[38]

---

[34] See id.
[35] Id.
[36] *Id*.
[37] See Plaintiffs' Motion to Compel the Deposition of Jess Rowland, Ex. E, In re: Roundup® Products Liability Litigation, MDL No. 2741 (N.D. Cal., Mar. 14, 2017), ECF No. 189-5 (emphasis original).
[38] *See* Plaintiffs' Motion to Compel the Deposition of Jess Rowland, Ex. G, *In re: Roundup® Products Liability Litigation*, MDL No. 2741 (N.D. Cal., Mar. 14, 2017), ECF No. 189-7.

30

Case ID: 210602213

### *Recent Worldwide Bans on Roundup/Glyphosate*

113.     Several countries around the world have instituted bans on the sale of Roundup and other glyphosate-containing herbicides, both before and since IARC first announced its assessment for glyphosate in March 2015, and more countries undoubtedly will follow suit as the dangers of the use of Roundup become more widely known.   The Netherlands issued a ban on all glyphosate-based herbicides in April 2014, including Roundup, which will take effect by the end of 2015.  In issuing the ban, the Dutch Parliament member who introduced the successful legislation stated: "Agricultural pesticides in user-friendly packaging are sold in abundance to private persons.  In garden centers, Roundup is promoted as harmless, but unsuspecting customers have no idea what the risks of this product are.  Especially children are sensitive to toxic substances and should therefore not be exposed to it."[39]

114.     The Brazilian Public Prosecutor in the Federal District requested that the Brazilian Justice Department suspend the use of glyphosate.[40]

115.     France banned the private sale of Roundup and glyphosate following the IARC assessment for Glyphosate.[41]

116.     Bermuda banned both the private and commercial sale of glyphosates, including Roundup.  The Bermuda government explained its ban as follows: "Following a recent scientific

---

[39] *Holland's Parliament Bans Glyphosate Herbicides*, The Real Agenda, April 14, 2014, *available at* http://real-agenda.com/hollands-parliament-bans-glyphosate-herbicides/.

[40] Christina Sarich, *Brazil's Public Prosecutor Wants to Ban Monsanto's Chemicals Following Recent Glyphosate-Cancer Link*, GLOBAL RESEARCH, May 14, 2015, *available at* http://www.globalresearch.ca/brazils-public-prosecutor-wants-to-ban-monsantos-chemicals-following-recent-glyphosate-cancer-link/5449440; *see* Ministério Público Federal, *MPF/DF reforça pedido para que glifosato seja banido do mercado nacional*, April, 14, 2015, *available at* http://noticias.pgr.mpf.mp.br/noticias/noticias-do-site/copy_of_meio-ambiente-e-patrimonio-cultural/mpf-df-reforca-pedido-para-que-glifosato-seja-banido-do-mercado-nacional.

[41] Zoe Schlanger, *France Bans Sales of Monsanto's Roundup® in Garden Centers, 3 Months After U.N. Calls it 'Probable Carcinogen'*, NEWSWEEK, June 15, 2015, *available at* http://www.newsweek.com/france-bans-sale-monsantos-roundup-garden-centers-after-un-names-it-probable-343311.

31

Case ID: 210602213

study carried out by a leading cancer agency, the importation of weed spray 'Roundup' has been suspended."[42]

117.     The Sri Lankan government banned the private and commercial use of glyphosate, particularly out of concern that glyphosate has been linked to fatal kidney disease in agricultural workers.[43]

118.     The government of Colombia announced its ban on using Roundup and glyphosate to destroy illegal plantations of coca, the raw ingredient for cocaine, because of the WHO's finding that glyphosate is probably carcinogenic.[44]

### *Statement of Concern Regarding Glyphosate-Based Herbicides*

119.     On February 17, 2016, a consensus statement published in the journal *Environmental Health*, entitled "Concerns over use of glyphosate-based herbicides and risks associated with exposures: a consensus statement," assessed the safety of glyphosate-based herbicides (GBHs).[45]   The paper's "focus is on the unanticipated effects arising from the worldwide increase in use of GBHs, coupled with recent discoveries about the toxicity and human health risks stemming from use of GBHs."[46]   The researchers drew seven factual conclusions about GBHs:

    1.     GBHs are the most heavily applied herbicide in the world and usage continues to rise;

---

42 *Health Minister: Importation of Roundup® Weed Spray Suspended*, Today in Bermuda, May, 11 2015, *available at* http://www.todayinbermuda.com/news/health/item/1471-health-minister-importation-of-roundup-weed-spray-suspended.

43 *Sri Lanka's New President Puts Immediate Ban on Glyphosate Herbicides*, Sustainable Pulse, May 25, 2015, *available at* http://sustainablepulse.com/2015/05/25/sri-lankas-new-president-puts-immediate-ban-on-glyphosate-herbicides/#.VeduYk3bKAw.

44 *Columbia to ban coca spraying herbicide glyphosate*, BBC, May 10, 2015, *available at* http://www.bbc.com/news/world-latin-america-32677411.

45 John P. Myers, et al, *Concerns over use of glyphosate-based herbicides and risks associated with exposures: a consensus statement*, Environmental Health (2016), *available at* http://ehjournal.biomedcentral.com/articles/10.1186/s12940-016-0117-0.

46 *Id.*

32

Case ID: 210602213

2.   Worldwide, GBHs often contaminate drinking water sources, precipitation, and air, especially in agricultural regions;

3.   The half-life of glyphosate in water and soil is longer than previously recognized;

4.   Glyphosate and its metabolites are widely present in the global soybean supply;

5.   Human exposures to GBHs are rising;

6.   Glyphosate is now authoritatively classified as a probable human carcinogen; and

7.   Regulatory estimates of tolerable daily intakes for glyphosate in the United States and European Union are based on outdated science.[47]

120.   The researchers noted that GBH use has increased approximately 100-fold since the 1970s.  Further, far from posing a limited hazard to vertebrates, as previously believed, two decades of evidence demonstrated that "several vertebrate pathways are likely targets of action, including hepatorenal damage, effects on nutrient balance through glyphosate chelating action and endocrine disruption."[48]

121.   The paper attributed uncertainties in current assessments of glyphosate formulations to the fact that "[t]he full list of chemicals in most commercial GBHs is protected as 'commercial business information,' despite the universally accepted relevance of such information to scientists hoping to conduct an accurate risk assessment of these herbicide formulations." Further, the researchers argue, "[t]he distinction in regulatory review and decision processes

---

47 *Id.*
48 *Id.*

Case ID: 210602213

between 'active' and 'inert' ingredients has no toxicological justification, given increasing evidence that several so-called 'inert' adjuvants are toxic in their own right."[49]

