Query   Reports   Utilities   Help   Log Out

# U.S. District Court
## Northern District of Iowa (Western Division)
## CIVIL DOCKET FOR CASE #: 5:23-cv-04020

Vonahn et al v. Monsanto Company et al

Assigned to:

Case in other court: Iowa District Court for Sac County,
LACV020271

Cause: 28:1332 Diversity-Torts

Date Filed: 04/10/2023

Jury Demand: Plaintiff

Nature of Suit: 245 Tort Product Liability

Jurisdiction: Diversity

**Plaintiff**

**Ray B Vonahn**                                 represented by   **Mary C Hamilton**
Hamilton Law Firm
606 Ontario Street
PO Box 188
Storm Lake, IA 50588
712 732 2842
Email: mary@hamiltonlawfirmpc.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Misty Brewster**                               represented by   **Mary C Hamilton**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Monsanto Company**                             represented by   **Jason M Craig**
Ahlers & Cooney, P.C.
100 Court Ave
Suite 600
Des Moines, IA 50309
515 246 0372
Email: jcraig@ahlerslaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Bayer AG**                                     represented by   **Jason M Craig**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|

| 04/10/2023 | 1 | NOTICE of Removal from Iowa District Court for Sac County, case number LACV020271. ( Filing fee $ 402 receipt number BIANDC-3898314), filed by Monsanto Company. Scheduling Report due by 6/9/2023 (Attachments: # 1 Local Rule 81(a) Removal Information Form, # 2 Civil Cover Sheet, # 3 Petition and Jury Demand, # 4 Original Notice, # 5 Return of Original Notice, # 6 Return of Original Notice) (Craig, Jason) (Entered: 04/10/2023) |

| PACER Service Center | | |
|---|---|---|
| **Transaction Receipt** | | |
| 04/11/2023 08:40:39 | | |
| **PACER Login:** | sh0019sh | **Client Code:** | 31943.356965 rhb |
| **Description:** | Docket Report | **Search Criteria:** | 5:23-cv-04020 |
| **Billable Pages:** | 1 | **Cost:** | 0.10 |

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
## WESTERN DIVISION

| | |
|---|---|
| RAY B. VONAHN and MISTY BREWER,<br><br>Plaintiffs,<br><br>v.<br><br>MONSANTO COMPANY and BAYER AG,<br><br>Defendants. | Case No. 5:23-cv-4020<br><br><br>**DEFENDANT MONSANTO COMPANY'S NOTICE OF REMOVAL** |

Pursuant to 28 U.S.C. §§ 1332, 1441, and 1446 (and any other applicable laws), Defendant Monsanto Company ("Monsanto"), hereby gives notice of removal of this action, captioned *Ray B. Vonahn et al. v. Monsanto Company et al.,* bearing Case Number LACV020271, from the Iowa District Court for Sac County to the United States District Court for the Northern District of Iowa. Pursuant to 28 U.S.C. § 1446(a), Monsanto provides the following statement of grounds for removal.

### Introduction

1.      In this products liability lawsuit, Plaintiffs Ray B. Vonahn and Misty Brewster sue Monsanto for injuries allegedly caused by Monsanto's Roundup®-branded herbicides, which have glyphosate as their active ingredient. For decades, farmers have used glyphosate-based herbicides to increase crop yields, and home-owners, landscaping companies, and local government agencies have used these herbicides for highly effective weed control. Glyphosate is one of the most thoroughly studied herbicides in the world, and glyphosate-based herbicides have received regulatory approval in more than 160 countries. Since 1974, when Monsanto first introduced a

Roundup®-branded herbicide to the marketplace, the United States Environmental Protection Agency repeatedly has concluded that glyphosate does not cause cancer. Nevertheless, Plaintiffs allege that Mr. Vonahn developed cancer — specifically, large cell anaplastic lymphoma (a form of non-Hodgkin's lymphoma ("NHL")) — caused by exposure to Monsanto's glyphosate-based herbicides.

2.      This is one of many lawsuits that have been filed against Monsanto involving Roundup®-branded herbicides. A multidistrict litigation proceeding is pending in the United States District Court for the Northern District of California, before the Honorable Vince G. Chhabria, pursuant to 28 U.S.C. § 1407. *See In re Roundup Prods. Liab. Litig.*, No. 3:16-md- 02741-VC (N.D. Cal.); *In re Roundup Prods. Liab. Litig.*, MDL No. 2741, 214 F. Supp. 3d 1346 (J.P.M.L. 2016).

3.      As discussed in more detail below, Monsanto removes this lawsuit because this Court has subject matter jurisdiction based on diversity of citizenship. Plaintiffs are citizens of Iowa. For purposes of diversity jurisdiction, none of the Defendants are citizens of Iowa. Accordingly, complete diversity of citizenship exists in this case as required by 28 U.S.C. § 1332. The statutory amount-in-controversy requirement is also satisfied because Plaintiffs seek damages for cancer allegedly caused by exposure to Monsanto's Roundup®-branded herbicides.

## Background and Procedural History

4.      On March 14, 2023, Plaintiffs commenced this lawsuit in the Iowa District for Sac County by filing a complaint, captioned *Ray B. Vonahn et al. v. Monsanto Company, et al.,* bearing Case Number LACV020271 (the "State Court Action").

5.      Pursuant to 28 U.S.C. § 1446(a), true and correct copies of all process, pleadings, and orders served upon Monsanto in the State Court Action are attached to Monsanto's Local Rule 81(a) Removal Information Form (filed this same date).

6.      Plaintiffs seek damages for large cell anaplastic lymphoma allegedly caused by exposure to Monsanto's glyphosate-based herbicides. *See, e.g.*, Complaint ¶¶ 5-10, 85, 89.

### Basis For Removal — Diversity Jurisdiction

7.      Plaintiffs are, and were at the time the State Court Action was filed, residents and citizens of the State of Iowa. *See* Complaint ¶ 2.

8.      Monsanto is, and was at the time the State Court Action was filed, a corporation incorporated under the laws of the State of Delaware, with its principal place of business in the State of Missouri. Thus, Monsanto is deemed to be a citizen of Missouri and Delaware, for purposes of federal diversity jurisdiction.

9.      Bayer AG is, and was at the time the State Court Action was filed, a German stock company with its principal place of business in Germany. *See* Complaint ¶ 3. Accordingly, Bayer AG is deemed to be a citizen of Germany, a foreign citizen, for purposes of diversity jurisdiction.

10.      The Complaint seeks compensatory and punitive damages based on the allegations that Monsanto's Roundup®-branded herbicides caused Mr. Vonahn to develop cancer (large cell anaplastic lymphoma). Therefore, it is plausible from the face of the Complaint that Plaintiffs seek damages in excess of $75,000, exclusive of interest and costs, which satisfies the jurisdictional amount-in-controversy requirement. 28 U.S.C. § 1332(a); *see Dart Cherokee Basin Operating Co. v. Owens*, 574 U.S. 81, 89 (2014) ("[A] defendant's notice of removal need include only a plausible allegation that the amount in controversy exceeds the jurisdictional threshold."). Indeed, Plaintiffs' request for punitive damages, *see* Complaint p. 41, "makes it virtually impossible to say that the claim is for less than the jurisdictional amount." *Woodward v. Newcourt Commercial Finance Corp.,* 60 F. Supp. 2d 530, 532 (D.S.C. 1999); *see also Ross v. First Family Fin. Servs., Inc.,* No. 2:01CV218-P-B, 2002 WL 31059582, at *8 (N.D. Miss. Aug. 29, 2002) ("[U]nspecified claims for punitive damage sufficiently serve to bring the amount in controversy over the requisite

3

jurisdictional threshold set out in 28 U.S.C. § 1332."). In fact, numerous other lawsuits seeking damages for cancer allegedly caused by Roundup®-branded herbicides have been filed against Monsanto in other federal courts asserting jurisdiction under §1332(a) and alleging damages in excess of $75,000, exclusive of interest and costs.

11.     In sum, this Court has original subject matter jurisdiction over this action based on § 1332(a) because there is complete diversity of citizenship and the amount in controversy exceeds $75,000, exclusive of costs and interest.

## Procedural Requirements

12.     The Iowa District Court for Sac County is located within the Western Division of the Northern District of Iowa. Therefore, removal to this Court satisfies the venue requirement of 28 U.S.C. § 1446(a).

13.     Monsanto received notice of process on March 20, 2023. This Notice of Removal is timely, in accordance with 28 U.S.C. § 1446(b)(1), because it is being filed within 30 days of March 20, 2023.

14.     Bayer AG's consent to removal is not required because Bayer AG has not been served in the State Court Action. 28 U.S.C. § 1446(b)(2)(A).

