Query   Reports   Utilities   Help   Log Out

## United States District Court
## Eastern District of Pennsylvania (Philadelphia)
## CIVIL DOCKET FOR CASE #: 2:23-cv-01751

| | |
|---|---|
| SCHANK et al v. MONSANTO COMPANY et al | Date Filed: 05/05/2023 |
| Assigned to: | Jury Demand: Both |
| Case in other court:  Philadelphia Court of Common Pleas, | Nature of Suit: 365 P.I.: Personal Inj. Prod. |
| 220200034 | Liability |
| Cause: 28:1332 Diversity-Product Liability | Jurisdiction: Diversity |

**Plaintiff**

**LORRAINE SCHANK**                    represented by  **LORRAINE SCHANK**
                                                        PRO SE

**Plaintiff**

**MICHAEL SCHANK**                    represented by  **MICHAEL SCHANK**
                                                        PRO SE

V.

**Defendant**

**MONSANTO COMPANY**                    represented by  **JOSEPH H. BLUM**
                                                        Shook Hardy & Bacon, L.L.P.
                                                        Two Commerce Square
                                                        2001 Market Street, Suite 3000
                                                        PHILADELPHIA, PA 19103
                                                        215-575-3115
                                                        Fax: 215-278-2594
                                                        Email: jblum@shb.com
                                                        *ATTORNEY TO BE NOTICED*

**Defendant**

**NOURYON SURFACE CHEMISTRY
LLC**

**Defendant**

**NOURYON CHEMICALS LLC**

**Defendant**

**NOURYON USA LLC**

| Date Filed | # | Docket Text |
|---|---|---|
| 05/05/2023 | 1 | NOTICE OF REMOVAL by MONSANTO COMPANY (Filing fee $ 402 receipt number APAEDC-16674705), filed by MONSANTO COMPANY. (Attachments: # 1 Certificate of |

Service, # 2 Exhibit A, # 3 Exhibit B, # 4 Exhibit C, # 5 Exhibit D, # 6 Exhibit E, # 7 Civil Cover Sheet, # 8 Designation Form)(BLUM, JOSEPH) (Entered: 05/05/2023)

| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 05/05/2023 18:20:34 | | | |
| **PACER Login:** | sh0019sh | **Client Code:** | 31943.356965 rhb |
| **Description:** | Docket Report | **Search Criteria:** | 2:23-cv-01751 |
| **Billable Pages:** | 1 | **Cost:** | 0.10 |

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| LORRAINE SCHANK AND MICHAEL SCHANK, HUSBAND AND WIFE,<br><br>Plaintiff<br><br>v.<br><br>MONSANTO COMPANY, NOURYON SURFACE CHEMISTRY LLC, NOURYON CHEMICALS LLC, and NOURYON USA LLC,<br><br>Defendants | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)    No. _____<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## DEFENDANT MONSANTO COMPANY'S NOTICE OF REMOVAL

Pursuant to 28 U.S.C. §§ 1332, 1441, and 1446 (and any other applicable laws), Defendant Monsanto Company ("Monsanto") hereby gives notice of removal of this action, captioned *Lorraine Schank, et al., v. Monsanto Company, et al.*, bearing case number 220200034, from the Court of Common Pleas of Philadelphia County ("PCCP"), Pennsylvania to the United States District Court for the Eastern District of Pennsylvania. Pursuant to 28 U.S.C. § 1446(a), Monsanto provides the following statement of grounds for removal.

### Introduction

1. Plaintiffs' counsel have named local Pennsylvania defendants, the Nouryon Defendants,[1] in nearly every case they filed in the PCCP, even though the Nouryon Defendants are not named in the numerous Roundup® lawsuits that are pending elsewhere across the country. This is a blatant anti-removal tactic. Plaintiffs plainly have no viable claim against the Nouryon Defendants—the alleged manufacturers of the "surfactant" ingredient in some Roundup®-branded herbicide products—in cases where the plaintiff did not use a Roundup®-branded herbicide that

---

[1] Nouryon Surface Chemistry LLC, Nouryon Chemicals LLC, and Nouryon USA LLC.

contained a surfactant. Instead of properly assessing on a case-by-case basis which of their clients actually used Roundup®-branded herbicides containing a surfactant, counsel took the opposite approach: asserting claims against the Nouryon Defendants in their cases despite either knowing or willfully ignoring the facts establishing that some of their clients—such as Plaintiff Lorraine Schank—never used a Roundup®-branded herbicide with surfactant. In fact, it is apparent from the record that the type of Roundup®-branded herbicide product Ms. Schank actually used, and the actual manufacturer of the ingredients therein, was not of concern to her counsel.

2. In December of 2021, Monsanto provided Plaintiffs' counsel with the Master Label[2] and Confidential Statement of Formula specific to the product at issue in this case, Roundup® Ready-to-Use Weed & Grass Killer III ("WGK III"). *Thus, before this case was ever filed,* Plaintiffs' counsel had information establishing that the product Ms. Schank allegedly used did not contain a surfactant. Rather than only pursuing claims against Monsanto, as has been done in the overwhelmingly vast majority of cases nationwide, Plaintiffs filed a complaint in the PCCP making two false allegations—(1) Ms. Schank began using Roundup®-branded herbicides in the 1990s (which was long before WGK III was on the market) and (2) Ms. Schank was exposed to surfactant manufactured by the Nouryon Defendants. Only last month, in the course of discovery, did Plaintiffs finally disclose the actual product and timing of use by Ms. Schank: "Roundup Weed & Grass Killer Premix" beginning in May of 2013, which is WGK III.

3. In short, Plaintiffs' counsel have relied on bad-faith, anti-removal tactics in an effort to prevent Monsanto from exercising its right to remove this case to federal court.

4. Like many other plaintiffs who have filed lawsuits against Monsanto, Ms. Schank alleges that she developed non-Hodgkin's lymphoma ("NHL") due to her use of Roundup®-branded herbicides. A multidistrict litigation ("MDL") proceeding is pending in the United States District Court for the Northern District of California, before the Honorable Vince G. Chhabria, pursuant to 28 U.S.C. § 1407. *See In re Roundup Prods. Liab. Litig.*, No. 3:16-md-02741-VC

---

[2] This Master Label also can be located on EPA's website:
https://www3.epa.gov/pesticides/chem_search/ppls/071995-00033-20120306.pdf.

(N.D. Cal.); *In re Roundup Prods. Liab. Litig.*, MDL No. 2741, 214 F. Supp. 3d 1346 (J.P.M.L. 2016). This case properly belongs in federal court—and more specifically, in the *Roundup* MDL proceeding.

5.    Plaintiffs are Pennsylvania citizens, as are the Nouryon Defendants for purposes of assessing federal diversity jurisdiction. Thus, Plaintiffs' anti-removal strategy relies on asserting claims against these non-diverse defendants. As discussed above, however, Ms. Schank did not use a Roundup®-branded product that contained a surfactant manufactured by, sold by, or otherwise attributable to the Nouryon Defendants. The Nouryon Defendants are fraudulently joined.

6.    Because some Roundup®-branded products contain surfactant, the factual basis for asserting claims against the Nouryon Defendants cannot be known to Monsanto or the Nouryon Defendants until a plaintiff provides information enabling identification of the Roundup®-branded product at issue. Plaintiffs' initial Complaint did not specify the Roundup®-branded product at issue. Instead, Ms. Schank generally alleged exposure to "Roundup" and defined the term "Roundup" to mean "all formulations" of Roundup®-branded herbicides. Complaint, ¶¶ 34, 38. Plaintiffs' initial Complaint further alleged that Ms. Schank began using Roundup®-branded products in "the early 1990's." Complaint, ¶ 34. Plaintiffs subsequently filed a short form complaint ("SFC") on January 31, 2023. The SFC lacked any additional information allowing Monsanto or the Nouryon Defendants to identify the product at issue.

7.    On April 5, 2023, Plaintiffs served a Plaintiff Fact Sheet ("PFS"). The PFS directly contradicts the Complaint's allegation that Ms. Schank began using Roundup®-branded products in the 1990s, stating that she did not actually begin to use such products until May 2013. The PFS also stated that Ms. Schank used only *one* Roundup®-branded herbicide product—"RoundUp Weed & Grass Killer Premix: built in sprayer." Based on the date of use and product identification, the PFS allowed Monsanto to determine, for the first time, that Plaintiffs' case conceivably involves only one product—WGK III, which has never included a surfactant, let alone a surfactant manufactured by, sold by, or otherwise attributable to the Nouryon Defendants.

8.      This case was filed more than one year ago.  Therefore, removal is proper only if Monsanto can establish bad faith. *See* 28 U.S.C. § 1446 (c)(1) (providing for "bad faith" exception to one year limitation).  It can. Plaintiffs and their counsel's conduct is the reason that Monsanto did not learn that this case was removable for more than a year after its filing.

9.      The bad faith exception applies here because Plaintiffs' counsel has asserted claims indiscriminately against the Nouryon Defendants specifically as to their alleged manufacture of surfactant in the product—without regard to whether the particular plaintiff actually used a surfactant-containing product.  And this is despite being in possession of both the product Master Label and the Confidential Statement of Formula that allow counsel to determine whether there is any basis for asserting claims against the Nouryon Defendants.

10.      In furtherance of this scheme, Plaintiffs' *verified* Complaint included multiple false allegations directly relating to product identification.  Plaintiffs falsely alleged that (1) Ms. Schank began using Roundup®-branded products in the 1990's and (2) that Ms. Schank "used Roundup that included the Nouryon Defendants' surfactants."  Complaint, ¶¶ 34, 159.  These knowingly false allegations in a verified complaint further demonstrate bad faith satisfying § 1446(c)(1).  And because discovery was stayed as part of the coordinated PCCP actions, and Plaintiffs did not produce, until April 5, 2023, a PFS showing what product Ms. Schank used, Monsanto was precluded from removing this case before that PFS was served.

11.      Accordingly, this Court should hold that it has subject matter jurisdiction and that removal is proper and timely here based on complete diversity of citizenship and Plaintiffs' bad faith efforts to avoid federal court and the *In re Roundup* MDL proceeding.

### Background and Procedural History

12.      Plaintiffs commenced this lawsuit against Monsanto and the Nouryon Defendants in the Court of Common Pleas of Philadelphia County, Pennsylvania by filing a Complaint, captioned *Lorraine Schank, et al., v. Monsanto Company, et al.*, case number 220200034, on January 31, 2022 (the "Common Pleas Action").  Pursuant to 28 U.S.C. § 1446(a), true and correct

copies of the Complaint (and other filings available from the files of the Common Pleas Action) are collectively attached as **Exhibit A**.

13.     Rather than alleging that she purchased any particular Roundup®-branded product, Ms. Schank alleged generally that she used "Roundup," and she defined Roundup to include "all formulations of Defendant's Roundup products."  Complaint, ¶ 38.  Plaintiff also alleged that she "began using Roundup in the early 1990's."  Complaint, ¶ 34.  The only specificity regarding the nature of the Roundup®-branded product allegedly used is provided in paragraph 159 of the Complaint, which states that Ms. "Schank used Roundup that included the Nouryon Defendants' surfactants."

14.     Moreover, the Complaint specifically alleged that the Nouryon Defendants' inclusion in the case resulted in a lack of federal diversity jurisdiction, precluding removal. Complaint, ¶¶ 16, 20–21.  Indeed, while alleging no meaningful facts regarding the identity of the product at issue in this product liability case, the Complaint devotes ten paragraphs to allegations intended to establish Monsanto's inability to remove this case.  Complaint, ¶¶ 16–25.

15.     Monsanto and the Nouryon Defendants challenged the Complaint by filing Preliminary Objections—the equivalent of a motion to dismiss.[3] The Nouryon Defendants specifically challenged the Complaint's failure "to identify which Roundup® products each plaintiff supposedly used."[4]

16.     On February 10, 2022—before Monsanto was even served with process— Plaintiffs' counsel filed a petition to establish a mass tort program providing for the "coordinated treatment" of this case and others.  *See* Plaintiffs' Petition to Coordinate Roundup Products Liability Cases Currently Pending in the Philadelphia Court of Common Pleas and for Mass Tort Designation, attached as **Exhibit B**.

---

[3] *See* Exhibit A, Defendant Nouryon Surface Chemistry LLC's, Nuryon Chemicals LLC's, and Nouryon USA LLC's Preliminary Objections to Plaintiffs' Complaint; and Defendant Monsanto's Company's Preliminary Objection to Plaintiffs' Complaint.

[4] *See id.* at ¶ 3.

17.     That petition was granted on May 10, 2022, when the Court of Common Pleas of Philadelphia County entered an order creating the *In Re: Roundup® Products Liability Litigation* mass tort program.  *See* Order Granting Petition to Coordinate Roundup Products Liability Cases in *In Re: Roundup® Products Liability Litigation*, attached as **Exhibit C**.  This case is included in the *In Re: Roundup® Products Liability Litigation* mass tort program.

18.     On June 7, 2022, the Philadelphia Court of Common Pleas entered a case management order staying all discovery in the *In Re: Roundup® Products Liability Litigation* mass tort program cases.  *See* Case Management Order 1 ("CMO 1"), attached as **Exhibit D**, at ¶ 2.

19.     Under the procedures applicable to the *In Re: Roundup® Products Liability Litigation* mass tort program, each plaintiff was required to file a SFC, the form of which was negotiated between liaison counsel named in CMO 1. While Monsanto and the Nouryon Defendants diligently pursued the development of the SFC and served Plaintiffs' counsel with a proposed SFC form on October 17, 2022, Plaintiffs' counsel delayed negotiating the form of the SFC and serving Defendants' counsel with Plaintiffs' proposal. The SFC the plaintiffs ultimately proposed does not provide any product-identifying information. The SFC process was not established until December 20, 2023, when the Philadelphia Court of Common Pleas entered Case Management Order 4 ("CMO 4").

20.     Plaintiffs filed their SFC pursuant to CMO 4 on January 31, 2023.  Consistent with the form for which Plaintiffs successfully advocated, the SFC does not identify the Roundup®-branded product that Ms. Schank allegedly used.

21.     Monsanto and the Nouryon Defendants diligently pursued the service of the PFS to obtain, among other things, specific detail on the product(s) each plaintiff alleged exposure, the details of the alleged exposure, and the details regarding where each plaintiff allegedly purchased the product(s) at issue. On February 1, 2023, the Philadelphia Court of Common Pleas entered Case Management Order 5 ("CMO 5") which provided a staggered schedule of deadlines for each plaintiff to serve their PFS, rather than a single deadline for all plaintiffs.

22.     On April 5, 2023, per the deadline established in CMO 5, Plaintiffs served their PFS. At that point, Monsanto learned—for the first time—facts allowing it to determine that the Nouryon Defendants are fraudulently joined. Accordingly, Monsanto now timely files this Notice of Removal. U.S.C. § 1446(b)(3) ("[I]f the case stated by the initial pleading is not removable, a notice of removal may be filed within thirty days after receipt by the defendant, through service or otherwise, of a copy of an amended pleading, motion, order or other paper from which it may first be ascertained that the case is one which is or has become removable.").

