# U.S. District Court
## Eastern District of California - Live System (Sacramento)
## CIVIL DOCKET FOR CASE #: 2:23-cv-00991-WBS-DB

| | |
|---|---|
| Zarate v. Monsanto Company | Date Filed: 05/25/2023 |
| Assigned to: Senior Judge William B. Shubb | Jury Demand: Plaintiff |
| Referred to: Magistrate Judge Deborah Barnes | Nature of Suit: 365 Personal Inj. Prod. Liability |
| Cause: 28:1332 Diversity-Personal Injury | Jurisdiction: Diversity |

**Plaintiff**

**Juan Delgado Zarate**

represented by **Joshua David Boxer**
Matern Law Group, PC
1230 Rosecrans Ave.
Suite 200
Manhattan Beach, CA 90266
310-531-1900
Email: jboxer@maternlawgroup.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Monsanto Company**

| Date Filed | # | Docket Text |
|---|---|---|
| 05/25/2023 | 1 | COMPLAINT against Monsanto Company by Juan Delgado Zarate. (Filing fee $ 402, receipt number ACAEDC-10878716) (Attachments: # 1 Civil Cover Sheet)(Boxer, Joshua) (Entered: 05/25/2023) |
| 05/25/2023 | 2 | SUMMONS ISSUED as to *Monsanto Company* with answer to complaint due within *21* days. Attorney *Joshua David Boxer* *Matern Law Group, PC* *1230 Rosecrans Ave, Suite 200* *Manhattan Beach, CA 90266*. (Kastilahn, A) (Entered: 05/25/2023) |
| 05/25/2023 | 3 | CIVIL NEW CASE DOCUMENTS ISSUED; Initial Scheduling Conference SET for 9/11/2023 at 01:30 PM in Courtroom 5 (WBS) before Senior Judge William B. Shubb. (Attachments: # 1 Consent Form, # 2 VDRP) (Kastilahn, A) (Entered: 05/25/2023) |
| 07/11/2023 | 4 | SUMMONS RETURNED EXECUTED: Monsanto Company served on 7/10/2023, answer due 7/31/2023. (Boxer, Joshua) (Entered: 07/11/2023) |

| PACER Service Center |
|---|
| Transaction Receipt |

| 07/11/2023 14:35:34 | | | |
|---|---|---|---|
| **PACER Login:** | Joshboxer | **Client Code:** | Delgado Zarate |
| **Description:** | Docket Report | **Search Criteria:** | 2:23-cv-00991-WBS-DB |
| **Billable Pages:** | 1 | **Cost:** | 0.10 |

1 | **MATERN LAW GROUP, PC**
2 | Matthew J. Matern (SBN 159798)
mmatern@maternlawgroup.com
3 | Joshua D. Boxer (SBN 226712)
jboxer@maternlawgroup.com
4 | 1230 Rosecrans Avenue, Suite 200
Manhattan Beach, CA 90266
5 | Tel: (310) 531-1900
Facsimile: (310) 531-1901
6 |
7 | Attorneys for Plaintiff

8 | UNITED STATES DISTRICT COURT

9 | EASTERN DISTRICT OF CALIFORNIA

10 |

11 | JUAN DELGADO ZARATE, an individual,

12 |

13 | Plaintiff,

14 | vs.

15 | MONSANTO COMPANY and Does 1-50, inclusive,

16 | Defendants.

17 |

18 |

19 |

CASE NO.:

**COMPLAINT**

1. Negligence;
2. Strict Products Liability—Design Defect;
3. Strict Products Liability—Failure to Warn;
4. Breach of Warranty.

**<u>DEMAND FOR JURY TRIAL</u>**

20 |
21 |
22 |
23 |
24 |
25 |
26 |
27 |
28 |

MATERN LAW GROUP
1230 ROSECRANS
AVENUE, STE 200
MANHATTAN
BEACH, CA 90266

1

COMPLAINT

Plaintiff JUAN DELGADO ZARATE ("Plaintiff"), demanding a jury trial, hereby brings this Complaint for damages against Defendants MONSANTO COMPANY and Does 1-50 and hereby alleges as follows:

**INTRODUCTION**

1.       This is an action for damages suffered by Plaintiff as a direct and proximate result of Defendant's negligent and wrongful conduct in connection with the design, development, manufacture, testing, packaging, promoting, marketing, advertising, distribution, labeling, and/or sale of the herbicide Roundup, containing the active ingredient glyphosate.

2.       Plaintiff maintains that Roundup and/or glyphosate is defective, dangerous to human health, unfit and unsuitable to be marketed and sold in commerce, and lacked proper warnings and directions as to the dangers associated with its use.

3.       Plaintiff's injuries, like those striking thousands of similarly situated victims across the country, were avoidable.

**JURISDICTION AND VENUE**

4.       This Court has subject matter jurisdiction over Defendants and this action pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship between Plaintiff and Defendants. In addition, the amount in controversy between Plaintiff and Defendants exceeds $75,000, exclusive of interest and costs.

5.       This Court has personal jurisdiction over Defendants insofar as Defendants are authorized and licensed to conduct business in the State of California, maintain and carry on systematic and continuous contacts in this judicial district, regularly transact business within this judicial district, and regularly avail themselves of the benefits of this judicial district.

6.       Additionally, Defendants caused tortious injury by acts and omissions in this judicial district and caused tortious injury in this district by acts and

MATERN LAW GROUP
1230 ROSECRANS
AVENUE, STE 200
MANHATTAN
BEACH, CA 90266

2                                              COMPLAINT

omissions outside this district while regularly doing and soliciting business, engaging in a persistent course of conduct, and deriving substantial revenue from goods used or consumed and services rendered in this judicial district.

7.     Venue is proper within this district pursuant to 28 U.S.C. § 1391 in that Defendants conduct business in California and in this judicial district and are subject to personal jurisdiction in this district. Defendants sell, market, and/or distribute Roundup throughout California. Furthermore, a substantial part of the acts and/or omissions giving rise to these claims occurred within this district.

