GALIHER DeROBERTIS & WAXMAN LLP

| | |
|---|---|
| L. RICHARD DeROBERTIS | 3179 |
| ILANA K. WAXMAN | 8733 |
| ALLISON M. AOKI | 6912 |
| ALYSSA R. SEGAWA | 9798 |
| CHRISTOPHER L. JOHNSON | 11389 |
| PETER A. KRAUS | 10912 |

820 Mililani Street, Suite 505
Honolulu, Hawai'i 96813
Telephone: (808) 597-1400
Facsimile: (808) 591-2608
E-mail:    richard.derobertis@galiherlaw.com
          ilana.waxman@galiherlaw.com
          allison.aoki@galiherlaw.com
          alyssa.segawa@galiherlaw.com
          christopher.johnson@galiherlaw.com
          kraus@waterskraus.com

Attorneys for Plaintiffs

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF HAWAI'I

| | |
|---|---|
| **ARVILLE MANGOBA** | Civ. Action No. 1:23-cv-248 (Toxic Tort/Personal Injury) |
| Plaintiff, | |
| | COMPLAINT; SUMMONS |
| v. | |
| **MONSANTO COMPANY** | |
| Defendant. | |

# TABLE OF CONTENTS

PAGE

NATURE OF THE CASE ............................................................................. 4

PARTIES......................................................................................................8

JURISDICTION AND VENUE.................................................................... 9

FACTUAL BACKGROUND ........................................................................ 9

    Plaintiffs Exposure to Roundup & PCBs Caused his Cancer........................... 9

    Defendants' Corporate Structure ................................................. 10

    PCBs................................................................................ 12

    Roundup ............................................................................ 16

    The Importance of Roundup to Monsanto's Market Dominance and
    Profits ............................................................................. 19

    Scientific Fraud Underlying the Testing of Glyphosate/Roundup ............... 20

    Monsanto's Misrepresentations Regarding the Safety of Roundup ............... 23

    IARC Classification of Glyphosate ................................................ 26

    Other Findings about Glyphosate's Dangers to Human Health ..................... 31

    The EPA's Review of Glyphosate.................................................. 32

    Monsanto's Inside Governmental Ties............................................. 34

    Recent Bans on Roundup/Glyphosate ............................................. 36

    EFSA Report on Glyphosate ....................................................... 37

    Leading Scientists Dispute EFSA's Conclusion................................... 39

    Toxicity of Other Ingredients in Roundup........................................ 43

    Statement of Concern Regarding Glyphosate-Based Herbicides .................. 48

    Discovery Rule .................................................................... 51

CAUSES OF ACTION ............................................................................... 52

COUNT I STRICT LIBABILITY – DESIGN DEFECT (NEW MONSANTO)...
................................................................................................................ 52

COUNT II STRICT LIABILITY – FAILURE TO WARN (NEW
MONSANTO) .............................................................................................. 56

COUNT III NEGLIGENCE (NEW MONSANTO) ..................................... 59

COUNT IV BREACH OF IMPLIED WARRANTIES (NEW MONSANTO).....
................................................................................................................ 64

DAMAGES ................................................................................................. 67

PRAYER FOR RELIEF................................................................................ 69

## **COMPLAINT**

## **NATURE OF THE CASE**

1.      Monsanto is a chemical company. Through its history it has taken different shapes and forms, going so far as to take new names to shed its past misdeeds. Nonetheless, one thing has withstood the passage of time and formal name of the company, Monsanto's business model. In fact, Monsanto's business model is so ever-present it has endured across generations of personnel filtering in and out of the company's doors and through hundreds of chemical products over the last century. Monsanto's business model comes at the expense of the environment, scientific integrity, and the health of the communities Monsanto pretends to serve. In order to execute its plan, Monsanto engages in the habit, routine and practice of the following: the mass manipulation of the science about its chemical product, the mass manipulation of the public perception of the safety of its chemical product, and then a denial that any manipulation ever happened. Monsanto's historical road is littered with examples proving its habit, routine, and practice and generally speaking, it consists of:

     i.  Make a chemical product.

    ii.  Fail to adequately test the chemical product to determine its potential hazards.

iii.  Lie about what tests are necessary to determine the hazards associated with its chemical product.

iv.  When tests are performed showing potential dangers, deny them or falsify them. Corrupt the science to push a false narrative about the risks associated with the chemical product.

v.  Fund compromised scientists and "ghost-write" articles for them that falsely minimize the hazards of the chemical product.

vi.  Present that compromised and corrupt literature to regulatory agencies as "independent science" to obtain permission for further sales of the chemical product.

vii.  Withhold from the public and regulatory authorities what it knows about the true dangers of its chemical product.

viii.  Co-opt and infiltrate governmental regulatory authorities who are expressly charged with oversight of its chemical product for the precise purpose of avoiding adequate inspection.

ix.  Make proclamations – better fit for caricature than consequential consumption – that the chemical product is tested and safe in order to move regulatory and public opinion.

x. Peddle in the dark arts of the underbelly of public relations platforms to mislead the public anonymously and intentionally about the dangers of its chemical product.

xi. Attack those scientists or concerned citizens who question the safety of its chemical product either directly or through shady third-party public relations mercenaries.

xii. Extract as much money as possible from sales before the true dangers of the chemical product are revealed to regulatory agencies and an unsuspecting public.

xiii. Deny any of the above ever happened.

xiv. Make another chemical product.

2.    Over Monsanto's long history, the business model above has been encouraged, embraced, and implemented across decades and chemicals. It is not the result of some rogue employees trying to prove their worth by unscrupulous means; it is the substratum of the company's existence. It is designed to manipulate the regulatory system, obscure public safety, and forestall the complete truth about the dangers of its products from becoming known to the public and its product consumers.

3.    This case is about Monsanto's business model, habits, routines, and practices and their effect on Plaintiff ARVILLE MANGOBA, specifically through

the sale and distribution of two chemicals, polychlorinated biphenyls and Roundup herbicide.

4.     In the 1930s, Old Monsanto implemented its business model and began making and selling polychlorinated biphenyls (*PCBs*). PCBs are durable almost indestructible organochlorines — they have thermal stability, are resistant to chemicals, have high electrical resistivity, are not easily burned, and are not water soluble. Without first performing the necessary testing to determine health and safety risks, Monsanto began putting PCBs in open-application products — products from which PCBs can easily escape and permeate the environment. Because PCBs are so durable and because Old Monsanto did not confine them, today they pollute the world. They have burrowed into our food supply — into the beef, fish, chicken and pork we eat and into the dairy products we consume. As a result, it is probable that every living thing on the planet has some measurable amount of Monsanto's PCBs in their body as a result of Monsanto's negligent, willful, wonton, oppressive and grossly negligent acts. PCBs are also extremely toxic. According to all credible scientific health organizations across the globe, including The World Health Organization, PCBs cause cancer in people. And in 1977 Congress outlawed their production.

5.     Around the time Congress was proscribing PCBs, Monsanto was busy introducing a new toxic product onto the market — Roundup. Before Roundup's

release, Monsanto failed to properly test it to determine Roundup's risk and when Monsanto finally did test Roundup, it lied about the safety of Roundup and the health risks associated with its use. The World Health Organization has found glyphosate, the main ingredient in Roundup to be a probable human carcinogen. And that is before glyphosate is combined with the toxic surfactants and other ingredients Monsanto, in all its forms, puts into Roundup and that help glyphosate seep into the body and bones of Roundup users.

6.      As a result of Monsanto's business model, Plaintiff ARVILLE MANGOBA, like all of us, has ingested and been poisoned with Old Monsanto's PCBs. They are in his blood. He also used Roundup. His doctors recently diagnosed him with non-Hodgkin's lymphoma. Both Roundup and PCBs cause non-Hodgkin's lymphoma. He brings this lawsuit against those who poisoned him.

## PARTIES

7.      Plaintiff Arville Mangoba is a citizen of the State of Hawaii and resides in Honolulu County, within the jurisdiction of this Court.

8.      Defendant Monsanto Company ("New Monsanto" or "Monsanto") is a Delaware corporation with its headquarters and principal place of business in St. Louis County, Missouri and is a wholly owned subsidiary of Bayer Cropscience, L.P.

## JURISDICTION AND VENUE

9.      There is complete diversity between the parties, and so there is federal jurisdiction under 28 U.S.C. § 1332. Plaintiff is a citizen of Hawaii. He lives in and is domiciled in Hawaii; he has his true, fixed, and permanent home in Hawaii and intends to return to Hawaii whenever he is absent from Hawaii. Defendant MONSANTO COMPANY has its principal place of business in Missouri and is incorporated in Missouri, and so is not a citizen of Hawaii. A federal court would, therefore have subject-matter jurisdiction over this case under 28 U.S.C. § 1332 because there is complete diversity between Plaintiff and the Defendants.[1]

## FACTUAL BACKGROUND

### Plaintiff's Exposure to Roundup & PCBs Caused his Cancer

10.      Plaintiff ARVILLE MANGOBA is a citizen of Hawaii who developed non-Hodgkin's lymphoma ("NHL") after being exposed to chemical products designed, manufactured, and distributed by Monsanto.  Specifically, Plaintiff has had substantial exposures to Roundup.  He also had substantial exposure to PCBs.

11.      Plaintiff ARVILLE MANGOBA was born in 1992. Old Monsanto exposed him at birth to its PCBs.  Old Monsanto has continued to expose him to PCBs since birth because he eats food and consumes dairy products.  Old Monsanto

---

[1] *Strawbridge v. Curtiss*, 7 U.S. 267 (1806); *Owens Equip. & Erection Co. v. Kroger*, 437 U.S. 365, 373 (1978).

has exposed him to PCBs through other environmental exposures as well. Arville Mangoba did nothing to intentionally or knowingly expose himself to PCBs. His exposure has been innocent and common. It has occurred through Old Monsanto's ubiquitous environmental contamination of PCBs.

12.     Plaintiff ARVILLE MANGOBA has had substantial exposure to Roundup through personal use of Monsanto's Roundup products, as well as, substantial exposures to Monsanto's other cancer-causing chemicals. Plaintiff ARVILLE MANGOBA was exposed to Monsanto's Roundup and other cancer-causing chemicals prior to his diagnosis of NHL and they substantially contributed to cause his cancer.

