Query    Reports    Utilities    Help    Log Out

LMR

# U.S. District Court
## Southern District of Florida (Ft Lauderdale)
### CIVIL DOCKET FOR CASE #: 0:23-cv-61067-RS

| | |
|---|---|
| Brookner et al v. Monsanto Company | Date Filed: 06/05/2023 |
| Assigned to: Judge Rodney Smith | Jury Demand: Plaintiff |
| Cause: 28:1332 Diversity-Product Liability | Nature of Suit: 365 Personal Inj. Prod. Liability |
| | Jurisdiction: Diversity |

**Plaintiff**

**Mendel Brookner**        represented by   **Jesse Nisan Bernheim**
Bernheim Kelley Battista & Bliss
FL
110 SE 6th Street, Suite 1719
Fort Lauderdale, FL 33301
954-866-1111
Email: JBernheim@realjustice.com
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Pamela Brookner**        represented by   **Jesse Nisan Bernheim**
(See above for address)
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Monsanto Company**

| Date Filed | # | Docket Text |
|---|---|---|
| 06/05/2023 | 1 | COMPLAINT against All Defendants. Filing fees $ 402.00 receipt number AFLSDC-16668272, filed by Mendel Brookner, Pamela Brookner. (Attachments: # 1 Civil Cover Sheet Civil Cover Sheet)(Bernheim, Jesse) (Entered: 06/05/2023) |
| 06/05/2023 | 2 | Clerks Notice of Judge Assignment to Judge Rodney Smith. <br><br>Pursuant to 28 USC 636(c), the parties are hereby notified that the U.S. Magistrate Judge Lisette M. Reid is available to handle any or all proceedings in this case. If agreed, parties should complete and file the Consent form found on our website. It is not necessary to file a document indicating lack of consent. (nwn) (Entered: 06/05/2023) |
| 08/29/2023 | 3 | NOTICE of Filing Proposed Summons(es) by Mendel Brookner, Pamela Brookner (Bernheim, Jesse) (Entered: 08/29/2023) |
| 08/30/2023 | 4 | Summons Issued as to Monsanto Company. (mee) (Entered: 08/30/2023) |

| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 09/06/2023 15:09:39 | | | |
| **PACER Login:** | sh0019sh | **Client Code:** | 31943.356965 rhb |
| **Description:** | Docket Report | **Search Criteria:** | 0:23-cv-61067-RS |
| **Billable Pages:** | 1 | **Cost:** | 0.10 |

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

**TRIAL COURT DEPARTMENT**
**DOCKET NO.**

MENDEL BROOKNER AND
PAMELA BROOKNER,

        Plaintiffs,

v.

MONSANTO COMPANY,

        Defendant.

## <u>COMPLAINT AND JURY DEMAND</u>

Plaintiffs, Mendel Brookner and Pamela Brookner (hereinafter referred to as "Plaintiffs"), by and through their undersigned counsel, file this Complaint against Defendant Monsanto Company and in support thereof make the following allegations:

**I.**      <u>THE PARTIES</u>

**Plaintiff**

1.      Plaintiff Mendel Brookner (hereinafter referred to as "Plaintiff") is currently a citizen of the city of Coral Springs, Broward County, Florida.

2.      In 2021, Mendel Brookner, then a 63-year-old citizen of Coral Springs, Florida was diagnosed with non-Hodgkin's lymphoma.

3.      Mendel Brookner has used Roundup® products at his home to manage weeds since approximately 2003.

**Defendant**

4.      Monsanto Company, Inc. is a Delaware corporation with its headquarters and principal place of business in St. Louis, Missouri, is authorized to do business in the State of Florida and conducted significant business within this judicial district at all times relevant herein.

5.      At all times relevant to this complaint, Defendant Monsanto discovered the herbicidal properties of glyphosate and was the manufacturer of Roundup®.

6.      Defendant Monsanto has regularly transacted and conducted business within this judicial district for years, and has derived substantial revenue from goods and products, including Roundup®, used in this judicial district during that same time.

7.      Defendant Monsanto expected or should have expected their acts to have consequences within the State of Florida, and derived substantial revenue from interstate commerce.

**II.      JURISDICTION AND VENUE**

8.      This Court has jurisdiction over the subject matter of this action pursuant to U.S. Code § 1332, as the parties are citizens of different states and the amount in controversy exceeds $75,000.

9.      Venue is proper in the Southern District of Florida pursuant to 28 U.S. Code 28 §1391 because the Defendant was doing business in, and because the tortious conduct described and resultant diagnosis of non-Hodgkin's lymphoma all took place within this judicial district.

**III.      FACTUAL BACKGROUND**

*Plaintiff's Exposure and Injuries*

10.      Plaintiff began using Roundup in or around 2003 in Coral Springs, Florida to control weeds around his residence.

11.     From 2003 to 2021, Plaintiff repeatedly sprayed Roundup® products on his property.

12.     As a direct and proximate result of exposure to Roundup, Plaintiff was diagnosed with Non-Hodgkin's lymphoma in or around 2021.

13.     Following Plaintiff's diagnosis of NHL, he suffered numerous injuries and damages attendant to the NHL diagnosis.

14.     Plaintiff's NHL diagnosis and injuries were the direct and proximate result of the unreasonably dangerous and defective nature of Roundup and Defendant's wrongful acts and omissions in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup.

### *Roundup*

15.     In 1970, Monsanto discovered the herbicidal properties of glyphosate and began marketing it in 1974 under the brand name Roundup.  Roundup is a non-selective herbicide used to kill weeds.  In addition to the active ingredient glyphosate, Roundup contains the surfactant Polyethoxylated tallow amine (POEA) and adjuvants and other so-called "inert" ingredients.

16.     Roundup refers to all formulations of Defendant's Roundup products, including, but not limited to, Roundup Concentrate Poison Ivy and Tough Brush Killer 1, Roundup Custom Herbicide, Roundup D-Pak herbicide, Roundup Dry Concentrate, Roundup Export Herbicide, Roundup Fence & Hard Edger 1, Roundup Garden Foam Weed & Grass Killer, Roundup Grass and Weed Killer, Roundup Herbicide, Roundup Original 2k herbicide, Roundup Original II Herbicide, Roundup Pro Concentrate, Roundup Prodry Herbicide, Roundup Promax, Roundup Quik Stik Grass and Weed Killer, Roundup Quikpro Herbicide, Roundup Rainfast Concentrate Weed & Grass Killer, Roundup Rainfast Super Concentrate Weed & Grass Killer, Roundup

Ready-to- Use Extended Control Weed & Grass Killer 1 Plus Weed Preventer, Roundup Ready-to- Use Weed & Grass Killer, Roundup Ready-to-Use Weed and Grass Killer 2, Roundup Ultra Dry, Roundup Ultra Herbicide, Roundup Ultramax, Roundup VM Herbicide, Roundup Weed & Grass Killer Concentrate, Roundup Weed & Grass Killer Concentrate Plus, Roundup Weed & Grass killer Ready-to-Use Plus, Roundup Weed & Grass Killer Super Concentrate, Roundup Weed & Grass Killer1 Ready-to-Use, Roundup WSD Water Soluble Dry Herbicide Deploy Dry Herbicide, or any other formulation of containing the active ingredient glyphosate.

17. Glyphosate is the most used herbicide in the world. Since 1974, 3.5 billion pounds of glyphosate has been sprayed in America alone, and another 15.4 billion pounds have been spread worldwide.

18. Given its widespread usage, glyphosate has contaminated the food chain and is a ubiquitous contaminant of the air, water, and soil where it is used. Glyphosate has been found in the urine of urban dwellers who are not in direct contact with the chemical.

19. Monsanto is the world's leading producer of glyphosate. Its glyphosate products are registered in 130 countries and approved for use on over 100 different crops.

20. On March 20, 2015, the International Agency for Research on Cancer (IARC), an agency of the World Health Organization (WHO), issued an evaluation of several herbicides, including glyphosate. That evaluation was based, in part, on studies of exposures to glyphosate in several countries around the world, and it traced the health implications from exposure to glyphosate since 2001.

21. Following the evaluation, IARC classified glyphosate as a Group 2A herbicide, which means that it is probably carcinogenic to humans. The IARC Working Group concluded that the cancers most associated with glyphosate exposure are NHL and other hematopoietic

cancers, including, but not limited to, lymphocytic lymphoma/chronic lymphocytic leukemia, B-cell lymphoma, and multiple myeloma.

22.     Monsanto, since it began selling Roundup, has represented it as safe to humans and the environment.  Indeed, Monsanto has repeatedly proclaimed, and continues to proclaim to the world, and particularly to United States consumers, that glyphosate-based herbicides, including Roundup, create no unreasonable risks to human health or to the environment.

23.     Monsanto participated in a prolonged campaign of misinformation to convince government agencies, farmers, customers, and the general population that its Roundup and other glyphosate-containing products are safe.

