ACCO,OPEN_MJ,PEND_CONSENT

## US District Court Electronic Case Filing System
### District of Utah (Central)
### CIVIL DOCKET FOR CASE #: 2:23-cv-00683-JCB

| | |
|---|---|
| Jolley v. Monsanto Company, Inc. et al | Date Filed: 09/29/2023 |
| Assigned to: Magistrate Judge Jared C. Bennett | Jury Demand: None |
| Demand: $75,000 | Nature of Suit: 245 Tort Product Liability |
| Cause: 28:1332 Diversity-Personal Injury | Jurisdiction: Diversity |

**Plaintiff**

**Steven R. Jolley**          represented by   **Matthew B. Crane**
FORD & CRANE PLLC
333 E MAIN ST #451
LEHI, UT 84043
801-331-8668
Email: matthew.crane@fordcranelaw.com
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Monsanto Company, Inc.**
*a Delaware corporation*

**Defendant**

**Bayer Corporation**

| Date Filed | # | Docket Text |
|---|---|---|
| 09/29/2023 | 1 | COMPLAINT against All Defendants (Filing fee $ 402, receipt number AUTDC-4826349) filed by Steven R. Jolley. (Attachments: # 1 Civil Cover Sheet Civil Cover Sheet) (Crane, Matthew) (Entered: 09/29/2023) |
| 09/29/2023 | | Magistrate Judge Jared C. Bennett added. Case number will now read **2:23-cv-00683-JCB.** Please make changes to document captions accordingly. (kec) (Entered: 09/29/2023) |
| 10/02/2023 | 2 | Summons Issued Electronically as to Bayer Corporation. Instructions to Counsel: 1. Click on the document number. 2. If you are prompted for an ECF login, enter your 'Attorney' login to CM/ECF. 3. Print the issued summons for service. (kec) (Entered: 10/02/2023) |
| 10/02/2023 | 3 | Summons Issued Electronically as to Monsanto Company, Inc.. Instructions to Counsel: 1. Click on the document number. 2. If you are prompted for an ECF login, enter your 'Attorney' login to CM/ECF. 3. Print the issued summons for service. (kec) (Entered: 10/02/2023) |
| 10/02/2023 | 4 | ORDER TO PROPOSE SCHEDULE - See order for details. Signed by Magistrate Judge Jared C. Bennett on 10/2/2023. (alf) (Entered: 10/02/2023) |

| Description: | Docket Report | Search Criteria: | 2:23-cv-00683-JCB |
|---|---|---|---|
| Billable Pages: | 1 | Cost: | 0.10 |

**Matthew B. Crane** (UTB# 13909)
FORD & CRANE PLLC
333 E. Main Street, #451
Lehi, Utah 84043
Telephone: (801) 753-8002
Email: matthew.crane@fordcranelaw.com
*Attorney for Plaintiff Steven R. Jolley*

## IN THE UNITED STATES DISTRICT COURT,
## IN AND FOR THE CENTRAL DISTRICT OF UTAH

| | |
|---|---|
| STEVEN R. JOLLEY,<br><br>　　　　　　Plaintiff,<br>vs.<br><br>MONSANTO COMPANY, INC., a Delaware corporation, and BAYER CORPORATION,<br><br>　　　　　Defendants. | **COMPLAINT**<br><br>Case No. 2:23-CV-683<br><br>Judge _____ |

Plaintiff, Steven R. Jolley, by and through counsel Matthew B. Crane of Ford & Crane PLLC, hereby files complaint against Monsanto Company, Inc. ("Monsanto"), a Delaware corporation, and Bayer Corporation ("Bayer"), a New Jersey corporation, and alleges as follows:

### INTRODUCTION

1.　　　This is an action for damages suffered by Plaintiff as a direct and proximate result of Defendants' negligent and deliberate wrongful conduct in the design, manufacture, testing, marketing, advertising, distribution, labeling, and/or sale of the herbicide Roundup, which employ glyphosate as the primary active ingredient.

