4months

# U.S. District Court
## Northern District of Georgia (Atlanta)
## CIVIL DOCKET FOR CASE #: 1:23-cv-04826-MLB

Green v. Monsanto Company
Assigned to: Judge Michael L. Brown
Case in other court:  State Court of Gwinnett County, 23-C-06864-S6
Cause: 28:1446 Notice of Removal - Wrongful Death

Date Filed: 10/20/2023
Jury Demand: Both
Nature of Suit: 365 Personal Inj. Prod. Liability
Jurisdiction: Diversity

**Plaintiff**

**Kari Dagny Louise Green**
*as Surviving Spouse and*
*as administrator of the estate of*
Brian Leroy Green, Deceased

represented by **John Calhoun Harris , Jr.**
Law Office of John Calhoun Harris, Jr.
Suite 1120
1001 Summit Blvd.
Atlanta, GA 30319
404-460-1550
Fax: 404-460-1560
Email: cal@poolehuffman.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Monsanto Company**

represented by **Jason Stephen Allard**
Shook, Hardy & Bacon, L.L.P.
1230 Peachtree Street NE
Suite 1200
Atlanta, GA 30309
470-867-6020
Email: jallard@shb.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Joshua Luke Becker**
Shook Hardy & Bacon LLP
1230 Peachtree Street
Suite 1200
Atlanta, GA 30309
470-867-6010
Email: jbecker@shb.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 10/20/2023 | 1 | NOTICE OF REMOVAL with COMPLAINT filed by Monsanto Company. (Filing fee $ 402 receipt number AGANDC-12976606) (Attachments: # 1 Exhibit 1 - State Court Action Pleadings, # 2 Civil Cover Sheet)(dnb) Please visit our website at http://www.gand.uscourts.gov/commonly-used-forms to obtain Pretrial Instructions and Pretrial Associated Forms which includes the Consent To Proceed Before U.S. Magistrate form. (Entered: 10/23/2023) |
| 10/20/2023 | 2 | Certificate of Interested Persons and Corporate Disclosure Statement by Monsanto Company. (dnb) (Entered: 10/23/2023) |
| 10/23/2023 | 3 | *Monsanto Company's* ANSWER to 1 NOTICE OF REMOVAL with Jury Demand by Monsanto Company. Discovery ends on 3/21/2024.(Allard, Jason) Please visit our website at http://www.gand.uscourts.gov to obtain Pretrial Instructions. (Entered: 10/23/2023) |

| PACER Service Center | | | |
|---|---|---|---|
| Transaction Receipt | | | |
| 10/23/2023 15:45:42 | | | |
| PACER Login: | sh0019sh | Client Code: | 31943.356965 rhb |
| Description: | Docket Report | Search Criteria: | 1:23-cv-04826-MLB |
| Billable Pages: | 1 | Cost: | 0.10 |

**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | |
|---|---|
| KARI DAGNY LOUISE GREEN, AS SURVIVING SPOUSE AND ADMINISTRATOR OF THE ESTATE OF BRIAN LEROY GREEN, DECEASED, | No. _____ |
| Plaintiffs, | |
| v. | |
| MONSANTO COMPANY, | |
| Defendant. | |

## <u>DEFENDANT MONSANTO COMPANY'S NOTICE OF REMOVAL</u>

Pursuant to 28 U.S.C. §§ 1332, 1441, and 1446 (and any other applicable laws), Defendant Monsanto Company ("Monsanto"), hereby gives notice of removal of this action, captioned *Kari Dagny Louise Green, as Surviving Spouse and Administrator of the Estate of Brian Leroy Green, Deceased v. Monsanto Company*, bearing Case Number 23-C-06864-S6, from the State Court of Gwinnett County, Georgia to the United States District Court for the Northern District of Georgia. Pursuant to 28 U.S.C. § 1446(a), Monsanto provides the following statement of grounds for removal:

1

## **Introduction**

1.      In this products liability lawsuit, Plaintiff Kari Dagny Louise Green ("Plaintiff"), sues Monsanto for the wrongful death of her spouse, Brian Leroy Green, allegedly caused by Roundup®-branded herbicides, which have glyphosate as their active ingredient. For decades, farmers have used glyphosate-based herbicides to increase crop yields, and homeowners, landscaping companies, and local government agencies have used these herbicides for highly effective weed control. Glyphosate is one of the most thoroughly studied herbicides in the world, and glyphosate-based herbicides have received regulatory approval in more than 160 countries. Since 1974, when a Roundup®-branded herbicide was first introduced to the marketplace, the United States Environmental Protection Agency repeatedly has concluded that glyphosate does not cause cancer. Nevertheless, Plaintiff alleges that exposure to Monsanto's glyphosate-based herbicides caused decedent Brian Leroy Green's cancer—specifically, non-Hodgkin's lymphoma ("NHL")—and death.

2.      As discussed in more detail below, Monsanto removes this lawsuit because this Court has subject matter jurisdiction based on diversity of citizenship. Plaintiff Kari Dagny Leroy Green is a citizen of Georgia. For purposes of diversity jurisdiction, Monsanto is deemed to be a citizen of Missouri and Delaware. Accordingly, complete diversity of citizenship exists in this case as required by 28

U.S.C. § 1332. The statutory amount-in-controversy requirement is also satisfied because Plaintiff seeks damages in excess of $500,000.00.

## Background and Procedural History

3.     On or about September 18, 2023, Plaintiff commenced this lawsuit in the State Court of Gwinnett County, Georgia by filing a complaint, captioned *Kari Dagny Louise Green, as Surviving Spouse and Administrator of the Estate of Brian Leroy Green, Deceased v. Monsanto Company,* bearing Case Number 23-C-06864-S6 (the "State Court Action").

4.     Pursuant to 28 U.S.C. § 1446(a), true and correct copies of the Complaint and all other pleadings filed in the State Court Action are attached as Exhibit 1. This lawsuit seeks damages in excess on $500,000.00 allegedly caused by exposure to glyphosate-based herbicides. *See, e.g.*, Complaint ¶¶ 62–64, 118.

## Basis For Removal — Diversity Jurisdiction

5.     Plaintiff Kari Dagny Louise Green is, and was at the time the State Court Action was filed, a resident and citizen of the State of Georgia, as was decedent before and when he died. *See* Complaint ¶¶ 1–2.

6.     Monsanto is, and was at the time the State Court Action was filed, a corporation incorporated under the laws of the State of Delaware, with its principal place of business in the State of Missouri. *See* Complaint ¶ 3.

3

7.      The Complaint seeks compensatory and punitive damages in excess of
$500,000.00 based on the allegations that Roundup®-branded herbicides caused
Decedent to develop NHL. *See* Complaint ¶¶ 62–64. Thus, Plaintiff seeks damages
in excess of $75,000, exclusive of interest and costs, which satisfies the jurisdictional
amount-in-controversy requirement. 28 U.S.C. § 1332(a); *see Dart Cherokee Basin
Operating Co. v. Owens*, 574 U.S. 81, 89 (2014) ("[A] defendant's notice of removal
need include only a plausible allegation that the amount in controversy exceeds the
jurisdictional threshold.").

8.      In sum, this Court has original subject matter jurisdiction over this
action based on § 1332(a) because there is complete diversity of citizenship, and the
amount in controversy exceeds $75,000, exclusive of costs and interest.

## **Procedural Requirements**

9.      The State Court of Gwinnett County, Georgia is located within the
Northern District of Georgia. Therefore, removal to this Court satisfies the venue
requirement of 28 U.S.C. § 1446(a).

10.     Monsanto was first served with the summons and Complaint in this
case on September 22, 2023. This Notice of Removal is timely. *See* 28 U.S.C.
§ 1446.

11.    The written notice required by 28 U.S.C. § 1446(d) will be promptly filed in the State Court of Gwinnett County, Georgia and will be promptly served on Plaintiff.

12.    Monsanto does not waive any defenses and expressly reserves its right to raise any and all defenses in subsequent proceedings, including but not limited to any and all defenses under Federal Rule of Civil Procedure 12.

13.    If any question arises as to the propriety of this removal, Monsanto requests the opportunity to present written and oral argument in support of removal.

## Conclusion

For the foregoing reasons, Monsanto removes this lawsuit to this Court pursuant to 28 U.S.C. §§ 1332, 1441, and 1446 (and any other applicable laws).

Respectfully submitted,

October 20, 2023

SHOOK, HARDY & BACON L.L.P.

*/s/ Jason S. Allard*
_____

Joshua L. Becker
GA Bar No. 046046
Jason S. Allard
GA Bar No. 660305
1230 Peachtree Street NE
Suite 1200
Atlanta, GA 30309

Telephone: (470) 867-6000
Facsimile: (470) 867-6001
jbecker@shb.com
jallard@shb.com

*Attorneys for Defendant*
*MONSANTO COMPANY*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that the foregoing Notice of Removal was filed electronically on October 20, 2023 and that service of the same on all counsel of record will be made by electronic mail, United States Mail, and the Court's CM/ECF system. Parties may access this filing through the Court's system.

