Query    Reports    Utilities    Help    Log Out

PAB

# U.S. District Court
## Southern District of Florida (Ft Lauderdale)
### CIVIL DOCKET FOR CASE #: 0:23-cv-62095-DMM

HERNANDEZ v. MONSANTO COMPANY
Assigned to: Judge Donald M. Middlebrooks
Case in other court:  17th Judicial Circuit Court, in and for
                     Broward Co, CACE-23-011577
Cause: 28:1441 Notice of Removal-Product Liability

Date Filed: 11/02/2023
Jury Demand: Both
Nature of Suit: 365 Personal Inj. Prod. Liability
Jurisdiction: Diversity

**Plaintiff**

**MARIA SANDRA HERNANDEZ**

represented by **Alexander Alvarez**
Law Office of Alexander Alvarez
8900 SW 107th Avenue
Suite 301
Miami, FL 33176
305-598-2000
Fax: 786-228-4890
Email: alex@aalvarezlawfirm.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Daniel J. DiMatteo**
The Ferraro Law Firm
600 Brickell Avenue, Suite 3800
Miami, FL 33131
305-375-0111
Fax: 305-379-6222
Email: djd@ferrarolaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Juan Pablo Bauta , II**
600 Brickell Avenue
Suite 3800
Miami, FL 33131
305-375-0111
Fax: 305-379-6222
Email: jpb@ferrarolaw.com *(Inactive)*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Michael A. Alvarez**
The Alvarez Law Firm
355 Palermo Avenue
Coral Gables, FL 33134
3054447675

Email: Michael@talf.law
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Nicholas Israel Reyes**
The Alvarez Law Firm
FL
3251 Ponce de Leon Boulevard
Coral Gables
Coral Gables, FL 33134
305-444-7675
Fax: 305-444-0075
Email: nick@talf.law
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Phillip Edward Holden**
The Alvarez Law Firm
355 Palermo Avenue
Coral Gables, FL 33134
305-444-7675
Fax: 444-0075
Email: phillip@integrityforjustice.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Xavier Navarro**
The Alvarez Law Firm
3251 Ponce de Leon Boulevard
Coral Gables, FL 33134
305-444-7675
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**MONSANTO COMPANY**                  represented by  **Antar Kwaku Vaughan**
Shook Hardy & Bacon L.L.P.
201 S. Biscayne Boulevard
Suite 3200
Miami, FL 33131
305-358-5171
Fax: 305-358-7470
Email: AVAUGHAN@shb.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Lori-Ann C. Ridley**
Shook Hardy & Bacon LLP
Citigroup Center, Suite 3200
201 South Biscayne Boulevard
Miami

305-358-5171
Fax: 305-358-7470
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Mihai Marian Vrasmasu**
Shook Hardy & Bacon
201 S Biscayne Boulevard
Suite 2400
Miami, FL 33131-4332
305-358-5171
Fax: 305-358-7470
Email: mvrasmasu@shb.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 11/02/2023 | 1 | NOTICE OF REMOVAL (STATE COURT COMPLAINT - Complaint And Demand For Jury Trial) Filing fee $ 402.00 receipt number AFLSDC-17045238, filed by MONSANTO COMPANY.(Answer exA Pg 135/ No Motion to Dismiss Filed)(Attachments: # 1 Civil Cover Sheet, (Answer Pg135)# 2 Exhibit A-State Court Filings)(Vrasmasu, Mihai) Modified Text on 11/3/2023 (wce). (Entered: 11/02/2023) |
| 11/02/2023 | 2 | Clerks Notice of Judge Assignment to Judge Donald M. Middlebrooks. <br><br>Pursuant to 28 USC 636(c), the parties are hereby notified that the U.S. Magistrate Judge Panayotta Augustin-Birch is available to handle any or all proceedings in this case. If agreed, parties should complete and file the Consent form found on our website. It is not necessary to file a document indicating lack of consent. (wce) (Entered: 11/03/2023) |
| 11/03/2023 | 3 | Bar Letter re: Admissions sent to attorneys Lori-Ann C. Ridley and Xavier Navarro, mailing date November 3, 2023. (cw) (Entered: 11/03/2023) |

| **PACER Service Center** | | |
|---|---|---|
| **Transaction Receipt** | | |
| 11/06/2023 10:06:19 | | |
| **PACER Login:** | sh0019sh | **Client Code:** | 31943.356965 rhb |
| **Description:** | Docket Report | **Search Criteria:** | 0:23-cv-62095-DMM |
| **Billable Pages:** | 2 | **Cost:** | 0.20 |

IN THE CIRCUIT COURT OF THE 17th
JUDICIAL CIRCUIT, IN AND FOR
BROWARD COUNTY, FLORIDA

MARIA SANDRA HERNANDEZ,                    CIVIL DIVISION

                                            CASE NO. CACE-23-11577 (18)

            Plaintiff,

vs.

MONSANTO COMPANY, a foreign for-profit
corporation; HOME DEPOT U.S.A., INC., a
foreign for-profit corporation; LANDWORKS
DEPOT, INC., a Florida for-profit corporation,

            Defendants.

_____/

## NOTICE OF FILING NOTICE OF REMOVAL

      Defendant Monsanto Company hereby files the attached copy of its Notice of Removal,

filed in the United States District Court for the Southern District of Florida on November 2, 2023.

Pursuant to 28 U.S.C. § 1446(d), the filing of this Notice effects the removal of this case, and this

Court shall proceed no further unless the case is remanded from the federal court.

Dated: November 2, 2023

                                  Respectfully submitted,

                                  **SHOOK, HARDY & BACON L.L.P.**
                                  Citigroup Center, Suite 3200
                                  201 South Biscayne Boulevard
                                  Miami, Florida  33131-4332
                                  T: 305.358.5171 | F: 305.358.7470

                         By: /s/ *Mihai M. Vrasmasu*
                                  MIHAI M. VRASMASU (FBN 0028610)
                                  E-Mail: mvrasmasu@shb.com
                                  ANTAR K. VAUGHAN (FBN 497754)
                                  E-Mail:  avaughan@shb.com
                                  LORI-ANN C. RIDLEY (FBN 1044695)
                                  E-Mail: lridley@shb.com

                                  ***Counsel for Defendant, Monsanto Company***

**<u>CERTIFICATE OF SERVICE</u>**

I HEREBY CERTIFY that a true and correct copy of the foregoing was served on all counsel of record via the Florida Courts E-Filing Portal (per Rule 2.516) this 2nd day of November, 2023.

By: <u>/s/ *Mihai M. Vrasmasu*</u>
Mihai M. Vrasmasu

2

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION

| | |
|---|---|
| MARIA SANDRA HERNANDEZ, | Case No. _____ |
| Plaintiff, | |
| v. | |
| MONSANTO COMPANY, | |
| Defendant. | |

**DEFENDANT MONSANTO COMPANY'S NOTICE OF REMOVAL**

Pursuant to 28 U.S.C. §§ 1332, 1441, and 1446 (and any other applicable laws), Defendant Monsanto Company ("Monsanto"), hereby gives notice of removal of this action, captioned *Maria Sandra Hernandez v. Monsanto Company, et al.*, bearing Case Number CACE-23-011577, from the Circuit Court of the 17th Judicial Circuit in and for Broward County, Florida to the United States District Court for the Southern District of Florida. Pursuant to 28 U.S.C. § 1446(a), Monsanto provides the following statement of grounds for removal.

**Introduction**

1. In this products liability lawsuit, Plaintiff seeks damages for plaintiff's cancer (acute lymphocytic leukemia ("ALL")) allegedly caused by exposure to Monsanto's Roundup®-branded herbicides, which have glyphosate as their active ingredient. For decades, farmers have used glyphosate-based herbicides to increase crop yields, and home-owners, landscaping companies, and local government agencies have used these herbicides for highly effective weed control. Glyphosate is one of the most thoroughly studied herbicides in the world, and glyphosate-based herbicides have received regulatory approval in more than 160 countries. Since 1974, when Monsanto first introduced a Roundup®-branded, glyphosate-based herbicide to the marketplace,

4879-7549-4029

the United States Environmental Protection Agency repeatedly has approved the sale of such herbicides without cancer warnings and repeatedly has concluded that glyphosate does not cause cancer. Nevertheless, Plaintiff alleges that she developed cancer due to exposure to Monsanto's glyphosate-based herbicides.

2.     This is one of many lawsuits that have been filed against Monsanto involving Roundup®-branded herbicides. A multidistrict litigation proceeding is pending in the United States District Court for the Northern District of California, before the Honorable Vince G. Chhabria, pursuant to 28 U.S.C. § 1407. *See In re Roundup Prods. Liab. Litig.*, No. 3:16-md- 02741-VC (N.D. Cal.); *In re Roundup Prods. Liab. Litig.*, MDL No. 2741, 214 F. Supp. 3d 1346 (J.P.M.L. 2016).

3.     As discussed in more detail below, Monsanto removes this lawsuit because this Court has subject matter jurisdiction based on diversity of citizenship. Plaintiff is a citizen of Florida. For purposes of diversity jurisdiction, Monsanto is deemed to be a citizen of Missouri (where its principal place of business is located) and Delaware (Monsanto's state of incorporation). Although Plaintiff initially asserted claims against additional companies– Home Depot U.S.A., Inc. ("Home Depot"), a diverse defendant, and Landworks Depot ("Landworks"), a non-diverse defendant – Plaintiff voluntarily dismissed her claims against these defendants. Accordingly, complete diversity of citizenship exists in this case as required by 28 U.S.C. § 1332. The statutory amount-in-controversy requirement is also satisfied because Plaintiff seeks "over $100,000.00" in damages for cancer allegedly caused by exposure to Monsanto's Roundup®-branded herbicides.

## Background and Procedural History

4.     On March 24, 2023, Plaintiff commenced this lawsuit in the Circuit Court of the 17th Judicial Circuit in and for Broward County, Florida by filing a Complaint. *See Maria Sandra*

2

*Hernandez v. Monsanto Company et al.*, Case No. CACE-23-011577 (the "State Court Action"). Plaintiff filed an Amended Complaint (the "Complaint") on April 6, 2023.

5.        Pursuant to 28 U.S.C. § 1446(a), true and correct copies of all process, pleadings, and orders served upon Monsanto in the State Court Action (and other filings available from the state court's files) are attached collectively as **Exhibit A.**

6.        Plaintiff seeks recovery for damages allegedly caused by exposure to Monsanto's glyphosate-based herbicides. *See, e.g.*, Complaint ¶¶ 1–3.

7.        The Complaint initially asserted claims against Home Depot and Landworks, but on October 27, 2023, Plaintiff filed a Notice of Voluntary Dismissal with Prejudice as to these two defendants.  *See generally* Notice of Voluntary Dismissal with Prejudice (true and correct copy included in Exhibit A).  Upon filing, that notice effectuated the dismissal of these defendants as a matter of law.  *See* FLA. R. CIV. P. 1.420(a)(1).