122.    Among various implications, the researchers conclude that "existing toxicological data and risk assessments are not sufficient to infer that GBHs, as currently used, are safe." Further, "GBH-product formulations are more potent, or toxic, than glyphosate alone to a wide array of non-target organisms including mammals, aquatic insects, and fish." Accordingly, "risk assessments of GBHs that are based on studies quantifying the impacts of glyphosate alone underestimate both toxicity and exposure, and thus risk." The paper concludes that this "shortcoming has repeatedly led regulators to set inappropriately high exposure thresholds."[50]

123.    The researchers also critiqued the current practice of regulators who largely rely on "unpublished, non-peer reviewed data generated by the registrants" but ignore "published research because it often uses standards and procedures to assess quality that are different from those codified in regulatory agency data requirements, which largely focus on avoiding fraud." In the researchers' view, "[s]cientists independent of the registrants should conduct regulatory tests of GBHs that include glyphosate alone, as well as GBH-product formulations."[51]

124.    The researchers also called for greater inclusion of GBHs in government-led toxicology testing programs:

> [A] fresh and independent examination of GBH toxicity should be undertaken, and . . . this re-examination be accompanied by systematic efforts by relevant agencies to monitor GBH levels in people and in the food supply, none of which are occurring today. The U.S. National Toxicology Program should prioritize a thorough toxicological assessment of the multiple pathways now identified as potentially vulnerable to GBHs.[52]

---

49 *Id.*

50 *Id.*

51 *Id.*

52 *Id.*

34

Case ID: 210602213

125. The researchers suggest that, in order to fill the gap created by an absence of government funds to support research on GBHs, regulators could adopt a system through which manufacturers fund the registration process and the necessary testing:

> "[W]e recommend that a system be put in place through which manufacturers of GBHs provide funds to the appropriate regulatory body as part of routine registration actions and fees. Such funds should then be transferred to appropriate government research institutes, or to an agency experienced in the award of competitive grants. In either case, funds would be made available to independent scientists to conduct the appropriate long-term (minimum 2 years) safety studies in recognized animal model systems. A thorough and modern assessment of GBH toxicity will encompass potential endocrine disruption, impacts on the gut microbiome, carcinogenicity, and multigenerational effects looking at reproductive capability and frequency of birth defects."[53]

126. Despite these stated concerns, Monsanto, to date, has failed to test its formulated Roundup products.

## **TOLLING OF THE STATUTE OF LIMITATIONS**

127. Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

### *Discovery Rule Tolling*

128. Plaintiff Ernest Caranci suffers from, has suffered from, and acquired an illness and disease, NHL, that has a latency period and does not arise until years after exposure.

129. Plaintiff Ernest Caranci had no way of knowing about the risks of serious illness associated with the use of and/or exposure to Roundup and glyphosate and/or reasonably discovering his causes of action and/or that his causes of action were attributable to conduct of

---

[53] *Id.*

Case ID: 210602213

another – Defendants – until he was made aware that his NHL could be caused by his use of and/or exposure to Roundup.

130.     Consequently, the discovery rule applies to this case, and the statute of limitations has been tolled and thus does not being to run until the day that Plaintiff and/or Ernest Caranci knew or had reason to know through the exercise of reasonable diligence that Ernest Caranci's NHL was linked to his use of and/or exposure to Roundup.

131.     Within two years of being diagnosed with NHL, Plaintiff Ernest Caranci could not have discovered, through the exercise of reasonable diligence, that exposure to Roundup and glyphosate is injurious to human health.

132.     Plaintiff Ernest Caranci did not know or have reason to know that he suffered his NHL due to the fault of another or due to his use of and/or exposure to Roundup until 2021.

133.     The very first time plaintiff Ernest Caranci knew or had reason to believe that he developed NHL due to the fault of another or due to his use of and/or exposure to Roundup occurred within 2021.

134.     For these reasons, all applicable statutes of limitations have been tolled by operation of the discovery rule with respect to Plaintiffs' claims.

### *Fraudulent Concealment*

135.     The running of the statute of limitations has been equitably tolled by reason of Defendants' fraudulent concealment and conduct, as alleged above.  Through their affirmative misrepresentations and omissions upon which Ernest Caranci justifiably relied, Defendants actively concealed from Ernest Caranci the true risks associated with use of or exposure to Roundup.

Case ID: 210602213

136.     As a result of Defendants' actions, Ernest Caranci was unaware, and could not reasonably have known or have learned through reasonable diligence, that Ernest Caranci had been exposed to the risks alleged herein and that those risks were the direct and proximate result of Defendants' acts and omissions.

137.     Defendants are estopped from relying on any statute of limitations because of their concealment of the truth regarding the safety of Roundup.  Defendants were under a duty to disclose the true character, quality and nature of Roundup because this was non-public information over which they continue to have exclusive control.  Defendants knew that this information was not available to others, including Ernest Caranci, Ernest Caranci's medical providers and/or their health facilities, yet they failed to disclose the information to the public.

138.     Defendants had the ability to and did spend enormous amounts of money in furtherance of their purposes of marketing and promoting a profitable product, notwithstanding the known or reasonably knowable risks.  Plaintiff Ernest Caranci and medical professionals could not have afforded to and could not have possibly conducted studies to determine the nature, extent and identity of related health risks, and they were forced to rely on Defendants' representations.

*Estoppel*

139.     Defendants were under a continuous duty to disclose to consumers, users and other persons coming into contact with their products, including Plaintiff Ernest Caranci, accurate safety information concerning its products and the risks associated with the use of and/or exposure to Roundup and glyphosate.

140.     Instead, Defendants' knowingly, affirmatively, and actively concealed safety information concerning Roundup and glyphosate and the serious risks associated with the use of and/or exposure to its products.

Case ID: 210602213

141.    Based on the foregoing, Defendants' estopped from relying on any statutes of limitations in defense of this action.

142.    The defendants' negligence, recklessness, fraudulent concealment, strict liability, and all other wrongful conduct as alleged throughout the entirety of this Complaint were factual causes of and/or placed plaintiff Ernest Caranci at an increased risk of harm for and/or were substantial factors in causing and did in fact directly and proximately cause the severe, permanent and grievous personal injuries and damages to Ernest Caranci previously described herein which include:

a)    Cancer;

b)    NHL;

c)    Multiple medical tests and procedures for treatment of NHL;

d)    Increased risk of developing NHL;

e)    Development of NHL;

f)    Multiple hospitalizations;

g)    Past and future conscious physical pain and suffering;

h)    Past and future conscious mental and psychological pain and suffering;

i)    Past and future mental anguish, severe emotional distress, disfigurement, embarrassment, humiliation, depression, anxiety, and fear;

j)    Past and future loss of life's pleasures;

k)    Past and future medical expenses;

l)    Past and future loss of income and wages;

m)    Past and future loss of earning capacity;

n)    Past and future pecuniary losses and damages;

o)    Loss of consortium;

38

Case ID: 210602213

    p)      Increased risk of harm; and

    q)      All injuries and damages set forth in Ernest Caranci's medical records and otherwise permissible under Pennsylvania law.