15.     The written notice required by 28 U.S.C. § 1446(d) will be promptly filed in the Iowa District Court for Sac County and will be promptly served on Plaintiffs.

16.     Monsanto does not waive any defenses and expressly reserves its right to raise any and all defenses in subsequent proceedings.

17.     If any question arises as to the propriety of this removal, Monsanto requests the opportunity to present written and oral argument in support of removal.

4

**Conclusion**

For the foregoing reasons, Monsanto removes this lawsuit to this Court pursuant to 28

U.S.C. §§ 1332, 1441, and 1446 (and any other applicable laws).


Dated: April 10, 2023

/s/ Jason M. Craig

Jason M. Craig (AT0001707)
AHLERS & COONEY, P.C.
100 Court Avenue, Suite 600
Des Moines, Iowa 50309-2231
Telephone: (515) 243-7611
Facsimile: (515) 243-2149
jcraig@ahlerslaw.com
ATTORNEY FOR DEFENDANT
MONSANTO COMPANY


Electronically filed and served on:

Mary Hamilton
Hamilton Law Firm, P.C.
P.O. Box 188
606 Ontario Street
Storm Lake, IA 50588
mary@hamiltonlawfirmpc.com
ATTORNEYS FOR PLAINTIFFS

| CERTIFICATE OF SERVICE | | | |
|---|---|---|---|
| The undersigned certifies that the foregoing instrument was served upon all parties to the above cause to each of the attorneys of record herein at their respective addresses disclosed on the pleadings on:   April 10, 2023 | | | |
| By: ☐ U.S. Mail | | ☐ | Fax |
| ☐ Hand delivery | | ☐ | Private Carrier |
| ☒ Electronically (*via CM-ECF*) | | ☐ | E-mail |
| Signature: /s/ Jason M. Craig | | | |

IN THE IOWA DISTRICT COURT IN AND FOR SAC COUNTY

| | |
|---|---|
| RAY B. VONAHN and MISTY BREWSTER, husband and wife,<br><br>    Plaintiff(s)<br><br>Vs.<br><br>MONSANTO COMPANY, a corporation, and BAYER AG, a foreign corporation,<br><br>    Defendant(s) | Case No.  LACV020271<br><br><br>**PETITION AT LAW AND JURY DEMAND** |

COME NOW the Plaintiffs and state as follows:

1.   Ray B. VonAhn and Misty Brewster, are husband and wife and have been husband and wife at all relevant times through common-law marriage laws of the State of Iowa.

2.   Ray B. VonAhn and Misty Brewster have resided in Sac County, Iowa, at all times relevant to this suit.

3.   Monsanto Corporation is a foreign corporation that manufactures a substance known as Roundup®, an herbicide that when applied, is designed to suppress noxious weeds that compete with growing crops or other desirable plants. In 2018, Bayer AG, a corporation organized in Germany, purchased Monsanto.

4.   Roundup® contains an active ingredient, glyphosate, the surfactant Polyethoxylated tallow amine and adjuvants and what Monsanto calls nominally "inert' ingredients.

- 2 -

## VENUE AND JURISDICTION

5.      Monsanto markets Roundup® all over the world and specifically in Sac County, Iowa.

6.      On July 29, 2015, the World Health Organization's International Agency for Research of Cancer (IARC) issued a formal, peer reviewed, scientific study and found that glyphosate was a Group 2A herbicide that was probably carcinogenic to humans.

7.      The cancer most likely caused by glyphosate exposure was a non-Hodgkins lymphoma and other lymphocytic cancers.

8.      Ray B. VonAhn was diagnosed with large cell anaplastic lymphoma on February 18, 2021.

## LIABILITY

9.      Ray B. VonAhn was exposed to Roundup® for approximately 25 or more years.  He is now 65 years old.  He has worked with it on his acreage from the month of June through August for over 25 years.

10.     Ray B. VonAhn worked around Roundup® in Sac County, Iowa.  He did this in a personal capacity and in other capacities. During the summer months, he was in contact with and used Roundup® 2 to 3 times each summer for many years. Frequently the substance, Roundup® would make contact with his skin for hours during the day.

- 3 -

11.   Roundup® works by absorption or respiration in plants and animals including humans. From the time of its introduction into agriculture, Monsanto has advertised Roundup® as a product that could kill almost every weed without harm to people or animals.

12.   Monsanto's claims were not true. Monsanto sought to discredit and impeach claims otherwise.

13.   The World Health Organization has found, through the International Agency on Research of Cancer, monographs that identify environmental factors that increase the risk of cancer.

14.   According to the WHO, the main chemical ingredient of Roundup®, glyphosate, is a probable cause of NHL, a blood cancer. Their finding is that persons who work in agriculture are the most likely victims of glyphosate.

15.   Monsanto to this date continues to deny the danger of glyphosate and Roundup®.

16.   Plants treated with glyphosate transmit the substance through their roots which interferes with the ability to form amino acids necessary for protein synthesis.

17.   For almost 40 years, farmers used Roundup® without realizing the danger. That is because Monsanto claimed that Roundup® was a breakthrough product and could not harm humans, even if consumed or ingested by them.

- 4 -

18.   These representations by Monsanto were not true. However, Monsanto made them to discredit any such studies that were contradictory. However, the World Health Organization, an agency created under Article 57 under the auspices of the United Nations, exists for the purpose of fostering the highest level of health for all peoples.   Within the WHO exists the International Agency on Research of Cancer (IARC) which oversees scientific research regarding cancer.   It does peer review on research concerning cancer.   It publishes peer reviewed studies in articles called Monograph.

19.   IARC Monographs exist to identify environmental and other factors that increase the risk of cancer.

20.   On July 29, 2015, IARC issued a formal peer reviewed Monograph related to glyphosate.   The IARC classified glyphosate as a Group 2A herbicide, meaning it is probably carcinogenic to humans.   It further determined that the cancers most often associated with glyphosate exposure was lymphocytic lymphoma, lymphocytic leukemia, B cell lymphoma and multiple myeloma.   This Monograph was done and issued within accepted scientific principles.

21.   Despite the IARC finding, Monsanto continues to engage in the denial of a causal link between its glyphosate products and certain cancer conditions.

- 5 -

22. According to the WHO and IARC, the main ingredient of Roundup®, which is glyphosate, is a probable cause of NHL, a blood cancer. Notwithstanding this finding, Monsanto continues to represent and claim that Roundup® is safe for farmers and others who handle it.

23. Glyphosate was discovered in 1970 by a Monsanto chemist. It was marketed as safe and effective by Monsanto.

24. The manufacture, formulation, and distribution of herbicides, such as Roundup®, are regulated under the Federal Insecticide, Fungicide and Rodenticide Act (FIFRA), 7 U.S.C. sec. 136 et. seq. FIFRA requires that all pesticides be registered with the Environmental Protection Agency (EPA) prior to distribution, sale or use except as otherwise excused.

25. Herbicides are toxic to plants, animals, and humans, to some degree. The EPA requires as part of the registration process, among other things, a number of tests to evaluate the potential for exposure to herbicides, toxicity to people and other non-target organisms and other adverse effects on the environment. Registration with the EPA is not a finding of safety. The EPA's decision to register or reregister a product is that use of the product in accordance with its label directions will not generally cause unreasonable adverse effects on the environment. It is not a finding by the EPA that the product is safe.

E-FILED  2023 MAR 14 12:07 PM SAC - CLERK OF DISTRICT COURT

- 6 -

26.   FIFRA defines "unreasonable adverse effects on the environment" to mean "any unreasonable risk to man or the environment, taking into account the economic, social and environmental costs and benefits of the use of any pesticide[1]". FIFRA requires EPA to make a risk/benefit analysis to decide whether a registration should be granted, or a pesticide allowed to continue to be sold in commerce.

27.   FIFRA generally requires a registration be conducted with health and safety of pesticide or herbicide.  The EPA has protocols governing the conduct of tests required for registration and the laboratory practices that must be followed in such cases.  Data used must be submitted to the EPA for evaluation. The EPA or any of its subagencies do not perform any testing.

28.   Evaluation of an herbicide occurs when it is initially registered.  At this time, the EPA is in the process of re-evaluating all pesticide products through a process called re-registration.  This requires completion of additional tests and submission of data for EPA to review and evaluate.

29.   In 1985, upon early studies, the EPA classified Roundup® as possibly carcinogenic to humans. (Group C).  Upon urging by Monsanto, including contrary studies provided by Monsanto, it was reclassified to group E in 1991.  This

---

[1]  The term "pesticides" includes herbicides. 7 U.S.C. §136(a).

- 7 -

classification simply states there is a question about whether Roundup® causes cancer.