## Basis For Removal – Diversity Jurisdiction

## I.     The Substantive Requirements for Removal Are Satisfied.

### A. There is Complete Diversity of Citizenship Between Plaintiff and the Only Properly Joined Defendant, Monsanto.

23.     Although complete diversity of citizenship usually is required for a federal court to have diversity jurisdiction, "[t]he doctrine of fraudulent joinder represents an exception to the requirement that removal be predicated solely upon complete diversity." *In re Briscoe*, 448 F.3d 201, 215 (3d Cir. 2006); *see also Morris v. Princess Cruises, Inc.*, 236 F.3d 1061, 1067 (9th Cir. 2001). A defendant removing a lawsuit from state court based on fraudulent joinder of a co-defendant is required to show that "there is no reasonable basis in fact or colorable ground supporting the claim against the joined defendant, or no real intention in good faith to prosecute the action against the defendant or seek a joint judgment." *Briscoe*, 448 F.3d at 217. When fraudulent joinder applies, the court can "disregard, for jurisdictional purposes, the citizenship of certain nondiverse defendants." *Id.* at 216. Moreover, "a court can look to more than just the pleading allegations to identify indicia of fraudulent joinder." *Id.* at 219; *see also McCabe v. General Foods Corp.*, 811 F.2d 1336, 1339 (9th Cir. 1987) ("The defendant seeking removal to the federal court is entitled to present the facts showing the joinder to be fraudulent."). Fraudulent joinder also renders the so-called "forum defendant rule" inapplicable because that statutory provision applies only to "properly joined" defendants. 28 U.S.C. § 1441(b)(2).

24. In this case, Plaintiffs sued the Nouryon Defendants in the hope that adding claims against Pennsylvania companies would prevent removal due to lack of diversity jurisdiction and/or due to the forum defendant rule. However, these Pennsylvania defendants have been fraudulently joined.

25. Plaintiffs are, and were at the time the Common Pleas Action was filed, a citizen of Pennsylvania. Complaint ¶¶ 1, 2.

26. Monsanto is, and was at the time the Common Pleas Action was filed, a corporation organized under the laws of the State of Delaware with its principal place of business in the State of Missouri. Complaint ¶ 3. Accordingly, Monsanto is deemed to be a citizen of Delaware and Missouri for purposes of federal diversity jurisdiction.

27. Plaintiffs allege that Nouryon Surface Chemistry LLC, Nouryon Chemicals LLC, and Nouryon USA LLC—*i.e.*, each of the Nouryon Defendants—are Delaware limited liability companies with their principal place of business in Pennsylvania. Complaint ¶¶ 4–6. Plaintiffs further allege the citizenship of the members of those companies, stating that each member is a citizen of Pennsylvania for purposes of federal diversity jurisdiction. Complaint ¶¶ 17–18.

28. Therefore, disregarding the Nouryon Defendants—which were fraudulently joined by Plaintiffs—means that there is complete diversity of citizenship and that the forum defendant rule does not apply.

### 1. Plaintiffs fraudulently joined the Nouryon Defendants

29. According to her sworn PFS, Ms. Schank used Roundup®-branded herbicide products for a limited time—from May 2013 to September 2019. *See* **Exhibit E**, excerpts of Plaintiffs' PFS at pp. 9-10, §§ VII.B and VII.D. The PFS describes the particular product as "RoundUp Weed & Grass Killer Premix: built in sprayer" and states that Ms. Schank purchased the product from "Home Depot" and "Lowe's." *Id.* at pp. 10, 12, §§ VII.D and VII.J. "Premix" Roundup Weed & Grass Killer is WGK III, which was approved by that name by the United States Environmental Protection Agency on March 6, 2012, per the Master Label in Plaintiff's possession. *See supra* note 2 and accompanying text.

30.     Plaintiffs' only purported basis for asserting claims against the Nouryon Defendants is that they manufactured surfactants that were used in certain Roundup®-branded herbicides.  Complaint, ¶¶ 144, 158–59.  Indeed, Plaintiffs' Complaint defines these defendants as "*the Surfactant Defendants.*"  Complaint, ¶ 7.  Because the only Roundup®-branded herbicide product Ms. Schank ever used did not include surfactants, there is no basis for her to assert claims against the Nouryon Defendants.

31.     Because Ms. Schank did not use a Roundup®-branded product containing a surfactant, she cannot conceivably recover against the Nouryon Defendants.  The Nouryon Defendants were fraudulently joined and their citizenship should be disregarded when assessing whether this lawsuit has been properly removed.

**B.      The Amount-in-Controversy Requirement is Satisfied.**

32.     The Complaint seeks compensatory and punitive damages based on the allegations that Monsanto's Roundup®-branded herbicides caused Ms. Schank to develop cancer (NHL).  It is plausible from the face of the Complaint that Plaintiff seeks damages in excess of $75,000, exclusive of interest and costs, which satisfies the jurisdictional amount-in-controversy requirement.  28 U.S.C. § 1332(a); *see Dart Cherokee Basin Operating Co. v. Owens*, 574 U.S. 81, 89 (2014) ("[A] defendant's notice of removal need include only a plausible allegation that the amount in controversy exceeds the jurisdictional threshold."); *see also Strauss v. Ghuman Truck Serv.*, No. 15-0900, 2015 WL 1822576, at *2-3 (E.D. Pa. Apr. 22, 2015) (finding amount-in-controversy requirement met based "[o]n the face of the instant Complaint" where the plaintiff "claimed serious injuries, medical expenses, and present and future wage loss that clearly indicate[d] that the amount in controversy is in excess of $75,000"); *Ross v. First Family Fin. Servs., Inc.*, No. 2:01CV218-P-B, 2002 WL 31059582, at *8 (N.D. Miss. Aug. 29, 2002) ("[U]nspecified claims for punitive damage sufficiently serve to bring the amount in controversy over the requisite jurisdictional threshold set out in 28 U.S.C. § 1332.").  In fact, numerous other lawsuits seeking damages for NHL allegedly caused by Roundup®-branded herbicides have been

filed against Monsanto in other federal courts asserting jurisdiction under Section 1332(a) and alleging damages in excess of $75,000, exclusive of interest and costs.

33.    In sum, this Court has original subject matter jurisdiction over this action based on Section 1332(a) because there is complete diversity of citizenship between Plaintiffs and Monsanto, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

## II.    The Procedural Requirements for Removal Are Satisfied.

### A.    This Notice of Removal is Timely.

34.    This Notice of Removal is timely in accordance with 28 U.S.C. § 1446(b)(3), which states that "if the case stated by the initial pleading is not removable, a notice of removal may be filed within thirty days after receipt by the defendant, through service or otherwise, of a copy of an amended pleading, motion, order or other paper from which it may first be ascertained that the case is one which is or has become removable." 28 U.S.C. § 1446(b)(3).

35.    When the Common Pleas Action was commenced, the "case stated by the initial pleading [was] not removable," § 1446(b)(3), because the Complaint included claims against non-diverse, Pennsylvania defendants (the Nouryon Defendants). Thus, based on the face of the Complaint, this lawsuit was not removable at that point due to lack of diversity of citizenship and due to the forum defendant rule, 28 U.S.C. § 1441(b)(2). Plaintiffs' April 5, 2023 service of the PFS was the "other paper from which it may first be ascertained that [this] case is one which is or has become removable," § 1446(b)(3), because that is when Plaintiffs first disclosed information to Monsanto that allowed it to ascertain that the Nouryon Defendants are fraudulently joined and, therefore, that this case is removable. This Notice of Removal is timely because it is being filed within 30 days of April 5, 2023.

36.    This Notice of Removal is also timely pursuant to 28 U.S.C. § 1446(c)(1), which states that a case may not be removed "more than 1 year after commencement of the action, unless

the district court finds that the plaintiff has acted in bad faith in order to prevent a defendant from removing the action." 28 U.S.C.A. § 1446(c)(1).

37. "[B]ad faith is evidenced by intentional conduct on behalf of the plaintiff which denies the defendant the opportunity to remove the case to federal court." *Bolus v. IAT Ins. Grp.,* No. 19-1712, 2019 WL 3001628, at *3 (E.D. Pa. July 9, 2019). Whether a plaintiff acted in bad faith can be ascertained by circumstantial evidence. *In re: Asbestos Prods. Liab. Litig. (No. VI),* No. 16-cv-02408, 2016 WL 4264193, at *2 (E.D. Pa. Aug. 11, 2016). ""[B]ad faith' can take the form of fraudulent joinder of a defendant to defeat diversity." *Nele v. TJX Companies, Inc.*, No. CIV.A. 11-07643, 2013 WL 3305269, at *3 (E.D. Pa. July 1, 2013).[5]

38. Before this lawsuit was ever filed, Plaintiffs' counsel had information allowing them to determine the formula for each Roundup®-branded product and, more specifically, confirming that WGK III does *not* contain a surfactant. Counsel did not utilize that information to determine whether any given plaintiff could assert non-frivolous claims against the Nouryon Defendants. Instead, in an expressly-stated effort to defeat removal (Complaint, ¶¶ 16–25), Plaintiffs' counsel sued the Nouryon Defendants without regard to whether any given plaintiff, including Ms. Schank here, actually used a surfactant-containing Roundup®-branded herbicide product. To support their fraudulent claims here, Plaintiffs filed a verified Complaint making two key false allegations: (1) Ms. Schank began using Roundup®-branded products in the 1990's and (2) Ms. Schank "used Roundup that included the Nouryon Defendants' surfactants." Complaint,

---

[5] Bad faith is often demonstrated by showing that the plaintiff failed to pursue its claims against the fraudulently joined defendant. Here, however, Plaintiffs' participation in mass-tort discovery directed at the Nouryon Defendants has no bearing on whether they have "acted in bad faith in order to prevent a defendant from removing the action." *See* 28 U.S.C.A. § 1446(c)(1). And the circumstances here—false allegations and no opportunity to discover the true facts—demonstrate that pursuing claims against a fraudulently joined defendant cannot itself establish an absence of bad faith.

¶¶ 34, 159.  Thus, this is not a case where a plaintiff mistakenly alleged incorrect facts but instead a case where Plaintiffs knowingly made false factual allegations in an effort to defeat removal. Thus, Plaintiffs have engaged in an intentional course of conduct designed to defeat removal in Pennsylvania Roundup cases:  to name Nouryon in nearly every Roundup case in the PCCP in order to keep the cases in state court, ignoring the facts readily available to them which would demonstrate which plaintiffs used Roundup®-branded herbicides products with surfactants and which plaintiffs did not use those products.[6]  This is bad faith.  *See In re: Asbestos Products Liab. Litig. (No. VI)*, 2016 WL 4264193, at *4 (rejecting plaintiffs' contention that they sued various defendants, including a fraudulently joined defendant, because "they did not know to which specific products [the decedent] was exposed"),

39.  Even if knowingly-false factual allegations are not sufficient alone to establish bad faith, Monsanto has also shown how Plaintiffs dictated this case's progression, directly delaying Monsanto's discovery of the facts establishing this case's removability.

40.  Because some Roundup®-branded herbicides do contain surfactants, the fact necessary to establish fraudulent joinder—the identity of the Roundup®-branded herbicide product actually at issue—was a fact solely within Plaintiffs' possession.  Monsanto had no way to independently identify the product used by Ms. Schank and had to rely on the knowingly-false allegations in her pleadings for more than a year after this case was filed.

41.  As demonstrated above, through counsel, Plaintiffs have delayed this case's progression at every turn. Though the initial Complaint was filed on January 31, 2022, Monsanto did not receive the most basic form of discovery—a PFS—until April 5, 2023.  And the reason for

---

[6] Since the day this case was filed, Plaintiffs' counsel have named the Nouryon Defendants in *every* Roundup® case filed in the PCCP.

this delay—a delay that Plaintiff will claim favor them—are entirely attributable to Plaintiffs and their counsel:

- Monsanto had not even been served with Plaintiffs' initial Complaint when Plaintiffs' counsel petitioned for the establishment of the *In Re: Roundup*® *Products Liability Litigation* mass tort program, which resulted in an extended stay of discovery;

- Plaintiffs' counsel delayed the development of the SFC form and successfully opposed Defendants' efforts to include in the SFC the identity of the product(s) allegedly used by each plaintiff, the dates of product use, and the place of purchase for the product(s); and

- Plaintiffs' counsel opposed Defendants' efforts to set an earlier, uniform deadline for each plaintiff to serve the PFS.

42. In short, the claims against the Nouryon Defendants are based on knowingly-false allegations, and the conduct of Plaintiffs' counsel directly deprived Monsanto of any opportunity to discovery the falsity of these allegations for more than a year after this case was commenced. Plaintiffs "acted in bad faith in order to prevent a defendant from removing the action." 28 U.S.C. § 1446(c)(1).

**B.      The Other Procedural Requirements of Removal Are Satisfied.**

43. The Court of Common Pleas of Philadelphia County, Pennsylvania is located within the Eastern District of Pennsylvania. Therefore, removal to this Court satisfies the venue requirement of 28 U.S.C. § 1446(a).

44. Consent to removal is not required from the Nouryon Defendants because they are not "properly joined." 28 U.S.C. § 1446(b)(2)(A).

13

45.  The written notice required by 28 U.S.C. § 1446(d) will be promptly filed in the Court of Common Pleas of Philadelphia County, Pennsylvania and will be promptly served on Plaintiffs.

46.  Monsanto does not waive any defenses and expressly reserves its right to raise any and all legal defenses in subsequent proceedings.

47.  If any question arises as to the propriety of this removal, Monsanto requests the opportunity to present written and oral argument in support of removal.

## **Conclusion**

For the foregoing reasons, Monsanto removes this lawsuit to this Court pursuant to 28 U.S.C. §§ 1332, 1441, and 1446 (and any other applicable laws).

SHOOK, HARDY & BACON L.L.P.