## **PARTIES**

8.     Plaintiff is a natural person and at all relevant times a resident of Sacramento County, California. Plaintiff brings this action for personal injuries sustained by exposure to Roundup containing the active ingredient glyphosate and the surfactant POEA. As a direct and proximate result of being exposed to Roundup, Plaintiff developed multiple myeloma ("MM"). "Roundup," as used herein, refers to all formulations of Defendants' Roundup products, including but not limited to: Roundup Concentrate Poison Ivy and Tough Brush Killer 1, Roundup Custom Herbicide, Roundup D-Pak herbicide, Roundup Dry Concentrate, Roundup Export Herbicide, Roundup Fence & Hard Edger 1, Roundup Garden Foam Weed & Grass Killer, Roundup Grass and Weed Killer, Roundup Herbicide, Roundup Original 2k herbicide, Roundup Original II Herbicide, Roundup Pro Concentrate, Roundup Prodry Herbicide, Roundup Promax, Roundup Quik Stik Grass and Weed Killer, Roundup Quikpro Herbicide, Roundup Rainfast Concentrate Weed & Grass Killer, Roundup Rainfast Super Concentrate Weed & Grass Killer, Roundup Ready-to-Use Extended Control Weed & Grass Killer 1 Plus Weed Preventer, Roundup Ready-to-Use Weed & Grass Killer, Roundup Ready-to-Use Weed and Grass Killer 2, Roundup Ultra Dry, Roundup Ultra Herbicide, Roundup Ultramax, Roundup VM Herbicide, Roundup Weed & Grass Killer Concentrate, Roundup Weed & Grass Killer Concentrate Plus, Roundup Weed &

MATERN LAW GROUP
1230 ROSECRANS
AVENUE, STE 200
MANHATTAN
BEACH, CA 90266

`                                                      3                                    COMPLAINT

Grass Killer Ready-to-Use Plus, Roundup Weed & Grass Killer Super Concentrate, Roundup Weed & Grass Killer1 Ready-to-Use, Roundup WSD Water Soluble Dry Herbicide Deploy Dry Herbicide, or any other formulation of containing the active ingredient glyphosate.

9.     Defendant MONSANTO COMPANY ("Monsanto") is a Delaware Corporation, Calif. Secretary of State Entity No. C2362863, in active status, with a principal place of business in St. Louis, Missouri. At all times relevant to this complaint, Monsanto was the entity that discovered the herbicidal properties of glyphosate and was the manufacturer of the Roundup at issue.

10.     Defendants advertise and sell goods, specifically Roundup, in Riverside County, California.

11.     Defendants transacted and conducted business within the State of California that relates to the allegations in this Complaint.

12.     Defendants expected or should have expected their actions to have consequences within the State of California, and derived substantial revenue from interstate commerce.

13.     Defendants engaged in the business of designing, developing, manufacturing, testing, packaging, marketing, distributing, labeling, and/or selling Roundup.

14.     Defendants are authorized to do business in California and derive substantial income from doing business in this state.

15.     Upon information and belief, Defendants purposefully availed themselves of the privilege of conducting activities within the State of California, thus invoking the benefits and protections of its laws.

16.     Upon information and belief, Defendants designed, sold, advertised, manufactured, and/or distributed Roundup, with full knowledge of the product's dangerous and defective nature.

///

MATERN LAW GROUP
1230 ROSECRANS
AVENUE, STE 200
MANHATTAN
BEACH, CA 90266

`                                      4                                    COMPLAINT

# FACTUAL ALLEGATIONS

17.   Glyphosate is a broad-spectrum, non-selective herbicide used in a wide variety of herbicidal products around the world, including the popular herbicide Roundup.

18.   Glyphosate interferes with a plant's ability to form aromatic amino acids necessary for protein synthesis. Plants treated with glyphosate generally die within two to three days. Because plants absorb glyphosate, it cannot be completely removed by washing or peeling produce, or by milling, baking, or brewing grains.

19.   The herbicidal properties of glyphosate were discovered in 1970 by Monsanto chemist John Franz. The first glyphosate-based herbicide was introduced to the market in the mid-1970s under the brand name Roundup.

20.   For about forty years, farmers around the world have used Roundup, containing glyphosate, without knowing of the dangers its use poses. That is because, when Monsanto first introduced Roundup, it touted glyphosate as a technological breakthrough: it could kill almost every weed without causing harm either to people or to the environment. History, however, has demonstrated otherwise. According to the WHO, the main chemical ingredient of Roundup—glyphosate—is a probable carcinogen. Anyone who uses Roundup is at risk. Despite that, Monsanto assured the public that Roundup was harmless. The company championed falsified data and attacked legitimate scientific studies exposing glyphosate's dangers. Consequently, agricultural workers, farmers, and even home gardeners have been exposed to a carcinogen, while Monsanto has made billions.

21.   The manufacture, formulation, and distribution of herbicides, such as Roundup, are regulated under the Federal Insecticide, Fungicide, and Rodenticide Act (FIFRA), 7 U.S.C. § 136 *et seq.* FIFRA requires that all pesticides be registered with the Environmental Protection Agency (EPA) prior to their distribution, sale, or use, except as described by FIFRA 7 U.S.C. § 136a(a).

MATERN LAW GROUP
1230 ROSECRANS
AVENUE, STE 200
MANHATTAN
BEACH, CA 90266

`                                                        5                                          COMPLAINT

## REGISTRATION OF HERBICIDES

22.     The EPA requires as part of the registration process, among other requirements, a variety of tests to evaluate the potential for exposure to pesticides, toxicity to people and other potential non-target organisms, and other adverse effects on the environment. Regulation by the EPA, however, is not an assurance or finding of safety. The determination the EPA makes in registering or non-registering a product is not that the product is "safe," but rather that use of the product in accordance with its label directions "will not generally cause unreasonable adverse effects on the environment." 7 U.S.C. § 136(a)(c)(5)(D).

23.     FIFRA defines "unreasonable adverse effects on the environment" to mean "any unreasonable risk to man or the environment, taking into account the economic, social, and environmental costs and benefits of the use of any pesticide." 7 U.S.C. § 136(bb). FIFRA thus requires the EPA to make a risk/benefit analysis in determining whether a registration should be granted or allowed to continue to be sold in commerce.

24.     The EPA and the State of California registered Roundup for distribution, sale, and manufacture in the United States and the State of California.

25.     FIFRA generally requires that the registrant, Monsanto, conduct health and safety testing of pesticide products. The government is not required, nor is it able, to perform the product tests that are required of the manufacturer.