13.     As a result of his exposure to Roundup and PCBs, ARVILLE MANGOBA was diagnosed with NHL on June 15, 2021.

14.     The Monsanto Entities' Roundup substantially contributed to and caused Plaintiff ARVILLE MANGOBA's cancer.

15.     Old Monsanto's PCBs also substantially contributed to and caused Plaintiff's cancer.

## **Defendants' Corporate Structure**

16.     From 1901 to 1997 the original Monsanto Co., also known as Monsanto Chemical Co., operated as a Missouri corporation manufacturing a variety of chemicals and agricultural products. This original corporate Monsanto entity, which

is now sometimes referred to as "Old Monsanto," ceased to exist in 1997 as the result of a series of corporate spin-offs and acquisitions. At that time, Old Monsanto's chemical division was split off and reformed into a newly independent corporation, which was renamed *Solutia, Inc.*. As part of this 1997 spin-off, Solutia assumed certain of Old Monsanto's debts and liabilities, including all liabilities related to Old Monsanto's production and sale of PCBs. Although Solutia was recently reorganized pursuant to Chapter 11 of the federal bankruptcy laws, it emerged from bankruptcy in February 2008.

17.     In 2000, the remaining portion of Old Monsanto, comprised of Old Monsanto's Life Sciences division, merged with Pharmacia/Upjohn Corp., which meant that Old Monsanto no longer existed as a separate corporate entity. Pharmacia then incorporated a new company in Delaware, also called *Monsanto Co.*, which is now referred to as *New Monsanto*, a Defendant in this case. In 2002, Pharmacia spun off its interest in Monsanto, and Monsanto now operates as an independent corporate entity with its corporate headquarters and principal place of business in St. Louis, Missouri.

18.     As part of Solutia's federal bankruptcy plan of reorganization, the current Monsanto agreed to indemnify Solutia for all tort "legacy liabilities" related to Old Monsanto's activities, including the production and sale of PCBs.

19.     As a result of these various transactions, Defendant Monsanto has legal responsibility for Old Monsanto's conduct in the production, sale, and distribution of PCBs, which is a subject of Plaintiff's claims in this case.

## PCBs

20.     In 1929, Old Monsanto's predecessor, Swann Chemical Co., began producing PCBs.  Old Monsanto, which was in the business of manufacturing a variety of chemicals and agricultural products, soon squired Swann Chemical Co., and began making PCBs.

21.     PCBs are a class of 209 discrete chemical compounds, called congeners, in which one-to-ten chlorine atoms are attached to biphenyl.

22.     Old Monsanto made 99% of the PCBs sold in the United States.

23.     Old Monsanto sold PCBs as liquid mixtures, under the trade name *Aroclor*, to a variety of industrial customers, for a wide variety of industrial uses. Each of Old Monsanto's Aroclor products contained a combination of different PCB congeners.

24.     Some of Old Monsanto's PCB customers used Monsanto's PCBs as insulating fluids, also known as *dielectric fluids*. They used these dielectric fluids in certain electrical equipment, including high-temperature transformers and capacitors. These applications for PCBs in transformers and capacitors are known *as closed applications* or *closed uses*.

25.    But other Old Monsanto PCB customers used PCBs in other applications, including inks, paints, pesticides, plasticizers, lubricants, adhesives, hydraulic fluids, dedusting agents, heat-transfer fluids, and carbonless copy paper.

26.    The applications for these other PCBs products — that is, the products that were not transformers and capacitors — are known as *open applications* and *non-controllable applications*. These applications have been described as "open" and "non-controllable" because the PCBs in those products are not confined. They are open, and during use of these products, they readily escape into the environment, contaminating it.

27.    Old Monsanto marketed and sold Aroclor and other PCB products for open-application products.

28.    In 1970, more than 40 percent of Old Monsanto's PCBs were sold for open-application products.

29.    The next year, Old Monsanto changed policy and from 1971 to 1977, it sold PCBs exclusively for closed applications.

30.    PCBs are durable, almost indestructible organochlorines — they have thermal stability, are resistant to chemicals, are not easily burned, and are not water soluble. Like other chlorinated organic compounds, which are collectively known as *organochlorines*, PCBs are considered "persistent organic pollutants," because they

do not readily degrade in the environment after disposal. Further, they are not easily metabolized or broken down by humans or animals after absorption.

31.    PCBs are lipophilic. They are stored in the fat tissue of humans and animals who have been exposed to them. Because Old Monsanto and its consumers and PCB end users dumped PCBs into the environment for decades — and because PCBs are so indestructible — PCBs are now ubiquitous in the environment.

32.    PCBs can be found in most animals and fish and in water, soil, sediment, and other environments.

33.    And so measurable quantities of PCBs are typically found in most of the foods that Americans consume on a daily basis, including fish, beef, poultry, dairy products, and even fruits and vegetables.

34.    PCBs are also extremely toxic. The International Agency for the Research on Cancer (*IARC*) has classified PCBs as "carcinogenic to humans" — the most toxic classification IARC has.

35.    Some people accumulate more PCBs in their cells than others. Those who easily accumulate PCBs are at a higher risk of getting cancer, including various forms of blood cancer such as non-Hodgkin lymphoma (*NHL*).

36.    PCBs are so toxic and so durable that in 1977 Congress banned the production of PCBs.

37.     Throughout the six decades that Old Monsanto produced and sold PCBs, the company knew or should have known that its PCBs sold for open or non-controllable applications would ultimately result in the release of those PCBs into the environment.

38.     Because Old Monsanto's PCBs have contaminated the food chain and continue to be ubiquitous contaminants of air, water, and soil, all Americans, including Plaintiff, have been substantially exposed to Old Monsanto's PCBs, including those PCBs that were sold for open and non-controllable applications. These exposures have happened through diet and other environmental exposures. If a person eats a fish that has been exposed to PCBs, that person will ingest the fish's fat, which is tainted with PCBs, and she will be exposed to the PCBs.

39.     Although Old Monsanto's PCBs were incorporated into many other products before being released into the environment, those PCBs themselves, to which Plaintiff has been exposed, are substantially the same chemicals as when they left Old Monsanto's possession.

40.     Throughout the decades during which Old Monsanto produced PCBs, the company was aware that exposure to PCBs carried significant health risks. Despite this knowledge, and despite the availability of substitute products, Old Monsanto continued to produce and market PCBs for open and non-controllable applications, while hiding from the public, its customers, and applicable

Case 1:23-cv-00148-HG-741   Document 31-1   Filed 06/09/23   Page 16 of 72   PageID.16

governmental authorities the true health risks associated with PCBs. Such conduct was despicable and done with a willful disregard of the rights and safety of others.

41.    In short, Old Monsanto was aware that its continued production and sale of PCBs for open and non-controllable applications would result in dangerous consequences, environmental devastation, and significant health risks for users and others exposed to PCBs. But it chose to market its PCBs for such open and non-controllable applications, anyway. It sold open-application PCB products for decades, despite this knowledge.

42.    While an analysis of the true risks of PCBs were taking shape, and the scientific community began to better understand the damage inflicted up the planet by Monsanto's business model, Monsanto busied itself with producing a new toxic chemical to sell and market.

## Roundup

43.    In 1970, around the time Old Monsanto was feeling pressure to stop marketing and selling PCBs for open-application products, it discovered the herbicidal properties of glyphosate. Old Monsanto began marketing glyphosate, combined with other chemicals, in 1974 under the brand name *Roundup*. Roundup is a non-selective herbicide used to kill weeds. In addition to the active ingredient glyphosate, Roundup contains the surfactant Polyethoxylated tallow amine (*POEA*) and adjuvants and other so-called "inert" ingredients.

16
Exhibit 1

44.     *Roundup* refers to all formulations of Defendant's Roundup products, including, but not limited to, Roundup Concentrate Poison Ivy and Tough Brush Killer 1, Roundup Custom Herbicide, Roundup D-Pak herbicide, Roundup Dry Concentrate, Roundup Export Herbicide, Roundup Fence & Hard Edger 1, Roundup Garden Foam Weed & Grass Killer, Roundup Grass and Weed Killer, Roundup Herbicide, Roundup Original 2k herbicide, Roundup Original II Herbicide, Roundup Pro Concentrate, Roundup Prodry Herbicide, Roundup Promax, Roundup Quik Stik Grass and Weed Killer, Roundup Quikpro Herbicide, Roundup Rainfast Concentrate Weed & Grass Killer, Roundup Rainfast Super Concentrate Weed & Grass Killer, Roundup Ready-to-Use Extended Control Weed & Grass Killer 1 Plus Weed Preventer, Roundup Ready-to-Use Weed & Grass Killer, Roundup Ready-to-Use Weed and Grass Killer 2, Roundup Ultra Dry, Roundup Ultra Herbicide, Roundup Ultramax, Roundup VM Herbicide, Roundup Weed & Grass Killer Concentrate, Roundup Weed & Grass Killer Concentrate Plus, Roundup Weed & Grass killer Ready-to-Use Plus, Roundup Weed & Grass Killer Super Concentrate, Roundup Weed & Grass Killer1 Ready-to-Use, Roundup WSD Water Soluble Dry Herbicide Deploy Dry Herbicide, or any other formulation of containing the active ingredient glyphosate.

45.     Glyphosate is the most used herbicide in the world.  Since 1974, 3.5 billion pounds of glyphosate has been sprayed in America alone, with another 15.4 billion pounds spread worldwide.

46.     Given its widespread usage, glyphosate has contaminated the food chain and is a ubiquitous contaminant of the air, water and soil where it is used. Glyphosate has been found in the urine of urban dwellers who are not in direct contact with the chemical.

47.     The Monsanto Entities are the world's leading producers of glyphosate. The Monsanto Entities' glyphosate products are registered in 130 countries and approved for use on over 100 different crops.  In this Complaint *The Monsanto Entities* will refer to those corporate entities that played a role in the design, marketing, distribution and sale of Roundup, and will include Old Monsanto, New Monsanto, and Pharmacia.

48.     On March 20, 2015, IARC, an agency of the World Health Organization (*WHO*), issued an evaluation of several herbicides, including glyphosate. That evaluation was based, in part, on studies of exposures to glyphosate in several countries around the world, and it traces the health implications from exposure to glyphosate since 2001.

49.     IARC classified glyphosate as a Group 2A herbicide, which means that it is probably carcinogenic to humans. The IARC Working Group concluded that the

cancers most associated with glyphosate exposure are NHL and other hematopoietic cancers, including, but not limited to, lymphocytic lymphoma/chronic lymphocytic leukemia, B-cell lymphoma, and multiple myeloma.