### Monsanto's Profits and Market Dominance

24.     The success of Roundup was key to Monsanto's continued reputation and dominance in the marketplace.  Largely due to the success of Roundup sales, Monsanto's agriculture division was outperforming its chemicals division's operating income, and that gap increased yearly.  But with its patent for glyphosate expiring in the United States in the year 2000, Monsanto needed a strategy to maintain its Roundup market dominance and to ward off impending competition.

25.     Monsanto thus began the development and sale of genetically engineered Roundup Ready® (Roundup Ready) seeds in 1996.  Because Roundup Ready crops are resistant to glyphosate, farmers can spray Roundup onto their fields during the growing season without harming the crop.  The advent of Roundup Ready seeds allowed Monsanto to expand its market for Roundup even further.  By 2000, Defendant Monsanto's biotechnology seeds were planted on more than 80 million acres worldwide and nearly 70% of American soybeans were planted from Roundup Ready seeds.  It also secured Monsanto's dominant share of the glyphosate/Roundup

market through a marketing strategy that coupled proprietary Roundup Ready seeds with continued sales of its Roundup herbicide.

26.    Through a three-pronged strategy of increased production, decreased prices, and coupling Roundup Ready seeds with Roundup, Roundup became Monsanto's most profitable product.  In 2000, Roundup accounted for almost $2.8 billion in sales, outselling other herbicides by a margin of five to one, and accounting for close to half of Monsanto's revenue.  Today, glyphosate remains one of the world's largest herbicides by sales volume.

### *Scientific Fraud in the Testing of Roundup*

27.    In the 1970s, Monsanto hired Industrial Bio-Test Laboratories (IBT) to perform and evaluate pesticide toxicology studies relating to glyphosate.

28.    In 1976, the United States Food and Drug Administration (FDA) performed an inspection of IBT that revealed discrepancies between the raw data and the final report relating to the toxicological impacts of glyphosate.  The Environmental Protection Agency (EPA) subsequently audited IBT and found the toxicology studies to be invalid.  An EPA reviewer stated, after finding "routine falsification of data" at IBT, that it was "hard to believe the scientific integrity of the studies."

29.    In 1983, top IBT executives were convicted of crimes arising from their fraudulent laboratory practices in 1983.  Included among those convicted was a Monsanto employee named Paul Wright.

30.    In 1991, Monsanto hired Craven Laboratories to perform studies on its pesticides and herbicides, including Roundup.  That same year, the owner of Craven Laboratories and three of its employees were indicted, and later convicted, of fraudulent laboratory practices in their testing of pesticides and herbicides.

31.     Monsanto has ghostwritten or published multiple studies through companies such as Intertek and Exponent, Inc.  These studies minimize any safety concerns about the use of glyphosate.  Such studies include, but are not limited to, Williams (2000); Williams (2012); Kier & Kirkland (2013); Kier (2015); Bus (2016); Chang (2016); and the Intertek Expert Panel Manuscripts.  Monsanto has also ghostwritten editorials to advocate for the safety of glyphosate in newspapers and magazines.  Monsanto failed to disclose the significant role it had in these studies, manuscripts, and editorials.

32.     In 2011, the Federal Institute for Risk Assessment (BfR) in Germany initiated a study on the safety of glyphosate.  Monsanto co-opted this study, became the sole provider of data for the study, and ultimately wrote the report which was rubber-stamped by the BfR.

33.     In March 2015, at Monsanto's behest, the Joint Glyphosate Task Force issued a press release sharply criticizing IARC, stating that IARC's conclusion was "baffling" and falsely claiming that "IARC did not consider any new or unique research findings when making its decision.  It appears that only by deciding to exclude certain available scientific information and by adopting a different approach to interpreting the studies was this possible."

### *Monsanto's Misrepresentations Regarding the Safety of Roundup*

34.     Monsanto knowingly has falsely advertised the safety of Roundup for decades.

35.     In 1996, the New York Attorney General filed a lawsuit against Monsanto based on its false and misleading advertising of Roundup products.  The lawsuit challenged Monsanto's general representations that its spray-on glyphosate-based herbicides, including Roundup, were "safer than table salt" and "practically non-toxic" to mammals, birds, and fish.  Among the representations the New York AG found deceptive and misleading about the human and environmental safety of glyphosate and/or Roundup are the following:

(a)     Remember that environmentally friendly Roundup herbicide is biodegradable. It won't build up in the soil so you can use Roundup with confidence along customers' driveways, sidewalks and fences.

(b)     And remember that Roundup is biodegradable and won't build up in the soil. That will give you the environmental confidence you need to use Roundup everywhere you've got a weed, brush, edging, or trimming problem.

(c)     Roundup biodegrades into naturally occurring elements.

(d)     Remember that versatile Roundup herbicide stays where you put it. That means there's no washing or leaching to harm customers' shrubs or other desirable vegetation.

(e)     This non-residual herbicide will not wash or leach in the soil. It ... stays where you apply it.

(f)     You can apply Accord with 'confidence because it will stay where you put it' it bonds tightly to soil particles, preventing leaching. Then, soon after application, soil microorganisms biodegrade Accord into natural products.

(g)     Glyphosate is less toxic to rats than table salt following acute oral ingestion.

(h)     Glyphosate's safety margin is much greater than required. It has over a 1,000-fold safety margin in food and over a 700-fold safety margin for workers who manufacture it or use it."

(i)     You can feel good about using herbicides by Monsanto. They carry a toxicity category rating of 'practically non-toxic' as it pertains to mammals, birds and fish.

(j)     Roundup can be used where kids and pets will play and breaks down into natural material. [This ad depicts a person with his head in the ground and a pet dog standing in an area which has been treated with Roundup.]

36.     On November 19, 1996, Monsanto and the New York AG entered into an Assurance of Discontinuance in which Monsanto agreed, among other things, "to cease and desist from publishing or broadcasting any advertisements [in New York] that represent, directly or by

implication" that:

    (a) its glyphosate-containing pesticide products or any component thereof are safe, non- toxic, harmless, or free from risk;

    (b) its glyphosate-containing pesticide products or any component thereof manufactured, formulated, distributed, or sold by Monsanto are bio-degradable;

    (c) its glyphosate-containing pesticide products or any component thereof stay where they are applied under all circumstances and will not move through the environment by any means;

    (d) its glyphosate-containing pesticide products or any component thereof are "good" for the environment or are "known for their environmental characteristics";

    (e) glyphosate-containing pesticide products or any component thereof are safer or less toxic than common consumer products other than herbicides; and

    (f) its glyphosate-containing products or any component thereof might be classified as "practically non-toxic."

37.    Upon information and belief, Monsanto has not altered its advertising in the same manner in any other state.

38.    In 2009, France's high court ruled that Monsanto had not told the truth about the safety of Roundup. The French court affirmed an earlier judgment that Monsanto had falsely advertised its herbicide Roundup as "biodegradable" and that it "left the soil clean."[1]

### IARC'S Classification of Glyphosate as "Probably Carcinogenic"

39.    The IARC process for the classification of glyphosate followed IARC's stringent procedures for the evaluation of a chemical agent. Over time, the IARC Mono- graph program has reviewed 980 agents. Of those reviewed, it has determined 116 agents to be Group 1 (Known

---

[1] *See Monsanto Guilty in 'False Ad' Row*, BBC, Oct. 15, 2009, available at http://news.bbc.co.uk/2/hi/europe/830903.stm.

Human Carcinogens); 73 agents to be Group 2A (Probable Human Carcinogens); 287 agents to be Group 2B (Possible Human Carcinogens); 503 agents to be Group 3 (Not Classified); and one agent to be Probably Not Carcinogenic.

40.     The established procedure for IARC Monograph evaluations is described in IARC Programme's Preamble.  Evaluations are performed by panels of international experts, selected based on their expertise and the absence of actual or apparent conflicts of interest.

41.     One year before a Monograph meeting, the meeting is announced and there is a call both for data and for experts.  Eight months before the Monograph meeting, the Working Group membership is selected and the sections of the Monograph are developed by the Working Group members.  One month before the Monograph meeting, the call for data is closed and the various draft sections are distributed among Working Group members for review and comment.  Finally, at the Monograph meeting, the Working Group finalizes review of all literature, evaluates the evidence in each category, and completes the overall evaluation.  Within two weeks after the Monograph meeting, the summary of the Working Group findings is published in Lancet Oncology, and within a year after the meeting, the final Monograph is finalized and published.

42.     In assessing an agent, the IARC Working Group reviews the following information: (a) human, experimental, and mechanistic data; (b) all pertinent epidemiological studies and cancer bioassays; and (c) representative mechanistic data.  The studies must be publicly available and have sufficient detail for meaningful review, and reviewers cannot be associated with the underlying study.