2.　　　The term "Roundup" refers to the herbicide product bearing that name, as well as its numerous iterations including but not limited to: Roundup Concentrate Poison Ivy and Tough

1

Brush Killer 1, Roundup Custom Herbicide, Roundup D-Pak herbicide, Roundup Dry

Concentrate, Roundup Export Herbicide, Roundup Fence & Hard Edger 1, Roundup Garden

Foam Weed & Grass Killer, Roundup Grass and Weed Killer, Roundup Herbicide, Roundup

Original 2k herbicide, Roundup Original II Herbicide, Roundup Pro Concentrate, Roundup

Prodry Herbicide, Roundup Promax, Roundup Quik Stik Grass and Weed Killer, Roundup

Quikpro Herbicide, Roundup Rainfast Concentrate Weed & Grass Killer, Roundup Rainfast

Super Concentrate Weed & Grass Killer, Roundup Ready-to-Use Extended Control Weed &

Grass Killer 1 Plus Weed Preventer, Roundup Ready-to-Use Weed & Grass Killer, Roundup

Ready-to-Use Weed and Grass Killer 2, Roundup Ultra Dry, Roundup Ultra Herbicide, Roundup

Ultramax, Roundup VM Herbicide, Roundup Weed & Grass Killer Concentrate, Roundup Weed

& Grass Killer Concentrate Plus, Roundup Weed & Grass killer Ready-to-Use Plus, Roundup

Weed & Grass Killer Super Concentrate, Roundup Weed & Grass Killer l Ready-to-Use,

Roundup WSD Water Soluble Dry Herbicide Deploy Dry Herbicide, or any other formulation of

Roundup containing the active ingredient glyphosate.

3. Roundup and/or glyphosate is defective, dangerous to human health, unfit and

unsuitable to be marketed and sold in commerce, and lacked proper warnings and directions as to

the dangers associated with its use.

## PARTIES, JURISDICTION AND VENUE

4. Plaintiff Steven R. Jolley is a citizen and resident of the State of Utah.

5. Like many of his fellow Americans, Plaintiff used Roundup for

personal purposes for many years, beginning in approximately the year 1993. Plaintiff

2

always used Roundup as a general-purpose herbicide as directed on the product's
packaging.

6.       In September 2014, Plaintiff was diagnosed with diffuse large B-cell
lymphoma ("DLBCL"), an aggressive type of non-Hodgkin lymphoma that develops
from the B-cells in the lymphatic system.

7.       Defendant Monsanto is a Delaware corporation with its principal place of
business in the state of Missouri. Monsanto is a large corporation that is registered to conduct—
and does in fact conduct—business in the state of Utah.

8.       Defendant Bayer is a New Jersey corporation with its principal place of business in
the state of New Jersey. Bayer represents the large international entity Bayer AG in the United
States "in all strategic business areas". Bayer acquired Monsanto in 2018 for the sum of $63
million.

9.       Defendants market, advertise, distribute and sell distribute products, including
Roundup, throughout the United States and specifically in the state of Utah.

10.      As described herein, Defendants have conducted substantial business in Utah
through the marketing, advertising, distribution and sale of their products, including Roundup,
and have profited handsomely therefrom.

11.      Defendants undertook to design, manufacture, market, advertise, distribute and
sell Roundup despite possessing knowledge that Roundup and/or its primary ingredient
Glyphosate was hazardous to human health.

12.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1332.

13.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2).

## FACTUAL ALLEGATIONS

14.     Plaintiff incorporates the foregoing paragraphs herein.

15.     Monsanto is a leading producer of glyphosate—the primary active ingredient in Roundup.

16.     In 1970, Monsanto chemical researchers discovered glyphosate's ability to perform as a broad-spectrum systemic herbicide. Armed with this knowledge, Monsanto set out to develop an herbicide product that employed the properties of glyphosate and, within only a few years, introduced the first glyphosate-based herbicide to the market—Roundup.

17.     Upon its introduction, Monsanto marketed Roundup as a general-purpose herbicide that was harmless to humans, animals and the environment and was safe for commercial and consumer use. Monsanto has continuously represented to the public that Roundup is safe when used as directed and continues to advertise, market and sell Roundup under these auspices.

18.     The manufacture, formulation, and distribution of herbicides, such as Roundup, are regulated in the United States under the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA" or "Act"), 7 U.S.C. § 136 et seq. FIFRA requires that all pesticides be registered with the Environmental Protection Agency ("EPA" or "Agency") prior to their distribution, sale, or use, except as described by the Act. 7 U.S.C. § 136(a).

19.     As part of the registration process, the EPA requires a variety of tests to evaluate the potential for exposure to pesticides, toxicity to humans and other organisms, and adverse effects on the environment. Registration by the EPA, however, is not a guarantee or finding of safety. The determination the Agency must make in registering or reregistering a product is not

that the product is "safe", but rather that use of the product in accordance with its labelling "will not generally cause unreasonable adverse effects on the environment". 7 U.S.C. § 136a(c)(5)(D).