John Calhoun Harris, Jr.
**POOLE HUFFMAN, LLC**
3562 Habersham at Northlake
Building J, Suite 200
Tucker, GA 30084
(404) 373-4008
Facsimile: 888-709-5723
cal@poolehuffman.com

*Attorney for Plaintiffs*

*/s/ Jason S. Allard*
_____

Jason S. Allard

# EXHIBIT 1



# Case Information

## LOUISE GREEN VS MONSANTO CO

23-C-06864-S6

↻ Refresh    📁🔒    👁🔒    🖨    ⌁    [ File Into ]

| Location | Case Category | Case Type | Case Filed Date | Judge | Case Status |
|---|---|---|---|---|---|
| Gwinnett County - State Court - Division 6 ⇄ | Civil | Tort - Product Liability Tort* | 9/18/2023 | Cope, Veronica ▾ | Open (Pending) |

## Parties ③

| Type | Name | Nickname/Alias | Attorneys |
|---|---|---|---|
| Plaintiff | ESTATE OF BRIAN LEROY GREEN ▾ | | JOHN CALHOUN HARRIS, JR ▾ |
| Plaintiff | KARI DAGNY LOUISE GREEN ▾ | | JOHN CALHOUN HARRIS, JR ▾ |
| Defendant | MONSANTO CO ▾ | | Pro Se |

## Hearings ⓪

No hearings found.

## Events ④

[ Search events ]  [🔍]    [❓ Expect To See More Filings?]

| Date ▲ | Event | Type | Comments | Documents | Pages | Price | [+ All] [− All] |
|---|---|---|---|---|---|---|---|
| 9/18/2023 | Filing | General Civil/Dom Relations ( | | Case Filing Form.pdf | 1 | $2.50 | Owned  [⌁] |
| 9/18/2023 | Filing | Complaint with Jury Demand | | 230918 Draft State Court... | 39 | $40.50 | Owned  [⌁] |
| 9/18/2023 | Filing | Summons | | Summons.pdf | 1 | $2.50 | Owned  [⌁] |
| 9/26/2023 | Filing | Sheriff/Marshall's Service | | Sheriffs Entry of Service.tif | 2 | $3.50 | Owned  [⌁] |

© 2023 Tyler Technologies, Inc. | All Rights Reserved
Version: 2023.8.0.52



E-FILED IN OFFICE - KMG
CLERK OF STATE COURT
GWINNETT COUNTY, GEORGIA

**23-C-06864-S6**
9/18/2023 4:35 PM

TIANA P. GARNER, CLERK

**General Civil and Domestic Relations Case Filing Information Form**

☐ Superior or ☒ State Court of ___GWINNETT___ County

| **For Clerk Use Only** | |
|---|---|
| | 23-C-06864-S6 |
| **Date Filed** _____ | **Case Number** _____ |
| **MM-DD-YYYY** | |

**Plaintiff(s)**
GREEN, KARI DAGNY LOUISE, AS SURVIVING SPOUSE

**Defendant(s)**
MONSANTO COMPANY

| Last | First | Middle I. | Suffix | Prefix | | Last | First | Middle I. | Suffix | Prefix |
|---|---|---|---|---|---|---|---|---|---|---|
| AND ADMINISTRATOR OF THE ESTATE OF BRIAN | | | | | | | | | | |
| Last | First | Middle I. | Suffix | Prefix | | Last | First | Middle I. | Suffix | Prefix |
| LEROY GREEN, DECEASED | | | | | | | | | | |
| Last | First | Middle I. | Suffix | Prefix | | Last | First | Middle I. | Suffix | Prefix |
| | | | | | | | | | | |
| Last | First | Middle I. | Suffix | Prefix | | Last | First | Middle I. | Suffix | Prefix |

**Plaintiff's Attorney** John Calhoun Harris, Jr.   **Bar Number** 330520   **Self-Represented** ☐

**Check One Case Type in One Box**

**General Civil Cases**

- ☐ Automobile Tort
- ☐ Civil Appeal
- ☐ Contract
- ☐ Garnishment
- ☐ General Tort
- ☐ Habeas Corpus
- ☐ Injunction/Mandamus/Other Writ
- ☐ Landlord/Tenant
- ☐ Medical Malpractice Tort
- ☒ Product Liability Tort
- ☐ Real Property
- ☐ Restraining Petition
- ☐ Other General Civil

**Domestic Relations Cases**

- ☐ Adoption
- ☐ Dissolution/Divorce/Separate Maintenance
- ☐ Family Violence Petition
- ☐ Paternity/Legitimation
- ☐ Support – IV-D
- ☐ Support – Private (non-IV-D)
- ☐ Other Domestic Relations

**Post-Judgment – Check One Case Type**

- ☐ Contempt
  - ☐ Non-payment of child support, medical support, or alimony
- ☐ Modification
- ☐ Other/Administrative

☐ Check if the action is related to another action(s) pending or previously pending in this court involving some or all of the same parties, subject matter, or factual issues. If so, provide a case number for each.

_____   _____
**Case Number**   **Case Number**

☒ I hereby certify that the documents in this filing, including attachments and exhibits, satisfy the requirements for redaction of personal or confidential information in O.C.G.A. § 9-11-7.1.

☐ Is an interpreter needed in this case? If so, provide the language(s) required. _____
**Language(s) Required**

☐ Do you or your client need any disability accommodations? If so, please describe the accommodation request.
_____
_____

Version 1.1.18

E-FILED IN OFFICE - KMG
CLERK OF STATE COURT
GWINNETT COUNTY, GEORGIA

23-C-06864-S6
9/18/2023 4:35 PM
TIANA P. GARNER, CLERK

# IN THE STATE COURT OF GWINNETT COUNTY
## STATE OF GEORGIA

KARI DAGNY LOUISE GREEN., AS )
SURVIVING SPOUSE AND )
ADMINISTRATOR OF THE ESTATE )
OF BRIAN LEROY GREEN, )
DECEASED, )
                                       )
      Plaintiffs, )
                                         )
v. )
                                         )
MONSANTO COMPANY, )
                                         )
      Defendant. )

Civil Action File No.:

23-C-06864-S6

**JURY TRIAL DEMANDED**

---

## COMPLAINT FOR WRONGFUL DEATH AND DAMAGES

---

Plaintiffs Kari Dagny Louise Green, as Surviving Spouse and Administrator of the Estate of Brian Leroy Green, Deceased, file this Complaint for Wrongful Death against Defendant Monsanto Company respectfully showing the following:

### I. PARTIES, JURISDICTION AND VENUE

1. Kari Green brings this action for the wrongful death of her spouse, Brian Leroy Green, pursuant to O.C.G.A. § 51-4-2. Kari Green is a citizen and resident of the State of Georgia, residing in Monroe, Walton County, Georgia.

2. The decedent, Brian Leroy Green, was a resident of the State of Georgia, who resided in Monroe, Walton County, Georgia.

3. Defendant Monsanto Company ("Monsanto" or "Defendant") is a foreign corporation formed under the laws of the State of Delaware with a principal place of business at 800 N. Lindbergh Blvd., St. Louis, MO 63167 and is doing business in the State of Georgia. Defendant Monsanto is subject to the jurisdiction of this Court because it transacts business in this state and is registered to do business in Georgia as a foreign profit corporation. Defendant's registered agent is Corporation Service Company, 40 Technology Parkway South, #300, Norcross, Gwinnett County, Georgia 30092. Defendant Monsanto may be served with process by service on its registered agent, Corporation Service Company, 40 Technology Parkway South, #300, Norcross, Gwinnett County, Georgia 30092.

4. By virtue of the allegations herein and the Defendant's conduct and negligence, venue is properly laid in this County.

5. This Court has jurisdiction over Defendant under O.C.G.A. § 9-10-91, because Monsanto knows or should have known that its Roundup® products are sold throughout the State of Georgia.

6. In addition, Defendant Monsanto maintains sufficient contacts with the State of Georgia such that this Court's exercise of personal jurisdiction over it does not offend traditional notions of fair play and substantial justice.

## II. FACTUAL ALLEGATIONS

7. Plaintiffs reallege all paragraphs of the Complaint as if set forth here in

full.

8.   Glyphosate is a broad-spectrum, non-selective herbicide used in a wide variety of herbicidal products around the world.

9.   Plants treated with glyphosate translocate the system herbicide to their roots, shoot regions, and fruit, where it interferes with the plant's ability to form aromatic amino acids necessary for protein synthesis. Treated plants generally die within two to three days. Because plants absorb glyphosate, it cannot be completely removed by washing or peeling produce or by milling, baking or brewing grains.

10.   For nearly 40 years, homeowners across the world have used Roundup® without knowing of the dangers its use poses. That is because when Monsanto first introduced Roundup®, it marketed glyphosate as a technological breakthrough: it could kill almost every weed without causing harm either to people or to the environment. History, of course, has shown that not to be true. According to the World Health Organization ("WHO"), the main chemical ingredient of Roundup® - glyphosate – is a probable cause of cancer. Those most at risk are individuals that are exposed to Roundup® with direct application to their lawns. Monsanto assured the public that Roundup® was harmless. In order to prove this, Monsanto championed falsified data and attacked legitimate studies that revealed its dangers. Monsanto led a prolonged campaign of misinformation to convince government agencies, farmers, and the general population that Roundup® was safe.

11.   The herbicidal properties of glyphosate were discovered in 1970 by Monsanto chemist John Franz. The first glyphosate-based herbicide was introduced to the market in the mid-1970s under the brand name Roundup®. From the outset, Monsanto marketed Roundup® as a "safe" general-purpose herbicide for widespread commercial and consumer use. It still markets Roundup® as safe today.

12.   The manufacture, formulation and distribution of herbicides, such as Roundup®, are regulated under the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA" or "ACT"), 7 U.S.C. § 136 *et seq*. FIFRA requires that all pesticides be registered with the Environmental Protection Agency ("EPA" or "Agency") prior to their distribution, sale, or use, except as described by the Act. 7 U.S.C. § 136a(a).