8.        Accordingly, the only Parties to this case are Plaintiff and Defendant Monsanto.

**Basis For Removal — Diversity Jurisdiction**

9.        Plaintiff is, and was at the time the State Court Action was filed, a resident and citizen of the State of Florida. *See* Complaint ¶ 4.

10.        Monsanto is, and was at the time the State Court Action was filed, a corporation incorporated under the laws of the State of Delaware, with its principal place of business in the State of Missouri. *See* Complaint ¶ 5. Thus, Monsanto is deemed to be a citizen of Missouri and Delaware, for purposes of federal diversity jurisdiction.

11.        Because Home Depot and Landworks were voluntarily dismissed from this lawsuit, their citizenship is not considered when assessing whether complete diversity of citizenship exists in this lawsuit.  *See, e.g.*, *Matlow v. MetLife Inv'rs USA Ins. Co.*, No. 08-60903-CIV, 2008 WL

3

11331965, at *2 (S.D. Fla. Aug. 12, 2008) ("[A] case that was nonremovable on the initial pleadings due to lack of diversity can become removable pursuant to the plaintiff's *voluntary dismissal* of the resident defendant."); *Gray v. Extended Stay Am., Inc.*, No. 219CV01269MCEEFB, 2020 WL 1274265, at *4 (E.D. Cal. Mar. 17, 2020) (stating that "if a resident defendant is dismissed from a case by a voluntary act by the plaintiff, then it is removable").

12.     The Complaint seeks compensatory damages based on allegations that Monsanto's Roundup®-branded herbicides caused Plaintiff's cancer.  Therefore, it is plausible from the face of the Complaint that Plaintiff seeks damages in excess of $75,000, exclusive of interest and costs, which satisfies the jurisdictional amount-in-controversy requirement. 28 U.S.C. § 1332(a); *see Dart Cherokee Basin Operating Co. v. Owens*, 574 U.S. 81, 89 (2014) ("[A] defendant's notice of removal need include only a plausible allegation that the amount in controversy exceeds the jurisdictional threshold."). Further, the Civil Cover Sheet filed by Plaintiff confirms that she seeks "over $100,000" in damages.  *See* Civil Cover Sheet, p. 1. In fact, numerous other lawsuits seeking damages for cancer allegedly caused by Roundup®-branded herbicides have been filed against Monsanto in other federal courts asserting jurisdiction under §1332(a) and alleging damages in excess of $75,000, exclusive of interest and costs.

13.     In sum, this Court has original subject matter jurisdiction over this action based on § 1332(a) because there is complete diversity of citizenship and the amount in controversy exceeds $75,000, exclusive of costs and interest.

**Procedural Requirements**

14.     The Circuit Court of the 17th Judicial Circuit in and for Broward County, Florida is located within the Southern District of Florida. Therefore, removal to this Court satisfies the venue requirement of 28 U.S.C. § 1446(a).

15.     This Notice of Removal is timely. When the State Court Action was commenced, the "case stated by the initial pleading [was] not removable," 28 U.S.C § 1446(b)(3), because the Complaint included claims against Landworks, a Florida defendant.  Thus, based on the face of the Complaint, this lawsuit was not removable due to lack of diversity of citizenship and due to the forum defendant rule, 28 U.S.C. § 1441(b)(2).  The October 27, 2023 Notice of Voluntary Dismissal with Prejudice, *see* Exhibit A, was the "order or other paper from which it may first be ascertained that [this] case is one which is or has become removable," § 1446(b)(3).  This Notice of Removal is timely because Monsanto is filing it within 30 days of October 27, 2023.  *See id.*; *see also Hanson v. Equilon Enterprises LLC*, No. C 14-02674 LB, 2014 WL 3897422, at *5 (N.D. Cal. Aug. 8, 2014) ("Events triggering the thirty-day period [for filing a removal notice] include the plaintiff's voluntary dismissal of a non-diverse defendant.") (citing cases).

16.     The written notice required by 28 U.S.C. § 1446(d) will be promptly filed in the Circuit Court of the 17th Judicial Circuit in and for Broward County, Florida and will be promptly served on Plaintiff.

17.     Monsanto does not waive any defenses and expressly reserves its right to raise any and all defenses in subsequent proceedings.

18.     If any question arises as to the propriety of this removal, Monsanto requests the opportunity to present written and oral argument in support of removal.

5

**Conclusion**

For the foregoing reasons, Monsanto removes this lawsuit to this Court pursuant to 28 U.S.C. §§ 1332, 1441, and 1446 (and any other applicable laws).

Dated: November 2, 2023

Respectfully submitted,

**SHOOK, HARDY & BACON L.L.P.**

Citigroup Center, Suite 3200
201 South Biscayne Boulevard
Miami, Florida  33131-4332
T: 305.358.5171 | F: 305.358.7470

By: /s/ *Mihai M. Vrasmasu*
    MIHAI M. VRASMASU, ESQ.
    Florida Bar No. 0028610
    E-Mail: mvrasmasu@shb.com
    ANTAR K. VAUGHAN, ESQ.
    Florida Bar No. 497754
    E-Mail:  avaughan@shb.com
    LORI-ANN C. RIDLEY, ESQ.
    Florida Bar No. 1044695
    E-Mail: lridley@shb.com

*Counsel for Defendant, Monsanto Company*

6

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on November 2, 2023 I electronically filed a copy of the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record identified on the Service List below in the manner specified, either via transmission of Notice of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Filing.

/s/ *Mihai M. Vrasmasu*
Mihai M. Vrasmasu

## SERVICE LIST

Alex Alvarez, Esq.
E-Mail: alex@talf.law
Phillip Holden, Esq.
E-Mail: phillip@talf.law
Michael Alvarez, Esq.
E-Mail: michael@talf.law
Nicholas Reyes, Esq.
E-Mail: nick@talf.law
Xavier Navarro, Esq.
E-Mail: xavier@talf.law
The Alvarez Law Firm
3251 Ponce de Leon Boulevard
Coral Gables, FL 33134
T: (305) 444-7675

and

Juan P. Bauta, II, Esq.
E-Mail: jbauta@ferrarolaw.com
Daniel J. Dimatteo, Esq.
E-Mail: ddimatteo@ferrarolaw.com
The Ferraro Law Firm, P.A.
600 Brickell Avenue, Suite 3800
Miami, FL 33131
T: (305) 375-0111

*Attorneys for Plaintiff*

**Served via E-Mail**

4879-7549-4029

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)* **NOTICE: Attorneys MUST Indicate All Re-filed Cases Below.**

## I. (a) PLAINTIFFS

MARIA SANDRA HERNANDEZ

### DEFENDANTS

MONSANTO COMPANY

**(b)** County of Residence of First Listed Plaintiff Miami-Dade
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant _____
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Alex Alvarez; The Alvarez Law Firm; 3251 Ponce de Leon Blvd.
Coral Gables, FL 33134 | T: 305.444.7675

Attorneys *(If Known)*
Mihai M. Vrasmasu; Shook, Hardy & Bacon L.L.P.; 201 S. Biscayne Blvd.
Suite 3200, Miami, FL 33131 | T: 305.358.5171

**(d)** Check County Where Action Arose: ☐ MIAMI- DADE ☐ MONROE ☐ BROWARD ☒ PALM BEACH ☐ MARTIN ☐ ST. LUCIE ☐ INDIAN RIVER ☐ OKEECHOBEE ☐ HIGHLANDS

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- ☐ 1 U.S. Government Plaintiff
- ☐ 3 Federal Question *(U.S. Government Not a Party)*
- ☐ 2 U.S. Government Defendant
- ☒ 4 Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff)*
*(For Diversity Cases Only)* and One Box for Defendant)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☒ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*
Click here for: Nature of Suit Code Descriptions

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** / **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane / ☒ 365 Personal Injury - Product Liability | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability / ☐ 367 Health Care/ | | | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Pharmaceutical Personal Injury | | **INTELLECTUAL PROPERTY RIGHTS** | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | Slander / Product Liability | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' / ☐ 368 Asbestos Personal | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted Student Loans | Liability / Injury Product Liability | | ☐ 835 Patent – Abbreviated New Drug Application | ☐ 460 Deportation |
| (Excl. Veterans) | ☐ 340 Marine | | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 345 Marine Product Liability | **LABOR** | ☐ 880 Defend Trade Secrets Act of 2016 | ☐ 480 Consumer Credit (15 USC 1681 or 1692) |
| ☐ 160 Stockholders' Suits | ☐ 350 Motor Vehicle | ☐ 710 Fair Labor Standards Acts | **SOCIAL SECURITY** | ☐ 485 Telephone Consumer Protection Act (TCPA) |
| ☐ 190 Other Contract | ☐ 355 Motor Vehicle Product Liability | ☐ 720 Labor/Mgmt. Relations | ☐ 861 HIA (1395ff) | ☐ 490 Cable/Sat TV |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal Injury | ☐ 740 Railway Labor Act | ☐ 862 Black Lung (923) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 196 Franchise | **PERSONAL PROPERTY** | ☐ 751 Family and Medical Leave Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| | ☐ 370 Other Fraud | ☐ 790 Other Labor Litigation | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | ☐ 371 Truth in Lending | ☐ 791 Employee Retirement Income Security Act | ☐ 865 RSI (405(g)) | ☐ 893 Environmental Matters |
| ☐ 210 Land Condemnation | ☐ 380 Other Personal Property Damage | | | ☐ 895 Freedom of Information Act |
| ☐ 220 Foreclosure | ☐ 385 Property Damage Product Liability | | **FEDERAL TAX SUITS** | ☐ 896 Arbitration |
| ☐ 230 Rent Lease & Ejectment | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 240 Torts to Land | ☐ 440 Other Civil Rights | **Habeas Corpus:** | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 950 Constitutionality of State Statutes |
| ☐ 245 Tort Product Liability | ☐ 441 Voting | ☐ 463 Alien Detainee | | |
| ☐ 290 All Other Real Property | ☐ 442 Employment | ☐ 510 Motions to Vacate Sentence | | |
| | ☐ 443 Housing/ Accommodations | ☐ 530 General | | |
| | ☐ 445 Amer. w/Disabilities - Employment | ☐ 535 Death Penalty | **IMMIGRATION** | |
| | ☐ 446 Amer. w/Disabilities - Other | **Other:** | ☐ 462 Naturalization Application | |
| | ☐ 448 Education | ☐ 540 Mandamus & Other | ☐ 465 Other Immigration Actions | |
| | | ☐ 550 Civil Rights | | |
| | | ☐ 555 Prison Condition | | |
| | | ☐ 560 Civil Detainee – Conditions of Confinement | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

- ☐ 1 Original Proceeding
- ☒ 2 Removed from State Court
- ☐ 3 Re-filed *(See VI below)*
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from another district *(specify)*
- ☐ 6 Multidistrict Litigation Transfer
- ☐ 7 Appeal to District Judge from Magistrate Judgment
- ☐ 8 Multidistrict Litigation – Direct File
- ☐ 9 Remanded from Appellate Court

## VI. RELATED/ RE-FILED CASE(S)

*(See instructions):* a) Re-filed Case ☐ YES ☒ NO   b) Related Cases ☐ YES ☐ NO

JUDGE: _____   DOCKET NUMBER: _____

## VII. CAUSE OF ACTION

Product Liability/Personal Injury exposure to herbicide   **28 U.S.C. sections 1331, 1441, and 1446**

Cite the U.S. Civil Statute under which you are filing and Write a Brief Statement of Cause *(Do not cite jurisdictional statutes unless diversity)*

LENGTH OF TRIAL via _____ days estimated (for both sides to try entire case)

## VIII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A **CLASS ACTION** UNDER F.R.C.P. 23   DEMAND $ _____   CHECK YES only if demanded in complaint:

JURY DEMAND: ☒ Yes ☐ No

**ABOVE INFORMATION IS TRUE & CORRECT TO THE BEST OF MY KNOWLEDGE**

DATE: 11/02/2023   SIGNATURE OF ATTORNEY OF RECORD: /s/ Mihai Vrasmasu

FOR OFFICE USE ONLY : RECEIPT # _____ AMOUNT _____ IFP _____ JUDGE _____ MAG JUDGE _____

NOT AN OFFICIAL COPY - PUBLISHERS - NOT AN OFFICIAL COPY

IN THE CIRCUIT COURT OF THE 17 TH JUDICIAL CIRCUIT IN AND FOR BROWARD COUNTY, FLORIDA

CIVIL DIVISION 18

CASE NO.: CACE23011577

MARIA SANDRA HERNANDEZ,

        Plaintiff,

vs.