**WHEREFORE**, Plaintiffs demand damages, including punitive damages, against all Defendants, individually, jointly, and severally, in an amount in excess of the prevailing arbitration limits, exclusive of pre-judgment interest, delay damages and costs.

<u>**COUNT ONE: STRICT LIABILITY**</u>
**(Plaintiffs v. All Defendants)**

143.    Plaintiffs incorporate by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

144.    All Defendants are in the business of selling Roundup products.

145.    All Defendants had a nondelegable duty to place into the stream of commerce only those products that were free of defects and dangers and, further, to refrain from placing into the stream of commerce products that were in a defective condition, were unreasonably dangerous, that fail to perform as safely as an ordinary consumer would expect when used in an intended or reasonably foreseeable manner, and/or for which, on balance, the risks of their design outweigh the benefits of the same.

146.    Defendants Monsanto and/or Bayer AG expected their Roundup products to reach consumers, users, and other persons coming into contact with them, including Ernest Caranci, without substantial change in their condition from when those products were designed and manufactured.

147.    Defendants Monsanto and Bayer AG did, in fact, sell their Roundup products to S&H Hardware & Supply Co., Penn Hardware, Inc., and Penn Hardware Two, Inc. knowing that those Roundup products would reach consumers, users, and other persons coming into contact with

Case ID: 210602213

them, including Plaintiff Ernest Caranci, without substantial change in their condition from when those products were designed and manufactured.

148.    S&H Hardware & Supply Co., Penn Hardware, Inc., and Penn Hardware Two, Inc., in turn, sold those Roundup products to consumers, users, and other persons who came into contact with them, including Ernest Caranci, without substantial change in their condition from when those products were designed and manufactured.

149.    At all relevant times, those Roundup products were in a defective condition, were unreasonably dangerous, failed to perform as safely as an ordinary consumer would expect when used in an intended or reasonably foreseeable manner, and/or on balance, the risks of their design outweighed the benefits of the same, once those products reached consumers, users, and other persons who came into contact with them, including Ernest Caranci.

150.    At all times relevant to this litigation, Ernest Caranci used and/or was exposed to Roundup products in an intended or reasonably foreseeable manner without knowledge of their dangerous characteristics.

151.    Plaintiff Ernest Caranci could not have reasonably discovered the defects and risks associated with Roundup or glyphosate-containing products before or at the time of exposure.

152.    The harm caused by Roundup products far outweighed their benefit, rendering the products dangerous to an extent beyond that which an ordinary consumer would contemplate.  The Roundup products were and are more dangerous than alternative products and Defendants could have avoided selling the Roundup products in such a dangerous form.  Indeed, at the time that Defendants placed these Roundup products into the stream of commerce, the state of the industry's scientific knowledge was such that a less risky design or formulation was attainable.

Case ID: 210602213

153. Placing these Roundup products into the stream of commerce amounts to willful, wanton, and/or reckless conduct by Defendants.

154. As a direct and proximate result of the defective design and manufacture of Roundup products, Ernest Caranci developed NHL and was injured catastrophically, including severe pain, suffering, disability, impairment, loss of enjoyment of life, loss of care, loss of comfort, death, economic damages, and all the damages alleged throughout the entirety of this complaint.

155. Therefore, as a result of the unreasonably dangerous condition of the Roundup products, Defendants are strictly liable to Plaintiffs.

156. The defects in the Roundup products were substantial and contributing factors in causing Ernest Caranci's grave injuries, and, but for Defendants' misconduct and omissions, Plaintiff Ernest Caranci would not have sustained their injuries.

157. As a direct and proximate result of the defective design and manufacture of Roundup products, Ernest Caranci developed NHL and was injured catastrophically and caused to suffer severe and permanent pain, suffering, disability, impairment, loss of enjoyment of life, loss of care, loss of comfort, death, and economic damages, giving rise to Plaintiffs' damages herein.

**WHEREFORE**, Plaintiffs demand damages, including punitive damages against Defendants Monsanto and Bayer, against all Defendants, individually, jointly, and severally, in an amount in excess of the prevailing arbitration limits, exclusive of pre-judgment interest, delay damages and costs.

Case ID: 210602213

## COUNT TWO: STRICT LIABILITY FOR DEFECTIVE MANUFACTURE AND DESIGN

### (Plaintiffs v. Defendants Monsanto and Bayer AG)

158. Plaintiffs incorporate by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

159. Plaintiffs bring this strict liability claim against Defendants Monsanto and Bayer AG for defective manufacture and design.

160. At all relevant times, Defendants Monsanto and Bayer AG engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting Roundup products, which are defective and unreasonably dangerous to consumers, users, and other persons coming into contact with them, including Plaintiff Ernest Caranci, thereby placing Roundup products into the stream of commerce. These actions were under the ultimate control and supervision of Defendants Monsanto and Bayer AG.

161. At all times relevant to this litigation, Defendants Monsanto and Bayer AG designed, researched, developed, formulated, manufactured, produced, tested, assembled, labeled, advertised, promoted, marketed, sold, and distributed the Roundup products used by Ernest Caranci, and/or to which Ernest Caranci was exposed, as described above.

162. At all times relevant to this litigation, Defendants Monsanto and Bayer AG's Roundup products were manufactured, designed, and labeled in an unsafe, defective, and inherently dangerous manner that was dangerous for use by or exposure to the public, and, in particular, Ernest Caranci.

163. At all times relevant to this litigation, Defendants Monsanto and Bayer AG's Roundup products reached the intended consumers, handlers, and users or other persons coming into contact with these products in Pennsylvania and throughout the United States, including

42

Case ID: 210602213

Ernest Caranci, without substantial change in their condition as designed, manufactured, sold, distributed, labeled, and marketed by Defendants Monsanto and Bayer AG.

164.    Defendants Monsanto and Bayer AG's Roundup products, as researched, tested, developed, designed, licensed, formulated, manufactured, packaged, labeled, distributed, sold, and marketed by Defendants Monsanto and Bayer AG, were defectively manufactured and designed by Defendants Monsanto and Bayer AG in that when they left the hands of the Defendants Monsanto and Bayer AG's manufacturers and/or suppliers, they were unreasonably dangerous because they were not as safe as an ordinary consumer would expect when used in an intended or reasonably foreseeable manner.