30. However, on two occasions the EPA found that laboratories hired by Monsanto to test Roundup® toxicity committed fraud. First, Monsanto hired Industrial Bio-Test Laboratories (IBT) to perform and evaluate studies related to Roundup®[2]. However, an FDA inspection of IBT in 1976, revealed discrepancies between raw data and the final report regarding Roundup®.

31. When EPA audited IBT's findings, it found that IBT's findings were invalid.[3] Subsequently, three executives were found to have committed fraud.

32. In a second round of testing, Monsanto hired Craven Laboratories in 1991 to do a re-registration. Craven had three of its executives charged and convicted of laboratory fraud in connection with testing. However, Monsanto utilized its findings to market Roundup® around the world.

33. Roundup®'s sales success was key to Monsanto's sales success. However, the patent would expire on glyphosate in

---

[2] Monsanto, *Backgrounder, Testing Fraud: IBT and Craven Laboratories* (Sep. 2, 2015), http://www.monsanto.com/products/documents/glyphosate-background-materials/ibt_craven_bkg.pdf.

[3] U.S. Envtl. Prot. Agency, *Summary of the IBT Review Program Office of Pesticide Programs* (1983), *avai. At* http://nepis.epa.gov/Exe/ZyNET.exe/91014ULV.TXT?ZyActionD=ZyDocument&Client=EPA&Index=1981 +Thru+1985&Docs=&Query=&Time=&EndTime=&SearchMethod=1&TocRestrict=n&Toc=&TocEntry=& QField=&QFieldYear=&QFieldMonth=&QFieldDay=&IntQFieldOp=0&ExtQFieldOp=0&XmlQuery=&Fil e=D%3A%5Czyfiles%5CIndex%20Data%5C81thru85%5CTxt%5C00000022%5C91014ULV.txt&User=A NONYMOUS&Password=anonymous&SortMethod=h%7C- &MaximumDocuments=1&FuzzyDegree=0&ImageQuality=r75g8/r75g8/x150y150g16/i425&Display=p%7 Cf&DefSeekPage=x&SearchBack=ZyActionL&Back=ZyActionS&BackDesc=Results%20page&Maximum Pages=1&ZyEntry=1&SeekPage=x&ZyPURL

- 8 -

the year 2000, so Monsanto developed and sold genetically engineered Roundup® Ready seeds beginning in 1996.

34.   Monsanto developed and sold genetically engineered Round Up Ready seeds that were resistant to glyphosate so farmers could spray Roundup® Ready crops onto fields during the growing season without harming the growing crop. It is believed that in 2000, Roundup® accounted for almost $2.8 billion.   This outsold all other herbicide-pesticide's by a margin of 5 to 1.   It remains one of the most heavily sold products.

35.   In 1996, the Attorney General of New York sued Monsanto based on false and misleading advertising concerning Roundup® products.   The following statements found to be misleading were:

 a. Roundup® herbicide is biodegradable.
 b. Roundup® is biodegradable and won't build up in the soil.
 c. Roundup® biodegrades into naturally occurring elements.
 d. Remember that versatile Roundup® herbicide stays where you put it.  That means there's no washing or leaching to harm customer's shrubs or other desirable vegetation.
 e. This non-residual herbicide will not wash or leach in the soil.  It stays where you apply it.
 f. You can apply Accord with confidence because it will stay where you put it.  It bonds tightly to soil particles preventing leaching. Then soon after application, soil micro-organisms biodegrade Accord into natural products.
 g. Glyphosate is less toxic to rats than table salt following acute oral ingestion.
 h. Glyphosate's safety margin is much greater than required.  It has over a 1000-fold safety margin in

- 9 -

    food and over a 700-fold safety margin for workers
    who manufacture it or use it.

i.  You can feel good about using herbicides by
    Monsanto. They carry a toxicity category rating of
    'practically non-toxic' as it pertains to mammals,
    birds and fish.

j.  Roundup® can be used where kids and pets will play
    and breaks down into natural materials. This ad
    depicts a person with his head on the ground and a
    pet dog standing in an area which has been treated
    with Roundup®.[4]

36.   On November 19, 1996, Monsanto entered into an
"Assurance of Discontinuance" with NYAG where Monsanto agreed "to
cease and desist from publishing or broadcasting any
advertisements (in New York) that represent, directly or by
implication" that:

    "a.  its glyphosate-containing pesticide products or
         components are safe, non-toxic, harmless or free
         from risk.

    b.  its glyphosate-containing pesticide products or any
        component thereof manufactured, formulated,
        distributed, or sold by Monsanto are biodegradable.

    c.  its glyphosate-containing pesticide products or any
        component thereof stay where they are applied under
        all circumstances and will not move through the
        environment by any means.

    d.  its glyphosate-containing pesticide products or any
        component thereof are good for the environment or
        are "known for their environmental
        characteristics."

    e.  glyphosate-containing pesticides products or any
        component thereof are safer or less toxic than
        common consumer products other than herbicides.

    f.  its glyphosate-containing products or any component
        thereof might be classified as "practically non-
        toxic."

---

[4] Attorney General of the State of New York, In the Matter of Monsanto Company, Assurance of Discontinuance
Pursuant to Executive Law § 63(15) (Nov. 1996).

E-FILED  2023 MAR 14 12:07 PM SAC - CLERK OF DISTRICT COURT

- 10 -

37.   Monsanto did not alter its advertising in the same manner in any state other than New York.

38.   In 2009, France's highest court ruled that Monsanto had not told the truth about the safety of Roundup®.  That Court affirmed an earlier judgment that Monsanto had falsely advertised its herbicide Roundup® as "biodegradable" and that it "left the soil clean".[5]

### Classifications and Assessments of Glyphosate

39.   The IARC process for the classification of glyphosate followed IARC's stringent procedures for the evaluation of a chemical agent.  Over time, the IARC Monograph program has reviewed 980 agents.  Of those reviewed, it has determined 116 agents to be Group 1 (Known Human Carcinogens); 73 agents to be Group 2A (Probable Human Carcinogens); 287 agents to be Group 2B (Possible Human  Carcinogens); 503 agents to be Group 3 (Not Classified); and one agent to  be Probably  Not Carcinogenic.  The established procedure for IARC Monograph evaluations is  described in the IARC Programme's Preamble.[6]  Evaluations are performed by panels  of international experts, selected on the basis of their expertise and the absence of actual  or apparent conflicts of interest.

---

[5]  *Monsanto Guilty in 'False Ad' Row*, BBC, Oct. 15, 2009, *available at* http://news.bbc.co.uk/2/hi/europe/8308903.stm.

[6]  World Health Org., *IARC Monographs on the Evaluation of Carcinogenic Risks to Humans: Preamble* (2006), available at http://monographs.iarc.fr/ENG/Preamble/CurrentPreamble.pdf.

- 11 -

40. One year before the Monograph meeting, the meeting is announced and there is a call both for data and for experts. Eight months before the Monograph meeting, the Working Group membership is selected, and the sections of the Monograph are developed by the Working Group members.  One month prior to the Monograph meeting, the call for data is closed and the  various draft sections are distributed among  Working Group members for review and comment.  Finally, at the Monograph meeting, the Working Group finalizes review of all literature, evaluates the evidence in each category, and completes the overall evaluation.  Within two weeks after the Monograph meeting, the summary of the Working Group findings are published in *The Lancet Oncology*, and within a year after the meeting, the finalized Monograph is published.

41. To perform its assessment, the IARC Working Group reviews: (a) human, experimental, and mechanistic data; (b) all pertinent epidemiological studies and cancer  bioassays; and (c) representative mechanistic data.  The studies must be publicly available and have sufficient detail for meaningful review, and reviewers cannot be associated with the underlying study.

42. On July 29, 2015, IARC issued its Monograph for glyphosate, Monograph Volume 112.  For Volume 112, a Working Group of 17 experts from 11 countries met at IARC from March 3-10, 2015 to assess the  carcinogenicity of certain herbicides,  including glyphosate.  The March meeting culminated a nearly one-year review

- 12 -

and preparation by the IARC Secretariat  and the Working Group, including a comprehensive review of the latest available scientific evidence.   According to published procedures,  the Working Group considered "reports that have been published  or accepted for publication in the openly available scientific literature" as well as "data  from governmental reports that are publicly available."

43.  The studies considered the two agriculture related exposure groups, including farmers and farm workers, and also related occupations.  Glyphosate was identified as the second-most used household herbicide in the United States for weed control between 2001 and 2007 and the most heavily used herbicide in the world in 2012.  Exposure pathways for Roundup®® are identified as air (especially during spraying), water, and food.  Community exposure to glyphosate is widespread as it is found in soil, air, surface water, and groundwater, as well as in food.