Dated: May 5, 2023

By: */s/ Joseph H. Blum*
    Joseph H. Blum (PA Bar No. 36874)
    Erin L. Leffler (PA Bar No. 204507)
    Two Commerce Square
    2001 Market Street, Suite 3000
    Philadelphia, PA 19103
    Phone: 215-278-2555
    Fax: 215-278-2594
    jblum@shb.com
    eleffler@shb.com

*Attorneys for Defendant Monsanto Company*

Court of Common Pleas of Philadelphia County
Trial Division

# Civil Cover Sheet

For Prothonotary Use Only (Docket Number)

**JANUARY 2022**

E-Filing Number: 2201057553

| PLAINTIFF'S NAME | DEFENDANT'S NAME |
|---|---|
| LORRAINE SCHANK | MONSANTO COMPANY C/O REGISTERED AGENT CSC OF ST. LOUIS COUNT |
| **PLAINTIFF'S ADDRESS** 708 RIDGELYN DRIVE DALLASTOWN PA 17313 | **DEFENDANT'S ADDRESS** 221 BOLIVAR STREET JEFFERSON CITY PA 65101 |
| **PLAINTIFF'S NAME** MICHAEL SCHANK | **DEFENDANT'S NAME** NOURYON SURFACE CHEMISTRY LLC |
| **PLAINTIFF'S ADDRESS** 708 RIDGELYN DRIVE DALLASTOWN PA 17313 | **DEFENDANT'S ADDRESS** 100 MATSONFORD ROAD, BLDG 5 SUITE 550 RADNOR PA 19087 |
| **PLAINTIFF'S NAME** | **DEFENDANT'S NAME** NOURYON CHEMICALS LLC |
| **PLAINTIFF'S ADDRESS** | **DEFENDANT'S ADDRESS** 100 MATSONFORD ROAD, BLDG 5 SUITE 550 RADNOR PA 19087 |

| TOTAL NUMBER OF PLAINTIFFS | TOTAL NUMBER OF DEFENDANTS | COMMENCEMENT OF ACTION |
|---|---|---|
| 2 | 4 | ☒ Complaint  ☐ Petition Action  ☐ Notice of Appeal ☐ Writ of Summons  ☐ Transfer From Other Jurisdictions |

| AMOUNT IN CONTROVERSY | COURT PROGRAMS | | | |
|---|---|---|---|---|
| ☐ $50,000.00 or less ☒ More than $50,000.00 | ☐ Arbitration ☒ Jury ☐ Non-Jury ☐ Other: | ☐ Mass Tort ☐ Savings Action ☐ Petition | ☐ Commerce ☐ Minor Court Appeal ☐ Statutory Appeals | ☐ Settlement ☐ Minors ☐ W/D/Survival |

CASE TYPE AND CODE

2P - PRODUCT LIABILITY

STATUTORY BASIS FOR CAUSE OF ACTION

RELATED PENDING CASES (LIST BY CASE CAPTION AND DOCKET NUMBER)

**FILED PRO PROTHY**

JAN 31 2022

**S. RICE**

IS CASE SUBJECT TO COORDINATION ORDER?
YES        NO

TO THE PROTHONOTARY:

Kindly enter my appearance on behalf of Plaintiff/Petitioner/Appellant: LORRAINE SCHANK , MICHAEL SCHANK

Papers may be served at the address set forth below.

| NAME OF PLAINTIFF'S/PETITIONER'S/APPELLANT'S ATTORNEY | ADDRESS |
|---|---|
| THOMAS R. KLINE | KLINE & SPECTER 1525 LOCUST ST., 19TH FL. PHILADELPHIA PA 19102 |
| **PHONE NUMBER** (215)772-1000 | **FAX NUMBER** (215)772-1359 | |
| **SUPREME COURT IDENTIFICATION NO.** 28895 | **E-MAIL ADDRESS** tom.kline@klinespecter.com |
| **SIGNATURE OF FILING ATTORNEY OR PARTY** *THOMAS KLINE* | **DATE SUBMITTED** Monday, January 31, 2022, 12:07 pm |

FINAL COPY (Approved by the Prothonotary Clerk)

## COMPLETE LIST OF DEFENDANTS:

1. MONSANTO COMPANY C/O REGISTERED AGENT CSC OF ST. LOUIS COUNT
   221 BOLIVAR STREET
   JEFFERSON CITY PA 65101
2. NOURYON SURFACE CHEMISTRY LLC
   100 MATSONFORD ROAD, BLDG 5 SUITE 550
   RADNOR PA 19087
3. NOURYON CHEMICALS LLC
   100 MATSONFORD ROAD, BLDG 5 SUITE 550
   RADNOR PA 19087
4. NOURYON USA LLC
   100 MATSONFORD ROAD, BLDG 5 SUITE 550
   RADNOR PA 19087

**KLINE & SPECTER, P.C.**
By:     THOMAS R. KLINE, ESQUIRE
          KILA B. BALDWIN, ESQUIRE
          TOBI L. MILLROOD, ESQUIRE
Attorney I.D. Nos. 28895/94430//77764
1525 Locust Street
Philadelphia, PA 19102
(215) 772-1000
ATTORNEYS FOR PLAINTIFFS



*Filed and Attested by the
Office of Judicial Records
31 JAN 2022 12:07 pm
S. RICE*

| | |
|---|---|
| LORRAINE SCHANK AND MICHAEL SCHANK, HUSBAND AND WIFE<br>708 Ridgelyn Drive<br>Dallastown, Pennsylvania 17313,<br>　　　　　　　　　Plaintiffs<br>v.<br><br>MONSANTO COMPANY<br>c/o Registered Agent<br>CSC of St. Louis County, Inc.<br>221 Bolivar Street<br>Jefferson City, MO 65101<br>and<br>NOURYON SURFACE CHEMISTRY LLC<br>100 Matsonford Road, Bldg 5, Suite 550<br>Radnor, Pennsylvania 19087<br>and<br>NOURYON CHEMICALS LLC<br>100 Matsonford Road, Bldg 5, Suite 550<br>Radnor, Pennsylvania 19087<br>and<br>NOURYON USA LLC<br>100 Matsonford Road, Bldg 5, Suite 550<br>Radnor, Pennsylvania 19087,<br>　　　　　　　　　Defendants. | COURT OF COMMON PLEAS<br>PHILADELPHIA COUNTY<br>CIVIL DIVISION<br><br>JANUARY TERM 2022<br><br>NO:<br><br>JURY TRIAL DEMANDED |

Case ID: 220102482

## NOTICE TO PLEAD

**NOTICE** You have been sued in court. If you wish to defend against the claims set forth in the following pages, you must take action within twenty (20) days after this complaint and notice are served, by entering a written appearance personally or by attorney and filing in writing with the court your defenses or objections to the claims set forth against you. You are warned that if you fail to do so the case may proceed without you and a judgment may be entered against you by the court without further notice for any money claimed in the complaint or for any other claim or relief requested by the plaintiff. You may lose money or prop-erty or other rights important to you. YOU SHOULD TAKE THIS PA-PER TO YOUR LAWYER AT ONCE. IF YOU DO NOT HAVE A LAWYER OR CANNOT AFFORD ONE, GO TO OR TELEPHONE THE OFFICE SET FORTH BELOW TO FIND OUT WHERE YOU CAN GET LEGAL HELP.

**PHILADELPHIA COUNTY BAR AS- SOCIATION** LAWYER REFERRAL AND INFORMATION SER-VICE 1101 MARKET STREET, 11TH FLOOR PHILADELPHIA, PENNSYLVANIA 19107 TELEPHONE: (215) 238-1701

**AVISO** Le han demandado a usted en la corte. Si usted quiere de- fenderse de estas demandas expuestas en las páginas siguientes, us- ted tiene veinte (20) días de plazo al partir de la fecha de la demanda y la notificación. Hace falta asentar una comparecencia escrita o en persona o con un abogado y entregar a la corte en forma escrita sus defensas o sus objeciones a las demandas en contra de su persona. Sea avisado que, si usted no se defiende, la corte tomara medidas y puede continuar la demanda en contra suya sin previo aviso o notifi- cación. Además, la corte puede decidir a favor del demandante y re-quiere que usted cumpla con todas las provisiones de esta demanda. Usted puede perder dinero o sus propiedades u otros derechos impor-tantes para usted. LLEVE ESTA DEMANDA A UN ABOGADO INMEDIATAMENTE. SI NO TIENE ABOGADO O SI NO TIENE EL DINERO SUFICIENTE DE PAGAR TAL SERVICIO, VAYA EN PERSONA O LLAME POR TELEFONO A LA OFICINA CUYA DIRECCION SE ENCUENTRA ESCRITA ABAJO PARA AVERIGUAR DONDE SE PUEDE CONSEGUIR ASISTENCIA LEGAL.

**ASOCIACION DE LICENCIADOR DE PHILADEL- PHIA** VICIO DE REFERENCIA DE INFORMACION LEGAL 1101 MARKET STREET, 11TH FLOOR PHILADELPHIA, PENNSYLVANIA 19107 TELEFONO: (215) 238-1701

2

**COMPLAINT – CIVIL ACTION**
**(2P-Product Liability)**

Plaintiffs, Lorraine Schank and Michael Schank, bring this lawsuit against Defendants. Plaintiffs allege as follows:

**PARTIES**

**Plaintiffs**

1.      Plaintiff, Lorraine Schank, is an adult citizen and resident of the Commonwealth of Pennsylvania, residing at 402 Boulder Laine, Schwenksville, Pennsylvania 19473.

2.      Plaintiff, Michael Schank, husband of Lorraine Schank, is an adult citizen and resident of the Commonwealth of Pennsylvania, residing at 402 Boulder Laine, Schwenksville, Pennsylvania 19473.

**Defendants**

3.      Defendant, Monsanto Company (*Monsanto*), is a Delaware corporation with its principal place of business in Missouri. It is a wholly owned subsidiary of Bayer Cropscience, L.P. Its agent for service of process is Corporation Service Company at 2595 Interstate Drive, Suite 103, Harrisburg, Pennsylvania 17110.

4.      Defendant, Nouryon Surface Chemistry LLC, is a Delaware LLC. It has its principal place of business at 100 Matsonford Road, Building 5, Suite 550, Radnor, Pennsylvania. It does not have a Pennsylvania Agent for Service of Process. Its agent for service of process in Delaware is Corporation Service Company at 251 Little Falls Drive, Wilmington, Delaware, 91807.

5.      Defendant, Nouryon Chemicals LLC, is a Delaware LLC. It has its principal place of business at 100 Matsonford Road, Building 5, Suite 550, Radnor, Pennsylvania. Its agent for

3

service of process in Pennsylvania is Corporation Service Company at 2595 Interstate Drive, Suite 103, Harrisburg, Pennsylvania, 17110.

6.      Defendant, Nouryon USA LLC, is a Delaware Limited Liability Company. It has its principal place of business at 100 Matsonford Road, Building 5, Suite 550, Radnor, Pennsylvania. It does not have a Pennsylvania Agent for Service of Process. Its agent for service of process in Delaware is Corporation Service Company, 251 Little Falls Drive, Wilmington, Delaware, 91808.

7.      Defendants Nouryon Surface Chemistry LLC, Nouryon Chemicals LLC, and Nouryon USA LLC will be collectively referred to as *the Nouryon Defendants* or *the Surfactant Defendants*.

## JURISDICTION

8.      Plaintiffs incorporate here the earlier paragraphs.

9.      This Court has original jurisdiction over this civil action.[1] By neither rule nor statute does another court have exclusive original jurisdiction over this matter.

10.      The damages Plaintiffs seek, exclusive of interests and costs, exceed the jurisdictional amount requiring arbitration referral. Plaintiffs seek more than $50,000 in damages.

11.      This Court has personal jurisdiction over the Defendants.

12.      This Court has specific jurisdiction over Defendant Monsanto because Monsanto marketed and sold, in Pennsylvania, Roundup that injured Plaintiff Lorraine Schank in Pennsylvania. Moreover, Defendant Monsanto targeted and sought to serve Pennsylvania. And Plaintiffs, Pennsylvania residents, purchased and used Roundup in Pennsylvania — where the

---

[1] 42 Pa. C.S.A. § 931.

Case ID: 220102482

Roundup injured Plaintiff Lorraine Schank. And so there is an affiliation between Pennsylvania and Plaintiffs' claims against Defendant Monsanto.

13.     This Court has personal jurisdiction over the Nouryon Defendants. The principles of personal jurisdiction set forth in *Daimler AG v. Bauman*[2] apply with equal force to limited-liability companies.[3] That is, a court may exercise jurisdiction over a LLC, through specific jurisdiction, if the LLC's actions in the forum, or directed to the forum, give rise to the Plaintiff's injuries. And a court may exercise jurisdiction over a LLC, through general jurisdiction, if the LLC is formed in the forum or if it has its principal place of business in the forum.[4]

14.     The Nouryon Defendants all have their principal place of business in Pennsylvania. And so, Pennsylvania has general jurisdiction over the Nouryon Defendants.

15.     But this Court also has specific jurisdiction over the Nouryon Defendants. The Nouryon Defendants' surfactants were combined with glyphosate and put into Roundup. Plaintiff Lorraine Schank purchased and used this Roundup in Pennsylvania. And the Roundup injured the Plaintiff in Pennsylvania. Moreover, the Nouryon Defendants sought to serve the market of Pennsylvania, and their product injured the Plaintiff, a Pennsylvania resident, in Pennsylvania. And so there is an affiliation between Pennsylvania and Plaintiffs' claims against the Nouryon Defendants.

16.     A federal court would not have jurisdiction over this case, and so it is not removable. There is not complete diversity between the parties, and so there is no federal jurisdiction under 28 U.S.C. § 1332.

---

[2] 571 U.S. 117 (2014).

[3] *Griggs v. Swift Transp. Co.,* No. 2:17-cv-13480-MCA-SCM, 2018 U.S. Dist. LEXIS 139864 at *4 (D.N.J. Aug. 16, 2018).

[4] *Daimle*r, 571 U.S. at 137.

Case ID: 220102482

17.     For purposes of diversity jurisdiction, a limited liability company's citizenship is determined by the citizenship of all its members.[5]

18.     Defendant Nouryon Surface Chemistry's sole member is Nouryon Chemicals LLC. Defendant Nouryon Chemicals LLC's sole member is Nouryon USA LLC. Defendant Nouryon USA LLC has nine members: Nouryon US Holding 1 Inc., Nouryon US Holding 2 Inc., Nouryon US Holding 3 Inc., Nouryon US Holding 4 Inc., Nouryon US Holding 5 Inc., Nouryon US Holding 6 Inc., Nouryon US Holding 7 Inc., Nouryon US Holding 8 Inc., and Nouryon Holding 9 Inc. The Nouryon Holding corporations are all citizens of Pennsylvania because they have their principal place of business in Pennsylvania. And so, because the Nouryon Holding corporations are citizens of Pennsylvania, Defendant Nouryon USA LLC is a citizen of Pennsylvania. Because Defendant Nouryon USA LLC is a citizen of Pennsylvania, Defendant Nouryon Chemicals LLC is a citizen of Pennsylvania. Because Defendant Nouryon Chemicals LLC is a citizen of Pennsylvania, Defendant Nouryon Surface Chemistry LLC is a citizen of Pennsylvania. All the Nouryon Defendants are, therefore, citizens of Pennsylvania.

19.     Plaintiffs are also citizens of Pennsylvania. That is, Plaintiffs live in and are domiciled in Pennsylvania. Plaintiffs have their true, fixed, and permanent home in Pennsylvania, and intend to return to Pennsylvania whenever they are absent from Pennsylvania.

20.     Because the Nouryon Defendants and Plaintiffs are all citizens of Pennsylvania there is not complete diversity between the parties, and federal jurisdiction does not exist under 28 U.S.C § 1332.

---

[5] *Johnson v. Smithkline Beecham Corp*., 724 F.3d 337, 348 (3d Cir. 2013); *Zambelli Fireworks Mfg. Co. v. Wood*, 592 F.3d 412, 418 (3d Cir. 2010); *Americold Realty Tr. v. ConAgra Foods, Inc*., 136 S. Ct. 1012, 1015 (2016).

Case ID: 220102482

21.     Because there is no federal diversity jurisdiction under 28 U.S.C. § 1332, the Defendants cannot avail themselves of snap removal — alleging that they removed the case to federal court before a defendant was properly joined or served. Plaintiffs are not relying on § 1446(b)(2) to oust federal jurisdiction. Federal jurisdiction never existed, and, by its terms, § 1441(b)(2) does not apply because there is no diversity jurisdiction under § 1332.

22.     A federal court would also not have jurisdiction under 28 U.S.C. § 1331. Plaintiffs affirmatively disclaim any damages or actions arising under the constitution, treaties, or laws of the United States. Federal law in no way forms an essential or potential ingredient of Plaintiffs' claims, and federal law does not create any of Plaintiffs' causes of action. Moreover, Plaintiffs' right to relief does not depend on resolution of a substantial question of federal law.

23.     Further, Plaintiffs raise no claim of admiralty or maritime law, so there is no federal jurisdiction under 28 U.S.C. § 1333.