26.     The evaluation of each pesticide product distributed, sold, or manufactured is completed at the time the product is initially registered. The data necessary for registration of a pesticide has changed over time. In 2020, the EPA released an interim decision for registration review finding that there are no risks of concern to human health when glyphosate is used in accordance with its current label. The EPA also found that glyphosate was not carcinogenic. This decision, however, ignored independent scientific studies linking glyphosate to cancer. Additionally, in June 2020, the Ninth Circuit Court of Appeals invalidated the

MATERN LAW GROUP
1230 ROSECRANS
AVENUE, STE 200
MANHATTAN
BEACH, CA 90266

`                                                            6                          COMPLAINT

registration for a similar pesticide manufactured by Defendants, finding that EPA understated that pesticide's risks. This indicates that EPA may have irresponsibly understated glyphosate's dangers as well.

## MONSANTO'S FALSE REPRESENTATIONS REGARDING THE SAFETY OF ROUNDUP

27.    In 1996, the New York Attorney General (NYAG) filed a lawsuit against Monsanto based on its false and misleading advertising of Roundup products. Specifically, the lawsuit challenged Monsanto's general representations that its spray-on glyphosate-based herbicides, including Roundup, were "safer than table salt" and "practically non-toxic" to mammals, birds, and fish. Among the representations the NYAG found deceptive and misleading about the human and environmental safety of Roundup are the following:

a)    "Remember that environmentally friendly Roundup herbicide is biodegradable. It won't built up in the soil so you can use Roundup with confidence along customers' driveways, sidewalks and fences . . . ."

b)    "And remember that Roundup is biodegradable and won't build up in the soil. That will give you the environmental confidence you need to use Roundup everywhere you've got a weed, brush, edging or trimming problem."

c)    "Roundup biodegrades into naturally occurring elements."

d)    "Remember that versatile Roundup herbicide stays where you put it. That means there's no washing or leaching to harm customers' shrubs or other desirable vegetation."

e)    "This non-residual herbicide will not wash or leach in the soil. It . . . stays where you apply it."

f)    You can apply Roundup with "confidence because it will stay where you put it," it bonds tightly to soil particles, preventing leaching. Then, soon after application, soil microorganisms biodegrade Accord into natural products.

g)    "Glyphosate is less toxic to rats than table salt following acute oral ingestion."

///

///

MATERN LAW GROUP
1230 ROSECRANS
AVENUE, STE 200
MANHATTAN
BEACH, CA 90266

`                                                     7                                    COMPLAINT

h)   "Glyphosate's safety margin is much greater than required. It has over a 1,000-fold safety margin in food and over a 700-fold safety margin for workers who manufacture or use it."

i)   "You can feel good about using herbicides by Monsanto. They carry a toxicity category rating of 'practically non-toxic' as it pertains to mammals, birds and fish."

j)   "Roundup can be used where kids and pets play and breaks down into natural material." This ad depicts a person with his head in the ground and a pet dog standing in the area which has been treated with Roundup.

28.   On November 19, 1996, Monsanto entered into an Assurance of Discontinuance with NYAG, which Monsanto agreed, among other things, to "cease and desist from publishing or broadcasting any advertisements [in New York] that represent, directly or by implication" that:

a)   its glyphosate-containing pesticide products or any component thereof are safe, nontoxic, harmless or free from risk;
b)   its glyphosate-containing pesticide products or any component thereof manufactured, formulated, distributed, or sold by Monsanto are biodegradable;

c)   its glyphosate-containing pesticide products or any component thereof will stay where they are applied under all circumstances and will not move through the environment by any means;

d)   its glyphosate-containing pesticide products or any component thereof are "good" for the environment or are "known for their environmental characteristics";

e)   glyphosate-containing pesticide products or any component thereof are safer or less toxic than common consumer products other than herbicides; and,

f)   its glyphosate-containing products or any component thereof might be classified as "practically non-toxic."

29.   Monsanto did not alter its advertising in the same manner in any state other than New York, and on information and belief still has not done so today.

30.   In 2009, France's highest court ruled that Monsanto had not told the truth about the safety of Roundup. The French court affirmed an earlier judgment that Monsanto had falsely advertised its herbicide Roundup as "biodegradable" and that it "left the soil clean."

///

MATERN LAW GROUP
1230 ROSECRANS
AVENUE, STE 200
MANHATTAN
BEACH, CA 90266

`                                                    8                                    COMPLAINT

## ASSESSMENTS OF GLYPHOSATE

31.     The International Agency for Research on Cancer (IARC) process for the classification of glyphosate followed stringent procedures for the evaluation of a chemical agent. Over time, the IARC Monograph program has reviewed 980 agents. Of those reviewed, it has determined 116 agents known to be Group 1 ("Known Human Carcinogens"); 73 agents to be in Group 2A ("Probable Human Carcinogens"); 287 agents to be in Group 2B ("Possible Human Carcinogens"); 503 agents to be in Group 3 ("Not Classified"); and one agent to be "Probably Not Carcinogenic."

32.     The established procedure for IARC Monograph evaluations is described in the IARC Program's preamble. Evaluations are performed by panels of international experts, selected on the basis of their expertise and the absence of actual or apparent conflicts of interest.

33.     In assessing an agent, the IARC Working Group reviews the following information: (a) human, experimental, and mechanistic data; (b) all pertinent epidemiological studies and cancer bioassays; and (c) representative mechanistic data. The studies must be publicly available and have sufficient detail for meaningful review, and reviewers cannot be associated with the underlying study.

34.     In March 2015, IARC reassessed glyphosate. The summary published in *The Lancet Oncology* reported that glyphosate is a Group 2A agent and probably carcinogenic in humans.

35.     On July 29, 2015, IARC issued its Monograph for glyphosate, Monograph 112. For Volume 112, the volume that assessed glyphosate, the Working Group consisted of 17 experts from 11 countries who met from March 3–10, 2015, to assess the carcinogenicity of certain herbicides, including glyphosate. The March meeting culminated after a nearly one-year review and preparation by the IARC Secretariat and the Working Group, including a comprehensive review of the latest available scientific evidence. According to published procedures, the

MATERN LAW GROUP
1230 ROSECRANS
AVENUE, STE 200
MANHATTAN
BEACH, CA 90266

`                                    9                        COMPLAINT

Working Group considered "reports that have been published or accepted for publication in the openly available scientific literature" as well as "data from governmental reports that are publicly available."