50.    The Monsanto Entities, since they began selling Roundup, have represented it as safe to humans and the environment. Indeed, The Monsanto Entities have repeatedly proclaimed, and continue to proclaim to the world, and particularly to United States consumers, that glyphosate-based herbicides, including Roundup, create no unreasonable risks to human health or to the environment.

51.    The Monsanto Entities participated in a prolonged campaign of misinformation to convince government agencies, farmers, customers, and the general population that Monsanto's Roundup and other glyphosate-containing products are safe.

**The Importance of Roundup to Monsanto's Market Dominance and Profits**

52.    The success of Roundup was a key to the Monsanto Entities' financial bottom line. Largely due to the success of Roundup sales, Old Monsanto's agriculture division was out-performing its chemicals division's operating income, and that gap increased yearly. But with its patent for glyphosate expiring in the United States in the year 2000, the Monsanto Entities needed a strategy to maintain Roundup's market dominance and to ward off impending competition.

53.    In response, the Monsanto Entities began developing and selling genetically engineered Roundup Ready® (*Roundup Ready*) seeds in 1996.  Since Roundup Ready crops are resistant to glyphosate, farmers can spray Roundup onto their fields during the growing season without harming the crop.  This allowed Monsanto to expand its market for Roundup even further.  By 2000, New Monsanto's biotechnology seeds were planted on more than 80 million acres worldwide and nearly 70% of American soybeans were planted from Roundup Ready seeds.  Glyphosate-resistant seeds helped secure New Monsanto's dominant share of the glyphosate/Roundup market through a marketing strategy that coupled proprietary Roundup Ready seeds with continued sales of its Roundup herbicide.

54.    Through a three-pronged strategy of increased production, decreased prices, and coupling Roundup Ready seeds with Roundup, Roundup became New Monsanto's most profitable product. In 2000, Roundup accounted for almost $2.8 billion in sales, outselling other herbicides by a margin of five to one and accounting for close to half of New Monsanto's revenue. Today, glyphosate remains one of the world's largest herbicides by sales volume.

## Scientific Fraud Underlying the Testing of Glyphosate/Roundup

55.    The manufacture, formulation, and distribution of herbicides, such as Roundup, are regulated under the Federal Insecticide, Fungicide, and Rodenticide Act (*FIFRA* or *Act*), which requires that all pesticides be registered with the

Environmental Protection Agency (*EPA* or *Agency*) before they can be distributed, sold, or used, except as otherwise described by the Act.[2]

56.     FIFRA generally requires the registrant, the New Monsanto Entities, in the case of Roundup, to conduct health-and-safety testing of pesticide products to register them. The EPA has protocols governing the laboratory practices that must be followed in conducting these tests and the testing data produced by the registrant must be submitted to the EPA for review and evaluation.

57.     On two occasions, the EPA found that laboratories hired by the Monsanto Entities to perform the required health-and-safety testing of its glyphosate-containing products, such as Roundup, committed fraud.

58.     In the first instance, Old Monsanto hired Industrial Bio-Test Laboratories (*IBT*) to perform and evaluate pesticide toxicology studies relating to glyphosate.

59.     In 1976, the United States Food and Drug Administration (*FDA*) performed an inspection of IBT that revealed discrepancies between the raw data and the final report relating to the toxicological impacts of glyphosate. The EPA subsequently audited IBT and found the toxicology studies to be invalid. An EPA

---

[2] *See* 7 U.S.C. § 136a(a).

reviewer stated, after finding "routine falsification of data" at IBT, that it was "hard to believe the scientific integrity of the studies."

60.    Top IBT executives were convicted of fraudulent laboratory practices in 1983, included among those convicted was an Old Monsanto employee named Paul Wright.

61.    In the second instance, in 1991, Old Monsanto hired Craven Laboratories to perform studies on its pesticides and herbicides, including Roundup. That same year, the owner of Craven Laboratories and three of its employees were indicted, and later convicted, of fraudulent laboratory practices in their testing of pesticides and herbicides.

62.    The Monsanto Entities have ghostwritten or published multiple studies through companies such as Intertek and Exponent, Inc. These studies minimize any safety concerns about the use of glyphosate. Such studies include, but are not limited to, Williams (2000); Williams (2012); Kier & Kirkland (2013); Kier (2015); Bus (2016); Chang (2016); and the Intertek Expert Panel Manuscripts. The Monsanto Entities have also ghostwritten editorials to advocate for the safety of glyphosate in newspapers and magazines. The Monsanto Entities failed to disclose the significant role they had in these studies, manuscripts, and editorials.

63.    In 2011, the Federal Institute for Risk Assessment (*BfR*) in Germany initiated a study on the safety of glyphosate. New Monsanto co-opted this study,

became the sole provider of data for the study, and ultimately wrote the report which was rubber-stamped by the BfR.

64.   In March 2015, The Joint Glyphosate Task Force at Monsanto's behest issued a press release sharply criticizing IARC, stating that IARC's conclusion was "baffling" and falsely claiming that "IARC did not consider any new or unique research findings when making its decision. It appears that only by deciding to exclude certain available scientific information and by adopting a different approach to interpreting the studies was this possible."

### Monsanto's Misrepresentations Regarding the Safety of Roundup

65.   The Monsanto Entities have knowingly falsely advertised the safety of Roundup for decades.

66.   For example, in 1996, the New York Attorney General (*NYAG*) filed a lawsuit against Old Monsanto based on its false and misleading advertising of Roundup products. Specifically, the lawsuit challenged Old Monsanto's general representations that its spray-on glyphosate-based herbicides, including Roundup, were "safer than table salt" and "practically non-toxic" to mammals, birds, and fish. Among the representations the NYAG found deceptive and misleading about the human and environmental safety of glyphosate and/or Roundup are the following:

a.  Remember that environmentally friendly Roundup herbicide is biodegradable. It won't build up in the soil so you can use Roundup with confidence along customers' driveways, sidewalks and fences ...

b.  And remember that Roundup is biodegradable and won't build up in the soil. That will give you the environmental confidence you need to use Roundup everywhere you've got a weed, brush, edging or trimming problem.

c.  Roundup biodegrades into naturally occurring elements.

d.  Remember that versatile Roundup herbicide stays where you put it. That means there's no washing or leaching to harm customers' shrubs or other desirable vegetation.

e.  This non-residual herbicide will not wash or leach in the soil. It ... stays where you apply it.

f.  You can apply Accord with 'confidence because it will stay where you put it' it bonds tightly to soil particles, preventing leaching. Then, soon after application, soil microorganisms biodegrade Accord into natural products.

g.  Glyphosate is less toxic to rats than table salt following acute oral ingestion.

h. Glyphosate's safety margin is much greater than required. It has over a 1,000-fold safety margin in food and over a 700-fold safety margin for workers who manufacture it or use it.

i. You can feel good about using herbicides by Monsanto. They carry a toxicity category rating of 'practically non-toxic' as it pertains to mammals, birds and fish.

j. Roundup can be used where kids and pets will play and breaks down into natural material. [This ad depicts a person with his head in the ground and a pet dog standing in an area which has been treated with Roundup.]

67. On November 19, 1996, Old Monsanto entered into an Assurance of Discontinuance with NYAG, in which Old Monsanto agreed, among other things, "to cease and desist from publishing or broadcasting any advertisements [in New York] that represent, directly or by implication" that:

a. its glyphosate-containing pesticide products or any component thereof are safe, non-toxic, harmless or free from risk;

b. its glyphosate-containing pesticide products or any component thereof manufactured, formulated, distributed or sold by Monsanto are biodegradable;

c.  its glyphosate-containing pesticide products or any component thereof stay where they are applied under all circumstances and will not move through the environment by any means;

d.  its glyphosate-containing pesticide products or any component thereof are "good" for the environment or are "known for their environmental characteristics";

e.  glyphosate-containing pesticide products or any component thereof are safer or less toxic than common consumer products other than herbicides;

f.  its glyphosate-containing products or any component thereof might be classified as "practically non-toxic."

68.   On information and belief, Monsanto has not altered its advertising in the same manner in any other state.

69.   In 2009, France's highest court ruled that the Monsanto Entities had not told the truth about the safety of Roundup and affirmed an earlier judgement that the Monsanto Entities had falsely advertised Roundup as "biodegradable" and that it "left the soil clean."

**IARC Classification of Glyphosate**

70.   The IARC process for the classification of glyphosate followed IARC's stringent procedures for the evaluation of a chemical agent. Over time, the IARC

Monograph program has reviewed 980 agents. Of those reviewed, it has determined 116 agents to be Group 1 (Known Human Carcinogens); 73 agents to be Group 2A (Probable Human Carcinogens); 287 agents to be Group 2B (Possible Human Carcinogens); 503 agents to be Group 3 (Not Classified); and one agent to be Probably Not Carcinogenic.

71.    The established procedure for IARC Monograph evaluations is described in the IARC Programme's Preamble. Evaluations are performed by panels of international experts, selected on the basis of their expertise and the absence of actual or apparent conflicts of interest.

72.    One year before the Monograph meeting, the meeting is announced and there is a call both for data and for experts. Eight months before the Monograph meeting, the Working Group membership is selected and the sections of the Monograph are developed by the Working Group members. One month prior to the Monograph meeting, the call for data is closed and the various draft sections are distributed among Working Group members for review and comment. Finally, at the Monograph meeting, the Working Group finalizes review of all literature, evaluates the evidence in each category, and completes the overall evaluation. Within two weeks after the Monograph meeting, the summary of the Working Group findings is published in Lancet Oncology, and within a year after the meeting, the final Monograph is finalized and published.

73.    In assessing an agent, the IARC Working Group reviews the following information: (a) human, experimental, and mechanistic data; (b) all pertinent epidemiological studies and cancer bioassays; and (c) representative mechanistic data. The studies must be publicly available and have sufficient detail for meaningful review, and reviewers cannot be associated with the underlying study.

74.    In March 2015, IARC reassessed glyphosate.  The summary published in The Lancet Oncology reported that glyphosate is a Group 2A agent and probably carcinogenic in humans.

75.    On July 29, 2015, IARC issued Monograph 112 for glyphosate. For Volume 112, a Working Group of 17 experts from 11 countries assessed the carcinogenicity of certain herbicides, including glyphosate. According to published procedures, the Working Group considered "reports that have been published or accepted for publication in the openly available scientific literature" as well as "data from governmental reports that are publicly available."

76.    The studies considered the following exposure groups: occupational exposure of farmers and tree nursery workers in the United States, forestry workers in Canada and Finland, municipal weed-control workers in the United Kingdom; and para-occupational exposures in farming families.