43.     In March 2015, IARC reassessed glyphosate.  The summary published in The Lancet Oncology reported that glyphosate is a Group 2A agent and probably carcinogenic in humans.

44.     On July 29, 2015, IARC issued Monograph 112 for glyphosate.  For Volume 112, a Working Group of 17 experts from 11 countries assessed the carcinogenicity of certain herbicides, including glyphosate. According to published procedures, the Working Group considered "reports that have been published or accepted for publication in the openly available scientific literature" as well as "data from governmental reports that are publicly available."

45.     The studies considered the following exposure groups: occupational exposure of farmers and tree-nursery workers in the United States, forestry workers in Canada and Finland, municipal weed-control workers in the United Kingdom, and para-occupational exposures in farming families.

46.     Glyphosate was identified as the second-most used household herbicide in the United States for weed control between 2001 and 2007 and the most heavily used herbicide in the world in 2012.

47.     Exposure pathways were identified as air (especially during spraying), water, and food. Community exposure to glyphosate is widespread and found in soil, air, surface water, groundwater, and food.

48.     The IARC Working Group found an increased risk between exposure to glyphosate and NHL and several subtypes of NHL, and the increased risk persisted after adjustment for other pesticides.

49.     The IARC Working Group also noted that glyphosate has been detected in the urine of agricultural workers, indicating absorption.  Soil microbes degrade glyphosate to aminomethylphosphonic acid (AMPA).  Blood AMPA detection after exposure suggests intestinal microbial metabolism in humans.

50.     The IARC Working Group also noted genotoxic, hormonal, and enzymatic effects

11

in mammals exposed to glyphosate.  Essentially, glyphosate inhibits the biosynthesis of aromatic amino acids, which leads to several metabolic disturbances, including the inhibition of protein and secondary product biosynthesis and general metabolic disruption.

51.     The IARC Working Group further found that glyphosate and glyphosate formulations induced DNA and chromosomal damage in mammals, and in human and animal cells in vitro.

52.     In addition to DNA damage and oxidative stress, studies have suggested that Roundup's association with various serious health conditions is linked to its effect on the digestive system.  Specifically, scientists believe the same mechanism that makes Roundup toxic to weeds also makes it toxic to the microbes within the human gut and mucous membranes.  When humans are exposed to Roundup, it leads to a chronic inflammatory state in the gut, as well an impaired gut barrier, which can lead to many long-term health effects, including an increased risk of cancer. Monsanto has deliberately refused to conduct tests on this aspect of Roundup's mechanism of action.

53.     Many Roundup products bear a label which either reads: "glyphosate targets an enzyme found in plants but not in people or pets" or "this Roundup formula tar- gets an enzyme in plants but not in people or pets."  These statements are false; it has been established that the human body is host to microorganisms that have the enzyme Monsanto asserts is not found in humans.  Thus, glyphosate targets microbes within the human body that have the enzyme, leading to a variety of adverse health effects.

54.     The IARC Working Group also reviewed an Agricultural Health Study, consisting of a prospective cohort of 57,311 licensed pesticide applicators in Iowa and North Carolina.  The results of the study support an association between glyphosate exposure and Multiple Myeloma,

Hairy Cell Leukemia (HCL), and Chronic Lymphocytic Leukemia (CLL), in addition to several other cancers.

### *Other Findings About Glyphosate's Dangers to Human Health*

55.    The EPA has a technical fact sheet, as part of its Drinking Water and Health, National Primary Drinking Water Regulations publication, relating to glyphosate.  This technical fact sheet predates the IARC March 20, 2015, evaluation and describes the release patterns for glyphosate.

56.    Per the EPA's fact sheet, glyphosate is released to the environment in its use as an herbicide for controlling woody and herbaceous weeds on forestry, right-of-way, cropped and non-cropped sites.  These sites may be around water and in wetlands.  It may also be released to the environment during its manufacture, formulation, transport, storage, disposal and cleanup, and from spills.

57.    The fact sheet further states that occupational workers and home gardeners may be exposed to glyphosate by inhalation; dermal contact during spraying, mixing, and cleanup; or touching soil and plants to which glyphosate was applied.  Occupational exposures may also occur during glyphosate's manufacture, transport, storage, and disposal.

58.    In 1995, the Northwest Coalition for Alternatives to Pesticides reported that in California, the state with the most comprehensive program for reporting of pesticide-caused illness, glyphosate was the third most commonly reported cause of pesticide illness among agricultural workers.

### *EPA's Review of Glyphosate*

59.    In April 2016, personnel within EPA's Office of Pesticides Program (OPP) leaked and posted on the internet a draft report of glyphosate carcinogenicity, entitled Cancer Assessment

Review Committee (CARC) report, which was dated October 2015. The EPA removed the document by May 2, 2016, within days of initially posting it online. An EPA spokesperson subsequently issued a statement on the agency's glyphosate review:

> Glyphosate documents were inadvertently posted to the Agency's docket. These documents have now been taken down because our assessment is not final. EPA has not completed our cancer review. We will look at the work of other governments as well as work by HHS's Agricultural Health Study as we move to make a decision on glyphosate. Our assessment will be peer reviewed and completed by end of 2016.

60. On September 12, 2016, EPA's OPP submitted a report on the carcinogenic potential of glyphosate, wherein it issued a "proposed conclusion" that glyphosate is "not likely to be carcinogenic to humans at doses relevant to human health risk assessment." There are no authors listed on this issue paper, which reiterates and adopts the conclusions of the October 2015 leaked assessment. The issue paper is based upon a review of industry-sponsored articles and studies. The OPP acknowledged that it rejected all studies that considered Roundup, instead of studies that isolated glyphosate, because "[g]lyphosate formulations contain various components other than glyphosate and it has been hypothesized these components are more toxic than glyphosate alone."

61. Thus, the OPP notes that dozens of studies considered by IARC were not reviewed by the OPP because the OPP's "evaluation focused on studies on the active ingredient glyphosate" and "additional research could also be performed to determine whether formulation components, such as surfactants, influence the toxicity of glyphosate formulations."

62. From December 13 to 16, 2016, EPA held FIFRA Scientific Advisory Panel (SAP) meetings to consider issues raised by the OPP's evaluation of glyphosate. Again, OPP allowed the SAP to consider only studies of glyphosate alone and not any study of the formulated product. In its Charge to the FIFRA SAP, the OPP noted that "[a]lthough there are studies available on

glyphosate-based pesticide formulations, the agency is soliciting advice from the FIFRA SAP on this evaluation of human carcinogenic potential for the active ingredient glyphosate only at this time."

63.     The OPP draft assessment therefore does not actually consider the product at issue in this litigation or, more importantly, how glyphosate, in conjunction with surfactants and other chemicals, affects carcinogenicity.

64.     On March 16, 2017, the final SAP meeting minutes and report were released, revealing disagreement and lack of consensus among the scientists on whether there was a positive association between glyphosate exposure and NHL.

### *Monsanto's Governmental Ties*

65.     Documents unsealed in the federal Roundup MDL (Multidistrict Litigation) reveal the extent to which Monsanto has been able to leverage its contacts within the EPA to protect glyphosate and Roundup from review and scrutiny.

66.      Monsanto email communications show that Jess Rowland, former Deputy Division Director, Health Effects Division of the EPA's OPP, and formerly the chair of the CARC (the same committee that inadvertently leaked the EPA's glyphosate report in April 2016), repeatedly and directly intervened on Monsanto's behalf.  These same documents reveal that Monsanto was secure in the knowledge that it had allies within the EPA.

67.     Indeed, in the months following IARC's initial March 2015 announcement that it had classified glyphosate as a probable carcinogen, Monsanto turned its attention to the EPA's review of glyphosate.  In one April 27, 2015, e-mail, Monsanto official Bill Heydens wrote to colleagues to suggest "approaching EPA and…. ask if there is anything that would help them defend the situation?"  His colleague Dan Jenkins responded: "I think you and I could get on the

phone w Jess Rowland and discuss this pretty openly. He'll give us straight talk."

68. The following day, Mr. Jenkins spoke to Mr. Rowland by telephone and then relayed the substance of the conversation for his colleagues in an April 28, 2015, e-mail. Specifically, Mr. Jenkins reported that with respect to the CARC investigation, Mr. Rowland had stated: "We have enough to sustain our conclusions. Don't need gene tox or epi I am the chair of the CARC and my folks are running this process for glyphosate in reg review. I have called a CARC meeting in June." Thus, even though the ostensible purpose of the CARC review was to evaluate the exhaustive IARC assessment on glyphosate, and even though the full IARC monograph on glyphosate would not be completed until July 2015, Mr. Rowland had already formed his conclusion months earlier, apparently as early as April 2015.