20.     FIFRA generally requires that the registrant conduct the health and safety testing of pesticide products. The EPA has established protocols which govern the conduct of tests required for registration and the laboratory practices that must be followed in conducting those tests. The data is then turned over to the EPA for review and evaluation.

21.     Based on the test data produced by Monsanto, the EPA registered Roundup for manufacture, distribution and sale in the United States.

22.     Studies conducted by entities other than Monsanto suggested that glyphosate could cause cancer in laboratory animals. Because glyphosate is its primary active ingredient, Roundup was initially classified by the EPA as "possibly carcinogenic to humans" (Group C).

23.     Monsanto challenged the initial classification of Roundup and pressured the EPA to change the classification to "evidence of non-carcinogenicity in humans" (Group E) in 1991. In so doing, the EPA clarified that: "It should be emphasized, however, that designation of an agent in Group E is based on the available evidence at the time of evaluation and should not be interpreted as a definitive conclusion that the agent will not be a carcinogen under any circumstances".

24.     Significantly, the EPA has discovered that the laboratories hired by Monsanto to conduct testing for registration and re-registration purposes had committed fraud.

25.     In 1976, the United States Food and Drug Administration ("FDA") performed an inspection of Industrial Bio-Test Industries ("IBTI") and discovered discrepancies between the raw data and the final report relating to the toxicological potential of glyphosate.

26.     Subsequently, the EPA also audited IBTI and found "routine falsification of data" and determined that the toxicology testing conducted for the registration Roundup was invalid. As a result, three (3) top executives of IBTI were convicted of fraud in 1983.

27.     In 1991, Monsanto hired Craven Laboratories to perform studies on a number of pesticides and herbicides that included Roundup. In a strikingly familiar turn of events, the owner of Craven Laboratories and three (3) of its employees were convicted of employing fraudulent laboratory practices during the testing of pesticides and herbicides shortly thereafter.

28.     The International Agency for Research on Cancer ("IARC") is an agency of the World Health Organization ("WHO") whose role is to conduct and coordinate research into the causes of cancer worldwide.

29.     On March 20, 2015, IARC published an evaluation of glyphosate that was based, in part, on studies of exposure to glyphosate in countries around the world and analyzes health implications from exposure to glyphosate since 2001.

30.     On July 29, 2015, IARC published its formal monograph in which the IARC Working Group thoroughly analyzes the numerous studies and data relating to human exposure to glyphosate.

31.     IARC determined that glyphosate is indeed toxic to humans and is appropriately classified as a Group 2A herbicide with likely carcinogenic effects to humans. IARC further determined that the types of cancer most often attributed to glyphosate exposure are non-Hodgkin lymphoma and other hematopoietic cancers, including lymphocytic lymphoma/chronic lymphocytic leukemia, multiple myeloma and B-cell lymphoma (DLBCL)—the aggressive form of cancer that afflicts Plaintiff.

32.     In 2018, Bayer acquired Monsanto for a staggering $63 billion USD.

33.     In the wake of IARC's published findings, Defendants continue to represent Roundup as a safe, general-purpose herbicide that poses no threat to human health when used as directed by the product label.

34.     Defendants knew or should have known that Roundup—in addition to glyphosate—contained toxic surfactants and allegedly inert ingredients such as Adjuvant 3 and Polyethoxylated tallow amine (POEA) which magnify the effectiveness of glyphosate, including its adverse effects to human health.

35.     Defendants knew or should have known that its own internal and/or commissioned tests that were limited to the effects of glyphosate were insufficient to prove that Roundup was not defective and was safe for residential and commercial use as an herbicide.

36.     Defendants refused or otherwise failed to conduct or commission adequate testing of Roundup, including its surfactants and "inert" ingredients. In so doing, Defendants consciously chose to prioritize their considerable profits from the sale of a defective product over the health and safety of the consuming public, including Plaintiff.

37.     Defendants reported falsified and misleading data and attacked legitimate studies that exposed Roundup's true, carcinogenic nature.

38.     Despite possessing full knowledge of the defective and hazardous nature of Roundup, Defendants have willfully manufactured, marketed and sold this product to the unsuspecting public, including Plaintiff, for more than forty (40) years.

39. Plaintiff began using Roundup for weed control around his family property in Alpine, Utah in approximately 1993. He used it continuously on his property and others until his cancer diagnosis in 2014.

40. When using Roundup, Plaintiff always strictly followed all safety precautions and usage instructions on the product label. Plaintiff believed that if he used Roundup according to its labelling, it posed no unreasonable risk to his health.