13.   Because pesticides are toxic to plants, animals and humans, at least to some degree, the EPA requires as part of the registration process, among other things, a variety of tests to evaluate the potential for exposure to pesticides, toxicity to people and other potential non-target organisms, and other adverse effects on the environment. Registration by the EPA, however, is not an assurance or finding of safety. The determination the Agency must make in registering, or re-registering a product is not that the product is "safe," but rather the use of the product in accordance with its label directions "will not generally cause unreasonable adverse effects on the environment." 7 U.S.C. U.S.C. § 136a(c)(5)(D).

14.   FIFRA defines "unreasonable adverse effects on the environment" to

mean "any unreasonably risk to man or the environment, taking into account the economic, social, and environmental costs and benefits of the use of any pesticide." 7 U.S.C. U.S.C. § 136(bb). FIFRA thus requires EPA to make a risk/benefit analysis in determining whether a registration should be granted or allowed to continue to be sold in commerce.

15. The EPA and State of Georgia registered Roundup® for distribution, sale and manufacture in the United States and the State of Georgia.

16. FIFRA generally requires that the registrant, Monsanto in the case of Roundup®, conduct the health and safety testing of pesticide products. The EPA has protocols governing the conduct of tests required for registration and the laboratory practices that must be followed in conducting these tests. The data produced by the registrant must be submitted to the EPA for review and evaluation. The government is not required, nor is it able, however, to perform the product tests that are required of the manufacturer.

17. The evaluation of each pesticide product distributed, sold, or manufactured is completed at the time the product is initially registered. The data necessary for registration of a pesticide has changed over time.

18. Based on early studies that glyphosate could cause cancer in laboratory animals, the EPA originally classified glyphosate as *possibly carcinogenic to humans* (Group C) in 1985. After pressure from Monsanto, including contrary

studies it provided to the EPA, the EPA changed its classification to *evidence of non-carcinogenicity in humans* (Group E) in 1991. In so classifying glyphosate, however, the EPA made clear that the designation did not mean the chemical does not cause cancer: "It should be emphasized, however, that designation of an agent in Group E is based on the available evidence at the time of evaluation and should not be interpreted as a definitive conclusion that the agent will not be a carcinogen under any circumstances."

19.  On two occasions, the EPA found the laboratories hired by Monsanto to test the toxicity of its Roundup® product for registration purposes committed fraud.

20.   In the first instance, Monsanto, in seeking initial registration of Roundup® by EPA, hired Industrial Bio-Test Laboratories ("IBT") to perform and evaluate pesticide toxicology studies related to Roundup®. IBT performed about 30 tests on glyphosate and glyphosate-containing products, including 9 of the 15 residue studies needed to register Roundup®.

21.  In 1976, the United States Food and Drug Administration ("FDA") performed an inspection of IBT that revealed discrepancies between the raw data and the final report related to the toxicological impacts of glyphosate. The EPA subsequently audited IBT. The EPA found the toxicology studies conducted for the Roundup® herbicide to be invalid. An EPA reviewer stated, after finding "routine falsification of data" at IBT, that it was "hard to believe the scientific integrity of the

studies when the said they took specimens of the uterus from male rabbits."

22. Three top executives of IBT were convicted of fraud in 1983.

23. In 1991, Monsanto hired Craven Laboratories to perform pesticide and herbicide studies, including Roundup®, resulting in a second incident of data falsification. In the same year, the owner of Craven Laboratories and three of its employees were indicted, and later convicted, of fraudulent laboratory practices in the testing of pesticides and herbicides.

24. Despite the falsity of the tests that underlie its registration, within a few years of its launch, Monsanto was marketing Roundup® in 115 countries.

25. Success in the marketing of sales of Roundup® was central to Monsanto's continued reputation and dominance in the marketplace. Monsanto's agriculture division was outperforming other divisions' operating income, largely due to the success of Roundup® sales.

26. Monsanto's patent for glyphosate expired in the United States in the year 2000.

27. With its patent for glyphosate expiring in the year 2000, Monsanto needed a strategy to maintain its Roundup® market dominance and to head-off or thwart impending competition.

28. The strategy involved Monsanto developing and selling genetically engineered Roundup Ready® seeds in 1996. Because Roundup Ready® crops are

resistant to glyphosate, farmers can spray Roundup® onto their fields during the growing season without harming the crop. This allowed Monsanto to further expand its market for Roundup® such that by 2000, Monsanto's biotechnology seeds were planted on more than 80 million acres worldwide and nearly 70% of American soybeans were raised from Roundup Ready® seeds. The steps also secured Monsanto's dominant share of the glyphosate/Roundup® market through a marketing strategy that coupled proprietary Roundup Ready® seeds with continued sales of its Roundup® herbicide.

29. Through a three-pronged strategy of increased production, decreased prices and by coupling with Roundup Ready® seeds, Roundup® became Monsanto's most profitable product. In 2000, Roundup® accounted for almost $2.8 billion in sales, outselling other herbicides by a margin of five to one, and accounting for close to half of Monsanto's revenue. Today, glyphosate remains one of the world's largest herbicides by sales volume.

30. In 1996, the New York Attorney General ("NYAG"0 filed a lawsuit against Monsanto based on its false and misleading advertising of Roundup® products. specifically, the lawsuit challenged Monsanto's general representations that its spray-on glyphosate-based herbicides, including Roundup®, were "safer than table salt" and "practically non-toxic" to mammals, birds and fish. Among the representations the NYAG found deceptive and misleading about the human and

environmental safety of Roundup® were the following:

a) Remember that environmentally friendly Roundup® herbicide is biodegradable. It won't build up in the soil so you can use Roundup® with confidence along customers driveways, sidewalks and fences...

b) Remember that Roundup® is biodegradable and won't build up in the soil. That will give you the environmental confidence you need to use Roundup® everywhere you've got a weed, brush, edging or trimming problem.

c) Roundup® biodegrades into naturally occurring elements.

d) Remember that versatile Roundup® herbicide stays where you put it. That means there's no washing or leaching to harm customers' shrubs or other desirable vegetation.

e) This non residual herbicide will not wash or leach in the soil. It... stays where you apply it.

f) You can apply Accord with "confidence because it will stay where you put it" it bonds tightly to soil particles, preventing leaching. Then, soon after application, soil microorganisms biodegrade Accord into natural products.

g) Glyphosate is less toxic to rats than table salt following acute oral ingestion.

h) Glyphosate's safety margin is much greater than required. It has over 1000-fold safety margin in food and over 700-fold safety margin for workers who manufacture or use it.

i) You can feel good about using herbicides by Monsanto. They carry a toxicity category rating of 'practically non-toxic' as it pertains to mammals, birds and fish.

j) "Roundup® can be used for kids and pets will play and breaks down into natural material." This ad depicts a person with his head in the ground and a pet dog standing in an area which has been treated with Roundup®.

31. On November 19, 1996, Monsanto entered into an Assurance of Discontinuance with NYAG. In the Assurance of Discontinuance, Monday agreed to cease and desist from publishing or broadcasting any advertisements in New York that "represent, either directly or by implication" that:

a) Its glyphosate-containing pesticide products or any component thereof are safe, non-toxic, harmless or free from risk.

b) Its glyphosate-containing pesticide products or any component thereof manufactured, formulated, distributed or sold by Monsanto are biodegradable.

c) Its glyphosate-containing pesticide products or any component thereof stay where they are applied under all circumstances and will not move through the environment by any means.

d) Its glyphosate-containing pesticide products or any component thereof are "good" for the environment or are "known for their environmental characteristics."

e) Glyphosate-containing pesticide products or any component thereof are

safer or less toxic than common consumer products other than herbicides

f) Its glyphosate-containing products or any component thereof might be classified as "practically non-toxic."

32. Monsanto did not alter its advertising in the same manner in any state other than New York, and on information and belief still has not done so today.

33. In 2009, France's highest court ruled that Monsanto had not told the truth about the safety of Roundup®, The French court affirmed an earlier judgment that Monsanto had falsely advertised its herbicide Roundup® as "biodegradable" and that it "left the soil clean."

34. In 2020, the NYAG began an investigation into whether Monsanto, and its current owner Bayer, were again engaging in false advertising of their Roundup® products, in violation of Monsanto's 1996 settlement. The investigation found that a number of claims made in advertising, including promises that Roundup® products "won't harm anything but weeds," and "do not pose a threat to the health of animal wildlife," were not adequately substantiated. The investigation also revealed that the companies made claims that implied Roundup® products were safer and less toxic than dish detergent and soap, a practice Monsanto had agreed to cease in the 1996 settlement.

35. In June 2023, an announcement from the NYAG disclosed a settlement of a matter involving allegations of Bayer CropScience LP (Bayer) and Monsanto

Company violating state laws against false and misleading advertising by making repeated claims that Roundup® consumer products containing the active ingredient glyphosate were safe and non-toxic without adequate substantiation.

36. The International Agency for Research on Cancer's (IARC) process for the classification of glyphosate follows stringent procedures for the evaluation of a chemical agent. Over time, the IARC Monograph program has reviewed 980 agents. Of those reviewed, it has determined 116 agents to be Group 1 (Known Human Carcinogens); 73 agents to be Group 2A (Probable Human Carcinogens); 287 agents to Group 2B (Possible Human Carcinogens); 503 agents to be Group 3 (Not Classified); and one agent to be Probably Not Carcinogenic.

37. The established procedure for IARC Monograph evaluations is described in the IARC Program's Preamble. Evaluations are performed by panels of international experts, selected on the basis of their expertise and the absence of actual or apparent conflicts of interest.