MONSANTO COMPANY, a foreign for-profit corporation; HOME DEPOT U.S.A., INC., a foreign for-profit corporation; LANDWORKS DEPOT, a Florida for-profit corporation,

        Defendants.

_____/

## AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff, MARIA SANDRA HERNANDEZ, by and through the undersigned counsel and pursuant to the Florida Rules of Civil Procedure, hereby sue the Defendants for damages and allege as follows.

### I.    INTRODUCTION

1. Plaintiff brings this cause of action for the significant damages sustained by MARIA SANDRA HERNANDEZ as a result of using Roundup®, an unreasonably dangerous and defective product. More specifically, Plaintiff' claims involve the Defendants' negligent and wrongful conduct in connection with the design, development, manufacture, testing, packaging, promoting, marketing, distribution, supply and/or sale of Roundup® containing the active ingredient glyphosate (hereinafter referred to as "Roundup" or "Roundup products"),[1] by each of

---

[1] "Roundup" refers to all formulations of Roundup products, including, but not limited to, Roundup Concentrate Poison Ivy and Tough Brush Killer 1, Roundup Custom Herbicide, Roundup D-Pak

1

the above-named Defendants, individually or through their predecessors or subsidiaries.

2.      Roundup is defective, dangerous to human health, unfit and unsuitable to be marketed, distributed and sold in commerce, and lacked proper warnings and directions as to the dangers associated with its use.

3.      As a direct and proximate result of MARIA SANDRA HERNANDEZ's exposure to Roundup she developed acute lymphocytic leukemia.

## II.    THE PARTIES

4.      Plaintiff MARIA SANDRA HERNANDEZ is a resident of Miami-Dade County, Florida during the years of her exposure and is otherwise *sui juris*.

5.      At all times material, Defendant, MONSANTO COMPANY ("MONSANTO"), was and is a for-profit corporation organized and existing under the laws of the State of Delaware, having its principal place of business located in Missouri. MONSANTO, at all times material, was authorized to conduct and is conducting business throughout the State of Florida, including, but not limited to, conducting business in Miami-Dade County, Florida. Service of process on Defendant, MONSANTO, is predicated on Fla. Stat. § 48.081 and Fla. Stat. § 48.091. At all times material, MONSANTO has had and continues to have substantial and not isolated contacts with

---

herbicide, Roundup Dry Concentrate, Roundup Export Herbicide, Roundup Fence & Hard Edger 1, Roundup Garden Foam Weed & Grass Killer, Roundup Grass and Weed Killer, Roundup Herbicide, Roundup Original 2k herbicide, Roundup Original II Herbicide, Roundup Pro Concentrate, Roundup Prodry Herbicide, Roundup Promax, Roundup Quick Stik Grass and Weed Killer, Roundup QuickPort Herbicide, Roundup Rainfast Concentrate Weed & Grass Killer, Roundup Rainfast Super Concentrate Weed & Grass Killer, Roundup Ready-to-Use Extended Control Weed & Grass Killer 1 Plus Weed Preventer, Roundup Ready-to-Use Weed & Grass Killer, Roundup Ready-to-Use Weed and Grass Killer 2, Roundup Ultra Dry, Roundup Ultra Herbicide, Roundup Ultramax, Roundup VM Herbicide, Roundup Weed & Grass Killer Concentrate, Roundup Weed & Grass Killer Concentrate Plus, Roundup Weed & Grass killer Ready-to-Use Plus, Roundup Weed & Grass Killer Super Concentrate, Roundup Weed & Grass Killer1 Ready-to-Use, Roundup WSD Water Soluble Dry Herbicide Deploy Dry Herbicide, or any other formulation containing the active ingredient glyphosate.

2

Florida and is subject to the jurisdiction of Florida.

6.    At all times material, Defendant, HOME DEPOT U.S.A., INC., (hereinafter "HOME DEPOT"), was and is a for-profit corporation organized and existing under the laws of the State of Delaware, having its principal place of business located in Georgia. HOME DEPOT, at all times material, was authorized to conduct and is conducting business throughout the State of Florida, including, but not limited to, conducting business in Miami-Dade County, Florida. Service of process on Defendant, HOME DEPOT, is predicated on Fla. Stat. § 48.081 and Fla. Stat. § 48.091. At all times material, HOME DEPOT has had and continues to have substantial and not isolated contacts with Florida and is subject to the jurisdiction of Florida.

7.    At all times material, Defendant, Landworks Depot, Inc., (hereinafter "Landworks"), was and is a Florida for-profit corporation with its principal place of business located in Florida. Landworks at all times material, was authorized to conduct and is conducting business throughout the State of Florida, including, but not limited to, conducting business in Broward County, Florida.    Service of process on Defendant, Landworks, is predicated on Fla. Stat. § 48.081 and Fla. Stat. § 48.091. At all times material, Landworks, were and are authorized distributors and/or suppliers of Roundup® products in the South Florida market, including, but not limited to, its Broward County branch. Plaintiff purchased Roundup from Landwork's at 4700 SW 195th Terrace Southwest Ranches, FL 33332 location.

8.    Each of the above-named Defendants have, at all times material to this cause of action, operated, conducted, engaged in and carried on a business venture in Florida; maintained an office or agency in this State; solicited business or provided service activities within this State; and/or committed a tortious act within this State by manufacturing, selling, distributing, supplying, and/or disseminating to the public Roundup products that are inherently dangerous.

9.    At all times material, MARIA SANDRA HERNANDEZ, used Roundup products

3

containing glyphosate at her home in Miami-Dade County, Florida between approximately 2010 and 2020.

10.     During this time period, Plaintiff MARIA SANDRA HERNANDEZ used Roundup products that were manufactured, designed, sold, distributed and/or supplied by the Defendants.

11.     Plaintiff, MARIA SANDRA HERNANDEZ at all times material, purchased, worked with and/or used Roundup products in the intended manner, without significant change in the products' condition, and being unaware of the dangerous properties of glyphosate contained in Roundup products, relied on the Defendants' instructions as to proper methods of handling the products.

### III.     JURISDICTION AND VENUE

12.     This is a negligence and strict liability action for damages in excess of the sum of THIRTY THOUSAND AND NO/100 ($30,000.00) DOLLARS, exclusive of interest and costs. Accordingly, this Court has exclusive original jurisdiction over this matter pursuant to Florida Statute § 26.012 and § 34.01.

13.     Venue is proper in Miami-Dade County, Florida pursuant to Florida Statute § 47.051 and § 47.021, as Plaintiff's exposure occurred in Miami-Dade County and at least one of the Defendants against whom this action is brought has an agent and/or representative in this County, and/or otherwise resides here.

14.     Plaintiff MARIA SANDRA HERNANDEZ's exposure to, contact with, and/or ingestion of Roundup products at her home located in Miami-Dade County, Florida, caused her to contract acute lymphocytic leukemia. Plaintiff's alleged causes of action arise out of, or are incidental to each Defendant's interstate, intrastate, and international business ventures conducted in the United States, including Florida.

4

15.     At all times material, the Defendants designed, manufactured, sold, distributed, and/or supplied Roundup products throughout the United States, including Florida, which Defendants knew or should have known contained glyphosate, and which Plaintiff MARIA SANDRA HERNANDEZ purchased, used and/or was exposed to in his life, causing Plaintiff's acute lymphocytic leukemia. Defendants' affiliations with the State of Florida are so continuous and systematic as to render them essentially at home in the State of Florida.

16.     Each of the above-named Defendants have, at all times material to this cause of action, through their agents, officers and representatives, operated, conducted, engaged in and carried on a business venture in Florida; maintained an office or agency in this State; solicited business or provided service activities within this State; and/or committed a tortious act within this State by manufacturing, selling, distributing, supplying, and/or disseminating to the public Roundup products that are inherently dangerous: 1) Without testing said products to determine their harmful effects on persons coming in contact with said products; and 2) By failing to take any reasonable precautions or to exercise reasonable care to adequately or sufficiently warn Plaintiff and other persons similarly situated, of the risks, dangers and harm of contracting acute lymphocytic leukemia and other forms of cancers, through exposure to, contact with, use of, handling and/or manipulation of Roundup products and the consequent exposure resulting from the ordinary and foreseeable use of said products.[2]

17.     Plaintiff's causes of action arise from each Defendant operating, conducting, engaging in, or carrying on a business or business venture in the State of Florida or having an office or agency in this State; and/or committing a tortious act within this State. Furthermore, each Defendant has caused injury to Plaintiff MARIA SANDRA HERNANDEZ within this State

---

[2] This paragraph contains allegations of fact (not allegations of law) supporting Plaintiff' claims. Thus, Plaintiff are not alleging that Defendants are subject to any legal requirement or legal duty not recognized under Florida law.

arising out of acts and/or omissions by each Defendant inside and outside this State. At the time of Plaintiff MARIA SANDRA HERNANDEZ's injury, each Defendant was engaged in solicitation or service activities within this State; and products, materials, or things processed, serviced, or manufactured by Defendants were used within this State in the ordinary course of commerce, trade, or use. Additionally, each of the above-named Defendants have, at all times material to this cause of action, through their agents, officers and representatives, engaged in substantial and not isolated activity within the State of Florida.

18.     Defendants' tortious conduct, including but not limited to failure to warn and/or the manufacture, sale and/or distribution of defective products, is continuing and presently existing, caused injuries to Plaintiff MARIA SANDRA HERNANDEZ and arose out of the acts and/or omissions which occurred inside and outside of the State of Florida during the relevant period of time Defendants' products were used and/or consumed in the ordinary course of commerce, trade and/or use, as set forth herein and said use or consumption caused Plaintiff MARIA SANDRA HERNANDEZ to contract acute lymphocytic leukemia.