165.    Defendants Monsanto and Bayer AG Roundup products, as researched, tested, developed, designed, licensed, formulated, manufactured, packaged, labeled, distributed, sold, and marketed by Defendants Monsanto and Bayer AG, were defective in manufacture, design, and formulation in that when they left the hands of Defendants Monsanto and Bayer AG's manufacturers and/or suppliers, the foreseeable risks associated with these products' reasonably foreseeable uses exceeded the alleged benefits associated with their design and formulation.

166.    At all relevant times, Defendants Monsanto and Bayer AG's Roundup products created significant risks to the health and safety of consumers and others who were exposed to the products that far outweigh the risks posed by other products on the market used for the same or similar purpose.

167.    Therefore, at all relevant times to this litigation, Defendants Monsanto and Bayer AG's Roundup products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold and marketed by Defendants, were defective in design and formulation, in one or more of the following ways:

Case ID: 210602213

a) When placed in the stream of commerce, the Roundup products were defective in design and formulation, and, consequently, dangerous to an extent beyond that which an ordinary consumer would expect.

b) When placed in the stream of commerce, the Roundup products were unreasonably dangerous in that they were hazardous and posed a grave risk of cancer and other serious illnesses when used in a reasonably anticipated manner.

c) When placed in the stream of commerce, the Roundup products contained unreasonably dangerous design defects and were not reasonably safe when used in a reasonably anticipated or intended manner.

d) Defendants Monsanto and Bayer AG did not sufficiently test, investigate, or study its Roundup products and, specifically, the active ingredient glyphosate.

e) Defendants Monsanto and Bayer AG failed to test, investigate, or study its formulated Roundup products.

f) Exposure to Roundup and glyphosate-containing products presents a risk of harmful side effects that outweighs any potential utility stemming from the use of the herbicide.

g) Defendants Monsanto and Bayer AG knew or should have known at the time of marketing its Roundup products that exposure to Roundup and specifically, its active ingredient glyphosate, could result in cancer and other severe illnesses and injuries.

h) Defendants Monsanto and Bayer AG did not conduct adequate post-marketing surveillance of its Roundup products.

i) Defendants could have employed safer alternative designs and formulations.

168. At all times relevant to this litigation, Ernest Caranci used and/or was exposed to Defendants Monsanto and Bayer AG's Roundup products in an intended or reasonably foreseeable manner without knowledge of their dangerous characteristics.

169. Ernest Caranci could not have reasonably discovered the defects and risks associated with Roundup or glyphosate-containing products before or at the time of exposure.

170. The harm caused by Defendants Monsanto and Bayer AG's Roundup products far outweighed their benefit, rendering Defendants Monsanto and Bayer AG's products dangerous to

Case ID: 210602213

an extent beyond that which an ordinary consumer would contemplate. Defendants Monsanto and Bayer AG's Roundup products were and are more dangerous than alternative products and Defendants Monsanto and Bayer AG could have designed its Roundup products to make them less dangerous. Indeed, at the time that Defendants Monsanto and Bayer AG designed their Roundup products, the state of the industry's scientific knowledge was such that a less risky design or formulation was attainable.

171.    Defendants Monsanto and Bayer AG's defective design of Roundup amounts to willful, wanton, and/or reckless conduct by Defendants.

172.    As a direct and proximate result of the defective design and manufacture of Roundup products, Ernest Caranci developed NHL and was injured catastrophically and caused to suffer severe and permanent pain, suffering, disability, impairment, loss of enjoyment of life, loss of care, loss of comfort, death, and economic damages, giving rise to Plaintiffs' damages herein.

173.    Therefore, as a result of the unreasonably dangerous condition of its Roundup products, Defendants Monsanto and Bayer AG are strictly liable to Plaintiff.

174.    The defects in Defendants Monsanto and Bayer AG's Roundup products were substantial and contributing factors in causing Plaintiffs' damages, and, but for Defendants Monsanto and Bayer AG's misconduct and omissions, Plaintiffs would not have sustained these damages.

175.    As a direct and proximate result of Defendants Monsanto and Bayer AG placing their defective Roundup products into the stream of commerce, Plaintiff suffered the damages set forth herein.

**WHEREFORE**, Plaintiffs demand damages, including punitive damages against Defendants Monsanto and Bayer, against all Defendants, individually, jointly, and severally, in

Case ID: 210602213

an amount in excess of the prevailing arbitration limits, exclusive of pre-judgment interest, delay damages and costs.

## COUNT THREE:  STRICT LIABILITY FOR FAILURE TO WARN
### (Plaintiffs v. All Defendants)

176.     Plaintiffs incorporate by reference each and every other paragraph of this Complaint as if each were set forth fully and completely herein.

177.     Plaintiffs bring this strict liability claim against Defendants for failure to warn.

178.     At all relevant times, Defendants engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and/or promoting Roundup products, which are defective and unreasonably dangerous to consumers, including Ernest Caranci, because they do not contain adequate warnings or instructions concerning the dangerous characteristics of Roundup and specifically, the active ingredient glyphosate.  These actions were under the ultimate control and supervision of Defendants.

179.     Defendants researched, developed, designed, tested, manufactured, inspected, labeled, distributed, marketed, promoted, sold, and/or otherwise released into the stream of commerce its Roundup products, and in the course of same, directly advertised or marketed the products to consumers and end users, including Ernest Caranci and persons responsible for consumers like him, and Defendants therefore had a duty to warn of the risks associated with the reasonably foreseeable uses (and misuses) of Roundup and glyphosate-containing products and a duty to instruct on the proper, safe use of these products.

180.     At all times relevant to this litigation, Defendants had a duty to properly test, develop, design, manufacture, inspect, package, label, market, promote, sell, distribute, maintain supply, provide proper warnings, and take such steps as necessary to ensure that its Roundup products did not cause users and consumers to suffer from unreasonable and dangerous risks.

Case ID: 210602213

Defendants had a continuing duty to warn users, like Ernest Caranci, of the dangers associated with Roundup use and exposure, and a continuing duty to instruct on the proper, safe use of these products. Defendants, as manufacturers, sellers, and/or distributors of chemical herbicides, are held to the knowledge of experts in the field.

181.    At the time of manufacture and sale, Defendants could have provided warnings or instructions regarding the full and complete risks of Roundup and glyphosate-containing products because it knew or should have known of the unreasonable risks of harm associated with the use of and/or exposure to these products.

182.    At all times relevant to this litigation, Defendants failed to investigate, study, test, or promote the safety of their Roundup products. Defendants also failed to minimize the dangers to users and consumers of their Roundup products and to those who would foreseeably use or be harmed by Defendants' herbicides, including Plaintiff Ernest Caranci.