44.  The assessment of the IARC Working Group identified several case control studies of occupational exposure in the United States, Canada, and Sweden.  These studies show a human health concern from agricultural and other work-related exposure  to glyphosate.  The IARC Working Group found an increased risk between exposure to  glyphosate and NHL and several subtypes of NHL, and the increased risk persisted after adjustment for other pesticides.

- 13 -

45. The IARC also found that glyphosate caused DNA and chromosomal damage in human cells.   One study of community residents reported increases in blood markers of chromosomal damage (micronuclei) after glyphosate formulations were sprayed. In male CD-1 mice, glyphosate induced a positive trend in the incidence of a rare tumor:   renal tubule carcinoma.   A second study reported a positive trend for haemangiosarcoma in male mice. Glyphosate increased pancreatic islet-cell adenoma in male rats in two studies.   A glyphosate formulation promoted skin tumors in an initiation-promotion study in mice.

46. Scientists of the IARC Working Group found that glyphosate has been detected in the urine of agricultural workers, indicating absorption.   Soil microbes degrade glyphosate to aminomethylphosphoric acid (AMPA).   Blood AMPA detection after exposure suggests intestinal microbial metabolism in humans.   In addition, the IARC found that glyphosate and glyphosate formulations induced DNA and chromosomal damage in mammals, and in human and animal cells in utero. The IARC Working Group connected genotoxic, hormonal, and enzymatic effects in mammals exposed to glyphosate.[7] Essentially, glyphosate inhibits the biosynthesis of aromatic   amino acids; this leads to metabolic disturbances,

---

[7] Guyton et al., *Carcinogenicity of Tetrachlorvinphos, Parathion, Malathion, Diazinon & Glyphosate, supra* at 77.

E-FILED  2023 MAR 14 12:07 PM SAC - CLERK OF DISTRICT COURT

- 14 -

including inhibition of protein and secondary product biosynthesis and general metabolic disruption.

47. The IARC scientific Working Group reviewed an Agricultural Health Study consisting of a prospective cohort of 57,311 licensed pesticide applicators in Iowa and North Carolina.[8] While this study, unlike others, was based on a self-administered questionnaire. Results support an association between glyphosate exposure and multiple myeloma, hairy cell leukemia (HCL), and chronic lymphocytic leukemia (CLL), in addition to several other cancers. These illnesses are of the blood as is NHL.

### Other Earlier Findings about Glyphosate's Dangers to Human Health

48. The EPA technical fact sheet, part of its Drinking Water and Health, National Primary Drinking Water Regulations publication, relating to glyphosate describes the release patterns for glyphosate as follows:

#### Release Patterns

Glyphosate is released to the environment in its use as an herbicide for controlling woody and herbaceous weeds on forestry, right-of-way, cropped and non-cropped sites. These sites may be around water and in wetlands.

It may also be released to the environment during its manufacture, formulation, transport, storage, disposal and cleanup, and from spills. Since glyphosate is not a listed chemical in the Toxics Release Inventory, data

---

[8] Anneclare J. De Roos et al., *Cancer Incidence Among Glyphosate-Exposed Pesticide Applicators in the Agricultural Health Study*, 113 Envt'l Health Perspectives 49–54 (2005), *available at* http://www.ncbi.nlm.nih.gov/pmc/articles/PMC1253709/pdf/ehp0113-000049.pdf.

E-FILED 2023 MAR 14 12:07 PM SAC - CLERK OF DISTRICT COURT

- 15 -

on releases during its manufacture and handling are not available.

Occupational workers and home gardeners may be exposed to glyphosate by inhalation and dermal contact during spraying, mixing, and cleanup. They may also be exposed by touching soil and plants to which glyphosate was applied. Occupational exposure may also occur during glyphosate's manufacture, transport storage, and disposal.[9]

### The Toxicity of Other Ingredients in Roundup®

49. In addition to the toxicity of the active ingredient, glyphosate, several studies noted by the IARC support the hypothesis that the glyphosate-based formulation in Defendant's Roundup® products is more dangerous and toxic than glyphosate alone. During 1991, available evidence demonstrated this danger.[10] A 2002 study by Julie Marc, entitled "Pesticide Roundup® Provokes Cell Division Dysfunction at the Level of CDK1/Cyclin B Activation," revealed that Roundup® causes delays in the cell cycles of sea urchins but the same concentrations of glyphosate alone did not alter cell cycles.[11]

50. A 2004 study by Marc and others, entitled "Glyphosate-based pesticides affect cell cycle regulation," demonstrated a molecular link between glyphosate-based products

---

[9] U.S. Envtl. Prot. Agency, *Technical Factsheet on: Glyphosate, supra.*

[10] Martinez, T.T. and K. Brown, *Oral and pulmonary toxicology of the surfactant used in Roundup herbicide,* PROC. WEST. PHARMACOL. SOC. 34:43-46 (1991).

[11] Julie Marc, et al., *Pesticide Roundup Provokes Cell Division Dysfunction at the Level of CDK1/Cyclin B Activation,* 15 CHEM. RES. TOXICOL. 326–331 (2002), *available at* http://pubs.acs.org/doi/full/10.1021/tx015543g

- 16 -

and cell cycle dysregulation.   The researchers noted that "cell-cycle dysregulation is a hallmark of tumor cells and human cancer. Failure in the cell-cycle checkpoints leads genomic instability and subsequent development of cancers from the  initial affected cell."  Further, "since cell cycle disorders such as cancer result from dysfunction of a unique cell, it was of interest to evaluate the threshold dose of glyphosate affecting the cells."[12]

51.  In 2005, a study by Francisco Peixoto, entitled "Comparative effects of the Roundup® and glyphosate on mitochondrial oxidative phosphorylation," demonstrated that Roundup®'s effects on rat liver mitochondria are far more toxic than equal concentrations of glyphosate alone.  The Peixoto study concluded that harmful effects  of Roundup® on mitochondrial bioenergetics could  not be exclusively attributed to glyphosate but could be the result of other chemicals, such as the surfactant POEA, or in the alternative, due to a potential synergic effect between  glyphosate  and  other  ingredients  in  the  Roundup® formulation.[13]

52.  In 2009, Nora Benachour and  Gilles-Eric Seralini published a study  examining the effects of Roundup® and glyphosate

---

[12] Julie Marc, et al., *Glyphosate-based pesticides affect cell cycle regulation*, 96 BIOLOGY OF THE CELL 245, 245-249 (2004), *available at* http://onlinelibrary.wiley.com/doi/10.1016/j.biolcel.2003.11.010/epdf.

[13] Francisco Peixoto, *Comparative effects of the Roundup and glyphosate on mitochondrial oxidative phosphorylation*, 61 CHEMOSPHERE 1115, 1122 (2005), *available at* https://www.researchgate.net/publication/7504567_Comparative_effects_of_the_Roundup_and_glyphosate_on_mitochondrial_oxidative_phosphorylation.

- 17 -

on human umbilical, embryonic, and placental cells. The study tested dilution levels of Roundup® and glyphosate that were far below agricultural recommendations, corresponding with low levels of residue in food. The researchers ultimately concluded that supposed "inert" ingredients, and possibly POEA, alter human cell permeability and amplify toxicity of glyphosate alone. Researchers further suggested that assessments of glyphosate toxicity should account for the presence of adjuvants or additional chemicals used in the formulation of the complete pesticide. The study confirmed that the adjuvants present in Roundup® are not, in fact, inert and that Roundup® is potentially far more toxic than its active ingredient glyphosate alone.[14]

53. Monsanto knew, or should have known, of these studies. It knew or should have known that Roundup® is more toxic than glyphosate alone and that safety studies of Roundup®, its adjuvants and "inert" ingredients, and/or the surfactant POEA were necessary to protect Plaintiffs from Roundup®. Despite this fact, Defendant continued to promote Roundup® as safe and did not disclose the dangers of glyphosate or its Roundup® formulation

---

[14] Nora Benachour, et al., *Glyphosate Formulations Induce Apoptosis and Necrosis in Human Umbilical, Cells*, 22 CHEM. RES. TOXICOL. 97-105 (2008), *available at* http://big.assets.huffingtonpost.com/france.pdf.