24.     Plaintiffs sue no foreign state or agency, so there is no federal jurisdiction under 28 U.S.C. § 1330. Nor is there federal jurisdiction under 28 U.S.C. § 1346 because the United States is not a defendant. Plaintiffs further disclaim any claim arising from an act or omission on a federal enclave, or any claim that Plaintiff Lorraine Schank was exposed to Monsanto's glyphosate-containing products on a federal enclave. Plaintiffs are also disclaiming any claim that any U.S. Federal Government Officer, Agency, or Department, injured Plaintiff while acting under the color of federal law.

25.     Because a federal court does not have original jurisdiction over this matter, it is not removable under § 1441.

7

Case ID: 220102482

**Venue & Joinder**

26.     Venue is proper in Philadelphia County under Pennsylvania Rule of Civil Procedure 2179(a)(2) because this is a personal action against Defendant Monsanto, and Monsanto regularly conducts business in Philadelphia County.

27.     Defendant Monsanto's contacts with Philadelphia have been directly related to, and furthered its corporate objective of selling chemical products, such as Roundup. And it has had these contacts with Philadelphia County in a sufficiently continuous manner so that these contacts can be said to be habitual. And so Defendant Monsanto's contacts with Philadelphia County have been of a quality and of a quantity such that it regularly conducts business in Philadelphia County.

28.     The core of Defendant Monsanto's business has been selling chemical products, such as Roundup. From its sale of Roundup it has branched out into selling seeds that Defendant Monsanto genetically modified so that plants grown from those seeds will not be killed when sprayed with Roundup. These genetically modified seeds not only create a market for the seeds themselves but increase sales of Roundup. As discussed later in this Complaint, Defendant Monsanto calls these seeds "Roundup Ready."

29.     Defendant Monsanto has been continuously selling Roundup in Philadelphia County for years. For example, according to Defendant Monsanto's internal documents, in 2011, Monsanto sold $194,455.26 of Roundup in Philadelphia County. In 2012, Monsanto sold $145,147.60 of Roundup in Philadelphia County. In 2013, Monsanto sold $139,439.20 of Roundup in Philadelphia County. In 2014, Monsanto sold $122,950.68 of Roundup in Philadelphia County. In 2015, Monsanto sold $138,889.10 of Roundup in Philadelphia County. In 2016, Monsanto sold $113,809.15 of Roundup in Philadelphia County. Defendant Monsanto made these sales in Philadelphia County through fourteen different retailers that sold its Roundup products. This is

Case ID: 220102482

just an example of Defendant Monsanto's regular and habitual sale of Roundup into Philadelphia County. Defendant Monsanto has continuously sold Roundup into Philadelphia County for much longer than this mere sample, as discovery will show.

30.     Defendant Monsanto also entered into joint marketing agreements with FMC Corporation to help market Roundup Ready seeds. FMC Corporation was based in Philadelphia County when Defendant Monsanto entered into these agreements with it. Defendant Monsanto entered into these agreements with FMC in 2010 and again in 2015. This joint marketing venture with FMC continued until 2018.

31.     Defendant Monsanto also regularly conducted such additional business in Philadelphia County as discovery will reveal.

32.     The Defendants are properly joined because Plaintiffs assert claims  against them that arise out of the same transaction, occurrence, or series of transactions or occurrences and common questions of law or fact affect the liabilities of all the Defendants.

## FACTUAL BACKGROUND

33.     Plaintiffs Lorraine Schank and Michael Schank are married and residents of the Commonwealth of Pennsylvania.

34.     Plaintiff Lorraine Schank developed NHL after being exposed to Roundup, a chemical product designed, manufactured, and distributed by Defendant Monsanto. Plaintiff had substantial exposure to Roundup through personal use of Defendant Monsanto's Roundup products. Plaintiff began using Roundup in the early 1990's on her residence. She used Roundup weekly during the seasonal growing months in the spring and summer, and used it numerous times a year for multiple years thereafter, exposing herself to Monsanto's carcinogenic product for decades. Plaintiff Lorraine Schank stopped using Roundup in 2019.

Case ID: 220102482

35.     After using Defendant Monsanto's Roundup, Plaintiff Lorraine Schank was diagnosed with non-Hodgkin's lymphoma (*NHL*) in 2020. Roundup substantially contributed to and caused Plaintiff's cancer.

36.     Following her diagnosis, Plaintiff Lorraine Schank suffered numerous effects attendant to NHL, including chemotherapy, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup and Defendants' wrongful conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup.

## Roundup

37.     In 1970, Defendant Monsanto discovered the herbicidal properties of glyphosate and began marketing it in 1974 under the brand name Roundup. Roundup is a non-selective herbicide used to kill weeds. In addition to the active ingredient glyphosate, Roundup contains the surfactant Polyethoxylated tallow amine (*POEA*) and adjuvants and other so-called "inert" ingredients.

38.     *Roundup* refers to all formulations of Defendant's Roundup products, including, but not limited to, Roundup Concentrate Poison Ivy and Tough Brush Killer 1, Roundup Custom Herbicide, Roundup D-Pak herbicide, Roundup Dry Concentrate, Roundup Export Herbicide, Roundup Fence & Hard Edger 1, Roundup Garden Foam Weed & Grass Killer, Roundup Grass and Weed Killer, Roundup Herbicide, Roundup Original 2k herbicide, Roundup Original II Herbicide, Roundup Pro Concentrate, Roundup Prodry Herbicide, Roundup Promax, Roundup Quik Stik Grass and Weed Killer, Roundup Quikpro Herbicide, Roundup Rainfast Concentrate Weed & Grass Killer, Roundup Rainfast Super Concentrate Weed & Grass Killer, Roundup Ready-to- Use Extended Control Weed & Grass Killer 1 Plus Weed Preventer, Roundup Ready-

Case ID: 220102482

to- Use Weed & Grass Killer, Roundup Ready-to-Use Weed and Grass Killer 2, Roundup Ultra Dry, Roundup Ultra Herbicide, Roundup Ultramax, Roundup VM Herbicide, Roundup Weed & Grass Killer Concentrate, Roundup Weed & Grass Killer Concentrate Plus, Roundup Weed & Grass killer Ready-to-Use Plus, Roundup Weed & Grass Killer Super Concentrate, Roundup Weed & Grass Killer1 Ready-to-Use, Roundup WSD Water Soluble Dry Herbicide Deploy Dry Herbicide, or any other formulation of containing the active ingredient glyphosate.

39.     Glyphosate is the most used herbicide in the world. Since 1974, 3.5 billion pounds of glyphosate has been sprayed in America alone, and another 15.4 billion pounds have been spread worldwide.

40.     Given its widespread usage, glyphosate has contaminated the food chain and is a ubiquitous contaminant of the air, water, and soil where it is used. Glyphosate has been found in the urine of urban dwellers who are not in direct contact with the chemical.

41.     Defendant Monsanto is the world's leading producer of glyphosate. Its glyphosate products are registered in 130 countries and approved for use on over 100 different crops.

42.     On March 20, 2015, the International Agency for Research on Cancer (*IARC*), an agency of the World Health Organization (*WHO*), issued an evaluation of several herbicides, including glyphosate. That evaluation was based, in part, on studies of exposures to glyphosate in several countries around the world, and it traces the health im- plications from exposure to glyphosate since 2001.

43.     IARC classified glyphosate as a Group 2A herbicide, which means that it is probably carcinogenic to humans. The IARC Working Group concluded that the cancers most associated with glyphosate exposure are NHL and other hematopoietic cancers, including, but not

Case ID: 220102482

limited to, lymphocytic lymphoma/chronic lymphocytic leukemia, B-cell lymphoma, and multiple myeloma.

44.     Defendant Monsanto, since it began selling Roundup, has represented it as safe to humans and the environment. Indeed, Defendant Monsanto has repeatedly proclaimed, and continues to proclaim to the world, and particularly to United States consumers, that glyphosate-based herbicides, including Roundup, create no unreasonable risks to human health or to the environment.

45.     Defendant Monsanto participated in a prolonged campaign of misinformation to convince government agencies, farmers, customers, and the general population that its Roundup and other glyphosate-containing products are safe.

### The Importance of Roundup to Defendant Monsanto's Market Dominance and Profits

46.     The success of Roundup was key to Defendant Monsanto's continued reputation and dominance in the marketplace. Largely due to the success of Roundup sales, Defendant Monsanto's agriculture division was outperforming its chemicals division's operating income, and that gap increased yearly. But with its patent for glyphosate expiring in the United States in the year 2000, Defendant Monsanto needed a strategy to maintain its Roundup market dominance and to ward off impending competition.

47.     In response, Defendant Monsanto began the development and sale of genetically engineered Roundup Ready® (*Roundup Ready*) seeds in 1996. Since Roundup Ready crops are resistant to glyphosate, farmers can spray Roundup onto their fields during the growing season without harming the crop. This allowed Defendant Monsanto to expand its market for Roundup even further; by 2000, Defendant Monsanto's biotechnology seeds were planted on more than 80 million acres worldwide and nearly 70% of American soybeans were planted from Roundup

Case ID: 220102482

Ready seeds. It also secured Defendant Monsanto's dominant share of the glyphosate/Roundup market through a marketing strategy that coupled proprietary Roundup Ready seeds with continued sales of its Roundup herbicide.

48.     Through a three-pronged strategy of increased production, decreased prices, and coupling Roundup Ready seeds with Roundup, Roundup became Defendant Monsanto's most profitable product. In 2000, Roundup accounted for almost $2.8 billion in sales, outselling other herbicides by a margin of five to one, and accounting for close to half of Defendant Monsanto's revenue. Today, glyphosate remains one of the world's largest herbicides by sales volume.

### Scientific Fraud Underlying the
### Testing of Glyphosate/Roundup

49.     Defendant Monsanto hired Industrial Bio-Test Laboratories (*IBT*) to perform and evaluate pesticide toxicology studies relating to glyphosate.

50.     In 1976, the United States Food and Drug Administration (*FDA*) performed an inspection of IBT that revealed discrepancies between the raw data and the final report relating to the toxicological impacts of glyphosate. The EPA subsequently audited IBT and found the toxicology studies to be invalid. An EPA reviewer stated, after finding "routine falsification of data" at IBT, that it was "hard to believe the scientific integrity of the studies."

51.     Top IBT executives were convicted of fraudulent laboratory practices in 1983, included among those convicted was a Monsanto employee named Paul Wright.

52.     In 1991, Defendant Monsanto hired Craven Laboratories to perform studies on its pesticides and herbicides, including Roundup. That same year, the owner of Craven Laboratories and three of its employees were indicted, and later convicted, of fraudulent laboratory practices in their testing of pesticides and herbicides.

Case ID: 220102482

53.     Defendant Monsanto has ghostwritten or published multiple studies through companies such as Intertek and Exponent, Inc. These studies minimize any safety concerns about the use of glyphosate. Such studies include, but are not limited to, Williams (2000); Williams (2012); Kier & Kirkland (2013); Kier (2015); Bus (2016); Chang (2016); and the Intertek Expert Panel Manuscripts. Defendant Monsanto has also ghost- written editorials to advocate for the safety of glyphosate in newspapers and magazines. Defendant Monsanto failed to disclose the significant role it had in these studies, manuscripts, and editorials.

54.     In 2011, the Federal Institute for Risk Assessment (*BfR*) in Germany initiated a study on the safety of glyphosate. Defendant Monsanto co-opted this study, became the sole provider of data for the study, and ultimately wrote the report which was rubber-stamped by the BfR.

55.     In March 2015, The Joint Glyphosate Task Force at Monsanto's behest is- sued a press release sharply criticizing IARC, stating that IARC's conclusion was "baffling" and falsely claiming that "IARC did not consider any new or unique research findings when making its decision. It appears that only by deciding to exclude certain available scientific information and by adopting a different approach to interpreting the studies was this possible."

**Defendant Monsanto's Misrepresentations Regarding the Safety of Roundup**

56.     Defendant Monsanto has knowingly falsely advertised the safety of Roundup for decades.

57.     For example, in 1996, the New York Attorney General (*NYAG*) filed a lawsuit against Monsanto based on its false and misleading advertising of Roundup products. Specifically, the lawsuit challenged Monsanto's general representations that its spray-on glyphosate-based herbicides, including Roundup, were "safer than table salt" and "practically non-toxic" to

14

Case ID: 220102482

mammals, birds, and fish. Among the representations the NYAG found deceptive and misleading about the human and environmental safety of glyphosate and/or Roundup are the following:

(a) Remember that environmentally friendly Roundup herbicide is biodegradable. It won't build up in the soil so you can use Roundup with confidence along customers' driveways, sidewalks and fences ...

(b) And remember that Roundup is biodegradable and won't build up in the soil. That will give you the environmental confidence you need to use Roundup everywhere you've got a weed, brush, edging or trimming problem.

(c) Roundup biodegrades into naturally occurring elements.

(d) Remember that versatile Roundup herbicide stays where you put it. That means there's no washing or leaching to harm customers' shrubs or other desirable vegetation.

(e) This non-residual herbicide will not wash or leach in the soil. It ... stays where you apply it.

(f) You can apply Accord with 'confidence because it will stay where you put it' it bonds tightly to soil particles, preventing leaching. Then, soon after application, soil microorganisms biodegrade Accord into natural products.

(g) Glyphosate is less toxic to rats than table salt following acute oral ingestion.

(h) Glyphosate's safety margin is much greater than required. It has over a 1,000-fold safety margin in food and over a 700-fold safety margin for workers who manufacture it or use it."

(i) You can feel good about using herbicides by Monsanto. They carry a toxicity category rating of 'practically non-toxic' as it pertains to mammals, birds and fish.

15

(j) Roundup can be used where kids and pets will play and breaks down into natural material. [This ad depicts a person with his head in the ground and a pet dog standing in an area which has been treated with Roundup.]

58.     On November 19, 1996, Defendant Monsanto entered into an Assurance of Discontinuance with NYAG, in which it agreed, among other things, "to cease and desist from publishing or broadcasting any advertisements [in New York] that represent, directly or by implication" that:

(a) its glyphosate-containing pesticide products or any component thereof are safe, non-toxic, harmless or free from risk;

(b) its glyphosate-containing pesticide products or any component thereof manufactured, formulated, distributed or sold by Monsanto are bio- degradable;

(c) its glyphosate-containing pesticide products or any component thereof stay where they are applied under all circumstances and will not move through the environment by any means;

(d) its glyphosate-containing pesticide products or any component thereof are "good" for the environment or are "known for their environmental characteristics";

(e) glyphosate-containing pesticide products or any component thereof are safer or less toxic than common consumer products other than herbicides;

(f) its glyphosate-containing products or any component thereof might be classified as "practically non-toxic."

59.     On information and belief, Defendant Monsanto has not altered its advertising in the same manner in any other state.

Case ID: 220102482

60.     In 2009, France's highest court ruled that Monsanto had not told the truth about the safety of Roundup®. The French court affirmed an earlier judgement that Monsanto had falsely advertised its herbicide Roundup® as "biodegradable" and that it "left the soil clean."[6]

### IARC Classification of Glyphosate

61.     The IARC process for the classification of glyphosate followed IARC's stringent procedures for the evaluation of a chemical agent. Over time, the IARC Mono- graph program has reviewed 980 agents. Of those reviewed, it has determined 116 agents to be Group 1 (Known Human Carcinogens); 73 agents to be Group 2A (Probable Human Carcinogens); 287 agents to be Group 2B (Possible Human Carcinogens); 503 agents to be Group 3 (Not Classified); and one agent to be Probably Not Carcinogenic.

62.     The established procedure for IARC Monograph evaluations is described in the IARC Programme's Preamble. Evaluations are performed by panels of international experts, selected on the basis of their expertise and the absence of actual or apparent conflicts of interest.