36.    The studies considered the various exposure groups, including occupational exposure of farmers and tree nursery workers in the United States, forestry workers in Canada and Finland, municipal weed-control workers in the United Kingdom, and para-occupational exposure in farming families.

37.    Glyphosate was identified as the second-most used household herbicide in the United States for weed control between 2001 and 2007 and the most heavily used herbicide in the world in 2012.

38.    Exposure pathways are identified as air (especially during spraying), water, and food. Community exposure to glyphosate is widespread and found in soil, air, surface water, and groundwater, as well as in food.

39.    The assessment of the IARC Working Group identified several case control studies of occupational exposure in the United States, Canada, and Sweden. These studies showed a human health concern from agricultural and other work-related exposure to glyphosate.

40.    The IARC Working Group conducted a systematic review of over fifteen studies designed to assess whether there was an association between Roundup exposure in agricultural workers and Myeloma. The researchers reviewed each study, identified the results and assessed each study's strengths and weaknesses. The IARC Working Group concluded that, despite the limited evidence concerning the carcinogenicity of glyphosate in humans, a "positive association has been observed for non-Hodgkin lymphoma."

41.    In male CD-1 mice, glyphosate induced a positive trend in the incidence of a rare tumor, renal tubule carcinoma. A second study reported a positive trend for haemangiosarcoma in male mice. Glyphosate increased pancreatic islet-cell adenoma in male rats in two studies. A glyphosate formulation

MATERN LAW GROUP
1230 ROSECRANS
AVENUE, STE 200
MANHATTAN
BEACH, CA 90266

`                                         10                              COMPLAINT

promoted skin tumors in an initiation-promotion study in mice.

42.     The IARC Working Group also found that glyphosate caused DNA and chromosomal damage in human cells. One study reported increases in blood markers of chromosomal damage after glyphosate formulations were sprayed. In assessing the genotoxicity of glyphosate (the property of chemical agents that damages the genetic information within a cell causing mutations, which may lead to cancer), the IARC Working Group concluded "[t]here is strong evidence that glyphosate causes genotoxicity."

43.     The IARC Working Group also reviewed an Agricultural Health Study, consisting of a prospective cohort of 57,311 licensed pesticide applicators in Iowa and North Carolina. While this study differed from others in that it was based on a self-administered questionnaire, the results support an association between glyphosate exposure and Multiple Myeloma, Hairy Cell Leukemia (HCL), and Chronic Lymphocytic Leukemia (CLL), in addition to several other cancers.

44.     In addition to the IARC's assessment, in 2014, scientists published a systematic review and meta-analysis on the relationship between MYELOMA and occupational exposure to agricultural pesticides, including glyphosate, in the *International Journal of Environmental Research and Public Health*. The study showed a statistically significant association between farm workers exposed to Roundup and MYELOMA. The study confirmed two smaller studies from 2002 and 2008, published in the journal *Leukemia & Lymphoma* (2002) and the *International Journal on Cancer* (2008), both of which also showed a statistically significant increase in MYELOMA among agricultural workers exposed to glyphosate.

45.     Recent studies, including a glyphosate residue study published in the *Journal of Environmental & Analytical Toxicology* in 2014, indicate that "chronically ill humans showed significantly higher glyphosate residues in urine than healthy population." Glyphosate has been detected in the blood and urine of

MATERN LAW GROUP
1230 ROSECRANS
AVENUE, STE 200
MANHATTAN
BEACH, CA 90266

11                        COMPLAINT

agricultural workers, indicating that agricultural use of Roundup leads to its absorption.

46.    In 1995, the Northwest Coalition for Alternatives to Pesticides reported that, in California, which has the most comprehensive program for reporting pesticide-caused illness, glyphosate was the third-most reported cause of pesticide illness among agricultural workers.

47.    Many countries around the world have instituted bans on the sale of Roundup and other glyphosate-containing herbicides, both before and since IARC first announced its assessment for glyphosate in March 2015. To date, nations including Belgium, Canada, Sri Lanka, Germany, India, Malawi, Portugal, Colombia, and Vietnam have banned glyphosate or restricted its use in some form. More countries undoubtedly will follow suit as the dangers of the use of Roundup are more widely known.

48.    In late 2015, following a public comment period, the State of California's Office of Environmental Health Hazard Assessment (OEHHA) has determined to list glyphosate as an agent "known to the state to cause cancer" pursuant to Proposition 65.

49.    In November 2015, 96 prominent experts, including almost the whole IARC team, reiterated IARC's assessment that Roundup is probably a human carcinogen.

50.    In late February 2016, another fourteen scientists signed a consensus statement in the Environmental Health journal, saying regulatory estimates of tolerable exposure levels for glyphosate were based on outdated science.

## PLAINTIFF'S EXPOSURE TO ROUNDUP AND SUBSEQUENT DIAGNOSIS OF MILTIPLE MYELOMA

51.    Plaintiff used Roundup beginning of early October 2009 at the Cagwin & Dorward properties where he worked. During the course of his job, he used Roundup as part of his job.

MATERN LAW GROUP
1230 ROSECRANS
AVENUE, STE 200
MANHATTAN
BEACH, CA 90266

`                                          12                              COMPLAINT

52.     When he sprayed Roundup, Plaintiff necessarily inhaled the fumes, and the pesticide would blow his face in the wind. Plaintiff was exposed to Roundup on a consistent basis through the end of February 2021.

53.     In or around September 2020, he was diagnosed with multiple myeloma. In or around January 2021, he started chemotherapy. During those months, Plaintiff suffered severe physical pain and mental and emotional anguish. Plaintiff is still in pain, continues chemotherapy once a week, and is taking chemotherapy pills called Pomalyst 21 days and 7 days off and successively 21 days and 7 days off. In April 2021, Plaintiff was fired from his well-paying job due to his symptoms. Plaintiff still experiences physical and mental damage, including bone pain, joint pain, back pain, mental anguish, exhaustion, and depression. He continually monitors his health with his oncologist because his multiple myeloma has not been cured.  It was not until 2022 that Plaintiff learned of the connection between his use of Roundup and his cancer.