77.     Glyphosate was identified as the second-most used household herbicide in the United States for weed control between 2001 and 2007 and the most heavily used herbicide in the world in 2012.

78.     Exposure pathways were identified as air (especially during spraying), water, and food. Community exposure to glyphosate is widespread and found in soil, air, surface water, groundwater, and food.

79.     The IARC Working Group found an increased risk between exposure to glyphosate and NHL and several subtypes of NHL, and the increased risk persisted after adjustment for other pesticides.

80.     The IARC Working Group also noted that glyphosate has been detected in the urine of agricultural workers, indicating absorption. Soil microbes degrade glyphosate to aminomethylphosphoric acid (*AMPA*). Blood AMPA detection after exposure suggests intestinal microbial metabolism in humans.

81.     The IARC Working Group also noted genotoxic, hormonal, and enzymatic effects in mammals exposed to glyphosate.  Essentially, glyphosate inhibits the biosynthesis of aromatic amino acids, which leads to several metabolic disturbances, including the inhibition of protein and secondary product biosynthesis and general metabolic disruption.

82.   The IARC Working Group further found that glyphosate and glyphosate formulations induced DNA and chromosomal damage in mammals, and in human and animal cells in vitro.

83.   In addition to DNA damage and oxidative stress, studies have suggested that Roundup's association with various serious health conditions is linked to its effect on the digestive system. Specifically, scientists believe the same mechanism that makes Roundup toxic to weeds also makes it toxic to the microbes within the human gut and mucous membranes. When humans are exposed to Roundup, it leads to a chronic inflammatory state in the gut, as well an impaired gut barrier, which can lead to many long-term health effects, including an increased risk of cancer. The Monsanto Entities have deliberately refused to conduct tests on this aspect of Roundup's mechanism of action.

84.   Many Roundup products bear a label which either reads: "glyphosate targets an enzyme found in plants but not in people or pets" or "this Roundup formula targets an enzyme in plants but not in people or pets." These statements are false; it has been established that the human body is host to microorganisms that have the enzyme the Monsanto Entities assert is not found in humans. Thus, glyphosate targets microbes within the human body that have the enzyme, leading to a variety of adverse health effects.

85.     The IARC Working Group also reviewed an Agricultural Health Study, consisting of a prospective cohort of 57,311 licensed pesticide applicators in Iowa and North Carolina. The results of the study support an association between glyphosate exposure and Multiple Myeloma, Hairy Cell Leukemia (*HCL*), and Chronic Lymphocytic Leukemia (*CLL*), in addition to several other cancers.

## **Other Findings about Glyphosate's Dangers to Human Health**

86.     The EPA has a technical fact sheet, as part of its Drinking Water and Health, National Primary Drinking Water Regulations publication, relating to glyphosate. This technical fact sheet predates the IARC March 20, 2015, evaluation. The fact sheet describes the release patterns for glyphosate.

87.     Per the EPA's technical fact sheet, glyphosate is released to the environment in its use as an herbicide for controlling woody and herbaceous weeds on forestry, right-of-way, cropped and non-cropped sites. These sites may be around water and in wetlands. Roundup may also be released to the environment during its manufacture, formulation, transport, storage, disposal and cleanup, and from spills.

88.     The EPA's fact sheet further states that occupational workers and home gardeners may be exposed to glyphosate by inhalation; dermal contact during spraying, mixing, and cleanup; or, touching soil and plants to which glyphosate was applied. Occupational exposures may also occur during glyphosate's manufacture, transport storage, and disposal.

89.     In 1995, the Northwest Coalition for Alternatives to Pesticides reported that in California, the state with the most comprehensive program for reporting of pesticide-caused illness, glyphosate was the third most commonly reported cause of pesticide illness among agricultural workers.

## The EPA's Review of Glyphosate

90.     In April 2016, personnel within the EPA's Office of Pesticides Program (*OPP*) leaked and posted on the Internet a draft report on glyphosate carcinogenicity, entitled Cancer Assessment Review Committee (*CARC*) report, dated October 2015. The EPA removed the document by May 2, 2016, within days of initially posting it online. An EPA spokesperson subsequently issued a statement on the agency's glyphosate review:

> Glyphosate documents were inadvertently posted to the Agency's docket. These documents have now been taken down because our assessment is not final. EPA has not completed our cancer review. We will look at the work of other governments as well as work by HHS's Agricultural Health Study as we move to make a decision on glyphosate. Our assessment will be peer reviewed and completed by end of 2016.

91.     On September 12, 2016, the EPA's OPP submitted a report on the carcinogenic potential of glyphosate, wherein it issued a "proposed conclusion" that glyphosate is "'not likely to be carcinogenic to humans at doses relevant to human health risk assessment." There are no authors listed on this issue paper, which

reiterates and adopts the conclusions of the October 2015 leaked assessment. The issue paper is based upon a review of industry-sponsored articles and studies. The OPP acknowledged that it rejected all studies that considered Roundup—the formulated product—instead of studies that isolated glyphosate because "[g]lyphosate formulations contain various components other than glyphosate and it has been hypothesized these components are more toxic than glyphosate alone."

92.     Thus, the OPP notes that dozens of studies considered by IARC were not reviewed by the OPP because the OPP's "evaluation focused on studies on the active ingredient glyphosate" and "additional research could also be performed to determine whether formulation components, such as surfactants, influence the toxicity of glyphosate formulations."

93.     From December 13 to 16, 2016, the EPA held FIFRA Scientific Advisory Panel (*SAP*) meetings to consider issues raised by the OPP's evaluation of glyphosate. Again, OPP only allowed the SAP to consider studies of glyphosate alone, and not any study of the formulated product. In its Charge to the FIFRA SAP, the OPP noted that "[a]lthough there are studies available on glyphosate-based pesticide formulations, the agency is soliciting advice from the FIFRA Scientific Advisory Panel (*SAP*) on this evaluation of human carcinogenic potential for the active ingredient glyphosate only at this time."

94.    The OPP draft assessment therefore does not actually consider the product at issue in this litigation or, more importantly, how glyphosate, in conjunction with surfactants and other chemicals, affects carcinogenicity.

95.    On March 16, 2017, the final SAP meeting minutes and report were released, revealing disagreement and lack of consensus among the scientists on whether there was a positive association between glyphosate exposure and NHL.

## Monsanto's Inside Governmental Ties

96.    Recently unsealed documents in the federal Roundup MDL litigation reveal the extent to which the Monsanto Entities have been able to leverage their contacts within the EPA to protect glyphosate and Roundup from scrutiny and review.

97.    Internal Monsanto documents, including e-mail communications, demonstrate that Jess Rowland, former Deputy Division Director, Health Effects Division of the EPA's OPP, and formerly the chair of the CARC (the same committee that inadvertently leaked the EPA's glyphosate report in April 2016), repeatedly and directly intervened on Monsanto's behalf. These same documents reveal that New Monsanto was secure in the knowledge that it had allies within the EPA.

98.    To begin, in the months following IARC's initial March 2015 announcement that it had classified glyphosate as a probable carcinogen, New

Monsanto turned its attention to the EPA's review of glyphosate. In one April 27, 2015 e-mail, New Monsanto official Bill Heydens wrote to colleagues to suggest "approaching EPA and…. ask if there is anything that would help them defend the situation?" His colleague Dan Jenkins responded: "I think you and I could get on the phone w Jess Rowland and discuss this pretty openly. He'll give us straight talk."

99.     The following day, Mr. Jenkins spoke to Mr. Rowland by telephone and then relayed the substance of the conversation for his colleagues in an April 28, 2015 e-mail. Specifically, he reported back that with respect to the CARC investigation, Mr. Rowland had stated: "We have enough to sustain our conclusions. Don't need gene tox or epi I am the chair of the CARC and my folks are running this process for glyphosate in reg review. I have called a CARC meeting in June." Thus, even though the ostensible purpose of the CARC review was to evaluate the exhaustive IARC assessment on glyphosate, and even though the full IARC monograph on glyphosate would not be completed until July 2015, Mr. Rowland had already formed his conclusion months earlier—in April 2015.

100.   Mr. Rowland also intervened to halt another agency's review of glyphosate. When the Agency for Toxic Substances and Disease Registry (*ATSDR*), a federal public health agency of the U.S. Department of Health and Human Services, announced in February 2015 that it planned to publish a toxicological review of glyphosate, it was Mr. Rowland who helped Monsanto stop the ATSDR's

investigation. In the same April 28, 2015, e-mail discussed above, Mr. Jenkins explained that Mr. Rowland wanted to help New Monsanto stop an investigation concerning the carcinogenicity of glyphosate being conducted by ATSDR. Since ATSDR is not controlled by the EPA, according to Mr. Jenkins, Mr. Rowland had bragged: "If I can kill this I should get a medal." Jenkins cautioned, however, that Monsanto should not "get your hopes up, I doubt EPA and Jess can kill this; but it's good to know they are going to actually make the effort now to coordinate due to our pressing and their shared concern that ATSDR is consistent in its conclusions with the EPA." The ATSDR never published its toxicological profile of glyphosate.

101.   Further, the released documents reveal New Monsanto's confidence that its allies within the EPA would continue to support glyphosate. In an internal memo on glyphosate, Monsanto executives wrote: "We know, but cannot say, that EPA's Office of Pesticide Program scientists strongly feel that glyphosate does not cause cancer and have defended their written determination internally for months." Notably, when Mr. Rowland attended the IARC glyphosate meetings as an observer for the EPA, internal communications indicate Monsanto was not displeased with his attendance since, "we all know Jess."

### Recent Bans on Roundup/Glyphosate

102.   Countries around the world have instituted bans on the sale of Roundup and other glyphosate-containing herbicides, both before and since IARC first

announced its assessment for glyphosate in March 2015, and more countries undoubtedly will follow suit as the dangers of exposures to Roundup become more widely known.

103. Countries that have outright banned, imposed restrictions, or issued statements of intent to ban or restrict glyphosate include: Argentina, Australia, Austria, Belgium, Bermuda, Brazil, Canada, Colombia, Czech Republic, Denmark, El Salvador, France, Germany, Greece, India, Italy, Luxembourg, Malta, Netherlands, New Zealand, Portugal, Scotland, Slovenia, Spain, Sri Lanka, Sweden, Switzerland, United Kingdom, and Vietnam.