69. Mr. Rowland also intervened to halt another agency's review of glyphosate. When the Agency for Toxic Substances and Disease Registry (ATSDR), a federal public-health agency of the U.S. Department of Health and Human Services, announced in February 2015 that it planned to publish a toxicological review of glyphosate, it was Mr. Rowland who helped Defendant Monsanto stop the ATSDR's investigation. In the same April 28, 2015, e-mail discussed above, Mr. Jenkins explained that Mr. Rowland wanted to help Monsanto stop an investigation concerning the carcinogenicity of glyphosate being conducted by ATSDR. Since ATSDR is not controlled by the EPA, according to Mr. Jenkins, Mr. Rowland had bragged: "If I can kill this I should get a medal." Jenkins cautioned, however, that Monsanto should not "get your hopes up, I doubt EPA and Jess can kill this; but it's good to know they are going to actually make the effort now to coordinate due to our pressing and their shared concern that ATSDR is consistent in its conclusions with the EPA." The ATSDR never published its toxicological profile of glyphosate.

70. Internal Monsanto documents further reveal Monsanto's confidence that its allies

within the EPA would continue to support glyphosate. In an internal memo on glyphosate, Monsanto executives wrote: "We know, but cannot say, that EPA's Office of Pesticide Program scientists strongly feel that glyphosate does not cause cancer and have defended their written determination internally for months." Notably, when Mr. Rowland attended the IARC glyphosate meetings as an observer for the EPA, internal communications indicate Monsanto was not displeased with his attendance since, "we all know Jess."

### *Bans on Roundup & Glyphosate*

71.     Countries around the world have instituted bans on the sale of Roundup and other glyphosate-containing herbicides, both before and since the time of IARC's March 2015 classification of glyphosate as a probable carcinogen.

72.     Countries that have outright banned, imposed restrictions, or issued statements of intent to ban or restrict glyphosate include: Argentina, Australia, Austria, Belgium, Bermuda, Brazil, Canada, Colombia, Czech Republic, Denmark, El Salvador, France, Germany, Greece, India, Italy, Luxembourg, Malta, Netherlands, New Zealand, Portugal, Scotland, Slovenia, Spain, Sri Lanka, Sweden, Switzerland, United Kingdom, and Vietnam.

### *European Food Safety Authority (EFSA) Report on Glyphosate*

73.     On November 12, 2015, the EFSA, the European Union's primary agency for food safety, reported on its evaluation of the Renewal Assessment Report (RAR) on glyphosate. The Rapporteur Member State assigned to glyphosate, the German Federal Institute for Risk Assessment (BfR), had produced the RAR as part of the renewal process for glyphosate in the EU.

74.     BfR sent its draft RAR to EFSA, and the RAR underwent a peer-review process by EFSA, other member states, and industry groups. As part of the on-going peer review of Germany's reevaluation of glyphosate, EFSA had also received a second mandate from the

European Commission to consider IARC's findings regarding the potential carcinogenicity of glyphosate and glyphosate-containing products.

75.     Based on a review of the RAR, which included data from industry-submitted unpublished studies, EFSA sent its own report (Conclusion) to the European Commission, finding that "glyphosate is unlikely to pose a carcinogenic hazard to humans and the evidence does not support classification with regard to its carcinogenic potential according to Regulation (EC) No 1272/2008." EFSA therefore disagreed with IARC: glyphosate allegedly was not genotoxic and did not present a carcinogenic threat to humans.

76.     In explaining why its results departed from IARC's conclusion, EFSA drew a distinction between the EU and IARC approaches to the study and classification of chemicals. Although IARC examined "both glyphosate—an active substance—and glyphosate-based formulations, grouping all formulations regardless of their composition," EFSA explained that it considered only glyphosate and that its assessment focuses on "each individual chemical, and each marketed mixture separately." IARC, on the other hand, "assesses generic agents, including groups of related chemicals, as well as occupational or environmental exposure, and cultural or behavioral practices." EFSA accorded greater weight to studies conducted with glyphosate alone than studies of formulated products.

77.     EFSA went further and noted:

> [A]lthough some studies suggest that certain glyphosate-based formulations may be genotoxic (i.e. damaging to DNA), others that look solely at the active substance glyphosate do not show this effect. It is likely, therefore, that *the genotoxic effects observed in some glyphosate-based formulations are related to the other constituents or "co-formulants"*. Similarly, certain glyphosate-based formulations display higher toxicity than that of the active ingredient, presumably because of the presence of co-formulants. In its assessment, *EFSA proposes that the toxicity of each pesticide formulation and in particular its genotoxic potential should be further considered*

> *and ad- dressed by Member State authorities while they re-assess uses of glyphosate-based formulations in their own territories.*

78.     Notwithstanding its conclusion, EFSA did set exposure levels for glyphosate. Specifically, EFSA proposed an acceptable daily intake (ADI) of 0.5 mg/kg of body weight per day; an acute reference dose (ARfD) of 0.5 mg/kg of body weight; and an acceptable operator exposure level (AOEL) of 0.1 mg/kg bw per day.

### *Leading Scientists Dispute EFSA's Conclusion*

79.     On November 27, 2015, ninety-six (96) independent academic and governmental scientists from around the world submitted an open letter to the EU health commissioner, Vytenis Andriukaitis.   The scientists expressed their strong concerns and urged the commissioner to disregard the "flawed" EFSA report, arguing that "the BfR decision is not credible because it is not supported by the evidence and it was not reached in an open and transparent manner."

80.     Signatories to the letter included Dr. Christopher J. Portier, Ph.D., and other renowned international experts in the field, some of whom were part of the IARC Working Group assigned to glyphosate.

81.     In an exhaustive and careful examination, the scientists scrutinized EFSA's conclusions and outlined why the IARC Working Group decision was "by far the more credible" and explained:

> The IARC WG decision was reached relying on open and transparent procedures by independent scientists who completed thorough conflict-of-interest statements and were not affiliated or financially supported in any way by the chemical manufacturing industry.  It is fully referenced and de- pends entirely on reports published in the open, peer-reviewed biomedical literature.  It is part of a long tradition of deeply researched and highly credible reports on the carcinogenicity of hundreds of chemicals issued over the past four decades by IARC and used today by international agencies and regulatory bodies around the world as a basis for risk assessment, regulation and public health policy.

82.     With respect to human data, the scientists pointed out that EFSA agreed with IARC

that there was "limited evidence of carcinogenicity" for NHL, but EFSA nonetheless dismissed an association between glyphosate exposure and carcinogenicity. IARC applies three levels of evidence in its analyses of human data, including sufficient evidence and limited evidence. EFSA's ultimate conclusion that "there was no unequivocal evidence for a clear and strong association of NHL with glyphosate" was misleading because it was tantamount to IARC's highest level of evidence: "sufficient evidence," which means that a causal relationship has been established. However, the scientists argued, "[l]egitimate public health concerns arise when 'causality is credible,' i.e., when there is limited evidence."

83. Among its many other deficiencies, EFSA's conclusions regarding animal carcinogenicity data were "scientifically unacceptable," particularly in BfR's use of historical control data and in its trend analysis. Indeed, BfR's analysis directly contradicted the Organization for Economic Co-operation and Development (OECD) testing guidelines while citing and purporting to follow those same guidelines. For instance, the EFSA report dismisses observed trends in tumor incidence "because there are no individual treatment groups that are significantly different from controls and because the maximum observed response is reportedly within the range of the historical control data." However, according to the scientists, concurrent controls are recommended over historical controls in all guidelines, scientific reports, and publications, and, if it is employed, historical control data "should be from studies in the same timeframe, for the same exact animal strain, preferably from the same laboratory or the same supplier and preferably reviewed by the same pathologist." BfR's use of historical control data violated these precautions: "only a single study used the same mouse strain as the historical controls, but was reported more than 10 years after the historical control dataset was developed." Further deviating from sound scientific practices, the data used by the BfR came from studies in seven different laboratories.

The scientists concluded:

> BfR reported seven positive mouse studies with three studies showing increases in renal tumors, two with positive findings for hemangiosarcomas, and two with positive findings for malignant lymphomas. BfR additionally reported two positive findings for tumors in rats. Eliminating the inappropriate use of historical data, the unequivocal conclusion is that these are not negative studies, but in fact document the carcinogenicity of glyphosate in laboratory animals.

84. The letter also criticized the EFSA report's lack of transparency and the opacity surrounding the data cited in the report: "citations for almost all of the references, even those from the open scientific literature, have been redacted from the document" and "there are no authors or contributors listed for either document, a requirement for publication in virtually all scientific journals." Because BfR relied on unpublished, confidential industry-provided studies, it is "impossible for any scientist not associated with BfR to review this conclusion with scientific confidence."

85. On March 3, 2016, the letter was published in the Journal of Epidemiology & Community Health.

### *Toxicity of Other Ingredients in Roundup*

86. In addition to the toxicity of Roundup's active ingredient, glyphosate, several studies have shown that the glyphosate-based formulation in Monsanto's Roundup products is more dangerous and toxic than glyphosate alone. Indeed, as early as 1991, available evidence demonstrated that glyphosate formulations were significantly more toxic than glyphosate alone.