41. In July 2014, large lesions began developing on Plaintiff's body, including very noticeably on his face. Plaintiff was treated by his dermatologist, but when even larger lesions developed on his face in September 2014, Plaintiff was referred to an ear, nose and throat specialist.

42. In September 2014, Plaintiff was diagnosed with stage four (4) diffuse large B-cell lymphoma ("DLBCL"), an aggressive type of non-Hodgkin lymphoma that develops from the B-cells in the lymphatic system. Plaintiff's DLBCL was attributed to his exposure to glyphosate by the cancer specialists who were treating him.

43. A lymph node grew in Plaintiff's parotid gland which grew and prevented him from opening his mouth to eat. Plaintiff was forced to subsist on a liquid-only diet.

44. A positron emission tomography (PET) scan revealed approximately one hundred (100) abnormal lesions along his spine and femur and two (2) masses in his lungs.

45. Plaintiff was treated with chemotherapy. In the first month of treatment, Plaintiff—a man standing six (6) feet tall—saw his body weight plummet to an alarming one-hundred and thirty-seven (137) pounds.

46.     Plaintiff's illness and treatment has had many tremendous and lasting effects on the emotional, financial and general well-being of Plaintiff and his close-knit family. Plaintiff has continued to suffer from memory loss, peripheral neuropathy and other medical issues that have significantly impacted his employment and earning potential.

47.     In October 2014, Plaintiff received his second chemotherapy treatment only two (2) days before his daughter's wedding. Plaintiff lost all of his hair, could not speak and could barely stand for his little girl's big day.

48.     Plaintiff received a total of six (6) chemotherapy treatments, which caused him extreme nausea and fatigue. Due to his illness and treatment, Plaintiff was unable to meet his obligations at work and was let go. Plaintiff's spouse had to work twelve (12) hour shifts during his treatment and recovery just to keep the family afloat—including through the 2014-15 holiday season.

49.     Plaintiff's daughter and son-in-law sacrificed a big, out-of-state employment opportunity so that they could be close during Plaintiff's treatment, and Plaintiff could see his first grandson after birth.

50.     During the course of Plaintiff's chemotherapy treatment, Plaintiff's son returned from a two (2) year volunteer church mission. Plaintiff was ill, nauseated and severely fatigued during the homecoming event (a landmark event in Plaintiff's church).

51.     The many traumas, trials, hardships and heartaches suffered by Plaintiff and his family due to his diagnosis with stage 4 DLBCL cannot be set forth herein for the sake of brevity. After this incredible journey, Plaintiff's cancer is in remission.

52.     As a result of Plaintiff's exposure to unsafe and defective Roundup herbicides, Plaintiff has incurred significant economic and non-economic damages.

## EQUITABLE TOLLING OF THE STATUTE OF LIMITATIONS

53.     Plaintiff incorporates the foregoing paragraphs herein.

54.     Cancer is an illness that does not manifest itself until years after exposure to a dangerous agent. Plaintiff and the many others who have been injured by Roundup could not have known of Defendants' wrongdoings until discovery of their illness—in Plaintiff's case, September 2014.

55.     Plaintiff's discovery of Defendants' wrongdoings was further delayed by Defendants' active concealment, affirmative misrepresentations and deliberate omission of the dangers glyphosate posed to his health. As a result, Plaintiff did not know and could not have known through reasonable diligence the risks of exposure to Roundup and/or glyphosate.

56.     Defendants are estopped from relying on any statute of limitations because of their fraudulent concealment of the true nature of Roundup. Defendants were under a duty to disclose the true nature of Roundup because this was non-public information over which they had exclusive control, and because Defendants knew that this information was not available to Plaintiff, the public, or to distributors of Roundup.

57.     Accordingly, Defendants are precluded by the discovery rule and/or the doctrine of fraudulent concealment from relying upon any statute of limitations.

## **FIRST CAUSE OF ACTION**
### **Negligence**

58.     Plaintiff incorporates the foregoing paragraphs herein.

59.     Monsanto had a duty to exercise reasonable care in the design, manufacture, testing, marketing, advertising, distribution, labeling, and/or sale of Roundup products, including the duty to take all reasonable steps necessary to not manufacture and sell a dangerous product to unsuspecting consumers such as Plaintiff.

60.     Monsanto owed a duty of care to Plaintiff and the general consuming public to provide true and correct information concerning the risks and adverse effects of using Roundup.

61.     Monsanto knew, or should have known through the exercise of reasonable care, that exposure to Roundup and/or glyphosate created a dangerous and unreasonable risk of injury to users, such as those injuries sustained by Plaintiff.