38. One year before a Monograph meeting, the meeting is announced and there is a call both for data and for experts. Eight months before the Monograph meeting, a Working Group membership is selected and sections of the Monograph are developed by the Working Groups members. One month prior to the Monograph meeting, the call for data is closed and the various draft sections are distributed among Working Group members for review and comment. Finally, at the

Monograph meeting, the Working Group finalizes review of all literature, evaluates the evidence in each category, and completes the overall evaluation. Within two weeks after the Monograph meeting, the summary of the Working Group findings are published in Lancet Oncology, and within a year after the meeting, the final Monograph is finalized and published.

39. In assessing an agent, the IARC Working Group reviews the following information: (a) human, experimental, and mechanistic data; (b) all pertinent epidemiological studies and cancer bioassays; and (c) representative mechanistic data. The studies must be publicly available and have sufficient detail for meaningful review, and reviewers cannot be associated with the underlying study.

40. In March 2015, IARC reassessed glyphosate. The summary published in The Lancet Oncology reported that glyphosate is a Group 2A agent and probably carcinogenic in humans.

41. On July 29, 2015, IARC issued a Monograph for glyphosate, Monograph 112. For Volume 112, the volume that assessed glyphosate, a Working Group of 17 experts from 11 countries met at IARC from March 3-10, 2015, to assess the carcinogenicity of certain herbicides, including glyphosate. The March meeting culminated a nearly one-year review and preparation by the IARC Secretariat and Working Group, including a comprehensive review of the latest available scientific evidence. According to published procedures, the Working Group considered

"reports that have been published or accepted for publication in the openly available scientific literature" as well as "data from governmental reports that are publicly available."

42. The studies considered the following exposure groups: occupational exposure of farmers and tree nursery workers in the United States, forestry workers in Canada and Finland, municipal weed-control workers in the United Kingdom; and para-occupational exposure in farming families.

43. Glyphosate was identified as the second-most used household herbicide in the United States for weed control between 2001 and 2007 and the most heavily used herbicide in the world in 2012.

44. Exposure pathways are identified as air (especially during spraying), water, and food. Community exposure to glyphosate is widespread and found in soil, air, surface water, and groundwater, as well as in food.

45. The assessment of the IARC Working Group identified several case control studies of occupational exposure in the United States, Canada, and Sweden. These studies show a human health concern from agricultural and other work-related exposure to glyphosate.

46. The IARC Working Group found an increased risk between exposure to glyphosate and non-Hodgkin lymphoma ("NHL") and several subtypes of NHL, and the increased risk persisted after adjustment for other pesticides.

47. The IARC Working Group also found that glyphosate caused DNA and chromosomal damage in human cells. One study in community residents reported increases in blood markers of chromosomal damage (micronuclei) after glyphosate formulations were sprayed.

48. In male CD-1 mice, glyphosate induced a positive trend in the incidence of a rare tumor, renal tubule carcinoma. A second study reported a positive trend for hemangiosarcoma in male mice. Glyphosate increased pancreatic islet-call adenoma in male rats in two studies. A glyphosate formulation promoted skin tumors in an initiation-promotion study in mice.

49. The IARC Working Group also noted that glyphosate has been detected in the urine of agricultural workers, indicating absorption. Soil microbes degrade glyphosate to aminomethlyphosphoric acid (AMPA). Blood AMPA detection after exposure suggests intestinal microbial metabolism in humans.

50. The IARC Working Group further found that glyphosate and glyphosate formulations induced DNA and chromosomal damage in mammals, and in human and animal cells in utero.

51. The IARC Working Group also noted genotoxic, hormonal, and enzymatic effects in mammals exposed to glyphosate. Essentially, glyphosate inhibits the biosynthesis of aromatic amino acids, which leads to several metabolic disturbances, including the inhibition of protein and secondary product biosynthesis and general

metabolic disruption.

52.  The IARC Working Group also reviewed an Agricultural Health Study, consisting of a prospective cohort of 57,311 licensed pesticide applicators in Iowa and North Carolina. While this study differed from others in that it was based on a self-administered questionnaire, the results support an association between glyphosate exposure and Multiple Myeloma, Hairy Cell Leukemia (HCL), and Chronic Lymphocytic Leukemia (CLL), in addition to several other cancers.

53. The EPA has a technical fact sheet, as part of its Drinking Water and Health, National Primary Drinking Water Regulations publication, relating to glyphosate. This technical fact sheet predates the IARC March 20, 2015, evaluation. The fact sheet describes the release patterns for glyphosate as follows:

54. Glyphosate is released to the environment in its use as an herbicide for controlling woody and herbaceous weeds on forestry, right-of-way and cropped sites. These sites may be around water and in wetlands. It may also be released to the environment during its manufacture, formulation, transport, storage, and disposal.

55. In 1995, the Northwest Coalition for Alternatives to Pesticides reported that in California, the state with the most comprehensive program for reporting of pesticide-caused illness, glyphosate was the third most commonly reported cause of pesticide illness among agricultural workers.

56. Several countries around the world have instituted bans on the sale of Roundup® and other glyphosate-containing herbicides, both before and since IARC first announced its assessment for glyphosate in March 2015, and more countries undoubtedly will follow suit in light of the dangers of Roundup® being more widely known. The Netherlands issued a ban on all glyphosate-based herbicides in April 2014, including Roundup® which took effect by the end of 2015. In issuing the ban, the Dutch Parliament member who introduced the successful legislation stated: "Agricultural pesticides in user-friendly packaging are sold in abundance to private persons. In garden centers, Roundup ® is promoted as harmless; but unsuspecting customers have no idea what the risks of this product are. Especially children are sensitive to toxic substances and should therefore not be exposed to it."

57. The Brazilian Public Prosecutor in the Federal District requested that the Brazilian Justice Department suspend the use of glyphosate.

58. France banned the private sale of Roundup® and glyphosate following the IARC assessment for Glyphosate.

59. Bermuda banned both the private and commercial sale of glyphosates, including Roundup®. The Bermuda government explained its ban as follows: "Following a recent scientific study carried out by a leading cancer agency, the importation of weed spray 'Roundup' has been suspended."

60. The Sri Lankan government banned the private and commercial use of

glyphosates, particularly out of concern that Glyphosate has been linked to fatal kidney disease in agricultural workers.

61. The government of Columbia announced its ban on using Roundup® and glyphosate to destroy illegal plantation of coca, the raw ingredient for cocaine, because of the WHO's finding that glyphosate is probably carcinogenic.

62. Plaintiff's decedent Brian Leroy Green ("Brian Green") began applying Roundup® to his lawn and property approximately thirty (30) years ago. He routinely applied the product to his own lawn and property, until approximately 2021.

63. Brian Green was diagnosed with Non-Hodgkin Lymphoma ("MFH") following approximately thirty (30) years of Roundup® application.

64. As a result of exposure to Roundup®, Brian Green suffered harm.

65. Plaintiff incorporates as if fully set forth herein each and every allegation set forth above.

66. Plaintiff brings this strict liability claim against Defendants for defective design.

67. At all times relevant to this litigation, Defendant engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting Roundup® products, which are defective and unreasonably dangerous to consumers, including Brian Green, thereby placing Roundup®

products into the stream of commerce. These actions were under the ultimate control and supervision of Defendant. At all times relevant to this litigation, Defendant designed, researched, developed, manufactured, produced, tested, assembled, labeled, advertised, promoted, marketed, sold and distributed the Roundup® products used by Brian Green, as described above.

68. At all times relevant to this litigation, Defendant's Roundup® products were manufactured, designed, and labeled in an unsafe, defective, and inherently dangerous manner that was dangerous for use by or exposure to the public, and, in particular, Brian Green.

69. At all times relevant to this litigation, Defendant's Roundup® products reached the intended consumers, handlers, and users or other persons coming into contact with these products in New York and throughout the United States, including Plaintiff, without substantial change in their condition as designed, manufactured, sold, distributed, labeled, and marketed by Defendant.

70. Defendant's Roundup® products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold, and marketed by Defendant were defective in design and formulation in that when they left the hands of the Defendant's manufacturers and/or suppliers, they were unreasonably dangerous and dangerous to an extent beyond that which an ordinary consumer would contemplate.

71. Defendant's Roundup® products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold, and marketed by Defendant were defective in design and formulation in that when they left the hands of Defendant's manufacturers and/or suppliers, the foreseeable risks exceeded the alleged benefits associated with their design and formulation.

72. At all times relevant to this action, Defendant knew or had reason to know that its Roundup® products were defective and were inherently dangerous and unsafe when used in the manner instructed and provided by Defendant.

73. Therefore, at all times relevant to this litigation, Defendant's Roundup® products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold, and marketed by Defendant were defective in design and formulation, in one or more of the following ways:

a) When placed in the stream of commerce, Defendant's Roundup® products were defective in design and formulation, and, consequently, dangerous to an extent beyond that which an ordinary consumer would contemplate.

b) When placed in the stream of commerce, Defendant's Roundup® products were unreasonably dangerous in that they were hazardous and posed a grave risk of cancer and other serious illnesses when used in a reasonably anticipated manner.

c) When placed in the stream of commerce, Defendant's Roundup® products contained unreasonably dangerous design defects and were not reasonably safe when

used in a reasonably anticipated or intended manner.

d) Defendant did not sufficiently test, investigate, or study its Roundup® products and, specifically, the active ingredient, glyphosate.

e) Exposure to Roundup® and glyphosate-containing products presents a risk of harmful side effects that outweigh any potential utility stemming from the use of the herbicide.

f) Defendant knew or should have known at the time of marketing its Roundup® products that exposure to Roundup® and specifically, its active ingredient glyphosate, could result in cancer and other severe illnesses and injuries.

g) Defendant did not conduct adequate post-marketing surveillance of its Roundup® products.

h) Defendant could have employed safer alternative designs and formulations.