**IV.     NATURE OF ACTION**

19.     At all times material, MONSANTO was and is in the business of, and does, design, research, manufacture, test, advertise, promote, market, sell and/or distribute the commercial herbicide Roundup.

20.     MONSANTO is a multinational agricultural biotechnology corporation based in St. Louis, Missouri. It is the world's leading producer of glyphosate.

21.     MONSANTO discovered the herbicidal properties of glyphosate during the 1970's and subsequently began to design, research, manufacture, sell and distribute glyphosate-based Roundup as a broad-spectrum herbicide.

6

22. Glyphosate is the active ingredient in Roundup.

23. Glyphosate is a broad-spectrum herbicide used to kill weeds and grasses known to compete with crops grown around the globe.

24. The original Roundup, containing the active ingredient glyphosate, was introduced in 1974. Today, glyphosate products are among the world's most widely used herbicides. MONSANTO's glyphosate products are registered in 130 countries and approved for weed control on more than 100 different crops.

25. From the outset, MONSANTO marketed Roundup as a "safe" general-purpose herbicide for widespread commercial and consumer use; Monsanto still markets Roundup as safe today.

26. On March 24, 2015, the International Agency for Research on Cancer ("IARC"), an agency of the World Health Organization ("WHO"), issued an evaluation of several herbicides, including glyphosate. That evaluation was based, in part, on studies of exposures to glyphosate in several countries around the world, and it traced the health implications from exposure to glyphosate since 2001.

27. Based on its cumulative review of human, animal, and DNA studies for more than one (1) year, many of which have been in MONSANTO's possession since as early as 1985, the IARC's working group published its conclusion that the glyphosate contained in MONSANTO's Roundup herbicide, is a Class 2A "probable carcinogen" as demonstrated by the mechanistic evidence of carcinogenicity in humans and sufficient evidence of carcinogenicity in animals.

28. The IARC's full Monograph was published on July 29, 2015, and established glyphosate as a class 2A *probable* carcinogen to humans. According to the authors, glyphosate demonstrated sufficient mechanistic evidence (genotoxicity and oxidative stress) to warrant a 2A

classification based on evidence of carcinogenicity in humans and animals.

29.     The IARC Working Group found an increased risk between exposure to glyphosate and non-Hodgkin's Lymphoma ("NHL") and several subtypes of NHL, including but not limited to acute lymphocytic leukemia.

30.     The IARC evaluation is significant. It confirms that glyphosate is toxic to humans.

31.     For nearly 40 years, consumers, farmers, and the public have used Roundup unaware of its carcinogenic properties.

## V.     **FACTS RELEVANT TO ALL CAUSES OF ACTION**

### A.     **Plaintiff's Use and Exposure to Roundup**

32.     At all times material, MARIA SANDRA HERNANDEZ, used Roundup products containing glyphosate in Florida between approximately 2010 and 2020.

33.     At all times material, MARIA SANDRA HERNANDEZ followed all safety and precautionary warnings during the course of his use of Roundup.

34.     During this time period, Plaintiff MARIA SANDRA HERNANDEZ used Roundup products that were manufactured, designed, sold, distributed and/or supplied by all the Defendants, including Roundup products that were sold and supplied by ACE. Plaintiff purchased Roundup from LANDWORK'S and HOME DEPOT stores located in Broward County, Florida.

35.     Plaintiff MARIA SANDRA HERNANDEZ at all times material, purchased, worked with and/or used Roundup products in the intended manner, without significant change in the products' condition, and being unaware of the dangerous properties of glyphosate contained in Roundup products, relied on the Defendants' instructions as to proper methods of handling the products.

36.     Defendants never warned Plaintiff MARIA SANDRA HERNANDEZ as to the

8

danger or risks of using Roundup products, never provided her with any written materials about the danger or risk of using Roundup products, and/or never advised her that she could contract acute lymphocytic leukemia as a result of using Roundup products.

37.     As a direct and proximate result of MARIA SANDRA HERNANDEZ's use of Roundup products, she contracted acute lymphocytic leukemia and suffered permanent and debilitating injuries.

**B.     The Discovery of Glyphosate and Development of Roundup**

38.     The herbicidal properties of glyphosate were discovered in 1970 by MONSANTO chemist John Franz.

39.     The first glyphosate-based herbicide was introduced to the market in the mid-1970s under the brand name Roundup.

40.     Glyphosate is a "non-selective" herbicide, meaning it kills indiscriminately based only on whether a given organism produces a specific enzyme, 5-enolpyruvylshikimic acid-3-phosphate synthase, known as EPSP synthase.

41.     Glyphosate, among other things, inhibits the enzyme 5-enolpyruvylshikimic acid-3-phosphate synthase that interferes with the shikimic pathway in plants, resulting in the accumulation of shikimic acid in plant tissue and ultimately plant death.

42.     Sprayed as a liquid, plants absorb glyphosate directly through their leaves, stems, and roots, and detectable quantities accumulate in the plant tissues.

43.     Each year, approximately 250 million pounds of glyphosate are sprayed on crops, commercial nurseries, suburban lawns, parks, and golf courses. This increase use has been driven largely by the proliferation of genetically engineered crops, crops specifically tailored to resist the activity of glyphosate.

44.     MONSANTO is intimately involved in the development, design, manufacture, marketing, sale, and/or distribution of genetically modified ("GMO") crops, many of which are marketed as being resistant to Roundup *i.e.*, "Roundup Ready®." As of 2009, MONSANTO was the world's leading producer of seeds, accounting for 27% of the world seed market, designed to be Roundup Ready®. In 2010, an estimated 70% of corn and cotton, and 90% of soybean fields in the United States contained Roundup Ready® seeds.

45.     Glyphosate is ubiquitous in the environment. Numerous studies confirm that glyphosate is found in rivers, streams, and groundwater in agricultural areas where Roundup is used. It has been found in food, in the urine of agricultural workers, and even in the urine of urban dwellers who are not in direct contact with glyphosate.

46.     Nevertheless, MONSANTO, since it began selling Roundup, has represented it as safe to humans and the environment. Indeed, MONSANTO has repeatedly proclaimed and continues to proclaim to the world, and particularly to United States consumers, that glyphosate-based herbicides, including Roundup, create no unreasonable risks to human health or to the environment.

**C.     Registration of Herbicides under Federal Law**

47.     The manufacture, formulation and distribution of herbicides, such as Roundup, are regulated under the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA" or "Act"), 7 U.S.C. § 136 et seq. FIFRA requires that all pesticides be registered with the Environmental Protection Agency ("EPA" or "Agency") prior to their distribution, sale, or use, except as described by the Act. 7 U.S.C. § 136a(a).

48.     Because pesticides are toxic to plants, animals, and humans, at least to some degree, the EPA requires as part of the registration process, among other things, a variety of tests to

evaluate the potential for exposure to pesticides, toxicity to people and other potential non-target organisms, and other adverse effects on the environment. Registration by the EPA, however, is not an assurance or finding of safety. The determination the Agency must make in registering or re-registering a product is not that the product is "safe," but rather that use of the product in accordance with its label directions "will not generally cause unreasonable adverse effects on the environment." 7 U.S.C. § 136a(c)(5)(D).

49.     FIFRA defines "unreasonable adverse effects on the environment" to mean "any unreasonable risk to man or the environment, taking into account the economic, social, and environmental costs and benefits of the use of any pesticide." 7 U.S.C. § 136(bb). FIFRA thus requires EPA to make a risk/benefit analysis in determining whether a registration should be granted or allowed to continue to be sold in commerce.

50.     The EPA registered Roundup for distribution, sale, and manufacture in the United States, including, in the State of Florida.

51.     FIFRA generally requires that the registrant, MONSANTO, conduct health and safety testing of pesticide products. The EPA has protocols governing the conduct of tests required for registration and the laboratory practices that must be followed in conducting these tests. The data produced by the registrant must be submitted to the EPA for review and evaluation. The government is not required, nor is it able, however, to perform the product tests that are required of the manufacturer.

52.     The evaluation of each pesticide product distributed, sold, or manufactured is completed at the time the product is initially registered. The data necessary for registration of a pesticide has changed over time. The EPA is now in the process of re-evaluating all pesticide products through a Congressionally-mandated process called "re-registration." 7 U.S.C. § 136a-1

11

In order to reevaluate these pesticides, the EPA is demanding the completion of additional tests and the submission of data for the EPA's review and evaluation.

53.     In the case of glyphosate and Roundup, the EPA had planned on releasing its preliminary risk assessment —in relation to the registration process—no later than July 2015. The EPA completed its review of glyphosate in early 2015, but it delayed releasing the risk assessment pending further review in light of the WHO's health-related findings.

**D.     The Importance of Roundup to Monsanto's Market Dominance Profits**

54.     The success of Roundup was key to MONSANTO's continued reputation and dominance in the marketplace.

55.     Largely due to the success of Roundup sales, MONSANTO's agriculture division was out-performing its chemicals division's operating income, and that gap increased yearly. But with its patent for glyphosate expiring in the United States in the year 2000, MONSANTO needed a strategy to maintain its Roundup market dominance and to ward off impending competition.

56.     In response, MONSANTO began the development and sale of genetically engineered Roundup Ready® seeds in 1996. Since Roundup Ready® crops are resistant to glyphosate, farmers can spray Roundup onto their fields during the growing season without harming the crop. This allowed MONSANTO to expand its market for Roundup even further; by 2000, MONSANTO's biotechnology seeds were planted on more than 80 million acres worldwide and nearly 70% of American soybeans were planted from Roundup Ready® seeds. It also secured MONSANTO's dominant share of the glyphosate market through a marketing strategy that coupled proprietary Roundup Ready® seeds with continued sales of its Roundup herbicide.

57.     Through a three-pronged strategy of increased production, decreased prices, and by coupling with Roundup Ready® seeds, Roundup became MONSANTO's most profitable product.

12

In 2000, Roundup accounted for almost $2.8 billion in sales, outselling other herbicides by a margin of five to one, and accounting for close to half of MONSANTO's revenue.

### E.   Monsanto's History of Avoiding Testing on Roundup, Attacking Adverse Science, Deceiving the Public, and Manipulating Scientific Discourse

58.   Glyphosate, the main active ingredient in Roundup, was first registered for marketing as an herbicide by the EPA in 1974 on the basis of fraudulent data produced by the notorious Industrial Bio-Test Laboratories ("IBT Lab"). Roundup was introduced to market in 1976, just before authorities discovered the rampant fraud at the IBT Lab. That year, the Food and Drug Administration ("FDA") discovered widespread discrepancies between the IBT Lab's studies and their underlying raw data. In 1977, the EPA placed a moratorium on all registration actions involving data developed at the IBT Lab. In 1978, the EPA ordered affected registrants, like Monsanto, to submit the raw data for the IBT studies underlying registration of their herbicides. In 1983, the EPA ordered replacement studies.