183.    Despite the fact that Defendants knew or should have known that Roundup products posed a grave risk of harm, they failed to warn of the dangerous risks associated with their use and exposure. The dangerous propensities of their products and the carcinogenic characteristics of glyphosate, as described above, were known to Defendants, or scientifically knowable to Defendants through appropriate research and testing by known methods, at the time they distributed, supplied, and/or sold the product, and not known to end users and consumers, such as Ernest Caranci.

184.    Defendants knew or should have known that their Roundup and glyphosate-containing products created significant risks of serious bodily harm to consumers, as alleged herein, and Defendants failed to adequately warn consumers and reasonably foreseeable users of the risks of exposure to these products. Defendants have wrongfully concealed information

47

Case ID: 210602213

concerning the dangerous nature of Roundup and its active ingredient glyphosate, and further made false and/or misleading statements concerning the safety of Roundup and glyphosate.

185.     At all times relevant to this litigation, Defendants' Roundup products reached the intended consumers, handlers, and users or other persons coming into contact with these products throughout Pennsylvania and the United States, including Ernest Caranci, without substantial change in their condition as designed, manufactured, sold, distributed, labeled, and marketed by Defendants.

186.     At all times relevant to this litigation, Ernest Caranci used and/or was exposed to the use of Defendants' Roundup products in their intended or reasonably foreseeable manner without knowledge of their dangerous characteristics.

187.     Ernest Caranci could not have reasonably discovered the defects and risks associated with Roundup or glyphosate-containing products before or at the time of his exposure. Ernest Caranci relied upon the skill, superior knowledge, and judgment of Defendants.

188.     Defendants knew or should have known that the minimal warnings disseminated with their Roundup products were inadequate, but they failed to communicate adequate information on the dangers and safe use/exposure and failed to communicate warnings and instructions that were appropriate and adequate to render the products safe for their ordinary, intended, and reasonably foreseeable uses, including agricultural and horticultural applications.

189.     The information that Defendants did provide or communicate failed to contain relevant warnings, hazards, and precautions that would have enabled agricultural workers, horticultural workers and/or at-home users such as Ernest Caranci to utilize the products safely and with adequate protection.  Instead, Defendants disseminated information that was inaccurate, false, and misleading and which failed to communicate accurately or adequately the comparative

48

Case ID: 210602213

severity, duration, and extent of the risk of injuries associated with use of and/or exposure to Roundup and glyphosate; continued to aggressively promote the efficacy of their products, even after they knew or should have known of the unreasonable risks from use or exposure; and/or concealed, downplayed, or otherwise suppressed, through aggressive marketing and promotion, any information or research about the risks and dangers of exposure to Roundup and glyphosate.

190.    To this day, Defendants have failed to adequately and accurately warn of the true risks injuries associated with the use of and exposure to Roundup and its active ingredient glyphosate, a carcinogen.

191.    To this day, Defendants have failed to test, investigate, or study their formulated Roundup products.

192.    As a result of their inadequate warnings, Defendants' Roundup products were defective and unreasonably dangerous when they left the possession and/or control of Defendants, were distributed and sold by Defendants, and used by consumers including Ernest Caranci.

193.    Defendants are liable to Plaintiffs for injuries caused by their failure, as described above, to provide adequate warnings or other clinically relevant information and data regarding the appropriate use of their Roundup products and the risks associated with the use of or exposure to Roundup and glyphosate.

194.    The defects in Defendants' Roundup products were substantial and contributing factors in causing Plaintiffs' damages, and, but for Defendants' misconduct and omissions, Plaintiffs would not have sustained these damages.

195.    Had Defendants provided adequate warnings and instructions and properly disclosed and disseminated the risks associated with its Roundup products, Ernest Caranci could

Case ID: 210602213

have avoided the risk of developing injuries as alleged herein and he could have obtained alternative herbicides.

196.    As a direct and proximate result of Defendants placing their defective Roundup products into the stream of commerce and failing to warn Ernest Caranci of the increased risk of cancer associated with the use of and/or exposure to Roundup products as described herein, Ernest Caranci has developed NHL and was injured catastrophically, including having been caused severe and permanent pain, suffering, disability, impairment, loss of enjoyment of life, loss of care, loss of comfort, death, and economic damages, including for medical care and treatment.  Plaintiffs will continue to incur damages associated with these Defendants' failures in the future.

**WHEREFORE**, Plaintiffs demand damages, including punitive damages against Defendants Monsanto and Bayer, against all Defendants, individually, jointly, and severally, in an amount in excess of the prevailing arbitration limits, exclusive of pre-judgment interest, delay damages and costs.

## COUNT FOUR:  VIOLATION OF PENNSYLVANIA UNFAIR TRADE PRACTICES ACT AND CONSUMER PROTECTION LAW, 73 P.S. §§201-1 et seq.
### (Plaintiffs v. Monsanto and Bayer AG)

197.    Plaintiffs incorporate by reference each and every other paragraph of this Complaint as if each were set forth fully and completely herein.

198.    At all relevant times, Defendants Monsanto and Bayer AG knew or should have known of the unreasonably dangerous and carcinogenic nature of the use of and/or exposure to Roundup.

199.    At all relevant times, Defendants Monsanto and Bayer AG, through labeling, advertisements, public representations and marketing of Roundup, intentionally used deception,

Case ID: 210602213

fraud, false pretenses, false promises, misrepresentations, misleading statements, and unfair trade practices in order to mislead consumers that Roundup products are safe for use.

200.    At all relevant times, Defendants Monsanto and Bayer AG also engaged in the concealment, suppression and/or omission of material facts in connection with the sale and/or advertisement of Roundup products in trade or commerce.  In particular, Defendants Monsanto and Bayer AG failed to disclose to the public that Roundup is unsafe and poses serious health hazards, particularly NHL and similarly cancers like B-Cell, which Ernest Caranci had. Defendants Monsanto and Bayer AG were aware of the hazardous risks posed by Roundup and yet failed to inform the public of these risks through their advertisements, labeling, or other means available to them.  The  failure of Defendants Monsanto and Bayer AG to state material facts about Roundup constitutes a violation of 73 P.S. §§ 201-1 *et seq.*

201.    At all relevant times, Plaintiff Ernest Caranci was deceived by the intentional misrepresentations and omissions of Defendants Monsanto and Bayer AG, including by the orchestrated claims made on or in television commercials, advertising materials, websites, and on product labels and packaging regarding the usage and safety of Roundup.

202.    At all relevant times, Plaintiff Ernest Caranci acted in reasonable reliance upon the unlawful trade practices of Defendants Monsanto and Bayer AG, and had the Defendants Monsanto and Bayer AG not engaged in the deceptive conduct described herein, Ernest Caranci would not have purchased Roundup® and/or would have protected himself from exposure to Roundup.