E-FILED  2023 MAR 14 12:07 PM SAC - CLERK OF DISTRICT COURT

- 18 -

### *Recent Worldwide Bans on Roundup®/Glyphosate*

54. Monsanto also knew that several countries around the world instituted bans on sale of Roundup® and other glyphosate-containing herbicides, both before and since IARC first announced its assessment for glyphosate in 2015. The Netherlands issued a ban on all glyphosate-based herbicides in April 2014, including Roundup®, which will  take effect by the end of 2015.  In issuing the ban, the Dutch Parliament member who  introduced the successful legislation stated:

> "Agricultural pesticides in user-friendly packaging are sold in abundance to private persons.  In garden centers, Roundup® is promoted as  harmless, but unsuspecting customers have no idea what the risks of this product are.  Especially children are sensitive to toxic substances and should therefore not be exposed to it."[15]

55. The Brazilian Public Prosecutor in the Federal District requested that the Brazilian Justice Department suspend the use of glyphosate.[16]

---

[15] *Holland's Parliament Bans Glyphosate Herbicides*, The Real Agenda, April 14, 2014, *available at* http://realagenda.com/hollands-parliament-bans-glyphosate-herbicides/.

[16] Christina Sarich, *Brazil's Public Prosecutor Wants to Ban Monsanto's Chemicals Following Recent Glyphosate-Cancer Link*, GLOBAL RESEARCH, May 14, 2015, *available at* http://www.globalresearch.ca/brazils-public-prosecutor-wants-to-ban-monsantos-chemicals-followingrecent-glyphosate-cancer-link/5449440; *see* Ministério Público Federal, *MPF/DF reforça pedido para que glifosato seja banido do mercado nacional*, April, 14, 2015, *available at* http://noticias.pgr.mpf.mp.br/noticias/noticias-do-site/copy_of_meio-ambiente-e-patrimonio-cultural/mpfdf-reforca-pedido-para-que-glifosato-seja-banido-do-mercado-nacional.

- 19 -

France banned the private sale of Roundup® and glyphosate following the IARC assessment for Glyphosate.[17]

56. Bermuda banned both the private and commercial sale of glyphosates, including Roundup®. The Bermuda government explained its ban as follows:

> "Following a recent scientific study carried out by a leading cancer agency, the importation of weed spray 'Roundup' has been suspended."[18]

57. The Sri Lankan government banned the private and commercial use of glyphosate, particularly out of concern that glyphosate has been linked to fatal kidney disease in agricultural workers.[19]

58. The government of Colombia announced its ban on using Roundup® and glyphosate to destroy illegal plantations of coca, the raw ingredient for cocaine, because of the WHO's finding that glyphosate is probably carcinogenic.[20]

59. On September 4, 2015, California's Office of Environmental Health Hazard Assessment ("OEHHA") published a notice of intent to include glyphosate on the state's list of

---

[17] Zoe Schlanger, *France Bans Sales of Monsanto's Roundup in Garden Centers, 3 Months After U.N. Calls it 'Probable Carcinogen'*, NEWSWEEK, June 15, 2015, *available at* http://www.newsweek.com/france-banssale-monsantos-roundup-garden-centers-after-un-names-it-probable-343311.

[18] *Health Minister: Importation of Roundup Weed Spray Suspended*, Today in Bermuda, May, 11 2015, *available at* http://www.todayinbermuda.com/news/health/item/1471-health-minister-importation-of-roundup-weedspray-suspended.

[19] *Sri Lanka's New President Puts Immediate Ban on Glyphosate Herbicides*, Sustainable Pulse, May 25, 2015, *available at* http://sustainablepulse.com/2015/05/25/sri-lankas-new-president-puts-immediate-ban-onglyphosate-herbicides/#.VeduYk3bKAw.

[20] *Columbia to ban coca spraying herbicide glyphosate*, BBC, May 10, 2015, *available at* http://www.bbc.com/news/world-latin-america-32677411.

- 20 -

known carcinogens under Proposition 65.[21]   California's Safe Drinking Water and Toxic Enforcement Act of 1986 (informally known as "Proposition 65"), requires the state to maintain and, at least once a year, revise and republish a list of chemicals "known to the State of California to cause cancer or reproductive toxicity."[22] The OEHHA determined that glyphosate met the criteria for the listing mechanism under the Labor Code following IARC's assessment of the chemical.[23] That section of the Labor Code identifies "[s]ubstances listed as human or animal carcinogens by the International Agency for Research on Cancer (IARC)." IARC's classification of glyphosate as a Group 2A chemical ("probably carcinogenic to humans") therefore triggered the listing.

60. A manufacturer like Monsanto that deploys a listed chemical in its products must provide "clear and reasonable warnings" to the public. To be clear and reasonable, and compliant with California state law, a warning must "(1) clearly communicate that the chemical is known to cause cancer, and/or birth defects or other reproductive harm; and (2) effectively reach the person

[21] Cal. Envtl. Prot. Agency Office of Envtl. Health Hazard Assessment, Notice of Intent to List Chemicals by the Labor Code Mechanism: Tetrachlorvinphos, Parathion, Malathion, Glyphosate (Sept. 4, 2015), http://oehha.ca.gov/prop65/CRNR_notices/admin_listing/intent_to_list/pdf_zip/090415NOIL_LCSet27.pdf.

[22] *Frequently Asked Questions*, STATE OF CAL. DEP'T OF JUSTICE, OFFICE OF THE ATTORNEY GENERAL, http://oag.ca.gov/prop65/faq (last visited April 19, 2016).

[23] Cal. Envtl. Prot. Agency Office of Envtl. Health Hazard Assessment, Notice of Intent to List Chemicals by the Labor Code Mechanism: Tetrachlorvinphos, Parathion, Malathion, Glyphosate (Sept. 4, 2015),

- 21 -

before exposure."[24]   California also prohibits the discharge of listed chemicals into drinking water.

61.   Monsanto responded to California with another chapter of its continuing denials that Roundup® is probably carcinogenic and is dangerous to humans. Monsanto alleged California's Agency's reliance on the IARC decision signified that "OEHHA effectively elevated the determination of an ad hoc committee of an unelected, foreign body, which answers to no United States official (let alone any California state official), over the conclusions of its own scientific experts."[25] Monsanto further alleged that the Labor Code listing mechanism presented various constitutional violations because it "effectively empowers an unelected, undemocratic, unaccountable, and foreign body to make laws applicable in California.[26]" Among other things, Monsanto argued that Proposition 65's requirement to provide a "clear and reasonable warning" to consumers that the chemical is a known carcinogen would damage its reputation and violate its First Amendment rights.[27] Monsanto's continuing denials in California remain in litigation against the OEHHA. The Agency's position stands as that litigation occurs.

---

[24]   *Frequently Asked Questions*, STATE OF CAL. DEPARTMENT OF JUSTICE, OFFICE OF THE ATTORNEY GENERAL, *supra*.
[25]   *Id.* at 2.
[26]*Id.* at 3.
[27]   *Id.*

– 22 –

### EFSA Report on Glyphosate

62. European scientists, working independently of Monsanto financial influence on research and as objective regulatory agencies, have continued to act to protect the public. On November 12, 2015, the European Food Safety Authority (EFSA), the European Union's primary agency for food safety, reported on its evaluation of the Renewal Assessment Report (RAR) on glyphosate.[28] This occurred in sequence after the German Federal Institute for Risk Assessment (BfR), published its RAR as part of the registration renewal process for glyphosate in the EU.

63. Within the EFSA the RAR underwent pre-publication scientific peer review by EFSA, non-German member states, and industry groups. As part of the on-going peer review of Germany's reevaluation of glyphosate, EFSA also received a second mandate from the European Commission to consider IARC's findings regarding the potential carcinogenicity of glyphosate and Roundup®-like products.

64. After review of the RAR, including review of data from industry-submitted unpublished studies, EFSA published its own report ("Conclusion") to the European Commission, finding

---

[28] European Food Safety Auth., Conclusion on the peer review of the pesticide risk assessment of the active substance glyphosate, *available at* http://www.efsa.europa.eu/sites/default/files/scientific_output/files/main_documents/4302.pdf.

- 23 -

that "glyphosate is unlikely to pose a carcinogenic hazard to humans and the evidence does not support classification with regard to its carcinogenic potential according to Regulation (EC) No 1272/2008."[29]  EFSA therefore disagreed with IARC: glyphosate was not genotoxic and did not present a carcinogenic threat to humans.