63.     One year before a Monograph meeting, the meeting is announced and there is a call both for data and for experts. Eight months before the Monograph meeting, the Working Group membership is selected and the sections of the Monograph are developed by the Working Group members. One month before the Monograph meeting, the call for data is closed and the various draft sections are distributed among Working Group members for review and comment. Finally, at the Monograph meeting, the Working Group finalizes review of all literature, evaluates the evidence in each category, and completes the overall evaluation. Within two weeks after the

---

[6] *Monsanto Guilty in 'False Ad' Row*, BBC, Oct. 15, 2009, *available at* http://news.bbc.co.uk/2/hi/europe/8308903.stm.

Case ID: 220102482

Monograph meeting, the summary of the Working Group findings is published in Lancet Oncology, and within a year after the meeting, the final Monograph is finalized and published.

64.     In assessing an agent, the IARC Working Group reviews the following information: (a) human, experimental, and mechanistic data; (b) all pertinent epidemiological studies and cancer bioassays; and (c) representative mechanistic data. The studies must be publicly available and have sufficient detail for meaningful review, and reviewers cannot be associated with the underlying study.

65.     In March 2015, IARC reassessed glyphosate. The summary published in The Lancet Oncology reported that glyphosate is a Group 2A agent and probably carcinogenic in humans.

66.     On July 29, 2015, IARC issued Monograph 112 for glyphosate. For Volume 112, a Working Group of 17 experts from 11 countries assessed the carcinogenicity of certain herbicides, including glyphosate. According to published procedures, the Working Group considered "reports that have been published or accepted for publication in the openly available scientific literature" as well as "data from governmental reports that are publicly available."

67.     The studies considered the following exposure groups: occupational exposure of farmers and tree-nursery workers in the United States, forestry workers in Canada and Finland, municipal weed-control workers in the United Kingdom; and para-occupational exposures in farming families.

68.     Glyphosate was identified as the second-most used household herbicide in the United States for weed control between 2001 and 2007 and the most heavily used herbicide in the world in 2012.

Case ID: 220102482

69.     Exposure pathways were identified as air (especially during spraying), water, and food. Community exposure to glyphosate is widespread and found in soil, air, surface water, groundwater, and food.

70.     The IARC Working Group found an increased risk between exposure to glyphosate and NHL and several subtypes of NHL, and the increased risk persisted after adjustment for other pesticides.

71.     The IARC Working Group also noted that glyphosate has been detected in the urine of agricultural workers, indicating absorption. Soil microbes degrade glyphosate to aminomethylphosphoric acid (*AMPA*). Blood AMPA detection after exposure suggests intestinal microbial metabolism in humans.

72.     The IARC Working Group also noted genotoxic, hormonal, and enzymatic effects in mammals exposed to glyphosate. Essentially, glyphosate inhibits the biosynthesis of aromatic amino acids, which leads to several metabolic disturbances, including the inhibition of protein and secondary product biosynthesis and general metabolic disruption.

73.     The IARC Working Group further found that glyphosate and glyphosate formulations induced DNA and chromosomal damage in mammals, and in human and animal cells in vitro.

74.     In addition to DNA damage and oxidative stress, studies have suggested that Roundup's association with various serious health conditions is linked to its effect on the digestive system. Specifically, scientists believe the same mechanism that makes Roundup toxic to weeds also makes it toxic to the microbes within the human gut and mucous membranes. When humans are exposed to Roundup, it leads to a chronic inflammatory state in the gut, as well an impaired gut barrier, which can lead to many long-term health effects, including an increased risk of cancer.

Case ID: 220102482

Defendant Monsanto has deliberately refused to conduct tests on this aspect of Roundup's mechanism of action.

75.     Many Roundup products bear a label which either reads: "glyphosate targets an enzyme found in plants but not in people or pets" or "this Roundup formula tar- gets an enzyme in plants but not in people or pets." These statements are false; it has been established that the human body is host to microorganisms that have the enzyme Defendant Monsanto asserts is not found in humans. Thus, glyphosate targets microbes within the human body that have the enzyme, leading to a variety of adverse health effects.

76.     The IARC Working Group also reviewed an Agricultural Health Study, consisting of a prospective cohort of 57,311 licensed pesticide applicators in Iowa and North Carolina. The results of the study support an association between glyphosate exposure and Multiple Myeloma, Hairy Cell Leukemia (*HCL*), and Chronic Lymphocytic Leukemia (*CLL*), in addition to several other cancers.

### Other Findings about Glyphosate's Dangers to Human Health

77.     The EPA has a technical fact sheet, as part of its Drinking Water and Health, National Primary Drinking Water Regulations publication, relating to glyphosate. This technical fact sheet predates the IARC March 20, 2015, evaluation. The fact sheet describes the release patterns for glyphosate.

78.     Per the EPA's technical fact sheet, glyphosate is released to the environment in its use as an herbicide for controlling woody and herbaceous weeds on forestry, right-of-way, cropped and non-cropped sites. These sites may be around water and in wetlands. It may also be released to the environment during its manufacture, formulation, transport, storage, disposal and cleanup, and from spills.

Case ID: 220102482

79.     The EPA's fact sheet further states that occupational workers and home gardeners may be exposed to glyphosate by inhalation; dermal contact during spraying, mixing, and cleanup; or touching soil and plants to which glyphosate was applied. Occupational exposures may also occur during glyphosate's manufacture, transport storage, and disposal.

80.     In 1995, the Northwest Coalition for Alternatives to Pesticides reported that in California, the state with the most comprehensive program for reporting of pesticide-caused illness, glyphosate was the third most commonly reported cause of pesticide illness among agricultural workers.

### The EPA's Review of Glyphosate

81.     In April 2016, personnel within the EPA's Office of Pesticides Program (*OPP*) leaked and posted on the Internet a draft report on glyphosate carcinogenicity, entitled Cancer Assessment Review Committee (*CARC*) report, dated October 2015. The EPA removed the document by May 2, 2016, within days of initially posting it online. An EPA spokesperson subsequently issued a statement on the agency's glyphosate review:

> Glyphosate documents were inadvertently posted to the Agency's docket. These documents have now been taken down because our assessment is not final. EPA has not completed our cancer review. We will look at the work of other governments as well as work by HHS's Agricultural Health Study as we move to make a decision on glyphosate. Our assessment will be peer reviewed and completed by end of 2016.

82.     On September 12, 2016, EPA's OPP submitted a report on the carcinogenic potential of glyphosate, wherein it issued a "proposed conclusion" that glyphosate is "not likely to be carcinogenic to humans at doses relevant to human health risk assessment." There are no authors listed on this issue paper, which reiterates and adopts the conclusions of the October 2015 leaked assessment. The issue paper is based upon a review of industry-sponsored articles and studies. The OPP acknowledged that it rejected all studies that considered Roundup — the formulated product

21

Case ID: 220102482

— instead of studies that isolated glyphosate because "[g]lyphosate formulations contain various components other than glyphosate and it has been hypothesized these components are more toxic than glyphosate alone."

83.     Thus, the OPP notes that dozens of studies considered by IARC were not reviewed by the OPP because the OPP's "evaluation focused on studies on the active ingredient glyphosate" and "additional research could also be performed to determine whether formulation components, such as surfactants, influence the toxicity of glyphosate formulations."

84.     From December 13 to 16, 2016, the EPA held FIFRA Scientific Advisory Panel (*SAP*) meetings to consider issues raised by the OPP's evaluation of glyphosate. Again, OPP allowed the SAP to consider only studies of glyphosate alone, and not any study of the formulated product. In its Charge to the FIFRA SAP, the OPP noted that "[a]lthough there are studies available on glyphosate-based pesticide formulations, the agency is soliciting advice from the FIFRA Scientific Advisory Panel (*SAP*) on this evaluation of human carcinogenic potential for the active ingredient glyphosate only at this time."

85.     The OPP draft assessment therefore does not actually consider the product at issue in this litigation or, more importantly, how glyphosate, in conjunction with surfactants and other chemicals, affects carcinogenicity.

86.     On March 16, 2017, the final SAP meeting minutes and report were released, revealing disagreement and lack of consensus among the scientists on whether there was a positive association between glyphosate exposure and NHL.

Case ID: 220102482

## Defendant Monsanto's Governmental Ties

87.     Recently unsealed documents in the federal Roundup MDL litigation reveal the extent to which Defendant Monsanto has been able to leverage its contacts within the EPA to protect glyphosate and Roundup from scrutiny and review.

88.     Internal Monsanto documents, including e-mail communications, demonstrate that Jess Rowland, former Deputy Division Director, Health Effects Division of the EPA's OPP, and formerly the chair of the CARC (the same committee that inadvertently leaked the EPA's glyphosate report in April 2016), repeatedly and directly intervened on Monsanto's behalf. These same documents reveal that Defendant Monsanto was secure in the knowledge that it had allies within the EPA.

89.     To begin, in the months following IARC's initial March 2015 announcement that it had classified glyphosate as a probable carcinogen, Defendant Monsanto turned its attention to the EPA's review of glyphosate. In one April 27, 2015 e-mail, Monsanto official Bill Heydens wrote to colleagues to suggest "approaching EPA and…. ask if there is anything that would help them defend the situation?" His colleague Dan Jenkins responded: "I think you and I could get on the phone w Jess Rowland and discuss this pretty openly. He'll give us straight talk."

90.     The following day, Mr. Jenkins spoke to Mr. Rowland by telephone and then relayed the substance of the conversation for his colleagues in an April 28, 2015 e-mail. Specifically, he reported back that with respect to the CARC investigation, Mr. Rowland had stated: "We have enough to sustain our conclusions. Don't need gene tox or epi I am the chair of the CARC and my folks are running this process for glyphosate in reg review. I have called a CARC meeting in June." Thus, even though the ostensible purpose of the CARC review was to evaluate the exhaustive IARC assessment on glyphosate, and even though the full IARC

Case ID: 220102482

monograph on glyphosate would not be completed until July 2015, Mr. Rowland had already formed his conclusion months earlier — in April 2015.

91.     Mr. Rowland also intervened to halt another agency's review of glyphosate. When the Agency for Toxic Substances and Disease Registry (*ATSDR*), a federal public-health agency of the U.S. Department of Health and Human Services, announced in February 2015 that it planned to publish a toxicological review of glyphosate, it was Mr. Rowland who helped Defendant Monsanto stop the ATSDR's investigation. In the same April 28, 2015, e-mail discussed above, Mr. Jenkins explained that Mr. Rowland wanted to help Monsanto stop an investigation concerning the carcinogenicity of glyphosate being conducted by ATSDR. Since ATSDR is not controlled by the EPA, according to Mr. Jenkins, Mr. Rowland had bragged: "If I can kill this I should get a medal." Jen- kins cautioned, however, that Monsanto should not "get your hopes up, I doubt EPA and Jess can kill this; but it's good to know they are going to actually make the effort now to coordinate due to our pressing and their shared concern that ATSDR is consistent in its conclusions with the EPA." The ATSDR never published its toxicological profile of glyphosate.

92.     Further, the released documents reveal Defendant Monsanto's confidence that its allies within the EPA would continue to support glyphosate. In an internal memo on glyphosate, Monsanto executives wrote: "We know, but cannot say, that EPA's Office of Pesticide Program scientists strongly feel that glyphosate does not cause cancer and have defended their written determination internally for months." Notably, when Mr. Rowland attended the IARC glyphosate meetings as an observer for the EPA, internal communications indicate Monsanto was not displeased with his attendance since, "we all know Jess."

24

Case ID: 220102482

**Recent Worldwide Bans on Roundup/Glyphosate**

93.      Countries around the world have instituted bans on the sale of Roundup and other glyphosate-containing herbicides, both before and since IARC first announced its assessment for glyphosate in March 2015, and more countries undoubtedly will follow suit as the dangers of exposures to Roundup become more widely known.

94.      Countries that have outright banned, imposed restrictions, or issued statements of intent to ban or restrict glyphosate include: Argentina, Australia, Austria, Belgium, Bermuda, Brazil, Canada, Colombia, Czech Republic, Denmark, El Salvador, France, Germany, Greece, India, Italy, Luxembourg, Malta, Netherlands, New Zealand, Portugal, Scotland, Slovenia, Spain, Sri Lanka, Sweden, Switzerland, United Kingdom, and Vietnam.

**EFSA Report on Glyphosate**

95.      On November 12, 2015, the European Food Safety Authority (*EFSA*), the European Union's primary agency for food safety, reported on its evaluation of the Renewal Assessment Report (*RAR*) on glyphosate. The Rapporteur Member State assigned to glyphosate, the German Federal Institute for Risk Assessment (*BfR*), had produced the RAR as part of the renewal process for glyphosate in the EU.

96.      BfR sent its draft RAR to EFSA, and the RAR underwent a peer-review process by EFSA, other member states, and industry groups. As part of the on-going peer review of Germany's reevaluation of glyphosate, EFSA had also received a second man- date from the European Commission to consider IARC's findings regarding the potential carcinogenicity of glyphosate and glyphosate-containing products.

97.      Based on a review of the RAR, which included data from industry-submit- ted unpublished studies, EFSA sent its own report (*Conclusion*) to the European Com- mission,

Case ID: 220102482

finding that "glyphosate is unlikely to pose a carcinogenic hazard to humans and the evidence does not support classification with regard to its carcinogenic potential according to Regulation (EC) No 1272/2008." EFSA therefore disagreed with IARC: glyphosate allegedly was not genotoxic and did not present a carcinogenic threat to humans.

98.     In explaining why its results departed from IARC's conclusion, EFSA drew a distinction between the EU and IARC approaches to the study and classification of chemicals. Although IARC examined "both glyphosate — an active substance — and glyphosate-based formulations, grouping all formulations regardless of their composition," EFSA explained that it considered only glyphosate and that its assessment focuses on "each individual chemical, and each marketed mixture separately." IARC, on the other hand, "assesses generic agents, including groups of related chemicals, as well as occupational or environmental exposure, and cultural or behavioural practices." EFSA accorded greater weight to studies conducted with glyphosate alone than studies of formulated products.

99.     EFSA went further and noted:

> [A]lthough some studies suggest that certain glyphosate-based formulations may be genotoxic (i.e. damaging to DNA), others that look solely at the active substance glyphosate do not show this effect. It is likely, therefore, that *the genotoxic effects observed in some glyphosate-based formulations are related to the other constituents or "co-formulants"*. Similarly, certain glyphosate-based formulations display higher toxicity than that of the active ingredient, presumably because of the presence of co-formulants. In its assessment, *EFSA proposes that the toxicity of each pesticide formulation and in particular its genotoxic potential should be further considered and ad- dressed by Member State authorities while they re-assess uses of glyphosate-based formulations in their own territories*.

100.     Notwithstanding its conclusion, EFSA did set exposure levels for glyphosate. Specifically, EFSA proposed an acceptable daily intake (*ADI*) of 0.5 mg/kg of body weight per

Case ID: 220102482

day; an acute reference dose (*ARfD*) of 0.5 mg/kg of body weight; and an acceptable operator exposure level (*AOEL*) of 0.1 mg/kg bw per day.

## Leading Scientists Dispute EFSA's Conclusion

101.     On November 27, 2015, 96 independent academic and governmental scientists from around the world submitted an open letter to the EU health commissioner, Vytenis Andriukaitis. The scientists expressed their strong concerns and urged the commissioner to disregard the "flawed" EFSA report, arguing that "the BfR decision is not credible because it is not supported by the evidence and it was not reached in an open and transparent manner."