**STATUTE OF LIMITATIONS FOR INJURY ACTIONS BASED ON EXPOSURE TO A HAZARDOUS MATERIAL OR TOXIC SUBSTANCE**

54.     An action for injuries based on exposure to toxic substances is governed by the statute of limitations set forth in the California Code of Civil Procedure section 340.8. This statute specifies that the statute of limitations for a claim relating to exposure to hazardous materials or toxic substances is two years either after the injury, or two years after the plaintiff becomes aware of, or reasonably should have become aware of, "(1) an injury, (2) the physical cause of the injury, and (3) sufficient facts to put a reasonable person on inquiry notice that the injury was caused or contributed to by the wrongful act of another, whichever occurs later." Cal. Civ. Proc. § 340.8(a).

55.     Plaintiff was diagnosed with multiple myeloma in 2021, but did not become aware of its cause until reading news reports of the ongoing litigation of claims brought against Defendants by similarly aggrieved parties in April, 2022.

MATERN LAW GROUP
1230 ROSECRANS
AVENUE, STE 200
MANHATTAN
BEACH, CA 90266

`                                        13                        COMPLAINT

During the years between his use of the product and his diagnosis, Plaintiff did not have access to information about Roundup's carcinogenic properties because of Defendants' fraudulent concealment of the truth. Defendants continuously advertised Roundup as a safe product. This is explored in further detail below. Even skilled physicians could not know the true cause of this disease due to Defendants' fraudulent concealment. Since Plaintiff only just discovered the physical cause of his injury in April 2022, the statute of limitations does not bar his claims.

**EQUITABLE TOLLING OF APPLICABLE STATUTE OF LIMITATIONS**

56.     Furthermore, the running of any statute of limitations has also been tolled by reason of Defendant's fraudulent concealment. Defendants, through their affirmative misrepresentations and omissions, actively concealed from Plaintiff or misrepresented the true risks associated with Roundup and glyphosate. Indeed, even as of June 2020, Defendants continue to insist that glyphosate is safe.

57.     As a result of Defendants' actions, Plaintiff was unaware, and could not reasonably know or have learned through reasonable diligence, that Roundup and/or glyphosate contact exposed Plaintiff to the risks alleged herein and that those risks were the direct and proximate result of Defendants' acts and omissions.

58.     Furthermore, Defendants are estopped from relying on any statute of limitations because of their fraudulent concealment of the true character, quality, and nature of Roundup. Defendants were under a duty to disclose these factors because this was non-public information over which Defendants had and continue to have exclusive control, and because Defendants knew that this information was not available to Plaintiff or to distributors of Roundup. In addition, Defendants are estopped from relying on any statute of limitations because of their intentional concealment of these facts.

59.     Plaintiff had no knowledge that Defendants were engaged in the wrongdoing alleged herein. Because of the fraudulent acts of concealment of wrongdoing by Defendants, Plaintiff could not have reasonably discovered the

MATERN LAW GROUP
1230 ROSECRANS
AVENUE, STE 200
MANHATTAN
BEACH, CA 90266

`                                    14                                    COMPLAINT

wrongdoing at any time prior. Also, the economics of this fraud should be considered. Defendants spent enormous amounts of money in furtherance of their purpose of marketing, promoting, and/or distributing a profitable herbicide, notwithstanding the known or reasonably known risks. Plaintiff and medical professionals could not have afforded and could not have possibly conducted studies to determine the nature, extent, and identity of related health risks, and were forced to rely on only the Defendants' representations. Accordingly, Defendants are precluded by the discovery rule and/or the doctrine of fraudulent concealment from relying upon any statute of limitations.

**FIRST COUNT**

**(NEGLIGENCE)**

**(Against All Defendants)**

60.     Defendants had a duty to exercise reasonable care in the designing, researching, testing, manufacturing, supplying, promoting, packaging, sale, and/or distribution of Roundup into the stream of commerce, including a duty to assure that the product would not cause users to suffer unreasonable, dangerous side effects.

61.     Defendants failed to exercise ordinary care in the designing, researching, testing, manufacturing, supplying, promoting, packaging, sale, testing, quality assurance, quality control, and/or distribution of Roundup into interstate commerce in that Defendants knew or should have known that using Roundup created a high risk of unreasonable, dangerous side effects, including, but not limited to, the development of myeloma, as well as other severe and personal injuries which are permanent and lasting in nature, such physical pain and mental anguish, including diminished enjoyment of life, as well as the need for lifelong medical treatment, monitoring, and/or medication.

62.     The negligence by the Defendants, their agents, servants, and/or employees, included but was not limited to the following acts and/or omissions:

MATERN LAW GROUP
1230 ROSECRANS
AVENUE, STE 200
MANHATTAN
BEACH, CA 90266

15                                    COMPLAINT

a.    Manufacturing, producing, promoting, formulating, creating, and/or designing Roundup without thoroughly testing it;

b.    Failing to test Roundup and/or failing to adequately, sufficiently, and properly test Roundup;

c.    Not conducting sufficient testing programs to determine whether or not Roundup was safe for use; in that Defendants knew or should have known that Roundup was unsafe and unfit for use by reason of the dangers to its users;

d.    Not conducting sufficient testing programs and studies to determine Roundup's carcinogenic properties even after Defendants had knowledge that Roundup is, was, or could be carcinogenic;

e.    Failing to conduct sufficient testing programs to determine the safety of "inert" ingredients and/or adjuvants contained within Roundup, and the propensity of these ingredients to render Roundup toxic or increase its toxicity; to determine whether these ingredients are carcinogenic or magnify Roundup's carcinogenic properties; and whether or not "inert" ingredients and/or adjuvants were safe for use;

f.    Negligently failing to adequately and correctly warn the Plaintiff, the public, the medical and agricultural professions, and the EPA of the dangers of Roundup;

g.    Negligently failing to petition the EPA to strength the warnings associated with Roundup;

h.    Failing to provide adequate cautions and warnings to protect the health of users, handlers, applicators, and persons who would reasonably and foreseeably come into contact with Roundup;

i.    Negligently marketing, advertising, and recommending the use of Roundup without sufficient knowledge of its dangerous propensities;

j.    Negligently representing that Roundup was safe for use for its intended purpose, and/or that Roundup was safer than ordinary and common items such as table salt, when, in fact, it was unsafe;

k.    Negligently representing that Roundup had equivalent safety and efficacy as other forms of herbicides;

l.    Negligently designing, manufacturing, producing, and formulating Roundup in a manner which was dangerous to its users;

m.    Concealing information from the Plaintiff while knowing that Roundup was unsafe, dangerous, and/or non-conforming with EPA regulations;

n.    Improperly concealing and/or misrepresenting information from the Plaintiff, scientific and medical professionals, and/or the

MATERN LAW GROUP
1230 ROSECRANS
AVENUE, STE 200
MANHATTAN
BEACH, CA 90266

16                                                            COMPLAINT

EPA, concerning the severity of risks and dangers of Roundup compared to other forms of herbicides; and

o.   Negligently selling Roundup with a false and misleading label.