## EFSA Report on Glyphosate

104. On November 12, 2015, the European Food Safety Authority (*EFSA*), the European Union's primary agency for food safety, reported on its evaluation of the Renewal Assessment Report (*RAR*) on glyphosate. The Rapporteur Member State assigned to glyphosate, the German Federal Institute for Risk Assessment (*BfR*), had produced the RAR as part of the renewal process for glyphosate in the EU.

105. BfR sent its draft RAR to EFSA and the RAR underwent a peer review process by EFSA, other member states, and industry groups. As part of the on-going peer review of Germany's reevaluation of glyphosate, EFSA had also received a second mandate from the European Commission to consider IARC's findings

regarding the potential carcinogenicity of glyphosate and glyphosate-containing products.

106.   Based on a review of the RAR, which included data from industry-submitted unpublished studies, EFSA sent its own report (*Conclusion*) to the European Commission, finding that "glyphosate is unlikely to pose a carcinogenic hazard to humans and the evidence does not support classification with regard to its carcinogenic potential according to Regulation (EC) No 1272/2008." EFSA therefore disagreed with IARC: glyphosate allegedly was not genotoxic and did not present a carcinogenic threat to humans.

107.   In explaining why its results departed from IARC's conclusion, EFSA drew a distinction between the EU and IARC approaches to the study and classification of chemicals. Although IARC examined "both glyphosate—an active substance—and glyphosate-based formulations, grouping all formulations regardless of their composition," EFSA explained that it considered only glyphosate and that its assessment focuses on "each individual chemical, and each marketed mixture separately." IARC, on the other hand, "assesses generic agents, including groups of related chemicals, as well as occupational or environmental exposure, and cultural or behavioural practices." EFSA accorded greater weight to studies conducted with glyphosate alone than studies of formulated products.

108.   EFSA went further and noted:

[A]lthough some studies suggest that certain glyphosate-based formulations may be genotoxic (i.e. damaging to DNA), others that look solely at the active substance glyphosate do not show this effect. It is likely, therefore, that the genotoxic effects observed in some glyphosate-based formulations are related to the other constituents or "co-formulants". Similarly, certain glyphosate- based formulations display higher toxicity than that of the active ingredient, presumably because of the presence of co-formulants. In its assessment, EFSA proposes that the toxicity of each pesticide formulation and in particular its genotoxic potential should be further considered and addressed by Member State authorities while they re-assess uses of glyphosate-based formulations in their own territories.

109.    Notwithstanding its conclusion, EFSA did set exposure levels for glyphosate. Specifically, EFSA proposed an acceptable daily intake (*ADI*) of 0.5 mg/kg of body weight per day; an acute reference dose (*ARfD*) of 0.5 mg/kg of body weight; and an acceptable operator exposure level (*AOEL*) of 0.1 mg/kg bw per day.

## Leading Scientists Dispute EFSA's Conclusion

110.    On November 27, 2015, 96 independent academic and governmental scientists from around the world submitted an open letter to the EU health commissioner, Vytenis Andriukaitis. The scientists expressed their strong concerns and urged the commissioner to disregard the "flawed" EFSA report, arguing that

"the BfR decision is not credible because it is not supported by the evidence and it was not reached in an open and transparent manner."

111.   Signatories to the letter included Dr. Christopher J. Portier, Ph.D., and other renowned international experts in the field, some of whom were part of the IARC Working Group assigned to glyphosate.

112.   In an exhaustive and careful examination, the scientists scrutinized EFSA's conclusions and outlined why the IARC Working Group decision was "by far the more credible":

> The IARC WG decision was reached relying on open and transparent procedures by independent scientists who completed thorough conflict-of-interest statements and were not affiliated or financially supported in any way by the chemical manufacturing industry. It is fully referenced and depends entirely on reports published in the open, peer-reviewed biomedical literature. It is part of a long tradition of deeply researched and highly credible reports on the carcinogenicity of hundreds of chemicals issued over the past four decades by IARC and used today by international agencies and regulatory bodies around the world as a basis for risk assessment, regulation and public health policy.

113.   With respect to human data, the scientists pointed out that EFSA agreed with IARC that there was "limited evidence of carcinogenicity" for NHL, but EFSA

nonetheless dismissed an association between glyphosate exposure and carcinogenicity. IARC applies three levels of evidence in its analyses of human data, including sufficient evidence and limited evidence. EFSA's ultimate conclusion that "there was no unequivocal evidence for a clear and strong association of NHL with glyphosate" was misleading because it was tantamount to IARC's highest level of evidence: "sufficient evidence," which means that a causal relationship has been established. However, the scientists argued, "[l]egitimate public health concerns arise when 'causality is credible,' i.e., when there is limited evidence."

114.    Among its many other deficiencies, EFSA's conclusions regarding animal carcinogenicity data were "scientifically unacceptable," particularly in BfR's use of historical control data and in its trend analysis. Indeed, BfR's analysis directly contradicted the Organisation for Economic Co-operation and Development (*OECD*) testing guidelines while citing and purporting to follow those same guidelines. For instance, the EFSA report dismisses observed trends in tumor incidence "because there are no individual treatment groups that are significantly different from controls and because the maximum observed response is reportedly within the range of the historical control data." However, according to the scientists, concurrent controls are recommended over historical controls in all guidelines, scientific reports, and publications, and, if it is employed, historical control data "should be from studies in the same timeframe, for the same exact animal strain,

preferably from the same laboratory or the same supplier and preferably reviewed by the same pathologist." BfR's use of historical control data violated these precautions: "only a single study used the same mouse strain as the historical controls, but was reported more than 10 years after the historical control dataset was developed." Further deviating from sound scientific practices, the data used by the BfR came from studies in seven different laboratories. The scientists concluded:

> BfR reported seven positive mouse studies with three studies showing increases in renal tumors, two with positive findings for hemangiosarcomas, and two with positive findings for malignant lymphomas. BfR additionally reported two positive findings for tumors in rats. Eliminating the inappropriate use of historical data, the unequivocal conclusion is that these are not negative studies, but in fact document the carcinogenicity of glyphosate in laboratory animals.

115.   The letter also critiqued the EFSA report's lack of transparency and the opacity surrounding the data cited in the report: "citations for almost all of the references, even those from the open scientific literature, have been redacted from the document" and "there are no authors or contributors listed for either document, a requirement for publication in virtually all scientific journals." Because BfR relied on unpublished, confidential industry-provided studies, it is "impossible for any

scientist not associated with BfR to review this conclusion with scientific confidence."

116.   On March 3, 2016, the letter was published in the Journal of Epidemiology & Community Health.

## Toxicity of Other Ingredients in Roundup

117.   In addition to the toxicity of the active ingredient, glyphosate, several studies show that Roundup is more dangerous and toxic than glyphosate alone. Indeed, as early as 1991, available evidence demonstrated that glyphosate formulations were significantly more toxic than glyphosate alone.

118.   Roundup consists of from 40 to 60 percent glyphosate. Another ten to fifteen percent is surfactant. The surfactant used in Roundup is polyethoxylated tallow amine — or POEA.

119.   Surfactants, like POEA, allow glyphosate to penetrate into the leaf of a plant, so it can kill the plant. Part of the way POEA does this is that it allows Roundup to lie flat on the leaf so that the oily, waxy leaf surface can absorb the Roundup and the glyphosate.

120.   In the same way that POEA allows Roundup to spread out on the leaf of a plant, it allows Roundup and glyphosate to spread out on human skin. This causes the skin to absorb more of the Roundup and glyphosate.

121.   But the POEA doesn't just spread Roundup on the skin. POEA increases the amount of time the Roundup and the glyphosate remains on the skin.

122.   POEA is a skin irritant. The body's response to a skin irritant is to dilate the capillary bed and increase blood flow. This increases absorption of Roundup, POEA, and glyphosate.

123.   Studies have shown that POEA increases the dermal absorption of Roundup — as compared to pure glyphosate — by ten percent, which is a statistically significant higher rate of dermal absorption.

124.   The Roundup, glyphosate, and POEA, once they penetrate into the skin, then collect in a reservoir in the epidermis — this reservoir is not immediately absorbed, and, because it is below the skin, it cannot be washed off. Studies have shown this reservoir lasts for as long as seven days.

125.   Because bone is a preferential point of distribution for glyphosate, glyphosate migrates from this reservoir to the bone.

126.   Lymphoma is a cancer that starts in the bones. Lymphatic stem cells are in the bone, the site of the start of the malignancy for NHL.

127.   POEA is banned in Europe. That is, as New Monsanto has admitted in pervious written discovery "the European Commission recommended that member states ban a co-formulant called POEA-Tallowamine from glyphosate-based products."

128. William Sawyer, Ph.D., an expert toxicologist, has testified that POEA is 40 times more toxic than glyphosate alone.

129. Because of the synergistic effect of combing glyphosate with POEA, Roundup is about 50 times more toxic than glyphosate alone.

130. There are surfactants less toxic than POEA, such as contact-lens solution, which is a harmless, nonionic surfactant. The Monsanto Entities have chosen not to use these surfactants in Roundup.

131. But POEA is not the only other dangerous ingredient in Roundup.

132. Formaldehyde, a confirmed human carcinogen, is in Roundup.

133. Ethylene oxide, an extremely powerful sterilization gas that is mutagenic and a human carcinogen, is in Roundup. Ethylene Oxide accumulates in the head space of a Roundup container. People are exposed to higher levels of it when they open a container of Roundup that has been sitting around for a while.

134. 1, 4-dioxane is another contaminant found in Roundup. IARC has classified 1, 4-dioxane as a possible human carcinogen.

135. Studies have shown the poisonous effects of having so many toxic substances in Roundup.

136. In 2002, a study by Julie Marc, entitled "Pesticide Roundup Provokes Cell Division Dysfunction at the Level of CDK1/Cyclin B Activation," revealed that

Roundup causes delays in the cell cycles of sea urchins but that the same concentrations of glyphosate alone were ineffective and did not alter cell cycles.

137.   A 2004 study by Marc and others, entitled "Glyphosate-based pesticides affect cell cycle regulation," demonstrated a molecular link between glyphosate-based products and cell cycle dysregulation. The researchers noted that "cell-cycle dysregulation is a hallmark of tumor cells and human cancer. Failure in the cell-cycle checkpoints leads genomic instability and subsequent development of cancers from the initial affected cell." Further, "[s]ince cell cycle disorders such as cancer result from dysfunction of a unique cell, it was of interest to evaluate the threshold dose of glyphosate affecting the cells."