87. Roundup consists of from 40 to 60 percent glyphosate. Another ten to fifteen percent is surfactant. The surfactant used in Roundup is polyethoxylated tallow amine (POEA).

88. Surfactants, like POEA, allow glyphosate to penetrate into the leaf of a plant, so it can kill the plant. Part of the way POEA does this is that it allows Roundup to lie flat on the leaf

so that the oily, waxy leaf surface can absorb the Roundup and the glyphosate.

89.     In the same way that POEA allows Roundup to spread out on the leaf of a plant, it allows Roundup and glyphosate to spread out on human skin.  This causes the skin to absorb more of the Roundup and glyphosate.

90.     But the POEA doesn't just spread Roundup on the skin.  POEA increases the amount of time the Roundup and the glyphosate remains on the skin.

91.     POEA is a skin irritant.  The body's response to a skin irritant is to dilate the capillary bed and increase blood flow.  This increases absorption of Roundup, POEA, and glyphosate.

92.     Studies have shown that POEA increases the dermal absorption of Roundup by ten percent, which is a statistically significant higher rate of dermal absorption.

93.     Once the Roundup, glyphosate, and POEA penetrate the skin, they collect in a reservoir in the epidermis.  This reservoir is not immediately absorbed, and, because it is below the skin, it cannot be washed off.  Studies have shown this reservoir lasts for as long as seven days.

94.     Because bone is a preferential point of distribution for glyphosate, glyphosate migrates from this reservoir to the bone.

95.     Lymphoma is a cancer that starts in the bones.  Lymphatic stem cells are in the bone, the site of the start of the malignancy for NHL.

96.     Notably, POEA is banned in Europe.  That is, as Monsanto has admitted in pervious written discovery "the European Commission recommended that member states ban a co-formulant called POEA-Tallow amine from glyphosate-based products."

97.     William Sawyer, Ph.D., an expert toxicologist, has testified that POEA is forty times more toxic than glyphosate alone.

98.     Because of the synergistic effect of combing glyphosate with POEA, Roundup is about 50 times more toxic than glyphosate alone.

99.     There are surfactants less toxic than POEA, such as contact-lens solution, which is a harmless, nonionic surfactant.  Defendant Monsanto has chosen not to use these surfactants in Roundup.

100.     But POEA is not the only other dangerous ingredient in Roundup.  Roundup also contains: (1) formaldehyde, a confirmed human carcinogen; (2) ethylene oxide, an extremely powerful sterilization gas that is both mutagenic and carcinogenic to humans; and (3) 1, 4-dioxane, another possible human carcinogen.

101.     Studies have shown the poisonous effects of having so many toxic substances in Roundup.

102.     In 2002, a study by Julie Marc, entitled "Pesticide Roundup Provokes Cell Division Dysfunction at the Level of CDK1/Cyclin B Activation," revealed that Roundup causes delays in the cell cycles of sea urchins but that the same concentrations of glyphosate alone were ineffective and did not alter cell cycles.

103.     A 2004 study by Marc and others, entitled "Glyphosate-based pesticides affect cell cycle regulation," demonstrated a molecular link between glyphosate-based products and cell-cycle dysregulation.  The researchers noted that "cell-cycle dysregulation is a hallmark of tumor cells and human cancer. Failure in the cell-cycle checkpoints leads genomic instability and subsequent development of cancers from the initial affected cell."  Further, "[s]ince cell cycle disorders such as cancer result from dysfunction of a unique cell, it was of interest to evaluate the threshold dose of glyphosate affecting the cells."

104.     In 2005, a study by Francisco Peixoto, entitled "Comparative effects of the

Roundup and glyphosate on mitochondrial oxidative phosphorylation," demonstrated that Roundup's effects on rat liver mitochondria are far more toxic than equal concentrations of glyphosate alone. The Peixoto study further suggested that the harmful effects of Roundup on mitochondrial bioenergetics could not be exclusively attributed to glyphosate but could be the result of other chemicals, such as the surfactant POEA, or in the alternative, due to a potential synergic effect between glyphosate and other ingredients in the Roundup formulation.

105. In 2009, Nora Benachour and Gilles-Eric Seralini published a study examining the effects of Roundup and glyphosate on human umbilical, embryonic, and placental cells. The study tested dilution levels of Roundup and glyphosate that were far below agricultural recommendations, corresponding with low levels of residue in food. The re- searchers ultimately concluded that supposed "inert" ingredients, and possibly POEA, alter human-cell permeability and amplify toxicity of glyphosate alone. The researchers further suggested that assessments of glyphosate toxicity should account for the presence of adjuvants or additional chemicals used in the formulation of the complete pesticide. The study confirmed that the adjuvants present in Roundup are not, in fact, inert and that Roundup is potentially far more toxic than glyphosate alone.

106. At all relevant times, the results of these studies were available to Defendant.

107. Monsanto's chief toxicologist, Donna Farmer, has admitted that she cannot say that Roundup does not cause cancer because Monsanto has not performed carcinogenicity studies with the formulated product Roundup, the very product that caused, or substantially contributed to cause, Plaintiff's NHL. Indeed, she admitted that in the 35 years that Monsanto has marketed Roundup to the public, Monsanto has conducted no chronic carcinogenicity studies on the formulated Roundup product merely because the EPA did not require that such a study be

performed for registration of glyphosate.

108.    Defendant thus knew or should have known that Roundup is more toxic than glyphosate alone and that safety studies of Roundup, Roundup's adjuvants and "inert" ingredients, and/or the surfactant POEA were necessary to protect Plaintiff from Roundup.

109.    Despite knowing that Roundup is considerably more dangerous than glyphosate alone, Defendant deceptively continued to promote Roundup as safe.

*Statement of Concern Regarding Glyphosate-Based Herbicides*

110.    On February 17, 2016, a consensus statement published in the journal of Environmental Health, entitled "Concerns over use of glyphosate-based herbicides and risks associated with exposures: a consensus statement," assessed the safety of glyphosate-based herbicides (GBHs).  The paper's "focus is on the unanticipated effects arising from the worldwide increase in use of GBHs, coupled with recent discoveries about the toxicity and human health risks stemming from use of GBHs."   The researchers drew the following factual conclusions about GBHs:

> (a) GBHs are the most heavily applied herbicide in the world and usage continues to rise;
>
> (b) Worldwide, GBHsoften contaminate    drinking    water    sources, precipitation, and air, especially in agricultural regions;
>
> (c) The half-life of glyphosate in water and soil is longer than previously recognized;
>
> (d) Glyphosate and its metabolites are widely present in the global soybean supply;
>
> (e) Human exposures to GBHs are rising;
>
> (f) Glyphosate is now authoritatively classified as a probable human carcinogen; and

> (g) Regulatory estimates of tolerable daily intakes for glyphosate in the
> United States and European Union are based on outdated science.

111.    The researchers noted that GBH use has increased approximately 100-fold since

the 1970s.  Further, far from posing a limited hazard to vertebrates, as previously believed, two

decades of evidence demonstrated that "several vertebrate pathways are likely targets of action,

including hepatorenal damage, effects on nutrient balance through glyphosate chelating action and

endocrine disruption."

112.    The paper attributes uncertainties in current assessments of glyphosate

formulations to the fact that "[t]he full list of chemicals in most commercial GBHs is protected as

'commercial business information,' despite the universally accepted relevance of such information

to scientists hoping to conduct an accurate risk assessment of these herbicide formulations."

Further, the researchers argue, "[t]he distinction in regulatory review and decision processes

between 'active' and 'inert' ingredients has no toxicological justification, given increasing

evidence that several so-called 'inert' adjuvants are toxic in their own right."

113.    Among various implications, the researchers conclude that "existing toxicological

data and risk assessments are not sufficient to infer that GBHs, as currently used, are safe." Further,

"GBH-product formulations are more potent, or toxic, than glyphosate alone to a wide array of

non-target organisms including mammals, aquatic insects, and fish."  Accordingly, "risk

assessments of GBHs that are based on studies quantifying the impacts of glyphosate alone

underestimate both toxicity and exposure, and thus risk."  The paper concludes that this

"shortcoming has repeatedly led regulators to set inappropriately high exposure thresholds."

114.    The researchers also critique the current practice of regulators who largely rely on

"unpublished, non-peer reviewed data generated by the registrants" but ignore "published research

because it often uses standards and procedures to assess quality that are different from those

codified in regulatory agency data requirements, which largely focus on avoiding fraud." In the researchers' view, "[s]cientists independent of the registrants should conduct regulatory tests of GBHs that include glyphosate alone, as well as GBH-product formulations."