62.     Monsanto knew, or should have known, that consumers such as Plaintiff could not be aware of the risks and serious effects of exposure to Roundup and/or glyphosate.

63.     Defendants breached the duty of reasonable care and failed to exercise ordinary care in the design, manufacture, testing, marketing, advertising, distribution, labeling, and/or sale of Roundup products because Monsanto knew, or should have known, the defects inherent in these products, and that a user's exposure to the products created a significant risk of harm and unreasonably dangerous side effects. Yet Defendants refused or otherwise failed to prevent or adequately warn Plaintiff and the general consuming public of these risks and injuries and/or death.

64.     Defendants failed to appropriately design and evaluate Roundup products and provide adequate warnings of the potential hazards of their use. Instead, Defendants wrongfully concealed information and made false and/or misleading representations to the unsuspecting Plaintiff and public about the safety of these products.

65.     Defendants were negligent in the following respects:

a.     The design, manufacture, marketing, advertising, distribution, labeling, and/or sale of Roundup products without thorough and adequate pre- and post-market testing;

b.     The design, manufacture, marketing, advertising, distribution, labeling, and/or sale of Roundup while negligently and/or intentionally concealing and failing to disclose the results of tests and studies of exposure to glyphosate and the risk of serious harm associated with human exposure to Roundup;

c.     Failing to undertake sufficient studies and conduct necessary tests to determine whether or not Roundup products and/or glyphosate were safe for their intended use in agriculture and horticulture;

d.     Failing to use reasonable and prudent care in the design, research, manufacture, and development of Roundup products so as to avoid the risk of serious harm associated with the prevalent use of Roundup and/or glyphosate as an herbicide;

e.     Failing to design and manufacture Roundup products so as to ensure they were at least as safe and effective as other general-purpose herbicides on the market;

f. Failing to provide adequate instructions, guidelines, and safety precautions to those persons who Defendants could reasonably foresee would use and be exposed to Roundup products;

g. Failing to disclose to the Plaintiff and the general consuming public that use of and exposure to Roundup presented severe risks of developing cancer and other serious illnesses;

h. Failing to warn Plaintiff and the general consuming public that Roundup products' risk of harm was unreasonable and that there were safer and effective alternative herbicides available to Plaintiff and other consumers;

i. Systematically suppressing or downplaying contrary evidence about the risks, incidence, and prevalence of the side effects of Roundup and glyphosate;

j. Representing that Roundup products were safe for their intended use when Defendants knew or should have known that the products were not safe for their intended purpose;

k. Declining to make or propose any changes to Roundup products' labeling or other promotional materials that would alert the general consuming public of the true risks associated with the use of Roundup and/or glyphosate;

l. Advertising, marketing, and promoting the use of Roundup products while concealing and failing to disclose or warn of the dangers known by Defendants to be associated with exposure to Roundup and/or glyphosate;

m.    Continuing to disseminate information to Plaintiff and the general

consuming public which represented or implied that Roundup products were safe for use

as a general-purpose herbicide;

n.    Continuing the manufacture, marketing, advertising distribution and/or

sale of Roundup products with full knowledge that the products were unreasonably

unsafe and dangerous.

66.    It was foreseeable that consumers such as Plaintiff would suffer injuries and/or

death as a result of Defendants' failure to exercise ordinary care in the design, manufacture,

testing, marketing, advertising, distribution, labeling, and/or sale of Roundup.

67.    Plaintiff did not know and could not have known the nature and extent injuries

that could result from using Roundup and/or glyphosate for its intended purpose as a general-

purpose herbicide.

68.    Plaintiff's injuries, harm, economic losses and non-economic losses were

proximately caused by Defendants' negligence complained of herein.

69.    Defendants' deliberate conduct as described herein was reckless and regularly

risked the health and lives of Plaintiff and other users of its products, with full knowledge of the

dangers they presented. Defendants made conscious decisions and took deliberate acts to

prioritize their considerable profits from the sale of a defective product over the health and safety

of Plaintiff and the consuming public. Defendants' reckless conduct warrants an award of

punitive damages.

70.    As a direct and proximate result of Defendants' conduct complained of herein,

Plaintiff has developed DLBCL, which leaves Plaintiff in a permanent state of serious illness and

anguish, and diminished enjoyment of life. Plaintiff has sustained non-economic and economic damages which include (but are not limited to) pain, suffering and staggering expenses for his ongoing medical care.