74. At all times relevant to this litigation, Brian Green used and/or was exposed to the use of Defendant's Roundup® products in an intended or reasonably foreseeable manner without knowledge of their dangerous characteristics.

75. Plaintiff could not have reasonably discovered the defects and risks associated with Roundup® or glyphosate-containing products before or at the time of exposure.

76. The harm caused by Defendant's Roundup® products far outweighed their benefit, rendering Defendant's products dangerous to an extent beyond that which

an ordinary consumer would contemplate. Defendant's Roundup® products were and are more dangerous than alternative products and Defendant could have designed its Roundup® products to make them less dangerous. Indeed, at the time that Defendant designed its Roundup® products, the state of the industry's scientific knowledge was such that a less risky design or formulation was attainable.

77. At the time Roundup® products left Defendant's control, there was a practical, technically feasible and safer alternative design that would have prevented the harm without substantially impairing the reasonably anticipated or intended function of Defendant's herbicides.

78. Defendant's defective design of its Roundup® products was willful, wanton, fraudulent, malicious, and conducted with reckless disregard for the health and safety of users of the Roundup® products, including Plaintiff's decedent, Brian Green.

79. Therefore, as a result of the unreasonably dangerous condition of its Roundup® products, Defendant is strictly liable to Plaintiff for the wrongful death of Brian Green.

80. The defects in Defendant's Roundup® products were substantial and contributing factors in causing the death of Brian Green, and, but for Defendant's misconduct and omissions, Plaintiff would not have sustained his injuries that caused his death.

81. Defendant's conduct, as described above, was reckless. Defendant risked the lives of consumers and users of its products, including Brian Green, with knowledge of the safety problems associated with Roundup® and glyphosate-containing products, and suppressed this knowledge from the general public. Defendant made conscious decisions not to redesign, warn, or inform the unsuspecting public. Defendant's reckless conduct warrants an award of punitive damages.

82. As a direct and proximate result of Defendant placing its defective Roundup® products into the stream of commerce, Plaintiff's decedent Brian Green suffered grave injuries and caused his untimely death, Brian Green endured physical pain and discomfort prior to his death, as well as economic hardship prior to his death, including considerable financial expenses for medical care and treatment in excess of $500,000.00.

83. Plaintiff incorporates as if fully set forth herein each and every allegation set forth above.

84. Plaintiff brings this strict liability claim against Defendant for failure to warn.

85. At all times relevant to this litigation, Defendant engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting Roundup® products, which are defective and unreasonably

dangerous to consumers, including Brian Green, because they do not contain adequate warnings or instructions concerning the dangerous characteristics of Roundup® and specifically, the active ingredient glyphosate. These actions were under the ultimate control and supervision of Defendant.

86. Defendant researched, developed, designed, tested, manufactured, inspected, labeled, distributed, marketed, promoted, sold, and otherwise released into the stream of commerce its Roundup® products, and in the course of the same, directly advertised or marketed the products to consumers and end users, including the Plaintiff, and therefore had a duty to warn of the risks associated with the use of Roundup® and glyphosate-containing products.

87. At all times relevant to this litigation, Defendant had a duty to properly test, develop, design, manufacture, inspect, package, label, market, promote, sell, distribute, maintain supply, provide proper warnings, and take such steps as necessary to ensure that its Roundup® products did not cause users and consumers to suffer from unreasonable and dangerous risks. Defendant had a continuing duty to warn Plaintiff's decedent Brian Green of the dangers associated with Roundup® use and exposure. Defendant, as manufacturer, seller, or distributor of chemical herbicides is held to the knowledge of an expert in the field.

88. At the time of manufacture, Defendant could have provided warnings or instructions regarding the full and complete risks of Roundup® and glyphosate-

containing products because it knew or should have known of the unreasonable risks of harm associated with the use of and/or exposure to such products.

89. At all times relevant to this litigation, Defendant failed to investigate, study, test, or promote the safety or to minimize the dangers to users and consumers of its product and to those who would foreseeably use or be harmed by Defendant's herbicides, including Brian Green.

90. Despite the fact that Defendant knew or should have known that Roundup® posed a grave risk of harm, it failed to exercise reasonable care to warn of the dangerous risks associated with the use and exposure. The dangerous propensities of its products and the carcinogenic characteristics of glyphosate, as described above, were known to Defendant, or scientifically knowable to Defendant through appropriate research and testing by known methods at the time it distributed, supplied, or sold the product, and not known to end users and consumers, such as Plaintiff's decedent Brian Green.

91. Defendant knew or should have known that its products created significant risks of serious bodily harm to consumers, as alleged herein, and Defendant failed to adequately warn consumers and reasonably foreseeable users of the risks of exposure to its products. Defendant has wrongfully concealed information concerning the dangerous nature of Roundup® and its active ingredient glyphosate, and further made false and/or misleading statements concerning the safety of

Roundup® and glyphosate.

92. At all times relevant to this litigation, Defendant's Roundup® products reached the intended consumers, handlers, and users or other persons coming into contact with these products in Georgia and throughout the United States, including Brian Green, without substantial change in their condition as designed, manufactured, sold, distributed, labeled, and marketed by Defendant.

93. Plaintiff's decedent Brian Green was exposed to Defendant's Roundup® products in the course of his regular lawn and property maintenance, without knowledge of their dangerous characteristics.

94. At all times relevant to this litigation, Brian Green used and/or was exposed to the use of Defendant's Roundup® products in their intended or reasonably foreseeable manner without knowledge of their dangerous characteristics.

95. Plaintiff's decedent Brian Green could not have reasonably discovered the defects and risks associated with Roundup® or glyphosate-containing products prior to or at the time of Brian Green's exposure. Plaintiff's decedent Brian Green relied upon the skill, superior knowledge, and judgment of the Defendant.

96. Defendant knew or should have known that the minimal warnings disseminated with its Roundup® products were inadequate, but they failed to communicate adequate information on the dangers and safe use/exposure and failed

to communicate warnings and instructions that were appropriate and adequate to render the products safe for their ordinary, intended, and reasonably foreseeable uses.

97. The information that Defendant did provide or communicate failed to contain relevant warnings, hazards, and precautions that would have enabled horticultural workers or users such as Brian Green to utilize the products safely and with adequate protection. Instead, Defendant disseminated information that was inaccurate, false, and misleading and which failed to communicate accurately or adequately the comparative safety, duration, and extent of the risk of injuries with use of and/or exposure to Roundup® and glyphosate; continued to aggressively promote the efficacy of its products, even after it knew or should have known of the unreasonable risks from use or exposure; and concealed, downplayed, or otherwise suppressed, through aggressive marketing and promotion, any information or research about the risks and dangers of exposure to Roundup® and glyphosate.

98. To this day, Defendant has failed to adequately and accurately warn of the true risks of injuries to users or consumers, like Brian Green, associated with the use of and exposure to Roundup® and its active ingredient glyphosate, a probable carcinogen.

99. As a result of their inadequate warnings, Defendant's Roundup® products were defective and unreasonably dangerous when they left the possession and/or

control of Defendant, were distributed by Defendant, and used by Plaintiff's decedent Brian Green.

100. Defendant is liable to Plaintiff for injuries and the wrongful death of Brian Green caused by its negligent or willful failure, as described above, to provide adequate warnings or other clinically relevant information and data regarding the appropriate use of its products and the risks associated with the use of or exposure to Roundup® and glyphosate.

101. The defects in Defendant's Roundup® products were substantial and contributing factors in causing Brian Green's injuries and death, and, but for Defendant's misconduct and omissions, Brian Green would not have sustained his injuries and died.

102. Had Defendant provided adequate warnings and instructions and properly disclosed and disseminated the risks associated with its Roundup® products, Brian Green could have avoided the risk of developing injuries as alleged herein and he could have obtained alternative herbicides.

103. As a direct and proximate result of Defendant placing its defective Roundup® products into the stream of commerce, Plaintiff's decedent Brian Green suffered grave injuries and caused his untimely death, Brian Green endured physical pain and discomfort prior to his death, as well as economic hardship prior to his death, including considerable financial expenses for medical care and treatment in

excess of $500,000.00.

104. Plaintiff incorporates as if fully set forth herein each and every allegation set forth above.

105. Defendant, directly or indirectly, caused Roundup® products to be sold, distributed, packaged, labeled, marketed, promoted, and/or used by Plaintiff's decedent Brian Green.

106. At all times relevant to this litigation, Defendant had a duty to exercise reasonable care in the design, research, manufacture, marketing, advertisement, supply, promotion, packaging, sale, and distribution of its Roundup® products, including the duty to take all reasonable steps necessary to manufacture, promote, and/or sell a product that was not unreasonably dangerous to consumers and users of the product.

107. At all times relevant to this litigation, Defendant had a duty to exercise reasonable care in the marketing, advertisement, and sale of the Roundup® products. Defendant's duty of care owed to consumers and the general public included providing accurate, true, and correct information concerning the risks of using Roundup® and appropriate, complete, and accurate warnings concerning the potential adverse effects of exposure to Roundup®, and, in particular, its active ingredient glyphosate.

108. At all times relevant to this litigation, Defendant knew or, in the exercise

of reasonable care, should have known of the hazards and dangers of Roundup® and specifically, the carcinogenic properties of the chemical glyphosate.