59.   The EPA acknowledged calls to remove glyphosate from the market pending the results of new tests but stated that the FIFRA did not give it the legal authority to do so.

60.   At any time, Monsanto could have voluntarily withdrawn Roundup from the market until a valid oncogenic study had been completed. Instead, Monsanto continued to market Roundup without any valid animal studies on Roundup's carcinogenicity, knowing full well that the studies on which the EPA had relied in approving glyphosate were invalid. There was no legitimate oncogenic study on glyphosate until a 1983 mouse study ("1983 Study"). The 1983 Study found renal tumors in exposed mice without any incidence of renal tumors in an unexposed control group. On the basis of that study, the EPA evaluated that glyphosate "has a statistically significant effect ... in the production of kidney tumors in male mice," "there is a dose-tumor relationship for Glyphosate," and that a "prudent person would reject the Monsanto assumption

13

that Glyphosate dosing has no effect on kidney tumor production... Glyphosate is suspect. Monsanto's argument is unacceptable." The EPA classified glyphosate as a possible human carcinogen.

61.     Internal Monsanto and EPA documents capture Monsanto's real-time reaction to the EPA's classification decision, revealing a company more concerned with winning regulatory approval for its product than investigating whether its product can cause cancer and reflecting a conscious disregard for public health and safety.

62.     When learning of the EPA's conclusions at a February 21, 1985, EPA meeting, Monsanto employees immediately asked how they could get glyphosate delisted as a possible human carcinogen. The EPA committee said it would consider a reanalysis of the kidney tissue from the control group of the 1983 Study. Monsanto retained a pathologist, Marvin Kuschner, to review the 1983 Study. Although Dr. Kuschner had not yet even looked at the kidney tumor slides, a Monsanto memo already knew what the outcome of Kuschner's review would be, stating "Kuschner will review the kidney sections and persuade the agency that the observed tumors are not related to glyphosate." In case that failed, Monsanto planned to arrange for ten toxicologists to challenge the EPA's evaluation before the Scientific Advisory Panel ("SAP"). As Monsanto employees had predicted in the April 3, 1985, memo, Kuschner claimed to the EPA that he had found a renal tumor in the recut tissue from the unexposed control group – the first and only time a renal tumor had been reportedly identified in the control group of the 1983 Study. The EPA then conducted its own examination of the recut slides, which confirmed no tumors in the unexposed control group.

63.     In 1986, the EPA determined that the available data was inadequate to determine whether glyphosate is carcinogenic and ordered Monsanto to repeat the 1983 Study with a larger

14

number of mice in each test group. Monsanto could have repeated the 1983 Study with a larger number of animals per test group just as ordered by the EPA, but, instead, Monsanto fought the EPA's request. At a November 10, 1988, meeting, Monsanto lobbied the EPA to reconsider its request for a second oncogenicity study on mice and tried to persuade the EPA to reclassify glyphosate with historical control data from several sources. On July 6, 1989, the EPA informed Monsanto that its data did not support its position that Roundup is safe.

64.     It bears emphasis that by this point in time, Monsanto had been voluntarily marketing Roundup for thirteen years without any valid cancer studies and four years while Roundup was classified as possibly carcinogenic to humans. Instead of further investigating Roundup's carcinogenic potential, Monsanto assumed a combative posture towards any scientific evidence that glyphosate is carcinogenic.

65.     Confronted by an intransigent EPA, Monsanto continued to apply pressure through persistent lobbying, until the EPA agreed to defer a repeat of the 1983 Study pending the results of a two-year rat study being conducted by Monsanto. The two-year rat study ultimately showed pancreatic tumors among rats exposed to glyphosate. In 1991, however, a new EPA committee reclassified glyphosate as having "evidence of non-carcinogenicity for humans" "based upon the lack of convincing carcinogenicity evidence." Three committee members protested and refused to sign their names to the reclassification memo. To this day, Monsanto never repeated the 1983 Study.

66.     MARIA SANDRA HERNANDEZ extensively used Roundup from 2010 to 2020. She was diagnosed with acute lymphocytic leukemia. Mrs. Hernandez was never warned that dermal exposure to Roundup could cause cancer, nor was she ever warned to protect herself from dermal exposure to Roundup. Monsanto's actions during the period of Mrs. Hernandez's exposure

15

to Roundup evince a conscious and willful disregard for the life and safety of Roundup users like Mrs. Hernandez.

### Early Efforts to Discredit Evidence of Genotoxicity: The Dr. Parry Affair

67.     In the late 1990s, four peer-reviewed studies concluded that Roundup is "genotoxic" – that is, causing DNA or chromosomal damage capable of producing cell mutations that lead to cancer. Monsanto immediately started plotting to discredit the studies. On December 17, 1998, Monsanto employees held a meeting where they agreed on the need to develop "an external global network of genotox experts" to address the "critical area" of glyphosate-based formulations' "genotox issues." It was agreed that Monsanto Europe's Toxicology Director Mark Martens would contact Dr. James M. Parry to discuss his "participation in the support of glyphosate…" On January 27, 1999, senior Monsanto employees Donna Farmer, Mark Martens, William Heydens, and Alan Wilson, and Monsanto consultant toxicologist Larry Kier, attended a meeting where Dr. Parry, "a recognized genotox expert," was proposed as a member of Monsanto's "external global network of genotox experts." Monsanto would determine whether to retain Dr. Parry as a consultant based on his written evaluation of the four articles that reported Roundup's genotoxicity. On January 28, 1999, Martens reported to Donna Farmer that Dr. Parry would submit a report of his evaluation of four genotoxicity studies by mid-February.

68.     Internal Monsanto emails from this period are a stark portrayal of a company utterly uninterested in the carcinogenicity of its product and zealously willing to manipulate and lie to the public and scientific community to shield that product from scrutiny and adverse scientific evidence.

69.     On February 11, 1999, Dr. Parry reported back to Monsanto that, based on his evaluation of the Rank, Bolognesi, Peluso, and Lioi papers, he concluded that glyphosate may be

16

genotoxic. Dr. Parry advised Monsanto to conduct further *in vitro* micronucleus testing. On February 15, 1999, Martens faxed Dr. Parry's findings to Donna Famer and William Heydens. Dismayed that their own hired expert would report that glyphosate may be genotoxic, Monsanto employees ridiculed Dr. Parry as being incognizant of his role as a hired company consultant, suggested terminating their professional relationship with Dr. Parry and finding someone willing to be used as an advocate, and rejected conducting the studies recommended by Dr. Parry.

70.      In an email thread from August 31 to September 2, 1999, Monsanto employee Stephen Wratten lamented Dr. Parry's report to Donna Farmer, Mark Martens, and William Heydens, questioning whether Parry had "ever worked with industry before on this sort of project?" Monsanto employee Alan G. Wilson suggested Monsanto "get someone else." Donna Farmer lamented that Dr. Parry had put Monsanto in a "genotox hole," and raised the option to "drop Perry" [sic]. Farmer also suggested that "the Good Dr. Kier" could "dig [Monsanto] out of this genotox hole".

71.      On September 16, 1999, William Heydens emailed Donna Farmer, Mark Martens, and Dr. Larry Kier. Heydens told Farmer, Martens, and Kier that they "simply aren't going to do the studies Parry suggests." Heydens admitted that "what we are really trying to achieve here" is "find/develop someone who is comfortable with the genetox profile of glyphosate/Roundup and who can be influential with regulators and Scientific Outreach operations when genotox issues arise. My read is that Parry is not currently such a person." Heydens suggested that if Dr. Parry cannot "become a strong advocate," they "should ***seriously*** start looking for one or more other individuals to work with" [emphasis original]. Heydens admitted that Roundup is "currently very vulnerable" in the area of genotoxicity.

72.      Monsanto never conducted genotoxicity studies recommended by Dr. Parry. Nor

17

did Monsanto ever disclose Dr. Parry's findings to the public.

Lying to the Public About Genotoxicity

73.     Internal company emails reveal Monsanto employees openly confessing to one another that there was mounting evidence that Roundup's formulation of glyphosate mixed with surfactant chemicals was likely genotoxic. Despite these private confessions, Monsanto engaged in a public campaign of deception, making numerous false statements to the public regarding Roundup's genotoxicity profile. Monsanto's public statements in this period are completely at odds with Monsanto's private admissions.

74.     In the January 28, 1999 email, Martens circulated a draft of a "positive" press release to be published for public consumption, _falsely_ stating that no studies on Roundup or other glyphosate formulations have shown any adverse or genotoxic findings. Monsanto developed this "positive" press release despite knowing that the Rank, Bologensi, Peluso, and Lioi papers all reported on the genotoxicity of glyphosate formulations. This press release was an outright lie to the public.

75.     At least as early as May 28, 1999, Monsanto became aware of a Swedish study evaluating that persons exposed to glyphosate were 2.3 times more likely to develop NHL, as well as subgroups including but not limited to acute lymphocytic leukemia. In an email thread from July 30, 1999 to August 3, 1999, William Heydens wrote that while "a ton of other data" supports the conclusion that glyphosate itself is not genotoxic, "formulations are obviously another issue," and stated his reluctance to "generate the data" on the genotoxicity of glyphosate formulants. Donna Farmer responded "I will not support doing any studies on glyphosate, formulations or other surfactant ingredients at this time…" In a September 16, 1999 email, Heydens admitted that Roundup is "currently very vulnerable" in the area of genotoxicity.

76. Despite Monsanto's actual knowledge of evidence that Roundup is genotoxic, Monsanto sought to build a public case to the contrary. Monsanto could have studied Roundup's genotoxicity but feared that in doing so they would "generate the data" (that is, adverse data) on genotoxicity of Roundup formulants. A July 30, 1999 email evidences that Monsanto's William Heydens made extensive ghost editing and ghostwriting on a manuscript that would be published in Regulatory Toxicology and Pharmacology, a peer-reviewed toxicology journal, reporting Roundup was not genotoxic. Monsanto sought to enhance the paper's credibility in the eyes of the public by concealing Monsanto's authorship and hiring outside toxicologists to serve as authors of record.

Additional private communications evidence Monsanto's knowledge of Roundup's genotoxicity and reveal that Monsanto refused to conduct testing on Roundup despite this knowledge. In an email dated February 12, 2001, Martens wrote to Donna Farmer and William Heydens that he would have "serious concern" if Roundup were tested for genotoxicity. In an email thread dated April 25, 2002, Donna Farmer and William Heydens, openly acknowledged that the formulated Roundup product was potentially genotoxic. In a November 22, 2003 email, Donna Farmer admitted that it cannot be stated "that Roundup is not a carcinogen… we have not done the necessary testing on the formulation to make that statement." In a September 21, 2009 email, Donna Farmer again admitted that "you cannot say that Roundup does not cause cancer. We have not done carcinogenicity studies with "Roundup"." In a December 14, 2010 email, Monsanto employee Stephen Adams admitted that "[w]ith regards to the carcinogenicity of our formulations we don't have such testing on them directly." In an August 6, 2015 email, William Heydens admitted that Roundup "played a role" in positive tumor results of a tumor promotion study.