203.    As a direct and proximate result of the unlawful trade practices of Defendants Monsanto and Bayer AG, Ernest Caranci developed NHL and was injured catastrophically, having

51

Case ID: 210602213

been caused severe and permanent pain, suffering, disability, impairment, loss of enjoyment of life, loss of care, loss of comfort, death and economic damages.

**WHEREFORE**, Plaintiffs demand damages, including punitive damages against Defendants Monsanto and Bayer, against all Defendants, individually, jointly, and severally, in an amount in excess of the prevailing arbitration limits, exclusive of pre-judgment interest, delay damages and costs.

## COUNT FIVE:  NEGLIGENCE
### (Plaintiffs v. Monsanto and Bayer AG)

204.    Plaintiffs incorporate by reference each and every other paragraph of this Complaint as if each were set forth fully and completely herein.

205.    At all relevant times, Defendants Monsanto and Bayer AG breached their duty to Plaintiff Ernest Caranci and were otherwise negligent in marketing, designing, manufacturing, producing, supplying, inspecting, testing, selling and/or distributing Roundup products.

206.    Defendants Monsanto and Bayer AG, directly or indirectly, caused Roundup products to be purchased and/or used by Ernest Caranci.

207.    At all times relevant to this litigation, Defendants Monsanto and Bayer AG had a duty to exercise reasonable care in the design, research, manufacture, marketing, advertisement, supply, promotion, packaging, sale, and distribution of Roundup products, including the duty to take all reasonable steps necessary to manufacture, promote, and/or sell a product that was not unreasonably dangerous to consumers, users, and other persons coming into contact with the product.

208.    At all times relevant to this litigation, Defendants Monsanto and Bayer AG had a duty to exercise reasonable care in the marketing, advertisement, and sale of Roundup products. The duty of care of Defendants Monsanto and Bayer AG owed to consumers and the general public

Case ID: 210602213

included providing accurate, true, and correct information concerning the risks of using Roundup and appropriate, complete, and accurate warnings concerning the potential adverse effects of exposure to Roundup and, in particular, its active ingredient glyphosate.

209. At all times relevant to this litigation, Defendants Monsanto and Bayer AG knew or, in the exercise of reasonable care, should have known of the hazards and dangers of Roundup and specifically, the carcinogenic properties of the chemical glyphosate.

210. Accordingly, at all times relevant to this litigation, Defendants Monsanto and Bayer AG knew or, in the exercise of reasonable care, should have known that use of or exposure to its Roundup products could cause Plaintiff Ernest Caranci's injuries and thus created a dangerous and unreasonable risk of injury to the users of these products, including Plaintiff Ernest Caranci.

211. Defendants Monsanto and Bayer AG knew or, in the exercise of reasonable care, should have known that Roundup is more toxic than glyphosate alone and that safety studies on Roundup, Roundup's adjuvants and "inert" ingredients, and/or the surfactant POEA were necessary to protect Plaintiff Ernest Caranci from Roundup.

212. Defendants Monsanto and Bayer AG knew or, in the exercise of reasonable care, should have known that tests limited to Roundup's active ingredient glyphosate were insufficient to prove the safety of Roundup.

213. Defendants Monsanto and Bayer AG also knew or, in the exercise of reasonable care, should have known that users and consumers of Roundup were unaware of the risks and the magnitude of the risks associated with the use of and/or exposure to Roundup and glyphosate-containing products.

214. As such, Defendants Monsanto and Bayer AG breached their duty of reasonable care and failed to exercise ordinary care in the design, research, development, manufacture, testing,

Case ID: 210602213

marketing, supply, promotion, advertisement, packaging, sale, and distribution of Roundup products, in that Defendants Monsanto and Bayer AG manufactured, produced, and sold defective herbicides containing the chemical glyphosate, knew or had reason to know of the defects inherent in these products, knew or had reason to know that a user's or consumer's exposure to the products created a significant risk of harm and unreasonably dangerous side effects, and failed to prevent or adequately warn of these risks and injuries.

215.   Defendants Monsanto and Bayer AG failed to test Roundup, Roundup's adjuvants and "inert" ingredients appropriately and adequately, and/or the surfactant POEA to protect consumers like Ernest Caranci from Roundup.

216.   Despite their ability and means to investigate, study, and test Roundup products and to provide adequate warnings, Defendants Monsanto and Bayer AG have failed to do so. Indeed, Defendants Monsanto and Bayer AG have wrongfully concealed information and have further made false and/or misleading statements concerning the safety and/or exposure to Roundup and glyphosate.

217.   The negligence of Defendants Monsanto and Bayer AG included:

a)   Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing Roundup products without thorough and adequate pre- and post-market testing;

b)   Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing Roundup while negligently and/or intentionally concealing and failing to disclose the results of trials, tests, and studies of exposure to glyphosate, and, consequently, the risk of serious harm associated with human use of and exposure to Roundup;

c)   Failing to undertake sufficient studies and conduct necessary tests to determine whether or not Roundup products and glyphosate-containing products were safe for their intended use in agriculture, horticulture, and at-home use;

d)   Failing to test, investigate, or study formulated Roundup products;

54

Case ID: 210602213

e)      Failing to undertake sufficient studies and conduct necessary tests to determine the safety of "inert" ingredients and/or adjuvants contained within Roundup, and the propensity of these ingredients to render Roundup toxic, increase the toxicity of Roundup, whether these ingredients are carcinogenic, magnify the carcinogenic properties of Roundup, and whether or not "inert" ingredients and/or adjuvants were safe for use;

f)      Failing to use reasonable and prudent care in the design, research, manufacture, formulation, and development of Roundup products so as to avoid the risk of serious harm associated with the prevalent use of Roundup/glyphosate as an herbicide;

g)      Failing to design and manufacture Roundup products so as to ensure they were at least as safe and effective as other herbicides on the market;

h)      Failing to provide adequate instructions, guidelines, and safety precautions to those persons who Defendants Monsanto and Bayer AG could reasonably foresee would use and/or be exposed to Roundup products;

i)      Failing to disclose to Plaintiff Ernest Caranci, users, consumers, and the general public that the use of and exposure to Roundup presented severe risks of cancer and other grave illnesses;

j)      Failing to warn Plaintiff Ernest Caranci, and other users, consumers, and the general public that the product's risk of harm was unreasonable and that there were safer and effective alternative herbicides available to Plaintiff, Ernest Caranci, and other users or consumers;

k)      Systematically suppressing or downplaying contrary evidence about the risks, incidence, and prevalence of the side effects of Roundup and glyphosate-containing products;

l)      Representing that Roundup products were safe for their intended use when, in fact, Defendants Monsanto and Bayer AG knew or should have known that the products were not safe for their intended use;

m)      Declining to make or propose any changes to Roundup products' labeling or other promotional materials that would alert the consumers and the general public of the risks of Roundup and glyphosate;

n)      Advertising, marketing, and recommending the use of Roundup products, while concealing and failing to disclose or warn of the dangers known by Defendants Monsanto and Bayer AG to be associated with or caused by the use of or exposure to Roundup and glyphosate;

o)      Continuing to disseminate information to its consumers, which indicate or imply that Roundup products are not unsafe for use in the agricultural, horticultural industries, and/or home use; and

Case ID: 210602213

p) Continuing the manufacture and sale of Roundup products with the knowledge that the products were unreasonably unsafe and dangerous.