65. In explaining why its results departed from IARC's conclusion, EFSA drew a distinction between the EU and IARC approaches to the study and classification of chemicals.[30] Although IARC examined "both glyphosate—an active substance—and glyphosate-based formulations, grouping all formulations regardless of their composition," EFSA explained that it considered only glyphosate and that its assessment focuses on "each individual chemical, and each marketed mixture separately."[31] IARC, on the other hand, "assesses generic agents, including groups of related chemicals, as well as occupational or environmental exposure, and cultural or behavioral practices."[32] EFSA accorded greater weight to studies conducted with glyphosate alone than studies of formulated products.[33] EFSA went further and noted:

---

[29] *Id.*

[30] EFSA Fact Sheet: Glyphosate, EFSA
    www.efsa.europa.eu/sites/default/files/corporate_publications/files/efsaexplainsglyphosate151112en.pdf

[31] *Id.*

[32] *Id.*

[33] *Id.*

- 24 -

> [A]lthough some studies suggest that certain glyphosate based formulations may be genotoxic (i.e. damaging to DNA), others that look solely at the active substance glyphosate do not show this effect. It is likely, therefore, that ***the genotoxic effects observed in some glyphosate-based formulations are related to the other constituents or "coformulants"***. Similarly, certain glyphosate-based formulations display higher toxicity than that of the active ingredient, presumably because of the presence of coformulants. In its assessment, ***EFSA proposes that the toxicity of each pesticide formulation and in particular its genotoxic potential should be further considered and addressed by Member State authorities while they re-assess uses of glyphosate-based formulations in their own territories.***[34]

66.  EFSA did set exposure levels for glyphosate.  It proposed an "acceptable daily intake" (ADI) of 0.5 mg/kg of body weight per day; an acute reference dose (ARfD) of 0.5 mg/kg of body weight; and an acceptable operator exposure level (AOEL) of 0.1 mg/kg bw per day.[35] Monsanto is aware of this action but has not warned the public even about these considerations.

### *Leading Scientists Dispute EFSA's Conclusion*

67.  On November 27, 2015, 96 independent academic and governmental scientists from around the world submitted an open letter to the EU Health Commissioner, Vytenis Andriukaitis.[36] The scientists expressed their strong concerns and urged the

---

[34]  *Id.*

[35]  European Food Safety Auth., Conclusion on the peer review of the pesticide risk assessment of the active substance glyphosate, *supra.*

[36]  Letter from Christopher J. Portier et al. to Commission Vytenis Andriukaitis, Open letter: Review of the Carcinogenicity of Glyphosate by EFSA and BfR (Nov. 27, 2015), http://www.zeit.de/wissen/umwelt/2015-11/glyphosat-offener-brief.pdf; http://www.theguardian.com/environment/2016/jan/13/eu-scientists-in-rowover-safety-of-glyphosate-weedkiller.

E-FILED  2023 MAR 14 12:07 PM SAC - CLERK OF DISTRICT COURT

- 25 -

commissioner to disregard the "flawed" EFSA report, arguing that
"the BfR decision is not credible because it is not supported by
the evidence and it was not reached in an open and transparent
manner."[37] Signatories to the letter included Dr. Christopher J.
Portier, Ph.D., and other renowned international experts in the
field, some of whom were part of the IARC Working Group assigned
to glyphosate.

      68. In an exhaustive and careful examination, the
critical community of scientists scrutinized EFSA's conclusions
and outlined why the IARC Working Group decision was "by far the
more credible":

> The IARC WG decision was reached relying on open
> and transparent procedures by independent
> scientists who completed thorough conflict-of-
> interest statements and were not affiliated or
> financially supported in any way by the chemical
> manufacturing industry. It is fully referenced and
> depends entirely on reports published in the open,
> peer reviewed biomedical literature. It is part of
> a long tradition of deeply researched and highly
> credible reports on the carcinogenicity of
> hundreds of chemicals issued over the past four
> decades by IARC and used today by international
> agencies and regulatory bodies around the world as
> a basis for risk assessment, regulation and public
> health policy.[38]

      69. With respect to human data, the scientists pointed
out that EFSA agreed with IARC that there was "*limited evidence
of carcinogenicity*" for non-Hodgkin's lymphoma, but they

---

[37] *Id.*

[38] *Id.*

- 26 -

criticized EFSA's dismissal of the association between glyphosate exposure and carcinogenicity.  IARC science applies three levels of evidence in its analyses of human data, including sufficient evidence and limited evidence.  The critical scientists submitted that EFSA's conclusion of "no unequivocal evidence for a clear and strong association of NHL with glyphosate" was misleading because it incorrectly confused scientific standards governing sufficiency of evidence to express different levels of confidence in conclusions. The critical scientists noted that the EFSA's disagreement mischaracterized the Working Group's "probably carcinogenic to humans" conclusion about Roundup® with a different IARC scientific confidence and evidence level called "sufficient evidence," which means a causal relationship has been established…not that it is probable.[39]

70. Among other deficiencies, the scientists noted that EFSA's conclusions regarding animal carcinogenicity data were "scientifically unacceptable," particularly in use of historical control data and trend analysis.  BfR's analysis directly contradicted the Organization for Economic Co-operation and Development ("OECD") testing guidelines while citing and purporting to follow those same guidelines. The scientists concluded:

---

[39] *Id.* The critical scientists observed that "[l]egitimate public health concerns arise when 'causality is credible, i.e., when there is *limited evidence*."

E-FILED  2023 MAR 14 12:07 PM SAC - CLERK OF DISTRICT COURT

- 27 -

BfR reported seven positive mouse studies with three studies showing increases in renal tumors, two with positive findings for hemangiosarcomas, and two with positive findings for malignant lymphomas. BfR additionally reported two positive findings for tumors in rats. Eliminating the inappropriate use of historical data, the unequivocal conclusion is that these are not negative studies, but in fact document the carcinogenicity of glyphosate in laboratory animals.[40]

71. The group of critical scientists condemned EFSA report's lack of transparency and the opacity about data cited in the report: "citations for almost all of the references, even those from the open scientific literature, have been redacted from the document" and "there are no authors or contributors listed for either document, a requirement for publication in virtually all scientific journals." EFSA authors relied on unpublished, confidential industry-provided studies. This made it "impossible for any scientist not associated with BfR to review this conclusion with scientific confidence."[41] On March 3, 2016,

---

[40] *Id.* For instance, the EFSA report dismissed observed trends in tumor incidence "because there are no individual treatment groups that are significantly different from controls and because the maximum observed response is reportedly within the range of the historical control data." However, according to the scientists, concurrent controls are recommended over historical controls in all guidelines, scientific reports, and publications, and, if it is employed, historical control data "should be from studies in the same timeframe, for the same exact animal strain, preferably from the same laboratory or the same supplier and preferably reviewed by the same pathologist." BfR's use of historical control data violated these precautions: "only a single study used the same mouse strain as the historical controls, but was reported more than 10 years after the historical control dataset was developed." Further deviating from sound scientific practices, the data used by the BfR came from studies in seven different laboratories.

[41] *Id.*

- 28 -

the letter of the group of critical, worldwide scientists was published in the Journal of Epidemiology & Community Health.[42]

### Statement of Concern Regarding Glyphosate-Based Herbicides

72.  On February 17, 2016, a consensus statement of scientists published in the journal *Environmental Health*, entitled "Concerns over use of glyphosate-based herbicides and risks associated with exposures: a consensus statement," assessed the safety of glyphosate-based herbicides (GBHs).[43]  The paper's "focus is on the unanticipated effects arising from the worldwide increase in use of GBHs, coupled with recent discoveries about the toxicity and human health risks stemming from use of GBHs."[44]

73. The researchers announced these factual conclusions:
73.1 GBHs are the most heavily applied herbicide in the world and usage continues to rise;
73.2 Worldwide, GBHs often contaminate drinking water sources, precipitation, and air, especially in agricultural regions;
73.3 The half-life of glyphosate in water and soil is longer than previously recognized;
73.4 Glyphosate and its metabolites are widely present in the global soybean supply;
73.5 Human exposures to GBHs are rising;
73.6 Glyphosate is now authoritatively classified as a probable human carcinogen; and
73.7 Regulatory estimates of tolerable daily intakes for glyphosate in the United States and European Union are based on outdated science.[45]

---

[42] Christopher J. Portier, et al., *Differences in the carcinogenic evaluation of glyphosate between the International Agency for Research on Cancer (IARC) and the European Food Safety Authority (EFSA)*, JOURNAL OF EPIDEMIOLOGY & CMTY. HEALTH, Mar. 3, 2016, *available at* http://jech.bmj.com/content/early/2016/03/03/jech-2015-207005.full.

[43] John P. Myers, et al, *Concerns over use of glyphosate-based herbicides and risks associated with exposures: a consensus statement*, Environmental Health (2016), *available at* http://ehjournal.biomedcentral.com/articles/10.1186/s12940-016-0117-0.