102.     Signatories to the letter included Dr. Christopher J. Portier, Ph.D., and other renowned international experts in the field, some of whom were part of the IARC Working Group assigned to glyphosate.

103.     In an exhaustive and careful examination, the scientists scrutinized EFSA's conclusions and outlined why the IARC Working Group decision was "by far the more credible":

> The IARC WG decision was reached relying on open and transparent procedures by independent scientists who completed thorough conflict-of-interest statements and were not affiliated or financially supported in any way by the chemical manufacturing industry. It is fully referenced and de- pends entirely on reports published in the open, peer-reviewed biomedical literature. It is part of a long tradition of deeply researched and highly credible reports on the carcinogenicity of hundreds of chemicals issued over the past four decades by IARC and used today by international agencies and regulatory bodies around the world as a basis for risk assessment, regulation and public health policy.

104.     With respect to human data, the scientists pointed out that EFSA agreed with IARC that there was "limited evidence of carcinogenicity" for NHL, but EFSA nonetheless dismissed an association between glyphosate exposure and carcinogenicity. IARC applies three levels of evidence in its analyses of human data, including sufficient evidence and limited evidence. EFSA's ultimate conclusion that "there was no unequivocal evidence for a clear and strong association of

Case ID: 220102482

NHL with glyphosate" was misleading because it was tantamount to IARC's highest level of evidence: "sufficient evidence," which means that a causal relationship has been established. However, the scientists argued, "[l]egitimate public health concerns arise when 'causality is credible,' i.e., when there is limited evidence."

105.    Among its many other deficiencies, EFSA's conclusions regarding animal carcinogenicity data were "scientifically unacceptable," particularly in BfR's use of historical control data and in its trend analysis. Indeed, BfR's analysis directly contradicted the Organization for Economic Co-operation and Development (*OECD*) testing guide- lines while citing and purporting to follow those same guidelines. For instance, the EFSA report dismisses observed trends in tumor incidence "because there are no individual treatment groups that are significantly different from controls and because the maximum observed response is reportedly within the range of the historical control data." However, according to the scientists, concurrent controls are recommended over historical controls in all guidelines, scientific reports, and publications, and, if it is employed, historical con- trol data "should be from studies in the same timeframe, for the same exact animal strain, preferably from the same laboratory or the same supplier and preferably reviewed by the same pathologist." BfR's use of historical control data violated these precautions: "only a single study used the same mouse strain as the historical controls, but was reported more than 10 years after the historical control dataset was developed." Further deviating from sound scientific practices, the data used by the BfR came from studies in seven different laboratories. The scientists concluded:

> BfR reported seven positive mouse studies with three studies showing in- creases in renal tumors, two with positive findings for hemangiosarcomas, and two with positive findings for malignant lymphomas. BfR additionally reported two positive findings for tumors in rats. Eliminating the inappropriate use of historical data, the unequivocal conclusion is that these are not negative studies, but in fact document the carcinogenicity of glyphosate in laboratory animals.

Case ID: 220102482

106.     The letter also criticized the EFSA report's lack of transparency and the opacity surrounding the data cited in the report: "citations for almost all of the references, even those from the open scientific literature, have been redacted from the document" and "there are no authors or contributors listed for either document, a requirement for publication in virtually all scientific journals." Because BfR relied on unpublished, confidential industry-provided studies, it is "impossible for any scientist not associated with BfR to review this conclusion with scientific confidence."

107.     On March 3, 2016, the letter was published in the Journal of Epidemiology & Community Health.

### Toxicity of Other Ingredients in Roundup

108.     In addition to the toxicity of the active ingredient, glyphosate, several studies show that the glyphosate-based formulation in Defendant Monsanto's Roundup products is more dangerous and toxic than glyphosate alone. Indeed, as early as 1991, available evidence demonstrated that glyphosate formulations were significantly more toxic than glyphosate alone.

109.     Roundup consists of from 40 to 60 percent glyphosate. Another ten to fifteen percent is surfactant. The surfactant used in Roundup is polyethoxylated tallow amine — or POEA.

110.     Surfactants, like POEA, allow glyphosate to penetrate into the leaf of a plant, so it can kill the plant. Part of the way POEA does this is that it allows Roundup to lie flat on the leaf so that the oily, waxy leaf surface can absorb the Roundup and the glyphosate.

111.     In the same way that POEA allows Roundup to spread out on the leaf of a plant, it allows Roundup and glyphosate to spread out on human skin. This causes the skin to absorb more of the Roundup and glyphosate.

29

Case ID: 220102482

112.     But the POEA doesn't just spread Roundup on the skin. POEA increases the amount of time the Roundup and the glyphosate remains on the skin.

113.     POEA is a skin irritant. The body's response to a skin irritant is to dilate the capillary bed and increase blood flow. This increases absorption of Roundup, POEA, and glyphosate.

114.     Studies have shown that POEA increases the dermal absorption of Roundup — as compared to pure glyphosate — by ten percent, which is a statistically significant higher rate of dermal absorption.

115.     The Roundup, glyphosate, and POEA, once they penetrate into the skin, then collect in a reservoir in the epidermis — this reservoir is not immediately absorbed, and, because it is below the skin, it cannot be washed off. Studies have shown this reservoir lasts for as long as seven days.

116.     Because bone is a preferential point of distribution for glyphosate, glyphosate migrates from this reservoir to the bone.

117.     Lymphoma is a cancer that starts in the bones. Lymphatic stem cells are in the bone, the site of the start of the malignancy for NHL.

118.     POEA is banned in Europe. That is, as Defendant Monsanto has admitted in pervious written discovery "the European Commission recommended that member states ban a co-formulant called POEA-Tallowamine from glyphosate-based products."

119.     William Sawyer, Ph.D., an expert toxicologist, has testified that POEA is forty times more toxic than glyphosate alone.

120.     Because of the synergistic effect of combing glyphosate with POEA, Roundup is about 50 times more toxic than glyphosate alone.

Case ID: 220102482

121.     There are surfactants less toxic than POEA, such as contact-lens solution, which is a harmless, nonionic surfactant. Defendant Monsanto has chosen not to use these surfactants in Roundup.

122.     But POEA is not the only other dangerous ingredient in Roundup.

123.     Formaldehyde, a confirmed human carcinogen, is in Roundup.

124.     Ethylene oxide, an extremely powerful sterilization gas that is mutagenic and a human carcinogen, is in Roundup. Ethylene Oxide accumulates in the head space of a Roundup container. People are exposed to higher levels of it when they open a container of Roundup that has been sitting around for a while.

125.     1, 4-dioxane is another contaminant found in Roundup.  IARC has classified 1, 4-dioxane as a possible human carcinogen.

126.     Studies have shown the poisonous effects of having so many toxic substances in Roundup.

127.     In 2002, a study by Julie Marc, entitled "Pesticide Roundup Provokes Cell Division Dysfunction at the Level of CDK1/Cyclin B Activation," revealed that Roundup causes delays in the cell cycles of sea urchins but that the same concentrations of glyphosate alone were ineffective and did not alter cell cycles.

128.     A 2004 study by Marc and others, entitled "Glyphosate-based pesticides affect cell cycle regulation," demonstrated a molecular link between glyphosate-based products and cell-cycle dysregulation. The researchers noted that "cell-cycle dysregulation is a hallmark of tumor cells and human cancer. Failure in the cell-cycle checkpoints leads genomic instability and subsequent development of cancers from the initial affected cell." Further, "[s]ince cell cycle

Case ID: 220102482

disorders such as cancer result from dysfunction of a unique cell, it was of interest to evaluate the threshold dose of glyphosate affecting the cells."

129.     In 2005, a study by Francisco Peixoto, entitled "Comparative effects of the Roundup and glyphosate on mitochondrial oxidative phosphorylation," demonstrated that Roundup's effects on rat liver mitochondria are far more toxic than equal concentrations of glyphosate alone. The Peixoto study further suggested that the harmful effects of Roundup on mitochondrial bioenergetics could not be exclusively attributed to glyphosate but could be the result of other chemicals, such as the surfactant POEA, or in the alternative, due to a potential synergic effect between glyphosate and other ingredients in the Roundup formulation.

130.     In 2009, Nora Benachour and Gilles-Eric Seralini published a study examining the effects of Roundup and glyphosate on human umbilical, embryonic, and placental cells. The study tested dilution levels of Roundup and glyphosate that were far below agricultural recommendations, corresponding with low levels of residue in food. The re- searchers ultimately concluded that supposed "inert" ingredients, and possibly POEA, alter human-cell permeability and amplify toxicity of glyphosate alone. The researchers further suggested that assessments of glyphosate toxicity should account for the presence of adjuvants or additional chemicals used in the formulation of the complete pesticide. The study confirmed that the adjuvants present in Roundup are not, in fact, inert and that Roundup is potentially far more toxic than its active ingredient glyphosate alone.

131.     The results of these studies were at all times available to Defendants.

132.     Defendant Monsanto's chief toxicologist Donna Farmer has admitted that she cannot say that Roundup does not cause cancer because Monsanto has not performed carcinogenicity studies with the formulated product Roundup, the very product that caused, or

Case ID: 220102482

substantially contributed to cause, Plaintiff Lorraine Schank's NHL. Indeed, she admitted that in the 35 years that Defendant Monsanto has marketed Roundup to the public, Monsanto has conducted no chronic carcinogenicity studies on the formulated Roundup product merely because the EPA did not require that such a study be performed for registration of glyphosate.

133.     Defendants thus knew or should have known that Roundup is more toxic than glyphosate alone and that safety studies of Roundup, Roundup's adjuvants and "inert" ingredients, and/or the surfactant POEA were necessary to protect Plaintiffs from Roundup.

134.     Despite knowing that Roundup is considerably more dangerous than glyphosate alone, Defendants deceptively continued to promote Roundup as safe.

**Statement of Concern Regarding Glyphosate-Based Herbicides**

135.     On February 17, 2016, a consensus statement published in the journal Environmental Health, entitled "Concerns over use of glyphosate-based herbicides and risks associated with exposures: a consensus statement," assessed the safety of glyphosate-based herbicides (*GBHs*). The paper's "focus is on the unanticipated effects arising from the worldwide increase in use of GBHs, coupled with recent discoveries about the toxicity and human health risks stemming from use of GBHs." The researchers drew seven factual conclusions about GBHs:

1.   GBHs are the most heavily applied herbicide in the world and usage continues to rise;

2.   Worldwide, GBHs often contaminate drinking water sources, precipitation, and air, especially in agricultural regions;

3.   The half-life of glyphosate in water and soil is longer than previously recognized;

4.   Glyphosate and its metabolites are widely present in the global soybean supply;

5.   Human exposures to GBHs are rising;

6.   Glyphosate is now authoritatively classified as a probable human carcinogen; and

7.   Regulatory estimates of tolerable daily intakes for glyphosate in the United States and European Union are based on outdated science.

33

Case ID: 220102482

136.     The researchers noted that GBH use has increased approximately 100-fold since the 1970s. Further, far from posing a limited hazard to vertebrates, as previously believed, two decades of evidence demonstrated that "several vertebrate pathways are likely targets of action, including hepatorenal damage, effects on nutrient balance through glyphosate chelating action and endocrine disruption."

137.     The paper attributes uncertainties in current assessments of glyphosate formulations to the fact that "[t]he full list of chemicals in most commercial GBHs is protected as 'commercial business information,' despite the universally accepted relevance of such information to scientists hoping to conduct an accurate risk assessment of these herbicide formulations." Further, the researchers argue, "[t]he distinction in regulatory review and decision processes between 'active' and 'inert' ingredients has no toxicological justification, given increasing evidence that several so-called 'inert' adjuvants are toxic in their own right."

138.     Among various implications, the researchers conclude that "existing toxicological data and risk assessments are not sufficient to infer that GBHs, as currently used, are safe." Further, "GBH-product formulations are more potent, or toxic, than glyphosate alone to a wide array of non-target organisms including mammals, aquatic in- sects, and fish." Accordingly, "risk assessments of GBHs that are based on studies quantifying the impacts of glyphosate alone underestimate both toxicity and exposure, and thus risk." The paper concludes that this "shortcoming has repeatedly led regulators to set inappropriately high exposure thresholds."

139.     The researchers also critique the current practice of regulators who largely rely on "unpublished, non-peer reviewed data generated by the registrants" but ignore "published research because it often uses standards and procedures to assess quality that are different from those codified in regulatory agency data requirements, which largely focus on avoiding fraud." In the

Case ID: 220102482

researchers' view, "[s]cientists independent of the registrants should conduct regulatory tests of GBHs that include glyphosate alone, as well as GBH-product formulations."

140.     The researchers also call for greater inclusion of GBHs in government-led toxicology-testing programs:

> [A]fresh and independent examination of GBH toxicity should be under- taken, and . . . this re-examination should be accompanied by systematic efforts by relevant agencies to monitor GBH levels in people and in the food supply, none of which are occurring today. The U.S. National Toxicology Program should prioritize a thorough toxicological assessment of the multiple path- ways now identified as potentially vulnerable to GBHs.

141.     The researchers suggest that to fill the gap created by an absence of government funds to support research on GBHs, regulators could adopt a system through which manufacturers fund the registration process and the necessary testing:

> [W]e recommend that a system be put in place through which manufacturers of GBHs provide funds to the appropriate regulatory body as part of routine registration actions and fees. Such funds should then be transferred to appropriate government research institutes, or to an agency experienced in the award of competitive grants. In either case, funds would be made available to independent scientists to conduct the appropriate long- term (minimum 2 years) safety studies in recognized animal model systems. A thorough and modern assessment of GBH toxicity will encompass potential endocrine disruption, impacts on the gut microbiome, carcinogenicity, and multigenerational effects looking at reproductive capability and frequency of birth defects.

142.     Despite these stated concerns, Defendant Monsanto, to date, has failed to test its formulated Roundup products.

### The Surfactant Defendants

143.     In 2018, for more than ten billion Euros, the Carlyle Group, Inc. purchased Akzo Nobel Specialty Chemicals, a division of Akzo Nobel Inc. It then spun this purchase off to create

Case ID: 220102482

the Nouryon Defendants. Today, the Nouryon Defendants make the toxic surfactants Defendant Monsanto uses to make Roundup.

144.     The Nouryon Defendants and their predecessors' entities — Akzo Nobel Incorporated, Akzo Nobel Surface Chemistry LLC, and Akzo Nobel Chemicals LLC — developed, researched, manufactured, and marketed surfactants, including POEA. On information and belief, the Nouryon Entities are liable for the acts and omissions of their predecessor entities.

145.     The Nouryon Defendants sold POEA and surfactants to Defendant Monsanto, and Monsanto used these surfactants in Roundup.

146.     The Nouryon Defendants conspired to ensure that the public would not know how toxic POEA and Roundup were.

147.     On March 20, 2013, Daniel Wright of Monsanto e-mailed David Pope, an employee or agent for the Nouryon Defendants' predecessor entities. Ethylene oxide is an ingredient in a surfactant that the Nouryon Defendants sold to Monsanto. Mr. Wright wanted the Nouryon Defendants to take this toxic chemical off the list of ingredients for this surfactant because, if it remained on the list of ingredients, Defendant Monsanto would have to put a cancer-warning label on Roundup it sold in California.