63.   Defendants under-reported, underestimated, and downplayed the serious dangers of Roundup.

64.   Defendants negligently and deceptively compared the safety risks and/or dangers of Roundup with common everyday foods such as table salt and other forms of herbicides.

65.   Defendants were negligent and/or violated California law in the designing, researching, supplying, manufacturing, promoting, packaging, distributing, testing, advertising, warning, marketing, and selling of Roundup in that they:

a.   Failed to use ordinary care in designing and manufacturing Roundup so as to avoid the aforementioned risks to individuals when Roundup was used as an herbicide;

b.   Failed to accompany their product with proper and/or accurate warnings regarding all possible adverse side effects associated with the use of Roundup;

c.   Failed to accompany their product with proper warnings regarding all possible adverse side effects concerning the failure and/or malfunction of Roundup;

d.   Failed to accompany their product with accurate warnings regarding the risks of all possible adverse side effects concerning Roundup;

e.   Failed to warn Plaintiff of the severity and duration of such adverse effects, as the warnings given did not accurately reflect the symptoms, or severity of the side effects including, but not limited to, the development of MYELOMA;

f.   Failed to conduct adequate testing, clinical testing and post-marketing surveillance to determine the safety of Roundup;

g.   Failed to conduct adequate testing, clinical testing, and post-marketing surveillance to determine the safety of Roundup's "inert" ingredients and/or adjuvants;

h.   Negligently misrepresented the evidence of Roundup's genotoxicity and carcinogenicity;

i.   Were otherwise negligent.

MATERN LAW GROUP
1230 ROSECRANS
AVENUE, STE 200
MANHATTAN
BEACH, CA 90266

`                                        17                          COMPLAINT

66.     Despite the fact that Defendants knew or should have known that Roundup caused, or could cause, unreasonably dangerous side effects, Defendants continued and continue to market, manufacture, distribute, and/or sell Roundup to consumers, including Plaintiff.

67.     Defendants knew or should have known that consumers such as Plaintiff would foreseeably suffer injury as a result of Defendants' failure to exercise ordinary care, as set forth above.

68.     Defendants' violations of law and/or negligence were the proximate cause of Plaintiff's injuries, harm and economic loss, which Plaintiff suffered and will continue to suffer.

69.     As a result of the foregoing acts and omissions, the Plaintiff suffered from serious and dangerous side effects including, but not limited to, myeloma, as well as other severe and personal injuries which are permanent and lasting in nature, physical pain and mental anguish, diminished enjoyment of life, and financial expenses for hospitalization and medical care. Further, Plaintiff suffered life-threatening myeloma and severe personal injuries, which are permanent and lasting in nature, including physical pain, mental anguish, and diminished enjoyment of life.

70.     WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in Plaintiff's favor for compensatory and punitive damages, together with interest, costs herein incurred, attorney's fees, and all relief as this Court deems just and proper. Additionally, Plaintiff demands a jury trial on all issues contained herein.

## SECOND COUNT
## (STRICT PRODUCTS LIABILITY—DESIGN DEFECT)
## (Against all Defendants)

71.     At all times herein mentioned, the Defendants designed, researched, manufactured, tested, advertised, promoted, sold, distributed, and/or have acquired

MATERN LAW GROUP
1230 ROSECRANS
AVENUE, STE 200
MANHATTAN
BEACH, CA 90266

`                                          18                                          COMPLAINT

the Defendants who have designed, researched, manufactured, tested, advertised, promoted, sold, and distributed Roundup as hereinabove described that was used by the Plaintiff.

72.    Defendants' Roundup was expected to and did reach the usual consumers, handlers, and persons coming into contact with said product without substantial change in the condition in which it was produced, manufactured, sold, distributed, and marketed by the Defendants.

73.    At those times, Roundup was in an unsafe, defective, and inherently dangerous condition, which was dangerous to users, and in particular, the Plaintiff herein.

74.    The Roundup designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed by Defendants was defective in design or formulation in that, when it left that hands of the manufacturer and/or suppliers, the foreseeable risks exceeded the benefits associated with the design of formulation of Roundup.

75.    The Roundup designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed by Defendants was defective in design and/or formulation, in that, when it left the hands of the Defendants' manufacturers and/or suppliers, it was unreasonably dangerous, unreasonably dangerous in normal use, and it was more dangerous than an ordinary consumer would expect.

76.    At all times herein mentioned, Roundup was in a defective condition and unsafe, and Defendants knew or had reason to know that said product was defective and unsafe, especially when used in the form and manner as provided by the Defendants. In particular, Defendants' Roundup was defective in the following ways:

a.    When placed in the stream of commerce, Defendants' Roundup products were defective in design and formulation and, consequently, dangerous to an extent beyond that which an ordinary consumer would anticipate;

b.    When placed in the stream of commerce, Defendants' Roundup products were unreasonably dangerous in that they were

MATERN LAW GROUP
1230 ROSECRANS
AVENUE, STE 200
MANHATTAN
BEACH, CA 90266

`                                      19                                      COMPLAINT

hazardous and posed a grave risk of cancer and other serious illnesses when used in a reasonably anticipated manner;

c. When placed in the stream of commerce, Defendants' Roundup products contained unreasonably dangerous design defects and were not reasonably safe when used in a reasonably anticipated manner;

d. Defendants did not sufficiently test, investigate, or study its Roundup products;

e. Exposure to Roundup presents a risk of harmful side effects that outweigh any potential utility stemming from the use of the herbicide;

f. Defendants new or should have known at the time of marketing its Roundup products that exposure to Roundup and could result in cancer and other severe illnesses and injuries;

g. Defendants did not conduct adequate post-marketing surveillance of its Roundup products.