138.   In 2005, a study by Francisco Peixoto, entitled "Comparative effects of the Roundup and glyphosate on mitochondrial oxidative phosphorylation," demonstrated that Roundup's effects on rat liver mitochondria are far more toxic than equal concentrations of glyphosate alone. The Peixoto study further suggested that the harmful effects of Roundup on mitochondrial bioenergetics could not be exclusively attributed to glyphosate but could be the result of other chemicals, such as the surfactant POEA, or in the alternative, due to a potential synergic effect between glyphosate and other ingredients in the Roundup formulation.

139.   In 2009, Nora Benachour and Gilles-Eric Seralini published a study examining the effects of Roundup and glyphosate on human umbilical, embryonic,

and placental cells. The study tested dilution levels of Roundup and glyphosate that were far below agricultural recommendations, corresponding with low levels of residue in food. The researchers ultimately concluded that supposed "inert" ingredients, and possibly POEA, alter human-cell permeability and amplify toxicity of glyphosate alone. The researchers further suggested that assessments of glyphosate toxicity should account for the presence of adjuvants or additional chemicals used in the formulation of the complete pesticide. The study confirmed that the adjuvants present in Roundup are not, in fact, inert and that Roundup is potentially far more toxic than its active ingredient glyphosate alone.

140.   The results of these studies were at all times available to Defendants.

141.   New Monsanto's chief toxicologist Donna Farmer has admitted that she cannot say that Roundup does not cause cancer because the Monsanto Entities have not performed carcinogenicity studies with the formulated product Roundup, the very product that caused, or substantially contributed to cause, Plaintiff's NHL. Indeed, she admitted that in the 35 years that the Monsanto Entities have marketed Roundup to the public, they have conducted no chronic carcinogenicity studies on the formulated Roundup product. They have not done so merely because the EPA did not require it to perform such a study in order to register glyphosate.

142.   Defendants thus knew or should have known that Roundup is more toxic than glyphosate alone and that safety studies of Roundup, Roundup's adjuvants

and "inert" ingredients, and/or the surfactant POEA were necessary to protect Plaintiff from Roundup.

143.   Despite knowing that Roundup is considerably more dangerous than glyphosate alone, Defendants deceptively continued to promote Roundup as safe.

### Statement of Concern Regarding Glyphosate-Based Herbicides

144.   On February 17, 2016, a consensus statement published in the journal Environmental Health, entitled "Concerns over use of glyphosate-based herbicides and risks associated with exposures: a consensus statement," assessed the safety of glyphosate-based herbicides (*GBHs*). The paper's "focus is on the unanticipated effects arising from the worldwide increase in use of GBHs, coupled with recent discoveries about the toxicity and human health risks stemming from use of GBHs." The researchers drew seven factual conclusions about GBHs:

1. GBHs are the most heavily applied herbicide in the world and usage continues to rise;
2. Worldwide, GBHs often contaminate drinking water sources, precipitation, and air, especially in agricultural regions;
3. The half-life of glyphosate in water and soil is longer than previously recognized;
4. Glyphosate and its metabolites are widely present in the global soybean supply;
5. Human exposures to GBHs are rising;
6. Glyphosate is now authoritatively classified as a probable human carcinogen; and

7.  Regulatory estimates of tolerable daily intakes for glyphosate in the United States and European Union are based on outdated science.

145.   The researchers noted that GBH use has increased approximately 100-fold since the 1970s. Further, far from posing a limited hazard to vertebrates, as previously believed, two decades of evidence demonstrated that "several vertebrate pathways are likely targets of action, including hepatorenal damage, effects on nutrient balance through glyphosate chelating action and endocrine disruption."

146.   The paper attributes uncertainties in current assessments of glyphosate formulations to the fact that "[t]he full list of chemicals in most commercial GBHs is protected as 'commercial business information,' despite the universally accepted relevance of such information to scientists hoping to conduct an accurate risk assessment of these herbicide formulations." Further, the researchers argue, "[t]he distinction in regulatory review and decision processes between 'active' and 'inert' ingredients has no toxicological justification, given increasing evidence that several so-called 'inert' adjuvants are toxic in their own right."

147.   Among various implications, the researchers conclude that "existing toxicological data and risk assessments are not sufficient to infer that GBHs, as currently used, are safe." Further, "GBH-product formulations are more potent, or toxic, than glyphosate alone to a wide array of non-target organisms including mammals, aquatic insects, and fish." Accordingly, "risk assessments of GBHs that

are based on studies quantifying the impacts of glyphosate alone underestimate both toxicity and exposure, and thus risk." The paper concludes that this "shortcoming has repeatedly led regulators to set inappropriately high exposure thresholds."

148.   The researchers also criticize the current practice of regulators who largely rely on "unpublished, non-peer reviewed data generated by the registrants" but ignore "published research because it often uses standards and procedures to assess quality that are different from those codified in regulatory agency data requirements, which largely focus on avoiding fraud." In the researchers' view, "[s]cientists independent of the registrants should conduct regulatory tests of GBHs that include glyphosate alone, as well as GBH-product formulations."

149.   The researchers also call for greater inclusion of GBHs in government-led toxicology testing programs:

> [A]fresh and independent examination of GBH toxicity should be undertaken, and . . . this re-examination be accompanied by systematic efforts by relevant agencies to monitor GBH levels in people and in the food supply, none of which are occurring today. The U.S. National Toxicology Program should prioritize a thorough toxicological assessment of the multiple pathways now identified as potentially vulnerable to GBHs.

150.   The researchers suggest that, in order to fill the gap created by an absence of government funds to support research on GBHs, regulators could adopt

a system through which manufacturers fund the registration process and the necessary testing:

> "[W]e recommend that a system be put in place through which manufacturers of GBHs provide funds to the appropriate regulatory body as part of routine registration actions and fees. Such funds should then be transferred to appropriate government research institutes, or to an agency experienced in the award of competitive grants. In either case, funds would be made available to independent scientists to conduct the appropriate long-term (minimum 2 years) safety studies in recognized animal model systems. A thorough and modern assessment of GBH toxicity will encompass potential endocrine disruption, impacts on the gut microbiome, carcinogenicity, and multigenerational effects looking at reproductive capability and frequency of birth defects.

151. Despite these stated concerns, The Monsanto Entities, to date, have failed to test their formulated Roundup products.

## DISCOVERY RULE

152. Plaintiff hereby pleads and invokes the "discovery rule." Plaintiff will show that after reasonably excising due diligence, he did not learn of the nature of the cause of his cancer or that such cancers were related to Monsanto's chemical products until less than two years prior to the filings of Plaintiff's causes of action

herein. Plaintiff also specifically invokes the Federally Required Commencement Date, pursuant to 42 U.S.C. 9658.

## CAUSES OF ACTION

153.   Arville Mangoba brings each of the following causes of action for himself.

154.   Arville Mangoba may be referred to as "Plaintiff."

## COUNT I: STRICT LIABILITY - DESIGN DEFECT

155.   Plaintiff incorporates herein each allegation set forth above.

156.   At all relevant times, Defendant was engaged in the business of manufacturing, formulating, creating, designing, testing, labeling, packaging, supplying, marketing, promoting, selling, advertising, and otherwise introducing its Roundup and PCBs. Plaintiff ARVILLE MANGOBA was exposed to Roundup and PCBs.

157.   Defendant marketed and advertised Roundup and PCBs for use by consumers, including Plaintiff.

158.   Defendant was a supplier of Roundup and PCBs. They were in the chain of distribution of Roundup and PCBs, and they manufactured and distributed Roundup and PCBs.

159.   Defendant sold or otherwise placed Roundup and PCBs into the stream of commerce. Defendant was in the business of putting Roundup and PCBs on the market.

160.   At all relevant times, Monsanto's Roundup and PCBs reached their intended consumers, users, and other persons coming into contact with them, including Plaintiff.

161.   When Plaintiff ARVILLE MANGOBA was exposed to Roundup and PCBs, there had not been substantial change in the condition of the Roundup and PCBs from the condition the Roundup and PCBs were in when the Defendant put the Roundup and PCBs on the market. Nor was there a substantial change in the condition of the Roundup from the condition that Defendant reasonably expected the Roundup to be used in.

162.   And the condition that the PCBs were in when Plaintiff ARVILLE MANGOBA was exposed to them was not substantially changed from the condition the Defendant reasonably expected the PCBs to be in when people, such as Plaintiff ARVILLE MANGOBA, were exposed to them.

163.   Defendant had a duty to create Roundup and PCBs in a way that was not unreasonably dangerous for their normal, intended, or anticipated use.

164.   Monsanto's Roundup and PCBs were formulated, designed, and manufactured with carcinogens.

165.   Defendant knew, or should have known, of the unreasonable risks of harm associated with the use of and/or exposure to Roundup and PCBs. Specifically, Defendant knew or should have known that Roundup and PCBs have dangerous and carcinogenic properties and that those substances have a propensity to cause cancer. Defendant knew or should have known this information when the Roundup and PCBs left their control.

166.   Monsanto's Roundup and PCBs were defective because their carcinogenic properties made them unreasonably dangerous in that they were dangerous to an extent beyond that which ordinary consumers, such as Plaintiff ARVILLE MANGOBA would contemplate.

167.   Moreover, Monsanto's Roundup and PCBs were defective because an unreasonable risk of injury — cancer — proximately results from the toxic and carcinogenic condition of those substances. No reasonable, prudent person with full knowledge of the risks associated with Roundup and PCBs would find those risks acceptable. And if Plaintiff ARVILLE MANGOBA would have known the full risks of Roundup and PCBs, he would not have found those risks acceptable.

168.   At the time of Plaintiff ARVILLE MANGOBA's exposure to Roundup, Plaintiff was using Roundup in its normal, intended, and anticipated manner, as a broad-spectrum herbicide. Moreover, at the time Plaintiff used Roundup, his use of

the product as a broad-spectrum herbicide was for a purpose and in a manner that was reasonably foreseeable to Defendants.

169.   At the time Plaintiff ARVILLE MANGOBA was exposed to PCBs, his exposure to PCBs was reasonably foreseeable to Defendants.

170.   When Plaintiff ARVILLE MANGOBA was exposed to Monsanto's Roundup and PCBs, he lacked knowledge of Roundup and PCB's dangerous characteristics, specifically the carcinogenic risks associated with exposures to those products.

171.   The foreseeable risks associated with exposures to Monsanto's Roundup and PCBs exceeded the alleged benefits associated with their design and formulation.