115.    The researchers call for greater inclusion of GBHs in government-led toxicology-testing programs:

> [A]fresh and independent examination of GBH toxicity should be under-taken, and . . . this re-examination be accompanied by systematic efforts by relevant agencies to monitor GBH levels in people and in the food supply, none of which are occurring today. The U.S. National Toxicology Program should prioritize a thorough toxicological assessment of the multiple path-ways now identified as potentially vulnerable to GBHs.

116.    The researchers suggest that to fill the gap created by an absence of government funds to support research on GBHs, regulators could adopt a system through which manufacturers fund the registration process and the necessary testing:

> [W]e recommend that a system be put in place through which manufacturers of GBHs provide funds to the appropriate regulatory body as part of routine registration actions and fees. Such funds should then be transferred to appropriate government research institutes, or to an agency experienced in the award of competitive grants. In either case, funds would be made available to independent scientists to conduct the appropriate long-term (minimum 2 years) safety studies in recognized animal model systems. A thorough and modern assessment of GBH toxicity will encompass potential endocrine disruption, impacts on the gut microbiome, carcinogenicity, and multigenerational effects looking at reproductive capability and frequency of birth defects.

117.    Despite these stated concerns, Monsanto, to date, has failed to test its formulated Roundup products.

## TOLLING

### *Discovery Rule*

118.    Plaintiff was not aware, and could not have been aware, through the exercise of reasonable diligence, of the nature of his claims against Defendant, including the connection

between Defendant's acts and omissions and Plaintiff's injuries, until less than two (2) years preceding the filing of the instant complaint.

### *Fraudulent Concealment*

119.     Defendant's acts and omissions amounted to fraud and/or concealment in keeping Plaintiff from discovering material facts, including the connection between Plaintiff's use of Roundup and Plaintiff's injuries, by causing Plaintiff to relax his vigilance or deviate from his right of inquiry into the facts.

120.     Said fraud and/or concealment prevented Plaintiff from discovering the nature of his claims against Defendant until less than two (2) years preceding the filing of the instant complaint.

## CAUSES OF ACTION

### COUNT I — STRICT LIABILITY, DESIGN DEFECT

121.     Plaintiffs reallege and incorporate by reference, as if fully set forth herein, each paragraph set forth above.

122.     At all relevant times, Defendant was engaged in the business of manufacturing, formulating, creating, designing, testing, labeling, packaging, supplying, marketing, promoting, selling, advertising, and otherwise introducing Roundup and the surfactants that went into Roundup.

123.     Plaintiff used Roundup.

124.     Defendant marketed and advertised Roundup and glyphosate-containing products, for use by consumers, including Plaintiff.

125.     At all relevant times, Roundup reached their intended consumers, users and/or other persons coming into contact with them, including Plaintiff, without substantial change in the

condition in which Defendant designed, produced, manufactured, sold, distributed, labeled, and marketed them.

126.    Defendant had a duty to create Roundup in a way that was not unreasonably dangerous for its normal, intended, or anticipated use.

127.    Defendant's Roundup and glyphosate-containing products were formulated, designed, and manufactured with carcinogens.

128.    The magnitude of the danger associated with use of Roundup outweighs its utility.

129.    The dangers of Roundup were unknown to the ordinary consumer and were unacceptable to the ordinary consumer. Plaintiffs did not know of these dangers. And if they would have known, these dangers would have been unacceptable to them.

130.    Furthermore, a reasonable person would conclude that the probability and seriousness of harm caused by Roundup outweighed the burden or costs of taking precautions.

131.    Defendant knew, or should have known, of the unreasonable risks of harm associated with the use of and/or exposure to Roundup and glyphosate-containing products, namely, their unreasonably dangerous and carcinogenic properties and their propensity to cause cancer, when the products left Defendant's control.

132.    Defendant's Roundup and glyphosate-containing products were defective because their carcinogenic properties made them unreasonably dangerous in that they were dangerous to an extent beyond that which an ordinary consumer, such as the Plaintiffs, would contemplate. Furthermore, the magnitude of the danger associated with use of Roundup and other cancer-causing chemicals that Monsanto is financially responsible for outweighs the utility of the products.

133.    At the time of Plaintiff's exposure, Roundup and/or glyphosate-containing products

were being used in a normal, intended, or anticipated manner, as a broad-spectrum herbicide and other applications known to Defendant.

134.    Plaintiff was exposed to Monsanto's Roundup and/or glyphosate-containing products without knowledge of their dangerous characteristics, specifically the carcinogenic risks associated with exposures to those products.

135.    The foreseeable risks associated with exposures to Monsanto's Roundup and glyphosate-containing products exceeded the alleged benefits associated with their design and formulation.

136.    Defects in Defendant's Roundup and/or glyphosate-containing products were a producing cause, proximate cause, and substantial factor in the development of Plaintiff's NHL.

137.    Plaintiff sustained the following damages as a foreseeable, direct, and proximate result of Defendant's acts and omissions:

   (a) Economic losses, including medical expenses; and

   (b) Noneconomic losses, including physical and mental pain and suffering, emotional distress, inconvenience, loss of enjoyment of life, and impairment of the quality of life.

WHEREFORE, Plaintiffs respectfully demand judgment in their favor and against Defendant, in an amount in excess of the applicable arbitration limits, including interest, costs of suit, delay damages, compensatory damages, punitive damages, and such other relief as this Honorable Court may deem appropriate.

## COUNT II — STRICT LIABILITY, FAILURE TO WARN

138.    Plaintiffs reallege and incorporate by reference, as if fully set forth herein, each paragraph set forth above.

139.    At all relevant times, Defendant engaged in the business of manufacturing,

formulating, creating, designing, testing, labeling, packaging, supplying, marketing, promoting, selling, advertising, and otherwise introducing Roundup.

140.    Defendant marketed and advertised its Roundup and glyphosate-containing products for use by consumers, including Plaintiff.

141.    Defendant had a duty to warn of the risks associated with the use of its Roundup.

142.    Defendant knew, or should have known, of the unreasonable risks of harm associated with the use of and/or exposure to Roundup and glyphosate-containing products, namely, their unreasonably dangerous and carcinogenic properties and their propensity to cause cancer, when the products left Defendant's control.

143.    Defendant failed to exercise reasonable care to warn of the dangerous carcinogenic risks associated with use of and exposures to its Roundup.

144.    The minimal warnings disseminated with Roundup and glyphosate-containing products were inadequate and failed to communicate the carcinogenic dangers attendant to exposures to and use of the products.

145.    As a result of Defendant's inadequate warnings, Defendant's Roundup products were defective and unreasonably dangerous when they left Defendant's possession, control, or both.

146.    Due to the absence of any warning or instruction by Defendant regarding the significant health-and-safety risks posed by Roundup and/or glyphosate-containing products, Plaintiffs were unaware that Defendant's Roundup was unreasonably dangerous and had carcinogenic properties, since such information was not known to the general public.

147.    Plaintiffs reasonably relied on the skill, superior knowledge, and judgment of Defendant.

148.     Had Defendant properly disclosed the risks associated with exposures to Roundup, Plaintiff could have avoided the risk of developing cancer from exposures to Roundup by choosing not to use Roundup.

149.     Instead, Defendant disseminated information that was inaccurate, false, and misleading and that failed to communicate accurately or adequately the comparative severity, duration, and extent of the risk of injuries associated with use of and/or exposure to Roundup; continued to promote the efficacy of Roundup, even after it knew or should have known of the unreasonable risks from exposure; and concealed, downplayed, or otherwise suppressed, through aggressive marketing and promotion, any information or research about the risks and dangers of exposure to Roundup.

150.     Defendant's failure to warn regarding the dangers associated with exposures to Roundup and/or glyphosate-containing products was a producing cause, proximate cause, and substantial factor in the development of Plaintiff's NHL.

151.     Plaintiff sustained the following damages as a foreseeable, direct, and proximate result of Defendant's acts and omissions:

    (a)     Economic losses, including medical expenses; and

    (b)     Noneconomic losses, including physical and mental pain and
            suffering, emotional distress, inconvenience, loss of enjoyment of
            life, and impairment of the quality of life.

WHEREFORE, Plaintiffs respectfully demand judgment in their favor and against Defendant, in an amount in excess of the applicable arbitration limits, including interest, costs of suit, delay damages, compensatory damages, punitive damages, and such other relief as this Honorable Court may deem appropriate.

## COUNT III — NEGLIGENCE

152.     Plaintiffs reallege and incorporate by reference, as if fully set forth herein, each paragraph set forth above.

153.     At all relevant times, Defendant was engaged in the business of manufacturing, formulating, creating, designing, testing, labeling, packaging, supplying, marketing, promoting, selling, advertising, and otherwise introducing Roundup.

154.     Plaintiff used Roundup.

155.     Defendant had a duty to exercise reasonable care in the research, design, manufacture, packaging, marketing, advertisement, supply, promotion, sale, and distribution of Roundup, including a duty to assure that the products would not cause users to suffer unreasonable, dangerous side effects, including developing cancer.