## SECOND CAUSE OF ACTION
### Strict Product Liability for Design Defect

71.    Plaintiff incorporates the foregoing paragraphs herein.

72.    At all times relevant, Defendants design, manufacture, testing, marketing, advertising, distribution, labeling, and/or sale of Roundup, or have acquired the Defendants who have taken these acts in regards to Roundup.

73.    Plaintiff purchased Roundup at retail locations near his home in substantially the same form as it was designed and manufactured by Defendants.

74.    At all times relevant, Defendants knew or should have known that Roundup was defective, unsafe and presented unreasonable health risks to its users, including Plaintiff.

75.    The Roundup products designed, manufactured, tested, marketed, advertised, distributed, labelled, and/or sold by Defendants were defective in design or formulation in that, when they left the hands of Defendants' manufacturers and/or distributors, the foreseeable risks of use exceeded the benefits associated with the design or formulation of Roundup.

83.    The Roundup designed, researched, manufactured, tested, marketed, advertised, distributed and/or sold by Defendants was defective in design and/or formulation, in that, when it left the hands of the Defendants' manufacturers and/or distributors, it was unreasonably dangerous, even when used as directed by the product's labelling, and it was more dangerous than an ordinary consumer would expect.

76.     At all times relevant, Roundup was in a defective and unsafe condition, and Defendants knew or should have known that Roundup was defective and unsafe, even when used as directed by the product's labelling provided by the Defendants. In particular, Defendants' Roundup was defective in the following ways:

a.     When placed in the stream of commerce, Defendants' Roundup products were defective in design and formulation and, as a result, were dangerous to an extent beyond that which an ordinary consumer would anticipate.

b.     When placed in the stream of commerce, Defendants' Roundup products were unreasonably dangerous in that they were hazardous and posed a grave risk of serious illness, including cancer, when used in a reasonably anticipated manner and according to the product's labelling.

c.     When placed in the stream of commerce, Defendants' Roundup products contained unreasonably dangerous design defects and were not safe when used in a reasonably anticipated manner according to the product's labelling.

d.     Defendants refused or otherwise failed to sufficiently research, test and study Roundup products before distributing them to an unsuspecting public, including Plaintiff.

e.     Exposure to Roundup presents a risk of harmful side effects that outweigh any potential benefit of using the product.

f.     Defendants new or should have known that exposure to Roundup could result in cancer and other severe illnesses and injuries when it marketed Roundup as safe when used as directed by the product's labelling.

g. Defendants did not conduct prudent and adequate monitoring of Roundup products after their release to the general consuming public, such as plaintiff.

77. Defendants knew, or should have known that, at all times relevant, its Roundup products were in a defective condition, and were inherently unsafe and dangerous to human health.

78. Plaintiff did not know the dangerous nature of Roundup when he used the product according to its labelling as a general-purpose herbicide—as promoted and marketed by Defendants.

79. Defendants had a duty to Plaintiff and the general consuming public to create a product that was not unreasonably dangerous for its normal, intended use as an herbicide. Defendants did not meet their duty and created a product that is indeed unreasonably dangerous for its normal, intended use.

80. Defendants promoted, marketed and labelled Roundup products in a manner which downplayed and/or concealed the known, medically-established risks that the use of glyphosate-based products such as Roundup posed to the user's health.

81. Roundup was designed, manufactured, tested, marketed, advertised, distributed, labelled, and/or sold by Defendants such that Roundup left the hands of Defendants in a defective condition and was unreasonably dangerous to its intended users. Roundup reached Plaintiff and the general consuming public in this defective and unsafe condition.

82. Defendants designed, manufactured, tested, marketed, advertised, distributed, labelled, and/or sold Roundup with willful, reckless and wanton disregard for the health of Plaintiff and the general consuming public.

83. Defendants knew or should have known that Roundup posed an unreasonable risk to the health of its users, thus Defendants are strictly liable to Plaintiff for the permanent injuries he has sustained from the use of their defective product.

84. As a direct and proximate result of Defendants' conduct complained of herein, Plaintiff has developed DLBCL, which leaves Plaintiff in a permanent state of serious illness and anguish, and diminished enjoyment of life. Plaintiff has sustained non-economic and economic damages which include (but are not limited to) pain, suffering and staggering expenses for his ongoing medical care.

### THIRD CAUSE OF ACTION
### Strict Product Liability for Failure to Warn

85. Plaintiff incorporates the foregoing paragraphs herein.

86. Defendants have engaged in the business of designing, manufacturing, testing, marketing, advertising, distribution, labeling, and/or sale Roundup, and through that conduct have knowingly and intentionally placed Roundup into the stream of commerce with full knowledge that it reaches consumers such as Plaintiff, who are exposed to it through ordinary and reasonably foreseeable uses.