109. Accordingly, at all times relevant to this litigation, Defendant knew or, in the exercise of reasonable care, should have known that use of or exposure to its Roundup® products could cause or be associated with Brian Green's injuries and thus created a dangerous and unreasonable risk of injury to the users of these products, including Plaintiff's decedent Brian Green.

110. Defendant also knew or, in the exercise of reasonable care, should have known that users and consumers of Roundup® were unaware of the risks and the magnitude of the risks associated with the use of and/or exposure to Roundup® and glyphosate-containing products.

111. As such, Defendant breached its duty of reasonable care and failed to exercise ordinary care in the design, research, development, manufacture, testing, marketing, supply, promotion, advertisement, packaging, sales, and distribution of its Roundup® products, in that Defendant manufactured and produced defective herbicides containing the chemical glyphosate, knew or had reason to know of the defects inherent in its products, knew or had reason to know that a user's or consumer's exposure to the products created a significant risk of harm and unreasonably dangerous side effects, and failed to prevent or adequately warn of these risks and injuries.

112. Despite its ability and means to investigate, study, and test its products and to provide adequate warnings, Defendant has failed to do so. Indeed, Defendant has wrongfully concealed information and has further made false and/or misleading statements concerning the safety and/or exposure to Roundup® and glyphosate.

113. Defendant's negligence included:

a) Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing its Roundup® products without thorough and adequate pre- and post-market testing.

b) Manufacturing, producing, promoting, formulating, creating, developing, designing, selling and/or distributing Roundup® while negligently and/or intentionally concealing and failing to disclose the results of trials, tests, and studies of exposure to glyphosate, and consequently, the risk of serious harm associated with human use of and exposure to Roundup®.

c) Failing to undertake sufficient studies and conduct necessary tests to determine whether Row1dup® products and glyphosate-containing products were safe for their intended use in agriculture and horticulture;

d) Failing to use reasonable and prudent care in the design, research, manufacture, and development of Roundup® products so as to avoid the risk of serious hmm associated with the prevalent use of Roundup®/glyphosate as an herbicide;

e) Failing to design and manufacture Roundup® products so as to ensure they were at least as safe and effective as other herbicides on the market;

f) Failing to provide adequate instructions, guidelines, and safety precautions to those persons who Defendant could reasonably foresee would use and be exposed to its Roundup® products.

g) Failing to disclose to Brian Green, users/consumers, and the general public that use of and exposure to Roundup® presented severe risks of cancer and other grave illnesses;

h) Failing to warn Brian Green, consumers, and the general public that the product's risk of harm was unreasonable and that there were safer and effective alternative herbicides available to Plaintiff and other consumers;

i) Systematically suppressing or downplaying contrary evidence about the risks, incidence, and prevalence of the side effects of Roundup® and glyphosate-containing products;

j) Representing that its Roundup® products were safe for their intended use when, in fact, Defendant knew or should have known that the products were not safe for their intended purpose.

k) Declining to make or propose any changes to Roundup® products' labeling or other promotional materials that would alert the consumers and the general public of the risks of Roundup® and glyphosate;

1) Advertising, marketing, and recommending the use of the Roundup® products, while concealing and failing to disclose or warn of the dangers known by Defendant to be associated with or caused by the use of or exposure to Roundup® and glyphosate.

m) Continuing to disseminate information to its consumers, which indicate or imply that Defendant's Roundup® products are not unsafe; and

n) Continuing the manufacture and sale of its products with the knowledge that the products were unreasonably unsafe and dangerous.

114. Defendant knew and/or should have known that it was foreseeable that consumers such as Brian Green would suffer injuries as a result of Defendant's failure to exercise ordinary care in the manufacturing, marketing, labeling, distribution, and sale of Roundup®.

115. Plaintiff's decedent Brian Green did not know the nature and extent of the injuries that could result from the intended use of and/or exposure to Roundup® or its active ingredient glyphosate.

116. Defendant's negligence was the proximate cause of the injuries, untimely and wrongful death that Brian Green suffered and the economic losses as described herein.

117. Defendant's conduct, as described above, was reckless. Defendant regularly risks the lives of consumers and users of their products, including Plaintiff,

with full knowledge of the dangers of its products. Defendant has made conscious decisions not to redesign, re-label, warn, or inform the unsuspecting public, including Plaintiff's decedent Brian Green. Defendant's reckless conduct therefore warrants an award of punitive damages.

118. As a proximate result of Defendant's wrongful acts and omissions in placing its defective Roundup® products into the stream of commerce without adequate warnings of the hazardous and carcinogenic nature of glyphosate, Plaintiff's decedent Brian Green suffered grave injuries and caused his untimely death, Brian Green endured physical pain and discomfort prior to his death, as well as economic hardship prior to his death, including considerable financial expenses for medical care and treatment in excess of $500,000.00.

119. Plaintiff incorporates as if fully set forth herein each and every allegation set forth above.

120. At all times relevant to this litigation, Defendant engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting its Roundup® products, which are defective and unreasonably dangerous to consumers, including Plaintiff's decedent Brian Green, thereby placing Roundup® products into the stream of commerce. These actions were under the ultimate control and supervision of the Defendant.

121. Before the time that Brian Green was exposed to the use of the

aforementioned Roundup® products, Defendant impliedly warranted to its consumers - including Brian Green - that its Roundup® products were of merchantable quality and safe for the use for which they were intended; specifically, as horticultural herbicides.

122. Defendant, however, failed to disclose that Roundup® has dangerous propensities when used as intended and that the use of and/or exposure to Roundup® and glyphosate-containing product carries an increased risk of developing severe injuries, including Brian Green's injuries.

123. Plaintiff's decedent Brian Green reasonably relied upon the skill, superior knowledge and judgment of Defendant and upon its implied warranties that the Roundup® products were of merchantable quality and fit for their intended purpose or use.

124. Upon information and belief, Plaintiff's decedent Brian Green was at all relevant times in privity with Defendant.

125. Plaintiff and her decedent, Brian Green, are the intended third-party beneficiary of implied warranties made by Defendant to the purchasers of its horticultural herbicides, and as such Plaintiff is entitled to assert this claim.

126. The Roundup® products were expected to reach and did in fact reach consumers and users, including Plaintiff's decedent Brian Green, without substantial change in the condition in which they were manufactured and sold by Defendant.

127. At all times relevant to this litigation, Defendant was aware that consumers and users of its products, including Brian Green, would use Roundup® products as marketed by Defendant, which is to say that Plaintiff's decedent Brian Green was a foreseeable user of Roundup®.

128. Defendant intended that its Roundup® products be used in the manner in which Brian Green in fact used them and Defendant impliedly warranted each product to be of merchantable quality, safe, and for this use, despite the fact that Roundup® was not adequately tested or researched.

129. In reliance upon Defendant's implied warranty, Plaintiff's decedent Brian Green used Roundup® as instructed and labeled and in the foreseeable manner intended, recommended, promoted and marketed by Defendant.

130. Plaintiff's decedent Brian Green could not have reasonably discovered or known of the risks of serious injury associated with Roundup® or glyphosate.

131. Defendant breached its implied warranty to Plaintiff's decedent Brian Green, and Plaintiff, in that its Roundup® products were not of merchantable quality, safe, or fit for their intended use, or adequately tested. Roundup® has dangerous propensities when used as intended and can cause serious injuries, including those injuries complained of herein.

132. The harm caused by Defendant's Roundup® products far outweighed their benefit, rendering the products more dangerous than an ordinary consumer or

user would expect and more dangerous than alternative products.

133. As a direct and proximate result of Defendant's wrongful acts and omissions Plaintiff's decedent Brian Green suffered grave injuries and caused his untimely death, Brian Green endured physical pain and discomfort prior to his death, as well as economic hardship prior to his death, including considerable financial expenses for medical care and treatment in excess of $500,000.00.

134. Plaintiff incorporates as if fully set forth herein each and every allegation set forth above.

135. As a result of the aforesaid acts and/or omissions of Defendant related to its Roundup® products, Plaintiff's decedent Brian Green suffered severe injuries causing damages, including, but not limited, to medical expenses in excess of $500,000.00 and funeral expenses, and pain and suffering prior to Brian Green's untimely death.

136. Said damages were directly, proximately, and solely caused by Defendant's Roundup® products.

137. Plaintiff, as Administrator of the Estate of Brian Leroy Green, is entitled to recover said damages.

138. At all times material to this Complaint, Plaintiff is the surviving spouse of Brian Green.

WHEREFORE, Plaintiffs pray for the following relief:

1. That Summons issue requiring Defendant to appear as provided by law to answer the allegations of this Complaint;

2. That Plaintiffs have a trial by jury of all issues so triable;

3. That on behalf of Plaintiff, as surviving spouse and as Administrator of the Estate of Brian Leroy Green, recover from Defendant compensatory damages for the bodily injury and fright, terror, pain, and suffering of Brian Green and for all medical, funeral, and other necessary expenses incurred as a result of the subject incident as authorized pursuant to O.C.G.A. §§ 9-2-21, 9-2-40 and -41, and 51-4-5. The amount of compensatory damages and expenses shall be proven at trial and determined by the jury;

4. On behalf of Plaintiff, as surviving spouse of Brian Leroy Green, recover damages representing the full value of the life of Brian Leroy Green, as authorized by O.C.G.A § 51-4-1;

5. That Plaintiffs have and recover all damages to which they are entitled to recover under Georgia law; and

6. For such other and further relief as this Court deems just and appropriate.

PLAINTIFFS DEMAND A TRIAL BY JURY ON ALL COUNTS.

Respectfully submitted this 18th day of September 2023.