19

## Monsanto Continues Attacking Independent Research

77.     When faced with an adverse epidemiological study, Monsanto did not inquire into
the merits of the study or propose testing Roundup formulations. Instead, Monsanto did exactly
what it did in 1985 when the EPA classified glyphosate as a human carcinogen and 1999 when the
Rank, Bologensi, Peluso, and Lioi papers came out reporting that glyphosate is genotoxic:
Monsanto recoiled into a combative posture. On October 14, 2008, Bayer executive Dean Nasser
emailed Donna Farmer a new epidemiological study published in *International Journal of Cancer*
reporting that exposure to glyphosate could more than double one's risk of developing non-
Hodgkin lymphoma. Farmer responded "We have been aware of this paper for awhile [sic] and
knew it would only be a matter of time before the activists pick it up. I have some epi experts
reviewing it... Here is their bottom line... how do we combat this?" Again, in face of mounting
evidence that glyphosate or Roundup is carcinogenic, Monsanto's sole interest was in defending
its own commercial interests: "[H]ow do we combat this?"

78.     On a separate occasion, when faced with a separate epidemiological study reporting
an association between glyphosate exposure and NHL, Monsanto celebrated the removal of
glyphosate references from the study's abstract as a "huge step forward – it removes it from being
picked up by abstract searches!"

## Monsanto Terminates Dermal Absorption Study

79.     In 2002, Monsanto was conducting a rat skin penetration study on its Roundup
formulation. When the study reported a "much higher" rate of skin absorption than accepted by
European regulators, Monsanto immediately terminated the study. Monsanto's "primary concern"
was that it would "blow Roundup risk evaluations."

## Monsanto Goes All in on Ghostwriting

20

80.     On December 8, 2010, Monsanto Toxicology Manager David Saltmiras circulated a PowerPoint presentation citing the need for "a stronger arsenal of robust scientific papers to support the safe use of our products as we face the next set of chemistry registration reviews across the globe." Instead of pursuing legitimate science that might support their position, Monsanto embarked on an elaborate ghostwriting scheme aimed at manipulating the scientific discourse.

81.     Monsanto ghostwrote at least two papers published in *Critical Reviews in Toxicology* arguing that glyphosate and glyphosate-based formulations are not carcinogenic.

82.     Monsanto ghostwrote an article published in the online version of Forbes magazine, arguing that "glyphosate is not a human health risk..."

83.     Monsanto not only concealed its authorship of the article but touted the article on its website as a "third party" "independent expert opinion."

84.     In each of these cases, as with the Williams article in 2000, Monsanto hired experts to serve as authors of record and concealed its authorship role. Monsanto intentionally used its "Ghostwriting" scheme to mislead the science, the regulators, and the public on the known dangers of its Roundup.

<u>Monsanto Colludes with EPA Regulators to Stall Other Agencies' Review of Glyphosate</u>

85.     In 2015, following the International Agency for Research on Cancer's designation of glyphosate as a probable human carcinogen, Monsanto was "very nervous" that the U.S. Department of Health and Human Services' Agency for Toxic Substances and Disease Registry ("ATSDR") was going to also classify glyphosate as probably carcinogenic. Monsanto attempted to dissuade the Deputy Assistant Secretary for Global Affairs at the Department of Health and Human Services from permitting ATSDR to carry out its planned glyphosate review. Monsanto later had an off the record conversation with the EPA's top regulatory official for pesticides, who

confirmed that ATSDR would be putting its glyphosate review "on hold." Chief Monsanto regulatory toxicologist William Heydens was pleased to know that "at least they know they are being watched," and that "hopefully that keeps them from doing anything too stupid…"

## Misrepresentations to the Public

86.    In 1996, the New York Attorney General ("NYAG") filed a lawsuit against MONSANTO based on its false and misleading advertising of Roundup products. Specifically, the lawsuit challenged MONSANTO's general representations that its spray-on glyphosate-based herbicides, including Roundup, were "safer than table salt" and "practically non-toxic" to mammals, birds, and fish. Among the representations the NYAG found deceptive and misleading about the human and environmental safety of Roundup are the following:

    a.    Remember that environmentally friendly Roundup herbicide is biodegradable. It won't build up in the soil so you can use Roundup with confidence along customers' driveways, sidewalks and fences.

    b.    And remember that Roundup is biodegradable and won't build up in the soil. That will give you the environmental confidence you need to use Roundup everywhere you've got a weed, brush, edging or trimming problem.

    c.    Roundup biodegrades into naturally occurring elements.

    d.    Remember that versatile Roundup herbicide stays where you put it. That means there's no washing or leaching to harm customers' shrubs or other desirable vegetation.

    e.    This non-residual herbicide will not wash or leach in the soil. It ... stays where you apply it.

    f.    You can apply Accord (another glyphosate-containing MONSANTO herbicide) with "confidence because it will stay where you put it" it bonds tightly to soil particles, preventing leaching. Then, soon after application, soil microorganisms biodegrade Accord into natural products.

    g.    Glyphosate is less toxic to rats than table salt following acute oral ingestion.

    h.    Glyphosate's safety margin is much greater than required. It has over a 1,000-fold safety margin in food and over a 700-fold safety margin for

workers who manufacture it or use it.

i.    You can feel good about using herbicides by MONSANTO. They carry a toxicity category rating of 'practically non-toxic' as it pertains to mammals, birds and fish.

j.    "Roundup can be used where kids and pets will play and breaks down into natural material." This ad depicts a person with his head in the ground and a pet dog standing in an area which has been treated with Roundup.

87.    On November 19, 1996, MONSANTO entered into an Assurance of Discontinuance with NYAG, in which MONSANTO agreed, among other things, "to cease and desist from publishing or broadcasting any advertisements [in New York] that represent, directly or by implication" that:

a.    its glyphosate-containing pesticide products or any component thereof are safe, non-toxic, harmless or free from risk;

b.    its glyphosate-containing pesticide products or any component thereof manufactured, formulated, distributed or sold by MONSANTO are biodegradable;

c.    its glyphosate-containing pesticide products or any component thereof stay where they are applied under all circumstances and will not move through the environment by any means.;

d.    its glyphosate-containing pesticide products or any component thereof are "good" for the environment or are "known for their environmental characteristics";

e.    glyphosate-containing pesticide products or any component thereof are safer or less toxic than common consumer products other than herbicides; and

f.    its glyphosate-containing products or any component thereof might be classified as "practically non-toxic."

88.    MONSANTO did not alter its advertising in the same manner in any state other than New York, and on information and belief still has not done so today.

89.    In 2009, France's highest court ruled that MONSANTO had not told the truth about

23

the safety of Roundup. The French court affirmed an earlier judgement that MONSANTO had falsely advertised its herbicide Roundup as "biodegradable" and that it "left the soil clean."

90.    Despite this overwhelming evidence, Defendant MONSANTO, at all times material, has maintained that Roundup products are safe, non-toxic, and non-carcinogenic.

91.    Indeed, even as of December 2019, MONSANTO continues to represent to the public that "regulatory authorities around the world have comprehensively and routinely reviewed glyphosate and glyphosate-based herbicides for more than 40 years and their conclusions consistently support the safety of glyphosate and glyphosate-based herbicides when used as directed." *See* Figure 1, below.



\*\*\*

24



Figure 1. Source: https://www.bayer.com/en/is-glyphosate-safe.aspx (last visited Jan. 28, 2021).

### F. Classifications and Assessments of Glyphosate

92. The IARC process for the classification of glyphosate followed the stringent procedures for the evaluation of a chemical agent. Over time, the IARC Monograph program has reviewed 980 agents. Of those reviewed, it has determined 116 agents to be Group 1 (Known Human Carcinogens); 73 agents to be Group 2A (Probable Human Carcinogens); 287 agents to be Group 2B (Possible Human Carcinogens); 503 agents to be Group 3 (Not Classified); and one agent to be Probably Not Carcinogenic.

93. The established procedure for IARC Monograph evaluations is described in the IARC Programme's Preamble. Evaluations are performed by panels of international experts, selected on the basis of their expertise and the absence of actual or apparent conflicts of interest.

94. One year before the Monograph meeting, the meeting is announced and there is a call both for data and for experts. Eight months before the Monograph meeting, the Working Group

25

membership is selected and the sections of the Monograph are developed by the Working Group members. One month prior to the Monograph meeting, the call for data is closed and the various draft sections are distributed among Working Group members for review and comment. Finally, at the Monograph meeting, the Working Group finalizes review of all literature, evaluates the evidence in each category, and completes the overall evaluation. Within two weeks after the Monograph meeting, the summary of the Working Group findings is published in Lancet Oncology, and within a year after the meeting, the final Monograph is finalized and published.

95. In assessing an agent, the IARC Working Group reviews the following information:

    a. human, experimental, and mechanistic data;

    b. all pertinent epidemiological studies and cancer bioassays; and

    c. representative mechanistic data. The studies must be publicly available and have sufficient detail for meaningful review, and reviewers cannot be associated with the underlying study.

96. In March 2015, IARC reassessed glyphosate. The summary published in The Lancet Oncology reported that glyphosate is a Group 2A agent and probably carcinogenic in humans.

97. On July 29, 2015, IARC issued its Monograph for glyphosate, Monograph 112. For Volume 112, the volume that assessed glyphosate, a Working Group of 17 experts from 11 countries met at IARC from March 3–10, 2015, to assess the carcinogenicity of certain herbicides, including glyphosate. The March meeting culminated nearly a one-year review and preparation by the IARC Secretariat and the Working Group, including a comprehensive review of the latest available scientific evidence. According to published procedures, the Working Group considered "reports that have been published or accepted for publication in the openly available scientific literature" as well as "data from governmental reports that are publicly available."

26

98.      The studies considered the following exposure groups: occupational exposure of farmers and tree nursery workers in the United States, forestry workers in Canada and Finland, and municipal weed-control workers in the United Kingdom; and para-occupational exposure in farming families.

99.      Glyphosate was identified as the second-most used household herbicide in the United States for weed control between 2001 and 2007 and the most heavily used herbicide in the world in 2012.

100.      Exposure pathways are identified as air (especially during spraying), water, and food. Community exposure to glyphosate is widespread and found in soil, air, surface water, and groundwater, as well as in food.

101.      The assessment of the IARC Working Group identified several case control studies of occupational exposure in the United States, Canada, and Sweden. These studies show a human health concern from agricultural and other work-related exposure to glyphosate.

102.      The IARC Working Group found an increased risk between exposure to glyphosate and non-Hodgkin's Lymphoma ("NHL") and several subtypes of NHL including but not limited to acute lymphocytic leukemia, and the increased risk persisted after adjustment for other pesticides.

103.      The IARC Working Group also found that glyphosate caused DNA and chromosomal damage in human cells. One study in community residents reported increases in blood markers of chromosomal damage (micronuclei) after glyphosate formulations were sprayed.