218. Defendants Monsanto and Bayer AG knew and/or should have known that it was foreseeable that consumers and/or users, such as Plaintiff Ernest Caranci, would suffer injuries as a result of Defendants' failure to exercise ordinary care in the manufacturing, marketing, labeling, distribution, and sale of Roundup.

219. Plaintiff Ernest Caranci did not know the nature and extent of the injuries that could result from the intended use of and/or exposure to Roundup or its active ingredient glyphosate.

220. The negligence of Defendants Monsanto and Bayer AG was the proximate cause of the injuries, harm, and economic losses that Plaintiff Ernest Caranci suffered, and will continue to suffer, as described herein.

221. The conduct of Defendants Monsanto and Bayer AG, as described above, was reckless. Defendants Monsanto and Bayer AG regularly risk the lives of consumers and users of Roundup products, including Plaintiff Ernest Caranci, with full knowledge of the dangers of these products. Defendants Monsanto and Bayer AG have made conscious decisions not to redesign, re-label, warn, or inform the unsuspecting public, including Plaintiff Ernest Caranci, with respect to the dangers of Roundup about which Defendants knew but the public, including Plaintiff Ernest Caranci, did not. The reckless conduct of Defendants Monsanto and Bayer AG therefore warrants an award of punitive damages.

222. As a proximate result of the wrongful acts and omissions of Defendants Monsanto and Bayer AG in placing defective Roundup products into the stream of commerce without adequate warnings of the hazardous and carcinogenic nature of glyphosate, Ernest Caranci developed NHL and was injured catastrophically, having been caused severe and permanent pain, suffering, disability, impairment, loss of enjoyment of life, loss of care, loss of comfort, death, and

Case ID: 210602213

economic damages, including significant expenses for medical care and treatment, and will continue to incur these expenses in the future.

**WHEREFORE**, Plaintiffs demand damages, including punitive damages against Defendants Monsanto and Bayer, against all Defendants, individually, jointly, and severally, in an amount in excess of the prevailing arbitration limits, exclusive of pre-judgment interest, delay damages and costs.

## COUNT SIX:  BREACH OF IMPLIED WARRANTIES
### (Plaintiffs v. Monsanto and Bayer AG)

223.    Plaintiffs incorporate by reference each and every other paragraph of this Complaint as if each were set forth fully and completely herein.

224.    At all relevant times, Defendants Monsanto and Bayer AG engaged in the business of testing, developing, designing, formulating, manufacturing, marketing, selling, distributing, and promoting its Roundup products, which are defective and unreasonably dangerous to users, consumers and those in proximity to users, including Plaintiff Ernest Caranci, thereby placing Roundup products into the stream of commerce.  These actions were under the ultimate control and supervision of Defendants Monsanto and Bayer AG.

225.    Before the time that Ernest Caranci was exposed to the use of the aforementioned Roundup products, Defendants Monsanto and Bayer AG impliedly warranted to its consumers and users—including Plaintiff Ernest Caranci —that its Roundup products were of merchantable quality and safe and fit for the use for which they were intended; specifically, as horticultural herbicides.

226.    Defendants Monsanto and Bayer AG, however, failed to disclose that Roundup has dangerous propensities when used as intended and that the use of and/or exposure to Roundup and

57

Case ID: 210602213

glyphosate-containing products carries an increased risk of developing severe injuries, including Plaintiffs' damages.

227.    Defendants Monsanto and Bayer AG further failed to test, investigate, or study its formulated Roundup products.

228.    Upon information and belief, Plaintiff Ernest Caranci reasonably relied upon the skill, superior knowledge and judgment of Defendants Monsanto and Bayer AG and upon their implied warranties that the Roundup products were of merchantable quality and fit for their intended purpose or use.

229.    Upon information and belief, Plaintiff Ernest Caranci reasonably relied upon the skill, superior knowledge and judgment of Defendants Monsanto and Bayer AG and upon their implied warranties that the Roundup products were of merchantable quality and fit for their intended purpose or use.

230.    The Roundup products were expected to reach and did in fact reach consumers, users and those in proximity to users, including Plaintiff Ernest Caranci, without substantial change in the condition in which they were manufactured and sold by Defendants Monsanto and Bayer AG.

231.    At all relevant times, Defendants Monsanto and Bayer AG were aware that consumers, users, and those in proximity of users of its products, including Plaintiff Ernest Caranci, would use Roundup products as marketed by Defendants Monsanto and Bayer AG, which is to say that Plaintiff Ernest Caranci was a foreseeable user of Roundup.

232.    Defendants Monsanto and Bayer AG intended that their Roundup products be used in the manner in which Ernest Caranci in fact used or was exposed to them and Defendants

Case ID: 210602213

Monsanto and Bayer AG impliedly warranted each product to be of merchantable quality, safe, and fit for this use, despite the fact that Roundup was not adequately tested or researched.

233.    In reliance upon the implied warranty of Defendants Monsanto and Bayer AG, Ernest Caranci used or was in proximity to the use of Roundup as instructed and labeled and in the foreseeable manner intended, recommended, promoted and marketed by Defendants Monsanto and Bayer AG.

234.    Plaintiff Ernest Caranci could not have reasonably discovered or known of the risks of serious injury associated with Roundup or glyphosate.

235.    Defendants Monsanto and Bayer AG breached their implied warranties to Plaintiff Ernest Caranci in that their Roundup products were not of merchantable quality, safe, or fit for their intended use, or adequately tested.  Roundup has dangerous propensities when used as intended and can cause serious injuries, including those injuries complained of herein.

236.    The harm caused by the Roundup products of Defendants Monsanto and Bayer AG far outweighed their benefit, rendering the products more dangerous than an ordinary consumer or user would expect and more dangerous than alternative products.

237.    As a direct and proximate result of the wrongful acts and omissions of Defendants Monsanto and Bayer AG Ernest Caranci suffered severe and permanent physical and emotional injuries, including but not limited to and untimely death.  Plaintiffs will continue to incur these expenses in the future.