[44] *Id.*

[45] *Id.*

- 29 -

74. The consensus statement researchers observed that GBH use increased approximately 100-fold since the 1970s. Further, far from posing a limited hazard to vertebrates, as previously believed, two decades of evidence demonstrated that "several vertebrate pathways are likely targets of action, including hepatorenal damage, effects on nutrient balance through glyphosate chelating action and endocrine disruption."[46]

75. Among various implications, the researchers conclude that "existing toxicological data and risk assessments are not sufficient to infer that GBHs, as currently used, are safe." Further, "GBH-product formulations are more potent, or toxic, than glyphosate alone to a wide array of non-target organisms including mammals, aquatic insects, and fish." Accordingly, "risk assessments of GBHs that are based on studies quantifying the impacts of glyphosate alone underestimate both toxicity and exposure, and thus risk." The paper concludes that this "shortcoming has repeatedly led regulators to set inappropriately high exposure thresholds."[47]

---

[46] *Id.* The paper attributes uncertainties in current assessments of glyphosate formulations to the fact that "[t]he full list of chemicals in most commercial GBHs is protected as 'commercial business information,' despite the universally accepted relevance of such information to scientists hoping to conduct an accurate risk assessment of these herbicide formulations." Further, the researchers argue, "[t]he distinction in regulatory review and decision processes between 'active' and 'inert' ingredients has no toxicological justification, given increasing evidence that several so-called 'inert' adjuvants are toxic in their own right."

[47] *Id.*

- 30 -

76. The researchers also critique the current practice of regulators who largely rely on "unpublished, non-peer reviewed data generated by the registrants" but ignore "published research because it often uses standards and procedures to assess quality that are different from those codified in regulatory agency data requirements, which largely focus on avoiding fraud." In the researchers' view, "[s]cientists independent of the registrants should conduct regulatory tests of GBHs that include glyphosate alone, as well as GBH-product formulations."[48] The researchers also call for greater inclusion of GBHs in government-led toxicology testing programs:

> [A] fresh and independent examination of GBH toxicity should be undertaken, and . . . this re-examination be accompanied by systematic efforts by relevant agencies to monitor GBH levels in people and in the food supply, none of which are occurring today. The U.S. National Toxicology Program should prioritize a thorough toxicological assessment of the multiple pathways now identified as potentially vulnerable to GBHs.[49]

**FDA Announces Testing of Glyphosate Residue in Foods**

---

[48] *Id.*

[49] *Id.* The researchers suggest that, in order to fill the gap created by an absence of government funds to support research on GBHs, regulators could adopt a system through which manufacturers fund the registration process and the necessary testing:

"[W]e recommend that a system be put in place through which manufacturers of GBHs provide funds to the appropriate regulatory body as part of routine registration actions and fees. Such funds should then be transferred to appropriate government research institutes, or to an agency experienced in the award of competitive grants. In either case, funds would be made available to independent scientists to conduct the appropriate long-term (minimum 2 years) safety studies in recognized animal model systems. A thorough and modern assessment of GBH toxicity will encompass potential endocrine disruption, impacts on the gut microbiome, carcinogenicity, and multigenerational effects looking at reproductive capability and frequency of birth defects."

- 31 -

77. On February 17, 2016, the U.S. Food and Drug Administration ("FDA") announced that it would begin testing certain foods for glyphosate residues. The FDA explained: "The agency is now considering assignments for Fiscal Year 2016 to measure glyphosate in soybeans, corn, milk, and eggs, among other potential foods."[50]

In 2014, the U.S. Government Accountability Office (GAO) rebuked the FDA for its failures to both monitor for pesticide residue, including that of glyphosate, and to disclose the limitations of its monitoring and testing efforts to the public.[51] The GAO cited numerous undisclosed deficiencies in the FDA's process, specifically highlighting its omission of glyphosate testing. In the past, both the FDA and the U.S. Department of Agriculture (USDA) routinely excluded glyphosate from their testing for residues of hundreds of other pesticides. The FDA however, now states that "the agency has developed 'streamlined methods' for testing for the weed killer."[52] The FDA possesses enforcement authority and can seek action if pesticide residues exceed enforcement guidelines.[53]

---

[50] Carey Gillam, *FDA to Start Testing for Glyphosate in Food*, TIME, Feb. 17, 2016, *available at* http://time.com/4227500/fda-glyphosate-testing/?xid=tcoshare.

[51] U.S. GOV'T ACCOUNTABILITY OFFICE, GAO-15-38, FDA AND USDA SHOULD STRENGTHEN PESTICIDE RESIDUE MONITORING PROGRAMS AND FURTHER DISCLOSE MONITORING LIMITATIONS (2014), *available at* http://www.gao.gov/products/GAO-15-38.

[52] Gillam, *supra* note 46.

[53] *Id.*; Pesticide Q&A, U.S. FOOD AND DRUG ADMINISTRATION, http://www.fda.gov/Food/FoodborneIllnessContaminants/Pesticides/ucm114958.htm (last visited April 19, 2016).

E-FILED  2023 MAR 14 12:07 PM SAC - CLERK OF DISTRICT COURT

- 32 -

### *EU Delays Vote on Glyphosate Renewal*

78. On March 7 and 8, 2016, experts from the 28 European Union member states met to vote on reapproving a 15-year license for glyphosate. The current license for glyphosate is scheduled to expire at the end of June 2016.[54]

79. On March 4, 2016, *The Guardian* reported that France, the Netherlands, and Sweden did not support EFSA's assessment that glyphosate was harmless.[55] The paper reported the Swedish environment minister, Åsa Romson, as stating: "We won't take risks with glyphosate, and we don't think that the analysis done so far is good enough. We will propose that no decision is taken until further analysis has been done and the EFSA scientists have been more transparent about their considerations."[56]

80. The Netherlands, in particular, argued that the relicensing should be put on hold until after a separate evaluation of glyphosate's toxicity can be conducted.[57] Leading up to the vote, Italy joined the other EU states in opposing the license renewal, citing health concerns.[58]

---

[54] Arthur Neslen, *Vote on Controversial weedkiller's European licence postponed*, THE GUARDIAN, Mar. 8, 2016, *available at* http://www.theguardian.com/environment/2016/mar/08/eu-vote-on-controversial-weedkillerlicence-postponed-glyphosate.

[55] Arthur Neslen, *EU states rebel against plans to relicense weedkiller glyphosate*, THE GUARDIAN, Mar. 4, 2016, *available at* http://www.theguardian.com/environment/2016/mar/04/eu-states-rebel-against-plans-torelicense-weedkiller-glyphosate.

[56] *Id.*

[57] Arthur Neslen, *Vote on Controversial weedkiller's European licence postponed*, THE GUARDIAN, Mar. 8, 2016, *available at* http://www.theguardian.com/environment/2016/mar/08/eu-vote-on-controversial-weedkillerlicence-postponed-glyphosate.

[58] *Id.*

- 33 -

81. On March 8, 2016, the EU ultimately decided to delay its vote and is  scheduled to meet again on May 18-19, 2016. [59]

82. Growing public awareness and concern over the chemical "led 1.4 million people to sign a petition against glyphosate in the biggest  online campaign since  neonicotinoid pesticides were banned during the last commission."[60]

83. Ray B. VonAhn used Roundup® as was foreseen by Monsanto.

84. Plaintiffs had no reasonable no way of knowing about the risk of serious illness associated with the use of, or exposure to, Roundup® and glyphosate.  They could not have discovered, through the exercise of reasonable diligence, that exposure to Roundup® and glyphosate is injurious to human health.  Monsanto engaged in two separate but parallel actions including:

84.1. Monsanto affirmatively claimed and claims that Roundup® and glyphosate are safe to human users like Plaintiffs and including them. It affirmatively denies the probability that Roundup® and glyphosate are probably carcinogenic to humans and are linked to blood born cancers including NHL.

84.2. Monsanto continues its campaign of denial of the scientific data amassed by the WHO. This continuing denial is designed to cause confusion, create credibility concerns, and cause users to continue to use Roundup®.

---

[59] *Id. The Guardian* quoted a commission spokesperson as stating: "We would like a solid majority to take a decision on this kind of issue and some member states had sceptical [*sic*] observations that we will have to answer, so it [a postponement] was the wise thing to do."

[60] *Id.*

- 34 -

85.  Ray B. VonAhn was frequently covered with Roundup® during each summer for approximately 25+ years of dispensing Roundup® to weeds.  When doing these tasks the Roundup® components would be absorbed through the skin and after years of use, caused Ray B. VonAhn to be diagnosed with anaplastic large cell lymphoma, ALK positive.

86.  Monsanto is equitably estopped to assert a statute of limitations defense.  It made, and continues to make, statements intended to be relied upon by farmers and agronomists and the public that Roundup® is safe and harmless to humans. Plaintiffs relied on those statements.

87. Plaintiffs did not discover and did not know of facts that would cause a reasonable person to suspect,  the risks associated with the use of and/or exposure to  Roundup® and glyphosate; nor would a reasonable and diligent investigation by them have disclosed that Roundup® and glyphosate would cause their illnesses.