148.     Mr. Wright said to Mr. Pope, the Akzo Nobel agent, "Monsanto uses the C-6330 surfactant in a number of our lawn and garden products. . . . [t]he surfactant contains <0.001% ethylene oxide. We have received communication from our ESH staff that this will cause an issue for us in California by requiring us to show a Prop. 65 warning on our product labels if we continue to use this surfactant."

36

Case ID: 220102482

149.     In California, Proposition 65 requires businesses to provide warnings to Californians about significant exposures to chemicals that cause cancer. These warnings come in the form of warning labels that say that the product "is known to the State of California to cause cancer." Such labels can be referred to as Prop. 65 warnings.

150.     Mr. Wright, in his e-mail to Mr. Pope went on, asking is "there some way [*sic.*] that [ethylene oxide] can be removed from the [safety data sheet for the surfactant]?. . . If Akzo Nobel cnnot [*sic.*] simply remove the ethylene oxide amount from the SDS, would it be possible to steam strip the product?"

151.     David Pope, of Akzo Nobel, wrote back, "Good news. Our regulatory group has decided that we are able to remove the [ethylene oxide] amount from our [Material Safety Data Sheet.]"

152.     Mr. Wright replied, "Thanks for the update. We will remove the Prop65 statement from the two [lawn and garden] formulations that are pending."

153.     The POEA and other toxic surfactants manufactured, marketed, researched, developed and sold by the Nouryon Defendants were used by Defendant Monsanto to make Roundup.

154.     On its website, Defendant Nouryon brags that Nouryon "operate[s] the world's largest fatty amines facility, located in Morris, Illinois. Amines are key to making surfactants used in industries such as agriculture."

155.     In another internet brochure, Defendant Nouryon states that "Nouryon has a heritage of successful adjuvant products that are trusted by experienced formulators worldwide due to reliable performance and high quality. As a major supplier of adjuvants to the glyphosate industry, we have a range of Adsee$^{TM}$ products to fit your special need."

Case ID: 220102482

156.     Defendant Nouryon's toxic surfactants have been combined with Defend- ant Monsanto's Roundup.

157.     At all relevant times, the Nouryon Defendants had actual or constructive knowledge that their surfactants were toxic.

158.     When the Nouryon Defendants sold their surfactants to Defendant Monsanto, they had actual or constructive knowledge that their surfactants would be combined with glyphosate and included in Roundup. They had actual or constructive knowledge of the toxic synergistic effects of combining their toxic surfactants with glyphosate and including them in Roundup.

159.     Plaintiff Lorraine Schank used Roundup that included the Nouryon Defendants' surfactants. These surfactants were a substantial cause of Plaintiff's injuries.

### DISCOVERY RULE

160.     Plaintiffs plead and invoke the discovery rule. Plaintiff Lorraine Schank's NHL is a latent injury. Accordingly, Plaintiffs couldn't reasonably have been expected to be aware of the cause of Plaintiff Lorraine Schank's NHL. Plaintiffs lacked the salient facts behind the cause of Mrs. Schank's NHL, and they couldn't have been aware of the salient facts through reasonable diligence until less than two years before the filings of Plaintiffs' causes of action. Plaintiffs also specifically invoke the Federally Required Commencement Date, pursuant to 42 U.S.C. § 9658.

### CLAIMS

### COUNT ONE

### STRICT LIABILITY — DESIGN DEFECT (ALL DEFENDANTS)

161.     Plaintiffs incorporate here each allegation set forth above.

162.     At all relevant times, Defendants were engaged in the business of manufacturing, formulating, creating, designing, testing, labeling, packaging, supplying, marketing, promoting,

Case ID: 220102482

selling, advertising, and otherwise introducing Roundup and the surfactants that went into Roundup.

163.    Plaintiff Lorraine Schank used Roundup.

164.    Defendants marketed and advertised Roundup and glyphosate-containing products, for use by consumers, including Plaintiff Lorraine Schank.

165.    The Nouryon Defendants marketed and advertised surfactants to glyphosate manufactures like Defendant Monsanto, but also for end use by consumers, including Plaintiff Lorraine Schank.

166.    At all relevant times, Roundup reached their intended consumers, users and/or other persons coming into contact with them, including Plaintiff Lorraine Schank, without substantial change in the condition in which the Defendants designed, produced, manufactured, sold, distributed, labeled, and marketed them.

167.    At all relevant times, the Defendants' surfactants reached the intended consumers, which included Plaintiffs. Although the surfactants were combined with glyphosate and included in Roundup by Defendant Monsanto, this was the intended result of the Nouryon Defendants when they designed and sold the surfactants to Monsanto. Indeed, these surfactants were designed to be included with glyphosate in products such as Roundup. As such, because the Roundup reached the consumers without substantial change, the surfactants reached the intended consumers, users, and/or other persons without substantial change from the condition in which the surfactants were designed by the Nouryon Defendants to be used by end consumers.

168.    Defendants had a duty to create Roundup and the surfactant that went into Roundup in a way that was not unreasonably dangerous for their normal, intended, or anticipated use.

Case ID: 220102482

169.     Defendants' Roundup and glyphosate-containing products were formulated, designed, and manufactured with carcinogens.

170.     The Defendants' surfactants were defective — especially when combined with glyphosate and the other ingredients in Roundup — because their carcinogenic properties made them unreasonably dangerous in that they were dangerous to an extent beyond that which an ordinary consumer, such as the Plaintiffs, would contemplate.

171.     Further the magnitude of the danger associated with use of the surfactants and Roundup, either alone or combined, outweighs the utility of these products.

172.     The dangers of Roundup were unknown to the ordinary consumer and were unacceptable to the ordinary consumer. Plaintiffs did not know of these dangers. And if they would have known, these dangers would have been unacceptable to them.

173.     Further a reasonable person would conclude that the probability and seriousness of harm caused by Roundup outweighed the burden or costs of taking precautions.

174.     Defendants knew, or should have known, of the unreasonable risks of harm associated with the use of and/or exposure to Roundup and glyphosate-containing products, namely their unreasonably dangerous and carcinogenic properties and their propensity to cause cancer, when the products left Defendants' control.

175.     Defendants' Roundup and glyphosate-containing products were defective because their carcinogenic properties made them unreasonably dangerous in that they were dangerous to an extent beyond that which an ordinary consumer, such as Plaintiffs, would contemplate. Further the magnitude of the danger associated with use of Roundup and other cancer-causing chemicals that Defendant Monsanto is financially responsible for outweighs the utility of the products.

Case ID: 220102482

176.     At the time of Plaintiff Lorraine Schank's exposure, Roundup and/or glyphosate-containing products were being used in a normal, intended, or anticipated manner, as a broad-spectrum herbicide and other applications known to Defendants.

177.     Plaintiff Lorraine Schank was exposed to Defendant Monsanto's Roundup and/or glyphosate-containing products without knowledge of their dangerous characteristics, specifically the carcinogenic risks associated with exposures to those products.

178.     The foreseeable risks associated with exposures to Defendant Monsanto's Roundup and glyphosate-containing products exceeded the alleged benefits associated with their design and formulation.

179.     Defects in Defendants' Roundup and/or glyphosate-containing products were a producing cause, proximate cause, and substantial factor in the development of Plaintiff Lorraine Schank's cancer.

180.     Plaintiffs sustained the following damages as a foreseeable, direct, and proximate result of Defendants' acts and omissions:

(a) Economic losses, including medical care and lost earnings; and

(b) Noneconomic losses, including physical and mental pain and suffering, emotional distress, inconvenience, loss of enjoyment of life, impairment of quality of life, past and future.

WHEREFORE, Plaintiffs respectfully demand judgment in their favor and against Defendants, in an amount in excess of the applicable arbitration limits, including interest, costs of suit, delay damages, compensatory damages, punitive damages, and such other relief as this Honorable Court may deem appropriate.

Case ID: 220102482

## COUNT TWO

## STRICT LIABILITY — FAILURE TO WARN (ALL DEFENDANTS)

181.     Plaintiffs incorporate each allegation set forth above.

182.     At all relevant times, Defendants engaged in the business of manufacturing, formulating, creating, designing, testing, labeling, packaging, supplying, marketing, promoting, selling, advertising, and otherwise introducing Roundup and the surfactants Roundup contains.

183.     Defendants marketed and advertised its Roundup and glyphosate-containing products for use by consumers, including Plaintiff Lorraine Schank.

184.     The Surfactant Defendants marketed and advertised their surfactants to be combined with glyphosate and used by end consumers, including Plaintiff Lorraine Schank.

185.     Defendants had a duty to warn of the risks associated with the use of its Roundup.

186.     The Surfactant Defendants had a duty to warn of the risks associated with the use of their surfactants, especially when combined with glyphosate and included in Defendant Monsanto's Roundup and glyphosate-containing products.

187.     Defendants knew, or should have known, of the unreasonable risks of harm associated with the use of and/or exposure to Roundup and glyphosate-containing products, namely their unreasonably dangerous and carcinogenic properties and their propensity to cause cancer. The Surfactant Defendants knew, or should have known, of the unreasonable risks of harm associated with the use of and/or exposure to their surfactants, especially when combined with Roundup and glyphosate-containing products.

188.     Defendants failed to exercise reasonable care to warn of the dangerous carcinogenic risks associated with use of and exposures to its Roundup and the surfactants Roundup contains.

Case ID: 220102482

189.     The minimal warnings disseminated with Roundup and glyphosate-containing products were inadequate and failed to communicate the carcinogenic dangers attendant to exposures to and use of the products. The Surfactant Defendants knew Defendant Monsanto's warnings were not sufficient.

190.     As a result of Defendants' inadequate warnings, Defendants' Roundup and surfactants were defective and unreasonably dangerous when they left Defendant Monsanto's possession, control, or both.

191.     Due to the absence of any warning or instruction by Defendants regarding the significant health-and-safety risks posed by Roundup and/or glyphosate-containing products, Plaintiffs were unaware that Defendants' Roundup was unreasonably dangerous and had carcinogenic properties, since such information was not known to the general public.

192.     Plaintiffs reasonably relied on the skill, superior knowledge, and judgment of Defendants.

193.     Had Defendants properly disclosed the risks associated with exposures to Roundup, Plaintiff Lorraine Schank could have avoided the risk of developing cancer from exposures to Roundup by choosing not to use Roundup.

194.     Instead, Defendants disseminated information that was inaccurate, false, and misleading and that failed to communicate accurately or adequately the comparative severity, duration, and extent of the risk of injuries associated with use of and/or exposure to Roundup; continued to promote the efficacy of Roundup, even after they knew or should have known of the unreasonable risks from exposure; and concealed, downplayed, or otherwise suppressed, through aggressive marketing and promotion, any information or research about the risks and dangers of exposure to Roundup.

Case ID: 220102482

195.     Defendants' failure to warn regarding the dangers associated with expo- sures to Roundup and/or glyphosate-containing products was a producing cause, proximate cause, and substantial factor in the development of Plaintiff Lorraine Schank's cancer.

196.     Plaintiffs sustained the following damages as a foreseeable, direct, and proximate result of Defendants' acts and omissions:

(a) Economic losses, including medical care and lost earnings; and

(b) Noneconomic losses, including physical and mental pain and suffering, emotional distress, inconvenience, loss of enjoyment of life, impairment of quality of life, past and future.

WHEREFORE, Plaintiffs respectfully demand judgment in their favor and against Defendants, in an amount in excess of the applicable arbitration limits, including interest, costs of suit, delay damages, compensatory damages, punitive damages, and such other relief as this Honorable Court may deem appropriate.

## COUNT THREE

## NEGLIGENCE (ALL DEFENDANTS)

197.     Plaintiffs incorporate here the earlier paragraphs.

198.     At all relevant times, Defendants were engaged in the business of manufacturing, formulating, creating, designing, testing, labeling, packaging, supplying, marketing, promoting, selling, advertising, and otherwise introducing Roundup and the surfactants Roundup contains.

199.     Plaintiff Lorraine Schank used Roundup.

200.     Defendants had a duty to exercise reasonable care in the research, design, manufacture, packaging, marketing, advertisement, supply, promotion, sale, and distribution of

Case ID: 220102482

Roundup and surfactants, including a duty to assure that the products would not cause users to suffer unreasonable, dangerous side effects, including developing cancer.

201.     Defendants had a duty to provide true and accurate information and warnings concerning the risks of using Roundup.

202.     Defendants failed to exercise ordinary care in that they knew, or should have known, of the unreasonable risks of harm associated with the use of and/or exposure to Roundup, namely Roundup's unreasonably dangerous and carcinogenic properties and Roundup's propensity to cause cancer, when the products left Monsanto's control.

203.     Defendants also knew, or in the exercise of reasonable care, should have known that consumers and users of Roundup were unaware of the carcinogenic risks associated with exposures to the products.

204.     Defendants' negligence includes, but is not limited to the following acts and/or omissions:

    a.  Failing to sufficiently test Roundup and glyphosate-containing products to determine whether they were safe for their intended use;

    b.  Failing to sufficiently test Roundup and glyphosate-containing products to determine their carcinogenic properties after learning that their formulations could be carcinogenic;

    c.  Marketing, advertising, and recommending the use of Roundup and glyphosate-containing products without sufficient knowledge as to their dangerous propensities;

    d.  Representing that Roundup and glyphosate-containing products were safe for their intended use when they were not;

Case ID: 220102482

e.  Comparing the safety risks and dangers of Roundup and glyphosate-containing products with common everyday foods such as table salt, and other forms of herbicides;

f.  Failing to disclose the risk of serious harm associated with use of and exposures to Roundup and glyphosate-containing products;

g.  Failing to provide adequate instructions, guidelines, and safety precautions to protect the health of those persons whom Defendants could reasonably foresee would use and/or be exposed to Roundup and/or surfactants;

h.  Failing to use reasonable and prudent care in the design, development, and manufacture of Roundup and glyphosate-containing products, so as to avoid the risk of serious harm associated with use of and/or exposures to Roundup;

i.  Failing to sufficiently test the "inert" ingredients and/or adjuvants contained within Roundup, and the propensity of these ingredients to render Roundup toxic or to increase the toxicity of Roundup;

j.  Systematically suppressing or downplaying contrary evidence about the risks, incidence, and prevalence of the side effects of exposures to Roundup and glyphosate-containing products;

k.  Failing to sufficiently test the surfactants they made and that were included in Roundup, to determine whether they were safe for their intended use, either alone or when included in Roundup;

l.  Failing to sufficiently test their surfactants, either alone or when included in Roundup, to determine the carcinogenic properties of the surfactants or Roundup, after learning that the surfactants could be carcinogenic, either alone or when included in Roundup;

Case ID: 220102482

m. Marketing, advertising, and recommending surfactants be included in Roundup and glyphosate-containing products without sufficient knowledge as to their dangerous propensities, either alone or when included in Roundup;

n. Representing that the surfactants they manufactured were safe for their intended use when they were not;

o. Failing to disclose — or ensure Monsanto disclosed — the risk of serious harm associated with use of and exposures to surfactants, either alone or when included in Roundup;

p. Working with Monsanto to ensure that customers were not warned about the dangerous qualities of their surfactants, either alone or when included in Roundup;

q. Continuing to disseminate information to Defendants' consumers and the general public that indicates or implies that Roundup and glyphosate-containing products are not unsafe for use; and

r. Continuing to manufacture and sell Roundup, with the knowledge that Roundup was unreasonably safe and dangerous.