77. Defendants knew, or should have known at all times herein mentioned its Roundup was in a defective condition, and was and is inherently dangerous and unsafe.

78. Plaintiff was exposed to Defendants' Roundup while caring for his home, as described above, without knowledge of Roundup's dangerous characteristics.

79. At the time of the Plaintiff's use of and exposure to Roundup, Roundup was being used for the purposes and in a manner normally intended, as a broad-spectrum herbicide.

80. Defendants, with knowledge of such a use, voluntarily designed its Roundup with a dangerous condition for use by the public, and in particular the Plaintiff.

81. Defendants had a duty to create a product that was not unreasonably dangerous for its normal, intended use.

82. Defendants created a product that was and is unreasonably dangerous for its normal, intended use.

///

MATERN LAW GROUP
1230 ROSECRANS
AVENUE, STE 200
MANHATTAN
BEACH, CA 90266

20                                    COMPLAINT

83.     Defendants marketed and promoted a product in such a manner so as to make it inherently defective as the product downplayed its suspected, probable, and established health risks inherent with its normal, intended use.

84.     The Roundup designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed by Defendants was manufactured defectively in that Roundup left the hands of Defendants in a defective condition and was unreasonably dangerous to its intended users.

85.     The Roundup designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed by Defendants reached their intended users in the same defective and unreasonably dangerous condition in which the Defendants' Roundup was manufactured.

86.     Defendants designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed a defective product, which created an unreasonable risk to the health of consumers and to Plaintiff in particular, and Defendants are therefore strictly liable for the injuries sustained by Plaintiff.

87.     Plaintiff could not, by the exercise of reasonable care, have discovered Roundup's defects herein mentioned or perceived its danger.

88.     By reason of the foregoing, the Defendants have become strictly liable to the Plaintiff for the manufacturing, marketing, promoting, distribution, and selling of a defective product, Roundup.

89.     Defendants' defective design, of Roundup amounts to willful, wanton, and/or reckless conduct by Defendants.

90.     Defects in Defendants' Roundup were the cause or a substantial factor in causing Plaintiff's injuries.

91.     As a result of the foregoing acts and omissions, Plaintiff developed myeloma, and suffered severe and personal injuries, which are permanent and lasting in nature, including physical pain and mental anguish, diminished enjoyment of life, and financial expenses for hospitalization and medical care.

MATERN LAW GROUP
1230 ROSECRANS
AVENUE, STE 200
MANHATTAN
BEACH, CA 90266

`                                    21                        COMPLAINT

92.     WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in Plaintiff's favor for compensatory and punitive damages, together with interest, costs herein incurred, attorney's fees, and all relief as this Court deems just and proper. Additionally, Plaintiff demands a jury trial on all issues contained herein.

### THIRD COUNT
### (STRICT PRODUCTS LIABILITY—FAILURE TO WARN)
### (Against all Defendants)

93.     Defendants have engaged in the business of selling, testing, distributing, supplying, manufacturing, marketing, and/or promoting Roundup, and through that conduct have knowingly and intentionally placed Roundup into the stream of commerce with full knowledge that it reaches consumers such as Plaintiff who are exposed to it through ordinary and reasonably foreseeable uses.

94.     Defendants did in fact sell, distribute, supply, manufacture, and/or promote Roundup to Plaintiff. Additionally, Defendants expected the Roundup that they were selling, distributing, supplying, manufacturing, and/or promoting to reach—and Roundup did in fact reach—consumers, including Plaintiff, without any substantial change in the condition of the product from when it was initially distributed by Defendants.

95.     At the time of manufacture, Defendants could have provided the warnings or instructions regarding the full and complete risks of Roundup and glyphosate-containing products because they knew or should have known of the unreasonable risks of harm associated with the use of and/or exposure to such products.

96.     At all times herein mentioned, the aforesaid product was defective and unsafe in manufacture such that it was unreasonably dangerous to the user, and was so at the time it was distributed by Defendants and at the time Plaintiff was exposed

MATERN LAW GROUP
1230 ROSECRANS
AVENUE, STE 200
MANHATTAN
BEACH, CA 90266

`                                          22                          COMPLAINT

to and/or ingested the product. The defective condition of Roundup was due in part to the fact that it was not accompanied by proper warnings regarding its carcinogenic qualities and possible side effects, including, but not limited to, developing myeloma as a result of exposure and use.

97.   Roundup did not contain a warning or caution statement, which was necessary and, if complied with, was adequate to protect the health of those exposed, violated 7 U.S.C. § 136(j)(a)(1)(E) as well as the laws of the state of California.

98.   Defendants could have amended the label of Roundup to provide additional warnings.

99.   This defect caused serious injury to Plaintiff, who used Roundup in its intended and foreseeable manner.

100.   At all times herein mentioned, Defendants had a duty to properly design, manufacture, compound, test, inspect, package, label, distribute, market, examine, maintain supply, provide proper warnings, and take such steps to assure that the product did not cause users to suffer from unreasonable and dangerous side effects.

101.   Defendants labeled, distributed, and promoted the aforesaid product that it was dangerous and unsafe for the use and purpose for which it was intended.

102.   Defendants failed to warn of the nature and scope of the side effects associated with Roundup, namely its carcinogenic properties and its propensity to cause or serve as a substantial contributing factor in the development of MYELOMA.

103.   Defendants were aware of the probable consequences of the aforesaid conduct. Despite the fact that Defendants knew or should have known that Roundup caused serious injuries, Defendants failed to exercise reasonable care to warn of the dangerous carcinogenic properties and side effect of developing MYELOMA from Roundup exposure, even though these side effects were known

MATERN LAW GROUP
1230 ROSECRANS
AVENUE, STE 200
MANHATTAN
BEACH, CA 90266

`                                                    23                              COMPLAINT

or reasonably scientifically knowable at the time of distribution. Defendants willfully and deliberately failed to avoid the consequences associated with their failure to warn, and in doing so, Defendants acted with a conscious disregard for the safety of Plaintiff.

104. At the time of exposure, Plaintiff could not have reasonably discovered any defect in Roundup prior through the exercise of reasonable care.

105. Defendants, as the manufacturers and/or distributors of the subject product, are held to the level of knowledge of an expert in the field.