172.   Defects in Monsanto's Roundup and PCBs were a producing cause, proximate cause, and substantial factor in Plaintiff ARVILLE MANGOBA developing cancer.

173.   Plaintiff sustained the following damages as a foreseeable, direct, and proximate result of Defendants' acts and omissions:

(a) Economic losses, including medical care and lost earnings; and

(b) Noneconomic losses, including physical and mental pain and suffering, emotional distress, inconvenience, loss of enjoyment of life, impairment of quality of life, past and future.

## COUNT II:  STRICT LIABILITY - FAILURE TO WARN

174.   Plaintiff incorporates herein each allegation set forth above.

175.   At all relevant times, Defendant was engaged in the business of manufacturing, formulating, creating, designing, testing, labeling, packaging, supplying, marketing, promoting, selling, advertising, and otherwise introducing its Roundup.

176.   Defendant was a supplier of Roundup. They were in the chain of distribution of Roundup, and they manufactured and distributed Roundup.

177.   Defendant sold or otherwise placed Roundup into the stream of commerce. Defendant was in the business of putting Roundup on the market.

178.   Defendant marketed and advertised Roundup for use by consumers, including Plaintiff.

179.   Roundup presented an unreasonable risk of injury — cancer.

180.   A reasonably prudent person, having full knowledge of the risk of cancer associated with Roundup, would find that risk unacceptable.

181.   Roundup was put on the market by Defendant, and it did not contain any warnings of cancer.

182.   This risk of cancer could have been avoided by an adequate warning.

183.   Defendant had a duty to warn of the risks associated with the use of its Roundup and glyphosate-containing products.

184.   Defendant knew, or should have known, of the unreasonable risks of harm associated with the use of and/or exposure to its Roundup and glyphosate-containing products, namely their unreasonably dangerous and carcinogenic properties and their propensity to cause cancer.

185.   Defendant failed to exercise reasonable care to warn of the dangerous carcinogenic risks associated with use of and exposures to its Roundup and glyphosate-containing products.

186.   The risks of Roundup were not reasonably obvious to foreseeable users of Roundup, including Plaintiff. Indeed, Plaintiff did not know of the risks of Roundup.

187.   Plaintiff ARVILLE MANGOBA, and foreseeable users like him, cannot reasonably be expected to know of the risks of Roundup.

188.   The minimal warnings disseminated with Monsanto's Roundup and glyphosate-containing products were inadequate and failed to communicate the carcinogenic dangers attendant to exposures to and use of Roundup.

189.   As a result of their inadequate warnings, Defendant's Roundup was defective and unreasonably dangerous when they left Defendant's possession, control, or both.

190.   Due to the absence of any warning or instruction by Defendant regarding the significant health-and-safety risks posed by their Roundup and/or

glyphosate-containing products, Plaintiff was unaware that Defendant's Roundup products were unreasonably dangerous and had carcinogenic properties. Such information was not known to the general public.

191.   Plaintiff reasonably relied on the skill, superior knowledge, and judgment of Defendant.

192.   Had Defendant properly disclosed the risks associated with exposures to its Roundup and glyphosate-containing products, Plaintiff could have avoided the risk of developing cancer from exposures to the products by choosing not to use the products.

193.   Instead, Defendant disseminated information that was inaccurate, false, and misleading and that failed to communicate accurately or adequately the comparative severity, duration, and extent of the risk of injuries associated with use of and/or exposure to Roundup and glyphosate-containing products. Indeed, Defendant continued to promote the efficacy of Roundup, even after it knew or should have known of the unreasonable risks from exposure. Defendant concealed, downplayed, or otherwise suppressed, through aggressive marketing and promotion, any information or research about the risks and dangers of exposure to its Roundup and glyphosate-containing products.

194.  Defendant's failure to warn regarding the dangers associated with exposures to Roundup products was a producing cause, proximate cause, and substantial factor in Plaintiff ARVILLE MANGOBA developing cancer.

195.  There was not substantial change in the condition of the Roundup when Plaintiff used it from the condition the Roundup was in when Defendant put the Roundup on the market. Nor was there a substantial change in the condition of the Roundup from the condition that Monsanto reasonably expected the Roundup to be used in.

196.  Plaintiff used the Roundup in a manner reasonably foreseeable to Monsanto. Indeed, he used it as a broad-spectrum herbicide. A use reasonably anticipated by Defendant.

197.  Plaintiff sustained the following damages as a foreseeable, direct, and proximate result of Defendant's acts and omissions:

    a.  Economic losses, including medical care and lost earnings; and

    b.  Noneconomic losses, including physical and mental pain and suffering, emotional distress, inconvenience, loss of enjoyment of life, impairment of quality of life, past and future.

## COUNT III: NEGLIGENCE

198.  Plaintiff incorporates herein each allegation set forth above.

199.   At all relevant times, Defendant was engaged in the business of manufacturing, formulating, creating, designing, testing, labeling, packaging, supplying, marketing, promoting, selling, advertising, and otherwise introducing Roundup and PCBs.

200.   Plaintiff ARVILLE MANGOBA used Roundup and was exposed to PCBs.

201.   New Monsanto could reasonably expect Plaintiff ARVILLE MANGOBA, and people like him, to use Roundup.

202.   Old Monsanto could reasonably expect Plaintiff ARVILLE MANGOBA, and people like him, to be exposed to PCBs.  Defendant had a duty to exercise reasonable care in the research, design, manufacture, packaging, marketing, advertisement, supply, promotion, sale, and distribution of Roundup and glyphosate-containing products, and PCBs. This duty included the duty to assure that the products would not cause users to suffer unreasonable, dangerous side effects, including cancer.

203.   Because Defendant was a manufacturer and supplier of PCBs and Roundup, this duty also included the duty to use ordinary care to avoid foreseeable risks of injury caused by the condition of Roundup and PCBs.

204.   Defendant had a duty to provide true and accurate information and warnings concerning the risks of using Roundup and glyphosate-containing products and PCBs.

205.   Defendant breached all these duties. Through their business model, they failed to exercise ordinary care in that they knew, or should have known, of the unreasonable risks of harm associated with the use of and/or exposure to Roundup and PCBs. These unreasonable risks included the unreasonably dangerous and carcinogenic properties of Roundup and PCBs and the propensity of Roundup and PCBs to cause cancer.

206.   New Monsanto also knew, or in the exercise of reasonable care, should have known that consumers and users of Roundup were unaware of the carcinogenic risks associated with exposures to Roundup.

207.   Old Monsanto also knew, or in the exercise of reasonable care should have known that people who would be exposed to PCBs, like Plaintiff, was unaware of the carcinogenic risks associated with exposures to PCBs Defendant's negligence is a direct result of its business model and includes, but is not limited to the following acts and/or omissions:

> a.   Failing to sufficiently test Roundup and PCBs to determine whether they were safe for their intended use;

b.  Failing to sufficiently test Roundup and PCBs to determine their carcinogenic properties after learning that their formulations could be carcinogenic;

c.  Marketing, advertising, and recommending the use of Roundup and PCBs without sufficient knowledge as to their dangerous propensities;

d.  Representing that Roundup and PCBs were safe for their intended use when they were not;

e.  Comparing the safety risks and dangers of Roundup with common everyday foods such as table salt;

f.  Failing to disclose the risk of serious harm associated with use of and exposures to Roundup and PCBs;

g.  Failing to provide adequate instructions, guidelines, and safety precautions to protect the health of those persons whom it could reasonably foresee would use and/or be exposed to Roundup and PCBs;

h.  Failing to use reasonable and prudent care in the design, development, and manufacture of Roundup and PCBs, so as to avoid the risk of serious harm associated with use of and/or exposures to them;

i.  Systematically suppressing or downplaying contrary evidence about the risks, incidence, and prevalence of the side effects of exposures to Roundup and PCBs;

j.  Failing to sufficiently test the "inert" ingredients and/or adjuvants contained within Roundup and the propensity of these ingredients to render Roundup toxic or to increase the toxicity of Roundup;

k.  Failing to test the synergistic effects of combining glyphosate with the surfactants used in Roundup and whether those synergistic effects renders Roundup toxic or increased the toxicity of Roundup;

l.  Continuing to disseminate information to consumers and the general public that indicate or imply that Roundup and/or PCBs are not unsafe; and

m. Continuing to manufacture and sell Roundup and PCBs with the knowledge that the products were unreasonably safe and dangerous.

208.  It was reasonably foreseeable that consumers, including Plaintiff, would suffer injury and possibly die as a result of Defendant's failure to exercise ordinary care in the manufacturing, marketing, promotion, labeling, distribution, and sale of Roundup and PCBs.

209.  Defendant under-reported, underestimated, and downplayed the serious dangers of its Roundup and PCBs.

210. Defendant's ongoing negligent decisions to market and distribute Roundup and PCBs were a producing cause, proximate cause, and substantial factor in the development of Plaintiff ARVILLE MANGOBA's cancer.

211. Plaintiff ARVILLE MANGOBA's cancer resulted from a reasonably foreseeable use of Roundup.

212. Plaintiff ARVILLE MANGOBA's cancer also resulted from a reasonably foreseeable exposure to PCBs.

213. Plaintiff sustained the following damages as a foreseeable, direct, and proximate result of Defendants' acts and omissions:

   a. Economic losses, including medical care and lost earnings; and

   b. Noneconomic losses, including physical and mental pain and suffering, emotional distress, inconvenience, loss of enjoyment of life, impairment of quality of life, past and future.

## COUNT IV: BREACH OF IMPLIED WARRANTIES

214. Plaintiff incorporates herein each allegation set forth above.

215. At all relevant times, Defendant was engaged in the business of manufacturing, formulating, creating, designing, testing, labeling, packaging, supplying, marketing, promoting, selling, advertising, and otherwise introducing its Roundup and glyphosate-containing products into the stream of commerce that Plaintiff used.

216.   At the time Defendant marketed, sold, and distributed its Roundup and glyphosate-containing products for use by Plaintiff, Defendant knew of their intended use and implicitly warranted that the products were of merchantable quality and safe and fit for the use for which they were intended; specifically, as horticultural herbicides.

217.   Before the time that Plaintiff used Defendant's Roundup and glyphosate-containing products, Monsanto impliedly warranted to consumers and Plaintiff that its Roundup and glyphosate-containing products were of merchantable quality and safe and fit for the use for which they were intended; specifically, as horticultural herbicides.