156.     Defendant had a duty to provide true and accurate information and warnings concerning the risks of using Roundup.

157.     Defendant failed to exercise ordinary care in that it knew, or should have known, of the unreasonable risks of harm associated with the use of and/or exposure to Roundup, namely Roundup's unreasonably dangerous and carcinogenic properties and Roundup's propensity to cause cancer, when the products left Monsanto's control.

158.     Defendant also knew, or in the exercise of reasonable care, should have known that consumers and users of Roundup were unaware of the carcinogenic risks associated with exposures to the products.

159.     Defendant's negligence includes, but is not limited to the following acts and/or omissions:

> (a) Failing to sufficiently test Roundup and glyphosate-containing products to determine whether they were safe for their intended use;

(b) Failing to sufficiently test Roundup and glyphosate-containing products to determine their carcinogenic properties after learning that their formulations could be carcinogenic;

(c) Marketing, advertising, and recommending the use of Roundup and glyphosate- containing products without sufficient knowledge as to their dangerous propensities;

(d) Representing that Roundup and glyphosate-containing products were safe for their intended use when they were not;

(e) Comparing the safety risks and dangers of Roundup and glyphosate-containing products with common everyday foods such as table salt, and other forms of herbicides;

(f) Failing to disclose the risk of serious harm associated with use of and exposures to Roundup and glyphosate-containing products;

(g) Failing to provide adequate instructions, guidelines, and safety precautions to protect the health of those persons whom Defendant could reasonably foresee would use and/or be exposed to Roundup;

(h) Failing to use reasonable and prudent care in the design, development, and manufacture of Roundup and glyphosate-containing products, so as to avoid the risk of serious harm associated with use of and/or exposures to Roundup;

(i) Failing to sufficiently test the "inert" ingredients and/or adjuvants contained within Roundup, and the propensity of these ingredients to render Roundup toxic or to increase the toxicity of Roundup;

(j) Systematically suppressing or downplaying contrary evidence about the risks, incidence, and prevalence of the side effects of exposures to Roundup and glyphosate-containing products;

(k) Continuing to disseminate information to Defendant's consumers and the general public that indicates or implies that Roundup and glyphosate-containing products are not unsafe for use; and

(l) Continuing to manufacture and sell Roundup, with the knowledge that Roundup was unreasonably dangerous.

160.    It was reasonably foreseeable that consumers, including Plaintiff, would suffer injury as a result of Defendant's failure to exercise ordinary care in the manufacturing, marketing,

promotion, labeling, distribution, and sale of Roundup.

161.    Defendant under-reported, underestimated, and downplayed the serious dangers of its Roundup.

162.    Defendant's ongoing negligent decisions to market and distribute Roundup and glyphosate-containing products were a producing cause, proximate cause, and substantial factor in the development of Plaintiff's NHL.

163.    Plaintiff sustained the following damages as a foreseeable, direct, and proximate result of Defendant's acts and omissions:

 (a) Economic losses, including medical expenses; and

 (b) Noneconomic losses, including physical and mental pain and suffering, emotional distress, inconvenience, loss of enjoyment of life, and impairment of the quality of life.

WHEREFORE, Plaintiffs respectfully demand judgment in their favor and against Defendant, in an amount in excess of the applicable arbitration limits, including interest, costs of suit, delay damages, compensatory damages, punitive damages, and such other relief as this Honorable Court may deem appropriate.

## COUNT IV — NEGLIGENT DESIGN

164.    Plaintiffs reallege and incorporate by reference, as if fully set forth herein, each paragraph set forth above.

165.    At all relevant times, Defendant was engaged in the business of researching, creating, testing, designing, and otherwise introducing Roundup.

166.    Plaintiff used Roundup.

167.    Defendant had a duty to exercise reasonable care in the research, testing, design, and creation of Roundup, including a duty to assure that the products would not cause users to

suffer unreasonable, dangerous side effects, including developing cancer.

168.    Defendant failed to exercise ordinary care in that it knew, or should have known, of the unreasonable risks of harm associated with the use of and/or exposure to Roundup, namely Roundup's unreasonably dangerous and carcinogenic properties and Roundup's propensity to cause cancer, when the products left Monsanto's control.

169.    Defendant also knew, or in the exercise of reasonable care, should have known that consumers and users of Roundup were unaware of the carcinogenic risks associated with exposures to the products.

170.    Defendant's negligence includes, but is not limited to the following acts and/or omissions:

> (a) Failing to sufficiently test Roundup and glyphosate-containing products to determine whether they were safe for their intended use;
>
> (b) Failing to sufficiently test Roundup and glyphosate-containing products to determine their carcinogenic properties after learning that their formulations could be carcinogenic;
>
> (c) Failing to use reasonable and prudent care in the design, creation, development, and manufacture of Roundup and glyphosate-containing products, so as to avoid the risk of serious harm associated with use of and/or exposures to Roundup;
>
> (d) Failing to sufficiently test the "inert" ingredients and/or adjuvants contained within Roundup, and the propensity of these ingredients to render Roundup toxic or to increase the toxicity of Roundup; and
>
> (e) Continuing to manufacture and sell Roundup, with the knowledge that Roundup was unreasonably dangerous.

171.    It was reasonably foreseeable that consumers, including Plaintiff, would suffer injury as a result of Defendant's failure to exercise ordinary care in the design, creation, development, and testing of Roundup.

172.    Defendant's ongoing negligent decisions on how the design, marketing, and

distribution of Roundup and glyphosate-containing products were a producing cause, proximate cause, and substantial factor in the development of Plaintiff's NHL.

173.    Plaintiff sustained the following damages as a foreseeable, direct, and proximate result of Defendant's acts and omissions:

(a) Economic losses, including medical expenses; and

(b) Noneconomic losses, including physical and mental pain and suffering, emotional distress, inconvenience, loss of enjoyment of life, and impairment of the quality of life.

WHEREFORE, Plaintiffs respectfully demand judgment in their favor and against Defendant, in an amount in excess of the applicable arbitration limits, including interest, costs of suit, delay damages, compensatory damages, punitive damages, and such other relief as this Honorable Court may deem appropriate.

## COUNT V — NEGLIGENT MARKETING

174.    Plaintiffs reallege and incorporate by reference, as if fully set forth herein, each paragraph set forth above.

175.    At all relevant times, Defendant was engaged in the business of labeling, packaging, marketing, promoting, selling, advertising, and otherwise introducing Roundup.

176.    Plaintiff used Roundup.

177.    Defendant had a duty to exercise reasonable care in the packaging, marketing, advertisement, supply, promotion, sale, and distribution of Roundup, including a duty to assure that the products would not cause users to suffer unreasonable, dangerous side effects, including developing cancer.

178.    Defendant had a duty to provide true and accurate information and warnings concerning the risks of using Roundup.

179.    Defendant failed to exercise ordinary care in that they knew, or should have known, of the unreasonable risks of harm associated with the use of and/or exposure to Roundup, namely Roundup's unreasonably dangerous and carcinogenic properties and Roundup's propensity to cause cancer, when the products left Monsanto's control.

180.    Defendant also knew, or in the exercise of reasonable care, should have known that consumers and users of Roundup were unaware of the carcinogenic risks associated with exposures to the products.

181.    Defendant's negligence includes, but is not limited to the following acts and/or omissions:

      (a) Failing to sufficiently test Roundup and glyphosate-containing products to determine whether they were safe for their intended use;

      (b) Failing to sufficiently test Roundup and glyphosate-containing products to determine their carcinogenic properties after learning that their formulations could be carcinogenic;

      (c) Failing to use reasonable and prudent care in the design, creation, development, and manufacture of Roundup and glyphosate-containing products, so as to avoid the risk of serious harm associated with use of and/or exposures to Roundup;

      (d) Failing to sufficiently test the "inert" ingredients and/or adjuvants contained within Roundup, and the propensity of these ingredients to render Roundup toxic or to increase the toxicity of Roundup; and

182.    It was reasonably foreseeable that consumers, including Plaintiff, would suffer injury and possibly die as a result of Defendant's failure to exercise ordinary care in the manufacturing, marketing, promotion, labeling, distribution, and sale of Roundup.

183.    Defendant under-reported, underestimated, and downplayed the serious dangers of its Roundup.

184.    Defendant's ongoing negligent decisions to market and distribute Roundup and

glyphosate-containing products were a producing cause, proximate cause, and substantial factor in the development of Plaintiff's NHL.

185.    Plaintiff sustained the following damages as a foreseeable, direct, and proximate result of Defendant's acts and omissions:

(a) Economic losses, including medical expenses; and

(b) Noneconomic losses, including physical and mental pain and suffering, emotional distress, inconvenience, loss of enjoyment of life, and impairment of the quality of life.