87. Defendants knew and expected the Roundup products that they were designing, manufacturing, testing, marketing, advertising, distributing, labeling, and/or selling to reach — and Roundup did in fact reach — consumers, including Plaintiff, without any substantial change in the condition of the product from when it was initially manufactured and distributed by Defendants.

88.     At the time of manufacture, Defendants could have provided the warnings or instructions regarding the full and complete risks of using Roundup and glyphosate-containing products because it knew or should have known of the unreasonable risks of harm associated with the use of and/or exposure to such products.

89.     At all times relevant, Roundup was defective and unsafe in manufacture such that it was unreasonably dangerous to the user, and was so at the time it was distributed by Defendants and at the time Plaintiff was exposed to the product. The defective condition of Roundup was due in part to the fact that it was not accompanied by proper warnings regarding its carcinogenic qualities and possible side effects, including, but not limited to, developing DLBCL as a result of exposure and use.

90.     Roundup did not contain a warning or caution statement, which was necessary and, if complied with, was adequate to protect health those exposed in violation of 7 U.S.C. § 136j(a)(1)(E).

91.     Defendants' refusal or failure to include a warning or caution statement which was necessary and, if complied with, was adequate to protect the health of those exposed, violated 7 U.S.C. § 136j(a)(1)(E), as well as the laws of the State of Utah.

92.     Defendants could have amended the labelling of Roundup products to provide additional warnings but refused or otherwise failed to do so.

93.     Plaintiff used Roundup as directed by the product labelling for its intended purpose as a general-purpose herbicide and sustained serious, permanent injury due to the product's defects.

94.     Defendants had a duty to Plaintiff and the general consuming public to properly design, manufacture, test, market, advertise, distribute, label with provide proper warnings, and take other steps to assure that Roundup did not cause unreasonable and dangerous side effects to consumers.

95.     Defendants failed to warn Plaintiff and the general consuming public of the true nature and seriousness of the side effects associated with Roundup, including its carcinogenic properties and its propensity to cause or serve as a substantial contributing factor in the development of DLBCL.

96.     Defendants knew or should have known the risks that Roundup posed to human health and refused or otherwise failed to exercise reasonable care to warn Plaintiff and the general consuming public of the scientifically-known or knowable carcinogenic properties of Roundup. Defendants also failed to warn Plaintiff and the general consuming public of the known effects of human exposure to glyphosate-containing products such as Roundup, including the risk of developing cancer, including DLBCL.

97.     Defendants willfully and deliberately acted to prioritize their considerable profits from the sale of Roundup products over their duty to warn Plaintiff and the general consuming public of the risks that Roundup posed to consumers' health. In so doing, Defendants acted with conscious and wanton disregard for the safety of Plaintiff and his fellow consumers.

98.     Plaintiff did not know and could not have reasonably discovered through the exercise of reasonable care that Roundup was defective.

99.     As the designers, manufacturers and distributors of Roundup, Defendants are held to the level of knowledge of an expert in the field. Plaintiff reasonably relied upon the skill,

superior knowledge and judgment of Defendants in regards to Roundup and its use as a general-purpose herbicide.

100.    If Defendants had properly disclosed the risks associated with using Roundup and provided adequate warnings, Plaintiff would have avoided the risk of DLBCL by using additional protection or not using Roundup at all.

101.    The information that Defendants provided to Plaintiff and the general consuming public failed to contain adequate warnings and precautions that would have enabled Plaintiff and his fellow consumers to evaluate the safety of Roundup and make informed decisions about the risks of its use with adequate protection.

102.    Instead, Defendants disseminated information about Roundup that was false, misleading, and which failed to communicate accurately or adequately the severity and extent of the risk of serious injury associated with exposure to Roundup.

103.    Defendants continued to promote the safety of Roundup when used as directed by the products' labelling, even after Defendants knew or should have known of the unreasonable risks to human health from use of or exposure to glyphosate. Through aggressive marketing and promotion, Defendants deliberately and actively concealed, downplayed or otherwise suppressed, information and research that exposed the unreasonable risks to human health associated with exposure to Roundup and glyphosate.

104.    As a direct and proximate result of Defendants' conduct complained of herein, Plaintiff has developed DLBCL, which leaves Plaintiff in a permanent state of serious illness and anguish, and diminished enjoyment of life. Plaintiff has sustained non-economic and economic

damages which include (but are not limited to) pain, suffering and staggering expenses for his ongoing medical care.