POOLE HUFFMAN, LLC

By:     */s/ John Calhoun Harris, Jr.*
        John Calhoun Harris, Jr.
        Georgia Bar No. 330520
        *Attorney for Plaintiffs*

3562 Habersham at Northlake
Building J, Suite 200
Tucker, GA 30084
(404) 373-4008
Facsimile: 888-709-5723
cal@poolehuffman.com

E-FILED IN OFFICE - KMG
CLERK OF STATE COURT
GWINNETT COUNTY, GEORGIA

**23-C-06864-S6**
**9/18/2023 4:35 PM**
TIANA P. GARNER, CLERK

# IN THE STATE COURT OF GWINNETT COUNTY

## STATE OF GEORGIA

KARI DAGNY LOUISE GREEN, AS

SURVIVING SPOUSE AND ADMINISTRATOR OF

THE ESTATE OF BRIAN LEROY GREEN, DECEASED

PLAINTIFF

CIVIL ACTION
NUMBER: _____ 23-C-06864-S6

VS.

MONSANTO COMPANY

800 N. LINDBERGH BLVD.

ST. LOUIS, MO 63167

DEFENDANT

# SUMMONS

**TO THE ABOVE NAMED DEFENDANT:**

You are hereby summoned and required to file with the Clerk of said court and serve upon the Plaintiff's attorney, whose name and address is:

JOHN CALHOUN HARRIS, ESQ.
POOLE HUFFMAN, LLC
3562 HABERSHAM AT NORTHLAKE
BLDG. J, STE. 200
TUCKER, GA 30084
CAL@POOLEHUFFMAN.COM

an answer to the complaint which is herewith served upon you, within 30 days after service of this summons upon you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint.

This _____ day of _____, 20_____.

18th day of September, 2023

Tiana P. Garner
**Clerk of State Court**

By _____
**Deputy Clerk**

**INSTRUCTIONS:** Attach addendum sheet for additional parties if needed, make notation on this sheet if addendum sheet is used.

SC-1 Rev. 2011

SHERIFF'S ENTRY OF SERVICE

Civil Action No. _23-C-06864-S6_

| Superior Court ☐ | Magistrate Court ☐ |
| State Court ☒ | Probate Court ☐ |
| Juvenile Court ☐ | |

Date Filed _09/18/2023_

Georgia, _GWINNETT_ COUNTY

Attorney's Address

POOLE HUFFMAN, LLC

3562 Habersham at Northlake, Bldg. J, Suite 200

Tucker, Georgia 30084 | (404) 373-4008

KARI DAGNY LOUISE, AS SURVIVING SPOUSE AND ADMINISTRATOR OF THE ESTATE OF BRIAN LEROY GREEN, DECEASED

_____
Plaintiff

VS.

Name and Address of Party to Served

MONSANTO COMPANY

c/o Corporation Service Company

2 Sun Court, Suite 400, Peachtree Corners, GA 30092

MONSANTO COMPANY _____

_____

_____
Defendant

_____

_____
Garnishee

## SHERIFF'S ENTRY OF SERVICE

**PERSONAL**
I have this day served the defendant _____ personally with a copy
☐ of the within action and summons.

**NOTORIOUS**
I have this day served the defendant _____ by leaving a
copy of the action and summons at his most notorious place abode in this County.

Delivered same into hands of _____ described as follows:
☐ age, about _____ years; weight _____ pounds; height _____ feet and _____ inches, domiciled at the residence of
defendant.

**CORPORATION**
Served the defendant Monsanto Company _____ a corporation
by leaving a copy of the within action and summons with Alisha Smith
In charge of the office and place of doing business of said Corporation in this County.

**TACK & MAIL**
I have this day served the above styled affidavit and summons on the defendant(s) by posting a copy of the same to the door of the premises
designated in said affidavit and on the same day of such posting by depositing a true copy of same in the United States Mail, First Class in an
☐ envelope properly addressed to the defendant(s) at the address shown in said summons, with adequate postage affixed thereon containing notice
to the defendant(s) to answer said summons at the place stated in the summons.

**NON EST**
Diligent search made and defendant _____
☐ not to be found in the jurisdiction of this Court.

This _22_ day of _September_, 20_23_          J. Williams 50139

DEPUTY

# Gwinnett County Sheriff's Office
## Cover Sheet



**Sheriff #:**   23030347

**Person Served:**   MONSANTO CO
2 SUN COURT, SUITE 400
C/O CORPORATION SERVICE COMPANY
PEACHTREE CORNERS GA 30092
PHONE:

**Process Information:**

Date Received:   09/21/2023

Assigned Zone:   2 Sun Court          Court Case #:   23-C-06864-S6

Expiration Date:                      Hearing Date:

Paper Types:   COMPLAINT FOR WRONGFUL DEATH AND DAMAGES

Notes/Alerts:

**Notes:**

JS44 (Rev. 10/2020 NDGA)

**CIVIL COVER SHEET**

1:23-cv-4626 MLB 365 28:1446wd

The JS44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form is required for the use of the Clerk of Court for the purpose of initiating the civil docket record. (SEE INSTRUCTIONS ATTACHED)

| **I. (a) PLAINTIFF(S)** | **DEFENDANT(S)** |
|---|---|
| Kari Dagny Louise Green<br>Brian Leroy Green | Monsanto Company |

| **(b) COUNTY OF RESIDENCE OF FIRST LISTED**<br>PLAINTIFF___Walton County (GA)___<br><span style="font-size:small">(EXCEPT IN U.S. PLAINTIFF CASES)</span> | **COUNTY OF RESIDENCE OF FIRST LISTED**<br>DEFENDANT___St. Louis (MO)___<br><span style="font-size:small">(IN U.S. PLAINTIFF CASES ONLY)</span><br>NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED |

| **(c) ATTORNEYS** (FIRM NAME, ADDRESS, TELEPHONE NUMBER, AND E-MAIL ADDRESS) | **ATTORNEYS** (IF KNOWN) |
|---|---|
| John Calhoun Harris, Jr.<br>Poole Huffman, LLC<br>3562 Habersham at Northlake, Building J, Suite 200<br>Tucker, GA 30084<br>cal@poolehuffman.com<br>404-373-4008 | Jason Stephen Allard and Joshua Luke Becker<br>Shook, Hardy & Bacon, LLP<br>1230 Peachtree St. NE, Suite 1200, Atlanta, GA 30309<br>jallard@shb.com and jbecker@shb.com<br>470-867-6000 |

**II. BASIS OF JURISDICTION** (PLACE AN "X" IN ONE BOX ONLY)

- [ ] 1 U.S. GOVERNMENT PLAINTIFF
- [ ] 2 U.S. GOVERNMENT DEFENDANT
- [ ] 3 FEDERAL QUESTION (U.S. GOVERNMENT NOT A PARTY)
- [X] 4 DIVERSITY (INDICATE CITIZENSHIP OF PARTIES IN ITEM III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** (PLACE AN "X" IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) (FOR DIVERSITY CASES ONLY)

| | PLF | DEF | | PLF | DEF | |
|---|---|---|---|---|---|---|
| | [X] 1 | [ ] 1 | CITIZEN OF THIS STATE | [ ] 4 | [ ] 4 | INCORPORATED OR PRINCIPAL PLACE OF BUSINESS IN THIS STATE |
| | [ ] 2 | [ ] 2 | CITIZEN OF ANOTHER STATE | [ ] 5 | [X] 5 | INCORPORATED AND PRINCIPAL PLACE OF BUSINESS IN ANOTHER STATE |
| | [ ] 3 | [ ] 3 | CITIZEN OR SUBJECT OF A FOREIGN COUNTRY | [ ] 6 | [ ] 6 | FOREIGN NATION |

**IV. ORIGIN** (PLACE AN "X" IN ONE BOX ONLY)

- [ ] 1 ORIGINAL PROCEEDING
- [X] 2 REMOVED FROM STATE COURT
- [ ] 3 REMANDED FROM APPELLATE COURT
- [ ] 4 REINSTATED OR REOPENED
- [ ] 5 TRANSFERRED FROM ANOTHER DISTRICT (Specify District)
- [ ] 6 MULTIDISTRICT LITIGATION - TRANSFER
- [ ] 7 APPEAL TO DISTRICT JUDGE FROM MAGISTRATE JUDGE JUDGMENT
- [ ] 8 MULTIDISTRICT LITIGATION - DIRECT FILE

**V. CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE - DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY)

This is a products liability action properly before this Court pursuant to 28 U.S.C. §§ 1332, 1441, and 1446.

**(IF COMPLEX, CHECK REASON BELOW)**

- [ ] 1. Unusually large number of parties.
- [ ] 2. Unusually large number of claims or defenses.
- [ ] 3. Factual issues are exceptionally complex
- [X] 4. Greater than normal volume of evidence.
- [X] 5. Extended discovery period is needed

- [ ] 6. Problems locating or preserving evidence
- [ ] 7. Pending parallel investigations or actions by government.
- [X] 8. Multiple use of experts.
- [ ] 9. Need for discovery outside United States boundaries.
- [X] 0. Existence of highly technical issues and proof.