104.      In male CD-1 mice, glyphosate induced a positive trend in the incidence of a rare tumor, renal tubule carcinoma. A second study reported a positive trend for hemangiosarcoma in male mice. Glyphosate increased pancreatic islet-cell adenoma in male rats in two studies.

27

A glyphosate formulation promoted skin tumors in an initiation-promotion study in mice.

105.    The IARC Working Group also noted that glyphosate has been detected in the urine of agricultural workers, indicating absorption. Soil microbes degrade glyphosate to aminomethylphosphoric acid (AMPA). Blood AMPA detection after exposure suggests intestinal microbial metabolism in humans.

106.    The IARC Working Group further found that glyphosate and glyphosate formulations induced DNA and chromosomal damage in mammals, and in human and animal cells in utero.

107.    The IARC Working Group also noted genotoxic, hormonal, and enzymatic effects in mammals exposed to glyphosate. Essentially, glyphosate inhibits the biosynthesis of aromatic amino acids, which leads to several metabolic disturbances, including the inhibition of protein and secondary product biosynthesis and general metabolic disruption.

108.    The IARC Working Group also reviewed an Agricultural Health Study, consisting of a prospective cohort of 57,311 licensed pesticide applicators in Iowa and North Carolina. While this study differed from others in that it was based on a self-administered questionnaire, the results support an association between glyphosate exposure and Multiple Myeloma, Hairy Cell Leukemia (HCL), and Chronic Lymphocytic Leukemia (CLL), in addition to several other cancers.

**G.    Other Earlier Findings about Glyphosate's Dangers to Human Health and Release Patterns**

109.    The EPA has a technical fact sheet, as part of its Drinking Water and Health, National Primary Drinking Water Regulations publication, relating to glyphosate. This technical fact sheet predates the IARC March 20, 2015, evaluation. The fact sheet describes the release patterns for glyphosate as follows:

*Release Patterns*

110.     Glyphosate is released to the environment in its use as an herbicide for controlling woody and herbaceous weeds on forestry, right-of-way, cropped and non-cropped sites. These sites may be around water and in wetlands. It may also be released to the environment during its manufacture, formulation, transport, storage, disposal, and cleanup, and from spills. Since glyphosate is not a listed chemical in the Toxics Release Inventory, data on releases during its manufacture and handling are not available. Occupational workers and home gardeners may be exposed to glyphosate by inhalation and dermal contact during spraying, mixing, and cleanup. They may also be exposed by touching soil and plants to which glyphosate was applied. Occupational exposure may also occur during glyphosate's manufacture, transport storage, and disposal.

111.     In 1995, the Northwest Coalition for Alternatives to Pesticides reported that in California, the state with the most comprehensive program for reporting of pesticide-caused illness, glyphosate was the third most commonly-reported cause of pesticide illness among agricultural workers.

**H.     Recent Worldwide Bans on Glyphosate/Roundup**

112.     Several countries around the world have instituted bans on the sale of Roundup and other glyphosate-containing herbicides, both before and since IARC first announced its assessment for glyphosate in March 2015, and more countries undoubtedly will follow suit as the dangers of the use of Roundup are more widely known. The Netherlands issued a ban on all glyphosate-based herbicides in April 2014, including Roundup, which took effect by the end of 2015. In issuing the ban, the Dutch Parliament member who introduced the successful legislation stated: "Agricultural pesticides in user-friendly packaging are sold in abundance to private persons. In garden centers,

29

Roundup is promoted as harmless, but unsuspecting customers have no idea what the risks of this product are. Especially children are sensitive to toxic substances and should therefore not be exposed to it."

113. The Brazilian Public Prosecutor in the Federal District requested that the Brazilian Justice Department suspend the use of glyphosate.

114. France banned the private sale of Roundup and glyphosate following the IARC assessment for Glyphosate.

115. Bermuda banned both the private and commercial sale of glyphosates, including Roundup. The Bermuda government explained its ban as follows: "Following a recent scientific study carried out by a leading cancer agency, the importation of weed spray 'Roundup' has been suspended."

116. The Sri Lankan government banned the private and commercial use of glyphosates, particularly out of concern that glyphosate has been linked to fatal kidney disease in agricultural workers.

117. The government of Colombia announced its ban on using Roundup and glyphosate to destroy illegal plantations of coca, the raw ingredient for cocaine, because of the WHO's finding that glyphosate is probably carcinogenic.

118. Despite numerous scientific findings from around the world demonstrating the highly-carcinogenic nature of Roundup and its main active ingredient, glyphosate, MONSANTO knowingly and willfully misrepresented Roundup as safe to humans and the environment. MONSANTO repeatedly claimed to the world and, particularly to United States consumers, that its Roundup products pose no unreasonable risks to human health or to the environment.

## COUNT I
## NEGLIGENCE: MONSANTO

Plaintiff adopts, reallege, and incorporate the allegations in paragraphs 1 through 118 above, and further allege the following:

119.    Defendant MONSANTO, directly or indirectly, caused Roundup products to be manufactured, sold, distributed, packaged, labeled, marketed, promoted, and/or used by consumers, including Plaintiff MARIA SANDRA HERNANDEZ.

120.    At all times relevant to this litigation, Defendant MONSANTO had a duty to exercise reasonable care in the design, manufacture, marketing, sale, and distribution of Roundup products (hereinafter "Roundup" or "Product"), including the duty to take all reasonable steps necessary to ensure that its product was not unreasonably dangerous to consumers and users of the product.

121.    At all times relevant to this litigation, Defendant MONSANTO knew or, in the exercise of reasonable care, should have known of the hazards and dangers of Roundup and specifically, the carcinogenic properties of the chemical glyphosate.

122.    Accordingly, at all times material, Defendant MONSANTO knew or, in the exercise of reasonable care, should have known that use of or exposure to Roundup could cause or be associated with Plaintiff's injuries and thus created a dangerous and unreasonable risk of injury to the users of these products, including to MARIA SANDRA HERNANDEZ.

123.    Defendant MONSANTO also knew or, in the exercise of reasonable care, should have known that users and consumers of Roundup were unaware of the risks and the magnitude of the risks associated with use of and/or exposure to Roundup and glyphosate-containing products.

124.    As such, Defendant MONSANTO breached its duty of reasonable care, which is a continuing duty and failed to exercise ordinary care in the design, manufacture, marketing, sale,

31

and distribution of Roundup, in that Defendant MONSANTO manufactured, marketed, distributed, and sold a defective product containing the chemical glyphosate, which created a significant risk of harm and dangerous side effects, and failed to prevent or adequately warn of these risks and injuries and/or death.

125.    At all times material, Defendant MONSANTO, breached its duty of care and acted in a negligent manner through the following acts of omission or commission, including but not limited to:

  a.    Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing Roundup which causes injury and death to people using the product as intended;

  b.    Failing to warn of the risk of serious harm and death associated with human use of the product as intended;

  c.    Failing to use reasonable and prudent care in the design, manufacture, and sale of Roundup so as to avoid the risk of serious harm associated with the use of Roundup/glyphosate as an herbicide;

  d.    Failing to provide adequate instructions, guidelines, and safety precautions; and

  e.    Continuing the manufacture and sale of its products with the knowledge that the products were unsafe and unreasonably dangerous.

126.    As a direct and proximate cause of Defendant MONSANTO's breach of its duty, the Plaintiff MARIA SANDRA HERNANDEZ suffered injuries including the development of acute lymphocytic leukemia.

127.    As a direct and proximate result of Defendant MONSANTO's negligent acts, Plaintiff MARIA SANDRA HERNANDEZ has suffered significant bodily injury and resulting pain and suffering, disability, mental anguish, loss of capacity for the enjoyment of life, embarrassment, inconvenience, expense of hospitalization, medical and nursing care and treatment, loss of earnings, loss of ability to earn money, as well as all damages allowable under Florida law.

These losses are permanent and continuing in nature and Plaintiff MARIA SANDRA HERNANDEZ will suffer these losses in the future.

128.     WHEREFORE, Plaintiff, MARIA SANDRA HERNANDEZ, pray for judgment against Defendant MONSANTO, for monies damages plus costs, interest and for such other and further relief both at law and in equity to which Plaintiff may show to be justly entitled.

**COUNT II**
**STRICT LIABILITY: MONSANTO**
**(Design Defect)**

Plaintiff adopts, reallege, and incorporate the allegations in paragraphs 1 through 118 above, and further allege the following:

129.     Plaintiff brings this strict liability claim against Defendant MONSANTO for defective design.

130.     At all times material, Defendant MONSANTO engaged in the business of designing, manufacturing, selling, distributing, and marketing Roundup, which was defective and unreasonably dangerous to Plaintiff MARIA SANDRA HERNANDEZ, thereby placing Roundup into the stream of commerce in Florida.

131.     At all times material, Roundup was designed, and labeled in an unsafe, defective, and unreasonably dangerous manner that was dangerous to Plaintiff MARIA SANDRA HERNANDEZ.

132.     At all times relevant to this litigation, Roundup reached the intended consumers, in Florida, including Plaintiff MARIA SANDRA HERNANDEZ, without substantial change in its condition.

133.     Roundup was defective in design in that, when it left the Defendant MONSANTO it was unreasonably dangerous because when used as intended, it can cause cancer and other severe

33

illnesses and injuries and/or death.

134.    Plaintiff MARIA SANDRA HERNANDEZ was exposed to Roundup without knowledge of its unreasonably dangerous characteristics.

135.    At all times relevant to this litigation, Plaintiff MARIA SANDRA HERNANDEZ was exposed to Roundup in an intended or reasonably foreseeable manner without knowledge of the product's unreasonably dangerous characteristics.

136.    Plaintiff MARIA SANDRA HERNANDEZ could not have reasonably discovered the defects and risks associated with Roundup before or at the time of exposure.

137.    Therefore, as a direct and proximate result of the unreasonably dangerous condition of Roundup, Plaintiff MARIA SANDRA HERNANDEZ suffered injuries including the development of acute lymphocytic leukemia.

138.    As a direct and proximate result of Defendant MONSANTO's wrongful acts described in this Count, Plaintiff MARIA SANDRA HERNANDEZ has suffered significant bodily injury and resulting pain and suffering, disability, mental anguish, loss of capacity for the enjoyment of life, embarrassment, inconvenience, expense of hospitalization, medical and nursing care and treatment, loss of earnings, loss of ability to earn money and all damages allowable under Florida law. These losses are permanent and continuing in nature and the Plaintiff MARIA SANDRA HERNANDEZ will suffer these losses in the future.

139.    WHEREFORE, Plaintiff, MARIA SANDRA HERNANDEZ, pray for judgment against Defendant MONSANTO, for money damages plus costs, interest and for such other and further relief both at law and in equity to which Plaintiff may show to be justly entitled.

## COUNT III
## STRICT LIABILITY: MONSANTO
### (Failure to Warn)

34

Plaintiff adopts, reallege, and incorporate the allegations in paragraphs 1 through 118 above, and further allege the following:

140. Plaintiff bring this strict liability claim against Defendant MONSANTO for failure to warn.

141. At the time of manufacture, Defendant MONSANTO had a duty, which is a continuing duty, to provided warnings regarding the full and complete dangers of Roundup because Defendant MONSANTO knew or should have known of the unreasonable dangers associated with the use of and/or exposure to such products.