**WHEREFORE**, Plaintiffs demand damages, including punitive damages against Defendants Monsanto and Bayer, against all Defendants, individually, jointly, and severally, in an amount in excess of the prevailing arbitration limits, exclusive of pre-judgment interest, delay damages and costs.

Case ID: 210602213

## COUNT SEVEN: FRAUDULENT CONCEALMENT
### (Plaintiffs v. Monsanto and Bayer AG)

238.    Plaintiffs incorporate by reference each and every other paragraph of this Complaint as if each were set forth fully and completely herein.

239.    Defendants Monsanto and Bayer AG are estopped from asserting a statute of limitations defense because they fraudulently concealed their wrongful conduct from Plaintiff Ernest Caranci with the intent that Plaintiff Ernest Caranci, as well as other consumers and users of Roundup, would justifiability rely on such material representations, on which Plaintiff, Ernest Caranci, and others similarly situated did justifiability rely.

240.    Defendants Monsanto and Bayer AG had actual knowledge that exposure to Roundup and, specifically, its active ingredient, glyphosate, could result in cancer and other severe illnesses and injuries.  Defendants Monsanto and Bayer AG knew or should have known that Roundup is more toxic than glyphosate alone and that safety studies of Roundup, Roundup's adjuvants and "inert" ingredients, and/or the surfactant POEA were necessary to protect Plaintiff Ernest Caranci from Roundup.

241.    Defendants Monsanto and Bayer AG failed to conduct adequate testing of glyphosate and the Roundup formulation.

242.    Defendants Monsanto and Bayer AG had actual knowledge of its misrepresentations, negligence, breach of warranties, and false, misleading, deceptive, and unconscionable conduct.  Even so, Defendants Monsanto and Bayer AG perpetuated its wrongful conduct with the intent and fixed purpose of concealing its wrongs from Plaintiff, Ernest Caranci, and the public at large. Despite their knowledge that Roundup is considerably more dangerous than glyphosate alone, Defendants Monsanto and Bayer AG continued to promote Roundup as safe.

60

Case ID: 210602213

243. Plaintiff Ernest Caranci was unaware of the falsity of these representations, acted in actual and justifiable reliance on such material misrepresentations, and were injured as a direct and proximate result.

244. Additionally, Defendants Monsanto and Bayer AG knowingly omitted material information and remained silent regarding said misrepresentations despite the fact that they had a duty to inform Plaintiff Ernest Caranci, and the general public, of the inaccuracy of said misrepresentations, which omission constitutes a positive misrepresentation of material fact, with the intent that Plaintiff, Ernest Caranci, and the general public would rely on the misrepresentations of Defendants Monsanto and Bayer AG.

245. Plaintiff, Ernest Caranci, and the general public did, in fact, act in actual and justifiable reliance on the representations of Defendants Monsanto and Bayer AG, and Plaintiff Ernest Caranci suffered damages as a result.

246. Defendants Monsanto and Bayer AG, as the manufacturers and sellers of Roundup, were in a position of superior knowledge and judgment regarding any potential risks associated with its products.

247. Defendants Monsanto and Bayer AG committed constructive fraud by breaching one or more legal or equitable duties owed to Plaintiff, Ernest Caranci, and the general public relating to Roundup, said breach or breaches constituting fraud because of their propensity to deceive others or constitute an injury to public interests or public policy.

248. In breaching its duties to Plaintiff Ernest Caranci, Defendants Monsanto and Bayer AG used their position of trust as the manufacturer and/or distributor of Roundup to increase sales of its products at the expense of informing Plaintiff, Ernest Caranci, and the general public, that

Case ID: 210602213

use of or exposure to Roundup® carries the risk of serious illness, such as NHL and other similar cancers.

**WHEREFORE**, Plaintiffs demand damages, including punitive damages against Defendants Monsanto and Bayer, against all Defendants, individually, jointly, and severally, in an amount in excess of the prevailing arbitration limits, exclusive of pre-judgment interest, delay damages and costs.

## COUNT EIGHT: LOSS OF CONSORTIUM
### (Plaintiff Carmela Caranci v. All Defendants)

249.    Plaintiffs incorporate by reference each and every other paragraph of this Complaint as if each were set forth fully and completely herein.

250.    At all material times hereto, Plaintiff, Carmela Caranci, was and is married to Ernest Caranci.

251.    As a direct and proximate result of the Defendants' negligence, recklessness, fraudulent concealment, strict liability, and all other wrongful conduct as alleged throughout the entirety of this Complaint and as described and incorporated by reference as though fully set forth herein, Carmela Caranci suffered the loss of services, society, comfort and companionship of her husband, Ernest Caranci, in the past and will continue to do so indefinitely into the future.

252.    As a direct and proximate result of the Defendants' negligence, recklessness, fraudulent concealment, strict liability, and all other wrongful conduct as alleged throughout the entirety of this Complaint and as described and incorporated by reference as though fully set forth herein, Carmela Caranci claims the full measure of damages allowable under Pennsylvania law for the loss of consortium of her husband.

253.    Carmela Caranci suffered a loss of consortium for the loss of their spouse's service, society, companionship, aid, affection, and sexual relations as a direct and proximate result of their

62

Case ID: 210602213

spouse's injuries due to the acts and/or omissions of the Defendants as outlined throughout the entirety of this Complaint, to which they are entitled compensation.

WHEREFORE, Plaintiffs demand damages, including punitive damages against Defendants Monsanto and Bayer, against all Defendants, individually, jointly, and severally, in an amount in excess of the prevailing arbitration limits, exclusive of pre-judgment interest, delay damages and costs.

Respectfully submitted,

**KLINE & SPECTER, P.C.**

By:  */s/ Kila B. Baldwin*
THOMAS R. KLINE, ESQUIRE
KILA B. BALDWIN, ESQUIRE
THOMAS E. BOSWORTH, ESQUIRE
PHILIP M. PASQUARELLO, ESQUIRE
*Attorneys for Plaintiffs*

Date: 8/19/21

Case ID: 210602213

## CERTIFICATION OF SERVICE

This is to certify that on this day a true and correct copy of the within Amended Complaint

in Civil Action was served upon the following parties via electronic notification from the Court:

Joseph H. Blum, Esquire
Erin L. Leffler, Esquire
Ka'Sandra N. Rogiers, Esquire
**SHOOK, HARDY & BACON, LLP**
Two Commerce Square
2001 Market Street, Suite 3000
Philadelphia, PA  19103

By: John C. McMeekin II, Esquire
Anisha S. Abraham, Esquire
**RAWLE & HENDERSON LLP**
The Widener Building
One South Penn Square
Philadelphia, Pennsylvania 19107

Date:   8/19/21

/s/ Kila B. Baldwin
KILA B. BALDWIN, ESQUIRE
*Attorneys for Plaintiffs*

64

Case ID: 210602213