88. Monsanto was under a continuous  duty to disclose to consumers, users and  other persons coming into contact with its products, including  Plaintiffs, accurate  safety information concerning its products and the  risks associated with the use of and/or  exposure to Roundup® and glyphosate. Instead, Monsanto knowingly,  affirmatively, and  actively concealed safety

- 35 -

information concerning Roundup® and glyphosate and the risks associated with the use of and/or exposure to its products.

89. As a proximate result of Monsanto's wrongful acts and omissions in placing its defective Roundup® products into the stream of commerce without adequate warnings of the hazardous and carcinogenic nature of glyphosate, and in breach of its duties of care and negligence and strict liability, Plaintiffs each suffered and continue to suffer severe and permanent physical and other injuries. Plaintiffs each endured the anguish of a cancer diagnosis, pain and suffering, and economic losses.

90. All allegations above are renewed here. Plaintiffs bring their strict liability claims against Monsanto for defective design.

91. At all times relevant to this litigation, Monsanto engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting Roundup® products, which are defective and unreasonably dangerous to consumers and users and other persons coming into contact them, including Plaintiffs, thereby placing Roundup® products into the stream of commerce. These actions were under Monsanto's ultimate control and supervision. At all times relevant to this litigation, Monsanto designed, researched, developed, formulated, manufactured, produced, tested, assembled, labeled, advertised, promoted, marketed, sold, and distributed the Roundup® products

- 36 -

used by the Plaintiffs, and/or to which the Plaintiffs were exposed, as described above.

92. At all times relevant to this litigation, Defendant's Roundup® products were manufactured, designed, and labeled in an unsafe, defective, and inherently dangerous manner that was dangerous for use by or exposure to the public, and, in particular, the Plaintiffs.

93. Monsanto's Roundup® products reached the intended farmers, consumers, handlers, and users or other persons coming into contact with these products in Iowa and other states including Plaintiff's, without substantial change in their condition and as designed, manufactured, sold, distributed, labeled, and marketed.

94. Monsanto's Roundup® products, as researched, tested, developed, designed, licensed, formulated, manufactured, packaged, labeled, distributed, sold, and marketed by Monsanto were defective in design and formulation when they left Monsanto's control; they were unreasonably dangerous to foreseeable human users, including Plaintiffs. These dangers could not be discovered by reasonable users.

95. Defendant's Roundup® products were defective in design and formulation in that when they left the hands of Defendant's manufacturers and/or suppliers, the foreseeable risks associated with these products' reasonably foreseeable uses exceeded the alleged benefits associated with their design and

- 37 -

formulation. Defendant's Roundup® products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold and marketed by Defendant, were defective in design and formulation, in one or more of the following ways:

95.1 When placed in the stream of commerce, Defendant's Roundup® products were defective in design and formulation, and, consequently, dangerous to an extent beyond that which an ordinary consumer would contemplate.

95.2. When placed in the stream of commerce, Defendant's Roundup® products were unreasonably dangerous in that they were hazardous and posed a grave risk of NHL, cancer and other serious illnesses when used in a reasonably anticipated manner.

95.3. When placed in the stream of commerce, Defendant's Roundup® products contained unreasonably dangerous design defects and were not reasonably safe when used in a reasonably anticipated or intended manner.

95.4. Defendant did not sufficiently test, investigate, or study its Roundup® products and, specifically, the active ingredient glyphosate.

95.5. Exposure to Roundup® and glyphosate-containing products presents a risk of harmful side effects that outweighs any potential utility stemming from the use of the herbicide.

95.6. Defendant knew or should have known at the time of marketing its Roundup® products that exposure to Roundup® and specifically, its active ingredient glyphosate, could result in cancer and other severe illnesses and injuries.

95.7. Defendant did not conduct adequate post-marketing surveillance of its Roundup® products.

95.8. Defendant could have employed safer alternative designs and formulations.

96. At all times relevant, Plaintiff Ray B. VonAhn used and/or was exposed to the use of Defendant's Roundup® products in

- 38 -

an intended or reasonably foreseeable manner without knowledge of their dangerous characteristics.   Plaintiff could not have reasonably discovered the defects and risks associated with Roundup® or glyphosate containing products before or at the time of exposure.

97. Harms caused by Monsanto's Roundup® products outweighed their benefit, rendering Defendant's products dangerous to an extent beyond that which an  ordinary consumer would contemplate.  Monsanto's Roundup® products were and are  more dangerous than alternative products and Defendant could have designed its Roundup® products to make them less dangerous.

98. At the time Roundup® products left Monsanto's control, there was a  practical, technically feasible, and safer alternative design that would have prevented  the harm without substantially impairing the reasonably anticipated or intended function  of Monsanto's Roundup® herbicides.  As a result of the unreasonably dangerous condition of its Roundup® products, Defendant is strictly liable to Plaintiffs.

99. Monsanto's defective design, its perpetuation, and the continuing denial  by Monsanto of safety risks of Roundup® amounts to willful, wanton, and/or reckless conduct. The defects in Monsanto's Roundup® products were substantial and proximate causes of Plaintiffs' injuries, illness and damages. Plaintiffs are each permanently  injured.

- 39 -

100. Monsanto was negligent in its acts, practices and methods to design, test, package, label, promote, market and distribute its Roundup® products. Plaintiffs assert their negligence claims.

101. Monsanto had, but breached, its duty to exercise reasonable care in the design, research, manufacture, marketing, advertisement, supply, promotion, packaging, sale, and distribution of its Roundup® products, including the duty to take all reasonable steps necessary to manufacture, promote, and/or sell a product that was not unreasonably dangerous to Plaintiffs as consumers and users of them.

102. Monsanto knew or, in the exercise of reasonable care, should have known of the hazards and dangers of Roundup® and specifically, the carcinogenic properties of the chemical glyphosate. Monsanto knew or, in the exercise of reasonable care, should have known that use of or exposure to its Roundup® products could cause Plaintiffs' injuries and thus create a dangerous and unreasonable risk of injury to the users of these products, including Plaintiffs.

103. Monsanto knew or, in the exercise of reasonable care, should have known that Roundup® is more toxic than glyphosate alone and that safety studies on Roundup®, Roundup®'s adjuvants and "inert" ingredients, and/or the surfactant POEA were necessary to protect Plaintiffs from Roundup® and it knew or, in the exercise

- 40 -

of reasonable care, should have known that tests limited to Roundup®'s active ingredient glyphosate were insufficient to prove the safety of Roundup®.

104. Monsanto also knew or, in the exercise of reasonable care, should have known that users and consumers of Roundup® were unaware of the risks and the magnitude of the risks associated with the use of and/or exposure to Roundup® and glyphosate-containing products.

105. Monsanto breached its duty of reasonable care and failed to exercise ordinary care in the design, research, development, manufacture, testing, marketing, supply, promotion, advertisement, packaging, sale, and distribution of its Roundup® products, in that Monsanto manufactured and produced defective herbicides containing the chemical glyphosate, knew or had reason to know of the defects inherent in its products, knew or had reason to know that a user's or consumer's exposure to the products created a significant risk of harm and unreasonably dangerous side effects, and failed to prevent or adequately warn of these risks and injuries.

106. Monsanto failed to appropriately and adequately test Roundup®, Roundup®'s adjuvants and "inert" ingredients, and/or the surfactant POEA to protect Plaintiffs from Roundup®. Indeed, Monsanto has wrongfully concealed information and has

- 41 -

further made false and/or misleading statements concerning the safety and/or exposure to Roundup® and glyphosate.

107. Monsanto knew and/or should have known it was foreseeable that consumers and/or users, such as Plaintiffs, would suffer injuries as a result of Monsanto's failure to exercise ordinary care in the manufacturing, marketing, labeling, distribution, and sale of Roundup®. Plaintiffs did not know the nature and extent of the injuries that could result from the intended use of and/or exposure to Roundup® or its active ingredient glyphosate. Monsanto's negligence was the proximate cause of the injuries, harm, and economic losses that Plaintiffs suffered, and will continue to suffer.

108. Monsanto made conscious decisions not to redesign, re-label, warn, or inform the unsuspecting public, including Plaintiffs. Monsanto's reckless conduct warrants an award of punitive damages payable to the State common school fund.

WHEREFORE Plaintiffs pray for an award of compensatory damages and punitive damages as well as all other relief to which they may be entitled.

### JURY DEMAND

Plaintiffs demand trial by jury.

- 42 -

HAMILTON LAW FIRM, P.C.
P.O. BOX 188
606 ONTARIO STREET
STORM LAKE, IOWA  50588
712-732-2842
712-732-6202 (FAX)


By: _____
MARY HAMLTON, AT0003125
mary@hamiltonlawfirmpc.com
ATTORNEY FOR PLAINTIFFS