205.     It was reasonably foreseeable that consumers, including Plaintiff Lorraine Schank, would suffer injury and possibly die as a result of Defendants' failure to exercise ordinary care in the manufacturing, marketing, promotion, labeling, distribution, and sale of Roundup and surfactants.

206.     Defendants under-reported, underestimated, and downplayed the serious dangers of its Roundup.

Case ID: 220102482

207.     Defendants' ongoing negligent decisions to market and distribute Roundup and glyphosate-containing products were a producing cause, proximate cause, and substantial factor in the development of Plaintiff's cancer.

208.     Plaintiffs sustained the following damages as a foreseeable, direct, and proximate result of Defendants' acts and omissions:

(a)  Economic losses, including medical care and lost earnings; and

(b)  Noneconomic losses, including physical and mental pain and suffering, emotional distress, inconvenience, loss of enjoyment of life, impairment of quality of life, past and future.

WHEREFORE, Plaintiffs respectfully demand judgment in their favor and against Defendants, in an amount in excess of the applicable arbitration limits, including interest, costs of suit, delay damages, compensatory damages, punitive damages, and such other relief as this Honorable Court may deem appropriate.

## COUNT FOUR

## NEGLIGENT DESIGN (ALL DEFENDANTS)

209.     Plaintiffs incorporate here the earlier paragraphs.

210.     At all relevant times, Defendants were engaged in the business of researching, creating, testing, designing and otherwise introducing Roundup and the surfactants Roundup contains.

211.     Plaintiff Lorraine Schank used Roundup.

212.     Defendants had a duty to exercise reasonable care in the research, testing, design, and creation of Roundup and surfactants, including a duty to assure that the products would not cause users to suffer unreasonable, dangerous side effects, including developing cancer.

Case ID: 220102482

213.     Defendants failed to exercise ordinary care in that they knew, or should have known, of the unreasonable risks of harm associated with the use of and/or exposure to Roundup, namely Roundup's unreasonably dangerous and carcinogenic properties and Roundup's propensity to cause cancer, when the products left Monsanto's control.

214.     Defendants also knew, or in the exercise of reasonable care, should have known that consumers and users of Roundup were unaware of the carcinogenic risks associated with exposures to the products.

215.     Defendants' negligence includes, but is not limited to the following acts and/or omissions:

a.   Failing to sufficiently test Roundup and glyphosate-containing products to determine whether they were safe for their intended use;

b.   Failing to sufficiently test Roundup and glyphosate-containing products to determine their carcinogenic properties after learning that their formulations could be carcinogenic;

c.   Failing to use reasonable and prudent care in the design, creation, development, and manufacture of Roundup and glyphosate-containing products, so as to avoid the risk of serious harm associated with use of and/or exposures to Roundup;

d.   Failing to sufficiently test the "inert" ingredients and/or adjuvants contained within Roundup, and the propensity of these ingredients to render Roundup toxic or to increase the toxicity of Roundup;

e.   Failing to sufficiently test the surfactants they made and that were included in Roundup, to determine whether they were safe for their intended use, either alone or when included in Roundup;

Case ID: 220102482

f.  Failing to sufficiently test their surfactants, either alone or when included in Roundup, to determine the carcinogenic properties of the surfactants or Roundup, after learning that the surfactants could be carcinogenic, either alone or when included in Roundup;

g.  Representing that the surfactants they manufactured were safe for their intended use when they were not; and

h.  Continuing to manufacture and sell Roundup, with the knowledge that Roundup was unreasonably safe and dangerous.

i.  It was reasonably foreseeable that consumers, including Plaintiff Lorraine Schank, would suffer injury and possibly die as a result of Defendants' failure to exercise ordinary care in the design, creation, development, and testing of Roundup and surfactants.

j.  Defendants' ongoing negligent decisions on how the design, marketing, and distribution of Roundup and glyphosate-containing products were a producing cause, proximate cause, and substantial factor in the development of Plaintiff's cancer.

k.  Plaintiffs sustained the following damages as a foreseeable, direct, and proximate result of Defendants' acts and omissions:

    (a)  Economic losses, including medical care and lost earnings; and

    (b)  Noneconomic losses, including physical and mental pain and suffering, emotional distress, inconvenience, loss of enjoyment of life, impairment of quality of life, past and future.

50

WHEREFORE, Plaintiffs respectfully demand judgment in their favor and against Defendants, in an amount in excess of the applicable arbitration limits, including interest, costs of suit, delay damages, compensatory damages, punitive damages, and such other relief as this Honorable Court may deem appropriate.

## COUNT FIVE

### NEGLIGENT MARKETING (ALL DEFENDANTS)

216.     Plaintiffs incorporate here the earlier paragraphs.

217.     At all relevant times, Defendants were engaged in the business of labeling, packaging, marketing, promoting, selling, advertising, and otherwise introducing Roundup and the surfactants Roundup contains.

218.     Plaintiff Lorraine Schank used Roundup.

219.     Defendants had a duty to exercise reasonable care in the packaging, marketing, advertisement, supply, promotion, sale, and distribution of Roundup and surfactants, including a duty to assure that the products would not cause users to suffer unreasonable, dangerous side effects, including developing cancer.

220.     Defendants had a duty to provide true and accurate information and warnings concerning the risks of using Roundup.

221.     Defendants failed to exercise ordinary care in that they knew, or should have known, of the unreasonable risks of harm associated with the use of and/or exposure to Roundup, namely Roundup's unreasonably dangerous and carcinogenic properties and Roundup's propensity to cause cancer, when the products left Monsanto's control.

Case ID: 220102482

222.     Defendants also knew, or in the exercise of reasonable care, should have known that consumers and users of Roundup were unaware of the carcinogenic risks associated with exposures to the products.

223.     Defendants' negligence includes, but is not limited to the following acts and/or omissions:

a.  Marketing, advertising, and recommending the use of Roundup and glyphosate-containing products without sufficient knowledge as to their dangerous propensities;

b.  Representing that Roundup and glyphosate-containing products were safe for their intended use when they were not;

c.  Comparing the safety risks and dangers of Roundup and glyphosate-containing products with common everyday foods such as table salt, and other forms of herbicides;

d.  Failing to disclose the risk of serious harm associated with use of and exposures to Roundup and glyphosate-containing products;

e.  Failing to provide adequate instructions, guidelines, and safety precautions to protect the health of those persons whom Defendants could reasonably foresee would use and/or be exposed to Roundup and/or surfactants;

f.  Systematically suppressing or downplaying contrary evidence about the risks, incidence, and prevalence of the side effects of exposures to Roundup and glyphosate-containing products;

Case ID: 220102482

g.  Marketing, advertising, and recommending surfactants be included in Roundup and glyphosate-containing products without sufficient knowledge as to their dangerous propensities, either alone or when included in Roundup;

h.  Representing that the surfactants they manufactured were safe for their intended use when they were not;

i.  Failing to disclose — or ensure Monsanto disclosed — the risk of serious harm associated with use of and exposures to surfactants, either alone or when included in Roundup;

j.  Working with Monsanto to ensure that customers were not warned about the dangerous qualities of their surfactants, either alone or when included in Roundup;

k.  Continuing to disseminate information to Defendants' consumers and the general public that indicates or implies that Roundup and glyphosate-containing products are not unsafe for use; and

l.  Continuing to manufacture and sell Roundup, with the knowledge that Roundup was unreasonably safe and dangerous.

224.    It was reasonably foreseeable that consumers, including Plaintiff Lorraine Schank, would suffer injury and possibly die as a result of Defendants' failure to exercise ordinary care in the manufacturing, marketing, promotion, labeling, distribution, and sale of Roundup and surfactants.

225.    Defendants under-reported, underestimated, and downplayed the serious dangers of its Roundup.

Case ID: 220102482

226.     Defendants' ongoing negligent decisions to market and distribute Roundup and glyphosate-containing products were a producing cause, proximate cause, and substantial factor in the development of Plaintiff's cancer.

227.     Plaintiffs sustained the following damages as a foreseeable, direct, and proximate result of Defendants' acts and omissions:

(a)  Economic losses, including medical care and lost earnings; and

(b)  Noneconomic losses, including physical and mental pain and suffering, emotional distress, inconvenience, loss of enjoyment of life, impairment of quality of life, past and future.

WHEREFORE, Plaintiffs respectfully demand judgment in their favor and against Defendants, in an amount in excess of the applicable arbitration limits, including interest, costs of suit, delay damages, compensatory damages,  punitive damages, and such other relief as this Honorable Court may deem appropriate.

## COUNT SIX

## BREACH OF IMPLIED WARRANTIES (DEFENDANT MONSANTO)

228.     Plaintiffs incorporate here the earlier paragraphs.

229.     At all relevant times, Defendant Monsanto was engaged in the business of manufacturing, formulating, creating, designing, testing, labeling, packaging, supplying, marketing, promoting, selling, advertising, and otherwise introducing its Roundup and glyphosate-containing products into the stream of commerce that Plaintiff Lorraine Schank used.

230.     At the time Defendant Monsanto marketed, sold, and distributed its Roundup and glyphosate-containing products for use by Plaintiffs, Monsanto knew of their intended use and

Case ID: 220102482

implicitly warranted that the products were of merchantable quality and safe and fit for the use for which they were intended; specifically, as horticultural herbicides.

231.     Before the time that Plaintiff Lorraine Schank was exposed to the use of Defendant Monsanto's Roundup and glyphosate-containing products, Monsanto impliedly warranted to consumers and those exposed, including Plaintiff Lorraine Schank, that its Roundup and glyphosate-containing products were of merchantable quality and safe and fit for the use for which they were intended; specifically, as horticultural herbicides.

232.     Defendant Monsanto, however, failed to disclose that its Roundup and glyphosate-containing products have dangerous propensities when used as intended and that the use of and/or exposure to its Roundup and glyphosate-containing products carries an increased risk of developing severe injuries, including Plaintiff's cancer.

233.     Plaintiffs reasonably relied upon the skill, superior knowledge, and judgment of Defendant Monsanto and upon its implied warranties that its Roundup and glyphosate-containing products were of merchantable quality and fit for her intended purpose or use.

234.     Defendant Monsanto's Roundup and glyphosate-containing products were expected to reach, and did in fact reach, consumers and/or users, including Plaintiff Lorraine Schank, without substantial change in the condition in which they were manufactured and sold by Monsanto.

235.     At all relevant times to this litigation, Defendant Monsanto was aware that consumers and users of its Roundup and glyphosate-containing products, including Plaintiff Lorraine Schank, would use the products as marketed by Monsanto, which is to say that Plaintiff was a foreseeable user of Roundup.

Case ID: 220102482

236.     Defendant Monsanto intended that its Roundup and glyphosate-containing products be used in the manner in which Plaintiff Lorraine Schank was exposed, and Defendant Monsanto implicitly warranted each product to be of merchantable quality, safe, and fit for this use, despite the fact that Roundup was not adequately tested and/or researched.

237.     In reliance on Defendant Monsanto's implied warranty, Plaintiff Lorraine Schank used or was exposed to Monsanto's Roundup and glyphosate-containing products as instructed and labeled and in the foreseeable manner intended, recommended, promoted, and marketed by Defendant Monsanto.

238.     Plaintiffs could not have reasonably discovered or known of the risks of serious injury associated with Roundup or glyphosate-containing products.

239.     Defendant Monsanto breached its implied warranty to Plaintiffs in that its Roundup and glyphosate-containing products were not of merchantable quality, safe, or fit for their intended use, an/or adequately tested. Defendant Monsanto's Roundup and glyphosate-containing products have dangerous propensities when used as intended and anticipated and can cause serious injuries, including those Plaintiffs complain of.

240.     The harm caused by Defendant Monsanto's Roundup and glyphosate-containing products far outweighed their benefits, rendering the products more dangerous than an ordinary consumer or user would expect and more dangerous than alternative products.

241.     As a direct and proximate result of Defendant Monsanto's wrongful acts and omissions Plaintiffs have suffered severe and permanent physical and emotional injuries, including, but not limited to, Plaintiff Lorraine Schank's diagnosis of NHL. Plaintiffs have endured pain and suffering, suffered economic loss (including significant expenses for medical care and treatment) and will continue to incur these expenses in the future.

Case ID: 220102482

242.     Plaintiffs sustained the following damages as a foreseeable, direct, and proximate result of Defendants' acts and omissions:

(a) Economic losses, including medical care and lost earnings; and

(b) Noneconomic losses, including physical and mental pain and suffering, emotional distress, inconvenience, loss of enjoyment of life, impairment of quality of life, past and future.

WHEREFORE, Plaintiffs respectfully demand judgment in their favor and against Defendants, in an amount in excess of the applicable arbitration limits, including interest, costs of suit, delay damages, compensatory damages, punitive damages, and such other relief as this Honorable Court may deem appropriate.

## DAMAGES

243.     Plaintiffs incorporate here each allegation set forth above.

244.     As a direct and proximate result of Defendants and their conduct described above, Plaintiffs sustained damages, including past and future medical expenses, past and future pain and suffering, past and future mental anguish and disfigurement, past and future earnings loss, costs of purchasing Roundup products, and all other applicable dam- ages.

245.     As a result of Defendants' gross negligence, complete indifference to or conscious disregard for the safety of others, and malice and oppression, Plaintiffs seek punitive damages to punish Defendants and to deter Defendants and others in similar situations from like conduct.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs seek judgment in Plaintiffs' favor as follows:

246.     Plaintiffs pray for judgment against all Defendants, joint and severally, on each of the claims and causes of action in this Complaint, and as follows:

Case ID: 220102482

(a) Awarding compensatory damages in excess of $50,000, including, but not limited to, pain, suffering, emotional distress, loss of enjoyment of life, and other noneconomic damages in an amount to be determined at trial of this action;

(b) Awarding economic damages in the form of medical expenses, out of pocket expenses, lost earnings, and other economic damages in an amount to be determined at trial  of this action;

(c) Punitive, or exemplary, damages for the wanton, willful, fraudulent, reckless acts of the Defendants who demonstrated a complete disregard and reckless indifference for the safety and welfare of the general public and Plaintiffs. Plaintiffs ask for an amount sufficient to punish Defendants and deter future similar conduct;

(d) Prejudgment interest;

(e) Post-judgment interest;

(f) Reasonable attorney's fees;

(g) Costs; and,

(h) Such other and further relief as this Court deems just and proper.

## **DEMAND FOR JURY TRIAL**

Plaintiffs demand a jury trial for any and all issues.

Respectfully submitted,

**KLINE & SPECTER, P.C.**

BY: */s/ Thomas R. Kline*
   THOMAS R. KLINE, ESQUIRE
   KILA B. BALDWIN, ESQUIRE
   TOBI L. MILROOD, ESQUIRE
Dated: 1/31/22 *Attorneys for Plaintiffs*

Case ID: 220102482

## <u>VERIFICATION</u>

We, Lorraine Schank and Michael Schank, w/h hereby verify that we are the plaintiffs in the foregoing action; that the attached Complaint is based upon information which we have furnished to our counsel and information which has been gathered by our counsel in the preparation of the lawsuit. The language of the Complaint is that of counsel and not of affiants. We have read the Complaint and to the extent that the allegations therein are based upon information we have given counsel, they are true and correct to the best of our knowledge, information, and belief. To the extent that the contents of the Complaint are that of counsel, we have relied upon counsel in making this Verification. We understand that false statements made herein are made subject to the penalties of 18 Pa. C.S.A. § 4904 relating to unsworn falsifications to authorities.

LORRAINE SCHANK

MICHAEL SCHANK

Dated: 1/31/22