106. Plaintiff reasonably relied upon the skill, superior knowledge, and judgment of Defendants.

107. Had Defendants properly disclosed the risks associated with Roundup, Plaintiff would have avoided the risk of myeloma by not using Roundup.

108. The information that Defendants did provide or communicate failed to contain adequate warnings and precautions that would have enabled Plaintiff, and similarly situated individuals, to utilize the product safely and with adequate protection. Instead, Defendants disseminated information that was inaccurate, false, and misleading and which failed to communicate accurately or adequately the comparative severity, duration, and extent of the risk of injuries associated with use of and/or exposure to Roundup and glyphosate; continued to promote the efficacy of Roundup, even after it knew or should have known of the unreasonable risks from use or exposure; and concealed, downplayed, or otherwise suppressed, through aggressive marketing and promotion, any information or research about the risks and dangers of exposure to Roundup and glyphosate.

109. To this day, Defendants have failed to adequately warn of the true risks of Plaintiff's injuries associated with the use of and exposure to Roundup.

110. As a result of their inadequate warnings, Defendants' Roundup products were defective and unreasonably dangerous when they left the possession and/or control of Defendant, were distributed by Defendant, and used by Plaintiff.

MATERN LAW GROUP
1230 ROSECRANS
AVENUE, STE 200
MANHATTAN
BEACH, CA 90266

`                                                    24                              COMPLAINT

111.  As a direct and proximate result of Defendants' actions as alleged herein, and in such other ways to be later shown, the subject product caused Plaintiff to sustain injuries as herein alleged.

112.  WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in Plaintiff's favor for compensatory and punitive damages, together with interest, costs herein incurred, attorney's fees, and all relief as this Court deems just and proper. Additionally, Plaintiff demands a jury trial on all issues contained herein.

## FOURTH COUNT
## (BREACH OF IMPLIED WARRANTIES)
## (Against all Defendants)

113.  At all times herein mentioned, the Defendants manufactured, distributed, compounded, recommended, merchandized, advertised, promoted, and sold Roundup and/or have acquired the Defendants who have manufactured, compound portrayed, distributed, recommended, merchandized, advertised, promoted and sold Roundup, as a broad spectrum herbicide. These actions were under the ultimate control and supervision of Defendants.

114.  At the time Defendants marketed, sold, and distributed Roundup for use by Plaintiff, Defendants knew of Roundup's intended use and impliedly warranted the product to be or merchantable quality and safe and fit for this use.

115.  Defendants impliedly represented and warranted to Plaintiff and users of Roundup, the agricultural community, and/or the EPA that Roundup was safe and of merchantable quality and fit for the ordinary purpose for which it was to be used.

116.  These representations and warranties were false, misleading, and inaccurate in that Roundup was unsafe, unreasonably dangerous, not of merchantable quality, and defective.

///

MATERN LAW GROUP
1230 ROSECRANS
AVENUE, STE 200
MANHATTAN
BEACH, CA 90266

`                                          25                                          COMPLAINT

117.   Plaintiff and/or the EPA relied on said implied warranty of merchantability of fitness for particular use and purpose.

118.   Plaintiff reasonably relied upon the skill and judgment of Defendants as to whether Roundup was of merchantable quality and safe and fit for its intended use.

119.   Roundup was injected into the stream of commerce by Defendants in a defective, unsafe, and inherently dangerous condition, and the products' materials were expected to and did reach users, handlers, and persons coming into contact with said products without substantial change in the condition in which they were sold.

120.   Defendants breached the aforesaid implied warranties, as their herbicide Roundup was not fit for its intended purposes and uses.

121. As a result of the foregoing acts and omissions, Plaintiff suffered from Myeloma. Subsequently, he suffered severe and personal injuries which are permanent and lasting in nature, including physical pain and mental anguish, diminished enjoyment of life, financial expenses for hospitalization and medical care, including medical expenses and other economic and non-economic damages.

122. WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in Plaintiff's favor for compensatory and punitive damages, together with interest, costs herein incurred, attorney's fees, and all relief as this Court deems just and proper. Additionally, Plaintiff demands a jury trial on all issues contained herein.

## JURY TRIAL DEMAND

123. Plaintiff demands a trial by jury on all of the triable issues within this pleading.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment against the Defendants on each of the above-referenced claims and causes of action as follows:

MATERN LAW GROUP
1230 ROSECRANS
AVENUE, STE 200
MANHATTAN
BEACH, CA 90266

`                                        26                        COMPLAINT

124. Awarding compensatory damages in excess of the jurisdictional amount, including, but not limited to,  pain, suffering, emotional distress, loss of enjoyment of life, and other non-economic damages in an amount to be determined at trial of this action;

125. Awarding compensatory damages to Plaintiff for past and future damages, including, but not limited to, Plaintiff's pain and suffering and for severe and permanent personal injuries sustained by the Plaintiff including healthcare costs and economic loss;

126. Awarding economic damages in the form of medical expenses, out-of-pocket expenses, lost earnings and other economic damages in an amount to be determine at trial of this action;

127. Punitive and/or exemplary damages for the wanton, willful, fraudulent, and reckless acts of the Defendants who demonstrated a complete disregard and reckless indifference for the safety and welfare of the general public and to the Plaintiff in an amount sufficient to punish Defendants and deter future similar conduct, to the extent allowed by applicable law;

128. Pre-judgment interest;

129. Post-judgment interest;

130. Awarding Plaintiff reasonable attorney's fees;

131. Awarding Plaintiff the costs of these proceedings; and

132. Such other and further relief as this Court deems just and proper.

///

///

///

///

///

///

///

MATERN LAW GROUP
1230 ROSECRANS
AVENUE, STE 200
MANHATTAN
BEACH, CA 90266

`

27                                                           COMPLAINT

1  DATED: May 25, 2023

Respectfully submitted,

2
**MATERN LAW GROUP, PC**

3

4  By:  /s/ *Joshua D. Boxer*

5  Matthew J. Matern
Joshua D. Boxer
6  Attorneys for Plaintiff
JUAN DELGADO ZARATE
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MATERN LAW GROUP
1230 ROSECRANS
AVENUE, STE 200
MANHATTAN
BEACH, CA 90266

`

28                                                                    COMPLAINT