218.   Defendant, however, failed to disclose that its Roundup and glyphosate-containing products have dangerous propensities when used as intended and that the use of and/or exposure to its Roundup and glyphosate-containing products carries an increased risk of developing severe injuries, including Plaintiff ARVILLE MANGOBA's cancer.

219.   Plaintiff reasonably relied upon the skill, superior knowledge, and judgment of Defendant and upon their implied warranties that its Roundup and glyphosate-containing products were of merchantable quality and fit for their intended purpose or use.

220. Defendant's Roundup and glyphosate-containing products were expected to reach, and did in fact reach, consumers and/or users, including Plaintiff, without substantial change in the condition in which they were manufactured and sold by Defendant.

221. At all relevant times to this litigation, Defendant was aware that consumers and users of its Roundup, including Plaintiff, would use the products as marketed by Defendant, which is to say that Plaintiff was a foreseeable user of Defendant's Roundup.

222. Defendant intended that their Roundup would be used in the manner in which Plaintiff used it, and Defendant implicitly warranted each product to be of merchantable quality, safe, and fit for this use, despite the fact that Roundup was not adequately tested and/or researched.

223. In reliance on Defendant's implied warranty, Plaintiff used Roundup as instructed and labeled and in the foreseeable manner intended, recommended, promoted, and marketed by Defendant.

224. Plaintiff could not have reasonably discovered or known of the risks of serious injury associated with Roundup or glyphosate-containing products.

225. Defendant breached their implied warranty to Plaintiff in that their Roundup were not of merchantable quality, safe, or fit for their intended use, an/or adequately tested. Defendant's Roundup products have dangerous propensities when

used as intended and anticipated and can cause serious injuries, including Plaintiff ARVILLE MANGOBA's cancer.

226. The harm caused by Defendant's Roundup far outweighs their benefits, rendering the products more dangerous than an ordinary consumer or user would expect and more dangerous than alternative products.

227. As a direct and proximate result of Defendant's wrongful acts and omissions, Plaintiff suffered severe and permanent physical and emotional injuries, including, but not limited to, his diagnoses of NHL. Plaintiff has endured pain and suffering, has suffered economic loss (including significant expenses for medical care and treatment) and will continue to incur these expenses in the future.

228. Plaintiff sustained the following damages as a foreseeable, direct, and proximate result of Defendants' acts and omissions:

    a. Economic losses, including medical care and lost earnings; and

    b. Noneconomic losses, including physical and mental pain and suffering, emotional distress, inconvenience, loss of enjoyment of life, impairment of quality of life, past and future.

## DAMAGES

229. As a result of the negligence of defendant, Plaintiff has sustained damages and injuries including:

    a. Past and future physical pain and suffering;

b. Past and future mental anguish;

c. Past and future medical, healthcare, and attendant care expenses;

d. Past and future lost income and of earning capacity;

e. Past and future physical impairment;

f. Past and future loss of enjoyment and quality of life;

g. Past and future loss of enjoyment of property;

h. Nuisance damages, including inconvenience, illness, and fear;

i. Out of pocket expenses;

j. Loss of personal property;

k. Costs;

l. Prejudgment and post-judgment interest as provided by law, at the maximum legal rate; and

m. Such other and further relief to which the plaintiffs may be justly

230. In addition to placing the unreasonably dangerous and defective Roundup and PCBs on the market, giving rise to strict liability and negligence liability, Defendant also acted intentionally, maliciously, willfully, recklessly, and/or with wanton disregard for the safety of others.

231. Among others, these intentional, malicious, willful, reckless, and/or wanton acts and omissions of Defendant, either singularly, in combination, or based

on the cumulative conduct of employees of Defendant, were a cause of Plaintiff's injuries and damages. Accordingly, Defendant is liable for punitive damages.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray that this Court:

a.    Award Plaintiffs judgment against all Defendants and Old Monsanto, joint and severally, herein for all actual damages, punitive damages, pre-judgment and post-judgment interest at the legal rate, costs of suit, attorneys' fees where applicable and all such other and further relief to which Plaintiff may show themselves to be justly entitled under the facts and circumstances; and

b.    Grant Plaintiffs such other and further relief as this Court deems just and proper.

DATED: June 9, 2023

Respectfully submitted,

/s/ Ilana K. Waxman
L. RICHARD DeROBERTIS ILANA
K. WAXMAN
ALLISON M. AOKI
ALYSSA R. SEGAWA
CHRISTOPHER L. JOHNSON
PETER A. KRAUS
**Galiher DeRobertis & Waxman LLP**
*Counsel for Plaintiffs*

# U.S. District Court
## District of Hawaii (Hawaii)
## CIVIL DOCKET FOR CASE #: 1:23-cv-00248-HG-RT

Mangoba v. Monsanto Company
Assigned to: SENIOR JUDGE HELEN GILLMOR
Referred to: MAGISTRATE JUDGE ROM TRADER
Cause: 28:1332 Diversity-Product Liability

Date Filed: 06/09/2023
Jury Demand: Both
Nature of Suit: 245 Tort Product Liability
Jurisdiction: Diversity

**Plaintiff**

**Arville Mangoba**                    represented by    **Allison Mina Aoki**
DeRobertis & Waxman LLP
820 Mililani St Ste 505
Honolulu, HI 96813
808-597-1400
Fax: 808-534-1420
Email: allison.aoki@galiherlaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Alyssa R Segawa**
DeRobertis & Waxman LLP
820 Mililani St Ste 505
Honolulu, HI 96813
8085971400
Fax: 8085341420
Email: alyssa.segawa@galiherlaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Christopher L. Johnson**
DeRobertis & Waxman LLP
820 Mililani Street Unit 505
Honolulu, HI 96813
(808) 597-1400
Fax: (808) 591-2608
Email: cjohnson@waterskraus.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Peter Andrew Kraus**
Waters & Kraus LLP
3141 Hood Street, Suite 700
Dallas, TX 75219
(214) 357-6244
Fax: (214) 357-7252
Email: kraus@waterskraus.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Ilana Kananipiliokala Waxman**
DeRobertis & Waxman LLP

Exhibit 2

820 Mililani St Ste 505
Honolulu, HI 96813
8085971400
Fax: 8085341420
Email: ilana.waxman@galiherlaw.com
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Monsanto Company**                              represented by **Glenn T. Melchinger**

Dentons US LLP
1001 Bishop Street 18th Floor
Honolulu, HI 96813
808.524-1800
Fax: 808.524-4591
Email: glenn.melchinger@dentons.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 06/09/2023 | 1 | COMPLAINT; *Summons* against *Monsanto Company* ~~All Plaintiffs~~ ( Filing fee $ 402 receipt number AHIDC-2852634.), filed by Arville Mangoba. (Attachments: # 1 Civil Cover Sheet, # 2 Demand for Jury Trial, # 3 Summons)(Waxman, Ilana) Modified on 6/9/2023 (jni) (Entered: 06/09/2023) |
| 06/09/2023 | 2 | NOTICE of Case Assignment: Please reflect Civil case number CV 23-00248 HG-RT on all further pleadings. (jni) (Entered: 06/09/2023) |
| 06/09/2023 | 3 | Order Setting Telephonic Rule 16 Scheduling Conference is set for 09:00AM on 8/7/2023 before MAGISTRATE JUDGE ROM TRADER - Signed by CHIEF JUDGE DERRICK K. WATSON on 6/9/2023.<br><br>**ATTACH THE SCHEDULING ORDER TO THE INITIATING DOCUMENT (COMPLAINT/NOTICE OF REMOVAL).**<br>**THE SCHEDULING ORDER MUST BE SERVED WITH THE DOCUMENT.**<br>(jni) (Entered: 06/09/2023) |
| 06/09/2023 | 4 | CIVIL Waiver of Service Packet - Notice to Parties Regarding Service Pursuant to Rule 4 of the Federal Rules of Civil Procedure (Attachments: # 1 Notice of a Lawsuit and Request to Waive Service of a Summons, # 2 Waiver of the Service of Summons) (jni) (Entered: 06/09/2023) |
| 06/09/2023 | 5 | Summons Issued as to Monsanto Company. (jni) (Entered: 06/09/2023) |
| 06/09/2023 | 6 | Notice to Parties RE: Corporate Disclosure Statements Federal Rule of Civil Procedure 7.1 and Criminal Rule 12.4 both address the filing of Corporate Disclosure Statements. Both rules state A party must:(1) file the Rule 7.1(a) (or 12.4(a)) statement with its first appearance, pleading, petition, motion, response, or other request addressed to the court, and (2) promptly file a supplemental statement upon a change in the information that the statement requires. (jni) (Entered: 06/09/2023) |

| 06/09/2023 | 7 | CIVIL Cover Sheet by Arville Mangoba. (Waxman, Ilana) (Entered: 06/09/2023) |
|---|---|---|
| 06/26/2023 | 8 | ACKNOWLEDGEMENT OF SERVICE Executed *Return of Service and Acknowledgment of Service (Monsanto Company)* Acknowledgement filed by Arville Mangoba. (Segawa, Alyssa) (Entered: 06/26/2023) |
| 07/11/2023 | 9 | ANSWER to 1 Complaint, with Jury Demand *[ANSWER OF DEFENDANT MONSANTO COMPANY TO COMPLAINT, AND JURY TRIAL DEMAND]* by Monsanto Company. (Melchinger, Glenn) (Entered: 07/11/2023) |
| 07/11/2023 | 10 | Corporate Disclosure Statement by Monsanto Company identifying Corporate Parent Bayer AG for Monsanto Company.. (Melchinger, Glenn) (Entered: 07/11/2023) |
| 07/31/2023 | 11 | REPORT of Planning Meeting *by Arville Mangoba*. (Segawa, Alyssa) (Entered: 07/31/2023) |
| 07/31/2023 | 12 | *Plaintiff's Rule 16* Scheduling Conference Statement . (Segawa, Alyssa) Docket text modified on 8/1/2023 (eta). (Entered: 07/31/2023) |
| 08/01/2023 | 13 | EO: Per Defendant's request, the deadline to submit scheduling conference statements in advance of the 8/7/2023 Telephonic Rule 16 Scheduling Conference before Magistrate Judge Trader is **EXTENDED** to **8/3/2023**.<br><br>(MAGISTRATE JUDGE ROM TRADER)<br>(laa) (Entered: 08/01/2023) |

| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 08/01/2023 16:28:25 | | | |
| **PACER Login:** | lderob597 | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 1:23-cv-00248-HG-RT |
| **Billable Pages:** | 2 | **Cost:** | 0.20 |