WHEREFORE, Plaintiffs respectfully demand judgment in their favor and against Defendant, in an amount in excess of the applicable arbitration limits, including interest, costs of suit, delay damages, compensatory damages, punitive damages, and such other relief as this Honorable Court may deem appropriate.

## COUNT VI — BREACH OF IMPLIED WARRANTY

186.    Plaintiffs reallege and incorporate by reference, as if fully set forth herein, each paragraph set forth above.

187.    At all relevant times, Defendant was engaged in the business of manufacturing, formulating, creating, designing, testing, labeling, packaging, supplying, marketing, promoting, selling, advertising, and otherwise introducing its Roundup and glyphosate-containing products into the stream of commerce that Plaintiff used.

188.    At the time Monsanto marketed, sold, and distributed its Roundup and glyphosate-containing products for use by Plaintiff, Monsanto knew of their intended use and implicitly warranted that the products were of merchantable quality and safe and fit for the use for which they were intended, specifically, as horticultural herbicides.

189.    Before the time that Plaintiff was exposed to the use of Monsanto's Roundup and

glyphosate-containing products, Monsanto impliedly warranted to consumers and those exposed, including Plaintiff, that its Roundup and glyphosate-containing products were of merchantable quality and safe and fit for the use for which they were intended; specifically, as horticultural herbicides.

190.    However, Monsanto failed to disclose that its Roundup and glyphosate-containing products have dangerous propensities when used as intended and that the use of and/or exposure to its Roundup and glyphosate-containing products carries an increased risk of developing severe injuries, including Plaintiff's NHL.

191.    Plaintiff reasonably relied upon the skill, superior knowledge, and judgment of Monsanto and upon its implied warranties that its Roundup and glyphosate-containing products were of merchantable quality and fit for its intended purpose or use.

192.    Monsanto's Roundup and glyphosate-containing products were expected to reach, and did in fact reach, consumers and/or users, including Plaintiff, without substantial change in the condition in which they were manufactured and sold by Monsanto.

193.    At all relevant times to this litigation, Monsanto was aware that consumers and users of its Roundup and glyphosate-containing products, including Plaintiff, who was a foreseeable user of Roundup.

194.    Monsanto intended that its Roundup and glyphosate-containing products be used in the manner in which Plaintiff was exposed, and Monsanto implicitly warranted each product to be of merchantable quality, safe, and fit for this use, despite the fact that Roundup was not adequately tested and/or researched.

195.    In reliance on Monsanto's implied warranty, Plaintiff used or was exposed to Monsanto's Roundup and glyphosate-containing products as instructed and labeled and in the

foreseeable manner intended, recommended, promoted, and marketed by Monsanto.

196.    Plaintiffs could not have reasonably discovered or known of the risks of serious injury associated with Roundup or glyphosate-containing products.

197.    Monsanto breached its implied warranty to Plaintiffs in that its Roundup and glyphosate-containing products were not of merchantable quality, safe, or fit for their intended use, an/or adequately tested.  Monsanto's Roundup and glyphosate-containing products have dangerous propensities when used as intended and anticipated and can cause serious injuries, including those of which Plaintiffs complain.

198.    The harm caused by Monsanto's Roundup and glyphosate-containing products far outweighed their benefits, rendering the products more dangerous than an ordinary consumer or user would expect and more dangerous than alternative products.

199.    As a direct and proximate result of Defendant Monsanto's wrongful acts and omissions, Plaintiff has suffered severe and permanent physical and emotional injuries, including, but not limited to, Plaintiff's diagnosis of NHL.  Plaintiff has endured pain and suffering, suffered economic loss (including significant expenses for medical care and treatment), and will continue to incur these expenses in the future.

200.     Plaintiff sustained the following damages as a foreseeable, direct, and proximate result of Defendant's acts and omissions:

(a) Economic losses, including medical expenses; and

(b) Noneconomic losses, including physical and mental pain and suffering, emotional distress, inconvenience, loss of enjoyment of life, and impairment of the quality of life.

WHEREFORE, Plaintiffs respectfully demand judgment in their favor and against Defendant, in an amount in excess of the applicable arbitration limits, including interest, costs of

suit, delay damages, compensatory damages, punitive damages, and such other relief as this Honorable Court may deem appropriate.

## COUNT VII — VIOLATION OF FLORIDA UNFAIR AND DECEPTIVE TRADE PRACTICES ACT ("FDUTPA"), § 501.201, et seq.

201. Plaintiffs reallege and incorporate by reference, as if fully set forth herein, each paragraph set forth above.

202. Defendant was at all times material hereto engaged in the conduct of trade and commerce throughout the United States including the state of Florida.

203. Defendant committed unfair and deceptive acts and practices in violation of the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"), § 501.201 et seq. These violations include, but are not limited to, Defendant's breach of their implied warranty of merchantability by manufacturing, selling and/or distributing Roundup® in a defective condition unreasonably dangerous to users and consumers, including Plaintiff, because Roundup® was unreasonably dangerous in its design, formulation and warnings, and there was a safer reasonable alternative design.

204. Defendant also violated Florida Deceptive and Unfair Trade Practices Act by engaging in business practices that were oppressive or otherwise unconscionable.

205. Defendant' misleading and fraudulent safety statements and concealment of the dangers of Roundup® described above was calculated to confuse the public as to the dangers of Roundup®. Such misleading statements and representations were made to increase Defendant's own profits and without regard for the health and safety of consumers, including Plaintiff.

206. Plaintiff sustained the following damages as a foreseeable, direct, and proximate result of Defendant's acts and omissions:

  (a) Economic losses, including medical expenses; and

(b) Noneconomic losses, including physical and mental pain and suffering, emotional distress, inconvenience, loss of enjoyment of life, and impairment of the quality of life.

WHEREFORE, Plaintiffs respectfully demand judgment in their favor and against Defendant, in an amount in excess of the applicable arbitration limits, and any and all damages recoverable under the UTPCPL, including the loss of money and property resulting from Defendant's violations of the UTPCPL, treble damages, all costs, and reasonable attorney fees.

## COUNT VIII — LOSS OF CONSORTIUM

207. Plaintiff repeats, reiterates, and re-alleges each and every allegation of the complaint above as if fully set forth herein.

208. At all relevant times in this lawsuit, Plaintiffs were married, and they continue to be married.

209. As a direct and proximate result of Defendant's acts and omissions, Plaintiff Pamela Brookner has suffered and will continue to suffer damages, including and not limited to, loss of help in completing household chores, disruption of companionship and friendship with a spouse, loss of a sexual relationship, mental pain and suffering, and emotional distress.

## <u>DAMAGES</u>

210. Plaintiffs reallege and incorporate by reference, as if fully set forth herein, each paragraph set forth above.

211. As a direct and proximate result of Defendant's conduct as described herein, Plaintiffs sustained damages, including: pain and suffering; mental and emotional anguish; disfigurement; emotional and psychological loss; loss of services, society, and comfort; lost earnings; pecuniary loss from the purchase of Defendant's products, medical expenses, and all damages recoverable under applicable law.

212.     As a direct and proximate result of Defendant's gross negligence, complete indifference to or conscious disregard for the safety of others, and malice and/or oppression, Plaintiffs seek punitive damages to punish Defendant and to deter Defendant and others in similar situations from like conduct.

## **PRAYER FOR RELIEF**

213.     Plaintiffs pray for judgment against Defendant on each of the claims and causes of action set forth herein, and as follows:

(a)   Compensatory damages in excess of seventy-five thousand dollars ($75,000.00), including but not limited to, pain, suffering, emotional distress, loss of enjoyment of life, and other noneconomic damages in an amount to be determined at trial;

(b)   Economic damages in the form of medical expenses, out-of-pocket expenses, lost earnings, and other economic damages in an amount to be determined at trial;

(c)   Punitive or exemplary damages for the wanton, willful, fraudulent, reckless acts of Defendant, who demonstrated a complete disregard and reckless indifference for the safety and welfare of the general public and Plaintiffs.  Plaintiffs ask for an amount sufficient to punish Defendant and deter future similar conduct;

(d)   Any and all damages recoverable for violations of the FDUTPA, including costs and reasonable attorneys' fees;

(e)   Pre-judgment interest;

(f)   Post-judgment interest;

(g)   Reasonable attorney's fees;

(h)   Costs of these proceedings;

(i)   Delay damages; and

(j)   Such other and further relief as this Court deems just and proper.

## **DEMAND FOR JURY TRIAL**

Plaintiffs demand a jury trial on all claims.


Date:   June 5, 2023

                                        Respectfully submitted,


                                        */s/ Jessie Bernheim*

                                        Jessie Bernheim (Fla. Bar #0525421)

                                        BERNHEIM KELLEY BATTISTA
                                        1212 E. Broward Blvd.
                                        3rd Floor
                                        Fort Lauderdale, FL 33301
                                        Telephone: (954) 866-1111
                                        Email: jbernheim@realjustice.com

                                        *Attorney for Plaintiffs*