### FOURTH CAUSE OF ACTION
### Breach of Implied Warranties

105. Plaintiff incorporates the foregoing paragraphs herein.

106. At all times relevant, Defendants designed, manufactured, marketed, promoted, distributed, and sold Roundup and/or have recently acquired the Defendants who have designed, manufactured, marketed, promoted, distributed, and sold Roundup as a general-purpose herbicide. These actions were under the ultimate control and supervision of Defendants.

107. At the time Defendants designed, manufactured, tested, marketed, advertised, distributed, labelled, and/or sold Roundup for use by consumers, including Plaintiff, Defendants knew of Roundup's intended use as a general-purpose herbicide and impliedly warranted the product to be of merchantable quality and safe and fit for this use.

108. Defendants impliedly represented and warranted to Plaintiff, the general consuming public, the agricultural community, and/or the EPA that Roundup was safe and of merchantable quality and fit for the ordinary purpose for which it was to be used—as a general-purpose herbicide.

109. Defendants' representations and warranties were false, misleading, and inaccurate in that Roundup was unsafe, unreasonably dangerous, not of merchantable quality, and defective.

110. Plaintiff reasonably relied on Defendants' skill, superior knowledge and skill in regards to Roundup—particularly Defendants' implied warranty of Roundup's merchantability or fitness for use as a general-purpose herbicide.

111.     Defendants caused Roundup to be placed into the stream of commerce in a
defective, unsafe, and inherently dangerous condition. Defendants expected Roundup to reach,
and did in fact reach, Plaintiff and the general consuming public without substantial change in
the condition in which they were manufactured and distributed.

112.     Defendants breached their implied warranties to Plaintiff because Roundup was
not fit for its intended use as a general-purpose herbicide and posed an unreasonable risk to
Plaintiff's health through its use.

113.     As a direct and proximate result of Defendants' conduct complained of herein,
Plaintiff has developed DLBCL, which leaves Plaintiff in a permanent state of serious illness
and anguish, and diminished enjoyment of life. Plaintiff has sustained non-economic and
economic damages which include (but are not limited to) pain, suffering and staggering
expenses for his ongoing medical care.

### FIFTH CAUSE OF ACTION
### Successor Liability

114.     Plaintiff incorporates the foregoing paragraphs herein.

115.     Upon publicly-available information and belief, Bayer acquired Monsanto in
2018 for the sum of $63 million. Roundup, the Monsanto product at issue in this action, was
acquired by Bayer along with its maker.

116.     Under successor liability, Bayer is responsible for the liabilities of Monsanto as
a result of the transaction being a de facto merger, regardless of whether the liabilities were
expressly purchased. As the successor entity, Bayer is a continuation of Monsanto, and Bayer
continues the same operations and/or product lines of Monsanto.

117.    Bayer continues to manufacture, market, advertise, distribute and sell Roundup without any significant changes to the product offered by Monsanto. As the successor entity, Bayer is liable for the conduct of Monsanto complained of herein.

118.    In Bayer's fiscal year 2020 annual report, Bayer CEO Werner Bauman published the statement "we [Bayer] remain firmly convinced that our glyphosate-based herbicides are safe and are not carcinogenic". As of the date of this writing, similar sentiments continue to be published on Bayer's website at https://www.bayer.com/en/roundup-litigation-five-point-plan.

119.    Bayer continues Monsanto's efforts to diminish and disregard scientific evidence of Roundup's carcinogenicity in order to prioritize the considerable profits from the sale of Roundup products over the health and safety of consumers. Bayer has offered no indication that it intends to deviate from this course of conduct.

120.    As a direct and proximate result of Defendants' conduct complained of herein, Plaintiff has developed DLBCL, which leaves Plaintiff in a permanent state of serious illness and anguish, and diminished enjoyment of life. Plaintiff has sustained non-economic and economic damages which include (but are not limited to) pain, suffering and staggering expenses for his ongoing medical care.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment against Defendants as follows:

A.    For judgment against Defendants for economic and non-economic damages, in an amount to be determined at trial;

B.    For punitive damages;

C.      For pre-judgment and post-judgment interest;

D.      For fees and costs incurred in bringing this action; and

E.      For all other relief the Court deems just and equitable.


DATED this 29th day of September, 2023.

FORD & CRANE PLLC


/s/ Matthew B. Crane
Matthew B. Crane (UTB# 13909)
*Attorney for Plaintiff Steven R. Jolley*