**CONTINUED ON REVERSE**

FOR OFFICE USE ONLY

RECEIPT #_____ AMOUNT $_____ APPLYING IFP_____ MAG. JUDGE (IFP)_____
JUDGE_____ MAG. JUDGE_____ (Referral) NATURE OF SUIT_____ CAUSE OF ACTION_____

## VI. NATURE OF SUIT (PLACE AN "X" IN ONE BOX ONLY)

**CONTRACT - "0" MONTHS DISCOVERY TRACK**
- [ ] 150 RECOVERY OF OVERPAYMENT & ENFORCEMENT OF JUDGMENT
- [ ] 152 RECOVERY OF DEFAULTED STUDENT LOANS (Excl. Veterans)
- [ ] 153 RECOVERY OF OVERPAYMENT OF VETERAN'S BENEFITS

**CONTRACT - "4" MONTHS DISCOVERY TRACK**
- [ ] 110 INSURANCE
- [ ] 120 MARINE
- [ ] 130 MILLER ACT
- [ ] 140 NEGOTIABLE INSTRUMENT
- [ ] 151 MEDICARE ACT
- [ ] 160 STOCKHOLDERS' SUITS
- [ ] 190 OTHER CONTRACT
- [ ] 195 CONTRACT PRODUCT LIABILITY
- [ ] 196 FRANCHISE

**REAL PROPERTY - "4" MONTHS DISCOVERY TRACK**
- [ ] 210 LAND CONDEMNATION
- [ ] 220 FORECLOSURE
- [ ] 230 RENT LEASE & EJECTMENT
- [ ] 240 TORTS TO LAND
- [ ] 245 TORT PRODUCT LIABILITY
- [ ] 290 ALL OTHER REAL PROPERTY

**TORTS - PERSONAL INJURY - "4" MONTHS DISCOVERY TRACK**
- [ ] 310 AIRPLANE
- [ ] 315 AIRPLANE PRODUCT LIABILITY
- [ ] 320 ASSAULT, LIBEL & SLANDER
- [ ] 330 FEDERAL EMPLOYERS' LIABILITY
- [ ] 340 MARINE
- [ ] 345 MARINE PRODUCT LIABILITY
- [ ] 350 MOTOR VEHICLE
- [ ] 355 MOTOR VEHICLE PRODUCT LIABILITY
- [ ] 360 OTHER PERSONAL INJURY
- [ ] 362 PERSONAL INJURY - MEDICAL MALPRACTICE
- [x] 365 PERSONAL INJURY - PRODUCT LIABILITY
- [ ] 367 PERSONAL INJURY - HEALTH CARE/ PHARMACEUTICAL PRODUCT LIABILITY
- [ ] 368 ASBESTOS PERSONAL INJURY PRODUCT LIABILITY

**TORTS - PERSONAL PROPERTY - "4" MONTHS DISCOVERY TRACK**
- [ ] 370 OTHER FRAUD
- [ ] 371 TRUTH IN LENDING
- [ ] 380 OTHER PERSONAL PROPERTY DAMAGE
- [ ] 385 PROPERTY DAMAGE PRODUCT LIABILITY

**BANKRUPTCY - "0" MONTHS DISCOVERY TRACK**
- [ ] 422 APPEAL 28 USC 158
- [ ] 423 WITHDRAWAL 28 USC 157

**CIVIL RIGHTS - "4" MONTHS DISCOVERY TRACK**
- [ ] 440 OTHER CIVIL RIGHTS
- [ ] 441 VOTING
- [ ] 442 EMPLOYMENT
- [ ] 443 HOUSING/ ACCOMMODATIONS
- [ ] 445 AMERICANS with DISABILITIES - Employment
- [ ] 446 AMERICANS with DISABILITIES - Other
- [ ] 448 EDUCATION

**IMMIGRATION - "0" MONTHS DISCOVERY TRACK**
- [ ] 462 NATURALIZATION APPLICATION
- [ ] 465 OTHER IMMIGRATION ACTIONS

**PRISONER PETITIONS - "0" MONTHS DISCOVERY TRACK**
- [ ] 463 HABEAS CORPUS- Alien Detainee
- [ ] 510 MOTIONS TO VACATE SENTENCE
- [ ] 530 HABEAS CORPUS
- [ ] 535 HABEAS CORPUS DEATH PENALTY
- [ ] 540 MANDAMUS & OTHER
- [ ] 550 CIVIL RIGHTS - Filed Pro se
- [ ] 555 PRISON CONDITION(S) - Filed Pro se
- [ ] 560 CIVIL DETAINEE: CONDITIONS OF CONFINEMENT

**PRISONER PETITIONS - "4" MONTHS DISCOVERY TRACK**
- [ ] 550 CIVIL RIGHTS - Filed by Counsel
- [ ] 555 PRISON CONDITION(S) - Filed by Counsel

**FORFEITURE/PENALTY - "4" MONTHS DISCOVERY TRACK**
- [ ] 625 DRUG RELATED SEIZURE OF PROPERTY 21 USC 881
- [ ] 690 OTHER

**LABOR - "4" MONTHS DISCOVERY TRACK**
- [ ] 710 FAIR LABOR STANDARDS ACT
- [ ] 720 LABOR/MGMT. RELATIONS
- [ ] 740 RAILWAY LABOR ACT
- [ ] 751 FAMILY and MEDICAL LEAVE ACT
- [ ] 790 OTHER LABOR LITIGATION
- [ ] 791 EMPL. RET. INC. SECURITY ACT

**PROPERTY RIGHTS - "4" MONTHS DISCOVERY TRACK**
- [ ] 820 COPYRIGHTS
- [ ] 840 TRADEMARK
- [ ] 880 DEFEND TRADE SECRETS ACT OF 2016 (DTSA)

**PROPERTY RIGHTS - "8" MONTHS DISCOVERY TRACK**
- [ ] 830 PATENT
- [ ] 835 PATENT-ABBREVIATED NEW DRUG APPLICATIONS (ANDA) - a/k/a Hatch-Waxman cases

**SOCIAL SECURITY - "0" MONTHS DISCOVERY TRACK**
- [ ] 861 HIA (1395ff)
- [ ] 862 BLACK LUNG (923)
- [ ] 863 DIWC (405(g))
- [ ] 863 DIWW (405(g))
- [ ] 864 SSID TITLE XVI
- [ ] 865 RSI (405(g))

**FEDERAL TAX SUITS - "4" MONTHS DISCOVERY TRACK**
- [ ] 870 TAXES (U.S. Plaintiff or Defendant)
- [ ] 871 IRS - THIRD PARTY 26 USC 7609

**OTHER STATUTES - "4" MONTHS DISCOVERY TRACK**
- [ ] 375 FALSE CLAIMS ACT
- [ ] 376 Qui Tam 31 USC 3729(a)
- [ ] 400 STATE REAPPORTIONMENT
- [ ] 430 BANKS AND BANKING
- [ ] 450 COMMERCE/ICC RATES/ETC.
- [ ] 460 DEPORTATION
- [ ] 470 RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS
- [ ] 480 CONSUMER CREDIT
- [ ] 485 TELEPHONE CONSUMER PROTECTION ACT
- [ ] 490 CABLE/SATELLITE TV
- [ ] 890 OTHER STATUTORY ACTIONS
- [ ] 891 AGRICULTURAL ACTS
- [ ] 893 ENVIRONMENTAL MATTERS
- [ ] 895 FREEDOM OF INFORMATION ACT 899
- [ ] 899 ADMINISTRATIVE PROCEDURES ACT / REVIEW OR APPEAL OF AGENCY DECISION
- [ ] 950 CONSTITUTIONALITY OF STATE STATUTES

**OTHER STATUTES - "8" MONTHS DISCOVERY TRACK**
- [ ] 410 ANTITRUST
- [ ] 850 SECURITIES / COMMODITIES / EXCHANGE

**OTHER STATUTES - "0" MONTHS DISCOVERY TRACK**
- [ ] 896 ARBITRATION (Confirm / Vacate / Order / Modify)

**\* PLEASE NOTE DISCOVERY TRACK FOR EACH CASE TYPE. SEE LOCAL RULE 26.3**

## VII. REQUESTED IN COMPLAINT:
- [ ] CHECK IF CLASS ACTION UNDER F.R.Civ.P. 23    DEMAND $ _____

JURY DEMAND [x] YES [ ] NO (CHECK YES ONLY IF DEMANDED IN COMPLAINT)

## VIII. RELATED/REFILED CASE(S) IF ANY
JUDGE _____ DOCKET NO. _____

CIVIL CASES ARE DEEMED RELATED IF THE PENDING CASE INVOLVES: (CHECK APPROPRIATE BOX)
- [ ] 1. PROPERTY INCLUDED IN AN EARLIER NUMBERED PENDING SUIT.
- [ ] 2. SAME ISSUE OF FACT OR ARISES OUT OF THE SAME EVENT OR TRANSACTION INCLUDED IN AN EARLIER NUMBERED PENDING SUIT.
- [ ] 3. VALIDITY OR INFRINGEMENT OF THE SAME PATENT, COPYRIGHT OR TRADEMARK INCLUDED IN AN EARLIER NUMBERED PENDING SUIT.
- [ ] 4. APPEALS ARISING OUT OF THE SAME BANKRUPTCY CASE AND ANY CASE RELATED THERETO WHICH HAVE BEEN DECIDED BY THE SAME BANKRUPTCY JUDGE.
- [ ] 5. REPETITIVE CASES FILED BY PRO SE LITIGANTS.
- [ ] 6. COMPANION OR RELATED CASE TO CASE(S) BEING SIMULTANEOUSLY FILED (INCLUDE ABBREVIATED STYLE OF OTHER CASE(S)):

- [ ] 7. EITHER SAME OR ALL OF THE PARTIES AND ISSUES IN THIS CASE WERE PREVIOUSLY INVOLVED IN CASE NO. _____ , WHICH WAS DISMISSED. This case [ ] IS [ ] IS NOT (check one box) SUBSTANTIALLY THE SAME CASE.

/s/ Jason S. Allard           10/20/2023

SIGNATURE OF ATTORNEY OF RECORD       DATE