142. At all times material, Defendant MONSANTO engaged in the business of designing, manufacturing, marketing, selling, distributing, and promoting Roundup, which was unreasonably dangerous to consumers, including Plaintiff MARIA SANDRA HERNANDEZ, because Roundup does not contain warnings concerning the unreasonably dangerous characteristics of Roundup, specifically that Roundup when used as intended can cause cancer, illness and death.

143. Defendant MONSANTO designed, manufactured, distributed, marketed, promoted, sold, and otherwise released into the stream of commerce in Florida Roundup without any warning of the unreasonable dangers associated with the use of Roundup.

144. At all times material, Roundup reached the intended consumers without substantial change.

145. Plaintiff MARIA SANDRA HERNANDEZ used the Roundup as intended, without knowledge of its unreasonably dangerous characteristics.

146. Plaintiff MARIA SANDRA HERNANDEZ could not have reasonably discovered the dangers with Roundup prior to or at the time of Plaintiff's exposure.

35

147.    As a direct and proximate result of Defendant MONSANTO failure to warn of the unreasonable dangers associated with the use of Roundup, Plaintiff MARIA SANDRA HERNANDEZ contracted acute lymphocytic leukemia and has suffered significant bodily injury and resulting pain and suffering, disability, mental anguish, loss of capacity for the enjoyment of life, embarrassment, inconvenience, expense of hospitalization, medical and nursing care and treatment, loss of earnings, loss of ability to earn money, as well as all damages allowable under Florida law. These losses are permanent and continuing in nature and the Plaintiff MARIA SANDRA HERNANDEZ will suffer these losses in the future.

148.    WHEREFORE, Plaintiff, MARIA SANDRA HERNANDEZ, pray for judgment against Defendant MONSANTO, for money damages plus costs, interest and for such other and further relief both at law and in equity to which Plaintiff may show to be justly entitled.

## COUNT IV
## NEGLIGENCE: HOME DEPOT and LANDWORKS

Plaintiff adopt, reallege, and incorporate the allegations in paragraphs 1 through 118 above, and further allege the following:

149.    Defendants, HOME DEPOT and LANDWORKS, directly or indirectly, caused Roundup products to be sold, distributed, marketed, promoted, and/or used by Plaintiff, MARIA SANDRA HERNANDEZ.

150.    At all times relevant to this litigation, Defendants, HOME DEPOT and LANDWORKS, had a duty to exercise reasonable care in the marketing, advertisement, supply, promotion, sale, and distribution of Roundup, including the duty to take all reasonable steps necessary to distribute, promote, and/or sell a product that was not unreasonably dangerous to consumers.

151.    At all times material, Defendants, HOME DEPOT and LANDWORKS, had a duty,

which is a continuing duty, to exercise reasonable care in the marketing, advertisement, and sale of Roundup. Defendants, HOME DEPOT and LANDWORK'S, duty of care owed to consumers and the general public included providing accurate, true, and correct information concerning the risks of using Roundup and appropriate, complete, and accurate warnings concerning the potential adverse effects of exposure to Roundup.

152. At all times relevant to this litigation, Defendants, HOME DEPOT and LANDWORK'S, knew or, in the exercise of reasonable care, should have known of the unreasonable dangers of Roundup and specifically its carcinogenic properties.

153. Accordingly, at all times material, Defendants, HOME DEPOT and LANDWORK'S, knew or, in the exercise of reasonable care, should have known that exposure to Roundup could cause an unreasonable risk of injury to the users, including Plaintiff MARIA SANDRA HERNANDEZ.

154. Defendants, HOME DEPOT and LANDWORK'S, also knew or, in the exercise of reasonable care, should have known that consumers of Roundup were unaware of the risks and the magnitude of the danger associated with exposure to Roundup.

155. As such, Defendants, HOME DEPOT and LANDWORK'S, breached the duty of reasonable care and failed to exercise ordinary care in the marketing, supply, promotion, advertisement, sale, and distribution of Roundup, in that Defendants, HOME DEPOT and LANDWORK'S, knew or had reason to know of the danger associated with the use of Roundup, and failed to prevent or adequately warn of these dangers that could result in death.

156. At all times material, Defendants, HOME DEPOT and LANDWORK'S, breached their duty of care and acted in a negligent manner through the following acts of omission or commission, including but not limited to:

a. Failing to provide adequate instructions, guidelines, and safety precautions to those persons who Defendant could reasonably foresee would use and be exposed to its Roundup products;

b. Failing to disclose to Plaintiff, users/consumers, and the general public that use of and exposure to Roundup presented severe risks of cancer and other grave illnesses;

c. Failing to warn Plaintiff, users/consumers, and the general public that the Roundup's risk of harm was unreasonable;

d. Advertising, marketing, and recommending the use of the Roundup products, while failing to disclose or warn of the dangers known by Defendant to be associated with or caused by the use of or exposure to Roundup and glyphosate;

e. Continuing to disseminate information to its consumers, which indicate or imply that Roundup is safe; and

f. Continuing to promote, market, sell, distribute and/or supply Roundup with the knowledge that the products were unreasonably dangerous.

157. Plaintiff, MARIA SANDRA HERNANDEZ did not know the nature and extent of the injuries and/or death that could result from the intended use of and/or exposure to Roundup.

158. Defendants, HOME DEPOT and LANDWORK'S, negligence was the proximate cause of the injuries, harm, and economic losses that Plaintiff MARIA SANDRA HERNANDEZ suffered, as described herein.

159. As a direct and proximate result of Defendants, HOME DEPOT and LANDWORK'S, negligent acts and/or omissions in placing defective Roundup into the stream of commerce without adequate warnings of the danger and carcinogenic nature of Roundup, Plaintiff MARIA SANDRA HERNANDEZ contracted acute lymphocytic leukemia.

160. As a direct and proximate result of the Defendants, HOME DEPOT and LANDWORK'S, negligent acts and/or omissions described in this Count, Plaintiff MARIA SANDRA HERNANDEZ has suffered significant bodily injury and resulting pain and suffering,

disability, mental anguish, loss of capacity for the enjoyment of life, embarrassment, inconvenience, expense of hospitalization, medical and nursing care and treatment, loss of earnings, loss of ability to earn money, as well as all damages allowable under Florida law. These losses are permanent and continuing in nature and the Plaintiff MARIA SANDRA HERNANDEZ will suffer these losses in the future.

161. WHEREFORE, Plaintiff, MARIA SANDRA HERNANDEZ, pray for judgment against Defendants, HOME DEPOT and ACE, for money plus costs, interest and for such other and further relief both at law and in equity to which Plaintiff may show to be justly entitled.

**COUNT V**
**STRICT LIABILITY: HOME DEPOT and LANDWORK'S**
**(Failure to Warn)**

Plaintiff adopt, reallege, and incorporate the allegations in paragraphs 1 through 118 above, and further allege the following:

162. Plaintiff bring this strict liability claim against Defendants, HOME DEPOT and LANDWORK'S, for failure to warn.

163. At all times material, Defendants, HOME DEPOT and LANDWORK'S, engaged in the business of marketing, selling, distributing, and promoting Roundup products, which are defective and unreasonably dangerous to consumers, including Plaintiff MARIA SANDRA HERNANDEZ, because they do not contain adequate warnings or instructions concerning the dangerous characteristics of Roundup and, specifically, the active ingredient glyphosate.

164. At all times material, Defendants, HOME DEPOT and LANDWORK'S, had a duty to provide proper warnings, and take such steps as necessary to ensure that Roundup products did not cause users and consumers to suffer from unreasonable and dangerous risks. Defendants, HOME DEPOT and ACE, had a continuing duty to warn Plaintiff of the dangers associated with

39

Roundup use and exposure.

165.    Defendants, HOME DEPOT and LANDWORK'S, knew or should have known that Roundup posed an unreasonable risk of harm, and yet failed to warn of the dangerous risks associated with use and exposure of Roundup, including but not limited to the carcinogenic characteristics of glyphosate.

166.    Plaintiff MARIA SANDRA HERNANDEZ was exposed to Roundup products without knowledge of its dangerous characteristics.

167.    At all times relevant, Plaintiff used and/or was exposed to the use of Roundup products in their intended or reasonably foreseeable manner without knowledge of their dangerous characteristics.

168.    Plaintiff MARIA SANDRA HERNANDEZ could not have reasonably discovered the defects and risks associated with Roundup or glyphosate-containing products prior to or at the time of Plaintiff's exposure. Plaintiff relied upon the skill, superior knowledge, and judgment of Defendants, HOME DEPOT and LANDWORK'S.

169.    As a direct and proximate result of the Defendants, HOME DEPOT and LANDWORK'S, placing defective Roundup products into the stream of commerce and engaging in the acts and/or omissions described in this Count, Plaintiff MARIA SANDRA HERNANDEZ contracted acute lymphocytic leukemia and has suffered significant bodily injury and resulting pain and suffering, disability, mental anguish, loss of capacity for the enjoyment of life, embarrassment, inconvenience, expense of hospitalization, medical and nursing care and treatment, loss of earnings, loss of ability to earn money, as well as all damages allowable under Florida law. These losses are permanent and continuing in nature and the Plaintiff MARIA SANDRA HERNANDEZ will suffer these losses in the future.

170. WHEREFORE, Plaintiff, MARIA SANDRA HERNANDEZ, pray for judgment against Defendants, HOME DEPOT and LANDWORK'S, for money damages plus costs, interest and for such other and further relief both at law and in equity to which Plaintiff may show to be justly entitled.

## DEMAND FOR JURY TRIAL

171. Plaintiff, MARIA SANDRA HERNANDEZ, demand a trial by jury of all issues so triable as a matter of right.

**DATED:** this 6th day of April 2023.

Respectfully submitted,

*/s/ Michael Alvarez*
Alex Alvarez
Florida Bar No. 946346
Phillip Holden
Florida Bar No. 14395
Michael Alvarez
Florida Bar No. 102515
Nicholas Reyes
Florida Bar No. 93931
Xavier Navarro
Florida Bar No. 1025039
The Alvarez Law Firm
3251 Ponce de Leon Boulevard
Coral Gables, Fl 33134
305-444-7675 Office
305/444-0075 Facsimile
phillip@talf.law
alex@talf.law
michael@talf.law
nick@talf.law
xavier@talf.law
Maria@talf.law

and

JUAN P. BAUTA, II, ESQ.
Florida Bar No.: 894060
DANIEL J. DIMATTEO, ESQ.
Florida Bar No.: 114914
THE FERRARO LAW FIRM, P.A.
600 Brickell Avenue, Suite 3800
Miami, Florida 33131
Telephone (305) 375-0111
Facsimile (305) 379-6222
ddimatteo@ferrarolaw.com
jbauta@ferrarolaw.com

*Attorneys for Plaintiff*

42